# In the United States Court of Federal Claims

No. 02-1894 C
(Filed: April 29, 2005)

| | | |
|---|---|---|
| **CONSUMERS ENERGY COMPANY,** Plaintiff, | * | Spent Nuclear Fuel; Nuclear Waste Policy Act; Standard Contract; One-Time Fee; Condition (condition precedent); Delivery Commitment Schedule (DCS); Recoupment; Contract Liability |
| v. | * | |
| **THE UNITED STATES,** Defendant. | * | |

*Thomas O. Mason*, Williams Mullen, McLean, VA, counsel of record for Plaintiff; of counsel were *Harvey J. Messing* and *Jeffrey S. Theuer*, Loomis, Ewert, Parsley, Davis & Gotting, P.C., Lansing, MI; and *James E. Brunner* and *Arunas T. Udrys*, Consumers Energy Company, Jackson, MI.

*Harold D. Lester, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, counsel of record for defendant, with whom were *Peter D. Keisler*, Assistant Attorney General and *David M. Cohen*, Director; of counsel was *Jane K. Taylor*, Office of General Counsel, United States Department of Energy, Washington, DC.

## OPINION AND ORDER

**Damich,** Chief Judge**.**

## I. INTRODUCTION

This case is one of 66 cases filed to date by nuclear utilities with the Court of Federal Claims regarding Defendant's compliance with the "Standard Contract"[1] issued pursuant to the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101-10270. The Standard Contract provides

[1] "Standard Contract for the Disposal of Spent Nuclear Fuel And/Or High-Level Radioactive Waste," published at 10 C.F.R. § 961.11.

for the government's acceptance, transportation, storage, and disposal of spent nuclear fuel and other high-level radioactive waste, the costs of which would be borne by the owners and generators of such fuel and waste.

Two principal motions are before the Court: in the first, Defendant seeks summary judgment dismissing Counts I (partial breach of contract) and II (breach of implied covenant of good faith and fair dealing) of Plaintiff's complaint on the grounds that Plaintiff has failed to satisfy a condition of the government's contractual obligations ("Def.'s Mot."); in the second, Plaintiff seeks summary judgment of liability against the government for partial breach of contract ("Pl.'s Mot.").

For the reasons stated below, the Court hereby **DENIES** Defendant's motion for summary judgment on Counts I and II, but **GRANTS** Defendant's motion in the alternative for recoupment against any prospective award of damages. The Court further **GRANTS** Plaintiff's motion on contract liability.

## II. FACTUAL BACKGROUND

Plaintiff is a utility company organized and incorporated in Michigan. Compl. ¶ 3. It owns the Big Rock Point Nuclear Plant (Big Rock) in Charlevoix, Michigan, which operated until its shutdown in August 1997. *Id.* Spent nuclear fuel (SNF) and other high-level radioactive waste (HLW)[2] generated over time at the plant is currently kept in dry cask storage on site. Pl.'s. Mot. at 5. The utility also owns the Palisades Nuclear Plant (Palisades) near Covert, Michigan, which continues to operate and generate SNF. Compl. ¶ 3. The Palisades SNF "is stored in [a] spent fuel pool and in dry cask storage at the Palisades site." *Id.*

In 1982, Congress passed the Nuclear Waste Policy Act of 1982 ("the Act"), 42 U.S.C. §§ 10101-10270 (2000). In the Act, Congress recognized that SNF represents a "national problem" and that "the Federal Government has the responsibility to provide for the permanent disposal of high-level radioactive waste . . . in order to protect the public health and safety." *Id.* § 10131(a)(2) & (4). While recognizing the federal government's responsibility to dispose of the SNF, Congress also mandated that "the costs of such disposal should be the responsibility of the generators and owners of such waste and spent fuel." *Id.* at § 10131(a)(4).

The Act authorized the Secretary of Energy to "enter into contracts with any person who generates or holds title to [SNF] . . . for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel." *Id.* at § 10222(a)(1). The Act further specified that, in return for the payment of fees, the federal government must begin disposing of SNF no later than January 31, 1998. *Id.* 10222(a)(5).

---

[2] For ease of discussion, the Court shall refer hereafter to both spent nuclear fuel and high-level waste as "SNF." The distinction between these materials is not pertinent to the motions at issue.

Pursuant to the Act, the Department of Energy (DOE) promulgated the Standard Contract,[3] which Plaintiff signed on June 3, 1983. Compl. ¶ 15. Article II of the Contract sets out the government's responsibility to accept, transport, and dispose of SNF and specifies that "[t]he services to be provided by DOE under this contract shall begin . . . not later than January 31, 1998." Article V of the contract specifies procedures for a utility's submission, and DOE's approval, of Delivery Commitment Schedules (DCSs) and Final Delivery Schedules (FDSs) for the "delivery" of SNF by the utility[4] for acceptance by DOE. Article I defines "delivery" as "transfer of custody." Of particular note with respect to Defendant's motion for summary judgment on Counts I and II, Article VIII establishes two fees required[5] of the utilities in return for the government's assumption of responsibility for nuclear waste storage: (1) a one-time fee based on the amount of electricity generated prior to April 7, 1983, and (2) a recurring fee based on the amount of electricity generated after April 7, 1983. Article VIII.A.1-2.

