**(Chief Judge Damich)**
**No. 04-10C**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE AND DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

**PETER D. KEISLER**
**Assistant Attorney General**

**DAVID M. COHEN**
**Director**

**HAROLD D. LESTER, JR.**
**Assistant Director**

**SHARON A. SNYDER**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D. C. 20530**
**Tele: (202) 616-0347**

**Attorneys for Defendant**

**OF COUNSEL:**

**JANE K. TAYLOR**
**Office of General Counsel**
**Department of Energy**
**1000 Independence Ave., S.W.**
**Washington, D.C. 20585**

**June 17, 2005**

TABLE OF CONTENTS

PAGE(S)

STATEMENT OF THE ISSUES . . . . . 1

STATEMENT OF FACTS . . . . . 2

SUMMARY OF ARGUMENT . . . . . 2

ARGUMENT . . . . . 4

I. THE STANDARD OF REVIEW FOR SUMMARY JUDGMENT . . . . . 4

II. THE GOVERNMENT IS ENTITLED TO SUMMARY JUDGMENT UPON ENERGY NORTHWEST'S BREACH OF CONTRACT CLAIM BECAUSE ENERGY NORTHWEST HAS SOUGHT DAMAGES BEFORE ANY RIGHT TO ACCEPTANCE OF ITS SNF BY DOE HAS ACCRUED . . . . . 5

A. Energy Northwest Cannot Seek A Liability Ruling When DOE Has Not Breached Any Contract Obligation To Accept Energy Northwest's Spent Nuclear Fuel And When Energy Northwest Cannot Establish Any Damage . . . . . 5

B. A Primary Requirement Of The Standard Contract Is That Oldest Fuel Generated In The Industry Receives Priority For Acceptance And That Acceptance Rights Be Defined In Delivery Commitment Schedules . . . . . 8

C. Under The "Oldest Fuel First" Allocation System, And Based Upon Energy Northwest's Failure To Submit Any DCSs, DOE Has Not Yet Breached Any Obligation To Accept SNF From Energy Northwest . . . 12

D. DOE Was Not Obligated To Begin SNF Acceptance From Energy Northwest Itself On January 31, 1998 . . . . . 13

E. Because DOE Is Not Obligated To Accept Energy Northwest's SNF During the First Ten Years Of SNF Acceptance Under The Standard Contract, Energy Northwest Cannot Identify Any Breach That Runs Directly To Energy Northwest . . . . . 15

TABLE OF CONTENTS (cont'd)

PAGE(S)

F.. Even If Energy Northwest Could Recover Future Damages Under A Partial Breach Theory, There Is No Basis Here Upon Which To Determine Future Damages And They Are Too Speculative To Recover . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

TABLE OF AUTHORITIES

CASES PAGE(S)

Alvin Ltd. v. United States Postal Service,
816 F.2d 1562 (Fed. Cir. 1987) . . . . . . . . . . 14

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . 4

Arnone v. Chrysler Corp.,
148 N.W. 2d 902 (Mich. 1967) . . . . . . . . . . 18

Avia Group International, Inc. v. L.A. Gear California, Inc.,
853 F.2d 1557 (Fed. Cir. 1988) . . . . . . . . . . 5

Consumers Energy Company v. United States,
No. 02-1894C (Fed. Cl. May 9, 2005) . . . . . . . . . . passim

Cosmo Construction Co. v. United States,
196 Ct. Cl. 463, 451 F.2d 602 (1971) . . . . . . . . . . 6

H.J.Lewis Oyster Co. v. United States,
107 F. Supp. 570 (Ct. C. 1952) . . . . . . . . . . 17

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004) . . . . . . . . . . 17

Julius Goldman's Egg City v. United States,
697 F.2d 1051 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983) . . . . . . . . . . 14

Kaiser Northwest Shopping Center.
587 S.W. 454 (Tex. Civ. Ct. 1979) . . . . . . . . . . 18

Mingus Constructors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . . . 4

Omni Corp. v. United States,
41 Fed. Cl. 585 (1998) . . . . . . . . . . 14

Power Authority Of The State Of New York v. United States,
No. 00-703C (Fed. Cl. Sept. 30, 2004) . . . . . . . . . . 14

TABLE OF AUTHORITIES (cont'd)

CASES PAGE(S)

Puritan Assocs. v. United States,
215 Ct. Cl. 976 (1977) . . . . . . . . . . 6

Story Parchment Co. V. Paterson Parchment Paper Co.,
282 U.S. 555 (1931) . . . . . . . . . . 18

Sweats Fashions, Inc. v. Pannill Knitting Company, Inc.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . 5

Tennessee Valley Authority v. United States,
60 Fed. Cl. 665 (2004) . . . . . . . . . . 13

The Pantry, Inc. v. Stop-N-Go Foods, Inc.,
796 F. Supp. 1164 (S.D. Ind. 1992) . . . . . . . . . . 5

William Green Constr. Co. v. United States,
477 F.2d 930 (Ct. Cl. 1973) . . . . . . . . . . 18

