QUESTIONS FROM SENATORS BREAUX AND SIMPSON

Question 4: Please provide the Department's position, including the supporting legal analysis, on the following questions regarding Section 302(a)(5) of the NWPA:

Question 4(a): Does this provision, or the contracts entered into pursuant to this provision, require the Department to have a repository in operation by January 31, 1998? If so, what legal recourse does a party with whom the Department has entered into a contract under this provision have if a repository is not in operation by that date? Is the Department obligated to take title to spent nuclear fuel or high-level radioactive waste in this situation by January 31, 1998?

Answer: It is the Department's intent to begin accepting spent fuel in 1998. With respect to contract obligations, it is the General Counsel's opinion that:

> The threshold question is whether, in view of the definition of "disposal" in Section 2(9) of the NWPA as "emplacement within a repository," this provision in substance requires that a repository have commenced operations by January 31, 1998. */ This question requires examination whether the duty to "dispose" of SNF and/or HLW required to be included in the contracts by Section 302(a)(5)(B) is confined to the statutory term "disposal" specified in Section 2(9) of the NWPA. For the reasons set forth below, we doubt that the terms were intended to have identical meanings, and thus the use of the word "dispose" in Section 302(a)(5)(B) was not intended as a statutory mandate that the first repository begin operations by that date. The first reason for this view

*/ Since the term "repository" is defined as a system used for "permanent deep geological disposal" of spent fuel and the term "storage" is defined as "retention of...spent nuclear fuel...for subsequent disposal," it is doubtful that a storage facility alone could be regarded as a "repository." NWPA Secs. 2(18), 2(25), 42 U.S.C. 10101 (18), (25).

is that this section's immediate companion would have been the logical place within Section 302(a)(5) to address the question when a repository would be required to begin operations. Section 302(a)(5)(A) reads as follows:

"[F]ollowing commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel...."

Had Congress intended in Section 302(a)(5) to specify a date by which a first repository was to begin operations, the logical point at which to express this policy would have been that section's subsection that deals expressly with "commencement of operation of a repository." Instead it refrained from specifying a date certain for commencement of repository operations, but required only that, once a repository has begun operations, the Secretary shall act with expedition to take title to SNF and/or HLW on the request of the generator or owner of such SNF and/or HLW.

A second indication that the Congress did not, through use of the term "dispose" in Section 302 (a)(5)(B), indirectly mandate commencement of first repository operations by 1998 is that that subsection goes on to describe the duty to "dispose" of spent fuel in the manner "as provided in this subtitle." Section 302(a)(5)(B) appears in Title III of the NWPA which title is not structured as to have subtitles. It is clear, however, that inclusion of the words "this subtitle" meant something other than the entirety of the NWPA. It could mean the entirety of Section 302 within which the subsection appears, which describes in detail the Secretary's authority to enter into contracts with generators or owners of SNF and/or HLW, specifies the fees to be paid by owners and generators for the services to be rendered by the Secretary in accepting SNF and/or HLW, requires

annual subsequent review of those fees by the Secretary, conditions Nuclear Regulatory Commission license issuances or renewals for utilization or production facilities on entry into a contract for disposal of spent fuel, and establishes the Nuclear Waste Fund that is to finance the nuclear waste program.

None of these provisions deals even remotely with procedures or the schedules leading to commencement of operation of the first repository. Similarly, if one interprets the use of the words "this subtitle" as having been intended to relate the contract obligation to "dispose" of spent fuel "beginning not later than January 31, 1998" to the entirety of Title III of the NWPA, the only provision remotely germane to the time by which the first repository will begin operations is Section 301, which imposes the requirement to formulate and submit to the Congress the original Mission Plan. If anything, such a construction would suggest that the requirement to contract to "dispose" of spent fuel beginning in 1998 would be fulfilled in the manner specified in the Mission Plan.

