This Page Intentionally Left Blank

This Page Intentionally Left Blank

This Page Intentionally Left Blank

This Page Intentionally Left Blank

This Page Intentionally Left Blank

This Page Intentionally Left Blank

This Page Intentionally Left Blank

DOE/RW-0005
Volume 1 of 3 Volumes

# Mission Plan for the Civilian Radioactive Waste Management Program

## Volume I

Part I Overview and Current Program Plans
Part II Information Required by the Nuclear Waste Policy Act of 1982

June 1985

U.S. Department of Energy
Office of Civilian Radioactive Waste Management
Washington, D.C. 20585

**Department of Energy**
Washington, DC 20585

TO: Members of Congress and Other Recipients

SUBJECT: Submittal of the Mission Plan as Required by the Nuclear Waste Policy Act of 1982

I am pleased to submit the Mission Plan for the Civilian Radioactive Waste Management Program as required by the Nuclear Waste Policy Act of 1982. I consider that this Plan meets the directive to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this Act." This document presents our best estimate at the present time of the objectives and the strategy of the Civilian Radioactive Waste Management Program and of the facilities, institutional activities, management approach and information needed to implement the program.

In accordance with the requirements of the Act, the Department of Energy (DOE) submitted a draft of this Mission Plan for comment to the States, affected Indian tribes, the Nuclear Regulatory Commission, other Government agencies, and the public. Approximately 2500 individual comments were received from 102 respondents. In addition to expanding the discussions of various topics in the Mission Plan as suggested in the comments and making changes where appropriate, detailed responses were prepared to address all of the issues raised in the comments. These responses are presented in Volume II of this set of three volumes. Volume III reproduces all of the comments received on the draft Mission Plan.

I believe we have addressed fairly and responsibly all of the comments. We appreciate everyone's interest and involvement as we continue to implement this important national program.

During the conduct of this program, I pledge the best efforts of DOE's Office of Civilian Radioactive Waste Management to observe the following operating principles: to safeguard the public trust; to be open and responsive; to cooperate and act in an evenhanded manner; and to strive for technical excellence, management excellence, and cost effectiveness. With these principles in mind and with the cooperation of all interested parties, I am confident the program will succeed.

Ben C. Rusche

Ben C. Rusche, Director
Office of Civilian Radioactive
Waste Management

# Chapter 1

## INTRODUCTION

The United States has no facilities for the permanent disposal of the highly radioactive waste generated during the production of electricity in nuclear power plants and during the production of nuclear materials for national defense. As more commercial nuclear power plants have come on line in recent years, the rate at which the resulting highly radioactive wastes have been accumulating has been increasing.

Although nuclear activities produce small volumes of wastes in comparison with other activities that generate hazardous wastes, nuclear wastes have the unique characteristic of being radioactive, and therefore they require special handling and storage. While such wastes have been safely stored for decades with no discernible adverse effects on the health and safety of the public, they will remain radioactive for thousands of years. The Federal Government has established the principle that the management of these wastes is the responsibility of the present generation and should not be left for future generations. Recognizing that a national problem has been created by the accumulation of radioactive wastes and that a safe and environmentally acceptable method of permanent disposal is needed, the Congress enacted the Nuclear Waste Policy Act of 1982, which, among other provisions, established the Office of Civilian Radioactive Waste Management in the U.S. Department of Energy (DOE). This document describes the plan the DOE is pursuing to comply with the mandate of the Congress to achieve a solution to this problem.

The DOE recognizes the difficult technical and institutional challenges that must be overcome during the course of this program. The technical challenge is great because the isolation of these wastes involves long time periods not often considered in other human endeavors. The institutional challenge is complex because a small number of States (and possibly affected Indian tribes) will be asked to host, for the good of the Nation, permanent waste-disposal facilities. And radioactive-waste shipments will traverse many States whether or not the wastes originated in those States.

The DOE pledges to work diligently in full compliance with the law, and with the full involvement and participation of affected parties, to achieve a solution to this national problem. Those involved in the program are dedicated to making technically sound decisions and to working with affected parties to identify potential negative impacts and to avoid, mitigate, or compensate for such impacts.

