**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# PLAINTIFF'S RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE AND MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

NORMAN M. HIRSCH
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

*Attorneys for Plaintiff*

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
LISA M. EDDINGTON
CHRISTOPHER TOMPKINS
NADA DJORDJEVIC
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
601 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 639-6000

August 11, 2005

## Table Of Contents


Table Of Contents .......... ii

Table Of Contents To Appendix .......... iv

Table Of Authorities .......... xiv

Introduction .......... 1

Statement Of Issues .......... 3

Statement Of Facts .......... 4

A. Energy Northwest's Operations. .......... 4

B. Energy Northwest's Standard Contract And DOE's Obligations. .......... 5

C. Energy Northwest's Actual Out-Of-Pocket Damages Caused By DOE's Breach. .......... 7

Argument .......... 9

I. The Court Should Enter A Finding Of Liability In Favor Of Energy Northwest Because The Government Cannot Distinguish This Case From The *Consumers Energy* Opinion. .......... 9

A. The Adjudicated Facts, And Your Honor's Opinion In *Consumers Energy*, Require Liability In Favor Of Energy Northwest. .......... 10

B. The Government's Arguments Fail To Distinguish *Consumers Energy*. .......... 14

1. The Government Cannot Distinguish This Court's *Consumers Energy* Holding That DOE's Adjudicated Breach Negatively Affected "The Acceptance Dates Of Every Contract Holder Down The Line," Including Energy Northwest. .......... 15

2. The Government's Focus On The Date Of Actual First Pick-Up From Energy Northwest Is Misplaced Because Energy Northwest Incurred Actual, Compensable Damages Caused By DOE's Program-Wide Breach. .......... 17

II. The Court Should Deny The Government's Motion For Summary Judgment. ..... 21

A. The Government's Motion Is Defective On Its Face Because It Does Not, And Cannot, Show That There Is No Genuine Dispute Of Fact That Energy Northwest Has No Compensable Damages. ..... 21

B. Independently, The Government's Theories Based On The ACRs and DCS Process Have Been Rejected By Every Court To Consider Them. ..... 22

1. The ACR And The DCS Process Do Not "Define" DOE's Contract Obligations Or Bind Either Party. ..... 25

2. Alternatively, Even If The ACR Or DCS Had Some Binding Significance, DOE's Conduct Violated The Duty Of Good Faith And Fair Dealing And Would Render The Contract Illusory ..... 28

C. Independently, As Your Honor Has Ruled, Summary Judgment Is Improper Because The Overall Acceptance Rate On Which The Government's Motion Relies Is, At A Minimum, A Disputed Issue Of Fact. ..... 34

Conclusion ..... 40

## Table Of Contents To Appendix

**Volume I of V**

Statutory Materials

Nuclear Waste Policy Act of 1982 (42 U.S.C. §§ 10101-10270) .....1

Selected Provisions of the Nuclear Waste Policy Act as They Appeared Prior to Amendment in 1987 (42 U.S.C. §§ 10101-10193) .....58

42 U.S.C. § 7133 .....78

Legislative History of the Nuclear Waste Policy Act of 1982

Statement of President Jimmy Carter on Nuclear Power Policy (13 Weekly Comp. Pres. Doc. 502)(April 7, 1977) .....81

Excerpts from H.R. Rep. No. 97-491 (1982) .....87

Excerpts from the Congressional Record (Apr. 28, 1982) .....128

Excerpts from the Congressional Record (Apr. 29, 1982) .....133

Excerpts from H.R. Rep. No. 97-785 (1982) .....135

Excerpts from the Congressional Record (Sep. 30, 1982) .....187

Excerpts from the Congressional Record (Nov. 29, 1982) .....205

Legislative History of the Nuclear Waste Policy Act Amendments Act of 1987

Excerpts from S. Hearing. Rpt. No. 100-230, pt. 2 (1987) .....214

Excerpts from S. Rep. No. 100-152 (1987) .....223

Excerpts from H.R. Rep. No. 100-425, pt. 1 (1987) .....260

Energy Northwest's Standard Contract

Contract for the Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste Contract No. DE-CR01-83NE44424 .....291

**Volume II of V**

Declarations

Larkin, David L. ....................................................................................................354

Supko, Eileen M. ....................................................................................................361

Deposition Transcript Excerpts and Trial Testimony Excerpts

Barrett, Lake
April 22, 2002 ....................................................................................................392
April 23, 2002 ....................................................................................................409
April 26, 2002 ....................................................................................................422
May 8, 2002 ....................................................................................................443
May 10, 2002 ....................................................................................................458
May 14, 2002 ....................................................................................................472

Brownstein, Alan
April 9, 2002 ....................................................................................................477
April 10, 2002 ....................................................................................................496
April 11, 2002 ....................................................................................................511
June 14, 2002 ....................................................................................................519

Cole, Billy M.
March 12, 2002 ....................................................................................................527
March 13, 2002 ....................................................................................................552
June 4, 2002 ....................................................................................................559

Klein, Susan
April 24, 2002 ....................................................................................................563
April 25, 2002 ....................................................................................................584

Kouts, Christopher
January 30, 2004 ....................................................................................................593
February 19, 2004 ....................................................................................................602
April 11, 2005 ....................................................................................................606
July 12, 2005 (in the *Tennessee Valley Authority v. United States* trial) ........................619

Lawrence, Michael J.
May 20, 2002 ....................................................................................................631
May 21, 2002 ....................................................................................................663

McDuffie, Patrick
March 18, 2002 ....................................................................................................674

Milner, Ronald A.
May 1, 2002 .....689
May 2, 2002 .....700
May 3, 2002 .....715
May 7, 2002 .....727
August 11, 2004 (in the *Yankee Atomic Electric v. United States* trial) .....736

Morgan, Robert L.
March 21, 2002 .....740
March 22, 2002 .....763
June 25, 2002 .....772

Pollog, Thomas E.
February 19, 2002 .....777
April 11, 2002 .....793
April 12, 2002 .....802
August 4, 2004 (*in the Yankee Atomic Electric v. United States* trial) .....809
July 12, 2005 (in the *Tennessee Valley Authority v. United States* trial) .....816

Rosselli, Robert M.
April 15, 2002 .....821

Rusche, Benjamin
May 16, 2002 .....863
May 17, 2002 .....874

Slater-Thompson, Nancy H.
April 21, 1999 .....883
April 22, 1999 .....889
June 13, 2002 .....893

Trebules, Victor W.
April 17, 2002 .....902
April 18, 2002 .....919

Vance, Scott
August 30, 2004 (in the *Yankee Atomic Electric v. United States* trial) .....924

Zabransky, David K.
April 17, 2002 .....927
April 18, 2002 .....947
April 19, 2002 .....965
June 6, 2002 .....971
August 5, 2004 (in the *Yankee Atomic Electric v. United States* trial) .....976
July 12, 2005 (in the *Tennessee Valley Authority v. United States* trial) .....979

**Volume III of V**

Other Documents In Chronological Order

Excerpts from EEI's Unsolicited Comments on Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (Jan. 25, 1983) .................... 984

Memorandum from Robert Morgan, Project Director, NWPA Project Office, to NWPA Project Office Personnel (Jan. 28, 1983) .................... 988

Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste, 48 Fed. Reg. 5458 (Feb. 4, 1983) .................... 990

Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste, 48 Fed. Reg. 16590 (Apr. 18, 1983) .................... 1005

Letter from John J. Kearney, Senior Vice President, Edison Electric Institute, to Robert Morgan, Project Director, NWPA Project Office (May 20, 1983) .................... 1025

Letter from Robert Morgan, Director, NWPA Project Office, to John J. Kearney (June 17, 1983) .................... 1028

Excerpts from Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste by U.S. Department of Energy (July 1983) .................... 1029

Memorandum from Richard H. Williamson, NWPA Project Office, to Robert Morgan, Director, NWPA Project Office, et al. (Sept. 15, 1983) .................... 1045

Remarks by Robert L. Morgan, Acting Director, Office of Civilian Radioactive Waste Management, U.S. Department of Energy before the International Atomic Energy Agency, Vienna, Austria (Oct. 12, 1983) .................... 1052

FY 1984 Program Guidance for Nuclear Waste Fund (NWF) Evaluations (Dec. 2, 1983) .................... 1061

Excerpts from Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting: Program Overview (Dec. 12-15, 1983) .................... 1072

Excerpts from Draft Civilian Radioactive Waste Management Program Mission Plan, Volume I, Overview and Current Program Plans (Dec. 20, 1983) .................... 1075

Letter from Robert L. Morgan, Activity Director, OCRWM, to Russell Stanford, Program Manager, Utility Nuclear Waste Management Group (Dec. 20, 1983) .................... 1096

Memorandum from J. F. Fletcher, Battelle/Pacific Northwest Laboratories, to R. J. Hall, Battelle/Pacific Northwest Laboratories (Jan. 24, 1984) .......................... 1098

Statement of Michael J. Lawrence, Activity Director, OCRWM, Before the Subcommittee on Energy Conservation and Power, House Committee on Energy and Commerce (Feb. 22, 1984) .................. 1099

Excerpts from Draft Mission Plan for the Civilian Radioactive Waste Management Program (Apr. 1984) .................. 1139

Excerpts from Final Draft of Preliminary Analysis of the Total System Life Cycle Cost of the Commercial High-Level Radioactive Waste Disposal Program (Apr. 27, 1984) .................. 1162

Letter from Theodore J. Garrish, General Counsel, U.S. Department of Energy, to the Honorable J. Bennett Johnson, U.S. Senator (May 30, 1984) .................. 1186

Article by Matt Yancey, *Nuclear Wastes*, Associated Press (June 13, 1984) .................. 1188

Article by Cass Petersen and Pete Early, *Waste-Disposal Advances*, WASH. POST (June 15, 1984) .................. 1189

Nuclear Waste Fund Fee Adequacy: An Assessment (July 1984) .................. 1190

Letter from Michael J. Lawrence, Director, U.S. Department of Energy, Richland Operations, to Ben C. Rusche, Director, Office of Civilian Radioactive Waste Management (July 23, 1984) .................. 1199

Letter from Donald Paul Hodel, Secretary of Energy, to the Honorable J. Bennett Johnston, U.S. Senator (Sept. 7, 1984) .................. 1203

Excerpts from Nuclear Waste Fund Fee Adequacy: An Assessment (Feb. 1985) .................. 1205

Excerpts from Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program (Apr. 1985) .................. 1218

Excerpts from The Need for and Feasibility of Monitored Retrievable Storage – A Preliminary Analysis (Apr. 1985) .................. 1242

Excerpts from Mission Plan for the Civilian Radioactive Waste Management Program, Volume I (June 1985) .................. 1250

Excerpts from Nuclear Waste Fund Fee Adequacy: An Assessment (Mar. 1986) .................. 1296

Excerpts from Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program, Volume I: The Analysis and Its Results (Apr. 1986)....1313

Excerpts from Draft Mission Plan Amendment (Jan. 1987)....1345

Excerpts from Monitored Retrievable Storage Submission to Congress, Volume I: The Proposal (Mar. 1987)....1365

Letter from John J. Kearney, Senior Vice President, Edison Electric Institute, to Ben C. Rusche, Director, OCRWM (Apr. 3, 1987)....1379

Letter from Steven P. Kraft, Director, Utility Nuclear Waste Management Group, to Christopher T. Jedrey, Contracting Office, U.S. Department of Energy (Apr. 28, 1987)....1387

Excerpts from OCRWM Mission Plan Amendment (June 1987) ....1401

**Volume IV of V**

Excerpts from 1987 Annual Capacity Report (June 1987)....1471

Letter from Christopher T. Jedrey, Contracting Officer, U.S. Department of Energy, to S. P. Kraft, Director, Utility Nuclear Waste Management Group (Oct. 2, 1987)....1491

Excerpts from 1988 Annual Capacity Report (June 1988)....1496

Excerpts from Draft 1988 Mission Plan Amendment (June 1988)....1519

John J. Kearney, Senior Vice President, Edison Electric Institute, Letter to Charles E. Kay, U.S. Department of Energy (Aug. 29, 1988)....1548

Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program (Nov. 1989) ....1565

Report of the Monitored Retrievable Storage Commission (Nov. 1, 1989) ....1597

Excerpts from Comment Response Document for The Secretary of Energy's Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program (Nov. 1990) ....1613

Excerpts from the Preliminary Estimates of the Total-System Cost for the Restructured Program: An Addendum to the May 1989 Analysis of the Total-System Life Cycle Cost for the Civilian Radioactive Waste Management Program (Dec. 1990) ....1621

Excerpts from the 1990 Annual Capacity Report (Dec. 1990) .......... 1625

Excerpts from General Accounting Office, Nuclear Waste: Operation of Monitored Retrievable Storage Facility is Unlikely by 1998 (Sept. 1991) .......... 1648

Excerpts from 1991 Annual Capacity Report (Dec. 1991) .......... 1682

1991 Acceptance Priority Ranking (Dec. 1991) .......... 1699

ACR Issues Status Report (Dec. 31, 1991) .......... 1733

M. Detmer, Contracting Officer, U.S. Department of Energy, Letter to A.P. DiDesidero, Contracting Officer, Washington Public Power Supply System (Mar. 4, 1992) .......... 1735

