**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# PLAINTIFF'S RESPONSE TO DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

---

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
LISA M. EDDINGTON
CHRISTOPHER TOMPKINS
NADA DJORDJEVIC
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
601 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 639-6000

NORMAN M. HIRSCH
Jenner & Block, LLP
One IBM Plaza
330 N. Wabash
Chicago, IL 60611
(312) 923-2782 telephone
(3412) 840-7782 facsimile

Dated: August 11, 2005

*Attorneys for Plaintiff*

In response to the Government's Proposed Findings of Uncontroverted Fact, Energy Northwest (formerly known as Washington Public Power Supply System), states as follows:

I. THE ORIGINAL PROVISIONS OF THE NUCLEAR WASTE POLICY ACT

1. On January 7, 1983, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)), was enacted. The bases for Congress' passage of the NWPA included statutory findings that the public health and safety necessitated that the Government provide a solution for the permanent storage and disposal of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW"), but that the costs of the interim and permanent storage and disposal of SNF and HLW were the responsibility of those entities that created the SNF and HLW. 42 U.S.C. §§ 10131(a)(4)-(5) (1982).

**RESPONSE:** Energy Northwest agrees that the NWPA was enacted on the date shown. Further Responding, Energy Northwest states that the Government's attempt at paraphrasing the NWPA findings is incomplete:

*First,* the specific health and safety concern with which Congress was concerned was that "a national problem has been created by the *accumulation of (A) spent nuclear fuel from nuclear reactors*; and (B) radioactive waste from (i) reprocessing of spent nuclear fuel; (ii) activities related to medical research, diagnosis, and treatment; and (iii) other sources." 42 U.S.C. § 10131(a)(2) (emphasis added).[EN1]

*Second*, the statutory findings in the NWPA with regard to responsibility for interim storage specify that "the generators and owners of high-level radioactive waste and spent nuclear fuel have the primary responsibility to pay the costs of, the interim storage of such waste and spent fuel *until* such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this chapter." 42 U.S.C. § 10131(a)(5) (emphasis added). Under the NWPA, acceptance was to take place "*not later than January 31, 1998*." 42 U.S.C. § 10222(a)(5)(B) (emphasis added).

---

[EN1] The NWPA is reproduced in Energy Northwest's Appendix at pages 1 through 57. Additionally, selected provisions as they appeared prior to amendment in 1987 are reproduced at pages 58 through 77 of Energy Northwest's Appendix.

Further responding, Energy Northwest incorporates into this response ¶¶ 1-30 of Plaintiff's Proposed Findings of Uncontroverted Fact, which more fully set forth the concerns and goals of Congress in passing the NWPA and ¶¶ 64-70 regarding the DOE's interpretation of its obligations.

2. In its statement of the statutory purposes underlying the NWPA, Congress identified the following four objectives: developing repositories to ensure the protection of the public and the environment from the hazards posed by SNF and HLW; establishing Federal responsibility and policy for the disposal of SNF and HLW; defining the relationship between the Federal Government and state governments regarding SNF and HLW disposal; and establishing

> . . . a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.

Id. § 10131(b).

**RESPONSE:** Energy Northwest agrees that the Government has accurately paraphrased three of the purposes of the NWPA and accurately quoted portions of Section 10131(b). Further responding, Energy Northwest states that the Government fails to quote the portion of the NWPA that provides that "the generators and owners of high-level radioactive waste and spent nuclear fuel have the primary responsibility to pay the costs of, the interim storage of such waste and spent fuel *until* such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this chapter," 42 U.S.C. § 10131(a)(5) (emphasis added), or the part that provides that "in return for payment of fees [into the waste fund] established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of high-level radioactive waste or spent nuclear fuel. . . ." 42 U.S.C. § 10222(a)(5)(B) (emphasis added). In enacting these provisions, Congress envisioned a *quid quo pro* under which the Department of Energy ("DOE") is "responsible for disposing of [HLW or SNF] … in permanent disposal facilities, beginning not

later than January 1998, in return for payment of fees established by this section." H.R. Rep. No. 97-425, pt. 1, at 59 (1982), ENA at 120.[EN2]

Further responding, Energy Northwest incorporates into its response to the proposed finding Plaintiff's Proposed Findings of Uncontroverted Fact ¶¶ 19-24 and 63-70 which more fully set forth the concerns and goals of the NWPA related to the nuclear waste fund and the contracts with utilities.

3. The NWPA provided that the Secretary would enter into contracts with the owners and generators of SNF of domestic origin for "the acceptance of title, subsequent transportation, and disposal of such [SNF]." 42 U.S.C. § 10222(a)(1)( (1982). The contracts had to "provide for payment to the Secretary of fees … sufficient to offset expenditures" described elsewhere in the statute. Id. The NWPA also required that the contracts with the nuclear utilities provide that:

> (A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>
> (B) in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subtitle.

42 U.S.C. § 10222(a)(5).

**RESPONSE:** Energy Northwest agrees that the NWPA required DOE and nuclear utilities to contract for the disposal of SNF, that the contracts were to provide for the payment of fees, and that the Government has accurately quoted portions of 42 U.S.C. § 10222(a).

Further responding, Energy Northwest incorporates into its response ¶¶ 19-24 of Plaintiff's Proposed Findings of Uncontroverted Fact regarding the purpose of the NWPA's provisions for contracts between utilities and DOE.

---

[EN2] Citations to Energy Northwest's Appendix are cited as "ENA at __." Citations to the Government's Appendix are cited as "GA at __."

## II. THE DEPARTMENT OF ENERGY'S PROMULGATION OF THE "STANDARD CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE" THROUGH NOTICE AND COMMENT RULEMAKING IN THE FEDERAL REGISTER

### A. The Proposed Rule.

4. On February 4, 1983, the Department of Energy ("DOE"), in furtherance of its obligations pursuant to the NWPA, 42 U.S.C. § 10222, published a notice of proposed rulemaking in the Federal Register, proposing terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste" ("Standard Contract") mandated by the NWPA, 42 U.S.C. § 10222. See 48 Fed. Reg. 5458 (Feb. 4, 1983).

**RESPONSE:** Energy Northwest agrees that the DOE published a notice of proposed rulemaking in the Federal Register on February 4, 1983.

Further responding, Energy Northwest incorporates into its response ¶¶ 14-18 and 66-67 of Plaintiff's Proposed Findings of Uncontroverted Fact about the expectations of Congress and the DOE concerning operation of a repository.

5. As required by the NWPA, the proposed rule contained a mechanism for defining each contract holder's financial obligations under the Standard Contract. Specifically, DOE proposed that each entity which entered into the Standard Contract would pay fees to the Secretary, for deposit into the Nuclear Waste Fund ("NWF"), in the following forms and amounts: (1) a one-time fee for SNF generated prior to April 7, 1983, and (2) continuing quarterly fees for SNF generated on or after April 7, 1983, in an amount of 1.0 mil per kilowatt-hour (or as otherwise adjusted) on electricity generated by the contract holder's nuclear power reactor. 48 Fed. Reg. at 5464 (Art. VIII).

