**No. 04-10C**

**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT

---

NORMAN M. HIRSCH
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
LISA M. EDDINGTON
CHRISTOPHER TOMPKINS
NADA DJORDJEVIC
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
601 Thirteenth Street, N.W.
Suite 1200 South
Washington, D.C. 20005
(202) 639-6000

August 11, 2005

*Attorneys for Plaintiff*

**Table of Contents**

Plaintiff's Proposed Findings Of Uncontroverted Fact ....................1

I. Congress Passes The Nuclear Waste Policy Act Of 1982. ....................1

II. The Department Of Energy Begins Implementation Of The NWPA. ....................12

B. DOE Publishes A Draft Of The Standard Contract. ....................12

C. Provisions Of The Standard Contract. ....................17

D. DOE Articulates Program Strategy. ....................25

III. DOE Undertakes Implementation Of The NWPA And Performance Under The Standard Contracts. ....................48

A. DOE Publishes The Mission Plan. ....................48

B. DOE Announces Delay From 1998 Until 2003 For Repository Operations. ....................50

1. DOE Announces Five Year Delay And Proposes Operation Of An MRS In The Interim. ....................50

2. DOE Representations To Congress Regarding The MRS Proposal. ....................53

3. Congress Passes The Nuclear Waste Policy Amendments Act Of 1987. ....................56

C. The 1988 Draft Mission Plan Amendment And 1988 Annual Capacity Report. ....................58

IV. DOE Announces Further Delays. ....................58

A. DOE Announces The Repository Will Be Delayed Until 2010. ....................58

B. DOE Publishes The 1990 Annual Capacity Report. ....................60

C. DOE Publishes The 1991 ACR And Projects A 900 Ton Acceptance Rate Beginning In 1998. ....................61

D. DOE Continues To Project A 900 Ton Rate In ACRs Published In 1993. ....................64

V. DOE Drops Plans For An MRS Facility, But Continues To Use The 900 Ton Rate. ....................65

A. DOE Abandons Plans To Build An MRS. ....................65

B. DOE Publishes The 1995 APR/ACR Using The 900 Ton Rate. ....................68

C. DOE Utilizes the 900 Ton Rate in the 1991, 1992 and 1995 ACRs to Limit Liability to Purchasers Under the Standard Contract. ....69

D. DOE's Position Regarding a Transition from the 900 Ton Rate. ....71

VI. DOE Announces Its Interpretation That It Has No Obligation To Perform In 1998 Absent A Repository. ....72

VII. The DCS Submission Process. ....75

A. DOE Issues DCS Instructions Beginning in 1992. ....75

B. DOE Makes DCS Submissions Impossible By Removing Dates from The 1995 APR/ACR. ....78

C. After 1995, DOE Abandons the DCS Process. ....78

1. DOE "Suspends" Processing Of DCSs Shortly After Decision In *Indiana Michigan* To Limit Liability. ....78

2. DOE Attempts to Resume the DCS Process in July 2004. ....80

3. DCS Re-abandons the DCS Process By December 2004. ....82

VIII. Energy Northwest Has Incurred Damages As A Result Of DOE's Failure To Perform Its Obligations Under Energy Northwest's Standard Contract. ....84

**Plaintiff's Proposed Findings Of Uncontroverted Fact**

Pursuant to RCFC 56(h)(2), Plaintiff Energy Northwest, formerly known as Washington Public Power Supply System, submits the following Proposed Findings of Uncontroverted Fact regarding matters relevant to the Court's Order to Show Cause and Defendant's Motion for Summary Judgment:

## I. Congress Passes The Nuclear Waste Policy Act Of 1982.

1. On January 7, 1983, after being signed by President Reagan, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-245, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)) was enacted.

2. The NWPA provided a framework for the safe, permanent disposal of the wastes of nuclear power generation by the Federal Government, an obligation which the Federal Government had recognized since the passage of the Atomic Energy Act of 1954. (*See* 5/20/02 Lawrence Dep. at 53[1], ENA at 638;[2] 5/16/02 Rusche Dep. at 45-46[3], ENA at 866-67; Robert Morgan, Remarks Before the International Atomic Energy Agency, at 3 (October 12, 1983), ENA

---

[1] Michael Lawrence worked for DOE in various positions from 1977-1990, including as Director, Spent Fuel Storage and Transport (1977-80), Deputy Director, Program for Geologic Disposal Storage and Disposal (1981-83), Deputy Director, Nuclear Waste Policy Act Implementation Office ("NWPAIO") (1983-84), and Acting Director, Office of Civilian Radioactive Waste Management ("OCRWM") (1984). As Deputy Director of NWPAIO and Acting Director of OCRWM, Mr. Lawrence was responsible for the DOE's initial implementation of the NWPA following its passage in 1983. (*See* 5/20/02 Lawrence Dep. at 24-27, 33-37, ENA at 632-33, 634-35.)

[2] Materials in Energy Northwest's Appendix are cited as "ENA at __." Materials in the Government's Appendix are cited as "GA at __." Citations to ENPF are cross references to other proposed findings in Energy Northwest's Proposed Findings of Uncontroverted Fact.

[3] Benjamin Rusche was the Director, OCRWM, Department of Energy, from 1984-1987. Mr. Rusche was the first politically-appointed DOE OCRWM Director. As Director, Mr. Rusche was responsible for implementing the NWPA and all aspects of the DOE's waste management program. (*See* 5/16/02 Rusche Dep. at 35-49, ENA at 864-67.)

at 1052, 1054; 3/22/02 Morgan Dep. at 231-39[4], ENA at 766-768; 128 Cong. Rec. 26,317 (1982) (Representative Skeen), ENA at 203; 128 Cong. Rec. 8,002 (1982) (Senator McClure), ENA at 132; *see also* 42 U.S.C. § 7133(a)(8)(C) (providing for the creation of the Department of Energy with responsibility for "the establishment of temporary and permanent facilities for storage, management, and ultimate disposal of nuclear wastes"), ENA at 78-79.)

3. A governmental solution to the nuclear waste problem had become urgent in the 1970s after President Carter issued an executive order in 1977 that effectively halted reprocessing of spent nuclear fuel by private industry. (13 Weekly Comp. Pres. Doc. 502, 503 (1977), ENA at 82; *see also* H.R. Rep. No. 97-785, pt. 1, at 46-47 (1982), ENA at 181-82; 3/18/02 McDuffie Dep. at 36-37,[5] ENA at 682.)

4. Discussing the purpose of an early version of the NWPA, one House of Representatives report stated: "When many of the nuclear power plants operating today were designed in the mid-1960s and early 1970s, their designers assumed that spent fuel would be 'reprocessed'. . ." (H.R. Rep. No. 97-785, pt. 1, at 46-47 (1982), ENA at 181-82; *see also* 3/18/02 McDuffie Dep. at 36-37, ENA at 682.)

5. The end of reprocessing effectively left utilities with no place to store spent nuclear fuel other than in storage pools at reactor sites. As the same House report stated:

> No reprocessing facility or repository is currently operating, so spent fuel is accumulating in the storage pools at the site of reactors. The storage pools at many reactors are approaching the limits of their original design. Without a place in which a utility

---

4 Robert Morgan was the Director, Nuclear Waste Policy Act Project Office, Department of Energy from 1983-84. Mr. Morgan was responsible for the DOE's initial implementation of the NWPA, establishment of program strategy and direction, and for development of the Standard Contract. (*See* 3/21/02 Morgan Dep. at 17, 24-27, ENA at 741, 742-43.)

5 Patrick McDuffie was the Principal Investigator for Pacific Northwest Laboratories ("PNL"), a DOE Contractor, from 1978-1995. Mr. McDuffie was responsible for work on the Civilian Radioactive Waste Management Program conducted at PNL, including analysis of the Standard Contract. (*See* 3/18/02 McDuffie Dep. at 12-21, ENA at 675-77.)

> can store spent fuel bundles, which must be done on average once a year during refueling, operation of the reactor must terminate.

(H.R. Rep. No. 97-785, pt. 1, at 47 (1982), ENA at 182.)

6. The NWPA sought to address the problem of spent nuclear fuel accumulation by creating a government program for disposal of the waste to: (1) ensure that the accumulation of waste at utility reactor sites would not interfere with electricity generation or result in premature shutdown of nuclear reactors; and (2) prevent any delay in decommissioning reactor sites after their scheduled shut down. (3/21/02 Morgan Dep. at 198, ENA at 759; 5/17/02 Rusche Dep. at 377, ENA at 881; 4/23/02 Barrett Dep. at 475, ENA at 419; 5/2/02 Milner Dep. at 273-74[6], ENA at 706-07.)

7. The NWPA included Congressional findings that:

> A national problem has been created by the *accumulation of (A) spent nuclear fuel from nuclear reactors*; and (B) radioactive waste from (i) reprocessing of spent nuclear fuel; (ii) activities related to medical research, diagnosis, and treatment; and (iii) other sources.

---

6 Ronald Milner began working for DOE in the Office of Civilian Radioactive Waste Management in 1984. At both the time of his deposition and when he testified in *Yankee Atomic Electric v. United States*, Mr. Milner was the Chief Operating Officer for the DOE Civilian Radioactive Waste Management Program. Mr. Milner has been employed in a variety of positions including: (a) Branch Chief, OCRWM (1984), where he was responsible for DOE's total system life cycle cost analysis, fee adequacy analysis, and preparation of the OCRWM Mission Plan, (b) Division Director, Budget and Project Management, OCRWM (1984-90), where he was responsible for DOE's OCRWM program budget, tracking costs, and project schedules, (c) Manager, Monitored Retrievable Storage Team, OCRWM (1990-92), where he was responsible for development of a Monitored Retrievable Storage facility, (d) Director, Office of Storage and Transportation, OCRWM (1992-94), where he was responsible for management of the DOE storage effort, (e) Director, Office of Program Management and Integration, OCRWM (1994-95), where he was responsible for the DOE OCRWM program budget, tracking costs, and project schedules, (f) Acting Deputy Director for the DOE Civilian Radioactive Waste Management Program (1995-99), and Chief Operating Officer for the DOE Civilian Radioactive Waste Management Program (1999 to the present). (*See* 8/11/04 Milner Testimony in *Yankee Atomic Electric v. United States*, at 4712, ENA at 738; 5/1/02 Milner Dep. at 11-12, 15-24, ENA at 691, 692-94.)

42 U.S.C. § 10131(a)(2) (emphasis added).[7]

> Federal efforts during the past 30 years to devise a permanent solution to the problems of civilian radioactive waste disposal have not been adequate . . .

42 U.S.C. § 10131(a)(3).

8. Congress intended to relieve utilities of the responsibility for building additional at-reactor storage after 1998. In the legislative history of the NWPA, Congress resisted delay because utilities were running out of space at reactors. (128 Cong. Rec. 26,308 (1982), ENA at 194; 128 Cong. Rec. 26,310- 26,311 (1982), ENA at 196-97; 128 Cong. Rec. 26,314 (1982), ENA at 200; 128 Cong. Rec. 27,775 (1982), ENA at 210.) For example, speaking in opposition to an amendment (eventually defeated) to an earlier bill that would have delayed siting of the repository 3 years,[8] Sen. McClure stated:

> [A] three year delay in the [repository] program would not affect the suitability of that particular storage.
>
> However, we do begin to run into the problem that there is not enough room to store all those rods at that site, in the pools that have been constructed, because they were not designed to do that. . . . They will have to apply some new technologies on that site, or will simply have to shut down because they cannot refuel. There is a time urgency, and it can be satisfied.

(128 Cong. Rec. 7,974 (1982), ENA at 129.)

---

[7] The NWPA is reproduced in Energy Northwest's Appendix at pages 1 through 57. Additionally, selected NWPA provisions as they appeared prior to amendment in 1987 are reproduced at pages 58 through 77 of Energy Northwest's Appendix.

[8] The amendment offered to S. 1662 called for the Department of Energy to recommend four sites for the repository, instead of a single site, an action that would have delayed the siting of a final repository three years. (128 Cong. Rec. 7,974 (1982), ENA at 129.) The bill was eventually amended to provide that contracts with utilities would provide for disposal no later than December 31, 1996. (128 Cong. Rec. 8,261-62 (1982), ENA at 133-34.)

9. Similarly, speaking about the need for speed in providing disposal capacity, Representative Broyhill stated that:

> The technology may still be 'here and now' but for many older nuclear plants which will run out of space to store their spent fuel at their reactor sites before the Federal Government completes its first permanent waste repository, 'here and now' may well be 'here and gone.' . . . These reactors were built when it was assumed the Federal Government would take custody of spent fuel by the early 1970's and reprocess it for reuse. Then the Carter administration banned reprocessing in 1977, and these utilities were left holding the bag.

(128 Cong. Rec. 26,314 (1982), ENA at 200.)

10. Similarly, Representative Mariott stated:

> We need a national waste repository, and it must be in place by the turn of the century. All waste that is now stored is temporarily stored. . . . Without a proper repository for interim and permanent waste, as many as 28 nuclear powerplants may be forced to close for lack of storage.

(128 Cong. Rec. 26,310-26,311 (1982), ENA at 196-97; *see also* 128 Cong. Rec. 26,308 (1982) (Representative Lujan) ("Further delay, which may or may not benefit provincial concerns of one group or anther, is not in the best interests of this nation and should be resisted."), ENA at 194; 128 Cong. Rec. 27,775 (1982) (Representative Berueter) ("The time for excuses is over . . . [t]he time for action has come."), ENA at 210; 128 Cong. Rec. 26,311 (1982) (Representative Fish) ("This repository should be built as quickly as possible . . ."), ENA at 197; 128 Cong. Rec. 26,311 (1982) (Representative Michel) ("This is a national problem that demands the immediate attention of the Federal Government."), ENA at 197.)

11. A House Report on a predecessor bill to the NWPA provided:

> Continued delays in establishing that radioactive materials can be disposed of safely and in an environmentally sound manner can no longer be tolerated. This is important not simply because the effect the failure to demonstrate that radioactive materials can be

> disposed of safely will have on the licensing of nuclear power plants, but also because it is no longer acceptable to allow increasing quantities of nuclear waste to be stored on an interim basis. The existence of these wastes in their present form poses a growing hazard which cannot be allowed to continue indefinitely. It is essential that an orderly and timely Federal program be established to properly address this aspect of the nuclear issue.

(H.R. Rep. No. 97-785, pt. 1, at 50 (1982), ENA at 185.)

12. The NWPA set January 31, 1998 as the date for the Department of Energy ("DOE") to begin spent nuclear fuel removal and required DOE and the owners and generators of Spent Nuclear Fuel and High-Level Radioactive Waste ("SNF") to enter into contracts calling for DOE to dispose of waste beginning on that date. 42 U.S.C. § 10222(a) (1982).

13. The Act contemplated that utilities would continue to have responsibility for waste "*until* such waste and spent fuel is accepted by the Secretary of Energy. . ." in 1998. 42 U.S.C. § 10131(a)(5) (1982) (emphasis added).

14. In discussing the legislation which became the NWPA, Congress expressed the intent that DOE would have a repository open by 1998. In two House reports on pending bills, Congress stated:

a. "The contracts are required to provide that the Secretary will take title to the waste and spent fuel upon delivery to the repository. The Secretary *must* begin repository operations no later than January 1998." (H.R. Rep. No. 97-785, pt. 1, at 38 (1982) (emphasis added), ENA at 173.)

b. DOE is "responsible for disposing of [SNF] . . . in permanent disposal facilities, beginning not later than January 1998, in return for the payment of fees established by this section." (H.R. Rep. No. 97-491, pt. 1, at 59 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3825, ENA at 120.)

15. The NWPA contemplated a series of steps which would lead to the operation of a repository and acceptance of SNF and HLW beginning in January 1998. 42 U.S.C. §§ 10132-10145; H.R. Rep. 97-785, pt. 1, at 32-34 (1982), ENA at 167-69; *Indiana Michigan Power Company v. Department of Energy,* 88 F.3d 1272, 1277 (D.C. Cir. 1996).

a. DOE was to issue guidelines for site characterization 180 days after January 7, 1983. 42 U.S.C. § 10132(a) (1982). DOE was then to nominate five sites for site characterization for selection as the site for the first repository. 42 U.S.C. § 10132(b)(1)(A) (1982).

b. DOE was to recommend site characterization at three of the nominated sites by January 1, 1985. 42 U.S.C. § 10132(b)(1)(B) (1982). Upon approval of these site recommendations by the President, the DOE was to conduct site characterization at the approved sites. 42 U.S.C. § 10133 (1982).

c. By March 31, 1987 the President was to submit a recommendation to Congress to site the first repository at one of the three characterized sites. 42 U.S.C. § 10134(a)(2)(A) (1982) (now amended).

d. After the President's recommendation, the state or Indian tribe where the recommended site was located had the opportunity to disapprove the selection, and Congress could then override that disapproval. 42 U.S.C. §§ 10134-10136 (1982) (now amended). (This process did not occur until July 2002.)

e. After the site recommendation became complete, DOE was to submit an application for construction authorization to the Nuclear Regulatory Commission ("NRC") within 90 days. 42 U.S.C. § 10134(b) (1982). NRC would then act on the application within four years of submission. 42 U.S.C. § 10134(d) (1982). (To date, DOE has not submitted an application for construction authorization.)

16. These provisions were intended to create a schedule leading to the establishment of a repository in 1998. A House report on an early version of the NWPA containing similar interim deadlines noted: "With respect to the establishment of a repository, the purposes are to establish a schedule for the siting, construction, and operation of repositories that will provide assurance that the public and the environment will be adequately protected from the hazards posed by high-level radioactive wastes." (H.R. Rep. 97-785, pt. 1, at 32 (1982), ENA at 167.)

17. The same House report listed the various interim deadlines in the bill and noted the final deadline: "January, 1998 - Federal Government statutorily and contractually obligated to begin to provide disposal capacity." (H.R. Rep. No. 97-785, pt. 1, at 32 (1982), ENA at 167.)

18. The House report also stated that building a repository was to be the principal purpose of DOE's program: "[Congress] instructs the Secretary [of Energy] that the repository program is paramount and no other radioactive waste or spent fuel program of the Secretary shall interfere with, delay, obstruct or deflect from the establishment of a repository development program as provided in this Act." (H.R. Rep. No. 97-785, pt. 1, at 44 (1982), ENA at 179.)

19. The NWPA provided that "the Secretary is authorized to enter into contracts with any person who generates or holds title to high-level radioactive waste, or spent nuclear fuel, of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel." 42 U.S.C. § 10222(a)(1).

20. The NWPA specified that the contracts were to provide that:

> (a) following commencement of operation of a repository, the Secretary shall take title to high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and

> (b) in return for payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of high-level radioactive waste or spent nuclear fuel involved as provided in this subchapter.

42 U.S.C. § 10222(a)(5).

21. Congress expected the contracts to be a quid pro quo under which the DOE would dispose of waste and the utilities would pay for the service. (H.R. Rep. No. 97-491, pt. 1, at 58 (1982), *reprinted in* 1982 U.S.C.C.A.N. at 3824 ("Section 124 authorizes the Secretary to contract with utilities . . . to provide repository services in exchange for payments. . . ."), ENA at 119; H.R. Rep. No. 97-491, pt. 1, at 59 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3825 (the DOE is "responsible for disposing of [SNF] . . . in permanent disposal facilities, beginning not later than January 1998, *in return for the payment* of fees established by this section." (emphasis supplied)), ENA at 120; 4/17/02 Zabransky Dep. at 183[9], ENA at 945; *see also System Fuels, Inc. v. United States*, No. 03-2624C, 2005 WL 1804314, at *1 (Fed. Cl. July 29, 2005), ENA at 2324, 2325; *Indiana Michigan Power Company v. United States*, 57 Fed. Cl. 88, 95 (Fed. Cl. 2003); *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 664-65 (Fed. Cl. 2003); *Indiana Michigan Power Company v. Department of Energy,* 88 F.3d 1272, 1276 (D.C. Cir. 1996).)

