No. 04-10C
(Chief Judge Damich)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ENERGY NORTHWEST,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE AND MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

SHARON A. SNYDER
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
ATTN: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: (202) 616-0347
Fax: (202) 307-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

October 3, 2005

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. CONTRARY TO ENERGY NORTHWEST'S ASSERTIONS, THE GOVERNMENT DISTINGUISHED THE COURT'S RULING IN CONSUMERS ENERGY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. ENERGY NORTHWEST HAS NOT PROFFERED SUFFICIENT EVIDENCE TO SUPPORT ITS ASSERTIONS THAT IT HAS INCURRED DAMAGES AS A RESULT OF DOE'S DELAY IN ACCEPTING SNF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III. BECAUSE THE STANDARD CONTRACT SPECIFICALLY IDENTIFIES THE PROCESS BY WHICH THE ACCEPTANCE SCHEDULE WILL BE DEVELOPED, THE ACCEPTANCE RATE IS NOT A "MISSING" TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV. EVEN IF ENERGY NORTHWEST HAD ESTABLISHED SOME DAMAGE UNDER ITS THEORY OF DOE'S OBLIGATIONS, ITS THEORY OF DOE'S OBLIGATIONS IS INCORRECT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

A. The DCS Mechanism Identified In The Standard Contract Provides An Orderly, Logical Process For Accepting Contract Holder's SNF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

B. Plaintiff's Attempt To Establish That The Acceptance Rates In The 1995 ACR/APR Were Intended Merely To Limit DOE's Damages Is Meritless . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

V. THE INTENT OF BOTH THE NWPA AND THE STANDARD CONTRACT MUST BE DETERMINED FROM THE FACE OF THOSE DOCUMENTS, AND NOT FROM INADMISSIBLE TESTIMONY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

VI. WITH ALL DUE RESPECT, SOME OF THE COURT DECISIONS RELIED UPON BY ENERGY NORTHWEST REGARDING THE SPENT NUCLEAR FUEL ACCEPTANCE RATE INCORRECTLY ANALYZE THE STANDARD CONTRACT SCHEDULE PROVISIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## TABLE OF AUTHORITIES

## FEDERAL CASES


Aleutian Constructors v. United States,
24 Ct. Cl. 372 (1991) . . . . . 13

C. Sanchez & Son, Inc. v. United States,
6 F.3d 1539 (Fed. Cir. 1993) . . . . . 9

City of Tacoma v. United States,
38 Fed. Cl. 582 (1997) . . . . . 9

Commonwealth Edison Co. v. United States,
56 Fed. Cl. 652 (2003) . . . . . 18

Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,
447 U.S. 102 (1980) . . . . . 16

David Nassif Associates v. United States,
226 Ct. Cl. 372, 644 F.2d 4 (1981) . . . . . 8

Department of Energy v. Westland,
565 F.2d 685 (CCPA 1977) . . . . . 17

Fawick Corp. v. United States,
149 Ct. Cl. 623 (1960) . . . . . 5

Florida Power & Light Co. v. United States,
64 Fed. Cl. 37 (2005) . . . . . 11

Gould, Inc. v. United States,
935 F.2d 1271 (Fed. Cir. 1991) . . . . . 19

Government Sys. Advisors, Inc. v. United States,
21 Cl. Ct. 400,
vacated on other grounds, 25 Cl. Ct. 554 (1990) . . . . . 13

Honeywell v. United States,
228 Ct. Cl. 595, 661 F.2d 182 (1981) . . . . . 17

Indiana Michigan Power Co. v. Department of Energy,

88 F.3d 1272 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Indiana Michigan Power Co. v. United States,
57 Fed. Cl. 88 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

International Brotherhood of Elec. Workers, Local Union No. 474, AFL-CIO v. NLRB,
814 F.2d 697 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Interwest Constr. v. Brown,
29 F.3d 611 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Ling-Temco-Vought, Inc. v. United States,
201 Ct. Cl. 135, 475 F.2d 630 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Myerle v. United States,
33 Ct. Cl. 1 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

National By-Products, Inc. v. United States,
186 Ct. Cl. 546, 405 F.2d 1256 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Northern Helex Co. v. United States,
197 Ct. Cl. 118, 455 F.2d 546 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Osage Oil & Ref. Co. v. Chandler,
287 F. 848 (2d Cir. 1923) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Piper v. Chris-Craft Indus., Inc.,
430 U.S. 1 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Power Authority of the State of N.Y. v. United States,
No. 00-703C (Fed. Cl. Sept. 30, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Ramsey v. United States,
121 Ct. Cl. 426, 101 #F. Supp. 353 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

San Carlos Irrigation & Drainage Dist. v. United States,
111 F.3d 1557 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Selman v. United States,
204 Ct. Cl. 675, 498 F.2d 1354 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Shannon v. United States,
512 U.S. 573 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Tennessee Valley Authority v. United States,
60 Fed. Cl. 665 (2004) . . . . . . . . . . 10

The Pantry, Inc. v. Stop-N-Go Foods, Inc.,
796 F. Supp. 1164 (S.D. Ind. 1992) . . . . . . . . . . 4

Turtle Island Restoration Network v. Evans,
284 F.3d 1282 (Fed. Cir. 2002),
cert. denied, 538 U.S. 960 (2003) . . . . . . . . . . 16

United Indus. Syndicate, Inc. v. Western Auto Supply Co.,
686 F.2d 1312 (8th Cir. 1982) . . . . . . . . . . 5

United States Steel Corp. v. United States,
618 F. Supp. 496 (Ct. Int'l Trade 1985) . . . . . . . . . . 17

Yankee Atomic Electric Co. v. United States,
No. 98-126C (Fed. Cl.) . . . . . . . . . . 18

**FEDERAL STATUTES**

Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270 . . . . . . . . . . 1, 15, 16, 20

