ask me questions, and if I remember it, I'll tell you what I remember.

Q. When you say you did nothing to prepare for either, you've not met with Department of Justice lawyers?

A. Yes, I did.

Q. You did?

A. Uh-huh.

Q. Prior to the last deposition?

A. Prior to the last deposition, but it was nothing -- I didn't do anything to prepare. They asked me a bunch of the same questions that people from Shaw Pittman asked me.

Q. Right. But you're not represented by the Department of Justice?

A. I am not represented by anyone.

Q. Okay. And when did the meetings with the Department of Justice occur; do you recall?

A. Phew! It was probably two or three weeks before the deposition; maybe four weeks. I don't remember exactly. I think it lasted half a day, three-quarters of a day -- half a day, probably.

And then there was another telephone conference that lasted a couple of hours the day before or two days before --



Q. Okay.

A. -- the deposition.

Q. Was there anyone at the meeting or on the phone call other than Department of Justice lawyers?

A. No.

Q. Nobody from the Department of Energy?

A. No one from the Department of Energy.

Q. Okay. Did the Department of Justice lawyers during either of those sessions, the meeting or the call, explain to you any of the positions, legal positions, they're taking in this litigation?

A. No.

Q. Okay.

A. I mean, I know what their position is. I worked on the program for -- since its inception, so I know what the positions are.

Q. Okay. What do you mean by that? You know what the positions are --

A. Well, I know the positions -- I know basically what both sides are -- what their position is. I mean, the Department of Energy says it doesn't really have an obligation, and the utilities say, yeah, you do. I mean, that's the bottom line, so...

Q. That's one bottom line, I guess you could call it.



A. Yeah.

Q. What about -- what's your understanding of the government's position on acceptance rates?

MS. HERRMANN: Objection; foundation.

THE WITNESS: My position on their --

BY MR. STOUCK:

Q. No, your understanding of their position on acceptance rates, if you have one.

A. I guess I don't know how to couch it in terms of their position on acceptance rates. The acceptance rates were established in this program in the beginning based on some hypothetical estimates of how big the repository program is going to be, what looked like a reasonable rate to accept fuel. It wasn't a lot of bases for it in those early days.

You have to recognize this program didn't start with the passage of the Nuclear Waste Policy Act on January 7th, 1983. It had been ongoing for quite a few years.

The whole purpose of this was after President Carter stopped reprocessing the utilities started being concerned with their spent fuel pools becoming constipated; they would have nowhere to put the stuff since they were no longer reprocessing. So, the government said, "We'll help you, we'll pass a law, but



you're going to have to pay for it."

And at that time we had programs ongoing that showed it was planning bases for a couple of three-thousand-ton repositories in this country. It looked feasible at that time, and also at that time we had projections of a tremendous amount of nuclear electricity projected which never happened.

When the Nuclear Waste Policy act was passed it was -- based on the language in the Act, it was decided if you had one three-thousand-ton repository, one in the west, and then a later second repository in the east, each one would have an acceptance rate of three thousand tons once they were fully operational, but probably, because of learning curves and start-up, what looked reasonable -- somebody just pulled some basic numbers out of the air at that time and said -- and if I remember right, it was like 1200 tons the first year and then a couple thousand tons the next year and then up to three thousand tons.

And then that kind of stuck around as the program was undergoing the maturation process in the early days. Then they started really trying to focus in on do we really have a real basis for acceptance, is there anything technical, concrete, that we can do?

One of the early acceptance rates that was

published in the annual capacity report after the 1200-ton rate was another rate of like, I think, 300, 700, something like that, and that was based on what the transportation function could claim they could do. They could not transport any more than that. But they really didn't have a basis for it at that time.

Along came around 1990, 1991, and I was asked could I come up with a basis, a real acceptance rate and a basis for it, based on what we knew at that time, and I developed the 400, 600 and 900 at that time.

Q. Right, which you testified about previously.

A. Right. And that's -- you know, that's -- their position has always been, well, that's it. Because they sent out notices prior to publishing that to all the utilities explaining how they were going to do things, why they were going to do it this way; speak now or forever hold your peace. They were given a three-month comment period. Nobody had any objections to it that I remember.

Q. Right.

A. Most of the utilities' positions at that time was, I don't care if it's 1200, 400, just do something; you know, start taking fuel. That's what they were concerned about. They didn't care if it went



in a hole or where it went; they only wanted to get rid of it so they could continue operating. The main thing was keeping on generating power. That was the big concern.

Q. Okay. Are you done?

A. Yeah.

Q. Okay. But you have no specific -- is this right? You have no specific understanding -- well, let me ask it this way:

Have you reviewed any of the court filings the government has made in this litigation?

A. No.

Q. So, you have no specific knowledge of what position they're taking in this --

A. Not with specificity, no.

Q. What you just told me is your understanding from working on the program?

A. That's absolutely true.

Q. Okay. Now, tell me -- you mentioned in your prior testimony that Mr. Vance, Scott Vance, had started working -- the date that sticks in my mind is 1986, from your testimony. Does that sound right?

A. I think that was about when he started working on the program.

Q. And, first of all, do you know what he did



prior to that?

