IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENERGY NORTHWEST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-10C |
| | ) | (Chief Judge Damich) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSES TO PLAINTIFF'S PROPOSED
FINDINGS OF UNCONTROVERTED FACT

Pursuant to Rule 56(h)(2) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits this response to plaintiff's proposed findings of uncontroverted fact.

INTRODUCTION

Plaintiff's proposed findings of fact are not proposed findings of "fact" at all. As the Court is aware, the plaintiff in this case, Energy Northwest, has submitted extensive proposed findings of fact, many of which contain multiple subparts and subparagraphs (with some subparagraphs numbering (a) through (v)). We have made a concerted effort to respond to each of Energy Northwest's proposed findings, regardless of whether they address an issue of fact or, in reality, address solely an issue of law. As a result, although our responses to Energy Northwest's proposed findings are lengthy, relatively few of the proposed findings or the responses relate to factual matters relevant to the Court's inquiry:

- Approximately 35 of Energy Northwest's proposed findings contain Energy Northwest's quotation of a statutory provision, a regulation, or a contractual provision, as evidenced by Nos. 1, 7, 12, 13, 15, 19, 20, 23, 24, 25, 26, 27, 28, 31, 32, 33, 34, 38, 42, 52, 54, 55, 56, 57, 59, 60, 61, 62, 102, 103, 104, 105, 106, and 107 of Energy Northwest's proposed findings;

- Approximately 13 of Energy Northwest's proposed findings reference Energy Northwest's interpretation of the terms of the Standard Contract (a matter which is not factual but is instead a matter of law for the Court), as evidenced by Nos. 39, 43, 45, 46, 47, 48, 51, 55, 72, 73, 128, 129 and 137 of Energy Northwest's proposed findings;

- Approximately 11 of Energy Northwest's proposed findings relate to deposition testimony regarding the "intent" of Congress in enacting the NWPA (which, again, is completely irrelevant in interpreting the statute), as evidenced by Nos. 2, 6, 22, 28, 95, 96, 98, 100, 108, 122, and 131 of the proposed findings;

- Approximately 14 of Energy Northwest's proposed findings of "fact" quote or cite to the legislative history of the NWPA to support Energy Northwest's proposed interpretation of the Act, as evidenced by Nos. 4, 5, 7, 8, 9, 10, 11, 14, 16, 17, 18, 21, 29, and 30 of the proposed findings, which, once again, are not "factual" matters that can create a genuine issue of material fact;

- Approximately 31 of Energy Northwest's proposed findings relate to testimony regarding or documents describing DOE's plans, hopes, and goals for its program of SNF and HLW disposal, which were never incorporated into the Standard Contract as commitments, as evidenced by Nos. 58, 63, 64, 65, 66, 67, 68, 69, 70, 73, 74, 75, 76, 80, 81, 82, 83, 84, 86, 92, 94, 99, 101, 109, 110, 116, 119, 120, 121, 122, and 123, of Energy Northwest's proposed findings, all of which are irrelevant to establish the meaning of the Standard Contract absent some incorporation into the Standard Contract of those plans, hopes, and goals, see National By-Products v. United States, 186 Ct. Cl. 546, 558-59, 405 F.2d 1256, 1263 (1969);

- Approximately 14 of Energy Northwest's proposed findings relate to Energy Northwest's new legal position that the NWPA required DOE to have an operational repository available in 1998, as evidenced by Nos. 82, 87, 89, 112, 113, 114, 121, 122, 163, 164, 167, 168, 169 and 170 of Energy Northwest's proposed findings, all of which are irrelevant to determining this legal issue.

In fact, the bulk of Energy Northwest's proposed findings of "fact" are wholly improper because matters of legal interpretation do not and cannot create genuine issues of material fact. Energy Northwest's extensive and repeated citations to deposition testimony of individuals in its proposed findings about Congress' "intent" in enacting the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. § 10101-10270, are absolutely ridiculous, given that deposition testimony is a completely inappropriate and irrelevant means of identifying congressional intent. See Selman v. United States, 204 Ct. Cl. 675, 685 n.6, 498 F.2d 1354, 1359 n.6 (1974) (affidavit of a United States Senator concerning particular legislation was "without evidentiary value" because "no member of a legislature, outside of the legislature, is empowered to speak with authority for that body"). Similarly, Energy Northwest's extensive citation to deposition testimony of individuals not involved in the process of promulgating the Standard Contract to establish the "intent" of the drafters of the Standard Contract is, again, completely irrelevant to any proper manner of regulatory or contract interpretation. See Honeywell, Inc. v. United States, 228 Ct. Cl. 591, 595, 661 F.2d 182, 185 (1981); see also Castle v. United States, 301 F.3d 1328, 1337 (Fed. Cir. 2002) ("[c]ontract interpretation is a question of law"); United States v. Boeing Co., 802 F.2d 1390, 1393 (Fed. Cir.1986) ("[t]he interpretation of regulations which are incorporated into government contracts is a question of law which this court is free to resolve"). Further, although Energy Northwest has proposed numerous findings of fact regarding the Department of Energy's planning goals based upon DOE's planning documents, including the Mission Plan and its drafts, Fee Adequacy Studies, and repository design documents, none of those documents contain requirements that have been made contractual obligations, rendering them irrelevant to a proper interpretation of the Standard Contract. See National By-Products, 186 Ct. Cl. at 558-59, 405

F.2d at 1263. As we establish in our reply brief, the only documents relevant to the determination of the schedule of SNF acceptance developed pursuant to the Standard Contract are the Annual Capacity Reports ("ACRs"), Annual Priority Rankings ("APRs"), and the delivery commitment schedules ("DCSs") that Energy Northwest submitted and that the Department of Energy ("DOE") approved. Other proposed findings, though extensively detailed, are wholly irrelevant to the only relevant issues presented by the Government's motion for summary judgment: the schedule for SNF acceptance that has been developed in the dealings between the parties, upon which the Court may premise the award of damages flowing from DOE's delay in accepting SNF and/or HLW pursuant to the Standard Contract.

In fact, there appear to be only approximately 29 proposed findings of fact, out of the more than 200 proposed findings and the numerous subparts and subparagraphs (some of which include subparagraphs (a) through (v)) within those proposed findings, that are not pure legal conclusions and that have any relevance to the issues raised in the Government's motion for summary judgment. Further, of those proposed findings, they relate almost exclusively to the mechanics of the Government's issuance of Annual Capacity Reports, to Energy Northwest's submission of DCSs, and to the Government's action upon Energy Northwest's DCS submissions. Those proposed findings of fact – the only ones to which the Court should properly refer – are Nos. 35, 36, 39, 40, 41, 44, 45, 81, 125, 127, 134, 135, 136, 137, 138, 148, 149, 151, 173, 174, 175, 176, 177, 178, 179, 180, 181, and 188 of Energy Northwest's proposed findings. For the reasons explained above and in our responses to the individual proposed findings, the remainder of Energy Northwest's proposed findings simply increase the size of the parties' pleadings, without adding any relevant factual evidence or contentions to this case.

If the Court were to remove all of the proposed findings that relate to a legal conclusion or that are irrelevant to the pending motion, the Court would find that there is no dispute as to the only facts that are relevant to the issue presented in our motion for summary judgment. In light of Energy Northwest's reference to portions of deposition testimony and portions of documents to support its proposed findings, taken out of context, the Government's response is, by necessity, voluminous, numbering more than 480 pages in length. In preparing its proposed findings, Energy Northwest must have been aware that the Government's response would have to be thorough and lengthy, which, based solely upon the size of the parties' pleadings, would it appear as though disputed issues of fact exist in this matter. We urge the Court to look beneath the volume of the parties' filings because the lengthy proposed findings of "fact" that Energy Northwest has submitted generally do not relate to "facts" at all, but instead seek to paper the record with legal conclusions and interpretations of law disguised as "fact" or, instead, relate to matters that are wholly irrelevant to the issues in the Government's motion for summary judgment. The remainder need not be considered by the Court, and the sheer volume of the proposed findings and their responses should not dissuade the Court from deciding, as a matter of

law, that the SNF acceptance schedule that has already been established by the parties pursuant to the Standard Contract governs the Court's award of damages in this matter.

GENERAL OBJECTIONS

Rule 56(h)(1) contemplates that a party's proposed findings of uncontroverted fact shall "set[] forth all of the material facts upon which the party bases its motion and as to which the party believes there is no genuine dispute." RCFC 56(h)(1). Plaintiff, Commonwealth Edison Company ("Energy Northwest"), has submitted proposed findings that include argument pertaining to matters of law. To the extent that Energy Northwest's proposed findings advance legal arguments or are conclusions of law, we object to such proposed "findings" upon the ground that they are outside the scope of RCFC 56(h)(1) and (2). RCFC 56(h)(2) does not require the Government to respond to Energy Northwest's legal arguments in response to Energy Northwest's proposed findings of fact. To the extent that we provide a specific response to matters of law raised in Energy Northwest's proposed findings, we do so for the convenience of the Court, without waiving our general objection.

Courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001) ("The requirement of Rule 56(e) that affidavit testimony be competent and admissible evidence applies with equal force to deposition testimony.") Numerous findings of fact proposed by Energy Northwest rely upon deposition testimony that was the subject of one or more objections. Although we have noted this fact in our responses to specific proposed findings, we also provide the Court with this general objection given the frequency of the problem.

Additionally, pursuant to the Rules Committee Note to RCFC 56(h), and for the convenience of the Court, we have included each proposed finding and our response on a separate single page.[1]

DEFENDANT'S RESPONSES

**I. Congress Passes The Nuclear Waste Policy Act Of 1982.**

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant agrees that Congress passed the Nuclear Waste Policy Act of 1982.

1. On January 7, 1983, after being signed by President Reagan, the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub. L. 97-245, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270 (1982)) was enacted.

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. "The United States Statutes at Large shall be legal evidence of laws . . . therein contained, in all the courts of the United States . . .," 1 U.S.C. § 112, and the judicial knowledge that arises from the Statutes at Large includes the time and date of a statute's enactment. See United States v. Casson, 434 F.2d 415, 417-18 (D.C. Cir. 1970). Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of law as to which evidence in contravention of the Statutes at Large is inadmissible. Without waiving this objection, defendant admits the allegations contained in this proposed

[1] Although the text of Rule 56(h)(2) does not appear to require a particular format, we note that the Rules Committee Note states, in pertinent part, ". . . and to require parties to express their views on any particular fact by noting them on a single page, . . . ."

finding to the extent that they are supported by the cited public law contained in the Statutes at Large, which is the best evidence of its contents; defendant otherwise denies the allegations contained in this proposed finding. Defendant specifically avers that plaintiff's reference to Public Law No. 97-245 is incorrect and that the correct Public Law Number is 97-425.

2. The NWPA provided a framework for the safe, permanent disposal of the wastes of nuclear power generation by the Federal Government, an obligation which the Federal Government had recognized since the passage of the Atomic Energy Act of 1954. (*See* 5/20/02 Lawrence Dep. at 53[2], ENA at 638;[3] 5/16/02 Rusche Dep. at 45-46[4], ENA at 866-67; Robert Morgan, Remarks Before the International Atomic Energy Agency, at 3 (October 12, 1983), ENA at 1052, 1054; 3/22/02 Morgan Dep. at 231-39[5], ENA at 766-768; 128 Cong. Rec. 26,317 (1982) (Representative Skeen), ENA at 203; 128 Cong. Rec. 8,002 (1982) (Senator McClure),

---

[2] Michael Lawrence worked for DOE in various positions from 1977-1990, including as Director, Spent Fuel Storage and Transport (1977-80), Deputy Director, Program for Geologic Disposal Storage and Disposal (1981-83), Deputy Director, Nuclear Waste Policy Act Implementation Office ("NWPAIO") (1983-84), and Acting Director, Office of Civilian Radioactive Waste Management ("OCRWM") (1984). As Deputy Director of NWPAIO and Acting Director of OCRWM, Mr. Lawrence was responsible for the DOE's initial implementation of the NWPA following its passage in 1983. (*See* 5/20/02 Lawrence Dep. at 24-27, 33-37, ENA at 632-33, 634-35.)

[3] Materials in Energy Northwest's Appendix are cited as "ENA at __." Materials in the Government's Appendix are cited as "GA at __." Citations to ENPF are cross references to other proposed findings in Energy Northwest's Proposed Findings of Uncontroverted Fact.

[4] Benjamin Rusche was the Director, OCRWM, Department of Energy, from 1984-1987. Mr. Rusche was the first politically-appointed DOE OCRWM Director. As Director, Mr. Rusche was responsible for implementing the NWPA and all aspects of the DOE's waste management program. (*See* 5/16/02 Rusche Dep. at 35-49, ENA at 864-67.)

[5] Robert Morgan was the Director, Nuclear Waste Policy Act Project Office, Department of Energy from 1983-84. Mr. Morgan was responsible for the DOE's initial implementation of the NWPA, establishment of program strategy and direction, and for development of the Standard Contract. (*See* 3/21/02 Morgan Dep. at 17, 24-27, ENA at 741, 742-43.)

ENA at 132; *see also* 42 U.S.C. § 7133(a)(8)(C) (providing for the creation of the Department of Energy with responsibility for "the establishment of temporary and permanent facilities for storage, management, and ultimate disposal of nuclear wastes"), ENA at 78-79.)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Further, defendant objects to plaintiff's attempt to support its interpretation of a law and to congressional intent by reference to deposition testimony and post-enactment statements of individuals. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of statutory interpretation as to which deposition testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms"). Defendant also objects to plaintiff's reference to the individual statements of legislators about drafts of the Nuclear Waste Policy Act to define the NWPA's meaning, given that legislative history is easily "created by advocates of one position or the other during the legislative process who did not get their views into the statutory language, and also is why it is so frequently a waste of time to use it to construe the statute." Hoonah Indian Ass'n v. Morrison, 170 F.3d 1223, 1228 (9th Cir. 1999). Any effort to discover the purposes behind the NWPA through testimony and individuals' statements is particularly inappropriate here, where Congress expressly identified, in the language of the NWPA itself, the purposes of the Act. See 42 U.S.C. § 10131. Finally, defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving these objections, defendant admits the allegations contained in this proposed finding to the extent that they are supported by the Nuclear Waste Policy Act, which is the best evidence of its contents; defendant otherwise denies the allegations contained in this proposed finding. Defendant avers that the proposed finding is wholly unsupported by the documents, testimony, or statements cited to support plaintiff's proposed interpretation of the NWPA.

3. A governmental solution to the nuclear waste problem had become urgent in the 1970s after President Carter issued an executive order in 1977 that effectively halted reprocessing of spent nuclear fuel by private industry. (13 Weekly Comp. Pres. Doc. 502, 503 (1977), ENA at 82; *see also* H.R. Rep. No. 97-785, pt.1, at 46-47 (1982), ENA at 181-82; 3/18/02 McDuffie Dep. at 36-37[6], ENA at 682.)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Further, to the extent that plaintiff is attempting to use this proposed finding of fact to define the meaning of the NWPA, defendant further objects to the proposed finding because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Without waiving these objections, the Government disagrees with this proposed finding. The cited documents do not establish that there was an urgent need for a "governmental solution" to the wastes from non-military nuclear power generation.

---

[6] Patrick McDuffie was the Principal Investigator for Pacific Northwest Laboratories ("PNL"), a DOE Contractor, from 1978-1995. Mr. McDuffie was responsible for work on the Civilian Radioactive Waste Management Program conducted at PNL, including analysis of the Standard Contract. (*See* 3/18/02 McDuffie Dep. at 12-21, ENA at 675-77.)

4. Discussing the purpose of an early version of the NWPA, one House of Representatives report stated: "When many of the nuclear power plants operating today were designed in the mid-1960s and early 1970s, their designers assumed that spent fuel would be 'reprocessed'. . ." (H.R. Rep. No. 97-785, pt.1, at 46-47 (1982), ENA at 181-82; *see also* 3/18/02 McDuffie Dep. at 36-37, ENA at 682.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment; the report on a bill that was never enacted is not probative of the issues involved in this case. Defendant also objects to plaintiff's characterization of this proposed finding as a proposed "fact" which could become a genuine issue of material fact, as the Court is entitled to take judicial notice of the contents of the House report. Carolene Prods. Co. v. United States, 323 U.S. 18, 27 (1944). Defendant also objects to the reference to deposition testimony to attempt to support the proposed finding that the House report contained the quoted language; because the contents of congressional reports are a matter of public record, reliance upon individuals' deposition testimony either to prove or to disprove the contents of such reports is impermissible, particularly from, in this instance, a witness who had no involvement with the enactment of the NWPA or the development of any prior legislation similar to the NWPA.

Without waiving these objections, defendant agrees that the quoted language is contained in the congressional report cited.

5. The end of reprocessing effectively left utilities with no place to store spent nuclear fuel other than in storage pools at reactor sites. As the same House report stated:

> No reprocessing facility or repository is currently operating, so spent fuel is accumulating in the storage pools at the site of

> reactors. The storage pools at many reactors are approaching the limits of their original design. Without a place in which a utility can store spent fuel bundles, which must be done on average once a year during refueling, operation of the reactor must terminate.

(H.R. Rep. No. 97-785, pt.1, at 47 (1982), ENA at 182.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment; the report on a bill that was never enacted is not probative of the issues involved in this case. Defendant also objects to plaintiff's characterization of this proposed finding as a proposed "fact" which could become a genuine issue of material fact, as the Court is entitled to take judicial notice of the contents of the House report. Carolene Prods. Co. v. United States, 323 U.S. 18, 27 (1944).

Without waiving these objections, defendant agrees that, with regard to the second sentence of the proposed finding, the quoted language is contained in the congressional report cited. However, with regard to the first sentence of this proposed finding, defendant disagrees with plaintiff's characterization of the language contained in the congressional report, disagrees with plaintiff's assertion that the "end of reprocessing effectively left utilities with no place to store spent nuclear fuel other than in storage pools at reactor sites;" and represents that plaintiff has not identified any evidence to support the first sentence of its proposed finding.

6. The NWPA sought to address the problem of spent nuclear fuel accumulation by creating a government program for disposal of the waste to: (1) ensure that the accumulation of waste at utility reactor sites would not interfere with electricity generation or result in premature shutdown of nuclear reactors; and (2) prevent any delay in decommissioning reactor sites after their scheduled shut down. (3/21/02 Morgan Dep. at 198, ENA at 759; Rusche Dep. at 377,

ENA at 881; 4/23/02 Barrett Dep. at 475, ENA at 419; 5/2/02 Milner Dep. at 273-74[7], ENA at 706-07.)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Further, defendant objects to plaintiff's attempt to support its interpretation of a law and to congressional intent by reference to deposition testimony of individuals who were not involved in the enactment of the NWPA. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of statutory interpretation as to which deposition testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms"). Any effort to define the purposes behind the NWPA through individuals' testimony is particularly inappropriate here, where the Congress expressly

---

[7] Ronald Milner began working for DOE in the Office of Civilian Radioactive Waste Management in 1984. At both the time of his deposition and when he testified in *Yankee Atomic Electric v. United States*, Mr. Milner was the Chief Operating Officer for the DOE Civilian Radioactive Waste Management Program. Mr. Milner has been employed in a variety of positions including: (a) Branch Chief, OCRWM (1984), where he was responsible for DOE's total system life cycle cost analysis, fee adequacy analysis, and preparation of the OCRWM Mission Plan, (b) Division Director, Budget and Project Management, OCRWM (1984-90), where he was responsible for DOE's OCRWM program budget, tracking costs, and project schedules, (c) Manager, Monitored Retrievable Storage Team, OCRWM (1990-92), where he was responsible for development of a Monitored Retrievable Storage facility, (d) Director, Office of Storage and Transportation, OCRWM (1992-94), where he was responsible for management of the DOE storage effort, (e) Director, Office of Program Management and Integration, OCRWM (1994-95), where he was responsible for the DOE OCRWM program budget, tracking costs, and project schedules, (f) Acting Deputy Director for the DOE Civilian Radioactive Waste Management Program (1995-99), and Chief Operating Officer for the DOE Civilian Radioactive Waste Management Program (1999 to the present). (*See* 8/11/04 Milner Testimony in *Yankee Atomic Electric v. United States*, at 4712, ENA at 738; 5/1/02 Milner Dep. at 11-12, 15-24, ENA at 691, 692-94.)

identified, in the language of the NWPA itself, the purposes of the Act. See 42 U.S.C. § 10131. Defendant further objects that the individuals whose deposition testimony is cited lack the proper foundation to testify regarding the purposes of the NWPA. Defendant also objects that the proposed finding is not supported by the deposition testimony cited.

Without waiving these objections, defendant disagrees with this proposed finding. As expressly stated in the statute itself, the purposes of the NWPA are the following:

> (b)(1) to establish a schedule for the siting, construction, and operation of repositories that will provide a reasonable assurance that the public and the environment will be adequately protected from the hazards posed by high-level radioactive waste and such spent nuclear fuel as may be disposed of in a repository;
>
> (2) to establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent fuel;
>
> (3) to define the relationship between the Federal Government and the State governments with respect to the disposal of such waste and spent fuel; and
>
> (4) to establish a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.

42 U.S.C. § 10131(b). Those expressly stated purposes do not include the purposes that plaintiff alleges in its proposed finding.

7. The NWPA included Congressional findings that:

> A national problem has been created by the *accumulation of (A) spent nuclear fuel from nuclear reactors*; and (B) radioactive waste from (I) reprocessing of spent nuclear fuel; (ii) activities related to medical research, diagnosis, and treatment; and (iii) other sources.

42 U.S.C. § 10131(a)(2) (emphasis added).[8]

> Federal efforts during the past 30 years to devise a permanent solution to the problems of civilian radioactive waste disposal have not been adequate . . .

42 U.S.C. § 10131(a)(3).

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant further objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Without waiving these objections, defendant admits the allegations contained in this proposed finding to the extent that they are supported by the Nuclear Waste Policy Act, which is the best evidence of its contents; defendant otherwise denies the allegations contained in this proposed finding. Defendant avers that the quoted language is contained in the portions of the statute cited.

8. Congress intended to relieve utilities of the responsibility for building additional at-reactor storage after 1998. In the legislative history of the NWPA, Congress resisted delay because utilities were running out of space at reactors. (128 Cong. Rec. 26,308 (1982), ENA at 194; 128 Cong. Rec. 26,310- 26,311 (1982), ENA at 196-97; 128 Cong. Rec. 26,314 (1982), ENA at 200; 128 Cong. Rec. 27,775 (1982), ENA at 210.) For example, speaking in opposition

[8] The NWPA is reproduced in Energy Northwest's Appendix at pages 1 through 57. Additionally, selected NWPA provisions as they appeared prior to amendment in 1987 are reproduced at pages 58 through 77 of Energy Northwest's Appendix.

to an amendment (eventually defeated) to an earlier bill that would have delayed siting of the repository 3 years,[9] Sen. McClure stated:

> [A] three year delay in the [repository] program would not affect the suitability of that particular storage. However, we do begin to run into the problem that there is not enough room to store all those rods at that site, in the pools that have been constructed, because they were not designed to do that.… They will have to apply some new technologies on that site, or will simply have to shut down because they cannot refuel. There is a time urgency, and it can be satisfied.

(128 Cong. Rec. 7,974 (1982), ENA at 129.)

**RESPONSE**: With regard to the first sentence of this proposed finding of fact, defendant objects because the allegations contained in the first sentence are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant further objects to the first sentence of this proposed finding because it is without citation to authority as required by RCFC 56(h)(1). Without waiving these objections, defendant disagrees with the first sentence of this proposed finding of law, as nothing in the NWPA provides any indication that "Congress" intended, through the Act, to "relieve utilities of the responsibility for building additional at-reactor storage after 1998," as plaintiff alleges. To the contrary, the NWPA expressly identified Congress' "findings and purposes" in enacting the NWPA, see 42 U.S.C. § 10131(a) & (b), and Congress did not identify as a finding of Congress or as a purpose of the NWPA a desire to "relieve utilities of the responsibility for building additional at-reactor storage

---

[9] The amendment offered to S. 1662 called for the Department of Energy to recommend four sites for the repository, instead of a single site, an action that would have delayed the siting of a final repository three years. (128 Cong. Rec. 7,974 (1982), ENA at 129.) The bill was eventually amended to provide that contracts with utilities would provide for disposal no later than December 31, 1996. (128 Cong. Rec. 8,261-62 (1982), ENA at 133-34.)

after 1998." See id. Further, no language incorporated into the NWPA imposed any such obligation upon DOE.

With regard to the second sentence of this proposed finding of fact, defendant objects because the allegations contained in the second sentence are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant also objects to plaintiff's reliance upon individual statements of legislators about drafts of the Nuclear Waste Policy Act to define the intent of "Congress" in enacting the NWPA. Legislative history is easily "created by advocates of one position or the other during the legislative process who did not get their views into the statutory language, and also is why it is so frequently a waste of time to use it to construe the statute," and "[b]etter guidance is available from the words of the law duly passed and signed." Hoonah Indian Ass'n v. Morrison, 170 F.3d 1223, 1228 (9th Cir. 1999); see id. ("[t]he remarks of an individual legislator on the floor are not part of the statute passed by both houses and signed by the President, so they lack the force of law"). Further, plaintiff's description of Congress' "intent" ignores individual members of Congress who opposed enactment of the NWPA or who had other reasons for supporting the NWPA, including the public health and safety. In this particular case, any effort to discover Congress' intent in enacting the NWPA through individuals' statements, rather than by reference to the language of the NWPA, is particularly inappropriate because Congress expressly identified, in the language of the NWPA itself, the purposes of the Act. See 42 U.S.C. § 10131. Defendant further objects to the second sentence of this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Defendant also objects to the second sentence of this proposed finding upon the grounds that the proposed finding is vague and unclear because the

terms "delay" and "running out of space" are undefined. Without waiving these objections, defendant disagrees with the second sentence of plaintiff's proposed finding. First, the cited statements do not evidence the intent of "Congress," but only of the individuals who are speaking. Second, not all of the cited statements from the Congressional Record actually support plaintiff's representation. Although the referenced pages identify statements regarding a desire for no delay, not all of the statements identify the reason for that desire as based upon the utilities' impending lack of storage space. See, e.g., ENA at 194 & 210.

With regard to the third sentence of this proposed finding of fact, defendant objects because it is irrelevant to the issues presented in our motion for summary judgment. A statement by Senator McClure in opposition to an amendment (that was later defeated) to a bill that was never enacted is not probative of the issues involved in this case. Further, as previously mentioned, "[t]he remarks of an individual legislator on the floor are not part of the statute passed by both houses and signed by the President, so they lack the force of law." Hoonah, 170 F.3d at 1228. Without waiving these objections, defendant states that the language quoted in the third sentence of this proposed finding, which plaintiff identifies as a statement from Senator McClure that is contained in the Congressional Record cited, is incomplete. The actual language contained in the portion of the Congressional Record cited is as follows:

> Every one of the operating plants has constructed at the site a place to put the spent fuel rods in storage. That is not designed to be permanent storage, in the terms of history, in the ages of time of man, but it is certainly suitable for any immediate period of time. Certainly, a three year delay in the program would not affect the suitability of that particular storage.
>
> However, we do begin to run into the problem that there is not enough room to store all those rods at that site, in the pools that have been constructed, because they were not designed to do that.

> You begin to run into the problem that these plants in operation must get changes in their operating licenses to allow them to rerack more of those spent fuel rods in the existing pools at that site. They will have to apply some new technologies on that site, or they will simply have to shut down because they cannot refuel.
>
> There is a time urgency, and it can be satisfied. There is no single way, no exclusive method, by which we can deal with that problem over the near term.

128 Cong. Rec. at 7974 (ENA at 129) (emphasis on material omitted from plaintiff's quotation). Further, the Senate version of the bill that Senator McClure was discussing was not enacted in the same form as existed at the time of Senator McClure's statement. In addition, as the plaintiff in this case successfully convinced the United States Court of Appeals for the District of Columbia to hold in prior litigation, the NWPA, as enacted, did not contain any requirement that a repository be operational by any specific date. See Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1276 (D.C. Cir. 1996).

9. Similarly, speaking about the need for speed in providing disposal capacity, Representative Broyhill stated that:

> The technology may still be ‘here and now' but for many older nuclear plants which will run out of space to store their spent fuel at their reactor sites before the Federal Government completes its first permanent waste repository, ‘here and now' may well be ‘here and gone.' … These reactors were built when it was assumed the Federal Government would take custody of spent fuel by the early 1970's and reprocess it for reuse. Then the Carter administration banned reprocessing in 1977, and these utilities were left holding the bag.

(128 Cong. Rec. 26,314 (1982), ENA at 200.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Defendant objects to plaintiff's reliance

upon individual statements of legislators about drafts of the Nuclear Waste Policy Act to define the intent of "Congress" in enacting the NWPA. Legislative history is easily "created by advocates of one position or the other during the legislative process who did not get their views into the statutory language, and also is why it is so frequently a waste of time to use it to construe the statute," and "[b]etter guidance is available from the words of the law duly passed and signed." Hoonah Indian Ass'n v. Morrison, 170 F.3d 1223, 1228 (9th Cir. 1999); see id. ("[t]he remarks of an individual legislator on the floor are not part of the statute passed by both houses and signed by the President, so they lack the force of law"). Further, plaintiff's description of Congress' "intent" ignores individual members of Congress who opposed enactment of the NWPA or who had other reasons for supporting the NWPA, including the public health and safety. In this particular case, any effort to discover Congress' intent in enacting the NWPA through individuals' statements, rather than by reference to the language of the NWPA, is particularly inappropriate because Congress expressly identified, in the language of the NWPA itself, the purposes of the Act. See 42 U.S.C. § 10131. Without waiving these objections, defendant agrees that the quoted language was contained in the portion of the Congressional Record cited.

10. Similarly, Representative Marriott stated:

> We need a national waste repository, and it must be in place by the turn of the century. All waste that is now stored is temporarily stored. … Without a proper repository for interim and permanent waste, as many as 28 nuclear powerplants may be forced to close for lack of storage.

(128 Cong. Rec. 26,310-26,311 (1982), ENA at 196-97; *see also* 128 Cong. Rec. 26,308 (1982) (Representative Lujan) ("Further delay, which may or may not benefit provincial concerns of one

group or an[o]ther, is not in the best interests of the nation and should be resisted."), ENA at 194; 128 Cong. Rec. 27,775 (1982) (Representative Berueter) ("The time for excuses is over … [t]he time for action has come."), ENA at 210; 128 Cong. Rec. 26,311 (1982) (Representative Fish) ("This repository should be built as quickly as possible…"), ENA at 197; 128 Cong. Rec. 26,311 (1982) (Representative Michel) ("This is a national problem that demands the immediate attention of the Federal Government."), ENA at 197.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Defendant objects to plaintiff's reliance upon individual statements of legislators about drafts of the Nuclear Waste Policy Act to define the intent of "Congress" in enacting the NWPA. Legislative history is easily "created by advocates of one position or the other during the legislative process who did not get their views into the statutory language, and also is why it is so frequently a waste of time to use it to construe the statute," and "[b]etter guidance is available from the words of the law duly passed and signed." Hoonah Indian Ass'n v. Morrison, 170 F.3d 1223, 1228 (9th Cir. 1999); see id. ("[t]he remarks of an individual legislator on the floor are not part of the statute passed by both houses and signed by the President, so they lack the force of law"). Further, plaintiff's description of Congress' "intent" ignores individual members of Congress who opposed enactment of the NWPA or who had other reasons for supporting the NWPA, including the public health and safety. In this particular case, any effort to discover Congress' intent in enacting the NWPA through individuals' statements, rather than by reference to the language of the NWPA, is particularly inappropriate because Congress expressly identified, in the language of the NWPA itself, the purposes of the Act. See 42 U.S.C. § 10131. Without waiving these

objections, defendant agrees that the quoted language from Representative Marriott was contained in the portion of the Congressional Record cited. However, defendant represents that the quoted statements of some other members of the House, as presented, are incomplete or contain an error. See ENA at 194 (Rep. Lujan) ("the nation" should read "this Nation"); ENA at 197 (Rep. Fish) (although plaintiff correctly quotes the portion of the sentence reading "[t]his repository should be built as quickly as possible," the remainder of that sentence, which plaintiff did not quote, reads "consistent with environmental requirements and administrative procedure safeguards," with Representative Fish adding, "I stress environmental considerations, because we are all fully aware that our future generations will have to live with the decisions we make on nuclear waste management today.").

11. A House Report on a predecessor bill to the NWPA provided:

> Continued delays in establishing that radioactive materials can be disposed of safely and in an environmentally sound manner can no longer be tolerated. This is important not simply because the effect the failure to demonstrate that radioactive materials can be disposed of safely will have on the licensing of nuclear power plants, but also because it is no longer acceptable to allow increasing quantities of nuclear waste to be stored on an interim basis. The existence of these wastes in their present form poses a growing hazard which cannot be allowed to continue indefinitely. It is essential that an orderly and timely Federal program be established to properly address this aspect of the nuclear issue.

(H.R. Rep. No. 97-785, pt. 1, at 50 (1982), ENA at 185.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Defendant objects because the legislative history of the NWPA does not provide a basis for establishing any facts in this case. The language of a House report "is not part of the statute." Puerta v. United States, 121 F.3d 1338,

1344 (9th Cir. 1997). It "suffers the usual infirmity, that it was not passed by both houses of Congress and signed into law by the President. For that reason, it is not law." Id. "The staff person who wrote the House committee's legislative history . . . might have been assigned to write what some committee members wanted in the bill but did not get, or to throw a bone to some . . . lobbyist whose preferred language was rejected by the House committee. The staff person could have written the 'history' before the bill was drafted, anticipating language that did not get into the bill. Legislative history need not be written with the same care, or scrutinized by those skeptical of the statute with the same care, as statutory language. There is no way for a House or Senate member outside the relevant committee to vote against legislative history, so there is not much reason for them or us to parse every sentence." Id.

Without waving these objections, and to the extent that the Court determines it appropriate to consider the quoted statements from the House report, equal consideration should be given to Representative Markey's statement, which was included in the same report that plaintiff cites, that there is not a "short-term interim nuclear waste storage problem. . . . The 'problem' is that utilities are unwilling to take advantage of storage technologies - waiting instead for the federal government to take responsibility for the waste." H. Rep. 97-785, pt. 1 at 118 (1982); SGA at 445.[10] Further, the cited House report accompanied a version of the bill, H.R. 6598, which was not enacted as the Nuclear Waste Policy Act. However, defendant agrees that the quoted language is contained in the House report cited.

[10] "SGA at __" refers to the Supplemental Government Appendix filed with our reply to Energy Northwest's opposition to our motion for summary judgment.

12. The NWPA set January 31, 1998 as the date for the DOE to begin spent nuclear fuel removal and required the Department of Energy ("DOE") and the owners and generators of Spent Nuclear Fuel and High-Level Radioactive Waste ("SNF") to enter into contracts calling for the DOE to dispose of waste beginning on that date. 42 U.S.C. § 10222(a) (1982).

**RESPONSE**: Defendant objects to this proposed finding of fact because the allegations contained in this proposed finding are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Without waiving this objection, and to the extent that they may be deemed allegations of fact, defendant admits the allegations contained in this proposed finding to the extent that they are supported by the cited statute, which is the best evidence of its contents; defendant otherwise denies the allegations contained in this proposed finding. Defendant further avers that it disagrees with plaintiff's proposed interpretation of the NWPA. The NWPA did not require either DOE or the owners and generators of SNF to enter into contracts. Instead, the NWPA authorized the Secretary of Energy to enter into contracts for the "acceptance of title, subsequent transportation, and disposal of [HLW and SNF]." 42 U.S.C. § 10222(a)(1). The NWPA further provided that the Secretary was to dispose of the HLW and SNF "beginning not later than January 31, 1998." 42 U.S.C. § 10222(a)(5)(B).

13. The Act contemplated that utilities would continue to have responsibility for waste "*until* such waste and spent fuel is accepted by the Secretary of Energy. . ." in 1998. 42 U.S.C. § 10131(a)(5) (1982) (emphasis added).

**RESPONSE**: Defendant objects to this proposed finding of fact because the allegations contained in this proposed finding are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Without waiving this objection, and to the extent

that they may be deemed allegations of fact, defendant admits the allegations contained in this proposed finding to the extent that they are supported by the cited statute, which is the best evidence of its contents; defendant otherwise denies the allegations contained in this proposed finding. Defendant further avers that it disagrees with plaintiff's proposed interpretation of the NWPA. The excerpt of the statutory provision quoted is incomplete. The provision reads in its entirety:

> (a) FINDINGS.– The Congress finds that –
>
> * * *
>
> (5) the generators and owners of high-level radioactive waste and spent nuclear fuel have the primary responsibility to provide for, and the responsibility to pay the costs of, the interim storage of such waste and spent fuel until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this Act;

42 U.S.C. § 10131(a)(5). The statute does not refer expressly to "utilities," but to the "generators and owners" of HLW and SNF, which includes, but is not necessarily limited to, nuclear utilities. Further, the proposed finding infers that the NWPA identifies 1998 as the "end date" by which the owners and generators of SNF and HLW would no longer bear any financial responsibility for the costs of storing their SNF and/or HLW. The NWPA does not require DOE to accept all SNF and HLW from any owner or generator of SNF in 1998, but instead only required DOE to begin acceptance of SNF by January 31, 1998, id. § 10222(a)(5)(B). Plaintiff's proposed finding, which suggests that the owners' and generators' obligations to pay for continued storage of any of their SNF and/or HLW would cease in 1998 is plainly inconsistent with the statute.

14. In discussing the legislation which became the NWPA, Congress expressed the intent that the DOE would have a repository open by 1998. In two House reports on pending bills, Congress stated:

a. "The contracts are required to provide that the Secretary will take title to the waste and spent fuel upon delivery to the repository. The Secretary *must* begin repository operations no later than January 1998." (H.R. Rep. No. 97-795, pt. 1, at 38 (1982) (emphasis added), ENA at 173.)

b. The DOE is "responsible for disposing of [SNF] … in permanent disposal facilities, beginning not later than January 1998, in return for the payment of fees established by this section." (H.R. Rep. No. 97-491, pt. 1, at 59 (1982), reprinted in 1982 U.S.C.C.A.N. 3792, 3825, ENA at 120.)

**RESPONSE**: Defendant objects to this proposed finding of fact because the allegations contained in this proposed finding are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required.

Defendant also objects to plaintiff's reliance upon legislative history as reflected in House reports regarding drafts of the Nuclear Waste Policy Act to define the intent of "Congress" in enacting the NWPA. The language of a House report "is not part of the statute." Puerta v. United States, 121 F.3d 1338, 1344 (9th Cir. 1997). It "suffers the usual infirmity, that it was not passed by both houses of Congress and signed into law by the President. For that reason, it is not law." Id. "The staff person who wrote the House committee's legislative history . . . might have been assigned to write what some committee members wanted in the bill but did not get, or to throw a bone to some . . . lobbyist whose preferred language was rejected by the House

committee. The staff person could have written the 'history' before the bill was drafted, anticipating language that did not get into the bill. Legislative history need not be written with the same care, or scrutinized by those skeptical of the statute with the same care, as statutory language. There is no way for a House or Senate member outside the relevant committee to vote against legislative history, so there is not much reason for them or us to parse every sentence." Id.; see Bank One Chicago, N.A. v. Midwest Bank & Trust Co., 516 U.S. 264, 280 (1996) (Scalia, J., concurring) ("[l]egislative history that does not represent the intent of the whole Congress is nonprobative"). In this particular case, any effort to discover Congress' intent in enacting the NWPA through individuals' statements, rather than by reference to the language of the NWPA, is particularly inappropriate because Congress expressly identified, in the language of the NWPA itself, the purposes of the Act. See 42 U.S.C. § 10131.

Defendant further objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Whether "Congress" intended that a repository would be open by 1998 has no bearing whatsoever on the motion. Further, as the plaintiff in this case successfully convinced the United States Court of Appeals for the District of Columbia to hold in prior litigation, DOE's obligation to begin SNF and/or HLW acceptance by January 31, 1998, was independent of the existence of a repository, and the NWPA did not contain any requirement that a repository be operational by any particular date. See Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Defendant further objects to this proposed finding as irrelevant because a House report upon a bill that was never enacted is not probative of the issues involved in this case.

Without waiving these objections, defendant notes that Energy Northwest's citation to the House Report for subparagraph a. should be H.R. Rep. No. 97-785 and agrees that the quoted language is contained in the House reports cited.

15. The NWPA contemplated a series of steps which would lead to the operation of a repository and acceptance of SNF and HLW beginning in January 1998. 42 U.S.C. §§ 10132-10145; H.R. Rep. 97-785, pt. 1, at 32-34 (1982), ENA at 167-69; *Indiana Michigan Power Company v. Department of Energy*, 88 F.3d 1272, 1277 (D.C. Cir. 1996).

a. The DOE was to issue guidelines for site characterization 180 days after January 7, 1983. 42 U.S.C. § 10132(a) (1982). The DOE was then to nominate five sites for site characterization for selection as the site for the first repository. 42 U.S.C. § 10132(b)(1)(A) (1982).

b. The DOE was to recommend site characterization at three of the nominated sites by January 1, 1985. 42 U.S.C. § 10132(b)(1)(B) (1982). Upon approval of these site recommendations by the President, the DOE was to conduct site characterization at the approved sites. 42 U.S.C. § 10133 (1982).

c. By March 31, 1987 the President was to submit a recommendation to Congress to site the first repository at one of the three characterized sites. 42 U.S.C. § 10134(a)(2)(A) (1982) (now amended).

d. After the President's recommendation, the state or Indian tribe where the recommended site was located had the opportunity to disapprove the selection, and Congress could then override that disapproval. 42 U.S.C. §§ 10134-10136 (1982) (now amended). (This process has only just occurred within the past six months.)

e. After the site recommendation became complete, the DOE was to submit an application for construction authorization to the NRC within 90 days. 42 U.S.C. § 10134(b) (1982). The NRC would then act on the application within four years of submission. 42 U.S.C. § 10134(d) (1982).

**RESPONSE**: Defendant objects to this proposed finding of fact because the allegations contained in this proposed finding are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant further objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. The schedule set forth in the NWPA for the steps to be undertaken in the development of a repository has no bearing whatsoever on the motion. Further, as the plaintiff in this case successfully convinced the United States Court of Appeals for the District of Columbia to hold in prior litigation, DOE's obligation to begin SNF and/or HLW acceptance by January 31, 1998, was independent of the existence of a repository, and the NWPA did not contain any requirement that a repository be operational by any particular date. See Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Therefore, these statutory provisions are wholly irrelevant. Without waiving these objections, and to the extent that they may be deemed allegations of fact, defendant admits the allegations contained in this proposed finding to the extent that they are supported by the cited statute, which is the best evidence of its contents; defendant otherwise denies the allegations contained in this proposed finding.

16. These provisions were intended to create a schedule leading to the establishment of a repository in 1998. A House report on an early version of the NWPA containing similar interim deadlines noted: "With respect to the establishment of a repository, the purposes are to

establish a schedule for the siting, construction, and operation of repositories that will provide assurance that the public and the environment will be adequately protected from the hazards posed by high-level radioactive wastes." (H.R. Rep. 97-785, pt. 1, at 32 (1982), ENA at 167.)

**RESPONSE**: With regard to the first sentence of this proposed finding of fact, defendant objects because the allegations contained in the first sentence are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant further objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. The schedule set forth in the NWPA for the steps to be undertaken in the development of a repository has no bearing whatsoever on the motion. Without waiving these objections, and to the extent that they may be deemed allegations of fact, defendant admits the allegations contained in this proposed finding to the extent that they are supported by the NWPA, which is the best evidence of its contents; defendant otherwise denies the allegations contained in this proposed finding. Defendant avers that, as the plaintiff in this case successfully argued before the United States Court of Appeals for the District of Columbia in prior litigation, the NWPA, as enacted, did not require DOE, or impose any obligation upon DOE, to have a repository operational by 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996).

With regard to the second sentence of this proposed finding of fact, defendant incorporates by reference the objections that it raised in response to the first sentence of this proposed finding. Further, defendant objects to the second sentence of this proposed finding because a House report upon a bill that was never enacted is not probative of the issues involved with this case. Instead, the House report does not necessarily represent the opinion of

"Congress;" the language of a House report "is not part of the statute" and "suffers the usual infirmity, that it was not passed by both houses of Congress and signed into law by the President. For that reason, it is not law." Puerta v. United States, 121 F.3d 1338, 1344 (9th Cir. 1997); see Bank One Chicago, N.A. v. Midwest Bank & Trust Co., 516 U.S. 264, 280 (1996) (Scalia, J., concurring) ("[l]egislative history that does not represent the intent of the whole Congress is nonprobative"). Without waiving these objections, defendant agrees that the quoted language is contained in the House report cited. However, defendant avers that, to the extent that plaintiff is using this quotation from a House report for a bill that was never enacted to support the first sentence of this proposed finding, the quotation does not identify any requirement that DOE begin acceptance of SNF and/or HLW in 1998 or at any particular time, rendering the quotation irrelevant to the first sentence of this proposed finding.

17. The same House report listed the various interim deadlines in the bill and noted the final deadline: "January, 1998 - Federal Government statutorily and contractually obligated to begin to provide disposal capacity." (H.R. Rep. No. 97-785, pt. 1, at 32 (1982), ENA at 167.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. The legislative history for the schedule set forth in the NWPA for the steps to be undertaken in the development of a repository has no bearing whatsoever on the motion. In addition, the language of a House report "is not part of the statute," particularly when the bill that the House report accompanies was not enacted. Puerta v. United States, 121 F.3d 1338, 1344 (9th Cir. 1997). A House report "suffers the usual infirmity, that it was not passed by both houses of Congress and signed into law by the President. For that reason, it is not law." Id. "The staff person who wrote the House

committee's legislative history . . . might have been assigned to write what some committee members wanted in the bill but did not get, or to throw a bone to some . . . lobbyist whose preferred language was rejected by the House committee. The staff person could have written the 'history' before the bill was drafted, anticipating language that did not get into the bill. Legislative history need not be written with the same care, or scrutinized by those skeptical of the statute with the same care, as statutory language. There is no way for a House or Senate member outside the relevant committee to vote against legislative history, so there is not much reason for them or us to parse every sentence." Id.; see Bank One Chicago, N.A. v. Midwest Bank & Trust Co., 516 U.S. 264, 280 (1996) (Scalia, J., concurring) ("[l]egislative history that does not represent the intent of the whole Congress is nonprobative").

Without waiving these objections, defendant agrees that the quoted language is contained in the House report cited. However, defendant avers that, under the version of the NWPA that Congress actually enacted, DOE's obligation to begin SNF and/or HLW acceptance by January 31, 1998, was independent of the existence of a repository, and nothing in the version of the NWPA that Congress actually enacted required DOE, or imposed any obligation upon DOE, to have a repository operational by 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Defendant further avers that the plaintiff in this case successfully argued before the United States Court of Appeals for the District of Columbia in prior litigation that, in fact, the version of the NWPA that Congress enacted did not require DOE to have an operational repository available by 1998. Id.

18. The House report also stated that building a repository was to be the principal purpose of the DOE's program: "[Congress] instructs the Secretary [of Energy] that the

repository program is paramount and no other radioactive waste or spent fuel program of the Secretary shall interfere with, delay, obstruct or deflect from the establishment of a repository development program as provided in this Act." (H.R. Rep. No. 97-785, pt. 1, at 44 (1982), ENA at 179.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. The legislative history for the schedule set forth in the NWPA for the steps to be undertaken in the development of a repository has no bearing whatsoever on the motion. In addition, the language of a House report "is not part of the statute," particularly when the bill that the House report accompanies was not enacted. Puerta v. United States, 121 F.3d 1338, 1344 (9th Cir. 1997). A House report "suffers the usual infirmity, that it was not passed by both houses of Congress and signed into law by the President. For that reason, it is not law." Id. "The staff person who wrote the House committee's legislative history . . . might have been assigned to write what some committee members wanted in the bill but did not get, or to throw a bone to some . . . lobbyist whose preferred language was rejected by the House committee. The staff person could have written the 'history' before the bill was drafted, anticipating language that did not get into the bill. Legislative history need not be written with the same care, or scrutinized by those skeptical of the statute with the same care, as statutory language. There is no way for a House or Senate member outside the relevant committee to vote against legislative history, so there is not much reason for them or us to parse every sentence." Id.; see Bank One Chicago, N.A. v. Midwest Bank & Trust Co., 516 U.S. 264, 280 (1996) (Scalia, J., concurring) ("[l]egislative history that does not represent the intent of the whole Congress is nonprobative").

Without waiving these objections, defendant disagrees with plaintiff's proposed finding. First, although plaintiff seems to infer from the cited House report that the "principal purpose" of the NWPA, as enacted, was "building a repository," the House report indicated that "[t]he primary purpose <u>of H.R. 6598</u> is to establish a program for the permanent disposal of [HLW] and [SNF];" however, H.R. 6598 was not enacted. Second, plaintiff has used a parenthetical containing the word "Congress" in its purported quotation from the House report to change the language actually contained in the House report. The actual language of the portion of the House report from which plaintiff quotes did not refer to "Congress" as a whole, but instead referred merely to the House Committee issuing the report: "The Committee . . . instructs the Secretary that the repository program is paramount and no other radioactive waste or spent fuel program of the Secretary shall interfere with, delay, obstruct or deflect the establishment of a repository development program as provided in this Act." ENA at 179. In any event, as previously noted, H.R. 6598 was not enacted. Finally, to the extent that plaintiff is using this House report to identify the "principal purpose" of the NWPA that was actually enacted, the House report is irrelevant because, in the NWPA itself, Congress expressly identified the purposes of the NWPA, as follows:

> (b)(1) to establish a schedule for the siting, construction, and operation of repositories that will provide a reasonable assurance that the public and the environment will be adequately protected from the hazards posed by high-level radioactive waste and such spent nuclear fuel as may be disposed of in a repository;
>
> (2) to establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent fuel;
>
> (3) to define the relationship between the Federal Government and the State governments with respect to the disposal of such waste and spent fuel; and

> (4) to establish a Nuclear Waste Fund, composed of payments made by the generators and owners of such waste and spent fuel, that will ensure that the costs of carrying out activities relating to the disposal of such waste and spent fuel will be borne by the persons responsible for generating such waste and spent fuel.

42 U.S.C. § 10131(b). Congress did not indicate in the NWPA that one of those four expressly identified purposes was of greater importance to Congress that any of the other expressly identified purposes.

19. The NWPA provided that "the Secretary is authorized to enter into contracts with any person who generates or holds title to high-level radioactive waste, or spent nuclear fuel, of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel." 42 U.S.C. § 10222(a)(1).

**RESPONSE**: Defendant objects to this proposed finding of fact because the allegations contained in this proposed finding are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Without waiving this objection, and to the extent that they may be deemed allegations of fact, defendant admits the allegations contained in this proposed finding to the extent that they are supported by the cited statute, which is the best evidence of its contents; defendant otherwise denies the allegations contained in this proposed finding.

20. The NWPA specified that the contracts were to provide that:

> (a) following commencement of operation of a repository, the Secretary shall take title to high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>
> (b) in return for payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of high-level radioactive waste or spent nuclear fuel involved as provided in this subchapter.

42 U.S.C. § 10222(a)(5).

**RESPONSE**: Defendant objects to this proposed finding of fact because the allegations contained in this proposed finding are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Without waiving this objection, and to the extent that they may be deemed allegations of fact, defendant admits the allegations contained in this proposed finding to the extent that they are supported by the cited statute, which is the best evidence of its contents; defendant otherwise denies the allegations contained in this proposed finding.

21. Congress expected the contracts to be a quid pro quo under which the DOE would dispose of waste and the utilities would pay for the service. (H.R. Rep. No. 97-491, pt. 1, at 58 (1982), *reprinted in* 1982 U.S.C.C.A.N. at 3824 ("Section 124 authorizes the Secretary to contract with utilities … to provide repository services in exchange for payments. . . ."), ENA at 119; H.R. Rep. No. 97-491, pt. 1, at 59 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3825 (the DOE is "responsible for disposing of [SNF] … in permanent disposal facilities, beginning not later than January 1998, *in return for the payment of fees established by this section*." (emphasis supplied)), ENA at 120; 4/17/02 Zabransky Dep. at 183,[11] ENA at 945; *see also System Fuels, Inc. v. United States*, No. 03-2624(, 2005 WL 1804314, at *1 (Fed. Cl. July 29, 2005), ENA at

[11] Since 2002, Mr. Zabransky has been employed as DOE's Contracting Officer. As Contracting Officer, Mr. Zabransky was the DOE official that communicated with the utilities regarding the 2004 DCS process. From 1994-2002, Mr. Zabransky served as the Contracting Officer's Technical Representative, providing technical advice to the Contracting Officer regarding interaction with the holders of Standard Contracts. In each of these positions, Mr. Zabransky was responsible for the DOE's management of the Standard Contract and interface with utilities. (*See* 4/17/02 Zabransky Dep. at 16-17, 23-25, 33, ENA at 928-29, 930-31, 933; 4/11/05 Kouts 30(b)(6) Dep. at 16-17, 30-31, 50, ENA at 608, 612, 615.)

2324, 2325; *Indiana Michigan Power Company v. United States*, 57 Fed. Cl. 88, 95 (Fed. Cl. 2003); *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 664-65 (Fed. Cl. 2003); *Indiana Michigan Power Company v. Department of Energy*, 88 F.3d 1272, 1276 (D.C. Cir. 1996).

**RESPONSE**: Defendant objects to this proposed finding of fact because the allegations contained in this proposed finding are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Further, defendant objects to plaintiff's attempt to support its interpretation of a law and to congressional intent by reference to deposition testimony and a House committee report. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of statutory interpretation as to which deposition testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms"). Further, as more fully explained in response to No. 11 of plaintiff's proposed findings of fact, plaintiff's reliance upon the House report here is irrelevant to establish the intent of "Congress," outside the language of the NWPA itself. See Puerta v. United States, 121 F.3d 1338, 1344 (9th Cir. 1997). Any effort to discover the purposes behind the NWPA through testimony and individuals' statements is particularly inappropriate here, where Congress expressly identified, in the language of the NWPA itself, the purposes of the Act. See 42 U.S.C. § 10131. Defendant further objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Defendant also objects to this proposed finding because Mr. Zabransky's testimony upon which it relies, in part, was the subject of an objection: that the question called for a legal conclusion, seeking to have the

witness interpret the purpose of the NWPA. Courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001) ("[t]he requirement of Rule 56(e) that affidavit testimony be competent and admissible evidence applies with equal force to deposition testimony").

Without waiving these objections, and to the extent that they may be deemed allegations of fact, defendant admits the allegations contained in this proposed finding to the extent that they are supported by the NWPA, which is the best evidence of its contents; defendant otherwise denies the allegations contained in this proposed finding.

22. Having required utilities to pay fees into the Nuclear Waste Fund for removal of SNF starting in January of 1998, Congress did not intend the utilities would have to pay again to build additional storage after 1998. (5/8/02 Barrett Dep. at 1063-65,[12] ENA at 455.)

**RESPONSE**: Defendant objects to this proposed finding of fact because the allegations contained in this proposed finding are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Further, defendant objects to plaintiff's attempt to support its interpretation of a law and to congressional intent by reference to deposition testimony. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of statutory interpretation as to which deposition testimony is

---

[12] Lake Barrett worked for DOE in various positions from 1985-2002, including as Acting Director, Office of Facilities Siting & Development ("OFS&D"), OCRWM (1989-90), and Acting Director or Deputy Director, OCRWM (1993-2002). As Acting Director, OFS&D, Mr. Barrett was responsible for DOE's Repository and MRS programs. As Acting Director or Deputy Director, OCRWM, Mr. Barrett had overall responsibility for running the Office of Civilian Radioactive Waste Management of DOE. (*See* 4/22/02 Barrett Dep. at 84-85, ENA at 399-400.)

inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms"). Defendant further objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Defendant also objects to this proposed finding because Mr. Barrett's testimony upon which it relies, was the subject of an objection: that the question called for a legal conclusion, seeking to have the witness interpret the purpose of the NWPA, and a lack of foundation. Courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001) ("[t]he requirement of Rule 56(e) that affidavit testimony be competent and admissible evidence applies with equal force to deposition testimony"). Defendant further objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1), as Mr. Barrett lacks foundation to testify as to the intent of Congress.

Without waiving these objections, and to the extent that plaintiff's proposed finding may be deemed allegations of fact, defendant admits the allegations contained in this proposed finding to the extent that they are supported by the NWPA, which is the best evidence of its contents; defendant otherwise denies the allegations contained in this proposed finding.

23. The NWPA provided that:

> The [Nuclear Regulatory] Commission shall not issue or renew a license to any person to use a utilization or production facility under the authority of section 2133 or 2134 of this title unless—
> (I) such person has entered into a contract with the Secretary under this section; or
> (ii) the Secretary affirms in writing that such person is actively and in good faith negotiating with the Secretary for a contract under this section.

42 U.S.C. § 10222(b)(1)(A) (1982).

**RESPONSE**: Defendant objects to this proposed finding of fact because the allegations contained in this proposed finding are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant further objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Without waiving these objections, and to the extent that they may be deemed allegations of fact, defendant admits the allegations contained in this proposed finding to the extent that they are supported by the cited statute, which is the best evidence of its contents; defendant otherwise denies the allegations contained in this proposed finding.

24. The NWPA also provided:

> Except as provided in paragraph (1), no spent nuclear fuel or high-level radioactive waste generated or owned by any person. . . may be disposed of by the Secretary in any repository constructed under this chapter unless the generator or owner of such spent fuel or waste has entered into a contract with the Secretary under this section by not later than—(A) June 30, 1983; or (B) the date on which such generator or owner commences generation of, or takes title to, such spent fuel or waste; whichever occurs later.

42 U.S.C. § 10222(b)(2) (1982).

**RESPONSE**: Defendant objects to this proposed finding of fact because the allegations contained in this proposed finding are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant further objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Without waiving these objections, and to the extent that they may be deemed allegations of fact, defendant admits the allegations contained in this proposed finding to the

extent that they are supported by the cited statute, which is the best evidence of its contents; defendant otherwise denies the allegations contained in this proposed finding.

25. The NWPA provided that the DOE was to prepare a report known as the "Mission Plan," which was to provide a "basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs under this chapter." 42 U.S.C. § 10221(a) (1982).

**RESPONSE**: Defendant objects to this proposed finding of fact because the allegations contained in this proposed finding are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant further objects to this proposed finding because the statutory requirement to issue the Mission Plan, pursuant to the NWPA, is irrelevant to the issues presented in our motion for summary judgment. Further, as the plaintiff in this case successfully argued before the United States Court of Appeals for the District of Columbia Circuit in prior litigation, the development and operation of the repository is independent of the Government's separate obligation to accept waste from Standard Contract holders. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996).

Without waiving these objections, and to the extent that plaintiff's proposed finding may be deemed allegations of fact, defendant admits the allegations contained in this proposed finding to the extent that they are supported by the cited statute, which is the best evidence of its contents; defendant otherwise denies the allegations contained in this proposed finding.

26. The Mission Plan was to include an estimate of total repository capacity required to dispose of all high-level radioactive waste and spent nuclear fuel expected to be generated through December 31, 2020. 42 U.S.C. § 10221(a)(9) (1982). Congress also required that the

Mission Plan contain a construction schedule for the repositories and an estimate of the time period during which the repository would accept waste. *Id.*

**RESPONSE**: Defendant objects to this proposed finding of fact because the allegations contained in this proposed finding are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant further objects to this proposed finding because the statutory requirement to issue the Mission Plan, pursuant to the NWPA, and the contents of the Mission Plan are irrelevant to the issues presented in our motion for summary judgment. Further, as the plaintiff in this case successfully argued before the United States Court of Appeals for the District of Columbia Circuit in prior litigation, the development and operation of the repository is independent of the Government's separate obligation to accept waste from Standard Contract holders. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996).

Without waiving these objections, and to the extent that plaintiff's proposed finding may be deemed allegations of fact, defendant admits the allegations contained in this proposed finding to the extent that they are supported by the cited statute, which is the best evidence of its contents; defendant otherwise denies the allegations contained in this proposed finding.

27. The DOE was required to submit drafts of the Mission Plan to interested parties and submit the final version to Congress, not later than 17 months after January 7, 1983. 42 U.S.C. § 10221(b).

**RESPONSE**: Defendant objects to this proposed finding of fact because the allegations contained in this proposed finding are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant further objects to this proposed

finding because the statutory requirements to issue the Mission Plan and to allow for comments upon a draft Mission Plan are irrelevant to the issues presented in our motion for summary judgment. Further, as the plaintiff in this case successfully argued before the United States Court of Appeals for the District of Columbia Circuit in prior litigation, the development and operation of the repository is independent of the Government's separate obligation to accept waste from Standard Contract holders. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996).

Without waiving these objections, and to the extent that plaintiff's proposed finding may be deemed allegations of fact, defendant admits the allegations contained in this proposed finding to the extent that they are supported by the cited statute, which is the best evidence of its contents; defendant otherwise denies the allegations contained in this proposed finding.

28. In the NWPA, Congress did not authorize DOE to build and operate a Monitored Retrievable Storage facility ("MRS"). Instead, the NWPA contemplated that the DOE would *study* how an MRS would facilitate waste disposal and issue a report to Congress on the need and feasibility of an MRS by June 1985. 42 U.S.C. § 10161(b)-(c) (1982). (*See also* 5/20/02 Lawrence Dep. at 215-16, 217-18 (DOE had no Congressional authorization to build an MRS), ENA at 659-60.)

**RESPONSE**: Defendant objects to this proposed finding of fact because the allegations contained in this proposed finding are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Further, defendant objects to plaintiff's attempt to support its interpretation of a law by reference to deposition testimony. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of

statutory interpretation as to which deposition testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms"). Defendant further objects to this proposed finding because the requirements of the NWPA regarding the development of an MRS are irrelevant to the issues presented in our motion for summary judgment.

Without waiving this objection, and to the extent that plaintiff's proposed finding may be deemed to constitute allegations of fact, defendant admits the allegations contained in this proposed finding to the extent that they are supported by the NWPA, which is the best evidence of its contents; defendant otherwise denies the allegations contained in this proposed finding. Defendant further avers that it disagrees that the paraphrased language accurately reflects the requirements of the NWPA or that the cited statutory provision supports plaintiff's proffered statutory interpretation. The statutory provision cited also provides that DOE "shall submit to the Congress a proposal for, the construction of one or more monitored retrievable storage facilities for high-level radioactive waste and spent nuclear fuel." 42 U.S.C. § 10161(b).

29. The House Committee on Interior and Insular Affairs reported that the committee "is not recommending and does not authorize construction of [MRS] facilities at this time or any future time." (H.R. Rep. No. 97-491, pt. 1, at 41 (1982), *reprinted in* 1982 U.S.C.C.A.N. at 3807, ENA at 102.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. The requirements of the NWPA regarding the development of an MRS do not have any bearing upon whether DOE was obligated to accept any SNF from Energy Northwest by January 31, 1998. Further, to the extent

that plaintiff is attempting to use this proposed finding as evidence of the meaning of the provisions of the NWPA, defendant objects to this proposed finding of fact because the allegations contained in this proposed finding are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. In addition, as more fully explained in defendant's response to No. 11 of plaintiff's proposed findings of fact, plaintiff's reliance upon the House report here is irrelevant to establish the intent of "Congress" or the meaning of the NWPA, outside the language of the NWPA itself. See Puerta v. United States, 121 F.3d 1338, 1344 (9th Cir. 1997); see also Bank One Chicago, N.A. v. Midwest Bank & Trust Co., 516 U.S. 264, 280 (1996) (Scalia, J., concurring) ("[l]egislative history that does not represent the intent of the whole Congress is nonprobative").

Without waiving these objections, defendant agrees that the quoted language is contained in the House report cited.

30. The House Committee on Interior and Insular Affairs, while considering amendments to the NWPA in 1987, reported: "Prior to enactment of the NWPA, a leading alternative to permanent geologic disposal of spent nuclear fuel was monitored retrievable storage (MRS) … *Although Congress chose permanent disposal over MRS in the NWPA*, the Act did direct DOE to study the need for and feasibility of constructing a MRS facility, and to submit to Congress by June 1, 1985 a proposal for siting, construction and operating one or more MRS facilities." (H.R. Rep. No. 100-425, at 13 (1987) (emphasis added), ENA at 272.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that the requirements of the NWPA regarding the development of an MRS are irrelevant to the issues presented in our motion for summary judgment. Further, to the extent that plaintiff is attempting

to use this proposed finding as evidence of the meaning of the provisions of the NWPA, defendant objects to this proposed finding of fact because the allegations contained in this proposed finding are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. In addition, as more fully explained in defendant's response to No. 11 of plaintiff's proposed findings of fact, plaintiff's reliance upon the House report here is irrelevant to establish the intent of "Congress" or the meaning of the NWPA, outside the language of the NWPA itself. See Puerta v. United States, 121 F.3d 1338, 1344 (9th Cir. 1997); see also Bank One Chicago, N.A. v. Midwest Bank & Trust Co., 516 U.S. 264, 280 (1996) (Scalia, J., concurring) ("[l]egislative history that does not represent the intent of the whole Congress is nonprobative").

Without waiving these objections, defendant agrees that the quoted language is contained in the House report cited, except that the first sentence of the quoted passage, rather than using the words "spent nuclear fuel," referred to "spent fuel."

## II. The Department Of Energy Begins Implementation Of The NWPA

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1).

31. Soon after enactment of the NWPA the DOE began to undertake its responsibilities to implement the Act by first establishing a Nuclear Waste Policy Act Project Office in 1983. (*See* 5/20/02 Lawrence Dep. at 24-25, 49-51, ENA at 623, 637-38; Memorandum from Robert Morgan to Nuclear Waste Policy Act Project Office Personnel

(January 28, 1983), ENA at 988.) Later, as required by the NWPA, the DOE created the Office of Civilian Radioactive Waste Management ("OCRWM"). 42 U.S.C. § 10224 (1982). These offices began to undertake implementation of the NWPA and the ultimate disposal of SNF.

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving this objection, defendant responds as follows. With regard to the first and second sentences of this proposed finding, defendant agrees. With regard to the third sentence of this proposed finding, although it is without citation to authority, as required by RCFC 56(h)(1), defendant agrees that, after its formation, OCRWM began to undertake its responsibilities as outlined in the NWPA.

**B. The DOE Publishes A Draft Of The Standard Contract**

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1). Without waiving this objection, defendant agrees that DOE published a draft of the Standard Contract in the Federal Register for notice and comment. See 48 Fed. Reg. 5458 (Feb. 4, 1983).

32. On February 4, 1983 the DOE published a proposed "Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste" ("Standard Contract") in the Federal Register. (Standard Contract for the Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste, 48 Fed. Reg. 5458-71 (Feb. 4, 1983) (to be codified at 10 C.F.R. Part 961), ENA at 991-1004.)

**<u>RESPONSE</u>**: Although this proposed finding of fact is unnecessary because the "contents of the Federal Register shall be judicially noticed," 44 U.S.C. § 1507, and because, as a result, neither party can create a genuine issue of material fact regarding those contents, defendant agrees that, on February 4, 1983, DOE published a notice of proposed rulemaking in the Federal Register, proposing terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste." Defendant also respectfully refers the Court to No. 12 of defendant's proposed findings of uncontroverted fact.

33. The Federal Register Notice that accompanied the draft contract stated that "The Act directs DOE to begin repository operations no later than January 31, 1998." (48 Fed. Reg. at 5458, ENA at 991.)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding because, as plaintiff in this case successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation to accept SNF beginning on January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that a repository be operational by January 31, 1998. <u>See</u> <u>Indiana Michigan Power Co. v. United States</u>, 88 F.3d 1272, 1276 (D.C. Cir. 1996).

Without waiving this objection, although this proposed finding of fact is unnecessary because the "contents of the Federal Register shall be judicially noticed," 44 U.S.C. § 1507, and because, as a result, neither party can create a genuine issue of material fact regarding its contents, defendant agrees that the quoted excerpt is contained in the cited Federal Register notice. However, defendant further avers that, in the final rule published in the Federal Register on April 18, 1983, DOE recognized the error of this interpretation of the NWPA. The <u>final</u> rule

containing the terms of the Standard Contract eliminated any requirement for DOE to begin SNF "disposal" in a permanent repository by January 31, 1998, but instead only required DOE to begin SNF acceptance by January 31, 1998, after the commencement of "facility" operations:

> The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 . . . .

48 Fed. Reg. 16590, 16600 (Apr. 18, 1983) (Art. II) (ENA at 1016). The "facility" to which the final rule refers is either a permanent repository to be constructed pursuant to the NWPA or such other facility to which SNF might be shipped by DOE prior to its transportation to a permanent repository:

> The term "DOE facility" means a facility operated by or on behalf of DOE for the purpose of disposing of spent nuclear fuel and/or high-level radioactive waste, or such other facility(ies) to which spent nuclear fuel and/or high-level radioactive waste may be shipped by DOE prior to its transportation to a disposal facility.

Id. (emphasis added) (Art. I.10) (ENA at 1016). As DOE expressly recognized in the "Supplementary Information" contained within the final rule, the NWPA did not obligate DOE to have an operational permanent repository by January 31, 1998:

> The definition of "DOE facility" (Article I.10) was expanded to expressly state, in accordance with the Act, that there may be an interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository.

Id. at 16591 (ENA at 1007). Further, in the "Supplementary Information," DOE stated that, in Article II of the Standard Contract, "the timing of services was changed to be consistent with Section 302(a)(5) [42 U.S.C. § 10222(a)(5)] of the Act." Id. (ENA at 1007).

34. In the Notice, DOE noted that under 42 U.S.C. § 10222(b)(5)(1) and (2), utilities had to sign a contract by June 30, 1983 or receive the affirmation of the Secretary of Energy that

they were actively and in good faith negotiating a contract. (48 Fed. Reg. at 5458-59, ENA at 850-51.)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Further, because the "contents of the Federal Register shall be judicially noticed," 44 U.S.C. § 1507, and because, as a result, neither party can create a genuine issue of material fact regarding those contents, plaintiff's proposed interpretation of the contents of the notice of proposed rulemaking in the Federal Register are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required.

Without waiving these objections, and to the extent that plaintiff's proposed finding may be deemed to constitute allegations of fact, defendant admits the allegations contained in this proposed finding to the extent that they are supported by the cited notice of proposed rulemaking in the Federal Register, which is the best evidence of its contents; defendant otherwise denies the allegations contained in this proposed finding. Defendant further avers that the cited statements in the Federal Register did not <u>require</u> nuclear utilities "to sign a contract by June 30, 1983 or receive the affirmation of the Secretary of Energy that they were actively and in good faith negotiating a contract, pursuant to the NWPA," as identified in this proposed finding. Instead, the statement in the Federal Register provided that, unless an owner or generator of SNF or HLW had "entered into a contract for disposal with the Secretary not later than (1) June 30, 1983, or (2) the date on which the owner or generator takes title to, or begins generation of, such spent fuel or waste, which is later," or unless "the Secretary affirms in writing that the owner or generator is actively and in good faith negotiating a contract for DOE's disposal services" by

June 30, 1983, the owner's or generator's SNF and HLW could not "be disposed of by DOE in any repository constructed under the [NWPA]." 48 Fed. Reg. 5458, 5458-59 (Feb. 4, 1983). An owner or generator was free not to enter into a contract with DOE, although the owner or generator's ability to continue its production of nuclear power could have been affected by that decision. See 42 U.S.C. § 10222(b).

35. In response to the proposed contract, industry groups commented on the lack of any performance standards contained within the contract. In particular, the Edison Electric Institute ("EEI") and the Utility Nuclear Waste Management Group ("UNWMG"), noted the Standard Contract lacked any performance standards other than the January 1998 date, including the absence of the quantity of SNF that DOE would accept. (John J. Kearney, Senior Vice President, Edison Electric Institute, Letter to Robert Morgan, Acting Director, OCRWM (March 7, 1983), GA at 2.)

**RESPONSE**: Defendant agrees with the proposed finding to the extent supported by the document cited, which is the best evidence of its contents; defendant otherwise disagrees with the proposed finding. Defendant acknowledges that, in a letter dated March 7, 1983 that constitutes a part of the administrative record of the rulemaking for the Standard Contract, Edison Electric Institute ("EEI") and the Utility Nuclear Waste Management Group ("UNWMG") jointly submitted comments on the notice of proposed rulemaking, which had been published at 48 Fed. Reg. 5458 (Feb. 4, 1983). Defendant further acknowledges that, in the cover letter accompanying those comments, John J. Kearney, Senior Vice President, EEI, wrote that, "[a]lthough the contract is generally comprehensive and complete, there are two significant issues on which the proposed contract is silent," one of which was "DOE performance

standards." GA at 2. Mr. Kearney, in his letter, also stated that, although "Article II states that the disposal services shall commence not later than January 31, 1998," "no other milestones are included" and "the contract [does not] commit DOE to accept any given quantity of SNF/HLW." GA at 2. However, plaintiff fails to note that, in the attachment to Mr. Kearney's letter, EEI and UNWMG recognized that the Standard Contract might not be the appropriate place to commit DOE to a specific, numerical acceptance rate. GA at 4. Defendant further avers that, other than EEI and UNWMG, plaintiff has not identified any other "industry groups" that submitted the cited comments.

36. On April 18, 1983, the DOE published the final version of the Standard Contract. (Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, 48 Fed. Reg. 16590-16608 (Apr. 18, 1983) (to be codified at 10 C.F.R. Part 961), ENA at 1005-24.) The deadline for signing the contract was June 30, 1983, or “the date on which such generator or owner commences generation of, or takes title to, such spent fuel or waste.” . (42 U.S.C. § 10222(b)(2).)

**<u>RESPONSE</u>**: With regard to the first sentence of this proposed finding of fact, although the first sentence is unnecessary because the "contents of the Federal Register shall be judicially noticed," 44 U.S.C. § 1507, and because, as a result, neither party can create a genuine issue of material fact regarding those contents, defendant agrees that, on April 18, 1983, DOE published a final rule in the Federal Register, which contained the terms of the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste."

With regard to the second sentence of this proposed finding, although the second sentence is unnecessary because the "contents of the Federal Register shall be judicially

noticed," 44 U.S.C. § 1507, and because, as a result, neither party can create a genuine issue of material fact regarding those contents, defendant agrees that, the deadline for signing the contract was June 30, 1983, or “the date on which such generator or owner commences generation of, or takes title to, such spent fuel or waste.” (42 U.S.C. § 10222(b)(2).)

37. DOE’s Final Notice on the Standard Contract did not address utility requests for an acceptance rate. Instead the notice contained only one reference to other utility requests for interim performance standards. The Notice did not refer at all to the issue of acceptance rates or the utility comments on the issue. (48 Fed. Reg. at 16,598, ENA at 1014.)

**RESPONSE**: Defendant objects to this proposed finding of fact because the allegations contained in this proposed finding, which seek to interpret the meaning of a final rule published in the Federal Register, are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required.

Without waiving this objection, defendant states that defendant disagrees with plaintiff's proposed finding. Contrary to plaintiff's assertion, DOE considered and addressed the "utility requests for an acceptance rate" in the final rule. Having received, reviewed, and considered those requests, DOE decided not to include a mandatory acceptance rate or schedule in the Standard Contract. As DOE stated in the "Supplementary Information" section of the final rule published in the Federal Register, "[a]ll comments received by DOE in response to its proposed rule of February 4, 1983, both at the public hearing and the written comments received thereafter, were carefully reviewed and fully considered in the formulation of this final rule." 48 Fed. Reg. 16590, 16590 (Apr. 18, 1983) (ENA at 1006). In fact, at the request of a substantial number of commenters, the final rule added a new provision to the Standard Contract, Article

IV.B.5(b), which states that DOE would issue "an annual report for planning purposes . . . set[ting] forth the projected annual receiving capacity for the DOE facility." Id. at 16592 (ENA at 1017) (edit in original); compare 48 Fed. Reg. 5458, 5463 (Feb. 4, 1983) (ENA at 997) (notice of proposed rulemaking). Defendant also respectfully refers the Court to Nos. 22 through 24 of defendant's proposed findings of uncontroverted fact, dated June 17, 2005.

38. The DOE Notice also stated that ". . . at the request of a substantial number of commenters, a new provision has been added as subparagraph IV.B.5(b), which states that DOE will issue 'an annual report for planning purposes . . . set[ting] forth the projected annual receiving capacity for the DOE facility.'" (48 Fed. Reg. 16592, ENA at 1008.) Robert Morgan testified that this provision was added solely because of utility requests for planning forecasts and that the ACR was not intended for any purpose other than planning. (3/21/02 Morgan Dep. at 139-41, ENA at 755-56; s*ee also* John Kearney letter to Robert Morgan, Attachment A (March 7, 1983), GA at 18.)

**RESPONSE**: With regard to the first sentence of this proposed finding of fact, defendant states that, although the first sentence of the proposed finding is unnecessary because the "contents of the Federal Register shall be judicially noticed," 44 U.S.C. § 1507, defendant agrees that the cited portion of the cited Federal Register notice contains the quoted language.

With regard to the second sentence of this proposed finding of fact, defendant objects to the proposed finding to the extent that it is intended to assist in or influence the interpretation of the language of the Standard Contract. Reference to individuals' testimony or subjective beliefs regarding the Standard Contract, beyond the context of the language contained in the notice of proposed rulemaking (48 Fed. Reg. 5458 (Feb. 4, 1983)), the final rule (48 Fed. Reg. 16590

(Apr. 18, 1983), and the administrative record of the rulemaking, is inappropriate. Without waiving this objection, defendant disagrees that Mr. Morgan testified that this provision was added solely because of utility requests for planning forecasts. In fact, Mr. Morgan testified that the provision pertaining to the ACR was "added at the request of a substantial number of commenters," who were not identified by Mr. Morgan. He further testified that DOE could not commit to a rate in the contract, but that DOE could include a provision so that utilities could identify the planning for on-site storage in which they needed to engage. ENA at 755.

39. After the promulgation of the final Standard Contract, the Edison Electric Institute again wrote to Robert Morgan on behalf of the industry expressing continued concern about "the lack of standards or milestones for DOE's performance" and the compressed timetable for drafting the Standard Contract. (John J. Kearney letter to Robert Morgan (May 20, 1983 ), ENA at 1025-27; 3/21/02 Morgan Dep. at 201-03, ENA at 760.)

**RESPONSE**: Defendant agrees with this proposed finding to the extent supported by the letter cited, which is the best evidence of its contents; defendant otherwise denies the proposed finding of fact. Defendant specifically avers that the cited letter contains the language that is quoted in this proposed finding. See ENA at 1025-27. However, defendant further avers that the citation to Mr. Morgan's deposition testimony in support of this proposed finding is inapt because Mr. Morgan did not testify about the substance of Mr. Kearney's letter, but, rather, only testified regarding the substance of Mr. Morgan's response to Mr. Kearney's letter. Finally, defendant avers that, in the cited letter from Mr. Kearney to Mr. Morgan, Mr. Kearney, upon behalf of the Edison Electric Institute, admitted that DOE "ma[de] the contract a regulation." ENA at 1026.

40. In response, Morgan stated "We believe that we adequately addressed all the industry's concerns in the rule at that time." (Robert Morgan letter to John J. Kearney (June 17, 1983 ), ENA at 1028; 3/21/02 Morgan Dep. at 202-04, ENA at 760.) Mr. Morgan cited time constraints, and asserted that the DOE could not address utility concerns prior to the NWPA's June 30, 1983 contract deadline. (*Id.*)

**<u>RESPONSE</u>**: With regard to the first sentence of this proposed finding, defendant agrees with the first sentence to the extent supported by the letter cited, which is the best evidence of its contents; defendant otherwise denies the first sentence of the proposed finding. Defendant avers that, although the cited letter contains the sentence quoted in this proposed finding, it fails to quote the preceding sentence in that letter that explains the scope and purpose of Mr. Morgan's statement. The two sentences, read together, are as follows:

> As you are aware, all of the issues that you raised in your letter, specifically, <u>a lack of standards for the Department of Energy's (DOE) performance</u>, utility review rights of DOE's waste management program, utility indemnification, "credits," interest rates, <u>the contract being a regulation</u>, and "Net versus Gross" electrical generation <u>were addressed in the preamble to the April 18, 1983, final rule</u>. We believe that we adequately addressed all the industry's concerns in the rule at that time.

ENA at 1028 (emphasis added).

With regard to the second sentence in this proposed finding, defendant disagrees. This sentence significantly misrepresents the substance of Mr. Morgan's letter. The sentence from Mr. Morgan's letter that plaintiff attempted to paraphrase reads as follows: "Recognizing the stringent (*sic*) time constraints the Act has imposed on the Department, we clearly cannot <u>reexamine</u> any issue of concern to the utilities prior to the June 30, 1983 deadline." ENA at 1028. (emphasis added). Plainly, Mr. Morgan's letter does not indicate that DOE had

inadequately considered and addressed the nuclear industry's concerns "prior to the NWPA's June 30, 1983 contract deadline," but instead indicated that, because of the continuing obligations that the NWPA imposed upon DOE to perform work after contract execution, DOE did not have time to reexamine issues that the utilities had identified as a concern prior to June 30, 1983. Further, in response to Mr. Kearney's suggestion in his May 20, 1983 letter that "[o]ne possibility" for dealing with perceived shortcomings in the Standard Contract that was "being considered" by the utilities "is the filing of a rulemaking petition to address the kind of concerns outlined above," ENA at 1026, Mr. Morgan's June 17, 1983 letter further states as follows: "However, as you mentioned in your letter, any issue can be readdressed by the industry and, I would add, by the Government as well, after the individual contracts are signed with utilities." ENA at 1028.

41. DOE expressed unwillingness to extend the June 30, 1983 deadline for execution of the Standard Contract to discuss issues related to the Standard Contract. The Federal Register Notice publishing the final version of the Standard Contract reversed DOE's prior statements that the DOE would certify that good faith negotiations were underway, and stated that the Standard Contract had to be signed by June 30, 1983. (48 Fed. Reg. at 16590, ENA at 1006.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Defendant further objects to this proposed finding to the extent that, through this proposed finding, plaintiff is seeking to interpret the meaning of statements contained in a final rule published in the Federal Register, which are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Without waiving these objections, and to the extent that the proposed

finding contains allegations of fact, defendant disagrees with this proposed finding. This proposed finding mischaracterizes DOE's explanation for the change in position regarding extension of the deadline. The discussion of the changes reflected in the final rule published in the Federal Register, which contained the final terms of the Standard Contract, regarding this issue reads as follows:

> In the "Legislative Background" section of the proposed rule (48 FR 5458-5459) an interpretation was set forth that an affirmation by the Secretary, in writing, that an owner or generator of SNF or HLW is actively negotiating in good faith would defer the preclusion of disposal of SNF or HLW in the absence of a timely executed contract. This interpretation was reflected in the last sentence of § 961.2 of the proposed rule (48 FR 5461), which stated that "[t]hese deadlines may be waived if the Secretary of Energy affirms in writing, in accordance with section 302(b)(1(A)(ii) of the Act, before the applicable deadline, that the owner of generator is actively and in good faith negotiating with the Secretary for a contract covered by this part." The interpretation has been reconsidered and the Department has concluded that the requirement that a contract be entered into not later than June 30, 1983 or the date on which an owner or generator commences generation of, or takes title to, SNF or HLW (whichever occurs later) cannot be deferred by a Secretarial affirmation. Accordingly, the above quoted last sentence of § 961.2 has been deleted.

48 Fed. Reg. 16590, 16590 (Apr. 18, 1983) (ENA at 1006). Further, the provision of the NWPA that speaks to this issue is a subparagraph in the section that provides that the Nuclear Regulatory Commission ("NRC") shall not issue or renew an operating license unless (1) a contract with DOE has been executed or (2) the Secretary affirms that the party is negotiating in good faith to enter into a contract. 42 U.S.C. § 10222(b); <u>see</u> 48 Fed. Reg. at 16590, ENA 1006. Accordingly, the Secretary had no authority otherwise to extend the deadline within which Congress required that contracts be executed.

42. The NWPA "effectively made entry into [the Standard Contract] mandatory for the utilities. . ." *Maine Yankee Atomic Power Company v. United States*, 225 F.3d 1336, 1337 (Fed. Cir. 2000). (*See also System Fuels, Inc. v. United States*, No. 03-2624C, 2005 WL 1804314, at *1 (Fed. Cl. July 29, 2005), ENA at 2324, 2325; 5/20/02 Lawrence Dep. at 100-01, ENA at 649; 3/12/02 Cole Dep. at 56, ENA at 538; 3/21/02 Morgan Dep. at 74, 204, ENA at 749, 760.)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Moreover, defendant objects to this proposed finding upon the grounds that this conclusion of law is irrelevant to a determination of the issues presented in our motion for summary judgment. Further, defendant objects to plaintiff's proposed finding to the extent that it attempts to support its interpretation of the NWPA by reference to deposition testimony. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms").

Without waiving these objections, and to the extent that the proposed finding contains allegations of fact, defendant incorporates by reference its response to No. 34 of plaintiff's proposed findings of fact. As we explained in our response to No. 34 of plaintiff's proposed findings of fact, which we incorporate by reference to this response, an owner or generator of SNF or HLW was free not to enter into a contract with DOE, although the owner or generator's ability to continue its production of nuclear power could have been affected by that decision and, if the owner or generator elected not to enter a contract by the dates established in the NWPA, DOE would have been barred from accepting that owner's or generator's SNF and HLW for

disposal in a repository constructed pursuant to the NWPA. See 42 U.S.C. § 10222(b). Further, defendant avers that, absent the Standard Contract, each nuclear utility would be solely responsible for the long-term storage and disposal of the SNF and HLW that it generated as a result of its production of nuclear power. Further, in light of the highly regulated nature of the nuclear utility industry, see, e.g., Commonwealth Edison Co. v. United States Dep't of Energy, 877 F.2d 1042, 1045 (D.C. Cir. 1989) ("[f]ew substances are as extensively regulated as high-level nuclear waste"), any lack of multiple options for disposal of SNF and HLW should not have been unexpected.

43. The Standard Contract was put together in such haste that it was "fraught with ambiguities, contradictions, incorrect statements. . ." (3/12/02 Cole Dep. at 55, ENA at 538.)[13] As noted years later in a December 1991 memorandum: "The Standard Disposal Contract. . . was unfortunately developed in such a way that the terms and conditions contained numerous omissions, inconsistencies, ambiguities and contradictions." (ACR Issues Status Report

[13] Mr. Cole also said that the Contract was ". . .pretty dammed good under the circumstances. . ." (3/12/02 Cole Dep. at 55, ENA at 538.)

(December 31, 1991), ENA at 1733; *see also* 4/11/02 Brownstein Dep. at 514-19,[14] ENA at 513-14.)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Regardless of whether this Court interprets the language of the Standard Contract as a regulation or under general contract interpretation principles, the question of whether the Standard Contract, as a whole, is ambiguous, is contradictory, or contains incorrect statements or omissions is a conclusion of law. See Castle v. United States, 301 F.3d 1328, 1337 (Fed. Cir. 2002) ("[c]ontract interpretation is a question of law"); United States v. Boeing Co., 802 F.2d 1390, 1393 (Fed. Cir.1986) ("[t]he interpretation of regulations which are incorporated into government contracts is a question of law which this court is free to resolve"). In interpreting a contract, testimony regarding the subjective beliefs of an individual, a party, or any other entity "as to the obviousness of the ambiguity" in the contract is irrelevant to this Court's de novo review of the contract language, based upon an "objective standard." Newsom

[14] At the time of his deposition, Alan Brownstein was serving as a Senior Policy Advisor, OCRWM, responsible for the DOE Yucca Mountain Site recommendation activities. Mr. Brownstein has worked for DOE in various capacities, including as a Nuclear Industry Specialist, Management & Support Division, OCRWM (1985-91), Branch Chief & Contracting Officer's Technical Representative, Logistics & Utility Interface Branch, OCRWM (1991-94), and Division Chief, Waste Acceptance Division, OCRWM (1994-95). In each of these positions, Mr. Brownstein was responsible for implementing the terms of the Standard Contract for DOE, including interactions with utilities, coordination of collection of utility SNF discharge information, development of the Annual Capacity Reports and Acceptance Priority Rankings, and the DCS process. In addition, Mr. Brownstein served as Director, Regulatory Coordination Division, OCRWM (1995-2001), where he was responsible for the DOE's interactions with regulatory agencies such as the NRC and EPA, and coordinated with OCRWM staff at Yucca Mountain for interaction with such agencies. (*See* 4/11/02 Brownstein Dep. at 535-37, ENA at 515-16; 4/9/02 Brownstein Dep. at 25-29, 31-41, ENA at 479-83.)

v. United States, 230 Ct. Cl. 301, 304, 676 F.2d 647, 650 (1982). Similarly, the Court's review of alleged ambiguities in a regulation do not depend upon an individual's beliefs, as opposed to the official policymakers of the agency. Further, defendant objects to plaintiff's reliance upon the deposition testimony of Alan Brownstein regarding the ACR Resolution Process document cited, for three reasons: because the testimony was subject to objection (because it calls for a legal conclusion and based upon a lack of foundation), ENA at 513-14; because Mr. Brownstein testified that he had never seen the cited document before, ENA at 513, rendering his testimony about it without foundation; and because Mr. Brownstein did not testify that the Standard Contract "contained omissions, inconsistencies, ambiguities and contradictions," ENA at 514.

Without waiving these objections, and to the extent that the proposed finding is deemed to constitute allegations of fact, defendant disagrees with this proposed finding. First, the citation to Mr. Cole's deposition does not support the proposed finding. Mr. Cole, who testified that he was not one of the individuals involved in the development of the Standard Contract, testified that it was his impression that it was put together in haste. ENA at 537-38. Additionally, the quoted language in the first sentence also refers to Mr. Cole's impression of the Standard Contract. Id. His hearsay testimony is inadmissible regarding the development of the Standard Contract. Second, the December 1991 memorandum to which the second sentence refers was written by DOE's management and operating contractor or one it of its subcontractors. ENA at 13-14. Accordingly, the memorandum does not purport to reflect the opinion of anyone at DOE. Moreover, as the memorandum states, the parties recognized 34 issues that needed to be resolved before waste acceptance could begin, which does not necessarily connote ambiguities, inconsistencies, omissions or incorrect statements. ENA at 1733.

44. On June 13, 1983, Energy Northwest, then known as Washington Public Power Supply System, executed Standard Contract #DE-CR01-83NE44424. (Contract fo the Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste Contract. No. DE CR01-83NE44424, ENA at 291-353.)

**<u>RESPONSE</u>**: With regard to the first sentence of this proposed finding, defendant disagrees because the document to which Energy Northwest cites is not titled, "Standard Contract # DE-CR01-83NE44424." Defendant avers that Energy Northwest signed a contract bearing that number that contained the same terms as the Standard Contract, published at 10 C.F.R. Part 961.

45. Despite continued concerns that the Standard Contract did not adequately address DOE's obligations, the Department continued to assure interested parties that DOE would meet the intent of the NWPA. In September of 1984, the Secretary of Energy, Donald P. Hodel, responded to Congressional concerns about DOE's commitments under the NWPA and stated "[p]ursuant to my authority, it is my intention that this commitment in the contracts, together with the overall thrust of the Act, will create an obligation for the Department to accept spent fuel in 1998 whether or not a repository is in operation. This should enable utilities to plan for their projected waste disposal needs with confidence and certainty." (Donald P. Hodel, Secretary, DOE Letter to J. Bennett Johnston, United States Senator (September 7, 1984), ENA at 1203-04.) Hodel also indicated that it was his intent to address utility concerns by incorporating a minimum rate into the Standard Contract. (*Id.*)

**<u>RESPONSE</u>**: With regard to the first sentence of this proposed finding, defendant is unable to respond because the proposed finding is vague in that it does not identify to whose

"concerns" plaintiff refers and is unsupported as required by RCFC 56(h)(1). With regard to the second sentence of this proposed finding, defendant disagrees. Plaintiff has mischaracterized the nature of Secretary Hodel's letter in this proposed finding. The letter states, in part, as follows:

> I am writing in response to your letter of June 21, 1984, which dealt with disposal of spent nuclear fuel under the Nuclear Waste Policy Act. In your letter, you expressed dissatisfaction with the completeness of the General Counsel's response of May 30, 1984, and stated you had requested "an opinion on the legal obligation of the Department and the Department's authority to take title to spent nuclear fuel in the event that a repository has not yet commenced operation" by January 31, 1998.

ENA 1203. Accordingly, Secretary Hodel's letter responded to the concerns expressed above, not those as characterized by Energy Northwest. Defendant agrees with the quotations from Secretary Hodel's letter to the extent supported by the letter cited, which is the best evidence of its contents; defendant otherwise denies the second sentence of this proposed finding of fact.

With regard to the third sentence of this proposed finding, defendant disagrees. Secretary Hodel's letter included the following language: "The Department is authorized to implement the [NWPA] through contractual commitments. To this end, the Department plans to incorporate into its contracts provisions which specify the minimum amount of spent fuel and waste which the Department will be obligated to accept, not later than January 31, 1998. Since these contracts have not yet been modified, it would be premature for the Department to speculate on particulars that might ultimately be incorporated in any or all of the contracts." ENA at 1203. Contrary to the representations contained in the third sentence of this proposed finding, Secretary Hodel's letter does not state that he was responding to utility concerns or that it was his intent to do so. Moreover, the fact that the parties never amended the contract to include a minimum rate of acceptance supports the position that, as explained in our motion for summary

judgment regarding the rate of acceptance, the Standard Contract contains the mechanism by which the parties would determine, upon an individual utility basis, a schedule for DOE's acceptance of that utility's SNF and/or HLW.

46. In June 1984, OCRWM Director Ben Rusche told reporters that the contract with owners of nuclear power plants were being revised to provide a minimum amount of fuel that would be accepted. (Matt Yancey, *Nuclear Wastes*, Associated Press, June 13, 1983, ENA at 1188; 5/17/02 Rusche Dep. at 337-43, ENA at 876-77; Cass Petersen and Pete Early, *Waste-Disposal Advances*, Wash. Post, June 15, 1984, ENA at 1189.) A wire story stated that Mr. Rusche "said the primary reason for revising the contracts was to assure utilities they would not have to build more 'swimming pools' for temporarily storing wastes beyond 1998." (*Id.*) Mr. Rusche also stated that "The Department is obligated to begin receiving spent fuel in 1998 whether or not a repository is in place." (*Id.*)

**RESPONSE**: Defendant objects to this proposed finding because plaintiff has offered no potentially admissible evidence to support it. The proposed finding purports to offer hearsay statements, contained in newspaper articles and press reports which are themselves hearsay, for truth of the matters asserted in the hearsay documents, in violation of RCFC 56(e). See Eisenstadt v. Centel Corp., 113 F.3d 738, 742 (7th Cir. 1997) (newspaper articles are inadmissible on summary judgment motion because "hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial"); 10A C. Wright & A. Miller, Federal Practice & Procedure § 2722. His hearsay testimony is inadmissible regarding the development of the Standard Contract.

Without waiving this objection, the deposition testimony of Mr. Rusche cited in support of this proposed finding does not support the proposed finding. Mr. Rusche was shown and questioned about the first two pages of one of the two press reports. See ENA at 1188 (AP wire report), ENA at 871-72 (Rusche testimony). The first two paragraphs of the AP wire report indicate that "[t]he Energy Department has agreed to begin taking highly radioactive wastes off the hands of the Nation's nuclear power plants in 1998 even if no Federal burial or storage facilities are completed by then" and that "Ben Rusche, the new Director of the Energy Department's Civilian Radioactive Waste Management Office, said Government contracts with owners of the Nation's 80 nuclear plants are being revised to include the guarantee." ENA at 1188. In response to questions about those two paragraphs, Mr. Rusche testified that, although he "do[esn't] doubt" that he made the statements based upon the fact that they were reported in the wire report, he has no recollection of making the statements. ENA at 870. Even if Mr. Rusche had testified that he recalled making the statements in the first two paragraphs of the AP wire report, it still would not support this proposed finding of fact. Mr. Rusche was not asked during his deposition about those portions of the AP wire report or the cited Washington Post article that contain the statements identified in this proposed finding. Accordingly, plaintiff has failed to provide any support for this proposed finding. In any event, even if the purported statements were supported by admissible evidence, Mr. Rusche's alleged statement would comport with statements contained in program documents issued contemporaneously that clearly expressed DOE's intention that it hoped to preclude the need for additional at-reactor storage, in the aggregate, rather than on an individual utility basis. However, even that hope was not

contractually binding, given that it was not expressed in the Standard Contract and was not a binding obligation that DOE was contractually required to satisfy.

47. In 1987, in response to a letter from UNWMG Director Steve Kraft (ENA at 1387-1400) expressing concerns about the DOE's future performance, Christopher Jedrey, the DOE Contracting Officer, acknowledged that DOE "recognized that the Contract may not provide sufficient detail and guidance to enable either DOE or the Purchasers to carry out all of their contractual responsibilities," but emphasized that DOE "intends to honor both the letter and spirit of the NWPA and the Contract, rather than seek opportunities to circumvent its obligations." (Christopher Jedrey, Contracting Officer, DOE, Letter to S.P. Kraft, Director UNWMG, at 1, 2 (October 7, 1987), ENA at 1491-92; 4/9/02 Brownstein Dep. at 128-43, ENA at 488-92.)

**RESPONSE**: Defendant disagrees with the proposed finding because Energy Northwest's quotations are taken out of context and attempt to link two separate discussions contained in the document cited. With regard to the first quotation, defendant avers that the cited letter refers to the 1987 Annual Capacity Report ("ACR") that had recently been issued, and that one of the two portions of the letter that plaintiff quotes in this proposed finding states that, "[a]side from fulfilling the mandated minimum reporting requirements, the ACR also: – recognized that the Contract may not provide sufficient detail and guidance to enable either DOE or the Purchasers to carry out all of their contractual responsibilities . . . ." ENA at 1491. However, Mr. Jedrey states, in the same October 2, 1987 letter, that "I believe that the issue resolution process embodied in the ACR offers an important mechanism for use by all parties to systematically identify, prioritize, address, and ultimately resolve mutual concerns." ENA at

1491. He also represented that the acceptance schedules contained in the ACR "will serve as the basis for developing contractually binding delivery schedules in 1991," ENA at 1491, but that, "given the current status of the WMS, the Department is unable to make a commitment to a minimum receipt rate of spent nuclear fuel (SNF) which will equal or exceed the annual rate at which SNF is being discharged from reactors." ENA at 1492. With regard to the second quotation, Mr. Jedrey was addressing the utilities' concern, as expressed in a letter from UNWMG Director Steve Kraft (ENA at 1387-1400), that "DOE could, in theory, meet its contractual obligation to begin the waste acceptance process by accepting a single assembly in 1998 and no more until decades later." ENA at 1492. In response to this concern, Mr. Jedrey stated that, "the Department intends to honor both the letter and spirit of the NWPA and the Contract, rather than seek opportunities to circumvent its obligations." ENA at 1492.

In support of this proposed finding, Energy Northwest also cites Mr. Brownstein's deposition testimony relating to Mr. Brownstein's authorship of the second quote from the letter. Those portions of testimony involve Mr. Brownstein providing his personal opinion as to whether DOE could satisfy its obligations to begin SNF acceptance on January 31, 1998, by accepting a single spent fuel assembly, which is a conclusion of law. Regardless of whether this Court interprets the language of the Standard Contract as a regulation or under general contract interpretation principles, the meaning of the Standard Contract's terms is a conclusion of law. See Castle v. United States, 301 F.3d 1328, 1337 (Fed. Cir. 2002) ("[c]ontract interpretation is a question of law"); United States v. Boeing Co., 802 F.2d 1390, 1393 (Fed. Cir.1986) ("[t]he interpretation of regulations which are incorporated into government contracts is a question of law which this court is free to resolve"). In interpreting a contract, testimony regarding the

subjective beliefs of an individual, a party, or any other entity is irrelevant to this Court's de novo review of the contract language, based upon an "objective standard." Newsom v. United States, 230 Ct. Cl. 301, 304, 676 F.2d 647, 650 (1982). Defendant also objects to the use of this testimony for any other reason because it was subject to objection as a legal conclusion. Legal conclusions are inadmissible as testimony from a lay witness because they are not based upon the witness' perception and require the kind of specialized knowledge reserved for expert testimony. Fed. R. Evid. 701. However, they are also inadmissible as expert testimony. Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992). Courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001). Finally, defendant objects to the use of this testimony as support for this proposed finding because it does not lend support to the proposed finding – that the letter simply contains the quoted language.

**C. Provisions Of The Standard Contract**

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1).

48. The Standard Contract signed by Energy Northwest creates an absolute obligation for DOE to begin taking SNF and high-level waste no later than January 31, 1998 and to continue to do so until all wastes have been disposed of:

> The services to be provided by the DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in

> Appendix A, annexed hereto and made a part hereof, has been disposed of.

(Standard Contract Art. II, ENA at 297.)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Moreover, defendant objects to this proposed finding upon the grounds that this conclusion of law is irrelevant to a determination of the issues presented in our motion for summary judgment. Without waiving these objections, defendant agrees that the quoted provision is contained in the Standard Contract.

49. To date, Energy Northwest has paid over $126 million dollars in quarterly fees under the Standard Contract. (*See* Larkin Decl.[15] ¶ 21, ENA at 360.) DOE has yet to remove any Energy Northwest SNF under the Standard Contract.

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to a determination of the issues presented in our motion for summary judgment. Without waiving this objection, defendant agrees with this proposed finding of fact.

---

[15] David Larkin first joined Energy Northwest in 1973, and is currently the Project Manager for Cask Fabrication at Energy Northwest. Mr. Larkin has also worked for Energy Northwest as a Nuclear Fuel Buyer; Supervisor, Core Analysis; Manager, Nuclear and Safety Analysis; Manager, Fuel Management; Manager, Engineering Services; and Program Leader, Nuclear Fuel. In his positions for Energy Northwest from 1982 to the present, Mr. Larkin has had responsibilities related to management and disposal of SNF generated by Columbia Generating Station ("Columbia"), including projecting the discharge of SNF from Columbia, tracking Energy Northwest's inventory of SNF, and tracking Energy Northwest's capacity to store SNF at Columbia, including consideration of how long Energy Northwest's existing storage capacity would accommodate projected SNF discharges and consideration of options for expanding storage capacity to accommodate projected SNF discharges. (Larkin Decl. ¶ ¶ 1, 2, 5, 8, ENA at 354, 355.)

50. As of February 28, 2005, the nuclear utility industry has paid $12.23 billion dollars in fees into the Nuclear Waste Fund under Standard Contracts signed by utilities. (Monthly Summary of Program Financial and Budget Information as of February 28, 2005, (Office of Civilian Radioactive Waste Management, Office of Program Management) at 1-3, ENA at 2266, 2272.) Including interest, approximately $20 billion has been collected in the Nuclear Waste Fund since 1983. (*See* 8/4/04 Pollog Testimony in *Yankee Atomic Electric v. United* States, at 4088, ENA at 815.) DOE has yet to remove any utility's SNF under its Standard Contracts.

**RESPONSE**: Defendant objects to this proposed finding of fact upon the grounds that it is irrelevant to a determination of the issues presented in our motion for summary judgment. Without waiving this objection, defendant agrees with this proposed finding.

51. The Standard Contract ultimately executed by Energy Northwest contained no term addressing the rate at which the DOE would accept SNF. (*See* Standard Contract *generally*, ENA at 291-353; 1987 Annual Capacity Report at 14 ("The Contract makes no provisions for the minimum amount of SNF that DOE will accept and transport in a given period."), ENA at 1471, 1487; 4/17/02 Zabransky Dep. at 30, ENA at 932; 5/1/02 Milner Dep. at 42, ENA at 696.)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Further, defendant objects to plaintiff's attempt to interpret the terms of the Standard Contract by reference to deposition testimony. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of contractual interpretation as to which deposition testimony is inadmissible. See, e.g., First

Heights Bank, FSB v. United States, 51 Fed. Cl. 659, 666 (2001). Further, all of the cited deposition testimony was subject to objection based upon the questions' requests for legal conclusions, rendering the testimony inadmissible pursuant to RCFC 56(e). See ENA at 932, 696.

Without waiving this objection, defendant disagrees with this proposed finding of law. While the contract contains no specific numerical acceptance rate, it plainly contains a mechanism by which the parties agreed that the schedule of SNF and HLW acceptance would be developed. Further, none of the "evidence" that plaintiff cites to support its contract interpretation provides any such support. The cited 1987 Annual Capacity Report refers to the fact that the Standard Contract did not obligate DOE to accept utilities' SNF and/or HLW at any particular or minimum mandatory rate. Similarly, in the cited deposition testimony of Mr. Zabransky, Mr. Zabransky testified that "[t]here's no rate of acceptance established in the contract." Zabransky Dep. at 30, ENA at 932. He did not testify that the Standard Contract did not contain any term addressing the rate. In fact, Mr. Zabransky testified, on the page following the page of the deposition transcript that plaintiff cites, that "[a]s a result of the contract the Department of Energy's obligation is to as it appears on the approved delivery commitment schedules" and that "[t]he contract stipulates how the utility" obtains approval of delivery commitment schedules. Id. at 31, ENA at 932..

52. The Standard Contract provided that:

> Beginning not later than July 1, 1987, DOE shall issue an annual capacity report *for planning purposes*. This report shall set for the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available,

> capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility.

(Standard Contract Art. IV.B.5.b, ENA at 301 (emphasis added).) As stated, this provision was added at the request of utilities. (ENPF ¶ 38.)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required.

Without waiving this objection, defendant responds as follows. With regard to the first sentence of this proposed finding, defendant agrees with the first sentence to the extent supported by the Standard Contract cited, which is the best evidence of its contents; defendant otherwise disagrees with the first sentence of this proposed finding. Defendant avers that the quoted language is contained in the Standard Contract. Defendant also notes that DOE has never asserted that Annual Capacity Reports ("ACRs") are binding documents. Instead, the ACRs are part of the contractual mechanism for the development of an acceptance schedule by which the parties would be bound. See, e.g., ENA at 1017. With regard to the second sentence of this proposed finding, defendant agrees with the proposed finding, but notes that the proper citation for this proposed finding is 48 Fed. Reg. 16590, 16592 (Apr. 18, 1983), not the cited proposed finding. See RCFC 56(h)(1).

53. The Standard Contract also provides that:

> Beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as

> provided in paragraphs B and D of Article V and paragraph B.3 of Article VI hereof.

(Standard Contract Art. IV.B.5.a, ENA at 301.)

**<u>RESPONSE</u>**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required.

Without waiving this objection, defendant agrees with this proposed finding to the extent supported by the Standard Contract cited, which is the best evidence of its contents; defendant otherwise disagrees with this proposed finding. Defendant avers that the quoted language is contained in the Standard Contract. Defendant further avers that this provision of the Standard Contract was part of the contractual mechanism for the development of an acceptance schedule by which the parties would be bound.

54. Further, the Standard Contract contained a ministerial process which required purchasers to provide information concerning the SNF or HLW they tentatively planned to deliver to DOE:

> Delivery commitment schedule(s), in the form set forth in Appendix C annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by Purchaser. After DOE has issued its proposed acceptance priority ranking, as described in paragraph B.5 of Article IV hereof, beginning January 1, 1992 the purchaser shall submit to DOE the delivery commitment schedule(s) which shall identify all SNF and/or HLW the Purchaser wishes to deliver to DOE beginning sixty-three (63) months thereafter. DOE shall approve or disapprove such schedules within three (3) months after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule form the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval.

(Standard Contract, Art. V.B.1, ENA at 302.)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required.

Without waiving this objection, defendant agrees with this proposed finding to the extent supported by the Standard Contract cited, which is the best evidence of its contents; defendant otherwise disagrees with this proposed finding. Defendant avers that the quoted language is contained in the Standard Contract. However, defendant avers that it disagrees with plaintiff's characterization of the DCS process as "ministerial," because the Standard Contract uses no such term and such characterization attempts to diminish or eliminate the provisions of the Standard Contract that provided for the establishment of the schedule for acceptance of SNF from each individual utility. In addition, submission of DCSs by the utilities is more than “ministerial” because it requires the exercise of judgment regarding the identification of SNF to DOE.

55. The DCS provisions in the Standard Contract did not refer at all to the Annual Capacity Reports regarding DOE’s annual receiving capacity. (Standard Contract Art. V.B., ENA at 302.)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant also objects upon the ground that this proposed finding is irrelevant to the issues presented in our motion for summary judgment.

Without waiving this objection, defendant agrees with this proposed finding to the extent supported by the Standard Contract cited, which is the best evidence of its contents; defendant

otherwise disagrees with this proposed finding. Defendant avers that it is axiomatic that, in construing the Standard Contract, the Court is required to consider the contract as a whole and to give meaning to all of its parts, if at all possible. Hughes Communications Galaxy, Inc. v. United States, 998 F.2d 953, 958 (Fed. Cir. 1993). Accordingly, merely because the DCS provision does not expressly refer to the ACRs is not dispositive. The Standard Contract, when read as a whole, clearly demonstrates that the parties agreed that the schedule for acceptance from individual utilities would be determined by the submission, review, and approval of DCSs, which were dependent upon the allocations contained in the ACRs.

56. Under the DCS provisions in the Standard Contract, the quantity of SNF listed on these DCSs could be adjusted by the purchaser plus or minus twenty percent up to two months prior to submission of a Final Delivery Schedule. (Standard Contract, Art. V.B.2, ENA at 302.)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required.

Without waiving this objection, defendant agrees with this proposed finding to the extent supported by the Standard Contract cited, which is the best evidence of its contents; defendant otherwise disagrees with this proposed finding.

57. One year prior to delivery, the purchaser was to provide more specific information concerning the fuel they would deliver:

> Final delivery schedule(s), in the form set forth in Appendix D, annexed hereto and made a part hereof, for delivery of SNF and/or HLW covered by an approved delivery commitment schedule(s) shall be furnished to DOE by Purchaser. The Purchaser shall submit to DOE final delivery schedules not less than twelve (12) months prior to the delivery date specified therein. DOE shall

> approve or disapprove a final delivery schedule within forty-five (45) days after receipt. In the event of disapproval, DOE shall advise the Purchaser in writing for the reasons for such disapproval and shall request a revised schedule from Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval. DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt. In the event of disapproval, DOE shall advise the purchaser in writing of the reasons for such disapproval and shall submit its proposed schedule(s). If these are not acceptable to the Purchaser, the parties shall promptly seek to negotiate mutually acceptable schedule(s).

(Standard Contract, Art. V.C., ENA at 302-03.)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required.

Without waiving this objection, defendant agrees with this proposed finding to the extent supported by the Standard Contract cited, which is the best evidence of its contents; defendant otherwise disagrees with this proposed finding. Defendant also disagrees with this proposed finding because the final delivery schedules require no new or specific information "concerning the fuel" from the utilities. Standard Contract, App. D, ENA at 331-32. That information was not required until submittal of the Appendix F, "Detailed Description of Purchaser's Fuel," not later that 60 days prior to the schedule transportation date. Standard Contract, App. F, ENA at 336-38. However, defendant avers that the quoted language is contained in the Standard Contract.

58. DOE witnesses testified that the delivery commitment schedule ("DCS") provision was for planning purposes only and that the DCSs submitted by utilities were not binding.

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant also objects to this proposed finding because the meaning of contractual provisions is a matter for the Court to decide and the interpretations of DOE witnesses, or any witnesses, are irrelevant to that determination. See, e.g., First Heights Bank, FSB v. United States, 51 Fed. Cl. 659, 666 (2001). Defendant further objects to the proposed finding because it is predicated upon a misunderstanding of the DCS approval process. DCSs become binding commitments upon approval by DOE. Therefore, although DCSs submitted by the Standard Contract holders were not binding on either party when submitted, they became binding upon both parties upon approval by DOE. Without waiving these general objections, to the extent that the Court finds that any of the specific cited testimony is relevant to an issue of fact, defendant further objects to the subparts of the proposed finding following each subpart. a. Nancy Slater-Thompson[16], the DOE official in charge of DCS submissions during the early 1990s, testified that she did not consider the DCS binding on either the DOE or the utilities:

[16] At the time of her 2002 deposition, Nancy Slater-Thompson was employed as Acting Division Director, Regulatory Coordination Division. At the time of her 1999 deposition, Ms. Slater-Thompson was employed as Team Leader, Regulatory Coordination Division. In both positions, Ms. Slater-Thompson was responsible for regulatory issues related to the program involving the NRC, EPA, National Academy of Science, and the Nuclear Waste Technical Review Board. Ms. Slater-Thompson has also been employed by DOE as Team Leader & Contracting Officer's Technical Representative, Waste Acceptance Division, OCRWM, where she was responsible for preparation of the DOE's Annual Capacity Report and Acceptance Priority Ranking, answering questions about the terms and conditions of the Standard Contract, and review of delivery commitment schedules. (*See* 6/13/02 Slater-Thompson Dep. at 4-6, 8-9, 102-04, ENA at 894-95, 898; 4/21/99 Slater-Thompson Dep. at 6, 14-15, 19-20, ENA at 884, 885, 886.)

> Q: What about the delivery commitment schedules? Was it your understanding that those similarly were for planning purposes only and not contractually binding on either the utilities or the department?
>
> A. In my personal opinion, they were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them. In addition, given the fungibility of the DCSs, that's why there is a final delivery schedule which is somewhat more than a planning document. And I do recall sitting across the table form numerous utility representatives, clearly recognizing that the DCSs were [for] planning purposes and they in fact did not view themselves as binding themselves to deliver specifically what was described on the DCS.
>
> Q. During the time that you worked in the waste acceptance division at the Department of Energy, do you recall anyone either within DOE or in industry who thought that the delivery commitment schedules were binding on either industry or the department?
>
> A. No, I don't.

(6/15/2002 Slater-Thompson Dep. at 98-99 (objections omitted), ENA at 897.)

Ms. Thompson also testified that the nature of the DCSs and their reliance on the non-binding ACRs made them non binding:

> Q. Did you view an approved delivery commitment schedule as binding a utility to not delivering more spent fuel than is set out on that delivery commitment schedule?
>
> A. It's not the DCS that establishes the allocation. It's simply a reflection.
>
> Q. What sets out the allocation?
>
> A. The ACR; and that's for planning purposes only because that allocation could change.

(6/15/2002 Slater-Thompson Dep. at 110 (objection omitted), ENA at 900; *see also* 4/22/1999 Slater-Thompson Dep. at 244-45, ENA at 892.)

**RESPONSE**: Defendant objects to subparagraph (a) of this proposed finding because all of the testimony that plaintiff cites from Ms. Slater-Thompson's 2002 deposition was subject to objection as a legal conclusion. Legal conclusions are inadmissible as testimony from a lay witness because they are not based upon the witness' perception and require the kind of specialized knowledge reserved for expert testimony. Fed. R. Evid. 701. However, they are also inadmissible as expert testimony. Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992). Courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001). Defendant further objects to subparagraph (a) because the deposition testimony to which plaintiff cites from Ms. Slater-Thompson's 1999 deposition, which plaintiff cites in addition to Ms. Slater-Thompson's 2002 deposition, does not support the proposed finding. Instead, it relates to the different issue of whether utilities would be bound by DCSs in the event that they subsequently were granted priority as shutdown reactors under the terms of the Standard Contract. 4/22/1999 Slater-Thompson Dep. at 233-45, ENA at 890-92. However, the complete testimony not provided in plaintiff's appendix states that, with respect to "quantity," a utility was limited to the amounts that they had been allocated, as reflected in the DCS. Id. at 245-46, SGA at 447-48. Without waiving these objections, to the extent that the Court determines that this testimony is not objectionable, defendant notes that the testimony of a DOE employee who was involved with this issue in the 1990s could not be relevant to the parties' intent at the time of the formation of the contract in 1983. Further, Ms.

Slater-Thompson expressly testified in her 2002 deposition that she was stating her "personal opinion," not the official position of DOE. ENA at 899.

b. Alan Brownstein, the DOE official in charge of the division that handled the DCSs during the early and mid 1990s, testified that the DCSs were exclusively for planning purposes. (4/10/02 Brownstein Dep. at 376-78, ENA at 506.) Brownstein agreed that before he read the Government's Summary Judgment Motion, he "had no understanding of what liabilities and obligations on the part of both parties are locked in by the DCS submittal and approval process." (6/14/02 Brownstein Dep. at 427, ENA at 525.) Brownstein testified that his reaction to reading the Government's motion was "well, that's interesting, when I read that it was interesting. *I never discussed it or thought about that before.*" (*Id.* (emphasis added).)

**<u>RESPONSE</u>**: All of the testimony of Mr. Brownstein that plaintiff cites in subparagraph (b) was subject to objection, either based upon its nature as a conclusion of law or because it called for speculation. As previously stated, courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. Accordingly, defendant objects to subparagraph (b) of this proposed finding to the extent supported by Mr. Brownstein's testimony because it is precluded by RCFC 56(e). Without waiving these objections, to the extent that the Court determines that this testimony is not objectionable, defendant notes that the testimony of a DOE employee who was involved with this issue in the 1990s could not be relevant to the parties' intent at the time of the formation of the contract in 1983.

c. Former OCRWM acting director Michael Lawrence testified that he viewed the DCS as a planning tool. (5/20/02 Lawrence Dep. at 131, ENA at 650.)

**<u>RESPONSE</u>**: The testimony that plaintiff cites in support of subparagraph (c) of this proposed finding was subject to objection, based upon its nature as a legal conclusion, and courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. Accordingly, defendant objects to subparagraph (c) of this proposed finding to the extent supported by the citation to Mr. Lawrence's testimony because it is precluded by RCFC 56(e). Without waiving these objections, to the extent that the Court determines that this testimony is not objectionable, defendant notes that Mr. Lawrence was not involved in the drafting or the formation of the Standard Contract in 1983. (Lawrence Dep. 5/20/02, page 59, ENA at 640)

d. Christopher Kouts, Director of the Office of Systems Analysis and Strategic Development, in charge of integration of the various components of the DOE's SNF program, testified that the "[t]he prior DCS was a planning document, and this {the 2004} DCS would also be a planning document." (4/11/05 Kouts Rule 30(b)(6) Dep. at 129, ENA at 618.)

**<u>RESPONSE</u>**: The testimony that plaintiff cites in support of subparagraph (c) of this proposed finding was subject to objection, based upon its nature as a legal conclusion, and courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. Accordingly, defendant objects to subparagraph (d) of this proposed finding to the extent supported by the citation to Mr. Kout's testimony because it is precluded by RCFC 56(e).

In addition, defendant states that plaintiff did not provide the full quote from Mr. Kouts' testimony, and therefore mischaracterizes his testimony. The full quote is as follows:

Q: What is the Department's position regarding the effect that new DCS submissions would have on those old DCS submissions?

[Objection]

A: The Department has responded to questions on that issue essentially to the extent that the former DCSs – before the Department will approve new DCSs under this or under the 2004 APR/ACR report, that essentially an agreement would need to be reached that the former DCSs were no longer under consideration.

Q: What do you mean by no longer under consideration?

A: That these would supplant – that the new DCS – approved DCSs would supplant whatever had occurred in the past.

Q: And the prior DCS Would no longer have any effect?

A: The prior DCS was a planning document, and this DCS would also be a planning document.

Kouts Dep. at 129, ENA at 618.

Without waiving these objections, defendant states that Mr. Kouts' testimony explains only the rationale for DOE's desire to obtain submittal of the DCS form from the utilities, and does not address the legal effect of the DCS process, or whether a DCS once approved was binding.

e. Robert Morgan testified that the DCS was to provide "background information" to the DOE concerning what fuel was out there, but that "[i]t did not commit acceptance by DOE." (6/25/02 Morgan Dep. at 135, ENA at 774..)

**RESPONSE**: Defendant objects to subparagraph (d) of the proposed finding because the cited testimony of Mr. Morgan was subject to objection, based upon its nature as a legal conclusion, and courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. Accordingly, defendant objects to this proposed finding to the extent supported by

the citation to Mr. Morgan's testimony because it is precluded by RCFC 56(e). Without waiving these objections, defendant agrees with subparagraph (d) only to the limited extent it is supported by Mr. Morgan's testimony. First of all, Mr. Morgan’s testimony only related to the DCS form (Appendix C to the Standard Contract) as that form was completed and “provided by the utilities.” Morgan Dep. at 135 ENA at 775 (emphasis added). In that regard, defendant agrees that Mr. Morgan testified that DOE was interested in the “delivery commitment by the utilities” because it would provide “background information” to the DOE concerning the SNF and/or HLW that “was out there.” Id. However, Mr. Morgan also testified that the delivery commitment schedule “provided by the utilities” did not commit acceptance by DOE. Transcript, at 134-35, ENA at 775 (emphasis added). Therefore, Mr. Morgan's testimony explains only the rationale for DOE's desire to obtain submittal of the DCS form from the utilities, and does not address the legal effect of the DCS process, or whether a DCS, once approved, was binding.

f. Lake Barrett characterized DCS submissions as “administrivia.” (4/22/02 Barrett Dep. at 217-18, ENA at 407.)

**RESPONSE**: Defendant objects to this proposed finding because the deposition testimony upon which it was based was subject to objection as to the lack of a proper evidentiary foundation. Further, although defendant agrees that the proposed finding is supported by the deposition testimony cited, its substance provides support for the "foundation" objection. Mr. Barrett testified very explicitly that he did not have any knowledge regarding the administration or implementation of the Standard Contract. Defendant further objects to this proposed finding because the deposition testimony upon which it was based is an inadmissible legal conclusion.

Legal conclusions are inadmissible as testimony from a lay witness because they are not based upon the witness' perception and require the kind of specialized knowledge reserved for expert testimony. Fed. R. Evid. 701. However, they are also inadmissible as expert testimony. Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992). Courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001). Without waiving these objections, defendant agrees that the proposed finding fairly paraphrases Mr. Barrett's testimony.

59. The final version of the Standard Contract left out language contained in a January 1983 draft, distributed to industry groups such as EEI, which provided that approved DCSs "shall become part of this contract." (EEI Unsolicited Comments on the Draft Contract at 4, ENA at 984; 986; 4/15/02 Rosselli Dep. at 52-54[17], ENA at 830-32.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it seeks to introduce parole evidence under circumstances where it is not permissible to do so. The contract is not ambiguous and Energy Northwest has not alleged that it is. "In general, when a contract is clear and unambiguous, evidence of prior negotiations and drafts is barred from consideration by the parol evidence rule." SCM Corp. v. U.S., 675 F.2d 280, 284 (Ct. Cl. 1982)(citing Butz Engineering Corp. v. United States, 204 Ct.Cl. 561, 578-79, 499 F2d 619, 628-29 (1974)). As set forth in our motion for summary judgment, the final written contract clearly

[17] Robert Rosselli was the Acting Associate Director, Resource Management Division, OCRWM, DOE from 1983-1984. In that position, Mr. Rosselli was a member of the team that developed the Standard Contract, and was responsible for organizational development, human resources management, contract administration, information resources, budget and finance. (*See* 4/15/02 Rosselli Dep. at 17, 43, ENA at 825, 926.)

contains the mechanism, in which DCSs play a part, by which the schedule of acceptance for individual utilities would be determined. Without waiving these objections, defendant agrees that the quoted language is contained in the document cited.

60. Furthermore, DOE's subsequent implementation of the DCS process indicated that DOE did not consider them binding. As discussed below, in ¶¶ 178 through 189, DOE's Instructions for submitting DCSs stated that they were to be based upon the ACRs. (DCS Instructions ¶ 2, GA at 145.) The Standard Contract and the ACRs themselves stated that they were "for planning purposes only and thus not contractually binding on either the DOE or the Purchasers." (Standard Contract Art. IV.B.5.b, ENA at 301; 1991 ACR at 1.1, ENA at 1687; July 2004 Acceptance Priority Ranking & Annual Capacity Report ("2004 APR/ACR") at 1, ENA at 2133, 2136.)

**RESPONSE**: With regard to the first sentence of this proposed finding, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1). Without waiving this objection, defendant disagrees with the proposed finding. Had plaintiff objected to the implementation of the DCS process, plaintiff should have raised its objection at the time it received the DCS instructions, or, at the latest, during the process of submitting its DCSs. See Standard Contract, 10 C.F.R. § 961.11, Art. V.B. and XVI, ENA at 302 and 329-30. Having failed to do so, plaintiff cannot now complain.

With regard to the second sentence of this proposed finding, defendant agrees that plaintiff discusses the DCS instructions in its proposed findings numbers 178 through 189. Defendant further agrees that the DCS instructions state that DCSs are to be based upon the ACRs, to the extent supported by the document cited, which is the best evidence of its contents;

defendant otherwise defendant disagrees with the second sentence of this proposed finding. Defendant avers that paragraph 2 of the DCS Instructions states: "The DCS should be submitted by all Purchasers with allocations in the 1991 Annual Capacity Report (ACR) (or subsequent ACRs, as appropriate) as specified in Article V.B of the [Standard Contract]." GA at 145.

With regard to the third sentence of this proposed finding, defendant agrees with the proposed finding to the extent supported by the documents cited, which are the best evidence of their contents; defendant otherwise disagrees with the third sentence of the proposed finding. However, to the extent that, by using the word "they," plaintiff attempts to imply in the third sentence of this proposed finding that either the Standard Contract or the 1991 ACR stated that the DCSs were "for planning purposes only and thus not contractually binding on either the DOE or the Purchasers," defendant disagrees with the third sentence of this proposed finding. The Standard Contract, like the 1991 ACR, stated that the ACR, not the DCS, was "for planning purposes." Neither the Standard Contract nor the 1991 ACR stated that the DCS was only for planning purposes. Further, defendant avers that the quoted language in the third sentence of this proposed finding is not contained in the Standard Contract.

61. The Standard Contract also provided that available capacity was to be allocated between utilities based on those with the oldest fuel or "oldest fuel first":

> Delivery Commitment schedules for SNF and/or HLW may require the disposal of more material than the annual capacity of the DOE disposal facility (or facilities) can accommodate. The following acceptance priority ranking will be utilized:
>
> > (a) except as may be provided for in subparagraph (b) below and Article V.D. of this contract, acceptance priority shall be based upon the age of the SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear

> power reactor. DOE will first accept from Purchaser the oldest SNF and/or HLW for disposal in the DOE facility, except as otherwise provided for in paragraphs B, D and E of Article V.
>
> (b) Notwithstanding the age of SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason.

(Standard Contract Art. VI.B.1, ENA at 305, 306.)

**<u>RESPONSE</u>**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required.

Without waiving this objection, defendant agrees with this proposed finding to the extent supported by the Standard Contract cited, which is the best evidence of its contents; defendant otherwise disagrees with this proposed finding. Defendant avers that the quoted language is contained in the Standard Contract.

62. While priority between utilities was based on the age of the fuel, utilities were allowed to determine which specific fuel assemblies they would deliver: "Purchaser shall have the right to determine which SNF and/or HLW is delivered to the DOE; *provided, however,* that the Purchaser shall comply with the requirements of this contract." (Standard Contract Art. V.D, ENA at 303-04; *see also* DCS Instructions ¶ 7(b), GA at 146.)

**<u>RESPONSE</u>**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required.

Without waiving this objection, defendant agrees with this proposed finding to the extent supported by the Standard Contract cited, which is the best evidence of its contents; defendant otherwise disagrees with this proposed finding. Defendant avers that the quoted language is contained in the Standard Contract; however, it is found in Article V.E, and not Article V.D. ENA at 303.

**D. DOE Articulates Program Strategy**.

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1).

63. In addition to publishing the Standard Contract following enactment of the NWPA, the DOE also began articulating its interpretation of what the NWPA required and how it would implement the SNF Program. (*See* ¶ 64, infra.)

**RESPONSE**: Defendant objects to this proposed finding because it is unsupported as required by RCFC 56(h)(1). Without waiving this objection, defendant respectfully refers to, and incorporates by reference, its responses to paragraph 64 of plaintiff's proposed findings of uncontroverted fact and its subparagraphs.

64. As evidenced by both contemporaneous documents and deposition testimony in this case, from the very beginning of the SNF program, the persons at the DOE charged with implementing the NWPA recognized that the NWPA required the DOE to implement a program that would: (1) avoid the need for utilities such as Energy Northwest to build additional SNF storage space at their reactor sites after 1998, and (2) to accept SNF at a rate that permitted the

DOE to keep up with the rate of production of SNF and eventually reduce the existing SNF backlog. (*See* subparagraphs a-t following.)

**RESPONSE**: Defendant objects to this proposed finding because it is unsupported as required by RCFC 56(h)(1). Additionally, even assuming that Energy Northwest's citation to subparagraphs (a) through (t) is intended to support this proposed finding, defendant further objects that it cannot be ascertained which subparagraphs, if any, are intended to support which parts of the proposed finding. Moreover, support for the requirements of the NWPA is to be found in the text of the statute itself, not in documents created after the statute was enacted. Similarly, testimony regarding what DOE perceived its obligations to be pursuant to the NWPA does not provide insight to the Court in deciding the actual requirements of the NWPA and the Standard Contract. Further, defendant objects to plaintiff's attempt to support its interpretation of a law and congressional intent by reference to deposition testimony of individuals who were not involved in the enactment of the NWPA. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of statutory interpretation as to which deposition testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms"). Any effort to define the purposes behind the NWPA through individuals' testimony is particularly inappropriate here, where the Congress expressly identified, in the language of the NWPA itself, the purposes of the Act. See 42 U.S.C. § 10131. Accordingly, this proposed finding and the subparagraphs that follow are irrelevant to the issues presented in our motion for summary judgment.

**Contemporaneous Statements or Documents**

**<u>RESPONSE</u>**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1).

a. **Robert Morgan's 1983 Program Overview.** At a December, 1983 conference of utilities and other SNF Program participants held only a few months after the Contract was signed, the Acting Director of the NWPA Project Office stated that the basic strategy of the program was that "beginning in 1998, utilities *will not have to provide any additional storage facilities on site*. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities on site or at another location." (Robert Morgan, Proceedings of the 1983 Radioactive Waste Management Program, December 12-15, 1983: Program Overview, at 11 (Feb. 1984) (emphasis added), ENA at 1072, 1073; *see also* 3/21/02 Morgan Dep. at 38-43, ENA at 744-45.)

**<u>RESPONSE</u>**: Although the cited document contains the words quoted in this proposed finding, defendant objects to this proposed finding because it takes the quoted language out of context. To obtain a true understanding of Mr. Morgan's statement, one must read the entire document, and we respectfully request that the Court do so. Particularly, we respectfully refer the Court to the following passage, contained in the second full paragraph in the second column of the first page of Mr. Morgan's written statement, which modifies and gives context to the language quoted by Energy Northwest:

> In the [preliminary draft of] the mission plan, what we are trying to do is outline the strategy, discuss the schedule in the interrelationship of all the aspects of the program, including Monitored Retrievable Storage (MRS), Federal Interim Storage and a Repository Program.

ENA at 1073. Notably, Mr. Morgan does not state that such was the intent of the parties when they entered into the Standard Contract. Furthermore, Energy Northwest fails to identify that Mr. Morgan's deposition testimony in this regard also contains the following passage:

> Q. Did the mission plan, when you left as director, effectuate the intent of Congress as expressed in the Nuclear Waste Policy Act in your view?
>
> A. I believe so.
>
> Could I add a couple of things to the answer of "I believe so"? There was not unanimity within Congress on the mission plan.
>
> * * *
>
> So I don't think that I can state what the intent of Congress was. I can tell you that the intent of Congress was not unanimous. Some of the members of the Senate wanted me to put more emphasis on the MRS program, monitored retrievable storage, because they felt a repository would not be approved by 1998, whereas other people said, "Don't go with the MRS. Put all your effort into the repository program."
>
> So there was a balancing act that we - - we made compromises as to what was in that mission plan to hit the middle of the road, I guess is the best way to describe it. And I don't think that it really had a full consensus by the House and Senate as to what their intent was.
>
> * * *
>
> A. Well, the goal - - I think that there was - - you know, our goal was to get a repository in by 1998. And there were some members of Congress that said, "Put all the emphasis on an MRS" so that there was a conflict in the goals.

ENA at 745-46. Defendant further notes that Mr. Morgan's statements at the December 1983 meeting were made before Congress passed the 1987 Amendments to the NWPA, which

imposed a 10,000 MTU limit upon the capacity of any MRS that operated before a repository opened. 42 U.S.C. § 10168(d)(3). Additionally, the Mission Plan, while required by the NWPA, is not a document referenced in the Standard Contract as part of the mechanism to establish the acceptance schedule.

Further, and importantly, this proposed finding is irrelevant to defendant's motion for summary judgment regarding the rate of SNF acceptance. Mr. Morgan's statement makes no reference to any provision of the NWPA or of the Standard Contract that would <u>require</u> DOE to accept the utilities' SNF in accordance with any hopes that, as of December 1983, Mr. Morgan or any other individuals might have had regarding DOE's future acceptance of SNF. Accordingly, absent a contractual term creating the obligation that plaintiff attempts to identify in this proposed finding, the proposed finding is irrelevant to the pending motion.

b. **December 1983 Draft Mission Plan.** In the initial draft of the OCRWM Mission Plan, which was provided to the utilities in December 1983 as required by the NWPA, OCRWM stated that:

> "The waste materials will be accepted in accordance with a Waste Acceptance Schedule designed to provide an acceptance rate in the first five years such that *no utility will have to provide additional storage capacity after January 31, 1998. Subsequently, the* acceptance *rate will be equal to or greater than the actual discharge rate of spent fuel each year."* (Draft Mission Plan at 2-1 (emphasis added), ENA at 1075, 1080);

> [DOE] "does not intend to delay or postpone the acceptance of civilian radioactive wastes even if a permanent geologic repository is not completed by 1998. The planning approach adopted by the Department has

> been designed to ensure that an acceptable facility will be available when needed. . ." (*id*.);
>
> DOE adopted this approach to "ensure that all utilities will be able to establish firm planning schedules for the disposition of their radioactive wastes sufficiently early to determine their on-site interim storage needs prior to 1998." (*id*.); and
>
> The rate of 3,000 ton after a five year ramp-up period set out in the 1983 Draft Mission Plan "is set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998. . . ." (*id.* at 2-2, ENA at 1081; *see also* 3/21/02 Morgan Dep. at 149-56, ENA at 757-58).

**RESPONSE**: Defendant objects to the first paragraph of this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. At least one commenter requested, in response to DOE's notice of proposed rulemaking in February 1983, that DOE add to the terms of the Standard Contract a requirement that rates identified in the 1985 Mission Plan would become the contractually required minimum rate of SNF acceptance under the Standard Contract, and DOE rejected that request. Further, although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Without waiving this objection, defendant agrees that the cited document contains the passage quoted.

Defendant objects to the second paragraph of this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20

years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Without waiving this objection, defendant agrees that the cited document contains the passage quoted.

Defendant objects to the third paragraph of this proposed finding upon the grounds that DOE adopted this approach to "ensure that all utilities will be able to establish firm planning schedules for the disposition of their radioactive wastes sufficiently early to determine their on-site interim storage needs prior to 1998." (*id.*) Defendant further objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Without waiving this objection, defendant agrees that the cited document contains the passage quoted.

Defendant objects to the fourth paragraph of this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. At least one commenter requested, in response to DOE's notice of proposed rulemaking in February 1983, that DOE add to the terms of the Standard Contract a requirement that rates identified in the 1985 Mission Plan would become the contractually required minimum rate of SNF acceptance under the Standard Contract, and DOE rejected that request. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Defendant also objects that the excerpt of Mr. Morgan's deposition testimony cited does not support the proposed finding of fact, which simply excerpts the portions of the of the December 1983 draft Mission Plan. Without waiving these objections, defendant disagrees with this portion of plaintiff's

proposed finding. Plaintiff's paraphrasing of the first phrase of the quoted passage completely turns the meaning of the passage on its head. The actual language of the document reads as follows:

> While the Department's acceptance rate during the initial five years is set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998, it is possible that an individual utility may face a need for expanded storage due to the timing of its shipment allocation. The planning basis assumes that, after 1998, individual utilities who actually realize this need will arrange for the right to ship spent fuel to the Department from a utility who is next in the queue in shipment allocation (subject to prior approval by the Department based on submittal of a request no less than six months prior to the scheduled delivery date). The use of such brokering arrangements should prevent the need for any utility to expand on-site storage and minimize transshipments.

ENA at 1081, 1083 (emphasis added). Accordingly, based upon this passage, it was DOE's stated goal at that time to attempt to prevent the need for additional at-reactor storage for the nuclear utility industry as a whole ("in the aggregate"), not that each individual utility would not need to build additional storage after 1998, as plaintiff would have the Court believe. Indeed, DOE's goals, with regard to individual utilities such as the plaintiff in this case, that would face the need for additional storage after 1998, were as stated above; that is, that the utility would arrange to exchange places in the queue with a utility that had an earlier shipment allocation. See also Standard Contract, 10 C.F.R. § 961.11, Article V.E. (ENA at 1017-18). Moreover, this discussion does not appear in the draft Mission Plan, issued in April 1984, see ENA at 1139, or the final Mission Plan, issued in June 1985. See ENA at 1250.

c. **Fiscal Year 1984 Program Guidance for Nuclear Waste Fund Evaluation.**

The "FY 1984 Program Guidance for Nuclear Waste Fund (NWF) Evaluations," prepared in December 1983, as part of the DOE's preparation of the 1984 Fee Adequacy Report, noted that:

> The underlying premise is that DOE will accept waste in 1998 at a sufficient rate so no additional utility owned storage Capacity is required during the first five years. Thereafter, the acceptance rate will be at least equal the utility spent fuel discharge rate. The planning base extends to the spent fuel discharged through 2020.

(FY 1984 Program Guidance for Nuclear Waste Fund (NWF) Evaluations (December 1983), enclosure at 2, ENA at 1061; 3/21/02 Morgan Dep. at 205-12, ENA at 761-62.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding its program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Accordingly, studies that evaluated the adequacy of the fee collected pursuant to the NWPA, and documents that provided program guidance to DOE's contractor that prepared the preliminary study for DOE, are not relevant to the parties' intent concerning the rate and schedule of acceptance.

Without waiving this objection, defendant disagrees with this proposed finding. The cited document was not prepared "as part of the DOE's preparation of the 1984 Fee Adequacy Report." Even though Mr. Morgan testified that he could not recall having seen this specific document, he testified, in response to a question from counsel, that the document was "marching orders to PNL to evaluate the fee adequacy issue." ENA at 761. Moreover, as the text of the document itself indicates, the "underlying premise" cited in this proposed finding is for a "draft plan for the financial analysis that will be performed by PNL for preparation of the annual Fee Adequacy Report." ENA at 1063 (emphasis added). For these reasons, this proposed finding does not support a finding that "persons at the DOE charged with implementing the NWPA

recognized that the NWPA required the DOE to implement a program that would: (1) avoid the need for utilities such as Energy Northwest to build additional SNF storage space at their reactor sites after 1998, and (2) to accept SNF at a rate that permitted the DOE to keep up with the rate of production of SNF and eventually reduce the existing SNF backlog," as Energy Northwest alleges in paragraph 64 above.

d. **Pacific Northwest Laboratories Memorandum Regarding Mission Plan Acceptance Schedules.** A Pacific Northwest Laboratories January 24, 1984 memorandum regarding potential waste acceptance schedules for inclusion in the Mission Plan noted that "the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year." (Memorandum from J.F. Fletcher to R. S. Hall (January 24, 1984), ENA at 1098.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Additionally, a document authored by an employee of DOE's support contractor, that quotes language from an otherwise unidentified draft mission plan cannot possibly support a finding that "persons at the DOE charged with implementing the NWPA recognized that the NWPA required the DOE to implement a program that would: (1) avoid the need for utilities such as Energy Northwest to build additional SNF storage space at their reactor sites after 1998, and (2) to accept SNF at a rate that permitted the DOE to keep up with the rate of production of SNF and eventually reduce the existing SNF backlog," as Energy Northwest alleges in paragraph 68 above. See Blanchard

v. People's Bank, 844 F.2d 264, 267 n.7 (5th Cir. 1988) (holding that statements not made during the existence of the agency relationship are not admissions which can be attributed to the employer); Irving v. United States, 162 F.3d 154, 166 (1st Cir. 1998) (en banc) ("[t]o determine what is agency policy, courts customarily defer to the statements of the official policymaker, not others, even though the others may occupy important agency positions"); see also FRE 801(d)(2)(D). Without waiving these objections, defendant agrees that the quoted language is contained in the document cited.

e. **Michael Lawrence Testimony Before Congress.** In February 1984, OCRWM Acting Director Michael J. Lawrence testified before the Energy Conservation and Power Subcommittee of the House Committee on Energy and Commerce regarding the DOE's 1985 budget. Lawrence testified that the activities of his office were:

> . . . fashioned on the fundamental objective of the Nuclear Waste Policy Act of 1982 (NWPA), which is:
>
> "to accept high-level radioactive waste for safe management, storage and permanent disposal on a firm schedule, beginning not later than January 31, 1998."
>
> By achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998, and, ultimately, remove all eligible waste from at-reactor storage.

(Michael J. Lawrence, Acting Director, Office of Civilian Radioactive Waste Management, Department of Energy, Statement Before the Subcommittee on Energy Conservation and Power, House Committee on Energy and Commerce, at 2 (February 22,1984), ENA at 1099; *see also* 5/20/02 Lawrence Dep. at 201-04, ENA at 655-56; 5/21/02 Lawrence Dep. at 302-05, ENA at 666-67.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Defendant also objects that the excerpt of Mr. Lawrence's deposition testimony cited in support of this proposed finding does not support the proposed finding of fact, which simply excerpts a portion of Mr. Lawrence's testimony before Congress. Without waiving these objections, defendant agrees that the quoted language is contained in the document cited.

f. **April 1984 Draft Mission Plan.** The April 1984 draft of the Mission Plan, which was circulated to SNF Program participants, noted the DOE was developing a waste acceptance schedule in accordance with the Contract. (Draft Mission Plan for the Civilian Radioactive Waste Management Program, at 1-1 (April 1984), ENA at 1130, 1148; 5/20/02 Lawrence Dep. at 206-07, ENA at 657.) The draft noted that "[i]n the event of a delay in repository operation, the Department could take the waste materials in accordance with the Waste Acceptance Schedule and arrange for either continued storage at the utilities in Federal storage casks, or for storage elsewhere pending transfer to the repository." (*Id.* at 2-1, ENA at 1139, 1150.) Further, the draft noted that the OCRWM's approach was "designed to ensure that all of the owners and generators of spent nuclear fuel and high-level wastes will be able to establish firm planning schedules for the disposition of their radioactive wastes sufficiently early to determine their on-site interim storage needs." (*Id.*) The draft contained an acceptance schedule which ramped up

to a steady state of 3,000 tons by the sixth year of operation. (*Id.* at 2-2, Table II-1, ENA at 1151.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. The Mission Plan, its drafts, and its amendments are not contractually binding documents. Instead, the Mission Plan was "to provide the informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under [the NWPA]. (ENA 1140); 42 U.S.C. § 10221(a). The Mission Plan is a statement of "the overall goals, objectives, and strategy for the disposal of spent nuclear fuel and high-level waste." ENA 1149; see also ENA 1148-49 (document describes plan DOE was pursuing to comply with the mandate of Congress to achieve a solution to this problem). In fact, during the promulgation of the Standard Contract terms through notice and comment, DOE rejected the request of at least one commenter that DOE contractually obligate itself to meet any acceptance rates or acceptance schedule contained in the Mission Plan. Accordingly, DOE's issuance of the Mission Plan and the planning goals stated in that document are irrelevant to the issues presented by defendant's motion.

Without waiving this objection, defendant responds as follows. With regard to the first sentence of this proposed finding, defendant disagrees that the paraphrased language fairly

represents the text contained in the document cited. The only reference to an "acceptance schedule" on the page cited is in the following recitation of one of DOE's program objectives:

> 3. To assure acceptance of waste for disposal by January 31, 1998, in accordance with the acceptance schedule provided for in the Department's disposal contract, and in conformance with the Nuclear Waste Policy Act of 1982.

(ENA 1148). In addition, the excerpt of Mr. Lawrence's deposition testimony cited does not support the proposed finding.

With regard to the second and third sentences of the proposed finding, and without waiving the objections noted above, defendant agrees that the quoted language appears in the document cited.

With regard to the fourth sentence of the proposed finding, and without waiving the objections noted above, defendant agrees that the proposed finding is supported by the document cited. However, defendant further avers that, as explained above, the Mission Plan, its drafts, and its amendments are not contractually binding documents. Instead, these documents contain statements of DOE's plans, goals, and objectives pertaining to the acceptance of SNF and HLW, pursuant to the NWPA, all of which were subject to substantial change. With regard to the acceptance schedules contained in the document, the draft Mission Plan explained that the acceptance schedule would be developed further in accordance with the dates set forth in the Standard Contract:

> [T]he Department has prepared a Waste Acceptance Schedule which specifies, in the aggregate, the quantities of commercial nuclear wastes that the Department will accept beginning in 1998. This schedule is presented in Table II-1.
>
> This Waste Acceptance Schedule will eventually be further developed to show not only the aggregate acceptance schedule, but

> also an acceptance priority ranking by utility and fuel element. The schedule will serve as a planning base which will be updated annually in response to the latest projections of nuclear power growth. Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987.
>
> The disposal contracts with the utilities specify that priority will be given to the oldest spent fuel or high-level wastes. In 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations.

(ENA 1150). Therefore, the acceptance schedules set forth in the Mission Plan and its drafts are not determinative of the issues set forth in the Government's motion for summary judgment.

g. **Lawrence Comments on April 1984 Draft Mission Plan.** In July 1984, former OCRWM Acting Director Michael Lawrence, who had moved on to a position at DOE's Richland Operations Office, expressed concern that the April 1984 Draft Mission Plan had not taken account of potential costs of continued storage at reactors after 1997. (Michael J. Lawrence, Manager, DOE Richland Operations, letter to Ben C. Rusche, Director, OCRWM, at 1-2 (July 23, 1984), ENA at 1199-1200; 5/21/02 Lawrence Dep. at 324-28, ENA at 669-70.) In this letter, the DOE Richland Operations Office commented that:

> Page 2-1, first paragraph [of the Draft Mission Plan] states "The acceptance rate is based on the emplacement Capacity currently projected for the two planned geologic repositories. . . ." *Based upon our interpretation of the NWPA, the minimum acceptance rate should be based upon the rate at which spent fuel is generated by civilian nuclear power reactors. This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998.*

(*Id.*, Enclosure 1 at 1 (emphasis added), ENA at 1201.)

**RESPONSE**: With regard to the first sentence of this proposed finding, defendant objects to the proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment regarding the schedule of acceptance to be adopted by the Court for the purposes of measuring damages. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. The Mission Plan, its drafts, and its amendments are not contractually binding documents. Instead, the Mission Plan was "to provide the informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under [the NWPA]." (ENA 1140); 42 U.S.C. § 10221(a). The Mission Plan is a statement of "the overall goals, objectives, and strategy for the disposal of spent nuclear fuel and high-level waste." ENA 1149; see also ENA 1148-49 (document describes plan DOE was pursuing to comply with the mandate of Congress to achieve a solution to this problem). In fact, during the promulgation of the Standard Contract terms through notice and comment, DOE rejected the request of at least one commenter that DOE contractually obligate itself to meet any acceptance rates or acceptance schedule contained in the Mission Plan. Accordingly, DOE's issuance of drafts of the Mission Plan and the comments that DOE may have received in response are irrelevant to the issues presented by defendant's motion for summary judgment. Without waiving these objections, defendant disagrees with plaintiff's characterization of the comments contained in the cited document. Mr. Lawrence's observation with respect to the costs of storage of SNF after January 31, 1998, were based upon the assumption (in itself a legal conclusion)

that, if DOE were to take title to SNF beginning on that date, the potential costs for continued storage of that SNF had not been accounted for in the fee adequacy analysis. ENA at 670 (Page 329, lines 17-22).

Without regard to the second sentence of this proposed finding, defendant incorporates by reference its objections to the first sentence of this proposed finding. Defendant further objects that documents purporting to provide an individual's subjective interpretation of the NWPA are inadmissible for that purpose, given that interpretation of a statute is a legal, rather than factual, issue. Without waiving those objections, defendant agrees that the quoted language appears in the document cited.

h. **Williamson Memorandum on SNF Program Strategy.** On September 15, 1983, Richard H. Williamson, the NWPA Project Office's Deputy Director of Analysis and Project Control, outlined the strategy for the SNF program:

> - The *central* criteria for this [waste acceptance] schedule is:- an acceptance rate during the first 5 years such that no utility would have to build additional storage facilities after 1998.
> - an acceptance rate after the first 5 years equivalent to the actual rate of utility discharge of spent fuel each year.

(Memorandum from Richard H. Williamson to Robert Morgan et. al., at 1 (September 15, 1983 Memorandum), ENA at 1045, 1046; 6/25/02 Morgan Dep. at 148-49, ENA at 775.) The memorandum also stated that "the lack of existence of particular type facilities will not delay or postpone the acceptance of spent fuel." (September 15, 1983 Memorandum at 1, ENA at 1046.)

**RESPONSE**: With regard to the first sentence of this proposed finding, defendant objects to the proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives

regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. The Mission Plan, its drafts, and its amendments are not contractually binding documents. Instead, the Mission Plan was "to provide the informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under [the NWPA]." (ENA 1140); 42 U.S.C. § 10221(a). The Mission Plan is a statement of "the overall goals, objectives, and strategy for the disposal of spent nuclear fuel and high-level waste." ENA 1149; see also ENA 1148-49 (document describes plan DOE was pursuing to comply with the mandate of Congress to achieve a solution to this problem). Accordingly, DOE's issuance of drafts of the Mission Plan and the comments that DOE may have received in response are irrelevant to the issues presented by defendant's motion for summary judgment. Without waiving these objections, defendant disagrees with plaintiff's characterization of the document cited and quoted in this proposed finding. In this proposed finding, plaintiff fails to identify that the first page of the memorandum contains the following language:

> Attached is a revised Mission Plan strategy overview based on the discussion in our last planning session. Please review to determine if this version represents your understanding of the guidance provided in the planning session (please note that subsequent discussions following the meeting have led to slight modifications of positions established in the meeting). Also, please provide me with estimates/corrections of the dates and lengths of time for the activities described.
>
> If this overview strategy meets with your approval, it will be used to guide the authors of the different volumes of the Mission Plan in the completion of the next draft.

(ENA at 1045). Accordingly, the language that plaintiff quotes in the first sentence of this proposed finding was still in draft form and was being forwarded for review by, among others, Mr. Morgan, who was the Acting Director of the program. (ENA at 775.) Mr. Williamson, the author of the memorandum, was not involved in the development of the draft mission plan. Id. For these reasons, this document is inherently unreliable to establish the proposition for which plaintiff cites it. However, defendant agrees that the quoted language is contained in the document cited.

With regard to the second sentence of this proposed finding, defendant objects to this sentence upon the same grounds as those set out for the first sentence. Without waiving these objections, defendant agrees that the quoted language is contained in the memorandum cited. Defendant avers that the cited document also contains the following language: "the placement of this waste will be dependent upon the type of facilities in place in 1998 (to be described later) but will generally be a repository, in buffer storage at the repository, or in a MRS." (ENA at 1046.) The draft document also made clear that DOE did not believe that it was obligated to have a repository available by 1998. (ENA at 1047-48.) The document also contains the following statement:

> The planning basis assumes that individual utilities, after 1998, whose turn to ship spent fuel to DOE has not occurred based on the contractual specification of oldest fuel first and the DOE rate of acceptance, and who would thus need to add more on-site interim storage, will either: 1) arrange to tranship spent fuel to a utility that has available storage (e.g., a utility who has already shipped spent fuel to DOE) or 2) will purchase the right to ship spent fuel to DOE from a utility who is next in the queue.

(ENA at 1046.)

Deposition Testimony

I. Robert Morgan, the first head of the SNF program, testified that the intent of the NWPA was to avoid having utilities provide on-site storage after 1998. (3/21/02 Morgan Dep. at 43-45, ENA at 745-46.) Mr. Morgan also stated that by 2001 DOE would meet the rate of discharge of SNF. (3/21/02 Morgan Dep. at 48-49, ENA at 746-47.)

**RESPONSE**: With regard to the first sentence of this proposed finding, defendant objects because the allegations contained in the first sentence are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant objects to plaintiff's attempt to support its interpretation of a law and to congressional intent by reference to deposition testimony of individuals. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of statutory interpretation as to which deposition testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms"). Any effort to define the purposes behind the NWPA through individuals' testimony is particularly inappropriate here, where the Congress expressly identified, in the language of the NWPA itself, the purposes of the Act. See 42 U.S.C. § 10131. Without waiving this objection, defendant disagrees with the first sentence of plaintiff's proposed finding upon the grounds that it mischaracterizes Mr. Morgan's testimony. The entire exchange of questions and answers upon this subject must be read to put Mr. Morgan's testimony in context. Mr. Morgan testified, first, that he believed the intent of the NWPA was summarized in the last paragraph of the statement he made at the informational meeting in December 1983 (contained at ENA 1072-74), a strategy that he tried to outline in the draft mission plan – that is, to have a repository in operation in 1998. (ENA at 745, Pages 42-43). Indeed, Mr. Morgan then continued to testify

that it was his conclusion, from talking to congressional staffers, that the strategy of the mission plan should be that no additional at-reactor storage would be necessary. (ENA at 745, Page 43). Importantly, however, Mr. Morgan conditioned this answer as follows: "There was not unanimity within Congress on the mission plan. I was getting stones from both sides of the aisle and from both houses on the Hill. . . . So I don't think I can state what the intent of Congress was. I can tell you that the intent of Congress was not unanimous. Some of the members of the Senate wanted me to put more emphasis on the MRS program, . . . because they felt a repository would not be approved by 1998, whereas other people said, 'Don't go with the MRS. Put all your effort onto the repository program.' So there was a balancing act that we - - we made compromises as to what was in the mission plan to hit the middle of the road. . . . And I don't think that it really had a full consensus by the House and Senate as to what their intent was." (ENA at 745-46, Pages 44-45).

With regard to the second sentence of this proposed finding, defendant objects to the proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment regarding the schedule of acceptance to be adopted by the Court for the purposes of measuring damages. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Without waiving this objection, defendant agrees that the paraphrased language fairly represents the text contained in the document cited.

Finally, with regard to the footnote contained in this proposed finding, defendant disagrees with plaintiff's proposed finding. Contrary to plaintiff's implication in the footnote that

Mr. Morgan changed his testimony after consultation with Government counsel, there was no break or consultation that occurred during the cited testimony and that which is quoted immediately above. Id. Further, as evidenced by the cited deposition testimony, Mr. Morgan never changed or "revers[ed]" his position.

j. The second Acting Director of OCRWM, Michael J. Lawrence, testified that the intent of the NWPA and DOE's intent was to allow utilities to avoid building additional storage facilities. (5/20/02 Lawrence Dep. at 187-89, ENA at 654; 5/21/02 Lawrence Dep. at 336-37, ENA at 672.[18]) Mr. Lawrence further testified that if "acceptance rates were as anticipated [shortly after executing the contract]. . . it would preclude the need for additional storage capacity." (5/21/02 Lawrence Dep. at 304-05, ENA at 304-05, ENA at 667.) Mr. Lawrence acknowledged that DOE's objective was to prevent shutdowns and reduce the backlog of accumulated fuel. (5/20/02 Lawrence Dep. at 142, ENA at 651.)

**RESPONSE**: With regard to the first sentence of this proposed finding, defendant objects because the allegations contained in the first sentence are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant objects to plaintiff's attempt to support its interpretation of a law and to congressional intent by reference to deposition testimony of individuals. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of statutory interpretation as to which deposition testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define

[18] While Lawrence today disclaims that this intent was a "requirement," he acknowledges that the DOE was charged with Carrying out the intent of the law. (5/21/02 Lawrence Dep. at 334, ENA at 671.)

legal terms"). Any effort to define the purposes behind the NWPA through individuals' testimony is particularly inappropriate here, where the Congress expressly identified, in the language of the NWPA itself, the purposes of the Act. See 42 U.S.C. § 10131. Without waiving this objection, defendant disagrees with this sentence of the proposed finding because it misrepresents Mr. Lawrence's testimony. Mr. Lawrence testified that the concept of no additional at-reactor storage was consistent with his recollection of how DOE wanted to implement the Act. (ENA at 654, Pages 187-88). Further, he testified that the mission plan laid out DOE's "planning base" and "goals" and that it was "what we originally set out with the intent - - with the hopes of doing." Id.

With regard to the second sentence of this proposed finding, defendant disagrees with plaintiff's characterization of Mr. Lawrence's testimony set out in the bracketed part of this quotation. The full sentence as set out in the official transcript is as follows: "If we achieved that objective, and the ramp-up and acceptance rates were as anticipated and the - - the spent fuel storage arising at the utilities were as projected, it would preclude the need for additional storage capacity." (ENA at 667, Page 304). We are unable to find in the transcript that Mr. Lawrence related the "acceptance rates" to which he referred to any point in time.

With regard to the third sentence of this proposed finding, defendant objects to the proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Without waiving this objection, defendant agrees that Mr.

Lawrence testified that it was DOE's objective "to accept waste at a rate that would avoid shutdowns and be able to eventually work off the backlog." ENA at 651.

k. Robert Roselli, one of the three individuals who drafted the Standard Contract, testified that he understood that the DOE was responsible for providing or eliminating the need for additional at-reactor storage after 1998. (Roselli Dep. at 140, 148-49, ENA at 842, 850-51.) “[A]fter 1998, the utilities would not have to build on-site storage. They could rely upon the Government to either accept fuel for disposal or provide some other means.” (Roselli Dep. at 140-41, ENA at 842-43.)

**RESPONSE**: With regard to the first sentence of this proposed finding, defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Regardless of whether this Court interprets the language of the Standard Contract as a regulation or under general contract interpretation principles, its meaning is a question of law that will be determined based upon its plain language, not upon the unofficial subjective beliefs of its drafters. See Castle v. United States, 301 F.3d 1328, 1337 (Fed. Cir. 2002) ("[c]ontract interpretation is a question of law"); United States v. Boeing Co., 802 F.2d 1390, 1393 (Fed. Cir.1986) ("[t]he interpretation of regulations which are incorporated into government contracts is a question of law which this court is free to resolve"). Without waiving this objection, defendant disagrees with the first sentence because it mischaracterizes the testimony of Mr. Rosselli to which it cites. The cited testimony refers to language contained in the draft mission plan, not the Standard Contract, contrary to the implication of the proposed finding. Additionally, Mr. Rosselli testified that the mission plan served as "a planning basis" for the

"road map in terms of how you anticipate getting from point A to point B and what assumptions you have built into that to make that plan possible." (ENA at 840, Page 138; ENA at 850-51, Pages 148-49). As explained above, DOE's issuance of the Mission Plan and the planning goals stated in that document are irrelevant to the issues presented by defendant's motion. Defendant further avers that, in addition to Mr. Rosselli, Mr. Jay Cavanaugh and Mr. Elliot Winnick were also involved in drafting the Standard Contract on behalf of DOE. 4/15/02 Rosselli Dep. at 43; SGA at 234.

With regard to the second and third sentences of this proposed finding, although defendant agrees that the quoted language appears in that portion of Mr. Rosselli's testimony cited, defendant disagrees with, and objects to, the implication of this proposed finding. Mr. Rosselli was not referring to DOE's obligation pursuant to the Standard Contract or individual utility contracts. He was referring to a portion of the draft mission plan that referred to exchanges as another means for utilities to avoid additional at-reactor storage after 1998. Indeed, the draft mission plan upon which Mr. Rosselli was being questioned contained very specific language about DOE's intentions should <u>individual</u> utilities face the need for additional at-reactor storage after January 31, 1998:

> The planning basis assumes that, after 1998, individual utilities who actually realize this need will arrange for the right to ship spent fuel to the Department from a utility who is next in the queue in shipment allocation (subject to prior approval by the Department based on submittal of a request no less than six months prior to the scheduled delivery date). The use of such brokering arrangements should prevent the need for any utility to expand on-site storage and minimize transshipments.

<u>See</u> ENA at 1083.

l. Victor Trebules, the DOE employee who had responsibility for coordinating preparation of the Mission Plan, testified that DOE's objective was "reaching waste acceptance rates that would preclude the utilities from having to provide additional on-site storage." (4/17/02 Trebules Dep. at 52,[19] ENA at 909.) Trebules also testified that after a ramp-up period, DOE intended to operate at a rate sufficient to work down the backlog of fuel. (4/17/02 Trebules Dep. at 53, ENA at 910; *see also* 4/17/02 Trebules Dep. at 97-99, 121, ENA at 913, 914; 4/18/02 Trebules Dep. at 19-21, ENA at 920-21.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. The Mission Plan, its drafts, and its amendments are not contractually binding documents. Instead, the Mission Plan was "to provide the informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required

[19] At the time he was deposed in 2002, Victor Trebules was employed by the DOE as Director, Office of Project Control, Yucca Mountain Site Characterization Office, OCRWM, and was responsible for the DOE's Yucca Mountain site characterization activities. Mr. Trebules has also been employed by the DOE as a Program Analyst; Senior Technical Advisor; Acting Director, Management & Operations Division; Director, Storage Division; and Director, Program Management Division. As a Program Analyst, Mr. Trebules was responsible for coordinating preparation of the DOE Mission Plan, Mission Plan Amendments, and 1989 Reassessment of the civilian radioactive waste management program. As Director, Storage Division, Mr. Trebules was responsible for work on the DOE's proposed MRS facility. As Director, Program Management Division, OCRWM, Mr. Trebules was responsible for the DOE's Yucca Mountain site characterization activities. (*See* 4/17/02 Trebules Dep. at 15-18, ENA at 903-04.)

under [the NWPA]." (ENA 1401); 42 U.S.C. § 10221(a). The Mission Plan is a statement of "the overall goals, objectives, and strategy for the disposal of spent nuclear fuel and high-level waste." ENA 1149; see also ENA 1148-49 (document describes plan DOE was pursuing to comply with the mandate of Congress to achieve a solution to this problem). Accordingly, Mr. Trebules' testimony about DOE's issuance of the Mission Plan and the planning goals stated in that document are irrelevant to the issues presented by defendant's motion. Defendant also objects to this proposed finding because all of the testimony of Mr. Trebules to which plaintiff cites was subject to numerous objections, including its nature as a legal conclusion, and courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001). Without waiving these objections, defendant disagrees with this proposed finding because it mischaracterizes the testimony of Mr. Trebules to which it cites. As reflected in the full context of Mr. Trebules's deposition testimony, he was asked to testify about statements Mr. Morgan made at the informational meeting conducted in December 1983. (ENA at 909, Page 51) Mr. Trebules was not sure he was even working on the program at that time. See ENA at 909, Page 50. Additionally, when asked about DOE's intent, he answer was given from his viewpoint of having worked on the mission plan:

> When I started working in the program on the mission plan, I remember that we discussed the objective of reaching waste acceptance rates that would preclude the utilities from having to provide additional on-site storage. That was our objective or planning target.
>
> I believe what happened early on was that when we sent the draft mission plan out for public review and comment, we got a number

> of comments that said our schedules were too optimistic and we, I believe, revised those schedules in the actual document that went out in June of 1985 to the point where it didn't quite meet the intent of the words described here.

ENA at 909-10 (Transcript pages 52-53).

m. Ben Rusche, the first politically appointed director of OCRWM, testified that there was a "strategy" or "objective" of preventing additional storage on site. (5/16/02 Rusche Dep. at 159, ENA at 869.) Rusche testified that this goal was "consistent" with the NWPA. (5/16/02 Rusche Dep. at 170-71, 244-46, ENA at 870, 871-72; *see also* 5/17/02 Rusche Dep. at 376-77, ENA at 880-81.)

**<u>RESPONSE</u>**: With regard to the first sentence of this proposed finding, defendant objects because the first sentence is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Defendant further objects to the first sentence of this proposed finding upon the grounds that it is vague with respect to the meaning of the phrase, "the first politically appointed director OCRWM" and, in any event, that phrase is irrelevant. Without waiving these objections, defendant disagrees with the proposed finding. Mr. Rusche testified that he did <u>not</u> believe that the strategy of beginning acceptance in 1998, as outlined in the NWPA, was to preempt the necessity for any future storage capacity in any of the utilities. ENA at 869 (Transcript page 161).

With regard to the second sentence of this proposed finding, defendant objects because the allegations contained in the second sentence are conclusions of law as to which, pursuant to

RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant objects to plaintiff's attempt to support its interpretation of a law and to congressional intent by reference to deposition testimony of individuals. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of statutory interpretation as to which deposition testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms"). Any effort to define the purposes behind the NWPA through individuals' testimony is particularly inappropriate here, where the Congress expressly identified, in the language of the NWPA itself, the purposes of the Act. See 42 U.S.C. § 10131. Without waiving this objection, defendant objects to this proposed finding because, after correctly understanding the question, the answer to which plaintiff cites here, Mr. Rusche testified as follows: "I can only respond by saying this is what those who were there wrote." ENA at 870, Page 172-73. Further, Mr. Rusche went on to testify that, "[i]n the light of what I then knew about the Act and the program when I arrived, I had serious questions as to whether that statement could be justified, that is - - that is was there enough data or information that would give confidence that a statement like that was even rationale. (*sic*)" Id.

n. Tom Pollog, DOE’s Rule 30(b)(6) witness on the rate of acceptance the DOE planned to use under the Standard Contract and the rate of acceptance in estimates made by DOE from 1982 to 1987, testified that DOE’s goal in the mid-1980s was to “alleviate the purchasers’ need to have storage outside of their [spent fuel] pools,” and that the 3,000 ton rate was the rate

the DOE calculated would achieve that objective. (4/11/02 Pollog Rule 30(b)(6) Dep. at 96-97,[20] ENA at 797.) Pollog stated that beyond the short term goal of relieving at-reactor storage problems, over the long term the rate needed to be "sufficient to deplete the backlog of spent fuel at reactors." (4/11/02 Pollog Rule 30(b)(6) Dep. at 203, ENA at 800.)

**RESPONSE**: Defendant objects because this proposed finding is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations.

Without waiving this objection, defendant disagrees with the first sentence of this proposed finding. Although Mr. Pollog did testify that the one of DOE's goals during the mid-eighties was to "alleviate the purchasers' need to have storage outside their pools," we are unable to determine that Mr. Pollog stated, in the cited portion of his deposition testimony, that "the 3000 ton rate was the rate the DOE calculated would achieve the objective," as Energy Northwest proposes. Mr. Pollog repeatedly testified that the 3,000-ton rate was calculated based

---

[20] Mr. Pollog is currently employed by the DOE as the Contracting Officer's Technical Representative, and is responsible for assisting in the implementation of the Standard Contract. Mr. Pollog has been performing a similar function since 1996. In addition, Mr. Pollog has worked for the DOE in various other positions since 1988, including as a Nuclear Engineer in the Systems Development Branch, Systems Integration Branch, Utility Interface & Logistics Team, Engineering Division, and Waste Acceptance and Transportation. While working in the Systems Integration Branch, Mr. Pollog was responsible for developing the specific requirements of the DOE waste management system and creation of requirements documents. In each position he has held at the DOE since 1990, Mr. Pollog has been responsible for assisting in the DOE's implementation and interpretation of the terms of the Standard Contract. (*See* 7/12/05 Pollog Testimony in *Tennessee Valley Authority v. United States*, at 1602-03, ENA at 818-19; 4/11/02 Pollog Dep. at 12, ENA at 795; 2/19/02 Pollog Dep. at 8-16, ENA at 784-92.)

on the 70,000 MTU capacity limit for a repository and the design length of repository equipment life. 4/11/02 Pollog Rule 30(b)(6) Dep. at 96-97, ENA at 797. Defendant further responds that, with regard to the second sentence of this proposed finding, defendant disagrees because the proposed finding mischaracterizes Mr. Pollog's testimony. The language quoted in this sentence of the proposed finding comes from the environmental assessment portion of the MRS report that DOE submitted to Congress. ENA at 800, Page 202-03. Mr. Pollog responded affirmatively when asked whether the language, "implementing an acceptance rate that should be sufficient to deplete the backlog of spent fuel at reactors," was one of the objectives "that DOE had with regard to implementing the acceptance rates that were in the 1987 ACR, for example." ENA at 800, Page 203-04 (emphasis added).

o. Lake Barrett, the acting or deputy director of the OCRWM from 1993 until February of 2002, stated that the NWPA required the reduction in the backlog of SNF located at the utilities and that the 3,000 ton rate was a reasonable rate to achieving those objectives. (4/22/02 Barrett Dep. at 52-55, 57-59, 120-22, ENA at 395-96, 397. 403-04; 5/10/02 Barrett Dep. at 1163-1165, ENA at 459-60.)

**RESPONSE**: Defendant objects because the allegations contained in this proposed finding are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant objects to plaintiff's attempt to support its interpretation of a law and to congressional intent by reference to deposition testimony of individuals. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of statutory interpretation as to which deposition testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not

testifying witnesses, to define legal terms"). Any effort to define the purposes behind the NWPA through individuals' testimony is particularly inappropriate here, where the Congress expressly identified, in the language of the NWPA itself, the purposes of the Act. See 42 U.S.C. § 10131. Without waiving this objection, defendant agrees that this proposed finding fairly paraphrases the cited testimony, except to note that Mr. Barrett served as "acting or deputy director of the OCRWM" until May of 2002. However, defendant avers that plaintiff has not identified any provision within the NWPA that contains the NWPA "requirement" alleged here.

p. Ronald Milner, the current Chief Operating Officer of OCRWM and long-time DOE employee, testified that his understanding of the SNF program was that the DOE "would pick up the fuel before a utility ran out of pool storage capacity which would then force it to shut down." (5/1/02 Milner Dep. at 85, ENA at 697.) Milner also testified that the goal of the program was to reduce the amount of storage needed and allow the timely decommissioning of reactors. (5/2/02 Milner Dep. at 273-74, ENA at 706-07.)

**RESPONSE**: Defendant objects because this proposed finding is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations.

Without waiving this objection, defendant disagrees with the allegations contained in the first sentence of this proposed finding because they mischaracterize Mr. Milner's testimony. As reflected in the transcript of his testimony, Mr. Milner was asked about specific language contained in the June 1985 Mission Plan and objectives of a waste acceptance system as outlined

in that plan. ENA at 697, Pages 84-84. His testimony did not relate to the "SNF program," as plaintiff alleges. With regard to the second sentence of this proposed finding, defendant agrees that the paraphrased language fairly represents Mr. Milner's testimony.

q. Billy Cole, who served as Manager of Waste Acceptance for DOE's principal contractor from 1984 until 1989, testified that the "basic purpose" of the SNF program was to "keep the utilities from having to run out of storage space," and the "basic strategy" and "primary mission" of the NWPA was to prevent utilities from "having to add more storage." (3/12/02 Cole Dep. at 80-81, ENA at 539.) Cole testified that the intent of the DOE at the time of the execution of the Standard Contract was "to get a facility operating in '98 to take the stuff away fast enough so the utilities would not have to add additional storage. That was the intent." (3/12/02 Cole Dep. at 202, ENA at 550.) Cole testified to meet this goal, and the goal of reducing the backlog of accumulated fuel, the DOE adopted a 3,000 ton acceptance rate. (3/12/02 Cole Dep. at 175-176, ENA at 547.)

**RESPONSE**: With regard to the first sentence of this proposed finding, defendant objects because this proposed finding is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Defendant further objects to the first sentence because, as an employee of a contractor of DOE, Mr. Cole is not the agency's official policymaker. Irving v. United States, 162 F.3d 154, 166 (1st Cir. 1998) (en banc) ("[t]o determine what is agency policy, courts customarily defer to the statements of the official policymaker, not others, even

though the others may occupy important agency positions"). Without waiving these objections, defendant agrees that the quoted material is contained in the deposition testimony cited.

With regard to the second sentence of this proposed finding, defendant objects because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Regardless of whether this Court interprets the language of the Standard Contract as a regulation or under general contract interpretation principles, its meaning and the parties' contractual intent is a question of law that will be determined based upon an objective interpretation of its plain language, not upon the unofficial subjective beliefs of individuals who were not involved in its promulgation. See Castle v. United States, 301 F.3d 1328, 1337 (Fed. Cir. 2002) ("[c]ontract interpretation is a question of law"); United States v. Boeing Co., 802 F.2d 1390, 1393 (Fed. Cir.1986) ("[t]he interpretation of regulations which are incorporated into government contracts is a question of law which this court is free to resolve"). Defendant further objects to this proposed finding upon the grounds that the deposition testimony cited was subject to the objection that a proper foundation had not been established for Mr. Cole's testimony. Courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001). Without waiving these objections, defendant agrees that the quoted material is contained in the deposition testimony cited. However, defendant avers that Mr. Cole lacks any foundation upon which to opine as to DOE's intent at the time that the Standard Contract was promulgated.

With regard to the third sentence of this proposed finding, defendant objects to this proposed finding as irrelevant, for the reasons set forth above. Without waiving these

objections, defendant disagrees with the proposed finding. While Mr. Cole agreed with the assertion that a 3,000 MTU acceptance rate "reflected what was required to work off what utilities were discharging as well as attacking the backlog," Mr. Cole did not state that the 3,000 MTU rate was "adopted" for these reasons. Mr. Cole further testified that the acceptance rate contained in the Annual Capacity Report that he helped develop, the 1991 ACR, "was based on if you started the facility in 1998, 400 tons the first year would be adequate to make sure that you at least didn't have to add additional storage in that year, every year, the same. Had nothing to do with 3,000 tons working off the backlog or anything." (ENA 547, pgs. 174-175).

r. Alan Brownstein, who was in charge of DOE's interface with utilities for over 10 years, testified that the "goal" and "objective" of the DOE was to eliminate the need for utilities to provide on-site storage after the DOE began acceptance and that that goal was communicated to utilities. (4/9/02 Brownstein Dep. at 80, ENA at 487; 4/10/02 Brownstein Dep. at 412, ENA at 507; *see also* 4/9/02 Brownstein Dep. at 60-61, ENA at 484.) Brownstein testified that an additional goal was to reduce the backlog of accumulated SNF. (4/9/02 Brownstein Dep. at 70, ENA at 486)

**RESPONSE**: Defendant objects because this proposed finding is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations.

Without waiving this objection, defendant agrees that plaintiff has fairly paraphrased Mr. Brownstein's testimony in the first sentence of this proposed finding. Defendant avers, however,

that Mr. Brownstein also testified that "I used the term and testified to such to distinguish between intent and goal and objectives as opposed to a contractual commitment." ENA at 507, Page 412. Further, Mr. Brownstein testified that he did not believe it was DOE's policy under the Standard Contract to provide an acceptance rate in the first five years such that no utility would have to provide additional storage capacity after January 31, 1998. ENA at 484, Pages 60-61.

With regard to the second sentence of this proposed finding, and without waiving the objection identified above, defendant objects to the second sentence of this proposed finding because the cited testimony of Mr. Brownstein was subject to objection for lack of foundation and because it called for a legal conclusion. Mr. Brownstein was shown a specific nuclear waste acceptance table that was created before he became a DOE employee. 4/9/02 Brownstein Dep. at 62; SGA at 194. He was then asked if that table reflected an "intent" on DOE's part to reduce the spent fuel backlog. Id. at 70, ENA at 486. His testimony of his opinion as to what the table reflected clearly lacks a proper evidentiary foundation. To the extent he testified to any "intent" on DOE's part, that testimony constitutes an improper legal conclusion. Legal conclusions are inadmissible as testimony from a lay witness because they are not based upon the witness' perception and require the kind of specialized knowledge reserved for expert testimony. Fed. R. Evid. 701. However, they are also inadmissible as expert testimony. Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992). Courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001) ("The requirement of Rule 56(e) that affidavit testimony be competent and admissible evidence applies

with equal force to deposition testimony”). Without waiving these objections, defendant disagrees with the proposed finding because it is not supported by the testimony of Mr. Brownstein cited. As stated above, Mr. Brownstein was asked whether a specific document reflected "DOE's intent," to which he agreed. 4/9/02 Brownstein Dep. at 70, ENA at 486. Mr. Brownstein did not testify, in the cited excerpt, that "an additional goal was to reduce the backlog of accumulated SNF." Id.

s. David Zabransky, currently DOE’s Contracting Officer, in charge of administering the Standard Contract, administering fee payments, and interpretation and correspondence to the utilities related to the Standard Contract, noted that when he was an employee of Wisconsin Electric Power Company, he had assumed that the DOE would perform at a rate such that all the fuel would be gone five to ten years after its reactor ceased operations. (7/12/05 Zabransky Testimony in *Tennessee Valley Authority v. United States*, at 1684-85, ENA 981-82; 4/17/02 Zabransky Dep. At 88-90, ENA 939-40) Zabransky stated “[I]t would have been my personal opinion at the time that a rate that would have been reasonable would have reflected the aggregate rate of discharges plus some amount of workoff.” (*Id.* at 90, ENA at 940.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is entirely irrelevant to the issues presented in our motion for summary judgment. Mr. Zabransky's testimony about his personal assumptions and subjective beliefs at the time that he was an employee of Wisconsin Power Company regarding DOE's schedule objectives is not relevant to the issues presented by the Government's motion for summary judgment. Without waiving these objections, and to the extent that this proposed finding is deemed to constitute allegations of relevant fact, defendant agrees that the quoted language is contained in the deposition testimony cited.

t. Patrick McDuffie, a retired employee of Battelle, DOE’s principal contractor during the early years of the program, and original author of the first ACR, testified that the intent of these reports was to devise a rate which “would allow the minimum or require the minimum at-reactor storage.” (3/18/02 McDuffie Dep. at 38, 111-13, ENA at 683, 685.)

McDuffie also testified that a rate of 3,000 tons would provide enough acceptance capacity to meet the goal of working off the industry SNF backlog. (McDuffie Dep. at 114, ENA at 686.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that an employee of DOE's contractor is not competent to testify concerning DOE's "intent." Defendant objects because this proposed finding is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations.

Without waiving this objection, defendant agrees that the language quoted from Mr. McDuffie's testimony in the first sentence of this proposed finding is quoted correctly. With regard to the second sentence of this proposed finding, and without waiving the identified objection, defendant disagrees with the proposed finding because plaintiff's paraphrasing of Mr. McDuffie's testimony mischaracterizes his testimony. Mr. McDuffie actually testified as follows: "[The 3000 MTU rate] would provide enough acceptance capacity to meet any combination of exchanges based on need and still work off the backlog." (McDuffie Dep. at 114, ENA at 686.

65. DOE also intended to operate at a rate sufficient to remove SNF quickly enough to prevent delays in decommissioning reactors after their scheduled shutdown:

a. David Zabransky, who worked for Wisconsin Electric at the time the Standard Contract was signed, testified that he understood the intent was to remove all SNF from reactors within five to ten years after reactor shutdown. (4/17/02 Zabransky Dep. at 89, ENA at 940.)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant further objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Regardless of whether this Court interprets the language of the Standard Contract as a regulation or under general contract interpretation principles, an individual's subjective belief regarding the meaning of the Standard Contract is wholly irrelevant to this Court's interpretation of the obligations that the Standard Contract created and is inadmissible to interpret the Standard Contract's terms. See, e.g., First Heights Bank, FSB v. United States, 51 Fed. Cl. 659, 666 (2001).

Without waiving this objection, and to the extent that this proposed finding is deemed to constitute allegations of relevant fact, defendant agrees that the proposed finding fairly paraphrases Mr. Zabransky's testimony cited.

b. Lake Barrett testified that one intent of the NWPA and the Standard Contract was to remove SNF so as not to "get in the way of utilities' decommissioning activities." (4/23/02 Barrett Dep. at 475, ENA at 419.) Barrett testified that this was the basis for the Standard Contract provision that DOE would remove any SNF over five years old. (*Id.*)

**RESPONSE**: Defendant objects because the allegations contained in this proposed finding are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant objects to plaintiff's attempt to support its interpretation of a law and to congressional intent by reference to deposition testimony of individuals. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of

statutory interpretation as to which deposition testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms"). Any effort to define the purposes behind the NWPA through individuals' testimony is particularly inappropriate here, where the Congress expressly identified, in the language of the NWPA itself, the purposes of the Act. See 42 U.S.C. § 10131. Defendant further objects to this proposed finding upon the grounds that Mr. Barrett did not work for DOE at the time of the formation of the Standard Contract and, therefore, is not competent to testify as to the intent of the contract discussed in this proposed finding. Courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001).

Without waiving these objections, defendant disagrees with the proposed finding because it incorrectly paraphrases Mr. Barrett's testimony. Mr. Barrett testified that he did not know whether it was the Standard Contract or the NWPA that provided the basis for the "five year" cooling requirement. Defendant avers that the quoted material in the first sentence is contained in the deposition testimony cited. With regard to the second sentence, defendant disagrees with the proposed finding because it is unsupported by the provisions of the Standard Contract. We are unaware of any provision of the Standard Contract that states that DOE would "remove any SNF over five years old."

c. Robert Morgan testified that the DOE did not want to hold up decommissioning activities at reactor sites or cause utilities to wait around 25 or 30 years to decommission their reactors. (3/22/02 Morgan Dep. at 313-15, ENA at 769.)

**RESPONSE**: Defendant objects because this proposed finding is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations.

Without waiving this objection, defendant agrees that the proposed finding fairly paraphrases the cited testimony.

d. Ron Milner testified that the DOE had a long-standing goal to permit orderly decommissioning of utilities' reactors. (5/2/02 Milner Dep. at 273-74, ENA at 706-07.)

**RESPONSE**: Defendant objects because this proposed finding is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations.

Without waiving this objection, defendant disagrees with the proposed finding because it mischaracterizes Mr. Milner's testimony. Mr. Milner testified as follows:

> Q. The proposed waste acceptance schedule embodied in this document indicates that one of its objectives as reflected in this second item is to substantially reduce the need for utilities to add new storage capacity after 1998 and to initiate the orderly decommissioning of reactor. Do you know why that was an objective?
>
> A. Specifically, I don't, but I think it had been long a goal of the program to do that, to try to reduce the amount of storage that would be needed, certainly ultimately to decommission a reactor.

5/2/02 Milner Dep. at 273-74, ENA at 706-07.

66. Consistent with Congressional intent, from the start of the SNF Program, DOE's intent was to have a repository in operation to meet the 1998 date and meet their objectives:

**RESPONSE**: Defendant objects to this entire proposed finding, including all of the subparagraphs that purport to support it. Defendant objects to this proposed finding because, as plaintiff in this case successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that a repository be operational by January 31, 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Further, although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Accordingly, this proposed finding and all of the subparagraphs that purport to support it are irrelevant to the issues presented in our motion for summary judgment. Defendant also objects that the proposed finding is vague because the phrases "meet their objectives" and "intent" are unclear and undefined.

Without waiving these objections, and based upon DOE's understanding that plaintiff seeks to infer a contractual intent to require DOE to have an operational repository by January 31, 1998, defendant disagrees with this proposed finding. Nothing in the Standard Contract or the NWPA obligated DOE to have an operational repository by January 31, 1998.

a. In the Federal Register Notice publishing the initial draft of the Standard Contract, the DOE stated that "The [NWPA] directs DOE to begin repository operations no later

than January 31, 1998." (Standard Contract for the Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, 48 Fed. Reg. 5458 (Feb. 4, 1983) (to be codified at 10 C.F.R. Part 961), ENA at 990,991.)

**RESPONSE**: Subparagraph (a) of this proposed finding is essentially the same as No. 33 of plaintiff's proposed findings of fact. Accordingly, as its response to subparagraph (a) of this proposed finding, defendant incorporates by reference its objections and response to No. 33 of plaintiff's proposed findings of fact.

b. In May 1984, DOE General Counsel Theodore J. Garrish wrote a letter to Senator J. Bennett Johnston responding to concerns regarding DOE's interpretation of the 1998 date. In the letter Mr. Garrish noted that:

> The Nuclear Waste Policy Act of 1982 was passed with the presumption that a repository would be operational by January 31, 1998. The department fully intends to meet this Congressional objective and is currently in the process of taking the steps necessary to ensure that we fulfill all of our corresponding legal obligations under the Act. Therefore, the program which has been developed by the Department to fulfill the requirements of the Act is designed "to assure acceptance of waste for disposal by January 31, 1998."
>
> We believe the intent of the Congress when formulating the Act was directed toward commencing disposal operations by 1998. The Department is totally committed to achieving this objective.

(Theodore J. Garrish, General Counsel, DOE, letter to J. Bennett Johnston, United States Senator (May 30, 1984) (footnote omitted), ENA at 1186-87.)

**RESPONSE**: Defendant objects to this proposed finding because, as plaintiff in this case successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation to accept SNF and/or HLW beginning no later than

January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that a repository be operational by January 31, 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Further, although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Accordingly, this proposed finding and all of the subparagraphs that purport to support it are irrelevant to the issues presented in our motion for summary judgment. Defendant also objects that the proposed finding is vague because the phrases "meet their objectives" and "intent" are unclear and undefined.

Without waiving these objections, defendant avers that this letter must be placed into context. By letter dated April 23, 1984, Senator Johnston requested that Secretary Hodel respond to several questions, including, as the DOE General Counsel's office summarized it, "the views of this office [the DOE General Counsel's office] on the legal obligations imposed by section 302(a)(5) of the Act in the event a repository has not commenced operation by the January 31, 1998 date contained in paragraph (B) of the Act." ENA at 1186 (summarizing April 23, 1984 request). Defendant agrees that the language which plaintiff has quoted above is contained in the cited May 30, 1984 letter, which responded to Senator Johnston's letter.

c. When recommending the Yucca Mountain site to the President in 2002, then-DOE Secretary Abraham stated: “The NWPA by its terms contemplated that the entire process of siting, licensing, and constructing a repository would have been completed more than four years ago, by January 31, 1998.” (Recommendation of the Secretary of Energy Regarding the

Suitability of Yucca Mountain Site for a Repository Under the Nuclear Waste Policy Act of 1982 at 6, ENA at 2140, 2152; 4/24/02 S. Klein, Rule 30(b)(6) Dep. at 171[21], ENA at 580.)

**RESPONSE**: Defendant incorporates by reference the objections that it raised in response to Nos. 66 and 66(b) of plaintiff's proposed findings of fact. Defendant also objects upon the grounds that the document cited offers legal conclusions about the meaning and intent of the NWPA, a response to which is not required by RCFC 56(h)(1) and 56(h)(2). Defendant further objects that the excerpt of Ms. Klein's testimony cited does not support the proposed finding. In the excerpt cited, Ms. Klein simply testified that she was familiar with the document cited. Without waiving these objections, defendant agrees that the quoted language is contained in the document cited.

d. In a Federal Register notice concerning interpretation of the NWPA and the Standard Contract, the DOE acknowledged that ". . .the [NWPA] originally envisioned that a geologic repository would be in operation, and DOE would be prepared to begin acceptance of SNF by January 31, 1998." (Department of Energy Final Interpretation of Nuclear Acceptance Issues 60 Fed. Reg. 21,793, 21,794 (May 3, 1995), ENA at 1896, 1897.)

**RESPONSE**: Defendant objects to subparagraph (d) of this proposed finding because plaintiff filed a court challenge to the "Final Interpretation" that forms the basis of this proposed

---

[21] Susan Klein worked for DOE from 1984-2002 in various positions, including as Assistant General Counsel (1992-97) in the Office of General Counsel, and then as Senior Policy Advisor to the Director & Deputy Director, OCRWM (1997-2002). While working in the Office of the General Counsel, Ms. Klein was responsible for legal issues related to waste acceptance ad transportation including interpretation of the Atomic Energy Act, NWPA, Low Level Waste Policy Act and the Standard Contract. As a Senior Policy Advisor, Ms. Klein was responsible for acting as the liaison with the DOE General Counsel's office, including responsibility for interpretation of the Standard Contract and spent fuel litigation issues. (*See* 4/24/02 Klein Dep. at 11-13, 15-21, 23-34, ENA at 564-70.)

finding. In challenging that "Final Interpretation," plaintiff in this case successfully argued to the United States Court of Appeals for the District of Columbia Circuit that, contrary to the statements contained in the "Final Interpretation," DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that a repository be operational by January 31, 1998. In deciding plaintiff's challenge to the cited "Final Interpretation," the D.C. Circuit adopted plaintiff's argument and rejected DOE's argument. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Plaintiff's effort now to rely upon the portion of the "Final Interpretation" that it successfully challenged provides no support for its current arguments, and plaintiff should be barred by judicial and collateral estoppel from seeking to support this "fact."

Defendant further objects because the allegations contained in this proposed finding refer to conclusions of law – specifically, the proper interpretation of the NWPA – as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required.

Without waiving these objections, defendant agrees that the quoted language is contained in the Federal Register cited.

e. Michael Lawrence testified that the “top” priority of the office was to a have a geologic repository beginning in 1998. (5/20/02 Lawrence Dep. at 58, 145, ENA at 640, 651; 5/21/02 Lawrence Dep. at 247-48, 304, ENA at 644-65, 667.) Lawrence testified that the purpose of the Standard Contract was not to provide for interim storage but for permanent disposal. (5/20/02 Lawrence Dep. at 149-50, ENA at 652-53.) The primary focus was to dispose of waste in a repository and not an MRS facility. (5/21/02 Lawrence Dep. at 324, ENA at 669.)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding because, as plaintiff in this case successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that a repository be operational by January 31, 1998. <u>See</u> <u>Indiana Michigan Power Co. v. United States</u>, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Further, although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Accordingly, this proposed finding and all of the subparagraphs that purport to support it are irrelevant to the issues presented in our motion for summary judgment. Defendant also objects upon the grounds that the testimony cited offers legal conclusions about the meaning and intent of the NWPA, a response to which is not required by RCFC 56(h)(1) and 56(h)(2). Defendant further objects upon the ground that the testimony cited was subject to objections, based upon the failure to establish a proper foundation for the testimony elicited and that the nature of the question sought a legal conclusion, and courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. <u>See</u> <u>Starr v. Pearle Vision, Inc.</u>, 54 F.3d 1548, 1555 (10th Cir. 1995); <u>Carmen v. San Francisco Unified Sch. Dist.</u>, 237 F.3d 1026, 1028 n.4 (9th Cir. 2001).

Without waiving these objections, defendant agrees that the first sentence of the proposed finding is supported by the testimony cited. Defendant disagrees with the second sentence of the proposed finding because it misconstrues Mr. Lawrence's testimony. 5/20/02 Lawrence Dep. at 149-50, ENA at 652-53. Mr. Lawrence, in his mention of "interim storage" in the testimony

cited, was referring to the interim storage authority granted to DOE pursuant to the NWPA for which none of the utilities sought to contract. 42 U.S.C. § 10156(a). Defendant also disagrees with the third sentence of the proposed finding because, in the testimony cited, Mr. Lawrence was asked to testify about the primary focus of the NWPA, not the Standard Contract, which is the implication of the proposed finding. Mr. Lawrence testified as follows:

> Q.: So the primary focus of the Act was to dispose of waste in a repository and not an MRS?
>
> MS. HERRMANN: Objection. Asked and answered. Calls for a legal conclusion.
>
> A: I believe that the original intent was repository, yes.

5/21/02 Lawrence Dep. at 324, ENA at 669.

f. Lake Barrett testified that he understood the NWPA provided that the DOE would have a geologic repository in operation by 1998. (4/26/02 Barrett Dep. at 710, ENA at 433.)

**RESPONSE**: Defendant objects to this proposed finding because, as plaintiff in this case successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation**,** DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that a repository be operational by January 31, 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Further, defendant objects to plaintiff's attempt to support its interpretation of a law by reference to deposition testimony of individuals. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of statutory interpretation as to which deposition testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the

responsibility of the court, not testifying witnesses, to define legal terms"). Accordingly, this proposed finding and all of the subparagraphs that purport to support it are irrelevant to the issues presented in our motion for summary judgment.

Without waiving these objections, defendant agrees that Mr. Barrett's testimony is fairly paraphrased.

67. While DOE believed it was obligated to have a repository in place by 1998, DOE also assured utilities that waste acceptance would take place in a manner consistent with NWPA goals regardless of what type of facility the DOE had in place:

**RESPONSE**: Defendant objects to this proposed finding, including the subparagraphs that purport to support it, upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Defendant also objects upon the grounds that the proposed finding is vague because the phrases "NWPA goals" and "manner consistent with NWPA goals" are unclear and undefined, and, therefore, may refer to things that were never incorporated into the Standard Contract or made contractually binding obligations.

a. A memorandum by Richard Williamson outlining the strategy of the SNF program stated that “The lack of existence of particular type facilities will not delay or postpone the acceptance of spent fuel.” (Memorandum from Richard H. Williamson to Robert Morgan et. al., at 2 (September 15, 1983), ENA at 1045, 1046.)

**RESPONSE**: The allegations contained in subparagraph (a) of this proposed finding, including the quotation identified in subparagraph (a), are also contained in No. 64(h) of plaintiff's proposed findings of fact. Accordingly, as its response to subparagraph (a) of this

proposed finding, defendant incorporates by reference its objections and response to No. 64(h) of plaintiff's proposed findings of fact.

b. The December 1983 draft of the Mission Plan stated that "[DOE] does not intend to delay or postpone the acceptance of civilian radioactive wastes even if a permanent geologic repository is not completed by 1998." (Draft Mission Plan at 2-1 (December 20, 1983), ENA at 1075, 1080.)

**RESPONSE**: Defendant objects to this proposed finding as irrelevant to the issues presented in defendant's motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Further, during the promulgation of the Standard Contract terms through notice and comment, DOE rejected the request of at least one commenter that DOE contractually obligate itself to meet any acceptance rates or acceptance schedule contained in the Mission Plan.

Without waiving these objections, defendant agrees that the quoted language is contained in the document cited.

c. The April 1984 draft of the Mission Plan stated that “[I]n the event of a delay in repository operation, the Department could take the waste materials in accordance with the Waste Acceptance Schedule and arrange for either continued storage at the utilities in Federal storage casks, or for storage elsewhere pending transfer to the repository." (Draft Mission Plan, at 2-1 (April 1984), ENA at 1139, 1150.) The Draft Mission Plan also noted that: “If there is a delay in the first repository schedule that does not threaten the successful completion of the

repository, the Department will accept waste for disposal at the rate shown in Table II-1 through means such as Federal at-reactor storage." (*Id.* at 2-5, ENA at 1154.) Table II-1 of the Draft Mission Plan indicates that the DOE would ramp up to accept 3,000 tons by 2003. (*Id*. at 2-2, Table II-1, ENA at 1151).

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. The Mission Plan, its drafts, and its amendments are not contractually binding documents. Instead, the Mission Plan was "to provide the informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under [the NWPA]." (ENA 1140); 42 U.S.C. § 10221(a). The Mission Plan is a statement of "the overall goals, objectives, and strategy for the disposal of spent nuclear fuel and high-level waste." ENA 1149; see also ENA 1148-49 (document describes plan DOE was pursuing to comply with the mandate of Congress to achieve a solution to this problem). In fact, during the promulgation of the Standard Contract terms through notice and comment, DOE rejected the request of at least one commenter that DOE contractually obligate itself to meet any acceptance rates or acceptance schedule contained in the Mission Plan. Accordingly, DOE's issuance of draft Mission Plan and the planning goals stated in that document are irrelevant to the issues presented by defendant's motion. Defendant also objects to this proposed finding upon the grounds that the document cited is a draft, and the final version of the Mission Plan that was

actually published contained substantially lower acceptance rates. (Testimony of Victor Trebules, ENA at 909-10, Pages 52-53.)

Without waiving these objections, defendant agrees that the quoted language and referenced schedules are contained in the document cited, but avers that the draft Mission Plan explained that the acceptance schedule would be developed further in accordance with the dates set forth in the Standard Contract:

> [T]he Department has prepared a Waste Acceptance Schedule which specifies, in the aggregate, the quantities of commercial nuclear wastes that the Department will accept beginning in 1998. This schedule is presented in Table II-1.
>
> This Waste Acceptance Schedule will eventually be further developed to show not only the aggregate acceptance schedule, but also an acceptance priority ranking by utility and fuel element. The schedule will serve as a planning base which will be updated annually in response to the latest projections of nuclear power growth. Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987.
>
> The disposal contracts with the utilities specify that priority will be given to the oldest spent fuel or high-level wastes. In 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations.

(ENA 1150).

d. In June 1984, OCRWM director Ben Rusche told the press that “The Department is obligated to begin receiving spent fuel in 1998 whether or not a repository is in place.” (Matt Yancey, *Nuclear Wastes*, Associated Press, June 13, 1983, ENA at 1188; Rusche Dep. at 337-43, ENA at 876-77; *see also* Cass Petersen and Pete Early, *Waste-Disposal Advances*, Wash. Post, June 15, 1984, ENA at 1189. )

**RESPONSE**: The allegations contained in subparagraph (d) of this proposed finding, including the quotation identified in subparagraph (d), are also contained in No. 46 of plaintiff's proposed findings of fact. Accordingly, as its response to subparagraph (d) of this proposed finding, defendant incorporates by reference its objections and response to No. 46 of plaintiff's proposed findings of fact.

68. Michael Lawrence, the Deputy Director of the NWPA Project Office at the time the Contract was signed, testified that the Contract did not contain a *specific* acceptance rate because it was not possible to include an exact rate it in 1983:

> A. At the time we were signing or proposing and signing contracts, we were very, very early in the process. We did not have a facility designed and subsequently – consequently, we also did not know what our ability to accept waste and fuel would be. So we knew there would be information that the utilities would like but we were in no position to provide. Nevertheless, to get general obligations down, begin accepting in '98, being the primary one, we needed to sign contracts which would allow the utilities to start putting the 1.0 mill per kilowatt hour in the Waste Fund.
>
> Q. So DOE understood that the utilities would have liked the contracts to have firm terms as far as the – the rate of spent fuel acceptance after 1998, but DOE just didn't have a means of specifying something at that time, at the beginning of 1983
>
> A. That's an accurate representation.

(5/20/02 Lawrence Dep. at 62-63 (objection omitted), ENA at 641; *see also* 6/25/02 Morgan Dep. at 12; ENA at 773; 3/12/02 Cole Dep. at 34-37 (acceptance rates should depend on projections of discharge rates by utilities, facility design, and cost), ENA at 553.)

**RESPONSE**: Defendant objects to this proposed finding because the testimony to which plaintiff cites was subject to several objections, including a lack of foundation, and courts have determined that Rule 56(e) precludes the use of inadmissible deposition testimony. See Starr v.

Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001). Defendant also objects because plaintiff mischaracterizes Mr. Lawrence's testimony. Although Mr. Lawrence did testify that it was “too early in the process” for DOE to have specified an acceptance rate at the beginning of 1983, he did not testify that this was the reason that the Standard Contract did not contain one. In fact, when asked whether, "because DOE didn't have a means of specifying something in 1983, you left that - - that term in the contract open," Mr. Lawrence responded, "I don't recall how that was covered in the contract, per se." ENA at 641, Page 63. Accordingly, Mr. Lawrence did not testify as to the reasons that the contract did not contain a specific rate, as plaintiff proposes. Additionally, defendant objects to plaintiff's cites to the deposition testimony of Billy Cole and Robert Morgan as support for this proposed finding that Mr. Lawrence testified in a certain manner.

Without waiving these objections, defendant agrees that the quoted language is contained in Mr. Lawrence's deposition transcript, except that: (1) at the end of the first paragraph, the actual transcript reads "into the Waste Fund," rather than "in the Waste Fund," and (2) plaintiff has omitted the foundation objection that precedes Mr. Lawrence's second answer identified above. Defendant avers that Mr. Lawrence’s testimony establishes only that the Standard Contract did contain an obligation on DOE’s part to begin acceptance in 1998, and a corresponding obligation on the utilities’ part to pay the 1.0 mill pre kilowatt hour fee. Further, with regard to the citation to the testimony of Billy Cole in support of this proposed finding, plaintiff’s parenthetical comment mischaracterizes Mr. Cole's testimony. Mr. Cole's testimony to which plaintiff cites was not even related to acceptance rates that DOE was considering as

applicable to the Standard Contract. Id. Instead, it related to how the issue of "acceptance rate was addressed in the commercial radioactive waste management impact statement that he worked on as a DOE contractor in the late 1970's, and which was published in 1980, prior to the enactment of the NWPA. Id. Mr. Cole characterized his discussion to which plaintiff cites as follows: "Had nothing to do with reality. This was predictions, and it was like if it did this, then this is what you would do." ENA at 533, Page 37. Mr. Morgan's cited testimony does speak to the issue described in the proposed finding. Mr. Morgan, the head of OCRWM at the time the standard contracts were being executed, testified that "because of the uncertainties" at the time, there was "no way" that DOE was going to "commit to an acceptance rate." ENA at 773.

69. DOE has consistently recognized that a 3,000 ton or similar rate is necessary to achieve the goals of the NWPA, the Standard Contract, and the SNF Program.[22] This fact is demonstrated by (1) the DOE's use of the 3,000 ton or similar rates in documents throughout the early years of the SNF Program, and (2) deposition testimony of DOE witnesses in this case:

**RESPONSE**: Defendant objects to this proposed finding because it is unsupported as required by RCFC 56(h)(1). Further, defendant objects to the proposed finding because it is irrelevant to the pending motion for summary judgment. Although DOE has had many goals and

[22] Indeed, some of the initial DOE program documents eventually projected an even higher acceptance rate, of approximately 6,000 tons per year, based upon the opening of a second repository several years after the first repository. (*See, e.g.*, Report on Financing the Disposal of Commercial SNF and Processed HLRW at 8-11 (June 1983), ENA at 1041-44; Draft Mission Plan at 2-3, 2-6 (December 1983), ENA at 1082, 1085.) Those projections were based on estimates of the growth of the nuclear industry and SNF discharge projections at existing reactors. Following slower actual growth of the nuclear power industry, the DOE subsequently deferred plans for a second repository. (OCRWM Mission Plan Amendment at 13 (June 1987), ENA at 1401, 1420.)

objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Defendant also objects to plaintiff's attempt to support its addition of unstated terms into the NWPA and into the Standard Contract by reference to deposition testimony of individuals. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified matters of statutory and contractual interpretation as to which deposition testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) (courts, not testifying witnesses, define the law); United States v. Boeing Co., 802 F.2d 1390, 1393 (Fed. Cir.1986) ("[t]he interpretation of regulations which are incorporated into government contracts is a question of law which this court is free to resolve"); Newsom v. United States, 230 Ct. Cl. 301, 304, 676 F.2d 647, 650 (1982) (courts review contract language under an "objective standard"). Additionally, even assuming that Energy Northwest's citation to subparagraphs (a) through (v) is intended to support this proposed finding, defendant further objects that it cannot be ascertained which subparagraphs, if any, are intended to support which parts of the proposed finding.

Without waiving these objections, defendant disagrees with the proposed finding. As demonstrated by our responses to the subparagraphs that follow, this proposed finding is a mischaracterization of the documents and/or testimony cited. Moreover, as plaintiff notes in the footnote to this proposed finding, DOE's projections of acceptance rates have changed over the years of the program based upon changed circumstances, such as the 1987 amendments to the NWPA. With regard to the footnote, defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had

many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted such as those set forth in the documents Energy Northwest cites, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Without waiving this objection, defendant agrees that the proposed finding is supported by the documents cited.

**DOE Program Documents From 1983 to 1988**

a. **Report on Financing SNF Disposal.** DOE's June 1983 Report on Financing the Disposal of Commercial SNF and Processed HLRW contemplated two repositories each with a steady state receipt rate of 3,000 tons per year beginning in the sixth year after the DOE began removing SNF. (Report on Financing the Disposal of Commercial SNF and Processed HLRW (June 1983) at 9, ENA at 1029, 1042; 4/15/02 Roselli Dep. at 95-96, ENA at 837-38.)

**RESPONSE**: Defendant objects to this proposed finding because the document cited, as the title indicates, pertains to the assessment of the fee paid by utilities to fund the SNF disposal program. Moreover, the cited document has nothing to do with the goals of the Standard Contract or the SNF program, although it implements a requirement of the NWPA that the adequacy of the fee mandated by the NWPA be reviewed yearly. Further, although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. For these reasons, this proposed finding is irrelevant to the issues presented in our motion for summary judgment upon the rate of acceptance. Defendant also objects that the excerpt of Mr. Rosselli's

deposition testimony cited does not support the proposed finding of fact. Instead, Mr. Rosselli was testifying as to his recollection as to why the document cited was prepared.

Without waiving these objections, defendant disagrees. The cited report does not pertain to acceptance rates pursuant to the Standard Contract because it specifically states that the rates to which Energy Northwest cites are "Repository design receipt rates." ENA at 1042. It is wholly unrelated to DOE's acceptance schedule. Further, the projected repository design receipt rates assume the existence of two repositories and that no MRS would be utilized. Id. As plaintiff in this Case successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that any repository be operational by January 31, 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996).

b. **December 1983 Draft Mission Plan.** The 1983 OCRWM draft Mission Plan dated December 20, 1983 projected a 3,000 ton acceptance rate by the sixth year after DOE began removing SNF. (Draft Mission Plan at 2-2 to 2-3 (December 20, 1983), ENA at 1081-82.) The document described the 3,000 ton rate as the rate "set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998." (*Id.*)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. The Mission Plan, its drafts, and

its amendments are not contractually binding documents. Instead, the Mission Plan was "to provide the informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under [the NWPA]." (ENA at 1140); 42 U.S.C. § 10221(a). The Mission Plan is a statement of "the overall goals, objectives, and strategy for the disposal of spent nuclear fuel and high-level waste." ENA at 1149; see also ENA at 1148-49 (this document describes plan DOE is pursuing to comply with the mandate of Congress to achieve a solution to this problem). In fact, during the promulgation of the Standard Contract terms through notice and comment, DOE rejected the request of at least one commenter that DOE contractually obligate itself to meet any acceptance rates or acceptance schedule contained in the Mission Plan. Accordingly, DOE's issuance of draft Mission Plan and the planning goals, including the acceptance schedules, set forth in that document are irrelevant to the issues presented by defendant's motion. Defendant also objects to this proposed finding upon the grounds that the document cited is a draft and the final version of the Mission Plan that was actually published contained substantially lower acceptance rates. (ENA at 1292; Testimony of Victor Trebules, ENA at 909-10, Pages 52-53.)

Without waiving these objections, defendant responds as follows: With regard to the first sentence of this proposed finding, defendant agrees that the proposed finding is supported by the document cited, but avers that, as explained above, the Mission Plan, its drafts, and its amendments are not contractually binding documents. Instead, these documents contain statements of DOE's plans, goals, and objectives pertaining to the acceptance of SNF and HLW, pursuant to the NWPA. With regard to the acceptance schedules contained in the document, the

draft Mission Plan explained that the acceptance schedule would be developed further in accordance with the dates set forth in the Standard Contract:

> [T]he Department has prepared a Waste Acceptance Schedule which specifies, in the aggregate, the quantities of commercial nuclear wastes that the Department will accept beginning in 1998. This schedule is presented in Table II-1.
>
> This Waste Acceptance Schedule will serve as a planning base which will be updated annually in response to the latest projections of nuclear power growth. The schedule will eventually be further developed to show not only the aggregate acceptance schedule, but also an acceptance priority ranking by utility and fuel element. Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual Capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987.
>
> The disposal contracts with the utilities specify that priority will be given to the oldest spent fuel or high-level wastes. In 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations.

(ENA at 1081). As explained in the Mission Plan and its drafts, DOE was to issue the firm waste-acceptance schedule in 1991, pursuant to the terms of the Standard Contract. It is that ACR and the approved delivery commitment schedules, not the acceptance schedules set forth in the Mission Plan and its drafts, that are determinative of the proper rate of acceptance that should be applied to Energy Northwest.

With regard to the second sentence of this proposed finding, and without waiving the previously identified objections, defendant agrees that the quoted excerpt is contained in the document cited, but avers that the entire passage reads as follows:

> While the Department's acceptance rate during the initial five years is set to prevent, in the aggregate, the need for utilities to provide additional on-site storage after 1998, it is possible that an individual utility may face a need for expanded storage due to the

> timing of its shipment allocation. The planning basis assumes that, after 1998, individual utilities who actually realize this need will arrange for the right to ship spent fuel to the Department from a utility who is next in the queue in shipment allocation (subject to prior approval by the Department based on submittal of a request no less than six months prior to the scheduled delivery date). The use of such brokering arrangements should prevent the need for any utility to expand on-site storage and minimize transshipments.

(ENA at 1081, 1083). Moreover, this discussion does not appear in the draft Mission Plan, issued in April 1984, see ENA at 1139, or the final Mission Plan, issued in June 1985. See ENA at 1250.

c. **April 1984 Draft Mission Plan.** The OCRWM April 1984 Draft Mission Plan showed the DOE accepting 3,000 tons by the sixth year after the DOE began removing SNF. (Draft Mission Plan at 2-2, Table II-1 (April 1984), ENA at 1151.)

**RESPONSE**: Defendant incorporates by reference its objections to subparagraph (b) of this proposed finding of fact.

Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited, but avers that the draft Mission Plan explained that the acceptance schedule would be developed further in accordance with the dates set forth in the Standard Contract:

> [T]he Department has prepared a Waste Acceptance Schedule which specifies, in the aggregate, the quantities of commercial nuclear wastes that the Department will accept beginning in 1998. This schedule is presented in Table II-1.
>
> This Waste Acceptance Schedule will eventually be further developed to show not only the aggregate acceptance schedule, but also an acceptance priority ranking by utility and fuel element. The schedule will serve as a planning base which will be updated annually in response to the latest projections of nuclear power growth. Under the terms of the contracts for disposal services that

> have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987.
>
> The disposal contracts with the utilities specify that priority will be given to the oldest spent fuel or high-level wastes. In 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations.

(ENA 1150). As explained in the Mission Plan and its drafts, DOE was to issue the firm waste-acceptance schedule in 1991, pursuant to the terms of the contracts. It is that ACR and the approved delivery commitment schedules, not the acceptance schedules set forth in the Mission Plan and its drafts, that are determinative of the proper rate of acceptance that should be applied to Energy Northwest.

d. **1984 Total System Life Cycle Cost Analysis**. OCRWM's April 1984 preliminary analysis of SNF Program costs projected a steady state acceptance rate of 3,000 tons by the sixth year after the DOE began removing SNF. (Preliminary Analysis of Total System Life Cycle Cost of the Commercial High-Level Radioactive Waste Disposal Program, at 2-4 (April 27, 1984), ENA at 1162, 1176.)

**RESPONSE**: Defendant objects to this proposed finding because the document cited pertains to the "means of comparing the revenues raised from the fee collection to the expenses of the waste management program." ENA at 1168. Moreover, the cited document has nothing to do with the goals of the Standard Contract or the SNF program, although it supports the fee adequacy determination required by the NWPA. ENA at 1166. Further, although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals and objectives to which plaintiff cites here were never

incorporated into the Standard Contract or made contractually binding obligations. For these reasons, it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving these objections, defendant disagrees. The cited report does not pertain to acceptance rates pursuant to the Standard Contract because it specifically states that the rates to which plaintiff cites are "Repository design receipt rates." ENA at 1176. It is wholly unrelated to DOE's acceptance schedule. Further, the projected repository design receipt rates assume the existence of two repositories. Id. As plaintiff in this Case successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that any repository be operational by January 31, 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Finally, the document is a draft that reflects a preliminary analysis. ENA at 1162.

e. **1984 Fee Adequacy Report**. A July 1984 Review of the Adequacy of the Waste Disposal Fee projected a 3,000 ton steady state repository rate by the sixth year after DOE began removing SNF. (Nuclear Waste Fund for Adequacy: An Assessment (July 1984) at 3, ENA at 1190, 1193.)

**RESPONSE**: Defendant objects to this proposed finding because the document cited, as the title indicates, pertains to the assessment of the fee paid by utilities to fund the SNF disposal program. Moreover, the cited document has nothing to do with the goals of the Standard Contract or the SNF program, although it implements a requirement of the NWPA that the adequacy of the fee mandated by the NWPA be reviewed yearly. Further, although DOE has had

many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals and objectives to which plaintiff cites here were never incorporated into the Standard Contract or made contractually binding obligations. For these reasons, it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving this objection, defendant disagrees. The cited report does not pertain to the acceptance schedule to be established pursuant to the Standard Contract because it specifically states that the rates to which plaintiff cites are "Repository receipt rates." ENA at 1193. They are wholly unrelated to DOE's acceptance schedule. Further, the projected repository design receipt rates assume the existence of two repositories. Id. As plaintiff in this Case successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that any repository be operational by January 31, 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996).

f. **OCRWM Mission Plan**. The OCRWM Final Mission Plan issued in June 1985 showed the DOE accepting 3,000 tons of SNF by the sixth year after the DOE began removing SNF. (Mission Plan for the Civilian Radioactive Waste Management Program at 26 (1985), ENA at 1250, 1292.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the

Standard Contract or made contractually binding obligations. The Mission Plan, its drafts, and its amendments are not contractually binding documents. Instead, these documents contain statements of DOE's plans, goals, and objectives pertaining to the acceptance of SNF and HLW, pursuant to the NWPA. With regard to the acceptance schedules contained in the Mission Plan, the Mission Plan contains the following disclaimer:

> It should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses.
>
> * * *
>
> Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations.

(ENA 1295). In addition, the schedules to which Energy Northwest refers were based upon the existence of two operating repositories. (ENA 1291). As previously discussed, DOE had no statutory or contractual obligation to have an operational repository by January 31, 1998. Further, during the promulgation of the Standard Contract terms through notice and comment, DOE rejected the request of at least one commenter that DOE contractually obligate itself to meet any acceptance rates or acceptance schedule contained in the Mission Plan. Therefore, the acceptance rate identified by Energy Northwest in this proposed finding is irrelevant for determining the acceptance schedule pursuant to the contract and deciding the Government's motion for summary judgment.

Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited.

g. **1985 Total System Life Cycle Cost Analysis.** The OCRWM 1985 Analysis of the Total Life Cycle Cost for the Civilian Radioactive Waste Management Program ("1985 TSLCC") projected a 3,000 ton acceptance rate by the sixth year after DOE began removing SNF. (Analysis of Total System Life Cycle Cost of the Commercial High-Level Radioactive Waste Disposal Program, at 2-3 (April 1985), ENA at 1218, 1231.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Further, defendant objects to this proposed finding because the document cited "helps determine whether the revenue-producing mechanism established by the [NWPA] - - a fee levied on the producers of nuclear power - - is sufficient to cover the cost of the program." ENA at 1219. Moreover, the cited document has nothing to do with the goals of the Standard Contract or the SNF program, although it supports the fee adequacy determination required by the NWPA. Id. For these reasons, it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving this objection, defendant disagrees. The cited report does not pertain to the acceptance schedule to be established pursuant to the Standard Contract because it specifically states that the rates to which plaintiff cites are "Repository design receipt rate[s]." Id. They are wholly unrelated to DOE's acceptance schedule. Further, the projected repository

design receipt rates assume the existence of two repositories. Id. As plaintiff in this Case successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that any repository be operational by January 31, 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996).

h. **1985 Fee Adequacy Study.** OCRWM's February 1985 report on the adequacy of the Nuclear Waste Fund fee projected an acceptance rate of 3,000 tons by the sixth after the DOE began removing SNF. (Nuclear Waste Fund Fee Adequacy: An Assessment, at 3 (February 1985), ENA at 1205, 1208.)

**RESPONSE**: Defendant objects to this proposed finding because the document cited, as the title indicates, pertains to the assessment of the fee paid by utilities to fund the SNF disposal program. ENA at 1206. Moreover, the cited document has nothing to do with the goals of the Standard Contract or the SNF program, although it implements a requirement of the NWPA that the adequacy of the fee mandated by the NWPA be reviewed yearly. Further, although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. For these reasons, it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving this objection, defendant disagrees. The cited report does not pertain to the acceptance schedule to be established pursuant to the Standard Contract because it specifically states that the rates to which plaintiff cites are "Repository receipt rates." ENA at

11208. They are wholly unrelated to DOE's acceptance schedule. Further, the projected repository design receipt rates assume the existence of two repositories. Id. As plaintiff in this case successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that any repository be operational by January 31, 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996).

I. **1986 Life Cycle Cost Analysis.** OCRWM's 1986 Analysis of the Total Life Cycle Cost for the Civilian Radioactive Waste Management Program ("1986 TSLCC") projected a 3,000 ton acceptance rate beginning in the sixth year after the DOE began removing SNF. (Analysis of Total System Life Cycle Cost of the Commercial High-Level Radioactive Waste Disposal Program, at 14, 22 (1986), ENA at 1313, 1328, 1336)

**RESPONSE**: Defendant objects to this proposed finding because the document cited contains an analysis in support of the evaluation of "the adequacy of fee collected for the Nuclear Waste Fund." ENA at 1316. Moreover, the cited document has nothing to do with the goals of the Standard Contract or the SNF program, although it supports the fee adequacy determination required by the NWPA. Id. Further, although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. For these reasons, it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving this objection, defendant disagrees. The cited report does not pertain to the acceptance schedule to be established pursuant to the Standard Contract because it specifically states that the rates to which Energy Northwest cites are "Repository design receipt rate[s]." ENA at 1197. They are wholly unrelated to DOE's acceptance schedule.

j. **1986 Fee Adequacy Report**. OCRWM's March 1986 report evaluating the adequacy of the Nuclear Waste Fund fee based its projections on a acceptance rate of 3,000 tons beginning in the sixth year after DOE began removing SNF. (Nuclear Waste Fund Fee Adequacy: An Assessment, at 3-4 (March 1986), ENA at 1296, 1300-01.)

**RESPONSE**: Defendant objects to this proposed finding because the document cited, as the title indicates, pertains to the assessment of the fee paid by utilities to fund the SNF disposal program. ENA at 1297. Moreover, the cited document has nothing to do with the goals of the Standard Contract or the SNF program, although it implements a requirement of the NWPA that the adequacy of the fee mandated by the NWPA be reviewed yearly. Id. Further, although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. For these reasons, it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving these objections, defendant disagrees. The cited report does not pertain to the acceptance schedule to be established pursuant to the Standard Contract because it specifically states that the rates to which Energy Northwest cites are "Repository receipt rates." ENA at 1301.

k. **1987 Mission Plan Amendment.** OCRWM's 1987 Mission Plan Amendment showed the DOE accepting 2,650 tons by the seventh year after the DOE began removing SNF. (OCRWM Mission Plan Amendment, at 61 (June 1987), ENA at 1401, 1467.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. As explained above, the Mission Plan, its drafts, and its amendments are not contractually binding documents. Instead, these documents contain statements of DOE's plans, goals and objectives pertaining to the acceptance of SNF and HLW, pursuant to the NWPA. ENA 1408.. With regard to the acceptance schedules contained in the 1987 Mission Plan Amendment, the document contains the following disclaimer:

> Like the schedule in the 1985 Mission Plan, the schedule presented here is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses.
>
> * * *
>
> Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual Capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations. Beginning January 1, 1992, the utilities are to submit to the DOE for approval delivery commitment schedules based on these rankings. These schedules will form the basis for final delivery schedules to be submitted by

> the utilities not less than 12 months before the actual delivery dates.

ENA 1466. Therefore, the acceptance rate identified by Energy Northwest in this proposed finding is irrelevant for determining the acceptance schedule pursuant to the contract and deciding the Government's motion for summary judgment.

Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited, but also notes that significant changes to the program are reflected in the document. These changes include DOE's determination that, for waste acceptance to begin in 1998, it must begin at an MRS, the proposal for which DOE had submitted to Congress. ENA at 1413, 1468. Accordingly, the quantity of SNF to be accepted by DOE by the seventh year after beginning acceptance as reflected in the "Illustrative waste-acceptance schedule" assumes the existence of an MRS and the beginning of its operation in 1998, with the commencement of operations at a repository beginning in 2003. ENA at 1467.

l. **1987 Annual Capacity Report.** The 1987 Annual Capacity Report, which was based on the 1987 Mission Plan Amendment, showed the DOE accepting 2,650 tons by the seventh year after the DOE began removing SNF. (1987 Annual Capacity Report at 7 (June 1987), ENA at 1471, 1481.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. The Annual Capacity Reports issued by DOE prior to 1991 were issued pursuant to the requirements set forth in the Standard

Contract and were part of the contractual mechanism to establish the acceptance schedule. However, the 1991 ACR is the document that established an acceptance schedule in response to which the utilities were required to submit delivery commitment schedules if they wished to have DOE accept their SNF. Therefore, the issuance of any ACR prior to 1991, and the rates contained in any such ACR, are not probative of the issues presented in our motion for summary judgment.

Without waiving this objection, and to the extent the Court considers this document relevant, significant changes to the program, as reflected in the 1987 Mission Plan Amendment, including DOE's determination that, for waste acceptance to begin in 1998, it must begin at an MRS, are represented in the waste acceptance schedule contained in this document. Accordingly, the quantity of SNF to be accepted by DOE by the seventh year after beginning acceptance as reflected in the "Illustrative waste-acceptance schedule" assumes the existence of an MRS and the beginning of its operation in 1998, with the commencement of operations at a repository beginning in 2003. ENA at 1479, 1481.

m. **1988 Draft Mission Plan Amendment.** OCWRM's 1988 Draft Mission Plan Amendment projected a steady state repository receipt rate of 3,000 tons by the sixth year after DOE began removing SNF and a steady state receipt rate of 2,700 tons at an MRS facility by the fifth year. (OCRWM Draft 1988 Mission Plan Amendment at 19 (June 1988), ENA at 1519, 1544.)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. As explained above, the Mission Plan, its drafts, and its amendments are not contractually binding documents. Instead, these documents

contain statements of DOE's plans, goals and objectives pertaining to the acceptance of SNF and HLW, pursuant to the NWPA. ENA at 1520. With regard to the acceptance schedules contained in the 1988 Draft Mission Plan Amendment, the document contains the following disclaimer:

> Table 2-2 presents a preliminary schedule for waste acceptance by DOE's waste management system. Because of the uncertainties in the siting and functional capabilities of the MRS facility, the schedule is preliminary and is presented for illustrative purposes only.

ENA 1543 Therefore, the acceptance rate identified by plaintiff in this proposed finding is irrelevant for determining the acceptance schedule pursuant to the contract and deciding the Government's motion for summary judgment.

Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited.

n. **1988 Annual Capacity Report**. The 1988 Annual Capacity Report issued by the DOE showed the DOE accepting 3,000 tons by the sixth year after DOE began removing SNF. (1988 Annual Capacity Report at 5 (June 1988), ENA at 1496, 1507.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. The Annual Capacity Reports issued by DOE prior to 1991 were issued pursuant to the requirements set forth in the Standard Contract and were part of the contractual mechanism to establish the acceptance schedule. However, the 1991 ACR is the document that established an acceptance schedule in response to

which the utilities were required to submit delivery commitment schedules if they wished to have DOE accept their SNF. Therefore, the issuance of any ACR prior to 1991, and the rates contained in any such ACR, are not probative of the issues presented in our motion for summary judgment.

Without waiving this objection, and to the extent the Court considers this document relevant, "the projected waste acceptance rate [was] increased because it [was] assumed that the MRS facility and the repository [would] commence operation simultaneously." ENA at 1507. However, as previously discussed, and as plaintiff successfully argued to the United States Court of Appeals for the District of Columbia Circuit, DOE was not required to have an operational repository available by January 31, 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996).

**Deposition Testimony**

o. Lake Barrett specifically affirmed that the DOE would have used the 3,000 ton rate if it had begun to perform in 1998:

> Q: What schedule would DOE have followed had it begun to take SNF from purchasers by January 31, 1998 pursuant to this contract?
>
> A: We would have operated our system at our plant [sic] which was, you know, whatever the operation rate which transiented [sic] and leveled out at 3,000 metric tons per year after five years. That's what we were planning to do.
>
> Q: That's what you would have done?
>
> A: That's what we would have done if we could have gotten, you know, the sites approved, et cetera.

(5/14/02 Barrett Dep. at 120-21 (objections omitted), ENA at 474.)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any <u>contract</u> provisions that create the obligation that plaintiff is attempting to create. Defendant further objects to this proposed finding upon the ground that most of the testimony cited was subject to objection, based upon a lack of foundation, and courts have determined that Rule 56(e) precludes the use of inadmissible deposition testimony. <u>See</u> <u>Starr v. Pearle Vision, Inc.</u>, 54 F.3d 1548, 1555 (10th Cir. 1995); <u>Carmen v. San Francisco Unified Sch. Dist.</u>, 237 F.3d 1026, 1028 n.4 (9th Cir. 2001).

Without waiving these objections, defendant states that, in response to the first sentence of this proposed finding, it agrees that the deposition testimony quoted in the first sentence of this proposed finding accurately reflects the language contained in the cited deposition transcripts. However, defendant avers that, in response to the next question asked, Mr. Barrett stated that he "did not know what system we are referring to or what time because those are changes as a function of time:"

> Q. And in what sequence – do you happen to know, can you just generally tell me a ramp-up rate up to that 3,000 ton rate that might have been realistic?
>
> MS. HERRMANN: Objection. Foundation.
>
> A. <u>I don't know what system we are referring to or what time because those are changes as a function of time</u>. So if you give us the time frame –

ENA at 474 (Transcript, at 121) (emphasis added).

p. Mr. Barrett testified that the justification for the 3,000 ton rate was that it matched the annual discharge rate of 2,000 tons and allowed DOE to "catch up and, you know, remove the waste that had been accumulating at whatever the start date of the facility would be." (5/10/02 Barrett Dep. at 1164-65, ENA at 460; *see also* 4/22/02 Barrett Dep. at 52-55, ENA at 395-96; 5/10/02 Barrett Dep. at 1332-33, 1370-73, ENA at 463, 466-67.) This allowed the DOE to meet its goals of reducing the backlog of SNF. (4/22/02 Barrett Dep. at 52-55, ENA at 395-96).

**RESPONSE**: Defendant objects to this proposed findings o and p because they are irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to create. Defendant further objects to this proposed finding upon the ground that most of the testimony cited was subject to objection, based upon a lack of foundation, and courts have determined that Rule 56(e) precludes the use of inadmissible deposition testimony. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001).

Without waiving these objections, defendant states that, with regard to the second sentence of this proposed finding, and without waiving the objections identified above, defendant agrees that the quoted language is contained at page 1165 of the cited Barrett deposition transcript, but avers that the second sentence of plaintiff's proposed finding

mischaracterizes Mr. Barrett's testimony. The "justification" to which Mr. Barrett refers in the cited testimony was the rationale for the 3000 MTU rate contained "in the old mission plans." ENA at 458, Page 1163.

With regard to the third sentence of this proposed finding, and without waiving the objections identified above, defendant disagrees with plaintiff's statement. Plaintiff is attempting to create, through its proposed finding, an indication of DOE's contractual "intent" regarding the rate of SNF acceptance applicable to the Standard Contract. However, Mr. Barrett expressly stated in the identified testimony that "[w]e did not – you all get into the contract. We did not consider the contract issues at that time . . . ." 4/22/02 Barrett Dep. at 54, ENA at 396. As a result, plaintiff's efforts to use Mr. Barrett's testimony as the basis of its contractual "intent" arguments are unfounded.

q. Mr. Barrett also testified that the 3,000 ton rate has been the DOE's way of achieving the requirement of reducing the existing SNF backlog since he joined the program in 1985 until present. (4/22/02 Barrett Dep. at 117-22, 197-98 ENA at 403-04; 5/10/02 Barrett Dep. at 1333-34, ENA at 463; *see also* 4/22/02 Barrett Dep. at 57-59, ENA at 397.) Each of the system studies prepared by the DOE from the mid-1980s to the mid-1990s supported the 3,000 ton rate. (4/22/02 Barrett Dep. at 197-98, ENA at 197-98.) Mr. Barrett explained that a slower rate, such as 900 tons, would not keep up with the utility discharge rate much less reduce the backlog of SNF. (4/23/02 Barrett Dep. at 340-45, ENA at 410-12; *see also* 5/10/02 Barrett Dep. at 1370-73, ENA at 466-67)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and

objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to create. Further, Mr. Barrett made clear in his deposition that he was not testifying as to DOE's obligations under the Standard Contract: "[w]e did not – you all get into the contract. We did not consider the contract issues at that time . . . ." 4/22/02 Barrett Dep. at 54, ENA at 396. Defendant further objects to this proposed finding because much of the testimony upon which it is based was subject to objection, and courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001).

Without waiving this objection, defendant disagrees with the proposed finding because it is not supported by the cited excerpts of Mr. Barrett's testimony. It appears from the excerpts cited that Mr. Barrett was testifying about the design receipt rates for the repository, rather than the acceptance rate to be established between the parties. 4/22/02 Barrett Dep. at 117, ENA 403. If, in fact, Mr. Barrett was discussing repository receipt rates rather than acceptance rates from the utilities, his testimony is irrelevant to the issues presented in the Government's motion for summary judgment because the repository design receipt rates are unrelated to the acceptance rates contemplated by the contractual mechanism as agreed to by the parties pursuant to the Standard Contract.

r. Finally, Mr. Barrett testified that the DOE also based its evaluation of the adequacy of the 1 mil/kwh fee on a 3,000 ton rate and program economics. (4/23/02 Barrett Dep. at 348-50, ENA at 412-13.) The 3,000 rate was chosen

> as a proper balance for total life-cycle costs as well as near-term cash flow requirements and performance. If you make the number too high, then you have – you would quickly work off the backlog, and then you would have a lot of idle Capacity. If it was too low, you would have reactors needing to put in dry storage, and 3,000, based on an early 1980s, seemed like a reasonable number to use."

(5/10/02 Barrett Dep. at 1332-33, ENA at 463.)

**RESPONSE**: Defendant objects to this proposed finding because the adequacy of the fee assessed pursuant to the NWPA is irrelevant to the issues presented in our motion for summary judgment. Moreover, as noted above, the repository design receipt rates, upon which the fee adequacy studies and the total system life cycle costs studies were based, are unrelated to the acceptance rates contemplated by the contractual mechanism as agreed to by the parties pursuant to the Standard Contract. As Mr. Barrett testified, "[t]he receipt rate, which is what you call 3,000, is something that is variable, but depending upon the system we design to build . . . ." 5/10/02 Barrett Dep. at 1332, ENA at 463 Defendant further objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to create. Further, Mr. Barrett made clear in his deposition that he was not testifying as to DOE's obligations under the Standard Contract: "[w]e did not – you all get into the

contract. We did not consider the contract issues at that time . . . ." 4/22/02 Barrett Dep. at 54 ENA at 396. Finally, as explained below, defendant objects because Mr. Barrett's testimony establishes that the quotation above constitutes inadmissible hearsay.

Without waiving these objections, defendant disagrees with the proposed finding. Defendant agrees that the portion of the sentence that plaintiff has quoted is contained in the cited deposition transcript. However, the full sentence reflects that Mr. Barrett's testimony was not based upon his personal knowledge, rendering the comments hearsay:

> The 3,000 rate that we have was established before I was ever involved in the program. It's my understanding that it was looked at then as a proper balance for total life-cycle costs as well as near-term cash flow requirements and performance. If you make the number too high, then you have – you would quickly work off the backlog, and then you would have a lot of idle Capacity. If it was too low, you would have reactors needing to put in dry storage, and 3,000, based on an early 1980s, seemed like a reasonable number at the time.

5/10/02 Barrett Dep. at 1333, ENA at 463 (underlining added to portions not included in plaintiff's quotation).

s. Tom Pollog, the DOE's Rule 30(b)(6) representative on the rate of acceptance the DOE planned to use under the Standard Contract and the rate of acceptance in estimates made by DOE from 1982 to 1987, testified that the 3,000 ton rate was the rate the DOE determined was needed to avoid at-reactor storage. (4/11/02 Pollog Rule 30(b)(6) Dep. at 96-97, ENA at 797; 4/12/02 Pollog Rule 30(b)(6) at 12, ENA at 804.) Mr. Pollog also testified that the 3,000 ton rate was necessary from a functional standpoint in order to collect all SNF during the twenty-five year period that the DOE expected to operate the repository. (*Id.*)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any <u>contract</u> provisions that create the obligation that plaintiff is attempting to create.

Without waiving this objection, defendant disagrees with this proposed finding because it mischaracterizes the scope of Mr. Pollog's Rule 30(b)(6) testimony. Mr. Pollog was identified as the Government's Rule 30(b)(6) witness on several topics, two of which are identified by plaintiff in this proposed finding:

> The rate of acceptance in estimates made by DOE from 1982 to 1987 in the areas of program cost, waste acceptance, transportation planning, and receiving Capacity of the program and the basis for those estimates, as set forth in the following documents: (list provided separately)
>
> The rate(s) of acceptance that DOE planned to use under the Standard Contract before DOE determined that it would not begin accepting SNF in a permanent repository in 1998.

4/11/02 Tom Pollog Rule 30(b)(6) Dep., Ex. 1, ENA at 2120. Plaintiff also mischaracterizes Mr. Pollog's testimony on these topics. Mr. Pollog's testified that "[t]here were points in time that one of the goals of the program was to develop a system where the acceptance rates would account - - would alleviate the purchaser's need to have storage outside of their pools." ENA at 797, Page 96. Additionally, the testimony to which plaintiff refers at page 734 of its appendix pertains to rates contained in one of the mission plans. As explained above, the Mission Plan, its drafts, and its amendments are not contractually binding documents. Finally, Mr. Pollog's

testimony concerning the use of the 3000 MTU rate over the expected 25-year life a repository also contemplated the use of two repositories. Id.

t. Billy Cole stated he agreed that the DOE began using the 3,000 ton rate from the outset of the SNF program and that the 3,000 ton rate was "required to work off what utilities were discharging as well as, attacking a backlog. . . Not only did they want to help utilities so they wouldn't have to add additional capacity, they wanted to make sure that you had to work off the backlog." (3/12/02 Cole Dep. at 175, ENA at 547; *see also* 3/12/02 Cole Dep. at 171-76, ENA at 546A-547.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to create.

Without waiving this objection, defendant objects to this proposed finding because it mischaracterizes Mr. Cole's testimony. Mr. Cole testified that the rates, which he testified that he formulated, contained in the 1991 ACR and upon which utilities were to base their delivery commitment schedule submissions, "had nothing to do with 3000 tons working off the backlog or anything." Rather, "[i]t was based on if you started the facility in 1998, 400 tons the first year would be adequate to make sure that you at least didn't have to add additional storage in that year, every year, the same." ENA at 547, pages 174-75. His testimony pertaining to the 3000

MTU rate was, when an ACR used the 3000 MTU rate, that reflected "the initial hope of the program." Cole Dep. at 175:17-19; ENA 547.

u. Robert Morgan testified that one criteria used in developing the 3,000 ton rate was to prevent utilities from having to provide additional on-site storage after January 1998. (3/22/02 Morgan Dep. at 225, ENA at 765.) Additionally, Mr. Morgan testified that early fee adequacy studies, which projected a 3,000 ton steady-state acceptance rate, were based on eliminating the need for additional at-reactor storage after 1998. (3/21/02 Morgan Dep. at 93-97, 205-12, ENA at 750-51, 761-62; 3/22/02 Morgan Dep. at 226-27, ENA at 765.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to create. Further, defendant objects to this proposed finding because not only was the testimony cited the subject of objections, Mr. Morgan was testifying about hearsay documents. Courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001).

Without waiving these objections, and to the extent the Court finds the testimony about the documents relevant, as we noted above, the draft mission plans and fee adequacy studies do

not pertain to DOE's contractual obligations and, at least in the Case of the fee adequacy studies, contained repository design receipt rates, not proposed Standard Contract acceptance rates.

v. Victor Trebules testified that the 3,000 ton rate was designed to initially avoid at-reactor storage and eventually work off the backlog. (4/17/02 Trebules Dep. at 52-54, 97-98, 170-71, ENA at 909-910, 913, 916.) The 3,000 ton rate would at least have matched the rate of generation. (4/17/02 Trebules Dep. at 53, ENA at 910; *see also* 4/17/02 Trebules Dep. at 180, ENA at 917.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to create.

Without waiving this objection, defendant disagrees with this proposed finding. Mr. Trebules testified that these were programmatic goals or objectives, not, as plaintiff implies, intended acceptance rates pursuant to the Standard Contract. Moreover, the testimony concerning the 3000 MTU rate as matching the generation rate pertained to projected generation rates. ENA at 914, pages 122-23. As Energy Northwest itself acknowledges in footnote 25 to its proposed findings, those projected generation rates have declined substantially since the initial projections upon which the early program documents relied.

w. David Zabransky testified that when he was in private industry: “my understanding, and I think it was the general understanding at the time [was] that 3,000 tons a

year would be a sufficient rate to work off the backlog and the discharges in a reasonable time frame." (4/17/02 Zabransky Dep. at 105, ENA at 943; *see also id*. at 90, ENA at 940.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to create. Further, defendant objects to this proposed finding because, regardless of whether the Court interprets the terms of the Standard Contract promulgated through notice-and-comment as a regulation or a contract, testimony regarding the subjective beliefs of an individual, a party, or any other entity is irrelevant to this Court's review of the contract terms. United States v. Boeing Co., 802 F.2d 1390, 1393 (Fed. Cir.1986) (regulations incorporated into government contracts); Newsom v. United States, 230 Ct. Cl. 301, 304, 676 F.2d 647, 650 (1982) (contracts).

Without waiving these objections, defendant agrees that the quoted language is contained at the cited page of the cited deposition transcript.

70. DOE's current planning basis for actual SNF receipt beginning in 2010 has, since 1994, projected a 3,000 ton steady state receipt rate[23]:

---

[23] In late 2004, the DOE determined that it could not meet the 2010 deadline for beginning to accept SNF. (*See* 4/11/05 Kouts 30(b)(6) Dep. at 62-63, ENA at 616.) The DOE has not issued a new date by which it expects to open a repository and begin accepting SNF. However, recent DOE announcements appear to indicate that the earliest DOE currently expects to open a repository is 2012. (*See* Statement of Theodore J. Garrish, Deputy Director, Office of Civilian Radioactive Waste Management, U.S. Department of Energy, to the Subcommittee on Energy and Air Quality, Committee on Energy and Commerce, U.S. House of Representatives

**<u>RESPONSE</u>**: Defendant objects to this proposed finding and the associated footnote because they are irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any <u>contract</u> provisions that create the obligation that plaintiff is attempting to create. Current projections for receipt rates at the repository itself are irrelevant to the determination of the parties' intent at the time of award of the contract at issue here, or at the time of formation of the Standard Contract, and the determination of the acceptance schedule for the first 10 years established through the mechanism contained in the Standard Contract.

a. A DOE document setting out the DOE's assumptions for estimating the total system life cycle costs for the SNF program distributed in December 1994 projected an acceptance rate of 3,000 tons by the fifth year of operation following commencement in 2010. (1995 TSLCC Assumptions Package, at 3, 13-15 (December 1994), ENA at 1807, 1812, 1814-16; 5/2/02 Milner Dep. at 375-79, ENA at 710-11.)

---

(March 10, 2005) at 4, ENA at 2294, 2297, presenting funding profiles for assumed repository start dates of 2012 and 2015; Ken Ritter, *Energy Department Official Says Yucca Project Delayed, Not Dead*, Associated Press, February 9, 2005, (available at www.signonsandiego.com/news/nation/20050209-1535-nv-yuccamountain.html), ENA at 2265, noting that then Director of DOE's Office of Civilian Radioactive Waste Management, Margaret Chu, stated that "[w]e're hoping [for]2012" as a repository start date.)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any <u>contract</u> provisions that create the obligation that plaintiff is attempting to create. The cited document contains assumptions to support an analysis of the total system life cycle costs for the program. ENA at 1814. The cited document has nothing to do with the establishment of the acceptance schedule through the mechanism contained in the Standard Contract. Instead, the purpose of the document is to provide support and inputs to the fee adequacy determination required by the NWPA. For these reasons, it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving this objection, defendant disagrees. The cited report does not pertain to acceptance rates pursuant to the Standard Contract because it specifically states that the rates to which plaintiff cites are waste acceptance rates at a repository. ENA at 11815.

b. In OCRWM's September 1995 Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program ("1995 TSLCC"), the DOE projected a steady state acceptance rate of 3,000 tons by the fifth year of operation. (Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program, at 8 (September, 1995), ENA at 1902, 1917.) Lake Barrett testified that the TSLCC is a baseline document which contained the rate at which DOE believed it could perform. (5/10/02 Barrett Dep. at 1343, 1334-35, ENA at 465, 463.)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any <u>contract</u> provisions that create the obligation that plaintiff is attempting to create. Further, defendant objects to this proposed finding because the document cited contains an analysis in support of the evaluation of the adequacy of fee collected for the Nuclear Waste Fund. ENA at 1910-11. The cited document has nothing to do with establishment of the acceptance schedule through the mechanism contained in the Standard Contract. Instead, the purpose of the document is to provide support and inputs to the fee adequacy determination required by the NWPA. <u>Id.</u> For these reasons, it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving this objection, defendant disagrees. The cited report does not pertain to acceptance rates pursuant to the Standard Contract because it refers to repository receipt rates. ENA at 1916. The document itself specifically states that is should not "be interpreted as [OCRWM] or [DOE] policy." ENA at 1910. Similarly, the proposed finding is not supported by the excerpt of Mr. Barrett's deposition testimony cited. In the excerpts cited, Mr. Barrett was testifying regarding design receipt rates, not about what DOE's acceptance rate will be once performance under the Standard Contract. 5/10/02 Barrett Dep. at 1343, 1334-35, ENA at 465, 463.

c. OCRWM's 1998 Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program ("1988 TSLCC") projects a steady state acceptance rate of 3,000 tons by the fifth year of operation. (Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program, at 15 (1998), ENA at 1971, 1996.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to create. Defendant further objects to this proposed finding because the document cited contains an analysis that provides the "basis for assessment of the adequacy the Nuclear Waste Fund Fee as required by the NWPA." ENA at 1974. Accordingly, the cited document has nothing to do with establishment of the acceptance schedule through the mechanism contained in the Standard Contract. For these reasons, it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving these objections, defendant disagrees. The document itself specifically states that is should not "be interpreted as [OCRWM] or DOE policy." ENA at 1983.

d. OCRWM's 1998 Viability Assessment of Yucca Mountain projects a steady state receipt rate of 3,000 tons by the fifth year of operation. (Viability Assessment of a Repository at Yucca Mountain, Volume 2: Preliminary Design Concept for the Repository and Waste Package, at 3-2 (1998), ENA at 1930, 1963.)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any <u>contract</u> provisions that create the obligation that plaintiff is attempting to create. Further, defendant objects to this proposed finding because the cited document, as its title indicates, pertains to the preliminary design concept for the repository. Accordingly, the rates cited by Energy Northwest are the predicted repository receipt rates, not the acceptance rates established pursuant to the Standard Contract. ENA at 1963.

e. OCRWM's May 2001 Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program ("2001 TSLCC") projects a steady state acceptance rate of 3,000 tons by the fifth year of operation. (Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program, at 4-14 (2001), ENA at 2010, 2027; *see also* Barrett Dep. at 1337-38, ENA at 464.)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any <u>contract</u> provisions that create the obligation that plaintiff is attempting to create. Defendant further objects to this proposed finding because the document cited contains an analysis that

provides the "basis for assessment of the adequacy the Nuclear Waste Fund Fee as required by the NWPA." ENA at 2012. Accordingly, the cited document has nothing with establishment of the acceptance schedule through the mechanism contained in the Standard Contract. For these reasons, it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving these objections, defendant disagrees. The document specifically states that the rates to which plaintiff cites "are targets only, and do not create any binding legal obligation upon DOE." ENA at 2027.. Additionally, the document specifically states that it should not "be interpreted as final [OCRWM] or DOE policy." ENA at 2023

f. OCRWM's January 2002 Waste Acceptance System Requirements Document, which controls planning for the SNF Program, projects a 3,000 ton steady state rate from the fifth year of operation through the end of waste emplacement. (Civilian Radioactive Waste Management Waste Acceptance System Requirements Document at 46, Table 7-1 (January 2002) ENA at 2050, 2061; 4/25/02 Klein Rule 30(b)(6) Dep. at 288-90, ENA at 586-588.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to create. Defendant further objects to this proposed finding because the purpose of the document cited is to "establish[] technical requirements" for the waste acceptance system. ENA at 2056. For these reasons, it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving these objections, defendant disagrees. The document specifically states that the rates to which Energy Northwest cites "<u>are targets only, and do not create any binding legal obligation upon DOE.</u>" ENA at 2060 (emphasis in original).

g. OCRWM's September 2004 Civilian Radioactive Waste Management System Requirements Document ("September 2004 CRD"), which sets forth the acceptance rate that serves as the planning basis for the repository, establishes a 3,000 ton steady state rate from the fifth year of operation through the end of waste emplacement. (September 2004 CRD at 8, ENA at 2222, 2241; *see also* 4/18/02 Zabransky Dep. at 375-76, ENA at 956; 4/12/02 Pollog Dep. at 120-21, ENA at 805.) The September 2004 CRD is the latest revision to the system requirements document for the waste management system. (*See* 4/11/05 Kouts Dep.[24] at 46, ENA at 614.)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding and the associated footnote because they are irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW

---

[24] Christopher Kouts has worked for the DOE in a variety of positions since 1979, and joined the Office of Civilian Radioactive Waste Management ("OCRWM") in 1985. Since August 2002, Mr. Kouts has held the position of acting and then permanent Director of the Office of Systems Analysis and Strategic Development. (1/30/2004 Kouts Dep. at 45-46, ENA at 600-601; 2/19/2004 Kouts Dep. at 370-71, 433, ENA at 603-604, 605.) In that position, Mr. Kouts is responsible for management of the waste acceptance function, including management of issues related to the Standard Contract. (2/19/04 Kouts Dep. at 370, ENA at 603.) The DOE's communications with the utilities regarding the 2004 DCS process (*see infra* ¶ ¶ 193-202) were sent under Mr. Kouts' direction. (4/11/05 Kouts Rule 30(b)(6) Dep. at 31-32, ENA at 612.) Mr. Kouts' other positions with OCRWM include working as part of the monitored retrievable storage team, heading the OCRWM transportation function, serving as Director of a division that dealt with regulatory coordination activities related to DOE's interactions with the Nuclear Regulatory Commission, Director of the planning division responsible for strategic planning activities, and serving as a liaison with the Yucca Mountain project. (1/30/2004 Kouts Dep. at 13-25, 36-46, ENA at 594-97, 598-601.)

acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to create. Current projections for receipt rates at the repository in 2010 are irrelevant to the determination of the parties' intent at the time of award of the contract at issue here or at the time of formation of the Standard Contract and further, are irrelevant to the rates at which DOE would have accepted SNF at an MRS in 1998. Accordingly, they are irrelevant to the determination of the acceptance schedule for the first 10 years established through the mechanism contained in the Standard Contract.

Without waiving these objections, defendant disagrees. With respect to the first sentence, the document cited specifically states that the rates to which Energy Northwest cites "are targets only, and do not create any binding legal obligation upon DOE." ENA at 2241 n. 3. Defendant states further that the deposition testimonies of Messrs. Zabransky and Pollog were both taken in 2002 and do not, and could not, address the document cited that is dated 2004. With respect to the second sentence, the cited deposition testimony of Mr. Kouts does not support the statement contained in the second sentence. See ENA 613- 614.

h. DOE's July 2004 APR/ACR also projects a steady state acceptance rate of 3,000 tons by the fifth year of operation. (2004 APR/ACR at p. 2, ENA at 2133, 2137; 4/11/05 Kouts Rule 30(b)(6) Dep. at 26-28, ENA at 611.)

**RESPONSE**: Defendant objects to this proposed finding and the associated footnote because they are irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW

acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to create. Current projections for receipt rates at the repository in 2010 are irrelevant to the determination of the parties' intent at the time of award of the contract at issue here or at the time of formation of the Standard Contract and further, are irrelevant to the rates at which DOE would have accepted SNF at an MRS in 1998. Accordingly, they are irrelevant to the determination of the acceptance schedule for the first 10 years established through the mechanism contained in the Standard Contract.

Without waiving these objections, defendant admits the allegations contained in this proposed finding to the extent that it is supported by the cited document, which is the best evidence of its contents.

i. Susan Klein, DOE's Rule 30(b)(6) witness in previous coordinated discovery on the issue of "what rate the DOE is planning to use once [SNF] acceptance begins" (ENA at 2206), testified that the DOE plans to use the 3,000 ton rate when it begins accepting SNF, and that the rate will ramp up to 3,000 tons by the fifth year after DOE begins removing SNF. (4/24/02 Klein Rule 30(b)(6) Dep. at 240-42, ENA at 581-82; 4/25/02 Klein Rule 30(b)(6) Dep. at 351, ENA at 589.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the

Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to create. The rate that DOE is presently using for planning purposes regarding SNF acceptance once a repository is operational is not relevant to the intent of the parties at the time of formation of the Standard Contract or to the terms of the Standard Contract.

Without waiving these objections, defendant disagrees with plaintiff's proposed finding. Ms. Klein did not testify "that the DOE plans to use the 3,000 ton rate when it begins accepting SNF." Instead, Ms. Klein was asked to identify "the Department of Energy's current estimate of the rate that it will begin removing spent nuclear fuel under the standard contract if it starts performing in 2010." 4/24/02 Klein Dep. at 240-41, ENA at 581-82. In response, she testified that, "[f]or planning purposes only, 400 the first year, 600 the second, 1200 the third, 2,000 the fourth, 3,000 the fifth and 3,000 thereafter for the next five years" and that "[t]he whole thing is 10 years, however that calculates to 2019." 4/24/02 Klein Dep. at 241, ENA at 582. However, none of those amounts have been added to the Standard Contract as contractual obligations and are subject to change.

## III. The DOE Undertakes Implementation Of The NWPA And Performance Under The Standard Contracts.

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1).

### A. The DOE Publishes The Mission Plan.

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1). Defendant also objects to this proposed finding because it is irrelevant to the issues presented in the our pending motion for summary judgment. Without waiving this objection, defendant agrees that DOE published the Mission Plan in 1985, pursuant to the requirements of the NWPA, 42 U.S.C. § 10221.

71. As required by the NWPA, in June 1985, the DOE published its *Mission Plan for the Civilian Radioactive Waste Management Program*. (ENA at 1250-59.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in the our pending motion for summary judgment. The Mission Plan, its drafts, and its amendments are not contractually binding documents. Instead, the Mission Plan was "to provide the informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under [the NWPA]." ENA 1140; 42 U.S.C. § 10221(a). The Mission Plan is a statement of "the overall goals, objectives, and strategy for the disposal of spent nuclear fuel and high-level waste." ENA 1149; see also ENA 1148-49 (this document describes plan DOE was pursuing to comply with the mandate of Congress to achieve a solution to this problem). Further, during the promulgation of the Standard Contract terms through notice and comment, DOE rejected the request of at least one commenter that DOE contractually obligate itself to meet any acceptance rates or acceptance schedule contained in the Mission Plan. See Defendant's Proposed Findings of Uncontroverted Fact Nos. 12 & 24. Accordingly, DOE's issuance of the Mission Plan and the

planning goals stated in that document are irrelevant to the issues presented by defendant's motion.

Without waiving these objections, defendant agrees that DOE published the Mission Plan in 1985, pursuant to the requirements of the NWPA, 42 U.S.C. § 10221.

72. DOE had previously distributed two drafts of the Mission Plan. The initial draft was transmitted in December 1983. (Draft Mission Plan (December 1983), ENA at 1075; Robert Morgan Letter to Russell Stanford, Program Manager, UNWMG (December 20, 1983), ENA at 1096-97; 3/21/02 Morgan Dep. at 149-50, ENA at 757.) A second draft was published in April 1984. (Draft Mission Plan (April 1984), ENA at 1139; 5/20/02 Lawrence Dep. at 204-07, ENA at 656-57.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in the our pending motion for summary judgment. The Mission Plan, its drafts, and its amendments are not contractually binding documents. Instead, the Mission Plan was "to provide the informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under [the NWPA]." ENA at 1252; 42 U.S.C. § 10221(a). The Mission Plan is a statement of "the overall goals, objectives, and strategy for the disposal of spent nuclear fuel and high-level waste." ENA at 1153. The drafts of the Mission Plan contained the same explanation of the scope of the document. ENA at 1079 (December 1983 draft – "Volume I defin[es] the program objective, strategy, and current program plans . . .."); ENA at 1149 (April 1984 draft). Further, during the promulgation of the Standard Contract terms through notice and comment, DOE rejected the request of at least one commenter that DOE contractually obligate itself to meet any

acceptance rates or acceptance schedule contained in the Mission Plan. See Defendant's Proposed Findings of Uncontroverted Fact Nos. 12& 24. Accordingly, DOE's issuance of drafts of the Mission Plan and the statements of plans and policy contained in those drafts are irrelevant to the issues presented by defendant's motion.

Without waiving these objections, defendant agrees that DOE published two drafts of the Mission Plan for the purpose of receiving comments and "feedback," pursuant to the requirements of the NWPA, 42 U.S.C. § 10221(b)(1) and (2).

73. The June 1985 Mission plan presented two program plans, including an authorized plan consisting of development and operation of a geologic repository. (Mission Plan at 16, ENA at 1282.) The Mission Plan also presented DOE's hopes for what they called an "Improved-Performance Plan." (Mission Plan at 17, ENA at 1283.) The "Improved-Performance Plan" contemplated the inclusion of an integral MRS facility which would begin operations two years *prior* to January 31, 1998. (Mission Plan at 17, 27, ENA at 1283, 1293.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in the our pending motion for summary judgment. The Mission Plan, its drafts, and its amendments are not contractually binding documents. Instead, the Mission Plan was "to provide the informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under [the NWPA]." ENA 1140; 42 U.S.C. § 10221(a). The Mission Plan is a statement of "the overall goals, objectives, and strategy for the disposal of spent nuclear fuel and high-level waste." ENA 1149; see also ENA 1148-49 (this document describes plan DOE was pursuing to comply with the mandate of Congress to achieve a solution to this problem). Further, during the

promulgation of the Standard Contract terms through notice and comment, DOE rejected the request of at least one commenter that DOE contractually obligate itself to meet any acceptance rates or acceptance schedule contained in the Mission Plan. See Defendant's Proposed Findings of Uncontroverted Fact Nos. 12 & 24. Accordingly, the planning goals stated in the Mission Plan are irrelevant to the issues presented by defendant's motion.

Without waiving these objections, defendant responds as follows. With regard to the first and second sentences of this proposed finding, defendant agrees that the first two sentences are supported by the document cited. With regard to the third sentence of this proposed finding, defendant disagrees with the proposed finding. The document contains no specific discussion as to when an MRS facility would begin operation. Instead, the cited pages contain the statement that an MRS facility "would be scheduled for initial operation as early as 1996." (ENA at 1284.)

74. Under either plan, the rate of waste acceptance ramped up to a rate of at least 3,000 tons per year. (Mission Plan at 26, 27, ENA at 1292, 1293.) The annual acceptance at each of two projected repositories reached a 3,000 ton steady state acceptance rate by the sixth year of repository operation. (Mission Plan at 26, 27, ENA at 1292, 1293.).

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to create. As explained above, the Mission Plan, its drafts, and its amendments are not contractually binding documents.

Instead, these documents contain statements of DOE's plans, goals, and objectives pertaining to the acceptance of SNF and HLW, pursuant to the NWPA. With regard to the acceptance schedules contained in the Mission Plan, the Mission Plan contains the following disclaimer:

> It should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses.
>
> * * *
>
> Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual Capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991, the DOE will begin to publish firm waste-acceptance schedules for individual reactors, including shipment allocations.

ENA 1295. In addition, the schedules to which plaintiff refers were based upon the existence of two operating repositories. ENA 1291. As plaintiff successfully argued to the United States Court of Appeals for the District of Columbia Circuit, DOE was not required to have any operational repository available by January 31, 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Therefore, the acceptance rate identified by Energy Northwest in this proposed finding is irrelevant for determining the acceptance schedule and deciding the Government's motion for summary judgment.

Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited.

75. With regard to these acceptance schedules, the DOE noted that “In the particular example depicted in Table 2-3, the spent-fuel backlog after 1998 never exceeds the cumulative spent-fuel inventory in 1998. In other words, with the exception of a few years just before the

startup of the second repository, the acceptance rate matches or exceeds the rate of spent-fuel generation after 1998." (Mission Plan at 28, ENA at 1294.)

**RESPONSE**: Defendant respectfully refers to, and incorporates by reference, its objections to No. 74 of plaintiff's proposed findings of fact.

Without waiving these objections, defendant disagrees with the beginning phrase of the proposed finding. The quoted language is taken from a passage of the Mission Plan, which discusses the comparative benefits of the two provisional acceptance schedules contained in the Mission Plan. The quoted language notes a specific benefit of the schedule based upon the "Improved Performance Plan." ENA at 1294.

76. The Mission Plan noted that its objectives were to: "Accept civilian spent fuel at an annual rate that will allow the utilities to maintain orderly operations of their nuclear power plants. . ." (Mission Plan at 29, ENA at 1295.) The Mission Plan further stated that the DOE intended to "Accept the current planning-base spent-fuel inventory of 130,000 MTU consistent with the objective of cost-effective operations while providing tangible evidence that the DOE fully intends to dispose of spent fuel in a timely manner." (*Id.*)

**RESPONSE**: Defendant respectfully refers to, and incorporates by reference, its objections to No. 74 of plaintiff's proposed findings of fact.

Without waiving these objections, defendant responds as follows. With regard to the first sentence of this proposed finding, defendant disagrees with the proposed finding because the quotation is incomplete. One of the objectives discussed in the Mission Plan for the "improved performance system" was to:

> Accept civilian spent fuel at an annual rate that will allow the utilities to maintain orderly operations of their nuclear power

> plants, *recognizing that the oldest spent fuel will have the highest priority for acceptance consistent with DOE's current contracts with the waste generators.*

ENA at 1295 (emphasis added).

With regard to the second sentence of the proposed finding, defendant disagrees with plaintiff's characterization of the quoted excerpt. The quoted portion is again an "objective" in reference to DOE's proposed "improved-performance system." Moreover, as repeatedly stated, the Mission Plan describes DOE's goals and objectives, and does not speak to DOE's contractual intent. ENA at 1252-52.

77. The Mission Plan noted that “[t]he growing accumulation of this waste in temporary storage poses potential health and safety problems for the public. It also threatens to overload the storage Capacity of individual reactors and eventually the entire nuclear power industry.” (Mission Plan at 4, ENA at 1271.)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. The excerpt quoted is taken from the "Background" discussion in the Mission Plan, which contains a description of the problem of SNF/HLW disposal generally. The quoted passage provides no insight into the issues presented by the Government's motion for summary judgment.

Without waiving this objection, defendant agrees that the quoted language is contained in the document cited.

78. The Mission Plan states that one of DOE’s prime objectives was to:

> . . . vigorously pursue the Act’s directive to begin accepting spent fuel and high-level waste for disposal no later than January 31, 1998, and to continue to dispose of the waste in a highly efficient manner consistent with the continued orderly operation of the Nation’s nuclear power-generation plants.

(Mission Plan at 15, ENA at 1281.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to create. The Mission Plan, its drafts, and its amendments are not contractually binding documents. Instead, the Mission Plan was "to provide the informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under [the NWPA]." ENA 1140; 42 U.S.C. § 10221(a). The Mission Plan is a statement of "the overall goals, objectives, and strategy for the disposal of spent nuclear fuel and high-level waste." ENA 1149; see also ENA 1148-49 ("This document describes the plan the DOE is pursuing to comply with the mandate of Congress to achieve a solution to this problem."). Further, during the promulgation of the Standard Contract terms through notice and comment, DOE rejected the request of at least one commenter that DOE contractually obligate itself to meet any acceptance rates or acceptance schedule contained in the Mission Plan. See Defendant's Proposed Findings of Uncontroverted Fact Nos. 12 & 24. Accordingly, the planning goals stated in the Mission Plan are irrelevant to the issues presented by the Government's pending motion.

Without waiving these objections, defendant disagrees with the proposed finding. The cited section speaks to program goals and objectives in the introduction to the chapter of the

Mission Plan devoted to "Program Strategy." The cited passage contains no discussion of "prime objectives." Rather, the section of the Mission Plan to which plaintiff refers states that several goals and objectives of the program "stand out." These four goals and objectives were:

> 1. The program must protect the health and safety of the public and the quality of the environment.
>
> 2. The program must provide for the dissemination of information to the public and ensure opportunities for participation by the public and their representatives in order to achieve their confidence and support.
>
> 3. The program must be conducted in a financially responsible, cost-effective manner and on the basis of full cost recovery.
>
> 4. *In accordance with the above goals*, the program must vigorously pursue the Act's directive to begin accepting spent fuel and high-level waste for disposal no later than January 31, 1998, and to continue to dispose of the waste in a highly efficient manner consistent with the continued orderly operation of the Nation's nuclear power-generation plants.

ENA at 1281 (emphasis added).

79. In 1985, DOE also published a report called "The Need for and Feasibility of Monitored Retrievable Storage – A Preliminary Analysis." This report outlined DOE's plans for an MRS, noting two potential roles for an MRS Facility – as an integral facility and as a back-up facility. (The Need for and Feasibility of Monitored Retrievable Storage – A Preliminary Analysis at iv-v (April 1985), ENA at 1242, 1246-47.) The report noted that it expected to meet the schedule for a repository but that an integral MRS, beginning operation in 1996, would be of some benefit. (*Id.*)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. The requirements of the NWPA

regarding the development of an MRS do not have any bearing upon the schedule of acceptance to be adopted by the Court for the purposes of measuring damages in this Case. Therefore, DOE's issuance of the document cited in this finding and the facts stated in that document are irrelevant to the issues presented in the Government's pending motion.

With regard to the first sentence of this proposed finding, and without waiving these objections, defendant agrees that DOE published the cited document in 1985, pursuant to the requirements of the NWPA, which directed DOE to "complete a study of the need for and feasibility of, [the construction of one or more] monitored retrievable storage (MRS) facilities." ENA 1244; 42 U.S.C. § 10161(b).

With regard to the second sentence of this proposed finding, and without waiving its objections, defendant disagrees because it refers to "DOE plans for an MRS." As explained in the preface of the document, the document formed "part of the basis for the Secretary's recommendation to Congress with regard to an MRS facility." ENA 1244. The construction of an MRS, either as an integral or backup facility, required Congressional authorization. (42 U.S.C. § 10161).

With regard to the third sentence of this proposed finding, and without waiving its objections, defendant disagrees with the proposed finding because Energy Northwest incorrectly paraphrases the cited passage. In the document cited, DOE noted that an "MRS facility could begin to receive and package spent fuel for disposal in 1996." The benefit from such a facility would come from the fact that the "facility would be centrally located for the majority of reactors." ENA 1246. At this central location, SNF could be loaded into rail casks for shipment

to the repository on dedicated trains. Id. Contrary to Energy Northwest's proposed finding, early operation of an integral MRS facility is not identified as a "benefit." Id.

**B. DOE Announces Delay From 1998 Until 2003 For Repository Operations.**

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1). Defendant also objects to this proposed finding because it is irrelevant to the issues presented in the our motion for summary judgment.

**1. The DOE Announces Five Year Delay And Proposes Operation Of An MRS In The Interim.**

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1). Defendant also objects to this proposed finding because it is irrelevant to the issues presented in the our motion for summary judgment.

80. In January 1987 the DOE published a "Draft Mission Plan Amendment." In this report, the DOE announced that it was projecting a delay in operations of the repository from 1998 until 2003. (Draft Mission Plan Amendment, at 5 (January 1987), ENA at 1345, 1353.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in the our pending motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to

create. The Mission Plan, its drafts, and its amendments are not contractually binding documents. Instead, the Mission Plan was "to provide the informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under [the NWPA]." ENA 1252; 42 U.S.C. § 10221(a). The Mission Plan Amendment was issued to apprise Congress of developments in the waste management program established pursuant to the NWPA. ENA 1349. Further, during the promulgation of the Standard Contract terms through notice and comment, DOE rejected the request of at least one commenter that DOE contractually obligate itself to meet any acceptance rates or acceptance schedule contained in the Mission Plan. DOE's issuance of the draft Mission Plan Amendment and the information stated in it are irrelevant to the issues presented by defendant's motion. Further, DOE's announcement of a delay in repository operations is also irrelevant because, pursuant to the appellate court's decision in Indiana Michigan Power Co. v. United States, 88 F.3d 1272 (D.C. Cir. 1996), DOE's obligation to begin acceptance of SNF on January 31, 1998, was independent of the existence of a repository, and the NWPA did not require DOE to have an operational repository by that date.

Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited.

81. To accept waste despite the delay, the DOE proposed opening an MRS facility in 1998. (*Id.* at 10, ENA at 1358.) DOE stated that the MRS would operate as a “system buffer.” (*Id.)* The DOE indicated that it would make its MRS proposal to Congress and accept a 15,000 MTU limit on MRS Capacity. (*Id.*) In addition, the DOE stated that it would ask Congress to

provide that an MRS could not start receiving SNF until construction authorization for a repository was granted. (*Id.*)

**RESPONSE**: Defendant respectfully refers to, and incorporates by reference, its objections to No. 80 of plaintiff's proposed findings of fact. In addition, defendant objects to this proposed finding because the requirements of the NWPA regarding the development of an MRS do not have any bearing upon a schedule of acceptance. DOE's plans for the construction of such a facility is also irrelevant to the issues presented in the Government's pending motion.

Without waiving these objections, defendant responds as follows. With regard to the first and second sentences of this proposed finding, defendant agrees that the proposed finding is supported by the document cited. With regard to the third and fourth sentences of this proposed finding, defendant disagrees with plaintiff's paraphrasing of the cited passage. The passage cited states:

> To allay concerns that the MRS facility could become a substitute for a permanent repository, whose development remains the highest priority, the DOE will ask Congress to limit the MRS storage Capacity to 15,000 metric tons of uranium and to specify that the MRS cannot start receiving spent fuel until a construction authorization for the repository has been received from the [NRC].

ENA at 1358.

82. In the Draft Mission Plan Amendment, DOE also announced its intention to delay work on the second repository until the late 1990s. (Draft Mission Plan Amendment at 10-11, ENA at 1358-59.) This was based in part on declining projections of rates at which SNF was discharged, which in turn was caused by slower nuclear industry growth than DOE originally projected. (*Id.*)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. As plaintiff in this case successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that any repository be operational by January 31, 1998. <u>See</u> <u>Indiana Michigan Power Co. v. United States</u>, 88 F.3d 1272, 1276 (D.C. Cir. 1996). DOE's plans to delay the site-specific work for building a second repository must be similarly independent of DOE's obligation to begin the acceptance of SNF and are wholly irrelevant to the acceptance schedule from contract holders.

Without waiving this objection, defendant agrees with the proposed finding to the extent supported by the document cited; defendant otherwise disagrees with the proposed finding. Defendant avers that the discussion which plaintiff cites refers to a delay in work on "site-specific" activities for the second repository until the late 1990s. The discussion in the draft Mission Plan amendment was not an "announcement" by DOE. Instead, DOE was reiterating information that the Secretary had previously announced as a decision regarding the site-specific activities for the second repository on May 28, 1986. ENA 1358. Finally, while the cited discussion identifies declining SNF projection rates as one of the reasons for the Secretary's decision, it does not indicate that there is any link between those declining SNF projection rates and the slower nuclear industry growth projected by DOE. <u>Id</u>

83. In a letter to OCRWM director Ben Rusche, the EEI's John Kearney noted that the five-year slippage "runs counter to the intent of the NWPA and the interests of the electric utilities and their customers, who are funding the NWPA implementation." (John J. Kearney

letter to Ben Rusche at 2 (April 3, 1987), ENA at 1379, 1380.) The letter also noted changes in the acceptance schedules from those provided in the 1985 Mission Plan. (*Id.* at 7, ENA at 1385.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. The Mission Plan, its drafts, and its amendments are not contractually binding documents. Instead, the Mission Plan was "to provide the informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under [the NWPA]." ENA 1252; 42 U.S.C. § 10221(a). The Mission Plan Amendment was issued to apprise Congress of developments in the waste management program, established pursuant to the NWPA. ENA 1349. DOE's issuance of the draft Mission Plan Amendment and the information stated in it are irrelevant to the issues presented by defendant's motion.

Without waiving this objection, defendant responds as follows. With regard to the first sentence of the proposed finding, defendant disagrees with the proposed finding because the quoted portion is incomplete. The entire sentence reads:

> EEI/UNWMG/NTG find that the five year slippage in the first repository operations date, *while probably inevitable and possibly only the first such slippage*, runs counter to the intent of the NWPA and the interests of the electric utilities and their customers, who are funding the NWPA implementation.

ENA at 1380 (emphasis added). As plaintiff in this case successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that any repository be operational by

January 31, 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996).

With regard to the second sentence of this proposed finding, defendant agrees that the second sentence of the proposed finding is supported by the document cited.

84. In March 1987, DOE published a "Monitored Retrievable Storage Submission to Congress." The report was issued to fulfill Section 141 of the NWPA, which required DOE to study the MRS concept and report back to Congress. (Monitored Retrievable Storage Submission to Congress, Vol. 1: The Proposal, at iii, 1 (1987), ENA at 1365, 1366.) The report recommended construction of an MRS facility at Clinch River in Tennessee. (*Id.* at 1, ENA at 1369.)

**RESPONSE**: The portion of the proposed finding regarding DOE's obligation to publish the document cited pursuant to the NWPA is a conclusion of law as to which no response is required pursuant to RCFC 56(h)(1) and (2). Defendant objects to the proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE proposed the construction of the MRS to enable performance under the Standard Contract prior to the operation of a repository, DOE's proposal for that facility is irrelevant to determining a schedule of acceptance. Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited.

85. To allay concerns that an MRS would become a de facto repository, the DOE proposed that Congress link the MRS to the repository schedule by providing that no SNF could be accepted at the MRS facility until DOE received NRC construction authorization for the first

repository. (*Id.* at 5, ENA at 1373.) The DOE also proposed a limit on the total Capacity of an MRS of 15,000 MTU. (*Id.*)

**RESPONSE**: Defendant agrees that the proposed finding is supported by the document cited.

86. The report noted that "If this proposal is approved by the Congress, the acceptance schedule will be adjusted for the improved performance of the integrated system. Full-scale operation at a rate of about 2500 to 3000 MTU per year would be achieved by 2004." (*Id.* at 20, ENA at 1377.).

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to create.

Without waiving this objection, defendant agrees that the proposed finding is supported by the documents cited.

87. DOE published the final version of the Mission Plan Amendment in June 1987. As in the draft amendment, the DOE noted a delay in repository operations from 1998 until 2003. (OCRWM Mission Plan Amendment at 6 (June 1987), ENA at 1401, 1413.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. As plaintiff in this Case successfully

argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that any repository be operational by January 31, 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Accordingly, any proposed finding regarding the delay in the start of repository operations is irrelevant to the schedule of acceptance to be adopted by the Court.

Without waiving this objection, defendant agrees that the proposed finding is supported by the document cited.

88. As in the draft amendment and the MRS proposal to Congress, the Mission Plan Amendment proposed operation of an MRS facility beginning in 1998, with repository operation commencing in 2003. (*Id.* at 12, ENA at 1419.) DOE again stated that it would accept a 15,000 MTU Capacity limit and proposed to link receipt of SNF at an MRS to NRC construction authorization for a repository. (*Id.* at 12-13, ENA at 1419-20.)

**RESPONSE**: Defendant objects to the proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE proposed the construction of the MRS to enable performance under the Standard Contract prior to the operation of a repository, DOE's proposal for that facility is irrelevant to determining a schedule of acceptance.

Without waiving this objection, defendant agrees that the proposed finding is supported by the document cited.

89. As in the draft, the Mission Plan Amendment announced that the DOE was postponing site-specific activities for a second repository in light of declining projections of SNF generation. (*Id.* at 13, ENA at 1420.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. As plaintiff in this Case successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that any repository be operational by January 31, 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Accordingly, any proposed finding regarding the delay in the start of site-specific activities for the second repository is irrelevant to the schedule of acceptance to be adopted by the Court.

Without waiving this objection, defendant agrees that the proposed finding is supported by the document cited.

90. While the MRS facility would provide some interim storage, DOE still intended the MRS to be an "integral" facility and not a location for long-term storage. (5/3/02 Milner Dep. at 553-54, ENA at 720.)

**RESPONSE**: Defendant objects to the proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE proposed the construction of the MRS to enable performance under the Standard Contract prior to the operation of a repository, DOE's proposal for that facility is irrelevant to determining a schedule of acceptance.

Without waiving this objection, defendant agrees that the proposed finding is supported by the deposition testimony cited.

91. DOE projected the MRS would operate as a stand alone facility only from 1998 until 2003, and would have begun shipping fuel to a repository after five years. (5/3/02 Milner Dep. at 555-56, ENA at 720-21; OCRWM Mission Plan Amendment at 12, 61, ENA at 1419, 1467.) Even with the Capacity limit, DOE's Chief Operating Officer, Ron Milner, admitted that the MRS could have operated at an acceptance rate approaching 3,000 tons, consistent with prior planning bases. (5/3/02 Milner Dep. at 555-56, ENA at 720-21; *see also* 8/11/04 Milner Testimony in *Yankee Atomic Electric v. United States*, at 4712, ENA at 738.)

**RESPONSE**: Defendant objects to the proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE proposed the construction of the MRS to enable performance under the Standard Contract prior to the operation of a repository, DOE's proposal for that facility is irrelevant to determining a schedule of acceptance. Without waiving this objection, defendant responds as follows. With regard to the first sentence of this proposed finding, defendant agrees that the proposed finding is supported by the document cited. With regard to the second sentence of this proposed finding, defendant disagrees with the proposed finding because it mischaracterizes Mr. Milner's testimony. In response to questioning, Mr. Milner stated as follows:

> Q. The capacity limit of 15,000 metric tons, do you know where the Department would have come up with that number?
>
> A. I believe that was the request or recommendation of the local community at the time.
>
> Q. At the time as we saw in the previous page this was assuming that the MRS would operate for only about five years prior to

> being able to move additional waste from the MRS and start feeding into the repository?
>
> A. It was intended to operate for five years before it began shipping waste and it certainly was going to operate longer than five years.
>
> Q. But over the course of that five years, would this limit on the Capacity of 15,000 metric tons have been a significant restraint on the ability of the Department to operate this facility?
>
> A. It certainly would have been a constraint. 15,000, I believe, was the limit wherein the Capacity could never exceed that of the MRS.
>
> Q. However, if divided over the course of five years, this Capacity doesn't exceed amounts that the DOE had previously projected that it was going to be receiving on an annual basis?
>
> A. That's correct.
>
> Q. In fact that would equal exactly 3,000 metric tons a year which had previously been the steady state operation under previous projections?
>
> A. That's correct. Whether that was a mathematical coincidence. I don't know.

ENA at 720-21. Mr. Milner did not state that there was any link between an acceptance rate of 3,000 metric tons of uranium and the suggested capacity limit upon an MRS. Rather, Mr. Milner testified that the suggested capacity limit for the MRS was imposed at the request of the local community and that he did not know whether there was any connection between that limit and any prior projections regarding rates of acceptance.

92. Under its revised acceptance schedule published in the 1987 Mission Plan Amendment, the DOE projected that it would begin accepting SNF at an MRS at a rate of 1,200 tons in 1998. (OCRWM Mission Plan Amendment at 61, ENA at 1467.) This would increase to

2,650 tons by 2004. (*Id.*) Total system acceptance would reach 3,000 tons by 2008. (*Id.*) The "full-scale" receipt rate at the MRS was projected at 2,650 tons. (*Id.* at 62, ENA at 1468.) This rate was possible despite the 15,000 ton Capacity limit, as the permanent repository would begin operating in 2003 and receive fuel from the MRS facility. (*Id*. at 61-62, ENA at 1467-68; *see also* 4/22/02 Barrett Dep. at 206-07, ENA at 406)

**RESPONSE**: Defendant objects to the proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to create. Although DOE proposed the construction of the MRS to enable performance under the Standard Contract prior to the operation of a repository, DOE's proposal for that facility is irrelevant to determining the schedule of acceptance to be adopted by the Court for the purposes of measuring damages. Moreover, as explained above, the Mission Plan, its drafts, and its amendments are not contractually binding documents. Instead, they contained DOE's statements regarding its program plans and goals. Defendant further objects that the cited excerpt of Mr. Barrett's deposition testimony does not support the proposed finding.

Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited.

93. DOE used the acceptance rates in the 1987 Mission Plan Amendment in drafting its 1987 Annual Capacity Report, which it published in June 1987. (1987 Annual Capacity Report

at 7, ENA at 1471, 1481.) In the 1987 ACR, the DOE projected that it would initially accept waste at a rate of 1,200 tons beginning in 1998 and ramp up to 2,650 tons by 2004. (1987 Annual Capacity Report at 7, ENA at 1481.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. The Annual Capacity Reports issued by DOE prior to 1991 were issued pursuant to the requirements set forth in the Standard Contract and were part of the contractual mechanism to establish the acceptance schedule. However, the 1991 ACR is the document that established an acceptance schedule in response to which the utilities were required to submit delivery commitment schedules if they wished to have DOE accept their SNF. Therefore, the issuance of any ACR prior to 1991, and the rates contained in any such ACR, are not probative of the issues presented in our motion for summary judgment.

Without waiving this objection, defendant responds as follows. With regard to the first sentence of this proposed finding, defendant disagrees with the proposed finding. The document cited states as follows:

> The waste acceptance schedule in this ACR is consistent with the schedule from the Mission Plan Amendment.

ENA at 1481. However, the document notes that there are differences between the ACR and the Mission Plan Amendment. With regard to the second sentence of the proposed finding, defendant agrees that the proposed finding is supported by the document cited.

94. The 1987 Annual Capacity report explicitly stated that "as specified in the Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers." (*Id.* at 2, ENA at 1477.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. The Annual Capacity Reports issued by DOE prior to 1991 were issued pursuant to the requirements set forth in the Standard Contract and were part of the contractual mechanism to establish the acceptance schedule. However, the 1991 ACR is the document that established an acceptance schedule in response to which the utilities were required to submit delivery commitment schedules if they wished to have DOE accept their SNF. Therefore, the issuance of the 1987 ACR is not probative of the issues presented in our motion for summary judgment.

Without waiving this objection, defendant agrees that the document cited contains the language quoted, but avers that the full text of the portion of the paragraph cited places the statement into context:

> Under the terms of the Standard Disposal Contract [Article IV.B.5(b)], an Annual Capacity Report (ACR) shall be issued by DOE, beginning not later than July 1, 1987, setting forth ". . . the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, Capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility." As specified in the contract, the ACR is for planning purposes only

> and, thus, is not contractually binding on either DOE or the Purchasers. The ACR will be published each year through 1990.
>
> Beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. In 1992, based on this priority ranking, the Purchasers will submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS).

ENA at 1476-77.

**2. DOE Representations To Congress Regarding The MRS Proposal.**

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1). Defendant also objects to this proposed finding and all the findings that follow it because they are irrelevant to the issues presented in our motion for summary judgment.

95. In conjunction with DOE's MRS proposal to Congress, OCRWM Director Ben Rusche testified before the Senate Committee on Energy and Natural Resources on April 29, 1987. In his testimony, Mr. Rusche reaffirmed that:

> The NWPA finds that "a national problem has been created by the accumulation of spent fuel from nuclear reactors" and that the "Federal Government has the responsibility to provide for the permanent disposal." *Additional operator burdens and complexity at the reactor sites* would be inconsistent with these findings which serve as the basis for the NWPA.

(Ben C. Rusche, Director OCRWM, Statement before the United States Senate Committee on Energy and Natural Resources, at 17 (April 29, 1987) (emphasis added), *reprinted in*, S. Rep. 100-152, at 84 (1987), ENA at 242.)

**<u>RESPONSE</u>**: Defendant objects to the proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE proposed the construction of the MRS to enable performance under the Standard Contract prior to the operation of a repository, DOE's proposal for that facility is irrelevant to determining a schedule of acceptance. Further, to the extent that plaintiff is using the cited testimony to interpret the meaning of the NWPA, defendant objects to plaintiff's attempt to support its interpretation of a law and to congressional intent by reference to testimony. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of statutory interpretation as to which testimony is inadmissible. <u>See</u>, <u>e.g.</u>, <u>Berry v. City of Detroit</u>, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms").

Without waiving this objection, defendant disagrees with the proposed finding because Mr. Rusche's statement is not quoted correctly. Mr. Rusche's statement was as follows:

> The NWPA finds that "a national problem has been created by the accumulation of spent fuel from nuclear reactors" and that the "Federal Government has the responsibility to provide for the permanent disposal." <u>Adding</u> additional operator burdens and complexity at the reactor sites would be inconsistent with these findings which serve as the basis for the NWPA.

(ENA at 242) (emphasis added to indicate omission). Moreover, this quotation, taken out of context, is misleading. Mr. Rusche was comparing the advantages of consolidating and packaging SNF at an MRS as opposed to having that function take place at numerous different reactor sites prior to shipment. (ENA at 241.) The "added" burden to which Mr. Rusche referred was limited to that issue.

96. In explaining the MRS proposal before Congress, the DOE represented that the

MRS facility would have a much higher acceptance rate than the 900 ton rate it now relies on. That was because DOE projected that the MRS would operate as a stand-alone facility for only five years, until the DOE could open a repository in 2003. In his April 29, 1987 statement, Mr. Rusche explicitly linked the proposal to use an MRS for storage over a five-year period to fulfilling the goals of the NWPA. Referring to the costs of the proposed MRS, Mr. Rusche stated that:

> The costs borne by the utility rate payers would be offset by savings in at-reactor storage cost; these [storage] costs would be avoided because an MRS facility would allow DOE to accept spent fuel at an earlier time.

(Ben C. Rusche April 29, 1987 Statement at 13, *reprinted in* S. Rep. 100-152, at 79, ENA at 237.)

**RESPONSE**: Defendant objects to the proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE proposed the construction of the MRS to enable performance under the Standard Contract prior to the operation of a repository, DOE's proposal for that facility is irrelevant to determining a schedule of acceptance. Defendant also incorporates its response to No. 97 into this response.

Without waiving its objections, defendant disagrees with this proposed finding. Defendant states that the first, second and third sentences are not supported by the document cited. With respect to the fourth sentence of the proposed finding, defendant states that the quoted language is contained in the document cited, which is the best evidence of its contents. Defendant further responds that Congress, in the 1987 NWPA amendments, placed a cap of

10,000 MTUs upon the amount of SNF that DOE could accept at the MRS, but did not include any obligatory minimum rate that DOE had to satisfy in the amendments to the statute.

97. In his April 29, 1987 statement, Mr. Rusche also stated that:

> Without an MRS facility, up to 13,500 metric tons of new temporary storage capacity would be needed at about 45 reactors by the year 2003, when the repository would start operating
>
> ..
>
> Without an MRS, utilities will have to add significantly more new storage capacity.

(*Id*. at 15, *reprinted in* S. Rep. 100-152, at 82, ENA at 240.)

**RESPONSE**: Defendant objects to the proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE proposed the construction of the MRS to enable performance under the Standard Contract prior to the operation of a repository, DOE's proposal for that facility is irrelevant to determining a schedule of acceptance.

Without waiving this objection, defendant disagrees with the proposed finding because the quotation in the finding is incomplete and the proposed finding is, therefore, misleading. The complete quotation reads:

> Without an MRS facility, up to 13,500 metric tons of new temporary storage capacity would be needed at about 45 reactors by the year 2003, when the repository would start operating. *New temporary storage capacity will have to be provided at some reactor sites in any event, but to a far smaller degree with an MRS facility added to the system. The necessary incremental storage can be provided at the MRS facility more efficiently and at less*

> *cost, mainly because a single facility specifically designed and licensed for that purpose would be used instead of many separately designed and licensed independent installations.*
>
> *The MRS facility could allow DOE to begin receiving waste for disposal in 1998, and the waste-acceptance rates of the waste-management system would start exceeding reactor-discharge rates 8 years earlier than would otherwise be possible.*
>
> Without an MRS, utilities will have to add significantly more new storage Capacity.

(ENA at 240) (emphasis added). Moreover, the final sentence of the passage quoted is followed by this statement:

> They [the utilities] are capable of doing this through such means as metal storage casks, concrete storage modules and rod consolidation. DOE has worked very hard to develop and demonstrate these technologies to help utilities "get by" until the Federal system begins operating to accept waste. Through cooperative programs with utilities, two dry storage facilities have been licensed by NRC.
>
> Some have suggested, however, that because utilities can add storage capacity and can consolidate fuel, an MRS is not needed. The ability of utilities to add storage is not an issue, and the MRS is not proposed with the primary objective of reducing the utility storage burden. Rather, reducing that burden in a very significant, but secondary, benefit associated with early implementation of the Federal disposal system that is permitted by the MRS and that makes the MRS all the more attractive.

(ENA at 240-41). Therefore, while the language quoted by the plaintiff suggests that an MRS facility was being contemplated for the purpose of reducing the utility storage burden, the complete statement shows that the utility storage burden was not the primary reason that DOE proposed an MRS.

98. In his live testimony on April 29, Mr. Rusche stated:

> The proposal, that is for you to authorize a capacity of 15,000 metric tons, which is about five or six years direct output from the discharge of reactors at that time. The 10,000 metric tons that we talked about was the amount of at-reactor storage that could be avoided in the five year period between 1998 and 2003.
>
> That is the time between [when] the MRS would come into operation, if the proposal is accepted, and 2003, the date in which we project the first repository would be in operation. That is the origin of those numbers.

(Statement of Ben C. Rusche, Director, OCRWM, Statement before the Committee on Energy and Natural Resources United States Senate, Senate Hearing Rep. 100-230, pt. 2, at 213, ENA at 221.)

**RESPONSE**: Defendant objects to the proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE proposed the construction of the MRS to enable performance under the Standard Contract prior to the operation of a repository, DOE's proposal for that facility is irrelevant to determining a schedule of acceptance.

Without waiving this objection, defendant agrees that the quoted language is contained in the document cited.

99. Mr. Rusche also testified that 10,000 tons of at-reactor storage would be required between 1998 and 2003, implying that the proposed 15,000 ton limit, and the 10,000 ton limit eventually imposed, would be sufficient to avoid additional at-reactor storage during that time period:

> MR. RUSCHE. . . . A second real benefit has to do with at-reactor storage and consolidation. As I mentioned to you a moment ago, there is a high probability that if the system unfolds as we now project, that between the years 1998 and 2003 there would be about 10,000 metric tons of at-reactor storage required to accommodate the fuel thus generated but which is beyond the Capacity of the storage basins at the reactors where generated.
>
> That means new temporary storage Capacity would have to be provided at some sites, but it would be much smaller if the MRS were in existence. The necessary incremental storage –
>
> THE CHAIRMAN. Excuse me. Why do you use 10,000 tons when the Capacity of the MRS is 15,000?
>
> MR. RUSCHE. The 10,000 derives from the rate at which at-reactor basins would exceed their storage Capacity. The Capacity of the MRS would be greater than that, but I was trying to make the point –
>
> THE CHAIRMAN. Well, that assumes 2003.
>
> MR. RUSCHE. That is right. That is in the period 1998 to 2003.
>
> THE CHAIRMAN. It would be more than that if you are not ready by 2003?
>
> MR. RUSCHE. Correct.

(Statement of Ben C. Rusche, Director, Office of Civilian Radioactive Waste Management U.S. Department of Energy before the Committee on Energy and Natural Resources United States Senate, Senate Hearing 100-230, pt. 2, at 169, ENA at 218.)

**RESPONSE**: Defendant objects to the proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to create. Although DOE proposed the construction of the MRS to enable performance under the Standard Contract prior to the operation of a repository, DOE's proposal for that facility is irrelevant to determining a schedule of acceptance.

Without waiving this objection, defendant avers that, although Mr. Rusche's April 29, 1987 statement makes clear that the utility storage burden was not the primary reason that DOE proposed an MRS, the proposed finding is supported by the document cited.

100. During a later hearing, Mr. Rusche also testified that:

> Our solution to date has been to buy time: Reactor storage basins and temporary holding tanks in a hundred separate locations in 33 States. It was never intended that private companies in the U.S. would dispose of nuclear waste. The U.S. Government has always assumed that responsibility – and yet, despite $2.8 billion already paid by utilities for this disposal service, many would have us renege on prior commitments and begin anew working toward yet another "solution" the future of which no one can predict.

(Ben C. Rusche, July 16, 1987 Statement at 3, *reprinted in* S. Rep. 100-152, at 172 (1987), ENA at 250.)

**RESPONSE**: Defendant objects to the proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE proposed the

construction of the MRS to enable performance under the Standard Contract prior to the operation of a repository, DOE's proposal for that facility is irrelevant to determining a schedule of acceptance.

Without waiving this objection, defendant agrees that the quoted language is contained in the document cited.

101. Deposition testimony by Mr. Rusche confirms that DOE's MRS proposal was made to avoid additional at-reactor storage for the period from 1998 until 2003. (5/17/02 Rusche Dep. at 367-69, ENA at 878-79.)

**RESPONSE**: Defendant objects to the proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to create. Although DOE proposed the construction of the MRS to enable performance under the Standard Contract prior to the operation of a repository, DOE's proposal for that facility is irrelevant to determining a schedule of acceptance.

Without waiving this objection, defendant disagrees with the proposed finding because it is not supported by the excerpt of Mr. Rusche's deposition cited. In his testimony, Mr. Rusche simply confirmed that he made a statement to Congress in 1987, which was discussed in No. 97 of plaintiff's proposed findings. As we stated in our response to that proposed finding, Mr.

Rusche's complete statement was that the utility storage burden was not the primary reason DOE proposed an MRS. ENA at 878-79.

### 3. Congress Passes The Nuclear Waste Policy Amendments Act Of 1987

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1).

102. In December of 1987 Congress passed the Nuclear Waste Policy Amendments Act ("1987 Amendments"), Pub. L. 100-120, 101 Stat. 1329-1401, 1329-121.

**RESPONSE**: The proposed finding of fact is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required.

103. The 1987 Amendments provided that DOE was to consider only Yucca Mountain in Nevada as a repository site. 42 U.S.C. § 10172(a). The 1987 Amendments also provided that DOE was to defer consideration of a second repository site and was to report to Congress after January 1, 2007 on the need for a second repository. 42 U.S.C. § 10172(a).

**RESPONSE**: The proposed finding of fact is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required. Defendant also objects that the proposed finding is irrelevant to the Government's motion for summary judgment.

104. The 1987 Amendments also authorized, but did not require, the DOE to construct an MRS. 42 U.S.C. § 10162(b).

**RESPONSE**: The proposed finding of fact is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required.

105. To prevent an MRS from becoming a de facto repository, Congress adopted a modified concept of the linkages proposed by DOE. Congress mandated that the DOE could not select a site for an MRS until DOE recommended approval of a repository site. 42 U.S.C. § 10165(b). Congress also required that construction of an MRS could not begin until a repository had received construction authorization. 42 U.S.C. § 10168(d)(1). The 1987 Amendments further provided that construction could not proceed on an MRS during any time that the repository was not licensed or repository construction was not ongoing. 42 U.S.C. § 10168(d)(2).

**RESPONSE**: The proposed finding of fact is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required.

106. The 1987 Amendments also provided that the MRS would have a capacity limit of 10,000 MTUs until a repository opened, and 15,000 MTUs thereafter. 42 U.S.C. § 10138(d)(3).

**RESPONSE**: The proposed finding of fact is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required.

107. To site an MRS, Congress created the Office of the Nuclear Waste Negotiator which was to enter into negotiations with Indian tribes and states to host an MRS facility. 42 U.S.C. §§ 10242(a), 10243(a). Congress also created a Monitored Retrievable Storage Review

Commission which was to evaluate the need for an MRS facility. 42 U.S.C. § 10163(a)(1)(A) and (B).

**RESPONSE**: The proposed finding of fact is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required. Defendant objects to this proposed finding because it is irrelevant to the Government's motion for summary judgment.

108. Congress' adoption of the 1987 Amendments was based on DOE's representations and was for the purpose of ensuring that DOE would meet its contractual obligations to begin receiving fuel in 1998. A report of the Senate Committee on Energy and Natural Resources stated: "In return for these [fee] payments, the Secretary is required to dispose of spent fuel and high-level waste covered by contracts under the NWPA beginning not later than 1998." (S. Rep. No. 100-152, at 4, ENA at 263.) The report specifically noted that the DOE's MRS proposal was premised on a *five-year* extension in the repository schedule. (*Id.* at 6 (emphasis added), ENA at 265.) The report stated that without action SNF "will continue to accumulate where it is generated. Commercial spent fuel is currently being generated at 68 nuclear reactor sites in 31 states …. While storage is carried out safely at these sites, none was ever contemplated or designed to be a permanent home for nuclear waste." (*Id.* at 7, ENA at 266.) The report stated that Congress needed to act "if the Department is to meet its contractual commitment to take spent fuel from utilities beginning in 1998." (*Id.* at 8, ENA at 267.) "The authorization of an MRS was intended to "better ensure that the Department is able to meet its contractual commitment to accept spent fuel from utilities beginning in 1998." (*Id.* at 9, eNA at 268.)

**RESPONSE**: Defendant objects to this proposed finding of fact because it is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required. In addition to being a question of law, reliance upon legislative history in divining the intent of Congress is "a step to be taken cautiously." Piper v. Chris-Craft Industries, Inc., 430 U.S. 1, 26 (1977). That is particularly true here, where plaintiff has chosen to assert a proposition without reference to any language in the statute itself. Shannon v. United States, 512 U.S. 573, 583-84 (1994) ("We agree with the District of Columbia Circuit that 'courts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point.'") (quoting International Brotherhood of Elec. Workers, Local Union No. 474, AFL-CIO v. NLRB, 814 F.2d 697, 712 (D.C. Cir. 1987)). Not only is plaintiff citing language from legislative history to support a conclusion that is not connected to the language of a statute, but, as explained further below, the language that is cited from the legislative history is not connected, linguistically or logically, to the proposition being asserted in the first sentence of this proposed finding. Defendant also objects to this proposed finding because it is irrelevant to the Government's motion for summary judgment.

Without waiving these objections, defendant responds as follows. With regard to the first sentence of the proposed finding, defendant disagrees because it is contrary to the document cited. The first paragraph of Senate Report 100-152 says that the purpose of the bill was "to redirect the program for the disposal of spent nuclear fuel and high-level radioactive waste under the Nuclear Waste Policy Act of 1982 to achieve budget savings, and for other purposes . . . ." App. 487. Additionally, under the heading "Purpose of the Measure," Senate Report 100-152 states:

> The purpose of the bill is to redirect the program for the management and disposal of spent nuclear fuel and high-level radioactive waste under the Nuclear Waste Policy Act of 1982 (NWPA) to provide for -
>
> Sequential characterization of candidate sites for a geologic repository for disposal of nuclear waste;
>
> Construction of a monitored retrievable storage facility for spent nuclear fuel as part of an integrated nuclear waste management system; and
>
> Benefits payments with respect to a repository or a monitored retrievable storage facility to States, Indian tribes and units of local government as appropriate.

App. 487. Therefore, the stated purposes of the bill do not suggest that, in passing the 1987 amendments, Congress was motivated by a desire to ensure that DOE would begin acceptance in 1998. Rather, the expressly stated purpose was to improve the program.

With regard to the second sentence of the proposed finding, defendant agrees that the quoted language is contained in the document cited. With regard to the third sentence, defendant disagrees. The document does not suggest a connection between the deferral of repository operations and the construction of an MRS. Rather, the document states:

> The Department also recommended that Congress authorize construction of an MRS both to improve operational efficiency of the waste management system and to better ensure waste acceptance by 1998.

App. 490. With regard to the fourth, fifth, and sixth sentences of the proposed finding, defendant agrees that the quoted language is contained in the document cited. With regard to the seventh

sentence, defendant disagrees. The cited report states that DOE had several reasons for recommending that Congress authorize the construction of an MRS:

> The Department's recommendation that Congress authorize construction of an MRS as an integral element of the overall waste management system is based on the conclusion in its March 1987 proposal that there is a substantial operational and cost benefit from having the MRS receive and package spent fuel prior to shipment to a permanent repository. The MRS proposed by the Department would be an above-ground facility that would include a receiving and handling building, a plant for manufacturing of concrete storage casks, an interim storage area, and support facilities. Such a facility could serve both as a packaging and handling facility prior to operation of a repository.

App. 490-91. Therefore, the suggestion that DOE's recommendation to build an MRS was based solely upon a desire to comply with contract commitments is incorrect.

**C. The 1988 Draft Mission Plan Amendment And 1988 Annual Capacity Report.**

**<u>RESPONSE</u>**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1).

109. In June 1988, DOE issued another Draft Mission Plan Amendment. This report projected that waste acceptance would begin at a repository in the year 2003. (Draft 1988 Mission Plan Amendment at 15, ENA at 1519, 1540.)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. The Mission Plan, its drafts, and its

amendments are not contractually binding documents. Instead, the Mission Plan was "to provide the informational basis sufficient to permit informed decisions to be made in carrying out the repository program and the research, development, and demonstration programs required under [the NWPA]." ENA 1149; 42 U.S.C. § 10221(a). The Mission Plan is a statement of "the overall goals, objectives, and strategy for the disposal of spent nuclear fuel and high-level waste." ENA 1140; see also ENA 1148-49 (this document describes plan DOE was pursuing to comply with the mandate of Congress to achieve a solution to this problem). Moreover, as plaintiff in this Case successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that any repository be operational by January 31, 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Accordingly, DOE's issuance of the draft Mission Plan Amendment and the planning goals stated in that document are irrelevant to the issues presented by defendant's motion.

Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited.

110. In June 1988, the DOE published the second Annual Capacity Report. In this report the DOE projected that it would begin acceptance of waste in 2003 and would ramp up to 3,000 tons a year by 2008, the sixth year after operations commenced. (1988 Annual Capacity Report at 5, ENA at 1496, 1507.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. The Annual Capacity Reports issued by DOE prior to 1991 were issued pursuant to the requirements set forth in the Standard Contract and were part of the contractual mechanism to establish the acceptance schedule. However, the 1991 ACR is the document that established an acceptance schedule in response to which the utilities were required to submit delivery commitment schedules if they wished to have DOE accept their SNF. Therefore, the issuance of any ACR prior to 1991, and the rates contained in any such ACR, are not probative of the issues presented in our motion for summary judgment.

Without waiving this objection, defendant agrees that the proposed finding is supported by the document cited.

111. Like the prior ACR, the 1988 ACR stated that "[a]s specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either the DOE or the Purchasers." (*Id.* at 1, ENA at 1503.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. The Annual Capacity Reports issued by DOE prior to 1991 were issued pursuant to the requirements set forth in the Standard Contract and were part of the contractual mechanism to establish the acceptance schedule. However, the

1991 ACR is the document that established the acceptance schedule, in response to which the utilities were required to submit delivery commitment schedules if they wished to have DOE create obligations to accept a particular amount of their SNF in a particular year. Therefore, the issuance of the 1988 ACR is not probative of the issues presented in our motion for summary judgment.

Without waiving this objection, defendant agrees that the document cited contains the language quoted, but avers that the full text of the document should be considered to place the language into context:

> Under the terms of the Standard Disposal Contract (Article IV), the Annual Capacity Report (ACR) is to project the DOE's annual receiving Capacity and present the annual acceptance ranking of SNF and/or HLW for disposal for 10 years following the projected commencement of operations of the DOE receiving facilities. As specified in the Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers. The ACR will be published each year through 1990.
>
> According to the contract, beginning in 1991, the ACR acceptance ranking will be converted into an Annual Priority Ranking for receipt of SNF/HLW. The Contract specifies that, based on this priority ranking, the Purchasers shall, in 1992, submit to DOE for approval, Delivery Commitment Schedules identifying the SNF/HLW that Purchasers propose to deliver to the DOE waste management system (WMS).

ENA at 1503-04.

**IV. The DOE Announces Further Delays**

**<u>RESPONSE</u>**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1).

**A. The DOE Announces The Repository Will Be Delayed Until 2010.**

**<u>RESPONSE</u>**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1).

112. In November 1989, the DOE published a "Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program." This report was the result of a comprehensive review of the repository schedule directed by the Secretary of Energy. (Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program at vii, ENA at 1565, 1570.) This review recommended a change in management structure of OCRWM, re-examination of the baseline for the repository program, and reexamination of the MRS concept. (*Id.* at vii-x, ENA at 1570-73.)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. As plaintiff in this Case successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that any repository be operational by January 31, 1998. <u>See</u> <u>Indiana Michigan Power Co. v. United</u>

States, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Moreover, the MRS is relevant only insofar as the limitations placed upon its capacity by Congress were limitations upon DOE's ability to accept any SNF prior to the operation of a permanent repository. DOE's eventual inability to site and build a monitored retrievable storage facility and the steps leading to that failure are irrelevant to the schedule of acceptance to be adopted by the Court for the purposes of measuring damages.

Without waiving this objection, defendant responds as follows. With regard to the first sentence of this proposed finding, defendant agrees that the proposed finding is supported by the document cited. With regard to the second sentence of this proposed finding, defendant disagrees that the report was the result of a comprehensive review of the "repository schedule." Instead, it was the result of a comprehensive review of the "schedule for repository-related activities." ENA at 1570. With regard to the third sentence of this proposed finding, defendant disagrees. In the "report," DOE announced the "initiation of a three-point action plan" to promote DOE's ability to achieve its near-term milestones and goals directed at the scientific investigation of the potential repository site at Yucca Mountain, Nevada. The report stated that "[t]his plan centers on a restructuring of [OCRWM], initiatives to gain access to the Yucca Mountain site to continue the scientific investigations needed to evaluate site's suitability for a repository, and an initiative for establishing integrated monitored retrievable storage (MRS) with a target for spent-fuel acceptance in 1998." ENA at 1570-71.

113. The Reassessment report announced that the expected start of repository operations would be delayed from 2003 to 2010. (*Id.* at vii, 8-11, ENA at 1570, 1581-84.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. As plaintiff in this case successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that any repository be operational by January 31, 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996).

Without waiving this objection, defendant agrees that the proposed finding is supported by the document cited. Defendant further avers that, at the time that the cited report was issued, DOE intended to pursue an initiative to modify the statutory linkages and begin waste acceptance, on a limited basis, at an MRS site by the January 31, 1998 date. ENA at 1584-85.

114. Patrick McDuffie, who worked for Pacific Northwest Laboratories and DOE's principal contractor Battelle, testified that, while DOE announced the delay of repository operations until 2010 in 1989, the DOE had known about the delay until 2010 for far longer, possibly even at the time the DOE announced the delay until 2003 in 1987. (3/18/02 McDuffie Dep. at 165, ENA at 687.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. As plaintiff in this case successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that any

repository be operational by January 31, 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Further, defendant objects to this proposed finding because plaintiff, based upon the testimony of an individual who worked for a contractor for DOE, purports to represent the knowledge of "DOE." The beliefs of various individuals does not provide proper support for the proposed finding. See Irving v. United States, 162 F.3d 154, 166 (1st Cir. 1998) (en banc) ("[t]o determine what is agency policy, courts customarily defer to the statements of the official policymaker, not others, even though the others may occupy important agency positions").

Without waiving these objections, defendant disagrees with this proposed finding because it is not supported by the excerpt of the deposition testimony cited. First, as previously stated, Mr. McDuffie has no basis upon which to testify as to the knowledge of "DOE," as opposed to the beliefs of particular individuals within DOE about whose knowledge he might have personal knowledge. Second, in the excerpt cited, Mr. McDuffie was testifying about statements contained in the draft of DOE's 1989 ACR. 3/18/02 McDuffie Dep. at 160-61 and Ex. 8, pp. 1-3, SGA at 455-60. (This document was Exhibit 8 to Mr. McDuffie's deposition, but was not made a part of plaintiff's appendix). Although Mr. McDuffie's testimony indicates that someone (possibly including himself) at some time reached the conclusion that the delay would extend until 2010, Mr. McDuffie did not testify that this conclusion was reached in 1987, the time period to which the proposed finding refers. 3/18/02 McDuffie Dep. at 165, ENA at 687. Mr. McDuffie also testified that any further delay in the beginning of repository operations "was not the official DOE position at that time." Id. While this latter statement certainly is not probative of what DOE actually knew at the time, it reflects that DOE may not have reached an

"official" conclusion on the subject at this point in 1989. Nothing in Mr. McDuffie's testimony supports a finding that DOE knew about the possibility of a further delay in the beginning of repository operations in 1987.

115. Also in the Reassessment report, the DOE stated that its ability to accept waste at an MRS in 1998 required modification of the 1987 Amendments linkages between the repository and MRS schedules. (Reassessment Report at ix-x, 17, ENA at 1572-73, 1590.)

**RESPONSE**: Defendant objects to this proposed finding because it is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required. Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited.

116. DOE stated that it hoped to work to modify the linkages imposed by the 1987 Amendments, so that an MRS could open in 1998 on a schedule independent from the repository. (*Id.* at 11-12, 18, ENA at 1584-85, 1591.) DOE stated that it would pursue two parallel tracks, through the Nuclear Waste Negotiator and through a DOE MRS site selection process. (*Id.* at 18-19, ENA at 1591-92.)

**RESPONSE**: Defendant objects to this proposed finding as irrelevant to the issues presented in our motion for summary judgment. The MRS is relevant only insofar as the limitations placed upon its capacity by Congress were limitations upon DOE's ability to accept any SNF prior to the operation of a permanent repository. DOE's eventual inability to site and

build a monitored retrievable storage facility and the steps leading to that failure are irrelevant to a schedule of acceptance.

Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited.

117. Also in November 1989, the MRS Review Commission issued its report. The report concluded that the schedule linkages "would make it impossible for an MRS to be operational more than three years before the repository." (Nuclear Waste: Is There A Need for Federal Interim Storage? Report of the Monitored Retrievable Storage Review Commission at xvi, ENA at 1597, 1611.)

**RESPONSE**: Defendant objects to this proposed finding as irrelevant to the issues presented in our motion for summary judgment. The MRS is relevant only insofar as the limitations placed upon its capacity by Congress were limitations upon DOE's ability to accept any SNF prior to the operation of a permanent repository. DOE's eventual inability to site and build a monitored retrievable storage facility and the steps leading to that failure are irrelevant to the schedule of acceptance.

Without waiving these objections, defendant agrees that the quoted language is part of a conclusion contained in the report cited.

118. In November 1990, DOE issued a report responding to comments it had received on the Reassessment report. (Comment Response Document for the Secretary of Energy's "Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program"

(November 1990), ENA at 1613.) In responding to comments regarding the contingency plans in lieu of an MRS, the DOE noted that "[t]he DOE disagrees with the suggestion that it recommend at-reactor storage in lieu of a repository or an MRS facility. Long term at-reactor storage will not address commitments to the utilities and their ratepayers. . . ." (*Id.* at 14-15, ENA at 1619-20.)

**__RESPONSE__**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving these objections, defendant responds as follows. With regard to the first sentence of this proposed finding, defendant agrees that the proposed finding is supported by the document cited. With regard to the second sentence of this proposed finding, defendant agrees that the quoted language is contained in the document cited, but avers that the sentence excerpted continues. The entire passage states as follows:

> The DOE disagrees with the suggestion that it recommend at-reactor storage in lieu of a repository or MRS facility. Long term at-reactor storage will not address commitments to the utilities and their ratepayers, not does it contribute to the development of the overall waste-management system.

ENA at 1619-20.

**B. The DOE Publishes The 1990 Annual Capacity Report.**

**__RESPONSE__:** To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1).

119. In December 1990, DOE published the third Annual Capacity Report. (1990 Annual Capacity Report, ENA at 1625.) In the report, DOE noted that it had not published an ACR in 1989 (as required by Standard Contract Art. IV.B.5.b). (1990 Annual Capacity Report at v, ENA at 1629.) DOE stated it did not meet this contractual requirement because of its then ongoing reassessment of the SNF Program. (*Id.*)

**RESPONSE**: Defendant objects to this proposed finding because it contains a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required. Defendant further objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. The Annual Capacity Reports issued by DOE prior to 1991 were issued pursuant to the requirements set forth in the Standard Contract and were part of the contractual mechanism to establish the acceptance schedule. However, the 1991 ACR is the document that established an acceptance schedule in response to which the utilities were required to submit delivery commitment schedules if they wished to have DOE accept their SNF. Therefore, the issuance of any ACR prior to 1991, and the rates contained in any such ACR, are not probative of the issues presented in our motion for summary judgment.

Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited.

120. The acceptance rates in the 1990 ACR marked a departure from previous ACRs. Instead of one acceptance schedule, DOE provided two potential acceptance schedules, an “upper bounding Case” and “lower bounding Case.” (*Id.* at 5-7, ENA at 1635-37.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. The Annual Capacity Reports issued by DOE prior to 1991 were issued pursuant to the requirements set forth in the Standard Contract and were part of the contractual mechanism to establish the acceptance schedule. However, the 1991 ACR is the document that established an acceptance schedule in response to which the utilities were required to submit delivery commitment schedules if they wished to have DOE accept their SNF. Therefore, the issuance of any ACR prior to 1991, and the rates contained in any such ACR, are not probative of the issues presented in our motion for summary judgment. Defendant also objects to the proposed finding as vague because the phrase, "marked a departure" is unclear and undefined.

Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited.

121. In the 1990 ACR, the upper bounding case projected a ramp-up to 3,000 tons per year and was based on the 1988 Draft Mission Plan Amendment and the rates contained in the 1988 ACR. (*Id.* at 5-7, ENA at 1635-37.) The rates in the 1988 Draft Mission Plan Amendment

had assumed the start of repository operations in 2003. (1988 Draft Mission Plan Amendment at 19, ENA at 1544.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. The Annual Capacity Reports issued by DOE prior to 1991 were issued pursuant to the requirements set forth in the Standard Contract and were part of the contractual mechanism to establish the acceptance schedule. However, the 1991 ACR is the document that established an acceptance schedule in response to which the utilities were required to submit delivery commitment schedules if they wished to have DOE accept their SNF. Therefore, the issuance of any ACR prior to 1991, and the rates contained in any such ACR, are not probative of the issues presented in our motion for summary judgment. In addition, as plaintiff in this case successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that any repository be operational by January 31, 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Therefore, the date for the beginning of operations at the repository is irrelevant.

Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited.

122. In the 1990 ACR, the lower bounding case was supposedly derived from the 1987 Amendments' 10,000 ton limit on MRS capacity. However, it required modification of the Act's schedule linkages. (1990 ACR at 5, ENA at 1635.) The DOE stated that it hoped that it could modify the provisions in the 1987 Amendments which linked operation of an MRS to the repository schedule. (*Id.*) However, the DOE also noted that "[i]f the current linkages to the repository are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF/HLW by DOE would not start until 2007." (*Id.*)

**RESPONSE**: Defendant objects to this proposed finding because it is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required. Defendant further objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. The Annual Capacity Reports issued by DOE prior to 1991 were issued pursuant to the requirements set forth in the Standard Contract and were part of the contractual mechanism to establish the acceptance schedule. However, the 1991 ACR is the document that established an acceptance schedule in response to which the utilities were required to submit delivery commitment schedules if they wished to have DOE accept their SNF. Therefore, the issuance of any ACR prior to 1991, and the rates contained in any such ACR, are not probative of the issues presented in our motion for summary judgment. In addition, as plaintiff in this Case successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation to accept SNF and/or HLW beginning no

later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that any repository be operational by January 31, 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996). Therefore, the date for the beginning of operations at the repository is irrelevant.

Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited.

123. In the 1990 ACR, the lower bounding rate ramped up to 875 tons by the third year and remained at that rate. (1990 ACR at 7, ENA at 1637.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, any goals or objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. The Annual Capacity Reports issued by DOE prior to 1991 were issued pursuant to the requirements set forth in the Standard Contract and were part of the contractual mechanism to establish the acceptance schedule. However, the 1991 ACR is the document that established an acceptance schedule in response to which the utilities were required to submit delivery commitment schedules if they wished to have DOE accept their SNF. Therefore, the issuance of any ACR prior to 1991, and the rates contained in any such ACR, are not probative of the issues presented in our motion for summary judgment.

Without waiving these objections, defendant disagrees with the proposed finding. The rates set forth in the lower bounding case in the 1990 ACR show a rate of 875 in the fourth year of operations, not the third year. That rate remains constant for the remaining ten years of operation. ENA 1637.

124. Like the prior ACRs, the 1990 ACR stated that "As specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either the DOE or the Purchasers." (1990 ACR at 2, ENA at 1632.)

**RESPONSE**: Defendant objects to this proposed finding because it contains a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required. Defendant further objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. The Annual Capacity Reports issued by DOE prior to 1991 were issued pursuant to the requirements set forth in the Standard Contract and were part of the contractual mechanism to establish the acceptance schedule. However, the 1991 ACR is the document that established the acceptance schedule in response to which the utilities were required to submit delivery commitment schedules if they wished to have DOE create obligations to accept a particular amount of their SNF in a particular year. Therefore, the issuance of the 1990 ACR and the statements contained in it are not probative of the issues presented in our motion for summary judgment.

Without waiving these objections, defendant agrees that the document cited contains the language quoted, but avers that the full text of the document should be considered.

> Under the terms of the Standard Disposal Contract (Article IV), the Annual Capacity Report (ACR) is to project the DOE's annual SNF/HLW receiving Capacity and present the annual acceptance ranking of the Purchasers for 10 years following the projected commencement of DOE facility operations. As specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers. The Standard Disposal Contract states that beginning in April 1991, the ACR is schedule to be replaced by the annual Acceptance Priority Ranking report for receipt of SNF/HLW. The Contract further specifies that, beginning in January 1992, and based on the Acceptance Priority Ranking, the Purchasers shall Delivery Commitment Schedules (DCS) to DOE identifying the range of discharge dates of the SNF/HLW that the Purchasers propose to deliver to the Waste Management System (WMS). The Contract provides that the approved DCSs will be come the bases for Final Delivery Schedules, which are to be submitted by the Purchasers not less than 12 months before the designated year of DOE's anticipated acceptance of title to the SNF/HLW and subsequent transport to a DOE facility.

ENA at 1631-32.

**C. DOE Publishes The 1991 ACR And Projects A 900 Ton Acceptance Rate Beginning In 1998**

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1).

125. DOE published its fourth Annual Capacity Report in December 1991. In this report, the DOE eliminated the upper bounding case and published a revised schedule ostensibly based on operation of an MRS from 1998 until 2010, subject to the 10,000 ton capacity limit in the 1987 Amendments of 1987. (1991 Annual Capacity Report at 4, ENA at 1682, 1690.)

**<u>RESPONSE</u>**: Defendant agrees that the proposed finding is supported by the document cited.

126. The projected acceptance rates in the 1991 ACR were:

| Year | SNF (MTU) |
|---|---|
| 1998 | 400 |
| 1999 | 600 |
| 2000 | 900 |
| 2001 | 900 |
| 2002 | 900 |
| 2003 | 900 |
| 2004 | 900 |
| 2005 | 900 |
| 2006 | 900 |
| 2007 | <u>900</u> |
| Total | 8,200 |

(*Id.* at 5, ENA at 1691.)

**<u>RESPONSE</u>**: Defendant agrees that the proposed finding is supported by the document cited.

127. The projected rates in the 1991 ACR assumed congressional modifications of the schedule linkages between the MRS and repository. In the 1991 ACR, the DOE acknowledged that "[i]f the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007." (*Id.* at 4, ENA at 1690.)

**<u>RESPONSE</u>**: Defendant agrees that the proposed finding is supported by the document cited.

128. Like the prior ACRs, the 1991 ACR stated that "as specified in the Standard Contract, the ACR is for planning purposes only and thus is not contractually binding on either the DOE or the Purchasers." (*Id.* at 1-2, ENA at 1687-88.)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding because it contains a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required. Without waiving this objection, defendant agrees that the document cited contains the language quoted, but avers that the full text of document should be considered.

> Under the terms of the Standard Disposal Contract (Article IV), the Annual Capacity Report (ACR) is to project DOE's annual receiving capacity and present the annual acceptance ranking of SNF and/or HLW for disposal for 10 years following the projected commencement DOE facility operations. Although the 1990 ACR indicated that it would be the last ACR published, DOE has elected to continue publication of the ACR after discussions with the Purchasers. As specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers. Beginning in January 1992, the Purchasers may submit Delivery Commitment Schedules identifying the range of SNF that the Purchasers propose to deliver to the Federal Waste Management System (FWMS) beginning 63 months thereafter. The Purchasers' allocations for each delivery year are presented in Tables A.1 through A.10 in Appendix A, and should be used as the basis for submitting DCSs. An allocation is a specified acceptance capacity (measured in MTU) in a particular year for an individual Purchaser.

ENA at 1687-88.

129. Also in 1991, DOE published for the first time an Acceptance Priority Ranking. This report ranked contract holders' SNF according to the date the SNF was discharged. (1991 Acceptance Priority Ranking at 4, ENA at 1699, 1702.) This ranking is the order among utilities in which the DOE was to pick up SNF under the Oldest Fuel First allocation scheme in the

Standard Contract, subject to exchanges. (1991 Acceptance Priority Ranking at 2, ENA at 1701; Standard Contract Art. IV.B.5 & VI.B.1, ENA at 298, 305-06.) The APR was merely a list of SNF assemblies ranked by discharge date and did not contain any information regarding acceptance rates. (4/19/02 Zabransky Dep. at 668, ENA at 968.)

**RESPONSE**: Defendant objects to this proposed finding because it contains a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required. Without waiving this objection, defendant responds as follows. With regard to the first and second sentences of this proposed finding, defendant agrees that the proposed finding is supported by the document cited. With regard to the third sentence of the proposed finding, defendant disagrees with the proposed finding because it is not supported by the documents cited. The APR states that it "details the order in which DOE will allocate Federal waste acceptance Capacity" and contains no information relating to the order in which the DOE was to "pick up SNF" from the utilities. ENA at 1701; see 10 C.F.R. § 961.11, Article IV.B.5(a) (APR provision of Standard Contract) ENA at 1017. With regard to the fourth sentence of this proposed finding, defendant disagrees with the second half of the fourth sentence in this proposed finding, in which plaintiff asserts that "[t]he APR . . . did not contain any information regarding acceptance rates," because it is not supported by the excerpt of Mr. Zabransky's testimony cited. 4/19/02 Zabransky Dep. at 668, ENA at 968. The excerpt of Mr. Zabransky's testimony supports the first half of the fourth sentence, in which plaintiff alleges that "[t]he APR was merely a list of SNF assemblies ranked by discharge date." Id.

130. DOE witnesses stated in deposition testimony that the basis for 900 ton rate in the 1991 ACR was the 10,000 ton limit contained in the 1987 Amendments allocated over the twelve-year period between 1998 and 2010, the expected date for the start of repository operations:

**<u>RESPONSE</u>**: Defendant objects to this proposed finding because it fails to identify the witnesses to which it refers and is vague and overbroad. Defendant further objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1).

a. Billy Cole, a DOE contractor who developed the 1991 ACR acceptance rates, testified in his deposition that he developed the 900 ton rate simply by dividing the 10,000 ton Capacity limit over the twelve year period during which the repository would be delayed – 1998 through 2010. (3/12/02 Cole Dep. at 129-31, 180, ENA at 543-44, 548; *see also* 3/13/02 Cole Dep. 306-07, 343-46 ENA at 555, 556-57.)

**<u>RESPONSE</u>**: Defendant agrees that Billy Cole is the DOE contractor who developed the 1991 ACR acceptance rates. Defendant disagrees with the remainder of this proposed finding because it is not supported by Mr. Cole's testimony about the manner in which he developed those rates. Mr. Cole testified that he analyzed information provided to him by the utilities on their RW-859 forms regarding their on-site storage of spent nuclear fuel. Based upon this information, he was able to determine that acceptance of "less than 400 tons" was all that was needed in the aggregate (<u>i.e.</u>, on an industry-wide basis) to avoid any additional on-site ("out of pool") storage in the year 1998. Likewise, he was able to determine that acceptance of an aggregate amount of 575 MTU in 1999 and 850 in 2000 "and from then on out" was all that was

needed to avoid any additional on-site storage in those years. From these calculations, he arrived at the nominal "400-600-900" aggregate acceptance rate described in the 1991 ACR. In his testimony, Mr. Cole describes that it was serendipitous (". . . geeze, isn't that kind of nice?") that by spreading these nominal rates over the 12-year period also allowed him to meet the 10,000 MTU-limit imposed by the 1987 amendments to the NWPA. 3/12/02 Cole Dep. at 129-31, 180, ENA at 543-44, 548; *see also* 3/13/02 Cole Dep. 306-07, 343-46, ENA at 556-57.

b. Tom Pollog, DOE's Rule 30(b)(6) representative witness on the basis for the acceptance rates contained in the Annual Capacity Reports, testified that DOE divided 10,000 tons over the ten or twelve years prior to the delayed start of repository operations. (4/11/02 Pollog Rule 30(b)(6) Dep. at 162, 179, ENA at 798, 799.)

**RESPONSE**: Defendant disagrees with the proposed finding because it oversimplifies Mr. Pollog's testimony, which concerned the rates contained in several ACRs. Without waiving this objection, defendant disagrees with the proposed finding. Plaintiff fails to note that Mr. Pollog testified that the rates included a ramp-up rate. ENA at 798; see also 3/12/02 Cole Dep. at 129-31, 180, ENA at 543-44, 548; see also 3/13/02 Cole Dep. 306-07, 343-46, ENA at 556-57. Accordingly, Mr. Pollog did not testify that DOE equally "divided 10,000 tons over the ten or twelve years prior to the delayed start of repository operations."

c. Lake Barrett testified that the 900 ton rate was based on the capacity limits and he could not identify any other reason for the rate. (4/23/02 Barrett Dep. at 947-50, ENA at 449-50.)

**RESPONSE**: Defendant objects to this proposed finding because the cited testimony of Mr. Barrett was the subject of objections, based upon its nature as a legal conclusion, and courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001) ("[t]he requirement of Rule 56(e) that affidavit testimony be competent and admissible evidence applies with equal force to deposition testimony").

Without waiving this objection, defendant disagrees with the proposed finding because it is unsupported by the excerpt of Mr. Barrett's testimony cited. Mr. Barrett did not testify that the 900 ton rate in portions of the ACRs were "based on the capacity limits." When asked "the purpose of the ACR," Mr. Barrett responded that "[i]t had something to do with the contract, and it was a planning document for – with the contract. That's the extent of my understanding of it." 4/23/02 Barrett Dep. at 945-96 (ENA at 449-50). Mr. Barrett also referred to funding constraints as a basis for reduced acceptance rates. 4/23/02 Barrett Dep. at 949-51, ENA at 449-50.

d. Ron Milner testified that the basis of the rate was the capacity limits in the 1987 Amendments. (5/1/02 Milner Dep. at 114, ENA at 698.) Mr. Milner also acknowledged that he could not think of any reason other than the capacity limits to operate an MRS at a 900 ton rate. (5/3/02 Milner Dep. at 560, ENA at 722.)

**RESPONSE**: Defendant disagrees with this proposed finding upon the ground that it mischaracterizes Mr. Milner's testimony. Mr. Milner testified that he did not know specifically

the basis for the rate and only that the capacity limitations in the 1987 amendments to the NWPA were "a factor." 5/1/02 Milner Dep. at 114, ENA at 698; 5/3/02 Milner Dep. at 560, ENA at 722.

131. The assumptions used in the 1991 ACR would have required a Congressional amendment of the NWPA to remove the statutory provisions linking MRS construction to the schedule for a repository.

**RESPONSE**: Defendant objects to this proposed finding because it is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required. Defendant also objects upon the grounds that it is vague in that Energy Northwest fails to identify to which "assumptions" this proposed finding refers.

a. Billy Cole, the DOE contractor that developed the 900 ton rate, acknowledged that it required Congressional action to modify the schedule linkages. (3/13/02 Cole Dep. at 363-64, ENA at 558.)

**RESPONSE**: Defendant objects to this proposed finding because the underlying proposition that plaintiff seeks to establish is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required. Defendant further objects to plaintiff's attempt to support its interpretation of a law by reference to deposition testimony. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of statutory interpretation as to which testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms"). A DOE contractor's acknowledgment of such a legal

conclusion is completely irrelevant. In addition, defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving these objections, defendant disagrees with the proposed finding. In the excerpt of Mr. Cole's testimony cited, Mr. Cole was asked to read a provision of the 1991 ACR that identified the schedule linkages and the need for congressional action. 3/13/02 Cole Dep. at 363, ENA at 558. Mr. Cole then was asked whether he agreed with the sentence he had read, which he did. 3/13/02 Cole Dep. at 364, ENA at 558.

b. Tom Pollog, the DOE's Rule 30(b)(6) representative witness on the basis for the acceptance rates contained in the ACRs, testified that the 900 ton rate schedule could not be accomplished without a Congressional amendment to the NWPA. (4/12/02 Pollog Rule 30(b)(6) Dep. at 134-35, ENA at 806.)

**RESPONSE**: Defendant objects to this proposed finding because the underlying proposition that plaintiff seeks to establish is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required. Defendant further objects to plaintiff's attempt to support its interpretation of a law by reference to deposition testimony. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of statutory interpretation as to which testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms"). In addition, defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment.

c. Lake Barrett testified that without changes to the schedule linkages between an MRS and a repository, MRS operations could not begin until somewhere between 2005 and 2007. (4/23/02 Barrett Dep. at 409-10, ENA at 416.) DOE witness Mr. Barrett also testified that the rates in the 1991 ACR and other documents containing the 900 ton rate were not achievable without a change in law. (4/23/02 Barrett Dep. at 453, ENA at 418; *see also* 4/23/02 Barrett Dep. at 490-91, ENA at 420; 4/26/02 Barrett Dep. at 621, 774, ENA at 432, 436; 5/8/02 Barrett Dep. at 947, ENA at 449.)

**RESPONSE**: Defendant objects to this proposed finding because the underlying proposition that plaintiff seeks to establish is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required. Defendant further objects to plaintiff's attempt to support its interpretation of a law by reference to deposition testimony. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of statutory interpretation as to which testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms"). In addition, defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment.

d. Alan Brownstein testified that the rates in the 1991 ACR required eliminating the schedule linkages between the MRS and repository. (4/10/02 Brownstein Dep. at 328-38, ENA at 501-03; *see also* 4/11/02 Brownstein Dep. at 729-30, ENA at 517.)

**RESPONSE**: Defendant objects to this proposed finding because the underlying proposition that plaintiff seeks to establish is a conclusion of law as to which, pursuant to RCFC

56(h)(1) and (2), no response is required. Defendant further objects to plaintiff's attempt to support its interpretation of a law by reference to deposition testimony. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of statutory interpretation as to which testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms"). In addition, defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment.

e. Ron Milner stated that the 1987 Amendments made it impossible to accept waste at an MRS on a schedule independent from that of a repository. (5/2/02 Milner Dep. at 247-48, 250-51, 333-34, ENA at 704, 705, 708-09; 5/3/02 Milner Dep. at 557-58, ENA at 721.)

**RESPONSE**: Defendant objects to this proposed finding because the underlying proposition that plaintiff seeks to establish is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required. Defendant further objects to plaintiff's attempt to support its interpretation of a law by reference to deposition testimony. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of statutory interpretation as to which testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms"). In addition, defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment.

f. David Zabransky acknowledged that the 900 ton acceptance rate required modification of the schedule linkages constraining siting and construction of an MRS. (4/18/02 Zabransky Dep. at 328-29, ENA at 949.)

**RESPONSE**: Defendant objects to this proposed finding because the underlying proposition that plaintiff seeks to establish is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required. Defendant further objects to plaintiff's attempt to support its interpretation of a law by reference to deposition testimony. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of statutory interpretation as to which testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms"). In addition, defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment.

132. There was no policy or technical justification for the 900 ton rate other than the DOE's supposed reliance on the capacity limit. (5/3/02 Milner Dep. at 560, 562, ENA at 722; 4/23/02 Barrett Dep. at 402, ENA at 415; 5/17/02 Rusche Dep. at 331-32, ENA at 875; 4/18/02 Zabransky Dep. at 415-16, ENA at 957.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Defendant also objects to this proposed finding based upon plaintiff's characterization of DOE's reliance upon the capacity limit on the operation of an MRS imposed by the 1987 Amendments to the NWPA, as "supposed."

Without waiving these objections, defendant disagrees with the proposed finding. As established in response to preceding proposed findings of fact, the 900 MTU rate was developed based upon information provided by the utilities regarding the need for additional at-reactor storage. Mr. Cole testified that he analyzed information provided to him by the utilities on their RW-859 forms regarding their on-site storage of spent nuclear fuel. Based upon this information, Mr. Cole was able to determine that acceptance of "less than 400 tons" was all that was needed in the aggregate (i.e., on an industry-wide basis) to avoid any additional on-site ("out of pool") storage in the year 1998. Likewise, he was able to determine that acceptance of an aggregate amount of 575 MTU in 1999 and 850 in 2000 "and from then on out" was all that was needed to avoid any additional on-site storage in those years. From these calculations, he arrived at the nominal "400-600-900" aggregate acceptance rate described in the 1991 ACR. Mr. Cole testified further that, by spreading these nominal rates over the 12-year period, he also met the 10,000 MTU-limit imposed by the 1987 amendments to the NWPA. 3/12/02 Cole Dep. at 129-31, 180, ENA at 543-44, 548; *see also* 3/13/02 Cole Dep. 306-07, 343-46 ENA at 556-57.

Defendant also disagrees with the proposed finding because it is not supported by the excerpts of the deposition testimony cited. Mr. Milner testified that he did not know the basis for the 900 MTU rate and that he was "aware that the capacity limitations on the MRS were certainly a factor." 5/3/02 Milner Dep. at 560, 562, ENA at 722. Mr. Barrett was read a statement, "there is not technical basis for the linkages between the MRS and the repository," and testified that he did not understand what the statement meant. Mr. Barrett then proceeded to testify about what he understood to be the political reason for what have been referred to as the "schedule" linkages between the MRS and the repository. 4/23/02 Barrett Dep. at 402, ENA at

415. Mr. Rusche also testified about the need to establish linkages between the MRS and the repository to prevent the MRS from becoming a de facto repository. The excerpt of his deposition testimony cited does not address the absence of a "technical justification" for the 900 MTU rate. 5/17/02 Rusche Dep. at 331-32, ENA at 875. Finally, the excerpt of Mr. Zabransky's testimony also does not appear address the absence of a "policy or technical justification" for the 900 MTU rate. 4/18/02 Zabransky Dep. at 415-16, ENA at 957.

133. The 900 ton rate would not meet the objectives of the NWPA and of the Civilian Radioactive Waste Management Program. (4/23/02 Barrett Dep. at 340-45, ENA at 340-45; *see also* 5/10/02 Barrett Dep. at 1369-72, ENA at 466-67.)

**RESPONSE**: Defendant objects to this proposed finding because the underlying proposition that plaintiff seeks to establish is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required. Defendant further objects to plaintiff's attempt to support its interpretation of a law by reference to deposition testimony. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of statutory interpretation as to which testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms"). Defendant also objects to this proposed finding as vague because the "objectives" to which Energy Northwest refers are not defined.

Without waiving these objections, as we set out more fully in our reply brief, defendant disagrees with this proposed finding. Plaintiff does not cite to a single provision of the NWPA that imposes an obligation that a "900 ton rate" would not meet. Further, in response to

plaintiff's arguments, as evidenced above, that DOE was required to prevent the need for at-reactor storage, to the extent that any such "objective" existed within the Civilian Radioactive Waste Management Program, the 900 MTU rate, based upon the projected figures at the time the 1991 ACR was developed, would have met this "objective" of preventing the need for additional at-reactor storage, in the aggregate, and beginning to work off the backlog of SNF. (See Section VI of our reply brief.) However, as previously explained in response to No. 8 of plaintiff's proposed findings of fact, nothing in the NWPA provides any indication that Congress intended, through the NWPA, to relieve utilities of the responsibility for building additional at-reactor storage after 1998, as plaintiff has alleged. To the contrary, the NWPA expressly identified Congress' "findings and purposes" in enacting the NWPA, see 42 U.S.C. § 10131(a) & (b), and Congress did not identify as a finding of Congress or as a purpose of the NWPA a desire to "relieve utilities of the responsibility for building additional at-reactor storage after 1998." See id. Further, no language incorporated into the NWPA imposed any such obligation upon DOE. In addition, as explained in response to No. 46 of plaintiff's proposed findings of fact, any hope by DOE or individuals within DOE that utilities, in the aggregate, would not have to build additional at-reactor storage was not contractually binding, given that it was not expressed in the Standard Contract and was not a binding obligation that DOE was contractually required to satisfy.

**D. The DOE Continues To Project A 900 Ton Rate In ACRs Published In 1993.**

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1).

134. In March 1993, the DOE published the 1992 ACR. Like the previous ACR, the report assumed acceptance at an MRS facility beginning in 1998 and ramping up to a rate of 900 tons per year. (1992 Annual Capacity Report at 4, ENA at 1741, 1748.)

**RESPONSE**: Defendant agrees that the proposed finding is supported by the document cited.

135. The 1992 ACR contained the same acceptance rates as the 1991 ACR. (*Id.*)

**RESPONSE**: Defendant agrees that the proposed finding is supported by the document cited.

136. As in previous reports, DOE acknowledged that "[i]f the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that facility operations and initial acceptance of SNF by DOE could not start until at least 2007." (*Id.* at 3, ENA at 1747.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Defendant also objects to the proposed finding as vague because the initial phrase, "[a]s in previous reports," is unclear and undefined. Without waiving this objection, defendant agrees that the quoted statement is

contained in both the 1991 and 1992 ACRs. ENA at 1690, 1747. A similar, though not exact, version of the statement also appears in the 1990 ACR. ENA at 1635.

137. As in previous ACRs, the report explicitly stated that "[a]s specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the purchasers." (*Id.* at 1-2, ENA at 1745-46.)

**RESPONSE**: Defendant objects to this proposed finding because the underlying proposition that plaintiff seeks to establish is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required. Defendant also objects to the proposed finding as vague because the initial phrase, "[a]s in previous reports," is unclear and undefined.

Without waiving these objections, defendant agrees that the document cited contains the language quoted, but notes that the full text of document should be considered:

> Under the terms of the Standard Disposal Contract (Article IV), the Annual Capacity Report (ACR) is to project DOE's annual receiving Capacity and present the annual acceptance Capacity allocations to the Purchasers for 10 years following the projected commencement DOE facility operations. An allocation is a specified acceptance Capacity (measured in MTU) in a particular year for an individual Purchaser. These Capacity allocations, as listed in the Appendix, form the basis for the Purchasers' submittal of Delivery Commitment Schedules (DCS) as discussed further in Section 3.2. As specified in the Contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the Purchasers.

ENA at 1745-46.

138. DOE also published an Acceptance Priority Ranking to accompany the ACR.

**<u>RESPONSE</u>**: Defendant objects to the use of the word "accompany" because DOE's obligation to publish an APR is separate from, although related to, its obligation to publish an ACR. Defendant agrees that DOE also published an Acceptance Priority Ranking in March 1993. ENA at 1743.

## V. DOE Drops Plans For An MRS Facility, But Continues To Use The 900 Ton Rate.

**<u>RESPONSE</u>**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1).

### A. The DOE Abandons Plans To Build An MRS.

**<u>RESPONSE</u>**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1). Defendant further objects that this proposed finding is irrelevant to the issues presented in the Government's motion for summary judgment.

139. By late 1993 or 1994, the prospect of building an MRS facility as outlined in the 1991 and 1992 ACRs was "dead." This was confirmed by numerous DOE witnesses in their depositions:

**<u>RESPONSE</u>**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. The MRS is relevant only insofar as the limitations placed upon its capacity by Congress were limitations upon DOE's ability to accept any SNF prior to the operation of a permanent repository. DOE's eventual

inability to site and build a monitored retrievable storage facility and the steps leading to that failure are irrelevant to the schedule of acceptance to be adopted by the Court for the purposes of measuring damages. Defendant also objects to this proposed finding on the grounds that it is vague with respect to the meaning of the phrase, "dead."

a. Lake Barrett testified that by October 1993, building an MRS had become "unlikely" after a funding cut by Congress and was no longer the central premise for waste acceptance. (4/22/02 Barrett Dep. at 88-89, ENA at 400-01; 4/26/02 Barrett App. at 716, 739-40, ENA at 434,435.) By March 1995, the MRS concept was "not viable." (4/26/02 Barrett Dep. at 779-80, ENA at 438; 5/8/02 Barrett Dep. at 963-64, ENA at 454; 5/10/02 Barrett Dep. at 1246-47, ENA at 461.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Defendant also objects to this proposed finding because the cited testimony of Mr. Barrett was subject to numerous objections, including the failure to lay a foundation for Mr. Barrett's testimony, the mischaracterization of Mr. Barrett's prior testimony, and the nature of the question as a legal conclusion. Courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001).

Without waiving these objections and the objections noted above, defendant agrees that Mr. Barrett testified that construction of the MRS became "unlikely" when Congress failed to fund the effort necessary to siting proposals with the three volunteer Indian tribes in DOE's FY

1994 budget. 4/22/02 Barrett Dep. at 88-89, ENA at 400-01. Mr. Barrett was asked to read the following statement from the Civilian Radioactive Waste Management Plan, Vol. I, Program Overview: "By 1993, it had become clear that continuation of the Program in accordance with the then current approach was no longer a viable option." ENA at 1782, 1792.. Mr. Barrett testified that he agreed with this statement. 4/26/02 Barrett App. at 739-40, ENA at 435.. Mr. Barrett did not agree with counsel's characterization of the MRS proposal as "dead." 4/26/02 Barrett App. at 716, ENA at 438. Finally, Mr. Barrett agreed with the assertion that "by early 1995 an MRS facility was either not likely or, in the words of the Department, not viable, correct?" 4/26/02 Barrett Dep. at 779-80, ENA at 438.

b. Alan Brownstein confirmed that the MRS idea was never successful and that prospects for the facility had come to an end sometime between 1990 and 1995. (4/10/02 Brownstein Dep. at 276-77, ENA at 498.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Without waiving this objection and the objections noted above, defendant disagrees with the proposed finding because it does not properly paraphrase Mr. Brownstein's testimony. Mr. Brownstein testified that "the MRS was never successful. The Office of Negotiators that was established by the Amendments Act never successfully identified an MRS . . ." 4/10/02 Brownstein Dep. at 276, ENA at 498. Mr. Brownstein further testified that there were two MRS negotiators and that the negotiators terms were between 1990 and 1995. 4/10/02 Brownstein Dep. at 277, ENA at 498.

c. David Zabransky testified by 1994 there was no longer an active MRS siting effort. (4/18/02 Zabransky at 344-45, ENA at 950.) Zabransky testified that by the time of the publication of the 1995 APR/ACR, the MRS process had ceased. (4/18/02 Zabransky Dep. at 358-59, ENA at 953-54.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Without waiving this objection and the objections noted above, defendant agrees that the proposed finding fairly paraphrases Mr. Zabransky's testimony.

d. Ron Milner testified that the DOE had essentially given up on plans for an MRS in 1994. (5/1/02 Milner Dep. at 114-17, ENA at 698; 5/2/02 Milner Dep. at 378, ENA at 711; 5/7/02 Milner Dep. at 620-22, 705-06, ENA at 730, 732.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Defendant also objects to this proposed finding because the cited testimony of Mr. Milner was subject to objections based upon the failure to lay a foundation for Mr. Milner's testimony and the nature of the question was a legal conclusion. Courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001). Without waiving this objection and the objections noted above, defendant agrees that the proposed finding fairly paraphrases Mr. Milner's testimony.

140. In 1991, the General Accounting Office reported that an MRS facility was "unlikely to be operating by 1998." (General Accounting Office, Operation of Monitored Retrievable Storage Facility is Unlikely by 1998, at 3, ENA at 1648, 1651.) The Report noted that the DOE's plans depended on the Nuclear Waste Negotiator working out a siting agreement by the end of 1992, and that even the Negotiator did not believe that this could be accomplished. (*Id.* at 3-4, ENA at 1651-52.) Additionally, the report noted that the DOE's MRS plans would require Congressional amendment of the NWPA. (*Id.* at 4-5, ENA at 1652-53.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. The MRS is relevant only insofar as the limitations placed upon its capacity by Congress were limitations upon DOE's ability to accept any SNF prior to the operation of a permanent repository. DOE's eventual inability to site and build a monitored retrievable storage facility and the steps leading to that failure are irrelevant to the schedule of acceptance to be adopted by the Court for the purposes of measuring damages. Defendant further objects to this proposed finding because the GAO report on which it is based is inadmissible hearsay. Fed. R. Evid. 801-02.

Without waiving this objection, defendant responds as follows. With regard to the first and second sentences of the proposed finding, defendant agrees that the proposed finding is supported by the document cited. With regard to the third sentence, defendant objects to the proposed finding of fact because the allegation contained in this sentence is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Further, defendant disagrees with the proposed finding because Energy Northwest has incorrectly

paraphrased the cited document. The GAO report states that "the Congress would have to rescind, as DOE has requested, the links between the MRS facility and repository schedules to prevent the facility from adversely affecting the incentive to complete the repository." ENA at 1652. The GAO report contains no discussion of DOE's "MRS plans" requiring congressional amendment of the NWPA on the pages cited.

141. In 1992, James Watkins, Secretary of Energy, submitted a "New Strategy for Management of Commercial Spent Nuclear Fuel," which concluded that an MRS would not be available in 1998 due to Waste Negotiator's inability to find a host site, and that "alternative actions are required." (James D. Watkins, Secretary of Energy, Letter to The Honorable J. Bennett Johnston, Chairman, Committee on Energy and Natural Resources, United States Senate, with attachment (December 17, 1992), ENA at 1737, 1738.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. The MRS is relevant only insofar as the limitations placed upon its capacity by Congress were limitations upon DOE's ability to accept any SNF prior to the operation of a permanent repository. DOE's eventual inability to site and build a monitored retrievable storage facility and the steps leading to that failure are irrelevant to the schedule of acceptance. Without waiving this objection, defendant states that plaintiff has overstated the contents of Secretary Watkins' letter. In the letter, he informed Senator Johnston that the Office of the Nuclear Waste Negotiator, in two years of "seeking a voluntary host and site for an MRS facility," had "not been able to identify a viable candidate site . . . ." ENA at 1738. However, the letter does not indicate that the Office of the

Nuclear Waste Negotiator ceased efforts in attempting to locate such a site. In fact, for a period of time, negotiations with the Mescalero tribe were pursued. Further, Secretary Watkins proposes alternative actions in the letter that would allow DOE to begin SNF acceptance by 1998. ("Enclosed for your information is a summary of my new strategy to provide SNF interim storage in 1998.") ENA at 1738-40.

142. In December 1994, OCRWM published a "Program Plan," which announced that "[t]he development of a monitored retrievable storage facility to meet the objective of spent nuclear fuel acceptance into an operating Federal radioactive waste management system by 1998 appears doubtful." (Civilian Radioactive Waste Program Plan (December 19, 1994 ) Vol. 1 at 5, ENA at 1782, 1796.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. The MRS is relevant only insofar as the limitations placed upon its capacity by Congress were limitations upon DOE's ability to accept any SNF prior to the operation of a permanent repository. DOE's eventual inability to site and build a monitored retrievable storage facility and the steps leading to that failure are irrelevant to the schedule of acceptance. Without waiving this objection, defendant agrees that the quoted language is contained in the document cited.

143. The "Program Plan" was based on another "reassessment" of the program mandated by the Secretary of the Department of Energy. (*Id.* at 1, ENA at 1792.) The document noted that "[b]y 1993, it had become clear that continuation of the Program in accordance with the then current approach was no longer a viable option." (*Id.*) The program shifted its

emphasis to development of a multi-purpose container that could be used at reactors starting in 1998. (*Id.* at 9, ENA at 1800; *see also* James D. Watkins, Secretary of Energy, Letter to The Honorable J. Bennett Johnston, Chairman, Committee on Energy and Natural Resources, United States Senate, with attachment (December 17, 1992, ENA at 1738.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, program plans, such as the cited document, are not contractually binding documents.

Without waiving this objection, defendant responds as follows. With regard to the first sentence, defendant disagrees with the proposed finding because it is not supported by the document cited. There is no discussion of a "reassessment" of the program in the document cited. Instead, the page in the Program Plan Energy Northwest cites contains a description of a "comprehensive assessment of the Program" initiated by the Director of the Office of Civilian Radioactive Waste Management, at the direction of the Secretary. ENA at 1792. With regard to the second sentence, defendant agrees that the quoted material is contained in the document cited. With regard to the third sentence, defendant disagrees with the proposed finding because Energy Northwest has incorrectly paraphrased the document. The document cited does not suggest that the program "shifted its emphasis." Rather, the document states that the multi-purpose canister was one option that was being considered at the time. ENA at 1800.

144. A DOE document regarding DOE's assumptions for estimating the Total System Life Cycle Costs for the SNF program, distributed in December 1994, stated that an MRS was no longer part of the planned waste management system. (1995 TSLCC Assumptions Package at 3, 13-15, ENA at 1807, 1812, 1814-16; 5/2/02 Milner Dep. at 375-79, ENA at 710-11.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. The MRS is relevant only insofar as the limitations placed upon its capacity by Congress were limitations upon DOE's ability to accept any SNF prior to the operation of a permanent repository. DOE's eventual inability to site and build a monitored retrievable storage facility and the steps leading to that failure are irrelevant to a schedule of acceptance. Defendant also objects to this proposed finding because the document cited is irrelevant to the issues in the Government's motion. As the document notes:

> The purpose of this report is to provide cost information to aid in the determination of Nuclear Waste (NWF) fee adequacy, and should not be assumed to be a firm estimate of the cost of the final design, or a statement of DOE policy.

ENA at 1821. Therefore, the document that purports to establish assumptions upon which a TSLCC is to be based is not reliable evidence pertaining to any of the issues presented for decision in our motion for summary judgment upon the rate of acceptance.

Without waiving these objections, defendant disagrees with the proposed finding because it is not supported by the document or deposition testimony cited. There is no statement in the document cited, the TSLCC 1995 Assumptions Package, that an MRS was no longer part of the

planned waste management system. ENA at 1807, 1812, 1814-16. Similarly, Mr. Milner did not testify that the TSLCC 1995 Assumptions Package stated that an MRS was no longer part of the planned waste management system. Defendant avers that an MRS was not part of the assumptions package for the 1995 TSLCC and that Mr. Milner testified that, as of November 1994, "[w]e no longer assumed an MRS in the system, that's true, and for all intents and purposes, yes, it was dead." 5/2/02 Milner Dep. at 375-79, ENA at 711.

145. As of December 1994, DOE was not doing any development work on an interim storage facility. (8/11/04 Milner Testimony in *Yankee Atomic Electric v. United States*, at 4760, ENA at 739.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. The MRS is relevant only insofar as the limitations placed upon its capacity by Congress were limitations upon DOE's ability to accept any SNF prior to the operation of a permanent repository. DOE's eventual inability to site and build a monitored retrievable storage facility and the steps leading to that failure are irrelevant to the issues before the Court.

Without waiving these objections, defendant agrees that plaintiff has fairly paraphrased the testimony in the sentence of the proposed finding.

146. In OCRWM's September 1995 Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program ("1995 TSLCC"), the DOE projected a repository system that reaches a steady state acceptance rate of 3,000 tons by the fifth year of

operation. (Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program (1995) at 8, ENA at 1902, 1917.) Lake Barrett testified that the TSLCC is a "baseline" document which contains the rate at which DOE believed it could perform. (5/10/02 Barrett Dep. at 1343, 1334-35, ENA at 465, 463.)

**RESPONSE**: Defendant objects to this proposed finding because the document cited contains an analysis in support of the evaluation of the adequacy of fee collected for the Nuclear Waste Fund. ENA at 1911. The document itself specifically states that is should not "be interpreted as [OCRWM] or [DOE] policy." ENA at 1910. For these reasons, the document and the information contain within it are irrelevant to the issues presented in our motion for summary judgment.

Without waiving these objections, defendant responds as follows. With regard to the first sentence, defendant disagrees that the proposed finding is supported by the document cited. The page to which Energy Northwest cites identifies "MGDS Receipt/Emplacement Rates" for the repository, not acceptance rates. ENA at 1917. Defendant acknowledges that, for the purposes of the analysis for which the document was prepared, these rates ramp up to a rate of 3,000 MTU by the fifth year of operations. Id. With regard to the second sentence, defendant disagrees with the proposed finding because Energy Northwest has incorrectly paraphrased Mr. Barrett's testimony. Mr. Barrett did not refer to the TSLCC as a "baseline" document which contains the rate that DOE believed it could perform. Rather, Mr. Barrett stated that the TSLCC represented DOE's best estimate of the year-by-year costs for the waste management program and, to

complete that exercise, assumptions had to be made regarding the receipt rate. 5/10/02 Barrett Dep. at 1334-35, ENA at 463.

147. To date, DOE has never built an MRS facility. (4/22/02 Barrett Dep. at 88-94, ENA at 400-02; 4/10/02 Brownstein Dep. at 276, 282-83, 328, ENA at 498, 499-500.)

**RESPONSE**: Defendant objects to this proposed finding as irrelevant to the issues presented in our motion for summary judgment. The MRS is relevant only insofar as the limitations placed upon its capacity by Congress were limitations upon DOE's ability to accept any SNF prior to the operation of a permanent repository. DOE's eventual inability to site and build a monitored retrievable storage facility and the steps leading to that failure are irrelevant to a schedule of acceptance.

Without waiving this objection, defendant avers that, although the direct question was never asked during the deposition testimony cited, the proposed finding is a fair inference that can be made based upon that testimony. Defendant further avers that DOE has never constructed an MRS facility pursuant to the NWPA or the 1987 amendments to the NWPA. Specifically, DOE has never constructed an MRS facility authorized pursuant to 42 U.S.C. § 10162(b), subject to the licensing and construction requirements of 42 U.S.C. § 10168, and funded under the authority provided in section 10222(d) of the NWPA.

**B. DOE Publishes The 1995 APR/ACR Using The 900 Ton Rate.**

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation

to authority as required by RCFC 56(h)(1). Defendant further objects that this proposed finding is irrelevant to the issues presented in the Government's motion for summary judgment.

148. In March 1995, OCRWM published a combined Acceptance Priority Ranking and Annual Capacity Report. (ENA at 1825.)

**RESPONSE**: Defendant agrees that the proposed finding is supported by the document cited.

149. Like prior ACRs, the March 1995 APR/ACR stated that “[a]s specified in the Standard Contract, the ACR is for planning purposes only, and thus, is not contractually binding on either DOE or the purchasers.” (1995 APR/ACR at 1, ENA at 1828.)

**RESPONSE**: Defendant objects that the use of the words "[l]ike prior ACRs" introduces an unnecessarily vague phrase into this proposed finding because it fails to identify to which of the prior ACRs Energy Northwest is referring.

Without waiving these objections, defendant agrees that the document cited contains the language quoted, but avers that the full text of the paragraph should be considered:

> The Standard Contract requires the Department to issue an Acceptance Priority Ranking (APR) report and an Annual Capacity Report (ACR). The APR establishes the order in which the Department allocates the projected acceptance capacity for commercial spent nuclear fuel. The ACR applies projected nominal acceptance rates for the system to the priority ranking in the APR, resulting in individual allocations for the owners and generators expressed in metric tons of uranium (MTU). These capacity allocations, as listed in the ACR, for the basis for the Purchasers' submittal of Delivery Commitment Schedules (DCS). As specified in the Standard Contract, the ACR is for planning

> purposes only and, thus, is not contractually binding on either DOE or the Purchasers.

ENA at 1828.

150. The 1995 APR/ACR noted that prior ACRs had based projected acceptance rates "on the assumption of SNF acceptance beginning in 1998 at a Monitored Retrievable Storage Facility." (1995 ACR at 3, ENA at 1830.) Like the other ACRs published since 1991, the 1995 APR/ACR projected an acceptance rate which would ramp up to 900 tons in the third year of operation. (*Id.* at 4, ENA at 1831.) Notwithstanding that the DOE's plan for an MRS was "dead," the 1995 APR/ACR continued to use an acceptance rate that assumed the construction of an MRS. The 1995 APR/ACR stated that the acceptance rates shown "reflect the Capacity limit imposed by the Act on such a storage facility [an MRS] prior to repository operations." (*Id.* at 4, ENA at 1831.) However, the "acceptance rates are presented by year(s) of operation of the system rather than by specific calendar year(s)." (*Id.* at 3-4, ENA at 1830-31.)

**RESPONSE**: Defendant objects to this proposed finding because plaintiff has paraphrased portions of the paragraph cited and quoted other portions, while excluding other relevant portions of the paragraph. This selective quoting and paraphrasing distorts the true content of the paragraph cited. Without waiving this objection, defendant avers that the paragraph which plaintiff cites in the first, fourth, and fifth sentences states as follows:

> The ACR (see Appendix B) applies a 10-year projected nominal waste acceptance rate to the APR, resulting in individual capacity allocations. In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a Monitored Retrievable Storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of the waste management system, the

> annual nominal waste acceptance rates are presented by year(s) of operation of the system rather than by specific calendar year(s). The projected nominal acceptance rates also reflect the capacity limit imposed by the Act on such a storage facility prior to repository operations. These projected nominal waste acceptance rates are presented in Table 1. The Department will continue to process DCS submittals on an annual basis.

ENA at 1830-31. Defendant further avers that the 1995 APR/ACR contains a table titled "Table 1. Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel," which contains rates set forth in Energy Northwest's next proposed finding, number 160. Defendant further objects to the third sentence of the proposed finding because it is without citation to authority as required by RCFC 56(h)(1). Without waiving these objections, defendant avers that, at the time that the 1995 APR/ACR was published, operation of an MRS was uncertain and that the rates contained in the 1995 APR/ACR are the same as those contained in the previous ACR.

151. The projected acceptance rates in the 1995 ACR were:

| Year | SNF (MTU) |
|---|---|
| Year 1 | 400 |
| Year 2 | 600 |
| Year 3 | 900 |
| Year 4 | 900 |
| Year 5 | 900 |
| Year 6 | 900 |
| Year 7 | 900 |
| Year 8 | 900 |
| Year 9 | 900 |
| Year 10 | 900 |
| Total | 8,200 |

(*Id.* at 4, ENA at 1831.)

**RESPONSE**: Assuming that plaintiff intended to refer to the 1995 APR/ACR, which is the document cited, defendant agrees that material set forth in the table is contained in the document cited.

**C. DOE Utilizes the 900 Rate in the 1991, 1992, and 1995 ACRs to Limit Liability to Purchasers Under the Standard Contract.**

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1). Defendant further objects that this proposed finding is irrelevant to the issues presented in the Government's motion for summary judgment.

152. The limitations on the capacity of an MRS contained in 42 U.S.C. § 10168(d) are not even arguably applicable to a geologic repository, and would not apply to a system which did not include an MRS. (4/26/02 Barrett Dep. at 792-94, ENA at 440.)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant further objects to this proposed finding because the entirety of Mr. Barrett's testimony cited in this subparagraph was subject to the objection that the questions asked and the testimony sought were all in the nature of a legal conclusion. Courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001).

Without waiving these objections, defendant disagrees with the proposed finding because it does not fairly paraphrase Mr. Barrett's testimony. Mr. Barrett testified that the capacity limits were "[n]ot applicable by law and not applicable as an engineering limitation on the performance of the system." 4/26/02 Barrett Dep. at 793, ENA at 440.

153. DOE witnesses agreed in their depositions that there was no reason to apply the MRS capacity limit to a repository, and that, in fact, the SNF program would never operate at a steady state rate of 900 tons a year:

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant also objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Defendant further objects to this proposed finding because it is not supported by the witness testimony cited in the subparagraphs below, as required by RCFC 56(h)(1). None of the witnesses testified that the program would "never operate at a steady state rate of 900 tons a year."

a. Lake Barrett testified that the ramp up schedule of 400, 600, 900 tons would have no technical relevance in the context of a stand-alone repository. (5/8/02 Barrett Dep. at 947-50, ENA at 449-50.)

**RESPONSE**: Defendant objects to this proposed finding because the testimony of Mr. Barrett cited in this subparagraph was subject to objections regarding the lack of foundation for the testimony and that the questions asked and testimony elicited were in the nature of a legal

conclusion. Courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001).

Without waiving this objection, defendant agrees that the cited deposition testimony generally supports the proposed finding.

b. David Zabransky testified that "[t]he Department of Energy never used these rates [400, 600, 900 tons] for the planning for the operation of a repository facility." (4/18/02 Zabransky Dep. at 363, ENA at 955.) Zabransky further testified that there was no programmatic reason for accepting such a small amount of fuel absent a capacity limit. (4/18/02 Zabransky Dep. at 415-16, ENA at 957.).

**RESPONSE**: Without waiving the objections noted above, defendant responds as follows. With regard to the first sentence, defendant agrees that the quoted language is contained in the deposition excerpt cited. With regard to the second sentence, defendant disagrees with the proposed finding because Energy Northwest's paraphrasing of Mr. Zabransky's testimony is incorrect. Mr. Zabransky actually testified, "I meant from a programmatic perspective, from an operations perspective it made no sense to accept a small amount of fuel at a repository, MRS assuming that there were no constraints on the acceptance capacity of those facilities." 4/18/02 Zabransky Dep. at 415-416, ENA at 957.

c. Ron Milner testified that the capacity limit in the 1987 Amendments would have no applicability to a permanent repository. (5/7/02 Milner Dep. at 711-12, ENA at 732-33.)

**RESPONSE**: Defendant objects to the proposed finding in subparagraph c because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant objects to plaintiff's attempt to support its interpretation of a law by reference to deposition testimony. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of statutory interpretation as to which testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms"). Defendant also objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment, since, pursuant to the United States Court of Appeals for the District of Columbia's decision in Indiana Michigan Power Co. v. Department of Energy, 88 F.3d 1272 (D.C. Cir. 1996), DOE's obligation to accept SNF, beginning on January 31, 1998, is independent of the existence of a repository.

Without waiving these objections, defendant disagrees with the proposed finding because plaintiff has incorrectly paraphrased the testimony cited. Mr. Milner testified as follows:

> Q: Any reason to apply for example a 10,000 MTU or a 15,000 MTU limit to the permanent repository?
>
> A: In terms of total capacity?
>
> Q: Yes.
>
> A: No.
>
> Q: Or capacity over a period of time.
>
> A: No.

5/7/02 Milner Dep. at 712, ENA 733.

154. When asked repeatedly in his deposition why the DOE published the 1995 APR/ACR using rates applicable only to an MRS facility that they had no intention of building, the former Acting Director and Deputy Director of the program Lake Barrett responded: "I don't know." (4/26/02 Barrett Dep. at 795-96 (objection omitted), ENA at 441.) Mr. Barrett also testified that utilities should not rely on the rates in the March 1995 APR/ACR as a basis for planning, but should look at the 3,000 ton rate in the TSLCC and other documents. (5/10/02 Barrett Dep. at 1418-20, ENA at 468-69.)

**RESPONSE**: Defendant objects to this proposed finding because the testimony of Mr. Barrett cited in this subparagraph was subject to objections regarding the failure to lay a proper foundation and that the questions asked called for speculation. Courts have determined that Rule 56 precludes the use of inadmissible deposition testimony. See Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1028 n.4 (9th Cir. 2001).

Without waiving this objection, defendant responds as follows. With regard to the first sentence, defendant disagrees with plaintiff's contention that DOE had no intention of building an MRS. As demonstrated by the numerous preceding facts about DOE's plans to site and construct an MRS, DOE did intend to build an MRS as part of the Federal Waste Management System. These plans were curtailed, however, when DOE received an insufficient amount in its FY1994 budget to fund the siting activities. Defendant avers that the quoted language is contained in the excerpt of the deposition testimony cited. With regard to the second sentence,

defendant disagrees with the proposed finding because Energy Northwest has paraphrased Mr. Barrett's testimony incorrectly. Mr. Barrett testified as follows:

> A. From a realistic planning perspective you have to look at what the likely reality is and plan accordingly.
>
> Q. What is the likely reality?
>
> A. You have to look at everything. What I would refer to as an obligation rate, what somebody's planned intentions are.
>
> Q. And what are DOE's planned intentions?
>
> A. What the mission – what the program plan, the TSLCC, you know, the -
>
> Q. The ramp up to 3,000?
>
> A. The ramp up to 3,000 starting as soon as we can possibly start. A utility company ought to look clearly at what is going on in the United States and make their own judgment on what they're going to do.

5/10/02 Barrett Dep. at 1419-20, ENA at 468-69. Mr. Barrett did not limit his response to the "TSLCC and other documents," but specifically stated that a utility should look at "everything." Additionally, Mr. Barrett stated that DOE would "ramp up to 3,000 as soon as [DOE] can possibly start." 5/10/02 Barrett Dep. at 1420, ENA at 469. Therefore, Mr. Barrett did not endorse the rate in a particular document in this testimony or suggest that DOE would begin acceptance at the 3,000 MTU rate from the start of facility operations.

155. Dave Zabransky admitted that from the date that it published the 1995 APR/ACR document in 1995, the DOE never used the 900 ton rate for planning the federal waste management system. (4/18/02 Zabransky Dep. at 359-63, ENA at 954-55.) However, unlike Mr. Barrett, Mr. Zabransky did provide an explanation why the DOE continued to use the 900

ton rate even though there was no basis to do so. Mr. Zabransky admitted in his deposition that the DOE continued to use that rate to attempt to limit its obligations to the utilities:

> Q: Why did the Department of Energy publish a document [the 1995 APR/ACR] to be used as the basis for delivery commitment schedules using rates which it was not using itself for the purpose of planning the system?
>
> A. The Department carried over the rates it had used in the previous ACR and did not change them.
>
> Q. Was the Department trying to minimize the commitments it had to utilities who were parties to the standard contracts in using this document, in using Exhibit 5?
>
> A. I believe that was a consideration.

(4/18/02 Zabransky Dep. at 364-65, ENA at 955.)

**RESPONSE**: With regard to the first sentence of the proposed finding, defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. DOE's use of potential schedules for planning the Federal waste management system after 1995 is only relevant to this issue if such a rate was based upon beginning SNF acceptance in January 1998. DOE has realized for several years that the only way it would be able to begin acceptance by January 1998 was through the use of an MRS. ENA at 1358. The 900-ton rate was based upon the statutory capacity limit imposed upon an MRS, and verification by DOE that the 900-ton rate would also meet the non-contractual goal of preventing, in the aggregate, the need for additional at-reactor storage after 1998. 3/12/02 Cole Dep. at 129-31, 180, ENA at 543-44, 548; *see also* 3/13/02 Cole Dep. 306-07, 343-46, ENA at 556-57. Mr. Zabransky testified that the reason DOE “carried over the rates it had used in the previous ACR” at this time was because there was great deal of "uncertainty" as to whether DOE

would be able to develop an MRS in order to begin SNF acceptance by the January 31, 1998 date. 4/18/02 Zabransky Dep. at 344-45, ENA at 950; and Dep. at 364, ENA 955. To the extent that Mr. Zabransky's testimony reflects that, "from the date that it published the 1995 APR/ACR document in 1995," DOE had abandoned the concept of an MRS and the only rate that it used for planning the Federal waste management system was one based upon the acceptance of SNF at an operating, permanent repository beginning in 2010, it is irrelevant because it relates to DOE's plans after it understood that it would be unable to commence acceptance in 1998. The only information relevant to the issues in this case is the rate that DOE planned to use prior to this time in order to meet its obligations. That would be the schedule identified in the 1991 through 1995 ACRs and APRs.

Likewise, the second and third sentences in the proposed finding are irrelevant because they relate to a purported reason that DOE continued to use the rate set forth in the 1991 through 1995 ACRs and APRs. Although plaintiff may feel that this information is relevant to other claims that it is making, it is not relevant to our motion for summary judgment. Defendant also disagrees with the second and third sentences of this proposed finding because it is clear from an examination of all of Mr. Zabransky's testimony relating to the 1995 APR/ACR that there was absolutely "no discussion of changing the rates that were in the ACRs from the previous years." 4/18/02 Zabransky Dep. at 359, ENA at 954; see also 4/18/02 Zabransky Dep. at 343-44, ENA at 950. Further, although Mr. Zabransky testified that, in continuing to use the 1995 APR/ACR acceptance schedule, one "consideration" was to "minimize the commitments" that it was making to contract holders, he testified that it was only one consideration. ENA at 955. Further, contrary to Energy Northwest's description of Mr. Zabransky's testimony, Mr. Zabransky did not

testify that DOE was attempting to limit its "obligations." See ENA at 955. To the contrary, DOE's obligations had already been established. To the extent that DOE was attempting to limit new commitments, it was limiting the number of new contractual obligations to which it was committing itself. Defendant also objects to second and third sentences of this proposed finding because they contain allegations that relate to conclusions of law as to which, pursuant to RCFC 56(h)(1) and (h)(2), no response is required.

156. Scott Vance,[25] who assisted in the preparation of the 1991 ACR, testified in the *Yankee* trial that he met with Alan Brownstein at DOE regarding what rate DOE should use in the 1991 ACR. Mr. Vance testified "[a]nd I was told at that time specifically from Alan Brownstein that the lower rate was going to be used. The decision had already been made. And the reason for that was that it was obvious at that point that '98 was not going to be met and that they desired to limit the liability to purchasers." *See* 8/30/04 Vance Testimony in *Yankee Atomic Electric v. United States*, Nos. 98-126C, 98-154C and 98-474C at 7620-22, ENA at 925.

**RESPONSE**: Defendant objects to this proposed finding because the allegations contained in the paragraph are irrelevant to the issues presented in our motion for summary judgment. Defendant further objects to the first sentence because, as an employee of a contractor of DOE, Mr. Vance is not the agency's official policymaker. Irving v. United States, 162 F.3d 154, 166 (1st Cir. 1998) (en banc) ("[t]o determine what is agency policy, courts customarily

[25] Scott Vance assisted in the preparation of the 1991 ACR. At that time, he worked for Pacific Northwest Lab ("PNL"), which had contracted with the DOE to support the Office of Waste Acceptance. Mr. Vance's primary contact person at DOE was Alan Brownstein, and Mr. Vance worked with the group responsible for preparing contractually required documents, including the ACRs. (*See* 8/30/04 Vance Testimony in *Yankee Atomic Electric co. v. United States*, Nos. 98-126C, 98-154C and 98-474C, at 7618-20, ENA at 924-25.)

defer to the statements of the official policymaker, not others, even though the others may occupy important agency positions"). Further, at the time of his testimony in the Yankee v. United States trial, Mr. Vance was employed by Pillsbury Winthrop Shaw Pittman, one of the law firms representing SNF plaintiffs in this Court. 8/30/04 Vance Testimony in *Yankee Atomic Electric co. v. United States,* Nos. 98-126C, 98-154C and 98-474C, at 7618, ENA at 924. Furthermore, Mr. Vance's testimony is hearsay and, therefore, clearly inadmissible. Moreover, Mr. Vance's testimony regarding the development of the rate in the 1991 ACR is without foundation. In fact, the 1991 ACR is based upon the assumption that DOE would begin acceptance of ANF at an MRS. 1991 ACR at 4-5, GA at 410 -11. Thus, the rate of acceptance set forth in the 1991 ACR is consistent with statutory limitations of no more than 10,000 MTU before a repository begins operation. Id. In addition, Mr. Billy Cole, another contractor employee, testified that Scott Vance was not involved in the development of the rate in the 1991 ACR. Cole Dep., 6/4/02, 15:10-14, SGA 203. Instead, Mr. Cole developed the rate with Mr. Brownstein, based upon the 10,000 MTU limitation on the MRS contained in the NWPA. Cole Dep., 6/4/02, 15:10-14, SGA 203; Cole Dep., 3/13/02, 306:21-307:10, ENA 555. Further, Mr. Cole testified that individuals he worked with at DOE were not concerned about liabilities, contrary to Mr. Vance's testimony. Cole Dep, 3/12/02, 152:6-13, SGA 198.

157. Lake Barrett, the acting director of OCRWM until February 2002, admitted in his deposition that he had discussions with the DOE lawyers that by maintaining a low "obligation" rate compared with the higher 3,000 ton rate at which DOE ultimately expected to perform, the DOE could reduce utility damage claims. (5/10/02 Barrett Dep. At 1426-27, ENA at 470; *see*

*also* 4/26/02 Barrett Dep. at 557-71, 585-92, ENA at 423-27, 429-31; 5/8/02 Barrett Dep. at 911-23, ENA at 444-47.)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant also objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving these objections, defendant disagrees with the proposed finding because it is not supported by the excerpt of Mr. Barrett's deposition testimony cited. Instead, Mr. Barrett stated: "Those kind of discussions would have been with counsel because that's a legal kind of thing so." 5/10/02 Barrett Dep. at 1427, ENA at 470. Mr. Barrett did not discuss the substance of any such discussions. He definitely did not testify that he had the discussions attributed to "the DOE lawyers" in this proposed finding.

**D. DOE's Position Regarding a Transition from the 900 Ton Rate.**

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1). Defendant further objects that this proposed finding is irrelevant to the issues presented in the Government's motion for summary judgment.

158. DOE has never stated that the DOE was going to pick up spent nuclear fuel at a 900 ton rate for the life of the program. (*See* 7/12/05 Kouts Testimony in *Tennessee Valley Authority v. United States*, at 1571-1579, ENA at 622-30; 6/4/02 Cole Dep. at 77-78, ENA at

561-62; 5/3/02 Milner Dep. at 563-64, ENA at 722-23; 4/23/02 Barrett Dep. at 348, ENA at 412; 4/19/02 Zabransky Dep. at 553, ENA at 966.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Furthermore, pursuant to the Standard Contract, DOE was given discretion to establish the schedule of acceptance, subject to the requirement that DOE's implementation of that discretion must be reasonable under the circumstances extant at the time. See, e.g., C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1543 (Fed. Cir. 1993) ("[a] contract is read in accordance with its express terms and the plain meaning thereof").

Furthermore, plaintiff has not fairly paraphrased the testimony cited. For example, Mr. Kouts testified, as follows:

> Q: Has the Department ever published a document where it indicated it was going to pick up spent nuclear fuel at the rate of 900 metric tons a year for the life of the program?
>
> A: No.

ENA at 630. Defendant furthers states that the cited testimony of Mr. Cole does not support the proposed finding, see ENA 561- 62, the cited testimony of Mr. Milner does not support the proposed finding, see ENA 723, the cited testimony of Mr. Barrett does not support the proposed finding, see ENA at 412, and the cited testimony of Mr. Zabransky does not support the proposed finding, see ENA 966.

159. Even in the 1991, 1992 and 1995 ACR reports, DOE did not project that the 900 ton rate would extend beyond the 10th year, or 2007. Instead, those reports only projected the

first ten years of waste acceptance (1995 APR/ACR at 4, ENA at 1831; 1992 ACR at 4, ENA at 1748; 1991 ACR at 5; ENA at 1691.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Furthermore, pursuant to the Standard Contract, DOE was given discretion to establish the schedule of acceptance, subject to the requirement that DOE's implementation of that discretion must be reasonable under the circumstances extant at the time. See, e.g., C. Sanchez & Son, Inc. v. United States, 6 F.3d 1539, 1543 (Fed. Cir. 1993) ("[a] contract is read in accordance with its express terms and the plain meaning thereof"). Finally, this proposed finding is nonsensical. The cited documents only project the acceptance rate for the first ten years of SNF acceptance so obviously would not demonstrate any particular rate beyond that.

160. In each of those reports, DOE continued to project that it would begin accepting SNF at a repository by 2010. (*Id.*)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving this objection, defendant states that none of the documents cited by plaintiff "continued to project that it would begin accepting SNF at a repository by 2010."

161. In December 1990, DOE published its Preliminary Estimates of the Total-System Cost for the Restructured Program: An Addendum to the May 1989 Analysis of the Total-

System Life Cycle Cost for the Civilian Radioactive Waste Management Program ("1990 TSLCC Addendum") (ENA at 1621.)

**RESPONSE**: Defendant objects to this proposed finding of fact because it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving this objection, defendant agrees that in December 1990, DOE published its Preliminary Estimates of the Total-System Cost for the Restructured Program: An Addendum to the May 1989 Analysis of the Total-System Life Cycle Cost for the Civilian Radioactive Waste Management Program.

162. The 1990 TSLCC Addendum updated the estimates contained in the May 1989 TSLCC analysis in light of a restructuring of the Civilian Radioactive Waste Management Program, including delaying the start of repository operations until 2010. (1989 TSLCC Addendum at 1 and 3, ENA at 1621, 1621A-B.) The 1990 TSLCC Addendum analyzed three different waste acceptance rate scenarios. (1990 TSLCC Addendum at A-1 to A-3, ENA at 1622-24.) Under each scenario, an MRS would begin accepting waste in 1998, and a repository became operational in 2010. (*Id*.) Each scenario projected an initial ramp up to a 900 ton rate, followed by an increase to a steady state 3,000 ton rate by 2015. (*Id*.)

**RESPONSE**: Defendant objects to the proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving this objection, defendant objects to the first sentence as misleading because the document does not indicate that the Addendum was updated as a result of a "restructuring." Defendant states further that the 1990 TSLCC Addendum states that:

> In November 1989, the Secretary of Energy presented his reassessment of the waste-management program in a report to Congress. The key programmatic changes resulting from the Secretary's reassessment which are incorporated in this cost analysis are:
>
> . . . . .
>
> - A delay in the start of repository operations from the year 2003 to 2010.

ENA 1621B. Defendant agrees that the document cited contains three waste acceptance schedules. See ENA at 1622-1624. Defendant avers that under each proposed schedule "an MRS would begin accepting waste in 1998, and a repository became operational in 2010." Defendant objects to the fourth sentence of this proposed finding upon the grounds that the proposed finding is vague and unclear because the terms "initial ramp up" and "increase to a steady state" are undefined.

## VI. DOE Announces Its Interpretation That It Has No Obligation To Perform In 1998 Absent A Repository

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1). Defendant objects to this proposed finding and all of the paragraphs that follow in this section because they are irrelevant to the issues presented in our motion for summary judgment. As plaintiff in this case successfully argued to the United States Court of Appeals for the District of Columbia Circuit in prior litigation, DOE's obligation

to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository, and the NWPA did not require that any repository be operational by January 31, 1998. See Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1276 (D.C. Cir. 1996). That appellate court decision was issued in response to plaintiff's successful challenge to the "Final Interpretation" that is the subject of this heading. Therefore, in light of the D.C. Circuit's resolution of this issue, the date for the beginning of operations at the repository is irrelevant.

163. On December 23, 1993, anticipating that the DOE would not meet the 1998 date, OCRWM director Dan Dreyfus wrote a letter to Susan F. Clark, a commissioner of the Florida Public Service Commission. In the letter, Mr. Dreyfus stated that it was DOE's interpretation that "[t]he Department does not have a clear legal obligation under the Nuclear Waste Policy Act to accept spent nuclear fuel absent an operational repository or other facility." (Dan Dreyfus, Director, OCRWM, letter to Susan F. Clark, Commissioner, Florida Public Service Commission (December 23, 1993), ENA at 1772.) Mr. Dreyfus further stated that "[t]he Secretary [of Energy] has acknowledged her belief that the Department may have created such an expectation through its implementation of the [Standard Contract]." (*Id.*)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. The D.C. Circuit held that DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository and that "section 302(a)(5)(B) creates an obligation in DOE, reciprocal to the utilities'

obligation to pay, to start disposing of the SNF no later than January 31, 1998," regardless of the existence of a repository, thus overturning DOE's interpretation. Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1277 (D.C. Cir. 1996). In fact, the letter discussed by Energy Northwest was mentioned by the D.C. Circuit in its opinion. Id. at 1274. Accordingly, defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Defendant also objects to the phrase "anticipating that DOE would not meet the 1998 date" as unsupported by the document cited as required by RCFC 56(h)(1). Instead, this phrase is Energy Northwest's characterization of why DOE may have sent the letter.

Without waiving these objections, defendant agrees with this proposed finding to the extent support by the document cited, which is the best evidence of its contents; defendant otherwise disagrees with the proposed finding. Defendant avers that Mr. Dreyfus sent a letter to Ms. Clark, dated December 23, 1993. Defendant further avers that the quoted language in the proposed finding is contained in the letter from Mr. Dreyfus to Ms. Clark.

164. These comments were reiterated in a February 18, 1994 memorandum from Secretary of Energy Hazel O'Leary to Mr. Dreyfus. In this memorandum, Secretary O'Leary states that "the Department does not have a clear legal obligation under the Nuclear Waste Policy Act to accept spent nuclear fuel absent an operational repository or another facility constructed under the Act." (Memorandum from Hazel O'Leary, Secretary, DOE to Dan Dreyfus, Director, OCRWM (February 18, 1994), ENA at 1774.) As in the December Letter from Mr. Dreyfus, Secretary O'Leary acknowledged that "[t]he Department may have created

such an expectation through its implementation of the [Standard Contract].” (*Id.*) Secretary O’Leary also directed OCRWM to explore “options for offsetting a portion of the financial burden associated with the costs incurred through continued on-site storage after 1998 resulting from delays in currently projected waste acceptance schedules.” (*Id.*)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. The D.C. Circuit held that DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository and that "section 302(a)(5)(B) creates an obligation in DOE, reciprocal to the utilities' obligation to pay, to start disposing of the SNF no later than January 31, 1998," regardless of the existence of a repository, thus overturning DOE's interpretation. Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1277 (D.C. Cir. 1996). In fact, the memorandum discussed by Energy Northwest was mentioned by the D.C. Circuit in its opinion. Id. at 1274. Accordingly, defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving these objections, defendant agrees with this proposed finding to the extent support by the document cited, which is the best evidence of its contents; defendant otherwise disagrees with the proposed finding. Defendant avers that Secretary O'Leary sent a memorandum to Mr. Dreyfus, dated February 18, 1994. Defendant further avers that the quoted language in the proposed finding is contained in the memorandum cited.

165. In May 1994, the Department published a "Notice of Inquiry" in the Federal Register. (Notice of Inquiry, 59 Fed. Reg. 27,007-27,009 (May 25, 1994), ENA at 1776.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Defendant further objects that this proposed finding of fact is unnecessary because the "contents of the Federal Register shall be judicially noticed," 44 U.S.C. § 1507, and because, as a result, neither party can create a genuine issue of material fact regarding those contents. Without waiving these objections, defendant agrees that DOE published a notice of inquiry in the Federal Register on May 25, 1994, to advise interested parties of its interpretation regarding its obligation to accept waste pursuant to the Standard Contract. Notice of Inquiry, 59 Fed. Reg. 27,007-27,009 (May 25, 1994), ENA at 1776.

166. In the Notice of Inquiry, the Department announced that "[t]he Department's preliminary view is that it has no statutory obligation to accept spent nuclear fuel beginning in 1998 of an operational repository or other facility constructed under the Act, although the Department in implementing the Standard Contract may have created an expectation that it would begin accepting such spent nuclear fuel in 1998." (59 Fed. Reg. at 27,008, ENA at 1779.)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. The D.C. Circuit held that DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository and that "section 302(a)(5)(B) creates an obligation in DOE, reciprocal to the utilities'

obligation to pay, to start disposing of the SNF no later than January 31, 1998," regardless of the existence of a repository. Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1277 (D.C. Cir. 1996). Accordingly, defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Defendant further objects that this proposed finding of fact is unnecessary because the "contents of the Federal Register shall be judicially noticed," 44 U.S.C. § 1507, and because, as a result, neither party can create a genuine issue of material fact regarding those contents.

Without waiving these objections, defendant agrees with the proposed finding to the extent support by the document cited, which is the best evidence of its contents; defendant otherwise disagrees with this proposed finding. Defendant avers that the quoted language is contained in the notice of inquiry cited.

167. Also in the May 1994 notice, the DOE stated that it would not have a repository in operation until 2010, and that 2010 was the earliest date possible for waste acceptance at a repository. (59 Fed. Reg. at 27,008, ENA at 1778.) The notice also noted that DOE and the nuclear waste negotiator had not "achieved the level of success needed to realize significant progress in locating and developing a site [for an MRS] by 1998." (*Id.*)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. The D.C. Circuit held that DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository and that "section 302(a)(5)(B) creates an obligation in DOE, reciprocal to the utilities' obligation to pay, to start disposing of the SNF no later than

January 31, 1998," regardless of the existence of a repository, thus overturning DOE's interpretation. Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1277 (D.C. Cir. 1996). Similarly, the MRS is relevant only insofar as the limitations placed upon its Capacity by Congress were limitations upon DOE's ability to accept any SNF prior to the operation of a permanent repository. DOE's eventual inability to site and build a monitored retrievable storage facility and the steps leading to that failure are irrelevant to the issues before the Court. Defendant further objects that this proposed finding of fact is unnecessary because the "contents of the Federal Register shall be judicially noticed," 44 U.S.C. § 1507, and because, as a result, neither party can create a genuine issue of material fact regarding those contents.

Without waiving these objections, defendant agrees with this proposed finding to the extent supported by the document cited, which is the best evidence of its contents; defendant otherwise disagrees with the proposed finding. Defendant avers that, in the notice of inquiry, DOE stated that "[t]he Department currently projects that the earliest possible date for acceptance of waste for disposal at a repository is 2010." ENA at 1778. DOE has previously represented that it anticipates that no Federal facility constructed under the Nuclear Waste Policy Act will be available until at least 2010. Under the current statutory requirements of the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270, the Department of Energy cannot begin SNF acceptance until a Federal facility is operational. However, the possibility exists that, for example, the Department of Energy could receive congressional direction or that other events, including congressional action, could occur which would allow the Department to begin spent nuclear fuel and/or high-level radioactive waste acceptance earlier than 2010. Absent congressional action that would allow the Department of Energy to make alternative

arrangements regarding SNF disposal and/or storage, DOE does not anticipate that it can begin SNF acceptance until at least 2010. Defendant further avers that the quoted language in the second sentence of the proposed finding is contained in the notice of inquiry. ENA at 1778.

168. A year later, in May 1995, DOE issued its final interpretation, of its waste acceptance obligation, and announced that no repository or interim waste acceptance facility would be in operation until 2010 and that no waste acceptance would occur until then. (60 Fed. Reg, at 21, 794, ENA at 1897). In the final interpretation, DOE also stated that "[t]he Act does not impose a statutory obligation on DOE to begin nuclear waste disposal in 1998 in the absence of a disposal or interim storage facility constructed under the Act." (Department of Energy Final Interpretation of Nuclear Acceptance Issues (May 3, 1995), 60 Fed. Reg. 21,793, 21,794-95, ENA at 1896, 1897-98.)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant also objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. The plaintiff in this case challenged the "Final Interpretation" from which it quotes in this proposed finding before the United States Court of Appeals for the District of Columbia Circuit. The D.C. Circuit held that DOE's obligation to accept SNF and/or HLW beginning no later than January 31, 1998, was independent of the existence of a repository and that "section 302(a)(5)(B) creates an obligation in DOE, reciprocal to the utilities' obligation to pay, to start disposing of the SNF no later than January 31, 1998," regardless of the existence of a repository, thus overturning

DOE's interpretation. Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1277 (D.C. Cir. 1996). Accordingly, it is irrelevant to this matter. Defendant further objects that this proposed finding of fact is unnecessary because the "contents of the Federal Register shall be judicially noticed," 44 U.S.C. § 1507, and because, as a result, neither party can create a genuine issue of material fact regarding those contents.

Without waiving these objections, defendant agrees with this proposed finding to the extent support by the document cited, which is the best evidence of its contents; defendant otherwise disagrees with this proposed finding. Defendant avers that the language quoted is contained in the Federal Register notice cited. ENA at 1897-98.

169. In the final interpretation, DOE acknowledged that ". . .the [NWPA] originally envisioned that a geologic repository would be in operation, and DOE would be prepared to begin acceptance of SNF by January 31, 1998." (60 Fed. Reg. at 21,794, ENA at 1897.) DOE stated that no repository or interim waste acceptance facility would be in operation until 2010, and that no waste acceptance would occur until then. (*Id.*)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant also objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. The plaintiff in this case challenged the same "Final Interpretation" from which it quotes in this proposed finding before the United States Court of Appeals for the District of Columbia Circuit. The D.C. Circuit held that DOE's obligation to accept SNF and/or HLW beginning no later than

January 31, 1998, was independent of the existence of a repository and that "section 302(a)(5)(B) creates an obligation in DOE, reciprocal to the utilities' obligation to pay, to start disposing of the SNF no later than January 31, 1998," regardless of the existence of a repository, thus overturning DOE's interpretation as set forth in the Federal Register notice cited. Indiana Michigan Power Co. v. United States, 88 F.3d 1272, 1277 (D.C. Cir. 1996). Defendant further objects that this proposed finding of fact is unnecessary because the "contents of the Federal Register shall be judicially noticed," 44 U.S.C. § 1507, and because, as a result, neither party can create a genuine issue of material fact regarding those contents.

Without waiving these objections, defendant disagrees with the proposed finding because plaintiff has incorrectly quoted and paraphrased the two sentences from the Federal Register notice cited. Defendant avers that the two sentences that plaintiff cites read in their entirety as follows:

> Although the Act originally envisioned that a geologic repository would be in operation, and DOE would be prepared to begin acceptance of SNF by January 31, 1998, it since has become apparent that neither a repository nor an interim storage facility constructed under the Act will be available by 1998. DOE currently projects that the earliest possible date for acceptance of waste for disposal at a repository is 2010.

ENA at 1897. Defendant further avers, however, that, under the current statutory requirements of the Nuclear Waste Policy Act, 42 U.S.C. §§ 10101-10270, the Department of Energy cannot begin SNF acceptance until a Federal facility is operational. However, the possibility exists that, for example, the Department of Energy could receive congressional direction or that other events, including congressional action, could occur which would allow the Department to begin

spent nuclear fuel and/or high-level radioactive waste acceptance earlier than 2010. Absent congressional action that would allow the Department of Energy to make alternative arrangements regarding SNF disposal and/or storage, DOE does not anticipate that it can begin SNF acceptance until at least 2010.

170. DOE's position was challenged by nuclear utilities in the D.C. Circuit. On July 23, 1996, the Court issued an opinion rejecting DOE's interpretation of its obligations, concluding that in exchange for the billions of fees paid by nuclear utilities, the DOE had an independent, unconditional obligation to start removing SNF in 1998. *Indiana Michigan Power Company v. Department of Energy*, 88 F.3d 1272, 1276-77 (D.C. Cir. 1996). In so holding, the court stated that:

> Although Congress anticipated the existence of a repository by 1998, the fact that such a repository does not exist does not make subsection (B) [requiring disposal of waste to begin no later than January 31, 1998] illogical; it simply affects the remedy we can provide. We agree with DOE that Congress contemplated a facility would be available by 1998; however, that Congress contemplated such a facility would be available does not mean that Congress conditioned DOE's obligation to begin acceptance of SNF on the availability of a facility. It does not make sense to assert that Congress would express an intent to exempt DOE from the January 31, 1998 deadline by including specific statutory procedures regarding the siting and development of repository in the NWPA. *Rather, these prerequisites evince a strong congressional intent that DOE's various obligations be performed in a timely manner. See, e.g.*, *Tennessee v. Harrington*, 806 F.2d 642, 648 (6th Cir. 1986) ("[T]he overall structure of the Act does reveal a consistent concern for timely implementation of the disposal provisions."), *cert. denied*, 480 U.S. 946, 107 S. Ct. 1604, 94 L. Ed. 2d. 240 (1987).

*Id.* at 1277 (emphasis added).

**<u>RESPONSE</u>**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant also objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving these objections, defendant agrees that the language above that is identified as a quotation from D.C. Circuit's opinion in <u>Indiana Michigan Power Co. v. United States</u>, 88 F.3d 1272, 1277 (D.C. Cir. 1996), is correct.

171. On December 17, 1996, DOE issued a Press Release announcing that it would not perform in 1998: "The Department of Energy (DOE) today notified generators and owners of commercial spent nuclear fuel that the department anticipates a delay in accepting fuel on January 31, 1998." (DOE Press Release, Department of Energy notifies utilities of anticipated delay in accepting commercial spent nuclear fuel (December 17, 1996) ENA at 1929.)

**<u>RESPONSE</u>**: Defendant agrees that the cited document contains the language quoted.

## VII. The DCS Submission Process.

**<u>RESPONSE</u>**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1).

### A. **DOE Issues DCS Instructions Beginning in 1992.**

**<u>RESPONSE</u>**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1).

172. On March 4, 1992, the DOE contracting officer sent a letter to Energy Northwest forwarding instructions ("Instructions") for completing and submitting Delivery Commitment Schedule forms as provided in Article V.B.1 of the Standard Contract. (M. Detmer, Contracting Officer, DOE, letter to A.P. DiDesidero, Contracting Officer, Washington Public Power Supply System, ENA at 1735.) The letter stated that DCS submittals were to be made beginning January 1, 1992 and that the submittals should be based on the 1991 Annual Capacity Report or the then applicable report. (*Id.* at 1, ENA at 1735.)

**<u>RESPONSE</u>**: Defendant agrees with this proposed finding to the extent supported by the document cited, which is the best evidence of its contents; defendant otherwise disagrees with this proposed finding. Defendant avers that the contracting officer sent a letter dated March 4, 1992, to Standard Contract holders and forwarded with that letter instructions for completing the Appendix C Delivery Commitment Schedules. ENA at 1735-36. Defendant further avers that the instructions, <u>not</u> the letter, stated that the DCS forms were to be submitted beginning January 1, 1992 and should be based upon the 1991 ACR (or subsequent ACRs, as appropriate). <u>Id.</u>; <u>see also</u> GA at 145.

173. The Instructions stated that "The DCS provides the Purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected Federal Waste management system (FWMS) acceptance capacity. This information will assist DOE in

meeting its contractual waste acceptance responsibilities in developing the FWMS." (DCS Instructions ¶ 1, GA at 145.)

**<u>RESPONSE</u>**: Defendant agrees that the quoted language is contained in the instructions for the completion of the Appendix C Delivery Commitment Schedules. GA at 145.

174. The Instructions stated that the "[t]he DCS should be submitted by all Purchasers with allocations in the 1991 Annual Capacity Report (ACR) (or subsequent ACRs, as appropriate) as specified in Article V.B of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste." (DCS Instructions ¶ 2, GA at 145.)

**<u>RESPONSE</u>**: Defendant agrees that the quoted language is contained in the instructions for the completion of the Appendix C Delivery Commitment Schedules. GA at 145.

175. The Instructions stated that utilities "shall submit DCSs at least 63 months prior to requested delivery." (DCS Instructions ¶ 3, GA at 145.)

**<u>RESPONSE</u>**: Defendant agrees that the quoted language is contained in the instructions for the completion of the Appendix C Delivery Commitment Schedules. GA at 145.

176. The Instructions stated that:

> The annual acceptance rates in the 1991 ACR provide an approximation of the FWMS acceptance capacity and are for planning purposes. The process described herein assumes that the FWMS will be able to accept the purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the 1991 ACR. *In the event that such circumstances change, all DCSs previously approved by the DOE may need to be reevaluated by DOE and the Purchasers.*

(DCS Instructions ¶ 7(c) (emphasis added), GA at 146.)

**RESPONSE**: Defendant agrees that the quoted language is contained in the instructions for the completion of the Appendix C Delivery Commitment Schedules. GA at 146..

177. The Instructions stated that utilities were not required to put a specific delivery date on the DCS form, only a delivery year. (DCS Instructions ¶ 2.4, GA at 150.)

**RESPONSE**: Defendant agrees with this proposed finding to the extent supported by the document cited, which is the best evidence of its contents; defendant otherwise disagrees with this proposed finding. Defendant avers that paragraph 2.4 of the Specific Instructions For Completion Of DCS, stated:

> PROPOSED DELIVERY DATE: Enter the appropriate delivery date (year) for the SNF to be delivered in accordance with your allocation (listed in the ACR). The actual date will be determined during the FDS process.

GA at 150. Defendant further avers that the instructions provided the following explanation for this instruction:

> WHEN TO SUBMIT
>
> Beginning January 1, 1992, Purchasers shall submit DCSs at least 63 months prior to requesting delivery. At this time, DOE suggests that the Purchasers designate only the appropriate delivery year (calendar year), recognizing that both the Purchaser's and the Department's ability to commit to a specific date over 63 months in the future is limited.

GA at 150.

178. According to the Instructions, a utility could "[e]nter the range of discharge dates for which the SNF will be selected for delivery." (DCS Instructions ¶ 2.6, GA at 150.)

**RESPONSE**: Defendant agrees to the quoted language is contained in the instructions for the completion of the Appendix C Delivery Commitment Schedules. GA at 150.

179. The DCS Instructions informed all Purchasers, including Energy Northwest, that they were to complete DCSs based on the amount of each Purchaser's allocations in the then-current "Annual Capacity Report" ("ACR"), and stated that "if the DCS does not reflect delivery rights available to the Purchaser, the DCS will be disapproved and returned to the Purchaser." (DCS Instructions ¶¶ 7 and 8, GA at 147-48; Larkin Decl. ¶ 10, ENA at 356.)

**RESPONSE**: Defendant agrees that the quoted language is contained in the instructions for the completion of the Appendix C Delivery Commitment Schedules. GA at 147-48.

180. The Instructions informed utilities that "the total quantity of SNF designated for delivery must not exceed the allocation in the ACR; exceeding the allocation will result in disapproval of the DCS(s)." (DCS Instructions ¶ 2.7, GA at 150.)

**RESPONSE**: Defendant agrees that the quoted language is contained in the instructions for the completion of the Appendix C Delivery Commitment Schedules. GA 150.

181. Under the DCS Instructions, a utility had no discretion as to how many tons of SNF to put on a DCS form. (4/17/02 Zabransky Dep. at 57, ENA at 937.) If a utility submitted a

DCS form that listed an amount of MTUs greater than the current ACR allocation, the DCS submission would be rejected. (*Id*. at 57-58, ENA at 937; 4/22/1999 Slater-Thompson Dep. at 230-31, ENA at 890.)

**RESPONSE**: With regard to the first sentence, defendant disagrees with the proposed finding because it is misleading. Defendant avers that, although the excerpt of Mr. Zabransky's deposition testimony supports the proposed finding, the testimony elicited and the proposed finding do not allow for the possibility that a utility could submit a DCS that listed an amount less that the allocation granted the utility in the current ACR. There was nothing in the DCS instructions that prohibited such a submission, and neither Mr. Zabransky nor Ms. Slater were asked about how such a submission would be processed. Further, the DCS instructions did not bar a contract holder from submitting a DCS seeking acceptance of amounts greater than the contract holder's allocations identified in the ACR, although the DOE contracting officer would not have approved such DCSs.

With regard to the second sentence, defendant disagrees with the proposed finding. Under the terms of the Standard Contract, the DOE contracting office would not "reject" a DCS submission that sought an acceptance amount that exceeded that with DOE was willing to commit itself to accept from a particular contract holder at a particular time. Instead, the DOE contracting officer would "approve or disapprove" such a DCS "within three (3) months after receipt." 10 C.F.R. § 961.11, Art. V.B.1 (ENA at 302). "In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of

DOE's notice of disapproval." Id. Subsequently, pursuant to the contract terms, "DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt" and, in the event of disapproval, "DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its [DOE's] proposed schedule." Id., Art. V.B.2. If the contract holder finds DOE's proposed schedule unacceptable, the parties must proceed under the "Disputes" clause of the Standard Contract. Id., Art. V.B.2 & XVI. Accordingly, plaintiff's proposed finding that it had no discretion or ability to contest the DOE contracting officer's disapproval of a DCS is incorrect.

182. Energy Northwest relied on DOE's "Instructions for Completing the Appendix C Delivery Commitment Schedule" (DCS Instructions") provided to Energy Northwest by DOE in March 1992, and in subsequent years. (*See* Larkin Decl. ¶ 10, ENA at 356.)

**RESPONSE**: Defendant is without knowledge or information sufficient to form a belief as to the matters in No. 182.

183. While the DCS process was ongoing in the early 1990s, the DOE disapproved any utility's DCS submission which listed more than the utility's allocation in the latest ACR. For example, the DOE disapproved three Yankee Atomic DCS submissions for the year 1998 which listed more fuel than Yankee was allocated in the 1991 ACR. (6/14/02 Brownstein Dep. at 295-304, ENA at 521-23.)

**RESPONSE**: Defendant objects to the first sentence of the proposed finding because it is without citation to authority as required by RCFC 56(h)(1). Without waiving this objection,

defendant avers that DOE disapproved DCS submissions that listed more than a utility's allocation identified in an ACR. With regard to the second sentence, defendant disagrees that the proposed finding is supported by the excerpt of the deposition testimony cited. In the excerpt cited, Mr. Brownstein was asked questions about the approval chain within DOE for letters regarding DCSs. His testimony did not relate at all to disapproval of any specific DCSs. 6/14/02 Brownstein Dep. at 295-304, ENA at 521-23.

184. Given DOE’s clear instruction not to submit DCS forms if the ACR document did not list an allocation for the relevant year, Energy Northwest did not submit DCS forms during the 1990s. (*See* Larkin Decl. ¶ 11, ENA at 356-57.)

**RESPONSE**: Defendant disagrees with the proposed finding. Under the terms of the Standard Contract, the DOE contracting office would not "reject" a DCS submission that sought an acceptance amount that exceeded that which DOE was willing to commit itself to accept from a particular contract holder at a particular time. Instead, the DOE contracting officer would "approve or disapprove" such a DCS "within three (3) months after receipt." 10 C.F.R. § 961.11, Art. V.B.1 (ENA at 302). "In the event of disapproval, DOE shall advise the Purchaser in writing of the reasons for such disapproval and request a revised schedule from the Purchaser, to be submitted to DOE within thirty (30) days after receipt of DOE's notice of disapproval." Id. Subsequently, pursuant to the contract terms, "DOE shall approve or disapprove such revised schedule(s) within sixty (60) days after receipt" and, in the event of disapproval, "DOE shall advise the Purchaser in writing of the reasons for such disapproval and shall submit its [DOE's] proposed schedule." Id., Art. V.B.2. If the contract holder finds DOE's proposed schedule

unacceptable, the parties must proceed under the "Disputes" clause of the Standard Contract. Id., Art. V.B.2 & XVI. Accordingly, plaintiff's proposed finding that it had no discretion or ability to contest the DOE contracting officer's disapproval of a DCS is incorrect.

**B. DOE Makes DCS Submissions Impossible By Removing Dates From The 1995 APR/ACR.**

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1).

185. Unlike prior years, the acceptance schedule in the APR/ACR published in 1995 contained no years indicating when the DOE would accept SNF; instead the APR/ACR indicated acceptance rates for “Year 1,” “Year 2” and so on. (1995 APR/ACR at 4, ENA at 1831.) The DOE noted this change and stated that “Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year(s) of operation of the system rather than by specific calendars year(s).” (*Id.* at 3-4, ENA at 1830-31.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Without waiving this objection, defendant agrees that the proposed finding is supported by the document cited.

186. By eliminating the specific years in the 1995 APR/ACR, the DOE effectively eliminated any basis for utilities to determine the due date of their DCS submissions. (4/18/02 Zabransky Dep. at 348-49, ENA at 951.)

**RESPONSE**: Defendant objects to this proposed finding because it is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required. Without waiving this objection, defendant disagrees with the proposed finding because it is incorrect. The 1995 APR/ACR listed the rates for years of operation of the waste management system. (ENA 1830-31). Reference to the document itself, rather than Mr. Zabransky's testimony, is the best evidence as to the contents of the document. Defendant also notes that "Summary of Purchasers' Annual Allocations," contained in each ACR or APR/ACR issued since 1991, identifies the utilities' allocations upon the basis of Year 1, Year 2, and the like, rather than calendar years. See ENA at 1695, 1752, 1833.

### C. After 1995, DOE Abandons the DCS Process.

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1). Defendant also objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required.

#### 1. DOE "Suspends" Processing Of DCSs Shortly After Decision In *Indiana Michigan* To Limit Liability.

**RESPONSE**: To the extent that Energy Northwest intends this heading to be a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1). Defendant also objects to the proposed finding of fact

because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required.

187. After the decision of the D.C. Circuit in *Indiana Michigan*, the DOE, on the advice of counsel, decided to stop processing DCSs. (4/17/02 Zabransky Dep. at 38-39, ENA at 934; 4/18/02 Zabransky Dep. at 438, ENA at 962.)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Without waiving this objection, defendant disagrees with the proposed finding of fact because a portion of it is not supported by the excerpts of the deposition testimony cited. Mr. Zabransky testified as follows:

> Q: I believe you testified earlier, Mr. Zabransky, that the DCS process was suspended based on instruction of counsel. Do you recall that?
>
> A: I think I said that, yes.
>
> Q: And that occurred I think around the time of the Indiana Michigan decision in 1996?
>
> A: I'm not sure. Yeah, whatever decision it was, there was a precipitant event.

4/18/02 Zabransky Dep. at 438, ENA at 962.

188. In early 1997, the DOE stopped approving any DCS submittals. (4/17/02 Zabransky Dep. at 32-33, ENA at 932-33.) DOE has not approved any DCSs since March 1997. (4/19/02 Zabransky Dep. at 636-37, ENA at 967; *see also* 5/8/02 Barrett Dep. at 1095-97, ENA

at 456; 4/10/02 Brownstein Dep. at 506, ENA at 538; 3/12/02 Cole Dep. at 204-05, ENA at 550; 4/24/02 Klein Rule 30(b)(6) Dep. at 101-05, 109-10, ENA at 574-75, 576)

**RESPONSE**: With regard to the first sentence of this proposed finding, defendant disagrees with the proposed finding because it is not supported by the deposition testimony cited. Mr. Zabransky did not testify that DOE stopped approving any DCS submittals in early 1997 in the excerpt cited. With regard to the second sentence of this proposed finding, defendant disagrees with the proposed finding because it is not supported by the deposition testimony cited, with the exception of the deposition excerpts of Mr. Zabransky and Ms. Klein. Defendant further avers that DOE has not approved any DCS submittals since March 1997.

189. DOE stopped approving DCS submittals on the advice of counsel. (*See* 8/5/04 Zabransky Testimony in *Yankee Atomic Electric v. United States*, at 4118, ENA at 977; 8/4/04 Pollog Testimony in *Yankee Atomic Electric v. United States*, at 3996, ENA at 813.)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Without waiving this objection, defendant agrees that the plaintiff has fairly paraphrased the testimony contained in the proposed finding.

190. As a result of DOE's suspension of the DCS process, it became "impossible" for a utility to obtain an approved DCS. (8/5/04 Zabransky Testimony in *Yankee Atomic Electric v.*

*United States*, at 4148, ENA at 978; 4/18/02 Zabransky Dep. at 353-54, ENA at 952; 4/24/02 Klein Rule 30(b)(6) Dep. at 122-23, ENA at 577.)

**RESPONSE**: Defendant objects to the proposed finding of fact because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required. Defendant further objects to plaintiff's attempt to support its interpretation of law by reference to deposition testimony. See, e.g., Berry v City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994).

Without waiving these objections, defendant disagrees with the proposed finding's reference to the deposition testimony of Ms. Klein because it is not supported by Ms. Klein's cited deposition testimony. With regard to plaintiff's citation to Mr. Zabransky's deposition testimony, defendant further avers that Mr. Zabransky testified as follows:

> Q: Because of the suspension of the DCS process it's impossible for a utility to have a DCS approved, correct.
>
> A: That's correct.

4/18/02 Zabransky Dep. at 353, ENA at 952.

191. When asked why the DOE suspended the DCS process, Zabransky testified: "I'll answer that question. I think the belief was that approving DCSs committed the department to that obligation, and the decision was to suspend that commitment." (4/18/02 Zabransky Dep. at 353-54, ENA at 952.)[26]

[26] Despite making the lack of approved DCSs a centerpiece of its argument that utilities such as Energy Northwest have limited damages, counsel for the Government repeatedly instructed their witnesses not to answer any questions regarding the reasons for the suspension, other than that it was advised by counsel. (*See, e.g.*, 4/18/02 Zabransky Dep. at 354-56, ENA at

**<u>RESPONSE</u>**: Defendant objects to the footnote to the proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. If the utility plaintiffs disagreed with Government counsel's instructions not to answer upon the basis of privilege, these instructions could have been challenged in the coordinated discovery proceedings over which Judge Sypolt has presided. Energy Northwest cannot ask the Court to draw any inferences from these unchallenged instructions not to answer. <u>See</u>, <u>e.g.</u>, <u>Nabisco, Inc. v. PF Brands, Inc.</u>, 191 F.3d 208, 225 (2d Cir. 1999); 2 J. Wigmore, <u>Wigmore on Evidence</u> § 291, at 225 (rev. 1979) ("the nature of a privilege is usually held to be incompatible with the allowance of an inference from exercising the privilege").

Without waiving these objections, and with regard to the main text of this proposed finding, defendant agrees that the quoted language in the proposed finding is contained in the excerpt of the deposition testimony cited.

192. The testimony given by Tom Pollog, the Contract Officer's Technical Representative, responsible for providing the Contracting Officer with guidance in implementing the Standard Contract, was even more direct. Mr. Pollog testified that it was his understanding that DOE stopped processing DCS submittals to limit the DOE's contractual liability to Contract Holders. (*See* 8/4/04 Pollog Testimony in *Yankee Atomic Electric v. United States*, at 3904, 3995-97, ENA at 811, 812-13.) Mr. Pollog further testified that by stopping the DCS process DOE felt it "could unilaterally cut off its obligation to all purchasers." (*Id.* at 4011, ENA at 814.)

---

952-53; 4/24/02 Klein Rule 30(b)(6) Dep. at 80-82, ENA at 572-73.)

**RESPONSE**: Defendant objects to this proposed finding because the underlying proposition that plaintiff seeks to establish is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required. With regard to the first sentence of this proposed finding, defendant disagrees with the proposed finding because it is not supported by the deposition testimony cited. Mr. Pollog did not testify that DOE stopped processing DCS submittals to limit DOE's contractual liability to Contract Holders. See ENA 812-13. With regard to the second sentence of this proposed finding, defendant disagrees with the proposed finding because plaintiff has not correctly paraphrased the testimony cited. Mr. Pollog testified, as follows:

Q: So your view is that, by stopping the approval of the DCSes, your understanding is that the Department could unilaterally cut off its obligations to all purchasers, correct.?

A: Yes.

**2. DOE Attempts to Resume the DCS Process in July 2004.**

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1). Defendant also notes that this proposed finding is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required.

193. After publishing the 1995 combined APR/ACR, DOE did not publish another ACR report until 2004. (*See* 7/12/05 Pollog Testimony in *Tennessee Valley Authority v. United States*, at 1660, ENA at 820; Defendant's Response to Utility Plaintiff's Requests for

Admissions, Request to Admit 45, ENA at 2128, 2129-30; 2004 APR/ACR, ENA at 2133-2213.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. Defendant also objects to the proposed finding upon the grounds that the proposed finding is vague and unclear because the terms "the 1995 combined APR/ACR" are undefined as there were two separate 1995 APR/ACRs published and its not clear to which document plaintiff refers.

Without waiving these objections, defendant states that DOE published an APR/ACR dated July 2004.

194. In July 2004, DOE published a new combined "Acceptance Priority Ranking & Annual Capacity Report" ("2004 APR/ACR"). (*See* Acceptance Priority Ranking & Annual Capacity Report (July 2004), ENA at 2133-2213.) The 2004 APR/ACR included a proposed acceptance rate that ramped up to a steady state rate of 3,000 ton by the fifth year of operations of the repository:

| Year | SNF (MTU) |
|---|---|
| 2010 | 400 |
| 2011 | 600 |
| 2012 | 1,200 |
| 2013 | 2,000 |
| 2014 | 3,000 |
| 2015 | 3,000 |
| 2016 | 3,000 |
| 2017 | 3,000 |
| 2018 | 3,000 |
| 1019 | 3,000 |
| Total | 22,200 |

(*Id*. at 2, ENA at 2137.)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. The Annual Capacity Report issued by DOE in 2004 was issued pursuant to the requirements set forth in the Standard Contract and were part of the contractual mechanism to establish the acceptance schedule. However, the 2004 ACR is not the document that established an acceptance schedule in response to which the utilities were required to submit delivery commitment schedules if they wished to have DOE accept their SNF beginning in January 1998. Therefore, the issuance of any ACR after January 1998, and the rates contained in any such ACR, are not probative of the issues presented in our motion for summary judgment.

Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited and that the material set forth in the table is contained in the document cited. However, the 2004 ACR anticipated acceptance of SNF beginning in 2010 for delivery to a <u>repository</u>. The 1991 through 1995 ACRs anticipated acceptance of SNF beginning in 1998 for delivery to an <u>MRS</u>. The NWPA did not require DOE to have a repository available in 1998. <u>See</u> <u>Indiana Michigan Power Co. v. Dep't of Energy</u>, 88 F.3d 1272, 1276-77 (D. C. Cir. 1996). Therefore, the 2004 ACR rates are irrelevant to acceptance at an MRS in 1998.

195. On July 27, 2004, the DOE sent a letter to the utilities announcing the "resumption" of the DCS process and including copies of the 2004 APR/ACR and DCS Instructions. (*See* David K. Zabransky, Contracting Officer, Department of Energy, Sample Letter to all Contract Holders (July 27, 2004), ENA at 2214; 4/11/05 Kouts Rule 30(b)(6) Dep. at 33, ENA at 612.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. The 2004 resumption by the DOE of the DCS process is not the process that established an acceptance schedule in response to which the utilities were required to submit delivery commitment schedules if they wished to have DOE accept their SNF beginning in January 1998. Therefore, the issuance of any DOE letter after January 1998 regarding resumption of the DCS process is not probative of the issues presented in our motion for summary judgment.

Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited.

196. The July 2004 DOE letter stated that DCS 2010 submittals were due September 30, 2004, and that the submittals should be based on the 2004 APR/ACR. (*See* David K. Zabransky, Contracting Officer, Department of Energy, Sample Letter to all Contract Holders (July 27, 2004), ENA at 2214.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. The 2004 resumption by the DOE of the DCS process is not the process that established an acceptance schedule in response to which the utilities were required to submit delivery commitment schedules if they wished to have DOE accept their SNF beginning in January 1998. Therefore, the issuance of any DOE letter after January 1998 regarding resumption of the DCS process is not probative of the issues presented in our motion for summary judgment.

Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited.

197. DOE took the position that the new DCS submissions would supersede the previous DCS process, and that the new DCSs would supplant the old ones. (4/11/05 Kouts Rule 30(b)(6) Dep. at 128-29, ENA at 618.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. The 2004 resumption by the DOE of the DCS process is not the process that established an acceptance schedule in response to which the utilities were required to submit delivery commitment schedules if they wished to have DOE accept their SNF beginning in January 1998. Therefore, any DOE position regarding whether the new DCS submissions would supersede the previous DCS process, and that the new DCSs would supplant the old ones, is not probative of the issues presented in our motion for summary judgment. Defendant further objects to this proposed finding because the underlying proposition that plaintiff seeks to establish is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required. Defendant further objects to plaintiff's attempt to support its interpretation of a law by reference to deposition testimony and that testimony was subject to an objection. Rather than identifying a "fact" which could become a genuine issue of material fact, plaintiff has identified a matter of statutory interpretation as to which testimony is inadmissible. See, e.g., Berry v. City of Detroit, 25 F.3d 1342, 1353 (6th Cir. 1994) ("[i]t is the responsibility of the court, not testifying witnesses, to define legal terms").

Without waiving these objections, defendant states that the deposition testimony is not properly paraphrased. The full testimony includes the following:

Q: What is the Department's position regarding the effect that new DCS submissions would have on those old DCS submissions?

[Objection.]

A: The Department has responded to questions on that issue essentially to the extent that the former DCSs —before the Department will approve new DCSs under this or under the 2004 APR/ACR report, that essentially an agreement would need to be reached that the former DCSs were no longer under consideration.

ENA 618.

198. The DCS instructions included with the July 28, 2004 letter, stated that "[t]he DCS shall be submitted by each Purchaser with an allocation in the 2004 Acceptance Priority Ranking/Annual Capacity Report (APR/ACR) (or subsequent APR/ACRs, as appropriate) as specified in Article V.B. of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste." (*See* 2004 DCS Instructions ¶ 2, ENA at 2216.) The 2004 DCS Instructions further stated that "Purchasers shall submit DCSs at least 63 months prior to requested delivery year. . . . For each allocation listed in the 2004 APR/ACR (or subsequent APR/ACRs, as appropriate), a Purchaser must submit at least one DCS for that allocation at least 63 months prior to the date that the allocation occurs (e.g., if a Purchaser has an allocation in 2010, a DCS must be submitted for that allocation by September 30, 2004)." (*Id.* ¶ 3, ENA at 2216.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. The 2004 resumption of the DCS process is not the process that established an acceptance schedule in response to which the utilities were required to submit delivery commitment schedules if they wished to have DOE accept their SNF beginning in January 1998. Therefore, the issuance of any DOE letter, or new

DCS instructions, after January 1998 regarding resumption of the DCS process is not probative of the issues presented in our motion for summary judgment.

Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited.

199. The 2004 DCS Instructions stated that DOE would only consider DCSs submitted by Purchasers with an allocation in a given year for approval for delivery in that year. (*Id* ¶ 7, ENA at 2217.) DOE also required purchasers with previously approved DCSs to submit new DCSs "based upon the currently planned operation date of 2010." (*Id*.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. The 2004 resumption of the DCS process is not the process that established an acceptance schedule in response to which the utilities were required to submit delivery commitment schedules if they wished to have DOE accept their SNF beginning in January 1998. Therefore, the issuance of any DOE letter, or DCS instructions, after January 1998 regarding resumption of the DCS process is not probative of the issues presented in our motion for summary judgment.

Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited.

200. According to the 2004 APR/ACR, Energy Northwest's first allocation was in 2016 — the sixth year after the then projected start of program operations in 2010:

| Year | |
|---|---|
| 2016 | 10.8 |
| 2017 | 29.4 |
| 2018 | 52.5 |
| 2019 | 37.9 |
| Total | 130.7 |

(*See* July 2004 APR/ACR at p. 3, ENA at 2138.)

**RESPONSE**: Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. The 2004 resumption of the DCS process is not the process that established an acceptance schedule in response to which the utilities were required to submit delivery commitment schedules if they wished to have DOE accept their SNF beginning in January 1998. Therefore, the issuance of any DOE letter after January 1998 regarding resumption of the DCS process is not probative of the issues presented in our motion for summary judgment.

Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited. However, the 2004 ACR anticipated acceptance of SNF beginning in 2010 for delivery to a repository. The 1991 through 1995 ACRs anticipated acceptance of SNF beginning in 1998 for delivery to an MRS. The NWPA did not require DOE to have a repository available in 1998. See Indiana Michigan Power Co. v. Dep't of Energy, 88 F.3d 1272, 1276-77 (D. C. Cir. 1996). Therefore, the 2004 ACR rates are irrelevant to acceptance at an MRS in 1998.

**3. DCS Re-abandons the DCS Process By December 2004.**

**RESPONSE**: To the extent that Energy Northwest intends this heading to constitute a

proposed finding of fact, defendant objects to this proposed finding because it is without citation to authority as required by RCFC 56(h)(1). Defendant also notes that this proposed finding is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required.

201. By December 2004, DOE again abandoned the DCS process, having concluded that the resumption of the DCS process was premature." (*See* Dave Zabransky, Contracting Officer, Office of Systems Analysis and Strategic Development, Department of Energy, Letter to Ronald G. Cocherell, Southern Nuclear Operating Company, Inc. (December 1, 2004) at 1, ENA at 2264; *see also* 7/12/05 Zabransky Testimony in the *Tennessee Valley Authority v. United States* case at 1749, ENA at 983, stating that a similar letter was sent to each Contract Holder.) DOE took this action because it concluded due to various developments that it would not perform starting in 2010. (*See* 4/11/05 Kouts 30(b)(6) Dep. at 62-63, ENA at 616.)

**RESPONSE:** Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. The 2004 resumption by the DOE of the DCS process is not the process that established an acceptance schedule in response to which the utilities were required to submit delivery commitment schedules if they wished to have DOE accept their SNF beginning in January 1998. Therefore, the issuance of any DOE letter after January 1998 regarding resumption of the DCS process is not probative of the issues presented in our motion for summary judgment.

Without waiving these objections, defendant agrees that the proposed finding is supported by the documents cited.

202. DOE does not intend to "resume" the DCS process until "[a]fter the Department has determined a revised date for the initial operation of the Yucca Mountain

repository." (*See* Dave Zabransky, Contracting Officer, Office of Systems Analysis and Strategic Development, Department of Energy, Letter to Ronald G. Cocherell, Southern Nuclear Operating Company, Inc. (December 1, 2004) at 1, ENA at 2264.)

**RESPONSE:** Defendant objects to this proposed finding because it is irrelevant to the issues presented in our motion for summary judgment. The 2004 resumption by the DOE of the DCS process is not the process that established an acceptance schedule in response to which the utilities were required to submit delivery commitment schedules if they wished to have DOE accept their SNF beginning in January 1998. Therefore, the issuance of any DOE letter after January 1998 regarding resumption of the DCS process is not probative of the issues presented in our motion for summary judgment.

Without waiving these objections, defendant agrees that the proposed finding is supported by the document cited.

203. DOE's current position is that it will not begin accepting SNF until some time after 2010. (*See* 4/11/05 Kouts 30(b)(6) Dep. at 63, testifying that the DOE suspended the 2004 DCS process as "premature" because DOE no longer believed that it could be able to receive fuel in 2010," ENA at 616.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Without waiving this objection, defendant disagrees with the proposed finding because Energy Northwest has incorrectly paraphrased Mr. Kout's testimony. Defendant avers that Mr. Kouts testified as follows:

> Q: What did the Department mean by the statement that the resumption of the DCS process was premature, in the letter of December 1, 2004?

A: That the Department no longer believed that it could be able to receive fuel in 2010. Therefore, the initiation of the planning process was premature.

4/11/05 Kouts 30(b)(6) Dep. at 62-63, ENA at 616..

204. DCSs are not due until 63 months prior to a scheduled delivery. (Standard Contract Art. V.B.1, ENA at 302; 4/17/02 Zabransky Dep. at 48, 51-52, ENA at 935, 936; 4/18/02 Zabransky Dep. at 325, 419, ENA at 948, 958; 4/24/02 Klein Rule 30(b)(6) Dep. at 122-3, ENA at 577; 4/10/02 Brownstein Dep. at 367, ENA at 504; 4/21/99 Slater-Thompson Dep. at 163-64, ENA at 888; 4/11/2002 Pollog Rule 30(b)(6) Dep. at 34, ENA at 796.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Defendant further objects because the allegations contained in this paragraph are conclusions of law as to which, pursuant to RCFC 56(h)(1) and 56(h)(2), no response is required.

Without waiving this objection, defendant agrees with this proposed finding to the extent supported by the Standard Contract cited, which is the best evidence of its contents; defendant otherwise disagrees with this proposed finding. See ENA at 1603.

205. DCSs are not due at this time. (*See* 4/11/05 Kouts Rule 30(b)(6) Dep. at 19-20, ENA at 609, testifying that DOE will only request DCSs when the DOE intends to accept SNF within 63 months of the date on which it requests the DCSs be submitted.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Defendant further objects to this proposed finding upon the grounds that the proposed finding is vague and unclear because the term "at this time" is undefined.

Without waiving these objections, defendant states that DCSs are due 63 months before any date upon which a contract holder wants DOE to accept a specific amount of SNF, as

indicated in Article V of the Standard Contract.

206. The DOE's most recent pronouncements indicate that it will not begin accepting SNF until 2012 at the earliest. (Statement of Theodore J. Garrish, Deputy Director, Office of Civilian Radioactive Waste Management, U.S. Department of Energy, to the Subcommittee on Energy and Air Quality, Committee on Energy and Commerce, U.S. House of Representatives (March 10, 2005) at 4, ENA at 2294, 2297, presenting funding profiles for assumed repository start dates of 2012 and 2015; Ken Ritter, *Energy Department Official Says Yucca Project Delayed, Not Dead*, Associated Press, February 9, 2005, (available at www.signonsandiego.com/news/nation/20050209-1535-nv-yuccamountain.html), ENA at 2265, noting that then Director of DOE's Office of Civilian Radioactive Waste Management, Margaret Chu, stated that "[w]e're hoping [for]2012" as a repository start date).)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving this objection, defendant disagrees with this proposed finding because plaintiff has not fairly paraphrased the testimony of Mr. Garrish. Mr. Garrish stated: "Attached to this testimony are charts of the program's preliminary estimated ten-year funding profiles for both 2012 and 2015 assumed start dates for repository operations." ENA 2297.

**VIII. Energy Northwest Has Incurred Damages As A Result Of DOE's Failure To Perform Its Obligations Under Energy Northwest's Standard Contract.**

**<u>RESPONSE</u>**: To the extent that Energy Northwest intends this heading to constitute a proposed finding of fact, defendant objects to this proposed finding because it is without citation

to authority as required by RCFC 56(h)(1). Defendant also notes that this proposed finding is a conclusion of law as to which, pursuant to RCFC 56(h)(1) and (2), no response is required.

207. Energy Northwest owns and operates the Columbia Generating Station

("Columbia") located in Richland, Washington. Columbia is a 1,157 megawatt boiling water reactor that was licensed by the NRC in December 1983, and commenced operations in December 1984. Columbia generates electricity by using nuclear fission to generate steam which in turn drives large turbines. Nuclear fission is fueled by uranium. The fuel consists of uranium pellets, which are sealed inside of long metal rods as part of a fuel assembly. After a fuel assembly has been used to generate nuclear fission for a period of time, the uranium becomes depleted and the fuel assemblies become spent and are referred to as Spent Nuclear Fuel ("SNF"). The Columbia reactor core holds 764 fuel assemblies. (*See* Larkin Decl. ¶¶ 3-4, ENA at 354.)

**<u>RESPONSE</u>**: Defendant, which has not yet had any discovery in this case, denies this proposed finding of fact for lack of knowledge or information sufficient to form a belief as to its truth.

208. Energy Northwest stores spent fuel assemblies in a spent fuel pool. A spent fuel pool is a large pool of water which both cools the SNF assemblies and provides shielding from radiation emitted from the assemblies. SNF assemblies stored in a spent fuel pool are stored in spent fuel racks. Spent fuel racks are metal racks which contain a number of storage locations or cells that can accommodate an SNF assembly. As currently configured, Columbia's spent fuel

pool can accommodate 2,651 SNF assemblies. There are currently 1,516 SNF assemblies in Columbia's spent fuel pool. (*See* Larkin Decl. ¶ 6, ENA at 355.)

**<u>RESPONSE</u>**: Defendant, which has not yet had any discovery in this case, denies this proposed finding of fact for lack of knowledge or information sufficient to form a belief as to its truth.

209. To date, Energy Northwest has paid more than $126 million into the NWF under the Standard Contract quarterly payment provision. (*See* Larkin Decl. ¶ 21, ENA at 360.)

**<u>RESPONSE</u>:** Defendant agrees with plaintiff's proposed finding of fact.

210. DOE failed to commence removing any SNF from the nuclear utility industry by January 31, 1998; and as of this date, has not picked-up any SNF from Energy Northwest.

**<u>RESPONSE</u>**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment.

Without waiving this objection, defendant avers that DOE has not removed any of Energy Northwest's SNF pursuant to the Standard Contract.

211. In 1995 Energy Northwest conducted a study of its SNF storage options in light of DOE's announcement that it would not begin waste acceptance until 2010. In the 1995 study, which was a continuation of work already performed in the early 1990s, Energy Northwest considered various options including (1) off-site storage, (2) expansion of Columbia's existing spent fuel pool by reracking with higher density racks, and (3) construction of an Independent Spent Fuel Storage Installation, or ISFSI. This study forced Energy Northwest to expend time

and effort to study long term spent fuel options it would not have otherwise had to spend had DOE been in a position to begin accepting SNF in 1998. (*See* Larkin Decl. ¶ 14, ENA at 357-58.) Energy Northwest's David Larkin, personally spent in excess of approximately 100 hours studying spent fuel storage options for this study that he could have devoted to other responsibilities. (*Id*.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Without waiving this objection defendant, which has not yet had any discovery in this case, denies this proposed finding of fact for lack of knowledge or information sufficient to form a belief as to its truth.

212. Long-range planning regarding SNF storage is particularly necessary in light of the character of the nuclear industry, which is one of the most regulated industries in the country. As a result, any changes to plant design or operation generally require more "lead time" to analyze, license and construct than in other industries. Prudent nuclear utility business practices require the operator to consistently look forward, over a period of years to ensure that operational issues can be addressed before they adversely affect plant operations. (Larkin Decl. ¶ 15, ENA at 358.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Without waiving this objection defendant, which has not yet had any discovery in this case, denies this proposed finding of fact for lack of knowledge or information sufficient to form a belief as to its truth.

213. After considering its options, Energy Northwest ultimately determined that it would construct an ISFSI. Energy Northwest awarded a contract for ISFSI construction in 1999 and first transferred SNF assemblies from Columbia's spent fuel pool to the ISFSI in 2002. Energy Northwest transferred additional SNF assemblies in 2004. These transfers will continue until DOE begins to accept Energy Northwest's SNF. (*See* Larkin Decl. ¶ 16, ENA at 358.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Without waiving this objection defendant, which has not yet had any discovery in this case, denies this proposed finding of fact for lack of knowledge or information sufficient to form a belief as to its truth.

214. To date, Energy Northwest has spent in excess of $42 million dollars in constructing the ISFSI and loading casks. (*Id*.)

**RESPONSE**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Without waiving this objection defendant, which has not yet had any discovery in this case, denies this proposed finding of fact for lack of knowledge or information sufficient to form a belief as to its truth.

215. SNF assemblies at an ISFSI are stored in dry storage casks which are placed on a large concrete pad. In addition to the concrete pad, construction of an ISFSI also involves installation of security systems, modification of Columbia's buildings and systems to accommodate transfer of SNF to the ISFSI, and the purchase of equipment required to transfer SNF to an ISFSI. (*See* Larkin Decl. ¶ 7, ENA at 355.)

**<u>RESPONSE</u>**: Defendant objects to this proposed finding upon the grounds that it is irrelevant to the issues presented in our motion for summary judgment. Without waiving this objection defendant, which has not yet had any discovery in this case, denies this proposed finding of fact for lack of knowledge or information sufficient to form a belief as to its truth.

216. If DOE had begun accepting SNF in 1998 at an acceptance that ramped up to a steady state rate of 3,000 ton by the sixth year of operations, Energy Northwest's first acceptance allocation would have occurred in 2004. This date is consistent with the DOE's 2004 APR/ACR which, using a 3,000 ton acceptance rate, projected that the DOE would begin removing SNF from Energy Northwest by the sixth year after the DOE began removing SNF. (*See* Supko Report at 9, 11, ENA at 362, 374, 376; 2004 APR/ACR at 3, ENA at 2138; *see also* Larkin Decl. ¶ 17, ENA at 358-59.)

**<u>RESPONSE</u>**: Defendant objects to the proposed finding because it is irrelevant to the pending motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any <u>contract</u> provisions that create the obligation that plaintiff is attempting to create. Furthermore, current projections for receipt rates at the repository itself are irrelevant to the determination of the parties' intent at the time of award of the contract at issue here, or at the time of formation of the Standard Contract, and the determination of the acceptance schedule for the first 10 years established through the mechanism contained in the Standard Contract. Accordingly, they are

irrelevant to the determination of the acceptance schedule for the first 10 years established through the mechanism contained in the Standard Contract.

Without waiving these objections, defendant, which has not yet had any discovery in this case, denies the proposed finding for lack of knowledge or information sufficient to form a belief as to its truth.

217. Using a 2012 date for the start of actual SNF acceptance – a date the most recent DOE announcements appear to indicate is the earliest possible date for DOE performance – and DOE's projections for when Energy Northwest's SNF will first be removed, DOE's breach has therefore resulted in a 14-year delay – from 2004 to 2018 – of the date for first removal of Energy Northwest's SNF. Had DOE begun accepting SNF from Energy Northwest in 2004, Energy Northwest could have avoided construction of an ISFSI and instead employed far less costly means of addressing its spent fuel situation. (*See* Larkin Decl. ¶¶ 17-18, ENA at 358-59.)

**RESPONSE:** Defendant objects to the proposed finding because it is irrelevant to the pending motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to create. Furthermore, current projections for receipt rates at the repository itself are irrelevant to the determination of the parties' intent at the time of award of the contract at issue here, or at the time of formation of the Standard Contract, and the determination of the acceptance schedule for the first 10 years

established through the mechanism contained in the Standard Contract. Accordingly, they are irrelevant to the determination of the acceptance schedule for the first 10 years established through the mechanism contained in the Standard Contract.

Without waiving these objections, defendant disagrees with the proposed finding. Plaintiff's assertion that there has already been a 14-year delay from 2004 to 2018 is simply false, given that it is currently only 2005. As Mr. Kouts has previously testified, various activities, including congressional action, could permit DOE to begin SNF acceptance on a schedule other than what plaintiff proposes here. See 8/2/04 Kouts Testimony in Yankee Atomic Electric Co. v. United States, Nos. 98-126C and 98-474C, at 3558-3559, SGA 211-12.

218. Even if DOE had begun accepting SNF in 1998 at the 900 ton rate the Government has advocated in other SNF cases, followed by a transition to a 3,000 ton rate by 2015, Energy Northwest's first acceptance allocation would have occurred in 2011. (*See* Supko Rep. at 9, 12; ENA at 362, 374, 377.) Even if DOE had performed at this artificially low rate, Energy Northwest could have avoided construction of an ISFSI by adopting less costly methods of expanding SNF capacity, such as a rerack of the spent fuel pool to expand the pool capacity of the pool. (*See* Larkin Decl. ¶ 19, ENA at 359.)

**RESPONSE**: Defendant objects to the proposed finding because it is irrelevant to the pending motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any

contract provisions that create the obligation that plaintiff is attempting to create. Furthermore, current projections for receipt rates at the repository itself are irrelevant to the determination of the parties' intent at the time of award of the contract at issue here, or at the time of formation of the Standard Contract, and the determination of the acceptance schedule for the first 10 years established through the mechanism contained in the Standard Contract.

Without waiving these objections, defendant denies the proposed finding for lack of knowledge or information sufficient to form a belief as to its truth.

219. Even assuming that the DOE began accepting SNF in 1998 at a 900 ton rate and continued to accept SNF at the 900 ton rate indefinitely, a farfetched scenario that the DOE has never contemplated, and that would require the waste acceptance program to run for approximately 100 years, Energy Northwest's first acceptance allocation would have occurred in 2013. (*See* Supko Rep. at 374 n. 15 and ENPF ¶¶ 152-162.)

**RESPONSE**: Defendant objects to the proposed finding because it is irrelevant to the pending motion for summary judgment. Although DOE has had many goals and objectives regarding the program for SNF and HLW acceptance in the 20 years since the NWPA was enacted, the goals and objectives to which plaintiff cites were never incorporated into the Standard Contract or made contractually binding obligations. Plaintiff has failed to identify any contract provisions that create the obligation that plaintiff is attempting to create. Furthermore, current projections for receipt rates at the repository itself are irrelevant to the determination of the parties' intent at the time of award of the contract at issue here, or at the time of formation of

the Standard Contract, and the determination of the acceptance schedule for the first 10 years established through the mechanism contained in the Standard Contract.

Without waiving these objections, defendant, which has not yet had any discovery in this case, denies the proposed finding for lack of knowledge or information sufficient to form a belief as to its truth.

220. In the 1995 Study of its SNF storage options Energy Northwest considered performing a rerack, which it determined was technically feasible and would cost less than constructing an ISFSI. However, Energy Northwest concluded, given DOE's statement that it would not begin removing SNF from any utility until at least 2010, that a rerack would not be cost-effective because Energy Northwest would still have to construct an ISFSI to store SNF before DOE began removing SNF from Energy Northwest. (Larkin Decl. ¶ 19, ENA at 359.)

**RESPONSE**: Defendant, which has not yet had any discovery in this case, denies the proposed finding for lack of knowledge or information sufficient to form a belief as to its truth.

221. Energy Northwest would not have had to construct an ISFSI if DOE had begun performance in 1998. However, even assuming that Energy Northwest had still decided to build an ISFSI if DOE had begun performing in 1998, Energy Northwest would have designed and built a smaller ISFSI than it ultimately built at Columbia. The size of the ISFSI that Energy Northwest built was based upon the fact that DOE had announced it would not begin to remove SNF from any utility until at least 2010. In addition, based upon the same assumptions regarding DOE's non-performance, as part of the original design of the ISFSI, Energy Northwest designed

an expansion of the ISFSI consisting of additional concrete pads, and the Company subsequently had the sites for the additional pads graded and prepared. Had DOE removed SNF starting in 1998 at either a 3,000 ton or 900 ton acceptance rate, Energy Northwest could have constructed a smaller ISFSI, at considerable savings to the Company, because it would not have needed to store as much SNF, and would not have had to spend money on the design and site preparation costs associated with the ISFSI expansion. (*See* Larkin Decl. ¶ 20, ENA at 359-360.)

**RESPONSE**: Defendant, which has not yet had any discovery in this case, denies the proposed finding for lack of knowledge or information sufficient to form a belief as to its truth.

Respectfully submitted,
PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Sharon A. Snyder
SHARON A. SNYDER
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
1100 L Street, N.W.

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.

Washington, D.C. 20585

October 3, 2005

ATTN: Classification Unit, 8th Floor
Washington, D.C. 20530
Tel: 202-616-0347
Fax: 202-307-2503

CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2005, a copy of the foregoing "DEFENDANT'S RESPONSES TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Sharon A. Snyder