# In the United States Court of Federal Claims

No. 04-10 C
(Filed: January 30, 2006)

| | | |
|---|---|---|
| **ENERGY NORTHWEST,** Plaintiff, v. **THE UNITED STATES,** Defendant. | * | Spent Nuclear Fuel (SNF); Nuclear Waste Policy Act; Standard Contract; Contract Liability; Rate of Acceptance; Pre-Breach Mitigation Damages; Unavoidable Delay |

*Norman M. Hirsch*, Jenner & Block LLP, Chicago, IL, counsel of record for Plaintiff; of counsel were *William D. Heinz*, *David Jimenez-Ekman*, *Lisa M. Eddington*, *Christopher Tompkins*, and *Nada Djordjevic*, Jenner & Block LLP, Chicago, IL, and *David A. Handzo*, Jenner & Block LLP, Washington, DC.

*Sharon A. Snyder*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, counsel of record for Defendant, with whom were *Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, and *Harold D. Lester, Jr.*, Assistant Director, United States Department of Justice; of counsel was *Jane K. Taylor*, Office of General Counsel, Department of Energy, Washington, DC.

## OPINION AND ORDER

**DAMICH**, Chief Judge.

## I. INTRODUCTION

This case is one of 66 cases filed by nuclear utilities in the Court of Federal Claims regarding Defendant's compliance with the "Standard Contract"[1] issued pursuant to the Nuclear

[1] "Standard Contract for the Disposal of Spent Nuclear Fuel And/Or High-Level Radioactive Waste," published at 10 C.F.R. § 961.11.

Waste Policy Act of 1982, 42 U.S.C. §§ 10101-10270. The Standard Contract provides for the government's acceptance, transportation, storage, and disposal of spent nuclear fuel (SNF) and other high-level radioactive waste (HLW),[2] the costs of which would be borne by the "generators and owners" thereof. *Id*. at § 10131(b).

On May 9, 2005, the court ordered the parties to show cause why the same holding as to contract liability rendered against the government in *Consumers Energy Co. v. United States*, 65 Fed. Cl. 364 (2005), "should not apply in this case as well." *Energy Northwest v. United States*, No. 04-10C (Fed. Cir. May 9, 2005) (order to show cause). In *Consumers Energy*, this court found that the government's delay in accepting any SNF "negatively implicated the acceptance dates of every contract holder down the line" and granted summary judgment for Plaintiff on liability on breach of contract. 65 Fed. Cl. at 375.

In conjunction with its response to the court's order, Defendant affirmatively moved for summary judgment in its favor that "Energy Northwest's breach of contract claim fails as a matter of law."[3] For the reasons discussed below, the court **DENIES** Defendant's motion for summary judgment and **ORDERS** the Clerk of the Court to enter judgment for Plaintiff on the issue of contractual liability.

## II. BACKGROUND

The background of the SNF cases has been well outlined in numerous other opinions. *See Indiana Michigan Power Company v. United States*, 422 F.3d 1369, 1371-72 (Fed. Cir. 2005), *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1337-40 (Fed. Cir. 2000), *Indiana Michigan Power Co. v. United States*, 88 F.3d 1272, 1273-74 (D.C. Cir. 1996), and *Consumers Energy v. United States*, 65 Fed.Cl. at 365-66.

When Congress passed the Nuclear Waste Policy Act of 1982 ("the Act"), 42 U.S.C. §§ 10101-10270 (2000), it recognized that SNF represents a "national problem" and that "the Federal Government has the responsibility to provide for the permanent disposal of [SNF] . . . in order to protect the public health and safety." *Id*. at § 10131(a)(2) & (4). While recognizing the federal government's responsibility to dispose of the SNF, Congress also mandated that "the costs of such disposal should be the responsibility of the generators and owners of such waste and spent fuel." *Id*. at § 10131(a)(4).

---

[2] For ease of discussion, the court shall refer hereafter to both spent nuclear fuel and high-level waste as "SNF." The distinction between these materials is not pertinent to the question of liability at issue here.

