**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# APPENDIX TO RESPONSE TO DEFENDANT'S MOTION FOR A PROTECTIVE ORDER

---

NORMAN M. HIRSCH
Jenner & Block LLP
One IBM Plaza
330 N. Wabash
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

OF COUNSEL:
WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block, LLC
601 Thirteenth Street, N.W.
Suite 1200 South
Washington, D.C. 20005
(202) 639-6000 (tel.)
(202) 639-6066 (fax)

October 1, 2007

*Attorneys for Plaintiff*

## Table Of Contents To Appendix

Letter from N. Hirsch to S. Snyder (July 3, 2007) .......... A.1

Energy Northwest Rule 30(b)(6) Notice of Deposition (July 3, 2007) .......... A.2

Plaintiff's First Set of Requests For Admission (July 3, 2007) .......... A.7

Letter from S. Orfield to N. Hirsch (July 19, 2007) .......... A.19

Letter from D. Jiménez-Ekman to S. Orfield (July 26, 2007) .......... A.23

Defendant's Response to Plaintiff's First Set of Requests To Admit (August 24, 2007) .......... A.25

*Energy Northwest v. United States*, No. 04-10C (Fed. Cl. May 12, 2004) .......... A.43

JENNER&BLOCK

Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611-7603
Tel 312 222-9350
www.jenner.com

Chicago
Dallas
New York
Washington, DC

Norman M. Hirsch
Tel 312 923-2782
Fax 312 840-7782
nhirsch@jenner.com

July 3, 2007

**VIA HAND DELIVERY**

Sharon A. Snyder
Attorney
U.S. Department of Justice
Commercial Litigation Section
1100 L Street, N.W.
Room 12068
Washington, D.C. 20005

***Re:*** ***Energy Northwest v. United States***
Case No. 04-010

Dear Sharon:

Enclosed please find Energy Northwest's First Set Of Requests For Admission and a Notice Of Deposition pursuant to RCFC 30(b)(6), which we are serving in the referenced case.

Please note that our Requests For Admission cover some of the same topics included in our Notice Of Deposition and, depending on the Government's responses to the Requests For Admission, we may be willing to eliminate some of those topics from our deposition notice.

Please call me regarding these matters so we can discuss potential dates for the 30(b)(6) deposition.

Sincerely,

Norman M. Hirsch

NMH:ct

cc: David Jiménez-Ekman
Christopher Tompkins

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENERGY NORTHWEST, | ) | |
| | ) | |
| Plaintiff, | ) | No. 04-0010C |
| | ) | |
| v. | ) | Chief Judge Damich |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## RULE 30(B)(6) NOTICE OF DEPOSITION

Please take notice that pursuant to RCFC 30(b)(6), the plaintiff, Energy Northwest, will take the deposition of the United States, or the person or persons designated by the United States, upon oral examination before an officer authorized by law to administer oaths commencing on July 31, 2007 at the offices of Jenner & Block LLP, 601 Thirteenth Street, NW, Washington, D.C., 20005, or at a time and place agreed upon by counsel for the parties, and continuing from day to day until completed. Pursuant to RCFC 30(b)(6), Energy Northwest requests that the Government designate a representative to testify regarding the subjects listed on Exhibit A.

Dated: July 3, 2007

Respectfully submitted,

NORMAN M. HIRSCH
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611
(312) 923-2782 telephone
(312) 840-7782 facsimile

OF COUNSEL:

David A. Handzo
Jenner & Block LLP
601 Thirteenth Street, N.W.
Washington, D.C. 20005

(202) 639-6000

William D. Heinz
David Jiménez-Ekman
Christopher Tompkins
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611
(312) 222-9350

*Attorneys for Plaintiff*

**Exhibit A**

1. The SNF acceptance rate at which DOE would have performed had it commenced waste acceptance under the Standard Contract on January 31, 1998, including without limitation, Energy Northwest's acceptance allocations under that rate.

2. The SNF acceptance rate at which DOE would have performed after the ten year period reflected in the 1991 Annual Capacity Report assuming that DOE commenced waste acceptance under the Standard Contract on January 31, 1998.

3. The basis for the acceptance rate contained in the "Preliminary Estimates of the Total-System Cost For The Restructured Program: An Addendum To The May 1989 Analysis Of The Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program" (DOE/RW-0295P).

4. The earliest date on which DOE will commence acceptance of SNF under the Standard Contract, including without limitation, DOE announcements that the earliest possible date for waste acceptance is 2017.

5. The type of casks and any other ancillary equipment DOE would have used to accept SNF from Energy Northwest under the Standard Contract had it commenced performance on January 31, 1998, including without limitation: (a) the capacity of the cask in number of SNF assemblies; (b) the weight of the cask prior to loading; (c) the approximate weight of the cask when fully loaded with SNF assemblies; and (d) whether the cask closure would have been bolted or welded.

6. The type of casks and any other ancillary equipment DOE will use to accept SNF from Energy Northwest under the Standard Contract after it commences performance, including without limitation: (a) the capacity of the cask in number of SNF assemblies; (b) the weight of the cask prior to loading; (c) the approximate weight of the cask when fully loaded with SNF assemblies; and (d) whether the cask closure will be bolted or welded.

7. DOE's position regarding the reasonableness or unreasonableness of Energy Northwest's decision to adopt and implement dry storage for its spent fuel.

8. The 1987 Nuclear Waste Policy Amendments Act and its effect on the civilian radioactive waste management program, including without limitation the (a) effect on DOE's plans to site, license, construct a geologic repository, and (b) effect on DOE's plans to site, license, construct a monitored retrievable storage facility.

9. DOE's efforts to seek modification of any provision of the Nuclear Waste Policy Amendments Act of 1987 limiting the capacity of a Monitored Retrievable Storage facility or linking the schedule of such a facility to the schedule for a repository.

10. Efforts to site a Monitored Retrievable Storage facility between 1989 and 1995, including without limitation, the efforts of the Nuclear Waste Negotiator to site a Monitored Retrievable Storage facility.

11. DOE's position on whether DOE will accept SNF loaded into multi-purpose cannisters ("MPC"), including without limitation, the Holtec MPC utilized by Energy Northwest.

