No. 04-10C
(Chief Judge Damich)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ENERGY NORTHWEST,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S RESPONSE TO PLAINTIFF'S SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION FOR A PROTECTIVE ORDER TO PRECLUDE PLAINTIFF'S NOTICED RCFC 30(b)(6) DEPOSITION OR, IN THE ALTERNATIVE, TO RE-INSTITUTE THE COORDINATED DISCOVERY PROCEEDINGS IN THE PENDING SPENT NUCLEAR FUEL CASES

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SHARON A. SNYDER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0347
Fax: (202) 307-2503

March 19, 2008

Attorneys for Defendant

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES. .......... ii

DEFENDANT'S RESPONSE TO PLAINTIFF'S SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION FOR A PROTECTIVE ORDER TO PRECLUDE PLAINTIFF'S NOTICED RCFC 30(b)(6) DEPOSITION OR, IN THE ALTERNATIVE, TO RE-INSTITUTE THE COORDINATED DISCOVERY PROCEEDINGS IN THE PENDING SPENT NUCLEAR FUEL CASES. .......... 1

I. ENERGY NORTHWEST SHOULD NOT BE PERMITTED TO DEPOSE A GOVERNMENT WITNESS ON ITS PROPOSED TOPICS BECAUSE THEY ARE DUPLICATIVE OF PRIOR DISCOVERY .......... 2

II. ENERGY NORTHWEST DOES NOT REQUIRE ADDITIONAL DEPOSITION TESTIMONY IN RESPONSE TO THE GOVERNMENT'S EXPERT REPORTS. .......... 13

CONCLUSION. .......... 18

# TABLE OF AUTHORITIES


**CASES** **PAGE(S)**

Boston Edison Company v. United States,
75 Fed. Cl. 557 (2007). .... 8, 9, 12

CSX Transp., Inc. v. Vela, No. 06-112, 2007 WL 3334966, at *2 (S.D. Ind. Nov. 8, 2007) .........7

Exxon Research and Engineering Co. v. U.S.,
44 Fed. Cl. 597, 601-601 (1999). .... 4

Indiana Michigan Power Company v. United States,
422 F.3d 1369 (Fed. Cir. 2005). .... 8, 16, 17

SEC v. Thrasher,
No. 92-6987, 1995 WL 46681 (S.D.N.Y. Feb. 7. 1995). .... 4

SmithKline Beecham Corp. v. Apotex Corp., No. 99-4304,
2004 WL 739959 (E.D. Pa. Mar. 23, 2004). .... 4

Van Den Eng v. The Coleman Co., Inc.,
No. 03-504, 2006 WL 1663714 (E.D. Wis. June 9, 2006). .... 5, 11

Vivid Technologies, Inc. v. American Science & Engineering, Inc.,
200 F.3d 795 (Fed. Cir. 1999). .... 7

**RULES**

Rule 30(b)(6) .... *passim*

RCFC 26(b)(2). .... 7, 12

RCFC 26(b)(2)(i). .... 10

RCFC 26(c). .... 7

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENERGY NORTHWEST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-10C |
| | ) | (Chief Judge Damich) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S SUPPLEMENTAL RESPONSE TO DEFENDANT'S MOTION FOR A PROTECTIVE ORDER TO PRECLUDE PLAINTIFF'S NOTICED RCFC 30(b)(6) DEPOSITION OR, IN THE ALTERNATIVE, TO RE-INSTITUTE THE COORDINATED DISCOVERY PROCEEDINGS IN THE PENDING SPENT NUCLEAR FUEL CASES

In its motion for a protective order filed September 14, 2007, defendant, the United States, requested that the Court issue a protective order preventing the RCFC 30(b)(6) deposition that plaintiff, Energy Northwest, noticed because Energy Northwest was simply seeking to repeat extensive depositions that have already been taken. If the Court determined that Energy Northwest was entitled to re-open any of the depositions already conducted, defendant requested that the Court re-institute the coordinated discovery proceedings in the spent nuclear fuel ("SNF") cases pending before the Court so that any further depositions of Government witnesses would occur only once.

