No. 04-10C
(Chief Judge Damich)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ENERGY NORTHWEST,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

Defendant's Supplemental Appendix in Support of Its Motion For a Protective Order

---

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SHARON A. SNYDER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 616-0347
Fax: (202) 307-2503

March 19, 2008

Attorneys for Defendant

CERTIFICATE OF FILING

I hereby certify that on March 19, 2008, a copy of the foregoing "Defendant's Supplemental Appendix in Support of Its Motion For a Protective Order " was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Sonia M. Orfield

INDEX TO APPENDIX

DOCUMENT PAGE

"DOE Idea: Going Private With Nuke Waste," WJLA (March 13, 2008) . . . . . . . . . . . . . . . . . . 1

Yucca Mountain Project Update Presentation (March 13, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 2

Excerpts of Expert Report of R. Larry Johnson (December 21, 2007) . . . . . . . . . . . . . . . . . . . . . 7

Christopher Kouts Deposition Excerpts, *Dairyland v. United States* (May 1, 2007) . . . . . . . . . . 9

Thomas Pollog Deposition Excerpts, *Yankee Plaintiffs v. United States* (May 15, 2002) . . . . . 20

David Zabransky Deposition Excerpts, *Utility Plaintiffs v. United States* (April 17-18, 2002) . 26

David Zabransky Deposition Excerpts, *Yankee Atomic v. United States* (May 4, 2004) . . . . . . 39

Trial Transcript Excerpts, *Sacramento Municipal v. United States* (March 29, 2005) . . . . . . . . 42

Trial Transcript Excerpts, *Tennessee Valley Authority v. United States* (July 11, 2005) . . . . . . 46

Trial Transcript Excerpts, *Pacific Gas & Electric v. United States* (June 14, 2006) . . . . . . . . . 52

Trial Transcript Excerpts, *Wisconsin Electric v. United States* (September 12, 2007) . . . . . . . . 55

# DOE Idea: Going Private With Nuke Waste

posted 8:38 pm Thu March 13, 2008 - Washington

**from ABC 7 News - http://www.wjla.com/news/stories/0308/503642.html**

Energy Department officials trying to promote nuclear power are suggesting that private industry assume some responsibility for the country's nuclear waste. Edward F. "Ward" Sproat said Thursday that the idea could ensure more stable management and financial support for the long-delayed Yucca Mountain nuclear waste dump project in Nevada that he manages.

"I do think that providing some sort of an organization with legislative fiat that provides that stability and fixes some of these institutional problems is a good idea," Sproat said after addressing a conference of nuclear regulators. "But it's got to be done right."

He heads the Energy Department's Office of Civilian Radioactive Waste Management.

Even Yucca Mountain supporters say stability has been lacking at the 77,000-ton repository planned 90 miles northwest of Las Vegas. It is intended as the resting place for the spent reactor fuel and high-level defense waste piling up at power plants and other sites around the country.

Yucca Mountain's most ardent critic, Senate Majority Leader Harry Reid, D-Nev., is in position to engineer annual budget cuts of $100 million or more. The project lacks management continuity because it's headed by a short-term political appointee - currently Sproat - rather than a career scientist or manager.

Sproat suggested a public-private partnership modeled on, for example, the Tennessee Valley Authority, the nation's largest public power company. The TVA was created by Congress and has a board of directors appointed by the president and confirmed by the Senate, but raises its own money and manages its own employees.

A power point briefing prepared for lawmakers by Dennis R. Spurgeon, the Energy Department's assistant secretary for nuclear energy, includes a slide showing a "non-governmental entity" that would manage nuclear waste disposal and fees from nuclear utilities in concert with a still undeveloped recycling program supported by the Bush administration.

The power point was obtained Thursday by The Associated Press.

Yucca Mountain's opening date has been delayed repeatedly since the original 1998 goal. Sproat had pegged 2017 as the best achievable opening date. But that has slipped and he could not give a new one on Thursday.

He did say that plans to submit a required construction license application to the Nuclear Regulatory Commission by the end of June are back on track, after coming into doubt this year because of Reid's budget cuts.

Meanwhile, liability to taxpayers is surpassing $7 billion because the department contracted with utilities to take possession of their nuclear waste beginning in 1998.

The idea of a public-private partnership to manage Yucca Mountain and other elements of spent fuel disposal has support from the nuclear industry and is garnering some interest on Capitol Hill. But the change would require legislation that also would have to deal with the liability to utilities and dedicating money from a special nuclear waste fund paid into by utilities, according to Sproat. No one thinks that could come about anytime soon.

"A move like that would greatly enhance the chances of success of the Yucca Mountain project and recently Congress is not inclined to enhance the success of the Yucca Mountain project," said Steve Kraft, senior director for used fuel management at the Nuclear Energy Institute.

Reid has long been declaring Yucca Mountain dead and his spokesman said no new plan would change that. "It's hard to privatize something that's not going to be built in the first place," said Reid spokesman Jon Summers.

