Page 74

utilities in view of the delay in meeting the 1998 date. Were there any other reasons?
A. Not to my knowledge.
Q. How about any benefits from a transportation perspective?
A. Could have been, but I don't recall that being mentioned to me when I started on this.
Q. What were the general physical characteristics of the canister that Westinghouse was designing for the Department?
A. It was big.
Q. Do you have a sense of how many MTUs of spent fuel was capable of handling?
A. Yes.
Q. What was that?
A. Approximately 10.
Q. This would be a rail or this canister would need to be transported by a rail cask?
A. I believe that was the intent.
Q. Was the cask being designed to accommodate failed fuel?
A. I don't recall any discussions relating to failed fuel in the canister ever.
Q. Is it possible it could have been designed to accommodate that?

Page 75

MR. CRAWFORD: Objection, foundation.
THE WITNESS: Just as easy, would it be possible to design not to accommodate that. I don't know.
MR. SKALABAN: You just don't know?
THE WITNESS: I don't know.
BY MR. SKALABAN:
Q. What was the maximum burn up of the spent fuel facilities that would be put in the canister?
A. I don't recall the specific number. And again, it would probably depend on what the initial enrichment was to.
Q. Do you have a sense of whether it was being designed to accommodate higher burn-up fuel that was being generated by utilities?
MR. CRAWFORD: Objection. Facts not in evidence.
THE WITNESS: I don't know what you mean by higher burn-up fuel.
BY MR. SKALABAN:
Q. Do you have an understanding of whether utilities have been burning up their fuel to higher levels as time progressed in the '80s and '90s?
MR. CRAWFORD: Objection, vague.
THE WITNESS: I understand utilities are

Page 76

increasing the burn-up of their fuel.
BY MR. SKALABAN:
Q. Do you have an understanding whether higher burn-up fuel generates less spent fuel?
A. Theoretically, higher burn-up fuel should use up in aggregate, industry wide, less spent fuel.
Q. Do you know whether the Department ever encouraged facilities to burn their fuel up at higher levels?
A. I have no knowledge of the Department ever expressing any preference for types of burn-ups, what the utilities should be doing from an operational point of view regarding burn-ups.
Q. If utilities were burning their fuel to higher levels there would be less overall spent fuel for the Department to handle, is that correct?
A. In theory in the aggregate, that's probably correct.
Q. What are the -- just in your general sense of having worked in the industry what is a high level of burn-up for fuel?
MR. CRAWFORD: Objection, vague.
THE WITNESS: When I, Tom Pollog, hear higher burn-up, I think of generally fuel that is burned up more than 45,000 megawatt days per metric

Page 77

ton of uranium. Other people may have different definitions.
BY MR. SKALABAN:
Q. Do you have any reason to believe that the MPC that was being developed wouldn't be able to accommodate full burned up to the level of 45,000?
A. I don't recall what the burn-up limitations were on the MPC at this time.
Q. My question actually was do you have any reason to believe that it wasn't designed to accommodate fuel of a greater burn-up than the level of 45,000?
MR. CRAWFORD: Objection. Asked and answered.
THE WITNESS: Again I just don't recall what the burn-up limitations were. I don't know.
BY MR. SKALABAN:
Q. So you don't have a reason to believe that it wasn't?
MR. CRAWFORD: Objection. Asked and answered. And best evidence.
THE WITNESS: I have no reason to believe it was nor wasn't.
BY MR. SKALABAN:
Q. And approximately September of 1996 you

Page 78

stopped working on the MPC design. Why was that?
A. Are you referring to me working on it or the Department of Energy?
Q. You first, please.
A. Well, I believe we stopped working on it prior to that. Department of Energy.
Q. When did the Department of Energy stop working on the MPC program?
A. I believe it was about two or three months prior to the date you mentioned.
Q. Approximately summer of '96?
A. Yeah. Early summer.
Q. What was your understanding of why the Department stopped working on the MPC program?
A. At that point in time I think -- I hope I have my dates right. That would have been for fiscal year 1996 we sustained a massive budget cut where it got reduced by almost one half, and the decision was made that we were going to take the money that was given to us in the budget and emphasize Yucca Mountain -- activities at Yucca Mountain.
Q. So would those budget cuts have been -- would the decision to cut the budget, I assume that's made by Congress?
A. Yes.

Page 79

Q. And that would have been made in September of '95?
A. September or October. I forget what the budget process was that year. We may have been under continuing resolution for a month or two. But late summer/fall of '95.
Q. And so those budget cuts would be taking effect January 1, 1996?
A. No. They would have been taken into effect as soon as the budget was passed which could have been January -- I don't remember when the budget was passed for FY 96. It could have been September, could have been October, could have been November of '95.
Q. So approximately late 1995 the MPC program was cut?
A. Approximately late '95 a decision was made we were going to take the funding that Congress had given us to emphasize Yucca Mountain and not pursue many other activities, one of which was the MPC.
Q. But you continued to work on the MPC program?
A. A certain portion of I believe the prior year's budget was already set aside for the phase 1 or -- I forget how we phase it, phase 1 or phase 2 or

Page 80

phase A or phase B, that portion of the MPC project. So funding was already available for the initial phase which was the design phase of the MPC. And when the budget cut -- when we saw the budget cut for the following year, the decision was made we were not going to follow up with any of the additional phases or later stages of the MPC program.
Q. So that kept you working on the MPC program into 1996, the finishing of phase 1?
A. Phase 1 or phase A, whatever it was called. Yes, that's correct.
Q. So then your work in that respect finished up in approximately September of '96?
MR. CRAWFORD: Objection, mischaracterizes prior testimony. Asked and answered.
THE WITNESS: I believe it was finished up before September of '96, but it could have been some additional details that were going on a little bit later than that into September, but I just don't recall if it was June, July, August, or September.
BY MR. SKALABAN:
Q. And what were the types of things as that program was transitioning out, what kind of new duties and responsibilities were you undertaking?
A. When?

