Page 2130

you used the word "grants" or "money " Can you describe what DOE did in reference to either funding or providing financial support to the Negotiator?

A Well, as I mentioned earlier, we administered a grant process for him. The grants were to be issued in phases. A Phase I grant was essentially $100,000 to a local community to study the issue, the feasibility of the issue Phase II, Phase II was cut into two different pieces, a Phase IIA and a Phase IIB

Phase IIA was further feasibility, that was a couple of hundred thousand dollars. And then Phase IIB was a 2 8 million dollar grant, which was to be given to a party that was serious about negotiating, in the expectation that we would have a negotiated agreement with those expenditures of funds

Q Were any of the grants you described actually provided to parties that were engaged with the Nuclear Waste Negotiator?

A. As I remember There were about 14 or 15 requests for Phase I grants, about six of those were issued. Phase IIA grants, which were the $200,000 grants, I think there were eight applications, and we issued five grants along those lines, and there were two applications for the big grants, the 2.8 million

Page 2131

dollars grants, by two Indian tribes, the Goshutes and the Mescalero Apaches. The Goshutes are in Utah –

THE COURT. We've learned a little bit about that

THE WITNESS If you're familiar with the private fuel storage facility, which is a private facility funded by utilities, the Goshutes are the tribe that were interested in that, they were also involved back in the MRS days And the Mescalero Apaches in New Mexico were also interested in having an MRS, and they applied for a grant, but Congress essentially withdrew all funding for these grants prior to the time that they were issued.

BY MR. DAMELIN

Q. And do you, do you know the time period, when you're referencing these grants, approximately what period of time we're talking about?

A It was the '93 to '94 time frame, as I remember, that the grants were issued

Q And you had just mentioned that, I guess, Congress had discontinued or cut off funding for the later grants Was that in that same time frame?

A Yes, and this gets into the political world, but one of the tribes was in a state of a very

Page 2132

influential Senator who was not happy with the concept.

THE COURT· This is Bingaman?

THE WITNESS It might have been Bingaman or Senator Domenici at the time, from the state of New Mexico

BY MR DAMELIN:

Q Now. The office of Nuclear Waste Negotiator – let me ask this question, what was the outcome of the Nuclear Waste Negotiator's efforts to negotiate a site for a MRS facility?

A He was not successful.

Q. And when did that office or the Negotiator's efforts end?

A The Act Amendments basically formed the office for a period of seven years, and after those seven years were up, basically, the office was terminated.

Q. Now, during the 1990s, and in addition to the MRS we've spoken about, were there, were there any other efforts to provide interim storage for commercial spent nuclear fuel, apart from the permanent repository?

A What you'll find in the mid-'90 time frame is moving away from the words and the acronym MRS

Page 2133

because that seemed to carry a lot of bad baggage, and what you seem to see is the emergence of the term "interim storage " So in Congress, there were a variety of bills that were introduced, and at some point, they had hearings on them, where Congress was interested in trying to identify a site and basically authorize the Department to undertake the building of an interim storage facility, which is essentially just a storage facility a little different than the integrated MRS we were looking at back in the mid-'80s

But a storage facility in the sense of trying to get a facility available in the near term, to take materials away from utility sites

Q. And during, if we can just be specific as to the time frame, when you had referenced these interim storage facilities were being considered or bounced around in Congress, when was that?

A They started in – I don't remember exactly because there were various bills on the House and the Senate side I believe in the '93, '94 time frame, there were various pieces of legislation that were introduced, and they carried up through a bill that was eventually actually passed in the '99 to 2000 time frame, which was then vetoed by then President

**Tennessee Valley Authority v. U.S No. 01-249C July 11, 2005**

**Heritage Reporting Corporation**

**Page 1264 to Page 1560**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 1264

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TENNESSEE VALLEY AUTHORITY, )
Plaintiff ) Case No 01-249C
v )
THE UNITED STATES, )
Defendant. )

Courtroom 4
National Courts Building
717 Madison Place NW
Washington, D C.

