**Wisconsin Electric Power Company v. U.S No. 00-697C October 10, 2007**

**Heritage Reporting Corporation**

**Page 5169 to Page 5446**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*HERITAGE REPORTING CORPORATION*
*1220 L Street, N.W.*
*Suite 600*
*Washington, DC 20005*
*Phone: 202-628-4888*
*FAX: 202-371-0935*

Page 5169

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------------X

WISCONSIN ELECTRIC POWER COMPANY,

Plaintiffs,

vs :NO 00-697C

THE UNITED STATES,

Defendant

---------------------------------------X

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday, October 10, 2007
Volume 22

The parties met, pursuant to the notice of the Judge at 10.04 a m

BEFORE THE HONORABLE JAMES MEROW

Page 5170

APPEARANCES·

ON BEHALF OF PLAINTIFFS
RICHARD OEHLER, ESQ
JAY GRIFFITHS, ESQ
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101
(206) 359-8000
and
EMILY POULIN, ESQ
DONALD CARNEY, ESQ
MARY ROSE HUGHES, ESQ
Perkins Coie LLP
607 Fourteenth Street, N W
Washington, D C 20005
(202) 628-6600

Page 5171

APPEARANCES CONTINUED·

ON BEHALF OF THE DEFENDANT
ALAN J. LO RE, ESQ
SHARON SNYDER, ESQ
RUSSELL SHULTIS, ESQ.
STEPHEN FINN, ESQ
SONIA ORFIELD, ESQ
U S. Department of Justice
1100 L Street, N.W
Washington, D C 20036

(Index appears at end of transcript)

Page 5172

P R O C E E D I N G S

(10.04 a m )

THE COURT Mr Lo Re

MR LO RE Good morning, Your Honor Your Honor, before I proceed, there is one matter that I would like to clarify that came up yesterday With the Court's indulgence, I'd like to address that.

THE COURT. Sure

MR LO RE This is the matter of the exhibit that was moved into evidence yesterday. This is PX-175

THE COURT Right.

MR LO RE It is the draft annual capacity report or ACR

THE COURT. Right

MR LO RE I wanted to put, for the Court, into context what happened there with respect to the government's movement for the admission of the document Frankly, when I was shown the transcript yesterday, I had forgotten that the government had moved that exhibit into evidence, and I wanted to, if I could, just give the Court a little context --

THE COURT Sure

Page 5213

have opposed locally the implementation of dry storage because they don't like the idea of this fuel being stored in larger amounts nearby their community, but that's the only opposition that I remember.

Q. Let's look at another document. This is DX-564.

MR. LO RE: And this document has been admitted I understand, Your Honor.

BY MR. LO RE:

Q. This is the draft mission plan amendment submitted by – issued by DOE, dated September 1991. And, Mr. Kouts, are you familiar with this document?

A. Yes, I am.

Q. And what is it?

A. It's a draft mission plan amendment that was issued in the late summer of 1991, and it, again, is a reflection of where we were in the implementation of the program at that time.

Q. And were you involved in the preparation and/or review of this document?

A. I was involved with the review.

Q. Now, if you could turn to page ending in Bates number 5001, and you'll see under the

Page 5214

heading, "Strategy for the MRS facility," it says, "To achieve the objective of timely and adequate waste acceptance, we plan to develop an MRS facility that is to start waste acceptance in 1998." What was the significance to DOE of that '98 date at this time?

A. Again, it has to do with compliance with the standard contract.

Q. And it says, "To make this possible, the President's legislative package for the national energy strategy includes a provision to repeal the schedule linkages established in the Nuclear Waste Policy Amendments Act of 1987 (Amendments Act). This could also be achieved by Congressional enactment of a negotiated siting agreement reached through the efforts of the Nuclear Waste Negotiator.

Now, what was your understanding at this time, Mr. Kouts, this is September of '91, as to the status of this legislative package issued by the President?

I'll ask a better question. What was your understanding at this time as to where this idea of the President's legislative package came from?

