**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**VOLUME II OF X**

---

# ENERGY NORTHWEST'S APPENDIX IN SUPPORT OF ITS NOTICE OF DESIGNATION OF DEPOSITION AND PRIOR TRIAL TESTIMONY OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO ADMIT PRIOR TESTIMONY INTO EVIDENCE

---


NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
202-639-6000


May 30, 2008

*Attorneys for Plaintiff*

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SYSTEM FUELS, INC., and<br>ENTERGY ARKANSAS, INC., | ) | |
| Plaintiffs, | ) | No. 03-2623C<br>(Judge Lettow) |
| v. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S UNOPPOSED MOTION TO DESIGNATE
PRIOR TRIAL TESTIMONY OF MR. ROBERT L. MORGAN

Defendant, the United States, respectfully requests that it be allowed to designate the trial testimony of Mr. Robert L. Morgan from the recent trial conducted in Northern States Power Co. v. United States, Fed. Cl. No. 98-484C. Allowing the designation of this testimony would preclude the need to have Mr. Morgan, who retired from Federal service almost 20 years ago, appear to testify in another spent nuclear fuel ("SNF") case. Plaintiff, System Fuels, Inc. ("SFI"), is not prejudiced by the designation of this testimony because its counsel, Mr. Alex Tomaszczuk, Pillsbury Winthrop Shaw Pittman LLC, cross-examined Mr. Morgan during his testimony in Northern States, and the Government's designation of testimony includes the full-text of that cross-examination. Counsel for SFI, Mr. Alex Tomaszczuk, has represented that SFI does not oppose this designation of testimony. The transcript of the testimony that the Government seeks to designate is attached to this motion.

BACKGROUND

Mr. Morgan was the director of the Nuclear Waste Policy Act Office, the precursor to the Office of Civilian Radioactive Waste Management ("OCRWM") within the Department of

Energy ("DOE"), from January 1983 to January 1984. Tr. 3779:15-19.[1] During that time, he was responsible for the review of comments on the draft Standard Contract, the response to those comments in the promulgation of the Standard Contract in the Federal Register, and the development of the December 1983 draft of the Mission Plan, which was published in final form in June 1985. Tr. 3781:8-13; 3825:9-3827-24. After he left OCRWM, Mr. Morgan had no involvement in or responsibility for commercial spent nuclear fuel matters for DOE. Tr. 3864:18-22. Mr. Morgan retired from the Federal Government in 1988. Tr. 3777:4-7.

Mr. Morgan was deposed about his responsibilities as Director between January 1983 and January 1984 during three days of deposition conducted in 2002. Counsel for SFI, Mr. Tomaszczuk, participated in these depositions upon behalf of several other SNF plaintiffs and questioned Mr. Morgan himself. After those depositions, Mr. Morgan testified in three different SNF trials before the Court – Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.) (Merow, S.J.); Tennessee Valley Authority v. United States, No. 01-115C (Fed. Cl.) (Lettow, J.); and Pacific Gas & Electric Co. v. United States, Nos. 04-74C & 04-75C (Fed. Cl.) (Hewitt, J.).[2]

In July 2006, counsel for SFI requested the opportunity to "update" his deposition of Mr. Morgan and the Government's other fact witnesses who had testified in previous SNF trials before the Court. In response to the Government's motion for a protective order seeking to preclude this deposition of Mr. Morgan filed in System Fuels, Inc. v. United States, No. 03-

[1] "Tr. __" refers to the transcript of Mr. Morgan's testimony, which is attached to this motion.

[2] The Government designated trial testimony for Mr. Morgan in the trial conducted in Southern Nuclear Operating Co. v. United States, No. 98-614C (Fed. Cl.)(Merow, S.J.).

2624C (Fed. Cl.) ("SFI-Mississippi"), the Court ordered that SFI's counsel be allowed a three-hour deposition in Monument, Colorado (where Mr. Morgan lives), if the Government intended to call Mr. Morgan at trial in that matter. Subsequently, the Government decided to call Mr. Morgan at trial in Northern States, and the Court in that case ordered that plaintiff's counsel, Mr. Tomaszczuk, be allowed to re-depose Mr. Morgan in Washington, D.C., on the eve of Mr. Morgan's testimony in that case.[3] Mr. Tomaszczuk deposed Mr. Morgan on November 15, 2006, in a single deposition that the parties agreed would be captioned as taken in this case, Northern States, and SFI-Mississippi, which is currently pending before Judge Braden. During this deposition, Mr. Tomaszczuk asked questions related to this case, to Northern States, and to SFI-Mississippi.

Mr. Morgan testified in Northern States on November 16, 2006, and was cross-examined by Mr. Tomaszczuk, who is also counsel for Northern States Power Company. Accordingly, counsel for SFI has had a full and fair opportunity to cross-examine Mr. Morgan during the trial in Northern States and the Government's designation of Mr. Morgan includes that cross-examination.

## ARGUMENT

This Court's rules are designed to ensure the "just, speedy, and inexpensive" determination of every action. RCFC 1. Similarly, RCFC 32(a) permits the use of deposition testimony, in lieu of live testimony, when a witness "is at a greater distance than 100 miles from the place of hearing" unless other factors not present here should preclude that use, RCFC

[3] Northern States Power Company had been a party to the previous deposition of Mr. Morgan in 2002.

32(a)(3)(E), or when, "upon application and notice, . . . such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used."

In this instance, we seek permission to submit Mr. Morgan's trial testimony from another SNF case as his testimony in this case. Mr. Morgan, who retired from Federal service almost 20 years ago, has repeatedly been required to testify in depositions and at trial in various SNF cases, even though his testimony has related to precisely the same issue in every case: that is, the development of the Standard Contract and the degree to which the parties were able to agree upon a rate of SNF acceptance applicable to that contract. Although RCFC 32 applies specifically to deposition testimony, the rationale behind that rule applies equally to the trial testimony in other SNF cases in the circumstances here, where all of the plaintiffs in the 66 SNF cases that were originally pending before this Court have had similar motives and where the cases all involve the same issues, including the development of the same standardized contract, the interpretation of the same contract terms, and the same alleged non-performance by DOE. Particularly where, as here, the plaintiff does not oppose our request to allow Mr. Morgan relief from the need repeatedly to testify in various trials regarding the same topics and the same underlying facts, where the same plaintiff's counsel represents the plaintiffs in both this case and the case in which the designated trial testimony from Mr. Morgan was taken, where the witness in question retired from Federal service almost 20 years ago, and where the witness has already been required to testify repeatedly regarding the same topics upon which he would testify here, the Court should exercise its discretion to permit us to rely upon Mr. Morgan's recent trial

testimony in Northern States in this case instead of requiring Mr. Morgan to testify yet again in another SNF case.

The burden to Mr. Morgan of having to travel to Washington D.C. to testify in yet another trial is great. The Government originally requested that the Court consolidate the SNF cases, in part to permit for coordinated discovery and to permit former Federal employees, like Mr. Morgan, to testify once, and only once, regarding matters that are relevant in all of the SNF cases. The SNF plaintiffs successfully opposed the Government's request, and, as a result, Mr. Morgan, who was involved in the formation of the Standard Contract at issue in this case, has now testified in the trial of the four cases. Given Mr. Morgan's age, the fact that he retired from Federal service almost 20 years ago, and the fact that counsel for SFI has had a full and fair opportunity to cross-examine Mr. Morgan about the testimony that the Government has designated, the Court should allow the Government to designate Mr. Morgan's testimony from the recent trial in Northern States, rather than make Mr. Morgan appear in person to testify again.

## CONCLUSION

For the foregoing reasons, the Government requests that it be allowed to designate the entirety of Mr. Morgan's testimony in Northern States as substantive evidence in this case.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Joshua E. Gardner
JOSHUA E. GARDNER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 305-7583
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

KEVIN B. CRAWFORD
SCOTT E. DAMELIN
LISA L. DONAHUE
JOHN C. EKMAN
MARIAN E. SULLIVAN
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

January 5, 2007

Attorneys for Defendant

# ENERGY NORTHWEST DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

Energy Northwest v. The United States
No. 04-10C
Chief Judge Damich

## LAKE BARRETT

| | | | | |
|---|---|---|---|---|
| 4/22/2002 Deposition | [10:21] - [11:8] | [81:2] - [81:22] | [152:3] - [152:14] | [214:18] - [220:2] |
| | [38:14] - [40:4] | [83:7] - [94:8] | [153:12] - [154:16] | [224:1] - [224:19] |
| | [44:5] - [47:10] | [95:12] - [96:7] | [159:16] - [160:19] | [225:4] - [228:12] |
| | [48:5] - [60:9] | [115:18] - [123:2] | [194:21] - [201:10] | [233:1] - [233:6] |
| | [61:6] - [63:17] | [137:11] - [139:20] | [201:17] - [201:21] | [234:9] - [235:14] |
| | [74:2] - [74:15] | [146:6] - [147:17] | [204:17] - [207:11] | [253:3] - [253:8] |
| | [76:8] - [76:19] | [148:18] - [149:21] | [209:17] - [210:2] | [259:13] - [261:15] |
| 4/23/2002 Deposition | [315:5] - [315:11] | [396:2] - [396:11] | [427:16] - [428:16] | [484:15] - [484:22] |
| | [336:11] - [350:11] | [399:3] - [399:9] | [429:20] - [431:1] | [489:22] - [491:22] |
| | [379:4] - [379:17] | [401:20] - [403:14] | [448:8] - [449:8] | |
| | [388:6] - [392:11] | [407:16] - [412:21] | [450:14] - [456:16] | |
| | [393:16] - [395:13] | [413:17] - [415:9] | [474:13] - [475:22] | |
| 4/26/2002 Deposition | [557:8] - [574:3] | [616:11] - [617:4] | [715:5] - [718:11] | [771:10] - [781:6] |
| | [579:1] - [584:14] | [618:22] - [619:11] | [736:10] - [737:2] | [781:21] - [782:19] |
| | [585:9] - [585:15] | [620:16] - [628:3] | [738:19] - [742:13] | [790:9] - [798:9] |
| | [587:8] - [592:12] | [706:19] - [707:15] | [753:22] - [755:11] | [800:21] - [802:11] |
| | [593:4] - [595:7] | [708:15] - [712:8] | [761:19] - [764:3] | [802:22] - [806:1] |
| 5/8/2002 Deposition | [900:6] - [901:20] | [955:18] - [956:22] | [967:21] - [970:17] | [1049:3] - [1050:9] |
| | [910:7] - [928:15] | [958:1] - [958:3] | [974:18] - [975:15] | [1057:6] - [1065:12] |
| | [945:13] - [953:7] | [961:22] - [967:2] | [1045:4] - [1046:14] | [1095:5] - [1099:13] |

# ENERGY NORTHWEST DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

Energy Northwest v. The United States
No. 04-10C
Chief Judge Damich

## LAKE BARRETT (continued)

| | | | | |
|---|---|---|---|---|
| 5/10/2002 Deposition | [1149:3] - [1151:14] | [1267:5] - [1268:10] | [1336:20] - [1339:4] | [1415:17] - [1421:21] |
| | [1159:16] - [1160:7] | [1283:1] - [1284:7] | [1341:2] - [1343:14] | [1426:9] - [1427:19] |
| | [1161:19] - [1166:7] | [1284:19] - [1286:7] | [1345:18] - [1347:13] | [1431:11] - [1432:10] |
| | [1243:18] - [1248:6] | [1331:7] - [1335:10] | [1367:1] - [1373:6] | |
| 5/14/2002 Deposition | [64:6] - [65:24] | [120:22] - [122:19] | [173:16] - [179:3] | [238:3] - [239:21] |
| 5/15/2002 Deposition | [387:24] - [389:2] | [390:2] - [393:12] | | |

## ALAN BROWNSTEIN

| | | | | |
|---|---|---|---|---|
| 4/9/2002 Deposition | [9:18] - [10:14] | [38:22] - [42:8] | [93:1] - [94:15] | [122:2] - [122:8] |
| | [13:15] - [13:25] | [43:19] - [44:4] | [95:11] - [96:1] | [125:12] - [128:21] |
| | [15:20] - [16:11] | [44:19] - [45:11] | [96:24] - [98:4] | [129:16] - [142:25] |
| | [18:17] - [18:22] | [59:1] - [62:3] | [98:17] - [100:17] | [143:22] - [144:18] |
| | [25:6] - [29:25] | [65:16] - [70:24] | [111:13] - [112:13] | [214:7] - [215:6] |
| | [31:10] - [32:5] | [71:19] - [72:10] | [113:22] - [114:17] | |
| | [33:7] - [38:8] | [79:4] - [80:24] | [119:8] - [120:7] | |

# ENERGY NORTHWEST DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

Energy Northwest v. The United States
No. 04-10C
Chief Judge Damich

## ALAN BROWNSTEIN (continued)

| | | | | |
|---|---|---|---|---|
| 4/10/2002 Deposition | [265:8] - [265:17]<br>[266:25] - [267:22]<br>[273:11] - [277:9]<br>[278:12] - [278:24]<br>[279:10] - [279:20]<br>[280:9] - [283:15]<br>[302:13] - [303:22] | [321:1] - [321:18]<br>[326:20] - [338:22]<br>[343:4] - [344:8]<br>[356:13] - [357:11]<br>[363:22] - [364:22]<br>[365:15] - [368:25]<br>[369:19] - [378:5] | [405:16] - [405:20]<br>[411:14] - [412:21]<br>[413:13] - [416:6]<br>[420:23] - [421:24]<br>[424:6] - [425:19]<br>[439:4] - [439:6]<br>[439:25] - [443:19] | [452:9] - [453:3]<br>[453:12] - [453:16]<br>[455:24] - [457:14]<br>[459:17] - [463:3] |
| 4/11/2002 Deposition | [506:18] - [508:8]<br>[509:2] - [519:9] | [534:20] - [538:9] | [630:9] - [631:17] | [727:23] - [732:17] |
| 5/23/2002 Deposition | [104:19] - [107:14] | [108:4] - [108:9] | [216:11] - [220:2] | |
| 6/14/2002 Deposition | [263:8] - [263:16]<br>[292:16] - [301:24] | [419:14] - [420:16] | [422:17] - [425:4] | [425:13] - [428:6] |

# ENERGY NORTHWEST DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

Energy Northwest v. The United States
No. 04-10C
Chief Judge Damich

## BILLY M. COLE

| | | | | |
|---|---|---|---|---|
| 3/12/2002 Deposition | [8:10] - [8:18] | [55:2] - [56:24] | [106:14] - [108:14] | [178:2] - [179:6] |
| | [23:21] - [36:24] | [65:7] - [66:1] | [110:1] - [113:16] | [180:1] - [180:24] |
| | [37:12] - [39:18] | [67:6] - [67:19] | [121:6] - [121:22] | [181:7] - [183:1] |
| | [40:18] - [45:9] | [68:25] - [69:5] | [126:11] - [127:24] | [196:24] - [200:3] |
| | [46:5] - [46:23] | [74:11] - [75:14] | [128:11] - [133:7] | [200:20] - [202:24] |
| | [48:6] - [50:8] | [78:11] - [81:13] | [158:5] - [158:13] | [204:1] - [205:7] |
| | [52:16] - [53:11] | [93:4] - [94:9] | [158:25] - [159:20] | |
| | [53:24] - [54:13] | [101:10] - [104:12] | [171:9] - [177:1] | |
| 3/13/2002 Deposition | [306:10] - [308:14] | [347:21] - [352:13] | [362:21] - [365:25] | |
| | [343:5] - [346:10] | [361:12] - [361:18] | | |
| 6/4/2002 Deposition | [77:22] - [78:23] | [199:5] - [200:11] | | |

## DANIEL DREYFUS

| | | | | |
|---|---|---|---|---|
| 5/15/2002 Deposition | [5:10] - [5:12] | [13:14] - [15:16] | [58:20] - [60:22] | [113:22] - [114:3] |
| | [6:12] - [6:14] | [16:24] - [20:5] | [63:23] - [69:9] | [114:13] - [119:6] |
| | [7:19] - [11:17] | [53:21] - [57:15] | [111:3] - [112:1] | [178:24] - [179:11] |
| | | | | [180:13] - [182:17] |

# ENERGY NORTHWEST DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

Energy Northwest v. The United States
No. 04-10C
Chief Judge Damich

## SUSAN KLEIN

| | | | | |
|---|---|---|---|---|
| 4/24/2002 30(b)(6) Deposition | [10:8] - [10:13] | [58:9] - [59:20] | [122:21] - [123:8] | [226:19] - [227:7] |
| | [10:19] - [13:13] | [61:12] - [62:14] | [140:7] - [141:20] | [231:2] - [231:22] |
| | [13:21] - [21:12] | [73:7] - [74:6] | [146:9] - [150:21] | [239:13] - [243:10] |
| | [22:17] - [24:7] | [78:12] - [80:11] | [151:6] - [152:2] | [244:20] - [248:5] |
| | [25:6] - [26:8] | [82:8] - [83:19] | [167:4] - [167:18] | [249:21] - [250:15] |
| | [30:20] - [34:14] | [84:16] - [85:1] | [170:8] - [172:14] | [251:21] - [255:1] |
| | [34:22] - [36:11] | [98:4] - [98:11] | [193:18] - [194:2] | [255:16] - [256:1] |
| | [44:1] - [44:17] | [99:2] - [106:14] | [195:3] - [195:10] | |
| | [45:8] - [45:17] | [108:4] - [112:16] | [196:1] - [196:17] | |
| 4/25/2002 30(b)(6) Deposition | [283:16] - [284:6] | [340:17] - [342:3] | [515:5] - [516:17] | [528:2] - [528:7] |
| | [284:18] - [286:10] | [351:6] - [354:16] | [521:13] - [522:11] | |
| | [287:1] - [291:11] | [388:11] - [389:12] | [523:8] - [525:8] | |

## CHRISTOPHER KOUTS

| | | | | |
|---|---|---|---|---|
| 1/30/2004 Deposition | [11:6] - [11:16] | [16:4] - [18:16] | [20:18] - [27:5] | [40:20] - [41:15] |
| | [15:1] - [15:11] | [19:10] - [20:6] | [36:9] - [40:10] | [42:3] - [46:7] |
| 2/19/2004 Deposition | [370:9] - [371:18] | [432:2] - [434:18] | | |
| 8/2/2004 Yankee Atomic Trial Transcript | [3443:24] - [3448:1] | [3479:21] - [3481:5] | [3517:4] - [3517:22] | [3540:1] - [3541:5] |
| | [3454:9] - [3455:9] | | | |

## ENERGY NORTHWEST DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

Energy Northwest v. The United States
No. 04-10C
Chief Judge Damich

**CHRISTOPHER KOUTS (continued)**

| | | | | |
|---|---|---|---|---|
| 4/11/2005 30(b)(6) Deposition | [13:11] - [13:22]<br>[14:14] - [16:2]<br>[16:15] - [17:10] | [19:19] - [21:1]<br>[24:7] - [28:5]<br>[30:22] - [33:16] | [45:15] - [47:11]<br>[50:6] - [50:19]<br>[62:20] - [63:4] | [114:12] - [115:1]<br>[127:6] - [130:1]<br>[143:6] - [145:8] |
| 7/12/2005 TVA Trial Transcript | [1563:25] - [1564:6] | [1566:21] - [1568:18] | [1569:4] - [1580:3] | [1582:12] - [1583:19] |
| 10/26/2005 Southern Nuclear Trial Transcript | [1743:11] - [1745:11]<br>[1773:8] - [1774:6]<br>[1774:25] - [1775:18]<br>[1822:20] - [1823:13] | [1831:17] - [1833:4]<br>[1833:18] - [1834:9]<br>[1837:5] - [1837:10]<br>[1838:3] - [1839:14] | [1845:15] - [1847:6]<br>[1850:22] - [1854:22]<br>[1861:17] - [1863:14]<br>[1909:9] - [1910:25] | [1921:2] - [1922:10]<br>[1922:22] - [1923:16] |
| 6/13/2006 Pacific Gas Trial Transcript | [2582:11] - [2582:17] | [2583:3] - [2586:13] | [2616:12] - [2620:12] | |
| 6/14/2006 Pacific Gas Trial Transcript | [2636:14] - [2637:14]<br>[2647:12] - [2648:7]<br>[2651:22] - [2654:15] | [2745:11] - [2745:15]<br>[2747:1] - [2748:12]<br>[2761:23] - [2761:24] | [2767:8] - [2770:13]<br>[2775:16] - [2777:5]<br>[2793:9] - [2793:11] | [2796:23] - [2798:9]<br>[2820:1] - [2821:24]<br>[2886:17] - [2887:9] |
| 10/11/2006 Deposition | [25:14] - [27:13]<br>[45:13] - [45:22] | [49:11] - [50:1]<br>[55:8] - [57:7] | [63:7] - [63:21]<br>[73:11] - [73:22] | [89:18] - [92:5] |
| 1/6/2007 System Fuels Miss. Trial Transcript | [1902:23] - [1904:13] | [1914:23] - [1915:3] | [1916:22] - [1919:8] | |

# ENERGY NORTHWEST DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

Energy Northwest v. The United States
No. 04-10C
Chief Judge Damich

## CHRISTOPHER KOUTS (continued)

| | | | | |
|---|---|---|---|---|
| 4/12/2007 System Fuels Entergy Trial Transcript | [3342:22] - [3344:13]<br>[3344:17] - [3347:15]<br>[3371:10] - [3373:20]<br>[3444:7] - [3449:9]<br>[3455:12] - [3457:5]<br>[3457:16] - [3460:25] | [3462:9] - [3464:15]<br>[3469:17] - [3472:19]<br>[3476:3] - [3477:1]<br>[3478:7] - [3481:17]<br>[3484:1] - [3484:15]<br>[3494:9] - [3495:2] | [3495:20] - [3496:2]<br>[3497:20] - [3498:7]<br>[3504:12] - [3505:14]<br>[3506:15] - [3514:8]<br>[3515:2] - [3525:23]<br>[3545:5] - [3547:18] | [3568:25] - [3571:7]<br>[3571:23] - [3574:11]<br>[3574:22] - [3575:11] |
| 5/1/2007 30(b)(6) Deposition | [24:19] - [26:14]<br>[97:1] - [97:16]<br>[100:4] - [101:6]<br>[102:2] - [104:8]<br>[116:3] - [116:11] | [117:8] - [118:20]<br>[131:12] - [132:20]<br>[133:14] - [135:4]<br>[167:7] - [168:14]<br>[172:18] - [173:9] | [176:10] - [179:5]<br>[180:18] - [181:21]<br>[190:5] - [191:14]<br>[192:11] - [193:1]<br>[193:7] - [196:14] | [200:17] - [202:1]<br>[206:18] - [209:11]<br>[223:6] - [224:4] |
| 5/2/2007 Deposition | [337:17] - [338:21]<br>[339:17] - [341:21]<br>[345:14] - [346:3]<br>[347:6] - [348:4]<br>[348:10] - [348:18] | [349:6] - [355:11]<br>[355:18] - [356:16]<br>[361:2] - [364:5]<br>[364:14] - [365:11]<br>[366:10] - [366:22] | [368:5] - [372:8]<br>[376:7] - [378:22]<br>[380:18] - [381:14]<br>[383:11] - [389:10]<br>[397:8] - [401:9] | [412:5] - [413:14]<br>[417:15] - [419:2] |

# ENERGY NORTHWEST DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

Energy Northwest v. The United States
No. 04-10C
Chief Judge Damich

## MICHAEL LAWRENCE

| | | | | |
|---|---|---|---|---|
| 5/20/2002 Deposition | [10:18] - [10:20] | [51:4] - [52:11] | [92:1] - [94:15] | [166:7] - [167:6] |
| | [11:21] - [12:1] | [52:18] - [52:25] | [98:24] - [101:7] | [181:16] - [182:20] |
| | [13:15] - [14:3] | [56:8] - [56:19] | [114:15] - [114:21] | [187:15] - [189:3] |
| | [19:12] - [20:11] | [57:3] - [59:6] | [122:8] - [123:3] | [194:21] - [195:6] |
| | [20:20] - [21:19] | [60:23] - [64:21] | [124:8] - [124:23] | [197:19] - [198:15] |
| | [22:8] - [23:4] | [67:10] - [68:19] | [129:11] - [133:17] | [199:23] - [204:4] |
| | [24:18] - [28:4] | [71:7] - [73:4] | [141:21] - [143:9] | [205:5] - [209:12] |
| | [32:25] - [37:21] | [77:2] - [78:4] | [143:17] - [145:24] | [214:23] - [219:7] |
| | [49:3] - [49:25] | [78:24] - [83:3] | [148:4] - [150:10] | [219:17] - [221:15] |
| 5/21/2002 Deposition | [244:7] - [245:14] | [258:11] - [259:1] | [305:25] - [310:12] | [336:12] - [339:9] |
| | [248:12] - [253:2] | [301:20] - [305:4] | [325:1] - [334:5] | |
| 11/16/2007 Carolina Power Trial Transcript | [2065:9] - [2065:17] | [2133:20] - [2133:25] | [2144:9] - [2144:15] | [2154:4] - [2157:11] |
| | [2066:3] - [2069:15] | [2135:7] - [2136:1] | [2146:23] - [2147:11] | [2158:8] - [2166:15] |
| | [2071:11] - [2073:17] | [2143:11] - [2143:17] | [2150:9] - [2152:11] | [2172:18] - [2175:25] |

## ENERGY NORTHWEST DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

Energy Northwest v. The United States
No. 04-10C
Chief Judge Damich

### RONALD MILNER

| | | | | |
|---|---|---|---|---|
| 5/1/2002 Deposition | [9:18] - [9:22] | [54:18] - [54:24] | [84:17] - [85:24] | [136:2] - [136:18] |
| | [11:23] - [13:11] | [60:5] - [60:16] | [94:9] - [94:22] | [137:19] - [138:22] |
| | [14:4] - [15:24] | [61:6] - [61:21] | [97:18] - [101:8] | [139:11] - [139:18] |
| | [16:21] - [18:12] | [65:21] - [67:1] | [103:25] - [104:18] | [151:24] - [152:22] |
| | [18:22] - [24:3] | [67:11] - [68:1] | [105:1] - [105:18] | [153:12] - [153:22] |
| | [31:1] - [31:22] | [69:14] - [69:23] | [113:23] - [117:23] | [161:4] - [162:17] |
| | [35:22] - [37:12] | [70:4] - [70:18] | [129:22] - [130:18] | [163:4] - [163:17] |
| | [41:21] - [42:24] | [72:21] - [74:13] | [133:7] - [133:12] | [164:21] - [165:23] |
| | [47:16] - [49:14] | [75:6] - [79:16] | [134:13] - [134:18] | [189:16] - [190:14] |
| 5/2/2002 Deposition | [206:6] - [208:15] | [263:13] - [264:15] | [331:22] - [333:3] | [377:8] - [380:10] |
| | [214:9] - [217:22] | [264:20] - [265:8] | [333:19] - [334:10] | [389:8] - [389:24] |
| | [219:24] - [221:21] | [266:2] - [268:5] | [334:20] - [337:19] | [390:17] - [390:22] |
| | [224:4] - [225:15] | [272:23] - [274:2] | [341:23] - [348:8] | [391:13] - [392:17] |
| | [232:7] - [234:13] | [278:21] - [279:21] | [356:13] - [357:7] | [393:5] - [394:19] |
| | [245:19] - [246:25] | [280:8] - [281:5] | [358:5] - [362:1] | [395:7] - [395:19] |
| | [247:19] - [248:5] | [314:4] - [314:21] | [363:7] - [363:24] | [396:2] - [397:2] |
| | [248:19] - [249:2] | [317:24] - [323:8] | [364:20] - [370:1] | [398:1] - [402:4] |
| | [250:4] - [251:13] | [327:22] - [328:2] | [371:20] - [374:3] | |
| | [261:7] - [262:20] | [330:19] - [331:17] | [374:14] - [376:13] | |
| 5/3/2002 Deposition | [411:7] - [411:13] | [448:9] - [448:15] | [552:3] - [564:11] | [575:21] - [578:9] |
| | [412:3] - [414:25] | [497:25] - [500:16] | [570:3] - [573:5] | |
| | [447:2] - [448:1] | [524:20] - [527:24] | [573:17] - [574:10] | |

# ENERGY NORTHWEST DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

Energy Northwest v. The United States
No. 04-10C
Chief Judge Damich

## RONALD MILNER (continued)

| | | | | |
|---|---|---|---|---|
| 5/7/2002 Deposition | [589:24] - [590:21]<br>[594:25] - [598:21]<br>[616:8] - [617:3]<br>[617:16] - [617:19] | [617:24] - [623:19]<br>[626:13] - [629:21]<br>[630:18] - [632:14]<br>[666:13] - [666:22] | [667:3] - [668:5]<br>[668:22] - [669:9]<br>[681:3] - [681:19]<br>[682:4] - [683:15] | [704:4] - [706:18]<br>[707:22] - [712:9] |
| 5/7/2002 Deposition (Afternoon) | [6:10] - [7:13]<br>[7:21] - [8:15] | [14:17] - [15:13]<br>[17:5] - [20:21] | [21:21] - [30:8]<br>[31:4] - [32:11] | |
| 5/8/2002 Deposition | [59:21] - [61:14]<br>[109:15] - [110:7]<br>[155:18] - [156:1] | [216:8] - [217:12]<br>[218:5] - [219:10]<br>[219:18] - [221:5] | [221:21] - [225:24]<br>[229:5] - [229:20]<br>[262:1] - [263:12] | [266:23] - [268:2]<br>[268:10] - [270:11]<br>[274:15] - [276:9] |
| 8/11/2004 Yankee Atomic Trial Transcript | [4711:17] - [4716:11]<br>[4722:23] - [4723:17]<br>[4725:18] - [4726:25] | [4741:11] - [4741:21]<br>[4745:14] - [4746:22]<br>[4749:21] - [4750:6] | [4756:14] - [4758:23]<br>[4760:5] - [4760:11]<br>[4761:3] - [4762:13] | [4772:2] - [4773:14]<br>[4776:11] - [4779:15] |

# ENERGY NORTHWEST DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

Energy Northwest v. The United States
No. 04-10C
Chief Judge Damich

## ROBERT MORGAN

| | | | | |
|---|---|---|---|---|
| 3/21/2002 Deposition | [10:1] - [10:4] | [54:14] - [55:25] | [95:4] - [96:12] | [144:3] - [144:10] |
| | [12:1] - [12:11] | [56:7] - [58:3] | [96:25] - [97:14] | [149:3] - [156:21] |
| | [15:2] - [15:5] | [58:11] - [60:20] | [104:10] - [107:2] | [167:25] - [169:17] |
| | [15:19] - [18:1] | [63:12] - [63:17] | [108:3] - [109:15] | [173:23] - [174:8] |
| | [24:10] - [27:6] | [67:14] - [67:23] | [117:23] - [118:15] | [175:24] - [176:10] |
| | [37:9] - [44:4] | [70:1] - [70:13] | [119:4] - [119:18] | [194:12] - [195:5] |
| | [46:18] - [49:2] | [74:9] - [74:23] | [125:10] - [128:5] | [197:14] - [200:5] |
| | [49:11] - [50:4] | [76:14] - [77:21] | [129:5] - [130:7] | [200:23] - [206:14] |
| | [52:9] - [52:15] | [93:6] - [94:20] | [137:3] - [142:11] | [206:24] - [212:13] |
| 3/22/2002 Deposition | [221:18] - [222:1] | [224:22] - [227:16] | [233:4] - [233:17] | [313:18] - [315:1] |
| | [223:6] - [224:1] | [231:6] - [232:16] | [234:9] - [238:14] | |
| 6/25/2002 Deposition | [11:25] - [13:22] | [133:24] - [135:14] | | |
| 8/3/2004 Yankee Atomic Trial Transcript | [3666:15] - [3667:16] | [3673:25] - [3675:10] | [3681:7] - [3681:13] | |
| | [3669:15] - [3670:25] | [3675:18] - [3675:23] | [3681:20] - [3686:22] | |
| | [3671:12] - [3673:10] | [3676:15] - [3679:5] | [3689:25] - [3692:13] | |
| 11/15/2006 Deposition | [6:10] - [7:4] | [16:14] - [17:11] | [48:10] - [50:4] | [90:13] - [90:21] |
| | [7:21] - [8:11] | [25:10] - [25:22] | [64:7] - [64:13] | [91:13] - [92:13] |
| | [8:15] - [8:21] | [27:6] - [28:9] | [65:3] - [66:4] | [110:4] - [113:4] |
| | [9:3] - [9:4] | [30:14] - [35:18] | [79:14] - [88:2] | |

# ENERGY NORTHWEST DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

Energy Northwest v. The United States
No. 04-10C
Chief Judge Damich

## ROBERT MORGAN (continued)

| | | | | |
|---|---|---|---|---|
| 11/16/2006 Northern States Trial Transcript | [3776:13] - [3777:10] | [3784:13] - [3784:22] | [3864:10] - [3865:10] | [3880:24] - [3885:13] |
| | [3779:15] - [3781:17] | [3824:13] - [3826:4] | [3878:16] - [3879:19] | [3887:13] - [3890:10] |
| 11/13/2007 Carolina Power Trial Transcript | [1383:13] - [1383:15] | [1389:22] - [1392:15] | [1411:21] - [1412:13] | [1429:20] - [1431:23] |
| | [1383:25] - [1384:9] | [1401:13] - [1403:7] | [1419:15] - [1421:21] | |
| | [1387:23] - [1388:16] | [1405:20] - [1408:8] | [1423:19] - [1424:8] | |

## THOMAS POLLOG

| | | | | |
|---|---|---|---|---|
| 4/11/2002 30(b)(6) Deposition | [9:12] - [10:4] | [45:12] - [51:2] | [111:24] - [113:4] | [169:9] - [170:1] |
| | [10:8] - [10:20] | [54:11] - [56:16] | [113:21] - [115:15] | [178:22] - [181:3] |
| | [10:24] - [12:18] | [61:5] - [62:18] | [116:21] - [119:4] | [182:8] - [183:18] |
| | [13:12] - [15:6] | [70:16] - [73:13] | [122:21] - [125:13] | [184:25] - [186:7] |
| | [15:13] - [15:16] | [93:10] - [94:13] | [126:1] - [126:15] | [186:23] - [188:2] |
| | [16:7] - [17:11] | [95:16] - [98:13] | [132:1] - [132:17] | [193:8] - [193:14] |
| | [20:8] - [21:4] | [99:6] - [100:16] | [138:24] - [140:2] | [194:21] - [195:17] |
| | [28:10] - [28:12] | [102:19] - [103:12] | [143:6] - [145:15] | [200:22] - [202:22] |
| | [33:2] - [35:23] | [104:25] - [105:6] | [158:16] - [162:22] | |
| | [44:20] - [45:4] | [110:5] - [110:16] | [164:6] - [164:16] | |
| 4/12/2002 30(b)(6) Deposition | [9:25] - [10:3] | [42:24] - [43:22] | [60:20] - [61:8] | [120:4] - [122:18] |
| | [11:15] - [14:12] | [44:24] - [45:10] | [61:22] - [63:13] | [132:23] - [137:3] |
| | [19:18] - [20:18] | [46:12] - [47:1] | [72:22] - [73:2] | [138:9] - [139:9] |
| | [21:17] - [24:21] | [50:25] - [55:6] | [105:11] - [106:2] | [143:14] - [145:16] |
| | [31:7] - [32:5] | [56:2] - [56:22] | [106:23] - [107:12] | |
| | [41:17] - [42:4] | [57:10] - [59:20] | [108:20] - [110:4] | |

## ENERGY NORTHWEST DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

Energy Northwest v. The United States
No. 04-10C
Chief Judge Damich

**THOMAS POLLOG (continued)**

| | | | | |
|---|---|---|---|---|
| 5/15/2002 30(b)(6) Deposition | [29:12] - [29:16] | [72:8] - [73:15] | [153:14] - [154:2] | [224:19] - [225:18] |
| | [31:18] - [31:25] | [73:23] - [74:8] | [161:3] - [161:14] | [242:5] - [242:24] |
| | [32:17] - [32:21] | [78:8] - [79:21] | [162:21] - [163:15] | [251:22] - [253:1] |
| | [34:23] - [35:20] | [90:13] - [90:19] | [171:6] - [172:5] | [253:15] - [254:23] |
| | [37:10] - [38:8] | [92:12] - [93:13] | [181:5] - [188:10] | [255:13] - [256:15] |
| | [67:13] - [69:14] | [94:14] - [96:6] | [224:3] - [224:10] | |
| 5/16/2002 30(b)(6) Deposition | [277:10] - [278:5] | [328:15] - [329:1] | [404:22] - [405:4] | [428:23] - [430:1] |
| | [291:8] - [292:20] | [330:15] - [330:24] | [407:16] - [409:15] | [431:3] - [432:5] |
| | [293:4] - [295:3] | [332:2] - [332:10] | [410:19] - [411:4] | [437:9] - [437:15] |
| | [296:19] - [297:18] | [332:21] - [335:4] | [411:20] - [412:6] | [439:1] - [440:4] |
| | [316:17] - [317:21] | [346:10] - [348:2] | [412:16] - [413:8] | |
| | [323:19] - [324:11] | [390:14] - [391:1] | [415:16] - [416:20] | |
| | [327:13] - [327:19] | [393:11] - [393:22] | [423:9] - [424:1] | |
| 5/22/2002 Deposition | [556:12] - [560:2] | [645:14] - [649:16] | [680:17] - [681:23] | |
| | [643:21] - [644:4] | [667:2] - [668:25] | | |
| 8/4/2004 Yankee Atomic Trial Transcript | [3902:13] - [3904:15] | [3995:6] - [3997:21] | [4017:12] - [4019:23] | [4060:19] - [4061:5] |
| | [3904:21] - [3905:3] | [3998:1] - [3998:5] | [4020:7] - [4023:11] | [4068:6] - [4069:7] |
| | [3947:13] - [3950:6] | [3999:25] - [4001:21] | [4032:8] - [4032:18] | [4084:25] - [4086:1] |
| | [3952:7] - [3954:2] | [4004:6] - [4004:14] | [4035:17] - [4037:3] | [4088:1] - [4089:7] |
| | [3973:20] - [3975:16] | [4007:17] - [4010:18] | [4039:15] - [4041:5] | [4089:23] - [4090:15] |
| | [3976:12] - [3980:7] | [4011:1] - [4011:5] | [4041:22] - [4042:19] | |
| | [3981:3] - [3982:9] | [4012:19] - [4016:6] | [4059:19] - [4060:8] | |

## ENERGY NORTHWEST DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

Energy Northwest v. The United States
No. 04-10C
Chief Judge Damich

### THOMAS POLLOG (continued)

| | | | | |
|---|---|---|---|---|
| 3/29/2005 SMUD Trial Transcript | [1964:11] - [1966:25]<br>[2026:10] - [2027:18] | [2030:18] - [2032:13]<br>[2033:17] - [2034:8] | [2037:4] - [2039:3] | [2049:5] - [2049:15] |
| 7/12/2005 TVA Trial Transcript | [1601:13] - [1601:20]<br>[1602:13] - [1604:3] | [1604:20] - [1605:11]<br>[1658:20] - [1661:5] | [1662:8] - [1666:19] | |
| 10/26/2005 Southern Nuclear Trial Transcript | [1861:17] - [1863:14] | [1909:9] - [1910:25] | [1921:2] - [1922:10] | [1922:22] - [1923:16] |
| 10/12/2006 Deposition | [5:22] - [6:6] | [54:2] - [54:14] | [55:20] - [56:5] | [57:2] - [59:20] |
| 11/15/2006 Northern States Trial Transcript | [3602:25] - [3607:5]<br>[3684:17] - [3686:19] | [3687:9] - [3687:17]<br>[3691:14] - [3691:22] | [3718:12] - [3721:1]<br>[3722:22] - [3723:3] | [3738:23] - [3740:14]<br>[3741:1] - [3741:10] |

### ROBERT ROSSELLI

| | | | | |
|---|---|---|---|---|
| 4/15/2002 Deposition | [11:12] - [11:19]<br>[16:18] - [19:7]<br>[19:18] - [22:4]<br>[24:1] - [25:24]<br>[31:1] - [32:18]<br>[33:10] - [34:13] | [43:1] - [44:10]<br>[50:12] - [54:15]<br>[68:9] - [68:22]<br>[69:5] - [72:15]<br>[93:1] - [93:9]<br>[94:14] - [97:7] | [119:10] - [119:18]<br>[134:23] - [135:5]<br>[136:24] - [145:24]<br>[146:19] - [149:17]<br>[154:13] - [154:23]<br>[156:7] - [158:10] | [163:22] - [165:18]<br>[166:13] - [169:2]<br>[176:9] - [176:25]<br>[177:7] - [181:2] |
| 4/16/2002 Deposition | [190:18] - [191:5] | | | |

# ENERGY NORTHWEST DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

Energy Northwest v. The United States
No. 04-10C
Chief Judge Damich

## BEN RUSCHE

| | | | | |
|---|---|---|---|---|
| 5/16/2002 Deposition | [6:10] - [6:17]<br>[8:1] - [8:6]<br>[12:6] - [12:10]<br>[12:21] - [14:1]<br>[33:9] - [36:16] | [37:23] - [42:14]<br>[45:4] - [47:12]<br>[48:13] - [48:16]<br>[49:6] - [50:13]<br>[68:10] - [68:13] | [153:11] - [156:4]<br>[157:4] - [157:12]<br>[158:24] - [160:12]<br>[166:2] - [167:2]<br>[168:18] - [174:24] | [221:6] - [221:16]<br>[222:7] - [223:24]<br>[242:5] - [248:3]<br>[297:11] - [301:8] |
| 5/17/2002 Deposition | [329:15] - [332:6]<br>[336:4] - [342:18] | [364:25] - [365:15]<br>[366:4] - [369:23] | [375:5] - [377:22]<br>[379:16] - [380:7] | |
| 8/3/2004 Yankee Atomic Trial Transcript | [3696:16] - [3697:9] | [3738:9] - [3742:4] | [3748:1] - [3748:23] | [3751:12] - [3754:4] |

## NANCY SLATER-THOMPSON

| | | | | |
|---|---|---|---|---|
| 4/21/1999 Deposition | [4:10] - [4:12]<br>[5:25] - [7:12]<br>[11:14] - [11:22] | [13:24] - [15:2]<br>[18:4] - [22:10]<br>[122:13] - [124:10] | [125:11] - [125:17]<br>[127:7] - [127:13]<br>[137:9] - [138:9] | [161:14] - [162:1]<br>[162:22] - [169:17] |
| 4/22/1999 Deposition | [228:25] - [232:18]<br>[233:4] - [234:3] | [235:1] - [235:18]<br>[240:3] - [241:13] | [242:18] - [246:4]<br>[273:11] - [274:5] | [283:25] - [286:15] |
| 6/13/2002 Deposition | [4:11] - [4:13]<br>[5:3] - [7:5]<br>[7:13] - [10:16] | [11:5] - [11:15]<br>[45:12] - [47:2]<br>[80:4] - [81:2] | [92:20] - [99:7]<br>[101:21] - [104:20]<br>[109:5] - [110:25] | [124:22] - [125:18]<br>[151:7] - [152:1]<br>[159:8] - [161:18] |

## ENERGY NORTHWEST DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

Energy Northwest v. The United States
No. 04-10C
Chief Judge Damich

### VICTOR TREBULES

| | | | | |
|---|---|---|---|---|
| 4/17/2002 Deposition | [10:18] - [12:11] | [51:10] - [51:20] | [84:10] - [85:16] | [143:2] - [143:12] |
| | [15:6] - [18:17] | [52:11] - [54:4] | [96:19] - [101:19] | [145:22] - [146:5] |
| | [41:21] - [42:21] | [57:15] - [58:14] | [104:2] - [107:21] | [159:10] - [162:9] |
| | [43:18] - [45:17] | [59:1] - [61:1] | [109:18] - [111:15] | [169:14] - [172:7] |
| | [48:5] - [49:6] | [78:2] - [79:17] | [120:9] - [124:18] | [177:18] - [180:22] |
| 4/18/2002 Deposition (Coordinated Discovery) | [273:15] - [279:7] | [326:12] - [328:2] | [343:17] - [344:5] | |
| | [322:10] - [323:13] | [338:4] - [338:21] | [347:3] - [349:17] | |
| 4/18/2002 Deposition (Yankee Cases) | [18:10] - [20:16] | [45:7] - [45:21] | [89:8] - [90:19] | [125:5] - [126:9] |
| | [23:17] - [24:10] | [85:11] - [85:21] | [92:1] - [94:9] | |
| | [43:19] - [45:1] | [86:10] - [88:8] | [94:13] - [94:18] | |
| 4/19/2002 Deposition | [4:22] - [5:20] | | | |

### JEFFREY WILLIAMS

| | | | | |
|---|---|---|---|---|
| 6/11/2002 Deposition | [6:1] - [6:2] | [30:19] - [31:20] | [79:17] - [81:14] | [164:14] - [167:3] |
| | [7:14] - [8:18] | [63:5] - [63:9] | [82:9] - [82:23] | [173:4] - [173:17] |
| | [9:11] - [11:15] | [64:8] - [65:8] | [107:11] - [111:5] | [174:7] - [176:8] |
| | [19:18] - [20:19] | [68:14] - [72:23] | [151:20] - [153:3] | [181:14] - [182:24] |
| | [27:3] - [29:15] | [74:13] - [77:1] | [154:6] - [154:16] | |

## ENERGY NORTHWEST DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

Energy Northwest v. The United States
No. 04-10C
Chief Judge Damich

### JEFFREY WILLIAMS (continued)

| | | | | |
|---|---|---|---|---|
| 1/22/2004 Deposition | [13:6] - [15:17] | [106:11] - [108:1] | [149:2] - [152:13] | [194:15] - [196:13] |
| | [17:1] - [19:5] | [108:21] - [111:4] | [165:18] - [166:11] | [197:5] - [200:5] |
| | [22:10] - [23:14] | [117:7] - [118:12] | [169:1] - [171:15] | [201:18] - [202:17] |
| | [86:22] - [95:22] | [120:12] - [121:13] | [177:16] - [179:9] | [203:6] - [203:12] |
| | [101:10] - [103:19] | [123:14] - [124:13] | [188:13] - [193:7] | [274:16] - [276:16] |

### DAVID ZABRANSKY

| | | | | |
|---|---|---|---|---|
| 4/17/2002 Deposition | [16:11] - [17:7] | [32:22] - [33:13] | [87:1] - [90:20] | [143:5] - [146:10] |
| | [18:2] - [18:16] | [38:5] - [42:13] | [92:3] - [94:9] | [150:4] - [152:4] |
| | [18:22] - [19:6] | [43:16] - [44:13] | [95:20] - [96:13] | [157:2] - [159:1] |
| | [19:17] - [21:1] | [44:22] - [53:8] | [101:11] - [105:14] | [163:1] - [164:10] |
| | [21:11] - [21:17] | [54:9] - [61:5] | [126:18] - [127:13] | [179:14] - [180:1] |
| | [22:16] - [25:7] | [74:2] - [74:14] | [127:21] - [129:3] | [181:10] - [182:19] |
| | [28:14] - [29:19] | [76:3] - [77:16] | [129:9] - [132:22] | [183:6] - [185:5] |
| | [30:6] - [32:11] | [78:2] - [79:19] | [142:7] - [142:12] | |
| 4/18/2002 Deposition | [290:16] - [294:14] | [334:9] - [335:21] | [374:8] - [376:15] | [434:1] - [436:13] |
| | [317:11] - [317:22] | [341:9] - [342:5] | [415:15] - [416:2] | [437:15] - [439:12] |
| | [320:19] - [321:16] | [343:2] - [349:14] | [418:5] - [420:18] | [440:22] - [441:16] |
| | [322:16] - [323:15] | [351:6] - [365:9] | [427:6] - [428:6] | [454:16] - [455:5] |
| | [324:19] - [331:9] | [371:20] - [372:22] | [434:1] - [437:3] | |
| 4/19/2002 Deposition | [548:6] - [549:13] | [630:22] - [631:9] | [667:9] - [671:20] | [685:15] - [690:14] |
| | [551:13] - [553:17] | [636:1] - [637:5] | [682:9] - [684:13] | |

## ENERGY NORTHWEST DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

Energy Northwest v. The United States
No. 04-10C
Chief Judge Damich

### DAVID ZABRANSKY (continued)

| | | | | |
|---|---|---|---|---|
| 6/5/2002 Deposition | [5:10] - [5:12] | [7:17] - [7:18] | [89:24] - [94:21] | [95:24] - [97:15] |
| 6/6/2002 Deposition | [242:11] - [245:12] | [246:2] - [248:1] | | |
| 8/5/2004 Yankee Atomic Trial Transcript | [4110:10] - [4112:22]<br>[4113:6] - [4113:21]<br>[4117:3] - [4118:12]<br>[4122:24] - [4124:1]<br>[4126:24] - [4127:10]<br>[4141:22] - [4142:16] | [4145:22] - [4152:22]<br>[4156:5] - [4158:7]<br>[4159:2] - [4160:2]<br>[4162:11] - [4167:16]<br>[4168:12] - [4169:15]<br>[4169:20] - [4172:11] | [4174:16] - [4175:5]<br>[4175:13] - [4178:20]<br>[4180:2] - [4182:3]<br>[4183:17] - [4184:6]<br>[4188:12] - [4188:25]<br>[4189:25] - [4192:24] | [4193:10] - [4193:25]<br>[4194:25] - [4195:10]<br>[4196:14] - [4200:4]<br>[4229:2] - [4230:10]<br>[4235:16] - [4236:1] |
| 3/28/2005 SMUD Trial Transcript | [1591:3] - [1591:5]<br>[1592:4] - [1594:4]<br>[1600:8] - [1600:19] | [1601:12] - [1602:20]<br>[1645:23] - [1646:24]<br>[1698:2] - [1698:9] | [1698:18] - [1699:5]<br>[1702:12] - [1705:16]<br>[1765:4] - [1768:26] | [1769:13] - [1774:2]<br>[1806:3] - [1807:6]<br>[1807:19] - [1813:20] |
| 3/29/2005 SMUD Trial Transcript | [1829:6] - [1829:12] | [1913:26] - [1914:13] | [1919:17] - [1920:6] | |
| 4/12/2005 30(b)(6) Deposition | [7:21] - [8:11]<br>[8:22] - [9:13]<br>[10:6] - [10:13]<br>[11:17] - [12:6] | [13:6] - [14:20]<br>[16:9] - [17:5]<br>[18:1] - [18:13]<br>[18:21] - [22:14] | [24:2] - [24:20]<br>[30:13] - [31:10]<br>[37:19] - [42:17]<br>[43:11] - [45:6] | [48:12] - [49:14]<br>[49:19] - [55:22]<br>[56:9] - [56:22] |
| 7/12/2005 TVA Trial Transcript | [1683:20] - [1684:16] | [1743:13] - [1745:14] | | |

# ENERGY NORTHWEST DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

Energy Northwest v. The United States
No. 04-10C
Chief Judge Damich

## DAVID ZABRANSKY (continued)

| | | | | |
|---|---|---|---|---|
| 10/27/2005 Southern Nuclear Trial Transcript | [1936:13] - [1938:9]<br>[1962:6] - [1967:3]<br>[1978:1] - [1979:13] | [1985:12] - [1989:23]<br>[1990:15] - [1991:5]<br>[1994:8] - [1996:2] | [1997:14] - [1997:25]<br>[1998:4] - [1998:11]<br>[1998:19] - [1999:12] | [2001:24] - [2002:18]<br>[2009:3] - [2010:1] |
| 11/20/2006 Northern States Trial Transcript | [4413:23] - [4413:24]<br>[4414:11] - [4415:5] | [4418:14] - [4428:19]<br>[4431:15] - [4432:16] | [4438:21] - [4441:10]<br>[4445:12] - [4446:19] | |
| 10/11/2007 Wisconsin Electric Trial Transcript | [5660:5] - [5662:15] | [5692:13] - [5693:5] | [5708:10] - [5708:17] | |
| 10/12/2007 Wisconsin Electric Trial Transcript | [5721:16] - [5722:23] | [5766:25] - [5767:5] | [5776:3] - [5777:14] | [5796:5] - [5799:19] |
| 11/13/2007 Carolina Power Trial Transcript | [1488:9] - [1488:11]<br>[1489:2] - [1489:17]<br>[1491:7] - [1491:22] | [1496:5] - [1497:4]<br>[1498:14] - [1499:9]<br>[1523:20] - [1524:12] | [1525:9] - [1527:6]<br>[1528:21] - [1530:20]<br>[1581:22] - [1582:10] | |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-12
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-4
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484(
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-48(
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-11
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Deposition of LAKE H. BARRETT
Washington, D. C.
Monday, April 22, 2002
9:31 a.m.

Job No.: 11792-4
Pages 1 through 272, Volume 1
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X



Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DU POWER, INDIANA MICHIGAN POWER COMPANY, BOST EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTH OF THE STATE OF NEW YORK, OMAHA PUBLIC POWEF DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
JEFFREY L. HANDWERKER, ESQUIRE
HOWARD CAYNE, ESQUIRE
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFF COMMONWEALTH EDISON COMPANY:

DONALD R. CASSLING, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350



A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC POWER COMPANY:

DONALD J. CARNEY, ESQUIRE (a.m. session)
SUZETTE W. DERREVERE, ESQUIRE (p.m. session)
PERKINS COIE LLP
607 14th Street, Northwest
Washington, D. C. 20005-2011
(202) 628-6600

ON BEHALF OF DEFENDANT UNITED STATES:

KEVIN B. CRAWFORD, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #12128
Washington, D. C. 20530
(202) 307-1011



A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF DEFENDANT UNITED STATES:

HEIDE L. HERRMANN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D. C. 20530
(202) 307-0290

ON BEHALF OF THE UNITED STATES DEPARTMENT OF ENERGY:

JANE K. TAYLOR, ESQUIRE
U.S. DEPARTMENT OF ENERGY
1000 Independence Avenue, Southwest
Washington, D. C. 20585
(202) 586-7530



C O N T E N T S


| EXAMINATION OF LAKE H. BARRETT | PAGE |
|---|---|
| By Mr. Cayne | 10 |


E X H I B I T S

(Retained by counsel.)


| BARRETT DEPOSITION EXHIBIT | PAGE |
|---|---|
| 1 Mission Plan for Civil Radioactive Waste Management Program | 95 |
| 2 Excerpt of Volume 2 of Records of Responses to Public Comments on Draft Mission Plan for the Civilian Radioactive Waste Management Program | 165 |
| 3 Letter dated 9/7/84 D. Hodel to J. Bennett Johnston dated 9/7/84 | 165 |
| 4 Draft of the Civilian Radioactive Waste Management Program Mission Plan as of 12/20/83 | 181 |
| 5 Annual Capacity Report Briefing for OCRWM Executive Committee, November 1996 | 194 |

EXHIBITS CONTINUED
(Retained by counsel.)


| BARRETT DEPOSITION EXHIBIT | PAGE |
|---|---|
| 6 June 1987 annual capacity report | 201 |
| 7 Nuclear Waste Fund Adequacy Assessment dated March 1986 | 220 |
| 8 Draft mission plan amendment dated January 1987 | 223 |
| 9 Annual capacity report issued by the Office of Civilian Radioactive Waste Management in June 1988 | 245 |
| 10 Section 10165 of Title 42 | 246 |
| 11 Section 10168 of Title 42 | 246 |
| 12 Draft 1988 mission plan amendment | 262 |




PROCEEDINGS
LAKE H. BARRETT
having been duly sworn, testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFF
SACRAMENTO MUNICIPAL UTILITY DISTRICT
BY MR. CAYNE:
Q Good morning, Mr. Barrett.
A Good morning.
Q Have you been deposed before?
A No.
Q First time?
A Yes.
Q Has your counsel explained to you the process?
A Sort of.
Q I will ask you questions, you give me your best answer. If you don't understand my question, please feel free to ask me to repeat the question or clarify it.
A Okay.
Q What is your current position, Mr. Barrett?
A I'm the deputy director of the Office of Civilian Radioactive Waste Management.
Q For how many years have you been employed by the Department of Energy?
A Since mid-'85 in various different positions.
Q And prior to 1985 what was your position?
A I worked for the Nuclear Regulatory Commission since the end of '74 in various positions.
Q Have you participated, Mr. Barrett, in the preparation of the briefs filed in the various spent nuclear fuel cases?
A No.
Q Have you reviewed briefs filed by the Department of Justice in this case prior to being filed?
A No.
Q Have you ever reviewed any briefs filed in this case?
A No.
Q By this case I'm right now referring to the case of Sacramento Municipal Utility District versus the United States.





A Briefs are the briefs, you know, legal proceedings before the court, right?
Q Yes, motions to dismiss?
A No. No. I've seen them but I never reviewed them.
Q Either before or after the filing?
A After. I've never seen one before.
Q And have you reviewed -- am I correct that you have not reviewed the briefs or legal pleadings filed in any other case involving spent nuclear fuel?
MR. CRAWFORD: Objection.
A Not to my recollection.
MR. CRAWFORD: Objection. Vague. You can answer.
Q How did you prepare for today's deposition?
A Kevin and some of the associates came to see me Friday.
Q How long did you spend with them?
A Oh, I don't know, a couple -- we did some of the morning and some in the afternoon. A couple of hours in the morning, an hour and a half in the afternoon, something like that.

Q Correct?
MR. CRAWFORD: Objection, asked and answered. Objection, argumentative.
A That's true.
Q And, similarly, it was not your opinion in 1986, that a repository could not be operational by 1998, correct?
MR. CRAWFORD: Objection, form. Objection, vague.
A You're asking what I thought --
MR. CRAWFORD: Objection, foundation, too. Go ahead.
A Are you asking what I thought in 1986, or are you asking what I think looking back over history?
Q I'm asking that you put yourself in the shoes of Lake Barrett in 1986.
MR. CRAWFORD: Objection, foundation.
A Okay. We went to '86. Before we were -- your line of questioning was going to mid-'84. You want to go to '86 now?
Q Yes, sir.
A In '86 I was working for the Department of



Energy, okay, so I had different knowledge. So the question is in 1986 did I think something. Now tell me what that something was again.
Q In 1986 was it your opinion that a repository could not be operational -- a repository for the disposal and storage of spent nuclear fuel could not be operational by 1998?
A I don't recall what I thought in 1986. Because in 1986 I was at the Department of Energy in a systems job probably, and the colleagues down the hall were working the repository. I did not. I don't recall what the repository schedule was in 19 -- what I personally thought in 1986.
Q When did you join the Department of Energy?
A Summer of '85 or spring of '85.
Q What was your position between the summer of '84 and the spring of '85?
A I was the branch chief of the engineering branch in the office -- the Division of Waste Management in the Office of Nuclear Materials Safety and Safeguards of the Nuclear Regulatory Commission.
Q Please describe for me your



responsibilities in that position.
A I was responsible for engineering for uranium mill tailings, low-level waste disposal sites and high-level waste disposal sites for the Nuclear Regulatory Commission is what my duties were.
Q Did you work with issues relating to the disposal of spent nuclear fuel in that position?
A Yes.
Q And can you describe for me your work on those issues?
A It was the engineering aspects of repository reviews for all media, including the development of branch technical positions and regulatory guidance and the regulations for high-level waste is what you asked about.
Q I asked about spent nuclear fuel.
A Well, okay, spent nuclear fuel and high-level waste.
Q Using the term "spent nuclear fuel" to cover both?
A Right.
Q Did you work with officials at the



Department of Energy in this position?
A Yes.
Q And which offices did you work?
A With the office that I'm presently in.
Q Do you recall which individuals at the Department of Energy you worked with during this period?
A Specific names, Ben Rusche is the only name that comes to mind, who was the director who I worked for years ago in the seventies.
Q When did you work for him in the seventies?
A Mid-seventies is the best I can recall.
Q Was that Electric Boat?
A No, at the Nuclear Regulatory Commission. So it would have been like '75, '76. He was the director of the Office of Reactor Regulation in the mid-seventies in the Nuclear Regulatory Commission, and he was the first confirmed director of the Office of Civilian Radioactive Waste Management. So he was one I know I talked to, but I did not talk much to the DOE people when I served at NMSS between -- that short period from mid-'84 to mid-'85.

Q How long did you work for Mr. Rusche? Was it approximately a year?
A At the Nuclear Regulatory Commission?
Q Yes.
A I don't remember, a couple of years.
Q And did you report directly to him?
A No. He was twice removed. He was my boss's boss. Maybe my boss's boss's boss. I can't remember the structure.
Q Did you ever meet with him or work with him directly during the period '75, '76?
A Repeat the question.
Q Did you ever work directly with him during that period?
A Directly with him. I was in contact with him on various issues that we mutually worked upon. I mean, I did not report to him. I mean, he was my boss's boss or something.
Q Did you believe that he was competent in his field of expertise?
A Very.
Q Why do you say very?



A Because he was a very knowledgeable individual in my opinion.
Q In what field was he knowledgeable?
A In nuclear matters.
Q Such as?
A Regulatory safety, which is what we did.
Q Did you ever speak with him in the period following the period during which you worked with him and the summer of 1984?
A Yes. In spring of '79 we worked together. I didn't work for him at Three Mile Island. He was brought in as a temporary manager for Metropolitan Edison, and I worked for the Nuclear Regulatory Commission. So we were -- we worked on the stabilization of Three Mile Island Unit 2 for several months.
Q So he was in private industry at that point?
A Correct.
Q Did you continue during that period to find him competent in nuclear matters?
A Yes.



Q Did you continue to describe him as very competent?
A Yes.
Q When did you next deal with him?
A Pardon?
Q When did you next deal with Mr. -- how do you say his name?
A Rusche.
Q Rusche.
A Well, he became my -- when I came to the Department of Energy in the spring of '85 he was my boss's boss.
Q How did it come to be that you left the NRC and went to the Department of Energy in 1985?
A Somebody told me that a fellow named Roger Hilley who worked for Ben Rusche wanted someone like myself there, and we had a phone call and asked me to come down and talk and one thing led to another and I transferred.
Q Do you recall who had that initial communication with you?
A No.



Q Did you speak with Mr. Rusche before you took your position?
A I don't remember. Probably did but I just don't remember.
Q What was your initial position at the Department of Energy?
A Division director, systems and transportation or something to that effect.
Q And what did that position involve?
A I was responsible for the development of the transportation systems to move spent fuel and high-level waste to the DOE facilities from their current locations was the primary job, and also for the systems engineering for the entire program.
Q Entire program you're referring to what?
A The civilian and all the different sites that we were looking at, the systems engineering requirements documents and the systems engineering structure for all of the civilian radioactive waste management program.
Q To whom did you report when you held this position?

A Roger Hilley.
Q And he reported to Mr. Rusche?
A Correct.
Q Are you familiar with the acronym MRS?
A Yes.
Q What does that stand for?
A Monitored retrievable storage facility.
Q Were you involved with monitored retrievable storage facilities during this period?
A Secondarily, yes. Insofar as in the -- that was the facility that the transportation --
MR. CRAWFORD: Objection. Let me object here and -- the objection is to vagueness. What period are you referring to?
MR. CAYNE: First I'm going to object for the record to counsel continuing to cut off the witness while he's in the process of answering a question. And I believe the witness has answered my question.
MR. CRAWFORD: Then I didn't cut him off.
Q For how long did you hold this position?
A I don't recall.



Q Two or three years?
A Probably.
Q Were you involved in issues relating to the siting and development of a repository during this period?
A In a general sense. I did not have direct line responsibility for repository development. That was another group.
Q But you said in a general sense. What did you mean?
A I would hear in staff meetings in various work we did together the general state of where the repository programs were, but I had no direct, you know, responsibility in that area.
Q You were a division director, correct?
A Correct. In the storage and something, whatever Hilley's organization title was. Which was not the repository. That was a completely different office did the repository. We were storage and transportation systems I think was the name of our office.
Q Were you involved in issues relating to the



rate at which spent nuclear fuel would be accepted for disposal during your time as director of this division?
A Probably. I don't -- probably.
Q You don't recall?
A I don't recall detailed discussions regarding the acceptance rates. I know that we had acceptance rates in various documents for the repository and for the proposed MRS, which was not authorized at that time, for planning purposes.
Q Were you an advocate of the MRS during this period?
MR. CRAWFORD: Objection, vague.
A Advocate. I would say that I thought an MRS was -- we were proposing an MRS to Congress, and, yes, I was an advocate. I thought that would have made a much better system if we had it.
Q Why were you of that view?
A Because -- one of the reasons was we were striving to meet the '98 removal date to the best of our ability, and an MRS circa early -- let's see in the late eighties the MRS we proposed to do it because



the repository date was post -- somewhere in that period it was post-1998. So, yeah, it was post-1998 in the mid-eighties. So the MRS was our primary means to remove fuel by 1998.
Q You referred to the '98 removal date a moment ago. Do you recall that?
A Yes.
Q What were you referring to when you referred to the '98 removal date?
A The statute said that -- had a January 1998 target date in it for removal of the fuel. We were trying to meet that to the best of our ability.
Q And what was it that you were trying to accomplish by January 1998?
A To accept fuel into the federal disposal system, which we were proposing to include an MRS in that mid -- I'm trying to get the years straight. Yeah, mid-eighties. '86 we made a proposal.
Q How much fuel were you attempting to accept at that point?
A I don't recall the numbers, but I would have to go back and look in the records. I don't

recall specific receipt rates.
Q Were you attempting to accept more than a single spent nuclear fuel assembly?
A Yes.
Q Was it ever the intent of your office to be able to accept a single spent fuel assembly by January 31st, 1998?
MR. CRAWFORD: Objection, vague. Objection to the extent it might call for a legal conclusion.
A From a systems perspective it was our intention to build a system that would take more than one fuel assembly.
Q From a systems perspective was it ever your intention to build a system that would take only -- be able to take only a single fuel assembly by January 31st, 1998?
A That was never our intention, to do just one fuel assembly.
Q Was it ever the intention of your office at any time subsequent to the period in which you held the position -- was it director of --
A Division director.



Q Was it ever the position of your office subsequent to that time that the goal would be to be in a position to accept a single spent fuel assembly by January 31st, 1998?
MR. CRAWFORD: Objection, vague. Objection, foundation, and objection to the extent it calls for a legal conclusion.
A It was never our plans to take one fuel assembly to my recollection.
Q Do you recall ever having any discussions internally whether the acceptance of a single fuel assembly would satisfy the department's obligations under the contract, the standard contract?
A I never recall any discussions from a systems perspective about the contract, so, no, I don't recall ever having a discussion.
Q What do you mean from a systems perspective?
A We were -- our job was to develop the systems to receive the material, and we never, to my recollection, we never discussed about a system that would receive one fuel assembly. Okay. We always



talked about more.
Q From a systems perspective was it ever your intention to design a system that could only accept 900 MTUs of spent nuclear fuel per year?
MR. CRAWFORD: Objection, vague. Objection, foundation. Objection to the extent it calls for a legal conclusion.
A Repeat the question.
Q From a systems perspective was it ever your intention to design a system that could only accept 900 MTUs of spent nuclear fuel per year?
A There's different things happened as a function of time, okay. What time are you referring to?
Q In 1986.
A In '86, no.
Q In 1986 how many MTUs per year did you attempt to design a system to accept?
A I don't recall a specific number, but it was -- I don't recall a specific number. It's in the records.
Q Would 3,000 refresh your recollection?



A That's probably about right.
Q And how did you come to the 3,000 number?
MR. CRAWFORD: Objection, foundation.
A I'd have to go back and look at records, which I have not done. It is the evolution of the design receipt rates for the first repository, second repository, the MRS in the system. My recollection is the MRS was to receive 3,000 tons a year circa that time prior to the amendments act, which was in excess of the generation rate of around 2,000.
Q That was important, wasn't it, that it be in excess of the generation rate?
MR. CRAWFORD: Objection, vague.
A Well, important? Yes, in my opinion it was significant that you design a system to remove the backlog of materials that were accumulating under the intent of the act.
Q And why was that significant in your view?
A Because the concept of a Nuclear Waste Policy Act was to -- for the federal government to take the materials from the high-level waste and spent fuel sites into federal custody.

Q And based on that concept it was significant or material that you be able to design a system to remove the backlog of materials that were accumulating, correct?
A Within a reasonable -- within a reasonable sense, correct.
Q What do you mean by within a reasonable sense?
A Well, you can -- there is no automatic number that you would calculate. The higher the numbers, the more the complexity of the system, the more the system costs. So there was a balance, and we did studies that I recall in a general sense as to what would be the appropriate receipt rates for planning designing purposes.
Q The goal was to make the take rate high enough so that you could eliminate the backlog within a reasonable amount of time without making the rate so high that the complexities would send the cost through the ceiling, correct?
MR. CRAWFORD: Objection, vague. Objection, foundation.



A In a general sense.
Q Again, what do you mean when you say in a general sense?
A We did not -- you all get into the contract. We did not consider the contract issues at that time, so we were balancing the size of the system, the uncertainties of an MRS would or wouldn't be approved, the repositories, where they might be, how many we would have. So it was a complicated balancing of many interests, and so to -- it would be inappropriate to say that we had a numerical number to move the backlog or anything like that because I don't recall anything like that.
Q You didn't have a numerical number to move the backlog but you had a goal to move the backlog, correct?
A Within a reasonable --
MR. CRAWFORD: Objection, vague.
A Within a reasonable sense, yes. In a general sense I mean.
Q And in establishing these goals you were considering the requirements, of course, of the



Nuclear Waste Policy Act of 1982, correct?
MR. CRAWFORD: Objection, foundation.
A We knew that the general policy laid out in the act for the federal, you know, intention to dispose of the nation's waste and spent fuel.
Q And you understood the policy behind the act would call for the elimination of the backlog of spent nuclear fuel within a reasonable amount of time, correct?
MR. CRAWFORD: Objection. Foundation.
A Reduction as opposed to elimination. As long as they operate, you don't eliminate it. So reduction, yes.
Q And just explain what you meant by as long as they operate you don't eliminate it?
A Well, when -- when reactors operate, there is always going to be some inventory of spent fuel there. We were working to minimize the backlog and reduce the backlog that was at the sites.
Q So in order to be able to minimize the backlog, the acceptance rate would have to be at some level higher than the rate at which spent nuclear fuel



was being produced, correct?
MR. CRAWFORD: Objection to the form. Objection, vague.
A Our intention was to design a system that would reduce the backlog to a reasonable sense.
Q And in order for that to happen, as a matter of mathematics or simple equation, the acceptance rate would have to be something in excess of the rate at which new spent nuclear fuel was being created, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes his prior testimony.
A In a general sense, yes.
Q And in 1986 you believed that the 3,000 take rate that you were targeting at that point would accomplish the goals you have been alluding to, correct?
MR. CRAWFORD: Objection.
Q And the goal I'm referring to is the reduction of the built up backlog.
MR. CRAWFORD: Objection to the foundation. Objection to the extent it mischaracterizes his prior

testimony.
A Yes.
Q Can you describe for me how the department actually arrived at the 3,000 number?
A I don't --
MR. CRAWFORD: Objection, foundation.
A I don't recall how it was done.
Q Do you recall the general issues that were considered?
A No more than what I've just said to you before.
Q Well, would you please state for me your understanding of the issues that were considered in establishing the 3,000 rate.
A The 3,000 number was there prior to my -- I didn't do the 3,000 number. My understanding of my predecessor's was that 3,000 --
MR. CRAWFORD: I'm going to object to the extent the question calls for speculation.
MR. CAYNE: Again, I'm going to object to counsel's continuing the interruption of the witness.
Q Please continue.



A That my predecessors did some of these balances of performance, reduction of the inventory, the cost and the complexities and the siting and had as a planning purpose the 3,000 number.
Q Did you consider political factors in coming up with the 3,000 number?
MR. CRAWFORD: Well, let me object to the extent it assumes facts not in evidence. Objection to foundation.
A Political, no. Not political. There was policy regarding Congress would or would not approve an MRS and those sorts of things. And schedules.
Q Was the 3,000 MTU take rate related to the Department of Energy's estimate of the utilities' discharge rate?
MR. CRAWFORD: Objection, foundation. Objection, speculation.
A I personally don't know. I assume -- I don't know.
Q You assumed what?
A That when they -- the production rate at the time was around 2,000. So I assumed that the



3,000 that existed was chosen in consideration with the production rate, you know, the cost and the transportation and the other issues involved.
Q So based on your prior testimony, Mr. Barrett, the 3,000 rate would be consistent with your understanding of the intent of the act to reduce over a reasonable period of time the backlog of spent nuclear fuel throughout the nation, correct?
MR. CRAWFORD: Objection, speculation. Objection, foundation.
A Yes.
MR. CRAWFORD: Can we take a break here.
MR. CAYNE: Certainly.
(There is a recess from the record.)
Q Mr. Barrett, how long did you hold the director position that you discussed?
A The division director?
Q Yes.
A I don't recall. Somewhere -- when I first came to the department, so that would have been '85, spring of '85 until I was assigned to be QA director I think. I don't know, a couple of years.



Q I'm sorry?
A A couple of years.
Q Assigned to be what director?
A I became QA director.
Q Quality assurance?
A Quality assurance. But I wasn't sure if that was a detail or an assignment.
Q That would have been in what year?
A '87, '88.
Q Who did you report to in that position --
A The office of the director, which then I believe was acting director was Ed Kay.
Q When did Mr. Rusche leave?
A '87ish. I think it was before the act was amended, so '86, '87.
Q Did he retire?
A He left. That's all I remember. I think he -- I don't know if he retired from federal service or what he did, but he left.
Q And Mr. Kay took over at that time?
A As the acting.
Q In either of the two positions you've

described, were you involved in any way in the legislative process that resulted in the enactment of 1987 amendments to the Nuclear Waste Policy Act of 1982?
A Not that I recall.
Q Did you have any input to the Department of Energy's proposals with respect to legislation relating to the establishment of an MRS?
A I inputted to Mr. Hilley --
MR. CRAWFORD: Objection, assumes facts not in evidence --
A And --
MR. CAYNE: Once again, I want to object to counsel's continuing to distract the witness and confusing the witness by interrupting him in mid-answer with objections that properly should have been made prior to the answer.
Q Do you need the question reread?
A Sure.
(The record is read.)
A In my duties I provided information to Mr. Hilley who then used it -- I don't know what he



used it for.
Q And Mr. Hilley occupied what position at that time?
A He was the office director of storage and transportation. He was my direct superior.
Q And what was the input that you provided to Mr. Hilley?
A Various systems work and transportation work that I did under his direction.
Q What did the systems work that you did under his direction involve?
MR. CRAWFORD: Objection, vague.
A Would have been whatever the reports and products that we produced in the '86, '85, '86, '87 time period.
Q Reports produced by the division that you were the director of?
A And input to documents.
Q What reports are you referring to that your division produced during this period?
A We produced input files to the environmental assessments for all the sites. We



produced input to the MRS proposals. Those sorts of things.
Q What I'm trying to get a better sense of, Mr. Barrett, is when you use the word "input" what do you mean?
A There were analyses for the environmental assessments. There were systems studies done for transportation casks, logistical studies, those type of things that are in the records that were part of the proposals, which one was the MRS proposal to Congress.
Q And the studies on the casks and the logistical studies, they were considered or given to Mr. Hilley in connection with proposals being fashioned by the Department of Energy with respect to the '87 amendments to the Nuclear Waste Policy Act?
A That's my understanding, yes.
Q Did you have any input with respect to the proposals made by the Department of Energy to link the MRS to the licensing process with respect to the repository under consideration?
MR. CRAWFORD: Objection. Asked and



answered. Objection, assumes facts not in evidence. Objection, vague.
A I was not involved to my knowledge in any of the linkage discussions nor dialogue to the '87 amendments.
Q You understand what I'm referring to by the linkage, correct?
A I assume you mean you couldn't site an MRS until a repository was sited, the statutory linkages?
Q Yes.
A I was not involved in those until after the fact.
Q What was your after-the-fact involvement in those linkages?
A When the '87 amendment was passed, you know, we basically needed to change the program to accommodate the direction of the new law.
Q How did the new law require your office to change the program?
MR. CRAWFORD: Objection, vague.
A I guess my office -- I guess from the '87 amendment -- I'm not sure where I even was. Probably

repository, correct?
MR. CRAWFORD: Objection, foundation.
A Probably so, but that was a full-up repository -- full-up MRS design at the time so I would have to go back and look. I just don't recall right now what the MRS construction schedules were from that long ago.
Q What do you mean by full-up repository?
A Full MRS. It's -- it was not -- at that time the MRS was not a modular construction. It had a big receipt building to it and it was built all at one time as opposed to being built in sections. It's in the records what the MRS construction schedules were. I just don't recall them.
Q What was the proposal of your department to Congress in 1987 with respect to the MRS?
MR. CRAWFORD: Objection, best evidence. Objection, foundation.
A I don't recall the details from that long ago. It's in the proposal.
Q What's your general recollection of it?
A I really don't remember the construction



time. I know that -- I just don't remember it.
Q Had Congress approved the MRS proposal made by the department to the Congress in 1987, would the department have been in a position to accept spent fuel at the 3,000 MTU rate in 1998?
MR. CRAWFORD: Objection, vague.
A It is my recollection that the proposal at that time we theoretically could have done that, 3,000 in '98.
Q So --
A Excuse me. Let me rephrase. Not that we would have reached 3,000 -- we would ramp up to 3,000. We would not have received 3,000 in 1998. We would have started receiving in 1998 and would have ramped up to 3,000 in an appropriate time period.
Q Had you been able to site the repository that was proposed in the 1987 time frame by 1998 and had that operational by 1998, would you have, would the department have been in the position to accept spent nuclear fuel at the 3,000 MTU rate in 1998?
MR. CRAWFORD: Objection, vague. Objection, foundation.



A Your question -- well, it's your question. Say the question again.
Q When you joined the department in 1985 there was simply a repository under consideration at that point; there was not yet an official MRS proposal, correct?
A Correct.
Q Had that repository that was under design in 1985 been sited and made operational by 1998, would the department in 1998 have been in a position to accept spent nuclear fuel at the annual rate of 3,000 MTUs?
MR. CRAWFORD: Objection to the extent it assumes facts not in evidence. Objection to the foundation.
A Not to my recollection.
Q What is your recollection?
A I don't think in '90 -- in circa '85 that the repository was capable to take 3,000 tons in 1998.
Q It would --
A You would have to go back and look.
Q It would have ramped up over a few years.



Is that what you're referring to?
A That's part of it.
Q What else was there?
A I'm not sure in '85 what the repository schedule was, because at some point it went from '98 to 2003. Then it went to 2010, and I don't remember when it went from '98 to 2003.
Q In a previous response you referred to a ramp-up to 3,000 MTUs within an appropriate time. Do you recall that?
A Yes.
Q How many years in your view was an appropriate time within which for the ramp-up to occur?
MR. CRAWFORD: Objection, vague. Objection, foundation.
A I believe the designs were a little over five years. We would start with a nominal 400 and go to a steady 3,000 before five years.
Q As a design systems matter, would it have been possible to start operations at a rate higher than 400 MTU?

81

A Not to my recollection.
Q For how long did you hold your position in quality assurance?
A I don't know, a year or so.
Q What position did you next take on?
A I don't remember my official titles. I became responsible for programmatic aspects of the repository. I became responsible for programmatic aspects of the MRS facility. And I was responsible for business development contracts for awhile.
Q And when did you take on those responsibilities?
MR. CRAWFORD: Objection. Asked and answered.
A I don't know, '88, '89, until I was sent by Admiral Watkins to defense programs in the spring of '90.
Q And what were your duties when you were responsible for the programmatic aspects of the repository?
A Project manager of Yucca Mountain project at the time reported to me.

82

Q Were you required to appear before Congress during this period?
A Not that I recall. I might have but I don't remember it.
Q Were you involved in the development of acceptance rates during this period?
A Not to the degree that I remember. I might have been.
Q Wouldn't you have been if you were responsible for the programmatic aspects of the repository?
MR. CRAWFORD: Objection, argumentative.
A I don't -- you know, I was responsible for the programmatic aspects. If we ever did anything regarding acceptance rates at that time, I don't recall doing anything.
Q Do you recall if you were involved in the establishment or analysis of acceptance rates prior to your next position in 1990?
A I don't recall anything. I might have.
Q We'll go through some documents later to refresh your recollection, but I just -- a lot of

83

documents actually.
A Whatever.
Q I just want to know what you recall.
MR. CRAWFORD: Objection. Form.
A 14 years ago. I don't remember specific documents at this time.
Q What was the position you took in 1990?
MR. CRAWFORD: Objection, form. Objection, vague.
A I was detailed initially and then transferred to the Office of Defense Programs. I was the -- what was my title? I don't know. I was director of the Rocky Flats program office.
Q And what responsibilities did that position involve?
A It was the restart of the Rocky Flats nuclear weapons production plant after the FBI raid.
Q Did you have continuing responsibilities for or involvement with the spent nuclear fuel program during this period?
A None whatsoever.
Q For how long did you hold this position?

84

A Until January of '93.
Q And in January 1993 what position did you take?
A Admiral Watkins made me acting director of RW.
Q And RW stands for?
A Offices of Civilian Radioactive Waste Management.
Q And what were your duties in that position?
MR. CRAWFORD: Objection, vague. Objection, lack of foundation.
A The duties of the director of the Office of Radioactive Waste Management.
Q You ran the program at that point, correct?
A That's correct.
Q And have you basically held that position either as acting director, director, or deputy director through today?
MR. CRAWFORD: Objection, vague.
A I was never the director. I was either the acting director or the deputy director.
Q And today you are the deputy director,

correct?
A Correct.
Q When you took the position as acting director, was the development of an MRS still under consideration?
A Yes.
Q And how did you envision or how did you plan for the MRS to operate at that point in time? I believe it was you said December '93?
A January.
Q Excuse me. January '93.
MR. CRAWFORD: Objection, lack of foundation.
A The plans then were to pursue a volunteer MRS site and to have the volunteer present their proposal for site and congressional approval.
Q Did you envision the MRS as a stand-alone facility at that time, not operating in conjunction with a repository to be built?
MR. CRAWFORD: Objection, foundation.
A My understanding was it was still an integrated facility with a repository. The only



repository at that time was the Yucca Mountain, and a volunteer MRS would integrate into the system.
Q And what do you mean by that phrase that it would integrate into the system?
A It was a variation of the old MRS of the mid-eighties where you could receive the material, repackage it and send it on to the repository.
Q When you say a repackage of the old MRS of the mid-eighties, are you referring to the MRS in the form in which it was originally proposed to Congress?
MR. CRAWFORD: Objection, vague.
A Many of the concepts of the MRS of the mid-nineties retained as much as it could the concept of the mid-eighties, which that was an integrated MRS of the mid-eighties. And we worked to maintain those integration aspects in the early nineties as well.
Q During your time at the Department of Energy was the MRS ever considered or planned to operate as a stand-alone facility separate and apart and without regard to whether a repository was established?
MR. CRAWFORD: Objection, vague.



A No.
Q Did you personally ever suggest, make such a suggestion, that an MRS be operated as a stand-alone facility without regard to whether a repository was ever sited and approved?
A Not to my recollection.
Q Do you recall anyone within the department ever making such a suggestion?
A No.
Q And you've been at the department since 1985, correct?
A Yes.
Q And we went through your different job positions. You never left the department since 1985, correct?
A Correct.
Q Could you describe for me the process that your office went through with respect to the MRS after you were appointed as acting director in January 1993. You indicated that the MRS was still under consideration at that point, correct?
A Yes, it was. Now, the question again is?



Q At some point after that it was taken off the table?
MR. CRAWFORD: Objection. Foundation. Objection, assumes facts not in evidence.
A Tell me what again you want me to describe about the MRS in what time period, because there's a change as a function of time.
Q I want you to describe for me the -- your office's considerations and deliberations from the period starting January 1993 which ultimately led to the decision to no longer propose the siting and -- the establishment of an MRS.
MR. CRAWFORD: Objection, foundation, and objection, assumes facts not in evidence.
A In the first half of '93, during the budget cycle, we proposed to enter into the next phase with three volunteer MRS site -- siting jurisdictions, which were three Indian tribes. We proposed in the FY '94 budget request monies to go to develop proposals to give to Congress to allow the creation of an MRS to meet the '98 date. That I testified to in the spring of '93. That was our plans until the '94 budget was

created by statute in nominal October of '94 in which the United States Congress and signed by President Clinton did not have funding for the MRS site. At that point there was no ability -- it was unlikely that there was going to be an MRS in 1998. Therefore, it would be difficult for us -- it would be very difficult for us to meet the 1998 date. So in '93 that's my recollection of what happened.

Q You're saying as a result of the budget enacted in October of '94 it would have been difficult --

A '93. '93. October '93.

Q October '93. It would have been difficult to establish an MRS by January 31st, '98, correct?

A Correct.

Q And was it at that point that your office made the decision to no longer consider the development and construction of an MRS?

MR. CRAWFORD: Objection to the foundation.

A I don't remember the details of the evolution in that period, but the MRS certainly waned in our thinking because our three leading candidate



sites were no longer funded.

Q Did you make any efforts to attempt to revive the MRS proposal after October '93?

MR. CRAWFORD: Objection to the foundation.

A We did what we could. I think we got another negotiator from the Clinton administration somewhere in that period, which we supported, but it was -- it wasn't -- we still tried to do it but there wasn't much that could be done.

Q When did you finally give up or cease the effort to establish an MRS?

A What we --

MR. CRAWFORD: Objection to the foundation.

A What we did was we moved to a nonsite-specific technical work on the MRS. We prepared -- our work focused on nonsite-specific work. We submitted a topical analysis to the NRC and we did not, given that the site-specific work was not desired by Congress, we did very little in that area, except to support Mr. Stallings who became the new negotiator.

Q What did your nonsite-specific work



involve?

A It was technical work leading up to the submittal in '95ish I guess of the generic topical safety analysis report for an interim storage facility to the Nuclear Regulatory Commission in hopes that some site -- siting might be able to happen and that we could accelerate receipt -- accelerate building -- and approvals, accelerate approvals through the NRC. That was the concept behind why we did that. And that was done in '94ish, '95ish.

Q And what happened next with respect to the development of the department's MRS plans?

A They were overtaken by events in the mid-nineties, what I refer to as the interim storage battle started to begin between the republican Congress and the Clinton administration.

Q For the record would you please explain what you're referring to by the interim storage battle?

A Well, the republican -- leaders -- some of the leaders in Congress wished to have an interim storage legislation and change the act. And then what



happened was instead of we in the department doing monitored retrievable storage facility, those discussions were overshadowed by the desire of certain elements within the Congress to have a stand-alone interim storage facility, which led to various legislations that never became law.

Q As a result of these battles, did your office cease its work on the development of an MRS?

MR. CRAWFORD: Objection to the foundation.

A Effectively, yes. Except for the generic. We did the generic work. We finished that work through the nineties, but we didn't do anymore site-specific MRS work during that mid-nineties after --

Q When did your office complete the, quote, generic work?

A I would have to look at the records. Somewhere in the mid-nineties.

Q And what did you do with the work product that was created as a result of those efforts?

A They're in the records for anybody to use. They exist in approvals of the NRC and the docket.

Q Were they submitted to Congress?
A No.
Q After your office completed the work on the generic, what you refer to as the generic work, between that date and today did your office or has your office engaged in any additional efforts with respect to the establishment of an MRS facility?
A No.
Q Since that time, being since the completion of the work on the generic facility, your office has been dedicated exclusively to the establishment of a permanent repository, correct?
A Yes. Let me clarify, when I say dedicated, there's transportation, I mean, but the primary focus is to determine if the Yucca Mountain site is suitable for geologic repository. Solely, it's got an absolute to it.
Q And the time frame that you've been basically exclusively working on the repository began sometime around 1995. Is that correct?
MR. CRAWFORD: Objection, vague. And objection to the extent it mischaracterizes prior



testimony.
A When you say exclusive, that's an absolute term. So primarily is what our focus has been. For example, the negotiator existed until whenever the negotiator's term expired and I don't know when it was. He would call and we would talk and so when you use the word "exclusive," it means like absolute zero, and that's what I don't want to say.
THE WITNESS: Want to take a break for a minute or two?
(There is a recess from the record.)
Q Mr. Barrett, when you first became employed by the Department of Energy in 1985, how did you get yourself up to speed with respect to the issues you would be facing in your position?
A Talked with staff. Basically talked to staff, both ones that reported to me and colleagues in the organization.
Q Did you familiarize yourself with the department's efforts to establish a permanent repository?
A Mostly focused on the MRS and



transportation. I did also familiarize myself to a degree on the repository program which was a separate line office.
Q What documents did you review in connection with your preparation for the office that you were assuming?
MR. CRAWFORD: Objection, vague.
A I don't remember any specific documents from 1985 that I looked at.
(Deposition Exhibit Barrett 1 was marked for identification and was retained by counsel.)
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Barrett 1. Do you have that before you?
A Uh-huh.
Q Is this document the mission plan for the civilian radioactive waste management program?
A Looks like it.
Q Have you ever seen this document before?
A I've seen it.
Q Have you ever read any portions of this document?



A I'm sure at one time or another I did. Not for ten plus years.
Q But back in the 1980s you would have read this document, correct?
A Prob -- yes. Well, I would say I read it -- I don't think I ever read it in its entirety. I knew it existed.
Q And you read portions of it, correct?
A I'm sure I did.
Q And do you believe you read it when you first came to the office in preparation for your new position?
A I don't recall that specifically, but I'm sure I read parts of it.
Q You understand the purpose for the mission plan?
A It's required by the act. I was never really quite sure what Congress had in mind.
Q You were not involved, am I correct, in the drafting of this mission plan?
MR. CRAWFORD: Objection, vague.
A I don't recall writing drafts or anything

A Probably.
Q And in 1987 did you personally read the amendments to the Nuclear Waste Policy Act?
A I'm sure -- well, did I sit down and actually read it? I mean, I dealt with it a lot, but yes, I'm sure I read most of it at one time or another.
Q In 1985 when you took on your position at DOE did you read the standard contract?
A No, actually I didn't.
Q Have you ever read the standard contract subsequently?
A Cover to cover, no.
Q Have you read portions of it?
A Yes.
Q What portions have you read?
MR. CRAWFORD: Objection, vague.
A I don't know. I would have to go -- you know -- the '98 date, the section. I mean I -- I don't know. I would have to look.
Q Do you think you read at least three-quarters of the contract?



MR. CRAWFORD: Objection. Asked and answered. Objection, vague.
A I doubt I've read --
MR. CRAWFORD: Objection, foundation.
A I doubt I've read three quarters of that contract.
Q Do you think you read at least half of that contract?
MR. CRAWFORD: Objection, asked and answered. Objection, vague. Objection, burdensome.
A I don't know.
Q Is it possible you did?
MR. CRAWFORD: Objection, asked and answered. Objection, vague, burdensome.
A I just don't know how much of it I read.
Q So it is possible that you have not read half of the provisions of the standard contract, correct, sir?
MR. CRAWFORD: Objection, argumentative. Objection, asked and answered. Objection, vague, burdensome.
A Possible.



Q Is it possible that you've read less than a quarter of the provisions, sir?
MR. CRAWFORD: Objection, argumentative, burdensome. Objection, asked and answered.
A I don't know.
Q So it is possible that you, in your years at the Department of Energy or before, have read personally less than 25 percent of the provisions of the standard contract, correct?
MR. CRAWFORD: Objection, argumentative. Objection, foundation. Objection, asked and answered.
A I probably read more than a quarter of it.
Q Are you certain?
MR. CRAWFORD: Objection, argumentative.
Q Are you certain?
MR. CRAWFORD: Objection, argumentative.
A No, I'm not certain.
Q I would like to return to paragraph three on the top of page seven. Have you had a chance to read that?
A Yes.
Q Can you explain that objective to me?



A That was an objective, okay, to receive waste in 1998 and along with the acceptance schedule it's -- in accordance with the acceptance schedule provided in the standard contract, okay. So that was the goal.
Q And you're comfortable with that goal?
MR. CRAWFORD: Objection.
A It wasn't mine. It wasn't my goal.
Q But you understand that was a goal of the program?
A Yeah.
Q In 1985, correct?
A That's correct.
Q And what acceptance schedule did the standard disposal contract provide for?
MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for speculation.
A I think the contract references other documents that references things, and I don't specifically know.
Q So is it your testimony that it provided for a schedule but you don't sitting here today know

what that schedule is?
MR. CRAWFORD: Objection. Argumentative.
A The receipt rate of January -- excuse me, the receipt date of January 31, 1998, clearly was always a goal. Okay. Regarding the acceptance rate of so many tons year one, year two, year three, okay, you know, that has changed over time. My focus has always been to create a siting process that got us a site to allow us to have the -- a reasonable receipt rate going toward the steady state 3,000 tons per year, and that's where my focus has always been, not on contract details. Okay. I am not a lawyer, I'm an engineer, okay, so I have not gone into the contract in any great detail at all.
Okay, now regarding your question here about the acceptance schedule in the contract, actually I don't recall seeing a metric ton per year in the contract.
Q Let me step back a second, Mr. Barrett. You just referred to a reasonable receipt rate going toward the steady state 3,000 tons per year.
A Right.



Q "That's where my focus has always been." Do you recall that testimony?
A That's what I just said I think.
Q Does that continue to be your focus to this very day, sir?
A Yes.
Q And does that continue to be the focus of the Department of Energy's spent nuclear fuel program?
MR. CRAWFORD: Objection to the form. Objection to the foundation. Objection, vague.
A We are still trying to perform under the Nuclear Waste Policy Act to receive the waste into the federal system as soon as we can under the constraints of the law. So, yes, that remains my goal and the organization's goal.
Q Again, just so the record is clear, your goal and the organization's goal is to achieve a reasonable receipt rate going towards the steady state of 3,000 tons per year, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony. Objection, foundation. Objection, vague.



A That has been our goal to do that.
Q And it continues to be your goal today, correct?
A Correct.
Q And it was your goal in 1985, correct?
A Correct.
Q And it was the goal of the department in 1982 when the standard contracts were signed, correct?
MR. CRAWFORD: Objection, vague. Objection, calls for speculation. Objection to the extent it mischaracterizes his prior testimony.
A I wasn't there in '82 so I don't know about '82, but in '85 and today it has always been our intent to try to do what we can from a technical point of view to receive the materials at a reasonable rate.
Q And the reasonable rate is the rate that would ramp up -- is a rate that would ramp up towards 3,000 MTUs per year, correct?
MR. CRAWFORD: Objection, vague. And foundation.
Q I believe your counsel cut you off. What was your answer, sir?



A That has been our intent.
Q Let's go back to paragraph three, page seven. You referred to January 31st, 1998, as being a goal. Was it something more, wasn't it a contractual commitment and a statutory command?
MR. CRAWFORD: Objection, argumentative. Objection, best evidence. Objection to the extent it calls for a legal conclusion.
A As an engineer, okay, and as a program administrator, okay, and dependent on what the contract said or what courts said, we were always trying to achieve that goal.
Q And why did you establish that goal for yourself?
A Because --
Q And your department?
A It was set in the law, okay, that our goal was to try to create a facility and to create a system that would meet that goal of January 31st, 1998, to start to receive fuel. And it has always been an important objective and goal.
Q To start to receive fuel on January 31st,

1998, at a ramp-up level that would -- in a reasonable amount of time and at a 3,000 per year MTU acceptance rate, correct?

MR. CRAWFORD: Objection to the form. Objection to the mischaracterization of prior testimony. Objection to the extent it assumes facts not in evidence.

A It was a systems goal to receive the material at a reasonable rate, okay, of which the 3,000, ramp up to 3,000 tons was a reasonable rate. It was never a -- in my opinion it was never a legal requirement to do 3,000 tons per year.

Q You base the goal on the statute, correct? That's what you've testified to, correct?

A Yes.

Q Back to paragraph three --

A Excuse me. Let me go back to that. When you say the statute does not say 3,000, okay, that was a judgment part. It is the receipt in January 31, 1998, is in the statute. The rate to my knowledge is not in the statute.

Q So why did you set the 3,000 MTU goal?



A That was a --

MR. CRAWFORD: Objection to the fact that that question assumes facts not in evidence.

A That was in our judgment a reasonable rate, steady state rate to move up to under the circumstances we were in.

Q Paragraph three. I'm not certain I understand your testimony. I'm still unclear what you're referring to with respect to the acceptance schedule. You see that language, acceptance schedule in paragraph three?

A You asked me to interpret this paragraph three which I never wrote.

MR. CRAWFORD: He's asking you whether you see that.

A Do I see it? I see that line.

Q And what do you understand that to be referring to? What acceptance schedule did the standard disposal contract provide for?

MR. CRAWFORD: Objection to the foundation of the question and objection, best evidence.

A I don't know because I do not recall an



acceptance schedule in the contract itself. So I would have -- I don't know what this means.

MR. CAYNE: It's 12:30. Let's break for a one-hour lunch.

(A luncheon recess is taken.)



AFTERNOON SESSION

BY MR. CAYNE:

Q Good afternoon, Mr. Barrett. Who are the individuals that report directly to you in your position as deputy director?

A Now?

Q Yes.

A Dr. Russell Dyer, project manager Yucca Mountain project; Sandra Waisley who is the acting director of the U.S.A. subprogram administration; and Mr. Jeffrey Williams who is the acting director of office of waste acceptance and transportation international or technology -- technology and QA director. Mr. Ron Murthey, and Mr. Ronald Milner who is the chief operating officer.

Q Do you work with Mr. David Zabransky?

A Yes.

Q And what position does he hold?

A I think he is now the acting director of transportation and waste acceptance.

Q And in that capacity to whom does he report?

A Did they for what? Were they consistent with which?
Q The system requirement documents that you just described.
A Consistent with -- what would they not be consistent with?
Q That's what I'm asking you, sir.
A I don't know of anything they would not be consistent with. I mean, there's -- I won't speculate.
Q Were the acceptance rates that the department was planning to use consistent with the ACRs?
MR. CRAWFORD: Objection to the form of the question. Objection, vague. Objection, assumes facts not in evidence. Objection, mischaracterizes prior testimony. Objection, foundation.
A I don't know.
Q You have no idea?
A I just don't know in the sequence of what you're referring to were they consistent, what they are. I would have to look and see what documents



you're referring to at the time.
Q Well, various points in time your office issued ACRs, correct?
A I believe so. I didn't follow, quote, the ACR, DCSs and those sort of things. I didn't follow those very closely. They should have been consistent.
Q So you didn't follow them very closely, correct?
A No. That's correct.
Q When you were acting director and deputy director of your office, did you not have ultimate responsibility for those documents?
A I did.
Q And did you delegate that responsibility to someone else?
A You can delegate authority; you retain responsibility.
Q And although you retained your responsibility for them, you did not familiarize yourself with them?
MR. CRAWFORD: Objection, argumentative.
A Oh, I think I was familiar with them, but I



didn't get into details of the -- of that process.
Q What process are you referring to?
A The -- when various ACRs were issued, when DCSs were issued or consummated or whatever administrative processes happened with those, I was focused on the policy and the direction of the program. The authorities were delegated to the appropriate organizations. Responsibilities were mine.
Q To your knowledge were the acceptance rates established by your office fairly consistent with your office's spent nuclear fuel program plans?
MR. CRAWFORD: Objection, vague.
A The requirements, system requirements and the program plans should, to my knowledge were consistent. There may be some time issues where if one thing changed, one of those might have changed fast within the other because they had administrative processes to follow, but in general they were consistent.
Q Who is Mr. Alan Brownstein?
A He's an employee.



Q What is his position?
A Right now his official position is director of regulatory coordination division.
Q Do you consider him a competent employee?
A Yes, I do.
Q Do you work with him personally?
A Yes.
Q Do you rely on his judgment?
A I do.
MR. CRAWFORD: Objection, vague.
Q What is his field of expertise?
A I believe his formal education is an economist, though he's been in the nuclear industry decades and is very knowledgeable.
Q Have you ever been critical of his professional judgment?
A Never.
Q I return your attention to page 17 of Exhibit 1.
A Okay.
Q Are you familiar with the plan referred to on page 17 denominated as the improved performance

Ridge, Tennessee. If that had been the nation's will, there would have been a certain chance of success of meeting the 1998 date. When it was the will of Congress to have a different course and reject that and it was actually rejected in the statute where that new course depended upon finding of a volunteer site and subsequent approval by Congress by statute made it a much more onerous and difficult task to achieve. So it was possible but it was more difficult than if there had been a simple congressional approval of the MRS proposal as the Department of Energy submitted it.
Q But it wasn't impossible, correct?
A It was not impossible.
Q If you had a volunteer site and Congress, assuming there was a volunteer site and Congress passed the necessary legislation, what else would have been required to have happened for your office to have proceeded with the improved performance plan?
A I don't believe we called it an improved performance plan in the post-'87 time period, but you would have had to have -- to succeed in the '98 date we would have had to maintain the progress on the



repository so the linkages permitted. You would have had to had sufficient funding from the Congress, which hindsight has shown that was very -- been very difficult to do. As well as the actual new legislation to consummate the volunteer site.
Q Would you turn your attention to page 24 of Exhibit 1.
MR. CRAWFORD: I'm sorry, what page?
MR. CAYNE: 24.
Q Do you see on the bottom half of the page on Roman III there are certain assumptions about an MRS facility.
A Uh-huh.
Q Are you familiar with these assumptions?
A No, but I --
MR. CRAWFORD: Objection. Foundation.
A No, but I can look at them.
Q Please.
A Okay, I'm familiar with them.
Q Were you familiar with them at the time?
A In a general sense, yes.
Q What was the basis of your office's



proposal that the capacity of the MRS be established at 15,000 MTU?
MR. CRAWFORD: Objection, foundation. Objection, vague.
A From a policy matter my recollection on this was that if you made the MRS capacity too large it would not be acceptable from a congressional perspective because it would appear to be a replacement for the geologic repository. On the other side, if you made it too small, you then would not have the performance of removing the waste that we would like to have had. 15,000 metric tons appeared to be a reasonable capacity that seemed to be not too large that it would be a replacement, nor too small that it didn't have any benefit, and that's why we proposed it in the 15,000 ton range. That is my recollection, but documents would say that.
Q Was it important to your office that the MRS not be perceived as a replacement for the repository?
MR. CRAWFORD: Objection, foundation.
A My understanding is the congressional



debate in the formulation of the '82 act was there was discussions between what was known at the time as away-from-reactor storage concept versus a geologic repository concept, and the after the debate was over the decision was not to authorize an away-from-reactor storage facility, which the new name became a monitored retrievable storage facility, because the opponents of that felt it would detract from the geologic repository and the DOE was to submit a proposal for an MRS, but it was not approved. It took an act of Congress to approve it and authorize it. That was the forces that were at play from a policy perspective on this.
Q In 1982?
A In 1982. And those existed right through '87. Some people vehemently opposed the MRS; some people wished -- were proponents of the MRS.
Q So then am I correct that in 1985 it was important to your office that the MRS as then proposed not be perceived as a replacement for the permanent repository?
A That's correct.

MR. CRAWFORD: Objection. Lack of foundation.
Q You see B, the waste receipt rate?
A Uh-huh.
Q Are you familiar with the basis for the 3,000 MTU per year receipt rate in 1985?
MR. CRAWFORD: Objection, asked and answered. Objection, foundation.
A I'm familiar with it. It was established before my arrival or personal participation in establishing that number. It seemed like a reasonable number to me then as it does today.
Q Has there ever been a time since you've been at the Department of Energy that a 3,000 MTU per year rate did not seem reasonable?
MR. CRAWFORD: Objection, vague. Objection, asked and answered. Objection, lack of foundation.
A As this is used in this case, as an assumption for an operating facility rate and capacity, it was a reasonable number.
Q In C, do I understand this correctly that



after two years the MRS would have been operating at full -- at the full acceptance rate?
MR. CRAWFORD: Objection, vague.
A That's what it says. I never thought it was that fast, but that's what it says.
Q Do you have any basis to disagree with the statement in C?
A I think going from zero to 3,000 in a two-year period is extremely challenging and questionable to go that fast.
Q Do you believe that the individuals in the Office of Civilian Radioactive Waste Management program were careless in establishing this two-year ramp-up period?
MR. CRAWFORD: Objection, foundation. Objection, speculation.
A I don't believe they were careless at all. I believe that's overaggressive in my judgment based on what history has shown us how difficult nuclear facility creation implementation is.
Q Would you believe it to be overly aggressive in 1985?



MR. CRAWFORD: Objection, foundation.
A I don't think I ever really tuned in on it.
Q Did you ever have discussions with anyone in your office concerning the reasonableness of the two-year ramp-up period?
A Not that I recall.
Q Who would have made the final decision in your office to authorize the two-year ramp-up period?
MR. CRAWFORD: Objection, vague. Objection, foundation.
A That would have been Roger Hilley who is responsible for that office.
Q Do you believe he was a competent individual?
A Yes, I do.
Q Do you believe he had good professional judgment?
MR. CRAWFORD: Objection, foundation.
A As a senior manager, yes.
Q Did you find him to be overly aggressive in his administration of the program?
MR. CRAWFORD: Objection, foundation.



Objection, vague.
A No.
Q Can you turn your attention to page 26. You see page 26 consists of a chart. Would you take a moment to refresh your recollection concerning its contents.
A Okay.
Q Are you familiar with this chart?
A Vaguely.
Q Have you seen the column labeled Spent Fuel, the fourth column to the right?
A There's four, four, four, four, nine, 18?
Q Right.
A Yeah.
Q Are you familiar with the basis for the projection that the ramp-up would go from 400 to 900 at the third year?
A I'm sorry, repeat the question.
Q Are you familiar with the basis, technical or otherwise, for the determination that the acceptance rate would ramp up from 400 to 900 between the third and the fourth year of the acceptance of the

153

repository?
A No, I -- no.
Q Are you familiar with the basis for the determination that a ramp-up from 900 to 800 MTUs per year would be an appropriate ramp-up rate between the fourth and fifth year of acceptance of the repository?
MR. CRAWFORD: Objection, vague.
A You mean 900 to 1800?
Q If I said anything else, I misspoke, yes.
A I know there's a question again about the 900 to 1800.
Q Are you familiar with the basis, technical or otherwise, for the projection that the acceptance rate would increase from 900 to 1800 MTU?
MR. CRAWFORD: Objection, foundation. Objection, speculation.
A No.
Q Do you believe that the ramp-up rate reflected in the column captioned Spent Fuel was overly aggressive?
MR. CRAWFORD: Objection, foundation.
A About the same column I'm looking at?

154

Q Yes.
A I don't consider that ramp-up rate from 400 to 3,000 over, one, two, three, four, five, six years to be overly aggressive, no.
Q In fact, you believe it to be reasonably achievable, correct?
A Yes. Let me modify that. This is for a repository. I don't believe it was reasonably achievable for a repository to start in 1998 and go up to 3,000 in the year 1985; so the rate of increase would have been reasonable but the absolute dates of '98 to 2003 I would consider overly aggressive.
Q But the five-year ramp-up was very reasonable in your view, correct?
A A five-year ramp-up, other than the absolute dates, was a reasonable ramp-up.
Q Could you turn to page 28 of the same exhibit.
A Okay.
Q And about a third of the way down, do you see the paragraph that starts, "A comparison of the two acceptance schedules"?

155

A I see it.
Q Can you take a moment to read that portion of the document, because I have a few questions to ask you about it.
A Okay. What's your question?
Q On paragraph one are you familiar with the basis for the projections that spent fuel acceptance can begin as soon as the integral MRS facility begins operations, possibly one to two years ahead of the repository?
A Yes, the concept was if the MRS was designated per the proposal it could be receiving materials, you know, before the repository was ready. So it could be in advance of, so yes.
Q But I take it this means the time necessary to construct the repository would likely be one to two years more than the time to construct the MRS facility, correct?
MR. CRAWFORD: Objection, vague.
A Well, it's more than just construction times. It's mostly the siting time. MRS, you could build the actual construction of the MRS versus the

156

actual construction of the repository receiving facilities might be comparable in time. It's the proposal of the improved performance plan here was that the MRS would be designated in the late eighties so that it could be receiving material sooner than the repository which had a long site designation process that was going to take many, many years to happen.
Q What is the basis for the projection that it would be, could begin operations one to two years ahead of the repository?
MR. CRAWFORD: Objection, foundation.
A Because it was sited a whole lot earlier.
Q That the repository was sited a whole lot earlier?
A No, the MRS was sited a whole lot earlier than the repository so it would be able to receive material in advance of the repository.
Q One to two years in advance?
A Yes.
Q Look at paragraph two. It starts "system waste acceptance rates." Do you see that?
A Yes, I do.

Q What are the problems of spent fuel storage that are being referred to in this paragraph?
A I assume they're referring to --
MR. CRAWFORD: Objection to the foundation. To lack of foundation.
A I assume they're referring to reactor storage.
Q And are you familiar with the problems that are being referred to here?
A No.
Q Is it referring to the fact that certain utilities were anticipated to run out of storage space during the critical years around 1998?
MR. CRAWFORD: Objection, asked and answered. Foundation.
A Could be.
Q You don't know?
A No, I don't know because I don't know what the authors meant by that.
Q Can you explain what is meant by paragraph three?
MR. CRAWFORD: Objection to the extent it



calls for speculation. Objection to the foundation.
A What the writers were doing in three were saying if there was an MRS in the system, okay, we could -- you could, DOE could be receiving fuel earlier and at a higher rate than if there wasn't. If you looked at it from a national perspective as this table 23 says, that the total inventory at the reactors doesn't go up much.
Q Doesn't go up much what?
A Doesn't go up much in total mass of fuel and that the government would be achieving its goal of taking into possession the spent fuel and high-level waste and minimizing the impact on the operating reactors.
Q What is the impact that you're referring to?
A Primarily the cost of storage.
Q Are you referring to the impact that would have occurred in the event of a failure to start taking spent nuclear fuel in 1998?
MR. CRAWFORD: Objection, vague. Objection to the extent it calls for speculation. Objection,



foundation.
A The failure of 19 -- as we were delayed there's more storage costs that are going to have to be paid for in society.
Q So in proposing this plan, this improved plan your office was attempting to reduce those costs, correct?
MR. CRAWFORD: Objection to the extent it calls for speculation and objection to the foundation and objection, vague.
A Yes. Let me add, it's much more than just cost. It's also the intent. The government should be trying to take the material and discharge its responsibilities under the act. So it's more than just cost.
Q And is it your understanding that the standard contract was entered into between the government and the utilities with nuclear reactors in order to carry out the underlying intent of the Nuclear Waste Policy Act?
MR. CRAWFORD: Objection. Mischaracterizes prior testimony. Objection, asked and answered.



Objection, foundation. Objection to the extent it calls for speculation.
A To me the contract was administrivia for aspects of the program.
Q What?
A Administrivia.
Q Can you explain that novel term to me?
A Paperwork. Legal stuff. I didn't pay much attention to the contract. We were -- our sights were set on trying to perform, to take the waste into the government system as quickly as possible.
Q Consistent with the intent of the act?
A Act. Not -- the contract is a small subpiece of the act. The act is primary; the contract is tertiary.
Q Your sights were focused on the requirements of the Nuclear Waste Policy Act of 1982, correct?
A Correct.
Q Continuing on page 28, subparagraph one towards the bottom of the page, would you take a moment to look at that, sir.

193

less than 2.5 years for its licensing review." Do you see that statement?

A Yes, I do.

Q Are you familiar with the basis for that conclusion, that it would require less than 2.5 years to complete that process?

A In this document, no.

Q Are you familiar outside of this document with the amount of time it would have taken the NRC to complete this process?

MR. CRAWFORD: Objection, vague.

A I'm familiar with the NRC processes to approve and, you know -- facility under 10 CFR Part 72 which is what this is.

Q And do you believe that a projection of that process would take less than 2.5 years to be an appropriate projection?

A It's around two and a half years, 30 some months I've testified to, which is about two and a half years. Two and a half to three years.

Q You've testified to today? Is that what you're referring to?

194

A In the last five years.

Q Before Congress? Have you testified anywhere in the last five years other than before Congress?

A What do you mean by testify?

Q You just referred to testimony you gave in the last five years, correct?

A Oh, Congress. Yes, I've testified before Congress regarding storage approval times in the last five years.

Q And you testified that the period in which -- the period that it would take to license an MRS facility would approximate 2.5 years, correct?

A It could be done that fast.

Q You testified to Congress that that was an appropriate projection of the required time, correct?

A I believe so. I would have to go back and look.

(Deposition Exhibit Barrett 5 was marked for identification and was retained by counsel.)

Q The court reporter, Mr. Barrett, has handed you a document marked for identification as Exhibit 5.

195

The first page states Annual Capacity Report Briefing for OCRWM Executive Committee, November, there's no date, 1986. Do you have that before you?

A Yes, I do.

Q Were you a member in November 1986 of the OCRWM executive committee?

A I don't think so.

Q In November 1986 you were a division director, correct?

A Correct.

Q And you don't believe that in that capacity you would have been a member of the executive committee?

A No, I was not then.

Q Have you taken a moment to leaf through this document?

A Okay.

Q I would like to turn your attention, on the left-hand side it says HQ 0002904.

A 290 --

MR. CRAWFORD: Wait a minute. Oh, I got you.

196

A Positions by decision group, current status?

Q Yes. You see under Decisions Group it has aggregate acceptance, the first entry, system study on technical basis under review confirms 3,000 MTU per year?

A I see it.

Q That's consistent with your testimony today, correct, that --

MR. CRAWFORD: Objection.

MR. CAYNE: Could I finish, counsel.

MR. CRAWFORD: Sorry.

Q That's consistent with your testimony today that in 1986 your office was projecting a 3,000 MTU per year acceptance rate, correct?

MR. CRAWFORD: Objection, vague.

A Seems consistent.

Q Do you know what the, or are you familiar with the system study that is being referred to in this entry?

A Not the specific one.

Q Do you have a general understanding of the

system study being referred to here?
MR. CRAWFORD: Objection. Asked and answered.
A There were various studies done in the eighties and also in the very early nineties on system performance rate, you know, what the costs were, schedules were, plausibility of them.
Q And these system studies looked at system issues, correct?
A Yes.
Q And am I correct that each one of these studies to which you've just referred confirmed an acceptance rate, an aggregate acceptance rate of 3,000 MTU per year?
MR. CRAWFORD: Well, objection, vague.
A I think it's overstated to say it confirmed it. It showed that, you know, at 2,000 it does this, at 3,000 it does that, 4,000 it does something different. I don't know if they actually reached an absolute confirmation that 3,000 was the exact number, but generally they supported the system rate of 3,000 was a reasonable rate.



Q So it's your understanding or your knowledge that each of the various system studies to which you just referred that were undertaken in the -- from the mid-1980s to I think you said the mid-1990s, supported an acceptance rate of 3,000 MTU per year, correct?
MR. CRAWFORD: Objection, vague. Objection, assumes facts not in evidence. Objection, mischaracterizes prior testimony.
A Yes.
Q I'll ask you to turn to page HQ 0002909 of this same exhibit.
A Okay.
Q Do you see under the second entry, allocation of acceptance under consequences of decisions, it says "allocation required to plan maximum storage at some sites." Do you see that statement?
A I see it.
Q Do you understand that statement?
A No.
Q Do you understand that statement to refer



to the need of the utilities to have significant advanced knowledge of the allocation rankings in order to store the fuel in the most efficient manner?
MR. CRAWFORD: Objection, speculation. Objection to the extent it assumes facts not in evidence. Objection to the foundation.
A Could be. I don't know.
Q Do you have any knowledge of the considerations that utilities undertake in attempting to maximize their storage capacity, their existing storage capacity?
A Yes.
Q And what considerations are necessary to be undertaken by a utility to do that?
A Safety considerations, economic considerations, future site use and decommissioning schedules, all sorts of issues a utility needs to consider to make decisions about how best to store the fuel.
Q And is one of the issues they need knowledge about the priority queue?
A The likely --



MR. CRAWFORD: Objection, foundation.
A The likely removal time for the Department of Energy is an important part of that consideration.
Q So the failure to provide the utility with that information could cost the utility to store fuel in a less than optimal manner, correct?
MR. CRAWFORD: Objection, speculation. Objection, foundation. Objection to the extent it assumes facts not in evidence.
A The removal date would be the important thing to the utility planner regarding where you are in your allocation as a subset. The most important part is the when will the federal facility be capable to receive material. So the allocation to me is a secondary issue compared to the rate of development of receiving facility, which is the primary consideration.
Q You said the most important part. The most important part to what?
A For a utility deciding what they should do with their storage. The most important -- one of the more important aspects of a utility decision will be

when will the federal government start taking waste and at what rate from their facility. The most important part of what the federal removal rate would be is not your allocation so much as is when does the federal system start.
Q So a utility would need to know when the federal system would start in order to most efficiently utilize its available storage space for spent nuclear fuel, correct?
A It's an important consideration.
MR. CRAWFORD: Howard, since we're moving to another document, can we take a break?
MR. CAYNE: Oh, sure.
(There is a recess from the record.)
(Deposition Exhibit Barrett 6 was marked for identification and was retained by counsel.)
Q Mr. Barrett, the court reporter has handed you a document marked as Exhibit 6, which is the June 1987, annual capacity report. Do you have that before you?
A Yes, I do.
Q Did you play any role in the preparation or



issuance of this report?
A None.
Q Did you ever see this report prior to its issuance?
A No.
Q Have you ever had occasion to look at this report before today?
A Yeah, I've seen it.
Q In what circumstances have you had occasion to look at this report?
A There was a big stack of stuff somebody gave me one time.
Q When would this have been?
A Somewhere in the early nineties. There's a newer one than this one. No. This was in a stack of stuff. I never read it.
Q Do you recall for what purpose you were given this document in the early nineties?
A No.
Q But you examined a portion of its contents at that time?
MR. CRAWFORD: Objection, asked and



answered.
A I'm not sure I ever even opened it. Because there was a newer one.
Q I'd like to step back. Do you recall with respect to the last document I asked you if you were a member of the executive committee of the OCRWM.
A Yes.
Q And you answered in the negative?
A Because I was -- I was not and then I was.
Q Who would have been members of that committee in November 1986 to your knowledge?
MR. CRAWFORD: Objection, foundation.
A Roger Hilley, the depository people. I think Keith Klein was still here then, Ed Kay, Sam Rousso ran admin, and I don't know who else. Wasn't many.
Q Excuse me?
A It wasn't very many people.
Q Who's on it today?
A It doesn't exist today.
Q When did it go out of existence?
A '89, somewhere in there.



Q You were a member of the committee prior to the time it went out of existence?
A At the very end I was a member of it.
Q When did you join, '89?
A '88, '89, somewhere in there when I was QA director or one or the other jobs. I don't remember. But I was officially a member of it, and I think it had one meeting and then it kind of went away.
Q Who were the other members of the committee at the time you joined?
A I don't remember.
Q You don't recall any of the other members at the time you joined?
A I guess it would have been Ed Kay who was the acting director. Sam Rousso probably would have been there. After that I just don't remember.
Q Would you turn to page Roman little v, captioned Summary of Exhibit 6. Are you there?
A Roman numeral v.
Q On the bottom. You see that?
A It says Section 1.
Q It's the fourth page of the document?

A Yeah, I got that. Summary.
Q Yes. Would you take a moment please to read that summary.
A Okay.
Q Are you familiar, I take it you are familiar from your prior testimony today with the Department of Energy's proposal with respect to spent nuclear fuel as it stood in June 1987, correct?
MR. CRAWFORD: Objection, vague.
A To a limited degree, yes.
Q And does this summary detail the plan with respect to the use of an MRS that you described earlier today?
A I didn't --
MR. CRAWFORD: Well, objection, vague.
A It's not inconsistent with my understanding.
Q It's not consistent --
A Not inconsistent with my understanding. I mean, that it was going to do 6,000 tons within '98 and 2003, that's a little detail I certainly don't remember, but.



Q Now, under this plan there's only the MRS that would start to operate in 1998, correct?
A Correct.
Q And the repository in 2003?
A Right.
Q You were not involved, were you, in the decision to advance the date of the repository operations from '98 to 2003, correct?
A That's correct, I was not involved in that.
Q Will you explain to me how the MRS and the repository would have worked together as described in the summary on these two pages?
A The proposal in early '87, you know, late '96, early '97 from the department to the Congress was that the integrated MRS that would begin operation between '96 and '98, it would receive the material based on the contractual allocations and then package it, store it as necessary for transmittal to the first repository, then the second repository.
Q Now, under this proposal, the MRS would accept 6,000 MTUs of spent nuclear fuel during the five-year period from 1988 to 2003, correct?



MR. CRAWFORD: Objection, foundation.
A That's what it says.
Q And would that have been a 1200 a year acceptance rate at the MRS?
MR. CRAWFORD: Objection, foundation.
A I don't know. I assume it has a ramp to it. It's not 1200. It's in here somewhere. The answer is I don't know.
Q Let's look on page seven.
A There you go. All right. Okay. There it is.
Q Are you familiar with the plans that existed in 1987 that the MRS would take 1200 MTU per year?
A Only very vaguely.
Q Are you familiar with the basis for that projection?
A No.
Q Do you know what factors would have been considered in making that projection?
MR. CRAWFORD: Objection. Asked and answered. Objection, foundation.



A I don't recall them. I mean, I can think of what they might have been but it would just be speculation on my part.
Q What do you think they might have been?
A Well --
MR. CRAWFORD: Objection to the extent it calls for speculation.
A How quickly, what kind of facility, the receiving facility, the hot -- number of hot cells for unloading the casks, the number of casks we had. You know, basically the design and the construction of the MRS itself.
Q On page Roman V you see the statement, "The schedule presumes congressional approval of DOE's MRS proposal"?
A Yes.
Q And precisely what did your office presume Congress would do, simply issue an authorization that an MRS facility could start operation as of 1998?
MR. CRAWFORD: Objection, vague.
A We would have to look at the proposal. I don't remember exactly what their proposal proposed

but certainly site designation was a key matter.
Q Look at page two of this document, two in Arabic at the bottom.
A Okay.
Q You see the statement, "As specified in the contracts, the ACR is for planning purposes only"?
MR. CRAWFORD: Where are you?
MR. CAYNE: I'm at the last sentence of the carryover paragraph -- next to the last sentence of the carryover paragraph on the top of page two.
A I've read it.
Q You see that?
A Yes.
Q To your knowledge does the contract actually make that statement, the standard contract?
A Don't know.
Q Have you ever been advised by anyone of the statement on this page two that the ACR is for planning purposes only?
A I've heard that statement.
Q Have you ever made that statement?
A Don't recall. Might have.



Q Is that your position?
A Yes.
MR. CRAWFORD: Objection, foundation.
A Yes.
Q And what is the basis for that position?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A My staff has advised me that's the proper thing to say when asked.
Q What members of your staff?
A Mr. Brownstein, Mr. Zabransky and the people who are responsible in that area.
Q When did they give you that advice?
A Numerous times over many years.
Q Starting when?
A Probably when I came back, '93 on I would guess.
Q Did they give you that advice in the context of discussions relating to the issue of whether operations would start at the repository by January 31st, 1998?
MR. CRAWFORD: Objection, vague.



Objection, foundation.
A It was always in the context of the entire program because in the early times the MRS was an important part and then later days it was not.
Q This is referring to the ACR. Why did you just refer to the MRS?
A Because the ACR has to do with obligation in other legal matters, and as we got closer to the '98 date this became more and more of a sensitive matter.
Q Why did it become more and more of a sensitive matter?
A Because of all the --
MR. CRAWFORD: Objection, vague.
A All of the legal, either in the rulemaking proposals that went out in the early nineties -- in the mid-nineties and then the litigations.
Q What rulemaking proposals are you referring to?
A There was a proceeding that we had circa '95ish about the department does or doesn't have an obligation.



Q And were you involved in that proceeding?
A Very peripherally. I was the acting director at the time or the DOE deputy, so I didn't personally get involved in it much but I knew it went on.
Q Did you make the decision to initiate that proceeding?
A I don't remember.
Q Are you referring to the notice of inquiry?
A That's probably what it was.
MR. CRAWFORD: Well...
A I don't know. I was referring -- I don't know if that's the official name of it. But it was a formal thing we did. We sent out in the notice -- I guess it was a notice, yeah, of -- that's probably it but I don't know.
Q Who in your office was responsible for the handling of the notice of inquiry?
MR. CRAWFORD: Objection to the foundation. Objection, assumes facts not in evidence.
A Brownstein. Brownstein was responsible.
Q Was it his idea to issue a notice of

213

inquiry?
A I don't recall.
Q Do you recall how the idea of the issue of notice of inquiry was generated?
MR. CRAWFORD: Objection, foundation.
A No, I don't.
Q What was your actual involvement with respect to the notice of inquiry?
MR. CRAWFORD: Objection, asked and answered. Objection, foundation.
A Brownstein was a responsible manager in that area. He recommended, after consultation with various parties, this was the best thing to do, and I agreed with that.
Q Do you know what the notice of inquiry did?
A Repeat the question.
Q Do you know what the notice of inquiry inquired about?
MR. CRAWFORD: Objection, vague.
A About the issue of the '98 date in the program.
Q And what action was taken by your office as

214

a result of the notice of inquiry?
MR. CRAWFORD: Objection, foundation.
A We had a conclusion of some sort that basically said there was a situation, we're trying to get this done, and that there was some legal aspects to it that I don't recall.
Q Was your office dealing with lawyers from the Department of Justice at this time?
A Not to my recollection.
Q When did your office begin dealing with lawyers from the Department of Justice?
A When we had lawsuits filed that were lawsuits as opposed to threats of lawsuits.
Q Which lawsuits are you referring to?
A The first ones, the Northern States Power, not -- you know, the obligation ones that was the D.C. Circuit Court of Appeals.
Q On page two of Exhibit 6, the first sentence of the first full paragraph, do you see that, beginning in 1991?
A Uh-huh.
Q Are you familiar with the annual priority

215

ranking?
A Not very.
Q Do you know what the annual priority ranking is?
A No.
Q I take it then you never read the annual priority ranking?
A That's correct.
Q Do you know when any annual priority ranking was actually issued?
A No.
Q And you don't know what the annual priority ranking does, correct?
A For sure, no.
Q Do you have an idea?
A Yeah.
Q What's your idea?
A My idea is it's, you know, who's got the old fuel and who's got what allocations in what order. It has to do with the ACR -- it relates to the ACRs and the DCSs, of which all of them I never really read.

216

Q You never really read what? I'm unclear.
A The ACR.
Q You never --
A The, yeah, the AP -- any of those documents you asked a question.
Q Which documents are you referring to?
MR. CRAWFORD: Objection, vague.
A The APR, I don't remember reading the APR.
Q Did you read the ACRs?
A I don't recall ever reading the ACRs.
Q Any of the ACRs?
A No. Yes, I didn't read -- I don't recall ever reading any of the ACRs.
Q You referred to DCSs, do you recall that, a moment ago?
A Uh-huh.
Q What is a DCS?
A Delivery commitment schedule.
Q Did you ever -- did I understand you -- I was unclear. Did I understand you to testify that you never read the DCSs?
A I never read a DCS cover to cover either.

217

Q Did you ever read part of a DCS?
A Might have. Don't know.
Q What is a DCS?
A Well --
MR. CRAWFORD: Objection. Asked and answered.
Q I understand the title.
A Delivery commitment schedule.
Q Do you understand what role it played in the overall SNF process?
MR. CRAWFORD: Objection, foundation.
A These were all part of the administrative details of the contract that I did not pay much management policy attention to.
Q So in your view was a DCS what you referred to, Mr. Barrett, I think the term was administrivia?
A That's correct.
Q A delivery commitment schedule was administrivia?
A Uh-huh.
Q Didn't really matter much to you, correct?
A That's correct, relative to running the

218

program and getting the site.
Q So you really did not have a particular understanding of what role or what function the overall administrative process that a DCS played; it was just another kind of bureaucratic piece of paper, correct?
MR. CRAWFORD: Objection, vague. Objection, mischaracterizes the witness's prior testimony. And objection to the foundation.
Q Correct?
A Yes.
Q My statement is correct?
A Correct.
Q Would you turn to page seven of Exhibit 6. Are you there, sir?
A Yes.
Q You see the section captioned Projected Waste Acceptance Capacity? That's the caption of the section?
A Yes. Yes.
Q And about seven lines down there's a sentence that begins, "The schedule will serve as a

219

basis for planning and it will be updated annually," and it continues.
A Yes.
Q Did you in your positions with the Office of Civilian Radioactive Waste Management use the schedule for planning purposes?
MR. CRAWFORD: Objection, foundation.
A This schedule was just subservient to the systems description documents and the system requirement documents. So this document itself never played a significant role to me.
Q It was those other documents that played the significant role that you just referred to, correct?
A Those were the primary programmatic documents.
Q This document being Exhibit 6, page seven we're looking at, projected waste acceptance capacity, was simply a derivative of or derived from those other key documents, correct?
MR. CRAWFORD: Objection. Mischaracterizes the witness's prior testimony. Objection, foundation.

220

Q Correct?
A That's my understanding.
MR. CAYNE: Let's take a two-minute break.
MR. CRAWFORD: Sure.
(There is a recess from the record.)
(Deposition Exhibit Barrett 7 was marked for identification and was retained by counsel.)
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 7. Do you have that before you?
A Yes, I do.
Q This is the nuclear waste fund adequacy assessment dated March 1986. Have you ever been involved in the preparation of this or any other nuclear waste fund fee adequacy assessment?
A Yes.
Q Were you involved in the 1986 fund fee adequacy assessment?
A I don't recall.
Q I'll ask you to look at this document, Exhibit 7, to see if it refreshes your recollection, but first let me ask you, which fee adequacy

assessments do you recall having been involved in?
A The ones when I was a director or deputy director, so it would be all the ones back to January of '93.
Q And in this assessment I particularly would like to direct your attention, the '86 assessment, to page five and more specifically to the third paragraph from the bottom of page five.
MR. CRAWFORD: The one that begins "an explicit"?
MR. CAYNE: No, the one after that, the one that begins "the total system."
A Okay. I read that.
Q Can you tell me what the fifth category refers to. The last sentence states, "At-reactor storage costs are a fifth cost category that appears in delay cases." And I specifically would like to ask you what are the delay cases being referred to in this document?
MR. CRAWFORD: Objection, best evidence. Objection, foundation. Objection, vague.
A Well, since I didn't -- you know, I was



probably a contributor to this report regarding transportation, I does not do this report. And when I did this report there never was a fifth at-reactor storage cost. So I don't know what they did here.
Q But based on your work in the -- in this office, do you have any knowledge from your discussions with your employees and your superiors as to what this, what the delay cases refers to?
MR. CRAWFORD: Objection, foundation.
A I don't know what they did here.
Q In the context of this report, and please take your time to examine the report if it assists you, do you believe that delay cases is referring to the possibility that the repository would not be operational by January 31st, 1998?
MR. CRAWFORD: Objection, foundation.
A I assume -- don't know. I'd have to look and see. Do you want me to?
Q Yes, you just said I assume and I don't know what you said after that.
A Okay. Rephrase the question again.
Q Do you believe based on your knowledge of



the work of the office and based on your view of this document that the delay cases being referred to on page five are -- delay cases refers to the possibility that the repository would not be operational by January 31st, 1998?
MR. CRAWFORD: Objection, best evidence. Objection, foundation.
A I don't know. I need to look and see, look at this document and see what it is. I don't know. You want me to look, I will.
Q Yes, I do want you to look, and specifically I will refer you to the section under Life Cycle Costs on page seven of this same document, Exhibit 7.
A Page seven? Where are the delay costs?
Q On the top -- the first paragraph you'll see under life cycles, number five here is referring to at-reactor storage costs.
A I see it, but I don't see any costs.
Q Move on to Exhibit 8.
(Deposition Exhibit Barrett 8 was marked for identification and was retained by counsel.)



Q The court reporter, Mr. Barrett, has handed you a document marked for identification as Exhibit 8, which is a draft mission plan amendment dated January 1987. Do you have that before you?
A I do.
Q Did you play any role in connection with the preparation of this draft mission plan amendment?
A I was probably a contributor to this.
Q To what aspects of this draft did you contribute?
A Probably transportation. I was probably also a reviewer of it.
Q Of the entire document?
A Probably.
Q Now, is this the document you referred earlier today to the fact that at some point the projected operation date for the repository moved from 1998 to 2003? Do you recall that testimony?
A I recall saying that, yes.
Q Is this draft mission plan amendment the first document in which your office announced that slippage?

A I don't know -- I don't recall. Does it do that? I didn't see that part. I don't know. It may be.
Q Turn to page nine under waste acceptance strategy. I'm sorry, page five, sir. And, actually, beginning at the bottom of page four there's a caption that states "extension of the schedule for the first repository." Do you see that?
A Okay. Yes.
Q And then on -- going over to page five towards the end of the second full paragraph it states "the new schedule shows a five-year extension."
A Right. I see that, yes.
Q Now, at this time Congress had not yet rejected the Department of Energy's MRS proposal, correct?
A December of '87 I think was when they had the act. So, no, they had not.
Q What factors led to the conclusion that the repository could not be ready and operational until 2003?
A The delays in the siting process in the



first repository.
Q And what was the cause of the delays to which you refer?
A There were multiple ones. We did a draft environmental impact statement incorporating comments and then did a final -- excuse me -- draft environmental assessment incorporating for public review and then they did a final environmental assessment that addressed the public comments. So there were many delays in the repository program that caused the date to slip from '98 to '03.
Q Were you involved in the decision to extend that date five years?
A No, I was not. That was done by the repository people.
Q But it states here that nevertheless, DOE could start accepting waste at the MRS in 1998, correct?
A If Congress accepted the proposal.
Q To approve the MRS?
A Yes.
Q On page nine under Waste Acceptance



Strategy.
A Yes.
Q You see in the third paragraph there's a reference to federal interim storage?
A Yes, I see it.
Q Did you have any personal involvement in that program?
A Only peripherally.
Q What was your involvement?
A Another group that work for Roger Hilley had responsibility for that, and I was doing systems that would integrate across the board. So I was, you know, knew of the concept.
Q And what is the concept to which you just referred?
A It's laid out in the act about what can be used for federal interim storage, and there was some discussion about using it, but the time was rapidly approaching expiration with that, so it was not a practical solution to the '98 receipt issue.
Q So the department did not actively promote the use of the federal interim storage proposal,



correct?
MR. CRAWFORD: Objection, vague.
A I saw -- I don't remember exactly what the department's position was or wasn't, and I just remembered there was some discussion about it in the FIS. And that it was about to expire and there were issues about who would pay and a bunch of other complications, and it was -- my understanding was it was not a -- it was not a worthy thing to pursue.
Q And, in fact, the program did expire without having ever been implemented, correct?
A That's my understanding.
Q Would you please turn to page 37, Appendix C.
A Okay.
Q See under Section 1 the functions and operations of an MRS facility?
A Yes.
Q In connection with your position as the director of the division that dealt with transportation issues, were you actively involved in the preparation and drafting of this portion of the

Q Could I ask you to turn to page 35 of Exhibit 8. I would like you to focus on the third paragraph from the bottom of the page that begins, "The amount of spent fuel available." Do you see that?
A I see it.
Q After reviewing that paragraph, I would ask if you would be kind enough to explain to me what that paragraph means.
A Well, I don't know what this means. Let me try to read this paragraph again.
Q Take your time to read it in context. Read as much of the document as you need to understand that paragraph, sir.
A What's your question?
Q My question is if you could explain to me in your words the meaning of that paragraph.
MR. CRAWFORD: Objection, best evidence. Objection, foundation.
A I can't. I don't know what they're trying to do.
Q This is a section of the report that you



likely would have read prior to its issuance, correct?
A No. I wasn't responsible for forecasts of waste generation. I can speculate that what they're saying in this last sentence is that by the year 2020 there will be available -- the amount of fuel existing at the reactors in the year 2020 is smaller than the amount of fuel that was discharged by the year 2015. What that has to do with anything, I have no clue.
Q Does this paragraph indicate that the acceptance rate would be larger than the discharge rate?
A The acceptance rate should be larger than the discharge rate under the plans then.
Q Under the plans laid out under the draft mission plan amendment?
A Right.
Q Can I turn your attention to page 56.
MR. CRAWFORD: 56?
MR. CAYNE: Yes.
A Okay.
Q Mr. Barrett, a moment ago I asked you does this paragraph indicate that the acceptance rate would



be larger than the discharge rate, and you answered the acceptance rate should be larger than the discharge rate under the plan then. Do you recall that answer?
A Yes.
Q Why did you give that answer?
A Because the acceptance rate would ramp up in excess of 2,000 tons per year which was the discharge rate.
Q Would ramp up to eventually what?
A Higher than 2,000.
Q So more fuel would be accepted than was being discharged, correct?
A Correct.
Q I ask you to look at the fourth column on page 56. Do you see that?
A Yes.
Q And the take rate for years starting in 2008 is set at 2650. Do you see that? Per year until many years out when it increases to 3,000?
MR. CRAWFORD: You're on the fourth column?
MR. CAYNE: Spent fuel shipped.



A You're on spent fuel shipped.
Q Yes.
A From -- ask your question.
MR. CRAWFORD: I'll object, vague.
Q Let me return first to spent fuel received. Under spent fuel received there's five years at 1200 MTUs. Do you see that?
A Yes.
Q And then it ramps up to 2,000 and 2650?
A Yes.
Q And then under first repository, several columns over, the ramp-up is from 400 to 900 to 3,000. Do you see that?
A Yes.
Q Now, a few moments ago I asked you whether all the spent fuel under the proposal in 1987 reflected in Exhibit 8 would pass through the MRS, and you responded in the negative. Do you recall that?
A Yes.
Q Is that why there's a difference between the 3,000 annual acceptance rate under the first repository and the 2650 under the MRS, because the

253

A Correct.
Q Thank you.
Mr. Barrett, you have before you a document marked for identification as Exhibit 9, which is the annual capacity report issued by the Office of Civilian Radioactive Waste Management in June 1988. Do you have that document, sir?
A I do.
Q Did you play any role in connection with the preparation or issuance of this annual capacity report?
MR. CRAWFORD: Objection, compound.
A Not that I recall.
Q Did you at any time review this annual capacity report prior to its issuance?
A Not that I recall.
Q Have you ever reviewed this annual capacity report prior to today or any portions of it?
A Not I recall.
Q Turn your attention to page four of this exhibit.
A Yes.

254

Q And specifically Section 2.1, which is on page four and continues on to page five. I ask that you take a moment to read that section and let me know when you're complete, sir.
A Starting from the beginning or just that paragraph?
Q Starting right under "waste acceptance schedule."
A Okay.
Q Turn your attention to page five, and there's a statement that "The projected waste acceptance rate has been increased because it is assumed that the MRS facility and the repository will commence operations simultaneously." Do you see that?
A Yes.
Q Prior to this time it was projected that the MRS would commence operations in 1998, five years prior to the repository, correct?
A I'm not sure the sequence between, you know, the time line, but that sounds reasonable.
Q The last document we looked at was from 1987, the mission plan amendment. Do you recall that?

255

A I'll go back and see what it was, but -- what's the question?
Q My question is what was the basis for the determination by your office that the MRS facility would commence operations simultaneously with the repository?
MR. CRAWFORD: Objection, vague. Objection, foundation.
A I don't know. I'd have to look and review. I had no personal knowledge or recollection of what was or wasn't in the office plans back in the middle of '88, or early '88.
Q Well, based on -- according to the document that you're now reviewing, the office of waste management was not -- was projecting that the MRS would not commence operations until 2003, correct?
A I thought this was the MRS would start in '98 and the repository was in '03.
Q Do you think that's what the first full sentence at the top of page five says?
A Okay. Let's look at this again. Maybe I'm assuming something I shouldn't. This apparently is

256

the MRS is going to start in '03. I said I never reviewed this document, so that's what it says. So I have no knowledge about any of the whys or wherefores of what they assume here. Ask your question again.
Q Let me ask you this question. You testified a few moments ago that as late as 1993 you believed that an MRS facility could be up and running by January 31st, 1998, correct?
A The volunteer site, yes.
Q Does this projection in Exhibit 9 that the MRS would not be operational until 2003 affect that conclusion, your conclusion in '93 that the facility could be operational by '98?
A No, because I don't know what the basis for this was. On the face this looks like the department was saying that the first waste acceptance wouldn't be until '03, and that was not my understanding as the department's position at that time.
Q Well, you indicated earlier that you were involved in the -- were you involved in the preparation of the 1988 mission plan amendment?
A Not that I recall. I believe I was doing

257

quality assurance at that time.
Q But you were involved in the preparation of the '87 mission plan amendment, correct?
A Probably. Only peripherally. I was not a major -- I would have provided the transportation work and I probably had seen it for review, but I -- but the '88 -- this '88 ACR I did not personally, was not personally involved in nor was I a reviewer nor did I know it said that.
Q When you testified that "it was not my understanding that that was the department's position at that time," specifically what position are you referring to?
A That this section you had me read implies that the department would not accept any waste until the year 2003.
Q And prior to today you were never aware that the department took that position in 1988, correct?
MR. CRAWFORD: Objection, vague. Objection, mischaracterizes his prior testimony.
A I was not aware of that. Because it was

258

always our intention to work with a volunteer to allow us to be able to receive materials in 1998.
Q So do I take it that if you had reviewed this document, Exhibit 9, in June 1988, you likely would have objected to the contents of page five that we are now reviewing?
MR. CRAWFORD: Objection, assumes facts not in evidence. Objection to foundation.
A I would not have objected. I would have made my opinion known to Ed Kay.
Q And you would have said to Mr. Kay what?
A I was saying --
MR. CRAWFORD: Objection. Calls for speculation.
A I would have said, are you -- you know, this is strong. I would still have tried to put more emphasis on the volunteer to achieve a '98 date, but, again, my responsibility at that time was quality assurance, not this.
Q Did you say something this is strong? I didn't hear you.
A I said I would have given him my opinion

259

that this was not strong enough that in our intention to try to work with a volunteer. Maybe it's somewhere else on another page that we haven't looked at. Reading the selective page here on five gives the impression that we were not trying to achieve a '98 date. And I think we were.
Q But you agree that the document, the portion of the document you're looking at is contrary to that view, correct?
A That portion --
MR. CRAWFORD: Objection, best evidence.
A -- appears to be.
Q Turn your attention to page six, the impacts of nuclear waste policy amendments of 1987. Do you see that?
A Yes.
Q The first sentence is, "The amendments act of 1987 could affect both the purchasers and the DOE in implementing the contract." Do you see that?
A Yes.
Q I take it the purchasers is referring to the nuclear utilities that entered into contracts with

260

the Department of Energy, correct?
MR. CRAWFORD: Objection to the foundation.
A That's my understanding.
Q How in your knowledge or in your view could the amendments act of '87 have affected the purchasers?
MR. CRAWFORD: Objection to the foundation. Objection, calls for speculation.
A By making it more difficult for the department to achieve a 1998 date.
Q And how would that have affected the purchasers.
A If we could not select a place by law we couldn't move the fuel, therefore the fuel would remain there longer.
Q And that would have what impact on the purchasers?
MR. CRAWFORD: Objection as to speculation. Objection to the foundation.
A Primarily one of cost, that they would have to store the fuel.
Q Additional cost?

A Additional cost.
Q Costs in addition to those that would have been incurred had the repository been up and running by January 31st, 1998, correct?
MR. CRAWFORD: Objection to foundation. Objection to the extent it calls for speculation.
A The system running by 1998, being the repository and MRS.
Q So you're referring to costs, additional costs that would have been sustained by the utilities -- you're referring to additional costs that would have been sustained by the utilities that would not have been incurred had the waste management system been up and running by January 31st, 1998, correct?
A Correct.
Q Please turn to page seven. First full paragraph. Actually, would you take a moment, please, to read that, the two paragraphs on page seven.
A Okay.
Q Did your office attempt to quantify the projected increase in the purchasers' need for at-reactor storage as a result of the delay in the



start of the WMS facilities from '98 to 2003?
MR. CRAWFORD: Objection, vague. Objection to foundation.
A At this time I was in the quality assurance program, so my office, which was the quality assurance program, didn't do any of that. So I don't know what others did. I didn't.
Q And sitting here today you are not aware of whether the office of which you are now deputy director ever undertook such a study?
A I'm not aware of one, if it was done.
Q Are you familiar with the study that the Department of Energy conducted with respect to the impacts of dry cask storage at SNF reactor sites?
A The only studies I'm aware of were a series of studies that were done for the MRS commission that was established by the amendments act, thereabouts back in the late eighties. So a lot of studies were done involving fuel and fuel storage with and without MRSs in the late eighties. Other than that, I don't know of anything.
(Deposition Exhibit Barrett 12 was marked



for identification and was retained by counsel.)
Q Mr. Barrett, the reporter has handed you a document marked for identification as Exhibit Number 12, which is the draft 1988 mission plan amendment. Do you have that before you?
A Yes.
Q Did you play any role in the preparation of this mission plan amendment?
A I don't think so.
Q Did you --
A I don't think so.
Q Have you ever read this, any portion of this draft mission plan amendment prior to today?
A I might have read pieces of it but never as a complete document.
Q Do you know what pieces you would have read?
A No.
Q If I could ask you to look -- I'm sorry, you were going to say something?
A I'm just trying to think. I never worked on this much, but I might have been in this -- I was



in this office for awhile but, you know, circa '87, '88, '89, I don't remember when. But, anyway, I don't think I -- I don't recall it. Let me phrase it that way.
Q If you could look back again at Exhibit 9, page five?
A Nine?
Q That was a document we were just looking at.
A Page what?
Q Five.
A Page five. Yes.
Q You see under Table 2.1 it says "source, draft 1988 mission plan amendment"?
A Uh-huh.
Q That is Exhibit 12, correct? That refers to Exhibit 12. Do you see that?
A Yes, yes. Looks like it.
MR. CRAWFORD: Well, let me just object to best evidence.
Q Do you recall our discussion concerning page five a few moments ago?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-1:
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-4
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484(
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-48(
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-11
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Tuesday, April 23, 2002
9:36 a.m.

Job No.: 11792-5
Pages 273 through 526, Volume 2
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X



Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DU POWER, INDIANA MICHIGAN POWER COMPANY, BOST EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTH OF THE STATE OF NEW YORK, OMAHA PUBLIC POWEF DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 893-0527

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
JEFFREY L. HANDWERKER, ESQUIRE
HOWARD CAYNE, ESQUIRE
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFF COMMONWEALTH EDISON COMPANY:

DONALD R. CASSLING, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350



A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC POWER COMPANY:

SUZETTE W. DERREVERE, ESQUIRE
PERKINS COIE LLP
607 14th Street, Northwest
Washington, D. C. 20005-2011
(202) 628-6600

ON BEHALF OF DEFENDANT UNITED STATES:

KEVIN B. CRAWFORD, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #12128
Washington, D. C. 20530
(202) 307-1011



A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF DEFENDANT UNITED STATES:

HEIDE L. HERRMANN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D. C. 20530
(202) 307-0290



C O N T E N T S

EXAMINATION OF LAKE H. BARRETT PAGE
By Mr. Cayne 282

E X H I B I T S

(Retained by counsel.)

BARRETT DEPOSITION EXHIBIT PAGE
13 Memorandum dated 1/28/88, subject: Assumptions for 1988 TSLCC 286
14 June 1983 Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High Level Radioactive Waste 315
15 Routing Slip with attached memo re: Document Change Proposal to Baseline, the Proposed Waste Acceptance Schedule 350
16 Document dated 11/30/82 signed by Lake Barrett 379
17 Document entitled Nuclear Waste PA-172230 through PA-172270 425

still the same if it was to the MRS or to the repository.
Q Let me ask you, with respect to the MRS would a ramp-up rate over a period from 2003 to 2008 from 400 to 3,000 have been reasonable as a technical and -- as a technical and systematic matter?
A Probably so, but I don't recall or know what the repository design was envisioned at that point, if there was some reason why they couldn't go higher than 400 in the first three years. There may have been one; I just don't know what it would have been.
Q So there could be repository designs that would allow a first-year acceptance rate higher than 400 MTUs, correct?
A There could have been.
Q Have any of the repository designs that you have dealt with over the past 15 or so years been consistent with an acceptance rate in excess of 400 MTU per year?
MR. CRAWFORD: Objection to the foundation. Assumes facts not in evidence.



A I don't know, because at one time my recollection is that the repository receiving facilities were built in two phases. Phase one was a nominal 400 rate capability building, and then a second building came on later that brought it to the nominal 3,000 type number. So there may have been a good reason why it was limited to 400.
Q Sitting here today are you familiar with any particular reason why the first-year acceptance rate at a repository would have to be limited to 400 MTU?
A From a technical perspective you could have built it, designed it at a 300 rate, a 400 rate or a 500 rate. I don't know why they chose a 400 rate.
Q From a technical perspective could you have designed it at a 1200 first-year acceptance rate?
A I believe you could have. I think you would have paid a very high cost in construction time penalty for building it three times larger.
Q What about 800 MTU per year for a first-year acceptance rate?
A It's somewhere in between the other two.



There would have been a lesser cost and schedule penalty for building it that large.
(Deposition Exhibit Barrett 14 was marked for identification and was retained by counsel.)
Q Mr. Barrett, the court reporter has handed to you a document marked for identification as Exhibit 14 which is the June 1983 report on financing the disposal of commercial spent nuclear fuel and processed high level radioactive waste. Do you have that report before you?
A Yes.
Q I would like to turn your attention, and feel free to review any portion of the report that will help you respond to my questions. I would like to refer your attention to page 11 of this report. Are you at page 11?
A Yes.
Q A moment ago you were referring to an earlier proposal in which there would be two repositories. Do you recall that testimony a moment ago?
A Generally.



Q And does this indicate that in 1983 the department was actively considering a two-repository proposal? And, again, take your time to review whatever you need on this document.
A It appears to be.
MR. CRAWFORD: Objection, vague.
Q And am I correct that in this 1983 proposal the first repository would commence operations at a 1,800 MTU annual acceptance rate?
A It appears to be.
Q Do you have any reason to believe that the officials of the department who prepared this report on financing the disposal of commercial spent nuclear fuel would have projected an 1800 annual acceptance rate had they not determined that such an acceptance rate was feasible as a technical and systematic matter?
MR. CRAWFORD: Objection to the foundation. Objection to the extent it calls for speculation.
A I don't know.
Q You don't know if you have any reason to believe?

Also I would expect coordination with the Office of Management and Budget. Also, depending on what it would be, sign-off by the general counsel.

Q What would the review by the Office of Repository involve?

A It my case it would be the Yucca Mountain project office, that the technical aspects of the report was consistent with the technical baseline and policies of the office.

Q So I take it line officers on the staff of the Office of Repository would carefully analyze this document to make the determinations you just referred to, correct?

MR. CRAWFORD: Objection to the extent it calls for speculation.

A And the procedures that I had in place, yes.

Q Do you have any reason to believe similar procedures were not undertaken in connection with the issuance of this report ultimately by the Office of the Secretary of the Department of Energy?

MR. CRAWFORD: Objection to the extent it



calls for speculation.

A I think it's a rather -- I don't know what they did then.

Q And, again, you before today never heard of an entity denominated as the Nuclear Waste Policy Act Project Office, correct?

MR. CRAWFORD: Objection. Asked and answered.

A I never knew what that was.

Q Have you ever heard of it before today?

A No.

Q Do you recall yesterday, Mr. Barrett, I inquired whether the determination by your office of the adequacy of the fees assessed on the utilities, in connection with the determination of that adequacy, whether your office considered different assumptions about the acceptance rate?

MR. CRAWFORD: Objection, vague. Objection to the extent it mischaracterizes any of his prior testimony.

A Very vaguely.

Q Do you recall the answer you gave to the



question I asked?

A No.

MR. CRAWFORD: Objection, foundation.

Q Could I turn your attention to page one of Exhibit 13?

A 13?

Q Yes.

A What page?

Q Page one.

A Page one of the attachment to --

Q Yes.

Now, in the first paragraph, take a moment to read the first paragraph, please.

A This is where it says A, waste type?

Q Oh, I'm sorry, I'm on page one which is the --

A You're on 14.

MR. CRAWFORD: No, no.

Q I'm on 14, you're right. I'm sorry, I misspoke. 14.

A Page one.

Q 14.



A Of page 14.

Q Please read the first paragraph.

A Okay, I've read it.

Q Now, based on that portion of this document you just reviewed, do you understand that this document evaluates whether collection of the fee from the operators of nuclear reactors will provide sufficient revenues to offset the cost of disposal of commercially generated nuclear waste?

A Yes.

Q Okay. Now, I would like to turn your attention to page nine of this same document. And once again, feel free to review any portion of this document in answering my question. Do you see that Table 3-1 is called Key Reference Case Assumptions?

A Yes.

Q And do you see that one of the key assumptions considered by the Office of the Secretary in evaluating the adequacy of the fee was the repository design receipt rates? And that would be number three. Do you see that?

A I see it says that.

Q Is that inconsistent with your understanding, Mr. Barrett, that in determining the adequacy of the fees imposed by the Department of Energy on operators of nuclear reactors that the department would consider repository receipt or acceptance rates?
MR. CRAWFORD: Objection to the foundation. Objection, vague.
A Say the question again.
Q Is it inconsistent with your understanding, Mr. Barrett, that in determining the adequacy of fees assessed against nuclear utilities that the Department of Energy would consider repository acceptance rates?
MR. CRAWFORD: Objection, vague.
A No, it's not inconsistent.
Q And can you tell me based on your understanding what is the relevance to the Department of Energy of repository acceptance rates in determining the adequacy of fees assessed against operators of nuclear reactors?
MR. CRAWFORD: Objection, vague.
A To determine if the fee is adequate you



need to know when the costs are incurred. So timing of the costs are important in knowing what the fee adequacy situation is.
Q And how does that relate to the repository acceptance rate?
A Earlier, higher receipt rates cost more earlier at high level, therefore they influence the fee adequacy calculations.
Q In this fee adequacy assessment the Secretary's office projected a 3,000 per annum acceptance rate, 3,000 MTU per annum acceptance rate, correct?
MR. CRAWFORD: Objection to the foundation and objection, best evidence. Are you talking about acceptance rate or design receipt rate? Which one are you talking about? You keep switching back and forth.
Q Do you understand there to be a difference, Mr. Barrett, between design receipt rate and acceptance rate?
A Yes.
Q What is the difference?
A The design receipt rate is what you design



the facility to be capable to do. The acceptance rate is what it will end up being.
Q And you understand it -- it's your understanding that the design receipt rate is a pertinent or a key assumption in the effort by the Department of Energy to assess the adequacy of fees imposed upon owners of nuclear generators, correct?
A Yes.
MR. CRAWFORD: Objection, vague.
Q And in this particular assessment by the Office of the Secretary on the adequacy of fees, the Office of the Secretary projected a repository design receipt rate of 1800 MTUs per year for the first five years and 3,000 MTUs per year for the 21 years following, correct?
MR. CRAWFORD: Objection. Best evidence.
A That's what it says.
Q And it is your understanding that different repository design receipt rates could have an effect on the adequacy of the fees assessed, correct?
A It could.
Q Let me ask you, what effect would it have



had on the adequacy of the fee assessed if the repository design receipt rate had been 900 MTUs per year for 26 years?
MR. CRAWFORD: Objection, vague.
A Repeat that again.
Q What effect would it have had on the department's assessment of the adequacy of fees imposed against operators of nuclear reactors if the repository design receipt rate had been 900 MTUs per year?
A It would have improved the adequacy.
Q It would have improved the adequacy?
A Yes.
Q And why is that?
A Because expenditures would have been lower earlier, so therefore the costs would be less.
Q How long would the repository have been required to operate in order to reduce the backlog of spent nuclear fuel had the repository design receipt rate been established at 900 MTU per year?
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the foundation.

A Longer.
Q How much longer?
MR. CRAWFORD: Objection. Same objections.
A I don't know. I would have to calculate. It would be longer.
Q Forever?
MR. CRAWFORD: Same objections.
A It depends on -- if the removal rate is less than the production rate, then it doesn't close until the reactors close and then it catches up eventually.
Q Well, isn't it your understanding as the former acting director of the office and today deputy director that a 900 MTU repository design receipt rate would not be sufficiently high to reduce the existing backlog of spent nuclear fuel?
MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for speculation.
A It's a function of time.
Q What do you mean by that?
A It would take a much longer time at 900 than say at 3,000 to work off the backlog. When the



reactors run their licensed lifetimes and close, eventually you'll catch up.
Q Well, would it take perhaps in excess of 80 to 90 years to work off the backlog with the repository design receipt rate established at 900 MTUs per year?
MR. CRAWFORD: Same objection.
Q Probably? Could it have been more?
A Could be.
Q Well, does that -- would that fact -- let me step back. Under a repository design receipt rate of 1800 per year for the first five years and 3,000 MTUs per year for the next 21 years, it would have taken how long to work off the backlog?
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the foundation.
A I don't know.
Q Would it have taken approximately 26 years?
MR. CRAWFORD: Same objections. Argumentative.
A I don't know.
Q Is that conceivable to you?



MR. CRAWFORD: Asked and answered. The same objections, argumentative.
A Could be.
Q Do you think it would be likely to have been less than 30 years?
MR. CRAWFORD: Same objections.
A I haven't done the calculation, but it's going to be the higher the receipt rate, the faster you work off the backlog.
Q I'm asking based on your knowledge of the backlog does it seem likely to you as the deputy director of this office, former acting director that the backlog could have been worked off in 30 years at the repository design receipt rates referenced in Table 3-1 of Exhibit 14?
MR. CRAWFORD: Same objections.
A I don't know exactly if it's less than 30, more than 30. I would have to calculate that out.
Q But does 30 strike you as a fair approximation?
MR. CRAWFORD: Same objections.
Q Sitting here today.



A It's in that order.
Q In that ballpark. So let's go back to the initial inquiry about the fee assessment adequacy. The program is supposed to operate on a full cost recovery basis, correct?
A Correct.
Q Under the scenario laid out in Exhibit 14, the repository would have had to operate in the ballpark of 30 years, correct?
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the foundation. Objection, asked and answered.
A Filled with lots of assumptions, yes.
Q Filled with what assumptions?
A Well, how long does nuclear power continue or not?
Q But based on the assumptions referenced in Exhibit 14, the repository would have been required to operate in the ballpark of 30 years, correct?
MR. CRAWFORD: Same objections.
A To do what?
Q To eliminate the backlog of spent nuclear

fuel.
MR. CRAWFORD: Same objections.
A Probably.
Q Probably. Now, let's return to the scenario I asked you to consider a few moments ago, that the repository design receipt rate is set at a level of 900 MTUs. Do you recall we discussed that?
A Yes.
Q And do you recall that you indicated that in order to eliminate the backlog under an annual receipt rate of 900 MTUs, it could take 80, 90, even more years? Do you recall that?
MR. CRAWFORD: Objection to the foundation. Objection to the hypothetical.
A It will take considerably longer at 900 versus the 3,000.
Q Wouldn't that fact that it would take considerably longer have an effect on the adequacy of the fee assessment in light of your testimony that the program was intended to be operated on a full cost recovery basis?
MR. CRAWFORD: Objection to the form.



Objection, vague.
A Not necessarily.
Q And why did you say that, sir?
A Because it all depends upon the amount of capital is there, the return on the investment versus the expenditures. There are different scenarios that were timed generally is on the side to make the fee more adequate.
Q But are there definitely scenarios that you can envision sitting here today, Mr. Barrett, that a repository design receipt rate set at 900 MTUs would have required the Department of Energy to have imposed a higher fee assessment upon the operators of nuclear reactors?
MR. CRAWFORD: Objection to the foundation. Objection, vague.
A Repeat the question again.
Q Certainly. Sitting here today can you identify scenarios under which a repository design rate set at 900 MTUs per year would have required the Department of Energy to have imposed a higher fee assessment upon the operators of nuclear reactors,



higher than the fee assessment that in actuality was imposed by the department?
A No.
Q You don't see any circumstance in which the fact that the department would be required to operate the repository for 80, 90 or more years as opposed to in the ballpark of 30 years would require the assessment of higher fees. Is that your testimony?
A Yes.
Q And what is the basis of that testimony?
A Because the rate of return on the monies not spent would more than pay for the additional costs due to the extended time because this program is front-end loaded dollarwise, it is not back-end loaded dollarwise. So I cannot -- at those low expenditure rates of a 900-ton-per-year system you most likely -- the value of the time of your investments would exceed your costs so that your fee adequacy is probably better. The only exception where you would get into trouble with that in finance space would be if there were other costs on the waste fund that are not part of the system. Such as damages.



Q Is it your testimony then that it would have been less costly for the Department of Energy to operate a repository for a period of 80, 90 or more years than it would have been for the department to operate a repository in the ballpark of 30 years?
MR. CRAWFORD: Objection to the foundation. Objection, vague.
A No.
Q In fact, it would have been much more expensive to the department to operate the repository for a period of 80, 90 or more years as contrasted with operations in the ballpark of 30 years, correct?
A Yes.
Q Are you aware of any TSLCC or fee adequacy study undertaken at any time that assumed a repository design receipt rate of 900 MTUs per year on a steady state basis?
A No.
Q Are you aware of any TSLCC or fee adequacy study that assumed a 900 MTU per year acceptance rate on a steady state basis?
A No.

Q In fact, Mr. Barrett, to your knowledge have not all of the TSLCC and fee adequacy studies assumed 3,000 MTU per year acceptance rates or repository design receipt rates?
MR. CRAWFORD: Objection to the foundation.
Q To your knowledge, sir.
A Repeat the question again.
Q To your knowledge, Mr. Barrett, have all TSLCC or fee adequacy studies issued on or after 1982 assumed a 3,000 per annum MTU acceptance rate or a repository design receipt rate?
MR. CRAWFORD: Objection to the foundation.
A Some had more.
Q Some had more? Which ones had more?
A Ones that had two repositories in it had rates higher than 3,000.
Q What was the highest annual aggregate rate of any of the TSLCC or fee adequacy studies that you're referring to?
MR. CRAWFORD: Objection. Best evidence.
A Some of the earlier ones, pre-'87, had two repositories at steady state which would run higher at



nominal 6,000 tons.
Q Per year?
A Per year. All recent ones, since '87 or so to my knowledge are basically steady state at 3,000.
Q And by recent ones -- I'm sorry.
A In the 1990s the TSLCCs had a state steady receipt rate at 3,000 tons per year.
Q And what about the most recent study?
A I believe the most recent ones --
MR. CRAWFORD: Objection, best evidence.
A -- is 3,000 tons per year steady state.
(Deposition Exhibit Barrett 15 was marked for identification and was retained by counsel.)
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 15, which is a multipage document, the first page of which is a routing and transmittal slip directed to L. Barrett, J. Hale, S. Brocoum, B-r-o-c-o-u-m, A. Brownstein, B-r-o-w-n-s-t-e-i-n, W. Danker, D-a-n-k-e-r, MRS team and D. Shelor, S-h-e-l-o-r. And attached to that is a multipage memorandum that the subject line reads "Document Change Proposal to



Baseline, the Proposed Waste Acceptance Schedule." Do you have that document before you?
A Yes.
MR. CRAWFORD: Howard, why don't we go ahead and note the Bates range on the record.
MR. CAYNE: The Bates range of this document is CTR-045-1032 -- doesn't look like it's in -- these numbers are off.
MR. CRAWFORD: I think it's 1041 is probably the last one.
MR. CAYNE: That's correct.
Q Do you have that document, Mr. Barrett?
A Yes.
Q Could you identify for me who S. Brocoum is?
A He worked in the Office of Geologic Repositories at that time.
Q What was his position?
A I don't recall what his title was.
Q Who is W. Danker?
A He worked on international matters. That's all I remember.



Q And who is D. Shelor?
A He worked storage and systems engineering work.
Q Who is Joe Daly?
A He was a cost analysis type person. Cost analyst I guess is the right term.
Q Is this your writing on the first page?
A No, it is not.
Q Are you able to read the handwriting under the black box in the upper left-hand side of this page?
A No.
Q Looks to me like "handed over," but I'm not certain.
A I don't know what that says. No, I can't figure that out. "Over" looks like the last word. The front part of that, I don't know what it is.
Q Have you seen this document and the attached memorandum in the past?
A I don't recall ever seeing it.
Q You don't recall ever seeing the attached memorandum? Did you not write the attached

you in analyzing the paragraph that reference starts "Table 1 compares"? And specifically what I am asking, does this, the proposed schedule, the statement that the proposed schedule would eliminate storage needs for all reactors who over spill, was that statement made on the assumption that the acceptance schedule would advance reactors in an overspill situation to the front of the priority queue?

MR. CRAWFORD: Objection to the form. Objection, vague.

A The answer is I don't know.

Q Do you believe that it's likely based on your personal understanding of the situation as it existed in 1990?

MR. CRAWFORD: Objection to the form. Objection, vague.

A I don't know. Let me read this paragraph.

Q Certainly. Take your time.

A What is your question again?

Q My question is do you believe that the way the proposed acceptance schedule would have eliminated



storage needs for all reactors in overspill situation after '97 would have been to use the exception authority that you've referred to in order to advance those reactors to the front of the priority queue?

A I don't know.

Q Do you believe that is likely what is intended here based on your knowledge of the issue as the issue existed in the time frame of 1990?

MR. CRAWFORD: Objection to the foundation.

A Probably.

MR. CRAWFORD: Can we take a lunch break at this time?

MR. CAYNE: Certainly. It's twelve o'clock. Why don't we reconvene at one.

(A luncheon recess is taken.)



AFTERNOON SESSION

(Deposition Exhibit Barrett 16 was marked for identification and was retained by counsel.)

Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 16, which is an exhibit, document dated November 30th, 1982, signed by Lake Barrett.

MR. CRAWFORD: Wait a minute. November 30th, 1989.

MR. CAYNE: I'm sorry.

MR. HANDWERKER: It's '89.

Q You're correct, '89. Starting with Bates number PNL-017-3359 continuing through PNL-017-3365. Do you have that document before you?

A I do.

Q Is that your signature on the first page?

A It looks like it.

Q First I would like to ask you who a few people are. Turn to the cc list.

A Yes.

Q Who is F. Peters?

A Frank Peters. He was the deputy director



then.

Q Deputy director of?

A RW, Office of Civilian Radioactive Waste Management otherwise known as RW.

Q Who is R. Stein?

A Ralph Stein. He worked geologic repository program.

Q Who is J. B-r-e-s-e-e?

A James Bresee. He was admin deputy director or something.

Q Deputy director of what?

A Admin. Admin.

Q What is admin?

A Administration, you know, finance. He was -- he worked administration.

Q Who is J. Williams?

A Jeffrey Williams. He was an MRS team member at the time. He's now division director of systems engineering.

Q Do you know what position he held in 1989?

MR. CRAWFORD: Objection. Asked and answered.

385

A I think so. I mean, I think we did present our proposal that we believed an MRS was an advantage and would be useful.
Q Do you recall if the commission agreed with your view?
A My recollection is in the record what the report is. It was not very helpful.
Q I'm sorry, what was not very helpful?
A Their report was not very helpful in advancing the MRS.
Q And why do you say that?
A I don't remember. I just remember it wasn't very helpful. It was kind of convoluted. It wasn't helpful. That's my recollection.
Q It wasn't helpful because it disagreed with views, the views of your office?
MR. CRAWFORD: Objection. Asked and answered. Argumentative.
A It wasn't it disagreed, it just didn't -- just wasn't very helpful was my recollection. I haven't been involved in it for 13 some years and kind of forgot about it. I just remember that it wasn't

386

very helpful. Not that it disagreed with anything. It wasn't very helpful in advancing the case in the national policy setting for an MRS.
Q The commission's function was to prepare a formal case in support of the development of an MRS facility?
MR. CRAWFORD: Objection, calls for speculation, foundation.
A I don't remember what the commission charge was. I think it's in the statute.
Q What is this document, Exhibit 16?
A Looks like it was a review of what their report said by my staff.
Q Well, can I assume correctly, Mr. Barrett, that in light of the fact that your signature appears on this document that you at one time read this entire document?
A I might have. My signature appears on thousands of documents.
Q Is it your practice to execute documents, Mr. Barrett, that you have not personally reviewed?
A Sometimes.

387

Q What kind of documents do you execute, Mr. Barrett, that you have not reviewed?
MR. CRAWFORD: Objection. Vague.
A Things that I believe that I had complete trust and confidence in my staff that I didn't need to personally review it.
Q Would an evaluation of the MRS review commission report be the type of document that you would not feel compelled to personally review, Mr. Barrett, prior to affixing your signature to the document?
A Going from me to -- this is probably Sam Ruosso I think at the time, I might or might not have. I don't remember.
Q Do you believe you have ever read this document before today?
MR. CRAWFORD: Objection. Asked and answered.
A I don't recall.
Q Do you think it's more likely than not that you read this document prior to today?
MR. CRAWFORD: Objection. Asked and

388

answered.
Q And take your time to review the document to see if that refreshes your recollection, sir.
A It's 13 years ago. I don't remember. I might have read it; I might not have.
Q Did you draft the letter that you signed?
A No.
Q Who would have drafted it for you?
A I don't recall.
Q Do you think you would have read at least the letter that you signed?
A Probably. I would have scanned -- I would probably have read the letter or scanned it anyway.
Q Why did your office prepare an evaluation of the MRS review commission report? Was that pursuant to your direction?
A Probably so.
Q Why did you direct your office to evaluate the report compiled by the MRS review commission?
A Probably because it was appropriate to do and maybe my -- probably the boss asked for it.
Q Boss being?

A Ruosso, who was the acting director.
Q Do you believe you may have participated in any way in the preparation of this report, even if you have not read it in its entirety?
A I'm sure I did.
Q How would you have participated in the preparation of this report?
A I'm sure we would have discussed the MRS report and about what it would say before we sent this on.
Q Who would have discussed it?
A Myself and my staff.
Q So in the course of those discussions you would have informed yourself, would you not have, of the contents of this document?
MR. CRAWFORD: Objection, vague.
A I'm sure before I signed this I would have had a general management concept of what was in it, yes.
Q In fact, based on your level of participation you likely had a very good concept of what was in this report before you executed the



transmittal memorandum, correct, sir?
MR. CRAWFORD: Objection. Asked and answered.
Q Correct, sir?
A I would have had -- I'm sure I had a good understanding of what was in there.
Q Thank you. And I assume not only did you have a good understanding of what was in this document, Exhibit 16, I assume you would have agreed with its contents or else you would not have affixed your signature as acting associate director for facilities siting and development, correct, Mr. Barrett?
MR. CRAWFORD: Objection, argumentative, asked and answered.
Q Is that a fair statement, Mr. Barrett?
A Fair statement.
Q Thank you. Turn your attention to the second page of this exhibit. It begins "summary." Do you see that?
A It begins "summary"? No. Second -- page two of the attachment?



Q No, no. Second page of the document.
A Oh, okay. Go ahead.
Q In the first paragraph, about two-thirds of the way through there's a sentence, "The MRS commission recommended that a federal emergency storage facility and user-funded interim storage facility be developed without linkages to the repository schedule." Do you see that statement?
A Yes.
Q Do you understand what that statement means?
A Vaguely.
Q Well, can you give me your understanding of that statement, Mr. Barrett?
A The MRS commission recommended that these type emergency facility and user-funded facility, you know, be developed or be considered or something to that effect. And that's what it says.
Q What does it mean that it be developed without linkages to the repository schedule?
MR. CRAWFORD: Objection. Best evidence.
A Well, it means that it would not be an MRS



which had the linkages in it.
Q Is this referring to the linkages established by the 1987 amendment to the Nuclear Waste Policy Act?
MR. CRAWFORD: Objection. Best evidence.
A That would be a reasonable interpretation of that.
Q Based on your participation in the preparation of this document, don't you think that that is a correct statement, sir?
A Probably is.
Q And why did the commission recommend that the facility be developed without linkages to the repository schedule?
MR. CRAWFORD: Objection. Calls for speculation.
A I don't recall.
Q Wasn't that your view also at the time?
A That what?
Q An MRS facility should be developed but it should be developed unburdened by the linkages established and required by the 1987 amendments to the

Nuclear Waste Policy Act of 1982?
MR. CRAWFORD: Objection as to form. Objection, vague.
A That would have been my preference, but the MRS commission was independent and they didn't say break the linkages. They said build different types of facilities that had a total different title to them. They were emergency storage facility and interim storage facility, user-funded one. These were not MRSs.
Q Would these facilities have been -- did you believe that these facilities were intended to be permanent storage sites?
MR. CRAWFORD: Objection. Foundation.
A No.
Q Why did you not agree with this proposal?
MR. CRAWFORD: Objection. Form, argumentative, mischaracterizes --
A I didn't say I didn't agree with it. I don't think it was very practicable.
Q Why was it not practicable?
A My recollection is, I go back, it required



long changes. It required utilities to go pay for it -- identified they would have to go pay for it extra. Okay. You would have to have it under an emergency condition and all sort of computations on what is an emergency. So it was not very helpful. Okay, and not very practicable.
Q Why is it not practicable or helpful to propose something that's going to require congressional action in your view, sir?
MR. CRAWFORD: Objection to the form. Objection to the foundation.
A Repeat the question again.
Q Why is it not practicable or helpful to propose something that's going to require congressional action in your view, Mr. Barrett?
A Because it would -- to bring statutes -- to bring a statute to fruition would require both the Senate and the House and the President, and under this circumstance it was never going to happen.
Q It's a difficult process, isn't it, the legislative process?
A Very.



Q And there's never any certainty that the legislature is going to act, is there?
A Correct.
Q And even if it acts, as we saw yesterday with respect to the proposal by the Department of Energy in 1987 with respect to certain proposed linkages, the Congress may change the proposal and enact something you find less likeable, correct?
A Correct.
Q So there are dangers in proceeding with the legislative route in order to fulfill your goals, correct?
A More or less, yes.
Q And it was based on those dangers and difficulties that you found this proposal by the MRS commission not to be helpful or practicable. Is that your testimony, sir?
MR. CRAWFORD: Objection to the extent it mischaracterizes. Objection to the vagueness of the question.
A I think you overstated that.
Q What did I overstate, sir?



A Whatever you said.
Q What I said is and it was based on those legislative dangers and difficulties that you found this proposal by the MRS commission not to be helpful or practicable. Is that your testimony?
A I wouldn't use -- I didn't use the word "danger." I don't think it was very likely that this was going to pass as opposed, you know, other types of scenarios have a greater probability of being approved. This one I didn't think had much of a chance.
Q Well, let me change the words I used. And it was based on the significant difficulties posed by the necessity of obtaining federal legislation to implement the proposal made by the commission that you found the proposal not to be helpful or practicable, correct?
MR. CRAWFORD: Objection to the foundation.
Q Correct, Mr. Barrett?
A Close enough.
Q Close enough to be correct, sir?
A Yes.

THE WITNESS: Can we take a break?
MR. CAYNE: Certainly.
THE WITNESS: About 60 seconds.
(There is a recess from the record.)
A Before we start with the next question, I would like to revisit something.
Q Mr. Barrett, before you speak, let me ask you, since we broke a few moments ago, have you spoken with your counsel concerning your testimony that you just provided?
MR. CRAWFORD: Yeah.
A Yes.
Q Please proceed.
A Okay. My concern here, I'll give you -- you asked a question; I'll give you an answer. You will restate the questions -- my answers, excuse me, slightly differently. You will introduce words that I did not use. And then you ask me to say yes or no to that. Okay. I don't like your recharacterizing my answer differently than I did. And it puts me in a position I don't want to say yes to something that's slightly different. Now, you may be close but they're



different. They're yours, not mine. I did not use the word "danger" in that previous series; you did. Okay. But you're recasting them all slightly different, and I think, that's my perception, setting up a record and putting words in this that I don't necessarily agree to. It's going to take a long time if we're going to go on every single phrase that you recast them because you don't like the way I answered it. That's a problem. All right? So I don't know how to work it out but...
Q I appreciate the lecture, Mr. Barrett. Let me explain to you this is the process of examination in a judicial proceeding. I ask you the questions. The issue is not whether you like or enjoy the question. Your job here today is to provide the best, most honest, most direct answer. If you think I misstated something, you point it out to me. If you don't like the terms I use, you make that clear in your answer. Okay, sir? I am attempting to determine factual issues to be used in the trial of this proceeding, and I have to ask the questions the way I deem best. You have to give me your most direct and



honest questions. Do you understand the process, sir?
A I understand the process.
Q Thank you, sir.
I would like to turn your attention to page two of the same exhibit.
A Page two or page two of the attachment?
Q Page two of the attachment. Can you take a look at the first paragraph on the top of page two.
A Yes.
Q Take a moment to read it.
MR. CAYNE: Let me state that Steve Cohn, C-o-h-n, counsel for Sacramento Municipal Utility District has entered the deposition room.
A So you want me to read the paragraph on top of page two?
Q Yes. Have you had a chance to read it?
A Yes.
Q Do you agree with the statement contained in that paragraph?
MR. CRAWFORD: Objection, vague.
A The points one, two, and three?
Q Let's go through it. It states that "the



commission recognized the perceived concern that an unlinked MRS facility might be recorded as a de facto repository." Do you see that?
A I see that.
Q Did you share that concern at the time of this memorandum?
A I had no opinion. That was a statement from the commission.
Q But did you as an individual, sir, as the director or acting director of RW have a concern that an MRS unlinked to a permanent repository might in fact be regarded as a de facto repository?
A I wasn't the director or the acting director.
Q In the capacity that you held at this time did you have that concern?
A I knew that was -- it was a policy issue in the United States Congress.
Q Did you have a view on that issue of any type?
MR. CRAWFORD: Objection. Asked and answered.

A There was an issue that I knew existed. It was immaterial what I personally felt one way or the other.
Q Fine. But my question, Mr. Barrett, is whether you personally had a view on that question, not whether or not your view was material to anything.
A I wished that Congress didn't have such a strong view about it, but that's what they had and that's the way it was.
Q Why did you wish that Congress did not have such a strong view about it?
A Because it really restricted our ability to take material into federal responsibility.
Q You're referring to the linkages imposed by the 1987 amendments to the Nuclear Waste Policy Act of 1982, correct?
A Correct. That's what this says.
Q And that was your view?
A Yes.
Q Do you understand the statement "and notwithstanding their finding that there is no technical basis for the linkages between the MRS and



the repository," do you know what that statement means?
A I don't know what it means.
Q You have no idea whatsoever?
A I can surmise what it means.
Q Well, what is your professional surmise, sir?
MR. CRAWFORD: Well, objection to the form.
Q Please answer the question, Mr. Barrett.
A All right. There is no technical reason for linkage other than the perception of the host of the storage facility that it is unfair for it to be there because it will stay for a long time and it may stay there forever, therefore they wanted, from a policy matter, a statutory linkage that prevented it from happening.
Q Does that mean that there was no technical basis for the provisions of the 1987 amendments to the Nuclear Waste Policy Act that imposed the linkages between the construction and operation of a permanent repository and the construction and operation of an MRS facility?



A Yes.
MR. CRAWFORD: Objection. Foundation.
Q What is the term "technical basis," what do you understand that term to refer to?
A That there's no scientific nor -- there's no technical or scientific reason that there needs to be a linkage.
Q So to be blunt, the linkages involve pure politics. Is that what you're saying?
MR. CRAWFORD: Objection. That's not what he's saying.
A Pure policy.
Q Pure policy?
A Policy.
MR. CAYNE: And I object to counsel for the government advising the witness as to what he has said or hasn't said or how he should testify. That is totally improper.
MR. CRAWFORD: It's proper for me to say when you're mischaracterizing what he said.
MR. CAYNE: It's totally improper, counsel.
MR. CRAWFORD: No, it's not.



Q I would like to direct your attention to the next section on page two, "DOE generally agrees with the commission's conclusions." Do you see that?
A Yes.
Q The paragraph has a statement, "The commission found that while no single factor could favor an MRS over the no-MRS option, cumulatively" --
A Excuse me. Are you reading here?
Q Under "DOE generally agrees with the commission's conclusions" on page two of the exhibit.
A Halfway down or --
Q Oh, about five lines down. Do you see that?
A Right. Start again.
Q "The commission found that while no single factor would favor an MRS over the no-MRS option, cumulatively the advantages of an MRS would justify the building of an MRS if, one, there were no linkages of between the MRS and the repository." Do you see that?
A Yes.
Q Do you agree with that statement?

A Yes, I do.
Q You agree strongly with that statement, don't you?
A I agree with that statement.
Q And then it continues. It states that "The commission found that while no single factor would favor an MRS over the no-MRS option, cumulatively the advantages of an MRS would justify the building of an MRS if," and the second factor is the MRS could be constructed at an early date. Do you agree with that statement?
A Yes.
MR. CRAWFORD: Objection to the form.
Q Yes?
A Yes.
Q And the third support provided is that the opening of the repository were delayed considerably beyond its present scheduled date of operation. Do you agree with that?
A I'm ambivalent about that.
Q Why are you ambivalent? I notice you making faces about that statement.



A No, because, you know, delayed considerably relative to what? I don't think it's as strong as the first two points.
Q So you don't think that it's a particularly strong factor in favor of the building of an MRS option that the permanent repository's construction would be delayed?
A Not as important as the first two.
Q Then it continues, sentence down, "DOE is proposing an MRS facility whose development is not linked to the repository schedule and which begins operation in 1998. The current repository schedule shows that a repository is now anticipated to be in operation approximately by the year 2010." Do you see that?
A Yes.
Q So notwithstanding your immediately prior testimony, the Department of Energy did in fact propose an MRS facility, the development of which was not linked to the delayed schedule of repository operations, correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony.



A Yes.
Q And did you personally support the establishment of an MRS facility, the operation of an MRS facility that would begin operations at -- which would begin a dozen years in advance of repository operations?
A Yes.
Q And why did you support that?
A Because I felt that it best enabled us to meet our intent of the act to remove the waste from the utilities, and with a volunteer we could do that, change the linkages.
Q Change the linkages.
A By statute.
Q Let's talk about the statute as it stood at this time in 1989. As the statute, as federal law stood in 1989 would it have been possible for the Department of Energy to establish an MRS facility, the operations of which would commence on January 31, 1998, when at that time the repository was not scheduled to be operational until 2010?



A Only with a change in the linkages to a volunteer site.
Q So my specific question is was it possible for that to occur without a change in the congressionally mandated linkages?
A I don't -- I would have to review the linkages again, but I don't think so.
Q Please do. I think they were Exhibits 10 and 11 from yesterday's session of the deposition. And take as much time as you need, Mr. Barrett, to refresh your recollection on the content of the linkages.
A Construction of the MRS could not.
Q Which exhibit are you looking at, sir?
A I'm looking at 11, D-1.
Q Exhibit 11?
A Yeah, Exhibit 11, D-1. MRS construction of such a facility, that's the MRS may not begin until the commission has issued a license for the construction of a repository -- construction of a repository. Under the schedule in 1989 the repository license -- the repository construction authorization

wasn't scheduled until after 1998, which would preclude a '98 fuel receipt.
Q The repository operation wasn't scheduled in 1989 to commence until the year 2010, correct?
A It says construction authorization.
Q Well, I just asked you about operation.
A That's correct.
Q The operations of the repository were not intended to commence until 2010, correct?
A That's correct.
Q And as it was then planned with a 2010 operation date, when was it anticipated that the repository -- the construction of the repository would be authorized?
A I don't recall, but I think it was something like 2005.
Q Somewhere between 2005 or somewhere between 2005 and 2007?
A Somewhere in there. I don't -- 2005 plus or minus a couple of years.
Q So based on the testimony you just provided, sir, am I correct that, returning your



attention to Exhibit 16, that the MRS facility referenced in the bottom of page two of the attachment to that exhibit, the MRS facility that is referred to there under the law that was in existence at that time could not begin operations until, at the earliest, sometime between the period 2005 and 2007, correct?
MR. CRAWFORD: Objection to the form of the question.
Q Correct, Mr. Barrett?
A Without any changes to the law, that is correct.
Q It is correct that the repository -- that the MRS facility could not become operational until sometime in the time frame 2005 and 2007?
A Under the statute currently in place, without a change.
Q And the statute currently in place was existing federal law, correct?
A The statute also provided for a volunteer process that could change the linkages.
Q And the volunteer process itself would require the enactment of additional federal



legislation, correct, Mr. Barrett?
A Correct.
Q And what is the nature of the additional federal legislation that would have been necessary in order to authorize a volunteer -- the siting of an MRS facility at a location owned by a volunteer?
A It would require proposal from the volunteer to the Congress with their proposal that could change the linkages.
Q And it would take federal law, an act of the United States Congress to both approve the linkages and to authorize the construction and operation of a facility on the location owned by the volunteer, correct?
A Basically, yes.
Q Let me rephrase my last question. And it would take federal law, an act of the United States Congress to either modify or eliminate -- to both modify or eliminate the linkages and to authorize the construction, operation of a facility on the location owned by the volunteer, correct?
A Close.



Q What is -- why only close, sir? And let's try to get it right.
A It's my recollection the facility was authorized by the amendment, so it didn't need to be reauthorized. So it was -- the MRS was already authorized by Congress. It didn't need to be reauthorized. There's something else in your statement that was close but not quite.
Q The Congress would have been required to either modify, substantially modify or eliminate the linkages, correct?
A And you used "or." The last time you used an "and."
Q Okay. Or?
A If you say it with "or" and "authorize," I agree.
Q And the volunteer would have to be approved, the siting of the facility at the location of the volunteer, and by volunteer you're referring to a volunteer state or Indian tribe, correct?
A Correct.
Q And the location of the volunteer state or

Indian tribe would also specifically have to be approved by affirmative federal legislation, correct?

A I don't know if the actual site had to. They had to change the linkages. They had to change the linkages. I'm not sure they actually had to approve the site.

Q You used the term "authorize." What did you mean by authorize?

A If you read the -- my recollection is if you read the amendments act of '87, they specifically authorize the construction of an MRS that did not exist in the '82 act. But then they put a limitation in the linkages that basically prevented us from ever building. But actually the construction was authorized in the amendments act. You can read it as a matter of record I believe.

Q Now, I believe you testified that an MRS would have been authorized or was authorized under the '87 legislation provided that the statutorily mandated links were satisfied, correct?

A That's my understanding.

Q And I'm referring to the links to the



repository, you understand that?

A Yes.

Q But did the '87 legislation authorize the construction and operation of an MRS facility that was not compliant with each of the links established by the 1987 amendments to the Nuclear Waste Policy Act of 1982?

MR. CRAWFORD: Objection, best evidence.

A I think the way you phrased that the answer is no.

Q Did you not understand the question?

A Your phraseology had a double negative in it, so I think the answer was no.

Q Let me try to ask the question again, because we want the record clear. Did the 1987 legislation authorize the construction and operation of an MRS facility that was not compliant with each of the links established by the 1987 amendment to the NWPA?

A No.

MR. CRAWFORD: Objection. Best evidence.

Q So you agree with me that such an MRS was



not lawful in 1989, correct?

MR. CRAWFORD: Objection. Asked and answered.

A The answer is yes.

Q And in fact --

A I do.

Q And, in fact, such an MRS never became lawful under the laws of the United States, correct?

A Yes.

Q Turn your attention to page four of Exhibit 16, please. The second full paragraph, Mr. Barrett. Are you there?

A Yes.

MR. CRAWFORD: What page?

MR. CAYNE: Page four of the attachment to Exhibit 16.

MR. CRAWFORD: Which paragraph are we on?

MR. CAYNE: The second full paragraph.

Q It starts, in conclusion number four, "The commission found that an MRS link as provided in the current law would not be justified, especially in light of uncertainties in completion time for the



repository." Do you agree with that statement or did you agree with that statement in 1989?

MR. CRAWFORD: Objection. Relevance.

A I don't recall what I felt in '89, but I basically agree with that.

Q And then it proceeds, "As a result of that conclusion the commission does not recommend a linked MRS as required by the current law." Do you now or did you then agree with that recommendation?

A Basically, yes.

Q Turn your attention to page five of the same document, the final paragraph. Towards the middle of the paragraph. And you can take your time again to read any part of this page or any part of this entire document that will assist you in responding to my inquiry. The part of the paragraph I'd like to focus your attention on is towards the middle. It states, "The capacity limit would be reached within a few short years, assuming any sort of reasonable acceptance rate for the waste management system." Do you see that statement?

A Yes.

consternation about what constitutes an emergency. So neither of those in my recollection did I consider practical. And we didn't pursue them.
Q What did you mean by the last statement, "The MRS review commission recommendations are viewed as an interim solution to a problem that requires long-range planning and thought"?
A That their recommendations didn't make any sense but we were being nice about it.
(Deposition Exhibit Barrett 17 was marked for identification and was retained by counsel.)
Q The court reporter has handed you, Mr. Barrett, a document marked for identification as Exhibit 17, which is encaptioned Nuclear Waste. Is there a need for federal interim storage by the U.S. monitored retrievable storage review commission? November '89, bearing Bates numbers PA-172230 through PA-172270. Do you have that document before you?
A Yes.
Q And let me tell you that this document is an excerpt from the entire -- of the entire report issued by the U.S. monitored retrievable storage



review commission.
Did you ever have an opportunity to review this document in the course of the performance of your duties as an official at the Department of Energy?
A I believe so.
Q Let me turn your attention to page bearing Bates number PA-172244.
A Okay.
Q I'd like to ask you to read the passage, the paragraph that begins at the very bottom of the left-hand column of that page starting, "However, the schedule linkage." Do you see that?
A Yes.
Q Could you read that paragraph up to including number five.
A I've read that.
Q Okay. Let me ask you to focus your attention to the first statement of that section, specifically, "However, the schedule linkage presently in the NWPAA (MRS construction may not begin until the Nuclear Regulatory Commission issues a license with a construction of a repository) would make it impossible



for an MRS to be operational more than three years before the repository." Do you see that statement?
A Yes.
Q Do you agree with that statement?
MR. CRAWFORD: Objection. Asked and answered.
A In general, yes.
Q Do you agree with it as stated here to be accurate and correct?
A It's a judgment call.
MR. CRAWFORD: Same objection.
A I don't disagree with it -- I don't disagree with that statement.
(Deposition Exhibit Barrett 18 was marked for identification and was retained by counsel.)
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 18. Do you have that before you?
A Yes.
Q This document is the report to Congress on reassessment of the civilian radioactive waste management program dated November 1989 issued by the



U.S. Department of Energy, Office of Civilian Radioactive Waste Management bearing Bates numbers PA-163156 through PA-163188. Did you have any role in the preparation of this report?
A I think so.
Q What was your role, Mr. Barrett?
A I don't specifically remember the details. I remember we did this. This was part of Admiral Watkins', you know, review of this. So I know I was involved in it. I don't remember what my title was then. I was one of the acting office directors. Not the entire program office but one of them.
Q Do you know whether you would have been a drafter or a reviewer of this document?
A I did not draft it. I was a reviewer. I was a participant in its generation and development.
Q In your position would you have been required to approve of or sign off on this document prior to its final issuance?
A I don't remember if I signed this or not.
Q You might have?
A I might have. I wasn't the final, because

429

I was not -- November '89. I was still there but I was not the act -- Sam Ruosso would have been the director, so Sam would have signed this.
Q But would it be a fair statement that it is likely that you would have been the person who would have had to sign off on this document prior to its final issuance?
MR. CRAWFORD: Objection to foundation.
A Sam ran things administratively loser than I do. I don't know if I would have signed this or not. I mean, under my regime I would have to sign it. I don't know if I signed it, but I was a participant in it.
Q You might have signed it?
A I might have signed it. But I might not have.
Q I would like to turn your attention to page -- you see page ten?
A Yes.
Q In connection with your participation in the preparation of this report, would you have reviewed and analyzed the content of this referenced

430

schedule for restructure program, Figure 1?
A I would have been involved in it. So, yeah, I would have reviewed it probably, yes.
Q And would you have been in agreement with its contents before this report was issued?
A Organizationally I would have been. I'm not sure what my personal opinion was versus the organization's. I just don't recall. I don't recall I had a big disagreement or anything with it.
Q So you believe that as an organizational matter you would have signed off on the contents of Figure 1, correct?
A I would have supported it, yes.
Q Let's just walk through -- first, can you explain to me what this Figure 1 represents?
A In '89 we reviewed the program, where it was in light of the amendments act, in light of the MRS commission report, and basically restructured the program to a degree around the new repository date which now went to 2010 whereas before it had been 2003. We reviewed that and this was the new, the new revised adjusted program based on those events.

431

That's my recollection of what it was.
Q How did the MRS commission report that we just reviewed affect your analysis with respect to your review of Figure 1 on page ten?
MR. CRAWFORD: Well, let me just -- I'll object to the foundation of that and to the form of the question about the statement made by counsel that we just reviewed the MRS commission report. I mean, you certainly asked the witness questions about it.
MR. CAYNE: I object to counsel's testimony and speaking objections. They're improper.
Q Could you please respond to the question, Mr. Barrett.
MR. CRAWFORD: I was speaking to you.
A Repeat the question, please.
Q Certainly. How did the report issued by the MRS commission affect your analysis of what appears in Exhibit 18 as Figure 1?
MR. CRAWFORD: Objection, foundation. Objection, vague.
A What the primary premise in this Figure 1 is is a volunteer MRS that would have a proposal to

432

Congress which would change the linkages which would allow us to receive waste in 1998. It does not have in it the user-funded facility. It does not have in it the emergency facility that they recommended.
Q You said it would have a proposal to Congress.
A Right.
Q A proposal to Congress would not be sufficient to allow the overall process referenced in Figure 1 to go forward, correct?
A A proposal from a volunteer site where the proposer agreed to the linkages, where the linkages were invented to protect the MRS site would surely have been approved by Congress in my opinion. So if we had a volunteer site, I thought it would be very easy -- Congress would readily approve the change in the linkages if it was satisfactory to the volunteer.
Q So you are confident that federal legislation would have been enacted and signed by the President approving any volunteer that came along that was willing to allow the siting of an MRS facility on its property?

445

A If the process was allowed to proceed, yes, I had -- I believed it could happen.
Q You believe what?
A I believed it could happen, it could be approved.
Q And you believed that firmly enough to invest a lot of personal energy and energy of your department and office in pursuing those possibilities, correct?
MR. CRAWFORD: Objection to the form of the question. Objection to the foundation.
Q Correct?
A Yes. Yes, that was the only alternative I had under the act to be able to meet the '98 date, so I pursued it with all the energy I could.
Q And you thought you had a reasonable possibility of success, correct?
A Yes.
Q And you thought wrong, didn't you?
A History turned out that that wasn't the way it's going to be.
Q It's not easy to get fair legislation, is

446

it?
MR. CRAWFORD: Objection to the vagueness of that.
A That particular issue never even got to be considered. I think you're surmising that if the proposal had been laid before Congress what was going to happen and you're speculating on that. But I wouldn't speculate like you are.
Q But what you saw is sometimes you can't even get your proposal before Congress?
A That's correct. That was cut off before the proposal was ever given to them.
Q Not only do you have to get Congress to approve your proposal, you have to get Congress to look at it, right?
A Say that again.
Q Let me ask you, on page ten of Exhibit 18, you see on the top column under program element, it goes out to 2010.
A Yes.
Q Does it go out to 2010 because that was the projected date of repository -- the first date of --

447

the projected date of repository operations?
A Yes.
Q What was the process that led to the extension of that date, the delay of that date out to 2010?
A I don't remember the details as to what happened with the schedules, but it's my recollection that when you put together the site characterization plan implementation and the processes spelled under the act, and that it was going to take until 2010 to emplace fuel.
Q Was there a formal process within the Department of Energy that was undertaken that led to the determination that this projection should be delayed to 2010?
A There was a review done by the staff in the program that came up with the schedule you see on Figure 1.
Q And who would have been involved, what offices would have been involved in that review?
A Pretty much all the offices in the program.
Q Who would have signed off on that

448

determination to delay the projected start date of the permanent repository?
A You know, Mr. Ruosso, who I think was the acting director at the time; Mr. Peters, who was the deputy director. I was involved. I might have signed off on it. Then there were dozens of other staff people involved.
Q Let me ask you to look, it's towards the middle of this document. 1997 it states "start construction 1/1/97." Do you see that?
A Yes.
Q You see that that refers, does it not, to the start -- what type of construction is that referring to? Construction of what?
A That's the MRS facility.
Q And how long does this Figure 1 indicate it would take for the completion of that facility from start to finish?
A Construction?
Q Yes. Construction and to be placed in a position that it would be ready to receive spent nuclear fuel.

A Let me see if I can read this. This is hard to read. Looks like "start construction 1/97. 1/98 ready to start limited waste acceptance." Okay. And that's the first part of it. And then it continues building it out into a larger facility to increase the capacity. So receive fuel in 1/98. So a two-year construction period for the initial receiving facility.

Q Then down to the right it says "ready to start MRS" -- I'm not sure -- "design waste acceptance." Do you see that?

A Yes.

Q Does that refer to the date on which the MRS would be prepared to commence full operations?

MR. CRAWFORD: Objection. Best evidence.

A When you say full operations, I don't know what was meant here. You had initial start of limited amounts, and I don't know what the limited amounts were on 1/98 with the initial facility and then you built the larger modules and you could start receiving at a higher rate on July '00. And then I don't know if it got bigger after that or not.



Q So --

A Because I see down the bottom here in the transportation line 1200 metric tons per year with new casks starting in, looks like 9/00. So you were receiving probably 1200 metric tons in 7/00 per this chart.

Q 7/00. A moment ago you mentioned 9/00.

A Well, the facility was start to start receiving at the higher rate at 7/00, and the transportation system would be functioning at 1200 on 9/00. So I'm surmising the design of the facility would be starting in say 10/00 being receiving at a rate of approximating 1200 metric tons a year.

Q So it would have taken, according to this projection, approximately two years and nine months from the start of construction before the MRS facility was capable of receiving 12,000 MTUs per year with new casks?

MR. CRAWFORD: 1200.

Q Yes, 1200. I misspoke.

A That's what it looks like.

Q And then if you look to the -- towards the



top of the page, can you walk me through the time period that would have been involved from submission of a license through construction through the start-up of waste emplacement for a repository? How long did your office project it would take from the submission of a license application through and including the first day on which the repository could accept waste emplacement?

MR. CRAWFORD: Objection. Best evidence.

A Looks like LA was submitted on 10/00. Three-year NRC review. So add construction authorization on 10/04. The construction was complete of the receiving facilities in 2009 and then you start waste emplacement in January 2010.

Q So am I correct that the -- from the start of construction to the commencement of waste emplacement would have been a period of approximately five years and four months?

A I would have said two, but go ahead, five years and a couple of months.

Q Did you or do you believe the projections referenced on Figure 1 to be reasonable, the



projections you and I just discussed?

A Yes, for the design at that time that's reasonable.

Q So let me ask you, based on the Nuclear Waste Policy Act amendments of 1987 -- and you may refer to Exhibits 10 and 11 if that will assist you -- how could the proposal reflected on Figure 1 have been implemented under the terms of the Nuclear Waste Policy Act of 1987 as those provisions remained in effect and binding as of November 1989?

MR. CRAWFORD: Objection. Asked and answered repeatedly.

A By the volunteer MRS, okay, proposal to change the linkages.

Q Let me be clear. My question is, assuming there is no additional federal legislation to modify or repeal the linkages, okay, this Figure 1 shows that the MRS facility would be ready to start limited waste acceptance in January, if I can read it, '98, and it would be ready to start MRS design waste acceptance in July 2000, correct? That's what it shows?

A Correct, it shows that.

Q And my question is simply if Congress did not enact legislation to modify or repeal the linkages imposed by the 1987 amendments to the Nuclear Waste Policy Act, would this schedule set forth on Figure 1 have been achievable or viable?
A No.
Q And why not?
A Because you needed to change the linkages.
Q Why would the linkages that were in effect in 1989 and remain in effect today have prevented or barred this proposal from being implemented?
MR. CRAWFORD: Objection. Asked and answered. Best evidence.
A The volunteer proposal would change -- would have to change the linkages which could have been done in any one of the appropriations acts every year. So this whole acceptance rates of '88 is premised upon changing of the linkages.
Q But if the linkages were not changed, what would have -- let me ask you this way: Let's assume you had a volunteer proposal and that Congress was willing and ready to enact legislation authorizing the



volunteer proposal except Congress refused to modify or repeal the linkages. Do you understand --
A Then you cannot have -- you could not have received waste in 1998 unless they changed the linkages.
Q Well, if Congress refused to change the linkages but the volunteer nevertheless was willing to proceed with its proposal.
A Yes.
Q Please tell me what would the first date, based on the projections contained on Figure 1, what would have been the first date on which fuel could have been received by the MRS facility?
MR. CRAWFORD: Objection. Best evidence. Asked and answered.
A Under that scenario the linkages still legally would exist and therefore the controlling linkage would have been the construction of the MRS could not begin until the construction authorization for the repository. The construction authorization for the repository was 10/04. If you use the nominal two-year construction to receive, that would give you



a 10/06 fuel receipt, if you had a volunteer site but Congress did not remove the linkages and if we chose to go forward with such an arrangement.
Q Under that scenario the earliest date that an MRS facility would have been in a position to accept spent nuclear fuel would have been when?
A 10/06.
Q October 2006, correct?
A Yes.
THE WITNESS: Wishful thinking putting it away.
Q What did you just say about wishful thinking?
A He put it on his stack. I said wishful thinking, we're putting it away.
Q Let me ask you to turn your attention to page 12 of Exhibit 18.
A Yes.
Q You just testified that without repeal of the linkages the volunteer proposal that we discussed would result in an MRS facility being in a position to accept fuel at 2006, correct, October 2006?



A Based on that --
MR. CRAWFORD: Objection to the form of the question.
A Based on Figure 1, yes.
Q Figure 1, page six of Exhibit 18, correct?
A Correct.
Q Is the first full paragraph on page 12, take a moment to read it, consistent or very close to your testimony?
MR. CRAWFORD: Objection. Best evidence.
A Yes.
Q The only difference being you testified to an October 2006 start-up date, this paragraph indicates the start-up date would be sometime in 2007, correct?
A Yes.
MR. CAYNE: It's 3:26. Let's take a short break.
(There is a recess from the record.)
(Deposition Exhibit Barrett 19 was marked for identification and was retained by counsel.)
Q Mr. Barrett, the court reporter has handed

Q What does it overstate?
A I think where it says "the peak annual unloading rate," which I'm assuming is receipt rate, has to be very high. Unless it's very high there is a, quote, substantial cost. I don't think the cost of that is substantial, and I don't think the unloading rates need to be, quote, very high. So on face value of my judgment of using the words "very high" and "substantial," I wouldn't have used the words this way.
Q Would you have agreed with the statement if it's stated that the point is that unless the peak annual unloading rate in this scenario is high, there will be additional costs for continued on-site storage after shutdown for many reactors?
A Getting close but high --
MR. CRAWFORD: Wait a minute. Is there a question?
MR. CAYNE: Yes.
MR. CRAWFORD: What is the question?
MR. CAYNE: The question that I just asked the witness.



MR. CRAWFORD: It sounded to me like you made a statement.
(The record is read.)
MR. CRAWFORD: Okay. Although, finish it for the witness.
THE WITNESS: No, I got it.
A I'm very close to agreeing with it. The thing is "high" is a relative term. If it was the higher the receipt rate, okay, there is less cost implications to the reactors, that's what I would agree with. So the faster we take it, the less the impact; the slower we take it, the greater the impact.
Q Look at paragraph seven. It states on post shutdown storage: Determination of the steady state loading rate for an early unconstrained storage-only MRS that would minimize storage beyond five years at shutdown reactors. Do you see that statement?
A I see it.
Q Do you know, do you have an understanding based on your work with Messrs. Carlson and Cotton why they were focusing on a five-year period in paragraph seven?



A In general I think the contract or the act, I don't know, somewhere there is, you know, we don't have to take fuel less than five years old. And also the concept that if we were to remove the fuel within five years of shutdown, we probably don't get in the way of the utilities' decommissioning, normal decommissioning activities. So I think that's what the basis for the five years was.
Q And was that one of the goals being pursued, to not get in the way?
A I believe that was one of the -- the basic tenets in the act was that the federal government was to be responsible for the waste and take the waste off so it should -- for all contract holders, be they operating, be they shut down, to fulfill the federal responsibilities under the act. So that's part of it, yes.
Q Part of it would be to be able to remove the fuel in a way that the shutdown process and the decommissioning process would not be hindered or impeded, correct?
A Correct.



MR. CRAWFORD: Objection. Asked and answered.
(Deposition Exhibit Barrett 21 was marked for identification and was retained by counsel.)
Q The court reporter, Mr. Barrett, has handed you a document marked for identification as Exhibit 21. The caption on this document is Evaluation of MRS Policy Options: (private) key to interactions with the MRS commission dated November 15th, 1988, prepared for the Argonne, A-r-g-o-n-n-e, National Laboratory. On the top appears Bates number 0001124, and the document goes through Bates number 0001131. Do you have that document before you?
A I do.
Q Are you familiar with the Argonne National Laboratory?
A Yes.
Q What is the Argonne National Laboratory?
A They were a contractor that supported the program.
Q Did you ever work with the Argonne National Laboratory?

clear. I've asked you whether you concur with the following statement: "The MRS design can ramp up more rapidly to a full scale acceptance rate than can a repository allowing greater acceptance in the early years. For example, the MRS is expected to accept 1200 tons during the first year compared to 400 tons at the repository. This more rapid ramp-up is expected to reduce the requirements for at-reactor storage by 2,240 to 3,290 MTHM compared to a system with only a repository beginning to accept waste in 2003." That was the statement to which I was referring. Was that the statement that you just testified about?

A That was the statement. The only thing I would also add the 1200, if I agreed with it, I think I said generally I did. The 1200 tons in the first year I think is a little aggressive for any facility, including an MRS.

Q Would you have considered a thousand aggressive?

A Less aggressive.

Q Turn to page six, please, and read the



first full paragraph. And let me read it into the record so we're clear on what I'm asking you to testify about. The date of initial acceptance is particularly important because it has such a large effect on the amount of additional storage capacity required at reactor sites beyond that available using conventional techniques for increasing the capacity of existing water-filled storage pools. The draft dry cask storage study concludes that with the reference acceptance schedule shown in Table 2-3, between about 9,800 MTHM and 16,200 MTHM of such additional storage would be required. A five-year acceleration or delay of the referenced start-up date of 2003 approximately halves or doubles the additional storage requirement." Do you see that statement?

A Yes.

Q Do you agree with that statement?

MR. CRAWFORD: Do you want him to review Table 2-3 before giving his answer?

MR. CAYNE: He's welcome to review any portion of this document that assists him in responding to my inquiry.



A Where's 2-3? Is there a 2-3?

MR. CRAWFORD: Why don't you go ahead and put down an objection I've got to the pending question, which is that it's vague.

A There is no 2-3.

Q I've given you the entire document that was provided to us by the government in discovery.

A But, you know, if there's -- in a general sense the sooner you start, you know, the less, you know, burden you have on the reactor sites. The later you start the more. That's what I was driving at. And I generally agree with that.

Q So you generally agree with the statement that I just read into the record, correct?

MR. CRAWFORD: No, that's not what he said. Objection, mischaracterizes his prior testimony.

MR. CAYNE: I object to counsel testifying.

Q So you generally agree --

MR. CRAWFORD: Well, I didn't.

Q -- Mr. Barrett --

MR. CRAWFORD: I object.

Q -- with the statement that I read into the



record, correct?

MR. CRAWFORD: Objection, mischaracterizes his prior testimony.

A I don't agree with any of the absolute numbers in there because I don't know what they are. You know, the 9,800, etc., nor any table, but the concept of the last sentence, you know, I generally agree with. The sooner you do it, the better off you are; the later, the more the impact.

Q You said the concept of the last sentence. Did you mean the concept of the first sentence?

A In the first sentence as well. Yes.

(Deposition Exhibit Barrett 22 was marked for identification and was retained by counsel.)

Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 22. This is the annual capacity report issued by the Office of Civilian Radioactive Waste Management dated December 1990. It carries the Bates numbers PA-102761 through PA-102883. Do you have that document before you?

A Yes.

generally familiar with resolution of contract-related issues, yes.
Q What contract-related issues are you familiar with?
MR. CRAWFORD: Well, objection. Vague.
A Well, there's many different issues, I mean, from a programmatic sense, things like what is the appropriate pickup campaigns that would need to be done. For example, the allocations are on, as I understand it, an oldest-fuel-first in certain sizes, and you'll get one ton here, a few tons there. From a practical operational point of view those need to be reconciled into sizes that are appropriate for the Department of Energy as well as the purchasers, the contract holders. There needs to be further definition of issues relating to near field and what cask can be used, rail versus truck. All kinds of issues need to be worked out between the DOE and the purchase holders prior to their actually being movement of materials. Those are the kind of contract-related issues that need to be addressed.
Q Let me ask you to look at page four of



Exhibit 22. The second full paragraph contains the statement that, "This schedule, based on a realistic assessment of activity durations and past experience, shows a significant slip for the start of repository operations from the year 2003 to approximately 2010. The current restrictions in the amendments act linking the repository and MRS make it impossible for DOE to accept waste at an MRS facility on a schedule independent from that of the repository." Do you see that statement?
A Yes.
Q Based on your testimony earlier this afternoon concerning linkage, can I assume correctly that you would agree with that statement?
A Yes. I would also -- the very next sentence says that DOE indicates a preference that it be done through the negotiator. So in a selective reading, yes, I agree with you.
Q You agree that as the law stood in 1990 and, in fact, as the law stands today it would be impossible for the DOE to accept waste at an MRS facility on a schedule that is independent from that



of the repository, correct?
MR. CRAWFORD: Objection, compound. Objection, asked and answered.
Q Correct?
A Correct.
MR. CRAWFORD: Objection, compound. Objection, asked and answered.
Q And proceeding on to page five, the last sentence of the carryover paragraph, do you agree with the statement that if the current linkages to the repository are maintained --
A Regular -- Arabic five?
Q Arabic five, yes.
A Oh, up top.
Q Do you agree with the statement "If the current linkages to the repository are maintained, it is estimated that the commencement of facility operations and initial acceptance of SNF/HLW by DOE would not start until 2007."
MR. CRAWFORD: Objection. Asked and answered.
A Yes.



MR. CRAWFORD: Can we take a break?
MR. CAYNE: Sure.
(There is a recess from the record.)
(Deposition Exhibit Barrett 23 was marked for identification and was retained by counsel.)
Q Mr. Barrett, the court reporter has handed you a document identified as Exhibit 23, and this document constitutes two pages involving nonconsecutive Bates number HQR-010-1621 and HQR-010-1640. Do you have that document in front of you, that exhibit in front of you?
A Yes.
Q Are you familiar with the document from which these pages were taken?
A No.
Q Do you know J. Roberts and R. Milner?
A Yes.
Q Who are they?
A John Roberts used to head up the regulatory division, and Ron Milner headed up the storage transportation office.
Q Who is Mary Ann Ferguson?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-1
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-4
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-48
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-11
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Friday, April 26, 2002
8:10 a.m.

Job No.: 11792-8
Pages 527 through 825, Volume 3
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X



Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DU POWER, INDIANA MICHIGAN POWER COMPANY, BOST EDISON COMPANY, GPU NUCLEAR, INC., POWER AUT OF THE STATE OF NEW YORK, OMAHA PUBLIC POWE DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
HOWARD CAYNE, ESQUIRE
JEFFREY L. HANDWERKER, ESQUIRE
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

with any congressional office concerning the rate of acceptance of spent nuclear fuel?
MR. CRAWFORD: Same objections.
A Yes. Take a break? I answered that question yes.
Q Can you please describe to me --
A Can I take a break?
MR. CRAWFORD: He's asking for a break.
A I answered your question yes. I can take a break, right?
Q Oh, I didn't hear you.
(The witness and Mr. Crawford confer outside the room.)
Q Have you had an opportunity to confer with your counsel?
A Yes.
Q And are you ready to proceed?
A Yes.
Q Can you please describe for me the most recent conversation or communication between your office and any congressional office concerning acceptance schedules for spent nuclear fuel.



A Repeat the question again, please.
(The record is read.)
MR. CRAWFORD: Overbroad, vague.
A Yes.
MR. CRAWFORD: Hold on a second. Take a break.
MR. CAYNE: There's a pending question.
MR. CRAWFORD: He answered it.
THE WITNESS: I answered yes.
MR. CAYNE: I asked him to describe it, counsel.
MR. CRAWFORD: No, now you're asking him that one.
MR. CAYNE: Let's not be cute. The question is for him to describe for me any communication.
Was that the question?
(The record is read.)
MR. CRAWFORD: He answered that question. Before you ask him the other one, I want to take a break.
MR. CAYNE: I can't stop you from doing



whatever you're going to do, counsel. I object to you taking a break with the witness with a pending question.
MR. CRAWFORD: Come on. The question wasn't pending.
(The witness and Mr. Crawford confer outside the room.)
Q Please describe for me the most recent conversation or communication between your office and any congressional office concerning acceptance schedules for spent nuclear fuel.
A There were discussions several years ago regarding various amendments to senate bills that got into, The bill should or shouldn't specify acceptance rates, and I believe it was a thing called the Fitzgerald Amendment in which we describe to senate staffers aspects regarding specified storage rate -- acceptance rates and what that might do regarding obligations or things that would have to do with these court cases.
Q You said there were discussions several years ago regarding various amendments to senate bills



that got into the bill should or shouldn't specify acceptance rates. I think you may have dropped a word or a word not get picked up because I didn't understand what that meant.
A There were discussions regarding --
MR. CRAWFORD: Objection to the form.
A -- acceptance rates being specified in a bill, putting numbers in. And we explained to senate staffers the differences between if they went by statute trying to establish rates, that some rates were very high, that you could never catch up to the -- you could never catch up, and that specifying rates in a bill, in statute could have impact upon lawsuits that were currently under way.
Q Did your office urge the office of Senator Fitzgerald not to pursue the amendment?
MR. CRAWFORD: Objection to the form of the question. Objection, vague.
A I never said anything about Senator Fitzgerald's staff.
Q Was it congressman?
A I said senate staff.

Q Oh, senate staffers.
Were the senate staffers from a particular committee?
A There were various --
MR. CRAWFORD: Objection, vague.
A There were various ones in the room. I know there were staffers from the energy committee and others that I don't know where they were from.
Q Did the Fitzgerald Amendment specify a particular acceptance rate?
MR. CRAWFORD: Objection. Vague.
A My recollection is that they did.
Q And what was the acceptance rate specified by the Fitzgerald Amendment?
A I don't remember.
Q Do you recall whether it was in excess -- more or less than 2,000 MTUs per year?
MR. CRAWFORD: Objection. Vague.
A I think it had a range. Some were less; some were higher.
Q Do you recall the top of the range?
MR. CRAWFORD: Objection to the extent it



calls for speculation. Objection to the foundation.
A I believe it was 3,000, but I'm not sure.
Q Do you recall the floor of the range?
A The what?
Q The floor of the range.
A No.
Q Did your office suggest to the senate staffers that this amendment be dropped?
MR. CRAWFORD: Objection, vague.
A Not that I recall.
Q Did your office take any position with respect to whether the senate should adopt this amendment?
MR. CRAWFORD: Objection, vague.
A I don't recall anything about to drop or not, but we explained to them the significance and, you know, dangerous ground that one went into by specifying rates when litigation was under way, and the importance of that.
Q What was the dangerous ground that you referred to?
MR. CRAWFORD: Objection to the extent it



calls for a legal conclusion.
A That the rate that the -- it was my understanding that the issue of damages, if there should ever be any, one of the key issues in that would be at what rate was the government, my term, liable for. And this had large dollar values. It was a very important policy issue, and they should be very careful about what they did in statutes while this national issue was being worked out in the judicial arena.
Q As a matter of design or systems, your office didn't indicate to the senate staff that the suggested range was inappropriate, did it?
MR. CRAWFORD: Objection, vague.
Q By "suggested range" I'm referring to the range in the amendment.
MR. CRAWFORD: Objection. Vague.
A I don't remember if it did or didn't.
Q Well, you didn't believe that it was inappropriate as a master design, did you?
MR. CRAWFORD: Objection, vague.
A Since I don't -- it was two-plus years ago,



I just don't remember. I don't remember.
Q Were you a personal participant in these discussions?
A Yes.
Q Did these discussions occur in a senate office?
A I think it was on the Hill. It was some office on the Hill.
Q Who was in attendance at these meetings?
A I don't remember the specific people.
Q Who was in attendance from the Department of Energy?
A I don't remember that either.
Q You don't remember anyone besides yourself?
A There were some people. I just don't remember who it was. I think I had one or two staffers, maybe one. And I don't know who they were.
Q Were any lawyers at this meeting?
A Not that I recall. There may have been, but I don't remember one.
Q Was there more than one meeting?
A I know of one. I don't -- the subject

might have come up in another meeting, but I don't remember it. I remember one -- you asked if I remembered one; I remembered one. There may have been others. I just don't recall.

Q Were any documents exchanged between senate staff and your office relating to the Fitzgerald Amendment?

A I don't remember. We had -- I don't remember exchanging documents. I remember showing them curves and projections and things like that.

Q What curves and projections did you show them?

A They were what we call -- the ones I remember is what we call crossover curves, that if we performed as we -- our plans were in 2010 that the receipt rate that was our reference receipt rate in 2000, which I think is the same today, but, you know, ramping up to 3,000 within five years, that with the amendment that they were discussing that you could never catch up on your obligation, where our performance rate would exceed the -- our goal had always been for our performance rate to exceed the --



my word, "obligation rate" -- such that we could catch up within -- as soon as we could, such that from a national perspective it would appear that we were running at the obligation rate as to four six nine constant. You catch up quickly, as quickly as possible. So that from a national perspective point of view it would have looked just like we had operated back on January 31, 1998, at the four six nine. That if you established by statute rates that you could never catch up and that the complications could be that you could -- in these court cases that if you never catch up, one could argue that you had damages or whatever the case would be, that you needed to be very careful in this area.

Q What is the obligation rate that you just referred to?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

Q And I'm asking specifically, you said that's your term, "obligation." And I would like to know what you meant by that.

A You mean the year one, 400 tons; year two,



600 tons; year three out through year ten at 900 tons per year?

Q Is that what you meant by four six nine?

A Yes, sir.

Q Why did you view that as the obligation rate?

A That is my understanding, that that is the government's position regarding --

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

A -- lawsuits.

Q When you were speaking with the senate staff concerning this amendment, why were you advising them about the government's position concerning lawsuits?

A I didn't.

Q I thought that's what you just said?

A No, it's what you said.

Q Well, you told the senate staff that -- did I understand it was the crossover curve that provided for a gain up to the 3,000 within five years?

A What you asked initially, what did we share



with the Senate. The only thing I recall, I remember was sharing what we call, our term, "crossover curves." What a crossover curve was that if you took the reference four, six, nine, nine, nine, up for ten years, there is a certain amount of fuel by a certain time it would have taken under that scenario. We'll call that a scenario. Okay. And we had a planned performance rate, which I think it was, you know, four, six, 12, 2 -- 2, 3. 2,000, 3,000. Then our goal always has been to discharge our responsibilities to take the waste as quickly as we reasonably can under law and under financial constraints and that we wished to -- and the issue was going to be, in lawsuits world, we were late and we needed to -- and there would be potential, you know, damages based on these issues and that we wanted -- one of the key things for us was how quickly can we from a performance point of view make this whole fuel situation look like we had met the January 31, 1998. That if you, you know, four-six-nine arrangement, if we -- if you change what the -- if I recall, the thing was like obligation rate in the Fitzgerald Amendment,

that if you change that to a high rate, it got to 3,000 tons fairly quickly. You could never catch up if we were performing at 3,000, because there was always -- the lines never converged and you would never have made up the amount -- you could not catch up. And that if that was the case, if that bill had become law, that there was a potential governmental undesirable situation vis-a-vis the utility plaintiffs, that they needed to be careful what they said and what they did. And that's what the discussion was.

Q What was the undesirable situation you just referred to?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

A That one could make a claim that the government was still in arrears 30 years down the road and should be, even though we had caught up to the four-six-nine rate, that there was still a governmental liability.

Q Why were you concerned that there would still be a governmental liability? Was it your



concern that there would still be a governmental liability even assuming the Department of Energy reached a 3,000 acceptance rate, 3,000 MTU acceptance rate?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

A Not that we would or wouldn't. There might be claims that if the statute -- if the bill became statute, and my recollection was that the bill, that would have stated what the obligation rate was. And if the obligation rate was 3,000 tons per year and if we had not caught up by that time, which we couldn't have, that one could make a case against the government -- and we only ran at 3,000 tons per year, that one could make a case dozens of years down the road that monies needed to be paid to the utilities, possibly in the form of damages, and this could be -- this would be detrimental to our program because we were never sure where the funds would come from.

So that was the way I referred to as dangerous ground, that they should be very careful and aware of these issues, which they were not.



Q But it was your plan to reach the 3,000 MTU per year acceptance rate, correct?

A As quickly as we could, which would have been like 2015.

Q Assuming you started in 2010?

A Yes.

Q Okay. And the Fitzgerald Amendment, you don't recall precisely but you think the take-rate required by the Fitzgerald Amendment was at or about 3,000 MTU per year, correct?

A Correct.

Q Starting in what year?

MR. CRAWFORD: Well, objection to the extent this calls for speculation.

A I don't remember, but it was such that if you -- we recognized the fact we had been delayed, all right? It is our intention and goal to catch up and make up for the material that we have been -- were not able to take because we were delayed, such that from a national perspective it would look like we were performing as we had proposed after several years.

Under the Fitzgerald Amendment a case could



be made, not that it would be successful or not, by utilities that you never caught up and therefore there should be payments made from some source due to the lateness that you never caught up.

Q So your problem with the Fitzgerald Amendment was not that it would have set an approximately 3,000 MTU per year rate; it was that the rate would have started at a time before you were ready to start accepting at 3,000 MTU per year. Is that correct?

MR. CRAWFORD: Objection to the form.

A That was the major part of it. But also to establish by statute things like an obligation rate when there was ongoing litigation was a very delicate thing that they needed to be careful of what they were doing.

Q And I assume that -- I want to know if I'm assuming right. Based on your testimony it's my assumption one of the arguments you made to the senate staff as to why this amendment was not needed was it was already your goal to get to 3,000 MTUs per year, so they didn't need to put that into law again,

correct?
MR. CRAWFORD: Objection, vague.
A That was -- to my recollection that was not -- I don't recall that ever being discussed nor, you know, an issue nor a position.
Q What was the source of the 400, 600, 900 obligation rate that you referred to?
A I don't recall specifically. It's a table in one of the contract-related documents, and I don't know what one it is. One of the last ACRs or something like that. Don't know.
Q Would that be the 1995 ACR?
A I don't know. It's the one that we normally had used -- my understanding of it is that the four, six, 900, and it was the last -- last reference point as it relates to the contract.
Q In the conversations with the senate staff during this meeting or meetings, were delivery commitment schedules ever discussed?
A Not to my recollection.
Q No discussion whatsoever?
A Not that I recall.



Q Prior to this meeting was there ever any other situation in which your office communicated with any congressional office concerning acceptance schedules?
MR. CRAWFORD: Objection, asked and answered.
A I've had dozens of congressional meetings over the last years, and I have no idea. It may have been in a cursory side issue, but nothing that I recall.
Q So sitting here today you cannot recall a single other discussion, meeting, communication, with any congressional office relating to acceptance schedules?
MR. CRAWFORD: Objection, mischaracterizes prior testimony.
A I don't know.
Q What is your best estimate of the time period during which the discussions occurred relating to the Fitzgerald Amendment?
A It was during the development of some of the senate interim storage legislation. I think it



was probably 1287, which would have been spring, summer, between '99 and 2000. I don't know.
Q But it was clearly after the point that a number of the spent nuclear fuel lawsuits had already been filed against the United States, correct?
MR. CRAWFORD: Objection.
Objection withdrawn.
A I don't know where it was because I'm not quite sure what lawsuits were filed when, but the obligation decision from the D.C. Circuit Court of Appeals was out there, and damage suits either were filed or about to be filed or something. Don't know.
Q But you do recall you were very concerned about litigation during the meeting relating to the Fitzgerald Amendment, correct?
MR. CRAWFORD: Objection, vague. Asked and answered.
A I'm not very concerned about the litigation. I just wanted to make sure the senate staff understood some of the complexities of how these -- when they put into legislation, what some of this could do. So I won't say it was legislation. I



was more concerned about if this became law that it was good law as opposed to law that would have made a complicated world intractable.
Q Did you advise the congressional staffers that the rate, acceptance rate proposed by the Fitzgerald Amendment was the same as or consistent with your goal for the 3,000 MTU acceptance rate?
MR. CRAWFORD: Objection. Asked and answered.
A I don't remember.
Q You think it was likely, in the context of the discussions?
MR. CRAWFORD: Objection. Asked and answered.
A I don't recall that being an issue one way or the other.
Q So you might have?
MR. CRAWFORD: Objection. Asked and answered. Objection, argumentative.
Q Excuse me?
A I don't know.
Q You don't know whether you did?

Q When is the first time, Mr. Barrett, that you personally used the term "obligation rate"?
A I believe around the mid-nineties.
Q Would it be approximately 1995?
MR. CRAWFORD: Objection. Asked and answered. Objection, vague.
A I don't know.
Q Does that sound like a fair approximation?
MR. CRAWFORD: Objection. Asked and answered.
A Somewhere between '93 and '98, and that '95 lies in the middle there.
Q When was the first time you ever heard that term used?
MR. CRAWFORD: Objection to the extent it assumes facts not in evidence. Objection to the foundation. Objection, vague.
A Somewhere in that time period.
Q Between '93 and '98?
A Yes.
Q Could it have been '95?
A Could have been.



Q And in what context did you hear that term used?
MR. CRAWFORD: Objection, vague.
Let me just instruct you that if you heard that in any communications with any DOJ attorneys or any attorneys from the Office of General Counsel relating to this litigation, I instruct you not to answer.
A I'm not going to answer, based on advice of counsel.
Q Because you heard the word used by a lawyer?
MR. CRAWFORD: Objection. And instruct not to answer.
Q Did you ever hear the term used by nonlawyer?
MR. CRAWFORD: As long as this did not occur in a communication at the instruction of counsel relating to this litigation, you may answer it. If it does, don't answer.
A What's the question again?
Q Did you ever hear the term "obligation



rate" used by a nonlawyer.
MR. CRAWFORD: Objection, vague.
A Yes, me.
Q Did you ever hear the term "obligation rate" used by a nonlawyer other than yourself?
A I don't recall.
Q Do you think you ever heard the term "obligation rate" used by a nonlawyer other than yourself?
MR. CRAWFORD: Objection. Asked and answered. Objection, argumentative.
A Not that I know of.
Q So sitting here today you cannot recall a single instance where you heard the term "obligation rate" used by a nonlawyer other than yourself, correct?
MR. CRAWFORD: Objection, asked and answered, argumentative.
A Correct.
Q How did you use the term "four six nine," was it the four-six-nine rate or -- you used it in an earlier answer.



MR. CRAWFORD: Objection. Asked and answered.
A It's the rate of 400 tons year number one, year number two 600 tons, year number three 900 tons out to year ten at 900. It's in some table that's attached to something that has to do with the contract, and that's what I meant by the four-six-nine rate.
Q To the best of your knowledge how is that four-six-nine rate, as you just explained it, calculated?
A It's my recollection that table was established based on the plans of the program in the early nineties with an MRS and linkages stated by statute. Modified by, you know, whatever it had to do with the linkages and then what was thought, reasonably thought linkages could be modified.
Q So the four-six-nine rate was based on the assumption, if I understand what you're saying right now, sir, that there would be an MRS and the linkages would be repealed, correct?
A Well, not completely repealed, but some --

no, not all linkages would be changed, but reasonable linkages that we thought reasonably could be changed, like build the thing based on a volunteer site. So that's what the four six nine to my recollection is based on.
Q Was the four-six-nine rate based on anything else besides what you just specified?
MR. CRAWFORD: I'll object to best evidence.
A To my understanding, the four six nine is just based on -- is based on, you know, the linkages that we felt could not get changed, and that's what they were based upon.
Q Can you give me, so the record is as clear as possible, a yes or no to my last question. And my last question is, or was, was the four-six-nine rate based on anything else besides what you have just specified?
MR. CRAWFORD: Objection. Overbroad and best evidence.
A I don't know.
Q You're not aware of anything else, correct?



A I don't know if there's anything else or not.
Q Are you aware of anything else?
MR. CRAWFORD: Objection, best evidence. Same objection I had to your last question or the last objections I had.
Q Were you aware of anything else?
A No.
Q Are you aware of anything else today?
A No.
Q Were you aware of anything else in 1995 when the 1995 ACR was issued?
MR. CRAWFORD: Objection, best evidence.
A No.
Q Are you comfortable with graphs?
MR. CRAWFORD: Objection, vague.
A Reasonably.
Q You often in the course of your daily work create graphs for different purposes?
A Seldom.
Q Do you ever do it?
A Yes.



Q You do know how to create a graph, right?
A Yes.
Q And you know how to read graphs, correct?
A Yes.
Q I'm going to ask you to do something for me, sir, to clarify some earlier answers.
MR. CAYNE: And I am handing the witness a blank yellow sheet of notepaper.
Q Do you recall you used the term earlier this morning "crossover"? Do you recall using that term?
A Yes.
Q And was it the crossover point, crossover curve, correct?
A Yes.
Q Do you have a pencil, sir?
A I have a pen.
Q Pen.
MR. CRAWFORD: Let me just say, I'm going to object to you having the witness draw a graph here to -- whether you're going to have him do it to illustrate the crossover curve, because there's no



foundation for this. Graphs are used to input data. He doesn't have the data here in front of him, so this is totally improper.
Q Could you take out your pen, please, sir.
MR. CRAWFORD: You don't have to do that. That's not part of your job as a witness here.
MR. CAYNE: I'm going to ask the witness to illustrate for me what he meant by his answer, and there is no appropriate objection to that.
MR. CRAWFORD: Well, I think there is.
MR. CAYNE: There is no privilege, that I can ask the witness -- he used the term "crossover curve," and I'm well within my rights to ask him to diagram for me what he meant by crossover curve.
MR. CRAWFORD: You can ask him to do it, but I'm going to object to the foundation because he doesn't have any of the data to input onto it.
MR. CAYNE: You may object to the foundation and it will be up to the Court to determine whether what I ask him to prepare is admissible or not. You have certainly perfected your record if you want to oppose the use of the curve, but the witness

responded to one of my questions with the term "crossover curve," and I would like the witness to illustrate to me, on the piece of paper that I have provided him for that purpose, what he meant by crossover curve.

MR. CRAWFORD: Okay. You can do it. To the extent you can.

Q Can you please, a pen would be better, sir, and do you recall we were talking about the Fitzgerald Amendment?

A Yes.

Q Do you recall that?

A Yes.

Q And do you recall you used the term "crossover curve" in connection with our discussions of the Fitzgerald Amendment?

A Yes.

Q And do you recall what the context was in which you used the term "crossover curve"?

A Yes.

Q And so the record is clear, how did the crossover curve relate to the discussions you had with



senate staff relating to the Fitzgerald Amendment?

A My recollection of what these curves were like -- no absolute magnitudes to anything because I don't remember the numbers, but you had on the abscissas time, year, you know, one, two, three, out in time. You had on the ordinate MTU received. There was a rate that was basically an obligation rate, which was something like approximately 3,000 MTUs per year. And I believe the Fitzgerald Amendment started that at a certain time. You call that X. And that our system would start at some time X plus something. And our system would start it -- this is the system performance which was approximately 3,000 MTUs per year. And that the lines were parallel and they never would cross.

Q Okay. I'd ask you to please hold the piece of paper in front of you. The lines don't cross because why?

A Because the -- what I recall, the bill had an obligation rate of 3,000 tons per year starting at a time before we were capable of starting, and if we started whenever we could at 3,000 tons per year, you



could never catch up.

Q Well, you used the term "crossover curve," correct?

A Right.

Q On the piece of paper before you the two lines never cross?

A Correct.

Q They remain parallel into infinity, correct?

A Correct.

Q So why do you use the term "crossover"?

A If there was an obligation rate that was at four six nine; at 400 tons, 600 tons, 900 tons, metric tons per year, you would have a point where we did cross over, and that would be a crossover.

Q And the crossover, you don't have to -- please hold the piece of paper in front of you, sir. When would the crossover occur?

MR. CRAWFORD: Objection, foundation.

A I don't recall what the absolute dates were. Or the year -- the year increments. I don't know.



Q The crossover would occur while the take-rate was still at 900?

MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for speculation.

A Repeat your question.

Q Would the crossover point occur at a point in time at which the take-rate was still at 900 MTUs?

A The take-rate at 900?

Q The acceptance rate.

A The acceptance rate?

Q Yes.

A The performance rate?

Q The performance rate.

A It would never have crossed at the performance rate of 900.

Q Why would the crossover point never occur at a point in time at which the acceptance rate or, in your terms, performance rate, was set at 900 MTU per year?

A If the obligation rate was 900 tons a year or 3,000 tons per year and if you started later at a 900-a-year rate, you would never catch up. It would

either diverge in the case of 3,000 or it would remain parallel in the case of 900.

Q Was it the concern of your office that if the lines remained parallel your office would -- or the United States would become liable for all the utilities' future storage costs into the indefinite future?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

A Please repeat that question.

(The record is read.)

MR. CRAWFORD: Let me object to the foundation, too, but the other objection as well.

A I didn't use the word "liability" and I don't know what that word means, but it was -- our concern was that this was an issue that was going to go through complicated national process in the courts and maybe other places, that it was dangerous ground and just don't go there. Regarding -- I never used the word "liability" that I recall or terms like that, which have potential legal meanings to them.

Q Was it your concern that if the lines



remained parallel a court could enter or court would enter a damages judgment requiring the United States to reimburse the utilities for all future storage costs?

MR. CRAWFORD: Objection to the extent that that calls for a legal conclusion.

A You're going into legal space where I didn't go and didn't go then and am not going now.

Q I'm not asking for a legal judgment. You indicated to the senate staff that they were on dangerous ground, correct?

A Right.

Q And I simply want to know was the danger that you were concerned about the possibility that by the enactment of the statute which would result in the parallel lines that you have drawn might lead to a court judgment requiring the United States to reimburse utilities for their future storage costs?

MR. CRAWFORD: Objection only to the vagueness.

A What's the question again in there?

MR. CRAWFORD: And to the extent it calls



for speculation.

(Deposition Exhibit Barrett 26 was marked for identification and was retained by counsel.)

Q My question is when you used the term "dangerous ground" -- and I think you may have used different variations of that term in the context of this discussion -- did you use that term to alert the senate staffers to the possibility that the parallel lines reflected on your Exhibit 26 might lead a court to compel the United States to reimburse the utilities for their future storage costs?

MR. CRAWFORD: Objection, mischaracterization of prior testimony and vague.

A That's far more specific than anything I would have said or thought.

Q What would you have said or thought?

MR. CRAWFORD: Objection, asked and answered.

A That there was very complex litigation under way or shortly to become under way and that where they were going with things in the statute could have -- could have possibly major considerations in



those things, and that they ought to have some understanding about how things like this may get used and interpretations of it and complicated settings and that they ought to be aware and careful about what they did.

Q Well, you were concerned about what you referred to as the parallel lines, correct?

MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony; and objection, foundation and vague.

A Much more than parallel lines. It's the whole -- use that to illustrate to them only as an illustration that one needed to be careful about stating things that I think they called obligation rates could have repercussions far beyond what they ever thought, and that they ought to be very careful about statutes in this area.

Q How did the parallel lines illustrate that?

A The parallel -- the parallel lines, that one could make an argue -- one could argue in a complicated court setting under complicated contract laws that none of us in the room knew and understood,

at least I don't anyway, they may have -- that one could make arguments that if you never caught up with what you were supposed to do, that there might be substantial sums from some unknown source at risk, and a complicated legal world was there and they ought to just be careful. So the parallel lines were illustrative of be careful about what you do.

Q Did you or your office ever have any conversations or communications with the Office of the President or any other office of the executive branch of the United States relating to acceptance schedules for spent nuclear fuel?

MR. CRAWFORD: Objection, asked and answered.

A Not that I recall.

Q At any time?

A At any time.

Q Was the senate staff concerned, in connection with the discussions on the Fitzgerald Amendment, did the senate staff express a concern that the amendment was necessary because the contract did not provide for a particular acceptance rate?



A Not that I recall.

Q Was there any discussion whatsoever concerning whether the contract included -- and during the discussions with senate staff, was there any discussion whether the contract provided for acceptance rates -- acceptance schedules?

A Not that I recall.

Q Was there any discussion of the contract in connection with the meetings with the senate staff relating to the Fitzgerald Amendment?

A My recollection is only that there is a contract, it's being -- this is a matter of litigation. It's very complicated, substantial sums will be litigated, and be careful about what you do here as it relates to bills or statute that has to do with rates and such. So only to that degree do I recall the contract discussed.

Q Do you know why the bill was introduced?

MR. CRAWFORD: Objection to the extent it calls for speculation.

A No.

MR. CRAWFORD: Objection, vague and



foundation.

Q Did any member of the senate staff make any statement relating to the reason why the bill was introduced?

A I don't recall.

Q Were there ever any letters sent between you or any member of your staff and the senate staff relating to the Fitzgerald Amendment?

A I don't recall any.

Q How did you find out about the Fitzgerald Amendment?

A I don't remember. I think somebody showed it to me. There were lots of amendments. Somebody showed me an amendment and someone said, Hey, we have a meeting on the Hill people want to know about. Does this mean anything? Do we have any opinion on it? We saw -- I remember seeing, you know, it went into, you know, this area that was a very sensitive area, and we ended up having a meeting to explain to them --

MR. CRAWFORD: Objection to the extent that you're going to -- if any of these meetings occurred in the presence of counsel or at the instruction of



counsel, I instruct you not to testify about the communication.

A That's my answer.

Q Who set up the meeting with the senate staff?

A I think they did. I don't recall. I don't know who set up the meeting. This is two, three years ago.

Q Do you think it was somebody on your staff?

A I don't know.

Q How long did the meeting last?

A Don't know.

Q Have you ever had any meetings, conversations, communications with any Senate or House staffers relating to the Upton Bill, U-p-t-o-n?

A I don't know what the Upton -- what you mean by the Upton Bill.

Q You never heard that term?

A There's multiple Upton -- there are multiple bills that Congressman Upton was involved in, and I don't know which one you mean because I...

Q Do you know whether there are any bills

Q What were you referring to when you used that term?
MR. CRAWFORD: Objection, vague.
A I don't know how much flexibility the Department of Energy has under its authorized or not authorized and all those kind of issues, so I guess I don't know. I probably shouldn't have used it. I don't know what it means.
Q What did you mean when you said it a couple of moment ago?
MR. CRAWFORD: Objection. Asked and answered.
A I don't know. It's inappropriate. I shouldn't have said it.
Q We can save time if you can reflect back or else we'll go back in the transcript and I can read it to you and maybe that will refresh your recollection, but you meant something when you used the phrase.
A Can I go back?
(The record is read.)
A I spoke in error in that. What I meant is that if it is designated, you know, material that



would be considered authorized under the Nuclear Waste Policy Act, there are a lot of policy issues that would have to be worked out regarding contracts, payments, etc., etc., etc. Those are the policy matters that are complicated in the subject of greater than Class C.
MR. CAYNE: Let's take a short break.
(There is a recess from the record.)
(Deposition Exhibit Barrett 28 was marked for identification and was retained by counsel.)
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 28. It's a memorandum dated January 25th, 1993, from Lake Barrett to the Secretary. It begins at Bates HQR-064-3925 and extends through HQR-064-3930. Do you have the document before you?
A I do.
Q For what purpose did you prepare this memorandum for the Secretary of the Department of Energy?
MR. CRAWFORD: Objection, best evidence.
A I don't think I ever did. I don't recall



ever doing it.
Q Did a member of your staff prepare this document?
A Probably.
Q Do you believe you would have at some point read this document?
A If it ever was to go out I would have. It says "Preliminary draft." I don't recall ever being a final one of these. There may have been, but I don't know.
Q I'll represent to you, sir, and we'll get to it later --
A Okay.
Q -- if it refreshes your recollection, but the document did go out in final.
A So I signed it?
Q This is a preliminary draft.
A Did I sign a successor to this?
Q Yes. It has your name on it. I don't recall if it has your signature.
A Okay, that's helpful. This one, though, doesn't have my signature on it.



Q Right. This one says "draft."
A So this is a forerunner of what we're going to get to?
Q Yes, sir.
A Okay. Go ahead. I don't remember this one but go ahead.
Q For what purpose -- next to "transmittal" it states "implementation plan for acceptance of civilian spent nuclear fuel by the federal government." Do you see that?
A Yes.
Q What does that refer to, the implementation plan?
A On January -- I was appointed the director two weeks before this or three weeks before this. We had an incoming new secretary. It was the Clinton administration's first weeks. President Clinton was sworn in five days before the date on this. I was preparing a summary for incoming Secretary O'Leary and her staff as to what my intentions were and what my plans were to implement the program.
Q Do you see in the first paragraph next to

Discussion it states that "The department is committed to providing timely and adequate waste acceptance of spent nuclear fuel into the civilian radioactive waste management system"? Do you see that?
A Yes.
Q What was the meaning of the term or what did you mean by the term "timely and adequate"?
A We were committed to implement the act to the best of our ability to start receiving fuel in January 1998, and this was a description of the actions that we were taking to do exactly that.
Q The next couple of sentences refer to a letter to Senator Bennett Johnston. Do you see that?
A Yes.
Q Do you recall if that was the letter we discussed at the conclusion of Tuesday's session of this deposition?
MR. CRAWFORD: Objection, vague.
A I believe so.
Q And you can refer to the exhibits to refresh your recollection.
A There were two Watkins letters. I assume



this is it. I don't know.
Q When you say there were "two Watkins letters," another Watkins letter that we did not discuss in the deposition?
A I think there was two, but I don't know which one we did here. One was on a repository -- my recollection is one was on a repository and one was on storage. Is this the one, if I dig back in the pile, I'll find --
Q Take a look and see.
MR. HANDWERKER: I think it's 24.
A What is it, 24? Yes. December 17th, yes.
Q So Exhibit 28 refers to Exhibit 24, correct?
A Yes.
Q What did you mean by the term "delink" in the next paragraph, last line?
A First of all, I didn't mean anything by this because I didn't write this. I didn't sign this. If you want to talk about what I signed, we can do that.
Q Do you understand the meaning of the term



"delink"?
A Well, that we can do, but you asked what I meant when I wrote this, and I didn't write this.
What's the question?
Q What's the meaning of the term "delink"?
A Delink would be to change the linkage that required the -- you couldn't start construction until the repository construction authorization is to change that linkage, not to change other linkages such as the 10,000 tons, etc. That was a premise or an assumption that we were operating on, that we could delink the timing part, but we would probably not be successful legislatively to eliminate all the linkages. So that's what was meant -- that's what I believe the author here was saying when they would delink the schedule constraints, not to delink the capacity.
Q Turn to the second page of this exhibit. Are you there?
MR. CRAWFORD: Give him a second now.
A I'm there.
Q Under Problem, the first sentence refers to "the possibility of failing to begin." Do you see



that?
A Yes.
Q At this point in 1993 how likely did the department consider it that it would be unable to begin acceptance of spent fuel in 1998?
A For myself at this time I looked on this as what we were going to do and try to do, not dwell on what we couldn't do. So it was our goal to achieve this, and we worked as hard as we possibly could within the law to achieve this goal.
Q But you knew there were substantial difficulties at this time, correct?
A Yes, we did.
Q And you didn't minimize those difficulties, did you?
MR. CRAWFORD: Objection, vague. Objection, leading.
A I don't believe we minimized them, no.
Q This paragraph further states "Thus, if the negotiator cannot site the monitored retrievable storage facility, the department cannot build such a facility and, consequently, it is not liable to accept

spent fuel." Do you see that statement?
A I see it.
Q Was that your understanding in 1993?
A I never would have used the word "liable" because that's a legal term, so I'm sure I never drafted it. I don't know what the author who drafted this meant by that.
Q Do you believe a lawyer might have drafted that?
MR. CRAWFORD: Objection. Mischaracterizes -- objection.
A I doubt it. I mean, given it was my staff that would write something like this, would write a document like this, it's unlikely the first drafter would have been a lawyer writing this.
Q How would you have stated this sentence had you drafted it?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A I would have -- if the negotiator cannot site the MRS facility, the department cannot build such a facility and I would say And consequently would



not be able to -- and here's where I would make the change -- and consequently would not be able to meet the 1998 date, period, is how I would have phrased it.
Q Do you see the last sentence in this paragraph: "This issue is a point of contention between the DOE and the utilities that may only be resolved through litigation"?
A I see it.
Q Was that your opinion in 1993?
A No.
Q What was your opinion in 1993?
A In 1993 I always viewed and I still do view the 1998 -- January 31, 1998, date in the statute as a goal. And it was prepared there as a goal and desire from the United States Congress to do something by date -- by that date certain. I don't believe that it is a contract litigation matter, but that's neither here nor there as far as I'm concerned.
So in 1993 I wouldn't have used the word "litigation." I would have used the words It's a national issue we'll have to deal with. Now, exactly how it would be dealt with, I doubt anything would



ever be solved through litigation. The only way this was going to be resolved would be through performance and statute. I still do.
Q What were you referring to when you used the "date certain" a moment ago?
A Date certain was the date, January 31, 1998, is the date certain in the act.
Q Date certain by which the government had to begin to perform, correct?
A The date stated in the act, just like there's other dates stated in the act. It said the EPA would issue their standard one year after the National Academy report. It took them four. You know, there's a lot of things stated in the act. There's a chicken in every pot and everything else.
Q Are you familiar with the assumptions referenced toward the bottom of page two?
A In general, yes.
Q Do you agree that each of these assumptions was necessary in order for a realistic and consistent plan to be implemented by the 1998 date?
A Rephrase the question again.



Q Yes. In 1993 did you believe that each of the assumptions listed on page two and three were necessary in order for a realistic and consistent waste disposal plan to be implemented by the 1998 date?
MR. CRAWFORD: Objection, best evidence. Objection, foundation.
A Reading them now, the answer is no.
Q Reading them in 1993?
A I'm not sure I --
MR. CRAWFORD: Objection, best evidence.
A Don't know. In 1993, not necessarily.
Q Why did you say that?
A Item number six I don't think is -- you used the word "necessary." This doesn't say necessary. It says the assumptions have been made. When you insert the word "necessary," you change it. Six I don't think is necessary, okay. And number five I don't think is necessary. One through four I think was necessary. I take that back. Let me look at this thing. Congress will support the... I don't know what -- wait a minute. Let me retract that. I don't

know what these assumptions are. I thought it was negotiator and everything else.
What's your question about these assumptions that some staff person wrote?
Q Were you familiar with the DCS process at the time Exhibit 28 was drafted?
A No.
Q Are you familiar with it now?
A No.
Q You're not familiar with the DCS process now?
A No.
Q Do you know what DCS stands for?
MR. CRAWFORD: Objection. Asked and answered.
A I think it's the delivery commitment schedule.
Q Right.
A DCS. Yes.
Q And you've never been, in 1993 or today, familiar with the delivery commitment schedule process, correct?



MR. CRAWFORD: Objection. Asked and answered.
A Correct.
(Deposition Exhibit Barrett 29 was marked for identification and was retained by counsel.)
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 29. It is the OCRWM planning for a no-MRS contingency. It begins at HQR 038-0031 and continues through HQR 038-0049. Do you have that document before you?
A I do.
Q Who is Tom Isaacs?
A He was a staff member in RW at that time.
Q And what does "OCRWM MNO senior staff," what does that refer to?
A That would have been management operating contractor. That would have been TRW Environmental Safety Systems at that time. That's what I believe it refers to.
Q Can I ask you to turn to page four. Can you take a moment to read this page that starts, "the



contingency."
A I've read it.
Q Look under the third caption, Diagnosis. It says "Given the time required to secure a site and license and construct an MRS, the contingency may be soon upon us if we are to accept waste in 1998." Do you see that?
A Yes.
Q Do you understand the contingency that's being referred to there?
MR. CRAWFORD: Objection, foundation. Objection, vague.
A I assume the author is saying that it's possible we won't be able to receive waste in 1998.
Q And what is the basis for the view in May 1992 that that contingency which you just described "may be soon upon us"?
MR. CRAWFORD: Objection, vague. Objection, foundation. Objection, speculation.
A I have no idea. I wasn't here then. I was in defense programs. I've never seen this before. I have no idea who the author was. I don't know what



the author was talking about.
Q Look at the heading of Consequences. The sentence under Consequences states "DOE's ability to accept waste in 1998 is threatened. If DOE cannot offer some means for timely waste acceptance that utilities can agree with, they will likely sue to terminate the waste fee." Do you see that?
A I see it.
Q Was that topic or concept or issue, was that ever discussed in your presence?
MR. CRAWFORD: Objection, vague. Objection, foundation.
A When? Then? No, I was in defense programs.
Q Has it ever been discussed in your presence?
MR. CRAWFORD: Objection, vague.
A The only time I know we've ever had discussion about utilities not paying a waste fee is when some of the public utilities commissions had proceedings in the mid-nineties about escrowing the fee. So the only time I've been involved in such

see that?
A Yes.
Q -- "all DCSs previously approved by DOE may need to be reevaluated by DOE and the purchasers." Do you see that?
A Yes.
Q Okay. Now, the assumption is that the federal waste management system will be able to accept spent fuel beginning in 1998, correct?
MR. CRAWFORD: Objection, speculation.
Q That's the assumption?
A I don't know.
Q I mean, that's what the document says the assumption is, correct?
MR. CRAWFORD: Objection, best evidence.
A That's what the words say.
Q And as I believe you just indicated, that assumption became -- you used the term "unrealistic" by year end 1993, correct?
A Whatever I used. Unlikely.
Q Unlikely?
A I think it was unlikely.



Q Okay. And this document, it states at the top left-hand corner on page one, was revised as of September 10th, 1993, correct?
MR. CRAWFORD: Objection. Best evidence.
A That's what it says.
Q Now, going back to subparagraph on page two -- subparagraph C on page two with respect to the statement that all DCSs previously approved may need to be reevaluated if the circumstances change, do you know whether this instruction form for the completion of DCSs was revised by the Department of Energy subsequent to the point in time in late 1993 when it became unlikely that spent fuel would be accepted beginning in 1998?
A I don't know anything about the timing nor what was, when this was done.
Q Based on the statement on 7C, would it be your assumption that this instruction form would have been revised following that time to reflect the fact that 1998 spent fuel acceptance became unlikely?
MR. CRAWFORD: That mischaracterizes prior testimony. Objection.



A I would doubt it. I mean, because if this was done really on December -- September 10th, and that was -- is this an official revision?
Q It's a form from your office. I would surmise that it is, but I'll ask you that.
A Well, if it is, then most likely not, because it takes a long time for these to go out through the processes they go through, and the decision wasn't made to stop the grants until September. So it is unlikely that the FY '94 grants decision by the Congress would have been reflected in an official revised form on September 10th.
Q But my question is do you believe it's likely that once the decision was made not to make the grants by Congress that the process would have at least commenced within the Department of Energy to revise this instruction form to reflect the fact that the assumption in 7C no longer was an appropriate assumption in light of the circumstances?
MR. CRAWFORD: Objection, foundation, mischaracterizes prior testimony.
A I don't know how that would have rippled



into this, if it would have at all.
Q Do you believe that the assumption in 7C continued to be reasonable after Congress denied the grants in late 1993?
A I don't know that -- I don't know.
Q You don't know if it was reasonable to assume -- again, the assumption is that the FWMS will be able to accept the purchasers' spent fuel beginning in 1998. Do you see that assumption?
A I see it.
Q By year end 1993 that was not Lake Barrett's assumption, was it? After the grants were turned down?
A I don't know what our official position was vis-a-vis the issue you asked me for or what I really thought. You asked me what I really thought. I don't know what our official contractual position was in these documents.
Q Putting aside the official contractual position, you've already stated, have you not, that it was the position of Mr. Lake Barrett at this point in time, late 1993, that it no longer was reasonable to

assume that the acceptance of spent fuel would begin in 1998, correct?
A I don't think I ever used those words "no longer reasonable to assume."
Q What words would you use?
A It was unlikely.
Q It was unlikely as of late '93 to assume -- the assumption -- put it in a sentence. How would you state it?
A Probably had a low chance of success, okay, for 1998. If this was after the grants. That's how I would say it in plain English.
Q Just so the record is clear, what had a low chance of success?
A Moving fuel in January 31, 1998.
Q Thank you.
On the next paragraph, 7D, it states that "Early submission of DCSs will facilitate the exchange of approved DCSs between purchasers." Do you see that?
A I see it.
Q Do you know, why was that? Why would the



early submission of DCSs facilitate the exchange?
MR. CRAWFORD: Objection to the foundation.
A I don't know.
Q On page three, paragraph nine, who is Nancy Slater?
A She was a staff member in the office.
Q Was she a contract officer?
A I don't think so.
Q Do you know what her position was?
A No.
Q Who is Doug Baptist?
A He was somebody who worked in procurement.
(Deposition Exhibit Barrett 34 was marked for identification and was retained by counsel.)
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 34. It's an entry from the Federal Register dated May 25th, 1994, re: Waste acceptance issues. It refers to an action notice of inquiry, and the Federal Register cites for this document start at 59 FR 27007 and go through 59 FR 27009. It's a seven-page document. Do you have it before you?



A I do.
Q What is a notice of inquiry?
A Some formal administrative procedures process that we use.
Q Was it your idea to issue this notice of inquiry, Exhibit 34?
A I don't remember. I don't think it was ever my idea.
Q Why was this notice of inquiry issued?
A It's my understanding that in this time frame it looked like the 1998 date was lower chance of success than we all wanted, and we figured we needed to go out and start some process in a national dialogue about what our views were. And this was a formal way to involve the public as to what was the next steps that the nation was going to do.
Q What did you hope to accomplish through the issuance of this notice of inquiry?
MR. CRAWFORD: Objection to foundation.
A It was my limited understanding that hopefully this administrative process would clarify or assist the nation in coming to grips with reality --



deciding what it was going to do regarding the situation where we might not make the January 1998.
Q When you said "come to grips with reality," what are you referring to?
A That the situation was looking unlikely that we were going to be able to make 1998.
Q Would you turn to, it says page three in the upper right-hand corner. It's actually the second page of this document. Under C, Development of a Repository and MRS. Do you see that?
A I see it.
Q The first sentence states, "When the act was passed the department anticipated that a geologic repository would be in operation and prepared to begin acceptance of spent nuclear fuel by January 31st, 1998." What was the basis of that anticipation?
A That's what the law said.
Q And the department anticipated that it would comply with the law?
A The department was doing everything it could to implement the law.
Q Continuing to the next sentence it states

that "It was envisioned that there would be a waste management facility in operation prepared to begin acceptance." Do you see that?
A Yes.
Q Why is the word "facility" used there?
A I don't know. I don't know. I will assume that it is for both the -- it could be either an MRS or it could be the repository, but a receiving facility. So we'll use that term. It could be either facility. Whatever we could get in place.
Q But at the time the standard contract was promulgated wasn't the focus on the repository?
MR. CRAWFORD: Objection, foundation.
Q This would be back in '82, '83.
A It is my understanding that even back then it was our goal to have an MRS as part of the system and would be proposing an MRS proposal. So the most likely receiving facility would have been an MRS in the program's mind.
Q And then the MRS would process the fuel and pass it on to the permanent repository?
MR. CRAWFORD: Objection, best evidence.



A Basically.
Q At that point in time to which you just referred wasn't the program goal to have an MRS up and running and accepting spent nuclear fuel prior to 1998, specifically in 1996?
MR. CRAWFORD: Objection, foundation. Objection, best evidence.
A That was the goal.
Q Page five in the upper right-hand corner states "The purpose of notice." The first entry there is that it's the department's preliminary view that it does not have a statutory obligation to accept spent nuclear fuel in 1998 in the absence of an operational repository or other facility constructed under the act. Do you see that statement?
A Yes.
Q Can you explain to me the process undertaken by the department to reach that preliminary view?
MR. CRAWFORD: Objection to the foundation.
A Well, there was lots of dialogue between our office, the procurement office, and the Office of



General Counsel about how to proceed in light of congressional actions.
Q Did your office advance the position that there was not an obligation to accept spent nuclear fuel prior to the operation of a repository?
MR. CRAWFORD: Objection, best evidence.
A I don't remember who said it first, but it was the department's view.
Q Were contrary views expressed during the discussions?
MR. CRAWFORD: Objection to the vagueness of the question. Objection to the extent that any answer would reveal any communications given at either the instruction of counsel or in the presence of counsel.
A None that I recall.
Q What is the reference to options for offsetting through the use of the nuclear waste fund? Why was that reference included in this notice of intent?
A I don't remember.
Q The department ultimately concluded that



that would not be a good idea, correct?
A I think what I said was it was not the program's desire.
Q What was the program's desire?
A Not to use the waste fund for, you know, schedule performance issues.
Q Continuing in that paragraph, what did the department have in mind when it stated that "It is possible that a release might be required as a condition of cost sharing?"
Well, first let me ask, what did the department have in mind with respect to the idea of cost sharing? What costs would be shared?
A I don't remember. I will take a guess that this had to do with some arrangement on storage costs and cost sharing through canisters or casks or, you know, if they bought a dual-purpose cask, maybe we would buy it back, some arrangement like that.
Q Did the department continue to pursue this idea of a release?
A It's my understanding the department always said during this period that we would try to work with

the contract holders for some equitable arrangement regarding our inability to have a facility capable to move the fuel. So that offer to work out some sort of arrangement was there for many years.
Q Turn to page six. Under Interim Storage Issues, do you see that?
A Yes.
Q There's an entry "What role, if any, should the department play in the development of private interim storage facilities." Can you describe for me the department's deliberations on that point?
A I don't remember deliberations about that question in this thing.
Q Was there any consideration of that proposal after this release went out for comment?
A Not that I recall. We must have said something about it in the final.
Q But you don't recall any internal discussions about that point?
A No.
Q Why is there the reference to, further down, "should the department pursue" -- why was the



suggestion that the department should pursue with Congress the elimination of existing restrictions on MRS site construction and operations? Had you not already pursued that with Congress at this point?
MR. CRAWFORD: Objection, vague.
A I don't remember why that's there.
Q This is basically what Congress had already shot down, correct? When the grants were denied.
A Well, they stopped the volunteer process for purposes of putting grants in. Doesn't mean you still couldn't try to do it, and at this time -- this is circa '94 -- I think they were starting -- there was discussions starting about interim storage.
Q Well, at the time on May 25th, 1994, when this notice of intent went out, was there any question in your mind, Mr. Barrett, that for all practical purposes the MRS proposal was dead?
MR. CRAWFORD: Objection, mischaracterizes prior testimony.
A No, I wouldn't say it was dead. I didn't use that word, "dead." I said it was unlikely. It wasn't dead.



Q Was part of your program plan waste management system at that time an MRS facility?
A I'm not sure of the timing, but we basically shifted from site-specific MRS to generic, and so we submitted a topical report to the Nuclear Regulatory Commission so that if a site could be developed through some process, you could expedite the licensing much faster and ran on line as quickly as possible close to 1998. And that's why we did that, spent money on that topical report. So hopefully there could have been maybe a breakthrough with a volunteer who didn't need grant money or some other arrangement through some other designating process that I don't know what it would have been, but could have been.
Q But at this point you did not expect it to happen, correct?
A It was less likely than it was likely.
MR. CRAWFORD: Objection.
Q Excuse me?
A It was less likely than it was likely.
Q It was a lot less likely than it was likely



at this point, wasn't it, Mr. Barrett?
MR. CRAWFORD: Objection, asked and answered.
A I don't know what "a lot" is, but I said it was unlikely.
Q We're saying it was unlikely that an MRS facility would be operational, be pursued and made operational, correct?
MR. CRAWFORD: Objection, vague. Objection --
A It was unlikely is what I said.
Q Was it part of your program plan waste management system at this time in mid-1994?
MR. CRAWFORD: Objection to form.
A I think the MRS was still there. We didn't take it out.
(Deposition Exhibit Barrett 35 was marked for identification and was retained by counsel.)
Q The court reporter has handed you a document marked for identification as Exhibit 35. It is a predecisional draft, Volume 3 of the Waste Acceptance Storage and Transportation Project

discussed on these various entries you were either the acting director or the deputy director of RW, correct?
A Correct.
Q So why don't you know whether acceptance priority ranking and annual capacity reports were issued throughout that period?
MR. CRAWFORD: Objection, argumentative.
Q Does that go back to your testimony about administrivia?
MR. CRAWFORD: Objection, argumentative.
A That was a detail I didn't personally get involved in. So my staff was capable of doing that with the rest of the elements in the department, and that was all that was necessary.
Q I take it you did not use these documents for planning purposes?
A I personally didn't, no.
Q And why did you stop taking these reports or publishing these reports by 2000?
A I don't know. Staff didn't bring them to issue them. Or they didn't issue them. I don't think I ever signed them, anyway, when they were issued.



They stopped issuing them. I don't know why.
Q No idea at all?
A No.
Q What about the "Publish spent fuel storage requirement for 1999 through 2040," did that ever occur?
A I don't know.
(Deposition Exhibit Barrett 36 was marked for identification and was retained by counsel.
Q The court reporter, Mr. Barrett, has handed you a document marked for identification as Exhibit 36, which is Volume 1 of the Civilian Radioactive Waste Management Program Plan bearing Bates SN 174276D through SN 174362. Do you have that document before you?
A I do.
Q What is a Civilian Radioactive Waste Management Program Plan?
A That's the basic general description of our plan to implement the law.
Q And what was your involvement in connection with the preparation of this program plan?



A I was a participant in its development and approved it.
Q This program plan is apparently dated December 1994. Why was the program plan issued at that particular time?
A Our desire was to put together an integrated management -- a document that would describe the integrated management program plan, what our plans were after we received the budget for that year, and also was a planning document and the basis for the budget presentation in defense for the next year.
Q My next question, answer it from your memory if you have one or examine the document to the extent you need to to refresh your recollection if required. My question is with respect to the Civilian Radioactive Waste Management Program Plan reflected in Exhibit 36, was a monitored retrievable storage facility part of the waste management system provided for by this plan?
MR. CRAWFORD: Objection, best evidence.
A I don't know. I would have to look at it.



Q Please do so.
A Is this the issued plan or is this a draft?
Q My understanding is it was issued.
A Okay. Because there is an issued one. I just don't know if this is the issued one or not.
Q To the best of my knowledge, it is.
A The MRS is still a possibility here, okay, because the transportation on page 32 talked about transportation to be ready in case there is an earlier facility on the 22.3. But when you go into the actual work that they were focused on at this time, the main focus of the waste acceptance and transportation project was focused on the multipurpose canister activities. So it still was there, but it was not specifically brought out as a major initiative.
Q Why was it not specifically brought out?
A Because with the '94 budget, the lack of grants for the volunteer, MRS was unlikely.
Q You refer to page 32. Does page 32 reference MRSs?
A Well, it says interim storage, which is basically MRS. Third line, second line. "To maintain

readiness for earlier transportation should a site for federal interim storage become available sooner than a repository." I believe that's the only part in here on the MRS.
Q You believe that's the only reference in this document to an MRS?
A My quick scan here, my recollection was I don't remember anything else. Somebody else may have read it closely.
Q Turn your attention to page one, Bates 174286.
A I'm sorry, page one?
Q Page one on the bottom, paragraph one.
A Okay.
Q On the end of the introduction section it states that "By 1993 it became clear that continuation of the program in accordance with the then-current approach was no longer a viable option." Do you see that?
A Yes.
MR. CRAWFORD: Where is that?
MR. CAYNE: Last sentence of the



introduction.
A Yes, I see it.
Q What was the then-current approach that's being referred to in that statement?
A That was the volunteer MRS that would -- had a reasonable chance of success for 1998. That was no longer a viable option.
Q So that was no longer a viable option?
A I would have used the word "unlikely," but it's certainly not the central premise for waste acceptance anymore.
Q The department used the word "viable," correct?
A That's what it says.
Q And you would have seen this document before it was issued, correct?
A Yes.
Q And I assume you were in the chain of command that had to approve this document?
A I was responsible, I'm sure. I don't know if I ever signed it off or not.
Q You would have been satisfied with the



language of this document, correct, before it became final?
A Yes.
MR. CRAWFORD: Objection, asked and answered. Argumentative.
A I would have accepted those words there.
Q The words being "no longer a viable option," correct?
MR. CRAWFORD: Objection, asked and answered. Argumentative.
Q Correct?
MR. CRAWFORD: Objection, asked and answered, argumentative.
A Correct.
Q Page four, please, bottom of page four. The first sentence. "When the Nuclear Waste Policy Act was enacted, it was envisioned that the department would have had a facility available in 1998 to accept waste for disposal, and the department entered into contracts with utilities on that basis." Do you see that?
A Yes.



Q What does that mean, that the department entered into contracts with utilities on the basis that it would have a facility available in '98 to accept waste for disposal?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A Just what it says.
Q Do you understand what that means?
A The act says we should have a contract within the time frame, and they put those contracts together under the limited time there in '83, '84. The base operating premise was it would have a facility ready to accept in 1998.
Q The time the contract was signed or contracts were signed in 1983, that is what the government and the nuclear utilities intended?
MR. CRAWFORD: Objection --
Q Correct?
MR. CRAWFORD: -- to the extent it calls for speculation. Objection to the extent it calls for a legal conclusion.
A I wasn't there. I wasn't involved in a

work that had been pursued in the past, in excess of 95 percent of the total work had ended? The reduction, it went from a large amount of work to a tiny amount of work. Would that be a fair statement?
A Yes. It was greatly reduced.
Q To almost an inconsequential level, correct?
MR. CRAWFORD: Objection, asked and answered.
Q To almost an inconsequential level, correct?
MR. CRAWFORD: Objection, asked and answered.
A No, I wouldn't say a couple of million dollars a year in a total budget year is inconsequential. I wouldn't characterize it that way, no.
Q Do you know what MGDS stands for on page four?
A Mine geologic disposal system.
Q Is that referring to a repository?
A Yes.



Q And on this acceptance-rate schedule --
A What page are you at?
Q Page four.
A Yeah, okay.
Q Are you there?
A Yes.
Q This acceptance-rate schedule does not reflect any spent nuclear fuel being accepted until 2010. Do you see that?
A Yes.
Q And why is that?
A Because under the schedule the time of the repository would not have been, you know, selected, licensed, designed, built and ready to receive until 2010.
Q But earlier schedules we looked at did show perhaps 900 MTU a year being accepted starting in 1998. Do you recall that?
MR. CRAWFORD: Objection, vague.
A Long before this date.
Q How long?
A I don't know. You would have to go back



and look.
Q Is this schedule in Table 1-2 based on the waste management system that was reflected in the department's 1994 program plan?
A I believe so. It probably was.
Q Why do the emplacement rates reflected on Table 1-2 not project any acceptance of spent fuel by a monitored retrievable storage system during the period 1998 through and including 2009?
MR. CRAWFORD: Objection, best evidence.
A Because this document followed the program plan that we just went through, and the primary emphasis was the MPCs, and there wouldn't be any -- it was unlikely to be fuel movement until the repository was ready, which the schedule is 2010.
Q And the program plan we just went through you're referring again to the 1994 program plan, correct?
A Right, correct.
(Deposition Exhibit Barrett 38 was marked for identification and was retained by counsel.)
Q The court reporter has handed you a



document marked for identification as Exhibit 38. Do you have that before you?
A I do.
Q Exhibit 38 is a draft 1994 acceptance priority ranking and annual capacity report. 1994 acceptance priority ranking and annual capacity report dated March 1995 bearing Bates number EDB 0010136, and the last page with the Bates number is 0149, and there's an additional page behind that. Let me see if I can read the Bates number. 014 -- it says 0147.
MR. CRAWFORD: Well, it follows that smaller Bates number range that's on here.
MR. CAYNE: Okay. But they're consecutive pages.
MR. CRAWFORD: Right.
Q Do you have that before you?
A I do.
Q Let me ask you to turn to the third page of this document. It says page one on the bottom.
A Yes.
Q Is this your handwriting?
A No.

Q Do you know whose handwriting it is?
A No.
MR. CRAWFORD: Off the record.
(There is a discussion off the record.)
Q You see in the bottom, toward the bottom of the first page there's a sentence that's struck through. "As specified in the standard contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers." Do you know why that's struck through?
A I have no idea.
Q And there's a handwritten sentence to the right, and below that it says "This is not stated in contract. It is a conclusion we have not yet reached." Do you see the language?
A I see it.
Q Do you know why that --
MR. CRAWFORD: Are you referring to the one that's crossed out in the corner?
MR. CAYNE: Yes, the one that's crossed out.
Q Do you know the meaning of that statement?



A No.
Q Do you have any idea why that was put there?
A No.
Q Do you know why no ACR was issued in 1993 or 1994?
MR. CRAWFORD: Objection. Asked and answered. Foundation.
A No.
Q Do you know why the issuance in 1994 is a combined acceptance priority ranking and annual capacity report?
A No.
Q On page four you see there's a --
MR. CRAWFORD: Hang on just a second.
Q There's a paragraph, about a paragraph in, and most of it is stricken through.
A Yes.
Q And at the start of the second paragraph which appears to be stricken through it states, "Although the program plan does not include the monitored retrievable storage facility, the existing



storage capacity restriction posed by the act is still in effect." Do you see that?
A Yes.
Q Do you believe that that -- or do you understand that that statement was stricken through because it's incorrect?
MR. CRAWFORD: Objection. Calls for speculation.
A I don't know. I don't know.
Q Well, the existing storage capacity restriction in the act would refer, would it not, to the 10,000 MTU storage capacity restriction placed on an MRS in the 1987 amendments to the Nuclear Waste Policy Act?
A Repeat the question again.
Q Yes. This sentence that was stricken out refers to existing storage capacity restrictions posed by the act. Do you see that?
MR. CRAWFORD: Let me object to that as mischaracterizing the document.
Q Do you see the language I'm referring to?
A I see the language.



Q What I'm asking is you, I believe, have testified in this deposition about a storage capacity restriction imposed by the 1987 Nuclear Waste Policy Act. My recollection is the restriction was the 10,000 total MTU restriction placed on an MRS facility, correct?
A Prior to something happening I think it was a 15,000 total, but it's one of the limitations.
Q 10,000 --
A Prior to something.
Q Prior to the repository it was 10,000, correct?
A I would have to go back and check the record. Sounds about right.
Q Are you familiar with any other storage capacity restriction imposed by that act?
MR. CRAWFORD: Isn't that the one he just said?
Q Any other one other than the one you just said, the 10,000 that could go up to 15?
A Those are two separate ones.
Q Are you aware of any other?

A Just the siting provisions.
Q Those are the only storage capacity restrictions, correct?
A Those are the only numerical, you know, capacity limitations.
Q And those numerical capacity limitations applied only to an MRS facility, correct?
A Correct.
Q They did not apply to the permanent repository, correct?
MR. CRAWFORD: Let me object to that to the extent it calls for a legal conclusion.
Q Those numerical capacity restrictions that you just referred to did not apply to a permanent repository, correct?
MR. CRAWFORD: Objection, best evidence. Objection to the extent it calls for a legal conclusion.
A To my knowledge, correct.
Q So my question is the sentence there that is stricken through, "Although the program plan does not include a monitored retrievable storage facility,



the existing storage capacity restriction imposed by the act is still in effect." Do you understand that statement?
A I understand what the statement says. I don't know if it's right, wrong, or indifferent. I don't know.
Q Well, based on your knowledge could it possibly be correct? And if so, how?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, best evidence.
A It could -- well, if so, how? I mean, you could argue that that -- the last time you did contract-related stuff that's what it was and then things happened outside, you just hold it in abeyance and just don't change it.
Q Could you say that in other words? I did not understand what you just said.
A Can she read it back?
Q You said, I mean, you can argue that last time you did contract-related stuff that's what it was and then things happened out, you just hold it in



abeyance and just don't change it.
A Because before, the last time one of these was done there was an MRS in the system and there was numerical numbers put in. Then the MRS -- due to events beyond our control we couldn't do the MRS, and it became pretty obvious you could not do 1998. It was unlikely to do 1998. To go and rewhip your numbers around, what value was that going to be? Because it was moot at that point.
Q What was moot? What was moot at that point?
A From my perspective -- I wasn't really much involved in all these -- the whole thing is moot as to what the numbers are because we focused on trying to perform and bring capacity on line, not what the administrative aspect of this was. From my perspective. That's why I don't consider this one way or the other.
Q You said "from my perspective I wasn't really much involved in all these." When you said "all these," what are you referring to?
A ACRs, DCSs, contract language, etc.



Q Because they were moot because of what was happening on the bigger picture?
A Because we were focused on trying to address the 1998 date through the -- at this time through the multipurpose canisters. We had negotiations, and we were focused on trying to get the repository done under extremely difficult budget conditions. So I as the deputy director, which I guess that's what I was then, did not focus on this. And trying to go and change around contracts to me was not a proper utilization of resources.
Q Because the whole issue of annual capacity reports and acceptance priority rankings and other such administrivia was moot until such time as you had a repository plan in place?
MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony.
A Until we had a facility in a place to move the material. That was our primary focus, was to create a facility so we could start to move the material. That was my main focus.
Q So is my statement correct that all this

administrivia such as acceptance priority rankings and annual capacity reports were, in your opinion, moot until that time?
MR. CRAWFORD: Objection, vague. Objection to the extent it mischaracterizes prior testimony.
A They weren't high on my priority.
Q They weren't on your priority at all?
A They were not on my priority, that's fair. They were not on my priority.
Q Because until you had a repository plan in place, in your words it was moot, correct?
A Okay. Yeah, I'll accept that. Yes.
MR. CAYNE: Let's take a five-minute break. It's 3:48.
(There is a recess from the record.)
(Deposition Exhibit Barrett 39 was marked for identification and was retained by counsel.)
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 39, which is the acceptance priority ranking and annual capacity report issued March 1995, and it bears Bates numbers -- looks like the last four digits on



the first page are 0676 through 0748. Do you have that document before you?
A I do.
Q Now, March 1995, this date is subsequent to the 1994 plan you were referring to a moment ago, correct?
A Correct.
Q What was that 1994 plan?
A Program plan.
Q And that program plan did not reflect in the table the -- the acceptance schedule did not reflect an MRS facility, correct?
A That's my recollection.
Q You can look at it again, sir, if you need to refresh your recollection.
A Did this have a table in it? You probably know what the table is.
Q 1-2.
A The program plan.
Q Mr. Barrett --
A You're asking about this one?
Q No. Strike that. I asked you I think



about the wrong document. You can put that down. Let's turn to Exhibit 39.
A All right.
Q The first paragraph, the last sentence, you see the standard contract provides for the acquisition of title to the spent nuclear fuel and/or high-level waste by the department, its transportation to federal facilities, and its subsequent disposal. Do you see that?
A Yes, sir.
Q Do you recall a little while ago we were talking about the stepped process for the waste management system?
A Yes.
Q And isn't this consistent with your prior testimony that first, pursuant to the contract, title would be acquired and, second, after the acquisition of title and the possession of the spent fuel, the fuel would be shipped to federal facilities for subsequent disposal?
MR. CRAWFORD: Objection to the mischaracterization of his prior testimony, and object



to the extent it calls for a legal conclusion.
A Yes.
Q So this confirms your earlier testimony, correct, sir?
MR. CRAWFORD: Objection to the extent it mischaracterizes his prior testimony.
A Not inconsistent.
Q It's not inconsistent with your prior testimony, correct?
A Correct.
Q Further down in the second paragraph there's a statement "These capacity allocations as listed in the ACR form the basis for the purchasers' submittal of delivery commitment schedules." Do you see that statement?
A I see it.
Q Why is that?
MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for a legal conclusion.
A I don't know.
Q Do you know if that statement is correct?

A Yes.
(There is a discussion off the record.)
(Deposition Exhibit Barrett 40 was marked for identification and was retained by counsel.)
Q In order to clarify the indecipherable prior questions, let's go and put the 1992 ACR in the record, because I have now discerned that we did not put that in the record before, and that's what we were referring to.
The court reporter has handed you Exhibit Number 40, which is the 1992 annual capacity report dated March '93, 1993, bearing Bates PA-102630 through 102678. Do you have that before you?
A Yes.
Q I would like to turn your attention to page three of this document, specifically pages three and four, captioned Waste Acceptance Projections. Are you there?
A Yes.
Q And if you look towards the bottom of page three, it refers to the Table 2-1 on the next page which would result in the receipt of 8,200 MTU of SNF



at the MRS facility during the first ten years. Do you see that?
A Yes.
Q We discussed that MRS facility and the assumptions on which the first ten years of operations were based a number of times in this deposition. Do you recall that?
A Yes.
Q And that MRS facility involved what you have referred to as a volunteer, correct?
A Correct.
Q And it involved a volunteer, and it would have required the enactment of congressional legislation repealing or modifying the linkages, correct?
A Some of the linkages.
Q Some of the linkages, correct?
A Some of the linkages, yes.
Q And had that happened, had you had a volunteer and some of the necessary legislation, the MRS you projected could have gone into effect in 1998, correct?



A Correct.
Q And, in fact, page four of this exhibit shows your projected schedule with such an MRS, correct?
A Correct.
Q And it shows a first-year acceptance rate of 400, second year 600, and years two through ten of 900 MTUs, three through ten of 900 MTUs per year, correct?
A Correct.
Q And that adds up to a total MTU take of 8,200 within the congressional limit at that point of 10,000 MTUs, correct?
A Correct.
Q But, again, this Table 2-1 is based on two assumptions that you -- or perhaps three assumptions that you have discussed throughout this deposition. First, an MRS facility that is based on a volunteer and that Congress deems it appropriate to enact authorizing legislation including the repeal or amendment of certain of the linkages, correct?
MR. CRAWFORD: Objection to the foundation



for that and objection, it assumes facts not in evidence. And just objection as to vague.
Q Correct?
A Except you used the word "authorized." It's already authorized.
Q That the necessary congressional legislation would have been enacted to modify or repeal the linkages, correct?
A Yes.
Q Now, we also discussed today that by the end of 1993 that type of MRS facility involving a volunteer and the modification or repeal of linkages had become a low probability, correct?
A Yes.
Q And we saw other documents issued by the Department of Energy that indicated that such a facility, a specific facility with a volunteer was, quote, not viable, correct?
A A facility like you described before was not viable, correct.
Q So the projections reflected on page four of Exhibit 40 at that point in time no longer would be

pertinent, correct?
MR. CRAWFORD: Objection, vague.
A Not necessarily.
Q Not necessarily? But this projection assumes an MRS facility operated by a volunteer and the modification of the linkages, correct?
MR. CRAWFORD: Objection, vague.
A That's how they got generated.
Q And without the modifications to the linkages, the MRS facility, an MRS facility could not operate, begin operations 12 years prior to the commencement of operations of a repository, correct?
A Correct.
Q We discussed that likely such an MRS facility could only begin operations three years prior to repository operations, correct?
A Correct.
Q Now let's go back to Exhibit 39. Specifically I would like to turn your attention to page four of this exhibit. And the first sentence -- and this is the sentence -- do you recall we looked at the draft of the 1995 ACR a short while ago?



A Yes.
Q And you could pull it out if it assists you, sir. Exhibit 38. Do you have that? And if you turn to page 4 of 38.
We spoke about a sentence on that page that was stricken. Do you see that sentence that reads "Although the program plan does not include a monitored retrievable storage facility, the existing storage capacity restriction imposed by the act is still in effect"? Do you see that sentence?
A I see the sentence that was in the draft.
Q Right. And do you recall I asked you why you believe it might have been stricken?
MR. CRAWFORD: Well, object again to the mischaracterization of that document.
A I'm not sure I ever understood that dialogue, but go ahead. What's your question?
Q Look at the top of page four of the final document. Are you there?
A Yes.
Q That still refers to the capacity limit. Do you see that? The first full sentence.



A The projected nominal rate sentence.
Q Yeah. "The projected nominal acceptance rate also reflects the capacity limit imposed by the act on such a storage facility prior to repository operations." Do you see that?
A Yes.
Q Well, in the context of 1995, after the year 1994 plans that said the specific MRS facility operated by the volunteer is no longer viable, my question is what is the relevance of capacity limits?
MR. CRAWFORD: Objection.
Q The capacity limits apply to the MRS facility, correct?
MR. CRAWFORD: Vague. Objection.
A The question is what was the capacity limits applied to the MRS facility? Is that the question?
Q No. My question is what is the pertinence of the capacity limits in a document that establishes acceptance rates in 1995?
MR. CRAWFORD: Objection, vague. Objection to the extent it calls for a legal conclusion.



A I don't know.
Q There isn't any, is there?
MR. CRAWFORD: Objection, vague. Objection to the extent it calls for a legal conclusion.
A I don't know.
Q Let's talk about it, because you understand capacity limits. We've spent quite a bit of time in this deposition talking about it. Let's see if we can figure out what relevance capacity limits have in 1995.
You've testified at great length the status of the volunteer MRS facility as of periods prior to 1995. Do you recall that?
A Yes.
Q And what was the status of that MRS facility that would have required congressional legislation to modify the linkages?
MR. CRAWFORD: Objection. Asked and answered.
Q As of 1995?
MR. CRAWFORD: Objection. Asked and answered.

A What's the question again?
Q What was the status of a volunteer MRS facility that would have required the enactment of affirmative congressional legislation modifying certain linkages, what was the status of such a facility in 1995?
MR. CRAWFORD: Same objection.
A Unlikely.
Q And weren't there answers that you even gave stronger than unlikely? Do you recall that, sir?
A Unlikely or --
MR. CRAWFORD: Objection, argumentative.
Q Unlikely or what?
A Unlikely is what I said.
Q Okay. What did the department say in the plan that we looked at before? Did it use the words "not viable"?
A It did.
MR. CRAWFORD: Objection.
Q And you said you would have approved that document, didn't you?
MR. CRAWFORD: Objection --



Q Didn't you?
MR. CRAWFORD: -- argumentative.
A I said I might have. I would not have objected to those words.
Q But you were comfortable with them, right?
MR. CRAWFORD: Objection, argumentative.
A I could support those words.
Q Okay. So by early 1995 an MRS facility was either not likely or, in the words of the department, not viable, correct?
A Correct.
Q If an MRS facility is not viable in early 1995, tell me, based on your understanding of the capacity limits, which I know you understand, what is the relevance of capacity limits as set forth in the first sentence of page four of Exhibit 39?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
Q And take as much time as you need, sir, to study the document.
A Just rephrase it. Now I'm in 39. What sentence?



Q The first sentence I'll read into the record. "The project nominal acceptance rates also reflect the capacity limit imposed by the act in such a storage facility prior to repository operations."
A That sentence is consistent with the table there, Table 1, and it describes what Table 1 is.
Q Thank you. What is the relevance of Table 1 in early 1995 when the department has publicly taken the position in a document that Lake Barrett has signed off on that states an MRS facility is not viable?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A I didn't say I signed that document, by the way.
Q But you were comfortable with it. Do you recall that, sir?
A I would support that.
MR. CRAWFORD: Objection, argumentative.
Q Thank you, sir.
What is the relevance of the table on page four of Exhibit 39?



A I don't know what the relevance of that is.
Q Does it have any relevance to projected acceptance rates as of early 1995 when the MRS no longer is viable, according to the Department of Energy, in official agency promulgations and publications?
MR. CRAWFORD: Objection, vague. Objection to the extent it calls for a legal conclusion.
A I don't have an opinion nor a feeling nor -- I just don't have any position regarding what this would be in a thing called an ACR or DCS that were very low priority. This was administrational activities regarding, you know, this, and I did not personally get involved in that. So the appropriateness or inappropriateness one would have of a table of a list that wasn't central to what the highest priority items were, I personally did not get involved in. So I really don't know if it is or isn't or -- your question, try it again.
Q For your purposes did you consider the projected nominal waste acceptance rates set forth in Table 1 on page four to be relevant?

reflected reality, did you?
A I don't know what reality is in contract-related space whatsoever. All right. They clearly showed, as I showed you on that chart, our goal for performance to design and operate was to ramp it up as quickly as we reasonably could, which was the four, six, 12, 2,000, 3,000 rate. And that's what I showed -- you can do all different kinds of hypothetical -- I used the term "obligation rate." It could be one stick of fuel.
Q Would you please turn to Exhibit 37.
A 37?
Q Yes.
A This is the draft TSLCC. Or maybe the final, I don't know.
Q Would you please turn to page four. You see Table 1-2?
A Okay. Exhibit 37, paragraph four.
Q Bates 1523.
A 1523.
Q Yes, sir.
A Oh, I see. Yes, I see the table.



Q And do you recall you testified about this table a short while ago?
A When we talked about this table. Go ahead, I see the table.
Q And do you recall that you testified that this table was based on the program plan from 1994?
A Yes, I believe that is.
Q And you don't recant that testimony, do you?
A No.
Q And this document on page 1494 shows a date of 2/16/95, correct? That's the second page of the document. On the bottom.
A I'm not sure what the dates mean because the dates on the page you took me to, the 1523 has 4/10/95 on it.
Q Early 1995, correct?
A Yeah, okay. Yes.
Q Exhibit 39 is dated March 1995, correct?
A Yes.
Q Now, Exhibit 37 uses the projections contained in Table 1-2 on page Bates 1523 because



those numbers were consistent with the 1994 waste management plan, correct? Waste management program plan, correct?
A Yes.
Q Why at approximately the same time did the ACR issued as Exhibit 39 not include the same acceptance rates?
MR. CRAWFORD: Objection to the foundation.
Q As Exhibit 37.
A The program plan performance rate, our goal for performance, three, six, 12, 2,000, 3,000, all right, is what -- that was what we were trying to perform at that rate. The table over here in this annual capacity report is what was our relationship, as I understood it, with the contract holders. It is always our desire to perform at a rate higher than what your commitments are -- requirements are, I'll use the word "requirements" -- in an engineering sense you always wanted to do better than.
So what exactly the requirements are and the contract matters, I left those to be what they are. But it's very common that you will see that your



design rates and your thing you're designing to should meet or exceed what your system requirements are. And that's what this does.
So it is common to me, in answer to your question, it is common to me that you would see that the performance rate should be at a rate higher than what your commitment rate or whatever you want to call it is on the other side.
Q But, again, let's look at page four in Exhibit 39. Are you there?
A Yes.
Q Now that we've gone through it, the capacity limits set by the act were applicable only in the context of an MRS, correct?
A Correct.
Q And specifically an MRS that went into service prior to repository operations, correct?
A Correct.
Q In March 1995 the Department of Energy was of the view that there was no viable option for putting an MRS into effect on a volunteer basis prior to repository operations, correct?

A Correct.
Q Now, the question is what is -- the sentence here says "also reflect the capacity limit imposed by the act in such a storage facility prior to repository operations." But as of March 1995 it was the position of the Department of Energy that such a storage facility going into operation prior to repository operations simply was not a viable option, correct?
A Repeat that again so I can get to a yes or no. Just repeat it.
Q The statement on page four --
A Yes.
Q -- refers to the capacity limits that the 1987 amendments to the Nuclear Waste Policy Act made applicable only in the context of an MRS, correct?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, best evidence.
Q Correct?
A The derivation of the numbers here on Table 1 came from that limitation.



Q Okay. And that capacity limit was only applicable in the context of an MRS, correct?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to the best evidence.
Q Correct?
A That's where they came from.
Q And it's only applicable in that context, correct?
MR. CRAWFORD: Objection. Same objections.
A Well, I don't know if it's -- it's applicable only for an MRS if there's an MRS in the system.
Q Right. Stated another way, those capacity limits are not applicable to a waste management system that consists only of a permanent repository, correct?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, best evidence.
Q Correct?
A Applicable in what way?
Q The capacity limits of 10,000 MTUs ramping



up to 15,000 MTUs would not be applicable to the operation of a permanent repository that was not accompanied by an MRS facility, correct?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, best evidence.
A As a --
Q Applicable by law.
A It would not be --
MR. CRAWFORD: Objection. Same objections.
A Not applicable by law and not applicable as an engineering limitation on the performance of the system.
Q Okay. Now, in March 1995 the program plan no longer envisioned a voluntary MRS, correct?
A Correct.
Q It envisioned a stand-alone repository, correct?
A Correct.
Q So as we just discussed, the capacity limits of the 1987 limitation -- 1987 legislation would not have been applicable to that stand-alone



repository. It would not have been applicable as a matter of law, correct?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, best evidence.
A Would not have been applicable to the repository, yeah, engineering or design, correct.
Q The provisions of the '87 amendments would not have been applicable in that context, correct?
A Not have been.
MR. CRAWFORD: Objection, vague. Objection -- same objections as before.
A Not applicable to the repository.
Q Correct. Is that your answer, correct?
MR. CRAWFORD: Objection, same objection.
A Not applicable to the repository.
Q What is not applicable to the repository?
A The MRS limitations.
Q Established by the 1987 amendment to the Nuclear Waste Policy Act, correct?
A That's my understanding, correct.
Q Okay.

A I don't want you -- okay.
MR. CRAWFORD: I have the same objections to that question.
Q Then let's return to Exhibit 39.
In light of the sworn testimony you have just provided, sir, why did the Department of Energy choose to use an acceptance rate that reflected capacity limits applicable to and only applicable to an MRS facility when all the governing plans at that point in time did not envision the use of any such facility?
MR. CRAWFORD: Objection, foundation.
A I don't know.
Q Can you give any reason sitting here today to justify why Exhibit 39 contains capacity limitations applicable only in the context of an MRS facility but no such facility was envisioned at the time Exhibit 39 was prepared?
MR. CRAWFORD: Objection, foundation, asked and answered, argumentative.
A I don't know.
Q Can you come up with any, sir?



MR. CRAWFORD: Objection, argumentative, asked and answered.
A No.
Q Did you in your capacity as director or deputy director of the Office of Civilian Radioactive Waste Management sign off on the acceptance rates reflected in Exhibit 39, specifically reflected in Table 1, page four of Exhibit 39?
A I don't recall doing so.
Q Do you think you would have?
A I don't think so. I normally didn't sign these lower priority documents like this.
Q Did anyone in the Office of Civilian Radioactive Waste Management who might have worked on Exhibit 39 consult with you personally concerning the acceptance rates reflected on page four of Exhibit 39?
A I don't recall ever discussing it.
Q If not, if you never discussed it, sir, who would have been the most senior official within your office, what you refer to as RW, who would have been the most senior official who would have signed off on Exhibit 39?



A I don't know who would have. That should have been in the records. Mr. Brownstein worked on it. Mr. Brownstein's supervisor, Mr. Shelor.
Q Do you believe the most senior official to sign off on these numbers would have been Mr. David Zabransky?
A It could be possible. I would not be surprised.
Q Well, if I wanted to find out why Mr. David Zabransky approved of the projections contained in Exhibit 39, would you suggest to me that I go talk to Mr. David Zabransky and rely on Mr. Zabransky's testimony?
A What's the question?
MR. CRAWFORD: Objection to the foundation. Objection to the extent it calls for speculation.
Q Because you did not approve Exhibit 39 --
A I didn't say I didn't. I might have. I don't think I did.
Q Because you don't believe you approved or even saw Exhibit 39, would you believe it would be sufficient for us to rely on testimony of Mr. David



Zabransky to determine why Exhibit 39 contains the projections reflected therein and specifically the projections reflected on Table 1 of page four?
MR. CRAWFORD: Objection, vague. Objection, foundation. Objection, assumes facts not in evidence.
A I would rely on Mr. Zabransky on this, so I would think that -- I would say the answer to your question is yes.
Q Thank you.
Do I understand correctly that you never discussed this issue, the issue of the projected acceptance rates on page four of Exhibit 39, with Mr. David Zabransky? Correct?
A I didn't say that.
Q Do you recall any discussions of these projected rates with Mr. Zabransky?
MR. CRAWFORD: Objection, assumes facts not in evidence.
A These specific --
Q In the content of the exhibit, do you recall ever discussing with Mr. Zabransky Exhibit 39

and the projected rates as they -- acceptance rates as they are included in Exhibit 39?

A I may have. I mean, we had periodic discussions on what was going on in the waste acceptance transportation project of which they would describe what activities they were doing. Specifically I did not do the prioritization, get into what was or wasn't in ACRs and DCSs. I delegated that down and completely trusted their judgment on doing the right thing as relates to these documents. So not that I didn't -- you said I testified I didn't speak with him on the matter. I probably did. Now, exactly -- it was of such inconsequential nature to me that I don't remember having a dialogue about, okay, the numbers should be 8200 or the number should be 3,000 or the number should be 30,000. It just was not pertinent in my prioritization scheme. Not that I didn't.

Q You didn't waste your time on administrivia, did you, sir?

MR. CRAWFORD: Objection. Argumentative. Objection to the foundation.



Q Did you, sir?

MR. CRAWFORD: Objection, vague.

A I focused on the higher priorities, which were getting the job done and performing.

Q And you considered this administrivia, did you not?

MR. CRAWFORD: Same objections.

Q That's what you've testified to in this case, haven't you, sir?

MR. CRAWFORD: Mischaracterizes prior testimony.

A Low priority on ACRs and DCSs in contract-related support documents.

Q Did you consider ACR, accepting the spent fuel acceptance schedule in ACRs to be inconsequential to the activities of the Office of Civilian Radioactive Waste Management?

A Do I consider the whats?

Q Did you consider the acceptance rates --

A What's the acceptance?

Q The spent-fuel acceptance rates such as the spent-fuel acceptance rate set forth in Table 1, page



four of Exhibit 39, did you consider those projected acceptance rates to be inconsequential to the activities of the Office of Civilian Radioactive Waste Management during the period in which you were trying with all your might to get the Yucca Mountain project under way?

MR. CRAWFORD: Objection, mischaracterizes prior testimony.

A No, not at all.

Q For what purposes did you use them?

A When you refer to a --

Q Excuse me. Were they of consequence to you in connection with your work?

A Which table are you referring to?

Q I'm referring to the changing acceptance rate projections in ACRs that we have looked at.

A The acceptance rate that I focused priority on would be that of Table 1-2 of 37, which is the performance rating. That I put high priority and high attention on. Regarding what was in the ACRs, DCSs, which really didn't involve performance, those were much lower priority items to me.



Now, this jargon, there are acceptance rates called Table 1 of Exhibit 39. That I paid little attention to.

Q Little or no attention to, correct?

A Little attention. I think I knew there were such tables, but as far as the basis and they should change, shouldn't change, and if you change them what do you change them to, no, I didn't pay much attention to that.

Q That's what you delegated?

A That's correct.

Q And that's what you would have relied on Mr. Zabransky for, correct?

A Well, the organization. I don't know if it was Mr. Zabransky alone or his supervision, because there was supervision between Mr. Zabransky and myself, and exactly who at what level made the final decision here I don't know, but I trust Mr. Zabransky completely to interface with the Office of Counsel and Office of Procurement to come up with the appropriate table in these DCSs and ACRs.

Q You consider yourself, do you not,

knowledgeable about the capacity limits set by the '87 amendments, correct?
A When you say "capacity limits," you mean the linkages?
Q The linkages and the limit to 10,000 MTUs ratcheting up to 15,000 MTUs for MRSs.
A I'm aware of those, yes, I am.
Q Before we leave this topic I want to ask you one more time, returning to Exhibit 39, page four.
A Yes.
Q Because you couldn't think of one before, and I want to see if you thought of one.
What possible reason can you perceive for the reference to the capacity limits imposed in connection with MRSs by the 1987 amendments -- what possible reason can you perceive for those capacity limits being relied upon or referenced in early 1995 in connection with an ACR which is a planning document when at that point in time the agency viewed the voluntary MRS as a nonviable alternative?
MR. CRAWFORD: Objection to the extent it calls for any kind of legal conclusion, and objection,



vague.
A I don't know of any better way to do it.
MR. CRAWFORD: And objection, overbroad.
Q Those capacity limits as you've testified are not relevant if an MRS is not being utilized in connection with a repository, correct?
A From a legal, legislative, or engineering point of view.
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
Q Okay. So in light of the fact from a legal, legislative, or engineering point of view those capacity limits are not relevant when an MRS is not in the picture, and in light of the fact that an MRS was not in the picture, in the plans, in the thinking of the Department of Energy in March 1995, can you discern a reason why the ACR reflected in Exhibit 39 refers to those MRS capacity limits?
MR. CRAWFORD: Objection to the foundation. Objection to the extent it calls for a legal conclusion. Objection, vague.
A I don't know. I just was not involved in



that table, and I can't speculate as to what is or isn't appropriate in that table.
Q But can you come up with any reason for including it in the table?
MR. CRAWFORD: Objection, overbroad. Objection to the extent it calls for --
A Because it was there.
Q What do you mean "it was there"?
A It was in the previous version.
Q So just leave it in?
A What's a better way?
Q At the time of the previous version the MRS was still on the table, wasn't it?
A Yes.
Q It no longer was a viable option in 1995, correct?
A Correct.
Q So shouldn't consideration have been given to taking this out?
A It could have been --
MR. CRAWFORD: Objection to the extent it assumes facts not in evidence.



A Don't know.
Q Don't you think you would have given consideration to taking it out had you been the drafter of this document?
A I don't know all the whys and wherefores and the puts and takes on this. I trust their judgment on it.
Q But can you sitting here today think of any logical reason or reason of law or engineering -- how about that. Can you think of any reason of law or engineering why the capacity limits should have continued to have been reflected in the ACR subsequent to the time that an MRS was determined to no longer be a viable option?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
Q You personally. Can you?
MR. CRAWFORD: Same objection.
A Could have been zero, could have been that. I don't know. It's kind of moot. We couldn't. I don't have anymore to add.
(There is a recess from the record.)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Deposition of LAKE H. BARRETT, VOLUME 4
Washington, D.C.
Wednesday, May 8, 2002
9:31 a.m.

Job No.: 11792-10
Pages: 826 through 1103
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X



Deposition of LAKE H. BARRETT, VOLUME 4, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORI
OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFFS SOUTHERN NUCLEAR OPERATI COMPANY, ALABAMA POWER COMPANY, and GEORGIA PO COMPANY:
RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000



A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF PLAINTIFF COMMONWEALTH EDISON COMPANY:
CHRISTOPHER P. TOMPKINS, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

ON BEHALF OF DEFENDANT UNITED STATES:
HEIDE L. HERRMANN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D.C. 20530
(202) 307-0290

ALSO PRESENT:
Kimberly Longford, Arnold & Porter



C O N T E N T S


EXAMINATION OF LAKE H. BARRETT PAGE
By Mr. Cayne 834


E X H I B I T S
(Retained by Counsel)


BARRETT DEPOSITION EXHIBIT PAGE
42 "Civilian Radioactive Waste Management System Alternatives to the Office of Management and Budget" dated 12/22/97 836
43 "Civilian Radioactive Waste Management System Approach to the Office of Management and Budget" dated 3/19/98 856
44 "Parametrics Analysis for Future Program Costs Scenarios" dated 9/16/99 900
45 "Analysis of Total System Life Cycle Cost of Civilian Radioactive Waste Management Program" dated 9/95 955




E X H I B I T S C O N T I N U E D
(Retained by Counsel)


BARRETT DEPOSITION EXHIBIT PAGE
46 Federal Register release dated 5/3/95 1005
47 "DOE Acceptance of SNF in Dual-Purpose Canisters" dated 9/2/93 1014
48 Letter dated 9/2/93 from L. Barrett to J. Shetler 1015
49 Letter dated 10/4/93 from L. Barrett to N. Dix 1015
50 Letter dated 4/26/95 from T. Glauthier and C. Curtis 1045
51 Letter dated 3/1/96 from A. Rivlin to F. Murkowski 1065
52 1995 Acceptance Priority Ranking and Annual Capacity Report 1077
53 E-mail messages 1083
54 Letter dated 3/13/97 from B. Tomasoni to R. Cocherell 1095

898

convenient breaking place?
MR. CAYNE: Five minutes.
MS. HERRMANN: Fine.
Q You said "I would have thought it important that OMB understand that there would be, from the contract point of view would be 3.1, from the performance point of view what we would like to do is 6.1." Do you recall that statement?
A Yes.
Q Why in your view was that important for the OMB to understand?
A Because we knew there would be eventually, either we had lawsuits or may not have had lawsuits then, I don't recall, but there would be an issue regarding the storage costs, and we wanted to make sure that they understood that the -- we always planned -- our desire was to perform at a higher rate than the contract required. It was our view at the time that the contract did not require, to my knowledge still is our view, did not require performance at the higher rates, and it was at four six nine, and that we would tell them that number.

899

Because the 6.1 was at the higher rate.
Q You said it was your view that the contract required performance at four six nine. I thought you didn't have any personal view on the contract. I thought you didn't get involved in that?
MS. HERRMANN: Objection. Foundation. Calls for a legal conclusion.
A I generally didn't get involved in any of the details on that as to waste acceptance contract folks. So, you know, you need to be careful about what we say, and four six nine was what it was in the ACR, and that was a reference point that we used as far as our -- it was a reference point we used.
Q Who told you to use that as the reference point?
MS. HERRMANN: Objection. Assumes facts not in evidence.
A My staff.
Q Who on your staff?
A Mr. Zabransky, Mr. Shelor at that time I suppose, Mr. Brownstein at various times.
Q They're the ones who told you that the

900

contract rate was the 400, 600, 900 MTUs per year?
A That from a systems point of view in the ACR, that's correct.
Q From a systems point of view?
A Yeah, from a program point of view.
Q From a systems point of view you could have accomplished 3,000 per year, correct?
A Okay. You use "systems" different, but yeah. Our desired performance rate was to level out at 3,000.
MR. CAYNE: Let's take a break.
(There is a recess from the record.)
(Deposition Exhibit Barrett 44 was marked for identification and retained by Counsel.)

Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 44, bears Bates HQR-036-5069 through 5141. The first page is entitled Parametrics Analysis for Future Program Costs Scenarios September 16th, 1999, Lake H. Barrett.
Do you have that document before you?

901

A I do.
Q What was your position in September 1999?
A Deputy and the acting director.
Q What is a parametrics analysis?
A It's where we were evaluating the cost -- various cost scenarios for the program, the Yucca Mountain repository, what it would cost for various interim storage scenarios, because the bills were -- there were various bills floating around. And also we tried at various times to evaluate cost of reactors as well. I don't know if this one does or not, but there are many versions of these documents.
Q Was your office directed by another federal agency to prepare this document?
MS. HERRMANN: Objection. Foundation.
A No.
Q Did you direct your staff to prepare the document?
MS. HERRMANN: Same objection.
A Yes.
Q And why did you direct your staff to prepare this document, Exhibit 44, in September 1999?

relied on, yes. That was his responsibility for the department, and they were the official contracting officer. So it was done in collaboration with counsel and contracts. And I expected Mr. Zabransky, et al., to properly coordinate things before they came to me, which he did, as far as I was concerned.
Q Could you turn to page 5089, Bates number 5089.
A Yes.
Q Do you recognize that writing?
A No.
Q Do you see that's the ACR, and it goes for 12 years, correct?
A That's what it looks like.
Q Do you have any idea what that's referencing?
MS. HERRMANN: Objection. Foundation, speculation.
A No.
Q Does that represent the ACR extended rate?
MS. HERRMANN: Asked and answered. Same objections.



A I don't know what it is.
Q This is not your writing?
A That's correct.
Q This document I'll represent to you came from the files of Mr. Jeff Williams. Are you familiar with his writing?
A No.
Q So you do not know whether that's Mr. Williams' writing?
A No, I do not know.
Q Can you turn to page 5091.
Are you there?
A Yes.
Q What does this graph demonstrate?
MS. HERRMANN: Objection. Foundation, speculation.
A My recollection on this is this graph is projection of the fuel that -- it's take title. The amount of fuel that would be -- we would take title to, I guess, according to various scenarios from -- for various scenarios.
Q You start off by saying, My recollection on



this graph is rejection of the fuel. What is --
A No, there was no rejection. I thought it was receipt, okay? Because most of these were done in receipts, but I see the title, it's cumulative take title. So it's -- there's no rejection in there. This is just -- I believe this is the total accumulation of fuel based on a simple time relationship to what the receipt rates would be for four different cases.
Q Do you remember we talked about crossover points in the last session of this deposition?
A Yes.
Q Does this graph on page 22, Bates 5091, reflect a crossover point?
MS. HERRMANN: Objection. Foundation.
A No.
Q What does that mean?
MS. HERRMANN: Objection. Vague.
A What does what mean?
Q You indicated during our last session, in the context of the Fitzgerald Amendment you discussed crossover points. Do you recall that?



A Yes.
Q And what is the meaning or the significance of a crossover point?
MS. HERRMANN: Objection. Asked and answered.
A The next page, not this page.
Q But my question is what is the significance of a crossover point?
A Are you now finished with --
Q No, we're still on page 22.
A There is no crossover point.
Q I know. But what is the significance of a crossover point?
A Crossover point has nothing to do with 22 but -- what's the question?
Q What thought were you conveying in the last session of our deposition when you talked about crossover point?
MS. HERRMANN: Asked and answered.
A That would be page 23, if you want to talk about crossover point. There's no crossover point on 22.

Q And you used the term "crossover point" in the context of analyzing the damages that the government would be subjected to under various alternatives, correct?
A I don't think that's what I said, but it had to do with when we would catch up to if we had performed in '98.
Q Well, on page 22 would you ever catch up?
MS. HERRMANN: Objection. Vague.
A Your question makes no sense because this is only a take-title or an obligation rate one might argue. It's got no performance on it. So the concept of catch-up or crossover doesn't exist on page 22.
Q If the government was required to perform at the utility legal claim rate would you have ever caught up?
MS. HERRMANN: Objection. Vague.
A Depends upon what the performance rate was.
Q Turn to page 23. Bates 5092. Does this page reflect a performance rate?
A Yes, it does.
Q And what is the performance rate?



A Whatever that line says, VA performance cumulative.
Q And what does that stand for, "VA performance cumulative"?
A I don't know. I would have to go and look.
Q Please look.
A I believe that's the rate on page 25, which is the four, six, 12, 2,000, 3,000.
Q Was that the desired performance rate?
MS. HERRMANN: Objection. Foundation.
A At that time I believe it was.
Q And by "desired" you mean desired by the Department of Energy, correct?
MS. HERRMANN: Objection. Foundation.
A Correct.
Q And can you explain to me the significance of the term "crossover point" as you used it in our last session in the context of this chart on page 23?
A The best way to describe that on -- would be on page 24, okay. If the -- I'll use the term "obligation rate" was the ACR determinated (sic) after ten years, which is the lower line, that if we perform



starting in 2010 you would cross over in the year nominal 2014. That would mean for any year after 2014, it would have looked like from a total cumulative fuel removed like we had performed from 1998 onward at an ACR cumulative obligation rate. So that one could say that after 2014 we caught up, and that would mean -- we used the term "crossover." In theory one could say that there were no harm done to the utilities after 2014 due to our delay.
Q By "no harm," you mean no damages?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A I never used the word "damages" in any of these things, because that becomes a legal issue. I always use the word "harm."
Q What do you mean by harm?
A Burdens caused by our delay.
Q So would the burdens under the -- you used the term, was it "obligation rate"?
A Sometimes I refer to it as that.
Q And the obligation rate you're referring to, the line captioned ACR Cumulative?



A Correct.
Q Why do you call that line the obligation rate?
A Because there were various scenarios with different -- my term -- obligation rate, okay, because it would be different interpretations of what was the obligation rate. We could claim that it was just the 8200 tons. One could claim it was the ACR extended, meaning the 900 continued. One could claim it was various rates that we designed the system to. And there was the Fitzgerald case where they tried to put it in the statute.
So we tried to look at -- we tried to cover the range up to this top one here on page 24 called "utility legal claim," which was -- somebody claimed that. I have no idea what it was. I would have to look.
Q So am I correct that other than the VA, other than the line captioned VA Performance Cumulative and the line captioned 2007 Performance Cumulative, each of the other lines on this graph represent possible obligation rates?

918

MS. HERRMANN: Objection. Calls for a legal conclusion. Compound.
Q Is that correct?
A As I would use the term in a nonlegal sense, yes.
Q And if it turns out that the obligation rate is what is referred to as the utility legal claim, is there ever a crossover point?
A Not on this graph.
Q And what is the meaning of that then?
A The implication would be that the government -- it is possible that in that case if that -- if the utility -- the curve here called "utility legal claim cumulative," if that were the legal obligation rate, that the utilities could make an argument that we never caught up, and the government could potentially be paying dollars forever because we never caught up.
Q When you say "never caught up," you never caught up to what?
A We never caught up to the performance which was always our desire for the performance to exceed

919

whatever our legal requirements were. You never caught up. Therefore, there could be continuing legal issues regarding we never caught up.
Q What are you referring to by "continuing legal issues"?
A What we're doing here.
Q You mean the amount of damages to which the government would be liable?
A Well --
MS. HERRMANN: Objection. Calls for a legal conclusion.
A Whatever all those issues and complications are.
Q Now, what is the significance of the area on this graph between the line labeled Utility Legal Claim and the line labeled VA Performance Cumulative?
A What's the question? I don't understand.
Q What is the significance of that area?
MS. HERRMANN: Objection. Vague.
Q My recollection is from your last session of the deposition you referred to the area beneath the line entitled Utility Legal Claim. And my question is

920

what is the significance of that area?
MS. HERRMANN: Objection. Vague.
A If the lines are parallel they never cross; therefore, the area is infinite, and the area would basically -- could be interpreted as dollars caused by the delay.
Q Okay. I'm handing you a yellow marker, Mr. Barrett. Would you please take that. Could you please shade in in yellow the area that could be interpreted as dollars caused by the delay if it is determined that the obligation rate is equal to the utility legal claim.
MS. HERRMANN: Objection. Calls for a legal conclusion, foundation, speculation.
A I will draw and shade the area between those two lines.
(Witness complies.)
Q May I see the exhibit, please.
What did you mean when you said earlier that the area that you just shaded in could be interpreted as dollars caused by the delay?
MS. HERRMANN: Objection. Calls for a

921

legal conclusion.
A If it was determined through legal processes that the harm caused by the delay should be judged referenced to some arbitrary number like that utility claim rate, and that's what we were measured against, then those costs would be proportional to that. It would be very hard for us to catch up.
Q What did you mean the "costs would be proportional to that"?
A That the more fuel that utilities could claim that we had not picked up and there are charges against the government, or whatever you call them, the higher that number, the greater the potential value.
Q The greater the potential value of what?
A Of how the nation would resolve that harm caused by our delay, through whatever processes those are, which you know better than me.
Q So when you say "the greater the potential value," the greater the dollar amount of harm sustained by the utilities, correct?
MS. HERRMANN: Objection. Calls for a legal conclusion.

A That's what they would claim.
Q But that is what would be the fact if the Court were to determine that the obligation rate is equal to the utility legal claim, correct?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A I don't know. You're way beyond me as an engineer at this point, so I don't know what that means.
Q Who prepared this chart? Who on your staff prepared this chart?
A Various members worked on this chart. I don't know who actually did this particular chart, but various people worked on this.
Q Who came up with the term "crossover point"?
MS. HERRMANN: Objection. Foundation.
A I don't remember.
Q Was that your term?
A I've used the term. I don't know if I invented the term.
Q You think you originated it?



MS. HERRMANN: Asked and answered.
A I don't know.
Q Do you know if it was originated by counsel?
MS. HERRMANN: Asked and answered.
And I would caution the witness that you are not to answer if it requires you to reveal communications between yourself and counsel.
A Again, I don't know.
Q Could it have been?
MS. HERRMANN: Asked and answered.
A Could have been anybody.
Q Would you turn to page 25, Bates 5094.
A Yes.
Q What was the basis for the projection of estimated cost of $3 billion in Case 1?
MS. HERRMANN: Objection. Foundation, speculation.
A I believe that's a summary of what's on the next page.
Q The 3 billion is cost to whom?
MS. HERRMANN: Same objections.



A The utilities.
Q Why are years 1998 and 1998 (sic) not reflected in this cost estimation?
MS. HERRMANN: Same objections.
A I believe those were rolled into the year 2000. We were looking at ten-year time horizons because this was done in '99. So we were looking at year 2000 to 2010, so that 244 on page 46 includes the '98 and '99 costs.
Q Why does this estimation not include years subsequent to 2010?
MS. HERRMANN: Objection. Foundation, speculation.
A Because we were looking at the costs out to 2010. That was our planning horizon to start repository operations. That was the number one issue in all budget scenarios that we were looking at.
Q What was the number one issue?
A 2010 was the number one issue, looking at the years with Mr. Barton and the hearings and what were the costs of the start of operations. Was it worth spending the money? Because we were at this



time still arguing for our budgets. So that's why -- ten-year projection.
Q Could you turn to page 27, Bates 5096.
A Yes.
Q You see this shows an estimated cost of 5.2 billion?
A I see that.
Q Again, was the point here in preparing this parametric analysis to give the reader an accurate estimation of the actual cost or was it simply to give the reader relative information to compare various scenarios?
MS. HERRMANN: Objection.
Q To determine by what percentage, for example, one scenario would be more or less expensive than another scenario?
MS. HERRMANN: Objection. Foundation, speculation, compound.
A Primarily the latter.
Q What is the difference in the assumptions between Case 1 and Case 2?
MS. HERRMANN: Objection. Foundation,

speculation.
A As stated on two pages, I believe the difference is what -- the take-title rate is the big difference.
Q So Case 1, the take-title rate is the rate established by the 1995 ACR, correct?
A I believe that's correct.
Q In Case 2 the take-title rate is what?
A It says in the third bullet on page 27, something that somebody -- some utility claimed in some litigation. 12, 12, 2, 2, 27, 3.
Q And then it was the view of your office at this time, 1999, that if the obligation rate reflected in Case 2 is accepted by the Court the total cost to the utilities would be approximately 64, 65 percent higher than if the obligation rate is determined to be the rate established by the ACR?
MS. HERRMANN: Objection. Foundation, calls for a legal conclusion.
A Looks like it.
Q How --
A I'm not sure what all that means in legal



space, but from a mathematical point of view, yes.
Q How did you make that determination?
A The assumptions are written in the footnote on page 26. We assume dry storage operation, etc., as you read there. That's how we determined the utility costs.
Q Now, are these assumptions on page 26 reasonable cost assumptions for a dry storage facility start-up?
MS. HERRMANN: Objection. Foundation, speculation.
A For a rough order of magnitude we believe they were.
Q Next to dry storage facility start-up you see the entry for ten million?
A Yes.
Q What does that include?
MS. HERRMANN: Objection. Foundation, speculation.
A That was our, you know, rough order estimate of what it would cost for a utility to license and develop and design a dry storage facility



so it would have approval to operate on an average case for a generic site. Then you would add to that the cost of the actual operations.
Q What would the actual cost of the operations be? That's the .5 million a year?
MS. HERRMANN: Objection. Speculation, foundation.
A No, five.
Q Five million a year. I'm sorry. What was the basis for that projection?
MS. HERRMANN: Same objections.
A That was the estimate that my staff had for what they felt the cost would be after discussing the matter and reviewing literature and utility costs and things like that.
Q Looking forward, did the events of September 11th have an effect on costs associated with dry storage operations looking into the future?
MS. HERRMANN: Objection. Foundation, speculation.
A Probably.
Q And what is the probable effect?



MS. HERRMANN: Same objections.
A The events of September 11th will probably make it more expensive. Relative to the five, I don't know.
Q Why in your opinion would the events of September 11th probably make it more expensive to operate a dry storage facility?
MS. HERRMANN: Same objections.
A They may -- utilities may have to have additional security precautions beyond what they had pre-September 11th.
Q Anything else?
MS. HERRMANN: Same objections.
A That's the main issue. I don't know of anything else other than security costs.
Q Has your office attempted, subsequent to September 11th, to in any way quantify or estimate the effect of September 11th on dry storage operations?
A Not that I know of. I haven't asked them to do anything.
Q You see the reference to storage cask.
A On 26?

yes.
Q Who was it?
A Ben Rusche I see. He signed it.
Q And is he someone you work with?
A Once upon a time.
Q Did you consider him competent?
A Yes, I did.
Q Did you ever discuss with him your disagreement on this point?
A No.
Q But you concede that your testimony is inconsistent with -- the testimony you just gave is inconsistent with this statement, correct?
A Well, I don't know what they meant by "waste acceptance schedule," "waste management system capacity" and those sorts of -- so I don't know what they meant by this.
Q But your testimony is you don't agree with this statement, correct?
MS. HERRMANN: Objection to the extent it mischaracterizes prior testimony.
A Well, since I don't quite know what they



meant by this, I'm not saying I agree or disagree with this. My statement stands the way I believe it.
Q According to this, the waste management system capacity equals the system operating capacity. Do you see that?
A I see those words.
Q Would you agree with that statement, that you have designed the waste management system capacity to equal the system capacity?
MS. HERRMANN: Objection. Foundation.
A I don't use those terms, so I don't know what that means.
Q Can you turn to page seven of this exhibit. See Table 2.1?
A I see it.
Q There's a waste acceptance schedule?
A Yes.
Q And under that there's a system receipt rate?
A Yes.
Q Does that help put in context for you the statement that I've referenced you to?



MS. HERRMANN: Objection. Vague.
A Not to me.
Q You understand the system receipt rate, correct?
A I'll tell you what I believe system receipt rate would be, but I don't know what they meant when they wrote it here.
Q What do you believe it to be?
A If someone says to me the words "system receipt rate" I would say, Are you talking about the design rate or are you talking about a requirement rate. I don't know what they meant by this. I believe they have them set the same, but I don't know what they have set here.
Q You believe they have them set the same you said?
A Sounds like the same numbers.
Q What is the same number, the system receipt rate and the -- can you just clarify that?
A I guess -- the answer is I don't understand it so I can't clarify it.
Q Well, let's work at it. The system receipt



rate. What is your understanding of that term?
A I don't know what the authors meant.
Q What do you mean by that term?
A I'd have to put it in context. Is it design receipt rate? Or is it a receipt rate that you are obligated to meet?
Q Have you ever used the term "system receipt rate"?
A Not that I know. I might have but -- I generally would avoid using it. I would have to have it in context. I've used the word "receipt rate" many times.
Q What was the purpose of the ACR?
A It had something to do with the contract.
Q You don't know what the purpose of the ACR was?
MS. HERRMANN: Objection. Calls for a legal conclusion.
Q Beyond that it had something to do with the contract?
A It had something to do with the contract, and it was a planning document for -- with the

contract. That's the extent of my understanding of it.
Q How did you use the ACR?
MS. HERRMANN: Objection. Foundation.
A I used the ACR when it became pretty clear we were not going to meet the '98 date, people said, you know, that you should use the four, six, nine as what I would refer to as an obligation rate.
Q So prior to the time that it became clear that you were not going to meet the '98 date, you did not use the ACR, correct?
A Actually, I did, because prior -- if we were going to make the '98 date, the only way we were going to make the '98 date was with an MRS, and the MRSs had the linkages, so there we were set at the four, six, nine.
Q But you've testified, haven't you, that you cannot satisfy the linkages?
MS. HERRMANN: Objection to the extent it calls for a legal conclusion.
A I don't know what you mean by that question. You say I testified -- help me. I don't



understand that question.
Q What was your reference to linkages a moment ago?
A To meet the '98 date, which I believe is the context of your question, you needed to abide by the linkages unless the law was changed. The linkages put a constraint on the system which was the -- my recollection was the four, six, nine, although the design capacity of the system could be to operate at a higher rate.
Q But you're saying the linkages limited the acceptance rate to four, six, nine?
A The linkages effectively would limit you to four, six, nine.
Q Why is that?
A Because of the -- it's my understanding, was the linkages held us to the four, six, nine because you would hit the legal linkages of so many tons before certain things happened.
Q But the linkages did not have any relevance in a stand-alone repository scenario, did they?
A Correct.



Q So in a stand-alone repository scenario what is the relevance of acceptance rates of 400, 600, 900 MTUs per year?
A Stand-alone repository never got you to the '98 date ever since I've been in the program.
Q But my question is in a stand-alone repository -- today we have a stand-alone repository scenario, correct?
A Correct.
Q Okay. And in today's stand-alone repository scenario, what is the relevance of 400, 600, 900 acceptance rate?
MS. HERRMANN: Objection. Foundation.
A Because of some contractual matter as relates to the contract is my understanding.
Q And what contractual matter are you referring to?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A This gets into the contract issues. There is no technical limit four, six, nine as it relates to the repository.



Q So as it relates to a stand-alone repository, the acceptance rate of 400, 600, 900 MTUs per year have no relevance, correct?
MS. HERRMANN: Objection to the extent it mischaracterizes prior testimony.
Q Correct?
A Has no technical design aspect to it.
Q It has no systematic aspect to it, correct?
MS. HERRMANN: Objection. Vague.
A I will define systematic as not involving legal contractual. Okay? And if you take out available financing to build the system, true.
Q What do you mean "if you take out available financing to build the system"?
A Well, for example, from an engineering perspective we would build it up to the 3,000. If for some reason we are held, due to artificial finance constraints due to Congress and appropriations, we may not be able to build it big enough to run at 3,000. You saw some studies that we did with lower receipt rates. Those were because of potentially funding constraints on the program.

Q What lower receipt rate studies were you just referring to?
A Oh, I don't know. Some of those ones you had back here.
Q Could you go through the exhibits and please identify for me which ones you were referring to.
A Which one is that OMB one that had the -- all the 2007, 2010, 2000 whatevers? Not this one.
Q You mean Exhibit 42?
A 43 I think.
Q 43?
A I think 43 had some lower receipt rates in it.
Q And those lower receipt rates in Exhibit 43 were based upon what?
A Funding constraints.
Q Funding constraints imposed by Congress?
A Yes.
Q Did Congress impose such funding constraints?
A They certainly have.



Q When were those funding constraints imposed?
MS. HERRMANN: Can we just give him a minute to get what he's looking at.
A About every year. For the last five years. We've been funding-constrained by Congress for the last five years.
Q Those funding constraints had an ability (sic) on your office's capability to begin the acceptance of spent nuclear fuel on a timely basis?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A They've slowed us down.
Q Substantially?
A Months.
Q Years?
A If you add them all up, probably a year or so.
Q Getting back to the ACR, what is the relevance of an ACR with an acceptance rate of 400, 600, 900 MTUs per year in today's environment where there is a stand-alone repository?



MS. HERRMANN: Objection. Vague, calls for a legal conclusion.
A I don't know.
Q Is there any?
MS. HERRMANN: Same objections.
A Only as it relates to the legalities of contracts.
Q The 400, 600, 900 MTUs standard was pertinent in the context where an MRS would have gone into effect in 1998 and have been in operation for ten to 12 years prior to repository, correct?
A That's my understanding.
Q And that's the only circumstance in which a 400, 600, 900 MTU take-rate had any relevance, correct?
A That was the basis at that time.
Q At that time, you're referring to what time?
A Back in the eighties when that was -- late eighties, early nineties when that was established, that's correct.
Q So in the late eighties, early nineties



when the 400, 600, 900 MTU take-rate was established, the only relevance that take-rate had was in the context where an MRS would commence operations in 1998 and would operate by itself for ten to 12 years prior to the time that a repository, a permanent repository, began operations, correct?
A Correct.
Q Back to Exhibit 6. WMS stands for waste management system, correct, on page ten of Exhibit 6?
A I think so.
Q And what is the waste management system?
MS. HERRMANN: Objection. Foundation.
Q You've used that term, haven't you?
A I generally don't.
Q Have you ever heard it used?
A Yes.
Q Do you have an understanding what it means?
A I think that was the overall -- yes. I think I do. I think it was the overall system as they described it back at that time.
Q And the overall system as described back at that time involved what?

A A repository, a transportation, an MRS.
Q What is system operating capacity?
A I don't know how they used it in this document.
Q How do you use it?
A I use it as that's what you really expect to operate at.
Q Okay. Using the term "system operating capacity" as you just defined it --
A Okay.
Q -- and the term "WMS" as you just defined it also, do you agree with this statement on page ten?
MS. HERRMANN: Which statement?
Q That the projected WMS capacity equals the system operating capacity?
A What was the question, do I agree with it?
Q Yes.
A No.
Q Why don't you agree with that?
A Because I believe that the system operating capacity should exceed the system operating requirement. It would appear to me in this, back in



'87 they were setting the system operating capacity exactly equal to the requirement, which I think is the wrong way to design a system.
Q But that is what the Department of Energy did in 1987?
A I don't know what they did in '87. I wasn't involved in this.
Q Did you ever discuss this issue with your predecessor?
A The issue of what?
Q The issue of setting the operating capacity exactly equal to the requirement.
A No. Not that I recall. Let me phrase it that way.
(Deposition Exhibit Barrett 45 was marked for identification and retained by Counsel.)

Q The court reporter, Mr. Barrett, has handed you a document marked for identification as Exhibit 45, bearing HQR-025-5075 --
MS. HERRMANN: Can I get one of those?
Q -- through 5139.



A 50?
Q 5075.
A Down the bottom here?
Q Yeah, bottom right.
A I got 176202.
MS. HERRMANN: We're not looking at the same document.
Q The Bates numbers I just read into the record are wrong. The correct Bates numbers are PA-176202 through PA-176266. The document is called Analysis of Total System Life Cycle Cost of Civilian Radioactive Waste Management Program dated September 1995. Do you have that document before you?
A I do.
Q Would you turn to page five. What was the purpose of this document?
MS. HERRMANN: Objection. Foundation.
A This is the total life-cycle cost analysis that we do periodically to determine -- to estimate the total cost of the system so we can do a fee adequacy report as to the adequacy of the charge to the utilities.



Q Now, in 1995, in September 1995 your office in performing the total system life-cycle cost analyses assumed that there would not be a monitored retrievable storage facility, correct?
A I have to check what the time is. September '95 we probably did not assume there was an MRS. I don't know what this document says.
Q Well, I refer your attention to page five, the third-to-the-last paragraph on page five.
A Okay. Does not.
Q Could you turn to page eight.
A Yes.
Q What does Table 1-2 represent?
MS. HERRMANN: Objection. Foundation.
A It says "monitored geologic disposal system receipt/emplacement rates."
Q What were the rates reflected on Table -- how were the rates reflected on Table 1-2 determined?
MS. HERRMANN: Objection. Foundation.
A I don't know.
Q You have no idea?
A No.

958

Q Did you have any involvement in the preparation of Exhibit 45?
A Probably. I probably signed off on it.
Q And take your time to review the document to refresh your recollection, but I'd like to discuss how these rates were determined by the Department of Energy, the rates in Table 1-2.
MS. HERRMANN: Asked and answered.
A These would have been the, you know, repository receipt rates that we used at that time. They're not dissimilar to the 3,000 metric tons steady-state rate that we've always had for the repository. I don't know what more detail you wish.
Q Are these the same receipt emplacement rates that the Department of Energy is currently using?
MS. HERRMANN: Objection. Foundation.
A We've slightly modified them.
Q How have they been modified?
A We raised them.
Q Which rates have been raised?
A The 300 is 400.

959

Q Any other changes?
A I'd have to compare what it is today, but they look pretty close. No, two -- yeah, I think it went from four -- my recollection is the 300 we changed to 400, and whatever it is in the record. I think that's the same.
Q Did your office rely on the rates set forth in Table 1-2 for planning purposes?
A Yes.
Q What planning purposes did you use it for?
A For determining total system life-cycle costs.
Q Did your office use the rates reflected in Table 8 for any other purposes?
A In Table 1-2?
Q Right.
A We used -- to my recollection this was used for the total life-cycle system cost. It may have been used for other things as well, but this is --
Q I'm not referring specifically now to just this table but to the rates contained in the table. The rates being the 300, 600, 1200, 2,000, 3,000. For

960

what purposes was your office in 1995 using those projected receipt rates?
A Probably they were used in the -- I think that should have been a reference -- that was a reference system design specification that we had circa that time. So the engineers would be designing the building layouts and the transportation system, for what very limited planning there was, were based on those numbers. The multipurpose canister cost estimates were probably based on those numbers. So it was used in various places in the system development.
Q Would the same rates appear in the system requirement documents?
MS. HERRMANN: Objection. The documents are the best evidence of their contents.
A Probably.
Q Why do you say that?
A Because the system design requirements document often would be -- should have been basically this. I think the system design description -- I don't know what requirements document. The system design description should have had these numbers in

961

it. Because this is what the system was expected to operate at. The design requirement may have had different numbers if there was even a design requirement document then. I don't believe there was.
Q And do you think it probably would include these numbers?
MS. HERRMANN: Same objection.
A Probably did, but you would have to look and see.
Q Did you use the numbers reflected in Table 1-2 for any other planning purposes?
A Not beyond what I've said that I recall.
Q But you used these numbers to plan the rate at which you would be able to pick up the spent nuclear fuel from the utilities with whom you had contracts, correct?
A To design the system to perform at that rate.
Q So that you could pick up the spent fuel in accordance with this rate, correct?
A Yes.
Q Now, we spoke earlier in this deposition

about the nuclear waste negotiator, correct?
A Yes.
Q And am I correct that the activities of the nuclear waste negotiator were terminated in 1995?
A I don't know the exact date, but somewhere in the mid-nineties.
Q Were they terminated at that point?
MS. HERRMANN: Objection. Foundation.
A I believe the term of office of Mr. Stallings, the last negotiator, expired by statute.
Q Do you know why his mandate was not renewed?
MS. HERRMANN: Objection. Foundation, speculation, calls for a legal conclusion.
A No.
Q What effect did the termination of the Office of Nuclear Waste Negotiator have on the planning activities of your office?
MS. HERRMANN: Objection. Foundation.
A Not appreciable that I recall.
Q Did it have any effect on your



consideration, for example, of the viability of an MRS facility?
A No, because -- not to my recollection, because the viability of an MRS facility was, you know, negative based on the budget enactment of FY '94.
Q So would you agree that the MRS facility was effectively dead prior to the time that the Office of the Nuclear Waste Negotiator terminated?
A I don't know when the term -- the office actually terminated. So I don't know. You said '95. I don't know when the negotiator officially terminated.
Q Take a look at page 33 of Exhibit 45. I refer you to paragraph 4.7.
A Uh-huh.
Q Does that indicate that the negotiator's activities terminated in 1995?
A It looks like it.
Q But based on that would you agree that the viability -- that an MRS facility was nonviable significantly before the time the Nuclear Waste



Negotiator's Office terminated?
A Well, in my opinion the MRS siting was not viable once the Congress act on the FY '94 appropriations prohibiting me from providing grants to the Indian tribes. That's in my mind when it became not viable. Exactly when a negotiator terminated I don't remember.
Q Do you remember we discussed the 1995 ACR in the last session of the deposition?
A Not really.
Q Do you recall discussing it at all?
A We had -- there were multiple ACRs of different dates. So that much I remember we talked about, but the '95 one versus other dates I don't recall.
Q You're referring to Exhibit 39?
A 39. I have it.
Q Take a moment to look through it and see if it refreshes your recollection that we discussed it during the last session of this deposition.
A What's the question? I see an ACR.
Q Do you recall that we discussed this ACR?



A Yes.
Q What was the purpose of the 1995 ACR?
MS. HERRMANN: Objection. Foundation, calls for a legal conclusion.
A Something that relates to the contract.
Q Do you have any more knowledge about the purpose of the 1995 ACR?
A No.
Q Did your office use the 1995 ACR for any purpose?
MS. HERRMANN: Objection. Asked and answered.
A I'm sure people in the office used it, okay.
Q For what purpose?
A For whatever they used it for. I don't know.
Q You didn't use it for any purpose?
A Does this have the table in it that I do use?
Q Which table are you referring to?
A The only thing I'm familiar with in this is

966

page six, Table 2. That's the only thing I ever personally used out of this document.
Q The only thing you ever used is the summary of the purchaser's annual allocations?
A Right.
Q And for what purpose did you use that chart?
A I used that to have an understanding of which utilities had what allocations in the year one, year two, year three, year four. For policy reasons is why I wanted to know.
Q What policy reasons?
A Just if I ever have to talk to various executors from various companies where they stood in the queue.
Q Look at page four, please.
A Yes.
Q Did you use the table on page four for any purpose?
A No.
Q None at all?
A No.

967

Q What was your position in March 1995?
A I think I was the deputy director.
Q Who prepared the table on page four?
MS. HERRMANN: Objection. Foundation.
A I don't know. Some people in the waste acceptance area.
Q People who worked for you?
A Yes.
Q For what purpose?
MS. HERRMANN: Objection. Foundation.
A Part of what they consider the business of the office, which I agreed with.
Q You agreed with what?
A Them doing what they felt they needed to do.
Q In March 1995 you did not expect to be picking up spent nuclear fuel at the rates referenced in Table 1, correct?
MS. HERRMANN: Objection. Vague.
A Repeat the question again.
Q In March 1995 you did not expect that the Department of Energy would be picking up spent nuclear

968

fuel at the rates reflected on Table 1?
MS. HERRMANN: Same objection.
A It was my desire and intention that we would pick up in year two, three, four a rate higher than this.
Q But there was no, in 1995 there was no expectation in the Office of Civilian Radioactive Waste Management that spent fuel would, in fact, be picked up at the rates reflected at Table 1, correct?
MS. HERRMANN: Objection. Foundation.
A Did you say no expectation?
Q Right. In March 1995, at which time, as you've testified, the MRS was not viable, your office did not expect that spent fuel would be picked up at the rates reflected on Table 1, correct?
MS. HERRMANN: Same objection.
A I ask you to clarify the word "expect." I didn't know what to expect. It was our intention and desire with all our energies to pick it up at a rate that we desired to pick it up, which was a higher rate than this.
Q That was the rate that moved up to 3,000

969

MTUs per year, correct?
A That was our desire, that was our goal, and we strived to do that. What actually would happen we did not know. So my expectation was very uncertain.
So you asked to say what I expect. The expectation, I have to say that I don't know what to expect. We were trying to run it as high as we could run it.
Q But you had various -- your office, the Office of Civilian Radioactive Waste Management Control, had various plans that it followed pursuant to which your activities were conducted, correct? You had various plans?
A We had plans and goals in trying to achieve the intent of the act.
Q Right. And in 1995, March of 1995, there was not a plan in effect that would have called for the acceptance of spent fuel at the rates reflected in Table 1, correct?
A Correct.
Q In fact, the plan that was in place in 1995 called for the acceptance of spent fuel at a rate that

had a steady state of 3,000 MTUs per year, correct?
A That was our planning basis, correct.
Q And, again, the Table 1, the rates in Table 1 were based on a scenario in which an MRS would go into effect in January 1998 and would be complemented by a permanent repository some ten to 12 years later, correct?
A That was the evolution of those numbers.
Q And that scenario was not viable in March '95, correct? With the MRS commencing operations --
A Very low probability.
Q Close to zero probability, correct?
A Very low probability. Miracles might have happened.
Q But short of a miracle, that was not going to happen, correct?
A Low probability.
Q Remember a moment ago you stated that was the evolution of those numbers?
A Yes.
Q Precisely what did you mean by that statement?



A Those were the old integers that we went through before.
Q Was there any other basis for the numbers, the acceptance rates reflected on Table 1 of Exhibit 39, other than that?
MS. HERRMANN: Objection. Foundation.
Q Other than the reference to the MRS.
MS. HERRMANN: Same objection.
A If you modify that to the bottom row of Table 2, which is the same numbers, yes. Because I never use Table 1.
Q Can you restate that?
A You keep saying Table 1. I told you earlier I never looked at Table 1. I use Table 2. The information in Table 1 is a subset of Table 2.
Q Okay. Look at Table 2 in the last row of Table 2, the nominal totals, see that?
A Yes.
Q Those nominal totals in Table 2 were -- the evolution of those totals was the plan to have an MRS facility up and running in 1998 to be complemented by a permanent repository ten to 12 years later, correct?



A Yes.
Q And my question then is are you aware of any other basis for the nominal totals reflected on Table 2 other than the proposed MRS facility which was not viable as of sometime in '93 or '94, according to your testimony?
MS. HERRMANN: Objection. Foundation, speculation.
A No.
Q Now, we've looked at a number of documents today that continued to use the 400, 600, 900 MTU rates, correct?
A Yes.
Q And you call that the obligation rate, correct?
A That's the term that's been used. Yes, I've used that term.
Q Why are you using as the obligation rate acceptance rates that evolved solely from a planned MRS facility that never, in fact, became reality?
MS. HERRMANN: Objection. Foundation.
A Because that is a -- this gets into the --



our plan was to operate at the higher rate. Once we were not able to meet the '98 date due to the MRS action by Congress, we knew this was an issue and we generically didn't -- I just didn't go there because this was a contractual matter that was going to be very complicated, as it is.
Q "We knew this was an issue." We knew what was an issue?
A Well, what the rate claimed by in this case the plaintiffs versus, you know, what the legal ramifications of this was, and just was not going to -- I as a programmatic matter was not going to go there, and we didn't change things.
Q You didn't change things?
A No.
Q In other words, these nominal totals were based on a plan that became not viable in late 1993, if I recall your testimony, correct?
A Yes.
Q But at that point when they became nonviable you realized that there were going to be legal controversies relating to the fact that spent

fuel pickup would not begin in 1998, correct?
MS. HERRMANN: Objection. Mischaracterizes prior testimony.
A I just knew it was going to become a very complicated matter.
Q And so you made the decision, because it was going to become a complicated matter with legal ramifications, you would simply leave in effect the annual pickup rates that related to an MRS facility, correct?
MS. HERRMANN: Objection. Mischaracterizes prior testimony.
A It wasn't anything that clear. It just wasn't a high priority to me to work on subtier issues off a contract that were meaningless as far as detracting from our energies to getting a facility in place to operate as soon as we could.
Q Well, in fact, the 400, 600, 900 acceptance rates were, for all practical purposes, meaningless as of late 1993, correct?
MS. HERRMANN: Objection. Mischaracterizes prior testimony.



Q Correct?
A They were meaningless from a programmatic aspect to me. They might have been important to somebody in contractual matters.
Q But in the 1995 ACR you continued to use these acceptance rates, correct?
MS. HERRMANN: Objection. 1995 ACR is the best evidence of its contents.
A I personally was never involved in -- this was never an issue in my mind in '95. I said I used the table. I do use the table. I never recalled a discussion that I was in where we should or shouldn't change them or anything like that. So, I mean, I don't remember being particularly involved in the dialogue, We should or shouldn't change them.
Q So it was not your decision in 1995 to continue to use the acceptance rates that are, in fact, contained in the 1995 ACR, correct?
A When you say my decision, I don't remember making an explicit decision that we shall not change them. I don't -- you know, since we issued this and it was done under my -- when I was there, so, I mean,



I support it. I wouldn't have changed it. But I don't remember having any explicit discussion about we should or shouldn't change them. I accept the numbers like they are and use them.
Q You accept the numbers as they are because you knew as a result of the fact that Congress didn't approve the funding in 1993 the whole matter was going to become very controversial with legal ramifications, correct?
MS. HERRMANN: Objection to the extent it mischaracterizes prior testimony.
Q Correct?
A No. Because I didn't pay much attention to the subcontractual matters.
Q You didn't pay much attention to it because you knew the office was not in a position to begin spent fuel pickup, correct?
A No. It's just -- we didn't -- I was trying to have the program survive and I didn't pay any attention to subissues on a contract. So I don't agree with your characterization.
Q We just looked a few moments ago at the



February 1995 analysis of the total system life-cycle cost, correct?
A I think so, yes. Yes.
Q Excuse me. I said February. I meant September.
A Yes, September '95.
Q Why doesn't the September 1995 analysis of the total system life-cycle cost use the acceptance rates reflected on Table 1.2 of Exhibit 39?
MS. HERRMANN: Objection. Foundation, speculation.
Q I'm sorry, Table 2 of Exhibit 39.
MS. HERRMANN: Same objection.
A The TSLCC was our best projection of what the actual costs of the program would be. Our plan and our desire was to operate at the higher receipt rate all along and to exceed whatever the, you know -- to exceed what was expected. So that's why the costs were at the high rate.
Q So did you view the 1995 annual capacity report as a statement of the department's view of its legal obligations to pick up spent fuel?

decommission their spent-fuel pools in the auxiliary buildings which would be expensive operating systems, and they wouldn't be required to have those pools. So that was the concept of why it was valuable to have dual-purpose systems, be they canisters or be they casks, to facilitate the utility costs and decommissioning.
Q So a utility such as Sacramento Municipal Utility District could use a dual-purpose canister or cask system in order to accelerate the closure of the spent-fuel pool, correct?
A Yes.
Q Now, just to clarify, the NRC has not to date licensed or certified any canisters or casks for disposal, correct?
A Correct.
Q On the last entry on page 2145 of Exhibit 47 you see the entry "possible use for at-reactor storage by 1998"?
A Yes.
Q Am I correct that dual-purpose canisters or casks would be equally amenable for use for at-reactor



storage? Correct?
A Yes.
Q And that could have been done by 1998 had the department proceeded with a program for the development of multipurpose canisters or dual-purpose canisters, correct?
MS. HERRMANN: Objection. Speculation.
A Yes, for dual-purpose canister -- for multipurpose canister. When you added the dual-purpose the answer is no because that was never the department's policy.
Q The department's policy was to obtain a license or certification for all three purposes; storage, transport, and disposal, correct?
A That was our desire, yes.
Q Does the Department of Energy play any role in the approval process of casks or canisters for disposal?
A Please repeat that.
Q Does the Department of Energy play any role in the approval of casks or canisters for disposal?
MS. HERRMANN: Objection. Vague.



A A support role.
Q And please describe that support role.
A We've done technological issues with the Nuclear Regulatory Commission to facilitate and support vendors getting certifications. An example of would be burn-up credit. We've submitted topical reports to the NRC which all vendors can use. So we play a support role to certifications.
Q The actual approval or certification comes from the NRC alone, correct?
A For health and safety purposes, yes.
Q What do you mean by "for health and safety purposes"?
A The NRC evaluates and approves based upon public health and safety. They do not on economics or interchange issues or other things like that. An example would be under the contract on the DOE accepting this as an acceptable waste form, there are issues such as size, loads, and things like that need to be worked out, which we have not done. So we have approval, DOE has approval for receipt as well as the NRC for health and safety.



(Deposition Exhibit Barrett 50 was marked for identification and retained by Counsel.)

Q Mr. Barrett, the court reporter has handed you Exhibit 50, which bears Bates CTR-040-0568 through 0583. It's dated April 26, 1995, and it's from T.J. Glauthier, G-l-a-u-t-h-i-e-r, Associate Director, Natural Resources, Energy, and Science; and Charles Curtis, Undersecretary, Department of Energy. Do you have that document before you?
A I do.
Q And do you see on the second page the distribution includes a copy going to Daniel Dreyfus?
A Yes.
Q Now, on April 26, 1995, you reported to Mr. Dreyfus, did you not?
A Correct.
Q Do you recall earlier today you I believe indicated that on, I don't know if you used the term "frequent," but perhaps regularly you deal, in your capacity as deputy director, with the Office of Management and Budget?

A Yes.
Q And --
A Well, excuse me. Primarily as the acting director.
Q Primarily as the acting director?
A Yeah. Sometimes I do.
Q And would you have dealt with the Office of Management and Budget in 1995 in connection with the issues addressed in Exhibit 50?
A In a nonpolicy sense.
Q So you would have dealt with the Office of Management and Budget in connection with these issues, correct?
A In a nonpolicy sense.
Q Now, the memorandum, it's on the letterhead of the Executive Office of the President, Office of Management and Budget. Do you see that?
A I see that.
Q Who is T.J. Glauthier, if that's how you state it?
A Yeah, T.J. Glauthier.
Q Who was he?



A At that time he was the associate director of natural resources and energy and science within the OMB.
Q And Mr. Charles Curtis, who the memorandum is also from, was an official with the Department of Energy, correct?
A He was the Undersecretary at that time.
Q Do you know why Mr. Curtis issued a memorandum on April 26th, 1995, on letterhead of the Office of Management and Budget?
MS. HERRMANN: Objection. Speculation.
A No.
Q Would that have been unusual based on your experience in the office?
A Not unusual. I'm not sure this is a final. I don't see any initials on it. I'm not sure this is issued.
Q Have you ever seen another memorandum in which Undersecretary of the Department of Energy issued a memorandum on letterhead of the Office of Management and Budget?
A What?



Q Are you familiar with any other situation in which an official of the Department of Energy issued a memorandum on letterhead of the Office of Management and Budget?
A You used the word "issued." I'm not sure this is issued. Usually I'm used to seeing a little curlicue, a signature, something with it. This may be issued.
Q But assuming it was issued, are you aware of any other instance in which an official of the Department of Energy issued a memorandum on letterhead of the Office of Management and Budget?
A I don't know of any, but it's -- I would think it's not uncommon.
Q Well, assuming this memorandum was, in fact, issued, why do you believe that Mr. Curtis would have issued a memorandum on the letterhead of the Office of Management and Budget?
MS. HERRMANN: Objection. Speculation.
A The first name on there is T.J.'s, not Charlie's. So this was a joint activity. So whose letterhead it is, it's going to be one or the other.



T.J. is first. That's probably why it's on his letterhead, but I'm speculating because I don't know.
Q Can you turn to page two, Bates number 0571.
A I'm sorry, 05 -- mine's cut off. So it's the second page?
Q Second page, yes.
A Okay. I'm there.
MR. MACDONALD: Fourth page of the document.
THE WITNESS: Says page two on the bottom?
MR. MACDONALD: Yes.
Q Under Issues in the first paragraph, will you take a moment to read that.
A Yes.
Q Have you read the first paragraph?
A Yes.
Q Is the first paragraph consistent with your understanding?
A When you said the first -- I haven't read -- you says issues. The first paragraph, not down to "expectation for waste"?

Q No. My question is with respect to this statement: When the nuclear waste policy was enacted, policy act was enacted, it was envisioned that the department would have a repository available for permanent waste disposal in 1998, and the department entered into contracts with the utility to begin accepting waste in 1998 on that basis. Is that statement consistent with your understanding?

A Yes.

MS. HERRMANN: Objection. Foundation, calls for a legal conclusion.

A Yes.

Q On page three could you please turn to the first paragraph on the top of the page. Do you see that?

A Yes.

Q Why would continued on-site storage of spent fuel threaten the orderly operation of the nation's civilian nuclear reactors?

MS. HERRMANN: Objection. Foundation.

You can take time to read it if you need to.



THE WITNESS: Yeah.

A You're referring to a phrase in this paragraph?

Q I'm looking at the last sentence of the first full paragraph on page three. Do you see that?

A The last sentence. I see the last sentence.

Q And my question is how or why would the continued on-site storage of spent fuel threaten the orderly operation of the nation's civilian nuclear reactors?

MS. HERRMANN: Objection. Foundation.

A The example of this would be the Prairie Island situation.

Q And please explain to me that example.

A Where due to local state -- state law they had difficulty getting storage and may have to shut the reactor down.

Q Are there any other situations that you're familiar with which at-reactor storage could threaten the orderly operation of nuclear reactors?

A No specific ones.



Q Do you believe that to be generally a concern?

A Yes.

Q Do you recall I asked you about an Upton Bill, U-p-t-o-n, the last session of this deposition?

A Vaguely.

Q Could you please turn to what's marked as page one, Bates number 0579 of this exhibit.

MS. HERRMANN: The next page in our copy, right, counsel?

A Policy options, option one?

Q Yes, that's the page.

A I see it.

Q It's Option 4. I'm sorry.

A Option 4?

Q Yes. The bottom of the page is Bates number 0579.

MS. HERRMANN: Our Bates numbers are cut off so we're going to need a better reference.

MR. CAYNE: It's Option 4.

A Yes, I see the page.

MS. HERRMANN: For the record, a good



number of these pages are numbered page number one and page number two, so that's not going to help.

A Just so you know, ten minutes from now I need to go.

Q It's 3:45.

A Oh, I'm a whole hour off. Sorry about that.

MS. HERRMANN: Wishful thinking.

Q I'd like to turn your attention to towards the bottom of the page there's a paragraph that begins "start of waste acceptance." Do you see that?

A Yeah, I see the paragraph.

Q Would you please read that.

A Okay.

Q Have you read that passage?

A Yes.

Q Now, the reference to the storage facility here is to an interim storage facility, correct?

MS. HERRMANN: Objection. Foundation.

A That's my understanding.

Q And just for the record, let me just read the statement so it's clear what we're talking about.

The paragraph reads "Start of waste acceptance: The Upton/Towns Bill mandates a storage facility in 1998, but this appears infeasible. More realistic estimates are that a storage facility could be available in five to seven years after legislation is passed, depending on the degree of procedural streamlining included in the law. Assuming passage of legislation 1995, therefore acceptance could begin from 1999 to 2003." Do you see that? That's the statement you're referring to, correct?

A Yes.

Q Earlier on your office believed that an interim storage facility could be up and running within three-and-a-half years of the start of construction, correct?

MS. HERRMANN: Objection. Speculation.

A I don't recall three-and-a-half years.

Q You do not recall testifying in this deposition that at an earlier point in time you believed that it would take less than five to seven years to get an interim storage facility up and running?



A All depends on the infrastructure and degree of streamlining, etc. The shortest I think I've ever said was four under some -- some circumstances which I don't remember the details. But generally -- I've never said less than four. You can do it in three and a half. That's the licensing phase or something, to put it in context. But go ahead. I mean, what's the -- what's the question? If you're saying three and a half, I don't think you can do it in three and a half.

Q My question is do you agree with the statement at page Bates 0579 that a realistic estimate of the amount of time that it would take to get an interim storage facility up and running would be from five to seven years after the enactment of authorizing legislation?

MS. HERRMANN: Objection. Speculation.

A Could be four, could be five, could be seven. All depends on a lot of things.

Q Would an MRS facility be an interim storage facility within the meaning of this paragraph on 0579?

MS. HERRMANN: Objection. Foundation.



A It would be very similar.

Q Is that what was in mind?

MS. HERRMANN: Objection. Foundation. Speculation.

A The Upton/Towns Bill was straight storage. An MRS was more than straight storage. It was an integral part of the system.

Q Turn to page -- it's a section that on the top of the page it states "supporting initiatives for policy options."

A We're going back in the document or forward?

Q It's --

MR. MACDONALD: Third-to-the-last page.

Q -- third-to-the-last page.

A I see that page.

Q And can you take a moment to read this portion of the memorandum. And to put it into context for you, I'm going to specifically ask you about, on the following page, the section on policy considerations. Why don't you read this memorandum, this portion of the memorandum so that you can respond



to the questions I have on that section.

A Am I supposed to read B or A?

Q I'm focusing on Subsection B.

A Oh, I'm sorry, I'm doing A.

I've read B.

Q Okay. Now, under page 0581.

A Tell me which one.

Q That's the first page with "supporting initiatives for policy actions." Do you see that?

A Yes.

Q In 1995, in April 1995 was the multipurpose canister program still in force, or had you terminated it already?

A It's my recollection it was still there in early '95.

Q And as you discussed earlier, the multipurpose canister program would have been intended to mitigate at least some of the harm suffered by utilities as a result of the delay in acceptance of spent nuclear fuel, correct?

A Correct.

Q Well, why, as reflected in this Exhibit 50,

was it also believed that -- by the department and the Office of Management and Budget that additional payments would be required to be made to the utilities to supplement the provision of multipurpose canisters?
MS. HERRMANN: Objection. Foundation.
A It doesn't say that. It says it could be. You know, if this option were adopted you could do that to additionally compensate them for the delays.
Q Because I thought when you explained the multipurpose canister program, that would have been a stand-alone proposal, to compensate the utilities?
A That was a -- that was a stand-alone proposal, but what this is referring to, I believe, is this would be in addition to the multipurpose canisters. It says right there, These payments would supplement the multipurpose canisters.
Q You indicated that the multipurpose canister program was intended to mitigate the harm suffered by the utilities, correct, as a result of the acceptance delays?
A Yes.
Q Why was the department in 1995 considering



the possibility of supplementing the provision of multipurpose canisters to utilities with additional payments reflected in the proposal on page 0581 and 0582 of Exhibit 50?
MS. HERRMANN: Objection. Foundation. Speculation.
A It would be my understanding that many utilities were not particularly satisfied that the multipurpose canisters being supplied were sufficient to cover the delays and wanted more. And this was our -- an option that we were looking at that we could provide more. An example is one you said earlier, we talked about earlier was that the multipurpose canisters did not cover the construction costs that on-site reactors would have to do.
Q And would the payments reflected in the proposal set forth at page 581 have covered such construction costs?
A Could have been used for that.
Q That would have been one of the purposes, correct?
A Could have been, yes.



Q For what other purposes would the payments reflected at page 051 have been used?
MS. HERRMANN: Objection. Foundation.
A I don't know.
Q Well, rather than giving me all the purposes, what other purposes can you think of? Can you think of any other purposes?
MS. HERRMANN: Same objection.
Q Other than construction?
A Well, if it was a payment in terms of cash, utilities could do with it what they wished to do in conjunction with the PUCs.
Q In conjunction with the?
A Public utility commissions.
Q How would the amount of the payments have been determined?
MS. HERRMANN: Objection. Foundation, speculation.
A That's a complexity that's there and one of the reasons why we never did it.
Q On the next page, page 0582.
MS. HERRMANN: Can we get a title on the



top, please?
MR. CAYNE: The first entry is Legislative Implications.
MR. MACDONALD: The second-to-the-last page.
A The next-to-the-last page?
Q Yes. You said a moment ago the payments weren't made because of the complexity of determining the amount. Do you recall that statement?
A Yeah, I recall the statement. I shouldn't have made it.
Q You didn't mean to indicate that the department didn't make the payments because it didn't believe that it had an obligation to mitigate or rectify the harm sustained by the utilities as the result of the delay in acceptance, did you?
MS. HERRMANN: Objection. Foundation, calls for a legal conclusion. Objection to the extent it mischaracterizes prior testimony.
A Cash payments are extremely complicated, and this was not pursued beyond the preconceptual discussion that you see here.

Q But it was not pursued, if I understand your testimony, because of the difficulty in determining the amount of the cash payments as opposed to a determination by the department that it didn't have an obligation to rectify the harm suffered by the utilities as a result of the acceptance delays, correct?

MS. HERRMANN: Objection. Foundation, calls for a legal conclusion.

Q Correct?

MS. HERRMANN: Same objections.

A I don't know how to answer that question, because you had so many things mixed in it. I don't know how to answer that question.

Q If I understand your testimony, the department basically threw up its hands and said, It's too complicated for to us figure out how much we should pay each utility, so we're not going to pursue this proposal. Would that be a correct statement?

MS. HERRMANN: Objection. Mischaracterizes prior testimony.

A No, it would not be, because the amount



that one would pay is probably one of the more easy things to do, and that is very complicated in itself. So there are many issues involving direct payments, of which determining what amounts to whom and when is a very complicated one, but that is probably less complicated than the source of funds and the other things discussed in this statement.

So I did say that, but that's a lesser item. Although that is a major item. I have nothing to do -- in my statement on that, my remark had nothing to do regarding obligations or anything else that revolved through contractual matters.

Q Do you see under Policy Consideration it says "mitigates the perceived problems of utilities 'having to pay twice for storage'"? Do you see that?

A I see that.

Q What is that?

MS. HERRMANN: Objection. Foundation, speculation.

A I believe what the authors were trying to do here was find a way to provide resources back to the utilities that were having to spend resources due



to the fact that we didn't pick the fuel up, through storage or whatever, while they were -- operating utilities, not shut down ones -- were still paying money into the waste fund. The ones who were operating claimed they were paying twice; once to pay the waste fund and once to do with storage. So we were trying to figure a way to cover some of the storage costs that would alleviate the utilities to have to, quote, pay twice.

Q Under the statute the utilities were supposed to pay into the waste fund, and at that point it became the obligation of the Department of Energy to store and dispose of the spent fuel, correct?

MS. HERRMANN: Objection. Calls for a legal conclusion.

Q Correct?

MS. HERRMANN: Same objection.

A Repeat the question again.

Q The problem of the utilities having to pay twice for storage arose because under the Nuclear Waste Policy Act it was the intention of Congress that the utilities pay once into the nuclear waste fund,



and the payments into the nuclear waste fund would be used to pay for the storage and disposal of spent fuel and the utilities would not have to pay again directly out of their own pockets to provide for such storage and disposal during the period that the department failed to comply with its statutory contractual obligations to pick up the fuel, correct?

MS. HERRMANN: Objection. Calls for a legal conclusion, compound.

A Yes.

Q My statement is correct?

A I believe so.

(Deposition Exhibit Barrett 51 was marked for identification and retained by Counsel.)

Q The court reporter has handed you a document marked for identification as Exhibit 51. Do you have that before you?

A I do.

Q And this document bears Bates numbers HQR-038-0202 through 0204. It's a letter dated March 1st, 1996, from the director of the Office of

A Just various things that Dave has done like that, other things, those parametric things we talked about earlier and things like that. So just other general analyses. Nothing special that I know of.
Q Did those analyses also compare ACR rates with revised program acceptance rates?
A I don't know.
Q See the statement in the third-to-the-last paragraph or fourth-to-the-last paragraph, "Each year of delay adds a year on to all utility storage needs and dramatically increases the post-shutdown storage costs"?
A I see that.
Q Did you discuss that point with Mr. Zabransky?
A No.
Q Did you disagree with that point?
MS. HERRMANN: Asked and answered.
A No, we didn't discuss it.
Q I said did you disagree with that point?
A No. I didn't pay attention to it because it had to do with what the NEI did, and I didn't pay



attention to it.
(Deposition Exhibit Barrett 54 was marked for identification and retained by Counsel.)

Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 54. It's a one-page document bearing Bates SN 120329D. It's a letter dated March 13th, 1997, from Beth A. Tomasoni T-o-m-a-s-o-n-i, to Mr. R.G. Cocherell, C-o-c-h-e-r-e-l-l of the Southern Nuclear Operating Company. Do you have that document before you?
A I do.
Q And this document refers to delivery commitment schedules, correct?
A That's what it says.
Q Why did the department advise the Southern Nuclear Operating Company on March 13th, 1997, that it would not be able to approve its delivery commitment schedule submittal?
MS. HERRMANN: Objection. Foundation, speculation.



A I don't know.
Q Did the department advise other utilities similarly that the department would be unable to approve their DCS submittals during this time period?
MS. HERRMANN: Objection. Foundation, speculation.
A I don't know.
Q Were you involved in any meetings or discussions internally within the Department of Energy relating to the decision to issue this letter to Southern Nuclear Operating Company or similar letters to other utilities?
A I think so. Yes.
Q And with whom did you have those discussions?
A Probably Zabransky.
Q And what was discussed during those discussions?
A I think he told me they were going to have the contracting officer write such letters. I asked something to the effect, That's what you, the contracting people, and the counsel says we ought to



do? And his response was yes. And I said, Go do it.
Q So the contracting people and the legal counsel told Mr. Zabransky that this letter and similar letters should be issued, correct?
MS. HERRMANN: Objection. Do not answer to the extent that requires you to divulge conversations between you and counsel or Mr. Zabransky and counsel.
Q I'm asking you to advise me, Mr. Barrett, what Mr. Zabransky advised you.
MS. HERRMANN: And if that requires you to advise what counsel discussed with Mr. Zabransky, do not answer.
A Okay. Repeat your question.
Q Did Mr. Zabransky advise you why this letter, Exhibit 54, was issued on March 13th, 1997?
A He said that after consultation with all appropriate people that this was the right thing to do, and I said, Go do it.
Q And who were the appropriate people he consulted with?
A I don't have specifics other than I know those he normally consults with, you know, the finance

people in our own program and the counsels as well as the contracting people. And I trust him, and he said, We need to do this, and I said, Go do it. So that's the extent of it.

Q Why did the appropriate people advise Mr. Zabransky that Exhibit 54 should be issued?

MS. HERRMANN: I will continue my caution that if that requires you to tell Mr. Cayne what counsel told Mr. Zabransky, you should not answer the question.

A I don't know.

Q Do you know and you can't respond because of counsel's admonition or do you just not know?

A I don't know. I was not involved in what those details were.

Q So you have no idea why the department made the decision not process DCS submittals in 1997?

MS. HERRMANN: Asked and answered.

A Not beyond Mr. Zabransky's advice after his statement that he appropriately coordinated with all the appropriate people in the department, and that was good enough for me.



Q What effect did the decision to not process DCS submittals have on the work of your office?

MS. HERRMANN: Objection. Foundation, speculation.

A None to my knowledge.

Q And why do you reach that conclusion?

A Because we were focused on trying to do Yucca Mountain and not on administrative stuff.

Q Oh, this would qualify as administrivia?

MS. HERRMANN: Objection. Vague.

A Basically.

Q Basically yes?

A Yes.

MR. CAYNE: It's 4:55. I understand the witness has to break for the day.

MS. HERRMANN: That's correct.

MR. CAYNE: We will reconvene on Friday at either eight or nine.

(Signature having not been waived, the deposition of LAKE H. BARRETT was adjourned at 4:54 p.m.)



ACKNOWLEDGMENT OF DEPONENT

I, LAKE H. BARRETT, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

________________________ _________________________

(DATE) (SIGNATURE)



CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLI

I, Diane Gomez, Registered Professional Reporter, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 8th day of May, 2002.

My commission expires:
June 14, 2005

_________________________

NOTARY PUBLIC IN AND FOR
THE DISTRICT OF COLUMBIA

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Friday, May 10, 2002
8:06 a.m.

Job No.: 11792-11
Pages 1104 to 1437, Volume 5
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X



Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHOR OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

1148

because of short-cooled fuel"?
MS. HERRMANN: Objection. Speculation.
A No.
Q Do you understand the term "derate"?
A I understand the term as I use it. How the author is using it I don't know.
Q How would you use it?
A It is to reduce the design capacity or reduce the output.
Q And do you understand the term "short-cooled fuel"?
A Yes.
Q What does that mean?
A Lower megawatt days per metric ton on the fuel.
Q Based on the understanding of those two terms you just expressed, if the author of that sentence used those two terms in the way you just explained them, do you understand this sentence?
MS. HERRMANN: Objection. Speculation.
A No.
(Deposition Exhibit Barrett 57 was marked

1149

for identification and was attached to the transcript.)
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 57. It is captioned Determination of Cost-effective Waste Management Receipt Rates. It is by R.W. McKee, M-c-K-e-e. It starts at Bates PA-221971. And it continues through PA-221980. Do you have that document before you?
A I believe so. I can't read the Bates number at the bottom, but go ahead. Yes.
Q And you'll see that the first two pages of this consecutively-Bates-numbered document appear to be the same other than the fact that the first page looks as if a buck slip covered over a portion of the left-hand column, correct?
A Correct.
Q Do you know a person named R.W. McKee?
A No.
Q Have you ever heard of that person?
A I've heard the name.
Q Are you familiar with Pacific Northwest

1150

Laboratory?
A Yes.
Q What is Pacific Northwest Laboratory?
A It's a contractor in Richland, Washington.
Q Were those contractors relied on often by the Department of Energy in connection with the development, design, and construction of the waste management system?
MS. HERRMANN: Objection. Vague.
A We use them as advisors and analysts for the waste management system.
Q Do you continue to so use them through today?
A No.
Q Through when did you use them?
A Through the late eighties.
Q There's also another name at the top of the first page, H.D. Huber, H-u-b-e-r. Do you know that individual?
A No.
Q Did you ever rely on the work of Pacific Northwest Laboratory?

1151

MS. HERRMANN: Objection. Vague.
A I used it as input.
Q For what purposes?
A For advice on systems analysis.
Q Did you ever personally assign work out to be performed by Pacific Northwest Laboratory?
A I don't remember me personally, but my staff did.
Q Did you authorize your staff to assign work out to Pacific Northwest Laboratory?
A Yes.
Q I take it then you considered the work of Pacific Northwest Laboratory to be competent?
A Yes.
Q I turn your attention to page Bates number PA-221972. It's the second page of the document. Actually, returning to the first page, do you see the buck slip on the first page? It says, '91 HLRWM conference papers, volume two, "high priority."
A I see it.
Q Is that your writing?
A No.

1156

generated within the Office of Civilian Radioactive Waste Management Control, if I got the name right, and I apologize if I got it wrong. I take it there would have been documentation generated within the office relating to the proposed report setting out the reason the report was proposed, arguing why or why not the report should be conducted, and that documentation would be circulated through the appropriate individuals in the office, correct?

MS. HERRMANN: Objection. Compound.

A Correct.

Q And would there be some type of typically sign-off sheet accompanying that analysis of the need of the report where the various authorizing officials within your office would individually sign off on the proposed report and then send it to the next person up the chain of command?

A Yes. The chain might be short. May only have been one person did it but, nonetheless, there should be those documents similar to what you described.

Q Is it possible that you personally may have

1157

signed off on the request for the report that is summarized in Exhibit 57?

A I could have.

Q Would the document circulating within the department relating to the requested report set forth a budget or an expected total cost of the report?

A Generally they do. I don't know if this one did or not, but generally they do.

Q Based on your experience, 15 or 17 years, what would a general range of expenses be for a report such as the report reflected by Exhibit 57?

MS. HERRMANN: What time frame are you talking about?

MR. CAYNE: The time frame of the report.

A This is probably over, you know, somewhere a man-year of effort. So this is, you know, a couple of hundred thousand dollars, thereabouts.

Q Could it have been as much as a quarter million dollars?

A Could have been.

Q You see in the second paragraph on page 1150 which has Bates number 221972, there's a

1158

statement "Higher receipt rates appear to be economically justified for both the repository and an MRS. For a repository-only system, minimum costs are found at a repository receipt rate of 6,000 MTU per year." Do you see that statement?

A I see it.

Q Was that statement accepted or rejected by the department?

A I don't believe it was either accepted or rejected.

Q Do you disagree with this statement?

MS. HERRMANN: Objection. Vague.

A I don't agree nor disagree. It is an assumption-driven statement. It all depends upon the assumptions.

Q Based on the assumptions reflected in this summary of the report, do you disagree with the statement?

MS. HERRMANN: Objection. Speculation.

Q And take your time to examine the assumptions, as much time as you need.

A I don't even see the assumptions there.

1159

Q Well, take your time to examine the report and tell me, based on what was considered in this report, whether you agree or disagree with this statement.

A If you want me to do that it's going to take a long time. All the assumptions are back here. We'll do it, but I'll tell you this is multi hours on a complicated subject like that based on assumptions that are 15 years old if you want me to say whether I agree or disagree with that statement.

Q Well, perhaps I'll just need to expand the time for the deposition because I --

A You know how much time -- well, anyway, we'll do what you wish to do. This is your time today.

Q Let's look to the column on the right-hand side of this page.

A Yes.

Q There's a statement underneath the numbers that says "Receipt rates ranging from 1500 to 6,000 MTU per year have been evaluated for both the MRS and repository facilities. The common assumption for

facility design work and for system studies has been to use a 3,000 MTU per year receipt rate for both of these facilities. There is, however, no fundamental reason for identical receipt rates, nor is there a clearly documented rationale for the 3,000 MTU per year receipt rate." Do you see that statement?
A I do.
Q Do you understand it?
A Yes.
Q What does it mean to you?
A For the system that was in place in '96, which was two repositories --
Q '96?
A '86, I'm sorry. -- which was two repositories and maybe an MRS, they looked at a range from 1500 to 6,000 tons per year receipt and started with the 3,000, which was the reference design that was there at that time, and they studied variations off the 3,000 with pros and cons of various scenarios.
Q You said '86, though. Wasn't this study from the '91 time period?
A I think it said '86 on it. Didn't it say



'86? Or was that the one before.
Q I believe that may have been the prior document.
A Well, whatever date. This is what -- what is the date of this?
Q Well, I see that it was given at a '91 high-level radioactive-waste management conference.
A That doesn't necessarily mean when the work was done.
Q And if you look at the references on page 1157 at the upper right-hand corner, the references are -- actually, the last page of the document there's a reference from 1991. So I would assume actually it was from 1991.
A In the early -- the late eighties or early nineties, whatever this -- whatever this was. Whenever this was. I don't remember. In the time when this was written. Let me phrase it that way.
Q Do you agree with the statement?
MS. HERRMANN: Objection. Vague.
Q And just to be clear for the record, the statement I am referring to is the statement on page



1150, Bates 221972, that starts "receipt rates ranging from 1500 to 6,000" and continuing through the sentence "There is, however, no fundamental reason for identical receipt rates, nor is there a clearly documented rationale for the 3,000 MTU per year receipt rate." That's the statement I'm referring to, Mr. Barrett.
MS. HERRMANN: Objection. Vague.
A No.
Q You disagree with it?
A Yes.
Q What aspect of the statement do you disagree with?
A Regarding the last phrase, you know, that there is no -- nor was there a clearly documented rationale for 3,000 metric tons receipt rate. There was a rationale that was written in the mission plan, if I recall, and one might debate about the sufficiency of the documented rationale, but there was one. So I disagree. I believe there was one. These folks had an opinion that there ought to be a different one, and that was their judgment, and that's



fine.
Q Do you disagree with any other aspect of the statement?
A No.
Q Again I'm starting with the beginning receipt rates ranging from 1500 to 6,000, that entire statement, do you disagree with any other aspect of it?
A No.
Q But you do disagree with the statement that there is not a clearly documented rationale for 3,000 MTU per year receipt rate, correct?
A Correct.
Q Because you believe that there is, in fact, a clearly documented rationale for a 3,000 MTU per year receipt rate, correct?
A Yes.
Q And could you explain to me that rationale that you believe has been clearly documented by the department?
A There was one in the old mission plans. It basically was that the rate of 3,000 tons per year

exceeded a generation rate of a nominal 2,000 tons per year and allowed a catchup of a thousand tons per year delta. And for where the program was at that time that was sufficient, and I felt that was sufficient at that time.

Q Sufficient to do what?

A Sufficient as a design basis for the facility. I didn't want to basically put resources, inasmuch as I was involved in this, into further refinements and expenditures of money on fine-tuning when we needed to focus on do we have a site and can we ever do this.

Q And fine-tuning, for example, whether it should be higher than 3,000?

A Correct.

Q And when you just stated "allowed a catchup of a thousand tons per year delta," what did that statement refer to?

A The receipt rate of a nominal 3,000 tons per year steady state when the generation rate was approximately 2,000 tons per year. The system capacity and take-rate was exceeding the generation



rate in the nation.

Q Why was that important?

A Because we would like to catch up and, you know, remove the waste that had been accumulating at whatever the start date of the facility would be.

Q Did you consider that to be your mission under this statute, the 1982 Nuclear Waste Policy Act?

MS. HERRMANN: Objection. Vague, calls for a legal conclusion.

A Repeat the question again.

Q You stated "We would like to catch up and, you know, remove the waste that had been accumulating at whatever the start date of the facility would be." Do you recall that statement?

A Yes.

Q Why would you have liked to have caught up, as you stated in that answer?

A Because waste existed in the United States, both commercial waste and defense waste, and we were to start, either be it '98 or some other date, there would be an inventory existing, and you wanted to work off that inventory as soon as practicable.



Q Why did you want to work off that inventory of spent nuclear fuel as soon as practicable?

A Because I believe that's the intent of the act.

Q By "the act" you're referring to the Nuclear Waste Policy Act of 1982?

A Correct.

MR. CAYNE: It's 9:18. Let's take a short break.

MS. HERRMANN: Okay.

(There is a recess from the record.)

(Deposition Exhibit Barrett 58 was marked for identification and was attached to the transcript.)

Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 58. It's a parametrics analysis for future program costs scenarios bearing Bates number HQR-022-0001 through 0030. On the front page it says November 5th, 1999, Stephen Goldberg with the DOE CBO staff, draft. Do you have that document before you?

A Yes.



Q Who is Mr. Stephen Goldberg?

A He was a staff member in our program.

Q Did he report to you?

A Not directly, but indirectly.

Q What does DOE CBO staff stand for?

A I don't know.

Q Congressional budget office?

MS. HERRMANN: Speculation.

A I don't know. If it didn't have DOE in it that's what I would have said. We don't have one of those that I know of.

Q What was Mr. Goldberg's role in your department?

A He was an engineer but also very familiar with federal budgeting processes, so he worked in our program administration area, primarily focused on long-term budgets and financial technical analysis.

Q Now, this document has the same caption as Exhibit 44, correct?

A It has the same caption, yes.

Q Was this document and the information in this document also used in connection with your

1240

A Yes.
Q So did the department not make the determination that taking title to spent nuclear fuel at a utility's nuclear facility was, in fact, consistent with the terms of the Nuclear Waste Policy Act of 1982?
MS. HERRMANN: Objection. Vague, foundation, calls for a legal conclusion.
A No.
Q You didn't make that determination?
A No.
MS. HERRMANN: Same objections.
Q Did it make the contrary determination, that the acceptance -- that taking title to spent nuclear fuel at the site of a utility would violate the requirements of the Nuclear Waste Policy Act of 1982?
MS. HERRMANN: Same objections.
A The answer to your question is no.
Q Did the department consider the issue?
MS. HERRMANN: Same objections.
A Yes.

1241

Q And what conclusions did the department reach based on those considerations?
MS. HERRMANN: Objection. Vague, foundation, calls for a legal conclusion.
A The Atomic Energy Act says certain things in it. The Nuclear Waste Policy Act says certain things in it. Fort St. Vrain was not the Nuclear Waste Policy Act. It was the Atomic Energy Act. There were discussions amongst people within the department about did the Nuclear Waste Policy Act provide authority to do it or not, but it is not stated in the Nuclear Waste Policy Act, that authority. So there was discussions about that with the Fort St. Vrain situation was different in an authorization aspect than the Nuclear Waste Policy Act.
Q What was the conclusion of those discussions, though, to which you just referred?
MS. HERRMANN: Objection. Foundation, calls for a legal conclusion.
A I don't recall other than if you read the official statements regarding the PECO agreement and

1242

statements from our counsel at the time, that's the only reference I would have.
Q Can you turn to page six.
A Yes.
Q The last entry begins "future funding levels are not likely to be adequate for both interim storage and the permanent repository."
A I see that.
Q Was that a concern of yours at the time?
A Yes.
Q Why?
A Because the program was habitually -- was funding-limited by Congress, and if we had a congressional requirement to build interim storage we were afraid that the funds would be limited and that the long-term repository would suffer.
Q So do I understand correctly that the department was at this time opposed to a statutory requirement for authorization for an interim storage facility because that would limit the amount of funding available for the construction of the permanent repository?

1243

MS. HERRMANN: Objection. Foundation. Mr. Barrett is not a 30(b)(6) witness. Compound.
A I said could, not would.
Q So do I understand correctly that the department was at this time opposed to the statutory requirement for the construction of an interim storage facility because that could limit the funding available for the construction and operation of a permanent repository?
MS. HERRMANN: Same objections.
A That was one of the reasons.
Q What were the other reasons?
A They're laid out on page six and seven of your document.
(Deposition Exhibit Barrett 63 was marked for identification and was attached to the transcript.)
Q The court reporter has handed you, Mr. Barrett, a document marked for identification as Exhibit 63, bearing Bates numbers YMP-012-2650 through 2687. The front page states Program History Briefing to Secretary Pena by Lake Barrett, and it continues.

1244

Do you have that document in front of you?
A I do.
Q And on the next page it indicates that the document is dated March 27th, 1997. Did you personally deliver this program history briefing to the Secretary?
A Probably.
Q Where would this have occurred, in his office?
A Probably.
Q What was the purpose of this briefing?
A I don't remember. Probably, most likely he asked to be brought up to speed on what Yucca Mountain was and what the issues were.
Q Why would he request that in March of 1997?
MS. HERRMANN: Objection. Speculation.
A I think he just became Secretary.
Q Could you turn to page Bates number 01 -- excuse me, Bates number 2674.
A 2674?
Q Yeah. The top of the page states "obligation-litigation highlights."

1245

A Yes. I'm there.
Q Okay. The first entry states "pre-FY 1994 MRS could enable meeting waste acceptance obligation - 'sidestep' legal obligation issue." Do you see that statement?
A I see it.
Q What did you mean by the statement that the MRS could enable the legal obligation issue to be sidestepped?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A I have no recollection.
Q But you believe you likely provided this to the Secretary, did you not?
A I remember briefing the Secretary many times on many things. I just don't remember this one in particular, and I certainly don't remember a, quote, sidestepping legal obligation issue.
Q Do you think that the MRS would have enabled the department to -- would have better enabled the department to comply with its binding contractual obligations?

1246

MS. HERRMANN: Objection.
Q Is that what you might have been referring to here?
MS. HERRMANN: Objection. Speculation, calls for a legal conclusion.
A My interpretation of this would have been that pre-FY '94 the MRS could enable meeting the waste acceptance obligation; therefore, we would not have had the legality issues that we have. So we could have avoided legal obligation issues if the MRS had received waste in '98.
Q Post-FY 1994 did an MRS or did the MRS proposal enable the department to sidestep its legal obligation to the utilities?
MS. HERRMANN: Objection. Asked and answered, calls for a legal conclusion.
A Well, post-FY '94 it was very unlikely that we were going to have an MRS to meet the 1998 issue and, therefore, it was a very real issue that we had to deal with. So there was no sidestepping ever anyway.
Q What do you mean there was no sidestepping

1247

ever anyway?
A I don't think I ever would have used the word "sidestepped." I'm not sure this was ever the delivered -- delivered -- it's not my kind of words.
Q What did you mean by the statement, though, that I just asked you about, which was that there was no sidestepping ever? When you just used that statement a moment ago what did you mean?
A I don't know what sidestepping is so I don't -- I don't use it, and if you say I did or didn't -- I don't know what sidestepping means. Post-'94 -- the '98 date issue became a more important matter from a programmatic planning point of view in post-'94.
Q What do you mean by that?
A We had to deal with the legalities of not being able to pick up fuel in 1998.
Q Why did that become more important post-'94? Wasn't it more important pre-'94?
A Pre-'94 we could have made it with an MRS, but once the MRS became implausible or very unlikely based on the FY '94 congressional budget

limitations, it became a much bigger programmatic issue.
Q What became a much bigger programmatic issue?
A The consequences of not making the 1998 date.
Q Turn to page, on the bottom, 2671. On the top it states "2000 contract allocations."
A I see it.
Q Do you see it says on the bottom "total 900 MTU"?
A Yes.
Q Was it just coincidental that these numbers happened to add up to 900 MTU, the numbers under the right-hand column under MTU?
MS. HERRMANN: Objection. Foundation, speculation, vague.
A No.
Q Why is it that these various numbers added up to 900 MTU?
A Because I believe these charts here reflect table something or other to one of the documents we've



talked about before. It's the one table I personally use from -- I guess it's an ACR.
Q Are you referring to on footnote one the DOE/OCRWM acceptance priority ranking an annual capacity report?
A Yes.
Q Report for 1995, correct?
A I believe so, yes.
Q My question is, the numbers added up to 900. Do you see that?
A Yes.
Q Is it just a coincidence that those numbers happen to add up to 900?
MS. HERRMANN: Objection. Foundation, speculation, vague.
A No. Because that's what's in that table based on oldest-fuel-first allocations or whatever the ACRs were generated with.
Q You see under the total 900 MTU it says "900 MTU thereafter until end of contract performance period."
A Yes.



Q I take it then it was DOE's position that the nine -- does this mean that 900 MTUs of spent nuclear fuel would be accepted each year through the period in which performance was required?
MS. HERRMANN: Objection. Foundation, to the extent you're asking for DOE's position.
Q All spent fuel from all utilities has been picked up?
MS. HERRMANN: Same objection.
A This table has nothing to do with what DOE was picking up, capacities, or moving. It says contract allocation.
Q What does this mean, footnote two, 900 MTU thereafter until end of contract performance period? What is the contract performance period?
A I don't know.
Q What do you think it means?
MS. HERRMANN: Foundation. Speculation.
A Exactly what it says.
Q Well, what does that mean, contract performance period? This is from a document you apparently delivered to the Secretary?



MS. HERRMANN: Same objections.
A It's whatever the contract -- I don't know -- it was the contract performance period. It didn't say ten years, didn't say forever. It's whatever the contract says it is. And people will debate what the contract says.
Q What did you tell the Secretary this meant?
MS. HERRMANN: Objection. Foundation.
A Because it was 900 tons per year was the contract allocation as we saw it, and that's what I told him. And it was put down to the end of the contract performance period, not to get into -- make a point that it was indefinite or it was only ten years. It was written that way -- I don't really remember the discussion. I don't know if he ever even asked, but certainly we didn't want to get into a long discussion about it is or isn't, so we put this down as an appropriate way to portray it to a senior man.
Q So then you didn't tell the Secretary that the 900 MTU per year contract allocations would stop after ten years, correct?
A I don't recall that topic coming up, if it

legal conclusion.

A What fuel picked up?

Q Assume a utility's spent nuclear fuel would have been picked up had the department complied with its obligations under the act.

A All of it or some of it?

Q All of it. Then would the storage costs be what you're referring to as additional costs?

MS. HERRMANN: Objection. Calls for a legal conclusion.

A Could be.

Q Why do you say "could be"?

A Depends if they could have gotten all of their fuel off within a certain period.

Q What do you mean by that?

A The answer would be yes to your question. If the utilities could move all spent fuel, then the spent-fuel storage costs could be avoided.

Q Do you know whether some utilities began their construction of dry storage facilities in anticipation of the department's failure to -- in anticipation of the department's delay in picking up



spent nuclear fuel?

MS. HERRMANN: Objection. Speculation, calls for a legal conclusion.

A I don't know.

Q You have no idea?

A No.

Q Do you know whether any utilities expended funds to build dry storage facilities that they would not have expended had they not expected the department to delay its compliance with the act and the terms of the standard contract?

MS. HERRMANN: Objection. Speculation, calls for a legal conclusion.

A The only one I know that's probably true for, it would be Philadelphia Electric Peachbottom. Not to say there aren't others. That one I know is probably true.

Q What did that utility do?

A That utility we evaluated in some detail because we had the agreement with them that the costs were due to our delay and it was quantifiable. Others I don't know.



Q But there might be others?

A There might be.

Q But you haven't explored to determine whether there are, in fact, others?

A Correct. I have not. I have not.

MR. CAYNE: It's twelve o'clock. Let's take an hour lunch break.

(A luncheon recess is taken.)



AFTERNOON SESSION

(Deposition Exhibit Barrett 65 was marked for identification and was attached to the transcript.)

Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 65. It bears Bates number HQR-036-0006 through 0085. On the front page it states Analysis Of the Total System Life-Cycle Cost of the Civilian Radioactive Waste Management Program, December 1998. Do you have this document before you?

A I do.

MS. HERRMANN: For the record, ours don't have Bates numbers.

Q I'll represent to the witness that the document handed to him was taken off the Department of Energy's public web site. And on the fourth page it has a reference to DOE/RW-0510. Do you have that before you? Do you see that?

A 0510? Oh, page number four. Yes, I do.

Q Am I correct that this TSLCC issued December 1998 was the first TSLCC issued by the

Department of Energy since 1995?
A I don't remember the dates. I thought there -- there may have been -- I just -- I don't know. I think it was the next one in the sequence.
Q Why was this report issued in 1998?
A We periodically issued total system life-cycle cost reports as precursors to the fee advocacy report. This was done in conjunction with the viability assessment which Congress requested. So this was released with the viability assessment.
Q The viability assessment you're referring to, when was that requested?
A 1998.
Q Was that requested pursuant to a statute?
MS. HERRMANN: Objection. Speculation, calls for a legal conclusion.
A It was -- yeah, I believe it was in our '98 or '97 appropriations act. '97 appropriations act. And it was in the statute.
Q So this TSLCC report was statutorily mandated by Congress, correct?
A No, that's not what I said. It supported



that -- the viability assessment requested costs to the license application. This report was a precursor and a basis for that.
Q And by that you're referring to?
A The viability assessment. Costs.
Q And that is what was requested or mandated by Congress, correct?
A Correct.
Q How did you use this as a precursor?
A This was the document we did the cost to license application, as well as the total life-cycle costs.
Q Do you recall this morning you used the term "reference documents"?
A What was the first part?
Q Reference?
A What about it?
Q You used that term today?
A Yes. Yes.
Q Is this document, Exhibit 65, what you would refer to as a reference document?
A It is a reference document, yes.



Q And why would you characterize it, Exhibit 65, as a reference document?
A This is the reference document for system costs.
Q Could you please look at page Arabic 15 of Exhibit 65.
A I have it.
Q Does this page indicate that in 1998 the Department of Energy was continuing to use the same acceptance rate schedule as it had previously issued in the 1995 total life-cycle cost program?
MS. HERRMANN: Objection. Best evidence.
A I don't have the '95 one in front of me, but I think they're the same.
Q You don't see any differences, do you?
A Well, I don't see the '95 one in front of me.
Q The '95 one is Exhibit 45. You can check.
MS. HERRMANN: Objection. Best evidence.
A That was a previous day's one? Do you know what page it is on here?
MR. MACDONALD: Page eight.



THE WITNESS: Thank you.
A Oh, they're a little bit different. Not much.
Q What is the difference?
A First year '95 was 300. That's the difference why I was questioning.
Q On here the first year is 400, correct?
A In '98 the first year is 400. In '95 the first year was 300. Other than that, they are the same.
Q Why did the first year increase by 100 MTU?
A I had them increase it.
Q I'm sorry?
A I had it increased.
Q Why did you have it increased?
A So it would match the 400 that was in the contracts.
Q Which contracts are you referring to?
A The waste acceptance contracts with the utilities.
Q Are you referring to the standard contract?
A Yes.

to exceed the 900 as quickly as we reasonably can.
Q And you thought you would exceed the 900 in three years, correct?
A Correct.
Q But you did make the, on this table, Table 3, you did make the first year entry, 400, the same as the 400 reflected in Table 1 of Exhibit 39, correct?
MS. HERRMANN: Asked and answered.
A It turned out to be the same number, yes.
Q And you believed that resolved some issues, correct?
A Yes.
Q So those same issues then have not been resolved with respect to years 2012 and all succeeding years as set forth in Table 3 of Exhibit 65, correct?
A I believe those issues are resolved in those out-years because it exceeds 900. If the numbers were 700 or 800, then I would consider that an issue that would need to still be addressed, but we exceeded the 900, we felt that was on the right side of...
Q And your view of the contractual



requirement was that the Department of Energy was only required to pick up 900 MTUs of spent fuel per year?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A I have no -- you keep using the word "contractual requirement." I don't know what a contractual requirement is. The contract-related documents state 900. We were in excess of 900. To me that's on the good side of 900 as opposed to less than 900.
Q In other words, what you're saying is your Table 3 provided for acceptance rates in excess of Tables 1 and 2 of Exhibit 39, correct?
A Meets or exceeds.
Q Of Exhibit 39, correct?
A Yes.
Q And that's all you're referring to as the contractual-related documents, correct?
A Correct.
Q If an ACR was to be issued today, hypothetically, what reference documents would you look to in determining what acceptance rate schedules



to set forth in the ACR?
MS. HERRMANN: Objection. Speculation.
A I don't know.
Q Well, based on past practice what reference documents would you look at?
MS. HERRMANN: Same objection.
A The last one we did was '95, correct?
Q I believe.
A I don't know what we would do in 2002.
Q Do you believe it's likely you would look at the most recent viability assessment report?
MS. HERRMANN: Objection. Speculation.
A I wouldn't.
Q What would you look at?
MS. HERRMANN: Same objection.
A This gets back to given that we're late, given that we're in litigation, I would look to counsel to decide what to do with that one. I can tell you from an engineering point of view I would try to run the system as high as I reasonably can do. That's what's in this Table 3. What is in the legal world, let the lawyers deal with that.



Q Would you turn to page 17, Bates 0034, of Exhibit 65.
A Yes.
Q What is the purpose of Table 5 on this page?
A It states clearly what the acceptance rate is for the DOE-owned high-level waste canisters.
Q Now, does this portion of the 1998 total system life-cycle cost program deal with the Department of Energy's transportation plans with respect to the transportation of spent nuclear fuel?
MS. HERRMANN: Objection. Vague.
A I believe it does.
Q And am I correct that in developing these transportation plans as reflected in Exhibit 65 that the Department of Energy was basing its plans on an annual acceptance rate -- on the annual acceptance rates as reflected in Table 3 on page 15 of Exhibit 65?
MS. HERRMANN: Objection. Foundation.
A I'm sorry. I'm not following you. Say it again. What's the question?

Q In developing the transportation plan reflected in Exhibit 65, was DOE basing those plans on an acceptance rate, annual acceptance rate that reached a steady acceptance rate of 3,000 MTUs per year?

MS. HERRMANN: Objection. Foundation.

A For the commercial fuel, yes.

Q And when you said "for the commercial fuel," you squinted a bit. Was that because there was also military fuel you would be picking up?

A This is the commercial fuel on Table 3. We clarified it in the '98 one because it wasn't quite so clear in the '95 one what was going to be the movement of department spent fuel which is Table 4. So we added Table 4 and added Table 5, what the department's high-level waste canisters. So it was clear what the system was going to do, which includes the transportation.

Q So was it clear that in developing the department's transportation plans the department was basing those plans on the assumption that it would accept spent nuclear fuel from commercial reactors at



an annual rate of 3,000 MTUs?

MS. HERRMANN: Objection. Foundation.

A That's my understanding.

Q Did the Department of Energy publish a draft or prepare a draft request for proposal for transportation assuming an acceptance rate of commercial spent nuclear fuel of 3,000 MTUs per year?

A I don't recall what the number was in the draft request for proposal.

Q But you do recall the draft request for proposal, correct?

A Yes.

Q And why did you issue a draft request for proposal?

A It was to alert the industry of what our plans were and desires were for services to move high-level waste to the repository.

Q And what were the department's plans and desires with respect to the movement of nuclear waste at that time?

MS. HERRMANN: Objection. Speculation, foundation. Mr. Barrett is not a 30(b)(6) witness.



A I believe it was to, you know, move fuel up -- ramp up to 3,000 tons per year as soon as practicable, starting in 2010.

Q So to ramp up to 3,000 tons per year of the spent nuclear fuel delivered by the commercial reactors, correct?

A Correct. I'm not -- yes.

Q And the ramp-up to 3,000 as contemplated by the draft RFP, the ramp-up to 3,000 would have occurred within five years, correct?

A I don't -- without having an RFP in front of me, I don't remember what it said.

Q Or as reflected in the total system life-cycle cost program as issued in December 1998?

A They were close in time. I'm just -- the RFP I think was done prior to December of '98, so I'm not sure if the RFP is more consistent with a December '98 TSLCC or the '95 TSLCC. I just don't know which one it is.

Q Regardless of which one it is, the ramp-up to 3,000 would have occurred within five years because the only difference between the two acceptance



schedules was in the very first year, correct?

A Yeah. Again, I don't know what the RFP said. It might have said it a little faster. I don't know. It should have been comparable to that.

Q But you think it may have actually been faster?

A I don't know.

MS. HERRMANN: Speculation.

A I don't know. I would have to look and see. I don't remember. It's five years ago. I don't know.

Q Was the draft RFP issued in 1997, was it based on a plan to ramp up to 3,000 as soon as practicable?

MS. HERRMANN: Objection. Foundation.

A I don't remember what was in the RFP from five years ago.

(Deposition Exhibit Barrett 66 was marked for identification and was attached to the transcript.)

Q The court reporter has handed you a document marked for identification as Exhibit 66. Do

Q PFS stands for private fuel storage?
A Correct.
Q What is private fuel storage?
A A proposed facility that's being considered in Utah for storage by utilities.
Q Why did you not assume instead of or also that additional storage requirements would be accommodated through additional spent-fuel pools?
MS. HERRMANN: Objection. Assumes facts not in evidence.
A Didn't think anybody was building any new pools in the United States.
Q And why did you believe that the utilities would only build dry storage as opposed to new pools?
A Because that's what they had been doing.
Q And do you have an understanding of why they have been doing that?
A I believe it's cheap.
MS. HERRMANN: Objection. Speculation.
A I believe it's cheaper and easier for them to do that than building a pool.
Q Is it safer?



A Don't know.
Q Could you look at general assumption number five, please. What is the basis of the assumption that in the absence of information to the contrary all spent nuclear fuel at sites with all reactors shut down is assumed to be placed in dry storage within five years after shutdown of the last reactor at that site?
MS. HERRMANN: Objection. Foundation, speculation.
A I don't know.
Q Does the assumption have no basis?
MS. HERRMANN: Objection. Foundation, speculation.
A I believe utilities have told my staff that's a reasonable assumption, and that's what they use.
Q This document comes from your file, does it not?
A I don't know where it came from. I have papers like this. I don't know if this came from my file or not.



Q But you have no personal understanding why the assumption was made in this document that shut-down reactors would place all spent nuclear fuel within dry storage facilities no more than five years after shutdown?
MS. HERRMANN: Objection. Foundation, speculation.
A Like I said, it's my understanding that utilities have said that's -- someone said that's what they intend to do. People have seen that assumption from NEI and others, and no one ever complained about it before.
Q Why do you understand that utilities plan to put their spent fuel in dry storage within five years after shutdown?
MS. HERRMANN: Objection. Foundation, speculation.
A I believe they would like to decommission their pools.
Q Couldn't they just leave it in the pool?
A Certainly could.
Q And why don't they, to your understanding,



plan to leave it in their pools?
MS. HERRMANN: Objection. Foundation, speculation.
A It's my understanding the utilities are building dry cask storage facilities, like your clients and others, to do -- to decommission their pools. I'm just -- my staff is trying to follow what we thought was industry common practice.
Q And do you understand why that is industry common practice?
MS. HERRMANN: Objection. Foundation, speculation.
A Because they're trying to decommission their plant.
Q And the plant can't be decommissioned without moving the fuel out of the pool?
A Yes.
(Deposition Exhibit Barrett 69 was marked for identification and was attached to the transcript.)
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit

69. It bears Bates number 00840676001 through 017. The front page states Proposed Approach for Establishing a Modified Acceptance Strategy, May 16th, 2001. Do you have that document before you?
A I do.
Q Why was your office proposing to establish a modified acceptance strategy in 2001?
MS. HERRMANN: Objection. Foundation.
A I have no idea.
Q Have you ever seen this document?
A Not that I recall.
Q What position did you hold in 2001?
A Acting director most of the time.
Q And as acting director you had no involvement in a proposal to modify the department's spent nuclear fuel acceptance strategy?
MS. HERRMANN: Objection. Mischaracterizes prior testimony.
A Only if it was a mature enough idea for my consideration.
Q Before today did you know that your office was considering the modification of the spent nuclear



fuel acceptance strategy?
MS. HERRMANN: Objection. Assumes facts not in evidence.
A I didn't know nor did I think I needed to know.
Q Well, you're pretty much in charge or the number two person in charge of the waste management system, correct?
A Correct.
Q So why did you not need to know?
A Because it was a detailed concept that somebody in staff was thinking, which is fine and good. I don't think it ever went anywhere.
Q Is the proposed approach reflected in Exhibit 69 no longer proposed?
A I don't know.
Q Pursuant to what process does the Department of Energy intend to start picking up fuel in 2010?
MS. HERRMANN: Objection. Foundation. Mr. Barrett is not a 30(b)(6) witness.
A I don't know yet. I don't know.



Q Does the department intend to continue to follow the ACR APR DCS process?
MS. HERRMANN: Same objection.
A I don't know.
Q Who would know?
A I don't think anyone knows.
Q Is the department intending to use the -- or rely on the existing ACR for terms of implementing the fuel acceptance program in 2010?
MS. HERRMANN: Objection. Foundation. Mr. Barrett is not a 30(b)(6) witness.
A I don't know.
Q As the deputy director of RW would you expect to know if the department had decided pursuant to what method it would provide for the acceptance of spent nuclear fuel from individual utilities starting in the year 2010?
MS. HERRMANN: Objection. Foundation, speculation.
A Not at this time.
Q Would you expect to know if the department had, in fact, adopted a strategy for determining how



to allocate acceptance slots for the pickup of fuel in 2010?
MS. HERRMANN: Objection. Foundation, speculation.
A Repeat the first part of that question.
Q Your last answer was "not at this time." My question was as the director of RW would you expect to know -- excuse me, as the deputy director of RW would you expect to know if the department had, in fact, decided as of today what method it would rely on in providing for the acceptance of spent nuclear fuel from individual utilities starting in the year 2010?
MS. HERRMANN: Objection. Foundation, speculation.
A I still don't see what the question is in there. About a third of the way into it I think was the question.
Q Does the department have a plan as of today of how it will go about picking up spent nuclear fuel from individual utilities starting in the year 2010?
MS. HERRMANN: Objection. Foundation.
A It has a conceptual plan, as stated in the

reference to a variety of DOE documents. My question is do you have an understanding of the term "steady-state rate"?

A I believe so.

Q What's your understanding of that term?

A Basically constant over time.

Q I believe you testified that there is a relationship between the 3,000 MTU annual steady-state rate and either the discharge rate or generation rate. Is that correct?

A There's a difference.

Q Is there a relationship between the two?

A Discharge rate is what it is. Utilities control that. The receipt rate, which is what you call 3,000, is something that is variable, but depending upon the system we design to build, we can vary that. So there's no direct relationship between the two.

Q My understanding from your testimony -- and please correct me if I'm wrong -- was that the 3,000 MTU steady-state rate or receipt rate as you just used that term, was chosen in part because it exceeded the



discharge rate or the generation rate by utilities. Is that right?

A Correct.

Q What other factors went into choosing a 3,000 MTU receipt rate?

A The 3,000 rate that we have was established before I was ever involved in the program. It's my understanding that it was looked at then as a proper balance for total life-cycle costs as well as near-term cash flow requirements and performance. If you make the number too high, then you have -- you would quickly work off the backlog, and then you would have a lot of idle capacity. If it was too low, you would have reactors needing to put in dry storage, and 3,000, based on an early 1980s, seemed like a reasonable number to use.

Q Do you know if there were any studies that talked about the 3,000 rate being a reasonable number to use?

A I don't know of any that were done back then, but I'm told there were some done. I never had reason to ever look. There were some -- we went



through some of them here that were done in the middle eighties and some done in the early nineties that would say that you can run them at a higher rate. And you can run them at a higher rate and there are puts and takes on costs and performance.

Q And am I right in understanding that the 3,000 steady-state rate has been used as the steady-state rate in the majority of design documents for the facility that DOE will eventually use to take and emplacement spent nuclear fuel?

A Yes, it's around 3,000.

Q And am I also right in understanding that the 3,000 steady-state rate has been the rate that is used in the majority of documents issued by DOE with regard to total system life-cycle costs?

A Correct.

Q With regard to those documents, the documents issued in connection with estimating total system life-cycle costs, what is that document supposed to reflect, the TSLCC document?

A Our best estimates of what the costs would be, you know, year by year for the program. And to



determine those you would have some assumption as to what the receipt rate would be, and we used 3,000.

Q And is the receipt rate of 3,000 used because that's what your intention at the time you issued that TSLCC report, is that the intention at that time, to use that rate for whatever facility you would have running when you begin to accept spent nuclear fuel?

MS. HERRMANN: Objection. Foundation.

A At steady state, yes.

Q Do you have an understanding of what the term "waste management system" is?

A Yes.

Q What's your understanding of that term?

A That would be the transportation system to remove it from the reactors. It would be an MRS if there were to be an MRS, and it would be the repository, or repositories if we have more than one.

Q With regard to the transportation system, other than the RFP that we've discussed just a couple of hours ago, were there any other documents that talked about the acceptance rate or the physical

capacity rate to take spent nuclear fuel with regard to the transportation system?

MS. HERRMANN: Objection. Vague.

A I recall there were transportation plans published back in the mid, late 1980s regarding that. Transportation can be made as big or as small as you wish to make it, and it's a minor issue compared to the siting of a repository.

Q Is it fair to say that the RFP that we just discussed that was issued in 1997 is the Department of Energy's best estimate of what the capacity or acceptance rates would be for a transportation system when a repository or another facility is up and running to take spent nuclear fuel?

MS. HERRMANN: Objection. Foundation. Mr. Barrett is not a 30(b)(6) witness.

A Those were the -- the RFP were the request for vendors to respond to that rate, not necessarily what the operating rate would be.

Q Do you have an understanding of what the operating rate would be when DOE begins to take spent nuclear fuel from utilities?



MS. HERRMANN: Objection. Foundation, speculation.

A My best estimate today would be those in the TSLCC, which would be the four, six, 12, you know, rate ramp-up, not the numbers that are in the RFP. Although if there's a national need, September 11th or whatever it is, we need to, it would be better to run it higher, we can certainly adjust the transportation system and adjust the design to possibly run higher if necessary.

Q When you refer to the term "TSLCC" in your prior answer, are you referring to a particular year? I understand those documents are issued on an annual basis.

A Well, they're not annual, but the most recent one.

Q When was that?

A Last May of 2000.

Q And to your best recollection does the May 2000 TSLCC reflect an acceptance rates along the lines of four, six, nine, 12, 3,000 as you just mentioned?

MS. HERRMANN: Objection. Best evidence.



A Same as the '98 one I believe.

Q Okay. Could it be that the most recent TSLCC that DOE issued was actually in May of 2001?

A Yes. Thank you.

Q He corrected me as well.

A Time goes fast when you're having fun.

Q Can you take a look at Lake Barrett Exhibit 65, which is the analysis of the total system life-cycle cost issued in 1998.

A I have it.

Q I'd like you to switch to page 15. We spent some time earlier today talking about Table 3 on page 15, and that's what I would like to draw your attention to.

A Okay.

Q I believe you testified that the reason that the acceptance rate in year 2010 was changed from 300 MTUs to 400 MTUs primarily was because DOE had an interest in increasing the rapidity at which you would actually take spent nuclear fuel from utilities. Is that right?

A Primarily, yes.



Q And a corollary factor was the fact that it would also coincide with the most recent ACR annual acceptance rates as well. Is that right?

A Correct.

Q If DOE's concern was to increase in year 2010 the acceptance rate from 300 to 400 to ensure a more prompt taking of spent nuclear fuel, why weren't increases of a similar nature; i.e., 100 MTUs per year, made in any succeeding year?

MS. HERRMANN: Objection. Asked and answered in the last portion of the deposition.

A We felt that would have sort of changed the design on the facilities itself, and we didn't want to go through a design change on the facilities for that.

Q Would adding 100 MTUs for year 2011, would that have necessitated a design change?

A It may have; it may not have. And I didn't want to have staff spend the energy to try to figure that out.

Q Why did you raise the MTUs in 2010 by only 100 MTUs and why not choose another figure?

MS. HERRMANN: Objection. Asked and

1340

answered.
A It was, you know, a relatively small amount. We had also gotten information -- we also put the transportation RFP which had the higher rates in it, and we thought we could get that extra out of the system. So we have always strived to perform at this high-as-possible, high-as-practicable rate we could operate at, so that's why.
Q Is it your testimony that the highest practicable rate that you could perform at for year 2011 would be 600 MTUs on an annual basis?
A We didn't really look hard to try to raise -- to see if we could raise that or the 1200 to 1300. I felt that was a lower priority item and didn't try to push it much. Didn't push it at all.
Q Do you know whether the acceptance rates that are included in this document are the same acceptance rates that are included in the 1995 TSLCC report?
MS. HERRMANN: Objection. Best evidence.
A I thought we just described it a little bit. The 300 to 400. Other than that, I think

1341

they're the same.
Q If you would take a look at Barrett Exhibit 45, which is the 1995 TSLCC document. And in particular I direct your attention to page eight.
A Yes.
Q And I think you're absolutely right that these rates are almost exactly the rates in the 1998 TSLCC but for the 2010 where you accurately noticed that it's 300 MTUs in the 1995 TSLCC.
When this document was issued in 1995, was this DOE's intention with regard to the acceptance rate it would implement when it began to take spent nuclear fuel from utilities in 2010?
MS. HERRMANN: Objection. Foundation. Mr. Barrett is not a 30(b)(6) witness.
A Restate that question again, please.
MS. HEWITT: Can you read it back.
(The record is read.)
MS. HERRMANN: Same objection.
A This was a cost report. The primary focus was, you know, to do a cost estimate for total life-cycle cost. This was not primarily a waste

1342

acceptance operating-type document. It should reflect what the system was at that time.
Regarding when we reviewed this document, when I reviewed the document, I was not paying much attention to if it was 300, 400, 600, or whatever. This should reflect what the repository design numbers were, and I just don't know what they were at the time. So the only reason I'm going through this is you asked this was the primary DOE document for acceptance rates. It really wasn't. It should have been the systems requirements documents for the repository of whatever were in place in 1995. If there was 100 percent alignment between those documents I honestly don't know.
Q Table 1-2 that we're talking about is entitled MGDS Receipt/Emplacement Rates. What does the acronym MGDS stand for, do you know?
A Mine geologic disposal system I believe.
Q Do you know whether or not the rates that are included in this document are different from the rates that were included in the 1995 APR ACR that was published around the same time?

1343

MS. HERRMANN: Objection. Best evidence.
A I think that the '95 ACR has the four-six-nine constant in it.
Q I think you're right, but if you would like to look at it, that's Exhibit 39.
A Well, that's different than these.
Q It is different?
A Yes.
Q Why was there a difference in rates published in two separate documents that were published around the same time?
A This is a performance document on what we thought we could perform at. That has something to do with the contract.
Q So is it your testimony that DOE could perform at a rate that's different than what it was supposed to perform under the contract?
MS. HERRMANN: Objection. Relevance.
A Yes.
Q Why don't you take a look at Exhibit 39, which is the 1995 APR ACR.
A Okay.

Q I'm going to refer your attention to Table 1 on page four.
A Yes.
Q The table is entitled Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel. My first question is -- and you've used this term quite a bit as well -- what does the term "nominal" mean when the DOE uses it in its documents?
A Not an exact number. To me the word "nominal" -- I don't know what the authors of this document meant. When I hear the word "nominal" or when I use the word "nominal" it's sort of an average number. It might be more; it might be less, but it's in that order of magnitude.
Q Now, this table sets forth projected waste acceptance rates for a period of ten years, correct?
A It appears to.
Q Do you know why it only sets forth projected acceptance rates for ten years?
A No.
MS. HERRMANN: Objection. Speculation.
Q Do you know what the acceptance rate would



have been in year 11?
MS. HERRMANN: Objection. Speculation.
A No.
Q Do you have any understanding of whether or not this ACR APR indicates that DOE will take spent nuclear fuel from utilities at a steady-state rate of 900 MTUs per year for the life of the program?
MS. HERRMANN: Objection. Best evidence. Speculation.
A Repeat the question, please.
(The record is read.)
A I don't know a relationship between this table and what we'll actually perform at.
Q Well, do you know what the purpose of issuing this table was?
MS. HERRMANN: Objection. Speculation.
A No.
Q Would an annual acceptance rate of 900 MTUs, if implemented by DOE, preclude the need of utilities to make arrangements for additional on-site storage after 1998?
MS. HERRMANN: Objection. Speculation.



A I don't know.
Q How would you figure that out?
A You would need to -- to calculate that you would need to project what the pool overflow rates would be, would know performance. You would need to then figure out how would the 900, or whatever rate we were going to perform at, how that would be allocated under the contract relationships. And then you could determine who had pool overflows and who did not.
Q Does DOE have information on what you call pool overflow rates?
A We have data reported by utilities in their 859 reports that you could derive that from.
Q Do you know whether or not that consideration, pool overflow, quote/unquote, was a factor in arriving at acceptance rates in this document?
A I don't know. I don't think so.
Q Do you know whether pool overflow was a consideration in developing any acceptance rate in any of the acceptance capacity reports issued by DOE?
A Not that I know of.



Q Were pool overflow rates a consideration in developing the 3,000 steady-state rate used for the design of the repository?
MS. HERRMANN: Objection. Speculation.
A Not specifically, but in a gross national sense, yes.
Q And how in a gross national sense?
A By setting the performance rate of nominally 3,000 being higher than the production rate of 2,000, that would give a thousand tons per year working off the backlog which should re-present if there was appropriate distribution amongst the contract holders' pool over -- anymore pool overflows.
Q Do you have an understanding of whether DOE ever established a minimum acceptance rate that would accomplish the need for eliminating pool overflow by utilities after 1998?
A Not specifically. The only reason I'm pausing, as I recall somewhere having a discussion with staff that the pool overflow rate in the teens, you know, post-2010, was something in the neighborhood of 500 tons per year if there was no -- if we did not

A The higher the rate of performance the better.

Q That doesn't answer the question of whether or not the rate --

A I couldn't understand the question. Repeat the question.

Q At least you told me that.

A All right. I thought that was your question, but try again.

Q My understanding is that one of the goals of the Civilian Radioactive Waste Management Program was to design a system that could take spent nuclear fuel at a rate that would eliminate the need for utilities to provide for additional on-site storage after January 31st, 1998. Is that correct?

A No.

Q What is not correct about that statement?

A I never considered the design of the system to solely try to avoid spent-fuel pool overflows. I tried to design the system to be as large as you could reasonably make it to avoid not only spent-fuel overflows but pool rerackings to allow shut-down



reactors to empty their sites. For all those other reasons in addition to. So the way you phrased it I don't think is correct.

Q Thank you for clarifying. It actually did clarify a misimpression I had, so I'm glad I asked the question.

And is it your testimony that prior to you actually coming to the Office of Civilian Radioactive Waste Management DOE had established that a steady-state rate of 3,000 MTUs on an annual basis would achieve all those objectives that you just specified in your prior answer?

MS. HERRMANN: Objection. Foundation.

A In a general sense, yes.

Q At any point during your tenure at OCRWM did you have a reason to disagree with that rate that was selected, the 3,000 MTU steady-state rate on an annual basis?

A Never paid much attention to it. Because all my energies were focused on trying to get a system that could run as soon as practicable.

Q But in your tenure at the program did you



ever see any evidence that would indicate that that 3,000 MTU rate was not sufficient to address all of those needs as you specified a couple of answers ago?

A I saw no reason nor saw no reports that said 3,000 was a bad choice. There were some studies done in the late eighties, also in the early nineties that, you know, it didn't say there was an obvious better number. That 2,000 was better or 4,000 was better. And 3,000 appeared to be okay. So I didn't pay much attention. So I was satisfied. It wasn't conscious per se. I saw no reason why I should change it. Let's phrase it that way.

Q And I'll take it a step further. Do you believe that the 3,000 annual steady-state rate is a reasonable rate for DOE to plan to use in terms of taking spent nuclear fuel from utilities?

A I think it's a reasonable rate. There may be better rates that if we -- if the nation gets a little clearer that we're going to really perform I think we will refine that number and we may, based on events of September 11th, maybe it will be raised.

Q And would you agree that the 3,000 annual



steady-state rate is a rate that is consistent with achieving the objectives that you enumerated earlier?

A Generally so, yes.

Q In your opinion would a steady-state rate of 2,000 MTUs on an annual basis be consistent with achieving those same objectives?

A I would think that's low.

Q Why?

A Because that's about what the generation rate is, and if we start with that, matching the generation rate at 2010 -- if we steady state at 2010, all the fuel that's in dry storage and a lot of the shut-down reactors, it will be difficult to avoid new storages or prolong decommissionings.

Q And what would your opinion be if an annual steady-state rate was chosen that was around 1,000 MTUs per year?

MS. HERRMANN: Objection. Speculation.

A For performance aspect it would be better, you know, better than none, but not as good as 2,000 and not as good as 3,000.

Q Would you believe that a steady-state

acceptance rate on an annual basis of 1,000 MTU is consistent with the program's goals of avoiding pool overflow and addressing the backlog and providing for some other concerns that you mentioned earlier?

A I don't know if it is or isn't.

Q Well, you testified just a minute ago that you thought 2,000 was pretty low with regard to that.

A Yeah.

Q But you have no opinion with regard to 1,000?

A I said -- I thought I said earlier 1,000 was not as good as 2,000.

Q Would 1,000 achieve any of those objectives?

MS. HERRMANN: Objection. Speculation.

A It might.

Q Which objectives would it achieve?

A If it was allocated right, it would probably avoid a lot of pool overflows. Maybe all pool overflows if it was allocated correctly.

Q But it's true that DOE didn't have absolute flexibility in that regard because it had to allocate,



at least in one regard, oldest fuel first, correct?

MS. HERRMANN: Objection. Calls for a legal conclusion.

A Correct. DOE does not -- it would be difficult for DOE to just automatically allocate to the greatest-need ones.

MS. HEWITT: Just give me a second and I might be done.

Q Mr. Barrett, did you participate ever in the development of any acceptance rates that were included in any DOE document?

A Rephrase the question.

Q Did you personally participate in the development of any acceptance rates that were included in any DOE published document?

A What do you mean by acceptance rates?

Q Well, let me first ask you the question that acceptance rates is used, as that term is used, "acceptance rate," not design receipt rate, not pool overflow rate. When it's called acceptance rate by DOE, did you ever participate in the development of that rate?



MS. HERRMANN: Objection. Vague.

A You mean APR?

Q Yes.

A In this thing?

Q Yes.

A Not directly.

Q Indirectly?

A Yes.

Q And in which APR ACR would you have participated in developing the acceptance rates designated therein?

A Back in the eighties, the group that I was responsible for provided input to ACRs in the late eighties. So I'm not -- so I probably indirectly participated in meetings or something. I just don't remember any details of it.

Q In your role as either acting director of OCRWM or deputy director of OCRWM did you ever personally participate in the development of any acceptance rate in any annual capacity or priority report?

A The '95 one I was the deputy, so I might



have been involved in. I just don't remember because I didn't work much on that. I was trying to build a tunnel in '95 so I didn't pay much attention to it. But I might have participated in a meeting or something. I just don't remember.

Q Mr. Barrett, do you believe the utilities have a legitimate claim for damages in this case?

MS. HERRMANN: Objection. Calls for a legal conclusion, irrelevant.

A I have no opinion on that at all.

Q Do you believe that DOE had an obligation to take the spent nuclear fuel in '98?

MS. HERRMANN: Objection. Calls for a legal conclusion, and relevance.

A I don't know what obligation means as it relates to court rulings and such.

Q Well, what was your understanding of DOE's legal obligation with regard to taking spent nuclear fuel by January 31st, 1998?

MS. HERRMANN: Same objections.

A I have no opinion on legal obligations.

Q My question was what was your

A Because I asked Bechtel, my architect/engineer, to review it in light of what we were doing with the advance modular construction staging designs, and it was our collective opinion that, you know, it could -- we didn't need to do this.

Q I think we're done with that.

(Deposition Exhibit Barrett 77 was marked for identification and was attached to the transcript.)

Q Mr. Barrett, I've handed you what we've marked as Barrett Exhibit 77, which states it is a total system life-cycle cost for site recommendation letter report, February 2002, prepared by Bechtel SAIC company. Could you take a minute and look at that document, please. Let me know when you're done.

A Okay. I've scanned it.

Q Your last answer before I gave you this document referred to your asking Bechtel to review it, "it" being the Burns & Roe Enterprises report. Is it Exhibit --

A It was to review it, your phraseology there, review it was to review the repository schedule



and the 2010 date in light of the information in the Burns & Roe report.

Q Okay. You used the phrase "it"?

A That's a good clarification.

Q Good. No problem. I'm trying to be clear.

A Well, that's good to do.

Q Yeah. And is this Barrett Exhibit 77 the results of the review that you asked Bechtel to perform?

A Part of it.

Q There is more than this document?

A Yes.

Q Do I take that to mean there are other documents that reflect the results of that review?

A Yes.

Q Could you describe those documents for me?

A Basically it's the -- this report is a cost report, primarily a cost report, okay? What's happened in the springtime was Bechtel is producing more of the detailed work plans for the license application date of 12/04, so there's much more being refined by Bechtel in the schedules, and they're



producing various internal documents as it goes along.

Q And one of the things that they're producing, are they not, are approaches to the modular design that we've been talking about?

A That's correct.

Q And have they produced any drafts for OCRWM with regard to that?

A I don't know.

Q You're not aware of any?

A I'm aware there's lots of paper. I've seen stacks of paper. I don't know what their names are, reports are, and I've never read any of it.

Q Are you aware of whether they have produced any construction schedules that reflect the modular design?

A I don't know.

Q Would Mr. Milner be more familiar with these issues than you in his role as chief operating officer in contrast to your role as deputy director?

A Probably not.

Q Would you expect him to have more awareness of whether any documents in conjunction with this were



prepared?

A He might. I mean, the persons who would know would be -- the engineering folks out of Yucca Mountain project would be the ones that would know, and Nancy Williams would know.

Q Mr. Trebules?

A Yeah, Vic probably should know.

Q And just to be clear, this document at least reflects in part Bechtel's assessment of the Burns & Roe report, does it not?

A I believe it addressed some of the aspects of Burns & Roe.

Q And this document contributed to your office's not changing the schedule at the time. Is that correct?

A Contributed, that's correct.

Q Could you please take from your stack Exhibit 69, which is the 1999 APR ACR. I have a couple of questions on that.

A I have it.

Q And could you flip to Table 2 on page six.

A I'm there.

Q And I believe you testified that a table in this form rather than a table in the form of Table 1 on page two was the table that you used or relied upon in some way or another. Is that an accurate characterization of your testimony?
A Correct.
Q Okay. And the rate reflected on this table, the 400, 600, 900, is what you have characterized I believe as the obligation rate?
A Yes.
Q Is that correct?
A Yes.
Q Okay. In the present scenario when is year one? You see the reference to year one at the beginning?
A I really don't know what that would mean. I interpret it often as the first year of operation, okay. But one can argue many other things for that.
Q Under that interpretation and the present scenario, that would be 2010, correct?
A That's correct.
Q And this is in contrast to the viability



assessment performance rate, the 400, 600, 1200 to 3,000 steady-state rate, correct?
A Say that again, please.
Q This is in contrast to the rate that's reflected in the viability assessment, the performance rate?
A Let me go back to your previous question.
Q Okay.
A I don't put any weight, really, on year one being 2007, 2010, 2015. I really don't. So to compare these four, six, 900 numbers as relates -- compared to something that's -- which is a contractual artifact. It's oldest-fuel-first rankings doesn't really compare in any way to the others, which is what we may or may not had been able to do. Maybe start in 2010, maybe 15. So I can't compare the two.
Q But I think you have compared the two, in some of your parametrics charts have compared the two.
Look at page one of this document, the second-to-the-last line where it says "the ACR is for planning purposes." Do you see that?
A I see it.



Q Do you have an understanding of what is meant by that, who's supposed to be using this for planning purposes?
A No.
Q Would it include the utilities?
A I don't know.
Q You have no idea what planning purposes this document is intended to...
MS. HERRMANN: Objection. Speculation.
A I never got involved in the ACR and what it did and didn't do.
Q Flip back to Table 2.
A Yes. Okay.
Q Where we were.
A Right.
Q Let's say I'm a utility. Say I'm Georgia Power Company. In fact, that's one of the utilities I represent.
A Get one that's yours.
Q Yeah, why not? If I am calculating when I'm going to run out of room in my pool, storage pool, am I to look at the rates -- and I need to understand



what I should expect DOE is going to do in terms of taking my fuel. Picking it up and taking it away. Is this the rate that I should use for planning purposes?
MS. HERRMANN: Objection. Foundation, speculation.
Q Year 4.8, year 5, 4.5?
MS. HERRMANN: Same objections. Calls for a legal conclusion.
A From a realistic planning perspective, no.
Q What rate should I use?
MS. HERRMANN: Same objections.
A From a realistic planning perspective you have to look at what the likely reality is and plan accordingly.
Q What is the likely reality?
A You have to look at everything. What I would refer to as an obligation rate, what somebody's planned intentions are.
Q And what are DOE's planned intentions?
A What the mission -- what the program plan, the TSLCC, you know, the --
Q The ramp up to 3,000?

A The ramp up to 3,000 starting as soon as we can possibly start. A utility company ought to look clearly at what is going on in the United States and make their own judgment on what they're going to do.

Q Now, if the utility is wrong, if it presumes a higher rate than actually happens and runs out of pool space, the consequence is it has to shut down, correct?

MS. HERRMANN: Objection. Speculation.

A I don't think that's correct.

Q What's incorrect about that statement?

A You have lots of options and meeting the plan well in advance before reaching a shut-down.

Q But let's presume that a utility for year five was going to use the TSLCC rate. That's 3,000, correct?

A Yes.

Q What happens if instead of the three -- and they plan based upon that and project how much pool space they will have left in year five based upon the ramp-up to 3,000. What happens if instead of that, DOE states that it's only going to pick up based upon



900, thank you?

MS. HERRMANN: Objection.

Q They'll run out of pool space, right?

MS. HERRMANN: Speculation.

A In the scenario you stated, yes.

Q And DOE would have to tell the utility far in advance what its plan is so that the utility can plan to avoid the scenario I was just talking about, right?

MS. HERRMANN: Calls for a legal conclusion.

A I don't know.

Q You have no idea. Do you know how long it takes to get dry storage facility licensed and built?

A Yes.

Q About how long?

A Five years probably.

Q So you would need five years probably of notice, wouldn't you?

A Probably.

Q Can you turn, please, to Exhibit 44.

A If you tell me what it was.



Q That's the parametrics chart. One last time, at least for me.

A There's a 58 one, too. But you want the 44?

Q I want 44, yeah, please.

A 44.

Q You got it?

A Yeah.

Q Could you please turn to page 47, Current Situation. I'd like you to focus on the second bullet, which I'll read into the record. "The current contract remedy -- 'Equitable Adjustments for Delays': 8.2 B dollars," $8.2 billion "lost from fund likely to change the current fee from adequate to inadequate." Can you tell me what your understanding of the meaning of that bullet is?

MS. HERRMANN: Objection. Foundation, speculation.

A I have to put that in context of what it was.

Q Please do. Take as much time as you need.

A I haven't looked at this thing in two



years.

What's the question again?

Q I asked you to tell me your understanding of the meaning of that bullet.

MS. HERRMANN: Same objections.

A I think what this -- since it says no relief from the caps.

Q Yeah.

A The author is right, these are not my words. No immediate relief from the caps, meaning we don't get any money to build anything. If we can't build anything, we don't perform. And if we don't perform and you take what is in the, you know, four-six-nine constant, if you run that out and we were to make equitable adjustments, meaning people didn't have to pay, that would be a cost of about $.2 billion is what I believe that meant.

Q What do you take the last phrase to mean "likely to change the current fee from adequate to inadequate"?

MS. HERRMANN: Same objections.

A If we had to -- that $8.2 billion not be

collected from the waste fund and we still had to perform somewhere else in the future to dispose of the waste, we would likely have to raise the one mil kilowatt fee to balance the books per the fee advocacy requirements of the act.

Q So, in other words, you would raise the fee under the act so that you could raise the $8.2 billion that had been taken from the fund for equitable adjustments?

A Whatever it took to make the fee, would make it balance.

Q But in other words, you will have to balance out what was taken out to reflect the equitable adjustments that are estimated as being lost from the fund there?

A No.

Q No? What did I get wrong there, please?

A You have to have sufficient income to cover the outgo. That may or may not be 8.2 billion.

Q I'm presuming that this bullet is accurate. Whatever number it is. It says 8.2 billion there, correct? That is the author's view of what was



adequate?

A No. That's not what it says. It says 8.2 would have to be paid out. It doesn't say you have to recover 8.2. Maybe 7.9 would be efficient to balance the books, or six or five. I don't know. It doesn't automatically say you have to raise it by 8.2.

Q But the money would be raised by the utilities generating --

A Under that scenario that was analyzed, that's what I believe the author of 47 is saying. Mind you, I'm not sure I ever saw page 47 before.

Q But this would reflect increasing the fee that operating utilities pay into the nuclear waste fund, correct?

MS. HERRMANN: Objection. Best evidence.

A Could.

Q Likely?

A If 8.2 billion, there's a lot of ifs in this. If 8.2 bill was a loss from the funds in the near term, it is likely under that scenario that the fee would have to be raised to maintain the advocacy required under the waste policy act.



Q That would come from operating utilities?

A I don't know where else it would come from.

Q Shutdowns would not be paying it because they're not generating electricity, correct?

A I don't know.

Q You don't know whether shut-down utilities make payments to the nuclear waste fund?

A I know they don't.

Q Okay. Thank you. Would you flip to page 23 of the same exhibit.

A Yes.

Q And this shows the so-called crossover point, correct --

A Yes.

Q -- that we've discussed on a couple of occasions.

Am I correct in understanding the way that crossover point works is that the lower the obligation rate and the higher the performance rate, the sooner the crossover point?

A Yes.

Q And in terms of the harm to utilities, the



lower the obligation rate, the higher the performance rate, the less the harm articulated to the utilities, correct?

MS. HERRMANN: Objection. Calls for a legal conclusion.

A Basically, yes.

Q Was that issue ever discussed in any of your discussions with regard to what the obligation or performance rate should be?

A Those kind of discussions would have been with counsel because that's a legal kind of thing so.

MS. HERRMANN: In which case you should not answer.

MR. SCHECHTER: The fact of the discussion is not privileged. The content of the discussion is.

Q Were there discussions of that issue? Without telling me what the contents of discussion were.

A Yes.

MR. SCHECHTER: I have no further questions.

Same reservation. Same objection.

MS. HERRMANN: Exactly. Same thing.
EXAMINATION BY COUNSEL FOR PLAINTIFF COMMONWE
EDISON COMPANY
BY MR. TOMPKINS:
Q Good afternoon, Mr. Barrett. My name is Chris Tompkins. I work for Jenner & Block. We represent Commonwealth Edison.
This shouldn't take long. I'm like the last comedian that goes on; everyone else stole my jokes.
I would like to go back to Barrett Exhibit 68 very briefly.
A And what's that one?
Q That is the document titled Additional Storage Requirements?
A Yes, I have it.
Q I believe you testified earlier that you had asked individuals on your staff to prepare this?
A Yes.
Q Do you know who those individuals were?
A Zabransky, et al.
Q In addition to Mr. Zabransky do you



remember any other specific names or people working for Mr. Zabransky?
A No. The way this worked, this was in what's known as my carry book I think. Which is just sort of, you know, facts and figures that I might need for doing my job. The actual maintenance of that book is the responsibility of Mr. Dong Kim and Booz-Allen, Bechtel support people who, in turn, are supposed to go to the cognizant line office people responsible for the data, which would be Mr. Zabransky, et al. So it made it clear the chain that I hold people accountable.
Q It would have been the individuals further on down the chain past Mr. Zabransky who would have prepared this, and Mr. Zabransky would have provided the information?
A Zabransky, et al., would have provided this to probably the Booz-Allen administrative people who would have placed it in my book.
Q Okay. This administrative book that you're talking about, does this have a title?
A I think they call it the carry book.



Q You testified earlier that a couple of years ago you provided documents or let attorneys for the government go through your documents. Do you recall whether or not those attorneys would have looked at that book at that time as well?
A Yeah. That book was there.
Q It was there.
You've testified several times about this modular construction concept which is currently under consideration. Would any aspect of this modular design affect the acceptance rates at which OCRWM is going to operate in 2010?
MS. HERRMANN: Objection. Speculation.
A It could.
Q It could? Are you aware of any scenarios that are currently under consideration under this modular design that would lower acceptance rates beyond what's currently projected in the reference case?
MS. HERRMANN: Same objection.
A No.
Q No? Where would the bottleneck exist?



Would it be in the receiving facilities or would it be in the underground facilities?
MS. HERRMANN: Objection. Vague.
A I don't know. I mean, you can -- it's a balance of where you put the money and where you put -- so it could be either one. We want it to be the same in both, to optimize the system. From a design point of view you want the transportation, the receipt, and the emplacement to all be linked together so that they're all consistent.
Q Do you know how likely it is that OCRWM will have to choose a modular design concept that requires it to lower the acceptance rate?
MS. HERRMANN: Objection. Speculation.
A Lower relative to our plan.
Q To the reference plan?
A 3,000 steady state.
Q Yes. The reference plan.
A All right. So repeat the question again.
Q Do you know how likely it is that OCRWM is going to have to pursue construction through modular design that requires it to lower its acceptance rates

lower than the reference, current reference plan?
MS. HERRMANN: Same objection.
A I don't think so. I have no intention -- I haven't really talked about wanting to lower below what our reference acceptance rate is. I don't know why we would do it unless -- the only reason we would do it would be for potential funding cuts or funding limitations or funding caps is the only reason we would do that, which we would hope we don't have to do.
Q And, actually, that brings me to my last set of questions about funding. You've testified previously today about a number of instances in which you have wanted to pursue the program in some manner, whether it be the MRS through voluntary siting in '94, the MPC in the mid-nineties. All of these programs were constrained by the lack of congressional appropriations?
MS. HERRMANN: Objection to the extent it mischaracterizes testimony.
Q The money you were --
MR. SCHECHTER: Did he answer?



A Yes.
Q So your answer is yes?
A I said basically yes.
Q Was this money that you were hoping to spend on these various projects money from the nuclear waste fund?
A Either the nuclear waste fund or the defense fund.
Q Or the defense fund, okay. So this would have been money that utilities or other purchasers paid in and is already sitting there? It wouldn't have been a separate -- some sort of separate budget appropriation outside of the fund?
MS. HERRMANN: Objection to the extent it calls for a legal conclusion.
A Well, it requires appropriations.
Q Sure.
A But they would be appropriations from the waste fund or from the defense fund.
Q Okay. And any future funding constraints that limit your ability to meet 2010, those would be restraints on spending money that's already in the



funds or is being paid on a regular basis?
A Yes.
Q Okay.
MR. TOMPKINS: I believe that's all I have.
We reserve our right to reopen the deposition pending resolution of the outstanding document production issues.
MS. HERRMANN: And of course we object to that.
MR. TOMPKINS: Other than that, we're done.
(Signature having not been waived, the deposition of Lake H. Barrett was concluded at 5:21 p.m.)

ACKNOWLEDGMENT OF DEPONENT

I, Lake H. Barrett, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

______________________ ______________________
(DATE) (SIGNATURE)



CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBL

I, Diane Gomez, Registered Professional Reporter, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 22nd day of May, 2002.

My commission expires:
June 14, 2005

______________________
NOTARY PUBLIC IN AND FOR
THE DISTRICT OF COLUMBIA

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC :
COMPANY, CONNECTICUT YANKEE :
ATOMIC POWER COMPANY, MAINE :
YANKEE ATOMIC POWER COMPANY, : Case No. 98-126C,
Plaintiff, : 98-154C, 98-474C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. : Volume I

\- - - - - - - - - - - - - - - X

Washington, D.C.
Tuesday, May 14, 2002

Deposition of LAKE H. BARRETT, a witness herein, called for examination by counsel for the Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 Eye Street, N.W., Washington, D.C., commencing at 9:30 a.m., Tuesday, May 14, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION
PURSUANT TO THE PROTECTIVE ORDER



APPEARANCES:

On behalf of the Plaintiff:
JERRY STOUCH, ESQUIRE
PETER J. SKALABAN, ESQUIRE
Spriggs & Hollingsworth
1350 Eye Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5839

On behalf of the Defendant:
HEIDE L. HERRMANN, ESQUIRE
KEVIN B. CRAWFORD, ESQUIRE
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Room 7002
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7594



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| LAKE H. BARRETT | PLAINTIFFS |
| By Mr. Stouck | 5 |
| Afternoon Session - Page 87 | |


E X H I B I T S


| BARRETT EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 78 | Defendant's Witness List | 6 |
| 79 | Excerpt from United States Code Title 42, Section 10222 | 41 |
| 80 | 9-29-87 letter, Cole to Karol, with attachments | 44 |
| 81 | 1-86 Transportation Business Plan | 91 |
| 82 | 3-14-02 Nuclear Waste News | 145 |
| 83 | Other Wastes/Nuclear Materials: A General Overview | 152 |
| 84 | 7-21-94 Meeting notes | 162 |
| 85 | 12-98 Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program | 182 |
| 86 | 9-15-83 memo, Williamson to Distribution List | 187 |





| BARRETT EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 87 | 5-3-00 Letter, Itkin to King | 196 |
| 88 | Transportation Under the Nuclear Waste Policy Act | |
| 89 | Litigation Chronology | 213 |
| 90 | 1-8-98 memo, Carlson to Barrett | 216 |
| 91 | 9-24-96 letter, Grube to Barrett | 234 |
| 92 | 4-30-96 Memorandum of Agreement | 238 |

together, so it would probably be both.
Q. Waste acceptance issues other than transportation are what, utility interface? I mean, what are the waste acceptance issues distinct from transportation issues that we are talking about?
A. Campaign size, some of the oldest fuel first allocations are fairly small, you know, ten tons here or five tons there. Efficient transportation arrangements, those would need to be negotiated with the contract holders. There is technical interface issues of truck and rail and crane capacities, site access issues, local routing issues, national routing issues. There may be thermal limits, thermal issues regarding our receipt. Existence of dual purpose canisters, casks, those kinds of issues will need to be dealt with.
Q. And those issues will be dealt with by the contractors under the current contract that is set out in the RFP?
MS. HERRMANN: Objection. Best evidence.
A. That's our planning desire for that.
Q. That approach in the final RFP when it



gets finalized?
MS. HERRMANN: Objection.
A. The approach for steady state, yes.
Q. What about the approach for other issues that you mentioned?
MS. HERRMANN: Objection. Vague and overbroad.
Q. I guess I don't understand. What do you mean by approach for steady state? I guess I don't understand what that means.
A. Five or six years into operation there is a pretty clear understanding by the industry on what the risks are and what the rewards are, and that a free market competition we believe would be successful. For the initial startup where the contractor would have to have substantial capital costs with uncertainties regarding legalities or startup issues, licensing, may require government assistance maybe in terms of hardware or other considerations.
Those are the issues that we would look at as we would revise and improve the RFP.
Q. Thank you.
(Discussion off the record.)
BY MR. STOUCK:



Q. Let me show you, hand you, Mr. Barrett, a copy of what was previously marked as Exhibit Number 40 to your deposition.
Do you have that?
A. I do.
Q. Okay. This is the 1992 Annual Capacity Report dated March '93, right?
A. Yes.
Q. And turn to Page 8.
A. Yes.
Q. What is that?
A. Table 3.1 of the '92 ACR.
Q. What is your understanding of what the table shows?
A. It's the annual allocations as they existed in '92 -- I don't know if they changed or not later -- by contract holder for who had what allocations for year one, year two, year three.
Q. On oldest fuel first basis; is that right?
A. Yes, that's my understanding.
Q. Now, putting aside the factor that these allocations may have changed -- if they have changed from '92 to the present, would you agree that the change would be relatively minor, that



most of the sequencing would remain the same?
A. They should be minor.
Q. So they would be substantially the same today, there might be some minor variations?
A. Correct.
Q. Putting aside those minor variations, is it your understanding that when the program starts to operate in 2010, or some other time, that this listing of allocations of oldest fuel first is going to be the actual sequence in which the Department picks up spent fuel from the various contract holders?
MS. HERRMANN: Objection.
THE WITNESS: Could I have that again?
(The record was read as requested.)
A. I doubt it.
BY MR. STOUCK:
Q. And why do you doubt it?
A. Because from a practical matter, the numbers on some of the contract holders are not an efficient size or, for example, Consolidated Edison has 2.9 tons, Dairyland 0.7 tons, and it would not be very efficient to pick up such small amounts for either the Department of Energy's contractor nor the utility itself to

prepare for shipping such small amounts, so most likely there will be some arrangement such as more efficient sizes as determined through a process yet to be worked out.
Q. When you say more efficient sizes, are you referring to fuel casks, filling up casks?
A. Correct, cask campaigns.
Q. So you are referring to filling up casks, but that's not all you are referring to?
A. Correct.
Q. So in addition to filling up casks you are referring to cask campaigns?
A. Correct.
Q. And what do you mean by cask campaigns?
A. From a practical point of view primarily for the utility, but also somewhat for the Department of Energy that you would establish, a term that's sometimes used, bite size, the campaign size of how much tonnage you would take in a campaign that would be scheduled to be consistent with the reactor's operating cycle or the situation at the contract holder which would be mutually beneficial for both parties.
Q. Okay. Could you just clarify or



amplify a little bit by what you mean by bite size campaigns?
A. Bite size meaning how much tonnage of fuel are you going to take in a campaign over a certain period of time.
Q. Okay. Is that determination something that is going to be substantially left to the regional contractors under the RFP that we were discussing earlier?
MS. HERRMANN: Objection. Speculation.
A. It is my opinion regarding the efficiency of the system that the RSC would work with the contract holders in their region or nationally to work out the best mutual arrangement for the contract holders and the government for the most efficient system that could be devised.
Q. As to schedule; is that what you are talking about? It may be other things, but including scheduling matters?
A. Including scheduling, recognizing the fact that there are contractual legal matters that will also have to be addressed, and that I would hope that the RSC, the regional services contractor or agent could facilitate and arrange



for an acceptable arrangement for both the contract holders and the Department of Energy, to present that for mutual approvals.
Q. Well, for mutual approvals. What are the contractual matters that you are referring to?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A. Given that the contract -- contracts exist under the statute and that there are implementing documents under the contract, I would -- it is our goal that there is an acceptable arrangement for all the parties how to work the allocations into actual shipping campaigns.
Q. And when you referred a moment or two ago to working out the most efficient system for scheduling that could be arranged -- do you recall that reference?
A. Yes.
Q. Okay. What are your expectations in the context of working out the most efficient system or an efficient system for scheduling? What are your expectations about the extent to which exchanges of allocations between or among utilities will occur?



MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
A. I don't -- I'm hopeful, but I don't know what the actual utility contract holders will do.
Q. Why are you hopeful?
A. From a macroscopic perspective it has always been my hope that utilities that have a lesser need earlier would exchange the appropriate remuneration or compensation with others that might have a greater need to work out the most effective national utilization of whatever capacity you were able to bring on line.
Q. And that's your hope because that would promote the most effective national utilization of the capacity? Is that why it is your hope, because it would be the most effective utilization of the capacity of a system?
A. It would be more effective than a layout like this on this table. You say the most -- it would be better.
Q. Okay, but that's a goal that the program has, is to promote effective utilization of the capacity of the system?
MS. HERRMANN: Objection. Foundation.

government expense, owned by the government and operated by a contractor. The concept in the RFP in '96 was the hardware was developed by the private industry, owned by the private industry, and also operated by the private industry.
Q. Okay, and what accounts for that change, those changes that you just described? Why did those changes occur in the objectives or purpose or whatever it is, nature of the plan?
A. We felt that the more comprehensive private possession of the system was in the nation's interests relative to a more classical government-owned contractor-operated system that was envisioned in '86.
Q. Was a factor in changing the plan in the manner you have described, was a factor that some significant number of utilities either already have canistered fuel or are in the planning stages to canister fuel during the 1990s as a result of the delay in commencement of performance? Was it that circumstance, that there is more canistered fuel around now, that led to the change in the transportation plan that you just described?
MS. HERRMANN: Objection. Assumes



facts not in evidence.
A. I don't recall that being a major factor when we discussed the pros and cons of shifting.
Q. Okay. Major factor was just philosophically better to do it through the private sector?
A. Primarily, and also budget, changed the budget profiles.
Q. Okay. The thinking is it is going to be more cost-effective to do it through the private sector?
A. We felt that it would be.
Q. Okay. Thank you.
This is another document that is kind of bulky. Let's see how we go, but I don't really want to mark this unless we can't avoid it. It's a thick document, but I have a couple short questions.
This is a document that is entitled Defendant's Responses to Utility Plaintiffs Joint First Set of Interrogatories, and my first question is, have you ever seen this document?
A. Not that I recall.
Q. On Page 77 -- it is dated October 9,



2001, but my question, at least my first question is on Page 77 at the top it says Interrogatory Number 50.
Do you see that?
A. Yes.
Q. Interrogatories are written questions that lawyers ask -- you know, that lawyers ask opposing parties in litigation and responses are given in writing, so we asked these questions of the government. We asked these questions of the government, the United States, and we got these answers. Interrogatory Number 50, let me read it. It says, "Identify the three individuals within DOE with the most knowledge of the schedule DOE would have followed had it begun to take SNF from purchasers by January 31, 1998 pursuant to the Standard Contract."
Do you see that?
A. Yes.
Q. If you look at the bottom of the page there is a couple of paragraphs here of objections and what-not. But at the bottom we have got -- we have more than three names in response, but the first name, Mr. Barrett, is yours. Is that correct?



A. Yes.
Q. Do you consider yourself to be knowledgeable about "the schedule DOE would have followed had it begun to take SNF from purchasers by January 31, 1998 pursuant to the contract."
MS. HERRMANN: Objection. Vague.
A. I suppose I have as much knowledge as many.
Q. As many? Your last word was M-A-N-Y; is that what you said?
A. Yes.
Q. What schedule --
A. I never said I know as much as one might know. I know it from a policy point of view.
Q. Could you give testimony under oath about the schedule that DOE would have followed had it taken SNF from purchasers by January 1998?
MS. HERRMANN: Objection. Vague.
A. I will answer questions under oath, if I can.
Q. What schedule would DOE have followed had it begun to take SNF from purchasers by January 31, 1998 pursuant to this contract?
MS. HERRMANN: Objection. Foundation.

Mr. Barrett is not here as a 30(b)(6) witness.
A. We would have operated our system at our plant which was, you know, whatever the operation rate which transiented and leveled out at 3,000 metric tons per year after five years. That's what we were planning to do.
Q. That's what you would have done?
A. That's what we would have done if we could have gotten the, you know, the sites approved, et cetera.
Q. And in what sequence -- do you happen to know, can you just generally tell me a ramp-up rate up to that 3,000 ton rate that might have been realistic?
MS. HERRMANN: Objection. Foundation.
A. I don't know what system we are referring to or what time because those are changes as a function of time. So if you give us the time frame --
Q. The government has told us that you are one of the most knowledgeable people about how the schedule would have been referenced. I'm not asking about any documents. I'm asking what the schedule would have been.
You already told me it would have



leveled out at a steady state of about 3,000 tons, and I'm trying to find out your best testimony about what the ramp-up rate would have been had DOE gotten to take spent fuel by January 31, 1998.
MS. HERRMANN: Objection.
Q. If you want to answer by reference to the current program plan or some other program plan, that's fine, or if you want to answer with numbers, that's fine, or if you want to tell me you don't know, that's fine. But it says here that you are knowledgeable about this and I want to know what your answer is.
MS. HERRMANN: Objection. Foundation, speculation, and now it is vague.
A. It would have been whatever the rate was for the MRS that we could have potentially put in place in 1993 with whatever was in the reference documents then which was something like 4-6-9-12, 2,000, 3,000.
Q. And in what sequence would DOE have accepted spent fuel from the various utility contract holders had DOE begun to take SNF from purchasers by January 31, 1998?
MS. HERRMANN: Objection. Foundation. Speculation.



A. We would have -- first of all it was nonstandard fuel, and then use the oldest fuel first table we looked at earlier by the contract holders and worked out the details, or waste acceptance issues, I think, was the name we used to actually go down to shipping campaigns.
Q. When you say worked out -- so the actual sequence would not have been oldest fuel first, it would have been some adjustment or rearrangement of oldest fuel first; is that what you are telling me?
MS. HERRMANN: Objection to the extent it mischaracterizes his testimony.
A. It is my understanding that utilities did not have to automatically ship the oldest fuel first. They had allocations based on oldest fuel first. What fuel was shipped was an issue that needed to be worked out between the contract holders and the Department.
Q. And as of today -- well, would what fuel have been shipped, have been worked out in the manner you just described by January 31, 1998 if DOE had begun to take SNF by that date from the purchasers?
MS. HERRMANN: Objection. Foundation.



Speculation.
A. Yes.
Q. Do you know what the outcome of that working out of the ultimate schedule for acceptance would have been?
MS. HERRMANN: Same objections.
A. No.
Q. Thank you.
Now, if you turn to Page 65 you are again -- now see how this document works. You are again listed as one of the individuals under Interrogatory Number 65, one of the individuals "within DOE with the most knowledge of whether DOE would have given priority to purchasers with shutdown facilities" -- I'm sorry, would have given -- strike all that. The diction of this is not very good, but let me start over.
What this interrogatory says, at least according to this page is, "Identify the three individuals within DOE with the most knowledge of whether DOE would have given priority to purchasers with shutdown facilities priority in the utility queue pursuant to the Standard Contract Article VI.B.1.b."
Do you see that?

beginning January 31, 1998, DOE could have readily developed a transportation cask fleet in time to commence that level of acceptance at that time?

MS. HERRMANN: Objection. Speculation.

Q. We talked about this to some extent earlier today.

A. And this is starting at what time? You said the early 1990s.

Q. There is no time frame to this question. DOE could have developed, could have deployed a transportation cask suitable to the task to the extent that task -- that casks were not already available.

A. That you had at least eight years or so, yes.

Q. And would you also agree that -- well, there was adequate time prior to -- there is adequate time from the enactment of the statute in 1983 to the planned January 1998 acceptance commencement date for DOE to have developed a transportation cask or casks for nonstandard fuel, failed fuel and GTCC wastes, obtained the necessary licenses from the NRC and procured enough such casks in time to accept these materials commencing in January of 1998?



MS. HERRMANN: Objection. Vague. Speculation.

Q. That that could have been done?

A. It could have been done.

Q. Okay.

A. It technically could have been done.

Q. Now, you again -- some of these things I know we touched on earlier, I'm just attacking it from a different angle here.

You mentioned earlier today shipping campaigns. Do you recall that?

A. Yes.

Q. Now, would you agree that there are advantages to shipping campaigns versus moving over only a small number of assemblies at a time?

A. Yes.

Q. Would you agree that one of the important advantages of shipping campaigns is that efficiencies in transportation operations tend to be realized?

MS. HERRMANN: Objection. Vague.

A. Yes.

Q. Okay, and would you agree that repetitive operations such as cask handling, loading, decontamination, receipt and turnaround



are all more efficiently accomplished per cycle in a campaign versus individual cask transport?

MS. HERRMANN: Objection. Vague, compound.

A. Yes.

Q. Okay. Good.

Now, also earlier today I believe you testified that you thought it was possible -- we looked at I think it was Page 8 from one of the ACRs which had the oldest fuel first queue, if you will. Do you recall that?

A. Yes.

Q. And the question was, do you think it's possible that when DOE commences fuel acceptance in 2010 or some other time that that queue, with minor variations that we put to one side for purposes of the earlier question and I will put aside here, did you think it was possible that that queue would be the actual sequence of pickup of spent fuel. Do you recall that?

A. Yes.

Q. And you said you thought that was possible?

A. It was possible. Unlikely.

Q. Unlikely. That would be my next



question. We are back to that now.

Now, would you agree that an acceptance sequence that strictly followed the OFF queue, if you will -- do you understand that reference?

A. Yes.

Q. -- would be economically inefficient?

MS. HERRMANN: Objection. Vague.

A. Not as economical nor efficient as other alignments might be.

Q. Okay. It would be relatively economical and efficient, relative to some other alignments.

A. Yes.

Q. Can you think of any -- do you know of any -- would there be some alignments that might be even less economically efficient than the OFF queue?

A. Well, I suppose you could make them less efficient. You could spread them out. Everybody has a right to go smaller amounts or something like that, but it's just speculative.

Q. Do you think it would make any economic sense to follow that queue for the actual sequence of pickup?

MS. HERRMANN: Objection. Vague.

177

A. The one that is in that table?
Q. Yes.
A. Do I think it would -- what is the question?
Q. Would it be economically sensible.
A. Yes, it could be sensible. I mean, it is not desirable, but, all things considered, if there is a strict adherence to certain interpretations of the contract, you could do it.
Q. Okay. Your answer is it would be sensible, because it might be required by the contract?
A. Yes.
Q. But that's not -- that's different from economical sense. It would be economically relatively inefficient you already testified?
A. It could be inefficient.
Q. It would be inefficient?
A. It would be inefficient.
Q. I think much earlier today we looked at the mission plan and there was an objective in the mission plan to conduct the program in a cost-effective manner; do you recall that?
A. Yes.
Q. And that is still one of the objectives

178

of the program?
A. Yes.
Q. What is your understanding of the relationship between the objective of economic efficiency and the fuel cost recovery nature of the contract?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A. I believe it is the federal government's responsibility to prepare a cost-effective system to minimize the costs on the waste generators for societal good.
Q. Is that related to the -- do you understand the term fuel cost recovery?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A. I believe I do.
Q. What is your understanding?
A. That the cost for -- the costs incurred by this program are fully paid for by the waste generators, in this case the utility contract holders and the defense activities of the Department of Energy.
Q. And is that related to what you just testified was -- I think you just testified was

179

DOE's responsibility to implement this program in a cost-effective manner?
A. Yes.
MS. HERRMANN: Objection. Calls for a legal conclusion.
Q. And I'm asking you to explain to me what your understanding of the relationship is between, on the one hand, the fuel cost recovery nature of the contract and, on the other hand, the DOE responsibility to conduct the program in an economical and efficient way?
MS. HERRMANN: Objection. Calls for a legal conclusion.
A. I'm not understanding the question yet.
Q. Okay. Maybe I should ask, is there a relationship --
A. Between --
Q. -- the fuel cost recovery nature of the contract, as you just explained it, and the responsibility that DOE has to proceed in an economically cost-effective way.
MS. HERRMANN: Objection. Calls for a legal conclusion.
A. I don't see the relationship there at all.

180

Q. The notion is you are spending the utilities' money. Maybe there is some obligation to spend it in a cost-effective manner.
MS. HERRMANN: Is that a question?
Q. Yes. I mean is that --
MS. HERRMANN: Objection. Calls for a legal conclusion.
Q. Is that right? Do you know whether that's correct?
A. We are always trying to do it in a cost-effective manner, whose ever money it is.
Q. Okay.
A. Fuel cost recovery is fuel cost recovery, efficient or inefficient.
Q. So in your mind the responsibility, as you phrased it, for DOE to proceed in an economical way is not necessarily related at all to the fuel cost recovery nature of the contract?
A. Correct.
Q. You would do it in an economically efficient manner regardless?
A. Yes.
Q. All right.
Do you believe that exchanges of acceptance allocations would have added to the

237

other utility canisters that are licensed by the NRC.
MS. HERRMANN: Objection. Speculation.
Q. This letter is not just limited to Maine Yankee's situation, is it? This Exhibit 87 letter, that's what I'm asking you.
A. That letter would apply to any contract holder.
Q. All right. And so insofar as this Exhibit 91 is concerned, DOE doesn't need to do anything special to approve Yankee Atomic canisters, because if they are approved by the NRC they are going to be acceptable to DOE with the qualifications that we talked about that we discussed in Exhibit 87. They are going to be acceptable, not necessarily standard.
A. Yes. I noticed this first sentence, this input was provided, we may have included this in our generic interim storage facility design submittal to the NRC. We may have included this as a reference. That was for storage, not for disposal.
Q. Right, but that proposal for storage that may have been current to 1996 is no longer on the table?

238

A. Right. It's moved now.
Q. All right.
MR. STOUCK: Can you mark this one, please, Number 92.
(Barrett Deposition Exhibit No. 92 was marked for identification.)
BY MR. STOUCK:
Q. Okay. This is a one-pager, Mr. Barrett. It has been marked Exhibit 92. It looks like a Memorandum of Agreement. It says, Subject: Multipurpose Canister Program, date April 30, 1996, Bates number HQR-045-2612. It has got your signature on it, and a Ms. Jill Lyte?
A. Correct.
Q. Do you recall this document?
A. Vaguely.
Q. Okay, what is it? And please review it before you answer.
A. This was when we -- we had a very bad budget year in FY96, and we were in the midst of finishing the Westinghouse design for the multipurpose canister. And we wanted to finish the design and complete the design before the design team disbanded to allow it to continue to

239

be of some use in the industry.
We asked the Office of Environmental Management to try to support us with that and they agreed to do so, and this was the agreement that they provided a million dollars to us to help us finish that design.
Q. Why would they do that?
MS. HERRMANN: Objection. Speculation.
A. So they could use the technology and storage that they have. They have storage needs, and that technology would be helpful to them as well.
Q. What are their storage needs?
A. They store commercial fuel at Idaho as well as West Valley, New York and also DOE fuel in the end reactor.
Q. And the technology being developed in the MPC program could be useful to EM in connection with its responsibility for the storage of that fuel you just mentioned?
A. Correct.
Q. Okay.
MR. STOUCK: Let's quit for the day.
(Discussion off the record.)
(Thereupon, at 5:40 p.m., the taking of the instant deposition ceased.)

240

______________________________
Signature of the Witness

SUBSCRIBED AND SWORN to before me this ______ day of _____________________, 20 ___.

__________________________
NOTARY PUBLIC
My Commission Expires: _________________

UNITED STATES OF AMERICA )
STATE OF MARYLAND )

I, CAPPY HALLOCK, the reporter before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was sworn by me; that said deposition is a true record of the testimony given by said witness.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially or otherwise interested in the outcome of this action.

Cappy Hallock, RPR, CRR

My Commission expires January 1, 2005

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C,
Plaintiffs, : 98-474C, 98-154C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. : VOLUME II
- - - - - - - - - - - - - - -X
Washington, D.C.
Wednesday, May 15, 2002

Deposition of LAKE H. BARRETT, a witness herein, called for examination by counsel for Defendant in the above-entitled matter, pursuant to notice, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 Eye Street, N.W., Washington, D.C., commencing at 9:05 a.m., Wednesday, May 15, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION
PURSUANT TO THE PROTECTIVE ORDER



APPEARANCES:

On behalf of the Plaintiff:
JERRY STOUCK, ESQUIRE
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5839

On behalf of the Defendant:
HEIDI L. HERRMANN, ESQUIRE
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7594



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| LAKE H. BARRETT | DEFENDANT |
| By Mr. Stouck | 246 |


E X H I B I T S


| BARRETT EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 93 | Memo, Barrett to Wade | 246 |
| 94 | Notes written by PNL re '96 meeting | 253 |
| 95 | Document entitled Civilian Radioactive Waste Management System, June '97 | 278 |
| 96 | Notes of telephone conversation with Mr. Barrett | 283 |
| 97 | Condensed transcript of Mr. Barrett's previous testimony, 4/22/01 (selected pages) | 289 |
| 98 | Memo, Tomasoni to Buchheit | 303 |
| 99 | Informal Memorandum, 7/8/93 | 309 |
| 100 | Condensed transcript of Mr. Barrett's previous testimony (selected pages) | 317 |





| BARRETT EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 101 | Memo, Milner to Barrett and attached concurrence sheet | 322 |
| 102 | Collection of documents | 340 |
| 103 | Excerpt of Proceedings, 1983 Civilian Radioactive Waste Management Information Meeting | 386 |

costs in the future.
Q. Do you agree it was the intent of the Act to eliminate these or reduce and eventually eliminate these costs of on-site storage? Do you agree that was an intent of the Act or do you know?
MS. HERRMANN: Objection, foundation. Calls for a legal conclusion.
A. I don't know.
Q. Okay.
MR. STOUCK: Can we go off the record for a second?
(Discussion off the record.)
(Recess taken -- 12:55 p.m.)
(After recess -- 1:05 p.m.)
(Barrett Deposition Exhibit No. 103 was marked for identification.)
BY MR. STOUCK:
Q. Okay, Mr. Barrett, you have been handed what has been marked Exhibit 103, and before I get to that and while I'm thinking of it, at various points recently we referred to Mr. Zabransky and Mr. Williams as being knowledgeable about this risk premium matter. Do you recall that?



A. Yes.
Q. And during the break I was reminded that Mr. Pollog is being deposed today also. I want to ask, did Mr. Pollog work with Mr. Zabransky on waste acceptance matters?
A. Yes.
Q. Do you think Mr. Pollog would be knowledgeable about this risk premium matter?
A. I don't know.
Q. Okay, but as a general matter, Mr. Pollog would be familiar with many of the same matters that Mr. Zabransky works on in the waste acceptance area, if not all of them?
A. Current issues, yes. I'm not sure Tom was in that group in the mid-'90s when we discussed the policies of the RFP, so he may or may not know. I just don't know.
Q. I'm not necessarily limiting it to the RFP, I'm talking about waste acceptance issues generally, scheduling for instance?
A. That he is.
Q. And he has been for how long?
A. At least the last three or four years.
Q. All right. Exhibit 103, which you have been handed, is an excerpt from a document



entitled, Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting. There is a date range there, several days in December 1983, and this particular document is Bates numbered SN069588 through 600.
Do you see that?
A. Yes.
MS. HERRMANN: It does not actually go through 60. There are pages missing in there, so it is clear on the record.
BY MR. STOUCK:
Q. 588 and there is a gap to 599 and then 600. That is correct. Thank you.
Now, the text that starts on 599 is titled Program Overview, Robert Morgan, Acting Director of Civilian Radioactive Waste management.
Do you see that?
A. Yes.
Q. And you know that Mr. Morgan was the Acting Director of the program at that time?
A. It is my understanding.
Q. Now, take a look at in the right-hand column, the fourth new paragraph down, okay? It starts, "I would like to talk a little bit about the strategy as laid out in the mission plan and



what we intend to do." Do you see that?
A. Yes.
Q. I'm going to read this to you and ask you some questions about it sentence by sentence.
The next sentence, "I think most of you know that the Act requires that we receive waste from the utilities by January 1, 1998."
Do you see that?
A. I see that.
Q. And that is your understanding as well?
MS. HERRMANN: Calls for a legal conclusion.
A. I don't normally use the word require.
Q. It's not your understanding?
MS. HERRMANN: Same objection.
Q. Is Mr. Morgan saying something wrong there?
MS. HERRMANN: Same objection.
A. I wouldn't call it wrong. It's not anything that I would say. I don't know what your question is.
Q. Do you know the Act requires that we receive waste from utilities by January 1, 1998?
MS. HERRMANN: Calls for a legal conclusion.