**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**VOLUME VI OF X**

---

# ENERGY NORTHWEST'S APPENDIX IN SUPPORT OF ITS NOTICE OF DESIGNATION OF DEPOSITION AND PRIOR TRIAL TESTIMONY OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO ADMIT PRIOR TESTIMONY INTO EVIDENCE

---

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
202-639-6000

NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

May 30, 2008

*Attorneys for Plaintiff*

BY MR. TOMASZCZUK:
Q. Did you discuss that with Mr. Danker or Mr. Beeman?
A. Not with Mr. Beeman. I don't recall discussing it with Mr. Danger, but it's possible that I did.
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Exhibit 30 a draft OCRWM program change control board document, change proposal, and I thought it was dated, and I can't find the date at this moment, but it may be embodied in the document somewhere.
(Milner Exhibit No. 30 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with this document?
A. I don't recall it offhand.
Q. You're identified in the lower left-hand corner as the originator, is that right?
A. That's correct.
Q. And were you indeed the originator?
A. Apparently I was.

261

Q. Do you know why this document was prepared?
A. Well, again, I don't recall the document specifically, but from reading through it, it indicates that we were establishing waste acceptance schedule according to this had been for a period of time briefly TBD.
Q. I'm sorry. What do you mean by TBD?
A. To be determined.
Q. And on what basis do you give that testimony?
A. I thought I saw that indicated in here.
Q. Okay. Well, if you could point me to where that's indicated?
A. In first page, block 8, change description and justification description of the change states that change the waste acceptance schedule table from TBD status to a numerical table for use in design studies.
Q. Did you prepare this document?
MR. SHULTIS: Objection -- asked and answered.
THE WITNESS: Not that I can recall.
BY MR. TOMASZCZUK:

262

Q. Are you aware of someone else who might have prepared it?
MR. SHULTIS: Same objection.
THE WITNESS: No, I'm not.
BY MR. TOMASZCZUK:
Q. Do you know why you're identified as the originator?
A. Probably would have been prepared under my direction.
Q. But you can't recall who did it?
A. But I don't recall the document, so I don't recall who did it.
Q. Do you know when it was prepared?
A. No, I don't. I cannot find a date.
Q. If I said it was prepared in 1990, would that sound right to you?
MR. SHULTIS: Objection. Calls for speculation, asked and answered.
THE WITNESS: I could only guess that that would be a rough timeframe.
BY MR. TOMASZCZUK:
Q. There is a reference here at the top of the first page to waste management system requirements, WMSR.
What is or are the waste management

263

system requirements?
A. It's an upper level, upper level in terms of not great detail, laying down the requirements for waste management system.
It's in essence a document that other documents would flow from in more detail, which would ultimately be used by designers of the system or components of the system.
Q. Is it the same as a system requirements document?
A. I believe the current name for that document is systems requirement document.
Q. So your understanding is that the WMSR preceded the SRD?
A. That's my understanding, yeah.
Q. Do you know when the change was made from referring to the document as a WMSR to begin to refer to it as an SRD?
A. No, I don't.
Q. Attachment 1 contains a table of spent nuclear fuel acceptance rates and appears to be roughly consistent with those in previous documents that we have seen, correct?
A. That's correct.
Q. And in particular, it depicts a, the

264

repository spent nuclear fuel acceptance rate commencing in 2010 at a rate of 400 metric tons, and then ramping up to 3,000 metric tons in the sixth year of operation?
A. That's correct.
Q. And then maintaining at a 3,000 metric ton rate for 20 years?
A. Approximately, yes.
Q. Does this Attachment 1 accurately reflect DOE's intentions with respect to spent nuclear fuel acceptance at or about the time it was prepared?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I don't recall that it did.
This is a draft document. I don't recall it ever being finalized.
BY MR. TOMASZCZUK:
Q. Do you know whether it was finalized or not?
A. I don't recall.
Q. It may have been? You just don't remember?

265

A. Correct.
Q. Can I direct your attention to Attachment 2, which is the third page of the document?
The first sentence states the inclusion of a waste acceptance schedule per se need not be justified in DCP since it is an essential system requirement.
What is meant by that sentence?
MR. SHULTIS: Objection. Calls for speculation.
THE WITNESS: My interpretation at this point would be that a waste acceptance schedule, as it indicates, is essential because you need to know what rates you're designing to for transportation, receipt handling facilities and so forth.
BY MR. TOMASZCZUK:
Q. In item 6 on this page, there is a reference to a levelized MRS acceptance rate after 2014 below 3,000 metric tons to allow MRS inventory to be gradually reduced as soon as repository reaches maximum acceptance rate, paren, 3,000 metric tons?
A. Correct.

266

Q. Does 3,000 metric tons reflect the maximum acceptance rate for the repository?
MR. SHULTIS: Objection. Calls for -- mischaracterizes the document.
Calls for speculation.
THE WITNESS: I believe at that point in time, the 3,000 metric tons steady-state receipt rate at the repository was the program goal.
BY MR. TOMASZCZUK:
Q. That reference is to the same 3,000 rate that we saw in Attachment 1 and we have seen in other documents, correct?
A. I believe so.
Q. And that rate is also referenced in item 8 on this same page?
A. Correct.
Q. Mr. Milner, this is the type of document that was initiated as a result of the reassessment in 1989, is that correct?
MR. SHULTIS: Objection -- lack of foundation, assumes facts not in evidence.
BY MR. TOMASZCZUK:
Q. Do you understand my question?
A. Yes, I think I do. I believe that

267

would have been the case.
Q. And this document was prepared in essence to control the baseline, to use your terms, is that what's --
A. Correct.
Q. Driving this? Thank you. Can I ask you to look at Attachment 3, which has the heading impact analysis?
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. There are four impacts that appear to be set forth here.
The first one is, quote, a positive technical impact created by determining a necessary system requirement.
Do you agree that adoption of the waste acceptance schedule would create a positive technical impact?
A. I agree that determining a waste acceptance schedule is a positive impact, yes.
Q. And you previously testified that a waste acceptance schedule was a necessary system requirement?
A. Correct.
Q. The second item states, quote,

268

potentially significant technical impact associated with discussing policy position with utilities related to waste acceptance basis, paren, i.e., spillover priority basis versus oldest fuel first priority basis.

Can you tell me, sir, what that means?

A. No, I can't. Parenthetical, I believe there were discussions at the time should priority be given to reactors that were running out of pool storage space versus what had been in the contract I believe as the oldest fuel first priority.

Q. The next item states a positive schedule impact by allowing design requirements and related documents to proceed.

That seems to me to be related to the first point above, right?

A. That would be my interpretation of that, yes.

Q. And then finally, quote, relatively minor cost and schedule impacts associated with modifying the other program documents affected by new waste acceptance schedule.

And do you know what other program documents are being referred to in this item?

269

MR. SHULTIS: Objection. Calls for speculation.

THE WITNESS: No. I can't recall specifically.

There's a hierarchy of program documents.

Certainly the waste management system requirements and now the systems requirements document is more on the upper level.

There is various lower-level documents that I can't recall the names.

BY MR. TOMASZCZUK:

Q. Would a TSLCC report be a lower-level document in this hierarchy?

A. No. No.

Q. Well, would it be an upper-level document in the hierarchy?

A. No.

Q. It's not in the hierarchy at all?

A. It's not in the control document hierarchy, that's correct.

Q. I see. Can you identify for me any of the documents in the control document hierarchy as you use that term?

A. Systems requirements document.

270

Q. And that's it?

A. I believe there is a document entitled waste acceptance systems requirement document.

My recollection is that that sets down more waste form, waste characteristic requirements for acceptance.

I cannot recall others offhand.

Q. Was it important to try and ensure that the waste acceptance schedules that were being used in the various OCRWM documents were consistent?

MR. SHULTIS: Objection -- vague.

THE WITNESS: I believe so, yes.

MR. TOMASZCZUK: Do you want to take a lunch break?

MR. SHULTIS: Sure.

(Whereupon, at 12:02 p.m., the deposition was recessed, to reconvene at 1:00 p.m. the same day.)

271

AFTERNOON SESSION

(1:08 p.m.)

MR. TOMASZCZUK: Back on the record.

Whereupon,

RONALD A. MILNER,

the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:

FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER AND LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INCORPORATED, POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, NEBRASKA PUBLIC POWER DISTRICT:

BY MR. TOMASZCZUK:

Q. Good afternoon, Mr. Milner.

A. Good afternoon.

Q. Still the same ground rules in effect?

A. Okay.

Q. At the break, we were looking at Milner Exhibit 30, and I just have a couple of follow-up questions on that.

272

A. Okay.
Q. Before we move on -- can I ask you to look at Attachment 2?
A. Um-hm.
Q. And the second item there is a reference to an MRS strategy paper.
Do you see that?
A. I do, yes.
Q. Do you know what MRS strategy paper is being referred to there?
A. I don't recall that, no.
Q. Do you know whether the MRS team on which you worked prepared such a strategy paper?
A. I don't believe so.
Q. The proposed waste acceptance schedule embodied in this document indicates that one of its objectives as reflected in this second item is to substantially reduce the need for utilities to add new storage capacity after 1998 and to initiate the orderly decommissioning of reactor.
Do you know why that was an objective?
A. Specifically, I don't, but I think it had been long a goal of the program to do that, to try to reduce the amount of storage that

273

would be needed, certainly ultimately to decommission a reactor.
MS. HERRMANN: Alex, before you go on to the next document, just for the record, you were referring to the program plan before he took a lunch break.
It looks like you may have found it, but we wanted to let you know that it is on the Web.
MR. TOMASZCZUK: Thank you. We had some difficulty apparently getting it off the Web, but we have found it, and I'm going to ask the witness about it a little later.
MS. HERRMANN: Okay. Great.
MR. TOMASZCZUK: Thank you. Ms. Reporter, could you mark as Milner Exhibit 31 a memorandum dated October 5, 1990?
Preliminary draft of the 1990 Annual Capacity Report is the subject.
It's a memo drafted by Alan Brownstein.
(Milner Exhibit No. 31 was marked for identification.)
BY MR. TOMASZCZUK:

274

Q. Mr. Milner, you're shown as receiving a copy of this document on the distribution list which appears at the second page.
A. Um-hm. Yes.
Q. Do you remember receiving a copy of this document in or about October 1990?
A. I don't specifically recall that, no.
Q. Do you recall the subjects which are addressed in Mr. Brownstein's cover memorandum?
A. Vaguely, I do, yes.
Q. It indicates the 1989 ACR, among other things, was not published because it was determined that publishing the ACR prior to developing revised waste acceptance schedules based on the reassessment would not be useful for planning purposes, right?
A. Um-hm.
Q. I think yesterday I showed you the draft 1989 ACR?
A. I believe so.
Q. Right. And does this refresh your recollection as to whether or not a final ACR was published in 1989?
A. Apparently it was not, yeah.
Q. And further on in this paragraph, Mr.

275

Brownstein indicates that it's important that the department issue another ACR since we need to meet contract deliverable deadlines to the extent possible, and the contract requires the priority ranking information to be converted into a binding document on April 1, 1991?
A. Um-hm.
Q. Did you view the ACR as a contract deliverable?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: In my opinion, the ACR was called for in the standard contract.
BY MR. TOMASZCZUK:
Q. So the answer to my question is yes?
A. Yes.
MS. HERRMANN: Same objection.
BY MR. TOMASZCZUK:
Q. And do you understand that the contract requires the priority ranking information to be converted into a binding document on April 1, 1991?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: Yes, in my opinion.

276

BY MR. TOMASZCZUK:
Q. Did you discuss these issues with Mr. Brownstein at any time?
A. I'm certain I must have. I don't recall.
Q. You don't recall any discussions with him about these subjects?
A. Not specifically.
Q. End of the second paragraph, it goes on to state therefore, this report utilizes two bounding cases to reflect a reasonable range of acceptance rates wherein the adopted rate is likely to fall.
Are you familiar with this concept of two bounding cases?
A. Well, in general terms, concept of bounding cases, yes.
Q. What is your understanding of those terms or that term?
A. You would have a higher and a lower case, and likely would be somewhere in the middle, somewhere in between at least.
Q. And why did OCRWM develop a higher and lower bounding case?
MS. HERRMANN: Objection --

277

foundation.
BY MR. TOMASZCZUK:
Q. Or upper and lower bounding case?
A. I don't recall at the time.
Q. Do you recall now?
A. I don't recall now.
Q. Did you play any role in the development of the upper and lower bounding cases?
MS. HERRMANN: Objection -- vague.
THE WITNESS: I don't recall having that, no.
BY MR. TOMASZCZUK:
Q. Do you know who did develop the upper and lower bounding cases?
A. Not specifically, no. It certainly was under Mr. Brownstein's direction, but I don't know specifically who.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner 32 an action memorandum dated December 21, 1990, approval for publication of the 1990 Annual Capacity Report, authored by Ronald A. Milner?

278

And while we're at it, why don't we mark as Milner 33 the Annual Capacity Report dated December 1990.
(Milner Exhibits Nos. 32 & 33 were marked for identification.)
BY MR. TOMASZCZUK:
Q. Did you draft the memorandum that we have marked as Milner Exhibit 32?
A. I don't recall having drafted it, no.
Q. Did somebody else draft it?
A. Somebody else probably drafted it.
Q. You reviewed it and approved it?
A. Correct.
Q. Do you know who drafted it?
A. I don't know for certain, although my copy appears to be a copy of the yellow concurrence chain for a letter, and that would indicate Mr. Pollog drafted it.
Q. He reported to you at this time?
A. Correct.
Q. Did you understand that the information in the ACR was for planning purposes only?
A. Yes.

279

Q. And was scheduled to be replaced by a contractually binding annual Acceptance Priority Ranking report on April 1991?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: Yes. Yes.
BY MR. TOMASZCZUK:
Q. The first sentence of the second paragraph under the heading discussion states since the last waste acceptance schedule has not yet been approved, and this is the last opportunity -- I'm sorry. I think I read that inaccurately. Let me try again.
Since the waste acceptance schedule has not yet been approved and this is the last opportunity according to the terms of the contract for an ACR to be issued, upper and lower bounding waste acceptance rates were used to provide the required information.
Can you explain that sentence to me?
MS. HERRMANN: Objection -- foundation.
BY MR. TOMASZCZUK:
Q. Or for me?
A. Well, apparently at this point in

280

time, because of program schedule changes, we had not approved a new waste acceptance schedule, and therefore we utilized the upper and lower bounding case to bracket so to speak what the likely schedule would ultimately be.
Q. What waste acceptance schedule is being referred to in the sentence, do you know?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: I don't understand the question.
BY MR. TOMASZCZUK:
Q. All right. Well, I don't know how to ask it a different way, but let me try and get at it.
Do you have an understanding of what the term waste acceptance schedule as used in this sentence means?
A. I have an understanding of what the term waste acceptance schedule means, yes.
Q. Okay. Could you relay that to me?
A. Which is the rate at which we would accept waste from the utilities.
Q. We have seen a waste acceptance schedule published in any number of documents

281

that I have asked you about yesterday and today, right?
A. That's correct.
Q. Is this reference to waste acceptance schedule a different schedule?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: As I indicated, apparently at this point in time, because of program schedule changes, we had not prepared a new waste acceptance schedule, so we used the bounding cases.
BY MR. TOMASZCZUK:
Q. I'm sorry.
A. So the waste acceptance schedule I think that is being referred to here is one that had not yet been approved.
Q. But isn't it true that as of this point in time, DOE had issued and you had approved a number of waste acceptance schedules in various documents?
A. I think that's correct.
Q. So given that fact, I'm struggling to understand what the reference to waste acceptance schedule means here.

282

MS. HERRMANN: Objection -- form.
BY MR. TOMASZCZUK:
Q. And if you can elucidate it for me in some way that I can understand it, that would be much appreciated.
A. Well, going by the information that's available in this particular memo in the paragraph above that, apparently we had advised the contract holders, the utilities, generally that we were developing a revised waste acceptance schedule based on the Secretary's reassessment of the program.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. That reassessment of the program was Exhibit 20 as I recall?
A. I believe 20 is correct.
Q. It was dated November 1989, and do you know whether subsequent to the reassessment published in November 1989 and prior to this memorandum of December 21, 1990, waste acceptance schedules were published by OCRWM?
A. I'm sorry. Would you repeat that?
MR. TOMASZCZUK: Could you read that

283

back?
THE REPORTER: Question: "It was dated November 1989, and do you know whether subsequent to the reassessment published in November 1989 and prior to this memorandum of December 21, 1990, waste acceptance schedules were published by OCRWM?"
THE WITNESS: I don't believe so.
BY MR. TOMASZCZUK:
Q. The upper and lower bounding cases assumed availability of an MRS, correct?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: Reading further in this memo, it indicates that the lower bounding case included an MRS and included the storage limits upper bounding case which would have been a higher acceptance rate, I assume, appears that it assumed that the schedule linkages on the MRS were assumed to have been removed.
BY MR. TOMASZCZUK:
Q. And those upper and lower bounding cases are reflected at page 7 of the 1990 ACR which I have marked as Milner Exhibit 33?
A. Yes, it appears to be.

284

Suggest using 1,000 2,000, 3,000, 4,000, 5,000 and 6,000.
So do I understand that your concern was with the use of numbers and increments other than hundreds?
A. Well, I think my concern at that point was that using a number like 1430 for a projection into the future indicated far more precision than was actually in that number.
Q. Was one of your roles at this time to ensure that the spent nuclear fuel acceptance rates that were being used in various OCRWM documents were consistent?
A. No, that was not my, one of my roles at that time.
Q. Was that one of your concerns?
A. Yes, that would be fair to say.
Q. That was something you were trying to keep an eye on so to speak?
A. Yes.
Q. And that was a concern because you believed that OCRWM ought to speak with uniformity on those questions?
A. From a corporate sense, I believe that the program should, all elements of the program

313

should work off the same assumptions.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner 40 a memorandum dated December 20, 1991, authored by Mr. Milner?
And it's an action memorandum approval for publication of the 1991 ACR.
(Milner Exhibit No. 40 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Do you recall this memorandum, Mr. Milner?
A. I don't specifically, no.
Q. Did you prepare it?
A. It's unlikely that I would have prepared it.
Q. Somebody prepared it for you and you viewed it and approved it?
A. That's correct.
Q. Do you know who prepared it?
A. No, I don't.
Q. As of this point in time, December 20, 1991, did you still believe that a MRS facility

314

could be cited?
A. Yes, I did.
Q. Was the MRS team still working at this time?
A. I don't believe it was, no.
Q. Who was working on siting an MRS at this point?
A. My organization.
Q. And when you say your organization, you mean the Office of Storage and Transportation?
A. That's correct.
Q. I may have misunderstood, but -- and if I did, correct me -- I thought I heard you say yesterday that when the MRS team was disbanded, that that effectively ended DOE's plans to site an MRS.
Did I misunderstand that?
MS. HERRMANN: Objection to the extent that it mischaracterizes prior testimony.
BY MR. TOMASZCZUK:
Q. I don't want to mischaracterize what you said.
I want to understand it correctly.
A. If, if I said or alluded to that, I

315

was in error.
The MRS team was disbanded I guess essentially at the time that I became the acting associate director for storage and transportation.
I don't recall specifically. That may have been incident to organizational change, but nonetheless, the Storage and Transportation Office subsumed the duties of the MRS team, and volunteer MRS siting effort continued at that time.
Q. And that effort was ongoing as of December 20, 1991?
A. I believe it was, yes.
Q. Who in your office was working on that issue?
A. I believe Victor Trebules was, Jeffrey Williams.
Offhand I don't recall the rest of the employees there.
Q. Were you working that issue as well?
A. I was.
Q. How much of your time were you spending on DOE's efforts to site an MRS?
MS. HERRMANN: Objection -- vague.

316

THE WITNESS: I would have to estimate 40 to 30 -- 30 to 40 percent of my time.
BY MR. TOMASZCZUK:
Q. And that level of activity continued until when?
A. Probably some time later, until 1992 perhaps.
I don't recall precisely -- approximately six months after the administration changed.
Q. When you say the administration changed, you're referring to a Presidential election?
A. Correct.
Q. So six months after a November election roughly?
A. Roughly six months after a January swearing in.
Q. Okay.
A. But very approximate.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. In this memo, under the heading discussion, the last sentence of the first

317

paragraph states the ACR applies a waste acceptance rate to the APR resulting in individual allocations to the contract holders of FWMS capacity.
Do you know who made the decision to utilize the ACR, in this instance, the 1991 ACR, to apply a waste acceptance rate to the APR?
A. I don't know that there was an individual that made that decision.
It was the process basically. The ACR was simply an annual capacity of the system's acceptance, an estimate without regard to which utilities were first, second and so forth, and how much was the first utility going to deliver and so forth, so as this indicates, the capacities listed in the ACR were applied to the priority ranking in the APR.
The result was that you had a priority listing by utility and by fuel quantity in the different years what the estimated acceptance rate would be.
Q. The memo goes on to state at the bottom of the page, the last paragraph, the 1991 ACR differs from the previously published ACRs for two reasons. First, while the information

318

in the ACR has traditionally been used for planning purposes only, the allocations in the 1991 ACR will also serve as the basis for submission of Delivery Commitment Schedules by the contract holders.
Do you know who made the decision to use the allocations in the 1991 ACR as the basis for submission of DCSs by the contract holders?
A. No, I don't.
Q. Do you know whether that decision was authorized by or set forth in the standard contract itself?
MS. HERRMANN: Objection. Calls for a legal conclusion.
Standard contract is the best evidence of its contents.
THE WITNESS: I'm fairly certain that the standard contract doesn't specify a 1991 ACR.
BY MR. TOMASZCZUK:
Q. Does it specify using the allocations in any ACR as the basis for submission of DCSs do you know?
MS. HERRMANN: Same objections.
THE WITNESS: Best of my recollection,

319

it does.
BY MR. TOMASZCZUK:
Q. It does?
A. It does.
Q. Could you identify for me where in the contract you find that language or direction?
A. I could try.
Q. Thank you.
MS. HERRMANN: Could you give him an exhibit number?
MR. TOMASZCZUK: I can -- No. 3, Milner deposition Exhibit No. 3.
(The witness reviewed the document.)
MS. HERRMANN: While he's looking, let me just object again it calls for a legal conclusion, and best evidence.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. If it helps you at all, Mr. Milner, Delivery Commitment Schedules are addressed in Article V. Maybe that's where you're looking, but --
A. Yes, that's where I'm looking.
(The witness reviewed the document.)
THE WITNESS: And I do not see ACRs

320

referenced there.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Have you finished your answer, Mr. Milner, or do you want more time?
A. Another minute.
Q. Sure.
(The witness reviewed the document.)
MS. HERRMANN: Could we have the question read back just so that I'm clear?
THE REPORTER: Question: "Could you identify for me where in the contract you find that language or direction?"
MS. HERRMANN: If it speeds things up at all, could I refer him to another section?
MR. TOMASZCZUK: Sure.
MS. HERRMANN: Or are we just hunting? Do you want him to hunt?
MR. TOMASZCZUK: No, I don't want him to hunt.
MS. HERRMANN: Okay -- right before Article V.
THE WITNESS: Yes. Actually I was just reading that paragraph 5.
Yes, it references both the ACR and

321

the APR.
BY MR. TOMASZCZUK:
Q. I'm sorry. Where are you referring to now?
A. Immediately above Article V; it's labeled paragraphs 5A and B.
Q. Um-hm. Has a reference to the APR and the ACR?
A. Correct.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. But no tie-in between the DCS and the ACR, right?
MS. HERRMANN: Same objection.
THE WITNESS: The Article V, paragraph B doesn't specifically reference the ACR.
However, the APR might be very useful since it contains no quantities.
BY MR. TOMASZCZUK:
Q. The last sentence on this page states these DCSs which will provide planning information for waste acceptance activities may be submitted to the department as early as January 1, 1992.
Were the DCSs to be contractually

322

binding, or were they for planning purposes?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I'm not actually certain.
BY MR. TOMASZCZUK:
Q. You don't know?
A. I don't know.
Q. Turning the page to reference at the top of this page to the upper and lower bounding waste acceptance rates that we saw in the 1990 ACR, and then the memo goes on to state, quote, although no annual acceptance rate has been baselined, and let me just stop you there, or let me stop myself there.
What do you mean by baselined as that term is used here?
A. Finally approved.
Q. The memo goes on to state the 1991 ACR uses a single acceptance rate that is very similar to the lower bounding rate in the 1990 ACR. While not stated in the ACR, this rate was selected because it is theoretically sufficient to eliminate in the aggregate the need for at-reactor out-of-pool storage starting in 1998.

323

What did you mean by using the term theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in 1998?
A. One of the goals at that point in time, assuming an MRS began operating in 1998, that we would at least accept waste at a rate sufficient to keep a utility from having to build additional dry storage.
Theoretically it refers to all of that as based on projections of spent fuel discharge.
Q. Does theoretically as used here mean mathematically?
A. My understanding of the way it's used here is that theoretically being based on projections of spent fuel discharge was not an exactly calculated number because it's a projection.
Q. Were you familiar with those projected discharge rates?
A. At the time, I would have been, yes.
Q. But you're not familiar with them now?
A. I can't recall what they were at that time, no.
I can't recall what they are right

324

now.
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Exhibit 41 the 1991 -- give me just a minute. I want the 1991 ACR, but I will need a moment.
THE WITNESS: Okay.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: While we're waiting, why don't we go ahead and use the 1991 and have marked the 1991 APR.
This should be marked as Milner 41.
(Milner Exhibit No. 41 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with what has been marked as Milner deposition Exhibit 41, the 1991 APR?
A. In general terms, yes.
Q. Was your office responsible for preparing and issuing this?
A. I believe it was.
Q. And what was the purpose of this document?

325

MS. HERRMANN: Objection -- vague.
THE WITNESS: It was essentially to inform the utilities, inform the utilities of --
BY MR. TOMASZCZUK:
Q. Thank you.
A. Determination as to who would be first, second, third, what the queue would be.
Q. And the discharge data that you were at one time familiar with is contained in this document?
A. These are the actual discharges, yes.
Q. As opposed to projected discharges?
A. Correct.
Q. And how were the projected discharge, how was the projected discharge information compiled by OCRWM or DOE?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: It was compiled from data provided on a form called RW-859 provided by the utilities, individual utilities.
BY MR. TOMASZCZUK:
Q. And on that form, utilities were asked to project their discharge information into the future?

326

A. Yes. They were requested to project discharges.
They were also requested to provide information, actual discharges.
Q. So when you stated in your memo Milner Exhibit 40 that the rate was selected because it is theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in 1998, you were referring to a, an assessment of all the projected discharges for 1998?
A. Well, actually the projected discharges from 1998 and beyond.
Q. And it was, was it simply a, a matter of adding the projected discharges for each year based on the RW-859 forms and then seeing what that totaled?
A. Correct.
Q. And do you recall what the projected discharge information for 1998 was?
A. No, I don't.
MR. TOMASZCZUK: I have now the 1991 ACRs. It's amazing.
Can we mark it as Exhibit 42?
(Milner Exhibit No. 42

327

was marked for identification.)
BY MR. TOMASZCZUK:
Q. Can I direct your attention, Mr. Milner, to page 5 of this document?
This table is the single acceptance rate that's referenced in your memo Milner Exhibit 40?
A. I believe it is.
Q. And do you know who compiled this rate?
A. Specifically, I don't know who, no.
Q. Can you explain for me what the number 400 SNF for 1998 represents as regards your statement in the memo that the rates selected was theoretically sufficient to eliminate the need for additional at-reactor out-of-pool storage?
MS. HERRMANN: Objection -- vague.
THE WITNESS: I would assume that the projection of fuel discharges versus what could be stored in the pool versus what would have had to have been put into dry storage, the amount that would have had to go, projected to be placed in dry storage was less than 400 MTUs.

328

MR. TOMASZCZUK: I'm sorry. Could you read that back?
THE REPORTER: Answer: "I would assume that the projection of fuel discharges versus what could be stored in the pool versus what would have had to have been put into dry storage, the amount that would have had to go, projected to be placed in dry storage was less than 400 MTUs."
BY MR. TOMASZCZUK:
Q. I'm not sure I understood your answer, so let me ask some follow-up.
Are you saying that the 400 figure represents the amount, the amount of spent nuclear fuel considering all the nuclear industry that would have had to have been placed in dry storage in fiscal or in Year 1998?
A. The number would have had to have been less than the 400, yes.
Q. 399 or less?
A. Or less, yes.
Q. So this Table 2.1 assumes that utilities would have been placing fuel in their spent fuel pools, correct?
A. That's correct.

329

Q. And the same question with respect to 1999 -- the number 600 represents the amount of spent nuclear fuel in the aggregate that would have been or would have had to have been placed in dry storage?
A. No. The number would have been less than 600.
Q. 599 or less?
A. I don't recall what the projections were.
Q. Do you know whether this table is based on any assumptions with respect to reracking?
MS. HERRMANN: Objection -- vague.
THE WITNESS: No, I don't know.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Can I ask you to look at the ACR, the summary page, Mr. Milner?
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. The end of the first paragraph indicates that the 1991 ACR applies the waste acceptance rates in Table 2.1 to the 1991 APR,

330

resulting in individual purchaser allocations, right?
A. Correct.
Q. And then further down this paragraph, or in the next paragraph about three quarters of the way down it's stated the annual acceptance rates provide an approximation of the system through-put and are subject to change as the program progresses, correct?
A. Correct.
Q. So that seems to be saying that the rates in the ACR are subject to change?
A. It would seem to say that, yes.
Q. And if that is so, would that not impact the APR?
A. I don't believe it would impact the APR since that was simply a priority ranking.
Q. Well, isn't the 1991 ACR used to develop the allocations in the APR?
A. The allocations I believe to be used for DCS.
Q. Well, I'm sorry. Go back and look at the sentence at the bottom of the first paragraph starting the 1991 ACR applies the waste acceptance rates in Table 2.1 to the 1991

331

APR.
A. Um-hm.
Q. Resulting in individual purchaser allocations -- what do you understand that sentence to be, to mean?
A. I understand that to mean that it takes the, the priority ranking which is contained in the APR and blends that with the capacity rates contained in the ACR to come up with a priority ranking that does have annual capacities by utility.
Q. All right.
A. Annual acceptance rates by utility.
Q. And if the rates in the ACR change, doesn't that necessarily mean that the APR is subject to change also?
MS. HERRMANN: Objection -- asked and answered.
MR. TOMASZCZUK: Well, it's been asked. I'm not sure it's been answered.
THE WITNESS: Priority doesn't change even if the acceptance rate changes.
Utility that's first in line is still first in line even if the rates change.
BY MR. TOMASZCZUK:

332

Q. But the individual allocations for the utilities would change, would they not?
A. Absolutely, yes.
Q. Were you responsible, Mr. Milner, for the development of the instructions for the Delivery Commitment Schedules?
A. I would have been I believe, yes.
Q. And did your office play a role in the review of Delivery Commitment Schedules?
A. It did.
Q. And it was your understanding that beginning in January of 1992, the purchasers, the utilities could submit Delivery Commitment Schedules?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: That was my belief, yes.
BY MR. TOMASZCZUK:
Q. Can I ask you to look at page 4 of the ACR?
And I direct your attention to the second paragraph.
At the end of the second paragraph, the sentence reads, quote, if the current linkages between MRS facility construction and

333

repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007?
A. Correct.
Q. Was that a true statement?
A. That was the best projection at the time, yes.
Q. You believed it to be true?
A. Yes, I did, at that time.
Q. I have to make a quick phone call. Can we take a five-minute break?
Is that okay? Do you want longer? Do you want ten? Want to take a ten-minute break?
A. That sounds good.
Q. Fine.
(A recess was taken.)
MR. TOMASZCZUK: Back on the record.
BY MR. TOMASZCZUK:
Q. Mr. Milner, the rates contained at page 5 of the 1991 ACR, Milner Exhibit 42, those rates are based on use of an MRS, correct?
A. That's correct.
Q. And that MRS, one of the assumptions is that MRS also has placed on it certain

334

statutory linkages or restrictions?
A. That's correct.
Q. At the time that this document was prepared, December 1991, OCRWM had other documents reflecting the design capacity of the geologic repository, is that right?
A. Correct. I believe so.
Q. And those documents reflected a steady-state spent nuclear fuel acceptance schedule of 3,000 MTU?
A. I believe that's correct, yeah.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Could we mark as Milner Exhibit 43 the general instructions issued by the Department of Energy for completing DCS forms?
(Milner Exhibit No. 43 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Are you familiar with these instructions, Mr. Milner?
A. In general terms, yes.
Q. Your office was responsible for

335

preparing them?
A. I believe that is correct.
Q. Do you know who in your office actually did that work?
A. Specifically who prepared it, I don't recall.
Q. Did you review and approve these instructions prior to their issuance?
A. I don't recall having done that, but it's most likely that I did.
Q. The second paragraph of the instructions indicates that the DCS should be submitted by all purchasers with allocations in the 1991 ACR or subsequent ACRs as appropriate, right?
A. Correct.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. And there is a reference to Article V.B of the standard contract after that direction, correct?
A. Correct.
Q. And that's the section that we looked at earlier I believe, right?

336

A. I believe so, yes.
Q. And that's entitled Delivery Commitment Schedule, that section Article V.B?
Does that sound right? If you can get it in front of you, that's fine.
It would be Milner Exhibit 3.
(The witness reviewed the document.)
THE WITNESS: That's correct.
BY MR. TOMASZCZUK:
Q. Okay, but there is, as you previously testified, no reference, at least none that you could identify, to ACRs in Article V.B, right?
A. That's correct.
Q. Were you aware of that fact at the time these instructions were issued?
A. I probably was, yes.
Q. Did you have any discussions with anyone at OCRWM about that?
A. I don't recall that, no.
Q. At or about the time that these instructions were issued and the 1991 ACR was issued, did you have any discussions with any utilities concerning the information contained in those documents?
MS. HERRMANN: Objection -- vague.

337

THE WITNESS: I don't recall specifically.
It's likely I did. It's likely I had discussions with industry representatives.
Whether they were utility representatives or association representatives, I don't know.
BY MR. TOMASZCZUK:
Q. You think it's likely you had such discussions, but you can't recall any of the details about them?
A. That's correct.
MR. TOMASZCZUK: Let's mark as Milner 44 an action memorandum from Mr. Milner requesting approval of the publication of the 1992 APR and 1992 ACR.
(Milner Exhibit No. 44 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Do you recall this memorandum, Mr. Milner?
A. Not specifically, I don't, no.
Q. Do you know who the director of the office of, who the director of OCRWM was at this

338

point in time?
A. I don't recall. I see no date in this.
Q. Well, there are various dates in the approval boxes.
Let me ask you do you think, was Mr. Barrett acting as the OCRWM director as of this point in time.
A. Okay. It appears that he may have been, yes.
This would have been right about the point in time where the political appointee would have departed, so yes, potentially he was the --
Q. There would have been a Presidential election in the fall of '92?
A. Right.
Q. And change of administration would have triggered a new appointment for the position of director of OCRWM?
A. That certainly would have triggered a departure of the previous director.
Oftentimes there were some time delay in a new director coming on board.
Q. That's fair. And Mr. Barrett appears

339

to be signing for this in the right-hand corner of page 2 as RW-1?
A. Okay. And I see the February date, so yes, it was likely he was the acting director at that point.
Q. Okay. So do I understand your testimony that you gave previously to be as of this point in time, the efforts to site an MRS facility were dead?
A. I don't believe that was the case at this point in time.
Q. It was still kicking?
A. I believe so, yes.
Q. And why do you say that?
A. My recollection was that we continued the effort for some period of time after the change of administration, and roughly that was a six-month period, but I don't recall with any precision.
Q. All right. This document reflects that there is no significant difference between the APR published in 1991 and the APR published in 1992.
Do you see that?
A. Yes, I do. That appears to be what is

340

indicated.
Q. But the ACR differs because since it is being published separately from the APR, there is no longer a need for an appendix to the ACR?
A. Yes. That's what it states here.
Q. There is a reference here at the bottom of this memo to purchaser, some purchasers expressing a concern about slippages in the waste acceptance schedule beyond 1998, right?
A. Correct.
Q. As of about this point in time, were you concerned that the utilities might bring litigation against the department for these slippages in the waste acceptance schedule?
A. I was not personally concerned, no.
Q. That issue hadn't come up on your radar screen so to speak?
A. No.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Exhibit 45 a memorandum dated February 23, 1993, from Ronald Milner to Chris

341

Kouts, subject, back-up material for new RW initiatives?
(Milner Exhibit No. 45 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, do you recall this memorandum?
A. I do, yes.
Q. What do you recall about it?
MS. HERRMANN: Objection -- vague.
THE WITNESS: I recall I was out the day it got signed.
At this point in time, and it is indicated in there, the nuclear waste negotiator was not having any success in securing a volunteer site.
The program had begun looking at possible alternatives, things that could be done.
We began looking at the potential for doing a federal siting initiative for a volunteer MRS host location.
I guess that had come about to some extent from interactions with some of the

342

potential interested host locations during nuclear waste negotiator phase, that they may be interested in dealing directly with the federal government.
We began discussing the possibility of federal government rather than the nuclear waste, the Department of Energy actually other than the nuclear waste negotiator attempting to negotiate a volunteer site.
At that time, the department had underway as indicated here a multi-purpose canister program which was attempting to develop a system wherein the, a utility could load fuel in a canister which would then be placed in a storage overpack at the reactor or at a storage facility, federal storage facility.
Could be removed from that storage overpack, placed into a transport overpack, shipped, ultimately placed into a disposal overpack, the idea being you would never have to open it again.
I don't recall what private opportunities refers to, nor the utility compensation initiative, reading further.
BY MR. TOMASZCZUK:

343

Q. Okay. The federal negotiated siting effort that you described, that was separate and distinct from the MRS siting efforts, is that correct?
A. Well, it was, it was aimed at siting an MRS.
It was separate and distinct from the nuclear waste negotiator efforts. Would have been.
I don't -- the Secretary of Energy ultimately never approved that initiative.
Q. The Secretary of Energy did not approve the federal siting initiative that's referenced here?
A. Yes. That's, the best of my recollection, that's correct.
Q. And do you know when that decision was made?
A. No, I don't.
Q. Some time in 1993 do you think?
A. That would be roughly the correct timeframe.
Q. And as of this point in time, it looked like the nuclear waste negotiator was not going to be successful?

344

A. Certainly had not been successful to that point.
Q. Why were you sending this memo to Mr. Kouts?
A. I don't specifically recall. He probably was preparing some information for the director.
Q. What was Mr. Kouts' role at this point in time, do you know?
A. He was a -- I'm not sure what his title would have been, but in essence he would have been a special assistant, program front office, the director's office.
Q. Did the multi-canister initiative bear fruit?
A. In my personal opinion, it did because I think some private efforts picked up on that concept.
It never bore fruit in the sense that I don't believe there is a current package that can do all three -- storage, transport and disposal.
Certainly there are packages that can do storage and transport.
I don't recall which appropriations

345

act, but again, the department was directed to terminate the NPC program.
Q. Was DOE at that time considering compensating for utilities, compensating utilities in the event of a delay in waste acceptance?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: I didn't recall that was the case.
I think the compensation that was referred to here related -- I'm guessing.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. I'm referring to the last page of this memo.
A. Correct.
(The witness reviewed the document.)
THE WITNESS: It would appear that we were.
I certainly recall discussions of providing multi-purpose canisters if they had been developed to utilities as a form of compensation.
BY MR. TOMASZCZUK:

346

Q. All right. That's the second option that was being considered at the time.
The first option was providing direct financial compensation, correct?
A. That's correct. As stated here, yes.
Q. Do you know why DOE was considering these options?
MS. HERRMANN: Objection -- foundation.
(The witness reviewed the document.)
MS. HERRMANN: Speculation.
THE WITNESS: I can only go by what is stated here, which is that the contingency in the event that we did not make the '98 date.
BY MR. TOMASZCZUK:
Q. I presume DOE would not have embarked upon this consideration unless someone had a concern that they weren't going to make 1998?
MS. HERRMANN: Objection -- foundation.
BY MR. TOMASZCZUK:
Q. Is that fair?
MS. HERRMANN: Speculation.
THE WITNESS: I think it's fair to say that prudency required you to do contingency

347

planning.
BY MR. TOMASZCZUK:
Q. You mean you had doubts about making 1998 at this point in time, didn't you?
A. I guess at that point in time, I was becoming concerned that we may not be able to site an MRS, which would then not have permitted a '98 acceptance date.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. It was DOE's position at this time that it did not have an unconditional obligation to accept spent nuclear fuel by January 31, 1998, correct?
MS. HERRMANN: Objection. Mr. Milner is not a 30(b)(6) witness, and calls for a legal conclusion.
THE WITNESS: I believe that that's correct.
BY MR. TOMASZCZUK:
Q. Do you know whether the courts have subsequently rejected that position?
A. I do.
Q. Of DOE?

348

proceedings.)
BY MR. TOMASZCZUK:
Q. In the section on discussion, it's stated in part that the department may have created an expectation that it would begin accepting spent fuel in 1998 through its implementation of the standard contract.
Did you agree with that statement?
A. That we may have created an expectation, yes.
Q. Yes. The text of the discussion section of the memo goes on to state that you, the Secretary of Energy, as I understand it, directed the program to explore with utilities and other interested parties options for offsetting a portion of the financial burden associated with the costs incurred through continued on-site storage resulting from delays in currently projected waste acceptance schedules.
It was well recognized within your office that a delay in meeting the 1998 date would cause the utilities to incur additional nuclear fuel storage costs?
A. That's correct.

353

(There was a pause in the proceedings.)
MR. TOMASZCZUK: Can we mark as Milner Exhibit 47 a Federal Register notice dated May 25th, 1994, published by OCRWM?
(Milner Exhibit No. 47 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Do you recall this notice, Mr. Milner?
A. I do, yes.
Q. Did you draft it?
A. I did not draft it.
Q. Did you review it and approve it as it worked its way through OCRWM?
A. I certainly reviewed it. Approval authority was not mine for this.
Q. In the Federal Register, the second page of the document, the middle column, starting with respect to, do you see that?
A. Yes.
Q. There is a discussion about DOE's efforts to site an MRS, right?
(The witness reviewed the document.)
THE WITNESS: Yes.

354

BY MR. TOMASZCZUK:
Q. And the notice in part says that there is significant challenges associated with siting any facility of this type. Thus far neither the efforts of the department nor any other organization, including the Office of the Nuclear Waste Negotiator, have achieved the level of success needed to realize significant progress in locating and developing a site by 1998, right?
A. Correct.
Q. So it is fair to say that at least as of this point in time, the MRS efforts were, had proven unsuccessful?
A. That's correct.
Q. And there was no reason for optimism that an MRS would be cited by 1998?
A. Well, there could be an operation by 1998 certainly.
Q. It could be?
A. No. I say that there was no reason for optimism that an MRS could be operational by 1998.
Q. And the notice deals with other subjects, but it also addresses the subject of

355

interim storage, right?
A. Correct.
Q. And I gather that interim storage was a concept that was being considered in lieu of an MRS, is that right?
A. An MRS in essence was interim storage.
Q. When you use those two terms, you think of them as being the same thing basically?
A. I do, yes.
Q. Would you like to take a little break?
A. Fine with me.
(A recess was taken.)
MR. TOMASZCZUK: Ms. Reporter, could we have marked as Milner Exhibit 48 a set of briefing charts entitled interim storage options presented by R.A. Milner originally I gather on February 8, 1994, and then revised on March 8, 1994?
(Milner Exhibit No. 48 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, do you recall this document?
A. I do, um-hm.

356

Q. Is this something that you prepared?
A. I don't believe I prepared it, no.
Q. Someone prepared it for you?
A. Yes.
Q. This appears to be a briefing to Mr. Dreyfus, who was then the director of OCRWM?
A. Correct.
Q. Do you know when he assumed the position of director?
A. I don't recall exactly, no.
Q. Summer of 1993 sound about right?
A. That would sound about right somewhere, somewhere, yeah.
Q. Okay. And this was a briefing that you presented to him orally?
A. Correct.
Q. Using an overhead projector?
A. Probably; I don't recall.
Q. Do you -- and the briefing took place on February 8, 1994?
A. Presume it did. I don't recall specifically.
Q. Do you know why, or was it revised then on March 8, 1994?
A. I don't recall.

357

Q. You don't recall any revisions that were made to the briefing after you gave it initially?
A. Not offhand, I don't, no.
Q. Okay. And the briefing was to address options for interim storage?
A. Correct.
Q. And do you know why you were giving this briefing?
A. My recollection was that I wanted to essentially provide him with information on state-by-state projected discharges, essentially the storage situation at the different reactors, and explore ways on how we might move forward or if we should move forward with interim storage.
Q. The third page of the document contains a listing of topics to be covered?
A. Um-hm.
Q. And there is a summary of issues followed by current status of at-reactor storage?
A. Um-hm.
Q. And then the third bullet, at-reactor storage requirements without MRS in system, and why was that topic being covered at this point

358

in time?
A. To provide him with information on how much fuel would be in storage at the different reactors if we did not begin accepting an MRS.
Q. So at least as of February of 1994, OCRWM was concerned about the possibility that an MRS might not be sited?
A. We were certainly doing contingency planning for that, yes.
Q. And the fifth bullet states impacts of no MRS?
A. Yes.
Q. Can I get you to look at the summary of issues, next page?
Can you explain the first bullet for me?
A. Besides having lousy grammar, it says that at-reactor dry storage will increase significantly by 2010.
Q. And when you say, there is a phrase be required in 32 states, do you mean that -- what do you mean by that?
A. I think the projection at this time was that there would be reactors in 32 different states that would require some sort of dry

359

storage by the Year 2010.
Q. Because their spent fuel pools could not handle the anticipated spent nuclear fuel discharges as of that point in time?
A. Correct.
Q. And the next bullet says utilities having to deploy at-reactor storage of spent nuclear fuel will incur significant non-reimbursable costs while still being burdened with the responsibility of maintaining the storage.
True statement at the time you wrote it?
A. Yes.
Q. And then the third issue was Congressional action is necessary to site a federal interim storage facility as soon as possible, correct?
A. Correct.
Q. What type of Congressional action was envisioned?
A. Well, legislation, authorization to federally site it in a storage facility.
Somewhat prior to this, as we had talked earlier, we had begun to explore federal

360

initiatives for siting an MRS or interim storage facility under the belief that the department had the authority under the current act to do that.

I believe that the department's general counsel subsequently determined that the department did not have that authority, additional legislation was required.

Q. So as of this point in time, a federal interim storage facility could not be sited without Congressional authorization?

A. That was the position of the general counsel I believe.

Q. Did you agree or disagree with that position?

MR. SHULTIS: Objection. Calls for a legal conclusion. Also might be privileged.

So you're asking his opinion of what the general counsel's office told him to do?

MR. TOMASZCZUK: I asked him whether he agreed or disagreed.

MR. SHULTIS: His personal opinion?

MR. TOMASZCZUK: Yes.

MR. SHULTIS: Okay. You can answer.

THE WITNESS: My personal opinion is I

361

agreed with that.

BY MR. TOMASZCZUK:

Q. The document then has a whole series of charts depicting the situation as I understand it in various states, right, with respect to spent nuclear fuel storage?

A. Correct.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. Were some states in worse or in worse positions than others with respect to their need for spent nuclear fuel storage facilities?

A. I think some, certainly some reactors were, then were in worse shape than others.

Q. Do you have some recollection here today as to which reactors were in the worst shape so to speak?

A. Well, certainly Oconee had dry storage at the time, or was in the process of planning at least.

I don't recall actually when it went into operation. Oconee was; Surrey Nuclear Power at that time.

Those are two that come to mind at

362

that time.

Q. Is Oconee operated by Duke?

A. Correct.

Q. And Surrey's operated by Virginia Power?

A. Virginia Power.

Q. Can I direct your attention back to page 51 of this document?

This is the identification as I understand it of the consequences, potential consequences of no MRS?

A. Yes.

Q. First is the fuel stays where it is until repository commences operation, currently scheduled for 2010?

A. Correct.

Q. All right. Utilities may sue DOE for failure to perform according to standard contract, no waste acceptance in 1998.

So at least as of this point in time, isn't it true, Mr. Milner, that you were aware of that possibility that utilities could bring suit against the department for its failure to perform according to the standard contract?

MR. SHULTIS: Objection. Calls for

363

speculation.

THE WITNESS: Apparently so.

MR. TOMASZCZUK: I just want to note for the record I don't know what about that question asked the witness to speculate.

MR. SHULTIS: You're asking him to speculate about what utilities would do as far as bringing a lawsuit.

MR. TOMASZCZUK: Can you read the question back?

THE REPORTER: Question: "All right. Utilities may sue DOE for failure to perform according to standard contract, no waste acceptance in 1998.

"So at least as of this point in time, isn't it true, Mr. Milner, that you were aware of that possibility that utilities could bring suit against the department for its failure to perform according to the standard contract?"

BY MR. TOMASZCZUK:

Q. My question, Mr. Milner, was not asking you to speculate as to what the utilities might do.

I was asking about your understanding as to whether at this point in time, there was a

364

risk that utilities would sue DOE for failure to perform according to the standard contract.
MR. SHULTIS: The same objection.
THE WITNESS: In my opinion, there was that possibility.
BY MR. TOMASZCZUK:
Q. All right. That's why you wrote this bullet, right?
A. That's correct.
Q. As risk storage pools are filled, utilities must resort to additional at-reactor storage.
I think that's another consequence?
A. Correct.
Q. This next one, venders provide and continue to develop at-reactor dry storage technology, technologies that may prove incompatible with the repository.
Was that a concern of yours at this time?
A. It was, yes.
Q. Next potential consequence, loss of system flexibility. MRS provides storage buffer preceding repository and allows for truck only reactor sites to ship their fuel.

365

I'm not sure I understand that one.
Can you explain it?
A. Storage buffer, I guess I would think of that as almost a surge tank in the system where you're shipping fuel from reactors, from multi-reactors ultimately to a repository which must receive it, repackage it, and place it in a repository, and my opinion, MRS provided a buffer or a surge tank to the system that if something were to occur at the repository that necessitated, for example, slowdown briefly of acceptance, you have a buffer.
Truck only reactor sites refers to some reactor sites that don't have rail capability.
Q. Okay. Next consequence, shutdown reactors must maintain their spent fuel pools or dry storage facilities for a longer time, causing utility costs to increase.
Was that a true statement?
A. I believe so, yes.
Q. Are there costs associated with requiring shutdown reactors to maintain their spent nuclear fuels, spent fuel pools or dry storage facilities for a longer time?

366

A. There are costs associated with that, yes.
Q. Next consequence, reopening of 10 CFR Part 50 license for some sites deploying dry storage may create other licensing problems, resulting in earlier shutdown of reactor.
I'm not sure I understand this potential consequence.
Can you explain it for me?
A. Well, Part 50 license, of course, being the operating, NRC's operating license which it issues to the reactor.
I think that, that at that time, there was some concern that certain instances, and I can't recall the specifics, or particular reactors, but certain instances, there was the potential that Part 50 license might have to be reopened which interventions and so forth could have caused reactor shutdowns.
Q. Yet another page of potential consequences from no MRS, TSLCC, paren, plus utility, close paren, costs increase by about one billion without MRS if repository starts operation in 2010.
Can you explain what was meant by

367

that?
A. I believe that statement was looking at not only the federal costs, but the costs of utility storage, and the estimate at that time was that considering both of those costs, increase was a billion dollars for that delay.
Q. And those costs would increase by about 2.5 billion if the repository did not open until 2020?
A. That's what it states here, yes.
Q. I think I understand the last consequence that's stated here.
Did Mr. Dreyfus have any reaction to these consequences when you presented them to him?
A. The only reaction I seem to recall is that he felt it was unlikely we would get legislation, the authority to site a federal interim storage facility.
Q. Did he explain to you why he felt that way?
A. I don't recall that he did, no.
Q. Did you share his pessimism as to that subject?
A. I did.

368

Q. And then on the following pages, as I understand this document, Mr. Milner, there are options for interim storage which you summarize and then review, is that right?
A. Yes.
Q. And there are, as I understand it, four options which were, which are considered in this paper?
A. Appears to be, yes.
Q. Did you, in making the presentation, favor one option over the others?
A. I don't recall that I did, no.
Q. There is a chart entitled summary of analysis at page 57.
Do you see that?
A. Yes.
Q. And the first option, at-reactor storage, right?
A. Correct.
Q. And in the cost column, it appears to indicate that this would have the highest total system life cycle cost?
A. It does.
Q. Of the four options, this would be the most expensive?



A. Yes, according to this.
Q. Second bullet under that column says no benefit payments.
Do you know what that refers to?
A. I believe there is either a provision in the act, or I can't be certain that it's in the act, but there certainly was discussion on the part of Congress that the government might provide benefit payments to an entity that signed an agreement to host the repository site, and I believe the same is true for an MRS in differing amounts.
Q. If you found a volunteer so to speak, then the, there might be payments that would have to be made to that volunteer?
A. Correct. Correct.
Q. And indeed volunteer is the next option that's identified.
Is that the, the MRS system that we have been discussing in some of the previous documents.
A. Yes, I believe so.
Q. And then the third option is federal, and that is the federal interim storage option?
A. I believe so, yeah.



Q. Which I believe you indicated in your testimony a few moments ago that concluded that would require legislation?
A. Correct.
Q. Last then, the last storage option is Congressionally directed, and I'm not sure I understand this option.
What was meant by that?
A. I think that the thought there was the Congress simply designated a site.
Q. Of these options, the lowest cost that would also require legislation?
A. Yes.
Q. I suppose that's implicit in the term Congressionally directed?
A. True.
Q. And then you list assumptions. Then you go through each of these options I gather in a little more detail.
Look at the page 59, please.
A. Um-hm.
Q. And this option is at-reactor/ISFSI sites.
I mean this option is basically where we are today, is it not?



A. That's correct.
Q. Now MRS in-system utilities are responsible for spent fuel storage. Fuel could be stored on site, transshipped or private ISFSIs developed to meet needs. May or may not include compensation.
Costs, lower NWF, I presume that's nuclear waste fund?
A. Correct.
Q. Costs since the MRS is not built and no benefit payments are made, utilities will optimize individual solutions to minimize their costs. Compensation will increase nuclear waste fund costs.
And by that, I presume you meant compensation to the utilities?
A. Correct.
Q. Longer at-reactor storage time results in high TSLCC.
And it is true, is it not, Mr. Milner, that longer at-reactor storage time results in high TSLCC?
A. I believe it does, yes.
Q. Continuing on to the next page, page 60, schedule, it states here that this scenario

is the default case.
What was meant by that?
A. Default case, if none of the other options were viable, that was the default. That was essentially a no federal action case.
Q. All right. And that's sort of where we are today, right?
A. That's correct.
Q. And then institutional, continued at-reactor storage will lead to local and state discontent.
Were you aware of such discontent at or about this time?
A. I think at about that time, there was the beginnings of some concern on the parts of states and local governments of not removing the spent fuel, in addition to the utilities' concerns.
Q. However, at-reactor storage eliminates MRS siting problems. At-reactor storage could be contested, resulting in inability to move spent fuel from reactor pool, eventually causing early reactor shutdown.
At this time, were you concerned that the inability to move spent fuel from the

373

reactor pool might cause some reactors to shut down early.
A. Yes.
Q. Is that still a concern today?
A. No.
Q. Why not?
A. Reactors seem to have been able to get licenses or license amendments to construct dry storage, and it has not seemed to be as problematic as was feared at the time.
Q. Do you know whether that's true in Minnesota?
A. There are exceptions.
Q. Failure of DOE to perform according to standard contract may lead to litigation after 1998.
And that was a concern of yours at this time, right?
A. Yes.
Q. Did you discuss that concern about DOE's failure to perform might lead to litigation with others at OCRWM?
A. Not that I specifically recall.
Q. Did Mr. Dreyfus have any reaction to that statement when you presented it in February

374

of '94?
A. Very general terms, I think he thought that almost anything could lead to litigation at any time.
Q. And then finally, compensation to utilities for at-reactor storage may make this option more acceptable.
Was that discussed at this briefing in February of '94?
A. I believe it was.
Q. Do you know what was said about that?
A. Other than the statement, no, I don't recall.
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Deposition Exhibit 49 a memorandum dated November 28, 1994, from Ron Milner, subject, draft TSLCC assumption package?
And I omitted 1995 draft TSLCC 1995 assumption package.
(Milner Exhibit No. 49 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, do you recall this document?

375

A. In general terms, I do, yes.
Q. Okay. Now you have signed this cover memo as the acting director, Office of Program Management and Integration, right?
A. Correct.
Q. So as of this point in time, you left the position of director of Office of Storage and Transportation?
A. That's correct.
Q. And as acting director of this office, you're then back involved in the TSLCC review, editing and approval process I gather?
A. That's correct.
Q. And I'm sure you were delighted to be back in it!
A. Absolutely.
Q. Do you know, Mr. Milner, whose handwriting appears on this first page of Milner 49?
A. No, I don't.
Q. It's not your writing?
A. It's not my writing, no.
Q. Except for the signature, it's not your writing?
A. Except for the signature, except for

376

the signature.
Q. Did Carl Connor and George Reiling work for you?
A. They did at this point in time, yes.
Q. They were assigned to the Office of Program Management and Integration?
A. I believe that's correct, yeah.
Q. Can I ask you, Mr. Milner, to look at page 14 of the document?
And the table at page 14 appears to reflect a delivery spent nuclear fuel ramp-up rate?
A. It does.
Q. And it appears to show an initial receipt of spent nuclear fuel at a rate of 300 metric tons?
A. That's correct.
Q. And then ramps up to 3,000 metric tons in the fifth year of operation?
A. That's what is indicated, yes.
Q. And as of this point in time, there was still a second repository on the table being considered?
A. There was a possibility of a second repository.

377

One was not actively under consideration.
Q. All right. The reason I asked the question is because Section 6.2 on the following page has ramp-up rates for a second repository?
A. Yes.
Q. And then finally, we have Section 6.3, which is the repository in a single repository system, and a listing of waste acceptance ramp-up rates in that table, right?
A. Correct.
Q. And that table shows a, an initial acceptance rate of 300 metric tons and then ramping up to 3,000 metric tons in 2014, correct?
A. Correct.
Q. And then staying at that steady-state 3,000 metric ton rate for a period of 25 years?
A. Correct.
Q. Am I correct in understanding that at least as of November of '94, if not sooner, the MRS siting effort was dead?
A. We no longer assumed an MRS in the system, that's true, and for all intents and purposes, yes, it was dead.

378

Q. Give me just one second.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Am I correct in understanding, Mr. Milner, that you were circulating this draft assumptions package to the various recipients of your memo to ensure that those affected offices within OCRWM would have the chance to review the data and concur in it?
A. Correct.
Q. And you were doing that, among other reasons, for purposes of trying to develop consistency in the OCRWM documents?
A. Correct.
Q. Do you recall whether any of the recipients of the memo provided comments to you or your office on --
A. I don't recall, no.
Q. Now these ramp-up rates are substantially different from those in the 1991 ACR, is that right?
A. They are different, yes.
Q. So at least insofar as the ACR was concerned, and the other documents, they were

379

using different rates?
A. I thought you referenced the 1991.
Q. Yes, I did. I'm sorry.
A. Yeah, the rate was different in this 1994 assumption than it was in the 1991 ACR.
Q. The rates in the 1991 ACR assumed an MRS, right?
A. I believe it did.
Q. And these rates do not?
A. Correct.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner Deposition Exhibit 50 the Civilian Radioactive Waste Management Program Plan, Volume 1, Program Overview?
The date is December 19th, 1994. You have to go to the second page to tell that.
(Milner Exhibit No. 50 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with this document?
A. I am.
Q. Did you have a role to play in its preparation?

380

Q. Is he still with the department?
A. No, he is not.
Q. Is he retired?
A. Yes, he has.
Q. Do you know where he is today?
A. I believe he lives in Springfield, Virginia.
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Exhibit 51 the March 1995 APR ACR?
(Milner Exhibit No. 51 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Are you familiar with this document, Mr. Milner?
A. In general terms, yes.
Q. Did your office prepare the document?
A. It did not.
Q. Do you know which office within OCRWM did prepare it?
A. I believe this was still being prepared at that time in the Office of Storage and Transportation.
Q. So Mister, this would have been Mr.

389

Shelor's office that prepared it?
A. I believe so.
Q. Now at some point in time, you came back to that office, that is, the Office of Waste Acceptance, Storage and Transportation, is that right?
A. That's correct.
Q. But that would have been after this APR/ACR was published?
A. I believe it was.
Q. Notwithstanding the fact that your office didn't publish this, did you have occasion to review this and sign off on it before it was published?
A. I don't recall specifically, but it's likely that I would have concurred in it.
Q. Can I ask you to look at page 1 of the document? And the second paragraph is what I'm going to ask you a few questions about.
There is a reference to the APR and the ACR?
A. Um-hm.
Q. And then there is a sentence in the middle of the paragraph which states the ACR applies projected nominal acceptance rates for

390

the system to the priority ranking and the APR, resulting in individual allocations for the owners and generators expressed in metric tons of uranium.
Do you have an understanding of what is meant by the phrase nominal acceptance rates in that sentence.
A. No. I don't know.
Q. Did you have any discussions with any OCRWM employees concerning what was meant by that phrase nominal acceptance rates?
A. Not that I recall.
Q. The last sentence of this paragraph states as specified in the standard contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers, right?
That's what it says?
A. That's correct.
Q. Did I understand your testimony earlier, Mr. Milner, to be that the DCSs represented a binding commitment of the parties?
A. That was my opinion, yes.
Q. And the DCSs as indicated by this paragraph, are based on the capacity allocations

391

as listed in the ACR, right?
A. Correct.
Q. Can you explain to me how it is that if the ACRs which form the basis for the DCSs are not binding, that the DCSs are binding?
MR. SHULTIS: Objection. Calls for a legal opinion.
THE WITNESS: The DCSs were submitted by the utilities to the department based upon the information in the ACR, the allocations.
Then the department would either approve or disapprove those, and if approved, then in my opinion, that became a binding agreement.
A utility could certainly choose to submit a DCS which reflected lower amounts than were contained in the ACR.
BY MR. TOMASZCZUK:
Q. Is there any reason of which you're aware why a utility would do that?
A. None that I know of.
Q. Wouldn't it be in the utility's interest to try and put as much fuel as they could in the DCS to get that fuel moved off site?

392

MR. SHULTIS: Calls for speculation.
THE WITNESS: If I were a utility fuel manager, I would have.
BY MR. TOMASZCZUK:
Q. Can I ask you to look back at the DCS instructions?
We looked at those this afternoon -- 43.
And in particular, I was going to ask you to look at, Mr. Milner, paragraph 7C.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. And this paragraph reflects in the first sentence that the rates in the ACR provide an approximation and are for planning purposes, right?
A. Correct.
Q. And then the next sentence, there is an assumption stated that the waste management system will begin acceptance of spent nuclear fuel in 1998, correct?
A. Correct.
Q. And then there is this third sentence in the event that such circumstances change, all DCSs previously approved by DOE may need to be

393

re-evaluated by DOE and the purchasers.
What was meant by that?
MR. SHULTIS: Objection. Calls for speculation.
THE WITNESS: Well, the program and the department position had always been that acceptance of spent fuel was conditioned upon having the facility available to accept it, and if those conditions changed, DCSs would have to be re-evaluated in terms of start of acceptance.
BY MR. TOMASZCZUK:
Q. So if circumstances changed, the DCSs wouldn't be binding?
MR. SHULTIS: Objection. Calls for a legal conclusion.
THE WITNESS: If there was no facility available to accept the fuel in 1998, which ultimately there was not, then yes, they would have to be re-evaluated.
BY MR. TOMASZCZUK:
Q. Do you know whether the Delivery Commitment Schedules once approved were subject to adjustment plus or minus 20 percent in final delivery schedules?
A. I don't recall that. I simply don't

394

know.
Q. Does that sound correct or incorrect to you?
A. I have no recollection of a 20 percent.
BY MR. TOMASZCZUK:
Q. Are you looking at the contract?
A. Yes, I am.
Q. If you would direct your attention to Article V.B.2?
A. Okay -- 20 percent.
Q. It seems to indicate that the quantities of spent nuclear fuel and high-level waste can be adjusted plus or minus 20 percent, right?
A. That does say that, yes.
Q. So the DCSs could change if circumstances changed, right?
A. That's correct.
Q. And they, and the amounts of fuel in the DCSs could be adjusted plus or minus 20 percent per the contract?
MR. SHULTIS: Objection. Calls for a legal conclusion unless you're just asking him to read the contract.

395

BY MR. TOMASZCZUK:
Q. I'll delete the reference to the contract in my question.
The DCS spent nuclear fuel information could be adjusted plus or minus 20 percent, right.
A. This is what I read in the contract, that's correct.
Q. Fine. Mr. Milner, were you surprised to see that reference in the contract?
A. That I did not recall it, yes.
Q. Does it change your view about the binding commitment reflected in the DCS?
MR. SHULTIS: Objection. Calls for a legal conclusion.
THE WITNESS: I guess in my interpretation of a commitment, not necessarily.
I think my interpretation of the delivery commitment was that it was a best estimate, good-faith commitment on the quantity and timing, and as I read this, neither the department nor the purchaser -- well, okay -- just the purchaser can adjust it up or down, so it's his option.
I guess I would interpret that to mean

396

it's less binding on the utility than it was on the department.
BY MR. TOMASZCZUK:
Q. There is a discussion, Mr. Milner, at the second page of the '95 APR and ACR which I want to direct your attention to.
And in particular, ask you to look at the paragraph that begins at the bottom of page 2, and it would appear to suggest that there was a delay in issuing the '93 ACR and APR, right?
A. Apparently so.
Q. And were you, do you have any knowledge as to why that '93 ACR and APR was delayed?
A. No, I don't.
Q. But in any event, the text goes on to indicate that that information was, is combined with this '95 APR/ACR, right?
A. That's correct.
Q. And it goes on to state that the department has decided to, in the interests of easing its administrative burdens, it has decided to issue a consolidated APR/ACR report for '94 and subsequent years?
A. Correct.

397

Q. And do you know, Mr. Milner, whether this was the, this document that has been marked as Milner Exhibit 51 was the last APR/ACR issued by the department?
A. I believe it was.
Q. Do you know why no APRs/ACRs have been issued after March of '95?
A. I don't offhand recall, no. I would presume nothing has changed, so it wasn't reissued.
Q. Now as of, certainly as of this point in time, March of '95, the department's efforts to site an MRS had stopped, right?
A. Basically, yes.
Q. Do you know whether the acceptance rates reflected in Table 1 at page 4 of this document assume an MRS or not?
A. I believe they do not.
Q. And what is the basis for that belief?
A. Just my general recollection at the time that we did not assume an MRS facility in the system.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:

398

Q. These rates are identical, are they not, to those contained at Table 2.1 in the 1991 ACR?
MR. SHULTIS: What exhibit is that?
MR. TOMASZCZUK: Exhibit 42.
(The witness reviewed the document.)
THE WITNESS: I'm sorry. What was the table number?
BY MR. TOMASZCZUK:
Q. The Table 2.1 in the '91 ACR at page 5.
A. Okay.
(The witness reviewed the document.)
THE WITNESS: Yes, they are the same.
BY MR. TOMASZCZUK:
Q. And indeed the text under Section 1.2 at page 3 of the '95 ACR/APR?
A. I'm sorry. Page what?
Q. Page 3, I'm at page 3 of Milner Exhibit 51, under Section 1.2.
A. Um-hm.
Q. And it says in the previous ACR in pertinent part the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a monitored

399

retrievable storage facility prior to repository operations?
A. Correct.
Q. So they're saying the previous ACR had the rates based on an MRS, right?
A. That's correct.
Q. And the next sentence goes on to say due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by years of operation of the system rather than by specific calendar years.
And we can see that if you compare the '91 ACR with the '95 ACR?
A. Correct.
Q. Right?
A. Correct.
Q. But isn't it true, Mr. Milner, that the '95 APR/ACR continued the practice of the previous ACR indeed going back to 1991 of basing a rate with an assumption that an MRS would be operating prior to repository operations?
MR. SHULTIS: Objection -- asked and answered.

400

THE WITNESS: I don't know if the rates are the same, but I'm not sure what the question really is.

MR. TOMASZCZUK: Can you read my question back?

THE REPORTER: Question: "But isn't it true, Mr. Milner, that the '95 APR/ACR continued the practice of the previous ACR indeed going back to 1991 of basing a rate with an assumption that an MRS would be operating prior to repository operations?"

MR. SHULTIS: Same objection; the document speaks for itself.

THE WITNESS: The rates are the same. The '95 document does not assume an MRS in the system.

MR. TOMASZCZUK: I'm sorry. Could you read that back for me?

THE REPORTER: Answer: "The rates are the same. The '95 document does not assume an MRS in the system."

BY MR. TOMASZCZUK:

Q. Can I direct your attention to the text at the top of page 4 of the '95 ACR/APR?

A. I stand corrected. It appears that it does.

Q. It appears that these rates are based on the existence of an MRS?

A. Apparently so.

MR. TOMASZCZUK: It's 6:20.

(Whereupon, at 6:20 p.m., the deposition was recessed, to reconvene at 9:00 a.m. May 3, 2002.)

---------------------------

RONALD A. MILNER

SUBSCRIBED AND SWORN to before me this----------

day of-------------------------------, 20------.

---------------------------

NOTARY PUBLIC

My commission expires:

CERTIFICATE OF NOTARY PUBLIC

I, Catherine S. Boyd, the Notary Public before whom the proceeding occurred, pages through , do hereby certify that the witness was duly sworn, that the testimony of said witness was taken by me and thereafter reduced to this typewritten transcript under my supervision, that said transcript is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to this proceeding, and further, that I am not a relative or an employee of any attorney or counsel employed by the parties thereto, or financially or otherwise interested in the outcome of the proceeding, or any action involved therewith.

Witness my signature and seal:

CATHERINE S. BOYD
Notary Public in and for
The Commonwealth of Virginia

My commission expires:
February 28, 2006

404

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY, : (98-126C)
CONNECTICUT YANKEE ATOMIC POWER COMPANY : (98-154
MAINE YANKEE ATOMIC POWER COMPANY : (98-474C)
FLORIDA POWER & LIGHT COMPANY : (98-483C)
NORTHERN STATES POWER COMPANY : (98-484C)
DUKE POWER, A Division of DUKE : ENERGY CORP. (98-48
INDIANA MICHIGAN POWER COMPANY : (98-486C)
SACRAMENTO MUNICIPAL UTILITY DISTRICT : (98-488C)
SOUTHERN NUCLEAR OPERATING COMPANY, : et al., (98-61
COMMONWEALTH EDISON COMPANY : (98-621C)
BOSTON EDISON COMPANY : (99-447C)
GPU NUCLEAR, INCORPORATED : (00-440C)
WISCONSIN ELECTRIC POWER COMPANY, : (00-697C)
POWER AUTHORITY OF THE STATE OF : NEW YORK (00-7
OMAHA PUBLIC POWER DISTRICT : (01-115C)
NEBRASKA PUBLIC POWER DISTRICT : (01-116C)
TENNESSEE VALLEY AUTHORITY : (01-249C)
Plaintiffs, : v. :
UNITED STATES OF AMERICA, : Defendant. :
- - - - - - - - - - - - - - - - - - - - X Washington, D.C.
Friday, May 3, 2002

Continued Deposition of RONALD MILNER, a witness herein, called for examination by counsel for



Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, 1650 Tysons Boulevard, McLean, Virginia, at 9:15 a.m., Friday, May 3, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority of the State of New York, Omaha Public Power District, and Nebraska Public Power District:

ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940

On behalf of the Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee:

PETER SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Ninth Floor
Washington, D. C. 20005-3305
(202) 898-5821



APPEARANCES (Continued):

On behalf of the Plaintiff Wisconsin Electric Power Company:

DONALD J. CARNEY, ESQ.
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D. C. 20005-2011
(202) 434-1690

On behalf of the Plaintiff Southern Nuclear Power:

RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of the Plaintiff Sacramento Municipal Utility District:

DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

APPEARANCES (Continued):

On behalf of the Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLP
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of the Defendant:
RUSSELL A. SHULTIS, ESQ.
HEIDE L. HERRMANN, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D. C. 20530
(202) 305-7561

407

C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| RONALD MILNER | PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, ET AL. | |
| By Mr. Tomaszczuk | | 410 |
| | EXAMINATION BY COUNSEL FOR PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT | |
| By Mr. Neslin | | 415 |
| | EXAMINATION BY COUNSEL FOR PLAINTIFF COMMONWEALTH EDISON | |
| Mr. Tompkins | | 524 |

Afternoon Session - Page 524

E X H I B I T S

| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| 52 | 427 |
| 53 | 440 |
| 54 | 449 |
| 55 | 455 |
| 56 | 460 |
| 57 | 470 |


408

E X H I B I T S (Continued)


| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| 58 | 472 |
| 59 | 477 |
| 60 | 480 |
| 61 | 491 |
| 62 | 497 |
| 63 | 505 |
| 64 | 510 |
| 65 | 515 |
| 66 | 526 |
| 67 | 530 |
| 68 | 532 |
| 69 | 535 |
| 70 | 541 |
| 71 | 548 |
| 72 | 552 |
| 73 | 570 |
| 74 | 577 |


* All exhibits retained by counsel.

409

P R O C E E D I N G S

Whereupon,
RONALD MILNER,
was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified further as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, ET AL.
BY MR. TOMASZCZUK:
Q. Mr. Milner, good morning.
A. Good morning.
Q. Same ground rules as applied to the previous day's deposition.
A. Correct. Okay.
Q. And I have just a few follow-up questions on the document that we were reviewing yesterday, the 1995 APR/ACR and I intend to ask you those questions and then I'm going to adjourn my questions and allow one of the other counsel, two of the other counsel who have travel commitments later today to proceed with their questions of you. And then after they've completed their questioning, then I will pick back up again and try and finish your deposition.
And because that is a slight variant from the procedures in the case, I would just ask counsel

410

for the government to indicate their consent to that, and let me also add that we appreciate the courtesy in that slight variant from the standard procedures.
MR. SHULTIS: You're very welcome and we have no problem with the change in the procedures.
BY MR. TOMASZCZUK:
Q. Mr. Milner, you recall, we had the March 1995, APR, ACR out late in the day yesterday?
A. I do.
Q. And if I could direct your attention to page 4 in the document. This is the table with the projected acceptance rate for spent nuclear fuel?
A. Correct.
Q. Do you know what that term nominal means in the title of this table?
A. I don't know for certain. I believe nominal refers to, in essence the number being a rounded number. You would intend to pick up a cask load from a particular utility rather than one assembly or two assemblies perhaps. You could easily, with that kind of a philosophy, end up with an odd number, 401.2 kind of number. So I think that nominal refers to simply a rounded number. I'm not certain of that but that's my understanding.
Q. This -- I'm sorry. Were you finished with

411

your answer?
A. Yes.
Q. This table as I understood your testimony yesterday reflects the, and adopts the MRS capacity limits, correct?
A. I believe it does, yes.
Q. And those MRS capacity limits are essentially imposed on the geologic repository here, is that right?
MR. SHULTIS: Objection as to characterization.
THE WITNESS: I can't answer -- I don't know.
BY MR. TOMASZCZUK:
Q. I mean, we know as of this point in time there was no MRS in the works, correct?
A. I believe we had determined yesterday that this particular APR ACR did assume an MRS.
Q. But did we also not determine that as of this point in time all work at DOE on an MRS siting had stopped?
A. That's correct.
Q. And isn't it true that as of this point in time the only work for a spent nuclear fuel storage facility was for a geologic repository?

412

A. On the part of the government -- on the part of DOE, that's correct.
Q. So doesn't this document reflect DOE's decision to impose the MRS capacity limits on its plans for a geologic repository?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I don't know.
BY MR. TOMASZCZUK:
Q. You don't know?
A. I don't know.
Q. Does that seem a fair inference from reading the document and understanding what was happening at the time?
MR. SHULTIS: Same objection.
THE WITNESS: To the best of my recollection there were discussions on pending legislation occurring at this time in the Congress relative to interim storage and I think this document attempted to reflect a potential for interim storage facility.
BY MR. TOMASZCZUK:
Q. An interim storage facility as reflected in your testimony yesterday would have required legislation as I understood it, right?

413

A. Correct.
Q. Do you know whether this document refers to such interim storage anywhere?
A. Well, if I recall correctly you had pointed me to some language that indicated it did. I believe that's page 3 and the top of page 4.
Q. And I'm sorry, what language were you referring to there, Mr. Milner? I didn't see a reference to interim storage but maybe I'm missing it.
A. I think the reference cites monitored retrievable storage.
Q. And in your view those concepts were the same, interim and monitored retrieval storage?
A. Yes.
Q. But interim storage would have required additional legislation whereas there was already legislation on the books with respect to an MRS, correct?
A. To site an MRS facility would have required additional legislation if it were to be sited prior to site approval of a repository.
Q. That would have required an amendment to the Nuclear Waste Policy Act amendments?
A. Correct.

414

A. No.
Q. I thought that you testified that you also considered the potential for brokering exchanges between utilities?
A. Yeah, as a concept, yes.
Q. What do you mean, what do you mean by as a concept?
A. We were -- well, looking at the concept of was it appropriate for the Department to do that sort of thing.
Q. What was your opinion?
A. My personal opinion was that it potentially could serve a useful purpose if the utilities desired such an activity.
Q. And what do you mean by useful purpose, what would that purpose be?
A. Well, certainly one purpose could have been if one utility that was needing to build a dry storage that was farther down in the queue, and another utility that had a higher priority that either didn't at that particular time or perhaps even life of plant storage, which I don't recall anybody was that high in the queue that they had life of plant, but you could preclude the need for constructing dry storage if such an exchange were

447

made.
Q. And that would be beneficial to the utilities?
A. Certainly to the utility that would have had to build the dry storage.
Q. Would it also be beneficial to the program?
A. Not necessarily, no.
Q. When you refer to brokering, what do you mean by that?
A. If we had done comparisons and saw a situation where, as I just described, that occurred, I guess one concept might have been that we would contacted both utilities and inquired as to their interest in exchange and trying to bring it about.
Q. Was this concept memorialized or documented in any way?
A. Not that I recall, no.
Q. Do you recall any documents discussing how this brokering might work?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: Not that I recall other than what we just looked at.
BY MR. NESLIN:

448

Q. Do you recall discussing this brokering concept with anyone else at DOE?
A. Not specifically. I probably discussed it with members of my staff.
Q. The same members of your staff that you identified previously?
A. Yes, including them.
(Milner Exhibit No. 54 was marked for identification.)
BY MR. NESLIN:
Q. Mr. Milner, you've been handed Exhibit 54 which is a March 31st, 1994 letter from James Blandford to you and an attachment consisting of a preliminary draft of a document entitled, DCS Exchange Review Criteria, First Set of Time Phased Review Criteria.
Are you familiar with this document?
A. I don't specifically recall it.
Q. Do you recall it generally?
MR. SHULTIS: Asked and answered.
THE WITNESS: No.
BY MR. NESLIN:
Q. Who was Mr. Blandford?
A. My recollection was that he was Mr. Vawter's predecessor in that position at the M&O.

449

Q. So he would have been your primary contact at the M&O?
A. Correct.
Q. You would have communicated with Mr. Blandford?
A. Correct.
Q. And do you know what Mr. Blandford's doing now?
A. I have no idea.
Q. Do you know where he is located today?
A. No, not at all.
Q. You see the first sentence of the letter states, The attached draft report presents the first set of time phased DCS exchange review criteria to be used by the Department and its contractors in reviewing DCS exchange requests submitted by purchasers.
Do you know, were such exchange review criteria ever adopted by the Department?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I don't recall them being adopted, no.
BY MR. NESLIN:
Q. Do you recall work being done by the

450

of spent fuel from other sites?
A. I believe it would. If over some period of time the Department were to -- according to the priority ranking, the ACR of 1995, since that combined both, one utility would expect to have X number of MTUs removed from their reactor within some specified time period. So if a portion of that allocation was given to another reactor, it would not be as timely.
Q. But would a portion of that allocation have to be given to another reactor if in fact the receipt rate exceeded the discharge rate?
A. Certainly.
Q. Why do you say that?
A. Any time there's a finite amount of fuel being accepted, and that finite amount of fuel is allocated amongst the utilities in the queue, whatever that number may be, if you reallocate that, a portion of that, to other utilities farther down in the queue, you're certainly impacting that.
Q. Would you disagree with criterion 3 here that granting priority can be shown to avoid the establishment of an otherwise unneeded reactor site storage facility?
A. I don't completely agree with that.



Q. And how do you disagree with it?
A. If a reactor is shutting down, presumably it has all of its spent fuel stored on site either in the pool or dry storage or a combination thereof. That storage exists when the reactor shuts down. Since no more fuel is being generated by the reactor I'm not sure what additional storage would be established.
Q. Would you agree that it would avoid the need to continue an otherwise unneeded reactor site storage facility?
A. I would.
Q. And the next item states that granting priority can be shown to be clearly cost effective for consumers from the standpoint of timely decommissioning?
A. I would agree with that.
Q. And the last item is that granting priority can be shown to support the national policy of efficient operation of the country's waste management system.
A. I can neither agree or disagree with that. I'm not quite sure what that means.
Q. You don't understand --
A. Correct.



Q. -- the criteria?
A. Correct.
Q. Do you know whether you or Mr. Barrett responded to this letter by Mr. Grube?
A. I don't recall for certain, I don't believe we did.
Q. Do you know whether the Department has ever adopted any criteria for making decisions on shutdown reactors?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I don't recall. I don't believe.
BY MR. NESLIN:
Q. You're not aware of it?
MR. SHULTIS: Same objection.
THE WITNESS: I'm not aware of it, no.
BY MR. NESLIN:
Q. Do you believe you would have been aware of it if such criteria had been developed?
A. I think I would have.
(Milner Exhibit No. 62 was marked for identification.)
BY MR. NESLIN:
Q. Mr. Milner, Exhibit 62 is a letter from



you to Dr. Andrew Kadak dated June 16th, 1994. Are you familiar with this letter?
A. I vaguely remember this letter, yes.
Q. Did you draft this letter?
A. I don't believe I did.
Q. But you would have reviewed and approved it?
A. Certainly.
Q. And the purpose of this letter was to respond to certain questions that Yankee Atomic had raised with the Department?
A. Apparently so, yes.
Q. Is that your recollection?
A. Yes.
Q. In the second paragraph of the first page, the first sentence reads that, "In designing the waste management system, the Department and the nuclear utilities share mutual goals of initiating federal acceptance of spent nuclear fuel as soon as possible and accommodating economic and physical situations confronting utilities such as yours."
What did you mean by mutual goals of initiating federal acceptance of spent nuclear fuel as soon as possible?
A. I think both the Federal Government, the

program and the utilities had a goal of taking fuel off the sites as soon as possible, to begin to take fuel off the sites as soon as possible.
Q. And what did you mean by accommodating economic and physical situations confronting utilities such as yours?
A. I think there was a goal to at least mitigate the economic situation relative to cost of storage, but I don't know what physical situation meant.
Q. What was meant by utilities such as yours? Were you referring to shutdown, utilities with shutdown reactors?
A. I don't recall. Likely that would have been the case.
Q. So you've testified that Department had an interest in mitigating the economic situation confronting such utilities. What do you mean by mitigating the economic situation for them?
A. Well, I don't know that -- hypothetically I don't know whether the condition of the economic situation could be totally alleviated, but potentially at least you could mitigate it.
Q. How?
A. Well, I guess one example I might think of

499

was that the Department entered into a cooperative program with the Rancho Seco reactor to demonstrate dry storage on site and assist that utility in off-loading at least a portion of its pool and storing it in multi-purpose canisters or what was hoped to be multi-purpose canisters on site. Potentially allowing the utility to decommission the pool.
Q. And how did the Department cooperate with Rancho Seco?
A. Providing funding.
Q. Do you recall what portion of the funding was provided for that project?
A. I don't recall. I believe the Department paid for two or three of the storage canisters and casks but I don't recall.
Q. And you say this would potentially allow the utility to decommission the fuel on site?
A. If you stored enough of the fuel, yeah.
Q. Was that an objective the Department had?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I think the Department desired to mitigate to the extent we could, you know.
BY MR. NESLIN:

500

Q. By mitigate do you mean allow timely decommissioning of these pools to the extent you could?
A. If that were possible, yes. I believe the Department was given specific authority to do that for SMUD. I believe the opinion of the Department's counsel was we did not have the authority to do that on a general basis.
Q. When you say the Department was given authority, what do you mean by that?
A. Legislation.
MR. SHULTIS: Objection, calls for a legal conclusion.
BY MR. NESLIN:
Q. You used the Rancho Seco as an example of how the Department might mitigate these effects, are there other examples that comes to mind here?
A. That was the only example because that one we were given authority to do.
Q. If I could ask you to turn to the first page of the attachment, Mr. Milner.
You see at the bottom half of this page, the top of the following page, you respond to a question which asks how are you going to grant priority acceptance of spent fuel from permanently

501

shutdown plants as permitted in our contract? Could you review what your response was?
A. Sure.
Q. Mr. Milner, the end of this response notes that article Roman V.E of the standard contract includes a provision allowing utilities to adjust their positions in the acceptance queue by exchanging acceptance allocations among themselves?
A. That's correct.
Q. And it then goes on to say that, "The Department encourages Yankee Atomic Electric Company to exercise their contractual right to exchange allocations with other interactive utilities." What did you mean by that?
A. What it says. We encouraged the Yankee Rowe or Yankee Atomic to exercise their rights under contract to enter into an exchange agreement with another utility.
Q. That was something that could address the problems facing a shutdown reactor?
A. Certainly.
Q. That by exchanging their place in the queue they could move up in the queue through the exchange provision?
A. Correct.

502

to reserve my right to reopen the deposition pending the resolution of certain outstanding discovery issues between the plaintiffs and the government regarding the government's obligation to produce additional documents in this case. So subject to that reservation, I'm done.

MR. SHULTIS: Thank you. Of course we oppose that. Thanks very much.

(Whereupon, at 1:00 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 2:00 p.m., this same day.)



AFTERNOON SESSION

(2:00 p.m.)

Whereupon,

RONALD MILNER,

the witness testifying at the time of recess, having been previously duly sworn, was further examined and testified further as follows:

EXAMINATION BY COUNSEL

FOR PLAINTIFF COMMONWEALTH EDISON

BY MR. TOMPKINS:

Q. Good afternoon, Mr. Milner. My name is Chris Tompkins. I'm from the law firm of Jenner & Block. We represent Commonwealth Edison. Before I start, I just wanted to state the same ground rules as before should apply, if you have any questions about any of my questions, something you don't understand, let me know.

And like I said, I'm hoping to keep this within two hours or so, so hopefully we can move along pretty quickly. You are currently the COO of OCWRM?

A. Correct.

Q. In that position, do you have a fairly good handle on the current state of the Nuclear Waste Fund?



A. I think I do.

Q. Okay. Just a ballpark estimate, could you tell me how much money utilities have paid into the fund since 1982?

A. Just as a ballpark, I think it's something in the neighborhood of 10, 11 billion.

Q. 10, 11 billion. Now, all these utilities paid this money to OCWRM on the expectation that they would receive a service, is that your perception?

A. That's my perception, yes.

Q. And that they would receive the service of removal of waste from their reactor sites?

A. Correct.

Q. Now, is it reasonable to assume that these utilities upon paying this fee have some sort of expectation that this waste will be taken away in a timely manner, and they won't have to expend further money to deal with this waste in addition to what they've already paid to the Federal Government?

A. I think they certainly had an expectation that the waste would be removed in a timely manner. I think some utilities would have had to assume that they would continue to pay storage costs in some form or another.

Q. Sure. But I mean in general, utilities



didn't enter into this thing expecting to have to spend additional billions to store waste that they're already paying the government to take away?

MR. SHULTIS: Objection, calls for speculation.

THE WITNESS: Yeah, I don't know what the utilities may have anticipated in terms of how much they would have to spend. They certainly prudently indicated they would spend some expenditures,.

BY MR. TOMPKINS:

Q. Well, they had to continue to store the waste through 1998, at the very least?

A. At the very least.

Q. I'd like to show you what we are marking Milner Exhibit 66.

(Milner Exhibit No. 66 was marked for identification.)

BY MR. TOMPKINS:

Q. Do you recognize this document?

A. Yes.

Q. Is this a statement that you prepared to the Minnesota State Legislature, back in 1994?

A. Without reading through it entirely --

Q. Sure.

A. -- just judging by the cover I think it

was probably a statement that I presented to them.
Q. Okay. So someone else would have prepared your remarks and then you would have gone out there and given them?
A. Correct.
Q. But they do represent your viewpoints at that time?
A. If it's in fact the statement that I presented, yes, it would have.
Q. Okay. I'd like to call your attention to the first page and the second paragraph of the first page, in fact the last sentence which reads, "The Secretary of Energy has stated the Department has at least a moral obligation to meet the 1998 waste acceptance date specified in the act." Did you deliver this statement to the Minnesota State Legislature?
A. I believe I did.
Q. Was this the Secretary of Energy's view of the Department's obligation at that time?
MR. SHULTIS: Objection, document speaks for itself.
THE WITNESS: I believe the Secretary at that time had made that statement.
BY MR. TOMPKINS:

527

Q. Had made that statement. Do you know what sort of discussion there had been within OCWRM about the Secretary's statement of the Department's moral obligation?
A. No, I don't recall.
Q. Did you share the view of the Secretary that the Department had a moral obligation to accept waste?
A. I did.
Q. You did, okay. Why at this time was this termed as a moral obligation versus a legal obligation?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: My opinion was that as was held by, I think, the program and I believe the Department that the Department's obligation under the contract was to begin accepting waste in 1998 conditioned upon the availability of a facility. But certainly given past program schedules and documents, I think we felt it was a moral obligation at least.
BY MR. TOMPKINS:
Q. I believe you testified yesterday that you joined the Department in around April of '84?
A. I joined the program.

528

Q. The program.
A. In April of '84.
Q. April of '84. At that time, were you aware of any efforts to modify the standard contract?
A. Yes, when I came on board there was a proposed modification of the standard contract.
Q. And do you know what that modification consisted of?
A. I don't recall, no.
Q. Don't recall. Do you know who was in charge of making the modification within the program?
MR. SHULTIS: Objection, assumes facts not in evidence.
THE WITNESS: Well, I believe there was a group involved in drafting the modification.
BY MR. TOMPKINS:
Q. Do you recall any of the individuals who were members of that group?
A. Let's see, from the program, I believe there was an individual by the name of George Chaconas.
Q. And what was his position at the time?
A. I don't recall what his title was but he was in essence the one managing -- although that's not a good turn, the standard contract at that time.

529

There was an individual from the procurement office, J. Cavanaugh. There was an individual from the office of general counsel, Elliot Winnick. And I believe there might have been an individual or two from the Energy Information Administration since they provided the data for the program.
Q. Do you recall who initiated this development of modifications, whether it was the utility industry or if it was the Department or the program?
A. That amendment had been initiated before I joined and no, I don't recall.
Q. Okay. I would like to show you what's being marked Milner Exhibit 67.
(Milner Exhibit No. 67 was marked for identification.)
MR. TOMPKINS: It was previously marked as an exhibit in Robert Morgan's deposition so just for consistency's sake we're using the same letter.
MR. SHULTIS: Okay.
BY MR. TOMPKINS:
Q. I'd like to give you a chance to read over the letter before I ask any questions on it.
Now, in the second paragraph, about halfway through, there's a sentence that says, "To

530

rate modifications which were being discussed at the time?
MR. SHULTIS: Objection, calls for speculation. Assumes facts not in evidence.
THE WITNESS: I don't know.
BY MR. TOMPKINS:
Q. You don't know. Certainly this does indicate that someone within the program was looking at that issue, though?
MR. SHULTIS: Objection, mischaracterizes the document. Calls for speculation.
THE WITNESS: To me it also indicates whoever M.R. Shay was wrote that.
BY MR. TOMPKINS:
Q. I'd like to talk to you about page 030-0039 and the following pages. Do you have any understanding of what they're referring to when M.R. Shay states, Preclude tran shipments between reactors?
A. To me the term tran shipment between reactors means just that, that one reactor may ship some of its spent fuel to the storage pool at another one of its reactors.
Q. Do you know what the reference is to 1/4 core and 1/3 core, would that be a reference to full

551

core reserve capacity in the pool, or --
A. I don't know.
Q. We previously marked -- I believe it was Wednesday we previously marked the 1987 mission plan amendment or actually one of the appendixes to it. This is also an excerpt of that same mission plan amendment. It's just a portion of the text rather than the appendix we looked at previously.
(Milner Exhibit No. 72 was marked for identification.)
BY MR. TOMPKINS:
Q. I believe you testified yesterday that you had some involvement in preparing this mission plan amendment?
A. I believe I would have, yeah.
Q. Okay. I'd like to call your attention to page 6 of this excerpt. The third full paragraph under extension of the schedule for the first repository, this indicates that at this time the program in OCWRM was projecting a delay in start of repository operations from 1998 to 2003; is that correct?
A. That's what's indicated here, yes.
Q. Okay. It indicates that this five-year extension is necessary for technical planning in the

552

program?
A. I don't see where it refers to technical planning.
Q. Okay.
A. It seems to indicate that the schedule was certainly due to budget reductions.
Q. Are you aware of any other reasons why the schedule would have slipped at this point?
MR. SHULTIS: Objection, mischaracterizes the document.
THE WITNESS: No, not offhand, I don't recall.
BY MR. TOMPKINS:
Q. Also in this same paragraph this amendment indicates as explained later, the DOE could nonetheless start accepting waste in 1998 in an MRS facility. Was this consistent with DOE planning at the time in 1987?
A. I believe it was.
Q. So they were going to operate an MRS from 1998 until about 2003 when a repository opened?
A. I think the intention was that the MRS would continue operating beyond 2003.
Q. In fact the MRS was intended to be an integral part of the whole waste acceptance system?

553

A. Yes.
Q. It wasn't intended to operate alone or as a permanent place for storage in disposal?
A. No.
Q. I'd like to talk to you about page 12 now, in particular the last full paragraph or actually the last paragraph which goes on to the next page under the heading MRS facility. It stays that on March 31st, 1987 the DOE submitted to Congress a proposal for construction of an MRS facility. To allay concerns that the MRS facility could become a substitute for a permanent repository whose development remains the highest priority, DOE asked Congress to limit the MRS storage capacity to 15,000 metric tons of uranium and to specify that the MRS cannot start receiving fuel until a construction authorization for the repository has been received from the Nuclear Regulatory Commission.
Is this an accurate statement that the DOE was the organization that requested the linkages between the repository and the MRS?
MR. SHULTIS: Objection, the document speaks for itself.
THE WITNESS: Certainly the DOE was the entity that requested Congress, my recollection of

554

the origins of those linkages were at that time, DOE was developing a site specific proposal for an MRS facility, actually at the old Clinch River Breeder reactor site at Oak Ridge, and I believe the local community had requested the Department insert those linkages.
BY MR. TOMPKINS:
Q. The capacity limit of 15,000 metric tons, do you know where the Department would have come up with that number?
A. I believe that was the request or recommendation of the local community at the time.
Q. At the time as we saw in the previous page this was assuming that the MRS would operate for only about five years prior to being able to move additional waste from the MRS and start feeding into the repository?
A. It was intended to operate for five years before it began shipping waste and it certainly was going to operate longer than five years.
Q. But over the course of that five years, would this limit on the capacity of 15,000 metric tons have been a significant restraint on the ability of the Department to operate this facility?
A. It certainly would have been a constraint.

555

15,000, I believe, was the limit wherein the capacity could never exceed that of the MRS.
Q. However, if divided over the course of five years, this capacity doesn't exceed amounts that the DOE had previously projected that it was going to be receiving on an annual basis?
A. That's correct.
Q. In fact that would equal exactly 3,000 metric tons a year which had previously been the steady state operation under previous projections?
A. That's correct. Whether that was a mathematical coincidence, I don't know.
Q. You don't know. If you could, I'd like you to look again at Milner Exhibit 20, which is the 1989 reassessment.
I'd like to talk about pages romanette viii and x, under the heading Monitor Retrievable Storage.
Now this reassessment states that the primary objective is still to develop a licensed geological repository for permanent disposal. Is that correct?
A. That's correct.
Q. So the repository was still central in OCWRM's planning and still was not intending to use

556

an MRS as a location for permanent disposal?
A. That's correct.
Q. Moving from the bottom of page 9 to 10 it says that "the DOE cannot meet the anticipated schedule set forth in the act for repository by 1998. Furthermore the current linkages between the repository and the MRS program make it impossible for the DOE to accept waste in an MRS facility on a schedule that is independent from that of the repository. Therefore, the DOE plans to work with Congress to modify the current linkages between the repository and the MRS facility, to embark on aggressive program, develop an integrated MRS facility for spent fuel."
The Department was now proposing to modify half of the linkages between the repository and the MRS, is that what this is indicating?
A. That's what it's indicating, yes.
Q. Okay. Was actually changing the construction part of the schedule, so that construction and siting of an MRS could happen independent of the repository licensing and construction?
A. Correct. That was what was being indicated here.

557

Q. Turning to page 11 and 12, in particular the first full paragraph in the top of page 12, this indicates that the linkages weren't changed. The repository wouldn't open until, rather the MRS, I'm sorry I misspoke, would not be able to open until 2007, three years prior to the start of operations of a repository.
Is that true?
A. That's what's stated here, yes.
Q. And you agree with that, that without modifications of the linkages the MRS couldn't open until 2007?
A. Yeah, I would have agreed that that was pretty unlikely.
Q. So the Department's plan at this time was to accept waste in 1998 through operation of an MRS, but it would expand the schedule over which the MRS would operate from the five years before the repository started operation it was projected in 1987 to 12 years at this time?
A. Yeah, it would have been 12 years if an MRS had started operation in '98.
Q. And it would continue to operate obviously with the repository after that?
A. Yeah.

558

Q. I'd like to look back at Milner Exhibit 42. And the acceptance rates that are in table 2.1.
A. Do you have a page number?
Q. Yeah, it's on page 5, sorry.
Now, this rate is significantly different than prior projections that you've looked at over the course of this deposition in the last two days?
MR. SHULTIS: Objection as to characterization.
THE WITNESS: Significantly different to some, identical to others.
BY MR. TOMPKINS:
Q. Well, the previous rates that were in various documents showed steady state operation upwards of 3,000 metric tons a year?
MR. SHULTIS: Objection, vague.
BY MR. TOMPKINS:
Q. Is that correct?
A. I believe most previous documents, all previous documents, I guess, showed a steady state of 3,000.
Q. And this rate is?
A. I don't know that this table indicates what the steady state was, I don't know if it carries through to steady state.

559

Q. Over the course of this roughly 10-year period however, it only ramps up to 900 metric tons?
A. That's correct.
Q. Are you aware of the basis for this rate?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: No.
BY MR. TOMPKINS:
Q. Are you aware of whether or not the only reason for the ramp-up at this rate is the capacity restrictions on the MRS in the 1987 amendments to the Nuclear Waste Policy Act?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I'm aware that the capacity limitations on the MRS were certainly a factor.
BY MR. TOMPKINS:
Q. Is there any other reason why the MRS would have to operate at a rate as low as 900 metric tons?
MR. SHULTIS: Objection, calls for speculation. Asked and answered.
THE WITNESS: No, I don't know of any other reason.
BY MR. TOMPKINS:
Q. I'd like to go back to Milner Exhibit 34, which is the December 1990 preliminary estimates for the total system costs of the restructured program. In particular, I'd like to talk to you about page 10. I'm correct that you previously testified that you would have been involved in development of this report, at least in a supervisory level?

560

MR. SHULTIS: I'm sorry, could you --
THE REPORTER: "Question: I'd like to go back to Milner Exhibit 34, which is the December 1990 preliminary estimates for the total system costs of the restructured program. In particular, I'd like to talk to you about page 10. I'm correct that you previously testified that you would have been involved in development of this report, at least in a supervisory level?"
THE WITNESS: I believe that's true.
BY MR. TOMPKINS:
Q. The last sentence of the second to last paragraph here states, "This analysis continues to assume, however, that the capacity limits on the MRS facility of 10,000 metric tons prior to the start of operations at the repository and 15,000 metric tons hereafter" or actually "thereafter," I'm sorry -- "as imposed by the amendments act remain in effect."
These are the same limits that we had previously been talking about in the amendments act?

561

A. Yes.
Q. Okay. In the next paragraph, it stays that due to the fact that the spent fuel acceptance at the MRS facility begins 12 years earlier than the repository, the MRS facility is forced to operate below its design acceptance rate until the repository has ramped up to its full design acceptance rate in order to remain within the capacity limits imposed by the amendment act.
Does this indicate that the MRS facility was actually designed to have a higher capacity than it could accept based on the amendments act?
A. In my opinion, that's what it indicates.
Q. So in reality the amendments are the sole reason for having a lower rate during this 12-year period accepted at an MRS?
MR. SHULTIS: Objection, mischaracterizes -- assumes facts not in evidence and I think mischaracterizes prior testimony.
THE WITNESS: I can't think of other reasons offhand.
MR. TOMPKINS: We've been going a little bit more than an hour. Why don't we take a 10-minute break or so.

562

(Recess.)
BY MR. TOMPKINS:
Q. Mr. Milner, welcome back from the break. Just one final question on this total system cost document, I'd like to look at appendix A, table A-1.
MR. SHULTIS: This is number 34.
MR. TOMPKINS: Yes, Milner Exhibit 34.
BY MR. TOMPKINS:
Q. I noticed that the acceptance schedule here continues beyond 2010 and then ramps up to approximately 3,000 by -- 3,000 MTU by 2015?
A. Correct.
Q. Am I correct in assuming that the Department of Energy was not intending to accept waste until only 2010 and then reconfigure their program somehow and not accept waste after that?
A. I'm not sure I understand that question.
Q. Well, even under these rates which are projected in this document and which show up in some of the annual capacity reports in the mid '90s, the Department wasn't intending to start acceptance in 1998 and accept only for 10 years, was it?
A. In total?
Q. Yes, in total?
A. No.

563

Q. In fact, under its plans in the early '90s, it planned on continuing to accept waste subsequent to 2010 and beyond and at that time have a repository in place to accept waste?
A. Correct.
Q. And in fact once the repository was operating in addition to the MRS, the rates would increase even further beyond the 900 rate which was in place during the 1998 to 2009 period but ramp up to 3,000 MTU a year?
A. That's correct.
Q. Okay, thank you. Mr. Milner, I know you moved from transportation into the budget related offices back and forth a little bit during the '90s, but are you aware of whether or not utilities have submitted DCS forms during the '90s and those have been approved?
A. I'm aware that they did and some were approved, yes.
Q. Some were approved. All those DCS submissions were approved under the assumption that we were operating under a schedule where waste acceptance would start in 1998, is that correct?
MR. SHULTIS: Objection, calls for speculation and probably a legal conclusion.

564

THE WITNESS: I believe that they assumed an MRS would begin operation in '98.
BY MR. TOMPKINS:
Q. Now, it's not. OCWRM and the Department isn't anticipating any acceptance will begin until at least 2010, is that correct?
A. That's correct.
Q. And at that time it's going to be in a repository and there's no MRS that's part of a system?
A. At the current time, that's correct.
Q. At the current time. Do you know what's going to happen to the DCS forms that have already been approved?
MR. SHULTIS: Objection, calls for a legal conclusion. Speculation.
THE WITNESS: I don't understand what you mean by what will happen to.
BY MR. TOMPKINS:
Q. Well, if a utility submitted its first DCS form in 1992 it would have submitted it on the basis of an allocation that they were expecting in 1998; isn't that correct?
A. That's correct.
MR. SHULTIS: Objection, calls for

565

speculation.
BY MR. TOMPKINS:
Q. And that would have been at this 900 rate that was anticipated for the MRS constrained operations?
MR. SHULTIS: Same objection.
THE WITNESS: I believe in the first year the rate was 400.
BY MR. TOMPKINS:
Q. 400. So any utilities allocations will necessarily have changed for the year 2010, when the repository operations commence. Or many of them will have. I should rephrase, let me not say all, because first of all the rate will be higher at the repository and the acceptance schedules have changed?
MR. SHULTIS: Objection, calls for speculation.
THE WITNESS: I don't understand the question.
BY MR. TOMPKINS:
Q. I don't think I understand it myself so I'll rephrase it a little bit.
If a utility such as Commonwealth Edison had an allocation under 400 metric ton rate for 1998, under the planning for the MRS operation in 1998,

566

would that allocation be different for operations
that begin in 2010 but at a 1,200 rate?
MR. SHULTIS: Objection, calls for a legal conclusion. Speculation.
THE WITNESS: I'm still not following the question. If you're asking if a utility had an allocation in year one of operation, and that allocation was based on year one being 1998, and the year 2010 being year 12, currently 2010 would be year one and it would be the allocation that would have existed for 1998.
BY MR. TOMPKINS:
Q. I'm actually more interested in the fact that the rate would have changed in between those two periods and that there would have been a 400 rate under the planning that was anticipated for 1998 and that the rate would be somewhere around 1,200 for the year 2010. So the fact that the rate was higher would mean all the utilities' allocations would change?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.
THE WITNESS: If I'm understanding the question correctly, the allocation in 2010 which currently is year one of operation would be different

567

than the allocation for 2010 that would have existed for a 1989 year one start of operation.
BY MR. TOMPKINS:
Q. And that's because the program would be accepting more waste in year one under one plan than versus the other?
MR. SHULTIS: Same objections.
THE WITNESS: I don't --
BY MR. TOMPKINS:
Q. It's been a long couple days, I think.
A. I believe year one in 1990, that year one was 400 MTUs, and currently year one is 400 MTUs.
Q. You mean under planning for 2010 year one's still going to be 400 MTUs?
A. Yes.
Q. It is. I stand corrected. But over the course of later years the current projections call for a ramp-up to 3,000 metric tons versus just 900 over the first five years of the program?
A. Yes.
MR. SHULTIS: Objection.
THE WITNESS: This schedules call for a ramp-up to a steady state of 3,000 MTUs.
BY MR. TOMPKINS:
Q. So in the later years, under prior

568

planning which was occurring in 1992 when the rate was 900, the rate would be 3,000 in actuality under current OCWRM plans for acceptance?
MR. SHULTIS: Objection, vague.
THE WITNESS: And not understandable. I'm sorry.
BY MR. TOMPKINS:
Q. Well, you testified that under current planning by 2014, which would be the fourth year of the repository, the rate will ramp up to 3,000 metric tons.
A. Yes, that's what's indicated here.
Q. Okay?
MR. SHULTIS: I'm sorry, were you asking about current planning?
MR. TOMPKINS: Yes.
THE WITNESS: Oh.
MR. SHULTIS: Okay. Do you want to answer again? Do you want to ask that question again, Chris? Because when Mr. Milner was responding he was looking at the 1990 TSLCC.
MR. TOMPKINS: Okay. I actually, just to make this easier.
THE WITNESS: I was -- you were asking me in the previous question a question on this document.

569

MR. TOMPKINS: No, no, I'm sorry. Well, that explains all the confusion because it really has been a long week. I'd like to mark this as Milner Exhibit 73.
(Milner Exhibit No. 73 was marked for identification.)
BY MR. TOMPKINS:
Q. This is the total system life cycle cost report which was issued in May of 2001, is that correct?
A. Correct.
Q. Would you have been involved in preparing this report or overseeing its preparation?
A. I would have -- no, I would have concurred in it before it was finally released.
Q. This is the most recent Total System Life Cycle Cost. I understand there was a letter update in 2002, but for the actual Fuller report this is the last one that's been issued by the Department?
A. I believe that's true.
Q. I'd like to refer your attention to page 4-14. Table 4-1 represents some acceptance rates. Are these the acceptance rates that the Department is currently forecasting for waste acceptance beginning in 2010?

570

MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I believe these are the Department's current goals for waste acceptance.
BY MR. TOMPKINS:
Q. Under this plan, the Department will be accepting 3,000 metric tons of waste per year beginning in 2014, am I reading the chart correctly?
A. That's certainly what's indicated, yes.
Q. And that would be the fourth year of operation of the program?
A. Yes. That would be the fourth year of the operation of the repository, not the program, yeah. Actually it is the fifth year.
Q. Fifth year, okay.
A. Engineers can't do math.
Q. Lawyers can't either. If you look back at the prior exhibit, Milner Exhibit 34, we were just discussing, this is the acceptance schedule that was being anticipated when the Department thought that they were going to have an MRS in place by 1998?
MR. SHULTIS: Objection to characterization. Also Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I believe that's the case.
BY MR. TOMPKINS:

571

Q. Okay. In this schedule, the fifth year of operation which would be 2003, it projects 900 metric tons would be accepted in that year?
A. That's correct.
Q. That's correct, okay. And utilities in the early '90s, when they submitted DCS forms, submitted forms based on this schedule, or one roughly like it?
A. I believe that's correct.
Q. Okay. And so they would have submitted DCS forms for the fifth year assuming a 900 metric ton rate?
A. That's correct.
MR. SHULTIS: Objection, calls for speculation.
THE WITNESS: So now in actuality, if current projections hold, instead of -- instead of receiving only 900 metric tons the Department will be receiving 3,000 metric tons.
MR. SHULTIS: Objection. I'm sorry; go ahead.
THE WITNESS: State that again. Or ask that again.
BY MR. TOMPKINS:
Q. Sure, under prior planning with the MRS

572

facility that started in 1998, a utility would have submitted a DCS form assuming a 900 ton metric rate?
A. For the fifth year of operation.
Q. For the fifth year of operations, right?
A. Correct.
Q. Now, in reality, there's actually going to be, in the fifth year of actual operations as currently projected, beginning in 2010 there's going to be 3,000 metric tons that are accepted.
MR. SHULTIS: Objection, mischaracter -- assumes facts not in evidence and Chris, I'm having a hard time with your question insofar as you're asking about in reality and about projections. They're two different things. Can you help me out there?
BY MR. TOMPKINS:
Q. Sure. Current projections for forecasts and what utilities are planning, or rather, the Department is currently planning on receiving in the year 2010 is 3,000 metric tons for the fifth year of operation of the repository. This 3,000 metric tons is higher in the fifth year of operations than under prior plans?
A. Correct.
Q. So because of this difference, when the

573

Department goes and prepares an APR, all the allocations for the fifth year will be different than they were originally in the '90s?
A. Yes, okay.
Q. Okay. So a utility that submitted a DCS for an allocation based on the rates in the early '90s may have a different allocation under current forecasts?
MR. SHULTIS: Calls for speculation.
THE WITNESS: I would assume, yes.
BY MR. TOMPKINS:
Q. Okay. Do you know what the Department is, or the program OCWRM is currently planning on doing about the fact that the allocations may be different with the DCS forms? Are they going to go back and have utilities prepare a new DCS form based on these rates?
A. Actually we've not addressed that yet.
MR. SHULTIS: Objection.
BY MR. TOMPKINS:
Q. Haven't addressed it. Would it be reasonable to assume that utilities will have that option?
MR. SHULTIS: Objection, calls for speculation. Mr. Milner's not a 30(b)(6) witness.

574

THE WITNESS: The Department simply has not addressed that yet. We decided we should probably focus our efforts on getting a site first and then work out the details.

BY MR. TOMPKINS:

Q. I'd like to turn your attention back to Milner Exhibit 43 which are the DCS instructions.

Under the general instructions which start on page one and go on page two, item 7C, we had discussed this yesterday but I just want to now apply this to the situation we've just been talking about. It states that in the event that such circumstances change, all DCS's previously approved by DOE may need to be reevaluated by DOE and the purchaser.

Would this type of change of allocation be the type of event that may implicate this instruction?

MR. SHULTIS: Objection, calls for a legal conclusion and also speculation.

THE WITNESS: In my opinion it would.

BY MR. TOMPKINS:

Q. One final question on this DCS form and I believe you testified about this earlier too. Instruction 7B states that once a purchaser has an allocation, any SNF owned by the purchaser can be designated for delivery against the allocation. Is

575

that saying that a utility does not have to deliver the fuel that its allocation was based on?

MR. SHULTIS: Objection, calls for a legal conclusion. The document speaks for itself.

THE WITNESS: In my opinion that's stating that it does not have to deliver the fuel that gave it its place in the queue.

BY MR. TOMPKINS:

Q. Now once it allocates fuel on a DCS form or a range of fuel, as the case may be, what's your understanding of which fuel it has to actually deliver after the DCS form has been approved?

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: Yeah. I don't think it specifies what fuel, as long as it's over five years old.

BY MR. TOMPKINS:

Q. Okay. Thank you. So a utility could deliver any fuel over five years when it came to actually accepting that fuel, even if it designated different fuel on the DCS?

A. That's my understanding.

Q. That's your understanding. If that's the case, I think I only have one last exhibit to go over with you, Mr. Milner.

576

I'd like to mark this document as Milner Exhibit 74.

(Milner Exhibit No. 74 was marked for identification.)

BY MR. TOMPKINS:

Q. This is a letter by Robert Bauer, is this the same Robert Bauer we've been discussing earlier?

A. Yes.

Q. Were you involved in the preparation of this letter or had you seen it before?

A. I don't recall.

Q. The last sentence of the second paragraph states that, "Failed fuel canned in a container provided by or approved by the Department also will be subject to the same scheduling procedures as other spent fuel." Is Mr. Bauer saying in this letter that once a failed fuel, once a failed fuel assembly is placed in an approved container, it will be treated just like standard fuel?

MR. SHULTIS: Objection, calls for a legal conclusion, also asks for speculation.

THE WITNESS: Let me read the context here.

MR. TOMPKINS: Sure.

THE WITNESS: It appears that it does, however I seem to recall a provision in the contract

577

that failed fuel was considered nonstandard fuel which may have a different scheduling.

BY MR. TOMPKINS:

Q. Do you have any knowledge of whether this statement is consistent with current OCWRM planning?

MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.

THE WITNESS: I don't recall any current discussions about failed fuel treatment.

MR. TOMPKINS: I think that's all I have, subject to the right to continue the deposition with Mr. Milner pending resolution of discovery issues.

MR. SHULTIS: Sure. We continue to object to those. I think we're done then for the day.

(Whereupon, at 4:00 p.m., the taking of the instant deposition ceased.)

______________________________
Signature of the Witness

SUBSCRIBED AND SWORN to before me this _______ day of _______________, 20_____.

______________________________
Notary Public

My Commission Expires:________________

579

578

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER ) Volume IV
COMPANY ) Washington, D.C.
(98-154C)(Merow, S.J.) ) Tuesday
MAINE YANKEE ATOMIC POWER COMPANY) May 7, 2002
(98-474C)(Merow, S.J.), et al., )
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - -)

Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:30 a.m., Tuesday, May 7, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

579

APPEARANCES:

On behalf of Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority for the State of New York, Omaha Public Power District, Nebraska Public Power District, and PSEG Nuclear L.L.C.:

ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7612

On behalf of Plaintiffs Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company:

PETER J. SKALABAN JR., ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

580

APPEARANCES CONTINUED:

On behalf of Plaintiff Sacramento Municipal Utility District:

TIMOTHY R. MacDONALD, ESQ.
(Appearing in the AM session only.)
ARNOLD & PORTER
370 17th Street, Suite 4500
Denver, CO 80202-1370
(303) 863-2334

On behalf of Plaintiff Southern Nuclear Operating Company, et al.:

RONALD A. SCHECHTER, ESQ.
ARNOLD & PORTER
555 12th Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000

581

APPEARANCES CONTINUED:

On behalf of Plaintiff Wisconsin Electric Power Company:

SUZETTE W. DERREVERE, ESQ.
(Appearing in the AM session only.)
JENNIFER MacLEAN, ESQ.
(Appearing in the PM session only.)
PERKINS COIE LLP
607 14th Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1690

On behalf of Defendant:

RUSSELL A. SHULTIS, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
Federal Claims Section
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561

582

C O N T E N T S


WITNESS EXAMINATION PAGE NO.
RONALD A. MILNER
By Mr. Tomaszczuk 586
By Mr. Schecter 689
Afternoon Session 654


E X H I B I T S


MILNER EXHIBIT NO. PAGE NO.
75 Memorandum, Nos. DB0000124-125 587
76 Letter, and attachments, Nos. 0379-399 590
77 Letter, and attachments, Nos. 0292317 602
78 Federal Register, pages 21793-21798 604
79 Other Wastes/Nuclear Materials: A. General Overview, Nos. YMP-012-1493-494 610
80 Memorandum, and attachments, Nos. HQR-057-1493-569 616
81 Analysis of the Total System Life Cycle Cost of the


583

E X H I B I T S C O N T I N U E D


MILNER EXHIBIT NO. PAGE NO.
Civilian Radioactive Waste Management Program, Nos. HQR-025-5075-139 628
82 Nuclear Waste Fund Fee Adequacy, Nos. PA-176267-282 634
83 1996 Acceptance Priority Ranking and Annual Capacity Report, September 1997, Nos. CTR-027-0001-085 638
84 Program Plan, Revision 2, July 1998, Nos. YMP-001-0885-945 641
85 Civilian Radioactive Waste Management System Total System Description, Revision 01, October 1998, Nos. PA-206300-335 646
86 Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program, December 1998, Nos. HQR-036-0006-086 651
87 Nuclear Waste Fund Fee Adequacy: An Assessment, December 1998, Nos. PA-195781-821 654


584

E X H I B I T S C O N T I N U E D


MILNER EXHIBIT NO. PAGE NO.
88 Program Plan, Revision 3, February 2000, Nos. HQR-043-3798-882 658
89 Nuclear Waste Fund Fee Adequacy: An Assessment, May 2001 666
90 Nuclear Waste, Technical, Schedule, and Cost Uncertainties of the Yucca Mountain Repository Project 670
91 Total System Life Cycle Cost for Site Recommendation Letter Report, February 2002 674
92 Letter, 2-14-02
93 Statement of Lake H. Barrett, 3-14-02 678
94 Certification of Ronald Milner, 4-18-02, and attachment 681
95 Independent Cost Estimate (ICE) Review, January 2001 683


585

P R O C E E D I N G S

Whereupon,

RONALD A. MILNER

was called as a witness by counsel for Plaintiffs, and, having been duly sworn by the Notary Public, was examined and testified as follows:

FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES PC COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMI BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY FOR THE STATE OF NEW YORK, OMAHA PUBLI POWER DISTRICT, NEBRASKA PUBLIC POWER DISTRICT, AN PSEG NUCLEAR L.L.C.

BY MR. TOMASZCZUK:

Q. Mr. Milner, good morning.
A. Good morning.
Q. Nice to see you begin. Thanks for coming back.
A. You too.
Q. I have some additional questions to ask you. I would expect to get through those this morning. I have some additional documents I want to ask you about.
Same ground rules as applied to the other day's questioning. If you have any questions or

586

don't understand my question, let me know.
A. Okay.
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner 75 a memorandum for director, RW 1, from Samuel Russo, subject, approve for publication the attached 1994 APR and ACR.
(Milner Exhibit No. 75 was marked for identification.)
BY MR. TOMASZCZUK:
Q. And Mr. Milner, do you recall this document?
A. Not specifically, I don't, no.
Q. Do you see your -- what appear to be your initials and your name in the column on the second page?
A. Right, concurrence chain.
Q. Right, concurrence chain. Thank you.
This appears to be a memorandum which sought approval from the director for publication of the APR/ACR; is that right?
A. Yes, m-hm.
Q. And I believe that it had attached to it some version of the APR/ACR, which was ultimately published in March of 1995?



A. Apparently so, yeah.
Q. And I believe that was Milner Exhibit 51. You can get that in front of you if you'd like.
And let me just say for the record, we're in a different locale this morning, but I believe all of the exhibits that have been previously marked are here and are present and available if you may need to refer to them in any of your testimony today.
My question to you is, there appears to be the notation handwritten next to your name, with comment.
Do you see that?
A. I do, yeah.
Q. Is that your handwriting, sir?
A. Actually very difficult to tell. I would assume so, but it doesn't look exactly like mine.
(Mr. MacDonald entered the room.)
BY MR. TOMASZCZUK:
Q. Do you know what comment you made on a draft of the APR/ACR that was appended to this document?
A. I have no idea.
Q. You agree that this notation appears to reflect that you had some comment on the draft?
A. I think it does, yes.



Q. But no present recollection as to what you had to say?
A. I don't recall. It could have been very minor. I don't know.
Q. Would there be some written record of what your comment was?
A. Typically the way the process works is, when the document is circulated and there's a comment, it's unlikely that that comment had been retained in the handwritten form, but I don't know for sure.
Q. Did Mr. Zabransky work for you at this point in time?
A. He did not, no.
Q. Do you recall, Mr. Milner, what your position was at or about the time you would have commented on this draft APR/ACR?
A. Judging by the code indication there, I -- it's likely I would have been director of the office of program management integration.
Q. And that's suggested to you by the designation, RW 30?
A. Correct.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner Exhibit 76 a series of DCS forms and



related correspondence between the department of energy and Northern States Power Company.
BY MR. TOMASZCZUK:
Q. And I can represent that these documents were appended to one of the government's motions for summary judgment in this case, and I've put them together as one document just for purposes of facilitating your review. I have some questions for you about this packet.
(Milner Exhibit No. 76 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, do you recall seeing any of these documents before today?
A. I've certainly seen the DCSs before, and I don't recall these specific ones.
Q. You've certainly seen the generic DCS form but don't recall seeing the specific Northern States DCS forms?
A. Correct.
Q. Would you have seen these at or about the time they were submitted by Northern States Power Company?
A. Likely I would not have, no.

Q. And why is that?
A. In at least the later ones in the '97, '98 time frame, I believe at that point in time, I was acting deputy director, so -- of the program, so that would have been handled by an office below that level.
Q. It would have been below your radar screen, so to speak?
A. Correct.
Q. What about the early ones that were recently submitted and approved in the 19- --
A. Potentially earlier.
Q. -- '95?
These fairly reflect, do they not, a series of DCS forms and some approvals of those by the department of energy?
A. Yes.
MR. SHULTIS: Objection as to characterization.
BY MR. TOMASZCZUK:
Q. You can disagree with me if you'd like, sir.
Is that a fair characterization?
MR. SHULTIS: Same objection.
A. I believe that they were reflecting

591

approval of DCSs, yes.
BY MR. TOMASZCZUK:
Q. Right. Can I direct your attention to the document with the Bates page number 0385 on it about a third of the way through. And if I could direct your attention, Mr. Milner, to the double asterisks on the right-hand side of the page and the notation that appears there.
A. Yes.
Q. Do you know who placed that language on this DCS form?
A. Specific person, no, I don't know who that would have been.
Q. Do you recall any discussions with any OCRWM personnel concerning this language?
A. In general terms, yes. It certainly was the program office opinion that delivery date was conditioned upon having an operational facility, be it a storage or a depository.
Q. Do you know who drafted this language?
A. Specifically, no, I don't.
Q. Similar language appears in the cover letter on the previous page, 0384, the bottom of the first paragraph.
A. Yes.

592

Q. And do you know whether Ms. Tomasoni drafted this language, or do you have reason to believe someone else drafted it?
MR. SHULTIS: Objection, asked and answered.
A. I don't know who drafted this specific language.
BY MR. TOMASZCZUK:
Q. The language was drafted by somebody at DOE, was it not?
A. I think that's safe to assume.
Q. Can I direct your attention, Mr. Milner, to a little further in the packet, Bates page 390. And I want to direct your attention to the bottom section, section 4.0, notification of DOE action.
Do you see that?
A. I do.
Q. All right. And it appears to me that this DCS was originally approved by both the technical representative and the contracting officer. Correct?
MR. SHULTIS: Objection, calls for speculation.
A. Difficult to tell from here. It would appear that the contracting officer's name has been crossed out, and I can't tell whether the "void"

593

written there reflects the entire line or the date.
BY MR. TOMASZCZUK:
Q. Well, does it appear to you from looking at the document that Ms. Tomasoni originally approved this DCS on January 14, 1997?
MR. SHULTIS: Same objection.
A. Difficult to tell. It appears that that may have been the case.
BY MR. TOMASZCZUK:
Q. And that Mr. Zabransky had approved it slightly earlier, on or about December 30, 1996?
MR. SHULTIS: Same objection.
A. Appears to be the case.
BY MR. TOMASZCZUK:
Q. And that Mr. Zabransky's approval was voided on February 27th of 1997?
A. That's what appears to be here, yes.
MR. SHULTIS: Same objection.
BY MR. TOMASZCZUK:
Q. And that Ms. Tomasoni's approval was voided on what appears to be March 13, 1997?
MR. SHULTIS: Same objection.
A. I can't make out that date at all.
BY MR. TOMASZCZUK:
Q. Okay. Look at the letter on the previous

594

page, 0389.
A. Okay.
Q. That letter is dated March 13th, 1997. Correct?
A. Correct.
Q. And in this letter, Ms. Tomasoni advises Northern States Power Company that the department was not able to approve its DCS submittal?
A. Correct.
MR. SHULTIS: Objection. The document speaks for itself.
BY MR. TOMASZCZUK:
Q. And Ms. Tomasoni in the letter advised Northern States Power Company that the department was waiting until further notice. The contract requirement you provided provides schedule within 30 days.
That's what's indicated here?
A. Yes.
Q. Do you know on what authority Mr. Zabransky and Ms. Tomasoni voided their previous approvals of the DCS?
MR. SHULTIS: Objection as to characterization and calls for speculation.
A. No, I don't.

595

BY MR. TOMASZCZUK:
Q. Were you involved in any discussions concerning the decision by OCRWM to void the DCS that had previously been approved by Mr. Zabransky and Ms. Tomasoni?
MR. SHULTIS: Same objections.
A. I don't recall the specific DCS. I believe at that time, the department had indicated that it likely was going to be delayed in starting the system operations and were soliciting the views of -- seems to be indicated in the third paragraph, were soliciting the views of the contract holders on how the delay could be accommodated.
BY MR. TOMASZCZUK:
Q. And in conjunction with that, OCRWM made a decision not to approve DCS forms?
A. Yes. I think that was held in abeyance until the views were received.
Q. The decision not to approve DCS forms is being held in abeyance even to this day, is it not?
A. That's correct.
Q. So that decision has been held in abeyance basically since March of 1997?
A. I believe so.
Q. Now, you said it was held in abeyance

596

pending the views of the contractor holders with respect to the delay?
A. Correct. That's my recollection.
Q. Were those views provided?
A. I think to some extent they were, yes. I don't recall the number of comments or the totality of the contract holders submitting views.
Q. So if views were provided and the DCS forms were being held in abeyance pending receipt of those, why are they still being held in abeyance?
MR. SHULTIS: Objection, assumes facts not in evidence, calls for speculation.
A. I don't know specifically. I guess my personal view is that until we had a more definitive schedule, which is certainly contingent upon actual approval of a site for repository, it didn't appear appropriate to continue approval.
BY MR. TOMASZCZUK:
Q. And as of this date, the schedule remains sufficiently indefinite such that you can't approve DCS forms?
MR. SHULTIS: Objection as to characterization.
A. Well, my personal opinion is -- we talked the other day about the schedule in the 2010 date,

597

and I indicated that I think that's an achievable schedule, but I also indicated there are many challenges between now and that date, many of those areas of which are not within the department's control.
BY MR. TOMASZCZUK:
Q. So is it your view that DCS forms can be approved now or not?
A. My personal opinion is that it's not appropriate to approve them until we have at least a site for a repository approved.
Q. And when you say, a site for repository approved, approved by the Congress?
Is that what you're referring to?
A. By the Congress. Correct.
Q. After that occurs, is it your expectation that OCRWM will begin approving DCS forms?
MR. SHULTIS: Objection, calls for speculation.
A. I believe -- in my opinion, that would certainly be a trigger to start doing that.
BY MR. TOMASZCZUK:
Q. Can I direct your attention, Mr. Milner, a little further back in this packet to page -- Bates page 395 and 396.

598

know the person.
Q. Is it fair to say, Mr. Milner, that confusion exists today even with DOE as to what constitutes GTCC and how to deal with it?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.
A. I don't know -- well, I specifically don't know, but my belief is that GTCC is defined by NRC regulations depending on radioactivity level. The department may not have fully characterized all of its waste to determine what is and what isn't GTCC within the definitions provided by the NRC.
BY MR. TOMASZCZUK:
Q. And that circumstance causes confusion about what to do with GTCC and where to put it.
Is that fair?
MR. SHULTIS: Same objections.
A. No, I don't know that that creates confusion as to where to put it.
BY MR. TOMASZCZUK:
Q. It's clear in your mind?
A. As to where to put it?
No, it's not. That has not been decided to the best of my knowledge.
MR. TOMASZCZUK: Do you want to take five?

615

Take a short break?
THE WITNESS: Doesn't matter to me.
MR. TOMASZCZUK: Let's take a short break. Sure. We've been going about an hour. Take ten minutes.
(Recess.)
MR. TOMASZCZUK: Back on the record.
Ms. Reporter, could we mark as Milner Exhibit 80 a memorandum from Mr. Milner, subject, total system life cycle cost, 1995 assumptions package, with an attachment.
(Milner Exhibit No. 80 was marked for identification.)
BY MR. TOMASZCZUK:
Q. And Mr. Milner, let me represent to you that this is similar to Exhibit -- I believe Exhibit 49, which I previously asked you about. Exhibit 49, I believe, was a draft of this document, which appears to be a final assumptions package. And you're welcome to get both of them in front of you if you'd like to.
Mr. Milner, have you seen this Exhibit Milner 80 prior to today?
A. I don't recall seeing it, no.

616

Q. That's your name that appears on the cover. Right?
A. That's my typed name on the cover, yes.
Q. Do you know whether you approved the issuance of this memorandum and the accompanying TSLCC '95 assumptions package?
A. I don't recall whether or not I did. And in simply looking at the concurrence chain, there's no indication that I initialed off on that. I don't recall.
Q. Do you have some reason to believe that you did not approve this -- the issuance of this memo and the attached assumptions?
A. I don't recall either approving or disapproving the issuance.
Q. The issuance of TSLCC reports was now within your area of responsibility as director of the office of program management and integration. Right?
A. It would have been.
Q. Right. Did Mr. Riling whose name is referenced on the second page of this document work for you?
A. He did.
Q. And this would appear to indicate that this memo was initially prepared by him in February

617

of '95?
A. It would appear so, m-hm.
Q. February 16, 1995, to be specific. Right?
A. It would appear so, yes.
Q. Could I direct your attention to the tables which appear at pages 14 and 15 of the attachment, and what is your understanding, Mr. Milner, of what these tables on these pages represent?
A. It appears that the tables show a delivery rate for a first repository, a second repository, and a single repository system.
Q. And the first table at 6.1 shows the spent nuclear fuel acceptance rates for a first repository and a two repository system?
A. I believe that's the case, yes.
Q. And it shows the repository beginning to accept spent nuclear fuel in 2010, and then ramping up to 3,000 MTU in the sixth year of operations -- fifth year of operations?
A. It does.
Q. And then maintaining that 3,000 MTU rate for a period of slightly less than 20 years, it looks like?
A. Through the year 2032, apparently, yes.

618

Q. Starting at a 3,000 rate in 2014 and then staying at that rate until 2032?
A. Yes, that's what's shown here.
Q. And then the second table, 6.2, is for a second repository and a two repository system. Right?
A. Correct.
Q. And then the third table, which is introduced at the bottom of page 14 and then actually appears on page 15, is a single repository and a single repository system?
A. Correct.
Q. And this shows a rampup rate starting at 300 metric tons in 2010. Correct?
A. Yes.
Q. And then going to 3,000 metric tons in 2014, the projected fifth year of operations?
A. Correct.
Q. And then staying at that steady state, 3,000 metric-ton figure, for 24 years, approximately. Right?
A. 2039, yes.
Q. Now, these tables were prepared assuming no MRS system; is that right?
A. I believe that's the case.

619

Q. Can I direct your attention to page 3, section 5, and in particular, section 5.2.
A. Okay. That would indicate no MRS was assumed.
Q. Right. You're referring to the parenthetical, no MRS system, which appears at 5.2?
A. Correct.
Q. Now, going back to the cover memo, this memo says that, attached is the final TSLCC assumptions package. Right?
A. It does.
Q. And it indicates that the major assumptions were reviewed with you, I presume the recipients of the package, in December of 1994. Correct?
A. It does.
Q. And am I correct in understanding that that would appear to be a reference to Milner Exhibit 49, which I had previously asked you about?
A. It would appear so.
Q. So the draft TSLCC assumptions were circulated by you in or about December of 1994. Correct?
A. Correct.
Q. And then you got comments back?

620

A. Presumably, m-hm.
Q. Well, this says that, and their comments have been incorporated as appropriate. Right?
You see that on the cover memo?
A. M-hm.
Q. So you received comments back and then circulated a final TSLCC assumptions package?
A. I don't know I can infer that from this since there's no indication of a date or an approval on it.
Q. Well, there is indication of a date on the second page, February 16, '95. Right?
A. When Mr. Riling would have prepared it, yes. Whether or not I actually sent this memo, I just don't recall.
Q. Well, this is the only version that I have.
And you have no reason to believe you didn't send it, do you?
A. I can recall no reason why I did not.
Q. And it's fair to assume, is it not, given that this had gone through some drafts, that at least as of February 1995, OCRWM was not expecting to site an MRS system?
MR. SHULTIS: Objection. Mr. Milner is

621

not a 30(b)(6) witness, calls for speculation, the document speaks for itself.
A. Certainly this package did not assume an MRS in the system.
BY MR. TOMASZCZUK:
Q. And do you know why the package did not assume an MRS system?
A. No, I don't.
MR. SHULTIS: Same objection.
BY MR. TOMASZCZUK:
Q. Was it because as of this point in time, OCRWM had essentially concluded an MRS was not going to be sited?
MR. SHULTIS: Same objection, asked and answered.
A. I don't know that OCRWM had concluded one was not going to be sited. I think at that point in time, OCRWM concluded we didn't have any authority to site one without being tied to a repository schedule.
BY MR. TOMASZCZUK:
Q. The rates that I asked about at -- reflected in the tables at 14 and 15, those are consistent with rates we've seen in other OCRWM-published documents, such as previous TSLCC reports and fee adequacy reports. Right?

622

A. They look roughly the same.
Q. And in particular the rampup to 3,000 and then maintaining a 3,000 MTU steady state acceptance rate, certainly that figure has been used in previous documents?
A. Certainly the 3,000 has been used. Yes, it's a steady state.
Q. Fairly consistently.
Isn't that true?
A. Yes.
Q. Can I ask you to look at Exhibit 51, Mr. Milner. This is the March 1995 APR/ACR.
A. Yes.
Q. Now, this document appears to have been issued roughly one month after the TSLCC assumptions package was circulated. Right?
A. It was issued a few months after the draft was circulated. I don't know when the final was actually circulated.
Q. But at least the draft reflected in Milner Exhibit 80 appears to have been circulated or at least prepared in February of '95. Right?
A. All's I can infer from here is that it was prepared in February of '95.
Q. And it reflects a revised draft from one

623

which had been previously circulated in December of '94. Correct?
A. Yes.
Q. And the attachment to Exhibit 80, as you've testified, was based on the assumption of no MRS system and either a single or dual geologic repository. Right?
A. I'm sorry. Can you repeat that question?
MR. TOMASZCZUK: Could you read it back.
(The reporter read the last question.)
A. Yeah. The previous one was no MRS.
BY MR. TOMASZCZUK:
Q. So is it fair looking now with the benefit of this Exhibit 80 to conclude that the acceptance rates reflected on Milner 51 dated March of 1995 are based on a no MRS system?
A. I guess you could assume that.
Q. And what is being done in Milner 51 is taking the statutory restrictions on an MRS and applying those restrictions to a geologic repository, which is all that OCRWM was really considering at the time?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation, and Mr. Milner is

624

not a 30(b)(6) witness. He's testified that he did not put the document -- Exhibit 51 together, so it calls for speculation.
A. The acceptance rates are similar.
BY MR. TOMASZCZUK:
Q. They are?
A. Similar.
Q. In what respect?
A. Let's see, one has delivery rate in the single repository system in the first year of operation of 300. The other has 400. The second year 600. The other one has 600.
Q. The rampup rates are remarkably different, aren't they?
A. They are different.
MR. TOMASZCZUK: Could you read my question two questions ago, because I don't think I got a responsive answer.
(The reporter read the record as follows:
"Question: And what is being done in Milner 51 is taking the statutory restrictions on an MRS and applying those restrictions to a geologic repository, which is all that OCRWM

625

was really considering at the time?")
MR. SHULTIS: Same objections.
A. In reading further on Exhibit 51, apparently at that point in time, there was some pending Congressional action on the conditions for siting, constructing, operating an MRS or interim storage facility -- use those terms interchangeably -- so I can only infer from that that under the potential of some Congressional action for siting a facility, those same rates were used.
BY MR. TOMASZCZUK:
Q. Mr. Milner, you testified I believe on several occasions that one of your concerns was to try and maintain some uniformity as I understood your testimony with respect to the various spent nuclear fuel acceptance rates embodied in OCRWM documents. Right?
A. Well, certainly one of my concerns was to try to ensure that the program was using the same set of assumptions, the program was consistently using the same numbers, if you will.
Q. And is it not true that the spent nuclear fuel steady state rates in these two documents prepared at roughly the same periods of time --

626

during the same periods of time are quite inconsistent. Right?
A. Steady state rates?
MR. SHULTIS: Objection.
BY MR. TOMASZCZUK:
Q. Do you understand what I mean by that term?
A. I know what you mean by, steady state rate, yeah.
Q. And is it not true that the -- that those steady state rates in these two documents prepared roughly within one month of each other are quite different?
A. Well, Exhibit 51 goes through ten years of operation. I can't tell whether that was the steady state rate at that point or not.
Q. Do I understand table one in the 1995 APR/ACR to show a rampup in year three to 900 metric tons and then to remain constant through the next seven years?
A. That's what's indicated in table one, yes.
Q. And the tables which appear on Milner 80 show in each instance rampups to 3,000 metric tons and then staying at that rate for at least 15 if not more years?

627

A. Correct.
Q. And aren't those quite dissimilar rampup rates or steady state rates?
A. 900 and 3,000 are certainly different numbers. I can't infer from ten years of operation whether that was intended to show a steady state of operation. I do not believe it was.
Q. So if this chart had been projected onward at Milner 51, higher numbers would have appeared for years 11 and beyond?
MR. SHULTIS: Calls for speculation.
A. In my opinion, higher numbers would have shown up in later years. Whether it's year 11, I don't recall.
BY MR. TOMASZCZUK:
Q. And why is that your view, sir?
MR. SHULTIS: Objection, calls for speculation.
A. Well, my recollection is that in most scenarios, steady state operation was going to be 3,000.
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Exhibit 81 the 19- -- September 1995 TSLCC analysis.
(Milner Exhibit No. 81

628

was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, you're welcome to take as much time as you want to review it. Just let me know when you're ready.
A. Okay.
Q. Would your office have been responsible for the preparation and issuance of this report in or about September of 1995?
A. I believe it would have.
Q. As of that moment, you were still the director of program management and integration?
A. I believe that was the case.
Q. And that office was responsible for issuance of the TSLCC reports as I understood your testimony?
A. Yes.
Q. And this appears to be now the final TSLCC report; is that right?
A. It looks to be, yes.
Q. For 1995.
Could I direct your attention, Mr. Milner, to page 7 at the bottom of the page?
A. M-hm.

629

Q. And do you want to just read to yourself the last paragraph there at the bottom of page 7.
A. Okay.
Q. Why was the decision made in this report not to include MRS or interim storage facility costs in the TSLCC analysis as reflected in this paragraph?
A. In my recollection, there was nothing definitive for an MRS at that point in time, so we simply didn't include it.
Q. And nor were any interim storage facility costs included. Right?
A. Correct.
Q. For the same reason?
A. Yes.
Q. That nothing was definitive at that point in time?
A. Right.
Q. Could I direct your attention, Mr. Milner, on the next page.
And this table appears to depict spent nuclear fuel acceptance rates, as I understand it?
A. It does.
Q. And indeed it depicts the rates which underlie this TSLCC report. Correct?
A. Yes.

630

Q. And the repository as reflected in this table is expected to start operation in 2010 and to take 3,000 metric tons of spent nuclear fuel in that year?
A. In the year 2010, I think it's expected to take 300.
Q. Did I say 3,000?
A. Yes.
Q. I misspoke. I meant 300. Thank you.
And 600 metric tons in 2011?
A. Yes.
Q. 1200 in 2012?
A. Correct.
Q. 2,000 in 2013?
A. Correct.
Q. And then 3,000 in 2014, the fifth year of operations. Right?
A. Right.
Q. And that 3,000 metric-ton rate is to be maintained for 22 years, approximately?
A. Through the year 2039.
Q. From 2015 through 2039?
A. Correct.
Q. Do you know why these rates are reflected on this table in this document?

631

A. They were the receipt rates that were assumed for purposes of costing at that point in time, costing out the system.
Q. And those rates are consistent with those we've seen in previous TSLCC and fee adequacy reports. Right?
A. I believe they were.
Q. And these rates accurately reflect, do they not, DOE's system design plans?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
A. Well, they certainly reflect the assumptions that underlie this TSLCC, which I would assume were the department's goals at the time.
BY MR. TOMASZCZUK:
Q. And these rates are fairly consistent, are they not, with DOE's current design for a geologic repository at Yucca Mountain?
A. I believe they are.
Q. This table starts in year 2010 and goes to year 2040 as I understand it. Right?
A. Correct.
Q. So it depicts 30 years of operation of a geologic repository?
A. Apparently so, yes.

632

Q. And do you know why that period is reflected in this table, that is, the 30-year period?
A. My recollection is that at that point in time -- I'd have to check the math to see -- that that was probably the time at which we would have accepted 20,000 metric tons -- I'm sorry -- 70,000 metric tons into the repository.
Q. It was never DOE's intention to operate a repository for only ten years, was it?
MR. SHULTIS: Objection.
A. For only ten years?
BY MR. TOMASZCZUK:
Q. Yes.
MR. SHULTIS: Calls for a legal conclusion.
BY MR. TOMASZCZUK:
Q. I'm sorry. You said no?
A. No, no.
Q. It has been DOE's intentions to operate a repository from anywhere between 30 and 100 years; is that right?
MR. SHULTIS: Objection, calls for a legal conclusion. Mr. Milner is not a 30(b)(6) witness.
A. I guess if you mean by the term operating in the process of accepting waste, approximately 30

633

years. If you mean by operating the repository until it was actually finally closed, that's certainly a longer period of time.
BY MR. TOMASZCZUK:
Q. Thank you for that refinement of a not very artful question.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner Exhibit 82 the fee adequacy assessment dated October 1996.
(Milner Exhibit No. 82 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, do you recall this fee adequacy assessment dated October 1996?
A. I don't specifically, no.
Q. Did you or your office have any role to play in its preparation?
A. I believe I did not.
Q. It's a good thing we have these organizational charts. Right?
A. Yes.
Q. And why do you say that, Mr. Milner?
A. Because from Exhibit 1, in September of 1996, I had changed positions, the office of waste

634

Q. The next milestone that's identified here is, submit license application amendment to receive and possess waste FY 2008?
A. Correct.
Q. And do you expect that to be accomplished in FY 2008?
A. No, I don't.
Q. And has that milestone slipped?
A. It has.
Q. To what -- by what date do you expect that milestone to be accomplished?
A. I guess best of my recollection we're looking at late 2009.
Q. And the final milestone that's identified here in this section is, commence waste acceptance and emplacement. It has the parenthetical after that heading, FY 2010.
Do you expect that to be accomplished in fiscal year 2010?
A. I do.
Q. And that's your expectation even though every other milestone that we've just identified has slipped by at least a year or more?
A. That's correct.
Q. And how is it that that milestone will be

663

met even though these other milestones are already behind schedule in your view?
A. I think in recent years our planning in terms of how to construct the repository, how to initiate operation of the repository have been further developed, further refined. I think older schedules assumed a somewhat lengthy in essence training phase before you actually began receiving waste. Once the repository was constructed but before you actually began receiving waste, it would be in essence a lengthy training period for operators.
I think we determined that that can be done in a shorter period of time. There were quite a number of the various construction activities which had originally been planned to be accomplished sequentially. I believe now we can accomplish a number of those in parallel, reducing construction time. We're continually at this point in time looking at ways where we could further shorten the period.
Q. This program plan that we were just looking at basically envisions a five-year period for construction through the commencement of spent nuclear fuel in the repository?

664

A. I think it envisions a three-year construction period.
Q. It says -- if you look at page 12, start repository construction in 2005.
A. I'm sorry. I'm sorry. I'm thinking current schedule versus -- yes, five years.
Q. Are there plans to amend this program plan, revision three, dated February 2000?
A. Yes.
Q. Is a draft revision in the works?
A. Draft has not yet been prepared, but that will begin shortly.
Q. And would I be correct in understanding that that draft will indicate a shorter time frame for repository construction?
A. That would be my thought at the time, yes, at this time.
Q. And it will shorten the time for repository construction by about half.
Did I understand that?
A. From five years, to, yeah, two and a half, three years.
Q. Have any studies been prepared assessing the feasibility of shortening the construction time from five years to two and a half years?

665

A. I don't know that there's any published documents that -- a study per se. I don't know that there's any published documents. Certainly that's been looked at and continues to be looked at as part of the design process.
Q. Has the DOE selected a contractor for -- to construct the repository at Yucca Mountain?
A. No.
Q. Do you know whether that contract would be awarded through competition or otherwise?
A. Well, the final contracting strategy hasn't been decided upon yet.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner 89 the May 2001 fee adequacy assessment.
(Milner Exhibit No. 89 was marked for identification.)
BY MR. TOMASZCZUK:
Q. And Mr. Milner, could you also look at what I understand has been marked as Milner Exhibit 73, which is the May 2001 TSLCC analysis, Milner 73.
Let me just ask you with respect to Milner Exhibit 73, is this the last TSLCC report that's been prepared, Mr. Milner?

666

Do you know?
A. It probably is, yes.
Q. And you would have reviewed, commented on drafts, and then approved the final?
A. Yes.
Q. All right. Can I ask you to look at page 4, dash, 14?
MR. SHULTIS: On 73?
MR. TOMASZCZUK: Yes, of Milner Exhibit 73.
A. M-hm.
BY MR. TOMASZCZUK:
Q. And this table 4. -- 4, dash, 1 depicts acceptance rates for commercial spent nuclear fuel. Correct?
A. Correct.
Q. And we see rates on this table similar to those in various other TSLCC fee adequacy and other reports. Right?
A. Correct.
Q. Showing an initial emplacement rate of 400 metric tons in 2010. Correct?
A. Correct.
Q. And then ramping up to 3,000 metric tons in 2014?

667

A. Correct.
Q. And then staying at that rate -- that 3,000 metric-ton steady state rate through 2039 per this table?
A. Correct.
Q. There's a note which appears under this table.
Do you know who drafted that note?
A. No, I don't.
Q. Do you know why that note was put in under this table?
A. No, I don't.
Q. Do you know whether this note was placed in here as a result of direction by Mr. Barrett that any rates beyond those reflected in the May -- or the March 1995 APR/ACR had had this language --
MR. SHULTIS: Objection, asked and answered.
BY MR. TOMASZCZUK:
Q. -- accompanying it?
A. I don't know.
Q. The rates reflected on this table 4, dash, 1 were used for purposes of preparing the accompanying fee adequacy report issued in May of 2001; is that right?

668

A. I believe that would be correct.
Q. And indeed, the fee adequacy report, Milner 89, references the TSLCC report, Milner 73, at page 1. Right?
A. Yes.
Q. And the conclusion of this fee adequacy report is that the 1 mil per kilowatt hour fee is adequate?
A. Correct, at that point in time, m-hm.
Q. Mr. Milner, is work being done now on a TSLCC report for 2002?
A. It's in the very early stages, yes.
Q. And same question with respect to a fee adequacy report for 2002?
A. Well, that would follow the work on the TSLCC.
Q. Generally, as I understand it, the work on the TSLCC is done, and then that is used to prepare the fee adequacy report?
A. Correct.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner Exhibit 90 a GAO report dated December 2001 entitled, nuclear waste, technical schedule and cost uncertainties of the Yucca Mountain repository project.

669

(Milner Exhibit No. 90 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with this GAO report which I've had marked as Milner Exhibit 90?
A. I am.
Q. And I gather you've read the report?
A. Yes.
Q. And did you provide comments back to GAO on the report?
A. I think I was involved in at least the reviewing, comments back on it.
Q. I'm sorry. You were involved in OCRWM's comments back to GAO?
A. Correct.
Q. And approving the release of those comments back to GAO?
A. Correct.
Q. Can I refer you back to the heading on page 2, results in brief. And as I understand the narrative which accompanies these results in brief, the GAO indicates some substantial skepticism with respect to DOE's ability to meet the schedule that it has laid out in other documents for siting a

670

Q. Did you participate in drafting any of it?
A. I did not.
Q. Did you review and approve it prior to its transmission to the president?
A. I did not.
Q. Did you see it before it went to the president?
A. I did not.
Q. And at this time, you're the -- in February, you were the chief operating officer. Correct?
A. That's correct.
Q. I gather that you saw other documents that accompanied this letter when it was transmitted?
A. Yes.
Q. But not this letter itself?
A. That's correct.
Q. Did you see it at any time prior to today?
A. Yes.
Q. So you saw it after it was sent and before today, just so I'm clear?
A. Yes, that's correct.
Q. Did somebody give you a copy of it after it was sent?
A. Yes.

679

Q. And who gave you a copy?
A. I guess it was Mr. Barrett.
Q. What did he say to you when he gave it to you?
A. This is a copy of the letter the secretary sent to the president.
Q. Nothing more colorful than that?
A. Nothing more colorful than that.
Q. Can I direct your attention to page 4. The very last paragraph on this page as I understand the letter is the formal recommendation of the secretary of energy to the president recommending Yucca Mountain. Right?
A. Correct.
Q. Can I direct your attention to the sentence which precedes that, starting with, not.
Do you see that?
A. Yes.
Q. Read that to yourself.
A. Yes.
Q. And this sentence states, quotes: Not completing the site designation process and moving forward to licensing the development of a repository as Congress mandated almost 20 years ago would be an irresponsible dereliction of duty.

680

Do you agree with that statement?
A. Yes, I do.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner Exhibit 93 a statement of Lake Barrett to the -- strike that -- a statement of Lake Barrett dated March 14, 2002, presented to an FY 2003 appropriations hearing, committee of the Congress.
(Milner Exhibit No. 93 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Have you seen this statement prior to today?
A. Yes, I have.
Q. Did you assist in its preparation?
A. I reviewed it.
Q. You reviewed it, provided comments, and approved its issuance?
A. Well, provided comments.
Q. But you didn't approve its issuance?
A. No. Approval was the person delivering the statement.
Q. Did you provide any comments on a draft of the document?
A. I believe I did.

681

Q. Do you recall what those comments were?
A. No, I don't. I do recall they were not substantive in nature.
Q. Do I understand that Mr. Barrett made an oral presentation which accompanied this written statement on or about March 14th?
A. Yes.
Q. Did you accompany him when he was appearing before the Congress on March 14th?
A. I believe I did.
Q. He had you with him during the testimony he gave?
A. Yeah, in the audience.
Q. All right. Do you recall whether Mr. Barrett said anything to the Congress about spent nuclear fuel acceptance rates for the repository that the department is planning to construct at Yucca Mountain?
A. I recall some discussion back and forth between Mr. Barrett and one of the members regarding acceptance.
Q. And what do you recall about the nature of that back and forth?
A. It's -- my recollection was that there was some discussion in terms of how long it would take to

682

empty the spent fuel from all the reactor sites at various acceptance rates.
Q. And what did Mr. Barrett say in response to that question?
A. I think there was a variety of questions and a variety of responses.
Q. Did he indicate during his discussion that DOE expected to use a 3,000 metric-ton steady state rate for spent nuclear fuel at the repository?
A. I believe he did.
Q. And that would have been consistent with the rate we've seen for steady state acceptance of spent nuclear fuel in any number of other documents. Correct?
A. Yes.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner Exhibit 94 a certification signed by Mr. Milner dated April 18th, 2002, which accompanied certain interrogatory responses, which were transmitted on or about April 16th of 2002 in connection with these spent nuclear fuel cases pending at the Court of Federal Claims.
(Milner Exhibit No. 94 was marked for identification.)

683

BY MR. TOMASZCZUK:
Q. Mr. Milner, that's your signature that appears underneath this certification. Right?
A. That's correct.
Q. And did you review the responses to interrogatories 81, 88, and 97 at or about the time you signed this certification?
A. I did.
Q. Did you have occasion to read Mr. Morgan's deposition transcript prior to signing the certification?
A. I did not.
Q. There's a reference here in the response to interrogatory 81 at the bottom of the page in a sentence which starts, as Mr. Morgan explained at his deposition.
Do you see that?
A. Yes.
Q. Do I gather that someone else told you about what Mr. Morgan stated at his deposition for purposes of enabling you to sign the certification?
A. That's my recollection, at least that portion.
Q. Because you weren't there and you haven't read the transcript. Right?

684

A. Correct.
Q. Can I direct your attention, Mr. Milner, to this last interrogatory, 97. There's a reference here to a task force assembled for purposes of reviewing the acceptance rate term of the standard contract.
Do you see that in the interrogatory itself?
A. Yeah, in the interrogatory, yes.
Q. All right. And then in the answer, it's stated that -- there's an identification of individuals that may have been members of a group that examined the acceptance rate term of the standard contract. Right?
A. Yes.
Q. And you are one of those individuals.
Indeed, you're the first one mentioned?
A. Correct.
Q. Can you tell me when this group examined the acceptance rate term of the standard contract?
When was this group performing its work?
A. This particular group would have been in the late '84, early '85 time frame, I guess.
Q. This would have been shortly after you arrived at OCRWM. Right?

685

A. That's correct.
Q. And why was this group conducting this examination of the acceptance rate term of the standard contract?
A. Well, at that particular point in time, I'm not even sure what acceptance rate term means here. There was a task force that we discussed earlier in these proceedings that were looking at a variety of contractual issues.
I don't recall there being any acceptance rate in the term that we're currently using it. I don't know what acceptance rate term means.
Q. Well, that language appears in the answer, so --
A. Yes, it does.
Q. At the time you reviewed the answer and signed the certification, what did you understand acceptance rate term to mean?
MR. SHULTIS: Objection. The interrogatory also says, we objected to that term in our response.
MR. TOMASZCZUK: I won't agree with many of your other objections, counsel, but I'll note that that objection was stated in the interrogatory response.

686

been responsible for the receive rates in these documents?
A. I don't recall, no.
Q. Would it have been Mr. Tribulis (phonetic)?
A. He would have prepared the mission plan, but he would not have prepared the receipt rates.
Q. And you have no idea anyone who worked on -- who would have been responsible for this?
A. I can't recall, no.
Q. Okay. I think we're done with these two. A couple more.
26 and 27, please. And if you could -- when you get --
(Discussion off the record.)
BY MR. SCHECHTER:
Q. You got 26 and 27?
A. Yes.
Q. Could you flip to page 24 in Exhibit 26, and just for the record, Exhibit 26 is the June '87 TSLCC report, and 27 is May '89. Okay?
A. Correct.
Q. Okay. I'm just making the record clear.
Do you have that page?
A. 24?

703

Q. Yes. And in 27, could you flip to schedule A 1, which is after page 9.7 -- 9, dash, 7. Excuse me.
Now, if you look on page 24 of Exhibit 26, it reflects an MRS startup date of 1998, does it not?
A. I'm sorry. In which one now?
Q. Exhibit 26, page 24.
A. M-hm.
Q. Third item from the bottom, MRS startup date, 1998.
A. Okay.
Q. Were you involved in the MRS activities at this point in time?
A. Not at that point in time, no.
Q. Not in 1987?
A. Correct.
Q. You see that reflects a startup date for the MRS of 1998. If you look at Exhibit 27, at pages A 1 and A 2, it reflects MRS startup dates of 2000 and 2003.
Can you explain why the MRS startup dates first of all changed from 1987 to 1989?
A. No.
Q. Do you recall anything in the program --
A. No.

704

Q. -- that might have done that?
A. No.
Q. The Nuclear Waste Policy Act amendments wouldn't have affected the projections on when the MRS would start?
MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.
A. Not that I can recall.
BY MR. SCHECHTER:
Q. Okay. And can you explain why the May 1989 TSLCC report has two different startup dates for the MRS facility?
A. No, I can't.
Q. Okay. Ask you a few questions, Mr. Milner, about what happened in the MRS world in the mid-1990s.
You were involved at that point in time, were you not?
A. In the mid-1990s, yeah, I guess I still was.
Q. Okay. In the budget cycle for fiscal year 1994, Congress eliminated funding for the proposal -- next round of proposals for the MRS volunteer sites, did they not?
A. It sounds like the right time frame for

705

it. I don't recall the exact year.
Q. If Mr. Barrett testified that that was the case, you wouldn't disagree with him on that, would you?
A. No.
Q. Okay. And if he testified that because of that that was the end of 1998 from a practical sense, and he says, achieving the date January 31, 1998, was not very practicable after the final decision of the fiscal 1994 budget.
Do you have any reason to disagree with that?
MR. SHULTIS: Objection, vague, calls for speculation.
A. I guess if I could characterize more the optimism or lack thereof of the program, certainly after that, we were not as optimis- -- at least I was not as optimistic about an MRS.
BY MR. SCHECHTER:
Q. There were two Indian tribes that were at least working their way through the process at that point; isn't that correct?
A. There were two Indian tribes, and there was also one county. I don't recall time frames, whether the county had dropped out at that point or

706

not.
Q. And the effect of the Congressional action at that time was to end the activities of those two or three possible sites?
MR. SHULTIS: Objection, calls for speculation.
A. It certainly cut off the funding.
BY MR. SCHECHTER:
Q. Would you agree with Mr. Barrett if he testified at page 653 of his deposition that the voluntary MRS was basically doomed in 1994?
MR. SHULTIS: Objection, asked and answered.
A. Again, I think it's a matter of various people's opinions and optimism. It certainly looked more dismal than it did before then.
BY MR. SCHECHTER:
Q. You were less optimistic?
A. I was less optimistic, but perhaps more optimistic --
Q. -- than Mr. Barrett.
What happened to the nuclear waste negotiator?
Do you know?
What happened to that position?

707

A. It eventually -- I can't recall -- I guess that had a sunset provision to it if I'm remembering correctly, but I don't recall for sure. It certainly went away.
Q. Let me see if Exhibit 84 can help you here. Exhibit 84 is the July 1998 program plan, and if you would flip to page 2 and look at the second-to-last sentence above, program organization, and I'll read that: The negotiator was unable to secure a volunteer host for a repository storage facility before the office's authority expired in January 1995.
Does that refresh your recollection?
A. Yep.
Q. He was out of business in January of 1995; is that correct?
A. Yeah.
Q. And prior to that time, was the department engaged in any siting activities independent of a negotiator?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
BY MR. SCHECHTER:
Q. If you know.
A. Simultaneously with the negotiator?

708

Q. Yes.
A. No.
Q. Well, now, in terms of efforts going forward for an MRS or interim storage, there was a change of administrations January 20th, 1993. Correct?
A. Sounds right.
Q. When the Clinton administration came in, they were opposed to interim storage, were they not?
MR. SHULTIS: Objection, calls for speculation.
A. I had never had a member of the administration state that to me.
BY MR. SCHECHTER:
Q. Take a look at page 12, please, and look at the second and third sentences in the paragraph under, waste acceptance storage and transportation project.
I'll read them into the record: Since the 1996 revised program plan was issued, bills were passed in the Senate and the House of Representatives that would authorize the siting and construction of an interim storage facility to receive waste prior to 2010. The administration opposed such legislation.
Does that refresh your recollection on

709

what the administration's position was?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
A. My recollection --
MR. SHULTIS: The document speaks for itself.
MR. SCHECTER: I'm asking if it refreshes his recollection on something he didn't recall.
A. My recollection was that the administration's stated position was that they opposed siting an interim storage facility until they -- whatever the exact words were, but more progress was made on the repository.
BY MR. SCHECHTER:
Q. But there was no interim storage facility authorized at that time?
MR. SHULTIS: Same objection,.
BY MR. SCHECHTER:
Q. There was no site for an interim?
A. There was no site for an interim, correct.
Q. And the negotiator was out of business?
A. Correct.
Q. And the folks who were proposing to be volunteers weren't funded?
A. Correct.

710

Q. Okay. Now, we've talked about the volume limitations so to speak, that were in the NWPA amendments, 10,000 and 15,000 tied to two different circumstances. Correct?
A. Correct.
Q. And those were volunteer limitations that related solely to the MRS?
A. Correct.
Q. There was no volume -- there was a 70,000 MTU volume limitation on the repository?
A. Correct.
Q. Can you think of any programmatic reason that one would apply the MRS volunteer limitations to the repository?
MR. SHULTIS: Objection, vague.
BY MR. SCHECHTER:
Q. For any reasons.
A. No, not that I can think of.
Q. In fact, the TSLCCs don't apply those limitations?
They have the rampup to 3,000?
A. M-hm.
Q. Okay. Sitting here today, you can't think of any particular reasons that you'd do that?
A. Which number are you speaking of?

711

Q. I'm sorry.
Any reason to apply for example a 10,000 MTU or a 15,000 MTU limit to the permanent repository.
A. In terms of total capacity?
Q. Yes.
A. No.
Q. Or capacity over a period of time.
A. No.
Q. Okay. I want to turn back just for a minute to Milner 88.
You got it?
A. Yep.
Q. And I want to ask you a couple of questions on pages 11 and 12, if I may. And I want to -- was it your testimony that the activity -- last activity on page 11, developments of middle license application FY 2002 would be done in FY 2004?
A. In the year 2004.
Q. So it might be calendar year 2004, which is actually fiscal year 2005. Correct?
A. The latter part, yeah.
Q. In fact, the report that went to the president said that the license application would be submitted at the end of 2004?

712

A. Correct.
Q. So it's really fiscal year 2005. Okay. I just wanted to clarify that.
Turn to page 12 for a minute, if you would. Now, as I understand it, this page shows at least two activities that have to be completed before the last activity, commence waste acceptance and emplacement can begin.
One is construction has got to be completed. Correct?
A. Correct.
Q. And the other is that you've got to have a license application amendment granted by the NRC or approved?
A. Correct.
Q. Okay. And I believe your testimony was that the present plan was to submit the license application amendment in late 2009.
Now, is that fiscal or calendar?
A. Well, I was I think characterizing that as the best of my recollection, because I could not really recall what our current schedule is for the amendment, so I -- later in '09, I don't know whether that would cross over into a different fiscal year or not.

713

Q. Thank you.
Now, under the schedule that's shown here, February 2000 schedule, the plan is to give the NRC two years to review and approve that proposal. Correct -- that amendment?
A. That's the time there. I don't recall whether we assumed that they would take the whole two years or not, because as best I can recall, we would build into this schedule a somewhat lengthy training phase, if you will, before we actually began receipt.
Q. Has the department advised the NRC that that application is going to be submitted in late 2009, presuming that's the date to the best of your recollection rather than fiscal year 2008?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
A. I don't know whether we've advised them on that date or not.
BY MR. SCHECHTER:
Q. And you described in your testimony that you thought it was realistic to cut the construction period considerably, whatever the number was, from five years to two and a half years.
Is that roughly right?
A. Correct.

714

THE WITNESS: Okay.

(Whereupon, at 3:25 p.m., the taking of the instant deposition ceased.)

______________________________

Signature of the Witness

SUBSCRIBED AND SWORN to before me this _______ day of _______________, 20_____.

______________________________

Notary Public

My Commission Expires:________________

731

CERTIFICATE OF COURT REPORTER

UNITED STATES OF AMERICA )

DISTRICT OF COLUMBIA )

I, CHERYL A. LORD, the reporter before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was sworn by me; that the testimony of said witness was taken by me in machine shorthand and thereafter transcribed by computer-aided transcription; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially or otherwise interested in the outcome of this action.

CHERYL A. LORD

Notary Public in and for the

District of Columbia

My Commission expires April 30, 2006

732

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER )
COMPANY )
(98-154C)(Merow, S.J.) ) Volume I
MAINE YANKEE ATOMIC POWER COMPANY) Washington, D.C.
(98-474C)(Merow, S.J.) ) Tuesday
Plaintiffs, ) May 7, 2002
v. )
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - -)

Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 3:48 p.m., Tuesday, May 7, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

1

APPEARANCES:

On behalf of Plaintiffs:

PETER J. SKALABAN JR., ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

On behalf of Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority for the State of New York, Omaha Public Power District, Nebraska Public Power District, and PSEG Nuclear L.L.C.:

DANIEL S. HERZFELD, ESQ.
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7612

2

APPEARANCES CONTINUED:

On behalf of Defendant:

RUSSELL A. SHULTIS, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
Federal Claims Section
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561

3

C O N T E N T S


| WITNESS | EXAMINATION PAGE NO. |
|---|---|
| RONALD A. MILNER | |
| By Mr. Skalaban | 5 |


E X H I B I T S

(No exhibits were marked.)

4

P R O C E E D I N G S
Whereupon,
RONALD A. MILNER
was called as a witness by counsel for Plaintiffs, and, having been duly sworn by the Notary Public, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. SKALABAN:
Q. Hello, Mr. Milner. My name is Pete Skalaban. I represent Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company in this litigation.
I'd like to apply the same general ground rules that occurred in the common deposition. If you don't understand a question, if you can let me know, and I'll try to clarify it.
A. All right.
Q. And that way, we can have a common understanding for my questions and your answer.
A. Fine.
Q. If you need a break at any time, please let me know. I'll be happy to stop. I just request that the break doesn't occur when a question is pending.
Is that okay?

5

A. Fine by me.
Q. Okay. And also, if I ask you a question and it occurs to you subsequently, perhaps when we're looking at another exhibit or what have you, that the answer was incomplete -- your prior answer was incomplete or inaccurate in some way, can you let me know so that we get a true and accurate record?
A. Certainly.
Q. Thank you.
Mr. Schecter was asking you about a schedule for accepting wastes at the repository. And there was one answer I didn't quite understand, and I wanted to go over it.
I believe you were talking about the facility would have an ability to take a canister out of a transportation overpack and place a canister in a storage overpack and that this might accelerate the ability of the repository to accept fuel.
Did I understand that correctly?
A. Well, what I was speaking of was, some of the fuels certainly will arrive at the repository site in dual-purpose canisters. That canister has the ability to be removed from its transport overpack and placed into a storage overpack.
Certainly there's a relatively -- in

6

relative terms, a simple matter.
Q. All right. And that's something you're planning to do, the department is planning to do with the repository, to accept the canister fuel and put it into storage overpacks?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
A. My understanding is that we're planning on having the capability to accept canisters, canistered fuel. There will be certainly an ability to store some fuel aboveground for some period of time. I didn't intend to characterize that as the department's plan to do that initially.
BY MR. SKALABAN:
Q. But it's what you expect to happen?
MR. SHULTIS: Objection, calls for speculation.
A. No, I don't expect it to happen or not to happen. It's an ability.
BY MR. SKALABAN:
Q. Okay. But if I understand your answer, you -- the department's plan is to accept canistered fuel and possibly put it in storage overpacks before it goes in the repository?
MR. SHULTIS: Objection, calls for

7

speculation.
A. The characterization is that we expect to receive canistered fuel. We expect to have the ability to store -- I don't think you can infer that the plan is it will go directly to storage and then later to a repository.
BY MR. SKALABAN:
Q. And the fuel in the canisters, would that be from canisters from different dry storage systems that different utilities have been implementing across the country?
A. Well, when I say, dual-purpose canister, it's a canister that's been approved by the NRC for both transport and storage, and then they could be utilized in different storage modes.
Q. And what are some of the canisters that you're aware of that have been licensed for dual storage and transportation?
A. I can't recall the designations now. I believe there's at least one or two that have currently been approved, perhaps more.
Q. Such as the NAC, N-A-C?
A. Yeah, I believe that's one of them.
Q. So the canistered fuel would be fuel that different utilities had put in systems like the NAC

8

speaks for itself.
A. This document states that the more significant linkage -- the more significant linkage is the construction.
BY MR. SKALABAN:
Q. And is that because the MRS can't begin to be built until the department has received authorization to begin building the repository?
MR. SHULTIS: Same objection.
A. Well, certainly that linkage states that, that they cannot begin construction of an MRS until you begin construction of a repository, yes.
BY MR. SKALABAN:
Q. If we can take a moment -- or actually, let me just ask you: Do you have a sense of what the -- from your time that you were at the program after the NWPA Amendments Act was passed, do you have a sense of what the department estimated that when it could build a -- I'm sorry -- when it could start waste acceptance in an MRS -- strike that.
Let me try to ask a better question.
When you started -- I'm sorry.
Following the amendments act, did you have a sense of what the time gap would be between -- given this construction linkage in the statute when

13

an MRS could come online and when a statute would come online, what the likely time gap between those would be in view of the statutory construction linkage?
MR. SHULTIS: Objection, calls for speculation and possibly a legal conclusion.
A. I'm trying to recall at that time -- I don't recall what the schedule assumptions were offhand at that point.
BY MR. SKALABAN:
Q. Well, let's take a look at Milner Exhibit 18.
MR. SHULTIS: Are we done with 27?
MR. SKALABAN: For the time being. You may want to leave it handy.
BY MR. SKALABAN:
Q. Milner Exhibit 18, which is the draft 1988 mission plan amendment from June 1988. And if you could turn to page 10, sir, and the document has a Bates number PNL, dash, 029, dash, 1253.
And there's -- in the middle of the page, middle paragraph, it begins: The DOE is confident that the system authorized by the Congress is prudent, reasonable, and workable, period. Schedules based on meeting the requirements in the amendment

14

act show that the MRS facility should be available no later than 2003, and the repository will begin accepting waste in 2003.
Do you see that, sir?
A. Yes, I do.
Q. Does that suggest to you at that time that the department estimated that the MRS -- or that given the schedule linkages, the MRS would be online at approximately the same time the repository would be?
MR. SHULTIS: Objection. The document speaks for itself.
A. That's what it suggests, yes.
BY MR. SKALABAN:
Q. I'd like to call your attention to page 20. And in the second full paragraph, it begins: The DOE believes that it may be possible to shorten the time between the start of MRS construction and the start of waste acceptance by developing the MRS in phases.
Do you see that, sir?
A. I do.
Q. So does that indicate to you given that -- given the statement -- and if you need to take time to read the paragraph in full -- but does this

15

suggest to you that June 1988 -- in the draft 1988 mission plan amendment, the department's best estimate was that the MRS would be online at the -- or could begin to accept waste at the same time as the repository, which would be 2003, or possibly as this paragraph indicates, that time might be able to be shortened a bit?
MR. SHULTIS: Objection. The document speaks for itself. Also, Mr. Milner is not a 30(b)(6) witness.
A. Yeah. This suggests several things, that the MRS that I think was being envisioned at that point in time did more than receive and store. It did -- as indicated here, loading fuel into canisters, possibly spent fuel consolidation, and so forth.
And so if you constructed just the receipt and storage portion of the facility, that that would certainly shorten the time between the start of construction and start of operation. I don't believe this mission plan -- well, okay.
I guess it did. So, yeah, m-hm, yes.
BY MR. SKALABAN:
Q. Okay. So they would come -- the best estimate was that they would come -- or begin -- both

16

facilities would be able to accept waste at the same time the department might be able to shorten or speed up the MRS somewhat?
A. Correct.
Q. I'd like to call your attention while we're on this document just to page 18 for a moment. In the bottom paragraph it says: The DOE recognizes that under current conditions waste acceptance as a waste management facility cannot begin in 1998. Furthermore the delay in repository schedule and the linkages between the schedule and key milestones in the siting and construction of an MRS facility make it unlikely that the DOE will be able to start accepting waste significantly before 2003.
Do you agree that this accurately describes DOE's beliefs at the time of June 1988?
MR. SHULTIS: Objection. The document speaks for itself.
A. I believe it does, at least the department's opinions given the linkages.
BY MR. SKALABAN:
Q. And would it be fair that for a purchaser -- and what I mean by that, someone who has -- utility has executed a standard contract -- would it be fair for a purchaser to read that to

17

assume that the department is not going it make the 1998 date and is unlikely to start accepting waste significantly before 2003?
MR. SHULTIS: Objection, calls for speculation, asking for a legal conclusion.
A. Well, I think to me this would indicate that the department was being candid in terms of its views of a schedule at that point in time.
How the purchasers would interpret that, I can't say.
BY MR. SKALABAN:
Q. And in "candid," you mean you're giving them a frank opinion that it's unlikely -- or that they cannot begin in 1988 and it's unlikely to begin much before 2003?
MR. SHULTIS: Objection, asked and answered.
A. Yeah, I believe so.
(Discussion off the record.)
MR. SKALABAN: Put on the record that I intended to say 1998.
BY MR. SKALABAN:
Q. And that doesn't change any of your answers, I assume?
A. I assumed that myself.

18

Q. Now, Mr. Milner, actually to perhaps speed things up a little bit, there are three exhibits I'd like to ask you about, and they're 20, 33, and 42.
BY MR. SKALABAN:
Q. Now, on No. -- Exhibit 20, which is, report to Congress on reassessment of the Civilian Radioactive Waste Management program, dated November 1989 -- 20 -- if you could turn for a moment to page 7 -- or roman numeral seven, the executive summary section.
The fourth paragraph down refers to the secretary's comprehensive review of the schedule for repository-related activities, and it states, quotes: This schedule shows a significant slip for the expected start of repository operations from the year 2003 to approximately 2010.
And this I assume accurately reflects the department's position at this time, November 1989, when it reported to Congress that it anticipated that a repository would not be available until 2010?
A. Yes.
MR. SHULTIS: Objection. The document speaks for itself.
BY MR. SKALABAN:
Q. And your answer to that question was, yes?

19

A. In November of 1989 that certainly reflected the department's opinion -- position.
Q. Now, on page 12, in the first full paragraph, it again refers to the statutory linkages between the MRS and the repository. And it states in the second sentence, quotes: If the current statutory linkages to the repository are maintained, an additional delay of five years would result, with startup estimated at 2007 for the basic MRS facility.
Does this suggest that at this time DOE's best estimate of the earliest time that it could begin an MRS operation in view of the scheduled linkages was 2007?
A. I think it reflects the department's view at the time, yes. If the linkages remained in place, that would be the startup date.
Q. At that time the department was estimating a gap between -- in view of the statutory linkages a gap of three years between when the repository would be operational and when the MRS would be operational?
A. Yes, that appears to be the case, yeah.
Q. Okay. Do you have any reason to believe that the department could have accelerated that three-year -- the ability of the MRS to be online three years before the repository any further under

20

the scheduled linkages?
MR. SHULTIS: Objection, calls for speculation.
A. I don't know.
BY MR. SKALABAN:
Q. Was there any talk that you were aware of that instead of three years, maybe you could have the MRS online in four years?
MR. SHULTIS: Same objection.
A. Take a year longer?
BY MR. SKALABAN:
Q. Well, a year earlier.
A. Extend the time delta to four years. I don't recall.
Q. I mean, this was at this time the department's best estimate --
A. Yes.
Q. -- of how quickly it could get an MRS up and running under the current statutory linkages?
A. Correct, correct.
Q. And, sir, if you could, please, turn to Milner 33, which for the record is the annual capacity report of December 1990, beginning with a Bates number of HQ 0002486.
A. I'm sorry. What was the page number

21

again?
MR. SHULTIS: That was just the cover. Right?
MR. SKALABAN: Yep.
A. Okay.
BY MR. SKALABAN:
Q. And here again, sir, on page 5, you see that the beginning paragraph, the last sentence of the beginning paragraph appears to estimate the possibility that the MRS could be ready three years prior to the repository operations.
Is that fair?
A. Correct.
Q. And that would again be the department's best estimate of when it could feasibly get an MRS up and running before a repository?
A. Yes.
MR. SHULTIS: The document speaks for itself.
BY MR. SKALABAN:
Q. And we did look at this document before, and there was the upper and lower bounding case?
A. I believe that's true, yeah.
Q. I just want to call your attention in the first full paragraph on page 4 -- almost in the

22

middle of the paragraph, it refers to the lower bounding case, and it says: The lower bounding case represents a receipt rate that would be in compliance with the amendments act restriction on storage limits at an MRS before a repository starts operations.
Do you see that?
A. Yes.
Q. And then it goes on to say that: However, this case assumes removal of the schedule linkages with the repository imposed by the amendments act.
In view of that passage, it's fair to say that the lower bounding rate in the lower capacity report, which for your reference can be found on page 7, is based on a change -- is based on a change in the law?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. Yes, because it removed one of the linkages.
BY MR. SKALABAN:
Q. It would require the removal -- a Congressional -- a law, a change in the law to remove some of the -- the scheduling?
A. That's correct.
Q. If we could turn to Milner 42, which is

23

the December 1991 annual capacity report, on page 4, it has what appears to me a similar estimate on when an MRS facility could be available to start spent fuel acceptance in view of the schedule linkages between an MRS and the operation of a repository.
Do you see that in the middle paragraph?
A. I do.
Q. And here again like in the 1990 annual capacity report the department is estimating that the time -- that it could not start MRS facility operations until at least 2007 in view of the statutory schedule linkage?
A. Correct.
Q. And again, at this point in time, the repository was anticipated to be in operation in 2010, so the department here is figuring that at the earliest -- and I'm focusing on the language, until at least 2007, the earliest that an MRS could be available to accept spent fuel before a repository could be available to accept spent fuel would be three years?
MR. SHULTIS: Objection. The document speaks for itself.
BY MR. SKALABAN:
Q. Is that fair?

24

A. Correct.
Q. Now, sir, on page 5, there are the waste acceptance rates for the 1991 ACR.
Do you see that, sir?
A. Yes.
Q. And this is a waste acceptance schedule that is based on the assumption of again like the 1990 ACR a change in the law?
A. Correct. I think at that point in time, it was envisioned that if the nuclear waste negotiator were successful in finding a volunteer site for an MRS that that volunteer host would certainly support a change in the schedule linkage.
Q. And it would still, however, would still require Congress to change the law, presumably the president to sign the law or --
A. Correct.
Q. -- or an override veto, but it would require a change in law to make the schedule linkages go away?
A. Correct.
Q. Now, this waste acceptance schedule on page 5, which is based on the absence of the schedule linkages in the statute, these were the basis for the DCS submittals; is that correct?



A. I believe.
MR. SHULTIS: Objection, calls for a legal conclusion.
BY MR. SKALABAN:
Q. If I could turn your attention to -- okay. Thank you.
If I could turn your attention to page 2. It talks about beginning in January 1992 the purchaser may submit delivery commitment schedules. It goes on to say that the purchaser's allocations for each delivery year are presented in tables A 1 through A 10 in appendix A and should be used as the basis for submitting DCSs.
Do you see that?
A. I see that.
Q. And the purchaser's allocations were based upon this table on page 5, this waste acceptance schedule on page 5, is that correct?
And if you need more time to go -- look through the whole document, please -- please take all the time you need. And if it helps you answer the question, I can refer you to page 9, where the total -- the total rates are stated at the bottom.
A. Okay. It would appear to be the case, yes.



MR. SHULTIS: Objection. The document speaks to tables that I don't think are attached. I don't find in this A 1 through A 10 appendix A. I don't see appendix A here.
MR. SKALABAN: Okay. Well, at least that's a fair comment. I don't think -- my copy does not have that -- the appendix either.
BY MR. SKALABAN:
Q. But at least viewing page 5 and page 9 -- page 9 is a table 3.1 that says, summary of purchaser's annual allocations; is that correct?
MR. SHULTIS: That's on page 9?
MR. SKALABAN: Yes.
A. Yes, that's what -- the title of the table.
BY MR. SKALABAN:
Q. And at the bottom, there are acceptance rates for different years of the system, and the 400, 600, 900 forward.
A. Correct.
Q. And those are the same acceptance rates that appear on table 2.1 on page 5, same aggregate acceptance rates?
A. Same aggregate, yes.
Q. And so is it fair to say it was the



department's position at the time that the delivery commitment schedule submitted by purchasers had to be based upon the waste acceptance schedule reflected here on page 5?
MR. SHULTIS: Objection. The document speaks for itself, Mr. Milner is not a 30(b)(6) witness, and calling for a legal conclusion.
A. In my opinion, that's what this states, yes.
BY MR. SKALABAN:
Q. And then also, sir, if you could please take out Exhibit 43. And on page -- for the record, Exhibit 43 is the DCS instructions. It's entitled, United States Department of Energy instructions for completing the appendix C delivery commitment schedule general instructions.
And item two, it says, who should submit. And it states there, the DCS should be submitted by all purchasers with allocations in the 1991 annual capacity report.
And that further suggests, does it not, that the department was requiring the purchasers to use this waste acceptance schedule here on page 5 of the -- of Milner 42 as well as the individual breakdown of allocations which appear on page 9 of

the 1991 ACR?
MR. SHULTIS: Objection. The document speaks for itself, calls for a legal conclusion.
A. In my opinion, that's what it states.
BY MR. SKALABAN:
Q. And if I could turn your attention to the specific instruction portion of this document, Milner 43 of the DCS instructions, there's a paragraph entitled, 2.7, on page 6. And if you could just take a moment to read paragraph 2.7.
A. Okay.
Q. This paragraph says -- or -- I'm sorry. In the second sentence of this paragraph after a comma, it states, quote: The total quantity of SNF designated for delivery must not exceed the allocation in the ACR, semicolon, exceeding the allocation will result in the approval of the DCS.
MR. SHULTIS: Objection, mischaracterizes the document.
MR. SKALABAN: Oh, I'm sorry. Okay. Thank you, counsel.
BY MR. SKALABAN:
Q. Exceeding the allocation will result in the disapproval of the DCS.
And doesn't this part 2.7 further confirm

29

that the department will require the purchasers to follow the waste acceptance schedule in page 5 and page 9 of the 1991 ACR?
MR. SHULTIS: Objection. The document speaks for itself, Mr. Milner is not a 30(b)(6) witness, calls for a legal conclusion.
A. In my opinion, that's what it says -- indicating here.
BY MR. SKALABAN:
Q. And is therefore, assuming that purchasers followed the instructions and submitted DCSs on the basis of the 1991 ACR -- the delivery commitment schedules would then be based upon a waste acceptance schedule that was not consistent with the Nuclear Waste Policy Act?
MR. SHULTIS: Objection, calls for a legal conclusion and -- objection, calls for a legal conclusion, and also Mr. Milner is not a 30(b)(6) witness.
MR. SKALABAN:
Q. Specifically to give you further clarification, I mean the Nuclear Waste Policy Act schedule linkages between the MRS and the repository.
MR. SHULTIS: Same objections.
BY MR. SKALABAN:

30

Q. The DCSs were -- do you understand my question?
A. No, I don't.
Q. I mean, assuming then, that the purchasers followed the instructions and submitted DCSs based on the schedules in the 1991 annual capacity report, then the DCSs would be based upon a waste acceptance schedule that was inconsistent with the statutory linkages in the Nuclear Waste Policy Act?
MR. SHULTIS: Objection. It calls for a legal conclusion.
A. You're talking schedule linkage?
BY MR. SKALABAN:
Q. Yes, sir.
A. Well, I just don't view it as inconsistent in the sense that certainly in my opinion at the time there was a possibility of that schedule linkage being removed.
Q. But it was -- but the schedule linkage was there?
A. Yes.
Q. And so as the law then existed and as it exists now, because I don't believe -- scratch that.
As the law then existed, the DCSs were based on a waste acceptance schedule that was

31

inconsistent with the Nuclear Waste Policy Act's schedule linkages as they existed at this time?
A. Sitting here today looking at that, that would be my opinion.
Q. And to your knowledge, the schedule linkages have never been changed. There's -- I'm sorry.
Let me ask a more artful question.
There hasn't been a change in the law removing those schedule linkages?
A. No, there has not.
Q. Mr. Milner, if you could just give me a general overview of how -- as the chief operating officer of OCRWM, how you envision the actual overall process of waste acceptance, transportation, disposal unfolding when it begins in approximately -- as you anticipate in 2010, an overview, just kind of a general overview of the process.
How do you envision that working?
MR. SHULTIS: I'm sorry. Which process?
MR. SKALABAN: The process of the -- well, let's say the real logistical process of sort of waste acceptance, transportation, disposal.
BY MR. SKALABAN:
Q. How do you envision that happening in

32

2010?
MR. SHULTIS: Vague, but if you can answer.
A. I'll give it a shot if I understand.
BY MR. SKALABAN:
Q. Sure.
A. The department would show up at the gates of the first utility in the queue and begin accepting their waste, taking title to their waste at the utility gate. I believe under contract at least if -- probably not in the legislation, but certainly under the contract, the department's responsibility is to show up at the reactor site with transport cask.
The utility is responsible for loading that cask with their spent fuel, in essence, delivering it back to the gate. The department takes title, transports that to the repository. It would undergo whatever packaging was necessary for replacement in the repository.
If for whatever reason that particular fuel were to be determined to go first into storage, it would be placed in a storage container, but eventually placed in the repository.
Q. How do you at this time -- what are the --

33

does the department have any general plans on how it plans to develop the transport casks necessary for the transport function you were talking about?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
A. The department, I think, is essentially planning to make maximum use of private industry, utilize casks that then exist and any new casks that are developed that are licensed -- certified, I should say.
BY MR. SKALABAN:
Q. How do you -- does the department have any current plants or projections on how it's going to ship the waste to the repository, by train or by truck?
Or what's the approximate breakdown that you expect?
A. Well, the department prefers that -- to ship by rail to the maximum extent possible. I don't recall the numbers and so forth. I am aware that a number of reactors are not rail-capable, so therefore, fuel would have to be taken from those reactors and either shipped by truck or perhaps shipped to a railhead and loaded onto a railcar.
Q. And that would would be -- I'm sorry --

34

that would be by heavy haul, I guess is the term of art, or barge?
A. Could be heavy haul if you're going to transfer it to a railcar. That would make the most sense.
Q. Why is the -- and I have seen this in a lot of the documents -- why is the preference for rail?
A. Well, I think that -- I believe the opinion is, it's more efficient, cost-effective.
Q. Because you can get more -- you can move larger casks?
A. Yeah, you can move -- you certainly have less shipments, because you're moving much larger casks.
Q. Has the department studied doing anything -- I think you mentioned there were a few sites that were not rail-accessible.
Has the department considered doing anything to encourage those sites to maybe upgrade to become rail-accessible?
A. I very vaguely recall discussions with industry representatives quite some time ago. Let me characterize it that way, because I have a hard time putting it into a specific frame -- about the

35

interest if the department were to in some manner encourage cost-share, whatever, upgrades that might be necessary to make a reactor rail-capable.
I think, as I recall, that seemed to run into a whole host of difficulties. Many reactors that had once upon a time been rail-capable theoretically could be upgraded to be rail-capable again. When it was looked at, close tracks were long gone.
I think more of a problem, not so much to the department but to the utility, was that many of the cranes were now reduced-capacity considerably, and I think certainly on the part of a number of reactors, there was a reluctance to open up and either replace or upgrade or try to get cranes certified for a higher capacity after they'd been reduced over the years. Many of the utilities were fearful of going through that process.
Q. Do you have a sense of what the approximate breakdown is between those that are rail-accessible or -- at the utilities, what percentage?
A. This is a guess, but I'm guessing it was somewhere in the neighborhood of ten, 15 percent.

36

Q. That were not rail-accessible?
A. That were not rail-capable, and I may be wrong.
Q. So an approximation is ten?
A. It's not 50-50.
Q. Right. So about ten, 15 percent are not rail, approximate?
A. That's my very general recollection, yeah.
Q. Okay. I recognize it's kind of a -- a rough approximation.
Is the department of energy planning to or intending to leave failed fuel at the utility reactor sites there indefinitely?
MR. SHULTIS: Objection, calls for a legal conclusion. Also Mr. Milner is not a 30(b)(6) witness.
A. In my opinion, the department does not plan to leave it there definitely.
BY MR. SKALABAN:
Q. Is there any -- well, actually, in your opinion, that wouldn't be a good policy, would it?
A. Not in my opinion.
MR. SHULTIS: Same objection.
BY MR. SKALABAN:
Q. In actuality, failed fuel is moved in this

37

country, isn't it?
A. I don't know.
Q. Okay. So you have no awareness of failed fuel, for example, being handled and moved to hot cells for studying or anything like that?
MR. SHULTIS: Objection, asked and answered.
A. With the possible exception of TMI 2.
BY MR. SKALABAN:
Q. Are you aware of any reasons why failed fuel cannot be moved at the same schedule as regular standard fuel?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.
A. Well, I think there are certification issues with the NRC. It's my understanding that failed fuel would require some special handling different than nonfailed spent fuel.
BY MR. SKALABAN:
Q. And what kind of special handling are you referring to?
A. I don't know. That would I think ultimately be determined by the NRC.
Q. Would placing failed fuel on a reconfigured fuel assembly be an example of

38

the kind of special handling that a utility might be able to do to get its failed fuel movable?
Actually, let me back up.
Does the term reconfigured fuel assembly mean anything to you?
Does that ring a bell?
A. I'm familiar with the term reconstituted fuel assembly. I'm not familiar with anybody having put a failed fuel rod back in an assembly. I think you'd have a heck of a time getting it out of the old one.
Q. Okay. But do you have any general sense of what the special handling might be?
A. I can make a guess that the NRC potentially could require some sort of special canistering of failed fuel.
Q. Special canister or special envelope or something of that nature?
A. Yes.
Q. Do you have any reason to believe that that's not technically feasible, to develop that kind of technology?
MR. SHULTIS: Objection, calls for

39

speculation.
A. I'm certainly not an expert in that area, but I don't know of any.
BY MR. SKALABAN:
Q. And having worked in the office of storage and transportation in OCRWM and now as its chief operating officer, have you ever heard anyone express the opinion that within OCRWM that failed fuel couldn't be moved or would be technically infeasible to move?
A. No.
Q. Are you aware of any current OCRWM plans to defer the acceptance of failed fuel?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I guess my understanding of the current situation -- and I think that's provided for under the standard contract -- that the failed fuel is back further in the queue.
BY MR. SKALABAN:
Q. Okay. Maybe we can take a look at that. If you could please take out Milner Exhibit 3. And in particular, article six on Milner Exhibit 3, criteria for disposal, page 16602, if you could take a look at article 6 A, 2 B.

40

A. 6 A, 2 B.
Q. It's on the first column.
A. M-hm.
Q. And please take all the time you need to look if you want to look up any other sections.
(Pause.)
BY MR. SKALABAN:
Q. Let me ask you, what is your understanding of this paragraph 6 A, 1 -- I'm sorry -- 6 A, 2 little B?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. Okay. In my opinion, at this point reading the paragraph, I would interpret that it means that DOE is, one, saying that it will accept both standard and nonstandard fuel, and nonstandard including failed fuel, that the purchaser will have to obtain delivery and procedural confirmation prior to delivery, and DOE will determine the technical feasibility of disposing of it on essentially the current schedule, which would essentially be the same as standard fuel.
So I would read that to say that we would have to look at each case of nonstandard fuel and determine whether that could be accepted as standard

41

fuel for purposes of the schedule.
BY MR. SKALABAN:
Q. Whether it would be technically feasible to accept that spent fuel?
A. On the currently agreed-to schedule.
Q. Do you have an understanding of what would happen if the department thought it wasn't technically feasible to do it at that point in time on the currently agreed-to schedule?
MR. SHULTIS: Objection, vague, calls for a legal conclusion. Mr. Milner is not a 30(b)(6) witness.
A. I guess in my opinion if the department determined that it wasn't technically feasible on the schedule and since we've already stated that we would accept it, it would move back in the queue.
BY MR. SKALABAN:
Q. Well, does this read to you more like just a basic operational provision, whereas the department is going to look at the individual case, if it can't accommodate it at that time, it's going to move it back a little bit?
A. That's the way I would read it.
MR. SHULTIS: Asked and answered.

42

BY MR. SKALABAN:
Q. This doesn't suggest to you that failed fuel is going to be put back years later in the queue, does it?
MR. SHULTIS: Objection, asked and answered, calls for a legal conclusion.
A. I couldn't say on that. It would depend on the nature of the fuel.
BY MR. SKALABAN:
Q. Well, assuming that there was an NRC-licensed container for that failed fuel, would the department then accept it upon the currently agreed schedule?
MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.
A. I guess in my opinion, if for that specific failed fuel, if there were an NRC-certified container, the NRC said, yep, that particular fuel is okay to move in that container, then, yes.
There's all kinds of failed fuel. You can have a fuel rod that goes -- the cladding is slightly unzipped, or it can have it totally failed and a bunch of pellets laying at the bottom of the pool. That's the extreme case, of

43

course.
BY MR. SKALABAN:
Q. And in the extreme case, do you know whether or not the technology has been developed to put that into a safe, licensed container?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I don't know. That would be a utility operation responsibility in any event.
BY MR. SKALABAN:
Q. But it's possible that that kind of situation would be dealt with?
A. As an engineer, I like to think that most things are technically feasible.
Q. And you have no reason to believe that it wouldn't be technically feasible to develop a safe, NRC-licensed container to handle that extreme situation you posited?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I can't think of any.
MR. SKALABAN: Can we go off the record a

44

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER )
COMPANY ) Volume II
(98-154C)(Merow, S.J.) ) Washington, D.C.
MAINE YANKEE ATOMIC POWER COMPANY) Wednesday
(98-474C)(Merow, S.J.) ) May 8, 2002
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - -)

Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:20 a.m., Wednesday, May 8, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

47

APPEARANCES:

On behalf of Plaintiffs:
PETER J. SKALABAN JR., ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

On behalf of Defendant:
RUSSELL A. SHULTIS, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
Federal Claims Section
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561

48

C O N T E N T S


| WITNESS | EXAMINATION PAGE NO. |
|---|---|
| RONALD A. MILNER | |
| By Mr. Skalaban | 51 |
| Afternoon Session | 159 |


E X H I B I T S


| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| 96 1992 Annual Capacity Report, Nos. HQ002314-352 | 61 |
| 97 Letter, 9-25-92, and attachments, Nos. YDK008922-229 | 68 |
| 98 Letter, 4-20-94, No. YDK-005-0417 | 120 |
| 99 Letter, 9-29-92, and attachments, various MOF and MPA numbers | 160 |
| 100 Letter, 9-25-92, and attachments, Nos. CDB006458-6437, and various other numbers | 166 |
| 101 10 CFR 61.55, Waste | |


49

E X H I B I T S C O N T I N U E D


| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| Classification | 186 |
| 102 Nuclear Waste Technical Review Board Full Board Meeting, 1-11-94, Nos. YDK-013-0001-035 | 216 |
| 103 Memorandum, 3-8-94, and attachments, Nos. HQR-028-2747-762 | 221 |
| 104 Memorandum, Nos. HQR-058-0330-331 | 223 |
| 105 Defendant's Proposed Stipulation of Facts, Case No. 98-126C | 226 |
| 106 Letter, 7-15-98, Nos. HQR-041-0600-601 | 276 |
| 107 Memorandum, Nos. EL-115711-713 | 277 |
| 108 Letter, 7-30-93, and attachments, Nos. HQ0013568-578 | 283 |


50

P R O C E E D I N G S
Whereupon,
RONALD A. MILNER
was called as a witness by counsel for Plaintiffs, and, having been duly sworn by the Notary Public, was examined and testified as follows:
FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. SKALABAN:
Q. Okay. Hello, Mr. Milner. How are you today?
A. Morning. Fine.
How are you?
Q. And just before we begin this morning, the same ground rules that we discussed apply.
Is that okay?
A. Fine with me.
Q. I wanted to cover something about failed fuel we were talking about at the end of yesterday's session. And I asked you if there was an NRC-licensed container for failed fuel with the department then accepted upon the currently agreed schedule, and your answer was, as I understand your answer, in your opinion you thought yes.
I mean, do you recall that exchange?
A. Yeah. My recollection was that

51

certainly -- well, overall, we're going to accept failed fuel, so ultimately there will have to be a certified container to move it in. And then I think you just have to deal on a case-by-case basis, what's the nature of the failure, what's it look like, and what kind of handling will it require, and at what point do you do that.
Q. If I understand your testimony from yesterday, in the failed fuel, if there was an NRC-licensed transportation cask -- I'm sorry -- canister system available for it, it would be taken on the same waste acceptance schedule?
A. Well, again, I think -- at least I intended to characterize that that you almost have to look at it on a case by case, what's the nature of the fuel, how badly is it failed, what does it look like, and what kind of handling will that require at the repository receipt facility.
And I guess just to use a hypothetical example, if you have some very, very badly failed fuel, and out of all the assemblies that we will accept, ultimately, if that's the only one that requires that type of handling, do you stop everything and try to deal with that one assembly or do you put it farther back in the queue.

52

It's hypothetical. I don't know. You'd have to know what the situation was to say what you do.
Q. But if there was an NRC canister system that was fully licensed to transport that failed fuel, you would still anticipate that there be could a problem with accepting the waste on an agreed-upon schedule?
A. I think there's a potential of that, yes, again, depending on the nature of the failure, what it looks like.
Q. And that's based on disposal problems?
A. Well, it's based on the ability to move that fuel from the transport pack -- transport cask to a waste package and then place it. You know, for example, if the requirement was that you had to physically put this in a hot cell and deal with it, that's a different matter than unloading a standard fuel assembly.
Q. How likely do you think that kind of a situation may arise, that you would have a failed fuel assembly that the NRC has blessed in effect for transportation in a licensed canister that you would be technically unable to dispose of it in a repository?

53

MR. SHULTIS: Objection, calls for speculation.
A. I don't think I said that we were technically unable to dispose of it. It was a question of, do you handle that in the normal queue, or do you have to make provision for special handling of it.
To me it's not a question of whether you're disposing of it. It's just a question of, you have to delay receipt of that until you make special arrangements to handle it.
BY MR. SKALABAN:
Q. Is the department making any plans at the current time to handle failed fuel at the disposal facility?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness, calls for -- I think it also calls for a legal conclusion.
A. Again, I guess in my opinion, if you had failed fuel that was not badly failed -- not a very good term of art -- but it probably would not require heroic special handling, and if you do, then I think you're going to have to be able to deal with that on a case by case. Certainly it would be sufficient for handling that, but again depending on the nature of

54

the failure, does that bring your receipt line to a stop, for example, to handle that one particular piece of fuel.
So, yes, the repository would be able to handle failed fuel, but what does that do to the receipt system. And I don't know that we have -- we have certainly asked the utilities in -- I believe we asked the utilities in the RW 859 form something about failed fuel.
I don't know that we -- the department -- have a very, very good handle on all the failed fuel, the nature of the failed fuel. I'm not sure even the utilities themselves would know exactly what they have in the way of failed fuel in their pools until they do an in-depth check.
BY MR. SKALABAN:
Q. Who's looking at the failed fuel, the integrating failed fuel into the acceptance and disposal system at DOE?
A. Well, that would be part of the overall design effort that's being done by our M and O contractor.
Q. I mean, is it fair to say that for the -- in general you're envisioning that most failed fuel would be accepted and taken without problems, but

55

there may be a few exceptions that would require an individual careful study?
MR. SHULTIS: Objection, mischaracterizes the prior testimony.
MR. SKALABAN: I'm not trying to mischaracterize. I just want to make sure I understand it.
MR. SHULTIS: Calls for speculation.
A. I mean, I just simply don't know, because I don't feel that I have a handle on how much failed fuel is out there, what are the nature of the failures. If you have a fuel assembly that has one or more pins that have pinhole leaks in them, that's not necessarily a large problem. If you've got very badly unzipped cladding, that could be a problem.
BY MR. SKALABAN:
Q. And how so?
MR. SHULTIS: Objection, asked and answered.
A. Again, you know, this is pure speculation, because I don't know the nature of the failed fuel.
BY MR. SKALABAN:
Q. Sure.
But I guess I'm just trying to explore -- in your mind you're drawing a distinction between

56

different types of failed fuel and unzipped cladding, I guess is something that pops in your head as something that could be a problem, and I'm just trying to understand why that --
A. If you have a fuel pin or a fuel rod that the cladding is split wide-open, you know, or are the fuel pellets going to fall out when you try to transfer that, you have to make provision for that.
Q. Wouldn't that be just in a canister?
A. If the canister is also certified for disposal by the NRC, then that's obviously less of a problem.
Q. Okay. And now, as a matter of background, I can represent to you that my clients are using a NAC multipurpose-canister, a Connecticut Yankee and Yankee Atomic-type system.
And assuming a system like that is licensed for storage and disposal, and it's licensed to transport failed fuel, would you anticipate that that kind of system couldn't be accommodated on the normal schedule?
A. If the NRC ultimately determines that that multipurpose-canister does not have to be opened, that it can be disposed as is, then that is no problem.

57

Q. And that's generally -- would that be generally your opinion with -- in terms of kind of multipurpose-canister systems?
A. I'm not aware at this point in time that the NRC has made any statements as to the disposability of those canisters.
Q. Is the department looking at that?
A. The department is not looking at that, no.
Q. Why not?
A. No. Again, that's a decision that would be made by the NRC. They will determine as part of the licensing process whether or not that canister can be disposed of without being opened or whether they'll have to pull the fuel out of there and move it into the waste-packing facility.
The department's objective when it was working on the MPC, the multipurpose-canister program, whenever it was, in the early '90s, our objective of that effort was to try to spur development of the canister that could be stored, transported, and disposed. I think I testified that we were ultimately directed to cease work on that program, so we have not continued development of an MPC. I'm aware that private vendors are trying to do that.

58

Q. And I believe you testified earlier that that was -- even though the MPC program had been canceled, that that was a positive that came out of it, is that industry did look and develop this technology?
A. In my opinion, that was a positive, yeah.
Q. And I mean, if it's not going to be compatible with the waste management system that RW is developing, then that wouldn't be a positive, would it?
A. That would be a negative. That's right.
Q. And so I mean as you sit here today, are you aware of any DOE plans to cut off that kind of technology from the system and not integrate it into the system?
MR. SHULTIS: Objection, asked and answered.
A. I think the department is certainly considering that it may have to open those canisters.
BY MR. SKALABAN:
Q. So at this point in time, there's a possibility in your mind that the DOE is not going to integrate multipurpose canisters into its system?
A. I think that's a mischaracterization. We're certainly going to be able to integrate and

59

handle multipurpose canisters. The decision as to whether or not that canister gets disposed of in the repository is not the department's decision. That's the Nuclear Regulatory Commission's decision.
Q. I see. Again, I'm not trying to mischaracterize. I'm trying to understand.
A. Yeah.
Q. And again -- so if I understand correctly, I mean, it's your understanding, I mean, as COO of OCRWM, that the system is going to accept those kind of canisters.
It's just a matter of whether or not for disposal the NRC will let you dispose of them as is or in an overpack, I guess?
A. Correct.
Q. You're not planning to go just cut that technology off and kind of leave the utilities hanging so to speak?
A. No.
MR. SKALABAN: I'd like to mark as Milner Exhibit 96 the 1992 annual capacity report.
BY MR. SKALABAN:
Q. And Mr. Milner, if you can look at this, and also Milner 51, which is the 1995 annual capacity report, and Milner 42. So the numbers are 42, 51,

60

and 96.
(Milner Exhibit No.96 was marked for identification.)
BY MR. SKALABAN:
Q. And Mr. Milner, before we start on these documents, I want to ask you a followup about what we just talked about. And I understand your testimony to be it's not the department's intent to not accept this kind of multipurpose canister technology that's being implemented by utilities.
It plans to accept those kind of waste packages?
A. That's correct.
MR. SHULTIS: Objection, calls for a legal conclusion.
BY MR. SKALABAN:
Q. And if you weren't going to do that, that would potentially create some very serious problems for the industry, wouldn't it?
MR. SHULTIS: Objection, calls for speculation.
A. If we were not going to accept multipurpose canisters, I think it would certainly cause some problems for the utilities. They would

61

have to remove the fuel from those canisters before it could be loaded into a transport cask.
BY MR. SKALABAN:
Q. Could it possibly create -- or do you think it could create problems with getting license -- or license extensions for nuclear power plants, or possibly impact the utilities' ability to implement dry storage at all?
MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.
A. My personal opinion, I don't believe that it would cause a problem in terms of implementing dry storage. Again personal opinion, I don't believe that it would affect the ability to get a license renewal, but that's really an NRC realm there.
BY MR. SKALABAN:
Q. And why is that your opinion?
A. Just based on my limited knowledge of the area. I can't particularly envision it would cause a problem in terms of a license renewal. And I can't envision why it would cause a problem with dry storage.
Q. Well, do you think it would cause some heartburn and potential anger from state Public Utility Commissions?

62

MR. SHULTIS: Objection, calls for speculation.
A. I have no idea.
BY MR. SKALABAN:
Q. Okay. Turning to the documents I had just referenced, 42, 96, and 51, we talked about the waste acceptance schedule that appeared on page 5 of the 1991 annual capacity report, Milner Exhibit 42.
And looking at Milner No. 96, which is the 1992 ACR, if you could turn to page 4.
What we see in the 1992 ACR, page 4, table 2.1, this is the same waste acceptance schedule that appears in the 1991 ACR at table 2.1; is that correct?
A. Sorry. You said -- okay. 1992 ACR dated May '93.
Q. Right.
A. Okay. Yes. That's the same schedule.
Q. And for Milner Exhibit 51, which is the 19- -- March 1995 annual capacity report and annual priority ranking, there's a table one that appears on page 4.
A. M-hm.
Q. And that table is the waste acceptance schedule which is the same as the waste acceptance

63

schedule that appears in Milner 42, table 2.1; is that correct?
MR. SHULTIS: Objection, mischaracterizes the document.
A. Appears to be the same tables, yes, the same rates.
BY MR. SKALABAN:
Q. The same rates of acceptance?
A. Correct.
Q. And so the individual utility allocations, assuming that there was no adjustment in a priority ranking for some unusual reason, but assuming that the priority ranking stayed the same, individual utilities' individual allocations would have stayed the same for -- or stayed the same and -- with respect to the 1991 ACR, the 1992 ACR, and the 1995 ACR?
MR. SHULTIS: Objection, calls for a legal conclusion.
Also for the record, the 1995 ACR does not specify the year, the calendar year.
You can answer.
A. Yeah. And if you're asking, will those allocations by individual utilities remain the same for the first year of operation, that would be

64

correct.
BY MR. SKALABAN:
Q. I'm sorry. I'm not sure if I understood your answer.
You mean the first year of operation of the program, whenever that is?
A. Of the repository, yes.
Q. So are you envisioning that these acceptance rates and any DCSs that may have been based on these acceptance rates would then be transferring over to 2010 beginning with the first year of repository operations at that time?
A. I believe so.
Q. If as you go down the repository is accepting more waste than is reflected in these waste acceptance schedules, what would happen -- for example, let me use an example of in 2013, instead of 900, the repository is accepting 2,000 or 3,000 MTUs, what's going to happen to the DCSs then?
MR. SHULTIS: Objection, calls for a legal conclusion.
BY MR. SKALABAN:
Q. In your opinion.
MR. SHULTIS: Same objection.
A. If I'm understanding you correctly, in

65

whatever year of operation, pick year five or whatever year it may be, if we're accepting more than 900 MTUs, would we increase the allocation for everybody in the first year, or would we go farther down on the list?
Is that the question?
We haven't really addressed that.
BY MR. SKALABAN:
Q. Okay. I'm not sure that exactly was my question, but what I was saying is, for example, if I understood what you just testified to, you were saying that the DCSs that were based on these schedules -- those are going to be applied to the actual year one of the system?
A. Correct.
Q. And if in year one -- for example, if you look at the 1995 ACR, it says, year one, 400 MTUs?
A. Correct.
Q. If the repository -- let's say it starts in 2010 and it's accepting 800 MTUs instead of 400 here, what's going to happen to the DCSs that were based on 400 MTUs?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. And again, we have not addressed that.

66

BY MR. SKALABAN:
Q. Would it be logical that the DCSs would have to be revisited in that situation?
MR. SHULTIS: Same objection. It calls for speculation.
A. No. We haven't discussed that yet, so I'd have to see what the decision was.
BY MR. SKALABAN:
Q. Who would make that decision?
A. Ultimately the program director.
Q. Do you have a personal opinion on what would happen as the chief operating officer?
MR. SHULTIS: Calls for speculation.
A. Not at this point, I don't, no.
MR. SHULTIS: Are we done with these exhibits?
MR. SKALABAN: I can't promise you that that we might not see them again, but at least for the time being, yes, yes.
MR. SHULTIS: Okay.
MR. SKALABAN: Off the record.
(Discussion off the record.)
MR. SKALABAN: Back on the record.
I'd like to mark as Milner Exhibit 97 a set of DCS correspondence from Yankee Atomic's files,

67

and the correspondence are between Yankee Atomic and the department of energy.
MR. SHULTIS: All of these together are 97?
MR. SKALABAN: Yes.
(Milner Exhibit No. 97 was marked for identification.)
BY MR. SKALABAN:
Q. Mr. Milner, if I could turn your attention to this Exhibit 97. The first document contained here is a letter signed by a Mr. R.M. Grube to U.S. Department of Energy, DOE contracting officer, dated September 25th, 1992.
I believe at this time you were the director of the office of storage and transport?
A. I believe I was.
Q. Okay. And is that --
A. Have to double-check, though.
Q. Yeah. Is that the office that had responsibility for the processing of the DCSs?
A. Yes, in conjunction with the office of procurement.
Q. Have you ever seen this letter before?
A. I don't recall specifically this letter,

68

no.
Q. And from the text of the letter, what do you understand that Yankee Atomic is asking here?
MR. SHULTIS: Objection, document speaks for itself, calls for speculation.
A. Sitting here today, in my opinion, they're basically asking for priority for reactor since it was shut down.
BY MR. SKALABAN:
Q. Does it also indicate too that they're asking the DOE to accept all of the spent fuel at the station over a three-year period starting in 1998 as indicated by the attached DCSs?
MR. SHULTIS: Objection. The document speaks for itself.
A. Certainly that's what's stated in the document, which in my view is requesting priority.
BY MR. SKALABAN:
Q. And if you turn to the next document in the series, it's dated December 1, 1992.
A. M-hm.
Q. And it's a letter from Linda Strand, the contracting officer, the office of placement and administration. And it's addressed to a Mr. Buchheit.

69

Does this appear to be the department's response to the September 25, 1992, letter that we just looked at?
A. It appears to be, yes.
Q. Did you have occasion to review this document as the director of the office of storage and transport?
A. I don't specifically recall that one way or the other.
Q. Can you take a moment to read the two paragraphs that begin, as stated, and, as a result, which are the last two paragraphs on the first page.
A. Let me take a moment to read the letter.
Q. Sure.
(Pause.)
A. Okay
BY MR. SKALABAN:
Q. What do you understand the department of energy to be telling Yankee Atomic in these last two paragraphs of the first page of the letter?
MR. SHULTIS: Objection. The document speaks for itself.
A. Sitting here reading this at this point, it would tell me that under the instructions for completing DCRs, contract holders were instructed to

70

keep their DCSs within the allocation specified in the ACR.
Yankee submitted three DCSs, all three of which exceeded some cases by a factor of about five, some cases more -- one case more those allocations, and therefore, consistent with the instructions in the DCS, they were disapproved, and Yankee was requested to submit revised DCSs.
BY MR. SKALABAN:
Q. What was the authority upon which the DOE relied in formulating these instructions restricting the DCSs to the specific allocations in the ACR?
MR. SHULTIS: Objection, calls for a legal conclusion. The document speaks for itself.
A. I guess in my opinion, you trace the authority back to the standard contract, which one indicates an oldest fuel first priority ranking. It also specifies that the department prepared ACRs and APRs to allocate fuel, and the allocations are based on that.
BY MR. SKALABAN:
Q. And at this time it was the department's position that any DCS that did not comply with the instructions -- instruction 2.7 would be disapproved?
A. I believe --

71

MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
MR. SKALABAN: Well, he was the director of the office with responsibility at the time.
MR. SHULTIS: I understand, that but he's not a 30(b)(6) witness.
MR. SKALABAN: Your objection is noted.
BY MR. SKALABAN:
Q. Can you answer, Mr. Milner?
A. I'm sorry. Would you repeat the question.
MR. SKALABAN: Could you read it back, please.
(The reporter read the next-to-last question.)
MR. SHULTIS: Same objections.
A. And I believe that was so stated in the instructions from the DCS.
BY MR. SKALABAN:
Q. And so that was the department's position?
A. I believe so.
Q. Do you remember ever talking about that instruction while you were director?
A. Not specifically. I don't know.
Q. And if you do need to refer to the instructions, they are No. 43. The item is 2.7 on

72

page 6.
A. Okay.
Q. Do you have any reason to believe that the department ever talked about deviating from that instruction and the approval and disapproval process?
MR. SHULTIS: Objection, foundation.
A. I'm not aware of any discussions that had taken place that deviate from the instruction, no.
BY MR. SKALABAN:
Q. Do you know if the pos- -- I mean, was it something even open for discussion, is that maybe there would be cases where a purchaser would be allowed to exceed their allocation?
MR. SHULTIS: Asked and answered.
A. I think I had indicated previously that in a number of points throughout the conduct of the program, there had been discussions and considerations as to whether priority should be given to shutdown reactors. I believe in each case, the final outcome in discussing it with the industry as a whole was that we should maintain the ranking, I guess, if you will, that's specified in the contract, that is, oldest fuel first. Priority should be given on oldest fuel first rather than shutdown.
BY MR. SKALABAN:

73

Q. Thank you. I appreciate that, but my question is actually a little bit more specific.
Was there any discussions that you are aware of or that you can recall where the department was considering or discussing whether or not it could or should deviate from this instruction 2.7 and approve any DCS that exceeded the 1991 ACR allocation?
MR. SHULTIS: Objection, asked and answered.
A. Yeah. I believe I stated that I wasn't aware of any discussion specific to deviating from the instruction.
BY MR. SKALABAN:
Q. And so then the only -- if I understand correctly the only conversations you recall generally about the topic of deviating from the 1991 ACR allocation would be the possibility of shutdown priority?
MR. SHULTIS: Objection, assumes facts not in evidence, asked and answered.
A. I think what I stated was that, yes, there had been discussions about should we maintain a priority based on oldest fuel first, should there be priority for shutdown reactors. I don't recall if

74

there were any other situations other than shutdown reactors that we discussed as to whether or not priority should be given, but certainly.
BY MR. SKALABAN:
Q. Turning back to this letter in Yankee -- this Sept- -- this December 1, 1992, letter in Milner 97, second paragraph says, as a result of these errors, the DCS has been approved --
MR. SHULTIS: Objection.
MR. SKALABAN: I'm sorry. Thank you, counsel.
BY MR. SKALABAN:
Q. -- has disapproved -- or, has been disapproved, so as a result of these errors, the DCS numbers specified here have been disapproved.
Was it the department's position at the time that Yankee Atomic had submitted -- had committed errors in submitting its DCSs as it did?
MR. SHULTIS: Objection. The document speaks for itself, calls for a legal conclusion.
A. In my opinion, certainly the department felt that Yankee had deviated from the instructions and submitted DCRs that were far in excess of the allocation.
BY MR. SKALABAN:

75

Q. If you look at the next letter in the series, it is a January 7th, 1993, letter to Linda Strand, the contracting officer, from a Mr. J.M. Buchheit, and the letter is under Yankee Atomic Electric Company letterhead. If you want to take a moment to review the letter, please feel free.
(Pause.)
BY MR. SKALABAN:
Q. Okay. From your review of this letter, is it fair to say that Yankee Atomic is taking exception to the DCS instruction 2.7?
MR. SHULTIS: Objection. The document speaks for itself, calls for speculation.
A. In my opinion, that's what's characterized here, m-hm.
BY MR. SKALABAN:
Q. Did you review this letter when it came in from Yankee Atomic?
A. I don't recall having done that.
Q. Would that be something you would probably review in your ordinary course of business as the director of office of storage and transport?
A. Not necessarily. It could have been handled by one of my staff.
Q. Who do you think that would be?

76

A. Exhibit 1 doesn't help me, so at this point in time, I can't really recall.
Q. Do you remember in early 1993 the subject coming up at all that Yankee Atomic was taking issue with the DCS instructions and not submitting DCSs per that instruction?
A. I generally recall that.
Q. What do you generally recall was being said within DOE at that time about this?
A. I think at that point in time as the best of my recollection, the industry in general had made it pretty clear to the department that they wanted to maintain the oldest fuel first as the basis for priority ranking.
Q. You remember anything else about internal DOE discussions about Yankee Atomic's objections?
A. Nothing specific within the department. I certainly remember the industry in general raising equity issues if we gave priority to shutdown reactors.
Q. If you look at page 2 of Mr. Buchheit's letter, in the last paragraph, he says: Storing spent fuel on-site for an extended period after a plant has shut down or could be dismantled is not what Congress had in mind when it passed the waste

77

policy act.
Do you agree with that statement?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I'm sorry. Where are you reading?
MR. SHULTIS: I can help you, I think.
A. I can neither agree or disagree. I don't know what Congress had in mind.
BY MR. SKALABAN:
Q. Well, when you came to the program in the early years, in 1984 and 1985 and were, if I understand your prior testimony correctly -- I mean, you were doing things to get orientated and learn about the program when you came on board.
At that time in, you know, '84, '85, did you have that -- an understanding similar to what's reflected here?
MR. SHULTIS: Objection, calls for a legal conclusion, also, asked and answered.
A. I guess the best of my recollection, when I first joined the program, oldest fuel first had been in essence the basis for priority ranking.
BY MR. SKALABAN:
Q. But when you came on board with DOE in '84 and '85, did you have any understanding about what

78

Congress had in mind or Congress intended when it passed NWPA?
MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.
A. No, other than what was in the act itself, which is certainly subject to interpretation.
BY MR. SKALABAN:
Q. If we turn to the next letter in the stack, that's an April 8, 1993, letter. And this letter is from Ms. Tomasoni, the contracting officer, to Mr. Buchheit. It has a Bates label of YDK 037406.
MR. SHULTIS: I'm sorry?
MR. SKALABAN: The small number.
MR. SHULTIS: Oh, okay. Thank you.
Q. If you could just take a moment to review that.
Does this letter appear to be a response to Yankee Atomic's January 7, 1993, letter?
A. Appears to be.
Q. And that January 7, 1993, letter was again a resubmittal after the first rejection of the DCSs?
A. I believe that's correct.
Q. And so this letter -- this DOE letter of April 8, 1993, is a second rejection, if you will, of Yankee Atomic's DCSs.

79

Do you agree?
MR. SHULTIS: Objection. The document speaks for itself.
A. Yeah. I believe it's restating the reason provided in the first ob- -- or rejection and in essence the second disapproval.
BY MR. SKALABAN:
Q. Do you agree it was the department's position at this time that DCSs were disapproved because each DCS was being incorrectly completed, specifically Yankee Atomic had exceeded its acceptance capacity allocations for each DCS?
MR. SHULTIS: Objection. The document speaks for itself. Mr. Milner is not a 30(b)(6) witness. Also it calls for a legal conclusion.
A. In my opinion, that's what the position was, yeah.
BY MR. SKALABAN:
Q. If you see down at the bottom of the first paragraph, the department is stating -- is referencing the DCS instructions, item 2.7.
Do you see that there?
A. Yes, I do.
Q. And they're making reference of the instructions that say, exceeding the allocation will

80

result in disapproval of the DCS?
A. Correct.
Q. And again on page 2, they characterize the failure to follow item 2.7 of the DCS instructions as an error.
A. Yes.
MR. SHULTIS: Objection. The document speaks for itself.
Where exactly are you reading?
MR. SKALABAN: I'm sorry. Top of page 2, first paragraph.
MR. SHULTIS: Okay. Okay.
BY MR. SKALABAN:
Q. Then the next sentence says: In order for the department to prove Yankee Atomic's DCSs, item 2.7 of each DCS must not exceed the annual allocations established in the ACR.
Do you see that?
A. Yes.
Q. So again it's fair to say the department is relying on Yankee Atomic's failure to follow the DCS instructions?
MR. SHULTIS: Objection. The document speaks for itself.
A. I believe it's relying on the DCS

81

instructions, yes.
BY MR. SKALABAN:
Q. Did you review this letter before it went out?
MR. SHULTIS: Asked and answered.
A. I don't recall.
BY MR. SKALABAN:
Q. Are you familiar with this second rejection letter?
MR. SHULTIS: Same objection.
A. I don't really recall.
BY MR. SKALABAN:
Q. Do you remember at this point in time, were any of the other utilities not following the department's instructions on how to fill out the DCSs?
A. I don't really recall. I guess I have a vague impression that there may have been one or two others that had some error in it, but I don't really recall.
Q. Just to clarify: When you say, error, are you talking about one or two other utilities who refuse to follow 2.7 -- the instruction 2.7 and put down in their DCSs more than their 1991 ACR, or some other error?

82

A. I don't -- I just don't recall. It's a very vague general recollection that there may have been a deviation or two from the instructions, not -- I don't recall specifically enough to say it was 2.7.
Q. Okay. You don't remember another -- specifically another utility protesting the allocations?
A. I don't recall that, no.
Q. Now, if you look at the next letter, Mr. Milner, it's an April 28th, 1993, letter from Yankee Atomic to Beth Tomasoni, the contracting officer. And in the third full paragraph, Mr. Buchheit states: First we wish to clearly state, comma, once again, comma, that our request for an accelerated acceptance schedule was not in error.
Do you think Yankee Atomic's previous two letters had made it very clear that it was deliberately and intentionally seeking an accelerated acceptance schedule?
MR. SHULTIS: Objection, calls for speculation. Also, the documents speak for themselves.
A. I guess in my personal opinion, the second letter -- the one dated January 7, 1993, I believe that's clear that they were requesting an exception.

83

Their first letter dated September 25, '92, may be a little more vague, but I think that would indicate to me in my personal opinion they were requesting an exception.
BY MR. SKALABAN:
Q. Now, if you look at the next letter, the June 10, 1993, letter from Yankee Atomic --
MR. SKALABAN: Can we just go off the record for a minute?
MR. SHULTIS: Okay.
(Recess.)
MR. SKALABAN: Back on the record.
BY MR. SKALABAN:
Q. Mr. Milner, before the break, we were talking about the DCS correspondence in Milner Exhibit 97.
And just for a moment, on this April 8, 1993, DOE letter, which we had previously just looked at --
A. April 8?
Q. Yes. -- addressed to Mr. Buchheit. On the second page in the second full -- I'm sorry -- the third full paragraph beginning, during 1991, there's a sentence indicating the department is reviewing the issue and intends to resolve it through

84

federal rule-making process. The department expects to issue notice of proposed rule making this summer.
Do you see that?
A. M-hm, yes.
Q. What do you understand the department to be saying here?
MR. SHULTIS: Objection. The document speaks for itself.
A. Well, in reading this paragraph at this point -- yeah, just what it says, that the department had discussions with industry -- industry representatives, and that at least the majority opinion was that no priority should be afforded to shutdown reactors, indicates that we were continuing to review it at that time and intended on going through a rule-making process to --
BY MR. SKALABAN:
Q. And is this accurate to the best of your recollection, that the department was reviewing the issue and that it intended at this time to resolve it through federal rule-making process?
A. Well, as I had indicated earlier, that there had been discussions at various points throughout the program history, apparently during that time as well, as to whether or not priority

85

should be afforded to shutdown reactors. I don't specifically recall intending on a rule-making process, but that's certainly what's indicated here.
Q. So if I understand your testimony correctly, as you read this part of Ms. Tomasoni's letter, she's indicating to Yankee Atomic that the issue at least is still open and that the department intends to address it in federal rule making?
Is that a fair characterization of what's being said?
MR. SHULTIS: Objection. The document speaks for itself.
A. Yeah. That's the way I would interpret this at this point.
BY MR. SKALABAN:
Q. It also indicates that the department expects to issue a notice of proposed rule making this summer?
MR. SHULTIS: Same objection.
BY MR. SKALABAN:
Q. Is that correct?
A. That's what it indicates, yes.
Q. And the next paragraph, it's fair to say that the DOE contracting officer is encouraging Yankee Atomic to exercise their contractual right to

86

swap; is that correct?
A. Correct.
Q. And the last paragraph, the contracting officer is requesting that Yankee Atomic contact DOE and arrange for a meeting to discuss the DCS issue?
MR. SHULTIS: Objection. The document speaks for itself.
I'm not sure where you're reading.
MR. SKALABAN: Sorry. The very last paragraph.
A. Yeah. It appears to say that, just that, that the contracting officer is requesting Yankee Atomic contract -- contact the contracting officer to discuss those issues, the DCS issues.
BY MR. SKALABAN:
Q. Now, in the following letter of April 28th, 1993, from Yankee Atomic, is it fair to say in the second paragraph, Yankee Atomic is again taking exception to the DCS instructions?
MR. SHULTIS: Objection. The document speaks for itself, calls for speculation.
A. I would not read sitting here today that second paragraph to explicitly request an exception. To me it says that they received the rejection, submitted their DCSs within 30 days of the rejection.

87

BY MR. SKALABAN:
Q. Okay. But looking at the sentence in the next paragraph below that, that again reiterates that the request for accelerated acceptance was not in error?
MR. SHULTIS: Same objection, and asked and answered.
A. I believe the third paragraph, I would interpret that that way.
BY MR. SKALABAN:
Q. Now, Mr. Buchheit, on the second page, makes a statement in the second full paragraph: Then if spent fuel shipping campaigns were consolidated rather than spread out over an extended period, comma, it would reduce DOE's cost, which is a goal that should be supported by all DOE's customers and regulatory bodies.
Is that a fair point, that spent nuclear fuel shipping campaigns are consolidated --
A. Oh, I'm having difficulty finding where you're reading.
Q. I'm sorry. The second full paragraph, and it begins, we have enclosed correspondence.
A. Okay. I see it. Yeah.
Q. Okay. Well, looking at that paragraph, it

88

indicates that Yankee Atomic has stated that as a matter of national policy it would be extremely undesirable to have decommissioned sites containing only spent fuel storage casks for over 20 years.
Do you agree that it would be undesirable as a matter of national policy to have decommissioned sites containing only spent nuclear fuel casks for over 20 years?
A. I don't know that I can agree or disagree.
Q. Well, in your opinion, would that be desirable, to have utilities who have completed decommissioning to have to incur operations and maintenance expenses for 20 years to watch over spent nuclear fuel casks on their site?
A. I think taken in isolation without other considerations, it would certainly be desirable not to have that occur.
Q. And the next sentence in the letter makes a point about spent fuel shipping campaigns being consolidated would revise DOE's cost, which is a goal that should be supported by all.
Do you think that's a fair point about spent fuel shipping campaigns?
MR. SHULTIS: Objection, calls for speculation, vague.

89

A. Yeah. I'm not sure what is really being referred to here. Certainly reducing costs are a goal, but I'm not sure what they're really referring to when they say, consolidating shipping campaigns rather than spread out over a period of time.
BY MR. SKALABAN:
Q. Well, to remove spent fuel from a site, if there were only five shipping campaigns in five years, for example, as opposed to 20 shipping campaigns to the same site spread out over 20 years, wouldn't that likely reduce DOE's cost?
MR. SHULTIS: Objection, calls for speculation.
A. I guess I'm still having a little trouble understanding if what's being referred to is, is it cheaper to -- just to use arbitrary numbers -- ship 500 MTUs of spent fuel in one year versus 500 MTUs of fuel over five years, a hundred per year, without really having any knowledge of what contractual arrangements might be made with the shipper, basically you're paying by the miles and numbers of shipments. And I don't know how that would vary whether you did it all in one year or over five years.
BY MR. SKALABAN:

90

Q. And in the last paragraph, it indicates that there would be a meeting and a conference call.
Do you see that in the last paragraph -- between DOE and Yankee Atomic -- a meeting and a conference call?
A. Yeah, yeah, I do.
Q. Do you remember or did you participate in any conference call with Yankee Atomic in or around April of 1993?
A. I don't recall that I did.
Q. Do you remember that such a conference call took place?
A. I don't recall, no.
Q. If you look at the next letter dated June 10, 1993, from Yankee Atomic, this says, this letter is written to document the apparent impasse reached in our June 4, 1993, meeting.
Did you have any participation in a meeting that may have occurred between Yankee Atomic and the department on June 4, 1993?
A. I don't recall having done so.
Q. The letter is copied to Allan Brownstein.
Do you know whether he might have been in such a meeting?
A. I don't know whether he was or not. It's

91

possible.
Q. He was someone reporting to you at this time?
A. I believe so.
Q. Now, on page 2 of this letter on the very last paragraph, it says, Yankee questions the inviolability of DOE projected capacity. Its projected schedule is only for planning purposes.
Do you understand this letter to be referring to the ACR?
MR. SHULTIS: Objection, lack of foundation, calls for speculation.
A. I can't ascertain from this paragraph whether that was the case or not. I would assume that would be the case, but you can't tell from this.
BY MR. SKALABAN:
Q. I mean, does this indicate to you that Yankee is objecting to the DOE schedule?
MR. SHULTIS: Objection, calls for speculation.
A. Well. All I can infer is projected capacity, so ACR rates, I guess. I don't know.
BY MR. SKALABAN:
Q. That's what it indicates to you as the reader?

92

A. Sitting here as I read this now, yes.
Q. And the very top of this page 2, in the very first paragraph, there's a sentence beginning, in any event.
Actually I'm sorry.
If we look at the first paragraph, first sentence, DOE suggested Yankee either wait for a pending rule making which would address among other things the issue of priority for shutdown plants or take matters in our own hands and negotiate swap arrangements with other utilities.
MR. SKALABAN: Page 2, very first paragraph.
MR. SHULTIS: Okay.
BY MR. SKALABAN:
Q. Do you see that sentence, Mr. Milner?
A. Yes, I do.
Q. Does this indicate to you that at the meeting between Yankee Atomic and the department of energy it indicated that there would be a rule making to address the priority for shutdown plants issue?
MR. SHULTIS: Objection, calls for speculation. Also the document speaks for itself.
A. Yeah. Guess in my opinion looking at this today, it indicates that pending rule making which

93

would address priority as well as apparently other issues.
BY MR. SKALABAN:
Q. Do you recall getting this letter or seeing this letter?
MR. SHULTIS: Objection, asked and answered.
A. I don't recall, no.
BY MR. SKALABAN:
Q. But do you believe that's correct, that the department had been indicating to Yankee Atomic at this time that there would be a rule making to address priority for shutdown plants?
MR. SHULTIS: Objection, calls for speculation. The document speaks for itself, asked and answered.
A. It appears to be the case from reading this.
BY MR. SKALABAN:
Q. And on page 3 of the letter, there is a heading called, negotiation rights, and there's a paragraph beginning, however.
Do you see that, sir?
A. Yeah. I'd like to read that section in context.

94

Q. Yeah, please do.
(Pause.)
A. Okay.
BY MR. SKALABAN:
Q. Did the department at this time tell Yankee Atomic that if they did not follow the DCS instructions that they could lose their allocation?
MR. SHULTIS: Objection, calls for speculation.
A. I don't know. I don't recall having been at that meeting. I don't believe I was. I don't know what was said there.
BY MR. SKALABAN:
Q. Recognizing that you don't recall being at the meeting, as the director of the office of storage and transport, do you remember that being discussed at all at this time?
A. No, I don't recall that.
Q. So you don't have a basis to agree or disagree that Yankee may have been threatened with the loss of their allocation?
MR. SHULTIS: Objection, mischaracterizes prior testimony, calls for speculation.
A. I don't know what was said at the meeting.
BY MR. SKALABAN:

95

Q. Now, the next letter is a June 15, 1993, letter from the DOE contracting officer to Mr. Buchheit.
Does this letter appear to be a response to the June 10, 1993, letter that we just looked at?
A. The letter states, this is in response to your letter of June 10, so I guess so.
Q. And on page 2 of this letter, it states that -- on the second paragraph beginning June 10, 1993 -- actually if you want to just take a minute to read through that paragraph and the next one.
A. Okay.
(Pause.)
BY MR. SKALABAN:
Q. Okay. Is this letter from the department denying Yankee Atomic's request for priority acceptance at that time?
A. That would be my interpretation, yes.
Q. Does the letter also indicate that after completion of a rule making on shutdown priority Yankee could resubmit its -- resubmit its request, at which time the department will respond in accordance with the terms of the final rule?
MR. SHULTIS: The document speaks for itself, also, lack of foundation.

96

A. What this is saying to me is that if -- once the rule making was completed, if the result of that rule making was to grant priority to shutdown reactors, then certainly Yankee could resubmit its request.
BY MR. SKALABAN:
Q. In that sentence, it says, Yankee Atomic may submit -- resubmit this request, which is in the second paragraph.
What is your understanding of what the department was referring to in the request?
Was it DCSs or another -- a request of another sort?
What was the department intending here --
A. Sitting here --
MR. SHULTIS: Objection. The document speaks for itself, also calls for speculation, lack of foundation.
A. At this point reading this, I would interpret this to mean their request for priority for shutdown reactors.
BY MR. SKALABAN:
Q. Is this indicating that after the rule making, Yankee Atomic could resubmit DCSs?
MR. SHULTIS: Same objection, asked and

97

answered.
A. Well, to me it doesn't say that. I would infer from that.
BY MR. SKALABAN:
Q. In the next paragraph, is the department again encouraging Yankee Atomic to swap?
A. Appears to be, yes.
Q. Do you know what the department intended by the phrase here, quote: The department is willing to assist Yankee Atomic in this process --
MR. SHULTIS: Objection, calls --
Q. -- end quote?
MR. SHULTIS: Objection, calls for speculation. The document speaks for itself.
A. I don't believe anything was specifically intended by saying that other than if Yankee Atomic felt that in some manner the department could be of assistance in arranging a swap, the department would be willing to do what it could.
BY MR. SKALABAN:
Q. To help Yankee Atomic obtain those swaps?
A. Yes.
Q. In the last paragraph, the department is stating that: As we discussed during our negotiations, submittal of an acceptable DCS does not

98

preclude Yankee Atomic's right under the contract should the department subsequent to rule making grant such priority under article -- under the articles of the contract?
A. M-hm.
Q. Do you see that part, sir?
A. I do.
Q. Does that indicate that Yankee Atomic would not be bound by acceptable DCSs, that this would be contingent upon future events?
MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion, lack of foundation.
A. In my personal opinion, I think what's intended here is that if through the rule-making process provisions of the contract were changed, then Yankee could submit a new DCS and not be bound by the previously approved one.
BY MR. SKALABAN:
Q. So this is providing some qualification of the DCS process, is it not?
MR. SHULTIS: Objection, asked and answered.
A. No, I don't believe it is. I think what this is saying to me is that if the contract were

99

ultimately changed through the rule-making process, then new DCSs could be submitted, which would be consistent with that new provision of the contract.
BY MR. SKALABAN:
Q. Well, the contract at that time already provided the department the ability to grant priority for shutdown plants?
A. The contract did not preclude the department's ability to do that.
Q. Well, it gave them an affirmative grant of authority to do that if they wanted to; isn't that correct?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I guess my recollection of the words is that the department may afford priority.
BY MR. SKALABAN:
Q. And so there -- wasn't the issue to be addressed whether rule making wasn't a change to the contract, it was whether or not priority would be available for Yankee?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation, and mischaracterizes the document.
A. In my personal opinion, the contract

100

provided for priority based on oldest fuel first. I think in totality, what this paragraph is saying is that -- it's suggesting that Yankee should submit DCSs based on current allocations, encouraged Yankee to exercise exchange rights, indicated the department would be willing to assist whatever Yankee would like to do, but that ultimately, if the rule making changed a provision of the contract away from oldest fuel first, then Yankee could submit -- well, new DCSs, whatever.
BY MR. SKALABAN:
Q. I understand your answer.
I guess what I'm trying to probe at this point in time is, the contract already provided that the department may grant priority. So the issue is not a change in the contract language itself. It was the issue of whether the department should or should not exercise that provision and grant authority.
Isn't that a more accurate characterization of the issue at that time?
MR. SHULTIS: Objection. The document speaks for itself, calls for a legal conclusion, asked and answered.
A. No, I don't believe so. I believe the contract provided for oldest fuel first. It did not

101

preclude some priority for shutdown.
BY MR. SKALABAN:
Q. What would be the effect if the rule making that's being discussed in this letter and the other letters we've seen -- what would be the effect if the department never carried through with that rule making on Yankee Atomic's DCSs?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation, and vague.
THE WITNESS: Yeah.
A. I mean, I don't understand the question.
BY MR. SKALABAN:
Q. I think it's fair to say that in view of the letters we've been seeing, the department has told Yankee Atomic that they're going to carry through a rule making on the priority for shutdown reactor issue?
MR. SHULTIS: Objection.
BY MR. SKALABAN:
Q. Do you agree with that?
A. Appears to be the case, yes.
Q. And there's nothing in your recollection as the director of office of storage and transport which makes you think otherwise?
A. Don't understand.

102

Q. There's nothing to your recollection at this time -- you were the director of office -- director of the office of storage and transport, and during this time, you have no recollection of anything other than the fact that Yankee Atomic was being told there was going to be a rule making to address this?

A. Yeah. I certainly recall -- in fact in one of these letters, I think I saw it that Yankee Atomic preferred not to have a rule-making process, and I can only speculate the reasons, but certainly under a rule-making process, you solicit the views of all interested parties, and you reflect essentially the majority views in that rule making, and I can only assume that Yankee would have felt it was in the minority and not received its intended objective in the rule making, but I do recall Yankee preferring not to go through the rule-making process.

Q. Okay. But my question was about what the department was telling Yankee. And if we look here at the very first part of the very first paragraph, it says: The department has not determined whether priority will be accorded to shutdown reactors. The department intends to address further the issue of priority acceptance for shutdown reactors through the



public process of rule making.

And the document also states that: As we discussed during our negotiations, submittal of acceptable DCSs does not preclude Yankee Atomic's rights under the contract should the department subsequent to rule making grant such priority.

I mean, in view of those statements, the department is clearly telling Yankee Atomic, is it not, that there's going to be a rule making on whether or not to grant shutdown priority?

MR. SHULTIS: Objection. The document speaks for itself, calls for speculation, and asked and answered.

A. Yeah. I think I stated that before, that that's what's said here to me, m-hm.

BY MR. SKALABAN:

Q. Okay. And so what would be the effect, then, if there is no rule making after the department is telling Yankee Atomic that they can resubmit based on the results of that rule making?

MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.

A. I guess in my opinion sitting here the -- if Yankee had submitted and gotten approved DCSs based on no priority for shutdown reactors and either



a rule making was not undertaken on priority or if a rule making had been undertaken and no change to the contract was made, then those DCSs would stand. If as a result of rule making the contract changed, then Yankee had the ability to submit DCSs based on the change to the contract.

BY MR. SKALABAN:

Q. But I mean, it's fair to say given these statements in this letter that the department is telling Yankee Atomic its going to do a rule making?

MR. SHULTIS: Objection. The document speaks for itself.

A. Yeah, I think it says that, but I don't think it tries to judge the outcome of the rule making.

BY MR. SKALABAN:

Q. Okay. Understanding that they're not judging the outcome of the rule making, it's telling Yankee Atomic that there's going to be a rule making, and depending on the results of that rule making, their schedule may change?

MR. SHULTIS: Objection, assumes facts not in evidence.

A. I don't know.

BY MR. SKALABAN:



Q. Is that a fair characterization?

A. Yeah. I think that's probably fair, saying that if the contract were amended and that amendment somehow affected the method by which priority was granted -- or allocation was granted, then, yeah, the schedule would change.

Q. And so my question is, after telling Yankee Atomic that there's going to be a rule making and that that rule making may affect its DCSs or its schedule, then what is the effect if the department doesn't follow through with what it told Yankee Atomic it's going to do and have a rule making?

MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.

A. Yeah. I can't judge what the effect would be, because to do so, I'd say have to judge -- at least make some projection as to what the outcome of the rule making would be. The outcome of the rule making may ultimately end up with no effect, or it may have some effect.

BY MR. SKALABAN:

Q. Now, on page 2 in the last paragraph, it says: If an acceptable year one DCS is not received within 30 days, the contracting officer will issue a decision regarding the status of Yankee Atomic to

year one allocation.
A. Yes.
Q. What is your understanding of what the department was trying to convey with that sentence?
MR. SHULTIS: Objection, calls for speculation. The document speaks for itself.
A. Well, sitting here reading this now, I think the contracting officer is saying that -- once again asking Yankee to submit its DCS in accordance with the instructions for the DCSs within 30 days of that date, and if one was not received, at that time the contracting officer would decide what was the status of Yankee's year one allocation.
BY MR. SKALABAN:
Q. Does that indicate to you that they're telling the Yankee -- or indicating to Yankee Atomic that if they didn't follow the DCS instructions that Yankee Atomic was going to lose its allocation?
MR. SHULTIS: Objection, asked and answered, calls for a legal conclusion.
A. My personal opinion, I wouldn't infer that from that paragraph, which is simply saying that the decision would be made. I can only guess that the decision could be -- it would be approved or disapproved.

107

BY MR. SKALABAN:
Q. Do you have any reason to believe sitting here that the contracting officer would have approved a DCS that was similar to Yankee's previous DCSs and that didn't follow the letter of the instructions?
MR. SHULTIS: Calls for speculation.
A. I have no reason to believe what -- which way the contracting officer would go.
BY MR. SKALABAN:
Q. Did you have any discussions with the contracting officer at this time about the dispute between Yankee and the department?
A. I can't recall specifically. I guess in general terms, I recall some discussions about Yankee's request for priority, the dispute, so to speak, but I don't recall discussing what the contracting officer's final decision might be.
Q. What do you remember about the conversations that you did have on the issue?
A. Again, in general terms that Yankee was requesting priority that the -- under the contract the department believed oldest fuel first was the ranking. Even under that, we weren't affording priority to shut down the reactors. If that changed, then the situation would change.

108

Q. Anything else?
A. Not that I can recall offhand, no.
Q. I mean, sitting here today, do you really believe that if Yankee Atomic had submitted a third DCS submittal again not following the letter of instructions that there was any chance that the department was going to approve it?
MR. SHULTIS: Objection, calls for speculation, asked and answered.
A. Again, I don't know ultimately what the contracting officer would have done. I don't have any reason to believe since nothing had changed that it would be approved.
BY MR. SKALABAN:
Q. In fact, when you look at the DCS's instructions, Milner 43, it's pretty clear in section 2.7 that the total quantity of SNF designated for delivery must not exceed the allocation in the ACR. Exceeding the allocation will result in disapproval of the DCS?
A. Yes. I recall that it states that.
Q. I mean, that's a pretty clear command, isn't it?
A. I believe it is.
Q. And so you wouldn't have any reason to --

109

I mean, do you have any reason to believe that the department was going to consider deviations to that command in this process?
MR. SHULTIS: Objection, asked and answered.
A. As I had indicated, no, I don't have any reason to believe that.
BY MR. SKALABAN:
Q. And if we turn to the next document in the series, there's -- it's a July 26, 1993, letter also from Mr. Buchheit. And beginning of this letter states that: Attached is the Yankee Atomic -- or I'm sorry -- the Yankee delivery commitment schedule for year one showing the allocation for delivery to DOE to be the same as detailed in the annual capacity report, open paren, ACR, close paren, period. We are filing this DCS under protest and only because of concern that failure to file as mandated by DOE will result in Yankee losing its place in year one of the DOE acceptance schedule.
Do you recall reviewing this letter?
A. No, I don't recall.
Q. Mr. Brownstein is copied on this letter.
A. M-hm.
Q. Do you recall having any discussions with

110

Mr. Brownstein about this letter?
A. No, I don't.
Q. This letter indicate to you that Yankee Atomic is filing under protest?
MR. SHULTIS: Objection. The document speaks for itself, calls for speculation.
A. No. It states that Yankee was filing under protest, yes.
BY MR. SKALABAN:
Q. And in the second page of the letter, second full paragraph, it says that: Regardless of your denial of our priority request, comma, we intend to further pursue this issue to higher levels, period. Accordingly, please be advised that we reserve our right under the standard contract to do so.
Does this indicate to you that Yankee Atomic is reserving its rights --
MR. SHULTIS: Objection. The document speaks --
BY MR. SKALABAN:
Q. -- with respect to its DCS submittals?
MR. SHULTIS: Objection. The document speaks for itself and calls for a legal conclusion.
A. That would have been my opinion. It says

111

that, we reserve our rights, m-hm.
BY MR. SKALABAN:
Q. In the following letter, there's a September 23, 1993, reply from Beth Tomasoni to Mr. Buchheit and an attached DCS signed by the department.
Does this appear to you to be the department's response to Yankee Atomic's July 26, 1993, letter?
A. Certainly a response to their DCS submittal.
Q. Now, in the cover letter, is Ms. Tomasoni taking any exception to Yankee Atomic's filing under protest and Yankee Atomic's reservation of its rights?
MR. SHULTIS: Objection. The document speaks for itself. I think it mischaracterizes the document.
A. The cover letter simply is an approval of the DCS.
BY MR. SKALABAN:
Q. It's fair to say the letter doesn't address Yankee Atomic's reservation of rights at all?
MR. SHULTIS: Same objections.
A. Yeah. I believe it does not.

112

BY MR. SKALABAN:
Q. Now, in the attached DCS, it's signed by Mr. Brownstein?
A. Yes.
Q. Does this refresh your recollection at all that Mr. Brownstein was involved with the contracting officer in considering these DCS submittals?
A. Well, he certainly approved as part of the program, as the contracting officer's technical representative.
Q. It indicates he was the branch chief RW 432.
Do you remember what the RW 432 designation means here?
A. I don't recall what the title of the branch was at that time.
Q. But he was under your direction at that time?
A. I believe he was, yeah.
Q. So he would have been a branch chief I guess of a subbranch, if you will, of the office of storage and transport?
A. Yes.
Q. And if you look at the next letter in the series, it's a September 23, 1993, letter from

113

Mr. Buchheit. And it contains -- and let me know if you disagree with this, but it contains a DCS with a -- for year two of operation of the Civilian Radioactive Waste Management system.
A. M-hm.
Q. Is that correct?
A. I believe so, m-hm.
Q. And here again, Yankee Atomic is saying that: Although the allocations shown on the DCS corresponds to the projected acceptance rate shown in the ACR, we are once again filing this DCS under protest as we did with our previous filing for year one and reserve our rights under the standard contract.
Do you see that?
A. I do.
MR. SHULTIS: Objection. The document speaks for itself.
Actually I'm not sure I see where that is. Could you specify that, please?
MR. SKALABAN: First paragraph of the letter.
MR. SHULTIS: Okay. In bold.
BY MR. SKALABAN:
Q. So the letter to you, Mr. Milner, is

114

indicating that they are filing under protest and reserving their rights?
MR. SHULTIS: The document speaks for itself, calls for a legal conclusion.
A. Yeah, in my opinion, it does.
BY MR. SKALABAN:
Q. I believe the next letter in the series is the department's response dated December 6, 1993.
Does that seem right to you?
A. Yeah. This is the response to their DCS submittal.
Q. For year two?
A. Yeah, for year two.
Q. And again nowhere either on the cover letter or the signed DCS form is the department indicating any exception to Yankee Atomic's reservation of rights?
MR. SHULTIS: Objection, calls for a legal conclusion. The document speaks for itself.
A. In my opinion, that's the case, yeah.
BY MR. SKALABAN:
Q. Now, in between -- actually, the -- in between this time -- the two letters we've just looked at for the year two Yankee Atomic DCS are September 23, 1993, and December 6, 1993.

115

I'd like you to take out for a minute Milner Exhibit 61. And please take all the time you need to review this letter, but I'd like to indicate for the record that this letter is dated October 7, 1993, which suggests that it is a letter that took place in between the last two letters we looked at dated September 23 and December 6; is that correct?
A. I believe it does -- or is, yes.
Q. Milner 61 is a letter to Lake Barrett from Mr. Rudy Grube, and I believe you are copied on the letter?
A. Yes.
Q. Reviewing this letter, does this refresh your recollection -- well, does this -- well, in view of this letter, do you recall having a meeting on September 20, 1993, where at least Mr. Grube, Mr. Barrett, and yourself were in attendance?
A. As soon as I review the letter, I'll let you know.
Q. Okay. And the meeting is referred to also -- is referred to in the cover letter.
(Pause.)
A. Certainly the cover letter states that a meeting occurred between at least the three of us on September 20th. I don't specifically recall the

116

meeting. Certainly there were probably several occasions where I, with or without Mr. Barrett, potentially with others, met with Mr. Grube.
BY MR. SKALABAN:
Q. So the specifics of this meeting you just don't recall?
A. I don't recall specifically, no.
Q. Do you keep notes as a general practice?
A. Usually, I do not.
Q. Do you have any notepads in your office?
A. No, not in terms of meeting notes, no. Reminder notes, yes, I do, all over the place.
Q. Like for example this kind of, you know, standard --
A. I do not.
Q. -- notepad with, you know, 200 pages?
You don't keep any of these in your office?
A. I do not.
Q. Why don't you keep notes of your business?
A. Haven't found the need to.
Q. Has that been your practice all along?
A. Yes.
Q. So as best as you recall, if there was a meeting here, you wouldn't have taken any notes

117

during the meeting?
MR. SHULTIS: Asked and answered.
A. I certainly don't recall, and my practice is generally not to take notes, so I doubt that I would have.
BY MR. SKALABAN:
Q. In your office anywhere like in a box or in storage or for that matter in a file cabinet, whether it's in your office or outside of it, I mean, do you think there's any notepads that you might have --
MR. SHULTIS: Objection, asked and answered.
BY MR. SKALABAN:
Q. -- with information on it?
MR. SHULTIS: Asked and answered.
A. I'm quite certain there is not.
BY MR. SKALABAN:
Q. Do you ever remember filing any -- you know, ripping out pages of a notepad and filing it anywhere or having it filed anywhere?
A. No.
Q. No?
A. Again, I as a practice don't take notes. I prefer to deal with the issue at the time and go

118

from there and rely on the official filing system of the program.
Q. Now, looking at this document, does this indicate to you that again Yankee Atomic was told that there was going to be a rule making on the subject of priority for shutdown plants?
MR. SHULTIS: Objection. The document speaks for itself.
A. Yes, it does.
BY MR. SKALABAN:
Q. And that's -- you have no reason to disagree with that sitting here today?
A. Disagree with?
Q. With the fact that Yankee Atomic would have been told on September 20th, 1993, that the department was planning to go through with a rule making on the issue of shutdown priority?
A. I have no reason to disagree with that at this point.
MR. SKALABAN: Off the record one moment.
(Discussion off the record.)
MR. SKALABAN: I'd like to mark as Milner Exhibit 98 a letter dated April 20, 1994, to the Honorable Hazel O'Leary.

119

(Milner Exhibit No. 98 was marked for identification.)
BY MR. SKALABAN:
Q. And I take it at the time, Hazel O'Leary was the secretary of the department of energy?
A. I believe so, yeah.
Q. And it's copied to a D. Dreyfus.
Can you tell me for the record who he is?
A. I guess at that point in time, Mr. Dreyfus was the director of the Office of Civilian Radioactive Waste Management.
Q. Did you work closely with Mr. Dreyfus at this time?
A. I was one of his office directors.
Q. So I guess that's a yes?
A. Reasonably closely.
Q. How long did he hold that position of director?
A. Approximately three years.
Q. And do you approximately know what the time frame is that he held that position?
A. I believe he left the position in January of 1997, so I guess it may have been slightly over three years that he held the position, because I

120

vaguely recall it was like fall time frame that he assumed the position, so that would have been, what, fall of '93? Very rough approximation.
Q. So -- I mean, again understanding it's a rough approximation, it was 1993 to -- I think all of 1993?
Is that what you said?
A. No. If I'm remembering correctly, and it's been quite a while, obviously, but seems to me that he assumed the position in the fall of '93.
Q. Okay. So the fall of '93 to approximately January '97.
Again, that's an approximation; is that right?
A. I think -- yeah, that's an approximation. It was -- his departure was very closely associated with the reswearing in of the new president.
Q. Was he a political appointee, or was he --
A. He was a political appointee. He was a presidential appointee.
Q. So if he was a presidential appointee, would he have -- do you know why he left?
A. I have no idea why he left, no.
Q. Did he ever express any reasons why?
A. It is not uncommon, even at the start of a

121

second term of the same individual in the presidency, for a political appointee position to change. It's not uncommon. But he's never stated to me why he departed.
Q. What do you think of him personally?
I'm sorry. Let me ask a better question.
What did you think of him professionally?
MR. SHULTIS: Objection, relevance.
BY MR. SKALABAN:
Q. Did you have respect for him?
A. I had respect for him, yes.
Q. Did you ever know him to make any inaccurate -- I'm sorry.
Let me ask that again.
Did you ever know him to make any -- did you ever know him to make any erroneous statements about the department's position when he was the director?
A. Certainly not that I can recall.
Q. Did you review this letter when it came in?
A. If I did, I certainly don't recall it.
Q. Looking through this letter, does this letter indicate to you that Yankee Atomic is asking for information on the department's actual plans for

122

removing spent fuel in order for it to comply with FERC proceedings and prepare a decommissioning cost estimate?

MR. SHULTIS: Objection. The document speaks for itself, calls for speculation.

A. In reading this at this point, yes, they're certainly asking when the department will begin accepting Yankee spent fuel.

BY MR. SKALABAN:

Q. Well, it also indicates that they need -- Yankee Atomic needs this information to comply with a FERC proceeding which requires Yankee to submit a revised decommissioning cost estimate.

Do you see that?

It's in the first paragraph.

MR. SHULTIS: Objection. The document speaks for itself.

A. I see that in the document, yes.

BY MR. SKALABAN:

Q. During your time at OCRWM, do you have any understanding that utilities need information on the schedules or need information for planning purposes so that they can put together a cost estimate and comply with FERC proceedings?

MR. SHULTIS: Objection, vague.

123

A. Well, as far as FERC proceedings, no, I'm not aware of that. Certainly in my own opinion, that utilities needed information for their planning purposes, which is I think specifically why the department issued a huge amount of documents, that the program went on to attempt to give the best estimates at that time.

BY MR. SKALABAN:

Q. Can you tell me what understanding you have of what FERC proceedings are?

A. I don't know.

Q. From the utilities' perspective?

A. I don't know.

Q. But given that the annual capacity report provision of the contract says it's for planning purposes, and in view of this letter, does this indicate to you that perhaps the reason the ACR is for planning purposes is so that the utilities can put together cost estimates and things of that nature?

MR. SHULTIS: Objection, calls for speculation.

A. Yeah. I mean, in my own opinion, the department put out the best information available at any given point in time for planning purposes, some

124

of which may have been cost estimates on the utility part.

BY MR. SKALABAN:

Q. As you can see here: Yankee Atomic asked the department a series of questions to support our plans for decommissioning.

Do you remember receiving or reviewing these questions?

MR. SHULTIS: I'm sorry.

Where are you reading?

MR. SKALABAN: Okay. It's in the third full paragraph that begins, to support our plans for decommissions, we also request the following information, and then there's a series of bullet points, and each of those bullet points contain a question.

MR. SHULTIS: Okay. And your question is?

BY MR. SKALABAN:

Q. Do you, Mr. Milner, remember reviewing these questions from Yankee Atomic?

MR. SHULTIS: Asked and answered.

A. I don't recall.

BY MR. SKALABAN:

Q. If you could take out Milner 62 and see if that refreshes your recollection.

125

(Pause.)

A. Okay. In reading this, it certainly would indicate that I was replying to that letter, but I don't specifically recall the reply.

BY MR. SKALABAN:

Q. You don't specifically recall this reply?

A. That's correct.

Q. In view of the fact that you signed the letter, is it fair to assume that you would have reviewed this letter and the attachment to it before it went out and agreed with its contents?

A. That's a fair assumption, yes.

Q. In the first paragraph, you're making reference to multipurpose canister system to support spent nuclear fuel transportation storage and disposal?

MR. SHULTIS: You're referring to 62 now?

MR. SKALABAN: I'm sorry. Yes. Thank you.

BY MR. SKALABAN:

Q. Exhibit 62 in the second full paragraph.

A. Yes, the multipurpose canister system is referred to here.

Q. What was your understanding of the -- in view of this paragraph, what was your understanding

126

of the purposes of the department in attempting to develop a multipurpose canister system at this time?
A. Well, at that point in time, I think the department was attempting to develop a system which would at least alleviate to some extent burdens on utilities because of potential delay in the program schedule. There had been I guess consideration given whether or not it would be possible for the department to provide MPCs to the utility.
Q. What are the key reasons that's referred to here in your letter?
What is your understanding of those?
MR. SHULTIS: Objection. The document speaks for itself.
A. I think in my opinion, the key reasons were just what it states here, that we -- and as I stated, that we were attempting to alleviate at least to the extent possible economic and physical constraints that were being confronted by the utilities.
BY MR. SKALABAN:
Q. And the reason as stated in your letter is that the department shared the mutual goal of initiating federal acceptance of spent nuclear fuel as soon as -- I mean, that's a fair statement, and

127

the department shared that goal?
A. Absolutely.
Q. And that the department shared the goal with Yankee Atomic of accommodating economical and physical situations confronting utilities such as Yankee Atomic?
A. Yeah, I believe so.
Q. And that's a reference to accommodating Yankee Atomic's shutdown status?
MR. SHULTIS: Objection, mischaracterizes prior testimony. The document speaks for itself.
A. I would take it in the broader sense, that I think all utilities had some economic situation confronting them as a result of a potential delay. Certainly Yankee Atomic did, so I don't think it was speaking specifically to shutdown reactors.
BY MR. SKALABAN:
Q. Okay. So the department's shared goal at this time as stated in your letter was accommodating the economic situations that were facing utilities across the board?
A. Yeah, I believe so.
Q. And I guess you understood at this time that different utilities had different situations and different needs.

128

I assume some would have full pools, not really have a great economic need -- I'm sorry -- someone had full pools and need -- you know, have immediate economic need -- someone had pools that weren't near capacity, wouldn't have economic need, and some were shut down and would have needed to get the fuel removed?
A. Certainly.
Q. And it was well understood in the department that different utilities had varying needs?
A. Absolutely.
Q. Was that always your understanding at the department that different utilities had varying needs?
A. Yes, it was always my understanding.
Q. Even back when you were first starting with the program back in '84, that was a well-understood fact in the industry?
A. In terms of my personal understanding of that, I'm not sure at what point in time I reached the age of enlightenment and learned that, but shortly after joining the program.
Q. That's a well-understood concept, is it not?

129

A. It certainly is.
Q. Well understood in the industry generally and in the department?
A. Yeah. But as to whether I understood that in April of 1984, I probably didn't.
Q. Now, in question two here, there's a fairly long response, and I'd like to turn your -- and I'm talking about the attachment to this document.
In the last paragraph -- and the Bates reference number is HQR 042, dash, 0327, and that paragraph spills over to HQR 0420328.
In this paragraph, the department -- or your letter again appears to be indicating that the department intends to resolve the shutdown priority issue through federal rule making?
MR. SHULTIS: Objection, mischaracterizes the document. Also the document speaks for itself.
A. May I take a minute to read that?
BY MR. SKALABAN:
Q. Sure. Please do.
(Pause.)
A. Okay.
BY MR. SKALABAN:
Q. In view of this paragraph, did the

130

department intend at this time to resolve shutdown -- the issue of shutdown priority through federal rule making?

MR. SHULTIS: Objection. The document speaks for itself.

A. Yeah, I think that's what's indicated here.

BY MR. SKALABAN:

Q. And it's fair to say that you are conveying that to Yankee Atomic in this paragraph; isn't that correct?

A. Yes.

Q. So at this time -- well, during this time that Yankee Atomic is submitting DCSs, the department is telling Yankee Atomic that the issue of shutdown priority is going to be resolved through federal rule making, and therefore, there may be a change -- in effect their DCSs could be changed?

MR. SHULTIS: Objection, assumes facts not in evidence, also calls for a legal conclusion. I think it mischaracterizes prior testimony.

A. I think what this says is, the department was planning to address that issue through a rule-making process, but it certainly did not in any way, shape, or form in my opinion prejudge the



outcome of that rule-making process.

BY MR. SKALABAN:

Q. Okay. So understanding that it's not prejudging the outcome, it's leaving open the possibility that there may be a change in the schedule based on this federal rule making?

A. Only if the rule-making process ultimately changed the contract.

Q. Well, you know, I hate to go back over other ground, but I think, again, could the department -- through this rule making could grant priority without changing any language in the contract, couldn't it?

MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation, asked and answered.

A. Well, my understanding of the standard contract is that while granting priority is not prohibited, the acceptance ranking was to be based on oldest fuel first. So in the opinion of an engineer, that would perhaps require some contract language change.

BY MR. SKALABAN:

Q. Well, let's take out the contract, then, for a minute. It's Exhibit 3. I'm holding in my hands Milner Exhibit 3, which is a copy of the April



18, 1983, Federal Register notice publishing the standard contract. And on -- and I'm referring to the Federal Register page number 16602.

There's a first column there. And under, article six, B 1, little B, I'd like to call your attention, please.

Have you found that reference, Mr. Milner?

A. Yes, I have. If I may take a moment to refresh myself on the article.

Q. Please.

(Pause.)

A. Okay.

BY MR. SKALABAN:

Q. Now, if I understand correctly, I believe you read that entire article, acceptance priority ranking?

A. I did.

Q. In subpart A of that article, subpart little A, it says, except as may be provided for in subparagraph B below -- it goes on to say, acceptance priority shall be based upon the age of the SNF and/or HLW, all caps.

Now, this paragraph A is establishing the -- what's known as the oldest fuel first criteria, or OFF?



A. I believe that's the case, yes.

MR. SHULTIS: Calls for a legal conclusion.

BY MR. SKALABAN:

Q. And that when in your prior answers you were talking about the contract sending up the acceptance priority by the age of the spent fuel, this is the provision that you had in mind, I assume?

A. Yeah.

Q. In the very start of that provision, it says, except as may be provided for in subparagraph B below, and another article of the contract.

Do you see that language?

A. I do.

Q. So does that indicate to you that subparagraph B below is an exception to OFF?

MR. SHULTIS: Objection, calls for a legal conclusion. The document speaks for itself.

A. I guess, again, in this engineer's opinion, I would put the emphasis not on "except," but rather on "may be provided."

BY MR. SKALABAN:

Q. Okay. Yeah. I think you're getting ahead of me just a little bit.

But in this article six, B 1, subpart

little A, it establishes OFF, and it recognizes one exception is subparagraph little B below?
MR. SHULTIS: Objection, calls for a legal conclusion. The document speaks for itself.
A. In my opinion, it permits an exception.
BY MR. SKALABAN:
Q. Permits an exception. Okay.
And if we look at subparagraph B below, doesn't it say: Notwithstanding the age of the SNF and/or HLW, priority may be accorded any SNF and/or HLW removed from a civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason?
That's what article subpart little B says. Correct?
A. Once again in this engineer's opinion, I think that's permissive. It says, may be accorded. It doesn't require.
Q. For the time being, I'd like you to focus on the language in little subpart A, which says, except as may be provided for in subparagraph B.
And again, in subparagraph little B, the language, notwithstanding the age of the SNF and/or HLW, so these two introductory clauses, if you will, the, except as may be provided in subparagraph B,

135

and, the notwithstanding the age of the SNF and/or HLW, do those not indicate that the department can grant priority regardless of the OFF ranking?
MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.
A. Yeah. As I stated, to me, I read that that it does not preclude the department from granting priority, but does not require it.
BY MR. SKALABAN:
Q. Okay. So under the terms of the contract, the department could grant priority regardless of oldest fuel first?
MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.
A. In my opinion, yes.
BY MR. SKALABAN:
Q. Okay. So I guess to get back to my original question before we looked back at the contract, the department could in this rule making that was discussed in your letter of June 16, 1984, and was also discussed in the previous letters from the contracting officer -- the department could grant shutdown priority without actually modifying the language of the contract?
MR. SHULTIS: Objection, calls for a legal

136

conclusion, asked and answered.
A. Well, again, in my opinion, I read that contract language as not requiring but allowing. If a change were to be made basically stating that -- or require that priority be given shutdown reactors, in my engineer's opinion again, that language would have to be modified somewhat to require priority be given rather than simply permit it.
BY MR. SKALABAN:
Q. Well, I -- if it's permitted by language of the contract, and we saw -- we've just gone through little subpart A and little subpart B where it had the except language to OFF and the notwithstanding to age language that we just looked at, is it not a pretty clear indication that if the department wants to -- under the existing language, it may -- priority may be accorded -- it may -- if it wants to, the department could grant priority without changing any language in the contract?
MR. SHULTIS: Same objection, calls for a legal conclusion, contract speaks for itself, asked and answered.
A. I guess in my opinion, if priority were to be granted to shutdowns, without any change in the contract language, I don't know how you would deal

137

with the converse argument, then, from nonshutdown utilities that the contract also states that priority -- or the acceptance ranking should be based on oldest fuel first.
BY MR. SKALABAN:
Q. So I guess I'm just -- I don't understand your -- or don't understand the import of your testimony.
Do you not read subpart A as creating an exception to OFF and subpart B also confirming that notwithstanding the age of the spent fuel, in other words OFF, the department has the ability to grant discretion under the existing terms of the contract?
MR. SHULTIS: Same objection, asks for a legal conclusion, the contract speaks for itself, asked and answered.
A. My opinion, the contract permits the potential of priority for a shutdown reactor. It's also my opinion that to do so would require some language modification of the contract. The reason that I just stated, which is, I don't know how you would address the converse argument from nonshutdown reactors, it's that they were in -- the contract states acceptance priority shall be accorded to oldest fuel first.

138

BY MR. SKALABAN:
Q. Well, what language would you think would be required to change these provisions on OFF and shutdown that we've just been looking at little part A, little part B?
What change would be needed for the department to have the ability if it wanted to grant priority?
MR. SHULTIS: Same objection. Objection, calls for speculation, asks for a legal conclusion, asked and answered.
A. I don't know. I would have to spend some time looking at the language and conferring with the contracting officer, attorneys, et cetera.
BY MR. SKALABAN:
Q. Now, going back to the document we were originally talking about, Milner 62, the letter from you dated June 16, 1994, in the very last paragraph of the attachment under the heading, question No. 2, and again, the ending Bates No. 0327, this letter from you states: While article six, B 1, B of the standard contract provides that the department may -- and may is underscored -- grant priority acceptance to shutdown reactors, when you said this here, isn't that -- isn't that indicating that the contract as it

139

currently exists allows the department the ability to -- they may grant that priority?
MR. SHULTIS: Objection, calls for a legal conclusion, the document speaks for itself, asks for speculation.
A. To me, that would indicate -- I believe that's probably why the "may" was underlined, that I view that as permissive. It doesn't say, shall. It says, may.
BY MR. SKALABAN:
Q. So the existing language is permissive and would allow the department to do it if it wanted to?
MR. SHULTIS: Same objection, calls for speculation, asks for a legal conclusion, asked and answered, and the document speaks for itself, both the letter and the standard contract.
A. Again, in my opinion, "may grant" to me doesn't preclude the department from doing that, but on the converse, I don't know how you would resolve the counterargument of oldest fuel first shall be the basis.
BY MR. SKALABAN:
Q. Going forward in this letter on the next page, again, it's still understood -- the question No. 2, is the department again encouraging Yankee

140

Atomic to exercise their contractual right to swap allocations with other interested utilities?
MR. SHULTIS: The document speaks for itself.
A. Are you referring to the last paragraph in that?
Yes.
BY MR. SKALABAN:
Q. Yes, sir.
And your answer is yes?
A. Yes.
Q. Now, in question No. 6, you refer to the 1990 annual capacity report as representing the best current estimate of the rate at which Yankee Atomic spent nuclear fuel would be accepted.
Do you see that?
A. If I may --
Q. Sure. Please take all the time you need.
(Pause.)
A. Okay.
BY MR. SKALABAN:
Q. Wasn't the 1992 annual capacity report the best estimate of how -- or the rate at which Yankee Atomic's spent fuel would be accepted?
MR. SHULTIS: The document speaks for

141

itself.
A. I believe it was.
BY MR. SKALABAN:
Q. Why did you say: Developing a meaningful waste acceptance schedule for the period beyond the initial ten years is not possible at this time?
A. I don't recall.
Q. Now, following this letter in the stack, we see the next letter in the series --
MR. SHULTIS: We're done with 62?
MR. SKALABAN: Yeah.
MR. SHULTIS: Okay. And now we're going back to 97?
MR. SKALABAN: Back to 97, the DCS letters.
THE WITNESS: Which letter?
MR. SHULTIS: The December 6, 1993, letter, he says hopefully.
MR. SKALABAN: September 30th, 1994.
MR. SHULTIS: Thank you.
MR. SKALABAN: Are you there, counsel?
BY MR. SKALABAN:
Q. Does this appear to be a Yankee Atomic's DCS submission for year three of operation of the Civilian Radioactive Waste Management system?

142

A. It does.
Q. Again does this cover letter indicate that Yankee Atomic is filing the DCS under protest and is reserving its rights?
A. It does.
MR. SHULTIS: Document speaks for itself, calls for a legal conclusion.
BY MR. SKALABAN:
Q. I don't think we need to spend too much time on the immediate next correspondence, but I believe that is a letter seeking to request a correction to an allocation to 9.65 MTU.
Do you see that, sir, the January 17th, 1995, letter?
A. Yes, I believe so.
Q. Now, the next letter in the series is a January 31, 1995, letter from Yankee Atomic?
A. M-hm.
Q. This appears to be a revision of the previously submitted DCS for year three of the operation of the waste management system.
Do you agree with that, sir?
A. Yes.
Q. And here again Yankee Atomic is reiterating that they're filing the DCS under protest

143

and reserving their rights.
Do you agree with that?
A. Yes.
MR. SHULTIS: The document speaks for itself, calls for a legal conclusion.
BY MR. SKALABAN:
Q. Now, the letter with the Bates number -- I'm sorry -- the letter that is from the department of energy marked June 14, 1995, which is just further down in the series, is this an approval of the DCS for year three of the operation of the waste management system?
A. I believe it is.
Q. Is there -- in the cover letter, are there any exceptions taken to Yankee Atomic's reservations of rights or its filing under protest?
MR. SHULTIS: Objection. The document speaks for itself.
A. Not that I can see.
BY MR. SKALABAN:
Q. And if you can see on the approved DCS form, I believe the signatures are somewhat illegible on the approved DCS form. And just for the record, that's Bates number YDK 022662.
Recognizing that the signature is very

144

hard to read, do you recognize who the technical representative might have been who signed off on this?
A. No, I don't. On mine, it's totally illegible.
Q. Right. Now, on this DCS form, there's a notation on the side, double asterisks, that says the proposed delivery date is dependent upon the existence of an operational repository or an interim storage facility constructed under the act.
Do you have an understanding of what this -- what this statement on Yankee Atomic's approved DCS for year three means?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.
A. In my opinion, this is stating a long-held program position that start of acceptance of spent fuel or high-level waste was contingent upon having a facility to take it to.
BY MR. SKALABAN:
Q. So this notice is simply confirming the department's, if I understand what you just said correctly, long-held position?
A. Correct.
Q. Is this conditioning the approval of the

145

DCS on a facility being available in the year 2000?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. Would you restate the question.
BY MR. SKALABAN:
Q. Is this statement on the DCS conditioning the approval of this DCS on a facility being available in the year 2000?
MR. SHULTIS: Calls for a legal conclusion. That's my objection.
A. In my opinion, when you specify the year, yes, it does.
BY MR. SKALABAN:
Q. So the force and effect of this statement in your view that the DCS is -- the DCS is -- the approval of the DCS is only valid if there's a facility available in 2000?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I guess my opinion would be that the DCS wouldn't necessarily be invalidated if there were no facility available in 1998. The delivery date of 2000 would not be valid, but I guess I would view that as this would be a valid DCS for year three of operation of the facility.

146

BY MR. SKALABAN:
Q. So this would be then -- I assume as you've testified to earlier -- it's your, I guess, belief or anticipation a receiving facility will be available in 2010, so this is -- this DCS in view of this statement would be valid in your view for the year 2012?
A. In my personal opinion, yes.
Q. Would that also hold true with the other two DCSs we saw for year one and year two for operations that were approved for Yankee Atomic?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. Again in my personal opinion.
BY MR. SKALABAN:
Q. Your personal opinion, yes?
A. In my personal opinion, yes.
Q. Now, the next letter in the series is September 27, 1995, letter from Mr. Buchheit, and in this -- you agree with me it appears to be a DCS submittal for year four of operation?
A. Yes.
Q. And do you agree with me that Yankee Atomic is again filing under protest and reserving its rights?

147

MR. SHULTIS: Calls for a legal opinion.
A. Yeah, in my opinion, it does.
BY MR. SKALABAN:
Q. Now, the following letter appears to be a response to that year four DCS, and this is a letter dated March 5, 1996, signed by Beth Tomasoni. And attached to it is a signed DCS.
Now, in this cover letter, is the department indicating to Yankee Atomic that the proposed delivery date is dependent on the existence of an operational repository and interim storage facility conducted pursuant to law?
MR. SHULTIS: Objection. The document speaks for itself.
A. Yeah, that's what's indicated here.
BY MR. SKALABAN:
Q. Did you have occasion to review this or other similar letters containing that language?
A. Not that I can specifically recall.
Q. And if you look at the approved DCS, does this also contain that qualification that we saw in the previous DCS from Yankee Atomic for year three?
And specifically the language I'm looking at is on the approved DCS, and it says, quote, the proposed delivery date is dependent upon the

148

existence of an operational repository or an interim storage facility constructed under the act.
You see that, sir?
A. I see that language, but I believe this DCS is for year four, not year three.
Q. So again, this -- in your view, this DCS for year four would then be applying to year four of operation of the waste management system, which would be in your view year 2013?
A. Yes.
MR. SHULTIS: Calls for a legal opinion.
BY MR. SKALABAN:
Q. The next correspondence in this series is a letter from Mr. Buchheit to the department of energy, again, Ms. Tomasoni. David Zabransky is copied on this letter.
And at this point in time, I believe you were the director of the office of waste acceptance and transportation; is that correct?
A. I believe I was.
Q. And Mr. Zabransky would have been reporting to you at that time?
A. Yes, not directly, but, yes.
Q. Do you remember seeing this letter from Yankee Atomic?

149

A. I don't recall it specifically, no.
Q. And again, in this letter, Yankee Atomic is filing the DCS under protest?
MR. SHULTIS: Same objection, calls for a legal conclusion, document speaks for itself.
A. I see in the letter where they're stating under protest, yes.
BY MR. SKALABAN:
Q. Do you know whether the department ever responded to this DCS submittal for year six of operation?
A. I don't know that. In my recollection, I don't recall the department did not respond to one or more DCSs. I believe the department responded to all the submittals, but I don't know for sure whether they did.
Q. Okay. Fair enough.
If we can move on to the next document in the series, which is the September 26, 1997, document from Mr. Buchheit to Ms. Tomasoni -- oh, I apologize.
Let me correct that.
The next document in the series is Mr. Buchheit to department of energy headquarters, procurement operations, Ms. Tomasoni, and it's a submission of a final delivery commitment schedule,

150

and the letter is dated January 31, 1997.
Do you see that?
A. I do.
Q. And the letter states that, attached is the final delivery schedule for Yankee for 1998.
Do you see that, sir, in the first paragraph?
A. I do.
Q. Now, if you look at the second page, first paragraph, it states that: Our final delivery schedule -- and I'm looking at the sentence beginning, as such, which is the second sentence in paragraph -- the first paragraph of page 2 of the letter, and it says: As such, our final delivery schedule specifies that all Yankee spent fuel and GTCC material is available for delivery on January 31, 1998.
Do you see that?
A. I do.
Q. You understand that to be a request that the department take all of the Yankee Atomic spent fuel and GTCC in January 31 -- or in 1998?
MR. SHULTIS: Objection. The document speaks for itself.
A. To me, that statement would -- is not to



request so much as it's stating that it's available for delivery at that point in time as may be contrasted with another utility all of whose spent fuel would not be available at any given point in time for delivery.
BY MR. SKALABAN:
Q. Well, if we actually look at the final delivery schedule that's attached to the document, this indicates that Yankee Atomic is requesting for the department to pick up 127 metric tons of spent fuel and 21 spent fuel assembly-size containers of GTCC waste.
MR. SHULTIS: The document speaks for itself.
Is that a question?
MR. SKALABAN: Yeah.
BY MR. SKALABAN:
Q. Is that correct, is that what it indicates?
A. Yes, I believe so.
Q. And that it's proposing a delivery estimate for all of that spent fuel and GTCC on October 31, 1998?
MR. SHULTIS: I'm sorry. I think that mischaracterizes the document.



Are you looking at the discharge date or the purchaser's delivery estimate?
MR. SKALABAN: Purchaser's delivery estimate.
MR. SHULTIS: And that's --
MR. SKALABAN: I'm sorry. If I said October, I meant to say January 31, 1998. And thank you, counsel, for correcting me.
MR. SHULTIS: The document speaks for itself, thankfully.
A. Yes.
BY MR. SKALABAN:
Q. So this is a final DCS requesting that on January 31, 1998, the department take approximately 127 metric tons of spent fuel and 21 spent fuel assembly-size containers of GTCC waste.
Is that fair?
A. That's what I would read in this, yes.
Q. Do you recall discussing with anyone at the department this final delivery commitment schedule submission by Yankee Atomic?
A. I don't recall having any discussion, no.
Q. And at this time, I believe you would have been office of waste acceptance and transport director?



A. I think at that point in time, I was acting deputy director of OCRWM.
Q. Okay. And did that take place in January of '97, that promotion?
A. That -- wouldn't call it promotion so much as an appointment, yes, a temporary appointment.
Q. I'd like to call your attention to the next document. It's dated March 11th, 1997. It's from Beth Tomasoni, and it appears to be addressing Yankee Atomic's final delivery commitment schedule submission.
A. M-hm.
Q. Would that appear to be the document we just -- the final delivery schedule submission would be the document we just looked at dated January 31, 1997?
A. I believe so.
Q. Do you have an understanding of what the department is telling Yankee Atomic at this time about the consideration of Yankee Atomic's final delivery commitment schedule submission?
MR. SHULTIS: Objection. The document speaks for itself.
A. I guess in my opinion it's stating that the department was not approving the final delivery

schedule at that point. It did not disapprove it. It just did not act on it, did not approve it.
BY MR. SKALABAN:
Q. Was the department intending to convey to purchasers at this time that the DCS and final delivery commitment schedule process had been in effect suspended?
MR. SHULTIS: Objection. The document speaks for itself, calls for a legal conclusion, and Mr. Milner is not a 30(b)(6) witness.
A. Well, I guess in my opinion, the -- when you got to the point of final delivery schedules, you then specified specific dates. Since the department didn't have a facility in operation, it felt that it couldn't approve or disapprove final schedules since we didn't know when a facility would be in operation.
BY MR. SKALABAN:
Q. Well, would DCSs in your view be binding if no final delivery schedule had been finalized?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I guess my understanding of the process of the contract is that, no, if a final delivery schedule had not been approved, then nothing in the DCS binds either party to accept or deliver waste on

155

a specified date.
BY MR. SKALABAN:
Q. So if no final delivery commitment schedules had been approved for Yankee Atomic, Maine Yankee, or Connecticut Yankee, there would be no binding commitments on either party?
MR. SHULTIS: Objection, calls for a legal conclusion.
BY MR. SKALABAN:
Q. Either DOE or Maine Yankee, Connecticut Yankee, on Yankee Atomic?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I don't understand the question.
BY MR. SKALABAN:
Q. Well, if I -- following up on your last answer and if I understood it, what you just testified to was that if an FDS had never been approved, there wouldn't be a binding commitment between Yankee Atomic and the department, and I'm asking, would that hold true for Connecticut Yankee and Maine Yankee if they never had a final commitment delivery schedule approved for the department?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.

156

A. Well, I'm still not clear on the question, but I think, whatever, it would hold true for the different Yankees as well as other utilities.
Was there a binding agreement in effect, my personal opinion, there was. That's called the contract.
Was there a binding commitment for a specific year, I don't in my opinion believe so.
BY MR. SKALABAN:
Q. Was there a binding commitment for an amount?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I think the annual capacity report giving priority ranking was certainly the department's intended goal. I think both of those indicated that there was -- were for planning purposes.
BY MR. SKALABAN:
Q. So there wasn't -- unless there's final DCSs approved, there is no binding commitment.
These are just goals and planning purposes documents?
MR. SHULTIS: Objection.
BY MR. SKALABAN:
Q. The ACR, the APR, the preliminary DCSs?

157

MR. SHULTIS: Objection, calls for a legal conclusion.
A. Yeah. In my opinion, they were for planning purposes, yes.
And I guess again in my opinion, I fail to see how you could commit to something when you didn't have a facility to take something to.
(Whereupon, at 12:35 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 1:37 p.m., this same day.)

158

AFTERNOON SESSION
(1:37 p.m.)
Whereupon,
RONALD A. MILNER,
the witness testifying at the time of recess, having been previously duly sworn, was further examined and testified further as follows:
MR. SKALABAN: Back on the record.
EXAMINATION BY COUNSEL FOR PLAINTIFFS (RESUMED)
BY MR. SKALABAN:
Q. Mr. Milner, I'd just like to remind you that you're still under oath. The same ground rules that we discussed at the beginning apply, if that's okay with you.
A. Okay. Sure.
Q. We were just looking over the exhibit marked Milner No. 97, which is a series of DCS correspondence between Yankee Atomic and the department of energy.
In view of the documents we've looked at in that exhibit and the back-and-forth that went on between Yankee Atomic and the department about whether Yankee could exceed its 1991 ACR allocation and not follow the DCS instructions, part 2.7 -- in view of that experience and record, do you think it

159

would be -- it would have been futile for any utility to try to propose an allocation that was higher than what was provided for in the ACRs?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. In my opinion, I can't offhand think of a circumstance wherein the department would have approved any utility's DCS if it exceeded the allocation.
MR. SKALABAN: I'd like to mark as Exhibit 99 a series of delivery commitment correspondence, and I'll represent to you that these are from the files of Maine Yankee Atomic Power Company.
(Milner Exhibit No. 99 was marked for identification.)
BY MR. SKALABAN:
Q. And towards the back of this package -- I believe it's the third document in the series. It's dated May 11th, 1998. It's a letter from Maine Yankee's Mr. Michael Thomas to the department of energy contracting officer, Beth Tomasoni.
Now, does this appear to be a final delivery commitment schedule submission from Maine Yankee to the department of energy?

160

MR. SHULTIS: Objection. The document speaks for itself.
A. It appears to be, yes.
BY MR. SKALABAN:
Q. And in the first paragraph, the sentence beginning, notwithstanding, does that indicate to you that Maine Yankee was requesting a larger allocation in its final delivery schedule than was provided for in its approved delivery commitment schedule?
MR. SHULTIS: Same objection.
A. It does.
BY MR. SKALABAN:
Q. Do you remember discussing this letter with anyone at the department?
A. No, I do not.
Q. Have you ever seen this letter before?
A. Not to my recollection.
Q. And the next letter in the correspondence is a letter from -- dated June 15th, 1998, from Beth Tomasoni to Michael Thomas.
MR. SHULTIS: I'm sorry?
MR. SKALABAN: It's actually stapled to it.
MR. SHULTIS: Oh, okay.
BY MR. SKALABAN:

161

Q. What do you understand the department to be telling Maine Yankee at this time?
MR. SHULTIS: Objection. The document speaks for itself.
A. That the final delivery schedule has not been approved.
BY MR. SKALABAN:
Q. Has it been rejected, or the department is not able to consider it at this time?
MR. SHULTIS: Objection. The document speaks for itself, and asked and answered.
A. My reading of this would say that it was neither approved nor disapproved.
BY MR. SKALABAN:
Q. And is this similar to other letters that we saw in the common discovery portion of your deposition and that we saw with Yankee Atomic where the department is not processing DCSs or final delivery commitment schedule submissions?
MR. SHULTIS: Same objections.
A. I believe it's similar, yeah.
BY MR. SKALABAN:
Q. Now, having reviewed some more of these documents where the department is not processing DCSs, does it refresh your recollection at all who

162

gave the direction to stop processing DCSs and FDSs?
A. No.
Q. And I believe you were acting deputy director at this time?
A. I believe I was, yeah.
Q. So that this was not discussed with you at all?
MR. SHULTIS: Objection, asked and answered.
A. Well, certainly no specific utility final delivery schedule was discussed with me. I guess I -- I guess there were discussions of, given the uncertainty and the -- of the program schedule -- certainly there was uncertainty in the sense that it didn't appear there was going to be a facility in '98 that you couldn't approve a final delivery schedule which was date-specific for delivery.
BY MR. SKALABAN:
Q. And how about DCSs?
I believe we've looked at -- either at some Yankee Atomic documents or documents from other utilities where the DCSs weren't being approved or disapproved as well.
Is your answer the same for the DCSs?
MR. SHULTIS: I'm sorry. Vague.

163

Are you asking about discussions now?
I'm not sure what your question is.
MR. SKALABAN: Okay. Let me try to rephrase my question. Thanks.
BY MR. SKALABAN:
Q. If I understand the answer you just gave me, the department was not processing final delivery commitment schedules because of the uncertainty of facility operations.
Is that fair?
A. Well, certainly the uncertainty in being able to make a '98 date, yes.
Q. And at this same time, the department was not processing delivery commitment schedules either?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. Actually, I don't recall whether they were processing DCSs or not.
BY MR. SKALABAN:
Q. And I mean, do you -- to the extent you remember discussions about the processing of final delivery commitment schedules, those discussions were based upon the fact that there was uncertainty in the start date?
A. No. There was uncertainty -- considerable

164

uncertainty in the start date of 1998.
Q. Well, at that time, when did the department anticipate that it was going to be able to receive fuel?
A. I believe at that time, our schedule and therefore our goal was 2010.
Q. Do you remember who you discussed this with, the processing of DCSs or FDSs?
A. I don't recall.
Q. Was there any memos or anything that came across your desk as either the head of the office of waste acceptance and transportation or as the acting deputy director about this?
A. I do not recall any memos, no --
Q. Any --
A. -- or written materials.
Q. Okay. So to the best of your recollection, there was nothing presented to you where you had to give your concurrence or sign off on stopping the processing of the FDSs?
A. Not that I recall, no.
Q. Do you know whether the department gave any indication to utilities that they should continue to submit DCSs or final delivery commitment schedules in 1997 and 1998?

165

MR. SHULTIS: Objection, vague.
A. I don't recall.
BY MR. SKALABAN:
Q. Well, in view of the letters that we saw with Yankee Atomic and Maine Yankee where they're not processing the final delivery commitment schedule submittals, does that indicate to you that the department was communicating to the utilities that it's not processing these kinds of submittals at this time?
MR. SHULTIS: Objection. The document speaks for itself, vague.
A. In my opinion, yes.
MR. SKALABAN: I think we're on No. Exhibit 100.
(Milner Exhibit No.100 was marked for identification.)
MR. SKALABAN: This is a collection of Yankee DCS correspondence, which I can represent to you is a collection of correspondence that was pulled from Connecticut Yankee files.
BY MR. SKALABAN:
Q. I'd like to turn your attention relatively to the back of the package. There's a letter dated

166

September 30th, 1996, under Northeast Utilities' letterhead, and it's addressed to DOE contracting officer. The small Bates number on the side is CDB 006481. And again it's a September 30, 1996, letter.
If you could take a moment to look at that letter and the attached DCS and let me know if it appears to be a DCS submittal for Connecticut Yankee Atomic Power Company for fuel to be removed in 2002.
(Pause.)
BY MR. SKALABAN:
Q. Mr. Milner, does that appear to be a letter containing a delivery commitment schedule submission for Connecticut Yankee Power Company for 2002?
A. I believe it is, yes.
Q. Now, after it, there's a March 13th, 1997, letter from Beth Tomasoni to Lee Hill.
A. Yes.
Q. Does that appear to be a response to the -- well, actually, I think this may be out of order.
Let me -- no. I don't think that's right.
Does this March 13, 1997, letter from Ms. Tomasoni appear to be a response to the September 30th, 1996, letter from Northeast Utilities?



A. It doesn't appear to be.
Q. Okay. Will you let me know why?
A. It's difficult to tell. I'm basing that only on that letter was sent to someone other than who sent the September 30th letter.
Q. Okay. Fair enough.
A. But perhaps somewhere in there, the contracting officer was advised that --
Q. -- it should be sent to Mr. Hill?
A. Perhaps, yeah. It's difficult to say.
Q. Okay. But at least in view of the -- let's take a look at, then, just focusing on the March 13th, 1997, letter --
A. M-hm.
Q. -- from Ms. Tomasoni, does that appear -- and again understanding that you're not sure which, you know, DCS submittal it was, but does this appear to be a letter advising Connecticut Yankee that it cannot process a DCS submittal?
A. Yes, yes, it appears to be so.
Q. And this is similar to other letters we've looked at where the department is not processing DCSs or final delivery commitment schedules?
A. I believe it is.
Q. And in view of this letter, would you



expect Connecticut Yankee to continue to submit DCSs or final delivery commitment schedules?
MR. SHULTIS: Objection, calls for speculation.
A. In my opinion, no, I wouldn't anticipate that it would.
BY MR. SKALABAN:
Q. And in the third paragraph on this March 13th, 1997, letter, Ms. Tomasoni makes reference to an invitation of views of contract holders on how they anticipate the delay can best be accommodated?
A. Yes.
Q. Do you understand what she's referring to in this letter?
A. I believe I do.
Q. Can you tell me what that is?
A. I believe that's referencing a notice of inquiry that was issued by the department that was discussed in previous testimony.
Q. And it's fair to say at this time the department knew it was not going to be performing in 1998?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
A. In my opinion at that point in time,



the '98 date was pretty unlikely.
BY MR. SKALABAN:
Q. And if you go further down the pack, there's a January 13th, 1998, letter from Beth Tomasoni -- oh, just so the record is clear: The letter we just looked at from March 13, 1997, I believe at this time you were the director of the office of waste acceptance transportation?
A. March 13th of '97?
Q. Yes, sir.
A. I probably was the acting deputy director at that point.
Q. Oh, okay. My apologies, because that was January 1997.
A. I believe so.
Q. And looking at -- okay.
Let's go to the January 13th, 1998, letter from Beth Tomasoni to Mr. Lee Hill.
And this references a DCS for Haddam Neck?
A. M-hm.
Q. Haddam Neck is Connecticut Yankee?
A. I believe it is.
Q. And this is also indicating that the department cannot approve the DCS submittal at this time?

A. That's correct.
Q. Now, we've looked at in this series of exhibits, 100, 99, and I believe 97, various letters from the department telling Connecticut Yankee, Maine Yankee, or Yankee Atomic that it cannot approve or disapprove DCSs or FDSs that have been submitted?
A. Yes.
Q. Now, does this refresh your recollection that approximately beginning March 13, 1997, if not earlier, the department was not processing DCSs and FDSs?
A. I believe that's true, yeah.
Q. And again, now having looked at these additional documents, the documents from Maine Yankee and Yankee Atomic I showed you were dealing with final delivery commitment schedules.
The Connecticut Yankee documents we've seen are dealing with DCSs.
Does that refresh your recollection that -- as to any discussions you may have had with people in the department about suspending the DCS process?
A. Not really beyond what I believe I've stated before, which was, I don't recall any utility-specific discussions. I recall general

171

discussions in the sense of affecting all utilities that given the inability at that point or the highly unlikely ability to meet a '98 date that to approve schedules that were year-specific didn't seem appropriate.
Q. Was there anything else about those discussions that you can remember?
MR. SHULTIS: Objection, asked and answered.
A. No.
BY MR. SKALABAN:
Q. And I used the term suspending.
The processing of DCSs and FDSs, I mean, is that a fair characterization of what was happening at the department?
They were no longer suspending consideration of these DCSs and FDSs?
A. That would be how I would characterize it, suspended rather than stopped processing. Stopped to me would be more permanent than suspend.
Q. So at some point in the future, this process may open up again?
A. Certainly that's my anticipation.
Q. I'd like to switch gears for a moment and talk about greater than class C waste, and for the

172

record, I may refer to that as GTCC waste, and you're familiar with that term?
A. Yes, I am.
Q. There was a few documents we looked at previously or that have been looked at previously in the coordinated portion of your deposition. I'd like to if you could please pull those out. That's No. 64 and 79.
Starting first with Exhibit 64, this describes a meeting that was scheduled for February 8, 1995, and it indicates here in this document that the meeting was scheduled for four hours?
A. It indicates that, yes.
Q. Is it fair to say the letter is indicating that the meeting is about the coordination between the office of environmental management, GTCC, LLW program, and the 5office of Civilian Radioactive Waste Management repository program?
A. I'm sorry. Would you --
Q. Sure. The document reflects that there was a -- that someone has recognized the need for coordination between the office of environmental management and RW regarding GTCC waste?
A. Yeah. It states that here.
Q. Do you remember who it was that kind of

173

came to that recognition, that there was a need for coordination?
A. Well, it would infer from this memo it was Mr. Plummer.
Q. Do you know prior to the time of this memo, dated January 27, 1995, were there any discussions in RW about accepting GTCC waste as part of RW's waste management program?
A. I can't remember -- I can't recall any specific meetings or discussions. I guess I do recall in general terms discussions which essentially focused on the idea that greater than class C was not required to be disposed of in a repository.
Q. And who -- do you recall who those discussions were with?
A. I can only recall just vaguely in general terms having such discussions. No, I can't recall who I had them with.
Q. And why were those discussions being held?
Was there a question in people's mind or a doubt in people's mind whether or not GTCC would have to be taken by RW as far as a waste program?
A. Actually, no. The nature of the discussions I recall were basically either in response to a question from somebody within the

174

program or perhaps even somebody from environmental management simply informing them that there was no requirement for RW, DOE -- RW.
Q. Did you make that decision, or did someone else?
A. I did not make that decision. I guess the program held that position stemming from -- I guess language in the NWPA, which indicated that the program would dispose of high-level waste that NRC had determined required disposal in the deep geologic repository, and NRC had not made that determination.
Q. Do you remember anyone in particular on RW who was -- may have studied this question or may have --
A. No, no.
Q. Now, I don't want to cover the same ground that was covered before, and I recall your answer being -- about this February 8, 1995, meeting being that you communicated to the office of environmental management RW's position that GTCC was not RW's responsibility.
I mean, is that what you recall you testified to?
A. Yes. I recall I guess having a meeting with Mr. Plummer and stating that. Whether it was a

175

February 8 meeting -- I can be certain not a meeting in room 4EO69, because the meeting was in my office, and that's not my office.
Q. Could you have had multiple meetings with them?
A. I only recall one.
Q. Were they also in the Forrestal Building?
A. Yes. The office of environmental management, essentially its front office is in the Forrestal Building. Elements of it are in DOE's Germantown facility, and I believe at the time, Mr. Plummer was located in the Germantown facility, but I can't recall for sure.
Q. Now, aside from your communicating that position, was there -- what else was discussed during this meeting?
MR. SHULTIS: Objection, asked and answered.
A. I don't recall.
BY MR. SKALABAN:
Q. Do you recall Mr. Plummer stating anything about GTCC waste?
MR. SHULTIS: Same objection.
A. I really don't recall. He may have given me some indication of quantities or whatever, but I

176

don't recall.
BY MR. SKALABAN:
Q. Okay. Seems to me that, you know, for -- if it was scheduled to be a four-hour meeting, it would seem to me that there would probably be, you know, several things on the agenda.
A. The one and only meeting that I recall lasted nowhere close to four hours.
Q. How long do you recall it lasted?
A. Probably less than an hour.
Q. Was there any written exchange between any of the people listed here in this memo, yourself, Barrett, Campbell, Gomberg, Plummer, about this meeting, the results of the meeting, any agendas, anything like that, any kind of written correspondence, other than what we see here?
A. Not that I recall, no, not that I recall. This indicates that the memo had an agenda attached. I do not recall their proposed agenda.
Q. Was there any path forward reached regarding GTCC waste from this meeting?
MR. SHULTIS: Objection, asked and answered.
A. No, I don't believe so.
BY MR. SKALABAN:

177

Q. And putting aside this meeting, has there been any other developments regarding GTCC waste?
A. Not that I'm aware of.
Q. Do you know what environmental management -- whether they have any plans for dealing with GTCC waste?
A. I don't know.
Q. Have you heard that at all, that they have plans?
MR. SHULTIS: Objection.
A. That they have plans? No, I have not.
BY MR. SKALABAN:
Q. So you have no awareness of whether they're developing any facility to house GTCC waste?
MR. SHULTIS: Objection, asked and answered.
A. I'm not aware of them developing any facility.
BY MR. SKALABAN:
Q. Now, I believe you testified that in the -- was it the draft environmental impact statement or the environmental impact statement that's been submitted, there is discussion of GTCC waste in the repository?
MR. SHULTIS: Objection, document speaks

178

for itself, and it might mischaracterize prior testimony.
A. Yeah. I believe my prior testimony indicated that I thought there had been some consideration of GTCC in the environmental impact statement, but I think I stated that I didn't recall that for sure.
BY MR. SKALABAN:
Q. Okay. Thank you for that clarification.
Other than the possibility that -- and the environmental impact statement, the final one, has been submitted, is that correct, or has it gone to the president?
A. That was part of the suite of documents that went to the president, that's correct. That was a recommendation.
Q. Thank you.
A. I guess I should point out that the environmental impact statement really tried to look at virtually everything that could conceivably be placed in a repository. For example, I believe the total quantity of waste that was analyzed as part of the environmental impact statement preparation far exceeds the statutory capacity limit on the repository.

179

Q. Okay. And outside of the fact that the -- you know, I recognize that you're not sure. You have a general recollection that maybe it's there, but if I understand your testimony correctly, you're not sure that -- whether GTCC waste is addressed in the environmental impact statement?
A. And I think I'm also trying to indicate in that that something that was addressed in the environmental impact statement doesn't necessarily indicate the department's plans are intending to put that in the repository. It's simply trying to look at all potential waste streams and waste forms that could go in the repository.
Q. Do you know who might have been involved in analyzing GTCC waste in the repository?
MR. SHULTIS: Objection, asked and answered.
BY MR. SKALABAN:
Q. And I'm talking about the environmental impact statement now.
A. Relative to GTCC, no, I don't recall.
Q. Do you know what wing of RW would have done that?
MR. SHULTIS: Objection.
BY MR. SKALABAN:

180

Q. I mean, again I'm trying to recognize that you're not perfectly sure whether it's in the environmental impact statement, but assuming it is, what branch of RW would you expect as the COO to be looking into that?
A. Okay. The --
MR. SHULTIS: Objection, assumes facts not in evidence.
A. The organizational entity within RW that prepared the environmental impact statement in totality was the Yucca Mountain site characterization office.
BY MR. SKALABAN:
Q. And who is the head of that at this time?
A. Dr. Russell Dyer is the project manager.
Q. And he's an RW employee?
A. Yes.
Q. In addition to Mr. Dyer, who are the principal RW employees in that office of RW?
A. Principal employees -- his deputy is Donald Horton -- I get fuzzy on organizational titles -- director of the office of licensing and something. Director of the office of licensing and regulatory compliance is Dr. Steven Brocouum, B-R-O-C-O-U-U-M, I believe. Strange spelling.

181

Director of the office of project control is Victor Tribulis (phonetic). Director of the office of project support is Mark Vanderpuy. The office of project execution is Suzanne Mellington.
Q. Mellington?
A. Mellington.
Q. With an M. Okay.
Now, of these principal employees, Dyer, Horton, Brocouum, Tribulis (phonetic), Vanderpuy, and Mellington, are there any in particular who you would expect to be involved in looking at GTCC waste with respect to preparing an environmental impact statement?
MR. SHULTIS: Objection, asked and answered.
A. I don't recall anybody specifically looking at GTCC.
BY MR. SKALABAN:
Q. And excuse me. I do understand that you don't recall specifically. I'm just asking you for who you would expect.
A. Well, I'm characterizing my answer to indicate people that would have been involved in preparation of the environmental impact statement, whatever it may contain.

182

Q. Okay.
A. Dr. Brocouum, Ms. Mellington I believe would have been involved to some degree, perhaps Mr. Vanderpuy.
Q. Now, if I could call your attention to Exhibit 79 and Exhibit 3, the contract. I believe there was some discussion on Exhibit 79 in previous days of your deposition. I want to focus on a different part of this document.
There's a citation in the background section. It's the third bullet point. And it states: GTCC waste not suitable for near-surface disposal, quote, must be disposed of in a geologic repository as defined in part 60, dot, dot, dot, unless proposals for disposal, dot, dot, dot, in a disposal site, dot, dot, dot, are approved by the NRC, end quote.
And it references 10 CFR 6155.
Do you see that?
A. I do.
Q. Is this your understanding of what the NRC stated in the code of federal regulations regarding GTCC waste and its disposal?
MR. SHULTIS: Objection, calls for a legal conclusion.

183

A. Well, I don't really understand what that particular excerpt is saying. I guess my general understanding is that the NRC had not determined whether or not GTCC required disposal in an OCRWM repository. I think this particular exhibit was the one that the other day I could not at all figure out what it was an excerpt from.
BY MR. SKALABAN:
Q. Okay. Well, let's just take a brief look at the contract, Exhibit 3. There's a definition section, and it begins on page 16600 of the Federal Register. And there's an article one, definitions. There's a No. 12, which defines the term high-level waste.
Do you see that?
A. Yes.
Q. And in subpart B, it says: In effect the term high-level waste means, quote: The other highly radioactive material that the commission consistent with existing law, comma, determines by rule requires permanent isolation.
What is your understanding of that provision I just quoted for you that's here on this Exhibit 3?
MR. SHULTIS: Objection, calls for a legal

184

conclusion.
A. Well, I guess in my opinion, that would say that if the NRC determines by rule that a particular material requires permanent isolation, then --
BY MR. SKALABAN:
Q. -- then it's covered by the contract?
A. -- it's covered by the contract.
Q. And, permanent isolation, that means -- does that mean to you disposal in a geologic repository?
MR. SHULTIS: Same objection.
A. Not necessarily.
BY MR. SKALABAN:
Q. What do you understand permanent isolation to mean?
A. Permanently isolate the material from whatever, presumably the public, the biosphere, whatever. It doesn't really state what it means there.
Q. Isn't permanent --
A. Permanent isolation could potentially be in a different type of repository, a different repository or different type of repository than what's envisioned under the act.

185

Q. Okay. So -- but disposal in a geologic repository such as the one that RW is developing would constitute permanent isolation?
MR. SHULTIS: Calls for a legal conclusion.
A. Disposal of a material in geologic repository contemplated under the act certainly constitutes permanent isolation. The converse is not necessarily true, that permanent isolation denotes disposal in the deep geologic repository contemplated under the act.
Q. Again, this is relating to Exhibit 79. Hopefully this will give you a little more context. I'd like to mark as Exhibit 101, and it is -- I can represent to you that this was printed out, I believe, this week from the NRC Web site.
(Milner Exhibit No.101 was marked for identification.)
MR. SHULTIS: Are we still going to be looking at Exhibit 79?
MR. SKALABAN: Yeah. We may refer back to it.
MR. SHULTIS: Okay.
MR. SKALABAN: So it's okay to keep that

186

out.
BY MR. SKALABAN:
Q. In Exhibit 101 at the top it says, 10 CFR 6155, waste classification?
A. That's correct.
Q. And does this appear to be classifications of different waste such as class A waste, class B waste, class C waste, and greater than class C waste?
MR. SHULTIS: Objection. The document speaks for itself.
A. If I may take a few moments?
Q. Please do.
MR. SKALABAN: Off the record for a sec.
(Discussion off the record.)
BY MR. SKALABAN:
Q. Now, does this appear to be the Nuclear Regulatory Commission regulations on classifying different radioactive wastes, including greater than class C waste?
A. It appears to be at least part of the provisions of that, yes.
Q. If I could turn your attention in particular to 10 CFR 6155, part A 2 4.
A. M-hm.
Q. Do you understand that part of the

187

regulation to be talking about greater than class C waste?
A. Yeah, that would be my reading of it.
Q. Now, here, what is your understanding of what the regulation means when it says, quote: In the absence of specific requirements in this part, comma, such waste must be disposed of in a geologic repository as defined in part 1663 of this chapter unless proposals for disposal of such waste in a disposal site licensed pursuant to this part are approved by the commission.
MR. SHULTIS: Object, calls for a legal conclusion.
A. I don't know. Appears to me to say that the commission would have to approve any proposals for disposal of GTCC, a licensed disposal site.
BY MR. SKALABAN:
Q. If we look back at this memo that came I believe based -- the memo I'm talking about is 79 -- and I believe based on the Bates number, it came from the DOE's Yucca Mountain project office.
And it says here in this bullet point GTCC waste not suitable for near surface disposal, and then it has that quotation that I read to you before about, must be disposed in a geologic repository as

188

defined in part 60 unless proposals for disposal in a disposal site are approved by the NRC.
That part of Milner 79 appears to be directly taken from this regulation, subpart four, doesn't it?
A. That particular bullet, it would certainly appear as excerpt from --
Q. -- an excerpt from the regulation?
A. -- regulation, yes. But you characterized Exhibit 79 as a Yucca Mountain memo. I have no idea what this Exhibit 79 is excerpted from.
Q. Okay.
A. It certainly doesn't appear to be a memo.
Q. Okay. Document. I'll refer to it as a document.
Now, in the reg, isn't this indicating that GTCC waste -- or isn't this stating that GTCC waste must be disposed of in a geologic repository unless proposals for disposal in a disposal site are approved by the NRC?
A. That's what it states.
MR. SHULTIS: Objection. It calls for a legal conclusion.
BY MR. SKALABAN:
Q. So unless there's a procedural proposal

189

for another disposal site for GTCC waste or approved by the commission, that GTCC has got to go in the geologic repository?
MR. SHULTIS: Same objection.
A. In a geologic repository.
BY MR. SKALABAN:
Q. So you believe -- you don't believe that that's referring to RW's efforts, the term geologic repository there?
A. I can't really determine that from this. It says, a geologic repository.
Q. Okay. Well, that would be permanent isolation, wouldn't it?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. Disposal in a repository at Yucca Mountain would be permanent isolation.
BY MR. SKALABAN:
Q. Do you know what part 60 is, that they're referring to?
Does that mean anything to you, geologic repository as defined in part 60?
A. It's an NRC regulation.
Q. You know what that NRC regulation deals with, part 60?

190

A. I believe it's licensing of repositories.
Q. Is that a regulation that applies to RW's efforts to license Yucca Mountain?
A. It does.
Q. So does this suggest to you that the geologic repository as defined in part 60 being referred to would be a geologic repository being developed by Yucca Mountain?
MR. SHULTIS: Objection, calls for speculation and asks for a legal conclusion.
A. In my opinion, it certainly could be the Yucca Mountain repository.
BY MR. SKALABAN:
Q. If I understand what the commission is ruling here, they're saying that GTCC waste must be disposed of in a geologic repository unless proposals for an alternative site are approved by the commission.
Is that a fair characterization of what the regulation says?
MR. SHULTIS: Objection, mischaracterizes the document, calls for a legal conclusion.
A. I can only go by what I'm reading, which says that it requires disposal in a geologic repository as defined. I guess I'd note that

191

disposal of GTCC in a Yucca Mountain repository would require approval of the NRC.
BY MR. SKALABAN:
Q. As part of the general licensing of the repository?
A. Yeah. As part of the licensing of the repository.
Q. Well, if -- when RW starts accepting spent fuel and high-level waste presumably in 2010, if there are no proposals for an alternative disposal site for GTCC waste and there's no approval by the commission for any alternative site, wouldn't the GTCC waste have to go into the geologic repository according to this provision of the NRC regulation?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.
A. I guess in my opinion, absent any other approved proposals, that that would indicate that GTCC would have to be disposed of in a repository -- the repository. To me it does not infer anything in terms of timing.
BY MR. SKALABAN:
Q. Well, let's look at the contract language. Contract language is referencing the commission's determination by rule requires permanent isolation.

192

Right?
A. Yes.
Q. Well, at the point in time when DOE is performing, isn't the effect of this regulation to require disposal in a geologic repository if there's no alternative available?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.
A. Well, again, in my opinion, it would appear to be the case, but again I don't think it indicates anything as to timing.
BY MR. SKALABAN:
Q. Well, what -- well, if it doesn't indicate anything to you on timing, I mean, are we talking about a situation where GTCC waste, assuming there's no alternative disposal sites approved by the commission, that GTCC waste is going to sit around in reactor sites for a hundred years?
MR. SHULTIS: Objection, assumes facts not in evidence, calls for speculation.
A. No, I didn't intend to infer anything close to that from what I said. The fact of the matter is that the department or at least the program doesn't address that.
BY MR. SKALABAN:

193

Q. So if -- when the department starts performing presumably in 2010, if there's no alternative disposal site proposed and approved by the commission, it's going to consider taking GTCC waste in your opinion?
MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.
A. Well, let me go to the matter of timing again.
To me, you seem to be inferring that when we begin accepting waste in the year 2010 that you can infer from the NRC regulation that at that time we'd begin accepting GTCC, and I'm saying in my opinion I don't think you can infer that.
By the same token, there's certainly not been any discussion or intent that GTCC would sit at a reactor site for a hundred years either. The department has simply not addressed that. This program has certainly not addressed that at this point.
BY MR. SKALABAN:
Q. As a matter of policy, wouldn't it be desirable to see that the GTCC waste goes somewhere when the department begins performing, that it goes either to the repository, or alternatively, if an

194

alternative disposal site is developed, that it would go there?
MR. SHULTIS: Objection, vague, calls for speculation.
A. In my personal opinion, I think there should be an agreed-upon path forward for the disposal of GTCC. Again, my personal opinion, I think it would not be good to leave it sitting at the reactor site or any site for any length of time, any significant length of time.
BY MR. SKALABAN:
Q. I mean, that would be a bad policy, wouldn't it, to leave GTCC waste at reactor sites for an extended period of time even when all the -- even when the rest of this -- well, let me rephrase.
It would be bad policy to leave GTCC waste at reactor sites for an extended period of time if the department has otherwise picked up all the spent fuel from the site?
MR. SHULTIS: Objection, mischaracterizes prior testimony.
BY MR. SKALABAN:
Q. Do you agree with that?
A. My personal opinion, in this mechanical engineer's opinion, I think it would be bad policy to

195

leave GTCC sit at a reactor site long after all of the spent fuel has been removed from that reactor site.
MR. SKALABAN: Off the record.
(Recess.)
MR. SKALABAN: Back on the record.
BY MR. SKALABAN:
Q. We were just looking at the definition of -- standard contract of high-level waste, and in particular the provision about other highly radioactive material that the commission consistent with existing law determines by rule requires permanent isolation.
Would you agree that there's some ambiguity in the application of that definition of high-level waste when it's applied to the NRC regulation that we've just been looking at, which requires disposal in a geologic repository in the absence of an alternative?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.
A. I guess it's my understanding that the NRC has not determined that GTCC requires disposal in the Yucca Mountain repository.
BY MR. SKALABAN:

196

Q. But is it fair to say that they've determined that it requires disposal in a geologic repository in the absence of alternatives?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. In my opinion, yes, it does.
BY MR. SKALABAN:
Q. So given that it requires disposal in a geologic repository, in the absence of an alternative, doesn't that create some question whether or not this definition of high-level waste then applies to GTCC waste?
MR. SHULTIS: Calls for a legal conclusion, assumes facts not in evidence.
A. I guess my personal opinion, there's some ambiguity.
BY MR. SKALABAN:
Q. There's some questions when you apply this contract definition to the existing regulation?
MR. SHULTIS: Same objection.
A. In my mind.
BY MR. SKALABAN:
Q. In your mind, there's some question whether this contract definition then requires GTCC disposal under the contract?

197

MR. SHULTIS: Same objections.
A. No. I -- my understanding at this point in time is that it does not require disposal in a geologic repository such as Yucca Mountain.
BY MR. SKALABAN:
Q. But this provision of the contract could be interpreted to require that.
It's susceptible to that interpretation?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.
A. I don't know that I -- let me say that in my opinion, it doesn't preclude that.
BY MR. SKALABAN:
Q. So while your reading of it is in view of that NRC regulation GTCC is not covered by the contract, but that is a plausible alternative interpretation of this reading of the contract that GTCC waste is covered in the contract?
MR. SHULTIS: Same objections, mischaracterizes prior testimony.
A. Well, I don't think any of the definitions in view of the NRC regulation necessarily preclude it. In terms of whether this is a plausible interpretation, I don't know.
BY MR. SKALABAN:

198

Q. Now, earlier, we looked at Yankee Atomic -- I'm sorry -- Exhibit No. 97, which was the series of DCS correspondence between Yankee Atomic and the department. And in that correspondence, we saw letters from the contracting officer encouraging Yankee Atomic to swap, and a letter from yourself encouraging Yankee Atomic to swap.
At the time the department was writing those letters to Yankee Atomic, did they -- did you envision that a swap market would develop for the exchange of acceptance swaps?
MR. SHULTIS: Objection, mischaracterizes prior testimony, and the document in Exhibit 97 speak for themselves, also lack of foundation.
A. The swap market for -- are you referring to spent fuel?
BY MR. SKALABAN:
Q. Yes.
A. I don't know that I would characterize it that the program envisioned that there would be a large swap market that would develop. It certainly envisioned the possibility, and I think was at least encouraging some swapping, yeah.
Q. And was that part of documents we looked at in earlier days in your deposition where the



department was considering brokering those kind of arrangements -- is that something it was doing to facilitate that market?
MR. SHULTIS: Same objections.
A. Yes. The department was considering trying to encourage that exchange, and the department had indicated that it was willing as it did in the case of Yankee Atomic to be of assistance in however they might deem appropriate.
BY MR. SKALABAN:
Q. At the time you wrote that letter, did you believe it was a realistic possibility that a swap market would develop?
MR. SHULTIS: Objection. Are we talking about Exhibit 97?
MR. SKALABAN: Yes. I'm referring to the 1994 letter from Mr. Milner.
MR. SHULTIS: Because I think '97 is a series of letters that he did not author.
Are we talking about '98?
MR. SKALABAN: I think -- actually, I would like to clarify. 97 is a series of letters, but 62 was the 1994 letter authored by Mr. Milner that where it states, quote: The department encourages Yankee Atomic Electric Company to exercise



their contractual right to exchange allocations with other interested utilities, unquote.
MR. SHULTIS: Okay. The document speaks for itself, but go ahead.
BY MR. SKALABAN:
Q. So at the time you wrote that, which is Milner 62, in 1994, did you envision that a swap market would develop that could accommodate Yankee Atomic?
A. I did, yes.
Q. Do you know, did others of the department hold that belief?
A. I believe others did, yes.
Q. Did you have any concern that given the uncertainty of meeting the 1998 date that that may be a hindrance to the ability of that swap market to develop?
A. Personally, I thought that had a potential of affecting that, yeah.
Q. And as you progressed from 1994 forward towards 1998, did that -- did your belief grow firmer so to speak that the uncertainty would affect the ability of a swap market to develop?
A. No, not necessarily.
Q. Well, given I believe -- was it



approximately '94 and '95 that the department issued its first notice -- I think it was a notice of rule making -- about the uncertainties of the 1998 date; is that right?
MR. SHULTIS: Objection, assumes facts not in evidence. I think it mischaracterizes prior testimony.
A. I don't recall the dates there.
Are you referring to the notice of inquiry?
BY MR. SKALABAN:
Q. Yes.
A. I don't recall what that date was. That's roughly the right time frame.
Q. Well, again, given that in approximately the '95 time period the department initiated notice of inquiry, wouldn't that create some substantial problems for a swap market to develop if there were a serious question about DOE was performing in 1998?
MR. SHULTIS: Calls for speculation.
A. I guess sitting here at this point, my opinion would be -- and I don't remember specifically thinking about it at the time, but, yeah, I think in my opinion, it would be a hindrance. I don't know that it would be a significant hindrance. My

assumption would be that if a utility for whatever reason needed to move itself up in the queue, it would need to do that regardless of whether the department began accepting in '98 or in 2010.
BY MR. SKALABAN:
Q. But if the utilities were considering exchanging amongst themselves, wouldn't it be very important for them to know whether the department was going to be begin in 1998 or 2010?
MR. SHULTIS: Same objection.
A. I've always held the personal belief that it was important that the utilities have the best estimate available as to when we would start operation.
BY MR. SKALABAN:
Q. Well, different utilities might have dramatically different storage needs in 1998 and 2010.
Isn't that a fair assumption?
A. Yeah, I think that would be fair.
Q. So if there's uncertainty whether the department is going to perform in '98 or 2010, that could have a large effect on whether they would be willing to swap, don't you think?
A. Potentially, m-hm.

203

Q. If I could call your attention briefly to Milner 60, in particular the position statement draft on page 3.
The second sentence says: The projected CRWMS acceptance capacity is currently anticipated to exceed the industry annual SNF discharge rate in the year 2010 or when a repository begins operations, period. At that time, DOE will revisit this issue and consider granting acceptance priority to shutdown reactors.
Now, recognizing that this is a preliminary draft and that it appears to be from a contractor, does that indicate to you that the department at this time would consider more favorably granting acceptance priority to shutdown reactors at a time when the industry's annual discharge rate had exceeded?
A. It does not.
Q. Why not?
A. Well, two things. The wording in this draft statement first of all indicates that it would be considered at that time. To me it gives no indication of whether that would be a more favorable consideration or not.
But then secondly, this is a preliminary

204

draft of a contractor work product, which would simply be input to the department's decision-making process.
Q. Well, from December 29, 1992, forward, did the department ever take the view that it would consider granting acceptance priority when the discharge rate is exceeded?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
A. Well, in my recollection, the department never took the view that it would grant priority to shutdown reactors once a certain rate was reached or exceeded. And I think I had testified earlier that in a number of points throughout the history of the program, the department addressed the issue of priority to shutdown reactors and usually addressed the issue in discussions with industry representatives.
And generally, I think the majority opinion was -- discussions on the part of the utility side was that priority should not be afforded to shutdown reactors.
(Discussion off the record.)
BY MR. SKALABAN:
Q. Well, if it could be shown that granting

205

priority to a shutdown reactor would not adversely impact an operating utility in the sense that that operating utility would not be required -- or no operating utilities would be required to rerack or build dry storage because of some accelerated priority for a shutdown, in that instance, would it make sense for the department to grant priority?
MR. SHULTIS: Objection, assumes facts not in evidence, also calls for speculation.
A. Well, I think that the view held by a large number of utilities were that any priority afforded a shutdown reactor would adversely affect them.
BY MR. SKALABAN:
Q. But if it could be demonstrated that it wouldn't -- that it wouldn't require any excess cost to be incurred for on-site storage to any operating utility, would that be an important consideration in the department's mind as to whether to grant acceptance priority or not?
MR. SHULTIS: Same objection, asked and answered.
A. Again, I think if it could be demonstrated -- in that sense demonstrated to all of the contractor holders as well as the department that

206

there was no adverse effect, and I wouldn't limit that to the need or not need -- or no need for building additional storage, just a general if everybody agreed that, yes, it was demonstrated that there was no adverse effect whatsoever in anyone's mind, then, yeah, that would have made sense.

I don't -- I can recall of nothing that was ever said, demonstrated, whatever, that went along those lines. I think it remains the position of quite a number of utilities to this day that any priority for shutdown reactors would adversely affect a utility.

BY MR. SKALABAN:

Q. Well, wouldn't the answer to the question on whether there would be an adverse impact to other purchasers -- wouldn't that be influenced to a very large extent by how great the acceptance rate is if the -- if, for example, there's a steady state rate of 3,000 MTUs, as opposed to, say, 400 MTUs, there would be a lot less need to build or to allow for additional storage at operating reactor sites?

Do you agree with that?

MR. SHULTIS: Calls for speculation.

A. I would agree with a part of the statement that said, if you -- well, if you up the acceptance

207

rate and utilities had no need for additional storage at the lower rate, certainly the higher rate they wouldn't need either.

And perhaps I misunderstood your question, but --

BY MR. SKALABAN:

Q. Okay. I guess what I'm driving at is, how great the steady state acceptance rate is would have a large impact on whether or not other purchasers would be impacted by a grant of priority if the department's performing in a rate such as 3,000 MTU.

It's accepting a lot more spent fuel from purchasers than if it's accepting rate at 400; is that right?

MR. SHULTIS: Asked and answered.

A. Well, I think in my opinion, a number of the contractor holders hold the view that regardless of what the acceptance rate is, any priority to a shutdown reactor would adversely impact them.

And if I can try to think of a hypothetical example.

If utility X had an allocation of a hundred MTUs in a given year and the overall acceptance rate was 500 MTUs for that year, if the department doubled that acceptance rate to a thousand

208

MTUs in that particular year, potentially utility X might expect that their allocation would increase to 200. And therefore, you know, likely their view would be that they were adversely impacted even though the rate were doubled.

BY MR. SKALABAN:

Q. I guess what I'm driving at, there's plenty of room in their spent fuel pool, that utility -- and the overall acceptance rate is, say, 3,000 MTU, and they can see in view of that acceptance rate that they're not going to have to add additional storage under that rate, and they have excess room, they're not going to be adversely affected economically if there's a grant of priority?

MR. SHULTIS: Objection, assumes facts not in evidence, calls for speculation, asked and answered.

A. I mean, we're both sitting here trying to get into the mind of a hypothetical utility, and if a utility's only view of adverse impact was whether or not they had to build additional storage, then I suppose that utility would deem that there was no adverse impact, but I no way can try to believe that I know what every utility's definition of adverse impact is.

209

BY MR. SKALABAN:

Q. Well from the department's perspective, if there was no -- if it could be shown that there's no economic impact to other utilities, in other words, because of this grant of priority, the other utilities are not going to have to add some additional storage facilities, they're not going to have to incur those costs, what other adverse impacts would there be that the department would be concerned about?

MR. SHULTIS: Same objections, including asked and answered.

A. Well, to characterize adverse impacts that the department would be concerned about, I think our concern more related to the allocation in our view under the contract specified oldest fuel first. To change that really would require I think the agreement on certainly the bulk of the contract holders.

BY MR. SKALABAN:

Q. But can you think of any other adverse economic -- I mean, any other adverse impacts other than economics?

MR. SHULTIS: Same objections, asked and answered.

210

A. Well, I can only speculate that a utility might be concerned if -- might perhaps be concerned about the reaction of its PUC or its post- -- that there may be a negative reaction for them giving up what might be viewed as a quicker removal of the spent fuel from that site, be it shutdown or operating reactor.
BY MR. SKALABAN:
Q. Now, while we have the contract still out, we looked and spent some time talking about the DCS instruction 2.7, which required the utility purchasers to follow the allocations in the ACR; is that correct?
We looked at that earlier?
A. Right.
Q. And I believe I asked you about what was the authority that the department based that instruction on, and I believe you referred me to different provisions in the contract, is that right, the ACR?
A. Well, I think I referred -- reference in the contract not to specific provisions but the ones that reference the ACR -- APR. Excuse me.
Q. Well, I'd like you to take a look at the contract section -- it's the page of the Federal

211

Register 16601. And in the article five, part B, delivery commitment schedule, it says on the top of column three: The purchaser shall submit to DOE the delivery commitment schedules which shall identify all SNF and/or HLW that the purchaser wishes to deliver to DOE beginning 63 months thereafter.
Do you see that, sir?
A. I do, yes.
Q. What was your understanding of that part of this provision of the contract?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. I guess my personal interpretation is that they would in fact submit DCSs which were consistent with their allocation.
BY MR. SKALABAN:
Q. If it says that the purchaser shall submit DCSs which shall identify all the SNF and/or HLW the purchaser wishes to deliver -- if the purchaser is required to by the instruction to, say, only submit up to the level of their allocation in MTUs, they can't then provide or can't identify -- they can't -- or more specifically, they're precluded from identifying all of the SNF that they may wish to deliver?

212

MR. SHULTIS: Objection, calls for a legal conclusion.
A. Yeah. In my personal opinion, I would read that -- I don't know that you can read any provision of the contract separate and apart from other provisions of the contract. And I guess I would be reading that in conjunction with the prior article, which talks about DOE issuing an annual acceptance priority ranking and an annual capacity report, which delineates our receiving capacity.
And in reading those two together, in my personal opinion, I think you would not -- I can't see a reason why you would infer that you would submit a DCS which was greater than your allocation.
BY MR. SKALABAN:
Q. Well, the language, all SNF and/or HLW that they wish to deliver, that language in that provision is -- it's not tied to an ACR allocation, is it?
MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.
A. In my opinion, it is. I mean, I guess if I were to read that provision -- you know, hypothetically if I were to read that provision separate and distinct from any other provision in the

213

contract, I could conceivably read that as requiring the utility to deliver that fuel to the repository.
BY MR. SKALABAN:
Q. All the fuel that it wishes to deliver?
A. To the repository.
MR. SHULTIS: Same objections.
BY MR. SKALABAN:
Q. So it can conceivably be read to allow the utility to identify all the fuel that it wishes to deliver, aren't the DCS instructions in effect changing the terms of the contract?
MR. SHULTIS: Objection, calls for a legal conclusion, mischaracterizes prior testimony.
A. Yeah, I think you are mischaracterizing my response.
I was saying a hypothetical that if you read that provision separate and apart from anything else in the contract, you could probably infer any number of things. But I think you read one provision in the contract in conjunction with other provisions. And to me you read that in conjunction with annual capacity report limitations and allocations.
BY MR. SKALABAN:
Q. Well, I guess what -- yeah, I definitely don't want to mischaracterize your prior answers.

214

Thank you for clarifying.
But there's nothing in this provision B 1 that references an annual capacity report. It does talk about a priority ranking, but there's nothing about the annual capacity report in the DCS provision.
MR. SHULTIS: Objection. The document speaks for itself, asked and answered.
A. Unless I'm totally remembering wrong, I believe the contract does reference annual capacity reports and annual priority rankings.
BY MR. SKALABAN:
Q. I'm just talking about this provision B 1.
MR. SHULTIS: Same objections.
A. I believe I've responded to that already.
BY MR. SKALABAN:
Q. Okay. So it's your view that this provision that purchasers shall submit to DOE the delivery commitment schedules which identify all SNF that they wish to deliver is tied to the annual capacity report?
A. That's my view.
Q. And in your view, it's not susceptible to another interpretation?
MR. SHULTIS: Same objection, asked and



answered, mischaracterizes prior testimony.
A. In my view, no.
MR. SKALABAN: I'd like to mark as Exhibit I believe it's 102 --
(Milner Exhibit No. 102 was marked for identification.)
MR. SKALABAN: This is a document entitled, U.S. Department of Energy, Office of Civilian Radioactive Waste Management, nuclear waste technical review board, full board meeting, subject, update on the multipurpose canister concept, presenter, Ronald A. Milner, and it's dated July 11th, 1994.
MR. SHULTIS: Actually -- I'm sorry. It says, January 11th.
MR. SKALABAN: Thank you. January 11th, 1994.
BY MR. SKALABAN:
Q. Do you remember giving this presentation?
A. Vaguely, I do, yeah.
Q. Can you tell me about what the purpose of the presentation was?
A. No. My recollection, it was just what the subject says, to update the TRB on the multipurpose



canister concept at that time.
Q. And who is the nuclear waste technical review board?
A. The nuclear waste technical review board is a body which as I recall was established -- the body in general was established by the Nuclear Waste Policy Amendments Act. They are a body of essentially 11 members which are nominated I believe by the National Academy of Sciences and appointed by the president to oversee the technical aspects of the OCRWM program, and they provide reports to the Congress.
Q. Are you a member of the board?
A. Oh, no. They are an independent body independent from the department.
Q. Now, at this presentation, would this be open to the public?
A. Yes, I believe virtually all of the board meetings are open to the public.
Q. And what's the purpose of the review board?
I think you just said they report to Congress.
A. I don't recall the exact wording from the act -- I believe it was the amendments act -- it



essentially created an oversight body over the program, and they are to in essence review and provide recommendations on various technical aspects of the program to the Congress.
Q. I'd like to call your attention to page 19. I'm hoping you can explain for me some of the bullet points that are there. That page is entitled, programmatic risks and contingency analysis.
A. M-hm.
Q. And it references contingencies evaluated for the MPC system.
Can you tell me what this is about, what contingencies were evaluated for MPC?
A. My recollection of that, which is very vague, but looking at some of the different contingencies there, probably related to the numbers of canisters that had to be dealt with, but I don't really recall.
Q. Do you know what was being referred to here with -- under the, dash, impact of transportation after storage uncertainty, what that contingency was?
A. My recollection of that, that it -- at this point in time, I don't believe NRC had certified any canister for transport subsequent to extended

storage. In other words, if a canister was loaded at the reactor site and stored for some period of time, I think at that point, there was no canister that was certified by the NRC that could subsequently be transported.
Q. I see. And that has changed, hasn't it?
A. It has now, yes.
Q. The canisters have been licensed for transportation?
A. Correct.
Q. And so when you're talking about programmatic risk measured as economic impact, there's a bullet point there for MPC not transportable after storage.
That's the concern you were just talking about?
A. Yes.
Q. And on the next page, page 20, in this first bullet point, it lists some concept benefits.
What does that mean, sited as motivation for work?
I don't understand that.
A. Well, at this point in time, I'm not sure I do either, but I would infer that these were reviewed as some potential system benefits which,

219

therefore, would provide some impetus or motivation for the department or others to develop an MPC system.
Q. And so these listed under that bullet point -- these are advantages of an MPC system, whether it's developed by the department or by others?
A. Yes.
Q. And you agree that these are advantages of the system, of an MPC canister system?
A. My personal opinion -- well, I didn't read all of them, but, yeah, I would agree those are advantages.
Q. Are there any major disadvantages of canisters, of using canisters in the program that you're aware of?
A. Certainly a disadvantage that it -- I could see would be that if ultimately no canister could be simply placed in a waste package and in the repository, then the department would have to open those canisters and repackage that fuel, which would probably to some degree increase the handling on DOE's part that would be required.
Certainly if there were widespread use of a canister system that ultimately could not be used

220

for disposal, you've created a fairly large secondary waste stream to deal with canisters.
Q. Any other disadvantages that you can think of?
A. Not offhand, no.
Q. And at this point, if I understand -- again I don't want to -- I want to make sure I'm correctly testifying -- or correctly representing your prior testimony -- at least currently the department's plans are to accept canister systems and to dispose of them if possible?
A. Certainly the department plans to accept canister systems. The department certainly hopes to be able to dispose of those. Obviously, we would prefer not to have to open them and create another waste stream.
MR. SKALABAN: Let me go ahead and mark this. I believe we're on Exhibit 102; is that correct?
MR. SHULTIS: 103.
MR. SKALABAN: Thanks.
(Milner Exhibit No. 103 was marked for identification.)
BY MR. SKALABAN:

221

Q. 103 is a memo from Mr. Ronald Milner dated March 8, 1994, to a series of people listed on a distribution list, and it contains an attachment. And the subject of the memo is, modification of the CRWMS program baseline to a multipurpose canister-based system.
Are you familiar with this document, Mr. Milner?
A. I am, yes.
Q. What was the purpose of this document?
A. Essentially, as it's stated here, that this was advising staff within the program that the director of the program had approved a change to the baseline to incorporate multipurpose canisters into the baseline.
Q. And what does that mean, to be incorporated into the baseline?
A. That means that essentially that we expect and would accept canisters into the system. That was part of the operation that we envisioned.
Q. Was the intent of this at this time to actually furnish multipurpose canisters to all of the utilities?
A. To the best of my recollection, time frames are unclear. Certainly at one point, which

222

would be this approximate time frame, the department gave consideration to furnishing multipurpose canisters to utilities as a potential means to mitigate any delays. Whether it was actually this exact time frame, I can't recall.
Certainly what this baseline change is dealing with is not the provision of canisters to anyone. It's simply a change in the baseline so that as part of the design process, designers will begin to take into account multipurpose canisters in the design of the system.
Q. And is that baseline still in effect?
A. I believe it is.
MR. SKALABAN: If I could mark now as Exhibit 104.
(Milner Exhibit No. 104 was marked for identification.)
BY MR. SKALABAN:
Q. Can you tell me what this -- and just for the record, 104 is a memo, although I will indicate there's no approval signature on the memo, but it appears to be a memo from Mr. Milner to Daniel Dreyfus, the director of OCRWM.
Do you recall this memo?

223

A. I do vaguely, yes.
Q. Did you send it Mr. Dreyfus?
A. My recollection is that I did.
Q. And what was the purpose of the memo?
A. Essentially to get the formal approval of the director to terminate funding for the MPC development program.
Q. And was this in response to Congressional appropriations?
A. It was.
Q. So the effect of this memorandum is that the department was no longer going to directly fund the development of MPCs?
A. Correct.
Q. Now, the second page, it says that the -- at the top: The technical and operational objectives and advantages of standard canistered SNF defined in the attached MPC approval memo are still applicable.
Recognizing that I don't have the attached memo, but at that time, do you agree with that statement that the general -- or do you agree with that generally that technical and operational objectives and advantages of standard canister SNF would still be applicable?
A. Yeah, I do.

224

Q. And it says at the very bottom: The program will continue actions that are necessary to encourage private industry development and utilization of casks, slash, canister technologies that provide the technical and operational objectives and advantages that were anticipated with the MPC.
Do you see that?
A. Yes.
Q. And that was your understanding of the program -- of a program goal at that time?
A. Yes.
Q. And to this day, does the program -- is -- are -- excuse me. Scratch that.
To this date, is the department still encouraging the development and utilization of cask/canister technologies?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
A. I believe it is. I guess I would add that at least in my opinion the work that DOE had done on MPC technology development I think provided the seed and the impetus which ultimately resulted in at least a couple of canister systems being so far certified for storage and transportation.
BY MR. SKALABAN:

225

Q. Such as some of the NAC systems?
A. Yeah.
Q. And that's a positive development?
A. It is.
MR. SKALABAN: I'd like to mark defendant's proposed stipulation of fact as Exhibit 105.
(Milner Exhibit No. 105 was marked for identification.)
BY MR. SKALABAN:
Q. I'm going to represent to you, Mr. Milner, that this is the government's proposed statements of fact in the Yankee Atomic litigation.
Do you -- have you ever reviewed or seen this document?
A. I don't recall that I did, no.
Q. Do you recall or have you reviewed any pleadings in this litigation or filings in this litigation other than interrogatories that we talked about yesterday?
A. I have not.
Q. And I'm sorry. Let me clarify my question also a little bit: What I'm saying, in this litigation, I'm not limiting it just to Yankee

226

Atomic. I'm talking about the spent fuel litigation generally.
Outside of those interrogatories, do you recall reviewing any spent fuel pleadings or filings?
A. I don't recall that I did, no.
Q. I'd like to call your attention to page 58. And in little part A, little part B, little part C, it refers to Yankee Atomic's election to use the NAC MPC storage system, Connecticut Yankee's election to use the NAC MPC storage system, and Maine Yankee's election to use the NAC UMS storage system.
Now, let me ask you first, do you have any reason to disagree with the government's proposed factual findings there?
A. That Yankee Atomic used that storage system?
Q. Yeah, or that Connecticut Yankee or Maine Yankee does.
A. Take a minute to read the rest.
(Pause.)
A. I don't have any reason to believe that that's not correct, no.
BY MR. SKALABAN:
Q. And each of those storage systems referred to there, the NAC MPC, the NAC -- and the NAC UMS, to

227

your understanding, are those canister systems that are an outgrowth of what we've just been talking about, the multipurpose canister program that DOE was looking at?
A. Actually, I'm not familiar with the designation UMS. Certainly the NAC MPC is -- my understanding suggests a canister system.
Q. Okay. So you're -- just with respect to the NAC UMS, you're just not sure if that is a multipurpose canister-type system?
A. Yes.
Q. Now, here the assertion is made that it is a multipurpose element sealed canister.
Does that suggest to you that it's a canister-type system?
I'm talking about the Maine Yankee part.
A. Yeah. It suggests that certainly. I've simply indicated I had not heard the term UMS before.
Q. Now, part 114, can you take a look at that paragraph.
(Pause.)
BY MR. SKALABAN:
Q. Do you agree with that?
MR. SHULTIS: Objection, calls for a legal conclusion.

228

A. To the best of my recollection, there is no provision in the contract that requires disposal of a canister.
BY MR. SKALABAN:
Q. Is there anything in the contract to your recollection that excludes acceptance of a canister?
MR. SHULTIS: Same objection.
A. In my recollection, nothing excludes it. That's my opinion.
BY MR. SKALABAN:
Q. So is the contract kind of open on the issue of whether or not a canister has to be accepted?
MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.
A. You know, in my opinion -- well, in fact, when the contract was written and executed, there were no such things as multipurpose canisters, so I would have been surprised if they'd been referenced in the contract in one way or another.
BY MR. SKALABAN:
Q. Can you take a look at proposed finding of fact 145, which is on page 70 of this document.
Mr. Milner, what I'd like to ask you first is, as a general matter, do you think it's an

229

unreasonable decision generally for Yankee Atomic to have put its spent fuel in a multipurpose canister?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.
A. I don't believe I know the answer to that.
BY MR. SKALABAN:
Q. How about with respect to Connecticut Yankee and Maine Yankee?
Do you think it's unreasonable for them to put their spent fuel into multipurpose canisters?
MR. SHULTIS: Same objections.
A. Likewise.
BY MR. SKALABAN:
Q. And for all three companies, do you have any reason to believe at all that it would be an unreasonable thing to do?
MR. SHULTIS: Same objections, asks for a legal conclusion, calls for speculation.
A. No. Likewise.
BY MR. SKALABAN:
Q. So you have no reason to believe that that's an unreasonable thing for them to do?
MR. SHULTIS: Same objections, asked and answered.
A. I'm saying I don't know all the facts

230

surrounding it to make a judgment in my opinion
whether it's reasonable or unreasonable.
BY MR. SKALABAN:
Q. Well, as the chief operating officer of
OCRWM, do you agree that Yankee Atomic has
indefinitely delayed the acceptance of its spent fuel
because it put the spent fuel in a multipurpose
canister?
MR. SHULTIS: Objection, calls for
speculation and also calls for a legal conclusion.
A. I guess I don't know just exactly how they
stored it.
Have they commingled failed fuel and spent
fuel and GTCC and --
BY MR. SKALABAN:
Q. Well, let's assume that there are many
canisters where there's no commingling of any failed
fuel or GTCC with the spent fuel.
With that assumption, do you think that
Yankee Atomic has indefinitely delayed the acceptance
of canisters with SNF without failed fuel or GTCC?
MR. SHULTIS: Objection, calls for a legal
conclusion, asks for speculation.
A. I don't know.
BY MR. SKALABAN:

231

Q. If the department is planning to pick up
canisters of failed fuel that are licensed for
storage and licensed for transport on the same
schedule, which I believe is what you had testified
to earlier, then they haven't indefinitely delayed
the acceptance of that fuel, have they?
MR. SHULTIS: Objection, asked and
answered, and calls for a legal opinion, assumes
facts not in evidence.
A. I don't know the facts surrounding their
storage, so I can't form an opinion on that.
BY MR. SKALABAN:
Q. Well, what information would you need to
know?
A. What exactly is in the canister.
Q. And in particular, what would you be
looking for?
I mean, what are the variables?
What would you need to know?
A. What's in the canister.
Q. Let's assume we have a canister of
standard fuel.
Is that going to be delayed indefinitely,
the acceptance of that, because it was put into a
multipurpose canister system?

232

MR. SHULTIS: Objection, calls for a legal
conclusion, also asks for speculation.
A. In my personal opinion, if the canister
contained nothing but standard fuel, I don't see any
reason why that canister would be delayed.
BY MR. SKALABAN:
Q. And if it contained some failed fuel but
the canister system was licensed to handle that
failed fuel and it was licensed to store it and it
was licensed to transport that failed fuel, would
there be any reason that that canister would be
delayed?
MR. SHULTIS: Objection, calls for a legal
conclusion and asks for speculation.
A. My personal opinion, if that canister were
licensed for storage and transport failed fuel, that
could still potentially delay that canister.
BY MR. SKALABAN:
Q. And why would that be?
MR. SHULTIS: Same objections.
A. If that canister were not licensed for
disposal, therefore, requiring the department to open
that canister, depending on the nature of the
failure, that may or may not require special
handling.

233

BY MR. SKALABAN:
Q. So that would again depend -- in your
view, in your opinion, it would depend on the
disposal facility's ability to process that failed
fuel?
MR. SHULTIS: Same objections.
A. Yeah. It would depend on the nature of
the failure and whatever requirement there may be for
special handling.
BY MR. SKALABAN:
Q. Do you know a Mr. Ivan Stewart?
A. Yes, I do.
Q. Can you tell me who Mr. Stewart is?
A. I believe -- he certainly was -- I believe
he still is an employee of Nuclear Assurance
Corporation.
Q. Let me ask you, have you had occasion to
work with Mr. Stewart?
A. Yes.
Q. What's your professional opinion of him?
MR. SHULTIS: Objection, relevance.
A. My personal opinion, I think he's a good
engineer. It's been some time since I've seen
Mr. Stewart.
BY MR. SKALABAN:

234

Q. Now, Mr. Tomaszczuk was asking you some questions about when the repository would open, and I believe you testified you thought it would be 2010.
When is the department going to work on implementing its transportation system?
A. Right now, the department intends to begin implementing its transportation system once it has a repository site approved.
Q. And the current estimation for that is calendar year 2007?
A. No. Site approval, current estimation for that is fiscal year 2002.
Q. Okay. So that's calendar year 2003?
A. No. I believe that is still calendar year 2003.
Q. Is there a difference between fiscal year and calendar year?
A. Yes. Calendar year 2002 goes through December 31st of this year, whereas fiscal year 2002 ends on September 30th of this year.
Q. I see. So in December of 2002, we're in fiscal year 2003?
A. 2003. But site approval is -- if it occurs, is expected to occur in fiscal year 2002.
Q. And what kind of preparations for

235

transportation are you planning to embark on once you've got site approval?
A. Assuming we get site approval, the first step will be to begin in earnest -- will be to acquire a contractor to do detailed planning for the transportation system. At some later stage, you'll begin procurement of the longer lead items like casks.
Approximately five years before start of shipments, we're required -- required under the act to provide assistance to states, local jurisdictions through which we'll pass. The department will begin that five years prior to start of operation of the transportation system.
Ultimately, we'll acquire a contractor for the actual operation shipment. And right now, the department is doing preliminary planning for how it will gear up that transportation program, but we think it prudent not to make large expenditures until we have a site approved.
Q. So you anticipate the large expenditures are going to begin in 2002?
A. No, no. I think that the large expenditures will be a little bit later, but the preparatory steps for those expenditures will begin

236

subsequent to site approval.
Q. Would that be the time of construction authorization is when you would begin to incur large transportation costs?
Is that the plan?
A. Yes, yes.
Q. Okay. And so that under the current schedule -- is that 2005 or 2007?
A. Construction authorization under the current schedule is 2007.
Q. So do you think -- will the department in your view be able to get a transportation system up in running in three years from the time it starts making large transportation expenditures?
A. That's kinds of a two-part question. It infers different things.
Q. Okay.
A. We'll -- do I believe that we can get a transportation system up and running in three years subsequent to making large expenditures?
Yes, I do, because that's not the point in time which we will start implementing a transportation system. That will begin shortly after site approval.
It just so happens that in the process of

237

developing the system, you don't incur those large expenditures until a little later, but that's not to say that's the starting gun for beginning to work on transportation system.
Q. How do you -- I mean, how do you currently envision the transportation system to be constituted?
What are the major components of it?
Do you plan on using a contractor?
A. Yes.
Q. How are the casks going to be developed?
A. Private industry. The department does not intend at this point in time to undertake cask development program on its own. The department feels that once the site is approved, then it will clearly move towards implementing a transportation system, and the private sector will develop the necessary casks, and some are in existence currently.
Q. What are some of the casks that spring to mind that are candidates in your mind?
A. What comes to mind right now is NAC LWT, like legal-weight truck cask.
Q. How about for rail casks?
A. I believe there are older rail casks in existence. I would hope that additional newer rail casks will be developed.

238

Q. About how large capacity rail cask do you anticipate being used?
A. I would expect that the rail cask would be nominal 125-ton.
Q. Which would hold about how much MTU?
A. I believe they hold -- would hold nominally ten, 12 assemblies, so that's five or six metric tons of uranium.
Q. Are there some rail casks that are currently licensed for transportation that can take ten MTU?
A. I'm not really sure.
Q. Okay. And if there are, that would be -- would that be something the department would consider incorporating in because it's a larger cask and can carry more at one time?
MR. SHULTIS: Objection, vague.
Are you talking about -- incorporating into what?
MR. SKALABAN: Into the waste management transportation program.
MR. SHULTIS: System.
A. The department has stated that it would prefer to use rail to the maximum extent possible.
BY MR. SKALABAN:

239

Q. What's the concept of -- I've heard it mentioned regional service contractors?
What is that concept?
A. It was the department's concept. I guess that concept was envisioned in the mid-'90s, rough time frame. That was a concept wherein department would utilize under a phased procurement approach a number of contractors. I believe we had divided the country up into four regions under that concept.
Phase one of that procurement process could have multiple awardees per region, and that first phase was envisioned that those particular contractors, RSCs, as they were termed shorthand, would begin working with utilities to develop protocols for shipment.
And assuming you had multiple contractors per region when you moved to the second phase -- we might have called it A, B, and C, or one, two, three -- I don't recall -- but when you moved to the next phase, you may do somewhat of a down-select, and that phase, those remaining contractors would begin equipment procurement.
And the final phase of course was the actual movement. But that whole concept envisioned a highly privatized system wherein the contractor

240

basically took virtually all of the upfront risk. They took the risk in performing the work because they never actually received compensation until fuel was shipped.
Q. I see. Has -- you mentioned phase two of the equipment procurement.
I guess that seems like casks?
A. Casks, and it's a truck shipment, then trailers, railcars, ancillary equipment to handle the casks.
Q. And was -- the plant had some standardized casks, or would each regional service contractor potentially use different cask systems?
A. Well, under that concept, the selection of the equipment was -- would have been left solely up to the contractor.
Q. So each regional service contractor could have gone to different vendors and got different cask systems?
A. Conceivably, although I think what was envisioned at the time was that various types of companies would team so that you potentially would have a shipper or a vendor and then maybe others as part of a team, but --
Q. Is this concept still -- what happened to

241

this concept?
Is it still -- what happened to it?
A. The department has not officially announced that its changing from that concept yet.
THE WITNESS: I'm not sure if we're into issues of procurement sensitivity or not here.
MR. SHULTIS: I think we probably are. I mean, you've already answered the question, so that's fine, but if --
Well, do you have any other questions?
MR. SKALABAN: Yeah. I want to find out if that's the current plan.
BY MR. SKALABAN:
Q. I mean, is that what the department is intending to do, is to implement this kind of regional service contractor plan?
MR. SKALABAN: I mean, if you want, we can put this portion of it under the protective order.
MR. SHULTIS: Well, I think that concerning the fact that we're talking about something that's -- I'd just as soon not have Mr. Milner testify about that at all.
You know, I think it's very speculative at this point. He's not a 30(b)(6) witness, because you're asking about DOE's intentions and policies,

242

and I really don't see how this line of questioning is particularly germane to this litigation.
So I think we should just move on. I understand that you probably want to pursue this. I think that that probably would be something you'd need to do through counsel. And let's just leave it for another day.
So I am -- so just to --
MR. SKALABAN: Are you instructing him not to answer?
MR. SHULTIS: I'm instructing him not to answer.
MR. SKALABAN: About what the current transportation -- the current plans for implementing the transportation system?
MR. SHULTIS: Right.
THE WITNESS: Let me try this. Maybe this works.
A. As part of its early planning for implementing a transportation program, the program, and I differentiate that from the department, is beginning to look at other alternatives to an RSC concept which may or may not be selected.
BY MR. SKALABAN:
Q. So it's up in the air about what the

243

actual transportation system is going to be like?
A. Recognizing that I'm not the ultimate authority, in my mind, it's up in the air. I'm not the -- the ultimate deciding --
MR. SHULTIS: So given that answer, is there really anything to pursue?
MR. SKALABAN: I guess the problem I have is, I do want to explore what the transportation plans are, and the problem I have is that you've put in the issue a lot of things about transportation and things at issue and transporting failed fuel, different things like that, so I think it's a relevant line of questioning. And, again, I'm happy to put it all under the protective order.
MR. SHULTIS: Well, everything is under the protective order anyway.
MR. SKALABAN: I don't think the transcript is. If there's a particular portion you want to designate under the protective order, you can let me know, but I think every document that I've introduced is publicly available, and I didn't think any of the testimony was.
MR. SHULTIS: But I mean, at the beginning of the deposition, the witnesses are told to read the protective order and that everything that they

244

discuss is covered.
MR. SKALABAN: Why don't we address this off the record at the end, but again I'm not going to have a problem if -- if we can take a very short break, I'd like to talk to Ron about this, and then we'll come back.
MR. SKALABAN: Okay. Sure.
MR. SHULTIS: Okay.
(Recess.)
BY MR. SKALABAN:
Q. Mr. Milner, does the department -- what's the department's current plants on whether to go forward or not with this regional services contractor approach?
A. Well, at this point in time, in reviewing not only -- well, let me back up a minute and say that when the department began developing the RSC approach, it issued at least one and I believe there were two draft requests for proposals for public comment. A final RFP had never been developed. A draft currently exists.
In looking at let me say the current situation in general in reviewing comments that were provided on the draft RFPs for the RSC concept, the department has begun looking at potential

245

alternatives which it might employ, no final decision has been made yet, but might employ, which those alternatives would certainly move away from the RSC concept.
Q. And what are those alternatives generally?
A. I guess kind of the common thread to draw the distinction between the RSC concept, it envisioned as I mentioned these regional contractors, which would be the principal interface with the utilities in determining I'll call it acceptance protocols which range from agreements on you will or you won't show up at a utility's doorstep during a refueling outage all the way down to particular types of ancillary equipment that might be required -- that you'd need.
So they would be the principal interface, with the utility developing those. They would be the entity that would do the route selections for transportation. They would be the entity that would determine what equipment is utilized. I think in the alternatives to that, the common thread is that the department would I think in most of the alternatives assume the role of the primary interface with the utility.
The department would be the one to

246

determine the routes consistent with DOT regulations, NRC regulations, and so forth. The department -- well, I guess it varies a little bit here between alternatives, but the department would at least play a more significant role in equipment selection and so forth, not that it would develop equipment or anything.
Q. But might set standards or things like that for the casks?
A. Yes, yes.
Q. Under the regional services contractor model, how would exchanges be done if you had an exchange between a utility in New England and a utility in for example Alabama?
A. I don't believe in my recollection that the regional service concept really impacted that. I believe the department was still planning on being the entity that would review and approve requests for exchanges.
Q. So implementing the RSC wouldn't in your view make exchanges more or less likely to happen?
A. No, in my view, it would not, no.
Q. If you can pull out Milner 86. Just for the record this is the analysis of total system life cycle cost for December 1988.

247

I'd like to call your attention to page 15. There's a paragraph there that talks about DOE's SNF?
A. Yes.
Q. And it says: DOE SNF contains many different types of fuel assemblies of varying characteristics. It is assumed that all of DOE SNF arrives at the repository in disposable canisters. These canisters will contain various quantities of fuel assemblies depending upon fuel types and characteristics.
Why was the department assuming that all DOE SNF would arrive at the repository in disposal canisters?
A. Well, to directly answer the question, I don't know. I think that assumption more goes to an assumption that the canister would not have to be opened at the repository.
Q. Is DOE spent fuel being put in canister systems -- multipurpose canister systems to your knowledge?
A. To my knowledge, they are not, but I'm -- that's a matter under DOE's office of environmental management. I'm not sure what their current plan is.
Q. Why would this assumption be made if there

248

wasn't some belief that DOE spent fuel is going to be put into canister systems?
MR. SHULTIS: Objection, mischaracterizes prior testimony.
A. I don't recall offhand exactly what that was referring to.
BY MR. SKALABAN:
Q. Okay. Again I didn't mean to mischaracterize anything if I did.
But I mean, is it fair to say that this reflects the department's estimate or belief in 1998 that there's a likelihood that DOE's SNF is going to come to the -- is going to be accepted and picked up and disposed of in disposable canister systems?
MR. SHULTIS: Objection. The document speaks for itself, asked and answered.
A. I don't know that you could characterize it as expected. That was just the assumption made at that point for DOE SNF. I don't recall the particulars.
BY MR. SKALABAN:
Q. Take a look at Milner 80 for a moment. I'd just like to call your attention to page 4, modal capability at sites, and it appears here that for the purposes of the assumptions to be used in the 1995

249

total system life cycle cost, an assumption was made that 90 percent of fuel would be shipped by rail to the repository, slash, repositories for the new MRS case, and three percent of fuel will be shipped by truck.
Is that what that indicates?
MR. SHULTIS: Objection, the document speaks for itself.
A. Yes, I believe it does.
BY MR. SKALABAN:
Q. Do you know why these assumptions were made on the distribution between rail and truck?
A. I'm inferring from what's written here that our previous M and O contractor, TRW, had done some evaluation of the reactor capability, and that must have been the estimate at that time.
Q. And do you think that's a good estimate of what the breakdown of shipping between rail and truck may be?
A. My recollection is that -- and I certainly don't recall exact numbers, but I believe that current estimates would have somewhat greater numbers of reactors that could only handle truck.
Q. But it would still be predominantly by rail?

250

A. Yes, by far.
Q. Maybe just not quite as much as 97 percent?
A. Correct.
Q. Do you have any sense of what the number might be?
A. I don't recall offhand. That would certainly be available in the most recent TSLCC document.
Q. If I could turn your attention to Milner 88. It's a document that was looked at I believe yesterday. It's part of the common proceeding.
And there's one particular portion I'd like to call your attention, and that's page 12.
For the record, Milner 88 is program plan provision three, and it's dated February 2000.
And I believe yesterday you testified that these two -- the two activities first listed on page 12, obtaining construction authorization and commence major transportation activities, were linked.
A. I believe they would be, yes.
Q. And commencing major transportation activities, that's what we were just talking about recently, that the kind of major expenditures for purchasing transportation-related equipment and that



would take place in 2007?
A. Yeah. Major acquisitions, yes.
Q. And in view of the major acquisitions would take place in 2007 with an anticipated start date of 2010, you don't anticipate that the department would have problems procuring all the needed major transportation items in that three-year window?
A. I don't believe so. And I should say that I don't recall exactly the current schedule on the transportation planning exactly when the major acquisitions occur --
Q. But --
A. -- begin to occur.
Q. Would it make sense that they'd begin after construction authorization is obtained?
A. In my opinion, it wouldn't necessarily have to wait for construction authorization.
Q. Why is that?
I'm just curious why that is.
A. Let me state this as a personal opinion, that once a site is selected, at some point during the licensing process, prior to issuance of a construction authorization, I think there's going to begin to be an understanding of whether a



construction authorization will ever be issued or not, and if it's a question of whether a construction authorization will be issued at one point in time or six months later, I think if the department were comfortable that one would ultimately be issued, in my personal opinion, you could go ahead and start making major expenditures.
Q. Okay. But you would have to feel fairly certain that you're going to get a construction authorization at that time I would assume?
A. That you would ultimately get a construction authorization, not at any particular time.
Q. So that's likely to be a little bit later in the licensing process.
It's more likely to be occurring around 2007 or possibly somewhere in 2006?
A. Yeah, maybe 2006 or maybe earlier. I don't know.
Q. So again I guess your answer still stands. I mean, you would anticipate whether it's a three- or four-year window, that you're going to be able to get those major transportation systems in place in that time frame?
A. I mean, the ultimate answer to when you



start major procurements relative to where you are in the licensing process, No. 1, begins with I guess a decision on the part of the program, subsequently on the part of department, as to how much risk the department wants to take in beginning major procurements then the final answer really rests with the Congress when they appropriates the funds to do that. If Congress deems that the risk is appropriate at some point in time to begin those procurements, they'll appropriate money, and I assume, if they don't, they won't.
Q. If we assume that that doesn't -- a point of comfort with a certainty level of construction authorization doesn't occur until 2007, you still believe that the department would be able to implement those major transportation systems in three years?
A. I think so, yes.
Q. I call your attention to Milner 85.
For the record, this is the document that I believe was looked at yesterday called, Civilian Radioactive Waste Management Systems -- System, singular, total system description revision one, and it has a date of October 1998.
And I'd like to call your attention

generally to the part of page 7 and page 8. There's a part called, waste acceptance transportation. There's a subpart 3.2 called, cask -- cask, slash, canister systems for spent nuclear fuel. If you could take a moment to read that second paragraph.
(Pause.)
BY MR. SKALABAN:
Q. Sir, if I can call your attention to page 7 in that last paragraph, we've been talking about some of those concepts earlier today, and I just wanted to call your attention to the one sentence in about the middle of that last paragraph that says: The use of canisters may reduce the number of times individual fuel assemblies have to be handled during transport storage and disposal.
Does the department consider that a desirable goal?
A. To reduce the number of times individual fuel assemblies were handled, yes.
Q. And on the next page it talks about the mix of casks and canisters to be deployed in the waste management systems unknown at that time, and this is a 1998 document.
Is that true today?
A. I think that would be a fair statement to

255

say that it's true today, yes.
Q. It's something that you're -- I guess will be studying probably in the near future?
A. Correct.
Q. And do you agree with this statement: It will depend on the availability of technologies that are certified by the NRC prior to the start of CRWMS operations and the needs of the individual purchasers?
A. Correct.
Q. And what is your understanding of that clause there, the mix will -- in essence the mix of casks and canisters will depend in part on the needs of the individual purchasers?
A. I think it's -- I believe it's the program's view -- it's certainly my view that individual utilities will make decisions on storage based on their own individual needs and economics studies. And I suppose it's conceivable that if a true multipurpose canister system -- and maybe now is a good time to make a distinction since we've been talking about multipurpose canister systems, but what we've really been talking about in terms of what's in existence are dual-purpose storage systems transport, but if a true multipurpose canister system is

256

developed, that's one that's considered by the NRC for storage, transport, and disposal, were available, it still could be decided by an individual utility not to use that system.
So therefore that would -- individual utility needs would certainly affect the mix. Some utility for whatever its own individual needs -- maybe it's economics. Maybe there are other considerations -- may not utilize all the technologies available.
Q. I just want to pick up on something you said.
You said we'd been talking about what are dual-purpose canister systems?
A. M-hm.
Q. Isn't it possible that the canisters such that are utilized in the NAC SDC (sic), NAC MPC could be licensed for storage -- I mean, licensed for disposal, which would make them a multipurpose canister system?
A. It's conceivable that they could, yes. I don't know that any of them have submitted an application for certification yet, but I know of no reason why that couldn't ultimately happen.
Q. And in this -- going back to this

257

sentence, it will depend on the needs of the individual purchasers, is that indicating RW's intent to accommodate the different dry storage technologies that may be deployed at different reactor sites?
A. My understanding is that, yeah, the department's goal is to handle all the technologies.
Q. Because different utilities may implement different vendors' dry cask storage systems to store their spent fuel?
A. Correct.
Q. If I could just take your attention to Milner 84, which I don't believe we've looked at today. I'm on page 5. Excuse me.
There's a strategy objective No. 1.
For the record, this is the program plan revision two from July 1988.
You see strategy objective No. 1 says: Dispose of high-level radioactive waste and spent nuclear fuel in accordance with the Nuclear Waste Policy Act of 1992 as amended?
A. I see that, yes.
MR. SHULTIS: 1982.
BY MR. SKALABAN:
Q. 1982 as amended.
A. Yes.

258

BY MR. SKALABAN:
Q. And I assume as long as you've been at RW, that's been the goal of or the objective of RW is to dispose of high-level waste spent nuclear fuel in accordance with the act?
A. Correct.
Q. And that has been RW's intent throughout the time you've been there?
A. Correct.
Q. Does the contract implement -- do you understand the contract to be implementing the NWPA?
A. I believe it does, yes.
MR. SHULTIS: Objection, calls for a legal conclusion.
BY MR. SKALABAN:
Q. And therefore in your view, is it important that the contract be consistent with the act?
MR. SHULTIS: Same objection.
A. Yes.
BY MR. SKALABAN:
Q. And that the contract should be implemented in a way that's consistent with the act.
That's important?
MR. SHULTIS: Same objection.

259

A. In my opinion, yes.
BY MR. SKALABAN:
Q. If I could take your attention briefly to Milner Exhibit 20. And page 8 in this document is a report to Congress from the department of energy, and it's dated November 1999, and I'd like to call your attention to page 8.
Does it state at the top of page 8 that the Nuclear Waste Policy Act of 1982 required the DOE to begin taking title to spent fuel and high-level waste after the start of repository operations, comma, which were expected to be begin no later than January 31, 1998?
A. It does state that.
Q. Was that the department's understanding of the requirements of the Nuclear Waste Policy Act in -- after it was passed when you were there 1984 or 1985?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness, also calls for a legal conclusion.
A. In my opinion, this states that the department's objective was that it would begin to start accepting spent fuel and high-level waste once a facility was available, a repository, and at that

260

time, we certainly did expect there -- and the objective that it would begin in January 1998.
BY MR. SKALABAN:
Q. Did you have an understanding in 1984, 1985 that the act required DOE to have a repository available to accept fuel in January 31, 1998?
MR. SHULTIS: Same objection, asked and answered.
A. Well, in my opinion, the act anticipated that spent fuel would begin to be accepted in January of 1998, but also in my opinion, that was conditioned on having a facility available.
BY MR. SKALABAN:
Q. So in 1984, 1985, 1986, the early years that you were with the program, was it your understanding that the department's view of the act was that it didn't have to begin acceptance in January 31, 1998?
MR. SHULTIS: Same objections, asked and answered.
A. I think I stated that it -- my belief was that that date was conditioned on having a facility available, and at that point in time the department's goal was to have a facility available.
BY MR. SKALABAN:

261

Q. If I could call to your attention Milner 18.
For the record this is the draft 1988 mission plan amendment.
If you could take a look at page 16. In the section 2.24, transportation, in the second paragraph under that heading in the second sentence it says: The casks to be developed for shipments from reactors will differ from the casks currently used for spent fuel shipments in that they will have considerably greater capacities.
Do you see that?
A. I do.
Q. Does that reflect the department's intent at the time to either directly develop or encourage the development of larger-capacity casks?
MR. SHULTIS: Objection. The document speaks for itself.
A. I believe at that point in time, the department was involved in development effort to develop higher-capacity casks.
BY MR. SKALABAN:
Q. So that was -- the department was intending to use greater-capacity casks in its program?

262

A. The department certainly had an objective to utilize higher-capacity casks.
Q. And it still has that objective today?
A. Certainly.
Q. What are the reasons for that?
A. Utilization of higher-capacity casks, you make less shipments.
Q. And so it's more cost-effective?
A. Yes.
Q. And there's less repetitive visits to individual utility sites?
A. Correct.
Q. What's the estimated average turnaround time for one rail cask trip to a reactor to a repository?
A. I don't recall.
Q. Would a month sound right, or is it longer than that?
A. I guess to me a month would be to the best of my recollection. It may be a little on the high side, but I really don't recall.
Q. You're thinking it could be a quicker turnaround time from a trip from the repository to a site and like a complete round-trip?
A. My recollection is, the estimate is a

263

little bit less than that, but again I really don't recall.
Q. If I wanted to find out the answer to that question, who would I ask in the department?
A. Well, I believe that the estimates of turnaround times and so forth are embodied somewhere in the TSLCC analysis. Whether it's specifically stated in the published report, I don't recall. The person responsible for the TSLCC analysis is currently the acting director of the -- I forget what we call it now -- acceptance transportation and integration office.
Q. And who is that?
A. That's Jeff Williams.
Q. Does the department anticipate any problems handling higher burnup fuel?
What I mean by that is fuel --
A. I understand the term higher burnup, yeah.
MR. SHULTIS: Objection, vague.
A. I guess I'm vaguely aware that somebody has raised the question as to whether or not there would be any difficulty in handling higher burnup fuel. I don't recall any specifics or any specific concern.
BY MR. SKALABAN:

264

Q. And in general hasn't the industry been moving towards higher burnup fuels in general matter because that reduces the amount of spent fuel generated?
A. It has.
Q. And as you sit here today, do you have any reason to believe that the department would have difficulties handling fuel burned up to say levels of 50,000?
A. The only -- in a general term, I don't know of any reason why the department would not handle higher burnup fuel. I think one potential difficulty that comes to mind is that higher burnup fuel could potentially have the effect of reducing the capacity of a transport cask.
Q. One way of possibly dealing with that would be mixing within a particular transportation cask some higher and some lower burned-up fuel?
A. Yes, that's a potential, sure.
Q. And still reach a full cask?
A. Potentially, yeah. You have to look at the specifics there.
Q. Sure. And if I could call your attention to Milner Exhibit 12.
For the record this is the 1987 annual

265

capacity report.
I'd like to call your attention to the -- inside the first page, there's a letter from Ben Rusche, or a statement signed by Mr. Rusche.
Do you see that there's a statement there where Mr. Rusche says: Even more importantly, comma, it activates a mechanism through which contract holders can express their views on how the waste management system can achieve maximum efficiency while assuring equity among the parties?
What did Mr. Rusche mean to your knowledge about achieving maximum efficiency?
MR. SHULTIS: Objection, calls for a legal conclusion, calls for speculation.
A. I don't know what specifically what Mr. Rusche was referring to. I can form an opinion in my own mind at this point in time reading that that the start of issuing this document indicated to the utilities at that time what the capacity in the rankings plans were, and that could be the basis for comment on how efficiencies might be improved
BY MR. SKALABAN:
Q. Has it been the objective of OCRWM to operate the waste management system in a way that can achieve maximum efficiency?

266

A. Yes.
Q. And that's been an objective throughout your time in RW?
A. Yeah, I believe it has.
Q. And when you consider efficiency in operating the waste management system, is it also proper in your view to take into account utility costs?
A. My personal opinion, that should be a consideration.
Q. And that would be particularly appropriate given that it is a full-cost recovery contract?
A. Well, I don't know that I would blend those two ideas together. Full-cost recovery only refers to the DOE expenditures. Full-cost recovery doesn't consider utility costs.
Q. Do you think given it is a full-cost recovery contract and program that it puts some kind of responsibility on the department to operate it in a way where practicable to minimize utility costs?
MR. SHULTIS: Objection, mischaracterizes prior testimony, asked and answered.
A. In my personal opinion, I think it -- the department should and in fact I think the department did consider utility costs, and that's factored in

267

many decisions what the impacts would be on utility costs.
BY MR. SKALABAN:
Q. And that consideration of utility cost has been a constant through your tenure at RW?
MR. SHULTIS: Objection, asked and answered.
A. In my mind, it has.
BY MR. SKALABAN:
Q. Now, in considering utility exchanges, what was the department's position if you have a utility that has an allocation for example that doesn't perfectly match up?
For example, you have a utility one year that has an allocation of 20 MTUs, another one that has an allocation of ten MTUs in a later year, and they want to swap that ten-MTU allocation. The first utility with the allocation of 20 would then be swapping away for example ten MTUs, but still hold a ten-MTU allocation.
Would that sort of partial trade, if you will, not a trade of exactly the same allocations, be permissible in the department's view?
MR. SHULTIS: Objection, calls for speculation, Mr. Milner is not a 30(b)(6) witness,

268

asks for a legal conclusion.
A. Well, since no exchange request or swapping request had ever been made, I can't really say how the department would have ultimately dealt with that. My personal opinion was that a partial trade like that would work.
BY MR. SKALABAN:
Q. Because as a practical matter, it would be coincidence or not very likely that any utility would have the exact same allocation in two different years. Right?
MR. SHULTIS: Same objections.
A. I believe that's true. I'd have to look at the allocations there, but I believe that's true.
BY MR. SKALABAN:
Q. I mean, I think that that's a fair characterization, more likely than not, they're not, and so to have a swap -- to be able to have swaps in the system, the partial trades would need to be allowed?
A. In my opinion, yes.
Q. And that wouldn't be a problem, would it, because the utility could just resubmit new DCSs to reflect that change?
MR. SHULTIS: Same objections, calls for a

269

legal conclusion, asks for speculation.
A. Yeah. Again, in my personal opinion, because the department had never received a request, in my opinion, that would make sense.
BY MR. SKALABAN:
Q. And you do not have any reason to believe that that would be a problem for the department?
MR. SHULTIS: Same objections.
A. Other than some slight increase in administrative burden, I have no reason to believe that.
MR. SKALABAN: Let's go off the record for a second.
(Discussion off the record.)
MR. SKALABAN: Back on the record.
BY MR. SKALABAN:
Q. You agree that commercial nuclear power has been used in the United States for a long period of time?
A. Yes.
Q. And is there a history of -- history available of shipping consistent quantities of spent fuel from reactor sites to commercial and governments facilities?
A. There's certainly been large numbers of

270

nuclear shipments within the country. I don't know that there's been large number of shipments from reactors to government facilities. There certainly has been some small amounts of that that I'm aware of, at least within this country.
Q. And has there been a lot of shipments of foreign fuel?
I mean, are you aware that spent fuel has been shipped in large quantities in foreign countries?
A. Yes.
Q. In fact, I believe countries such as Britain, France, Japan, and Russia reprocess spent fuel, don't they?
A. France and Britain reprocess spent fuel. Germany, Japan, I believe others ship their fuel to one of those two countries for reprocessing or have in the past at least.
Q. So in view of that, there's been substantial amounts of spent fuel transportation shipments abroad?
A. Yes.
Q. Would you have any reason to disagree with an opinion that through 1998 more than 100,000 MTUs of spent fuel has been shipped by road, rail, and sea

271

outside of the United States?
A. I certainly don't recall the number, but I don't have any reason to disagree with that.
Q. And in view of the history of spent fuel transportation in this country and the substantial body of spent fuel transportation abroad, would the sort of history and experiences of those -- of that spent fuel transportation have been something that DOE would have drawn upon if it had performed in 1998?
MR. SHULTIS: Objection, calls for speculation.
BY MR. SKALABAN:
Q. Well, let me say this, I mean, that history of transportation here and abroad, is that something that DOE draws upon now in planning its spent fuel transportation program?
A. I'm not sure I understand what you mean by, draw upon.
Q. I mean, in the history and experience within this country and abroad, does RW use any of that information and experience --
A. Well, we're certainly aware of experiences and shipments that have been accomplished in other countries, yeah. In terms of for example casks, I

272

don't know that any of the casks used for shipments have been certified by the United States Nuclear Regulatory Commission, but certainly we're aware of what's been done and utilize that information.
Q. Would you agree with the opinion that with sufficient advance planning, DOE could develop the casks or casks for nonstandard fuel, failed fuel, and GTCC waste and obtain the necessary licenses from the NRC --
MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.
BY MR. SKALABAN:
Q. -- to perform in 1998 if it had been able to do so?
MR. SHULTIS: Same objection.
A. Transport casks, you're referring to?
BY MR. SKALABAN:
Q. M-hm.
A. Certainly transport casks could have been developed and in fact I believe were developed that were certified by the NRC for transport of spent fuel. I guess in my recollection, I don't know of any that had been developed for failed fuel or GTCC. I can't offhand at this point -- I have no reason to believe at this point that that couldn't have been

273

done.
Q. And in the period of 1991 approximately through part of 1994 when you were the director of storage and transport, did you have any concerns at that time?
And I believe you had testified previously that at that time you still believed DOE could make 1998?
A. M-hm.
Q. Did you have any -- during that '91 through '94 time period, did you have any concerns that the transportation system wouldn't be able to be in place if you were going to perform in 1998?
A. No, I didn't.
Q. In view of the documents that we've been seeing about the department's current plans or current objectives to reach a steady state of 3,000 MTUs shortly after the beginning of repository operations in approximately 2010, do you have any reason to believe that the department can't develop a corresponding transportation system that can take that 3,000 MTU a year?
MR. SHULTIS: Objection, asked and answered.
A. No, I see no reason why a transportation

274

system can't be developed to eventually handle 3,000 MTUs.
BY MR. SKALABAN:
Q. And how about if the department had been performing in 1998?
Do you think it could have developed a transportation system that could have handled 3,000 MTUs in 1998 or within a few years thereafter?
MR. SHULTIS: Objection, asked and answered.
A. It had never been the department's plan to begin accepting 3,000 MTUs in 1998, but according to the schedule that existed, I don't recall what the year that we ramped up to 3,000 was, but, yes, I think the system could have been developed.
BY MR. SKALABAN:
Q. A system could have been developed in 1998 after a reasonable rampup that would have been capable of handling 3,000 MTU?
A. A system could have been developed with a rampup which began in 1998 and ultimately have ended up with 3,000 MTU whatever that year was, yes, I believe that a system could have been developed.
Q. Because for example from the early mission plans, we see rampup period beginning in 1998 and

275

within a few years thereafter making 3,000 MTU.
A. M-hm.
Q. Again on that kind of schedule, you wouldn't see a problem on making -- on developing a transportation system to do that?
A. Developing a transportation system? No. Because that's simply -- how many MTU you can handle relates strictly to how many casks trailers and railcars there are.
MR. SKALABAN: Off the record briefly.
(Discussion off the record.)
MR. SKALABAN: I'd like to mark Exhibit 106.
(Milner Exhibit No. 106 was marked for identification.)
BY MR. SKALABAN:
Q. Mr. Milner, I'd like to call your attention -- this is a letter that's actually signed by you for Lake Barrett, and it's dated July 15, 1998.
A. I just received it, so if I can take a moment.
Q. Sure. Please.
(Pause.)

276

A. Okay.
BY MR. SKALABAN:
Q. I just want to call your attention to the last sentence in this letter dated July 15, 1998, the last sentence in the third full paragraph.
It states that: Due to the delay in opening a disposal facility, the department has been unable to finalize the schedules.
Does that further confirm your recollection that the department was unable to -- or stopped processing -- scratch that.
Does that further confirm your recollection of that the department was unable to finalize schedules because of the delay in opening a disposal facility?
MR. SHULTIS: Objection, vague, calls for a legal conclusion, asked and answered, document speaks for itself.
A. Yes, in my opinion, it does.
MR. SKALABAN: And I believe this will be Exhibit 107.
(Milner Exhibit No. 107 was marked for identification.)
BY MR. SKALABAN:

277

Q. Mr. Milner, can you identify for the record what is Exhibit 107?
A. Appears to be a memo from myself to then acting director Lake Barrett requesting his approval of a letter from the contracting officer to Yankee denying priority acceptance.
Q. Now, in the second paragraph in the background section, it indicates that the director committed to subject this issue, shutdown priority, to rule making to clarify how this provision of the contract should be implemented; is that right?
A. That's what it states, yes.
Q. And in view of that, does that confirm for you that the DOE had told Yankee Atomic that the issue of shutdown priority was going to be addressed by rule making?
A. Yes, I believe so.
Q. In fact it goes on a little bit further here and says that: Secretary O'Leary reaffirmed our intent to clarify this issue through rule making in response to a question from Congressman Gallo.
Do you see that?
A. Yes.
Q. Do you recall that exchange between Secretary O'Leary and Congressman Gallo?

278

A. No, I don't.
Q. It also reflects that in the interim the director encouraged Yankee to exercise a contractual right to exchange allocations with other interested utilities; is that correct?
A. Correct.
Q. And that is in fact what the department did?
A. I believe so, yes.
Q. On the second page, a few bullet points down under the department's position is that, colon, there's a provision -- well, can you tell me what you understand what's being talked about in this first -- the first bullet point under, the department's position is that, and I'm referring to the part that it says the contract provides a priority may be granted?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. Well, in my opinion, I believe that that particular bullet is responding to the first bullet under the section that's labeled Yankee's position. Yankee's position was that they believed that priority acceptance was provided for in the contract, and I think this states that the department's



position was that it may be granted, that it was not required to be granted, but that to grant priority to shutdowns would adversely impact other utilities.
BY MR. SKALABAN:
Q. Here you wrote to the director of the program that the grant of shutdown priority in Yankee would adversely impact other utilities, quote, due to the legal limit on acceptance capacity prior to repository operations, unquote.
Do you see that part?
A. I see that.
Q. What do you mean by that?
A. That particular parenthetical referred to the 10,000 metric-ton capacity limit prior to the start of the repository operation on an MRS.
Q. Here you seem to be linking the fact that it would adversely impact other utilities to the statutory capacity limits, but I believe in other testimony you at least indicated or I understood you to indicate that granting shutdown priority would just as a general matter adversely impact other utilities.
A. Well, with the capacity limit, it would certainly impact -- adversely impact other utilities. In my personal opinion, is that even without the



capacity limits, under almost any acceptance rate, it would adversely impact other utilities.
Q. Well, why add this parenthetical, then, in your letter to the director?
A. I don't specifically recall why it was added there, but it's certainly true, and --
Q. So the situation -- I mean, is it fair to say that if the legal limits on acceptance capacity were not there, there may be opportunities where shutdown priority would not adversely impact other utilities?
MR. SHULTIS: Objection, calls for speculation, document speaks for itself.
A. In my opinion I guess I have to go back to what's each individual utility's definition of an adverse impact, and you and I may determine is or is not an adverse impact might be completely different for another utility if we were utility representatives.
BY MR. SKALABAN:
Q. Okay. And the concurrence chain on the side indicates that this memo was circulated to a wide variety of people and they concurred in it?
MR. SHULTIS: Objection, mischaracterizes the document.



MR. SKALABAN: I'm sorry. Am I missing something?
MR. SHULTIS: Mr. Barrett's initials are not there.
MR. SKALABAN: Okay. Fair enough.
BY MR. SKALABAN:
Q. Excluding Mr. Barrett, whose initials are not there, everyone else on the chain of concurrence --
MR. SKALABAN: Thank you counsel for pointing that out.
BY MR. SKALABAN:
Q. -- everyone else on the chain had signed off on it?
A. Yes. I don't see any indication of nonconcurrence or comment or whatever, although I note that three of the concurees there were members of my staff, and the other three people who -- aside from myself who initialed off on the concurrence were front office staff at the time.
Q. Do you know, did Mr. Barrett sign off on this memo ultimately?
A. I don't recall.
MR. SKALABAN: All right. I believe this is the last exhibit. This is 108.

(Milner Exhibit No. 108
was marked for
identification.)
(Discussion off the record.)
BY MR. SKALABAN:
Q. Do you recognize this TRW letter?
It's dated July 30, 1993, and it's addressed to you.
A. I don't offhand recall it, no.
Q. It says: The attached report provides the current status of all domestic utility dry storage facilities.
Do you know why you or your office might have requested TRW do a report on this subject?
A. Just to stay abreast of the current status of storage at the utilities.
Q. And it was important to you to do so?
A. Yeah. In my mind it was.
Q. And is that for purposes of -- why was it important to you?
A. Well, for acceptance, I think it was important to know whether we would be picking up spent fuel from a spent fuel pool, from a dry storage facility, what the nature of the dry storage facility was. In my opinion, it would potentially affect

283

which fuel the utility shipped to us.
Q. How so?
A. Utilities verbally -- I don't recall anything in writing -- but I think utilities verbally indicated to us that if they placed fuel in dry storage, they would more likely give us fuel out of spent fuel pool than pull it out of dry storage.
Q. I see. If I can call your attention to Bates No. HQ 0013570, and it's a page entitled, dry storage requirements, 1998 to 2002.
A. Yes.
Q. In the I guess the third paragraph, it says: There are eight shutdown reactors prior to 1998. No additional reactors shut down during the period 1998 to 2002. The annual maintenance cost at each of these reactors is assumed to be 4.5 million.
Do you know where the 4.5 million figure came from?
A. No, specifically I don't. I vaguely recall at some point in time that utilities were basically asked what their costs were. Whether that is the basis of this figure, I don't know.
Q. Okay. Do you have any reason to believe it's -- or it's an accurate estimate?
I mean, do you believe it's an accurate

284

estimate at the time?
A. I don't know.
Q. Just don't know.
Why was the department looking for this information about the number of shutdown reactors and the annual maintenance cost of those reactors?
MR. SHULTIS: Objection, asked and answered.
A. The department was interested in the status of reactors and storage, and certainly we had been interested in utility cost.
BY MR. SKALABAN:
Q. And part of your interest in utility cost was to help promote efficiency in the overall system and at the individual reactor sites?
A. Yeah.
MR. SHULTIS: Asked and answered.
A. It had been a goal of the department to minimize those costs to the extent possible, looking at the industry as a whole.
MR. SKALABAN: Mr. Milner, I have no further questions.
THE WITNESS: Okay.
MR. SHULTIS: I don't have any redirect.
MR. SKALABAN: Great.

285

MR. SHULTIS: Off the record.
MR. SKALABAN: We are concluded.
(Whereupon, at 6:02 p.m., the taking of the instant deposition ceased.)

______________________________
Signature of the Witness
SUBSCRIBED AND SWORN to before me this _______ day of _______________, 20_____.

______________________________
Notary Public
My Commission Expires:________________

286

CERTIFICATE OF COURT REPORTER

UNITED STATES OF AMERICA )
DISTRICT OF COLUMBIA )

I, CHERYL A. LORD, the reporter before whom the foregoing deposition was taken, do hereby certify that the witness whose testimony appears in the foregoing deposition was sworn by me; that the testimony of said witness was taken by me in machine shorthand and thereafter transcribed by computer-aided transcription; that said deposition is a true record of the testimony given by said witness; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this deposition was taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially or otherwise interested in the outcome of this action.

CHERYL A. LORD
Notary Public in and for the
District of Columbia

My Commission expires April 30, 2006

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC ) Case Nos.
COMPANY, CONNECTICUT YANKEE ) 98-126C
ATOMIC POWER COMPANY, and MAINE ) 98-154C
YANKEE ATOMIC POWER COMPANY, ) 98-474C
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant. )

Courtroom Number 5

National Courts Building
717 Madison Street, Northwest
Washington, D.C.

Wednesday, August 11, 2004

VOLUME 21

The parties met, pursuant to the notice of the Judge, at 10:06 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

4614

APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAII
YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, DC 20005
(202) 898-5800

ON BEHALF OF THE UNITED STATES:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
(202) 305-7562

*** Index appears at end of transcript ***

4615

P R O C E E D I N G S

_ _ _ _ _

JUDGE MEROW: Ms. Herrmann?

MS. HERRMANN: Ready to continue with Mr. Buchheit, Your Honor?

MR. STOUCK: I've got a couple of preliminary points if I could mention it, Your Honor.

JUDGE MEROW: Sure.

MR. STOUCK: One is we do want to get to the exhibits that came up yesterday. We do want to get to the exhibits from yesterday. I've looked at the transcript and we're certainly ready to deal with those. We're not proposing at this moment because we would like to get finished with Mr. Buchheit, but either between witnesses or at the end of the day.

JUDGE MEROW: Fine.

MR. STOUCK: That's number one. Number two, also, I would like today to address the counterclaim, the motion to amend the counterclaim, which we've given some thought to.

Thirdly, one thing I need to take care of right now, on the question of notice and documents, as I was looking back over the transcript thinking about the exhibit issues, I noticed that little colloquy and I just didn't want there to be any remaining

4616

misunderstanding. We certainly have worked well, you know, for six years and don't want to run into a misunderstanding now. There's really two rules: one is disclosure and the other is cross-examination.

There certainly may be documents that we want to show the government's witnesses that we don't want to show the government's lawyers the night before and, you know, unless we get some different direction, we're not intending to do that, and I just don't want to be vilified again if that comes up, because I think it might.

JUDGE MEROW: Okay.

MR. LESTER: I think we addressed this several times. The issue here is the difference between impeachment documents and documents which the plaintiffs are going to ask be introduced as substantive evidence. We did not play this kind of game when we were doing our cross-examination. We didn't pull out unidentified exhibits and then just sort of pop them in during the cross-examination, then say please admit this as a substantive exhibit. We didn't do that.

We identified our exhibits, and if and when we identified that there's an exhibit on our may-use list that we're going to want to introduce as

4617

memo to which the plaintiffs have referred that Mr. Rusch had -- that has Mr. Rusch's name on it in fact somehow goes with the concurrence on the prior page.

With that understanding, we will not object to this series of documents being admitted as a single exhibit.

JUDGE MEROW: Well, okay. Then with that explanation, Plaintiff's Exhibit 1972 is admitted into evidence.

(PX Exhibit 1972 was received in evidence.)

MR. LESTER: I've been told, Your Honor, the prior exhibit the plaintiffs had tried to introduce was Plaintiff's Exhibit 1951, and I understand that that exhibit's being withdrawn and that it will not be admitted here.

MR. SHAPIRO: That's correct, Your Honor. That was subsumed within the larger one.

JUDGE MEROW: Okay. 1951 is considered withdrawn. Does that take up our prelunch -- anything else?

MR. STOUCK: Take up the other matters at the end of the day.

JUDGE MEROW: Fair enough. We'll break

4710

for lunch. And what time?

MR. LESTER: I'm told Mr. Milner cannot be here until 2 o'clock, so if we could resume at 2, that would be great.

JUDGE MEROW: Okay, we'll resume at 2 o'clock.

(Luncheon recess taken from 12:40 p.m. through 2:06 p.m.)

- AFTERNOON SESSION -

MS. SULLIVAN: Government's ready to call its next witness.

JUDGE MEROW: Fine.

MS. SULLIVAN: We call Ronald Milner to the stand, please.

(The witness was sworn.)

MS. SULLIVAN: Thank you, Your Honor.

RONALD MILNER

was sworn and testified as follows:

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q Good afternoon, Mr. Milner.
A Good afternoon.
Q Mr. Milner, are you currently employed in the Office of Civilian Radioactive Waste Management at the Department of Energy?

4711

A Yes, I am.
Q What is your current position?
A Chief operating officer.
Q What are your responsibilities as chief operating officer?
A I assist the deputy director for strategy and program development in the day-to-day management of that office.
Q And do you report to the deputy director?
A Yes, I do.
Q And who is the department director?
A Ted Gerrish.
Q Does anybody report to you?
A Not directly.
Q How long have you served as chief operating officer?
A In total, about four years.
Q When did you first join the Office of Civilian Radioactive Waste Management?
A I believe it was April of '84.
Q What was your first position? And I'm going to refer to it as RW, if that's all right.
A Okay.
Q What was your first position with RW?
A I was the branch chief of the

4712

organization.
Q What were your responsibilities in that position?
A Preparation of total system life cycle cost, adequacy analyses and the first mission plan.
Q What position did you next hold in RW?
A I was a division director.
Q And what were your responsibilities in that position?
A Budget, human resources, total system life cycle costs, fee adequacy analyses.
Q And what position did you next hold in RW?
A Next, I was first acting director and then permanent director of the Office of Storage and Transportation.
Q And do you remember when you became acting director of the Office of Storage and Transportation?
A Roughly 1990.
Q And how long did you serve as director of the Office of Storage and Transportation?
A About four years.
Q What were your responsibilities as acting and then director of the Office of Storage and Transportation?
A Management of the MRS monitor to treatable

4713

storage program, transportation program, waste acceptance issues, such as preparation of the annual capacity reports, processing of delivery commitment schedules and so forth.
Q You said that you were responsible for management of the MRS process. What specifically were you doing?
A At that point in time, we were attempting to find a volunteer site to construct an MRS.
Q Do you recall, was Dr. Bartlett the director of the program while were you the acting director and director of the Office of Storage and Transportation?
A Yes, he was.
Q Did you report to Dr. Bartlett?
A Yes.
Q After serving as the director of office -- of storage and transportation, what position did you next hold?
A Director of the Office of Program Management and Integration.
Q And what were your responsibilities in that position?
A The program's budget, human resources, preparation of total system life cycle costs and fee

4714

adequacy analysis.
Q Did you also have responsibility for regulatory interface with the NRC?
A Yes, uh-huh.
Q And then what position did you hold next after you were director of program management and integration?
A After that, I was appointed the acting deputy director of the program.
Q Do you recall approximately when that was?
A I believe that was 1996.
Q And how many times have you served as deputy director of the program?
A I was acting deputy two different times.
Q And what time periods were those?
A It was '96 through '99, roughly, and then 2001 through 2002, roughly.
Q What position did you hold in between these periods that you were data director?
A Chief operating officer.
Q And were your responsibilities as the chief operating officer then substantially the same as they are today?
A Substantially the same, yes.
Q And then in 2002, is that when you became

4715

chief operating officer again?
A Yes, uh-huh.
Q Mr. Milner, prior to joining RW, where were you employed?
A With the Department of Energy with the -- first with the Strategic Petroleum Reserve and then with the Office of Conservation and Renewable Energy.
Q Prior to becoming a DOE employee, where were you employed?
A Prior to that, I served eight years as a Naval officer.
Q Mr. Milner, do you hold a Bachelor's degree?
A Yes, I do.
Q In what?
A Mechanical engineering.
Q Where did you obtain that degree?
A University of Mississippi.
Q When?
A 1966.
Q And do you also hold a Master's degree?
A I do.
Q In what subject?
A Also mechanical engineering.
Q When did you obtain that degree?

4716

A 1967.
Q Was that also from the University of Mississippi?
A Yes.
Q Can we have Plaintiff's Exhibit 95, please?
MS. SULLIVAN: May I approach?
JUDGE MEROW: Sure.
MS. SULLIVAN: We're going to look at several different pages of this exhibit, so I'd like to provide copies to the Court as well.
JUDGE MEROW: All right.
MS. SULLIVAN: Plaintiff's Exhibit 95 is a multivolume set. What I provided to the Court and the witness is simply an excerpt of that document.
BY MS. SULLIVAN:
Q Mr. Milner, do you have water there? Do you want a cup of water?
A Yeah, that would be great.
MS. SULLIVAN: Could I get a cup of water for the witness, Your Honor?
JUDGE MEROW: Of course.
BY MS. SULLIVAN:
Q Mr. Milner, do you recognize the document that I've handed to you and put up on the computer

4717

screen?
A Yes, I do.
Q Could you identify it for the Court, please?
A It's the original 1985 mission plan for the program.
Q What were your responsibilities for the preparation of this document?
A I was responsible for developing and issuing this document.
Q Why did DOE prepare this document?
A It was required by the Nuclear Waste Policy Act.
Q Can we go to page 15, please? Could we highlight that first paragraph?
Mr. Milner, could you read the portion of the document that's been highlighted on the -- on the computer screen? And then I'm going to ask you questions about a number of paragraphs below that.
A Okay. The Nuclear Waste Policy Act of 1982, the act, put into -- in place a comprehensive complex set of activities for achieving the capability to dispose of the nation's high level radioactive waste. The strategy of the program is -- activities for achieving the capability to dispose of the

4718

nation's high-level radioactive waste.
The strategy of the program is intended to provide maximum assurance that the goals identified in chapter 1, implementing the provisions of the act, are met. Among these goals and objectives, several stand out.
Q And could I ask you to go through each of the numbered paragraphs that are set forth below there and explain what you understood about those goals and objectives at the time the mission plan was prepared?
A Sure. The first one, the program must protect the health and safety of the public and the quality of the environment, and to me at the time, and as it does now, meant that certainly an imperative of the program was to protect the safety and health of the public as well as the environment.
Q Number 2?
A The program must provide for the dissemination of information to the public and ensure opportunities for participation by the public and their representatives in order to achieve their confidence and support.
To me, that meant that ours was certainly intended to be a very open program, and we had to seek opportunities to involve the public and afford the

4719

public opportunity for participation in the program.
The third, the program must be conducted in a financially responsible, cost-effective manner and on the basis of full cost recovery. I think that recognized that we had a -- a stewardship responsibility over the funds paid into the Nuclear Waste Fund, and we had to manage those in a responsible manner. We had to operate the program as efficiently and cost effectively as we could.
The final one: In accordance with the above goals, the program must vigorously pursue the act's directive to begin accepting spent fuel and high-level waste for disposal no later than January 31, 1998 and to continue to dispose of the waste in a highly efficient manner consistent with the continued orderly operation of the nation's nuclear power generating plants.
And that just simply reaffirmed the directive in the Nuclear Waste Policy Act that we needed to vigorously pursue trying to get a system in place by that date.
Q Thank you.
Mr. Milner, did RW try to manage the waste management system in accordance with these goals today?

4720

A Yes, I believe it does.
Q Directing your attention to paragraph 4 there, there's a reference to highly efficient manner. Does that goal translate into a specific acceptance rate?
A No, it does not.
Q Going back to paragraph 3, do you have an understanding of the term "full cost recovery" as it's used in that sentence?
A I believe I do, yes.
Q What is your understanding of that term?
A I believe that's intended to mean that all of the costs associated with executing the program defined in the act be paid for by the owners and generators of the waste, be they commercial utilities or the Department of Energy.
Q Mr. Milner, how do you define program costs?
A Program costs would be all the costs expended by the program, the Office of Civilian Radioactive Waste, in carrying out the program.
Q Does program costs include the costs to utilities of storing their spent nuclear fuel on site prior to delivery to DOE?
A No, they do not.

4721

Q Thank you. Mr. Milner, did DOE evaluate possible contingencies in the mission plan?
A Yes, it did.
Q Can we go to page 20 of this document? Can you highlight the text on the page? Mr. Milner, could you read the highlighted sentence?
A Should no repository be constructed and an MRS facility not be authorized, utilities would continue to be responsible for storing the spent fuel at reactor sites.
Q Was one of the contingencies that DOE evaluated in the mission plan the possibility that DOE could not construct either an MRS or a repository?
A Yes, it certainly was.
Q Mr. Milner, I believe you testified that DOE prepared the mission plan because it was a requirement of the NWPA.
A That's correct.
Q Okay. Do you remember whether there was specific statutory provision that went to the mission plan?
A I believe there was, yes.
Q Mr. Milner, I've handed you an excerpt from Title 42 of the US Code, Section 10-221, which is titled mission plan. Do you recognize this provision

4722

to be the provision that sets forth the requirements of the mission plan?
A Yes, I do.
Q Mr. Milner, did you have an understanding as to whether this provision contained a requirement for the mission plan to set forth a specific acceptance rate?
A I did not.
Q Why did DOE include acceptance rates in the mission plan?
A Well, one of the requirements for the mission plan was to provide an estimation of -- of how long the repository would be in operation before it was closed. To do that, you had to assume an acceptance rate, so there were acceptance rates assumed in the mission plan as examples of how the -- the program might be operated.
Q Thank you.
And that requirement, is that set forth on -- as your understanding of that requirement is set forth in paragraph 9, A9 of this provision?
A Yes.
Q Thank you.
Could we go back to Plaintiff's Exhibit 95, please? Page 26. Mr. Milner, for some

4723

reason our electronic copy -- I checked it against the paper copy. For some reason, it's turned. I don't know why we turned it but it's -- same information is there. I think the information just got squeezed.
Mr. Milner, do you recognize the schedule that's set forth on page 26 of the mission plan?
A Yes. That was an example of -- of how the authorized system might operate.
Q How many repositories did DOE assume would be constructed at the time the mission plan was prepared?
A Two.
Q Can we go to page 29? Can you bring up the first full paragraph under the numbered paragraphs?
Mr. Milner, can you read that section, that highlighted material?
A It should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses.
Q Mr. Milner, does that paragraph accord with your recollection regarding the schedule set forth in the mission plan?

4724

A Yes, it does.
Q Could we bring up the last paragraph on this page and, Mr. Milner, would you read the last two sentences that are highlighted there?
A Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991 the DOE will begin to publish firm waste acceptance schedules for individual reactors, including shipment allocations.
Q Mr. Milner, what was your understanding of the term "firm waste acceptance schedules" as that term's used in that paragraph?
A That would be the schedules that DOE was committing to to accept the waste.
Q Did DOE publish, if I recall, waste acceptance schedules in 1991?
A Yes, it did.
Q Where were those schedules set forth in the annual capacity report for that year? And what were utilities to do with these schedules set forth in the annual capacity report?
A They were to utilize those to develop

4725

their delivery commitment schedules, DCSs, for submittal to the department.
Q And which office within DOE prepared the 1991 ACR?
A The Office of Civilian Radioactive Waste Management.
Q And which office within RW?
A The Office of Storage and Transportation.
Q That was your office?
A Yes, it was.
Q Mr. Milner, in your various positions within DOE, have you had responsibility for preparing total system life cycle costs?
A Yes, I have.
Q Have you also had responsibility for preparing what are referred to as fee adequacy studies?
A Yes.
Q Could you explain to the Court what a total system life cycle cost is, or a TSLCC?
A It was a -- an estimate at any given time of -- of the total costs of -- of the entire waste management system from identifying sites, characterizing sites through construction operation of the system and -- and ultimately decommissioning.

4726

Q Decommissioning of what?
A Of the repository facilities.
Q What is a fee adequacy study?
A The fee adequacy studies using the -- the cost estimates as a basis attempted to analyze whether or not the fee that was being paid by the utilities was adequate to cover the -- the costs.
Q Why is a TSLCC, or total system life cycle cost report, prepared?
A Well, one, it's -- it's good to keep track of the estimate of the program costs but principally is -- is input to the fee adequacy analysis.
Q And why are fee adequacy studies prepared?
A They're mandated by the act.
Q By the Nuclear --
A Waste Policy Act.
Q Are there assumptions made for the preparation of a TSLCC?
A Yes, there are.
Q What is the basis for those assumptions?
A They were the current program planning bases at the time.
Q Has DOE changed the assumptions that form the basis for TSLCCs over time?
A Yes.

4727

Q Can we have Plaintiff's Exhibit 248, please?
Mr. Milner, I've handed you what's been marked as Plaintiff's Exhibit 248. Do you recognize this document?
A Yes, I do.
Q Could you tell the Court what the document is?
A Well, it -- again, it's -- the title basically says preliminary estimate of the restructured program, which was an addendum to a prior -- prior TSLCC analysis.
Q Were you involved in the preparation of this document?
A No, I was not.
Q Okay. Are you familiar with this document based upon your work with other TSLCCs?
A Yes.
Q Can we go to page 1, please? Can we bring out the first paragraph on the page and highlight the third sentence?
Mr. Milner, would you read the highlighted portion into the record, please?
A The primary use for the total system life cycle costs, TSLCC, analysis is to provide cost data

4728

necessary for determining whether the fees paid by the waste generators will be sufficient to fully cover the costs of the program, parentheses, the fee adequacy analysis.
Q Okay, thank you. For our court reporter, as you read things, you can take your time. Thank you.
Mr. Milner, the sentence that you read, does -- just read, does that sentence accord with your understanding as to the purpose of the TSLCC?
A Yes, it does.
Q Can we go to page 2, please? And in the first full paragraph, bring that out. The first two sentences.
Mr. Milner, would you please read those -- the highlighted material into the record?
A It must be recognized that the waste management program is continually evolving. The TSLCC estimates represent snapshots in time which incorporated all available and appropriate information on program activities up to a specific point in -- specific point in time in order to develop comprehensive set of cost estimates for the system.
Q Mr. Milner, do you agree with that statement regarding the nature of TSLCCs?

4729

A Yes, I do.
Q Can we go back to page 1 of this document, that first paragraph again? Mr. Milner, in that paragraph there's a reference to report to Congress on reassessment of the Civilian Radioactive Waste Management Program issued by the Secretary of Energy in November of 1989.
A Yes.
Q Do you recall that reassessment?
A Yes, I do.
Q Do you recall what the result of that reassessment was?
A I think principal result of that reassessment was the repository would not be able to be opened until the your 2010.
Q Okay. As a result of that reassessment, was there a date by which the MRS was to be opened?
A 1998.
Q Can we go to pages 4 and 5? Could I ask you to read the highlighted sentences into the record?
A The TSLCC estimates presented in this report are updated estimates from the May 1989 TSLCC analysis which reflect the changes in the system outlined in the secretary's reassessment of the Waste Management Program. As such, these estimates are

4730

derived in the same manner as those presented in May 1989, since the majority of the assumptions and methodologies have remained unchanged; however, a major change in the schedule had a significant impact on the updated estimates. Thus, the difference between the May 1989 estimates and the updated estimates represent the overall cost impact due to the restructured program.
Q Mr. Milner, were you responsible for the preparation of the 1989 TSLCC?
A I believe I was.
Q It was a long time ago. Could we go to appendix A, page A1?
Mr. Milner, what information is presented in table A1 of this document?
A That's the waste acceptance schedule, which included acceptance rates, amount of material that would be stored at the MRS at any given point in time, cumulative numbers.
Q So is it your understanding that these are the waste acceptance assumptions for the preparation of this TSLCC?
A Yes.
Q This is an addendum to the 1989 TSLCC. Can we have Plaintiff's Exhibit 976, please?

4731

Mr. Milner, do you recognize what's been marked as Plaintiff's Exhibit 976?
A Yes. It's the 1986 TSLCC estimate.
Q Were you involved in the preparation of this document?
A I believe I was, yes.
Q Can we go to page 2? And can we highlight the first three sentences of the first paragraph?
Mr. Milner, could you read the highlighted portion, please?
A Two important program developments pertinent to the TSLCC analysis have emerged since the previous analysis in January 1985. First, the president has determined that defense high-level waste, parentheses, DHLW, should be emplaced in the civilian geologic repositories. Second, the DOE has announced its plans to seek Congressional approval for a monitored retrievable storage, parentheses MRS, facility that will be fully integrated into the overall waste management system.
Q Thank you. Mr. Milner, based upon what you just read, do you recall what the basis for the 1986 TSLCC was?
A Essentially would have been the mission plan.

4732

Q Thank you. Can we have Plaintiff's Exhibit 982, please?
MS. SULLIVAN: Your Honor, I should note that on Plaintiff's Exhibit 976, I provided to counsel and to the witness just an excerpt of that document. It also is a multivolume -- volume document.
BY MS. SULLIVAN:
Q Mr. Milner, do you recognize Plaintiff's Exhibit 982?
A Yes. It's the 1998 TSLCC analysis.
Q Were you responsible for the preparation of this document?
A Not directly, no.
Q Okay. Would you have reviewed it prior to its issuance?
A Yes.
Q Can we go to page 1 of this document, please? Paragraph one, second sentence. Mr. Milner, can you read that highlighted material, please?
A This estimate is consistent with the viability assessment of a repository at Yucca Mountain, parentheses, VA, design basis and cost estimate, parentheses, DOE 1998, extended to address total system costs for all waste planned for disposal in a geologic repository for the total system life

4733

cycle.
Q Thank you. Mr. Milner, what was the basis for the 1998 TSLCC?
A The viability assessment that was submitted to Congress.
Q Can we go to page little Roman numeral v, the introduction by -- actually, let me ask you, this indicates that Lake Barrett was the acting director at the time this document was signed. Were you the deputy director at that time?
A Acting deputy director, yes.
Q Thank you.
Could we highlight the second paragraph, bring up the second paragraph?
Mr. Milner, could you read that portion, the highlighted portion into the record?
A This TSLCC analysis differs from the previous TSLCC analysis published in 1995, as several key assumptions have changed. First, additional waste from US Department of Energy, parentheses DOE, owned and managed SNF and HLW, disposition of surplus weapons plutonium have been included.
Second, the repository would remain open for at least 100 years following initial waste emplacement and would have the capability to be kept

4734

open with appropriate maintenance and monitoring for up to 300 years. Costs are included in this analysis for 100 years of monitoring.
Third, unlike the 1995 TSLCC analysis that relied heavily on the use of multipurpose canisters, this analysis provides the capability to dispose of a wide range of canistered and uncanistered SNF as well as HLW.
Q Thank you. Mr. Milner, once a new TSLCC has been issued, is the old TSLCC still valid?
A No, it is not.
Q Why not?
A Well, you would issue a new one once the assumptions have changed, the program has evolved.
Q Does DOE prepare a test TSLCC every year?
A Not every year.
Q Mr. Milner, I believe you already testified that it was your office that was responsible for the issuance of the 19 -- or the preparation of the 1991 ACR, correct?
A Yes.
Q Were you -- was your office also responsible for the preparation of the 1990 ACR?
A Yes, it was.
Q Could I have Defendant's Exhibit 130,

4735

please? Mr. Milner, do you recognize this document?
A Yes, I do.
Q Could you identify it for the Court, please?
A Yes. It was my action memo to the director of RW seeking his approval to publish the 1990 ACR.
Q Who was the director at the time you prepared this memo?
A Dr. John Bartlett.
Q Could we go to the second page, if we could? Now, Mr. Milner, is that your signature on the second page of this document?
A Yes, it is.
Q Okay. Do you recognize that other signature to be that of Mr. Bartlett?
A Yes.
Q Or Dr. Bartlett, excuse me.
A Yes.
Q Could we go back to the first page, please? Could we bring out the second paragraph, the first paragraph under discussion, and highlight it?
Mr. Milner, would you please read that, the highlighted portion, into the record?
A The ACR is required to project both the

4736

annual receiving capacity of the waste management system and the annual acceptance ranking of contract holders for ten years following projected commencement of facility operations. The information in the ACR is for planning purposes only and is scheduled to be replaced as required by the contract by a contractually binding annual acceptance priority ranking report on April 1991.
Q Thank you. Mr. Milner, does that excerpt that you just read comport with your recollection regarding the issuance of the 1991 ACR?
A Yes, it does.
Q Can we have Defendant's Exhibit 23, please? Mr. Milner, do you recognize Defendant's Exhibit 23?
A Yes, I do.
Q Would you identify it for the Court, please?
A It was my action memorandum to the director, Dr. Bartlett, seeking his approval for issuing the 1991 ACR.
Q At the time you prepared this memo, did you believe that MRS could still be sited so that DOE could accept spent fuel beginning in 1998?
A Yes, at that time.

4737

Q At the time you prepared this memo, were you responsible for MRS siting activities?
A Yes.
Q And approximately at the time of this memo, approximately how much time did you devote to MRS siting activities?
A Oh, probably something like 30 or 40 percent of my time.
Q Can we highlight the second paragraph in the background, please? We haven't highlighted that, but could you read the portion that's been blown up into the record?
A The 1990 ACR stated that it would be the last ACR to be issued and would be replaced by the acceptance priority ranking, parentheses APR. However, based on discussions with contract holders and their representatives, the department elected to continue to publish the ACR. This change in plans was conveyed to contractholders in a May 15, 1991 from -- letter from the department's contracting officer.
Q Thank you.
Mr. Milner, does that sentence accord with your recollection of DOE's decision regarding the issuance of the 1991 ACR?
A Yes, it does.

4738

Q Can we go to the second page of this document? Actually, can we stop that for a second? Mr. Milner, is that your signature on that page?
A Yes, it is.
Q Do you recognize the other signature to be that of Mr. -- Dr. Bartlett?
A Yes.
Q Now, could we bring up the first paragraph and highlight the second sentence? Mr. Milner, could you read that highlighted portion into the record?
A While not stated in the ACR, this rate was selected because it is theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in 1998.
Q Mr. Milner, what was your understanding as to the -- about the rates that were contained in the 1991 ACR with regard to meeting any additional at-reactor storage needs?
A Well, if -- if you looked at, as it says in the aggregate, you looked at each utility and what their projected spent fuel discharges would be, what their pool storage capacities would be and you aggregated the shortcomings, this rate would have in the aggregate prevented any further need for out-of-pool storage.

4739

Q Okay. Plaintiff's Exhibit 629, please? Mr. Milner, you've been provided with a copy of Plaintiff's Exhibit 629. Do you recognize this document?
A Yes, I do.
Q Would you identify it for the Court, please?
A Yes. It was my memo to the director, Dr. Bartlett, seeking his approval to issue for comment a draft of the annual acceptance priority ranking.
Q Okay. Can we go to the second page of this document? Do you recognize that to be your signature on that page?
A Yes.
Q Could we go back to the first page? Would you bring up the third paragraph, the second paragraph under "discussion"? Mr. Milner, could you read that portion into the record, please?
A The publication of the APR begins the contractually binding waste acceptance process. The APR will be used in conjunction with waste acceptance rates to be published in the 1991 annual capacity report, parentheses ACR, as the basis for purchasers to submit delivery commitment schedules, parentheses

4740

DCS, beginning in January 1992 for the department's approval. In turn, purchasers will have the opportunity to exchange approved DCSs, also subject to departmental approval.
Q Thank you.
Mr. Milner, does this statement that you just read accord with your understanding as to how firm waste acceptance schedules were to be established with individual utilities?
A It does, yes.
Q Mr. Milner, are you familiar with DOE's plans for the steady-state acceptance rate?
A I believe I am, yes.
Q What is that rate that you're familiar with?
A The steady-state acceptance rate, the design rate, if you will, of the system is 3,000 metric tons per year.
Q Thank you. During your tenure at DOE, has DOE assumed any other design rate for the repository?
A No.
Q During your tenure at DOE, are you aware of any planning basis by which -- by DOE in which DOE has assumed a three-year ramp-up period to a steady-state rate of 3,000 MTU?

4741

A No, not that I'm aware.
Q At the time DOE issued the 1991 ACR, was DOE planning to accept waste at a 3,000 MTU rate beginning in 1998?
A No.
Q Why not?
A At -- at that time, we assumed that an MRS would be operational in the system. The MRS had a capacity limit of 10,000 metric tons, so a ramp-up rate was designed such that you would not exceed that rate before the repository began operation.
Q Mr. Milner, during Dr. Bartlett's tenure as director, do you recall consideration of the idea that DOE should remove all five-year-old cooled fuel from shutdown reactors?
A What I recall is Dr. Bartlett on occasion mentioning that gee, that would be something that would be good to do or that perhaps we might should look at. I would characterize it as thinking out loud, I guess, really.
Q Do you recall receiving any direction from Dr. Bartlett to implement an acceptance rate that would have allowed all five-year-old cooled fuel to be removed from shutdown reactors?
A No.



Q Would you have been responsible during Dr. Bartlett's tenure for determining what such an acceptance rate would be if you had been directed to develop one?
A I -- I would have, yes.
Q Mr. Milner, do you recall attending industry meeting -- sorry, attending meetings with utility representatives with Dr. Bartlett?
A Yes.
Q Was attending utility meetings with Dr. Bartlett among your responsibilities?
A It was, yes.
Q Do you recall any meetings at which utility representatives expressed great interest in pursuing exchanges?
A No.
MS. SULLIVAN: One moment, Your Honor. Your Honor, I have nothing further at this time. I would move for admission of Plaintiff's Exhibit 629. That's an exhibit that was on Plaintiff's may-use list. I notified Mr. Shapiro the night before last that we expected that we might use it with Mr. Milner. Mr. Milner's identified the document and authenticated it.
MR. SHAPIRO: We have no objection, Your



Honor.
JUDGE MEROW: Plaintiff's 629 is admitted in evidence.
(PX Exhibit 629 was received in evidence.)
MS. SULLIVAN: Thank you, Your Honor. Might we have a break for the witness?
MR. SHAPIRO: Certainly.
JUDGE MEROW: Do you want to take a -- sure. Return about -- on the hour?
MR. SHAPIRO: 3 o'clock?
JUDGE MEROW: 3 o'clock.
MS. SULLIVAN: Thank you, Your Honor.
(Recess taken from 2:47 p.m. through 3:03 p.m.)
JUDGE MEROW: Mr. Shapiro?
MR. SHAPIRO: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SHAPIRO:
Q My name is Robert Shapiro.
A Uh-huh.
Q I'd like to start out asking you some questions about the rate of acceptance. You discussed that topic in various planning documents in your direct examination.
Now, if I understand correctly, the



Department of Energy's purpose in publishing the information contained in documents like the mission plan was for utilities to use it for -- for planning purposes, correct?
A Well, in the mission plan at -- at that time, since it was the very beginning of the program, we were simply trying to illustrate how a system might operate. I think at that stage of the game, it was too early to say you could use that for planning purposes.
Q What about the mission plan amendment?
A Oh, I think that might have been suitable for some very early planning.
Q And let me turn to the TSLCC. One of the objectives of the TSLCC report is to make cost estimates that reflect as closely as possible the most current Department of Energy program strategy for -- for meeting the -- the legislative milestones, correct?
A True.
Q And one of your concerns has been to try to ensure that the program is using the same set of numbers and the same assumptions in various documents, correct?
A Well, if you're talking about from -- from

as the various TSLCCs progressed over the years, no, certainly the assumptions changed depending on the circumstances.

Q No, not the same -- not to be consistent across all the TSLCCs, but at any one time, the department's documents, the -- the program plan, the TSLCC, the fee adequacy report, they would all have the same set of assumptions?

A We would hope so.

Q And you thought it was important that all of the -- the OCRWM entities be using the same assumptions with respect to the acceptance rate for spent nuclear fuel, right?

A Yes, yes.

Q In fact, when you reviewed and approved some of these documents that you discussed, one of the purposes for your review was to ensure that the documents accurately reflected what you understood to be the Department of Energy's position at the time with respect to issues such as the acceptance rate, correct?

A Correct.

Q Now, at the time you joined Office of Civilian Radioactive Waste Management, it was your understanding that the intent of the department was to



work off the backlog of spent nuclear fuel stored in utilities. True?

A Well, at the time I joined the department, since -- again, very early stages of the program, we were in the very early stages of planning the program, trying to identify potential sites and so forth. I don't know that we -- we had evolved to talking about working off the backlog at that point. Obviously, at some point in time you would hope that you would work off the backlog.

Q But at the time you joined the program, your understanding was the intent was to work off the backlog?

A Well, the intent was ultimately to accept all spent fuel from the utilities.

Q Do you recall having your deposition taken over a number of days?

A Oh, yes.

Q One of those was back on May 1st of 2002, a little more than two years ago.

A Two and a half years ago, roughly, uh-huh.

Q I'm sure you endeavored to testify accurately.

A Yes.

Q Truthfully.



A Yes.

Q I want to ask you about a question and answer that you gave at that time, reading on May 1st, page 73.

MS. SULLIVAN: Could the witness be provided a copy of the deposition?

MR. SHAPIRO: If he needs one. I'm trying to be quick about it.

THE WITNESS: Given that it was approximately two and a half years ago, I probably wouldn't know the context in which the question and answer were given.

BY MR. SHAPIRO:

Q Would you like to see a copy?

A Yes.

Q Sure enough.

As it turns out, May 1st is the first tab in your binder. Page 73, if you look, there are four pages per page the way it's printed out. Are you on page 73 Mr. Milner?

A Yes, uh-huh.

Q I'm going to start reading at line 10, and my question is, were you not asked the following question and give the following answer?

Question: And was that a fair statement



of DOE's intentions at or about the time to work off the backlog of spent nuclear fuel that utilities were storing?

There was an objection by Mr. Shultis.

You answered: Well, at this specific point in time, I don't know what the department's intent was. At the point I joined the program, my understanding of the intent was to work off the backlog.

That was your testimony, Mr. Milner?

A Yes, if I could have a moment to look at the -- the context.

Q I'm just asking about your testimony. And that was your -- your honest testimony?

A Yes.

Q Now, it's true that the Department of Energy's intentions with respect to the repository design receipt rates had stayed constant pretty much to the present day, 3,000 MTU per year?

A I'm sorry, would you repeat that?

Q It's true, is it not, that the Department of Energy's intentions with respect to the repository design receipt rates have stayed constant to the present day, 3,000 MTU per year?

A Yes, uh-huh.

Q And that -- that 3,000 MTU steady-state acceptance rate has been used fairly consistently in the OCRWM published documents, correct?
A As far as the steady-state rate, yes.
Q And that's a reasonable rate?
A Yes, I think so.
Q Now, you testified, I believe it was about Defendant's Exhibit 23, the memorandum for approval of the 1991 annual capacity report.
A Uh-huh.
Q And there's one little aspect I wanted to ask you about that. Part of that annual capacity report -- we have copies of that available if you need to review that. Part of that had a slow acceptance rate because of some of the limitations that were imposed by the alternative set. Do you recall that?
A Correct.
Q But you were asked to read part of that memorandum that said: Nonetheless, that lower rate was theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in -- in 1998.
A Uh-huh.
Q Could you explain for us how -- how that analysis was done, how you reached that conclusion?

4750

A Well, if -- if you took each utility, what its -- its projected spent fuel discharges were, what its pool capacity was, its remaining pool capacity when it would run out of capacity and -- and you did that for each utility, then you took the overflow, if I can call it that, from pool storage, in the aggregate, that would be the amount of -- of dry storage that would be needed across the industry and our rate would have in the aggregate prevented the need for additional storage.
However, that -- that didn't address the fact that -- that where the utility that was running out of storage in the queue and at what time their -- their waste would be accepted.
Q So that analysis ignored the oldest rule first priority scheme?
A No, it didn't ignore the oldest fuel first.
Q Well, how did it -- I thought you just said that it didn't take into account where the utility was in the queue.
A Where the utility that was running out of the storage was in the queue.
Q So how would that acceptance rate be sufficient to help that utility that was running out

4751

of space?
A I think I said that in the aggregate, it would prevent additional at-reactor storage but not necessarily for each specific utility and in fact, that was not the case.
Q So there -- there would be utilities that would have to add additional at-reactor storage?
A Yes.
Q What about shutdown reactors? Would that lower rate contemplated in the 1991 annual capacity report do anything for shutdown reactors?
MS. SULLIVAN: Objection, vague.
BY MR. SHAPIRO:
Q Do you understand the question, Mr. Milner?
A No, I'm sorry. Repeat the question.
Q Would the lower rate contemplated in the 1991 annual capacity report, would that be sufficient to handle the spent fuel removal needs of shutdown reactors?
A Well, I'm not -- I'm not sure in what sense you mean that, because we did base everything on oldest fuel first if -- if a shutdown reactor had the oldest fuel, I suppose it could have handled it, but I don't suppose that was the case in all situations.

4752

Q So with the lower acceptance rate in the 1991 annual capacity report, a shutdown reactor might -- might still have to store spent fuel for an extended period of time?
A Yes.
Q So that annual -- that lower rate in the 1991 annual capacity report would not have been sufficient to handle the needs of shutdown reactors?
A Again, in the aggregate it would have been sufficient. Looking at each utility, no.
Q I'd like to ask you a few questions about monitor retrieval storage. You testified about that a little bit. We discussed also some of these limitations in Department of Energy's ability to accept spent fuel in light of the amendments passed in 1987 that provided linkages between monitored retrievable storage and progress in repository. Are you aware of that?
A Right.
Q It's the Department of Energy that requested those -- that those linkages be put into the amendment set, correct?
A Well, no. I believe -- as I recall, earlier in the program, the -- the department was attempting to develop a -- a MRS facility at a site in

4753

Tennessee, the -- the former Clinch River breeder reactor site. As I recall, discussions and negotiations with the host community at that time gave rise to those linkages, and Congress simply chose to carry forward those linkages when it authorized an MRS in the amendment side.

Q It wasn't the Department of Energy that requested those linkages?

A I don't recall that to be the case.

Q Let's go back to your -- your deposition. I want to ask you about May -- a statement you made at May 3rd. Do you want to follow along in your binder? Tab 3. If you could turn to page 554, and were you not asked the following question and gave the following answer starting on line 5? It's a little bit long.

I'd like to talk to you about page 12 now, in particular the last full paragraph, or actually the last paragraph which goes on to the next page under the heading MRS facilities. It says that on March 31, 1987, the DOE submitted to Congress the proposal for construction of an MRS facility to allay concerns that the MRS facility could become a substitute for a permanent repository whose development remains the highest priority. DOE asked Congress to limit the MRS



storage capacity to 15,000 metric tons of uranium and to specify that the MRS cannot start receiving fuel until the construction authorization for the repository has been received from the Nuclear Regulatory Commission.

Is this an accurate statement, that the DOE was the organization that requested the linkages between the repository and the MRS?

And there was an objection and you answered: Certainly, the DOE was the entity that requested Congress. My recollection of the origins of those linkages were at the time DOE was developing a site-specific proposal for an MRS facility, actually, the old Clinch River breeder reactor site in Oak Ridge, and I believe the local community had requested the department insert those linkages.

MS. SULLIVAN: Objection. The statement that's just been read into the record isn't inconsistent with what Mr. Milner testified to.

MR. SHAPIRO: That can be brought out in redirect. I certainly believe that he denied that it was the department that asked for those linkages.

THE WITNESS: If I could clarify.

JUDGE MEROW: Yes.

A I misunderstood your statement because I



thought you asked me if the department had requested those linkages be placed in the legislation. We had requested those linkages when we submitted an MRS proposal for the Clinch River breeder reactor site not to be placed in the amendment set.

Q Nevertheless, it was the Department of Energy that requested it.

A In its proposal for the Clinch River site.

JUDGE MEROW: Is that to satisfy community?

THE WITNESS: That was to satisfy community concerns, yes.

BY MR. SHAPIRO:

Q We're going back, Mr. Milner, to this 1987 time frame. It was the Department of Energy's plan to start accepting waste at a monitored retrievable storage facility in 1998 and to open a repository in 2003?

A In the '87 time frame, I believe that was correct.

Q And the MRS was intended to be an integral part of the whole waste acceptance system, correct?

A Yes, I believe so.

Q It wasn't intended to be a -- a -- a standalone system or as a permanent replacement for



storage and disposal?

A Correct.

Q And fast-forward a little bit to June of '88. By that time, the Department of Energy believed that the linkages between the -- the schedule and the key milestones in siting the construction of an MRS facility made it unlikely that the department would be able to start accepting waste significantly before 2003, isn't that correct?

A At a -- at a repository?

Q At any facility.

A At any facility?

Q Linkages.

A Yes, I believe that was the case.

Q And as of November 1989 -- and that was the time that report to Congress on reassessment of the program -- it was the Department of Energy's position that a repository would not be available until 2010, correct?

A Correct.

Q It was also the Department of Energy's view at that time that if the statutory linkages remained in place, that the MRS operations would not begin until 2007, correct?

A Correct.

Q And that's because that -- that three-year difference between repository and MRS opening, that represented the department's best estimate of how quickly it could get an MRS up and running given the linkages?
A Correct.
Q Now, you believed at the time of that November 1989 report to Congress on the reassessment of the Civilian Radioactive Waste Management Program that if the statutory linkages were modified, that the department could begin to accept waste beginning in 1998?
A Yes.
Q And by 1991, you believe that if the linkages between the MRS construction and the repository authorization were maintained so the initial acceptance by DOE could not begin until 2007?
A Correct.
Q And ultimately, the DOE abandoned its effort to site an MRS sometime roughly between 1991 and 1994?
A Yeah, I think it was probably closer to 1994.
Q And even by February of 1994, RW was doing contingency planning for the possibility that an MRS

4758

might not be sited at all. True?
A I don't recall that, but potentially.
Q Well, let me ask you again about your deposition. And this was a short one. Let me ask you if you recall the following question and giving the following answer. Page 359 if counsel wants to follow.
MS. SULLIVAN: Which day?
MR. SHAPIRO: It's May 2.
BY MR. SHAPIRO:
Q Are you on that page, Mr. Milner?
A Yes, sir.
Q Start on line 5. Do you recall being asked the following question and giving the following answer?
Question: So at least as of February of 1994, OCRWM was concerned about the possibility that an MRS might not be sited?
Answer: We were certainly doing contingency planning for that, yes.
That was your testimony, Mr. Milner?
A Yes, it was.
Q And that was accurate testimony?
A Yes, at the time.
Q Do you have a different opinion now,

4759

Mr. Milner?
A Well, that was two and a half years ago. I have different recollections than what I did two and a half years ago, but no, that would be accurate.
Q Now, as of December 1994, that -- the end of that year, there was no development work on an interim storage facility, was there, Mr. Milner?
A By that time no, I don't believe so.
Q And DOE has no current plans to site an MRS?
A No.
Q Do you believe that -- that an MRS would have offered a better opportunity for the department of meeting the objective of accepting waste by 1998?
A Yes, I do.
Q I'm going to turn to the subject of delivery commitment schedules. You touched on that a little bit during your direct testimony. I'd like to ask you two questions. First, you would agree that if there was no facility to accept fuel in 1998, then the delivery commitment schedules that were entered into between utilities and the department would not be binding and would have to be reevaluated, true?
A Well, I certainly recall discussions as to what would -- what would happen in that case and yeah,

4760

I think we would have certainly had to reevaluate what would have occurred.
Q So the delivery commitment schedules could change if circumstances change?
A Potentially, that would have to be evaluated, yes.
Q If circumstances change, the DCSs could change. True?
A I'd have to know what the circumstances were before I knew whether they would change or not.
Q In your opinion, the delivery commitments were really best estimates, good-faith commitments on quantity and timing?
A No, I viewed the DCSs as a binding commitment.
Q Let me go back to your deposition again, once again May 2, the same day that we were at, this time page 396. Have you found that page, Mr. Milner?
A Yes, I have.
Q I'm going to start on line 12. Do you recall being asked the following question and giving the following answer?
Question: Does it change your view about the binding commitment reflected in the DCS? There was an objection from Mr. Shultis.

4761

Your answer: I guess in my terms of a commitment, not necessarily. I think my interpretation of the delivery commitment was that it was a best estimate, good-faith commitment on the quantity and timing, and as I read this, neither the department nor the purchaser -- well, okay, just the purchaser can adjust it up or down, so it's his option. I guess I would interpret that to mean it's less binding on the utility than it was on the department.
That was your truthful testimony, Mr. Milner?
A Yes, it was.
MS. SULLIVAN: Objection. It's taking the statement out of context, but I'll address that on redirect.
BY MR. SHAPIRO:
Q It's your opinion, Mr. Milner, that it's not appropriate to approve -- not appropriate for the department to approve delivery commitment schedule forms until the department has a site for a repository approved, correct?
A I'm sorry, repeat that question.
Q It's your opinion that it's not appropriate for the Department of Energy to approve

4762

delivery commitment schedule forms until the department has a site for a repository approved. True?
A No, no.
Q Let's go back to your deposition once again, this time May 7th and tab 4. There are two tabs. Page 598.
A I can't find the page.
Q Are you in tab 4, Mr. Milner?
A Thought I was. Okay.
Q I'm going to start on line 7, and my question for you is, were you asked the following question and gave the following answer?
Question: So is it your view that the DCSs forms can be approved now or not?
And your answer: My personal opinion is that it's not appropriate to include them until we have at least a site for a repository approved.
That was your answer?
A Correct.
Q And that was your -- your correct answer?
A In -- in looking earlier in the testimony, I think the context at that time was at that particular point in time, we had suspended processing of -- of the DCSs, and I believe the questions at that

4763

time were going to should we restart processing the DCSs, and at that time, two and a half years ago, my answer was no.
Q Because you thought that was inappropriate because the department didn't have a site approved for a repository. True?
A Because the schedules were indefinite, yes, we had -- we had already approved DCSs for the first ten years of operation and we -- we in my opinion at that time, given that context, should wait until our schedules firmed up a bit more before we processed additional ones.
Q Once site approval occurs, you expect the department to begin approving delivery commitment schedule forms once again, don't you?
A Yes, uh-huh.
Q I want to ask you about those delivery commitment schedule forms that you said were approved following the publication of the 1991 annual capacity report.
A Uh-huh.
Q Now, those -- the DCSs that were submitted after the 1991 annual capacity report, they were based on waste acceptance schedule that was inconsistent with the Nuclear Waste Policy Act schedule linkages as

4764

they existed at the time they were submitted for approval, weren't they?
MS. SULLIVAN: Objection, calls for a legal conclusion as to the terms of the NWPA.
MR. SHAPIRO: I'd like to get Mr. Milner's understanding.
JUDGE MEROW: I'll overrule the objection. You may answer the question if you have -- you have the background, I think, to do it, so --
THE WITNESS: I'm sorry, repeat the question, inconsistent with --
BY MR. SHAPIRO:
Q The -- the DCSs submitted after the 1991 annual capacity report, they were based upon a waste acceptance schedule that was inconsistent with the Nuclear Waste Policy Amendment Act's schedule linkages as they existed at that time, the -- at the time those -- those forms were submitted, weren't they?
A No, I don't believe they were.
JUDGE MEROW: I guess the question is you couldn't accept quantities until you had an approved repository.
THE WITNESS: Repository.
JUDGE MEROW: The schedule showed quantities, you know, without taking that into

4765

consideration.
THE WITNESS: Right. Well, on my recollection, our -- our schedules were based on 400 metric tons the first year, 600 the second and then 900 for the remaining eight years in that case, so they were -- they were based on a ten-year allocation. There was a 12-year difference in the assumed start of operation between an MRS and a repository, so in the first two years you would have accepted a thousand metric tons and then in the next ten years you would have accepted 9,000 metric tons which -- so you would have stayed, as I recall, under the 10,000 metric ton cap.
JUDGE MEROW: I think he's worried more about when you could start accepting.
BY MR. SHAPIRO:
Q That's right. The -- well, let me first go to this specific question that I asked, because I believe you gave a different answer at your deposition. Let's take a look at that, Mr. Milner. If you could turn this time to tab 5 of your binder. It's still May 7, but there were two sessions on May 7th. Specifically, on page 31 -- I'll let you find that. Have you found that page, Mr. Milner?
A Yes, uh-huh.



Q It's a little bit long, but I'll go through it. And my question for you is, were you -- were you asked the following series of questions and gave the following answers, starting on line 4 on page 31?
I mean, assuming then that the purchasers followed the instructions and submitted DCSs based on the schedules in the 1991 annual capacity report, then the DCSs would be based upon a waste acceptance schedule that was inconsistent with the statutory linkages and the Nuclear Waste Policy Act.
Objection from Mr. Shultis.
Answer: You're talking schedule linkage?
By Mr. Skalaban: Yes, sir.
And your answer: Well, I just don't view it as inconsistent in the sense that certainly in my opinion at the time, there was a possibility of that schedule linkage being removed.
Question: But it was -- but the schedule linkage was there?
Answer: Yes.
Question: And so the law then existed as it exists now because I don't believe -- well, scratch that. As the law then existed, the DCSs were based on a waste acceptance schedule that was inconsistent with



the Nuclear Waste Policy Act schedule linkages as they existed at this time.
And your answer: Sitting here today looking at that, that would be my opinion.
MS. SULLIVAN: Objection. I don't think that that was the question that was asked of the witness on cross, but we can clean that up on redirect.
BY MR. SHAPIRO:
Q That was your -- your truthful testimony, Mr. Milner?
A That was my truthful testimony. If I may, there are, in my view, capacity linkages with the MRS to 10,000 metric tons and there are schedule linkages that -- that being that an MRS could not be sited by the department until a repository site was selected, the -- the particular assumption at that time, the MRS program was working with the then-office of the nuclear waste negotiator to attempt to find a volunteer MRS site.
It was -- all of the program planning assumptions at that time assumed if you were successful in finding a volunteer MRS site, that -- that those negotiations will hopefully lead to -- to removal or at least alteration of -- of some of those



linkages, certainly schedule linkage.
Q But the schedule linkage was, in fact, there at the time it was delivered and the schedules were there?
A Correct.
Q And these delivery commitment schedules were inconsistent with the laws as it stood at that time?
A It was inconsistent with the scheduling and --
JUDGE MEROW: Wouldn't they make conditional upon the -- didn't the approval say they were conditioned upon approval of a repository, or something of that nature?
THE WITNESS: Yes, sir.
JUDGE MEROW: Rather than just approval?
THE WITNESS: Yes, sir.
MR. SHAPIRO: Thank you, Your Honor.
BY MR. SHAPIRO:
Q I'd like to switch topics a little bit. We discussed a little bit the issue of dealing with shutdown reactors and -- and providing priority acceptance for shutdown reactors. I have a few questions on that subject.
The Department of Energy does have an

interest in the timely decommissioning of shutdown reactors. True?
A Yes, uh-huh.
Q And allowing shutdown reactors to decommission in a timely manner has been an objective of the department's. True?
A I wouldn't say so much an objective, but certainly an interest of the department.
Q But what's the distinction there that you're drawing between objective and interest?
A Objective would be something we would vigorously pursue, and interest is something that we would support if -- if it was consistent with the program planning.
Q Didn't the department have an objective of allowing shutdown reactors to decommission in a timely manner?
A The program did not have an objective in that definition of -- of allowing them to shut down, timely manner. Certainly an interest in doing so.
Q Well, let's go back to your deposition, Mr. Milner, this time on May 3rd, which is tab 3 of your binder. And I'm looking at page 419 within that tab. Have you found that page, Mr. Milner?
A Yes, uh-huh.

4770

Q I'm going to start on line 15 and ask you were you asked the following question and gave the following answer.
Question: My question isn't about asking granting priority, my question is simply did the department have an objective of allowing shutdown reactors to decommission in a timely manner?
Objection by Mr. Shultis.
Your answer: It did, yes.
Then one more question: And would that remain an objective of the department's today?
And your answer: I believe so.
That was your truthful testimony, Mr. Milner?
A Yes, it was, as was also my earlier truthful testimony where I indicated it was not so much an objective as a case where the department preferred not to preclude that ability.
Q Okay. It's been a goal of the department's to minimize storage cost of all reactors including shutdowns. True, Mr. Milner?
A Yes, certainly a consideration that we would like to have seen.
Q Are you drawing a distinction between consideration and a goal?

4771

A Yes, yes.
Q Has it been a goal of the department's to minimize storage costs for all reactors, including shutdowns?
A I guess in that sense, yes. Yes, we would certainly do what we could to minimize storage costs.
Q In fact, you believe it's long been a goal of the program to try to reduce the amount of storage that would be needed and ultimately to decommission reactors. True?
A Yes, uh-huh.
Q The water program and utilities have a goal of taking fuel off sites as soon as possible. True?
A Yes.
Q In fact, going back to the MRS for a moment, you were specifically concerned about the effects of not having an MRS facility on shutdown reactors, weren't you?
A I'm sorry?
Q You were concerned about the effects of not having an MRS facility on shutdown reactors, weren't you?
A I was certainly concerned about the effects on -- on all reactors of not having an MRS and delaying the start of waste acceptance.

4772

Q Including the effect on shutdown reactors?
A Yes, yes.
Q And others at the department shared that concern?
A I believe so.
Q Because of the department's not having -- not beginning to accept waste -- excuse me, let me restart that.
Because of the department's not having an MRS facility, that would force shutdown reactors to maintain their spent fuel pools or storage facilities for a longer time period. You understood that?
A Yes, uh-huh.
Q Your recollection is that as of 1990, the department had not yet determined whether priority would be accorded shutdown reactors or, if priority is granted, under what specific -- specific circumstances it would be?
A I believe at that time, we -- we had not completed what we called the issue resolution process and so I -- I think that's correct, yes, we had not made a final determination.
Q And, in fact, there has been no final decision on whether or not priority for shutdown

4773

reactors will be granted?
A Well, I mean, at that time we were discussing what -- what possible amendments there might be to the -- to the contract through the issue resolution process, which was a -- a lengthy discussion between the department and utilities.
The standard contract gives priority to oldest fuel first, and consideration was given, again in collaboration and discussion with the utilities, as to whether that should be changed or in any way modified. And in 1990 I believe we had not concluded that process so then had not made any determination as to whether we would or would not change the contract. Ultimately, the determination was made not to change the contract and to continue with oldest fuel first as a priority.
Q So it's your understanding, Mr. Milner, that the contract would have to be changed in order to provide the option of providing priority to shutdown reactors?
A Well, I believe the contract says that -- that you may give priority to shutdown reactors but it -- it does state oldest fuel first as the main consideration, I believe.
Q Let me go back to my initial question. So

4774

the option is -- is there in the contract -- and I'm reading focusing on what the department's plans are with respect to that option in -- in the contract.
And isn't it true that there has been no final decision on whether or not such priority will be granted? Is that not true?
A Yes, I think that is not true, that -- that we have determined that we will -- we use oldest fuel first as the means for establishing the queue, and have.
Q Let me go back to your -- your deposition once again, Mr. Milner. Tab 3, May 3rd, page 474. Have you found that page, Mr. Milner?
A Yes, sir, I have.
Q If you would look on -- starting on line 23, were you not asked the following question and gave the following answer?
Question: Are you saying that the department's not decided whether or not it would accord priority to a shutdown reactor, or are you saying that the department has decided that it would not grant priority to any shutdown reactors?
Objection by Mr. Shultis.
And your answer: Well, I think that there has been no final decision as to whether or not,

4775

although it is not under active discussion.
That was your truthful testimony, Mr. Milner?
A It was.
Q You can't think of any other reason other than equity to other utilities why the Department of Energy would be unwilling to grant priority to shutdown reactors. True?
A I think that's the principal reason, equity, yes. I can't think of any others offhand, no.
Q Granting shutdown priority avoids the need to continue otherwise unneeded reactor site storage or shutdown reactors?
A It does.
Q And granting shutdown priority can be shown to be clearly cost-effective for consumers from the standpoint of timely decommission. True?
A Certainly -- certainly cost-effective for the consumers of -- of that particular utility.
Q And in your opinion, the department would have looked favorably on exchange requests from shutdown reactors?
A Yes, I think in general terms, I think -- I think we would have. Certainly would have to see the -- the terms of an exchange request but we never

4776

received any.
Q Finally on this topic, Mr. Milner, it's -- in your opinion, just taken in isolation and without other considerations, it would be desirable not to have utilities who have completed decommissioning to have to incur operations and maintenance expenses for 20 years to watch over spent fuel casks on their sites?
A Certainly, I would think that would be desirable.
Q You mentioned a couple times, Mr. Milner, that -- I think it came up in your direct testimony that you don't recall utilities asking about exchanges of approved delivery commitment schedules. I want to ask you just a few questions about that topic.
First of all, if an exchange request were consistent with the department's transportation capabilities and acceptance capacity for a given delivery year in your opinion, that request would have been approved. True?
A I think so, yeah. Again, you'd have to look at the specifics of a request but yes, I wouldn't see why it would not be.
Q You recall maintaining a list of approved delivery commitment schedules and comparing it to a

4777

list of utilities that might be running out-of-pool space and utilities with sufficient pool space and considering brokering something between those utilities?
A Yeah, certainly we maintained a list of the approved DCSs, we knew the status of utilities' pool storage, and there had been some general discussion about brokering exchanges should -- should utilities desire that.
Q You believe that brokering exchanges for utilities could serve a useful purpose?
A Yeah, I -- I think it could have.
Q And one of those purposes would be potentially precluding the need for -- for dry storage?
A Yes, uh-huh.
Q At one point, the department was planning for the possibility of exchange requests and began looking at criteria for approving or disapproving them?
A Yeah, I think again we -- we started looking at if -- if we got exchange requests, what would be the criteria, how would we handle them, but again, we never -- never received any.
Q By 1994 you envisioned that swap market

4778

would develop that could accommodate Yankee Atomic's spent fuel?
A I could have envisioned that, yes.
Q In fact, you did envision that, didn't you?
A I seem to have some recollection of that, yes.
Q And others at the department held that belief as well, didn't they?
A I think so, I think so.
Q But you have thought that the uncertainty of the department meeting the 1998 acceptance date had the ability to hinder that swap market from ultimately developing?
A Yes.
Q You believed that as a practical matter, it would -- I'm sorry, I cut off that question. If I could have a moment, Your Honor?
JUDGE MEROW: Surely.
MR. SHAPIRO: Apologize for that delay. We have no further questions.
JUDGE MEROW: Any redirect?
MS. SULLIVAN: Yes, Your Honor. May we take a break? I don't think we're going to go very long this afternoon.

4779

JUDGE MEROW: Take a ten-minute break? Is that enough?
MS. SULLIVAN: Yes, thank you.
JUDGE MEROW: Back on the hour then.
MS. SULLIVAN: Okay, thank you.
(Recess taken from 3:48 p.m. through 4:06 p.m.)
MS. SULLIVAN: I apologize, Your Honor.
JUDGE MEROW: Oh, no problem. Continue when ready.
MS. SULLIVAN: Thank you.
Your Honor, I'd first like to ask a couple questions that have been raised in a pleading that Plaintiff's counsel has filed, I believe, today that I meant to make part of my direct. Certainly, Mr. Shapiro can cross-examine on those questions.

REDIRECT EXAMINATION

BY MS. SULLIVAN:
Q Mr. Milner, do you know what the Pacific National Laboratory is?
A It's one of the national laboratories in the DOE system.
Q And who runs PNL?
A A contractor, an M and O contractor.
Q And what does an M and O contractor do, to

4780

your understanding?
A In the indication of a lab, they operate the entire lab.
Q Has PNL done work for the Office of Civilian Radioactive Waste Management?
A It has, yes, uh-huh.
Q Okay. And are the reports that PNL has provided for the Office of Civilian Radioactive Waste Management the statements of DOE?
A No, they -- they would be treated like another contractor, any other contractor report.
Q And how is that?
A Which is input to -- to the department for -- for consideration.
Q Thank you.
Mr. Milner, could -- could I direct your attention -- do you have the binder of your deposition in front of you?
A Yes.
Q Could you go to the first tab and just have one -- the first day of your deposition, May 1st, page 73. Okay. Do you have that in front of you?
A Yes, uh-huh.
Q And Mr. Shapiro asked you about a statement that you had made at your deposition

4781

counterclaim issue. Maybe we can do that first thing. And the first witness tomorrow is Dr. Kadak, who is one of these folks who's on a -- we'll keep him here as long as we need to but I guess I'll -- we'd like to either address the counterclaim first or get Mr. Kadak on and off and then do the counterclaim, if that's okay.

MR. LESTER: Well --

MR. STOUCK: Then take up these documents some other time when we have more time.

MR. LESTER: I would say, Your Honor, Ms. Bubar actually was supposed to go first tomorrow because she has to get back to the site of an accident that she's investigating in South Carolina at the Savannah River facility.

Because of Mr. Kadak's schedule, we agreed to allow Mr. Kadak to go first, but Ms. Bubar actually also still needs to get out of here tomorrow if at all possible so perhaps we could put off the other until after Ms. Bubar is finished as well to try to minimize her impact.

MR. STOUCK: Sure. That's fine. I would like to try to do it tomorrow, maybe do it at the end of the day. That's fine.

JUDGE MEROW: Okay, fair enough.



(Whereupon, the hearing was adjourned at 6:10 p.m.)



C O N T E N T S

W I T N E S S E S


| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOHN BUCHHEIT | 4624 | 4688 | 4697 | 4704 |
| RONALD MILNER | 4711 | 4744 | 4780 | |


E X H I B I T S


| NUMBER | IN EVID |
|---|---|
| PX-1193 | 4828 |
| PX-629 | 4744 |
| PX-1192 | 4827 |
| PX-1194 | 4830 |
| PX-1198 | 4831 |
| PX-1199 | 4832 |
| PX-1200 | 4838 |
| PX-1202 | 4854 |
| PX-1337 | 4860 |
| PX-1614 | 4843 |
| PX-1654 | 4824 |
| PX-1972 | 4710 |
| DX-103 | 4685 |

AFTERNOON SESSION: Page 4711

EVENING SESSION: Page 4855




CERTIFICATE OF REPORTER

DOCKET NO.: 98-126C; 98-154C; 98-474C

CASE TITLE: YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAII YANKEE ATOMIC POWER COMPANY

HEARING DATE: August 11, 2004

LOCATION: Washington, DC

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Claims.

Date: 8/11/04

________________________________

Mary Ann Payonk, CRR, RDR
Official Reporter
Heritage Reporting Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY )
CONNECTICUT YANKEE ATOMIC POWER COMPANY )
MAINE YANKEE ATOMIC POWER COMPANY )
FLORIDA POWER & LIGHT COMPANY )
NORTHERN STATES POWER COMPANY )
DUKE POWER, A Division of DUKE ENERGY CORP.)
INDIANA MICHIGAN POWER COMPANY )
SACRAMENTO MUNICIPAL UTILITY DISTRICT )
SOUTHERN NUCLEAR OPERATING COMPANY, et al. )
COMMONWEALTH EDISON COMPANY )
BOSTON EDISON COMPANY )
GPU NUCLEAR, INCORPORATED )
WISCONSIN ELECTRIC POWER COMPANY )
POWER AUTHORITY OF THE STATE OF NEW YORK )
OMAHA PUBLIC POWER DISTRICT )
NEBRASKA PUBLIC POWER DISTRICT )
TENNESSEE VALLEY AUTHORITY, )
Plaintiffs, )
v. )
UNITED STATES, )
Defendant. )

DEPOSITION OF ROBERT L. MORGAN
March 21 and 22, 2002 Volume 1, Pgs. 1 - 212



Case Nos.: 98-126C, 98-154C, 98-474C, 98-483C, 98-484C, 98-485C, 98-486C, 98-488C, 98-614C, 98-621C, 99-447C, 00-440C, 00-697C, 00-703C, 01-115C, 01-116C, 01-249C

THE DEPOSITION OF ROBERT L. MORGAN was taken as a witness on behalf of the Plaintiffs, pursuant to Rules of the Court of Federal Claims, at 9:30 a.m. on Thursday, the 21st day of March 2002, at the Eugene Hilton Hotel, 66 East 6th Avenue, in the City of Eugene, County of Lane, State of Oregon, before Eleanor G. Knapp, CSR-RPR, Certified Shorthand Reporter in and for the State of Oregon.

APPEARANCES

For Plaintiffs Southern Nuclear Operating Company, et al.:
BALCH & BINGHAM LLP
Attorneys at Law
1710 Sixth Avenue North
Birmingham, Alabama 35203
205/251-8100
BY: MR. M. STANFORD BLANTON
MR. K.C. HAIRSTON



A P P E A R A N C E S
(continued)

For Plaintiff Commonwealth Edison Company:
JENNER & BLOCK, LLC
Attorneys at Law
One IBM Plaza
Chicago, Illinois 60611-7603
312/222-9350
BY: MR. NORMAN M. HIRSCH

For Plaintiff Wisconsin Electric:
PERKINS COIE LLP
Attorneys at Law
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
206/583-8419
BY: MR. RICHARD W. OEHLER

(continued)



A P P E A R A N C E S

For Plaintiffs Florida Power & Light, et al.:
SHAW PITTMAN LLP
Attorneys at Law
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703/770-7940
BY: MR. ALEX D. TOMASZCZUK

For Plaintiff Sacramento Municipal Utility District:
ARNOLD & PORTER
Attorneys at Law
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
303/863-2301
BY: MR. DAVID S. NESLIN

(continued)

ROBERT L. MORGAN,
as a witness on behalf of Plaintiffs Southern Nuclear Operating Company, et al., having been first duly sworn to testify the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. BLANTON:
Q. Mr. Morgan, we met off the record. My name is Stan Blanton. I am a lawyer representing Alabama Power Company, Georgia Power Company, and Southern Nuclear Operating Company in litigation pending in the United States Court of Federal Claims styled Yankee Atomic Electric Company, et al., v. United States. We're in a consolidated discovery proceeding, and your deposition is being taken in that proceeding.
MR. HIRSCH: You mean "coordinated"?
MR. BLANTON: Coordinated. Whatever. What did I say? Consolidated? Strike "consolidated." Coordinated.
BY MR. BLANTON:



Q. I understand you are being represented today by Mr. Banes and the other Government lawyers. Is that correct?
A. That's correct.
Q. In the course of your deposition today, you'll most likely be shown documents that are subject to a protective order jointly entered by the parties in this litigation restricting the disclosure of the contents of material that's been marked confidential.
I understand that you have not had an opportunity to review that order, so what I'm going to do now is hand you the pleading titled Joint Motion for Entry of Agreement and Protective Order. Attached to that as Exhibit A is an agreement and protective order, and I specifically direct your attention to page 3, paragraph 5, of the order and ask if you would review that, please, sir.
A. All right.
Q. All right, sir. Have you read the order?
A. Yes, I have.
Q. Have you got any questions about it?
A. None.



Q. Do you agree to maintain the confidentiality of any documents you are shown today?
A. Yes.
Q. Have you ever had your deposition taken before today?
A. Yes.
Q. So you know that the court reporter here is going to take down your answers. And you need to answer my questions verbally. She can't take down nods or shakes of the head.
A. I understand.
Q. Do you also understand that if I ask you a question that you either don't understand or that you think in some way mischaracterizes something you have said previously, you have the right to stop me, make me restate my question until you have one you understand and can answer correctly?
A. I understand.
Q. Any time you want to take a break today, as long as there's not a pending question, just let me know and we can take a break.
A. Fine.



Q. Are you currently employed, Mr. Morgan?
A. No.
Q. Are you retired?
A. Yes.
Q. How long have you been retired?
A. I retired from the Government in 1988, worked for a small 8(a) company in Washington, D.C., for five years after that, and have consulted with several people and companies up until last year.
Q. Let's go backwards. Who have you consulted for since you worked for the 8(a) company? Let me ask you a different way since that rocked you back in your chair.
A. There are numerous companies and corporations.
Q. On what subjects have you consulted?
A. Mainly defense program activities within the Department of Energy.
Q. Have you consulted for any electric utilities that you know of?
A. Yes.
Q. Who are they?
A. It was the V.G. Sumner plant in

South Caroline when they were proposing to use their reactor for tritium production.
Q. All right, sir. Anybody else?
A. Any other utilities?
Q. Yes, sir.
A. None.
Q. Have you consulted at all with the United States Department of Energy?
A. Indirectly for their contractors.
Q. For which DOE contractors have you consulted?
A. Kaiser in Los Alamos. Sandia in Albuquerque. I can't recall of any other directly for Department of Energy.
Q. Since you left the 8(a) company, have you consulted with any entity on issues that involve the management, storage, or disposal of spent nuclear fuel?
A. I have not.
Q. What was the 8(a) company that you worked for?
A. Meta, M-e-t-a.
Q. What business is it in?
A. We were doing environmental assessments for the Department of Energy.



Q. And the years you worked for Meta, that was 1988 through 1993? Is my math right?
A. I think there was a year in between -- or two years that I consulted. I started working for them in 1990 and ended in 1995.
Q. Did any of your work for Meta involve spent nuclear fuel in any way?
A. It did not.
Q. Is there a two-year period between '88 and '90 when you also consulted? Did I understand that correctly?
A. Yes. That's correct.
Q. Did any of your consulting work during that period involve spent nuclear fuel?
A. No.
Q. Did any of that work -- was any of that work for electric utilities during that period of time?
A. I think it was that period of time that I did the consulting at the V.G. Sumner plant.
Q. On tritium production?
A. Yes. I'm not sure of the dates.
Q. Does that take us back to the date of your retirement from the Government?



A. Yes.
Q. What was your position when you retired from the Government?
A. Manager, the Savannah River Operations Office in Aiken, South Carolina.
Q. What does the Savannah River site -- What is the Savannah River site?
A. What is it?
Q. Yes, sir. What is it?
A. It's basically a material production site for the production of plutonium and tritium for nuclear weapons. It ran four production reactors, two separation canyons, waste tank area, and tritium loading facilities.
Q. Are there other resource and development activities that go on at Savannah River other than weapons production?
A. No.
Q. How long were you in that job?
A. Seven years.
Q. So that takes us back to 1981?
A. That's correct. No. Excuse me. Eight years. Eight years as manager, then seven years as deputy manager. So I was at Savannah River for 15 years.



During that period I had various details to Washington, D.C., where I commuted.
Q. Describe for me, if you would, what a "detail" is in U.S. Government parlance?
A. A detail is an assignment to a specific job at another location.
Q. Check my math, but in some form or fashion you were at Savannah River either as manager or deputy manager from 1973 to 1988. Is that accurate?
A. '73 to '88. Yes. Yes, that's correct.
Q. What details were you assigned to during that 15-year period away from Savannah River?
A. Acting Assistant Secretary for Defense Programs on two occasions.
Q. Do you remember the dates?
A. No, I don't.
Q. All right, sir.
A. I think I can construct that for you. The first time was in February after the inauguration of President Reagan. And I held that job for about six months until a political appointment was made.

Then was detailed to Washington just after the passage of the Nuclear Waste Policy Act from February -- I guess it was 1983 -- through the about one-year period.

I was again detailed as Acting Assistant Secretary for Defense Programs, again awaiting a new appointee in that position, and that lasted for approximately six months.

Q. What was the scope of your authority as Acting Assistant Secretary for Defense Programs? What does that include?

A. The entire weapons complex, which included the laboratories -- Sandia, Livermore, Los Alamos -- and all the weapon production facilities, which included Savannah River; Rocky Flats; Richland; Oak Ridge, Tennessee. And that's all I can -- oh, Pantex plant in Amarillo and Bendix plant in Kansas City. Approximately about a $5 billion operation.

Q. After your detail to -- your second detail as Acting Assistant Secretary for Defense Programs, did you return to Savannah River?

A. Yes, I did.

Q. And did you stay at Savannah River until your retirement?



A. That's correct.

Q. There were no further details after that?

A. No.

Q. As Acting Assistant Secretary for Defense Programs, were you involved at all in the issues of spent nuclear fuel management or storage?

A. Only the spent nuclear fuel from the defense program activities. Nothing to do with commercial fuel.

Q. All right. At that time was defense spent fuel intended to be part of the DOE program that was initiated under the Nuclear Waste Policy Act?

A. During the last detail, that's correct.

Q. That would have been from the first quarter of '84 until --

A. Mid -- until mid --

Q. I didn't get how long that lasted.

A. I think that one was about six months.

Q. As manager of the Savannah River site, did you also have some involvement with



spent fuel produced in weapons production?

A. Yes.

Q. In that job did you have any involvement in the DOE spent fuel program at all?

A. The commercial spent --

Q. Yes, sir.

A. None.

Q. All right. Prior to Savannah River, just briefly describe your career for me, prior to 1973.

A. I had graduated from the Military Academy in 1952, was commissioned, spent 13 years in the Army Corps of Engineers.

First assignment was the Korean War; second in Japan; third, 82nd Airborne at Fort Bragg; fourth was a year in Indonesia as a special assistant to the Ambassador for Civic Action; and then resigned my commission in 1965 and went to work for the DOE -- or the Atomic Energy Commission at that time.

Q. What was your job at the AEC?

A. Director of the heavy water organic tool reactor program at Savannah River for one year from '65 to '66.



1966, I joined the reactor development program, Canoga Park, California, and stayed there seven years.

And then in '73 went to work for Savannah River.

Q. Are you an engineer by training?

A. Yes. The Army Corps of Engineers sent me to MIT for two years, and I have a master's in civil and a master's in nuclear.

MR. OHLER: What was that last master's in, sir?

THE WITNESS: Nuclear engineering.

BY MR. BLANTON:

Q. During your time in the Service, were you involved in nuclear weapons issues?

MR. BANES: Objection. Irrelevant.

A. I was not. I had a detail of four years to the Atomic Energy Commission in Idaho Falls in reactor development for Army reactor programs.

BY MR. BLANTON:

Q. Mr. Morgan, have you talked to anybody other than your attorneys today to

prepare for this deposition?
A. I made a call -- After I first got a call from someone that said some lawyers were looking for me and that I should call a lawyer in Washington before I call that lawyer -- all he knew was about the Nuclear Waste Policy Act.
I called Mike Lawrence, and he told me there was litigation and he had a deposition. And that was the extent of that discussion.
Q. I'm sorry. I didn't understand what Mike Lawrence said about a deposition.
A. He said he had been deposed regarding a lawsuit and that it was regarding the Nuclear Waste Policy Act. No further details were discussed.
Q. When was that conversation, if you recall?
A. Prior to my call to the lawyers in Washington, DOE.
Q. Weeks? Months? Or how long ago was it, do you think?
A. I have no idea. Probably three months, four months, something like that.
Q. Did Mr. Lawrence tell you anything about the issues --



A. No.
Q. -- in the case?
A. No.
Q. Did he tell you anything about -- Did he say that he had been deposed?
A. Yes.
Q. Did he tell you what he had been asked?
A. No.
Q. Have you looked at any documents in preparation for your deposition today?
A. Yes.
Q. What documents have you looked at?
A. The documents given to me by counsel.
Q. You recall what they were?
A. I have them with me.
Q. Okay.
A. Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting, December 12th through 15th, dated February 1984.
December 20 memorandum of 1991, Approval of Publication of the 1991 Annual Capacity Report.



A compilation of comments from various utilities relative to the contract with the utilities.
And then the last item was the Federal Register of Monday, April 18th, 1983, Part II, Department of Energy.
And I happened to find in my files the old Public Law 97-425, January 7, 1983.
Q. Is that the Nuclear Waste Policy Act?
A. Yes.
Q. Do you have any other personal files that involve the Nuclear Waste Policy Act other than just the old copy of the Act?
A. That's it.
Q. Do you recall having seen any of these other documents before preparing for your deposition today? Do you recall seeing them at the time they were published?
A. I did review them during the time that I was acting as director.
Q. How about -- I think you mentioned the 1991 cover letter to the ACR.
A. Yes.
Q. Did you mention that?



A. December 20th, 1991?
Q. Yes, sir.
A. Had I seen this?
Q. Had you seen that before preparing for your deposition?
A. No. No.
Q. Have you told me now about all the documents you've looked at?
A. Yes.
Q. Mr. Morgan, at the time you were detailed to DOE just after the passage of the Nuclear Waste Policy Act, what was your title?
A. Director, Nuclear Waste Project Office, as I recall.
Q. What were your duties?
A. Implementation of the Nuclear Waste Policy Act within DOE.
Q. At some point in time did the name of the office become Office of Civilian Radioactive Waste Management?
A. Yes. That was when the political appointee was confirmed by the Senate. So it was after -- it was -- when I left, the name changed.
Q. Do you recall who the political

appointee was?
A. Ben Rusche.
(Deposition Exhibit No. 1 marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, I've handed you a document that's been marked Exhibit 1 to your deposition. And it's a five-page document, I believe, and the first page of it is titled Office of Civilian Radioactive Waste Management, and has a box -- an organizational chart on the first page.
And the top box says Director of Office of Civilian Radioactive Waste Management, and by the side it has R.L. Morgan (A). Do you see that?
A. Yes.
Q. Do you recall at what point in time this -- Do you recall whether this organizational chart was ever correct? Was there an organization that that accurately reflects?
A. It was my impression that I was there during the time it was the Nuclear Waste Project Office. But evidently I am incorrect



because this shows it as the Office of Civilian Radioactive Waste Management, which I know it changed into. But I thought it was after I left.
Q. Regardless of what they called -- what the name of the office was, does that organization look like the one that was there when you were acting director?
A. Absolutely.
Q. Mr. Morgan, who would have been in the box just above you on this org chart? Who did you report to during the time you were acting director of OCRWM?
A. Secretary of Energy, Donald Hodel.
Q. Do you recall whether you had some sort of delegation of authority from Secretary Hodel, formal delegation of authority with respect to the program?
A. I don't understand the question.
Q. Was there a piece of paper saying this is what your authority is within the Department of Energy signed by the Secretary of Energy?
A. I don't recall.
Q. What did you understand your scope



of responsibilities and authority to be?
A. The entire Nuclear Waste Policy Act activities within the department.
Q. Did you have decision-making authority?
A. Yes.
Q. Mr. Morgan, let me get you to look at the page of Exhibit 1 which is marked -- you see these numbers in the top right-hand corner that have SN on them?
A. Yes.
Q. Let me get you to turn to SN010809, which has Office of Management at the top of it.
A. Yes.
Q. You see that? You see all those? At the top of the document it has Associate Director, and it has R.M. Rosselli by the side of it, and then his deputy is H.F. Perry, and then a Finance Division, Operation Division, and Management Division with what appear to be acting heads in each one of those boxes. Is that correct?
A. Yes. Yes.
Q. Below that there are a series of bullets that are below each one of the



divisions. Is that right?
A. Yes.
Q. And, for instance, under Operations Division, there is a bullet on the top that says "Coordinate OCRWM Mission Plan."
A. Yes.
Q. My question is: Are there names of people that are associated with each one of those bullets, people who were in charge of each one of these items that are listed as bullets on this organizational chart during the time you were there?
A. I didn't go down to that level below the division level.
Looking at the assignments, I'm sure in some cases there was a collaborative effort and in some cases people had a lead on it.
But I looked to the division directors.
Q. All right, sir. Did all of those functions eventually report up through Mr. Rosselli and eventually to you while you were there?
A. That's correct.
Q. Were there -- still focusing on the

can't recall whether I had unanimity in certain things, but I would say that not everyone felt the same way about every part of the Act.

So I was ultimately responsible for the definition of what was in there.

BY MR. BLANTON:

Q. What did you decide it meant?

A. Pardon?

Q. What did you decide that the Act meant?

MR. BANES: Objection. Vague. Compound.

A. I really don't understand the question. In other words, the Act as written is what we tried to implement. And there were some interpretations, and we interpreted it a given way.

BY MR. BLANTON:

Q. What problem did you determine that the Act was attempting to solve?

A. What problem?

Q. What problem? Or was there a problem that the Act was trying to solve?

A. Yes, the storage of the nuclear waste from the commercial establishment. That's



what the whole act was about.

(Deposition Exhibit No. 2 marked for identification.)

BY MR. BLANTON:

Q. Mr. Morgan, I've handed you a document marked Exhibit 2 to your deposition, the first page of which is titled Proceedings of the 1983 Civilian Radioactive Waste Information Management Meeting, December 12 through 15, 1983, Washington, D.C., and then it has February 1984 below that.

And then following that we've included the forward and table of contents but we've not included all the papers listed in the table of contents. But we have included the last two pages titled Program Overview. Do you see that in the document?

A. Yes.

Q. First of all, when we -- In reviewing the cover of the document, there are two dates on it. One is December 12 through 15 of '83, and one is February of 1984. Do you know what those two dates refer to?

A. The February 1984 is the date it was published.



Q. And December of '83?

A. The December 12 through 15 of '83 was the time that the meeting took place.

Q. Do you recall this meeting?

A. Yes.

Q. Did you go? Were you there?

A. Yes.

Q. What was the purpose of the meeting?

A. It was basically, as I recall, an information as to what we were doing within DOE and what were some of the issues that we were looking at. And it was basically an overview for those that had interest, including the utilities.

Q. All right, sir. Now, at the time of this meeting, what had happened in the program since the passage of the Act? What progress had you made toward implementing the Act at this point?

A. Okay. The first -- within the first month there were letters that I had the Secretary sign to all the governors as to the process we were about.

We had completed the draft contract as required with the utilities.



Then we had resolved those issues and the Federal Register notice that I referred to before.

And the rest of it was just getting a mission plan outlined as to what our goals were and how we intended to get there.

That was the purpose of this meeting, an information meeting.

Q. And for context, the Act was signed by the President in January of '83. Is that right?

A. That's correct.

Q. So you had -- at the time of this meeting, you had been in your job in the Office of Civilian Radioactive Waste Management -- or Nuclear Waste Office or whatever it was -- basically a year?

A. Just about. It was February that I -- that I recall being asked to take the job. I don't have the dates. Close to a year.

Q. Turning to the page of the exhibit that's marked SN069599, it has the title Program Overview, and then under that it has Robert Morgan, Acting Director of Civilian Radioactive Waste Management. Was that you?

A. Yes.
Q. Did you write this paper?
A. I gave the first initial outline, it was filled in, and then I reviewed it.
Q. Who filled it in for you?
A. As I recall, it was Mike Lawrence and other people on the staff.
Q. Did they produce drafts and then bring the draft back to you and you would edit it and give it back to them?
A. I think it was just the one sequence that we used. I'm not sure. But I think I outlined it. We gave it to the people. They sent in the information. I reviewed it and edited it and presented it.
Q. So do I understand correctly that you actually addressed the group verbally and said what's in this paper?
A. That's my recollection.
Q. Who were the attendees at this meeting?
A. I have no idea.
Q. In general. Was it open to the public?
A. Utilities. Utilities, people from



the Hill, staffers. It was an open meeting.
Q. Let me direct your attention, Mr. Morgan, to the seventh paragraph. That paragraph starts, "I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend to do." Do you see that?
A. Yes.
Q. I'm going to give you a chance to read that whole paragraph before I ask you any questions about it.
(Pause.)
A. All right.
Q. The fourth and fifth sentences of that paragraph say, "In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act."
My question is: With respect to what DOE was required to do in January of 1998, what did you believe at this time was the intent of the Act?
A. We put a mission plan together to where hopefully -- again, this was in the



mission plan. I think it's summarized in the last paragraph of the statement on the next page.
Q. What was the source of your understanding of what the intent of the Act was?
A. I don't recall.
Q. The last two sentences of the -- what did I say that was, the seventh paragraph? -- states that, "The basic strategy which we've outlined in the mission plan is that beginning in 1998 utilities will not have to provide any additional storage facilities on site."
Do you see that sentence?
A. Yes.
Q. How did that basic strategy come about?
A. That was my input.
Q. Why did you decide that that was the strategy?
A. That's what I felt was the intent of the Congress. And I think listening to some of the staffers is how I got to that conclusion. But it was my conclusion.
Q. And did the drafts or the outline of the mission plan -- Strike that. Do I



understand you correct that the mission plan, in the state it was when you left, was designed to implement that strategy?
A. That's correct.
Q. So in your view as director of the program, was the mission plan -- Strike that.
Did the mission plan, when you left as director, effectuate the intent of Congress as expressed in the Nuclear Waste Policy Act in your view?
A. I believe so.
Could I add a couple of things to the answer of "I believe so"? There was not uananimity within Congress on the mission plan. I was getting stones from both sides of the aisle and from both houses on the Hill -- or the House and the Senate.
And I felt that as long as we are getting stoned from both directions that we were about in the right place.
So I don't think that I can state what the intent of Congress was. I can tell you that the intent of Congress was not unanimous. Some of the members of the Senate wanted me to put more emphasis on the MRS program, monitored

retrievable storage, because they felt a repository would not be approved by 1998, whereas other people said, "Don't go with the MRS. Put all your effort onto the repository program."
So there was a balancing act that we -- we made compromises as to what was in that mission plan to hit the middle of the road, I guess is the best way to describe it. And I don't think that it really had a full consensus by the House and Senate as to what their intent was.
Do you understand what I'm saying?
Q. Let me ask you a question and I'll see. You can answer my question, and I'll figure that out.
You got conflicting statements from members of Congress --
A. Yes.
Q. -- based on the tactics, for lack of a better word, outlined in the mission plan for meeting the goal.
A. Yes.
Q. Not on the goal.
MR. BANES: Objection. Vague.



A. Well, the goal -- I think that there was -- you know, our goal was to get a repository in by 1998. And there were some members of Congress that said, "Put all the emphasis on an MRS" so that there was a conflict in the goals.
BY MR. BLANTON:
Q. All right, sir. Did the people who said, "Focus on an MRS," was their purpose that you won't be able to get a repository done, so you won't be able to move fuel by '98?
MR. BANES: Objection. Lack of foundation.
A. I cannot -- I cannot, you know, attribute any background or what they felt about it. I just don't know.
BY MR. BLANTON:
Q. As the head of the -- or the acting director of the Civilian Radioactive Waste Management Program, you determined that, as far as your office was concerned, the mission plan at the time you left was the proper way to accomplish the goals?
A. Yes.
(A discussion was had off the



record.)
BY MR. BLANTON:
Q. Back on the record. Mr. Morgan, still looking at Morgan Exhibit 2 and still looking at the seventh paragraph of your Program Overview, the last sentence says, "During the first year of operation" -- the last sentence of the seventh paragraph says, "During the first year of operation of the repository, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location."
At this point in time, did you know what that rate was in terms of what quantity of fuel in a year?
MR. BANES: Objection. Calls for a legal conclusion. Go ahead.
A. As I recall, we generally knew the discharge rates from the reactors. There was information available to us. And I recall that there was a company in Atlanta -- and I can't remember the company -- that provided that information. They had it in their database.
BY MR. BLANTON:
Q. Not NAC, is it?



A. Could have been.
Q. So as far as you were concerned, was the rate that was sufficient such that no utility would have to add further storage facilities either on site or at another location, was that rate equivalent to the discharge rate?
A. You notice the next paragraph?
Q. Yes, sir.
A. It says, "So by the year 2000 or 2001, we should be accepting in the repository the amount of fuel as being . . . ."
Q. Right?
A. So there was a time from '98 to 2001, and in '98 the utilities would be making commitments or possibly commitments for dry storage that would be delivered in the 2000, 2001, but that they wouldn't have to make new commitments for ordering, in that time lag, of commitment to additional storage and then actually having that storage.
So we're talking about hopefully -- In other words, when you start receiving fuel in '98, we're not going to be at full run. There's a start-up lag time. So we felt by the year

2000 or 2001 that we would be meeting the discharge rate.
Q. During your meeting with Congressional staffers when you first received this detail, did the subject of what the rate under the Act should be come up?
MR. BANES: Objection. Irrelevant.
A. I don't recall.
BY MR. BLANTON:
Q. Do you recall what process you went through at DOE internally in arriving at the plan that during the first year of operation we should be -- of the repository in 1998 we should be receiving fuel at a rate so that no utility would have to add any further storage facilities?
Do you recall what the process in DOE was to arrive at that?
A. That was debated and discussed within my staff there. And that was my conclusion.
Q. Okay. Who worked on that issue beside yourself?
A. I would say all the first level



people. I believe in a -- what you would call a collaborative approach to management. I like to have the input discussed before I make a decision.
Q. And by first level people, you are referring to the people who were your direct reports on that organizational chart?
A. Yes, plus Mike Lawrence and McElvey.
Q. Where is Mike Lawrence now? Do you know where he lives?
A. In Richland, Washington.
Q. Does he still work for the Department of Energy as far as you know?
A. No.
Q. Is he retired?
A. No.
Q. Do you know who he worked works for?
A. PNL.
MR. BLANTON: Off the record.
(A discussion was had off the record.)
BY MR. BLANTON:
Q. Do you recall how far in advance of this meeting on December 12 through 15th that DOE arrived -- and really you arrived at this



strategy of picking up fuel at a rate such that utilities would not have to add storage space after 1998?
A. Do I recall?
Q. How far in advance of this December 12 through 15 meeting.
A. I think it was quite some time.
Q. Was it something that evolved over time from the time you got there?
A. Yes.
Q. If I could, let me back up for a second and ask you: Did formal notices go out to various stakeholders about this meeting? Do you recall how it was advertised?
A. There's a certain requirement that I can't recall which says all the stakeholders -- the states, utilities -- had to be involved in a notice. And I believe -- well, I believe that that was accomplished.
Q. All right, sir. It says it was sponsored by the U.S. Department of Energy. Did the Department of Energy fund the meeting?
A. Yes.
Q. Do you recall where it was held? Was it at DOE headquarters, or was it at



someplace else?
A. It was someplace else, as I recall.
Q. Do you know whether you ever discussed the issues that are set out in this Program Overview and specifically the issues discussed in paragraphs seven and eight of the Program Overview?
A. Issues?
Q. Do you recall whether you ever discussed the subject matter in the seventh and eighth paragraph of this Program Overview regarding the intent of the Nuclear Waste Policy Act and the strategy and the mission plan with the Secretary of Energy?
A. Oh, yes.
Q. Did you review this paper with him before you presented it at these proceedings?
A. I had reviewed the initial schedule, a layout of the program, with him in order to get from Point A to 1998.
And in that discussion I do recall saying that this was extremely optimistic, as stated on the next page, that there were many things that were impediments to getting there -- NRC licensing, siting, the siting criteria,

litigation. We had, as I recall, three lawsuits in the period of time that I was acting director -- some of which could cause delays.

The fact that we were dealing with three different media -- basalt, tuff, and salt. Excavation in salt is a lot quicker and easier than excavation in basalt.

So that the characterization by 1987 we thought was an extremely difficult milestone to meet. So there were many uncertainties that we had to face. And we tried to put a schedule together balancing all those and saying, yeah, if it works, this is how you are going to do it.

Q. When you say the schedule, do you mean the schedule for the development of the various facilities described in the Act?

A. The schedule to accept fuel in 1998 I considered extremely optimistic.

Q. Did you ever discuss with him your characterization of the intent of the Nuclear Waste Policy Act?

A. In an overall basis, but not specifics. You know, in other words, we are going to accept fuel in 1998. That was the goal.



Q. All right, sir.

A. And I discussed with him the schedule, all the items that had to be implemented and laid out in a PERT network in order to get there. You had to do A before you do B. And sometimes B defines back to A, so that you do a logic network to get there. And that was discussed with him.

Q. Did you discuss with him your strategy that beginning in 1998 utilities would not have to provide any additional storage facilities on site?

A. I don't recall.

Q. Based on your conversations with the Secretary of Energy at the time, did you feel that the Program Overview as you gave it in these proceedings in December of 1983 were consistent with his views of the Nuclear Waste Policy Act?

MR. BANES: Objection. Lack of foundation.

A. That's presumption on my part, you know. But overall, trying to accept fuel in 1998, that was discussed with him. But again, I described that as a very optimistic schedule.



BY MR. BLANTON:

Q. But he agreed with it?

A. He didn't object to it, to me.

Q. How did DOE go about developing the standard contract?

A. That was a consensus between my office, contracts, and legal.

Q. Was there a team that did the drafting? Do you recall who the specific individuals were?

A. I believe Rosselli was one of the members, but I don't think he was the only one.

Q. Can you describe how the process worked? Would somebody generate a draft and then circulate it and take comments, or what happened?

A. Yes.

MR. BANES: Objection as to form. Go ahead.

A. There were several discussions that we had in resolution of some of the items.

BY MR. BLANTON:

Q. Do you recall any specific items that were discussed?

A. Oh, boy.



MR. BANES: Objection to the extent it requests discussions with counsel. Don't answer those questions, sir.

THE WITNESS: Pardon?

MR. BANES: Don't answer it insofar as it requests discussions with counsel.

A. I know that we discussed the -- how to deal with the fuel that was already discharged as to the fact that some of it was low exposure fuel and some was high exposure fuel, that we had to charge an average of one mill per kilowatt for that.

But we felt that those people that had failed fuel elements that we would have to insert in the repository required a greater amount of effort on our part than those that had high exposure.

In other words, digging the hole, encasing it in the repository, took X amount of dollars to do that. So the only thing that you can do is --

Basically, a repository is heat-loaded limited so that you could put the less exposed fuel closer together. But you still had to excavate and drill for those as you

would any of the high-use fuel.
That was -- that was litigated after the final rule by General Electric. And my recollection is that we prevailed and the judge decided in our favor. That was one of the items discussed.
The other item discussed was the rate of acceptance, whether we should have a rate of acceptance or not. And it was decided that we would not put in a rate of acceptance in the contract.
Those are two areas that I recall specifically at this time. I think there were others.
BY MR. BLANTON:
Q. What do you recall about the discussions regarding putting in a rate of acceptance, other than it was -- what the decision was?
A. Well, with the uncertainties and the optimistic schedule that we were looking at, we felt it was inappropriate to commit to a rate at this time in a contract.
Q. Did you view the contract as a mechanism for implementing the intent of



Congress?
A. Absolutely. That was specified in the Act.
Q. Do you recall any other issues, other than the issue on -- that was litigated with GE and the rate of acceptance?
MR. BANES: Objection. Compound.
A. The gross versus net charged to the utility.
BY MR. BLANTON:
Q. Let me ask you another question. We may be able to short-circuit this. Are all the issues that -- do you recall discussing any issues internally in DOE during the contract formation that are not addressed in the notice of rulemaking on the standard contract?
A. No. We only dealt with the comments that we received and resolved. We didn't have any further discussion.
Q. At the time the contract was executed, was your view regarding the intent of Congress in enacting the Nuclear Waste Policy Act the same as it was when you addressed that issue in the Program Overview?
A. One is a contract; the other is a



mission plan. Two different entities. And a mission plan is laying out how to get there.
With the uncertainties that we had facing us in the program, I didn't think it was realistic to include a rate. And there was no objection to that that I know of.
Q. Let me ask the question in a slightly different way. I understand your testimony to be -- and correct me if I'm wrong -- that at the time you gave the Program Overview statement in December of 1983, that it was your view that the intent of Congress in passing the Act was that beginning in 1998 utilities would not have to provide any additional storage facilities on site.
A. No. That wasn't -- The intent was clearly -- you know, they said to accept fuel in 1998. And there was no rate specified.
Q. What was -- so what was the source of your plan to -- as expressed in the Program Overview that beginning in 1998 utilities will not have to provide any additional storage facilities? Why did you say that?
A. Because I thought it made sense. And this is one of the things that was not



defined by Congress in a conference report, which I don't think I could have gotten consensus as to putting a rate in that Congress would agree to.
Q. Was eliminating the need for utilities to add storage facilities on site beginning in 1998 DOE's purpose in drafting the contract the way it drafted it?
A. There was no mention of rate in the contract, no acceptance rate.
And again, I'll say that it was an optimistic schedule presented in the mission plan. And your reference to accepting rate or no new facilities for on-site storage -- again, I'd like to call attention to the fact that in that same testimony I talked about the 2000, 2001, rather than 1998, of matching the discharge so that commitments would be made in '97, '98 for additional storage that would come on line in the 2000 and 2001 period.
Q. I'm still not sure I understand that.
MR. BANES: Objection. Vague.
BY MR. BLANTON:
Q. What's the difference between --

Strike that. How do you reconcile "utilities will not have to provide any additional storage facilities on site beginning in 1998" with the following paragraph, then?

MR. BANES: Objection. Asked and answered.

THE WITNESS: Do I answer it?

MR. BANES: You can if you want to. I'm just objecting.

A. Okay. It takes time from making a commitment until those storage facilities are available. The utilities, in good prudence, would have ordered additional facilities on site in '97, '98, that would come on line in 2001 or 2002.

So that at that point we would be matching the discharge rate so that they would be making no new commitments after 1998.

Do you understand what I'm saying?

BY MR. BLANTON:

Q. I think I see what you're saying.

A. There's a lead time for licensing, the actual construction, all the things that you are fully aware of.

Q. And to go back to a couple of



questions ago: Was that plan, as expressed in that paragraph you just referred to, DOE's purpose in drafting the standard contract the way it drafted it?

MR. BANES: Objection. Asked and answered.

A. No. This was a mission plan. The contract was sent out months before that, before we were even working on schedules. The contract was required to be in place, what, some 60, 90 days after the enactment? I don't know the date, but there is a requirement in there.

That was too early to tell what we were doing. In other words, the contract had no rate in it.

BY MR. BLANTON:

Q. Was there any way to calculate a rate in the contract -- from the contract?

MR. BANES: Objection. Calls for a legal conclusion. You can answer that, sir.

A. Could you repeat the question?

BY MR. BLANTON:

Q. You say there was no rate in the contract. Was there any way to calculate a rate in the contract?



MR. BANES: Same objection.

A. No. The rate of acceptance is what I'm talking about. How would you calculate that?

BY MR. BLANTON:

Q. Well, that's my question. If you can't, then the answer is no.

MR. BANES: Objection. Vague. Do you understand it, sir?

THE WITNESS: No.

BY MR. BLANTON:

Q. Is there any way to calculate an acceptance rate from the contract? You say there is not one expressly stated in there. Is there any way to calculate one?

MR. BANES: Objection. Vague.

A. No.

BY MR. BLANTON:

Q. Which came first, the preparation -- or the work on the mission plan or the work on the contract? Or did they start at the same time?

MR. BANES: Objection. Compound.

A. I don't recall. But, you know, the -- I -- in my estimation, recollection, I



believe we were working on things in parallel over the entire items in the Act. So I would say they were -- you know, best of my recollection, that they would be in parallel.

BY MR. BLANTON:

Q. Do you know whether the people who were working on the mission plan were different than the people working on the contract? Or were they the same?

A. The mission plan included far more people than were involved in the contract.

Q. Did both of those functions report through Mr. Rosselli up to you?

A. No. No.

Q. Did either one of them report up through Mr. Rosselli to you?

A. The contract was probably more lead by Rosselli. The mission plan was more lead by Bennett.

Q. I'm going to get you to look back at Exhibit 1 to your deposition.

A. All right.

Q. And looking at the Office of Management page, the first bullet under Operations Division, which reports up through

Mr. Rosselli, has "Coordinate OCRWM mission plan." Is that wrong?
A. No. That's correct. But Bennett had all the information that -- or most of the information that goes into it. They had the MRS activity, which was not under Bennett, also going into it so that the Operation Division got this input and put it together.
In other words, it says "coordinate." It doesn't say, "You are responsible for preparing every part of it."
Q. I understand. How did the drafts of the mission plan come to you? Did they come to you through Mr. Bennett or through Mr. Rosselli?
A. The document, you know, the preparation, the final preparation after discussion came from the Operations Division. The discussions included the entire top level staff.
Q. All right, sir. Which division had the responsibility for the contract as far as OCRWM was concerned?
A. My recollection was it was under Rosselli.
Q. And it appears to be Operations --



next-to-the-last bullet under Operations?
A. Right.
Q. So both the mission plan and the contract came through Operations, through Mr. Rosselli, to you? Am I understanding that correctly? Understanding that other people had input into the mission plan.
A. Yes.
Q. Who is Mr. Head, Mr. C.R. Head? What is his name, first name?
A. I don't recall.
Q. Do you know where he is now?
A. No, I don't.
Q. At the time the standard contract was drafted, did you know what the discharge rate of spent nuclear fuel was going to be in 1998?
A. We had an idea, yes.
Q. What factors was it dependent on, the rate of spent nuclear fuel discharge? What was that dependent on?
A. Experience from the reactors in previous years.
Q. Did it depend on the growth rate in new reactors?



A. There were no new reactors planned. There were some coming on line, as I recall, but nothing new had been ordered, as I recall.
Q. Do you recall an upper-bound case, a mid-level case, and a no-growth case being reviewed by DOE in terms of projecting what the quantities of spent nuclear fuel would be in 1998 and forward?
A. I think that NAC had those numbers. I just don't recall.
(Deposition Exhibit No. 3 marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, the court reporter has marked as Exhibit 3 to your deposition a February 4, 1983 Federal Register notice titled Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste. And the action under the title says "Notice of proposed rulemaking."
Have you seen that document before?
A. I'm sure that I saw it at the time it went out.
Q. This is not one of the documents you reviewed in preparation for your deposition. Is



that correct?
A. That's correct.
Q. You reviewed the final contract rule.
A. I don't know and I cannot say whether I reviewed the final rulemaking in the process of preparing the testimony or discussion that we had on December 12 through 14th or whatever it was.
Q. I didn't make my question clear. In preparation for your deposition today, you have not reviewed this proposed rulemaking?
A. That is correct.
Q. But you did review the final rulemaking in preparation for your deposition today?
A. Yes.
Q. This document has several sections under a heading marked Supplementary Information. Do you see that on the first page, top of the first page of text?
A. Right.
Q. It would be page ADM-001-0669 in the stamp at the bottom of the page.
A. Right.

Q. And that Supplementary Information covers Legislative Background and then Proposed Rule and then Comment Procedures and then Procedural Requirements. Do you see all those?
A. Yes.
Q. When you were the acting director of the Office of Civilian Radioactive Waste Management, how would materials such as that included in this notice of proposed rulemaking and described in that Supplementary Information section be prepared?
A. Okay. I think I reported into the -- this Office of Nuclear Waste Policy, whatever, about the time -- I think it was early February. I don't know if I reviewed this specific document before it went out. I don't think I did because of the timing.
I reviewed the comments and the final rulemaking, but I cannot say whether I participated in this. I just don't believe I did.
Q. So the draft contract would have been prepared prior to the time you came on board?
A. I believe that to be the case.



Q. All right, sir. Do you recall whether there was a -- there were time constraints in the Nuclear Waste Policy Act on the preparation and execution of the contracts?
A. Yes.
Q. What were they?
A. I think it was 90 days, but I'd have to refer to the Act.
Q. Regardless of what they were, were you operating under time pressure to get the draft contract done and the final contract done?
A. Yes, sir. We were operating under time pressure the entire time.
Q. Did that affect the way you drafted the contract, the amount of time you had available?
MR. BANES: Objection. Vague.
A. I don't think I drafted this contract. I don't think I was there during the time of that.
BY MR. BLANTON:
Q. Do you know who at DOE was responsible for preparation of this material?
MR. BANES: Objection. Lack of foundation.



A. In my opinion, it would have been the Assistant Secretary for Nuclear Energy who was running the program prior to my detail -- my detail assignment.
BY MR. BLANTON:
Q. Who was that?
A. Shelby Brewer.
Q. Do you know whether, as part of the process of becoming acquainted with the program, whether you reviewed this notice of proposed rulemaking?
A. I don't believe that I did. I reviewed the -- I reviewed it when the comments came in and the comment resolution process and to the final rulemaking.
Q. Okay.
A. I didn't specifically review this document until the comments came in.
Q. Did you use this document in responding to the comments in some fashion?
A. The comments were specifically to items in the contract, so I would have to review those items where there were comments coming in.
Q. Okay. On the far right-hand column of the notice -- of the first page of the notice



of proposed rulemaking, in the paragraph that begins, "The proposed standard contract would establish the rights and duties of the U.S. Department of Energy and the owners and generators of SNF and HLW" -- Do you see that?
A. I'm there.
Q. The last sentence of that paragraph states, "The Act directs DOE to begin repository operations no later than January 31, 1998."
A. That's correct.
Q. Did that continue to be the position of the Department of Energy throughout the time you were there, that that's what the Act directed DOE to do?
A. Yes.
Q. What rights did the contract establish on the part of the owners and generators of SNF and HLW in your view?
MR. BANES: Objection. Vague and overbroad.
A. I'd have to read the document to ascertain that. I don't recall.
BY MR. BLANTON:
Q. Well, in general?
MR. BANES: Objection. Asked and

answered.
BY MR. BLANTON:
Q. Did the utilities have a right to expect anything?
MR. BANES: Objection. Argumentative, asked and answered.
A. He objected. Do I still answer it?
BY MR. BLANTON:
Q. I would appreciate it if you would.
MR. BANES: I wouldn't answer that.
BY MR. BLANTON:
Q. So you are not going to answer that question on the advice of your counsel?
MR. BANES: You just asked him whether they could expect anything. He has already answered: The rights and obligations are defined by the contract.
Let's look at the contract if you want to ask him specific questions about it.
MR. BLANTON: I just want to make it clear on the record, I've asked the question and you are telling him not to answer. That's all I'm asking. Is that where we are?
MR. BANES: That's not what



you're asking.
MR. BLANTON: Well, the record will reflect what the question is.
MR. BANES: Let's move on.
A. What's the question again? What rights do the utilities expect from the contract?
BY MR. BLANTON:
Q. What do the utilities have a right to expect from the contract?
MR. BANES: That wasn't the question. That's a new question.
MR. BLANTON: Okay. I'll ask that one.
MR. BANES: Asked and answered.
A. By signing the contract, they were allowed to continue operation.
BY MR. BLANTON:
Q. How so?
A. NRC. They were required to sign it for continuation of the license, in my understanding. And I don't know what else is specifically in the contract.
BY MR. BLANTON:
Q. On the second page of the notice of



proposed rulemaking, which is page -0670, there's a reference in the last paragraph before the heading that says II, Proposed Rule. It says, "DOE determined that it would be most appropriate to develop the proposed . . . contract through rulemaking" --
Do you see that?
A. Yes, I see that.
Q. It says, "DOE determined that it would be most appropriate to develop the proposed standard contract through rulemaking because the process presents the best opportunity for interested persons, particularly the affected parties, to participate in developing the standard contract which will be used in DOE's nuclear waste disposal activities."
Was there any other reason other than that to do it as a rulemaking?
A. I don't believe I participated in this. I think you should ask the people that prepared this what the intent was.
Q. Do you recall being involved in any discussions with respect -- in response to the comments about whether or not rulemaking was the



appropriate mechanism for doing the contract?
A. That was already in process. It had already been done, and I was dealing with the comments that came in on the rulemaking.
Do you understand what I'm saying? I don't think I can address anything in this -- this Part IV that you've handed me as R. Morgan Exhibit No. 3.
Q. All right, sir. Well, let's get out the final rule, then. Okay.
(Deposition Exhibit No. 4 marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, you have before you Exhibit 4 to your deposition, which is a Federal Register notice dated Monday April 18, 1983, titled Department of Energy Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste. Do you recognize that document?
A. Yes.
Q. This is the document that you reviewed in preparation for your deposition. Is that right?
A. Yes. I had a copy of this prior to

the deposition.
Q. Do you recall what the process was for the preparation of this document? Who participated?
A. Specifically, there are three people: Rosselli, Cavanagh, and Winnick. They are specifically listed for further information contact. They had the lead of putting together the response.
Q. Mr. Rosselli reported to you. Did either of the other two people report to you?
A. No, they did not.
Q. Did you participate in any discussions with either of the other two -- without talking to me about what you talked about with --
A. I'm sure I did.
Q. -- Mr. Winnick.
A. I'm sure we had resolution meetings when not only these people were present but others.
Q. What other people would be present during resolution meetings?
A. Oh, boy. Mike Lawrence. And then I -- the one that reports to Rosselli that had the



lead for that which you have in the organization chart listing responsibilities, the division director.
Q. Mr. Head?
A. Yes.
Q. Let me make sure my memory is right. Mr. Head, C.R. Head?
A. That's correct.
Q. And just describe for the record, if you would, how resolution meetings would come about.
A. They would review the comment that came in against the paragraph, and then the proposed response or resolution of that comment in the final rule.
Q. All right, sir. Were these regular meetings that were held at a particular time every week, or were they ad hoc, or how would they come about?
A. Basically they were ad hoc. There was not a time -- time to review that. When various sections were prepared, they were reviewed.
Q. Were the people involved ad hoc as well?



A. In some cases, yes. Like a Bennett would be involved on some issues and not on others.
Q. Were different contract issues assigned to different people?
A. I think they were referred to various people that fed back in to Head.
Q. What was the basis for the referral to a particular person?
A. The organizational responsibilities, as defined in the org chart.
I would like to add that there is not a date on that organization chart that you have showed me as --
Q. No, sir. There's not.
A. -- Exhibit 1. So I'm not sure just, you know, the date of when things happened and when people were on board.
I know that Bob Bauer, as a for instance, was not there during the early formation of the program. I brought him in from the Chicago office at a later point in time, but I don't remember that exact date.
But I do know that Mr. Head was there during this process, as was Rosselli,



Bennett, and Lawrence.
But I would -- I just -- I'm cautious as to did this person have that responsibility at the time we're talking about. I just don't have an organization chart with me for that date.
Q. I understand. Does the fact that Mr. Bauer is shown as Associate Director, Storage and Systems Development, indicate to you that this org chart was later in your tenure as acting director than earlier?
A. Yes. I do not believe that he was there in this process to the best of my recollection. I just have a problem being specific to that organization chart when it doesn't have a date.
Q. I understand. Let me ask you a question this way. Other than Mr. Bauer, are you confident that the other individuals listed on the first page of this org chart that's marked as Exhibit 1 to your deposition were there throughout your tenure as director?
A. Yes.
Q. And were they there in the jobs shown on the organizational chart?

what the life cycle cost of the system was?
A. No. It was not a consideration.
(Deposition Exhibit No. 5 marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, I've handed you a document marked Exhibit 5 to your deposition. And it's titled Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste, and it's dated July 1983. And it appears to be a United States Department of Energy document.
And it's -- At the top of it, it says Office of the Secretary of Nuclear Waste Policy Act Project Office. Was that your office before the name changed?
A. Yes.
Q. And in July of '83 you were acting director. Is that correct?
A. Yes.
Q. Do you recall having seen this document before?
A. I do not recall.
Q. Let me refer you to page 1 of the document. And first of all, take as long as you



want to. Don't let me rush you. Take as long as you want to to look at it. Tell me when you are ready for me to ask you a question.
A. Go ahead.
Q. All right. On page 1 of the document under Section 1, Introduction and Summary, 1.1 Background, the last sentence of the paragraph says, "This report evaluates whether collection of the fee will provide sufficient revenues to offset the costs of disposal of commercially generated spent nuclear fuel and solidified high-level radioactive waste produced from reprocessing such fuel."
Do you see that?
A. Yes.
Q. Was that one of the requirements of the Nuclear Waste Policy Act, that DOE evaluate the fee from time to time to see if it was sufficient to cover the costs of the program?
A. Yes.
Q. Let me get you to refer to page 9, which has Table 3-1, Key Reference Case Assumptions is its title.
(Conference between Mr. Blanton and Mr. Hirsch



out of the hearing of the reporter.)
BY MR. BLANTON:
Q. I skipped ahead of where I should have skipped. Let me get you to go back to page 8.
A. Page 8?
Q. Yes, sir.
A. All right.
Q. Under Reference Case and Assumptions, Section 3.1.
MR. BANES: You are not limited to reading just that if you need further context.
BY MR. BLANTON:
Q. Yeah. Read whatever you want to.
(Pause.)
A. Okay.
Q. The first paragraph on page 8 says, "The key assumptions used to estimate and project life-cycle program costs under the reference case are listed in Table 3-1."
And then the next paragraph -- Do you see that, that I just read?
A. Yes.



Q. And then the next -- the second paragraph under Section 3.2 on the same page says, "It is assumed that each of the two geologic repositories will begin receiving either spent fuel discharge or reprocessing waste in 1998 and 2002 respectively. Each repository has a design receipt rate of 3,000 metric tons a year, although a receiving rate of 1,800 metric tons annually is assumed for the first five years."
Do you see where I read that from?
A. Yes.
Q. The question is: What relevance do those assumptions have to the total life-cycle costs of the system?
MR. BANES: Objection. Vague.
A. I do not understand your question.
BY MR. BLANTON:
Q. Do you know what "reference case" refers to as used in this report?
MR. BANES: Objection. Lack of foundation.
A. I don't understand that question.
BY MR. BLANTON:
Q. All right. Let me ask you this

question, then. Do you know how the total life-cycle costs of the DOE waste management system were estimated for the purposes of determining whether the fee was adequate to cover them?

A. I don't know. I don't recall.

Q. Does it appear to you from reading this that the receipt rate, the projected receipt rate, was a factor in calculating or projecting that cost?

MR. BANES: Objection. Calls for speculation and lack of foundation.

A. I would conclude from reading this that that is the case.

BY MR. BLANTON:

Q. Do you ever recall being involved in a decision while you were director of the Nuclear Waste Policy Act Project Office or the Office of Civilian Radioactive Waste Management about what receipt rates should be included in any estimates of life-cycle costs?

A. I do not recall any specific discussions regarding what was to be used in this cost estimation. That's all I can say.

Q. All right. Do you have an



understanding as we sit here today of how the nuclear waste fee was supposed to work?

A. The fee of one mill per kilowatt was a number given to us by Congress and that we were required to forecast whether that was adequate or not.

The conclusion that I participated in was that it was adequate at the time I was there.

Q. Was that decision based on some estimate of the costs of the program that somebody presented?

A. It was primarily reviewed for our current and projected years, not through the life-cycle costs, from my standpoint. I was looking at the near-term requirements. That was my concern.

I was very bluntly told by Congress not to try to get any modification or change anything in the first year.

Q. Who told you that?

A. One of the Congressional staffers. If I changed anything or opened it up, it would -- they felt would substantially hurt the program because of the divergence of opinion as



to what was to be covered in the Act legally.

Q. Did the Act provide for adjustments both up and down in the fee?

A. In my mind, they did.

Q. What would cause a downward adjustment in the fee?

MR. BANES: Objection. Calls for speculation. Go ahead. It's also outside the scope of the schedule issues.

A. Yeah. When I look at this, I have reviewed exposition salt mines in Germany as to how they were excavated versus some of the tunneling in granite in Sweden and what we expected in the basalt excavations. And the prices were extremely wide.

If we went into a salt dome, I believe there may have been a reduction. I don't know. But it would cost less for the Government to open a salt repository than a basalt or tuff repository.

BY MR. BLANTON:

Q. Would the cost of operating the repository change with the quantity of fuel you received at it each year?

MR. BANES: Objection. Calls for



speculation.

A. In my opinion, you would have potentially, you know, to excavate and mine and deposit fuel in a salt mine, you could work several drifts at the same time. So it would not change the cost of the down- -- down-hole activities.

It would increase the elevator cycles. And as to whether, you know, you could handle that with the -- with one lift versus two, that was yet to be decided. And I think that the number of elements going in per day, I think you could handle it with one lift.

Q. How about such things as transportation costs and other operating costs as opposed to construction costs? Would those vary?

A. You would probably have to have --

MR. BANES: Objection. Relevance.

A. You would have to have a larger inventory of casks to move more fuel. But the actual expense of the transportation of that would be the same. In other words, after the initial investment of casks, that would be the

only difference in my mind.
BY MR. BLANTON:
Q. How about the amount of time that the repository stayed open before it was closed? Would that affect the life-cycle cost of it?
A. It's potential.
Q. Does that -- does the amount of time that the repository stayed open relate to the receipt rate?
A. Of course.
Q. How so?
A. Well, if you receive more -- You are going to -- you are limited by the number of metric tons you can have in the first and second repository. If you bring it in quicker, you can close it up quicker.
Q. Which would retire -- Excuse me.
A. That's obvious.
Q. And that, in turn, would affect the cost?
MR. BANES: Objection. Calls for speculation. Irrelevant.
A. It has the potential in my mind of affecting the cost. But that could be up or down.



BY MR. BLANTON:
Q. Is that the reason -- all of these issues we've been talking about, is that the reason a Reference Case Material Flows such as shown in Table 11 (sic) was included in this report, marked Exhibit 5?
MR. BANES: Objection. Lack of foundation. Calls for speculation.
A. Please repeat the question. I'm sorry.
BY MR. BLANTON:
Q. Is the effect of the receipt rate at the repository or in the system -- Strike that.
Is the effect of the receipt rate on cost of the system the reason a table such as 3-3 would be in your report on financing the disposal of commercial spent nuclear fuel?
MR. BANES: Same objection.
A. I think this was the case. I don't recall whether it has alternates or, in other words, sensitivity analysis whether this rate goes up or not. I don't know if that's in this report or not. I do not recall that.
BY MR. BLANTON:
Q. But would that be the reason it's in



the report, because receipt rate has an effect on cost?
MR. BANES: Objection. Lack of foundation.
A. This was a case based on these numbers. I don't know if there was sensitivity analysis made relative to whether those -- if the rate changed, what that would do to the cost.
This was a -- what I'm looking at right now is a one-case basis.
BY MR. BLANTON:
Q. What other reason would there be for including the Reference Case Material Flows table in this report, other than to make some assumptions about the cost of the system?
MR. BANES: Objection as to form. Lack of foundation.
A. This was an estimate of cost that reviewed the life-cycle costs under given conditions.
I did not focus on this report because of a preconception that I was not going to change the one mill per kilowatt rate during the first year.



BY MR. BLANTON:
Q. I think the question was, though: Is there any other reason, other than a projection of cost, for these numbers to be in the document?
A. That's the basis that they used for calculating the cost. I don't know if a sensitivity analysis was done relative to changing those numbers.
Q. All right, sir. Are you aware of whether in July of '83, when this report that's marked Exhibit 5 to your deposition was produced, whether there was within the Department of Energy any reference case other than the one shown in Table 3-3?
MR. BANES: Objection. Irrelevant.
A. I have no recollection.
BY MR. BLANTON:
Q. Was there any consideration in July of '83 within the Department of Energy regarding the acceptance of less than the amounts shown in Table 3-3?
MR. BANES: Objection. Asked and answered.

A. I have no recollection.
BY MR. BLANTON:
Q. Let me refer you back to Exhibit 4 now, which is the final rulemaking, and get you to look with me at the second page of that document. It's got page 16591 up in the upper right-hand corner.
A. Yes.
Q. In the second full paragraph in the far left-hand column, there's a paragraph that says, "A new second 'Whereas' clause relating to the responsibility of DOE to take title to SNF or HLW 'as expeditiously as practicable,' has been added to the following language of the Act." And then in a parenthetical it has a citation of the Nuclear Waste Policy Act.
Do you see that?
A. Yes.
Q. Do you recall any of the discussions that led to the inclusion of the second "Whereas" clause that that refers to?
A. This is what the mission plan was trying to do; in other words, get to the acceptance. That was a goal established. And this was part of that goal.



Q. Do you recall whether any of the commenters suggested inclusion of that clause?
A. In order for it to be changed, there would have to be a comment.
Q. Okay. So you --
A. I don't think there were any changes made that had not been commented on either in the written or the oral comment period.
Q. So if there is a change from the proposed contract to the standard contract, that tells us there was a comment on that change. Is that right?
A. That would be my assumption.
Q. DOE did not change anything just of its own volition?
A. Not to my knowledge.
(Deposition Exhibit No. 6 marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, the court reporter has handed you a document marked Exhibit 6 to your deposition, which is a letter dated March 4, 1983, from F. L. Clayton, Senior Vice President, Alabama Power Company, I presume to you, Robert Morgan, Project Director, Nuclear Waste Policy



Act.
A. Yes.
Q. Take your time, review that letter, and let me know when you're ready for me to ask you a question.
(Pause.)
A. All right.
Q. All right, sir. On the numbered page 8 of that letter --
A. Yes?
Q. -- there's a paragraph 7 that says Spent Fuel Receipt Rate at DOE Facility.
A. Yes, I've read that.
Q. Do you recall receiving comments -- either this comment or comments like it in the comment process on the contract?
A. There were many comments, as you know. And we collectively reviewed those comments.
And I can see from paragraph 7 that "as expeditiously as practicable" is in this paragraph. And that was -- and the contract was modified to make that statement.
Q. All right, sir.
A. I mean this is -- Never mind.



Q. Go ahead.
A. Never mind.
Q. You see the sentence in paragraph 7 that says, "In this regard, we would like to emphasize the importance of the annual receipt rate of the disposal facility being designed, to the extent practicable, to be commensurate with the levels of spent fuel being generated annually and the need to also reduce the backlog of spent fuel as expeditiously as possible."
A. Yes.
Q. "Consistent with Section 302(a)(5) of the Act, the contract should express the intent of DOE to take title to spent nuclear fuel as expeditiously as practicable upon request of the generator or owner."
Did the sentence that says "In this regard, we would like to emphasize the importance of the annual receipt rate of the disposal facility being designed, to the extent practicable, to be commensurate with the levels of spent nuclear fuel being generated annually and the need to also reduce the backlog of spent fuel as expeditiously as possible" -- was that the goal of DOE in implementing the

program?
MR. BANES: Objection. Vague.
A. That was basically in my statement of December which said we'd like to catch up with the generating rate in the 2001 period or that time frame.
BY MR. BLANTON:
Q. All right.
A. So that's -- The design of the facility is to accommodate that. It doesn't say when. We would like to have that -- the repository not only take the generating rate but, more than that, to get rid of the backlog. That was the intent of sizing the facility. And that hasn't changed.
Q. Let me get you to take a look at Defendant's Exhibit 4, again, and get you to refer to page 16598.
A. Yes.
Q. If you would just read to yourself the paragraph that says, "Similarly, seven commenters addressed the DOE performance standards . . . ."
(Pause.)
A. Yes.



Q. At the seventh line from the bottom of that paragraph, it says, "The 1998 date is called for in the Act, and we believe it to be a realistic date." Do you see that?
A. Yes.
Q. Was that a true statement at the time that the final contract was issued?
A. That's, again, what I testified in December, that it was an optimistic date but that we believed that we could meet it barring intervention and all the other uncertainties that the Act had.
Q. But at this particular time, DOE believed it was realistic?
A. Optimistically realistic.
Q. I don't see "optimistic" in the sentence. Do you?
MR. BANES: Objection. Argumentative.
A. That's in my statement of December 12.
BY MR. BLANTON:
Q. The next sentence says, "Our performance will be judged by meeting this date." Could you elaborate on that, what that



means?
A. Exactly what it says.
Q. What, in your view, was DOE's performance?
A. Meeting that date.
Q. By doing what?
A. Accepting spent fuel in 1998.
Q. What quantity of spent fuel in 1998 would have satisfied DOE's obligation as stated in that?
MR. BANES: Objection. Calls for a legal conclusion.
A. As I said in the December 12th, that if we accepted one spent fuel element in 1998, we would have met the requirements of the Act as specified, but we did not think that was the intent of the Act.
So the answer to the question, one spent fuel element.
BY MR. BLANTON:
Q. What did you think the intent of the Act was?
MR. BANES: Objection. Irrelevant. Calls for a legal conclusion.
A. I have no idea. That's drawing a



conclusion. I didn't participate in the preparation of that Act.
BY MR. BLANTON:
Q. Well, as the director of the program, was the intent of Congress a factor in what you did?
A. Absolutely.
Q. And what was your working definition of what the intent of Congress was as to the quantity of spent fuel that should be accepted?
MR. BANES: Objection. Calls for a legal conclusion. Irrelevant.
A. Yeah. I can only read intent as to what the words required in the Act, which required the acceptance in 1988 of -- or 1998 of spent fuel.
And as I said on the 12th, to meet that, those words, would be one spent fuel element. That was my comment then. It's the same.
BY MR. BLANTON:
Q. I don't want to argue with you about it, but you said in the next sentence that was not the intent of Congress. And my question is directed to what was your understanding what the

period.
BY MR. BLANTON:
Q. Do you think your strategy was consistent with the Act, though?
MR. BANES: Objection. Calls for a legal conclusion. Go ahead.
A. The Act specified that I accept spent fuel in 1998. Regarding that, yes, it was consistent with that.
BY MR. BLANTON:
Q. How about the goal of utilities not having to add storage facilities after 1998? Was that consistent with the Act?
A. I don't think it specifies that. The Act doesn't specify that.
Q. Did you think it was inconsistent with the Act?
A. I did not think it was inconsistent with the Act. But the Act didn't require it.
(Deposition Exhibit No. 7 marked for identification.)
BY MR. BLANTON:
Q. We've marked as Exhibit 7 to your deposition a memorandum dated April 8, 1983. It has as the subject, Action Memorandum, Final



Rulemaking on Standard Contract for Nuclear Waste Disposal, the second page of which has a signature line, Robert L. Morgan, Project Director, Nuclear Waste Policy Act Project Office.
Do you recognize that?
A. Yes, sir.
Q. Did you draft that memorandum?
A. I signed that memorandum.
Q. Did somebody draft it for you? Or do you know?
A. I don't recall.
Q. Attached to it are three tabs, Tab A, Tab B, Tab C, and Tab D. Do you see those?
A. Yes.
Q. Do you recall how those tabs would have been produced during the time that you were at the Department of Energy -- excuse me -- during the time that you were at the Nuclear Waste Project Office?
A. Do I recall how?
Q. How they -- the process for producing these descriptions of the contract.
MR. BANES: Objection. Compound.
A. The process is -- My recollection



would be that it came from Rosselli's office for my approval.
BY MR. BLANTON:
Q. Let me just back up and ask you: What was the purpose of this memorandum to the Secretary?
A. The purpose of this memorandum was to get approval from the Secretary in order to publish the final rulemaking. That's what I wanted.
Q. And the tabs, the purpose of the tabs are to describe the contract to the Secretary? Is that correct?
A. I think it really gives him background of what was happening in defining what was in the contract. Tab B covers those. Tab C is the time sequence of events in the process.
Q. What is Tab A? What is that intended to do?
A. That says Disposal Fund Contract.
Q. I guess my question is: What is the difference between Tab A and Tab B, which is Section by Section Contract Analysis?
A. Tab A is a summary. And then Tab B



is the section by section contract analysis. That's what it reads.
Q. Looking at Tab B, Section by Section Contract Analysis, there's a section that is titled Scope of the Contract. Do you see that?
A. Yes.
Q. The last sentence of that section says, "The contract services shall commence not later than January 31, 1998, and continue until disposal of all SNF and/or HLW accepted by DOE hereunder." Do you see where I just read?
A. Yes.
Q. Now, you told us a minute ago what you thought "disposal services" meant. Does "contract services" mean the same thing to you as used in that contract? Does "contract services" mean acceptance of spent fuel from utilities?
A. Yes.
Q. What does the phrase "continue until disposal of all SNF and/or HLW accepted by DOE hereunder" mean? What does that mean?
A. That this continues until all the spent fuel is removed from the commercial reactors and from DOE, high-level waste.
Q. Does that mean that DOE would not

have any knowledge or thought at the time what would cause you not to approve it?
A. No. We had no idea.
Q. Does this indicate that Secretary Hodel approved the publication of the standard contract?
MR. BANES: Objection.
A. I beg your pardon?
BY MR. BLANTON:
Q. Does it indicate that Secretary Hodel approved the publication of the standard contract as a final rule?
A. Of course. That's the approval signature on page 2 of my memorandum. I asked him to approve it, and he did.
Q. Did you have any conversation with him about it, or did you just send this memorandum to him and he approved it?
A. I don't recall. But I had several conversations with the Secretary, and I think this is one significant enough that I would have. But I don't specifically recall it. I'm sorry.
Q. Now, Tab D lists eight policy issues that were addressed. Is that all the policy



issues that were addressed during the comment period?
A. These are the ones that we considered significant that the Secretary should be aware of.
Q. Do you recall any insignificant ones? Anytime you say "significant" to a lawyer, you are going to get asked what's insignificant.
A. Well, I think there was one relative to the last item we covered from Alabama, was it not? "As expeditiously as practicable," that was a change that was made, and I don't see that referenced here. I think that's an example of what I would consider insignificant.
Q. Why did you consider that insignificant?
A. Because it wasn't -- I don't believe that the Secretary wants to see everything. And those things that are important I should call to his attention. That's what I've done in this memorandum.
Q. How did you determine, though, what was insignificant and what wasn't?
A. Policy issues. That's what I have



in here. Policy issues. "As expeditiously as practicable" is not a policy issue in my humble opinion.
Q. You are going to have to help me with that one. Why? Why is that not a policy issue?
A. Because it's a given in my mind. We're going to do it as fast as we can in any event. And he was aware of that.
Q. Is the fact that it conformed the contract to the language of the Act a factor in whether it was significant or insignificant?
A. Wait a minute. Excuse me. Everything is consistent with the Act. Everything in here is consistent with the Act or it wouldn't -- wouldn't have gone out of the final rulemaking. We wouldn't put anything in the rulemaking that was inconsistent with it in our opinion.
Q. Okay. Does that go for the mission plan, too? Would you put anything in the mission plan that you thought was inconsistent with the Act?
A. No.
Q. Would you put anything in the



mission plan that you thought was inconsistent with the contract?
A. In the mission plan we established rates. In the contract -- rates of acceptance. In the contract we did not.
Q. But in your view, were the rates in the mission plan inconsistent with the contract?
MR. BANES: Objection. Calls for a legal conclusion.
BY MR. BLANTON:
Q. Let me rephrase my question.
MR. BANES: Also, I'd point out this line of questioning has already been asked and answered.
BY MR. BLANTON:
Q. Were the rates in the mission plan the way DOE intended to perform its obligations under the contract?
MR. BANES: Objection. Vague as to time.
BY MR. BLANTON:
Q. At the time you were there.
A. The mission plan was a plan; the contract was a contract. They were both consistent with the Nuclear Waste Policy Act.

Q. Were the obligations of DOE under the contract a factor in the development of the mission plan?
A. Could you rephrase that question?
Q. Well, when you developed the mission plan --
A. Yes.
Q. -- was the performance of the contract what you were trying to accomplish through the mission plan?
A. You are trying desperately to get me to say that we had an obligation under the contract to accept fuel at a given rate. We did not.
And what's in the mission plan is not what's in the contract. We set the mission plan as an ideal goal that we wanted to meet. Okay?
Q. Did you understand that the utilities also wanted you to meet that goal?
A. Oh, yes.
MR. BANES: Objection. Argumentative.
BY MR. BLANTON:
Q. Did you understand that at the time



the contracts were signed?
MR. BANES: Objection. Irrelevant.
A. We had those comments from the utilities and chose not to accept and put in the contract a given rate. That was a -- that was a clear understanding on our part -- on my part.
BY MR. BLANTON:
Q. Well, then what was the objective of the mission plan? If it wasn't to perform the contract, what was the objective?
A. It was our goals that we were trying to reach in conformance with the Nuclear Waste Policy Act.
Q. Mr. Morgan, I've lost may place. I'll be with you in a minute. Let's go back to Exhibit 4, which is my Tab 2. Let me refer you to page 16591.
A. Right.
Q. In the middle column there is a paragraph that says, "The definition of 'DOE facility'" --
A. Yes.
Q. -- "was expanded to expressly state, in accordance with the Act, that there may be an



interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository. "
A. Yes.
Q. Would that definition have included a monitored retrievable storage facility?
A. Yes.
Q. What was the purpose of expanding the definition of DOE facility? I understand what that says, but what goal were you trying to reach by expanding the term?
A. It's saying that in order to comply with the Act we may have to operate a monitored retrievable storage facility to meet the '98 date.
Q. Might it also have been possible to use a, quote, DOE facility to accept fuel before the 1998 date?
MR. BANES: Objection. Calls for a legal conclusion and speculation.
A. I don't think it limited that we couldn't accept it before. But it certainly said we wanted to accept it by January 31st, 1998. So that could be before.
BY MR. BLANTON:



Q. Was there any -- At the time you were director of the program, was there any distinction between a monitored retrievable storage facility and a repository in terms of how much fuel DOE could accept in a given year?
MR. BANES: Objection. Calls for a legal conclusion.
A. I -- I have no recollection of -- you know, it was -- In my mind, the monitored retrievable storage was the fall-back position on a repository. In other words, if you couldn't get the repository done, then you had the capability of having monitored retrievable storage to accept fuel.
BY MR. BLANTON:
Q. Going further down that page under Article II, Scope, there's a sentence that says, "This clause was amended to more closely reflect the statutory language found in Section 302(a)(1) of the Act, as well as the fact that the services to be provided would occur in the future."
What I'd like for you to do is refer to Article II of the contract -- and I suppose you are going to need to compare that to Article

repository.
BY MR. BLANTON:
Q. The provision of the proposed rule you just referred to a minute ago under Article II, Scope, on page 5459 of Defendant's -- excuse me -- of Plaintiffs' Exhibit 3 says, "In exchange for these services, Purchasers will pay fees established in the contract."
My question is: At the time you were director of the program, did you view the fees being paid by the utilities as being in exchange for the services being provided under the contract?
A. Yes.
Q. And what were the services that the utilities were paying for?
MR. BANES: Objection. Asked and answered. Calls for a legal conclusion.
A. The scope -- the scope says we will accept spent fuel for -- from the commercial reactors and put it in the repository. And it would be on a full cost recovery basis. And if it cost more than the 1 mill per kilowatt, we would have to adjust the fees.
BY MR. BLANTON:



Q. What did the utilities get?
MR. BANES: Objection. Asked and answered.
A. Disposal of commercial spent fuel.
BY MR. BLANTON:
Q. When?
A. Beg your pardon?
Q. When?
MR. BANES: Objection.
A. Beginning January 31st, 1998.
THE WITNESS: Excuse me.
MR. BANES: Sorry.
BY MR. BLANTON:
Q. And continuing as expeditiously as possible?
MR. BANES: Objection. Misleading. Calls for a legal conclusion.
A. I think that that is stated in the contract, "as expeditiously as possible." I recall that was someplace.
BY MR. BLANTON:
Q. All right, sir. Let me get you to look at the next page of the final rule and the standard contract. I guess it's your Exhibit 4.
A. Right. Page?



Q. 16592.
A. 16592.
Q. Up there in the upper left-hand corner.
A. Okay.
Q. Down at the next-to-the-last paragraph on the far left-hand column, it says, "In addition, at the request of a substantial number of commenters, a new provision has been added as subparagraph IV.B.5(b), which states that DOE will issue 'an annual report for planning purposes . . . setting forth the projected annual receiving capacity for the DOE facility.'" Do you see that?
A. Yes.
Q. Why was a report like that not in the proposed rule? Do you know?
A. This was added, it says, at the request of a substantial number of commenters as a new provision. In other words, this was -- this was in response to comments we had received.
We could not commit to a rate in the contract, but we would establish an annual report for planning purposes so that people



would know what to plan on.
Q. Okay.
A. The utilities would know what to plan on.
Q. Is this the Annual Capacity Report? Is that what that ended up being called?
A. Yes. Yes.
Q. Was that document included in the contract for any purpose other than planning?
A. No.
Q. In the discussions about whether to include that provision in the contract dealing with the Annual Capacity Report, was there any discussion within your office about whether that report was necessary other than because the utilities asked for it?
MR. BANES: Objection as to form. Vague.
A. There were discussions, as I recall, that in the response to the commenters we felt that they should have as much notice as possible as to when we knew what we would accept and when, for their planning purposes, so they knew what they had to provide for on-site storage.
In other words, this is a heads-up

document to where they can properly plan their activities until we get the repository going. That was the whole intent of this change, as I recall.

Q. All right, sir. Staying on that same page, there is a -- down at the bottom there's a reference to the lack of definition of the term "emergency delivery." Do you see that?

A. Yes, I see that.

Q. And then the next sentence after that says, "One situation which would receive consideration is one in which a delivery is needed to permit licensed reactor operations to continue." Do you see that?

A. Yes.

Q. What was the basis for DOE's thinking about why that particular situation would satisfy the emergency -- might satisfy the emergency delivery definition?

MR. BANES: Objection. Calls for speculation.

BY MR. BLANTON:

Q. Well, to the extent you know.

A. Well, I think that -- You know, I don't recall specific discussions on this, but



sitting here today, it makes sense that we wanted to keep reactors operating and that that would be considered an emergency situation.

In other words, if they had to discharge fuel from a core and they didn't have a full core reserve, that we would maybe accept fuel from -- as an emergency basis from that reactor so they could continue with a full core reserve capacity.

It makes sense to me sitting here today.

BY MR. BLANTON:

Q. Was an emergency delivery an exception to the normal priority --

A. Yes.

Q. -- rights under the contract?

A. Yes.

Q. Was keeping reactors from having to shut down because of lack of storage space for spent fuel a purpose of the contract -- of the whole contract?

MR. BANES: Objection. Calls for a legal conclusion.

A. I don't think anywhere in the Nuclear Waste Policy Act is there any statement



regarding continued operation of commercial reactors.

BY MR. BLANTON:

Q. My question was: Was that a purpose of the contract? Was that one of your purposes as director of DOE Office of --

A. As I recall, the purpose of the contract was to comply with the Nuclear Waste Policy Act.

Q. Would treating situations in which a delivery is needed to permit licensed reactor operations to continue a purpose of the Nuclear Waste Policy Act?

MR. BANES: Objection. Asked and answered. Don't answer that.

MR. BLANTON (to the Reporter): Would you index for me the questions that didn't get answered?

MR. BANES: That question has already been answered. I've been very, very lenient on that, but I'm not going to be lenient on it anymore. We have a limited amount of time here.

Let's take a break.

MR. BLANTON: Okay.



(A recess was taken.)

BY MR. BLANTON:

Q. Mr. Morgan, during your tenure as director -- or acting director of the Nuclear Waste Project Office, was there consideration of amending the standard contract to include a waste acceptance schedule?

A. No. I do not recall it. There were discussions on that because of the requests and the comments we'd received.

Q. Were you involved -- Let me just show you this letter, the Hodel letter from Senator Johnston.

(Deposition Exhibit No. 8 marked for identification.)

BY MR. BLANTON:

Q. Mr. Morgan, I have marked as Exhibit 8 to your deposition a letter dated September 7, 1984, from Donald Paul Hodel to J. Bennett Johnston.

And my question is: Do you recall having been involved in an exchange of letters from Johnston and Secretary Hodel relating to the Nuclear Waste Policy Act?

A. This is dated after I had left, so I

A. I have no recollection.
BY MR. BLANTON:
Q. Are you aware of any analysis by DOE of the cost of storing fuel at the reactor site if the repository was delayed?
MR. BANES: Objection. Irrelevant. Beyond the schedule issues.
A. I don't recall.
BY MR. BLANTON:
Q. Do you recall what stage the mission plan was in at the time you left?
A. I believe it was in draft.
Q. There are several drafts. Do you remember which draft was being worked on?
A. I have no idea.
Q. I'm going to show one to you.
(Deposition Exhibit Nos. 9 and 10 marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, we've handed you a document marked Exhibit 9, which is a cover letter dated December 20, 1983, to Russell Stanford, who is identified as the Program Manager, Utility Nuclear Waste Management Group,



and signed by you.
And it says it's enclosing the draft -- most recent working draft of the mission plan that's being prepared. And it's dated December 20, 1983.
And then Exhibit 10 is a document titled Civilian Radioactive Waste Management Program Mission Plan, Volume One, Overview and Program Plans, also dated December 20, 1983.
Do you see those?
A. Yes.
Q. Was this cover letter the cover letter for this version of the mission plan, as far as you can tell?
A. Yes. As far as I can tell.
Q. Was this, this 1983 draft, was it the first draft of the mission plan that you are aware of? Or was there one previous to this?
A. I just don't know.
Q. Okay.
A. I believe this is the first one that was disseminated outside of DOE. Whether there were earlier drafts -- I assume there may have been, but not distributed. You understand what I'm saying?



Q. There might have been working drafts of this document, but this is the first one circulated to the public?
A. That's my feeling regarding it.
Q. What was your involvement in the production of this document?
A. Review. My responsibility to send it out, so I have to accept what's in it.
Q. I think you mentioned earlier in your deposition who all was involved in preparation of the mission plan. Would that have applied to this document?
A. Yes.
Q. Was there any approval authority above you for the mission plan? Did the Secretary have to approve it?
A. No. I think I advised him that I was sending it out as a matter of information. He did not review it.
Q. Did you advise him of -- in general of the contents of it, what was said?
A. I don't believe I did.
Q. What is meant by "firm schedule" in the third paragraph of page 1-1?
A. That would be an acceptance



schedule.
Q. Do you recall who within your office would have been responsible for writing the introduction to this?
A. I have no idea. Probably Head. Head probably.
Q. Mr. Head, the division director?
A. Yes. He's the one that was responsible for putting it together. And he is referenced on page 2 of my cover letter.
Q. The second paragraph or -- Excuse me. Go to page 2-1. Beg your pardon. Page 2-1.
A. Yes.
Q. If it helps, it's -45172 of the stamped number.
A. Got it.
Q. The second paragraph of that Program Strategy says, "The Department does not intend to delay or postpone the acceptance of civilian radioactive wastes even if a permanent geologic repository is not completed by January 1998."
What went into that decision?
A. The MRS.
Q. Is there a difference in the term "delay" or "postpone" in that sentence? Do

those mean the same thing, or do they mean different things, "delay" and "postpone"?
A. My answer to that would only be speculation. I'm sorry.
Q. Was that an accurate statement of what the Department's intention was?
MR. BANES: Objection. Vague as to time.
BY MR. BLANTON:
Q. At the time you were there.
A. We had an MRS program while I was there. And we would accept fuel in the MRS program by January 19 -- or January 31st, 1998, if we didn't have a repository. That was our plan. That was our goal.
Q. Take a look at Table II-1, Waste Acceptance Schedule.
A. Yes.
Q. Do you recall who developed that schedule?
A. No, I don't. I think this is the same schedule we talked about before.
Q. In the financing document?
A. Yes.
Q. Did you approve that schedule going



into the mission plan?
A. Yes.
Q. Do you recall having any conversations with anybody about it?
A. I'm sure we had discussions about it, but I can't recall any because this was one of the things we put in there based, you know, on the financial thing and the goal of the mission plan.
Q. Was there any discussion about whether this schedule or a different one should go into the mission plan, that you recall?
A. We had several discussions on what to put in the mission plan. And I don't recall, you know, other numbers. But there were discussions regarding this type of table.
Q. Referring back to this page 2-1, which is stamped SN045172 --
A. Right.
Q. -- the last sentence of that document -- of that page says, "Until 1998, each utility will be responsible for providing its own additional on-site interim storage, unless the utility applies for and is certified for the Federal Interim Storage Program." Do you see



that?
A. Yes.
Q. Is there an Interim Storage Program provided for in the Nuclear Waste Policy Act?
A. I don't recall.
Q. Was it your understanding that after 1998 utilities were not responsible for providing their own additional on-site interim storage?
MR. BANES: Objection. Calls for a legal conclusion.
A. Discussions were that until we took possession of the fuel FOB at the reactors, that they were responsible for storage on site.
BY MR. BLANTON:
Q. Did you understand that was to occur in 1998?
MR. BANES: Objection. Asked and answered.
A. We discussed earlier that -- in my discussion, the presentation in December, that it would be about 2001 when we would match that rate.
We go back to this discussion of they did not have to order new things in '98,



but they would -- we would not match the discharge rate until 2000, 2001.
So there is an inference, clearly, that they may have commitments and there would be delivery of reactor storage in 2000, 2001 that had been ordered in '98, the same issue we talked about earlier.
Q. Right. What I'm trying to understand is what this last sentence of this page means, then.
A. Again, this is the mission plan. And what we were trying to do, our goal, was to accept fuel from the reactors in 1998, and by 2001 we would match the discharge rate. That's what the goal was.
Q. Did you approve this sentence that says, "Until 1998, each utility will be responsible for providing its own additional on-site interim storage"?
A. I approved the document -- as a planning document.
Q. Let me get you to look at page 2-2. And really, from the bottom of that page and the paragraph that starts, "While the Department's acceptance rate in the initial five

connection with the program with them?
A. That's correct.
Q. Were you involved in any way, shape, or form with the amendments to the Nuclear Waste Policy Act in 1987?
A. No. No.
Q. Didn't even know what they were?
A. I didn't know what they were until it happened. I had no foreknowledge.
Q. In your job as Assistant Secretary for Defense Programs, were you a potential customer of DOE -- of the Civilian Radioactive Waste Program?
A. Yes.
Q. After the '87 amendments?
A. I was a potential customer while I was Acting Assistant Secretary to Defense Programs because of the fact that the repository may take defense waste fuel. That was in the Act.
Q. Right.
A. And that's covered in the draft mission plan.
Q. You looked like you were taking a breath and about to say something else.



A. I have nothing further to say.
Being a potential customer, then there was a question of what -- of fees that they were going to charge me as -- for defense programs. And I deferred any discussion of those fees while I was Acting Assistant Secretary.
Q. You deferred because of?
A. I didn't want to pay any fees.
Q. Okay. Not because of some conflict of interest or anything?
A. No.
Q. You just didn't talk about it.
A. It would take funds away from the Office of Defense Programs.
Q. What was the mechanism for the program to collect fees from your organization?
A. There wasn't. And I don't believe there is now. I have no knowledge.
Q. Do you recall when you -- during the time you were manager of Defense Programs, doing any analysis or having an analysis done of when or at what rate you could expect defense waste to be removed?
A. We purposely, while I was --



MR. BANES: Objection. Irrelevant. Go ahead.
A. Let me just say this. We were authorized for the defense waste processing facility at Savannah River, and we were making interim storage facilities to handle the defense waste after it was reprocessed. And we designed modular interim storage facilities to take care of all of the defense waste.
In other words, we were planning on-site storage until these things were resolved. In other words, we were ahead of the system in interim storage of our own fuel.
BY MR. BLANTON:
Q. Mr. Morgan, as we sit here today, do you have any knowledge of how the delivery commitment schedule was supposed to work under the standard contract?
A. I understand, you know, that they were going to issue the, what do you call it, the acceptance -- annual acceptance report. Other than saying that that was the way it was going to happen, but had not happened while I was there.
Q. Was there any process under way to



help define how the DCS process would work while you were there?
A. After approval, as I recall, it was planned -- I recall -- it was planned that when the site selection was approved, then we'd have a firm schedule and would then present an acceptance schedule.
Q. When you say site selection, you are referring to --
A. Of the repository.
Q. -- the repository site?
A. Or approval of an MRS construction.
Q. Why was the repository site selection -- or the site selection a key to that?
A. Well, the site selection and approval then allows you a firm date in order to -- then it's a schedule that you know. In other words, I would not want to make any commitment on acceptance until there was a date that you could accept fuel on a known basis either in an MRS or a repository.
Q. So do I understand you to be saying that without a firm date, there wasn't any reason to send in or for DOE to look at, a

delivery commitment schedule?
A. That's correct.
MR. BANES: Objection. Calls for a legal conclusion.
BY MR. BLANTON:
Q. Go ahead, sir. Would you say that's correct?
A. Until we had a schedule that I knew that we could meet, I was not going to commit to an acceptance schedule. That was my position that prevailed at the time that I was there.
Q. My question is about the delivery commitment schedule. Would your answer be the same about a delivery commitment schedule?
BY MR. BLANTON:
A. The delivery or acceptance schedule is the same in my opinion.
MR. BLANTON: Why don't we take a short break.
(A recess was taken.)

E X A M I N A T I O N

BY MR. BANES:
Q. Mr. Morgan, earlier you stated that in your position as head of the Office of



Civilian Radioactive Waste Management, you believed that your job was to implement the Nuclear Waste Policy Act as written. Is that correct?
A. That's correct.
Q. If you could turn to Exhibit 2 for a minute, sir, earlier when you were discussing with Mr. Blanton the -- let's see -- on the second column in the paragraph that starts "I would like to talk a little bit about the strategy as laid out in the mission plan," does this paragraph discuss -- is this paragraph focused on the mission plan?
MR. BLANTON: Object to leading.
A. Yes.
BY MR. BANES:
Q. Now, in the third sentence it says, "Technically, the Act does not specify how much waste or spent fuel we must be receiving at that time," referencing back to January 1st, 1998. And then it says, "In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act."
That was your understanding of what the words of the Act itself required?



A. Yes.
Q. All right. Now, with respect to -- you used the words "goals" and "strategy" several times when you were discussing the remainder of that paragraph, including what -- the rate that's discussed in there. Do you see that part?
A. Yes.
Q. Now -- Let's see. Did you believe that the Nuclear Waste Policy Act obligated the Department of Energy to any particular rate of acceptance?
A. No.
MR. BLANTON: Object. Document speaks for itself.
BY MR. BANES:
Q. Did you believe that -- Was it your intent in the mission plan to obligate the Department of Energy to any particular rate of acceptance?
A. No.
MR. BLANTON: Object.
BY MR. BANES:
Q. And did the Department of Energy obligate itself to any particular rate of



acceptance in the standard contract?
A. No.
MR. BLANTON: Object. The document speaks for itself.
BY MR. BANES:
Q. To your knowledge, did the standard contract contain the mechanism for establishing a rate of spent fuel acceptance at a later time?
MR. HIRSCH: Objection. Leading.
A. That's my understanding.
BY MR. BANES:
Q. All right. Now, on Exhibit 2, again, sir, you used the phrase "intent of the Act" there. But is it fair to say that in your discussions with members of Congress and staffers that there was not unanimity about what the intent of the Nuclear Waste Policy Act was beyond its wording?
MR. BLANTON: Objection. Leading.
MR. HIRSCH: Objection. Leading.
A. That's correct.
MR. BANES: I think Mr. Blanton objects during this time.
MR. HIRSCH: That's fine. Happy

to have him object.
MR. BLANTON: Mr. Hirsch has my proxy.
BY MR. BANES:
Q. One final question, Mr. Morgan. Have you purported to speak on behalf of Congress today?
A. No, I have not.
MR. BANES: Thank you, sir. I have no further questions.
MR. BLANTON: Now do I get to do rebuttal? Is anybody familiar enough with the procedures in this room?
MR. OEHLER: Yeah.
MR. MILLER: I've got it if you want to look at it.
MR. BLANTON: If you all don't have any objection to me asking one or two, I'll just do it.

FURTHER EXAMINATION

BY MR. BLANTON:
Q. Mr. Morgan, are you aware of anything in the Nuclear Waste Policy Act that says anything about DOE accepting one spent fuel



assembly in 1998?
A. No.
Q. Was there anything that DOE was doing or that your office was doing subsequent to the enactment of the Act that had as its goal accepting one spent nuclear fuel assembly and no more in January of 1998?
A. No.
Q. Did you believe that accepting one spent nuclear fuel assembly would accomplish what Congress intended in enacting the Act?
MR. BANES: Objection. Lack of foundation. Calls for a legal conclusion.
A. I have no idea what the intent of Congress was regarding the rate of acceptance. When I read the Nuclear Waste Policy Act, the words specified accept spent fuel on January 31st, 1998. One could construe that one fuel element would meet that requirement.
BY MR. BLANTON:
Q. Is the statement in Exhibit 2 in your Program Overview, was that statement that ". . . we did not believe that that" -- referring to accepting one spent fuel element -- "meets the intent of the Act" -- was that



statement a true statement at the time you made it?
A. There was clearly a divergence of opinion in dealing with no conference report on that act. And I would get varying answers.
And clearly there was no rate requirement other than to accept fuel in 1998. It didn't say one, two, three, or four.
And in my interpretation -- When I said the intent, I should have said the intent of some members in Congress. Okay? Do you understand what I'm saying?
Q. My question is: What was your belief about the intent of Congress at the time you stated in this Proceedings of the 1983 Radioactive Waste Management Information meeting that acceptance of one spent fuel element in 1998 would not meet the intent of the Act?
Was that your belief at the time?
MR. BANES: Objection. Asked and answered.
A. Repeat the question.
BY MR. BLANTON:
Q. Let me rephrase it. As director of the Office of Nuclear Waste Policy Act



Programs --
A. Whatever.
Q. -- whatever it was, was it your interpretation of the Act, of the intent of the Act, that acceptance of one spent fuel assembly would not meet the intent of the Act?
A. I interpreted the Act that accepting one would meet the written word of the Act. I did not believe that that was the full intent of Congress.
MR. BLANTON: Thank you, sir. Now I guess it ping-pongs back to you now.
MR. BANES: I don't have any further questions.
MR. MILLER: Paragraph A in the procedures, it provides for direct, cross, direct, cross,

EXAMINATION

BY MR. HIRSCH:
Q. Mr. Morgan, my name is Norm Hirsch. I'm a lawyer for Commonwealth Edison Company, which is a plaintiff in these cases.
Let me ask you, just off the bat, during the time that you had responsibility for

BY MR. HIRSCH:
Q. You're not sure?
A. No. I'm making an assumption.
Q. You know that this paper, Exhibit 12, was submitted to the Department of Energy. Correct?
A. I don't know that, but I assume that it was.
Q. That's fine.
A. I'm sorry.
Q. After you submitted the paper, did you receive any follow-up or feedback in terms of additional work?
MR. BANES: Objection. Irrelevant. Beyond the scope of the schedule issues.
A. I don't recall. Okay. If you look at page -0962, "The Administration submitted such legislation in February" --
BY MR. HIRSCH:
Q. I'm sorry. Where are you looking?
A. Under Legislative Status, fifth line down: "The Administration submitted such legislation in February 1979" -- da-da, da-da -- and then talks about the Senate bill and the



96th Congress. So definitely it was after '79. Right? One could make that assumption. I'm trying to put a date on this.
Q. I appreciate that. Based on that reference, it looks like this document, Exhibit 12, was submitted sometime after February 1979.
A. That's correct. And I don't know how it was used, if at all.
(Deposition Exhibit No. 13 marked for identification.)
BY MR. HIRSCH:
Q. Mr. Morgan, I've handed you what's been marked as Morgan Deposition 13 which is a United States Department of Energy memorandum dated January 28th, 1983. It's got Bates label EDB-003-0855 through -0856.
Is this a memo that you sent out as the Project Director to all Nuclear Waste Policy Act Project Office personnel?
A. Can I read it first?
Q. Please do.
(Pause.)
A. What's the question?
(The question appearing on page 194, lines 17 - 19, was read as follows:



QUESTION: Is this a memo that you sent out as the Project Director to all Nuclear Waste Policy Act Project Office personnel?)
A. Yes. Yes.
BY MR. HIRSCH:
Q. And would that have been basically everybody who was working in the project office?
A. In looking at the date and the time, it appears that I arrived on or close or about the 28th of January, because this is the basic organizational letter establishing this Nuclear Waste Project Office under the Secretary and the transfer of people from Shelby Brewer to the Nuclear Waste Policy Act office.
Q. So this memo, Exhibit 13, was something that you sent out after you assumed your position as the project director?
A. Probably the day that I assumed. This would be initial agreement with the Secretary that I would be able to select from the existing organization within Shelby Brewer's organization those that I wanted working for me in the Nuclear Waste Policy Act Office.
I did not accept all the people that



were in that organization at the time.
Q. I think you referred to this earlier. When you were asked to be the head of this program office --
A. Yes.
Q. -- you said that you went and talked to people about the organization of the office. Do you recall that?
A. Yes.
Q. Is it fair to say that one of the things or -- Strike that.
Did you talk to Secretary Hodel about the organization of the office?
A. I talked to Earl Geldea, who was Special Assistant or -- I'd say Special Assistant to the Secretary. And he is the one that I discussed conditions that I would like to have before the Secretary announced it on the following Monday.
Q. I take it that one of the conditions that you requested was that you got to pick the people who you wanted in the office who previously worked --
A. Yes.
Q. -- under the Assistant Secretary.

Is that correct?
A. Yes. And that the office would be removed from -- out from under Shelby Brewer.
Q. So let me restate that. So another condition that you requested and that was accepted was that your office would be removed out from under Mr. Brewer and would be a direct report to Secretary Hodel. Is that correct?
A. That's correct.
Q. And is it fair to characterize Exhibit 13 as what amounted to marching orders to the people in your new project office?
A. Basically, yes.
Q. Do you see in the last line of the memo on page 2 you say, "I solicit your full support and cooperation so that the major national objectives of the Nuclear Waste Policy Act of 1982 can be implemented effectively and on time"?
What did you consider the major national objectives of the Nuclear Waste Policy Act to be?
A. To accept the nuclear fuel from commercial reactors, to eliminate the problem of any regulatory shutdown.



Q. Well, when you say an objective was to accept commercial -- spent nuclear fuel from commercial nuclear reactors, was the objective to begin that waste acceptance from utilities in January 1998 as provided in the Nuclear Waste Policy Act?
A. Yes.
MR. BANES: Objection. Calls for a legal conclusion. Asked and answered.
BY MR. HIRSCH:
Q. You answered my question yes?
A. Yes.
Q. You also mentioned a major objective as eliminating regulatory shutdowns.
A. Yeah.
Q. What do you mean by "regulatory shutdown"?
A. When people ran out of full core reserve, they wouldn't be licensed.
Q. So we're all on the same page, can you explain what you mean by "full core reserve"?
MR. BANES: Asked and answered.
A. My understanding of full core reserve is that the reactor basins could accept



a full core unloading from the reactor core into the storage area. That's my understanding of full core reserve.
(Deposition Exhibit No. 14 marked for identification.)
BY MR. HIRSCH:
Q. Mr. Morgan, I've handed you what's been marked as Morgan Deposition Exhibit 14. It's a document titled Testimony of Robert L. Morgan, Project Director, Nuclear Waste Policy Act Project Office, U.S. Department of Energy, before the Subcommittee on Energy and Water Development, Senate Committee on Appropriation, March 1st, 1983. And it contains Bates labels EDB-002-0324 through -0345.
Do you recognize Morgan Deposition Exhibit 14 as written testimony you provided to the Senate Committee on Appropriation -- excuse me -- before the Subcommittee on Energy and Water Development of the Senate Committee on Appropriation on March 1st, 1983?
A. Yes.
Q. Did you prepare this testimony?
A. I outlined it. It was prepared. I reviewed it. I modified it, and then submitted



it.
Q. Do you know who prepared the draft after they got your outline?
A. No. But I'll say that it was reviewed by all the senior staff.
Q. When you say "the senior staff," you mean the direct reports on the organizational chart that we looked at earlier. Is that correct?
A. Yes. That's correct.
Q. Do you know if Secretary Hodel would have looked or did look at this testimony?
A. There is a process by which all written testimony is reviewed within the Department prior to submittal to Congress. I don't know if Secretary Hodel actually reviewed this or not.
These are submitted, in my recollection, to the Office of Congressional Affairs. And they do the vetting, if you will, or they send it to who they believe should see it.
Q. You see on page -- starting on page 4 or page -0329 at the bottom there's a discussion that begins, "Regarding the Nuclear

Waste Policy Act of 1982"?
A. Yes.
Q. And then you see at the bottom of page -0330, that's page 5 of the testimony, there's a bulleted statement that reads, "In return for payment of fees, DOE will dispose of nuclear waste beginning no later than January 1998." Do you see that?
A. Yes.
Q. At the time that you submitted this testimony to Congress, was that statement a correct reflection of what you believed the Nuclear Waste Policy Act required?
A. Yes.
MR. BANES: Objection. Asked and answered.
(Deposition Exhibit Nos. 15 and 16 marked for identification.)
BY MR. HIRSCH:
Q. Mr. Morgan, I've handed you what's been marked as Morgan Deposition 15, which is a letter dated May 20th, 1983, to you from John Kearney, Senior Vice President of Edison Electric Institute.



A. Yes.
Q. Do you recall seeing this letter at or about the time it was sent?
A. I don't recall, but I'm sure I did because I responded to it.
Q. All right. Did you know Mr. Kearney?
A. Not personally.
Q. Had you had any discussions with Mr. Kearney regarding the standard contract before you got this letter?
A. I don't recall.
Q. All right. Well, let's look at your response. Morgan Deposition Exhibit 16 is a letter dated June 17th, 1983, to Mr. Kearney from yourself. It's got the Bates label ZAB-001-1462.
A. Yes.
Q. Exhibit 16 is your letter in response to Mr. Kearney's letter, which is Exhibit 15. Is that correct?
A. Yes.
Q. Did you prepare the letter, or did someone prepare it for you?
A. I don't know if I outlined this one.



But most letters were prepared for me, and I reviewed and signed. I accept fully what's in the letter as my position.
Q. You see there's a reference in the second paragraph of your letter to the issues raised in Mr. Kearney's letter including the lack of standards for the Department of Energy's performance. You see that reference?
A. Yes.
Q. And then you say, I believe in the next full sentence, "We believe that we adequately addressed all the industry concerns in the rule at that time."
What did you mean by "adequately addressed" the industry's concerns in the rule?
A. We considered every comment and addressed those comments as to whether we accepted or rejected the comments. And that, to me, means adequately addressed.
Q. The next paragraph down you say, at the beginning, "Recognizing the stringent time constraints the Act has imposed on the Department, we clearly cannot reexamine any issue of concern to the utilities prior to the June 30th, 1983 deadline."



A. Yes.
MR. BANES: Objection. Misleading.
MR. HIRSCH: All right. Well, I don't want to be misleading. Let me restate the question.
BY MR. HIRSCH:
Q. You see the reference in the first sentence in the first paragraph there, Mr. Morgan?
A. Yes.
Q. What did you mean by "stringent time constraints in the Act"?
A. Well, in this case, all the contracts had to be signed by June 30th. That was specified in the Act.
And here we're dealing with a letter that was received May 20th and responded to on June 17th.
Q. And as I think you mentioned earlier, basically, the utilities, if they wanted to continue operating, had to sign the contract. Is that correct?
A. That's what's in the Act.
(Deposition Exhibit No. 17

marked for identification.)
BY MR. HIRSCH:
Q. Mr. Morgan, I've handed you what's been marked as Morgan Deposition Exhibit 17, which is a document with Bates label PNL-021-0234 through -0268.
And it's titled FY -- I take it that means fiscal year -- 1984 Program Guidance for NWF Evaluations.
Why don't you take a minute to look at the document.
(Pause.)
A. Okay.
Q. Do you recognize Morgan Deposition Exhibit 17?
A. What do you mean by "recognize"?
Q. All right. Is this a document -- Strike that. Do you recall seeing this document at or about the time it was submitted?
A. I don't recall --
MR. BANES: Objection. Assumes facts not in evidence.
A. -- seeing this specific document, but I understand what it is.
BY MR. HIRSCH:



Q. What is your understanding of what this document is?
A. This is program guidance relative to the adequacy of the one mill per kilowatt hour fee, and it's directed to Pacific Northwest Laboratories.
Q. So is it correct --
A. This is what we wanted them to do in FY '84.
Q. Is it correct that this document basically was the marching orders to PNL to evaluate the fee adequacy issue?
A. That's my understanding in looking at this document.
Q. And you see the first page, at the bottom there's a reference to -- well, it says WMD:Mel Shupe.
A. Yes.
Q. Who is Mel Shupe? Do you remember?
A. I really don't recall.
Q. Do you know what the reference to WMD is?
A. No.
Q. Will you turn to the second page of the document, page -0235, titled Detailed



Analysis Plan for the Fee Adequacy Report. It says at the top, "This is a draft plan for the financial analysis that will be performed by PNL for preparation of the annual Fee Adequacy Report. This analysis will rely heavily on cost estimates provided by Roy F. Weston Company and on interactions with DOE/HQ." I assume that means headquarters.
A. Yes.
Q. And what role had Roy Weston played --
A. Roy Weston --
Q. Let me finish. -- in the process up to this point?
A. Excuse me.
Q. Thank you.
A. Roy F. Weston Company was selected by the Nuclear Waste Project Office to be the support contractor for the office.
Q. What does it mean to be the support contractor for the office?
A. To provide technical help, assistance, et cetera, for the implementation of the Nuclear Waste Policy Act.
Support contractors are commonly



used by headquarters and some of the field offices to perform tasks as designated.
Q. Would PNL also have been a support contractor, or did they have a different role?
A. They had a different role, but they provided technical support also for the office but from the field location at Richland.
Q. You see in the second paragraph it says -- of the page -0235, "The Fee Adequacy Report will present an analysis of projected performance of the Nuclear Waste Fund. It will make a recommendation concerning the adequacy of the one mill per kilowatt hour disposal fee."
A. Right.
Q. That task was something that the DOE had been charged by Congress to do under the Nuclear Waste Policy Act. Is that correct?
A. Yes.
MR. BANES: Objection. Asked and answered.
BY MR. HIRSCH:
Q. You see, then, at the beginning of the third paragraph it says, "The planning base used for this analysis is consistent with the draft DOE Civilian Waste Management Program

Mission Plan. The underlying premise is that DOE will accept waste in 1998 at a rate sufficient so no additional utility-owned storage capacity is required during the first five years. Therefore, the acceptance rate will be at least equal the utility spent fuel discharge rate." You see that statement?
A. Yes.
Q. And that premise was the premise that PNL was given to make this determination regarding fee adequacy. Is that correct?
A. Yes.
Q. And, in fact, that premise was the DOE's policy at the time. Isn't that correct?
MR. BANES: Objection.
A. It was the mission plan goal, planning document. I don't think it was policy. Okay? There's a difference in my mind between planning and policy.
MR. BANES: He has explained that difference about four times now.
MR. HIRSCH: Did I ask him a question?
MR. BANES: I mean, we are getting dangerously close -- I'm just going to



state for the record my objection, if you don't mind.
MR. HIRSCH: Fine.
MR. BANES: If we are going to go over the same language in different documents, I consider that the same question.
BY MR. HIRSCH:
Q. Do you see -- Why don't you look at page -0238 of this document, Mr. Morgan.
A. Got it.
Q. You see there's a heading there, Repository Deployment Variations?
A. Yes.
Q. Why don't you read those two paragraphs to yourself for a minute.
(Pause.)
A. Yes.
Q. Did you see the statement, "To meet the planed DOE waste acceptance schedule, the MRS must have the same receiving rate as the replaced repository or repositories, i.e., 3,000 MTU maximum receipt rate if the delay is longer than five years, and a total capacity of 3,000 metric tons for each year of delay."
Did you read that statement to



indicate that the DOE planned waste acceptance schedule was to accept 3,000 metric tons per year --
A. I think the --
MR. BANES: Objection.
THE REPORTER: I can only take one at a time.
BY MR. HIRSCH:
Q. I have to finish the question, and then Mr. Banes can object, and then you can answer. I apologize, but otherwise she's got three people talking.
A. All right.
Q. Did you understand the statement that I just read from this document to mean that the DOE planned waste acceptance schedule was to accept 3,000 metric tons per year by the sixth year after the repository opened and 3,000 tons per year after that?
MR. BANES: Objection. Asked and answered.
You don't have to answer it if you don't want to. You've answered it several times.
MR. HIRSCH: He has not answered



this question.
A. I'll say it again. This is consistent with what we have already discussed relative to the mission plan. So that's correct. It was in the plan. It was in the mission plan. This is definitely consistent with the mission plan.
BY MR. HIRSCH:
Q. So the rate that's described on page -238 is the same rate that was identified in the mission plan. Is that correct?
A. Yes. That's my understanding. We've been through that.
Q. All right. We won't do it anymore.
A. Thank you. I'm sorry.
MR. HIRSCH: Why don't we take a break here.
(The deposition was adjourned at 5:30 p.m. and resumed at 8:00 a.m. on Friday, March 22, 2002. The transcript of proceedings is continued in Volume 2.)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY )
CONNECTICUT YANKEE ATOMIC POWER COMPANY )
MAINE YANKEE ATOMIC POWER COMPANY )
FLORIDA POWER & LIGHT COMPANY )
NORTHERN STATES POWER COMPANY )
DUKE POWER, A Division of DUKE ENERGY CORP.)
INDIANA MICHIGAN POWER COMPANY )
SACRAMENTO MUNICIPAL UTILITY DISTRICT )
SOUTHERN NUCLEAR OPERATING COMPANY, et al. )
COMMONWEALTH EDISON COMPANY )
BOSTON EDISON COMPANY )
GPU NUCLEAR, INCORPORATED )
WISCONSIN ELECTRIC POWER COMPANY )
POWER AUTHORITY OF THE STATE OF NEW YORK )
OMAHA PUBLIC POWER DISTRICT )
NEBRASKA PUBLIC POWER DISTRICT )
TENNESSEE VALLEY AUTHORITY, )
Plaintiffs, )
v. )
UNITED STATES, )
Defendant. )

DEPOSITION OF ROBERT L. MORGAN

March 21 and 22, 2002 Volume 2, Pg 213 - 330



Case Nos.: 98-126C, 98-154C, 98-474C, 98-483C, 98-484C, 98-485C, 98-486C, 98-488C, 98-614C, 98-621C, 99-447C, 00-440C, 00-697C, 00-703C, 01-115C, 01-116C, 01-249C

THE DEPOSITION OF ROBERT L. MORGAN was taken as a witness on behalf of the Plaintiffs, pursuant to Rules of the Court of Federal Claims, at 9:30 a.m. on Thursday, the 21st day of March 2002, at the Eugene Hilton Hotel, 66 East 6th Avenue, in the City of Eugene, County of Lane, State of Oregon, before Eleanor G. Knapp, CSR-RPR, Certified Shorthand Reporter in and for the State of Oregon.

APPEARANCES

For Plaintiffs Southern Nuclear Operating Company, et al.:
BALCH & BINGHAM LLP
Attorneys at Law
1710 Sixth Avenue North
Birmingham, Alabama 35203
205/251-8100
BY: MR. M. STANFORD BLANTON
MR. K.C. HAIRSTON



A P P E A R A N C E S
(continued)

For Plaintiff Commonwealth Edison Company:
JENNER & BLOCK, LLC
Attorneys at Law
One IBM Plaza
Chicago, Illinois 60611-7603
312/222-9350
BY: MR. NORMAN M. HIRSCH

For Plaintiff Wisconsin Electric:
PERKINS COIE LLP
Attorneys at Law
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
206/583-8419
BY: MR. RICHARD W. OEHLER

(continued)



A P P E A R A N C E S

For Plaintiffs Florida Power & Light, et al.:
SHAW PITTMAN LLP
Attorneys at Law
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703/770-7940
BY: MR. ALEX D. TOMASZCZUK

For Plaintiff Sacramento Municipal Utility District:
ARNOLD & PORTER
Attorneys at Law
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
303/863-2301
BY: MR. DAVID S. NESLIN

(continued)

A P P E A R A N C E S

For the Defendant:
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division / Commercial Litigation
1100 L. Street, N.W.
Washington, D.C. 20530
202/353-0516
BY: MR. BRYANT S. BANES
MS. HEIDE L. HERRMANN
MR. R. ALAN MILLER

Reported by:
ELEANOR G. KNAPP, CSR-RPR
C & C COURT REPORTING
EUGENE 541/485-0111
SALEM 503/362-9193
TOLL FREE 800/344-0983



I N D E X


| WITNESS | VOL. 1 | VOL. 2 |
|---|---|---|
| ROBERT L. MORGAN | | |
| By Mr. Blanton | 9, 173 | |
| By Mr. Banes | 169 | |
| By Mr. Hirsch | 176 | 221, 242 |
| By Mr. Banes | | 241 |
| By Mr. Tomaszczuk | | 243 |
| By Mr. Banes | | 301 |
| By Mr. Neslin | | 304 |

EXHIBITS:

| FOR IDENTIFICATION | MARKED/REFERRED |
|---|---|
| 1 Organizational charts | 25/25,64,79,311 |
| 2 Proceedings for the 1983 Civilian Radioactive Waste Management Information Meeting | 38/38,47,170, 239 |
| 3 Standard Contract, Proposed Rulemaking | 67/67,76,137, 228 |
| 4 Standard Contract, Final Rule | 76/76,84,90,105,109, 130,138,301,304,313 |
| 5 Report on Financing | 93/93,102,104 |


(continued)



I N D E X


EXHIBITS:

| FOR IDENTIFICATION | MARKED/REFERRED |
|---|---|
| 6 3/4/93 letter from Alabama Power | 106/106 |
| 7 4/8/83 memorandum re: final rulemaking | 117/117,284 |
| 8 9/7/84 letter to Senator Johnston | 144/144,180, 184 |
| 9 12/20/83 cover letter to Edison Electric | 149/149 |
| 10 12/20/83 draft, Mission Plan | 149/150,162,177, 221,224,261 |
| 11 Mission Plan, Volumes I and II | 159/159,162 |
| 12 U.S. Dept. of Energy's Spent Fuel Storage Policy and Activities | 185/185,190 |
| 13 1/28/83 memo, Morgan to staff | 194/194,227 |
| 14 3/1/83, Morgan's testimony before Congress | 199/199 |
| 15 5/20/83 letter to Morgan from Edison Electric Institute | 201/201 |
| 16 6/17/83 letter from Morgan to Edison Electric Institute | 201/202 |
| 17 FY 1984 Program Guidance for NWF Evaluations | 204/205,226 |


(continued)



I N D E X


EXHIBITS:

| FOR IDENTIFICATION | MARKED/REFERRED |
|---|---|
| 18 6/21/83 memo to Secretary re: MRS | 229/229,274 |
| 19 Remarks before IAEA, 10/12/83 | 230/231 |
| 20 Letter to Governor Alexander | 275/275,279 |
| 21 Draft letter to Governor Bryan | 278/278 |
| 22 3/3/83 letter from Northwest States Power Company | 281/281,301 |
| 23 2/8/83 comments from Duke Power Company | 282/283 |

INSTRUCTIONS NOT TO ANSWER:

Page 143, line 15 QUESTION: Would treating situations in which a delivery is needed to permit licensed reactor operations to continue a purpose of the Nuclear Waste Policy Act?

Page 179, line 15 QUESTION: Was Table II-1 in this document the schedule or the acceptance rate that DOE had determined at that point was sufficient to prevent the utilities from having to provide additional on-site storage after 1998?

(The deposition was resumed
on Friday, March 22, 2002,
at 8:00 a.m. as follows:)
MR. BANES: We've had an opportunity to review the excerpts of the testimony.
While we think that the question concerning Table II-1 is just the same question that's been asked before in a different context regarding acceptance rate, we will allow the question at this time, although we would caution the Plaintiffs' counsel that there was an agreement not to be repetitive in this case, and we will enforce that agreement. Thank you.

EXAMINATION

BY MR. HIRSCH:
Q. Okay. Mr. Morgan, do you recall that we were talking about Morgan Deposition Exhibit 10, the December 20th, 1983 draft mission plan, yesterday?
A. Yes.
Q. Can you refer to Table II-1, the Waste Acceptance Table -- or Schedule in that document. Do you see that table?



A. Yes.
Q. Was Table II-1 in Exhibit 10 the schedule of the acceptance rate that DOE had determined at that point was sufficient to prevent the utilities from having to provide additional on-site storage after January '98.
MR. BANES: Objection. Calls for speculation. You can answer, sir.
A. When I look at the table -- you see the backlog, the far column on the right?
The backlog does increase through the year -- up until 2003, so that it would be speculative on my part to say specifically there would be no requirement for any reactor to have additional storage.
Do you understand my answer?
Q. Well, I'm not sure I do, Mr. Morgan. You are saying that because there is an increasing backlog for some period you are not sure whether --
A. That's correct.
Q. -- utilities wouldn't have to provide additional storage?
A. That's correct. Specific.
Q. I'm sorry. Specific? What do you



mean?
A. A specific utility, a specific reactor. It would be speculation on my part whether any one of them would need additional on-site storage.
Q. All right. Recognizing that there might be an individual utility that might need on-site storage, is it true that Table II-1 was the acceptance rate that DOE had generally determined was sufficient to prevent the utilities from having to provide additional on-site storage after January of 1998?
MR. BANES: Objection. Calls for speculation.
A. You know, clearly this says that initially the first repository acceptance is at a low rate for the first five years and then jumps up to 3,000. Those are numbers that were used in planning.
Certainly the first year of operation would have much less than that number, and there would be a gradual growth in my mind.
This was used as a mission plan that we were shooting for in the Nuclear Waste Policy Act. And there is an increase in the backlog



through the year -- through the year 2003.
BY MR. HIRSCH:
Q. When you said -- I think you said, at some point, a low rate. Does this show that in the -- does the table show that in the first five years the rate is 1800 metric tons per year?
A. That's what it says.
Q. Would you look back at page 1-1 -- excuse me -- at page 2-1 of the document, Exhibit 10.
A. Got it.
Q. You see in the first paragraph there is this statement, next-to-last sentence, "The waste materials will be accepted in accordance with a waste acceptance schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31st, 1998"?
A. That's what it says.
Q. All right. Will you look on the next page, 2-2.
A. Yes.
Q. At the top it says, "Based on the

criteria described above, the Department has prepared a waste acceptance schedule which specifies in the aggregate the quantities of commercial nuclear wastes that the program will accept beginning in 1998. This schedule is presented in Table II-1."
Do you see that statement?
A. Yes, I see that.
Q. Isn't one of the criteria identified, in fact, on the previous page that the waste materials would be accepted in accordance with a schedule designed to provide an acceptance rate such --
A. Yes.
Q. Let me just finish. -- such that no utility would have to provide additional storage after January 1998?
A. That's what the document says.
Q. Well, one of the criteria that the department used in preparing Table II-1 was that generally no utility would have to provide on-site storage after January '98. Isn't that correct?
A. That's correct.
MR. BANES: Objection.



BY MR. HIRSCH:
Q. All right. Mr. Morgan, you also were asked some questions -- or I asked you some questions, to be more specific, about Morgan Deposition Exhibit 17. Can you pull that document?
A. Yes.
Q. Do you recall we were discussing yesterday that this document was generally intended to provide marching orders to PNL regarding preparation of a fee adequacy study?
MR. BANES: Objection. Lack of foundation.
A. Yes.
BY MR. HIRSCH:
Q. Is it correct that the guidance that DOE provided to PNL directed them to evaluate the one mill per kilowatt hour charged under the contract based on the goal of the mission plan that DOE would accept waste at a rate sufficient so that the utilities would not have to provide additional storage after January of '98?
MR. BANES: Objection as to form. Lack of foundation. Calls for speculation.
BY MR. HIRSCH:



Q. You can answer.
A. Repeat the question, please.
(The question appearing at page 226, lines 16 - 22, was read as follows:)
QUESTION: Is it correct that the guidance that DOE provided to PNL directed them to evaluate the one mill per kilowatt hour charged under the contract based on the goal of the mission plan that DOE would accept waste at a rate sufficient so that the utilities would not have to provide additional storage after January of '98?)
MR. BANES: Same objection.
A. Yes.
BY MR. HIRSCH:
Q. Mr. Morgan, will you look at Morgan Deposition Exhibit 13.
A. Yes.
Q. I just want to refer you to the date here. This was a memo we were looking at yesterday that you sent out on January 28, 1983. And I believe you testified yesterday that you assumed that you had assumed or taken the



position as the head of the project office for spent fuel by this date, January 28th.
A. That's correct.
Q. Now, I don't know -- maybe we need to get out the document -- but if you look at Exhibit 3, you'll see that the notice of proposed rulemaking for the standard contract was dated February 4th, 1983.
A. Yes.
Q. Do those two documents indicate to you that you would have seen the notice of proposed rulemaking on the standard contract before it was sent out?
MR. BANES: Objection. Asked and answered.
A. I don't recall. There is a process time of sending or submitting something to the Federal Register for publication, and that's normally -- I don't know what that delay is, but in my recollection, it's something like a week that when a document leaves the Department there's a delay before the publication.
And that was published on that date, but I do not recall seeing that before it left the office -- while I was in the office.

BY MR. HIRSCH:
Q. All right. Assuming that you were in the office, the head of the office by January 28th, 1983, do you think it's likely that someone who worked for you at that point would have shown you the notice of proposed rulemaking before February 4th, 1983?
MR. BANES: Objection. Asked and answered. He has already testified he didn't see it.
A. I don't recall seeing it.
(Deposition Exhibit No. 18 marked for identification.)
BY MR. HIRSCH:
Q. Mr. Morgan, I've handed you what's been marked as Morgan Deposition Exhibit 18, which is a two-page memo dated June 21st, 1983, along with some attachments. And it has Bates label PNL-001-1524 through -1549.
A. Yes.
Q. Is that your signature at the bottom of the second page of this document?
A. Yes.
Q. So this would have been a memo that you sent to the Secretary of Energy on or about



this date?
A. Yes.
Q. And the memo related to the proposal for a monitored retrievable storage system. Is that correct?
A. That's correct.
Q. If you look at the bottom of the second page of the document, I think you'll see a reference that says prepared by S-10:JHCarlson. And it's got some numbers after that. Do you see that?
A. Yes, I see that.
Q. Is that James Carlson?
A. I have no recollection.
Q. Do you know whether an individual named James Carlson or Jim Carlson worked in your department?
A. The symbol S-10 would tell me they would not be working for me.
Q. What does that indicate?
A. I believe it's a person in the Secretary's office. That was a symbol, as I recall, for people that were assigned to the Secretary's office.
Q. Do you know a Jim Carlson who worked



on spent fuel issues?
A. I don't recall.
(Deposition Exhibit No. 19 marked for identification.)
BY MR. HIRSCH:
Q. Mr. Morgan, I've handed you what's been marked as Morgan Deposition Exhibit 19, which is a document titled Remarks by Robert L. Morgan, Acting Director, Office of Civilian Radioactive Waste Management, U.S. Department of Energy, Before the International Atomic Energy Agency, Vienna, Austria, October 12th, 1983. And the Bates label is EDB-003-1642 through -1650.
Mr. Morgan, is this the text of some prepared remarks that you presented to the International Atomic Energy Agency --
A. I believe that.
Q. Let me finish. -- on or about October 12th, 1983?
A. I believe that's correct.
Q. Do you recall how it was that you were invited to this conference?
A. I accompanied Secretary Hodel to this conference at his request.



Q. And why -- Did he indicate why he wanted you to come along with him?
A. I don't recall.
Q. At the time in 1983, to the best of your recollection, was the International Atomic Energy Agency addressing issues regarding what to do with spent fuel?
A. I think this was to provide information to the IAEA of what our mission plan and program was about.
Q. When you say "our," you mean the DOE mission plan program?
A. Yes.
Q. Did the IAEA meet on a regular basis?
A. Annually.
Q. Did you attend any meetings besides the one that's identified in this document?
A. Meetings of the IAEA?
Q. Yes.
A. This is the only meeting of the IAEA that I attended.
Q. In your subsequent positions with the Government, did you go to any IAEA meetings?
A. Not that I recall.

Q. Do they usually meet in Vienna, Austria?
A. Yes.
Q. Did Secretary Hodel make a presentation at that meeting, to the best of your recollection?
A. I believe that he did, but I'm not sure.
Q. Who, generally, would attend the meetings of the International Atomic Energy Agency?
A. The Secretary of Energy.
Q. I mean, who would be the attendees from other countries?
A. The head of their atomic energy activities. It was a high-level meeting of all the member states, if you will, of the IAEA.
Q. In this set of remarks, did you accurately attempt to describe what the DOE policy was regarding spent fuel at that time?
MR. BANES: Objection. Have you had time to look at the document, sir?
THE WITNESS: I don't know what's in the document.
BY MR. HIRSCH:



Q. Please take a look at the document.
(Pause.)
THE WITNESS: Can I go off the record for just a moment?
MR. HIRSCH: Sure.
(A discussion was had off the record.)
BY MR. HIRSCH:
Q. Mr. Morgan, in an effort to get you out of here and speed things along, let me just ask you some specific questions of the document, if that's all right with you.
A. Fine.
Q. Will you look at page -1644 of the document, first full -- second full paragraph.
A. -1644?
Q. That's the little page at the bottom --
A. Yes.
Q. -- page number. You see there's a reference in the middle to studies and explorations in the different media? And then there's a sentence that says, "However, while the responsibility for permanent disposal of this waste has rested with our Federal



Government since the Atomic Energy Act of 1954 was enacted, until recently, major obstacles have existed in the United States which have impeded the successful disposal of nuclear waste."
Is it correct that the U.S. Government had the responsibility for the permanent disposal of spent nuclear fuel since the Atomic Energy Act of 1954 was enacted?
MR. BANES: Objection. Calls for a legal conclusion and irrelevant.
A. I'd have to read the Atomic Energy Act of 1954 to -- otherwise it would be speculation. I'm sorry.
But these are the words that I used.
BY MR. HIRSCH:
Q. You made that statement to the leaders or the high-level people present at the International Atomic Energy Agency meeting. Is that correct?
A. Yes, that is correct.
Q. And presumably you wouldn't have made that statement if you didn't think it was correct. Right?
A. That's correct.



Q. Then you say at the bottom of the same page, reading from the last sentence, ". . . late last year, the United States Congress passed legislation to bring to an end years of indecision on how to solve the problem." Do you see that statement?
A. Yes.
Q. And the problem was the problem of disposing of spent fuel. Correct?
A. Yes.
Q. And was it your view at the time that the Nuclear Waste Policy Act was intended to end years of indecision --
A. That's correct.
Q. -- on how to solve the problem of disposal of spent fuel?
A. Yes. That's correct.
Q. Will you look at page -1646 at the bottom.
A. Yes.
Q. Do you see at the top of that page it says, "The Department of Energy has the responsibility to provide for the permanent disposal of high-level radioactive waste such as spent nuclear fuel or reprocessed spent nuclear

fuel"?
A. Yes.
Q. "The Act strengthened this responsibility and confirmed the nation's commitment to nuclear waste disposal and to the role of the states and the public in the process leading to permanent disposal."
A. Yes.
Q. What did you mean that the Nuclear Waste Policy Act had strengthened the responsibility for disposal of spent fuel?
A. It clearly set out goals and a requirement for the Department of Energy. The Nuclear Waste Policy Act set out the processes and timetable and commitments, which we didn't have before that.
Q. Will you look at page -1647.
A. Yes.
Q. You see the third paragraph on that page, second sentence, that says, "The Commission has three to four years to approve the application, and once we receive the construction license, construction will begin with the mandated target to begin accepting waste by 1999"?



A. Yes.
Q. And that's -- when it talks about the application and the construction license, that's referring to the geologic repository. Is that correct?
A. Yes.
MR. BANES: Objection. Irrelevant.
BY MR. HIRSCH:
Q. And the mandated target to begin accepting waste by 1998 was the target mandated by the Nuclear Waste Policy Act. Is that correct?
A. That's correct.
MR. BANES: Objection. Calls for a legal conclusion.
BY MR. HIRSCH:
Q. Mr. Morgan, is the Government or -- Strike that. Mr. Morgan, are the Government lawyers present today representing you in this deposition?
A. Yes.
MR. BANES: Objection. Asked and answered.
BY MR. HIRSCH:



Q. Did you meet with them before the deposition?
A. I had a telephone call from them, and then I met with them for dinner night before last.
Q. So that would have been Wednesday night?
A. Wednesday evening.
Q. You recall yesterday morning we had about -- I think about an hour when we started the deposition at 9:30 and then we took a break?
A. Yes.
Q. Do you recall that?
A. Yes.
Q. Did you speak with the lawyers for the Government during that break between the first hour and when we resumed?
A. I'm sure I did.
Q. Did you talk about Exhibit 2 to the deposition?
MR. BANES: Objection. I'm not going to let him answer that.
MR. HIRSCH: I'm not going to ask him any other questions.
MR. BANES: Okay.



A. I don't recall.
BY MR. HIRSCH:
Q. But you are fairly certain that you did have a discussion with the Government attorneys during that break yesterday morning?
A. I have met with them at every break.
Q. All right.
A. But I cannot say that in any one there were specific items covered.
MR. HIRSCH: All right. At this point, I don't have any additional questions for Mr. Morgan.
However, there are outstanding issues in this case relating to the privilege log that the Government provided and other documents that the utilities have requested from the Government. So I am reserving my right to ask additional questions at a later time.
MR. BANES: Okay.
MR. HIRSCH: Thank you, Mr. Morgan.
MR. BANES: I have a few questions. And we would reserve the right to reopen the deposition depending upon what additional matters you want to address, whether

we think that's repetitive or not.
But I have a few questions for Mr. Morgan.

EXAMINATION

BY MR. BANES:
Q. Mr. Morgan, can you turn to -- Let me ask this. With respect to your testimony regarding the Nuclear Waste Policy Act, did you believe that the Nuclear Waste Policy Act imposed or required the Department of Energy to accept spent nuclear fuel or high-level waste at any particular or specific rate prior to the opening of a repository or MRS?
A. No, it did not.
MR. HIRSCH: Objection. Asked and answered and beyond the scope of what I asked.
MR. BANES: Well, I disagree with that, but fine.
BY MR. BANES:
Q. Let's see. With respect to the standard contract, do you believe -- did you believe that it imposed or it required the Department of Energy to accept spent nuclear



fuel or high-level waste at a particular or specific rate --
A. No, it did not.
Q. -- of acceptance prior to the opening of a repository or MRS?
A. It did not.
Q. Have any of the documents Mr. Hirsch has showed you today changed that testimony for you?
A. No.
MR. HIRSCH: I have one question based on those questions.

EXAMINATION

BY MR. HIRSCH:
Q. Did the standard contract require the utility parties who had signed it to continue to pay the 1 mill per kilowatt hour nuclear waste fee whether the repository was opened or not?
MR. BANES: Objection. Calls for a legal conclusion. Answer it if you can.
A. There was the backup, which was the monitored retrievable storage program which could accept fuel and would be covered by the



one mill per kilowatt hour -- or as modified in the future if it needed to be changed.
BY MR. HIRSCH:
Q. But my question for you, Mr. Morgan, was: Isn't it correct that the utilities under the contract were required to continue paying the one mill per kilowatt hour fee regardless of whether there was a repository available or not?
A. That's correct.
MR. BANES: Objection. Calls for a legal conclusion.
MR. HIRSCH: I have no further questions at this time, subject to the reservation I made earlier.
MR. BLANTON: We talked about it before we went on the record, but we will make the same reservation on the record regarding additional documents that might be produced.
MR. BANES: We reserve the right to make the same objection we made before.
MR. BLANTON: So reserved.

EXAMINATION

BY MR. TOMASZCZUK:
Q. Mr. Morgan, good morning. My name



is Alex Tomaszczuk. I represent various utilities that are plaintiffs in these cases. And in particular, for the record, I represent Duke Energy Corporation, Indiana Michigan, Florida Power & Light Company, Northern States Power Company, Nebraska Public Power District, Omaha Public Power District, Boston Edison, GPE Nuclear, New York Power Authority, and Public Service Electric & Gas Company.
I want to thank you for making yourself available yesterday and today.
A. You're welcome.
Q. I have a few follow-up questions based on the testimony you've given, and then I have a few documents I want to go over with you as well.
The same ground rules that Mr. Blanton discussed with you yesterday apply here. If you don't understand my question, please let me know. I'll try to rephrase it so we have a common understanding of my question and your answer.
I believe you testified yesterday that you had been previously deposed.
A. Yes.

Q. Can you tell me when your deposition has been taken previously.
A. I cannot recall. It was not relative to the Nuclear Waste Policy Act.
Q. You don't recall, sitting here today, when you've been previously deposed or in what context?
A. No. It was a number of years ago.
Q. Was it in connection with your work for the Department of Energy?
MR. BANES: Objection. Irrelevant.
A. Wait a minute. I had a deposition in Washington, D.C., by the Office of Special Counsel.
BY MR. TOMASZCZUK:
Q. What was the context of that deposition?
MR. BANES: Objection. Irrelevant.
A. It was regarding my activities in Washington, D.C., during the transition of the Secretary of -- Secretary Edwards coming in.
Q. The deposition was taken by the Office of Special Counsel of which agency?



MR. BANES: Objection. Irrelevant.
A. Office of Special Counsel is a separate entity, in my recollection.
BY MR. TOMASZCZUK:
Q. Within the United States Government?
A. Yes.
Q. It's a separate entity within the United States Government?
A. Yes.
Q. And within the United States Government, what agency does that office operate?
A. I have no idea.
Q. What was the purpose of that deposition?
MR. BANES: Objection. Irrelevant.
A. Answering questions regarding accusations by Congressman Dingle.
BY MR. TOMASZCZUK:
Q. Accusations by Congressman Dingle against whom, sir?
A. Beg your pardon?
Q. Against whom were those accusations



made?
A. Me.
MR. BANES: Objection. Irrelevant.
BY MR. TOMASZCZUK:
Q. What was the nature of those accusations?
MR. BANES: Same objection.
A. My recollection is that Congressman Dingle thought that I was running the Department of Energy in certain areas and that I was the shadow secretary or something like that.
All those accusations, by the way -- the Special Counsel has absolved me of any of the accusations. I have that in writing someplace.
BY MR. TOMASZCZUK:
Q. Do you recall the year in which these accusations were made and your deposition was taken?
MR. BANES: Objection. Irrelevant.
A. It was regarding activities in early, let's see, 1981. And the deposition was subsequent to that, of course. And I can't



recall the date.
BY MR. TOMASZCZUK:
Q. So this would have been prior to your taking the position as acting director of the Nuclear Waste Project Office?
A. It had --
MR. BANES: Objection. Irrelevant.
A. It was before I was acting director of the Nuclear Waste Policy Project Office, and it had nothing to do with my activities in the Nuclear Waste Policy Act.
BY MR. TOMASZCZUK:
Q. Other than the deposition that you've just described with reference to the accusations by Congressman Dingle, have you been deposed on other occasions?
A. I believe so.
Q. Can you briefly tell me what those occasions were?
A. No. I don't recall. I think one was an automobile accident to which I was a witness, as one. And that's a number of years ago. I don't believe that I was in the Department of Energy or Atomic Energy Commission

at that time.
Q. Now, we've seen through some of the documents that my colleagues have shown you and asked you about that you've testified on the Hill. Is that correct?
A. Yes, I have.
Q. Do you know how many times you've testified on the Hill with respect to your work at DOE?
MR. BANES: Objection.
A. Probably up to a dozen times.
BY MR. TOMASZCZUK:
Q. And of those dozen times you've testified, how many instances related to the Nuclear Waste Policy Act work that you've done?
A. Three or four, to my recollection.
Q. Do you recall which committees those -- that testimony was given to?
A. Udahl, Ottinger, Bennett Johnston, I believe.
Q. So it was both the House and Senate side?
A. Yes.
Q. And do you recall when?
A. No. That's a matter of record.



I'm sorry. I don't recall the dates.
Q. Would it have been in 1983 and 1984?
A. Yes. Those associated with the Nuclear Waste Policy Act would be in '83 and '84.
Q. After you left your position as director of the Nuclear Waste Policy Act Project Office, did you have occasion to testify before any Congressional committee with respect to the Nuclear Waste Policy Act?
A. I don't believe I did.
Q. You testified yesterday, Mr. Morgan, about the position of acting director of the Nuclear Waste Policy Act Project Office being offered to you and then the short period of time within which you had to consider that opportunity. Is that right?
A. I don't think I had an opportunity to consider it.
Q. And why do you say that, sir?
A. Because when I said I'd like to think about it, I was told that the Secretary was going to announce it on Monday at the staff meeting.
Q. So you understood that you were



essentially being told to take the job?
A. That was my understanding at the time.
Q. Were you concerned about that?
MR. BANES: Objection. Vague.
BY MR. TOMASZCZUK:
Q. Do you understand my question?
A. One is always concerned about the responsibilities associated with a change of job -- and the responsibility of the Nuclear Waste Policy Act, because of the -- what I considered the obstacles that were in the way.
Q. What were those obstacles as you perceived them at the time?
A. Potential litigation, change of legislation, not a conference report on the legislation that existed for the Nuclear Waste Policy Act, the licensing requirements by NRC, the schedule, the process that was outlined in the Nuclear Waste Policy Act.
I think those were the areas that I considered extremely difficult.
Q. Do you know why you were tapped to take the position?
A. I have no idea. That would be



speculative. I think I answered that yesterday.
Q. I think you said because you were a good guy, as I recall.
A. That was a smart-ass remark.
Q. And I was trying to find out if there was some other reason of which you were aware that you could testify.
A. Evidently it was based on my job performance and reputation.
Q. At that point in time at which the position had been offered to you, how long had you known Secretary Hodel?
A. I don't recall the date that Jim Edwards left and Don Hodel came in. I don't recall.
Q. My question was how long had you known Secretary Hodel at the time the position was offered to you.
A. I would -- I did not know Secretary Hodel until he became the Secretary of Energy. I did not have any previous contacts or exposure to him at all.
Q. At the time you took the job, was there some understanding that you would be in it for a certain period of time or was it

open-ended?
A. The understanding is that I would be in this position until a presidential appointee was confirmed by the Senate. And that, in my opinion, is open-ended.
Q. And so it turned out that you were in the position roughly 15 months or so. Do I have that right?
A. I think it was less than that. I'm not sure of the date that I left -- left the Office of the Nuclear Waste Policy Act and went to the job of Acting Assistant Secretary for Defense Programs. I'm sure that's a matter of record somewhere in the Department of Energy.
Q. At the time you left the job, did you have any discussions with Secretary Hodel or anyone else at DOE about your performance in it?
A. After I left? Is that the question?
Q. At or about the time you were leaving, did you have any discussions with Secretary Hodel concerning your performance in the position?
A. I received a special award for performance, cash award.
Q. And that award was presented to you



by the Secretary?
A. I'm sure that he passed on it.
Q. Was there an award ceremony of some kind?
A. I had received numerous awards of cash from the Department, and there had been ceremonies. I don't know if there was one specifically associated with the Nuclear Waste Policy Act.
Q. Who are the individuals that you most relied upon while you were serving as acting director of the Nuclear Waste Policy Act Project Office?
A. The key people in the organization: Mike Lawrence, McElvey, and then the three other people, Rosselli, and Bennett.
Q. Now, those were all direct hire employees of the Department of Energy. Correct?
A. Yes.
Q. Did you rely on any contractors?
A. We had a support service contract -- contractor. And we used the various on-site contractors such as PNL for certain activities and we used their input.
Q. And within that group of



contractors, were there any individuals on which you personally relied upon?
MR. BANES: Objection. Vague.
A. I -- I don't recall.
BY MR. TOMASZCZUK:
Q. Sitting here today, no one that stands out in your memory as providing a particular service to you or was particularly helpful to you?
MR. BANES: Objection. Vague.
A. No.
BY MR. TOMASZCZUK:
Q. At the time you assumed the position of acting director, how many people reported to you?
A. I do not recall.
Q. 100?
A. I don't believe it was that high initially, but it did -- in other words, when the office opened, I had X number of people, but that number did grow.
Again, that's a matter of record within the Department of Energy in the management and administration division.
Q. Did your office have some



alphabetical or numerical designation? Let me explain by way of background.
I believe you testified in response to a question by Mr. Hirsch this morning that your office was not S-10. Do you recall that testimony?
A. Yes.
Q. Was there some alphabetical or numeric --
A. I think it was RW. I think it was RW. I know that it was RW after the OCRWM designation.
Q. I understood you to testify yesterday, Mr. Morgan, about a PERT chart. Do you recall that testimony?
A. Yes.
Q. Did I understand you to say that you had prepared a PERT chart to brief Secretary Hodel with respect to the Nuclear Waste Policy Act obligations?
A. Yes.
Q. Was that a written document?
A. A PERT chart is a network arrangement. It's like a critical path layout that you use in construction -- what activities

that you can do in parallel, what activities have to follow another activity and then what leads from that. It's a network analysis.
Q. And is that a document that you prepared?
A. Let's say that I did the first level and then other people filled in the subsequent level two and three.
Q. And was the document finalized at some point in time?
A. By reference into a bar chart that we used at a later point in time showing the schedule of activities in bar graphs.
Q. And you used the final version of this PERT chart to brief the Secretary?
A. Yes.
Q. You've been shown various documents yesterday and today. Does that PERT chart appear in any of the documents you've been shown?
A. I have not seen it in the documents that have been provided.
Q. Do you, by chance, have a copy of it?
A. Beg your pardon?
Q. Do you have a copy of the PERT



chart?
A. No, I do not.
Q. Do you know where it might be located?
A. I have no idea.
Q. Was it physically in your office at the time you left to assume your position down in Savannah River?
A. I don't know.
Q. Did you --
A. By the way, I left not to go back to Savannah River. I left to take the job as Assistant Secretary for Defense Programs.
Q. I'm sorry. I thought you were physically located in Savannah River at that time. I misunderstood.
A. No. My physical assignment was manager of Savannah River.
The Assistant Secretary for Defense Programs is located in the DOE headquarters in the Forestall Building.
Q. I apologize for the misunderstanding. I appreciate the clarification.
A. Thank you.



Q. Did the Secretary's office keep a copy of the PERT chart?
MR. BANES: Objection. Calls for speculation.
A. I have no idea.
BY MR. TOMASZCZUK:
Q. Do you know who in your office would have had a copy?
A. Probably Mike Lawrence.
Q. Did he help prepare it?
A. Yes.
Q. Other than Mr. Lawrence and yourself, who worked on or helped prepare the PERT chart?
A. There was input on the third and fourth levels, you know, when it went down where I know Bennett and Rosselli would have played.
And there was a similar one for an MRS. There was one for a repository and one for the MRS.
Q. How many pages would have compromised the PERT chart?
A. I have no recollection. There's level one that goes on one page, and then level two and three are a blow-up from that so that it



would amount to several pages.
Q. And would the pages have been on 8 1/2-by-11 paper or a different size?
A. We started out -- when you start drawing bubbles -- I call it a bubble machine -- you use a sheet of paper. That's full desk size, like a pull-off chart, you know, 3 foot by 4 foot.
Q. To the best of my knowledge, Mr. Morgan, we have not received a copy of the PERT chart that you've just described.
MR. TOMASZCZUK: And I would like to respectfully request that we receive a copy of that.
MR. BANES: To the extent such documents exist, we believe it's already been provided.
MR. TOMASZCZUK: Do you know in what production or where I might find the PERT chart? Because we have not been able to locate it.
MR. BANES: Nor have we.
MR. TOMASZCZUK: So it's not been produced, I gather, because if you haven't located it, it obviously hasn't been provided to

us. Just so I'm clear.
MR. BANES: Yeah. We don't have it either -- at least we haven't identified it. If it's in the documents, we have not identified it yet, although we have tried.
BY MR. TOMASZCZUK:
Q. You --
A. Let me interrupt you. If you would look at Exhibit No. 10, in the back of that there's a bar chart called SN045236.
MR. BANES: That's the Bates stamp number in that document.
MR. BLANTON: Is that the mission plan, Mr. Morgan?
THE WITNESS: Draft mission plan I just pulled the first document.
MR. BANES: Exhibit 10?
MR. TOMASZCZUK: Yes.
A. That's a bar chart. Okay? I'm on -36. I don't know what that page was, that page you just had.
BY MR. TOMASZCZUK:
Q. That appeared to be page 4-4 of what I understand to be Morgan Deposition Exhibit 10.
MR. OHLER: Can we go off the



record for a minute?
(A discussion was had off the record.)
A. That and --
BY MR. TOMASZCZUK:
Q. When you say that, you are referring to page 3-B-5 of Morgan Deposition Exhibit 10?
A. This page (indicating).
Q. Yes.
A. That's a bar chart, bar graph, of milestones and activities. To generate --
Q. And this particular figure relates to the MRS. Correct?
A. To generate such a chart, the precursor to that is a network analysis that tells you when you can start and when you stop an event.
This is a graph showing the activities, as an example, for the MRS. Behind this, as a working document -- in order to get these things laid out in time schedule, you have to have a network analysis that shows what you can do in parallel and what you can do or what you can't do sequentially. That's a -- that's a network analysis process. This is the result of



that process.
I don't know if the PERT charts, backing up similar schedules that would have been published, are still in existence.
These were things that were published. It's very difficult to publish a PERT chart because they will end up as big as this table when you get to about a level four. And if you try to reduce that in size, you lose it. It's a management technique.
Q. And your testimony is that three of these charts were prepared, one for the contract itself or the -- I'm sorry -- for the Nuclear Waste Policy Act obligations of DOE. Correct?
MR. BANES: Objection. Mischaracterizing testimony.
A. I don't know -- I don't know --
BY MR. TOMASZCZUK:
Q. I'm not trying to mischaracterize your testimony. I just want to understand.
A. I believe you have mischaracterized it.
Q. All right. Tell me how.
A. The Nuclear Waste Policy Act has specific items required in it. Those are



milestones that exist. You don't need a PERT chart to lay that out. You can lay that out in a page. Okay?
But the activities that you must do -- the site characterization, the drilling, all the exploratory work -- that has to go in a sequence. You drill a hole, you drill side trenches, and all the other things. That, in my mind, always starts out with a network analysis, a, quote, PERT chart.
The use the word "PERT" is a step beyond it. It's a probability analysis, so I better correct it and say it was a network analysis rather than a PERT chart. But it lays out the network.
So there was one for the MRS and one for the repository that I recall participating in.
Q. So there were two of these PERT network analyses prepared?
A. Yes.
Q. And there was not a third one prepared with respect to DOE's obligations under the Nuclear Waste Policy Act?
MR. BANES: Objection. Calls for

speculation. Vague as to time.
A. Absolutely not. I'm sorry. I'm getting hot.
MR. BANES: Do you want to take a break?
THE WITNESS: Yes. I'd appreciate it.
(A recess was taken.)
BY MR. TOMASZCZUK:
Q. Mr. Morgan, my notes reflect that Mr. Hirsch asked you whether or not you had occasion to discuss spent nuclear fuel management issues with any representative of Commonwealth Edison, his client in this case. Do you recall that?
A. Yes.
Q. I believe you said no, that you had not had any such discussions with representatives of Commonwealth.
A. I don't recall.
Q. Do you recall, sitting here today, any discussions of spent nuclear fuel management issues with any representatives of any utilities?
A. Oh, yes.



Q. What do you recall about your discussions of spent nuclear fuel management issues with utility representatives?
A. I recall several discussions regarding comments from the utility representatives -- or representative that they felt that the waste fund that was the contribution of the one mill per kilowatt hour was their money and that they wanted to participate in the management of the program.
I advised that person that it was the ratepayers' money, that they were charging to the ratepayers, and that the Nuclear Waste Policy Act did not give them any management of the program.
And I met, at one case I know, in a large conference room with representatives from utilities, a large group in a conference room someplace -- it might have been at EEI or elsewhere -- to where there was an exchange and discussions. I don't recall the content of those.
Q. The discussion that you had with the utility representative regarding the use of the waste fund and the monies therein, do you recall



with whom you had that discussion?
A. Loring Mills.
Q. Who was Mr. or Ms. Mills? Was it Mr. or Ms. Mills?
A. Loring, Mr. He was a representative of EEI.
MR. BANES: L-o-r-i-n-g.
BY MR. TOMASZCZUK:
Q. Did you have discussions with other utility representatives along the lines of that that you had with Mr. Mills?
A. I don't recall.
Q. And you don't recall any specifics about the meeting that you had with representatives of the utilities?
A. I don't recall.
Q. How would you characterize these conversations and meetings? Were they pleasant?
MR. BANES: Objection. Vague as to time.
BY MR. TOMASZCZUK:
Q. Unpleasant? How would you characterize them?
A. I would say most of them were pleasant.



I got tired of hearing some of the same litany from one person, Mr. Mills, and I guess I'd have to say that they became unpleasant with him.
Q. How did they become unpleasant with Mr. Mills?
A. Covering the same subject, wanting to tell me how to run the program.
Q. What was the basis for your statement to Mr. Mills that the monies in the waste fund belonged to the ratepayers?
A. That was my interpretation of where the money was coming from.
Q. Was that based on some analysis you had done?
A. No. The utilities, in my mind, were going to pass on to the ratepayers any additional revenues that they had to disburse under the waste fund.
Q. What was the basis for that knowledge?
A. My understanding.
Q. At the point in time that you had that understanding, had you ever had occasion to work for a commercial utility?

269

MR. BANES: Objection. Irrelevant.
A. I consulted with South Carolina Electric & Gas. I consulted for them on the V.G. Sumner plant.
BY MR. TOMASZCZUK:
Q. But that was after you left Government service. Correct?
A. Yes.
Q. I was trying to find out at the time that you had this understanding that you testified about with respect to the ratepayers' money into the nuclear waste fund, had you ever worked for a commercial utility?
A. No.
Q. I believe you testified yesterday that you had gotten a call from Ed Johnson with respect to your deposition.
A. Yes.
Q. And do I understand your testimony that Mr. Johnson called you?
A. Yes.
Q. And he --
A. My recollection of that phone call was that he was -- that someone in DOE was

270

trying to locate me. And I had known Ed, and he chased me down through someone. And I don't know who it was.
And he said I'm going to -- it was a lawyer about some litigation and that he was going to call them and let them know where I was and that I should expect a call from someone.
Q. Were you surprised to get his phone call?
A. Yes.
Q. You then had a subsequent conversation with Mr. Lawrence? Do I understand that correctly?
A. Yes.
Q. Did you contact Mr. Lawrence?
A. Yes.
Q. And that was after Mr. Johnson contacted you?
A. Yes.
Q. All right. What did you say to Mr. Lawrence?
MR. BANES: Objection. Asked and answered.
A. What did I say?

271

BY MR. TOMASZCZUK:
Q. As best you can recall.
A. I asked him -- I said, "Have you been contacted, you know, about some litigation?" He said yes, and it was regarding the Nuclear Waste Policy Act.
And that was about the end of the conversation.
Q. I think the transcript will reflect and my notes reflect that Mr. Lawrence said that he had been deposed.
A. Yes.
Q. And did he say that he had been deposed in connection with these cases or some other matter?
A. No. He had been deposed on this case.
Q. And did he say by whom?
A. No.
Q. What, if anything, else did he say about that deposition?
A. Nothing. We both recognized that it was a situation that we should not discuss, quite honestly.
Q. Why was that?

272

A. Because I think it would be improper for him to discuss a deposition with me.
Q. Why do you have that understanding?
A. Common ethics and conduct, professional conduct.
Q. Did you have a discussion with him to the effect that you shouldn't discuss what had been the subjects on which he had been deposed about?
A. I don't recall how it happened, but -- whether we both understood or just said that okay, that's enough, thank you very much. I think I cut it off with that.
Q. After you had the discussion with Mr. Lawrence, what happened next with respect to your either preparation for or attendance at this deposition?
A. First I was contacted by a lawyer in DOE who is, as I understand, the person that talked to Ed Johnson. And then I was called by attorneys from the Department of Justice.
Q. Do you recall the name of the lawyer at DOE that contacted you?
A. No.
Q. Was it a man or a woman? Do you

remember?
A. It was a man.
Q. Are you searching for a document or a note to --
A. A note that I made -- might have made at the time. I have a note, "Contacted by Dave Zicranski" (phonetic).
Q. Could that be Dave Zibranski?
A. I don't know. I wrote it down as Z-a-c-r-a-n-s-k-i. Telephone number 202-586-9198, which I believe is a DOE headquarters exchange.
MR. BANES: The Government will represent that is Dave Zibranski's number.
THE WITNESS: Pardon me?
MR. BANES: That is Dave Zibranski's number.
BY MR. TOMASZCZUK:
Q. When were you contacted by Mr. Zibranski?
A. I don't recall the date. Within a day or two of my phone call with Ed Johnson.
Q. And what did Mr. Zibranski say to you?
A. He asked me if I was the Morgan that



was in charge of the Nuclear Waste Policy Act thing. And then he told me I would be contacted by office -- or the Department of Justice.
Q. Did he talk at all about the substance of the case?
A. Not that I recall.
Q. Short conversation, then, I presume.
A. Yes.
Q. Have you ever heard of a term "nuclear waste disposal task force"?
A. I don't recall that name.
Q. While you were serving as acting director, do you recall setting up or creating a nuclear waste disposal task force?
A. No.
Q. In one of the documents that Mr. Hirsch showed you this morning -- I believe it was Exhibit 18 -- the subject of interim storage was addressed.
A. Yes, monitored retrievable storage.
Q. What was your role and involvement during your tenure as acting director with respect to the development of an MRS system?
A. That was totally under my direction.
Q. And in that regard, what did you do



to pursue that issue?
A. Many things.
Q. Tell me about them.
A. Well, I don't understand -- you know, I don't understand your question.
Q. Okay.
A. I think it's too broad, and I just don't want to deal with it.
Q. Well, were you involved in any way in studying the feasibility of creating an MRS?
A. Yes.
Q. And what was your personal involvement in that effort, if any?
MR. BANES: Objection. Irrelevant.
A. I recall, again, working on a network analysis on schedule, talking about the layout, some of the things that would have to be done.
I met with Bennett Johnston and staff members regarding his high level of interest in monitored retrievable storage to ensure that that was not hurt at the expense of a repository. In other words, he wanted to make sure it was appropriately funded and supported.



BY MR. TOMASZCZUK:
Q. I'd like to hand you a document, Mr. Morgan, and ask the court reporter to mark it as Exhibit 20.
(Deposition Exhibit No. 20 marked for identification.)
BY MR. TOMASZCZUK:
Q. This appears to be a two-page document with the Bates number PNL-089-2195 and the second page is -2196.
A. Yes.
Q. And it has stamped in the upper right-hand corner April 6, 1983?
A. Yes.
Q. This is a letter from you, Mr. Morgan, to Lamar Alexander --
A. Yes.
Q. -- the then governor of Tennessee?
A. Yes.
Q. Do you recall this letter?
A. Yes.
Q. Did you draft it?
A. I signed it.
Q. Okay. Do you recall why you were sending this letter to Governor Alexander?

A. This was relative to interim storage, not monitored retrievable storage. Similar letters were sent, in my recollection, to the governors of South Carolina, Illinois, and maybe Idaho.
MR. BANES: Object to this line of questioning as irrelevant since the federal interim storage provisions of the Act have now expired.
BY MR. TOMASZCZUK:
Q. Do you understand that the federal interim storage provisions of the Act have expired?
A. I beg your pardon?
Q. Do you understand that the federal interim storage provisions of the Nuclear Waste Policy Act have expired?
MR. BANES: Objection. Calls for a legal conclusion.
A. I don't know that.
BY MR. TOMASZCZUK:
Q. At the time you drafted this letter, the Nuclear Waste Policy Act had certain requirements with respect to interim storage. Is that correct?



A. Yes.
Q. In the second paragraph of this letter to Governor Alexander, you wrote, "By the year 2000, approximately 58,000 metric tons of fuel will have been discharged from commercial reactors." Do you see that?
A. Yes.
Q. Was that a true statement at the time you wrote it?
A. I believed it to be true at the time I wrote it -- or signed it.
Q. And the reason you sent this letter to Governor Alexander was the possibility, as reflected in the third paragraph of the letter --
A. That's correct.
Q. -- that federally-owned facilities which might be suitable for interim storage of spent fuel were those situated at Oak Ridge National Laboratories?
A. That's correct.
Q. I'm going to ask the court reporter to mark and hand you another document. This will be Morgan 21.
(Deposition Exhibit No. 21



marked for identification.)
BY MR. TOMASZCZUK:
Q. This is a document that appears to be a draft letter, and it has the Bates numbers PNL-086-0153 through -0155.
MR. BANES: The Government poses the same objection to this exhibit as the last.
MR. TOMASZCZUK: I'm sorry. For the record, just so I know, what is that objection?
MR. BANES: It's irrelevant because the terms of -- the federal interim storage terms of the Nuclear Waste Policy Act have expired and are now irrelevant.
BY MR. TOMASZCZUK:
Q. Can you identify this document for me, Mr. Morgan?
A. It says it's a draft to the governor of Nevada. And it shows my signature block down on the bottom, but it is unsigned.
Q. Do you know what the purpose of this draft letter was?
A. The same as Exhibit 19 -- 20. I thought that we sent that letter to all of the governors where there were federal facilities



that might be used for interim storage.
Q. In the second paragraph of this draft letter, the sentence -- the first sentence of the second paragraph reads, "With respect to this latter requirement, we note that by the year 2000, approximately 58,000 metric tons of fuel will have been discharged from commercial reactors."
Do you know whether that was a true statement at or about the time this draft was prepared?
A. I felt it was a true statement. I felt it was a true statement on the letter I signed. And I don't -- since you don't show me a copy of a signed one, I don't think this is relevant. Excuse me.
Q. My question was simply whether or not you believed that.
A. I answered that question relative to Exhibit 20. It's the same question and the same draft letter.
Q. If I had the final version, I would have provided it to you, but this is the draft that I have.
A. If I signed it, the answer would be

I believed it to be true if I signed it. I don't sign things I don't think are true. Excuse me.
Q. Okay. I'm going to ask the court reporter to mark and hand you another document.
(Deposition Exhibit No. 22 marked for identification.)
BY MR. TOMASZCZUK:
Q. This appears to be a letter from Northern States Power Company to you dated March 3, 1983. And it has in the lower right-hand corner the Bates numbers HQR-052-0163 through -0167.
A. Yes.
Q. Do you recall, Mr. Morgan, receiving these comments in or about March 1983?
A. I don't recall. We received many letters from many utilities. I don't specifically recall this one.
Q. I was going to ask you about the first page of these comments and, in particular, under the numerical heading 1, the third paragraph starting with the word "Further."
A. Yes.
Q. And this paragraph reads, "Further,



the contract should have a clear statement of intent that DOE shall incur a contract obligation to take delivery of all spent fuel and high-level waste at the earliest practicable time upon the request of the owner or generator of such fuel and waste."
Do you know whether that comment was reflected in any way in the standard contract that was ultimately published by DOE?
MR. BANES: Objection. Calls for a legal conclusion. Asked and answered.
A. I believe that there is in the resolution process or -- whether it was in the first draft or the final rule -- that words "as early as practicable" I believe were in there.
But clearly there is no schedule for receipt or commitment that is covered in the contract.
BY MR. TOMASZCZUK:
Q. I'm going to hand you another document and ask the court reporter to mark it. And I believe we're up to No. 23.
(Deposition Exhibit No. 23 marked for identification.)
BY MR. TOMASZCZUK:



Q. Morgan 23 appears to be preliminary comments from Duke Power Company dated February 8th, 1983. And this exhibit is a three-page document which has in the lower right-hand corner HQR-052-0147 through -0149.
And, Mr. Morgan, do you recall receiving this document in or about February 1983?
A. No.
Q. I'd like to direct your attention to the third paragraph of these comments that starts with the word "second."
A. Yes.
Q. Do you see the reference there in the second and third lines to the effect that Duke believed it is appropriate that the purchaser be granted audit rights regarding DOE expenditures from the fund?
A. I see that here.
Q. Do you recall that issue being addressed at or about this time?
A. I don't see any cover letter that this was transmitted to the Nuclear Waste Policy Act Office. I can't deal with that. I don't recall. You haven't shown me that this was



transmitted to the Department.
Q. That's a fair point. My question was whether or not you recall the issue of audit rights, of utility audit rights coming up.
A. Audit rights was involved in the resolution on the final rule. And it was denied.
Q. And do you recall why it was denied?
A. I think it's self-explanatory in the rule.
Q. In the lower right-hand corner of this document is the designation HQR. Do you know what that refers to?
A. No.
Q. If I said it stands for headquarters, would that sound right to you?
A. That would sound right for me.
Q. Do you know whether the document came from DOE headquarter files?
MR. BANES: Objection. Calls for speculation.
A. I have no idea.
BY MR. TOMASZCZUK:
Q. I'd like you to now turn to an exhibit that was used yesterday, I believe, with

Mr. Blanton. And that would be Morgan Exhibit 7. Do you have that?
A. Yes.
Q. I believe, for the record, this was an action memo that -- from your office to the Secretary dated April 8, 1983.
A. Yes.
Q. I'd like to direct your attention to the very last page of this document, Bates stamp ZAB-001-0902.
A. Yes.
Q. Actually, you can go back to the previous page if you like. I'm going to ask you to direct your attention to paragraph seven there entitled Utilities Rights to Audit the Waste Disposal Fund with the words "rights" and "audits" in quotes.
A. That's on the bottom of page -901.
Q. Yes, sir.
A. Yes.
Q. And continues on to page -902.
A. Yes.
Q. At page -902 appears the sentence, "Additionally, the utilities will be able to get programmatic access from several other sources."



Do you see that?
A. Where is that located?
Q. At the very last page of the document, -0902, in the middle of the page there, the sentence starting with the word "Additionally" --
A. I see it.
Q. -- "the utilities will be able to get programmatic access from several other sources," colon, and then there's listed what appear to be several sources there.
A. Yes.
Q. What do you understand to be meant by the term "programmatic access" as that term is used here?
A. Access to the program is what we are doing, what are the activities to carry out the implementation of the Nuclear Waste Policy Act.
Q. And it's stated here that utilities will be able to get access to information relating to your office's activities. Is that fair?
A. That's fair.
Q. How was that information provided to the utilities?



MR. BANES: Objection. Calls for speculation and lack of foundation.
A. Beg your pardon?
BY MR. TOMASZCZUK:
Q. How was this reference to programmatic access met?
MR. BANES: Objection. Lack of foundation. The witness has not testified that he has worked for either the DOE IG, GAO, or the OMB.
BY MR. TOMASZCZUK:
Q. Do you understand my question?
A. No. Would you repeat it, please?
MR. TOMASZCZUK: I would ask the court reporter to read it back.
(The question appearing on page 287, lines 5 - 6, was read as follows:
QUESTION: How was this reference to programmatic access met?)
MR. BANES: Objection.
A. But it says the utilities will be able to get programmatic access from several other sources. It says that that's available if they ask for it.
I don't know if there were any



requests from the utilities for programmatic access or programmatic information that they hadn't already gotten from me.
We shared all the program planning documents with the utilities initially. And I don't think that this was ever kicked in because I don't think the utilities ever were denied anything relative to programmatic access.
BY MR. TOMASZCZUK:
Q. And do I understand this paragraph to essentially conclude that because the utilities would be able to get programmatic access, there was not going to be an audit provision put in the contract for the benefit of the utilities?
A. I think that the --
MR. BANES: Objection. Asked and answered.
A. It says, "Out of sheer history, there is clearly no precedent for the private sector to audit the Federal Government."
I believe that was what -- the reason that it was denied. And then it went on to say where you could get information if you weren't getting it from the program office.