**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**VOLUME V OF X**
**(Pages A 0612 to A 0761)**

---

**ENERGY NORTHWEST'S CORRECTED APPENDIX IN SUPPORT OF ITS CORRECTED NOTICE OF DESIGNATION OF DEPOSITION AND PRIOR TRIAL TESTIMONY OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO ADMIT PRIOR TESTIMONY INTO EVIDENCE**

---

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
202-639-6000

NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

June 2, 2008

*Attorneys for Plaintiff*

**Table Of Contents To Appendix – Volumes I to X**

**Volume I**

Documents Cited

DOE's Responses to Utility Plaintiffs' First Set of Interrogatories.........................A 0001

DOE's Responses to Utility Plaintiffs' Joint Supplemental Interrogatories.............A 0013

April 3, 2002 30(b)(6) Notice of Deposition .........................................................A 0028

April 18, 2002 30(b)(6) Notice of Deposition .......................................................A 0033

November 12, 2004 30(b)(6) Notice of Deposition................................................A 0039

March 2, 2005 30(b)(6) Notice of Deposition .......................................................A 0043

**Volume IA**

April 19, 2007 30(b)(6) Notice of Deposition .......................................................A 0047

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 2450874
(Fed. Cl. Sept. 17, 2004) (unpublished)..........................................................A 0050

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, slip. op.
(Fed. Cl. Sept. 21, 2004) (unpublished)..........................................................A 0063

*Wisc. Elec. Power Co. v. United States*, No. 00-697C, slip op.
(Fed. Cl. Aug. 16, 2007) (unpublished)..........................................................A 0073

Defendant's Unopposed Motion to Designate Prior Trial Testimony of
Mr. Robert L. Morgan in System Fuels ..........................................................A 0103

**Volume II**

Deposition Transcripts and Trial Testimony Excerpts

Chart of Energy Northwest Deposition and Trial Testimony Designations .............A 0109

Barrett, Lake ..........................................................................................................A 0128
April 22, 2002 ..................................................................................................A 0129
April 23, 2002 ..................................................................................................A 0165
April 26, 2002 ..................................................................................................A 0191
May 8, 2002 .....................................................................................................A 0225
May 10, 2002 ...................................................................................................A 0250
May 14, 2002 ...................................................................................................A 0278
May 15, 2002 ...................................................................................................A 0286

## Volume III


Brownstein, Alan ....................A 0289
April 9, 2002 ....................A 0290
April 10, 2002 ....................A 0318
April 11, 2002 ....................A 0350
May 23, 2002 ....................A 0363
June 14, 2002 ....................A 0368

Cole, Billy M. ....................A 0376
March 12, 2002 ....................A 0377
March 13, 2002 ....................A 0411
June 4, 2002 ....................A 0419

Dreyfus, Daniel ....................A 0422
May 15, 2002 ....................A 0423


## Volume IV


Klein, Susan ....................A 0438
April 24, 2002 (Rule 30(b)(6))....................A 0439
April 25, 2002 (Rule 30(b)(6))....................A 0478

Kouts, Christopher ....................A 0493
January 30, 2004 ....................A 0494
February 19, 2004 ....................A 0504
August 2, 2004 (in the Yankee Atomic Trial Transcript) ....................A 0509
April 11, 2005 (Rule 30(b)(6))....................A 0516
July 12, 2005 (in the TVA Trial Transcript)....................A 0532
October 26, 2005 (in the Southern Nuclear Trial Transcript)....................A 0538
June 13, 2006 (in the Pacific Gas Trial Transcript) ....................A 0550
June 14, 2006 (in the Pacific Gas Trial Transcript) ....................A 0555
October 11, 2006....................A 0571
January 16, 2007 (in the System Fuels Mississippi Trial Transcript)....................A 0581
April 12, 2007 (in the System Fuels Entergy Trial Transcript) ....................A 0585


## Volume V


Kouts, Christopher (continued)....................A 0612
May 1, 2007 (Rule 30(b)(6))....................A 0612
May 2, 2007 ....................A 0634

Lawrence, Michael....................A 0654
May 20, 2002 ....................A 0655
May 21, 2002 ....................A 0697
November 16, 2007 (in the Carolina Power Trial Transcript)....................A 0712

Milner, Ronald ........ A 0726
May 1, 2002 ........ A 0727

**Volume VI**

Milner, Ronald (continued)........ A 0762
May 2, 2002 ........ A 0762
May 3, 2002 ........ A 0799
May 7, 2002 ........ A 0814
May 7, 2002 (Afternoon) ........ A 0831
May 8, 2002 ........ A 0838
August 11, 2004 (in the Yankee Atomic Trial Transcript) ........ A 0851

Morgan, Robert ........ A 0866
March 21, 2002 ........ A 0867
March 22, 2002 ........ A 0905
June 25, 2002 ........ A 0913
August 3, 2004 (in the Yankee Atomic Trial Transcript) ........ A 0917

**Volume VII**

Morgan, Robert (continued)........ A 0925
November 15, 2006........ A 0925
November 16, 2006 (in the Northern States Trial Transcript) ........ A 0943
November 13, 2007 (in the Carolina Power Trial Transcript) ........ A 0953

Pollog, Thomas ........ A 0962
April 11, 2002 (Rule 30(b)(6))........ A 0963
April 12, 2002 (Rule 30(b)(6))........ A 1002
May 15, 2002 (Rule 30(b)(6))........ A 1026
May 16, 2002 (Rule 30(b)(6))........ A 1046
May 22, 2002 ........ A 1066

**Volume VIII**

Pollog, Thomas (continued)........ A 1073
August 4, 2004 (in the Yankee Atomic Trial Transcript) ........ A 1073
March 29, 2005 (in the SMUD Trial Transcript)........ A 1098
July 12, 2005 (in the TVA Trial Transcript)........ A 1108
October 26, 2005 (in the Southern Nuclear Trial Transcript)........ A 1115
October 12, 2006........ A 1122
November 15, 2006 (in the Northern States Trial Transcript) ........ A 1126

Rosselli, Robert........ A 1137
April 15, 2002 ........ A 1138
April 16, 2002 ........ A 1168

Rusche, Benard ....................A 1173
May 16, 2002 ....................A 1174
May 17, 2002 ....................A 1197
August 3, 2004 (in the Yankee Atomic Trial Transcript)....................A 1207

Slater-Thompson, Nancy ....................A 1215
April 21, 1999 ....................A 1216
April 22, 1999 ....................A 1228

**Volume IX**

Slater-Thompson, Nancy (continued)....................A 1239
June 13, 2002 ....................A 1239

Trebules, Victor ....................A 1255
April 17, 2002 ....................A 1256
April 18, 2002 (Coordinated Discovery) ....................A 1289
April 18, 2002 (Deposition in Yankee Cases....................A 1305
April 19, 2002 ....................A 1317

Williams, Jeffrey....................A 1319
June 11, 2002 ....................A 1320
January 22, 2004 ....................A 1340

Zabransky, David....................A 1368
April 17, 2002 ....................A 1369

**Volume X**

Zabransky, David (continued) ....................A 1401
April 18, 2002 ....................A 1401
April 19, 2002 ....................A 1428
June 5, 2002 ....................A 1440
June 6, 2002 ....................A 1445
August 5, 2004 (in the Yankee Atomic Trial Transcript)....................A 1449
March 28, 2005 (in the SMUD Trial Transcript)....................A 1473
March 29, 2005 (in the SMUD Trial Transcript)....................A 1487
April 12, 2005 (Rule 30(b)(6))....................A 1491
July 12, 2005 (in the TVA Trial Transcript)....................A 1503
October 27, 2005 (in the Southern Nuclear Trial Transcript)....................A 1508
November 20, 2006 (in the Northern States Trial Transcript)....................A 1519
October 11, 2007 (in the Wisconsin Electric Trial Transcript) ....................A 1528
October 12, 2007 (in the Wisconsin Electric Trial Transcript) ....................A 1532
November 13, 2007 (in the Carolina Power Trial Transcript)....................A 1538

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
----------------------------------:
DAIRYLAND POWER COOPERATIVE, :
Plaintiff, :
v. : No. 04-106C
UNITED STATES OF AMERICA, :
Defendant. :
----------------------------------:
ENERGY NORTHWEST, :
Plaintiff, :
v. : No. 04-0010C
UNITED STATES OF AMERICA, :
Defendant. :
----------------------------------:
Washington, D.C.
Tuesday, May 1, 2007
Volume 1
Deposition of:
CHRISTOPHER KOUTS
called for oral examination by counsel for Plaintiff, Dairyland Power Cooperative, pursuant to notice at the Law Offices of Greenberg Traurig, LLP 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Vicky Stallsworth Reiner of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:10 a.m., when were present on behalf of the respective parties:

1

A P P E A R A N C E S

On behalf of Dairyland Power Cooperative:
JERRY STOUCK, ESQUIRE
ROBERT L. SHAPIRO, ESQUIRE
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202) 331-3173

On behalf of Energy Northwest:
DAVID JIMENEZ-EKMAN, ESQUIRE
CHRISTOPHER TOMPKINS, ESQUIRE
Jenner & Block, LLP
330 N. Wabash Avenue
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of Defendant:
ALAN J. LO RE, ESQUIRE
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Suite 12070
Washington, D.C. 20530
(202) 307-0226

2

C O N T E N T S


EXAMINATION BY: PAGE
Counsel for Dairyland .................. 6
Counsel for the Defendant .............. 296
Counsel for Dairyland .................. 305

KOUTS DEPOSITION EXHIBITS: * PAGE
1 Summary of employment history at DOE .. 6
2 Excerpt of testimony at PG&E trial .... 28
3 Excerpt of testimony at PG&3 trial .... 40
4 Standard Contract between Dairyland Power Cooperative and the Department of Energy, dated June 15, 1983 ........ 58
5 March 04, 1992 letter from M. Detmer to Mr. J.E. Barrett at PG&E .......... 66
6 Excerpt of testimony at PG&E trial .... 79
7 Delivery-commitment schedule forms .... 91
8 July 28, 2004 letter from Mr. Zabransky to William Berg ...................... 104
9 Letter to Russ Shultis identifying 30(b)(6) topics ...................... 114
10 Letter from Marian Sullivan designating witnesses for 30(b)(6) topics ......... 114


3

C O N T E N T S (Continued)


11 Notice of Deposition ................. 114
12 Segment of trial testimony from Yankee Atomic trial .................. 127

KOUTS DEPOSITION EXHIBITS: * PAGE
13 Excerpt from proceedings of 1983 Civilian Radioactive Waste Management information meeting held in December of 1983 ............................. 150
14 June 1987 Annual Capacity Report ...... 166
15 1988 Annual Capacity Report .......... 172
16 December 1991 Annual Capacity Report .. 193
17 1987 Monitored Retrievable Storage submission to Congress ............... 206
18 1995 APR and ACR ..................... 218
19 Excerpt of 1985 Mission Plan .......... 271
20 Excerpt from June 4, 1999 deposition in Yankee Atomic case ................ 275
21 Letter from Michael J. Lawrence to Ben Rusche, dated July 23rd, 1984 ..... 281
22 Memorandum on the Department of Energy memo letterhead stationary dated


4

C O N T E N T S (Continued)

December 21, 1992 ..................... 284
23 Letter from Spencer Abraham, Secretary of Energy, to Senator Orrin Hatch, dated July 8, 2002 .................... 288
24 Memorandum on the Department of Energy memo letterhead stationary dated December 20, 1991 ..................... 290

(*Exhibits attached to transcript.)



P R O C E E D I N G S
\- - - - - -
Whereupon,
CHRISTOPHER KOUTS
was called as a witness, and, having first been duly sworn, was examined and testified as follows:
(Kouts Exhibit No. 1 was marked for identification.)
EXAMINATION
BY MR. STOUCK:
Q Good morning, Mr. Kouts.
A Good morning.
Q We've met before. And I know that you are experienced at testifying in depositions, so I won't belabor the mechanics.
Is there any reason today, like illness or medication, that you cannot give your best testimony?
A Not that I'm aware of.
Q Okay. You've been handed what's been marked Exhibit Number 1 to this deposition, which is a -- a summary, I would say, I think of your



employment history at DOE. And I want to ask you about the accuracy of this document.
MR. LO RE: Is this -- for the record, Counsel, is this a document --
MR. STOUCK: I don't know the source of this document, if that's your question. Okay. I don't know where this came from. It's a compilation from somewhere. I don't -- it's certainly not an official resume. It doesn't look like one to me. That's why I'm going to ask him about the accuracy of it. That's one of the reasons.
BY MR. STOUCK:
Q So starting at the top, Mr. Kouts you did join DOE in 1985; is that correct?
A Yes.
Q Approximately when in 1985?
A I believe it was in June of 1985.
Q What was your immediately prior position? Or were you in school? Or did you have a job?
A No. I worked in a different area of the Department, in the Office of Conservation and Renewable Energy.



Q I see. So June of '85 is when you joined OCRWM?
A That's correct.
Q Prior to that you were employed by the Department of Energy?
A Yes.
Q When were you first employed by the Department of Energy?
A I believe I was first employed by the Department of Energy in 1978.
Q Okay. But prior to June of 1985, you had no involvement with OCRWM or the spent nuclear fuel program; is that correct?
A No. That's not correct.
Q Okay. What -- prior to June 1985, what involvement did you have with OCRWM or the spent nuclear fuel program?
A In one of the positions that I held, which was working, at that time, for the Office of Environment, and I don't remember the specific organizational name at that time because that has mutated over the years, I was responsible for

MR. STOUCK: Yeah. And I'll also note that we did find a copy of the order for you.
MR. LO RE: Thank you.
BY MR. STOUCK:
Q I'm just curious about this. And we'll talk about MRS matters a little later, Mr. Kouts. But I was curious about the centralized interim storage facility that was being worked on in some fashion in this '95/'96 time frame.
Can you just briefly tell me how that came about that DOE was looking at that in that time frame?
A In that time frame, and I believe if you go back, you could look at our budget request for that time frame, the Department requested funds to develop a topical safety analysis report for a centralized interim storage facility.
The rationale behind undertaking this effort was that there were a variety of bills that were winding their way through Congress. And all of those bills anticipated a very quick deployment of a storage facility, should a site be identified and

21

should the Congress approve it, which would also have meant that the Nuclear Waste Policy Act would have had to be amended.
In anticipation of the potential passage of those bills, the Department undertook the development of a topical safety analysis report to -- that would have been used to expedite the licensing of such a facility should authorization modifying the Act allowing the implementation of such a facility be passed and enacted by Congress and signed by the President.
Q Okay. And was the development of that safety analysis report your principal responsibility during the time that you were in this position, starting after your work for Dr. Dreyfus?
A No. There were other activities within the division.
Q Okay. Well, how would you -- just, again, summarize your -- what was the job that you were in at that time? Generally, what were your responsibilities?
A Well, in addition to the topical safety

22

analysis report on -- on a centralized interim storage facility, we also worked on a topical safety analysis report for a dry transfer system that could be deployed at reactor sites. And the potential use of that would have been to assist those reactors that did not have transfer capability on site for spent fuel into dry storage devices or into larger transportation casks.
Q Okay. What was your position? What was your title? It indicates here, on this paper that we're looking at, storage and technology division?
A That's correct.
Q You were working in that division?
A I was the director of the storage and technology division.
Q Okay. You were the director. Got it. Okay.
And were both of those SARs completed, the two that you've told me about?
A Yes, they were.
Q And do you -- you know, what's your best -- and was your next position as Yucca Mountain

23

liaison?
A That's correct.
Q And that was liaison between headquarters and the Yucca Mountain project office?
A That's correct.
Q Can you give me your best estimate of when you assumed that position?
A It was in either in late 1997 or early 1998. I remember undertaking a substantial effort on the -- on the 1998 viability assessment, which is incorrectly identified here. You have it down as a liability assessment. It's a viability assessment that was directed by Congress. That was submitted in 1998. I remember working on it. And I believe I started, perhaps, in late 1997 in that position.
Q Okay.
A But I -- again, I don't have a specific month that I transferred into my new duties.
Q Okay. And your next position was your current position; is that correct? First on an acting basis and then permanent?
A Actually, this is inaccurate. Because

24

the office of systems analysis and strategy development no longer exists. We reorganized last year. And the title of my office now is the waste management office. And I'm director of that office.

It has essentially the same duties that the previous position had except they don't have safeguards now. That went to another organization. But by and large that's -- it was a major change.

Q Well, let's take it one step at a time. After you left your position as Yucca Mountain liaison, did you become the director for what was then called the Office of Systems Analysis and Strategy Development?

A I became the acting director for that office.

Q Was that in 2002?

A Yes.

Q When in 2002?

A Approximately in October of 2002.

Q And at some point you became the not acting but the permanent director of that office?

A I believe that was in July of 2003, as



your paper indicates.

Q Right. And then at some point, that office, as you just said, was reorganized, kept most of its functions. Maybe a couple went somewhere else. Kept most of its functions but now has a different name?

A That's correct.

Q And you're still the director?

A Yes, I am.

Q And when did that reorganization take place?

A The reorganization took place last year. The effective date of the organization was April or May. I don't remember the specific date.

Q Okay. Thanks a lot. For now, I'm done with that piece of paper, although obviously you can keep it in front of you.

Let me ask you this, Mr. Kouts. I want to get -- since the beginning of 2006, about the last year, almost a half, can you give me your best estimate of approximately what percentage of your time, what percentage of your time from, you know,



in the last, say, year and a half, just an estimate, but your best estimate, what percentage of your time has been spent in any way on this spent nuclear fuel litigation, whether depositions, trial testimony, talking to lawyers, getting ready for things. Just an estimate. But I would like your best estimate.

MR. LO RE: Objection. Vague.

BY MR. STOUCK:

Q If you're more comfortable with a different time -- if there's some other way you can estimate in your mind a different time frame, that would be okay, too.

MR. LO RE: Same objection.

THE WITNESS: I'd say somewhere between 10 and 20 percent of my time.

BY MR. STOUCK:

Q And that would be since the beginning of 2006?

A Roughly. If you're talking about actual time spent in the office or whether in depositions or in court, I would say no more than 10 to 20 percent.



MR. STOUCK: Okay. Thanks. Can you mark this as Number 2, please.

(Kouts Exhibit No. 2 was marked for identification.)

BY MR. STOUCK:

Q Mr. Kouts, you've been handed what's been marked as Exhibit Number 2 to this deposition, which is an excerpt of your testimony at the Pacific Gas and Electric trial last summer. I was questioning you. And just to orient you, as you may recall, I asked you some questions about ACRs and APRs and DCSs. And you gave me some answers, which I thought were different from answers that you had given in a deposition in June of 1999. And I asked you about that.

And again, just generally -- we'll look at the specific testimony. Just generally, you told me you had learned some things since that deposition which led you to have different answers. That's how you explained the discrepancy. Do you recall the exchange, generally?

A Generally.

Now, what was your role, Mr. Kouts, in the development of the 2004 ACR/APR?
A It was developed under my direction.
Q Okay. Did you have ultimate responsibility for the document once it was finalized and prepared? Ultimate in the sense of -- well, did you have ultimate responsibility for it?
Strike that.
What does it mean when you say it was prepared under your direction? What was your role? That's really what I'm interested in.
A Okay. Well my staff developed it with the support from contractors. And my role was to verify its accuracy, appropriateness for issuance, and also to work with senior management within the program toward its issuance.
Q Okay. Thank you. And do you know if -- do you know whether or not, in connection with the 2004 ACR/APR, DOE distributed new DCS instructions?
A It distributed instructions, yes.
Q Okay. Were they not new? I mean why do you omit the word "new" from your answer which was

97

in my question?
A New instructions as opposed to --
Q Well, we looked at some instructions before. Do you recall those? They were dated 1992.
A I very well do.
Q Okay. I'm -- okay. I guess I termed them -- termed the 2004 instructions new instructions because my understanding is they are different than the 1992 instructions.
Do you have a different understanding -- are they the same instructions that were distributed in '92 that were just redistributed in 2004?
A They're very similar instructions.
Q Well, are they identical?
A There will certainly be differences in the dates.
Q Any other differences?
A There might be minor differences here or there.
Q Do you know one way or another, before comparing them, whether or not there were differences between the instructions that DOE

98

distributed in 1992 and the instructions that were distributed in 2004?
MR. LO RE: Objection. Asked and answered.
THE WITNESS: There were differences.
BY MR. STOUCK:
Q Okay. What was your role in the development of the 2004 DCS instructions?
A They were developed under my direction.
Q So pretty much the same answer you gave me when I asked you for your role in the ACR itself?
A That's correct.
Q Staff, contractors, and then you reviewed and so forth?
MR. LO RE: By the way, I would like to put on the record that we object to this line of questions on the grounds that it is outside the scope of the forthcoming trial in Dairyland and is inconsistent with the holding in Indiana and Michigan.
BY MR. STOUCK:
Q Was your role in development of the 2004

99

DCS instructions the same as your role in the development of the -- of the 2004 ACR, Mr. Kouts?
A Yes.
Q Okay. Now, why did DOE issue the 2004 ACR/APR?
A Because --
Q Excuse me.
A Are you finished, Counsel?
Q Yes. I'm sorry.
A Because the Department anticipated that it was going to have a facility available for waste acceptance in 2010.
Q Okay. And was -- any other reason that you know of that the 2004 ACR/APR, that DOE decided to issue that document at that time or about that time?
A Other than that the Department was planning to have a repository available.
Q That was the -- that was -- you know, that was the main, principal motivating reason for issuing the document?
A Yes.

100

Q Okay. Does that -- do you know whether there was any -- do you know when the prior -- the immediately prior ACR or APR was issued before 2004, the last prior one, prior to that?
A To the best of my recollection, it was the 1994 APR/ACR that was issued in early 1995.
Q So does that mean that DOE did not anticipate having a facility available -- that during that time period between the issuance of the '94 or '95 ACR in early '95 that you just told me about and the issuance of the -- or the preparation of the 2004 ACR/APR, during that time period, DOE did not anticipate having a facility available for acceptance of spent fuel?
MR. LO RE: Objection. Mischaracterized the testimony. Vague as to time.
BY MR. STOUCK:
Q Would that be a fair inference to draw from the answers you've given me to the preceding questions?
THE WITNESS: You would have to specify what time period you're referring to.

101

BY MR. STOUCK:
Q The time period between the issuance of the -- you termed it the '94 ACR that was issued in early 1995 and, you know, the preparation of the 2004 ACR/APR. I mean, I'm not talking about the exact days. But there was a roughly 8 or 9-year period there. You told me that the reason DOE issued the 2004 document was the anticipation that there would be a facility available.
Now I'm asking you whether it would be reasonable to just infer that, during the time period, that long 9-year gap or the 8-year gap between the two ACR/APRs, is it reasonable to infer that, during that period, DOE did not anticipate -- or is it not reasonable? You know, but the question is: Does it mean that DOE did not anticipate having a facility available to accept spent fuel during that period?
MR. LO RE: Objection. Vague as to when the facility would be open.
THE WITNESS: I think the best way for me to answer that question is that, in that time frame,

102

the Department did not anticipate that it would have a facility for waste acceptance available within a 63-month time frame.
BY MR. STOUCK:
Q Okay. Okay. And so your understanding is that when -- or is this right, that when DOE believes that it will have a facility available within a 63-month time frame, then it should issue a new ACR or APR?
A Prior to the 63 months, yes. So there can be a -- so the planning process as identified in the contract can occur.
Q Okay. And conversely, it's your understanding that if DOE does not anticipate having a facility available within a 63-month period, then there's no obligation on DOE to issue an ACR or APR; is that correct?
MR. LO RE: Objection. Mischaracterizes the testimony.
BY MR. STOUCK:
Q Take obligation out. There's no need for DOE to issue an ACR/APR; is that right?

103

A The contract calls for the issuance of an APR/ACR. However, in the Department's view, to issue one does not serve any useful purpose since it would not have specific information for the utilities to plan with.
Q Wouldn't be useful, since there's no facility?
A Correct.
Q Okay. And do you know whether or not -- do you know whether or not DOE made that determination during that period that it -- well, strike that.
The question really is: Do you know why -- well, strike all that.
I think I've got my answer. Thanks.
Now, do you know -- okay. Let's mark this as the next number, please, which is 8.
(Kouts Exhibit No. 8 was marked for identification.)
BY MR. STOUCK:
Q Mr. Kouts, what's been marked as Exhibit Number 8 to this deposition is a July 28,

104

A That was the Department's desire, yes.
Q Okay. Now, the -- the DCSs that were approved in the 1990s, they were based on acceptance rates, you know, in the '91 ACR and elsewhere that reflected an MRS with a capacity limit of 10,000 MTU. Is that your understanding?
A That's correct.
Q Okay. And that MRS -- well, no MR -- currently, DOE's plans do not include an MRS; is that correct?
A That's correct.
Q Do you know whether or not the DCSs that were submitted in the 1990s and approved by DOE are still binding today?
A You know, that's a legal question. And that's a reason why we're involved in 65 different actions. I think there is a view that -- it's what this litigation is all about.
Q What's your understanding of whether or not those approved DCSs are still binding today?
MR. LO RE: Calls for a legal conclusion.
THE WITNESS: My sense is, yes, they're

113

still binding.
BY MR. STOUCK:
Q Even though -- okay. Even though -- okay. Even though the MRS is not currently part of your plan?
A Yes.
MR. STOUCK: Okay. All right. I want to turn now to the 30(b)(6) topics, which I know will make Mr. Lo Re happy -- less unhappy.
MR. LO RE: Everything is relative.
MR. STOUCK: Do you want to take a short break? I'm ready to plow forward, but if you want to take a short break, we can do that for a while and then have lunch.
THE WITNESS: I can keep going.
MR. STOUCK: Okay.
(Kouts Exhibit Nos. 9, 10 and 11 were marked for identification.)
(Discussion off the record.)
MR. STOUCK: Okay. We've got three exhibits here. And just to summarize a colloquy we just had off the record, Exhibit 9 is my letter to

114

Russ Shultis, identifying the 30(b)(6) topics that we wanted to put to the government's designated deponents.
Exhibit Number 10 is Marian's letter responding to me and identifying three witnesses, Mr. Kouts, Mr. Pollog, Mr. Zabransky as the designated witnesses for certain respective topics.
There was a subsequent letter, which I'm not going to burden the record with, that took number 15 away from Mr. Kouts and put it on to Mr. Zabransky.
And Exhibit Number 11 is a -- a notice of this deposition which takes the 30(b)(6) topics designated for Mr. Kouts in Exhibit 10 and subtracts out topic number 15, because that was moved to Mr. Zabransky, and renumbers the remaining topics 1 through 8. And that's what we're going to be dealing with momentarily. Okay.
MR. LO RE: Okay.
MR. STOUCK: Is that okay with you?
MR. LO RE: Does that make sense to you?
THE WITNESS: That's fine.

115

MR. LO RE: Thank you.
BY MR. STOUCK:
Q Mr. Kouts, I think all you need from all of that is number 11, actually. But you can keep the other ones handy in case that's wrong. Here is number 11.
You understand that you have been designated as a 30(b)(6) witness to testify on the government's behalf on certain topics that are listed in Exhibit Number 11; is that right?
A Yes.
Q Okay. And just tell me, in your own words, what is your understanding of what that role entails?
A Providing answers for the government on these specific questions.
Q Okay. And are you able to do that today?
A Yes, I am.
Q Okay. Let's take the first one. And I'll read it into the record as topic number 1 on the -- on Exhibit 11.
The rate(s) of acceptance that DOE

116

planned to use under the Standard Contracts, A, before DOE determined that it would not begin accepting spent fuel in a permanent repository in 1998; and, B, after that time.
A Okay.
Q Do you understand the topic?
A Yes.
Q Okay. Let's start with when did DOE make the determination that's referred to here, that it would not begin acceptance at the repository in 1998?
A I believe -- well, the government provided notice to the Congress in early March 1987 that the Department schedule for the beginning of waste acceptance at a repository would not be in 1998. So it was an early March of 1987.
Q Okay. Notice to the Congress, do you know in what form? Was there a particular document that was transmitted to Congress that you're thinking of?
A Yes. The MRS proposal to Congress identified the fact that the repository was no

117

longer going to be submitted -- going to be operational until 2003.
Q And that is the document -- can I just show it to you? We'll get to this later. But it's marked as Defendant's Exhibit 107 in the PG&E case. And it's called Monitored Retrievable Storage submission to Congress in 1987. Is it is that the document you're referring to?
A Correct.
MR. LO RE: Let the record reflect the counsel has shown the exhibit.
BY MR. STOUCK:
Q As I said, I think we'll get to it later.
So that's what you identify as the -- as the time that that -- this determination was made that, you know, officially, that acceptance at a repository would not begin in 1998?
A The decision was made several months prior to the submission of that document, but it was in that general time frame, yes.
Q Okay. All right. Did you have any involvement in that determination?

118

A In the determination?
Q It would --
A Did the government have any involvement in that? Is that what you're asking? Or asking --
Q Chris Kouts.
A -- me, personally, whether I had had involvement?
Q Yes.
A In the decision to delay the repository 5 years, I sat in the briefings associated with the schedule for the repository but I was not the decision maker.
Q Okay. And did you have any responsibility for the decision?
A I was working in the MRS program at that time. I had no responsibility in the repository schedule area.
Q Now, again, back to -- to this topic number 1, it refers to the rates of acceptance that DOE planned to use. Do you see that? This is on your Exhibit Number 11.
A Yes.

119

Q Okay. What is your understanding of that term the -- the rate of acceptance that DOE planned to use? Before I ask you questions about it, I want to get your understanding of that phrase.
A Okay. I'm getting confused as to whether or not you're asking me as a statement on the part of government or personal.
So if you could preface your statements by saying I'm asking your personal opinion or your personal involvement, or I'm asking for the government's position on it, that would be very helpful.
Q All of these -- I'm sorry.
That's a very fair question, Mr. Kouts, and let me try to address it. And if your counsel wants to add something, I'm sure he will.
We're in a part of the deposition now, this Rule 30(b)(6) part of the deposition, where all of the questions that I'm asking you are addressed to you in your capacity as a 30(b)(6) witness, which means that you are speaking for -- for the government, if that's your understanding of what

120

specific facility. Did they differ for the
repository? Did they differ for an MRS? You know,
you -- it would be helpful if you were more
specific.
Q I thought my question was easier, which
was: Did they ever differ at any time? It was a
broader -- again, not to be too open-ended, but --
and if the answer to that is no, then we're done.
If the answer to that is yes, we can zero in on
exactly what it was. If the answer is you don't
know, that's your answer.
A The simple answer to your question is
that facilities are designed according to baseline
requirements of the program. In order to assure
that the facility has the capacity to handle
acceptance rates, sometimes designers will take
acceptance rates that are in the baseline of the
program and design greater capability into the
facilities such that, if those facilities -- if a
specific aspect of those facilities is down, that we
would still have the capability to meet the
acceptance rate.



So the potential is that the acceptance
rate could be different than the maximum receipt
rate of facilities. That could have occurred and
probably did occur over the development of designs
for the various facilities that the Department
developed over the years of the program.
Q Okay. But you're not able to cite me any
specific examples, which, you know, I'm not -- it's
a long period of time here. But are you able to
cite me any specific examples of when the receipt
rate differed from the acceptance rate?
MR. LO RE: Objection. Compound.
THE WITNESS: Typically, receipt rates
would exceed acceptance rates by a percentage in
order, again, to assure that, given the operations
of the facilities and anomalies in those operations,
that we could still maintain the acceptance rates
planned for those facilities.
BY MR. STOUCK:
Q It's kind of like a buffer or
contingency?
A That's correct.



Q Okay. Is there any other reason than
this -- you know, I've characterized it as a buffer
or contingency but I think you sort of generally
agreed with that.
Is there any other reason besides that,
that sort of margin of excess capacity that the
receipt rate would differ from the acceptance rate?
A Yes.
Q Okay.
A If there were statutory limitations, the
capabilities of the facilities.
Q Okay. And how -- how would any such
statutory limitations cause the acceptance rate to
differ from the receipt rate?
A Well, in -- specifically in the case of
an MRS, the MRS cannot receive any more than 10,000
metric tons of spent fuel until the repository is
operational.
So to the extent that, depending on when
the MRS is deployed, the capabilities of that
facility would need to be adjusted to address the
statutory limitations on total amount of fuel



that --
Q Okay.
A -- that the facility could handle in a
specific period, depending on what those statutory
limitations were.
Q Right. That would limit the receipt
rate, if I'm understanding this correctly. But how
would those statutory limitations or any statutory
limitations cause the acceptance rate to differ from
the receipt rate, which I thought is what you told
me before?
MR. LO RE: Objection. Asked and
answered.
THE WITNESS: To the extent that the
statutory limitation and the time frame under which
the facility would be operational, depending on what
the limitation is, that specific limitation would
affect the design of the facilities since the
facilities would have to stay under that capacity
limitation.
BY MR. STOUCK:
Q So the acceptance rate could be -- let's

take the example of the 10,000 MTU capacity limit, which I think you're referring to, or I'll refer to in my question. It's possible that the acceptance rate could -- could exceed the receipt rate as the receipt rate is constrained by that limitation. Is that -- is that possible?
A The acceptance rate could never exceed the receipt rate.
Q Ah. Okay. Okay. Well then -- okay.
A The receipt rate is the capabilities of the facilities. The acceptance rate is what's the planning basis for -- for acceptance in terms of what would be received from purchasers.
Q Okay. Then I'm sorry, but I'm still not understanding how statutory constraint on capacity could cause the receipt rate to depart from the acceptance rate.
Because if I understand your last answer, the acceptance rate is always below the receipt rate. But if I understand your other answers, the statutory constraints only operate on the receipt rate. So -- but, you know, maybe I'm not --

133

A Perhaps the best way is to provide an example.
Q Okay.
A The APR/ACRs that went out in the '91/'92 time frame envisioned an MRS operational in the 1998 time frame with the repository operational in the 2010 time frame.
Q Okay.
A Given that 12-year difference in the operations of the facilities, the acceptance rate and the design for the MRS, from an economic and -- and management standpoint, would need to be reduced to be in the -- as the APR/ACR indicated, approximately 900 tons per year.
It would make no sense to develop an MRS with a capability of 3,000 metric tons per year and all the surface facilities and all the transportation equipment that would need to be bought for those for a 3,000-ton acceptance rate, for example, and only operate the facility for 3 and a third years until the repository was operational.
So to the extent that the capacity

134

limitations dictated the acceptance rate and the receipt rate of the facilities, that was a factor in terms of how the Department would design the facilities.
Q Okay. Thank you. Here is Exhibit Number 12.
Mr. Kouts, this is a segment of your trial testimony from the Yankee Atomic trial. Do you remember that one a couple years ago?
A Vaguely.
Q Okay.
A Yes.
Q But it's on the same subject. If you look at page 3450 -- let's see. I'm sorry. 3451, line 5, what is the receipt rate? Okay. And you gave an answer that I think, you know, is not unlike the answer you've given us today.
And then I asked you about acceptance rate. Do you see that?
A Yes.
Q And the answer on acceptance rate that you gave here on line 14 was, quote: The acceptance

135

rate is the contractual rate at which the Department has committed to receive materials from the contract holders, close quote.
Do you see that?
A Yes.
Q Is that right?
A Yes.
Q Then I asked on line 21: Could the receipt rate and the acceptance rate be different?
And you said: Yes, they could.
Do you see that?
A Yes.
Q And I asked you why. And you can read the answer to yourself, but generally it says, I'm paraphrasing, that from a business standpoint, a business judgment, that DOE could determine it does not want to commit to accept materials at the amount of maximum capability.
Do you see that?
A Yes.
Q Okay. And that's -- you know, I don't -- is that -- is that right?

136

ACR.
And if I were to ask you -- actually, I do not have a copy of here because I wasn't planning to use it. But in 1987, if I asked you what was the rate of acceptance that DOE planned to use under the Standard Contracts, your answer is the rates shown in the 1987 ACR? Is that right?
MR. LO RE: Objection. Vague. Objection. Calls for speculation.
THE WITNESS: Planned to use -- can I ask a clarification question here? Planned to use for acceptance in 1998?
BY MR. STOUCK:
Q Well, I mean my question did not have that part of it. Again, the topic that we've asked you to come testify on behalf of the government on is shown here in paragraph number one. And I'm still just on the first line of that.
The rates of acceptance that DOE planned to use under the Standard Contracts. And we've sort of been going year by year. Hopefully we won't have to do every year. But so far we've been doing every

165

year.
I am asking you, in 1987, what was the rate of acceptance that DOE planned to use, if any, under the Standard Contracts?
My question doesn't include 1998. But if that's what DOE was planning to do, I guess, which I think is what's shown in the '87 ACR -- would it be helpful to get a copy of the '87 ACR?
A Okay.
(Discussion off the record.)
(Whereupon, at 1:38 p.m. a recess was taken until 1:40 p.m.)
(Kouts Exhibit No. 14 was marked for identification.)
BY MR. STOUCK:
Q You've been handed what's been marked Exhibit Number 14. It's the June 1987 Annual Capacity Report, correct?
A Yes.
Q If you turn to page 7. Table 2.1, do you see that?
A Yes.

166

Q Now let me just ask you, are these the rates of accept -- in 1987, or as of the time of this document, are these the rates of acceptance that DOE planned to use under the Standard Contracts?
A Yes.
Q Okay. Now I want to ask about receipt rates, okay. In 1985, what receipt rate, if any, was DOE planning to use?
A To the extent that there was design -- conceptual design of facilities, the capabilities of the facilities would have been designed to meet the schedules identified for both the repository and the MRS, as identified in the '85 Mission Plan.
Q Okay. So you're saying that the -- the rates identified in the '85 Mission Plan for both the approved -- well, for both -- let me just ask the question. You're saying the rates identified in the '85 Mission Plan for both the approved design and the improved performance or enhanced performance, those are the receipt rates that DOE, at that time in 1985, was planning to use?

167

A Those were the steady state receipt rates, recognizing that the facilities, as was represented earlier, that the facilities needed to have additional capability over and above the planned receipt rates in order to make sure you could deal with maintenance cycles and anomalous situations in the operation of the system.
Q I thought that the additional capability that you told me about earlier was an additional capability for rates above the acceptance rates. So I -- again, I know --
A The -- the acceptance rates and the receipt rates were very similar in terms of planning rates within the program.
Q Okay.
A But the design engineering rates, in terms of what the physical capacity of the facilities would be, would have to assure themselves that they could deal with the anticipated receipt rates with some margin to deal with anomalies in operation.
Q Okay. I'm going to hand you what I'll

168

represent to you as pages 26 and 27 of the 1985 Mission Plan. I've only got one copy. I'm sorry. We'll get more copies if necessary. This is the Mission Plan.

MR. LO RE: Are you marking this as an exhibit?

MR. STOUCK: No.

BY MR. STOUCK:

Q That is pages 26 and 27 from the 1985 Mission Plan. You can just take my representation on that. Those are the rates we've just been talking about; is that right?

A Yes.

Q Okay. Are those the receipt rates that DOE was planning to use in 1985?

MR. LO RE: Objection. Asked and answered.

THE WITNESS: As I testified earlier or as I provided information earlier, these were the nominal design rates in which the facilities would have -- have to be sized in order to meet this schedule.

169

And to the extent that any design work in the system was ongoing, which was very embryonic, these were the guides to the engineers to understand basically how many receipt bays they would need in any one year in order to meet what's identified here.

BY MR. STOUCK:

Q So you would not say that DOE was planning -- that those are the receipt rates that DOE was planning. It's just too preliminary? Is that the -- is that the tenor of your response? Or was DOE planning to use those receipt rates?

MR. LO RE: Objection. Asked and answered.

THE WITNESS: As the Mission Plan says in numerous places, these schedules are illustrative and can change. So the -- what might have been the planning basis for this, and subsequently into the program those did evolve and change. As we get into other documents, you'll see how they did change.

BY MR. STOUCK:

Q At this time.

170

A At this time, this was more or less -- the best way for me to represent it was the technical baseline for the program in the sense that this -- that the facilities needed to be designed to address this kind of receipt rate into the system.

Q Okay. But you would not say these are receipt rates that DOE was planning to use, which is, again, the language of the topic?

A Again, planning -- again, going back to your question, which was plan to use under the Standard Contracts, I think you have to go back to the Annual Capacity Report. And as we move forward, you'll see that that evolves also as the -- our deployment of the system.

Q Right. Those are acceptance rates?

A Right.

Q Now we're talking about receipt rates.

A Correct.

Q Are the rates on that piece of paper, pages 26 and 27 from the 1985 Mission Plan, are you able to say that those are receipt rates that DOE was planning to use at that time or are you not able

171

to say that, for whatever reason? For example, because the -- you know, there just were not any plans that were sufficiently formed that you're able to testify that DOE was planning to use those rates?

MR. LO RE: Objection. Asked and answered.

BY MR. STOUCK:

Q Or for whatever other reason you're not able to say that DOE was planning to use those rates? That's just --

A I would characterize these as receipt rates and design basis rates for those who were doing design work for the facilities to size those facilities from a design standpoint.

Q Okay. Thank you. Let me have that back.

MR. STOUCK: Now let's mark this, which is number 15, I think.

(Kouts Exhibit No. 15 was marked for identification.)

BY MR. STOUCK:

Q All right. Exhibit 15, Mr. Kouts, is the 1988 ACR. Is that what you have in front of you?

172

A Yes.
Q Okay. Good. And I take it, on page -- is it 5? What page is this on? Yeah. Page 5 -- are you on page 5?
A Yes.
Q In 1988, those were the acceptance rates that DOE was planning to use under the Standard Contract; is that right?
A Yes.
Q Okay. Actually, I'll tell you what, before we get into the '88, let's go back to the '87 for a moment, if we could. And you can certainly consult the ACR if you want to.
Do you know whether the -- well, you do know that DOE, in the 1980s, missed certain deadlines or milestones in the statute for various steps in the repository siting process; is that right? There were statutory milestones that DOE did not scrupulously conform to?
MR. LO RE: Objection. Counsel, can you explain how that relates to this 30(b)(6) notice, Counsel?

173

MR. STOUCK: I'm going to ask him whether it affected rates.
MR. LO RE: Does it relate to the 30(b)(6)?
MR. STOUCK: I'm going to ask him whether it affected rates.
BY MR. STOUCK:
Q My question is: Isn't it true that DOE missed -- there were statutory milestones in the NWPA for siting a repository and DOE missed at least some of those statutory deadlines?
MR. LO RE: Objection. Beyond the scope.
MR. STOUCK: I'm trying to orient him.
MR. LO RE: Beyond the scope of this deposition.
THE WITNESS: In relation to the repository, I would have to review the Act. I believe the MRS proposal certainly was delayed due to litigation brought on by the state of Tennessee.
In terms of the issuance of the Mission Plan, which is the only milestone that I believe -- I would have to go back and count the months under

174

which the Act required that the Department to issue that. My sense is that the desire of Congress was to have it submitted earlier. But I would have to review the Act to make determinations as to what potential statutory milestones were missed by the Department.
BY MR. STOUCK:
Q Okay. Thank you for that, Mr. Kouts.
Do you know whether or not the NWPA specified milestones for various steps in the process of siting repositories?
MR. LO RE: Same objection. And the question -- now I'll object on the grounds that, are you now asking Mr. Kouts as the 30(b)(6) witness or in his personal capacity?
MR. STOUCK: We're on 30(b)(6).
MR. LO RE: I'll object as outside the scope of this notice. This notice says nothing, Jerry, about --
MR. STOUCK: Okay. I'll ask him in his personal capacity.
BY MR. STOUCK:

175

Q Do you know whether or not the NWPA set forth milestones, dates by which DOE had to take various steps in the process of siting one or more repositories? If you know, fine. If you don't know, just tell me.
A I would have to go back and review the Act.
Q So you don't know.
A Not offhand.
Q Okay. Thank you. Now, the 1987 amendments to the NWPA, are you generally familiar with that enactment?
A Yes.
Q Okay. And that statute imposed something we've already referred to, which is -- it authorized an MRS, correct?
A Yes.
Q And it imposed a 10,000 MTU capacity limitation on the MRS until a repository was operational; is that correct?
A Yes.
Q Okay. And it also linked the -- in some

176

manner linked the MRS to construction authorization for the repository, correct?
A To be precise, the MRS could not be constructed until the repository received a construction authorization from the Nuclear Regulatory Commission.
Q Right. Okay. Now, back to Exhibit Number --
A In addition to that, it could not be sited until the site was selected for a repository.
Q Until a site was selected for a repository.
A That's correct.
Q Selected by whom?
A Selected by the Secretary, following the dictates of Section 114.
Q Okay. Now, back to the '88 ACR, if you would, please, turn to page -- that's this document right here. If you would turn to page 5, please.
A Just to supplement my other answer.
Q Oh, sorry.
A And the siting was, if the governor in

177

the state in which the repository was identified or selected decided to submit a notice of disapproval, then it would require a joint -- an act of Congress, if you will, to override by majority vote, which has been interpreted as meaning a joint resolution of Congress would have to be passed. And then the President would have to sign that joint resolution.
Q Okay. Thank you.
A And the siting process also for the MRS would be similar. If the Secretary selected a site for the MRS, that governor would also have, likewise, a right to disapprove it. And that site would then have to go to Congress for override or for a joint resolution by a majority vote. And then the President would have to approve that before the MRS was sited.
Q Okay. Thank you for that. Exhibit 15, page 5, please. Right here.
A Okay.
Q This is the June 1988 Annual Capacity Report.
A Yes.

178

Q On page 5, this table 2.1, again, just from your prior answers, I take it that in 1988, these were the rates of acceptance that DOE was planning to use under the Standard Contracts?
A Yes.
Q Okay. In 1988, what receipt rate did DOE plan to use?
A The -- with the issuance of this document, the baseline of the program would have reflected that facilities would need to be sized in order to meet the acceptance rates identified in this table. Therefore, engineers would have to look at each of these years to make sure that they could have facilities available that could meet this, with some margin to deal with maintenance issues and other anomalies in operation.
Q In 1988, was DOE planning to use receipt rates identical to these rates that we are looking at on page 5?
A As I just stated, the designers would look at what they needed to identify -- what they needed to size for facilities to meet this

179

acceptance rate.
To the extent that they built additional capability into those facilities to deal with anomalous operations or maintenance cycles, the full capacity receipt rate might have been slightly higher, but nonetheless, at a normal operation rate, given maintenance cycles, reliability of equipment, the facilities would have been designed to meet this acceptance rate.
Q So the receipt rate would be at least these numbers on page 5 and maybe a little larger?
A Correct.
Q Okay. And the basis for these rates that we see on page 5, I mean, it says right there: Source, draft 1988 Mission Plan Amendment; is that right? Is that your understanding?
A Yes.
Q Okay. Now, do you know when the 1987 NWPA amendments became law? Was it in 1987?
A It was in early 1988.
Q Thanks. '88. Okay. It was prior to June 1988 when Exhibit 15 was issued?

180

A Yes.
Q Okay. So at the time of this document, Exhibit 15, the 1987 NWPA amendments were enacted and in force as law in the understand?
A That's correct.
Q So after the 1987 amendments, DOE was still planning to use acceptance rates that ramped up to 3,000 MTU per year in year 6, as shown in page 5; is that correct?
A At the repository. That's correct.
Q Okay. And why did DOE plan to use these rates at the repository, as you say, after the 1987 amendments?
A Because the MRS, with the conditions that we went through a little earlier, did not allow it to be available in the time frame of prior to 2003.
And, therefore, the planning basis of the program was such that an MRS was not in the system. And, therefore, the planning basis of the program was to have a repository available in 2003 with these planned acceptance rates.
Q And the 2003 commencement date, if you

181

will accept that term for the repository, when was that first outlined by DOE? In other words, the slippage from '98 to 2003. Do you know?
A Yes. It was provided to Congress in, I believe, March of 1987 in the MRS proposal.
Q We talked about that earlier. Just as you were speaking, I remembered that, okay.
So at this time, planning basis that supports these rates or that led to these rates, DOE's planning base was still focused on commencement of operations and acceptance at a repository in 2003?
A That's correct.
Q And not in an MRS?
A That's correct.
Q Okay.
MR. LO RE: Just one second.
(Discussion off the record.)
BY MR. STOUCK:
Q Okay. Mr. Kouts, at the time of this ACR in June of 1988, how, if at all, was DOE planning to use the MRS that had been authorized by the 1987

182

amendments?
A At this point in time, the Department was not planning to have an MRS of the system.
Q Okay. It was not -- okay. And it was not in the planning -- the MRS was not in the planning base at this time?
A That's correct.
Q Where -- if I wanted to go and find out what was in the planning base, is there -- at this time in June of 1988, what document would I look at, if you know?
A I would look at the 1988 Mission Plan Amendment.
Q Okay. And if I read that, it would say that DOE was still focused on commencing operations at a repository and not at an MRS?
A Well, as I read this document and I'm always learning things, it says at the top of page 5 that, although the Draft Mission Plan Amendment projects a 5-year delay in waste management system operation -- I'm sorry for reading so fast -- the projected waste acceptance rate has been increased

183

because it is assumed that the MRS facility and repository will commence operation simultaneously.
So if I could amend my previous testimony, this was a two facility acceptance rate, assuming that the MRS and the repository were operational at the same time in 2003.
Q Okay.
A And I'm sure that was laid out in the Mission Plan Amendment.
Q Okay. Thanks for that clarification. I appreciate that.
All right. Okay. Do you know -- just so you don't go year by year, do you know when -- well, strike that.
Just again, not to necessarily go year by year here, with respect to the acceptance rates that DOE planned to use, is it your testimony that the acceptance rates laid out, shown in the most recent recently issued ACR are the acceptance rates that DOE was planning to use?
In other words, from the time of the '87 ACR to the time of this document, the acceptance

184

rates on page 5 of the '88 ACR, which start in 2003. And I thought I understood that -- I did understand that those were based on DOE's plans to commence operations at a repository in 2003. Is that right? That's what these rates are based on?
A Is that the 1988?
Q '88. Yeah. '88.
A As I read to you earlier, that was based on joint acceptance at the MRS and repository.
Q Yes. Thank you. Okay. Yes. You did tell me that. That is what the document says.
Okay. So maybe planning base is the wrong term. But when did DOE first plan to have an MRS as part of the facilities, you know, when the facilities -- you know, when the program commenced operation. I guess it was prior to this document because this document that we just looked at, as you pointed out a couple of times now, refers to simultaneous commencement at an MRS and a repository?
MR. LO RE: Just so the record is clear, are you talking independent of an MRS? With an MRS?

189

Or both?
BY MR. STOUCK:
Q With -- either independent or with -- this document talks about simultaneous.
So when did having an MRS on day 1 become something that DOE was planning to do, if you know?
A Well, I have to go back to the Mission Plan, because the Mission Plan originally in the -- the 1985 Mission Plan originally reflected that the department could have the MRS available in the '96 time frame. So in terms of -- in trying to be fully responsive to your questions, there was a group working on MRS. There were people looking at facility designs. There was time frames, budgets, so forth being developed internally within the program for deployment of such facility subsequent to congressional authorization.
So the program had activities, planning activities underway prior to the time, actually, that the 1985 Mission Plan Amendment was issued -- 1985 Mission Plan was issued in 1985.
Q Okay. So as early as the time of the

190

1985 Mission Plan, subject to congressional authorization, DOE already, at that time, was planning to -- to have an MRS as part of the facilities for the spent fuel program?
MR. LO RE: Objection. Vague as to the term planning.
THE WITNESS: Subject to congressional authorization, yes.
BY MR. STOUCK:
Q Subject to congressional authorization, my statement is correct?
A Uh-huh.
Q Yes?
A Yes.
Q Okay. All right. When did DOE first plan to commence operations only at an MRS and not at a repository?
MR. LO RE: Objection. Lack of foundation.
BY MR. STOUCK:
Q If you know?
THE WITNESS: Never.

191

BY MR. STOUCK:
Q Okay. I was going to fix the foundation. I guess the prior question is: Did there come a time when DOE planned to commence operations only at an MRS, with the repository to come later, but on day 1 there's only an MRS? Did there come a time when DOE planned to commence operations at an MRS first with the repository to come later?
A If you could help me identify, when you say on day 1, what day 1 are you referring to?
Q Well -- oh. Let's try it this way. Let's say day 1 is 1998. Did there come a time when DOE was planning to commence operations in 1998 at an MRS with the repository to come on line subsequently?
A That strategy of the department was first provided to the Congress in the secretary's reassessment report in 1989.
Q Okay. The strategy was provided. But what about -- does that mean that, in 1989, DOE was planning to start operations in 1998 at an MRS with the repository to come online subsequently?

192

A Yes.
Q Okay.
MR. STOUCK: Can we mark this, please.
(Kouts Exhibit No. 16 was marked for identification.)
BY MR. STOUCK:
Q Mr. Kouts, you've been handed what's marked Deposition Exhibit Number 16. This is the December 1991 Annual Capacity Report, correct?
A Yes.
Q Okay. Now, if you turn to page 5, you will find rates. And my question is: As of December 1991, is it correct that these rates shown here on page 5 are the rates of acceptance that DOE was planning to use under the Standard Contracts?
A Yes.
Q Okay. And these rates assume -- or these rates reflect, I think is a better word, these rates reflect the 10,000 MTU capacity limit from the 1987 amendments? It assumes -- well it assumes that that capacity limit is in place, but that the linkage between MRS construction and repository construction



is not in place; is that correct?
A As well as the siting and -- as well as the siting linkages, yes.
Q Yes. So with that correction, my statement is correct?
A Yes.
Q Okay. Did DOE at this time in December 1991 believe it was likely that the construction -- what I'll call the construction linkage would be removed?
MR. LO RE: Objection vague as to the term likely.
THE WITNESS: The government believed that this was the best strategy for it to undertake. In terms of whether or not it would ultimately be successful, that was in the hands of Congress. And the Department could only anticipate that, assuming a site was found and the Nuclear Waste Negotiator was successful, that Congress would approve that agreement which would address the linkages.
So to the extent that the Department's -- whether or not the Department's strategy was likely



at this time, it was the Department's belief that it was the best strategy in order to get 1998 waste acceptance and it threw all its resources behind it.
BY MR. STOUCK:
Q Would it be helpful to have a definition of likely?
A Sure.
Q My definition is "more likely than not." That's what I mean when I say likely. Okay. Greater than 50 percent chance.
So, again, the question is: At the time of this ACR, did the government believe it was likely that the construction linkage would be removed in a manner and a time frame that allowed commencement of MRS operations in 1998?
You know, do you know? It's always do you know. If you don't know, just tell me you don't know.
A Based on the -- based on the options available to the Department in terms of strategies, it was considered to be the best strategy to follow. In terms of the Department's trying to forecast what



Congress would do, you know, the Department's not in the business of trying to forecast what Congress would do.
However, it was, from the government's perspective and from the Department's perspective, reasonable to expect that, if there was a willing host to the facility, and if there was an agreement that was negotiated by the Negotiator, which was part of the strategy that we did not get into in the discussion of the Secretary's reassessment report, that, given those eventualities, that Congress would have approved it and would have given the Department the flexibility in order to have the facility available in the 1998 time frame.
Q As of the time of this ACR, which is December 1991, the Department had no projection of the likelihood of the construction linkage being removed; is that your testimony?
A No, it's not.
MR. LO RE: Objection. Mischaracterizes.
BY MR. STOUCK:
Q I asked if, at the time of this document,

the Department had a projection of the -- I asked him if -- he was telling me that the Department did not have a projection of the likelihood of the construction linkage being removed. And I believe what he said was no.

So then I was following up with, okay, so the Department, at this time, did have a projection of the likelihood of the construction linkage being removed.

It's one or the other. They either did have a projection of the likelihood in December of 1991 or they did not have a projection of a likelihood. I'm just trying to find out which it is.

A Based on the interest of potential sites by the Negotiator, and the issuance of grants which, again, the grants program was issued -- was being administered by the Department, there was considerable interest in the siting of a facility at a variety of places.

And the Department believed at this time that there was a good chance that it would be

197

successful and be able to attain a site and have a facility available.

That was the reason why the Department went out and started the planning process with the utilities, because it felt ultimately that it would have been successful in having a facility availability.

Q Okay. Can you say or can you not say that the good chance that you just mentioned was a greater than 50 percent likelihood or can you not -- you know, can you say or can you not say?

MR. LO RE: Objection. Asked and answered.

THE WITNESS: The -- the Department felt it was plausible that -- that this would happen. And it continued to spend resources. It continued to request budgets from Congress, which Congress approved, in order to implement this activity.

So the -- the -- in answer to your question, I don't believe the Department would have submitted budgets and allocated resources if it felt that -- that this was a futile effort.

198

BY MR. STOUCK:

Q At this time in 1991 when this document was issued, Exhibit Number 16, was DOE working actively to have the construction linkage removed by Congress?

A It was working actively to the extent of supporting the Negotiator in identifying a site. And if that -- if that site was identified and an agreement was reached with the host state, the Department would have worked actively with the Congress in order to have that agreement approved.

So basically the strategy of the Department was to find a site through the office of the Negotiator, which was provided by the Nuclear Waste Amendments Act of 1987. And it felt that that process, at this time, was still going to bear fruit.

Q Was DOE planning -- okay. Thank you for that answer.

Was any part of DOE's efforts to, let's say, overcome the construction linkage, did any part of those efforts involve a statutory change to just

199

get rid of the linkage as opposed to promoting the Negotiator's efforts with an agreement, you know, an agreement with the state or a tribe?

A As presented in the 1989 reassessment report, I believe that a -- a section of the President's energy initiative had removing the linkages. I would have to go back to review that report to look at the exact language.

But according to that document, the Department had did have, as part of the President's energy initiative, in 19 -- I believe either '90 or '91, that would have had language as part of a legislative package to modify the linkages as they were identified in the 1987 amendments.

Q Through a statutory change?

A Through a statutory change.

Q Now. Can you explain to me the following. Having -- the DOE recommended the construction linkage in 1987, correct?

MR. LO RE: Objection. Mischaracterizes the testimony.

BY MR. STOUCK:

200

Q Well it was slightly different form and the Congress modified it when it enacted it.

But the concept of linking the MRS to the operation of the repository was something that DOE recommended in the MRS submission and generally recommended the MRS; is that correct?

A The linkages that the Department proposed in the 1987 proposal to Congress were that the facility not be operated until the repository received a construction authorization from the NRC.

At that point in time, the repository construction authorization was planned to be received in 1998.

Therefore, the department's linkage, as proposed in the MRS proposal, would have allowed the MRS to operate in 1998.

In addition to that, the Department proposed a 15,000 metric ton limitation on the storage field at the MRS.

Q Okay. And the -- okay. As you just described the linkage in the '87 statute, that was recommended by DOE?



A That's correct.

Q And having recommended that linkage in 1987, can you explain to me why, in 1989 or thereabouts, as you just told me, a part of DOE's efforts to deal with this -- with the construction linkage that was actually enacted involved trying to have that linkage removed by statutory change?

MR. LO RE: Objection. Asked and answered. That's what he just said.

BY MR. STOUCK:

Q There seems to be at least a little bit of change of position there. But I'm sure there's an explanation for it.

MR. LO RE: Objection. Asked and answered. Go ahead.

THE WITNESS: All right. The statutory linkage proposed was consistent with the recommendation -- and the concerns, if you will, of local citizenry around the Oak Ridge site where the MRS was intended to be deployed. That the MRS -- the MRS's operation be tied to progress within the repository.



Subsequent to -- and that would still have allowed the MRS to operate in 1998 and be tied to the construction authorization and the repository.

With the repository moving on, the Department changed its position on linkages because, in the 1989 reassessment report, the repository was then delayed by the Secretary till 2010, which -- and the construction authorization would have been approximately 5 years earlier in 2006.

So, therefore, given the same schedule linkages, the MRS would not be able to begin operation until the 2006 time frame, which was, again, not consistent with the contracts or the desire of the Department to have a facility operational in the 1998 time frame.

So as a result, the Department pursued removing the schedule linkage but maintained the capacity limitations such that the MRS would not exceed 10,000 metric tons until the repository was operational, to deal with concerns that the facility would not be a substitute for repository, become a



de facto repository.

BY MR. STOUCK:

Q Okay. Thank you. Let's just take a look at Exhibit Number 16 which is the '91 ACR.

A Okay.

Q Page 5, where it says where the rates are?

A Okay. Yes.

Q Okay. I mean, just piecing it together here, DOE is planning to use acceptance rates that, as shown, start in 1998, correct?

A Yes.

Q Because, at this time, DOE was planning to accept spent fuel in 1998, at least working towards that plan?

A Yes.

Q And that would have been -- if that had occurred, that would have been at an MRS, at least as of the time -- you know, as of December 1991, DOE's plan was to commence acceptance at an MRS in 1998?

A That's correct.

Q Okay. Okay. What role, if any, did you play, yourself, Mr. Kouts, yourself, so I'm departing from the 30(b)(6). I'm asking about Chris Kouts, what role, if any, did you yourself play in the development of this December 1991 ACR, Exhibit 16?
MR. LO RE: Objection. Asked and answered.
THE WITNESS: In the development, I believe I reviewed this document before it went out in my capacity where I was at the time in the program. But I was not directly involved in the development, no.
BY MR. STOUCK:
Q Okay. Where you were in the program at that time was the head of the transportation program, according to Exhibit 1?
A At this time I believe I was probably working in strategy and contingency planning of the program.
Q Okay. Thank you. So you reviewed and commented or just reviewed or....

205

A Reviewed and commented. Usually when documents are sent out for review, if people have comments, they provide comments.
Q Who is -- what part of the DOE -- what are the comments -- to what part of DOE were the comments directed? In other words, who was responsible for this document?
A That document would have been the responsibility of Mr. Brownstein, I believe, who is identified in the document.
Q Okay. All right. Let's -- in the -- okay.
MR. STOUCK: Can we mark this, please, as Exhibit Number 17.
(Kouts Exhibit No. 17 was marked for identification.)
BY MR. STOUCK:
Q I believe -- you have you have been handed what's been marked Exhibit Number 17, Mr. Kouts. It's the 1987 Monitored Retrievable Storage submission to Congress. Is that right?
A Yes.

206

Q You've referred to this, maybe we both have, a couple of times today already, right?
A Yes.
Q Did you yourself, Chris Kouts, play any role in developing this document?
A I helped write it.
Q Okay. Do you know -- yeah. When DOE recommended the 15,000-ton capacity limit that's reflected in this document, you can see reference to it, for example, on page 27, probably elsewhere, when DOE recommended that capacity limit, why did DOE recommend a capacity limit of 15,000 MTU? What was the derivation of that number?
MR. LO RE: Objection. Asked and answered.
THE WITNESS: To the best of my recollection, and I will -- since you're asking me, I will answer it to my recollection, since I'm not responding -- I'm assuming your question is not as a 30(b)(6) witness, but as my own personal recollection.
To the best of my recollection, it was

207

a -- it derived somewhat from the concept of operations at a facility and the construct of the department's vision of MRS at that time. The MRS was a packaging facility that was to receive spent fuel and package it into disposal ready canisters for subsequent shipment to the repository.
The 15,000-ton limit was a -- an inventory -- it was an inventory of spent fuel that was felt to be approximately 5 years of maximum receipt capability that would be used as a pool of spent fuel that would be used for those packaging operations.
So it was somewhat subject to the construct of the operations of the facility.
And it was -- the 15,000-ton limit was less than 25 percent of the total capacity of the repository. And that was deemed to be an appropriate amount for the facility.
BY MR. STOUCK:
Q Okay. So this --
A To the best of my recollection.
Q Okay. And this inventory of spent fuel

208

that was felt to be approximately 5 years of maximum receipt capability, so just by arithmetic, that means that maximum receipt capability would be 3,000 tons a year for 5 years? Is that -- is my math right?
A That's correct. Except that the facility would not have initiated operations at 3,000 metric tons. It would have ramped up. So you're talking about a downstream capability. And I believe that was the -- the sizing that we used for the processing -- the processing facilities on the site.
Q Okay. Thank you for that.
Now, we're moving right along here. I'm sorry.
A Having reviewed the document --
Q Yeah.
A -- and it's amazing how these things come back to me.
Q What page are you on?
A I'm on page 27.
Q Yeah. That's where I was, too.
A It says here, in the second full

209

paragraph: In addition, DOE recommends that the storage capacity of the MRS facility be limited to 15,000 metric tons. This capacity is sufficient to offset potential storage shortfalls at reactors for approximately 5 years. But it is less than the one-third spent fuel obligation to develop a geologic repository. And progress in achieving this mandate is monitored very closely by a wide range of interesting parties.
So, again, what I gave you was my recollection. I have no reason to believe that the document is -- you know, is incorrect. But I did not remember that specific aspect.
Q What you're now saying is that -- I guess it's in the document, so I assume it's right. You're saying, this is right. That the 15,000 MTU was -- that number was derived from the fact that it was sufficient to offset potential storage shortfalls at reactors for approximately 5 years.
MR. LO RE: Objection. Mischaracterizes the testimony.
THE WITNESS: As I remember -- this is

210

what we stated in the document. What I'm suggesting to you is that, as we were developing the size of the facility, I believe that 5 years of full operation was also something that sticks in my mind. So, although this is stated here, I believe there were other -- there was other rationale for providing the 15,000 metric tons. And that seems to stick in my memory. So I --
BY MR. STOUCK:
Q That's fine, Mr. Kouts. That's why you're here. I've read the document. So that's why I'm asking you for, you know, whatever you can add to that.
Thank you. Now, let's turn now to -- don't put this in the record.
(Discussion off the record.)
BY MR. STOUCK:
Q If you guys are ready.
A Sure.
Q Let me try to do a little filler here. Ramp up. Okay. Let's talk about ramp up. Is there a similar distinction between receipt rate and

211

acceptance rate with respect to ramp up? Does the distinction between those concepts also apply to ramp up?
A Yes.
Q Okay. Would you say that the reason the distinction applies to ramp up as well as to steady state rates, it's the same reason that there's a distinction with respect to steady-state rates?
A I don't think I understand your question.
Q Okay. Let me try to straighten it out and clarify it.
There's a distinction between receipt rates and acceptance rates at the steady-state rate; is that correct? We talked about that earlier. At least in concept, there's a distinction. The rates may actually be the same or close to the same. But it's a different concept, receipt rate versus acceptance rate.
A That's correct.
Q Okay. And my understanding is that, from your testimony, is that the reason that distinction exists, largely, is to have some buffer or

212

be provided, again, to contract holders at the appropriate time in the future, 63 months prior to the time the Department is going to initiate acceptance.

So the simple answer to your question is we have a technical planning baseline, in terms of what the facilities are being designed to. And as the design evolves, we will be informed by more information and will be able to provide more specific information to contract holders at the appropriate time.

Q Is the technical baseline to which you refer, is that the same thing as the receipt rates that DOE, as of today, is planning to use?

A Those provide guidance. The receipt rates that you're referring to on our technical baseline documents provide guidance to facility designers as to what to design their facilities to.

To the extent that they -- again, as I've testified earlier today and in court in other case, the designers may look at some additional capability in order to meet those receipt rates, due to

221

anomalous situations, maintenance cycles, so forth and so on.

So the baseline requirements are generally the minimal requirements that the designers have to meet. There may be some additional capacity in the system. So --

Q So the receipt rate -- excuse me. I'm sorry. Go ahead. I didn't mean to interrupt.

The receipt rates would be the rates in the technical baseline or maybe a little bit above those?

A Correct.

Q Okay. And at the present time, there are no acceptance rates that DOE is planning to use under the Standard Contract; is that correct? Those will only become available 63 months before facility operations?

A That's correct.

Q Okay. Let's move now. If you take -- go all the way back to Exhibit Number 11, it says, list of topics. I am going to move on to another topic, believe it or not.

222

And that is -- it's listed -- I'm going to skip over topic number 2 for now. And I'm going to go straight to topic number 3. And let me ask you what is -- are you there?

A Yes.

Q Okay. What is the earliest date that DOE currently believes it will begin accepting spent fuel under the Standard Contracts?

MR. LO RE: I would like to just put on the record, the government objects to this as outside the scope of the trial and in violation of the order and the decision in Indiana/Michigan.

Go ahead, you can answer.

THE WITNESS: The current planning baseline for the program is to begin receipt in the 2017 time frame. And that schedule is predicated on passage of the administration's legislation that was submitted earlier this year and last year and the availability of annual appropriations to meet the cash flow provided to Congress earlier this year.

BY MR. STOUCK:

Q Okay. So 2017 is the earliest date that

223

DOE currently believes it will begin accepting spent fuel under the Standard Contracts?

A Subject to the caveats that I stated in my answer, yes.

Q Earlier -- earliest date might bring those in. That's what I said. And then he was saying he thinks it's important to do something.

A It's the earliest date, subject to the caveats that I stated in my previous answer.

Q Okay. Thank you for that.

And then we move now to topic number -- that's listed on the list as number 4. If you could just look at that and let me ask you what acceptance rate -- we just covered this, actually, in a different form. But since it's on my list, let me just ask it again. And I apologize. I won't dwell on it.

What acceptance rate is DOE planning to use once spent fuel acceptance begins pursuant to the Standard Contracts?

MR. LO RE: Asked and answered.

BY MR. STOUCK:

224

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------:
DAIRYLAND POWER COOPERATIVE, :
Plaintiff, :
v. : No. 04-106C
:
UNITED STATES OF AMERICA, :
Defendant. :
----------------------------------:
:
ENERGY NORTHWEST, :
Plaintiff, :
v. : No. 04-0010C
:
UNITED STATES OF AMERICA, :
Defendant. :
----------------------------------:

Washington, D.C.
Wednesday, May 2, 2007
Volume 2

Deposition of:
CHRISTOPHER KOUTS

called for oral examination by counsel for Plaintiff, Dairyland Power Cooperative, pursuant to notice at the Law Offices of Greenberg Traurig, LLP 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Vicky Stallsworth Reiner of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:45 a.m., when were present on behalf of the respective parties:



A P P E A R A N C E S

On behalf of Dairyland Power Cooperative:
JERRY STOUCK, ESQUIRE
KEVIN E. STERN, ESQUIRE
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202) 331-3173

On behalf of Energy Northwest:
DAVID JIMENEZ-EKMAN, ESQUIRE
CHRISTOPHER TOMPKINS, ESQUIRE
Jenner & Block, LLP
330 N. Wabash Avenue
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of Defendant:
ALAN J. LO RE, ESQUIRE
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Suite 12070
Washington, D.C. 20530
(202) 307-0226



C O N T E N T S


EXAMINATION BY: PAGE
Counsel for Energy Northwest ........... 316
Counsel for the Defendant .............. 426
Counsel for Energy Northwest ........... 439
Counsel for the Defendant .............. 446

KOUTS DEPOSITION EXHIBITS: * PAGE
25 Document ............................ 319
26 Document ............................ 324
27 Document ............................ 338
28 Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program ................... 350
29 Preliminary Estimates of the Total System Cost for the Restructured Program, dated December 1990 .......... 361
30 Report issued by the GAO, entitled: Operation of Monitored Retrievable Storage Facility Is Unlikely by 1998 .. 377
31 Report entitled OCRWM Planning for No MRS Contingency ................... 393




C O N T E N T S (Continued)


32 Letter from James Watkins to Bennet Johnston ...................... 398
33 Document ............................ 417
34 Interrogatory responses Government provided in Energy Northwest .......... 420


(*Exhibits attached to transcript.)

Q Okay. And who was your supervisor at this point, if you remember?
A James Carlson.
Q James Carlson.
If you look, Mr. Kouts, please, at Kouts Exhibit 15. Mr. Kouts, with respect to Kouts Exhibit 15, which is the 1988 Annual Capacity Report, did you participate in the drafting of this document?
A No, I did not.
Q Okay. And, again, as with the 1987 report, did you participate in the approval of this document? Did you directly approve this document?
A I believe I may have reviewed it. My duties at this point in time, I believe, had changed. And I may have been head of the transportation program. But, in any event, I probably -- I believe I did review it before it went out, yes.
Q Mr. Kouts, do you recall having any discussions with the authors of this document about its contents?

335

A No.
Q And the same question with respect to Kouts Exhibit 14. Did you have any discussions or recall any discussions with the author of that document?
A I don't recall any.
MR. TOMPKINS: Can we take a short five-minute break?
(Whereupon, at 10:21 a.m. a recess was taken until 10:28 a.m.)
BY MR. TOMPKINS:
Q Okay. Mr. Kouts, returning for a brief moment to Kouts Exhibit 14, do you have any knowledge about the motivations of the individuals preparing this document or the reasons they prepared it?
MR. LO RE: Objection. Calls for speculation.
THE WITNESS: No.
BY MR. TOMPKINS:
Q Okay. And with respect to Kouts Exhibit 15, the 1988 ACR, do you have any knowledge

336

about the motivations of the individuals that prepared this or the reasons they prepared this report?
MR. LO RE: Objection. Calls for speculation. Chris, these documents all speak for themselves. Mr. Kouts is working in a large organization. He's testified repeatedly about his involvement in the ACR and his review of those reports. I'm going to object to you continuing asking him about documents and people who wrote documents to the extent he already testified about his involvement in those documents.
THE WITNESS: No.
(Kouts Exhibit No. 27 was marked for identification.)
BY MR. TOMPKINS:
Q Okay. Mr. Kouts, you've been handed a document marked Kouts Exhibit 27. Have you seen this document before?
A Yes.
Q Okay. Were you involved in the preparation of this document?

337

A Yes.
Q Okay. And what was your role on the preparation of this document?
A I was one of the staff members and managers who contributed to aspects of it, and since it was prepared as a result of an upcoming hearing to be held by the Monitored Retrievable Storage Review Commission, I also helped prepare the DOE official who testified in front of the Commission in relation to this position.
Q And do you know who that official was?
A Yes, I do.
Q Who was it?
A Thomas Isaacs.
Q Mr. Kouts, was this document actually submitted to the MRS Review Commission?
A Yes. I believe it was. It was a published DOE document. And I believe it was given to the Commission. I don't know whether it went under a separate letter or it was just given to them, perhaps when we went to the hearing.
Q Mr. Kouts, do you know what the purpose

338

of the MRS Review Commission was?
MR. LO RE: Objection. Calls for speculation. The document speaks for itself.
THE WITNESS: The purpose of the MRS Review Commission was laid out the Nuclear Waste Policy Act.
BY MR. TOMPKINS:
Q Sitting here today, do you have any knowledge about the purpose of the Review Commission, other than it was called for by the NWPA?
A Generally, to my recollection, it was a group that was commissioned by Congress to provide perspective to Congress on their independent view as to whether or not an MRS facility should be a part of the Federal Waste Management System.
Q Turn to page 1 of this document, Mr. Kouts: There's two bullets at the top of this page. And the second bullet states: Recognizing the difficulty of DOE-directed siting through national or regional screening, the DOE prefers an MRS facility that is sited through the efforts of

339

the Nuclear Waste Negotiator, especially if the siting negotiations led to linkages that allow advantages of an MRS facility to be more fully realized.
Mr. Kouts, were you involved in this aspect of the document?
A I don't remember specifically.
Q Okay. Do you recall, Mr. Kouts, why DOE preferred to site an MRS through the efforts of the Negotiator?
MR. LO RE: Objection. Calls for speculation.
THE WITNESS: My perspective is that the Department was unsuccessful in its siting of an MRS and its efforts to siting an MRS in the state of Tennessee. And the Department felt that perhaps a third party not related to the Department would be more successful than the Department was.
BY MR. TOMPKINS:
Q Okay. Mr. Kouts, am I correct that the siting provisions of the '87 amendments for an MRS provided two options for siting the MRS? One

340

through a department process and one through a Negotiator?
A I'd have to review the Act. I know there was a screening process that was available to the Secretary. However, that was -- that was somewhat constrained by the provisions in the Act which did not allow the Secretary to select a site until after a repository site was selected.
Q Okay.
A Therefore, embarking on site screening when repository siting was substantially in the future was not a path that the Department was excited about embarking upon.
Q Mr. Kouts, do you know if, following the '87 amendments, the Department has ever pursued its independent siting process for an MRS?
A Not to my knowledge, no.
Q Okay. So following the 1987 amendments, the Department was relying exclusively on the Negotiator to site an MRS?
A Yes.
Q I would like to turn to page 11 of this

341

document, Mr. Kouts. The last paragraph on this page states that: Early federal acceptance can reduce any potential problems resulting from the fact that the longer federal acceptance is delayed, the more utilities must make decisions about storage options that may involve doing something to the spent fuel (for example, consolidating it or loading it into canisters of some sort) other than simply storing it as it is.
If any operations are performed on the spent fuel before key elements of the federal system (example, the waste package) are well defined, they run the risk of being incompatible with the system design that is finally developed, thereby leading to increased costs.
Do you see that, Mr. Kouts?
A Yes, I do.
Q Okay. At this time, were you aware that one of the concerns resulting from delayed acceptance was that utilities may have to process the fuel in some manner and that may be incompatible with the repository?

342

A I don't recall whether or not, from where I sat in the program, that I was privy to discussions where this was an issue. I -- you know, the document speaks for itself in that regard. I don't remember contributing to this aspect of this document.

Q Okay. This document, did this represent the position of the Department at this time?

MR. LO RE: Objection. Calls for speculation. Mr. Kouts is not testifying as a 30(b)(6) witness today.

THE WITNESS: My own personal perspective, yes, this represented the DOE position on the MRS facility as of June 1989.

BY MR. TOMPKINS:

Q Okay. And do you have any reason to believe that this was not, at this time, the position of the Department?

A No.

Q Mr. Kouts, do you know if, in light of the delay, the Department has provided any guidance to utilities about what forms of canisters and dry

343

cask storage it should implement?

MR. LO RE: Objection. Vague as to the term "should."

THE WITNESS: I don't recall.

BY MR. TOMPKINS:

Q Mr. Kouts, if utilities had asked which form of dry cask storage it should implement, would the Department have provided any guidance?

MR. LO RE: Objection. Calls for speculation. Objection. Hypothetical.

THE WITNESS: Since I wasn't involved in that area at that time, I have no way of knowing whether or not -- what the Department would have done had a utility asked for such guidance.

BY MR. TOMPKINS:

Q Okay. At any time during your time at OCRWM, has there been a time that you were in a position that would have dealt with such a request?

A Yes.

Q And when was that?

A Since October of 2002.

Q And that's when you became acting

344

director of the systems integration group?

A That's when I became acting director of the office of systems analysis and strategy development.

Q Mr. Kouts, you testified briefly yesterday about the TAD concept.

A Yes.

Q Is that a recent change in the strategy of the Department for designing the waste package?

A You'll have to define what "recent" means.

Q Within the past 2 years.

A Yes.

Q Okay. Mr. Kouts, I just want to talk about the waste package for a moment here. The waste package is an item which is being designed by DOE, is that correct, and its contractors?

MR. LO RE: Objection. Vague.

THE WITNESS: The Department's approach is to have components of the waste package designed by private industry in accordance with a performance spec that was issued on a preliminary basis in

345

November of last year.

So in answer to your question, the Department is designing parts of the waste package.

BY MR. TOMPKINS:

Q And when the Department submits its license application to the repository for the NRC, are you going to need to include the design of the waste package in the license application?

MR. LO RE: Objection. Calls for speculation.

THE WITNESS: Not necessarily.

BY MR. TOMPKINS:

Q What do you mean by not necessarily?

A The Department will provide the appropriate analytical basis, including the TAD specification in its demonstration of how the waste package will meet Environmental Protection Agency and Nuclear Regulatory Commission standards.

Q So the Department is going to provide performance specifications in the license application?

MR. LO RE: Objection. Calls for

346

speculation. Objection. Mischaracterizes the prior testimony.

THE WITNESS: That decision hasn't been made yet.

BY MR. TOMPKINS:

Q Okay. Mr. Kouts, the design of the repository and the specifications that you're going to be submitting to the NRC with respect to waste packages, is that entirely within the control of the DOE?

MR. LO RE: Objection. Vague.

THE WITNESS: In answer to your question, I indicated that we hadn't decided -- the Department hadn't decided whether specifications are going to be submitted to the NRC. So to the answer of the part of the question not in relation to that, certainly the design of the repository is entirely in control of DOE.

BY MR. TOMPKINS:

Q Okay. And Mr. Kouts, until the DOE has a design for the repository, is it possible for a utility to design a waste package that would be

347

acceptable for that repository design?

MR. LO RE: Objection. Calls for speculation.

THE WITNESS: Anything is possible.

BY MR. TOMPKINS:

Q It could meet the final repository design; is that correct?

MR. LO RE: Same objection.

BY MR. TOMPKINS:

Q But absent actually seeing DOE's design, it would be very difficult for a utility to design something that meets the repository design?

MR. LO RE: Objection. Vague.

THE WITNESS: Certainly knowledge of the Departments perspective and approach on long-term disposal would be needed in order to successfully develop a design that potentially might be acceptable to the Department for disposal purposes.

BY MR. TOMPKINS:

Q And as you testified, the TAD concept is relatively new. Has the Department's approach changed several times over the course of the

348

program?

MR. LO RE: Objection. Vague.

THE WITNESS: You have to help me with approach, what you mean by approach.

BY MR. TOMPKINS:

Q The concept of waste package that the Department was going to implement. Has that changed over time?

A The design of a waste package has evolved over time, yes.

(Kouts Exhibit No. 28 was marked for identification.)

BY MR. TOMPKINS:

Q Mr. Kouts, I've handed you what's been marked Exhibit 28 to your deposition, which is titled Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program.

Did you participate in drafting this document?

A No, I did not.

Q Okay. Did you have any role in reviewing or providing input into this document?

349

A I believe I reviewed it before it went out of the Department, yes.

Q Do you know why this document was prepared?

MR. LO RE: Objection. Vague. The document speaks for itself.

THE WITNESS: It was the Secretary's reassessment of the program. It was initiated when the Secretary came into office as Secretary Watkins. And there was later congressional direction to submit his reassessment to it. And this is the report that was, according to the foreword, submitted to Congress in compliance with their request.

BY MR. TOMPKINS:

Q Okay. On page -- in the executive summary, roman, at page vii, the fourth paragraph down, there's a sentence which states: This schedule shows a significant slip for the expected start date of repository operations from the year 2003 to approximately 2010.

Did the start date for repository

350

operations slip from 2003 to 2010 in the 1989 time frame?
A Yes.
Q Okay. And do you know the reasons for that change in projected start date?
MR. LO RE: Objection. Asked and answered. Objection. Overly broad.
THE WITNESS: The -- there was additional work that needed to be done for repository site characterization. In addition, it was anticipated that obtaining environmental permits from the state of Nevada would be a challenge. And other activities outside the Department's control, such as NRC review of the license application, et cetera, were potentially issues that would -- that were considered in the -- in the new schedule provided by the Secretary.
BY MR. TOMPKINS:
Q Turn to page 10 of the document, Mr. Kouts. Does this schedule reflect the new schedule that the Secretary was going to implement in 1989 following the reassessment?



MR. LO RE: Objection. Calls for speculation.
THE WITNESS: Yes.
BY MR. TOMPKINS:
Q Okay. Looking at the top half of this page, there is a repository schedule there which contains a number of milestones for development and construction of the repository. Is that correct?
A Yes.
Q Okay. And over on the right-hand side -- and you can correct me if I'm reading this wrong -- it appears that the Department was projecting that it would receive construction authorization for the repository at the end of 2004.
A That's what the document says.
Q Okay. Now, Mr. Kouts, I believe earlier you testified that, when DOE made its proposal to Congress for the MRS facility, it proposed linking start of receipt at the MRS to construction authorization for the repository; is that correct?
A That's correct.
Q Okay. So under this new schedule, which



came into being in 1989, if Congress had adopted the linkage that had been proposed by DOE, receipt could not begin at the MRS until 2004?
MR. LO RE: Objection. Calls for speculation. Objection. Mischaracterizes his prior testimony.
THE WITNESS: My perspective is that, had the Department known that construction authorization for the repository would not be until 2004, it would not have submitted such linkages. The linkages that the Department submitted were based on the fact that, at that point in time, the repository was intended to begin operations in 2003. And the construction authorization for the repository was expected to be received in 1998.
So the simple answer to your question, had the Department known that construction authorization for the repository would have been in 2004, it would not have submitted linkages such that the MRS would not have begun operation in 2004 since the intent of the department in the MRS proposal was to have the MRS available in 1998.



BY MR. TOMPKINS:
Q And the reason the -- the reason the Department intended to have an MRS in 1998 was so that waste receipt could begin in 1998?
A That's correct.
Q Okay. And so the Department viewed the MRS facility as a way of meeting this deadline in light of the slippage of the repository schedule?
A It wasn't as a way. It was the only way the Department had available to it in order to meet the 1998 time frame.
And with the disapproval, if you will, by Congress of the MRS proposal, it was at that point in time a new strategy that the program -- that the program developed a new strategy and began a process to support the Office of the Nuclear Waste Negotiator to develop grants and to find an MRS site which would hopefully would also engender an agreement with the localities that would allow Congress to readdress the linkages that the 1987 amendments to the Act -- to the Act to the extent that those constraints would have been released so

the Departments could still have a facility available in the 1998 time frame.
Q I believe you testified earlier, though, that the original NWPA did not authorize DOE to construct an MRS. Is that correct?
A Yes.
Q Okay. So when the Department made its proposal in 1987, it already announced the repository had been delayed from 1998 to 2003; is that correct?
A Yes.
Q Okay. And at that time, at the time it made the proposal, the Department asked Congress to authorize an MRS so it could begin waste acceptance in 1998 in light of the repository delay; is that correct?
A Yes.
Q Okay. If you look at the schedule on this page 10, Mr. Kouts, for the MRS facility, there's a -- there's a bar here, in about the middle of the section on the MRS, that says: Volunteer siting.

355

Do you see that?
A Yes.
Q Okay. And it appears that, in this schedule, Department anticipated that siting activities for the MRS would begin in February of 1990 and end at the end of 1992; is that correct?
A That's what the schedule says.
Q Okay. So this -- this schedule anticipates that DOE would have an MRS site at the end of 1992; is that correct?
A As I read this schedule, it says candidate sites identified in March of 1993.
Q Okay. So this schedule anticipates that the Department would have an MRS site by March of 1993?
A Or sites available.
Q Okay. Looking a little bit further down at the construction schedule for the MRS, there's a line which indicates that simple receiving facility construction would begin in January of 1997. Do you see that?
A Yes.

356

Q Okay. Do you know what is meant by simple receiving facility?
A Generally, yes.
Q And what is that?
A That the purpose of the facility would be essentially to either use existing storage transport casks, take them to the site and put them on pads or to use a canister-based system that would store fuel and transfer the canisters on site into storage devices such that the facility could be built in a very rapid and -- manner.
Q So I believe you testified yesterday that DOE's original conception -- or one of DOE's original conceptions of the MRS facility was as an integrated facility that would have fuel handling capability?
A I believe you mischaracterized my testimony. I basically said that it also had packaging capability to consolidate spent fuel, to put those consolidated fuel rods into disposal-ready canisters that would have serviced either of the three repository sites that the Department, at that

357

time, was -- was characterizing.
Q Okay. Would the simple receiving facility have those capabilities?
A No.
Q Okay. And then it appears that, beginning in January 1998, DOE was going to start remaining MRS construction. Do you know if, at that time, they intended to construct those facilities?
MR. LO RE: Objection. The document speaks for itself.
BY MR. TOMPKINS:
Q Those being the packaging facilities you just referred to?
A No. The Department was not going to embark on that path.
Q Okay. If you know, what further facilities did it plan to construct, starting in January of 1998, under this schedule?
A I don't recall exactly. I believe there were larger facilities that would have allowed greater capacity, potentially, to accept, other than the initial capability of the simple transfer

358

facility. But I don't recall the specifics of that.
Q Okay. And was there a reason that the Department was no longer considering packaging facilities, the type that they were proposing in the 1997 time frame?
MR. LO RE: Objection. Calls for speculation.
BY MR. TOMPKINS:
Q If you know.
A It had somewhat to do with the site that we were characterizing. It wasn't felt that that type of packaging would be needed for -- based on our understanding of Yucca Mountain.
Q And when you say the site you were characterizing, you mean the site for the repository, Yucca Mountain?
A That's correct.
Q Okay. And what about that site eliminated the need for those types of packaging facilities, if you know.
A At that point in time, we were looking at a thin-walled waste package which could easily be

359

transferred into on site. And the need for rod consolidation and the other aspects of the original MRS proposal were not deemed necessary at that point.
To look in context, this was 5 years -- actually 2 years beyond. But the -- there were a lot of challenges associated with doing a lot of the packaging aspects of the MRS as we originally conceived it.
And this was -- again, the strategy of the program was to get something deployed as quickly as possible. Had we initiated and had Congress approved the MRS proposal in the 1987 time frame, we could have gone forward and developed all that. We would have had the developmental time.
At this point in time --as the time period between where we were in the program at that time, 1989 and 1998, as that was getting smaller, we had to look at more simplistic facilities, more initial waste acceptance at an MRS.
(Kouts Exhibit No. 29 was marked for identification.)

360

BY MR. TOMPKINS:
Q Mr. Kouts, I've handed you what's we've marked as Exhibit 29 to your deposition, which is titled Preliminary Estimates of the Total System Cost for the Restructured Program, dated December 1990.
Have you seen this document before, Mr. Kouts?
A Yes. I believe I have.
Q Were you involved in the preparation of this document?
A No.
Q Do you know if you reviewed this document at the time it was issued?
A I would have reviewed it from the standpoints of the transportation costs associated in this document, since I was head of the OCRWM transportation program.
Q Okay. Mr. Kouts, what is your understanding of the purpose of the total system cost studies, which the Department has undertaken from time to time?

361

A The purpose of total system life cycle cost estimates is to support an annual assessment of the adequacy of the fee by the Secretary, as required by the Nuclear Waste Policy Act.
Q And the total system cost portion of that effort looks at the anticipated costs of the program?
A Looks at the past and anticipated cost of the program through repository operations and repository closure and any monitoring that may be done.
Q Okay. And so I've seen a number of these reports. They're updated periodically as the Department's plans for the program change and you incorporate the latest plans?
A That's correct.
Q Okay. I would like to take a look at Appendix A of this document, which is entitled Waste Acceptance Tables.
Now, the ACR documents that you were asked about yesterday, they only project the first 10 years of the program; is that correct?

362

A First 10 years of waste acceptance, yes.
Q Okay. The first 10 years of waste acceptance.
Table A1 includes some waste acceptance schedules, is that correct, or projected waste acceptance schedules?
A Yes.
Q Okay. And looking at the columns in the far right-hand side, there's two columns there. And they're both labeled Total Annual System Acceptance. Do you see that?
A Yes.
Q Okay. And there's one column under that that's labeled Spent Fuel?
A Yes.
Q Does this column represent the amount of spent fuel that the Department anticipated receiving in any particular year at the time of this report?
A Yes.
Q Okay. And just looking at the rates here, it starts at 400 in 1998, and then you accept 400 in 1999; is that correct?

363

A Yes.
Q Okay. And then it ramps up to 900 metric tons and maintains 900 metric tons from 2000 until 2009; is that correct?
A Yes.
Q Okay. Now, this period, I guess, from 1998 to 2008, does that correspond to the 10 year represented by the ACR?
MR. LO RE: Vague as to the term "ACR."
THE WITNESS: Assuming an ACR was written with these acceptance rates, it would cover the first 10 years, yes.
BY MR. TOMPKINS:
Q Okay. What I'm really interested in, Mr. Kouts, is what happens after the first 10 years, beginning in 2009, '10 and '11 and actually going up to 2018 and 2020.
Were these the acceptance rates that the Department intended to use following the 10-year period represented in the ACR?
A Well, this is one table of several tables in this document. So this facility has an MRS, a

364

single repository column. And table A2, it has a first repository and a second repository. And I'm trying to understand the difference between A3 and A2. But, you know, I would have to study them to understand it.
So for the purposes of analysis, these are -- my sense is that these were waste acceptance tables. All three of them were used by the analyst to do a -- what my perspective is, probably a perimetric analysis of the total cost of the program.
Q Okay. And you've identified some differences between table A1 and table A2. It looks like table A1 anticipates a single repository system?
A That's what it says.
Q And table A2, it looks like at some point DOE would build a second repository?
A In reviewing the document, it appears that reading A1 and A2, it's based on an end-of-reactor-life case, which would mean no new orders of reactors. Table A3 is an upper reference

365

case, which my sense is assumes that new reactors would be developed and there would be additional fuel that would have to be provided to the system.
So my sense is that the total system life cycle cost estimators, back in this time frame, were looking, again, at a perimetric analysis as to whether or not the -- what the cost of the program would be given any three of these potential scenarios.
Q Okay. And looking -- looking at table A1 for the moment, beginning in 2009, it looks like the -- it indicates the Department would anticipate receiving 900 metric tons?
A That's what the document says.
Q And then it ramps up for a number of years to 1800 metric tons?
A That's what the document says.
Q For a period of 5 years?
A That's what the document says.
Q And then after that, it would ramp up to a rate of 3,000 metric tons. Do you see that?
A That's what the document says.

366

Q If the Department was using these rates in this document, do you know if they had any relation to the rates the Department actually intended to implement at this time?
A You would have to go back to the Annual Capacity Reports and, more specifically, the one that was -- the previous ones pointed to, which was the one issued in 1991, in anticipation of 1998 operations.
These were, again used by the analyst to -- as schedules to evaluate, you know, perimetrically what the total cost of the program might be.
So in terms of whether or not these would be used, you would have to look to a subsequent ACR that had the rates that the Department was intending contract holders to respond with DCSs to.
Q Okay. Well, I think I probably misphrased my question, because obviously you made the distinction yesterday between receipt rates and acceptance rates.
So do these tables represent the receipt

367

rate that the Department anticipated using?
A What the tables say is that they are waste acceptance schedules. So my sense is they are waste acceptance schedules.
Q Mr. Kouts, even though the ACR only projects 10 years, I'm assuming that the Department still would have some sort of plan for what was going to happen beyond that first 10 years; is that correct?
A Well, the construct of the ACR is that, for each successive year, let's assume that the Department was initiating waste acceptance in 1998. And the 1991 ACR provides the first 10 years. And in 1992, it would provide an additional year. And so forth and so on.
So the planning basis would be updated on an annual basis to inform the contract holders of succeeding years, if you will, of what planning -- planned waste acceptance the Department would have.
Q But the Department itself, because it's building facilities and constructing them and designing them, the Department needs to look beyond

368

10 years; isn't that correct?
A The Department is responsible for disposal of all the spent fuel under contract.
Q Okay. In this report, is this looking at how the Department, at this time, was planning on disposing of all the spent fuel that had been generated or would be generated?
A For the purposes of cost estimating, these are schedules that the estimators used to evaluate repository -- cost of repository operation and closure, out to 2042 in one case and 2049 in another and 2051 in another.
And the costs would also have to encompass a monitoring period and eventual closure of the repository.
So for the purposes of this analysis, this analysis requires that an estimate be made of the cost of the program up until the point of repository closure.
Q And as you testified, the purpose of this estimate is to provide input into the fee adequacy study; is that correct?

369

A That's correct.
Q And DOE is required to look at the adequacy of the fee each year to make sure it's collecting enough money to cover the cost of the program?
A The Secretary is responsible for evaluating the fee on an annual basis to determine whether or not the fee is -- the fee should be reduced or increased.
So the fee adequacy analysis, should the Secretary determine the fee is more than adequate, he is potentially bound to go inform the Congress that the fee needs to be reduced.
So it works both ways. It's not just whether or not the cost of the program or the fee should go up, but whether or not also the fee should go down based on the analytical approach that the Department has taken.
Q And for the purpose of doing that study, the Department needs a forecast of what's going to happen over the life of the program that it believes is accurate; is that correct?

370

A Well, the Department hopefully would not conduct analyses that are inaccurate. But in order to assure that you have bounded the cost, what this analysis did was look at various scenarios of the program.
Q Okay.
A And the scenarios were, you know, identified in the three tables.
Q Okay. And while each of the three tables represents a different case, all three tables include the same waste acceptance schedule for the first 20 years of the program; isn't that correct?
A Well, I would have to evaluate each of the individual tables to see whether or not, indeed, they did. But they look similar, just on initial glance.
Q Okay. So, regardless of which one of these cases you're looking at, the Department was looking at an acceptance rate that began at 400, ramped up to 900 for a period of time until the repository operated, and then, over a period of time, ramped up to 3,000 metric tons.



MR. LO RE: Objection. The document speaks for itself.
THE WITNESS: The document reflected the strategy of the program, which was that an MRS would not exceed 10,000 tons until the first repository was in operation. So acceptance rates were based on that. Afterwards, there was a ramp up over a 5-year period to 3,000 metric tons in 2015 of spent fuel.
BY MR. TOMPKINS:
Q And so at the time this report was issued, the Department was projecting that a repository would begin operations in 2010?
A That's correct.
Q And so that's why you're reflecting the ramp up in 2010 from 900 to 1800 and then up to 3,000?
A That's correct. It also was projecting the second repository would be operational in 2039.
Q At least in tables A2?
A And A3.
Q And A3.
MR. TOMPKINS: Let's take a 5-minute



break.
(Whereupon, at 11:19 a.m. a recess was taken until 11:27 a.m.)
BY MR. TOMPKINS:
Q Okay. Mr. Kouts, just following up on one question about Kouts Exhibit 29, this document is used, as you say, to allow the Secretary to evaluate whether the fee should be raised or lowered in any particular year; is that correct?
A That's correct.
Q Okay. I would like to turn briefly to Kouts Exhibit 16, which was marked yesterday, the 1991 Annual Capacity Report.
A Okay.
Q And, again, Mr. Kouts, did you participate in drafting this document at all?
A No, I did not.
Q Okay. And did you review or approve this document prior to being published?
A I may have reviewed it. I was not the approving official.
Q Okay. And did you have any discussions



with the people who actually drafted the document? Do you recall?
A I don't recall any.
Q And do you know personally the motivations of the people who was drafting this, the purpose they drafted it for?
MR. LO RE: Objection. Calls for speculation.
THE WITNESS: No, I do not.
BY MR. TOMPKINS:
Q I would like to turn to -- back to Kouts Exhibit 5 for a moment. This document was the letter to contract holders, in this case, Pacific Gas & Electric, enclosing the DCS instructions.
And, again, I think Mr. Stouck may have asked you these questions yesterday, but I just want to confirm. Were you involved at all in drafting these DCS instructions or this letter?
A No, I was not.
Q Okay. And did you have any input in the drafting of this letter or these instructions?
A Not to my recollection.

Q Okay. And at that time, were you aware of the purpose of this document or the reasons that it was being issued?
MR. LO RE: Objection. Calls for speculation.
THE WITNESS: I knew at the time that we started the planning process with the utilities, but the specifics of it and the significance of the documents was not something that I was involved with. So I was not -- I was not involved in this process.
BY MR. TOMPKINS:
Q Were you personally -- did you, at this time in 1992, actually review any DCS submissions submitted by utilities?
A No, I did not.
Q And I believe you just said that you were aware that the planning process was ongoing. But at this time in 1992, were you aware of the significance of Delivery Commitment Schedules?
MR. LO RE: Objection. Vague.
THE WITNESS: Again, I was not involved

375

in this area of the program. And to the significance of any aspect of it, I was not intimately involved with.
(Kouts Exhibit No. 30 was marked for identification.)
BY MR. TOMPKINS:
Q Mr. Kouts, you've been handed what's been marked Exhibit 30 to your deposition, which is a report issued by the GAO, entitled: Operation of Monitored Retrievable Storage Facility Is Unlikely by 1998.
Have you seen this document before?
A Yes, I have.
Q Did you see this at the time it was issued in 1991, September 1991?
A I believe I did. I remember the existence of such a document, yes.
Q Okay. At this time in September of 1991, what was your position at OCRWM?
A I was either -- I was in one of two positions. I was either head of the transportation program or I was working on strategic and

376

contingency planning, since -- I don't remember the exact change over date. So I could have been in either of those two positions.
Q And when you referred to contingency planning, what duties did that job entail?
A Basically working with the director of the office at that time in developing strategies, contingencies about how the program might move forward if we were unsuccessful implementing it as we currently planned.
Q Okay. We'll touch on that in a minute, Mr. Kouts.
Turning to Exhibit 30, can you turn to page 3 of this document, please, Mr. Kouts. And three-quarters of the way down the page, the report has a section called principal findings. And it appears the principal finding of the report is that an MRS was unlikely by 1998.
The report states in the paragraph right underneath that heading, first, DOE's plans depend on a negotiator's completing and Congress' approving a siting agreement by the end of 1992 that would

377

permit early development of an MRS facility.
Do you see that statement?
A Yes, I do.
Q Okay. Do you know if that statement was true?
MR. LO RE: Objection. Calls for speculation. The document speaks for itself.
THE WITNESS: That seems to be inconsistent with what the Secretary's reassessment report had in terms of, to my recollection, that we reviewed just a little bit earlier, that a site had to be identified by March of 2003.
So I don't know on what basis that this information was received by the GAO or, you know, on what basis they made that conclusion.
BY MR. TOMPKINS:
Q At this time, were you familiar with the schedule that the program was operating under for siting of an MRS?
A Generally, yes, but in terms of the specifics of when we needed something specifically, I don't recall it.

378

Q And as you said, the reassessment report in the table we looked at previously had a date of March 1993. This says the end of 1992. Would that be about the general time frame that siting would be required?
A If a site was identified in May of that year or in April, I still think that would have worked. Or even later. So it's hard to say. It's really hard to say. There are a lot of contributing factors.
Q And what are those contributing factors?
MR. LO RE: Objection. Vague. Calls for speculation.
THE WITNESS: Should the Department have received a site, it would have tried to adjust its schedule to a later time than any of these dates. It would have tried to adjust its schedule to make sure it still had waste acceptance in 1998.
We had general dates where we felt those were appropriate, but there were always options in terms of trying to accelerate things, assuming we had additional funding, assuming that we approached

379

the design of the facility differently and the license differently so forth. So there were options in terms of how we might implement the program based on when we identified a site.
BY MR. TOMPKINS:
Q Okay. But as a general target, the end of 1992, early 1993 was the target at this point in time?
A Generally, yes.
Q And, do you have knowledge that that was the target?
A Other than what the Secretary's report said -- this is different from it. Again, as I stated earlier, I have no basis for understanding why the GAO believed that that was the magic date, as opposed to the Secretary's date that was contained in his reassessment report.
Q This report also states that Negotiator also -- this is in the same paragraph. The Negotiator -- excuse me. It's the sentence above.
However, because the Negotiator expects the process to take considerable time, he does not

380

believe that these activities can be completed by then.
Were you aware at this time, in September of 1991, about the activities of the Negotiator?
A Yes.
Q Okay. And are you aware of whether or not the Negotiator expected his siting process to take considerable time?
MR. LO RE: Objection. Vague. Objection. Document speaks for itself. Objection. Calls for speculation.
THE WITNESS: I don't remember conversations with the Negotiator or the staff where that came up. But the document speaks for itself.
BY MR. TOMPKINS:
Q Okay. Independent of this document, do you recall having any conversations with anyone about what the Negotiator believed about when he would site an MRS facility?
A My perspective and my interactions with members of the Negotiator's office was that they were doing what they could to site a facility as

381

quickly as they could.
Q Okay.
A I don't remember any hard and fast, that we will have it by a specific date or we'll need more time. I just don't remember any conversations to that effect.
Q Did you have direct interactions with the office of the Negotiator?
A I, on occasion, interacted with members of the Negotiator's staff and with the Negotiator.
Q And was that in your job in the contingency planning or was that in your role in the transportation branch?
A More contingency planning than transportation.
Q Okay. Do you have any reason to believe that the GAO's characterization of the Negotiator's beliefs here is not accurate?
A I have no reason to believe that it's accurate or inaccurate.
Q Mr. Kouts, do you know when the position of the Negotiator was first filled by the President?

382

A Not specifically, no.
Q Okay. Turn to page 11 of this report. The first full paragraph here indicates that the position of the Negotiator was filled in August of 1990. Do you know if that's true?
A The document speaks for itself.
Q Do you have any knowledge yourself about whether or not that's true?
A I don't have any independent knowledge as to whether or not that's true or untrue.
Q Okay. Mr. Kouts, turning back to the principal findings on page 3, the GAO indicates that it believes that an MRS facility was unlikely by 1998.
At this point in September of 1991, did you believe that an MRS facility was unlikely to be operating by 1998?
MR. LO RE: Objection. Asked and answered. Mr. Kouts has testified repeatedly about his understanding of an MRS. If you want to ask the GAO about their opinion, I suggest that you attempt to ask them.

383

This is an improper question of this witness who has now sat here for close to 12 hours of deposition and numerous times in trial and has testified about his opinions and understanding of the MRS in this time frame.
Go ahead and answer if you can.
THE WITNESS: My perspective as an employee of the program, was that we were doing everything we could to implement the MRS in 1998. And the Department still had a belief and I had a belief that that was still attainable.
BY MR. TOMPKINS:
Q It was attainable. Was it likely?
MR. LO RE: Objection. Vague.
THE WITNESS: I believe it was -- I -- it's difficult to think back as to how I thought in 1991. My perspective at that point was that we still had a very good chance of being successful and that we were going to do everything we could to have that facility available.
In terms of likely or unlikely, there were lots of variables. My belief was that there

384

was a strong desire to have a facility available to meet our obligations under the contract. And that if the Negotiator found a site, that Congress would approve changes to the conditions under the Act such that we would be able to operate it.
So whether it was likely or unlikely, I believed from my own perspective that it was a very viable approach and that it had -- it had merit to pursue.
BY MR. TOMPKINS:
Q Your last answer, I think, indicates that it was dependent upon a number of other factors; is that true?
MR. LO RE: Objection. Mischaracterizes the testimony.
BY MR. TOMPKINS:
Q And one of those was whether or not the Negotiator identified a site and reached an agreement with the host?
A Yes.
Q Okay. And another contingency was whether or not Congress acted and authorized such a

385

facility?
A Congress had already authorized the facility.
Q Would Congress need to approve any agreement reached by the Negotiator?
MR. LO RE: Objection. Calls for speculation.
THE WITNESS: The plan was that the negotiated agreement with the host site would address the linkages in the Nuclear Waste Policy Act. So in order for the linkages to be removed, Congress had to approve the agreement.
So had those linkages not existed, it's unclear to me whether or not Congress would have had to approve the agreement; other than if the agreement was monetary, that Congress would have had to approve that it was agreeing to the monetary provisions of that agreement.
BY MR. TOMPKINS:
Q But the Department, at this point, needed to change the linkages which were enacted in 1987 to actually begin acceptance in 1998; is that correct?

386

MR. LO RE: Objection. No foundation.
THE WITNESS: The Department could not change the linkages. Congress had to change the linkages.
BY MR. TOMPKINS:
Q Okay. And so one of the contingencies for DOE's plan to begin waste acceptance in 1998 was a change by Congress of the existing linkages?
MR. LO RE: Objection. Asked and answered.
THE WITNESS: I wouldn't characterize it as a contingency. I would characterize it as that was the strategy of the Department in having a facility available in 1998, as presented in the Secretary's reassessment report in 1989.
BY MR. TOMPKINS:
Q And without a change in the linkages, the Department would not be able to have an MRS facility in 1998; is that correct?
MR. LO RE: Objection. Mischaracterizes the testimony.
THE WITNESS: If Congress did not change

387

the linkages such that the Department could not deploy an MRS, until -- or it could not build an MRS until the repository construction authorization was received, the Department would have been unable to have a facility available in the 1998 time frame.
BY MR. TOMPKINS:
Q Were there any other actions that beginning waste acceptance in 1998 was dependent upon? Was there any other necessary contingencies required for acceptance of waste in 1998?
MR. LO RE: Objection. Vague. Objection. Asked and answered.
THE WITNESS: Congress would have to appropriate the funds for the Department to deploy the facility. The Nuclear Regulatory Commission would have to license the facility in a timely manner such that the Department could construct it in a time frame that would allow it to have operations in 1998.
There would have had to have been -- any litigation associated with the facility would have had to be addressed in a rapid manner. Extended

388

litigation would have affected the schedule.
If the Department was unable to obtain permits necessary for the construction of such a facility, depending on wherever that facility was sited, that could have been an issue.
And any aspect of the deployment of the facility that required essentially an action by an outside agency other than the Department was outside the Department's control and potentially could affect the schedule to have it implemented by 1998.
BY MR. TOMPKINS:
Q At this time, in September of 1991, did you have any view about the likelihood of Congress changing the linkages?
MR. LO RE: Objection. Asked and answered.
THE WITNESS: Based on my understanding of the views of the Senate Energy Committee, there was strong support in the Senate Energy Committee for identification of the site, approval of a negotiated agreement that would address the linkages. And there seemed to be other support in

389

Congress for such an activity.
So to the extent that, of my own personal knowledge, that's what I was led to believe.
BY MR. TOMPKINS:
Q And I missed part of that answer. Which committee in Congress were you referring to?
A Senate Energy and Natural Resources.
Q And did you have any interactions with them about these linkages and removing these linkages?
A In my position that I was in at the time in strategic and contingency planning, I was privy to discussions where the director either informed me or my management about conversations that he had with Congress at that time.
And that was also communicated throughout the program.
Q In September of 1991, were you monitoring the progress of the Nuclear Waste Negotiator and his siting effort?
MR. LO RE: Objection. Asked and answered.

390

Q If you turn to page 11 of this document, Mr. Kouts. There's identification here of a mandatory MRS siting process. Do you see that?
A Yes.
Q Okay. Do you recall if the Department was looking at a mandatory siting process at this time?
A No, it was not.
Q It was not.
A No. This was a report provided by contractors. It was not -- this is not a DOE document. These are the views of contractor staff within, at that time -- this would have been TRW was the M&O contractor at that time.
So these were the views of contractors, not the Department.
Q These contractors, they were operating at the behest of the Department at the Department's direction; is that true?
A They were paid by the Department. And they provided deliverables to the Department for its consideration.

395

Q Okay. So they were asked to prepare this document and the conclusions in this document?
MR. LO RE: Objection. No foundation.
THE WITNESS: They may have been asked to prepare a report on the MRS contingency. The contents of the report was developed by contractor staff, not by DOE staff. These are the views of a contractor who worked for this area of the program.
BY MR. TOMPKINS:
Q Okay. On page 11, there's a statement about this mandatory siting process. The second to last paragraph states: A mandatory process could offer the only hope of achieving an MRS in time to receive waste from utilities on a schedule they could accept.
Do you see that?
A I see that.
Q Okay. And do you know if the Department shared that view at this time?
MR. LO RE: Objection. Asked and answered.
THE WITNESS: No.

396

BY MR. TOMPKINS:
Q It did not?
A It did not.
Q Did you have this view?
MR. LO RE: Objection. Asked and answered.
THE WITNESS: No.
(Kouts Exhibit No. 32 was marked for identification.)
BY MR. TOMPKINS:
Q Mr. Kouts, you have been handed what's been marked as Exhibit 32 to your deposition. It's a letter from James Watkins to Bennet Johnston, chairman of the Energy and Natural Resources Committee in the United States Senate. Have you seen this letter before?
A Yes, I have.
Q Okay. And did you see this letter around the time it was drafted in December of 1992?
A No. I saw it after it was sent.
Q Okay. Were you working in the office contingency planning at this time?

397

A Yes.
Q Okay. Did you have any input into the content of this letter or its attachment?
A No.
Q Okay. James Watkins, was he the Secretary of Energy at the time?
MR. LO RE: Objection. Document speaks for itself.
THE WITNESS: Yes, he was.
BY MR. TOMPKINS:
Q Okay.
A I should say he was the outgoing Secretary of Energy.
Q Okay. The outgoing Secretary of Energy. Do you know when he left his position?
A Shortly after this letter was sent. There was a change in administration.
Q Okay. He attaches to this letter -- I will -- actually, turning to the letter itself, the second paragraph indicates: Enclosed for your information is a summary of my new strategy to provide interim storage in 1998. Do you see that?

398

A Yes.
Q Okay. And then attached is a document which is titled: A New Strategy for Management of Commercial Spent Nuclear Fuel; is that correct?
A That's what the document says.
Q Okay. Did you participate at all in the drafting of this attachment?
A No, I did not.
Q Okay. Do you know who drafted it?
A No, I do not.
Q Okay. Did this represent -- okay.
The first page under the heading MRS Facility and Siting, the first sentence indicates the Office of the Nuclear Waste Negotiator established under the NWPA as amended in 1997 has spent more than 2 years seeking a voluntary host and site for an MRS facility. That office has not been able to identify a final candidate site that can be recommended to Congress by June 1993 and that will permit spent fuel receipt by January 1998, as planned. Thus, alternative actions are required.
Do you see that?

399

A Yes, I do.
Q Okay. Was this the position of the Department of Energy at this time that the MRS facility could not be cited in time to receive spent fuel in January 1998?
MR. LO RE: Objection. Asked and answered. Objection. Calls for speculation.
THE WITNESS: That's what the Secretary's letter and the attachment said.
BY MR. TOMPKINS:
Q Okay. And the Secretary of Energy speaks for the Department?
A Yes, he does.
Q Okay. At this time, do you have any reason to disagree with the Secretary's assessment?
MR. LO RE: Objection. Vague as to the term "at this time."
THE WITNESS: At this time?
BY MR. TOMPKINS:
Q In December of 1992, did you agree with Secretary Watkins' conclusion?
MR. LO RE: Objection. Asked and

400

answered.
THE WITNESS: I don't know that I had an opinion one way or the other as to whether the Secretary was right or wrong. This was the new strategy as he represented it, which was changed shortly after he left office.
So, again, I don't know that I had an opinion one way or the other as to whether or not he was right or wrong.
BY MR. TOMPKINS:
Q He -- you had no opinion about whether this was right or wrong?
MR. LO RE: Objection. Mischaracterizes the prior testimony.
THE WITNESS: I don't remember having an opinion at that time as to whether or not the Secretary was right or wrong.
BY MR. TOMPKINS:
Q The document continues and identifies some potential alternative actions. The first of which refers to a multiple purpose and standardized container system. What was that?

401

MR. LO RE: Objection. No foundation.
THE WITNESS: Well, the document goes on to explain what that is. Reading from the document, it says: Such a system would simplify the design of a storage facility but would require expeditious development and certification to be effective.
And it -- this a standardized system for spent fuel receipt, storage, transport and disposal could be developed to reduce cost, minimize, handling and spent fuel assemblies and provide more efficient storage at both an interim storage site and nuclear plant sites.
BY MR. TOMPKINS:
Q Was this the MPC concept, that's commonly referred to as an MPC?
A Yes.
It goes on to say that the Department should plan for the use of federal government sites for interim storage.
Q Okay.
A So this was, again, a change in strategy from the perspective of where the program was at

402

MR. TOMPKINS: Dairyland.
THE WITNESS: Dairyland. Okay.
BY MR. TOMPKINS:
Q Okay. Mr. Kouts, I believe you testified that you were the head of the transportation branch from 1988 to 1991 --
A Yes.
Q -- is that correct?
A That's correct.
Q And in that position, were you responsible for procurement of SNF transport casks?
A I was not procuring them at that time. We were designing them at that time.
Q Okay.
A So if I was still head of that program when those needed to be procured, I would have been the head of that. But at that time, we were not involved in the procurement process.
Q But you were in the design process at that time --
A That's correct.
Q -- in the late '80s, early '90s?

411

A That's correct.
Q Okay. And were you using vendors to design those casks?
A Yes, we were.
Q Okay. Did the Department in the '80 to early '90s time frame select any cask that it intended to use for transportation when the program began operating?
A The Department didn't select any casks. The Department was designing casks that potentially could be of use at a time when we would begin operations. We did not -- we selected vendors to develop designs. And we down scoped the amount of vendors based on funding restraints. But in terms of selecting casks, I guess I'm struggling with the context of your answer.
Q Okay. Which vendors were working on this -- on this process?
A Now you're challenging my memory. For the two truck casks that we were developing, it was Westinghouse Corporation and General Atomics.
For the three rail casks that we were

412

developing, it was NAC Corporation, Babcock & Wilcox, and an organization that I don't believe exists any more, which was Newpack.
Q Okay. And I believe you just testified that there was a winnowing process and you reduced the number of vendors at some point?
A During my tenure in that position, due to a reduction in fund funding, we terminated one design effort, which was the Newpack effort. We selected two primary efforts and kept two backups. The primaries were General Atomics and Babcock & Wilcox, B W.
And the backups for the rail were NAC. And for the truck was Westinghouse.
Q Okay. Turn to Appendix E of Exhibit 4, please, Mr. Kouts.
This specific exhibit, Exhibit 4 is a contract between Dairyland and the Department of Energy. Are you aware of whether or not the contracts with other purchasers, such as Energy Northwest, have the same terms and same version of Appendix E?

413

A My understanding is they are similar if not identical.
Q Okay. The first page of Appendix E contains some nominal physical dimensions for spent fuel assemblies. Do you see that?
A Yes, I do.
Q And the cross-section of a BWR assembly measurement is 6 inches by 6 inches. Do you see that?
A That's what the document says, yes.
Q So any BWR fuel, provided it meets the other requirements in here, which is 6 inches by 6 inches, will be standard fuel --
MR. LO RE: Objection.
BY MR. TOMPKINS:
Q -- under Appendix E.
MR. LO RE: This document speaks for itself.
THE WITNESS: Not necessarily. If it -- it has to meet the length requirements, et cetera. Also, there are some issues associated with -- with the state of the fuel, whether it's failed and so

414

forth, in terms of whether or not it's standard. And I'm not the exact expert on this. I would, you know, encourage you to ask someone like Mr. Zabransky who is more conversant with this area of the contract than I am. But that's my general view of this.

BY MR. TOMPKINS:

Q Okay. So Mr. Zabransky has more knowledge what constitutes failed fuel or --

A Yes, he certainly does.

Q -- intact fuel?

A Yes.

Q Just referring to this cross-section, however, were you aware of an issue with respect to the casks that were being designed and whether or not the Westinghouse casks had a basket which met the 6 inches by 6 inches specification?

MR. LO RE: Objection. Vague.

THE WITNESS: I may have been at the time. But the Westinghouse design, again, was a backup design. It was -- it used a titanium cask structure. The primary truck cask design that we



were developing was the GA 4 and the GA 9 design.

And to the best of my knowledge, they were fairly well designed to be fairly universal.

And to the extent that they would have required a different basket, to the extent to service an individual purchaser, we would have developed that, if appropriate.

MR. TOMPKINS: I'm getting very close to the end. Let's take a 5-minute break. And I'll see if there's anything else and wrap up.

(Whereupon, at 12:23 p.m. a recess was taken until 12:29 p.m.)

(Kouts Exhibit No. 33 was marked for identification.)

BY MR. TOMPKINS:

Q Mr. Kouts, you've been handed what's been marked as Exhibit 33 to your deposition. Do you recognize it?

A Yes. I think I do.

Q Okay. And my understanding is this is actually a document that was prepared at your direction?



A That's correct.

Q Okay. And that reflects the request for appropriation to Congress for the program over its history and the actual appropriations?

A That's correct.

Q Okay. And I believe you have provided testimony about this exhibit in several trials to date; is that correct?

A That's correct.

Q Okay. And I believe you've testified that, as reflected in the chart, over the course of time, Congress has not appropriated the total amount of the requests in many years; is that correct?

A That's correct.

Q Okay. Is it your view, Mr. Kouts, that the lack of congressional appropriations is a substantial factor in the failure of the Department to meet the 1998 date?

MR. LO RE: Objection. Vague.

THE WITNESS: I don't believe I ever testified it was a substantial factor. I testified that it was a contributing factor, yes.



BY MR. TOMPKINS:

Q A contributing factor. And what other factors beyond the lack of appropriations were there?

A In terms of having waste acceptance capability available in 1998?

Q Uh-huh.

A A factor would have been the fact that Congress did not act on the Department's MRS proposal when it was submitted to Congress.

The fact that the Environmental Protection Agency standard for repository performance was remanded in the late '80s and took an act of Congress and an additional 10 years, approximately 10 years, in order to get a standard so the Department could make a site recommendation, which was outside the control of the Department.

The fact that -- the Nuclear Waste Negotiator was unable to find a site that would have been acceptable for deployment of an MRS.

I mean, those are generally the major contributing factors, from my perspective

contributing factors, to why the Department was unable to have waste acceptance capability in 1998.

Q And the lack of appropriations, would you say that that was more important than the other factors?

MR. LO RE: Objection. Mischaracterized the prior testimony.

THE WITNESS: Yeah. I -- as I said, it's a contributing factor. More important, less important? Certainly having a site, from my perspective, would have been more important to do that. But without the appropriations in order to implement the program, even if you had a site, you couldn't have had it available in that time frame. So they kind of go hand in hand.

(Kouts Exhibit No. 34 was marked for identification.)

BY MR. TOMPKINS:

Q Mr. Kouts, I would like to show you what's been marked Kouts Exhibit 34, which are interrogatory responses the government has provided in Energy Northwest's spent fuel case. Have you

419

ever seen these before?

A No. I have not.

Q Okay. I would like to refer you to interrogatory 7, which is on page 10. The interrogatory asks about a statement in one of the DOJ's briefs in this case. Yet, it is quite possible that, after DOE eventually begins SNF acceptance, it will be able to increase the speed of SNF acceptance beyond that which it was otherwise obligated to satisfy, enabling it to catch up to the place where it should have been had it timely began SNF acceptance.

Do you see that? It appears there is some typo in the interrogatory but....

A I see that, yes.

Q The response which was provided by the Department of Justice on behalf of the Department of Energy specifically refers to you and your testimony regarding future congressional action that could affect the program.

MR. LO RE: Objection. The document speaks for itself.

420

THE WITNESS: I don't see what you're referring to in that regard.

BY MR. TOMPKINS:

Q The response on page 11, which is the next page, which is response to interrogatory number 7, the last sentence states: In addition, Christopher Kouts has previously testified regarding the possibility that future congressional action could affect the program.

A That's correct. I don't know specifically what that's referring to, though.

Q Okay. Are you aware of any future congressional action that would allow the Department of Energy to catch up to its obligations to receive SNF under the current contract in the NWPA?

MR. LO RE: Objection. Mischaracterizes prior testimony.

THE WITNESS: Certainly the administration has submitted legislation last year and this year that is critical to the implementation, the eventual implementation of a repository. First and foremost in that legislative

421

was land withdrawal authority -- permanent land withdrawal authority.

The Nuclear Regulatory Commission will not issue a construction authorization for the repository unless the Department demonstrates that it has permanent control of the land. The only way that permanent control of federal lands can occur is through congressional authorization.

So, without that, certainly the repository cannot be implemented.

In addition to that, the administration's package also addresses funding reform for the program. It also addresses to assure that you don't have the problems identified in this exhibit here.

In addition to that, it identifies a variety of aspects addressing the program, which I won't go into in detail here, because my standard congressional briefing usually takes an hour to go through all of that, to the extent that this would forestall the opportunity for litigation and delay the implementation of the repository.

So to the extent that this is referring

422

# LAWRENCE

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
et al., )
)
Plaintiffs, )
vs. ) No. 98-126C
UNITED STATES, )
Defendant. )

DEPOSITION OF MICHAEL J. LAWRENCE, VOLUME I

May 20, 2002
Richland, Washington



APPEARANCES

For the Plaintiff Yankee Atomic Electric,
Connecticut Yankee Atomic Power Company
Maine Yankee Atomic Power Company:

Robert L. Shapiro
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5879
(202) 682-1639 Fax

For the Defendant:

Heide L. Herrmann
R. Alan Miller
United States
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0290
(202) 514-8624 Fax



APPEARANCES

For the Plaintiff Sacramento Municipal
Utility District:

Timothy R. Macdonald
Arnold & Porter
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2334
(303) 832-0428 Fax

For the Plaintiff Commonwealth Edison
Company:

Christopher P. Tompkins
Jenner & Block
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350
(312) 840-8786 Fax



APPEARANCES

For the Plaintiff Boston Edison Company,
Duke Power, Florida Light & Power,
GPU Nuclear, Indiana Michigan Power
Company, Northern States Power Company,
Power Authority of the State of New
York, Omaha Public Power District,
Nebraska Public Power District, PSEG
Nuclear, LLC:

Daniel S. Herzeld
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7612
(703) 770-7901 Fax

EXAMINATION INDEX


| EXAMINATION BY: | PAGE NO. |
|---|---|
| Mr. Shapiro | 10 |


EXHIBIT INDEX


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 1 | 43-page Draft Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste SN048683 - SN048724. | 67 |
| 2 | 16-page Federal Register Part IV Department of Energy Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste DC-107942 - DC-107956. | 91 |
| 3 | 11-page Memorandum dated April 8, 1983 ZAB-001-0893 - ZAB-001-0902. | 101 |




EXHIBIT INDEX


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 4 | 4-page letter to Robert Morgan from Yankee Atomic Electric Company dated March 4, 1983 YDK-026-103054 - YDK-026-103057. | 107 |
| 5 | 6-page letter to Robert Morgan from Northeast Utilities dated March 3, 1983 CDB-021-0180 - CDB-021-0185. | 110 |
| 6 | 87-page letter to Robert Morgan from Edison Electric Institute dated March 7, 1983 YDK-026-103876 - YDK-026-103963. | 114 |
| 7 | 21-page Federal Register Part II Department of Energy Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste DC-107922 - DC-107941. | 131 |




EXHIBIT INDEX


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 8 | 4-page Seminar on the Nuclear Waste Policy Act of 1982 - Its Requirements and Significance May 3-5, 1983 agenda YDK-026-104312 - YDK-026-104315. | 164 |
| 9 | 56-page letter to Gentlemen from Robert M. Rosselli attaching Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste PNL028-2010 - PNL028-2064. | 166 |
| 10 | 7-page Memorandum dated September 15, 1983 from Richard H. Williamson Re: Mission Plan Strategy PNL-173-1282 - PNL-173-1288. | 181 |




EXHIBIT INDEX


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 11 | 127-page Draft Civilian Radioactive Waste Management Program Mission Plan Volume I Overview and Current Program Plans December 20, 1983 CTR042-1065 - CTR042-1191. | 194 |
| 12 | 3-page Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting excerpt dated December 12-15, 1983 SN069588 - SN069600. | 199 |
| 13 | 40-page Statement of Michael J. Lawrence Acting Director Office of Civilian Radioactive Waste Management Department of Energy Before the Subcommittee of Energy Conservation and Power House Committee on Energy and Commerce PNL 173-0225 - PNL 173-0264. | 201 |

EXHIBIT INDEX


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 14 | 4-page letter to Emmett Moore from Thomas Overcast dated April 26, 1984 Re: MRS Institutional Report PNL 117-3151 - PNL 117-3154. | 205 |
| 15 | 24-page Mission Plan for the Civilian Radioactive Waste Management Program Volume I and II of II Volumes April 1984 (No Bates number.) | 206 |
| 16 | 1-page AP Wire SN044976. | 214 |
| 17 | 14-page Nuclear Waste Fund Fee Adequacy: An Assessment. Second Annual Report July 1984 PA-177336 - PA-177349. | 218 |




BE IT REMEMBERED that on Monday, May 20, 2002, at 1550 George Washington Way, Richland, Washington, at 9:31 a.m., before SHAUNA L. BEACH, CCR, RMR, CRR, Notary Public in and for the State of Washington, appeared MICHAEL J. LAWRENCE, VOLUME I, the witness herein;

WHEREUPON, the following proceedings were had, to wit:

<<<<<< >>>>>>

MICHAEL J. LAWRENCE,having been first duly sworn by the Notary, deposed and testified as follows:

EXAMINATION

BY MR. SHAPIRO:

Q. Would you state your name for the for the record, please.
A. Michael J. Lawrence.
Q. Mr. Lawrence, have you had your deposition taken before?
A. I don't really recall.
Q. Well, let me explain since -- maybe it's been a while, let me explain just very briefly what we're



going to be doing today. Hopefully speed up the process.

It's really basically a conversation. I'll be asking you questions. You'll be answering. It's a bit more formal than a typical conversation. We have a court reporter who is taking down everything that's said.

Counsel for the government may be making objections after I ask questions that may say the word "objection" and say a few other things that's for the written record. But would you -- unless something unusual happens, you will be expected to answer.

If I ask a question that you're confused about, I'm not sure what I'm really asking, please ask me to rephrase it, since it's not helpful to anybody to try to answer a question that's unclear to you.

Do you understand what we're doing today?
A. Yes.
Q. Mr. Lawrence, are you represented by the government counsel today?
A. Yes.
Q. When did you ask for representation by the government?



A. It was about three weeks ago.
Q. And before you asked for representation by the government, did you discuss potentially giving a deposition today with anyone?
A. No.
Q. Have you prepared for your deposition today in any way?
A. Yes.
Q. How have you prepared?
A. I discussed with government lawyers last Thursday, the process.
Q. When you say "the process," what do you mean?
MS. HERRMANN: Objection.
Don't discuss what we talked about in our meeting.
Q. (By Mr. Shapiro) I'm just asking what you mean by "process."
MS. HERRMANN: I'm telling you not to answer.
Q. (By Mr. Shapiro) Did you discuss what -- what the procedures are for a deposition?
MS. HERRMANN: Don't answer the question.
Q. (By Mr. Shapiro) Are you not answering the question?

A. We did not discuss anything of merit in the case. It was the formality of questions and answers. That was all.
Q. And other than your conversation with government counsel, have you discussed potentially testifying with anybody else?
A. No.
Q. Did you review any documents to prepare for testifying today?
A. No.
Q. Let me ask about your background. It might help me understand just where you -- you fit in. Why don't we start from your current position and work backyard.
What is your current position?
A. I'm associate laboratory director for Energy Science & Technology at the Pacific Northwest National Lab.
Q. What do you do as associate director for Energy Science & Technology?
A. I'm responsible for the energy programs, the information science programs, and material science programs that the laboratory conducts for the Department of Energy and industry.
Q. How long have you been in this position?

13

A. Since April 1st.
Q. Of this year?
A. This year.
Q. In this position, do you do any work for the Office of Civilian Radioactive Waste Management?
A. Not to the best of my knowledge.
Q. How many people come under your supervision as associate director?
A. 620.
Q. That's a lot of people. There may be somebody involved somewhere doing something for Civilian Radioactive Waste Management but you may not be personally aware of?
A. That's correct.
Q. And before April 1st, what was your prior position?
A. I was the manager of Nuclear Safety & Technology at Pacific Northwest National Lab.
Q. When did you start that position?
A. I don't recall the specific date.
Q. Just approximately.
A. January 2001.
Q. What kind of work did you do when you were manager of Nuclear Safety & Technology?
A. In general, I was responsible for our nuclear

14

technology programs at PNNL.
Q. And in that position, did you do any work for the Office of Civilian Radioactive Waste Management?
A. I don't believe so.
Q. You didn't do any work personally for Civilian Radioactive Waste Management?
A. That's correct.
Q. By the way, I've been using the long name, Office of Civilian Radioactive Waste Management. Are you familiar with the abbreviated acronym RW?
A. Yes.
Q. Can we use the term RW to abbreviate for Office of Civilian Radioactive Waste Management?
A. Yes.
Q. Prior to your position of manager of Nuclear Safety & Technology, what was your position before that?
A. Manager of International Nuclear Programs.
Q. What did you do in that position.
A. I was responsible for our international nuclear work.
Q. What do you mean by "international"? What sort of international nuclear work were you responsible for?
A. We have international nuclear safety programs. We

15

have projects with international nuclear organizations. I was responsible for developing and carrying out that work.
Q. And when did you start that position as manager of International Nuclear Programs?
A. July 2000.
Q. And prior to July of 2000, what was your position?
A. I worked for British Nuclear Fuels, Limited.
Q. What was your position at British Nuclear Fuels, Limited?
A. I was executive vice-president and manager of the waste treatment plant project.
Q. When did you start that position?
A. April of 1999.
Q. You say manager -- executive vice-president and manager of the waste treatment program. What sort of waste treatment? What sort of waste were you treating?
A. It was to build a treatment plant for the defense wastes that's buried at the Hanford site.
Q. And why did you leave the BNFL position?
A. I had a serious disagreement with the way BNFL was managing -- handling that project and responding to problems on that project.
Q. What sort of disagreement?

16

A. I -- there was a serious cost overrun, which they would not acknowledge responsibility for, and they would not go along with my recommendation to provide the government with an alternative way of getting the job done.
Q. So you left as a matter of principle?
A. Yes.
Q. When did you start at BNFL?
A. July 1995.
Q. In April of '99, you were executive vice-president and manager of the waste treatment program. What was your position at BNFL before that?
A. Immediately prior to that, I was chief operating officer and executive vice-president of BNFL in Fairfax, Virginia.
Q. When did you start that position?
A. January '98, I believe.
Q. What did you do as chief operating officer and executive vice-president?
A. I was responsible for the execution of a number of the projects that BNFL was conducting for the Department of Energy or private industry.
Q. You referred to BNFL, you were chief operating officer. Was that BNFL United States operations?
A. Yes. It's BNFL, Inc.

17

Q. And then you reported to someone in Great Britain?
A. No, I reported to the CEO of BNFL, Inc.
Q. Why did you switch positions from chief operating officer to become manager of the waste treatment program?
A. There were two reasons: One, there were, I felt, a very strong influence on our operations in the U.S. by the British parent that made it difficult at times to carry out the programs the way I felt they should be; and two, I really looked for an opportunity to return to the Tri-Cities.
Q. Before you were chief operating officer, what was your prior position?
A. I was president and CEO of Bajarito Scientific Corporation. Would you like me to spell that?
Q. I'm sure the court reporter would.
A. B-a-j-a-r-i-t-o.
Q. What did that company do, when you were president?
A. Bajarito was a subsidiary of BNFL, Inc. It had been acquired in 1995. It was located in Los Alamos, New Mexico. And it developed and provided scientific instrumentation for the classification of nuclear waste.
Q. Scientific instrumentation for the classification of nuclear waste. Can you explain a little bit

18

more just what that means?
A. The Department of Energy has a number of drums of wastes that are called transuranic wastes, which have to be disposed of in a geologic formation of which the waste isolation pilot plant in Carlsbad, New Mexico, was to be the final disposition site.
In order to be eligible for disposal, the waste had to meet certain criteria and composition. Our system allowed a drum to be measured to determine whether or not it met those criteria.
Q. When did you start that position with Bajarito?
A. July 1995.
Q. And prior to that position, what -- what was your employment?
A. From October 1991 until July 1995, I was counselor for nuclear policy for the United States State Department at the United States Mission to the Vienna International Organizations in Vienna, Austria.
Q. What did you do in that position?
A. I was responsible on a day-to-day basis for the United States representation to the International Atomic Energy Agency, which was located in Vienna.
Q. Did the International Atomic Energy Agency deal

19

with civilian radioactive waste management issues?
A. Yes.
Q. What sort of issues were you involved in dealing with civilian radioactive waste management, when you were counselor?
A. The IAEA sets very broad, general international guidelines or standards for a number of nuclear activities, including the management, disposal of nuclear waste. And so consequently, I would be -- could be involved in discussing criteria, requirements for waste disposal.
Q. In that position, as counselor for nuclear policy at the State Department, did you have a relationship with RW?
A. No.
Q. So there was no attempt at the State Department to make sure that its policies were consistent with what RW was doing?
A. Not that I ever saw.
Q. And prior to that position, as counselor for nuclear policy, what did you do?
A. I was director of waste operations for Chem Nuclear Environmental Services in Golden, Colorado.
Q. And what did you do as director of waste

20

operations for Chem Nuclear?
A. Tried to develop business with either government or industry for the management, storage, treatment, or disposal of various types of nuclear wastes.
Q. What was Chem's capability? What sort of business were you trying to develop for them?
A. We were attempting to have the Department of Energy look at a concept called privatization, where we would actually build -- finance and build and provide services to treat or manage nuclear waste in return for a fixed unit price by the government.
Q. Why were you trying to develop this business through the Department of Energy?
A. Because the government had a number of obligations to meet in the cleanup of their sites. And their budgets were insufficient to allow them to meet all their requirements.
Q. You referred to the government having obligations to clean up its own sites. Did you ever try to develop business through RW?
A. No.
Q. Why did you leave the Chem Nuclear position?
A. I was offered a diplomatic post in Vienna,

21

Austria.
Q. And that was attractive?
A. Yes.
Q. Why did you leave the diplomatic post in Austria?
A. Four years was enough time.
Q. You worked your way back to beautiful Tri-Cities?
A. I went to Sante Fe.
Q. Before Chem Nuclear, where did you work?
A. I was the manager of the Richland Operations Office for the Department of Energy in Richland, Washington.
Q. So I'm going to get my dates mixed up. When did you start with the Chem Nuclear position?
A. August 1991 -- 1990. I'm sorry. August 1990.
Q. And when did you become manager of the DOE Richland operations office?
A. June 1984.
Q. What did you do as manager of Richland operations office?
A. I was responsible for all the operations and programs associated with the Hanford site.
Q. Did any of those programs have a relationship to RW?
A. Yes.
Q. Which ones?

22

A. Up until 1987 -- I forget the month -- Hanford was one of the candidate sites for geological repository for high-level waste and spent fuel disposal for RW.
Q. Other than the connection of Hanford being a candidate site for a geological repository, did your work as manager of the Richland operations office have any other connections to RW?
A. No.
Q. When Hanford was a candidate site, what sort of work did you do involving Hanford's location as a geological repository?
A. Through an assistant manager and divisions and branches under that assistant manager, we were responsible for the characterization of the basalt under the Hanford site to determine if it qualified to be either a finalist or the repository or to be the repository or to disqualify it if the data did not support its selection.
Q. And why did that work stop?
A. Congress in '87 amended the Nuclear Waste Policy Act to focus all attention on Yucca Mountain, and to terminate the other two programs, including the one at Hanford and the one at Death Smith County,

23

within 90 days.
Q. About how many people did you supervise when you were manager of the Richland operations office?
A. There were about 340 Feds and anywhere between 12,500 to 15,000 contract employees.
Q. Why did you leave that position as manager of the Richland operations office?
A. I was ready for something different and I also felt that the Secretary of Energy, who I reported to, wanted all decisions to be made in Washington, but left the managers in the field responsible for those decisions.
Q. So you were left with the consequences of the decisions that you couldn't make?
A. That's correct.
Q. Who was the DOE Secretary at that time?
A. Admiral James Watkins.
Q. Prior to your work at the -- as manager of the Richland operations office, what was your position before that?
A. I was -- and I'm not sure if the title "acting" was in there or not -- but I was the director of the Nuclear Waste Policy Act Implementation Office at the Department of Energy in Washington, D.C.
Q. The Nuclear Waste Policy Act Implementation

24

Office, that was the precursor of RW?
A. Correct.
Q. Why did you leave that position as acting director of that program?
A. Two reasons: One, the Nuclear Waste Policy Act required a political appointee to be the director of RW, and one was found and accepted; two, the manager of the Richland operations office was a job that I very much wanted.
Q. Why did you want that job?
A. It would give me the responsibility for carrying out and fulfilling a number of nuclear and scientific programs that were of great interest and challenging.
Q. And how long were you director or acting director of the Nuclear Waste Policy Act Implementation Office?
A. From January of '84 to June of '84.
Q. And prior to January of '84 -- January of '84, what was your position?
A. I was the deputy director of the Nuclear Waste Policy Act Implementation Office and the -- I think it was director of spent fuel storage and transportation programs in the Nuclear Waste Policy Act Implementation Office.

25

Q. When did you start that position?
A. That position started in January of '83.
Q. And before that position, what did you do?
A. I was deputy director of the DOE program for geologic storage and disposal, which existed prior to the passage of the Nuclear Waste Policy Act. And I don't recall the name of that organization.
Q. When did you start that position?
A. I really don't recall. My guess would be late 1980, early 1981.
Q. What did you do in that position?
A. As deputy director, I was responsible for overseeing the -- the implementation of the programs that were conducted in that organization and acting for the director when he was not there.
Q. Who was the director of that program? Do you recall?
A. His name was Frank Coffman.
Q. What sorts of program does that office conduct?
A. It was looking for geologic repository and providing or monitoring the storage of spent fuel at commercial plants around the country.
Q. Why did -- what was your understanding as to why DOE had a program to look for a geological repository?

26

MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: The Atomic Energy Commission and its successor agencies had a statutory responsibility for the permanent disposal of nuclear waste.
Q. (By Mr. Shapiro) And these programs were an effort to meet that statutory obligation?
MS. HERRMANN: Same objections.
THE WITNESS: It was my understanding.
Q. (By Mr. Shapiro) And besides looking for a geological repository, what other programs was that office engaged in?
A. That was its primary responsibility.
Q. Were there any other responsibilities?
A. Not that I recall.
Q. You mentioned monitoring the storage of spent fuel at commercial plants. Why was that office monitoring the storage of spent fuel at commercial plants?
A. In the mid 1970s, when commercial efforts to provide reprocessing and recycle services for commercial nuclear plants were not available, because of either delays in facilities or facilities that didn't work, the ERDA and

27

subsequently DOE monitored that situation to determine if any action or activities by the government were necessary or warranted to avert premature -- premature shutdown of nuclear plants.
Q. What is -- what did ERDA stand for?
A. Energy Research & Development Administration.
Q. And that administration was merged into DOE?
A. Correct.
Q. And you referred to reprocessing not being available. Was that also due in part to President Carter's administration's policy against domestic reprocessing?
A. Not initially.
Q. Initially private industry was doing well enough on its own?
A. That's correct.
Q. Why was ERDA concerned that the commercial plants be able to continue operating? Commercial plants, why was that a concern of ERDAs?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: The Energy Research & Development Administration was interested in the energy supply of the country. And if nuclear plants were to shut down due to lack of storage space, that would affect the energy supply of the

28

country. So they had an interest in the energy supply to the country and the ability of the plants to operate.
Q. (By Mr. Shapiro) Did you ever have a sense that ERDA, or subsequently DOE, felt an obligation to maintain a situation such that civilian generation of electricity through nuclear power would continue to be viable?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: Can you rephrase that?
Q. (By Mr. Shapiro) Did you ever have a sense that ERDA felt an obligation to the civilian nuclear electric generation industry to maintain its viability by providing a -- some sort of an outlet for the nuclear waste?
MS. HERRMANN: Same objection.
THE WITNESS: There was never, in my mind, a legal obligation to do so at that point in time.
Q. (By Mr. Shapiro) Was there any other sort of obligation, a moral obligation?
MS. HERRMANN: Objection. Vague. Foundation.
THE WITNESS: No.
Q. (By Mr. Shapiro) You said that -- that office

29

monitored whether or not current nuclear power plants might have to shut down. How -- how -- how did that office do that?
A. We employed a number of -- of different approaches, but the most useful and accurate means was we contracted with Nuclear Assurance Corporation of Georgia, which maintained records on storage space and plans for utilities and we would work from that data.
Q. Nuclear Assurance Corp., that's also known by the acronym NAC?
A. NAC.
Q. And the data that NAC collected was the data on how much waste the plants were discharging from the reactors?
A. Among other things.
Q. What other things -- what other sorts of information was NAC collecting?
A. How much storage space they had, what their expansion plans were, what their capabilities were to compact or consolidate their fuel to provide for more storage, among other things.
Q. And your office collected that data and analyzed it to determine when various nuclear plants might run out of space?

30

A. Correct.
Q. Do you have any recollection of what that analysis was showing back in the -- in the 1980 time frame?
MS. HERRMANN: Objection. Vague.
THE WITNESS: In general, we always -- it always appeared that three, four, five -- some period of time in the future, plants would run out of storage space and consequently subsequently shut down. And in reality, each year the utilities seemed to find a way to provide more storage space or to adjust their operation, that that date always got pushed out into the future.
Q. (By Mr. Shapiro) How were utilities adding more storage space?
A. One very prevalent way was putting in racks that allowed fuel to be stored more compactly.
Q. That's a process that's also known as reraking?
A. Correct. The other was fuel consolidation, where the fuel rods would be taken out of their assembly configuration and packed -- the rods packed much closer together in -- in tubes or canisters. There was also double raking, two tiers within a pool. A number of ways of handling that.
Q. Was fuel consolidation a significant effort by utilities? Let me rephrase that.

31

How many utilities do you recall were engaged in fuel consolidation?
A. I don't recall. I'd say a majority.
Q. Do you know if fuel consolidation continued to be a significant contributor to adding to utilities' capability to store spent fuel?
You're not understanding the question?
A. Because you -- you didn't give me a time frame.
Q. After 1980.
A. My recollection was it became somewhat routine.
Q. You said the utilities managed to deal with limited capacity both by adding to capacity and adjusting their operations. How did they adjust their operations to deal with limited capacity to store spent fuel?
A. Longer operating cycles.
Q. Is that also referred to as burning up the fuel to a higher level --
A. Higher burn-up.
Q. And in higher burn-up, you're basically taking the same fuel and you're using it for a longer period of time before you put in another round of fresh fuel?
A. Correct.
Q. What was your personal role as deputy director of

32

that office, the office that dealt with the geologic repositories and that also monitored the storage situation at civilian plants?
A. To act for the director when he wasn't there and monitor the progress of the programs for him.
Q. You say, act for the director when he wasn't there. What did that entail?
A. I would consider those typical deputy responsibilities.
Q. How long were you in that position?
A. I believe it was for a little over a year.
Q. And what did you do prior to that position?
A. For a brief period of time, I had responsibility for trying to -- looking at impediments to commercial reprocessing, to determine if commercial reprocessing services could be once again provided for the commercial nuclear industry.
Q. What office was that position in?
A. I don't recall.
Q. And what did you do prior to that position?
A. I was the director of Spent -- Spent Fuel Storage & Transport in -- again, I just -- another waste organization in DOE.
Q. And what did you do as director of Spent Fuel



Storage & Transport?
A. Monitored the storage situation and the ability of the transport industry to move spent fuel and waste around the country.
Q. And when did you start in that position?
A. My best recollection is '87.
Q. '77?
A. I'm sorry. '77.
Q. You said in that position as director of Spent Fuel Storage & Transportation you -- you monitored the spent fuel storage situation. Was that the same sort of monitoring activity that -- that the geologic repository office was involved in a few years later, or was it different monitoring?
A. Could you repeat the question?
Q. You said that when you were director of Spent Fuel Storage & Transportation, that office monitored the spent fuel storage situation. I'm asking you to compare that monitoring activity to the monitoring activity you described a little bit earlier that went on in the office in which you were the deputy director that dealt primarily with geologic repositories.
A. Yes.
Q. Same activity? Did the responsibility --



A. Are you referring to the Nuclear Waste Policy Act Implementation Office deputy director role?
Q. No, the one that you described prior to that. I don't have the exact title in my notes, but it -- it's deputy director of geologic repositories, which you said was a primary function of that office, but it also did some monitoring --
A. Yeah. No, they were different.
Q. Okay. How were they different?
A. I did not focus on storage and transportation in the latter position.
Q. So when you describe some of the monitoring that that office did, that was done by people other than yourself?
A. To the best of my recollection.
Q. But the monitoring itself actually -- you described what the Geologic Repository Office did, was collect data from NAC and analyze it and figure out when plants might be running out of room. Is that the same sort of work that the Spent Fuel Storage & Transportation Office was engaged in?
A. Yes.
Q. Did that responsibility at some point transition from the Spent Fuel Storage & Transportation



Office to -- to the Geologic Repository Office or --
A. It was reorganized into it.
Q. But you had more of a direct role in that work, when you were director of Spent Fuel Storage & Transportation?
A. Correct.
Q. What was your role?
A. To monitor the storage situation in utilities and determine what their plans and needs would be and if they would impact their operations.
Q. What did you understand the purpose of that work to be?
A. To determine if utilities were going to have to shut down their plants early and, if so, to consider if the United States Government should do anything about it.
Q. And in that position, then, did you prepare -- prepare reports for policy makers on those issues?
A. Yes.
Q. You said earlier that the studies tended to show that almost whenever you picked a time, four, five years in the future, some plants were going to run out of room. Did that analysis cause you to -- to recommend some action to policy makers at

Department of Energy?
A. We had under consideration the construction of a facility for the interim storage of spent fuel. That name of such a facility goes by a number of different names, such as the away from reactor, or AFR, storage facility, to a monitored retrievable, or MRS, facility, to an -- to an interim spent fuel storage facility, ISFSF. But they were all fundamentally the same facility.
Q. When you say there was consideration of such a facility, who was considering the facility?
A. I was. And when I would make reports about projected needs, the people that I was providing that to would be considering it. But there was never a decision to actually provide that capability, which would have required legislation and the approval of Congress.
Q. Who were you reporting to when you were director of Spent Fuel Storage & Transportation?
A. To the -- the director of the overall waste management program.
Q. Now, you said you were considering some sort of an interim storage facility. Did you ever actually recommend that the government move forward with such a facility?

37

A. I don't recall.
Q. Did the individual that you report to or others in -- in more policy-making positions, did they oppose such a facility?
A. No.
Q. You weren't given instructions, you know, Don't recommend a facility because we're not going to move forward with that?
A. No.
Q. What's your recollection as to why nothing happened with those considerations that a facility -- of an interim storage facility?
A. A compelling case couldn't be made that the facility was needed, nor that it was a government responsibility to do so.
Q. When you say a compelling case couldn't be made that a facility was needed, why was that, if the analysis was showing that plants might have to shut down in four or five years?
A. Because the next year, it was still four or five years out.
Q. You also said a compelling case couldn't be made that it was a Federal responsibility to do this. Did you actually look at whether or not this was a Federal obligation?

38

A. My recollection was quite clear that it was not a government obligation.
Q. Was the issue whether or not it was a government obligation, was that in fact an issue that was considered by your office?
A. What was considered by my office was that in the -- should we seek to make it a Federal responsibility in order to ensure adequate electricity from the nuclear plants.
Q. And your office recommended that DOE not seek to make the interim spent fuel storage a Federal responsibility?
A. I don't really recall. It's too long ago.
Q. When you were looking at plans for some of these interim storage facilities, do you have any recollection as to what they were supposed to do?
A. They would serve as a centralized storage facility, such that the overflows which would be occurring at a number of utilities could be accommodated in one facility.
Q. And how would those facilities store the spent fuel?
A. They were storing it in their reactor storage basins, which, you know -- which we had monitored and looked at variability to do so.

39

Q. My question wasn't -- the -- the theoretical interim storage facility that you were considering, how would that facility have stored the spent fuel?
A. There were various techniques, depending upon the age of the fuel. You could have -- initially we looked at storage pools or basins. Subsequently, in looking at fuel that had been cooled for a longer period of time, we looked at dry cask storage or dry vault storage.
Q. Is there a difference between dry cask storage and dry vault storage?
A. Absolutely.
Q. What's the difference?
A. Casks are -- have smaller capacity and are primarily passively cooled; whereas, a vault would be a large building in which fuel elements or consolidated fuel elements would be put in sleeves with a central cooling capability.
Q. About how much spent fuel were you considering storing at one of these facilities?
A. I don't recall.
Q. Do you have any recollection on an annual basis how much spent fuel one of these facilities might receive?

40

EXAMINATION (Continuing)
BY MR. SHAPIRO:
Q. Mr. Lawrence, as you might imagine, the one part that we spent the least amount of time on this morning as we went over your background, and we'll spend more time on it the rest of the day, is the time when you worked for RW and its predecessor, the Nuclear Waste Policy Act Implementation Office.
How did you come to work for that office?
A. In December of 1982, Congress passed the Nuclear Waste Policy Act of 1982. It laid out a number of activities which the Department of Energy needed to undertake to implement the Act. The Department had just received a new -- a new Secretary of Energy whose name was Don Hodel. And he requested that the manager of the Savannah River plant, Bob Morgan, come up from Savannah River on a temporary assignment to begin the implementation of the Act. And Bob Morgan, who I knew and had worked with previously, and who knew that I was deputy director of the waste program at that time, requested that I come down and be his deputy and to also cover the responsibilities which I had had previously on Spent Fuel Storage & Transportation.

49

Q. Did the Nuclear Waste Policy Act Implementation Office, did that basically take over the Geologic Repository Office?
A. Yes.
Q. Do you have any sense as to why the director of the Geologic Office, why that individual did not become director of the Nuclear Waste Policy Act Implementation Office?
MS. HERRMANN: Objection. Speculation.
THE WITNESS: The simple answer is he wasn't asked to by the Secretary of Energy.
Q. (By Mr. Shapiro) You don't have any sense as to why he wasn't asked?
MS. HERRMANN: Same objection.
THE WITNESS: That would purely be speculation on my part.
Q. (By Mr. Shapiro) You said you knew Mr. Morgan before December '82. How did you know Mr. Morgan?
A. In one of those previous jobs, when I was the -- I think I used the term director of Spent Fuel Storage & Transport -- it might have been assistant director, I'm not sure -- but he was -- he was also, like, an accounting director of the whole program. And he had asked me -- and he had actually given me that responsibility for -- for

50

Spent Fuel Storage & Transport previously, back in the roughly '77 time frame. So we had worked together.
Q. Nuclear Waste Policy Act became law January 7th, 1983. I'll represent that to you. Do you have any recollection as to when you did first become involved, then, with the -- the Nuclear Waste Policy Act Implementation Office? Was it before then or was there some time prior to that when you knew it was going to pass and so DOE was getting its act together?
A. Prior to its passage by Congress, which was December, the President didn't sign it until January, the office that I was deputy director of was very involved in monitoring and supporting the legislative process. I was not directly involved in that. But during staff meetings or other activities, we'd conduct -- you know, the -- the progress of that bill and the passage of that bill was something that was generally discussed.
Q. You said that -- that the Geologic Repository Office was involved in -- in monitoring and supporting. What did the Office do to support the Nuclear Waste Policy Act legislation?
A. Well, with any piece of legislation, there are

51

amendments and provisions, and basically you have members of Congress, or more particularly their staffs, trying to spell out how something should work. They would often ask the people who had the responsibility for doing that work, would this work or that work and how would this work. And consequently, through our Legislative Affairs Office, we would often discuss with them the pros and cons of the various approaches they were considering. Not me personally, but others within that group.
Q. Do you recall who was involved in that effort?
A. The director of -- Mr. Coffman was involved.
Q. And besides Mr. Coffman, do you recall anyone else who was involved in supporting the NWPA legislation effort?
A. Not in any major way.
Q. You said that you were not personally involved in -- in that effort. Did you have any role in -- in the NWPA legislative effort at all?
MS. HERRMANN: Objection. Vague.
THE WITNESS: I indicated previously that in staff meetings, certain things would be discussed and I could give my opinion. But it was never direct or specific or -- direct or specific.

52

Q. (By Mr. Shapiro) Do you remember any issues that came up at these meetings?
A. No.
Q. The Regan Administration, to your recollection, was generally supporting the NWPA?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: The administration very much wanted to see the Nuclear Waste Policy Act passed.
Q. (By Mr. Shapiro) What was your understanding as to why the administration wanted the Act passed?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: I previously had indicated that through the Atomic Energy Act, the -- the Department had a -- had a responsibility to provide for the permanent disposal of nuclear waste. The Nuclear Waste Policy Act provided a congressionally approved process to do so. And it was clearly felt that a process set in law was far preferable to an ad hoc program.
Q. (By Mr. Shapiro) What do you mean by an ad hoc program?
A. One which does not specifically have a legal basis for the actions and steps you are taking.

53

Q. Let me try to rephrase to make sure I understand.
So the administration liked the NWPA because it provided a specific congressionally authorized, mandated path to meet the obligations that were otherwise set out in the Atomic Energy Act, but for which there was no particular mechanism for -- for achieving those responsibilities?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: With the exception of the term "liked." I would have said was supportive of the act. I would say that's -- that characterization is -- is accurate.
Q. (By Mr. Shapiro) Was there any particular about the pathway prescribed by the NWPA that was supported by the administration or was it just, Gee, this is -- this is a solution; let's go with it?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: Difficult to answer in a specific sense. But one thing that is very much timely is the process by which the Department could recommend a site and a state object to it and have Congress then override or deal with that

54

was -- was a provision of the Act that we felt was quite good.
Q. (By Mr. Shapiro) What did you like about that provision of the Act?
A. It allowed national needs and priorities to be considered in relation to individual state or local objections.
Q. Were there any other particular facets of the NWPA that -- that were deemed attractive by the administration when it was being considered?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: The overall process of going from a large group of sites, to a -- to a narrowing down, to a selection of a specific site, with times and dates associated with them were felt as a useful way to lay out a program with an end point, which if it could be met was our intention to try to meet that.
Q. (By Mr. Shapiro) What about the funding mechanism for the -- for the program? Did the administration have any particular view on the -- on the advisability of the funding mechanism?
MS. HERRMANN: Same objections.
THE WITNESS: Well, it was generally

55

considered that the storage and disposal of the waste was a utility responsibility. And therefore, the beneficiaries of the nuclear power and energy should pay for that service. And the 1.0 mill per kilowatt fee was considered to be an equitable and fair way to provide the money necessary to provide the services.
Q. (By Mr. Shapiro) Let me go to the time when Mr. Morgan asked you to -- to work for the NWPA Project Office. And do you recall, again, when -- when that might have been?
A. Well, my -- it was the -- it was late in the week preceding my first day on the job. And my first day on the job was the day after the Red Skins won the Super Bowl. So I think that's -- I think that was the 30th of January of 1983.
Q. Before starting in the job as -- and you started the job as deputy director with Mr. Morgan?
A. Correct.
Q. Before starting that position, what did Mr. Morgan tell you as to how -- what his strategy was for -- for the Office?
A. There was no discussion before that.
Q. Did you have discussions with anyone other than Mr. Morgan, as to what the strategy was for the

56

program?
A. No.
Q. Who did Mr. Morgan report to?
A. The Secretary of Energy as manager of the Savannah River Operations Office. And subsequently as the director of the Nuclear Waste Policy Act Implementation Office.
Q. Was the Secretary of Energy the day-to-day report? Was there anybody who you dealt with on an intermediate basis, other than the Secretary?
A. I dealt with Mr. Morgan. Who Mr. Morgan dealt with, I'm not sure. A number, though, within the Department: Legal, Congressional, the Secretary's Office, per se.
Q. When you started with the NWPA Project Office in around January 30th of 1983, how many people were there? How large of an office are we talking about?
A. The Secretary had transferred into what was the previous repository program. Some people from policy and planning. But I can't recall the -- the number of people all total.
Q. Once you got there in January 30th, how was the Office organized?
A. There was -- there was myself and Mr. Morgan and

57

there were several administrative or staff support people. And there were basically three groups. Whether they're divisions or something, I don't recall. There was the geologic repository group, there was the spent fuel storage and transportation group, and there was a business administration, budgeting-type group.
Q. The spent fuel storage and transportation group, was that group doing the same work that had previously been done by the office that you were director of -- the same spent fuel storage and transportation issues?
A. It was pretty much the same -- the same people.
Q. After you got to the NWPA implementation office in January -- January of 1983, what did you understand the top priorities of the Office to be?
A. To provide a geologic repository beginning in 1998.
Q. Were there any other priorities?
A. There were a number -- well, it was -- it was fulfilling all of the requirements of the Act, leading to that.
Q. What about kind of in the immediate time frame after -- after January of '83? What were the -- do you recall what -- what immediately had to be

58

done?
A. Two things, which I recall -- among what I'm sure were many -- was the development of a Mission Plan and the establishment and signing of a contract with utilities such that the funds necessary for the program could begin to be collected.
Q. Let me start with the -- with the second of those topics, the establishment of the contract.
What -- what did you understand the need to be with -- to establish a contract? Was that just to get the money? Or was there -- was there more to it than that?
A. Well, it was to establish our -- our responsibilities and utilities' responsibilities.
Q. What was your role in establishing the contract?
A. I was not all that involved in it.
Q. Who was involved in establishing the contract?
A. Within the Nuclear Waste Policy Act Office, Mr. Morgan delegated that responsibility to Mr. Rosselli, who was in the business administration or whatever that grouping was, who also was working very closely with the Legal Department at the Department of Energy and -- and Contracts.
Q. There was a separate Contracts Office outside of the Nuclear Waste Policy Act Implementation

59

Office?
A. There is. And -- and I -- I would speculate that the Department of Energy's professionals were assisting the offices of the -- the Nuclear Waste Policy Act Implementation Office team in establishing that contract, because it -- quite frankly, it wasn't something that we had -- had had experience in.
Q. You said you had a somewhat limited role. Do you remember more precisely what was your role as deputy director of the Office in terms of development of the contract?
A. I would give my opinions when issues would come up. I would support Mr. Morgan in any way that he would ask me. We would discuss options and approaches in general. I also had the responsibility for -- I shouldn't say I had the responsibility. I took the opportunity about every two months to go up on Capitol Hill and meet with either the members or their staff who had potential sites in their district, to brief them or talk to them about where the program was.
Q. Let me focus on that -- the concept of a contract for -- what was your understanding as to the significance of the fact that the NWPA mandated

60

that utilities and the Department of Energy enter into contracts?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: Contract was necessary to collect the fee, and would allow us to establish contractual commitments in terms of when services would begin to be available.
Q. (By Mr. Shapiro) These would be contractual commitments on the part of the Department of Energy to make the services available?
MS. HERRMANN: Same objection.
THE WITNESS: Commitments as to when services would begin to be available.
Q. (By Mr. Shapiro) What do you mean by "begin to be available"?
A. Well, the Act called for us to begin accepting nuclear waste in 1998, so our goal was to have a facility to begin accepting nuclear waste in 1998. We knew then that the rate and the ability to accept waste then or whenever it became available would be constrained. So consequently, we wanted to provide as much information as we could to utilities to assist them in their planning process so they could ensure that they could keep their

61

fuel up until that time, until when they could eventually ship to a repository, whenever that might be.
Q. And so I'm sure I understand or try to make clear my understanding what you've just said: So that because DOE understood that the rate at which it would accept spent fuel and even its ability to accept spent fuel might be constrained, part of what it wanted to put into the contract was a mechanism to provide utilities with as much information as possible about those issues?
MS. HERRMANN: Objection to the extent it mischaracterizes prior testimony.
THE WITNESS: I will -- I wouldn't agree with that.
Q. (By Mr. Shapiro) Okay.
A. At the time we were signing or proposing and signing contracts, we were very, very early in the process. We did not have a facility designed and subsequently -- consequently, we also did not know what our ability to accept waste and fuel would be. So we knew there would be information that the utilities would like but we were in no position to provide. Nevertheless, to get general obligations down, begin accepting in '98, being

62

the primary one, we needed to sign contracts which would allow the utilities to start putting the 1.0 mill per kilowatt hour into the Waste Fund.
Q. So DOE understood that the utilities would have liked the contracts to have firm terms as far as the -- the rate of spent fuel acceptance after 1998, but DOE just didn't have a means of specifying something at that time, at the beginning of 1983?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: That's an accurate representation.
Q. (By Mr. Shapiro) And because DOE didn't have a means of specifying something in 1983, you left that -- that term in the contract open?
A. I don't recall how that was covered in the contract, per se. I do recall in either general discussions with the utilities or when they would talk to us, we made it clear to them that we certainly wouldn't be able to accept everything that they wanted to ship to us right away, but that we would try to provide information which would help them get a better feel for where -- where and when they might be able to ship as the program developed.

63

Q. And when you say it was clear that DOE wouldn't be able to take everything right away, you meant right away, in 1998?
A. Correct. Or ever. Couldn't take everything -- there were physical constraints with how much you could accept in any given year.
Q. Why did -- let me ask a different question.
How did you know that utilities would have wanted DOE to accept more spent fuel in any given year, certainly by 1998, than was going to be your capability to do so?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: In our discussions with utilities, it was clear that they had a liability for the spent fuel while it remained in their possession. If they could transfer that spent fuel to us, and therefore this responsibility and liability for that fuel, then it would rest with the government. It was in their best interest to get rid of as -- as much of it as they could, as quickly as they could.
Q. (By Mr. Shapiro) Let me ask you a few questions about the process that -- that DOE took to create this contract. Do you recall that it was done through a -- a regulatory rule-making procedure?

64

MS. HERRMANN: Objection. Foundation.
THE WITNESS: I really don't recall.
Q. (By Mr. Shapiro) Do you recall that DOE issued something called a Notice of Proposed Rule Making with a draft contract?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: I don't specifically recall.
Q. (By Mr. Shapiro) But you have a general recollection?
A. The -- the term you just used sounds -- sounds vaguely familiar in my head, but I don't have any recollection. It was too long ago.
Q. You don't have any recollection, then, as to why that mechanism was used as opposed to some other mechanism to draft the contract?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: I don't recall specifically. It may have been reported in the Nuclear Waste Policy Act. But that would be pure speculation on my part.
Q. (By Mr. Shapiro) Do you recall when you first saw a draft of the proposed contract?
A. No.



Q. But you would have seen a draft or drafts before one was finalized?
A. Most likely, yes. But I cannot recall ever sitting down and reading verbatim the contract.
Q. Ever?
A. Not in one sitting.
Q. So the whole time that you were deputy director, you never actually focused and read the whole contract?
MS. HERRMANN: Asked and answered.
THE WITNESS: I do recall discussing the basic provisions and services and terms and conditions of the contract, but I do not specifically recall in one sitting, sitting down and having that much time or patience and actually reading the entire contract from cover to cover.
Q. (By Mr. Shapiro) Did you have -- did you have a sense, when you got to the Implementation Office in the end of January, that that work on developing the contract was already ongoing?
A. I don't recall.
Q. Were you at the Implementation Office right at the beginning or were there people at work for some period of time before you got there?
A. The -- the program was a continuation of work that



had preceded it. So clearly, the geologic work and other issues were things that were -- were picked up in process and progress.
I can't recall, though, about the contract because that was -- that was fairly specific to the Nuclear Waste Policy Act.
(Exhibit No. 1 marked for identification.)
Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed a document that we've just marked for purposes of identification as Lawrence Exhibit 1, which on its cover appears to be a "Draft Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste." And it has handwritten on the cover "EEI's Unsolicited Comments."
A. Uh-huh. (Witness answers affirmatively.)
Q. Do you recall looking at drafts of the contract like this?
A. I do recall looking at at least portions of this contract. Whether it was this contract or a subsequent contract, I have no idea.
Q. Now, page -- the cover of this document, in the upper right-hand corner, has a date 1/25/83.
A. Uh-huh. (Witness answers affirmatively.)



Q. I'm sure that pertains to something. I don't know what that would be.
A. Uh-huh. (Witness answers affirmatively.)
Q. But then would that indicate, gee, this draft or at least these comments of the draft might have been done even before you got to the Implementation Office?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: Well, since I indicated that my first day there was in -- like the 29th, just by sheer logic you would assume that to be the case, if this date is accurate.
Q. (By Mr. Shapiro) Now, you said that you reviewed drafts or portions of drafts like -- like the one that we have here as Exhibit 1. What were you looking at the drafts for?
A. Sensibility, doability, consistency with the law would be the three good places to start.
Q. When do you mean by "sensibility"?
A. By sensibility, I mean are we stating things that we have the ability to deliver on or to do.
Q. Is that different -- you mentioned sensibility and doability and conformance with the law. What did you mean by doability?

A. Physically is it possible.
Q. Possible?
And conformance with the NWPA, you were also looking at that issue?
A. Yes.
Q. Did you have a particular role in reviewing these draft contracts, as opposed to others who might be involved in the process of looking at it from kind of an overall levels at the deputy director level?
MS. HERRMANN: Objection. Compound.
THE WITNESS: When I looked at it, I looked at it in my position as a deputy and the overall responsibility for the Act. But I also brought to it my experience base in the terms -- like transport, receipt, and handling, to ensure that it was reasonable and practical and doable.
Q. (By Mr. Shapiro) Do you recall any particular concerns you had with any of the early drafts, about the practicality, the doability of what was doing proposed?
MS. HERRMANN: Objection. Assumes facts not in evidence.
THE WITNESS: I do recall paying particular attention to the issues associated with start-up, ramp-up, and ability to meet what would

69

eventually become design rates. And I wanted to make sure that we were not overly optimistic or committing to something which practice and experience said we couldn't meet or we would have great difficulty in meeting.
Q. (By Mr. Shapiro) What do you mean by the start-up or ramp-up?
A. If a facility says it will be able to receive, round number -- this has no basis in fact -- 1,000 metric tons of fuel a year for some period of time, you will not be able to achieve that design limit. There will be unforeseen problems. There will be bugs in the system. There will be things that constrain your ability to meet that. So that you need to factor into your plans a lesser capacity, which only over time would eventually reach your design capacity.
Q. Was there some sort of analysis that you were employing to -- to figure out how much time you would need to work up to the design capacity?
A. No. It was only basing it on experience and subsequent -- wanted to make sure that that concept was -- was appropriately handled.
Q. And what do you mean by "appropriately handled"? How would that concept be appropriately handled in

70

the concept of ramping up to DOE?
A. To make it clear that in this case an acceptance rate and therefore the ability to take fuel from the utilities, it was clear to anyone from -- from the beginning, that there would be constraints on that.
Q. Do you recall, did -- did any of the drafts of the contract have -- have, then, an actual proposed acceptance rate that you were looking at the ramp-up to that to make sure that it wasn't too fast? Is that what you're talking about?
A. To the best of my knowledge, I don't recall if that was in the contract or not. I do know that that was a concept which we tried to illustrate and point out in our Mission Plan, our Draft Mission Plan.
Q. We'll probably turn more to the Mission Plan a little later. Let me focus at this point on one subject at a time on the contract.
If you turn your attention to Exhibit 1, to a couple of the suggested comments that were made and see if you recall anything about what happened to those.
First, on Page 3.
MS. HERRMANN: Are you looking at Bates

71

No. 3?
MR. SHAPIRO: I'm looking at Page 3 of the document. I guess the Bates number, the last three digits are 686.
THE WITNESS: Uh-huh. (Witness answers affirmatively.)
Q. (By Mr. Shapiro) Near the bottom, under the Article II, Section B there, someone wrote in a suggestion that -- that says that -- to the effect that "each party agrees to use its best efforts to allow delays in furthering the purposes of this contract."
A. I'm sorry, whereabouts are you? I'm reading the handwritten Article II, A. That's not what you're saying?
Q. If I said II, A, I misspoke. II, B.
A. The one that's crossed out?
Q. The last sentence of that is crossed out and then there is some handwriting under that contract. And the last sentence of that handwriting begins, "Each party agrees to use its best efforts to avoid delays in furthering the purposes of this contract."
Do you see where I am?
A. Yeah.

72

Q. Okay. Do you recall that concept being
considered?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: I can't say that I do.
Q. (By Mr. Shapiro) Let me turn your attention to
the next page, Page 4 of the draft.
A. Uh-huh. (Witness answers affirmatively.)
Q. Under where it says "Article III," and then there
is a "Section B Schedule for Delivery
Commitments," which actually has been crossed out,
but I want to ask you about the draft language
there.
It refers to delivery commitment schedules as
set forth in an appendix and annexed hereto. And
then it says they shall be furnished to DOE by
purchaser. And if approved by DOE, shall become
part of this contract.
Do you recall that concept at all?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: I have a general
recollection of that concept and the fact that I
would have had serious concerns and reservations
about that because we weren't in any position,
whatsoever, to make a commitment like that at that
particular point in time.

73

Q. (By Mr. Shapiro) So you would have been
particularly concerned about making those approved
delivery commitment schedules part of the
contract? Was that the part that would have
troubled you?
A. If they were in any way to become a contractual
obligation and binding, yes, they definitely would
have been a concern to me.
Q. One of your -- one of the things you were looking
at when you were reviewing terms was -- was making
sure that DOE didn't commit itself to do something
that it would have a tough time doing.
A. Everything in the Nuclear Waste Policy Act was
going to be tough. But particularly those things
which were outside of our control, I was concerned
about.
Q. Was part of your concern an understanding that
since DOE would be entering into a contract, that
the government might face some financial
responsibility if it couldn't meet its commitments
that it was entering into?
MS. HERRMANN: Objection. Calls for a
legal conclusion.
THE WITNESS: I wouldn't limit it to
financial. I would refer to it as any obligation

74

which I felt we couldn't meet.
Q. (By Mr. Shapiro) Did the fact that you were
negotiating into a contract affect the level of
your concern about entering into commitments that
DOE would have great difficulty meeting?
MS. HERRMANN: Objection. Vague.
THE WITNESS: Can you rephrase that?
Q. (By Mr. Shapiro) Let me come at it in a different
direction.
You mentioned that the Atomic Energy Act put
forward an obligation to the government to
ultimately dispose of spent fuel. Would that have
troubled you just to have that obligation out
there by itself, something like that?
MS. HERRMANN: Objection. Vague.
THE WITNESS: The -- the obligation was
for nuclear waste, not spent fuel. But no,
that -- that obligation in a general sense would
not have concerned me. It -- someone had to be
responsible and the government was the most likely
person -- organization.
Q. (By Mr. Shapiro) What concerned you about taking
on more specific obligations?
A. To the degree there is a specific date, a specific
capacity, those become much more focused and

75

direct, and consequently you wanted to make sure
that you had a reasonable ability to meet it.
Q. Would that concern have been any -- that concern
of yours have been any less if the terms would
simply be in a statute or a regulation as opposed
to being set forth in a contract?
MS. HERRMANN: Objection. Speculation.
THE WITNESS: In the sense that I was
not the author of the legislation or the statute
that you referred to, you know, I would have just
been the recipient of direction. I would be less
concerned in making that -- I had no hand in
making the commitment, I was given the commitment;
versus a contract which I am more than a party to,
but in -- in actually negotiating and laying down
those responsibilities and, therefore, I have a
greater role and responsibility in saying what I
can reasonably do and not do.
Q. (By Mr. Shapiro) But there wasn't anything about
the -- about the construct of a contract, per se,
as opposed to a regulation that -- that concerned
you?
A. I viewed the contract as something which we were a
party to and had a hand in developing and
negotiating and consequently would feel a greater

76

responsibility in the contract.
Q. You referred a couple of times to negotiating the contract. Was there a real negotiation or was it a matter of the Department of Energy simply setting out the terms of the contract?
MS. HERRMANN: Objection. Vague. Compound. Foundation.
THE WITNESS: To the best of my recollection, there was only going to be one contract for all utilities. We were interested in finding out their views on the contract via drafts, meetings, whatever. Prior to formalizing the contract and whether that was through some process, I just don't recall.
So, you know, we were interested, just as we were interested in our ability to live up to the contract. We wanted to know the views of the utilities about the contract before finalizing it.
Q. (By Mr. Shapiro) My understanding, you wanted to know their views. I'm trying to get a sense of the extent to which there was negotiation. How would you characterize what a negotiation is?
A. I recognize -- I used the term "negotiation" because normally in a contract, that's what one does. In this case, I think it's probably a --

77

the wrong phrase to use. More appropriately, it would be to get their comments and views on the contract before we finalized our -- the contract we would offer to the utilities.
Q. Because your office understood that you don't have two parties with equal negotiating ability; the utilities had to sign a contract ultimately with DOE or shut their facilities down?
MS. HERRMANN: Objection. Calls for a legal conclusion. Compound.
THE WITNESS: Theoretically the utilities did not have to sign the contract. They only needed to sign the contract if they wanted to eventually show that they had a disposal path for their waste or spent fuel.
Q. (By Mr. Shapiro) What was your understanding of how a utility could continue to operate without signing the contract?
MS. HERRMANN: Objection. Calls for a legal conclusion. Vague.
THE WITNESS: Theoretically speaking, they could continue to provide interim storage indefinitely for their fuel.
Q. (By Mr. Shapiro) Do you recall any discussions at the end of NWPA Implementation Office concerning

78

the draft contracts of what -- what the general strategy was of the Office in terms of what it was trying to accomplish with the contracts?
MS. HERRMANN: Objection. Vague.
THE WITNESS: We wanted to -- we wanted to provide a legal basis for the collection of the fee. Two, establish responsibilities and -- and dates when services would begin to be available. And three, we wanted to, to the best of our ability, have the contract, you know, be considered fair and reasonable while protecting the government and the taxpayers' rights, as well as providing the utilities with a -- as -- as reasonable a planning base as we could given the limited information we had.
Q. (By Mr. Shapiro) Do you recall any -- do you recall what the DOE strategy was for how the contract would handle the issue of how fast DOE could or would take the waste?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: The concept was as more information became available, and plans, or our capabilities became clearer, we would share that information with utilities to assist them in their planning process. Because they had to -- they had

79

the responsibility up until the time we took the fuel, it was theirs, and they had to know in advance what was expected of them or what -- what -- more accurately, what they could expect from us.
Q. (By Mr. Shapiro) Other than mechanisms to continually provide additional information, was there any strategy for an act -- developing an actual acceptance rate of -- for the contract of how fast DOE would take the spent fuel?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: My recollection was at some point in the future, as the program developed, the site was selected, the design was done, therefore its location was known, its transport capability was known, we would, prior to the actual shipment, of course, try to firm up an acceptance rate. And prior to that time, we would provide to the utilities some of the general considerations that would go into our thinking with regard to who could ship what, when.
Q. (By Mr. Shapiro) But DOE decided not to put any particular acceptance rate terms in the contract itself?
MS. HERRMANN: Objection. Foundation.

80

THE WITNESS: That's my recollection.
Q. (By Mr. Shapiro) What about the sequence of acceptance? By that I mean, from -- from what utility would DOE take spent fuel first? In what order they would take the spent fuel? Was there a general strategy that DOE was trying to implement in the strategy on that issue?
MS. HERRMANN: Same objection.
THE WITNESS: There were various considerations. Probably the most important was whether a reactor was facing a -- an imminent certifiable shutdown if they weren't allowed to ship. Then there were other considerations, such as the heat load of the fuel, how high a burn-up, and how long it had been cooled, which creates demands on the receiving, handling, and storage. And I'm sure there were others, but I just can't recall.
Q. (By Mr. Shapiro) When you -- you referred to an imminent certifiable potential shutdown by a -- by a utility, what -- could you describe a little bit more what -- what would constitute such a situation at a utility?
A. They physically were unable to discharge any additional fuel.

81

Q. Would this concept include the consideration as to whether or not that utility could add more storage at its site?
A. That could be a consideration.
Q. What about accepting spent fuel from permanently shut down reactors, reactors that are being decommissioned? Was there any thought about taking that spent fuel faster or slower than any other?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: There are two considerations in that example. One is, the reactor is already shut down, so it would do no -- not have a -- an effect on the generation of electricity, but it would have a financial impact on the utility for keeping a site active longer. And those would have to be balanced. We were not indifferent towards the issue of causing additional expenditures by the ratepayer.
On the other hand, in balancing -- in balancing, you would take it from a reactor that's shut down already, waiting to be decommissioned, versus an active, operating reactor, supplying electricity to the taxpayer, that would have to shut down because of no storage space. In

82

general, we -- I believe we indicated to them -- or would indicate that that operating reactor would take precedence as a general rule of thumb.
Q. (By Mr. Shapiro) And would operating reactors that -- that otherwise weren't running out of space, would they then have third priority?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: They would not have as high a priority as certainly the first that was operating that would have to shut down.
Q. (By Mr. Shapiro) I pointed you a few moments ago on Page 4 of what we are calling Exhibit 1, this draft contract, to a section that dealt with delivery commitment schedules.
Is there an Article III, Section B, Page 4? Do you recall what the general strategy was for this delivery commitment schedule process or was there a -- a general strategy for that process?
A. Well, are you talking about this paragraph under III, B?
Q. That's correct.
A. "On an annual basis, commencing on October 1, 1985 Purchaser shall provide DOE a forecast of estimated deliveries during the succeeding 10 year period"?

83

Q. Right. And I'll tell you that this precise language is not precisely how it ultimately came to be in the contract, but I'm just talking about this general idea.
MS. HERRMANN: Objection. Foundation. Vague.
THE WITNESS: I view this wording as somewhat strange because I'm not sure what they're talking about, deliveries during succeeding 10-year period from October 1985, because -- since we weren't to have ability to accept it until '98. So it -- it strikes me as kind of strange right here.
Q. (By Mr. Shapiro) Let me ask about a different topic.
This draft contract, I think in general there is a reference to spent fuel and high-level radioactive waste. What did you understand to -- what did you understand the term "high-level radioactive waste" to -- to cover?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I believe there should be a definition of high-level radioactive waste in this contract.

84

referring to there?
A. A fuel assembly is an array of fuel pins containing the nuclear material. But it's held in place -- the pins are held in place by end assembly -- end units, end caps, spacers, various other components that make up the fuel assembly. And that's the material that I'm referring to. Because once you disassemble it, you're left with just the rods, you also have some hardware left over.
Q. I've previously heard the term "nonfuel components." Is that what you're referring to?
A. Yes.
Q. You're familiar with the term "nonfuel components"?
A. It's -- it's pretty much a general term that -- that reflects what it says.
Q. Okay. What about the term "greater than class C waste"? Are you familiar with that term?
A. I'm familiar -- I'm -- I know -- I've heard the term, but I don't recall -- I don't recall the specifics of it.
Q. Are you aware that greater than class C waste is one of the by-products that comes about when a commercial nuclear power plant is decommissioned,

89

that a certain amount of the waste is greater than class C waste?
A. Yes, in general.
Q. What's your understanding of -- of what the utilities are supposed to do with that greater than class C waste?
MS. HERRMANN: Objection. Foundation. Calls for a legal conclusion.
THE WITNESS: My recollection, which is very vague, was that the Nuclear Waste Policy Act, I don't believe, specifically addressed that. I could be wrong. And consequently, I think there was some uncertainty regarding that.
Q. (By Mr. Shapiro) What about the term that we just referred to, the high-level radioactive waste? Do you have any recollection as to whether or not there was consideration as to whether or not greater than class C waste would be considered that sort of high -- highly radioactive material?
MS. HERRMANN: Objection. Foundation. Calls for a legal conclusion.
THE WITNESS: No, I -- I have no recollection of whether or not that was intended to cover that or not.
Q. (By Mr. Shapiro) Let's go back to this Exhibit 1

90

for a moment, to another term that's suggested in here. And it's on -- the last three numbers of the Bates number are 688.
A. Uh-huh. (Witness answers affirmatively.)
Q. It looks like this is some new language that someone is recommending. And specifically at the bottom, "Exchanges" --
A. Yeah.
Q. -- it's commenting or suggesting that purchasers, utilities, have the right to exchange approved delivery commitment schedules with other utilities. Do you recall that concept?
MS. HERRMANN: Objection. Vague.
THE WITNESS: I recall the concept. And in general, it was viewed as a means of allowing the utilities to have the flexibility to work among themselves for any -- should there be any restrictions on -- on their ability to -- to ship us, and if -- if they could work out with another utility, that did have the rights, they could have some right to do that. In general, it was a -- to provide some flexibility on the utility's part.
(Exhibit No. 2 marked for identification.)

91

Q. (By Mr. Shapiro) Mr. Lawrence, we've handed what we've marked for purposes of identification as Exhibit 2. Which I'll represent to you is a Notice of Proposed Rule Making for Standard Contract for Disposal of Spent Nuclear Fuel and/or High-level Radioactive Waste.
Do you recall this document?
A. Not until you gave it to me. But now that I see it, it certainly answered a question that I couldn't recall earlier. There was a rule making.
Q. Now, this document, the first column, it's pretty standard for notices of proposed rule making. It says, for further information you can contact three individuals. And it -- it lists a Mr. Rosselli, a Mr. Cavanagh, and Mr. Winnick.
A. Uh-huh. (Witness answers affirmatively.)
Q. What's your recollection of -- of the roles of those three individuals in developing the -- the contract?
MS. HERRMANN: Objection. Compound.
THE WITNESS: When I told you the structure of the Nuclear Waste Policy Act Implementation Office, I mentioned that there was a business administration and contracts. Mr. Rosselli was the head of that. It was not the

92

title that is shown here. That's -- that was from, I think, a previous organization. But nonetheless, the -- the room was the right room.
I'm sorry, I forget -- I forget the rest of the question.
Q. (By Mr. Shapiro) I was interested in the role of each of these three individuals. You mentioned Mr. Rosselli. Do you -- do you remember, did -- did these three individuals have particular roles in developing the contract --
MS. HERRMANN: Objection. Compound.
Q. (By Mr. Shapiro) -- or was it just sort of a team effort?
A. I can only talk in broad general responsibilities.
Mr. Rosselli was part of the Nuclear Waste Policy Implementation Office, which given the date of this publication in the Federal Register, this probably was something that was in process as a result of the signing of the Act by the President on -- January 7th, did you say?
Q. Yes.
A. -- and the beginning of the Nuclear Waste Policy Act Implementation Office on or about January 30th.
Given this date, that would have had to have

93

been in the pipeline prior to that. So Mr. Rosselli would have been handling contracts, business.
Mr. Cavanagh, I don't recall specifically Jim Cavanagh, but from looking at the title there, he would have been within the Department of Energy, a professional in our contracting and procurement office. So he would have been a professional -- not part of the Nuclear Waste Policy Act Implementation Office, but a person with responsibility in DOE for their contracts and procurement.
And the last person, Mr. Winnick I do remember, and he was the Office of General Counsel and consequently he was our legal adviser.
Q. On the page that at the top it's 5461 of Exhibit 2, right before where it says Part 61, it says it's -- this notice was issued in Washington and that the name of the person actually issuing the notice is a Hilary Rauch.
A. Rauch.
Q. Rauch. What do you recall her role being?
A. He was director of Procurement & Assistance within the Department of Energy, and as such was Mr. Cavanagh's boss.

94

Q. Other than being Mr. Cavanagh's boss, do you remember Mr. Rauch having any particular role in the development of the contract?
A. Not really.
Q. Other than the individuals that we just talked about -- Mr. Rosselli, Mr. Cavanagh, Mr. Winnick, Mr. Rauch -- do you recall who else was involved in developing the contract?
A. Boy, it's been so long, I really don't recall.
Q. Was there anyone else in the -- in the Counsel's Office besides Mr. Winnick who was involved?
A. There were other individuals in the Counsel's Office that I dealt with, but I do not believe they were associated with the contract.
Q. Part of the -- of this Notice of Proposed Rule Making that I've pointed you to, by Mr. Rauch's name, it says it -- the notice was issued in Washington January 31. Compare that to Exhibit 1, where at least somebody's written at the top of the cover page January 25th, '83, which at least seems to indicate that some sort of advanced drafts were being circulated.
Do you recall advanced drafts being circulated prior to publication of the Notice of Proposed Rule Making?

95

MS. HERRMANN: Objection. Asked and answered.
THE WITNESS: I don't have any recollection of advanced drafts being circulated.
Q. (By Mr. Shapiro) So you don't know who else besides the Edison Electric Institute might have received an advanced draft?
A. No.
MS. HERRMANN: Speculation.
MR. SHAPIRO: Why don't we go off the record for a minute.
(Off the record discussion.)

(Recess 12:10 - 1:24 p.m.)

EXAMINATION (Continuing)
BY MR. SHAPIRO:
Q. Mr. Lawrence, I'd like to ask you again about, now, Exhibit 2, the Notice of Proposed Rule Making and the draft contract that's in there.
Let me direct your attention to page at the top that's 5462. Do you have that page?
A. Uh-huh. (Witness answers affirmatively.)
Q. And in the second column, where it actually starts with the draft of the contract, the several

96

recitals, "Whereas" clauses in the middle of the column --
A. Yes.
Q. -- I want to ask you about a couple of those.
The second one refers to all costs associated with the preparation, transportation, and the disposal of spent nuclear fuel and high-level radioactive waste being borne by the owners.
Do you recall that concept?
A. Yes.
Q. I've also heard that referred to as a "full cost recovery concept." Have you ever heard that term?
A. I've heard that term and I don't think that would be appropriate for this particular contract.
Q. Why not?
A. Full cost recovery is a concept for the government providing services in its laboratories and other -- it's not clear to me that the activities covered by the Nuclear Waste Policy Act are one and the same as those covered by full cost recovery contracts that the government has with other users. So I just wouldn't associate those two.
Q. Was your understanding, though, that RW was to recoup all of its expenses --

97

A. Yes.
Q. -- from -- from utilities?
A. Yes.
Q. Did that recovering all of the expenses concept -- how did that affect -- let me ask it this way.
Did the concept that all of the expenses were going to be recovered by RW, did that have any impact on how you viewed the government's obligations under the contract?
MS. HERRMANN: Objection. Foundation. Calls for a legal conclusion.
THE WITNESS: The -- could you repeat the question?
Q. (By Mr. Shapiro) Did the concept that RW was going to recover all of its expenses from the utilities, did that concept have any impact on your understanding of -- of the government's obligations under the contract that it was entering into?
MS. HERRMANN: Same objections.
THE WITNESS: No. Our obligations would be dictated by the Nuclear Waste Policy Act, not by the fact that we were going to get paid for it.
Q. (By Mr. Shapiro) You didn't view any difference, then, between the government -- what the

98

government was being obligated to do by the statute and what it was obligating itself to do by entering into the contracts?
MS. HERRMANN: Object to the extent it mischaracterizes prior testimony. Foundation. Calls for a legal conclusion.
THE WITNESS: The purpose of the contract was to carry out the provisions of the Nuclear Waste Policy Act. So from that perspective, I wouldn't see any contradiction or differences.
Q. (By Mr. Shapiro) The concept that utilities were paying for the government's services, that didn't cause the government to feel that it was obligated, then, to perform the services in a way that was particularly useful to utilities?
MS. HERRMANN: Foundation. Calls for a legal conclusion. Vague.
THE WITNESS: I -- I wouldn't phrase it that way at all.
Q. (By Mr. Shapiro) How would you phrase it?
A. We were providing services to the utilities as specifically authorized by the Nuclear Waste Policy Act and the utilities were to pay a fee commensurate with us recovering our costs for

99

doing that work.
Q. I want to go back to something we had covered at least briefly before that. I think it's also covered in Exhibit 2.
You had said that utilities didn't have to enter into these contracts, that they had an option not to. Do you recall us discussing that?
A. What I recall saying is that it wasn't clear to me that they had to sign the contract. They could choose, you know, not to and continue to provide for storage of their fuel.
Q. Well, I'll point you to the page that's marked at the top 5458. It's the -- it's the first page of the notice after the cover. The third column there, and paragraph -- I guess the easiest way to look at it -- second from the bottom, the one that starts out "Section 302 of the Act."
A. Uh-huh. (Witness answers affirmatively.)
Q. It says -- it contains two provisions which demonstrate the importance that the NWPA places on the contract. And the first is that the NRC will not renew or issue a license to a utility that has not entered into a contract.
Do you recall that provision?
A. No, I don't recall that specific provision.

100

Q. Do you recall anything generally like that?
A. No, I didn't -- I didn't recall it.
Q. But you understand the provision like that --
A. Yeah.
Q. -- would have limited the utilities' ability not to enter into contracts?
A. That's correct.
Q. The Notice of Proposed Rule Making refers to a -- a hearing that was held on March 3, a month after the publication of the -- of the notice. Do you have any recollection of that hearing?
A. You're using the term "hearing." I don't have recollection of a hearing. I do have recollection of a public meeting we had in the Department of Energy Forrestal Auditorium.
Q. Okay. What do you understand the difference between a -- to be between a hearing and a public meeting?
A. A hearing tends to be a more formal process with minutes -- not minutes, but with transcripts and the like. I don't recall if that was the case. I do recall a public meeting where we were dialoguing with the participants who came.
Q. What do you recall about that meeting?
MS. HERRMANN: Objection. Vague.

101

THE WITNESS: I really only have one specific memory, and that was a Mr. Larry Penberthy from Western Washington, who has for years had theories about how to treat and process nuclear waste, coming up and having a great big chart and rolling it out in front of everybody, and Bob Morgan actually to get up and hold one end of it. And it really wasn't pertinent to the meeting, but it was kind of amusing in my mind. But that's the only thing I specifically remember.
Q. I know it's long years back.
Were there -- were there discussions with -- with utilities or others outside of DOE other than at this public meeting?
A. I don't recall any specifically.
Q. You weren't involved in any, though?
A. I don't recall any.
Q. Do you recall industry representatives talking to you about various proposed contract terms on the telephone or approaching you individually in any way?
A. Again, I -- I just don't recall any. I do recall having sessions with environmental groups, Congressional aides, utilities representatives, NRC representatives about the whole concept of

102

implementing the Act.
Q. What's your recollection as to what was going on between the time that the -- this Notice of Proposed Rule Making came out February 4th of '83 and either when comments came in in March or even when the final rule of contract came out in April? What was going on within RW?
MS. HERRMANN: Objection. Vague.
THE WITNESS: The Act had a number of milestones or activities you were supposed to conduct within X number of days within passage of the Act. We were trying to meet all of those deadlines despite the fact that we were just getting an organization in place to do so. Consequently, there were a lot of long hours, and there was an urgency about trying to meet these near-term deadlines.
Q. (By Mr. Shapiro) What sorts of deadlines are you referring to?
A. I would assume that it had a deadline for getting a draft contract out. I would assume -- and I know that it had one for getting out a Mission Plan. So the -- these were things -- there were a number of things which Congressional staffers, legislators, in their efforts to put together a

103

process in the Nuclear Waste Policy Act specified things that all of a sudden we were being called on to actually physically produce and go through all of the mechanics to make it happen; such as a Federal Register notice doesn't just appear.
Q. Sure.
A. So we were trying to get off to a good start and to get these documents out as quickly as we could and to meet the deadlines. I -- to meet the deadlines, as quickly as we could, but consistent with the deadlines in the Act.
Q. Focusing specifically on the -- the deadline of getting a contract out, do you recall what was being done in this time frame between publication of the proposed rule in February and, let's say, April, when the final rule came out?
A. I don't recall what specifically happened, no.
(Exhibit No. 3 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, we've handed to you what's been marked as Lawrence Exhibit 3. And generally, you know, you'll be seeing a number of exhibits in hopes of jogging your recollection about some of the things that we might have gone

104

of rate?
A. I don't recall any specific discussions of it. However, based upon my experience, I would -- my belief is is that would put a very great demand on the Department that would be very, very difficult for us to meet.
Q. Why is that?
A. Because of the excess capacity that would be needed to take not only what was being generated daily, annually, plus working off the entire backlog of over 30 years of operation of nuclear plants within a five-year period. That would result in substantial additional cost and capacity which ultimately the ratepayer would have to bear. And it was not -- it's not clear to me now, at least, that that would have been warranted -- why five years would have been warranted; whereas, some other time frame, where you could do it perhaps more economically might be the better way to go.
Q. And we don't have to focus on -- on Exhibit 5 necessarily, because I'm not sure I would interpret it the same way. But do you recall the concept of -- let me ask a slightly different question.



Did DOE ever discuss the possibility of undertaking an obligation to accept spent fuel at a rate such that five years after the -- at five years after 1998, it would then be accepting rate as fast as the rate equivalent to the discharges plus some amount to start working off the backlog? In other words, a slower rate. Not that it would immediately in '98 to be able within five years to work off the backlog, but it would ramp up to a rate within five years to start to do that?
A. I really can't recall that.
(Exhibit No. 6 marked for identification.)
Q. (By Mr. Shapiro) Mr. Lawrence, we've handed you what we've had marked as Lawrence Exhibit 6, which are comments from the Edison Electric Institute on the draft contract.
Again, do you have any recollection of dealing with this particular letter?
A. No, I don't.
Q. Let me point your attention to a particular -- one of the comments being made by Edison Electric Institute. It starts at the bottom of Page 6 of the letter, referring to priorities.



A. Page 6 of the letter?
Q. Page 6 of the letter, the last three numbers of the Bates number are 881.
A. Gotcha. And where did you say?
Q. At the bottom of the page, dealing with priorities.
A. Okay.
Q. It refers, first of all, to the possibility -- or recognized the possibility that utilities will want DOE to take more spent fuel than DOE can handle. That you recall, that concept? I think we discussed that.
A. Uh-huh, yes.
Q. People have made numerous suggestions for dealing with that. They make a particular suggestion, at the top of the next page, that there be two priorities: One based on the age of the spent fuel, and then they suggest that there be another priority for a utility -- the size of a particular utility's inventory of spent fuel.
Do you recall consideration of those criteria?
MS. HERRMANN: Let me just object to the mischaracterization of the document.
Go ahead and read as much of that as you need



to.
THE WITNESS: (Witness complies.)
In reading this, I see it says the contract itself establishes two priorities -- assuming this is accurate -- one for the age of the fuel and the second is from shutdown facilities. I did not recall that that was in the contract. I assume it is. But then they go on and suggest an alternative.
Q. (By Mr. Shapiro) Let me focus first on the -- on the criteria of age of the spent fuel being a criteria. Do you recall that being a criteria discussed for -- for use in the contract?
A. I now recall that it was a criteria. I did not recall that it was -- at least if this is an accurate representation -- as high a priority as it was.
Q. What's your recollection as to why that was a criteria in the contract?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: The age of the spent fuel is directly proportional to the heat of the spent fuel. The lower the heat, the greater your ability to load it into the repository in a given space. And consequently, it would make the

Do you recall that complaint?
A. No, I don't. In part because the Nuclear Waste Policy Act certainly had a number of milestones which it's not at all clear to me that those interim milestones would need to be in this contract.
Q. Which milestones are you referring to?
A. Mission Plan, contract -- contract out for signing, and the like.
Q. What about milestones -- more physical milestones of actually getting closer to DOE taking the spent fuel?
MS. HERRMANN: Objection. Vague. I'm not sure I hear the question in there.
Q. (By Mr. Shapiro) Do you understand the question?
A. No.
Q. Okay. You referred to recollection that there were certain milestones within the NWPA for the contract for the Mission Plan. Do you recall there being milestones that would more concretely put RW on the path of actually receiving spent fuel, other than the 1998 date?
MS. HERRMANN: Objection. Calls for a legal conclusion. NWPA and the standard contract are the best evidence of their contents.

121

THE WITNESS: Upon reading the contract, it does seem to have other dates or time frames in here, such as 12 months prior to delivery date, within 30 days, other things like that, which would indicate to me that there are other interim steps in here. It's just the main feature of the contract was to begin taking the fuel in '98.
Q. (By Mr. Shapiro) Point your attention to further down in the same paragraph that we were talking about, really the next concept, wherein in addition to there not being other milestones -- or at least that's the complaint of Edison Electric Institute -- the letter complains that the contract does not commit DOE to accept any given quantity of -- of spent fuel or -- or high-level waste.
Do you recall that complaint?
A. Where are we here in this --
Q. The top paragraph on Page 8 of Exhibit 6.
A. Uh-huh. (Witness answers affirmatively.) Oh, I see it.
I previously commented that the utilities wanted to know and have more specific information regarding difficulties, but that we were in no position to provide that.

122

Q. Do you recall any discussions with utilities, back-and-forth discussions about that issue?
A. No specific discussions, no.
Q. If RW was not in a position to commit itself to a specific rate, was RW -- did you understand RW, then, to be committing itself to -- to take spent fuel that -- at a reasonable rate that would ultimately develop as you did more work?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
THE WITNESS: That would be an objective, but by no means were we in any position then to make any commitments regarding that. And it may not ever materialize.
Q. (By Mr. Shapiro) What do you mean, it may not ever materialize?
A. There could be just basic constraints on the ability of the system, receipt capability of the transport system, to move the fuel at a rate equal to or greater than its generation. I mean, I can speculate, but I won't as to what might that cause that -- reasons for that. And so consequently, although it's something that you would like to be able to have, we certainly were in no position to commit to it.

123

Q. And I think I asked about a reasonable rate and you referred to a rate that was equal to or greater than the rate at which spent fuel was generated. Does that reflect your understanding that in an abstract sense, accepting spent fuel --
A. I don't recall the specific context of that. We'd have to go back and look at that.
Q. Okay. Let me just ask what -- what -- what you meant -- would you mean, then, in the abstract, if -- if RW could accept spent fuel at a rate that was -- that was at least equal to the discharge rate that that would be something that would be reasonable.
MS. HERRMANN: Objection to the extent it mischaracterizes prior testimony. Speculation.
THE WITNESS: I'm not recalling the context in which we were discussing it before. I would think that you would want to -- it would be desirable if at all possible to not only take the waste that was being generated, but to over a -- some reasonable period of time -- which I'm not sure what that would be -- you could work off the backlog. So it would have to be greater.
Q. (By Mr. Shapiro) And the countervailing pressure on achieving that rate would be the technical

124

obligation to accept spent fuel from utilities at a particular rate?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: At this particular point in time, I wouldn't feel as if we were limiting anything because we weren't making an obligation with regard to acceptance rate. The only obligation we felt we were making was to begin accepting waste or spent fuel beginning in '98.
Q. (By Mr. Shapiro) Now, I know you've testified that it was your understanding that eventually things would get -- at least utilities would get additional information from RW as to how fast we would be able to deliver spent fuel to RW.
Did you foresee a time when the government would be obligated to accept a certain amount of spent fuel from utilities within a particular amount of time?
MS. HERRMANN: Objection. Calls for a legal conclusion. Speculation.
THE WITNESS: Yes, I think we always anticipated that when it was clear what our capabilities were, and we felt confident enough in those capabilities, that we could commit that we



would do so. However, we probably, even -- even at that stage, would have probably put -- wanted some clause to allow us to change that and not legally obligated us, because we -- there were too many -- too many variables that could affect your ability to actually deliver.
Q. (By Mr. Shapiro) Do you recall anything in the contract that was signed in 1983 that established a form or a mechanism to -- to create that subsequent obligation?
A. I don't recall specifically.
Q. Do you recall generally?
A. Well, in looking at the contract, I know it talked about getting a -- just now, it -- it appeared that they were supposed to give us a delivery schedule which we could either accept or reject, and there would be some process of back-and-forth with the utilities regarding that.
My general opinion would have been you would have had to get much closer to the actual date of an acceptance before you could actually really commit. And as I indicated, there would be some provisions in case you wouldn't be able to accept it that would not result in any penalty on the government's part.



Q. The delivery commitment schedule process that you just referred to, did you view those as creating binding commitments, then, to the parties?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I wouldn't use the term "binding commitments."
Q. (By Mr. Shapiro) What term would you use?
A. Good faith efforts to work with the utilities and share information so that they could get a reasonable approximation of when they would be able to ship and how much they would be able to ship.
Q. So you viewed the delivery commitment schedule process as more of a planning tool?
A. That's my recollection.
(Exhibit No. 7 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, we've handed you what's been marked as Lawrence Exhibit 7. We've reached, finally, the final rule that was published in the Federal Register. Now, I'll represent to that you by final rule, that this is the -- the final draft of the contract that was --



through various iterations, ultimately DOE entered into.
Do you recall the publication of the standard contract, the final contract in the Federal Register?
A. No, I don't.
Q. Were you involved at all in -- in the final edits, changes to the prior drafts that resulted in the -- in the final rule?
A. I would assume that I was, but I have no specific recollection of it whatsoever.
Q. I'll point your attention, Mr. Lawrence, to a particular term on the page at the top that's marked 16592.
A. Uh-huh. (Witness answers affirmatively.)
Q. The second column on that page, at the bottom of column, the last paragraph that starts on that column referring to -- it says, "Five commenters questioned the lack of a definition for 'emergency deliveries.'" It says, "We have intentionally not defined the term 'emergency delivery.'"
Do you recall that issue of whether or not to define an emergency delivery -- or how to define an emergency delivery being considered in 1983?
A. No, I don't.

Q. Do you recall the -- the one concept that is mentioned there on the -- that carries over to the next column, the one situation which would receive consideration by RW would be a delivery needed to permit a licensed reactor to continue its operations. Do you recall that?
A. I believe I've stated previously that I felt that would be at a very high priority. And it appears that was covered by the contract -- or covered in the discussion of the contract.
Q. Do you recall -- independent of the document that we're looking at, do you recall any discussion on whether or not that concept would be determined an emergency delivery or is that whole term, "emergency delivery," something that you don't recollect?
A. I don't recall the emergency delivery concept.
Q. Okay. Do you recall the term "annual capacity report"?
A. Not really.
Q. We've discussed just a few moments ago the concept of DOE issuing a report that would project forecasts of -- of how fast they might ultimately accept spent fuel. Do you have any recollection of that concept turning into something called

133

"annual capacity reports"?
A. No, I -- I don't recall the term "annual capacity reports."
Q. Do you -- do you recall reports like those, whether or not you recall the -- the -- the specific title?
MS. HERRMANN: Objection. Vague.
THE WITNESS: I mean, since I don't recall, I have no -- it's not clear to me what an annual capacity -- whose capacity is referred to? Is it --
Q. (By Mr. Shapiro) I'll represent to you that there are documents called annual capacity reports that -- that are referring to RW's capacity --
A. Oh.
Q. -- to receive spent fuel.
But you don't recall those?
A. No, I don't recall those.
Q. Are you aware that in three of the -- the cases that are being litigated, the ones that -- that I represent the plaintiffs, the Yankee Atomic case, the Connecticut Yankee case, the Maine Yankee case, that you've been listed by the government as a potential witness for the government in those cases?

134

A. I know I received something, but I don't recall which cases. I haven't really spent any time thinking about it.
Q. When the government lists who their witnesses are going to be and they also list the subjects on which they might testify about, are you aware that the subjects on which you're listed as testifying about include annual capacity reports?
A. No, I'm not aware of that.
Q. Do you have any idea how -- how you would be associated with annual capacity reports --
MS. HERRMANN: Objection.
Q. (By Mr. Shapiro) -- if you have no recollection of that?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: I had no participation on putting my name on that list. And I will only assume that it was because the official duties that I had at -- at or around that time.
Q. (By Mr. Shapiro) While I'm on that subject, let me cover a couple of things which are listed as potentially testifying about. And I'm not sure you're involved.
Do you recall the 1987 amendments to the

135

Nuclear Waste Policy Act?
A. I remember the one that specifically said stop work at Hanford and Death Smith County and focus on Yucca very vividly.
Q. Do you recall any others?
A. No.
Q. Did you have any involvement with the implementation of the 1987 amendments to the NWPA other than stopping work at Hanford?
MS. HERRMANN: Objection. Vague.
THE WITNESS: No.
Q. (By Mr. Shapiro) We'll discuss a little later the 1985 Mission Plan.
Are you aware that there was a move to amend the Mission Plan in 1987?
A. No.
Q. You had no involvement in any consideration of amendments of the NW -- of the NWPA Mission Plan in 1987?
A. No. In fact, my only involvement with the Mission Plan was in issuing the draft. I had no involvement in the finalization of that draft.
Q. Is that because the -- the finalization was -- that was done after you left RW?
A. Right.

136

statute just how fast DOE starts taking the spent fuel in 1998.

Do you recall any discussions with Hill staffers or others on that issue, as on -- as to what was intended in the legislation with respect to the 1998 date?

MS. HERRMANN: Objection. Calls for a legal conclusion.

THE WITNESS: I don't find that beginning to accept spent fuel by January 31, 1998, as ambiguous. The acceptance rate over time and as our capacity allowed, it was clearly over time we wanted to avoid shutdowns and ultimately take all of the fuel, at least up to the capacity limit of the repository, which continues to be a problem. But from my own perspective, if we were just able to accept one spent fuel element in January of '98, and perhaps no more that entire year, we would have at least -- at least met the obligation we were committing to.

Q. (By Mr. Shapiro) So it's your understanding of the NWPA, that all it committed DOE to accept in 1998 was -- was one fuel element?

MS. HERRMANN: Objection. Calls for a legal conclusion.

141

THE WITNESS: No, that wasn't what I said. But I -- I said technically we would have met that contractual obligation once we did that. Ultimately, over time, our objective was to accept waste at a rate that would avoid shutdowns and be able to eventually work off the backlog. But over what period of time that was and under what rate, we were in no position to commit to at that particular point in time.

Q. (By Mr. Shapiro) Did you have discussions with Hill staffers or anyone within RW about the concept of acceptance of one fuel element in 1998 technically meeting RW's obligations?

A. No. I'm certain -- I feel quite certain I didn't have discussions along those lines, because it wasn't our intent.

Q. What was your intent, then?

A. Our intent would have been able to begin accepting it and continue accepting the -- the waste or spent fuel at a rate that over some reasonable period of time, number of years, would have gotten up to whatever the design capacity of the repository was to be. I don't believe at that point in time we had a firm repository rate in mind, although that could -- maybe we did. I

142

don't know. I just don't recall it. But that -- that we would, over a period of time, be able to get up to that.

We -- we weren't interested in playing games and just taking one and declaring victory. But in terms of commitments, we knew we weren't in a position to commit to any specific quantity that first year or second year, at that particular point in time.

MR. SHAPIRO: Is now a good time for a little break?

MS. HERRMANN: Sure.

(Recess 2:45 - 2:59 p.m.)

EXAMINATION (Continuing)

BY MR. SHAPIRO:

Q. Mr. Lawrence, I want to direct your attention to another part of the -- the final rule, Federal Register notice, the part that starts at the top of the page, 16598.

The first column there, the first new paragraph that starts in that column refers to comments -- I think we've read probably one of those -- that refer to the lack of a performance standard other than the January 31, 1998, date.

143

In the middle of the -- of that paragraph it says, "DOE has considered this comment and the suggestion that suitable language be included in the contract, but it has not decided not to adopt the recommended modification."

Do you recall the decision not to -- to adopt the recommended modification?

A. No, I don't recall that.

Q. Later on in that paragraph, it says that the 1998 date is called for in the Act and we believe it to be a realistic date.

Does that comport with your recollection? Did you view the 1998 date as being realistic?

MS. HERRMANN: Objection. Foundation.

THE WITNESS: At that point in time, I did.

Q. (By Mr. Shapiro) Did there come a point in time when you didn't believe that the 1998 date was realistic?

MS. HERRMANN: Same objection.

THE WITNESS: I believe that the 1998 date was achievable, but there were a large number of activities that had to be successful in order to meet that date and so it was not an easy date to meet, by any stretch of the imagination, but it

144

was realistic and reasonable, certainly. Given 1984 or '83 is the time frame we're talking about, it certainly was.
Q. In 1983, was your expectation that DOE would meet the 1998 date necessary by having a repository open by that date or perhaps by meeting that date by some other means?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: Our plan was to have a repository open by that date.
Q. (By Mr. Shapiro) So when you say you felt it was realistic that you could meet the 1998 date, you thought it was realistic that DOE could have a repository open by 1998?
A. Yes.
Q. Turning back to the language in Exhibit 7, that paragraph, it says, "Our performance will be judged by meeting this date." Do you recall what was meant by "meeting this date"?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: Being able to begin accepting waste or spent fuel as of that date.
Q. (By Mr. Shapiro) Would that entail accepting

145

spent fuel in 1998 at a meaningful rate?
MS. HERRMANN: Same objections. Vague.
THE WITNESS: I don't know what you mean by "meaningful rate."
Q. (By Mr. Shapiro) Going back to a discussion we had earlier, did this reference to "meeting that date," was it intended that -- that that could be met by simply taking one fuel element in 1998?
MS. HERRMANN: Objection since Mr. Lawrence did not author this document. Foundation. Speculation. Vague.
THE WITNESS: While this would not have been our intent, I would have felt we had met a commitment should that have been the case.
Q. (By Mr. Shapiro) What commitment are you referring to?
A. Take one spent fuel element by January 30th, 1998, for permanent disposal.
Q. Did you ever consider whether or not RW had a commitment to accept spent fuel for any purpose other than permanent disposal?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: The ultimate purpose of our taking spent fuel was permanent disposal.

146

Q. (By Mr. Shapiro) Did you ever consider, though, having -- whether or not you had a commitment to store -- storing spent fuel from utilities in 1998, even if you might not start to dispose of it until some later period in time?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: My recollection is that in the Draft Mission Plan, which I was involved with, we talked about the possibility of interim storage leading up to the repository. But there was clearly no legal requirement in the Nuclear Waste Policy Act for it, nor was it clear that that was something which we could ultimately do. But it was something that was to be considered.
Q. (By Mr. Shapiro) I want to turn your attention now to the next page, 16599, of the final rule; specifically to Section 961.4 of the final rule that's titled "Deviations." It refers to a mechanism where utilities could seek to deviate from the standard contract.
Do you recall any utility requesting a deviation from the standard contract?
A. No.
Q. Do you recall any discussions about potential

147

deviations from the terms of the standard contract?
A. No.
Q. I want to turn now to the next page, get to the actual text of the contract. The first column, about halfway down the column, has a number of "whereas" clauses. And the second one there, if you could read that one, it says, that "Whereas, the DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved as expeditiously as practicable upon the request of the generator or owner of such wastes or spent nuclear fuel."
I'll represent to you that that particular "whereas" clause was not in the earlier Notice of Proposed Rule Making.
A. Uh-huh. (Witness answers affirmatively.)
Q. Do you recall why that language was -- was added to the final rule?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: Previously stated, we wanted to be as transparent and work with the utilities as best we could. And this is an

148

indication of our intent to do exactly what it says here.
Q. (By Mr. Shapiro) So the intent was to take the spent fuel as quickly as practicable?
A. As expeditiously as practicable upon request of the generator. There are a number of things which could impact the practicality of it, however; the transport system, restrictions, legal objections, and the like.
Q. What about the first part of that "whereas" clause that refers to "following commencement of operation of a repository"? Did you ever view there being a distinction between the rate at which DOE would accept spent fuel before a repository became operational as opposed to after that time?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: As I previously indicated, the concept of interim storage prior to repository was something which I had had responsibility for back in the '70s, as well as something which we -- my recollection was we had at least addressed the possibility of that or at least the concept of that in the Mission Plan.
These words make it clear that we are not

149

talking about interim storage or taking it before the repository starts. So even though it was a concept that people had discussed and we knew that -- that utilities -- some utilities, at least, would like us to have, this contract clearly did not cover that.
Q. (By Mr. Shapiro) That's your recollection of -- of the contract?
A. Based upon this reading and my recollection of the contract.
Q. I want to just ask you so that it's clear in my mind about another potential reading of this, to make sure that, I guess -- I guess, that that other reading is not what you recollect.
The other reading would be that perhaps RW would take the spent fuel at some lower rate after 1998, but perhaps before an operation of a repository took effect; but once repository became operational, then DOE had the obligation to take the spent fuel as quickly as practicable.
That's not your recollection?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: No, that's not my recollection.

150

Q. (By Mr. Shapiro) Mr. Lawrence, let me ask you to turn to -- it's the next page. Focusing on Article V, it's the third column on the page. It starts -- it's 16601. Do you have that page?
A. Uh-huh. (Witness answers affirmatively.)
Can I ask a question?
Q. Sure.
A. I noticed there is notations and additions here. What does that refer to? Because it's not in the original Federal Register notice.
Q. Another one of my questions. I'll ask it now.
Do you have any sense of what those notations are?
A. I asked you first.
Q. I don't know.
A. Okay. The answer is no. I'm going to ignore what's written here because it's not part of the record.
Q. I'm not asking you to read it. I think the section I'm referring to now -- I think all of the sections that I'm referring to are not ones that are affected by the handwritten notes.
The third column on 16601, the first new paragraph begins on that page, in fact has the number 2 on it, refers to DOE approval or

151

disapproval of delivery commitment schedules. I want to focus in actually on the bottom of that paragraph. It says that purchaser shall have the right to adjust quantities of SNF and/or high-level waste plus or minus 20 percent.
Do you recall that provision?
A. Not specifically.
Q. Do you recall it generally?
A. In general, we wanted to provide as much flexibility as we could. And this would appear to be consistent with that. So it would be consistent with what I recall our intent to be.
Q. But you don't have any more specific recollection of why 20 percent as opposed to some other percentage?
A. No.
Q. The next thing I want to point your attention to, Mr. Lawrence, is at the bottom of that column, a section dealing with exchanges. We've looked at prior language that was similar to this. There is one change I want to focus in on. It says here, in the middle, the "Purchaser shall have the right to exchange approved delivery commitment schedules with parties to the other contracts with DOE for disposal of SNF and/or HLW; provided, however,

152

Q. What do you tell people in sessions like -- like the one that is depicted here in Exhibit 9? I'm sorry, Exhibit 8.
MS. HERRMANN: Objection. Vague.
THE WITNESS: At this particular point in time, we probably were just saying what we were doing in -- in -- in implementing the Act.
Q. (By Mr. Shapiro) Do you recall any questions or concerns being voiced by participants in this program or similar programs?
MS. HERRMANN: Objection. Vague.
THE WITNESS: Yeah, that was very vague.
Q. (By Mr. Shapiro) Do you recall at any of these sessions where you gave oral presentations to interested parties on the Nuclear Waste Policy Act, particular concerns voiced by participants about how the Department was implementing the Act?
MS. HERRMANN: Objection. Vague.
THE WITNESS: In a very general sense, I recall that there was a desire to get the government to commit to and be as specific as possible, which we, or I necessarily, was reluctant to do because the technical basis and the information to allow us to do so just were not there. And I could not and would not commit the

165

government to something which we may not be able to deliver on.
Q. (By Mr. Shapiro)
(Exhibit No. 9 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed what we've had marked as Lawrence Exhibit 9, which has a cover letter and then has a Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-level Radioactive Waste.
Do you recall this report?
A. Not specifically, no, I don't.
Q. Do you recall it generally?
A. Yeah. The -- the title rings a bell, Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-level Radioactive Waste.
Q. What was the purpose of this report, to the extent that you recall?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: My recollection was that the utilities needed to get this money added -- the fee added to their rate base -- or the charges added to their rate base, and they needed some

166

basis or documentation to take to the Public Utility Commissions to allow that to occur.
And I don't know if this is the report or whatever. But we -- if we were going to collect the fee, we needed to provide some basis for how the numbers were arrived at.
Q. (By Mr. Shapiro) So this report was intended to -- to show the relationship between the costs of the disposal program and the 1.0 mill per kilowatt fee?
A. I can't say that that's specifically what that report was doing. I was speculating to that.
Q. Let me point you to that cover letter signed by Mr. Rosselli. The second paragraph there, second sentence of that paragraph says the report "Demonstrates the methodology which will be used to evaluate whether the revenues resulting from the mandated 1.0 mill per kilowatt hour fee will be sufficient to offset the costs of disposal of commercially generated spent nuclear fuel and solidified high-level radioactive waste."
A. Uh-huh. (Witness answers affirmatively.)
Q. Does that refresh your recollection at all as to what --
A. Yeah, I think that adds -- it speaks for itself.

167

Q. Is that statement consistent with your recollection of what the purpose of this report was?
A. No, it's somewhat different --
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: No, it's -- it's somewhat different than what I was implying. Although, they may still have had the same -- may have been used by the utilities for that purpose, of justifying a rate.
Q. (By Mr. Shapiro) The statement in the cover letter, does that imply to you that the purpose of this report, Exhibit 9, is more for an internal DOE purpose, to see if the 1.0 mill per kilowatt fee is in fact going to cover the costs?
MS. HERRMANN: Objection. Foundation. Speculation. The document speaks for itself.
THE WITNESS: Yeah, I -- I do not believe this was a strictly internal document. And obviously, the fact that it was sent out to the public means it did serve a broader purpose.
Q. (By Mr. Shapiro) Would you have had any role in the preparation or review of this report?
A. Yes.

168

Q. Was the Mission Plan something that was drafted by different parts of your office, so there's not a particular drafts person, or was -- or was there someone who -- who ultimately had some responsibility for drafting this thing?
A. I -- I don't recall. I would certainly -- and this just would be a guess on my part. But I would actually hope that we had one person at the end to put it all together so it looked like one document. We did have a communications organization that most likely had that responsibility.
(Exhibit No. 10 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed what we've had marked as Lawrence Exhibit 10. First page of which seems to be a memorandum, subject line is Mission Plan Strategy, dated in March -- I'm sorry -- the date at the top is September 15th of 1983. There is also a received date by someone in March of '84.
Do you recall this document?
A. No, I don't.
Q. What about the -- the nuclear waste strategy and

181

overview proposal that starts on the next page?
Do you recall that overview proposal?
A. No, I don't.
Q. Let me stick to the first page for just a moment, to the -- to the distribution list, to see if I can understand who the various players are.
The distribution list on that starts with Bob Morgan and then yourself.
A. Uh-huh. (Witness answers affirmatively.)
Q. Is that list of names, is that consistent with your recollection of who would have been involved in the preparation of the Mission Plan?
A. I -- I would not characterize it necessarily involved in the preparation. These were key program and policy people who would -- you know, are responsible for aspects of the implementation of the Act and so they would have been involved in certainly reviewing this document and making sure it made sense and having a hand in preparing the Mission Plan.
Q. The name one up from the bottom, Keith Klein, do you recall what his role was?
A. Keith was -- was working on the geologic repository group under Bill Bennett, was my recollection.

182

Q. Let me turn your attention to a couple of concepts on the next page of the Exhibit 10. It's the Overview Proposal. It refers to the central focus of the program is that DOE will begin accepting spent fuel in significant quantities in 1998.
Do you have any recollection of that statement?
A. No, I don't recall any of the specifics of this document.
Q. Do you have any idea what would have been meant by the term "significant quantities"?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: Well, in -- in reality, I would -- I would say it -- it is -- it is a clear indication that we weren't talking about just accepting one spent fuel element for disposal, but that we did intend to accept as much as we'd reasonably and safely could leading up to eventually reaching capacity, the design capacity.
Q. (By Mr. Shapiro) And there are four dashes under that -- that central focus. The third one says that "The lack of existence of particular type facilities will not delay or postpone the acceptance of spent fuel."

183

Do you recall that concept?
A. No, I can't say that I do.
Q. What about the next dashed concept, that "This posture is designed to ensure that all utilities will have firm planning schedules for the disposition of their nuclear wastes sufficiently early to determine their on-site interim storage needs during the 1990s"?
Do you recall that concept?
A. I think this is in keeping with what I said earlier, that we wanted to be transparent and work with the utilities and give them as much information when we could. The time frame stated in this -- in here, by the 1990s, during the 1990s, we would have selected a repository -- the repository site for the first repository. Basically either we would be in the final licensing process or close to it and we would have a design. So we could start working with the utilities in the '90s had we been able to maintain the schedules envisioned at this particular point in time.
Q. Do you have any understanding of what the connection would be between not letting the lack of existence of a particular type of facility have

184

with enabling utilities to have a firm planning
schedule for the disposition of their spent fuel?
MS. HERRMANN: Objection. Foundation.
Speculation. Assumes facts not in evidence.
THE WITNESS: We had always envisioned a
concept where once the repository was under -- was
approved and was either under construction or to
be constructed, that you would need a receipt in
handling capacity or a buffer storage, as referred
to here, to -- between the time the fuel actually
comes in and the time it goes down the shaft into
the repository. So if there were some delay in
some subsequent handling capability, you could
still begin accepting in the buffer storage
facility, but that buffer storage facility was
tied to the geologic repository.
Q. (By Mr. Shapiro) Would the buffer storage
facility be something at the repository itself
or -- or something apart from that?
A. It would --
MS. HERRMANN: Objection. Speculation.
THE WITNESS: It was always envisioned
that it would be at the repository site so you
wouldn't have to transport things twice.
Q. (By Mr. Shapiro) During earlier parts of today,

185

we've been talking about different receipt rates
at which RW might have been expecting that it
might receive spent fuel. Was it your
understanding that we were talking about receipt
at the buffer facility or receipt within the
actual disposal facility?
MS. HERRMANN: Objection. Vague.
THE WITNESS: At the receiving facility
or buffer storage, however you want to call it.
Q. (By Mr. Shapiro) How large did DOE envision this
buffer storage facility being?
MS. HERRMANN: Objection. Foundation.
Speculation.
THE WITNESS: I -- I don't recall, and
that would be very dependent upon the type of
buffer storage. I believe -- my recollection is
that the -- the initial Draft Mission Plan called
for looking at a transportable storage cask that
would in and of itself provide the buffer storage
capability, where the -- where the material itself
would be canistered and you would have to handle
it a minimum number of times.
Q. (By Mr. Shapiro) This would be a -- a canister --
a dry canister that you could simply put on a
concrete pad until you were ready to deal with it?

186

A. My recollection was that we wanted to see if it
would be possible to encapsulate or put the spent
fuel into a canister at the utility site, put it
in a transport cask that either, one, if you could
economically do this, then that just becomes the
storage. Or because that could be very, very
expensive to meet all of the transport
requirements, have it in an over pack. So you
take it out of the over pack and then set it out
and then move the cask back to get more spent
fuel. The -- the principle which we were trying
to follow there was minimizing the handling of the
fuel and the need to pack and unpack and minimize
any contamination.
Q. Can we turn back to Exhibit 10 that we were just
talking about, that -- the same page and the --
and the next heading is called Waste Acceptance
Schedule.
The second dashed entry says that "The
central criteria for this schedule is: An
acceptance rate during the first 5 years such that
no utility would have to build additional storage
facilities after 1998."
Do you recall that concept?
A. I don't specifically recall the concept, but it's

187

consistent with my recollection of how we wanted
to implement the Act.
Q. And the next dashed entry is an acceptance rate
after the first five years equivalent to the
actual rate of utility discharge of spent fuel
each year. Do you recall that concept?
A. I would say the same thing I did about the last
one: it's consistent.
I would emphasize that this says -- this is
our planning base. This is what we'd like to do.
And that's how our Mission Plan would -- would lay
this out. So it represents, you know, what our
plans would be.
Q. And I think, if I recall correctly from your prior
testimony, your review of -- of the Mission Plan
for issues such as insuring it was consistent with
what you thought was actually doable; that these
criteria were not simply pie-in-the-sky hopes, but
actually your reasonable expectations of what you
would be able to do.
MS. HERRMANN: Objection. Foundation.
Speculation. Vague.
THE WITNESS: As a planning basis, it's
what we originally set out with the intent -- with
the hopes of doing. We may find out during the

188

course of technical work and design that it's not possible to achieve that. So this is just a planning basis.
Q. (By Mr. Shapiro) Did you expect to be able to -- to meet these goals?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: "Expect" would be too strong a word.
Q. (By Mr. Shapiro) Turn to the next hash mark that would -- refers to the planning basis assumes that individual utilities after 1998, whose turn to ship spent fuel to DOE, has not occurred based on the contractual specification of oldest fuel first, but otherwise need to add more on-site interim storage, would have two options: Arranging for transhipment or purchasing the right to ship spent fuel to DOE from another utility who is next in the queue.
Let me take those two concepts in turn. First, the transhipment. Do you recall that concept?
A. Yes.
Q. How did transhipment play into expectations as to how the program would operate?



MS. HERRMANN: Objection. Foundation. Vague.
THE WITNESS: Theoretically a utility with excess storage space could loan that excess space to another utility that needed it. My current thought is that was probably naive.
Q. (By Mr. Shapiro) Is that because of the political difficulties of moving spent fuel from one person's pool to another?
A. Yes. And a pragmatic business approach of why take a risk if you don't have to.
Q. What about the second approach, of purchasing the right to ship spent fuel from a utility that's next in the queue?
A. This -- that's another way of saying the exchange rights for shipping with another utility. And I think this is probably a little bit more pragmatic and it assumes they are not going to give you that right, they are going to charge you for that right.
Q. Is this statement consistent with your expectation that utilities that needed an early slot would be able to purchase the right to do so from -- from utilities that are earlier in the queue?
MS. HERRMANN: Objection. Foundation.



Speculation to the extent it mischaracterizes prior testimony.
THE WITNESS: This just reflected the fact that if we gave the utilities flexibility, they would work out any problems that they had.
Q. (By Mr. Shapiro) And it was your expectation that -- that they would in fact be able to work that out?
A. Yes.
Q. Was there ever a concern when you were at RW that these purchases or exchanges might not work out because of the -- the risk referenced with respect to the transhipment problems that, Gee, why take a risk and sell my -- my earlier spot in the queue?
Was that ever a concern that you recall being voiced about the exchange provision working?
A. I don't recall us ever discussing or believing that in a true necessity they couldn't work it out.
Q. What do you mean by a "true necessity"?
A. I have to shut down unless I can put this fuel somewhere. And I would think a utility that had excess storage space or -- or was earlier in the queue could very easily arrive at a negotiated price that would allow that to happen.



Q. So if I understand correctly, what -- what you mean by if faced with a necessity, you mean that a situation that would cause a utility that wanted to purchase the earlier spot, to pay enough money to -- to get somebody to -- to sell it?
A. As much or as little. Depends upon the utility and -- and that -- that had the space.
Q. Let me turn your attention, then, to the next page of the document. Down near the bottom of the page, it's the -- actually, the last dash, the item after that, it says that if by 1994, it is known that the first repository will be delayed, but by an expected period of less than 2 years, then DOE will take one of two actions. And it -- it refers to a design the size of a buffer storage facility. And then the second option is take title to the spent fuel and have it placed in dry storage casks and pay a rental fee.
Take those one at a time.
Do you recall consideration of this idea of designing the size of the buffer storage facilities to -- to handle a two-year delay in the opening of the first repository?
A. I don't specifically remember it.
Q. What about the -- the second option, of DOE taking

title to the spent fuel? Do you remember consideration of that idea?
A. No, I don't specifically remember that either.
Q. Do you generally remember that -- that notion?
A. Yeah, I think I -- I commented earlier about transportable storage cask and having the flexibility to accommodate unforeseen events, but to give you enough flexibility. This whole process and whole system required flexibility in order to be workable, and these seemed to be reasonable assumptions for a planning base.
Q. Why would DOE take title to utility spent fuel at the utility sites in 1998?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: Well, at this particular point in time, which was September 15th, 1983, I believe we had contracts that said we would begin accepting waste in '98. So it would be to fulfill that contractual provision.
Q. (By Mr. Shapiro) The terms that we've just gone over in this -- in this overview proposal, most of them did not find their way into the -- the final Mission Plan. Do you have any recollection -- I mean, I can go through them one at a time and

193

perhaps I should.
The -- let me start -- the first one we talked about. The lack of existence of a particular facility not delaying acceptance of spent fuel. That's not quite in the Mission Plan, I'll represent to you, quite that way.
Do you have any recollection as to what might have accounted for that change?
A. I had -- didn't -- wasn't involved in the issuance of the final Mission Plan.
Now, if you were to tell me what was in the Draft Mission Plan -- I don't recall -- I don't think it found its way into the Draft Mission Plan either. It may have. I just have no recollection.
Q. Maybe it's fairer to go slower and go to the Draft Mission Plan first.
(Exhibit No. 11 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed what we've marked as Exhibit 11, which is a Draft Mission Plan.
A. This is not the one I was referring to.
Q. I will later show you another Draft Mission Plan.

194

We've got two.
A. I don't believe this one was ever issued publicly.
Q. This one, referring to Exhibit 11, is dated December 20th, 1983. Do you recall this -- this draft?
A. Vaguely.
Q. What was the purpose of this draft, if it wasn't distributed publicly?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: Well, before a document would go out for public review, even in draft form, it had to make sure it reflected what the Department of Energy's views and thoughts were. So any document had multiple drafts before it's -- before it was issued. And this would -- my recollection would be it would serve that purpose, for internal DOE review and comment.
Q. (By Mr. Shapiro) Would this document have passed your review?
A. Actually, at the time this was being issued, I was on a one-month assignment in the Secretary's Office, and I -- so I would doubt that I had specifically reviewed this version -- this December 20, 1983, version.
Q. What were you doing in the Secretary's Office,

195

December of '83?
A. I was representing -- I was -- my responsibility was to represent the sites' needs and -- to the Secretary -- to the Secretary's Office.
Q. Did someone else serve as -- in an acting capacity as deputy director at that time?
A. I don't believe so. It was unexpected, but come January 1, they needed to move Mr. Morgan to another position, which was the acting assistant secretary for Defense programs. And because of that, they moved me back into the director's position for the -- for the Nuclear Waste Policy Act Implementation Office.
Q. Actually, this draft, Exhibit 11, the cover of it refers to the office of Civilian Radioactive Waste Management.
A. Uh-huh. (Witness answers affirmatively.)
Q. That seems to indicate that the Implementation Office had become RW by that time? Do you recall that?
A. I didn't recall that, no.
Q. You do recall, generally, that there was a time when the Implementation Office became the Civilian Radioactive Waste Management?
A. I'd forgotten that.

196

Q. Do you recall significance to that transition from an Implementation Office to the Civilian -- Office of Civilian Radioactive Waste Management?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: I would speculate it may have been required by the Act, to have the Office up and running by that time. I do know that the Department was having difficulty in finding a person to be the political appointee called for in the Act to head the Office. And so that's -- that was the difficulty.
Q. (By Mr. Shapiro) They couldn't find anybody who wanted the job?
A. Well, I'm on record as saying they needed a person smart enough to do it and dumb enough to take it. So that was -- I can't get away from that. Fortunately Ben Rusche came along.
Q. Let me point your attention to the page after the table of contents of Exhibit 11, Page 1-1. The bottom of the page, the last sentence actually, this sentence seems to have the same concept that we talked about earlier, that the waste acceptance schedule will, initially, preclude the need for additional at-reactor storage and ultimately



remove from at-reactor storage all waste that is more than five years old.
A. Uh-huh. (Witness answers affirmatively.)
Q. Does the fact that this concept is in the December 20th draft, does that refresh your recollection at all as to the significance of that concept?
MS. HERRMANN: Objection. Vague. Speculation.
THE WITNESS: I have to admit, I doubt if there is something that could refresh my memory from something this long ago. But certainly the concept described here is consistent with my recollection of how we were trying to implement the Act so as to preclude unnecessary additional storage and unnecessary additional expense.
Q. (By Mr. Shapiro) Again, this time pointing your attention to Page 2-1, two more pages into the document. The second paragraph there says that "The Department does not intend to delay or postpone the acceptance of civilian radioactive wastes even if a permanent geologic repository is not completed by 1998."
Do you recall that intent?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: I -- I did not recall this



provision or this portion of the -- of the strategy. Even though I would say it's consistent with my understanding of what we were trying to -- or hopeful of doing. But even as it states here, that was -- probably went beyond the original Nuclear Waste Policy Act and called for additional Congressional approval to make it possible.
Q. (By Mr. Shapiro) You needed additional Congressional approval because you might need some additional facilities?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: Some of the things we were proposing, we did not have the legislative authority to do.
(Recess 4:34 - 4:54 p.m.)

(Exhibit No. 12 marked for identification.)

EXAMINATION (Continuing)
BY MR. SHAPIRO:
Q. Mr. Lawrence, you were just handed what we've marked as Lawrence Exhibit 12. It's titled "Proceedings of the 1983 Civilian Radioactive



Waste Management Information Meeting, December 1983." The document is dated February of '84.
Do you recall this meeting at all?
A. No, I wasn't there.
Q. Do you recall Mr. -- helping Mr. Morgan prepare for this meeting?
A. No, I don't.
Q. Let me turn your attention to the second page of this exhibit. It says, at the bottom, actually, 12. It's -- last three numbers, Bates No. 600. And the second paragraph that starts on that page says, "We are concerned with the schedule on the repository is extremely optimistic for getting to 1998."
Do you recall that concern?
A. Yes.
Q. Is that consistent with your recollection? Were you concerned that having a repository operational by 1998 was extremely optimistic?
A. I -- I've previously stated that it required a number of things to occur and the possibility that any or all of those could be delayed would jeopardize the date. So I mean, this is consistent with what I've said.
Q. I know there were things that would jeopardize the

repository happening, but do you think it was likely that the repository would be operational by 1998 or did you think that was extremely optimistic thinking?
MS. HERRMANN: Asked and answered several times.
THE WITNESS: The '98 date was doable.
(Exhibit No. 13 marked for identification.)
Q. (By Mr. Shapiro) Mr. Lawrence, we've handed you what we've had marked as Lawrence Exhibit 13, which is titled "Statement of Michael Lawrence, Accounting Director, RW." It's dated February 22, 1984.
Do you recall this statement?
A. I remember a number of Congressional hearings, not necessarily this specific one.
Q. Is it fair to say that this document represents your written testimony to the committee?
A. Yeah.
Q. I want to turn your attention, Mr. Lawrence, to the -- I guess it's the third page of the document, although it says 2 at the top. The last three numbers are the Bates No. 228. The last



paragraph on that page says, "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998."
Is it fair, then, to say that as of February 22, '84, the plan was still to accept spent fuel at a rate that would preclude the need for additional at-reactor storage after January 31, 1998?
A. Assuming we had a repository in place by January 31, 1998.
Q. And that was also part of the plan, to have a repository operational by 1998?
A. Well, the statement you're referring to says, by achieving this fundamental objective, which was beginning to accept it no later than January 31, 1998. So I was just linking those two thoughts. You can't decouple them.
Q. I think you just referred to having a repository operating by 1998 and I don't quite see that in this statement.
A. I'm sorry. You're right. It says we're beginning to accept high-level radioactive waste for safe



management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998.
Q. So as of February of '84, taking this spent fuel as of 1998 to -- fast enough to preclude the need for at-reactor storage was not necessarily linked to having a repository operating.
MS. HERRMANN: Objection to the extent it mischaracterizes his testimony.
THE WITNESS: I believe, but I would need to go look at the Act, that there were certain things that had to occur before you could start shipping and accepting waste. Although I don't recall exactly, I think it might have been things like you had a license to construct the repository. You had selected the site. A number of things had been approved.
So this statement here, in quotes, would -- I think has a number of other activities that have gone on before it that would have had to have occurred.
It then says, By achieving this objective, meaning all those predecessor events would have occurred, it says, "this will initially preclude the need for additional at-reactor storage" and



"ultimately remove all eligible waste." That -- that to me indicates some uncertainty of whether or not it would always preclude the need for additional storage.
Q. (By Mr. Shapiro) Turn your attention, Mr. Lawrence, to Page 13 of this -- of this statement. The third paragraph says that when finalized in mid 1984, the Mission Plan will be submitted to Congress. I'll represent to that you the Mission Plan was not finalized until midyear 1985. Do you recall what caused the delay in -- in finalizing the Mission Plan?
A. No, I don't. All I -- I -- I believe -- and I'm sure you can check this -- that we issued the draft -- well, I've been saying the Draft Mission Plan in May, but sometime while I was the director of the Office, which would have been between January and July.
Q. Well, I'll represent to you that it was -- it was dated April of '84.
A. Okay.
Q. And there is a --
A. So I mean --
Q. -- there is a transmittal from you dated May 2nd of '84, so you're right on.

A. Okay. Okay. Yeah, I left the program to come out here in the end of June 1984, so I -- and I really don't have any recollection or experience with what caused the delay in getting it out.

(Exhibit No. 14 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed what has been marked as Lawrence Exhibit 14, which is a memorandum on Battelle letterhead dated April 26, 1984, and subject line is MRS Institutional Report.

I want to turn your attention, first, to the third page of the document. The paragraph in the middle of the page under subject "Domenici Asks DOE to Address Environmentalists' Demands." It says, "Michael Lawrence, acting director of the waste program, said that he had discussed the same points raised by Domenici in an interview with Berick but Lawrence still says DOE believes that the 'key thing to maintain is the 1998 date as a commitment.'" That "even if full-scale operation cannot be achieved by 1998, some initial capacity could be available to receive spent fuel."

Do you recall that statement?



MS. HERRMANN: Objection. Vague.

Let me just say, take as much time you need to read the rest of this.

THE WITNESS: I don't remember this specific statement, but this specific statement is consistent with my recollection of our responsibilities.

Q. (By Mr. Shapiro) Do you have a recollection of what the initial capacity is that you would have been referring to, some initial capacity? Is that the buffer facility that you had referred to earlier? Was that something else?

MS. HERRMANN: Objection. Speculation. Compound.

THE WITNESS: The receipt and handling facility's capability to accept fuel is what would be initial capacity in my mind.

(Exhibit No. 15 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed what's been marked as Lawrence Exhibit 15. This is the April '84 draft of the Mission Plan that you've referred to previously. I'll represent to you, by the way, that this is an excerpt of that.



You might imagine that the Mission Plan draft was much longer.

Let me direct your attention, first, to the cover letter that -- or transmittal letter that appears right after the -- the cover. The last paragraph says that this April '84 Mission Plan incorporates changes in response to comments on a preliminary version --

A. I'm sorry, where are you?

Q. The last paragraph on that page.

A. Oh, okay.

Q. It looks like the "Th" is obliterated.

A. I'm with you. Okay.

Q. It says, "The Department issued that preliminary version in order to obtain input from States, affected Indian tribes, Nuclear Regulatory Commission and other Federal agencies early in the preparation process."

Does that statement refresh your recollection as to the purpose of --

A. The DOE document?

Q. -- the December '83 draft that we reviewed earlier?

A. Well, it -- I have to admit it doesn't really refresh my memory, but it does seem to clearly



state that that was a document that did go out for comment.

Q. If it went out for comment, is that -- is that, then, consistent with your prior statement? Would that indicate that that draft was -- was -- was vetted at least to the Department level to reflect the DOE's views as to how they felt the program would operate?

A. Yes, it would.

Q. Do you recall making any particular changes from the December '83 draft to this April '84 draft of the Mission Plan?

A. I -- I can't remember any specific changes, no.

Q. Let me point your attention to Page 2-2, place acceptance schedule there. There is a column in the middle that seems to represent the actual waste acceptance, the one that says "first repository acceptance." Am I correct to say that that is the column that represents waste acceptance?

A. Certainly appears to. And I would also add that those figures in there more appropriately represent the ramp-up that I referred to earlier.

Q. What do you mean by "more appropriately"?

A. You may recall early it said 1,800 tons a year for

the first five years and then 3,000 tons. This is 400, 400, 400, 900, 1800. They are much lower cumulative total, but much more accurately reflect -- reflecting my technical judgment and opinion as to what we could expect.
Q. Do you recall how -- how the numbers in that column were developed?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: My vague recollection would be much more based upon judgment and experience.
Q. (By Mr. Shapiro) Mr. Lawrence, I'm going to ask you to compare the two Draft Mission Plans, Exhibit 11, the December '83 draft, and Exhibit 15, I believe, the April '84 draft; about a couple of those changes that we talked about, things that were in the earlier draft that -- that I don't believe are in the later draft.
In particular, do you have the earlier draft in front of you?
A. I do.
Q. Page 2-1?
A. Okay.
Q. At the bottom of the first paragraph, you might

209

recall we discussed the concept that no utility will have to provide additional storage capacity after January 31, 1998. And that does not appear in the April '84 draft.
A. Uh-huh. (Witness answers affirmatively.)
Q. Do you have any recollection as to why that change was made?
MS. HERRMANN: Objection. Asked and answered.
THE WITNESS: The statement in the initial draft represents an assumption, planning assumption, on our part. It is not a requirement of the Nuclear Waste Policy Act. I would think in getting comments back on the original plan, and specifically earlier referred here to things like discussions with Mr. Berick that Senator Domenici asked us to do, that -- I'm speculating, now -- but my recollection is the environmental and intervenor groups didn't want -- were opposed to the Department doing more than the law required and may have objected to that provision. In which case, it -- it's one -- that's one potential reason why it wouldn't find its way into the final report.
Q. But you don't recall specifically why -- why it's

210

not in the report?
A. No.
Q. Can you think of any other potential reasons as to why that statement was taken out of the draft?
MS. HERRMANN: Objection. Speculation.
THE WITNESS: I -- I'd -- if I had to speculate, it would be because that is not a requirement of the Nuclear Waste Policy Act.
Q. (By Mr. Shapiro) And by the time you got to the April '84 draft, you were trying to -- to limit what you're planning to do to the minimum statutory requirements in the Nuclear Waste Policy Act?
MS. HERRMANN: Objection to the mischaracterization of prior testimony.
THE WITNESS: Exactly. That's not what I said. We -- we were going to do as much as we could. We had to, one, satisfy the Act; and then two, do it in such a way that would minimize the likelihood of legal objections to what we were doing, which we knew could slow up and prevent us from meeting our objectives.
So to the extent we were trying to do more than the Act required, that could be -- result in a lawsuit, which would slow us down and prevent us

211

from meeting our key objective. So we had to back off on some of those provisions, some of those things that we may have wanted to do, but didn't have the legal authority to do.
Q. (By Mr. Shapiro) Just a couple of other concepts that are in the December '83 report.
One in the next paragraph that we discussed, that the Department has not intended to delay or postpone acceptance of wastes even if a permanent geologic repository is not completed by 1998. That term also seems to have --
A. Didn't make it in.
Q. -- to have been left out of the next draft. Do you have any recollection of what happened there?
MS. HERRMANN: Objection. Asked and answered. Speculation.
THE WITNESS: I would assume the exact same thing that I said about the earlier statement.
Q. (By Mr. Shapiro) But you don't recall?
A. No, I don't recall specifically.
Q. Sticking now with Exhibit 15, the April '84 draft --
A. Uh-huh. (Witness answers affirmatively.)
Q. -- let me direct your attention to Page 2-8. At

212

the bottom there's a section that's titled "Federal Storage to Meet Waste Acceptance Commitments."
A. Uh-huh. (Witness answers affirmatively.)
Q. It says, "In order to begin accepting waste in January 1998, the Department is considering methods whereby delays in the completion of the repositories can be accommodated." And that gives a for-instance. "The Department may provide Federal at-reactor storage to maintain the Waste Acceptance Schedule in the event of a delay in the repository schedule that does not threaten successful completion of the repository."
The term Waste Acceptance Schedule is -- is capitalized. Do you have any recollection of what's being referred to as the Waste Acceptance Schedule?
A. On Page 2.1 it says, "Based on the approach described previously, the Department has prepared a Waste Acceptance Schedule which specifies, in the aggregate, the quantities of commercial nuclear wastes that the Department will accept beginning in 1988. This schedule is presented in Table 2-1 on Page 2.2." So I'm assuming it's referring to that.

213

Q. Do you recall if in fact there was supposed to be -- that one is referring to the other or is that what you're gleaning from the document?
MS. HERRMANN: Objection. The document speaks for itself.
THE WITNESS: It appears fairly obvious to me that that's what it refers to.
Q. (By Mr. Shapiro) Mr. Lawrence, I'll represent to you that the -- the final Mission Plan, at least the one that came out in June of '85, refers to two scenarios, the -- the authorized plan and the improved performance plan.
When you were at RW, do you recall any discussion of two such plans?
MS. HERRMANN: Objection. Foundation. Vague.
THE WITNESS: No, I don't recall dual plans. To the best of my recollection, we only had one plan.
(Exhibit No. 16 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, I've handed to you what's been marked as Lawrence Exhibit 16, which I believe is a AP wire of a story. And at the

214

bottom it refers to -- to you, Michael Lawrence, Rusche's predecessor, had resisted pressure from Senator Johnston and the utility industry to proceed simultaneously with both an underground dump and an above-ground facility capable of storing the wastes for 50 to 100 years.
Do you recall having pressure from Senator Johnston or others about pursuing both the repository and some other facility to store waste?
A. Yes.
Q. What was Senator Johnston urging you to do?
A. Simultaneously provide a monitored storage facility and a repository.
Q. Were you resisting that suggestion?
A. I didn't have the authority to do that. The Act didn't provide -- it said you could study it, but you had to get Congressional approval to do it. You could not commit to do it without Congressional approval. And there was strong opposition by environmental groups and actually some nuclear people who felt that if you really went for the interim, you'd never get to the geologic repository.
So there were a number of people who opposed the idea of doing both.

215

Q. Were you studying the idea with an intent of making a proposal to Congress to actually authorize this repository -- monitored retrievable storage facility?
A. We were planning on submitting a proposal to Congress to develop a monitored retrievable storage facility as an available option to geologic repository should it be needed. My personal opinion was I was a proponent and a believer that MRS capability was a practical thing to do. But I also recognized, from all my experience leading up to this particular point in time, that there was also opposition to it, as well. And without the legal authority and the -- and the approval of Congress to do it, I wasn't in any position to commit to it.
Q. Why do you say it was a practical thing to do, the MRS?
A. To accommodate any unforeseen delays in the repository; to accommodate any, perhaps, problems you would find once you had started operating the repository. If you had to shut down for a while, if your shaft was somehow not working properly, it -- it was a form of buffer storage which would allow the system to continue to operate. You had

216

lag capacity.
Q. The first, there was reasons to accommodate unforeseen delays in the repository, is part of that idea to enable the Department to -- to meet its obligations to start taking spent fuel from utilities in 1998, even if a repository is available?
A. Would you repeat the question.
Q. You referred to unforeseen delays in the repository as one justification for -- for having monitored retrievable storage. Was it the desire to be able to accommodate unforeseen delays in the repository in part based upon the need for DOE to be able to meet its obligation to start accepting spent fuel from utilities in 1998?
A. That's correct.
Q. You said a couple of times that DOE couldn't commit to preparing an MRS because it didn't have Congressional authorization to -- to actually build an MRS. Do you contrast that with a repository? Did you have Congressional authorization to build a repository?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I think the Nuclear Waste

217

Policy Act of 1982 charges the Department with the selection of a site and design/construction licensing and operation of a facility for the permanent disposal, a geologic facility for permanent disposal. So that's the obligation.
Q. (By Mr. Shapiro) But even with the repository, you needed Congressional authorizations every year to -- to keep studying and -- and developing it, and you had to -- you needed Presidential approval, you needed to be able to override a state veto?
A. There were a number of other obligations, but the basic undertaking was -- was approved by Congress.
Q. As opposed to the MRS, that even the basic undertaking was not yet approved?
A. The Department never received the authority to build an MRS, to the best of my knowledge.
(Exhibit No. 17 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed a document that we've called Lawrence Exhibit No. 17. It's from July of 1984. It's titled "Nuclear Waste Fund Fee Adequacy: An Assessment." It says it's a second annual report.

218

Do you recall this document?
A. No. I'd left the program at this point in time.
Q. It says it's the second annual report. Do you recall the first of these annual reports?
A. My thought was that it was the same as this Rosselli report that you showed me earlier, but it's not clear that's the case.
Q. I know you said that you left the month before. Perhaps the work on this started when you were at -- still at RW. But you don't recall any work on -- on this fee adequacy report?
MS. HERRMANN: Objection. Speculation. Compound.
THE WITNESS: It is the same report. This the first one right here, document 19.
I'm sorry, what was the question again?
Q. (By Mr. Shapiro) The report that -- that -- the July '84 report came -- came out the month after you left RW?
A. Uh-huh. (Witness answers affirmatively.)
Q. But knowing the documents don't come out in a couple of days, I was asking if you recall any work on this report before you left RW.
A. No, I don't recall any specific work on this report, although I recall that we were continually

219

collecting cost estimates and revenue projections. And since the conclusion is the one mill remained adequate, there would have been no -- you know, this would have been pretty much status quo.
Q. Let me point your attention to Page 3 of -- of the July '84 report. Again, there's some -- there are some assumptions listed in the middle of the page. One of those is repository receipt rates. And it -- it maintains the -- the same rates that -- that were noted in the earlier report, 1,800 MTU for the first five years and then 3,000 MTU yearly thereafter.
A. Uh-huh. (Witness answers affirmatively.)
Q. These rates you observed considerably fast or at least in the first four years than those in the April '84 draft of the mission plan. Do you have any recollection as to why subsequent to the April '84 draft, RW would still have been using these faster rates for the fee adequacy report?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: This is a financial analysis, not a planning document for -- for receipt and handling. Consequently, it looks to me as if at least in that -- in that regard to

220

receipt rates, the same assumption is used on the previous report were used here, and maybe for consistency sake or ease of calculation, it was done that way. I -- I don't know otherwise.
I would -- I would add, that things like the fee adequacy report would -- its specific purpose was to see if the fee was sufficient and whether or not the utilities would need to change their 1.0 mill per kilowatt hour. Anything in the assumptions would not -- we wouldn't -- we wouldn't have felt that anything in the assumptions would have changed the either contractual requirements or commitments or operational plans. This is just for illustrative purposes for the fee.
Q. (By Mr. Shapiro) Do you have any sense as to how the repository receipt rates received in any DOE facility, how those receipt rates would impact the fee adequacy analysis?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: That would require sensitivity analysis, which I'm not aware of.
MR. SHAPIRO: Let me take a quick break and I might be at the end of my questioning. Only

221

three more people to go.
(Recess 5:36 - 5:50 p.m.)

EXAMINATION (Continuing)
BY MR. SHAPIRO:
Q. Mr. Lawrence, I just have a couple more questions for you, really, about your transition out of radioactive waste management.
Do you recall the time when you left RW, June of '84, did you have any particular transition out of that office?
A. We had a party at O'Donnell's in Bethesda.
Q. Besides the party in Bethesda, was -- were there briefing books prepared for your successor?
A. I don't recall a briefing book.
Q. Was anything done to effect the transition to the next director?
A. There were -- there were meetings and discussions.
Q. Was the next director Mr. Rusche?
A. Yes.
Q. He in fact was the first Presidentially appointed director?
A. Right.
Q. What sorts of discussions did you have -- did you have with Mr. Rusche?

222

A. You know, basically the Mission Plan. The Mission Plan served as a very good transition document because the Draft Mission Plan, which was issued there in late April early May, laid out our thinking. And so he was able to review that and see what we had in store and in mind.
Q. Did you discuss with Mr. Rusche at all the contract that -- that RW had with the utilities?
A. I don't recall.
Q. Did you discuss with Mr. Rusche the acceptance rate issue of utilities' desire that -- that DOE establish a firmer schedule for accepting spent fuel?
A. I don't recall.
Q. Did you discuss your understanding of RW's legal obligations with Mr. Rusche?
A. I don't recall specifically, but I would assume I did. I know his statements in this press release here were consistent with my understanding regarding a commitment to begin accepting waste in '98.
Q. Do you recall discussing with Mr. Rusche any further obligation to -- to accept any particular quantity of spent fuel beginning in 1998?
A. No, I don't -- I have no recollection of that.

223

Q. After you left RW, did Mr. Rusche or others ever contact you for clarification or input on any issues that they were facing?
A. No, I don't believe they did.
MR. SHAPIRO: That's all I have.
(Signature reserved.)
(Deposition adjourned at 5:54 p.m.)

224

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
et al., )
)
Plaintiffs, )
vs. ) No. 98-126C
UNITED STATES, )
Defendant. )

DEPOSITION OF MICHAEL J. LAWRENCE, VOLUME II

May 21, 2002
Richland, Washington

227

APPEARANCES

For the Plaintiffs Yankee Atomic Electric, Connecticut Yankee Atomic Power Company Maine Yankee Atomic Power Company:

Robert L. Shapiro
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5879
(202) 682-1639 Fax

For the Defendant:

Heide L. Herrmann
R. Alan Miller
United States
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0290
(202) 514-8624 Fax

228

APPEARANCES

For the Plaintiff Sacramento Municipal Utility District:

Timothy R. Macdonald
Arnold & Porter
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2334
(303) 832-0428 Fax

For the Plaintiff Commonwealth Edison Company:

Christopher P. Tompkins
Jenner & Block
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350
(312) 840-8786 Fax

229

APPEARANCES

For the Plaintiffs Boston Edison Company, Duke Power, Florida Light & Power, GPU Nuclear, Indiana Michigan Power Company, Northern States Power Company, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District, PSEG Nuclear, LLC:

Daniel S. Herzfeld
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7612
(703) 770-7901 Fax

230

EXAMINATION INDEX

| EXAMINATION BY: | PAGE NO. |
|---|---|
| Mr. Macdonald | 7 |
| Mr. Tompkins | 79 |
| Mr. Herzfeld | 123 |

EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 18 | 10-page letter to Robert Morgan from Alabama Power dated March 4, 1983 HQR-052-0272 - HQR-052-0280. | 22 |
| 19 | 6-page Memorandum to Michael J. Lawrence MOV.19990831.0061. | 35 |
| 20 | 37-page Memorandum to various from Michael J. Lawrence dated March 28, 1984 MOV.19990831.0022. | 62 |



EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 21 | 7-page Mission Plan for the Civilian Radioactive Waste Management Program Volume II of II Volumes dated April 1984 (No Bates number.) | 67 |
| 22 | 25-page letter to Ben C. Rusche from Michael J. Lawrence dated July 23, 1984 (No Bates number.) | 98 |
| 23 | 8-page handwritten notes titled: Nuclear Waste Acceptance Schedule Alternatives mov.19990831.0058. | 120 |



BE IT REMEMBERED that on Tuesday, May 21, 2002, at 1550 George Washington Way, Richland, Washington, at 9:36 a.m., before SHAUNA L. BEACH, CCR, RMR, CRR, Notary Public in and for the State of Washington, appeared MICHAEL J. LAWRENCE, the witness herein;

WHEREUPON, the following proceedings were had, to wit:

<<<<<< >>>>>>

MICHAEL J. LAWRENCE, having been previously sworn by the Notary, deposed and testified as follows:

EXAMINATION

BY MR. MACDONALD:

Q. Good morning, Mr. Lawrence.
A. Good morning.
Q. We met yesterday off the record. But, for the record, I'm Tim Macdonald. I represent Sacramento Municipal Utility District, otherwise known as SMUD. You won't be offended if I refer to them as SMUD?
The same ground rules that Mr. Shapiro went



over yesterday apply to me as well. If you don't understand a question that I ask, please stop me and I will try to clarify my question or make it so that we are on the same page. Okay?
A. Right.
Q. Yesterday I think you mentioned that you did not recall whether you had been deposed before. Is that right?
A. Yeah, I don't think I have, but somewhere back in the old brain cells, I -- I may have been, but I -- but it made no impression on me.
Q. Not recently?
A. Certainly not recently.
Q. And I think you also testified that you hadn't discussed this deposition with anyone, other than counsel for the government. Is that correct?
A. Yes, although the fact that a lawsuit was pending and we would probably be called was something which Bob Morgan, Bob Rosselli, and I, because we're friends also, we were aware of. But we did not discuss of the substance of the case.
Q. Do you have reason to talk with Mr. Morgan or Mr. Rosselli generally?
A. Not really Mr. Morgan, because he lives some distance away. Mr. Rosselli and I both reside in

flexibility was and should have been provided for in the government's assigning of priorities because of a number of circumstances that might require you to give a high priority to a transfer.
Q. And a reactor -- the example you just gave of a reactor having a leak in its spent fuel pool, that could -- or would fall under a sort of emergency situation?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I -- I would not necessarily believe that would have to be an emergency situation.
Q. (By Mr. Macdonald) You recall yesterday you discussed with Mr. Shapiro a clause in the contract providing that DOE could give priority for emergencies and that emergency provision is not defined in the standard contract?
A. I recall that discussion.
Q. If a reactor had a leak in its spent fuel pool, under what provision other than the emergency provision would they be entitled to priority?
MS. HERRMANN: Objection. Speculation. Calls for a legal conclusion. Standard contract is the best evidence of its contents.



THE WITNESS: I don't recall the specific provisions of this contract, but what I was indicating would be my belief that flexibility should be established to allow the government to make decisions such as that. But the contract speaks for itself.
Q. (By Mr. Macdonald) If you'd turn to Page 16593 of Exhibit 7 --
A. (Witness complies.)
Q. -- and look at the first column, the first full paragraph. States that "Article VI.B.3(b) gives priority to SNF/HLW from permanently shutdown reactors, and four commenters recommended that this provision be deleted. This type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity. Therefore, we have not accepted the recommendation."
Do you see where I'm reading?
A. Yes.
Q. Do you recall, generally, that certain utilities recommended deleting the provision for priority for shut-down reactors?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: No, I don't recall that.



Q. (By Mr. Macdonald) Do you recall DOE reaching the conclusion that a priority for shut-down reactors is necessary to prevent reactors waiting 20 to 30 years to be decommissioned after they've finished generating electricity --
MS. HERRMANN: Objection. Foundation.
Q. (By Mr. Macdonald) -- as stated in the final published version of the standard contract, Exhibit 7?
A. I recall that it was an issue that we wanted to acknowledge, and as stated in the contract that some -- some priority be given to them so that they wouldn't have to wait for an extended period of time before they would ship.
Q. And it was DOE's intent that they not be forced to wait for an extended period of time before they should ship?
MS. HERRMANN: Objection. Foundation. Calls for a legal conclusion.
THE WITNESS: I would say that the contract -- you know, what it says here -- is fairly clear. It doesn't say they'd be the first, second, or third, but it says there would be consideration.
I also would point out that it -- clearly



this is something that can only occur once the repository is in operation, not prior to.
Q. (By Mr. Macdonald) And explain that for me.
A. My understanding is that we would not be able to start receiving wastes or accepting it until certain events had occurred. And it was clear that even if the repository weren't finished, it had been -- its construction license has been granted, that its construction had started, that there was a relatively well-defined end date. And so consequently, you could begin the movement of fuel, but -- but that its -- it wasn't for indefinite interim storage. It would be for eventual, in not too indefinite period of time, permanent disposal in a repository.
Q. So I understand your last answer, you stated that it was clear that even if the repository weren't finished, it had been -- its construction license has been granted, that its construction had started, that there's a relatively well-defined end date, and so consequently you could begin the movement of fuel. What did you mean by that?
MS. HERRMANN: Objection. Compound.
THE WITNESS: When the Nuclear Waste Policy Act was being debated in Congress and while

we were working to implement it, we received comments from a number of organizations concerning its implementation or had discussions with people concerning that. And it was clear that a number of organizations, particularly environmental organizations, had objections to monitored retrievable storage or shipment to a repository before it was clear that that was going to be an acceptable permanent disposal site.

That is why the Mission Plans that we looked at -- and the law itself says we should study an MRS, but we -- and make recommendations concerning it, but we did not have the authority to do it. It was because of these objections.

So my comment on the last answer reflected the fact that in deference to those concerns, shipments not be allowed or not be provided for until it was clear that the facility for permanent disposal was in fact going to be approved and operational such that there wouldn't be just temporary storage at the site.

Q. The focus of the Nuclear Waste Policy Act was getting a repository up and running?

MS. HERRMANN: Objection. Calls for a legal conclusion.

247

THE WITNESS: I think -- my opinion, it was clear that the primary focus of the Nuclear Waste Policy Act was to provide a permanent disposal of radioactive waste.

Q. (By Mr. Macdonald) And that means a repository, correct?

MS. HERRMANN: Same objection.

THE WITNESS: That's my interpretation.

(Exhibit No. 18 marked for identification.)

Q. (By Mr. Macdonald) Mr. Lawrence, I've had marked as Exhibit 18 a letter to Robert Morgan dated March 4, 1983, from Alabama Power Company. Do you have that document before you?

A. Yes, I do.

Q. I see you're leafing through it, at least briefly. Take as much time as you need. But do you recollect having seen this letter before?

A. No, I don't recollect having seen it before.

Q. I believe you testified yesterday you were aware that utilities had commented on the proposed contract published in the Federal Register on February 4, 1983. Is that correct?

A. That's correct.

248

Q. And you were aware of those comments but weren't sure if you actually reviewed specifically the comments that came in from utilities?

A. I said I couldn't recollect reviewing them. I feel my -- my speculation is that I did look through them, but I can't say that I looked through all or any specific one, since we got comments from a large number of utilities and others. I was, in general, aware of the comments and the general classification of comments and the issues they provided.

Q. Was Bob Rosselli primarily responsible for reviewing comments from utilities on the standard contract?

MS. HERRMANN: Objection. Foundation.

THE WITNESS: His organization was primarily responsible for reviewing those comments, but I can't speculate as to whether he personally went through them.

Q. (By Mr. Macdonald) When you say "his organization," he was the head -- the head of which branch or division of RW at that time?

A. He was associate director of management of the Nuclear Waste Policy Act Office, which subsequently became the Office of Civilian

249

Radioactive Waste Management.

Q. And so it was either Mr. Rosselli or people under Mr. Rosselli you believe would have been responsible for reviewing comments on the standard contract?

MS. HERRMANN: Objection. Foundation. Speculation. Asked and answered.

THE WITNESS: My speculation would be that people under Mr. Rosselli read each and every comment letter and then provided either summary documentation or representations as to what the comments were. I can't -- I have no knowledge of what Mr. Rosselli did or didn't do.

Q. (By Mr. Macdonald) Yesterday you recall you had discussions with Mr. Shapiro about the second "whereas" clause in the standard contract, which states --

A. Where are we?

Q. Lawrence Exhibit 7, Page 16600.

And the second "whereas" clause states, "Whereas, the DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved as expeditiously as practicable upon the request of

250

the generator or owner of such waste or spent nuclear fuel."
Do you see where I'm reading?
A. Yes.
Q. Do you recall having discussions yesterday with Mr. Shapiro about this provision?
A. Yes.
Q. If you would turn to Page 8 of Exhibit 18, the letter from Alabama Power dated March 4, 1983, to Mr. Morgan. Under No. 7, the second sentence reads, "In this regard, we would like to emphasize the importance of the annual receipt rate of the disposal facility being designed, to the extent practicable, to be commensurate with the levels of spent nuclear fuel being generated annually and the need to also reduce the back-log of spent fuel as expeditiously as possible. Consistent with Section 302(a)(5) of the Act, the contract should express the intent of DOE to take title to spent nuclear fuel as expeditiously as practicable upon request of the generator or owner."
Do you see where I'm reading?
A. Yes.
Q. Do you understand -- or do you believe that this comment was adopted by DOE in publishing the final

251

version of the standard contract set forth in Exhibit 7?
MS. HERRMANN: Objection. Foundation. Speculation. Standard contract is the best evidence of its contents and speaks for itself.
THE WITNESS: I'd have to read the contract to find out what the contract says. As I read this comment, however, I can understand why the utility would feel that way. But I also believe -- my belief now and I believe it would have been then, that we would not have been able to accommodate that contract, because it says to take title to the fuel as expeditiously as practicable upon request of the generator or owner. And my belief is that the Nuclear Waste Policy Act, which we were operating to fulfill, said we'd take title to it once we had an operating repository.
Q. (By Mr. Macdonald) If you would look at Exhibit 7, Page 16600, the second "whereas" clause --
A. Uh-huh. (Witness answers affirmatively.)
Q. -- we just looked at, states that DOE has the responsibility to take title to the spent nuclear fuel as expeditiously as practicable upon the request of the generator or owner of such waste or

252

spent nuclear fuel, correct?
A. Uh-huh. (Witness answers affirmatively.)
Q. Is that not the same language set forth in Exhibit 18, as requested by Alabama Power?
MS. HERRMANN: Objection. Both documents are the best evidence of their contents and speak for themselves.
THE WITNESS: No, I don't believe that accurately reflects what's in document 18, because it's -- it's preceded document -- item -- Exhibit 7, says, "following commencement of the operation of a repository to take title to the spent fuel." That provision -- that comment is not included in Alabama's comment.
Q. (By Mr. Macdonald) I believe you testified yesterday that it was DOE's intent, expectation, that a repository be operational by January 31, 1998. Is that correct?
A. That's correct.
Q. And in fact, if you would look at Lawrence Exhibit 2, the February 4, 1983, published version of the draft standard contract, if you will look at second page of Exhibit 2, the third --
A. What page is that?
Q. That's page 5458. I know the print is a little

253

bit hard to read, but if you would look at the third column, about middle of the page, the last paragraph -- the last sentence of the paragraph that begins, "The proposed standard contract would establish." The last sentence of that paragraph states, "the Act directs DOE to begin repository operations no later than January 31, 1998."
A. Uh-huh. (Witness answers affirmatively.)
Q. Do you see where I'm reading?
A. Yes.
Q. Do you agree with that statement that the Act directs DOE to begin repository operations no later than January 31st, 1998?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: That is one of many things that the Act directs the DOE to do, but it also directed it to get approvals and -- and a number of other actions, prior to that occurring, which could make that impossible to do.
Q. (By Mr. Macdonald) I understand it could be impossible --
A. Yeah.
Q. -- for a variety of reasons. But you would --
A. Otherwise, it does direct the Department to do

254

so -- to have a repository in operation by January 31st, 1998.
Q. And based on what we just discussed in Exhibit 7, final version of the standard contract, DOE also obligated itself to take fuel as expeditiously as practicable once that repository was operational, correct?
MS. HERRMANN: Objection. Foundation. Calls for a legal conclusion. The document speaks for itself. Asked and answered.
THE WITNESS: I think the "whereas" clause we're referring to is fairly clear in what it says. Including the phrase "as expeditiously as practicable," which implies a number of considerations.
Q. (By Mr. Macdonald) I appreciate that "as expeditiously as practicable" means -- could mean a variety of things. But you would agree that, as we just discussed in Lawrence Exhibit 2, the Act directed DOE to begin repository operations by January 31st, 1998. And as set forth in Exhibit 7, DOE also is obligated take fuel as expeditiously as practicable once that repository was operating, correct?
MS. HERRMANN: Objection. Calls for a

255

legal conclusion. Now it's compound. Asked and answered.
THE WITNESS: To the extent that you just quoted two statements from two documents that -- they appear to be, you know, what the documents say. But the documents themselves are -- you know, clearly state those positions.
I -- I -- I'm just -- I'm wondering how we go from a draft document to a final document. I would think that the only applicable document is the final, which is Exhibit 7.
Q. (By Mr. Macdonald) What do you understand "as expeditiously as practicable" to mean?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
THE WITNESS: That the Department would not unduly restrict or delay receipt and transfer of fuel; that it would -- if it had the ability to do so, it would begin accepting waste according to the priorities and the -- the acceptance criteria that was to be laid out, and would do so once it knew just what its capabilities, in terms of receipt, were.
Q. (By Mr. Macdonald) When you say, "it would not unduly delay receipt and transfer of fuel," do you

256

mean -- I guess, what do you mean? Where there would be no technical barriers to the receipt of fuel?
MS. HERRMANN: Objection to the extent it mischaracterizes his testimony.
THE WITNESS: Would you repeat the question.
Q. (By Mr. Macdonald) You testified a minute ago that you understood "as expeditiously as practicable" to mean that the Department would not unduly restrict or delay receipt and transfer of fuel. Do you recall that testimony?
A. Yes.
Q. I'm just trying to understand what you mean by the Department would not unduly restrict or delay receipt and transfer of fuel.
A. As an example, if a fuel shipment was very low on the priority list and there were higher priority shipments out there, that would -- that would classify as higher priority shipments would be out there, but for whatever reason they weren't going to be shipped, then the government would move to -- to -- to go down on the priority list and take fuel earlier.
Q. Was it DOE's intention to accept fuel once the

257

repository was up and running at its design rate?
MS. HERRMANN: Objection. Foundation. Calls for a legal conclusion. Asked and answered.
THE WITNESS: I've already testified that the design rate was something we knew would not be achieved initially and it would take time to get to it. And no matter what the design rate was, it was always our -- our receipt would always be driven by our physical capability to safely receive and -- and process the waste.
Q. (By Mr. Macdonald) I understand you testified about a reasonable ramp-up period that you characterized, if I remember from yesterday, around three to five years. Is that correct?
A. That was -- that was an estimate that we used for planning purposes only. But that was used.
Q. Did you believe that a three- to five-year ramp-up was a reasonable ramp-up period?
MS. HERRMANN: Objection. Foundation. Speculation. Asked and answered repeatedly yesterday.
THE WITNESS: Based upon technical judgment some 15 years ahead of the fact, it appeared at that time a three- to five-year ramp-up was a reasonable amount of -- rate of

258

time.
Q. (By Mr. Macdonald) Did you understand DOE to have an unconditional obligation to begin accepting spent fuel on January 31st, 1998?
MS. HERRMANN: Objection. Calls for a legal conclusion. Vague.
THE WITNESS: As I understand the question, absolutely not.
Q. (By Mr. Macdonald) And why do you say that?
MS. HERRMANN: Same objections.
THE WITNESS: Because I felt the Department could only receive the waste once we had a repository licensed and in operation.
Q. (By Mr. Macdonald) So in your view, until DOE had a repository licensed and in operation, it had no obligation to accept spent fuel?
MS. HERRMANN: Objection. Calls for speculation.
THE WITNESS: It was my belief that the contract which we signed did commit the government to begin accepting title to the fuel and take responsibility -- begin taking title to the fuel by January 31st, 1998. But we did not know then at what rate that could be or what that would ultimately entail.

259

Q. (By Mr. Macdonald) When you say "begin accepting title to the fuel," are you positing that that would have been done possibly at the reactor site?
MS. HERRMANN: Objection. Speculation. Asked and answered yesterday.
THE WITNESS: That was a possibility.
Q. (By Mr. Macdonald) And you felt that was a possibility consistent with the Nuclear Waste Policy Act and the standard contract?
MS. HERRMANN: Same objections. And now it calls for a legal conclusion.
THE WITNESS: I would have to state I believe the contract has to speak for itself. My personal views and opinion don't alter anything in the contract. I did believe then and now that when we entered into these contracts, we were committing to have a capability or take responsibility by '98. But I also was concerned then, as I am now, that we could not and did not make any commitment as to the rate at which we would be able to begin taking responsibility and ownership of the fuel.
Q. (By Mr. Macdonald) I'm not sure that answers exactly the question I asked. And I'll rephrase it because I'm not sure you liked the question,

260

but I'll --
With respect to the standard contract, did you believe that taking title of the spent fuel at the reactor site was consistent with the Nuclear Waste Policy Act?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: No, I don't believe that was consistent with the intent of the Nuclear Waste Policy Act. The intent of the Nuclear Waste Policy Act, in my opinion, was for us to have a repository in operation by January 31st, 1998. And all of the other provisions of the Act and subsequently the contract were based upon that premise.
MR. MACDONALD: Take a five-minute break?
MS. HERRMANN: Sure.
(Recess 10:27 - 10:35 a.m.)
(Exhibit No. 19 marked for identification.)

EXAMINATION (Continuing)
BY MR. MACDONALD:
Q. Mr. Lawrence, I've had marked for identification

261

as Exhibit 19 a draft memorandum to Michael J. Lawrence and it is from Robert M. Rosselli, and the subject is "Use of Reference Case Assumptions as the Technical/Costing Baseline for OCRWM's Program." Is that document before you?
A. Yes.
Q. I appreciate that this is a draft document. And if you turn to Page 4, 5, and 6 you'll see some handwritten notations. And at the top it states, "Rosselli Comments, Version 2 of 24 February '84." And in parentheses, "(Editorially revised by Head)."
Do you see that --
A. Uh-huh. (Witness answers affirmatively.)
Q. -- notation?
A. Uh-huh. (Witness answers affirmatively.)
Q. Do you know if those are Robert Rosselli's handwritten comments?
A. Umm, I can't -- I can't say whether those are Bob's or not. I get the impression they're Charlie Head's, but that would just be a guess on my part.
Q. What gives you that impression?
A. Well, for one thing it says, "Editorially revised by Head." And I am going to speculate that

262

Q. And if would you look at the language on Page 9.6 of Exhibit 21, it uses the word "will" and states that "additional storage capacity needed to accommodate the delay in schedule will be provided by the Department."
A. Uh-huh. (Witness answers affirmatively.)
Q. Correct?
A. Uh-huh. (Witness answers affirmatively.)
Q. Does that eliminate the ambiguity that you believed existed in -- look at it on Page 2-1 of Exhibit 15.
A. No, it -- it most certainly wouldn't reduce or -- or eliminate the ambiguity. I would say -- where was it in the first one?
Q. It was on Page 2-1 of Exhibit 15, the last sentence of the first full paragraph.
A. Yeah. Yeah. In fact, I would in general believe that a statement that appears in Volume I, Page 2.1, in the first paragraph of Program Strategy, would probably have gotten more attention than the last sentence on -- in Section 9.4 of Volume II. And one possibility would be -- didn't catch -- if in fact it was intentional.
As I've previously testified, it's a Draft Mission Plan. It states what our -- what we would

299

like to be able to do; what our assumptions were in doing it. And then it would go after public comment.
And perhaps, you know, clearly from my recollection, what is stated there is something which I personally would have liked to have been able to provide, and I think many of the people implementing the program would have liked to have been able to provide. But also, as testified yesterday and discussed today, the Nuclear Policy Act was a balance and there were people for things and against things and things in there and not in there.
And so it only said what we'd like to be able to do, but it just by saying it didn't give us the authority or the ability to do it.
Q. If --
A. Is that clear?
Q. I'm not sure. If -- if you had read the last sentence on Page 9-6 of Exhibit 21 in 1984 --
A. Uh-huh. (Witness answers affirmatively.)
Q. -- would you have approved of that statement and let it stay in this Draft Mission Plan that you published publicly?
A. You're asking me to look in hindsight -- comment

300

today in hindsight on something that is -- that is very difficult. You know, I -- I don't know if I physically and actually read that sentence or not, or if I would have changed it then or not. I can't say that.
Q. You can't say either way?
A. I can't say either way.
Q. You may have left it in; you may have taken it out?
MS. HERRMANN: Speculation.
Q. (By Mr. Macdonald) The court reporter can't get a nod. Was that a "yes"?
A. I cannot say what I would have done back then.
MR. MACDONALD: Take a five-minute break?
(Recess 11:56 - 12:08 p.m.)

EXAMINATION (Continuing)
BY MR. MACDONALD:
Q. Mr. Lawrence, if you would take out Exhibit 13 for me, which is your statement dated February 22nd, 1984, before the Subcommittee to Energy Conservation and Power.
A. (Witness complies.)
Q. If you would turn to Page 2, which is Bates Page

301

228.
A. (Witness complies.)
Q. And I know you discussed this with Mr. Shapiro briefly yesterday, but I just wanted to direct your attention to the statement in the middle of the page, "These activities are fashioned on the fundamental objective of the Nuclear Waste Policy Act of 1982."
A. Uh-huh. (Witness answers affirmatively.)
Q. Do you see where I'm reading?
A. Uh-huh. (Witness answers affirmatively.)
Q. Do you know where you would have taken this fundamental objective of the NWPA from?
A. Well, the quote is from the Nuclear Waste Policy Act.
Q. And that quote is "to accept high-level radioactive waste for safe management, storage and permanent disposal on a firm schedule beginning not later than January 31st, 1998."
A. That's were the quote is taken from. I'm sure there is context around that quote about having a geologic repository licensed and constructed and in operation.
Q. But you believed this was the fundamental objective of the NWPA, as demonstrated by your

302

testimony to the House Committee, in Exhibit 13, correct?
MS. HERRMANN: Calls for a legal conclusion.
THE WITNESS: A fundamental -- the term "fundamental objective" represents my judgment at that point in time, my opinion. It doesn't necessarily mean it was the fundamental objective.
Q. (By Mr. Macdonald) In your view, it was the objective?
A. Yes. But in the context that we were requesting an appropriation of a quarter of a billion dollars for a geologic repository, I think that had to be factored -- that was pretty big objective, as well.
Q. Having the repository was a pretty big objective?
A. Having a repository was the primary means of which that objective could be met.
Q. Your statement goes on to say that "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31st, 1998."
Do you see where I'm reading?

303

A. I see that.
Q. Did you anticipate that DOE would meet the fundamental objective of the NWPA?
MS. HERRMANN: Objection. Speculation. Calls for a legal conclusion. Asked and answered. Mischaracterization.
THE WITNESS: It was our goal to have a repository selected, constructed, licensed and in operation by January 31, 1998. That was our objective. That was our goal.
Was I certain it was going to happen? No.
Q. (By Mr. Macdonald) Did you believe that DOE would meet this fundamental objective of the NWPA, when you were acting director in 1984?
MS. HERRMANN: Same objection. Asked and answered like 18 times yesterday.
THE WITNESS: I believed that we could meet that objective.
Q. (By Mr. Macdonald) And if you met that objective, it would preclude the need for additional at-reactor storage, correct?
A. If we achieved that objective, and the ramp-up and acceptance rates were as anticipated and the -- and the spent fuel storage arising at the utilities were as projected, it would preclude the

304

need for additional storage capacity.
Q. Additional storage capacity after January 31st, 1998?
A. That's correct.
MR. MACDONALD: I think for now I am done with my questions. Like we have in the other depositions, I will reserve my right to reopen the deposition pending document issues and motions to compel and the like.
MS. HERRMANN: We continue to oppose your reservation.
MR. MACDONALD: Off the record.
(Recess 12:14 - 1:45 p.m.)

EXAMINATION
BY MR. TOMPKINS:
Q. Mr. Lawrence, my name is Chris Tompkins. I'm from the law firm of Jenner & Block.
Before I start, I just want to make sure we have the ground rules straight. The same rules that Tim and Robert Shapiro before me laid down still apply. If you don't understand my question, please let me know. If you want to clarify any answers, please let me know.
My first question is back in this 1983/1984

305

time period, when RW was putting together the standard contracts, did RW foresee that if it did not make the 1998 date and could not begin acceptance of spent fuel, that utilities would have expenses related to storing spent fuel and would have to build additional storage after 1998?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: Yes, it was anticipated that over time, that additional storage and expenses would be incurred by the utilities.
Q. (By Mr. Tompkins) And was it also anticipated that over a period of years, this may eventually result in problems for operating reactors in maintaining fuel pools and maintaining operations?
MS. HERRMANN: Same objections.
THE WITNESS: Yes, I think that was a natural consequence of -- of no -- no place to send the fuel.
Q. (By Mr. Tompkins) Okay. And further, depending on the length of the -- of the delay, was it anticipated that continued storage of spent fuel at reactor sites could eventually result in a delay of decommissioning of reactors, after they had reached the end of their -- their licensed

306

term or their -- or their life operating period?
MS. HERRMANN: Same objections.
THE WITNESS: All of the things you've said are just a natural consequence and progress of having no place to send fuel. Ultimately all of those things occur.
Q. (By Mr. Tompkins) Now, I believe you previously testified this morning and yesterday that with regard to acceptance rates, the Department did not want to make a commitment to any specific rates, at least early in the process, in 1983, 1984. Is that correct?
A. What I believe I said was that we did not have the capability to make any commitment to acceptance rates before we had more information on the design and capabilities of the repository.
Q. But you did testify that you were trying to provide utilities with as much information so that they could plan themselves, as far as how much fuel they were going to have on-site?
A. I believe what I said is we intended to provide them as much information as early as possible. But basically nothing we had in the '83/'84 time frame could provide a reasonable basis for planning. That would all be subsequent to that.

307

Q. Now, a utility who was looking into the future and seeing what their storage needs were, they would need some sort of lead time to be able to plan to add additional storage if it was anticipated that pickup would begin at a lower rate or wouldn't begin at all in 1998?
A. That's correct.
Q. Do you know how long that lead time would be for a utility if they wanted to add additional dry storage on their site, for example?
MS. HERRMANN: Objection. Speculation.
THE WITNESS: It's difficult to say with any accuracy what that would be, because it would require licensing actions and -- and other activities. But this -- in general, we knew we wouldn't be in a position to give them more information until sometime in the '90s, assuming a '98 opening, and that they would have to plan accordingly prior to that time. And even once we did give them that information, they needed to plan accordingly.
Q. (By Mr. Tompkins) So the utility could be in a position where they should plan for additional at-reactor storage that they never build?
A. Yes.

308

Q. Was this ever communicated to the utilities?
A. I don't have a specific recollection, but I know that we felt and I -- and I believe communicated, but I have no specific recollection, that, you know, the utilities were responsible for the fuel up until the time we took title to it and they had to plan accordingly and provide sufficient storage to -- for the continued operation of their reactors.
Q. The utilities and the Department, however, were aware of a date that -- 1998 that was set in the Nuclear Waste Policy Act?
MS. HERRMANN: Objection. Speculation.
THE WITNESS: I assume. We certainly were aware of the date set in the Act, but a date set in the Act did not mean that the physical, you know, repository would in fact be in place by then. That was our intent and that was our plan. Everyone in this business knows that plans can often change.
Q. (By Mr. Tompkins) In that case, what was the intent of putting a date in the statute? I mean, was -- was it your view or the Department that in passing the Nuclear Waste Policy Act in 1982, Congress, at the very least, put the Federal

309

Government in a position where a policy was disposal would begin in 1998?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
THE WITNESS: The date in the Act was clearly a date that Congress wanted the Department of Energy to meet. But the Congress also put a number of provisions and activities and precursor events that had to occur, I assume with full recognition that if those dates weren't met, that it would make it difficult to meet the '98 date. But they were all prerequisites.
Q. (By Mr. Tompkins) I'd like to go back to Lawrence Exhibit 13. Back on Page 2 again, which is Bates No. PNL-173-0228, I believe you previously testified this quote here in the middle of this page was something that came from the Nuclear Waste Policy Act.
A. That's my assumption.
Q. What is your interpretation of what a "firm schedule" means, as -- as it appears in this quote?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
THE WITNESS: I can't say for certain

310

Exhibit 20 for a minute, shifting gears a little bit.
Going back to Page 1-2 of this document, the -- the title across the top is "Program Objectives." I believe you testified earlier that under the original Nuclear Waste Policy Act of 1982, a MRS facility was not authorized and that the Department under -- under that department, while it was to study an MRS, could not actually site and -- and construct an MRS. Is that correct?
A. My recollection was that, although there were certain members of Congress who wanted an MRS, there wasn't sufficient support to have a provision to provide an MRS included in the Act. So instead, the Act I believe required the Department to do a study and submit to them a study for an MRS for whatever purposes. And one such purpose might be for those people who wanted it to try to push it forward.
Q. Under Program Objective 2 here it states, "To submit a proposal to Congress to develop Monitored Retrievable Storage Facilities as an option to geologic repositories in the event that such repositories cannot be sited or licensed."

323

Does this objective infer that an MRS facility was going to be a backup to a repository?
MS. HERRMANN: Objection. Asked and answered.
THE WITNESS: I think that that was at least one of the intents.
Q. (By Mr. Tompkins) So the primary focus of the Act was to dispose of waste in a repository and not an MRS?
MS. HERRMANN: Objection. Asked and answered. Calls for a legal conclusion.
THE WITNESS: I believe that the original intent was repository, yes.
MR. TOMPKINS: I'd like to take a short break. I'm expecting a document and I need to check to see if it's arrived.
(Recess 2:21 - 3:06 p.m.)

EXAMINATION (Continuing)
BY MR. TOMPKINS:
Q. I'd like to apologize for the delay, but technology was conspiring against us in addition to other things.
(Exhibit No. 22 marked for identification.)

324

Q. (By Mr. Tompkins) I'm showing you, Mr. Lawrence, Exhibit No. 22.
Exhibit 22 is a document that we pulled off of RIS-Web. And I was just looking for a Bates number to put in the record; however, it doesn't look like there is one except for the number on the side, which is 90002 and then it's 2008.
Mr. Lawrence, is this a letter that you wrote?
A. (Examination of documents.) Although I don't recall -- recall this specific letter, that is my signature. The letter itself appears to have been written by a person with the initials RDH, and I don't recall who that was.
Q. This letter is dated July 23rd, 1984. Had you moved to Richland by this point?
A. I couldn't recall the exact date, but it's obvious that I was the manager on that date, because I signed it as such.
Q. Okay. Am I correct in interpreting the letter that they're commenting from the Richland office about the Draft Mission Plan that we had looked at previously, dated April 1984?
A. The third page here is entitled "RL Comments on the Draft Mission Plan Dated April 1984." And I

325

assume that reflects the fact that these are RL's comments, or Richland Operations comments. And as stated here -- I guess that's enclosure one.
Q. What role would the Richland Operations Office have had in reviewing the -- the Draft Mission Plan?
A. The Mission Plan called for a process to select a repository site and also to provide for taking both commercial and Defense wastes into the repository. Richland would have had two primary areas of interest.
One, Richland was at that time under consideration for a geologic repository. So it would have been appropriate to comment on the site -- the siting and the site selection process.
Rockwell, who was our contractor at that time, was managing the program at Hanford, looking at the basalt under the Hanford site for a repository.
The other aspect, the second aspect that we would have been interested in, would have been the fact that Pacific Northwest Laboratory was responsible for tracking the spent fuel storage needs of the utilities and so, consequently, they would have -- or could have provided comments.

326

And according to this letter, I assumed they and Rockwell did provide comments on. But NPL would have provided comments on the commercial spent fuel storage needs.
Q. On the first page of this letter, it states, "The most significant comments, some of which are discussed in detail" below "are as follows:" Number one, it states, "It should be noted that to eliminate the need for additional at-reactor storage after January 31, 1998, the initial waste acceptance rate for 1998 should be about 2,800 MTU plus some amount up to 630 MTU, depending upon the extent Federal Interim Storage is utilized."
Do you know if this 2,800 MTU plus some amount is sufficient -- is sufficient to eliminate the need for additional at-reactor storage?
Perhaps more precisely, do you have any reason to doubt the adequacy of this forecast?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: If I -- you know, I signed this letter, so I -- I know no reason why to doubt that estimate.
Q. (By Mr. Tompkins) You said you didn't remember this specific letter. Would you have reviewed

327

this letter, though, before you signed it. I do see that it has your signature on it.
A. I certainly would have read the letter before signing it.
Q. And would you have agreed with its contents before signing it?
A. Based upon my knowledge at that time, I -- I would believe that whatever I put in this letter and signed would reflect my views or what I reasonably expected to be accurate.
Q. Now, this letter is addressed to Mr. Ben Rusche, a director. Was he the director at this point? You had left, obviously, and gone to Richland, but --
A. Yes, we've already established that he was the first director of the Office of Civilian Radioactive Waste Management, who was, you know approved by the Senate.
Q. Comment No. 2, the second sentence states, "If title to the fuel passes to the DOE on January 31, 1998, as implied in the DOE/utility disposal contracts, the financial responsibility for this post-1997 storage could rest with DOE. This cost has not yet been considered in the Nuclear Waste Fund Fee Adequacy Analysis."
Did this comment reflect your viewpoint at

328

this time?
MS. HERRMANN: Objection. Calls for a legal conclusion. Relevance. Speculation.
THE WITNESS: This -- reading this section -- or this comment No. 2, it states an implication, therefore not a -- a specific, but an implied or an implication of the contracts. And points out that these are costs that were not in the nuclear waste fund fee adequacy analysis that we, I think, have here as document, Exhibit 17.
Q. (By Mr. Tompkins) This Statement 2, however, does imply that someone at Richland was concerned that DOE would be responsible for storage after January 31, 1998 -- financially responsible?
MS. HERRMANN: Objection. Speculation. Calls for a legal conclusion.
THE WITNESS: It would indicate to me that someone raised the possibility that if the government was responsible for storage after 1998, that the costs would be significant and that cost had not yet been put into the fee adequacy analysis.
Q. (By Mr. Tompkins) Well, the statement specifically implied in the DOE/utility disposal contracts. That's on the top of Page 2.

329

A. Uh-huh. (Witness answers affirmatively.)
Q. So this is inferring that -- that DOE has responsibility for these costs under the standard contract?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: No, I would not characterize it the way you did.
Q. (By Mr. Tompkins) How would you characterize it?
A. I would say if the DOE were to -- I think it means there's an uncertainty here. Because I cannot -- because I would assume all costs that we knew would be incurred would be put into the fee adequacy report. And so they're drawing attention to the fact that there is uncertainty or could be uncertainty about the costs for this additional storage, and therefore drawing attention to Mr. Rusche, that that is something that should be considered.
I'd go further. That my recollection is that although we knew that a goal -- or we established as a goal for the Department was to preclude the need for building additional at-reactor storage after we began accepting the waste, that was a goal which we couldn't guarantee and could not

330

commit to take the fuel such that that would not occur.
Now, one possible -- and I'm just speculating here -- but one possible explanation is, from the time I left and Mr. Rusche came on board, Mr. Rusche being a -- the -- a full -- fully appointed and approved director of the Office of Civilian Radioactive Waste Management, may have been stating services or capabilities that he now wanted to bring to the program that went beyond what was in our original -- what was in the Mission Plan in April of '84.
And I recall -- I'll call your attention to Exhibit 16, which states, basically he wanted to do something which was further -- or beyond what I was talking about. So consequently, if subsequent to Mr. Rusche being confirmed and coming into position as director, he had contemplated the possibility of the government assuming a contractual responsibility for all fuel and storage post '98, it would seem reasonable to point out what the cost of that assumption or desire could be so that he could factor into -- that into his consideration.
But what it says here doesn't change what's

331

in the Mission Plan, and it certainly doesn't change what's in the contract.
Q. But this statement specifically says, "as implied in the DOE/utility disposal contract." It doesn't -- it doesn't reference any -- any new policy imposed by Mr. Rusche.
MS. HERRMANN: Is that a question?
Q. (By Mr. Tompkins) Does it?
MS. HERRMANN: Objection. Speculation. The document speaks for itself.
THE WITNESS: Well, I -- I -- I'm going to speculate that the use of the word "implied" is clear and that it doesn't say as "stated in the disposal contract" or "as required in the disposal contract." Implied means that it is something not clearly and specifically spelled out.
If I felt it was a contractual obligation, I do not believe I would have used the word "implied."
Q. (By Mr. Tompkins) And yet someone, either the person that wrote this letter for you or you at this time, recognized that that was the implication from the contract, even if it wasn't clearly stated?
MS. HERRMANN: Objection. Calls for a

332

legal conclusion. Speculation.
THE WITNESS: I can't recall what -- what would have been going through my mind at this point in time.
Q. (By Mr. Tompkins) Moving to the first enclosure attachment to this letter, enclosure one, which at the top is titled "RL Comments on Draft Mission Plan."
Could you read, for now, just the -- the paragraph under Item No. 3.
A. (Witness complies.) Okay, I've read 3.
Q. Okay. We had talked briefly -- or actually at some length earlier about the -- the goal of precluding the need for additional at-reactor storage. In this first paragraph under No. 3, the third sentence, I believe, in states that "This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998."
Doesn't this statement imply that it was actually the intent and goal of the NWPA to preclude the need for -- the need for additional at-reactor storage and not just a goal of the Department?
MS. HERRMANN: Objection. Calls for a

333

legal conclusion. Document speaks for itself.
THE WITNESS: I think the statement is rather clear. And I would specifically note the use of the word "intent" rather than "requirement."
Q. (By Mr. Tompkins) Well, certainly in trying to implement the NWPA, DOE was -- and RW was -- was charged with -- was implementing Congress's intent. Is that true?
MS. HERRMANN: Objection. Calls for a legal conclusion. Vague.
THE WITNESS: Clearly we were charged with carrying out the requirements of the law and, to the degree we possibly could, to meet the intent of the law, to the best we could discern it and the best we could do it.
Q. (By Mr. Tompkins) Well, the intent of the law is reflected in the requirements, is it not?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: Yes. And to the best of my knowledge, the Act does not say it is a requirement of this Act that facilities be provided such that no additional storage capacity is necessary. But I don't recall that specially.

334

Q. (By Mr. Tompkins) But this intent, as reflected here in this document, conflicts with the requirements of the Act?
MR. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I would have to reread the Act, but I believe this intent goes beyond the requirement of the Act.
Q. (By Mr. Tompkins) There is no provision in the Act, however, that the intent was not to preclude the additional -- was not to preclude the need for additional at-reactor storage?
MS. HERRMANN: Objection.
THE WITNESS: There are too many negatives in there. Could you repeat the questions?
Q. (By Mr. Tompkins) Sure. I'd be glad to.
There's -- there aren't any provisions in the Act which state that the purpose of the Act is not -- is -- I'm sorry. Yeah.
A. Yeah.
Q. This is getting a little out there.
The Act does not contain any provisions which state that the purpose of the Act is anything other than to preclude the need for additional

335

at-reactor storage?
MS. HERRMANN: Objection. Calls for a legal conclusion. Nuclear Waste Policy Act is the best evidence of its contents.
THE WITNESS: There's still too many negatives in your question for me to understand it. I would maybe try to offer some helpful -- it might be easier to say that there is no provision in the Act requiring the Department to ensure that additional storage space is not required by the utilities after 1998.
Q. (By Mr. Tompkins) Well, there's -- there's nothing in the Act that's -- that states that DOE's mission is anything other than to -- to preclude at-reactor storage?
MS. HERRMANN: Objection. Calls for a legal conclusion. Best evidence.
THE WITNESS: My recollection and understanding was that Congress in passing the Act wanted to ensure a system was in place to safely dispose of nuclear waste by 1998. It was also my understanding that many of these supporters of the Act felt that a benefit of doing so would be to preclude the need for additional and costly at-reactor storage to be provided. And therefore,

336

by having a repository in place by '98 and to begin accepting waste by '98, it was hoped that additional storage at reactors could be precluded.
In the Mission Plans, both drafts that we've looked -- talked about, it states that the Department sought to provide capability such that additional storage would not have to be provided. All of those, I think, are reflected in writing in the exhibits we've got here.
But having said that, I saw nothing in those documents that said it was a legal requirement of the Act that that be the case.
Q. (By Mr. Tompkins) This statement here, though, does link up that goal with the Act and the purpose of the Act.
A. It links it up with -- via the word "intent," which to me implies that it was something desirable but not a specific requirement.
My belief is I would have used the word "requirement" because it's a much stronger word and -- and something that -- certainly conveys much more of a commitment or an obligation than the word "intent."
Q. This paragraph goes on to discuss the appropriate acceptance rate to achieve that goal.

337

A. Uh-huh. (Witness answers affirmatively.)
Q. Again, it states that the acceptance rate should start at 2800 MTU per year and increase to 2500 MTU per year in six years rather than starting at 400 MTU per year and increasing to 3,000 MTU per year.
A. Uh-huh. (Witness answers affirmatively.)
Q. Are you aware of where these numbers would have been generated or how they would have been calculated?
MS. HERRMANN: Objection. Foundation and speculation.
THE WITNESS: I don't recall specifically, but that is the type of information that we relied upon PNL to provide. And consequently, since the '84 Mission Plan -- Draft Mission Plan had the acceptance rate, which we've previously discussed, at the buildup, this would have been drawing attention to the fact that what was in the Mission Plan, and the stated objectives in the Mission Plan, resulted in an -- in an inconsistency.
Q. (By Mr. Tompkins) It implies that the -- the ramp-up in the Mission Plan, which started at 400 MTUs, was insufficient to preclude more at-reactor

338

storage during the first five years.
MS. HERRMANN: Objection to the characterization of what's written in the document. The document speaks for itself.
THE WITNESS: This statement is commenting on a draft plan and saying that based upon the analysis that was conducted by individuals here, they felt that it was insufficient.
Q. (By Mr. Tompkins) The -- the second paragraph, first sentence, makes a reference to selective acceptance of spent fuel only from reactors having difficulty maintaining a full core reserve.
A. Uh-huh. (Witness answers affirmatively.)
Q. What is full core reserve?
A. Full core reserve is the amount of space that the utility needs available in its spent fuel storage basin to accommodate the capability to discharge all the fuel that is in the core of the reactor at any given time. It is considered a desirable but not essential capability. Its impact, if not available, is that a utility could have a protracted outage if it needed to remove the fuel from its reactor to do any repairs or work necessary. And it was therefore something that

339

many utilities sought to have as somewhat of an insurance policy.
Q. We discussed earlier that RW would be inclined to grant priority to an operating reactor that had some sort of emergency that would preclude it from continuing to operate. Would maintaining full core reserve be this type of emergency that we were speaking about earlier?
MS. HERRMANN: Object to the mischaracterization of prior testimony.
THE WITNESS: No, I would not view that as being an emergency situation.
Having said that, my recollection -- and I'm not certain of this; I -- it's been too long. But I believe there might have been a situation, an isolated situation, or certainly a limited number of situations, where perhaps the -- the operating procedures of a reactor called for full core reserve capability or a requirement of operation costs. But in general, that was not the case, and therefore it would not constitute an emergency.
Q. (By Mr. Tompkins) Moving to the final paragraph. I'll give you a chance to read it first.
A. I have read it.
Q. Okay, you've read it.

340

The second sentence here says, "Assuming DOE would be financially responsible for the additional spent fuel storage after 1997, as reflected in the 17 year excess in the 'remaining backlog' of Table II-1, something on the order of one billion 1983 dollars would be required for this additional interim storage at power reactor."
Do you know if this estimate back in 1983 was accurate?
MS. HERRMANN: Objection. Beyond the scope of this deposition. Objection. Calls for a legal conclusion. Objection. Speculation. Foundation.
THE WITNESS: Based upon the fact that that number is in an enclosure to a document that I signed and sent in, I have no reason to doubt that it was a reasonable estimate based upon the assumptions stated in the paragraph.
Q. (By Mr. Tompkins) Like the text of the letter that we looked at just a little while ago, this comment here also evidences someone's recognition that DOE could be financially responsible for additional storage required after 1997; is that correct?
MS. HERRMANN: Objection. Calls for a

341

legal conclusion. Asked and answered.
THE WITNESS: Could you repeat the question?
Q. (By Mr. Tompkins) This statement evidences that someone at RW, or at the Richland Operations Office, was concerned about the cost of additional at-reactor storage at reactors after 1987, if -- if the '98 date wasn't -- wasn't met, and reflected DOE's potential responsibility for that -- for that amount.
MS. HERRMANN: Same objections and now it's compound.
THE WITNESS: That would not reflect my -- the way I would characterize that. I would -- I would say that this is drawing attention to a potential cost based upon certain assumptions. It is not stating anything in definite or absolute terms whatsoever.
Q. (By Mr. Tompkins) But your interpretation of this comment is reflected in the -- in the cover letter you sent along in -- in Comment No. 2. Again, I don't mean to go back to this again and again, but it says, the fuel passage -- "as implied in the DOE/utility disposal contracts."
MS. HERRMANN: Is that a question?

342

2060

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------------x

CAROLINA POWER & LIGHT COMPANY and :
FLORIDA POWER CORPORATION, :
Plaintiffs, :No. 04-37C
vs. :
THE UNITED STATES, :
Defendant. :

-----------------------------------x

Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.

Friday, November 16, 2007
Volume 9

The parties met, pursuant to the notice of the Judge at 9:32 a.m.

BEFORE THE HONORABLE THOMAS C. WHEELER



APPEARANCES:

ON BEHALF OF PLAINTIFFS:

Arnold Bradley Fagg, ESQUIRE
Paul Bessette, ESQUIRE
Linda Eaton, ESQUIRE
David Kerr, ESQUIRE
Morgan, Lewis & Bockius
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-5191

ON BEHALF OF THE DEFENDANT:

Andrew P. Averbach, ESQUIRE
Christopher J. Carney, ESQUIRE
Marian Sullivan, ESQUIRE
Lisa Donahue, ESQUIRE
U. S. Department of Justice, Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
12th Floor
Washington, D.C. 20530
(202) 353-0527

Index appears at end of transcript



P R O C E E D I N G S

(9:32 a.m.)

THE COURT: We're on the record this morning for day 9 in the trial of Carolina Power. And I think we can have the government call the next witness.

MR. AVERBACH: Good morning, Your Honor, thank you. We have a couple of very small preliminaries.

THE COURT: Sure.

MR. AVERBACH: First, I believe on Wednesday morning, in connection with the 52(c) motion, I had represented to the Court that the PG&E appeal had been scheduled for oral arguments in January. I wanted to correct that statement. I am informed that the scheduling has not been finalized yet. It may well be in January, but that has not been set in stone by the Federal Circuit, and I wanted to make sure the Court was aware of that.

THE COURT: Okay, I appreciate knowing that.

MR. AVERBACH: The second matter is one that Ms. Sullivan would like to address.

THE COURT: All right.



MS. SULLIVAN: Your Honor, just to finish up with the matters with regard to depo designations, I filed last night and this morning two filings. The one last night was a motion for the admission of testimony designations for Loring Mills.

THE COURT: I have that motion.

MS. SULLIVAN: Okay. I was going to provide the Court with copies if you didn't have it. And then this morning, I just filed a very short response to the supplemental designations that Plaintiffs had filed with the responsive motion to strike. I have copies of that and have already provided copies to counsel, if the Court would like those.

THE COURT: Yes, please.

MS. SULLIVAN: And, Your Honor, one matter with regard to the Mills' testimony, as I noted in my motion, there are seven exhibits discussed in Mr. Mills' testimony in Northern States, four of which have already been admitted by the Court. But we would also seek the admission of the three additional exhibits, Defendant's Exhibit 23 and 102, and Plaintiffs' Exhibit 28, based on Mr. Mills' testimony.

THE COURT: Your motion states that the Plaintiff concurs with your motion, is that correct?

MR. FAGG: That's correct, Your Honor. We did not recite any objections to the three additional exhibits, so we'll stand by that.

THE COURT: So for the sake of a complete record, I will admit Defendant's Exhibits 23 and 102, and Plaintiffs' Exhibit 28, and I will accept the designated portions of the Mills' testimony from the Northern States Power Company case.

(Defendant's Exhibit Numbers DX-23 and DX-102 were received in evidence.)

(Plaintiffs' Exhibit Number PX-28 was received in evidence.)

MS. SULLIVAN: Thank you, Your Honor.

MR. FAGG: And one additional, if I may, Your Honor, with a related matter, we talked about the designations of Mr. Rusche a few days ago. And you may recall that the government agreed if we would change the basis of our motion to rule 32 rather than rule 801, they would consent to the designations. And when we raised that, Your Honor said, all



right. And we just wanted to confirm that meant motion made and granted.

THE COURT: Yes, again, for the sake of a clear record, I will grant that deposition designation for Mr. Rusche.

MR. FAGG: Thank you very much, Your Honor.

THE COURT: Yes.

MR. AVERBACH: Your Honor, the government's next witness is Michael Lawrence. And Mr. Lo Re will be conducting the examination.

THE COURT: All right.

Whereupon--

MICHAEL LAWRENCE

a witness, called for examination, having been duly sworn, was examined and testified as follows:

THE COURT: Please be seated.

THE WITNESS: Thank you.

THE COURT: Good morning, Mr. Lo Re.

MR. LO RE: Good morning, Your Honor.

THE COURT: You may proceed.

MR. LO RE: Thank you.

DIRECT EXAMINATION

BY MR. LO RE:



Q. Good morning, Mr. Lawrence.

A. Good morning.

Q. Mr. Lawrence, could you state your full name for the record?

A. Michael J. Lawrence.

Q. And where are you currently employed?

A. I'm employed by Battelle Pacific Northwest National Laboratory in Richland, Washington.

Q. Does your work currently involve work for the Office of Civilian Radioactive Waste Management?

A. No, it does not.

Q. Can you provide the Court with a brief description of your career? Why don't we start with your education after high school, and then career subsequent to your education?

A. I have a degree in physics from the University of Maryland. While at the University of Maryland, I started a career with the Atomic Energy Commission, first, as a summer intern, and then a production engineer in 1969. I continued in working for the Atomic Energy Commission until it became the Energy Research and Development Administration in



1974, and then became the Department of Energy, I believe it was 1977.

During that time, I was responsible for environmental impact statements, isotope development programs, and then eventually programs for the storage and disposal of radioactive waste. In the 1977 timeframe or so, I was responsible for spent fuel storage programs of the Department of Energy. And in the late '70s and early '80s was involved in the geologic repository program.

When the Nuclear Waste Policy Act was passed in 1982, and the Department of Energy set up a Nuclear Waste Policy Act implementation office at the end of January 1983, I was the deputy director of that implementation office. And in January of 1984, I was the acting director of the Office of Civilian Radioactive Waste Management until the summer of that year, at which time Mr. Rusche was confirmed as a political appointee to run that office.

And I was -- I went to Washington State as the Department of Energy's manager of the Richland operation office overseeing the

Hanford site. I did that until 1990, when I resigned from the government. I went into private industry, doing work on cleanup of radioactive sites. But then in 1991, I was appointed, given a limited diplomatic appointment to represent the United States with the International Atomic Energy Agency in Vienna, Austria. And I served in that capacity from 1991 to 1995.

In 1995, I returned to the United States, and I was the president and chief executive officer of a small nuclear instrumentation firm in Los Alamos, New Mexico. And subsequently, was brought -- came back to Washington as the chief operating officer of the parent company, or the company that owned that organization, British Nuclear Fuels, Limited.

In 1999, I went back to Washington State and to the Richland area as the general manager of the waste vitrification plant project, but I resigned from that position in 2000, and subsequently joined Battelle at the Department of Energy's Pacific Northwest National Laboratory.



I've served in nuclear programs there up until around 1984 when I was named deputy laboratory director for campus development responsible for providing new facilities for the laboratory. That position was successfully completed about a year ago, and I am now the manager of nuclear programs at the lab.

Q. Now, I want to go back to your work with the implementation office. What years was that, do you recall?

A. It started in January of 1983, and the implementation office transformed into the Office of Civilian Radioactive Waste Management and I left there, I believe it was July of 1984. It was the summer of 1984, in any event.

Q. And let me just back up, if I may. Before the implementation office, what was the office that you were in?

A. I don't recall the specific name of that organization, but it was responsible for the Department of Energy's programs for establishing geologic repositories for the disposal of nuclear waste, either from utilities in commercial applications and possibly also defense applications.



Q. And in that position, did you work with the development of what became the Nuclear Waste Policy Act?

A. I did not work directly on that. I did not interact with members of Congress or staff, or directly with utilities with the intent of actually putting the Act into place.

Q. Were you aware that the Act was something that was being worked on, on Capitol Hill?

A. Yes, I was.

Q. And what, if anything, was your involvement with that, the development of the Act?

A. Well, in staff meetings and other meetings where the people and the organization will be talking about activities under consideration for the Act, the steps and the processes that the Act would lay out to site a repository. I would certainly offer my views and opinions about what was possible, not possible, what was practical.

The issue, as I see it, was up until the Nuclear Waste Policy Act, the government and the Department of Energy almost had to act



ad hoc in the process of trying to develop and site a nuclear repository, so it could begin accepting waste.

And it was clear that some legislative legal basis and process for doing it and for collecting the money to pay for that needed to be established. And that's what the Nuclear Waste Policy Act was all about. But I was not directly involved in interacting with Congress or congressional staff in its formulation.

Q. Now let's talk about after the time that the Act was passed, which was, I guess, late '82, and then early 1983, at that point, when did you transition into the implementation office? And if you can provide the circumstances under which you transitioned to that new job?

A. I believe the Act passed in December of 1982. I believe it was signed into law by President Reagan in early January of 1983, and that was about at that same time a new Secretary of Energy had been appointed, Donald Paul Hodel.

And Secretary Hodel's -- one of his first activities was implementation of the

Nuclear Waste Policy Act. Even though there was an existing organization at the Department of Energy, up until that time, responsible for geologic repositories and disposal, Secretary Hodel had met and had been quite impressed with the manager of the Savannah River operations office with the Department of Energy, Mr. Bob Morgan. And felt that this important task of implementing the Act, he had confidence that Mr. Morgan would be best suited to implement the Act.

And he asked Mr. Morgan to come to Washington and head up what was then known as the Nuclear Waste Policy Act implementation office. Mr. Morgan, in looking and assembling the people that he would have with him to help do that, looked at the existing organization. And I was the deputy director of that repository program at that time. We knew each other from previous working together, and he called me and asked me to come and be his deputy for the implementation office, as well as head up the activity for interim spent fuel storage in the implementation office. And that all occurred, that actually went into place the



last Monday of January 1983.

Q. Now, upon your arrival in the implementation office, what were your duties?

A. I worked with Mr. Morgan in putting in place all of the activities which the Department had to do to implement the Nuclear Waste Policy Act. And that was in general and more specifically, I had direct responsibility for implementing or putting in place those activities associated with transportation and interim storage of spent fuel.

Q. And did your work involve the review of the Act?

A. Yes, obviously, we had to look and say what were the requirements, what were we required to do in the Act, and what were the steps necessary to make that happen.

Q. Let's take a look at the Act.

MR. LO RE: Your Honor, we have copies of the -- this is the Nuclear Waste Policy Act as written in 1983. Currently, the current version includes amendments. So what I'd like to do is I'm not planning to move this into evidence, but I'd like to pass this out and use it with the witness. I have copies for counsel



and for the Court?

THE COURT: All right.

MR. LO RE: If I may approach, Your Honor?

THE COURT: Yes.

BY MR. LO RE:

Q. Okay. Mr. Lawrence, you have in front of you a document marked Public Law 97-425 and it says January 7th, 1983. Do you see that document?

A. Yes I do.

Q. And are you familiar with it?

A. Yes, I am.

Q. And what is it, sir?

A. It is the Nuclear Waste Policy Act as signed by President Reagan.

Q. And I think we actually have a copy we can put up on the screen.

Let's look at some of the provisions of this Act. I'd like you to turn, if you could, to page 45. No, I'm sorry -- yes, 45. And I'm referring to there are Bates numbers on the lower -- it's landscape, so I guess it's on the lower left hand side.

Do you see those Bates numbers?



A. Yes, I'm there.

Q. And before we talk about that specific provision of the Act, can you tell the Court what you understood the obligations were upon DOE as part of this Act? In other words, what did the Act obligate DOE to do?

A. The Act obligated the Department of Energy to begin the process and accept specified quantities of either spent fuel or nuclear waste for permanent geologic disposal or disposal -- anyway storage, if geologic disposal was not possible.

And that would commence in January of 1998. It provided the steps and activities that would be necessary to lead up to that for planning purposes and for licensing purposes and planning. And it also provided the mechanism whereby rate payers, the beneficiaries of nuclear energy, would pay for those disposal services, so it wouldn't be based upon the taxpayer overall, but by the beneficiaries of nuclear energy.

Q. Now let's look at the section I pointed out earlier, which is section 302, which is under the heading nuclear waste fund?

Q. And were you aware of any political issues surrounding the development of an MRS at this time as of '84?
A. Yes. I think there were feelings that monitored retrievable storage was a potentially acceptable and suitable interim storage, an ability for the government to begin to implement its responsibility to take title and possession of the fuel. But it was not a suitable permanent solution to the disposition of the spent fuel or waste, and that ultimately some other means would be necessary.
MR. LO RE: Thank you, Your Honor, I have no further questions?
THE COURT: All right. Cross-examination.
MR. FAGG: Just a bit, Your Honor.

CROSS-EXAMINATION

BY MR. FAGG:
Q. Good morning, Mr. Lawrence.
A. Good morning.
Q. You and I never met before this morning, correct?
A. Correct.
Q. You had your deposition taken in



connection with spent fuel proceedings in the past, correct?
A. Correct.
Q. And was that on two days back in or around 2002?
A. I believe so.
Q. Did you review those deposition transcripts to prepare for today?
A. I looked through them, but quite frankly, I didn't read them all.
Q. Okay.
MR. FAGG: May I approach, Your Honor?
THE COURT: Yes.
BY MR. FAGG:
Q. Mr. Lawrence, I'm just going to place on the table next to you those deposition transcripts in case we need to refer to them, okay?
A. Yes.
Q. You're represented by the Department of Justice for these purposes?
A. Yes, I am.
Q. Did you confer with the Department of Justice prior to your testimony today?
A. Yes, I did.



Q. Mr. Lawrence, you talked a bit about the standard contract on direct, do you recall that?
A. Yes, I do.
Q. Let's talk about your involvement in the standard contract. You were not all that involved in the establishment of the standard contract, is that a fair statement?
A. That's correct.
Q. And at least back in 2002, when we were five years closer than we are today, you did not recall that the standard contract came from a Federal Register notice, correct?
A. I believe that's the case.
Q. Okay. You don't remember when you first saw the standard contract, correct?
A. I don't recall specifically, no, I knew it would have been in 1983.
Q. At least as of five years ago, you'd never sat down and read the whole thing cover to cover, correct?
A. I had never read it in one sitting, but I was familiar with all of the provisions and aspects.
Q. You did not remember the term annual



capacity report, correct?
A. That is correct, I did not recall that specific term. I did recall that acceptance rate and receipt rates and ability to predict what and when we would take it from the utilities was an important issue.
Q. You don't recall in January of '83, when you got to the office, whether the standard contract was already being developed or not, do you?
A. That's correct, I don't recall that from January of '83.
Q. Negotiation's probably the wrong phrase to use regarding how the standard contract was formed, correct?
A. Yes, negotiations would not have been the proper term. We used to use terms like consultation, concurrence and other things where we would get individual views to try to shape our opinion on those things. But, you know, and in reality, and in reflection since the Nuclear Waste Policy Act was not signed into law until January of 1983, anything that had gone on prior to that time would most likely have been based on assumptions and

speculation, not the Act itself.
Q. Thank you, Mr. Lawrence. You don't recall any discussions with utility representatives about terms of the standard contract, correct?
A. I recall discussions with members of utilities or their representatives about what they would like to see in the Act, and what they'd like to see us provide. But not specifically to the contract, no, I do not.
Q. You don't recall what may or may not have happened between February of 1983 and April of 1983 regarding the contract, correct?
A. Could you rephrase that?
MR. LO RE: Objection. I will withdraw the objection momentarily, Your Honor.
BY MR. FAGG:
Q. I suspect it may have been vague.
You don't recall what may have happened in connection with the development of the standard contract and what became the final standard contract between February and April of 1983, correct?
A. I don't recall specifically and exactly what happened that long ago. I do know



that we had an organization that was working within our organization, also working with the general counsel's office in the Department to come up with the terms and provisions. And I do specifically recall a meeting that I attended, along with Mr. Morgan, where we got comments and talked about the contract, that was held in the Forrestal Auditorium at the Department of Energy.
Quite frankly, I don't know if it was in that timeframe, but I recall that meeting.
Q. Let's just make sure the record is clear. Can I ask you to turn to volume 1 of your deposition, page 104?
MR. LO RE: Your Honor, I would ask at this time for clarification, are we impeaching Mr. Lawrence?
MR. FAGG: Sure. It's impeachment.
THE COURT: Okay. Go ahead.
THE WITNESS: Okay.
BY MR. FAGG:
Q. Do you see page 104, Mr. Lawrence?
A. Yes, I do.
Q. And do you see that you were asked by one of the attorneys conducting that



deposition, which incidentally I wasn't there, correct?
A. That's correct.
Q. We never met. But one of the attorneys asked you, "focusing specifically on the deadline of getting a contract out, do you recall what was being done in this timeframe between publication of the proposed rule in February and let's say April, when the final rule came out?
"Answer: I don't recall what specifically happened, no."
Were you asked that question and did you give that answer?
MR. LO RE: Your Honor, I will object on the grounds that this isn't really proper impeachment of what Mr. Lawrence has said.
THE COURT: Well, I'm going to let it stand. It's not an outrageous contradiction, but for the sake of a clear record, I'll let it stand.
THE WITNESS: In reading this and assuming it's an accurate transcript and I have no reason to doubt that, it is what I said. I would like to elaborate on the fact that I



did -- I did say specifically what happened, I don't recall specifically what happened 20 some odd years ago during a two-month period, but I do have a recollection of processes that were taken in order to develop the contract.
BY MR. FAGG:
Q. Fair enough. Thank you, Mr. Lawrence. But let's talk, and again, recognizing the ravages of time on all of us, but you don't recall any specific discussions or back and forth with utilities regarding acceptance rate or pickup rate; is that correct?
A. No, I don't believe that is correct. I do not recall any one-on-one or individual discussions which I personally had. I do recall general discussions, where the desires of the utilities to be able to have us commit to and accept rates for their planning purposes as early as possible were expressed.
I do recall the general position that they wanted as much specificity and as much commitment as early as possible. And that was entirely reasonable from my perspective of what they wanted, but it was something that I felt we weren't -- or the office was not in a

position to do.
So I recall the tenor and the more general content of discussions, but I do not recall specific discussions with specific individuals.
Q. Do you recall it better today than you did five years ago?
A. Obviously, in thinking about this, looking over both the mission plan and this, yes, it has brought into some sharper focus than when I walked in cold on the deposition in 2002.
Q. Let's go to page 123 of the deposition.
MR. LO RE: Your Honor, again, I would request to know whether this is impeachment or something else?
MR. FAGG: It's impeachment.
THE WITNESS: Yes.
BY MR. FAGG:
Q. And at the very top of that page, Mr. Lawrence, you see you were asked, "do you recall any discussions with utilities, back and forth discussions about that issue?"
And you answered, "no specific



discussions, no." Do you see that testimony?
MR. LO RE: Once again --
THE WITNESS: I see it says no.
MR. LO RE: Once again, Your Honor, I do not believe that this is proper impeachment. This is wholly consistent with what Mr. Lawrence has testified, both on direct and to Mr. Fagg's questions on cross. And I will object, Your Honor.
MR. FAGG: I don't think it's wholly consistent, Your Honor.
THE COURT: I'll let this testimony stand, and you may answer the question.
THE WITNESS: I do note that I said no specific discussions.
BY MR. FAGG:
Q. You don't recall any edits to the final contract whatsoever, correct?
A. I do not recall any specific edits. I know an editing process, based upon comments, was done, but I don't recall the specifics of those edits.
Q. Okay. Do you still have Plaintiffs' Exhibit 8 in front of you, Mr. Lawrence?
A. And what is that?



Q. I think it's the fee document.
A. Yes, I do.
Q. That Mr. Lo Re asked you about. What's the date of that document?
A. June 1983.
Q. And do you know when the standard contracts were signed?
A. I know that they were signed in that timeframe.
Q. The one in front of you, can you look at the date of that one?
A. June 30th, 1983.
Q. This report was before the contracts were signed, correct?
A. I can't say that specifically. June 1983 and 30th of June 1983 are of the same timeframes in these, so I don't know. It was drafted and prepared prior, but I can't say specifically it was issued on, before, or at the same time of the contract.
Q. What's your best judgment, do you think this document came out on or before June 30th?
A. Most likely.
Q. The purpose of the contract was to



carry out the provisions of the Nuclear Waste Policy Act, right, Mr. Lawrence?
A. The commitments of the Department as we knew them, yes.
Q. And at the time of the contract formation, you were not indifferent about issues of causing additional expenditures by rate payers, correct?
A. Can you rephrase that? I'm not sure I understand what you're saying.
Q. Maybe I'll try to say it more clearly, my apologies. At the time the contracts were formed, you were not indifferent to rate payer expenditures, correct?
A. No, we were not indifferent. We needed to spend it, just like taxpayer dollars, in the most efficient way possible.
Q. As you recall it, exchanges, those could be accommodated by the contract as it was ultimately drafted, correct?
A. What do you mean by exchanges?
Q. Exchanges of allocation rights between utilities?
A. That's correct. We felt that -- at the time, that the fuel -- we'd know more about

the specifics of the acceptance rate, that that could cause some problems at utilities whose fuel may not have been oldest, and therefore, higher up in the queue, but had a storage problem. We wanted to leave it up to the utilities to be able to exchange the time at which they could send the fuel to us to alleviate problems for the utilities.

Q. During this time period, putting our heads back in 1983 when you were putting together the standard contracts, it was foreseeable if DOE failed to perform, additional storage and expenses would be incurred by the utilities, correct?

A. That's correct.

Q. Do you recall with Mr. Lo Re on direct, Mr. Lawrence, speaking about the capacity of the system, do you recall those discussions?

A. Yes, I do.

Q. And you recall that you said you would know that capacity by 1987 when you issued the annual capacity report, do you recall that?

A. I don't recall saying we would know with certainty the capacity as of 1987. I



knew -- I did say that we'd be able to state what we anticipated the capacity to be.

Q. And what was the capacity of the system as it was stated by DOE in 1987, do you know that?

MR. LO RE: Objection, no foundation.

THE COURT: He can tell us if he doesn't know. I'll take the answer.

THE WITNESS: What eventually was stated in 1987, I do not recall. I wasn't associated with the program at the time.

BY MR. FAGG:

Q. You had left by that point, correct?

A. That's correct.

Q. And in fact, you weren't around in 1987 when Congress passed the amendments to the Nuclear Waste Policy Act, you were not around in this office, the Office of Civilian Radioactive Waste Management, correct?

A. No, I was not around. However, I was at Hanford, where one of the sites that had been selected for the three repository sites to be investigated was located. And consequently, I was still involved in the sense of the basalt waste isolation project with the program.



Q. And in fact, your recollections about the 1987 amendments was essentially that Hanford was no longer a candidate site, correct?

A. Yes, that was definitely my recollection.

Q. You wouldn't use -- well, let me ask you. Delivery commitment schedules, a term used in the contract, did you have any familiarity with that term?

A. Yes.

Q. You wouldn't call those binding commitments, correct?

MR. LO RE: Objection, Your Honor, outside the scope of direct examination.

MR. FAGG: We looked at all kinds of pieces of the contract, Your Honor. I think it's a fair question.

THE COURT: I don't think he spoke about delivery commitment schedules, so I'll sustain the objection.

BY MR. FAGG:

Q. The primary focus of the Nuclear Waste Policy Act was permanent disposal of nuclear waste, and your interpretation meant that was a



repository and not an MRS, correct?

A. That meant that ultimate disposal in a repository would be necessary and the MRS would only be used if there would be a delay or a problem with having that repository available in the '98 timeframe.

Q. And I think you said it was your intent and expectation at the time you were there that there would be a permanent repository, correct?

A. That was our plan.

Q. And in fact, your belief was that the standard contract clearly did not cover or contemplate interim storage, correct?

A. No, that's not correct. There are two provisions in the Act for possible interim storage. One is -- I believe it's limited to 1800 metric tons, and then the other is that associated with the monitored retrievable storage facility. You know, initially, we did not factor into our base assumptions the interim storage or the MRS, but the possibility that they could be required existed.

Q. Let's go back to your deposition, if we could, Mr. Lawrence. This is impeachment.

And I'm at page 149 and 50. Mr. Lawrence, in your deposition -- are you with me?
A. Yes, I am.
Q. You were asked the question -- I'm about the middle of the page on page 149, "what about the first part of that whereas clause that refers to following commencement of operation of a repository, did you ever view there being a distinction between the rate at which DOE would accept spent fuel before a repository became operational, as opposed to after that time?"
There's an objection.
And you testified, "as I previously indicated, the concept of interim storage prior to repository was something which I had had responsibility for back in the '70s, as well as something which we -- my recollection was we had at least addressed the possibility of that or at least the concept of that in the mission plan.
"These words make it clear that we are not talking about interim storage or taking it before the repository starts, so even though there was a concept that people had discussed



and we knew that, that utilities, some utilities at least would like us to have, this contract clearly did not cover that."
Were you asked that question and did you give that answer?
A. Yes, I did.
Q. And specifically, your recollection is that DOE would not take it at some lower rate at an interim facility, and then as quickly as practicable after a permanent repository became operational, correct?
A. Would you repeat that question?
Q. Let's try to court reporter reading it back, and if you don't understand it, I'll rephrase it.
THE REPORTER: "Question: And specifically, your recollection is that DOE would not take it at some lower rate at an interim facility, and then as quickly as practicable after a permanent repository became operational, correct?"
THE WITNESS: As I understand the question, it has as its foundation that we would begin accepting prior to the repository being available, at some rate, a lower rate.



And that in my -- I think I was stating specifically, I did not recollect or believe we were committing to accept anything before January of 1998.
BY MR. FAGG:
Q. That wasn't quite my question, Mr. Lawrence, so let me try it again.
A. Okay.
Q. At this time, as you understood the contract that you testified about on direct, you did not contemplate DOE initiating acceptance in 1998 at some slow rate, slower than otherwise contemplated, at an interim storage or an MRS, and then only ramping up to a higher rate when a permanent repository became operational, that was not how you thought about it, correct?
MR. LO RE: Objection, vague, objection, mischaracterizes the witness's testimony.
THE COURT: Overruled, I'll take his answer.
THE WITNESS: Since we were not planning, therefore were not anticipating, having interim storage either at a federal



interim storage facility or at an MRS, it's correct to say we were not planning on doing that.
BY MR. FAGG:
Q. Okay. Thank you. And in fact, I think you said on direct, to the extent there was an MRS, the rates you were planning were the same rates that you were planning for a permanent repository, correct?
A. What I said was I would assume they were the same rates. I couldn't see a reason not to have them about the same.
Q. In 1983, you viewed the 1998 date as a realistic date, correct?
A. That's correct.
Q. And as a reasonable date, correct?
A. Although I viewed it as a reasonable date, I also viewed it as a very challenging date.
Q. As of 1983, that date was doable, correct?
A. That date was doable, assuming all of the steps laid out in the Nuclear Waste Policy Act, and the timeframes we assumed for them to take were, in fact, met.

Q. And when you were asked this question before, you didn't provide all of those qualifications, did you, Mr. Lawrence?
A. I don't recall if I did or not, but I'm --
Q. Should we find out? Page 201. Impeachment. You with me, Mr. Lawrence?
A. I am, and I see I said the 1998 date was doable.
Q. And that's all you said, right?
A. That's correct.
MR. LO RE: Well, Your Honor --
THE WITNESS: I'd like to see if I maybe said something later.
MR. LO RE: And while the witness is doing that, I will again put on the record that this is not impeachment. Impeachment is, as the Court said, a contrary statement. The fact that Mr. Lawrence has elaborated on an answer he gave, a one word answer he gave five years ago today in court really is not an inconsistent statement with what he said then.
THE COURT: I'm going to take his testimony and I'll let it stand. I would just note for the record that we're dealing with a



case that unfortunately has relevant events that were some 24, 25 years ago. And certainly the Court will draw no adverse reflection on this witness's credibility just because he may have said things a little bit differently in 2002 than he may have said today.
MR. LO RE: Thank you, Your Honor.
THE COURT: But in the interest of a full record, I think it's useful to have references to testimony that were five years closer in time to the events.
MR. FAGG: Thank you, Your Honor.
THE WITNESS: I now have had a chance to look at my deposition. And on the previous page, page 200, I said, "I previously stated that it required a number of things to occur and the possibility that any or all of those could be delayed would jeopardize the date. So I mean, this is consistent with what I've said."
And so consequently, when I was subsequently asked, is the date doable, when I said the date is doable, I think it has to be viewed in the context of my earlier statement that said a number of things had to occur, and



that there was a possibility that there could be delays.
BY MR. FAGG:
Q. Okay, thank you, Mr. Lawrence. Let's move and talk a little bit about the mission plans that you talked about with Mr. Lo Re on direct. Do you recall that?
A. Yes, I do.
Q. Now, as I understood it, you were involved in Plaintiffs' Exhibit 22, the April 1984 draft of the mission plan, correct?
A. That's correct.
Q. But you were aware that there had been a prior draft which we also looked at, Plaintiffs' Exhibit 17, correct?
A. That's correct.
Q. And before a draft mission plan goes out to Congress or the public or utilities, there's an effort to make sure it's reasonable, realistic, clear, correct?
A. That's correct.
Q. All right. And before it would go out for public review, even in draft form like these documents, it would reflect the Department's views and thoughts, correct?



A. That's correct. I would add that as you worked your way towards a final, those reviews would probably become more in depth and detailed. And that the more preliminary a draft would be, the more clearly you were just -- you were expressing your best intent or your ideas, but you didn't have the value of feed back on them. So they didn't get -- you weren't as -- you were looking to solicit comment. And therefore, you didn't feel it was final, you didn't feel it was a commitment, but you were looking to get a reaction. You certainly meant it to be accurate, and to accurately reflect your plans, but it was not reflecting commitment.
Q. Okay. Thank you. Let's look at the passage that we talked about a bit on direct, or Mr. Lo Re talked about a bit on direct, in Plaintiffs' Exhibit 17. The first and earlier draft, December 1983 mission plan. And Mr. Lo Re asked you about the last two sentences in the first paragraph on what's Bates page 172, do you recall that?
A. The last two sentences in the first paragraph on 172, yes, I do.

Q. Okay. And referring to no additional storage capacity after January 31st, 1998, and then subsequently keeping up with the utility discharge rate, correct?
A. That's correct.
Q. And that was consistent with how DOE was trying to implement the Act at that time, correct?
A. That is consistent with an objective or a goal that the Department had. And my recollection is it was also consistent with what we knew the utilities would like to be the case.
Q. And that goal didn't change in the ensuing four months, did it, from December of '83 -- well, I may not have counted my months right, but from December of '83 to April of '84, that didn't change, did it?
A. I believe it did.
Q. Well, in February of '84 -- let's go to your congressional statement, do you have that in front of you?
A. Yes, I do.
Q. In February of 1984, you told Congress, at page 0228, "by achieving this



fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31st, 1998. And ultimately remove all eligible waste from at-reactor storage." You said that to Congress?
A. That's correct.
Q. And you were truthful when you talked to Congress?
A. Yes, I was.
Q. And no one from the congressional committee you testified said, wait a minute, you're mischaracterizing the fundamental objective of the Nuclear Waste Policy Act, right?
A. I don't recall what their questions or response was to this testimony, specifically.
Q. And more particularly, the exercise Mr. Lo Re went through with you on comparing the 1983 draft and the 1984 draft, in particular, five years ago, you didn't recall any specific changes between those two drafts, correct?
A. I did not recall any specific changes



and did not look at one versus the other to be able to refresh my memory of what changes did occur.
MR. FAGG: If I may approach, Your Honor?
THE COURT: Yes.
BY MR. FAGG:
Q. I'm going to Plaintiffs' Exhibit 15. Mr. Lawrence, I'm handing to you Plaintiffs' Exhibit 15, which is a memorandum regarding the mission plans that you testified about on direct. Do you recall that document?
A. I recall this document in the sense that we were provided with some general assumptions and planning basis that would go into the preparation of the mission plan. Specifically the details of this, I do not recall.
Q. But you're indicated as a recipient of the document, the second?
A. That's correct.
Q. Any reason to believe you did not receive this document?
A. No, I'm certain I did.
Q. We'd offer Plaintiffs' Exhibit 15?



MR. LO RE: No objection.
THE COURT: Plaintiffs' Exhibit 15 is admitted.
(Plaintiffs' Exhibit Number PX-15 was received in evidence.)
BY MR. FAGG:
Q. And just briefly, Mr. Lawrence, if you go to the second page of that document, there's a discussion about waste acceptance schedule. And in the second sort of bullet down, it says, "the central criteria for this schedule is an acceptance rate during the first five years such that no utility would have to build additional storage facilities after 1998. And an acceptance rate after the first five years equivalent to the actual rate of utility discharge of spent fuel each year."
And again, is that consistent with what you understood the central criteria of the schedule to be at the time this memo was written in September of 1983?
A. My recollection then and now is that was an objective or a goal that we wanted to have for the mission plan, and for our ability to implement the Act.

Q. Now, as I understand it, shortly after the issuance of the April 2004 version of this mission plan, you left, I guess in the summer of '84, you left the office, right?
A. That's correct.
Q. And subsequently, you had occasion to comment on or provide comments on that mission plan, didn't you?
A. Yes, I did.
MR. FAGG: May I approach, Your Honor?
THE COURT: Yes.
BY MR. FAGG:
Q. And it's Plaintiffs' Exhibit 26. And could you just identify what I've handed you, Mr. Lawrence, as Plaintiffs' Exhibit 26 for the record?
A. Yes, these are comments provided by the Richland operations office of the Department of Energy back to the Office of Civilian Radioactive Waste Management on the draft mission plan, which was sent out for comment in April of 1984, and the unique situation or somewhat unique situation that I was responding to something which I had issued in a previous position.



Q. That is a unique situation. You weren't very hard on yourself, were you? I'll rephrase.
A. I found some mistakes which was not something -- or not mistakes, but some issues that I needed to point out to Mr. Rusche. But that's not at all surprising in that in the months between the time the draft was issued and the time we gave them our comments, more was learned, as we expected. And we were able to provide more insight as to the impacts of the mission plan.
Q. Let's talk about some of those.
MR. FAGG: We would offer Plaintiffs' Exhibit 26?
MR. LO RE: No objection.
THE COURT: Plaintiffs' Exhibit 26 is admitted.
(Plaintiffs' Exhibit Number PX-26 was received in evidence.)
BY MR. FAGG:
Q. And your signature appears on here in the cover letter, correct?
A. That's correct.
Q. And Mr. Rusche was your successor as



the director of the program, correct?
A. Yes. To be more specific, though, Mr. Rusche was the first political appointee and full nonacting director of the Office of Civilian Radioactive Waste Management.
Q. Mr. Morgan and yourself were acting and not political appointees, and then Rusche was a political appointee?
A. Yeah. Again, to be more specific -- and I'm not certain of this -- but I believe that Mr. Morgan was the director of the Nuclear Waste Policy Act implementation office, but that the law required the Office of Civilian Radioactive Waste Management to be stood up, I believe it was one year after signing of the Act. And that's when I was in place. And so I was the acting director of the Office of Civilian Radioactive Waste Management, as opposed to the implementation office.
Q. And at the time you signed this letter out in July of 1984, you were -- had become manager of the Richland operations office of DOE?
A. That's correct.
Q. And so you were essentially responding



as, what, an interested party on the prior April draft plan? Well, let me ask you, why were you responding?
A. Well, the one very specific reason we were responding is we had a site that was under consideration for a repository.
Q. So --
A. Plus -- plus the Pacific Northwest laboratory, which the Richland operations office was responsible for, was the contractor, the government owned contractor operated laboratory providing support to the Office of Civilian Radioactive Waste Management on spent fuel storage, which would involve both the MRS and the federal interim storage aspects of the program.
Q. Okay. And you have this two page cover letter, and then there's enclosures. I think this version and the only version we have just has enclosure 1, but you're offering this enclosure, you say, "and offer our comments to you in the following enclosures," do you see that?
A. Yes, I do.
Q. And then moving further down in your

letter, you characterize the most significant comments or summarize them, do you see that?
A. Yes, I do.
Q. And you state, "it should be noted that to eliminate the need for additional at-reactor storage after January 31st, 1998, the initial waste acceptance rate for 1998 should be about 2800 MTU, plus some amount up to 630 MTU, depending upon the extent," there's an "of" missing, I think, of federal interim storage -- I'm sorry, you were right, I was wrong -- "depending upon the extent federal interim storage is utilized."
Okay, and you see that comment?
A. Yes, I do.
Q. Okay. So do you recall that you are telling Mr. Rusche, your successor, that at least in the initial years, they need to take more MTUs per year than is reflected in the April schedule we looked at, correct?
A. I wouldn't phrase it that way. I said -- I was just pointing out a consequence of what was the rates that they were using based upon the generation rates of utilities. Whether or not they needed to do it was a



decision of the Office of Civilian Radioactive Waste Management.
Q. And moving over to the additional comments that you were offering to Mr. Rusche on enclosure 1, one set of comments you're offering to Mr. Rusche in paragraph 3, and I'm looking at starting with the second sentence, it says, "based upon our interpretation of the NWPA, the minimum acceptance rate should be based upon the rate at which spent fuel is generated by civilian nuclear power reactors. This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31st, 1998."
That was a comment you were offering to Mr. Rusche, correct?
A. Yes.
Q. And one more passage in this document I'd like to ask you about, if you could turn over to the next page, Mr. Lawrence, comment 4.
Another comment that you're offering to Mr. Rusche regards the one mill per kilowatt hour fees. You recall testifying about those fees on direct, correct?
A. Yes.



Q. And you say here in this document to Mr. Rusche, in the last sentence, "if the present mission plan initial acceptance rate of 400 MTU per year is retained, it is likely that the one mill per kilowatt hour fee will be perceived as too high, in addition to not providing post 1997 storage relief to the utilities as intended by the NWPA, see previous comment."
Again, this is a comment on the April 1984 document that you were offering to your successor, who is the director of the Office of Civilian Radioactive Waste Management, correct, Mr. Lawrence?
A. That's correct.
MR. FAGG: Thank you, I have no further questions, Your Honor.
THE COURT: Any redirect, Mr. Lo Re?
MR. LO RE: Just a bit, Your Honor.

REDIRECT EXAMINATION

BY MR. LO RE:
Q. Mr. Lawrence, Mr. Fagg asked you about interim storage, do you remember that?
A. Yes, I do.
Q. And he showed you a passage from your



deposition?
A. Yes.
MR. LO RE: I'd like to -- Your Honor, I'd like to show the witness another passage from his deposition in response to the testimony that was elicited, for clarity's sake.
MR. FAGG: Again, Your Honor, I think he can ask the question, but I don't think that's a proper use of prior deposition testimony.
THE COURT: Just ask him a question.
MR. LO RE: Sure.
BY MR. LO RE:
Q. Did you consider that you were in any way precluded from using an MRS to begin performance under the Nuclear Waste Policy Act?
A. Yes, I did, because Congress had not authorized an MRS. So we were precluded from doing that. If we wanted to provide an MRS, we would have to ask Congress for the authorization and appropriations to do so.
Q. And did you consider that performance could begin with an MRS, in other words, assuming congressional authorization?

MR. LO RE: Objection, mischaracterizes the testimony, Your Honor, and asked and answered.
THE COURT: Overruled.
THE WITNESS: We certainly desired to fully and completely implement both the letter and the spirit of the law. Sometimes, however, we found that depending upon who you talked to in Congress or the legislative history as you looked at it, there were some conflicts and there were differing goals and objectives. And consequently, when it came to intent or legislative history, those were things that we may not be in a position -- it might be impossible to fully implement them, because they could be contradictory.
BY MR. FAGG:
Q. And maybe -- and I don't mean to belabor this, Mr. Lawrence. And maybe I'm being too general in my questions. Let's go back to what we were just talking about, Plaintiffs' Exhibit 26. Enclosure 1. And there's a statement, I won't characterize it, but there's a statement about the intent of the Nuclear Waste Policy Act. Not an intent, an



interpretation.
A. Interpretation.
Q. Interpretation.
A. Yes.
Q. And on the next page, it says, as -- where is it at. I'm sorry, it's on that page.
Interpretation of the Nuclear Waste Policy Act. And then on the prior page -- I'm sorry, I'm moving too far around in the -- too quickly in the document. Let's focus on that one.
A. Uh-huh.
Q. Based upon our interpretation of the NWPA. Now, let's just focus on this. That was, in fact, your interpretation of the NWPA when you signed this letter out, correct?
A. The words speak for themselves in that it says our interpretation, which means some judgment was brought into this. Otherwise, I believe we would have said the Nuclear Waste Policy Act requires. By saying our interpretation of the Nuclear Waste Policy Act, I think makes it clear that, in my mind, the Nuclear Waste Policy Act was not specific or clear in what they desired, but we had to



interpret that into it.
Q. This was your interpretation, though, right?
A. That's correct.
Q. Okay. And so there might be other interpretations, but this was your interpretation?
A. It was our interpretation that there was an objective in the passage of the Nuclear Waste Policy Act to preclude the need for additional at-reactor storage. Yes.
Q. But that's not what you said here, is it, Mr. Lawrence? You said the interpretation of the NWPA is the minimum acceptance rate should be based upon the rate at which spent fuel is generated, correct?
MR. LO RE: Your Honor, if I may ask that Mr. Lawrence be permitted to finish. I think he was finishing his answer earlier, and was accidentally cut off by counsel.
MR. FAGG: I apologize if I cut you off, Mr. Lawrence.
THE COURT: Did you finish your answer, Mr. Lawrence, previously?
THE WITNESS: That sentence says that



if you interpret a goal of the Nuclear Waste Policy Act to be to preclude -- if you interpret the Nuclear Waste Policy Act's intent or goal or objective, whatever you want to call it, I don't know, but it's not specific in the Act, but to preclude the need for the utilities to continue to add storage space, then a natural consequence of that would be an acceptance rate by the DOE that would be equal to what they were generating.
So we were pointing out a fact that the numbers used in the draft mission plan would not be adequate to achieve that objective.
BY MR. FAGG:
Q. Just -- and I'm not going to belabor this, Mr. Lawrence, but in your prior answer, you said, intent, goal, objective. You didn't tell Mr. Rusche any of that back in 1983, did you? You did not use the word intent, you did not use the word goal, you did not use the word objective, did you?
A. I used the words in 1983 that it was based upon our interpretation of the Nuclear Waste Policy Act.

# MILNER

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

1

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia
Wednesday, May 1, 2002

Deposition of RONALD A. MILNER, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

2

Boulevard, McLean, Virginia 22102-4859, at 9:30 a.m., Wednesday, May 1, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

3

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:

ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:

DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

4

APPEARANCES: (Continued)

On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:

RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of Plaintiff Wisconsin Electric Power Company:

DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:

CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

5

APPEARANCES: (Continued)

On behalf of Plaintiff Yankee Atomic Electric Company:

PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

On behalf of the Defendant:

RUSSELL A. SHULTIS, ESQ.
HEIDE L. HERRMANN, ESQ.
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561

6

C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFFS | DEFENDANT |
|---|---|---|
| RONALD A. MILNER | | |
| By Mr. Tomaszczuk 9 | | |

Afternoon Session -- 81


E X H I B I T S


| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 | 45 |
| 2 | 59 |
| 3 | 61 |
| 4 | 66 |
| 5 | 74 |
| 6 | 83 |
| 7 | 90 |
| 8 | 94 |
| 9 | 100 |
| 10 | 122 |
| 11 | 131 |
| 12 | 133 |
| 13 | 142 |
| 14 | 144 |
| 15 | 152 |
| 16 | 175 |


7


| MILNER EXHIBIT NO. (Continued) | PAGE NO. |
|---|---|
| 17 | 186 |
| 18 | 189 |
| 19 | 194 |
| 20 | 195 |


8

P R O C E E D I N G S
Whereupon,
RONALD A. MILNER,
was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER AND LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INCORPORATED, POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, NEBRASKA PUBLIC POWER DISTRICT:
BY MR. TOMASZCZUK:
Q. Would state your name for the record?
A. Ronald Milner.
Q. And where are you employed, Mr. Milner?
A. U.S. Department of Energy.
Q. Mr. Milner, I'm counsel for various of the utility Plaintiffs who have pending cases at the Court of Federal Claims, and I'm going to

9

ask you some questions about your knowledge concerning issues which underlie those cases.
If at any time you don't understand my question, let me know, and I'll try and rephrase it so that we have a common understanding as to my question and your answer.
A. Okay.
Q. Any time you want to take a break, just say so, and we'll be happy to take a break.
I would prefer that it not be while a question is pending, but after you have answered the question, if you want to break, just speak up, and we'll be happy to accommodate that.
A. Great.
Q. There is a protective order that has been entered in these cases, and have you had occasion to read it?
A. No, I haven't.
Q. Okay. I'm going to hand you a copy and ask you to take a moment and read it. It concerns certain material which has been designated as confidential, and through the course of the examination, I may hand you some documents which fall within the scope of that protective order.

10

I would ask you to take a moment and read the protective order.
It basically requires that you're going to treat that information as confidential and limited to --
A. Okay.
Q. These cases, and matters relating thereto and for no other purpose, but take a moment and read it if you will.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, have you read the order?
A. Yes, I have.
Q. And do you understand it?
A. Yes.
Q. You do you agree to comply with its provisions?
A. Yes.
MR. TOMASZCZUK: All right. Counsel, any objection to proceeding on that basis?
MR. SHULTIS: No.
BY MR. TOMASZCZUK:
Q. Mr. Milner, what is your present position at DOE?
A. My present position is Chief Operating

11

Officer for the Civilian Radioactive Waste Program.
Q. And how long have you held that position?
A. About two and a half years.
Q. And to whom do you report?
A. Lake Barrett, who is the deputy director.
Q. And how many people report to you as the Chief Operating Officer?
A. I guess approximately 150 federal staff.
Q. Are there contractors that report to you also?
A. Not directly, but there are contractors in the organization.
Q. Can you describe for me your duties as the, what I'll refer to as the COO for OCRWM?
A. Okay. Basically it's to manage the operational aspect of the program.
Q. What do you mean by operational aspect?
Can you tell me what you mean by that term?
A. Day-to-day operations of the program,

12

administrative principally.
Q. All right. When you say administrative, do you mean you're primarily involved in personnel matters, or am I misunderstanding what you mean by that term?
A. Personnel matters, contractual matters.
Q. When you say contractual matters, what do you mean by that?
A. Matters relating to our support service contracts, our contract with our M&O.
Q. What is your educational background?
A. I'm a mechanical engineer by education.
Q. Okay. From what institution did you obtain a degree?
A. University of Mississippi.
Q. And that was a Bachelor of Science Degree?
A. A Bachelors and a Masters.
Q. What year did you obtain your Bachelors Degree?
A. 1966.
Q. And in what year did you obtain your Masters Degree?

13

A. 1967.
Q. Do you hold any professional licenses?
A. No, I don't.
Q. Can you trace for me your employment history after you obtained your Masters Degree in 1967?
A. Okay. Following college, I spent eight years as a naval officer.
Following that, I worked as a civilian for two years with the Navy, and then I joined the Department of Energy working first in the Strategic Petroleum Reserve office.
Q. Okay. And what year did you join the Department of Energy?
A. This was 1977.
Q. All right. And that was at the Strategic Petroleum Reserve --
A. Correct.
Q. Operation?
A. Um-hm.
Q. Where physically were you located?
A. In Washington.
Q. How long did you stay in that position?
A. Approximately one year.

14

Q. Okay. And then where did your career take you?
A. Okay. And then I went to work for the Office of Conservation and Renewable Energy within the Department of Energy.
Q. All right. And after that?
A. Okay. And after that, then I joined the Office of Civilian Radioactive Waste Management.
Q. How long were you with the Office of Conservation and Renewable Energy?
A. I guess it was approximately six years.
Q. So roughly 1978 to 1984?
A. Eighty-four, correct.
Q. And then you joined the office that I'll refer to as the OCRWM in or around 1984?
A. Correct.
Q. And have you been with OCRWM without interruption since 1984?
A. Yes.
Q. So you have been in OCRWM by my math roughly 18 years?
A. Roughly 18 years.
Q. I'm sure it's been a thrill a minute!

15

A. It has!
Q. Can you tell me the circumstances that caused you to take a position at OCRWM in 1984?
A. Promotion.
Q. And to what grade level were you promoted?
A. GM-15 at that time.
Q. So you took the job in 1984 and were promoted at that time to a GM-15?
A. Correct.
Q. And what is your current designation or position within the federal personnel system?
A. Currently I'm with the Senior Executive Service.
Q. And at what level?
A. Five I think.
Q. Which is the top level? Am I right about that?
A. No, it's not the top level. I believe six is.
Q. All right. What was your title when you joined OCRWM in 1984?
A. I was a branch chief, but I can't recall the exact title.
Q. What were your duties?

16

A. I was responsible for preparation of the total system life cycle cost analysis, fee adequacy analysis, preparation of the original Mission Plan.
Q. How long did you stay in the position of branch chief responsible for the TSLCC, the fee adequacy and the Mission Plan documents?
A. Several months.
Q. At which point your duties changed?
A. At which point my duties changed, yes.
Q. Okay. Can you describe for me how your duties changed?
A. I was placed into a division director position responsible for budget, project management activities.
Q. When you say budget, you mean you were working on the portion of the DOE budget related to OCRWM?
A. Correct.
Q. And when you used the term project management activities in your answer, what did you mean by that?
A. Essentially tracking project cost and schedule.
Q. What project costs were you tracking?

17

A. Well, program costs and schedule.
Q. What program costs and schedule were you tracking?
A. It related to the transportation program, the monitored retrieval storage, MRS program, as well as the repositories program.
Q. Can you tell me why your duties changed after several months in the branch chief position to the division director position, why that change occurred?
A. The division director in that position was replaced by myself.
Q. Okay. And whom did you replace as division director?
A. Jack Yanofski I believe his name was.
Q. So was that a promotion when you moved from branch chief to division director?
A. Not a great promotion, no.
Q. But it was a discernible change in duties as I understand it, is that correct?
A. Yes. Yes.
Q. How long did you stay in the position of division director?
A. I can't actually recall.
Q. One year? Two months? Six years?

18

Can you put some rough approximation?
A. Rough approximation would be in that particular organizational configuration, three years.
Q. Okay. So do I have it right roughly from '84 to '87 you served as division director?
A. Very roughly.
Q. Okay. And then did your duties change in some way?
A. They did. I remained a division director.
I guess it was a result of a reorganization.
Q. Okay. And how substantively did your duties change, if at all?
A. I guess I would have to say not significantly.
Q. You were still responsible for budget and project management activities?
A. Correct.
Q. That has been true of your career at DOE since '87 that you have been responsible for budget and project management activities?
A. I guess pretty much through the time I was a division director with various titles.

19

Q. Okay. Did there come a point in time when you left the position of division director?
A. Yes.
Q. Okay. And when was that?
A. Approximately 1990.
Q. All right. And in or about 1990, did you take a different position within OCRWM?
A. Yes, I did.
Q. Okay. And what position was that?
A. That was a position, I guess the title was manager of MRS team.
Q. Was that a promotion or a lateral move?
A. Lateral move.
Q. Okay. And how long did you stay in the position as manager of the MRS team?
A. It was probably about two years roughly.
Q. Roughly 1990 to 1992?
A. Roughly.
Q. Okay. And then at that point in time, you took another position within the organization?
A. Yes.
Q. Okay. And what position was that?

20

A. At that point, I was named acting director of the Office of Storage and Transportation.
Q. You assumed the position of acting director of the Office of Storage and Transportation in or about 1992?
A. Roughly.
Q. And what were your duties in that position?
A. Managed, continued to manage the storage effort, which was the MRS effort, as well as the transportation program.
Q. When you say transportation program, what do you mean?
A. The planning to prepare for waste shipment from the utilities to an MRS and subsequently repository site.
Q. By this point in time, how many direct hire government employees were reporting to you?
A. Approximately 25.
Q. How long did you remain in the position as acting director of the Office of Storage and Transportation?
A. A matter of months when I was promoted to the SES and made permanent director.

21

Q. Did that promotion occur in 1993?
A. Ninety-two, '93 timeframe.
Q. Okay. And how long did you stay in the position of director of the Office of Storage and Transportation?
A. Roughly two years.
Q. Okay. And then did your duties change?
A. They did.
Q. How did they change?
A. I was reassigned to, as director of the Office of Program Management and Integration.
Q. What were your duties as director of Program Management and Integration?
A. Back to being responsible for budget, regulatory interface activities, personnel, administrative, systems engineering.
Q. Okay. How long did you stay in the position of director of Program Management and Integration?
A. Approximately a year.
Q. Okay. So from 1994 to 1995?
A. Roughly.
Q. And then did your duties change again in some way?

22

A. Yes.
Q. Can you tell me how?
A. I was appointed acting deputy director of the program.
Q. So roughly 1995, you were appointed acting deputy director?
A. Roughly.
Q. And when you say acting deputy director, you mean of the entire OCRWM operation?
A. Yes.
Q. And I gather that was a promotion?
A. Not grade-wise.
Q. How long did you serve as acting deputy director of OCRWM?
A. About three years.
Q. Did that position require Senate confirmation or approval?
A. No.
Q. Did your title or duties change in 1998?
A. Yeah, it did.
Q. Can you tell me how they changed?
A. I became Chief Operating Officer.

23

Q. And that's the position you hold today, correct?
A. Correct.
Q. With whom do you work most closely in your position as Chief Operating Officer?
A. Most closely, the director and the deputy director.
Q. And the director is Margaret Chu?
A. Correct.
Q. And the deputy director is Lake Barrett?
A. Correct.
Q. Do you work regularly with Dave Zabransky?
A. Yes, I do.
Q. Do you work regularly with Alan Brownstein?
A. I do.
Q. Do you work regularly with Susan Klein?
A. Yes.
Q. Have you been deposed before?
A. Yes, I have.
Q. How many times?
A. Once.

24

Q. Did you read any other documents relating to OCRWM or its programs at that time?
A. Relating to OCRWM, yes.
Q. Okay. And what were they?
A. The most recent total system life cycle cost report, final draft of the Mission Plan, most recent fee adequacy analysis report.
Q. Why did you read those documents?
A. Those are items under my responsibility.
Q. Do I understand it correctly that at the time you became the branch chief, a total systems life cycle cost report had already been prepared?
A. Yes.
Q. All right. I'm going to refer to that as a TSLCC report.
A. Much easier.
Q. Right -- certainly easier to say. And what was the -- you said, I believe you have testified that you had read the final draft of the Mission Plan.
Had a final Mission Plan been prepared at the time you became the branch chief?
A. No, it had not.

29

Q. So at that time, the Mission Plan was still a draft document?
A. Correct.
Q. All right. And the fee adequacy report that you read, was that a final or a draft version of that report?
A. That was a final.
Q. Mr. Milner, do you have training in finance or accounting?
A. No, I do not.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Do you recall, Mr. Milner, what spent nuclear fuel acceptance rate was identified in the TSLCC report that you read?
A. No, I don't recall.
Q. Do you recall what spent nuclear fuel acceptance rate was contained in the final draft of the Mission Plan?
A. I don't recall.
Q. Do you recall what spent fuel acceptance rate was identified in the fee adequacy report?
A. No.

30

Q. Can you tell me your understanding as to the purpose of the TSLCC report?
A. One, to, estimate at that point in time, what the cost components of the entire program were.
Also it was utilized as input data to do the fee adequacy analysis.
Q. Do you know whether the TSLCC report is required by statute?
A. It is not.
Q. Do you know whether DOE has prepared a TSLCC report every year subsequent to 1984?
A. Roughly every year.
Q. And do you know for whom the report is intended?
MR. SHULTIS: Objection -- vague.
BY MR. TOMASZCZUK:
Q. Do you understand my question?
MR. SHULTIS: Go ahead.
THE WITNESS: It's an internal document principally, although it is issued publicly.
BY MR. TOMASZCZUK:
Q. Have you had occasion to review and approve TSLCC reports prior to their issuance?

31

A. Yes.
Q. How often have you done that?
A. During the times when I was responsible for that activity on a roughly annual basis.
Q. Okay. And your testimony at least in my mind is a little bit unclear as to when you were responsible for that activity.
Can you tell me when you were responsible for reviewing and approving TSLCC reports in the course of your career at OCRWM?
A. I think I have given that to the best of my recollection.
Q. Okay. Well, then can you restate it for me because it's not clear from my notes? Maybe I misunderstood.
A. When I first joined the program, I was responsible for TSLCC.
As a result of reorganizations over a period of time, that activity was in and out of my area of responsibility.
I cannot recall the exact timeframes of that.
Q. Just so I'm clear, I understood that you initially became a branch chief and you had

32

responsibility for among other things, the TSLCC reports?
A. Correct.
Q. And then your duties changed, and I understood your testimony to be that you then no longer had that responsibility, and if I understand you correctly, at some point in time over your career at OCRWM, then you assumed that responsibility again for TSLCC reports?
A. Correct.
Q. All right. Can you state for me your understanding as to the purpose of the Mission Plan?
A. My understanding, the original Mission Plan was intended to be I guess a higher level of plan for how we would conduct the program.
Q. What do you mean by higher level as you used that term in your testimony?
A. Not a detailed step-by-step description.
Q. Would the mission plans therefore in your mind be less detailed than the TSLCC reports?
A. Yes.
Q. And for what audience was the Mission

33

Plan intended?
A. The general public.
Q. And could you state for me your understanding as to the purpose of the fee adequacy report?
A. To assess on a roughly annual basis whether or not the one mill fee charged the utilities would be adequate to cover the costs of the program.
Q. And for what audience was the fee adequacy report prepared?
A. Principally the Congress.
Q. And over the course of your career at OCRWM, have you had occasion to review and approve of mission plans?
A. Yes.
Q. And over the course of your career at OCRWM, have you had occasion to review and approve of the fee adequacy reports?
A. Yes.
Q. Of these three documents, which in your view is the most detailed in terms of how OCRWM is going to accomplish the spent nuclear fuel disposal program?
A. The Mission Plan would have been.

34

Q. Would have been the most detailed?
A. Um-hm.
Q. I thought I had understood you to say a few minutes ago that you thought the TSLCC report was more detailed than the Mission Plan.
Did I misunderstand you?
A. No, you didn't.
Q. Well, I have to admit to some confusion then.
Of the Mission Plan versus the TSLCC, which is the more detailed in terms of laying out DOE's step-by-step approach towards satisfying the program requirements?
A. The Mission Plan.
Q. The Mission Plan, all right. And as between the Mission Plan and the fee adequacy report, which is more detailed in terms of laying out DOE's step-by-step approach to, towards satisfying the requirements of the program?
A. The Mission Plan.
Q. Have you ever had occasion to testify before Congress?
A. Yes, I have.
Q. Can you tell me in what context you

35

have testified before Congress?
A. I have testified at a field hearing related to the MRS program and the multi-purpose canister program.
Q. Is that the only instance in which you have testified before Congress?
A. Yes.
Q. And when you say a field hearing, do you mean a hearing held away from Washington, D.C.?
A. Correct.
Q. Where was that hearing held?
A. Newport News, Virginia.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, did you have any role to play in the preparation of annual capacity reports, which I will refer to as ACRs?
A. I did.
Q. Okay. What was your role in the preparation of ACR reports?
A. One of the organizational elements under me was responsible for preparing those.
Q. And at what point in time were you

36

referring to?
A. Late '80s, early '90s.
Q. So you have had occasion to review and approve of ACRs?
A. Correct.
Q. What about acceptance priority rankings, what I'll refer to as APRs?
Have you also had occasion to review and approve of those?
A. Yes.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Do you know what spent nuclear fuel acceptance rate DOE is currently using for purposes of the geologic repository it's working on at Yucca Mountain?
A. Yes, I do.
Q. Can you tell me?
MR. SHULTIS: Objection to the degree it's seeking a legal conclusion.
BY MR. TOMASZCZUK:
Q. Can you tell me what your understanding is as to that acceptance rate?
A. The, it's a ramp-up rate. The first

37

year, I believe it was 400 metric tons, second year, 600 metric tons, the third year, 900 metric tons, and I believe the following year, it went up to 1200.
Q. And any understanding beyond that?
MR. SHULTIS: Same objection.
THE WITNESS: I recall that peaks at 2000.
BY MR. TOMASZCZUK:
Q. Your understanding is that it peaks at 2000, and then does it stay at 2000 for a number of years?
A. I believe so.
MR. SHULTIS: Same objection.
THE WITNESS: I believe so.
BY MR. TOMASZCZUK:
Q. Do you know if that understanding is reflected in any documents?
MR. SHULTIS: Objection -- vague.
THE WITNESS: I believe it is.
BY MR. TOMASZCZUK:
Q. Okay. Can you identify for me the documents -- when I say documents, I'm referring to DOE or OCRWM documents -- can you identify for me the documents that reflect the acceptance

38

rates you just referred to?
A. I don't know that I can recall all of the documents that's reflected in.
Q. Any of them?
A. It's reflected in the ACR. It's reflected in the program plan.
Q. And in what year was the ACR that you just referred to in your last answer published, do you know?
A. I don't recall.
Q. Do you know when the last ACR was published by OCRWM?
A. No, I don't.
Q. If I said 1995, would that sound about right to you?
MR. SHULTIS: Objection -- asked and answered.
THE WITNESS: Roughly.
BY MR. TOMASZCZUK:
Q. With what, with which support contractors do you work most closely now in your role as COO?
A. Booz Allen Hamilton.
Q. Over the course of your career at OCRWM, have there been any personnel employed by

39

contractors with whom you have worked particularly closely?
A. Yes.
Q. Can you state for me their names?
A. Not all of them.
Q. Okay. Those that come to mind?
A. Charles Metzger.
Q. Metzger you say?
A. Metzger; Richard Goffi, Robert Bauer, probably those would be the closest.
Q. Are those individuals employed by Booz Allen?
A. Robert Bauer is not.
Q. But Mr. Goffi and Mr. Metzger are?
A. Correct.
Q. And who is Mr. Bauer's employer?
A. He was employed by the former support service contractor at OCRWM -- Weston.
Q. Did you ever have occasion to work with a support contractor that I'll refer to as PNL?
A. Yes.
Q. And when was that?
A. That would have been in mid-'80s.
Q. Did you ever have occasion to work

40

with or speak with Pat McDuffie?
A. No. I don't recall that name.
Q. What role have you had in DOE's administration or implementation of the standard contract?
MR. SHULTIS: Objection -- vague.
THE WITNESS: A variety of roles.
BY MR. TOMASZCZUK:
Q. Okay. Can you explain that for me or detail that for me?
A. At various positions or during various positions that I held, administration of the standard contract again was done by an element under my supervision.
Q. Is that one of your roles or duties today?
A. In a very rough sense, yes.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. When is the last time you had occasion to read the standard contract?
A. It's probably been several years since I have read it in its entirety.
Q. And when you last read it in its

41

entirety, what was the circumstance or circumstances that caused you to read it at that time?
A. I don't recall.
Q. You don't recall why you read it at that time?
A. No, I don't.
Q. Do you know whether the standard contract contains a spent nuclear fuel acceptance rate?
MR. SHULTIS: Objection. Asks for a legal conclusion.
THE WITNESS: I don't believe it does.
BY MR. TOMASZCZUK:
Q. Have you discussed that subject with anyone at OCRWM?
A. What subject?
Q. The subject about the, your understanding that the standard contract does not contain a spent nuclear fuel acceptance rate.
MR. SHULTIS: Same objection.
THE WITNESS: I don't recall having discussed that.
BY MR. TOMASZCZUK:

42

Q. Do you know whether the TSLCC reports contain a spent nuclear fuel acceptance rate?
MR. SHULTIS: Objection to the degree it's calling for a legal conclusion.
THE WITNESS: I don't know.
MR. SHULTIS: Asked and answered.
BY MR. TOMASZCZUK:
Q. Do you know whether the mission plans contain a spent nuclear fuel acceptance rate?
MR. SHULTIS: Same objections.
THE WITNESS: It's my understanding that the original Mission Plan did.
BY MR. TOMASZCZUK:
Q. And the fee adequacy reports, do you know whether those contained a spent nuclear fuel acceptance rate?
MR. SHULTIS: Objection to the degree it's calling for a legal conclusion.
I think he has answered this question.
THE WITNESS: I don't believe it does.
BY MR. TOMASZCZUK:
Q. Did you or have you had occasion, Mr. Milner, to review any of the comments by the utilities on the draft version of the standard contract that DOE published?

43

A. No, I never did.
Q. Have you participated in any meetings with utility representatives concerning the standard contract?
A. Yes, I believe I have.
Q. And has your participation been often and frequent, or rare?
A. Which timeframe are you referring to?
Q. Well, let's break it up. Let's go back when you started back in 1984.
A. Early on, relatively frequently.
Q. And did that change over the course of the years?
A. Yes.
Q. And would I be correct in understanding that as of this point in time, you don't spend a lot of time in meetings with utilities dealing with the standard contract?
A. You would.
Q. Would that statement be true at or about the time you became COO?
A. Yes.
Q. I'm about to get into some documents. Do you want to keep going, or do you want to take a break?

44

MR. SHULTIS: Why don't we take a break? That would be a good idea.
(A recess was taken.)
MR. TOMASZCZUK: Ms. Reporter, I would like you to mark as Milner Exhibit 1 a series of organizational charts which were provided to us by the government.
(Milner Exhibit No. 1 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, I ask you to look at those, and I'm going to ask you some questions about them.
Just tell me whenever you're ready.
(The witness reviewed the document.)
THE WITNESS: I took a walk down memory lane.
BY MR. TOMASZCZUK:
Q. Have you reviewed Milner Deposition Exhibit No. 1?
A. Yes, I have.
Q. All right. Mr. Milner, as I understand your testimony, we should start with the second page of this document since the first

45

page predates your arrival at OCRWM, is that right?
A. Actually, the first page, a couple of names are different, but I think that was the rough organizational structure as best I can recall when I first joined the program.
Q. Okay. And where on this -- thank you for that.
And where on this organizational chart did your position fall?
A. Within RW-13.
Q. Under the name of Charles Reid, the acting director of operations?
A. Charles Head.
Q. Chart Head -- I'm sorry. You said you started in 1984.
What month in 1984 did you start at OCRWM, do you recall?
A. I believe it was April.
Q. Okay. Can I direct your attention to the second page?
A. Um-hm.
Q. And using this second page of Milner 1, can you identify for me where your branch chief position fell?

46

A. I believe at that time, I was the finance, acting finance division director.
Q. RW-10? Oh, no. I'm sorry. I misspoke.
There is a number ten next to finance division, and I thought that might be an RW designation, is that correct?
A. It's not an RW designation.
Q. Okay. Is this finance division office where you became responsible for budget and project management activities?
A. I believe at that time -- it's difficult to recall that far back.
I believe at that time, for a short period of time, it was just budget.
Q. At this point in time, July 1984, were you responsible for TSLCC reports?
A. As best I can recall, I was.
Q. Were you, at this point in time, were you responsible for fee adequacy reports?
A. As best I can recall, I was.
Q. At this point in time, were you responsible for preparation of the mission plans?
A. I believe at that time, the Mission

47

Plan had been issued in final, and there was no more responsibility there.
Q. But you had been responsible for the preparation and issuance of that Mission Plan, correct?
A. Correct, Although to put that in context, that was a very brief period of time.
It was just about final when I came into that job.
Q. Okay. That's fair. Could I turn your attention to page 3 of this exhibit?
A. Um-hm.
Q. And this appears to be a OCRWM organizational chart dated September 1985, correct?
A. Correct.
Q. And you're identified here as the acting director of the financial management and analytical services division?
A. Correct.
Q. At that point in time, were you responsible for the preparation of the TSLCC reports?
A. I believe I was.
Q. Were you responsible for preparation

48

of the fee adequacy reports?
A. I believe so.
Q. Were you responsible for preparation of the mission plans?
A. No.
Q. Another office reflected on this chart was responsible for the mission plans?
A. Again, the Mission Plan had been issued, so there was no responsibility in that regard.
Q. When you say the Mission Plan had been issued, you mean the Mission Plan that was issued in 1985?
A. Whenever the original one was issued.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. All right. Would you turn to the next page of this exhibit?
A. Um-hm.
Q. It has got a date in the lower right-hand corner that's a little hard to read.
I think it is May 19, '86, but I'm not sure.
(The witness reviewed the document.)

49

BY MR. TOMASZCZUK:
Q. Do you know where your position fell within this organizational chart apparently dated May of 1986?
A. I believe it was still the financial management analytical services division.
Q. Okay. And at that point in time, were you responsible for the TSLCC reports?
A. I believe I was.
Q. Were you responsible for the fee adequacy reports?
A. I believe I was.
Q. Were you responsible for the preparation of the mission plans?
A. No.
Q. And you say no because the Mission Plan had been issued, or because another office was responsible for it?
A. Because it had been issued.
Q. If I said that the Mission Plan had been issued in June 1985, would that sound about right?
A. I guess that would sound about right. My recollection, it had been earlier, but that may well be correct.

50

Q. All right. Well, we'll look at it later.
The next page of this exhibit, Mr. Milner, has handwritten in the lower right-hand corner 1988?
A. Um-hm.
Q. Where did your office fall on this organizational chart?
A. I think program control division.
Q. All right. At this point in time, were you still responsible for the preparation of TSLCC reports?
A. I believe I was.
Q. Were you still responsible for fee adequacy reports?
A. I believe so.
Q. And were you responsible for mission plans or Mission Plan Amendments?
A. I don't recall that I was.
Q. Was another office reflected on this chart responsible for amendments to the Mission Plan?
A. I don't believe so.
Q. So if there was a Mission Plan Amendment in progress, that would have been your

51

responsibility or not?
A. I don't believe so, no.
Q. Who would have been responsible for a Mission Plan Amendment?
A. I don't recall.
Q. Okay. Next page, you're identified on this page which has on it the date of April 1988 as the acting director of the program control division?
A. Correct.
Q. And at this point in time, were you still responsible for TSLCC reports?
A. I believe I was.
Q. Fee adequacy reports?
A. I think so.
Q. What about Mission Plan Amendments?
A. No. I don't recall that.
Q. Next page, you're identified as director of the program control division, right?
A. Correct.
Q. Do you recall when you became the director of this division as opposed to the acting director?
A. No, I don't.
Q. As the director of the program control

52

division, were you responsible for TSLCC reports?
A. Yes.
Q. Were you responsible for fee adequacy reports?
A. I believe so.
Q. Were you responsible for Mission Plan Amendments?
A. I don't believe so.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Were you responsible at this time for annual capacity reports?
A. I believe I was.
Q. All right. Could you turn to the next page?
The next page of this Exhibit No. 1 identifies you as the associate director of storage and transportation?
A. Correct.
Q. It appears to have on it a date of, if I'm understanding this designation, of 1991?
A. That would probably be correct.
Q. Okay.

53

A. It's hard to tell.
Q. At this point in time, were you responsible for TSLCC reports?
A. I don't believe I was.
Q. At this point in time, were you responsible for fee adequacy reports?
A. I don't believe so.
Q. At this point in time, were you responsible for any amendments to any mission plans?
A. I don't believe so.
Q. Do you know who would have had responsibility for Mission Plan Amendments?
A. No, I don't.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. So am I right, Mr. Milner, in understanding that from when you joined OCRWM in '84 until some time in, in or about 1991 when you became the director of storage and transportation, you were responsible for TSLCC and fee adequacy reports, correct?
A. I believe that's correct.
Q. While you served at the Office of

54

Storage and Transportation, did you have any responsible, any responsibility for either TSLCC or fee adequacy reports?
A. I don't believe so.
Q. Okay. While you served within the Office of Storage and Transportation, did you have responsibility for ACRs or APRs?
A. I believe I did.
Q. Mr. Milner, can I direct your attention to the page of this exhibit, it's got printed in the, what I'm looking at, the lower right-hand corner, the date of 5/19/94.
Do you see that? And it has the heading proposed realignment?
A. Um-hm.
Q. Looking at this proposed realignment chart, can you tell me where your office appeared?
A. I believe it was Program Management and Integration.
Q. So at this point in time, you would have moved from your role in the Office of Storage and Transportation to Program Management and Integration?
A. I believe that's correct.

55

Q. All right. As the -- were you the director of the Office of Program Management and Integration?
A. I believe I was at that time.
Q. Okay. And in that role, were you responsible for TSLCC reports?
A. Yes, I would have been.
Q. Were you responsible for fee adequacy reports?
A. Yes.
Q. Would you have been responsible for any Mission Plan Amendments?
A. Not that I can recall.
Q. Would you have been responsible for APRs or ACRs?
A. No.
Q. Okay. Can I get you to turn to the next page of this exhibit?
I see your name here under the Office of Waste Acceptance, Storage and Transportation?
A. Correct.
Q. So do I understand this right that you went back to that office from Program Management and Integration?
A. Yes, I believe so -- musical chairs.

56

Q. And do you recall when you left the Program Management and Integration Office and went back to Waste Acceptance, Storage and Transportation?
A. No, I don't.
Q. Would it be fair to say that you were in Program Management and Integration from roughly '94 to '96?
A. Roughly, yes.
Q. And then back to Waste Acceptance, Storage and Transportation?
A. Correct.
Q. At Waste Acceptance, Storage and Transportation, did you have responsibility for TSLCC reports or fee adequacy reports?
A. No.
Q. Did you have responsibility for ACRs or APRs?
A. Yes.
Q. I thought I understood your testimony, Mr. Milner, to be that in or about 1995, you became acting deputy director of OCRWM?
A. I don't recall the timeframe exactly.
Q. Okay.
A. I guess it would have been later.

57

Q. May have been a little later than '95?
A. Right.
Q. All right. I think we can probably skip the next page and go to the page which follows which has the date of July 31, 1998, printed on it, and this shows that you were acting office deputy director as of July 31, 1998?
A. Correct.
Q. In that capacity, were you responsible for TSLCC reports?
A. Yes.
Q. Were you responsible for fee adequacy reports?
A. Yes.
Q. Were you responsible for Mission Plan Amendments, if any?
A. No.
Q. Would somebody else have been responsible for those?
A. No.
Q. And why is that?
A. There were no Mission Plan Amendments at that point.
Q. Do you know when the last Mission Plan

58

Amendment was issued?
A. I can't recall.
Q. Can I direct your attention to the last page of this exhibit, Mr. Milner?
This has printed on it the date of 8/10/99 in the lower right-hand corner.
As of that date, what was your position on this organization chart?
(The witness reviewed the document.)
THE WITNESS: I believe it was acting deputy director.
I can't recall exactly when I became Chief Operating Officer.
MR. TOMASZCZUK: Ms. Reporter, I would like marked as Milner Exhibit No. 2 a one-page document which we have downloaded from the DOE Web site, and it is entitled Appendix C, organization chart, Office of Civilian Radioactive Waste Management.
(Milner Exhibit No. 2 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Are you familiar with this document, Mr. Milner?

59

A. Yes.
Q. All right. And does it accurately depict OCRWM's current organization?
A. Yes, it does.
Q. And you're serving as Chief Operating Officer, correct?
A. Correct.
Q. This organization chart shows that everybody reports up to you, is that fair?
A. Correct.
Q. And in that capacity, you're responsible for all of OCRWM's publications?
A. Yes.
Q. Including but not limited to the TSLCC reports and the fee adequacy reports, right?
A. Correct.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. I understand that Mr. Barrett is going to retire.
Is that your understanding?
A. That's correct.
Q. Do you know who is going to replace him?

60

A. No, I don't yet.
Q. Are you a candidate for that position?
A. I don't know.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, I would like marked as Milner Exhibit No. 3 a Federal Register notice dated April 18, 1983, and represent that it, I believe it contains the text of the standard contract.
(Milner Exhibit No. 3 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with this document?
A. Yes.
Q. Okay. Is this the document that you read shortly after you became an employee of OCRWM?
A. Yes.
Q. Did you have any discussions with anyone at OCRWM at that time about the standard contract?
A. Yes.

61

Q. And with whom did you have such discussions?
A. There would have been a variety of people; certainly the people listed in here -- J.W. Winnech, Office of General Counsel, James Cavanagh, Procurement Office, Robert Roselli; probably others that I can't recall.
Q. And what, if anything, do you recall about those discussions?
MR. SHULTIS: Objection to the degree it calls for a privileged conversation. Mr. Winnech is an attorney.
THE WITNESS: I can't recall.
BY MR. TOMASZCZUK:
Q. You can't recall any of the discussions you had with any of those individuals?
A. No.
Q. You didn't have any role to play, did you, Mr. Milner, in the preparation of this document, correct?
A. Correct.
Q. At or about the time you read it, was there anything in it that you disagreed with or didn't understand?

62

MR. SHULTIS: Objection to the degree it calls for a legal conclusion.
THE WITNESS: There was probably a great many things I didn't understand initially.
BY MR. TOMASZCZUK:
Q. Any that you can recall today?
A. Not that I can recall.
Q. Are there any aspects of the standard contract that you don't understand today?
MR. SHULTIS: Same objection.
THE WITNESS: I don't believe so.
BY MR. TOMASZCZUK:
Q. And I direct your attention to the Federal Register notice page 16598. It's at Bates page number ADM-001-0657, and if I can direct your attention, Mr. Milner, to the first paragraph that appears on this page, starting with the word similarly, do you see that?
A. Um-hm.
Q. Take a minute and read that paragraph.
(The witness reviewed the document.)
THE WITNESS: Get that section in context.
MR. TOMASZCZUK: Sure.
(The witness reviewed the document.)

63

THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Okay. Did you read the Nuclear Waste Policy Act at or about the time you became an OCRWM employee?
A. Yes.
Q. Okay. Prior to becoming an OCRWM employee, had you had any familiarity with the Nuclear Waste Policy Act?
A. No, I had not.
Q. In pertinent part, this language states that, quote, the 1998 date is called for in the Act, and we believe it to be a realistic date?
A. Correct.
Q. At or about the time you became an OCRWM employee, did you believe that the 1998 date was a realistic date?
MR. SHULTIS: Objection to the degree it calls for a legal conclusion.
THE WITNESS: Yes, I believed it was a realistic date.
As a new employee, I probably wasn't qualified to judge that, though.
BY MR. TOMASZCZUK:

64

Q. Did you have any discussions with Mr. Roselli or Mr. Cavanagh about that date?
A. Not that I can specifically recall.
Q. This reference goes on to state, quote, our performance will be judged by meeting this date, quote close.
Did you understand that OCRWM's performance at the time you became an employee in 1984 was going to be judged by meeting the January 31, 1998 date?
MR. SHULTIS: Objection to the degree it calls for a legal conclusion.
THE WITNESS: My personal opinion was yes.
BY MR. TOMASZCZUK:
Q. Now that date has not been met, correct?
A. That's correct.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, I would like to mark as Milner Exhibit 4 the draft Mission Plan overview dated December 20, 1983, and this is an excerpt from that document in the interest of killing a few less trees.

65

(Milner Exhibit No. 4 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Are you familiar with this document, Mr. Milner?
A. Very vaguely. This would appear, judging by the date, to be an early draft.
Q. Early draft of a Mission Plan?
A. Yes.
Q. And is this a document that you read at or about the time you became an employee of OCRWM?
A. I don't believe I would have reviewed this draft.
Q. You would have reviewed another draft?
A. Subsequent draft.
Q. A later draft do you think? And why do you say that?
A. Only judging by the date; I'm assuming that drafts would have occurred between December '83 and April of '84.
Q. And why do you make that assumption?
A. Typically over that intervening period, the document would have been refined and

66

further drafts produced.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. At the time you became an OCRWM employee, was it a goal of OCRWM to provide an acceptance rate in the first five years such that no utility would have to provide additional storage capacity after January 31, 1998?
A. I don't recall that being a goal.
Q. Could I direct your attention to page 2-1 of the document under the heading program strategy?
A. Oh, 2-1.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Do you see the last two sentences of the first paragraph on page 2-1?
A. Yes.
Q. It states in part the waste materials would be accepted in accordance with the waste acceptance schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998?

67

A. Um-hm.
Q. And you disagree that that was an intention of DOE at or about this time?
MR. SHULTIS: Objection. Mischaracterizes the prior testimony.
Calls for calls for a legal conclusion.
BY MR. TOMASZCZUK:
Q. I didn't mean to mischaracterize your testimony.
I understood it to be that you did not agree with that statement.
A. I did not recall that that was a goal at that time.
Q. Okay. Having read it, do you now recall that that was a goal?
A. I don't recall whether that language was in the final Mission Plan.
Q. Okay. Even if it wasn't, was that a goal of DOE at or about this time?
MR. SHULTIS: Objection -- asked and answered.
THE WITNESS: I don't recall it.
BY MR. TOMASZCZUK:
Q. The text of this paragraph goes on to

68

state subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year.

At or about this time, did DOE intend that the acceptance rate would be equal to or greater than the actual discharge rate of spent fuel each year?

MR. SHULTIS: Objection. Calls for a legal conclusion.

Also Mr. Milner is not a 30(b)(6) witness.

THE WITNESS: I didn't recall that.

BY MR. TOMASZCZUK:

Q. The next page of this document, 2-2, under the heading waste acceptance schedule, and this paragraph states that the department has prepared a waste acceptance schedule which specifies in the aggregate the quantities of commercial nuclear waste that the program will accept beginning in 1998.

This schedule is presented in Table 2-1, and then turning to Table 2-1 whenever you're ready --

(The witness reviewed the document.)

BY MR. TOMASZCZUK:

69

Q. Do you recall seeing this Table 2-1 before today?

A. I don't recall it, no.

Q. It shows under the column first repository acceptance, a spent nuclear fuel acceptance rate starting in 1998 of 1800 metric tons?

A. Correct.

Q. And maintaining at that 1800 metric ton rate for five years, correct?

A. Correct.

Q. And then ramping up to 3,000 metric tons?

A. Correct.

Q. And then continuing at a steady-state rate of 3,000 metric tons for roughly 20 years I think?

A. Correct.

Q. And does that column accurately reflect DOE's intentions at this time with respect to spent nuclear fuel acceptance rate commencing in 1998?

MR. SHULTIS: Objection. Calls for a legal conclusion.

Also Mr. Milner is not a 30(b)(6)

70

witness.

MR. TOMASZCZUK: I don't want my silence to be construed as acquiescence in the notion that I can't ask him these questions because he is not a 30(b)(6) witness.

I don't know what --

MR. SHULTIS: You're asking about DOE's intention or position.

Mr. Milner has not been designated as a witness who is qualified to speak to DOE's position.

MR. TOMASZCZUK: Oh, I understand that Mr. Milner has been at OCRWM for 18 years and is the Chief Operating Officer, and if he is not qualified to answer these questions, I don't know who would be, but in any event, your objection is noted for the record.

MR. SHULTIS: The people we designated for those responses is qualified, but you can answer.

THE WITNESS: At the point this draft was prepared, December of 1983, I was not with the program.

I don't know what the department's intent was.

71

BY MR. TOMASZCZUK:

Q. Did you have any understanding about the data reflected on this table at or about the time you read it?

MR. SHULTIS: Same objections.

THE WITNESS: I don't understand the question.

BY MR. TOMASZCZUK:

Q. Did you have any understanding as to what information was being conveyed by the data on this table at or about the time you became an OCRWM employee and looked at this document?

MR. SHULTIS: The same objections -- asked and answered.

The document speaks for itself.

THE WITNESS: I don't recall seeing this specific table.

I can look at it now and see what's on it.

BY MR. TOMASZCZUK:

Q. Okay. This table goes on to, under the column remaining backlog MTU, do you see that?

A. Yes.

Q. In the right-hand side? It shows a

72

pre-1998 backlog of 40,809 metric tons?
A. Yes.
Q. Correct? And that number basically decreases over time, and the table shows a backlog as of 2020 of 23,775 metric tons, right?
A. Correct.
Q. Showing that the backlog is being reduced over time?
A. Correct.
Q. And was that a fair statement of DOE's intentions at or about this time, to work off the backlog of spent nuclear fuel that utilities were storing?
MR. SHULTIS: Objection. Calls for a legal conclusion, and Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: Well, at this specific point in time, I don't know what the department's intent was.
At the point I joined the program, my understanding of the intent was to work off the backlog.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Mr. Milner, I'm going

73

to hand you what I'm going to ask the court reporter to mark as Milner Exhibit 5.
It is the Mission Plan for OCRWM, Volume 1.
It's an excerpt dated June 1985.
(Milner Exhibit No. 5 was marked for identification.)
MR. SHULTIS: Alex, just for the record, and you might have already done this, but I just want it shown that this exhibit is pages through page 29 of Volume 1 of the 1985 Mission Plan.
MR. TOMASZCZUK: That's fair. I believe I identified it as an excerpt.
The Mission Plan goes on for several hundred pages.
What he has in front of him is an excerpt which consists of Part 1, Section 1, and Part 1, Section 2.
Section 1 is the introduction.
Section 2 is program strategy.
MR. SHULTIS: Thank you.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:

74

Q. Mr. Milner, looking at the Table of Contents, can you identify any sections of this Mission Plan that you authored?
A. I authored no sections of the Mission Plan, but I don't have a Table of Contents.
Q. I'm sorry. You don't have the Table of Contents?
All right. We'll get that at the lunch break for you.
My copy does, but can I direct your attention to page 25 of this document?
I was going to ask you some questions about Section 2.7, waste acceptance schedules.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Did you prepare Section 2.7 entitled waste acceptance schedules?
A. No, I did not.
Q. Do you know who did?
A. Actually no, I don't.
Q. The first sentence of this section reads the DOE is committed to accept waste from the signatories of Standard Disposal Contracts on a firm schedule that begins no later than January 31, 1998.

75

It is true as of this point in time, right, that all of the utilities operating nuclear power plants had executed the standard contract?
A. Yes.
Q. What do you understand by the term firm schedule?
What is your understanding of that term as used in this first sentence?
MR. SHULTIS: Objection to the degree it calls for a legal conclusion.
THE WITNESS: My understanding would have been that the department's goal was to be accepting waste on January 31st, 1998.
BY MR. TOMASZCZUK:
Q. Did you have an understanding of the term firm schedule?
MR. SHULTIS: Objection -- asked and answered; same objections.
THE WITNESS: Yes.
BY MR. TOMASZCZUK:
Q. Can you articulate that for me?
A. As related to the contract?
Q. Sure.
MR. SHULTIS: Objection. Calls for a

76

legal conclusion.
THE WITNESS: My personal opinion is firm schedule was that we had intended to begin accepting waste in January 1998.
BY MR. TOMASZCZUK:
Q. If I could direct your attention to the Table 2.2 that appears on the next page -- well, let me ask you first what is the purpose of this Table 2.2?
A. My opinion, the purpose of this would have been to show the relative levels of waste, what's being generated, cumulative generation still at reactors, the planned acceptance at first and second repository, and a depiction of how the overall backlog would have been worked out.
Q. And the planned acceptance at the first repository starts at 400 metric tons in 1998, correct?
A. Correct.
Q. Goes to 900 metric tons in 2001?
A. Correct.
Q. Goes to 1800 metric tons in 2002?
A. Yes.
Q. And then goes to 3,000 metric tons in

77

3,000 -- I'm sorry -- in 2003?
A. Correct.
Q. And then stays at 3,000 metric tons until I believe it's 2022?
A. Yes -- 2021, 2022.
Q. And does that accurately depict DOE's intentions at this time with respect to spent nuclear fuel acceptance under the contract?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Also Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: It would indicate that the department planned to do that, yes.
BY MR. TOMASZCZUK:
Q. The far right-hand column is entitled spent fuel backlog?
A. Um-hm.
Q. And this appears I think similar to what we saw in the 1983 draft Mission Plan, but it starts, it shows an initial backlog pre-1998 of 40,100 metric tons?
A. Correct.
Q. And then that backlog actually increases on this chart, does it not, for a

78

couple of years?
A. Correct.
Q. But eventually is reduced to 800 metric tons as of 2030 if I'm reading the chart right?
A. Correct.
Q. And does that accurately reflect DOE's intentions at this time with respect to reduction of spent nuclear fuel backlog?
A. Well --
MR. SHULTIS: Objection. Calls for a legal conclusion.
Also Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: My opinion, it reflects DOE's plans at that point in time.
BY MR. TOMASZCZUK:
Q. Did you have any role to play, Mr. Milner, in the development of the information which appears on this Table 2-2?
A. I don't recall that I did.
Q. Do you know who did?
MR. SHULTIS: Objection -- asked and answered.
THE WITNESS: No, I don't recall who

79

did.
MR. TOMASZCZUK: It's noon. Do you want to take a lunch break?
MR. SHULTIS: Are we done with this document?
MR. TOMASZCZUK: Well, I hope so, but I reserve the right to ask him some additional questions after lunch break.
MR. SHULTIS: Sure. Sure.
(Whereupon, at Noon, the deposition was recessed, to reconvene at 1:00 p.m. the same day.)

80

AFTERNOON SESSION
(1:09 p.m.)
Whereupon,
RONALD L. MILNER,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:
FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER AND LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INCORPORATED, POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, NEBRASKA PUBLIC POWER DISTRICT:
BY MR. TOMASZCZUK:
Q. Back on the record?
A. All set.
Q. Good afternoon, Mr. Milner. The same ground rules apply as this morning, and you're still under oath.
A. Okay.
Q. What was your role in the preparation of the Mission Plan which we have marked as

81

Milner Exhibit 5?
A. The original Mission Plan, an entity, I hesitate to call it a organizational entity, several people under me prepared it, so essentially, since it was very near completion when I took the job, it was pretty perfunctory in terms of final approval I guess, but it was really more of a production issue at that point.
Q. You came on board in 1984, and it was published in final form in June 1985, right?
A. I guess so, yeah.
Q. Using Milner Exhibit 1, the organizational chart, can you identify which of the pages of Milner No. 1 would reflect the organization responsible for the preparation of the Mission Plan?
A. On page 1, RW-13; beyond that, I really don't recall the transitional entity.
As I say, my recollections have been that the Mission Plan was earlier than that, but obviously it was not.
Q. Who were the people that were under you that were responsible for the preparation of the Mission Plan?
A. I can only recall one name -- Victor

82

Trebules.
Q. Did DOE make an annual determination regarding the need to revise the Mission Plan?
A. There has not necessarily been an annual determination.
I believe there had been one Mission Plan Amendment.
I can't actually recall the timeframe of that.
Q. Did you participate in any annual reviews conducted by OCRWM of the need to revise the Mission Plan?
A. I'm sure I must have, but I don't recall specifically.
MR. TOMASZCZUK: Ms. Reporter, could you mark as Milner Exhibit 6 the Table of Contents to the June 1985 Mission Plan which I had alluded to in one of my questions this morning, but it was not contained in the copy that I provided you?
(Milner Exhibit No. 6 was marked for identification.)
BY MR. TOMASZCZUK:
Q. And my question to you, Mr. Milner, is

83

looking at the Table of Contents, are you able to identify any of the section of the Mission Plan that you have drafted, if any?
A. I did not draft any sections of it.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. You reviewed the entire document prior to its issuance, correct?
A. I'm sure I did, yes.
Q. Were there sections of the Mission Plan that you spent more time on or devoted more attention to than others that you can recall?
MS. HERRMANN: Objection -- vague.
THE WITNESS: Not that I can recall.
BY MR. TOMASZCZUK:
Q. Can I direct your attention to the page 29 of the June '85 Mission Plan?
A. Page 29?
Q. Page 29 should be the last page.
A. Um-hm.
Q. Of this excerpt.
A. Um-hm.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:

84

Q. This page 29 appears to identify for DOE objectives for a waste acceptance system, and it lists them one, two, three, four?
A. Um-hm.
Q. Right?
A. Correct.
Q. And the first states accept civilian spent fuel at an annual rate that will allow the utilities to maintain orderly operations of their nuclear power plants, recognizing that the oldest spent fuel will have the highest priority for acceptance consistent with the DOE's current contracts with the waste generators?
A. Yes.
Q. All right? What is your understanding of the phrase in that quote that will allow the utilities to maintain orderly operations of their nuclear power plants?
A. My personal opinion of that was that given the limitations of the spent fuel pools of various utilities, that in essence we would pick up the fuel before a utility ran out of pool storage capacity which would then force it to shut down.
Q. The next objective, No. 2, states



accept the current planning base spent fuel inventory of 130,000 metric tons consistent with the objective of cost effective operations while providing tangible evidence that the DOE fully intended to dispose of spent fuel in a timely manner.
Do you have an understanding of the phrase while providing tangible evidence that the DOE fully intended to dispose of spent fuel in a timely manner?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: I guess my personal opinion on that one would have been that the program through whatever manner was showing progress in reaching its objective.
BY MR. TOMASZCZUK:
Q. Did DOE have an intention at or about the time it issued this Mission Plan as to how long it was going to take to accomplish this second goal?
MS. HERRMANN: Objection -- foundation.
Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I'm not sure I



understand the question.
MR. TOMASZCZUK: Okay. Could you read it back for him?
THE REPORTER: Question: "Did DOE have an intention at or about the time it issued this Mission Plan as to how long it was going to take to accomplish this second goal?"
MS. HERRMANN: Same objection.
THE WITNESS: Oh, I heard the question.
I didn't understand it.
BY MR. TOMASZCZUK:
Q. What about it don't you understand?
A. I'm not sure what, what, how long it would take to reach that objective, the objective being what?
Q. The objective of cost effective operations while providing tangible evidence that the DOE fully intends to dispose of spent fuel in a timely manner.
MS. HERRMANN: Same objection.
BY MR. TOMASZCZUK:
Q. As stated here.
A. Well, I guess my understanding of that would be upon reading it now, that the plan



would have been without specific timeframes.
You're trying to demonstrate progress.
I don't know that there was any specific timeframes other than the '98 date.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Assuming that DOE began performance in 1998, do you have an understanding as to how long it would take for DOE to complete its performance?
MS. HERRMANN: Objection -- speculation.
THE WITNESS: Performance in terms of?
BY MR. TOMASZCZUK:
Q. Compliance with the Nuclear Waste Policy Act and the contract.
MS. HERRMANN: Same objection.
THE WITNESS: Well, at that point in time, the compliance would have begun with waste acceptance in 1998.
BY MR. TOMASZCZUK:
Q. Right. And I'm trying to inquire as to your understanding at or about this time, assuming that they began performance in 1998,

Q. And do you have some recollection of having done that?
A. Not specifically, no.
Q. It's fair to say that PNL would not have developed these receipt rates on their own?
They would have come from DOE in the first instance?
A. Personal opinion, that would have been correct, yes.
Q. And do you know who at DOE would have provided that?
A. My office would have provided the data to PNL.
My office did not generate the data.
Q. Okay. And do you know --
A. And I don't recall who generated the data.
Q. And you don't recall who provided it, either, correct, to PNL?
A. Specific person, no.
Q. Do you know what you or individuals in your office did with this report after it was generated?
MS. HERRMANN: Objection -- speculation.

93

THE WITNESS: Relative to the department, the department submitted it to Congress and published it.
BY MR. TOMASZCZUK:
Q. When you say the department submitted it to Congress, you mean the department submitted final fee adequacy report?
A. Correct.
MR. TOMASZCZUK: Ms. Reporter would you mark as Milner Exhibit 8 a document entitled nuclear waste fund fee adequacy and assessment dated February 1985?
(Milner Exhibit No. 8 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Mr. Milner, is this the first fee adequacy report that was published subsequent to your going, becoming an OCRWM employee?
A. It would appear that this would be the second.
Q. There was one published prior to this when you were an OCRWM employee?
A. Yes.

94

Q. And how do you know that?
A. Simply by timeframe.
Q. Do you recall the date of that fee adequacy report that would have been published under your watch so to speak?
A. September 1984.
Q. And you recall that September 1984 fee adequacy report?
A. From the extent that we were just discussing it, yes.
Q. Were we just discussing it? I'm sorry.
A. I believe we were.
Q. Were you referring to Milner Exhibit 7?
A. Yes.
Q. I understood that to be a document prepared by PNL for use by DOE and not to be a fee adequacy report itself.
A. Okay. I may be mistaken. That may have been the input.
Q. You can correct me if I'm wrong. I'm just trying to understand your answers.
A. Well, since I don't, I don't specifically recall all of the different fee

95

adequacy reports, I'm going by dates and timeframes. I didn't notice the differentiation.
Yes, this probably was the report that PNL prepared for the department which ultimately became a fee adequacy report.
Whether there was one prior to February '85, I am not sure I guess.
Q. Well, I think there was an initial fee adequacy report which is referred to in Milner 8 which was prepared in July of '84.
My presumption based on your testimony is that you had little, if anything, to do with that initial fee adequacy report, but maybe that's an incorrect assumption.
A. That would certainly have been the case, yeah.
Q. And given your arrival upon the scene, I would have thought that this would have been the first fee adequacy report for which you or your office were responsible.
A. I think that's correct.
Q. All right. Looking at Milner 8, did you draft this document do you know?
A. Did I personally draft the document?

96

Q. Yes.
A. No, I did not.
Q. And when you say no, you did not, you did not draft any sections of it that you recall?
A. Correct.
Q. And do you know who did?
A. I cannot recall, no.
Q. Would I be correct in understanding that Milner Exhibit 7, the document that PNL prepared for DOE, was used in the preparation of the final fee adequacy report reflected in Milner 8?
MS. HERRMANN: Objection -- speculation.
THE WITNESS: It would appear so.
BY MR. TOMASZCZUK:
Q. This 1985, February 1985 fee adequacy report concluded that the disposal fee should remain at one mill per kilowatt hour for 1985, correct?
A. Correct.
Q. Do you know whether that recommendation changed in subsequent fee adequacy reports?



A. Yes, I do. I don't believe it ever changed.
Q. And is it your view that the one mill per kilowatt hour fee remains adequate up to this point in time?
A. My personal opinion is it does.
Q. Have you done any studies or analyses to support that opinion?
A. Personally?
Q. Yes.
A. No, I have not.
Q. But you've seen studies and --
A. Yes.
Q. And you share in their findings?
A. Yes.
Q. Can I direct your attention to page 3 of Milner Exhibit 8?
This page, if I understand it correctly, appears to reflect the principal, the principal assumptions underlying the analysis in the report.
Is that fair?
A. Correct.
Q. And one of those assumptions is a repository design capacity of 70,000 metric tons



for each of two repositories?
A. Correct.
Q. And there are rates, waste acceptance rates which are assumed for the first and second repositories, right?
A. Correct.
Q. And in each instance, those ramp up to 3,000 MTU after five years?
A. Correct.
Q. And this document indicates that that rate was to remain constant for a Year 6 and beyond?
A. Correct.
Q. Did you have any input in the development of those receipt rates?
A. No, I did not.
Q. Do you know who at DOE was responsible for them?
A. I don't recall who did it.
Q. Do you agree that these rates reflect DOE's intentions at the time with respect to spent nuclear fuel acceptance?
MS. HERRMANN: Objection -- foundation.
Mr. Milner is not a 30(b)(6) witness.



THE WITNESS: On the basis that it was contained in the fee adequacy report, it would be, would have been DOE's plans at the time.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: We get into the big gorillas!
Ms. Reporter, would you mark as Milner Exhibit 9 a document entitled analysis of the total system life cycle cost for the Civilian Radioactive Waste Management Program dated April 1985?
(Milner Exhibit No. 9 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, have you seen this document before today?
A. I don't specifically recall it, but I must have.
Q. You and others in your office were responsible for the issuance of this report?
A. Correct.
Q. Did I understand your testimony to be that this document was used as an input into the

fee adequacy report that we just saw?
A. That's correct.
Q. Just so I understand the timing of these documents correctly, the fee adequacy report that I asked you about a few moments ago was dated February of 1985, and this document Milner 9 is dated April 1985?
A. Um-hm.
Q. The, the analysis contained in the TSLCC report, would that have been used to prepare next year's fee adequacy report?
A. I believe that would be the case, yeah.
Q. So a fee adequacy report would be issued using the previous TSLCC, and once that fee adequacy report was completed, then you would turn to preparing the next TSLCC for use in preparing the following year's fee adequacy report?
A. Correct.
Q. Can you walk me through this document since you and those in your office were responsible for it?
Give me an overview section by section.



MS. HERRMANN: Objection -- vague.
THE WITNESS: I would start with the Table of Contents, go through.
BY MR. TOMASZCZUK:
Q. Okay. You can take the binder clip off if it helps.
A. Okay. Introduction and summary as it indicates in the Table of Contents would have given a summary of the cost findings in the report, the program strategy.
Without reading it, I assume that includes the program assumptions, how that compared with the previous year's TSLCC.
Second chapter was a little bit about the methodology that was used in developing the cost and so forth.
The next several sections got into more detail in terms of the cost estimates.
There are several categories of cost estimate in the TSLCC -- the cost of the transportation program, repository costs, the cost of the potential MRS -- and the section on development and evaluation costs was essentially all other costs of the program.
Q. Do you -- I'm sorry. I didn't mean to



interrupt you.
A. No. No.
Q. Were you finished with your answer?
A. I was.
Q. Do you know how many people worked on the preparation of this report?
A. In total, no, I don't.
Q. Is this the first TSLCC report that you would have worked on or issued?
A. Probably was. I don't recall specifically.
Q. Did the preparation of the report consume most of your time while it was underway, or was this something that you were less personally involved in and left to others primarily?
MS. HERRMANN: Objection -- vague.
THE WITNESS: Less personally involved in.
BY MR. TOMASZCZUK:
Q. Do you know the names of any DOE personnel who would have been involved in the preparation of this TSLCC?
A. I can't recall.
Q. Is the purpose of the document to



estimate life cycle costs for the then currently planned system plus a number of alternatives?
A. That's correct.
Q. And the objective of the TSLCC report was to make cost estimates that reflect as closely as possible the most current DOE program strategy for meeting legislative milestones?
A. That's correct.
Q. Could I direct your attention to page 2-12 of this exhibit?
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. This table, if I understand it correctly, indicates an initial receipt rate commencing, initial spent nuclear fuel receipt rate commencing 1998 of 400 metric tons?
A. That would be my understanding as well.
Q. Do you know why the mathematics are reflected differently on this table than they are in others?
MS. HERRMANN: Objection -- speculation.
THE WITNESS: No, I don't.
BY MR. TOMASZCZUK:

Q. And that's, the same table shows steady-state receipt rate of 400 metric tons for the first three years 1998, 1999 and 2000, correct?
A. Correct.
Q. And then increasing to 900 metric tons in 2001, correct?
A. Correct.
Q. Increasing to one point -- I'm sorry -- to 1800 metric tons in 2002?
A. Correct.
Q. And then ramping up to 3,000 metric tons in 2003?
A. Correct.
Q. And at least continuing at that rate for a number of years thereafter in this first repository?
A. Correct.
MS. HERRMANN: Objection -- vague.
BY MR. TOMASZCZUK:
Q. Do you know the source of the receipt rates that are reflected on this Table 2-4?
A. No, I don't.
Q. Would that have been somebody in your office or from another organization that

105

provided that data?
MS. HERRMANN: Objection -- asked and answered.
THE WITNESS: Would not have been from my organization.
Would have been from another organization within the program.
BY MR. TOMASZCZUK:
Q. And do you know which organization?
A. No, I don't.
Q. Could you answer the question if you used Milner Exhibit 1?
A. I could make a better guess.
Q. Okay.
MS. HERRMANN: Objection -- speculation.
BY MR. TOMASZCZUK:
Q. Would you do the best you can?
A. I would assume that it came from the organization indicated as RW-20.
Q. And you're referring to the first page of Milner 1?
A. Correct.
Q. And RW-20 was the Office of Geologic Repository Deployment?

106

A. Correct.
Q. And why do you think the data would have come from that office?
A. That was the organization specifically responsible for repository planning.
Q. Now that office doesn't exist at least in that name anymore today, does it?
A. No, it does not.
Q. Looking at Milner 2, can you tell me where within the organization it appears?
A. The closest semblance to that organization would be in Exhibit 2 what's labeled the Yucca Mountain site characterization office.
Q. That's the office today that's responsible for, primarily responsible for the design of the geologic repository?
A. That's correct.
Q. And that office reports to you, does it not?
A. Yes, it does.
Q. And do you know what that office's plans are with respect to the design of the geologic repository at Yucca Mountain insofar as spent nuclear fuel acceptance rates are

107

concerned?
MS. HERRMANN: Objection -- vague.
THE WITNESS: Yes, I do.
BY MR. TOMASZCZUK:
Q. And can you tell me?
A. Yes -- receipt at the rate of 400 metric tons in the first year, 600 in the second, 900 in the third, and ramping up.
Q. Four hundred in the first, 600 in the second, 900 in the third, and then what happens after the third year?
A. Then I believe it goes to 1200.
Q. And does it stay at 1200, or does it increase beyond that?
A. It increases beyond that. I believe it increases to 2000.
Q. And does it stay at 2000 or increase or decrease?
A. I don't recall.
Q. So your, your understanding is that the geologic repository that's currently being planned at Yucca Mountain envisions spent nuclear fuel acceptance rate of 2000 metric tons in its fifth year of operation?
A. That's my recollection.

108

I reviewed it upon issuance.
BY MR. TOMASZCZUK:
Q. And for what purpose is the program plan prepared?
A. It's intended to be a five-year look at the operation, how we would operate the program, what our plans are over that period of time.
That certainly looks to 2010, but there is more detail than the five years.
Q. And the last program plan was prepared in roughly 2000?
Do I have that right?
A. Roughly; I don't recall specifically when it was issued.
Q. And that program plan looks at the Years 2000 through 2005 in some detail?
A. In some detail, yes; farther out, in much less detail.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Did there come a time, Mr. Milner, when the spent nuclear fuel acceptance rates as reflected in this Exhibit Milner 9 that we just

113

looked at in Table 2-4, did those change?
A. Yes, they did.
Q. And do you know when that occurred?
A. Early '90s timeframe; I can't recall specifically.
Q. And do you know why they were changed?
A. I don't recall specifically.
Q. Do you recall generally?
A. In very general terms, there was a limitation at that point in time, there was an anticipation that there would be an MRS in the system.
Under law, the limitation on an MRS was I believe 10,000 metric tons. No more than 10,000 metric tons could be stored at that facility until a repository began operation. That factored into it.
I can't recall the specifics.
Q. DOE has no current plans to site an MRS, is that right?
A. That's correct.
Q. And when did DOE essentially give up on plans to site an MRS?
MS. HERRMANN: Objection -- foundation.

114

Mr. Milner is not a 30(b)(6) witness; and vague.
THE WITNESS: Mid-'90s, '94 timeframe maybe.
BY MR. TOMASZCZUK:
Q. And do you know what caused DOE to give up on attempting to site an MRS?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: Prior to cancelling the MRS effort, there had been an Office of the Nuclear Waste Negotiator that was established, official title appointed by the President to attempt to find a volunteer MRS site.
That effort was unsuccessful. Under the Nuclear Waste Policy Act, an MRS can't be cited unless it was through the volunteer effort.
Until the repository site was selected with the failure of the nuclear waste negotiator to find a volunteer, it made no sense to pursue an MRS.
BY MR. TOMASZCZUK:
Q. If I understood your testimony this morning, you spent a couple of years at OCRWM

115

working on the MRS effort, was that right?
A. That's correct.
Q. That was roughly between 1990 and 1992?
A. Correct, yeah.
Q. And when you stopped working on the MRS effort, was that, did that occur I should say at the same time that DOE gave up on its efforts to site an MRS?
A. It did. It did.
Q. So do I understand that that effort stopped in 1992, is that right?
A. I can't recall; '92 to '94 timeframe.
Q. Would any of the organizational charts at Brownstein -- I'm sorry -- at Milner -- also happened to be an exhibit for your colleague, Mr. Brownstein -- at Milner Exhibit 1 help you pin that timeframe down?
A. It probably would.
Q. Would you take a moment and look at those and attempt to do that?
(The witness reviewed the document.)
THE WITNESS: Okay. Between, it would have been somewhere between '91 and '94.
BY MR. TOMASZCZUK:

116

Q. And what pages of Milner Exhibit 1 did you use to help you in that answer?
A. Okay. Well, I don't have page numbers on mine.
Q. I'm sorry. You have got to use dates on the documents or captions as best you can.
A. Okay. Looking at one that has I guess some machine printed date of 91040, which we took earlier to be '91.
MS. HERRMANN: Looking at the left margin?
THE WITNESS: Correct, the left margin, yeah.
BY MR. TOMASZCZUK:
Q. All right.
A. And the subsequent page which was dated 3/2/94.
Q. So would I be correct in understanding that at least as of March 2, 1994, DOE's efforts to site an MRS had died?
A. I can't recall specifically that that would have been true.
It was roughly that timeframe.
(There was a pause in the proceedings.)

117

BY MR. TOMASZCZUK:
Q. Mr. Milner, can you tell me what you did, what your activities were with respect to attempting to site an MRS?
MS. HERRMANN: Objection -- vague.
THE WITNESS: Very general terms, we, my office supported the Office of the Nuclear Waste Negotiator.
Some of the things that constituted that support were discussing what an MRS facility might look like to entities that expressed an interest.
Certainly we did preliminary designs of an MRS.
BY MR. TOMASZCZUK:
Q. When you said my office or your office, what was the name of that office again?
I'm sorry.
A. Storage and transportation or transport, whatever it was -- transportation.
Q. And within that office, how many people worked on the effort to site an MRS, if you know?
MS. HERRMANN: Objection -- vague.
THE WITNESS: Roughly about five or

118

six people.
BY MR. TOMASZCZUK:
Q. And within your office, you were leading that effort, do I understand that correctly?
A. That's correct.
Q. Were you disappointed that the efforts to site an MRS did not succeed?
A. Personally I was, yes.
Q. Why?
A. Okay. My opinion, to have such a facility in the system would have been beneficial, certainly offered a better opportunity to reach a program objective of waste acceptance in '98.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Do you know what construction period for a geologic repository is embodied in Milner Exhibit 9, the 1985 TSLCC report?
A. I don't recall, no.
Q. If you looked at the document, would that refresh your recollection?
A. It may.

119

MS. HERRMANN: Do you have a section you want to point out or --
MR. TOMASZCZUK: Well, I'll let him look, and if he can't find it, then I'll be happy to try and --
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Do you want to look at Figure C3 at page C-4.
I think it's an appendix actually.
Just a minute.
A. Okay. From this, it appears that construction was estimated to be roughly two and a half years.
Q. And on what do you base that?
A. A schedule chart that -- I'm sorry.
I'm incorrect there.
It looks like it was estimated to be four and a half years of construction.
Q. And you base that on the bullet for construction authorization by, approved by NRC in August of '93, and then the commencement of facility operations in January '98?
A. Correct.
Q. All right. So that shows roughly four

120

Q. It appears to be a bullet listing of four problems with disposal contract?
A. Um-hm.
Q. And the first is that it's general?
A. That's correct.
Q. It says general there?
A. Correct. It says general.
Q. Second bullet says incomplete?
A. It does say incomplete.
Q. The third says dated?
A. It does say dated.
Q. And the fourth says unclear?
A. It does say that.
Q. All right. Do you have any understanding sitting here today as to what is being referred to in that listing of problems?
MS. HERRMANN: Objection -- foundation, and speculation, and vague.
THE WITNESS: No, I do not know what was being referred to here.
BY MR. TOMASZCZUK:
Q. Sitting here today, do you have any understanding that the standard contract is either general, incomplete, dated, or unclear?
MS. HERRMANN: Objection --



speculation, and compound.
THE WITNESS: I have personal opinions in some regards.
BY MR. TOMASZCZUK:
Q. Okay. And I'm anxious to hear about those.
Would you tell me what your personal opinions in that area are?
MS. HERRMANN: Objection -- vague.
THE WITNESS: Well, one opinion is that in some areas, I do believe it is incomplete.
One example would be that the contract doesn't clearly define how you would deal with non-standard fuel.
It doesn't clearly define how you deal with non-fuel bearing components of the fuel assembly.
BY MR. TOMASZCZUK:
Q. Any other opinions that fall within these four areas?
MS. HERRMANN: Objection -- vague.
THE WITNESS: No.
(There was a pause in the proceedings.)



MR. TOMASZCZUK: Ms. Reporter, would you mark as Milner Exhibit 11 another document entitled briefing for OCRWM Executive Committee dated November 1986, disposal contract and Annual Capacity Report?
(Milner Exhibit No. 11 was marked for identification.)
MS. HERRMANN: Do we get one?
MR. TOMASZCZUK: Oh, I'm sorry -- absolutely.
BY MR. TOMASZCZUK:
Q. Have you seen this document before today, Mr. Milner?
A. Not that I recall, no.
Q. Did you participate in any briefing of the OCRWM Executive Committee in November of 1986 concerning the disposal contract and Annual Capacity Report?
A. Not that I recall.
Q. Can I direct your attention to Bates page number PNL-102-1182?
And this appears to be a listing of bullet points relating to the purpose and background for the Annual Capacity Report?



A. To my understanding, yeah.
Q. Was it your understanding that the ACR was intended to lead to contractually binding waste acceptance commitments starting in 1992?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: My recollection is not so much the timeframe, but yes, they would lead to a binding commitment.
BY MR. TOMASZCZUK:
Q. At the time the ACR was issued, was it binding?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: My personal opinion was that no, it was not.
As indicated here, it was for planning purposes.
BY MR. TOMASZCZUK:
Q. But the ACR issued for planning purposes in your understanding would lead to a mutually binding commitment on the parties?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: That would have been my

understanding.
BY MR. TOMASZCZUK:
Q. And is your understanding today?
A. Yes.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Let's mark as Milner Exhibit 12 the Annual Capacity Report dated June 1987.
(Milner Exhibit No. 12 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Actually, Mr. Milner, before I ask you about that, I had a couple of questions on the OCRWM Executive Committee I forgot to ask you about.
Were there any minutes of the meetings of that committee do you know?
MS. HERRMANN: Objection -- foundation, speculation.
THE WITNESS: None that I can recall. I simply don't know on that one actually.
BY MR. TOMASZCZUK:
Q. Do you know insofar as the meetings

133

that you attended whether anyone took notes?
A. Not that I can recall.
Q. Were any decisions reached as a result of the OCRWM Executive Committee meetings?
MS. HERRMANN: Objection -- foundation, speculation, vague.
THE WITNESS: Well, I don't know.
BY MR. TOMASZCZUK:
Q. Have you seen any reports or documents summarizing decisions reached at any meetings of the OCRWM Executive Committee?
A. No.
Q. Okay. Now I'm going to ask you some questions about the ACR.
Have you seen this document before today?
A. I must have. I don't specifically recall, though.
Q. Were you responsible for its preparation?
A. I don't recall whether I was the first one or not.
Q. If you were not, do you know who would have been?
A. No, I don't.

134

Q. Would the organizational charts in Exhibit 1 help you answer that question?
A. Perhaps.
(The witness reviewed the document.)
THE WITNESS: I don't believe I was responsible for this one.
BY MR. TOMASZCZUK:
Q. And why do you say that?
A. I believe at the timeframe I was in a position which wasn't responsible for that.
Q. And which position are you referring to in your answer?
A. That was financial management and analytical services.
Q. So at the point in time that this was prepared, you were working on fee adequacy reports, TSLCC reports, but not the ACR?
A. Correct.
Q. Did you see the ACR at or about the time it was issued?
A. I don't specifically recall, but I likely would have.
Q. Is it fair to assume that you would have reviewed it before it was released to the public?

135

A. Likely I would have, yes.
Q. If I could direct your attention to the summary, which is, it's the fourth page of the document. It's got small Roman Numeral Five there.
This first paragraph appears to indicate that this report is required by the standard contract, correct?
A. Correct.
Q. For planning purposes, that is also embodied in the first sentence, right?
A. Correct.
Q. And the ACR will set forth the projected annual receiving capacity of the waste management system for ten years following the expected commencement of facility operations, right?
A. Correct.
MS. HERRMANN: Objection. The document speaks for itself.
BY MR. TOMASZCZUK:
Q. And the report is the first in a series to be published by DOE?
A. That's correct.
Q. Okay. And the next sentence and the

136

first sentence of the second paragraph on this page indicates that the system configuration used as the basis for the report is defined in the Mission Plan Amendment?
MS. HERRMANN: Objection. The document speaks for itself.
BY MR. TOMASZCZUK:
Q. Correct?
A. Correct.
Q. And that's the Mission Plan Amendment that you presumably were working on, right?
A. Presumably, yeah.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Now do you know the date of that Mission Plan Amendment that's referred to here?
A. I don't recall.
Q. Let's look at page 7 of this document, and the first sentence on this page states that the waste acceptance schedule in this ACR is consistent with the schedule from the Mission Plan Amendment, correct?
A. That's correct.
Q. All right. And the Mission Plan

137

Amendment itself is referred to underneath Table 2.1 here, right?
A. Correct.
Q. And it appears to be a, the June 1987 Mission Plan Amendment?
A. Correct.
Q. And that's a document that you worked on?
A. I believe I did, yes.
Q. And that is the source for the acceptance rates that are reflected on this Table 2.1?
A. Yes. That's what is indicated here.
Q. And this table shows a, an initial rate of 1200 metric tons in 1998?
A. Yes, it does.
Q. And then ramping up in the fifth year or sixth year, correct me, to 2,000 metric tons?
A. Correct.
Q. And then increasing to 2,650 metric tons thereafter?
A. Correct.
Q. Do you know how those rates were derived?
A. No, I don't.

138

Q. Do you know on what they're based?
A. No, I don't.
Q. Who would know?
A. I don't know.
Q. Is there any basis for them?
MS. HERRMANN: Objection -- vague.
THE WITNESS: I don't know what they're based on.
I don't know.
BY MR. TOMASZCZUK:
Q. Do you know what a utility was to do with this information when it received it from DOE in or about June of 1987?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I think the purpose was to provide some information for planning purposes.
BY MR. TOMASZCZUK:
Q. Now the rates were not binding on DOE, is that right?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: That would be my understanding.

139

BY MR. TOMASZCZUK:
Q. Were they binding on the purchasers?
MS. HERRMANN: Same objection.
THE WITNESS: I'm not sure I understand that question.
BY MR. TOMASZCZUK:
Q. You understand my question that they were not binding on DOE, but you don't understand my question, which is the same question, as to whether or not they were binding on the purchasers?
A. That's correct.
MS. HERRMANN: Objection -- vague.
BY MR. TOMASZCZUK:
Q. What about it don't you understand?
A. I don't know how a receipt rate would be binding on a utility since this is an aggregate rate.
Q. Would the receipt rate be binding in the aggregate on nuclear utilities?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I don't believe it would.
(There was a pause in the

140

BY MR. TOMASZCZUK:
Q. Do you know whether the utilities had any reaction that was communicated to you with respect to the Mission Plan Amendment issued in June 1987?
MS. HERRMANN: Objection -- vague.
THE WITNESS: I don't recall them expressing any reaction to me, no.
BY MR. TOMASZCZUK:
Q. At or about this time, 1985, 1986, 1987, that timeframe, did you have discussions with any utilities as to the acceptance rates contained in the Mission Plan or the Mission Plan Amendment?
A. I don't recall any discussions on acceptance rates.
Q. Have you had any discussions that you can recall at any time with any utilities regarding acceptance rates published by DOE?
A. I recall discussions with industry representatives.
I couldn't recall specific utilities. It may have been NEI or its predecessor EEI.
I guess the discussions were more in terms of their stating that their preference

149

would be that the quicker, the better.
Q. Do you know why they would state that preference?
MS. HERRMANN: Objection -- speculation.
THE WITNESS: My personal opinion would be they would state that because the storage costs at the utility, the quicker they no longer had to store fuel, the less their cost, their storage cost.
MR. TOMASZCZUK: Can we take a short break?
MS. HERRMANN: Sure.
(A recess was taken.)
MR. TOMASZCZUK: Back on the record.
BY MR. TOMASZCZUK:
Q. Mr. Milner, can I get you to look at the Mission Plan Amendment June '87 and that Table F-1?
And as I understand this table for the first repository, it shows a receipt rate in the first year on this table that's 2003, 400 metric tons, correct?
A. Yes. It appears to be.
Q. And that 400 metric ton figure stays

150

at that rate for a total of three years.
Then this ramps up to 900, then 1800, and then to 3,000 metric tons in the, would be the sixth year of operations, correct?
A. Correct.
Q. And it stays at the 3,000 metric ton rate for a period which I believe to be 20 years?
A. Yes.
Q. And then could I direct your attention back to the Annual Capacity Report for 1987? I believe it's Milner Exhibit 12, and what I was going to ask you to do was to look at page 7 of the Annual Capacity Report, and do I understand this correctly that these figures that appear at page 7 of the ACR at Table 2.1 adopt the Mission Plan spent nuclear fuel acceptance rates assuming operation of an MRS facility?
A. It appears to be, yes.
Q. And that MRS facility, as I believe you have testified earlier today, was never established, right?
A. Correct.
MR. TOMASZCZUK: Let's mark as Milner 15 a memorandum from Ron Milner to Lake Barrett

151

dated September 9, 1987, proposed assumption and case list for 1988 TSLCC.
(Milner Exhibit No. 15 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. That's your signature on this document?
A. It is.
Q. And why did you prepare this memorandum?
A. Typically when we began to prepare a TSLCC analysis, we did get the concurrence of the rest of the organizational elements on what the assumptions were, and it was also a way of informing other elements of assumptions prepared by different elements.
Q. When you say elements, you mean different offices within OCRWM?
A. Different branches, divisions, whatever, yeah.
Q. Mr. Barrett at this time was your supervisor?
A. No, he was not.

152

Q. And so why were you sending this memo to Mr. Barrett as opposed to sending it to someone else?
A. Without looking at the organizational chart, I believe Lake at that time was the director of the Transportation and Systems Engineering Division, so I would have been asking his agreement with the assumptions relative to transportation, and also as a way of informing him of assumptions that would have been relative to the repository, for example.
Q. Did you prepare this memorandum?
A. I probably did not personally prepare it.
Probably was prepared by a member of my staff.
I don't recall specifically.
Q. The second paragraph reflects that the assumptions were prepared by Weston in consultation with headquarters staff and others.
Weston was a contractor at this time?
A. Correct.
Q. Do you know who at Weston prepared these assumptions?
A. I don't recall.

153

Q. There is a gentleman referenced at the second page.
Do you have a second page that shows a list of cc's?
A. Oh, okay. Yes.
Q. And at the bottom of this list of individuals who, to whom copies were directed appears a name A. Leiter, comma, Weston?
A. Yes.
Q. Do you know whether Mr. Leiter prepared the assumptions?
A. I don't recall for sure, but it could well have been.
Q. Did Weston consult with you regarding the assumptions?
A. Yeah, they probably would have.
Q. You don't recall sitting here today the details of any such consultations?
A. No, I don't.
Q. The third paragraph of your memo states, quote, it is essential that the TSLCC assumptions be consistent with the current planning of the individual projects, current OCRWM policies, and the overall integration of the waste management system.

154

Why was that essential?
A. Well, in, in the sense that TSLCC was intended to be as accurate as possible or reflection of the estimated system cost, you needed to ensure that system that you were estimating was in fact what the different elements were planning to at that point in time.
Q. Would it be fair to say that at this time, the various OCRWM offices and divisions were working on a coordinated effort with respect to a waste acceptance system?
MS. HERRMANN: Objection -- vague.
THE WITNESS: I would hope it would have been, yes.
BY MR. TOMASZCZUK:
Q. Is it fair to say that one of the purposes that you circulated this memorandum was to make sure that everybody was on board so to speak with the assumptions attached to the memo?
A. Well, that everybody was utilizing the same assumptions, yes.
Q. And indeed was everybody utilizing the same assumptions?
A. My recollection is they were.
Q. And why was that important?

155

A. By? I don't --
Q. Why was utilizing the same assumptions among the various OCRWM offices, why was that important?
A. Oh, for purposes of the TSLCC; if different offices were using different assumptions, you wouldn't get an accurate cost estimate.
Q. Were there reasons other than the need for accuracy in the TSLCC that it was important that the various OCRWM offices and divisions and branches were utilizing the same assumptions?
MS. HERRMANN: Objection -- vague.
THE WITNESS: Well, my opinion was that certainly you wanted everybody, for different programmatic reasons, you wanted everybody utilizing the same assumptions and working the same planning base.
At that time, I was looking at it from a fairly narrow perspective of the TSLCC.
BY MR. TOMASZCZUK:
Q. When you say the same planning base, what do you mean by that?
A. Well, in the gross sense, you would hope that the transportation division I guess it

156

document speaks for itself.
THE WITNESS: It appears to be, yeah.
BY MR. TOMASZCZUK:
Q. Do you know, Mr. Milner, whether utilities were relying on the information that DOE published in the, for example, Mission Plan Amendment for purposes of planning their own spent nuclear fuel system needs?
MS. HERRMANN: Objection -- speculation.
THE WITNESS: No. I don't know what the utilities were planning on.
BY MR. TOMASZCZUK:
Q. Would it have been fair for them to rely upon this information?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: Our purpose in publishing this information was for them to utilize it for planning purposes.
BY MR. TOMASZCZUK:
Q. What does that mean to a utility, for planning purposes?
A. I don't know what it meant to the utility.

161

Q. Well, what do you mean by that term?
A. It meant that it was our best estimate at the time.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Did you review the attachments to Milner Exhibit 15?
A. I believe I probably did. I don't specifically recall.
Q. Could I direct your attention to page 9 of the attachment?
MS. HERRMANN: My copy is missing page 9.
BY MR. TOMASZCZUK:
Q. Do you have a page 9, Mr. Milner?
A. Yes, I do.
MR. TOMASZCZUK: Well, let's correct that.
Page 9, you have no page 9 to the attachment?
MS. HERRMANN: No page 9 -- oh, they're just backwards.
It's okay. Eight and nine are reversed.

162

Everybody is fine.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. There is a section here repository design receipt rates.
Do you see that?
A. Yes.
Q. And under this heading authorized system, as I understand it, in both circumstances, A and B, which are described here, there's an initial rate which ramps up to 3,000 MTU per year thereafter to closure.
Is that your understanding?
A. That's my understanding, yes.
Q. And those ramp-up rates to 3,000 MTU per year appear to apply with or without an MRS?
A. I believe that's the case.
Q. And would I be correct in understanding that you agreed with those assumptions at the time that this memorandum was sent?
A. Well, first, it wouldn't have been my place to agree or disagree, but yes, I did agree with them.
Q. In your cover memo, you were asking

163

Mr. Barrett to review the assumptions and ensure that the assumptions were appropriate for the 1988 TSLCC analysis and fee adequacy assessment, right?
A. Correct.
Q. And so in making that statement to Mr. Barrett, it would be fair to assume that you agreed with the assumptions as stated herein?
MS. HERRMANN: Objection -- asked and answered.
THE WITNESS: No, it would not be fair to assume from the memo that I agreed with those.
I in fact did, but --
BY MR. TOMASZCZUK:
Q. Would I be correct in understanding that if you disagreed with them, you would have mentioned that somewhere to Mr. Barrett in the memo?
A. Probably I would have.
Q. This design receipt rate that's reflected in this document ramping up to 3,000 MTU and then maintaining at that rate to closure, that's the rate that DOE is currently using, is it not, for purposes of the geologic

164

repository that it's planning to site at Yucca Mountain?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: The receipt rate for the first repository?
BY MR. TOMASZCZUK:
Q. Yes, or for the second one that's referenced here; the 3,000 MTU rate is what I'm asking about.
A. Well, yes, I guess it is the steady-state rate.
Q. For the design that DOE is currently contemplating for the repository at Yucca Mountain?
A. That's correct. I believe that's correct.
Q. I believe earlier in your testimony today, Mr. Milner, and I know it has been a long day, I believe you referred to a 2,000 MTU rate.
Did you mean 3,000?
A. I think I was in error. I believe it was 3,000 as the steady-state rate.
Q. Right.
(There was a pause in the

165

proceedings.)
BY MR. TOMASZCZUK:
Q. Do you know whether the other assumptions that are laid out in this document have stayed the same, or have they changed over the course of the years, do you know?
MS. HERRMANN: Objection -- vague, compound.
THE WITNESS: I think probably a number of the assumptions have changed.
BY MR. TOMASZCZUK:
Q. Do you know which ones have changed? Which ones come to mind?
A. Receipt rate.
Q. I'm sorry. And how has that changed?
A. The ramp-up rate has changed.
Q. And to what degree or to what extent?
A. The current ramp-up rate begins with 400 MTUs in the first year, 600 in the second year, 900 in the third year, and I believe it's 1200 in the fourth year.
At some point, it goes to 1200. I believe at some point it goes to 2,000, and ultimately a steady state of three.
Q. Okay. Sitting here today, are you

166

aware of other assumptions that are contained in this document that have changed, and if so, can you identify them for me as best you can?
A. Without reading through this, no, offhand, I can't.
Well, okay, one, one assumption is that there is no longer a second repository.
Another one is there is no longer an MRS.
Q. All right. Can we just go back to page 1 and just sort of flip through some of these? And maybe some other assumptions have changed as well.
I would like to find out about that if I can, for example, waste type.
MS. HERRMANN: I'm sorry. Was that a question?
BY MR. TOMASZCZUK:
Q. Have assumptions changed from those as set forth herein under the heading waste type?
MS. HERRMANN: Objection -- vague, compound.
(The witness reviewed the document.)
THE WITNESS: I believe that the waste type essentially remains the same.

167

I don't know of a difference.
BY MR. TOMASZCZUK:
Q. Okay. Quantity of spent fuel?
MS. HERRMANN: Same objections.
THE WITNESS: Quantity of spent fuel certainly has changed.
I don't believe EIA any longer produces a series of case assumptions, upper/lower/mid-case assumptions.
I believe they only publish a projection based on no new orders case.
MR. TOMASZCZUK: Okay.
(There was a pause in the proceedings.)
THE WITNESS: Characteristics of spent fuel, I believe the burn-up of spent fuel has been gradually increasing.
BY MR. TOMASZCZUK:
Q. I'm sorry. You said increasing?
A. Increasing, yes. Utilities are leaving the fuel in the reactor longer.
(The witness reviewed the document.)
THE WITNESS: Quantity of defense high-level waste and commercial high-level waste, I believe the projections of the number

168

Q. If you used Milner Exhibit 1, would that help you?
A. I might be able to make a better guess.
Q. Okay.
MS. HERRMANN: I'll just go ahead and object to speculation now.
(The witness reviewed the document.)
THE WITNESS: I would guess that it was somewhere within the Office of External Relations and Policy.
BY MR. TOMASZCZUK:
Q. And do you know who is heading that office at this time?
A. I don't recall.
BY MR. TOMASZCZUK: Let's mark as 18 a draft 1988 Mission Plan Amendment dated June 1988.
(Milner Exhibit No. 18 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Are you familiar with this document, Mr. Milner?
A. I vaguely recall it, yes.

189

Q. What is this document, do you know?
A. It's the draft Mission Plan Amendment.
Q. Do you know why it was released in draft form?
A. I think typically, continues to this day really, the majority of our documents are issued in draft for public review, comment, so I would assume that that was the purpose of this one.
Q. Do you know whether it was ever issued in final?
A. I don't believe it was.
Q. Do you know why not?
A. I don't recall.
Q. Was there something peculiar about this document that caused it not to be issued as a final document?
A. I don't recall, no.
Q. Can I direct your attention to page 19?
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. And on this page is another table depicting waste acceptance schedules?
A. Correct.

190

Q. Do you know who prepared this table?
A. No, I don't.
Q. And this table shows a, an MRS facility waste acceptance schedule of 1200 MTU commencing in 2003?
A. It does.
Q. And it also depicts spent nuclear fuel acceptance schedule commencing in 2003 at a first repository at a 400 MTU rate?
A. It does.
Q. And that repository rate ramps up to 3,000 MTU in the sixth year of operations?
A. It does.
Q. And stays current for approximately 20 years?
A. It does.
Q. Was the development of these rates reflected in these tables important to OCRWM?
A. Yeah, I think it would have been.
Q. Did you often discuss them with other OCRWM personnel?
A. I can't say that I did, no.
Q. Are you familiar, Mr. Milner, with the amendments to the Nuclear Waste Policy Act that were made in 1987?

191

A. I believe I am.
Q. Did the concept of linkages derive from those amendments?
MS. HERRMANN: Objection -- vague.
THE WITNESS: Concept of -- I don't understand the question.
BY MR. TOMASZCZUK:
Q. Okay. Do you have an understanding of the term linkages?
A. In general, yes.
Q. Yes. Can you state for me your understanding of that term?
A. The term linkage as a mechanical engineer would link two components together.
Q. Do you know whether the NWPA amendments established any linkages between the operation of a repository and the siting of a geologic repository?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I believe it did.
BY MR. TOMASZCZUK:
Q. Okay. And what is your understanding as to those linkages or linkage?
MS. HERRMANN: Same objection.

192