Under the Contract, Plaintiff had three options with regard to payment of the one-time fee: (1) payment of principal and interest could be prorated over 40 quarters; (2) payment could be made "in the form of a single payment anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule, and shall consist of the fee plus interest on the outstanding fee balance"; or (3) payment could be made before June 30, 1985, or within two years after contract execution, whichever came later. Article VIII.B.2. Plaintiff chose Option 2. Def.'s Mot. App. at 1.

In 1993, Plaintiff submitted its first DCSs. Within the same year, DOE approved four of Plaintiff's DCSs, proposing a combined total of 2.5 metric tons of uranium (MTUs) for delivery in 1999. *Id.* at 18-21.

On May 25, 1994, however, DOE's Office of Civilian Radioactive Waste Management promulgated a Notice of Inquiry, advising the utilities that it "currently projects that the earliest possible date for acceptance of [SNF] for disposal . . . is 2010." 59 Fed. Reg. 27007-02, 27007-08 (1994). One year later, in a "final interpretation of nuclear waste acceptance issues," the same office advised that it "has become apparent that neither a repository nor an interim storage facility under the Act will be available by 1998. DOE currently projects that the earliest possible

---

[3] The Standard Contract served as a template for the individual contracts between the utilities and DOE. In every material respect, there is no difference between the Standard Contract and Plaintiff's Contract in particular. The Court's references herein to the "Standard Contract" or the "Contract" shall be construed to encompass Plaintiff's individual contract as well.

[4] The "Purchaser," in the parlance of the Contract.

[5] If a nuclear utility did not sign the Standard Contract, it would forfeit renewal by the Nuclear Regulatory Commission of its license to operate. See 42 U.S.C. § 10222(b)(1)(A). All of the nuclear utilities signed "standard" contracts with DOE.

date for acceptance of waste for disposal at a repository is 2010." 60 Fed. Reg. 21793-02, 21794 (1995). To date, Defendant has not yet accepted SNF waste from Consumers Energy, or any other utility. Compl. ¶ 2; Def.'s First Am. Answer, Aff. Defenses, and Countercl. ¶ 2 ("Answer"); *See also Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1338 (Fed. Cir. 2000).

Subsequent to DOE's notice to the industry that DOE would not meet the January 31, 1998, date to begin SNF acceptance: (1) Plaintiff never submitted, nor did DOE request, FDSs for the previously approved 1999 delivery timetable; (2) DOE did not pick up Plaintiff's SNF in 1999; and (3) Plaintiff has not yet made payment of its one-time fee.

## III. PROCEDURAL BACKGROUND

Consumers Energy Company filed suit against DOE on December 16, 2002. In Count I, partial material breach of contract, Plaintiff alleges that Defendant failed to begin to accept, transport, and dispose of SNF by January 31, 1998, as specified in Article II of the Contract. Pl.'s Brief in Opp'n to Def.'s Mot. ("Pl.'s Resp.") App. at 6. Count II alleges breach of implied covenant of good faith and fair dealing. Count III alleges taking without just compensation and Count IV alleged illegal exaction. On April 6, 2003, this court stayed Defendant's motion to dismiss Count III, and on July 1, 2003, this court dismissed Count IV. *See Consumers Energy Co. v. United States*, 57 Fed. Cl. 278, 279 (2003).

Defendant filed an amended answer to the complaint on July 9, 2004, in which it asserted two counterclaims and related affirmative defenses: (1) that Plaintiff was required to pay the one-time fee "prior to first delivery, as reflected in the DOE approved delivery commitment schedule"; that, since Plaintiff did not do this, prior to the Court's awarding damages to Plaintiff based on DOE's failure to begin SNF acceptance in 1998 or anytime thereafter, Plaintiff should pay in its entirety the amount of the one-time fee that Plaintiff would have been obligated to pay had DOE accepted the SNF on time. Answer ¶¶ 55-56; and (2) that "Plaintiff's claim is barred by the affirmative defense of recoupment or setoff, and Defendant is entitled to setoff or to recoup the one-time fee" against any judgment awarded in Plaintiff's favor. *Id.* ¶ 60.