Winstar Corp. v. United States,
21 Cl. Ct. 112 (1990), aff'd, 64 F.3d 1531 (Fed. Cir. 1995) (en banc), aff'd,
518 U.S. 839 (1996) . . . . . . . . . . 6

STATUTES AND REGULATIONS

10 C.F.R. § 961.11, Art. V.B . . . . . . . . . . Passim

# INDEX TO APPENDIX

DOCUMENT PAGE

Portions of the Administrative Record of the DOE Standard Contract Rulemaking for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste . . . . . . . . . . . . . . . . . . 1

Edison Electric Institute Comments, March 7, 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of M.C. Cook, Vice President, Florida Power & Light Company, March 1, 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Northern States Power Comments, March 3, 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Cincinnati Gas & Electric Comments, March 4, 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Consumers Power Company Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Public Service Company of Colorado Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Cleveland Electric Illuminating Company Comments . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Gulf States Utilities Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Wisconsin Public Service Corporation Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

Yankee Atomic Electric Company Comments, March 4, 1983 . . . . . . . . . . . . . . . . . . . 64

Public Service Electric and Gas Company Comments . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Long Island Lighting Company Comments, March 3, 1983 . . . . . . . . . . . . . . . . . . . . . 70

Northeast Utilities Comments, March 3, 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

Alabama Power Company Comments, March 4, 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Kansas Gas and Electric Company Comments, March 1, 1983 . . . . . . . . . . . . . . . . . . . 78

Iowa Electric Light and Power Company Comments, March 3, 1983 . . . . . . . . . . . . . . 81

Mississippi Power & Light Company Comments, March 4, 1983 . . . . . . . . . . . . . . . . . 84

INDEX TO THE APPENDIX (cont'd)

DOCUMENT PAGE


Portland General Electric Company Comments, March 4, 1983 . . . . . . . . . . . . . . . . . . . 89

Detroit Edison Comments, March 3, 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

Florida Power & Light Company Comments, March 7, 1983 . . . . . . . . . . . . . . . . . . . . . 94

Duquesne Light Company Comments, March 4, 1983 . . . . . . . . . . . . . . . . . . . . . . . . . 96

Pacific Gas and Electric Company Comments, March 4, 1983 . . . . . . . . . . . . . . . . . . . . 99

TVA Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

Houston Lighting and Power Company Comments . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Middle South Services, Inc. Comments, March 7, 1983 . . . . . . . . . . . . . . . . . . . . . . . 107

Vermont Yankee Nuclear Power Corp. Comments, March 7, 1983 . . . . . . . . . . . . . . . 110

Consolidated Edison Company of New York Comments, March 7, 1983 . . . . . . . . . . 113

Dairyland Power Cooperative Comments, March 7, 1983 . . . . . . . . . . . . . . . . . . . . . 115

Georgia Power Comments, March 4, 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

Letter from Secretary Hodel to Senator Johnston, September 7, 1984 . . . . . . . . . . . . . . . . . . . 122

Letter from J. Michael Farrell to Honorable Philip R. Sharp, April 1, 1987 . . . . . . . . . . . . . . . 126

Memo from Ronald A. Milner, December 20, 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

Letter from M. Detmer to J.M. Buchheit, March 4, 1992 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 143

Letter from M. Detmer to Michael E. Thomas, March 4, 1992 . . . . . . . . . . . . . . . . . . . . . . . . 153

Letter from M. Detmer to J.E. McKissick, March 4, 1992 . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

Portions of Mission Plan for the Civilian Radioactive Waste Management Program, June 1985 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

INDEX TO THE APPENDIX (cont'd)


DOCUMENT PAGE

Portions of OCRWM Mission Plan Amendment, June 1987 . . . . . . . . . . . . . . . . . . . . . . . . . 205

Portions of Annual Capacity Report, June 1987 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

Portions of Annual Capacity Report, June 1988 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211

Portions of Annual Capacity Report, December 1990 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

Portions of Annual Capacity Report, December 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

Portions of 1992 Acceptance Priority Ranking, Revision 1, May 1993 . . . . . . . . . . . . . . . . . . 257

Portions of Acceptance Priority Ranking and Annual Capacity Report, March 1995 . . . . . . . 289

Energy Northwest’s Standard Contract For Disposal Of Spent Nuclear Fuel
And/Or High-Level Radioactive Waste . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 358

Portions of Annual Capacity Report, December 1991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 402

Portions of 1992 Annual Capacity Report, Revision 1, May 1993 . . . . . . . . . . . . . . . . . . . . . 464

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENERGY NORTHWEST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-10C |
| | ) | (Chief Judge Damich) |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO COURT'S ORDER TO SHOW CAUSE AND MOTION FOR SUMMARY JUDGMENT

Pursuant to the Court's Order to Show Cause filed on May 9, 2005, and Rule 56 of the Rules of this Court ("RCFC"), defendant, the United States, respectfully files this response and motion for summary judgment upon the plaintiff's complaint. There are no genuine issues of material fact that would preclude judgment as a matter of law in defendant's favor. In support of our motion, we rely upon the following brief and appendix, the accompanying proposed findings of uncontroverted fact, and the pleadings filed by the parties in this case.