Question 4(b): If this provision does not require the Department to have a repository in operation by January 31, 1998, does this provision, or the contracts entered into pursuant to this provision, impose any legal obligation on the Department to do any of the following by January 31, 1998 -- (i) take title to spent nuclear fuel or high-level radioactive waste? (ii) provide some alternative means for storing or disposing of such spent nuclear fuel or high-level radioactive waste? Aside from any legal obligation that the Department might have, has the Department decided as a matter of policy that, beginning January 31, 1998, it intends to -- (i) take title to spent nuclear fuel or high-level radioactive waste? (ii) provide some alternative means for storing or disposing of such spent nuclear fuel or high-level radioactive waste?

Answer: Continuing the General Counsel's opinion:

> As stated in the response to Question 4(a), above, we believe Section 302(a)(5) and the contracts impose a legal obligation on the Secretary after commencement of repository operations to take title to spent fuel promptly on request, but does not foreclose the Secretary from taking title to SNF and/or HLW in advance of commencement of repository operations if that step is necessary and appropriate in fulfilling the terms of the contract by which the program is implemented.

In a September 7, 1984 letter to Senator J. Bennett Johnston, former Secretary Hodel expressed the Department's intention to "... create an obligation for the Department to accept spent fuel in 1998 whether or not a repository is in operation." Consistent with this expressed intention, the Department plans to issue, beginning in July 1987, an Annual Capacity Report for planning purposes. As required by Article IV B(5) of the contract, the report will inform utilities of the amount of spent fuel the Department intends to accept beginning in 1998. This information will become contractually binding upon the Department effective April 1991.

Should delays prevent any DOE facility as defined in Article I 10 of the contract from allowing the Secretary of Energy to begin providing services by January 31, 1998, then Article IX of the contract becomes operative. Under this section,

avoidable delays (within the "reasonable control" of DOE or utility) allow for an equitable adjustment of charges and schedules to reflect additional costs incurred, while unavoidable delays ("beyond the control and without fault or negligence" of DOE or utility) result in no liability and require only a readjustment of schedules to accommodate the delay. The Department has made no policy decisions as to what actions it may pursue should no DOE facility be available and has not explored how and under what conditions the terms of Article IX of the contract may be implemented.

United States Government Department of Energy

# memorandum

DATE: December 20, 1991

REPLY TO ATTN OF: RW-432 --

SUBJECT: ACTION: Approval for Publication of the 1991 Annual Capacity Report

TO: Director, Office of Civilian Radioactive Waste Management, RW-1

Through: Deputy Director, Office of Civilian Radioactive Waste Management, RW-2

Background:

The Standard Contract for the Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) that the Department of Energy has executed with owners or generators of civilian spent nuclear fuel and high-level radioactive provides for annual publication of the Annual Capacity Report (ACR).

The 1990 ACR stated that it would be the last ACR to be issued and would be replaced by the Acceptance Priority Ranking (APR). However, based on discussions with Contract holders and their representatives, the Department elected to continue to publish the ACR. This change in plans was conveyed to Contract holders in a May 15, 1991, letter from the Department's Contracting Officer.

Discussion:

The ACR is required to project both an annual acceptance ranking of Contract holders and the annual receiving capacity of the Federal waste management system (FWMS) for ten years following projected commencement of facility operations. The 1991 APR assigns the highest acceptance priority, on an industry-wide basis, to the owners of the oldest spent nuclear fuel (SNF). The ACR applies a waste acceptance rate to the APR, resulting in individual allocations to the Contract holders of FWMS capacity.

The 1991 ACR assumes that FWMS operations commence in 1998 and the system configuration is that authorized by the Nuclear Waste Policy Amendments Act of 1987, specifically a Monitored Retrievable Storage facility with a 10,000 MTU storage limit prior to repository operations.

The 1991 ACR differs from previously published ACRs for two reasons. First, while the information in the ACR has traditionally been used for planning purposes only, the allocations in the 1991 ACR will also serve as the basis for submission of Delivery Commitment Schedules (DCS) by the Contract holders. These DCSs, which will provide planning information for waste acceptance activities, may be submitted to the Department as early as January 1, 1992.