### 1.1 BACKGROUND

In 1984, domestic nuclear power plants generated more than 13 percent of the electricity produced in the United States. Nuclear power has surpassed hydroelectric power to become the second leading energy source for electricity generation in the United States after coal.

tors of high-level waste and spent fuel) and, accordingly, creating in the Treasury of the United States a special Nuclear Waste Fund to be composed of the payments made by those using the services (Section 302).

2. Committing the Federal Government to study monitored retrievable storage in parallel with geologic repositories (Section 141).

3. Providing for a federally owned and operated system of interim-storage facilities for no more than 1900 MTU of spent fuel from civilian reactors whose owners cannot reasonably provide adequate storage capacity at the reactor site (Section 131) and creating an Interim Storage Fund to make certain that those using the services will pay the full costs (Section 136).

4. Setting out an extensive system of checks and balances through public involvement, along with written consultation-and-cooperation (C&C) agreements, to ensure Federal accountability to, and communication with, States and affected Indian tribes (Section 117).

## 1.3 POLICY GOALS AND PROGRAM OBJECTIVES

Unprecedented technical and institutional challenges require resolution before the intent and the letter of the Act are achieved. First, the public must be convinced that the interests of the Nation are best served by consolidating the radioactive waste dispersed throughout the country in a limited number of geologic repositories designed for permanent disposal. The national interest must take precedence over parochial concerns. Next, the DOE must be able to achieve the tasks set forth in an unusually precise and complex schedule and to persuade the citizens of the country that the waste disposal program will be safe, efficient, and on schedule. Furthermore, the conflicting and competing interests that are mirrored by the tension between program schedule and technical certitude must be resolved. Finally, the DOE must grapple with the contentious issues that often accompany a task as complex and enduring as its waste-management program while never wavering from its commitment to build and operate the required disposal facilities.

The following policy goals guide the formulation and the implementation of the DOE's program:

1. The protection of public health and safety and environmental acceptability are of paramount importance.

2. The program must be credible to the public by virtue of its integrity and technical excellence.

3. The program must neither subsidize nor penalize nuclear power as an energy source.

4. The program must be conducted in a cost-effective manner, with full cost recovery.

2. The acceptance of waste for disposal beginning not later than January 31, 1998.

3. Safe transportation of wastes to the repository.

4. Protection of the health and safety of the public and environmental acceptability.

5. The provision of limited interim storage for utilities determined by the Nuclear Regulatory Commission to require such storage.

6. Encouragement to waste generators to effectively use existing storage facilities for the safe storage of the waste at the reactor site until the waste is accepted for disposal.

7. Full and open public participation.

8. Full cost recovery, with the costs borne equitably by the waste generators.

## 2.3 THE IMPROVED-PERFORMANCE PLAN

The improved-performance plan (see Figure 2-2) reflects the opportunities built into the Act to evaluate options for enhancing the authorized plan in meeting the requirements of the Act. Careful analyses of the provisions of the Act and of programmatic options have shown that increased confidence and improved performance can be achieved by emphasizing systems integration--that is, by considering all of the elements of the program as part of a single system, optimized as a unit to best meet the program requirements.

This concept of optimizing the system by integrating all the facilities and components applies not only to the authorized plan but also to any other waste-management system that could be developed to meet the requirements of the Act. In particular, the Act requires the DOE to complete a detailed study of the need for, and the feasibility of, monitored retrievable storage (MRS) and submit a proposal to Congress for the construction of one or more MRS facilities. Analyses to date continue to reinforce the tentative conclusion that an MRS facility fully integrated into the overall waste-management system can significantly enhance several important program objectives. The improvements include the following:

1. Improved transportation efficiency because spent-fuel consolidation and packaging at the MRS facility would reduce the number of shipments to the repository with concomitant reductions in potential environmental impacts and risks to the public.

2. Increased reliability and flexibility in operating the system in an integrated cost-effective manner by incorporating an additional facility that can regulate the flow of waste to the repository.




Figure 2-2. Improved-performance system with integral MRS facility.