James D. Watkins, Secretary of Energy, Letter to The Honorable J. Bennett Johnston, Chairman, Committee on Energy and Natural Resources, United States Senate (Dec. 17, 1992) .......... 1737

Excerpts from 1992 Annual Capacity Report (Mar. 1993) .......... 1741

Excerpts from 1992 Annual Capacity Report, Revision 1 (May 1993) .......... 1756

Daniel A. Dreyfus, Director, OCRWM, Letter to Susan F. Clark, Florida Public Service Commission (Dec. 23, 1993) .......... 1772

Memorandum from Hazel R. O'Leary, Secretary of Energy, to Daniel Dreyfus, Director, OCRWM (Feb. 18, 1994) .......... 1774

Notice of Inquiry On Waste Acceptance Issues, 59 Fed. Reg. 27004 (May 25, 1994) .......... 1776

Excerpts from Civilian Radioactive Waste Management Program Plan, Volume I, Program Overview (Dec. 19, 1994) .......... 1782

Memorandum from Ronald A. Milner, Department of Energy, to Director, OCRWM, attaching TSLCC 1995 Assumption Package (Feb. 16, 1995) .......... 1807

Acceptance Priority Ranking and Annual Capacity Report (Mar. 1995) .......... 1826

U.S. Department of Energy Final Interpretation of Waste Acceptance Issues, 60 Fed. Reg. 21793 (May 3, 1995) .......... 1896

Excerpts from Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program (Sept. 1995) .......... 1902

James Blumford, TRW, Letter to Samuel Rousso, Director Waste Acceptance and Storage Division, OCRWM (Oct. 25, 1995) .......... 1921

U.S. Department of Energy Press Release, Department Notifies Utilities of Anticipated Delays In Accepting Commercial Spent Nuclear Fuel (Dec. 17, 1996)....................1929

**Volume V of V**

Excerpts from Viability Assessment of a Repository at Yucca Mountain, Volume 2: Preliminary Design Concept for the Repository and Waste Package (Dec. 1998) ....................1930

Excerpts from Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program (Dec. 1998)....................1970

Excerpts from FY2000 U.S. Department of Energy Financial Statements ....................2002

Excerpts from Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program (May 2001)....................2010

Excerpts from Nuclear Waste Fund Fee Adequacy: An Assessment (May 2001)....................2033

Excerpts from Civilian Radioactive Waste Management System, Waste Acceptance System Requirements Document, Revision 4 (Jan. 2002)....................2050

Spencer Abraham, Secretary of Energy, Letter to the President, (Feb. 14, 2002)....................2063

Notice of Deposition of Tom Pollog in *Yankee Atomic Electric Co., et al. v. United States* (Apr. 2002) ....................2116

Notice of Deposition of Susan Klein in *Yankee Atomic Electric Co., et al. v. United States* (Apr. 18, 2002) ....................2122

Excerpts from Defendant's Response to Utility Plaintiffs' Requests for Admissions in *Yankee Atomic Electric Co., et al., v. United States,* Case Nos. 98-126C (Apr. 18, 2002) ....................2128

Acceptance Priority Ranking & Annual Capacity Report (July 2004)....................2133

David K. Zabransky, Contracting Officer, U.S. Department of Energy, Sample Letter to all Contract Holders, including Instructions for Completing the Appendix C Delivery Commitment Schedule (July 27, 2004)....................2214

Civilian Radioactive Waste Management Requirements Document, Revision 6 (Sept. 2004) ....................2222

Dave Zabransky, Contracting Officer, U.S. Department of Energy, Letter to Ronald G. Cocherell, Southern Nuclear Operating Company, Inc. (Dec. 1, 2004)........................2264

Ken Ritter, *Energy Department Official Says Yucca Project Delayed, Not Dead*, Associated Press (Feb. 9, 2005) ........................................................................2265

Excerpts from the Monthly Summary of Program Financial and Budget Information as of February 28, 2005 (Office of Civilian Radioactive Waste Management, Office of Program Management) ................................................2266

Rule 30(b)(6) Notice of Deposition in *South Carolina Electric & Gas Company v. United States* (March 2, 2005) .....................................................2290

Statement of Theodore J. Garrish, Deputy Director, Office of Civilian Radioactive Waste Management, U.S. Department of Energy, to the Subcommittee on Energy and Air Quality, Committee on Energy and Commerce, U.S. House of Representatives (March 10, 2005) ....................................................................................2294

Unpublished Orders in Alphabetical Order

*Commonwealth Edison Co. v. United States,* No. 98-621 (Fed. Cl. Aug. 1, 2001) .................2309

*Duke Power v. United States*, No. 98-485C (Fed. Cl. Mar. 7, 2005) ......................................2310

*Energy Northwest v. United States*, No. 04-10C (May 9, 2005) (Order to Show Cause) ........2311

*Florida Power & Light Co. v. United States,* No. 98-483 (Fed. Cl. Jan. 11, 2002) ................2312

*Indiana Michigan Power Co. v. United States,* No. 98-486 (Fed. Cl. Jan. 17, 2003) .............2313

*Northern States Power Co. v. United States,* No. 98-484 (Fed. Cl. July 31, 2001) .................2314

*Southern Nuclear Operating Co. v. United States*, No. 98-614 (Fed. Cl. Apr. 7, 2004) ..........2315

*System Fuels, Inc. v. United States*, No. 03-2624C, 2005 WL 1804314 (Fed. Cl. July 29, 2005) ..........................................................................................2324

*System Fuels, Inc. v. United States*, No. 03-2624C (Aug. 2, 2005) (erratum correcting case citation in caption) ..........................................................................................2336

*Washington Public Power Supply System v. Department of Energy*, No. 97-1064, (D.C. Cir. July 2, 1998) ...........................................................................................2337

*Wisconsin Electric Power Co. v. United States*, No. 00-697 (Fed. Cl. Oct. 8, 2004) ...............2338

*Yankee Atomic Electric Co. v. United States*, No. 98-126C (Fed. Cl. June 26, 2003) ............2343

*Yankee Atomic Electric Co. v. United States*, No. 98-126C, 2004 WL 1535688
(Fed. Cl. June 28, 2004) ..........................................................................................2348

**Table Of Authorities**

**Cases**

*Air et Chaleur, S.A. v. Janeway,* 757 F.2d 489 (2d Cir. 1985) .................................................... 19

*Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348 (Fed. Cir. 2001) ......................... 18

*Boston Edison Co. v. United States*, 64 Fed. Cl. 167 (2005) ........................................... 13, 14, 33

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) .......................................................................... 22

*Centex Corp. v. United States*, 49 Fed. Cl. 691 (2001)................................................................ 29

*Chain Belt Co. v. United States*, 115 F. Supp. 701 (Ct. Cl. 1953)............................................... 19

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) ................................. passim

*Commonwealth Edison Co. v. United States*, No. 98-621 (Fed. Cl. Aug.1, 2001) ....................... 11

*Connecticut Yankee Atomic Power Co. v. United States*, 42 Fed. Cl. 448 (1998), *affirmed*, 225 F.3d 1336 (Fed. Cir. 2000)........................................................................................... 11

*Consumers Energy Co. v. United States*, 65 Fed. Cl. 364 (2005)........................................ passim

*Cosmo Constr. Co. v. Unites States*, 451 F.2d 602 (Ct. Cl. 1977)............................................... 13

*David Nassif Associates v. United States*, 557 F.2d 249 (Ct. Cl. 1977) ("*Nassif I*").................... 35

*David Nassif Associates v. United States*, 644 F.2d 4 (Ct. Cl. 1981) ("*Nassif II*") ...................... 35

*Duke Power v. United States*, No. 98-485C (Fed. Cl. Mar. 7, 2005) .......................................... 10

*Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159 (3d Cir. 2001).................................... 30

*Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336 (2005) .............. 10, 13, 14, 33

*Entergy Nuclear Indian Point 2, LLC v. United States*, 64 Fed. Cl. 515 (2005) .................. passim

*Florida Power & Light Co. v. United States*, No. 98-483 (Fed. Cl. Jan. 11, 2002) ..................... 10

*Granite Mgmt. Corp. v. United States*, 2005 WL 1762182 (Fed. Cir. July 27, 2005).................. 22

*Home Sav. of America v. United States*, 57 Fed. Cl. 694 (2003), *aff'd in part and rev'd in part,* 399 F.3d 1341 (Fed. Cir. 2005)........................................................................................ 18

*Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88 (2003) ................................. 24, 28

*Indiana Michigan Power Co. v. United States*, No. 98-486 (Fed. Cl. Jan. 17, 2003) .................. 10

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) ("*Maine Yankee II*") .......... 11, 28

*Maine Yankee Atomic Power Co. v. United States*, 42 Fed. Cl. 558 (1998), *affirmed*, 225 F.3d 1336 (Fed. Cir. 2000) ("*Maine Yankee I*") .......... 11

*Maxima Corp. v. United States*, 847 F.2d 1549 (Fed. Cir. 1988) .......... 29

*Northern States Power Co. v. Dep't Of Energy,* 128 F.3d 754 (D.C. Cir. 1997) .......... 11

*Northern States Power Co. v. United States*, No. 98-484 (Fed. Cl. July 31, 2001) .......... 11

*Power Authority of New York v. United States,* No. 00-703 (Fed. Cl. Sept. 30, 2004) .......... 3, 5, 35

*Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35 (2001) .......... 30

*S.N.A. Nut Co. v. Haggen-Daas Co.*, 247 B.R. 7 (Bankr. N.D. Ill. 2002) .......... 19

*Sacramento Municipal Utility District v. United States*, 63 Fed. Cl. 495 (2005) .......... 10, 24, 28

*Southern Nuclear Operating Co. v. United States*, No. 98-614 (Fed. Cl. Apr. 7, 2004) .......... 10, 24

*St. Regis Paper Co. v. United States*, 368 U.S. 208 (1961) .......... 29

*System Fuels, Inc. v. United States*, 65 Fed. Cl. 163 (2005) ("*System Fuels I*") .......... 10, 11, 33

*System Fuels, Inc. v. United States*, No. 03-2624, 2005 WL 1804314 (Fed. Cl. July 29, 2005) ("*System Fuels II*") .......... 10, 14, 24

*Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665 (2004) ("*TVA*") .......... 10, 20, 33

*Torncello v. United States*, 231 Ct. Cl. 20, 681 F.2d 756 (1982) .......... 34

*Unihealth v. United States Healthcare Inc.*, 14 F. Supp. 2d 623 (D.N.J. 1998) .......... 35

*Washington Public Power Supply System v. Dep't of Energy*, No. 98-1213, 1998 WL 545405 (D.C. Cir. July 2, 1998) .......... 11

*Wisconsin Electric Power Co. v. United States*, No. 00-697 (Fed. Cl. Oct. 8, 2004) .......... 10

*Yankee Atomic Electric Co. v United States*, 42 Fed. Cl. 223 (1998), *affirmed*, 225 F.3d 1336 (Fed. Cir. 2000) ("*Yankee Atomic I*") .......... 11

*Yankee Atomic Electric Co. v. United States*, No. 98-126C (Fed. Cl. June 26, 2003) ("*Yankee Atomic II*") .......... 23

*Yankee Atomic Electric Co. v. United States*, No. 98-621, 2004 WL 1535688 (Fed. Cl. June 28, 2004) ("*Yankee Atomic III*") .......... 20

**Other Authorities**

Restatement (Second) of Contracts § 33 (1981) .......... 35

Restatement (Second) of Contracts § 204 (1981) .......... 35

Restatement (Second) of Contracts § 205 (1981) .......... 28

Restatement (Second) of Contracts § 347 (1981) .......... 18

Restatement (Second) of Contracts § 350 (1981) .......... 19

**Introduction**

As Your Honor knows, Energy Northwest and the Department of Energy ("DOE" or the "Government") are parties to a valid and enforceable contract, the Standard Contract for the Disposal of Spent Nuclear Fuel And/Or High-Level Radioactive Waste ("Standard Contract"). In the Standard Contract, DOE made a specific and statutorily-required promise directly to Energy Northwest to begin accepting Spent Nuclear Fuel ("SNF") from utilities with nuclear power plants "not later than January 31, 1998." DOE failed to begin accepting SNF by January 1998 and has now stated that waste acceptance will not begin until some time after 2010. Your Honor and the Federal Circuit (as well as numerous other Judges of this Court) have conclusively ruled that DOE's action was an unexcused breach of its duties under the Standard Contract. Energy Northwest has already incurred actual, substantial damages because of that breach: Energy Northwest incurred damages evaluating its SNF storage options in light of DOE's breach, and, after that evaluation, Energy Northwest spent approximately $42 million in obtaining alternate SNF storage through the design, licensing, construction and loading of an Independent Spent Fuel Storage Installation, or "ISFSI."

On April 29, 2005, Your Honor entered summary judgment on liability for breach of contract against the Government and in favor of another Standard Contract holder, Consumers Energy Company. *Consumers Energy Co. v. United States*, 65 Fed. Cl. 364 (2005). In so ruling, Your Honor recognized that the DOE's adjudicated breach of its duty to each and every utility to commence SNF acceptance damaged *every Standard Contract holder* down the line in the oldest-fuel-first queue. *Id.* at 375. On May 9, 2005, Your Honor ordered the Government in this case "to show cause . . . why the same holding [as in *Consumers Energy*] should not apply in this case as well." (May 9, 2005 Order.)