**RESPONSE:** Energy Northwest agrees that the proposed contract contained the terms cited regarding a one-time fee and quarterly fees.

6. The proposed Standard Contract also provided a mechanism for determining both the order in which, and the rate at which, the various contract holders' SNF would be accepted. As for the order of SNF acceptance, the Standard Contract proposed that DOE would issue an "acceptance priority ranking" ("APR") of SNF and/or HLW, through which SNF and/or HLW would receive acceptance priority based generally upon its age:

> Acceptance Priority Ranking. Delivery commitment schedules for SNF and/or HLW may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate. The following acceptance priority ranking will be utilized:

> (a) Except as may be provided for in paragraph (2) below, acceptance priority shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such materials from the civilian nuclear power reactor to the date specified for transportation by DOE in the delivery commitment schedule. DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility;
>
> (b) Notwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason.

48 Fed. Reg. 5458, 5464 (Feb. 4, 1983) (Art. VI.B.3) (emphasis added).

**RESPONSE:** Energy Northwest disagrees with the Government's characterization that: "[t]he proposed Standard Contract also provided a *mechanism for determining both the order in which, and the rate at which, the various contract holders' SNF would be accepted*." Energy Northwest agrees that under the Standard Contract the *order* among utilities in which DOE was to accept SNF was based on the discharge date of a utility's SNF, subject to the possible exceptions identified in the contract. (Proposed Standard Contract, Art.V.B.6 and VI.B.3.b, 48 Fed. Reg. 5458, 5464 (Feb. 4, 1983), ENA at 991, 997-98.) Energy Northwest disagrees that the proposed contract provisions cited by the Government in their proposed findings establish the *rate* at which DOE was to accept and dispose of SNF.

The Acceptance Priority Ranking ("APR") does not establish the rate of SNF acceptance because it is nothing more than a list of SNF assemblies discharged from reactors ranked by the date of discharge. (Proposed Standard Contract, Art. V.B.6, 48 Fed. Reg. at 5463 (Feb. 4, 1983), ENA at 996; 4/19/02 Zabransky Dep. at 668, ENA at 968.) For example, the 1991 APR published by DOE does nothing more than indicate the order among utilities in which SNF will be removed, subject to exchanges, but says nothing about the rate at which the Government will accept SNF. (*See, e.g.,* 1991 Acceptance Priority Ranking at 4, ENA at 1699, 1702.)[EN3]

---

[EN3] While the priority ranking among utilities is based on the ranking of their oldest fuel, a utility could actually deliver any SNF for removal meeting the basic requirements for disposal

7. Although the proposed Standard Contract itself did not identify a specific rate by which DOE would accept contract holders' SNF, it provided for DOE's issuance of documents for planning purposes to assist in the eventual definitization of the specific rate and order of SNF acceptance and disposal:

> 5. DOE shall annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports.
>
> 6. Beginning on April 1, 1991, DOE shall issue an annual acceptance ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraph B.3 of Article VI of this contract.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. V.B.5 & Art. V.B.6).

**RESPONSE:** Energy Northwest agrees that the proposed contract "did not identify a specific rate by which DOE would accept contract holders' SNF" and that the Government has accurately quoted portions of the proposed Contract. Further responding, the proposed contract also did not identify a rate at which DOE would accept contract holders' SNF. Energy Northwest disagrees with the proposed finding to the extent that the Government is attempting to characterize the requirement for annual reports and for the APR as setting a rate of acceptance. As discussed in its response to defendant's proposed finding ¶ 6, which is incorporated herein, the APR does not establish the rate of SNF acceptance; instead, the APR is nothing more than a list of SNF assemblies discharged from reactors ranked by the date of discharge. The other provisions cited by the Government do not establish a rate. They merely require annual progress

---

under the contract. (Standard Contract, Art. V.E. ("Purchaser shall have the right to determine which SNF and/or HLW is delivered to DOE; *provided, however,* that purchaser shall comply with the requirements of this contract."), ENA at 303-04; DCS Instructions ¶7(b), GA at 146 ("Once a purchaser has an allocation, any SNF owned by the Purchaser may be designated against the allocation. The DCS does not restrict the Purchaser to deliver the specified SNF that was the basis for the allocation.").)

reports and reference other reports required by the NWPA, such as fee adequacy reports. 42 U.S.C. § 10224(a)(4).

8. The proposed contract further provided that, following DOE's issuance of planning documents, rates of SNF acceptance, as well as the specific order of SNF acceptance from particular contract holders, would be defined through the contract holders' submission of, and DOE's approval of, delivery commitment schedules ("DCSs"):

> … The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article IV below. The disposal services to be provided by DOE under this contract shall commence not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix "A", annexed hereto and made a part hereof, has been disposed of as provided for in this contract.

58 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (emphasis added). Specifically, in describing the purpose of the DCS in the preamble to its proposed rule, DOE stated that the procedures to be followed in defining any particular contract holder's allocation for SNF acceptance for any given year included the contract holder's obligation to describe the SNF that it would deliver to DOE, followed by submission of a DCS and of a final delivery schedule ("FDS"):

> *Article IV – Delivery of SNF and/or HLW* – Sets forth the procedures to be followed by Purchaser, including the requirement that the Purchaser describe the waste material to be delivered to DOE, the furnishing of a delivery commitment schedule 63 months prior to the specified delivery date, and a final delivery schedule which Purchaser submits 12 months prior to delivery. In case of an emergency DOE may, subject to prior approval, accept a Purchaser's waste material before the scheduled delivery date.

48 Fed. Reg. 5458, 5459 (Feb. 4, 1983) (italics in original; emphasis added).

**RESPONSE:** Energy Northwest assumes that the Government's citation of the first block of quoted material is supposed to refer to the comments on Article II of the proposed contract on page 5,463 of 48 Fed. Reg. rather than page 5,462. Assuming that clarification, Energy Northwest agrees that the Government has accurately quoted portions of the Notice.

Further responding, Energy Northwest disagrees with the Government's characterization of the quoted material as setting a rate of acceptance. The DCS provisions in the proposed contract do not set a rate of acceptance. The Standard Contract itself provided that the utilities

could submit a DCS for "all SNF and/or HLW the [utility] wishes to deliver to" DOE. (Standard Contract Art. V.B.1., ENA at 302 (emphasis added). Indeed, the proposed Standard Contract specifically recognized that the DCSs submitted "may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate" (Proposed Standard Contract, Art. VI.B.3, 48 Fed. Reg. at 5464, ENA at 997), and provided that each standard contract holder for every year could increase or decrease the amount of SNF in any DCS by 20%. (Proposed Standard Contract, Art. IV.B, 48 Fed. Reg. at 5463, ENA at 996.)