---

9 Since 2002, Mr. Zabransky has been employed as DOE's Contracting Officer. As Contracting Officer, Mr. Zabransky was the DOE official that communicated with the utilities regarding the 2004 DCS process. From 1994-2002, Mr. Zabransky served as the Contracting Officer's Technical Representative, providing technical advice to the Contracting Officer regarding interaction with the holders of Standard Contracts. In each of these positions, Mr. Zabransky was responsible for the DOE's management of the Standard Contract and interface with utilities. (*See* 4/17/02 Zabransky Dep. at 16-17, 23-25, 33, ENA at 928-29, 930-31, 933; 4/11/05 Kouts 30(b)(6) Dep. at 16-17, 30-31, 50, ENA at 608, 612, 615.)

22. Having required utilities to pay fees into the Nuclear Waste Fund for removal of SNF starting in January of 1998, Congress did not intend the utilities would have to pay *again* to build additional storage after 1998. (5/8/02 Barrett Dep. at 1063-65[10], ENA at 455.)

23. The NWPA provided that:

> The [Nuclear Regulatory] Commission shall not issue or renew a license to any person to use a utilization or production facility under the authority of section 2133 or 2134 of this title unless—
>
> (i) such person has entered into a contract with the Secretary under this section; or
>
> (ii) the Secretary affirms in writing that such person is actively and in good faith negotiating with the Secretary for a contract under this section.

42 U.S.C. § 10222(b)(1)(A) (1982).

24. The NWPA also provided:

> Except as provided in paragraph (1), no spent nuclear fuel or high-level radioactive waste generated or owned by any person. . . may be disposed of by the Secretary in any repository constructed under this chapter unless the generator or owner of such spent fuel or waste has entered into a contract with the Secretary under this section by not later than—(A) June 30, 1983; or (B) the date on which such generator or owner commences generation of, or takes title to, such spent fuel or waste; whichever occurs later.

42 U.S.C. § 10222(b)(2) (1982).

---

10 Lake Barrett worked for DOE in various positions from 1985-2002, including as Acting Director, Office of Facilities Siting & Development ("OFS&D"), OCRWM (1989-90), and Acting Director or Deputy Director, OCRWM (1993-2002). As Acting Director, OFS&D, Mr. Barrett was responsible for DOE's Repository and MRS programs. As Acting Director or Deputy Director, OCRWM, Mr. Barrett had overall responsibility for running the Office of Civilian Radioactive Waste Management of DOE. (*See* 4/22/02 Barrett Dep. at 84-85, ENA at 399-400.)

25. The NWPA provided that DOE was to prepare a report known as the "Mission Plan," which was to provide a "basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs under this chapter." 42 U.S.C. § 10221(a) (1982).

26. The Mission Plan was to include an estimate of total repository capacity required to dispose of all high-level radioactive waste and spent nuclear fuel expected to be generated through December 31, 2020. 42 U.S.C. § 10221(a)(9) (1982). Congress also required that the Mission Plan contain a construction schedule for the repositories and an estimate of the time period during which the repository would accept waste. *Id.*

27. DOE was required to submit drafts of the Mission Plan to interested parties and submit the final version to Congress, not later than 17 months after January 7, 1983. 42 U.S.C. § 10221(b).

28. The NWPA contemplated that DOE would *study* how a Monitored Retrievable storage facility ("MRS") would facilitate waste disposal and issue a report to Congress on the need and feasibility of an MRS by June 1985. In the NWPA, Congress did not authorize DOE to build and operate a MRS. 42 U.S.C. § 10161(b)-(c) (1982). (*See also* 5/20/02 Lawrence Dep. at 215-18 (DOE had no Congressional authorization to build an MRS), ENA at 659-60.)

29. The House Committee on Interior and Insular Affairs reported that the committee "is not recommending and does not authorize construction of [MRS] facilities at this time or any future time." (H.R. Rep. No. 97-491, pt. 1, at 41 (1982), *reprinted in* 1982 U.S.C.C.A.N. at 3807, ENA at 102.)

30. The House Committee on Interior and Insular Affairs, while considering amendments to the NWPA in 1987, reported: "Prior to enactment of the NWPA, a leading

alternative to permanent geologic disposal of spent nuclear fuel was monitored retrievable storage (MRS) . . . *Although Congress chose permanent disposal over MRS in the NWPA,* the Act did direct DOE to study the need for and feasibility of constructing a MRS facility, and to submit to Congress by June 1, 1985 a proposal for siting, construction and operating one or more MRS facilities." (H.R. Rep. No. 100-425, at 13 (1987) (emphasis added), ENA at 272.)

**II. The Department Of Energy Begins Implementation Of The NWPA.**

31. Soon after enactment of the NWPA DOE began to undertake its responsibilities to implement the Act by first establishing a Nuclear Waste Policy Act Project Office in 1983. (*See* 5/20/02 Lawrence Dep. at 24-25, 49-51, ENA at 632, 637-38; Memorandum from Robert Morgan to Nuclear Waste Policy Act Project Officer Personnel (January 28, 1983), ENA at 988.) Later, as required by the NWPA, DOE created the Office of Civilian Radioactive Waste Management ("OCRWM"). 42 U.S.C. § 10224 (1982). These offices began to undertake implementation of the NWPA and the ultimate disposal of SNF.

**B. DOE Publishes A Draft Of The Standard Contract.**

32. On February 4, 1983 DOE published a proposed "Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste" ("Standard Contract") in the Federal Register. (Standard Contract for the Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste, 48 Fed. Reg. 5,458-71 (Feb. 4, 1983) (to be codified at 10 C.F.R. Part 961), ENA at 991-1004.)

33. The Federal Register Notice that accompanied the draft contract stated that "The Act directs DOE to begin repository operations no later than January 31, 1998." (48 Fed. Reg. at 5,458, ENA at 991.)

34. In the Notice, DOE noted that under 42 U.S.C. § 10222(b)(5)(1) and (2), utilities had to sign a contract by June 30, 1983 or receive the affirmation of the Secretary of

Energy that they were actively and in good faith negotiating a contract. (48 Fed. Reg. at 5,458-59, ENA at 991-92.)

35. In response to the proposed contract, industry groups commented on the lack of any performance standards contained within the contract. In particular, the Edison Electric Institute ("EEI") and the Utility Nuclear Waste Management Group ("UNWMG"), noted the Standard Contract lacked any performance standards other than the January 1998 date, including the absence of the quantity of SNF that DOE would accept. (John J. Kearney, Senior Vice President, Edison Electric Institute, Letter to Robert Morgan, Acting Director, OCRWM (March 7, 1983), GA at 2.)

36. On April 18, 1983, DOE published the final version of the Standard Contract. (Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, 48 Fed. Reg. 16,590-608 (Apr. 18, 1983) (to be codified at 10 C.F.R. Part 961), ENA at 1005-24.) The deadline for signing the contract was June 30, 1983, or "the date on which such generator or owner commences generation of, or takes title to, such spent fuel or waste." (42 U.S.C. § 10222(b)(2).)

37. DOE's Final Notice on the Standard Contract did not address utility requests for an acceptance rate. Instead the notice contained only one reference to other utility requests for interim performance standards. The Notice did not refer at all to the issue of acceptance rates or the utility comments on the issue. (48 Fed. Reg. at 16,598, ENA at 1014.)

38. DOE's Notice also stated that ". . . at the request of a substantial number of commenters, a new provision has been added as subparagraph IV.B.5(b), which states that DOE will issue 'an annual report for planning purposes . . . set[ting] forth the projected annual receiving capacity for the DOE facility.'" (48 Fed. Reg. 16,592, ENA at 1008.) Robert Morgan testified that this provision was added solely because of utility requests for planning forecasts

and that the ACR was not intended for any purpose other than planning. (3/21/02 Morgan Dep. at 139-41, ENA at 755-56; s*ee also* John Kearney letter to Robert Morgan, Attachment A (March 7, 1983), GA at 18.)

39. After the promulgation of the final Standard Contract, the Edison Electric Institute again wrote to Robert Morgan on behalf of the industry expressing continued concern about "the lack of standards or milestones for DOE's performance" and the compressed timetable for drafting the Standard Contract. (John J. Kearney Letter to Robert Morgan (May 20, 1983 ), ENA at 1025-27; 3/21/02 Morgan Dep. at 201-03, ENA at 760.)

40. In response, Morgan stated "We believe that we adequately addressed all the industry's concerns in the rule at that time." (Robert Morgan letter to John J. Kearney (June 17, 1983 ), ENA at 1028; 3/21/02 Morgan Dep. at 202-04, ENA at 760.) Mr. Morgan cited time constraints, and asserted that the DOE could not address utility concerns prior to the NWPA's June 30, 1983 contract deadline. (*Id.*)

41. DOE expressed unwillingness to extend the June 30, 1983 deadline for execution of the Standard Contract to discuss issues related to the Standard Contract. The Federal Register Notice publishing the final version of the Standard Contract reversed DOE's prior statements that DOE would certify that good faith negotiations were underway, and stated that the Standard Contract had to be signed by June 30, 1983. (48 Fed. Reg. at 16,590, ENA at 1006. )

42. The NWPA "effectively made entry into [the Standard Contract] mandatory for the utilities. . ." *Maine Yankee Atomic Power Company v. United States,* 225 F.3d 1336, 1337 (Fed. Cir. 2000). (*See also System Fuels, Inc. v. United States*, No. 03-2624C, 2005 WL 1804314, at *1 (Fed. Cl. July 29, 2005), ENA at 2324, 2325; 5/20/02 Lawrence Dep. at 100-

01, ENA at 649; 3/12/02 Cole Dep. at 56[11], ENA at 538; 3/21/02 Morgan Dep. at 74, 204, ENA at 749, 760.)

43. The Standard Contract was put together in such haste that it was "fraught with ambiguities, contradictions, incorrect statements. . ." (3/12/02 Cole Dep. at 55, ENA at 538.)[12] As noted years later in a December 1991 memorandum: "The Standard Disposal Contract . . . was unfortunately developed in such a way that the terms and conditions contained numerous omissions, inconsistencies, ambiguities and contradictions." (ACR Issues Status Report (December 31, 1991), ENA at 1733; *see also* 4/11/02 Brownstein Dep. at 514-19[13], ENA at 513-14.)

---

[11] Billy Cole worked for two DOE Contractors – PNL and JAI Corporation — from 1975 until 1999. While working for PNL, Mr. Cole worked in various DOE-related positions including as a Specialist, Deputy Manager Commercial Spent Fuel Management Program ("CSFMP"), and Manager of Waste Acceptance and Transportation Programs. As a Specialist, Mr. Cole studied waste management issues for the Energy Research & Development Administration prior to the passage of the Nuclear Waste Policy Act ("NWPA"). As Deputy Manager, CSFMP, Mr. Cole studied waste management issues for the DOE prior to passage of the NWPA, developed storage requirements reports, nuclear fee adequacy studies, and assisted the DOE in consulting Congress regarding the NWPA. As Manager of Waste Acceptance and Transportation Programs, Mr. Cole was responsible for managing PNL work on the civilian radioactive waste management program pursuant to a contract with DOE, including consulting with DOE officials on a variety of waste acceptance and transportation issues. (*See* 3/12/02 Cole Dep. at 22-54, 111, ENA at 530-38, 542.)

[12] Mr. Cole also said that the Contract was ". . . pretty damned good under the circumstances. . ." (3/12/02 Cole Dep. at 55, ENA at 538).

[13] At the time of his deposition, Alan Brownstein was serving as a Senior Policy Advisor, OCRWM, responsible for the DOE Yucca Mountain Site recommendation activities. Mr. Brownstein has worked for DOE in various capacities, including as a Nuclear Industry Specialist, Management & Support Division, OCRWM (1985-91), Branch Chief & Contracting Officer's Technical Representative, Logistics & Utility Interface Branch, OCRWM (1991-94), and Division Chief, Waste Acceptance Division, OCRWM (1994-95). In each of these positions, Mr. Brownstein was responsible for implementing the terms of the Standard Contract for DOE, including interactions with utilities, coordination of collection of utility SNF discharge information, development of the Annual Capacity Reports and Acceptance Priority Rankings, and the DCS process. In addition, Mr. Brownstein served as Director, Regulatory Coordination Division, OCRWM (1995-2001), where he was responsible for the DOE's interactions with regulatory agencies such as the NRC and EPA, and coordinated with OCRWM staff at Yucca

44. On June 13, 1983, Energy Northwest, then known as Washington Public Power Supply System, executed Standard Contract # DE-CR01-83NE44424. (Contract for the Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste Contract. No. DE-CR01-83NE44424, ENA at 291-353.)

45. Despite continued concerns that the Standard Contract did not adequately address DOE's obligations, the department continued to assure interested parties that DOE would meet the intent of the NWPA. In September 1984, the Secretary of Energy, Donald P. Hodel, responded to Congressional concerns about DOE's commitments under the NWPA and stated "[p]ursuant to my authority, it is my intention that this commitment in the contracts, together with the overall thrust of the Act, will create an obligation for the Department to accept spent fuel in 1998 whether or not a repository is in operation. This should enable utilities to plan for their projected waste disposal needs with confidence and certainty." (Donald P. Hodel, Secretary, DOE Letter to J. Bennett Johnston, United States Senator (September 7, 1984), ENA at 1203-04.) Hodel also indicated that it was his intent to address utility concerns by incorporating a minimum rate into the Standard Contract. (*Id.*)

46. In June 1984, OCRWM Director Ben Rusche told reporters that the contract with owners of nuclear power plants were being revised to provide a minimum amount of fuel that would be accepted. (Matt Yancey, *Nuclear Wastes*, Associated Press, June 13, 1984, ENA at 1188; 5/17/02 Rusche Dep. at 337-43, ENA at 876-77; Cass Petersen and Pete Early, *Waste-Disposal Advances*, WASH. POST, June 15, 1984, ENA at 1189.) A wire story stated that Mr. Rusche "said the primary reason for revising the contracts was to assure utilities they would not have to build more 'swimming pools' for temporarily storing wastes beyond 1998." (*Id.*)

---

Mountain for interaction with such agencies. (*See* 4/11/02 Brownstein Dep. at 535-37, ENA at 515-16; 4/9/02 Brownstein Dep. at 25-29, 31-41, ENA at 479-83.)

Mr. Rusche also stated that "The Department is obligated to begin receiving spent fuel in 1998 whether or not a repository is in place." (*Id.*)

47. In 1987, in response to a letter from UNWMG Director Steve Kraft (ENA at 1387-1400) expressing concerns about DOE's future performance, Christopher Jedrey, the DOE Contracting Officer, acknowledged that DOE "recognized that the Contract may not provide sufficient detail and guidance to enable either DOE or the Purchasers to carry out all of their contractual responsibilities," but emphasized that DOE "intends to honor both the letter and spirit of the NWPA and the Contract, rather than seek opportunities to circumvent its obligations." (Christopher Jedrey, Contracting Officer, DOE, Letter to S.P. Kraft, Director UNWMG, at 1, 2 (October 2, 1987), ENA at 1491-92; 4/9/02 Brownstein Dep. at 128-43, ENA at 488-92.)

**C. Provisions Of The Standard Contract.**

48. The Standard Contract signed by Energy Northwest creates an absolute obligation for DOE to begin taking SNF and high-level waste no later than January 31, 1998, and to continue to do so until all wastes have been disposed of:

> The services to be provided by the DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of.

(Standard Contract Art. II, ENA at 297.[14])

---

14 The version of the Standard Contract executed by Energy Northwest is reproduced at pages 291 through 353 of Energy Northwest's Appendix.

49. To date, Energy Northwest has paid over $126 million dollars in quarterly fees under the Standard Contract. (*See* Larkin Decl. ¶ 21[15], ENA at 360.) DOE has yet to remove any Energy Northwest SNF under the Standard Contract.

50. As of February 28, 2005, the nuclear utility industry has paid $12.23 billion dollars in fees into the Nuclear Waste Fund under Standard Contracts signed by utilities. (Monthly Summary of Program Financial and Budget Information as of February 28, 2005 (Office of Civilian Radioactive Waste Management, Office of Program Management) at 1-3, ENA at 2266, 2272.) Including interest, approximately $20 billion has been collected in the Nuclear Waste Fund since 1983. (*See* 8/4/04 Pollog Testimony in *Yankee Atomic Electric v. United* States, at 4088, ENA at 815.) DOE has yet to remove any utility's SNF under its Standard Contracts.

51. The Standard Contract ultimately executed by Energy Northwest contained no term addressing the rate at which DOE would accept SNF. (*See* Standard Contract *generally*, ENA at 291-353; 1987 Annual Capacity Report at 14 ("The Contract makes no provisions for the minimum amount of SNF that DOE will accept and transport in a given period."), ENA at 1471, 1487; 4/17/02 Zabransky Dep. at 30, ENA at 932; 5/1/02 Milner Dep. at 42, ENA at 696.)

---

15 David Larkin first joined Energy Northwest in 1973, and is currently the Project Manager for Cask Fabrication at Energy Northwest. Mr. Larkin has also worked for Energy Northwest as a Nuclear Fuel Buyer; Supervisor, Core Analysis; Manager, Nuclear and Safety Analysis; Manager, Fuel Management; Manager, Engineering Services; and Program Leader, Nuclear Fuel. In his positions for Energy Northwest from 1982 to the present, Mr. Larkin has had responsibilities related to management and disposal of SNF generated by Columbia Generating Station ("Columbia"), including projecting the discharge of SNF from Columbia, tracking Energy Northwest's inventory of SNF, and tracking Energy Northwest's capacity to store SNF at Columbia, including consideration of how long Energy Northwest's existing storage capacity would accommodate projected SNF discharges and consideration of options for expanding storage capacity to accommodate projected SNF discharges. (Larkin Decl. ¶ ¶ 1, 2, 5, 8, ENA at 354, 355.)

52. The Standard Contract provided that that:

> Beginning not later than July 1, 1987, DOE shall issue an annual capacity report *for planning purposes*. This report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility.

(Standard Contract Art. IV.B.5.b, ENA at 301 (emphasis added).) As stated, this provision was added at the request of utilities. (ENPF ¶ 38.)

53. The Standard Contract also provides that:

> Beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraphs B and D of Article V and paragraph B.3 of Article VI hereof.

(Standard Contract Art. IV.B.5.a, ENA at 301.)

54. Further, the Standard Contract contained a ministerial process which required purchasers to provide information concerning the SNF or HLW they tentatively planned to deliver to DOE:

> Delivery commitment schedule(s), in the form set forth in Appendix C annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance priority ranking, as described in paragraph B.5 of Article IV hereof, beginning January 1, 1992 the purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule form

> the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval.

(Standard Contract, Art. V.B.1, ENA at 302.)

55. The DCS provisions in the Standard Contract did not refer at all to the Annual Capacity Reports regarding DOE's annual receiving capacity. (Standard Contract Art. V.B., ENA at 302.)

56. Under the DCS provisions in the Standard Contract, the quantity of SNF listed on these DCSs could be adjusted by the purchaser plus or minus twenty percent up to two months prior to submission of a Final Delivery Schedule. (Standard Contract, Art. V.B.2, ENA at 302.)

57. One year prior to delivery, the purchaser was to provide more specific information concerning the fuel they would deliver:

> Final delivery schedule(s), in the form set forth in Appendix D, annexed hereto and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than twelve (12) months prior to the delivery date specified therein. DOE shall approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing for the reasons for such disapproval and shall request a revised schedule from Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s).

(Standard Contract, Art. V.C., ENA at 302-03.)