Standard Contract, 10 C.F.R. § 961.11 . . . . . . . . . . passim

**INDEX TO THE SUPPLEMENTAL GOVERNMENT APPENDIX**

DOCUMENT PAGE

Delivery Commitment Schedules and Correspondence

Comparison of DCSs to 1991 ACR (MTU . . . . . 1

Babcock & Wilcox
Year 3 (2000) . . . . . 2

Baltimore Gas & Electric
Year 1(1998) . . . . . 3
Year 4 (2001) . . . . . 4
Year 5 (2002) . . . . . 6
Year 6 (2003) . . . . . 8
Year 7 (2004) . . . . . 9
Year 9 (2006) and Year 10 (2007) . . . . . 11

Carolina Power & Light
Year 2 (1999) . . . . . 14
Year 3 (2000) . . . . . 16
Year 4 (2001) . . . . . 19
Year 5 (2002) . . . . . 24
Year 7 (2004) . . . . . 28

Commonwealth Edison
Year 4 (2001) . . . . . 30
Year 6 (2003) . . . . . 36

Connecticut Yankee
Year 5 (2002) . . . . . 38

Consolidated Edison
Year 1 (1998) . . . . . 41
Year 2 (1999) . . . . . 42
Year 3 (2000) . . . . . 45

Consumer Power Company
Year 2 (1999) . . . . . 47
Year 3 (2000) . . . . . 51
Year 4 (2001) and Year 5 (2002) . . . . . 55
Year 6 (2003) . . . . . 60

Year 7 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
Year 9 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
Year 10 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Dairyland Power Cooperative
Year 1 (1998), Year 2 (1999), Year 3 (2000), Year 4 (2001),
Year 6 (2002), Year 9 (2006), and Year 10 (2007) . . . . . . . . . . . . . . . . . . . . . . . 69
Year 1 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
Year 2 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
Year 3 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
Year 4 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
Year 6 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
Year 9 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76
Year 10 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

DOE
Year 1 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
Year 2 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

Duquesne Light Company
Year 7 (2004) and Year 19 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

GE Morris Facility
Year 1 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

General Atomics
Year 1 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89
Year 2 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90
Year 6 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
Year 8 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
Year 9 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
Year 10 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

IES Utilities Inc.
Year 3 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

Niagra Mohawk Power Utilities
Year 1 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96
Year 2 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
Year 2 (1999) and Year 3 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100
Year 4 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102
Year 6 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104
Year 9 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Northeast Utilities
Year 1 (1998) . . . . . . . . . . 108
Year 2 (1999) . . . . . . . . . . 110
Year 3 (2000) . . . . . . . . . . 113
Year 4 (2001) . . . . . . . . . . 115
Year 5 (2002) . . . . . . . . . . 116
Year 7 (2004) . . . . . . . . . . 121

Northern States Power
Year 9 (2006) . . . . . . . . . . 122
Year 10 (2007) . . . . . . . . . . 124

Pacific Gas & Electric
Year 1 (1998) . . . . . . . . . . 126
Year 2 (1999) . . . . . . . . . . 127
Year 3 (2000) . . . . . . . . . . 128
Year 4 (2001) . . . . . . . . . . 129

PECO Energy Company
Year 3 (2000) . . . . . . . . . . 130
Year 4 (2001) . . . . . . . . . . 132
Year 5 (2002) . . . . . . . . . . 134
Year 6 (2003) . . . . . . . . . . 136
Year 7 (2004) . . . . . . . . . . 137

Portland General Electric
Year 5 (2002) . . . . . . . . . . 139
Year 8 (2005) . . . . . . . . . . 141
Year 9 (2006) . . . . . . . . . . 144
Year 10 (2007) . . . . . . . . . . 147

Rochester Gas & Electric
Year 1 (1998) . . . . . . . . . . 150
Year 3 (2000) . . . . . . . . . . 152
Year 4 (2001) . . . . . . . . . . 154
Year 5 (2002) . . . . . . . . . . 156

Southern California Edison
Year 1 (1998) . . . . . . . . . . 158
Year 2 (1999) . . . . . . . . . . 159
Year 3 (2000) . . . . . . . . . . 160
Year 4 (2001) . . . . . . . . . . 161
Year 8 (2005) . . . . . . . . . . 162

Tennessee Valley Authority
Year 10 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

Virginia Power
Year 2 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165
Year 3 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167
Year 5 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168

Wisconsin Public Service Corporation
Year 3 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171
Year 4 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 172
Year 5 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173
Year 7 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174
Year 8 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 175
Year 9 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176
Year 10 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

Yankee Atomic
Year 3 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178

Arkansas Power & Light
Year 4 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

Consolidated Edison
Year 5 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181
Year 7 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183
Year 8 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185
Year 9 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 187

Rochester Gas & Electric
Year 2 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 189

Legislative Documents

H.R. Report No. 97-785, Dissenting views of Representative
Edward J. Markey, 1982 (1 Page) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

Depositions

Alan Brownstein Deposition Excerpt, April 9, 2002 (3 pages) . . . . . . . . . . . . . . . . . . . 192

Billy M. Cole Deposition Excerpt, March 12, 2002 (4 pages) . . . . . . . . . . . . . . . . . . . 195

Billy M. Cole Deposition Excerpt, June 4, 2002 (5 pages) . . . . . . . . . . . . . . . . . . . . . . 199

Christopher Kouts Trial Testimony, Yankee v. U.S., August 2, 2004 (9 pages) . . . . . 204

Patrick McDuffie Deposition Excerpt, March 18, 2002,
And Exhibit 8 (1989 Annual Capacity Report) (7 pages) . . . . . . . . . . . . . . . . . . . . . . . 213

Robert Morgan Trial Testimony, TVA v. US, July 14, 2005 (13 pages) . . . . . . . . . . . 220

Robert Rosselli Deposition Excerpt, April 15, 2002 (2 pages) . . . . . . . . . . . . . . . . . . . 233

Nancy Slater-Thompson Deposition Excerpt, April 22, 1999 (3 pages) . . . . . . . . . . . 235

Defendant, the United States, respectfully submits this reply to plaintiff's response to the Court’s Order to Show Cause and opposition to the Government's motion for summary judgment.