A. Yeah. He was in school. I hired him out of MIT.

Q. Okay. And can you tell me -- why did you hire him?

A. Why did I hire him?

Q. Yeah.

A. Well, I was short-handed, for one thing, and I was at that time on the Department of Energy's program for -- it was a scholarship/fellowship program where six of us in the United States were chosen to review the scholarship and/or fellowship request, stipends they could get from the government to work on various things.

I was one of the people on that committee to decide who got what, and we gave out, from funding out of this, out of the spent fuel program, seven or eight stipends every year.

When the program first got started, Mr. Vance was one of the early applicants on the program. That was my first encounter, was seeing his application, and when he -- he -- you know, I followed his career path through school and stuff, and he was one of the best candidates I had ever seen. I said, I'd like to have him, partly because he got his Master's



degree in nuclear engineering, but it was what we called fuzzy nuclear engineering. He understood the nuclear aspects, but he understood what really ran the program. It was more policy. His thesis was basically the economic impact on the utilities by delaying the repository. So, he understood what the real problems were. They weren't technical.

Q. That was his master's thesis at MIT?

A. Uh-huh.

Q. And what was his role -- first of all, he started in about '86?

A. It was around '86, if I remember right.

Q. And do you remember when he left?

A. Well, I left before he did.

Q. Okay.

A. He was working for me up until I left in -- I think I left in December of '88, and then I still worked on the program after I left through JAI, and, so, I still had contacts with him.

He left probably -- I'm guessing 1990, sometime in that time frame.

Q. 1990?

A. Sometime in that time frame, '89, '90.

Q. Okay. And what did he do while he was there? He worked for you?

14

A. He worked for me, and then after I left he worked for my successor.
Q. In relation to, for example, Pat McDuffy what was --
A. They both worked for me.
Q. Okay. Did they have similar rolls?
A. Yes and no. Pat was more senior, and Scott supported him a lot. Scott had his own projects that he was responsible for, also, but he supported Pat quite a bit.
Q. Okay.
A. You know, he left and went to work for CH2M Hill, I think, out in Boise, out in that area. And I kept trying to hire him to come back out here, and he wanted to live in Boise. And then he decided he wasn't going anywhere in his career if he stayed in Boise and if he was going to work in his area of education he needed to get back here. So we hired him again, and he worked out of his house there for a while until he made the decision to move the family back here.
Q. Now, did he work with you on developing the '91 ACR?
A. At that time I was not -- it's kind of a complicated relationship.
In '91 I was not responsible for the ACR,

15

although I was -- I shouldn't say I wasn't responsible for it. I was responsible for it but not -- well, Pacific Northwest Laboratories had the contract to do the job. DOE gave it to them. I no longer worked for them, but I was under subcontract to them --
Q. Okay.
A. -- to support them on this as more or less a consultant. I developed all this stuff, gave it to Pat McDuffy and all that stuff and published the report.
Q. What did Scott Vance do?
A. He was working with Pat. He was aware of it. He was not party to the development of that rate. I developed that rate, along with Mr. Brownstein of DOE, sitting in the Forrestal Building.
Q. Was Mr. McDuffy involved in the development of the rate?
A. I can't remember. I know he was involved at least to the point of I had to get his approval because I was under subcontract to him at that time and explain everything to him and get his okay. I don't remember how much physical involvement. I'm sure I bounced all this off of him before I did anything with it to get his approval, since he signed the contract.
Q. Do you know who Ivan Stewart is?
A. Ivan Stewart? Yes, I do. He worked for

16

NUS Corporation for many years. I don't know where he is now.
Q. Okay. Did you ever work with him?
A. No, not really. You know, we've known each other because we've been in the business for years, but I never really worked with him.
Q. What about Ed Davis?
A. I know Ed Davis.
Q. Who is Ed Davis?
A. He was president and CEO of NUS for quite a few years. I don't know where he is now.
Q. Do you know what he was doing at the time of the Nuclear Waste Policy Act?
A. Huh-uh.
Q. Okay.
A. I don't remember if he took over NUS before or after the Act.
Q. Okay. And what about E. R. Johnson?
A. Oh, yeah.
Q. You know him?
A. I know him. He's my boss -- well, he likes to think he's my boss.
Q. Right.
A. He's not really.
Q. What was he doing at the time of the

17

Nuclear Waste Policy Act?
A. What was Ed Johnson doing?
Q. Yeah.
A. President of E. R. Johnson Associates. He had several jobs working for the Department of Energy through various laboratories. I think at that time he had a lot of funding through Oak Ridge, at the time it was passed.
Q. The program was ongoing at the time of the Nuclear Waste Policy Act?
A. Uh-huh.
Q. Was Ed Johnson working --
A. He probably was. I didn't know him at that time. I met him after the Act got passed. He became one of my subcontractors when he was at PNL.
Q. Okay. What about Tom LaGuardia?
A. Tom LaGuardia? Never heard of him.
Q. What about Micky Buchheit?
A. I've heard the name. I think he was with one of the utilities, wasn't he?
Q. Yeah, he worked for Yankee Atomic.
Let me ask about the companies. Did you in your work in relation to this program that we're talking about ever have a direct relation with Yankee Atomic?
A. I don't know how you qualify "direct."