[3] This court had hoped that the issue of liability could have been addressed more efficiently by the parties' responses to the show cause order without the "usual full briefing," as the court noted at a status conference in this case on March 30, 2005. *Energy Northwest v. United States*, Tr. 25:4-6, March 30, 2005.

The Act authorized the Secretary of Energy to "enter into contracts with any person who generates or holds title to [SNF] . . . for the acceptance of title, subsequent transportation, and disposal of such waste or spent fuel." *Id*. at § 10222(a)(1). The Act further specified that, in return for the payment of fees, the federal government must begin disposing of SNF no later than January 31, 1998. *Id*. at § 10222(a)(5).

Pursuant to the Act, the Department of Energy (DOE) promulgated the Standard Contract,[4] which Plaintiff signed on June 13, 1983. Compl. ¶¶ 1, 12. The Contract sets out the government's responsibility to accept, transport, and dispose of SNF and specifies that "[t]he services to be provided by DOE under this contract shall begin . . . not later than January 31, 1998." 10 C.F.R. § 961.11, Art. II.

On May 25, 1994, DOE's Office of Civilian Radioactive Waste Management promulgated a Notice of Inquiry, advising the utilities that it "currently projects that the earliest possible date for acceptance of [SNF] for disposal . . . is 2010." 59 Fed. Reg. 27007-02, 27007-08 (1994). One year later, in a "final interpretation of nuclear waste acceptance issues," the same office advised that it "has become apparent that neither a repository nor an interim storage facility under the Act will be available by 1998. DOE currently projects that the earliest possible date for acceptance of waste for disposal at a repository is 2010." 60 Fed. Reg. 21793-02, 21794 (1995).

Plaintiff here owns and operates the Columbia Generating Station, a nuclear electricity generating facility located near Richland, Washington. Compl. ¶ 4. SNF generated at the plant is currently stored on site. *Id*. It is not disputed that Plaintiff has paid all of the fees required under the contract. Def.'s Resp. to Ct.'s Order to Show Cause and Mot. for Summ. J. at 3 [hereinafter Def.'s Resp. and Mot.]. To date, Defendant has not accepted SNF under the Act from any of the nuclear utilities. *See* Compl. ¶ 1, Answer ¶ 39; *See also Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1338 (Fed. Cir. 2000).

## III. STANDARD OF REVIEW

Summary judgment "is a salutary method of disposition 'designed to secure the just, speedy and inexpensive determination of every action.'" *Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.*, 833 F.2d 1560, 1562 (Fed. Cir. 1987) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)); *see also Quad Environmental Technologies Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 872 (Fed. Cir. 1991) ("The process of summary judgment is a salutary means

[4] The Standard Contract served as a template for the individual contracts between the utilities and DOE. In every material respect, there is no difference between the Standard Contract and Plaintiff's contract in particular. The court's references herein to the "Standard Contract" or the "Contract" shall be construed to encompass Plaintiff's individual contract as well.

of avoiding an unnecessary trial when the movant is clearly entitled to judgment as a matter of law.").

Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC"), like its counterpart in the Federal Rules of Civil Procedure, instructs the Court to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See also Mingus Constr., Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987) ("Summary judgment is properly granted only where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."). Furthermore, "summary judgment . . . may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." RCFC 56(c).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact." *Mingus*, 812 F.2d at 1390. Once the moving party makes such a showing, the burden shifts to the non-moving party to "designate specific facts showing that there is a genuine issue for trial." *Novartis Corp. v. Ben Venue Laboratories*, 271 F.3d 1043, 1046 (Fed. Cir. 2001). In evaluating the motion, the Court must view the facts "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## IV. DISCUSSION