## CERTIFICATE OF SERVICE

I certify under penalty of perjury that, on this 3rd day of July, 2007, I caused to be served by hand delivery a copy of the foregoing Rule 30(b)(6) Notice of Deposition addressed as follows:

Sharon A. Snyder
U.S. Department of Justice
Commercial Litigation Branch, Civil Division
Attn: Classification Unit
Eighth Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-0347 (Tel.)
(202) 307-2503 (Fax)

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ENERGY NORTHWEST, | ) | |
| | ) | |
| Plaintiff, | ) | No. 04-0010C |
| | ) | |
| v. | ) | Chief Judge Damich |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION**

Plaintiff Energy Northwest, by its attorneys, pursuant to RCFC 36, hereby requests that you serve responses to the following requests for admission within 30 days after the service hereof.

**DEFINITIONS AND INSTRUCTIONS**

**A. Definitions**

1. "Acceptance Rate" means the aggregate pace or rate at which DOE takes delivery of spent nuclear fuel and/or High Level Radioactive Waste from Purchasers pursuant to the Standard Contract.

2. "Document" or "Documents" shall be construed in the broadest sense possible under RCFC 34 and shall include all writings as that term is defined in Federal Rule of Evidence 1001, and all written, typed, printed, recorded, graphic, computer-generated, or other matter of any kind from which information can be derived, whether produced, reproduced, or stored, on paper, cards, tape, film, electronic facsimile, computer storage devices, or any other medium in DOE's possession, custody or control, or whose existence is or was ever known to DOE, including but not limited to: correspondence, letters, notes, memoranda, appointment calendars, schedules, telegrams, telexes, facsimiles, electronic mail, press releases, notices, brochures, pamphlets, guidelines, manuals, instructions, summaries or abstracts, diaries, notebooks,

minutes, computer printouts or information stored in computer-readable form, tests, reports, files, file jackets, analyses, studies, testimony, speeches, worksheets, invoices, bills, written estimates, contracts, agreements of any kind, purchase orders, change orders, plans, charts, diagrams, drawings, graphs, designs, blueprints, tables, photographs, books, articles, or extracts from any of the foregoing, and any other writings or documentary materials of any nature whatsoever, whether or not divulged to other parties, together with any attachments thereto and enclosures therewith.

"Document" encompasses all forms and manifestations of electronically or optically coded, stored, and/or retrievable information, included but not limited to "e-mail," digital images and graphics, digital or analog audio tapes and files, and digital or analog video tapes and files. The term "document" or "documents" shall also include any preliminary drafts of any documents or any working papers related thereto, and specifically includes internal memoranda. If a document responsive to any request for production was, but no longer is, in DOE's possession and control, describe in detail the contents of the document, its date of creation and disposition, and its present location and custodian.

3. "DOE" or "Government" shall mean the United States Department of Energy as well as its predecessors, including without limitation, the United States Atomic Energy Commission, the Office of Civilian Radioactive Waste Management, the Office of Nuclear Waste Storage Investigations, and the Office of Nuclear Energy, as well as all offices, divisions or departments, officials, directors, officers, employees, agents, contractors, subcontractors and other representatives, past or present, thereof.

4. "NRC" means the Nuclear Regulatory Commission.

5. "Individual" or "person" means any natural person, corporation (private or governmental), subsidiaries, syndicate, trust, partnership, proprietorship, firm, group, association, joint venture, governmental or other public entity or agency, or any other form of organization or legal entity, including all respective officials, directors, officers, employees, representatives, independent contractors, investigators, consultants, agencies, or agents, whether or not still alive or in existence.

6. "NWPA" means the Nuclear Waste Policy Act of 1982, codified at 42 U.S.C. § 10101 et seq., as well as any amendment(s) thereto.

7. "Purchaser" means an owner or generator of SNF that has executed a Standard Contract with DOE.

8. "Relating to" or "relates to" means containing, constituting, discussing, describing, identifying, referring to, supporting, explaining, contradicting and/or in any way pertaining to the subject specified.

9. "SNF" means spent nuclear fuel as that term is defined in the Standard Contract and for purpose of these requests also includes the term High Level Radioactive Waste ("HLW") as it is defined in the Standard Contract.

10. "HLW" means High Level Radioactive Waste as it is defined in the Standard Contract.

11. "Standard Contract" means the Standard Contract for the Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste set forth in 10 C.F.R. Part 961, pursuant to which DOE is to accept and dispose of spent nuclear fuel and/or high-level radioactive waste delivered to DOE by those owners or generators of such fuel or waste who executed the contract.

12. "Energy Northwest's Standard Contract" means Standard Contract for the Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste No. DE-CR01-83NE44424 between Washington Public Power Supply System, and DOE dated June 13, 1983.

13. "Utility Plaintiffs" means any party or former party to a Standard Contract that has brought suit in the United States Court of Federal Claims for breach of the Standard Contract, including without limitation: Arizona Public Service Company, Atlantic City Electric Co., Boston Edison Co., BWX Tech, Inc., Canal Electric Co., Carolina Power & Light Company, Florida Power Corporation, Cleveland Electric Illuminating Co., Commonwealth Edison Co., Connecticut Yankee Atomic Power Co., Consolidated Edison Co. of New York, Inc., Constellation Generation Group, LLC, Calvert Cliffs Nuclear Power Plant, Inc., Nine Mile Point Nuclear Station, LLC, Consumers Energy Co., Dairyland Power Cooperative, Delmarva Power and Light Co., Detroit Edison Co., Dominion Resources, Inc., Dominion Nuclear Connecticut, Inc., Dominion Resources, Inc., Virginia Electric and Power Company, Duke Power, Energy Northwest, Entergy Gulf States, Inc., Entergy Nuclear Fitzpatrick, LLC, Entergy Nuclear Indian Point 3, LLC, Entergy Nuclear Operations, Inc., Entergy Nuclear Generation Company, Entergy Nuclear Indian Point 2, LLC, Entergy Nuclear Vermont Yankee, LLC, Entergy Nuclear Operations, Inc., Exelon Generation Company, LLC, Exelon Generation Company, LLC, Exelon Generation Company, LLC, AmerGen Energy Company, LLC, Florida Power & Light Co., FPL Energy Seabrook, LLC, GPU Nuclear, Inc., General Atomics, General Electric Company, General Electric Company, Illinois Power Company, Indiana Michigan Power Co., Interstate Power and Light Company, Kansas Gas & Electric Company, Maine Yankee Atomic Power Co., Nebraska Public Power District, Niagara Mohawk Power Corporation, Niagara Mohawk, Rochester Gas & Electric Company, New York State Electric & Gas Company, Central Hudson