Pursuant to the Court's January 30, 2008 order, plaintiff has filed a supplemental response to the Government's motion. Having reviewed the Government's argument that Energy Northwest has already addressed most of its proposed topics in its earlier deposition of Mr. Kouts, Energy Northwest now contends that, regardless of what other testimony exists, it requires

additional RCFC 30(b)(6) testimony. As set forth below, this argument is unavailing, either because RCFC 30(b)(6) testimony on these topics already exists, because these topics have been definitively addressed in responses to interrogatories, or because Government witnesses have already been deposed on these issues so many times that further testimony would be unreasonably cumulative and burdensome regardless of the RCFC 30(b)(6) status of the earlier testimony. Plaintiff's argument that it should be entitled to further RCFC 30(b)(6) testimony because the Government's response to one of its topics could change over time also fails because information on that topic is publicly available and indicates that the Government's position has not changed beyond what is already known to plaintiff.

Energy Northwest's argument that the Government's expert reports necessitate additional RCFC 30(b)(6) testimony also falls flat. Plaintiff has already had an opportunity to depose the Government's experts about these issues and they are the appropriate parties to address any concerns raised by their reports. Moreover, plaintiff is already familiar with DOE's positions on these issues, and the Government's experts have done nothing to suggest that these positions have changed. Finally, plaintiff's argument with respect to one of the topics fails to come to terms with what time frames are relevant to its claim.

## ARGUMENT

## I. ENERGY NORTHWEST SHOULD NOT BE PERMITTED TO DEPOSE A GOVERNMENT WITNESS ON ITS PROPOSED TOPICS BECAUSE THEY ARE DUPLICATIVE OF PRIOR DISCOVERY

The First Topic. In an apparent effort to overcome the fact that their first topic has been covered extensively in RCFC 30(b)(6) depositions, plaintiff has revised that topic for the first time in its supplemental briefing. Rather than asking for testimony on the SNF acceptance

rate at which DOE would have performed had it commenced waste acceptance under the Standard Contract on January 31, 1998, Energy Northwest is now seeking testimony on "Energy Northwest's acceptance allocations had DOE commenced waste acceptance under the Standard Contract on January 31, 1998." See Pl.'s Supp. Br. at 3. This tactic, however, is unavailing.

As an initial matter, the very interrogatory that plaintiff characterizes as non-responsive, see id., clearly lays out the Government's position on this issue. In the Government's response, it explains that, in accordance with the Standard Contract, the 1991 Annual Capacity Report ("ACR") was the document by which DOE began making firm acceptance commitments to individual utilities. Defendant's Response to Plaintiff's First Set of Interrogatories, at 5-6 (Appendix to Plaintiff's Supplemental Response to Defendant's Motion for a Protective Order "Pl.'s Supp. App." at 10-12). That ACR and subsequent ones issued in 1992, 1994, and 1995 contained a table entitled "Summary of Purchasers' Annual Allocations (MTU)," which identifies the acceptance allocation of each utility for the first ten years of the program. Id. Based upon this table, in accordance with Article V.B.1. of the Standard Contract, contract holders submitted Delivery Commitment Schedules ("DCSs") to the Department of Energy. Id. Once these DCSs were approved, they reflected the parties' agreement as to when that utility's fuel would be accepted. Id.

Because Energy Northwest did not have any allocations in the first ten years of the program, its allocations are not reflected in the ACR documents. Id. Nevertheless, as the Government stated in its interrogatory response, "No other binding 'schedules' applicable to the Standard Contract were issued by the Department of Energy or accepted by the Department of Energy through the approval of DCSs. . . . With regard to plaintiff's request for the identification

of the schedule after the first 10 years of performance and through 2020, the parties never agreed upon any schedules beyond the first 10 years of SNF acceptance, and DOE did not publish any schedules for use as the basis for the submission of DCSs. Accordingly no such schedule exists." Id.