© 2008 WJLA-TV
© 2008 The Associated Press
All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

U.S. Department of Energy
Office of Civilian Radioactive Waste Management

www.ocrwm.doe.gov

# Yucca Mountain Project Update

Presented to:
**RIC 2008**
**Spent Fuel Storage & Disposal**

Presented by:
**Edward F. Sproat, III**
**Director, Office of Civilian Radioactive Waste Management**
**U.S. Department of Energy**

**March 13, 2008**
**Bethesda, MD**

# Program Key Milestones

- Design for License Application Complete- Nov. 2007
  - Actual: Completed 12/1/07
- LSN Certification- December 2007
  - Actual: October 19, 2007
- Supplemental EIS- May 2008
  - Actual: Draft Issued October 2007/Hearings completed
- License Application Submittal- June 2008
  - Impact of $108M FY 08 appropriations reduction addressed
  - Expect submittal to NRC in June
  - Submittal to include approx. 200 references

# Program Key Milestones (cont'd)

- Start Nevada Rail Construction- October 2009
  - Delayed- Inadequate funding to proceed with design
- YM Construction Authorization- September 2011
  - Depends on NRC decision
- Operating License Submittal- March 2013
  - Predicated on Funding and Construction Schedule
- Rail Line Operational- June 2014
  - 2016 is achievable only if adequate funding is provided
- Begin Receipt- March 2017 (Best Achievable Date)
  - Currently under evaluation due to FY '07 and '08 actual funding shortfalls and expected near term funding limitations
  - Firm date cannot be set until funding issue resolved

# OCRWM Releases

- Independent Assessments (on website)
  - QAMA
  - Quality Assurance Programs
  - Engineering Processes
- TSLCC
  - Draft revised to include current and constant dollars
- Final Supplemental EIS
- License Application
- Fee Adequacy Determination
- Second Repository Report
- Interim Storage Report

# Where the Program is Today

- **Challenges**
  - **Program Structure for Management and Funding Continuity**
  - **Access to Nuclear Waste Fund and Revenues**
- **Successes**
  - **Preliminary Engineering Complete**
  - **LSN Certified**
  - **QA Problems Fixed**
  - **High Quality License Application Nearly Complete**
  - LA Defense Team in Place
  - DOE Culture Changing
- **Alive and Well - Definitely Not Dead!**

veris

# Expert Report of R. Larry Johnson

Energy Northwest

v.

United States of America

In the United States Court of Federal Claims

No. 04-0010C (Chief Judge Damich)

Prepared By:

R. Larry Johnson, CPA

R Larry Johnson

December 21, 2007

Protected Material to be Disclosed Only in Accordance with U.S. Court of Federal Claims Protective Orders in Spent Nuclear Fuel Litigation

11710 Plaza America Drive
Suite 300
Reston, VA 20190
703.654.1400 Main
703.796.1200 Fax

41 South High Street
Suite 3700
Columbus, OH 43215
614.456.4440 Main
614.220.9202 Fax

230 Half Mile Road
Red Bank, NJ 07701
732.747.9800 Main
732.747.8700 Fax

VERIS CONSULTING, LLC
www.verisconsulting.com

## DETAILED FINDINGS – SCENARIO 1

Mr. Emmert has opined that, assuming a 900 MTU industry wide acceptance rate, DOE would not have commenced spent fuel acceptance from Columbia until 2011.[15] I have been instructed by DOJ counsel that, assuming a 900 MTU acceptance rate and the resultant effect that DOE would not have commenced spent fuel acceptance through August 31, 2006, as a matter of law DOE has not caused Energy NW to incur any costs for additional at-reactor storage.

As described previously, my damages calculation methodology, as well as that of Mr. Emmert, involves measuring costs that are directly related and necessary to activities caused by the breach and subtracts from those amounts costs that would have been incurred but for the breach. Since, under this scenario, DOE has not caused Energy NW to incur costs as a result of the delay in DOE acceptance of spent fuel from Energy NW none of the costs claimed by Energy NW were caused by the breach and consequently there are no damages.

[15] Expert Report of Michael Emmert, dated September 14, 2007, p. 23.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

```
-----------------------------------:
DAIRYLAND POWER COOPERATIVE,       :
               Plaintiff,          :
                v.                 : No. 04-106C
UNITED STATES OF AMERICA,          :
               Defendant.          :
-----------------------------------:
ENERGY NORTHWEST,                  :
               Plaintiff,          :
                v.                 : No. 04-0010C
UNITED STATES OF AMERICA,          :
               Defendant.          :
-----------------------------------:
```

Washington, D.C.

Tuesday, May 1, 2007

Volume 1

Deposition of:

CHRISTOPHER KOUTS

called for oral examination by counsel for Plaintiff, Dairyland Power Cooperative, pursuant to notice at the Law Offices of Greenberg Traurig, LLP 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Vicky Stallsworth Reiner of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:10 a.m., when were present on behalf of the respective parties:

APPEARANCES

On behalf of Dairyland Power Cooperative:
JERRY STOUCK, ESQUIRE
ROBERT L. SHAPIRO, ESQUIRE
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202) 331-3173

On behalf of Energy Northwest:
DAVID JIMENEZ-EKMAN, ESQUIRE
CHRISTOPHER TOMPKINS, ESQUIRE
Jenner & Block, LLP
330 N. Wabash Avenue
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of Defendant:
ALAN J. LO RE, ESQUIRE
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Suite 12070
Washington, D.C. 20530
(202) 307-0226



CONTENTS

EXAMINATION BY: PAGE
Counsel for Dairyland .................. 6
Counsel for the Defendant .............. 296
Counsel for Dairyland .................. 305
KOUTS DEPOSITION EXHIBITS: * PAGE
1 Summary of employment history at DOE .. 6
2 Excerpt of testimony at PG&E trial .... 28
3 Excerpt of testimony at PG&3 trial .... 40
4 Standard Contract between Dairyland Power Cooperative and the Department of Energy, dated June 15, 1983 ........ 58
5 March 04, 1992 letter from M. Detmer to Mr. J.E. Barrett at PG&E ........... 66
6 Excerpt of testimony at PG&E trial .... 79
7 Delivery-commitment schedule forms .... 91
8 July 28, 2004 letter from Mr. Zabransky to William Berg ...................... 104
9 Letter to Russ Shultis identifying 30(b)(6) topics ...................... 114
10 Letter from Marian Sullivan designating witnesses for 30(b)(6) topics ......... 114