Page 81

Q. In '96.
A. What time period?
Q. Summer of '96.
A. Finishing up the MPCs, making sure all the deliverables under that phase were submitted, approved. We were still working on the General Atomics casks with similar activities because that program had also been essentially stopped because of the same budget cuts. I'd call them close-out activities for the GA program, General Atomics program and the MPC program.
Q. And according to Exhibit -- well, actually it's not -- if I understand from your prior testimony, it was the fall of '96 that you went to work for the waste acceptance team?
A. Yes.
Q. Was that September '96?
A. Approximately, yes.
Q. Now, with the General Atomics cask, can you tell me what that program was about?
A. General Atomics was designing a height-capacity legal-weight truck cask.
Q. And what was the purpose of the high capacity legal weight truck cask?
A. Theoretically to be used for truck

Page 82

shipments as part of our transportation system.
Q. And when you say high capacity, what was the intended design capacity of that light weight truck cask?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: The GA had a design capacity of four PWR assemblies and nine BWR assemblies.
BY MR. SKALABAN:
Q. And approximately how much MTU does that translate to?
A. Four Ps would translate to approximately 2 MTUs, and nine Bs would be approximately the same number.
Q. Now, was it your understanding this cask was an interexchangeable system that could be used for either PWR or BWR?
A. At points in time they were looking at a removable basket. The final design, I forget at this point in time whether in the licensing process they decided it may have to be two separate casks. I just don't recall.
Q. How about the NPC, was that an interchangeable system between?
A. I don't believe so. I don't recall that fact, so I'm not a hundred percent sure, but I do not

Page 83

believe it was an interchangeable basket.
Q. The canister can be interchanged between the two types?
A. Well, the canister would go from transportation to storage to transfer to waste disposal. So that could be interexchange between the overpacks. I'm talking about in the GA the basket itself is a transportation-only cask. So the basket that contains the Bs and the Ps, WR assemblies, they were attempting to make that interchangeable.
Q. So there would have to be an entirely different canister design for the MPCs to accommodate BWR as opposed to PWR?
A. I believe so.
Q. So the best of your recollection, there was no sort of universal design spec for the canister for both systems, for both types of fuel?
MR. CRAWFORD: Objection. Asked and answered.
THE WITNESS: I believe what you said was correct. There was no interexchangeability between the canisters or baskets for boiling water reactors and pressurized water reactors.
BY MR. SKALABAN:
Q. Was Westinghouse doing two separate

Page 84

canisters?
A. I believe so.
Q. Were they doing more than that?
A. Yes.
Q. What other types of canisters were they looking at?
A. The way this works is basically there's different types of PWR fuel. There's Westinghouse, Combustion Engineering, B&W, and although they are similar, they are not exactly the same regarding the physical dimensions of them, especially the lengths of some of them are a little bit longer, some are a little bit shorter.
So for specific types of PWR fuel there may have been a specific design just for Westinghouse fuel, for B&W fuel, or for CE, or Combustion Engineering fuel.
Q. And so you recall multiple canisters being designed for different types of PWR fuel?
A. Yes.
Q. And you don't remember the number?
A. Not specifically.
Q. Do you recall any discussions on whether the canister should try to be designed in a way that could accommodate all the different types of PWR

Page 85

fuel?
A. No.
Q. Was that technically feasible?
MR. CRAWFORD: Objection, foundation.
THE WITNESS: Given infinite resources, possibly.
BY MR. SKALABAN:
Q. So to your understanding it was less expensive to develop different canisters than to try to develop one universal canister?
A. Less expensive and also shorter time-wise. That might introduce new licensing difficulties.
Q. What kind of licensing difficulties are you referring to?
A. Oh, if it used any type of new technology or new material or something the NRC hadn't seen before in their cask approval process, that could put a great deal of regulatory uncertainty into the approval of it. NRC likes to operate on proven, known materials, methods.
They believe greatly in licensees using regulatory precedents in the licensing process. If you're using things that weren't consistent with what they'd seen in the past, it could delay things in the licensing.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER . 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC · 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & . 98-485C, 98-486C,
LIGHT COMPANY, NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; . 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Deposition of DAVID ZABRANSKY
Washington, D.C.
Wednesday, April 17, 2002
9:38 a.m

Job No.: 12597-1
Pages 1 through 226, Volume I
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X



Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT.
JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

CONTENTS

EXAMINATION OF DAVE ZABRANSKY PAGE
By Mr. Blanton 13

EXHIBITS
(Attached to the Transcript)

ZABRANSKY DEPOSITION EXHIBIT PAGE
1 Federal Register Notice dated 4/18/83, "Standard Contract for Disposal of Spent Nuclear Fuel" 28
2 Letter dated 9/30/96 from R. Cocherell 34
3 Letter from B Tomasoni to R. Cocherell 39
4 Instructions for Completing Appendix C Delivery Commitment Schedule 43
5 1995 Acceptance Priority Ranking and Annual Capacity Report 44
6 Federal Register Notice dated 2/4/83 65
7 Final Interpretation of DOE's Nuclear Waste Acceptance Issues 67



EXHIBITS CONTINUED
(Attached to the Transcript)

ZABRANSKY DEPOSITION EXHIBIT PAGE
8 1984 Civilian Radioactive Waste Program Mission Plan 83
9 1985 Civilian Radioactive Waste Program Mission Plan 98
10 Excerpts from 1985 Mission Plan 114
11 "FWMS Cases Requested by the DOE HQ" 123
12 Proposed Contract Changes, Revision O, 4/13/92 124
13 "Index to Tables of Issues Related to the Standard Contract" 127
14 Document, "Disposal Contract Modifications" dated 10/22/84 130
15 Document from files of D. Zabransky 138
16 Document with Subject: Potential Modifications to the Standard Disposal Contract 139
17 Meeting Notes dated 3/25/87 142
18 Letter from J. Kearney to B. Rusche 150



EXHIBITS CONTINUED
(Attached to the Transcript)

ZABRANSKY DEPOSITION EXHIBIT PAGE
19 Letter dated 4/28/87 from S. Kraft to C. Jedrey 164
20 Letter dated 10/2/87 from C. Jedrey to S. Kraft 166
21 Statement of Sol Burstein dated 3/19/87 171
22 Documents from the Wisconsin Production 173
23 Letter dated 8/29/88 from J. Kearney to C. Kay 179
24 UWASTE Presentation dated 5/16/89 189
25 UWASTE Report dated 2/16/90 193
26 Preliminary Projection of Spent Fuel Acceptance Rate 197
27 Letter dated 2/16/94 from S. Parker to D. Dums 199
28 Document dated 3/31/92, "ACR Response Team Meeting" 214



PROCEEDINGS

DAVID ZABRANSKY

having been duly sworn, testified as follows:

MR. BLANTON: Before I start asking Mr. Zabransky questions, I want to put on the record an understanding we have with the government's counsel that Mr. Zabransky's deposition has been noticed both as a fact witness and he's been designated by the government, as I understand it, as the government's 30(b)(6) representative as to certain topics. Somebody want to tell me --

MR. OLSEN: I believe topics eight and ten.