Monday, July 11, 2005
Volume 7

The parties met pursuant to the notice of the Judge, at 9 32 a m

BEFORE: THE HONORABLE CHARLES F LETTOW

Page 1265

APPEARANCES
ON BEHALF OF THE PLAINTIFF
PETER K SHEA, ESQ
EDWIN W. SMALL, ESQ
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1499
(865) 632-7319

ON BEHALF OF THE DEFENDANT:
ALAN J LO RE, ESQ.
SONIA ORFIELD ESQ
SHARON A SNYDER, ESQ
KEVIN CRAWFORD, ESQ
U S Department of Justice
1100 L Street, Northwest
Washington, D C. 20530
(202) 305-7562

***Index appears at end of transcript***

Page 1266

P R O C E E D I N G S
- - - - -

THE CLERK All rise The Court of Federal Claims is now in session the Honorable Charles Lettow presiding

THE COURT. Good morning. We've all arrived in Washington, and we appear to be ready to go People have documents in hand Preliminarily Mr Shea, is there anything that you would care to address?

MR SHEA No, Your Honor I'll leave that, I've spoken with Mr Lo Re, and we're in agreement We had the joint exhibits that we discussed in Chattanooga, and we've put them together, and we have Joint Exhibit 2 and 3, copies with us and we will introduce those in due course. And I don't believe there's anything else from TVA's point of view, Your Honor. I understand Mr Lo Re has an item or two of administrative procedure

THE COURT All right. Mr. Lo Re?

MR. LO RE: Good morning, Your Honor, just a couple of housekeeping notes. As Mr Shea said we have received Joint Exhibit 3 which is the site plan from the Sequoyah plant that we visited back in June. We wanted to make that an exhibit introduce that

Page 1267

into evidence and we have experts who will be talking about the site plan, and in addition, we have the site plan for the Browns Ferry plant, which has already been marked as an exhibit

THE COURT As the Court recalls, we had Joint Exhibit 1 already in evidence Joint Exhibits 2 and 3 were in effect presented during our site visit to the Sequoyah plant so they are, as far as the Court's concerned, already admitted

MR LO RE. That's fine Your Honor

(Joint Exhibit Numbers 2-3 were received in evidence )

THE COURT All right

MR LO RE With respect to two other matters, one there were two witnesses the Court may recall who have been former DOE employees who have long since retired One is Robert Morgan The other is Michael Lawrence We will be presenting testimony of both of those individuals later in the week but we did want to make the Court aware that we had spoken with Mr Morgan and because he is on the other side of the country, I believe he's in New Mexico, we were inquiring into the possibility of presenting his testimony through video conferencing.

We have spoken about this with TVA counsel.

Page 1448

in any affirmative defense in an answer. It's simply not in this case.

THE COURT: I'm thinking of the opinions by the Federal Circuit earlier this decade, written by Judge Freedman. Those opinions are binding on this Court. If we get an argument that is a delay based argument that is different from those, then it's beyond the power of this Court to act on, but I certainly acknowledge that the government is entitled to put forward its case in the effort of perhaps to get the Court of Appeals to change its mind or to get the Supreme Court to address the matter.

I don't recall this being put forward as an affirmative defense, but that's not to say that the government has actually asked that it be put forward as an affirmative defense here. I'm going to allow people to preserve the record though. There's no doubt about that And I take it that's what both you, Mr. Lo Re, are doing, and that's what you, Mr Small, are doing.

MR. SMALL: Yes, Your Honor, we do want to preserve the record on the point, and of course, I would ask for a continuing objection throughout the trial to that particular line of questions I do not wish to delay the trial or obstruct it when it comes

Page 1449

to objections, but I did want to make the point clear to the Court as we receive evidence, and of course, there may be particular times when I will renew that objection as to some particular matter. If I can't concede that, it might be relevant to "telling the story" if you will.

THE COURT: All right. Thank you, Mr. Small, and you do have a continuing objection in that respect.

MR. LO RE: Thank you, Your Honor, and that's fine, and I believe the opinion the Court may have been referring to is Judge Freedman's decision in the Yankee Atomic case.

THE COURT: Yes.

MR. LO RE: I believe that was maybe --

THE COURT: What did I say it was?

MR LO RE: You didn't say. You said earlier in the decade, and I believe it may be the Yankee case. Thank you.

THE COURT: All right. I was trying to remember. It was one of the Yankee cases, and I couldn't precisely remember the style.

MR. LO RE: Ms Court Reporter, could you read back the last question, please?

(The reporter read the record as

Page 1450

requested.)

THE WITNESS: Simplistically, Congress in the Amendments Act indicated that the Department could not site an MRS until the repository was sited. It could not construct an MRS until the repository construction authorization was received from the Nuclear Regulatory Commission. It could not -- the MRS under those conditions could not receive more than 10,000 tons until the repository was operational and no more than 15,000 tons overall while the repository was in operation.