Page 5215

A. I believe it dates back to the Secretary's reassessment report that we discussed earlier, where the Department was to work with Congress on addressing schedule linkages, and this is following through on that commitment on the part of the Secretary to do that.

Q. Now, there's also a reference here to enactment of a negotiated siting agreement reached through the efforts of the Nuclear Waste Negotiator. What does that refer to?

A. Let me just give a little background to that statement. Another provision in the Nuclear Waste Policy Act Amendments of 1987 was the establishment of the Office of the Nuclear Waste Negotiator, and this individual was to assist the Department in obtaining either an MRS site or a repository site and developing a negotiated agreement with the locality and the state associated with either of those facilities.

In the Secretary's reassessment report of 1989, the strategy laid out for the Department was that we would work through the Nuclear Waste Negotiator and assist the

Page 5216

Negotiator in obtaining an MRS facility site and also, to the extent the negotiated agreement with the state of Nevada, since that was the only repository site that was provided for in the amendments, this strategy essentially would allow the Negotiator to develop a negotiated agreement with the state, the sited state, if you will, of the MRS facility.

And part of that agreement would be to address the schedule linkages associated that would repeal the linkages that were identified in the '87 amendments. Since this negotiated agreement had to be approved by Congress, effectively, enactment of that agreement would have also amended the Nuclear Waste Policy Act amendments, allowing us to move forward and build and operate the MRS facility in advance of the repository.

Q. Now, you mentioned support by DOE of the Waste Negotiator. How did DOE support the Waste Negotiator's office?

A. We had a dedicated group within the program that would effectively go out to local governments and give presentations on the

Page 5217

Department's vision about what an MRS facility could be. We also effectively managed a grants program for the Negotiator.

In other words, if the Negotiator found a willing host, a local government that was interested in having the facility then we would issue grants to that locality in a series of stages that would allow them to study the facility, hire consultants and evaluate whether, further, in more detail, whether or not they wanted to accept it.

So we managed that grants program for the Negotiator throughout the Negotiator's existence.

Q. Did the Department actually issue any grants, to your knowledge?

A. Yes, they did They issued a variety of what we called phase one feasibility grants which were for several hundred thousand dollars, and then there were also phase two agreements, which were more substantial agreements with much more money, to effectively help negotiate the settlement and also accomplish further study on the part of the locality and the state involved

Page 5218

Q Now, I'd like to go to page 205 of this document, which is the Bates number ending in 5176, and this is under the heading, "Waste Acceptance Schedule."

A Okay.

Q. And there's a reference to several tables, which we'll talk about in a moment. It says, "Table B3 presents a preliminary schedule for waste acceptance by the waste management system This schedule shows the MRS facility starting to accept spent fuel in 1998 and is based on the statutory limits on MRS capacity (10,000 MTU before the start of operations at the repository)."

And then it goes on and says, "The first 10 years of the waste acceptance schedule correspond to the lower bound schedule published in the annual capacity report." Do you see that?

A. Yes, I do.

Q. What did that sentence mean?

A. Essentially, that we were reflecting in this waste acceptance schedule the fact that we would not exceed 10,000 metric tons of uranium, if you will, before the start of

Page 5219

operations at the repository which, again, was a capacity linkage that was in the '87 amendments to the Nuclear Waste Policy Act and no more than 15,000 tons thereafter at the MRS, it could not exceed 15,000 metric tons, as long as the repository was operational.

Q. And there is a reference there to the lower bounding schedule in the ACR. Do you know what that refers to?

A. Yes, there were two schedules published in that ACR, I believe, referred to in footnote 11. There was an upper bound and a lower bound. This was reflective of the lower bound schedule, which was consistent with the linkages in the Nuclear Waste Policy Act amendment.

Q. Now, at this point in time, Mr. Kouts, this is the September 1991 timeframe, did you believe that there was a possibility that DOE could begin performing with an MRS in 1998?

A. Yes, I did.

Q. Why is that?

A. Well, we had a very active program supporting the Negotiator. The Negotiator had a variety of localities that he was working

Page 5220

with at the time. We were undertaking some preliminary design work on the facility, which was fairly substantial, and we had a fairly substantial effort within the program to try to make the facility happen.