On July 9, 2004, Defendant filed a motion for summary judgment seeking to dismiss Counts I and II on the grounds that Consumers's obligation to pay the one-time fee was a condition of DOE's obligation to accept its SNF. "Because Consumers did not satisfy that condition, DOE's obligation to begin SNF acceptance from Consumers has not yet arisen, and Consumers has no basis for seeking partial breach of contract damages from DOE." Def.'s Mot. at 4. In the alternative, Defendant asked the Court for partial summary judgment on its counterclaims. Plaintiff cross-moved for summary judgment dismissing the counterclaims relating to the one-time fee. In addition, on October 18, 2004, Plaintiff filed its own motion for summary judgment as to Defendant's liability for partial breach of contract.

## IV. STANDARD OF REVIEW

Summary judgment "is a salutary method of disposition 'designed to secure the just, speedy and inexpensive determination of every action.'" *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)); *see also Quad Environmental Technologies Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 872 (Fed. Cir. 1991) ("The process of summary judgment is a salutary means of avoiding an unnecessary trial when the movant is clearly entitled to judgment as a matter of law.").

Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC"), like its counterpart in the Federal Rules of Civil Procedure, instructs the Court to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See also Mingus Constr., Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987) ("Summary judgment is properly granted only where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."). Furthermore, "summary judgment . . . may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." RCFC 56(c).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Mingus*, 812 F.2d at 1390. Once the moving party makes such a showing, the burden shifts to the non-moving party to "designate specific facts showing that there is a genuine issue for trial." *Novartis Corp. v. Ben Venue Laboratories*, 271 F.3d 1043, 1046 (Fed. Cir. 2001). In evaluating the motion, the Court must view the facts "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). For cross-motions for summary judgment, the Court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus*, 812 F.2d at 1391.

## V. DISCUSSION

### A. Defendant's Motion on Counts I and II

Defendant's motion centers on Plaintiff's obligation to pay the one-time fee. First, Defendant seeks dismissal of Counts I and II on the grounds that Defendant's contractual obligations have not been triggered because they are conditioned on Plaintiff's payment of that fee and that such payment has not been tendered. In the alternative, Defendant asks that the Court either order Plaintiff to pay the one-time fee in full or allow Defendant to recoup the amount of the one-time fee against any damages the Court might later award Plaintiff. Def.'s Mot. at 1, 21-22; Answer ¶¶ 56, 60.

The first step in addressing these motions is to examine the language of the Contract's requirement for payment of the one-time fee. "In resolving disputes involving contract interpretation, we begin by examining the plain language of the contract." *M.A. Mortenson Co. v. Brownlee*, 363 F.3d 1203, 1206 (Fed. Cir. 2004). Article VIII.B.2(b) of the Contract provides that, under Option 2, Plaintiff's one-time fee, based on the amount of electricity generated prior to April 7, 1983, would be made "in the form of a single payment anytime prior to the first delivery, as reflected in the DOE approved delivery commitment schedule." The payment under this option would consist of the fee plus interest on the outstanding fee balance, calculated from that 1983 date. *Id.*; Pl's. Resp. at 3; Def.'s Mot. at 6.

The phrase "anytime prior to" signifies a formulation for establishing the payment due date. "[F]irst delivery" completes the formulation by specifying the event prior to which payment is due. Although not defined specifically in the contract's "Definitions" article (Article I), the phrase "first delivery" clearly means the first occasion for "delivery," which *is* defined: "transfer of custody . . . from Purchaser to DOE at the Purchaser's civilian nuclear power reactor or such other domestic site as may be designated by the Purchaser and approved by DOE." Article I.7. While Plaintiff argues that "first delivery" can only mean "actual completion" of delivery,[6] which in fact did not take place and which still has not occurred, Plaintiff's interpretation is plainly countered by the restrictive clause that follows, "as reflected in the DOE approved delivery commitment schedule." If that additional language is to have any meaning, it must be to establish "first delivery" as the earliest *date* for delivery *specified in an approved DCS*, rather than as an actually completed delivery. Otherwise, the reference to delivery "as reflected in" the DOE-approved DCSs would have no purpose or effect. The contract must be construed "to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract." *Hercules, Inc. v. United States*, 292 F.3d 1378, 1381 (Fed. Cir. 2002).

Plaintiff submitted four DCSs, which DOE approved in 1993, that proposed a delivery date of "1999." Def.'s Mot. App. at 18-21. The actual delivery commitment schedule was a form DOE provided in the Standard Contract and referenced as "Appendix C" in Article V.B.1: "Delivery commitment schedule(s), in the form set forth in Appendix C annexed and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser." The four DCSs in question each show the year 1999 in the blank for line 2.4 ("*Proposed* Delivery Date") (emphasis added) of the form. On the surface, it would appear, then, that Plaintiff was obliged to pay the one-time fee "anytime prior to" the year "1999."

1. <u>Plaintiff's DCSs Did Not Set Dates for "First Delivery"</u>

However, line 2.5, entitled "DOE Assigned Delivery Commitment Date," of each of the DCSs in question, shows: "(Not Required) (Assigned by DOE)." Not only did DOE approve

---

[6] "The language in Option 2 means that the delivery that has actually taken place . . ." Pl.'s Br. in Opp'n at 10; "A delivery that never materialized is not a delivery contemplated" under the Contract. *Id.* at 13.