STATEMENT OF THE ISSUES

1. Whether the Court's ruling in Consumers Energy Company v. United States, No. 02-1894C (Fed.Cir.), filed on May 9, 2005, applies to this case.

2. Whether Energy Northwest has any basis upon which to seek breach of contract damages that pre-date the Government's actual partial breach of any obligations running directly to Energy Northwest.

STATEMENT OF FACTS

For our statement of facts, we respectfully refer the Court to our proposed findings of uncontroverted fact, which accompany this motion.

SUMMARY OF ARGUMENT

Energy Northwest alleges in its complaint that the Department of Energy ("DOE") partially breached its Standard Contract on January 31, 1998, when it failed to begin acceptance of spent nuclear fuel ("SNF") on that date. However, under the terms of the Standard Contract, DOE was not obligated to accept SNF from every Standard Contract holder on that date. Instead, the Standard Contract establishes a mechanism by which specific acceptance obligations from individual Standard Contract holders, including the specific amounts of SNF that are to be accepted during specific periods of time and at specific locations under specific Standard Contracts, are created and defined. In accordance with the Standard Contract's contractual mechanism for creating these specific acceptance obligations, Energy Northwest would have submitted delivery commitment schedules ("DCSs") to DOE no later than 1992, if it had SNF to be accepted by DOE in January 1998. However, under the terms of the Standard Contract, DOE is obligated to accept SNF from the nuclear utility contract holders in the order in which it was generated, on an "oldest fuel first" basis developed by comparing the age of SNF across the nuclear industry. Because Energy Northwest operates a relatively new nuclear reactor, it did not have any SNF allocations for acceptance of its SNF within at least the first ten years of the SNF acceptance program. Although Energy Northwest could have submitted DCSs to DOE seeking to obtain DOE's agreement to accept Energy Northwest's SNF outside of an "oldest fuel first" acceptance queue, Energy Northwest made no effort to do so.

This Court has requested that we show cause regarding whether its May 9, 2005 decision in Consumers Energy automatically establishes the Government's liability in this case. This Court's ruling in Consumers Energy had two components. First, the Court held that plaintiff Consumers Energy's failure to pay the one-time-fee was not a condition of the Government's duty to accept SNF. The one-time fee is not at issue in this case, so the Court's ruling on that issue is not applicable here. The Court also held as to Consumers Energy that liability for partial breach of contract began on January 31, 1998. With respect to the Court's ruling that, when DOE did not begin accepting SNF on January 31, 1998, it automatically became liable to Consumers Energy for a partial breach of contract, the facts in this case differ from those in Consumers Energy. Unlike Consumers Energy, which had SNF acceptance rights in 1999, Energy Northwest had no allocation rights for SNF acceptance within at least the first ten years of performance, and thus, DOE was not obligated to accept any of Energy Northwest's SNF in January 1998, or in the ten years following. The Court's finding that Consumers Energy was negatively implicated because of the DOE's failure to accept SNF on January 31, 1998, does not create any contractual liability flowing to DOE on behalf of Energy Northwest. Defendant thus respectfully suggests that the Court's ruling in Consumers Energy is not applicable to this case.

Because Energy Northwest has no basis upon which to argue that DOE was obligated to have begun acceptance of its SNF prior to the date upon which it filed its complaint, Energy Northwest's breach of contract claim fails as a matter of law. DOE has not breached its obligations under the Standard Contract to accept Energy Northwest's SNF, and, thus, Energy Northwest's right to sue for breach of contract has not yet accrued. Under straightforward contract law, Energy Northwest has not suffered any cognizable injury because DOE has failed

to begin SNF acceptance from other utility contract holders that have earlier allocation rights. Because Energy Northwest had no allocation rights for SNF acceptance before the date on which it filed its complaint and, in fact, would not have been in line for SNF acceptance for many years to come, there can be no breach of contract here that runs to Energy Northwest's acceptance rights. To establish its own entitlement to damages, it must identify the rights and obligations that DOE had to accept Energy Northwest's SNF and that DOE's failure to act in accordance with those obligations constituted a breach of Energy Northwest's contract. Energy Northwest cannot establish that over the course of the next few years, DOE will not be able to take action to ameliorate the effects of the past delays and begin accepting Energy Northwest's SNF by the date that it otherwise was contractually required to do so. Because Energy Northwest does not have any basis for asserting that DOE was obligated to accept any of its SNF under the Standard Contract by January 31, 1998, or even by the date upon which it filed its complaint, it has no basis for seeking damages from this Court at this time.[1]

## ARGUMENT

### I. THE STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is an acceptable and favored procedural means for disposition of claims or issues as to which there are no genuine issues of material fact in dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). It is "a salutary method of disposition designed to secure

[1]Further, Energy Northwest's claim for breach of implied covenant of good faith and fair dealing, which the Court did not address in its Consumers Energy ruling, fails as a matter of law because its claim is based on a contract delay and there is no clear and convincing evidence that DOE did not act in good faith.

the just, speedy and inexpensive determination of every action." Sweats Fashions, Inc. v. Pannill Knitting Company, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). "[T]here is no genuine issue of material fact for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Avia Group Int'l, Inc. v. L.A. Gear California, Inc., 853 F.2d 1557, 1560 (Fed. Cir. 1988) (quoting Anderson, 477 U.S. at 249-50). When the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. RCFC 56(c).