Second, the 1990 ACR presented lower and upper bounding annual waste acceptance rates and corresponding Contract holder allocations of capacity. Although no annual waste acceptance rate has been baselined, the 1991 ACR uses a single acceptance rate that is very similar to the lower bounding rate in the 1990 ACR. While not stated in the ACR, this rate was selected because it is theoretically sufficient to eliminate, in the aggregate, the need for additional at-reactor, out-of-pool storage starting in 1998.

As in previous years, the 1991 ACR includes an update on the progress of the cooperative interactions between the Department and Contract holders to address issues of mutual concern arising from implementation of the Contract. The ACR is distributed to Contract holders, nuclear industry trade associations and other interested parties. Response to previous ACRs has been generally favorable, although some Contract holders have expressed concern about slippages in the waste acceptance schedule beyond 1998. Consistent with past ACRs, this report states that waste acceptance will begin after commencement of facility operations.

Recommendation:

That you approve the attached 1991 ACR for publication.

Ronald A. Milner
Ronald A. Milner
Associate Director for
Storage and Transportation

Attachment

APPROVED: John N. Bartlett

DISAPPROVED: ____________

DATE: 27 Dec 1991

Department of Energy
Washington, DC 20585

Mr. J. M. Buchheit
Engineer, Fuel Procurement Group
Yankee Atomic Electric Company
580 Main Street
Bolton, MA 01740-8000

Dear Mr. Buchheit:

The Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (10 CFR Part 961) provides that, beginning January 1, 1992, Purchasers shall submit to the Department of Energy (Department) Delivery Commitment Schedules (DCS). The DCS provides the Purchaser with the opportunity to inform the Department of plans regarding its allocation of projected Federal waste acceptance capacity. This information will assist the Department in meeting its contractual waste acceptance responsibilities and in the development of the Federal waste management system (FWMS).

The allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals. An allocation is a specified acceptance capacity (measured in metric tons of uranium) in a particular year for an individual Purchaser. The 1991 Acceptance Priority Ranking has been used as the basis for the allocation of waste acceptance capacity to specific Purchasers in the 1991 ACR. These reports have been recently issued by the Department and sent to all Purchasers. Once a Purchaser has an allocation, any equivalent quantity of spent nuclear fuel (SNF) owned by the Purchaser can be designated for delivery within the limits of that allocation. A Purchaser may submit DCSs for as many of their allocations as they choose, throughout the 10 year period identified in the ACR. The Department requests that the Purchasers submit DCSs for as many allocations as possible to assist in the Department's planning of the FWMS. The enclosed DCS instructions are intended to assist the Purchaser in completing the DCS.

The Standard Contract provides that Purchasers shall submit DCSs to DOE at least 63 months prior to delivery. The Department recognizes that both the Purchaser's and Department's ability to commit to a specific delivery date over 63 months in the future is limited. Therefore, the Department suggests that the Purchasers designate only the year of delivery on the DCS. The actual date of delivery will be proposed by the Purchasers in their Final Delivery Schedule submittal. Two entries were added to the DCS form, identification number and contact person, to allow the Department to communicate more effectively with the Purchaser concerning their DCS submittal.

After a DCS has been approved, Purchasers may either use the DCS as the reference document for submittal of the Final Delivery Schedule, which is required 12 months prior to delivery, or use the DCS as the basis for exchanges with other Purchasers. Specific guidelines for submission of exchange requests are under development, but will not have an impact on the submission of DCSs for approval.

HQ0002153

The enclosed DCS form will be submitted to the Office of Management and Budget (OMB) for approval shortly. The Department will transmit to the Purchasers the OMB approved DCS form as soon as possible..

If you have any questions concerning these instructions, please contact Nick Graham of my staff on (202) 586-9634 or Alan Brownstein of the Department's Office of Civilian Radioactive Waste Management on (202) 586-4973.