3. Improved confidence in the DOE's ability to meet schedules, particularly in beginning to accept quantities of waste no later than January 31, 1998. The integral MRS facility would be scheduled for initial operation as early as 1996.

4. Ability to accept significantly larger quantities of waste in the early years of operation, substantially reducing the added cost of providing increased at-reactor storage capabilities.

5. Ability to focus repository licensing efforts on demonstrating the long-term isolation capability of the site because many of the operational functions (i.e., waste preparation) would be handled at the MRS facility.

The studies and analyses necessary to fully describe the MRS facility and to define its potential costs and benefits are being prepared. The final results will be presented in a proposal to be submitted for Congressional consideration, as required by the Act. Should the Congress authorize the construction of an integrated MRS facility, the improved-performance plan will become the reference program plan, and the integrated system described in this document will be the reference waste-management system.

## 2.4 CONTINGENCY PLANS

The preceding sections outline the strategy of the DOE's waste-management program. However, all those involved in, and concerned about, these activities recognize that this program is highly controversial; involved in it are a number of important constituencies with widely varying views of how, when, and whether elements of the program should be carried out. The Act is a remarkable piece of legislation in that there is general agreement on its key provisions: the timely development of a geologic repository for the permanent disposal of spent fuel and high-level waste is in the national interest, and the Act provides sufficient authority to get the job done. The Act further anticipated potential conflicts between the various constituencies and provided a means for resolving ultimate disputes, such as the one that could arise between a chosen host State and the Federal Government. Nevertheless, a program intended to span more than a century, with some choices by Congress, States, affected Indian tribes, and the nuclear power industry yet to be made, requires that contingency plans be considered.

The number and the detail of the options that could be considered are potentially great. But the Act and the accomplishments of the program to date provide increasing confidence in the DOE's ability to follow its strategy. Therefore, the contingencies identified below and shown in Figure 2-3 are limited to major areas of uncertainty and will be more fully defined as the evolving situation requires.

The Act specifies a schedule and a process for the siting of repositories. It gives the affected State and any affected Indian tribe on whose reservation a repository would be located the right to file a notice of disapproval after a repository site has been recommended to Congress, and this notice can be overridden only by a joint resolution of Congress. Should a notice of disapproval be made and not overturned, the President is required to recommend another site for the first repository within one year, with the same approval provisions to apply. Thus, the first repository could become operational on time, it could be substantially delayed, or successive notices of disapproval not overridden by Congress could prevent its construction.

The baseline program assumption, of course, is that the repository is built on schedule. Should the repository be substantially delayed, one of two contingency approaches would be pursued. If the MRS facility is authorized by Congress and constructed, it can begin to accept spent fuel in a timely manner and package and store it (up to the authorized storage-capacity limit) until a repository becomes operational. If the MRS facility is not authorized, or if it is significantly delayed, increasing quantities of spent fuel will have to be stored at reactor sites. In that event, the pools for storing the fuel will continue to be filled, and additional onsite storage capacity through the use of dry storage in casks or similar technologies will have to be employed.

If site characterization shows that none of the candidate sites for the first repository are suitable or should successive notices of disapproval be made and upheld, the DOE has two main contingency plans. If an MRS facility has been authorized and constructed, it can accept spent fuel on or ahead of schedule, packaging and storing it (up to the authorized storage-capacity limit) until the "second" repository is authorized (which, of course, would




Figure 2-3. Contingency plans.

then become the first repository) and becomes operational. If an MRS facility has not been authorized, spent fuel will continue to be stored at reactor sites in spent-fuel pools and possibly in dry storage.

Should no repository be constructed and an MRS facility not be authorized, utilities would continue to be responsible for storing the spent fuel at reactor sites. In this event, the Nation would return to the situation where it had no viable, assured method for the permanent disposal of spent fuel and high-level waste. It should be added that a number of other methods of disposal have been proposed and evaluated in the past. In accordance with the Act, research and development continues on some techniques (e.g., subseabed disposal), and, should future progress demonstrate their practicality, they would be considered in program decisionmaking.