Rather than address the Court's Order directly, the Government filed an affirmative motion for summary judgment seeking a liability determination *in its* favor. In its motion, the

Government argues that Energy Northwest *could not* have suffered any damages to date on the rationale that Energy Northwest would not have been entitled to make its own first delivery of SNF until some time after 2008. In making this argument, the Government relies upon a critical assumption – that a 900 ton industry acceptance rate, and the Delivery Commitment Schedules DOE instructed utilities to fill out based on that rate, apply as a matter of law.

The Government's arguments to avoid liability here are fundamentally flawed and are directly contrary to numerous rulings in the SNF cases by Your Honor and other Judges of this Court. The Court should resolve the Order to Show Cause and Summary Judgment Motion by entering a judgment of liability in favor of Energy Northwest:

First, the Court should enter a judgment of liability in favor of Energy Northwest because the Government fails to distinguish the Court's ruling in *Consumers Energy*. The Government does not address the Court's conclusion in *Consumers Energy,* and numerous other opinions from Judges of this Court, that DOE's failure to begin removal of SNF in 1998 was a breach of the Standard Contract. Nor does the Government contend that the Court's central ruling – that the DOE's adjudicated breach damaged Consumers Energy because it negatively affected "the acceptance dates of every contract holder down the line" – was wrong as a matter of law; indeed, the Government does not cite *any* law on that issue (Gov't Br. at 16-17). Instead, the Government argues that it should be rescued from obvious liability because of the possibility – no matter how remote – that future factual events could reverse the harm already caused by DOE's breach. Without citing any factual support whatsoever, the Government hypothesizes (at 16-17) that the Government might "'catch up' to the place where it should have been had it timely begun SNF acceptance." But that unsupported speculation is baseless. There is no possibility consistent with the undisputed facts, that DOE could "catch up" and accept SNF from Energy Northwest as required by its place in the queue absent the breach. Moreover, the Government has not addressed the fact that Energy Northwest *already* has incurred actual

damages because of the negative effect DOE's breach has had on Energy Northwest's delivery date in the oldest-fuel-first queue.

Second, the Government's summary judgment motion should be denied for two reasons. In the first place, the Government's motion is defective on its face because it does not make a prima facie summary judgment showing: the Government does not demonstrate an absence of a genuine dispute of material fact that Energy Northwest has no damages. To the contrary, as Your Honor recognized in *Consumers Energy*, the inevitable delay in the DOE queue will, and in Energy Northwest's case already has, resulted in damages. Moreover, the arguments the Government does make – that the 900 ton rate contained in DOE's 1995 Acceptance Priority Ranking and Annual Capacity Report ("APR/ACR") is binding (at 12-13), and that the Delivery Commitment Schedule ("DCS") process that was based upon that rate is contractually binding and limits DOE's liability (at 6-11) – have been soundly rejected in *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003), and in each of the SNF cases filed in this court where the issue has been squarely presented. Indeed, in the *Power Authority Of New York* case, Your Honor rejected a virtually identical Government argument based upon the 900 ton rate, concluding that the acceptance rate presents "a fact-laden inquiry that the Court finds does not lend itself to resolution on summary judgment." *Power Authority of New York v. United States,* No. 00-703 (Fed. Cl. Sept. 30, 2004).

As Your Honor contemplated when issuing the Order to Show Cause, a judgment of liability should be entered in favor of Energy Northwest, and the parties should go on to damages discovery and a trial on the amount of damages Energy Northwest has suffered.

**Statement Of Issues**

1. Whether the Government has shown cause why Your Honor's ruling in *Consumers Energy*, finding the Government liable for breach of contract, should not apply here.

2. Whether the Government has demonstrated that there are no genuine disputes of

material fact, and the Government is entitled to judgment as a matter of law on contract liability, where (1) the Government provides no support for its argument that Energy Northwest has suffered no damages and, in fact, Energy Northwest's evidence demonstrates the contrary is true; and (2) the Government's argument requires the Court to accept as an undisputed fact a 900 ton acceptance rate, an issue Your Honor already has concluded requires an evidentiary hearing to resolve.

**Statement Of Facts**

Your Honor is well aware of the general background of the Nuclear Waste Policy Act, the Standard Contract, and DOE's breach of its obligations under the Standard Contract, and Energy Northwest respectfully refers to its Proposed Findings of Uncontroverted Fact on these issues. Energy Northwest respectfully believes that the following selected facts specific to Energy Northwest's claim will assist the Court in resolving the pending issues.

**A. Energy Northwest's Operations.**

Energy Northwest owns and operates the Columbia Generating Station ("Columbia") located in Richland, Washington. (ENA at 354, ENPF ¶ 207.)[1] Columbia is a 1,157 megawatt boiling water reactor which was licensed by the NRC in December 1983, and commenced operations in December 1984. (*Id.*) The fuel for the reactor consists of uranium pellets, which are sealed inside of long metal rods as part of a fuel assembly. (*Id.*) After a fuel assembly has been used to generate nuclear fission for a period of time the uranium, becomes depleted and the fuel assemblies become spent and are referred to as Spent Nuclear Fuel ("SNF"). (*Id.*)

Energy Northwest stores SNF in a spent fuel pool. (ENA at 355, ENPF ¶ 208.) A spent fuel pool is a large pool of water which both cools the SNF assemblies and provides shielding

---

[1] Citations to Energy Northwest's Appendix are cited as "ENA at __." Citations to the Government's Appendix are cited as "GA at __." Citations to Energy Northwest's Proposed Findings are cited as "ENPF ¶ ___." Citations to the Government's Proposed Findings are cited as "GPF ¶ ___."

from radiation emitted from the assemblies. (*Id.*) SNF assemblies stored in a spent fuel pool are stored in spent fuel racks – metal racks which contain a number of storage locations or cells that can accommodate an SNF assembly. (*Id.*) As currently configured, Columbia's spent fuel pool can accommodate 2,651 SNF assemblies. (*Id.*)

**B. Energy Northwest's Standard Contract And DOE's Obligations.**

Energy Northwest (then known as Washington Public Power Supply System) executed a Standard Contract with DOE on June 13, 1983. (ENA at 291-353, ENPF ¶ 44.) Energy Northwest has fulfilled all of its obligations under the Standard Contract, including the payment of more than $126 million into the Nuclear Waste Fund. (ENA at 360, ENPF ¶¶ 49, 209.) In the Standard Contract, as Your Honor and the Federal Circuit have held, DOE made an unconditional promise to "begin accepting nuclear waste no later than January 31, 1998." *Consumers Energy*, 65 Fed. Cl. at 374. As Your Honor has held and the Government acknowledges in this case, the Standard Contract does not contain an express rate at which DOE was obligated to accept nuclear waste. (GPF ¶ 7.) There is, therefore, a factual dispute about the rate at which DOE was obligated to accept waste from the industry as a whole. *Power Authority of New York,* No. 00-703 (Fed. Cl. Sept. 30, 2004).

At trial, Energy Northwest will present a literal mountain of contemporaneous evidence showing that DOE intended to operate a program that accepted nuclear waste at a rate that ramps up to 3,000 tons each year, and that a 3,000 ton rate is the only reasonable rate to achieve the goals of the NWPA and the Standard Contract. (ENPF ¶¶ 63-70.) As DOE's own most recent ACR report shows, a 3,000 ton acceptance obligation beginning in 1998 would have required DOE to begin accepting Energy Northwest's SNF under DOE's oldest-fuel-first acceptance queue in 2004. (ENA at 376, ENPF ¶ 216; *see also* ENA at 2138, ENPF ¶ 200.)[2] In contrast,

---

[2] As described, the Standard Contract provides, with some exceptions, that the order of SNF acceptance *among* utilities is established on the oldest fuel principle through an acceptance

using DOE's now-discarded 2010 date for the start of SNF acceptance and DOE's projections under the oldest fuel first queue (using a 3,000 ton rate) for when it will remove Energy Northwest's SNF, the earliest possible date that DOE has ever projected it will actually remove Energy Northwest's SNF is 2016. (ENA at 2138, 358-59, ENPF ¶ 200.) Even assuming DOE's now-abandoned 2010 start date, DOE's breach has therefore resulted in at least a 12-year delay – from 2004 to 2016 – of the date for first removal of Energy Northwest's SNF. (ENA at 2138, 374, 376, ENPF ¶¶ 200, 216.)

The Government will apparently contend, contrary to the evidence and based on its own unilateral and bad faith actions, that it only was obligated to operate the program at a rate (after a ramp-up) that accepted 900 tons annually at least for the first ten years of the program. (Gov't Br. 12-13, 15; GPF ¶ ¶ 31-36, 38.) While Energy Northwest vigorously disputes that there is any validity to a 900 ton rate, and (as described below at II.B, 22-25) every Judge to consider the issue has rejected the Government's argument that the 900 ton rate applies as a matter of law, Energy Northwest's expert also has analyzed the obligations DOE would have had to Energy Northwest under that scenario. (ENA at 370, 374, 377, ENPF ¶ 218.) A 900 ton acceptance rate obligation followed by a transition to a 3,000 ton rate by 2015, which is the transition DOE projected in a 1990 DOE report, would have required DOE to begin accepting Energy Northwest's SNF under DOE's oldest fuel first acceptance queue in 2011 – five years before the

---

priority ranking. (Standard Contract Art. VI.B.1(a).) Utility SNF discharge information is regularly reported to DOE using data supplied by utilities on a standardized RW-859 form, and is also available in DOE reports, such as its most recent Acceptance Priority Ranking & Annual Capacity Report published in July 2004. As described in the declaration and report of Ms. Eileen Supko, using this data, it is a fairly simple matter to identify an individual utility's allocations by working down the list of SNF discharges in the APR. (ENA at 368-69.) In her report, which we have placed in the summary judgment record, Ms. Supko has calculated Energy Northwest's allocations at both the 3,000 ton rate and the artificially low 900 ton rate advocated by the Government. Ms. Supko's calculations at the 3,000 MTU rate are confirmed by the APR/ACR published by DOE in 2004, which uses a 3,000 MTU rate and shows Energy Northwest's allocation occurring the same number of years after commencement of SNF acceptance as Ms. Supko's report does.

earliest date DOE ever projected it will remove Energy Northwest's SNF in the "breach" world. (ENA at 377, ENPF ¶ 218.)[3]

By December 2004, DOE determined that because of various developments, it would not meet its long-projected 2010 start date to begin removing SNF. (ENA at 616, 2265, ENPF ¶¶ 201, 206.) While DOE has refused to commit itself to when it will actually start SNF acceptance, most recently, in March 2005, a DOE representative, Theodore Garish, testifying before Congress gave two "illustrative" scenarios for budgetary purposes showing DOE starting performance in 2012 and 2015. (ENA at 2294, 2297.)

### C. Energy Northwest's Actual Out-Of-Pocket Damages Caused By DOE's Breach.

The nuclear industry is one of the most regulated industries in the country. (ENA at 358, ENPF ¶ 211.) As a result, any changes to plant design or operation generally require more "lead time" to analyze, license and construct than in other industries. (*Id.*) Prudent nuclear utility business practices require the operator to consistently look forward, over a period of years, to ensure that operational issues can be addressed before they adversely affect plant operations. (*Id.*)

By the early 1990s, it was increasingly clear that DOE would not commence acceptance of SNF on January 31, 1998 as required by the Nuclear Waste Policy Act and the Standard Contract. (ENA at 357, *see also e.g.* ENPF ¶¶ 127, 136, 139-47, 163-71.) In May 1994, DOE published a "Notice of Inquiry" stating that it would not would not have a repository in operation by 1998 and that DOE's plan for an interim storage facility had not progressed. (ENA at 1776,

---

[3] While the DOE never has projected that it would remove SNF at a 900 ton rate indefinitely (ENPF ¶¶ 152-62) – a rate that assumes that a repository never opens and that would require approximately 100 years for DOE to remove SNF from existing nuclear plants – even using a 900 ton rate indefinitely, Energy Northwest's first allocation under the oldest fuel first queue would still be in 2013. (ENA at 374, ENPF ¶ 218.) That is three years before the earliest DOE projection for removing Energy Northwest's SNF using the now discarded 2010 date. (ENA at 2138, ENPF ¶ 200.)

ENPF ¶ 165.) In May 1995, DOE published a "Final Interpretation," confirming that it would not begin performance until at least 2010. In response to that announcement, Energy Northwest incurred actual expenditures in two specific ways. (ENA at 1896, 1897-98, ENPF ¶ 168.)