In addition, in its Instructions to Standard Contact Holders to Complete the DCSs ("DCS Instructions"), DOE made it even clearer that the DCSs did not establish a rate. The DCS Instructions, contrary to the Standard Contract itself, now informed the utilities that they had to fill out the DCSs using whatever particular allocation the most recent ACR report showed that the utility had for a particular year. (DCS Instructions ¶ 2, 2.7, GA at 145, 150.) Yet, as stated, the final Standard Contract and ACR reports themselves explicitly provided that they were not binding on either party and, under the contract, were to be reissued every year. (*See* Standard Contract Art. IV.B.5.b, ENA at 301; 1991 ACR at 1-2, ENA at 1687-88.) Moreover, the Instructions also stated that DOE and the purchasers could "reevaluate" the submissions if DOE did not remove SNF at the rate provided in the non-binding ACR. (DCS Instructions ¶ 7(c), GA at 146.) Finally, the instructions made it clear that the utilities did not have to identify specific SNF assemblies that they planned to submit in five years; instead, the utilities were only asked to submit a non-restrictive date range of when SNF they planned to provide had been (or would be) removed from reactors. (DCS Instructions ¶ 2.6, GA at 150.)

Not surprisingly, then, the DOE official in charge of DCS submissions testified that she did not consider those submissions binding on either the DOE or the utilities:

> Q: What about the delivery commitment schedules? Was it your understanding that those were for planning purposes only and not contractually binding on either the utilities or the department?

A: In my personal opinion they were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them. In addition, given the fungibility of the DCSs, that's why there is a final delivery schedule which is somewhat more than a planning document. And I do recall sitting across the table from numerous utility representatives, clearly recognizing that the DCSs were [for] planning purposes and they in fact did not view themselves as binding themselves to deliver specifically what was described on the DCS.

Q. During the time that you worked in the waste acceptance division at the Department of Energy, do you recall anyone either within DOE or in industry who thought that the delivery commitment schedules were binding on either industry or the department?

A. No, I don't.

(6/13/2002 Slater-Thompson Dep. at 98–99 (objections omitted), ENA at 897.) Ms. Slater-Thompson also testified that that the nature of the DCSs and their reliance on the non-binding ACRs also made them non binding:

Q. Did you view an approved delivery commitment schedule as binding a utility to not delivering more spent fuel than is set out on that delivery commitment schedule?

A. It's not the DCS that establishes the allocation. It's simply a reflection.

Q. What sets out the allocation?

A. The ACR; and that's for planning purposes only because that allocation could change.

(6/13/2002 Slater-Thompson Dep. at 110 (objections omitted), ENA at 900; *see also* 4/22/1999 Slater-Thompson Dep. at 244-245, ENA at 892.) Ms. Slater-Thompson's supervisor, Alan Brownstein, testified that the DCSs were only for planning purposes. (4/10/02 Brownstein Dep. at 376-78, ENA at 506.) Finally, Lake Barrett, the acting director or deputy director of OCRWM from 1993 until February 2002, testified that the DCSs were "adminstrivia" that really

didn't matter to him in his responsibilities to run the SNF program. (4/22/02 Barrett Dep. at 217-18, ENA at 407.)

9. In Article I.7 of the proposed Standard Contract, the term "delivery commitment" was defined as the SNF and/or HLW that a contract holder would deliver to DOE in a given year:

> The term "Delivery Commitment" means a promise by the Purchaser to deliver spent nuclear fuel and/or high-level radioactive waste to the DOE within a specified year.

48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art. I.7). The proposed contract provided that, after DOE had issued its proposed acceptance ranking, the contract holder was required to submit DCSs at least 63 months before the proposed delivery date:

> Delivery commitment schedule(s), in the form set forth in Appendix B, annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance ranking, described in paragraph B.6 of Article V of this contract, the Purchaser shall submit delivery commitment schedule(s) at least sixty-three (63) months prior to the delivery date specified therein. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. Purchaser shall have the right to adjust the quantities of SNF and/or HLW + or – 20%, and the delivery schedule +2 months, up to the submission of the final delivery schedule.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. IV.B).

**RESPONSE:** Energy Northwest agrees that the Government has accurately quoted provisions of the proposed standard contract. However, as stated in Energy Northwest's response to proposed finding ¶ 8, which is incorporated herein, the DCS related provisions in the proposed and the final contract did not establish a rate of acceptance. Furthermore, the definition of "Delivery Commitment" did not appear in the final version of the Standard Contract published in the Federal Register on April 18, 1983 and Art. IV.B. as quoted by the Government was also

revised. (Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, 48 Fed. Reg. 16590 (Apr. 18, 1983), ENA at 1005.)

10. The proposed Standard Contract also provided for the contract holders' subsequent submission of Final Delivery Schedules, which would serve to take the annual allocation defined in a DCS and further refine it to reflect as closely as possible the month(s) and day(s) upon which SNF acceptance would occur in that year:

> Final delivery schedule(s), in the form set forth in Appendix C, annexed here and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than 12 months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of disapproval.

48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (Art. IV.C).

**RESPONSE:** Energy Northwest agrees that the proposed Standard Contract called for submission of Final Delivery Schedules and that the proposed Standard Contract contained the provisions quoted by the Government. For the reasons identified in response to proposed finding ¶ 8, which is incorporated herein, Energy Northwest disagrees with the Government's implication that the DCS process established an acceptance rate for the Standard Contract or that the DCS "defined" Energy Northwest's allocation. As stated, the amount listed on the DCS was a mere reflection of the ACR, which the ACR, and the Standard Contract, stated were not binding. (6/13/02 Slater-Thompson Dep. at 98-99, ENA at 897; Standard Contract Art. IV.B.5.b, ENA at 301; 1991 ACR at1-2, ENA at 1687-88.)

11. The proposed rule provided that written comments had to be submitted by March 7, 1983. 48 Fed. Reg. at 5458.

**RESPONSE:** Energy Northwest agrees.

B. Comments Upon The Proposed Rule

12. DOE received numerous comments in response to the proposed rule. One commenter, Northern States Power Company, stated that "[t]he context of the contract is inverted." A. 38. (emphasis in original).[1] The proposed rule provided that "[t]he term 'Delivery Commitment' means a promise by the Purchaser to deliver spent nuclear fuel and/or high-level radioactive waste to the DOE within a specified year." 48 Fed. Reg. 5458, 5462 (Feb. 4, 1983) (Art. I.7). NSP stated that, "[r]ather than a context of spent fuel 'delivery commitments' as a binding obligation placed upon the utility, the contracts should be restated as in terms of 'acceptance commitments' as a binding obligation placed upon DOE." A. 38.

**RESPONSE:** Energy Northwest agrees that Northern States Power Company commented in part as quoted above.

13. Another commenter, Public Service Company of Colorado, stated that "[t]he [proposed] standard contract requires utilities to commit to spent nuclear fuel delivery schedules more than five years in advance of delivery, with the option of extending the delivery commitment date by only two months." A. 51. (emphasis added). It suggested that "[s]uch a restriction on delivery scheduling is entirely unwarranted" and that "[l]ong term waste delivery schedules (5 to 8 year advance projections) should specify waste deliveries to later years as actual plant operations become known." Id.