58. DOE witnesses testified that the delivery commitment schedule ("DCS") provision was for planning purposes only and that the DCSs submitted by utilities and were not binding:

a. Nancy Slater-Thompson,[16] the DOE official in charge of DCS submissions during the early 1990s, testified that she did not consider the DCS binding on either the DOE or the utilities:

> Q: What about the delivery commitment schedules? Was it your understanding that those similarly were for planning purposes only and not contractually binding on either the utilities or the department?
>
> A. In my personal opinion, they were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them. In addition, given the fungibility of the DCSs, that's why there is a final delivery schedule which is somewhat more than a planning document. And I do recall sitting across the table from numerous utility representatives, clearly recognizing that the DCSs were [for] planning purposes and they in fact did not view themselves as binding themselves to deliver specifically what was described on the DCS.
>
> Q. During the time that you worked in the waste acceptance division at the Department of Energy, do you recall anyone either within DOE or in industry

[16] At the time of her 2002 deposition, Nancy Slater-Thompson was employed as Acting Division Director, Regulatory Coordination Division. At the time of her 1999 deposition, Ms. Slater-Thompson was employed as Team Leader, Regulatory Coordination Division. In both positions, Ms. Slater-Thompson was responsible for regulatory issues related to the program involving the NRC, EPA, National Academy of Science, and the Nuclear Waste Technical Review Board. Ms. Slater-Thompson has also been employed by DOE as Team Leader & Contracting Officer's Technical Representative, Waste Acceptance Division, OCRWM, where she was responsible for preparation of the DOE's Annual Capacity Report and Acceptance Priority Ranking, answering questions about the terms and conditions of the Standard Contract, and review of delivery commitment schedules. (*See* 6/13/02 Slater-Thompson Dep. at 4-6, 8-9, 102-04, ENA at 894-95, 898; 4/21/99 Slater-Thompson Dep. at 6, 14-15, 19-20, ENA at 884, 885, 886.)

who thought that the delivery commitment schedules were binding on either industry or the department?

A. No, I don't.

(6/13/2002 Slater-Thompson Dep. at 98-99 (objections omitted), ENA at 897.)

Ms. Thompson also testified that that the nature of the DCSs and their reliance on the non-binding ACRs made them non-binding:

Q. Did you view an approved delivery commitment schedule as binding a utility to not delivering more spent fuel than is set out on that delivery commitment schedule?

A. It's not the DCS that establishes the allocation. It's simply a reflection.

Q. What sets out the allocation?

A. The ACR; and that's for planning purposes only because that allocation could change.

(6/13/2002 Slater-Thompson Dep. at 110 (objection omitted), ENA at 900; *see also* 4/22/1999 Slater-Thompson Dep. at 244-45, ENA at 892.)

b. Alan Brownstein, the DOE official in charge of the division that handled the DCSs during the early and mid 1990s, testified that the DCSs were exclusively for planning purposes. (4/10/02 Brownstein Dep. at 376-78, ENA at 506.) Brownstein agreed that before he read a motion similar to the Government's Summary Judgment Motion in this case, he "had no understanding of what liabilities and obligations on the part of both parties are locked in by the DCS submittal and approval process." (6/14/02 Brownstein Dep. at 427, ENA at 525.) Brownstein testified that his reaction to reading a motion containing the Government's DCS theory was "well, that's interesting, when I read that it was interesting. *I never discussed it or thought about that before*." (*Id.* (emphasis added).)

c. Former OCRWM acting director Michael Lawrence testified that he viewed the DCS as a planning tool. (5/20/02 Lawrence Dep. at 131, ENA at 650.)

d. Christopher Kouts, Director of the Office of Systems Analysis and Strategic Development, in charge of integration of the various components of the DOE's SNF program, testified that the "[t]he prior DCS was a planning document, and this [the 2004] DCS would also be a planning document." (4/11/05 Kouts Rule 30(b)(6) Dep. at 129, ENA at 618.)

e. Robert Morgan testified that the DCS was to provide "background information" to the DOE concerning what fuel was out there, but that "[i]t did not commit acceptance by DOE." (6/25/02 Morgan Dep. at 135, ENA at 774.)

f. Lake Barrett characterized DCS submissions as "administrivia." (4/22/02 Barrett Dep. at 217-18, ENA at 407.)

59. The final version of the Standard Contract left out language contained in a January 1983 draft, distributed to industry groups such as EEI, which provided that approved DCSs "shall become part of this contract." (EEI Unsolicited Comments on the Draft Contract (Jan. 25, 1983) at 4, ENA at 984, 986; 4/15/02 Rosselli Dep. at 52-54[17], ENA at 830-32.)

60. Furthermore, DOE's subsequent implementation of the DCS process indicated that DOE did not consider them binding. As discussed below, in ¶¶ 172 through 183, DOE's Instructions for submitting DCSs stated that they were to be based upon the ACRs. (DCS Instructions ¶ 2, GA at 145.) The Standard Contract and the ACRs themselves stated that they were "for planning purposes only and thus not contractually binding on either the DOE or the

---

17 Robert Rosselli was the Acting Associate Director, Resource Management Division, OCRWM, DOE from 1983-1984. In that position, Mr. Rosselli was a member of the team that developed the Standard Contract, and was responsible for organizational development, human resources management, contract administration, information resources, budget and finance. (*See* 4/15/02 Rosselli Dep. at 17, 43, ENA at 825, 926.)

Purchasers." (Standard Contract Art. IV.B.5.b, ENA at 301; 1991 ACR at 1.1, ENA at 1687; July 2004 Acceptance Priority Ranking & Annual Capacity Report ("2004 APR/ACR") at 1, ENA at 2133, 2136.)

61. The Standard Contract also provided that available capacity was to be allocated between utilities based on those with the oldest fuel or "oldest fuel first":

> Delivery Commitment schedules for SNF and/or HLW may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate. The following acceptance priority ranking will be utilized:
>
> > (a) except as may be provided for in subparagraph (b) below and Article V.D. of this contract, acceptance priority shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B, D and E of Article V.
> >
> > (b) Notwithstanding the age of SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason.

(Standard Contract Art. VI.B.1, ENA at 305, 306.)

62. While priority between utilities was based on the age of the fuel, utilities were allowed to determine which specific fuel assemblies they would deliver: "Purchaser shall have the right to determine which SNF and/or HLW is delivered to the DOE; *provided, however,* that the Purchaser shall comply with the requirements of this contract." (Standard Contract Art. V.E., ENA at 303-04; *see also* DCS Instructions ¶ 7(b), GA at 146.)

**D. DOE Articulates Program Strategy.**

63. In addition to publishing the Standard Contract following enactment of the NWPA, DOE also began articulating its interpretation of what the NWPA required and how it would implement the SNF Program. (*See* ¶ 64, infra.)

64. As evidenced by both contemporaneous documents and deposition testimony in this case, from the very beginning of the SNF program, the persons at DOE charged with implementing the NWPA recognized that the NWPA required the DOE to implement a program that would: (1) avoid the need for utilities such as Energy Northwest to build additional SNF storage space at their reactor sites after 1998, and (2) to accept SNF at a rate that permitted the DOE to keep up with the rate of production of SNF and eventually reduce the existing SNF backlog. (*See* subparagraphs a-t following.)

**<u>Contemporaneous Statements or Documents</u>**

a. **Robert Morgan's 1983 Program Overview**. At a December 1983 conference of utilities and other SNF Program participants held only a few months after the Contract was signed, the Acting Director of the NWPA Project Office stated that the basic strategy of the program was that "beginning in 1998, utilities *will not have to provide any additional storage facilities on site*. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities on site or at another location." (Robert Morgan, Proceedings of the 1983 Radioactive Waste Management Program, December 12-15, 1983: Program Overview, at 11 (Feb. 1984) (emphasis added), ENA at 1072, 1073; *see also* 3/21/02 Morgan Dep. at 38-43, ENA at 744-45.)

b. **December 1983 Draft Mission Plan.** In the initial draft of the OCRWM Mission Plan, which was provided to the utilities in December 1983 as required by the NWPA, OCRWM stated that:

> "The waste materials will be accepted in accordance with a Waste Acceptance Schedule designed to provide an acceptance rate in the first five years such that *no utility will have to provide additional storage capacity after January 31, 1998. Subsequently, the* acceptance *rate will be equal to or greater than the actual discharge rate of spent fuel each year."* (Draft Mission Plan at 2-1 (emphasis added), ENA at 1075, 1080);
>
> [DOE] "does not intend to delay or postpone the acceptance of civilian radioactive wastes even if a permanent geologic repository is not completed by 1998. The planning approach adopted by the Department has been designed to ensure that an acceptable facility will be available when needed. . ." (*id.*);
>
> DOE adopted this approach to "ensure that all utilities will be able to establish firm planning schedules for the disposition of their radioactive wastes sufficiently early to determine their on-site interim storage needs prior to 1998." (*id.*); and
>
> The rate of 3,000 ton after a five year ramp-up period set out in the 1983 Draft Mission Plan "is set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998. . . ." (*id.* at 2-2, ENA at 1081; *see also* 3/21/02 Morgan Dep. at 149-56, ENA at 757-58).

c. **Fiscal Year 1984 Program Guidance for Nuclear Waste Fund Evaluation.** The "FY 1984 Program Guidance for Nuclear Waste Fund (NWF) Evaluations," prepared in December 1983, as part of DOE's preparation of the 1984 Fee Adequacy Report, noted that:

> The underlying premise is that DOE will accept waste in 1998 at a sufficient rate so no additional utility owned storage capacity is required during the first five years. Thereafter, the acceptance rate will be at least equal the

> utility spent fuel discharge rate. The planning base extends to the spent fuel discharged through 2020.

(FY 1984 Program Guidance for Nuclear Waste Fund (NWF) Evaluations (December 1983), enclosure at 2, ENA at 1061, 1063; 3/21/02 Morgan Dep. at 205-12, ENA at 761-62.)

d. **Pacific Northwest Laboratories Memorandum Regarding Mission Plan Acceptance Schedules.** A Pacific Northwest Laboratories January 24, 1984 memorandum regarding potential waste acceptance schedules for inclusion in the Mission Plan noted that "the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year." (Memorandum from J.F. Fletcher to R. S. Hall (January 24, 1984), ENA at 1098.)

e. **Michael Lawrence Testimony Before Congress.** In February 1984, OCRWM Acting Director Michael J. Lawrence testified before the Energy Conservation and Power Subcommittee of the House Committee on Energy and Commerce regarding DOE's 1985 budget. Lawrence testified that the activities of his office were:

> . . . fashioned on the fundamental objective of the Nuclear Waste Policy Act of 1982 (NWPA), which is:
>
> > "to accept high-level radioactive waste for safe management, storage and permanent disposal on a firm schedule, beginning not later than January 31, 1998."
>
> By achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998, and, ultimately, remove all eligible waste from at-reactor storage.

(Michael J. Lawrence, Acting Director, Office of Civilian Radioactive Waste Management, Department of Energy, Statement Before the Subcommittee on Energy

Conservation and Power, House Committee on Energy and Commerce, at 2 (February 22,1984), ENA at 1099, 1102; *see also* 5/20/02 Lawrence Dep. at 201-04, ENA at 655-56; 5/21/02 Lawrence Dep. at 302-05, ENA at 666-67.)

f. **April 1984 Draft Mission Plan.** The April 1984 draft of the Mission Plan, which was circulated to SNF Program participants, noted DOE was developing a waste acceptance schedule in accordance with the Contract. (Draft Mission Plan for the Civilian Radioactive Waste Management Program, at 1-1 (April 1984), ENA at 1139, 1148; 5/20/02 Lawrence Dep. at 206-08, ENA at 657.) The draft noted that "[i]n the event of a delay in repository operation, the Department could take the waste materials in accordance with the Waste Acceptance Schedule and arrange for either continued storage at the utilities in Federal storage casks, or for storage elsewhere pending transfer to the repository." (Draft Mission Plan for the Civilian Radioactive Waste Management Program at 2-1 (April 1984), ENA at 1139, 1150.) Further, the draft noted that the OCRWM's approach was "designed to ensure that all of the owners and generators of spent nuclear fuel and high-level wastes will be able to establish firm planning schedules for the disposition of their radioactive wastes sufficiently early to determine their on-site interim storage needs." (*Id.*) The draft contained an acceptance schedule which ramped up to a steady state of 3,000 tons by the sixth year of operation. (*Id.* at 2-2, Table II-1, ENA at 1151.)

g. **Lawrence Comments on April 1984 Draft Mission Plan.** In July 1984, former OCRWM Acting Director Michael Lawrence, who had moved on to a position at DOE's Richland Operations Office, expressed concern that the April 1984 Draft Mission Plan had not taken account of potential costs of continued storage at reactors after 1997. (Michael J. Lawrence, Manager, DOE Richland Operations, Letter to

Ben C. Rusche, Director, OCRWM, at 1-2 (July 23, 1984), ENA at 1199-1200; 5/21/02 Lawrence Dep. at 324-28, ENA at 669-70.) In this letter, the DOE Richland Operations Office commented that:

> Page 2-1, first paragraph [of the Draft Mission Plan] states "The acceptance rate is based on the emplacement capacity currently projected for the two planned geologic repositories. . . ." *Based upon our interpretation of the NWPA, the minimum acceptance rate should be based upon the rate at which spent fuel is generated by civilian nuclear power reactors. This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998.*

(Michael J. Lawrence, Manager, DOE Richland Operations, Letter to Ben C. Rusche, Director, OCRWM, Enclosure 1 at 1 (July 23, 1984) (emphasis added), ENA at 1201.)

h. **Williamson Memorandum on SNF Program Strategy.** On September 15, 1983, Richard H. Williamson, the NWPA Project Office's Deputy Director of Analysis and Project Control, outlined the strategy for the SNF program:

> - The *central* criteria for this [waste acceptance] schedule is:
>
>   - an acceptance rate during the first 5 years such that no utility would have to build additional storage facilities after 1998.
>   - an acceptance rate after the first 5 years equivalent to the actual rate of utility discharge of spent fuel each year.

(Memorandum from Richard H. Williamson to Robert Morgan et. al., at 1 (September 15, 1983 Memorandum), ENA at 1045, 1046; 6/25/02 Morgan Dep. at 148-49, ENA at 775.) The memorandum also stated that "the lack of existence of particular type facilities will not delay or postpone the acceptance of spent fuel." (September 15, 1983 Memorandum at 1, ENA at 1046.)

**Deposition Testimony**

i. Robert Morgan, the first head of the SNF program, testified that the intent of the NWPA was to avoid having utilities provide on-site storage after 1998. (3/21/02 Morgan Dep. at 43-45, ENA at 745-46.[18]) Mr. Morgan also stated that by 2001 DOE would meet the rate of discharge of SNF. (*Id*. at 48-49, ENA at 746-47.)

j. The second Acting Director of OCRWM, Michael J. Lawrence, testified that the intent of the NWPA and DOE's intent was to allow utilities to avoid building additional storage facilities. (5/20/02 Lawrence Dep. at 187-89, ENA at 654; 5/21/02 Lawrence Dep. at 336-37, ENA at 672.[19]) Mr. Lawrence further testified that if "acceptance rates were as anticipated [shortly after executing the contract]. . . it would preclude the need for additional storage capacity." (5/21/02 Lawrence Dep. at 304-05, ENA at 667.) Mr. Lawrence acknowledged that DOE's objective was to prevent shutdowns and reduce the backlog of accumulated fuel. (5/20/02 Lawrence Dep. at 142, ENA at 651.)

k. Robert Rosselli, one of the three individuals who drafted the Standard Contract, testified that he understood that DOE was responsible for providing or eliminating the need for additional at-reactor storage after 1998. (4/15/02 Rosselli Dep. at 140, 148-49, ENA at 842, 850-51.) "[A]fter 1998, the utilities would not have to build

---

18 In his deposition Mr. Morgan exhibited a 180 degree reversal of position. Before the first break in the deposition, Mr. Morgan testified that it was his responsibility to determine for DOE what the intent of the NWPA was and it was his determination that the NWPA intent was to prevent utilities from having to provide additional on-site storage after 1998. (3/21/02 Morgan Dep. at 43-45, ENA at 745-46.) After the break, during which he consulted the Government attorney representing him, Mr. Morgan testified that he did not know what the intent of the NWPA was and that it was only DOE's goal to prevent utilities from having to provide on-site storage. (3/21/02 Morgan Dep. at 58-60, 115-17, ENA at 748, 752A-B.)

19 While Lawrence later disclaimed that this intent was a "requirement," he acknowledged that the DOE was charged with carrying out the intent of the law. (5/21/02 Lawrence Dep. at 334, ENA at 671.)

on-site storage. They could rely upon the Government to either accept fuel for disposal or provide some other means." (*Id* at 140-41, ENA at 842-43.)

l. Victor Trebules, the DOE employee who had responsibility for coordinating preparation of the Mission Plan, testified that DOE's objective was "reaching waste acceptance rates that would preclude the utilities from having to provide additional on-site storage." (4/17/02 Trebules Dep. at 52,[20] ENA at 909.) Trebules also testified that after a ramp-up period, DOE intended to operate at a rate sufficient to work down the backlog of fuel. (*Id*. at 53, ENA at 910; *see also id*. at 97-99, 121, ENA at 913, 914; 4/18/02 Trebules Dep. at 19-21, ENA at 920-21.)

m. Ben Rusche, the first politically appointed director of OCRWM, testified that that there was a "strategy" or "objective" of preventing additional storage on site. (5/16/02 Rusche Dep. at 159, ENA at 869.) Rusche testified that this goal was "consistent" with the NWPA. (*Id*. at 170-71, 244-46, ENA at 870, 871-72; *see also* 5/17/02 Rusche Dep. at 376-77, ENA at 880-81.)

n. Thomas Pollog, DOE's Rule 30(b)(6) witness on the rate of acceptance DOE planned to use under the Standard Contract and the rate of acceptance in estimates made by DOE from 1982 to 1987, testified that DOE's goal in the mid-1980s

---

[20] At the time he was deposed in 2002, Victor Trebules was employed by the DOE as Director, Office of Project Control, Yucca Mountain Site Characterization Office, OCRWM, and was responsible for the DOE's Yucca Mountain site characterization activities. Mr. Trebules has also been employed by the DOE as a Program Analyst; Senior Technical Advisor; Acting Director, Management & Operations Division; Director, Storage Division; and Director, Program Management Division. As a Program Analyst, Mr. Trebules was responsible for coordinating preparation of the DOE Mission Plan, Mission Plan Amendments, and 1989 Reassessment of the civilian radioactive waste management program. As Director, Storage Division, Mr. Trebules was responsible for work on the DOE's proposed MRS facility. As Director, Program Management Division, OCRWM, Mr. Trebules was responsible for the DOE's Yucca Mountain site characterization activities. (*See* 4/17/02 Trebules Dep. at 15-18, ENA at 903-04.)

was to "alleviate the purchasers' need to have storage outside of their [spent fuel] pools," and that the 3,000 ton rate was the rate DOE calculated would achieve that objective. (4/11/02 Pollog Rule 30(b)(6) Dep. at 96-97,[21] ENA at 797.) Pollog stated that beyond the short term goal of relieving at-reactor storage problems, over the long term the rate needed to be "sufficient to deplete the backlog of spent fuel at reactors." (*Id*. at 203, ENA at 800.)

o. Lake Barrett, the acting or deputy director of the OCRWM from 1993 until February of 2002, stated that the NWPA required the reduction in the backlog of SNF located at the utilities and that the 3,000 ton rate was a reasonable rate to achieving those objectives. (4/22/02 Barrett Dep. at 52-55, 57-59, 120-22, ENA at 395-96, 397, 403-04; 5/10/02 Barrett Dep. at 1163-65, ENA at 459-60.)

p. Ronald Milner, the Chief Operating Officer of OCRWM and long-time DOE employee, testified that his understanding of the SNF program was that the DOE "would pick up the fuel before a utility ran out of pool storage capacity which would then force it to shut down." (5/1/02 Milner Dep. at 85, ENA at 697.) Milner also testified that the goal of the program was to reduce the amount of storage needed and

---

[21] Mr. Pollog is currently employed by the DOE as the Contracting Officer's Technical Representative, and is responsible for assisting in the implementation of the Standard Contract. Mr. Pollog has been performing a similar function since 1996. In addition, Mr. Pollog has worked for the DOE in various other positions since 1988, including as a Nuclear Engineer in the Systems Development Branch, Systems Integration Branch, Utility Interface & Logistics Team, Engineering Division, and Waste Acceptance and Transportation. While working in the Systems Integration Branch, Mr. Pollog was responsible for developing the specific requirements of the DOE waste management system and creation of requirements documents. In each position he has held at the DOE since 1990, Mr. Pollog has been responsible for assisting in the DOE's implementation and interpretation of the terms of the Standard Contract. (*See* 7/12/05 Pollog Testimony in *Tennessee Valley Authority v. United States*, at 1602-03, ENA at 818-19; 4/11/02 Pollog Dep. at 12, ENA at 795; 2/19/02 Pollog Dep. at 8-16, ENA at 784-92.)