## INTRODUCTION

Plaintiff, Energy Northwest, has now identified the “mountain” of evidence and testimony that it believes is critical to its response to defendant’s motion for summary judgment. However, the sheer amount of evidence alone belies Energy Northwest’s assertion that the record is “clear” and that the Court should find liability here. Also, unbelievably, the bulk of the evidence cited by Energy Northwest – consisting of individuals' testimony regarding the "intent" of Congress in passing the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. §§ 10101-10270, and hopes and goals of Department of Energy (“DOE”) program employees that were never incorporated as commitments into the Standard Contract – is either inadmissible and/or irrelevant to the issues presented in the Government's motion. Although Energy Northwest has presented this Court with a massive number of proposed findings of fact, the bulk of them relate to legal interpretations of the NWPA and the Standard Contract, defining Congress' intent by reference to testimony. Despite Energy Northwest's puffery, the volume of its response brief and proposed findings of fact, and its extensive efforts to make it appear as though the Court needs a massive trial to interpret the terms of the Standard Contract, Energy Northwest has not identified a single factual dispute that has any effect upon the Government's motion.

Although Energy Northwest discusses the purported "intent" of the NWPA, as well as the intent of the Standard Contract, in its response brief, Energy Northwest does not cite to a single provision within either the NWPA or the Standard Contract to support the congressional and contractual "intent" that it proposes. It ignores the language in the NWPA itself that directly

conflicts with the legislative history upon which it purports to rely to create a statutory obligation. It provides no analysis of the terms of, and actual language contained in, the Standard Contract. Importantly, Energy Northwest fails to explain the manner in which it believes the spent nuclear fuel ("SNF") acceptance schedule terms of the Standard Contract were envisioned to work, even though it claims, without any support or analysis, that the Government's explanation of the acceptance schedule terms is completely incorrect. Energy Northwest also improperly relies upon unsupported attacks against DOE, maintaining that DOE acted intentionally to limit its damages. Such attacks are unfounded and misplaced.

In addition, Energy Northwest asserts repeatedly that it has incurred damages as a result of DOE's delay in accepting SNF from other utilities beginning in January 1998. However, Energy Northwest has made no attempt to show any connection between its so-called damages and the delay in accepting SNF from others. Energy Northwest asks this Court to ignore the fact that it had no SNF allocations in the first ten years according to Annual Capacity Reports ("ACRs") published from 1991 through 1995, to ignore the commitments made by DOE to other utilities that established their place in the queue under the schedule terms that those utilities and DOE have made, and to award damages for DOE's delay in beginning SNF and/or high-level radioactive waste ("HLW") acceptance without reference to any contract language. Rather than depend upon contract language, Energy Northwest prefers to ask the Court to turn into binding commitments those program goals that DOE, in promulgating the Standard Contract, specifically declined to adopt as contractual obligations. Energy Northwest attempts to prejudice this Court's views of the Standard Contract and appropriate acceptance rates by engrafting upon the Standard Contract much larger acceptance rates than those previously adopted by DOE. Such

efforts should be rejected. Energy Northwest relies solely on conjecture, innuendo, and incorrect assertions to make its case. As we will demonstrate, such "evidence" is not enough to withstand the Government's motion for summary judgment on liability. At a minimum, the Court should not apply its holding in Consumers Energy here, as Energy Northwest has not made the showing that it must – that it has incurred damages as a result of DOE's delay in accepting SNF from Energy Northwest as of January 31, 1998 – for a grant of summary judgment.

## ARGUMENT

### I. CONTRARY TO ENERGY NORTHWEST'S ASSERTIONS, THE GOVERNMENT DISTINGUISHED THE COURT'S RULING IN CONSUMERS ENERGY

Energy Northwest repeatedly asserts that we have failed to address this Court's ruling in Consumers Energy. See, e.g., Pl. Br. 1-3, 9, 14-16.[2] However, we clearly distinguished the Court's ruling there with the facts at issue in this case. See Def. Br. 3, 6-8, 16-7. Energy Northwest is different, and the Court should not find liability here, because, unlike Consumers Energy, Energy Northwest had no spent fuel allocations in the first ten years. Therefore, DOE's delay in accepting SNF from Consumers Energy and other parties with allocations within the first ten years does not create any automatic liability as to Energy Northwest. In addition, as we will explain more fully below, Energy Northwest has utterly failed to show any causation between its alleged "damages" and DOE's delay and, thus, has not proffered the evidence necessary for a summary judgment ruling here.

---

[2] "Pl. Br" refers to "Plaintiff's Response to the Court's Order to Show Cause and Memorandum in Opposition to Defendant's Motion for Summary Judgment, dated August 11, 2005. "ENA" refers to Energy Northwest's Appendix, dated August 11, 2005. "Def. Br." refers to "Defendant's Response to the Court's Order to Show Cause and Defendant's Motion for Summary Judgment," dated June 17, 2005. "GA" refers to the Defendant's Appendix dated June 17, 2005. "SGA" refers to defendant's supplemental appendix filed herewith.