3378

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| YANKEE ATOMIC ELECTRIC | ) | |
| COMPANY, CONNECTICUT YANKEE | ) | Case Nos.: |
| ATOMIC POWER COMPANY, and MAINE | ) | 98-126C |
| YANKEE ATOMIC POWER COMPANY, | ) | 98-154C |
| Plaintiffs, | ) | 98-474C |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

Courtroom Number 5

National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Monday, August 2, 2004

VOLUME 15

The parties met, pursuant to the notice of the Judge, at 10:03 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

3443:1 Honor.

THE COURT: Okay. I'll defer a ruling on this, get an objection from Plaintiff, which I assume I will, and I'll defer ruling on it for the time being. And do you have a witness that you wish to present?

MR. LESTER: We do, Your Honor. Before we start, though, if we could take just a short five-minute break.

THE COURT: Sure.

MR. LESTER: A short 10-minute break I'm told. But our first witness will be Christopher Kouts from the Department of Energy.

THE COURT: Okay. A little bit after quarter of then.

MR. LESTER: Thank you, Your Honor.

(Whereupon, a recess was taken at 11:37 a.m., and the proceedings reconvened at 11:49 a.m.)

MS. SULLIVAN: Yes, Your Honor, the government calls its first witness, Christopher Kouts.

THE COURT: Okay.

Whereupon,

CHRISTOPHER KOUTS

was called as a witness, and, having first been duly

3444:1 sworn, was examined and testified as follows:

MS. SULLIVAN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q Good morning, Mr. Kouts. Where are you currently employed?

A I'm currently employed with the Office of Civilian Radioactive Waste Management at the Department of Energy.

Q What is your current position at DOE?

A I'm director of the office of systems analysis and strategy development.

Q What are your responsibilities in your current position?

A Briefly, my office is responsible for analytical activities to determine and to evaluate how the waste management system is being deployed, in other words how the waste acceptance component of the system, how the transportation component and how the repository component can act efficiently.

I also have responsibility for the waste acceptance component, the management of the standard contract with utilities. And I also have safeguards and securities policy, technical baseline management, and a variety of other activities.

3454:1 254?

MS. SULLIVAN: May I approach, Your Honor?

THE COURT: Sure. Yes.

MS. SULLIVAN: Your Honor, would you like a copy?

THE COURT: I can use this.

MS. SULLIVAN: Okay.

BY MS. SULLIVAN:

Q Mr. Kouts, what's been put up on the screen and I provided you a paper copy of has been marked as Plaintiffs' Exhibit 254. Do you recognize this document?

A Yes, I do.

Q Would you explain to the Court what this document is.

A This is a, I believe, revision 5 of our parent or our main technical requirements document. It's typically a document that the director of the program owns, and it lays out the technical requirements for the program to implement.

Q And does this document contain information with regard to the design requirements of the repository?

A Yes, it does.

Q Okay. How is this document used by your

office in its waste acceptance function?

A Essentially, it gives us guidance to -- in terms of what the receipt rate of the system would be. It also gives various policy guidance to the program as a whole.

Q Is your office responsible for the preparation of this document?

A I -- yes. I manage changes to this. And I basically do that for the director of the program.

Q Could we go to page 15 of this document, please. Mr. Kouts, are you familiar with the centralized interim storage facility mentioned on this page?

A Yes, I am.

Q How are you familiar with that facility?

A As I mentioned, when I went through my history within the program, I was responsible for developing the design of a centralized interim storage facility that essentially met these requirements.

Q What type of facility did DOE plan to build as the centralized interim storage facility?

A It was a, essentially a canister handling facility that could meet the ramp-up rates identified in -- in table 3 here.

Q Okay. And the rates in table 3, do you have

3456:1 an understanding as to what the source of those rates was?

A Yes.

MR. STOUCK: Your Honor, can I interpose an objection for the record here. I don't mean to interrupt unduly. But Mr. Kouts was disclosed in the government's witness list to testify about two topics. And I just want to make a record on that. And we can deal with the consequences later. The first one, DOE's plans to begin waste acceptance in 2010. The second was the fact that the Yucca Mountain repository is not being designed to accept GTCC waste.

So I just wanted to have that on the record. And, again, we can deal with questions about whether this is beyond that once we see if it ties up.

MS. SULLIVAN: Would you like me to address that, Your Honor?

THE COURT: If you wish.

MS. SULLIVAN: Or shall I just continue? Your Honor, the tables specifically in this chart are the ones that Dr. Graves or Mr. Graves relied upon. Mr. Kouts has some testimony we believe is important. So I believe it was raised in Plaintiffs' case.

And also, further questions will make clear it's tied in part to the 2010 date.

3457:1 THE COURT: Okay. Go forward.

MS. SULLIVAN: Thank you, Your Honor.

BY MS. SULLIVAN:

Q Mr. Kouts, what was -- do you have an understanding what the source of the rates were for the facilities that were set forth in this document?

A Yes.

Q And what was your understanding?

A There were several bills that were winding their way through Congress that would have directed the Department, should they have been passed, to deploy a facility to essentially begin to take materials from utilities for storage purposes.