This court's finding of contractual liability against the government in *Consumers Energy* takes as its foundation the decision of the Court of Appeals for the Federal Circuit in *Maine Yankee*, in which the appellate court held, "Congress found this objective [beginning SNF disposal by January 31, 1998] so important when it promulgated the Act that it took the unusual action of specifying that all the contracts must contain this explicit reference. *The breach involved all the utilities that had signed the contract – the entire nuclear electric industry.*" *Maine Yankee*, 225 F.3d at 1341-42 (emphasis added). Thus, despite the government's argument that Consumers Energy's own delivery commitment schedules (DCSs) did not call for SNF delivery until an unspecified time in "1999," this court found that the government's liability began as of January 31, 1998. This earlier date of the accrual of contractual liability stems from a recognition of the Standard Contract's acceptance priority ranking on the basis of "oldest fuel first," necessarily creating a queue for all the nuclear utilities' SNF. "[A]ny delay in the start of DOE's SNF acceptance as of January 31, 1998, negatively implicated the acceptance dates of every contract holder down the line." *Consumers Energy*, 65 Fed. Cl. at 375.

Here, the government attempts to distinguish the court's finding in *Consumers Energy* by narrowing the grounds for the court's rationale to the fact that DOE at least had approved that utility's DCSs for SNF acceptance in 1999. Energy Northwest by contrast had no allocation rights in the queue for SNF acceptance, according to the government, "within at least the first ten years of performance," based on the interplay of DOE's acceptance priority ranking and the government's premise of a 900-metric tons of uranium (MTU) annual SNF acceptance rate (and

based as well on Plaintiff's failure to propose DCSs requesting an exception to its lower place in the queue). Without any approved DCSs, the government avers, Energy Northwest was effectively not in the allocation queue, so that a delay in the general industry start date of January 31, 1998, would not necessarily have "negatively implicated" Plaintiff's SNF acceptance. Because there was such a long duration between the government's general obligation to the industry to begin SNF acceptance at the end of January 1998 and the earliest occasion that Plaintiff could have obtained allocation rights under the contractual queue-based DCS process, "DOE has not breached its obligations under the Standard Contract to accept Energy Northwest's SNF, and, thus, Energy Northwest's right to sue for breach of contract has not yet accrued." Def.'s Resp. and Mot. at 3.

Defendant's argument fails for a combination of overlapping reasons, as it: 1) too narrowly construes this court's holding in *Consumers Energy* with regard to the DCS process and overlooks the court's finding therein that DOE had effectively suspended the DCS process in the late 1990s; 2) disregards the Federal Circuit's explicit statement that DOE's failure to begin SNF acceptance as of January 31, 1998, breached the contracts of *every* nuclear utility; 3) assumes an acceptance rate that this court has elsewhere concluded presents a fact-laden inquiry not appropriate for summary judgment; 4) gives short shrift to Plaintiff's claim of pre-breach mitigation expenses; and 5) unnecessarily conflates the inquiry into quantum of damages (in which Plaintiff must prove foreseeability, causation, and reasonableness) and the instant question of contractual liability.

When this court held in *Consumers Energy* that the government was liable for breach of contract, it did not base its holding specifically on the fact the plaintiff there had submitted and obtained DOE's approval of DCSs setting a date for first delivery of its SNF. Nor did this court require Consumers Energy to prove its damages concurrent with its motion for summary judgment on liability. "[T]he inquiry for determining Plaintiff's recoverable damages is a factual matter for trial at a later occasion." 65 Fed. Cl. at 375. Rather, this court followed the clear guidance of the Federal Circuit in *Maine Yankee* that the government breached *every* utility's contract when it failed to begin SNF acceptance as of January 31, 1998. *Maine Yankee*, 225 F.3d at 1341-42.[5]

---

[5] The Federal Circuit's finding of government liability was held sufficiently clear to warrant a succinct two-sentence order in *Indiana Michigan Power Co. v. United States*, No. 98-486C (Fed. Cl. Jan 17, 2003): "Whether styled as a motion for summary judgment or a motion for the Government to acknowledge liability, it seems clear that decisions by the Federal Circuit establish liability against the United States. Therefore, we direct that the Clerk enter judgment for plaintiff on the issue of liability." Indeed, the Federal Circuit subsequently cited, with no demurral, the trial court's liability order in the appeal of *Indiana Michigan*, 422 F.3d 1369, 1372-73 (Fed. Cir. 2005).