Gas & Electric Corporation, Northern States Power Co., Omaha Public Power District, Pacific Gas & Electric Company, Pacific Gas & Electric Company, Portland General Electric Co., PPL Susquehanna, LLC, PSEG Nuclear LLC, Power Authority of New York, Rochester Gas & Electric Corporation, Sacramento Municipal Utility District, South Carolina Electric & Gas Company, Southern California Edison Company, Southern Nuclear Operating Co. et al., System Fuels Inc., on its own behalf and as agent for Entergy Arkansas, Inc., System Fuels Inc., on its own behalf and as agent for Entergy Louisiana, Inc., System Fuels Inc., on its own behalf and as agent for System Energy Resources, Inc. and South Mississippi Electric Power Association, Tennessee Valley Authority, Texas Genco, LP, TXU Generation Company, Union Electric Company, United Illuminating Co., Vermont Yankee Nuclear Power Corp., Wisconsin Electric Power Co., Wisconsin Public Service Corporation, and Yankee Atomic Electric Co.

14. "Spent Fuel Litigation" refers to lawsuits brought by the Utility Plaintiffs in the United States Court of Federal Claims for breach of a Standard Contract.

**B. <u>Instructions</u>**

1. Respond to each request for admission separately, completely and in writing. Your response shall comply, in all respects, with the requirements of RCFC 36.

2. If any objections are made to any of these requests for admission, set forth the legal and factual basis for the objection.

3. Your answer to each request for admission shall either admit or specifically deny the matter. Pursuant to RCFC 36(a), if you cannot specifically admit or deny the matter, you shall set forth in detail the reasons why you cannot truthfully admit or deny the matter.

4. Pursuant to RCFC 36(a), if you cannot in good faith admit the entire matter requested, you shall specify so much of the matter as can be admitted and qualify or deny the remainder.

5. Pursuant to RCFC 26(e) you are required to revise your answers and objections in a timely fashion upon the discovery of any new information that would, if you possessed it at the time of your initial response, cause you to respond differently in any way.

6. The singular and plural forms of any word are interchangeable.

## REQUESTS FOR ADMISSION

**Request No. 1.**

Admit that the Standard Contract does not contain any specific term identifying a numerical Acceptance Rate that will apply to the Government's performance under the Contract.

**Request No. 2.**

Admit that as of the date of your answer, the earliest date on which DOE will begin acceptance of SNF and/or HLW under the Standard Contract is 2017.

**Request No. 3.**

Admit that DOE cannot commit that waste acceptance will actually begin under the Standard Contract in 2017.

**Request No. 4.**

Admit that the July 2004 "Acceptance Priority Ranking & Annual Capacity Report" published by DOE (DOE/RW-0567) is an official publication of DOE's Office of Civilian Radioactive Waste Management.

**Request No. 5.**

Admit that Exhibit A is a true and accurate copy of the July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567).

**Request No. 6.**

Admit that Appendix A to DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) is a true and accurate list of spent fuel discharged by parties to Standard Contracts through December 31, 2002 ranked by date of permanent discharge.

**Request No. 7.**

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts aggregate annual acceptance rates of 400 MTU in the first year of operation.

**Request No. 8.**

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts aggregate annual acceptance rates of 600 MTU in the second year of operation.

**Request No. 9.**

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts aggregate annual acceptance rates of 1,200 MTU in the third year of operation.

**Request No. 15.**

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts aggregate annual acceptance rates of 3,000 MTU in the ninth year of operation.

**Request No. 16.**

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts aggregate annual acceptance rates of 3,000 MTU in the tenth year of operation.

**Request No. 17.**

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts that Energy Northwest would have its first pickup allocation of 10.8 MTU in the seventh year of operation.

**Request No. 18.**

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts that Energy Northwest would have a pickup allocation of 29.4 MTU in the eighth year of operation.

**Request No. 19.**

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts that Energy Northwest would have a pickup allocation of 52.5 MTU in the ninth year of operation.

**Request No. 20.**

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts that Energy Northwest would have a pickup allocation of 37.9 MTU in the tenth year of operation.

**Request No. 21.**

Admit that if (1) DOE had commenced performance in 1998 using the rate identified in the July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) published by DOE, (2) Energy Northwest did not exchange any of its allocations, and (3) priority was not granted to a shut-down reactor, Energy Northwest's first acceptance allocation would have occurred in 2004.

**Request No. 22.**

Admit that the document "Preliminary Estimates Of The Total-System Cost For The Restructured Program: An Addendum To The May 1989 Analysis Of The Total System Life Cycle Cost Of The Civilian Radioactive Waste Management Program" (DOE/RW-0295P) is an official publication of DOE's Office of Civilian Radioactive Waste Management.

**Request No. 23.**

Admit that that the document attached as Exhibit B is a true and accurate copy of the "Preliminary Estimates Of The Total-System Cost For The Restructured Program: An Addendum To The May 1989 Analysis Of The Total System Life Cycle Cost Of The Civilian Radioactive Waste Management Program" (DOE/RW-0295P).

**Request No. 24.**

Admit that DOE created the document "Preliminary Estimates Of The Total-System Cost For The Restructured Program: An Addendum To The May 1989 Analysis Of The Total System Life Cycle Cost Of The Civilian Radioactive Waste Management Program" (DOE/RW-0295P) to comply with its statutory duty under the NWPA to evaluate the adequacy of 1 mill/kwh fee on an annual basis.

**Request No. 25.**

Admit that, at the time DOE published the "Preliminary Estimates Of The Total-System Cost For The Restructured Program: An Addendum To The May 1989 Analysis Of The Total System Life Cycle Cost Of The Civilian Radioactive Waste Management Program" (DOE/RW-0295P) in December 1990, DOE's planned acceptance rates for the years 2008 through 2020 approximated the rates reflected in the Tables A-1, A-2, and A-3 of that document.