This interrogatory response itself should be sufficient to preclude further depositions on this issue. See Exxon Research and Engineering Co. v. U.S., 44 Fed. Cl. 597, 601-601 (1999) (adopting view that a party is only entitled to pursue same discovery through multiple methods under certain circumstances, the absence of which warrants an evaluation of which discovery device is most appropriate); SmithKline Beecham Corp. v. Apotex Corp., No. 99-4304, 2004 WL 739959, at *2 (E.D. Pa. Mar. 23, 2004) (collecting cases finding that, in certain circumstances a party may resist a Rule 30(b)(6) deposition on the grounds that the information sought is more appropriately discoverable through interrogatories); SEC v. Thrasher, No. 92-6987, 1995 WL 46681, at *14 (S.D.N.Y. Feb. 7. 1995) (interrogatory answer is agency answer rather than individual answer). However, this response is also completely consistent with DOE's prior RCFC 30(b)(6) deposition testimony addressing the same topic. For instance, in the 30(b)(6) deposition of Mr. Kouts, at which Energy Northwest was present, he indicated that the rates of acceptance that DOE planned to use under the Standard Contract "would be in the ACR/APRs that were issued by the Department and by the Government post 1987." Def.'s Supp. App. at 11[1] (Kouts 5/1/07 30(b)(6) deposition, 126:6-126:13). In this regard, Mr. Kouts also made it clear that during periods of time when there was no ACR in effect to establish the rate, such as the

[1]"Def.'s Supp. App. __" refers to Defendant's Supplemental Appendix in Support of Its Motion For a Protective Order attached hereto.

time period prior to 1987, there was no specific rate. Def.'s Supp. App. at 12-13 (Kouts 5/1/07 30(b)(6) deposition, 161:10-164:17).

Essentially, Energy Northwest is taking the position that the Government has not provided sufficient information on this issue simply because the Government has explained that such information does not exist. The Government, however, has fully addressed this issue, and plaintiff is not entitled to further response. "Rule 30(b)(6) does not entitle a party to the evidence he believes exists." Van Den Eng v. The Coleman Co., Inc., No. 03-504, 2006 WL 1663714, at *16 (E.D. Wis. June 9, 2006).

The second topic. Energy Northwest's second topic, "[t]he SNF acceptance rate at which DOE would have performed after the ten year period reflected in the 1991 Annual Capacity Report assuming that DOE commenced waste acceptance under the Standard Contract on January 31, 1998," is also addressed by the Government's same prior statements. Indeed, in the Government's response to plaintiff's interrogatory focusing on acceptance after the first ten years, the Government incorporated by reference its response to the interrogatory corresponding to plaintiff's first request. Defendant's Response to Plaintiff's First Set of Interrogatories at 7-8 (Pl.'s Supp. App. at 7-8). That response by itself comprehensively addresses this topic, as it explains that "the parties never agreed upon any schedules beyond the first 10 years of SNF acceptance, and DOE did not publish any schedules for use as the basis for the submission of DCSs. Accordingly no such schedule exists." Id. at 6. The Government, however, also reiterated this point, stating that "[t]he parties never agreed upon any schedules beyond the 10 years of SNF acceptance, and DOE did not publish any schedules for use as the basis for

submission of DCSs. Any final schedule for the acceptance of WPPSS's[2] SNF would have depended upon the parties' agreement pursuant to the mechanism set forth in the Standard Contract." Id. at 8. Moreover, as plaintiff's brief indicates, Mr. Kouts addressed this topic in the same manner in its earlier deposition of him. Pl.'s Supp. Br. at 4 (citing Kouts Dep. 5/2/07 at 368:10-369:19) (Pl.'s Supp. App. at 61). Although plaintiff takes the position that this testimony was not sufficient because Mr. Kouts did not provide a schedule, but indicated that it was to be determined later, plaintiff cannot continue to seek that testimony simply because they wish it existed. If questioned yet again upon this topic, the response will be the same. Moreover, this testimony is consistent with a good deal of additional testimony that is also available to plaintiff. See e.g., Def.'s Supp. App. at 27-36 (Zabransky Dep. 4/17/02 at 12:4-48:1); Def.'s Supp. App. at 41 (Zabransky Dep. 5/4/04 at 31:8-32:3); Def.'s Supp. App. at 38 (Zabransky Dep. 4/18/02 at 325:13-326:17).

The third topic. With respect to topic three, which deals with the basis for the acceptance rate in a particular document, Energy Northwest acknowledges that it has addressed this issue with Mr. Kouts in the individual portion of his deposition. Pl.'s Supp. Br. at 5. Nevertheless, it wishes to have a second bite at the apple, or an opportunity to ask Mr. Kouts "additional questions." Id. It contends that it is entitled to do so because this testimony was not RCFC 30(b)(6) testimony.