CONTENTS (Continued)

11 Notice of Deposition .................. 114
12 Segment of trial testimony from Yankee Atomic trial ................... 127
KOUTS DEPOSITION EXHIBITS: * PAGE
13 Excerpt from proceedings of 1983 Civilian Radioactive Waste Management information meeting held in December of 1983 .............................. 150
14 June 1987 Annual Capacity Report ...... 166
15 1988 Annual Capacity Report ........... 172
16 December 1991 Annual Capacity Report .. 193
17 1987 Monitored Retrievable Storage submission to Congress ................ 206
18 1995 APR and ACR ...................... 218
19 Excerpt of 1985 Mission Plan .......... 271
20 Excerpt from June 4, 1999 deposition in Yankee Atomic case ................. 275
21 Letter from Michael J. Lawrence to Ben Rusche, dated July 23rd, 1984 ..... 281
22 Memorandum on the Department of Energy memo letterhead stationary dated



CONTENTS (Continued)

December 21, 1992 ..................... 284
23 Letter from Spencer Abraham, Secretary of Energy, to Senator Orrin Hatch, dated July 8, 2002 ..................... 288
24 Memorandum on the Department of Energy memo letterhead stationary dated December 20, 1991 ..................... 290

(*Exhibits attached to transcript.)



 ©2007
917ffa92-9800-4498-95e6-5e4b9a24ccb0

Page 126

that that phrase means the rates that are set forth in the ACRs. Is that -- or is that -- again, I don't want to put words in your mouth, believe me. But I thought that's what you said. If that's not right -- just -- just -- when we're talking about this -- this subject, what -- what are you referring to when you refer to the rates of acceptance that DOE planned to use under the Standard Contracts? I just want to get a common understanding of that before we move forward.

A They would be in the ACR/APRs that were issued by the Department and by the government post-1987.

Q Okay. Do you understand the difference between the term rate of -- acceptance rate and receipt rate?

A Does the government understand that?

Q Is there a difference? Let me phrase it that way. You -- I understand the word "you" may get a little confusing in this context.

Is there a difference between the term acceptance rate and receipt rate?

Page 127

MR. LO RE: As the 30(b)(6) witness.

THE WITNESS: Essentially, no.

BY MR. STOUCK:

Q No?

A No.

Q At any time? There's not been a difference between those two at any time? Is that your testimony?

A Yes.

MR. STOUCK: Can we mark this, please.

(Kouts Exhibit No. 12 was marked for identification.)

BY MR. STOUCK:

Q Is there a difference in the concepts?

A Yes.

Q Okay. What's the difference in the concepts?

A The acceptance rate is the rate at which the Department or the government would accept fuel from utilities. The receipt rate -- well, let the government amend its previous statement.

There could be a difference between the

Page 128

receipt rate and the acceptance rate depending on whether the receipt rate for the facilities was different, greater, less than, if you will, than the proposed acceptance rate or the acceptance rate in the APRs/ACRs.

Q Okay. Did that difference -- I think what you told me in the prior answer was that no such difference ever occurred in fact. Even though the concepts were different. Or did it? Again, I don't mean to put words in your mouth. Was there ever a difference between the receipt rate and the acceptance rate?

A The receipt rate reflects the capabilities of facilities and what the facilities are designed to handle. The acceptance rate is what the government, again, would accept in accordance with the planning process under the Standard Contract.

Q Okay. Could those rates differ?

A Yes, they could differ.

Q Okay. Did they ever differ; do you know?

A What facility -- if you could specify a

Page 129

specific facility. Did they differ for the repository? Did they differ for an MRS? You know, you -- it would be helpful if you were more specific.

Q I thought my question was easier, which was: Did they ever differ at any time? It was a broader -- again, not to be too open-ended, but -- and if the answer to that is no, then we're done. If the answer to that is yes, we can zero in on exactly what it was. If the answer is you don't know, that's your answer.

A The simple answer to your question is that facilities are designed according to baseline requirements of the program. In order to assure that the facility has the capacity to handle acceptance rates, sometimes designers will take acceptance rates that are in the baseline of the program and design greater capability into the facilities such that, if those facilities -- if a specific aspect of those facilities is down, that we would still have the capability to meet the acceptance rate.

Page 158

would have to evaluate what the generation rate of spent fuel would have been in -- or projected to be in 1998, based on 1983 information and to the extent that the Department coalesced its planning in relation to receipt rates that was provided along with those projections in the 1985 Mission Plan.

Q Okay. Let me just, again, try to break that down, just in the interest of understanding.

You're saying that, whatever plans -- whatever plan -- whatever receipt rate DOE was planning to use in 1983 would have been informed by discharge rates? I realize you didn't use those exact words. Is that part of what you're telling me?

A Potentially, yes.

Q Okay. Do you know whether the discharge rates -- expected discharge rates in 1998 were known to DOE in '83, whether that data or those projections were available to DOE in '83?

A Since the contracts were signed in 1983, the first submissions of RW-859 forms probably had not occurred. So my -- so the government's

Page 159

perspective is that, whatever estimates it had would have been based on information that the industry may have provided.

Q So does that mean that that data was -- about expected discharge rates in 1998 was or was not available to DOE in 1983? Or do you not know?

A I don't know the answer to that question.

Q Okay. But, again, just back to the basic question of, in 1983, are you able -- is the government able to tell me whether there was any particular receipt rate that DOE was planning to use at that time or had it just not been developed?

A I would rely on Mr. Morgan's statement that that would be revealed in the Mission Plan, which the Department was working on at that time.