MR. BLANTON: Eight and ten of the plaintiff's deposition notice under Rule 30(b)(6). What we have agreed to do is essentially conduct Mr. Zabransky's fact deposition first and all the lawyers will have their chance to ask Mr. Zabransky questions regarding his fact deposition, and then we will take his deposition on the topics as to which he's been designated the government's representative under Rule 30(b)(6)

MR. CRAWFORD: That sounds exactly like

what we've agreed to. And you might want to put the 30(b)(6) deposition under separate cover.

MR. BLANTON. Which is okay by me, too

EXAMINATION BY COUNSEL FOR PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY and GEORGIA POWER COMPANY

BY MR. BLANTON.

Q Mr Zabransky, my name is Stan Blanton. I'm counsel to Southern Nuclear Operating Company, Alabama Power Company, and Georgia Power Company in litigation filed by those companies against the United States in the Federal Court of Claims on the standard contract for disposal of spent nuclear fuel and high-level waste within the Department of Energy.

We're taking your deposition today under coordinated discovery proceedings that exist in the Federal Court of Claims amongst other nuclear as well as other companies. And these other lawyers sitting here at the table represent other companies that have filed similar complaints against the Department of Energy

What I would like to do today is ask you a



series of questions and perhaps show you some documents and ask you questions about those documents. If I at any time ask you a question that you don't understand, I want you to stop me and make me rephrase my question so you understand it. Will you do that for me?

A Yes, I will.

Q If I in trying to ask a question attempt to repeat some testimony you've given and you feel that I've mischaracterized your testimony, I would like for you to stop me and make me properly characterize what you feel your testimony has been as well. Will you do that?

A Yes.

Q The parties to this coordinated discovery proceeding have entered into something called a joint motion for entry of agreement and protective order, and attached to that is an agreement and protective order -- and by "parties" I mean all the utilities and the government -- which deals with the protection of confidential information in general. Have you had a chance to review that protective order?



A No, I haven't.

Q Okay. I've handed you and your lawyers a copy of the protective order --

A One moment.

Q What I would like for you to do is to take as long as you need to to review the protective order, and then when you get through reviewing it I'm going to ask you if you agree to abide by its terms concerning the protection of confidential information that might be disclosed to you during the course of deposition.

A Okay.

Q Have you reviewed the terms of the order governing the protection of confidential information that might be revealed to you during the course of the deposition?

A Yes.

Q Do you agree to abide by the terms of the order --

A Yes.

Q -- with respect to that information?

Okay. Thank you.



Mr. Zabransky, have you ever had your deposition taken before?

A Once, yes.

Q Then you know this lady at the end of the table is the court reporter and she's going to take down everything you say and everything I say and that she can't take down nods and that you and I need not talk at the same time or she'll get up and leave. Do you understand that?

A Yes.

Q Mr. Zabransky, what is your current position?

A Currently I'm the acting director of the Waste Acceptance and Transportation Division, Department of Energy, Office of Civilian Radioactive Waste Management.

Q How long have you been in that position?

A I believe since sometime in January, early January. This year.

Q Are you acting director because somebody who used to be the director left --

A Yes.

17

Q -- and has not been replaced?
A Yes.
Q Who is that person?
A James Carlson.
Q What was your position before you became acting director?
A Team leader, waste acceptance.
Q Who did you report to when you were team leader of waste acceptance?
A James Carlson.
Q Who do you report to now?
A Jeff Williams.
Q What is Mr. Williams' title?
A The acting director of the Office of Acceptance, Transportation, and Integration.
Q Do you know who Mr. Williams reports to?
A I believe he reports to the director and the deputy director of the program.
Q So in your current job there's essentially one level of organization between you and the deputy director of the program. Is that accurate?
A That's correct.

18

Q Am I understanding you?
When did you become team leader of waste acceptance?
A I believe that's when I came to the government in '94 was my original position. I think that's what it was back then.
Q Do you recall a date more specific than just 1994 when you joined the government?
A I believe it was July 8th or 10th, whatever the Monday was after the Fourth of July that year.
Q What did you do before that?
A Worked for Wisconsin Electric Power Company.
Q What was your last position with Wisconsin Electric?
A I was manager of nuclear fuel services.
Q And I may slip up sometime during the next two days and call Wisconsin Electric WEPCO.
A Same thing.
Q But the court reporter likes to know acronyms for real-time.
How long were you manager of nuclear fuel

19

services at Wisconsin Electric?
A It was a couple of years, maybe since '91. I'm not sure of the exact date.
Q And what did you do before that?
A I was a project engineer in nuclear fuel for a number of years.
Q Did you begin your career with Wisconsin Electric?
MR. CRAWFORD: Objection. Vague.
Q Well, did you have a job between your graduation from college and -- well, did you graduate from college?
A Yes.
Q Did you have a job between graduation from college and joining Wisconsin Electric?
A No.
Q All right. How about just tell me all the positions you had with Wisconsin Electric and the dates of them as best you can.
A After my graduation?
Q Right.
A After graduation I was a civil engineer in

20

the nuclear power department, which would have been sometime in 1980.
Q Okay.
A And I became a project engineer, nuclear power department, sometime after that. I believe in around '84 I became a contract administrator for nuclear fuel.
Q That was in 1984?
A Yeah, sometime around '84. Sometime after that I became a project engineer for nuclear fuel, and then I believe in '91 or thereabouts I was the manager of nuclear fuel services.
Q As the contract administrator for nuclear fuel, what were your duties?
A My duties were to negotiate and administer all the contracts for the procurement of nuclear fuel commodities for the Point Beach nuclear plant.
Q When you were in that position was the standard contract for disposal of spent nuclear fuel in your area of responsibility?
A Yes.
Q And that job started in 1984 did you say?

21

A I believe it was around '84, yes.
Q In your previous position as project engineer for nuclear fuel, did you have any responsibilities with respect to nuclear fuel contracts?
MR. CRAWFORD: Objection as to whether it properly characterizes his prior testimony.
MR. BLANTON: Okay.
Q Well, don't let me mischaracterize your testimony.
What were your responsibilities as project engineer for nuclear fuel?
A As project manager of nuclear fuel I had responsibilities for the contracts as well as some other functions such as nuclear material accountability, economic forecasting, rate case development.
Q The project engineer job came after your contract administrator job?
A That's correct.
Q Is that what I fouled up? Okay.
I should have asked in your civil

22

engineering job did you have any connection with nuclear fuel contracts and specifically the standard contract for disposal of spent nuclear fuel?
A No.
Q What were your responsibilities when you were manager of nuclear fuel -- services? Did I say that right?
A That's correct. Same as project engineer but also included transient analysis, core-design activities, spent-fuel storage activities.
Q Did the project engineers and contract administrators for nuclear fuel report to you when you were manager --
A Yes.
Q -- of nuclear fuel services?
All right. What were your areas of responsibility when you became the team leader for waste acceptance for the Department of Energy?
A Primary responsibility was issues and management of the standard contract and utility interface.
Q What all sorts of things did that include?