BY MR. LO RE:

Q. Now, with respect to the limits on the operation, what, if any, effect did that have upon the rate of acceptance at which DOE could begin to accept the spent nuclear fuel from facilities?

A. Well, depending on when you were deploying the MRS in relation to the repository, you were now reduced from 15,000 tons to 10,000 tons until the repository was operational, so that limited even further the ability of waste acceptance in that small window of time that they allowed you from the timing.

Q. Now, Mr Kouts, could you please turn to Exhibit DX-292? And this is a document entitled, "Preliminary Estimate of the Total System Cost For

Page 1451

the Restructured Program: An Addendum to the May 1989 Analysis of the Total System Life Cycle Cost For the Civilian Radioactive Waste Management Program," and the document is dated December 1990. Mr. Kouts, are you familiar with this document?

A. Yes, I am.

Q. What is it, sir?

A. It's another total cost projection of the program, based on new assumptions, based on the Secretary's reassessment of the program, Secretary Watkins' reassessment of the program in 1989.

Q. And what was that reassessment of the program, Mr. Kouts?

A. Again, simplistically, that had the repository, the first repository operation no longer in 2003, but operational in 2010.

Q. Now, did you use this document in the course of your work with the document?

A. I was aware of it

Q. And, again, I notice in the upper left-hand corner, there is a stamp, DOE/RW-0295. What does that number indicate to you?

A. It's, again, a departmental document issued under departmental letterhead.

MR. LO RE: Your Honor, at this time, the

Page 1452

government would move for the admission of DX-292 into evidence.

THE COURT: Denied; it was already admitted on the 27th of June.

MR. LO RE: Thank you, Your Honor.

BY MR. LO RE:

Q. Now, Mr. Kouts, could you turn to page -- before we go there, the cover, it says, "An Addendum to the May 1989 Analysis." What is, why was an addendum required?

A. I quite honestly don't remember the specifics of why it was. It was probably that the, the earlier version, and this is speculation on my part, but the earlier version which was issued earlier in the year of 1990 did not reflect the latest direction from the Secretary, so this probably was an addendum to reflect the latest programmatic assumptions at that time

Q Now, Mr. Kouts, if you could turn to Roman Numeral III of this document, does not have Bates numbers, Roman Numeral III, under the heading, "Abstract"?

A Yes

Q And do you know what is meant by the term "abstract" in this document?

Page 1453

A. It's a synopsis of what's inside the document, essentially

Q. Now, it says, after the underlined portion, a third of the way down this paragraph, it says, starting with, "The major elements"?

A. Yes

Q. It says, "The major elements of the restructured program announced in this report which pertain to the program's life cycle costs are: A prioritization of scientific investigations program at the Yucca Mountain candidate site to focus on identification of potentially adverse conditions, a delay in the start of repository operations until 2010, the start of limited waste acceptance at the monitored retrievable storage facility in 1998, and the start of waste acceptance at the full-capability MRS in 2000."

I'd like to focus on the last part of that sentence there, and that is starting with the assumption regarding a delay in the start of the repository operations until 2010. What is that referring to?

A In our discussion earlier, basically, we had seen that the planning of the Department was to have the repository operational in 2003. This now

Page 1454

delayed the first repository to 2010, but it still had the MRS facility, or a more limited MRS facility operational in 1998.

Q. And the next clause says, "the start of limited waste acceptance in a monitored retrievable storage in 1998." Again, what is that referring to?

A. This, again, indicates that at, in the time frame, without authorization, we probably couldn't build the entire facility that we had in our proposal in 1987 by 1998, but we could build a smaller facility that could just receive materials and store them, and then the larger facility, the integrated facility would come later, and that's what this reflects.

Q. Now, with respect to the commencement of an MRS in 1998, I believe you testified that there were linkages in the amendment that would preclude that?

A. That's correct.

Q And so why was the, why was the DOE making an assumption with respect to MRS operation in 1998, notwithstanding those linkages?