Q. Now, let's look at an ACR. Can we look at DX-566, please?

MR. LO RE: This document, Your Honor, is DX-566, which is also PX-237, and the document has been admitted

BY MR. LO RE:

Q. Mr. Kouts, this is an annual capacity report dated December 1991. Are you familiar with this document?

A. Yes, I am.

Q. And what is it?

A. Actually, it's a dual report. It has an annual capacity report and also an acceptance priority ranking, which shows the ranking in which fuel was discharged from the various contract holders. That's basically what the document is.

Q. Now, if you turn to page V of this document under, "Summary," second paragraph starts with, "the projected waste acceptance

Page 5221

rates."
A. Yes.
Q. And I think you may have just answered this, but why don't we read into the record that, starting with, "the projected waste acceptance rates," down to the words "will be modified"?
A. "The projected waste acceptance rates for SNF presented in table 2.1 assume: A site for a monitored retrievable storage facility (MRS) facility will be obtained and the facility will initiate operations in 1998, and the statutory schedule linkages between the MRS facility and the repository set forth in the Nuclear Waste Policy Act of 1982, as amended (NWPA) will be modified."
Q. And what was DOE conveying with that statement you just read?
A. That this waste acceptance schedule was premised on the fact that the schedule linkages contained in the 1987 amendments to the Nuclear Waste Policy Act were effectively repealed by Congress, and it's done essentially through the, either an act of legislation or through approval of a negotiated -- an

Page 5222

agreement by the Nuclear Waste Negotiator on a host MRS facility area.
Q. Now, let's go to page five of the document, which is table 2.1. Do you have that, sir?
A. Yes, I do.
Q. And, Mr. Kouts, do you believe that if DOE had begun performing at the rate depicted in this document as of January 31st, 1998 at an MRS, that DOE would have been meeting its obligations under the NWPA in the standard contract?
A. To my understanding, yes.
Q Prior to the issuance of this document, specifically, the table depicted at 2 1, did anyone indicate to you that DOE should not publish this rate because DOE had already concluded it would not perform by 1998?
A. No.
Q Are you aware of anyone advising that this rate not be published for any reason?
A. Not that I'm aware of.
Q Was it your understanding at this time, Mr. Kouts, that is December 1991, that DOE had concluded that it was obvious that it

Page 5223

would be unable to perform in 1998 at an MRS?
A. No.
Q. The rate that is depicted here at table 2.1, do you consider this to be a reasonable rate?
A. Yes, I do, based on the fact that the schedule linkages, excuse me, that the schedule linkages were broken and that the capacity linkage in the Act was still in place, this was a very reasonable rate for the Department to design and operate a facility at.
Q. Now, let's look at another ACR. This is DX-584-A.
MR. LO RE: And I understand, Your Honor, that this document is admitted, and I also understand, having looked at this myself, I think this is identical to 584, although I think the print's just larger in this one, so we wanted the easier to read version.
THE COURT: Both versions are admitted in evidence.
MR. LO RE: Belt and suspenders.
BY MR. LO RE:
Q. Mr. Kouts, what is this exhibit?
A. This is an acceptance priority

Page 5224

ranking/annual capacity report that was issued in March of 1995.
Q. And did you review this document?
A. Yes, I did.
Q. Now, if you turn to page two of this document, the bottom paragraph, there's a reference to the Department, it says, "The Department has decided to issue a consolidated APR/ACR report for 1994 and subsequent years."
You mentioned this document was actually issued in March of 1995. Do you know why there's a reference there to 1994?
A. I believe the data is based on '94 data, but the document was not issued until 1995.
Q. Now, if you turn to the next page, there's a heading that says, "1.2"?
A. Yes.
Q And it's basis for the annual capacity report. It says, "in the previous ACR," and do you know which ACR that refers to?
A. I believe it was the '91.
Q. It says, "The projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a monitored