Plaintiff's DCSs with line 2.5's notations, these notations were prefilled by DOE when it submitted the DCS forms to the utilities to begin the DCS process. Def.'s Resp. to Pl.'s Mot. Summ. J. on Contract Liability ("Def.'s Resp.") App. at 168 ("SPECIFIC INSTRUCTIONS FOR COMPLETION OF DCS . . . Requests for information which have been determined to not be currently needed by DOE have been prefilled with "Not Required" in the attached DCS.") (capitalization in original).[7]

DOE included these instructions in a letter to the nuclear utilities dated March 4, 1992, in which DOE advised:

> The Department recognizes that both the Purchaser's and Department's ability to commit to a specific delivery date over 63 months in the future[8] is limited. Therefore, the Department suggests that the Purchasers designate only the year of delivery on the DCS. *The actual date of delivery will be proposed by the Purchasers in their Final Delivery Schedule[9] submittal*.

*Id.* at 163 (emphasis added; footnotes added).[10]

---

[7] Although this and certain other documents in this regard were submitted by Defendant in the appendix of its opposition to Plaintiff's motion for summary judgment on contract liability, the Court will take judicial notice of their existence pursuant to Federal Rule of Evidence 201(b) in weighing Defendant's motion for summary judgment (and Plaintiff's cross-motion) on the one-time fee issue. *See Phonometrics, Inc. v. Hospitality Int'l, Inc.*, 2004 U.S. Dist. Lexis 26626 at *10 (S.D.Fla. Mar. 3, 2004), *aff'd*, 120 Fed. App. 341 (Fed. Cir. 2005) (noting that the court may take judicial notice of statements existing in court records in another, related matter); *Willcox v. U.S.*, 3 Cl. Ct. 83, 87 (1983), *aff'd*, 769 F.2d 743 (Fed. Cir. 1985) ("Judicial notice of the court's own files and records in closely related litigation is entirely appropriate."); 5 Am. Jur. Trials § 105(2), WL 5 AMJUR-TRIALS 105 (indicating that courts may use judicial notice to support a disposition of summary judgment).

[8] Article V.B.(1) of the Contract requires Purchasers to submit their DCSs 63 months in advance of delivery.

[9] Article V.C directs Purchasers to submit a final delivery schedule (FDS) not less than 12 months prior to the delivery date specified therein.

[10] Although this particular letter in Defendant's appendix is addressed to a different utility, Defendant's counsel at oral argument characterized this letter and the instructions as "generic instructions that went to . . . everybody. If you look at pages 163 through 171 of the government's appendix, there's a copy of those instructions there." Tr. 23:8-13, February 16, 2005.

The letter further advises, "The enclosed DCS instructions are intended to assist the Purchaser in completing the DCS" and includes not only several pages of instructions but the DCS form itself with the notations on line 2.5 as noted above. The first page of the instructions, "General Instructions," Paragraph 3 ("When to Submit"), again advises:

> At this time, DOE suggests that the Purchasers designate only the appropriate delivery year (calendar year), recognizing that both the Purchaser's and the Department's ability to commit to a specific date over 63 months in the future is limited.

*Id.* at 165.

In line 2.2 of the "SPECIFIC INSTRUCTIONS FOR COMPLETION OF DCS," DOE notes that "a DCS should not identify a specific date for delivery." In line 2.4, entitled "*PROPOSED* DELIVERY DATE" (emphasis added), DOE advises the utilities to enter only a year for delivery and clarifies that, "The actual date will be determined during the FDS process." And, finally, in line 2.5, entitled "DOE ASSIGNED DELIVERY COMMITMENT DATE," DOE advises that, "This entry will be completed by DOE." *Id.* at 170 (capitalization added).

In the context of DOE's instructions for completion of the DCSs, it is clear that line 2.5's prefilled notations – that the assigned delivery commitment date was "not required" of Plaintiff and would be "assigned by DOE" during the later FDS process – trump the "proposed" delivery year of "1999" in line 2.4. Furthermore, even without the language of line 2.5 of the DCS,[11] the letter to the utilities dated March 4, 1992, and the instructions for line 2.4 referencing the FDS signify that the date for "first delivery" purposes would be provided in the FDS stage of the delivery schedule process. With respect, therefore, to Article VIII's provision for payment of the one-time fee under Option 2, it is equally apparent that Plaintiff's DCSs did not "reflect" a date for "first delivery." In sum, Plaintiff is, to this day, not overdue in making payment of its one-time fee because a date for first delivery has not been set.