## II. THE GOVERNMENT IS ENTITLED TO SUMMARY JUDGMENT UPON ENERGY NORTHWEST'S BREACH OF CONTRACT CLAIM BECAUSE ENERGY NORTHWEST HAS SOUGHT DAMAGES BEFORE ANY RIGHT TO ACCEPTANCE OF ITS SNF BY DOE HAS ACCRUED

### A Energy Northwest Cannot Seek A Liability Ruling When DOE Has Not Breached Any Contractual Obligation To Accept Energy Northwest's Spent Nuclear Fuel And When Energy Northwest Cannot Establish Any Damage

Energy Northwest's complaint is premised upon the assumption that DOE's partial breach of the Standard Contract resulting from DOE's failure to begin SNF acceptance from the commercial nuclear utility industry by January 31, 1998, automatically created not only a breach, but also an injury-in-fact to each and every member of the commercial nuclear utility industry. See Compl. ¶ 1.[2] The existence of a breach of contract is only one component of the issue of liability. See The Pantry, Inc. v. Stop-N-Go Foods, Inc., 796 F. Supp. 1164, 1166 (S.D. Ind. 1992) (plaintiff "requested a judgment finding in Plaintiff's favor on the *issue* of liability and not merely a component *element* of that issue (whether there was a breach)" (italics in original)); see

[2]"Compl. ¶ ___" refers to the complaint that the plaintiff filed in this case. "A. ___" refers to the appendix to this brief.

also Winstar Corp. v. United States, 21 Cl. Ct. 112, 117 (1990) ("court requires further briefing on several elements of plaintiffs' contract claim which are necessary to determine liability," including "whether a breach occurred" and, "if so, whether it resulted in injury"), aff'd, 64 F.3d 1531 (Fed. Cir. 1995) (en banc), aff'd, 518 U.S. 839 (1996). Further, the Court of Claims has recognized that, before a contractor is entitled to judgment as to entitlement, it must establish as part of its proof that it suffered some damage, beyond mere speculation, because of the Government's actions:

> Even if, as here, the assessment of damages is reserved for the quantum phase of the case, the plaintiff as part of its proof of entitlement, must show it was damaged to some extent, by defendant's derelictions, and it has failed to do so . . .

Puritan Assocs. v. United States, 215 Ct. Cl. 976, 978 (1977). "A wrong done, but from which no loss or damage results, . . . will not sustain an action." Cosmo Constr. Co. v. United States, 196 Ct. Cl. 463, 469 n.3, 451 F.2d 602, 605 n.3 (1971) (quoting Black's Law Dictionary (4th ed.)). In an action bifurcated as to entitlement and quantum issues, "evidence on damages or quantum is not totally excluded [from consideration of the entitlement phase of the case], because there must be some evidence of damage to support a finding on liability" that is "sufficient to demonstrate that the issue of liability is not purely academic." Id. at 469-70, 451 F.2d at 605-06 (emphasis in original).

We understand that, in Consumers Energy, this Court found that the plaintiff was entitled to a liability ruling based upon a January 31, 1998 breach, even though the plaintiff’s first acceptance allocation and approved delivery commitment schedule (“DCS”) did not require SNF acceptance from the plaintiff until 1999. One of the bases of this finding appears to be that, in Consumers Energy, it was clear on January 31, 1998, that there could be no acceptance by

January 1999, the date of the plaintiff's approved DCS. Yet, here, Energy Northwest does not have an approved DCS for 1999. In fact, it has never submitted a DCS. Further, and importantly, under the "oldest fuel first" acceptance allocation method that the Standard Contract requires, Energy Northwest does not have any acceptance allocations in at least the first 10 years of the SNF acceptance program. See A. 296. Accordingly, given that DOE was not required under the Standard Contract to begin SNF acceptance from Energy Northwest for many years into the future, Energy Northwest has no basis for claiming that it has already suffered some "damage" – sufficient to provide for a liability, as opposed to a breach, ruling – because of DOE's potential failure to begin accepting Energy Northwest's SNF sometime in the future.