M. Detmer
Contracting Officer
Office of Placement and
Administration

Enclosure

# U. S. DEPARTMENT OF ENERGY

## INSTRUCTIONS FOR COMPLETING THE APPENDIX C DELIVERY COMMITMENT SCHEDULE

### GENERAL INSTRUCTIONS

1. PURPOSE AND USE OF DATA
The _Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste_ (10 CFR Part 961) states that, beginning January 1, 1992, Purchasers may begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter. The DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity. This information will assist DOE in meeting its contractual waste acceptance responsibilities and in developing the FWMS.

2. WHO SHOULD SUBMIT
The DCS should be submitted by all Purchasers with allocations in the 1991 Annual Capacity Report (ACR) (or subsequent ACRs, as appropriate) as specified in Article V.B. of the _Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste_.

3. WHEN TO SUBMIT
Beginning January 1, 1992, Purchasers shall submit DCSs at least 63 months prior to requested delivery. At this time, DOE suggests that the Purchasers designate only the appropriate delivery year (calendar year), recognizing that both the Purchaser's and the Department's ability to commit to a specific date over 63 months in the future is limited. For each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992).

4. WHERE TO SUBMIT
Purchasers shall forward the completed DCS and one copy to:

U.S. Department of Energy
DOE Contracting Officer
Office of Placement and Administration
PR-322.1
1000 Independence Avenue, S.W.
Washington, DC 20585

cc: U.S. Department of Energy
Chief, Logistics and Utility Interface Branch
Office of Civilian Radioactive Waste Management
RW-432
1000 Independence Avenue, S.W.
Washington, DC 20585

5. AUTHORITY

Data on the DCS are collected under the authority of the Nuclear Waste Policy Act of 1982, as amended, (42 U.S.C. 10101 et seq.) and Article V.B of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste.

6. PROVISIONS REGARDING CONFIDENTIALITY OF INFORMATION

Data being collected on the DCS are not considered to be confidential.

7. BACKGROUND INFORMATION

(a) The 1991 Acceptance Priority Ranking (APR) established the order in which FWMS acceptance capacity is allocated in the 1991 ACR. As required by the Standard Contract, the priority ranking is based on the date the SNF was permanently discharged, with the owners of the oldest SNF, on an industry-wide basis, given the highest priority. The 1991 ACR applied a 10 year projected waste acceptance rate to the 1991 APR for planning purposes, resulting in individual Purchaser allocations. The Purchasers' allocations for each delivery year (for a 10 year period) are presented in the 1991 ACR and are the basis for Purchasers submitting DCSs to DOE for approval. Due to the limited annual acceptance capacity of the FWMS, only DCSs submitted by Purchasers with an allocation in the delivery year will be considered for approval (e.g., in order for a Purchaser to have a DCS considered for approval for delivery in 1998, the Purchaser must have an allocation in 1998.)

(b) Once a Purchaser has an allocation, any SNF owned by the Purchaser can be designated for delivery against that allocation. The DCS does not restrict the Purchaser to deliver the specified SNF that was the basis for the allocation (see also Item 7.(h)).

(c) The annual acceptance rates in the 1991 ACR provide an approximation of the FWMS acceptance capacity and are for planning purposes. The process described herein assumes that the FWMS will be able to accept the Purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the 1991 ACR. In the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the Purchasers.

(d) Over the 10 year period for which the 1991 ACR allocated FWMS acceptance capacity, Purchasers may qualify for a specific number of allocations (from 0 through 10). Beginning in January 1992, Purchasers may submit DCSs for any or all of their allocations, up through year 10. Early submission of DCSs will facilitate the exchange of approved DCSs between Purchasers, as allowed by Article V.E. of the Standard Contract.

(e) The actual number of DCSs submitted by a Purchaser will vary according to the number of allocations they have in the ACR and the number of DCSs they choose to submit for each allocation. A DCS should be submitted for only one designated delivery site, only one fuel type (BWR, PWR, or Other) and only one delivery

year. Therefore, if a Purchaser splits an allocation between two or more delivery sites or between fuel types, more than one DCS will be required. There is no limit to the number of DCSs that can be submitted for each allocation, as long as the total metric tons of uranium (MTU) requested does not exceed the Purchaser's total MTU allocation for that year.