First, in 1995, Energy Northwest completed a study of its SNF storage options in light of DOE's announcement that it would not begin waste acceptance until 2010. (ENA at 357-58, ENPF ¶ 211.) Energy Northwest's study examined a number of options for expanding SNF storage capacity including: (1) off-site storage options, (2) construction of a dry-cask storage facility known as an Independent Spent Fuel Storage Installation or "ISFSI,"[4] and (3) increasing the capacity of the Columbia spent fuel pool through re-racking using higher density racks that would effectively expand the storage capacity of the pool. (*Id.*) During the study, Energy Northwest expended time and effort that it would not have otherwise had to spend had DOE not announced its breach and had instead begun accepting SNF in 1998. (*Id.*)

Second, after considering its options, Energy Northwest ultimately determined that it would construct an ISFSI and transfer SNF from its spent fuel pool to the ISFSI. (ENA at 358, ENPF ¶ 213.) Energy Northwest awarded a contract for ISFSI construction in 1999 and paid for the construction of that ISFSI. (*Id.*) Energy Northwest transferred SNF assemblies from Columbia's spent fuel pool to the ISFSI in 2002 and 2004. (*Id.*) Energy Northwest anticipates that it will continue to transfer SNF assemblies to its ISFSI on a periodic basis to maintain sufficient space in the fuel pool to accommodate projected discharges. (*Id.*) These transfers will continue until DOE begins to accept Energy Northwest's SNF. (*Id.*) To date, Energy Northwest already has incurred in excess of $42 million dollars in constructing the ISFSI and loading casks as a direct result of DOE's acknowledged breach of its duties. (ENA at 358, ENPF ¶ 214.)

---

[4] Dry storage casks are large concrete or metal containers designed to store SNF while shielding radiation. Dry storage casks are loaded in the spent fuel pool and transported to the ISFSI, which is a large concrete pad constructed outside of the reactor or fuel handling building along with associated security and monitoring equipment. (ENA at 355.)

Energy Northwest's decision to build an ISFSI, rather than invest in other far less costly solutions, was driven by the reality of a (then) 12 year delay in performance by DOE and the potential of still further delays in DOE's repository program. (ENA at 359, ENPF ¶ 220.) If DOE had begun accepting SNF from Energy Northwest in 2004, the first year it would have had an allocation under the 3,000 ton rate, Energy Northwest would not have had to incur expenses to build additional on-site storage in the form of an ISFSI. (ENA at 359-60, ENPF ¶ 221.) Even if DOE had performed at the artificially low 900 ton rate for ten years, Energy Northwest could have avoided building an ISFSI. (ENA at 359, ENPF ¶ 218.) Instead, Energy Northwest could have employed less costly means of addressing its spent fuel situation, such as a re-rack of the spent fuel pool. (*Id.*) Finally, even assuming that, contrary to fact, Energy Northwest would have built an ISFSI if DOE had not breached the Standard Contract, the Company would have constructed a smaller ISFSI, and could have avoided costs it already has incurred for an expansion of the ISFSI. (ENA at 359-60, ENPF ¶ 221.)

## Argument

### I. The Court Should Enter A Finding Of Liability In Favor Of Energy Northwest Because The Government Cannot Distinguish This Case From The *Consumers Energy* Opinion.

On May 9, 2005, Your Honor ordered the Government "to show cause . . . why the same holding [as in *Consumers Energy*] should not apply in this case as well." (May 9, 2005 Order.) To properly respond to the Court's order, it is incumbent on the Government to point to specific factual or legal reasons why the Court's well-reasoned decision in *Consumers Energy* – joining the 16 other Standard Contract cases in which liability orders have been entered – does not apply with equal force here. Instead of doing that, the Government has recycled fact-bound arguments that go only to the amount of damages, rather than the fact of damages, and that have been rejected by every Judge of this Court who has directly considered them. Because the Government simply cannot overcome the adjudicated fact that Energy Northwest's place in the

"oldest-fuel-first" queue – no matter what the ultimate overall acceptance rate – has been adversely affected and that, as a direct result, Energy Northwest has already incurred and suffered actual, out-of-pocket damages, an order finding liability in favor of Energy Northwest is warranted.

### A. The Adjudicated Facts, And Your Honor's Opinion In *Consumers Energy*, Require Liability In Favor Of Energy Northwest.

In *Consumers Energy*, the plaintiff, like Energy Northwest, was a nuclear utility and a party to its own Standard Contract with DOE. Like Energy Northwest, Consumers Energy sued the Government for breach of the Standard Contract when DOE failed to commence SNF acceptance in January 1998. Consumers Energy moved for summary judgment on liability as of January 1998, demonstrating that there was no genuine dispute that (1) there was a valid contract between the parties, (2) Consumers Energy had performed all of its obligations under the contract, (3) DOE had breached the Consumers Energy Standard Contract (and all similar contracts) by not commencing waste acceptance in January 1998, and (4) the breach caused damage to Consumers Energy. *Consumers Energy*, 65 Fed. Cl. at 367-68. The Government cross-moved for summary judgment, contending that Consumers Energy could not recover because it had not yet paid the "one-time fee" required of certain utilities under the Standard Contract. *Id.* Your Honor, supported by similar entries of liability findings in 16 other cases brought by utilities for breach of the Standard Contract,[5] granted Consumers Energy's motion

---

[5] *System Fuels, Inc. v. United States*, No. 03-2624, 2005 WL 1804314 (Fed. Cl. July 29, 2005) (*"System Fuels II"*); *Consumers Energy*, 65 Fed. Cl. 365; *System Fuels, Inc. v. United States*, 65 Fed. Cl. 163 (2005) ("*System Fuels I*"); *Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336 (2005); *Entergy Nuclear Indian Point 2, LLC v. United States*, 64 Fed. Cl. 515 (2005); *Duke Power v. United States*, No. 98-485C (Fed. Cl. Mar. 7, 2005); *Sacramento Municipal Utility District v. United States*, 63 Fed. Cl. 495 (2005); *Wisconsin Electric Power Co. v. United States*, No. 00-697 (Fed. Cl. Oct. 8, 2004); *Tennessee Valley Authority v. United States*, 60 Fed. Cl. 665 (2004) ("*TVA*"); *Southern Nuclear Operating Co. v. United States*, No. 98-614 (Fed. Cl. Apr. 7, 2004); *Indiana Michigan Power Co. v. United States*, No. 98-486 (Fed. Cl. Jan. 17, 2003); *Florida Power & Light Co. v. United States*, No. 98-483 (Fed. Cl. Jan. 11, 2002);

and entered summary judgment on liability in favor of Consumers Energy. *Id.* at 373-75.

In granting summary judgment, Your Honor made two important rulings that apply with equal force here. First, the Court held that when DOE failed to commence SNF acceptance in January 1998, the Federal Circuit has *already held* that DOE breached its contractual duty to *each and every* utility that is a party to a Standard Contract:

> "Congress found this objective [beginning SNF disposal by January 31, 1998] so important when it promulgated the Act that it took the unusual action of specifying that all the contracts must contain this explicit requirement. *The breach involved all the utilities that had signed the contract-the entire nuclear electric industry.*" [*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1341-42 (2000)("*Maine Yankee II"*)] (emphasis added). Lest there be any ambiguity in its decision, the court further noted, "The government does not, and could not, deny that it failed to meet the contractual requirement to begin accepting nuclear waste no later than January 31, 1998," and observed that failure to perform a contractual duty when due is a breach of contract. *Id.* at 1343.

*Consumers Energy,* 65 Fed. Cl. at 374.[6]

Second, Your Honor expressly rejected the same principal argument that the Government makes here regarding damages. In *Consumers Energy*, the Government asserted that "Plaintiff could not have incurred injury at least until such time as its SNF would have been picked up

---

*Commonwealth Edison Co. v. United States*, No. 98-621 (Fed. Cl. Aug.1, 2001); *Northern States Power Co. v. United States*, No. 98-484 (Fed. Cl. July 31, 2001); *Connecticut Yankee Atomic Power Co. v. United States*, 42 Fed. Cl. 448 (1998), *affirmed*, 225 F.3d 1336 (Fed. Cir. 2000); *Maine Yankee Atomic Power Co. v. United States*, 42 Fed. Cl. 558 (1998), *affirmed*, 225 F.3d 1336 (Fed. Cir. 2000) ("*Maine Yankee I"*); *Yankee Atomic Electric Co. v United States*, 42 Fed. Cl. 223 (1998), *affirmed*, 225 F.3d 1336 (Fed. Cir. 2000) ("*Yankee Atomic I"*).

[6] Furthermore, as Judge Lettow has concluded, DOE is collaterally estopped from arguing that it breached the Standard Contract any later than January 31, 1998 in SNF cases brought by plaintiffs, such as Energy Northwest, who also participated in the District of Columbia Circuit's opinion in *Northern States Power Co. v. Dep't Of Energy,* 128 F.3d 754 (D.C. Cir. 1997). *System Fuels I*, 65 Fed. Cl. at 174-76. Energy Northwest, then known as Washington Public Power Supply System, filed a petition before the D.C. Circuit which was consolidated into the *Northern States* case, and denied in accordance with the ruling in *Northern States*. *See* Order in *Washington Public Power Supply System v. Dep't of Energy*, No. 98-1213, 1998 WL 545405 (D.C. Cir. July 2, 1998).

absent the government's breach," and also argued that that time was fixed by Consumers Energy's submission of a DCS. *Id.* at 374. But Your Honor rejected that argument, holding that because the breach ran to the entire industry, and the Standard Contract calls for acceptance of SNF in an "oldest-fuel-first" queue, each and every utility's place in the queue was adversely affected:

> The Court finds however that, while Defendant's arguments may be pertinent to the quantum of damages to which Plaintiff may be entitled, liability for partial breach of contract began on January 31, 1998 . . . Furthermore, the Standard Contract's acceptance priority ranking on the basis of "oldest fuel first" necessarily created a queue for all the nuclear utilities' SNF. Thus, any delay in the start of DOE's SNF acceptance *as of January 31, 1998*, negatively implicated the acceptance dates of every contract holder down the line.

*Id*. at 374-75 (emphasis in original).[7]

Energy Northwest is entitled to judgment as a matter of law on liability here because its situation with regard to the Court's two rulings is indistinguishable from Consumers Energy's. Like Consumers Energy, Energy Northwest is a party to a Standard Contract and has performed all of its obligations under the contract. As with Consumers Energy, the Federal Circuit has already adjudicated that DOE breached a duty running specifically to Energy Northwest to commence waste acceptance by January 31, 1998. And, like Consumers Energy, Energy Northwest has suffered damages because – no matter the ultimate industry-wide acceptance rate – Energy Northwest's place in the "oldest fuel first" queue has been adversely affected by, at this point, at least 12 years.

Moreover, if anything, Energy Northwest has made a more compelling case for judgment on liability here than Consumers Energy made because Energy Northwest has put in the record *evidence of the actual damages and expenses it has incurred* as a direct result of, and because of,

[7] As an alternative ground, Your Honor also found that by January 31, 1998, the Government already had delayed Consumers Energy's acceptance by one month. *Consumers Energy,* 65 Fed. Cl. at 375.

DOE's undisputed breach. The damages fall into two categories:

1. In direct response to the DOE's announcement in 1995 that it would breach and not begin performance by 1998, Energy Northwest conducted an additional SNF management study to determine what actions Energy Northwest needed to take to continue to operate in light of DOE's breach. The time and expense involved in this analysis, directly and specifically required by the DOE's announcement, are compensable damages. (ENA at 357-58, ENPF ¶ 211.)

2. Also as a direct and specific result of the DOE's breach, Energy Northwest licensed, constructed, and operates an ISFSI, and incurs additional expenses each time it loads a cask with SNF to be stored at the ISFSI. Energy Northwest has established with evidence in the record that no ISFSI would have been required if DOE had performed its obligations under the Standard Contract or, at the very least, an ISFSI as large as Energy Northwest built would not have been required. (ENPF ¶¶ 213-21.)

The requirement for demonstration of injury is lenient, and requires only a showing that a finding of breach of contract would not be a merely academic exercise. *Entergy Nuclear Indian Point 2,* 64 Fed. Cl. at 523-24; *Cosmo Constr. Co. v. Unites States*, 451 F.2d 602, 605-06 (Ct. Cl. 1977). Furthermore, RCFC 56(c) permits summary judgment on the issue of liability alone even though issues regarding the amount of damages may remain. Moreover, other Judges of this Court repeatedly have found in other Standard Contract cases that damages in these categories are recoverable, and satisfy the "some damage" element of liability. Other decisions of this Court have found sufficient injury to find liability from: (1) the loss of right to exchange acceptance allocations;[8] (2) the administrative costs which will be associated with re-initiation of

---

[8] *Entergy Nuclear Generation*, 64 Fed. Cl. at 344; *Entergy Nuclear Indian Point 2*, 64 Fed. Cl. at 524; *Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 184 (2005).

the DCS process;[9] (3) the cost of increasing a reactor's spent fuel pool capacity by re-racking;[10] and (4) the costs to design, license and construct a dry cask storage facility, and to purchase dry storage casks, and ancillary equipment.[11] Indeed, most recently, in the *System Fuels II* case, Judge Braden held that the commencement of construction of a dry cask storage facility in advance of the date a utility reaches its SNF storage capacity was sufficient damages for a summary judgment ruling on liability:

> A long lead time is required to plan and construct SNF dry storage facilities due to the extremely hazardous nature of SNF, the logistical problems associated with storing it safely, and the significant public interest in safely storing such materials. Therefore, [plaintiff] began planning and developing an ISFSI in 2003 to prepare for the time when the wet pool at [the plant] will reach capacity in 2007 . . . Therefore, under the precedent binding the court, [plaintiff] has proffered sufficient evidence of damage to establish liability for breach of contract. The actual causation and final determination of damages due, if any, has not been adjudicated and can only be determined after an evidentiary hearing.