**RESPONSE:** Energy Northwest agrees that Public Service Company of Colorado commented in part as quoted above.

14. Edison Electric Institute ("EEI"), an association of investor-owned utilities, and the Utility Nuclear Waste Management Group ("UNWMG"), a consortium of 43 utilities with specific interests relating to nuclear waste management, suggested that the "definition of 'Delivery Commitment" (Article I.7) is unnecessary and should be deleted," since the term 'Delivery Commitment Schedule' is described in detail in Article IV.B and Appendix B," and since the definition of "Delivery Commitment" "adds nothing and could be inconsistent with Article IV.B and Appendix B" of the Standard Contract. A. 6.

**RESPONSE:** Energy Northwest agrees that EEI and UNWMG commented in part as quoted above.

15. Another commenter requested deletion of the "Delivery Commitment" definition, stating that "[d]efining this as a 'promise' introduces ambiguity as to whether this is a contract commitment or a non-binding planning arrangement," and suggested that "[t]he 'Delivery Commitment Schedule' described in Article IV.B is the applicable term." A. 108 (emphasis added); see A. 120 (Comments (after Georgia Power), at 1).

---

1 "A ___" refers to the Government's appendix in support of our motion for summary judgment.

**RESPONSE:** Energy Northwest agrees that Middle South Services, Inc. commented in part as quoted above. Energy Northwest further responds that it cannot determine the identity of the commenter on A.120 from the text of the page.

16. Another commenter, Northeast Utilities, recognized that, in the proposed rule, "DOE is requiring that utilities firm their delivery commitment five years prior to delivery and allows only minor changes within that five year period." A. 73 (emphasis added).

**RESPONSE:** Energy Northwest agrees that the comments of Northeast Utilities stated that "DOE is requiring that utilities firm their delivery commitment five years prior to delivery and allows only minor changes within that five year period."

17. Another commenter, Mississippi Power & Light Company, stated as follows in its comments:

> Article I, Definition 7 – The definition of "Delivery Commitment" is unnecessary and should be deleted. Article IV.B and Appendix B describe in detail the "Delivery Commitment Schedule." If the definition must remain we suggest it be revised as follows: "… within a specified year, and a promise by DOE to receive such deliveries within a specified year in accordance with Article IV.B."

A. 85 (emphasis in original).

**RESPONSE:** Energy Northwest agrees that Mississippi Power & Light Company commented in part as quoted above.

18. Yet another commenter suggested that the DCS provision, requiring submission 63 months in advance of delivery, was "much too restrictive," recognizing that "[t]his commitment should be eliminated or, as a minimum, the flexibility to the Purchaser should be increased" by, as one suggestion, "reducing the commitment leadtime to 36 months . . . ." A. 106 (emphasis added); see A. 116 ("[i]t should not be necessary to submit firm (within + or – 20%) commitment schedules sixty-three (63) months prior to the delivery date").

**RESPONSE:** The Government's Proposed Finding misquotes the comment, the final sentence should read "*delivery* commitment schedules." Assuming this clarification, Energy Northwest agrees Houston Lighting and Power Company and Dairyland Power Cooperative commented in part as quoted above.

19. Another commenter, Cleveland Electric Illuminating Company, requested that the "Delivery Commitment Schedule" be changed "for the sake of additional clarification" to "Preliminary Delivery Commitment Schedule." A. 53, 55.

**RESPONSE:** Energy Northwest agrees that Cleveland Electric Illuminating Company commented in part as quoted above.

20. In their comments to the proposed rule, EEI and UNWMG recognized the importance of having DOE receive Delivery Commitment Schedules from all contract holders for a given year:

> If DOE is to be able to establish a reasonable planning basis for its delivery commitments, it should receive proposed delivery commitment schedules from all purchasers at the same time and covering the same time frame. Unless delivery commitment schedules are submitted on a consistent basis, DOE will not be able to plan on a consistent basis. Retaining the 63 month timetable, all purchasers should submit delivery schedules by July 1 covering any deliveries they wish to make during the fiscal year commencing 63 months later.

A. 11.

**RESPONSE:** Energy Northwest agrees that EEI commented in part as quoted above. Energy Northwest objects to the Government's additional comment regarding the "importance" of the procedure suggested.

21. Many commenters suggested a contract change to provide that, if DOE disapproved a contract holder's DCS and the contract holder did not accept the alternate schedule that DOE identified in response, the contract could provide for mandatory negotiation among the parties to arrive at an acceptable schedule. A. 100-01; see A. 53, 86.

**RESPONSE:** Energy Northwest disagrees that the Government's citations to A.53 and A.86 support the Government's assertion that utilities commented as quoted above. Pages A.53 and A.86 of the Government's appendix appear to bear no relation to the comments noted above. Energy Northwest also disagrees with the Government's characterization "many commenters." Energy Northwest agrees that Pacific Gas and Electric Company commented in part as quoted above.

C. The Final Rule

22. On April 18, 1983, DOE issued the Standard Contract as a final rule. The final rule, as promulgated, made several important modifications to the Standard Contract set forth in the proposed rule. First, although the proposed rule provided that "services provided to the Purchaser by DOE under this contract are related to disposal of SNF," 48 Fed. Reg. 5458, 5462 (Feb. 4, 1983), that "disposal" was defined as emplacement in a permanent repository, id., and that such "disposal" services would begin by January 31, 1998, id., the final Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998. Instead, the final Standard Contract only required DOE to begin SNF acceptance by January 31, 1998, after the commencement of "facility" operations:

> This contract applies to the delivery by Purchaser to DOE of SNF and/or HLW of domestic origin from civilian nuclear power reactors, acceptance of title by DOE to such SNF and/or HLW, subsequent transportation and, with respect to such material, establishes the fees to be paid by the Purchaser for the services to be rendered hereunder by DOE. The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article V below. The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of.

10 C.F.R. § 961.11, Art. II (emphasis added). The "facility" to which the final Standard Contract refers is either a permanent repository to be constructed pursuant to the NWPA or such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository:

> The term "DOE facility" means a facility operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel and/or high-level radioactive waste, or such other facility(ies) to which spent nuclear fuel and/or high-level radioactive waste may be shipped by DOE prior to its transportation to a disposal facility.

Id. § 961.11, Art. I.10 (emphasis added). As the preamble to the final rule expressly recognized, the final Standard Contract would not obligate DOE to have an operational permanent repository by January 31, 1998:

> The definition of "DOE facility" (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository.

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983).

**RESPONSE:** Energy Northwest agrees that the final version of the contract made the specific changes referenced in the preamble and Articles I.10 and II of the Standard Contract. Energy Northwest disagrees with the Government's characterization of the effect of these changes. First, in the *Indiana-Michigan Power Company v. Department of Energy*, 88 F.2d 1272 (D.C. Cir. 1996), the D.C. Circuit specifically rejected the Government's argument that the language "after commencement of facility operations" relieved DOE of any obligation to begin removing waste in January 1998. *Id.* at 1276-77. In addition, as the *Indiana-Michigan* decision recognized, and DOE has admitted, Congress and DOE expected that DOE would have a repository in operation by January 1998. *See id.* at 1277. Further responding, Energy Northwest incorporates its response to proposed findings ¶ 3, and ¶¶ 12-18 and 66-67 of Plaintiff's Proposed Findings of Uncontroverted Fact.