allow the timely decommissioning of reactors. (5/2/02 Milner Dep. at 273-74, ENA at 706-07.)

q. Billy Cole, who served as Manager of Waste Acceptance for DOE's principal contractor from 1984 until 1989, testified that the "basic purpose" of the SNF program was to "keep the utilities from having to run out of storage space," and the "basic strategy" and "primary mission" of the NWPA was to prevent utilities from "having to add more storage." (3/12/02 Cole Dep. at 80-81, ENA at 539.) Cole testified that DOE's intent at the time of the execution of the Standard Contract was "to get a facility operating in '98 to take the stuff away fast enough so the utilities would not have to add additional storage. That was the intent." (*Id*. at 202, ENA at 550.) Cole testified to meet this goal, and the goal of reducing the backlog of accumulated fuel, DOE adopted a 3,000 ton acceptance rate. (*Id*. at 175-176, ENA at 547.)

r. Alan Brownstein, who was in charge of DOE's interface with utilities for over 10 years, testified that the "goal" and "objective" of DOE was to eliminate the need for utilities to provide on-site storage after the DOE began acceptance and that that goal was communicated to utilities. (4/9/02 Brownstein Dep. at 80, ENA at 487; 4/10/02 Brownstein Dep. at 412, ENA at 507; *see also* 4/9/02 Brownstein Dep. at 60-61, ENA at 484.) Brownstein testified that an additional goal was to reduce the backlog of accumulated SNF. (4/9/02 Brownstein Dep. at 70, ENA at 486.)

s. David Zabransky, currently DOE's Contracting Officer, in charge of administering the Standard Contract, administering fee payments, and interpretation and correspondence to the utilities related to the Standard Contract, noted that when he was an employee of Wisconsin Electric Power Company, he had assumed that DOE would perform at a rate such that all the fuel would be gone five to ten years after its

reactor ceased operations. (7/12/05 Zabransky Testimony in *Tennessee Valley Authority v. United States*, at 1684-85, ENA at 981-82; 4/17/02 Zabransky Dep. at 88-90, ENA at 939-40.) Zabransky stated "[I]t would have been my personal opinion at the time that a rate that would have been reasonable would have reflected the aggregate rate of discharges plus some amount of workoff." (*Id*. at 90, ENA at 940.)

t. Patrick McDuffie, a retired employee of Battelle, DOE's principal contractor during the early years of the program, and original author of the first ACR, testified that the intent of these reports was to devise a rate which "would allow the minimum or require the minimum at-reactor storage." (3/18/02 McDuffie Dep. at 38, 111-13, ENA at 683, 685.) McDuffie also testified that a rate of 3,000 tons would provide enough acceptance capacity to meet the goal of working off the industry SNF backlog. (*Id*. at 114, ENA at 686.)

65. DOE also intended to operate at a rate sufficient to remove SNF quickly enough to prevent delays in decommissioning reactors after their scheduled shutdown:

a. David Zabransky, who worked for Wisconsin Electric at the time the Standard Contract was signed, testified that he understood the intent was to remove all SNF from reactors within five to ten years after reactor shutdown. (4/17/02 Zabransky Dep. at 89, ENA at 940.)

b. Lake Barrett testified that one intent of the NWPA and the Standard Contract was to remove SNF so as not to "get in the way of utilities' decommissioning activities." (4/23/02 Barrett Dep. at 475, ENA at 419.) Barrett testified that this was the basis for the Standard Contract provision that DOE would remove any SNF over five years old. (*Id.*)

c. Robert Morgan testified that DOE did not want to hold up decommissioning activities at reactor sites or cause utilities to wait around 25 or 30 years to decommission their reactors. (3/22/02 Morgan Dep. at 313-15, ENA at 769.)

d. Ron Milner testified that DOE had a long-standing goal to permit orderly decommissioning of utilities' reactors. (5/2/02 Milner Dep. at 273-74, ENA at 706-07.)

66. Consistent with Congressional intent, from the start of the SNF Program, DOE's intent was to have a repository in operation to meet the 1998 date and meet their objectives:

a. In the Federal Register Notice publishing the initial draft of the Standard Contract, the DOE stated that "The [NWPA] directs DOE to begin repository operations no later than January 31, 1998." (Standard Contract for the Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, 48 Fed. Reg. 5,458 (Feb. 4, 1983) (to be codified at 10 C.F.R. Part 961), ENA at 990, 991.)

b. In May 1984, DOE General Counsel Theodore J. Garrish wrote a letter to Senator J. Bennett Johnston responding to concerns regarding DOE's interpretation of the 1998 date. In the letter Mr. Garrish noted that:

> The Nuclear Waste Policy Act of 1982 was passed with the presumption that a repository would be operational by January 31, 1998. The department fully intends to meet this Congressional objective and is currently in the process of taking the steps necessary to ensure that we fulfill all of our corresponding legal obligations under the Act. Therefore, the program which has been developed by the Department to fulfill the requirements of the Act is designed "to assure acceptance of waste for disposal by January 31, 1998."
>
> We believe the intent of the Congress when formulating the Act was directed toward commending disposal operations by 1998. The Department is totally committed to achieving this objective.

(Theodore J. Garrish, General Counsel, DOE, letter to J. Bennett Johnston, United States Senator (May 30, 1984) (footnote omitted), ENA at 1186-87.)

c. When recommending the Yucca Mountain site to the President in 2002, then-DOE Secretary Abraham stated: "The NWPA by its terms contemplated that the entire process of siting, licensing, and constructing a repository would have been completed more than four years ago, by January 31, 1998." (Recommendation of the Secretary of Energy Regarding the Suitability of Yucca Mountain Site for a Repository Under the Nuclear Waste Policy Act of 1982 at 6, ENA at 2140, 2152; 4/24/02 S. Klein, Rule 30(b)(6) Dep. at 171,[22] ENA at 580.)

d. In a Federal Register notice concerning interpretation of the NWPA and the Standard Contract, DOE acknowledged that ". . .the [NWPA] originally envisioned that a geologic repository would be in operation, and DOE would be prepared to begin acceptance of SNF by January 31, 1998." (Department of Energy Final Interpretation of Nuclear Acceptance Issues 60 Fed. Reg. 21,793, 21,794 (May 3, 1995), ENA at 1896, 1897.)

e. Michael Lawrence testified that the "top" priority of the office was to a have a geologic repository beginning in 1998. (5/20/02 Lawrence Dep. at 58, 145, ENA at 640, 651; 5/21/02 Lawrence Dep. at 247-48, 304, ENA at 664-65, 667.) Lawrence testified that the purpose of the Standard Contract was not to provide for

---

22 Susan Klein worked for DOE from 1984-2002 in various positions, including as Assistant General Counsel (1992-97) in the Office of the General Counsel, and then as Senior Policy Advisor to the Director & Deputy Director, OCRWM (1997-2002). While working in the Office of the General Counsel, Ms. Klein was responsible for legal issues related to waste acceptance and transportation including interpretation of the Atomic Energy Act, NWPA, Low Level Waste Policy Act, and the Standard Contract. As a Senior Policy Advisor, Ms. Klein was responsible for acting as the liaison with the DOE General Counsel's office, including responsibility for interpretation of the Standard Contract and spent fuel litigation issues. (*See* 4/24/02 Klein Dep. at 11-13, 15-21, 23-34, ENA at 564-65, 565-67, 567-70.)

interim storage, but for permanent disposal. (5/20/02 Lawrence Dep. at 149-50, ENA at 652-53.) The primary focus was to dispose of waste in a repository and not an MRS facility. (5/21/02 Lawrence Dep. at 324, ENA at 669.)

f. Lake Barrett testified that he understood the NWPA provided that the DOE would have a geologic repository in operation by 1998. (4/26/02 Barrett Dep. at 710, ENA at 433.)

67. While DOE believed it was obligated to have a repository in place by 1998, DOE also assured utilities that waste acceptance would take place in a manner consistent with NWPA goals regardless of what type of facility DOE had in place:

a. A memorandum by Richard Williamson outlining the strategy of the SNF program stated that "The lack of existence of particular type facilities will not delay or postpone the acceptance of spent fuel." (Memorandum from Richard H. Williamson to Robert Morgan et. al., Attachment at 1 (September 15, 1983), ENA at 1045, 1046.)

b. The December 1983 draft of the Mission Plan stated that "[DOE] does not intend to delay or postpone the acceptance of civilian radioactive wastes even if a permanent geologic repository is not completed by 1998." (Draft Mission Plan at 2-1 (December 20, 1983), ENA at 1075, 1080.)

c. The April 1984 draft of the Mission Plan stated that "[I]n the event of a delay in repository operation, the Department could take the waste materials in accordance with the Waste Acceptance Schedule and arrange for either continued storage at the utilities in Federal storage casks, or for storage elsewhere pending transfer to the repository. (Draft Mission Plan, at 2-1 (April 1984), ENA at 1139, 1150.) The Draft Mission Plan also noted that: "If there is a delay in the first repository schedule that does

not threaten the successful completion of the repository, the Department will accept waste for disposal at the rate shown in Table II-1 through means such as Federal at-reactor storage." (*Id*. at 2-5, ENA at 1154.) Table II-1 of the Draft Mission Plan indicates that the DOE would ramp up to accept 3,000 tons by 2003. (*Id.* at 2-2, Table II-1, ENA at 1151).

d. In June 1984, OCRWM director Ben Rusche told the press that "The Department is obligated to begin receiving spent fuel in 1998 whether or not a repository is in place." (Matt Yancey, *Nuclear Wastes*, Associated Press, June 13, 1984, ENA at 1188; 5/17/02 Rusche Dep. at 337-43, ENA at 876-77; *see also* Cass Petersen and Pete Early, *Waste-Disposal Advances*, Wash. Post, June 15, 1984, ENA at 1189. )

68. Michael Lawrence, the Deputy Director of the NWPA Project Office at the time the Contract was signed, testified that the Contract did not contain a *specific* acceptance rate because it was not possible to include an exact rate it in 1983:

A. At the time we were signing or proposing and signing contracts, we were very, very early in the process. We did not have a facility designed and subsequently – consequently, we also did not know what our ability to accept waste and fuel would be. So we knew there would be information that the utilities would like but we were in no position to provide. Nevertheless, to get general obligations down, begin accepting in '98, being the primary one, we needed to sign contracts which would allow the utilities to start putting the 1.0 mill per kilowatt hour in the Waste Fund.

Q. So DOE understood that the utilities would have liked the contracts to have firm terms as far as the – the rate of spent fuel acceptance after 1998, but DOE just didn't have a means of specifying something at that time, at the beginning of 1983

A. That's an accurate representation.

(5/20/02 Lawrence Dep. at 62-63 (objection omitted), ENA at 641; *see also* 6/25/02 Morgan Dep. at 12, ENA at 773; 3/12/02 Cole Dep. at 34-37 (acceptance rates should depend on projections of discharge rates by utilities, facility design, and cost), ENA at 533.)

69. DOE has consistently recognized that a 3,000 ton or similar rate is necessary to achieve the goals of the NWPA, the Standard Contract, and the SNF Program.[23] This fact is demonstrated by (1) DOE's use of the 3,000 ton or similar rates in documents throughout the early years of the SNF Program, and (2) deposition testimony of DOE witnesses in this case:

**DOE Program Documents From 1983 to 1988**

a. **Report on Financing SNF Disposal.** DOE's June 1983 Report on Financing the Disposal of Commercial SNF and Processed HLRW contemplated two repositories each with a steady state receipt rate of 3,000 tons per year beginning in the sixth year after the DOE began removing SNF. (Report on Financing the Disposal of Commercial SNF and Processed HLRW (July 1983) at 9, ENA at 1029, 1042; 4/15/02 Rosselli Dep. at 95-96, ENA at 837-38.)

b. **December 1983 Draft Mission Plan.** The 1983 OCRWM draft Mission Plan dated December 20, 1983 projected a 3,000 ton acceptance rate by the sixth year after DOE began removing SNF. (Draft Mission Plan at 2-2 to 2-3 (December 20, 1983), ENA at 1081-82.) The document described the 3,000 ton rate as the rate "set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998." (*Id.* at 2-2, ENA at 1081.)

---

23 Indeed, some of the initial DOE program documents eventually projected an even higher acceptance rate, of approximately 6,000 tons per year, based upon the opening of a second repository several years after the first repository. (*See, e.g.,* Report on Financing the Disposal of Commercial SNF and Processed HLRW at 8-11 (July 1983), ENA at 1041-44; Draft Mission Plan at 2-3, 2-6 (December 20, 1983), ENA at 1082, 1085.) Those projections were based on estimates of the growth of the nuclear industry and SNF discharge projections at existing reactors. Following slower actual growth of the nuclear power industry, DOE subsequently deferred plans for a second repository. (OCRWM Mission Plan Amendment at 13 (June 1987), ENA at 1401, 1420.)

c. **April 1984 Draft Mission Plan.** The OCRWM April 1984 Draft Mission Plan showed DOE accepting 3,000 tons by the sixth year after DOE began removing SNF. (Draft Mission Plan at 2-2, Table II-1 (April 1984), ENA at 1151.)

d. **1984 Total System Life Cycle Cost Analysis.** OCRWM's April 1984 preliminary analysis of SNF Program costs projected a steady state acceptance rate of 3,000 tons by the sixth year after DOE began removing SNF. (Preliminary Analysis of Total System Life Cycle Cost of the Commercial High-Level Radioactive Waste Disposal Program, at 2-4 (April 27, 1984), ENA at 1162, 1176.)

e. **1984 Fee Adequacy Report.** A July 1984 Review of the Adequacy of the Waste Disposal Fee projected a 3,000 ton steady state repository rate by the sixth year after DOE began removing SNF. (Nuclear Waste Fund Fee Adequacy: An Assessment (July 1984) at 3, ENA at 1190, 1193.)

f. **OCRWM Mission Plan.** The OCRWM Final Mission Plan issued in June 1985 showed DOE accepting 3,000 tons of SNF by the sixth year after the DOE began removing SNF. (Mission Plan for the Civilian Radioactive Waste Management Program at 26 (June 1985), ENA at 1250, 1292.)

g. **1985 Total System Life Cycle Cost Analysis.** The OCRWM 1985 Analysis of the Total Life Cycle Cost for the Civilian Radioactive Waste Management Program ("1985 TSLCC") projected a 3,000 ton acceptance rate by the sixth year after DOE began removing SNF. (Analysis of Total System Life Cycle Cost of the Commercial High-Level Radioactive Waste Disposal Program, at 2-3 (April 1985), ENA at 1218, 1231.)

h. **1985 Fee Adequacy Study.** OCRWM's February 1985 report on the adequacy of the Nuclear Waste Fund fee projected an acceptance rate of 3,000 tons by

the sixth year after DOE began removing SNF. (Nuclear Waste Fund Fee Adequacy: An Assessment, at 3 (February 1985), ENA at 1205, 1208.)

i. **1986 Life Cycle Cost Analysis.** OCRWM's 1986 Analysis of the Total Life Cycle Cost for the Civilian Radioactive Waste Management Program ("1986 TSLCC") projected a 3,000 ton acceptance rate beginning in the sixth year after DOE began removing SNF. (Analysis of Total System Life Cycle Cost of the Commercial High-Level Radioactive Waste Disposal Program, at 14, 22 (April 1986), ENA at 1313, 1328, 1336.)

j. **1986 Fee Adequacy Report.** OCRWM's March 1986 report evaluating the adequacy of the Nuclear Waste Fund fee based its projections on an acceptance rate of 3,000 tons beginning in the sixth year after DOE began removing SNF. (Nuclear Waste Fund Fee Adequacy: An Assessment, at 3-4 (March 1986), ENA at 1296, 1300-01.)

k. **1987 Mission Plan Amendment.** OCRWM's 1987 Mission Plan Amendment showed DOE accepting 2,650 tons by the seventh year after DOE began removing SNF. (OCRWM Mission Plan Amendment, at 61 (June 1987), ENA at 1401, 1467.)

l. **1987 Annual Capacity Report.** The 1987 Annual Capacity Report, which was based on the 1987 Mission Plan Amendment, showed DOE accepting 2,650 tons by the seventh year after DOE began removing SNF. (1987 Annual Capacity Report at 7 (June 1987), ENA at 1471, 1481.)

m. **1988 Draft Mission Plan Amendment.** OCRWM's 1988 Draft Mission Plan Amendment projected a steady state repository receipt rate of 3,000 tons by the sixth year after DOE began removing SNF and a steady state receipt rate of 2,700

tons at an MRS facility by the fifth year. (OCRWM Draft 1988 Mission Plan Amendment at 19 (June 1988), ENA at 1519, 1544.)

n. **1988 Annual Capacity Report.** The 1988 Annual Capacity Report issued by DOE showed DOE accepting 3,000 tons by the sixth year after DOE began removing SNF. (1988 Annual Capacity Report at 5 (June 1988), ENA at 1496, 1507.)

**Deposition Testimony**

o. Lake Barrett specifically affirmed that DOE would have used the 3,000 ton rate if it had begun to perform in 1998:

> Q: What schedule would DOE have followed had it begun to take SNF from purchasers by January 31, 1998 pursuant to this contract?
>
> A: We would have operated our system at our plant [sic] which was, you know, whatever the operation rate which transiented [sic] and leveled out at 3,000 metric tons per year after five years. That's what we were planning to do.
>
> Q: That's what you would have done?
>
> A: That's what we would have done if we could have gotten, you know, the sites approved, et cetera.

(5/14/02 Barrett Dep. at 120-21 (objections omitted), ENA at 474.)

p. Mr. Barrett testified that the justification for the 3,000 ton rate was that it matched the annual discharge rate of 2,000 tons and allowed DOE to "catch up and, you know, remove the waste that had been accumulating at whatever the start date of the facility would be." (5/10/02 Barrett Dep. at 1164-65, ENA at 460; *see also* 4/22/02 Barrett Dep. at 52-55, ENA at 395-96; 5/10/02 Barrett Dep. at 1332-33, 1370-73, ENA at

463, 466-67.) This allowed DOE to meet its goals of reducing the backlog of SNF. (4/22/02 Barrett Dep. at 52-55, ENA at 395-96).

q. Mr. Barrett also testified that the 3,000 ton rate has been DOE's way of achieving the requirement of reducing the existing SNF backlog since he joined the program in 1985 until the present. (4/22/02 Barrett Dep. at 117-22, 197-98, ENA at 403-404, 405; 5/10/02 Barrett Dep. at 1333-34, ENA at 463; *see also* 4/22/02 Barrett Dep. at 57-59, ENA at 397.) Each of the system studies prepared by DOE from the mid-1980s to the mid-1990s supported the 3,000 ton rate. (4/22/02 Barrett Dep. at 197-98, ENA at 405.) Mr. Barrett explained that a slower rate, such as 900 tons, would not keep up with the utility discharge rate much less reduce the backlog of SNF. (4/23/02 Barrett Dep. at 340-45, ENA at 410-412; *see also* 5/10/02 Barrett Dep. at 1370-73, ENA at 466-67.)

r. Finally, Mr. Barrett testified that DOE also based its evaluation of the adequacy of the 1 mil/kwh fee on a 3,000 ton rate and program economics. (4/23/02 Barrett Dep. at 348-50, ENA at 412-13.) The 3,000 rate was chosen

> as a proper balance for total life-cycle costs as well as near-term cash flow requirements and performance. If you make the number too high, then you have – you would quickly work off the backlog, and then you would have a lot of idle capacity. If it was too low, you would have reactors needing to put in dry storage, and 3,000, based on an early 1980s, seemed like a reasonable number to use."