## II. ENERGY NORTHWEST HAS NOT PROFFERED SUFFICIENT EVIDENCE TO SUPPORT ITS ASSERTIONS THAT IT HAS INCURRED DAMAGES AS A RESULT OF DOE'S DELAY IN ACCEPTING SNF

Energy Northwest repeatedly asserts in its motion that it has incurred damages as a result of DOE's delay in accepting spent nuclear fuel from other utilities. While sidestepping the issue of whether it had any allocations in the first ten years under any of DOE's ACRs beginning in 1991 through 1995, Energy Northwest insists that it "already has incurred actual damages because of the negative effect DOE's breach has had on Energy Northwest's delivery date in the oldest-fuel-first queue." Pl. Br. 3. However, Energy Northwest never provides any evidence which demonstrates that its alleged need to build additional on-site storage for its spent nuclear fuel was actually caused by DOE's delay in accepting its spent nuclear fuel. Without some evidence of causation, this Court should not find liability as a matter of law.

As we explained in our opening brief, Energy Northwest must show more than that there has been a breach of contract to withstand a motion for summary judgment. See The Pantry, Inc. v. Stop-N-Go Foods, Inc., 796 F. Supp. 1164, 1166 (S.D. Ind. 1992). To be recoverable, damages must be direct and not the result of any intervening incident. See Ramsey v. United States, 121 Ct. Cl. 426, 434, 101 F. Supp. 353, 357 (1951). "For a damage to be direct there must appear no intervening incident . . . ; the cause must produce the effect inevitably and naturally, not possibly nor even probably." Id. Further, "[t]here must not be two steps between cause and damage." Myerle v. United States, 33 Ct. Cl. 1, 27 (1897). Similarly, the loss must be one which the non-breaching party can show that, "but for" the breach of contract, it would not have been suffered:

> [T]he loss for which a recovery may be had in an action against a wrongdoer must be the result of the wrong inflicted. The party

> complaining must show, not only that he has suffered a loss, but also that it would not have been incurred, but for the wrongful act of his adversary . . . .

Fawick Corp. v. United States, 149 Ct. Cl. 623, 637 (1960) (emphasis added) (quoting Osage Oil & Ref. Co. v. Chandler, 287 F. 848, 852 (2d Cir. 1923)); see San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered" (emphasis added)); accord United Indus. Syndicate, Inc. v. Western Auto Supply Co., 686 F.2d 1312, 1316 (8th Cir. 1982) ("[t]he fundamental measure of contract damages is that which places the nonbreaching party in the position it would have been but for the breach").

In its brief, Energy Northwest acknowledges that DOE was not obligated to begin accepting Energy Northwest's SNF by January 31, 1998, but, instead, that DOE was only obligated to begin accepting other nuclear utilities' SNF by that date. Pl. Br. 5, 6, 7. As we established, Energy Northwest has never submitted a delivery commitment schedule ("DCS") to DOE for acceptance of its SNF and, under ACRs that DOE issued in the early 1990s, Energy Northwest did not have any allocations for SNF acceptance within at least the first 10 years of SNF acceptance. See Def. Br. 7-8, 13-14. Accordingly, Energy Northwest has not identified any basis upon which it has suffered any monetary "damage" at this point from DOE's delay.

In its brief, Energy Northwest has done nothing more than assert that it needed to build on-site storage in 1999 as a result of the delay in accepting spent nuclear fuel from other utilities in January 1998. It has not provided any evidence that, “but for” the delay, it would not have had to build on-site storage. In fact, Energy Northwest admits that it would have needed additional on-site storage even if DOE commenced acceptance from other utilities in January

1998. Pl. Br. 5.[3] Energy Northwest has failed to proffer the evidence necessary for this Court to grant summary judgment on liability. Further, plaintiff has failed to provide the rationale necessary for this Court to apply the same reasoning as to liability that it did in Consumers Energy. The Court should grant our motion for summary judgment as to liability. To the extent that the Court does not grant our motion, it should deny plaintiff's motion for summary judgment. Discovery is necessary before this Court can consider Energy Northwest's arguments as to liability. See Power Authority of the State of N.Y. v. United States, No. 00-703C, slip op. at 1 (Fed. Cl. Sept. 30, 2004) (unpublished) (denying summary judgment on liability in SNF case where acceptance rate issue was "fact-laden inquiry" tied to liability).

## III. BECAUSE THE STANDARD CONTRACT SPECIFICALLY IDENTIFIES THE PROCESS BY WHICH THE ACCEPTANCE SCHEDULE WILL BE DEVELOPED, THE ACCEPTANCE RATE IS NOT A "MISSING" TERM

Energy Northwest bases its arguments requesting damages in part on a melange of assertions about the proper acceptance rate that this Court should apply to this case in order to determine when DOE would have accepted specifically from Energy Northwest in the "but for" world. On the one hand, Energy Northwest seems to argue that a 3,000 MTU rate, after a short ramp-up period, is the proper rate. Pl. Br. 5-6. Energy Northwest also proposed other rates in its brief, while, at the same time, arguing that these alternative rates cannot possibly be correct. Pl. Br. 5-6 n.16,16. Energy Northwest's analysis is incorrect, confusing, and without support.

Energy Northwest claims that, because the Standard Contract does not contain the specific schedule or rate for accepting the contract holders' SNF and HLW, it is an "open" or

---

[3] Energy Northwest uses a 3,000 MTU rate beginning in January 1998 to establish that its first SNF pick-up would have been in 2004. This is an aggressive rate for which there is no support in the record and which the Government will argue is inappropriate.

"missing" term that requires the Court to "look to the intent of the parties, as well as the intent of the underlying statute, the NWPA, in determining how to apply the contract." Pl. Br. 34. However, plaintiff's argument completely ignores the actual language of the Standard Contract. In appropriate circumstances, if a term of a contract "which is essential to a determination of [the parties'] rights and duties" has been omitted from a contract, "a term which is reasonable in the circumstances [may be] supplied by the court." Restatement (Second) of Contracts § 204 (1981). However, an "omission" occurs where "[t]he parties to an agreement . . . entirely fail to foresee the situation which later arises and gives rise to a dispute" or where "they . . . have expectations but fail to manifest them either because the expectation rests on an assumption which is unconscious or only partly conscious, or because the situation seems to be unimportant or unlikely, or because discussion of it might be unpleasant or might produce delay or impasse." Id. § 204 cmt. b. "Sometimes it is said that the search is for the term the parties would have agreed to if the question had been brought to their attention" when negotiating the contract. Id. § 204 cmt. d.