These ramp-up rates were basically rates that were contained in those bills.

Q I'm sorry. Let me just clarify. You say bills were pending in the Department. Did you mean bills pending in Congress?

A Bills pending in Congress.

Q And did you have an understanding as to what the legislation called for, generally?

A The -- the legislation went through a variety of mutations. The initial form of the legislation was for the Department to build a -- an interim storage facility or centralized interim

3458:1 storage facility at, potentially in Nevada, next to where the Yucca Mountain site is right now. And there were also other options in terms of where that facility could be deployed.

Q How was the centralized interim storage facility different from the MRS designed by DOE in the early '80s -- in the 1980s and early '90s?

A In the mid-'80s, we were looking at a facility that had a great deal more capability. It was one that basically had packaging capability that would essentially do some of the packaging that a repository typically would have done.

It also had rod consolidation. It also had the flexibility to develop disposal-ready canisters for any of the three sites that we were considering at that time, which were the basalt site in Hanford, Washington, the tuff site, t-u-f-f, volcanic tuff site in Nevada, and also the Deaf Smith bedded salt site in Texas.

Q Was the facility, the centralized interim storage facility set forth on this page ever constructed?

A No, it was not.

Q Why not?

A The legislation was never passed and the

3459:1 Department never received any authorizations to proceed on it.

Q Could there be a similar congressional initiative today that would allow or mandate acceptance of spent nuclear fuel prior to 2010?

A If Congress passed that legislation, then the Department would be authorized to implement it, yes.

Q Are you aware of the spent nuclear fuel storage issue that arose in connection with the NRC's budget last year?

A Yes, I am.

Q And what was the initiative discussed in that budget submission?

A I believe there was a set amount of funds that was supposed to be distributed from the Nuclear Regulatory Commission budget to the National Academy of Sciences, where they were to undertake a study to look at the -- the safety, if you will, of fuel that's currently stored in spent fuel pools, at reactors, and also that's in dry storage at reactor sites, and to provide the Academy's views on the safety of both types of storage mechanisms.

Q Do you have an understanding as to what initiatives could result from this study?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY,)
(98-126C) (Merow, S.J.), )
et al., )
)
Plaintiffs, )
)
vs. )
)
THE UNITED STATES, )
)
Defendant. )
)

full caption on page 3

DEPOSITION OF PATRICK MC DUFFIE
VOLUME I, PAGES 1 - 184
TAKEN ON
MONDAY, MARCH 18, 2002

VICTORIA MELEKIAN
CSR NO. 6996

Page 158

A. That did not come about. That's why there is a 5,500 MTU increase in total acceptance.
Q. What did not come about, the MRS facility and repository were operating together?
A. Yes; that's correct.
Q. So if you compare this table 2.1 to the previous one, there is a five-year delay in the commencement date reflected on the table; right?
A. Yes.
Q. But an increase from 18,600 metric tons as a receipt rate to 24,100?
A. Yes. The subliminal reason for that is certain utilities were starting to shut down reactors and they would have received priority and this would allow them to accept the fuel on a non contract basis if it was needed for additional storage capacity.
Q. Another change that I observe in the two tables is it appears that the ramp-up if you will, proceeds slightly more aggressively on the 1998 table.
A. Uh-huh.
Q. Do you know why that is?
MR. BANES: Objection as to form.
THE WITNESS: Okay. The assumption was the MRS and the repository would commence operation simultaneously. The MRS is a function of dollars that you want to spend

Page 159

for the receipt rate you want. The repository is limited in how fast they can get the stuff into the hole. The MRS and the facility, they could have stored 10,000 MTU per year if they wanted to pay the price because it's a transfer facility out of the garbage can into the tank out in the back. As long as you've got enough out in back, you can put it all out there in casks. So that's the beauty of the MRS.
BY MR. TOMASZCZUK:
Q. Sitting here today, do you recall any discussions with Mr. Brownstein about the data that's reflected on table 2.1 of this Exhibit 7?
A. Not really. The draft Mission Plan, that's the DOE position today. That's what we used. It could change tomorrow, the next day, we were used to that. We did the best we could in an engineering basis to accommodate the users with the capacity we expected to have on hand. You'll find that on a lot of the paragraphs, reference to plus or minus 20 percent and cask handling limitations.
Q. Yes.
A. We were all trying to be nice guys.
Q. Now, this document is dated June of 1988; right?
A. Yes.