*See also System Fuels Inc. v. United States*, 66 Fed. Cl. 722, 729 n.8 (2005) (citing Court of Federal Claims opinions on liability in SNF cases based on Federal Circuit precedent in *Maine*

The government argues, however, that Energy Northwest's earliest SNF acceptance date, under the oldest-fuel-first priority ranking, would not have occurred until more than 10 years after DOE was to have begun overall SNF acceptance under the Standard Contract. This calculation assumes a 900 MTU rate of acceptance, in contrast to a 3,000 MTU rate that Plaintiff (and, apparently, the industry in general) argues was intended.[6] Because Energy Northwest's SNF acceptance date was so far off into the future, DOE's delay at the start of the queue would not necessarily have rippled down the line to Energy Northwest because "it is quite possible that, after DOE eventually begins SNF acceptance, it will be able to increase the speed of its SNF acceptance beyond that which it is otherwise obligated to satisfy, enabling it to 'catch up' to the place where it should have been had it timely begun SNF acceptance." Def.'s Resp. and Mot. at 17. Even at the 900 MTU rate, Defendant's scenario to explain away the "down the line" effect on Energy Northwest's acceptance date is much too speculative to warrant the government's conclusion that Plaintiff has proferred no basis for any injury in fact.

Moreover, if the acceptance rate were 3,000 MTU per year, according to Plaintiff's calculations, its right to SNF acceptance under the general ranking would have begun in 2004. App. to Pl.'s Resp. to the Ct.'s Order to Show Cause and Mem. in Opp'n to Def.'s Mot. Summ. J. at 361-76 (hereinafter Pl.'s App.). This earlier acceptance date would conceivably buttress the reasonableness of Plaintiff's claim of pre-breach expenses in mitigation of the government's failure even to begin the SNF acceptance process in 1998. Regardless, this court has already found that the rate of acceptance is "a fact-laden inquiry that the Court finds does not lend itself to resolution on summary judgment." *Power Authority of New York v. United States*, No. 00-703 (Fed. Cl. Sept. 30, 2004).

The government makes a great deal of Plaintiff's failure to have submitted DCSs seeking any earlier SNF acceptance date. However, as this court noted in *Consumers Energy*, "Defendant plainly abandoned the DCS process prior to January 31, 1998." 65 Fed. Cl. at 370. *See also* Pl.'s App. at 356-57; *System Fuels Inc.*, 66 Fed. Cl. at 731 ("In fact, DOE unilaterally refused in 1996 to approve or disapprove any new DCSs and voided the DCSs from utilities that previously had been approved."). Because the DCS process was abandoned by the government, the court is not persuaded that Plaintiff's failure to have submitted DCSs at least 63 months in advance of its arguable 2004 acceptance date (as required by Article V.B. of the Standard Contract) should serve so conveniently to shield the government from contract liability.

---

*Yankee*).

[6] No particular acceptance rate is specified in the Standard Contract. Given the oldest-fuel-first priority ranking (although subject to certain exceptions), the rate of SNF acceptance has a direct bearing on the timetable for the earliest acceptance of a given utility's SNF. The greater the amount of SNF that DOE was obliged to accept industry-wide per year, the sooner any particular utility would be relieved of its burden of providing storage.