**Request No. 26.**

Admit that if (1) DOE performed beginning in 1998 at the rates identified in Table A-1 of the "Preliminary Estimates Of The Total-System Cost For The Restructured Program: An Addendum To The May 1989 Analysis Of The Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program" (DOE/RW-0295P), (2) Energy Northwest did not exchange any of its allocations, and (3) priority was not granted to a shut-down reactor, Energy Northwest's first acceptance allocation would have occurred in 2011.

**Request No. 27.**

Admit that DOE has never identified the type(s) of cask(s) it would have used to accept SNF from Energy Northwest had DOE commenced performance in 1998 under the Standard Contract.

**Request No. 28.**

Admit that, as of the date of your answer, DOE has not identified the type(s) of cask(s) it will use to accept SNF from Energy Northwest when it commences waste acceptance sometime after 2017.

.

Respectfully submitted,

NORMAN M. HIRSCH
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611
(312) 923-2782 telephone
(312) 840-7782 facsimile

OF COUNSEL:

David A. Handzo
Jenner & Block LLP
601 Thirteenth Street, N.W.
Washington, D.C. 20005
(202) 639-6000

William D. Heinz
David Jiménez-Ekman
Christopher Tompkins
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611
(312) 222-9350

*Attorneys for Plaintiff*

# CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of July 2007, a copy of the foregoing Plaintiff's First Set Of Requests For Admission was served by hand on:

Sharon A. Snyder
U.S. Department of Justice
Commercial Litigation Branch, Civil Division
Attn: Classification Unit
Eighth Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-0347 (Tel.)
(202) 307-2503 (Fax)

Jeanne E. Davidson
Director

Bryant G. Snee
Deputy Director

**Department of Justice, Civil Division**
**Commercial Litigation Branch / National Courts**
**1100 L Street, N.W.**
**Washington, D.C. 20530**

**FAX NUMBERS:**

| | | | |
|---|---|---|---|
| 4TH FLOOR | RM 4037 | (202) 353-7988 | |
| 7TH FLOOR | RM 7101 | (202) 305-7644 | |
| | | (202) 305-7643 | |
| 8TH FLOOR | RM 8001 | (202) 305-3291 | |
| 10TH FLOOR | RM 10125 | (202) 514-8640 | |
| 11TH FLOOR | RM 11021 | (202) 514-7969 | |
| | RM 11068 | (202) 514-7965 | |
| 12TH FLOOR | RM 12113 | (202) 307-0972 | |
| | | (202) 305-1571 | |
| | RM 12007 | (202) 514-8624 | |

DATE: 7/19/07

TO: Norman M. Hirsch

FAX: (312) 840-7782

FROM: Sonia M. Orfield

PHONE: (202) 353-0534

NUMBER OF PAGES SENT (INCLUDING COVER PAGE): 51

SPECIAL INSTRUCTIONS:

IMPORTANT: This facsimile is intended only for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected from disclosure under applicable law. If the reader of this transmission is not the intended recipient or the employee or agent responsible for delivering the transmission to the intended recipient, you are hereby notified that any dissemination, distribution, copying or use of this transmission or it's contents is strictly prohibited. If you have received this transmission in error, please notify us by telephoning and return the original transmission to us at the address given below.

**U.S. Department of Justice**

Civil Division

Telephone (202) 353-0534
Facsimile (202) 307-2503

PDK:JED:HDL:SMOrfield

*Washington, D.C. 20530*

July 19, 2007

Norman M. Hirsch
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611-7603

Re: Energy Northwest v. United States, No.04-0010 (Fed. Cl.)

Dear Mr. Hirsch:

I am writing in response to your RCFC 30(b)(6) notice of deposition dated July 3, 2007. Because you have access to extensive deposition and trial testimony of Department of Energy ("DOE") personnel, we cannot agree to additional depositions of these individuals absent an explanation as to why the existing exhaustive record of deposition testimony is not sufficient to meet Energy Northwest's trial preparation requirements.

As you know, Energy Northwest has already taken its own deposition of Mr. Kouts, who would likely be called upon to be the Government's RCFC 30(b)(6) witness, should your proposed deposition proceed. This deposition covered much of the same scope proposed by your notice. For instance, in the RCFC 30(b)(6) portion of that deposition taken by Dairyland Power Cooperative, Mr. Kouts was questioned extensively on the issues involved in topics one and two, Tr. 116:19-222:18; topic four, Tr. 222:19-224:10; and topic 11 of your notice. Tr. 263:6-266:13; see also Exhibit 9. In addition, at that same deposition, Mr. Tompkins of your firm questioned Mr. Kouts on topic three, Tr. 361:1-373:10; topic four, Tr. 423:11-425:1; topics five and six, Tr. 345:5-349, 405:22-408:9, 410:17-416:7; topic seven, Tr. 409:12-410:16; and topics eight through ten of your notice. Tr. 315:8-341:21, 349:13-360:20, 376:6-408:9. Moreover, as you know, all of the spent nuclear fuel ("SNF") cases concern the same subject matter – partial breach of the Standard Contract – and extensive depositions of DOE personnel have been taken in other cases. RCFC 30(b)(6) depositions taken in other cases have also addressed topics one and two, see Exhibits 1, 3; topic 4, see Exhibits 2, 3, 4, 5, 7, 8; topics 5 and 6, see Exhibit 8, 10; topic seven, see Exhibit 5; topic 9, see Exhibit 5; topic 6, see Exhibit 6; and topics ten and eleven of your notice. see Exhibits 6, 8. With regard to the majority of these depositions, Jenner and Block noticed the deposition, either on its own, or in conjunction with counsel on other spent fuel matters. Likewise, SNF plaintiffs have conducted fact depositions of 58 different Government witnesses over the course of 145 days, in many of which Jenner and Block has participated, and

Government witnesses have also addressed these topics in extensive trial testimony. Thus, the discovery that you seek is unreasonably cumulative or duplicative. See RCFC 26(b)(2)(i). To the extent that Energy Northwest was not a party to these depositions or trials, the transcripts of the testimony are still available for the purpose of impeachment at trial. See Rules of the Court of Federal Claims ("RCFC") 32(a)(1) ("Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness"). Given that the subject matter about which the Government witnesses have testified in the past will be the same in this case, and given that Jenner and Block has taken much of their deposition testimony, it is possible that the Court would treat their deposition testimony as if it had been provided in this case. See RCFC 32(a)(4) ("when an action has been brought in any court of the United States or of any state and another action involving the same subject matter is afterward brought between the same parties or their representatives or successors in interest, all depositions lawfully taken and duly filed in the former action may be used in the latter as if originally taken therefor."); see also Shaklin v. Norfolk Southern Railway Co., 369 F.3d 978, 990-91 (6th Cir. 2004). Since you have not identified any basis for re-opening these depositions or re-deposing these individuals, we can see no reason that we should permit the proposed deposition to proceed.