As an initial matter, it is important to note that, in spite of the apparent lack of RCFC 30(b)(6) testimony on this issue, there is still an extensive record of other testimony upon which

---

[2]WPPSS refers to Washington Public Power Supply System, the predecessor name of Energy Northwest.

plaintiff can draw. In addition to discussion in depositions, Mr. Kouts has discussed this document as well as the background that allows him to speak to such documents in most, if not all, of the 12 spent nuclear fuel trials that have taken place to date. For instance, in the trial in Wisconsin Electric Power Co. v. United States, No. 00-697 (Fed. Cl.), Mr. Kouts identified the document and went through the document, throughly explaining various passages and tables including the broader context of the Department's thinking on rate in which the text and tables were created. Def.'s Supp. App. at 66-68 (Tr. 5336:3-5342:3). As plaintiff acknowledges, this issue was also addressed by Mr. Kouts during the trial in Tennessee Valley Authority v. United States. Pl.'s Supp. Br. at 5 n.2.; See Def.'s Supp. App. at 48-51 (Tr. at 1450:23-1463:6 Kouts). Plaintiff even seems to indicate that this testimony is sufficiently detailed for its purposes. Pl.'s Supp. Br. at 5 n.2. Its only failing in Energy Northwest's view is that it is not RCFC 30(b)(6) deposition testimony. Id.

In the unique circumstances of the spent fuel cases, the Court should protect the Government from a RCFC 30(b)(6) deposition on this topic, even without the availability of other RCFC 30(b)(6) testimony. The Court's rules of procedure give it "broad powers of case management, including the power to limit discovery . . . ." Vivid Technologies, Inc. v. American Science & Engineering, Inc., 200 F.3d 795, 803-04 (Fed. Cir. 1999). Specifically, the Court's rules provide that the "frequency or extent of use of the discovery methods otherwise permitted under these rules shall be limited by the Court if it determines that . . . the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive." RCFC 26(b)(2); see CSX Transp., Inc. v. Vela, No. 06-112, 2007 WL 3334966, at *2 (S.D. Ind. Nov. 8, 2007) (granting protective order on Rule

30(b)(6) topic as cumulative of prior sworn testimony). The Court's rules also permit it to enter "any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. . . ." RCFC 26(c).

Here, the Government is in the unique position of litigating 49 cases in which it must rely upon the same set of witnesses. Already, 105 depositions totaling 148 days of testimony have been taken of those witnesses. The Government's main witnesses, Mr. Kouts, Mr. Pollog, and Mr. Zabransky have been deposed for eight, 13, and 19 days respectively. Each of them has also testified in most, if not all, of the 12 trials that have already taken place. While the Government must generally make do with one day of testimony from each of the witnesses that plaintiff will use at trial, plaintiff has between 20 to 30 days of testimony with which to cross-examine each of the Government's primary witnesses, some of which it has even acknowledged addresses the same issue in which it is interested. Under these circumstances, further testimony should be viewed as unreasonably cumulative or duplicative, obtainable from another source, and an undue burden for the Government, if not oppression.

The fourth topic. Topic four of plaintiff's request seeks testimony regarding "[t]he earliest date on which DOE will commence acceptance of SNF under the Standard Contract, including without limitation, DOE announcements that the earliest possible date for waste acceptance is 2017." As an initial matter, this topic deals with the future, and, as such, it is not relevant to this case. See Indiana Michigan Power Company v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005); cf. Boston Edison Company v. United States, 75 Fed. Cl. 557, 567 (2007) (noting that, while the Government's estimates on the availability had undoubtedly changed since 2002, that circumstance did not affect plaintiff's claim, the span of which was limited). As

plaintiff has acknowledged, this topic has been addressed in previous depositions, including the RCFC 30(b)(6) deposition in which counsel for Energy Northwest participated. Specifically, during that deposition, Mr. Kouts stated that "the current planning baseline for the program is to begin receipt in the 2017 time frame." Pl.'s Supp. App. at 43 (Kouts 30(b)(6) deposition 5/1/07 223:6-20); see Boston Edison, 75 Fed. Cl. at 567 (finding coordinated discovery had given plaintiff ample opportunity to delve into the repository start date).