Q Okay. Thank you very much. Let's move forward. And I'm not going to go year by year from '83 to the present. But I'm going to start that way. What I'm really after is when would they change. I'm interested in acceptance rate and receipt rate.

In 1984, there was no acceptance rate

Page 160

that DOE was planning because there had been no ACR yet, correct, that's your testimony?

A That's correct.

Q And that would be the same in 1985 for the acceptance rate or would it?

A There was no issued APR/ACR in 1985, that's correct.

Q Okay.

A But there was a Mission Plan that showed illustrative schedules about how the waste management system might evolve potentially in the future.

Q Let's me ask the question, then, just straight up. In 1985, what rate of acceptance was DOE planning to use under the standard contracts, if any?

A The government can only answer that in the context of the illustrative schedules that it provided in the June 1985 Mission Plan.

Q Okay. So the acceptance rates that DOE was planning to use in 1985 are those shown as illustrative rates in the 1985 Mission Plan. Is

Page 161

that your testimony?

MR. LO RE: Objection. Mischaracterizes the testimony.

THE WITNESS: The rates identified in the 1985 Mission Plan were illustrative. And as indicated in virtually every page that they appear, is that they are subject to change based on how the waste management system may evolve.

BY MR. STOUCK:

Q Right. That's fine. I'm just asking -- I thought what you told me before was that the rates of acceptance that DOE planned to use under the Standard Contracts were the rates set out in the ACRs.

A That's correct.

Q And I also thought you said -- but, you know, you tell me because you're the witness. I thought you said that, prior to the issuance of the first ACR, which was in 1987 -- I can show it to you; I would be happy to -- that there wasn't any acceptance rate or rates that DOE was planning to use.

Page 162

Is that right or is that not right?
A I believe you mischaracterized --
Q Okay.
A -- the government's testimony again.
Q Okay.
A I believe that the APR and ACR publications provide the purchasers an understanding of what the Department is considering from the standpoint of an obligation -- not an obligation, but in terms of an acceptance rate. And -- as a planning basis for the utilities to be implemented later when the 63-month period prior to the time of shipment occurs.
Q Okay.
A The information provided in 1985 in the Mission Plan -- in the Mission Plan and subsequent Mission Plan Amendments and in the MRS proposal is also information that provides stakeholders, including the Congress, a perspective of the illustrative ways in which the system might be implemented.
In addition, there were instances where

Page 163

Mission Plan Amendment and APR/ACR rates were identical.
Q Okay. Just again, what I'm interested in right here on Exhibit Number 11 is the rates of acceptance that DOE planned to use under the Standard Contracts.
So are you now telling me that these illustrative rates that are set out -- let's just take it one at a time -- in the 1985 Mission Plan, those rates -- you know, we've both seen them. There's the approved plan and there's the enhanced performance plan, whatever it is called, the improved performance. Are you saying that those rates shown in those tables in the 1985 Mission Plan are within the meaning of the phrase in this topic number 1 the rates of acceptance that DOE planned to use under the Standard Contracts?
MR. LO RE: Objection. Mischaracterizes the testimony. Objection, asked and answered.
THE WITNESS: I believe I answered the question previously. And the rates under which the contract holders should plan would be contained in

Page 164

the APR/ACRs.
The information that's provided in the Mission Plan and other documents is information to people to -- to people who follow the program, including contract holders, Congress and others, to inform them about how the system might be implemented.
BY MR. STOUCK:
Q Okay. I'm not interested in informing people. I'm only interested in the rates -- right now I'm not -- the rates of acceptance that DOE planned to use under the Standard Contract.
So in 1985, in 1985, prior to the issuance of the first ACR in 1987, what was the rate of acceptance, if any, that DOE planned to use under its Standard Contracts?
A There was no specific rate.
Q Thank you. Okay. Good.
And would that also be your answer in 1986?
A Yes.
Q Okay. Now, in 1987, we have the 1987

Page 165

ACR.
And if I were to ask you -- actually, I do not have a copy of here because I wasn't planning to use it. But in 1987, if I asked you what was the rate of acceptance that DOE planned to use under the Standard Contracts, your answer is the rates shown in the 1987 ACR? Is that right?
MR. LO RE: Objection. Vague. Objection. Calls for speculation.
THE WITNESS: Planned to use -- can I ask a clarification question here? Planned to use for acceptance in 1998?
BY MR. STOUCK:
Q Well, I mean my question did not have that part of it. Again, the topic that we've asked you to come testify on behalf of the government on is shown here in paragraph number one. And I'm still just on the first line of that.
The rates of acceptance that DOE planned to use under the Standard Contracts. And we've sort of been going year by year. Hopefully we won't have to do every year. But so far we've been doing every

Page 174

MR. STOUCK: I'm going to ask him whether it affected rates.

MR. LO RE: Does it relate to the 30(b)(6)?

MR. STOUCK: I'm going to ask him whether it affected rates.

BY MR. STOUCK:

Q My question is: Isn't it true that DOE missed -- there were statutory milestones in the NWPA for siting a repository and DOE missed at least some of those statutory deadlines?

MR. LO RE: Objection. Beyond the scope.

MR. STOUCK: I'm trying to orient him.

MR. LO RE: Beyond the scope of this deposition.

THE WITNESS: In relation to the repository, I would have to review the Act. I believe the MRS proposal certainly was delayed due to litigation brought on by the state of Tennessee.

In terms of the issuance of the Mission Plan, which is the only milestone that I believe -- I would have to go back and count the months under

Page 175

which the Act required that the Department to issue that. My sense is that the desire of Congress was to have it submitted earlier. But I would have to review the Act to make determinations as to what potential statutory milestones were missed by the Department.