23

A It included the day-to-day administration of the contract, overview of the payment and verification process, acting as the contracting officer's technical representative, contacts with utilities as required to facilitate contract administration.
Q What was the difference between your responsibilities and the contracting officer's responsibilities with respect to the standard contract in that job?
A I provided technical input to the contracting officer for their consideration in making determinations under the contract.
Q Did your responsibilities as team leader stay in general the same from 1994 until January when you became acting director?
A They expanded in that I became responsible for other DOE activities related to other portions of the waste stream that would go to Yucca Mountain, for instance the interface, the activities related to the acceptance of government-owned materials.
Q Was there a particular time when they

24

expanded or was it a gradual process?
A I think it was a gradual process that expanded over time as people left and systems -- things evolved.
Q Okay.
A We went through a downsizing, and as a result there were fewer people and the same work.
Q Was there a particular time when the downsizing occurred?
A I think -- no, I don't recollect. There was a particular time where there was a reduction in force, but there was no particular time where it addressed this. People just moved to different places as a result of that.
Q Okay. How have your duties changed with your most recent position?
A I am responsible for the transportation aspects now also.
Q Are you still responsible for all the other stuff that you were responsible for?
A Yes.
Q Is there somebody else in the team leader

spot now?
A No.
Q Have those two positions been combined or is the team leader spot just vacant?
**A I'm still a team leader for waste acceptance. I'm just the acting director of the division.**
Q Have you done anything to prepare for your deposition today?
**A I've reviewed the contract. In preparation for my 30(b)(6) deposition I've reviewed documents provided to me by counsel. And I've had discussion with counsel.**
Q Have you had any discussions with anybody other than your counsel to prepare?
**A I've had discussions with Nancy Slater in conjunction with counsel. In preparation for my 30(b)(6) deposition.**
Q Okay. I'm not asking you about the 30(b)(6) deposition right now, just your fact deposition.
**A Okay.**



Q Have you had conversations with Nancy Slater outside the presence of counsel about your fact deposition?
A No.
Q How about with anybody else outside the presence of counsel about your fact deposition?
A No.
Q Have you reviewed any documents other than the standard contract?
**A Not in preparation for my fact deposition.**
Q Have you reviewed the complaints in the case, or any of them?
A No.
Q Have you reviewed any of the briefs filed by either of the parties?
A No.
**I'd like to clarify my last answer.**
Q Okay.
**A I've not reviewed any briefs, complaints, or filings as -- in preparation for my deposition. Over the course of my job over the last years I've reviewed them and read them. I haven't reviewed them**



**recently.**
Q Okay. You say "over the last years." There have been several lawsuits over the standard contract. Is that correct?
**A That's correct.**
Q And some of those have been in the Court of Appeals for the District of Columbia circuit, and some of them have been in the Court of Federal Claims. Are you aware of that?
**A I'm aware of that.**
Q Do you know whether you've read any of the briefs filed in the cases currently pending in the Court of Federal Claims?
MR. CRAWFORD: Well, let me object to this line as getting into areas of privilege. I mean --
MR. BLANTON: You served them on us.
MR. CRAWFORD: Right.
MR. BLANTON: They're not privileged.
MR. CRAWFORD: Well, whatever he's done in reviewing them and so forth, but, I mean, your question is proper as to with respect to what he's reviewed in terms of preparing for his deposition, but



his other work on the case I would think is privileged.
Q You're obviously aware today of what you've read in the past. Is that correct?
**A In the past counsel has provided me some -- some of the briefs. Some of the complaints. I'm not sure all of them or which ones, and asked me to take a look at certain parts of them and comment. But I don't know which ones in particular. I can't recollect.**
**(Deposition Exhibit Zabransky 1 was marked for identification and was attached to the transcript.)**
Q Mr. Zabransky, I'm handing you a document that's been marked as Exhibit 1 to your deposition, which, if all goes well, is a Federal Register notice dated Monday, April 18, 1983, entitled Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste. And after some background material there is what purports to be a form of the standard contract for disposal of spent nuclear fuel and/or high-level radioactive waste. Do

29

you see that?
A **Yes.**
Q Is that the contract or the form of contract that you reviewed in preparation for your deposition?
A **This is the form of the contract. I may have reviewed a later version of this, I believe a '91 or a '92 version of this that was in the Federal Register that has modifications.**
Q Okay. What modifications were done in 1991, can you tell me off the top of your head?
A **In general there were modifications related to electricity generated and sold and allowances for credits or-reductions due to energy losses not delivered to the ultimate consumer as a result of the litigation.**
Q All those deal with how the fee is calculated? Is that correct?
A **That's correct.**
Q Are there any other differences that you know of between the standard contract that was promulgated in 1983 and the one that was contained or

30

the one you reviewed?
A **Not that I recollect.**
Q Have you seen this version of the contract before?
A **Yes, I have.**
Q What is the Department of Energy's obligation under that contract with respect to the quantity and rate of spent fuel acceptance?
MR. CRAWFORD: Objection. Calls for a legal conclusion.
A **There's no rate of acceptance established in the contract.**
Q Are you saying the Department of Energy does not have any obligation with respect to the rate of spent nuclear fuel acceptance?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A **I'm saying that the contract does not contain the rate.**
Q And my question is what is the department's obligation under the contract with respect to the quantity of spent fuel it would accept in a particular

31

year from the utilities?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A **As a result of the contract the Department of Energy's obligation is as it appears on the approved delivery commitment schedules.**
Q If a utility does not have an approved delivery commitment schedule, is it your testimony then that the DOE does not have any obligation to pick up spent fuel from that utility?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A **With respect -- if there's not a delivery commitment schedule approved for a given year, there's no obligation for that given year.**
Q How does a utility go about getting a delivery commitment schedule approved?
A **The contract stipulates how the utility does that.**
Q When is the last time the Department of Energy approved a delivery commitment schedule?
A **I don't recollect the exact date.**