A. Okay. The Secretary's redirection report basically informed the program that we weren't going to go and try to site MRSes anymore since we were somewhat unsuccessful in trying to site one in

Page 1455

Tennessee, so we were going to rely on the good office of the Nuclear Waste Negotiator to assist us in doing that, and the planning assumption that was built into this was that once the negotiator identified a host site, that a benefits package would be agreed to by the negotiator and the host community and the host state That would have to be approved by Congress, and part of that act of Congress would be to address the linkages, such that we could begin accepting materials at an MRS in 1998, and it effectively would adjust the linkages that were put in, in 1987. So that was the assumption at this point, that we would be successful in siting this with a negotiator, then the negotiator's package would be approved by Congress, with the understanding that those linkages would be removed, and we would be able to deploy the facility in 1998.

Q. And, again, what was the significance of deploying the facility in 1998?

A Again, to meet the Department's contractual obligation

Q. Mr. Kouts, could you please turn to page 10 of this document, under the heading, "Waste Logistics," and can you describe for the Court what

Page 1456

is meant by the term "waste logistics"?
A. It's essentially a waste acceptance schedule, if you will, similar to what we've seen earlier.
Q. Now, under the third paragraph here, it says, "In calculating the logistics," do you see that?
A Yes
Q. "In calculating the logistics, it was assumed that DOE would be able to work with Congress to modify the current linkages between the repository and the MRS facility in order to allow the MRS facility to begin accepting waste in 1998." How does that relate to what you just testified to, sir?
A. That just is reflective of exactly what I just said.
Q. And then it goes on and says, "This analysis continues to assume, however, that the capacity limits on the MRS facility of 10,000 MTHM prior to the start of operations at the repository and 15,000 MTHM thereafter, as imposed by the Amendments Act, remain in effect." Before I ask you about that, can you describe to me what the term "MTHM" is?
A. It stands for metric tons of heavy metal.

Page 1457

Q And how does that relate in any way, if in any way, to MTU?
A. It's another acronym used to acknowledge the same thing
Q. Could you describe for the Court what is meant by that sentence there that I just read into the record?
A That the only linkage that we were suggesting was going to be modified by Congress was the one that would not allow us to deploy the facility until the repository – or build the facility until the repository – and operate it until the repository was operational or had been constructed, but we kept the same linkages that were in the Act, which were that we wouldn't – not receive more than 10,000 metric tons of heavy metal or of spent fuel until the repository was in operation, and we would not exceed 15,000 tons at any time at the facility.
Q. Now, at the very bottom of that page, Mr. Kouts, it says, "Appendix A presents the waste acceptance schedules for the three cases analyzed in this analysis." Now, before we go to that, do you recall what those three cases were that were analyzed?

Page 1458

A. Not offhand; I would assume that they would do the authorized system, then the – an MRS system and other variants I'd have to look at them to try to decipher them.
Q. This isn't a memory test, so why don't we take a look at them?
A. I think I failed it.
Q. You're doing fine. Why don't we turn to. Appendix A, which is entitled, "Waste Acceptance Tables"? And you'll see behind that title, there are three tables. One is A-1, one is A-2, and one is A-3, and these are appropriately at pages A-1, A-2, and A-3. And can you just take a look at those three pages and explain to the Court what the different scenarios are?
A. Okay. Well, the first one seems to be an MRS facility deployed in 1998 with a ramp-up rate that would not exceed the 10,000 metric ton requirements in the Act and would not – up to the point of repository operation, and would not exceed 14,900 tons at any time during the first repository's operation.
Okay. The second one on table A-2 looks to me to be a two-repository system, again, not exceeding the 10,000 ton limit until the repository

Page 1459

was operational at the MRS and not exceeding 14,900 metric tons at the MRS throughout the life cycle of the first repository, and then it has a second repository beginning operations in 2039. And the third one looks like kind of a variance of the second, and I'm trying to decipher –
Q. I see in the heading, it says, "Upper Reference Case." Do you see that?
A. Yes, I do. It's probably a variant of the previous one; in other words, taking – although, it's kind of hard to figure out what the differences are offhand.
Q. And with respect to that A-3, just so the record is clear, how many repositories does that assume?
A. It's two repositories again.
Q. And A-2, how many repositories does that assume?
A. Two.
Q. And A-1, how many repositories does that assume?
A. One.
Q. At this point, after the issuance of the amendments to the Nuclear Waste Policy Act, how many repositories were authorized by Congress?