Page 5265

stand-alone facility.
THE COURT: Could it have been sited at the repository site, however?
THE WITNESS. No, it could not, unless the Nuclear Waste Policy Act was changed, because the Nuclear Waste Policy Act directed that -- the amendments directed that the MRS could not be within the state of Nevada, nor within 50 miles of the repository site. So it effectively had to be in a state other than Nevada and far enough away from the repository, such that it had to be a stand-alone facility.
BY MS. HUGHES:
Q. As DOE proposed it to Congress in March of 1987, the MRS was to be used for both interim storage and as a central receiving station to prepare spent nuclear fuel for placement into the repository, correct?
A. I don't believe we called it interim storage at the time, I believe we called, it and I can't remember the specific word, but there were -- I don't believe we would refer to it as interim storage, it was buffer storage for the system, or we used a similar word to that extent, but I don't believe we

Page 5266

characterized it as interim storage
Q. And as DOE proposed it to Congress, the MRS was to have a 15,000 MTU storage capacity, correct?
A Yes
Q. And, again, as DOE proposed it to Congress, the MRS was to have a throughput rate of close to 3000 MTU annually at full operation, correct?
A. That's correct.
Q Still focusing on the time that DOE proposed the MRS to Congress, DOE had already determined that the schedule for the operation of the repository would slip five years to 2003, correct?
A. Yes.
Q. So four years into the program, DOE was slipping the repository schedule by five years, correct?
A. Yes.
Q. And so four years into the program, DOE was announcing that it would only begin to pick up spent nuclear fuel from the utilities by January 31st, 1998, if it had an MRS operation by 1998, correct?

Page 5267

A. That's correct.
Q. So at this point, it was critical that there be an MRS operational by January 31st, 1998, if DOE was going to begin picking up spent nuclear fuel from the utilities by January 31st, 1998, correct?
A. Yes.
Q. And DOE subsequently issued its 1987 mission plan amendment showing how it planned on performing with the MRS that it proposed to Congress, correct?
A. Yes.
Q. And I think that's one of the documents that you looked at with government counsel earlier today?
A. That's correct.
Q. And at the same time that DOE issued its 1987 mission plan amendment, it issued its first annual capacity report, correct?
A. That same year, that's correct.
Q. I think it was the same month as well, is that correct?
A. Your memory is better than mine.
Q. And like the 1987 mission plan amendment, the 1987 ACR showed how DOE planned

Page 5268

to perform the program with the MRS that DOE proposed at the time, correct?
A. At that time of the planning, yes, that's correct.
Q. And you're welcome to look at the 1987 ACR or the 1987 mission plan, if you'd like to, Mr. Kouts?
A. Thank you.
Q. Now, Congress subsequently amended the Nuclear Waste Policy Act in late 1987, correct?
A. That's correct.
Q. And with the amendments, Congress imposed conditions of linkages on DOE's authority to use in MRS?
A. Correct.
Q. And one of the conditions was that an MRS could not be constructed until the construction of the repository was authorized, correct?
A. By the Nuclear Regulatory Commission, that's correct.
Q. Another condition was that the MRS could only accept 10,000 MTUs total until the repository started accepting spent nuclear fuel, correct?

Page 5269

A. That's correct
Q. And yet another condition was that DOE could not select a site for the MRS until the Secretary of Energy recommended to the president approval of a site for the repository, correct?
A. That's correct.
Q. Now, without a change in the linkages by Congress, it was now clear to the Department of Energy that it would not be able to have an MRS in operation by January 31st, 1998, correct?
A. That's correct.
Q. And now, separate and apart from these Congressional conditions on DOE's authority to use an MRS, DOE had to find a site for an MRS, correct?
A. That's correct. Now, I should mention also that the Congress wanted to assist the Department in that regard, and as a result, the Nuclear Waste Policy Act amendments essentially created the Office of the Nuclear Waste Negotiator to assist the Department in finding a site for an MRS and for a repository.
Q. Thank you, and we'll talk about that