2. <u>DOE Abandoned the DCS Process Before a Date for First Delivery Was Established</u>

In addition, Defendant plainly abandoned the DCS process prior to January 31, 1998, the date under the Contract for Defendant to begin fulfilling its obligations to accept title to, transport, and store the SNF. Following DOE's *Federal Register* notice to the industry in 1995 that the earliest date for SNF acceptance would be 2010, DOE in 1997 began to decline to approve or disapprove DCSs from the industry. Tr. 51:13-14, Feb. 16, 2005. Plaintiff never

---

[11] The Court notes that, by at least January 30, 1996, DOE was utilizing a revised form of the DCS, in which the previous line 2.4, "Proposed Delivery Date," apparently was changed to the new line 2.3, "Proposed Delivery *Year*" (emphasis added), and the old line 2.5, "DOE Assigned Delivery Commitment Date," was eliminated entirely. Def.'s Mot. App. at 27, 28.

submitted any FDSs for the proposed 1999 SNF delivery, nor did DOE ever make demand for, object to Plaintiff's failure to submit, or otherwise make mention of the lack of such FDSs. Tr. 20:24 - 22:18, Feb. 16, 2005. Furthermore, DOE did not notify Plaintiff of its non-payment or underpayment of the one-time fee as required under Article VIII.C.1.[12] Despite Defendant's claim that the DCS process was not abandoned, Tr. 51:10-22, Feb. 16, 2005, DOE's general announcement of the expected delay in the SNF acceptance date to 2010, its subsequent inaction as to Plaintiff's failure to submit FDSs, and its failure to give notice of non-payment lend credence to the conclusion that DOE abandoned the process. Furthermore, on July 28, 2004, DOE wrote to Plaintiff (and presumably all the nuclear utilities) that it was proceeding with plans to begin operations of the SNF repository in 2010 and to advise, in accordance with Article V.B of the Standard Contract, that "the Department is hereby announcing the *resumption* of the Delivery Commitment Schedule (DCS) process." Pl.'s Resp. App. at 35 (emphasis added).

The American Heritage Dictionary defines "resumption" as the act of resuming or beginning again; it defines "resuming" as a participial form of "resume," which in turn is defined as "to begin or take up again after interruption." The American Heritage Dictionary of the English Language 1487 (4th ed. 2000). This language that DOE has employed signifies DOE's recognition that there was a hiatus or break in the DCS process.

Defendant also employed variants of the same terminology in a December 1, 2004, letter, apparently to all the industry, advising that its July 28, 2004, letter "resuming" the DCS process was premature:

> [R]ecent developments relating to the FY 2005 budget along with other issues have led the Department to conclude that the resumption of the DCS process was premature . . . . After the Department has determined a revised date for the initial operation of the Yucca Mountain repository, it will resume the DCS process in accordance with the provisions of the Standard Contract.

Pl.'s Resp. Supp. App., February 28, 2005 (ellipsis added).

Despite its submission for the opposite purpose, even Defendant's supplement to its appendix sustains Plaintiff's allegation that the government abandoned the original DCS process. In a response dated November 3, 2004, to a suggestion of the Tennessee Valley Authority (TVA),

[12] "DOE will notify the Purchaser of amounts due only when unpaid or underpaid by the dates specified in paragraph B above." Article VIII.C.1.

another nuclear utility, that DOE had abandoned the earlier DCS process,[13] David Zabransky, the Contracting Officer of DOE's Office of System Analysis & Strategy Development, wrote,

> To the extent that TVA has concerns about the interrelationship between previously approved DCSs and any new DCSs that DOE receives, the DCS approval process should eliminate those [rate of acceptance and allocation] concerns. . . . We anticipate that any new DCSs that are approved will *replace, rather than supplement*, the previously approved DCSs.

Def.'s Resp. Supp. App., March 1, 2005 (emphasis added).

Defendant cannot credibly hold Plaintiff accountable for not paying the one-time fee (1) prior to a "first delivery" date never specified, (2) for SNF acceptance still not begun, and (3) in a process abandoned by the government itself.

3. Payment of the One-Time Fee Is Not a Condition of the Government's Obligation to Accept Plaintiff's SNF

Defendant also argues that the one-time fee payment is a contractual condition of the government's obligation to accept delivery of Plaintiff's SNF. Accordingly, because of Plaintiff's failure to make payment yet, the government's duty has not yet been triggered and, hence, there has been no government breach.

> Because Consumers has, to date, failed to make [its one-time fee] payment, Consumers has failed to perform its Option 2 fee payment obligation. Consumers' Option 2 fee payment obligation is a condition to DOE's contractual duty to accept SNF under Consumers' Standard Contract. Accordingly, DOE's duty to accept SNF under Consumers' Standard Contract has yet to arise. Because DOE's duty to perform has not arisen, no cause of action

[13] The government's implicit acknowledgment of abandonment of the DCS process is also supported by the observation of the court in a recent decision in another SNF case. In *Boston Edison Co. v. United States*, the court observed that

> In 1997, when it became manifestly evident that a repository would not be in place by 1998, DOE officials *suspended* the DCS process. Hr'g Tr. at 40, 44. Pl.'s Post-Hr'g Rep., Ex. 2 at 362-63 (*Dep. of David Zabransky*) (Apr. 17, 2002).

*Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 172 (emphasis added).

> for breach of this duty can have accrued to Consumers under its Standard Contract.

Def.'s Mot. at 9.

The government seems to argue further that, regardless of whatever date the DCS process set for Plaintiff to pay the fee or of what circumstances may have contributed to delaying the due date, the government's obligations are not triggered unless and until the fee is paid.

The Court finds that Defendant has the sequence of obligations backwards here. As discussed *supra*, Plaintiff is obligated under the contract to pay the one-time fee *prior to* the date of first delivery as provided in the delivery commitment schedule process (which, under the instructions specified by DOE itself, would be in the FDS step, rather than in the DCS). In this respect, the setting of the delivery date was itself a condition of Plaintiff's payment obligation. As Defendant notes, "if a contractual duty is subject to a condition *precedent,* that condition must be satisfied *before* the duty arises." *Landmark Land Co. v. United States*, 256 F.3d 1365, 1376 (Fed. Cir. 2001) (emphasis in original). Because the delivery date has not been established, Plaintiff's one-time fee payment is still not due.

Furthermore, if DOE's abandonment (or suspension, interruption, etc.) of the DCS process serves to allow the government's obligation to accept delivery of SNF to be postponed until whenever the DCS process resumes, it would render the government's duties under the Standard Contract illusory. "We note as one of the most elementary propositions of contract law that a party may not reserve to itself a method of unlimited exculpation without rendering its promises illusory and the contract void." *Torncello v. United States*, 681 F.2d 756, 760 (Ct. Cl. 1982). Yet DOE's letter to TVA clearly signifies that resumption of the DCS process is in the hands of the government; its on-again/off-again status continues to effect postponement of the DCS and FDS timetables for SNF delivery. Yet Defendant urges on the Court a construction of the Contract that would allow the government to avoid its contractual obligation indefinitely as a consequence of DOE's abandonment of the DCS process. The Court, however, is obliged to construe contracts to avoid rendering them illusory. *Id.* at 771.

What Defendant argues is a condition of DOE's obligation, the Court sees rather as one of the parties' mutual contractual promises. The Court of Appeals for the Federal Circuit has described a methodology to distinguish a condition from a promise:

> A condition creates no right or duty of and in itself, but is merely a limiting or modifying factor. If it is breached or does not occur, the promisee acquires no right to enforce the promise. A promise raises a duty to perform and its breach subjects the promisor to liability and damages, but does not necessarily excuse performance by the other party.

*Charron v. United States*, 200 F.3d 785, 790-91 (Fed. Cir. 1999) (citing *United States v. Schaeffer*, 319 F.2d 907, 911 (9th Cir. 1963)).

Thus, if the Standard Contract gives DOE a right to enforce Plaintiff's obligation to pay the one-time fee if it is not properly paid when due, then Plaintiff's fee obligation is not merely a "limiting or modifying factor," but rather a separately enforceable promise. The Standard Contract does just that. In sub-paragraph 1 of Article VIII.C, "Interest on Late Fees," the Contract provides for the levy of interest on fees due from Purchasers "when unpaid or underpaid by the dates specified in paragraph B above."[14] Such "penalty" interest suggests that Plaintiff's payment of the one-time fee by the due date is not merely exhorted; failure to pay on time triggers DOE's right to an independently enforceable remedy.

The government adverts to the same provision but argues, "Because Consumers is obligated to pay its one-time fee only prior to the date upon which it wants DOE to begin accepting its SNF, its *election* to defer its one-time fee payment does not make that payment late, but merely defers DOE's duty to begin SNF acceptance." Def.'s Reply on Counts I and II (Def.'s Reply") at 14 n. 6 (emphasis added). Defendant's interpretation of this provision would render it meaningless, because, if Plaintiff's payment was deferrable at Plaintiff's whim, there would be no such thing then as a "late" payment and no starting point for the levy of "interest on late fees."

The enforceability of the one-time fee payment is bolstered as well by Article VIII.E.1, which empowers DOE to perform audits or inspections as necessary to ensure that a Purchaser "is paying the correct amount under the fee schedule and interest provisions set forth in paragraphs A, B, and C above"; Article VIII.E.2, which authorizes an audit by the General Accounting Office (now named the Government Accountability Office); and Article VIII.E.3, which requires a Purchaser to furnish necessary records, reports, and other data for, *inter alia*, "final settlement of amounts due under this contract . . . ."