In fact, Energy Northwest could not have suffered any injury as a result of DOE's failure to begin SNF acceptance from the commercial nuclear utility contract holders by January 31, 1998, under the Nuclear Waste Policy Act program. Instead, any injury that Energy Northwest incurred would result from DOE's failure to accept Energy Northwest's SNF as identified in Energy Northwest's approved DCSs. However, because Energy Northwest has never submitted a DCS to DOE for approval, it has no basis for asserting that DOE failed to act in accordance with the terms of the Standard Contract with regard to its DCS submissions or acceptance of its SNF. Because the January 31, 1998, deadline for beginning SNF acceptance is not a deadline that required DOE to begin accepting SNF from each and every contract holder by January 31, 1998, but, instead, is a statutory deadline by which DOE was required to begin its program of accepting SNF from the contract holders as a collective whole, Energy Northwest must establish, before it can seek a liability ruling, that DOE had a specific obligation to accept particular SNF from Energy Northwest by the date that it filed its complaint and that DOE breached that specific

obligation to Energy Northwest. Absent such a showing, Energy Northwest has not identified any injury-in-fact that could provide this Court with a basis to consider a liability ruling or any cause of any damage to Energy Northwest.

As explained below, the Standard Contract created a mechanism by which contract holders would obtain commitments from DOE that would define the specific 12-month periods – beginning January 31, 1998 – within which DOE would accept specific amounts of SNF from specific contract holders. That contractual mechanism required all contract holders, when they wanted DOE to accept their SNF, to timely submit a DCS to DOE at least 63 months prior to the desired SNF acceptance date, followed by submission of a final delivery schedule. See 10 C.F.R. § 961.11, Art. V.B. Submission of a DCS, followed by actions necessary to obtain DOE's approval of that DCS, constituted a condition precedent to DOE's obligation to accept any SNF from any particular contract holder.

### B. A Primary Requirement Of The Standard Contract Is That Oldest Fuel Generated In The Industry Receives Priority For Acceptance And That Acceptance Rights Be Defined In Delivery Commitment Schedules

As this Court recognized in Consumers Energy, the Standard Contract identifies a general framework for determining the order, or priority, of SNF acceptance from the various contract holders. It provides that "acceptance priority [for contract holder SNF and HLW] shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor." 10 C.F.R. § 961.11, Art. VI.B.1. It further provides that "DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B and D of Article V" and in paragraph B.1.b of Article VI. Id. Therefore, the Standard Contract generally requires that the

"order" of DOE's acceptance of contract holders' SNF be based upon an "oldest fuel first" scenario, subject, among other things, to definitization of an allocation commitment to accept SNF through the contract holder's submission of, and DOE's approval of, a delivery commitment schedule.

Pursuant to the terms of the Standard Contract, and beginning not later than July 1, 1987, DOE was to "issue an annual capacity report for planning purposes," which would "set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility." 10 C.F.R. § 961.11, Art. IV.B.5.b. The Standard Contract provided DOE with the authority to identify and publish for planning purposes the rates of SNF acceptance that it anticipated, at any given time, might be utilized by DOE once SNF acceptance began. See id. Further, beginning on April 1, 1991, DOE was to "issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository," based upon "the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor" and with "[t]he oldest fuel or waste . . . hav[ing] the highest priority for acceptance," except as provided in Articles V.B, V.D, and VI.B.3. Id., Art. IV.B.5.a.

Further, beginning January 1, 1992, following DOE's issuance of the 1991 Annual Capacity Report and Acceptance Priority Ranking, the contract holders were required to submit delivery commitment schedules to DOE, "in the form set forth in Appendix C" to the Standard Contract, in which they would "identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter." 10 C.F.R. § 961.11, Art. V.B.1 (emphasis

added). Accordingly, if the 1991 ACR identified a 1998 allocation for SNF acceptance from a particular contract holder, and if the contract holder wanted to use that 1998 allocation, the contract holder would have to submit a DCS for 1998 acceptance no later than September 30, 1992. See id.; A. 145-52 ("Instructions For Completing The Appendix C Delivery Commitment Schedule").

DOE was to "approve or disapprove such schedules within three (3) months after receipt." 10 C.F.R. § 961.11, Art. V.B.1. "In the event of disapproval, DOE [was to] advise the Purchaser in writing of the reasons for disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval." Id. DOE had 60 days to approve or disapprove any revised DCS submission. Id., Art. V.B.2. "In the event of disapproval [of the revised DCS submission], DOE [was to] advise the Purchaser in writing of the reasons for such disapproval and [to] submit [DOE's] proposed schedule." Id. If the contract holder disagreed with DOE's proposed schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)." Id.

Upon approval by DOE, the delivery commitment schedule defined, among other things, the first year in which DOE was obligated to begin acceptance of a contract holder's SNF, and the amount of SNF that DOE was to take from a particular contract holder in a given year. 10 C.F.R. § 961.11, Appendix C. As the Standard Contract expressly provided, the SNF that DOE was to accept for any particular year "shall be specified in a delivery commitment schedule as provided in Article V below." Id., Art. II. Absent a delivery commitment schedule, DOE had no basis for identifying any SNF that a contract holder intended to deliver to DOE within a given year. Further, the "oldest fuel first" acceptance priority ranking in Article VI.B.1 of the Standard

Contract was made expressly contingent upon the DCS provisions in Article V.B, indicating that, absent a submitted and approved DCS for a given year, a contract holder would lose its priority, or right to SNF acceptance, for that year. Thus, a contract holders' submission of a DCS, and DOE's approval thereof, determined the first year in which DOE was obligated to begin acceptance of the contract holder's SNF and HLW.