(f) Unless specifically requested otherwise, DOE will evaluate all DCSs submitted against a single allocation period independently. If a Purchaser prefers all DCSs submitted against a single allocation year to be considered as one package, this should be communicated to DOE at the time of submission. When evaluating the DCSs as a package, if one DCS is disapproved then all DCSs for that period will be disapproved and returned to the Purchaser for resubmittal.

(g) Waste acceptance capacity allocated to Purchasers is expressed in terms of MTU. The MTU allocation does not necessarily limit the number of assemblies that can be delivered. The DCS is designed to cover a given quantity of SNF as measured in MTU, not assemblies. DOE realizes that the number of assemblies associated with an allocation will vary according to the actual SNF designated for delivery. The appropriate entry for the blank on the DCS labeled "Number of Assemblies" is discussed in more detail below in the Specific Instructions For Completion of DCS.

(h) Since the DCS does not require the identification of the specific fuel to be delivered, each DCS is assumed to be for Standard Fuel, Class S1 or Class S2, as defined in Appendix E of the Standard Contract. An approved DCS should not be interpreted as a commitment by DOE to accept other than standard fuel. The Contract makes specific provisions for delivery of other than standard fuel. If a Purchaser intends to deliver other than standard fuel, the Purchaser must submit proposed handling/shipping procedures to DOE for evaluation and confirmation as to the technical feasibility of accepting the delivery on the schedule in the approved DCS. Submittal of these proposed handling/shipping procedures is not required until after the DCS has been approved. If the acceptance of other than standard fuel cannot be accommodated, the Purchaser has the option to deliver standard fuel on the schedule in the approved DCS or exchange the approved DCS with another Purchaser, provided contractual time limitations can be met.

8. DCS PROCESS

Upon receipt by DOE, each DCS will be date stamped. DOE shall approve or disapprove the DCS within 3 months of receipt. Such approval will be confirmed by signatures of the DOE Contracting Officer and DOE Technical Representative on the DCS returned to the Purchaser. If the DCS is incomplete or if the DCS does not reflect delivery rights available to the Purchaser, the DCS will be disapproved and returned to the

Purchaser. The Purchaser will then have 30 days to resubmit the revised DCS. DOE shall approve or disapprove the revised DCS within 60 days of receipt. If the revised DCS is disapproved, DOE will submit to the Purchaser reasons for such disapproval, and proposed alternative DCS(s) for their consideration. If this DOE-proposed alternative DCS is not acceptable to the Purchaser, both parties shall promptly seek to negotiate acceptable schedule(s).

9. QUESTIONS ON THE DCS

If you have any questions or require more information for completing the DCS, please contact Mr. Alan Brownstein at (202) 586-4973, or Mr. Nick Graham at (202) 586-9634. Please direct all correspondence to DOE Contracting Officer, Office of Placement and Administration, PR-322.1, 1000 Independence Avenue, S.W., Washington, D.C., 20585.

# SPECIFIC INSTRUCTIONS FOR COMPLETION OF DCS

The following are specific instructions for completing the DCS. Each indicated entry of the DCS should be filled in with the information as described below. Requests for information which have been determined to not be currently needed by DOE have been prefilled with "Not Required" in the attached DCS.

1.1 **DCS IDENTIFICATION NUMBER:** A 12-digit unique identification number having the form YY-RRID-NNNN-SS, where

- YY = the last two digits of the Proposed Delivery Year
- RRID = RW-859 reactor identification number of the designated delivery site
- NNNN = the last four digits of the contract number associated with the SNF being designated for delivery, and
- SS = a two digit sequential code to uniquely identify the DCS within this Purchaser's annual allocation.