*System Fuels II,* 2005 WL 1804314 at *10 (citations omitted). Similarly, the precise amount of damages recoverable here must await trial. But there can be no genuine dispute of material fact that Energy Northwest has incurred *some* damage, or that the Government is liable for breach of its Standard Contract with Energy Northwest.

### B. The Government's Arguments Fail To Distinguish *Consumers Energy*.

The Government's charge in responding to the Court's order to show cause was to point to a legally dispositive distinction that distinguishes Energy Northwest's claim from the one made by Consumers Energy. As demonstrated below, the Government has not done, and cannot do, that.

---

[9] *Entergy Nuclear Generation*, 64 Fed. Cl. at 344; *Entergy Nuclear Indian Point 2*, 64 Fed. Cl. at 524; *Boston Edison*, 64 Fed. Cl. at 184.

[10] *Entergy Nuclear Generation,* 64 Fed. Cl. at 342-43 and n.7; *Boston Edison*, 64 Fed. Cl. at 184.

[11] *System Fuels II,* 2005 WL 1804314 at *10; *Entergy Nuclear Indian Point 2,* 64 Fed. Cl. at 522; *TVA*, 60 Fed. Cl. at 674-75.

### 1. The Government Cannot Distinguish This Court's *Consumers Energy* Holding That DOE's Adjudicated Breach Negatively Affected "The Acceptance Dates Of Every Contract Holder Down The Line," Including Energy Northwest.

The Government only addresses Your Honor's holding in *Consumers Energy* that all contract holders' rights were adversely affected by the delay in the entire queue at pages 16 through 17 of its brief. The Government does *not* contend that the Court's ruling was wrong as a matter of law; indeed, the Government does not cite *any* law in this section.

Instead of addressing the Court's *legal* holding, the Government argues (at 16-17) that it should be saved from obvious liability because of the possibility – no matter how remote – that future *factual* events could reverse the harm already caused by DOE's breach. Without offering any evidence of any kind that this could be a possibility, the Government theorizes (at 17):

> it is quite possible that, after the DOE eventually begins SNF acceptance, it will be able to increase the speed of its SNF acceptance beyond that which it is otherwise obligated to satisfy, enabling it to "catch up" to the place where it should have been had it timely begun SNF acceptance. Under that scenario, there would be no damages to that utility.

The Government then hypothesizes a fictional utility whose place in the "oldest-fuel-first" acceptance queue, given the DOE's asserted overall acceptance rate and an unspecified acceptance start date, makes it first entitled to deliver SNF in 2020. The Government then asserts that it should have no liability in this case because, given the entirely fictional scenario it hypothesizes, it is possible that even with the current delay of more than twelve years in the commencement of SNF acceptance, DOE could still accept that utility's SNF by 2020, and the hypothetical utility would suffer no damages. There are two fatal flaws in the Government's only response on this dispositive issue.

First, Energy Northwest is not the fictional utility hypothesized by the Government, and even using the Government's proposed acceptance rate, Energy Northwest's rights in the queue entitle it to have its SNF accepted before the Government asserts it can even *begin* performance. Although it surely has this information, the Government has not offered any *evidence* as to

Energy Northwest's place in the oldest-fuel-first queue, or by what date the Government believes it was obligated to begin accepting SNF from Energy Northwest.

But Energy Northwest has put evidence regarding its right to deliver SNF into the record. In contrast to the misleading 2020 hypothetical date used by the Government, if the DOE had honored its contractual obligations and begun performing at a 3,000 ton rate (after a ramp up) in January 1998, Energy Northwest's first allocations in the queue would have come *last year*, in 2004. (ENA at 374, 376, 2138, ENPF ¶ 216.) Even using the Government's artificially low 900 ton rate for the ten years predicted by DOE, if DOE began performing in January 1998, DOE would have begun removing Energy Northwest's SNF in 2011, 5 years *before* DOE said in its 2004 ACR/APR that it would accept Energy Northwest's SNF using a 3,000 ton rate *if* DOE had started in 2010. (ENA at 374, 377, ENPF ¶¶ 200, 218.) There is no possibility consistent with the undisputed facts that DOE could "catch up" and accept SNF from Energy Northwest as required by its place in the queue absent the breach.

<u>Second</u>, and independently, even if the Government's theory otherwise had merit, it does not and cannot address the damages that Energy Northwest's evidence demonstrates it already has incurred as a result of the breach. As demonstrated below (at I.B.2, 17-21), expenses that Energy Northwest has incurred to address DOE's breach are recoverable as mitigation so long as it was reasonable to incur them at the time. Here, even if (contrary to fact) DOE could "catch up" and perform by the time it was obligated to accept SNF from Energy Northwest, Energy Northwest still would be entitled to recover the damages it already has expended based on the undisputed breach and Energy Northwest's reasonable response in mitigating the damages from that breach based on the information known at the time.

**2. The Government's Focus On The Date Of Actual First Pick-Up From Energy Northwest Is Misplaced Because Energy Northwest Incurred Actual, Compensable Damages Caused By DOE's Program-Wide Breach.**

Most of the Government's brief attempts to demonstrate that Energy Northwest *could not* have suffered any damages because DOE was not required to accept SNF *from Energy Northwest itself* prior to January 31, 1998. To get to this meritless point, the Government argues (i) the 1995 APR/ACR issued by DOE set a contractually binding rate and order of acceptance (at 9), (ii) the DCS process based upon that 1995 ACR/APR established an individual utility's delivery rights (at 9-12), and (iii) Energy Northwest's lack of an allocation under the 1995 ACR issued by DOE and lack of an approved DCS show that Energy Northwest had no right to deliver *its* SNF prior to 2008 (at 12-15). After stringing together these predicates, without citing any law, the Government asserts its conclusion: "[i]t appears that the first 'breach' that might have caused an injury to Energy Northwest would not have occurred until sometime after January 2008, when Energy Northwest's SNF would have been given some allocation rights based upon the age of its SNF." (Gov't Br. at 16.)

The Government's argument is constructed on a string of vigorously disputed factual contentions and theories that have repeatedly been rejected by other Judges of this Court as a matter of law. As demonstrated in Part II below, Energy Northwest strongly contests each link in the Government's chain of predicates. However, the Court need not resolve or even address any of these necessary predicates to the Government's arguments to resolve the issues before the Court. Energy Northwest is entitled to a judgment of liability because there is a missing link in the chain – the Government's crucial, but unstated and unsupported, assumption that compensable damages cannot be incurred prior to the Government's failure to accept SNF from Energy Northwest itself. This critical assumption is wrong as a matter of law for two reasons.

First, contrary to the Government's argument, DOE *has* breached a duty that runs directly to Energy Northwest – the statutorily required promise to commence acceptance of SNF, in

essence starting the oldest-fuel-first queue, on January 31, 1998. As Your Honor has held, the Federal Circuit already has conclusively adjudicated that DOE owed this duty to each and every utility, the entire industry. *Consumers Energy,* 65 Fed. Cl. at 374-75. The Government attempts to turn this ruling on its head. The Government contends that its duty to *all* utilities to commence SNF acceptance is meaningless because, in essence, only one utility was "first in line." But DOE's breach of duty has been clearly adjudicated, and its current position is contrary to law, the language of the Standard Contract, and the Federal Circuit's ruling. Moreover, as Your Honor recognized in *Consumers Energy*, that breach "negatively implicated the acceptance dates of every contract holder down the line." *Consumers Energy,* 65 Fed. Cl. at 375.

Second, the law specifically authorizes Energy Northwest to recover damages incurred, based on DOE's breach of that duty, prior to the time that DOE otherwise would have taken delivery of Energy Northwest's SNF. The basic, black letter damages measure that applies to Energy Northwest's breach of contract claim is the expectation interest measure. "Expectation damages are generally measured by the 'loss in the value to [the injured party] of the other party's performance caused by its failure or deficiency, plus . . . any other loss, including incidental or consequential loss, caused by the breach . . . .'" *Home Sav. of America v. United States*, 57 Fed. Cl. 694, 723 n.47 (2003)(citations omitted), *aff'd in part and rev'd in part,* 399 F.3d 1341 (Fed. Cir. 2005). Expectation damages can include both mitigation expenses and the costs of providing substitute or alternative performance. Restatement (Second) of Contracts § 347 cmts. a, b (1981) (expectation interest measure includes costs to "arrange a substitute transaction" and "costs incurred in a reasonable effort, whether successful or not, to avoid loss"); *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355-57 (Fed. Cir. 2001) (plaintiff was entitled to recover increased financing costs incurred to maintain capital compliance and avoid government seizure)*, subsequent appeal*, 339 F.3d 1341 (Fed. Cir. 2003); *Home Sav. of America*, 57 Fed. Cl. at 722 (plaintiff was entitled to recover costs of replacing supervisory

goodwill with tangible capital as "expectancy damages in the form of the cost of cover"); *Chain Belt Co. v. United States*, 115 F. Supp. 701, 714 (Ct. Cl. 1953) (plaintiff was entitled to recover expenses incurred "in a reasonable effort to avoid the harm which both parties had reason to foresee would be the probable result of defendant's breach of the contract").

Once DOE announced in 1995 that it would not commence performance in 1998, and actually failed to perform beginning in 1998, Energy Northwest was entitled to engage in mitigation efforts and recover the expense incurred as damages. "Once the party has reason to know that performance by the other party will not be forthcoming" he is "expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise." Restatement (Second) of Contracts § 350 cmt. b (1981). The injured party must begin mitigation efforts "within a reasonable time after he learns of the breach." *Id.* § 350 cmt. f. Energy Northwest's duty to mitigate continues during DOE's delay until DOE performs its obligations under the Contract. *Id.* § 350 cmt. g (where "the breach is accompanied by assurances that performance will be forthcoming," the injured party "may be expected to take some steps to avoid loss due to a delay in performance."). *Accord Chain Belt*, 115 F. Supp. at 714; *Air et Chaleur, S.A. v. Janeway,* 757 F.2d 489, 494 (2d Cir. 1985) (holding that "[w]hen plaintiffs learned . . . that [the defendant] intended to breach the contract . . . [t]hey were obligated to take whatever reasonable actions they could to minimize their damages"); *S.N.A. Nut Co. v. Haggen-Daas Co.*, 247 B.R. 7, 17-18 (Bankr. N.D. Ill. 2002) (holding that where supplier indicated that goods would be temporarily unavailable in the future the buyer was entitled to immediately mitigate its damages for the partial repudiation).

Indeed, other Judges of this Court expressly have ruled that given DOE's announcement that it would not commence timely performance, a utility who is a party to a Standard Contract may seek to recover as damages expenses incurred to mitigate damages and/or obtain substitute

performance prior to the time DOE may have been obligated to take SNF directly from that utility. For example, in *TVA*, Judge Lettow addressed whether TVA could seek to recover damages incurred prior to the first date of the earliest scheduled pickup of TVA's SNF, in 2002. Judge Lettow held:

> When it became obvious to TVA that DOE would not perform under the contract, TVA was justified, indeed obligated, to take steps to minimize its losses in light of DOE's imminent non-performance. . . TVA's construction of dry storage facilities for spent fuel at its [plants] must be viewed as an affirmative step toward mitigation to avoid loss for the government's partial ongoing breach.

*TVA*, 60 Fed. Cl. at 674. In rejecting the identical argument in *Yankee Atomic*, Judge Merow similarly held:

> Consider the ramifications of defendant's position. Should plaintiffs have waited until December 31, 1998 and then decided what to do with their nuclear waste? The court thinks not, and accordingly, will not preclude evidence in this regard.

*Yankee Atomic Electric Co. v. United States*, No. 98-621, 2004 WL 1535688, at *6 (Fed. Cl. June 28, 2004) ("*Yankee Atomic III"*).

Under this clear law, which is not addressed at all in the Government's brief but merely assumed away "sub silentio," the Court may assume – contrary to fact and law, and for purposes of argument only – the truth of the Government's entire chain of predicates, with a result that the Court assumes (contrary to fact) that DOE has no obligation to take Energy Northwest's SNF prior to 2008. Even on that assumption, it remains undisputed that DOE breached a duty running to Energy Northwest, and that Energy Northwest *already* has suffered actual damages mitigating that breach and/or obtaining substitute performance. Energy Northwest's claim is for more than $42 million that already has been expended, and *not* entirely (as the Government hypothesizes) for damages that will be incurred in the future. The Government may contend that not all of those damages are recoverable, but that is an issue for trial. The "some damages" required for a

liability finding is undisputedly present here.[12]

## II. The Court Should Deny The Government's Motion For Summary Judgment.

The Government's summary judgment motion asserts that there should be no liability because (according to the Government) Energy Northwest has suffered absolutely no damages as a result of the DOE's more than 12-year delay in commencing SNF acceptance under the Standard Contract. The Government's argument is not based on any facts regarding expenses Energy Northwest has incurred or the reasons for those expenses. Instead, the Government has cobbled together a number of recycled factual and legal theories designed to demonstrate that any expenses Energy Northwest incurred to date "could not" be the result of the breach of any duty owed directly to Energy Northwest because, the Government asserts, Energy Northwest was not entitled to have DOE accept any of its SNF until some time after 2008. The Court should reject these arguments because (1) the Government's motion does not on its face satisfy the summary judgment standard, (2) the Government's arguments are incorrect as a matter of law and have been soundly rejected by numerous Judges on this Court, and (3) the Government's arguments rely on a foundational fact – that the 900 ton acceptance rate applies as a matter of law simply because it was published in the 1995 version of DOE's ACR – that Your Honor has specifically held presents a disputed issue of fact that is not appropriate for resolution on summary judgment.