23. As for the order of SNF acceptance, the final Standard Contract retained the proposed rule's intention to provide SNF acceptance priority among contract holders upon an "oldest fuel first" basis, 10 C.F.R. § 961.11, Art. VI.B.1, and, like the proposed rule, provided for DOE's issuance of an acceptance priority ranking beginning April 1, 1991. 10 C.F.R. § 961.11, Art. IV.B.5.a.

**RESPONSE:** Energy Northwest agrees that under the final version of the Standard Contract, the priority ranking among utilities would be based on an "oldest fuel first" basis, and that DOE was to issue an APR beginning April 1, 1991.

24. As for identification of the rate of SNF acceptance, although the proposed rule stated that DOE would "annually provide to the Purchaser pertinent information to support waste disposal program cost projections, project plans and progress reports," 48 Fed. Reg. 5458, 5463 (Feb. 4, 1983), the final Standard Contract provided, "at the request of a substantial number of commenters," 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983), that DOE would issue an annual capacity report "for planning purposes" beginning no later than July 1, 1987 to set forth information regarding "the projected annual receiving capacity for the DOE facility(ies)" for the 10 years following the projected commencement of the initial DOE facility:

> Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes. This report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for

> the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility.

10 C.F.R. § 961.11, Art. IV.B.5.b.

**RESPONSE:** Energy Northwest agrees that the final contract requires the yearly publication of a report titled "Annual Capacity Report" ("ACR"). Energy Northwest notes that the Standard Contract expressly stated that the ACRs were for "planning purposes" and that the ACRs themselves when issued, explicitly stated they were not binding on either party. (Standard Disposal Contract Art. IV.B.V.b, ENA at 301; *see, e.g.,* 1991 ACR at 1-2, ENA at 1687-88, 2004 APR/ACR at 1, ENA at 2136.) Energy Northwest agrees that the DOE Notice stated that ACR provision was added ". . . at the request of a substantial number of commenters…."(48 Fed. Reg. 16592, ENA at 1008.) Further responding, Energy Northwest notes that Robert Morgan testified that this provision was added solely because of utility requests for planning forecasts and that the ACR was not intended for any purpose other than planning. (3/21/02 Morgan Dep. at 139-141, ENA at 755-56.)

Further responding, Energy Northwest notes that the notice indicated DOE would issue an "*annual* report for planning purposes." (48 Fed. Reg. at 16592, ENA at 1008 (emphasis added).) DOE has repeatedly failed to comply with this requirement. For example, the DOE failed to issue an ACR in 1989, and also failed to publish an ACR 1996-2003. (*See Defendant's Response to Utility Plaintiff's Requests for Admissions*, Request to Admit 45, ENA at 2129-30; *see also* 7/12/05 Pollog Testimony in *Tennessee Valley Authority v. United States,* at 1660, (ENA at 820, 2004 APR/ACR, ENA at 2133-2213.)

25. The final Standard Contract also deleted some provisions from the proposed rule regarding the DCSs, but with the intention only of eliminating redundant provisions. As the "Sectional Analysis of Contract" portion of the final rule provided, DOE's intention was to retain the purpose of the DCSs, as had been defined in the proposed rule:

> The definition of "delivery commitment" which appeared in the proposed rule (48 FR 5462, Article I.7) has been deleted as this

> aspect is adequately covered in the contract itself (See Articles IV and V.)

48 Fed. Reg. 16590, 16591 (Apr. 18, 1983). Accordingly, adopting the purpose of the DCSs from the proposed rule, the final Standard Contract established a procedure through which, after DOE's issuance of the 1991 annual capacity report ("ACR") and acceptance priority ranking ("APR"), contract holders would be required to begin submission of DCSs (beginning January 1, 1992) for any SNF and/or HLW that they wanted DOE to accept 63 months later:

> 1. Delivery commitment schedule(s), in the form set forth in Appendix C annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance priority ranking, as described in paragraph B.5 of Article IV hereof, beginning January 1, 1992 the Purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval.
>
> 2. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s). Purchaser shall have the right to adjust the quantities of SNF and/or HLW plus or minus (+/-) twenty percent (20%), and the delivery schedule up to two (2) months, until the submission of the final delivery schedule.

10 C.F.R. § 961.11, Art. V.B (emphasis added). Unlike the proposed rule, the DCS submission provision of the final Standard Contract included a requirement that, if a contract holder found a DCS that DOE required to be unacceptable, "the parties shall promptly seek to negotiate mutually acceptable schedule(s)." Id.

**RESPONSE:** Energy Northwest cannot respond to the last sentence as an apparent typographical error renders it unintelligible.

Energy Northwest agrees that the proposed finding accurately quotes portions of the final Standard Contract. Energy Northwest disagrees with the Government's characterization of the quoted material as setting a rate of acceptance. The DCSs in the Standard Contract do not set a

rate of acceptance. The Standard Contract itself provided that the utilities could submit a DCS for "all SNF and/or HLW the [utility] wishes to deliver to" DOE. (Standard Contract Art. V.B.1., ENA at 302 (emphasis added).) Indeed, the Standard Contract specifically recognized that the DCSs submitted "may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate" (Standard Contract Art. VI.B.1, ENA at 302), and provided that each Standard Contract holder for every year could increase or decrease the amount of SNF in any DCS by 20%. (Standard Contract Art. V.B.2, ENA at 302.)

In addition, in its DCS Instructions, DOE made it even clearer that the DCSs did not establish a rate. The DCS Instructions, contrary to the Standard Contract itself, informed the utilities that they had to fill out the DCSs using whatever particular allocation the most recent ACR report showed that the utility had for a particular year. (DCS Instructions ¶¶ 2, 2.7, GA at 145, 150; 2004 DCS Instructions ¶ 7, 2.3, ENA at 2217, 2220.) Yet, as stated, the Standard Contract and ACR reports themselves explicitly provided that they were not binding on either party and, under the contract, were to be reissued every year. (*See* Standard Contract Art. IV.B.5.b, ENA at 301; 1991 ACR at 1-2, ENA at 1687-88; 2004 APR/ACR at 1, ENA at 2136.) Moreover, the DCS Instructions also stated that DOE and the purchasers could "reevaluate" the submissions if DOE did not remove SNF at the rate provided in the non-binding ACR. (DCS Instructions ¶ 7(c), GA at 146.)[EN4] Finally, the DCS Instructions made it clear that the utilities did not have to identify specific SNF assemblies that they planned to submit in five years; instead, the utilities were only asked to submit a non-restrictive date range of when SNF they planned to provide had been (or would be) removed from reactors. (DCS Instructions ¶ 2.6, GA at 150.)

---

[EN4] The 2004 DCS Instructions did not contain this statement. (2004 DCS Instruction ¶ 7(c), ENA at 2217.)