(5/10/02 Barrett Dep. at 1332-33, ENA at 463.)

s. Tom Pollog, the DOE's Rule 30(b)(6) representative on the rate of acceptance DOE planned to use under the Standard Contract and the rate of acceptance in estimates made by DOE from 1982 to 1987, testified that the 3,000 ton rate was the rate the DOE determined was needed to avoid at-reactor storage. (4/11/02 Pollog Rule

30(b)(6) Dep. at 96-97, ENA at 797; 4/12/02 Pollog Rule 30(b)(6) at 12, ENA at 804.) Mr. Pollog, also testified that the 3,000 ton rate was necessary from a functional standpoint in order to collect all SNF during the twenty-five year period that the DOE expected to operate the repository. (*Id.*)

t. Billy Cole stated he agreed that DOE began using the 3,000 ton rate from the outset of the SNF program and that the 3,000 ton rate was "required to work off what utilities were discharging as well as, attacking a backlog. . . Not only did they want to help utilities so they wouldn't have to add additional capacity, they wanted to make sure that you had to work off the backlog." (3/12/02 Cole Dep. at 175, ENA at 547; *see also id*. at 171-76, ENA at 546A-547.)

u. Robert Morgan testified that one criteria used in developing the 3,000 ton rate was to prevent utilities from having to provide additional on-site storage after January 1998. (3/22/02 Morgan Dep. at 225, ENA at 765.) Additionally, Mr. Morgan testified that early fee adequacy studies, which projected a 3,000 ton steady-state acceptance rate, were based on eliminating the need for additional at-reactor storage after 1998. (3/21/02 Morgan Dep. at 93-97, 205-12, ENA at 750-51, 761-62; 3/22/02 Morgan Dep. at 226-27, ENA at 765.)

v. Victor Trebules testified that the 3,000 ton rate was designed to initially avoid at-reactor storage and eventually work off the backlog. (4/17/02 Trebules Dep. at 52-54, 97-98, 170-71, ENA at 909-10, 913, 916.) The 3,000 ton rate would at least have matched the rate of generation. (*Id*. at 53, ENA at 910; *see also id*. at 180, ENA at 917.)

w. David Zabransky testified that when he was in private industry: "my understanding, and I think it was the general understanding at the time [was] that

3,000 tons a year would be a sufficient rate to work off the backlog and the discharges in a reasonable time frame." (4/17/02 Zabransky Dep. at 105, ENA at 943; *see also id*. at 90, ENA at 940.)

70. DOE's current planning basis for actual SNF receipt has, since 1994, projected a 3,000 ton steady state receipt rate[24]:

a. A DOE document setting out DOE's assumptions for estimating the total system life cycle costs for the SNF program distributed in December 1994 projected an acceptance rate of 3,000 tons by the fifth year of operation following commencement in 2010. (1995 TSLCC Assumptions Package, at 3, 13-15 (December 1994), ENA at 1807, 1812, 1814-16; 5/2/02 Milner Dep. at 375-79, ENA at 710-11.)

b. In OCRWM's September 1995 Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program ("1995 TSLCC"), the DOE projected a steady state acceptance rate of 3,000 tons by the fifth year of operation. (Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program, at 8 (September, 1995), ENA at 1902, 1917.) Lake Barrett testified that that the TSLCC is a baseline document which contained the rate at which

[24] In late 2004, the DOE determined that it could not meet the 2010 deadline for beginning to accept SNF. (*See* 4/11/05 Kouts 30(b)(6) Dep. at 62-63, ENA at 616.) The DOE has not issued a new date by which it expects to open a repository and begin accepting SNF. However, recent DOE announcements appear to indicate that the earliest DOE currently expects to open a repository is 2012. (*See* Statement of Theodore J. Garrish, Deputy Director, Office of Civilian Radioactive Waste Management, U.S. Department of Energy, to the Subcommittee on Energy and Air Quality, Committee on Energy and Commerce, U.S. House of Representatives (March 10, 2005) at 4, ENA at 2294, 2297, presenting funding profiles for assumed repository start dates of 2012 and 2015; Ken Ritter, *Energy Department Official Says Yucca Project Delayed, Not Dead*, Associated Press, February 9, 2005, (available at www.signonsandiego.com/news/nation/20050209-1535-nv-yuccamountain.html), ENA at 2265, noting that then Director of DOE's Office of Civilian Radioactive Waste Management, Margaret Chu, stated that "[w]e're hoping [for]2012" as a repository start date.)

DOE believed it could perform. (5/10/02 Barrett Dep. at 1343, 1334-35, ENA at 465, 463.)

c. OCRWM's 1998 Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program ("1998 TSLCC") projects a steady state acceptance rate of 3,000 tons by the fifth year of operation. (Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program, at 15 (1998), ENA at 1971, 1996.)

d. OCRWM's 1998 Viability Assessment of Yucca Mountain projects a steady state receipt rate of 3,000 tons by the fifth year of operation. (Viability Assessment of a Repository at Yucca Mountain, Volume 2: Preliminary Design Concept for the Repository and Waste Package, at 3-2 (1998), ENA at 1930, 1963.)

e. OCRWM's May 2001 Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program ("2001 TSLCC") projects a steady state acceptance rate of 3,000 tons by the fifth year of operation. (Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program, at 4-14 (2001), ENA at 2010, 2027; *see also* 5/10/02 Barrett Dep. at 1337-38, ENA at 464.)

f. OCRWM's January 2002 Waste Acceptance System Requirements Document, which controls planning for the SNF Program, projects a 3,000 ton steady state rate from the fifth year of operation through the end of waste emplacement. (Civilian Radioactive Waste Management Waste Acceptance System Requirements Document at 46, Table 7-1 (January 2002) ENA at 2050, 2061; 4/25/02 Klein Rule 30(b)(6) Dep. at 288-90, ENA at 586-88.)

g. OCRWM's September 2004 Civilian Radioactive Waste Management System Requirements Document ("September 2004 CRD"), which sets

forth the acceptance rate that serves as the planning basis for the repository, establishes a 3,000 ton steady state rate from the fifth year of operation through the end of waste emplacement. (September 2004 CRD at 8, ENA at 2222, 2241; *see also* 4/18/02 Zabransky Dep. at 375-76, ENA at 956; 4/12/02 Pollog Dep. at 120-21, ENA at 805.) The September 2004 CRD is the latest revision to the system requirements document for the waste management system. (*See* 4/11/05 Kouts Dep.[25] at 46, ENA at 614.)

h. DOE's July 2004 APR/ACR also projects a steady state acceptance rate of 3,000 tons by the fifth year of operation. (2004 APR/ACR at p. 2, ENA at 2133, 2137; 4/11/05 Kouts Rule 30(b)(6) Dep. at 26-28, ENA at 611.)

i. Susan Klein, DOE's Rule 30(b)(6) witness in previous coordinated discovery on the issue of "what rate DOE is planning to use once [SNF] acceptance begins" (ENA at 2206), testified that DOE plans to use the 3,000 ton rate when it begins accepting SNF, and that the rate will ramp up to 3,000 tons by the fifth year after DOE begins removing SNF. (4/24/02 Klein Rule 30(b)(6) Dep. at 240-42, ENA at 581-82; 4/25/02 Klein Rule 30(b)(6) Dep. at 351, ENA at 589.)

---

25 Christopher Kouts has worked for the DOE in a variety of positions since 1979, and joined the Office of Civilian Radioactive Waste Management ("OCRWM") in 1985. Since August 2002, Mr. Kouts has held the position of acting and then permanent Director of the Office of Systems Analysis and Strategic Development. (1/30/2004 Kouts Dep. at 45-46, ENA at 600-601; 2/19/2004 Kouts Dep. at 370-71, 433, ENA at 603-604, 605.) In that position, Mr. Kouts is responsible for management of the waste acceptance function, including management of issues related to the Standard Contract. (2/19/04 Kouts Dep. at 370, ENA at 603.) The DOE's communications with the utilities regarding the 2004 DCS process (*see infra* ¶ ¶ 193-202) were sent under Mr. Kouts' direction. (4/11/05 Kouts Rule 30(b)(6) Dep. at 31-32, ENA at 612.) Mr. Kouts' other positions with OCRWM include working as part of the monitored retrievable storage team, heading the OCRWM transportation function, serving as Director of a division that dealt with regulatory coordination activities related to DOE's interactions with the Nuclear Regulatory Commission, Director of the planning division responsible for strategic planning activities, and serving as a liaison with the Yucca Mountain project. (1/30/2004 Kouts Dep. at 13-25, 36-46, ENA at 594-97, 598-601.)

j. Christopher Kouts, DOE's Rule 30(b)(6) witness on the issue of the acceptance rate utilized in the DOE's July 2004 Annual Priority Ranking & Annual Capacity Report ("2004 APR/ACR"), testified that DOE considered the 3,000 rate to be a reasonable rate for the system. He further testified that the rate drives the facility – specifically, "the [rate] requirement is set down and the facilities are designed to meet it." (*See* 4/11/05 Kouts Rule 30(b)(6) Dep. at 26-28, ENA at 611.)

**III. DOE Undertakes Implementation Of The NWPA And Performance Under The Standard Contracts.**

**A. DOE Publishes The Mission Plan.**

71. As required by the NWPA, in June 1985, DOE published its *Mission Plan for the Civilian Radioactive Waste Management Program*. (ENA at 1250-59.)

72. DOE had previously distributed two drafts of the Mission Plan. The initial draft was transmitted in December 1983. (Draft Mission Plan (December 1983), ENA at 1075; Robert Morgan Letter to Russell Stanford, Program Manager, UNWMG (December 20, 1983), ENA at 1096-97; 3/21/02 Morgan Dep. at 149-50, ENA at 757.) A second draft was published in April 1984. (Draft Mission Plan (April 1984), ENA at 1139; 5/20/02 Lawrence Dep. at 204-07, ENA at 656-57.)

73. The June 1985 Mission Plan presented two program plans, including an authorized plan consisting of development and operation of a geologic repository. (Mission Plan at 16, ENA at 1282.) The Mission Plan also presented DOE's hopes for what they called an "Improved-Performance Plan." (*Id*. at 17, ENA at 1283.) The "Improved-Performance Plan" contemplated the inclusion of an integral MRS facility which would begin operations two years *prior* to January 31, 1998. (*Id*. at 17, 27, ENA at 1283, 1293.)

74. Under either plan, the rate of waste acceptance ramped up to a rate of at least 3,000 tons per year. (*Id*. at 26, 27, ENA at 1292, 1293.) The annual acceptance rate at each

of two projected repositories reached a 3,000 ton steady state acceptance rate by the sixth year of repository operation. (*Id*. at 26, 27, ENA at 1292, 1293.)

75. With regard to these acceptance schedules, DOE noted that "[i]n the particular example depicted in Table 2-3, the spent-fuel backlog after 1998 never exceeds the cumulative spent-fuel inventory in 1998. In other words, with the exception of a few years just before the startup of the second repository, the acceptance rate matches or exceeds the rate of spent-fuel generation after 1998." (Mission Plan at 28, ENA at 1294.)

76. The Mission Plan noted that its objectives were to: "Accept civilian spent fuel at an annual rate that will allow the utilities to maintain orderly operations of their nuclear power plants. . ." (Mission Plan at 29, ENA at 1295.) The Mission Plan further stated that DOE intended to "Accept the current planning-base spent-fuel inventory of 130,000 MTU consistent with the objective of cost-effective operations while providing tangible evidence that DOE fully intends to dispose of spent fuel in a timely manner." (*Id*.)

77. The Mission Plan noted that "[t]he growing accumulation of this waste in temporary storage poses potential health and safety problems for the public. It also threatens to overload the storage capacity of individual reactors and eventually the entire nuclear power industry." (Mission Plan at 4, ENA at 1271.)

78. The Mission Plan states that one of DOE's prime objectives was to:

> . . . vigorously pursue the Act's directive to begin accepting spent fuel and high-level waste for disposal no later than January 31, 1998, and to continue to dispose of the waste in a highly efficient manner consistent with the continued orderly operation of the Nation's nuclear power-generation plants.

(Mission Plan at 15, ENA at 1281.)

79. In 1985 DOE also published a report called "The Need for and Feasibility of Monitored Retrievable Storage – A Preliminary Analysis." This report outlined DOE's plans

for an MRS, noting two potential roles for an MRS Facility – as an integral facility and as a back-up facility. (The Need for and Feasibility of Monitored Retrievable Storage – A Preliminary Analysis at iv-v (April 1985), ENA at 1242, 1246-47.) The report noted that it expected to meet the schedule for a repository but that an integral MRS, beginning operation in 1996, would be of some benefit. (*Id.*)

**B. DOE Announces Delay From 1998 Until 2003 For Repository Operations.**

**1. DOE Announces Five Year Delay And Proposes Operation Of An MRS In The Interim.**

80. In January 1987 DOE published a "Draft Mission Plan Amendment." In this report, DOE announced that it was projecting a delay in operations of the repository from 1998 until 2003. (Draft Mission Plan Amendment, at 5 (January 1987), ENA at 1345, 1353.)

81. To accept waste despite the delay, DOE proposed opening an MRS facility in 1998. (Draft Mission Plan Amendment at 10, ENA at 1358.) DOE stated that the MRS would operate as a "system buffer." (*Id.)* DOE indicated that it would make its MRS proposal to Congress and accept a 15,000 MTU limit on MRS capacity. (*Id.*) In addition, DOE stated that it would ask Congress to provide that an MRS could not start receiving SNF until construction authorization for a repository was granted. (*Id.*)

82. In the Draft Mission Plan Amendment, DOE also announced its intention to delay work on the second repository until the late 1990s. (Draft Mission Plan Amendment at 10-11, ENA at 1358-59.) This was based in part on declining projections of rates at which SNF was discharged, which in turn was caused by slower nuclear industry growth than DOE originally projected. (*Id.*)

83. In a letter to OCRWM director Ben Rusche, the EEI's John Kearney noted that the five-year slippage "runs counter to the intent of the NWPA and the interests of the electric utilities and their customers, who are funding the NWPA implementation." (John J.

Kearney letter to Ben Rusche at 2 (April 3, 1987), ENA at 1379, 1380.) The letter also noted changes in the acceptance schedules from those provided in the 1985 Mission Plan. (*Id.* at 7, ENA at 1385.)

84. In March 1987, DOE published a "Monitored Retrievable Storage Submission to Congress." The report was issued to fulfill Section 141 of the NWPA, which required DOE to study the MRS concept and report back to Congress. (Monitored Retrievable Storage Submission to Congress, Vol. 1: The Proposal, at iii, 1 (1987), ENA at 1365, 1366, 1369.) The report recommended construction of an MRS facility at Clinch River in Tennessee. (*Id.* at 1, ENA at 1369.)

85. To allay concerns that an MRS would become a de facto repository, DOE proposed that Congress link the MRS to the repository schedule by providing that no SNF could be accepted at the MRS facility until DOE received NRC construction authorization for the first repository. (*Id.* at 5, ENA at 1373.) DOE also proposed a limit on the total capacity of an MRS of 15,000 MTU. (*Id.*)

86. The report noted that "If this proposal is approved by the Congress, the acceptance schedule will be adjusted for the improved performance of the integrated system. Full-scale operation at a rate of about 2500 to 3000 ton per year would be achieved by 2004." (*Id.* at 20, ENA at 1377.)

87. DOE published the final version of the Mission Plan Amendment in June 1987. As in the draft amendment, DOE noted a delay in repository operations from 1998 until 2003. (OCRWM Mission Plan Amendment at 6 (June 1987), ENA at 1401, 1413.)

88. As in the draft amendment and the MRS proposal to Congress, the Mission Plan Amendment proposed operation of an MRS facility beginning in 1998, with repository operation commencing in 2003. (*Id.* at 12, ENA at 1419.) DOE again stated that it

would accept a 15,000 MTU capacity limit and proposed to link receipt of SNF at an MRS to NRC construction authorization for a repository. (*Id.* at 12-13, ENA at 1419-20.)

89. As in the draft, the Mission Plan Amendment announced that DOE was postponing site-specific activities for a second repository in light of declining projections of SNF generation. (*Id.* at 13, ENA at 1420.)

90. While the MRS facility would provide some interim storage, DOE still intended the MRS to be an "integral" facility and not a location for long-term storage. (5/3/02 Milner Dep. at 553-54, ENA at 720.)

91. DOE projected the MRS would operate as a stand alone facility only from 1998 until 2003, and would have begun shipping fuel to a repository after five years. (5/3/02 Milner Dep. at 555-56, ENA at 720-21; OCRWM Mission Plan Amendment at 12, 61, ENA at 1419, 1467.) Even with the capacity limit, DOE's Chief Operating Officer, Ron Milner, admitted that the MRS could have operated at an acceptance rate approaching 3,000 tons, consistent with prior planning bases. (5/3/02 Milner Dep. at 555-56, ENA at 720-21; *see also* 8/11/04 Milner Testimony in *Yankee Atomic Electric v. United States*, at 4712, ENA at 738.)

92. Under its revised acceptance schedule published in the 1987 Mission Plan Amendment, DOE projected that it would begin accepting SNF at an MRS at a rate of 1,200 tons in 1998. (OCRWM Mission Plan Amendment at 61, ENA at 1467.) This would increase to 2,650 tons by 2004. (*Id.*) Total system acceptance would reach 3,000 tons by 2008. (*Id.*) The "full-scale" receipt rate at the MRS was projected at 2,650 tons. (*Id.* at 62, ENA at 1468.) This rate was possible despite the 15,000 ton capacity limit, as the permanent repository would begin operating in 2003 and receive fuel from the MRS facility. (*Id.* at 61-62, ENA at 1467-68; *see also* 4/22/02 Barrett Dep. at 206-07, ENA at 406.)

93. DOE used the acceptance rates in the 1987 Mission Plan Amendment in drafting its 1987 Annual Capacity Report, which it published in June 1987. (1987 Annual Capacity Report at 7 (June 1987), ENA at 1471, 1481.) In the 1987 ACR, DOE projected that it would initially accept waste at a rate of 1,200 tons beginning in 1998 and ramp up to 2,650 tons by 2004. (*Id*. at 7, ENA at 1481.)

94. The 1987 Annual Capacity report explicitly stated that "as specified in the Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers." (*Id.* at 2, ENA at 1477.)

**2. DOE Representations To Congress Regarding The MRS Proposal.**

95. In conjunction with DOE's MRS proposal to Congress, OCRWM Director Ben Rusche testified before the Senate Committee on Energy and Natural Resources on April 29, 1987. In his testimony, Mr. Rusche reaffirmed that:

> The NWPA finds that "a national problem has been created by the accumulation of spent fuel from nuclear reactors" and that the "Federal Government has the responsibility to provide for the permanent disposal." *Additional operator burdens and complexity at the reactor sites* would be inconsistent with these findings which serve as the basis for the NWPA.

(Ben C. Rusche, Director OCRWM, Statement before the United States Senate Committee on Energy and Natural Resources, at 17 (April 29, 1987) (emphasis added), *reprinted in,* S. Rep. 100-152, at 84 (1987), ENA at 242.)

96. In explaining the MRS proposal before Congress, the DOE represented that the MRS facility would have a much higher acceptance rate than the 900 ton rate it now relies on. That was because DOE projected that the MRS would operate as a stand-alone facility for only five years, until the DOE could open a repository in 2003. In his April 29, 1987 statement, Mr. Rusche explicitly linked the proposal to use an MRS for storage over a five-year

period to fulfilling the goals of the NWPA. Referring to the costs of the proposed MRS, Mr. Rusche stated that:

> The costs borne by the utility rate payers would be offset by savings in at-reactor storage cost; these [storage] costs would be avoided because an MRS facility would allow DOE to accept spent fuel at an earlier time.

(Ben C. Rusche April 29, 1987 Statement at 13, *reprinted in* S. Rep. 100-152, at 79, ENA at 237.)

97. In his April 29, 1987 statement, Mr. Rusche also stated that:

> Without an MRS facility, up to 13,500 metric tons of new temporary storage capacity would be needed at about 45 reactors by the year 2003, when the repository would start operating.
>
> . . .
>
> Without an MRS, utilities will have to add significantly more new storage capacity.

(*Id*. at 15, *reprinted in* S. Rep. 100-152, at 82, ENA at 240.)