Here, however, the schedule terms of the Standard Contract are not "missing." As we explained, the Standard Contract contained terms that expressly identified, in great detail, the manner in which specific acceptance schedules would be developed under the contract, through the submission and approval of DCSs and final delivery schedules ("FDSs"). See Def. Br. 8-12. Further, the record of the administrative rulemaking supporting the promulgation of the Standard Contract in the Federal Register, coupled with DOE's comments and representations contained in the proposed and final rules, plainly refutes any argument that the parties simply overlooked, forgot to include, or accidentally "omitted" a specific acceptance schedule or rate in the Standard

Contract. DPFUF ¶¶ 15-27.[4] To the contrary, the proposed and final rules and the record of the administrative rulemaking clearly evidence that the importance of the schedule terms of the Standard Contract were well-known and the terms were extensively evaluated and developed. Id. As we explained, the Standard Contract clearly creates a contractual mechanism for the development of a specific acceptance schedule. See Def. Br. 9-10.[5] In situations in which the Court supplies a "missing" term, the Court must consider what "the parties would have agreed upon at the time of their initial . . . negotiations . . ." David Nassif Associates v. United States, 226 Ct. Cl. 372, 644 F.2d 4, 7 (1981). Yet, here, DOE specifically considered, but rejected, the utilities' request that DOE obligate itself to meet the requirements that Energy Northwest now seeks to impose. Plaintiff's argument that the schedule terms of the Standard Contract are "missing" or "open," and that the Court should therefore supply them, is unsupported by the language of the Standard Contract itself and the history of the rulemaking. Thus, the Court should not write into the contract any SNF acceptance "rate" or schedule that renders meaningless the Standard Contract's schedule terms. Even in situations in which the standard

[4] To the extent that it is appropriate to consider evidence from outside the contract language and administrative record, see 10 C.F.R. § 961.11, Art. XXII (integration clause of Standard Contract precluding incorporation of outside understandings into contract), testimony in the SNF cases firmly establishes that DOE intentionally declined to include a specific acceptance schedule or rate in the Standard Contract. See, e.g., 7/14/04 Robert Morgan Testimony, TVA v. United States, No. 01-249, at 2198-2199, SGA 231-32 ("I felt it was absolutely impossible or incomprehensible that I would agree to an acceptance rate with all these unknowns.").

[5] Many of the parties to the Standard Contract followed the mechanism in the Standard Contract for several years, beginning in 1992, and "agreed" upon various SNF acceptance dates and acceptance amounts. See SGA 1-190. Specifically, these parties to the Standard Contract submitted DCSs, and DOE approved many of those DCSs. Based upon the provisions of the Standard Contract, those approved DCSs become commitments that define the parties' schedule obligations for those years of SNF acceptance to which the approved DCSs apply.

rules of contract construction apply, where a contract's clear and unambiguous language explicitly expresses the intent of the parties, there is no need for the Court to determine any "reasonable term." See City of Tacoma v. United States, 38 Fed. Cl. 582, 588-89 (1997). Instead, if the Court were to apply the standard contract construction rules, the Court would have to recognize that the Standard Contract contains the mechanism by which DOE was given the discretion to establish the schedule of acceptance, subject to the requirement that DOE's implementation of that discretion must be reasonable under the circumstances extant at the time. See, e.g., C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1543 (Fed. Cir. 1993) ("[a] contract is read in accordance with its express terms and the plain meaning thereof"); Interwest Constr. v. Brown, 29 F.3d 611, 615 (Fed. Cir. 1994) ("extrinsic evidence ... should not be used to introduce an ambiguity where none exists").

## IV. EVEN IF ENERGY NORTHWEST HAD ESTABLISHED SOME DAMAGE UNDER ITS THEORY OF DOE’S OBLIGATIONS, ITS THEORY OF DOE’S OBLIGATIONS IS INCORRECT

### A. The DCS Mechanism Identified In The Standard Contract Provides An Orderly, Logical Process For Accepting Contract Holder’s SNF

Although Energy Northwest seems to complain that the DCS process envisioned by the Standard Contract is meaningless and unenforceable, Energy Northwest has failed to identify any other means by which the activities contemplated by the Standard Contract could ever proceed. Under Energy Northwest's theory, DOE will magically know when each contract holder wants SNF accepted; each contract holder's desires will magically correspond to the "oldest fuel first" requirements of the Standard Contract; DOE will have no problems simply taking SNF from every contract holder when they want acceptance regardless of space, capacity, staffing, or transportation limitations; and DOE will have no problem with the significant

financial repercussions and waste that it will suffer if a contract holder is not prepared to deliver SNF to DOE when DOE arrives at the contract holder's site with the appropriate transportation casks contemplated by the Standard Contract. By reading the DCS process out of the Standard Contract, Energy Northwest has eliminated the only mechanism that would allow the parties to plan for, and commit themselves to, actual performance under the Standard Contract. Without enforcement of the DCS provisions, the Standard Contract cannot work. Energy Northwest suggests that the submission of a DCS form was not binding or a necessary precedent to DOE's obligation to take SNF from Energy Northwest under the Standard Contract. Pl. Br. 25-28. Yet, absent Energy Northwest's submission of a DCS and DOE's approval of it, Energy Northwest has not identified any practical manner in which activities contemplated under the Standard Contract, including the significant development time necessary for DOE to prepare transportation casks and coordinate their use for SNF acceptance from various contract holders, see 10 C.F.R. § 961.11, Art. IV.B.2, could ever be performed. Accord Tennessee Valley Authority v. United States, 60 Fed. Cl. 665, 674 (2004) (although Government generally breached the Standard Contract with respect to the nuclear utility industry by failing to begin acceptance of the utilities' SNF on January 31, 1998, that breach did not apply to each and every nuclear utility because the DCS mechanism in the Standard Contract determined the earliest date that DOE was obligated to accept a particular utility's SNF).