Page 160

Q. And at this point in time, this utility group had been meeting; is that correct?
A. I think that's -- let's see if there is a reference to the meeting, the discussion of the makeup of the group or at least the responses. Yes. If you turn to page 10, please. Under section 4.0, the annual capacity report issue resolution process discussed the fact that we met with the utility user groups. Those days they were the UNWMG and the USCEA. I think we had -- I think there were only two utilities that didn't participate.
Q. That did not participate?
A. Yeah. I think one of them was Fort St. Varain, V-a-r-a-i-n. So that was the basis for our staff-to-staff technical discussions which resulted in working on things like Exhibit 2, issues identified in Exhibit 2 among other things. The things that I participated in related to Exhibit 2.
Q. Okay. All right.
MR. BANES: Off the record.
(A discussion was held off the record.)
BY MR. TOMASZCZUK:
Q. I'm returning to you another document. Let's get copies of this one marked as Mc Duffie 8.
(Mc Duffie Exhibit 8 was marked

Page 161

for identification by the reporter and is attached hereto.)
THE WITNESS: First comment about issue number 8.
BY MR. TOMASZCZUK:
Q. What is this document?
A. This document is labeled Office of Civilian Radioactive Waste Management 1989 Annual Capacity Report dated June 1989. However, this is not the published copy of this document. Because it has my line numbers. This was a draft which apparently was submitted to DOE headquarters. It may have been our final submission. The cover sheet is missing. The cover sheet would have draft working papers stamped on that about that long about an inch high.
Q. Did you have a role in the preparation of this document?
A. It is my impression that I prepared this draft. I have two cover sheets. Anybody need one?
Q. All right. This is one of the documents that government counsel had sent to you; is that right?
A. Yes. You can tell this is an edited version. It has editing marks. We used brackets and stars to indicate where changes were required.
Q. Are you referring to the cover page? The cover letter?

ERRATA SHEET FOR THE TRANSCRIPT OF:

Notice Date: April 3, 2002
Case Name: Yankee Atomic vs. United States
Dep. Date: March 18, 2002
Deponent: Patrick McDuffie
Place: Carlsbad, CA
Ref. No.: 4082-3

CORRECTIONS:

| Page | Line | Now Reads | Should Read | Reasons Therefore |
|---|---|---|---|---|
| 115 | 19 | commercial fuel | commercial spent fuel | correction |
| 127 | 7 | 18,000 pounds MTU | 18,000 MTU | correction |
| 129 | 8 | 10,000 depending | 10,000 MTU depending | correction |
| 129 | 16 | it's in the cask | it's accepted and in the cask | correction |
| 147 | 21 | Management Commission | Management Mission Plan | correction |
| 148 | 5 | Alan or to Billy | Alan or Dave to Billy | correction |
| 149 | 17++ | peeked (all places) | peaked | sp |
| 156 | 24 | draft 1998 | draft 1988 | correction |
| 157 | 5 | draft 1998 | draft 1988 | correction |
| 159 | 3 | MRS and the facility | MRS is a flexible facility | correction |
| 164 | 11 | 1998 Mission | 1988 Mission | correction |
| 165 | 11 | at that we | at that time we | correction |
| 170 | 17 | Mars? | Morris> | correction |
| 171 | 15 | be ten dats | be ten years | correction |
| 173 | 17 | DEI | EEI | correction |
| 176 | 3-7 | garbled garbage | Delete lines 3-7 | garbled |
| 177 | 6 | MTU for the | MTU before the | correction |
| 178 | 13 | repository cycle by | repository site by | correction |

Signature of Deponent

04/12/02

Date of Signature

**JURAT**

State of California
County of San Diego } ss.

Subscribed and sworn to (or affirmed) before me this 10th (Date) day of April (Month), 2002 (Year), by

(1) Patrick McDuffie
Name of Signer(s)

(2) ______________________
Name of Signer(s)

Theresa L. Siaca
Signature of Notary Public

MGC1 THERESA L. SIACA COMM. # 1177332 NOTARY PUBLIC-CALIFORNIA SAN DIEGO COUNTY COMM. EXP. APRIL 20, 2002 MGC1 — THE GREAT SEAL OF THE STATE OF CALIFORNIA

**OPTIONAL**

*Though the information in this section is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: Errata Sheet

Document Date: March 18, 2002 Number of Pages: one

Signer(s) Other Than Named Above: none

**RIGHT THUMBPRINT OF SIGNER #1**
Top of thumb here

**RIGHT THUMBPRINT OF SIGNER #2**
Top of thumb here

© 1998 National Notary Association • 9350 De Soto Ave., P.O. '02 • Chatsworth, CA 91313-2402 Prod. No. 5914 Reorder: Call 1-800-876-6827

HQX.890227.0052

# OFFICE OF CIVILIAN RADIOACTIVE WASTE MANAGEMENT

## 1989 ANNUAL CAPACITY REPORT

June 1989



DEPOSITION EXHIBIT 8

DB0000465

HQX.890227.0052

# OFFICE OF CIVILIAN RADIOACTIVE WASTE MANAGEMENT

## 1989 ANNUAL CAPACITY REPORT

June 1989

This Annual Capacity Report (ACR) is the [*** delete second ***] [*** add third ***] in a series to be published by the Department of Energy. The report, required by the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, provides, for planning purposes, the latest estimate of projected annual receiving capacity and an annual acceptance ranking for the first 10 years of waste management system operation. The projections in this year's ACR are based on the [*** delete Draft 1988 in all occurrences ***] [*** change to 1989 Mission Plan Amendment ***] issued in [*** delete June 1988,***] [*** add date of Amendment ***] in conformance with the changes mandated by the Nuclear Waste Policy Amendments Act of 1987.