In any event, the essential question that remains is whether Plaintiff has sufficiently demonstrated evidence of injury such that liability is not simply an academic exercise. *Cosmo Constr. Co. v. United States*, 196 Ct. Cl. 463, 451 F.2d 602, 605-06 (1971) ("[T]here must be *some* evidence of damage to support a finding of liability. But that evidence [need only be] sufficient to demonstrate that the issue of liability is not purely academic; that some damage has been incurred.") (emphasis in original, footnote omitted). In addition to the storage costs that it arguably would not have incurred had DOE begun acceptance of Energy Northwest's SNF by 2004 (or even at a later date), Plaintiff has more than sufficiently alleged expenses – incurred prior to the industry-wide acceptance start date in 1998 – to plan and develop expanded and/or alternative storage capacity. Pl.'s App. at 357-58. Plaintiff attributes these pre-1998 expenses to DOE's announcement in the mid-1990s that it would not begin SNF acceptance until 2010 at the earliest. "DOE currently projects that the earliest possible date for acceptance of waste for disposal at a repository is 2010." 60 Fed. Reg. at 21794 (1995). Plaintiff's claim for pre-breach mitigation damages is sustainable as a matter of law, if not yet proven in fact. *Indiana Michigan Power Co.*, 422 F.3d at 1375 ("[W]e see no reason why efforts to avoid damages in contemplation of a partial breach should not also be recoverable.").

The issues that the government raises in its response to the court's show cause order and in its own motion for summary judgment – Plaintiff's earliest possible acceptance date, Plaintiff's failure to have submitted any DCSs, the appropriate rate of acceptance, the nexus of any of Plaintiff's alleged pre-breach mitigation expenses (and the reasonableness thereof) to DOE's failure to begin general acceptance in 1998 – are disputed questions of fact that go to damages, but are not material to the preliminary question of contractual liability. Not only is such liability clear from the decision of the Federal Circuit in *Maine Yankee*, 225 F.3d at 1337-40,[7] but also in the appellate court's more recent *Indiana Michigan* decision. In speaking of the nuclear utilities' "pecuniary" losses and exacerbated environmental responsibility as consequences of the government's breach beginning January 31, 1998, the court noted, "It is beyond debate that because the government unequivocally announced in 1994 that it would not meet its contractual obligations beginning in 1998, the utilities were in fact obligated to take mitigatory steps." *Indiana Michigan*, 422 F.3d at 1375. Inherent in the court's holding – affirming the recoverability of pre-breach mitigation damages in a partial breach of contract claim – is a recognition of the contractual liability of the government industry-wide as of the date set in the Standard Contract for the beginning of SNF acceptance, i.e., January 31, 1998.[8]

---

[7] See also *Northern States Power Co. v. United States*, 224 F.3d 1361, 1367 (Fed. Cir. 2000) (referring to the government's "failure to begin performance at all by the statutory and contractual deadline of January 31, 1998.").

[8] The court is cognizant of the government's contention that the Federal Circuit's decisions in *Maine Yankee* and *Northern States* did not dispositively address issues concerning liability that the government proposes to advance based on the unavoidable delay clause of the Standard Contract, Article IX.A. *See* Defendant's Response to the Court's October 5, 2005 Order, filed October 13, 2005, in *Nebraska Public Power Dist. v. United States*, No. 01-116 C

## VI. CONCLUSION

For the reasons discussed above, the court **DENIES** Defendant's motion for summary judgment and finds that Defendant breached its contract with Energy Northwest as of January 31, 1998, when it failed to begin accepting SNF from the nuclear utility industry on that date. The quantum of Plaintiff's damages will be addressed in further proceedings. The Clerk of the Court is directed to enter summary judgment in favor of Plaintiff and against the government on the issue of contractual liability.

s/ Edward J. Damich
EDWARD J. DAMICH
Chief Judge

---

(Judge Allegra). The government avers that a mandamus order prohibiting argument against liability based on the unavoidable delay clause, issued by the United States Court of Appeals for the D.C. Circuit in *Northern States Power Co. v. Dep't of Energy*, 128 F.3d 754, 760 (D.C. Cir. 1997), exceeded that court's jurisdiction. The government's arguments regarding the proper scope of the D.C. Circuit's jurisdiction in *Northern States* are presently before the Federal Circuit in *PSEG Nuclear, L.L.C., et al., v. United States*, No. 05-5162. However, unless and until the Federal Circuit reopens the issue of contractual liability, its decisions in *Maine Yankee* and *Indiana Michigan* clearly establish such liability.