The Government also objects to your list of proposed topics because your first, fourth, fifth and sixth requests duplicate extensive written discovery that has been served by the SNF plaintiffs. See Exxon Research & Engineering Co. v. United States, 44 Fed. Cl. 597, 602 (1999); McCormick-Morgan, Inc. V. Teledyne Indus., Inc., 134 F.R.D. 275, 286 (N.D. Cal), rev'd in other part, 765 F. Supp. 611 (N.D. Cal 1991). Your list of proposed topics is also improper to the extent that it seeks discovery into matters that are irrelevant to the Court's consideration of damages. Specifically, topics two, four, six, and eleven concern DOE's plans for activities in the future. In accordance with the United States Court of Appeals for the Federal Circuit's decision in Indiana Michigan Power Co. v. United States, 422 F.3d 1369 (Fed. Cir. 2005), future damages are not recoverable in a partial breach of contract case. Likewise, the Government objects to topic seven of your notice, which seeks the Government's position regarding the reasonableness or unreasonableness of Energy Northwest's decision to adopt and implement dry storage for its spent fuel. As Mr. Kouts testified in his recent deposition, DOE is not able to answer these questions because "the Department does not collect spent fuel storage cost information from utilities." Tr. 250:14-18. While we may eventually reach conclusions on these issues after the Government has completed its discovery and has received Energy Northwest's expert reports explaining its claimed damages, we will do so through our expert witnesses for purposes of defending this litigation. When the Government's expert witnesses have submitted their reports, Energy Northwest will have an opportunity to depose those witnesses. There is simply no other witness that will be able to testify to these matters, and the Government does not have any obligation to reach conclusions on plaintiff's damages prior to that time, particularly before we have seen an actual damages claim.

Further, it is quite clear that the burden of any additional depositions to the individual involved far outweighs the likely benefits to plaintiff. See RCFC 26(b)(2)(ii). For example, to date, Mr. Kouts has provided eight days of deposition testimony. In addition, in the Court of Federal Claims, Mr. Kouts has testified in spent nuclear fuel cases in excess of nine days. In fact, in your recent deposition of Mr. Kouts, he testified that between 10 and 20 percent of his time is spent on spent nuclear fuel litigation. Tr. 26:18-27:22. Given the amount of testimony that he has

already provided, it is difficult to imagine a relevant question that you could ask Mr. Kouts that he has not already answered. Similarly, Messrs. Pollog and Zabransky have collectively sat for more than 30 days of deposition. Again, Energy Northwest has not identified any basis for again deposing these, or any other, individuals from the Department of Energy.

I look forward to hearing from you. If we are not able to reach some resolution, we plan to seek a protective order from the Court.

Sincerely,

Sonia M. Orfield
Trial Attorney
Commercial Litigation Branch

JENNER&BLOCK

July 26, 2007

Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611-7603
Tel 312 222-9350
www.jenner.com

Chicago
Dallas
New York
Washington, DC

David Jiménez-Ekman
Tel 312 923-2683
Fax 312 840-7683
djimenez-ekman@jenner.com

**VIA FACSIMILE AND U.S. MAIL**

Ms. Sonia M. Orfield
Trial Attorney, Commercial Litigation Branch
Department of Justice, Civil Division
1100 L Street, N.W.
Washington, D.C. 20530

**RE: Energy Northwest v. United States, No. 04-0010 (Fed. Cl.)**

Dear Sonia:

This responds to your July 19, 2006 letter to Norm Hirsch objecting to our Rule 30(b)(6) deposition notice. In short, we think your position that you will not make a witness or witnesses available for the deposition based on burdensomeness is not well-founded and we intend to proceed with a deposition. At the outset, we point out that in this case involving a claim for more than $60 million, we have only asked for and obtained the deposition of a single other witness, Mr. Kouts. In contrast, the Government has deposed 10 persons to date in this matter and has asked for the deposition of 3 more. We do not think that a single additional Rule 30(b)(6) deposition in this case on behalf of Energy Northwest, on a limited number of clearly discoverable topics, most of which you concede are relevant, is even close to objectionable based on burdensomeness grounds. Your other specific objections are likewise misplaced.

*First*, your representation that you intend to choose to designate Mr. Kouts as your witness on some of our requested topics does not then entitle you to claim that Mr. Kouts will be overburdened. You may designate any witness who is sufficiently prepared to answer the questions under the rules; we obviously cannot require, and are not requiring, the production of Mr. Kouts. You cannot escape your discovery obligations by choosing a Rule 30(b)(6) witness who you then claim will be personally overburdened based on his obligations in *other* cases.

*Second*, the discovery burden generally on the Government based on the number of SNF cases is no justification for not complying with Energy Northwest's modest discovery request in this case. As the courts have held, the Government breached its contract with every standard contract holder, and the discovery obligations it faces as a consequence do not excuse it from compliance.

*Third*, even if (contrary to fact) there were some bar to our taking depositions on topics that were also explored in other cases, many of the topics we have specified were not in fact covered by the exhibits to your letter. In particular, based on our review, topics 2, 3, and 7 through 10 were not the subject of any prior Rule 30(b)(6) deposition notice you reference in your letter. In addition, a number of the topics we specified, including topics 4, 6, 7, and 11, are subject to change over time. We are certainly entitled to take reasonable updated testimony on those topics.

*Fourth*, your assertion that certain topics are irrelevant because DOE's future actions are irrelevant ignores the clear caselaw that the reasonableness of a utilities' past mitigation measures can be evaluated considering not only current DOE actions but announced and anticipated future DOE actions. Indeed, Judge Damich has specifically ruled that information regarding the DOE's future projections, plans, activities or actions is discoverable. *Dairyland Power Coop. v. United States*, No. 04-106 C, Order On Motion To Compel at 1 (Feb. 5, 2007, Ct. Fed. Cl.).