Plaintiff contends that these statements are not sufficient because Mr. Kouts also indicated that this schedule "is predicated on passage of the administration's legislation that was submitted earlier this year and last year and the availability of annual appropriations to meet the cash flow provided to Congress earlier this year." Pl.'s Supp. App. at 43 (Kouts 30(b)(6) deposition 5/1/07 223:17-20) cited in Pl.'s Supp. Br. at 6. Plaintiff also points to a recent comment of Edward F. Sproat III, the Director of the Office of Civilian Radioactive Waste Management, in the *New York Times*, to the effect that the 2017 start date is "clearly out the window." Plaintiff's reliance on the *New York Times* article shows the reasons why, even assuming this future issue is relevant to plaintiff's case, plaintiff does not require further deposition testimony on this issue: (1) plaintiff already has the most up to date information available; and (2) when additional information becomes available, plaintiff will have access to that, too. Plaintiff's information reflects the current state of the Department's projected acceptance date – essentially, the date is being reevaluated, but no new date has been established. In fact, in another recent news article, and in a recent DOE presentation, the Department has also indicated that DOE is reevaluating the 2017 date, but has not arrived at a new date, see Def.'s Supp. App. at 1-6, and the same article cited by plaintiff indicated that 2017 was still the

officially projected date. Pl.'s Supp. App. at 97. Moreover, when such dates are established, they are announced in public fora, albeit more often through congressional testimony than in the press. When such public statements are made, they are "obtainable from some other source that is more convenient, [and] less burdensome." RCFC 26(b)(2)(i). Thus, plaintiff should not be permitted continually to depose DOE witnesses on this topic, particularly since the specific date regarding when DOE will begin SNF acceptance in the future is irrelevant to Energy Northwest's damages claim, which seeks damages only through August 31, 2006.

The fifth topic. With its topic five, Energy Northwest seeks to obtain testimony on specific aspects of the casks that DOE would have used to accept SNF from Energy Northwest under the Standard Contract had it commenced performance on January 31, 1998. This is another topic upon which Energy Northwest has access to testimony that completely addresses this issue, but simply insists that something else must exist. In one of the same RCFC 30(b)(6) depositions cited by plaintiff as not providing any substantive information, see Pl.'s Br. at 7-8 n.3 (citing Pl.'s Supp. App. at 89-90 (Zabransky 30(b)(6) deposition 4/12/05 38:10-39:21)), the Government's witness actually completely addresses this topic. Specifically, he explains that DOE never got to the point where it made a final determination as to the type of cask it would use to accept utilities fuel starting in 1998. Pl.'s Supp. App. at 89-90 (Zabransky 30(b)(6) deposition 4/12/05 38:10-14). Taken in conjunction with other testimony setting forth DOE's early efforts to develop casks (which never came to fruition), see, e.g., Def.'s Supp. App. at 22-25 (Pollog 30(b)(6) deposition 5/15/02 72:7-77:19; 81:19-85:12); Pl.'s Supp. App. at 69-79; 49-53 (Kouts 5/2/02 deposition 405:22-408:9; 410:17-416:7; 345:5-349), there is simply no more to

this story.[3] Once again, "Rule 30(b)(6) does not entitle a party to the evidence he believes exists." Van Den Eng, 2006 WL 1663714, at *16.

The remaining topics. The remaining group of topics upon which Energy Northwest seeks deposition testimony, topics 8, 9 and 10, relate to the 1987 amendments to the Nuclear Waste Policy Act, DOE's efforts to seek modifications thereto, and DOE's efforts to site an MRS. As an initial matter, plaintiff concedes that these issues have been addressed in the previous depositions that Energy Northwest has taken in this case, but it maintains that this testimony is not adequate because it is not RCFC 30(b)(6) testimony. As discussed above, it is not clear, in the unique circumstances of the spent fuel cases, that plaintiff's need for RCFC 30(b)(6) testimony should outweigh the considerations that militate in favor of sparing the Government witnesses further depositions. Moreover, it simply is not the case that these issues have not been addressed in RCFC 30(b)(6) testimony. For instance, in the RCFC 30(b)(6) portion of the deposition of Mr. Kouts, at which Energy Northwest was present, Mr. Kouts addressed all three of these topics. Mr. Kouts explained that, based upon the amendments, DOE was limited to accepting 10,000 MTU at an MRS and explained the linkages between construction of an MRS and construction of a repository. Def.'s Supp. App. at 14-15 (Kouts RCFC 30(b)(6) deposition 5/1/07 at 176:10-178:16). Mr. Kouts addressed the effect of the MRS contemplated by the 1987 amendments upon the Department's assumptions about the rate at