BY MR. STOUCK:

Q Okay. Thank you for that, Mr. Kouts.

Do you know whether or not the NWPA specified milestones for various steps in the process of siting repositories?

MR. LO RE: Same objection. And the question -- now I'll object on the grounds that, are you now asking Mr. Kouts as the 30(b)(6) witness or in his personal capacity?

MR. STOUCK: We're on 30(b)(6).

MR. LO RE: I'll object as outside the scope of this notice. This notice says nothing, Jerry, about --

MR. STOUCK: Okay. I'll ask him in his personal capacity.

BY MR. STOUCK:

Page 176

Q Do you know whether or not the NWPA set forth milestones, dates by which DOE had to take various steps in the process of siting one or more repositories? If you know, fine. If you don't know, just tell me.

A I would have to go back and review the Act.

Q So you don't know.

A Not offhand.

Q Okay. Thank you. Now, the 1987 amendments to the NWPA, are you generally familiar with that enactment?

A Yes.

Q Okay. And that statute imposed something we've already referred to, which is -- it authorized an MRS, correct?

A Yes.

Q And it imposed a 10,000 MTU capacity limitation on the MRS until a repository was operational; is that correct?

A Yes.

Q Okay. And it also linked the -- in some

Page 177

manner linked the MRS to construction authorization for the repository, correct?

A To be precise, the MRS could not be constructed until the repository received a construction authorization from the Nuclear Regulatory Commission.

Q Right. Okay. Now, back to Exhibit Number --

A In addition to that, it could not be sited until the site was selected for a repository.

Q Until a site was selected for a repository.

A That's correct.

Q Selected by whom?

A Selected by the Secretary, following the dictates of Section 114.

Q Okay. Now, back to the '88 ACR, if you would, please, turn to page -- that's this document right here. If you would turn to page 5, please.

A Just to supplement my other answer.

Q Oh, sorry.

A And the siting was, if the governor in

Page 178

the state in which the repository was identified or selected decided to submit a notice of disapproval, then it would require a joint -- an act of Congress, if you will, to override by majority vote, which has been interpreted as meaning a joint resolution of Congress would have to be passed. And then the President would have to sign that joint resolution.
Q Okay. Thank you.
A And the siting process also for the MRS would be similar. If the Secretary selected a site for the MRS, that governor would also have, likewise, a right to disapprove it. And that site would then have to go to Congress for override or for a joint resolution by a majority vote. And then the President would have to approve that before the MRS was sited.
Q Okay. Thank you for that. Exhibit 15, page 5, please. Right here.
A Okay.
Q This is the June 1988 Annual Capacity Report.
A Yes.

Page 179

Q On page 5, this table 2.1, again, just from your prior answers, I take it that in 1988, these were the rates of acceptance that DOE was planning to use under the Standard Contracts?
A Yes.
Q Okay. In 1988, what receipt rate did DOE plan to use?
A The -- with the issuance of this document, the baseline of the program would have reflected that facilities would need to be sized in order to meet the acceptance rates identified in this table. Therefore, engineers would have to look at each of these years to make sure that they could have facilities available that could meet this, with some margin to deal with maintenance issues and other anomalies in operation.
Q In 1988, was DOE planning to use receipt rates identical to these rates that we are looking at on page 5?
A As I just stated, the designers would look at what they needed to identify -- what they needed to size for facilities to meet this

Page 180

acceptance rate.
To the extent that they built additional capability into those facilities to deal with anomalous operations or maintenance cycles, the full capacity receipt rate might have been slightly higher, but nonetheless, at a normal operation rate, given maintenance cycles, reliability of equipment, the facilities would have been designed to meet this acceptance rate.
Q So the receipt rate would be at least these numbers on page 5 and maybe a little larger?
A Correct.
Q Okay. And the basis for these rates that we see on page 5, I mean, it says right there: Source, draft 1988 Mission Plan Amendment; is that right? Is that your understanding?
A Yes.
Q Okay. Now, do you know when the 1987 NWPA amendments became law? Was it in 1987?
A It was in early 1988.
Q Thanks. '88. Okay. It was prior to June 1988 when Exhibit 15 was issued?

Page 181

A Yes.
Q Okay. So at the time of this document, Exhibit 15, the 1987 NWPA amendments were enacted and in force as law in the understand?
A That's correct.
Q So after the 1987 amendments, DOE was still planning to use acceptance rates that ramped up to 3,000 MTU per year in year 6, as shown in page 5; is that correct?
A At the repository. That's correct.
Q Okay. And why did DOE plan to use these rates at the repository, as you say, after the 1987 amendments?
A Because the MRS, with the conditions that we went through a little earlier, did not allow it to be available in the time frame of prior to 2003.
And, therefore, the planning basis of the program was such that an MRS was not in the system. And, therefore, the planning basis of the program was to have a repository available in 2003 with these planned acceptance rates.
Q And the 2003 commencement date, if you

Or both?
BY MR. STOUCK:
Q With -- either independent or with -- this document talks about simultaneous.
So when did having an MRS on day 1 become something that DOE was planning to do, if you know?
A Well, I have to go back to the Mission Plan, because the Mission Plan originally in the -- the 1985 Mission Plan originally reflected that the department could have the MRS available in the '96 time frame. So in terms of -- in trying to be fully responsive to your questions, there was a group working on MRS. There were people looking at facility designs. There was time frames, budgets, so forth being developed internally within the program for deployment of such facility subsequent to congressional authorization.
So the program had activities, planning activities underway prior to the time, actually, that the 1985 Mission Plan Amendment was issued -- 1985 Mission Plan was issued in 1985.
Q Okay. So as early as the time of the



1985 Mission Plan, subject to congressional authorization, DOE already, at that time, was planning to -- to have an MRS as part of the facilities for the spent fuel program?
MR. LO RE: Objection. Vague as to the term planning.
THE WITNESS: Subject to congressional authorization, yes.
BY MR. STOUCK:
Q Subject to congressional authorization, my statement is correct?
A Uh-huh.
Q Yes?
A Yes.
Q Okay. All right. When did DOE first plan to commence operations only at an MRS and no at a repository?
MR. LO RE: Objection. Lack of foundation.
BY MR. STOUCK:
Q If you know?
THE WITNESS: Never.