32

Q Has it had delivery commitment schedules submitted to it that it has neither approved or disapproved?
A **That's correct.**
Q Why is that?
MR. CRAWFORD: Objection. Vague.
Q Are you responsible for deciding whether a delivery commitment schedule gets approved or not?
A **I'm responsible for reviewing them and making a technical recommendation to the contracting officer.**
Q Do you know why delivery commitment schedules that have been submitted have not been approved or disapproved?
MR. CRAWFORD: Objection. Vague.
MR. BLANTON: I was asking if he knew.
MR. CRAWFORD: I know. Which DCS are you talking about?
MR. BLANTON: Any DCS.
MR. CRAWFORD: Well, objection. Vague.
A **Repeat the question you asked me?**
Q Do you know why any DCS that has been

33

submitted but has not been approved or disapproved, do you know why that has been done?
MR. CRAWFORD: Objection. Vague.
A **Yes.**
Q Would you tell me?
A **On the advice of counsel.**
Q On the advice of counsel they've neither been approved or disapproved?
MR. CRAWFORD: Objection. Compound.
Q I'm just trying to make sure I understand your answer, Mr. Zabransky.
A **They have not been processed. They've not been approved or disapproved on the advice of counsel.**
Q As I understand your testimony, you provide technical advice to the contracting officer on various issues regarding interaction with holders of standard contracts. Is that accurate?
A **That's correct.**
Q Now, do you have any authority on your own to take actions with respect to delivery commitment schedules, or does the contracting officer take action based on whatever advice the contracting officer

34

gives?
A **The contracting officer takes the final action. I would make a recommendation.**
MR. BLANTON: Let's mark that as number 2.
(Deposition Exhibit Zabransky 2 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, I'm going to show you what's been marked as Exhibit 2 to your deposition, which is a letter dated September 30, 1996, from R.G. Cocherell, and his name is spelled C-o-c-h-e-r-e-l-l. He's manager of nuclear fuel services at Southern Nuclear Operating Company. Take a look at that letter.
For your information, I just note that you are copied on there as an "attention to."
A **Uh-huh.**
Q Do you recall whether you've ever seen this letter or not?
A **I don't recall this specific letter.**
Q What does this appear to be to you?
A **This appears to be a submittal of delivery**

35

**commitment schedules to the contracting officer by Southern Nuclear Operating Company.**
Q All right. Let me refer you just for a minute to the attachment to the letter which is titled U.S. Department of Energy Appendix C Delivery Commitment Schedule. Do you see that?
A **Yes.**
MR. CRAWFORD: Let me just ask you, Stan, they appear to be the same. There are two attachments that are marked identically. Are they the same? They appear to be.
No, maybe not.
MR. BLANTON: They're two different Bates numbers.
THE WITNESS: They're different.
MR. BLANTON: That's the way they were in our file.
MR. CRAWFORD: And the cover letter indicates there are six copies of DCSs. It doesn't indicate which one's original, which ones are copies or not. Is this thing complete?
MR. BLANTON: It's complete the way it is

36

in our file.
MR. CRAWFORD: Okay. I got you. Well, it might be helpful to the witness then just to note that there are two different DCSs.
MR. BLANTON: Okay.
Q You see what your lawyer is referring to? You got a DCS identification number on the first page that ends in 901 and one that ends in 902 on the second page.
A **Yes.**
Q What I wanted to ask you about is you see in the top left and right-hand corners of the form, the DCS form --
A **Uh-huh.**
Q -- there is -- on the left-hand side there's something that says NWPA-830 C and it says revised 9/10/93, which I take to mean September 10, '93. Is that what you take that to mean?
A **I take it to be the date September 10th, 1993.**
Q And on the right-hand corner of the document it has OMB number 1901-0260, and under that

it has "expires 5/31/97." Do you see that?
A Yes, I see that.
Q What do you take that to mean?
A That's the date that this forms expires from OMB clearance.
Q Okay. Are you aware of whether or not this form has been re -- what has to happen in order for this to be a valid form if it expires?
A I'm aware --
Q Not talking about this particular document here but this form.
A I understand your question. I'm aware of what has to happen for this form to be renewed.
Q Has it been renewed since May 31, '97?
A I don't know.
Q How would we find that out?
A We would ask the person who does this.
Q Who does this?
A On my staff, Mr. Pollog is -- oversees ensuring that forms are renewed, and he has that done for him by the Energy Information Administration.
Q Okay. Could we also then ask the Energy



Information Administration whether this particular form has been renewed or when the last time it was renewed was?
A Yes, we could.
Q Okay. What is the process in the Department of Energy in your area when a utility sends in a letter containing delivery commitment schedules such as this?
A The process is -- has been to review the schedule and make a recommendation to the contracting officer. Per the direction of counsel, we have not been reviewing these documents.
Q So you don't even review them now?
A We don't review the documents. We do not process them at this time.
Q Is there --
A One of my staff actually does look at it and makes sure there's no questions, and then we file them, but we don't perform a review or make a recommendation to the contracting officer.
Q Are you aware of any reason other than this, the lawyers told us not to do that, that you



don't do it?
A No.
(Deposition Exhibit Zabransky 3 was marked for identification and was attached to the transcript.)
Q Do you know when the practice of not reviewing the DCS submittals started?
A I don't recollect the specific date.
Q How about a year?
A I believe it was tied to a court decision in the Court of Appeals, the department's obligation.
Q Okay.
A That might have been 1996.
Q Okay. Would that be the decision that said, paraphrasing, and nobody's going to hold you to my paraphrase, that the Department of Energy has an unconditional obligation to begin acceptance of spent fuel in 1998?
A To the best of my recollection.
Q Okay. And subsequent to that decision it's your recollection that the department at that time stopped reviewing delivery commitment schedules,



submittals?
MR. CRAWFORD: Objection. Vague.
Q Did you understand my question?
A You asked me if subsequent to that decision is that what caused us or is that the time that we stopped reviewing at the direction of counsel, delivery commitment schedules.
Q You asked it better than I did.
A And the answer to that question is that's -- yes.
Q All right. Let me show you what's been marked as Exhibit 3 to your deposition. I think I've already given your counsel a copy of it.
MR. CRAWFORD: Yes.
Q That is a letter, operating from memory, from Ms. Tomasoni, is that correct, back to Mr. Cocherell?
A Yes, it is.
Q Do you recall seeing that letter or similar letters?
A I recall seeing --
MR. CRAWFORD: Objection. Compound.