Page 1460

A. Only one.
Q Okay. Let's take a look at A-1, please.
A. Okay.
Q. Now, what does this chart depict, sir, with respect to acceptance rates?
A. Well, as I said earlier, it has the MRS operational in 1998 and it basically accepting it at 400 metric tons for the first two years and then ramping, going up to a 900 ton rate and up to the point of repository operation and then bumping up from there with the repository in operational to an 1,800 ton rate and then eventually a 3,000 ton rate.
Q. Now, if you look at first 10 years, going through 2007, can you – after 2007, the rate remains steady at 900 in 2008 and then 900, again, in 2009. Why is that?
A. Well, that's to make sure that you don't exceed the 10,000 metric ton limit in the linkages that Congress had in the Nuclear Waste Policy Act amendments of 1987
Q. And can you tell the Court why that rate does not jump up to 3,000 in 2008?
A In 2008, it's essentially because you would exceed the 10,000 metric ton limit, the statutory limit imposed on the facility

Page 1461

Q. Now, I see from this document, A-1, that the repository comes online in 2010, is that right?
A. That's correct.
Q And the acceptance there at the repository is 400, is that right?
A That's correct.
Q So that would mean that the cumulative acceptance between the MRS and the repository for that year, 2010, is how much?
A. Well, actually, the cumulative acceptance is 1,800 because the 400 that's at the repository, that goes to the repository comes directly from the MRS, so the total acceptance into the system in 2010 is 1,800. 400 metric tons, however, would be shipped from the MRS to the repository.
Q. Now, why doesn't the rate jump up from 900 in 2009 to 3,000 in 2010 when the repository comes online?
A. Well, essentially, the repository is ramping up here, as we see, it's just beginning operations, where you do see a bump up in 2010 of capability at an MRS because we are shipping away from the repository, but essentially, the – shipping to the repository. Essentially, what you're seeing here is, again, a start-up of a nuclear facility,

Page 1462

which you want to start fairly slowly.
Q. Now, when does the rate, at what point does the rate actually hit 3,000 MTU on this chart?
A. Five years after the start of operation of the repository.
Q. Do you know why that is, sir?
A That's essentially because that's the, that's kind of the five-year ramp-up that we've used in, ever since, in terms of trying to develop a capability at the repository to ramp-up and have more capability to receive materials.
Q. Now, Mr Kouts, the rates that are depicted here in this chart, which is A-1 of DX-292, how did those rates comport with the rates set forth in the documents we've been looking at to-date; that is, the documents that DOE issued prior to the December 1990 PETSC?
A. Well, the ones prior did not have this limitation in terms of the 10,000 metric tons.
Q And specifically, can you describe to the Court what that limitation is?
A. Well, again, with the restriction that Congress put on the facility, we could not receive more than 10,000 tons until the repository was operational, so therefore, this waste acceptance rate

Page 1463

essentially limits and tries to get to a steady state amount quickly, so that we could take a measured amount on a year that would be integrated across the 10 years of operation, if you will, 10 to 12 years of operation, we would be operating the MRS in advance of the repository.
Q. And how does that comport with the assumptions in previous documents we looked at?
A. Well, it's a lesser acceptance rate.
THE COURT. Mr. Lo Re, before we leave this page?
MR. LO RE: Yes, Your Honor.
THE COURT: Are you about ready to leave it?
MR. LO RE: I am, certainly.
THE COURT: Mr Small, with apologies, I have a couple of questions here, just because I don't understand – well, I think I don't understand the method of presentation, and while it's fresh in my mind, I want to try to sort it out You may obviously object to any question I ask.
Mr. Kouts, you said for 2010 that the 4,000 – or 400 MTUs that are shown on table A-1 came from the repository, is that correct?
THE WITNESS: No, sir, they came from the

**Pacific Gas & Electric Company v. U.S No. 04-74C June 14, 2006**

**Heritage Reporting Corporation**

**Page 2633 to Page 2985**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 2633

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
------------------------------x
PACIFIC GAS & ELECTRIC :
COMPANY, No. 04-74C
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant :
------------------------------x
Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D C.

Wednesday, June 14, 2006

VOLUME 8

The parties met, pursuant to the notice of the Judge at 9:00 a m.