Page 5270

in a minute
A. Good
Q Now, in June of 1988, DOE published its 1988 draft mission plan amendment, correct?
A. I don't remember the specific month, but I'll take your word for it.
Q You might want to pull that out, Mr Kouts. I know this is a document I believe we talked about with Plaintiff's counsel, maybe not, but it's Plaintiff's Exhibit 148, and it should be in volume 10
A Government's counsel did not provide that document, so what volume is it in?
Q. Sorry, volume 10, and it should be tabbed as Exhibit 148.
A 148 just has a page that says, "withdrawn," on it
Q I'm sorry, I'm informed it's volume 115 – sorry, it's Exhibit 150?
A. Exhibit 150.
Q. So it should be right after two tabs later up there.
A. Okay.
Q. And please take a moment to review Exhibit 150, and let me know when you're

Page 5271

finished.
A. Okay. I'm ready.
Q. You're familiar with the 1988 draft mission plan amendment, correct?
A. I'm familiar with it, yes.
Q. Now, also in June of 1988, the DOE issued its second annual capacity report, correct?
A. I don't know the specific month, but I'll accept your characterization on it.
Q. Would you take a look at Plaintiff's Exhibit 149 in volume 10?
A. Okay. Okay.
Q. Can you identify Exhibit 149, please?
A. It's the one you just mentioned, it's the annual capacity report that the program issued in June of 1998 – '88, excuse me.
Q. And you're familiar with the 1988 annual capacity report, correct?
A. I reviewed it before it went out, yes.
Q. Now, both of these documents, the 1988 draft mission plan amendment and the 1988 annual capacity report, recognized the statutory linkages or conditions that were placed on DOE's authority – ability to use an

Page 5272

MRS, correct?
A. Yes.
Q. And neither of these documents assume that Congress is going to modify the linkages, do they?
A. I'd have to review the documents, I'll accept your word for it, but if they're showing 2003 waste acceptance, then my perspective is that they do not assume that the linkages would be modified.
Q Both documents recognize that, under the current conditions, DOE would not begin accepting spent nuclear fuel anywhere at any rate in 1998, correct?
A. That's what the documents say.
Q And in the 1988 ACR, DOE specifically tells the utilities that, in DOE's view, under current conditions, the utilities will continue to be responsible for storing their spent nuclear fuel until acceptance by DOE, correct?
A The Nuclear Waste Policy Act states that, but to the extent this document restates that, I'll accept your word for it.
Q. Mr. Kouts, would you please look at page four of Exhibit 149, which is the annual

Page 5333

to the repository.
And the only linkage, if you were going to break the schedule linkage, was some kind of limitation on capacity.

Q. Now, you talked on cross-examination about fee adequacy studies. Do you remember that, sir?

A. Yes.

Q. And have you been involved in preparing documents that have been used as part of the fee adequacy study efforts?

A. Yes, I have.

Q. And what's been your involvement in that?

A. Since 2002, the fee adequacy assessment, that it's an annual requirement, for the Secretary to evaluate the adequacy of the fee, has been under my responsibility.

Q. Have you reviewed documents related to fee adequacy studies?

A. Yes, I have.

Q. Prior to that 2002 date?

A. Yes, I have.

Q. What is the purpose of the fee adequacy study?

Page 5334

A Essentially, besides the requirement in the Act to accomplish it, the Act recovers that the program is a full cost recovery program. As a result, the Secretary is duty bound to determine whether or not the receipts coming into the Fund and the Nuclear Waste Fund, in and of itself, is adequate to pay for the overall cost of the program, until all spent fuel is eventually disposed of.
So the total system life cycle cost estimate is done in order to accomplish – understand the flow of funds that has to occur until the end of the program, which our latest estimate will be somewhere in the area of 2133, and whether or not, once the fees end from the reactors and the operating reactors no longer provide funds, whether or not there is a corpus of the Fund assuming various economic conditions in the future that will be able to be drawn down in order to pay for the ultimate costs of the program and the closure of the program.

Q. Now, in performing the fee adequacy study, does DOE make any assumptions with respect to the rate of acceptance under the

Page 5335

standard contract?