By contemplating the possibility of late payment and providing a mechanism for levying interest on late or underpaid fees, Article VIII clearly establishes that the one-time fee obligation is more than merely a "limiting or modifying factor" of DOE's duty to accept Plaintiff's SNF. Rather, it is a contractual promise that DOE has a right to enforce. If DOE has an independent right to enforce the one-time fee payment, then the fee payment was not merely a condition of DOE's duty to accept SNF delivery.

> If a condition does not occur, whether through breach or other cause, the party fails to meet the condition, and acquires no right to enforce the promise. A contractual promise or obligation, on the other hand, raises a duty to perform a service and its breach

[14] Article VIII.B.2(b) (Option 2) already provides for interest on the one-time fee principle amount beginning in April 1983. The interest contemplated in Article VIII.C.1 would be penalty interest on the outstanding balance. Tr. 37:23 - 38:13, Feb. 16, 2005.

> subjects the promisor to liability and damages, but does not necessarily excuse performance by the other contracting party.

*Favell v. United States*, 16 Cl. Ct. 700, 712 (1989) (citing *Schaeffer*, 319 F.2d at 911).

As a further matter, Defendant's condition precedent argument – that any delay in Plaintiff's payment of the one-time fee defers DOE's obligation to accept Plaintiff's SNF – runs contrary to the public policy of the Nuclear Waste Policy Act. In that legislation, Congress declared that it would become the federal government's responsibility to provide for the permanent disposal of SNF in order to protect the public's health and safety and the environment. 42 U.S.C. § 10131(a); Standard Contract at 1. Indefinite deferral of the government's obligation to accept civilian nuclear waste, because of dispute over a given utility's fee payments, would only prolong a status quo of accumulated SNF stored on-site at civilian reactors. That prospect was manifestly found by Congress to be a "national problem." 42 U.S.C. § 10131(a)(2)-(A). Construing Plaintiff's fee obligation as a condition of the government's duty to accept its SNF cannot be reconciled with the public policy goals of the Act.

4. Defendant is Entitled to Recoup the One-Time Fee Against Any Damages Judgment in Plaintiff's Favor

Defendant asks, in the alternative, to recoup Plaintiff's one-time fee against any award of damages in Plaintiff's favor, should damages ultimately be awarded.[15] The Court accepts that a right to recoup the fee would logically follow from a damages judgment favoring Consumers. "To derive the proper amount for the damages award, the costs resulting from the breach must be reduced by the costs, if any, that the plaintiffs would have experienced absent a breach." *Bluebonnet Sav. Bank, F.S.B. v. United States*, 339 F.3d 1341, 1345 (Fed. Cir. 2003); *see also United States v. Munsey Trust Co.*, 332 U.S. 234, 239 (1947) ("The government has the same right 'which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts owed to him.'"). Had DOE properly proceeded with the DCS process, such that a date for "first delivery" had been specified in an FDS, Consumers would have been obligated to pay the one-time fee "anytime prior to first delivery." If Consumers had not paid the fee on time, or underpaid the fee, DOE would have been entitled under Article VIII.C to seek Plaintiff's payment, subject to an additional interest levy.

In any event, "the non-breaching party should not be placed in a better position through the award of damages than if there had been no breach." *Bluebonnet*, 339 F.3d at 1345. Plaintiff's recovery of damages without having to account for its obligation to pay the one-time

[15] Recoupment is "a demand asserted to diminish or extinguish the plaintiff's demand that arises out of the same transaction forming the basis of the plaintiff's claim; setoff, on the other hand, arises out of a transaction extrinsic to the plaintiff's claim." *In re Gober*, 100 F.3d 1195, 1207 (5th Cir. 1996).

fee, which it would have owed had there been no breach, would surely put Plaintiff in a more advantageous position.

Accordingly, on Defendant's motion for summary judgment on Counts I and II and its related motions in the alternative and on Plaintiff's cross-motions on Defendant's counterclaim and affirmative defense on the one-time fee, the Court hereby **ORDERS** that:

1) Defendant's motion to dismiss Counts I and II is **DENIED**;

2) Defendant's motion to recover the unpaid one-time fee, plus accrued interest, is **DENIED**;

3) Defendant's motion to recoup Plaintiff's one-time fee against any award of damages in Plaintiff's favor is **GRANTED**;

4) Plaintiff's cross-motion to dismiss Defendant's affirmative defense (alleging Plaintiff's failure to satisfy condition precedent) is **GRANTED**; and

5) Plaintiff's cross-motion to dismiss Defendant's affirmative defense and counterclaim for recoupment is **DENIED**.

**B. Plaintiff's Motion for Judgment of Liability Against the Government for Partial Breach of Contract**

Plaintiff, in turn, seeks summary judgment against the government for contractual liability as of January 31, 1998, based on Article II of the Contract, which provides in relevant part:

> The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of.