Indeed, a contract holder's failure to submit a delivery commitment schedule at least 63 months before its acceptance allocation waives its position in the acceptance queue for that particular allocation period. Absent an approved DCS through which a contract holder commits to delivering a specific amount of SNF to DOE in a given year, there is no basis in the Standard Contract upon which DOE could, or would, be able to accept any SNF from a contract holder in that year. If a contract holder elects not to submit a DCS for a particular year in which DOE had provided it an allocation, the contract holder has waived its rights to acceptance for that allocation period.

The delivery commitment schedule thus defined the amount of SNF and/or HLW that DOE would accept from a contract holder in a given year, and established the first year in which DOE was obligated to begin that acceptance. Further definitization of the timing for SNF and/or HLW acceptance came through the submission, review, and approval of final delivery schedules. Specifically, not less than 12 months before the delivery date "for delivery of SNF and/or HLW covered by an approved [DCS], the contract holder holding that DCS was required to "submit to DOE final delivery schedules . . . ," which DOE would review and either approve or disapprove. 10 C.F.R. § 961.11, Art. V.C. The final delivery schedule required identification of the proposed "delivery first estimate" to further define the specific dates for SNF and HLW acceptance during

the assigned year. As with the DCS submittal and approval process, if the parties could not agree upon the final delivery schedule, the parties were required "promptly [to] seek to negotiate mutually acceptable schedule(s)."[3] Id.

C. Under The "Oldest Fuel First" Allocation System, And Based Upon Energy Northwest's Failure To Submit Any DCSs, DOE Has Not Yet Breached Any Obligation To Accept SNF From Energy Northwest

One of the stated objectives of the Standard Contract was to dispose of SNF in the order that it is discharged from reactors. To achieve that goal, the Standard Contract specifically provided for SNF acceptance priority among contract holders upon an "oldest fuel first" basis. 10 C.F.R. § 961.11, Art. VI.B.1. The Standard Contract provided for the issuance of an acceptance priority ranking, based on the oldest fuel first principle, beginning in April 1991. 10 C.F.R. § 961.11, Art. IV.B.5.a.

In compliance with the NWPA and the language of the Standard Contract, DOE issued the 1991 Acceptance Priority Ranking in December 1991. That APR stated:

> The 1991 APR will be the basis for the annual allocation of waste acceptance capacity to the Purchasers in the 1991 Annual Capacity Report (ACR), to be issued later this year. Purchasers with allocation in the first 10 years following the projected commencement of the Federal waste management facility operations may submit Delivery commitment Schedules (DCS) beginning January 1, 1992. The allocations in the 1991 ACR will be the basis for the DCS submittals.

---

[3]If the parties could not agree upon a delivery commitment schedule that had not been approved by DOE, or a final delivery schedule after negotiation, the Standard Contract's "Disputes" clause would apply. 10 C.F.R. § 961.11, Art. XVI.A. Pursuant to that clause, "any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy to the Purchaser." Id. The contracting officer's decision is final and conclusive unless, within 90 days from the purchaser's date of receipt of the decision, the purchaser appeals in writing to the Department of Energy Board of Contract Appeals. Id.

According to that APR, the first SNF discharge dates recorded were in November 1967. The first SNF discharge recorded for Energy Northwest's facility at Columbia Generating Station ("CGS" formerly Washington Nuclear Power 2) was in April 1986. A. 244 (1991 APR, p. 27). Given CGS's recent vintage, it did not have fuel old enough to be placed into the allocation ranking for acceptance by DOE within the first ten years. In fact, the 1995 Acceptance Priority Ranking ("APR") and Annual Capacity Report ("ACR") shows that, had DOE begun SNF acceptance from the contract holders in 1998, Energy Northwest would not have had any allocation in at least the first ten years of DOE's acceptance of SNF. A. 296 (1995 APR/ACR, Table 2, p. 6). Further, Energy Northwest never submitted any DCSs to DOE to indicate that it had any expectation that DOE was obligated to accept its fuel in January 1998 or at any other time to the present date.

D. DOE Was Not Obligated To Begin SNF Acceptance From Energy Northwest Itself On January 31, 1998

Energy Northwest was not entitled to have DOE begin accepting its SNF by January 31, 1998. As previously explained, any such requirement would completely conflict with the "oldest fuel first" acceptance requirement in the Standard Contract. In Tennessee Valley Authority v. United States, 60 Fed. Cl. 665 (2004), this Court recognized the nature of the Standard Contract and the fact that the January 31, 1998 date identified in the Standard Contract did not mean that every Standard Contract holder would have its SNF accepted by that date:

> It bears noting, however, that TVA was not entitled to have its SNF removed beginning in January 1998. Rather, the earliest that any of TVA's SNF would have been collected by DOE was sixty-three months after TVA's submission of its first proposed DCS. See Standard Contract Art. V.B.1. TVA submitted its first proposed DCS, for the collection of 58.7 MTU from the Sequoyah plant, in April of 1997. Consequently, the earliest scheduled

> pickup of TVA's SNF would have occurred in July 2002, putting aside the possibility of adjusting a final schedule by two months under Article B.2.