As an example, suppose Electric Power Company (Contract Number DE-CR01-83NE12345) submits a DCS to deliver SNF from Unit I (RW-859 ID Number 8801) in the year 1999. Assume that this is the third DCS that Electric Power Company plans to submit under this allocation. The unique identifier for this DCS would be 99-8801-2345-03. Type the number on the top right-hand corner of the DCS. If the Purchaser elects not to insert an identifying number, one will be assigned by DOE upon receipt of the DCS.

1.2 **CONTACT PERSON:** Enter the name and telephone number of the person the Department should contact if there are questions concerning the DCS.

1.3 **CONTRACT NUMBER:** Enter the number of the Contract under which the disposal fees were paid for the SNF designated on this DCS. For Purchasers with multiple Contracts, the entry relates to the Contract number associated with the SNF designated for delivery and may differ from the Contract number of the SNF which qualified the Purchaser for the allocation or the Contract number associated with the designated delivery site.

1.4 **REACTOR/FACILITY INFORMATION:** Enter the name of the designated delivery site where the SNF will be delivered to DOE. The facility may differ from the facility that generated the SNF that qualified the Purchaser for the allocation. Enter the street address (not mailing address) of the designated delivery site.

2.1 **TYPE OF CASK REQUIRED:** Indicate (in tons) the maximum loaded cask lifting weight (weight on the hook including lifting equipment and water in the cask) that you intend to use at the delivery location indicated in Item 1.4. If you plan to upgrade the cask handling capacity at this facility prior to shipment, this upgrade should be reflected in the maximum lifting weight. This information is to be used by DOE for

planning purposes and does not imply any commitment by DOE or the Purchaser. The identification of the specific cask will be determined during the Final Delivery Schedule (FDS) process.

2.2 SHIPPING LOT NUMBER: ("Not Required" has been entered.) A shipping lot is a specified quantity of SNF designated for delivery on a specific date. Since a DCS should not identify a specific date for delivery, assignment of a shipping lot number would be premature at this time.

2.3 PROPOSED SHIPPING MODE: Check the appropriate box for: (a) Truck, (b) Rail or (c) Barge, indicating your proposed shipping mode. Purchasers should indicate the mode of carriage that the cask identified in Item 2.1 will be delivered to DOE at the Purchaser's gate, f.o.b. carrier. An entry of "Truck" will indicate to DOE that the Purchaser proposes to deliver the cask on a truck trailer, an entry of "Rail" will indicate delivery on a rail car, and an entry of "Barge" will indicate that the Purchaser proposes to deliver the cask to a barge. Selection of shipping mode is independent of cask type and only indicates the carrier mode. Final selection of the shipping mode will be determined during the FDS process. If a Purchaser intends to upgrade a facility from truck to rail access, "Rail" should be indicated on the DCS. Similarly, if a facility has either rail or barge access but the Purchaser plans to deliver by truck, "Truck" should be indicated on the DCS.

2.4 PROPOSED DELIVERY DATE: Enter the appropriate delivery date (year) for the SNF to be delivered in accordance with your allocation (listed in the ACR). The actual date will be determined during the FDS process.

2.5 DOE ASSIGNED DELIVERY COMMITMENT DATE: This entry will be completed by DOE.

2.6 RANGE OF DISCHARGE DATES (Earliest to Latest): Enter the range of discharge dates from which the SNF will be selected for delivery. Purchasers are encouraged to be as specific as possible. For example, the Purchaser may know that there is certain SNF that they prefer not to deliver under this DCS (e.g., SNF in dry storage) and exclude that SNF from the range of discharge dates. A Purchaser may include other than standard SNF in the range of discharge dates, although confirmation of the technical feasibility of delivery of the other than standard SNF on the agreed to schedule will be required prior to submittal of an FDS. Canistered nonfuel waste should not be included in this entry at this time.

2.7 METRIC TONS OF URANIUM (Initial): Enter the MTU for this proposed delivery. If several DCSs are submitted for one allocation period, the total quantity of SNF designated for delivery must not exceed the allocation in the ACR; exceeding the allocation will result in disapproval of the DCS(s).

(Discharged) "Not Required" has been entered. The Contract makes provisions for allocation only on the basis of Initial MTU content.