### A. The Government's Motion Is Defective On Its Face Because It Does Not, And Cannot, Show That There Is No Genuine Dispute Of Fact That Energy Northwest Has No Compensable Damages.

As described above, in response to the Government's motion, Energy Northwest has

[12] Energy Northwest strongly disagrees with the Government's argument (at 17-18) that damages that will be incurred in the future may not be recovered in this action, and Energy Northwest's claim likely *also* will include such damages. However, the Court need not address the issue now because Energy Northwest already has incurred damages, in the past, sufficient to decide the pending issues.

placed specific evidence in the record of expenses and costs it has incurred as a direct result of DOE's breach – costs and expenses incurred in analyzing Energy Northwest's response to the Government's announcement of its impending breach, and the licensing, construction, and loading of an ISFSI. (ENA at 354-60, ENPF ¶¶ 208-21.) In order to obtain summary judgment on liability on the ground that Energy Northwest suffered no damages, the summary judgment standard requires – as the Government acknowledges – the Government to make an initial showing that there are "no genuine issues of material fact in dispute" and that the Government is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). Here, to meet that standard, the Government must establish there is no genuine issue of material fact regarding whether *Energy Northwest has suffered no damages* as a result of the DOE's breach. *See, e.g., Granite Mgmt. Corp. v. United States*, 2005 WL 1762182 (Fed. Cir. July 27, 2005) (reversing grant of summary judgment in light of genuine issue of material fact regarding whether plaintiff suffered damages).

The Government's motion should be denied because it fails to meet that standard on its face. Even without considering the evidentiary materials offered by Energy Northwest in its response, the Government has made no demonstration whatsoever regarding Energy Northwest's response to the Government's breach or the lack of any damages. Moreover, as demonstrated above (at I.B.2, 17-21), Energy Northwest has presented evidence that it has incurred damages even applying the Government's artificially low 900 ton acceptance rate. Accordingly, there is absolutely no basis to enter summary judgment for the Government.

### B. Independently, The Government's Theories Based On The ACRs and DCS Process Have Been Rejected By Every Court To Consider Them.

In its motion, the Government fails to acknowledge that the crucial legal premises in its argument – that the 900 ton rate contained in DOE's 1995 ACR is binding (at 12-13), and that the DCS process is contractually binding and limits DOE's liability (at 6-11) – have been soundly rejected in *Commonwealth Edison*, 56 Fed. Cl. 652, and in each of the SNF cases filed

in this Court where the issue has been squarely presented. Further, even in a number of decisions which have not directly addressed the issue, Judges of this Court have seriously questioned that the Government's arguments could possibly have any merit whatsoever.

As in this case, in *Commonwealth Edison*, the Government argued (1) the submission and approval of DCS forms was a contractual "mechanism" that established the rate of acceptance and, alternatively, (2) DOE's liability was governed by the 900 ton rate contained in the 1991, 1992, 1993 and 1995 ACR documents. *Commonwealth Edison*, 56 Fed. Cl. at 663. Judge Hewitt specifically rejected both of the Government's arguments. First, Judge Hewitt determined that the exchange of DCS forms under the contract did not constitute a "mechanism" that established a rate of acceptance. *Id.* at 662-63, 666. Judge Hewitt found that the DCSs were merely planning documents and that there was no evidence the DCSs were intended to create a contract between the parties. *Id.* at 663. Second, Judge Hewitt found that, in any case, DOE's manipulation of the DCS process likely violated the Government's duty of good faith and fair dealing. *Id*. at 665-66. Third, Judge Hewitt rejected the Government's arguments that the artificially low acceptance rates contained in the 1991 through 1995 ACR documents applied as a matter of law and further noted that DOE was not "entitled to limit its damages based upon an optional disposal method of which it did not avail itself." *Id*. at 662-63, 666-67. In light of these findings, Judge Hewitt determined that the rate of acceptance was a missing term that would be determined based on the intent of the parties. *Id*. at 667.

Decisions in other SNF cases either explicitly adopt or follow Judge Hewitt's reasoning in *Commonwealth Edison*:

- In *Yankee Atomic,* Judge Merow rejected identical arguments and explicitly adopted Judge Hewitt's decision in *Commonwealth Edison*. *Yankee Atomic Electric Co. v. United States*, No. 98-126C (Fed. Cl. June 26, 2003) ("*Yankee Atomic II").*

- In *Indiana Michigan,* Judge Hodges determined that (1) the DCS process did not establish an acceptance rate, and (2) the rate published by DOE in ACR documents from 1991 through 1995 was artificially low. *Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88 (2003). Judge Hodges further determined that the evidence supported a finding that a 3,000 ton steady state acceptance rate applied as a matter of law. *Id.*

- In *Southern Nuclear*, Judge Merow again rejected the Government's rate arguments citing *Commonwealth Edison* and *Indiana Michigan. Southern Nuclear Operating Co. v. United States*, No. 98-614C (Fed. Cl. Apr. 7, 2004).

- In *Sacramento Municipal Utility District* and *System Fuels II,* Judge Braden rejected the Government's DCS arguments. *System Fuels II*, 2005 WL 1804314 (Fed. Cl. 2005); *Sacramento Municipal Utility District v. United States*, 63 Fed. Cl. 495 (2005).

- While he has not had occasion to squarely decide the issue, Judge Lettow has expressed considerable skepticism about the Government's DCS argument (and its variations), noting that DOE cannot avoid the unconditional obligation to dispose of SNF recognized by the District of Columbia Circuit.[13]

- In *Consumers Energy*, Your Honor recognized that DCS submission alone could not establish a delivery date, and that DOE could not use its abandonment of the

---

[13] *See Entergy Nuclear Indian Point 2*, 64 Fed. Cl. at 524 n.14, 525 ("[DOE's Unconditional Obligation] has not been overridden by DOE's efforts to adjust requirements via the DCS process"); *Entergy Nuclear Generation*, 64 Fed. Cl. at 343 n.8, 344-45 (rejecting the Government's alternative contract argument and noting that the DCS argument has not been successful in other courts); *Boston Edison Co.*, 64 Fed. Cl. at 186-87 and n.21 (plaintiff stated a claim for breach of duty of good faith and fair dealing based on manipulation of the DCS process and DOE's continued violation of the writ of mandamus issued by the D.C. Circuit in *Northern States*); *TVA*, 60 Fed. Cl. at 671-73 and n.7 (Government's reliance on the lack of approved DCS forms was legally insufficient because DOE hindered the DCS process).

DCS process to exculpate itself from the consequences of its breach. *Consumers Energy,* 65 Fed. Cl. at 369-72.

As demonstrated below, these essentially unanimous decisions are based on a solid reading of established law as applied to the identical Standard Contract language and common facts regarding DOE's conduct in all of these cases.

**1. The ACR And The DCS Process Do Not "Define" DOE's Contract Obligations Or Bind Either Party.**

The Standard Contract provisions the Government cites simply do not support the Government's position that the DCS process "defines" the Government's obligations or was binding on either party. Thus, while the Government relies on the ACR reports as essentially establishing the rate set out in the Standard Contract (Br. at 8-11), neither the Contract nor the reports support that position. The Standard Contract stated that the ACRs were only for "planning purposes." (Standard Contract Art. IV.B.5.b, ENA at 301.) Moreover, the ACR documents themselves, such as the 1991 ACR, explicitly disclaimed that they were binding on either party: "As specified in the Standard Contract, the ACR is for planning purposes only *and thus is not contractually binding on either the DOE or the Purchasers*." (ENA at 1687-88, 2137; ENPF ¶¶ 60, 128 (emphasis supplied).)

In addition, contrary to the Government's argument, the utilities' submission of DCSs did not establish a rate under the Standard Contract.[14] While DOE attempts to link the DCS provisions with the provision governing ACRs, implying that the DCS process was supposed to somehow make binding the projected rates in the ACR (Br. at 12), there is no such connection in

[14] As recounted in the declaration of David Larkin, Energy Northwest did not submit DCS forms in the 1990s because the DOE instructed utilities not to submit DCS forms if the ACR document did not list an allocation for the relevant year. (ENA at 356-57, ENPF ¶ 182 and 184; see also GA at 147-48, ENPF ¶ 179-81.) Moreover, it is undisputed that DOE uniformly rejected any DCS submission by a utility that failed to conform to the allocations listed in the ACR document. (ENA at 521-23, ENPF ¶ 183.)

the Standard Contract itself. The ACR provision does not refer at all to the DCS provision. (Standard Contract Art. IV.B.5.b, ENA at 301.) Nor does the DCS provision refer to the ACR reports. (*Id*., Art. V.B., ENA at 302.) In fact, the Standard Contract provided that the utilities could submit a DCS for "all SNF and/or HLW the [utility] wishes to deliver to" DOE. (*Id*., Art. V.B.1., ENA at 302.) Indeed, the Standard Contract specifically recognized that the DCSs submitted "may require the disposal of more material than the annual capacity of the DOE disposal facility [or facilities] can accommodate" (Standard Contract Art. VI.B.1., ENA at 305-06), and provided that each Standard Contract holder for every year could increase or decrease the amount of SNF in any DCS by 20%. (*Id.* Art. V.B.2., ENA at 302.)

Moreover, in its Instructions to Standard Contact Holders to Complete the DCSs ("DCS Instructions" or "Instructions"), DOE made it even clearer that the DCSs did not establish an acceptance rate. The Instructions, contrary to the terms of the Standard Contract itself, informed the utilities that they had to fill out the DCSs using whatever particular allocation the most recent ACR report showed that the utility had for a particular year. (ENA at 2216, GA at 147-48; ENPF ¶¶ 179, 198.) Yet, as stated, the ACR reports explicitly provided that they were not binding on either party and, under the Contract, were to be reissued every year. (*See, e.g.*, Standard Contract Art. IV.B.5.b, ENA at 301; ENA at 1503, 1632, 1687-88, 1745-46, 1828; ENPF ¶ 60, 94, 111, 124, 128, 137, 149.) The Instructions also stated that DOE and the purchasers could "reevaluate" the submissions if DOE did not remove SNF at the rate provided in the non-binding ACR. (GA at 146; ENPF ¶ 176.)[15] Finally, the Instructions made it clear that the utilities did not have to identify specific SNF assemblies that they planned to submit in five

[15] The preface to the DCS Instructions emphasized the point that the DCSs were for planning purposes. The preface provided: "The DCS provides the Purchasers with the *opportunity* to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity. This information will *assist* DOE in meeting its contractual waste acceptance responsibilities and in developing the FWMS." (GA at 145 (emphasis supplied); ENPF ¶ 173.)

years; instead, the utilities were only asked to submit a non-restrictive date range of when SNF they planned to provide had been (or would be) removed from reactors. (GA at 150; ENPF ¶ 175.) Indeed, the DOE official in charge of DCS submissions, Nancy Slater-Thompson, testified that she did not consider those submissions binding on either DOE or the utilities:

> Q: What about the delivery commitment schedules? Was it your understanding that those similarly were for planning purposes only and not contractually binding on either the utilities or the department?
>
> A: In my personal opinion, they were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them. In addition, given the fungibility of the DCSs, that's why there is a final delivery schedule which is somewhat more than a planning document. And I do recall sitting across the table from numerous utility representatives, clearly recognizing that the DCSs were [for] planning purposes, and they in fact did not view themselves as binding themselves to deliver specifically what was described on the DCS.
>
> Q. During the time that you worked in the waste acceptance division at the Department of Energy, do you recall anyone either within DOE or in industry who thought that the delivery commitment schedules were binding on either industry or the department?
>
> A. No, I don't.

(ENA at 897 (objections omitted); *see also* ENA at 892; ENPF ¶ 58(a).) Other DOE officials with responsibility for performing under the Standard Contract testified similarly.[16]

It is this language of the Standard Contract and ancillary documents, and the clear testimony of DOE officials, that led Judges Hewitt, Merow, Braden, Hodges and Lettow all to conclude that the publishing of the ACR, and the DCS process, did not define or limit DOE's obligations under the Standard Contract in any way. As Judge Hewitt explained:

---

[16] Alan Brownstein, who headed DOE's SNF waste acceptance and scheduling office, testified that the DCSs were only for planning purposes (ENA at 525; ENPF ¶ 58(b)); Lake Barrett, who started working on the DOE SNF program in 1985 and served as the acting or deputy director of OCRWM from 1993 until February 2002, testified that the DCSs were "adminstrivia" that really didn't matter to him in his responsibilities to run the SNF program (ENA at 407; ENPF ¶ 58(f)); Christopher Kouts, currently in charge of integration of the various components of DOE's SNF program, testified that DCSs were for planning purposes (ENA at 618; ENPF ¶ 58(d)).