Not surprisingly, then, the DOE official in charge of DCS submissions testified that she did not consider those submissions binding on either DOE or the utilities:

> Q: What about the delivery commitment schedules? Was it your understanding that those were for planning purposes only and not contractually binding on either the utilities or the department?
>
> A: In my personal opinion they were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them. In addition, given the fungibility of the DCS's, that's why there is a final delivery schedule which is somewhat more than a planning document. And I do recall sitting across the table form numerous utility representatives clearly recognizing that the DCSs were [for] planning purposes and they in fact did not view themselves as binding themselves to deliver specifically what was described on the DCS.
>
> Q. During the time that you worked in the waste acceptance division at the Department of Energy, do you recall anyone either within DOE or in industry who thought that the delivery commitment schedules were binding on either industry or the department?
>
> A. No, I don't.

(6/13/2002 Slater-Thompson Dep. at 98–99 (objections omitted), ENA at 897.) Ms. Slater-Thompson also testified that that the nature of the DCSs and their reliance on the non-binding ACRs also made them non binding:

> Q. Did you view an approved delivery commitment schedule as binding a utility to not delivering more spent fuel than is set out on that delivery commitment schedule?
>
> A. It's not the DCS that establishes the allocation. It's simply a reflection.
>
> Q. What sets out the allocation?
>
> A. The ACR; and that's for planning purposes only because that allocation could change.

(6/13/2002 Slater-Thompson Dep. at 110 (objections omitted), ENA at 900; *see also* 4/22/1999 Slater-Thompson Dep. at 244-245, ENA at 892.) Ms. Slater-Thompson's supervisor, Alan

Brownstein, testified that the DCSs were only for planning purposes. (4/10/02 Brownstein Dep. at 376-78, ENA at 506.) Finally, Lake Barrett testified that the DCSs were "adminstrivia" that really didn't matter to him in his responsibilities to run the SNF program. (4/22/02 Barrett Dep. at 217-18, ENA at 407.)

Further responding, Energy Northwest agrees that the quoted language regarding negotiation appears in the final Standard Contract. Energy Northwest notes that it was clear that any such "negotiation" would have been futile. In its DCS instructions, DOE informed Energy Northwest and other purchasers that it would disapprove any DCS which contained more SNF than was listed in the ACR. (DCS Instructions ¶¶ 2, 2.7, GA at 145, 150; 2004 DCS Instructions ¶¶ 7, 2.3, ENA at 2217, 2220.) Furthermore, as set forth in Plaintiff's Proposed Findings of Uncontroverted Fact ¶¶ 172-81, 183, which are incorporated herein, DOE refused the requests of other utilities, such as the Yankee Utilities, who attempted to list more SNF than allocated in the ACR. If a utility submitted a DCS form that listed MTUs greater than the current ACR allocation, the DCS submission would be rejected. (4/17/02 Zabransky Dep. at 57-59, ENA at 937; 4/22/1999 Slater-Thompson Dep. at 230-231, ENA at 890.)

In addition, as stated in response to proposed finding ¶ 31, which is incorporated herein, because as DOE has admitted the ACRs were exclusively for planning purposes, there was no basis to "protest" any DOE action. (4/11/05 Christopher Kouts Rule 30(b)(6) Dep. at 129-30, ENA at 618; 6/13/02 Slater-Thompson Dep. at 98-99, ENA at 897; 1991 ACR at 1-2, ENA at 1687-88.) Finally, Energy Northwest disagrees that the disputes clause had any application to the submission or approval of DCSs. The quoted language regarding "negotiation" does not provide a specific remedy which will invoke the disputes clause.

26. The final Standard Contract, like the proposed rule, contained (1) language providing for the submission of FDSs after the submission and approval of DCSs and (2) a new sentence that required the parties "promptly [to] seek to negotiate mutually acceptance schedules" if the FDS that DOE was willing to approve was unacceptable to the contract holder.

> Final delivery schedule(s), in the form set forth in the Appendix D, annexed hereto and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than twelve (12) months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s).

10 C.F.R. § 961.11, Art. V.C.

**RESPONSE:** Energy Northwest agrees that the Contract contained the quoted provision providing for the submission of Final Delivery Schedules one year prior to delivery.

27. Finally, the final Standard Contract contained an integration clause, precluding reliance upon any representation, promise, or condition not expressly incorporated into the contract:

> This contract, which consists of Articles I through XXII and Appendices A through G, annexed hereto and made a part hereof, contains the entire agreement between the parties with respect to the subject matter hereof. Any representation, promise, or condition not incorporated in this contract shall not be binding on either party. No course of dealing or usage of trade or course of performance shall be relevant to explain or supplement any provision contained in this contract.

10 C.F.R. § 961.11, Art. XXII.

**RESPONSE:** Energy Northwest agrees that the Standard Contract contained the quoted language. Energy Northwest disagrees with the Government's legal characterization of its effect where, as here, the Contract does not contain a term establishing the rate of acceptance. (Energy Northwest Br. Section II.C.)

III. ENERGY NORTHWEST'S EXECUTION OF ITS STANDARD CONTRACT

28. On June 13, 1983, Washington Public Power Supply System, the predecessor to Energy Northwest, executed its Standard Contract with DOE. See Complaint ¶ 2. Energy Northwest's Standard Contract contained the same terms and conditions as the final rule promulgated by DOE on April 14, 1983, 10 C.F.R. § 961.11. A. 358-401.

**RESPONSE:** Energy Northwest agrees that Washington Public Power Supply System (now known as Energy Northwest) executed its Standard Contract on June 13, 1983, and that Energy Northwest's Standard Contract contains the same terms and conditions as the final rule promulgated on DOE on April 14, 1983. Energy Northwest disagrees that Washington Public Power Supply System is the "predecessor" to Energy Northwest. Washington Public Power Supply System officially changed its name to Energy Northwest on June 2, 1999.

IV. DOE'S ISSUANCE OF THE 1987 MISSION PLAN AMENDMENT

29. In June 1985, DOE issued the Mission Plan, in accordance with the requirements of 42 U.S.C. § 10221 (1982), which was to "provide an informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under this chapter." 42 U.S.C. § 10221 (1982).

**RESPONSE:** Energy Northwest agrees that DOE issued a Mission Plan in 1985, the text of which speaks for itself.

30. In the 1987 Mission Plan Amendment, which DOE submitted to Congress in June 1987, DOE noted the importance of the Annual Capacity Report that would be issued in 1991, which would provide the basis for the submission of DCSs:

> Under the terms of the contract that has been signed between the DOE and the owners and generators of spent fuel and high-level waste, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE for planning purposes beginning in 1987. In 1991, the DOE is required to begin publishing annual acceptance priority rankings for spent-fuel receipt by the DOE. Beginning January 1, 1992, the utilities are to submit to the DOE for approval delivery commitment schedules based on these rankings. These schedules will form the basis for final delivery schedules to be submitted by the utilities not less than 12 months before the actual delivery dates.