98. In his live testimony on April 29, Mr. Rusche stated:

> The proposal, that is for you to authorize a capacity of 15,000 metric tons, which is about five or six years direct output from the discharge of reactors at that time. The 10,000 metric tons that we talked about was the amount of at-reactor storage that could be avoided in the five year period between 1998 and 2003.
>
> That is the time between [when] the MRS would come into operation, if the proposal is accepted, and 2003, the date in which we project the first repository would be in operation. That is the origin of those numbers.

(Statement of Ben C. Rusche, Director, OCRWM, Statement before the Committee on Energy and Natural Resources United States Senate, Senate Hearing Rep. 100-230, pt. 2, at 213, ENA at 221.)

99. Mr. Rusche also testified before Congress that 10,000 tons of at-reactor storage would be required between 1998 and 2003, implying that the proposed 15,000 ton limit,

and the 10,000 ton limit eventually imposed, would be sufficient to avoid additional at-reactor storage during that time period:

> MR. RUSCHE: . . . A second real benefit has to do with at-reactor storage and consolidation. As I mentioned to you a moment ago, there is a high probability that if the system unfolds as we now project, that between the years 1998 and 2003 there would be about 10,000 metric tons of at-reactor storage required to accommodate the fuel thus generated but which is beyond the capacity of the storage basins at the reactors where generated.
>
> That means new temporary storage capacity would have to be provided at some sites, but it would be much smaller if the MRS were in existence. The necessary incremental storage --
>
> THE CHAIRMAN. Excuse me. Why do you use 10,000 tons when the capacity of the MRS is 15,000?
>
> MR. RUSCHE. The 10,000 derives from the rate at which at-reactor basins would exceed their storage capacity. The capacity of the MRS would be greater than that, but I was trying to make the point --
>
> THE CHAIRMAN. Well, that assumes 2003.
>
> MR. RUSCHE. That is right. That is in the period 1998 to 2003.
>
> THE CHAIRMAN. It would be more than that if you are not ready by 2003?
>
> MR. RUSCHE. Correct.

(Statement of Ben C. Rusche, Director, Office of Civilian Radioactive Waste Management U.S. Department of Energy before the Committee on Energy and Natural Resources United States Senate, Senate Hearing 100-230, pt. 2, at 169, ENA at 218.)

100. During a later hearing, Mr. Rusche also testified that:

> Our solution to date has been to buy time: Reactor storage basins and temporary holding tanks in a hundred separate locations in 33 States. It was never intended that private companies in the U.S. would dispose of nuclear waste. The U.S. Government has always assumed that responsibility – and yet, despite $2.8 billion already paid by utilities for this disposal service, many would have us renege on prior commitments and begin anew working toward yet another "solution" the future of which no one can predict.

(Ben C. Rusche, July 16, 1987 Statement at 3, *reprinted in* S. Rep. 100-152, at 172 (1987), ENA at 250.)

101. Deposition testimony by Mr. Rusche confirms that DOE's MRS proposal was made to avoid additional at-reactor storage for the period from 1998 until 2003. (5/17/02 Rusche Dep. at 367-69, ENA at 878-79.)

**3. Congress Passes The Nuclear Waste Policy Amendments Act Of 1987.**

102. In December of 1987 Congress passed the Nuclear Waste Policy Amendments Act ("1987 Amendments"), Pub. L. 100-120, 101 Stat. 1329-1401, 1329-121.

103. The 1987 Amendments provided that DOE was to consider only Yucca Mountain in Nevada as a repository site. 42 U.S.C. § 10172(a). The 1987 Amendments also provided that DOE was to defer consideration of a second repository site and was to report to Congress after January 1, 2007 on the need for a second repository. 42 U.S.C. § 10172(a).

104. The 1987 Amendments also authorized, but did not require, DOE to construct an MRS. 42 U.S.C. § 10162(b).

105. To prevent an MRS from becoming a de facto repository, Congress adopted a modified concept of the linkages proposed by DOE. Congress mandated that the DOE could not select a site for an MRS until DOE recommended approval of a repository site. 42 U.S.C. § 10165(b). Congress also required that construction of an MRS could not begin until a repository had received construction authorization. 42 U.S.C. § 10168(d)(1). The 1987 Amendments further provided that construction could not proceed on an MRS during any time that the repository was not licensed or repository construction was not ongoing. 42 U.S.C. § 10168(d)(2).

106. The 1987 Amendments also provided that the MRS would have a capacity limit of 10,000 MTUs until a repository opened, and 15,000 MTUs thereafter. 42 U.S.C. § 10138(d)(3).

107. To site an MRS, Congress created the Office of the Nuclear Waste Negotiator which was to enter into negotiations with Indian tribes and states to host an MRS facility. 42 U.S.C. §§ 10242(a), 10243(a). Congress also created a Monitored Retrievable Storage Review Commission which was to evaluate the need for an MRS facility. 42 U.S.C. § 10163(a)(1)(A) and (B).

108. Congress' adoption of the 1987 Amendments was based on DOE's representations and was for the purpose of ensuring that DOE would meet its contractual obligations to begin receiving fuel in 1998. A report of the Senate Committee on Energy and Natural Resources stated: "In return for these [fee] payments, the Secretary is required to dispose of spent fuel and high-level waste covered by contracts under the NWPA beginning not later than 1998." (S. Rep. No. 100-152, at 4, ENA at 263.) The report specifically noted that DOE's MRS proposal was premised on a *five-year* extension in the repository schedule. (*Id.* at 6 (emphasis added), ENA at 265.) The report stated that without action SNF "will continue to accumulate where it is generated. Commercial spent fuel is currently being generated at 68 nuclear reactor sites in 31 states . . . . While storage is carried out safely at these sites, none was ever contemplated or designed to be a permanent home for nuclear waste." (*Id.* at 7, ENA at 266.) The report stated that Congress needed to act "if the Department is to meet its contractual commitment to take spent fuel from utilities beginning in 1998." (*Id.* at 8, ENA at 267.) "The authorization of an MRS was intended to "better ensure that the Department is able to meet its contractual commitment to accept spent fuel from utilities beginning in 1998." (*Id.* at 9, ENA at 268.)

**C. The 1988 Draft Mission Plan Amendment And 1988 Annual Capacity Report.**

109. In June 1988, DOE issued another Draft Mission Plan Amendment. This report projected that waste acceptance would begin at a repository in the year 2003. (Draft 1988 Mission Plan Amendment at 15, ENA at 1519, 1540.)

110. In June 1988, DOE published the second Annual Capacity Report. In this report DOE projected that it would begin acceptance of waste in 2003 and would ramp up to 3,000 tons a year by 2008, the sixth year after operations commenced. (1988 Annual Capacity Report at 5, ENA at 1496, 1507.)

111. Like the prior ACR, the 1988 ACR stated that "[a]s specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either the DOE or the Purchasers." (*Id.* at 1, ENA at 1503.)

**IV. DOE Announces Further Delays.**

**A. DOE Announces The Repository Will Be Delayed Until 2010.**

112. In November 1989, DOE published a "Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program." This report was the result of a comprehensive review of the repository schedule directed by the Secretary of Energy. (Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program at vii, ENA at 1565, 1570.) This review recommended a change in management structure of OCRWM, re-examination of the baseline for the repository program, and reexamination of the MRS concept. (*Id.* at vii-x, ENA at 1570-73.)

113. The Reassessment Report announced that the expected start of repository operations would be delayed from 2003 to 2010. (*Id.* at vii, 8-11, ENA at 1570, 1581-84.)

114. Patrick McDuffie, who worked for Pacific Northwest Laboratories and DOE's principal contractor Battelle, testified that, while DOE announced the delay of repository operations until 2010 in 1989, DOE had known about the delay until 2010 for far longer,

possibly even at the time DOE announced the delay until 2003 in 1987. (3/18/02 McDuffie Dep. at 165, ENA at 687.)

115. Also in the Reassessment report, the DOE stated that its ability to accept waste at an MRS in 1998 required modification of the 1987 Amendments linkages between the repository and MRS schedules. (Reassessment Report at ix-x, 17, ENA at 1572-73, 1590.)

116. DOE stated that it hoped to work to modify the linkages imposed by the 1987 Amendments, so that an MRS could open in 1998 on a schedule independent from the repository. (Reassessment Report at 11-12, 18, ENA at 1584-85, 1591.) DOE stated that it would pursue two parallel tracks, through the Nuclear Waste Negotiator and through a DOE MRS site selection process. (*Id.* at 18-19, ENA at 1591-92.)

117. Also in November 1989, the MRS Review Commission issued its report. The report concluded that the schedule linkages "would make it impossible for an MRS to be operational more than three years before the repository." (Nuclear Waste: Is There A Need for Federal Interim Storage? Report of the Monitored Retrievable Storage Review Commission at xvi, ENA at 1597, 1611.)

118. In November 1990, DOE issued a report responding to comments it had received on the Reassessment Report. (Comment Response Document for the Secretary of Energy's "Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program" (November 1990), ENA at 1613.) In responding to comments regarding the contingency plans in lieu of an MRS, DOE noted that "[t]he DOE disagrees with the suggestion that it recommend at-reactor storage in lieu of a repository or an MRS facility. Long term at-reactor storage will not address commitments to the utilities and their ratepayers. . . ." (*Id.* at 14-15, ENA at 1619-20.)

**B. DOE Publishes The 1990 Annual Capacity Report.**

119. In December 1990, DOE published the third Annual Capacity Report. (1990 Annual Capacity Report, ENA at 1625.) In the report, DOE noted that it had not published an ACR in 1989 (as required by Standard Contract Art. IV.B.5.b). (1990 Annual Capacity Report at v, ENA at 1629.) DOE stated it did not meet this contractual requirement because of its then ongoing reassessment of the SNF Program. (*Id.*)

120. The acceptance rates in the 1990 ACR marked a departure from previous ACRs. Instead of one acceptance schedule, DOE provided two potential acceptance schedules, an "upper bounding case" and "lower bounding case." (*Id.* at 5-7, ENA at 1635-37.)

121. In the 1990 ACR, the upper bounding case projected a ramp-up to 3,000 tons per year and was based on the 1988 Draft Mission Plan Amendment and the rates contained in the 1988 ACR. (*Id.* at 5-7, ENA at 1635-37.) The rates in the 1988 Draft Mission Plan Amendment had assumed the start of repository operations in 2003. (1988 Draft Mission Plan Amendment at 19, ENA at 1544.)

122. In the 1990 ACR, the lower bounding case was supposedly derived from the 1987 Amendments' 10,000 ton limit on MRS capacity. However, it required modification of the Act's schedule linkages. (1990 ACR at 5, ENA at 1635.) DOE stated that it hoped that it could modify the provisions in the 1987 Amendments which linked operation of an MRS to the repository schedule. (*Id.*) However, DOE also noted that "[i]f the current linkages to the repository are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF/HLW by DOE would not start until 2007." (*Id.*)

123. In the 1990 ACR, the lower bounding rate ramped up to 875 tons by the fourth year and remained at that rate. (*Id.* at 7, ENA at 1637.)

124. Like the prior ACRs, the 1990 ACR stated that "[a]s specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either the DOE or the Purchasers." (*Id*. at 2, ENA at 1632.)

**C. DOE Publishes The 1991 ACR And Projects A 900 Ton Acceptance Rate Beginning In 1998.**

125. DOE published its fourth Annual Capacity Report in December 1991. In this report, DOE eliminated the upper bounding case and published a revised schedule ostensibly based on operation of an MRS from 1998 until 2010, subject to the 10,000 ton capacity limit in the 1987 Amendments of 1987. (1991 Annual Capacity Report at 4, ENA at 1682, 1690.)

126. The projected acceptance rates in the 1991 ACR were:

| Year | SNF (MTU) |
|---|---|
| 1998 | 400 |
| 1999 | 600 |
| 2000 | 900 |
| 2001 | 900 |
| 2002 | 900 |
| 2003 | 900 |
| 2004 | 900 |
| 2005 | 900 |
| 2006 | 900 |
| 2007 | 900 |
| Total | 8,200 |

(*Id.* at 5, ENA at 1691.)

127. The projected rates in the 1991 ACR assumed congressional modifications of the schedule linkages between the MRS and repository. In the 1991 ACR, DOE acknowledged that "[i]f the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility

operations and initial acceptance of SNF by DOE could not start until at least 2007." (*Id.* at 4, ENA at 1690.)

128. Like the prior ACRs, the 1991 ACR stated that "as specified in the Standard Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers." (*Id.* at 1-2, ENA at 1687-88.)

129. Also in 1991, DOE published for the first time an Acceptance Priority Ranking. This report ranked contract holders' SNF according to the date the SNF was discharged. (1991 Acceptance Priority Ranking at 4, ENA at 1699, 1702.) This ranking is the order among utilities in which DOE was to pick up SNF under the Oldest Fuel First allocation scheme in the Standard Contract, subject to exchanges. (*Id.* at 2, ENA at 1701; Standard Contract Art. IV.B.5 & VI.B.1, ENA at 298, 305-06.) The APR was merely a list of SNF assemblies ranked by discharge date and did not contain any information regarding acceptance rates. (4/19/02 Zabransky Dep. at 668, ENA at 968.)

130. DOE witnesses stated in deposition testimony that the basis for 900 ton rate in the 1991 ACR was the 10,000 ton limit contained in the 1987 Amendments allocated over the twelve-year period between 1998 and 2010, the expected date for the start of repository operations:

a. Billy Cole, a DOE contractor who developed the 1991 ACR acceptance rates, testified in his deposition that he developed the 900 ton rate simply by dividing the 10,000 ton capacity limit over the twelve year period during which the repository would be delayed – 1998 through 2010. (3/12/02 Cole Dep. at 129-31, 180, ENA at 543-44, 548; *see also* 3/13/02 Cole Dep. at 306-07, 343-46 ENA at 555, 556-57.)

b. Tom Pollog, DOE's Rule 30(b)(6) representative witness on the basis for the acceptance rates contained in the Annual Capacity Reports, testified that

DOE divided 10,000 tons over the ten or twelve years prior to the delayed start of repository operations. (4/11/02 Pollog Rule 30(b)(6) Dep. at 162, 179, ENA at 798, 799.)

c. Lake Barrett testified that the 900 ton rate was based on the capacity limits and he could not identify any other reason for the rate. (5/8/02 Barrett Dep. at 947-50, ENA at 449-50.)

d. Ron Milner testified that the basis of the rate was the capacity limits in the 1987 Amendments. (5/1/02 Milner Dep. at 114, ENA at 698.) Mr. Milner also acknowledged that he could not think of any reason other than the capacity limits to operate an MRS at a 900 ton rate. (5/3/02 Milner Dep. at 560, ENA at 722.)

131. The assumptions used in the 1991 ACR would have required a Congressional amendment of the NWPA to remove the statutory provisions linking MRS construction to the schedule for a repository.

a. Billy Cole, the DOE contractor that developed the 900 ton rate, acknowledged that it required Congressional action to modify the schedule linkages. (3/13/02 Cole Dep. at 363-64, ENA at 558.)

b. Tom Pollog, the DOE's Rule 30(b)(6) representative witness on the basis for the acceptance rates contained in the ACRs, testified that the 900 ton rate schedule could not be accomplished without a Congressional amendment to the NWPA. (4/12/02 Pollog Rule 30(b)(6) Dep. at 134-35, ENA at 806.)

c. Lake Barrett testified that without changes to the schedule linkages between an MRS and a repository, MRS operations could not begin until somewhere between 2005 and 2007. (4/23/02 Barrett Dep. at 409-10, ENA at 416.) Mr. Barrett also testified that the rates in the 1991 ACR and other documents containing the 900 ton rate were not achievable without a change in law. (*Id*. at 453, ENA at 418; *see also id*. at 490-

91, ENA at 420; 4/26/02 Barrett Dep. at 621, 774, ENA at 432, 436; 5/8/02 Barrett Dep. at 947, ENA at 449.)

d. Alan Brownstein testified that the rates in the 1991 ACR required eliminating the schedule linkages between the MRS and repository. (4/10/02 Brownstein Dep. at 328-38, ENA at 501-03; *see also* 4/11/02 Brownstein Dep. at 729-30, ENA at 517.)

e. Ron Milner stated that the 1987 Amendments made it impossible to accept waste at an MRS on a schedule independent from that of a repository. (5/2/02 Milner Dep. at 247-48, 250-51, 333-34, ENA at 704, 705, 708-09; 5/3/02 Milner Dep. at 557-58, ENA at 721.)

f. David Zabransky acknowledged that the 900 ton acceptance rate required modification of the schedule linkages constraining siting and construction of an MRS. (4/18/02 Zabransky Dep. at 328-29, ENA at 949.)

132. There was no policy or technical justification for the 900 ton rate other than the DOE's supposed reliance on the capacity limit. (5/3/02 Milner Dep. at 560, 562, ENA at 722; 4/23/02 Barrett Dep. at 402, ENA at 415; 5/17/02 Rusche Dep. at 331-32, ENA at 875; 4/18/02 Zabransky Dep. at 415-16, ENA at 957.)

133. The 900 ton rate would not meet the objectives of the NWPA and of the Civilian Radioactive Waste Management Program. (4/23/02 Barrett Dep. at 340-45, ENA at 410-12; *see also* 5/10/02 Barrett Dep. at 1369-72, ENA at 466-67.)

**D. DOE Continues To Project A 900 Ton Rate In ACRs Published In 1993.**

134. In March 1993, DOE published the 1992 ACR. Like the previous ACR, the report assumed acceptance at an MRS facility beginning in 1998 and ramping up to a rate of 900 tons per year. (1992 Annual Capacity Report at 4, ENA at 1741, 1748.)

135. The 1992 ACR contained the same acceptance rates as the 1991 ACR. (*Id.*)

136. As in previous reports, DOE acknowledged that "[i]f the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that facility operations and initial acceptance of SNF by DOE could not start until at least 2007." (*Id.* at 3, ENA at 1747.)

137. As in previous ACRs, the report explicitly stated that "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the purchasers." (*Id.* at 1-2, ENA at 1745-46.)

138. DOE also published an Acceptance Priority Ranking to accompany the ACR.

**V. DOE Drops Plans For An MRS Facility, But Continues To Use The 900 Ton Rate.**

**A. DOE Abandons Plans To Build An MRS.**

139. By late 1993 or 1994, the prospect of building an MRS facility as outlined in the 1991 and 1992 ACRs was "dead." This was confirmed by numerous DOE witnesses in their depositions:

a. Lake Barrett testified that by October 1993, building an MRS had become "unlikely" after a funding cut by Congress and was no longer the central premise for waste acceptance. (4/22/02 Barrett Dep. at 88-89, ENA at 400-01; 4/26/02 Barrett App. at 716, 739-40, ENA at 434, 435.) By March 1995, the MRS concept was "not viable." (4/26/02 Barrett Dep. at 779-80, ENA at 438; 5/8/02 Barrett Dep. at 963-64, ENA at 454; 5/10/02 Barrett Dep. at 1246-47, ENA at 461.)

b. Alan Brownstein confirmed that the MRS idea was never successful and that prospects for the facility had come to an end sometime between 1990 and 1995. (4/10/02 Brownstein Dep. at 276-77, ENA at 498.)

c. David Zabransky testified by 1994 there was no longer an active MRS siting effort. (4/18/02 Zabransky Dep. at 344-45, ENA at 950.) Zabransky testified that by the time of the publication of the 1995 APR/ACR, the MRS process had ceased. (*Id.* at 358-59, ENA at 953-54.)

d. Ron Milner testified that DOE had essentially given up on plans for an MRS in 1994. (5/1/02 Milner Dep. at 114-17, ENA at 698; 5/2/02 Milner Dep. at 378, ENA at 711; 5/7/02 Milner Dep. at 620-22, 705-06, ENA at 730, 731.)