Energy Northwest also suggests that the Court should ignore the 1991 and 1995 Acceptance Priority Ranking/Annual Capacity Reports ("APR/ACRs"), which identified the SNF allocations that DOE anticipated it would be able to commit itself to satisfying during the first 10 years of SNF acceptance and which did not identify any allocations for Energy

Northwest in the first 10 years of SNF acceptance. See Pl. Br. 3-4, 28-34; see also 10 C.F.R. § 961.11, Art. IV.B.5 (identifying requirement for issuance of APR and ACR). The plaintiff's argument regarding the 1991 and 1995 APR/ACR is based essentially upon its theory that, once DOE began acceptance and after a short ramp-up period, DOE was contractually obligated to accept 3,000 Metric Tons Uranium ("MTUs") of SNF from contract holders every year. Pl. Br. 35. Yet, it has identified no contract language containing any such requirement, and this Court has recently stated, in response to four SNF plaintiffs' requests that "the contract be reformed to provide an allegedly 'reasonable' post-1998 annual industry-wide acceptance rate of 3,000" MTUs, that this assertion appears unfounded:

> Plaintiffs appear to provide no objective basis for this reformation, relying instead on equitable principles and a widely-shared impression, among jurists and others, that the agency should be punished for transgressing against public safety. None of the demanded terms is found in the contract; and it is clear that the parties shared no meeting of the minds regarding those terms, as was made clear to all during contract negotiations.

Florida Power & Light Co. v. United States, 64 Fed. Cl. 37, 48 n.12 (2005).

Further, the acceptance rates contained in various planning documents to which Energy Northwest cites in its brief (see, e.g., page 5), including the recently issued 2004 APR/ACR, are generally based upon an assumption that an operating repository will be available when SNF acceptance begins. However, as the United States Court of Appeals for the District of Columbia has recognized, DOE was not obligated to have an operating repository available in 1998. Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1276, 1277 (D.C. Cir. 1996). Instead, it was obligated only to begin SNF acceptance in 1998 in some type of facility, such as an MRS facility, and the Standard Contract expressly permits DOE to accept SNF for

delivery to a facility other than a repository. 10 C.F.R. § 961.11, Art. I(10) (defining "DOE facility"); see 48 Fed. Reg. 16590, 16591 (Apr. 18, 1983) (preamble to final rule creating Standard Contract terms: "The definition of 'DOE facility' (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository"). DOE expressly informed contract holders in early ACRs that, beginning with the 1991 ACR, DOE would issue a firm waste acceptance schedule which would be the basis for the submission of delivery commitment schedules ("DCSs") by the purchasers. Each of the ACRs from 1987 through 1990 contained the following, or substantially similar, language:

> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS). Once approved, these schedules will become the basis for Final Delivery Schedules to be submitted by the Purchasers not less than 12 months before the date of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

GA 210 (1987 ACR); see GA 213 (1988 ACR), GA 216 (1990 ACR); GA 204 (1985 Mission Plan), 408 (1991 ACR); see also GA 209 (1987 ACR: "projections in this initial report are based on current plans and best available information; they are not contractually binding"). Given that DOE was entitled under the Standard Contract to accept SNF at an MRS facility in 1998, rather than directly at a repository, proposed rates for SNF acceptance at a repository do not somehow become contractually binding obligations upon DOE. See National By-Products, Inc. v. United States, 186 Ct. Cl. 546, 558-59, 405 F.2d 1256, 1263 (1969) ("[b]efore a representation can be contractually binding, it must be in the form of a promise or undertaking . . . and not a mere

statement of intention, opinion, or prediction"). Accordingly, Energy Northwest cannot base its theory of liability upon DOE's obligation to use higher acceptance rates than those that DOE had proposed to use for SNF acceptance at an MRS.

In any event, Energy Northwest never contested or complained about allocations contained in the 1991-1995 ACRs until it filed this lawsuit in 2004. Its suggestion that it can wait 12 years after the issuance of those acceptance allocations in 1991 and then, and only then, complain that the allocations granted were somehow "counterfeit" and that damages should be based upon some scenario not in existence 12 years earlier is not sustainable. Established precedent of this Court and its predecessor, the Court of Claims, requires the contractor to protest a material breach of contract upon learning of that breach, or else waive the breach. Ling-Temco-Vought, Inc. v. United States, 201 Ct. Cl. 135, 146, 475 F.2d 630, 637 (1973) (quoting Northern Helex Co. v. United States, 197 Ct. Cl. 118, 125-26, 455 F.2d 546, 551 (1972)); see Aleutian Constructors v. United States, 24 Cl. Ct. 372, 384 (1991); Government Sys. Advisors, Inc. v. United States, 21 Cl. Ct. 400, 411, vacated on other grounds, 25 Cl. Ct. 554 (1990). Further, Energy Northwest asks this Court to create a legal fiction excusing its failure to take action in response to the 1991, 1992, or 1995 ACRs. To obtain any basis for SNF acceptance in 1998, 1999, or any other year, Energy Northwest would have had to have submitted a DCS at least 63 months in advance of the desired SNF acceptance date. 10 C.F.R. § 961.11, Art. V.B.1. Accordingly, for a 1998 acceptance, Energy Northwest had to submit a DCS in 1992. Energy Northwest, in essence, asks this Court to ignore its failure to protest and its failure to submit any DCSs. Energy Northwest fails to explain how it ever could have obtained acceptance rights for specific amounts of SNF on specific dates without having

complied with the contractual requirements. It has identified no basis for forgiving its failure to protest and failure to submit any DCS.