I want to thank Contract holders for their positive response to the Department's offer [*** delete in the 1987 ACR ***] to work cooperatively in identifying and resolving Contract-related issues. The Department fully supports this effort. As the waste management system evolves, we will need to move forward in this same spirit of cooperation to ensure that the decisions that are made reflect, to the extent possible, the interests of all parties to the Contract.

Charles E. Kay, Acting Director
Office of Civilian Radioactive
Waste Management
[*** verify signatory ***]

1264:1 IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TENNESSEE VALLEY AUTHORITY, )
Plaintiff, ) Case No. 01-249C
v. )
THE UNITED STATES, )
Defendant. )

Courtroom 4
National Courts Building
717 Madison Place NW
Washington, D.C.

Monday, July 11, 2005
Volume 7

The parties met, pursuant to the notice of the Judge, at 9:32 a.m.

BEFORE: THE HONORABLE CHARLES F. LETTOW

2188:1

MS. SULLIVAN: We are, Your Honor.

MR. LO RE: Your Honor, I wondered if maybe we could just take a very quick break while we set up and if we could reconnoiter here momentarily?

THE COURT: Yes, in fact, we'll go off the record for a minute. Everyone can stay, or they may leave. It's up to them.

MS. SULLIVAN: Thank you, Your Honor.

(Whereupon, a short recess was taken.)

MS. SULLIVAN: Your Honor, Ms. Heide Herrmann is with Mr. Morgan in Los Alamos. She's a member of our office. Just to speed things along, may I ask, Ms. Herrmann, could you make sure the following exhibits are easily accessible for Mr. Morgan: The binder containing Defendant's Exhibit 5, the separate documents Defendant's Exhibit 5.034, 5.063, Defendant's Exhibit 28, Defendant's Exhibit 27, and Defendant's Exhibit 37.

Do you have all those documents?

MS. HERRMANN: Yes, I believe I do.

(Discussion off the record.)

THE COURT: Ms. Sullivan, would you formally call Mr. Morgan as a witness?

MS. SULLIVAN: Yes, Your Honor. The government calls Robert L. Morgan as its next

2189:1 witness.

THE COURT: Mr. Morgan, I'm authorized by statute and rule to administer the oath to you by this remote means, if you're testifying by video conference. If I give you the oath, will you respond, please?

THE WITNESS: Yes, I will respond.

THE COURT: All right, thank you.

Whereupon--

ROBERT MORGAN

a witness, called for examination, having been duly sworn, was examined and testified as follows:

THE WITNESS: I do.

THE COURT: Would you please state your full name for the record?

THE WITNESS: Robert L. Morgan.

THE COURT: Thank you, Mr. Morgan. And, Ms. Sullivan, you may proceed.

MS. SULLIVAN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q. Mr. Morgan, when did you serve as the director of what became known as the Office of Civilian Radioactive Waste Management?

A. From late January 1983 until sometime in

2190:1 January of 1984.
Q. And was the office called by a different name when you first became director?
A. Yes, it was a different name.
Q. And do you recall that name?
A. It was the Nuclear Waste Project Office, as I recall.
Q. Mr. Morgan, how were you selected to be the director?
A. I was selected by Secretary Hodel.
Q. And as director, to whom did you report?
A. To the Secretary.
Q. How many years were you with the Department of Energy and its predecessor agencies?
A. I joined the Atomic Energy Commission in 1965 and retired in 1988.
Q. Mr. Morgan, do you hold a Bachelor's degree?
A. Yes, I do.
Q. And from where?
A. The United States Military Academy.
Q. When was that degree conferred?
A. 1952.
Q. And in what subject is that degree?
A. Military engineering.

2191:1

Q. Mr. Morgan, do you also hold a Master's degree?
A. Yes, I do.
Q. And where did you obtain that Master's degree?
A. From MIT.
Q. And when was that degree conferred?
A. 1959.
Q. And what subject is your Master's degree?
A. I have a Master's degree in civil engineering and a Master's degree in nuclear engineering.
Q. Mr. Morgan, did you serve in the Army?
A. Yes, I did.
Q. For how long?
A. 13 years.
Q. And after you left the Army, where were you first employed?
A. At the Savannah River operations office at the Atomic Energy Commission.
Q. Would you please summarize briefly your positions from the time you joined the Atomic Energy Commission until the time you retired from the Department of Energy?
A. From 1965 to 1966, I was division director

of the heavy water organic pool reactor program at Savannah River. 1966 to 1973, I was the senior site representative at Canoga Park, adjoining to the national core of the reactor development and technology division of the Atomic Energy Commission. '73 to 1980, I was deputy manager of the Savannah River operations office. And then in 1980, I was selected as manager of the Savannah River operations office.

Q. And did you remain the manager of the Savannah River operations office until you retired in 1988?

A. Yes, though I had some details in Washington with the Nuclear Waste Policy Act and also the Assistant Secretary for defense programs.

Q. Mr. Morgan, how have you been employed since you retired from the Department of Energy in 1988?

A. Could you repeat the question, please?

Q. Yes. How have you been employed since you retired from DOE in 1988?

A. From 1988 until 1990, I did consulting with various companies that were doing business with the Department of Energy. And then in 1990, I joined an 8A firm called Mesa, which was doing environmental

2193:1 impact statements for the Department of Energy. I left there in 1995. And then since 1995, I have been in consulting again.