*Finally,* your assertion that we are precluded from seeking deposition testimony on topics that have been the subject of written discovery, in this case or in other SNF cases, is meritless. It is standard practice to obtain oral discovery after seeking written discovery, and it is not considered overly-burdensome, particularly in a case of this magnitude and in which we have sought such limited deposition discovery. That is particularly the case here given the Government's generally non-responsive answers to the interrogatories we have propounded in this case.

In short, we do not intend to withdraw our notice, and if you do not intend to comply, you should seek a protective order. We are available to have a telephone conference with you at any reasonable time to meet the personal conference requirement and allow you to present this issue to the Court, so we may respond.

I look forward to hearing from you.

Best personal regards.

Sincerely,

David Jiménez-Ekman

DJ:cjh

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENERGY NORTHWEST, Plaintiff, | ) | |
| v. | ) | No. 04-0010C (Chief Judge Damich) |
| UNITED STATES OF AMERICA, Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S
FIRST SET OF REQUESTS FOR ADMISSION

Pursuant to Rules 26 and 36 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, provides the following response to plaintiff's interrogatories and requests for admissions.

GENERAL OBJECTIONS

1. Defendant objects to each and every request for admission to the extent that it calls for the disclosure of material or information that is subject to any claim of privilege or protection, including, without limitation, the attorney-client privilege, the work-product doctrine, or any Government privilege.

2. Defendant objects to the instructions and definitions accompanying plaintiff's requests to the extent that such instructions and definitions attempt to impose obligations on defendant other than those imposed by Rules 26 and 36 of the RCFC.

3. Defendant objects to plaintiff's requests upon the grounds and to the extent that, by them, plaintiff seeks to have defendant make certain legal conclusions and/or conclusions as to the legal significance of certain documents and/or events which it is not required to make.

4. Defendant objects to the plaintiff's requests upon the grounds and to the extent that, by them, plaintiff seeks the discovery of information which is irrelevant and immaterial and not reasonably calculated to lead to the discovery of admissible evidence.

5. Defendant objects to the plaintiff's requests to the extent that the manner in which they are worded, when read with their definitions and general instructions, are so vague, broad, general, and all inclusive that they do not permit a proper or reasonable response and are, therefore, unduly burdensome and oppressive.

6. Defendant objects to the plaintiff's requests upon the grounds that, by them, plaintiff seeks to require defendant to make legal conclusions and/or conclusions concerning the legal significance of certain documents and/or events which must be determined by the United States Court of Federal Claims in this action and upon the grounds that, to respond to them, defendant would be required to make an extensive investigation, research, compilation, and evaluation of data and records in its possession, which would constitute annoyance, harassment, oppression, undue burden, and undue expense to defendant.

7. Defendant objects to any inference that can be drawn from any portion of plaintiff's request or the response to them that the documents requested or the events referred to in the requests actually exist or occurred. The failure to object to each such inference in no way constitutes an admission by defendant that such information exists or that such events actually occurred.

8. The objections set forth above apply to each of the numbered paragraphs of the plaintiff's requests for admissions.

9. Without waving the above objections, defendant will provide only relevant, non-privileged information currently available to it, subject only to the requirements for supplementation of responses contained in the RCFC.

RESPONSE TO REQUESTS FOR ADMISSION

REQUEST NO. 1:

Admit that the Standard Contract does not contain any specific term identifying a numerical Acceptance Rate that will apply to the Government's performance under the Contract.

RESPONSE:

Defendant objects to extent that plaintiff implies there is no contractual mechanism for determining the rate of acceptance. Defendant admits that, although there is no specific numerical rate of acceptance expressly set forth in the Standard Contract, the 1991 Annual Capacity Report ("ACR"), in conjunction with the 1991 Annual Priority Ranking ("APR"), provided the basis upon which DOE would begin making firm acceptance commitments to individual utilities based upon the Delivery Commitment Schedules ("DCSs") submitted by Purchasers that DOE approved. After issuance of the 1991 ACR/APR, and in accordance with Article V.B.1 of the Standard Contract, those utility plaintiffs with allocations identified in the ACR/APRs were required to submit DCSs to the Department of Energy. Those DCSs identify both the amount of spent nuclear fuel and high-level radioactive waste (collectively, "SNF") and the location of SNF for which an allocation exists under the relevant ACR/APR for a given year. No other binding "Acceptance Rates" applicable to the Standard Contract were issued by the Department of Energy or accepted by the Department of Energy through the approval of DCSs.

REQUEST NO. 2:

Admit that as of the date of your answer, the earliest date on which DOE will begin acceptance of SNF and/or HLW under the Standard Contract is 2017.

RESPONSE:

Defendant objects upon the grounds of relevance. See Indiana Michigan Power Co. v. Dept. of Energy, 88 F.3d 1272, 1274-77 (D.C. Cir. 1996). Notwithstanding our objection, deny. Plaintiff's request implies that DOE acceptance equates to DOE acceptance at a repository. DOE's obligation to begin acceptance pursuant to the Standard Contract is independent of the existence of an operational repository. Id. Thus, legislative changes could result in DOE acceptance before 2017. Conversely, while DOE currently plans to begin receipt of SNF at the Yucca Mountain repository in 2017, those plans are based upon several assumptions, including the issuance of a construction authorization by the Nuclear Regulatory Commission ("NRC") within the three year period specified in the Nuclear Waste Policy Act, and the timely issuance by the NRC of a receive and possess license. This schedule also is dependent upon the timely issuance of other necessary authorizations and permits, the absence of litigation related delays, and the enactment of certain pending legislation..

REQUEST NO. 3:

Admit that DOE cannot commit that waste acceptance will actually begin under the Standard Contract in 2017.

RESPONSE:

Deny. Defendant objects to the extent that the term "commit" is vague and undefined. See Response to Request No. 2.

REQUEST NO. 4:

Admit that the July 2004 "Acceptance Priority Ranking & Annual Capacity Report" published by DOE (DOE/RW-0567) is an official publication of DOE's Office of Civilian Radioactive Waste Management.

RESPONSE:

Admit.

REQUEST NO. 5:

Admit that Exhibit A is a true and accurate copy of the July 2004 "Acceptance Priority Ranking & Annual Capacity Report." (DOE.RW-0567).

RESPONSE:

Admit.

REQUEST NO. 6:

Admit that Appendix A to DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) is a true and accurate list of spent fuel discharged by parties to Standard Contracts through December 31, 2002 ranked by date of permanent discharge.