---

[3]Plaintiff's insistence to the contrary is particularly puzzling given its own expert's opinions that "DOE never did choose a shipping cask in the but for world and has not done so in the real world," and her recital of the "limited information available regarding the types of casks DOE might have employed in the but for world. . . ." See Rebuttal Report Regarding The Expert Witness Report of Charles L. Stuart, Eileen M. Supko, February 22, 2008.

which it would accept fuel from the utilities, including the assumption that the linkage between MRS construction and repository construction would be broken, which is implicit in some of the Department's assumptions about rate. Def. Supp. App. at 15-17 (Kouts 30(b)(6) deposition 5/1/07 at 181:2-21; 193:7-194:6.). He further addressed the Department's conclusion that trying to get rid of the construction linkage was the best approach, the effort and resources involved in this approach, and the Department's belief that there was a good chance this approach would be successful. Def.'s Supp. App. at 17-19 (Kouts 30(b)(6) deposition 5/1/07 at 194:7-204:1). He also touched on efforts to site the MRS. Def.'s Supp. App. at 17-19 (Kouts 30(b)(6) deposition 5/1/07 at 197:15-198:7; 199:1-202:11; 200:16-204:1). These topics have also been addressed at length in other testimony. See, e.g., SMUD v. United States, No. 98-488C (Fed. Cl.) (Tr. 2127:16-2131:20) (testimony of Mr. Kouts regarding efforts to site an MRS) (Def.'s Supp. App. at 44-45); Pacific Gas & Electric v. United States, No. 04-74C (Fed. Cl.) (Tr. 2655:12-2656:16) (testimony of Mr. Kouts regarding efforts to site MRS and efforts to modify linkages) (Def.'s Supp. App. at 54); Wisconsin Electric Power Co. v. United States, No. 00-697C (Fed. Cl.) (Tr. 5213:11-5217:25; 5218:1-5223:11; 5268:9-5269-24; 626:1-629:15) (testimony of Mr. Kouts and Mr. Zabransky regarding the 1987 amendments to the NWPA, efforts to site an MRS, and efforts to modify linkages) (Def.'s Supp. App. at 61-65; 57-58). Because additional deposition testimony on these topics is unreasonably cumulative or duplicative, the Court should enter an order protecting the Government from further deposition. RCFC 26(b)(2); see Boston Edison, 75 Fed. Cl. at 566 (finding proposed RCFC 30(b)(6) topic similar to plaintiff's topic 8 "duplicative and cumulative because this general subject was central to addressing the previously-filed

dispositive motions that were the focus of the coordinated discovery conducted several years ago.").

## II. ENERGY NORTHWEST DOES NOT REQUIRE ADDITIONAL DEPOSITION TESTIMONY IN RESPONSE TO THE GOVERNMENT'S EXPERT REPORTS

Energy Northwest also argues that it is entitled to take a RCFC 30(b)(6) deposition based upon its topics four and five because the Government's experts have put these topics at issue in their reports. Pl.'s Supp. Br. at 12-17. Topic 5 deals with "[t]he type of casks and any other ancillary equipment DOE would have used to accept SNF from Energy Northwest under the Standard Contract had it commenced performance on January 31, 1998 . . . ," including various specific attributes of those casks. Energy Northwest contends that this issue is raised by the report of Mr. Stuart, the Government's technical expert, who develops an estimate of the type of casks that DOE would have brought, which is then used by the Government's accounting expert, Mr. Johnson, to make a deduction from Energy Northwest's damages claim.