BY MR. STOUCK:
Q Okay. I was going to fix the foundation. I guess the prior question is: Did there come a time when DOE planned to commence operations only at an MRS, with the repository to come later, but on day 1 there's only an MRS? Did there come a time when DOE planned to commence operations at an MRS first with the repository to come later?
A If you could help me identify, when you say on day 1, what day 1 are you referring to?
Q Well -- oh. Let's try it this way. Let's say day 1 is 1998. Did there come a time when DOE was planning to commence operations in 1998 at an MRS with the repository to come on line subsequently?
A That strategy of the department was first provided to the Congress in the secretary's reassessment report in 1989.
Q Okay. The strategy was provided. But what about -- does that mean that, in 1989, DOE was planning to start operations in 1998 at an MRS with the repository to come online subsequently?



A Yes.
Q Okay.
MR. STOUCK: Can we mark this, please.
(Kouts Exhibit No. 16 was marked for identification.)
BY MR. STOUCK:
Q Mr. Kouts, you've been handed what's marked Deposition Exhibit Number 16. This is the December 1991 Annual Capacity Report, correct?
A Yes.
Q Okay. Now, if you turn to page 5, you will find rates. And my question is: As of December 1991, is it correct that these rates shown here on page 5 are the rates of acceptance that DOE was planning to use under the Standard Contracts?
A Yes.
Q Okay. And these rates assume -- or these rates reflect, I think is a better word, these rates reflect the 10,000 MTU capacity limit from the 1987 amendments? It assumes -- well it assumes that that capacity limit is in place, but that the linkage between MRS construction and repository constructio

Page 194

is not in place; is that correct?
A As well as the siting and -- as well as the siting linkages, yes.
Q Yes. So with that correction, my statement is correct?
A Yes.
Q Okay. Did DOE at this time in December 1991 believe it was likely that the construction -- what I'll call the construction linkage would be removed?
MR. LO RE: Objection vague as to the term likely.
THE WITNESS: The government believed that this was the best strategy for it to undertake. In terms of whether or not it would ultimately be successful, that was in the hands of Congress. And the Department could only anticipate that, assuming a site was found and the Nuclear Waste Negotiator was successful, that Congress would approve that agreement which would address the linkages.
So to the extent that the Department's -- whether or not the Department's strategy was likely

Page 195

at this time, it was the Department's belief that it was the best strategy in order to get 1998 waste acceptance and it threw all its resources behind it.
BY MR. STOUCK:
Q Would it be helpful to have a definition of likely?
A Sure.
Q My definition is "more likely than not." That's what I mean when I say likely. Okay. Greater than 50 percent chance.
So, again, the question is: At the time of this ACR, did the government believe it was likely that the construction linkage would be removed in a manner and a time frame that allowed commencement of MRS operations in 1998?
You know, do you know? It's always do you know. If you don't know, just tell me you don't know.
A Based on the -- based on the options available to the Department in terms of strategies, it was considered to be the best strategy to follow. In terms of the Department's trying to forecast what

Page 196

Congress would do, you know, the Department's not in the business of trying to forecast what Congress would do.
However, it was, from the government's perspective and from the Department's perspective, reasonable to expect that, if there was a willing host to the facility, and if there was an agreement that was negotiated by the Negotiator, which was part of the strategy that we did not get into in the discussion of the Secretary's reassessment report, that, given those eventualities, that Congress would have approved it and would have given the Department the flexibility in order to have the facility available in the 1998 time frame.
Q As of the time of this ACR, which is December 1991, the Department had no projection of the likelihood of the construction linkage being removed; is that your testimony?
A No, it's not.
MR. LO RE: Objection. Mischaracterizes.
BY MR. STOUCK:
Q I asked if, at the time of this document,

Page 197

the Department had a projection of the -- I asked him if -- he was telling me that the Department did not have a projection of the likelihood of the construction linkage being removed. And I believe what he said was no.
So then I was following up with, okay, so the Department, at this time, did have a projection of the likelihood of the construction linkage being removed.
It's one or the other. They either did have a projection of the likelihood in December of 1991 or they did not have a projection of a likelihood. I'm just trying to find out which it is.
A Based on the interest of potential sites by the Negotiator, and the issuance of grants which, again, the grants program was issued -- was being administered by the Department, there was considerable interest in the siting of a facility at a variety of places.
And the Department believed at this time that there was a good chance that it would be

50 (Pages 194 to 197)

 ©2007
917ffa92-9800-4498-95e6-5e4b9a24ccb0

successful and be able to attain a site and have a facility available.

That was the reason why the Department went out and started the planning process with the utilities, because it felt ultimately that it would have been successful in having a facility availability.

Q Okay. Can you say or can you not say that the good chance that you just mentioned was a greater than 50 percent likelihood or can you not -- you know, can you say or can you not say?

MR. LO RE: Objection. Asked and answered.

THE WITNESS: The -- the Department felt it was plausible that -- that this would happen. And it continued to spend resources. It continued to request budgets from Congress, which Congress approved, in order to implement this activity.