41

Q Do you recall seeing that letter?
A I don't recall the specific letter.
Q Do you recall seeing letters like that?
A I've seen -- yes, I have seen letters like this.
Q Is that a standard form letter that the Department of Energy sends in response to DCS submittals?
MR. CRAWFORD: Well, objection. Vague.
Q Is Exhibit 3 to your deposition a standard form letter that the Department of Energy sends in response to DCS submittals?
MR. CRAWFORD: Objection. Vague.
A A letter of this type has been sent in response to most of the submittals since we stopped processing them.
Q Okay. And that letter indicates that the DCSs submitted by Southern Nuclear cannot be approved or that the department is unable to approve them. Is that correct?
MR. CRAWFORD: Objection. Best evidence.
A The letter says what it says.

42

Q I'm sorry. It does not say "unable." It says "Not able at this time to approve your DCS submittal." Is that correct?
A That's what the letter says.
Q Given the Department of Energy's current practice, is there any way for a utility to get a DCS approved at the current time?
A Under the current guidance, no.
Q And that guidance has been the same since the decision in 1996 that the Department of Energy had an unconditional obligation to accept spent fuel in 1998. Is that correct?
A That is my recollection.
Q Now, let me get you to look back at number two again. And referring you to DCS identification of the document with that DCS identification number that ends in 901, how does the utility know how many metric tons of uranium to put in line 2.5?
MR. CRAWFORD: Objection to the extent it calls for speculation.
Q If you know.
A I don't know how Southern Nuclear knows.

43

Q Well, let me rephrase my question then. Has the Department of Energy given instructions to utilities as to how they should complete these delivery commitment schedule forms?
A Yes, it has.
Q And what are those instructions with respect to the quantities of spent nuclear fuel that are included on a particular delivery commitment schedule?
MR. CRAWFORD: Objection. Best evidence.
A I would have to review the instructions to find out exactly what it says.
(Deposition Exhibit Zabransky 4 was marked for identification and was attached to the transcript.)
Q All right, sir, I'm going to hand you what's been marked as Exhibit 4 to your deposition, which is titled U.S. Department of Energy Instructions for Completing the Appendix C Delivery Commitment Schedule General Instructions. There's one for your lawyer.
A Okay.

44

Q All right, sir. Do those instructions indicate how a utility is to complete the delivery commitment schedule?
A Yes.
Q Do they indicate how the utility is to quantify on the delivery commitment schedule the amount of spent nuclear fuel that's to be picked up in a particular year?
A Yes.
Q What do they say about that?
A They say in instruction 7A, When submitting DCSs purchasers should base their DCSs on allocations contained in the latest annual capacity report, ACR.
Q All right. What is the latest annual capacity report? When was the latest annual capacity report issued?
A I believe it was issued in March of '95.
Q Okay.
(Deposition Exhibit Zabransky 5 was marked for identification and was attached to the transcript.)
Q Let me show you what I've marked as Exhibit

45

5.
Zabransky Exhibit 5 is a document titled Acceptance Priority Ranking and Annual Capacity Report, and it's dated March 1995, is it not?
A Yes, I believe it is. It's hard to read but...
Q Is that the last annual capacity report the Department of Energy has published?
A Yes, it is.
Q Let me get you to take a look at page six of that annual capacity report. What is that?
A Page six contains Table 2, Summary Of Purchaser's Annual Allocations.
Q All right. Is that the document that's referred to in the instructions for completing the DCS that the utility is supposed to use to determine what quantity of fuel is inserted in a DCS for a particular year?
A That's a summary of the information.
Q Okay There are only ten years on that document. Is that correct?
A That's correct.

46

Q That's not all the spent fuel covered by standard contracts?
MR. CRAWFORD: Objection.
Q Is it? Do you know whether all the spent fuel covered by standard contracts is reflected on Table 2 of Exhibit 5?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A If you're asking me if the total quantity of spent fuel generated to date and expected to be generated by reactors covered by the contract is contained within this table, the answer is no.
Q All right, sir. How would a utility who has spent fuel that's not contained on Table 2 of Exhibit 5 to your deposition fill out a DCS for that fuel?
A They would not be able to.
Q Okay. Has the Department of Energy ever published anything, any document, that would inform a utility that had spent fuel that's not in DOE's initial ten-year schedule as reflected on this document, how they would include that fuel on a

47

delivery commitment schedule?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
Q Do you understand my question, Mr. Zabransky?
A Your question was has the Department of Energy published anything that would give guidance to a utility as to how to fill out a DCS beyond this first ten-year schedule.
Q Yes, sir.
A The answer is no.
Q Is it your position that under the standard contract a utility has no right to have that fuel picked up under the standard contract?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A That's not my position.
Q Well, what is your position with respect to utilities who have fuel that does not show up on this ten-year schedule?
A My position is that that fuel would show up on subsequent schedules after the first ten years of

48

operations.
Q But those utilities don't have approved DCSs, do they?
A DCSs aren't due until 63 months prior to the date of pickup. Date of pickup is now anticipated to be no sooner than 2010.
Q So how does whether or not the utility has an approved DCS affect its rights under the contract?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A The department has not committed to pick up fuel on a certain date at a certain rate other than as it showed in the approved DCSs. Its obligation to remove fuel exists, but not on a specific date or a specific rate.
Q Does the Department of Energy have any plans to publish another annual capacity report at any particular time?
A I don't know what the department's plans are.
Q Are you aware of any plans to publish an additional annual capacity report?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------x

YANKEE ATOMIC ELECTRIC COMPANY; · Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES · 98-488C, 98-614C,
POWER COMPANY, DUKE POWER, a · 98-621C, 99-447C,
Division of DUKE ENERGY CORP., · 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; . 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C

-----------------X

(Caption continued on the next page)

Continued Deposition of DAVID ZABRANSKY
Washington, D.C.
Thursday, April 18, 2002
9 44 a m

Job No 112597-2
Pages 227 through 458, Volume 2
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :

-----------------X



Continued Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT

ALEX D TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT

JEFFREY L HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D C 20004-1206
(202) 942-5000

323

MR. OLSEN: Objection. Vague.
A **It was clear to me that things had to happen for anything like that to happen, that the assumptions DOE made for whatever reason they made them had to come to pass.**
Q Okay. And that they had not come to pass as of 1990?
A **That's correct, they had not.**
Q Are you aware that they've ever come to pass?
A **I don't believe they did.**
Q Do you know what things had to happen in order for those assumptions to come true?
A **No, not specifically. But they didn't build an MRS, and they didn't start accepting waste.**
MR. BLANTON: Are you ready to break?
MR. OLSEN: Yeah, I was about to say this might be a good time to break for lunch.
(A luncheon recess is taken.)