BEFORE THE HONORABLE EMILY C. HEWITT

Page 2634

APPEARANCES.
ON BEHALF OF PLAINTIFF:
JERRY STOUCK, ESQ.
ROBERT L. SHAPIRO, ESQ.
DAVID CALLET, ESQ.
ERIC ROWE, ESQ.
Greenberg Traurig LLP
800 Connecticut Avenue, Northwest, Suite 500
Washington, D C 20006
(202) 331-3100

ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ
ALAN LO RE, ESQ
HEIDE HERRMANN, ESQ
SCOTT R. DAMELIN ESQ
SHARON A SNYDER, ESQ
JOSHUA E GARDNER, ESQ.
MARIAN SULLIVAN ESQ
U S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20036
(202) 514-2000

Page 2635

APPEARANCES (Continued):

ALSO PRESENT: DAVID ZABRANSKY
JANE TAYLOR
GABRIELLE BUTLER

***Index appears at end of transcript***

Page 2636

PROCEEDINGS
-----
THE COURT: We are on the record to continue hearing evidence in the Defendant's case-in-chief. Our witness is Mr. Kouts. The witness continues under oath. Good morning, sir.
THE WITNESS: Good morning.
THE COURT: Mr. Lo Re to continue direct examination.
MR. LO RE: Good morning, Your Honor.
THE COURT: Good morning.
Whereupon--
CHRISTOPHER KOUTS
a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:
DIRECT EXAMINATION(continued)
BY MR. LO RE:
Q. Mr. Kouts, when we broke yesterday, we were looking at DX-114.
MR. LO RE: Which is admitted as PX-97, Your Honor.
BY MR. LO RE:
Q. Mr. Kouts, do you have that document

Page 2653

need to plan years in advance, since the linkage concept advanced by DOE could well leave open to doubt DOE's ability to receive spent fuel by the 1998 deadline. Utilities would be forced to assume that the MRS would not be available to take deliveries of spent fuel starting in January 1998 and that DOE would therefore be likely to breach its commitment to take delivery of spent fuel starting in January 1998." Do you see that?

A. Yes, I do.

Q. How did the DOE interpret what EEI was saying in that phrase?

A. The planning basis for utilities to plan for spent fuel storage on-site essentially has a long lead time, and without more certainty in the availability of the MRS, in a sense that being linked to the repository that potentially could be delayed, this would force the utilities to make decisions in anticipation of the fact that DOE may not have that MRS available.

And essentially, this comment was putting the Department on notice that the

Page 2654

utilities would have to make their own decisions based on their view on whether or not the MRS is likely to be there, which they're indicating here, if it is tied to the repository, in their view, it would not be.

Q. Mr. Kouts, how do you view the importance of planning for utilities with respect to the acceptance of spent nuclear fuel?

A. I think it's important for them to plan, but my own view is that they have to make their own decisions in terms of what they need to do on their sites. The Department is not involved in that, and that's totally a utility decision.

Q. Now, Mr. Kouts, the bottom of this paragraph, the last sentence reads, "In revising the DMPA for formal submission to Congress, DOE, to demonstrate its commitment to the 1998 date, should delete the linkage between MRS start-up and first repository construction authorization." How did DOE interpret what EEI was saying in that comment?

A. Well, again, this gets to the point that there was concern from EEI that the

Page 2655

linkage would essentially delay MRS start-up, and there comment was that the Department should delete the linkage and not pursue the linkage between MRS start-up and first repository construction authorization.

Q. Now, subsequent to this, what actions, if any, did DOE take with respect to the schedule linkage between the repository and the MRS?

A. The Department did not change its view on the linkage of the MRS to the repository.

Q. Did the Department ever take any action to address that linkage after the statute was passed, the amendments to the Nuclear Waste Policy Act was passed?

A. Yes, it did. In relation to – this gets into another evolution of the program. However, after the Amendments Act was passed, the Amendments Act did a variety of things. It essentially authorized an MRS facility, but it put a variety of linkages in-between the MRS and the repository.

And I can go through those, if you want, but effectively, it set up the office of the Nuclear Waste Negotiator to help the

Page 2656

Department find a site for an MRS or a repository. And basically, in the next several years, the Department took the strategy that we would use the Nuclear Waste Negotiator to help us find a site.

And if we found the site and a willing host and an agreement was reached between the Nuclear Waste Negotiator and that host, which would have to be approved by Congress, that part of that agreement would be to address the linkages and to change the linkages between the MRS and the repository.

So that was a strategy that the Department took subsequent to this document, in terms of how we were going to address those linkages.

Q. Now, we've talked about the linkages – or strike that.

We've talked about the schedule linkage between the MRS and the repository. You also talked yesterday about the capacity limit. Do you recall in this document that we're looking at the EEI comments, that EEI commented on the capacity limit that DOE was proposing for the MRS?