A. Yes, it does.

Q. What does it base those assumptions upon? In other words, where does it get the rates that it uses?

A. It comes right out of our technical requirements document, similar to what I've testified to just previously.

Q. Now, over the course of your involvement with the program, has the fee changed?

A. The fee has not changed since the Act cited in 1982 – 1983, I should say.

Q. To your knowledge, has the fee adequacy study ever resulted in a request by DOE that the fee should be changed?

A. No, it has not.

Q. I'd like to look at a document now. Could we look at PX-213, please? And I'm going to bring a copy up to you, Mr. Kouts.

MR. LO RE: Your Honor, this is a document, I guess it was not used, I don't think we have this one in our binders back with Mr. Kouts, so I'm going to hand a copy, it's 213. And for the record, this has also been

Page 5336

marked as Defendant's Exhibit 557.

BY MR. LO RE:

Q. This is a document, Mr. Kouts, entitled, "Preliminary Estimates of the Total System Cost For the Restructured Program, an Addendum to the May 1989 Analysis of the Total System Life Cycle Cost For the Civilian Radioactive Waste Management Program"? This document is dated December 1990 Mr. Kouts, are you familiar with this document?

A. Yes, I've seen it before.

Q. And when you say you've seen this before, where have you seen it, sir?

A. I reviewed it many years ago, before it came out, and then I've been shown it in various trials and depositions.

Q. Is this document, a document that DOE – if you look on the first page of this document, there's a DOE/RW number on the upper left-hand side?

A. Yes.

Q. Is this a document that DOE keeps in its files?

A. Yes, it's a program document.

MR. LO RE: Your Honor, at this time,

Page 5337

the government would move for the admission of –
THE COURT: It's already admitted.
MR. LO RE: I have bad information apparently, Your Honor
MS. HUGHES: Your Honor, I'm checking, I didn't realize that this had not been admitted.
THE COURT: I have it listed as admitted.
MS. HUGHES: That's my understanding.
THE COURT: All right.
MR. LO RE: Thank you, I'm sorry, Your Honor, we had it not admitted. Great.
BY MR. LO RE.
Q. Okay. I'd like to turn your attention to III of this document, under the heading abstract, that first paragraph, and it says, a third of the way down, it says, "the costs contained in this report," do you see that?
A. Yes.
Q. There's a reference there to the reassessment that we talked about on direct examination and that you talked about on cross-examination, right?

Page 5338

A. Yes
Q And then it say, "It is major elements of the restructured program announced in this report, which pertain to the program's life cycle costs, are a prioritization of the scientific investigations program at the Yucca Mountain candidate site to focus on identification of potentially adverse conditions delaying the start of repository operations until 2010 and start of limited waste acceptance at the monitored retrievable storage (MRS) facility in 1998 and the start of waste acceptance at the full-capability MRS facility in 2000." Do you see that?
A. Yes.
Q. Now, Mr. Kouts, what is your understanding as to the significance of that statement that I just read into the record with respect to the assumptions that are being made in this document?
A. Well, the assumptions being made are consistent with the Secretary's reassessment report, which was November of '89, this is December of '90, so it was roughly about a year earlier, and obviously, a delay in the start of

Page 5339

the repository operations, you were looking somewhat at a two phase MRS at that point, to have initial operations in 1998 and a little greater capability in MRS in the year 2000.
Q. Now, I'd like to turn your attention to page A-1, it's just behind appendix A of this document, and on my version, it's PNL, there's a Bates number that ends in 1666. I don't know if you have the same Bates number as me. I think it may actually be tabbed for you.
A. Yes, I have it.
Q. Okay. And if you flip back one page, you'll see appendix A, it says, "waste acceptance tables"?
A. Right.
Q. Now, if you see, if you look at the left-hand column here, it says, "year," and above that, it says, "MRS facility," do you see that?
A. Yes, I do.
Q. And then you see 4, 4, 9 and then it goes to 9 through 2009, do you see that?
A. Yes.
Q. How does those rates that are depicted there below the MRS facility from 1998 through