Plaintiff argues that the Federal Circuit, in *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (2000), has already found the government in breach as to all the nuclear utilities. In *Maine Yankee*, the court addressed whether the government's failure to begin SNF acceptance by January 31, 1998, was an avoidable delay arising under the disputes clause of the Contract. Finding that Yankee's claim was broader than one merely for improper delay,[16] the

[16] Although the Federal Circuit made special note that "Yankee has paid all the contract fees," 225 F.3d at 1343, this Court has found, *supra,* that Consumers has paid all of its fees that

court held, "Congress found this objective [beginning SNF disposal by January 31, 1998] so important when it promulgated the Act that it took the unusual action of specifying that all the contracts must contain this explicit requirement. *The breach involved all the utilities that had signed the contract–the entire nuclear electric industry*." *Id.* at 1341-42 (emphasis added). Lest there be any ambiguity in its decision, the court further noted, "The government does not, and could not, deny that it failed to meet the contractual requirement to begin accepting nuclear waste no later than January 31, 1998," and observed that failure to perform a contractual duty when due is a breach of contract. *Id.* at 1343.

The government does not contest that it has not yet begun disposal of Plaintiff's SNF under the Contract. Answer ¶ 2. Nonetheless, it asserts that Plaintiff could not have incurred injury at least until such time as its SNF would have been picked up absent the government's breach. In light of Plaintiff's own DCS submissions, its SNF delivery would not have occurred until some time in 1999. Therefore, Plaintiff's action for contract liability as of January 31, 1998, cannot lie as a matter of law. "A wrong done, but from which no loss or damage results, . . . will not sustain an action." *Cosmo Constr. Co. v. United States*, 451 F.2d 602, 605 n.3 (Ct. Cl.1971) (quoting *Black's Law Dictionary* (4th ed.)).

Defendant properly notes that the Standard Contract provides that the queue for the government's acceptance of the contract holders' SNF was to be based on an "oldest fuel first" priority ranking, Article VI.B.1(a) (subject to such exceptions as SNF from permanently shut-down reactors, Article VI.B.1(b); emergency deliveries, Article V.D; and exchanges negotiated among purchasers with approved DCSs, Article V.E). Therefore, based on the "oldest fuel first" allocation system and Plaintiff's DCS submissions for SNF delivery at the earliest in "1999," Plaintiff has no valid claim for liability before 1999.

The Court finds however that, while Defendant's arguments may be pertinent to the quantum of damages to which Plaintiff may be entitled, liability for partial breach of contract began on January 31, 1998.[17] First, that was the date made explicit in the Contract for the government to begin its services. By that date, Plaintiff was current in its payments of the recurrent fees established in the Contract and, as noted above, did not yet owe its one-time fee. In addition, given the 12-month-in-advance requirement for submission of Plaintiff's FDS

---

are presently due and owing. Thus, Plaintiff's non-payment of the one-time fee does not necessarily take this case outside of the reach of *Maine Yankee.*

[17] The government has requested, in the event the Court is inclined to grant Plaintiff's motion for summary judgment on contract liability, a prior opportunity for discovery pursuant to Rule 56(f) of the Rules of the Court. Such discovery is necessary, it argues, to ascertain Plaintiff's pre-litigation understanding of its entitlement to SNF acceptance earlier than 1999. To the extent the government's request is intended as a motion, the motion is denied. There is no genuine issue of material fact before the Court in weighing Defendant's general contractual liability and Plaintiff is entitled to summary judgment as a matter of law.

(Article V.C), DOE's posture on January 31, 1998, was such that its acceptance of Plaintiff's SNF could not have begun at least until January 31, 1999. That one month's delay (from January 1 to January 31) in the earliest delivery conceivable within "1999" as proposed in Plaintiff's approved DCSs constitutes sufficient damage to Plaintiff for purposes of contract liability and was triggered as of January 31, 1998.

Furthermore, the Standard Contract's acceptance priority ranking on the basis of "oldest fuel first" necessarily created a queue for all the nuclear utilities' SNF. Thus, any delay in the start of DOE's SNF acceptance *as of January 31, 1998*, negatively implicated the acceptance dates of every contract holder down the line. Plaintiff's motion for summary judgment on contract liability is **GRANTED**.

While the Court finds that Plaintiff suffered sufficient injury as of January 31, 1998, to warrant a finding of contractual liability against Defendant beginning on that date, the inquiry for determining Plaintiff's recoverable damages is a factual matter for trial at a later occasion.

## VI. CONCLUSION

Pursuant to the decisions of the Court in Parts V.A and V.B of this opinion, the Court hereby **ORDERS** the parties to submit a joint status report on or before June 6, 2005, addressing, *inter alia,* a timetable for submission of any additional dispositive motions and/or a schedule for trial on damages.

s/ Edward J. Damich
EDWARD J. DAMICH
Chief Judge