Id. at 674. Although the Court limited the application of its Tennessee Valley decision, accepting "only for the purposes of [that] case that the DCS process creates a binding 'benchmark' for addressing breaches of the Standard Contract," id. at 671 n.7, the rationale supporting that decision should apply here.[4]

Further, Energy Northwest never took any action during the course of contract performance that would have allowed DOE to take any of its SNF by January 31, 1998. Had it wanted DOE to begin acceptance of its SNF by that date, it would have had to have submitted a DCS identifying the SNF that it wanted taken and the time period within which it wanted that SNF taken. Yet, it has never submitted a DCS to DOE. DOE could not simply appear at Energy Northwest’s site on January 31, 1998, and "begin" to take some undefined amount of its SNF. Yet, outside the DCS procedures identified in the Standard Contract, there is no other mechanism through which the parties notify each other of the dates upon which DOE will accept specific amounts of SNF from a particular contract holder.

The costs that DOE incurs to prepare to accept SNF from a particular site, including travel and transport, are extensive, and it also takes time for the nuclear utility to prepare to deliver the SNF to DOE. Given that Energy Northwest has never satisfied the only procedure

---

[4] In an unpublished order in Power Authority of the State of New York v. United States, No. 00-703C (Fed. Cl. Sept. 30, 2004), the Court found that the issue implicated by the Government's motion for partial summary judgment upon the rate of SNF acceptance, as well as the plaintiff's cross-motion for summary judgment regarding the rate, "is a fact-laden inquiry that the Court finds does not lend itself to resolution on summary judgment." Order, at 1 (Sept. 30, 2004). Accordingly, the Court in Power Authority denied both parties' motions regarding the rate.

contained in the Standard Contract for obtaining an acceptance and delivery obligation in 1998, Energy Northwest's assertion that DOE breached its contract by not accepting its SNF in 1998 is without basis in fact or law. In interpreting the requirements of a contract, the behavior of the parties before the "advent of controversy" is often more revealing than the contract language alone. Omni Corp. v. United States, 41 Fed. Cl. 585, 591 (1998). "One may not ignore the interpretation and performance of a contract, whether termed 'mistake' or not, before a dispute arises." Alvin Ltd. v. United States Postal Serv., 816 F.2d 1562, 1566 (Fed. Cir. 1987). "A principle of contract interpretation is that the contract must be interpreted in accordance with the parties' understanding as shown by their conduct before the controversy." Julius Goldman's Egg City v. United States, 697 F.2d 1051, 1058 (Fed. Cir. 1983), cert. denied, 464 U.S. 814 (1983).

Energy Northwest's failure to submit any DCS to DOE identifying specific SNF that was to be accepted by DOE demonstrates that Energy Northwest had no expectation that SNF would be accepted in January 1998, or for ten years thereafter.

E. Because DOE Is Not Obligated To Accept Energy Northwest's SNF During the First Ten Years Of SNF Acceptance Under The Standard Contract, Energy Northwest Cannot Identify Any Breach That Runs Directly To Energy Northwest

Pursuant to the 1995 APR/ACR, DOE's obligation to accept Energy Northwest's SNF will not arise until some date after January 2008. Accordingly, Energy Northwest has not yet accrued any right to have DOE accept its SNF under the Standard Contract. Although Energy Northwest could have submitted a DCS to DOE as early as 1992, seeking to have DOE agree to accept its SNF outside of the "oldest fuel first" allocation queue,[5] Energy Northwest never made

[5]We are not suggesting that Energy Northwest's effort would have been successful. For DOE to have agreed to have accepted Energy Northwest's SNF outside of the "oldest fuel first"

any such effort. Accordingly, Energy Northwest could not have suffered any injury as a result of DOE's failure to begin SNF acceptance from the commercial nuclear utility industry by January 31, 1998. Any injury that Energy Northwest incurred would result from DOE's failure to accept Energy Northwest's SNF as identified in Energy Northwest's approved DCSs. However, as explained above, Energy Northwest did not submit any DCSs that required DOE to begin SNF acceptance of Energy Northwest's SNF. Consequently, Energy Northwest has no basis for arguing that DOE's failure to accept SNF on January 31, 1998, caused it to incur damages. Instead, it appears that the first "breach" that might have caused an injury to Energy Northwest would not have occurred until sometime after January 2008, when Energy Northwest's SNF would have been given some allocation rights based upon the age of its SNF.