> Defendant eventually conceded at oral argument that the ACRs were for planning purposes. DOE's position that it would reject plaintiff's DCS submissions if it "exceeded the allocation in the 1991 ACR" is inconsistent with plaintiff's justified expectation that the ACRs were negotiable and to be used for "planning purposes." The parties could not have expected that planning documents would create binding contractual obligations. In these circumstances, plaintiff's submission and defendant's acceptance of the proposed DCSs *did not create a contractually binding obligation for either party*.

*Commonwealth Edison*, 56 Fed. Cl. at 666 (emphasis supplied; citations omitted). Judge Braden's conclusion in *Sacramento Municipal Utility District* is similarly dispositive:

> Moreover, the DOE Standard Contract provided that the ACRs were the basis for DCS submission and therefore were only for "planning purposes." Therefore, the DCSs imposed no legal obligation on either party to the DOE Standard Contract.

63 Fed. Cl. at 505. Judge Braden reached the identical conclusion most recently in *System Fuels II*: "Therefore, the court has determined that, as a matter of law, the ACR and DCSs did not amend the Standard Contract and [plaintiffs'] failure to submit a DCS is irrelevant and does not alter the Government's obligation under the Standard Contract to accept and store and SNF." *System Fuels II,* 2005 WL 1804314 at *9. *Accord Indiana Michigan*, 57 Fed. Cl. at 98 ("The Contract does not use Annual Capacity Reports and Delivery Commitment Schedules to determine an Acceptance Rate . . . The Contract contemplated that DOE would use these reports for planning purposes only.").

**2. Alternatively, Even If The ACR Or DCS Had Some Binding Significance, DOE's Conduct Violated The Duty Of Good Faith And Fair Dealing And Would Render The Contract Illusory.**

Even assuming (contrary to fact) that the Standard Contract gave some binding effect to the ACR and DCS processes, DOE's discretion in that regard was and is limited by the duty of good faith and fair dealing. In its opinion in the *Maine Yankee* case, the Federal Circuit already has held that the duty of good faith and fair dealing applies to the Standard Contract. *Maine Yankee II,* 225 F.3d at 1342. *See also* Restatement (Second) Contracts § 205 ("Every contract

imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."); *Centex Corp. v. United States*, 49 Fed. Cl. 691, 708 (2001) ("All contracts, including Government contracts, contain an implied covenant of good faith and fair dealing."). Indeed, "[t]he need for mutual fair dealing is no less required in contracts to which the Government is a party, than in any other commercial arrangement. 'It is no less good morals and good law that the Government should turn square corners in dealing with the people than that the people should turn square corners in dealing with their Government.'" *Maxima Corp. v. United States*, 847 F.2d 1549, 1556 (Fed. Cir. 1988) (quoting *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (1961)).

The determination of whether conduct complies with the duty of good faith and fair dealing is necessarily highly fact specific. However, the Restatement comments contain a helpful description of the kinds of conduct that are not permitted:

> The phrase "good faith" is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness *to an agreed common purpose and consistency with the justified expectations of the other party*; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness or reasonableness.

Restatement (Second) Contracts § 205 cmt. a (emphasis supplied).[17] Pursuant to the Restatement, the courts have emphasized that a party's performance should be consistent with the mutual expectations of the parties and the purpose of the contract. *See Precision Pine &*

---

[17] The Restatement amplifies the requirement of good faith during performance as follows:

Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: *evasion of the spirit of the bargain*, lack of diligence and slacking off, willful rendering of imperfect performance, *abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.* *Id*. cmt. d (emphasis supplied).

*Timber, Inc. v. United States*, 50 Fed. Cl. 35, 58-67 (2001) (Government's contractual discretion is subject to implied duty of good faith, which allows courts to monitor how a promise is performed so that it is consistent with the expectations of the contracting party); *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 170 (3d Cir. 2001) (even where contract affords one party discretion, duty of good faith and fair dealing protects parties' reasonable expectations and right to receive fruits of the contract) (citations omitted).[18]

The evidence here shows that DOE's continued use of a 900 ton rate – after the idea for the Monitored Retrievable Storage ("MRS") facility that the Government contends could have justified that rate was "dead" – was for the purpose of minimizing its own liability. The summary judgment evidence conclusively reveals that by the time DOE issued the 1995 APR/ACR in March 1995 (and in fact, far earlier), the possibility of building an MRS was no longer viable. (ENPF ¶¶ 139-47.) When asked repeatedly at his deposition why DOE continued to use the 900 ton rate in the 1995 APR/ACR document when the MRS proposal upon which it was based was dead, Lake Barrett, the former acting director and deputy director of the program, could provide no explanation. (ENA at 441 (objections omitted); ENPF ¶ 154.)

Dave Zabransky, who was directly involved in the decision to use the 900 ton rate in the 1995 ACR/APR document, also conceded that the MRS plan was dead by 1995. (ENA at 950, 953-54; ENPF ¶¶ 139(c), 155.) Mr. Zabransky also admitted that from the date that it published the 1995 APR/ACR document in 1995, DOE never used the 900 ton rate for planning the federal

---

[18] *See also Hooters of America, Inc. v. Phillips*, 173 F.3d 933, 940 (4th Cir. 1999) ("Good faith emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party. . . . Bad faith includes the evasion of the spirit of the bargain and an abuse of a power to specify terms.") (internal citations omitted); *Sterling Nat'l Mort. Co., Inc. v. Mortgage Corner, Inc.*, 97 F.3d 39, 44 (3d Cir. 1996) ("Duty of good faith limits the parties' ability to act unreasonably in contravention of the other party's reasonable expectations. . . ."); *Criss & Cross Prop.'s, Ltd. v. Everett Allied Co.*, 886 F.2d 497, 502 (2d Cir. 1989) (contracting parties' discretion under a contract "is bounded by the parties' mutual obligation to act in good faith [which is] generally defined by the parties' intent and reasonable expectations in entering the contract").

waste management system. (ENA at 954-55; ENPF ¶ 156.) However, unlike Mr. Barrett, Mr. Zabransky did provide an explanation why DOE continued to use the 900 ton rate even though there was no basis to do so. *Mr. Zabransky admitted in his deposition that DOE continued to use that rate to attempt to limit its obligations to the utilities*:

> Q. Why did the Department of Energy publish a document [the 1995 APR/ACR] to be used as the basis for delivery commitment schedules using rates which it was not using itself for the purpose of planning the system?
>
> A. The Department carried over the rates it had used in the previous ACR and did not change them.
>
> Q. Was the Department trying to minimize the commitments it had to utilities who were parties to the standard contracts in using this document, in using Exhibit 5.
>
> A. I believe that was a consideration.

(ENA at 955; ENPA ¶ 156.)[19]

There is also evidence that DOE's decision to use the 900 ton rate in the 1991 and 1993 ACRs was also based on DOE's efforts to limit damages. Scott Vance, one of the individuals involved in preparation of the ACR report for DOE, has testified that he had raised concerns about the "low rate" contained in the 1991 ACR prior to its publications with Alan Brownstein of DOE. (ENA at 925, ENPF ¶ 157.) Mr. Vance testified: "And I was told at that time specifically from Alan Brownstein that the lower rate was going to be used. The decision had already been made. And the reason for that was that it was obvious at that point that '98 was not going to be met and that they desired to limit the liability to purchasers." (*Id.*) Circumstantial evidence confirms Mr. Vance's testimony. By the time that DOE issued the 1991 ACR in March 1991, DOE already had announced that it likely would not be able to open a repository until 2010.

---

[19] Lake Barrett admitted in his deposition that he had discussions with the DOE lawyers that by maintaining a low "obligation" rate compared with the higher 3,000 ton rate that DOE ultimately expected to perform at, the DOE could reduce utility damage claims. (*See* ENA at 470; *see also* ENA at 557-71, 585-92; ENPF ¶ 158.)

(ENA at 1581-84; ENPF ¶ 113.) Moreover, by 1991, DOE had substantial reason to doubt that it would be able to open an MRS by 1998 to accept SNF. (ENA at 400-01, 434-35, 438, 454, 461, 498, 698, 711, 730-31, 950, 953-54, 1651-53, 1738, 1796; *see also* ENPF ¶¶ 115, 139-41.) Therefore, in light of the strong possibility that it would breach the Standard Contract, DOE had virtually the same motivation in 1991 that it had in 1995 to issue documents in which it lowered the acceptance rate in an effort to reduce utilities' damages.

Moreover, the evidence shows that DOE intentionally acted to manipulate the second step in its string of arguments – the DCS submission process in the Contract – to limit its liability. Sometime in 1997, acting on the advice of counsel, DOE adopted an official policy of not approving DCS submittals by utilities. (ENA at 813, 962, 977; ENPF ¶¶ 187-88; *see also, Entergy Nuclear Indian Point 2*, 64 Fed. Cl. at 519-20; *Consumers Energy,* 65 Fed. Cl. at 670-72.) Thereafter it became "impossible" for a utility to get a DCS approved. (ENA at 952, 978; ENPF ¶ 190; *see also, Entergy Nuclear Indian Point 2*, 64 Fed. Cl. at 519-20; *Consumers Energy,* 65 Fed. Cl. at 370-72.) Moreover, before the Government lawyers began instructing him not to answer questions on this issue in his deposition (ENA at 953), Mr. Zabransky, one of the DOE decision-makers responsible for the DCS process, candidly admitted that the Government stopped approving DCSs to limit its damages under Standard Contracts:

> Q: You told me yesterday the first hour of your deposition that unless a utility has an approved DCS that the department has no obligation to that utility.
>
> A: I did say that, yes.
>
> Q: Because of the suspension of the DCS process, it's impossible for a utility to have a DCS approved, correct?
>
> A: That's correct.
>
> Q: Why has the department suspended the DCS process?
>
> A: I'll answer the question. I think the belief was that approving DCSs committed the department to that obligation, and the decision was made to suspend that commitment.

(ENA at 952 (objection omitted); ENPF ¶ 191.) More recently, DOE again requested submission of DCS forms, and then abruptly returned the submissions it received after it apparently realized that it would not commence acceptance in 2010. (ENA at 2264, ENPF ¶ 195-201; *see also, Entergy Nuclear Indian Point 2,* 64 Fed. Cl. at 519-20; *System Fuels I.,* 65 Fed. Cl. at 167.)

Members of this Court have consistently recognized that DOE does not have unfettered discretion to establish its own obligations under the Standard Contract and that its argument relying on the rate DOE itself selected for the 1995 ACR, and the subsequent DCS process, would either render the contract illusory or would violate the covenant of good faith and fair dealing. Judge Hewitt determined that the use of the 1991 ACR to limit the amount of SNF on DCS submissions may be a breach of the duty of good faith and fair dealing. *Commonwealth Edison*, 56 Fed. Cl. at 666. Judge Lettow observed that DOE's suggestion of "unfettered discretion to determine its obligations" would either render the contract illusory or would violate the covenant of good faith and fair dealing. *Entergy Nuclear Indian Point 2,* 64 Fed. Cl. at 524-25 and n. 8 (noting that the Government's DCS arguments "misconceive" the amount of discretion it has under the Standard Contract); *Entergy Nuclear Generation*, 64 Fed. Cl. at 343 n. 8, 344-45 (rejecting argument that "DOE has virtually unfettered discretion to determine its obligations under the contract, through the DCS process or otherwise, especially where no repository is available"); *Boston Edison*, 64 Fed. Cl. at 186-87 (DOE's response to its impending breach, including its conduct in the DCS process, states a claim for violation of the duty of good faith and fair dealing); *TVA,* 60 Fed.Cl. at 671 (DOE cannot exculpate itself from its breach because of its failure to approve DCS forms).

Although the Government has not acknowledged it, in *Consumers Energy* – the case the Government is supposed to distinguish from the situation here – Your Honor reached the same conclusion:

> [I]f DOE's abandonment (or suspension, interruption, etc.) of the DCS process serves to allow the government's obligation to accept delivery of SNF to be postponed until whenever the DCS process resumes, *it would render the government's duties under the Standard Contract illusory*. "We note as one of the most elementary propositions of contract law that a party may not reserve to itself a method of unlimited exculpation without rendering its promises illusory and the contract void." *Torncello v. United States*, 231 Ct. Cl. 20, 681 F.2d 756, 760 (1982). Yet DOE's letter to TVA clearly signifies that resumption of the DCS process is in the hands of the government; its on-again/off-again status continues to effect postponement of the DCS and FDS timetables for SNF delivery. Yet Defendant urges on the Court a construction of the Contract that would allow the government to avoid its contractual obligation indefinitely as a consequence of DOE's abandonment of the DCS process. The Court, however, is obliged to construe contracts to avoid rendering them illusory. *Id*. at 771.

*Consumers Energy*, 65 Fed. Cl. at 371 (emphasis supplied). In making its recycled DCS and ACR propositions crucial to its summary judgment argument, the Government fails to even mention the ruling by Your Honor or the other Judges, let alone explain why they should not apply here. The Government's motion should be denied on this ground alone.

### C. Independently, As Your Honor Has Ruled, Summary Judgment Is Improper Because The Overall Acceptance Rate On Which The Government's Motion Relies Is, At A Minimum, A Disputed Issue Of Fact.