A. 207 (emphasis added).

**RESPONSE:** Energy Northwest agrees that the 1987 Mission Plan Amendment contained the quoted statements. Further responding, Energy Northwest notes that the Acceptance Priority Ranking ("APR") does not establish the rate of SNF acceptance because it is nothing more than a list of fuel assemblies discharged from reactors ranked by the date of discharge. (Standard Contract Art. IV.B.5.a, ENA at 301; 4/19/02 Zabransky Dep. at 668, ENA at 968.) For example, the 1991 APR published by DOE does nothing more than indicate the order among utilities in which SNF will be removed, subject to exchanges, but says nothing about the rate at which DOE will accept SNF. (*See, e.g.,* 1991 Acceptance Priority Ranking at 4, ENA at 1699, 1702.) Further responding, Energy Northwest disagrees with the DOE's characterization of the "importance" of the 1991 Annual Capacity Report ("ACR") among other things because the quoted statement does not even refer to the 1991 ACR. Further responding, Energy Northwest incorporates into this response its response to proposed finding ¶ 31.

In addition, Energy Northwest disagrees that the 1991 ACR "would provide the basis for the submission of DCSs." The DCS provisions in the Standard Contract did not refer at all to the Annual Capacity Reports regarding DOE's annual receiving capacity. (Standard Contract Art. V.B., ENA at 302.) The Standard Contract itself provided that the utilities could submit a DCS for "all SNF and/or HLW the [utility] <u>wishes</u> to deliver to" the DOE. (Standard Contract Art. V.B.1., ENA at 302 (emphasis added).) The Standard Contract and the ACRs themselves also explicitly provided that the ACRs were "for planning purposes only" and explicitly stated that the ACRs were not binding on either party. (*See* Standard Contract Art. IV.B.5.b, ENA at 301, 1991 ACR at 1-2, ENA at 1687-88, 2004 APR/ACR at 1, ENA at 2136.)

V. <u>DOE'S ISSUANCE OF ANNUAL CAPACITY REPORTS</u>

31. Beginning in 1987, in compliance with the NWPA and the language of the Standard Contract, DOE issued an "Annual Capacity Report." DOE's ACRs expressly stated that "the ACR is for planning purposes only and thus is not contractually binding on either DOE

or the Purchasers." A. 210; 212; 216. Further, each of the ACRs from 1987 through 1990 contained the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

A. 210; 213, 216 (emphasis added).

**RESPONSE:** Energy Northwest agrees that DOE issued its first ACR in 1987 and that the referenced ACR contained the language quoted in the proposed finding. Further responding, Energy Northwest notes that in the case of the 1987 and 1988 ACRs, the projected acceptance rates ramped up to a steady state operation of 2,650 tons and 3,000 tons respectively. (ENA at 1481, 1507.)

32. Although DOE announced that the 1990 ACR would be the last, DOE decided that it would continue publication of the ACR "after discussion with the Purchasers." A. 407. DOE provided the following guidance regarding the DCSs in the 1991 ACR:

> The Purchasers' allocations for each delivery year are presented in Tables A.1 through A.10 in Appendix A, and should be used as the basis for submitting DCSs. An allocation is specified acceptance capacity (measured in MTU) in a particular year for an individual Purchaser."

A. 408.

**RESPONSE:** Energy Northwest agrees that DOE issued an ACR in 1991 which contained the quoted language. Further responding, Energy Northwest notes that the 1991 ACR noted, as had prior ACRs, that "[a]s specified in the Standard Contract, the ACR is for planning purposes only and thus is not contractually binding on either the DOE or the Purchasers." (1991 ACR at 1-2, ENA 1687-88.)

Further responding, DOE's initial decision to make the 1990 ACR the last ACR was in contravention of the requirements of the Standard Contract. Under the Standard Contract, the DOE is required to issue an annual capacity report "for planning purposes." (Standard Contract Art. IV.B.5.b., ENA at 301 (emphasis added).) DOE has repeatedly failed to comply with this requirement.

33. Energy Northwest did not have any allocations in any of those years. See generally A. 420-445.

**RESPONSE:** Energy Northwest agrees that it did not have any allocations in Tables A.1 through A.10 contained in Appendix A of the 1991 ACR.

Further responding, Energy Northwest incorporates into this response ¶¶ 125-33, 152-57 of Plaintiff's Proposed Findings of Uncontroverted Fact. As noted in those proposed findings, the 1991 and 1992 ACR acceptance rates (1) were supposedly based on a hypothetical facility that DOE admittedly never came close to building, (2) were based upon assumptions that were prohibited by the 1987 NWPA Amendments and were inconsistent with DOE's own representations to Congress at the time Congress considered the NWPA Amendments legislation, (3) would not achieve any of the objectives of the NWPA of preventing the need for additional at-reactor storage or reducing the backlog of SNF at utility sites, and (4) were improperly intended to limit utility damages for breach of the Standard Contract.

Further responding, it is Energy Northwest's understanding that if DOE had begun accepting SNF in 1998 at an acceptance that ramped up to a steady rate of 3,000 MTU by the sixth year of operations (the rate used in the 1987-1989 ACRs and DOE planning documents), Energy Northwest's first acceptance allocation would have occurred in 2004. (*See* Supko Report at 9, 11, ENA at 362, 374, 376; *see also* Larkin Decl. ¶ 17, ENA at 358-59.)

34. The 1991 and 1992 ACRs contained identical projected SNF acceptance rates for the first ten years of SNF acceptance:

**Table 2.1**
Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel

| Year | SNF (MTU) |
|---|---|
| 1998 | 400 |
| 1999 | 600 |
| 2000 | 900 |
| 2001 | 900 |
| 2001 | 900 |
| 2002 | 900 |
| 2003 | 900 |
| 2004 | 900 |
| 2005 | 900 |
| 2006 | 900 |
| TOTAL | 8,200 |

A. 411; 473.

**RESPONSE:** Energy Northwest agrees that the 1991 ACR and the 1992 ACR contain the same acceptance rate projections. Further responding, Energy Northwest incorporates into this response ¶¶ 125-33, 152-57 of Plaintiff's Proposed Findings of Uncontroverted Fact. As noted in those proposed findings, the 1991 and 1992 ACR acceptance rates (1) were supposedly based on a hypothetical facility that DOE admittedly never came close to building, (2) were based upon assumptions that were prohibited by the 1987 NWPA Amendments and were inconsistent with DOE's own representations to Congress at the time Congress considered the NWPA Amendments legislation, (3) would not achieve any of the objectives of the NWPA of preventing the need for additional at-reactor storage or reducing the backlog of SNF at utility sites, and (4) were improperly intended to limit utility damages for breach of the Standard Contract. Energy Northwest also incorporates its response to the Government's Proposed Findings ¶ 31 regarding the significance of the ACR.

In addition, it is Energy Northwest's understanding that if DOE had begun accepting SNF in 1998 at an acceptance that ramped up to a steady rate of 3,000 MTU by the sixth year of operations (the rate used in the 1987-89 and 2004 ACRs and DOE planning documents), Energy

Northwest's first acceptance allocation would have occurred in 2004. (*See* Supko Report at 9, 11, ENA at 362, 374, 376; *see also* Larkin Decl. ¶ 17, ENA at 358-59.)