140. In 1991, the General Accounting Office reported that an MRS facility was "unlikely to be operating by 1998." (General Accounting Office, Operation of Monitored Retrievable Storage Facility is Unlikely by 1998, at 3, ENA at 1648, 1651.) The Report noted that DOE's plans depended on the Nuclear Waste Negotiator working out a siting agreement by the end of 1992, and that even the Negotiator did not believe that this could be accomplished. (*Id.* at 3-4, ENA at 1651-52.) Additionally, the report noted that DOE's MRS plans would require Congressional amendment of the NWPA. (*Id.* at 4-5, ENA at 1652-53.)

141. In 1992, James Watkins, Secretary of Energy, submitted a "New Strategy for Management of Commercial Spent Nuclear Fuel," which concluded that an MRS would not be available in 1998 due to Waste Negotiator's inability to find a host site, and that "alternative actions are required." (*See* James D. Watkins, Secretary of Energy, Letter to The Honorable J. Bennett Johnston, Chairman, Committee on Energy and Natural Resources, United States Senate, with attachment (December 17, 1992), ENA at 1737, 1738.)

142. In December 1994, OCRWM published a "Program Plan," which announced that "[t]he development of a monitored retrievable storage facility to meet the objective of spent nuclear fuel acceptance into an operating Federal radioactive waste management system by 1998 appears doubtful." (Civilian Radioactive Waste Program Plan (December 19, 1994 ) Vol. 1 at 5, ENA at 1782, 1796.)

143. The "Program Plan" was based on another "reassessment" of the program mandated by the Secretary of the Department of Energy. (*Id.* at 1, ENA at 1792.) The document noted that "[b]y 1993, it had become clear that continuation of the Program in accordance with the then current approach was no longer a viable option." (*Id.*) The program shifted its emphasis to development of a multi-purpose container that could be used at reactors starting in 1998. (*Id.* at 9, ENA at 1800; *see also* James D. Watkins, Secretary of Energy, Letter to The Honorable J. Bennett Johnston, Chairman, Committee on Energy and Natural Resources, United States Senate, with attachment (December 17, 1992, ENA at 1738.)

144. A DOE document regarding DOE's assumptions for estimating the Total System Life Cycle Costs for the SNF program, distributed in December 1994, stated that an MRS was no longer part of the planned waste management system. (1995 TSLCC Assumptions Package at 3, 13-15, ENA at 1807, 1812, 1814-16; 5/2/02 Milner Dep. at 375-79, ENA at 710-11.)

145. As of December 1994, DOE was not doing any development work on an interim storage facility. (8/11/04 Milner Testimony in *Yankee Atomic Electric v. United States*, at 4760, ENA at 739.)

146. In OCRWM's September 1995 Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program ("1995 TSLCC"), DOE projected a repository system that reaches a steady state acceptance rate of 3,000 tons by the fifth year of

operation. (Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program (1995) at 8, ENA at 1902, 1917.) Lake Barrett testified that the TSLCC is a "baseline" document which contains the rate at which DOE believed it could perform. (5/10/02 Barrett Dep. at 1343, 1334-35, ENA at 465, 463.)

147. To date, DOE has never built an MRS facility. (4/22/02 Barrett Dep. at 88-94, ENA at 400-02; 4/10/02 Brownstein Dep. at 276, 282-83, 328, ENA at 498, 499-500, 501.)

**B. DOE Publishes The 1995 APR/ACR Using The 900 Ton Rate.**

148. In March 1995, OCRWM published a combined Acceptance Priority Ranking and Annual Capacity Report. (ENA at 1826.)

149. Like prior ACRs, the March 1995 APR/ACR stated that "[a]s specified in the Standard Contract, the ACR is for planning purposes only, and thus, is not contractually binding on either DOE or the purchasers." (1995 APR/ACR at 1, ENA at 1828.)

150. The 1995 APR/ACR noted that prior ACRs had based projected acceptance rates "on the assumption of SNF acceptance beginning in 1998 at a Monitored Retrievable Storage Facility." (*Id.* at 3, ENA at 1830.) Like the other ACRs published since 1991, the 1995 APR/ACR projected an acceptance rate which would ramp up to 900 tons in the third year of operation. (*Id.* at 4, ENA at 1831.) Notwithstanding that DOE's plan for an MRS was "dead," the 1995 APR/ACR continued to use an acceptance rate that assumed the construction of an MRS. The 1995 APR/ACR stated that the acceptance rates shown "reflect the capacity limit imposed by the Act on such a storage facility [an MRS] prior to repository operations." (*Id.* at 4, ENA at 1831.) However, the "acceptance rates are presented by year(s) of operation of the system rather than by specific calendar year(s)." (*Id.* at 3-4, ENA at 1830-31.)

151. The projected acceptance rates in the 1995 ACR were:

| Year | SNF (MTU) |
|---|---|
| Year 1 | 400 |
| Year 2 | 600 |
| Year 3 | 900 |
| Year 4 | 900 |
| Year 5 | 900 |
| Year 6 | 900 |
| Year 7 | 900 |
| Year 8 | 900 |
| Year 9 | 900 |
| Year 10 | 900 |
| Total | 8,200 |

(*Id.* at 4, ENA at 1831.)

**C. DOE Utilizes the 900 Ton Rate in the 1991, 1992 and 1995 ACRs to Limit Liability to Purchasers Under the Standard Contract.**

152. The limitations on the capacity of an MRS contained in 42 U.S.C. § 10168(d) are not even arguably applicable to a geologic repository, and would not apply to a system which did not include an MRS. (4/26/02 Barrett Dep. at 792-94, ENA at 440.)

153. DOE witnesses agreed in their depositions that there was no reason to apply the MRS capacity limit to a repository, and that, in fact, the SNF program would never operate at a steady state rate of 900 tons a year:

a. Lake Barrett testified that the ramp up schedule of 400, 600, 900 tons would have no technical relevance in the context of a stand-alone repository. (5/8/02 Barrett Dep. at 947-50, ENA at 449-50.)

b. David Zabransky testified that "[t]he Department of Energy never used these rates [400, 600, 900 tons] for the planning for the operation of a repository

facility." (4/18/02 Zabransky Dep. at 363, ENA at 955.) Zabransky further testified that that there was no programmatic reason for accepting such a small amount of fuel absent a capacity limit. (*Id*. at 415-16, ENA at 957.)

c. Ron Milner testified that the capacity limit in the 1987 Amendments would have no applicability to a permanent repository. (5/7/02 Milner Dep. at 711-12, ENA at 732-33.)

154. When asked repeatedly in his deposition why DOE published the 1995 APR/ACR using rates applicable only to an MRS facility that they had no intention of building, the former Acting Director and Deputy Director of the program Lake Barrett responded: "I don't know." (4/26/02 Barrett Dep. at 795-96 (objection omitted), ENA at 441.) Mr. Barrett also testified that utilities should not rely on the rates in the March 1995 APR/ACR as a basis for planning, but should look at the 3,000 ton rate in the TSLCC and other documents. (5/10/02 Barrett Dep. at 1418-20, ENA at 468-69.)

155. Dave Zabransky admitted that from the date that it published the 1995 APR/ACR document in 1995, DOE never used the 900 ton rate for planning the federal waste management system. (4/18/02 Zabransky Dep. at 359-63, ENA at 954-55.) However, unlike Mr. Barrett, Mr. Zabransky did provide an explanation why DOE continued to use the 900 ton rate even though there was no basis to do so. Mr. Zabransky admitted in his deposition that DOE continued to use that rate to attempt to limit its obligations to the utilities:

> Q: Why did the Department of Energy publish a document [the 1995 APR/ACR] to be used as the basis for delivery commitment schedules using rates which it was not using itself for the purpose of planning the system?
>
> A. The Department carried over the rates it had used in the previous ACR and did not change them.

Q. Was the Department trying to minimize the commitments it had to utilities who were parties to the standard contracts in using this document, in using Exhibit 5?

A. I believe that that was a consideration.

(*Id*. at 364-65, ENA at 955.)

156. Scott Vance,[26] who assisted in the preparation of the 1991 ACR, testified in the *Yankee* trial that he met with Alan Brownstein at DOE regarding what rate DOE should use in the 1991 ACR. Mr. Vance testified "[a]nd I was told at that time specifically from Alan Brownstein that the lower rate was going to be used. The decision had already been made. And the reason for that was that it was obvious at that point that '98 was not going to be met and that they desired to limit the liability to purchasers." *See* 8/30/04 Vance Testimony in *Yankee Atomic Electric v. United States*, Nos. 98-126C, 98-154C, and 98-474C, at 7620-222, ENA at 925.)

157. Lake Barrett, the acting director of OCRWM until February 2002, admitted in his deposition that he had discussions with DOE lawyers that by maintaining a low "obligation" rate compared with the higher 3,000 ton rate at which DOE ultimately expected to perform, DOE could reduce utility damage claims. (5/10/02 Barrett Dep. at 1426-27, ENA at 470; *see also* 4/26/02 Barrett Dep. at 557-71, 585-92, ENA at 423-27, 429-31; 5/8/02 Barrett Dep. at 911-23, ENA at 444-47.)

**D. DOE's Position Regarding a Transition from the 900 Ton Rate.**

158. DOE has never stated that the DOE was going to pick up spent nuclear fuel at a 900 ton rate for the life of the program. (*See* 7/12/05 Kouts Testimony in *Tennessee*

---

[26] Scott Vance assisted in the preparation of the 1991 ACR. At that time, he worked for Pacific Northwest Lab ("PNL"), which had contracted with the DOE to support the Office of Waste Acceptance. Mr. Vance's primary contact person at DOE was Alan Brownstein, and Mr. Vance worked with the group responsible for preparing contractually required documents, including the ACRs. (*See* 8/30/04 Vance Testimony in *Yankee Atomic Electric Co. v. United States*, Nos. 98-126C, 98-154C and 98-474C, at 7618-20, ENA at 924-25.)

*Valley Authority v. United States*, at 1571-1579, ENA at 622-30; 6/4/02 Cole Dep. at 77-78, ENA at 561-62; 5/3/02 Milner Dep. at 563-64, ENA at 722-23; 4/23/02 Barrett Dep. at 348, ENA at 412; 4/19/02 Zabransky Dep. at 553, ENA at 966.)

159. Even in the 1991, 1992 and 1995 ACR reports, DOE did not project that the 900 ton rate would extend beyond the 10th year, or 2007. Instead, those reports only projected the first ten years of waste acceptance (1995 APR/ACR at 4, ENA at 1831; 1992 ACR at 4, ENA at 1748; 1991 ACR at 5; ENA at 1691.)

160. In each of those reports, DOE continued to project that it would begin accepting SNF at a repository by 2010. (*Id.*)

161. In December 1990, DOE published its Preliminary Estimates of the Total-System Cost for the Restructured Program: An Addendum to the May 1989 Analysis of the Total-System Life Cycle Cost for the Civilian Radioactive Waste Management Program ("1990 TSLCC Addendum") (ENA at 1621.)

162. The 1990 TSLCC Addendum updated the estimates contained in the May 1989 TSLCC analysis in light of a restructuring of the Civilian Radioactive Waste Management Program, including delaying the start of repository operations until 2010. (1989 TSLCC Addendum at 1 and 3, ENA at 1621, 1621A-B.) The 1990 TSLCC Addendum analyzed three different waste acceptance rate scenarios. (1990 TSLCC Addendum at A-1 to A-3, ENA at 1622-24.) Under each scenario, an MRS would begin accepting waste in 1998, and a repository became operational in 2010. (*Id.*) Each scenario projected an initial ramp up to a 900 ton rate, followed by an increase to a steady state 3,000 ton rate by 2015. (*Id.*)

## VI. DOE Announces Its Interpretation That It Has No Obligation To Perform In 1998 Absent A Repository.

163. On December 23, 1993, anticipating that DOE would not meet the 1998 date, OCRWM director Dan Dreyfus wrote a letter to Susan F. Clark, a commissioner of the

Florida Public Service Commission. In the letter, Mr. Dreyfus stated that it was DOE's interpretation that "[t]he Department does not have a clear legal obligation under the Nuclear Waste Policy Act to accept spent nuclear fuel absent an operational repository or other facility." (Dan Dreyfus, Director, OCRWM, Letter to Susan F. Clark, Commissioner, Florida Public Service Commission (December 23, 1993), ENA at 1772.) Mr. Dreyfus further stated that "[t]he Secretary [of Energy] has acknowledged her belief that the Department may have created such an expectation through its implementation of the [Standard Contract]." (*Id.*)

164. These comments were reiterated in a February 18, 1994 memorandum from Secretary of Energy Hazel O'Leary to Mr. Dreyfus. In this memorandum, Secretary O'Leary states that "the Department does not have a clear legal obligation under the Nuclear Waste Policy Act to accept spent nuclear fuel absent an operational repository or another facility constructed under the Act." (Memorandum from Hazel O'Leary, Secretary, DOE to Dan Dreyfus, Director, OCRWM (February 18, 1994), ENA at 1774.) As in the December Letter from Mr. Dreyfus, Secretary O'Leary acknowledged that "[t]he Department may have created such an expectation through its implementation of the [Standard Contract]." (*Id.*) Secretary O'Leary also directed OCRWM to explore "options for offsetting a portion of the financial burden associated with the costs incurred through continued on-site storage after 1998 resulting from delays in currently projected waste acceptance schedules." (*Id.*)

165. In May 1994, DOE published a "Notice of Inquiry" in the Federal Register. (Notice of Inquiry on Waste Acceptance Issues, 59 Fed. Reg. 27,007-27,009 (May 25, 1994), ENA at 1776.)

166. In the Notice of Inquiry, DOE announced that "[t]he Department's preliminary view is that it has no statutory obligation to accept spent nuclear fuel beginning in 1998 in the absence of an operational repository or other facility constructed under the Act,

although the Department in implementing the Standard Contract may have created an expectation that it would begin accepting such spent nuclear fuel in 1998." (59 Fed. Reg. at 27,008, ENA at 1779.)

167. Also in the May 1994 Notice of Inquiry, DOE stated that it would not have a repository in operation until 2010, and that 2010 was the earliest date possible for waste acceptance at a repository. (59 Fed. Reg. at 27,008, ENA at 1778.) The notice also noted that DOE and the nuclear waste negotiator had not "achieved the level of success needed to realize significant progress in locating and developing a site [for an MRS] by 1998." (*Id.*)

168. A year later, in May 1995, DOE issued its final interpretation of its waste acceptance obligation, and announced that no repository or interim waste acceptance facility would be in operation until 2010 and that no waste acceptance would occur until then. (60 Fed. Reg. at 21,794, ENA at 1897.) In the final interpretation, DOE also stated that "[t]he Act does not impose a statutory obligation on DOE to begin nuclear waste disposal in 1998 in the absence of a disposal or interim storage facility constructed under the Act." (Department of Energy Final Interpretation of Nuclear Acceptance Issues (May 3, 1995), 60 Fed. Reg. 21,793, 21,794-95, ENA at 1896, 1897-98.)

169. In the final interpretation, DOE acknowledged that ". . .the [NWPA] originally envisioned that a geologic repository would be in operation, and DOE would be prepared to begin acceptance of SNF by January 31, 1998." (60 Fed. Reg. at 21,794, ENA at 1897.) DOE stated that no repository or interim waste acceptance facility would be in operation until 2010, and that no waste acceptance would occur until then. (*Id.*)

170. DOE's position was challenged by nuclear utilities in the D.C. Circuit. On July 23, 1996, the Court issued an opinion rejecting DOE's interpretation of its obligations, concluding that in exchange for the billions of fees paid by nuclear utilities, DOE had an

independent, unconditional obligation to start removing SNF in 1998. *Indiana Michigan Power Company v. Department of Energy*, 88 F.3d 1272, 1276-77 (D.C. Cir. 1996). In so holding, the court stated that:

> Although Congress anticipated the existence of a repository by 1998, the fact that such a repository does not exist does not make subsection (B) [requiring disposal of waste to begin no later than January 31, 1998] illogical; it simply affects the remedy we can provide. We agree with DOE that Congress contemplated a facility would be available by 1998; however, that Congress contemplated such a facility would be available does not mean that Congress conditioned DOE's obligation to begin acceptance of SNF on the availability of a facility. It does not make sense to assert that Congress would express an intent to exempt DOE from the January 31, 1998 deadline by including specific statutory procedures regarding the siting and development of repository in the NWPA. *Rather, these prerequisites evince a strong congressional intent that DOE's various obligations be performed in a timely manner. See, e.g.*, *Tennessee v. Harrington*, 806 F.2d 642, 648 (6th Cir. 1986) ("[T]he overall structure of the Act does reveal a consistent concern for timely implementation of the disposal provisions."), *cert. denied*, 480 U.S. 946, 107 S. Ct. 1604, 94 L. Ed. 2d. 240 (1987).

(*Id.* at 1277 (emphasis added)).

171. On December 17, 1996, DOE issued a Press Release announcing that it would not perform in 1998: "The Department of Energy (DOE) today notified generators and owners of commercial spent nuclear fuel that the department anticipates a delay in accepting fuel on January 31, 1998." (DOE Press Release, Department of Energy notifies utilities of anticipated delay in accepting commercial spent nuclear fuel (December 17, 1996), ENA at 1929.)

## VII. The DCS Submission Process.

### A. DOE Issues DCS Instructions Beginning in 1992.

172. On March 4, 1992, the DOE contracting officer sent a letter to Energy Northwest forwarding instructions ("Instructions") for completing and submitting Delivery

Commitment Schedule forms as provided in Article V.B.1 of the Standard Contract. (M. Detmer, Contracting Officer, Office of Placement and Administration, Department of Energy, Letter to A.P. DiDesidero, Contracting Officer, Washington Public Power Supply System, ENA at 1735.) The letter stated that DCS submittals were to be made beginning January 1, 1992 and that the submittals should be based on the 1991 Annual Capacity Report or the then applicable report. (*Id.* at 1, ENA at 1735.)

173. The Instructions stated that "The DCS provides the Purchasers with the *opportunity to inform DOE of their plans* for utilizing their allocations of projected Federal Waste management system (FWMS) acceptance capacity. This information will assist DOE in meeting its contractual waste acceptance responsibilities in developing the FWMS." (DCS Instructions ¶ 1 (emphasis added), GA at 145.)

174. The Instructions stated that the "[t]he DCS should be submitted by all Purchasers with allocations in the 1991 Annual Capacity Report (ACR) (or subsequent ACRs, as appropriate) as specified in Article V.B of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste." (DCS Instructions ¶ 2, GA at 145.)

175. The Instructions stated that utilities "shall submit DCSs at least 63 months prior to requested delivery." (DCS Instructions ¶ 3, GA at 145.)

176. The Instructions stated that:

> The annual acceptance rates in the 1991 ACR provide an approximation of the FWMS acceptance capacity and are for planning purposes. The process described herein assumes that the FWMS will be able to accept the purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the 1991 ACR. *In the event that such circumstances change, all DCSs previously approved by the DOE may need to be reevaluated by DOE and the Purchasers.*

(DCS Instructions ¶ 7(c) (emphasis added), GA at 146.)

177. The Instructions stated that utilities were not required to put a specific delivery date on the DCS form, only a delivery year. (DCS Instructions ¶ 2.4, GA at 150.)

178. According to the Instructions, a utility could "[e]nter the range of discharge dates for which the SNF will be selected for delivery." (DCS Instructions ¶ 2.6, GA at 150.)

179. The DCS Instructions informed all Purchasers, including Energy Northwest, that they were to complete DCSs based on the amount of each Purchaser's allocations in the then-current "Annual Capacity Report" ("ACR"), and stated that "if the DCS does not reflect delivery rights available to the Purchaser, the DCS will be disapproved and returned to the Purchaser.". (*See* DCS Instructions ¶¶ 7 and 8, GA at 147-48; Larkin Decl. ¶ 10, ENA at 356.)

180. The Instructions informed utilities that "the total quantity of SNF designated for delivery must not exceed the allocation in the ACR; exceeding the allocation will result in disapproval of the DCS(s)." (DCS Instructions ¶ 2.7, GA at 150.)

181. Under the DCS Instructions, a utility had no discretion as to how many tons of SNF to put on a DCS form. (4/17/02 Zabransky Dep. at 57, ENA at 937.) If a utility submitted a DCS form that listed an amount of MTUs greater than the current ACR allocation, the DCS submission would be rejected. (*Id.* at 57-58, ENA at 937; 4/22/1999 Slater-Thompson Dep. at 230-31, ENA at 890.)