### B. Plaintiff's Attempt To Establish That The Acceptance Rates In The 1995 ACR/APR Were Intended Merely To Limit DOE's Damages Is Meritless

Plaintiff's attempts to establish that the only reason that DOE adopted the acceptance rates included in the 1995 ACR/APR was a deliberate effort to reduce its exposure to damages are likewise meritless. Interestingly, though, the acceptance rates in the 1995 ACR/APR were the same rates that had been included in the 1991 ACR, when DOE was planning to have an operational MRS that would have allowed it to accept SNF beginning January 31, 1998. The evidence that plaintiff cites to support its position does not indicate any "wrongdoing" by DOE. Although plaintiff cites to the deposition testimony of Lake Barrett, a former DOE employee, in support of its argument, Pl. Br. 30, Mr. Barrett merely testified, over objection, that he did not know the reasons that the acceptance rates included in the 1995 ACR/APR were used. See Defendant's Response to PPFUF ¶ 154. Similarly, plaintiff cites to the deposition testimony of David Zabransky, another DOE employee. Pl. Br. 30-31. However, as more fully explained in the Government's response to paragraph 155 of plaintiff's proposed findings of uncontroverted fact, Mr. Zabransky only testified that DOE did not modify the 1995 APR/ACR acceptance rate from that which had been included in the prior ACR because of DOE's concern about making new "commitments," beyond those that it had already made, as a result of its likely inability to accept SNF beginning January 31, 1998. DOE's obligations to accept SNF, through approvals of DCSs that began in 1992 and continued through 1997, had already been established.

## V. THE INTENT OF BOTH THE NWPA AND THE STANDARD CONTRACT MUST BE DETERMINED FROM THE FACE OF THOSE DOCUMENTS

Ignoring that the process for defining the schedule of SNF acceptance has already defined a large part of the schedule against which damages may be measured, plaintiff argues that "the “DOE’s intent at the time it executed the Standard Contract was to accept SNF at a rate that would (1) prevent the utilities from having to build at-reactor storage after DOE began accepting SNF and HLW and (2) reduce the backlog of SNF at nuclear reactors." Pl. Br. 36. Plaintiff then argues that an annual acceptance rate of 3,000 MTUs of SNF would have been necessary to achieve this objective.

However, the NWPA itself is not only devoid of <u>any</u> support for plaintiff's far-fetched argument, but actually <u>conflicts</u> with it. Unlike many statutes, the NWPA expressly identifies, in the statute itself, the purposes of the Act, as well as the congressional findings supporting the Act. Nowhere in those express findings or purposes is the "intent" that plaintiff proposes identified. <u>See</u> 42 U.S.C. § 10131. In fact, the identified purposes of the NWPA relate to protecting "the public and the environment . . . from the hazards posed" by SNF and HLW and in "ensur[ing] that the costs of carrying out activities relating to the disposal of [SNF and HLW] will be borne by the persons responsible for generating" it. <u>Id.</u> § 10131(b)(1) & (4). The NWPA not only says absolutely nothing about ensuring that private commercial nuclear utilities are <u>protected</u> against expenditures, but it affirmatively seeks to ensure that those utilities, rather than taxpayers, pay <u>all</u> incurred storage and disposal costs. <u>Id.</u> Further, the language of the Act that authorizes the Secretary of Energy to develop and enter into contracts with the owners and generators of SNF and/or HLW, 42 U.S.C. § 10222, makes no reference to the "intent" that plaintiff proposes. In short, the NWPA itself is devoid of any support for plaintiff's alleged intent. Statutory interpretation begins with "the plain words of the law," <u>Turtle Island</u>

Restoration Network v. Evans, 284 F.3d 1282, 1291 (Fed. Cir. 2002), cert. denied, 538 U.S. 960 (2003), and the words of statutes are to be given their ordinary meaning. Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980). Here, the words of the actual statute do not create the obligations, or "intent," that plaintiff alleges.

To the extent that Energy Northwest relies upon self-serving references to snippets of legislative history, those snippets cannot create a statutory obligation that does not exist in the NWPA. "[C]ourts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point." Shannon v. United States, 512 U.S. 573, 583-84 (1994) (quoting International Brotherhood of Elec. Workers, Local Union No. 474, AFL-CIO v. NLRB, 814 F.2d 697, 712 (D.C. Cir. 1987)); see Piper v. Chris-Craft Indus., Inc., 430 U.S. 1, 26 (1977) (reliance upon legislative history in divining the intent of Congress is "a step to be taken cautiously").

Further, the "evidence" upon which plaintiff relies to support its "legislative intent" is, for the most part, not even admissible. Plaintiff's reliance upon deposition testimony of individuals as evidence of the "intent" of Congress in the NWPA is ludicrous, see, e.g., Pl. Br. 36-39 (citing testimony of Robert Morgan, Michael Lawrence, Lake Barrett, and others), because even the opinions of individuals who actually participated in the legislative process are irrelevant to a proper interpretation of the requirements of a statute. See, e.g., Selman v. United States, 204 Ct. Cl. 675, 685 n.6, 498 F.2d 1354, 1359 n.6 (1974) (affidavit of a United States Senator concerning particular legislation was "without evidentiary value" because "no member of a legislature, outside of the legislature, is empowered to speak with authority for that body"); accord Honeywell v. United States, 228 Ct. Cl. 595, 661 F.2d 182, 185 (1981); Department of

Energy v. Westland, 565 F.2d 685, 690-91 (CCPA 1977); United States Steel Corp. v. United States, 618 F.Supp. 496, 500 n.5 (Ct. Int'l Trade 1985). Here, plaintiff relies upon various individuals' beliefs who began working with the NWPA long after Congress enacted it as to the meaning that Congress presumably intended when it passed the Act.