Q. Thank you. Mr. Morgan, what was accomplished during your year as director of the Office of Civilian Radioactive Waste Management?

A. The first activity was the notification of the governments that were affected in the program. They had, there was a requirement within the Nuclear Waste Policy Act that they be notified. The second thing was regarding the contract with the utilities. The Federal Register notice had been sent out as the draft, it actually got to the Federal Register after I had arrived, but I had not seen it when it was transmitted to the Federal Register.

We resolved the comments from that and published the final ruling for the contract. We then started into the mission plan, which was to try to integrate all the activities of the repository, the monitored retrievable storage and transportation activities that would be required over the Act.

Q. Thank you. I think you just said the answer to this next question, but let me ask it again. What was the status of the development of the standard contract when you arrived at the Office of

2194:1 Civilian Radioactive Waste Management?

A. There had been a draft of that contract submitted to the Federal Register, and then we received comments on that draft, and then --

THE COURT: Mr. Morgan, we're making an adjustment, so we don't get feedback on your voice transmission. It'll just take a moment. I think we'll be fine now, Ms. Sullivan.

MS. SULLIVAN: Thank you, Your Honor.

BY MS. SULLIVAN:

Q. Mr. Morgan, let me ask the question again, what was the status of the development of the standard contract when you arrived to be director of the Office of Civilian Radioactive Waste Management?

A. When I arrived or accepted the position in Washington, the draft of the contract had already been transmitted to the Federal Register for publication. After it was published, we received comments from the utilities and the states and other interested parties, and then we resolved those comments and submitted the final ruling to the Federal Register.

Q. Do you recall meeting with utility representatives prior to the publication of the final standard contract?

2195:1
A. Yes.
Q. With whom did you meet?
A. I met with representatives of Edison Electric Institute and several of the utility members of EEI and, I believe, several states.
Q. And what did you discuss in your meeting with EEI?
A. They felt very strongly that the contract should include a rate of acceptance beginning in 1998, which we denied.
Q. And what did you discuss in your meeting? Actually, let me back up. You testified that you met with several of the utilities. Were there several meetings that you had with individual utility representatives?
A. Primarily, there was a, as I recall, a meeting at EEI where several of the utilities were present, and I met also with General Electric and Westinghouse, and I'm not sure of how many other utilities we met with.
Q. And briefly, what was the issue that you discussed? Do you recall what the issue was that you discussed with GE and Westinghouse?
MR. SMALL: Objection, Your Honor, I don't understand how these discussions are relevant to this

2196:1 lawsuit, and they're hearsay.

THE COURT: Well, let's sort out relevance first. Ms. Sullivan?

MS. SULLIVAN: Your Honor, my questions are geared to the period of contract formation, meetings and input that DOE had with regard to the final standard contract and what inputs there were to that document. I understand that the standard contract is at issue in this case and what terms were and were not negotiated during the period of contract formation is my question about meetings held with utilities.

THE COURT: Mr. Small, do you have anything further?

MR. SMALL: Your Honor, the question in this case would be whether such a term was negotiated with TVA.

THE COURT: Liability has been established. However, we do have a rate issue in the case that has been raised regarding damages, so I'm going to take the testimony. Now, since we are past the relevance objection, Mr. Small, do you have something further that you'd care to add?

MR. SMALL: Additionally, Your Honor, I also had an objection on the grounds of hearsay

2197:1 because I anticipated that the witness was being asked what was said at a meeting that occurred many, many years ago.

THE COURT: Well, if Mr. Morgan were to answer that a certain person said a certain thing, which would be absolutely remarkable at this time, that would be hearsay. If he relates what he now believes to be the gist of the meetings and the points or objections that were posed, that's a different matter, that's not hearsay. And so with that as a general guide, let's go forward. Ms. Sullivan?

MS. SULLIVAN: Thank you, Your Honor, and I will tailor my question to the Court's guidance. Thank you.

BY MS. SULLIVAN:

Q. Mr. Morgan, you testified that you met with GE and Westinghouse. Do you recall the topics that were discussed during that meeting?

A. The topic that were discussed were charges relating to fuel prior to the establishment of the 1 mil per kilowatt hour. The problem was that GE's fuel did not have the irradiation that Westinghouse did, and therefore, there was going to be more fuel elements from GE submitted per kilowatt hour than

2198:1 there was from Westinghouse.

So we were trying to formulate a way to make it an equitable cost for both GE and Westinghouse. This is the fuel that existed prior to the establishment of the 1 mil per kilowatts. The average of the expenses to GE and Westinghouse had to be an average of 1 mil per kil watt for the aggregate of that fuel.

Q. Thank you, Mr. Morgan. Turning back to what you recall about your discussions regarding the rate of acceptance, I believe you testified that the request of the utilities with regard to the rate of acceptance was rejected. Why was the request rejected?

A. The Nuclear Waste Policy Act was a series of requirements that I felt were extremely difficult to meet. There were many technical unknowns, what would be the licensing requirements from NRC, what would be the characterization requirements of a repository, and that there was the potential intervention by some of the stakeholders.