RESPONSE:

Deny. Appendix A provides a listing of purchasers' SNF discharges through December 31, 2002 based upon information reported to DOE on Nuclear Fuel Date Survey Form, RW-859. Although DOE assumes that information to be true and accurate, it is the contract holders that are responsible for the truth and accuracy of that data.

REQUEST NO. 7:

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts aggregate annual acceptance rates of 400 MTU in the first year of operation.

RESPONSE:

Deny. The projected nominal acceptance rate in 2010, based upon the assumption that SNF acceptance at the Yucca Mountain Geologic Repository would begin in 2010, is 400 MTU in 2010.

REQUEST NO. 8:

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts aggregate annual acceptance rates of 600 MTU in the second year of operation.

RESPONSE:

Deny. The projected nominal acceptance rate in 2011, based upon the assumption that SNF acceptance at the Yucca Mountain Geologic Repository would begin in 2010, is 600 MTU in 2011.

REQUEST NO. 9:

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts aggregate annual acceptance rates of 1,200 MTU in the third year of operation.

RESPONSE:

Deny. The projected nominal acceptance rate in 2012, based upon the assumption that SNF acceptance at the Yucca Mountain Geologic Repository would begin in 2010, is 1,200 MTU in 2012.

REQUEST NO. 10:

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts aggregate annual acceptance rates of 3,000 MTU in the fourth year of operation.

RESPONSE:

Deny. The projected nominal acceptance rate in 2013, based upon the assumption that SNF acceptance at the Yucca Mountain Geologic Repository would begin in 2010, is 2,000 MTU in 2013.

REQUEST NO. 11:

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts aggregate annual acceptance rates of 3,000 MTU in the fifth year of operation.

RESPONSE:

Deny. The projected nominal acceptance rate in 2014, based upon the assumption that SNF acceptance at the Yucca Mountain Geologic Repository would begin in 2010, is 3,000 MTU in 2014.

REQUEST NO. 12:

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts aggregate annual acceptance rates of 3,000 MTU in the sixth year of operation.

RESPONSE:

Deny. The projected nominal acceptance rate in 2015, based upon the assumption that SNF acceptance at the Yucca Mountain Geologic Repository would begin in 2010, is 3,000 MTU in 2015.

REQUEST NO. 13:

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts aggregate annual acceptance rates of 3,000 MTU in the seventh year of operation.

RESPONSE:

Deny. The projected nominal acceptance rate in 2016, based upon the assumption that SNF acceptance at the Yucca Mountain Geologic Repository would begin in 2010, is 3,000 MTU in 2016.

REQUEST NO. 14:

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts aggregate annual acceptance rates of 3,000 MTU in the eighth year of operation.

RESPONSE:

Deny. The projected nominal acceptance rate in 2017, based upon the assumption that SNF acceptance at the Yucca Mountain Geologic Repository would begin in 2010, is 3,000 MTU in 2017.

REQUEST NO. 15:

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts aggregate annual acceptance rates of 3,000 MTU in the ninth year of operation.

RESPONSE:

Deny. The projected nominal acceptance rate in 2018, based upon the assumption that SNF acceptance at the Yucca Mountain Geologic Repository would begin in 2010, is 3,000 MTU in 2018.

REQUEST NO. 16:

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts aggregate annual acceptance rates of 3,000 MTU in the tenth year of operation..

RESPONSE:

Deny. The projected nominal acceptance rate in 2019, based upon the assumption that SNF acceptance at the Yucca Mountain Geologic Repository would begin in 2010, is 3,000 MTU in 2019.

REQUEST NO. 17:

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts that Energy Northwest would have a pickup allocation of 10.8 MTU in the seventh year of operation.

RESPONSE:

Deny. Based upon the assumption that SNF acceptance would begin at the Yucca Mountain Geologic Repository in 2010 at the nominal waste acceptance rates specified in Table 1, Table 2 provides that Energy Northwest would receive an annual allocation in 2016 of 10.8 MTUs.

REQUEST NO. 18:

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts that Energy Northwest would have a pickup of 29.4 MTU in the eighth year of operation.

RESPONSE:

Deny. Based upon the assumption that SNF acceptance would begin at the Yucca Mountain Geologic Repository in 2010 at the nominal waste acceptance rates specified in Table 1, Table 2 provides that Energy Northwest would receive an annual allocation in 2017 of 29.4 MTUs.

REQUEST NO. 19:

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts that Energy Northwest would have a pickup of 52.5 MTU in the ninth year of operation.

RESPONSE:

Deny. Based upon the assumption that SNF acceptance would begin at the Yucca Mountain Geologic Repository in 2010 at the nominal waste acceptance rates specified in Table 1, Table 2 provides that Energy Northwest would receive an annual allocation in 2018 of 52.5 MTUs.

REQUEST NO. 20:

Admit that DOE's July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) forecasts that Energy Northwest would have a pickup of 37.9 MTU in the tenth year of operation.

RESPONSE:

Deny. Based upon the assumption that SNF acceptance would begin at the Yucca Mountain Geologic Repository in 2010 at the nominal waste acceptance rates specified in Table 1, Table 2 provides that Energy Northwest would receive an annual allocation in 2019 of 37.9 MTUs.

REQUEST NO. 21:

Admit that if (1) DOE had commenced performance in 1998 using the rate identified in the July 2004 "Acceptance Priority Ranking & Annual Capacity Report" (DOE/RW-0567) published by DOE, (2) Energy Northwest did not exchange any of its allocations, and (3) priority was not granted to a shut-down reactor, Energy Northwest's first acceptance allocation would have occurred in 2004.

RESPONSE:

Deny. Defendant also objects upon the grounds that the request is misleading. The 2004 ACR/APR rate, which DOE issued six years after 1998, contemplates acceptance beginning at a repository in 2010. Accordingly, that rate has no relation to a world where DOE began performance in 1998. Further, as of 1987, DOE announced that it envisioned commencing performance in 1998 at a Monitored Retrievable Storage ("MRS") facility. In addition, because of statutory limitations places upon the MRS, that facility could not accept SNF at the same rate as an MRS in 1998 and it would have done so in accordance with the 1991 ACR. Since Energy Northwest did not have any allocations under the 1991 ACR, Energy Northwest's acceptance allocation would not have occurred until after 2007.