On its face, Mr. Stuart's analysis does not warrant an investigation into the specific casks that DOE would have used to accept spent nuclear fuel. As plainly stated in the same testimony cited by plaintiff, Mr. Stuart is not taking the position that a specific cask would have been used by DOE. To the contrary, he clearly states that, "while <u>the specific cask</u>, or casks, that DOE would have used at a specific utility site <u>cannot be positively identified,</u> it is possible understanding the technology of the but-for world period, to identify the range of size and type of cask that could have been used. This range provides a means to evaluate and bound the actions to utilize such casks." Stuart Rep. at 10 (emphasis added) ( Pl.'s Supp. App. at 101). Mr. Stuart arrives at this range by identifying all of the rail casks for BWR fuel that had been designed and

licensed for use or had licensing pending with the NRC during the relevant time period. As Mr. Stuart explained, it was "reasonable to assume that Columbia would request and DOE would provide a large rail cask because Columbia has a DOE railroad line which runs onto and through the site, the GE IF-300 rail cask was analyzed in the Columbia FSAR for removal of spent fuel from the site, and Columbia has a 125 ton reactor building crane that can handle a large rail cask." Stuart Rep. at 12 (Pl.'s Supp. App. at 12). Based upon the characteristics of this range of casks, Mr. Stuart then concludes that certain site modifications, which Energy Northwest made to accommodate its Holtec casks, or portions thereof, would have also been required for the range of casks that were available to DOE. In addition, Mr. Stuart concluded that, conservatively assuming the largest capacity casks from his range, the "activities to prepare and load a cask would not be measurably different between a cask used to store fuel in the ISFSI and a DOE-supplied transportation cask." Stuart Rep. At 18-19 (Pl.'s Supp. App. at 105-106). Thus, there is no sense in which a specific cask has been identified warranting an investigation into DOE's views of the specific casks.

In addition, should something in Mr. Stuart's expert report warrant evaluation through deposition, he alone would be the proper deponent to address his report, and Energy Northwest has already had that opportunity. Mr. Stuart's report is clear that he is not relying on any one else in reaching this conclusion, much the less any DOE personnel. In fact, during his deposition, Mr. Stuart explicitly stated that he was not relying on information from DOE in drawing his conclusions:

BY MR. TOMPKINS:
Q Mr. Stuart, did you talk to anyone at

the Department of Energy about what type of casks
the DOE would have used had it commenced waste
acceptance beginning in 1998?
A Did not.
Q Did you review any documents from DOE
discussing its cask procurement program for the
casks it would have used had it commenced waste
acceptance in 1998?
A Did not.
Q Did you review any of the testimony
given by Department of Energy witnesses in this
case and other cases about the types of casks that
DOE would have used had it commenced waste
acceptance in 1998?
MR. DAMELIN: Assumes facts not in
evidence. Objection.
THE WITNESS: I have not reviewed any
testimony from DOE witnesses.

Tr. 217:21-218:18.

Moreover, in its papers, Energy Northwest acknowledges as much, stating that, "[i]n his deposition, Mr. Stuart testified that he had made no factual inquiry of DOE documents or officials to determine the type of cask DOE might have used had it performed. . . ." Pl.'s Supp. Br. at 15 n.6. Having had an opportunity to explore the basis for his conclusions with Mr. Stuart, and having not been identified any unknown positions taken by DOE, Mr. Stuart's expert report simply does not provide any basis for seeking further testimony from DOE.

Finally, even had Mr. Stuart's report somehow implicated DOE's understanding of the casks that would have been used to accept spent fuel from Energy Northwest in the but for world,

as set forth above, DOE is already on record regarding this issue. Although DOE had a preliminary cask program, DOE never got to the point where it made a final determination as to the type of cask it would use to accept utilities fuel starting in 1998. Pl.'s Supp. App. at 89-90 (Zabransky 30(b)(6) deposition 4/12/05 38:10-14); Def.'s Supp. App. at 22-25 (Pollog 30(b)(6) deposition 5/15/02 72:7-77:19; 81:19-85:12); Pl.'s Supp. App. at 69-79; 49-53 (Kouts 5/2/02 deposition 405:22-408:9; 410:17-416:7; 345:5-349). As plaintiff's own expert agrees with these facts, as previously discussed in the third footnote of this brief, any basis for further deposition is unclear.