So the -- the -- in answer to your question, I don't believe the Department would have submitted budgets and allocated resources if it felt that -- that this was a futile effort.



BY MR. STOUCK:

Q At this time in 1991 when this document was issued, Exhibit Number 16, was DOE working actively to have the construction linkage removed by Congress?

A It was working actively to the extent of supporting the Negotiator in identifying a site. And if that -- if that site was identified and an agreement was reached with the host state, the Department would have worked actively with the Congress in order to have that agreement approved.

So basically the strategy of the Department was to find a site through the office of the Negotiator, which was provided by the Nuclear Waste Amendments Act of 1987. And it felt that that process, at this time, was still going to bear fruit.

Q Was DOE planning -- okay. Thank you for that answer.

Was any part of DOE's efforts to, let's say, overcome the construction linkage, did any part of those efforts involve a statutory change to just



get rid of the linkage as opposed to promoting the Negotiator's efforts with an agreement, you know, an agreement with the state or a tribe?

A As presented in the 1989 reassessment report, I believe that a -- a section of the President's energy initiative had removing the linkages. I would have to go back to review that report to look at the exact language.

But according to that document, the Department had did have, as part of the President's energy initiative, in 19 -- I believe either '90 or '91, that would have had language as part of a legislative package to modify the linkages as they were identified in the 1987 amendments.

Q Through a statutory change?

A Through a statutory change.

Q Now. Can you explain to me the following. Having -- the DOE recommended the construction linkage in 1987, correct?

MR. LO RE: Objection. Mischaracterizes the testimony.

BY MR. STOUCK:



Q Well it was slightly different form and the Congress modified it when it enacted it.

But the concept of linking the MRS to the operation of the repository was something that DOE recommended in the MRS submission and generally recommended the MRS; is that correct?

A The linkages that the Department proposed in the 1987 proposal to Congress were that the facility not be operated until the repository received a construction authorization from the NRC.

At that point in time, the repository construction authorization was planned to be received in 1998.

Therefore, the department's linkage, as proposed in the MRS proposal, would have allowed the MRS to operate in 1998.

In addition to that, the Department proposed a 15,000 metric ton limitation on the storage field at the MRS.

Q Okay. And the -- okay. As you just described the linkage in the '87 statute, that was recommended by DOE?





917ffa92-9800-4498-95e6-5e4b9a24ccb0

Page 202

A That's correct.
Q And having recommended that linkage in 1987, can you explain to me why, in 1989 or thereabouts, as you just told me, a part of DOE's efforts to deal with this -- with the construction linkage that was actually enacted involved trying to have that linkage removed by statutory change?
MR. LO RE: Objection. Asked and answered. That's what he just said.
BY MR. STOUCK:
Q There seems to be at least a little bit of change of position there. But I'm sure there's an explanation for it.
MR. LO RE: Objection. Asked and answered. Go ahead.
THE WITNESS: All right. The statutory linkage proposed was consistent with the recommendation -- and the concerns, if you will, of local citizenry around the Oak Ridge site where the MRS was intended to be deployed. That the MRS -- the MRS's operation be tied to progress within the repository.

Page 203

Subsequent to -- and that would still have allowed the MRS to operate in 1998 and be tied to the construction authorization and the repository.
With the repository moving on, the Department changed its position on linkages because in the 1989 reassessment report, the repository was then delayed by the Secretary till 2010, which -- and the construction authorization would have been approximately 5 years earlier in 2006.
So, therefore, given the same schedule linkages, the MRS would not be able to begin operation until the 2006 time frame, which was, again, not consistent with the contracts or the desire of the Department to have a facility operational in the 1998 time frame.
So as a result, the Department pursued removing the schedule linkage but maintained the capacity limitations such that the MRS would not exceed 10,000 metric tons until the repository was operational, to deal with concerns that the facility would not be a substitute for repository, become a

Page 204

de facto repository.
BY MR. STOUCK:
Q Okay. Thank you. Let's just take a look at Exhibit Number 16 which is the '91 ACR.
A Okay.
Q Page 5, where it says where the rates are?
A Okay. Yes.
Q Okay. I mean, just piecing it together here, DOE is planning to use acceptance rates that, as shown, start in 1998, correct?
A Yes.
Q Because, at this time, DOE was planning to accept spent fuel in 1998, at least working towards that plan?
A Yes.
Q And that would have been -- if that had occurred, that would have been at an MRS, at least as of the time -- you know, as of December 1991, DOE's plan was to commence acceptance at an MRS in 1998?
A That's correct.

Page 205

Q Okay. Okay. What role, if any, did you play, yourself, Mr. Kouts, yourself, so I'm departing from the 30(b)(6). I'm asking about Chris Kouts, what role, if any, did you yourself play in the development of this December 1991 ACR, Exhibit 16?
MR. LO RE: Objection. Asked and answered.
THE WITNESS: In the development, I believe I reviewed this document before it went out in my capacity where I was at the time in the program. But I was not directly involved in the development, no.
BY MR. STOUCK:
Q Okay. Where you were in the program at that time was the head of the transportation program, according to Exhibit 1?
A At this time I believe I was probably working in strategy and contingency planning of the program.
Q Okay. Thank you. So you reviewed and commented or just reviewed or....

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.), :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :

\- - - - - - - - - - - - - - - - - - - - - - X

Discovery Judge (Judge Sypolt)
Washington, D.C.
Wednesday, May 15, 2002

Deposition of THOMAS POLLOG, a (30)(B)(6) witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness having been duly sworn by BRYAN WAYNE, Notary Public for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:30 a.m., Wednesday, May 15, 2002, and the proceedings being taken down by Stenotype by BRYAN

Page 2

WAYNE, RPR, and transcribed under his direction.