324

AFTERNOON SESSION
MR. OLSEN: We're back on the record. Mr. Zabransky would like to clarify one of the answers he gave earlier today.
A **When you asked me with respect to these documents if I used them in my work at DOE my answer was no, but that was with respect to my job at DOE. That was not with respect to preparing with counsel for litigation. So I have looked at these preparing with counsel for litigation pulling documents and going through files.**
Q Okay. In your real job you haven't used them?
A **No.**
Q As contrasted from your litigation job which is being the brains behind the DOE. Is that right?
A **Supporting counsel.**
Q Before the break you mentioned that you did not believe that there was a contractual obligation to publish more than one annual capacity report provided the annual capacity report had data for ten years' worth of operation. Is that correct? Did I understand your testimony correctly?

325

A **I believe that's what I said, yes.**
Q What provision is there then in the contract for the preparation of delivery commitment schedules for spent fuel that does not appear on that first ten-year schedule?
MR. OLSEN: Objection, calls for a legal conclusion. Objection, asked and answered.
A **There is no provision. The DCSs aren't due until five years before the receipt, 63 months prior to date of receipt.**
Q If you didn't have fuel in the first ten years of the ACR and DOE didn't publish an ACR except for the first ten years, how would you ever know when the receipt of fuel other than that first ten years was?
MR. OLSEN: Objection, calls for a legal conclusion. Objection, asked and answered. I think we went over this yesterday.
MR. BLANTON: Different topic.
A **It was my belief that DOE would publish an ACR that would add a year on, so, in other words, you would have the first ten years, then you would have the 11th year, then the 12th year, then the 13th year. So eventually all the fuel would be covered by an ACR.**

326

Q Does it make any sense to suggest that only one ACR would be published?
A **For the first ten years, yes. That covers the first ten-year period. It covers enough for planning purposes and for committing to delivery commitment schedules which are five years out.**
Q Additional ACRs would have to be published for additional years?
MR. OLSEN: Objection.
A **For periods beyond the first ten years.**
Q Otherwise the system wouldn't work. Is that right?
A **That's a true statement. I agree.**
Q Is the last exhibit you have 35?
A **Yeah, the '98 is 35, correct.**
**(Deposition Exhibit Zabransky 36 was marked for identification and was attached to the transcript.)**

# TRANSCRIPT OF PROCEEDINGS



In the United States Court of Federal Claims

-----------------------------------x

Yankee Atomic Electric Company : NO. 98-126C

v. :

United States of America :

-----------------------------------x

May 4, 2004

**DEPOSITION OF:**

**David Zabransky**

a witness, called by counsel pursuant to notice, commencing at 9:30 a.m., which was taken at Spriggs and Hollingsworth, 1350 Eye St., NW, Washington, DC

This transcript has been completely indexed for your convenience. It will help you locate the testimony you want **FAST.** The index is located in the back pages of this volume.

Page 1

In the United States Court of Federal Claims

---------------------------------x
Yankee Atomic Electric :
Company :
: NO. 98-126C
v. :
:
United States of America :
---------------------------------x

May 4, 2004

DEPOSITION OF:

David Zabransky

a witness, called by counsel pursuant to notice, commencing at 9:30 a.m., which was taken at Spriggs and Hollingsworth, 1350 Eye St., NW, Washington, DC

Page 2

Appearances

Robert L. Shapiro, Esq.
Spriggs and Hollingsworth
1350 Eye St., NW
Washington, DC20005
for the Plaintiff

Russell A. Shultis, Esq.
R. Alan Miller, Esq.
U.S. DOJ, Federal Claims Section
1100 L Street, NW
Washington, DC20530
for the Defendant

Page 3

INDEX OF EXAMINATIONS

| WITNESS | D | C | RD | RC |
|---|---|---|---|---|
| David Zabransky | 5 | | | |

Index of Exhibits

(Exhibits maintained by counsel)

| Description | Page |
|---|---|
| exhibit number 1 | 6 |
| exhibit number 2 | 15 |
| exhibit number 3 | 18 |
| exhibit number 4 | 24 |
| exhibit number 5 | 27 |
| exhibit number 6 | 43 |
| exhibit number 7 | 57 |
| exhibit number 8 | 59 |
| exhibit number 9 | 66 |
| exhibit number 10 | 67 |
| exhibit number 11 | 68 |
| exhibit number 12 | 78 |
| exhibit number 13 | 108 |
| exhibit number 14 | 113 |
| exhibit number 15 | 120 |

Page 4

you would have had to have run such a letter through the procurement office and the contracting officer, is that correct?

MR. MILLER: Objection, foundation.

A. Previously the contracting officer would have resided in the procurement and he would have issued the letter, yes.

Q. Rather than you on the program side being able to simply send out the letter, you would have had to have forwarded that through procurement to send it out?

A. Previously the procurement would have sent out the letters, yes.

Q. Is that extra step the kind of thing you meant by saying the process is less cumbersome now?

A. No, not really.

Q. Maybe you can explain better. What did you mean that your being contracting officer has made the process less cumbersome?

A. What I meant was that Mr. Buchheit didn't need to send letters to procurement any more. He



sent them to fewer places, streamlined the process for their communications.

Q. Mr. Buchheit used to send letters, the same letter both to you and to the contracting officer and procurement?

A. Yes.

Q. Does the procurement office have any role at this point administering the spent fuel contracts between utilities and DOE?

A. No.

Q. Looking back at exhibit five more in a substantive manner than procedural, why did the department inform utilities in 2002 that it did not intend to issue a new annual capacity report?

A. Because it didn't intend to issue one and I don't know if someone had asked for one or what. I don't recall the circumstances.

Could have been that someone called and asked if one was going to be issued and the Department decided to send a letter out in general and say no, we weren't going to.



I don't recall the specifics or actually -- I don't recall much more than what this letter says on its face.

Q. In fact, the Department hadn't issued a new annual capacity report since March of 1995, had it?

A. That's the last one that was issued, yes.

Q. If I understand correctly, that annual capacity report notes allocations going out through 2007.

A. The 1995 report covered ten years of operations. Under some constructs, could have gone from 1998 through 2007, yes.

Q. Is it your understanding that's why this letter says the Department does not intend to issue allocations for years 2008 and 2009?

MR. MILLER: Asked and answered, foundation.

A. From reading the letter without recalling what was exactly going on at the time, it appears that the letter says we're not going to issue



allocations for 2008 and 2009. The first ten years were out there and no further ones were going to be issued at that time.