**Wisconsin Electric Power Company v. U.S No. 00-697C September 12, 2007**

**Heritage Reporting Corporation**

**Page 553 to Page 798**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 553

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------x

WISCONSIN ELECTRIC POWER COMPANY, .
Plaintiffs, :
vs :NO. 00-697C
THE UNITED STATES. :
Defendant. .

-------------------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington D C.

Wednesday, September 12, 2007
Volume 3

The parties met, pursuant to the notice of the Judge at 10:00 a m

BEFORE THE HONORABLE JAMES MEROW

Page 554

APPEARANCES

ON BEHALF OF PLAINTIFFS
RICHARD OEHLER. ESQ
JAY GRIFFITHS ESQ
Perkins Coie LLP
1201 Third Avenue Suite 4800
Seattle Washington 98101
(206) 359-8000
and
EMILY POULIN ESQ
DONALD CARNEY, ESQ.
MARY ROSE HUGHES, ESQ
Perkins Coie LLP
607 Fourteenth Street, N.W
Washington D C 20005
(202) 628-6600

Page 555

APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
SHARON SNYDER, ESQ.
RUSSELL SHULTIS, ESQ.
STEPHEN FINN, ESQ.
SONIA ORFIELD, ESQ.
U.S. Department of Justice
1100 L Street, N.W
Washington, D C. 20036

(Index appears at end of transcript)

Page 556

P R O C E E D I N G S

(10:00 a.m.)

THE COURT Mr Oehler, are you in charge today?

MR OEHLER: I don't know about in charge. I think the Court's in charge, but I did have a few administrative matters. As the Court knows, we're going to be calling Mr David Zabransky today. And I just wanted to confirm my understanding that he's going to be appearing twice in the case. First, we're calling him as a witness, and then the government is calling him as a witness.

MS. SNYDER: That's right. Your Honor. And I think that our understanding is, is that we will take testimony from Mr. Zabransky at the close of this portion of the trial, specifically on his WEPCO employment, and then in our case-in-chief, we will put Mr. Zabransky on for his DOE employment and Plaintiff's counsel can cross him at that point. So they'll also have an opportunity to examine him twice

MR. OEHLER Well, I guess I do have a little bit of a question That was something

Page 625

permanent repository until at least 2003?

A. And, again, I don't want to be technical, hyper technical, this document relays that information. I don't know if that's an announcement, per se, or if DOE announced it in some other form or whatever, so I'm not disagreeing that that's what this says and that, as a result, the information that was given to me and to the industry was 2003 for a repository. I just don't know if this was an announcement.

Q. Okay Fair enough. Let me just ask you, from your own knowledge, at that period of time, again, while you were working at Wisconsin Electric, at this period of time, was there any way DOE was going to have an operational repository in place and operating by 1998?

A. No, I don't believe that's the case any more. I don't believe that was the case at that point in time

Q. Thank you. Are you familiar with the term "monitored retrievable storage facility" or "MRS"?

A Yes, I am.

Page 626

Q And are you familiar with the amendments to the Nuclear Waste Policy Act that Congress enacted in 1987?

A Yes, I am.

Q. And did you follow those while you were working for Wisconsin Electric?

A Yes, I did.

Q. Did the 1987 NWPA amendments impose linkages on the timing regarding when an MRS could be placed into use and the total amount of spent fuel that could be stored at the MRS?

A. Yes, they did.

Q And what were those linkages?

A. I believe the linkages were such that DOE could not begin receiving spent fuel at the MRS until after it had received a construction authorization from the Nuclear Regulatory Commission for the repository and that the quantity of spent fuel received at the MRS could be no more than 10,000 metric tons prior to the operation of the repository and no more than 15,000 metric tons at any point in time.

Q. Did these amendments make DOE acceptance of fuel at an MRS in 1998 impossible, unless these linkages were removed?

Page 627

A. Well, I think the amendments also set in place the negotiator's office to negotiate a voluntary MRS site, and the industry's belief, to my knowledge, was that part of the process of finding a volunteer site would also be to negotiate with the volunteer to remove the limits, so in the absence of that happening, yes, they couldn't begin to receive spent fuel in 1998. But that's not what the industry was looking at happening as a totality.