Page 5340

2007, how do they comport with the 1991 ACR that we talked about both – that you talked about both on direct and cross-examination?
A. They're similar. The '91 ACR, I think, has 600 tons in the second year and then going to 900 tons, so it's a ramp-up of three years, but other than that, they're identical.
Q. And then you'll see at 2010 – actually, before we get there, through 2009, you'll see that the amounts stored at the MRS totals 9800 MTU, do you see that?
A. Yes, I do.
Q. How does that total from 1998 through 2009, how does that total of 9800 comport with your understanding of the capacity limitations that were placed on the MRS as part of the NWPA amendments?
A. Well, the NWPA amendments do not allow the MRS to have more than 10,000 tons until the repository is operational, so effectively, this brings through 2009 to right up to 9800 tons, so this is totally consistent with that capacity limitation.
Q. And then you'll see that 2010, if you go to the, in year 2010, if you go a little bit

Page 5341

to the right of where we were there, a single repository, do you see that column?
A. Yes.
Q. And then 2010, there's a number 400 under spent fuel from MRS, do you see that?
A. Yes.
Q. Now what does that indicate to you about a repository in the year 2010?
A. That it's starting initial waste acceptance at 400 tons per year from basically taking it from the MRS facility.
Q. Now, you'll see that between 2010 and 2014, the total amount received at the MRS is 1800, do you see that?
A. Yes.
Q. And then in the column that says, "Total Annual System Acceptance," far to the right, you'll see that amount jumps from 1800 to 3000 in the year 2015, do you see that?
A. Yes, I do.
Q. And then that rate of 3000 remains in effect until -- I think it's the year 2036, do you see that?
A. Yes.
Q. Do you consider that range of

Page 5342

acceptance at 3000 from 2015 to 2036 to be a steady state rate of 3000 MTU?
A Yes, I do.
Q. Now, this document we're looking at, the PETSC, preliminary estimate of total system life cycle costs, was this document used as part of the fee adequacy study?
A. My assumption that was -- I don't have direct knowledge, but we did not do these analyses or develop total system life cycle cost estimates unless it was for the purpose of fee adequacy because that's the rationale in order to develop this, and it's necessary in order to be do a comprehensive fee adequacy assessment.
Q Now, with respect to the fee adequacy assessment, what is the relationship between the rate of acceptance over, let's say, the first in this case 10 years of the program, what is the relationship between the acceptance rates over that period of 10 years or 12 years in this case, before the repository comes on, what is the relationship in your mind between that rate or the first 12 years and the actual fee adequacy analysis?

Page 5343

A. It's what I would consider to be a minor contributor to that. The initial acceptance rates into the system are not major drivers in terms of overall fee adequacy, nor is the 3000 ton rate for that matter. If it was a lower rate, actually, fee adequacy would look that much better essentially because you're deferring costs of the program into the future, so the waste acceptance rates certainly are a factor, but they're not the major factor in terms of adequacy of the fee. The greater determinant essentially is your cost of things, like waste packages and also economic conditions into the future, if you have a very pessimistic view of economic conditions into the future, that can have far more impact on the overall adequacy of the fee than any initial acceptance rates into the system
Q. Mr. Kouts, in your experience, given your experience on the program, when the utilities pay their fees into the NWF, they are paying for a particular rate of acceptance?
A. Not in my estimation, no.
Q. Why is that?

Page 5344

A. Because, effectively, the determination of waste acceptance rates really is driven by what you can design facilities at and also what's a reasonable approach, if you will, toward the deployment of facilities and the amount of material and equipment that you need to operate the system. If you, for instance, if you had a very high acceptance rate, you could build many facilities in order to accommodate that, plus the transportation casks, but you would only operate those facilities for a relatively shorter period of time, which would make the capital investment in those facilities not a good economic decision
Q. Now, I want to shift gears on you, I can take that exhibit back, so we don't lose it, if you don't mind. Thank you. You talked on cross-examination about the 1988 draft mission plan amendment. Do you recall that testimony?
A. Yes, I do.
Q. And you will recall, Mr. Kouts, that there is a statement in there about the recognition by DOE that, under current

CERTIFICATE OF FILING

I hereby certify that on March 19, 2008, a copy of the foregoing "Defendant's Supplemental Appendix in Support of Its Motion For a Protective Order " was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Sonia M. Orfield