In its decision in Consumers Energy, the Court determined that "any delay in the start of DOE's SNF acceptance *as of January 31, 1998*, negatively implicated the acceptance dates of every contract holder down the line." Consumers, slip op. at 16 (italics in original). Yet, particularly when the utility in question would not have its first right to seek SNF acceptance under the "oldest fuel first" allocation method for years into the future, any assertion that the utility is automatically harmed by early delays in the acceptance program has no support. Assume that a particular utility would, under the "oldest fuel first" scenario, have its first SNF

---

allocation system required by the Standard Contract, Energy Northwest was required to identify a reason under the "Priority for Shutdown Reactors" or the "Emergency Deliveries" provisions of the Standard Contract for DOE to accept Energy Northwest's SNF earlier than it would under an "oldest fuel first" allocation. 10 C.F.R. § 961.11, Art. VI.B.1.b & VI.B.1.d. We are aware of no basis upon which Energy Northwest could have made such a request. In any event, Energy Northwest never submitted such a request to DOE, leaving Energy Northwest to the allocations that it would receive under the "oldest fuel first" allocation system. Those allocations would have been at some point after January 2008.

acceptance allocation in 2020. Under the literal terms of the Court's rationale, DOE is automatically liable to that utility in 1998. Yet, it is quite possible that, after DOE eventually begins SNF acceptance, it will be able to increase the speed of its SNF acceptance beyond that which it is otherwise obligated to satisfy, enabling it to "catch up" to the place where it should have been had it timely begun SNF acceptance. Under that scenario, there would be no damages to that utility. Further, it is possible that, to minimize damages, DOE might be able to reorder SNF acceptance from some of the contract holders – through agreements or otherwise – to alleviate the most difficult damages situations. Under these circumstances, it is impossible to say now that, between now and 2020, or some other future date, DOE will not be able to eliminate the gap between the "but for" world and the real world. In light of that fact, the utility plaintiff with a first acceptance date of 2020 cannot now legitimately provide proof that it has already been automatically damaged because DOE may not begin accepting its SNF 15 years from now.

F. Even If Energy Northwest Could Recover Future Damages Under A Partial Breach Theory, There Is No Basis Here Upon Which To Determine Future Damages And They Are Too Speculative To Recover

Even if Energy Northwest can somehow prove that it will be damaged by DOE's failure to accept SNF by January 31, 1998, at sometime in the future, its claim is not now properly before this Court. Recovery of future damages for a partial breach of contract is precluded as there is no basis for determining the possible future harm. Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 642 (2004), appeal pending, (Fed. Cir.)(precluding recovery of future damages in partial breach case); Arnone v. Chrysler Corp., 148 N.W.2d 902, 905 (Mich. Ct. App. 1967) (barring recovery of future damages for partial breach or breach of divisible

contract); Kaiser v. Northwest Shopping Ctr., Inc., 587 S.W.2d 454, 457 (Tex. Civ. Ct. 1979) (suggesting that plaintiffs seeking damages for partial breach may recover damages incurred through date of filing pleading); 28 Am. Jur. 2d: Damages § 488 ("[i]f the breach of an entire contract is only partial, the plaintiff can recover only such damages as he or she has sustained, leaving prospective damages to a later suit in the event of further breaches").

Any damages that depend on evidence that future events will occur at a particular time and in a particular manner that will require it to incur particular identified future damages is wholly speculative. It is axiomatic that speculative damages are not compensable. See, e.g., Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562-63 (1931); William Green Constr. Co. v. United States, 477 F.2d 930, 936-37 (Ct. Cl. 1973). As the Court of Claims recognized in H.J. Lewis Oyster Co. v. United States, 107 F. Supp. 570 (Ct. Cl. 1952), where "plaintiff's proof [was] uncertain as to the number of oysters remaining on the bottom, uncertain as to whether the damage from the mud was the same on all lots, and uncertain as to whether the oysters would be removed in the future before death overtook them from natural causes," the Court was required to "reject these claims as requests for speculative damages." Id. at 577.

Here, Energy Northwest's damages will not be incurred until sometime after 2008, because it does not have any acceptance allocations in the first ten years. Any evidence that Energy Northwest may proffer to demonstrate that it will be damaged in the future will be purely speculative or lacking in credibility. Such evidence cannot provide the basis upon which this Court may award damages.

CONCLUSION

For the foregoing reasons, the Court should grant our motion for summary judgment and enter judgment for the United States as a matter of law.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Sharon A. Snyder
SHARON A. SNYDER
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
ATTN: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: 202-616-0347
Fax: 202-307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

June 17, 2005

CERTIFICATE OF FILING

I hereby certify that on June 17, 2005, a copy of the foregoing "DEFENDANT'S RESPONSE TO COURT'S ORDER TO SHOW CAUSE AND MOTION FOR SUMMARY JUDGMENT ON LIABILITY" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Sharon A. Snyder

**(Chief Judge Damich)**
**No. 04-10C**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**APPENDIX TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

**PETER D. KEISLER**
**Assistant Attorney General**

**DAVID M. COHEN**
**Director**

**HAROLD D. LESTER, JR.**
**Assistant Director**

**SHARON A. SNYDER**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D. C. 20530**
**Tele: (202) 616-0347**
**Fax: (202) 307-2503**

**OF COUNSEL:**

**JANE K. TAYLOR**
**Office of General Counsel**
**Department of Energy**
**1000 Independence Ave., S.W.**
**Washington, D.C. 20585**

**June 17, 2005**

**Attorneys for Defendant**