Underlying all of the Government's arguments is the assumption that DOE's obligations under the Standard Contract are limited to accepting 900 tons per year – the rate used in the 1995 ACR that is the cornerstone of the Government's argument. The Government simply glosses over the fact that every judge – including Your Honor – to which it has presented the 900 ton assumption has rejected it, either as a matter of law, or determined it was a disputed fact issue. Consequently, even if the Court were to resolve every other issue against Energy Northwest, the fact dispute that Your Honor has found must be resolved at a trial would prevent summary judgment in the Government's favor now. There are three basic points on this issue.

First, the overall acceptance rate is a "missing term" in the Standard Contract that must be supplied by the Court after a trial. It is undisputed that the Standard Contract lacks any

acceptance rate, leaving an open term.[20] *Commonwealth Edison,* 56 Fed. Cl. at 662-63; 667. "When the parties to a [contract] have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts § 33 cmt. d & § 204 (1981). "[T]here is no doubt that courts have the power to adjust or reform contracts by supplying missing terms that adhere to the parties' original purpose and intent." *Unihealth v. United States Healthcare Inc.*, 14 F. Supp. 2d 623, 637, 640 (D.N.J. 1998). The Court of Claims adheres to the universal view that courts fill open contract terms according to the intent of the parties at the time of contracting. *David Nassif Associates v. United States*, 644 F.2d 4 (Ct. Cl. 1981) ("*Nassif II*"); *David Nassif Associates v. United States*, 557 F.2d 249 (Ct. Cl. 1977) ("*Nassif I*").

Second, there is literally a mountain of evidence supporting a much higher rate obligation – specifically, 3,000 tons – that creates a genuine dispute of material fact. Even a compact summary of the evidence Energy Northwest has placed in the summary judgment record would add many pages to this brief, pages which we respectfully believe are unnecessary given that Your Honor already has determined this to be an issue of disputed fact. Indeed, Your Honor specifically ruled in the *Power Authority of New York* case: "The acceptance rate, and the 'ramp-up' period necessary to reach a steady-state acceptance rate, is a fact-laden inquiry that the Court finds does not lend itself to resolution on summary judgment." *Power Authority of New York*, No. 00-703 (Fed. Cl. Sept. 30, 2004). We respectfully rely on our Statement of Uncontroverted Facts for the entire body of evidence supporting this sound – and obvious – conclusion, but that evidence falls generally into three categories:

---

[20] The Government has been careful to avoid explicitly admitting that the Standard Contract lacks a rate term. It does state in its proposed findings, however, that the "proposed Standard Contract itself did not identify a rate by which DOE would accept contract holder's SNF." (GPF ¶ 7.)

Category I (ENPF ¶¶ 4-11, 64-67, 69-70, 75-77): Evidence that DOE's intent at the time it executed the Standard Contract was to accept SNF at a rate that would (1) prevent the utilities from having to build additional at-reactor storage after DOE began accepting SNF and HLW and (2) reduce the backlog of SNF at nuclear reactors (ENPF ¶ 64-65).

- Robert Morgan, the first director of the SNF program, testified in his deposition that the intent of the program and the NWPA was to avoid having the utilities provide on-site storage. (ENA at 745-46; ENPF ¶ 64(i).)[21]
- Mr. Morgan, in a speech delivered to program participants at a DOE-sponsored conference on the SNF program in December 1983, summarized the SNF program strategy as follows:

  "[B]eginning in 1998, utilities will not have to provide any additional storage facilities on site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location." (ENA at 1072, 1073; ENPF ¶ 64(a).)
- Michael Lawrence, the second acting director of the SNF Program, by then known as the Office of Civilian Radioactive Waste Management ("OCRWM"), testified in his deposition that the intent of the NWPA and DOE's intent was to prevent the utilities from having to build additional SNF storage facilities after 1998 and to reduce the backlog of accumulated SNF. (ENA at 654, 672;[22] ENPF ¶ 64(j).)
- Mr. Lawrence also testified under oath before Congress in 1984 that achieving the "fundamental objective" of the NWPA would "initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998." (ENA at 1099, 1102; ENPF ¶ 64(e); *see also* ENA at 655-56, 666-67.)
- Ben Rusche, the first politically-appointed director of OCRWM, testified that that there was a "strategy" or "objective" of preventing additional storage on site.

[21] In his deposition, Mr. Morgan exhibited a 180 degree reversal of position. Before the first break in the deposition, Mr. Morgan testified that it was his responsibility to determine for the DOE what the intent of the NWPA was and it was his determination that the NWPA intent was to prevent utilities from having to provide additional on-site storage after 1998. (ENA at 745-46.) After the break, in which he consulted the Government attorney representing him, Mr. Morgan testified that he did not know what the intent of the NWPA was and that it was only the DOE's goal to prevent utilities from having to provide on-site storage. (ENA at 748, 752 A-B.)

[22] While Lawrence today disclaims that this intent was a "requirement," he acknowledges that the DOE was charged with carrying out the intent of the law. (5/21/02 Lawrence Dep. at 334, ENA at 640.)

(ENA at 869.) Rusche also testified that this goal was "consistent" with the NWPA. (ENA at 870, 871-72, 880-81; ENPF ¶ 64(m).)

- Robert Roselli, one of the three individuals who drafted the Standard Contract, testified that he understood that DOE was responsible for eliminating the need for additional at-reactor storage after 1998. (ENA at 842, 850-51; ENPF ¶ 64(k).)
- DOE, in its draft Civilian Radioactive Waste Management Program Mission Plan ("Mission Plan"), a document required by the NWPA and circulated to all Standard Contract holders in December 1983, explained the SNF program objective as follows:

  "The waste materials will be accepted in accordance with a Waste Acceptance Schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998. Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year." (ENA at 1075, 1080; ENPF ¶ 64(b).)
- Lake Barrett, the acting or deputy director of OCRWM from 1993 until February 2002, testified that the "intent of the [NWPA]" was to reduce the backlog of SNF located at the utilities as soon as practical and that the 3,000 rate was chosen for that reason. (ENA at 419; *see also* ENA 395-96, 397, 403-04, 459-60; ENPF ¶¶ 64(o), 65(b).)
- A DOE memorandum prepared in July 1984 by DOE Richland Operations Office, which was headed at that time by Mr. Lawrence, stated:

  "Based on our interpretation of the NWPA, the minimum acceptance rate should be based upon the rate at which spent fuel is generated by civilian nuclear power reactors. This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998." (ENA at 1201, ENPF ¶ 64(g).)
- A FY 1984 Program Guidance for Nuclear Waste Fund ("NWF") Evaluations, which was prepared in December 1983, concluded that "the underlying premise is that DOE will accept waste in 1998 at a sufficient rate so no additional utility owned storage capacity is required during the first five years. Thereafter, the acceptance rate will at least equal the utility spent fuel discharge rate." (ENA at 1061, 1063; ENPF ¶ 64(c).)
- Victor Trebules, the DOE official responsible for preparing the DOE 1985 Mission Plan, testified that DOE's objective was "reaching waste acceptance rates that would preclude the utilities from having to provide additional on-site storage" and that DOE intended to operate at a rate sufficient to work down the backlog of SNF. (ENA at 909; *see also* ENPF ¶ 64(l); ENA at 913, 914, 920-21.)
- Tom Pollog, DOE's Rule 30(b)(6) witness on the rate of acceptance DOE planned to use under the Standard Contract, testified that DOE's goal in the mid-1980s was to "alleviate the purchaser's need to have storage outside of their [spent fuel] pools." (ENA at 794; ENPF ¶ 64(n); *see also* ENPF ¶ 64(r), ENA at 487, 507.)

<u>Category II (ENPF ¶¶ 69-70, 158-62, 194)</u>: Evidence that from the very beginning of the program through today, DOE has recognized that the 3,000 ton rate was the minimum rate necessary to achieve the goals of the NWPA and the intent of the parties, and that DOE set program fees based on a 3,000 ton acceptance rate:

- Lake Barrett testified in his deposition that the 3,000 ton rate has been DOE's way of achieving the requirement of reducing the existing SNF backlog since he joined the program in 1985. (ENA at 403-04, 405, 463; ENPF ¶ 69(o)-69(q).) Mr. Barrett explained that a slower rate, such as 900 metric tons, would not keep up with the utility discharge rate, much less reduce the backlog of SNF. (ENA at 410-12.) Mr. Barrett also testified that each of the system studies prepared by DOE from the mid-1980s to the mid-1990s supported the 3,000 ton rate. (ENA at 405.) Finally, Mr. Barrett testified that using a rate that was "too low" would result in "reactors needing to put in dry storage" and that based on all the relevant factors 3,000 tons was a reasonable rate to use. (ENA at 463, ENPF ¶ 69(r).)

- Tom Pollog, DOE's Rule 30(b)(6) witness on the rates of acceptance that DOE planned to use under the Standard Contract, testified that the 3,000 ton rate was the rate that DOE determined in the mid-1980s would achieve DOE's objective of alleviating the need for utilities to construct additional on-site storage. (ENA at 797; ENPF ¶ 69(s).)

- DOE used the 3,000 ton rate, or a comparable rate, in all of DOE's initial program documents for the first seven years of the program following passage of the NWPA, including the Mission Plan documents required by the NWPA and the Annual Capacity Reports. (ENPF ¶ 69(a)-(n).)

- Susan Klein, DOE's official Rule 30(b)(6) witness on the issue of "what rate the DOE is planning to use once [SNF] acceptance begins," testified that DOE plans to use the 3,000 ton rate when it begins accepting SNF and that the rate will ramp up to 3,000 tons by the fifth year after DOE begins removing SNF. (ENA at 581-82, 589; ENPF ¶ 70(i).)

- The OCRWM's current Waste Acceptance System Requirements Document, which controls the DOE's planning for the SNF program, projects the 3,000 ton rate by the fifth year after the DOE starts SNF acceptance. (ENA at 2061; ENPF ¶ 70(f); *see also* ENA at 598-600.) The DOE also has used the 3,000 ton rate in numerous other recent official program documents. (ENA at 1963, 1996, 2027, 2241; ENPF ¶ 70(c) - (g).)

- DOE documents from the outset of the program to today have calculated system costs and the adequacy of utility fee payments based on its assumption that DOE will remove waste at the 3,000 ton rate. (ENA at 412-13, 589, 750-51, 761-62; *see also* ENPF ¶¶ 69, 70.)

Category III (ENPF ¶¶ 125-62): Evidence that the 900 ton rate advocated by the Government (i) would *not* meet any program goals (ENPF ¶ 133), (ii) was based on a hypothetical "Monitored Retrievable Storage" facility that DOE never came close to building (ENPF ¶¶ 130-132, 134, 139-47), (iii) was based upon assumptions that were specifically barred under the NWPA Amendments and inconsistent with DOE's own representations to Congress (ENPF ¶¶ 130-32, 136), and (iv) was admittedly left by DOE in the 1995 ACR even after the MRS facility upon which it was supposedly based had long since "died," for the specific purpose of limiting DOE' damages in cases for breach of the Standard Contract. (ENPF ¶¶ 139-62.)

Third, depending on the resolution of the factual dispute on the overall acceptance rate, Energy Northwest's right to deliver its SNF could have come as early as last year, 2004. While the Government generally asserts that Energy Northwest has no allocations early in the waste acceptance queue, the Government's motion fails to tell the Court *when* those allocations would actually occur. Under the 3,000 ton rate – the only rate the evidence supports – DOE would have begun accepting Energy Northwest's SNF in 2004. (ENA at 374, 376, ENPF ¶ 216.) In fact, even under the artificially low 900 ton rate advocated by the Government, Energy Northwest's first acceptance allocation would occur in 2011. (ENA at 374, 377, ENPF ¶ 218.) The foundational assumption of the Government's entire position is that, given the 900 ton rate reflected in its 1995 ACR, Energy Northwest had no right to deliver to DOE any SNF prior to 2008. Consequently, the substantial fact dispute over the overall acceptance rate, which directly affects when DOE was obligated to accept Energy Northwest's SNF, alone prevents summary judgment in the Government's favor.

**Conclusion**

For the foregoing reasons, this Court should deny the Government's motion for partial summary judgment and enter an order finding the Government liable for breach of the Standard Contract.

Dated: August 11, 2005

Respectfully submitted,

s/ Norman M. Hirsch
NORMAN M. HIRSCH
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611
(312) 923-2782 telephone
(312) 840-7782 facsimile

OF COUNSEL:

David A. Handzo
Jenner & Block LLP
601 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 639-6000

William D. Heinz
David Jiménez-Ekman
Lisa M. Eddington
Christopher Tompkins
Nada Djordjevic
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611
(312) 222-9350

*Attorneys for Plaintiff*

**Certificate Of Filing And Certificate Of Service**

I hereby certify that on this 11th day of August, 2005, a copy of foregoing "Plaintiff's Response To The Court's Order To Show Cause And Memorandum In Opposition To Defendant's Motion For Summary Judgment" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Pursuant to the Court's August 10, 2005 Order, the Appendix To Plaintiff's Response To The Court's Order To Show Cause And Memorandum In Opposition To Defendant's Motion For Summary Judgment (the "Appendix") was filed in paper form with the Clerk's office. A copy of the Appendix was also served by hand delivery on:

Sharon A. Snyder
Trial Attorney
Commercial Litigation Branch, Civil Division
U.S. Department of Justice
ATTN: Classification Unit, 8th Floor
1100 L Street NW
Washington, D.C. 20530

/s Norman M. Hirsch