35. In 1995, DOE issued a combined Acceptance Priority Ranking and Annual Capacity Report, to "establish[] the order in which the Department allocates the projected acceptance capacity for commercial [SNF]" and to appl[y] projected nominal acceptance rates for the system to the priority ranking in the APR, resulting in individual allocations for the owners and generators expressed in metric tons per uranium (MTU)." A. 291. The 1995 ACR contained substantially similar SNF acceptance rates as the 1991 and 1992 ACRs, shown above. A. 294. The 1995 ACR also contained the following statement:

> The ACR (See Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. . . . . The projected nominal acceptance rates also reflect the capacity limit imposed by the Act on such a storage facility prior to repository operations. These projected nominal waste acceptance rates are presented in Table 1. The Department will continue to process DCS submittals on an annual basis.

A. 293-94. The 1995 ACR further provided that "[t]hese capacity allocations, as listed in the ACR, form the basis for the Purchasers' submittal of Delivery Commitment Schedules (DCS)." A. 291 (emphasis added). The 1995 ACR also provided that, "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers." A. 291.

**RESPONSE:** Energy Northwest agrees that DOE issued a combined APR/ACR in 1995 and that it contained the statements quoted. Further responding, Energy Northwest states that the Government failed to quote the portion of the 1995 APR/ACR that provides that

> In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a Monitored Retrievable Storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year(s) of operation of the system rather than by specific calendar year(s).

(A. 293-94.) Further responding, Energy Northwest agrees that the 1995 APR/ACR contained the same acceptance rates as the 1991 and 1992 ACRs, although the 1995 APR/ACR specifically removed any years associated with particular rates. Further responding, Energy Northwest incorporates into this response its Proposed Findings of Uncontroverted Fact ¶¶ 130-33, 139-51

which demonstrate that DOE continued to utilize the 900 ton rate in the 1995 APR/ACR, even though DOE plans for an MRS facility were dead at the time it published this ACR, in an attempt to limit liability for breach of contract.

## VI. THE LACK OF DELIVERY COMMITMENT SCHEDULE SUBMISSIONS FROM ENERGY NORTHWEST

36. On May 11, 1992, the DOE contracting officer issued a letter to each of the contract holders, along with instructions for the submission of DCSs. The contracting officer stated that "[t]he allocations in the 1991 Annual Capacity Report (ACR) should be the basis for the DCS submittals." See, e.g., A. 143-52, 153-62, 163-72. The accompanying instructions provided that purchasers could "begin submitting to the Department of Energy (DOE) Delivery Commitment Schedules (DCS) that identify all spent nuclear fuel (SNF) the Purchasers plan to deliver to DOE beginning 63 months thereafter." A. 145, 155, 165. The instructions stated that "[t]he DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal waste management system (FWMS) acceptance capacity." A. 145, 155, 165. They further provided that, "[f]or each allocation listed in the 1991 ACR (or subsequent ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)." Id.

**RESPONSE:** Energy Northwest agrees that it received a letter and accompanying instructions from DOE (with the clarification that that the DOE's letter to Energy Northwest was sent on March 4, 1992 and not May 11, 1992), and that the Government has accurately quoted certain portions of the letter and instructions. (ENA at 1735; *see also* Larkin Decl. ¶ 10, ENA at 356.) Further Responding, Energy Northwest incorporates into this response ¶¶ 172-83 of Plaintiff's Proposed Findings of Uncontroverted Fact, concerning how DOE instructed Energy Northwest to complete DCSs.

37. Energy Northwest is a relatively new operating unit, having started its commercial operations on or about February 1, 1984. A. 392. The first SNF discharge at Columbia Generating Station nuclear power plant did not occur until April, 1986, almost 20 years after discharges at other older nuclear facilities. A. 246.

**RESPONSE:** Energy Northwest disagrees that it started commercial operations on or about February 1, 1984. Energy Northwest started its commercial operations on or about December 1984. (*See* Larkin Decl. ¶ 3, ENA at 354.) Energy Northwest agrees that the first

SNF discharge at Columbia Generating Station (then known as Washington Nuclear Plant-2) occurred in April 1986.

38. According to the 1995 APR/ACR, Energy Northwest did not have any allocation in 1998 or in any of the first 10 years of the SNF acceptance queue. A. 296. Energy Northwest has never submitted a DCS to DOE.

**RESPONSE:** Energy Northwest agrees that it did not have any allocations in the tables contained in Appendix A of the 1995 APR/ACR, and that it has not submitted any DCSs to DOE. Energy Northwest denies that it did not have an allocation in 1998 or in any particular calendar year based on the 1995 APR/ACR. The acceptance schedule in the 1995 APR/ACR contained no years indicating when the DOE would accept SNF; instead the APR/ACR indicated acceptance rates for "Year 1," "year 2" and so on. (1995 APR/ACR at 4, ENA at 1831; A. 296.)

Further responding, Energy Northwest incorporates into this response ¶¶ 125-33, 152-57 of Plaintiff's proposed Findings of Uncontroverted Fact. As noted in those proposed findings, the 1991 and 1992 ACR acceptance rates (1) were supposedly based on a hypothetical facility that DOE admittedly never came close to building, (2) were based upon assumptions that were prohibited by the 1987 NWPA Amendments and were inconsistent with DOE's own representations to Congress at the time Congress considered the NWPA Amendments legislation, (3) would not achieve any of the objectives of the NWPA of preventing the need for additional at-reactor storage or reducing the backlog of SNF at utility sites, and (4) were improperly intended to limit utility damages for breach of the Standard Contract. Further responding, Energy Northwest incorporates into this response ¶¶ 172-183 of Plaintiff's Proposed Findings of Uncontroverted Fact, concerning how DOE instructed Energy Northwest to complete DCSs.

Further responding, it is Energy Northwest's understanding that if DOE had begun accepting SNF in 1998 at an acceptance that ramped up to a steady rate of 3,000 MTU by the sixth year of operations (the rate used in the 1987-1989 and 2004 ACRs and DOE planning

documents, Energy Northwest's first acceptance allocation would have occurred in 2004. (*See* Supko Report at 9, 11, ENA at 362, 374, 376; *see also* Larkin Decl. ¶ 17, ENA at 358-59.)

Respectfully submitted,

/s Norman M. Hirsch
NORMAN M. HIRSCH
Jenner & Block LLP
One IBM Plaza
330 N. Wabash
Chicago, IL 60611
(312) 923-2782 telephone
(3412) 840-7782 facsimile

Of Counsel:

William D. Heinz
Lisa M. Eddington
Christopher Tompkins
Nada Djordjevic
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611
(312) 222-9350

David A. Handzo
Jenner & Block LLP
601 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 639-6000

Dated: August 11, 2005

**Certificate of Filing and Certificate of Service**

I hereby certify that on this 11th day of August, 2005, a copy of the foregoing "Plaintiff's Response to Defendant's Proposed Findings of Uncontroverted Fact" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s Norman M. Hirsch