182. Energy Northwest relied on DOE's "Instructions for Completing the Appendix C Delivery Commitment Schedule" ("DCS Instructions") provided to Energy Northwest by DOE in March 1992, and in subsequent years. (*See* Larkin Decl. ¶ 10, ENA at 356.)

183. While the DCS process was ongoing in the early 1990s, DOE disapproved any utility's DCS submission which listed more than the utility's allocation in the latest ACR.

For example, DOE disapproved three Yankee Atomic DCS submissions for the year 1998 which listed more fuel than Yankee was allocated in the 1991 ACR. (6/14/02 Brownstein Dep. at 295-304, ENA at 521-23.)

184. Given DOE's clear instruction not to submit DCS forms if the ACR document did not list an allocation for the relevant year, Energy Northwest did not submit DCS forms during the 1990s. (*See* Larkin Decl. ¶ 11, ENA at 356-57.)

**B. DOE Makes DCS Submissions Impossible By Removing Dates from The 1995 APR/ACR.**

185. Unlike prior years, the acceptance schedule in the APR/ACR published in 1995 contained no years indicating when the DOE would accept SNF; instead the APR/ACR indicated acceptance rates for "Year 1," "Year 2" and so on. (1995 APR/ACR at 4, ENA at 1831.) DOE noted this change and stated that "Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year(s) of operation of the system rather than by specific calendars year(s)." (*Id.* at 3-4, ENA at 1830-1831.)

186. By eliminating the specific years in the 1995 APR/ACR, DOE effectively eliminated any basis for utilities to determine the due date of their DCS submissions. (4/18/02 Zabransky Dep. at 348-49, ENA at 951.)

**C. After 1995, DOE Abandons the DCS Process.**

**1. DOE "Suspends" Processing Of DCSs Shortly After Decision In *Indiana Michigan* To Limit Liability.**

187. After the decision of the D.C. Circuit in *Indiana Michigan*, DOE, on the advice of counsel, decided to stop processing DCSs. (4/17/02 Zabransky Dep. at 38-39, ENA at 934; 4/18/02 Zabransky Dep. at 438, ENA at 962.)

188. In early 1997, the DOE stopped approving any DCS submittals. (4/17/02 Zabransky Dep. at 32-33, ENA at 932-33.) DOE has not approved any DCSs since March 1997. (4/19/02 Zabransky Dep. at 636-37, ENA at 967; *see also* 5/8/02 Barrett Dep. at 1095-97, ENA at 456; 4/10/02 Brownstein Dep. at 375, ENA at 506; 3/12/02 Cole Dep. at 204-05, ENA at 550; 4/24/02 Klein Rule 30(b)(6) Dep. at 101-05, 109-10, ENA at 574-75, 576.)

189. DOE stopped approving DCS submittals on the advice of counsel. (*See* 8/5/04 Zabransky Testimony in *Yankee Atomic Electric v. United States*, at 4118, ENA at 977; 8/4/04 Pollog Testimony in *Yankee Atomic Electric v. United States*, at 3996, ENA at 813.)

190. As a result of DOE's suspension of the DCS process, it became "impossible" for a utility to obtain an approved DCS. (8/5/04 Zabransky Testimony in *Yankee Atomic Electric v. United States*, at 4148, ENA at 978; 4/18/02 Zabransky Dep. at 353-54, ENA at 952; 4/24/02 Klein Rule 30(b)(6) Dep. at 122-23, ENA at 577.)

191. When asked why DOE suspended the DCS process, Zabransky testified: "I'll answer that question. I think the belief was that approving DCSs committed the department to that obligation, and the decision was to suspend that commitment." (4/18/02 Zabransky Dep. at 353-54, ENA at 952.)[27]

192. The testimony given by Tom Pollog, the Contract Officer's Technical Representative, responsible for providing the Contracting Officer with guidance in implementing the Standard Contract, was even more direct. Mr. Pollog testified that it was his understanding that DOE stopped processing DCS submittals to limit the DOE's contractual liability to Contract Holders. (*See* 8/4/04 Pollog Testimony in *Yankee Atomic Electric v. United States*, at 3904,

---

[27] Despite making the lack of approved DCSs a centerpiece of its argument that utilities such as Energy Northwest have limited damages, counsel for the Government repeatedly instructed their witnesses not to answer any questions regarding the reasons for the suspension, other than that it was advised by counsel. (*See, e.g.,* 4/18/02 Zabransky Dep. at 354-56, ENA at 952-53; 4/24/02 Klein Rule 30(b)(6) Dep. at 80-82, ENA at 572-73.)

3995-97, ENA at 811, 812-13.) Mr. Pollog further testified that by stopping the DCS process DOE felt it "could unilaterally cut off its obligation to all purchasers." (*Id.* at 4011, ENA at 814.)

**2. DOE Attempts to Resume the DCS Process in July 2004.**

193. After publishing the 1995 combined APR/ACR, DOE did not publish another ACR report until 2004. (*See* 7/12/05 Pollog Testimony in *Tennessee Valley Authority v. United States*, at 1660, ENA at 820; Defendant's Response to Utility Plaintiff's Requests for Admissions, Request to Admit 45, ENA at 2128, 2129-30; 2004 APR/ACR, ENA at 2133-2213.)

194. In July 2004, DOE published a new combined "Acceptance Priority Ranking & Annual Capacity Report" ("2004 APR/ACR"). (*See* Acceptance Priority Ranking & Annual Capacity Report (July 2004), ENA at 2133-2213.) The 2004 APR/ACR included a proposed acceptance rate that ramped up to a steady state rate of 3,000 ton by the fifth year of operations of the repository:

| Year | SNF (MTU) |
|---|---|
| 2010 | 400 |
| 2011 | 600 |
| 2012 | 1,200 |
| 2013 | 2,000 |
| 2014 | 3,000 |
| 2015 | 3,000 |
| 2016 | 3,000 |
| 2017 | 3,000 |
| 2018 | 3,000 |
| 1019 | 3,000 |
| Total | 22,200 |

(*Id*. at 2, ENA at 2137.)

195. On July 27, 2004, the DOE sent a letter to the utilities announcing the "resumption" of the DCS process and including copies of the 2004 APR/ACR and DCS

Instructions. (*See* David K. Zabransky, Contracting Officer, Department of Energy, Sample Letter to all Contract Holders (July 27, 2004), ENA at 2214; 4/11/05 Kouts Rule 30(b)(6) Dep. at 33, ENA at 612.)

196. The July 2004 DOE letter stated that DCS 2010 submittals were due September 30, 2004, and that the submittals should be based on the 2004 APR/ACR. (*See* David K. Zabransky, Contracting Officer, Department of Energy, Sample Letter to all Contract Holders (July 27, 2004), ENA at 2214.)

197. DOE took the position that the new DCS submissions would supersede the previous DCS process, and that the new DCSs would supplant the old ones. (4/11/05 Kouts Rule 30(b)(6) Dep. at 128-29, ENA at 618.)

198. The DCS instructions included with the July 28, 2004 letter, stated that "[t]he DCS shall be submitted by each Purchaser with an allocation in the 2004 Acceptance Priority Ranking/Annual Capacity Report (APR/ACR) (or subsequent APR/ACRs, as appropriate) as specified in Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste." (*See* 2004 DCS Instructions ¶ 2, ENA at 2216.) The 2004 DCS Instructions further stated that "Purchasers shall submit DCSs at least 63 months prior to requested delivery year. . . . For each allocation listed in the 2004 APR/ACR (or subsequent APR/ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 2010, a DCS must be submitted for that allocation by September 30, 2004)." (*Id.* ¶ 3, ENA at 2216.)

199. The 2004 DCS Instructions stated that DOE would only consider DCSs submitted by Purchasers with an allocation in a given year for approval for delivery in that year.

(*Id* ¶ 7, ENA at 2217.) DOE also required purchasers with previously approved DCSs to submit new DCSs "based upon the currently planned operation date of 2010." (*Id*.)

200. According to the 2004 APR/ACR, Energy Northwest's first allocation was in 2016 — the sixth year after the then projected start of program operations in 2010:

| Year | |
|---|---|
| 2016 | 10.8 |
| 2017 | 29.4 |
| 2018 | 52.5 |
| 2019 | 37.9 |
| Total | 130.7 |

(*See* July 2004 APR/ACR at p. 3, ENA at 2138.)

**3. DCS Re-abandons the DCS Process By December 2004.**

201. By December 2004, DOE again abandoned the DCS process, having concluded "that the resumption of the DCS process was premature." (*See* Dave Zabransky, Contracting Officer, Office of Systems Analysis and Strategic Development, Department of Energy, Letter to Ronald G. Cocherell, Southern Nuclear Operating Company, Inc. (December 1, 2004) at 1, ENA at 2264; *see also* 7/12/05 Zabransky Testimony in the *Tennessee Valley Authority v. United States* case at 1749, ENA at 983, stating that a similar letter was sent to each Contract Holder.) DOE took this action because it concluded due to various developments that it would not perform starting in 2010. (*See* 4/11/05 Kouts 30(b)(6) Dep. at 62-63, ENA at 616.)

202. DOE does not intend to "resume" the DCS process until "[a]fter the Department has determined a revised date for the initial operation of the Yucca Mountain repository." (*See* Dave Zabransky, Contracting Officer, Office of Systems Analysis and Strategic Development, Department of Energy, Letter to Ronald G. Cocherell, Southern Nuclear Operating Company, Inc. (December 1, 2004) at 1, ENA at 2264.)

203. DOE's current position is that it will not begin accepting SNF until some time after 2010. (*See* 4/11/05 Kouts 30(b)(6) Dep. at 63, testifying that the DOE suspended the 2004 DCS process as "premature" because DOE no longer believed that it could be able to receive fuel in 2010," ENA at 616.)

204. DCSs are not due until 63 months prior to a scheduled delivery. (Standard Contract Art. V.B.1, ENA at 302; 4/17/02 Zabransky Dep. at 48, 51-52, ENA at 935, 936; 4/18/02 Zabransky Dep. at 325, 419, ENA at 948, 958; 4/24/02 Klein Rule 30(b)(6) Dep. at 122-23, ENA at 577; 4/10/02 Brownstein Dep. at 367, ENA at 504; 4/21/99 Slater-Thompson Dep. at 163-64, ENA at 888; 4/11/2002 Pollog Rule 30(b)(6) Dep. at 34, ENA at 796.)

205. DCSs are not due at this time. (*See* 4/11/05 Kouts Rule 30(b)(6) Dep. at 19-20, ENA at 609, testifying that DOE will only request DCSs when the DOE intends to accept SNF within 63 months of the date on which it requests the DCSs be submitted.)

206. The DOE's most recent pronouncements indicate that it will not begin accepting SNF until 2012 at the earliest. (Statement of Theodore J. Garrish, Deputy Director, Office of Civilian Radioactive Waste Management, U.S. Department of Energy, to the Subcommittee on Energy and Air Quality, Committee on Energy and Commerce, U.S. House of Representatives (March 10, 2005) at 4, ENA at 2294, 2297, presenting funding profiles for assumed repository start dates of 2012 and 2015; Ken Ritter, *Energy Department Official Says Yucca Project Delayed, Not Dead*, Associated Press, February 9, 2005, (available at www.signonsandiego.com/news/nation/20050209-1535-nv-yuccamountain.html), ENA at 2265, noting that then Director of DOE's Office of Civilian Radioactive Waste Management, Margaret Chu, stated that "[w]e're hoping [for]2012" as a repository start date).)

**VIII. Energy Northwest Has Incurred Damages As A Result Of DOE's Failure To Perform Its Obligations Under Energy Northwest's Standard Contract.**

207. Energy Northwest owns and operates the Columbia Generating Station ("Columbia") located in Richland, Washington. Columbia is a 1,157 megawatt boiling water reactor that was licensed by the NRC in December 1983, and commenced operations in December 1984. Columbia generates electricity by using nuclear fission to generate steam which in turn drives large turbines. Nuclear fission is fueled by uranium. The fuel consists of uranium pellets, which are sealed inside of long metal rods as part of a fuel assembly. After a fuel assembly has been used to generate nuclear fission for a period of time, the uranium becomes depleted and the fuel assemblies become spent and are referred to as Spent Nuclear Fuel ("SNF"). The Columbia reactor core holds 764 fuel assemblies. (*See* Larkin Decl. ¶¶ 3-4, ENA at 354.)

208. Energy Northwest stores spent fuel assemblies in a spent fuel pool. A spent fuel pool is a large pool of water which both cools the SNF assemblies and provides shielding from radiation emitted from the assemblies. SNF assemblies stored in a spent fuel pool are stored in spent fuel racks. Spent fuel racks are metal racks which contain a number of storage locations or cells that can accommodate an SNF assembly. As currently configured, Columbia's spent fuel pool can accommodate 2,651 SNF assemblies. There are currently 1,516 SNF assemblies in Columbia's spent fuel pool. (*See* Larkin Decl. ¶ 6, ENA at 355.)

209. To date, Energy Northwest has paid more than $126 million into the NWF under the Standard Contract quarterly payment provision. (*See* Larkin Decl. ¶ 21, ENA at 360.)

210. DOE failed to commence removing any SNF from the nuclear utility industry by January 31, 1998; and as of this date, has not picked-up any SNF from Energy Northwest.

211. In 1995 Energy Northwest conducted a study of its SNF storage options in light of DOE's announcement that it would not begin waste acceptance until 2010. In the 1995 study, which was a continuation of work already performed in the early 1990s, Energy Northwest considered various options including (1) off-site storage, (2) expansion of Columbia's existing spent fuel pool by reracking with higher density racks, and (3) construction of an Independent Spent Fuel Storage Installation, or ISFSI. This study forced Energy Northwest to expend time and effort to study long term spent fuel options it would not have otherwise had to spend had DOE been in a position to begin accepting SNF in 1998. (*See* Larkin Decl. ¶ 14, ENA at 357-58.) Energy Northwest's David Larkin, personally spent in excess of approximately 100 hours studying spent fuel storage options for this study that he could have devoted to other responsibilities. (*Id.*)

212. Long-range planning regarding SNF storage is particularly necessary in light of the character of the nuclear industry, which is one of the most regulated industries in the country. As a result, any changes to plant design or operation generally require more "lead time" to analyze, license and construct than in other industries. Prudent nuclear utility business practices require the operator to consistently look forward, over a period of years to ensure that operational issues can be addressed before they adversely affect plant operations. (Larkin Decl. ¶ 15, ENA at 358.)

213. After considering its options, Energy Northwest ultimately determined that it would construct an ISFSI. Energy Northwest awarded a contract for ISFSI construction in 1999 and first transferred SNF assemblies from Columbia's spent fuel pool to the ISFSI in 2002. Energy Northwest transferred additional SNF assemblies in 2004. These transfers will continue until DOE begins to accept Energy Northwest's SNF. (*See* Larkin Decl. ¶ 16, ENA at 358.)

214. To date, Energy Northwest has spent in excess of $42 million dollars in constructing the ISFSI and loading casks. (*Id.*)

215. SNF assemblies at an ISFSI are stored in dry storage casks which are placed on a large concrete pad. In addition to the concrete pad, construction of an ISFSI also involves installation of security systems, modification of Columbia's buildings and systems to accommodate transfer of SNF to the ISFSI, and the purchase of equipment required to transfer SNF to an ISFSI. (*See* Larkin Decl. ¶ 7, ENA at 355.)

216. If DOE had begun accepting SNF in 1998 at an acceptance that ramped up to a steady state rate of 3,000 ton by the sixth year of operations, Energy Northwest's first acceptance allocation would have occurred in 2004. This date is consistent with the DOE's 2004 APR/ACR which, using a 3,000 ton acceptance rate, projected that the DOE would begin removing SNF from Energy Northwest by the sixth year after the DOE began removing SNF. (*See* Supko Report at 9, 11, ENA at 362, 374, 376; 2004 APR/ACR at 3, ENA at 2138; *see also* Larkin Decl. ¶ 17, ENA at 358-59.)

217. Using a 2012 date for the start of actual SNF acceptance – a date the most recent DOE announcements appear to indicate is the earliest possible date for DOE performance – and DOE's projections for when Energy Northwest's SNF will first be removed, DOE's breach has therefore resulted in a 14-year delay – from 2004 to 2018 – of the date for first removal of Energy Northwest's SNF. Had DOE begun accepting SNF from Energy Northwest in 2004, Energy Northwest could have avoided construction of an ISFSI and instead employed far less costly means of addressing its spent fuel situation. (*See* Larkin Decl. ¶¶ 17-18, ENA at 358-59.)

218. Even if DOE had begun accepting SNF in 1998 at the 900 ton rate the Government has advocated in other SNF cases, followed by a transition to a 3,000 ton rate by 2015, Energy Northwest's first acceptance allocation would have occurred in 2011. (*See* Supko

Rep. at 9, 12; ENA at 362, 374, 377.) Even if DOE had performed at this artificially low rate, Energy Northwest could have avoided construction of an ISFSI by adopting less costly methods of expanding SNF capacity, such as a rerack of the spent fuel pool to expand the pool capacity of the pool. (*See* Larkin Decl. ¶ 19, ENA at 359.)

219. Even assuming that the DOE began accepting SNF in 1998 at a 900 ton rate and continued to accept SNF at the 900 ton rate indefinitely, a farfetched scenario that the DOE has never contemplated, and that would require the waste acceptance program to run for approximately 100 years, Energy Northwest's first acceptance allocation would have occurred in 2013. (*See* Supko Rep. at 374 n. 15 and ENPF ¶¶ 152-162.)

220. In the 1995 Study of its SNF storage options Energy Northwest considered performing a rerack, which it determined was technically feasible and would cost less than constructing an ISFSI. However, Energy Northwest concluded, given DOE's statement that it would not begin removing SNF from any utility until at least 2010, that a rerack would not be cost-effective because Energy Northwest would still have to construct an ISFSI to store SNF before DOE began removing SNF from Energy Northwest. (Larkin Decl. ¶ 19, ENA at 359.)

221. Energy Northwest would not have had to construct an ISFSI if DOE had begun performance in 1998. However, even assuming that Energy Northwest had still decided to build an ISFSI if DOE had begun performing in 1998, Energy Northwest would have designed and built a smaller ISFSI than it ultimately built at Columbia. The size of the ISFSI that Energy Northwest built was based upon the fact that DOE had announced it would not begin to remove SNF from any utility until at least 2010. In addition, based upon the same assumptions regarding DOE's non-performance, as part of the original design of the ISFSI, Energy Northwest designed an expansion of the ISFSI consisting of additional concrete pads, and the Company subsequently had the sites for the additional pads graded and prepared. Had DOE removed SNF starting in

1998 at either a 3,000 ton or 900 ton acceptance rate, Energy Northwest could have constructed a smaller ISFSI, at considerable savings to the Company, because it would not have needed to store as much SNF, and would not have had to spend money on the design and site preparation costs associated with the ISFSI expansion. (*See* Larkin Decl. ¶ 20, ENA at 359-360.)

Dated: August 11, 2005

Respectfully submitted,

/s Norman M. Hirsch
Jenner & Block, LLP
One IBM Plaza
Chicago, IL 60611
(312) 823-2782 (tel.)
(312) 840-7782 (fax)

COUNSEL FOR PLAINTIFF
ENERGY NORTHWEST

Of Counsel:

David A. Handzo
Jenner & Block LLP
601 Thirteenth Street, N.W.
Suite 1200 South
Washington, D.C. 20005
(202) 639-6000 (tel.)
(202) 639-6066 (fax)

William D. Heinz
David Jiménez-Ekman
Lisa M. Eddington
Christopher Tompkins
Nada Djordjevic
Jenner & Block, LLP
One IBM Plaza
Chicago, IL 60611
(312) 222-9350

**<u>Certificate of Filing and Certificate of Service</u>**

I hereby certify that on this 11th day of August, 2005, a copy of the foregoing "Plaintiff's Proposed Findings of Uncontroverted Fact" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s Norman M. Hirsch