Similarly, Energy Northwest's attempt to introduce evidence regarding the goals of DOE's program, and the hopes of some individuals that, at some point in time after the repository is operational, DOE will be able to accept SNF at a rate of 3,000 MTUs per year, does not somehow make these hopes and goals contractual obligations for which, because the hopes and goals were not satisfied, damages can be awarded. Pl. Br. 38. Although plaintiff repeatedly cites to the testimony of various individuals indicating that they would have liked to preclude the need for at-reactor storage after 1998, in the aggregate and including exchanges of acceptance allocations between the parties, plaintiff, yet again, fails to cite any language in the Standard Contract that converted these hopes and goals into contractual obligations.

## VI. WITH ALL DUE RESPECT, SOME OF THE COURT DECISIONS RELIED UPON BY ENERGY NORTHWEST REGARDING THE SPENT NUCLEAR FUEL ACCEPTANCE RATE INCORRECTLY ANALYZE THE STANDARD CONTRACT SCHEDULE PROVISIONS

Energy Northwest cites to several decisions in this Court to support its arguments regarding the DCS process. However, with all due respect, those decisions do not consider the practicalities of the acceptance of SNF necessitated by the Standard Contract. The Court's decision in Commonwealth Edison Co. v. United States, 56 Fed. Cl. 652 (2003), the rationale of which Senior Judge Merow adopted in unpublished orders in Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.), and other SNF cases assigned to him, rejected the Government's arguments that the schedule provisions contained in the Standard Contract provide

the mechanism for determining the SNF acceptance schedule. Yet, the Court did not explain – from a practical standpoint – the manner in which SNF acceptance would, or will, work absent reference to that schedule mechanism. Finding that the DCS process did not limit the contract holder's damages or limit its right to the acceptance of larger amounts of SNF than identified in those DCSs, the Court found that the DCS process was only "non-binding and preliminary." Commonwealth Edison, 56 Fed. Cl. at 663. However, the Court did not consider that without the DCS process, the Standard Contract contains no requirement that the contract holder notify DOE of the amount of SNF it wants DOE to take in any particular year (either in advance or on the day that acceptance is desired); no notice of the location, date, or time for that acceptance within a particular year; and no notice of the characteristics of the SNF that will need to be accepted at that time or the size of the cask that DOE will have to procure to transport the SNF.

Without requirements for advance notice, such as that required by the DCS provisions, and given the long lead times that many aspects of DOE's performance take (such as the procurement of the transportation casks), DOE could never perform the Standard Contract if interpreted as it has been in the ComEd case. Further, the ComEd Court fails to explain how, given its belief that the DCS provisions of the Standard Contract are meaningless, DOE would be able to perform its obligations to accept SNF. Certainly, contract provisions cannot be interpreted in a manner that renders them meaningless. See Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (contract interpretation should not render portion of contract meaningless). Yet, the ComEd decision renders the DCS provisions meaningless and, further, would make the Standard Contract virtually impossible to perform.

In Indiana Michigan Power Co. v. United States, 57 Fed. Cl. 88 (2003), the Court stated that its "obligation is to provide a rate of [SNF] acceptance that the Department of Energy would have employed in absence of the breach." Id. at 100 (emphasis added). With all due respect, that focuses upon the wrong question. The issue presented requires a determination of the rate of SNF acceptance that DOE was contractually obligated to satisfy. DOE cannot be held financially responsible in damages for a failure to take actions that it might have elected voluntarily to perform, even though it was not required to do so. The only damages that the Court can award are those based upon DOE's breach of its obligation to perform actions that it was contractually obligated to perform. Accordingly, the Court's finding in Indiana Michigan that "[n]othing in the record supports the collection rate that defendant would use – 900 metric tons per year," id. at 98, is irrelevant to the identification of the rate at which DOE was contractually obligated to accept SNF.

The Indiana Michigan Court also found, like the Court in ComEd, that the schedule terms of the Standard Contract did not define the contractual acceptance schedule and, in fact, found that both "Congress and the parties anticipated that the Department of Energy would collect fuels at a rate sufficient to eliminate the need for additional storage capacity on site and to reduce the backlog of already-stored materials." Id. at 99. Yet, the Court in Indiana Michigan cites no support for this assertion. As we establish in our motion, there is no language in the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270, or its legislative history that identifies any such congressional "anticipation," and we are aware of no documentation that supports a belief by DOE that it was contractually binding itself to such an obligation. In fact, DOE declined during the administrative proceedings that resulted in the promulgation of the Standard Contract to

place any such requirement in the Standard Contract. The trial court's decisions in ComEd and Indiana Michigan, in essence, render the schedule terms of the Standard Contract so indefinite that the Standard Contract is inoperable.

Energy Northwest's arguments are to no avail. It did not have any allocations in the first ten years of the program, assuming an operating MRS or repository in January 1998, it submitted no DCSs during that time to indicate it should have allocations, and it never filed a challenge to the DCS process. Under the circumstances, Energy Northwest cannot establish that it has incurred any damages as a result of DOE's delay in accepting SNF. Accordingly, the Court should deny Energy Northwest's motion for summary judgment, and grant the Government's motion for summary judgment. At the very least, because there appear to be factual issues, the Court should defer a liability ruling until discovery has been taken.

## CONCLUSION

For the foregoing reasons, and those discussed in our motion for partial summary judgment, we respectfully request that the Court grant our motion for summary judgment.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Sharon A. Snyder
SHARON A. SNYDER
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
ATTN: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: 202-616-0347
Fax: 202-307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

October 3, 2005

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on October 3, 2005, a copy of the foregoing "DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO COURT'S ORDER TO SHOW CAUSE AND MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Sharon A. Snyder