But I felt that there was a potential that Congress may change the law which, in effect, they did at a later point in time. So I felt it was absolutely impossible or incomprehensible that I

2199:1 would agree to an acceptance rate with all these unknowns. I felt that that would be just absolutely inappropriate.

Q. Mr. Morgan, do you have the exhibits that comprise Defendant's Exhibit 5 before you?

MS. SULLIVAN: Ms. Herrmann, could you provide those exhibits to Mr. Morgan? Your Honor, this is a binder that's been provided to the Court.

THE WITNESS: Yes, I have.

MS. SULLIVAN: Thank you. And, Your Honor, we elected not to use the Trial Director because, if we did do that, we would lose Mr. Morgan's picture.

BY MS. SULLIVAN:

Q. So, Mr. Morgan, did you have an opportunity to review the stack of materials that's been placed in front of you prior to before we began today?

A. This entire record was transmitted to me by e-mail yesterday, and I spent last evening and a little time this morning going through these records.

Q. Mr. Morgan, do you recognize the set of documents before you to be the administrative record to the standard contract?

A. Yes, I do.

Q. Do you recall receiving these documents in the course of the development of the standard

# COPY OF TRANSCRIPT

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY
CONNECTICUT YANKEE ATOMIC POWER COMPANY
MAINE YANKEE ATOMIC POWER COMPANY
FLORIDA POWER & LIGHT COMPANY
NORTHERN STATES POWER COMPANY
DUKE POWER, A Division of DUKE ENERGY CORP.
INDIANA MICHIGAN POWER COMPANY
SACRAMENTO MUNICIPAL UTILITY DISTRICT
SOUTHERN NUCLEAR OPERATING COMPANY, et al.
COMMONWEALTH EDISON COMPANY
BOSTON EDISON COMPANY
GPU NUCLEAR, INCORPORATED WISCONSIN
ELECTRIC POWER COMPANY
POWER AUTHORITY OF THE STATE OF NEW YORK
OMAHA PUBLIC POWER DISTRICT
NEBRASKA PUBLIC POWER DISTRICT
TENNESSEE VALLEY AUTHORITY,

Plaintiffs,

vs. Case Nos. 98-126C, 98-154C, 98-474C
98-483C, 98-484C, 98-485C
98-486C, 98-488C, 98-614C
98-621C, 99-447C, 00-440C
UNITED STATES, 00-697C, 00-703C, 01-115C
01-116C, 01-249C

DEFENDANT.

---

VOLUME I
DEPOSITION OF ROBERT M. ROSSELLI
Taken on behalf of Sacrament Municipal Utility District
April 15, 2002
- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 15, 2002, commencing at the hour of 9:34 a.m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington.

Q. You mentioned that one of the things you worked on initially was the development of the standard contract. What was your role in the development of that contract?

A. I was the head of, let me call it a special project team, that had responsibility to see that the contract was developed in the time frame specified in the contract that would allow sufficient time for the utilities to, you know, be able to review and sign it.

Q. Special contract team. Who else was on that team?

A. There were two other individuals that were party to the team. Mr. Jay Cavanaugh who was from the office of procurement, and a Mr. Elliott Winneck, who was from the office of chief counsel.

Q. Who established the team?

A. I did, to what I remember.

Q. When did you begin working on the contract?

A. To the best of my knowledge, there -- well, I guess I don't remember the exact time frame we started working on it.

Q. Let me ask this. I'll represent to you

ORIGINAL



IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - x

Washington, D.C.
Thursday, April 22, 1999

Continued deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 2:10 p.m., Thursday, April 22, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

fuel that earned you the slot.

So simply going to the APR and drawing a line at 300 MTU wasn't a good way of predicting what you were likely to get, because people who had older plants might decide to put their older plant's fuel in dry storage and might want to empty the pools at some of the younger plants.

So the DCS was intended to provide us with an indication of the age of the fuel, the location of the fuel. Multiplant utilities could deliver from any site as long as they met the conditions established in the standard contract.

So it wasn't as clear as looking at the APR. The DCS was intended to provide a little bit more sound information for planning purposes.

Q. Focusing just on quantity then, the DCS was not intended to indicate what quantity the utility really wanted to deliver, it was limited to the allocation provided in the APR?

A. Right. Now, theoretically they could have delivered -- they could have said, jeez, I don't want to disrupt my operations and I'm not going to deliver at all. But they could not ask for -- they could not have more than what they

were allocated because of the equity issue. There's only so much system capacity. If I accept more from someone else, I accept less from someone else.

Q. And then briefly I want to point your attention to the next sentence on page 2 of Slater Exhibit 20 that says they have the contractual right to exchange allocations with other interested utilities, what was that referring to?

A. That's the DCS exchanges. They have the contractual right to exchange their slot in the queue with someone else in the queue and conceivably either obtain the ability to deliver in a year in which they weren't originally scheduled to deliver or obtain the ability to deliver more than they were scheduled to deliver.

Q. And so the availability of the right to exchange was being offered to the director of the program as another justification as to why it was appropriate to deny the priority request that Yankee Atomic was making, because they had the right to accomplish what they wanted through the exchange process?

A. Yes.