REQUEST NO. 22:

Admit that the document "Preliminary Estimates of the Total-System Cost for The Restructured Program: An Addendum To The May 1989 Analysis Of The Total System Life Cycle Cost Of The Civilian Radioactive Waste Management Program" (DOE/RW-0295P) is an official publication of DOE's Office of Civilian Radioactive Waste Management.

RESPONSE:

Admit.

REQUEST NO. 23:

Admit that the document attached as Exhibit B is a true and accurate copy of the "Preliminary Estimates of the Total-System Cost for The Restructured Program: An Addendum To The May 1989 Analysis Of The Total System Life Cycle Cost Of The Civilian Radioactive Waste Management Program" (DOE/RW-0295P).

RESPONSE:

Admit.

REQUEST NO. 24:

Admit that DOE created the document "Preliminary Estimates Of The Total-System Cost For The Restructured Program: An Addendum To The May 1989 Analysis Of The Total System Life Cycle Cost Of The Civilian Radioactive Waste Management Program" (DOE/RW-0295P) to comply with its statutory duty under the NWPA to evaluate the adequacy of the 1 mill/kwh fee on an annual basis.

RESPONSE:

Deny. The total-system life-cycle cost analysis for DOE's Civilian Radioactive is an ongoing activity that helps determine whether the revenue-producing mechanism established by the Nuclear Waste Policy Act of 1982 - a fee levied on electricity generated and sold by commercial nuclear power plants - is sufficient to cover the cost of the program. The December 1990 TSLCC represents a preliminary analysis of the cost impacts associated with the Secretary of Energy's Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program issued in November 1989.

REQUEST NO. 25:

Admit that, at the time DOE published the "Preliminary Estimates Of The Total-System Cost For The Restructured Program: An Addendum To The May 1989 Analysis Of The Total System Life Cycle Cost Of The Civilian Radioactive Waste Management Program" (DOE/RW-0295P) in December 1990, DOE's planned acceptance rates for the years 2008 through 2020 approximated the rates reflected in Tables A-1, A-2, and A-3 of that document.

RESPONSE:

Deny. Defendant also objects on the grounds that the request is misleading. Tables A-1, A-2, and A-3 provide potential waste acceptance schedules based upon various assumptions regarding the potential waste acceptance systems described in the December 1990 TSLCC. Although these were scenarios contemplated by DOE, they were not "planned" acceptance rates.

REQUEST NO. 26:

Admit that if (1) DOE performed beginning in 1998 at the rates identified in Table A-1 of the "Preliminary Estimates Of The Total-System Cost For The Restructured Program: An Addendum To The May 1989 Analysis Of The Total System Life Cycle Cost Of The Civilian Radioactive Waste Management Program" (DOE/RW-0295P), (2) Energy Northwest did not exchange any of its allocations, and (3) priority was not granted to a shut-down reactor, Energy Northwest's first acceptance allocation would have occurred in 2011.

RESPONSE:

Deny. Defendant also objects on the grounds that the request is misleading. The December 1990 TSLCC contains potential waste acceptance schedules based upon various assumptions regarding the potential waste acceptance systems described. Although these were scenarios contemplated by DOE, the TSLCC does not describe an acceptance allocation.

REQUEST NO. 27:

Admit that DOE has never identified the type(s) of cask(s) it would have used to accept SNF from Energy Northwest had DOE commenced performance in 1998 under the Standard Contract.

RESPONSE:

Deny. Defendant objects that "type(s) of cask(s)" are terms that are vague and undefined. DOE would have provided transportation casks certified by the NRC.

REQUEST NO. 28:

Admit that, as of the date of your answer, DOE has not identified the type(s) of cask(s) it will use to accept SNF from Energy Northwest when it commences waste acceptance sometime after 2017.

RESPONSE:

Deny. Defendant objects that "type(s) of cask(s)" and "DOE has not identified" are vague and undefined. DOE will provide transportation casks certified by the NRC.

Submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

RUSSELL A. SHULTIS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Attorney
SHARON SNYDER
SCOTT DAMELIN
SONIA ORFIELD
Trial Attorneys
Department of Justice
Washington, D.C. 20530

August 24, 2007

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 24th day of August, 2007, I caused to be served by facsimile and placed in the United States mail (first-class mail, postage prepaid) a copy of "DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION" addressed as follows:

NORMAN M. HIRSCH
Jenner & Block, LLP
One IBM Plaza
Chicago, IL 60611
Tel: (312) 923-2782
FAX: (312) 840-7782

Alexander V. Scott

# In the United States Court of Federal Claims

No. 04-10 C
(Filed: May 12, 2004)

*****************************************

**ENERGY NORTHWEST**, *

Plaintiff, *

v. *

**THE UNITED STATES,** *

Defendant. *

********************************************

**ORDER**

In light of motions of Defendant filed in a number of recently-filed Spent Nuclear Fuel (SNF) cases for a stay or, in the alternative, for coordinated discovery, and in light of the discovery conference held before Judge Sypolt on April 30, 2004, and the report of the parties filed on May 7, 2004, the Court hereby **ORDERS** that discovery in this case on the rate of acceptance or damages issues, and/or any discovery duplicative of information from previous coordinated discovery in SNF cases, be **STAYED** through December 31, 2004.

This stay of discovery, however, shall not be construed to preclude access by the parties – subject to the protective order, the e-mail preservation order, and the order governing access to the RIS-web issued in the coordinated discovery proceedings – to the discovery previously obtained under the coordinated discovery in the earlier-filed SNF cases. Defendant shall deem Plaintiff's use of discovery obtained under the coordinated discovery in the earlier-filed SNF cases as if it were taken in this case.

The judges assigned to SNF cases, including the undersigned, expect that counsel will make every effort to work cooperatively, and that plaintiff's counsel, in particular, consistent with client obligations, will keep party colleagues in the other SNF cases fully and timely informed of the motions and discovery activities contemplated and undertaken, as the case may be, in this proceeding.

Any party objecting to all or any part of a discovery request on the grounds that it contravenes this stay order shall file a motion pursuant to Rule 26(c) of the Rules of the Court of Federal Claims.

s/ Edward J. Damich
EDWARD J. DAMICH
Chief Judge