The second topic for which Energy Northwest believes that further RCFC 30(b)(6) testimony is justified based upon the Government's expert reports is its topic 4: when DOE currently plans to begin acceptance of SNF. As set forth above, the Government has already addressed this issue in RCFC 30(b)(6) depositions and other testimony on several occasions, and, when DOE makes changes in its estimates, it announces these changes in public fora, eliminating the need for discovery. In addition, as the Government has argued, this topic deals with the future, and, as such, it is not relevant to this case. See Indiana Michigan Power Company v. United States, 422 F.3d 1369, 1376 (Fed. Cir. 2005). Energy Northwest, however, contends that the Government has made the future acceptance of Energy Northwest's fuel relevant by arguing that Energy Northwest should have reracked its pool rather than, or prior to, building an ISFSI, as reracking is a lower cost method of storage. Specifically, Energy Northwest argues that whether it would have made sense to rerack at the outset depends upon when DOE will begin accepting

fuel in the future. Pl.'s Supp. Br. at 17.[4]

Energy Northwest's argument fails to come to terms with the way in which a party's efforts to mitigate losses are evaluated. "Mitigation is appropriate where a reasonable person, in light of the known facts and circumstances, would have taken steps to avoid damages." Indiana Michigan, 422 F.3d at 1375 (citation omitted) (emphasis added). Thus, to the extent that the Government's eventual acceptance factors into the mitigation decision, it is only in terms of the "known facts and circumstances" at the time the party was required to mitigate its losses. Current, up-to-the-minute estimates simply play no role in this evaluation. Indeed, those estimates may continue to change not only to a later acceptance date as suggested by plaintiff, but to earlier dates as well, should the program ultimately developed by the Government involve a

---

[4]In this portion of its brief, Energy Northwest asserts that "the Government's experts do not dispute that, in light of DOE's delay in removal of SNF from Energy Northwest, Energy Northwest needed to construct additional SNF storage space, and do not dispute that, at some point, Energy Northwest would have been required to build an ISFSI to continue." Pl.'s Br. at 16 (citing Hartman Rep. at 12; Stuart Rep. at 7). While the Government's experts discuss how far into the future a reracking would have pushed Energy Northwest's need for additional storage, plaintiff's characterization is inaccurate in two respects. First, the Government's experts do not conclude that Energy Northwest's need for storage was caused by the Government's delay in accepting spent nuclear fuel. To the contrary, as stated by another of the Government's experts, Mr. Johnson, "assuming a 900 MTU acceptance rate and the resultant effect that DOE would not have commenced spent fuel acceptance through August 31, 2006, . . . DOE has not caused Energy NW to incur any coss for additional at-reactor storage. . . . Since under this scenario, DOE has not caused Energy NW to incur costs as a result of the delay in DOE acceptance of spent fuel from Energy NW none of the costs claimed by Energy NW were caused by the breach and consequently there are no damages." Def.'s Supp. App. at 8 (Johnson Rep. at 8). Nor has the Government taken a position on whether Energy Northwest will ultimately require dry storage. In fact, as stated in a portion of the Government's motion for summary judgment quoted by plaintiff, the Government stated that it is "quite possible that after DOE eventually begins SNF acceptance, it will be able to increase the speed of its SNF acceptance beyond that which it is otherwise obligated to satisfy, enabling it to 'catch up' to the place where it should have been had it timely begun performance." Pl.'s Br. at 16 (citing Gov. Summ. Judg. Br. at 17).

higher rate of fuel acceptance than that upon which the Government has generally focused in the past. See Gov. Summ Judg. Br. at 17.

CONCLUSION

For all of the foregoing reasons, and for those set forth in the Government's initial motion, defendant respectfully requests that the Court enter a protective order to preclude Energy Northwest's proposed deposition.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

s/Sharon A. Snyder
SHARON A. SNYDER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0347
Fax: (202) 307-2503

March 19, 2008

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on March 19, 2008, a copy of the foregoing "Defendant's Response to Plaintiff's Supplemental Response to Defendant's Motion for a Protective Order to Preclude Plaintiff's Noticed RCFC 30(b)(6) Deposition Or, in the Alternative, To Re-institute the Coordinated Discovery Proceedings In the Pending Spent Nuclear Fuel Cases" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Sonia M. Orfield