APPEARANCES:

On behalf of Plaintiffs Yankee Atomic, Connecticut Yankee, and Maine Yankee:
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5821

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Room 12128
Washington, D.C. 20530
202-305-9640

Page 3

CONTENTS

WITNESS EXAMINATION BY COUNSEL FOR
THOMAS POLLOG PLAINTIFFS
By Mr. Skalaban: 4

Afternoon Session - Page 123

EXHIBITS

POLLOG EXHIBIT NO. PAGE NO.
1 - Letter, 3/1/99, Lester to Stock, Shapiro 8
2 - Standard Contract 127
3 - Government's Witness List 167
4 - Copy of 1990 ACR 169
5 - 1991 ACR 171
6 - Unspecified Doc., Contains APR 208
7 - Nancy Montgomery Document, Identifies 35 Issues With Std. Contract Needing Correction 251
* All exhibits retained by counsel.

Page 4

PROCEEDINGS

Whereupon,

THOMAS POLLOG,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. SKALABAN:

Q. Hello, Mr. Pollog. My name is Pete Skalaban. I represent Yankee Atomic, Maine Yankee, and Connecticut Yankee in the spent fuel litigation. I understand you've been deposed twice in the litigation. Prior to that, have you ever been deposed?
A. Three times, and no, prior to that I have not been deposed.
Q. And the three times was in connection with this spent fuel litigation?
A. Yes.
Q. There was a 30(b)(6) deposition on document issues, is that correct?
A. Yes.
Q. There was a 30(b)(6) deposition on certain other issues, is that correct?
A. Yes.

Page 5

Q. What's the third time?
A. There was another 30(b)(6) yesterday.
Q. I see. And what was that? What did that entail? What were the issues discussed?
A. DCS approval process. It was one of the issues identified by the non-Yankee litigants in their 30(b)(6) witness request.
Q. What's your understanding of what will happen here today?
A. You'll ask me questions, and I'd try and answer them.
Q. Okay. If you don't understand any of my questions, will you let me know so we can have a common ground for my questions and your answers?
A. Yes.
Q. And if you need to take a break at any time will you let me know?
A. Yes.
Q. I just ask that you do that -- you can take a break at any time just so long as a question is not pending, is that fair?
A. Yes.
Q. If I understand correctly, in 1998 you joined DOE as a general engineer for the systems development branch?

Page 70

don't know if he actually worked for TRW or Framaton or one of the -- which specific consortium of companies was part of the M&O at that time.
Q. Was there a particular office of RW or branch of RW that was looking -- or that was managing this effort to design a waste disposal package?
A. Yes.
Q. And what branch was that?
A. That would have been an office in our Las Vegas office.
Q. When you say the Las Vegas office, what does that -- does it have a more formal title to that?
A. Yucca Mountain site characterization office. I will call it YMSCO if that's okay if it comes up in the future -- Y-M-S-C-O is how it's usually seen -- in the future.
Q. Is that the main Nevada office?
A. For RW, yes.
Q. Are there any other RW offices in Nevada?
A. Not to my knowledge.
Q. Is there a Yucca Mountain site project office?
A. I don't know. It may be called different things by different people.

Page 71

Q. When you were at project manager, did you have a lot of -- did you have any interface with Mr. Doerring on the waste package design?
A. Very little.
Q. Do you know who's responsible for seeing that the designs of the Westinghouse MPC and the waste package would be compatible?
A. Yes.
Q. Who was that?
A. It would be Jim Clark.
Q. And was Jim Clark with DOE?
A. No.
Q. He was a contractor?
A. Yes.
Q. Do you remember if --
A. Yes.
Q. Can you tell me?
A. Yes. JAI.
Q. And would he have been reporting to Jeff Williams or to someone at the Las Vegas office?
A. Neither.
Q. Who would he have been reporting to?
A. He would have been reporting to the M&O east coast manager.
Q. And do you recall who the M&O was at this

Page 72

time?
A. Yes. It was TRW.
Q. TRW. And who is TRW reporting to on accordation between the MPC and the waste package design at DOE?
A. Myself or Jeff Williams. Or Bill Lake.
Q. Why was the Department interested in designing an MPC?
A. Several reasons.
Q. Can you tell me what they are?
A. I believe they saw it as a method for reducing the handling of spent fuel once it's loaded into the canister that it would never need to be handled bare again, thus reducing occupational exposures for all parties; utility and government or government contractor. I believe there was also some discussion about whether we could use MPCs or supplying MPCs to purchasers as an option if there was a delay in meeting the 1998 date.
Q. And were you involved in those -- were you personally involved in those discussions about whether MPC should be supplied to the purchasers as a form of compensation for meeting the 1998 date?
A. No.
MR. CRAWFORD: Objection to the extent it

Page 73

mischaracterizes prior testimony.
THE WITNESS: No.
BY MR. SKALABAN:
Q. Was that a fair characterization of what you had just testified to, in terms of supplying MPCs to the purchasers would be some sort of compensation?
A. I wouldn't say compensation.
Q. How would you characterize it?
MR. CRAWFORD: Objection to the extent it might call for a legal conclusion.
THE WITNESS: One way we could meet our '98 date would be to supply the purchasers -- or meet waste acceptance starting January 31, 1998, would be to supply them MPCs.
BY MR. SKALABAN:
Q. Is it your understanding that that would satisfy the requirements of the contract?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
THE WITNESS: Have no idea.
BY MR. SKALABAN:
Q. Now, reasons you gave me for why the Department was pursuing the MPC was method of reducing the handling of bare fuel, number one, and number two, something that could be given to the