Q. Why wasn't the department going to issue a new annual capacity report?

A. I don't recall. Again, other than the letter sitting here in front of me and reading what it says, I don't recall the situation.

Q. When does the Department plan to issue a new annual capacity report?

A. Can I ask you a question?

MR. MILLER: Well, only if your answer -- only if you think your answer might reveal privileged communications.

A. That's why I need to talk to you.

MR. MILLER: Okay. We need to take a break.

(Recess from 10:21 a.m. - 10:27 a.m.)

Q. Before our little break, I believe the question on the table was when does the Department intend to issue a new annual capacity report?

Sacramento Municipal v. U.S No. 98-488C March 29, 2005

Heritage Reporting Corporation

Page 1826 to Page 2214

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone. 202-628-4888*
*FAX. 202-371-0935*

Page 1826

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
--------------------------------x
SACRAMENTO MUNICIPAL UTILITY
DISTRICT,
NO 98-488C
Plaintiff
vs
UNITED STATES,
Defendant
--------------------------------
Courtroom 5
National Courts Building
715 Madison Place
Washington, D C

Tuesday, March 29, 2005

VOLUME 7

The parties met, pursuant to the notice of the Judge at 9:00 a m

BEFORE THE HONORABLE SUSAN G BRADEN

Page 1827

APPEARANCES
ON BEHALF OF PLAINTIFF
DAVID S NESLIN, ESQ
TIMOTHY R MACDONALD, ESQ
Arnold & Porter LLP
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

HOWARD N CAYNE ESQ
Arnold & Porter LLP
555 Twelfth Street, N W
Washington, D C 20004-1206
(202) 942-5656

Page 1828

APPEARANCES (Continued )

ON BEHALF OF THE DEFENDANT
ALAN J LO RE, ESQ
JOSHUA E GARDNER ESQ
TODD J COCHRAN, ESQ
SCOTT DAMELIN, ESQ
RUSSELL SHULTIS ESQ
ELIZABETH THOMAS, ESQ
U S Department of Justice
1100 L Street, N W
Washington, D C 20036

ALSO PRESENT
STEVEN M COHN, ESQ
STEVE J REDEKER
THOMAS POLLOG

***Index appears at end of transcript***

Page 1829

P R O C E E D I N G S
- - - - - - -
THE COURT Let's go
Whereupon--
DAVID ZABRANSKY
a witness, called for examination, having previously been duly sworn, was examined and testified further as follows:
CROSS-EXAMINATION (Resumed)
BY MR CAYNE
Q Good morning, Mr Zabransky
A Good morning
Q I'd like to turn your attention to Plaintiff's Exhibit 121 I believe that will be in the first binder, one out of three Do you have that document before you, sir?
A Yes I see it
Q And is this document a memorandum from you to -- was this a memorandum from you, sir?
A It's an e-mail from me to Mr -- I believe it's Auke Piersma
Q And who is that person?
A Mr Piersma used to be with a group called Public Citizen
Q And there's also a CC?
A Yes

Page 2126

A It more or less nullified the siting in
Tennessee, so it effectively removed that from the table Other than that, it didn't give any further direction on where an MRS would be located In the expectation that the Negotiator could find a state, it could be any other state except Tennessee and Nevada
Q Let me – I might have asked an imprecise question You had mentioned a couple other sites, I think, including a salt site?
A. Right, those were repository sites
Q Okay. What, what effect, if any –
A Oh
Q – did the 1987 amendments have on the repository sites that were being considered in addition to Yucca Mountain?
A It effectively directed the Department to terminate the site characterization efforts in the state of Washington and the state of Texas, and also, we had a second repository effort underway at that time, it also terminated those programs and told the Department effectively to focus on Yucca Mountain.
Now, in relation to the second repository, it did direct us to submit a report to Congress in the 2007, 2010 time frame on the need for a second repository

Page 2127

THE COURT· I'm sure everybody here knows this but me, but who owns Yucca Mountain?
THE WITNESS· It's effectively owned by the federal government. There are three different types of land that it sits on. Part of the site is owned by the Bureau of Land Management, BLM Part of it's owned by the Nevada Test Site. And the other part of the site is owned by the Department of the Air Force It's the Nellis bombing range So it's all federally owned, but it's under different jurisdictions
THE COURT· It's remote?
THE WITNESS: Yes, it's about 100 miles northwest of Las Vegas and extremely remote and very arid.
BY MR. DAMELIN
Q. If I can turn your attention to page 17 of this document, Mr Kouts?
A Sure.
Q In the middle of the page, there is a section marked 4 3, titled, "DOE's Position on the MRS Facility " Now, I neglected to actually ask you, this document, the report to Congress on a reassessment of the OCRWM program, who is submitting this to Congress back in November 1989?
A I believe this was the Secretary's

Page 2128

document We – it was by the Secretary of Energy, as indicated, it's dated November 29th, 1989 It was his report to Congress.
Q Now, in this section, the last sentence of the first paragraph reads, "The DOE also expressed preference for an MRS facility sited through the efforts of the Negotiator, especially if these siting negotiations lead to modified linkages " What does that sentence mean to you, Mr. Kouts?
A Well, obviously, the preference to have a negotiated site with a volunteer state is kind of obvious "Modified linkages" refers to the restrictions in the Act that I mentioned earlier, on how we could deploy the facility I think that the Department's view then and now is that the value of such a facility is very limited with those restrictions in place.
So that, basically, we were hopeful that if the Negotiator was going to negotiate a deal, that part of that deal would be that these linkages would be removed, and that we could deploy the facility as quickly as possible.
Q Now, was there any type of – let me ask this, at the time of this report, had there been a Nuclear Waste Negotiator actually appointed?

Page 2129

A I believe it was, it was a few years after the Amendments Act, but the first Negotiator, Mr. Leroy, was appointed, it might have been after this point that he was eventually appointed.
Q. And was there any type of relationship following the 1987 Amendments Act, and I guess the appointment of a Negotiator, between the DOE and the office of Nuclear Waste Negotiator?
A As I mentioned earlier, it was an independent entity from the Department and was his own – he had his own office in the executive branch of government with that specific role, so the Department and the Negotiator were definitely separate.
We did, however, support his efforts through administering a grant program for him and also providing technical staff and, whenever he needed it, to go out and talk to people to explain what the Department's concept of an MRS was and to explain, for instance, issues that might be of interest to, to local governments about how much employment was going to be there, how much the facility was going to cost, et cetera, those kinds of issues
Q Now, you had referenced – I'm not sure if