MR. OEHLER: I would move the Court to strike the first part of the answer, which was definitely not responsive to my question, and I would hope in the future Mr. Zabransky could answer the question that I'm asking. I asked what I thought was a very straightforward question, where the question assumed you'd have to remove the linkages, and I said, without removal of those linkages, what would happen? And then he gave a speech on how linkages might in fact be removed, but that wasn't my question. My question was, without removal of the linkages, what was going to happen? I just express that bit of frustration on that issue to the Court.

Page 628

THE COURT: I noticed, from earlier testimony, that there was an indication that if you could find a volunteer site, that that might not be subject to the linkages. Now, I don't know whether that's a fact or not. I put a note down to check it out, but that may be what Mr. Zabransky is saying, that the linkages would not apply in the statute if you found a voluntary site.

MR. OEHLER: Let's ask that question then.

THE COURT: I don't know if that's correct.

BY MR. OEHLER:

Q. Based on the statute, would simply finding a volunteer site make those linkages in the amendments go away?

A. In the statute itself, the answer would be no.

Q. Thank you. I think you've answered my question. So these linkages did raise questions as to DOE's ability to begin accepting spent fuel by any means in 1998, isn't that correct?

A. That's correct.

Page 629

Q. And even without the linkages, as of 1987, was there any assurance that an MRS would be developed in 1998?
A. Without the linkages, was there any assurance? No more – I mean, without the linkages, it would have been easier to develop one, but I'm not sure what you mean by the word "assurance."
Q. Well, I'm asking you, was that a certainty? Could you be assured that, even with the removal of the linkages, that an MRS would be available in 1998?
A. And, again, I'll be responsive. Nothing is a certainty, Mr. Oehler, so, no, nothing is certain until it happens.
Q. Thank you. And I'd now like you to turn your attention to Plaintiff's Exhibit 149 of volume 10. Let me know when you have it before you, Mr. Zabransky
A I do.
MR. OEHLER: And government counsel?
MS SNYDER: I'm good. Thank you.
BY MR. OEHLER:
Q Do you recognize this document?
A. It's the 1988 annual capacity report.

Page 630

Q. And what month was that published?
A. June of '88
Q And I'd like you to turn to page four of the document, the Bates number is PA102893. Now, Mr. Zabransky, do you see the sentence that begins, "DOE recognizes"?
A. DOE recognizes?
Q. It would be the second sentence.
A. Yes, I see it.
Q. And let me read that and the following sentence for the Court: "DOE recognizes that, under current conditions, operations of and waste acceptance at a DOE facility probably cannot begin in 1998. The delay in the repository schedule first noted in the OCRWM mission plan amendment published in June 1987 and the conditions imposed on the siting and construction of an MRS facility by the Nuclear Waste Policy Amendments Act of 1987 (the Amendments Act) make it unlikely that DOE will be able to start accepting spent nuclear fuel significantly before 2003." Do you see that, sir?
A. I do.

Page 631

Q. When you were at Wisconsin Electric, was this a publication that Wisconsin Electric followed and reviewed when it was issued?
A. Yes, we looked at this, and I'm sure we looked at it, yeah.
Q. And did you, yourself, look at it?
A. I'm sure I did, yes.
Q. And was your understanding of this ACR that DOE was unlikely to begin accepting spent fuel significantly before 2003 at any sort of facility?
A. I think that the sentences you read accurately portray what DOE thought at that time and what they led us to believe, yes.
Q. And is what I just said your understanding of what they said?
A. That's what they said, yes.
Q. At this time, again, in 1988, would it have been commercially reasonable for a nuclear utility to rely on DOE performing in a timely manner in 1998?
A. I think I said previously, and I'll say it again now, is I don't think it would be commercially reasonable or prudent for a utility to rely upon DOE's performance at any

Page 632

time. You need to rely upon your own ability to keep the plant running.
Q. So are you saying then that a utility can never assume that DOE will perform its obligations under the standard contract?
A. I didn't say that, Mr. Oehler.
Q I'm sorry, I thought that's exactly what you said.
A. No.
Q. I thought you said you couldn't rely on DOE's performance at any time?
A. What I said was that – you asked me would it be commercially prudent, is how I interpreted your question, for a utility to rely upon performance of a third party for its major asset. And my answer was, no, I would never rely upon that because, even if that party performed, it could always, for some reason beyond its control, not continue to perform.
MR. OEHLER: Your Honor, I think this would be a good time for a break.
THE COURT: Sure.
MR. OEHLER: If that's the preference of the Court.