**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant**.

---

**VOLUME IX OF X**
**(Pages A 1239 to A 1400)**

---

# ENERGY NORTHWEST'S CORRECTED APPENDIX IN SUPPORT OF ITS CORRECTED NOTICE OF DESIGNATION OF DEPOSITION AND PRIOR TRIAL TESTIMONY OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO ADMIT PRIOR TESTIMONY INTO EVIDENCE

---


NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
202-639-6000


June 2, 2008

*Attorneys for Plaintiff*

# Table Of Contents To Appendix – Volumes I to X

## Volume I

Documents Cited

DOE's Responses to Utility Plaintiffs' First Set of Interrogatories..........................A 0001

DOE's Responses to Utility Plaintiffs' Joint Supplemental Interrogatories.............A 0013

April 3, 2002 30(b)(6) Notice of Deposition .........................................................A 0028

April 18, 2002 30(b)(6) Notice of Deposition .......................................................A 0033

November 12, 2004 30(b)(6) Notice of Deposition................................................A 0039

March 2, 2005 30(b)(6) Notice of Deposition .......................................................A 0043

## Volume IA

April 19, 2007 30(b)(6) Notice of Deposition .......................................................A 0047

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 2450874
(Fed. Cl. Sept. 17, 2004) (unpublished).........................................................A 0050

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, slip. op.
(Fed. Cl. Sept. 21, 2004) (unpublished).........................................................A 0063

*Wisc. Elec. Power Co. v. United States*, No. 00-697C, slip op.
(Fed. Cl. Aug. 16, 2007) (unpublished).........................................................A 0073

Defendant's Unopposed Motion to Designate Prior Trial Testimony of
Mr. Robert L. Morgan in System Fuels .........................................................A 0103

## Volume II

Deposition Transcripts and Trial Testimony Excerpts

Chart of Energy Northwest Deposition and Trial Testimony Designations .............A 0109

Barrett, Lake .........................................................................................................A 0128
April 22, 2002 ...............................................................................................A 0129
April 23, 2002 ...............................................................................................A 0165
April 26, 2002 ...............................................................................................A 0191
May 8, 2002 ..................................................................................................A 0225
May 10, 2002 ................................................................................................A 0250
May 14, 2002 ................................................................................................A 0278
May 15, 2002 ................................................................................................A 0286

## Volume III

Brownstein, Alan ........................................................A 0289
April 9, 2002 ........................................................A 0290
April 10, 2002 ........................................................A 0318
April 11, 2002 ........................................................A 0350
May 23, 2002 ........................................................A 0363
June 14, 2002 ........................................................A 0368

Cole, Billy M. ........................................................A 0376
March 12, 2002 ........................................................A 0377
March 13, 2002 ........................................................A 0411
June 4, 2002 ........................................................A 0419

Dreyfus, Daniel ........................................................A 0422
May 15, 2002 ........................................................A 0423

## Volume IV

Klein, Susan ........................................................A 0438
April 24, 2002 (Rule 30(b)(6))........................................................A 0439
April 25, 2002 (Rule 30(b)(6))........................................................A 0478

Kouts, Christopher ........................................................A 0493
January 30, 2004 ........................................................A 0494
February 19, 2004 ........................................................A 0504
August 2, 2004 (in the Yankee Atomic Trial Transcript)........................A 0509
April 11, 2005 (Rule 30(b)(6))........................................................A 0516
July 12, 2005 (in the TVA Trial Transcript)........................................A 0532
October 26, 2005 (in the Southern Nuclear Trial Transcript)....................A 0538
June 13, 2006 (in the Pacific Gas Trial Transcript)...............................A 0550
June 14, 2006 (in the Pacific Gas Trial Transcript)...............................A 0555
October 11, 2006........................................................A 0571
January 16, 2007 (in the System Fuels Mississippi Trial Transcript)............A 0581
April 12, 2007 (in the System Fuels Entergy Trial Transcript) ....................A 0585

## Volume V

Kouts, Christopher (continued)........................................................A 0612
May 1, 2007 (Rule 30(b)(6))........................................................A 0612
May 2, 2007 ........................................................A 0634

Lawrence, Michael........................................................A 0654
May 20, 2002 ........................................................A 0655
May 21, 2002 ........................................................A 0697
November 16, 2007 (in the Carolina Power Trial Transcript).......................A 0712

Milner, Ronald ........................................ A 0726
May 1, 2002 ........................................ A 0727

**Volume VI**

Milner, Ronald (continued) ........................................ A 0762
May 2, 2002 ........................................ A 0762
May 3, 2002 ........................................ A 0799
May 7, 2002 ........................................ A 0814
May 7, 2002 (Afternoon) ........................................ A 0831
May 8, 2002 ........................................ A 0838
August 11, 2004 (in the Yankee Atomic Trial Transcript) ........................................ A 0851

Morgan, Robert ........................................ A 0866
March 21, 2002 ........................................ A 0867
March 22, 2002 ........................................ A 0905
June 25, 2002 ........................................ A 0913
August 3, 2004 (in the Yankee Atomic Trial Transcript) ........................................ A 0917

**Volume VII**

Morgan, Robert (continued) ........................................ A 0925
November 15, 2006 ........................................ A 0925
November 16, 2006 (in the Northern States Trial Transcript) ........................................ A 0943
November 13, 2007 (in the Carolina Power Trial Transcript) ........................................ A 0953

Pollog, Thomas ........................................ A 0962
April 11, 2002 (Rule 30(b)(6)) ........................................ A 0963
April 12, 2002 (Rule 30(b)(6)) ........................................ A 1002
May 15, 2002 (Rule 30(b)(6)) ........................................ A 1026
May 16, 2002 (Rule 30(b)(6)) ........................................ A 1046
May 22, 2002 ........................................ A 1066

**Volume VIII**

Pollog, Thomas (continued) ........................................ A 1073
August 4, 2004 (in the Yankee Atomic Trial Transcript) ........................................ A 1073
March 29, 2005 (in the SMUD Trial Transcript) ........................................ A 1098
July 12, 2005 (in the TVA Trial Transcript) ........................................ A 1108
October 26, 2005 (in the Southern Nuclear Trial Transcript) ........................................ A 1115
October 12, 2006 ........................................ A 1122
November 15, 2006 (in the Northern States Trial Transcript) ........................................ A 1126

Rosselli, Robert ........................................ A 1137
April 15, 2002 ........................................ A 1138
April 16, 2002 ........................................ A 1168

Rusche, Benard ....................A 1173
May 16, 2002 ....................A 1174
May 17, 2002 ....................A 1197
August 3, 2004 (in the Yankee Atomic Trial Transcript)....................A 1207

Slater-Thompson, Nancy ....................A 1215
April 21, 1999 ....................A 1216
April 22, 1999 ....................A 1228

**Volume IX**

Slater-Thompson, Nancy (continued)....................A 1239
June 13, 2002 ....................A 1239

Trebules, Victor ....................A 1255
April 17, 2002 ....................A 1256
April 18, 2002 (Coordinated Discovery) ....................A 1289
April 18, 2002 (Deposition in Yankee Cases....................A 1305
April 19, 2002 ....................A 1317

Williams, Jeffrey....................A 1319
June 11, 2002 ....................A 1320
January 22, 2004 ....................A 1340

Zabransky, David....................A 1368
April 17, 2002 ....................A 1369

**Volume X**

Zabransky, David (continued) ....................A 1401
April 18, 2002 ....................A 1401
April 19, 2002 ....................A 1428
June 5, 2002 ....................A 1440
June 6, 2002 ....................A 1445
August 5, 2004 (in the Yankee Atomic Trial Transcript)....................A 1449
March 28, 2005 (in the SMUD Trial Transcript)....................A 1473
March 29, 2005 (in the SMUD Trial Transcript)....................A 1487
April 12, 2005 (Rule 30(b)(6))....................A 1491
July 12, 2005 (in the TVA Trial Transcript)....................A 1503
October 27, 2005 (in the Southern Nuclear Trial Transcript)....................A 1508
November 20, 2006 (in the Northern States Trial Transcript)....................A 1519
October 11, 2007 (in the Wisconsin Electric Trial Transcript) ....................A 1528
October 12, 2007 (in the Wisconsin Electric Trial Transcript) ....................A 1532
November 13, 2007 (in the Carolina Power Trial Transcript)....................A 1538

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C
Plaintiffs : 98-474C, 98-154C
-v- : (Senior Judge
: Merrow)
UNITED STATES OF AMERICA, :
Defendant :
- - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, June 13, 2002

Deposition of NANCY SLATER THOMPSON, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:40 a.m., Thursday, June 13, 2002, and the proceedings being taken down in Stenotype by DEBORAH K. WILKINS, RPR, and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs:
ROBERT L. SHAPIRO, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5839

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7594



C O N T E N T S


| WITNESS | EXAMINATION |
|---|---|
| NANCY SLATER THOMPSON | |
| By Mr. Shapiro | 4 |
| By Ms. Sullivan | 149 |
| By Mr. Shapiro | 153 |

Afternoon Session - Page 67


E X H I B I T S


| Ex.No. | Description | Page |
|---|---|---|
| 1 | December, 1990 ACR | 17 |
| 2 | 6-22-83 contract | 25 |
| 3 | March, 1995 APR and ACR | 32 |
| 4 | June, 1987 ACR | 47 |
| 5 | June, 1988 ACR | 67 |
| 6 | December, 1991 ACR | 69 |
| 7 | May, 1993 ACR | 84 |
| 8 | March, 1993 ACR | 86 |
| 9 | 9-28-95 letter, Dreyfus to Kadak | 113 |
| 10 | Instructions for Completing the Appendix C - Delivery Commitment Schedule | 127 |
| 11 | Review Record | 139 |




P R O C E E D I N G S

- - - - -

Whereupon,

NANCY SLATER THOMPSON,

was called as a witness by counsel for Plaintiff, and having been duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF:

BY MR. SHAPIRO:

Q. Would you state your name for the record, please?

A. Nancy Slater Thompson.

Q. Ms. Slater Thompson, my name is Robert Shapiro. As you recall I deposed you, gee --

A. Some time ago.

Q. -- a couple years ago now in these cases, and they are still going on. I won't have to go back over the procedures, I have your deposition, and I think you understand what we are doing today. It also saves -- I mean, we are not going to cover the same material the same way again, either. I just have a couple, I guess, catch-up items to make sure I understand what's happened with your background in the last couple

years, and I have some additional topics I want to cover with you today.
What is your current position?
A. I am the acting division director of the regulatory coordination division.
Q. How long have you been in that position?
A. I have been in that position since January of 2001.
Q. What was your position before that one?
A. Team leader in the regulatory coordination division.
Q. How did your duties change when you moved from the team leader position to the acting director position?
A. In the main, I believe that most of the technical and policy-related duties that I had been performing didn't change, but I have now assumed responsibility for personnel actions.
Q. Are there any other teams in that division other than the one in which you were team leader?
A. No, there are not.
Q. How many people are in that division?

5

A. There are, including details, four in addition to myself, and one pending for a secretary.
Q. Did someone resign from the division director position? Is that how you became the acting division director?
A. Not a resignation. Alan Brownstein moved on to other duties.
Q. When did you start in the regulatory -- when did you start in the team leader position?
A. We would have to check my personnel actions, but I believe it was about December of 1987. I'm not sure.
Q. Let me ask the question differently. The team leader in the regulatory division, when did you start that?
A. That would have been immediately upon my advent in that division, so I moved from the waste acceptance division, I moved right into the regulatory coordination division.
Q. My recollection is that when I last deposed you your current position at that time was that team leader position in the regulatory division. Is that --

6

A. Yes.
MS. SULLIVAN: You said 1987. Did you mean '97?
A. I'm sorry, '97, yes. I wasn't even there in '87.
Q. For the most part, the questions I want to ask you about will go to the time when you were dealing with the waste acceptance issues and were directing the waste acceptance division. First, I would like to ask about Annual Capacity Reports. You are familiar with those documents?
A. Yes.
Q. Which Annual Capacity Reports did you have a role in the development of when you were in the waste acceptance division?
MS. SULLIVAN: Objection. Vague.
A. My recollection is that the first ACR that I could have participated in would have been the '92.
Q. When you say the first one you could have participated in, you don't recall if you participated in the development of the '92 ACR at all?
A. No. I don't actually recall that, no, I'm not sure what stage it was at at the time that

7

I entered the department.
Q. What about the 1995 ACR?
When I say -- let me explain, I am referring to the ACR that was published in March of 1995. Did you have a role in the development of that --
A. Yes.
Q. -- ACR?
You did not have a role in the development of the ACRs prior to the one in 1992?
A. I don't believe so.
Q. Prior to that ACR, you don't think you could have had a role in the development of those ACRs because you were not within DOE at that time?
MS. SULLIVAN: Objection. Vague.
A. I joined the DOE in August of 1991.
Q. But you were working in the nuclear industry looking at some of those same issues from private industry's point of view, weren't you?
MS. SULLIVAN: Objection. Vague.
A. During what time period are you asking the question?
Q. During the time period when the earlier ACRs, the ones earlier than 1992, came in.

8

A. I recall dealing with ACR-related issues at the time I was at EEI in the utility nuclear waste management group.
Q. What do you mean by ACR-related issues?
A. I believe during my prior deposition we discussed the fact that there were certain issues that both the department and the utilities had identified as issues that might bear some clarification in order for both parties to be able to implement the contract. Those came to be known as part of the ACR issue resolution process.
Q. We covered that in some detail during your last deposition.
I was referring more to the ACRs themselves. For example, do you recall, did you ever comment on any of the ACRs prior to the one that was published in 1992?
A. I don't know.
MS. SULLIVAN: Objection. Vague.
Q. What role do you think you had with respect to the development of the 1992 ACR?
A. My role, I believe, would primarily, given the position that I was in as a member of that group, would have been to conduct a review of

9

the document that was in draft.
Q. What was the purpose of your review?
A. My review would have looked at certain technical issues that might have been addressed in the ACR from both a technical standpoint and for the need perhaps to do additional work because it wasn't complete; to make sure that, for example, the work that was done in the Acceptance Priority Ranking and the work that was reflected in the ACR were consistent.
Q. What about the acceptance rate projections in the ACR? What role would you have had with respect to reviewing and commenting on those projections?
MS. SULLIVAN: Objection. Vague.
A. None.
Q. Who would have worked on that?
A. I believe Alan Brownstein might have some knowledge of that, perhaps Jeff Williams.
Q. Those are both individuals within DOE?
A. Yes.
Q. What about contractors? Would there be particular contractor personnel who would have been responsible for developing those projections?
A. There might be.

10

Q. Do you recall who those people would have been?
A. Not by name. I believe it would have been the people supporting those two individuals.
Q. What about the 1995 ACR? What role would you have had in the development of the 1995 ACR?
MS. SULLIVAN: Objection. Vague.
A. At that point, I believe that it would have been my responsibility to produce the document in final form; assure that much of what I described to you previously with the '92 ACR in fact happened with the 1995 ACR; and to the extent that we made any additional changes that those additional changes were in fact appropriate.
Q. Again, focusing on the acceptance rate projections in the 1995 ACR, would you have had a role in the development of those acceptance rate projections?
A. No.
Q. Why wouldn't you have had a role in the development of the acceptance rate projections if you were responsible for the entire document?
A. The document includes data from a variety of sources. That does not necessarily

11

mean that you are responsible for developing the data.
Q. Who is responsible for the 1995 acceptance rate projections?
MS. SULLIVAN: Objection. Vague.
A. I really don't recall who at the DOE would have had the watch for that.
Q. The ACR published in March of 1995 is the last one that's been published. Do you know why there's been no ACR published since then?
A. No.
Q. Have you ever discussed that issue with anyone?
A. No.
Q. Have you ever been curious as to why ACR hasn't been published since 1995?
A. No.
Q. Are you aware that the Standard Contract between DOE and utilities calls for the ACR to come out annually?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
You can answer.
A. I recall a provision, but I could not give you the specific citation that does address

12

don't recall how the progressions from 300 to 400 to 550 to 875 MTU was developed, do you?
A. As I previously indicated, I wasn't in the department at the time and would not have had any insight or involvement in developing those rates, so I have no recollection.
Could I impose on you to take a break?
MR. SHAPIRO: Absolutely.
(A recess was taken from 11:00 a.m. to 11:15 a.m.)
BY MR. SHAPIRO:
Q. I want to go back to, I guess, a little bit of something we covered when you were deposed last so I understand the context in which you might have seen or worked with these ACRs, the ones before you got to DOE.
What was your position prior to moving to the Department of Energy?
A. I worked at the Edison Electric Institute. I think I started at EEI in roughly April of '86 and left the institute roughly August of '91, so it was a five-year period there. The first -- I'm not sure how long it was -- two to two and a half years was spent with the utility nuclear waste management group working on the

45

issues that we are discussing today.
The second half of my stay there was spent in the fossil energy group, so actually at the time this was going on you understand I had absolutely no responsibility for anything related to these issues. I had other things to think about.
Q. Okay.
So the time when you were with Edison Electric Institute where you did work on issues, spent nuclear fuel, was roughly '86 to mid-'88 or perhaps even, I guess, as late as the beginning of '89?
A. Perhaps.
Q. When you did work on issues concerning spent nuclear fuel with the Edison Electric Institute, do you recall, was the industry concerned with the rate at which DOE would ultimately pick up spent fuel pursuant to the Standard Contract?
MS. SULLIVAN: Objection. Vague.
A. Yes, that is my recollection. There was always a concern in the industry that they be able to deliver as much as possible.
Q. The industry's view was that faster

46

was better?
A. Faster and more was better.
Q. Do you recall projections of waste acceptance by the Department of Energy being issued when you were working on those issues for the Edison Electric Institute?
MS. SULLIVAN: Objection. Vague.
A. No, I don't.
Q. Let's pull out one of those and see if that refreshes your recollection.
(Thompson Deposition Exhibit No. 4 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater Thompson, you have been handed what's been marked as Exhibit 4 to your deposition. It's an Annual Capacity Report, it is dated June of 1987, and I know you might want to take a minute to look at it. I'll tell you in advance that the waste acceptance projections in this ACR appear, at least the table appears, on page 7.
Would you like to take a minute to take a look at the document?
A. Please.
Q. Ms. Slater Thompson, again I indicated

47

that I wanted to refer you to page 7 of the 1987 ACR which has the acceptance rate projections. Do you recall the acceptance rate projections that are noted in that table?
A. No, I don't.
Q. Do you have any recollection if the industry was satisfied with the acceptance rates reflected in that table?
MS. SULLIVAN: Objection. Vague.
A. I have a general recollection that the industry was rarely satisfied with any acceptance rate either in terms of schedule or quantity.
Q. What's your recollection as to what acceptance rate the industry was looking for?
MS. SULLIVAN: Objection. Vague.
A. I do recall that one of the things in industry that we had discussed internally and I believe at some point may have discussed with Alan Brownstein in his capacity then with the department, that we as an industry would like to be able to deliver basically at a rate that would equal our discharge rate.
Do you understand what I mean by that?
Q. I think so. I may ask a question or two more about it.

48

existing law?
MS. SULLIVAN: Objection. Argumentative.
You may answer.
A. Actually, I don't envision that my role would have been to assure that this is consistent with existing law. I do envision that there were others in the department, including the contracting officer and his counsel, who would have been responsible for making sure that the legalities were observed.
Q. Did you view as part of your role in working on and reviewing the 1995 ACR ensuring that the ACR was consistent with the department's obligations under the Standard Contract?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
You may answer.
A. I would have been responsible for assuring that the ACR, the technical aspects of the ACR of which I was responsible, were in fact consistent with the Standard Contract. I would also have been responsible for assuring that this was coordinated with the contracting officer.
Q. When you say the technical aspects

77

were consistent with the Standard Contract, what do you mean to be referring to?
A. For example, that we had developed an Acceptance Priority Ranking that was accurate, that was reflected appropriately and accurately in the subsequent allocation of capacities in the ACR.
Q. Going back to Exhibit 6 for a moment, that same page we were looking at, page 4, that explains the linkages between the MRS or repository and that aspect of the development of those projected acceptance rates. Maybe the best -- at the same time I want to also ask you to consider the similar section in the 1995 ACR which begins at the bottom of page 3; that is Exhibit 3.
The reason I am asking you to look at both of those is that there's less explanation of those linkages in the 1995 ACR. Do you recall why those edits were made? Why was that explanation reduced or taken out?
MS. SULLIVAN: Objection, foundation. Objection, vague.
You can answer the question.
A. This may perhaps be clearer when you discuss this in the context of year 1, year 2,

78

year 3, which is, that at the time this ACR was prepared it was, at least to me, fairly obvious that there was uncertainty about commencement of operations in 1998. There was uncertainty about whether or not we would have an MRS or a repository. As a matter in my opinion of efficiency, these dates were changed so that they would represent a sliding scale that would then be relevant no matter what the actual acceptance year turned out to be. There were uncertainties in budget. There were uncertainties in system design and development.
Q. I certainly intend to ask about that, but I want to get back to what -- I had a somewhat different question. I was just asking about the editing, what appears from my standpoint to be editing of the text explaining the same waste acceptance projections in the 1991 version, there is a paragraph that we had talked about previously that explained the two linkages. In the 1995 version, there's not as much explanation of that issue.
Do you recall a decision to edit that explanation?
MS. SULLIVAN: Objection, foundation.

79

Objection, the documents speak for themselves.
A. No, I do not explicitly recall a decision to edit the document.
Q. Going back to the point you had just made about the use of years, you do recall a decision to change from noting the 10 years on the ACR from the specific calendar year as 1998, 1999, and so forth, to year 1, year 2?
A. Yes, I do.
Q. And you made that decision because of uncertainty as to whether or not the department would accept anything in 1998?
A. Yes. That's my personal opinion, yes.
Q. You say that's your personal opinion. Do you recall, was that the basis for why the department made that change in the 1995 ACR?
A. That was my basis for making that change.
Q. Did Mr. Brownstein ever discuss with you a different reason for making that change in the 1995 ACR?
MS. SULLIVAN: Objection. Foundation.
A. Not to my recollection.
Q. Are you aware of anyone who had a different reason for making that change in the

80

1995 ACR?
A. No.
MS. SULLIVAN: Objection. Foundation.
THE WITNESS: Sorry.
MS. SULLIVAN: That's okay.
BY MR. SHAPIRO:
Q. This is a little out of order, we will get to the delivery commitment schedule process in a minute with you. One question I had to setting the years that way.
Given the listing in the 1995 ACR of year 1, year 2, year 3, how would a utility know when its proposed delivery commitment schedule is due?
MS. SULLIVAN: Objection. Vague.
Q. Do you understand what I am getting at, the question?
A. Yes, I do. I think there are probably two prongs to the answer.
As you know, the contract says that delivery commitment schedules have to be issued 63 months, I believe it is, in advance of the year in which you intend to deliver fuel. That would mean that we would have started that process, the DCS process, roughly, that's just round, five years



prior to 1998.
So reasoning this out, people would have already begun to submit DCSs. It was simple at this point for people -- people knew who submitted in year 1, they had already submitted, people knew who had submitted in year 2. And the second prong is that actually during the first year and during the subsequent years we had communications with the utilities, in fact I recall specifically in year 1 to remind everybody that they needed to submit, to ask if they had any questions that they would like answered in the process of preparing the DCSs, that kind of thing. So there was a cooperative process to assure that everyone did what they needed to do, or wanted to do. If utilities did not want to submit DCSs despite the fact that we reminded them, that was certainly their option.
Q. I am not sure that that answered my question.
Suppose the utility had an allocation for acceptance of spent fuel in year 5 pursuant to the 1995 ACR. How would that utility know when its deadline was for submitting the proposed delivery commitment schedule to claim that



allocation?
MS. SULLIVAN: Objection. Calls for speculation.
You may answer.
A. Had I been responsible subsequently for handling that process, I believe it would have been reasonable to write a letter to those utilities that had allocations in year 5 saying just a reminder, please call if you have questions.
Q. So if I understand your answer correctly, you would have sent them a letter basically setting out your interpretation as to when their deadline is so that the utilities have a deadline for them?
MS. SULLIVAN: Objection. Mischaracterizes the witness' testimony.
You may answer.
A. Given that in year 1 DCSs were submitted 63 months in advance, my intention would have been to continue that process on a rolling one-year front and to notify the utilities with allocations in that year that they had DCSs that they should submit.
Q. So for purposes of the deadline for



submittal of delivery commitment schedules, you would have still treated year 1 as 1998, year 2 as 1999, and so forth?
A. That was my intention, yes.
(Thompson Deposition Exhibit No. 7 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater Thompson, you have been handed what's been marked as Exhibit 7 which is a copy of the 1992 Annual Capacity Report dated May, 1993, and it says Revision One.
Do you recall this document?
A. Not explicitly, no.
Q. Actually, just on the cover for a moment, do you recall that the department at times issued ACRs for a year after the specific year for that ACR?
A. Let me make sure I understand your question. Are you asking me, for example, that an ACR -- let's call it the 1992 ACR -- could be published in the succeeding chronological year?
Q. Correct.
A. I have got one in front of me.
Q. Is it your recollection that -- well, my question is: That's what it appears to me to

first year? Logistically, I don't believe you could have done it. You didn't have the transportation capacity. That makes a lot of assumptions, again, that we had facility, that we had a license to receive and possess, but ...

Q. To what extent were the waste acceptance projections in the 1995 ACR reflective of a desire by the department to limit its commitments to utilities?

MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal conclusion. Objection, foundation.

A. I have no knowledge of anything like that.

Q. You don't recall anybody discussing a desire to have relatively low acceptance projections in the ACR so as to limit the department's commitments to the utilities?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, foundation.

A. No, I do not.

Q. Let's switch subjects to talk about the delivery commitment schedule process. Why don't we turn first to that provision in the

89

contract, which is Exhibit 2. The part that I want to ask you about first is on page 11.

Section B1 there, I guess it's the second sentence, it says: After DOE has issued its proposed Acceptance Priority Ranking as described in paragraph B5 of Article IV hereof, beginning January 1, 1992 the purchaser shall submit to DOE the delivery commitment schedule which shall identify all SNF and/or high-level waste the purchaser wishes to deliver.

The part of that phrase that I really would like to ask you to focus on is the part that says all SNF or HLW the purchaser wishes to deliver. What is your understanding of what that phrase is referring to?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

You can answer the question.

A. I would like to take us back to the ACR resolution process and actually to the time when I sat on the industry side of the table.

As I mentioned before, there were some roughly three dozen issues that the utilities and the department believed it would be worthy to conduct technical information exchanges on in an

90

effort to see if we could clarify some of the statements like that one in the contract that could be interpreted in a number of ways.

There was a concern on the part of the utilities that, for example, this might in fact be a request to identify absolutely all the fuel they would ever intend to deliver under the contract over the life of the time when they would deliver fuel. Another interpretation was that no, actually what this is asking for is for you to identify as a utility to the department the fuel that you intend to deliver in a given calendar year.

One of the other issues that I recall being associated with this was do we specify a range of discharge dates, do we specify a specific discharge date, how valuable is the information, if what I do is provide you with ten years of discharge dates so that you have no clue what I am really delivering when the year comes to deliver fuel.

One of the other issues that was tied up with this that I recall is whether or not you could project the discharge date. For example, if I am submitting a DCS 63 months in advance

91

theoretically of the calendar year in which the department arrives to accept it, by the time they arrive to accept it I have generated more fuel theoretically that could have been included in that range of discharge dates. Am I permitted to extend the upper bound on that discharge date range to include the fuel that will be discharged between now and acceptance.

There were a lot of issues that were associated with this that the utilities and the department in fact discussed, and my recollection is what we had all mutually reached consensus on in terms of our understanding was that it was okay to specify a range of discharge dates, that this was not intended to impose on the utilities a requirement to disclose absolutely every single assembly that they would deliver over the life of the plan, that in fact it was for a particular acceptance year.

Q. Was it your understanding that the utility in their proposed delivery commitment schedule could specify or should specify all of the spent fuel that utility wished to deliver in a particular year?

MS. SULLIVAN: Objection. Calls for a

92

legal conclusion.
You may answer.
A. These discussions are perhaps more fruitful when we use an example to illustrate what we are talking about.
Let's assume that you have 10 MTU that you wish to deliver to me in year 1. You are not required to submit DCSs to me if you choose not to. If you do choose to submit DCSs, I would assume that you would submit for the entire 10 MTU. You may either do it in one DCS and specify a specific discharge date or a range of discharge dates. You may choose to submit 10 DCSs for one MTU each and do the same thing. I don't have an expectation or a requirement in terms of how you do it in the context of one, many or none. I do have an expectation that when you do it, the total, when you total all the DCSs up in terms of the allocation, it will not exceed the allocation to which you are entitled and which is provided in the NCR.
Q. Where is that limitation on the total amount of spent fuel a purchaser may note on their delivery commitment schedule or schedules for a particular year provided for in the contract?

93

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, foundation.
A. I do not recall.
Q. Isn't such a limitation inconsistent with the language that we just focused on, all spent fuel or all SNF and/or HLW the purchaser wishes to deliver?
MS. SULLIVAN: Objection, argumentative. Objection to the extent it calls for a legal conclusion.
You may answer.
A. No, I don't believe it is inconsistent. It's all fuel that you wish to deliver within the bounds of what you are entitled to deliver.
Q. A little while ago you referred to the ACR as a planning document. What did you mean by that?
MS. SULLIVAN: Objection. The documents speak for themselves.
You may answer.
A. As we have discussed in my prior deposition and previously in this deposition, the ACR represents a planning basis. The acceptance

94

rates are subject to influences by future budget constraints, lack of a facility, unavailability of transportation casks.
For example, no one would have contemplated at the time that I did these that we would have an RSA, Regional Services Agreement, that would in fact contract out with someone else to provide the transportation which would have financial effects and could have scheduling and capacity effects. It's a planning document. And in fact when I sat on the utilities side of the table the industry recognized that not only was the ACR for planning purposes only, but that in fact their DCSs were for planning purposes, and they filled DCSs out consistent with that planning presumption because providing a range of discharge dates which might be over a 10-year period certainly doesn't permit a system to do more than plan.
Q. A couple sentences before the end of your answer, you said it was understood by the industry that both the ACRs and the delivery commitment schedules were for planning purposes only. By using the word "only," did you mean to exclude -- what did you mean to exclude?

95

A. That we viewed the DCSs as fungible, and we have been through that in prior deposition as well; that the industry recognized that in fact they wouldn't be providing us with specifics about what they wanted us to accept until they submitted a final delivery schedule; and the final delivery schedule actually does represent the commitment on their part to this reactor, this time, this amount of fuel, this age fuel, so greater specificity with the FDS, ball park with the DCS.
It was important for the utilities to give us DCSs because of their very fungibility. If you didn't submit a DCS, you couldn't exchange your slot in the cue, and given that those exchanges were possible, I don't know how one would perceive a DCS as anything other than for planning purposes.
Q. Let's go back first just to the ACRs and the statement that they are for planning purposes only.
When you say that ACRs were for planning purposes only, does that mean that the ACRs were not meant to be binding on the Department of Energy?
MS. SULLIVAN: Objection, vague.

96

Objection to the extent it calls for a legal conclusion.

A. I can't speak to that legal issue or speak for a contracting officer. In my estimation, that's a question you would have to ask someone else.

Q. When you published the 1995 ACR, did you understand that you were committing the Department of Energy to accept the amount of spent fuel noted in the waste acceptance projections in that document?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, the document speaks for itself. Objection, vague.

A. My understanding is entirely consistent with the sentence at the bottom of page 1 in the -- I guess this would be Exhibit 3, which is the 1995 ACR. As specified in the Standard Contract, the ACR is for planning purposes only, and this is not contractually binding on either DOE or the purchasers. And so were I to reason this out and not make a legal decision, I would have to say as a simple engineer my clear reading of that language would say if it's in the contract, everyone, including the utility, would

97

be well aware of that.

Q. What about the delivery commitment schedules? Was it your understanding that those similarly were for planning purposes only and not contractually binding on either the utilities or the department?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.

A. In my personal opinion, they were for planning purposes only and in fact were completed in such a way that not much but planning could be done based on the information contained in them. In addition, given the fungibility of the DCSs, that's why there is a final delivery schedule which is somewhat more than a planning document. And I do recall siting across the table from numerous utility representatives, clearly recognizing that the DCSs were planning purposes, and they in fact did not view themselves as binding themselves to deliver specifically what was described on the DCS.

Q. During the time that you worked in the waste acceptance division at the Department of Energy, do you recall anyone either within DOE or

98

in industry who thought that the delivery commitment schedules were binding on either industry or the department?

MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal conclusion.

A. No, I don't.

Q. You said something a minute ago that I guess has me a little confused. You said that the delivery commitment schedules are definitely for planning purposes but they provided relatively little information so you couldn't do much planning with them. I may be getting your language a little wrong, but what did you mean by that?

A. The DCSs -- and you need to put this in the context of their fungibility -- the DCSs, were they to remain as is, would provide you with the location of the reactor to which you would arrive to pick fuel up, so you know the type of fuel, you can plan appropriately for the type of cask to send. Given that they have submitted one DCS for, let's assume, 10 MTU, you know how many casks to send. The date on which you would show up and schedule a pickup was not resolved until

99

the FDS because that was actually done in consultation with the utilities because you don't want to show up and disrupt their operations, that's money.

You had no certainty about the age of fuel, however, because if they specified a range of discharge dates that's 10 years apart, that doesn't tell you much in terms of the thermal output of the fuel I am coming to get because conceivably it could range from five-year-old fuel to 15-year-old fuel. There's a big difference. There's a big difference in terms of the number of casks I would have to send to get that as well, assuming that they elected to deliver fuel that was all, say, six years old.

Q. Did the department ever consider restricting the utility's ability to put broad ranges of fuel discharge dates on their delivery commitment schedules?

A. Not that I recall, no.

Q. Would it be fair to say that the department didn't find it necessary to have narrower spent fuel discharge dates on the delivery commitment schedules for purposes of the department's planning?

100

MS. SULLIVAN: Objection.
Argumentative.
You can answer.
A. Based on my experience on utilities' side of the table, I would say that the industry had communicated to them that they had the ability to fill that out with a range of discharge dates, and they intended to, and I would say from my side of the table as DOE, in my opinion I don't believe I could have restricted them to providing me with a specific discharge date.
Q. You don't recall when you were at DOE anyone within DOE coming to you or the waste acceptance division saying gee, for purposes of planning, transportation or the repository we really would like to have hour discharge date ranges on the delivery commitment schedules?
MS. SULLIVAN: Objection, vague.
Objection, foundation.
A. No, I don't recall that.
Q. To your knowledge, how has DOE actually used the delivery commitment schedules that have been approved?
MS. SULLIVAN: Objection. Vague.
A. I have no specific knowledge of that.

101

Q. You are not aware of any use that the department has made for approved delivery commitment schedules for the department's planning?
A. No, I am not.
Q. We might have covered this last time, but make sure I understand. What was your role with respect to the delivery commitment schedule process?
A. Originally, the industry and the department recognized that it would be advisable to issue some simple clear instructions on how to fill the form out. Those instructions were developed in consultation with the industry, and it was actually a very good exercise because we got some feedback from them in terms of how to be clearer or how to simplify the instructions.
Those instructions were provided to the utilities. For example, once the instructions were finalized, I do recall calling utilities going hey, you've got a DCS due this year, do you intend to submit, do you have any questions, is there anything I can answer for you or help you out with.
Once a DCS was received, I would have

102

reviewed it to make sure that, for example, the DCS was signed by someone at the utility who really had the authority to sign for the utility; that in fact they had not specified a range of discharge dates that would result in their ultimately delivering fuel that was less than five years old; that they had not requested an allocation of capacity for which they were not entitled. I don't remember the explicit contents of the DCS anymore, but those stick in my mind.
Q. Would it be a reasonable summary to say that you reviewed the delivery commitment schedules to make sure that the utilities were following the instructions that you had sent out previously?
A. Yes.
Q. When you were reviewing the delivery commitment schedules that utilities submitted, was that in your role as the contracting officer's technical representative?
MS. SULLIVAN: Objection. Foundation.
A. Yes. I think so.
Q. Is there a technical or is there a particular role that the contracting officer's technical representative has as opposed to anyone

103

else conducting their review of the delivery commitment schedule proposed by a utility?
MS. SULLIVAN: Objection. Vague.
A. "Anyone else" defined as?
Q. Someone else in the waste acceptance division, a contractor you might have helping you out.
MS. SULLIVAN: Same objection.
A. Were I to recommend approval of a DCS as the COTR, C-O-T-R, as the COTR, my judgment as the COTR would have been relied upon as the judgment. The contractor did not approve or disapprove. They do not have that ability.
Q. It was the COTR's assessment of the delivery commitment schedule that was deemed authoritative?
A. I would have to refresh my memory about whether or not I was the final stop or whether or not there was a subsequent stop at the contracting officer. I don't honestly recall.
Q. Well, I will represent to you in fact that I believe it's in the back of Exhibit 2, the contract, one of the blank forms -- actually, no, I think it got changed.
I will represent to you that there is

104

irrespective of whether it's approved, but let me ask you --
A. Conceptually.
Q. Approved. Let's focus on approved.
Do you believe that a delivery commitment schedule that's been proposed and approved is binding on any party?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
You may answer.
A. In my personal opinion, I do not believe that it is binding because I do not believe -- I am at a loss as to how you could bind yourself to anything in a range of discharge dates. I am at a loss as to how you could bind yourself when it's not final.
Q. So a utility wouldn't even be binding itself as to the total amount of MTU of spent fuel that it would be delivering to DOE in a particular year?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.
A. I think it is possible that a utility in fact could deliver less than it indicated on

109

its DCS for whatever reason.
Q. Did you view an approved delivery commitment schedule as binding a utility to not delivering more spent fuel than is set out on that delivery commitment schedule?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.
A. It's not the DCS that establishes the allocation. It's simply a reflection.
Q. What sets out the allocation?
A. The ACR; and that's for planning purposes only because that allocation could change.
Q. And is it fair to say then that the allocations reflected on the delivery commitment schedules are not binding because they are based in turn on the allocations set out in the Annual Capacity Reports which say explicitly that they are not binding?
MS. SULLIVAN: Objection. Calls for a legal conclusion.
A. I really think that's a legal issue. We are really stepping beyond what I feel skilled enough to answer.

110

MR. SHAPIRO: Do you want to take a little break?
MS. SULLIVAN: Yes.
(A recess was taken from 2:25 p.m. to 2:40 p.m.)
BY MR. SHAPIRO:
Q. Ms. Slater Thompson, you referred a couple times, I think, to instructions that were issued to help utilities complete their proposed delivery commitment schedules. Do you recall that there was a revision to the instructions when you were in the waste acceptance division?
A. No.
Q. You don't recall then why the instructions would have been revised?
A. No.
MS. SULLIVAN: Objection. Foundation.
Q. If the instructions were revised, it probably went through you?
A. Depending on --
MS. SULLIVAN: Objection. Foundation.
A. -- when it was done.
Q. If they were revised September 10 of 1993?
A. That would probably be a good

111

assumption.
Q. That you would have been involved. You just don't recall it?
A. Correct, I don't recall.
Q. Let's change subjects to something that was also mentioned just briefly a few minutes ago, the provision in the contract providing for exchanges of approved delivery commitment schedules. What was your understanding of the purpose of such exchanges?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A. My understanding of provision for exchanges was to provide the utilities with flexibility in terms of altering their position in a cue.
Q. Would it be fair to say that the exchange provision was intended to enable utilities to optimize the scheduling of their delivery of spent fuel to DOE?
MS. SULLIVAN: Objection. Vague.
A. I think I would have to have a better definition of the word optimize. I mean, optimize in what sense?
Q. Let me show you a letter which has a

112

have had some level of control over directing exchanges, and I'm not sure how you would arrive at a campaign through the randomness of exchange processes.

Q. I think you testified that you didn't expect that the changes would be random, that they would only occur if the two utilities exchanging each saw an economic benefit to the exchange. Isn't that right?

A. It might, but I can't predict for you which utility in which area of the country would choose to exchange with another utility. That's what I mean by random. I don't have the ability, for example, to pick up the Annual Capacity Report and tell you over that ten-year period which utilities will exchange with which other utilities. There is no predictiveness to that process.

Q. Couldn't you look at the utilities' exchanges and compare that to information as to when utilities are likely to run out of space for storing spent fuel and see which utilities would be wanting more spent fuel acceptance and which utilities wouldn't need more spent fuel acceptance?

121

MS. SULLIVAN: Objection, calls for speculation. Objection, compound. Objection, foundation.

A. I am not sure I really understand your question, to be honest.

Q. Did you understand before what I meant by campaign shipments of spent fuel?

A. Yes.

Q. To make sure we are on the same page, what's your understanding of what a campaign shipment of spent fuel is?

A. At the time that I was in the industry as well as during the time when I was at DOE, my understanding of the term campaign was at one point, for example, you might wish to -- for example, you have a list of utilities you have in your one, it may be all over the map in terms of where they are in the country. You might wish to define campaign in terms of during that calendar year of acceptance I will go to the southeast and pick all the southeastern reactor fuel up first which people have an allocation in that year and then I will move to the northeast, but the nature of the campaign would tend to argue against I go from Georgia to Illinois to Texas to New York to

122

California and that kind of thing, so campaigning is an efficiency consideration.

Q. A considering being that it is less efficient to pick up small amounts of spent fuel, relatively small amounts of spent fuel, from the utility multiple times as opposed to picking up a relatively larger amount of spent fuel from a utility a fewer number of times?

MS. SULLIVAN: Objection, vague. Objection, asked and answered to the extent we went into this in the previous deposition.

You can answer.

A. I think in the context I just discussed it with you actually, it would be in the context, for example, of weather-related concerns. Campaign, I might not want to go pick things up in Illinois and New York in the middle of the winter and I might want to pick fuel up during the middle of the winter in the south, and so again a matter of efficiency. I know at one point there was consideration, and I believe we have discussed this before, that you might in fact wish on a 3-year rolling front to pick up the first year's fuel, you might have room for the second year's fuel, you would debit additional allocations

123

against that, and theoretically in year 2 you wouldn't come back to that utility. So there are aspects of campaigning that deal with many factors, and actually that again is not my area of expertise. This is kind of like the acceptance rates and the utility of those.

Frankly, the group that would find the information most useful would be in transportation, which is not my responsibility, and I think that extends, for example, to the DCSs. That's why when you asked the question do I have any knowledge of what the department would use it for, not really, not my area. Campaigning is really not my area, either.

Q. Focusing back on exchanges, proposed exchanges of approved delivery commitment schedules, I believe you did testify that when you were at the department you did work on consideration of how the department would go about evaluating proposed exchanges.

A. That's correct.

Q. It was the department's intent to approve proposed exchanges to the extent practicable?

MS. SULLIVAN: Objection, vague.

124

Objection, foundation.
A. Practicable is a very broad word, but if, for example, a utility wanted to exchange with another utility with exactly the same age fuel, the same type fuel, reasonably close locations, the same number of MTU, I would say that would be practicable. I don't think it was the department's intention, nor mine, to hinder that process.
Q. Would it be reasonable to say that the department intended to minimize the number of proposed exchanges that it would have to disapprove?
MS. SULLIVAN: Objection, vague.
A. I don't think we had a specific intention to minimize or maximize. I think it was our intention to accommodate, to the extent practicable, all reasonable requests to exchange.
Q. Let's switch subjects to failed fuel, something that I think you mentioned briefly before. I believe that you mentioned before that you had at least a vague recollection of an understanding that acceptance by the department of failed fuel might be delayed. Am I remembering that correctly?

125

A. Correct.
Q. Why would acceptance of failed fuel be delayed?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.
You may answer.
A. I believe, again I am absolutely not sure about this, but I believe there were operational issues in terms of the ability to handle canisters that contained failed fuel at the repository. I believe there were issues about defining how failed failed is before it's failed. There were transportation issues. The industry had questions, as did we, and I don't recall many specifics about that issue, honestly.
Q. That was going to be one of my next questions. What was the nature of your work at DOE in failed fuel?
MS. SULLIVAN: Objection, vague.
A. The only involvement I can recall on failed fuel was in the context of whether or not failed fuel had been adequately defined and whether or not the definition was clear. Other than that, I don't recall doing much on failed

126

fuel.
(Thompson Deposition Exhibit No. 10 was marked for identification.)
BY MR. SHAPIRO:
Q. We have had handed to you what's been marked as Exhibit 10 which is a copy of the September 10, 1993 revised version of the instructions for completing the Appendix C delivery commitment schedule. I want to turn your attention to a particular provision on page 3, section 7H. Why don't you take a moment to read that paragraph.
I have a question as to how the acceptance timing for failed fuel was intended to work. The subsection that I pointed you to covers fuel, and it notes that if a purchaser intends to deliver other than standard fuel.
Let me ask you this: The phrase other than standard fuel, did you understand that to include failed fuel?
A. My recollection is yes.
Q. The provision in the instructions says that if the purchaser intends to deliver other than standard fuel the purchaser must submit proposed procedures to DOE, and particularly I

127

want to focus on the part at the bottom that says that if other than standard fuel cannot be accommodated, the purchaser has an option to deliver standard fuel or to exchange the approved DCS with another purchaser.
My question is: Suppose the purchaser with the nonstandard fuel can't find anybody to exchange with and doesn't have any more standard fuel left, what happens? Does the purchaser lose that allocation?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, calls for speculation.
A. I don't ever remember having contemplated that particular issue. I don't believe I have a factual bases on which to speculate on it. I think that's one of those issues that would have to be addressed by the contracting officer and legally.
Q. Let me focus on shutdown reactors and failed fuel for a moment. Do you understand that a shutdown reactor incurs some cost to store its spent fuel until they can get rid of all of its spent fuel?
A. I do.

128

we may or may not get which may or may not address issues that relate to you. I am sure we will have to deal with Ms. Sullivan and the government on that, but except for that possibility I don't think we will have further questions for you.
A. I understand. Thank you.
MS. SULLIVAN: I have a couple questions.
EXAMINATION
BY MS. SULLIVAN:
Q. Ms. Thompson, do you recall your testimony in response to some questions from Mr. Shapiro as to whether you had any knowledge as to what the approved DCSs would be used for?
A. Yes, I do, and I believe I had indicated to him that I didn't have a real knowledge of what others were using those for.
Q. Sitting here today, do you have an understanding as to what aspects of the program would use approved DCSs for planning purposes?
A. I think it would be safe to say that the transportation group would probably find the most utility in the DCSs.
Q. Do you have or have you ever had responsibility for transportation planning for the

149

program?
A. No.
Q. Ms. Thompson, while you were in the waste acceptance division, do you recall disapproving delivered commitment schedules delivered by utilities?
A. Yes.
Q. Given your testimony that delivery commitment schedules are largely for planning purposes only, why would you disapprove a delivery commitment schedule?
A. There could be multiple administrative reasons like the DCS not signed, signed by a person not identified as having ability to sign, but primarily for exceeding their allocation for a particular year.
Q. And do you have an understanding as to the effect of the utility's failure to submit a DCS in a year in which they have an allocation?
A. Yes. I believe it was always our intent that if a utility failed to submit a DCS in that year that it would be a waiver of their desire to deliver, and we would have reallocated that capacity to the next utility or utilities in the cue.

150

Q. I believe Mr. Shapiro has asked you previously today about the provision of the Standard Contract or whether there was a provision of the Standard Contract that told purchasers that they were limited in their DCSs to the allocation set forth in the ACR.
Other than in the Standard Contract, is there another place that purchasers were informed that they were limited to the amount set forth in the ACR when submitting their DCSs?
A. I am positive it's in the DCS instructions.
Q. Could you turn to Exhibit 10, please, to your deposition.
Are these the DCS instructions to which you are referring?
A. Yes.
Q. Could you point to me where in these instructions purchasers were informed that they were limited to the amounts set forth in the ACR?
A. Give me a minute.
Q. Sure.
A. Page 2, number 7E, the last sentence.
Q. Could you read that for me, please?
A. Exceeding the allocation will result

151

in disapproval of the DCS.
Q. Thank you.
While you were in the waste acceptance division at DOE, what was your understanding of the effect of the DCSs with regard to DOE's performance in 1998, if DOE had begun performance in 1998?
MR. SHAPIRO: Objection. Vague.
Q. Do you want me to clarify the question?
A. Please.
Q. I believe you testified that in your opinion the DCSs were for planning purposes only. While you were in waste acceptance, did you ever have an understanding as to the role of the DCSs if DOE had started performance in 1998?
MR. SHAPIRO: Objection. Vague.
A. My understanding of the role of the DCSs, if we had begun to accept in 1998, is that those individuals who had submitted DCSs and had them approved for year 1, which the question you are posing would be 1998, those would be the utilities that I would expect to receive FDSs from, and they would be the utilities that would deliver in that year.

152

ever get that 3 MTU allocation back to enable them
to deliver all of their spent fuel to DOE?
A. If my recollection serves me
correctly, and I would need to go through and
really review this document, but my understanding
is that they would commute to the end of the cue.
Q. My question is: Would they ever get
back on the cue? Don't you only get onto the cue
based upon discharges of spent fuel, and that if
you give up an allocation based upon a discharge,
you can't get that allocation back because you
only discharge a final time once?
Do you understand what I'm asking?
MS. SULLIVAN: Objection. Vague.
A. I'm not really sure. I think -- let
me see if I can put it this way. You don't lose
your ability to deliver that fuel. What you are
in essence giving up is your ability to deliver it
in that year, and other people have theoretically
already submitted DCSs and have slots in the cue,
so you move to the end of the cue. You will still
deliver it.
Q. You move to the end of the cue as the
cue stood at the time you waived that particular
allocation?

157

A. Correct. That would have been my
intention.
Q. Can you point me to a part of the
contract for the DCS instructions that leads to
that result?
MS. SULLIVAN: Objection to the extent
it calls for a legal conclusion.
A. No, I can't at this time.
Q. Ms. Sullivan also asked you about the
delivery commitment schedule instructions. Can
you point me to a provision in the contract that
calls for or even permits DOE to issue
instructions to utilities as to how to complete
the delivery commitment schedule form?
MS. SULLIVAN: Objection to the extent
it calls for a legal conclusion.
A. No, at this point I can't point you to
a provision in the contract.
Q. Do you have any understanding of the
basis on which the delivery commitment schedule
form instructions were issued?
MS. SULLIVAN: Objection to the extent
it calls for a legal conclusion.
A. Actually, from sitting on the
utilities side of the table, the utilities had

158

asked if we would work with them to provide them
with a better understanding of how to complete the
form. This was a cooperative effort, mutually
agreed to by both sides. That's why we took the
time once we had drafted instructions to go back
over and discuss the instructions with them and
get comments.
Q. Did you view the DCS instructions as
guidance to utilities as to how to fill out their
delivery commitment schedule forms or did you view
the instructions more directly as requirements for
how the forms must be filled out by utilities?
MS. SULLIVAN: Objection to the extent
it calls for a legal conclusion.
You may answer.
A. I view the DCS instructions as my
expectations for what it would take in completing
these forms in order for me to approve a DCS. For
example, if I told them, which I did on page 2,
section 7, section E, that if they exceeded their
allocation I would disapprove the DCS, I view that
as an instruction.
Actually, that point is also made
clear on page 5, item number 2.5, that says:
The total quantity of SNF designated for delivery

159

must not exceed the allocation in the ACR.
Exceeding the allocation will result in
disapproval of the DCS (S).
This is Exhibit 10.
Q. Do you recall whether you ever
disapproved a proposed delivery commitment
schedule for any reason other than the proposed
schedule exceeding a utility's allocation of spent
fuel acceptance?
A. No, I don't.
Q. I am not sure that -- maybe I didn't
ask the question quite clearly enough.
You don't recall whether you did or
you recall that you didn't disapprove any for any
other reason?
A. I do not recall whether I disapproved
additional DCSs for reasons other than having
exceeded the acceptance allocation.
Q. We have been talking about you
approving or disapproving delivery commitment
schedule forms submitted by utilities.
Technically, wasn't it the contracting officer who
was doing the approval or disapproval?
A. Yes, but as the contracting officer's
technical representative, it was my responsibility

160

by virtue of my signature to make a recommendation.
Q. And as a practical matter, you were in fact the person who was approving or disapproving; wouldn't that be a fair statement?
A. Well, I can't make that statement. That's to imply that the contracting officer had no role whatsoever and did no review.
Q. Did the contracting officer ever disagree with one of your recommendations concerning the approval or disapproval of a proposed delivery commitment schedule?
A. Not that I recall.
Q. Did the contracting officer ever question one of your recommendations to approve or disapprove a proposed delivery commitment schedule?
A. Not that I recall.
Q. Did the contracting officer ever question any of your recommendations that you made in your role as COTR?
MS. SULLIVAN: Objection. Vague.
A. That's a lot of history and a lot of time. Unless you can be more specific, I am not sure I can answer that question.

161

Q. I am just asking for your recollection. Do you recall any instance when the contracting officer questioned a recommendation?
MS. SULLIVAN: Objection. Vague.
A. I recall instances where the contracting officer and I discussed issues related to implementation of the Standard Contract including, for example, the DCS instructions. I don't recall specifically that the contracting officer ever took serious objection, significant -- ever had a significant objection to my recommendations.
Q. What was the nature of your discussion with the contracting officer concerning the delivery commitment schedule instructions?
A. We would have -- I don't recall the specific nature of the discussions, but I recall having discussed the fact that collaboratively the industry -- and we believed that there was a greater chance of the industry completing their DCSs accurately and having them approved on the first try if they clearly understood our expectations for what it took to successfully complete a DCS. I remember being told that that was a good idea.

162

I remember transmitting the DCS instructions to the contracting officer for his review, or her review, I can't remember who the CO was now at that point, and we would have gotten comments back from them, incorporated those, held additional discussions if we needed to, and the contracting officer -- these are not things we would have done unilaterally. Absolutely not.
Q. You mean the delivery commitment schedule instructions were not something that the waste acceptance division would have sent out without at least consultation with the contracting officer?
A. And his approval or her approval.
Q. Was there anyone in the contracting office besides Beth Tomasoni who you dealt with on issues concerning the Standard Contract?
A. I'm searching my memory for names.
What was Liotta's first name?
Q. Richard?
A. Rich Liotta, and I always want to say Ray Liotta because of the actor. Rich Liotta, Nick Graham, who I believe worked with Beth. That's all that springs to mind at this point.
MR. SHAPIRO: That's all the questions

163

I have.
THE REPORTER: Reading and signing?
MS. SULLIVAN: Yes, reading and signing.
Off the record.
(Thereupon, at 4:35 p.m., the taking of the instant deposition was ceased.)
\- - - - - -

Signature of the Witness

SUBSCRIBED AND SWORN to before me this day of , 20 .

NOTARY PUBLIC

164

# TREBULES

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------------X YANKEE ATOMIC ELECTRIC COMPANY :

(98-126C)(Merow, S.J.) : CONNECTICUT YANKEE ATOMIC POWER COMPANY :

(98-154C)(Merow, S.J.) : MAINE YANKEE ATOMIC POWER COMPANY :

(98-474C)(Merow, S.J.) : FLORIDA POWER & LIGHT COMPANY :

(98-483C)(Wilson, J.) : NORTHERN STATES POWER COMPANY :

(98-484C)(Wiese, J.) : DUKE POWER, a Division of DUKE ENERGY CORP.:

(98-485C)(Sypolt, J.) : INDIANA MICHIGAN POWER COMPANY :

(98-486C)(Hodges, J.) : SACRAMENTO MUNICIPAL UTILITY DISTRICT :

(98-488C)(Yock, S.J.) : SOUTHERN NUCLEAR OPERATING COMPANY, et al. :

(98-614C)(Merow, S.J.) : COMMONWEALTH EDISON COMPANY :

(98-621C)(Hewitt, J.) : BOSTON EDISON COMPANY :

(99-447C) (Allegra, J.) : GPU NUCLEAR, INCORPORATED :

(00-440C)(Bush, J.) : WISCONSIN ELECTRIC POWER COMPANY :

(00-697C)(Merow, S.J.) : POWER AUTHORITY OF THE STATE OF NEW YORK :VOLUME

(00-703C)(Damich, J.) : I OMAHA PUBLIC POWER DISTRICT :

(01-115C)(Bush, J.) : NEBRASKA PUBLIC POWER DISTRICT :Discovery

(01-116C)(Sypolt, J.) :Judge: TENNESSEE VALLEY AUTHORITY :(Judge

(01-249C)(Bruggink, J.) :Sypolt)

Plaintiffs, :PAGES

V. :1 - 241

THE UNITED STATES, :

Defendant. :

-------------------------------------------X

Deposition of Victor W. Trebules, Jr.

Washington, DC

Wednesday, April 17, 2002

Reported by: Denise Dobner Vickery, RMR, CRR

JOB NO. 144458

April 17, 2002

9:32 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Devon E. Hewitt, Esq.

Arnold & Porter
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
555 Twelfth Street, NW
Washington, DC 20004-1206

(202) 942-5160
BY: Ronald A. Schechter, Esq.

Arnold & Porter
For the Plaintiff SACRAMENTO MUNICIPAL UTILITY DISTRICT
370 Seventeenth Street, Suite 4500
Denver, CO 80202-1370
(303) 863-2301
BY: David S. Neslin, Esq.

Perkins Coie LLP
For the Plaintiff WISCONSIN ELECTRIC
607 Fourteenth Street, NW
Washington, DC 20005-2011
(202) 434-1609
BY: Suzette W. Derrevere, Esq.

Spriggs & Hollingsworth
For the Plaintiffs YANKEE ATOMIC ELECTRIC COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY AND MAINE
YANKEE ATOMIC POWER COMPANY
1350 I Street, NW

Ninth Floor
Washington, DC 20005-3305
(202) 898-5839
BY: Jerry Stouck, Esq.

United States Department of Justice, Civil Division
For the Defendant THE UNITED STATES
Commercial Litigation Branch
Federal Claims Section
1100 L Street, NW
Washington, DC 20530
(202) 305-7561
BY: Russell A. Shultis, Esq.
Heide L. Herrmann, Esq.

I N D E X

EXAMINATION OF VICTOR W. TREBULES, JR. PAGE
BY MR. EIDUKAS 8

TREBULES DEPOSITION EXHIBITS: PAGE
No. 1 Federal Register on Standard Contract. 22

2 Interim Spent Fuel Storage Policy.
CTR-044-0180 through 0201. 37
3 Proceedings of the 1983 Civilian Radioactive
Waste Management Information Meeting.
SN 069588 D, SN 069599 through 600. 48
4 December 20, 1983 Draft Mission Plan.
CTR-042-1065 through 1190. 78
5 A Mission Plan for the Radioactive Waste
Management Program, Volumes 1 and 2.Draft. 84
6 June 1985 Volume I Mission Plan.
CE 14791 through 15200. 143
7 January 1987 Draft Mission Plan Amendment.
DER-002-3157 through 3217. 197
8 June 1987 OCRWM Mission Plan Amendment.
PA-142069 through PA-142139. 211
9 Report to Congress. YMP-002-0181 to 0215. 218
10 Radioactive Waste Review Committee.
HQR-077-1119 through HQR-077-1143. 230

**Exhibits are attached.

Thereupon,

VICTOR W. TREBULES, JR.

Was called for examination, and, after having been duly sworn or affirmed, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

COMMONWEALTH EDISON

BY MR. EIDUKAS:

Q. Good morning, Mr. Trebules. My name is Ted Eidukas and I represent one of the plaintiffs in this case, Commonwealth Edison.

A. Okay.

Q. And why don't you go ahead and just spell your full name for the court reporter for the record.

A. Okay. My name is Victor, V-i-c-t-o-r, Trebules, T-r-e-b-u-l-e-s.

Q. Mr. Trebules, have you ever been deposed before?

A. No, I have not.

Q. Well, let me just go over some of the, you know, kind of ground rules they call it. You know, basically I'll ask you a question and please try to

answer them as best you can.
A. Okay.
Q. If at any time you don't understand a question, it's probably because I've misphrased it or I'm not making any sense. So, just stop me, ask me to ask the question again or rephrase the question so it makes sense to you.
A. (Nods head).
Q. Also, because the court reporter can only take down what we say and not any gestures or physical answers like nods of the head, you know, in other words, what I'm saying, your answers have to be verbal.
And also because she can only take down what one person is saying at any one time, it's important that I try not to talk over your answers and, you know, wait until I finish the questions just so that she can get down exactly what's been said and there's not two people trying to talk at one time.
A. (Nods head).
Q. So that the record is accurate.
A. Okay.
Q. And if at any time you need a break for



whatever reason, as long as a question is not pending, I would be more than happy to accommodate you in taking a break.
A. (Nods head).
Q. Could you just quickly just describe your education after high school.
A. All right. I went to Ohio University for five years. I got a degree in engineering and a bachelor's degree in physics. I then did graduate work at Lehigh University in Bethlehem, Pennsylvania. I got a master's degree in mechanical engineering.
Q. And when did you receive that final degree?
A. 1972 I graduated from Lehigh.
Q. And that was the master's?
A. Yes. Master's degree in mechanical engineering.
Q. Okay. When did you first -- strike that.
Do you presently work for the Department of Energy?
A. Yes, I do.
Q. Okay. When did you first -- when did you start working for the Department of Energy?



A. Actually, I started working for the Atomic Energy Commission in 1972, which became the Energy Research and Development Administration, which became the Department of Energy. I don't remember the exact year ERDA became the Department of Energy. I think it was about -- I don't remember.
Q. Okay. But you were there when the Department of Energy was first formed it sounds like?
A. Yes. Yes.
Q. What was your first position in the Department of Energy?
A. The Department of Energy or the Atomic Energy Commission?
Q. I'm going to start with the Department of Energy.
A. Okay. Again, I don't remember exactly when name changed, but I spent the first five years working for the Pittsburgh Naval Reactors Office after I graduated from college, and then I transferred to the Atomic Energy Commission headquarters in Germantown, Maryland and I worked in the Office of Nuclear Energy Programs.



Q. In the Office of Nuclear Energy Programs, did your responsibilities include the handling of spent nuclear fuel at that time?
A. The handling of spent. No, we never handled any spent nuclear fuel.
Q. All right. I will rephrase that. Did your responsibilities include the disposal of spent nuclear fuel?
A. We did planning for activities involving radioactive waste and spent nuclear fuel. We never actually handled, though, any material.
Q. Could you briefly describe what the planning you did entailed that involved the disposal of radioactive waste and spent nuclear fuel.
MR. SHULTIS: Objection. Could we get a little more specific on the time period we're talking about here? I think that's important.
MR. EIDUKAS: I'm talking of the time period where you were at the Office of Nuclear Energy Programs, and I believe the witness has said he doesn't know a specific date when he was doing this.
BY MR. EIDUKAS:

Q. Mr. Trebules, if you can specify a date that you were working on the planning for the disposal of radioactive waste and spent nuclear fuel while at the Office of Nuclear Energy Programs, that would be helpful.

A. Let me try to clarify what I think you asked. I don't remember exactly when ERDA switched over to the Department of Energy. My guess, that was sometime in the 1980s. But in 1977, I joined the Office of Nuclear Energy Programs, which may have been part of ERDA or, you know, Atomic Energy Commission or ERDA or Department of Energy. It was 1977 and at that time I was involved in the planning activities for nuclear energy programs, which included breeder reactor development like the Clinch River breeder reactor, and I was responsible for preparing what was called the Fish and Energy Program Plan for the Department of Energy, which included some at that time it was called fuel cycle activities, which included handling of radioactive waste.

Q. Did that planning for the handling of nuclear radioactive waste that you just described, did that



involve planning for the disposal of those wastes in a deep geologic repository?

MR. SHULTIS: Objection, relevance.

BY MR. EIDUKAS:

Q. Generally, when your lawyer objects --

MR. SHULTIS: You still have to answer.

BY MR. EIDUKAS:

Q. You still have to answer unless he instructs you not to, if you're able to.

A. As best as I could remember, we did in the Fish and Energy Program document talk about reactor development and waste activities, and it did include I believe reprocessing at that time. This was prior to the ban on reprocessing and ultimate disposal of radioactive waste.

Q. Did those plans that you worked on go so far as to discuss the design of a repository? Did it get that specific?

MR. SHULTIS: Objection, relevance.

THE WITNESS: As best as I could remember, I don't believe we got involved in the -- at least I didn't get involved in the design of repositories for



the disposal of waste. My primary area of emphasis at that time was on reactor development. As I said, the Clinch River breeder reactor and, for example, Whitewater breeder reactor.

BY MR. EIDUKAS:

Q. At some point did your position at either ERDA or the Department of Energy change?

MR. SHULTIS: Objection, vague.

THE WITNESS: I had a number of activities during my career. As I mentioned, I stayed in the Office of Nuclear Energy Programs for a while and then soon after the passage of the Nuclear Waste Policy Act, about a year or two after the act was passed, then I joined the Office of Civilian Radioactive Waste Management.

BY MR. EIDUKAS:

Q. When you joined the Office of Civilian Radioactive Waste Management, you say a year or two after the act was passed, so we're talking somewhere in the 1983-1984 time frame?

A. That's correct.

Q. What was your first position at the Office of



Radioactive Waste Management?

A. I don't remember the title of my first position. It was probably program analyst or something like that, but I'm not exactly sure.

Q. What did that position entail? What were your responsibilities in that position?

A. First major assignment I could remember was coordinating the preparation of the mission plan for the Civilian Radioactive Waste Management Program.

Q. Was there anything else that your role entailed in that position?

MR. SHULTIS: Objection, vague.

THE WITNESS: That preparation of the mission plan was pretty much a full-time activity for a number of years. So there might have been other minor assignments I was given, but, you know, overall it was primarily the mission plan.

BY MR. EIDUKAS:

Q. Okay. Did there come a time when your position at the Office of Civilian Radioactive Waste Management changed from program analyst working on the mission plan?

MR. SHULTIS: Objection, vague.
THE WITNESS: I had a number of different assignments in the Office of Civilian Radioactive Waste Management over the nearly 20 years that I've worked in that program.
BY MR. EIDUKAS:
Q. I guess what I'm trying to get at is I'd like to have just a brief chronology of the different positions you've been in with dates, if possible.
So you started out as a program analyst in the Office of Civilian Radioactive Waste Management in the approximately 1983-1984 time frame. What I'd like you to do is going forward to the present with dates, if possible, just state the various positions you've held in the OCRWM.
A. Okay. Around the 1984-'85 time frame, as I said, I believe I was a program analyst. I think in 1985 or '86 I became the senior technical adviser and technical assistant to the Director of Office of Civilian Radioactive Waste Management. I don't remember the exact time frame, but when Admiral Watkins became Secretary of Energy, I was detailed to his



office for I think little over half a year as an adviser to the Secretary.
I then came back into the Office of Civilian Radioactive Waste Management I think in 1990 or 1991, and I was the Acting Director of what was called the M&O Management Division with responsibility to bring on board the M&O contractor for the program. I think that was 1991. About the a year or two after that, I became the Director of the Storage Division. The primary responsibility was to work on a proposed monitored retrievable storage facility.
A few years after that, I became the Director of the Program Management Division. And let's see. About four years ago I transferred out to Las Vegas to the Yucca Mountain site characterization office, and I'm currently the Director of the Office of Project Control.
Q. Did you have any involvement in the drafting of the Nuclear Waste Policy Act?
MR. SHULTIS: Objection, asks for legal conclusion.
BY MR. EIDUKAS:



Q. My question was whether or not you had any involvement in actually writing or preparing the text of the Act.
A. Not that I could remember.
Q. At the time that the Act was being -- and when I say the Act, I'm referring to the Nuclear Waste Policy Act of 1982. At the time that Act was being drafted, did you have discussions with people who were involved in drafting that Act?
MR. SHULTIS: Objection, vague.
THE WITNESS: I don't believe so. I obviously talked to people in the department, you know, who were talking to people, you know, involved in nuclear energy activities, but I don't know that I've ever had any conversations with anyone that was actually involved in drafting the Nuclear Waste Policy Act.
BY MR. EIDUKAS:
Q. Okay. Do you have an understanding as to what the intent of the Nuclear Waste Policy Act is?
MR. SHULTIS: Objection, asks for legal conclusion.



THE WITNESS: I'm not sure what you mean by intent of the Nuclear Waste Policy Act. Obviously I was familiar with some of the provisions and some of the requirements. As I said, my main job when I was in the Office of Civilian Radioactive Waste Management was to prepare the mission plan. That was clearly required by the Nuclear Waste Policy Act.
BY MR. EIDUKAS:
Q. I'll try to clarify what I mean. Do you have an understanding of what the primary purpose of the Nuclear Waste Policy Act is?
MR. SHULTIS: Objection, asks for legal conclusion.
THE WITNESS: My understanding of the Nuclear Waste Policy Act is that it laid out a blueprint for this country to follow to provide for the management and disposal of spent nuclear fuel and high level radioactive waste with a number of specific provisions.
BY MR. EIDUKAS:
Q. Are you familiar with the term standard contract?

just re-ask the question. Do you know whether it is the Department of Energy's position that it entered into contracts with utilities to begin accepting waste in 1998 on the basis that it would have a repository available for permanent waste disposal in 1998?

MR. SHULTIS: Same objections.

THE WITNESS: As I understand your question, the Department of Energy did enter into contracts and the date I believe you indicated was correct, 1983, on the basis that it planned to have a repository or it was planning to have a repository in operation by 1998.

BY MR. EIDUKAS:

Q. I'm done with that document. If you want to put that aside. You just want to turn it over. That way.

MR. SHULTIS: Keep in order.

BY MR. EIDUKAS:

Q. Keep in order if you have to refer back to something in the future.

Do you know what the parties to the standard contract intended with respect to how fast spent



nuclear fuel would be taken by the Department of Energy?

MR. SHULTIS: Objection. It asks for a legal conclusion, vague, asks for speculation.

THE WITNESS: Yeah. I do not know what the parties had intended in terms of the rate of waste acceptance. If you're referring to the utilities, I do not know that.

BY MR. EIDUKAS:

Q. Okay. Do you know what the DOE intended with respect to the rate of waste acceptance?

MR. SHULTIS: Objection, asks for a legal conclusion, speculative.

THE WITNESS: I would have to answer that as follows. I know what the plans were that the Department of Energy was working on to develop the facilities because I was primarily responsible for developing those plans. We had planned or our objective was to try to have the facilities, primarily the repository, online in operation by 1998. But, again, those were plans.

BY MR. EIDUKAS:



Q. And I'm sorry, were you done with your answer?

A. Yes.

Q. Okay. When you're referring to working on those plans in that answer, what time frame are you talking about?

A. The early schedules that we prepared indicated that we had hoped to have the repository in operation by 1998, but we clearly I guess the word would be identified caveats or issues or uncertainties associated with that because we, again, as I had indicated before, we recognized the schedules were optimistic and success oriented was the phrase we used to describe them. And we had also identified, as I think I indicated before, schedules for the MRS facility, if that were to eventually be authorized by Congress, that showed that that could go into operation at least by 1998, perhaps a year or two earlier.

Q. Okay. I think -- well, I think I may have misphrased my question. What I was trying to get at was: What was the time frame that you were working on the plans you had referred to? Are you referring to the mission plan, or is this something earlier than



that?

A. It was the mission plan again. We worked on that in 1984, and I think we published it after a round of public review and comment. I think we published it in June of 1985.

Q. Okay. And I think you said that you personally at least were primarily involved in the planning for the designing of the facility. Did I understand you correctly?

A. No, not the design. I was responsible for developing the overall plan, which included design, included some of the siting issues, some of the permitting issues, some of the institutional issues that we had to deal with, as well as the bulk of the activity at that time, though, was the scientific programs that we had to conduct.

Q. Okay. Do you have knowledge as to he what rate of acceptance of spent fuel the repository was designed to operate at this time?

MR. SHULTIS: Objection, asks for legal conclusion.

THE WITNESS: Again, going back to the

mission plan of some 17 years ago, we had put in the mission plan what were called waste acceptance schedules, which were again planning targets of what we thought the system could do if it were developed, you know, in total as we had laid it out. Starting in 1998 with one repository operating. We had laid out what we thought were practical waste acceptance rates.

What I mean by that is it allowed for a ramp-up. I think the number that we started with was for the first repository, for example, 400 metric tons and then it increased. I don't remember the other numbers, but it increased 400 to 600 up to a rate of about 3,000 metric tons per year for a single repository, but at that time we also had authorization to pursue a second repository. That was a provision in the Nuclear Waste Policy Act that we laid out waste acceptance schedules for that two-repository system.

BY MR. EIDUKAS:

Q. Do you have any knowledge about whether there were waste acceptance schedules prepared or proposed prior to the mission plan?

MR. SHULTIS: Objection, asks for



speculation.

THE WITNESS: No, I have no knowledge of any waste acceptance schedules proposed prior to the mission plan.

BY MR. EIDUKAS:

Q. Just so I'm clear on the scope of your knowledge or your involvement, is it correct to say that your first involvement or encounter with waste acceptance schedules was when you began working on the mission plan in about 1984?

MR. SHULTIS: Objection, mischaracterizes witness's testimony.

THE WITNESS: Could you repeat the question, please.

BY MR. EIDUKAS:

Q. Sure. I'll rephrase it. I'm trying to make sure I understand whether or not your first involvement with waste acceptance schedules in connection with the Nuclear Waste Policy Act and the standard contract was when you began working on the mission plan in, I believe you said, 1984?

A. I don't remember the exact date, but I think I



joined the Civilian Radioactive Waste Management Program in 1984. And my first assignment was working on the mission plan and in that mission plan we did include proposed waste acceptance schedules.

Q. But you personally didn't work on waste acceptance schedules prior to that time? This is what I'm asking.

A. I do not remember working on any waste acceptance schedules prior to that time.

Q. When you joined the Office of Civilian Radioactive Waste Management and you said you were assigned to work on the mission plan, at that time had there already -- had work already been done on preparing the mission plan?

MR. SHULTIS: Objection, asks for speculation.

BY MR. EIDUKAS:

Q. If you know.

A. I honestly don't remember. I know it was a provision of the Nuclear Waste Policy Act, which I believe was passed by the Congress in December of '82, signed by the President in January '83. As I said, I



joined the program in '84. I don't remember if people had worked on that before I did, but I know that when I joined the program, that was the first assignment I was given.

MR. EIDUKAS: I'm going to go ahead and mark this as Number 3 and for the record I'm having marked Bates MS 069588 --

MR. STOUCK: 528?

MR. EIDUKAS: I'm sorry.

MR. STOUCK: I didn't hear.

MR. EIDUKAS: I'm sorry. I'll repeat. It's actually three pages. The first page is Bates number SN 069588D and then it skips some Bates numbers and then you have SN 069599 through 600. It's a document entitled "Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting," December 12th through 15th, 1983 in Washington, DC and the date of the actual document is February 1984.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 3.)

BY MR. EIDUKAS:

Q. Mr. Trebules, as you can see, this is three

pages from what appears to be a larger document. But if you can just take a moment to take a look at these and let me know if you're familiar with this.
A. (Pause). I note that from the two pages you gave me, it's only page 11 and 12. So I assume it was from a larger document.
Q. That's correct.
A. That's not included here.
Q. That's correct.
A. All right. I've looked over these two pages.
Q. Okay. Do you recall, have you seen these pages before?
A. I don't ever remember seeing these two pages.
Q. Okay. These refer to -- purport to refer to apparently a meeting or a conference that was held in mid-December 1983, during which Robert Morgan at the time appears to have been the Acting Director of Civilian Radioactive Waste Management gave this presentation or talk about the mission plan.
A. Right.
Q. Were you present for such a conference or meeting, whatever you want to call it?



A. I don't remember being at this meeting. I'm not even sure that I was working in the program at this time.
Q. Right.
A. This was in 1983.
Q. At the top of the middle page, page 11, on the right-hand side, the first full paragraph there says: "We have just received a preliminary draft of Volume I of the mission plan and we hope to have this available to interested parties, the states and others by Christmas."
Does that refresh your recollection as to whether or not work had been performed in preparing a mission plan prior to your arrival at the Office of Civilian Radioactive Waste Management?
A. I honestly don't remember that. I could only speculate that when he said we have just received a preliminary draft, it might have been a draft prepared by the support service contractor at the time, but I honestly don't remember that.
Q. Okay. I want to move down to that same column. It's the largest paragraph there on the



right-hand side.
A. Uh-huh.
Q. The paragraph starts out "I would like to talk a little bit about." You see that?
A. Yes.
Q. What I want to refer you to is about midway through that paragraph. There's a sentence that starts, "The basic strategy which we've outlined."
A. Yes.
Q. Okay. I just refer from there on to the end of the paragraph that says: "The basic strategy which we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage facilities on-site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at any -- I'm sorry -- or at another location." You see where it says that there?
A. Yes, I see that.
Q. Okay. Do you know whether that was -- or strike that.



Do you know was that the intent of the DOE at the time?
MR. SHULTIS: Objection, asks for legal conclusion. Mr. Trebules is not a 30(b)(6) witness, asks for speculation.
THE WITNESS: Again, as I understand your question, did I understand that to be the intent of DOE at the time. I don't believe I worked in the program at that time.
BY MR. EIDUKAS:
Q. When you worked in the program, do you know whether or not it was the intent of DOE to receive fuel at a rate beginning in 1998 that no utility would have to add any further storage facilities?
MR. SHULTIS: Same objections and relevance.
THE WITNESS: When I started working in the program on the mission plan, I remember that we discussed the objective of reaching waste acceptance rates that would preclude the utilities from having to provide additional on-site storage. That was our objective or planning target.

I believe what happened early on was that when we sent the draft mission plan out for public review and comment, we got a number of comments that said our schedules were too optimistic and we, I believe, revised those schedules in the actual document that went out in June of 1985 to the point where it didn't quite meet the intent of the words described here.

We started out as best as I could remember with a number like 400 metric tons in 1998, and we incorporated a ramp-up period that after four or five years or so we would eventually get up to about 3,000 metric tons a year, which we believed was the accepted spent fuel generation rate of the nuclear power plants at that time.

And it was over that ramp-up period that we hoped to get to the point where we would preclude the utilities from having to provide additional on-site storage. And then when the second repository came into operation, then we could, when that one reached full capacity, be able to reduce the backlog.

So, again, I'm speculating that when this



was written that was the intent, but that was changed after we got comments on those early draft versions of the mission plan. We adjusted those waste acceptance schedules a bit.
BY MR. EIDUKAS:
Q. Okay. Do you know whether or not it was the intent of the parties to the standard contract when they entered those contracts back in 1983 that fuel would be received at the repository at a rate that no utility would have to add any further storage facilities either on-site or at another location?
MR. SHULTIS: Objection, asks for a legal conclusion, calls for speculation.
THE WITNESS: As I think I heard your question, did I know the intent of the parties to the contract. Again, if you're referring to the utilities, I do not.
BY MR. EIDUKAS:
Q. Okay. Do you know whether or not the DOE had an intent -- had this intent when they entered into the standard contracts with the utilities?
MR. SHULTIS: Objection, asks for a legal



conclusion. Mr. Trebules is not a 30(b)(6) witness. Calls for speculation.
THE WITNESS: Could you help me? Could you clarify what you mean by the word intent?
BY MR. EIDUKAS:
Q. Sure.
A. Because I know we had planning targets or objectives or goals that we were trying to meet, but I know there was concern about the characterization of those and we put in, as I said before, caveats as this document indicates, you know, that represented some of the difficulties. And as I say on page 11 where it says, at the end of the second full paragraph. "Our intent is to fully comply with the act in process and in technical mandates. However, if we must slip a date in the schedule to accomplish the requirements and intent of consultation, we will do so." Again, can you clarify your question by what you mean by intent?
Q. Sure. I mean, I think we're talking about DOE here because you said you don't know what the utilities intended. What I mean by intent is what the DOE expected to do when -- and I was talking and my



question was referring to the time that the standard contracts were entered into back in 1983. You may not know the answer to that, but that was my question.
MR. SHULTIS: Same objections as before. Legal conclusion, 30(b)(6) witness, calls for speculation.
THE WITNESS: Again, I would have to characterize my answer by saying that our planning targets or our objectives or our strategies were such that, you know, we tried to have the facilities in operation to take the field by 1998. You know, with the caveats that I previously indicated. If that's what you mean by intent, that's how I would answer that question.
BY MR. EIDUKAS:
Q. Look quickly at the section of this paragraph right above where we've been looking. Starting with the sentence "I think most of you know." Do you see where I'm referring to? It's the second sentence of that paragraph. "I think most of you know."
A. I see that.
Q. Okay. Great. "I think most of you know that

the Act requires that we receive waste from the utilities by January 1, 1998."
First of all, is that your understanding that the Act requires that DOE start receiving waste from utilities on January 1, 1998?
MR. SHULTIS: Objection, calls for a legal conclusion. Calls for speculation.
THE WITNESS: Again, my recollection -- I don't remember the exact wording in the Act -- is that there was a qualifier that, you know, once we had the facilities available to do that, specifically the repository and the MRS that we already talked about. But other than that, that's my understanding.
BY MR. EIDUKAS:
Q. Okay. The sentence and this paragraph goes on to say, "Technically, the act does not specify how much waste or spent fuel we must begin receiving at that time. In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act."
Do you recall having any discussions back when



you were working on the mission plan as to regarding whether or not accepting one spent fuel element in 1998 would be in accordance with the Nuclear Waste Policy Act?
MR. SHULTIS: Objection, calls for speculation. Asking for a legal conclusion.
THE WITNESS: As I understood your question, do I recall having discussions, the answer is yes. I was involved in many discussions or speculation as about what that meant and would accepting only one fuel assembly satisfy the intent of the act. And as best as I can remember, I don't know that we ever got a clear determination, you know, from those involved that that was the case.
BY MR. EIDUKAS:
Q. Did you personally draw any conclusions regarding that?
MR. SHULTIS: Objection, relevance. Calls for a legal conclusion.
THE WITNESS: Again, would you repeat the question. Did I?
BY MR. EIDUKAS:



Q. I'm sorry. You had said that you recall there being discussions regarding whether or not accepting one spent fuel element in 1998 would comply with the Nuclear Waste Policy Act.
My question was whether or not you personally reached a conclusion as to whether or not accepting only one spent fuel element in 1998 would comply with the act?
MR. SHULTIS: Same objection.
THE WITNESS: I'm not quite sure how to answer that because at the time I was, you know, a fairly low level staff person. I was given an assignment. So I'm not sure if my conclusion would have mattered much. I mean, I'm not trying to be frivolous, but I don't know that I consciously thought of the implications of that at the time. I mean --
BY MR. EIDUKAS:
Q. Have you -- I'm sorry. I was going to ask you whether or not you have since come to such a conclusion or thought about the implications.
MR. SHULTIS: Same objections and relevance.



THE WITNESS: I think I would personally feel that one could argue since the Act was not specific, if we only accepted one fuel assembly, you know, we met the intent of the words. However, I also would be sympathetic to the additional phrase in here that where it says, "However, we did not believe that that meets the intent of the Act."
I believe the intent of the Act was for the government to develop the facilities to solve the nuclear waste problem, which isn't accepting just one assembly, and we were to develop the facilities. And we were trying to do that as expeditiously as we could, you know, to really deal with the overall problem of the accumulation of spent fuel.
BY MR. EIDUKAS:
Q. Okay. And was there ever a schedule or plan developed that called for only receiving one spent fuel element in 1998?
MR. SHULTIS: Objection, calls for speculation. It's vague.
THE WITNESS: I don't ever remember developing a schedule that only called for one assembly

in 1998.
Could we take a break?
MR. EIDUKAS: Yes. Off the record.
(Recess, 10:49 to 11:00 a.m.)
BY MR. EIDUKAS:
Q. Mr. Trebules, before we went off the record, we were discussing whether or not accepting one spent fuel element in 1998 would comply with the Act, and you I believe testified that back when you were working on the mission plan that you had discussions regarding whether or not doing so would comply with the Act; is that correct?
MR. SHULTIS: Objection, calls for speculation.
THE WITNESS: I'm not sure I said it was when I was working on the mission plan. During the period I've been working on the program over the 18 or 19 years, I've been involved in discussions where people speculated as to whether or not accepting one fuel element meant intent of the Act, and I think I said I don't know that we ever clearly resolved that. But as the previous document you've shown me indicated,



we had people that said that they don't think that would meet the intent of the Act.
BY MR. EIDUKAS:
Q. Who did you have these discussions with?
MR. SHULTIS: Objection. Calling for facts not in evidence.
BY MR. EIDUKAS:
Q. Well, did you have these discussions?
A. I remember participating in those kind of discussions, and I'd only be guessing, you know, if I identified names of individuals. You know, other than people like, you know, Alan Brownstein, who was much more involved in the contracts issues than I was. But over my 18 years in the program, I've worked with, you know, hundreds of people that have been in and out of the program and, I mean, it's a list of people. Again, I'd only be guessing to remember who exactly I discussed it with, you know, at those various meetings over the 18 years.
Q. So, other than Mr. Brownstein, you have no other recollection of a specific person you had these discussions with?



MR. SHULTIS: Objection, asked and answered.
THE WITNESS: Other than Al Brownstein, I'd only be guessing if I identified any more names. I mean, I can think of a long list of names, but I could not relate those to particular meetings or discussions where we talked about this. I believe I heard Lake Barrett discuss in various staff meetings that that could be argued that we meet, you know, the intent of the Act, but, again, I couldn't relate that to a specific time or place.
BY MR. EIDUKAS:
Q. Okay. Do you recall anyone -- strike that.
Did you personally discuss that issue with Mr. Barrett?
MR. SHULTIS: Objection, asks for speculation. Asked and answered.
THE WITNESS: I don't ever remember personally discussing that with Mr. Barrett. As I said, I believe he probably mentioned it in staff meetings or something like that, but, you know, it wasn't a conversation between just he and I.



BY MR. EIDUKAS:
Q. Okay. Do you remember any responses to Mr. Barrett's statements about that?
MR. SHULTIS: Objection, calls for speculation, asked and answered.
THE WITNESS: Again, I could only remember general discussions where people speculated as to whether or not that would meet the intent, and I don't remember any specific conclusions one way or another.
BY MR. EIDUKAS:
Q. Do you recall specifically what you discussed about this issue with Mr. Brownstein?
MR. SHULTIS: Objection, calls for speculation. Asked and answered.
THE WITNESS: No, I don't remember any the specific issues that I may have discussed with Al Brownstein about.
BY MR. EIDUKAS:
Q. I just want to go back over something background wise I forgot to do at the beginning of the deposition. Did you do anything to prepare for today's deposition?

picture of a person standing next to a fuel assembly before it got inserted into a reactor. I essentially wrote that first chapter.

I was heavily involved in the second chapter, which was sort of the strategy, which we talked about before, laid out the authorized system and the improved performance system. Although I remember Tom Isaacs provided a lot of the direction as to how that chapter should be structured and what it should say.

I compiled the table of assumptions that went into that second chapter. Sort of give people an understanding of the magnitude of the issue that we were dealing with. It talked about the quantities of spent fuel, the modes of transportation, the number of repositories, you know, some of the parameters. The waste acceptance schedule, that was also included in Chapter 2.

And then I wrote a lot of the response to comments in the comment response document that we prepared, and again all these had to be reviewed by my management, and ultimately the director of the program before it got published.



MR. EIDUKAS: Mark this as 4.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 4.)

BY MR. EIDUKAS:

Q. Mr. Trebules, I have marked as Exhibit 4 -- this version doesn't have Bates stamps on it. This is a December 20, 1983 marked as "Draft, Civilian Radioactive Waste Management Program Mission Plan, Volume 1, Overview and Current Program Plans." This appears to be a December 20, 1983 draft of the mission plan. Are you familiar with this document?

A. Could I have a few minutes to look at it?

Q. Sure, sure.

A. (Pause).

MR. SHULTIS: Ted, ours has Bates numbers.

MR. EIDUKAS: Let me read it into the record. For the record, the Bates stamp of the exhibit is CTR-042-1065 through 1190. Thank you.

(Counsel and witness conferring).

MR. EIDUKAS: There's a question pending. If you want to ask questions of the witness, you can ask them on the record, but I prefer you don't have



these consultations while there's a question pending.

MR. SHULTIS: What is the question pending?

MR. EIDUKAS: Are you familiar with this document, and you'll have a turn to ask questions of the witness when I'm done.

THE WITNESS: I'm ready to answer.

BY MR. EIDUKAS:

Q. Sure. I believe the question was: Are you familiar with this document?

A. To be honest with you, I don't remember specifically seeing this document before. I believe this was probably prepared before I joined the Civilian Radioactive Waste Management Program. However, I'm very familiar with some of the material in here and the reasons why we changed it in the eventual mission plan that got published in June of 1985.

Q. Okay. Would you describe what was changed --

MR. SHULTIS: Objection, vague.

BY MR. EIDUKAS:

Q. -- that you're referring to in your earlier answer.



A. Just very briefly, in looking at Chapter 1, for example, just skimming through it, this only has, for example, two pages and I believe in the version that I was responsible for, the one that got issued in June of '85, we had a much more extensive discussion in Chapter 1 on, as I indicated before, the types of wastes. We had a picture of the fuel assembly, you know, as to what it looks like, you know, before going into a reactor. We talked about other kinds of waste that we might have to deal with. The high level waste that came from the DOE operations.

Chapter 2, for example, looks like an early, early version of the strategy, which I think bears no resemblance to the one that ultimately got published in June of '85 where we talked about the authorized system and the improved performance system. This does have an early version of a waste acceptance schedule, but it's got numbers that were changed significantly from the one that got published in June of '85.

So, again, I mean, it's obviously an early version of the mission plan. I can't say for certain whether this is the one that was issued for public

review and comment. I would think not, but it's significantly different than the one that got published in June of '85.
Q. I can't recall if you answered this or not. Do you know whether or not -- do you know who prepared this version, this draft of the mission plan?
A. No.
MR. SHULTIS: Objection.
THE WITNESS: I do not know specifically who prepared this.
BY MR. EIDUKAS:
Q. Okay. And I think this follows from what you testified, but do you know whether or not this draft of the mission plan was used in any way in preparing the later drafts and the final mission plan?
A. I don't know. I don't remember how it was used. I mean, normally the process is, you know, drafts evolve, you know, through successive iterations. I'd only be guessing, but I'd assume that is what happened with this one.
Q. When you referred to Chapter 2, you said this was an early version of the strategy and didn't include



the authorized plan and the approved performance plan, but the final version of the mission plan did. Do you know why that was changed?
MR. SHULTIS: Objection, calls for speculation. Asked and answered.
THE WITNESS: I believe, as I indicated, Tom Isaacs was the primary author or inventor of the approach in that strategy chapter where we felt we had to clarify, as the names imply, what the department currently had authorization to execute. At the time that was the first repository in the transportation system, and we included discussion in the improved performance plan as to how that system could operate if we proposed and Congress accepted our recommendation on incorporating a monitored retrievable storage facility.
So we wanted to expand on and clarify that discussion, which I don't see in this document that you've provided me, the one dated December of '83.
BY MR. EIDUKAS:
Q. And you referred to a waste acceptance schedule. Is that the -- were you referring to the table that appears on page 2-3?



A. Yes.
Q. Okay.
MR. SHULTIS: You want to identify the Bates number?
THE WITNESS: CTR-042-1072.
BY MR. EIDUKAS:
Q. Is that the schedule that you were referring to?
A. Yes.
Q. Okay. And you said that this was changed in the eventual mission plan that was published?
A. Yes. This table doesn't look familiar to me, and I think the one that got published in the version of the mission plan in June of '85 was -- is different.
Q. So I take it you don't know the source of this waste acceptance schedule on page 2-3?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I don't remember the source. I don't know.
BY MR. EIDUKAS:
Q. And I think you said you don't recall seeing



this schedule before?
MR. SHULTIS: Go ahead.
THE WITNESS: I don't specifically recall it. I may have, but I don't -- I mean, I don't recollect it at all.
BY MR. EIDUKAS:
Q. Why don't we put this one aside for now. I may come back to this one later.
A. Okay.
MR. EIDUKAS: Would you mark this as Exhibit 5.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 5.)
BY MR. EIDUKAS:
Q. Mr. Trebules, I've had marked as Exhibit 5 a document titled "A Mission Plan for the Radioactive Waste Management Program, Volumes 1 and 2 of Two Volumes, Overview and Current Program Plans." This appears to be -- and it's dated April 1984 up in the right-hand corner. It says that it's a draft that was reprinted in July of 1984. Feel free to take a look at this.

My first question is going to be: Are you familiar with this document? I can also say for reference that this was the same document that was marked as Exhibit Number 11 of Mr. Robert Morgan's deposition.

MR. STOUCK: Can you give us Bates numbers?

MR. EIDUKAS: There are no Bates numbers on the document.

THE WITNESS: (Pause). All right.

BY MR. EIDUKAS:

Q. Are you familiar with this document?

A. Yes, I am.

Q. Is this a draft of the mission plan that you worked on?

A. Yes, it is.

Q. Okay. Turn to page Section I-Introduction. It has in the upper right-hand corner page 1-1. Is this a section that you drafted?

A. That I don't remember.

Q. I guess I'll back up a second. On this particular draft that is marked as Exhibit Number 5,



what specifically was your role in preparing this document?

A. Well, that's tough to answer. Again, when I got there, the mission plan work was underway. I don't remember exactly when or where I picked up because, you know, this is like 16, 17 years ago. I do remember, I believe this is the document that went out for public review and comment. As the cover letter indicates, signed by Mike Lawrence. As I indicated, the comments were due back to Charlie Head, who was my supervisor at the time.

Once we -- and I remember, you know, after this document much clearer that when the comments came back in, we revised some of these chapters and I did write the next version of this Chapter 1, for example, which was much more extensive with the pictures in it and the waste sites. To be honest, I may have been involved in structuring some of these words back then, but this is just about the time when I was, you know, coming into the program to work on it.

We made a lot of changes in response to those comments such as Chapter 1. We changed the strategy



chapter significantly, and I remember very clearly working on, you know, writing sections of the document after this version. To be honest with you, I don't remember exactly what I did with this document because this was the one that had been under work and went for public review and comment.

Q. Okay. Do you know who drafted this Section I of this draft?

MR. SHULTIS: Objection, asked and answered. Calls for speculation.

THE WITNESS: No, I don't remember specifically who might have drafted this.

BY MR. EIDUKAS:

Q. If you look down that second paragraph, page 1-1, the last sentence says, "The program developed by the department to fulfill the requirements of the Act is described in this mission plan."

A. I see that.

Q. Okay. Do you agree that the mission plan describes the program developed to fulfill the requirements of the Nuclear Waste Policy Act?

MR. SHULTIS: Objection, asks for legal



conclusion.

THE WITNESS: I believe that's the case, but I would point out, though, that this was a draft document that went out for public review and comment and does not reflect the final version of the mission plan, which was the June '85 version of the plan.

BY MR. EIDUKAS:

Q. Okay. The sentence in that paragraph says, "Specifically, the following program objectives have been identified to implement the Act," and then it lists five numbered program objectives.

Is it your understanding that these program objectives would fulfill or would implement and fulfill the requirements of the Act?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Give me a second to review them, please.

BY MR. EIDUKAS:

Q. Sure.

A. As I recollect, these are the objectives that the department identified, which they thought would

THE WITNESS: Again, I'm not familiar with the provisions of the contract that, as these words indicate, that included the development of a waste acceptance schedule. I was involved in the subsequent development of the waste acceptance schedules that we used for planning purposes, which we put in the following version of the mission plan that got published in June of '85.

BY MR. EIDUKAS:

Q. Okay.

A. But I'm not clear at all as to the relationship of that to the contract, to the provisions of the contract.

Q. Okay. So if you'll just turn to the back side of that page you're looking at, there is a Table 2-1 Waste Acceptance Schedule.

A. Right.

Q. Did you have any involvement in preparing this particular schedule?

A. As best as I could recollect, I believe I did and, as I indicated, this is -- if I could refer back to the previous --



Q. Sure.

A. -- version that you gave me. The previous document.

Q. You're looking at page 2-3 is the table in that?

A. Yeah. I noted very quickly some changes. For example, in the previous exhibit, okay, if you note that this one began with acceptance rates for the first repository starting at 1800 metric tons, okay, for five years. Then it ramped up to 3,000 metric tons. Again, as best as I could recollect, upon reflection of this ramp-up rate, it was determined that was probably optimistic and unrealistic.

So, in Exhibit 5 that you just gave me, if you note the difference in the first repository acceptance rates, it started out at 400 metric tons, a much lower rate, a gradual ramp-up to 3,000 metric tons. And as I think I've previously indicated in some of my earlier answers, you know, my recollection of the first waste acceptance schedule we published started at 400 metric tons. So I am familiar with the ones in Exhibit 5, but I wasn't familiar with the ones in Exhibit 4.



Q. Okay. Talking about the schedule in exhibit -- strike that.

I think you said that the ramp-up period was revised downward in the schedule in exhibit -- between the schedule in Exhibit 4 and the schedule in Exhibit 5. You said it started at 400 rather than the 1800 metric tons that's set forth in Exhibit 4, and I think you characterized it in order to make it more realistic or probable.

My question is whether or not it's your opinion that the schedule set forth in Exhibit 5 is a realistic schedule?

MR. SHULTIS: Objection, calls for characterization. Legal conclusion.

THE WITNESS: Let me try to correct one thing you said. You said the ramp-up period was revised downward. It's the ramp-up rate that was revised downward.

BY MR. EIDUKAS:

Q. Thank you. That's correct.

A. I think I recollect discussions, you know, back again some 16, 17 years ago where people looked at



bringing a nuclear facility online like the waste receiving facilities of a repository and recognizing that it needs a gradual ramp-up rate before it reaches its full capacity steady state operations. And when we compared the numbers in Exhibit 4 to Exhibit 5, as we just discussed, you know, the ramp-up rate in Exhibit 5 is more gradual and I think in many people's minds, particularly the engineers that were working on it at the time, probably more realistic.

Q. Okay. Who did you have those discussions with, if you can recall?

A. Again, the only names I remember at the time the people I was talking to were people like Charlie Head, who was my immediate supervisor, who is the name indicated in this cover letter to provide comments to. He was, you know, back then he was the one that I talked to most of the time about the work on the mission plan.

Q. Referring to the acceptance schedule in Exhibit 5 that you have in front of you, how was that prepared?

MR. SHULTIS: Objection, vague.

BY MR. EIDUKAS:
Q. And what I mean by how was it prepared, I don't mean how was it typed. I mean, how were these numbers decided upon? How was this schedule developed?
MR. SHULTIS: Objection, vague. Asks for a legal conclusion.
THE WITNESS: As best as I could remember, we had two overriding goals or objectives that we were trying to meet. One was to begin waste acceptance in 1998. The other was to reach a rate for which the amounts of additional at-reactor storage would be minimal or zero.
As Table II-1 in Exhibit 5 shows, in the second column, the annual spent fuel generation rate, these were numbers that we got from the Department of Energy's Energy Information Administration. Based on their analysis of the nuclear power plants in operation and the expected amount of spent fuel that they'd be generating, and as you can see in this table, the numbers start at in 1998 at 2,700 metric tons. They go up a little bit. They approach 3,000 metric tons.



So, for the first 10 years of operation, our target was sort of to reach an acceptance rate of about 3,000 metric tons, which would more than the generation rate from all the nuclear plants.
We did recognize, though, at that time we still had a backlog, which is shown in column 4, you know, of over 40,000 metric tons that already was in storage. So, again, our two objectives or goals were to try to begin, as you know, as soon as possible, you know, 1998 or as soon as possible thereafter. And as we indicated before, those were what we characterize as optimistic schedules and reach an acceptance rate of 3,000 metric tons, which would preclude the utilities from having to provide any additional on-site storage.
Then when we got a second repository in operation, again, this is shown in Table 2.1 in column 6, a second repository would come into operation about a half a dozen years after the first, and we expected that to ramp-up faster because we would have experience from operating the first repository. And when those two repositories were then operating in tandem, at that point then we'd be able to start reducing the backlog,



which is indicated in the column on the far right.
You know, eventually to the point where we'd between the two repositories accommodate all the expected spent fuel, which at that time was still judged to be 140,000 metric tons.
BY MR. EIDUKAS:
Q. Okay. So, just looking at the -- let's take the first repository acceptance rate that starts at 400 and ramps up to 3,000 and then stays at 3,000 until it looks like 2025 or 2026 where it goes to has 100 and then stops.
I guess, how were those numbers actually -- how did you actually come up with those numbers? Was there a source or a basis for the actual numbers you have here in this for that schedule?
MR. SHULTIS: Objection, vague.
BY MR. EIDUKAS:
Q. I mean, do you understand what I'm asking? I mean, in other words, is this representing a physical limitation that was projected or recognized? Were these numbers picked out and then the idea was to design repository around them? I guess what I'm



trying to get at what, I guess, first the source for these numbers?
A. Okay.
MR. SHULTIS: Objection, compound.
THE WITNESS: It's a compound answer. It's somewhat complicated, but again my recollection is that going back to the Nuclear Waste Policy Act, which indicated that the country planned on developing two repositories, and there were various reasons for that, but the plan was to develop two repositories. And based on the projections at the time, again, the source that I'm familiar with is the Department of Energy's Energy Information Administration, which projected we'd have a total of about 140,000 metric tons of spent nuclear fuel to accommodate or dispose of.
There was a provision in the law that said the first repository could not emplace more than 70,000 metric tons until the second repository goes into operation, and I think there were various reasons for that. But that was sort of a guideline that we used that said the first repository should be designed, if the geology permits, to accommodate 70,000 metric tons

and then the other 70,000 metric tons would go in a second repository.

It was that in combination with what I indicated earlier that the objective was to get an acceptance rate of about 3,000 metric tons, which at that time was the anticipated annual spent fuel generation rate from the nuclear power plants in operation. So if you just do the math, you have a capacity for repository of 70,000 metric tons divided by 3,000 metric tons per year. That would indicate that that repository would operate for about 25 years as this table shows.

And then the second repository would be in operation. Again, a capacity of about 70,000 metric tons, at about 3,000 metric tons per year. That one would operate for about 25 years, and the sum of those two would accommodate all the anticipated spent fuel to be generated by the nuclear power plants in operation at that time.

BY MR. EIDUKAS:

Q. Okay. Referring to -- I think other witnesses have called it the steady state rate or the



maximum rate. The 3,000 that's carried out for the most of the years on this schedule for the repository. Does that represent a limitation on how fast the repository was designed to accept waste?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: I'm not quite sure how to answer your question. You said does it. You could design the repository to operate in a number of different ways, and if money or schedule or no object, you could increase its capacity. Although you complicate the operations.

I believe we again established various goals or objectives and operating parameters which we thought were reasonable based on the experience to date because you also had to consider, for example, the transportation requirements to service these repositories. And in 3,000 metric tons per year, that equates to a large number of truck shipments or, you know, somewhat lesser number of train shipments. And, again, you're looking for the reasonable accommodation of all these interrelated factors.



But I think my earlier answer is still pertinent that the overriding objectives were, again, to develop two repositories. The first with the capacity suggested by the Nuclear Policy Act of 70,000 metric tons with an acceptance rate that would accommodate the expected spent fuel generation rate from nuclear power plants in operation. So when you balance all those design factors, you know, for the engineering solution, you get something I think that was represented at the time by the parameters in this Table 2.1 in Exhibit 5.

Let me point out, though, that this is not our current approach because there have been subsequent actions by Congress which essentially have postponed any work on the second repository. So we knew at the time when we published the mission plan back in the '84-'85 time frame that there were a lot of things beyond our control and, again, this was just a plan. These were just objectives we were trying to meet, and we knew we'd have to accommodate a lot of, you know, prohibitions and hiccups as we began to execute the program.



BY MR. EIDUKAS:

Q. Okay. You had set forth the two objectives and the second was that you wanted the rate to reach -- to basically reach -- you wanted to basically reach a rate that would equal the waste generation rate. So that the need for additional reactor storage would be either minimal or zero.

My question is: What was the source of that objective? Why was that an objective you had?

A. Okay. Could you give me a minute --

Q. Sure.

A. -- to review some of these previous documents. Because I think there were words in one of those that I remember being presented to me when I joined the program. Let me just... Is it Bob Morgan?

Q. It's Number 3.

A. Yes. Let me quote from Exhibit 3, page 11, column 2, the large paragraph in that column about halfway through the paragraph. There's a sentence that begins "The basic strategy which we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage

facilities on-site."

It goes on to say, "During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at another location." And if you look at the progress of these documents, this one dated --

Q. February '84?

A. -- February '84 but reflecting a meeting in December of 1983, and Exhibit 4 in the draft mission plan dated December 20, 1983, which had that more optimistic waste acceptance schedule with the higher numbers. Starting in 1998, 1800 metric tons for a few years. Then rising to 3,000 metric tons.

You can see how that realization that that might have been too optimistic evolved because in the exhibit, the last exhibit you gave me, Exhibit 5, those numbers have been adjusted downward. You know, the ramp-up rate to the numbers, you know, showing beginning at 400 metric tons ramping up to 900, 1800, 3,000 metric tons. But that was an objective, you know, to try to accommodate the nuclear power plants



and not have them generate or not have them have to add any on-site storage.

Q. I think you said when you started, someone gave you that language or told you that language. Do you know who it was?

MR. SHULTIS: Object.

THE WITNESS: I don't remember specifically, but it's similar to what, you know, appeared in that other exhibit.

BY MR. EIDUKAS:

Q. Robert Morgan?

A. And that became sort of a program -- again, it was a program objective that we were trying to meet.

Q. Okay. Do you know why that was a program objective?

MR. SHULTIS: Objection, calls for speculation.

THE WITNESS: Yeah. I would be speculating. I mean, I'm inclined to answer and say that, you know, we were trying to accommodate the utilities, who are in fact our customers. That's what the program was designed, you know, to deal with, which



is the spent fuel being generated by nuclear power plants. And we knew it would be a financial burden for them to add on-site storage. So we were trying to develop a program, again, to accept waste in 1998, but again with all the caveats that that was optimistic and success oriented.

BY MR. EIDUKAS:

Q. Okay. And just again while we were comparing the acceptance schedule in Exhibit 4, the December 1983 draft, and the waste acceptance schedule in Exhibit 5, the 1984 draft, you said the ramp-up rate was revised down between Exhibit 4 and Exhibit 5, but the steady state rate or the maximum rate is 3,000 in both documents, correct?

A. That's correct.

Q. Okay.

A. Steady state rate is 3,000 in both documents.

Q. So that remained a constant at this point in time as to what was planned for the repository's acceptance rate to be?

A. That's my recollection, that's right.

Q. Okay. Focusing on Exhibit 5, it's like the



page on the other side of the acceptance schedule. It's 2.1 we had looked at a little earlier. There's that section there we were looking at, the middle of that first paragraph where it talks about developing a waste acceptance schedule.

The next sentence, which I didn't read, says that -- and feel free to circle that or mark that if it helps you keep track of this. It says, "The acceptance rate is based on the emplacement capacity currently projected for the two planned geologic repositories and will be maintained by the department."

Is it your understanding that, again, this is referring to what you've discussed already, but is it your understanding that the acceptance rate that's found on the next page is based on the emplacement capacity projected for the repositories?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Let's see. The sentence reads "The acceptance rate is based on the emplacement capacity currently projected for the two planned geologic repositories." That's what we talked about.

The first one beginning at 400 ramping up to 900, 1800, to the -- as you said, steady state of 3,000. The second repository starting a few years later at 1800 metric tons for five years. Then reaching a steady state rate of 3,000 metric tons. Those were our planning assumptions at the time.

However, as I indicate and it goes on to say, "and these will be maintained by the department." I know, for example, that after this April 1984 Exhibit 5 version, when we published the mission plan in June of '85, we did also include waste acceptance schedules. We had I think two. One reflecting, as I previously indicated, the authorized system and another one reflecting the improved performance system. So we did, you know, continue to examine and evaluate waste acceptance schedules beyond Exhibit 5.

BY MR. EIDUKAS:

Q. Okay. I was referring back to that sentence we've been looking at here. It seems to be suggesting that the acceptance rate that's found on the next page in the schedule is based -- it says, you know, based on the emplacement capacity currently projected.



I guess what I'm trying to understand is whether or not this rate reaching the steady rate of 3,000, is that based on, you know, taking the design the way that the repository was designed at this time and determining what this sentence called the emplacement capacity was. In other words, how fast could they accept waste there and that's how the schedule was developed.

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: Yeah. I think I indicated as best as I could what we considered or what the objectives were in developing the waste acceptance schedules, and then that in turn would be used as input to the designers who design the facilities to meet or, you know, accomplish those objectives. You could design the facilities to operate at different rates if that was required, but these waste acceptance schedules would be used as designed input into that process for those facilities.

BY MR. EIDUKAS:

Q. I guess maybe that's what my question is



getting at. What came first, the objective or the design in terms of these rates. Was the objective given and then the design built around that objective, or did you take what the design was and then back out what can this design accommodate?

MR. SHULTIS: Objection, asked and answered.

BY MR. EIDUKAS:

Q. If you know.

A. I honestly don't know. I mean, I would probably have to research that, you know, to see what we talked about in the design area of the repositories. Again, my familiarity is working on the waste acceptance schedules, you know, to accomplish the two objectives that I previously talked about.

MR. EIDUKAS: Okay. It's approximately -- off the record.

(A lunch recess was had, 12:15 to 1:22 p.m.)

AFTERNOON SESSION

(Mr. Stouck not present.)

BY MR. EIDUKAS:

Q. I want to refer back to the first document we



looked at today, which was the copy of the standard contract. And I want to also -- I want to look at that in connection with the acceptance schedule that is in Exhibit 5 that we were looking at, which would be on page 2-2.

My question is, I'm referring to the part of the standard contract we looked at earlier this morning that talks about: "The DOE has the responsibility following commencement of operations of a repository to take title to the spent nuclear fuel or high level radioactive waste involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel."

My question is: When you were developing or working on the waste acceptance schedule that's in Exhibit 5, was there any discussion as to whether or not that schedule was designed to meet this requirement that the DOE take title to the spent nuclear fuel as expeditiously as practicable?

MR. SHULTIS: Objection, asks for a legal conclusion.

THE WITNESS: Your question was, was there

executing the program. You know, we had to make decisions on -- actually at that time one of the big decisions was which sites were we going to examine. I think we were looking at -- it was called nine first ground sites. Looking at a site in Hanford, Washington, the Yucca mountain site, we were looking at two sites in Texas, we were looking at some sites in Utah, in Louisiana and Mississippi.

So, one of the decisions would be, you know, of those nine, which ones are you going to identify for further work. That was a major decision that we knew about at that time. There were decisions to be made on the design of the repository itself and how it was going to operate. Decisions on the type of waste package. You know, the licensing strategy.

I mean, the amount of public involvement was another one. So there were big decisions that we were well aware of even at that time that needed to be made, and the intent was, you know, decision-makers within the Department of Energy and subsequent administrations.

Q. Did you have any understanding as to whether



or not utilities would be relying upon this information?

MR. SHULTIS: Objection, calls for legal conclusion, speculative.

THE WITNESS: I think the best way we could answer that is indicate when we sent the draft of the mission plan, I think we sent two drafts out for public review. Looks like this earlier one I think was worked on before I got there. When they were sent out for public review and comment, that included the utilities. And I'd have to go back and look in the comment response document, but I'm fairly certain that we got comments from either individual utilities or groups of utilities at the time.

So, one of the major operating parameters for this program compared to other DOE programs is this one was done, you know, with full public disclosure. There was no classified information, you know, no nothing like that. So, most of the information we developed was made available to the public. We accepted comments from everybody. As I said, I think we got over 100 comment letters, some 2,500 comments,



and I'm fairly certain that that included comments from utilities at that time.

BY MR. EIDUKAS:

Q. And, in fact, if you look at the bottom of that letter, we had talked about earlier about the December 1983 draft of the mission plan. The paragraph that starts at the bottom of the first page of that cover letter says that "This draft mission plan incorporates changes in response to comments on a preliminary version of Volume 1 distributed on December 20, 1983. The department issued that preliminary version in order to obtain input from the states, affected Indian tribes, the Nuclear Regulatory Commission and other Federal agencies early in the preparation process."

Does that refresh your recollection as to whether or not -- what that December 20, 1983 draft we looked at was used for?

MR. SHULTIS: Same objection.

THE WITNESS: Yes. I think I answered that, but I'd also have to go back and check my personnel records, but I think that earlier version was



issued, was compiled and issued before I joined the Civilian Radioactive Waste Management Program. I do remember working on the subsequent volume, Exhibit 5.

BY MR. EIDUKAS:

Q. Okay.

A. Okay. And then the final mission plan, the one that was published in June of '85. But I don't remember working on this first one, Exhibit 4.

Q. And I believe you testified -- and if I'm mischaracterizing your testimony, please correct me -- that you were talking about and you were comparing Exhibits 4 and 5 in this schedule, the waste schedules there, and talked about how caveats were given as to whether or not these schedules might change. I believe you testified to that. It was possible these schedules, these specific schedules right here might change.

Am I correct in understanding that that was your testimony?

A. Yes.

Q. Okay. But it is also fair to say that the objective of these schedules remained constant, and one

of those objects being that it would ramp up to equal, at least equal the waste generation rate. So that it would either eliminate or, you know, reduce to either minimal or zero the need for utilities to build additional on-site storage after 1998?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Again, as best as I can remember, we had two overriding objectives. One was to begin acceptance in 1998 and the other one was to ramp up, you know, as fast as realistically possible, you know, with all the engineering constraints to preclude the need for utilities to add additional on-site storage. But we did anticipate that the schedules would change and, in fact, in Exhibit 5 on page 2-1, just quickly looking at the section that's entitled "(A) Waste Acceptance Schedule."

BY MR. EIDUKAS:

Q. Yes.

A. The second paragraph begins by saying that: "This waste acceptance schedule will eventually be further developed to show not only the aggregate



acceptance schedule, but also an acceptance program ranking by utility and fuel element." So we anticipated that these waste acceptance schedules would continue to evolve, you know, would change based on, you know, new or updated information.

The next sentence goes on to read: "The schedule will serve as a planning base, which will be updated annually, with responsible latest projections." So, again, we anticipated that they would be updated.

Q. To stop you there, that sentence that you referred to is that "The schedule will serve as a planning basis, which will be updated annually in response to the latest projections of nuclear power growth." Is that connected to the objective you stated that the schedule was intended to ramp up and then to meet the generation rate?

MR. SHULTIS: Objection, looking for a legal conclusion.

THE WITNESS: My recollection is that the main reason we said "The schedule will serve as a planning basis, which will be updated annually in response to the latest projections," the projections



that we were monitoring closely were the EIA projections, the Energy Information Administration projections. And I believe at the time the Nuclear Waste Policy Act was passed, those projections indicated there were would be 140,000 metric tons of spent fuel generated. And if I can look back quickly to Exhibit 4 here.

BY MR. EIDUKAS:

Q. Sure.

A. Again, when the Act was passed in the end of 1982, the number was 140,000 metric tons, which divided by two was the basis for the 70,000 metric ton limit. By the time this draft of the mission plan was published in December of '83, those projections had already fallen to 133,000 metric tons, and one of the factors obviously was Three Mile Island in 1977 I think. You know, that the number of power plants under construction was dropping. Some were being canceled.

And let me just look here. Well, this one still says 133,000 metric tons. But, you know, we thought that the total amount of spent fuel to be generated might continue to decrease. You know, so we



wanted to make sure we could accommodate that.

Q. Okay. To your knowledge, was the objective of having a rate that would meet the generation rate, did that objective ever change over time?

MR. SHULTIS: Objection, asks for a legal conclusion.

THE WITNESS: I think we tried to maintain that as an objective and that sort of became institutionalized with this 3,000 metric tons per year, you know, acceptance capability for one repository, and again when the second one would come online with an additional 3,000 metric tons, then we'd be able to reduce the backlog. That remained a planning objective or assumption for a number of years but got seriously set back when Congress I believe in 1987 pretty much put the second repository program on hold. So, at that time we sort of had to regroup and figure out what we were going to do.

BY MR. EIDUKAS:

Q. Looking again at the schedule in Exhibit 5, it provides for schedules for the first and second repository, but there's no acceptance schedule in this

meetings cannot possibly call for speculation. The question is whether or not they recall something.

I would just ask please if counsel for the government would listen to the questions and attempt to interpose only objections that are proper and actually meet the substance of my questions so as not to unnecessarily delay the length of this deposition.

MR. SHULTIS: The objections I'm making are based on the questions being asked. If you don't want me to make objections, don't ask objectionable questions. I'm sorry that you feel that I am not listening to your questions. I'm listening. I'm sorry that you think that Mr. Trebules is not having a clear memory of something that happened 16 or 18 years ago is speculative, but if he's already answered that he doesn't remember, then asking another question is speculative. But your objection is noted.

MR. EIDUKAS: Okay. This is not the proper place to debate this. I would only -- my objections to your objections has been stated.

BY MR. EIDUKAS:

Q. But my question still stands, Mr. Trebules, is



if you can recall who at these meetings discussed this issue, I would please like to know the names of those persons.

MR. SHULTIS: Objection, asked and answered.

MR. EIDUKAS: It's been asked but not answered.

THE WITNESS: Okay. Again, at this time back in 1984-'85 I don't remember specific meetings or the names of specific individuals that were at those meetings, other than the people I normally talked to, you know, in the normal course of events with the names I've already given like Charlie Head and Bob Rosselli and Tom Isaacs and Roger Gale. But I couldn't relate that to a specific meetings or specific topics but, you know, just in general we talked about issues like this. So that's the best I could do.

BY MR. EIDUKAS:

Q. Okay. I think I'm done with this particular document at the moment. Although, again, you may want to refer back to it in later course of this deposition.

MR. EIDUKAS: Mark that as the next



exhibit, please.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 6.)

BY MR. EIDUKAS:

Q. Mr. Trebules, I've had the court reporter mark and hand to you Exhibit 6, which is a copy of the June 1985 Volume I of the June 1985 mission plan and I'll represent to you that it contains Volume I through Chapter 10. It goes from -- it goes through the end of Chapter 10, which is page 403/404 of the documents. The Bates range that I've handed you is CE 14791 through CE 15200.

I have remaining portions of this available if you would like to look at it. I will not have any questions beyond that involve the section that is not attached here. But if you need to look at it at any time, let me know and I will provide it for you.

Take a look at this and take all the time you want, but my question is: Is this a copy, at least the sections that are present, a copy of that final mission plan that you worked on that you have testified was published in June of 1985?



A. (Pause). (Conferring with counsel).

MR. SHULTIS: Is there a pending question?

MR. EIDUKAS: Yes, there is.

MR. SHULTIS: Would you read it back.

MR. EIDUKAS: I'll rephrase it. I was asking whether or not this was for the portions that are here a copy of the mission plan that Mr. Trebules had testified he worked on and that was published in June of 1985. Off the record.

(Discussion off the record.)

(Recess, 2:15 to 2:26 p.m.)

BY MR. EIDUKAS:

Q. The exhibit marked as Exhibit 6, we've had some discussion off the record and have determined that it had some discrepancies in the copying of the original document and in particular what we noticed was that page 13 of this document was absent. So we have located another copy of page 13 and inserted it into Exhibit 6. We believe that page 14 was blank and that's why there's no page 14 present. Also, the page part 2 is out of place?

A. Oh, the section in part 2 Chapter 11 was not

included and doesn't include Volumes II and III of the entire mission plan.

Q. I also was going to refer there was a page out of order. There was like a cover page for part 2 of Volume I.

A. Oh, it's the one that was in place at page 13 in the front section.

Q. Right. So the page that's Bates numbered CE 14820 is out of place. It should go later in the document and then, in addition to that, I've also represented and the witness has confirmed I believe that Chapter 11 of this volume, Volume I, is not present and Volume II and Volume III of the mission plan are also not present and part of this exhibit.

Is that an accurate statement of what --

MR. SHULTIS: That's consistent with my understanding. Mr. Trebules found the discrepancy. So...

THE WITNESS: I think that covers it.

MR. SHULTIS: Okay.

BY MR. EIDUKAS:

Q. Okay. With all of those caveats and



clarification as to what is present in Exhibit 6 for this deposition, is what is present here, those portions here, are they from the June 1985 mission plan that you worked on?

A. I believe so, yes.

Q. If you could turn to page 3. It's titled Chapter 1 Introduction and that section appears to go through page 13 that we added to this document. Is this the chapter that you testified to earlier as being the author of?

A. Yes.

Q. If you could turn to pages 6 and 7, and in particular on page 7 there's a section that starts: "The following specific program objectives have been established to implement the provisions of the Act. They evolve from the previously mentioned policy goals."

And then the third objective listed here says, "To insure the acceptance of waste for disposal by January 31, 1998 in accordance with the acceptance schedule provided for in the DOE standard disposal contracts and in conformance with the Act."



My question is: When you wrote this section, what did you mean by "the acceptance schedule provided for in the DOE standard disposal contracts"?

MR. SHULTIS: Objection, calls for a legal conclusion.

THE WITNESS: This is on page 7 with the introductory sentence that says, again, "The following specific program objectives have been established." So, again, this was an objective for the program. It was a goal or a target. And we identified the five objectives. One of our objectives was to insure the acceptance of waste. It says for disposal by January 1998. Again, this is one of our objectives.

"In accordance with the acceptance schedule provided in DOE standard disposal contract." My understanding was that the contracts that the government entered into with the utilities at some point in the future would have more detailed schedule information, and I believe that was to be provided after, you know, later. It was to come after this mission plan and when those specific schedules were developed, that's what we would -- that's what the



government would target to meet.

BY MR. EIDUKAS:

Q. The language you used here does say that "the acceptance schedule provided for in the DOE standard disposal contracts" and I would just, if you could tell me, what it is, what are you referring to in the contracts in this passage?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Again, I was not the person that worked directly on the standard disposal contracts. My understanding was that they were to -- I'm trying to think of the terms. There were going to be documents issued later in the late 1980s or early 1990s and I think they were related to -- and these are documents I'm not familiar with -- the annual capacity report, annual priority rankings that were to be -- I think they were going to be negotiated with utilities and those would become the specific schedules that the government would try to meet in terms of accepting spent fuel.

BY MR. EIDUKAS:

BY MR. EIDUKAS:
Q. Okay. Why don't we turn to page 15. That's the page titled Chapter 2 Program Strategy, and Chapter 2 appears to run through page 29 and in my version at 29/30. So 30 is probably a blank page.
A. Right.
Q. But my question is: Is this a chapter that you also wrote?
A. I wrote sections of it, not the entire thing.
Q. Do you recall what sections of this chapter you wrote?
A. I believe I wrote most of the information beginning on page 21 through the end of the chapter.
Q. Okay.
A. Wrote -- let me correct that. I wrote or I compiled information from other sources that made up the entire chapter through the end of the chapter. For example, you know, we had previous waste acceptance schedules that we --
Q. Correct.
A. I have to look at the numbers, but we probably modified them to some extent, you know, from previous



editions. Although I didn't write these, it was my responsibility to try to get the correct information to complete the chapter.
Q. Okay. Before I get to that portion of the chapter, I do want to direct your attention to the first page and, similar to the previous section we looked at, there appears to be a section, four numbered sentences or sections that are stated to be goals and objectives of the program.
Did you have any involvement in preparing these or in preparing this section of the chapter?
A. Yes, I had some involvement because it was my responsibility to coordinate and produce the entire document. The primary author of the first part of Chapter 2, though, was Thomas Isaacs.
Q. Do you recall discussing the first portion of Chapter 2 with Mr. Isaacs, and a specific discussion on that section of Chapter 2?
A. I remember we had specific discussions on the first part of Chapter 2, yes.
Q. Okay. Generally, what was the issues that you had or that you did discuss with Mr. Isaacs about this



chapter?
A. Again, this is where we introduced the concept of the authorized plan, which we talked about before, and the so-called improved performance plan. This was a major change from the earlier versions of the drafts of the mission plan where we wanted to highlight the benefits that a monitored retrievable storage facility could add, you know, to an integrated waste management system.
Q. I want to look again at the first page of the chapter. That's page 15. I'm looking at goal number 4 or numbered section -- numbered paragraph number 4. It says, "In accordance with the above goals, the program has vigorously pursued the Act's directive to begin accepting spent fuel and high level waste for disposal no later than January 31, 1998." Just stopping there.
Was it your understanding that it was a directive of the Nuclear Waste Policy Act to begin accepting spent fuel and high level waste for disposal no later than January 31, 1998?
MR. SHULTIS: Objection, calls for a legal



conclusion.
THE WITNESS: I believe there were words in the Nuclear Waste Policy Act which referred to January 1998. I think it also said once a facility is available. I don't remember exact words, but if we had a copy of the Nuclear Waste Policy, I think we could probably dig that out.
BY MR. EIDUKAS:
Q. And the section goes on to say, "and to continue to dispose of the waste in a highly efficient manner consistent with the continued orderly operation of the nation's nuclear power generation plants."
Do you understand that it was also a directive of the Nuclear Waste Policy Act that the Department of Energy continue to dispose of waste after January 31, 1998?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: I don't recollect words in the Nuclear Waste Policy Act that -- there may be some, but I don't recollect that talked about the orderly operation of the nation's nuclear power generation

plants, other than, you know, it talked about the environmental problem that had to be resolved with nuclear waste in general. You know, it said that it's going to be the policy of the nation to deal with that and that's why they passed the Nuclear Waste Policy Act.

BY MR. EIDUKAS:

Q. Okay.

A. There may have been a reference to continuing the orderly operation of nuclear power plants. I just don't remember one.

Q. Okay. I guess maybe what I'm referring to is the part that talks about continuing to dispose of the waste. Was it your understanding that the Act didn't just require that the Department of Energy begin accepting waste in 1998 and then stop; that there had to be continuation of waste acceptance until all the waste was accepted?

MR. SHULTIS: Objection, calls for a legal conclusion.

THE WITNESS: It was my understanding that the Act was intended to deal with the problem and the



problem is not just to begin, but, you know, to resolve the problem, which is why we focused on the waste acceptance schedules we did, which had beginning, you know, as an objective in 1998 in trying to reach a level that would, as I said before, preclude the utilities from having to add additional storage and ultimately reducing the backlog that was already -- that would have already been accumulated until it was all placed in, you know, in a repository.

BY MR. EIDUKAS:

Q. Okay. Why don't we go on and let's turn to the page 17. This is Section 2.3 The Improved Performance Plan. Is this the section that you were referring to earlier that Mr. Isaacs' authored that you had referred to earlier in your testimony?

A. Yes.

Q. Okay. And, again, could you explain what -- strike that.

And, again, this is an addition or a change from the April 1984 draft mission plan that we looked at earlier, correct?

A. Yes.



Q. Okay. What was the -- and you may have done this already, but could you just again say what's the reason for including the improved or developing the improved performance plan for the mission to the 1985 mission?

MR. SHULTIS: Objection, calls for legal conclusion.

THE WITNESS: Again, as best as I can remember, we wanted to indicate that the department had authorization to pursue or develop one repository was approved by Congress and the transportation system to move the waste to the repository. And I think that is explained in the diagram on page 16 of Exhibit 6.

If you look at that upper right-hand block, the first geologic repository, and there's a solid line from the block that says, "Spent fuel." It indicates that the solid block around the first repository means it was authorized by Congress as opposed to, for example, the lower right-hand block, the second repository, which is a dash line, that's not yet authorized by Congress.

Federal interim storage was also



authorized and we had planned to take the commercial and defense waste. All of the things with solid blocks around it, you know, were authorized by the original Act or understood, you know, to be accommodated by the original Act, along with the transportation system.

BY MR. EIDUKAS:

Q. So -- I'm sorry.

A. Okay. There also was the opportunity to propose to Congress incorporating what was called a monitored retrievable storage facility if we felt it was warranted and it would offer substantial benefits. So that that concept evolved from the earlier drafts of the mission plan, which we already talked about, to the one published in June of '85 where we incorporated an MRS as an integral part. And I think that word is a little too -- yes, in caption Figure 2.2 it says, "Improved performance system with an integral MRS facility."

Which meant that the MRS was not just a backstop nor backup, but we were going to operate the MRS to consolidate some of the spent fuel coming from

BY MR. EIDUKAS:
Q. Okay.
A. That's a summary of some of the advantages we saw in the so-called improved performance system with an integral MRS facility.
Q. In looking back on number 4, so one of the purposes behind proposing the MRS, the improved performance plan, was that it would meet that objective to reduce the need for additional at-reactor storage that utilities might have to build after 1998. Is that --
A. That's correct.
Q. -- correct?
Why don't we turn to pages 26 and 27. That appears to be where the waste acceptance schedules are set out. Are the tables or the schedules that appear at pages 26 and 27, are these waste acceptance schedules that you worked on or helped prepare?
A. Yes.
Q. And, again, the difference between the table on 26 or the schedule on 26 and the schedule on 27 is that the schedule on 26 represents the authorized



system that did not have an integral MRS and the schedule on page 27 is a schedule based on the improved performance plan that used -- that intended to have an MRS as an integral part of the plan; is that correct?
A. That's correct.
MR. SHULTIS: Objection. The documents speak for themselves.
BY MR. EIDUKAS:
Q. Focusing on the waste acceptance schedule for the authorized system on page 26, how was this schedule developed?
MR. SHULTIS: Objection, vague.
THE WITNESS: I think I have to give you a three-part answer to that. Again, talking about what we talked about before. The schedules were developed with two main objectives in mind, beginning waste acceptance by 1998 and trying to reach a level, a steady state level where it would preclude the need for the utilities to add additional on-site storage.
The third part of that answer, though, in response to your question is how were they developed. You know, we developed these in an iterative process.



We had, as we saw before in the other exhibits, we had published earlier waste acceptance schedules that in some cases we got comments on when we issued the documents for public review and comment.
And I think as we reviewed the numbers, we showed that we made some modifications based on the collective wisdom of that process. Some of the people said our ramp-up rates were unrealistically optimistic.
So I think if you compare, you know, the earlier numbers we saw, which I believe begin at like 1800 metric tons. The latest version of the authorized system waste acceptance schedule is at a slower ramp-up of 400 metric tons in the first couple of years. This shows for three years. Then up to 900, 1800 and 3,000 metric tons for that first repository.
BY MR. EIDUKAS:
Q. I believe if you look back at the April '84, the acceptance schedule in the April '84 draft, I believe that also started at a 400 MTU rate and ramped up to 3,000 similarly.
So when you're referring to a rate that



started at 1800, were you referring back to the rate in the December '83 mission plan as opposed -- draft mission plan as opposed to the April 1984 draft mission plan?
A. Yes. The one in Exhibit 4 started at the 1800, 1800, 1800 rate for five years before it got to 3,000 metric tons.
Q. So the ramp-up rate in Exhibit 6 in the final mission plan is -- for the authorized system anyway -- that ramp-up rate is similar to the ramp-up rates that was presented in the April 1984 mission plan, which was Exhibit 5; is that correct?
MR. SHULTIS: Same objection. The documents speak for themselves.
THE WITNESS: Actually, there are some significant differences.
BY MR. EIDUKAS:
Q. Okay. Would you please tell me what the significant differences are.
A. Okay. The waste acceptance schedule in the June '85 version of the mission plan, Exhibit 6, for the first repository includes acceptance of high level

BY MR. EIDUKAS:

Q. Okay.

A. There's obviously a different heat load that the repository has to accommodate and the size of -- which is why we put the pictures in the document. The size of the waste forms we're dealing with are significantly different. If you look at the spent fuel picture on page 9, okay? We would design waste packages to accommodate multiple fuel assemblies, you know, from reactors. The spent fuel assemblies.

The high level waste is in the form of the picture on page 11, you know, which is a different geometry. So, I mean, to me it's obvious. There's got to be some differences in the design now that you're going to accommodate a different waste geometry, waste form, waste heat load, but I can't give you any of the specifics of what those design changes would be.

Q. Okay. But the decision was made apparently that there might be a design change, but there was not going to be a difference in what the steady state rate of accepted spent fuel range was going to be?

MR. SHULTIS: Objection, vague, assumes



facts not in evidence.

THE WITNESS: As best as I could remember, again our objectives were to try to reach a steady state rate, you know, along the lines that we talked about to preclude for need for utilities to add storage, which, you know, was still estimated to be around 3,000 metric tons per year. And that's still supported by the spent fuel generation column on both waste acceptance schedules. There's still around 3,000 metric tons per year in the early years of repository operation.

BY MR. EIDUKAS:

Q. So, even after it was determined that you were going to start accepting the high level waste in addition to spent nuclear fuel, the objective to continue accepting at the 3,000 rate or because of the objective you've identified, you didn't decrease the 3,000 steady state rate in order to accommodate the additional need to accept high level waste. Is that a fair statement?

A. I believe that's a fair statement.

Q. Okay. Turning to the -- you're looking at



the next. Do you need a break? We've been going for a while.

A. I'm okay.

Q. Going to the next page, waste acceptance schedule on page 27. This is for the improved performance system or plan that we've discussed today, correct?

A. Right.

Q. Okay. Did you work on developing this acceptance schedule?

A. Yes.

Q. And is this the first acceptance schedule involving an integral MRS facility that the DOE published?

A. To the best of my recollection it is.

Q. So, because we didn't see an acceptance schedule like this involving an MRS in the earlier drafts of the mission plan, right?

A. The reason I'm hesitating is I don't know if there were any presentations like that one meeting you referred to. You had the handout from that one meeting. I don't know if there were any others at the



time where DOE might have, you know, released some preliminary numbers. This is the one first one I'm aware of.

Q. Okay.

A. I can answer it that way. This is the first one I'm aware of.

Q. So one of the additions, changes here is that there's a column for MRS acceptance, which is the third column. What's the basis or how was this rate for the MRS facility determined?

A. The best answer I could give you is that we, again, had as -- it can sound repetitive, but we again had as our objective to accept spent fuel to preclude the need for additional at-reactor storage, which again was 3,000 metric tons per year at that time. That was our projection. In 1984-'85 we were trying to anticipate what the spent field generation rate would be, you know, some 13, 14 years into the future. So, again, based on the EIA projections, it looked like it would be about 3,000 metric tons per year based on the number of nuclear power plants online. So that was our design target for the MRS. Okay.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------------X YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) : CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) : MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) : FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) : NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) : DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) : INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) : SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) : SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) : COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) : BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) : GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) : WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) : POWER AUTHORITY OF THE STATE OF NEW YORK :VOLUME
(00-703C)(Damich, J.) : II OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) : NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge: TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
V. :242 - 396

THE UNITED STATES, :

Defendant. :

-------------------------------------------X

Deposition of Victor W. Trebules, Jr.

Washington, DC

Thursday, April 18, 2002

Reported by: Denise Dobner Vickery, RMR, CRR

JOB NO. 144459

April 18, 2002

9:30 A.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Jenner & Block
601 13th Street, NW
12th Floor
Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY,
et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Devon E. Hewitt, Esq.

Arnold & Porter
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY,
et al.
555 Twelfth Street, NW
Washington, DC 20004-1206

(202) 942-5160

BY: Ronald A. Schechter, Esq.

Arnold & Porter

For the Plaintiff SACRAMENTO MUNICIPAL UTILITY DISTRICT

370 Seventeenth Street, Suite 4500

Denver, CO 80202-1370

(303) 863-2301

BY: David S. Neslin, Esq.

Perkins Coie LLP

For the Plaintiff WISCONSIN ELECTRIC

607 Fourteenth Street, NW

Washington, DC 20005-2011

(202) 434-1609

BY: Suzette W. Derrevere, Esq.

Spriggs & Hollingsworth

For the Plaintiffs YANKEE ATOMIC ELECTRIC COMPANY,

CONNECTICUT YANKEE ATOMIC POWER COMPANY AND MAINE

YANKEE ATOMIC POWER COMPANY

1350 I Street, NW

Ninth Floor
Washington, DC 20005-3305
(202) 898-5839
BY: Jerry Stouck, Esq.

United States Department of Justice, Civil Division
For the Defendant THE UNITED STATES
Commercial Litigation Branch
Federal Claims Section
1100 L Street, NW
Washington, DC 20530
(202) 305-7561
BY: Russell A. Shultis, Esq.
Heide L. Herrmann, Esq.

I N D E X


EXAMINATION OF VICTOR W. TREBULES, JR. PAGE

BY MS. HEWITT 250, 310

BY MR. SHULTIS 309

BY MR. SCHECHTER 311

BY MR. NESLIN 372

TREBULES DEPOSITION EXHIBITS: PAGE

No. 11 Environmental Assessment.
DER-003-1257 to 1765. 279

12 Statement by Ben C. Rusche.
PA-141922 to 141950. 314

13 Letter of December 17, 1992.
HQR-010-1623 to 1626. 322


**Exhibits are attached.

Thereupon,

VICTOR W. TREBULES, JR.

was called for examination, and, after having been previously sworn or affirmed, was examined and testified further as follows:

MR. EIDUKAS: Good morning, Mr. Trebules.

THE WITNESS: Good morning.

MR. EIDUKAS: At this point I am going to -- I'm finished with my questions for you in this deposition. But at this time I also want to state for the record that we're reserving my client's right to recall you to the extent that there are outstanding document and privilege issues that weren't resolved that might take a further session of this deposition, but at this time I have no further questions.

MR. SHULTIS: Okay. In response to that reservation we object. We object. This is coordinated discovery and we think this is complete.

MR. EIDUKAS: Well, as you might know, there are pending issues regarding documents listed on your privilege log that there's a dispute about. So while your objection is noted, I reserve my right to

You could put spent fuel in storage above ground. You could emplace underground at a different rate. Obviously then you'd have an accumulation of spent fuel at the storage facilities above the repository or you could be reducing the backlog. They don't have to be the same. They could be independent. Although if you reach steady state operation, ideally they're very close, if not identical.
BY MS. HEWITT:
Q. When I use the term OCRWM, do you have an understanding of what that term is?
A. Yes, I do.
Q. Were you ever involved in OCRWM's efforts to design a repository?
MR. SHULTIS: Objection, vague.
THE WITNESS: I think I would have to answer yes.
BY MS. HEWITT:
Q. What was the extent of your involvement?
A. Again, my primary role over the past 10 years or so has been in the planning, budgeting and scheduling part of the program of the OCRWM program,

270

the Office of Civilian Radioactive Waste Management, and I'm primarily responsible for the cost and schedule baselines for the program. But obviously the cost and schedule baselines have to relate to the technical baseline, which includes as a subset the design solution for the system. So I had to have some familiarity of the design or the evolving parameters of the design to be able to fully integrate the cost and schedule activities.
Q. What is the present design receipt rate for the repository?
MR. SHULTIS: Objection, assumes -- well, calls for speculation. Assumes facts not in evidence, vague.
THE WITNESS: I cannot say for certain what the present receipt rate is. We typically talk about the current design as the design in our site recommendation documents that have been submitted to Congress. I do not know the exact numbers. I believe they are, though, close to the 3,000 metric tons once it reaches a steady state. Although we are looking at a variety of design options or modifications

271

to that conceptual design.
BY MS. HEWITT:
Q. Are those designs or possible modifications going to affect the design receipt rate?
MR. SHULTIS: Same objection.
THE WITNESS: Yeah, that would be speculation on my part. That's not my major area of focus and I really would be speculating at that point.
BY MS. HEWITT:
Q. During your tenure at OCRWM, has the design receipt rate at a steady state been different than 3,000 MTUs on an annual basis?
MR. SHULTIS: Objection, vague.
BY MS. HEWITT:
Q. Do you understand my question?
A. Yes, and as we discussed in some detail yesterday, the receipt rate changed significantly through the various documents we went through yesterday. In the early versions of the draft mission plan and in the subsequent versions of the amendment, it changed because of the facilities involved.
Q. Understand.

272

A. Obviously when we had a two-repository system, the receipt rate for the system in total was higher than a single repository system or in, again, referring to Exhibit 8, I believe the waste acceptance schedule we were just talking about, this shows a significant delay in the operation of the second repository. So yesterday in the earlier documents, the earlier exhibits and mission plan documents, we had a combination of the two repositories which had a receipt rate much greater than what this latest version would show.
Q. You're absolutely correct. My question was a little bit unclear. It wasn't very specific. I'm going to further narrow it.
At any time during your tenure at the DOE program, was the design receipt rate for the single repository other than 3,000 MTU on an annual basis?
A. You said at any time during my? I believe basically the nominal design receipt rate target -- again, this was a target; this was an objective -- on an annual basis was 3,000 metric tons.
Q. And that's also what you refer to as the

273

steady state rate?
A. That's correct.
Q. When you use the term nominal, what do you mean by nominal?
A. Nominal in my jargon typically means like an average or a design number that you try to meet. You know, it usually implies a certain degree of precision. You know, you could say 3,000 plus or minus 20 metric tons, you know, but nominal, when you say nominally 3,000 metric tons, it could vary. In some years it could, depending on the truck and train shipments, it could be 2,980. Next year it could be 3,022, but we sort of average that out over the operation of the facility and say the nominal rate of 3,000 metric tons.
Q. And I believe you testified earlier that the 3,000 annual MTU steady state rate corresponded to the discharge rate by utilities; is that correct?
MR. SHULTIS: Objection, calls for -- mischaracterizes prior testimony.
THE WITNESS: Yeah. I believe I said yesterday that we had two overriding design objectives, you know, two goals. One was to initiate operations

274

in 1998. The other was to design a system to try to meet the EIA projection that we were using at the time of the spent fuel discharge rate from the utilities, which at that time I think was nominally, again, nominally about 3,000 metric tons a year. Although it varied, you know, year by year.
BY MS. HEWITT:
Q. I believe yesterday also you testified regarding that -- regarding the 3,000 MTU annual rate and said that it was at some point designed to ensure that utilities did not "have to engage in additional storage, on-site storage after 1998." Is that a correct fair reading of your testimony yesterday?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: Again, without looking at the transcript, I think that was close to what I said. I guess I would also want to refer to a paper that was worked on I think before I joined the program. This is Exhibit 3. This is the proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting. Again, this was developed before I got to

275

the program, but this became sort of my understanding of the design objective that we were trying to meet.
It's on page 11. There's only two pages in this exhibit, but on page 11, the second column, the largest paragraph near the end. This says, "During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at another location."
Again, I think I referred to that as sort of one of our design objectives, you know, with the proper caveats.
BY MS. HEWITT:
Q. When you use the term design objective, do you mean the design objective for the facility that DOE ultimately would build?
A. Facility or facilities; that's correct.
Q. And so that the term design objective would apply equally to MRS or a repository?
A. I think that's a fair statement.
Q. And then I'd like to explore the meaning of the term on-site storage. Do you have an

276

understanding of what consists of on-site storage?
A. I have an understanding of what I think that term means, yes.
Q. What's your understanding?
A. The spent fuel discharged from nuclear power plants, first of all, has to be aged a certain amount of time, and it goes into storage at the reactor sites or on the site of the reactor power plants. Typically it goes into storage pools, or I believe if it meets certain conditions, it could go into dry storage on the sites of the nuclear power plants.
Q. And when the term additional on-site storage is used, for example, in that document, does that refer to storage in the spent fuel -- spent nuclear fuel pools as well?
A. I'm sorry. Can you repeat the question again, please.
Q. When the term is used -- and you've used it and other witnesses have used it -- saying that the MTU rate is designed at some point to preclude the need for "on-site storage," does that include storage in the spent nuclear fuel pools that are on site?

277

A. I think the way we use the term was to provide additional on-site storage over and above what was originally intended to be constructed at the nuclear power plants. Okay? And it would include the storage of the fuel in the pools as well as any other dry storage that the utilities would decide to construct to store their fuel.
Q. And are you familiar with the term reracking?
A. Somewhat.
Q. What's your understanding of the term?
A. Initially when the spent fuel storage pools were built and licensed I think by the Nuclear Regulatory Commission, they were designed to accommodate a certain amount of spent fuel. If additional fuel needed to be stored at the reactor sites, obviously you could build additional pools or you could build dry storage or, if you could justify it, you could increase the quantity of fuel you could store in the original pool by reracking or redesigning the storage racks for the assemblies and essentially putting the spent fuel elements closer together. So you could increase the capacity of the original storage

278

pool.
Q. Now, would reracking fall within the term additional on-site storage as has been used by you in your testimony?
A. I think the honest answer is I'm not sure I'm qualified to make that distinction. I think it could apply, but I'm not sure.
MS. HEWITT: I'm going to hand you what will be -- I have no idea what number exhibit this is.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 11.)
BY MS. HEWITT:
Q. I'm handing you the environmental assessment portion of the MRS submission to Congress which starts with Bates range DER-003-1257 and continues until 1765. Have you ever had occasion to look at this document, Mr. Trebules?
I will further clarify for the record that it begins with Chapter 1.0 entitled "Background to the need and feasibility of monitored retrievable storage" and the first page is 1.1. And the last page is D.26 is the last numbered page.

279

A. (Pause). Okay. I'm not too familiar with this entire document. Although I have seen some of the information in here, you know, at various times. I believe the document was primarily prepared before I joined the Storage Division. So this was done before I got there.
Q. Do you know who would have prepared it?
A. I'd be guessing. It's some of the names of the people that I think worked on it at that time, but names like Keith Klein, Roger Hilley, Jeff Williams come to mind, but I don't know exactly what part of the organization they were in.
Q. Okay.
A. But I think they were involved to some extent.
Q. Would you switch or flip to page 2.17 and particularly draw your attention to the first full paragraph under the title called Accelerated Acceptance Rate.
A. All right.
Q. If you'd just skim the first paragraph. I'm going to ask you a couple questions regarding certain terms that are used in that paragraph.

280

A. (Witness complying). All right.
Q. In the second full sentence in that paragraph, there is a reference to "allocation of acceptance rates." Do you see that reference?
A. Yes.
Q. Do you have an understanding of that term?
MR. SHULTIS: Objection, calls for -- Mr. Trebules has already testified that he did not write this document. So you're asking him to speculate about the meaning of the term.
MS. HEWITT: I'm asking if he understands what that term means.
MR. SHULTIS: Same objection. I think you might be asking for a legal conclusion, too.
THE WITNESS: I'm not entirely sure I know what that means since it pertains to the standard contract and, again, I didn't have much association with that standard contract.
BY MS. HEWITT:
Q. Okay. Later on in that sentence it refers to spent fuel aged and reactor status. Do you have an understanding what the term reactor status means?

281

or in that detail; is that fair to say?
A. That sounds about the right time frame, yes.
Q. Is that your best recollection?
A. As I said, after the mission plan I was -- I became the executive assistant and senior technical adviser to the director. So it's all around that same time frame.
MR. SCHECHTER: Let's have this marked as the next exhibit, please.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 13.)
BY MR. SCHECHTER:
Q. For the record, Exhibit 13 is a December 17, 1992 letter from the Secretary of Energy to the Honorable J. Bennett Johnston, Bates number HQR-010-1626 through 1625.
MR. STOUCK: 1626 through 1625? That sounds backwards?
MR. SCHECHTER: Yeah, it sure does. The Bates numbers are -- I think that the attachment as produced by the government preceded the letter. So the letter is 1626. The attachment is 1623, 24 and

322

25.
BY MR. SCHECHTER:
Q. Have you ever seen this before?
A. Yes.
Q. Were you involved in preparing this document?
A. I don't believe I prepared any part of this particular document.
Q. Did you review it before it was submitted to Senator -- either the letter or its attachment to Senator Johnston?
A. I don't think so. I don't recollect.
Q. Are you familiar with its contents?
A. Yes.
Q. The second paragraph of the letter begins by saying, "Enclosed for your information is a summary of my new strategy to provide SNF interim storage in 1998." Could you describe what that new strategy is, please?
MR. SHULTIS: Objection. It calls for speculation.
BY MR. SCHECHTER:
Q. You may answer.

323

A. I could not now give you any of the details of the new strategy, other than reading the attachment and going through those. I remember discussions about these particular items around this time frame, but I would not be able to give you the specifics other than to go through the attachment itself.
Q. Is it your recollection that the strategy relates to the fact that the nuclear waste negotiator had at least by this point been unable to find a voluntary hosting site for an MRS?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I am familiar with the activities of the Office of the Nuclear Waste Negotiator, and I knew that they were unsuccessful with finding a voluntary host that survived the process. What I mean by that is there were some communities that wanted to host the facility, but typically the governors of those states opposed and the process was never ultimately successful. So, in that sense, I was aware of the activities of the Office of the Nuclear Waste Negotiator in not finding an MRS host site.

324

BY MR. SCHECHTER:
Q. Could you turn to page 1623 of the document, which is the first page of the attachment.
A. Right.
Q. And could you read the paragraph, first paragraph under the subheading MRS Facility and Siting.
A. (Witness complying). All right.
Q. Do you have any reason to disagree with the contents of that paragraph?
A. No.
Q. Could you read the remainder of that section, including the two numbered paragraphs and the two paragraphs that follow them on the next page.
A. I'm sorry. Could I go back to that --
Q. Absolutely.
A. -- paragraph and clarify that my understanding is that we were unable to find an MRS facility site that would allow us to -- at that time we were unable to find an MRS facility site that would have allowed us to accept spent fuel at the MRS by 1998.
Q. Yeah. Yes. And that is the reason that alternative actions are required, isn't it?

325

A. Right.
Q. Now, could you read the remainder of that section, which goes over to the next page. Tell me when you're done.
A. (Witness complying). How far did you want me to read?
Q. Just through the end of that section. Stop before standardized container system on 1624.
A. Okay.
Q. Have you done that?
A. Yes.
Q. Okay. The first few words of the portion you just read say, "The department has examined potential alternative actions." Were you involved in any way in the department's examination of potential alternative actions?
MR. SHULTIS: Objection, vague.
THE WITNESS: Yes.
BY MR. SCHECHTER:
Q. What was your involvement?
A. I was aware of the activities with the development of the multipurpose canister system or

326

container system.
Q. When you say you were aware of the activities, what does that mean?
A. There were discussions and I'm trying to think because I'm not sure what position I was in exactly at this time. Eventually I became the Director of the Storage Division, which had the responsibility to try to develop multipurpose cannisters, but I don't remember if it was before or after this. There were discussions with -- actually I think with the utilities or with the trade organizations representing utilities, either EEI or NEI at the time, where we tried to work with them to develop multipurpose cannisters.
A concept for which would be to take the spent fuel out of pool storage in particular, but any storage, put them into metal containers and seal them up, and essentially leave them in that sealed form through all subsequent handling steps in the waste management system. With one of the advantages being the potential reduction of contamination was a concept that the government began to develop in conjunction with utility organizations, and we funded that for

327

several years until we had a significant budget reduction I think in 1996.
Q. Do you know whether implementing this alternative action would have required Congressional approval?
MR. SHULTIS: Objection, calls for legal conclusion.
THE WITNESS: I'm not sure, other than we need Congressional approval of our annual budget appropriations, and we would put such work in our budget request, and Congress would act on our budget request and either endorse it or tell us not to do it.
BY MR. SCHECHTER:
Q. Could you look at the subparagraph number 2 at the top of page 1624. It talks about "to meet the needs and expectations of the nuclear industry, the department should plan for use of Federal government sites for interim storage." Were you involved in examining that potential alternative action?
MR. SHULTIS: Objection, relevance.
THE WITNESS: I believe I had a minor role in this general area where we looked at -- we did a

328

preliminary examination of some candidate Federal sites.
BY MR. SCHECHTER:
Q. Do you know what ever happened with this as a potential alternative action?
A. I don't want to say what, but it didn't go very far. I think we needed -- obviously we needed Congressional understanding of that approach and it never happened. I don't remember the details of what happened, but we just never -- it never came to fruition.
Q. Do you recall any other potential alternative actions that were considered other than the two that are identified in this section of the document?
MR. SHULTIS: Objection, relevance, calls for speculation.
THE WITNESS: Could you clarify that? Any actions considered for what purpose?
BY MR. SCHECHTER:
Q. Well, it says, if you go back to 1623: "The department has examined potential alternative actions and has concluded the following," 1 and 2. And we

329

THE WITNESS: To be honest, I don't remember the details of that process.
BY MR. SCHECHTER:
Q. Okay. When you joined, got involved in work on the mission plan in early 1984, the process was already in progress; is that correct?
A. I believe that's true. That's right.
Q. We looked at a December 1983 draft?
A. Right.
Q. What did you do in joining to sort of get yourself up to speed in order to be able to perform your job? Did you review any documents?
A. Wow, 19 years ago. My recollection is that I immediately got involved in the 1984 version of the mission plan that was about ready to go out for public review and comment.
Q. And that would be the April 1984?
A. Yes.
Q. It's an exhibit whose number I don't remember. Just for identification purposes.
MR. SHULTIS: Exhibit 5.
MR. SCHECHTER: You can say.

338

MR. SHULTIS: It's Number 5.
MR. SCHECHTER: Thank you. Mine are not marked. I apologize for that.
MR. SHULTIS: Let Mr. Trebules confirm that.
BY MR. SCHECHTER:
Q. Of course.
A. April 1984 version of the mission plan, Exhibit 5.
Q. Okay. I believe you testified that you didn't recall reviewing the December 1983 draft at the time; is that correct?
A. I don't remember doing it. I may have, but I don't remember doing it.
Q. Okay. And you didn't review the standard contract at the time in full?
A. That's correct.
Q. Did you review the Nuclear Waste Policy Act?
A. Like everyone else I think in the program at the time, I had a copy of it and I tried to read through it, but I just made sure I knew where it was so I can refer to particular sections when I needed to get

339

the exact wording of what the Act said.
Q. Do you recall whether you ever reviewed the legislative history of the statute?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I don't recall reviewing the legislative history of the Act.
BY MR. SCHECHTER:
Q. Do you recall reviewing any drafts of the standard contract?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I don't believe I ever did.
BY MR. SCHECHTER:
Q. Do you recall reviewing any comments that may have been submitted on drafts of the standard contract?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: No.
MR. SCHECHTER: I don't see how these questions are asked and answered.
BY MR. SCHECHTER:

340

Q. Did you review any comments that were submitted in response to the December 1983 draft mission plan?
MR. SHULTIS: Same objection.
THE WITNESS: I don't believe I reviewed comments on the '83 version of the mission plan.
BY MR. SCHECHTER:
Q. Do you recall any meetings or briefings or discussions when you first came on that were intended to sort of bring you up to speed on where things stood?
MR. SHULTIS: Asked and answered.
THE WITNESS: I think as I indicated yesterday, I can't relate specific meetings. I know in general the people that I was working with at the time and we -- I mean, routinely we had discussions in the office, you know, on the work involved. That was people like Charlie Head and Bob Rosselli.
BY MR. SCHECHTER:
Q. Okay. At the time of the April 1984 draft, what was the stated policy regarding DOE providing storage at utility sites in the event there was a delay in the repository?

341

MR. SHULTIS: Objection. Mr. Trebules is not a 30(b)(6) witness. Calls for -- leave it at that.
THE WITNESS: The best way I could answer that would be to go back to --
BY MR. SCHECHTER:
Q. Okay. Let's do it. Go back to the document.
A. -- the exhibit --
Q. Sure.
A. -- I saw yesterday. I think for the first time.
Q. No. I want to go back to -- go ahead.
A. You asked about the policy.
Q. What was the policy?
A. Yes. I believe -- and these are words similar to what I had heard after I got there, but I think it's most clearly stated in Exhibit 3.
Q. Right.
A. As I indicated before, on page 11, column 2, the largest paragraph in that column. Although it's not characterized as policy so much as it is basic strategy, that was my understanding of what we were

342

attempting to do.
Q. Yes, but does this paragraph deal with the what if, what happens if the repository is not ready and DOE -- and therefore additional on-site storage is required? Does this discuss or describe any DOE role in that?
MR. SHULTIS: Objection, calls for speculation.
THE WITNESS: I believe the way you ask the question, this paragraph does not talk about what happens if the repository is not ready. It just confirms that our strategy or objective at the time was to try to have the repository in operation by 1998. So that utilities will not have to provide any additional storage facilities on site.
BY MR. SCHECHTER:
Q. Okay. Could you please take out the draft mission plan, the April 1984 draft mission plan. Please turn --
MR. SHULTIS: I think you want to look at that one.
THE WITNESS: He said '84.

343

MR. SHULTIS: You're right.
BY MR. SCHECHTER:
Q. The draft '84, yes. Could you turn to page 2-1.
A. All right.
Q. Could you read the last sentence in the first paragraph and tell me once you've read it.
A. (Witness complying). All right.
Q. Does this refresh your recollection as to the D OE role in providing on-site storage in the event of the delay in repository operation?
MR. SHULTIS: Objection, assumes facts not in evidence, mischaracterizes prior testimony.
THE WITNESS: I obviously see these words. At the time, I just joined the Civilian Waste Program. I'm not sure I would have understood exactly what was entailed when this was written.
BY MR. SCHECHTER:
Q. Do you have an understanding of it now?
MR. SHULTIS: Objection, calls for speculation. Asks for a legal conclusion.
THE WITNESS: I have been involved in some

344

discussions where this issue was discussed as to what physically could be done, but as I think I indicated yesterday, it was never clear to me if there was a clear determination. I hate to use the term legal, but I think there were legal issues involved as to what the appropriate role for the Federal government would be.
I know there were discussions about the Federal government taking title to fuel at utility sites and whether that was practical or not, and I don't remember if there was ever a clear resolution of that within the government organization.
BY MR. SCHECHTER:
Q. Do you recall when those discussions took place?
A. Not specifically. They were --
Q. Were they in the 1980s?
A. My recollection is they were later in my association with the program rather than earlier. If they did occur earlier, I probably didn't understand them back then. But within the past six or eight years, I think they were, you know, part of the general

345

discussion topics.
Q. So if I'm doing the math right, which is always dangerous, that would suggest after 1994? That's eight years ago.
A. That's probably right.
Q. Do you recall any of the people with whom you had these discussions?
A. Not specifically, but typically these were the topics that I would talk about with people like Alan Brownstein and Jeff Williams, for example.
Q. Anyone else?
A. I would be guessing even more so than I am now.
Q. I don't want you to guess. Thank you.
A. There were probably, you know, more people and I can't again identify particular meetings or dates or groups of people, but, you know, those were typically the discussions I would have.
Q. And I believe you said that the issue was ultimately not resolved; is that fair to say?
A. I don't know that I ever understood there was a clear resolution of the issue. Some other people

346

may have a better idea, but it was mostly what if, you know, and speculation as best as I can recall.
Q. Do you know looking back at that sentence that we started with words "Federal storage casks" is used. Do you have an understanding of what that means?
MR. SHULTIS: I really don't know where you're reading from.
MR. SCHECHTER: I'm sorry. Page 2.1, the last sentence in the first paragraph. The top of the page.
MR. SHULTIS: The top.
MR. SCHECHTER: First paragraph on the page. I'm sorry. Last sentence, first paragraph. If I said that wrong, I apologize.
MR. SHULTIS: I'm sorry. What was the question?
MR. SCHECHTER: My question, the sentence uses the word "Federal storage casks" the phrase and I'm asking him if he has an understanding of what that term means.
THE WITNESS: In the 1984 time frame, I don't recollect I had an understanding of what that

347

meant at that time.
BY MR. SCHECHTER:
Q. Do you have an understanding of what it means now?
A. Again, it's good part speculation on my part, but it's probably a predecessor to what ultimately might have become the multipurpose canister concept that we talked about just a little while ago.
Q. Okay. Can you flip to page 2-5, second paragraph. If you could read to yourself the first sentence in the second paragraph under Subsection D. "If there is a delay" is how it begins.
A. Which sentence in that paragraph?
Q. The first one, "If there is a delay."
MR. SHULTIS: Actually, I think it's the second.
MR. SCHECHTER: First sentence in that paragraph.
MR. SHULTIS: Okay. Right there.
MR. SCHECHTER: Yeah.
THE WITNESS: (Witness complying). All right.

348

BY MR. SCHECHTER:
Q. And that sentence refers to Table 2-1, and you would agree with me that that's the waste acceptance schedule that's a couple of pages before that that we've talked about earlier, correct?
A. Right.
Q. Do you know what the reference to Federal at-reactor storage in that sentence refers to?
A. I believe this sentence was meant to indicate that there were other means of the Federal government taking title to the fuel, and this one gives as an example, it says, "include means such as Federal at-reactor storage." I believe this was a concept where the Federal government would not physically remove the fuel from the reactor sites, but the phrase I remember at the time was take title to it at reactor sites.
Q. Do you recall at this time whether there was any discussion about whether the Federal government would pay for that at-reactor storage?
MR. SHULTIS: Objection, asked and answered.

349

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------------X YANKEE ATOMIC ELECTRIC COMPANY :VOLUME

(98-126C)(Merow, S.J.) : I CONNECTICUT YANKEE ATOMIC POWER COMPANY :Discovery

(98-154C)(Merow, S.J.) :Judge: MAINE YANKEE ATOMIC POWER COMPANY :(Judge

(98-474C)(Merow, S.J.) :Sypolt)

Plaintiffs, :

V. :

THE UNITED STATES, :PAGES

Defendant. :1 - 160

-------------------------------------------X

Deposition of Victor W. Trebules, Jr.

Washington, DC

Thursday, April 18, 2002

Reported by: Denise Dobner Vickery, RMR, CRR

JOB NO. 144559

April 18, 2002

2:15 P.M.

Deposition of Victor W. Trebules, Jr., held at the offices of:

Spriggs & Hollingsworth
1350 I Street, NW
Ninth Floor
Washington, DC 20005-3305

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

APPEARANCES:

Spriggs & Hollingsworth
For the Plaintiffs YANKEE ATOMIC ELECTRIC COMPANY,
CONNECTICUT YANKEE ATOMIC POWER COMPANY AND MAINE
YANKEE ATOMIC POWER COMPANY
1350 I Street, NW
Ninth Floor
Washington, DC 20005-3305
(202) 898-5839
BY: Jerry Stouck, Esq.

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Theodore T. Eidukas, Esq.

United States Department of Justice, Civil Division
For the Defendant THE UNITED STATES
Commercial Litigation Branch

Federal Claims Section
1100 L Street, NW
Washington, DC 20530
(202) 305-7561
BY: Russell A. Shultis, Esq.
Heide L. Herrmann, Esq.

I N D E X

EXAMINATION OF VICTOR W. TREBULES, JR. PAGE
BY MR. STOUCK 5
TREBULES DEPOSITION EXHIBITS: PAGE
No. 14 Defendant's Witness List. 51
15 Documents CTR 006-1645, 1648 to 53,
1657 to 58, 1661 to 65. 71
16 Documents DB-110060 to 70. 71
17 Letter of April 19. HQR 064-2234 to 2253. 71
18 Memo of 6-21-93. HQR 064-6684 to 85. 71
19 Memo of 7-28-93. DE-108508 to 8515. 71
20 NCAI Briefing. HQR 064-5423 to 5435. 71
21 Privilege Log Excerpts. 145
**Exhibits are attached.

but who would have been working from the Department of Energy side of things on contract matters at that time?

MR. SHULTIS: Same objection.

THE WITNESS: As best as I can remember, it would have been Robert Rosselli, and I'm not so sure about Charlie Head because he was my direct supervisor when we worked on the mission plan, but I don't remember if he had a significant role in the contracts. I believe Robert Rosselli did, though.

BY MR. STOUCK:

Q. Okay. But you did not?

A. No, I did not.

Q. Do you know whether Mr. Rusche had any involvement in contract matters at that time?

MR. SHULTIS: Asked and answered.

THE WITNESS: I don't know specifically his degree of involvement, but as head of the program, I'm sure he would have, you know, he would have had some degree of knowledge of the status and progress of the contracts, but I don't know exactly what that was.

BY MR. STOUCK:

Q. What do you mean by status and progress of the

17

contracts?

A. Just, you know, again, I'm not sure when they were signed, but I knew there was a target date to have them signed and, you know, I believe there was a large number of contracts. I mean on the order of, you know, 60 or 70. So it was just the overall status of all of those contracts. I'm sure somebody must have been a report to Mr. Rusche, but, again, I don't know the specifics of that at that time.

Q. Okay. I believe you testified and, you know, I'm sure you'll correct me or your counsel will if I'm not characterizing this correctly, but you testified I think at various points previously that OCRWM had a goal of solving problems, solving the spent fuel problem. That was an objective. In a general sense an objective was to solve the spent fuel problem for the utility industry.

Is that fair or is that too broad, or do you want to rephrase it? I just want to get you back to that subject so I can ask you some questions about it.

A. I think that's a fair characterization.

Q. Okay. Now, is it your understanding that the

18

Department of Energy had an obligation to solve the spent fuel problem in the sense that you've testified about solving that problem?

MR. SHULTIS: Objection, calls for a legal conclusion. Also, Mr. Trebules is not a 30(b)(6) witness.

THE WITNESS: In the sense that the Nuclear Waste Policy Act identified by name the Secretary of Energy and established the Office of Civilian Radioactive Waste Management and the position of director to deal with the spent fuel situation in the United States, I would say that we had an obligation to, you know, to execute the provisions of the Nuclear Waste Policy Act, you know, to, as you say, solve the spent fuel problem.

BY MR. STOUCK:

Q. Okay. And again referring back to some of your previous testimony, I believe you testified that the program had -- and, again, please rephrase or this is my understanding of what you said I believe a couple of times previously in your testimony. That there were two overriding goals or objectives.

19

One was to begin in 1998 and the other was to reach a rate, an acceptance rate that at which or for which amounts of additional at-reactor storage would be minimal or zero after 1998. Is that a fair characterization of what you told us here?

MR. SHULTIS: Objection as to characterization of his testimony, especially regarding overriding goals.

BY MR. STOUCK:

Q. Okay. Well, if it's not, please tell me, but I'm trying to -- again, I want to ask you some follow-up questions. I just want to get back to those two goals. Recharacterize them for me if you don't like my characterization.

A. I think that's close. I think that's reasonably accurate.

Q. Okay. Now, is it your understanding that the Department of Energy had an obligation to achieve those goals?

MR. SHULTIS: Objection, calls for a legal conclusion and Mr. Trebules is not 30(b)(6) witness.

THE WITNESS: My understanding -- do you

20

mean by back -- let me ask a clarifying question. Do you mean in the early days back in 1984-'85 or any time after that during my tenure with the program?

BY MR. STOUCK:

Q. Let's start 1984-'85 and then see where that takes us.

MR. SHULTIS: Same objections.

THE WITNESS: Again, primarily my work on the mission plan back in '84 and '85, I don't remember forming an opinion one way or the other about whether the department had an obligation. I think if you mean that in a legal sense. Again, what I do remember was that we were developing plans, as the name implies, the mission plan, which had schedules in it which we characterized as goals or objectives that we would try to meet, but we indicated that those schedules were subject to change.

That we would do our best to try to meet them but, you know, I believe we -- there was concern, you know. We wanted to give the department some flexibility, and I think as we previously discussed when we went through the exhibits, we showed even in

21

those early days that some of those schedules changed for various reasons.

BY MR. STOUCK:

Q. Okay. Excuse me. Are you finished?

A. Yeah.

Q. So, what you just told me is your understanding as of around '84-'85?

A. Right.

Q. That's the question you're answering?

A. Right.

Q. Okay. And you said you hadn't formed an opinion. Is that the same thing as saying at that time you did not know if the department had an obligation to achieve these two objectives?

MR. SHULTIS: Same objections.

BY MR. STOUCK:

Q. I mean, is that the gist of it? You didn't know and you say you hadn't formed an opinion? I just --

MR. SHULTIS: Same objections.

THE WITNESS: Yes, I think that's fair. I did not know for sure.

22

BY MR. STOUCK:

Q. Okay. Did there come a point later in time subsequent to that time when you did know or did come to have a better understanding of whether or not the Department of Energy had an obligation to achieve the two objectives that were testified about?

MR. SHULTIS: Objection, calls for a legal opinion.

THE WITNESS: I obviously heard a lot of discussion about the department's position that we were relying on the specific words in the Nuclear Waste Policy Act, which said we would target to begin waste acceptance in 1998 after we had a facility in operation. I think that became the department's position.

BY MR. STOUCK:

Q. Okay. Do you have a view today about whether or not the Department of Energy has an obligation to achieve the two objectives that you've testified about and discussed?

MR. SHULTIS: Objection, relevance.

THE WITNESS: My understanding of the

23

current position is obviously we can't meet the 1998 date. We've already -- in fact, we've already missed that and we have laid out our plans or best-effort plans to try to have the repository in line -- since we're no longer working on an MRS facility -- to try to have the repository on online by 2010. And I think we also discussed earlier that, you know, as in regards to the second objective or goal still to try to reach an acceptance rate of about -- the nominal acceptance rate of about 3,000 metric tons.

BY MR. STOUCK:

Q. Okay. Now, still with reference to these two objectives that you had testified about previously, can you tell me what -- let's go back to the '84-'85 time frame. Put yourself in that time frame for purposes of this question.

What is your understanding of why it is that the Department of Energy was pursuing those two objectives at that time?

MR. SHULTIS: Objection, relevance.

BY MR. STOUCK:

Q. Why was, if that's the proper diction?

24

this is somewhat speculative -- is in specific regard to transportation issues. If we were unable to transport, you know, a sufficient amount from one utility. If we weren't able to get -- I don't quite know the right term. You know, a reasonable amount of fuel in one shipping campaign. You know, because that's not necessarily all the oldest fuel, that could lead to some inefficiencies in the operation of the system.

BY MR. STOUCK:

Q. Okay. I just don't understand. I just don't understand what you just said. So, could you -- when you say you weren't able to get enough, well, I just didn't understand the answer. So let me see what there is about it.

If you couldn't get a reasonable amount of fuel in one shipping campaign, you know, because that's not necessarily all the oldest fuel, that could lead to some inefficiencies. I'm just not -- it's not registering with me. Could you try to repeat the answer?

MR. SHULTIS: Objection. Again, it calls

41

for speculation. Go ahead.

THE WITNESS: Again, my understanding is it goes back to the literal interpretation of oldest fuel first.

BY MR. STOUCK:

Q. Okay.

A. If we're obligated to go pick up a limited number of fuel assemblies, which would result in an inefficient shipping campaign, and then we'd have to go to another location and pick up again a limited number of fuel assemblies as opposed to what would be a more efficient campaign.

Q. Okay.

A. Okay. You'd like to -- once you make all the arrangements and get the rail routes or truck routes approved, you have the waste packages, you'd like to get an optimum amount, which may be several hundred metric tons. Go to one location, one utility, pick up, you know, a number of metric tons, not just the minimum according to the oldest fuel first principle.

Q. Okay. So, if I understand your answer, one of the impediments that may stand in the way of efficiency

42

is the oldest fuel first principle; is that what you're saying, itself if that were applied strictly?

MR. SHULTIS: Objection, calls for -- mischaracterizes Mr. Trebules's testimony.

BY MR. STOUCK:

Q. I'm really just trying -- that's what I heard I thought you say. If that's wrong, please tell me. If that's not what you said, I still don't understand what you said, but maybe we should move on.

MR. SHULTIS: Same objection. Mischaracterizes Mr. Trebules's testimony. I think calls for a legal conclusion.

THE WITNESS: Right. My understanding is if there's a strict literal interpretation which results in counting, you know, small numbers of individual fuel assemblies, it may not allow the optimum kind of operation of the system.

BY MR. STOUCK:

Q. And is it your understanding or do you have an understanding about whether or not oldest fuel first pickup is required by the standard contract?

MR. SHULTIS: Objection, calls for a legal

43

conclusion. Also seeks -- asks for speculation.

BY MR. STOUCK:

Q. Okay. If you want to, please review it if you want to. It is Exhibit 1. Yeah, that would be fine.

A. (Pause). I believe my understanding results from my reading of Exhibit 1.

Q. Okay. Which page are you on?

A. Bates number, is that what you want?

Q. Yeah.

A. HQR 0380014.

Q. Okay.

A. This would be article --

MR. STOUCK: Wait. Hold on. Hold on. The copy I'm looking at only has the first page. Could I take a look at counsel's copy? I'll have one made.

(Discussion off the record.)

THE WITNESS: Okay. It would be Article VI Criteria for Disposal, B Acceptance Procedures, 1 Acceptance Priority Ranking (A), which reads near the end: "DOE will first accept from purchaser the oldest spent nuclear fuel and/or high level waste for disposal

44

in the DOE facility."
BY MR. STOUCK:
Q. Right.
A. I guess it says except as otherwise provided in paragraph B, paragraph 5, and I don't know right now what those are.
Q. So, therefore, it is your understanding -- I mean, are you saying that based on that, it is your understanding that there is an obligation for DOE to accept spent fuel under the standard contract according to oldest fuel first? Is that what you're saying?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: I would answer that my understanding is based more on the numerous discussions I have had with various people over the past 20 or so years.
BY MR. STOUCK:
Q. Okay.
A. But I think they stem from this provision of the contract.
Q. Okay. But did you have that understanding

45

when you were working on the mission plan?
MR. SHULTIS: The same objection.
THE WITNESS: Back in 1984 or 1985, I can't say for sure that I had that understanding. I just don't remember.
BY MR. STOUCK:
Q. Okay. My general understanding of your testimony was that you really didn't know much about the provisions of the contract?
A. Not at that time frame, right.
Q. Okay. But you know more now?
A. A little.
Q. Okay. Okay. Now, you also testified I believe -- I believe you also testified that back at the time that you were working on the mission plan and you were working with the schedules that showed roughly a 3,000 ton steady state acceptance rate, that you were focused primarily on the sort of aggregate industry wide acceptance rates and didn't really get into questions of at that time in which order -- for purposes of preparing the mission plan -- in which order would spent fuel be picked up from utilities.

46

Is that again a fair characterization of your testimony?
A. I think that's fair.
Q. Yeah. You were focused on the aggregate --
A. Right.
Q. -- acceptance rates and not necessarily who would go first or second or fifth at that time?
A. Correct.
Q. Okay. But at that time did you have -- so, was it your understanding at that time that this question of sequencing which utility would go first, second, third, that that subject would be addressed at a later time? Was that your understanding in the time you were preparing the mission plan? Or did you have any understanding about when it might be addressed?
A. I don't know that back in 1984-'85 I even raised the question or got involved in those kind of discussions as to whether or not the oldest fuel first provision would be solved at a later time or not. I just don't remember that I knew enough about that issue at that time to get involved in those discussions.
Q. Okay. But in any event, you weren't focused

47

on that. You were focused on aggregate acceptance rates?
A. That's correct.
Q. Do you know if anyone at that time in the department -- that time being '84-'85 when you were working on the mission plan -- was addressing questions of sequencing and priority for shutdowns and exchanges and the order within the utilities as opposed to the aggregate rate?
A. I don't know for sure, other than I know people were working on the contract, but I don't know specifically what issues they were addressing.
Q. Okay. Thank you.
Do you know if the question has ever been addressed up to the present time at the Department of Energy, the question of how the sequence of pickup is going to be determined for the program?
A. I don't know for sure. I don't know for sure.
Q. Don't know if it's been addressed or not --
MR. SHULTIS: Objection.
BY MR. STOUCK:

48

because I think the milestone I remember is in our 1996 budget appropriation, which was significantly less than what we ask asked for, we cut back a lot of the MPC work.
Q. That was 1996 you said?
A. Yes.
Q. So that was kind of the end point at least?
A. Right.
Q. Maybe not end but the reduced?
A. Right.
Q. Take a look at what's been marked Exhibit 17. It appears to be a letter dated April 19 and there's an attached proposal. This is Bates range HQR 064-2234 through 2253. And my first question is going to be whether you recognize this.
A. I don't remember this letter, other than I have to admit that this arrow with Jeff by it may be my handwriting.
Q. Okay. All right. But you see your name there on the fourth or fifth line?
A. Yes.
Q. Okay. You may not have -- well, if that's

85

your handwriting, then I guess you probably have seen the letter, but otherwise you may not have. It's not addressed to you or written by you. It does mention you. Do you recall the attached proposal?
A. No, I do not.
Q. Actually it does. On the second page it does indicate you were copied. You don't recall the proposal?
A. No.
Q. Okay. Do you recall the standardized spent fuel canister, that phrase being used at or about this time?
A. There were a number of phrases used to describe a concept, including multipurpose cannisters, universal cannisters. I don't remember this one particularly, but it sounds like it's in that same vein.
Q. Okay. And what was the concept that these terms were applied to?
A. The concept was based on discussions we had with, as I indicated yesterday, the trade group representing the utilities, EEI/NEI where we thought we

86

could -- since we knew we would probably not meet the 1998 date to accept spent fuel, we thought we could join into a cooperative venture with the industry to develop what we called multipurpose cannisters, which was a concept whereupon removal of the fuel elements from storage pools or storage, the individual elements, they would be put in a metal canister, multiple elements on the order of 20 PWRs, 40 BWRs.
They would be put in a metal cannister. The canister would be sealed and it would remain in that sealed condition through all subsequent steps in the waste management system, including possibly on-site storage, transportation, and hopefully disposal in the waste package covering.
Q. Okay. And the reference at least in this cover letter to standardized spent fuel canister, does the term standardized indicate that these cannisters were to be a kind of one size fits all? I mean, was that part of the concept? It would accommodate different types of fuel? Do you recall that?
A. Again, I do not recall this particular reference to standardized spent fuel canister. It

87

does go on to say in that first sentence, "which could become a component in the multipurpose canister system," which is what I just described.
Q. Okay.
A. This appears to be a particular organization's approach to trying to participate into that venture that I talked about with the utilities to develop multipurpose cannisters.
Q. What was your involvement in this effort at this time?
A. In --
Q. Yes, in 1993. Yeah, in that time frame.
A. In this particular effort?
Q. Yes.
A. With Lawrence Livermore National Laboratory?
Q. Yeah.
A. Again, I don't remember this specific letter or the presentation that's referred to. My overall role at this time, though, as the -- I guess in 1993 I was Director of the Storage Division -- was, as I indicated before, several fold. The primary responsibility was to work on trying to find a site for

88

a monitored retrievable storage facility, to work on the design for that MRS storage facility, and we were also involved in the -- our division was also involved in the development of multipurpose cannisters.
Q. Okay. And so your involvement was as the head -- were you at this time the Director of Storage?
A. Yes.
Q. Okay. You were the Director of Storage and the storage division was involved in this effort to develop multipurpose cannisters. So you were involved as the director?
A. That's right.
Q. Were the -- the multipurpose cannisters were to be suitable for transport; is that right? That was one of the purposes among the multis?
A. That was the intent was that the canister itself would go in a transportation cask.
Q. Okay.
A. The transportation cask provides the structural and radiological shielding for, you know, during the transport operation. Canister itself is an insert that would go inside that transport cask.

89

Q. I understand, but development of that transport cask was part of this effort, yes? Or was it limited? Maybe not. Was it only limited to development of the inside part, the canister?
A. Development of the transport cask was not necessarily part of the multipurpose canister concept, but it was the multipurpose canister would have to be compatible with transport casks.
Q. Okay. At this time were there efforts underway at the department to develop transport casks?
A. Wow. The reason I'm hesitating is early on in the Civilian Radioactive Waste Management Program history, it was a significant effort to develop transport casks both for truck and rail. A number of those efforts, though, were terminated for a variety of reasons. I don't remember in 1993 if those activities were still going on or if they had for the most part been terminated. That's why I'm -- I don't know the date.
Q. Okay. Your recollection -- excuse me.
A. I think most of the efforts, though, had either been terminated or were winding down.

90

Q. At this time?
A. Yeah, for transport casks.
Q. Okay. The efforts then to your recollection were earlier than this?
A. For transport casks; that's correct.
Q. That would have been in the 1980s?
A. Yes, I think so.
Q. And why was the Department of Energy wanting to develop transport casks in the 1980s?
A. It was one of the directives from the Nuclear Waste Policy Act. We were also responsible for shipping the waste to the waste management facilities.
Q. Were you involved yourself in any efforts aimed at the development of transport casks?
A. No. That was a responsibility of another division.
Q. Okay. But even though those efforts had trailed off, the efforts to develop a multipurpose canister either continued or maybe picked up when events dropped off? In any event, they were ongoing in 1983?
A. That's right.

91

Q. These multipurpose cannisters, as I asked before, using a phrase that is maybe a little imprecise, were they to be one size fits all? By that I mean -- let me ask it this way. Was a different multipurpose canister to be developed for each individual reactor?
A. As best as I could remember, the intent was to try to find a single design to accommodate most but probably not all of the spent fuel that's in the United States today. I think there are some unique reactors. For example, I think there's a reactor in Texas that has unusually long fuel elements, but we were looking at trying to design a multipurpose canister that would accommodate the bulk of the spent fuel that we thought we had to deal with, and it would accommodate different designs or different types of fuels by possibly having different inserts into which you put the fuel assemblies.
Q. Okay. And why was it that the department was attempting to design a canister that would accommodate most, if not all, of these spent fuel types in the United States?

92

MR. SHULTIS: Objection. Mr. Trebules is not a 30(b)(6) witness.
BY MR. STOUCK:
Q. You can answer.
A. My recollection is that at about this time we were -- this was pretty much after the effort to find an MRS, which didn't look like it was going to be successful, and we had previously indicated our schedules for the repository were going to slip. So we weren't going to probably begin accepting fuel by 1998.
We hoped to talk to the utilities as a group through their trade organizations, EEI and NEI -- I don't remember when they switched over -- about what could be done, and one of the concepts that emerged was that if we could develop the multipurpose canister system, the government would provide the cannisters to the utilities that they could use for their on-site storage needs. And that if it worked out as we had hoped, this canister would become part of the waste management system that we were developing.
It was an attempt to try to find part of a



mutually acceptable partial solution to the waste management issue.
Q. Okay. When you say DOE would provide -- and you may have told us this earlier today and, if so, I apologize. I just don't recall. DOE was going to finance this, was going to pay for these casks or these cannisters; was that --
A. That was one of the options under discussion as to how exactly that transfer would occur.
Q. Okay. I think you mentioned grants earlier as another option?
A. No, that was a different activity.
Q. Okay. I'm sorry. All right. So what other options were other than DOE paying for them, for these multipurpose cannisters?
A. I'm trying to think. I think one was that DOE would buy them and provide them to the utilities. That's the main one I can remember at this time.
Q. Okay. And why is it that DOE -- well, I guess, I think you answered that question or a similar one. But, you know, you referred to part of an effort to find a mutually agreeable solution; is that -- am I



recalling correct?
A. Uh-huh.
Q. Mutually agreeable. To what problem or issue would the provision of multipurpose cannisters by the Department of Energy to the utilities, to what issue or problem would that possibly provide a mutually agreeable solution?
A. Well, it looked like, again, since we were not going to be able to begin accepting or removing the spent fuel in 1998, the utilities would incur costs to provide for additional extended at-reactor storage. We were looking for a mutual effort, you know, that would provide some benefit to the utilities, but it would also help us in developing the entire waste management system.
And it had the additional identified benefit of potentially reducing the chance for contamination because you'd put the fuel assemblies in the canister and seal it up early in the handling operation for the spent fuel cannisters all the way through the waste management effort.
Q. And that was beneficial from a health and



safety point of view?
A. That's correct.
Q. Okay. And so this effort, if I understood your answer to my last question, the problem or at least one of the problems that was being addressed by this effort was the problem of additional on-site storage that the utilities might face if a '98 date were missed; is that right?
MR. SHULTIS: Objection, mischaracterizes Mr. Trebules's testimony.
THE WITNESS: I think that's a fair summary.
BY MR. STOUCK:
Q. Okay. And was the idea that -- I mean, at some point in the future transportation casks would be built I guess that these cannisters would go into, or was that not on the drawing board as of 1993?
A. No, that was part of the concept that these cannisters would be compatible with, would fit in the ultimate transportation casks that would be developed, and that would be primarily by rail. You probably couldn't use truck for those.

A reference, which I think is where the data is from. If we were to look at current estimates, you don't know whether or not they'd be similar, more, less, the same?
A. No, I don't.
Q. Okay. But I believe you also testified that the current plans today, in your job today, the current plans -- it's not written down anywhere, but the thinking is that if and when the repository begins operation, the annual acceptance rates will, at least at the steady state, the ultimate steady state rate, will be approximately 3,000 tons a year; is that right?
A. I think that's one of our design objectives still, yes, that's right.
Q. And is that also related in some way to an objective of being able to accommodate all of the aggregate industry wide annual generation of spent fuel?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I'm hesitant because when we prepared these schedules back in 1985, we were considering the two-repository system and, remember,

125

our objective was to try to reach 3,000 metric tons with the first repository. And then when the second repository came online with its added capacity, we would begin to reduce the backlog. Because of the evolution of the program, the fact that Congress told us to delay work on the second repository, you know, our current design objectives are for a single repository. Again, I think at about the 3,000 metric ton rate, which has impacts on future generation.
BY MR. STOUCK:
Q. Okay. I didn't understand the last part. Why does it have impacts on the future generation?
A. Well, again, as I just mentioned, I don't know what the current projections are, but if you look at Table 2-2.
Q. Yes.
A. Spent fuel generation, okay? Around 1998-2000, the spent fuel generation rate was about 3,000 metric ton per year, which the one repository system could accommodate, but this shows that the numbers continued to grow, okay, to, you know, in the 4,000 range, you know, or higher and obviously the one

126

repository system wouldn't be able to accommodate that.
Q. Okay. And so --
A. I thought your question had to do with, you know, if our current plans enough to accommodate --
Q. Right.
A. -- the current spent fuel generation rates.
Q. Okay. What you're saying, you don't know?
A. Yeah, I don't know.
Q. But if they're the same generation rates, --
A. Right.
Q. -- then it would not be able to accommodate because the number is smaller than these numbers here?
A. Exactly.
Q. Okay. I see. And so that suggests to me that I think it just follows that the three -- well, what is the 3,000 ton? So it seems to follow that the 3,000 ton a year acceptance rate that is in the current planning, current as of today planning, thinking for this program when it starts operating, it sound like is not based on a consideration of the actual annual discharge rates in the future and an ability to accommodate them. Would you agree with that?

127

MR. SHULTIS: Objection, mischaracterizes --
BY MR. STOUCK:
Q. At least to your knowledge it's not based?
MR. SHULTIS: -- prior testimony.
THE WITNESS: Again, I haven't kept up on the current generation rates. I do believe, though, that the total amount of spent fuel that was expected to be generated has continued to shrink substantially. We're no longer considering 130,000 metric tons as the '85 mission plan did. I think the number in total is down to around 90,000 metric tons.
BY MR. STOUCK:
Q. Okay.
A. Of spent fuel generated.
Q. Okay.
A. So there are significant changes, you know, that would have to be looked at to update this table, and I'm just not familiar with all the current numbers.
Q. That's fine. All I'm saying is, you are familiar with what the current planning and thinking is about the annual acceptance rates once the repository

128

In the U.S. Court of Federal Claims

---------------------------------x

Yankee Atomic Electric Co., :
et al :
: NO. 98-126C
v. : 98-154C
: 98-474C
United States of America :

---------------------------------x

April 19, 2002

DEPOSITION OF:

Victor W. Trebules, Jr.

a witness, called by counsel pursuant to notice, commencing at 9:00 a.m., which was taken at Spriggs and Hollingsworth, 1350 I St., NW, Washington, DC

1

Appearances

Jerry Stouck, Esq.
Spriggs and Hollingsworth
1350 I Street, NW
Washington, DC 20005-3305
for Yankee

Russell A. Shultis, Esq.
Heide L. Herrmann, Esq.
U.S. Dept. of Justice, Civil Division
Commercial Litigation Branch
1100 L Street, NW
Washington, DC 20530
for the government

Richard Johnson, Esq.
Jenner and Block
for Commonwealth Edison

2

INDEX OF EXAMINATIONS


| WITNESS | D | C | RD | RC |
|---|---|---|---|---|
| Victor W. Trebules, Jr. | 4 | | | |


Index of Exhibits

(Exhibits maintained by counsel)


| Description | Page |
|---|---|
| exhibit number 22.. . . . . . . . . . . . | 39 |


3

(Morning Session)

Stipulations

(It is stipulated and agreed by and between counsel for the respective parties that the reading and signing of this transcript by the witness are not waived.

It is further stipulated and agreed that the filing of this transcript with the clerk of the court be and the same is hereby waived.)

* * * * *

Whereupon,

Victor W. Trebules, Jr.

was called for examination by counsel and, having been previously sworn, was recalled and testified as follows:

DIRECT EXAMINATION:

BY MR. STOUCK:

Q. Good morning, Mr. Trebules. Would you

4

agree that at the time that you were working on the
plan in 1984 and 1985 it was an objective of the
spent fuel program that that program be operated in
an economically efficient manner?
MR. SHULTIS: Objection as to
"economically efficient." It's vague.
A. I believe we said words to that effect in
the mission plan, that's correct.
Q. Why was that an objective?
A. To the best of my recollection, I think
we used phrases like fiduciary responsibility.
People working in the program felt that they had an
obligation to try to execute the program
efficiently and effectively.
Q. Why was that an objective?
A. We knew the program was going to cost a
lot of money over its lifetime.
I guess it's my opinion that the people
felt they ought to try to be efficient in carrying
out that program.
Q. Let's pull out the mission plan which I
think is exhibit six, if you would, please.

5

A. Okay.
Q. Take a look at page six, please, which is
Bates CE14813. It's a listing of goals and
objectives. We discussed this earlier.
Number four, do you see that? "The
program must be conducted in a cost effective
manner with full cost recovery."
Do you see that?
A. Yes.
Q. What does "full cost recovery" mean?
MR. SHULTIS: Objection to the extent
it's calling for a legal conclusion.
A. It was my understanding that the Nuclear
Waste Policy Act had a provision that the owners
and generators of the spent nuclear fuel and the
radioactive waste would pay for the cost of the
program. It would not be funded by taxpayer money.
It would be funded by the owners and generators of
the waste.
The Act initially established a rate of
one mill per kilowatt hour for the nuclear
utilities which would go into a nuclear waste fund

6

and the government would draw on that money plus
any other monies, for example monies for the
disposal of defense high level waste, and that
would cover the cost of the program.
Q. Is that concept of full cost recovery
related to the objective of economic efficiency?
MR. SHULTIS: Same objection.
A. To the best of my understanding, it is.
Q. What's the relationship, if you would
just explain that?
MR. SHULTIS: The same objection.
A. Not being an economist, I guess I would
explain it in more or less layman's terms.
The people working in the program knew
they had a source of funds, that was the nuclear
waste fund, and any appropriations to cover the
disposal of defense high level waste.
They wanted to conduct the activities, the
scientific characterization, the design and the
engineering aspects essentially at minimum cost, do
the necessary, minimum necessary, but sufficient
work to develop the facilities, the geologic

7

depository and the transportation system to manage
and dispose of the radioactive waste.
Q. Is it your understanding at the time of
this mission plan, at the time this mission plan
was written, these words we've been looking at, is
it your understanding that this objective of
economic efficiency was a requirement for the
program?
MR. SHULTIS: Objection to the degree
it's calling for a legal conclusion.
A. I don't ever remember back then some 16,
17, 18 years ago it being described as a
requirement.
My recollection is, as exhibit six states,
it was a policy goal that guided DOE's
implementation of that program.
I don't ever remember the terms
requirement when it came to conducting the program
in a cost effective manner.
Q. Let's turn to page 37. Under mission
3.1.4, mission and objectives, do you see that?
A. Yes.

8

# WILLIAMS

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - x

YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C,
Plaintiffs, : 98-474C, 98-154C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. :

- - - - - - - - - - - - - - -X

Washington, D.C.
Tuesday, June 11, 2002

Deposition of JEFFREY ROBERT WILLIAMS, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn Public, taken at the offices of Spriggs & Hollignsworth, Suite 900, 1350 I Street, N.W., Washington, D.C. 20005, commencing at 9:30 a.m., Tuesday, June 11, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION



PURSUANT TO THE PROTECTIVE ORDER

APPEARANCES:

On behalf of the Plaintiffs:
Robert Shapiro, Esquire
SPRIGGS & HOLLINGSWORTH
Suite 900
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5800

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQUIRE
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7594

Also Present: Nicholas Parrillo



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFFS | DEFENDANT |
|---|---|---|
| JEFFREY R. WILLIAMS | | |
| By Mr. Shapiro | 5 | |
| Afternoon Session - Page 95 | | |


E X H I B I T S


| WILLIAMS EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 1 | January 1990 INMM Spent Fuel Seminar VII MRS Systems Studies | 106 |
| 2 | 2-12-97 memo, Williams to Barrett | 128 |
| 3 | December 1990 Annual Capacity Report | 139 |
| 4 | December 1991 Annual Capacity Report | 145 |
| 5 | March 1995 Acceptance Priority Ranking & Annual Capacity Report | 148 |
| 6 | 6-2-92 Run Plan for Continuation of the Throughput Rate Study | 159 |
| 7 | 3-23-92 Civilian Radioactive Waste Management System Throughput Rate Study Interim Report: Analysis of Oldest Fuel First Acceptance | 159 |





| WILLIAMS EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 8 | 4-10-92 memorandum, Lemeshewsky to Distribution with attachment | 160 |
| 9 | 10-5-90 memorandum, Brownstein to Distribution with attachment | 161 |
| 10 | Article | 163 |
| 11 | 11-98 TSLCC and Fee Adequacy Summary | 182 |
| 12 | 4-12-99 Program Update US DOE/Enresa Bilateral Meeting | 184 |
| 13 | 9-18-96 letter, Blandford to Williams with attachment | 200 |
| 14 | May 2000 Civilian Radioactive Waste Management System Requirements Document Revision 05 | 203 |

PROCEEDINGS

\- - - - - -

Whereupon,

JEFFREY ROBERT WILLIAMS,

Radioactive Waste Management Office, Forrestal Building, Department of Energy, 1000 Independence Avenue, N.W., Washington D.C., was called as a Witness by counsel for the Plaintiffs, and having been duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MR. SHAPIRO:

5

Q. State your name for the record, please.
A. Jeffrey Robert Williams.
Q. Mr. Williams, my name is Robert Shapiro. I'm an attorney for three plaintiffs that are suing the United States for breach of contract, Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company. We have asked you to come to give a deposition today.
Have you ever had your deposition taken before?
A. No, I haven't.
Q. You have probably gone over this with your counsel, but let me mention a few things of how this works. It is basically a conversation. I ask you questions, you give answers.
It is more formal than your average conversation. We have a court reporter who is taking everything down. That does make for a couple differences. It's helpful if we don't talk over one another. It's helpful if you give yes's and no's rather than uh-huhs. It makes the record clear as to just what you mean.
Also in the interest of being clear, it is important if I ask a question and you're not

6

sure what I'm asking, don't guess. If you're not sure, ask me to rephrase it and I will be happy to.
Anything you don't understand?
A. No.
Q. Okay.
One of the things that helps me starting out the deposition is to go through your background so I understand just where you fit into the issues that we have in our case. I would like to do that starting with your current position and moving backward.
A. Okay.
Q. Where do you currently work?
A. In the Civilian Radioactive Waste Management Office, Forrestal Building, Department of Energy, 1000 Independence Avenue.
Q. What is your position there?
A. I have two positions. I am the director of the systems engineering and international division, and I'm the acting director of the Office of Acceptance, Transportation, and Integration.
Q. When did you start that dual role?
A. Well, a few years ago. I can't

7

remember exactly, probably the spring of '99, I think. I did that on a rotational basis, 90 days, and then I switched with somebody else. Since January I have been in that dual role continuously.
Q. When you say you were in that dual role on a rotational basis from roughly spring of '99 through the end of 2001, what do you mean by a rotational basis?
A. I served for 90 days, and then -- I served as the acting director for the Office of Acceptance, Transportation and Integration for 90 days and then another division director served for 90 days. Then I served for 90 days and he served for 90 days. We did that until January of this year.
Q. Who was the other division director?
A. Jim Carlson.
Q. Do you have any idea why the two of you did that on a rotational basis as opposed to somebody being selected for the office director position?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A. I was going to say, you would have to

8

ask someone else.
Q. There was never a vacancy posted for the office director position?
A. No. No.
Q. Did you ever inquire about that position?
A. No, I didn't.
Q. There was no office gossip as to why that position was left open?
A. Might have been. I didn't hear it.
Q. To the extent that you were office director, who did you report to?
A. Ron Milner, Ronald Milner.
Q. And what was Mr. Milner's position?
A. He has been either the chief operating officer or the acting deputy director for OCRWM, depending on what time it was.
Q. Going back before you started to have the two positions on a rotational basis, what was your position before that, before I guess the spring of '99?
A. I have been the division director for systems engineering since 1996, basically. The division moved from one office to the other, but it has been basically the same, the same division

9

since '96.
Q. How did you come in the spring of '99 to take on the two positions on a rotational basis?
A. Management asked me to -- when somebody left, the person who was in the office, the office director before that left and I was asked to do that.
Q. Who was the office director before you were asked to do that?
A. Dwight Shelor.
Q. You said that one of your two positions is director of the systems engineering and international division. What do you do as director of that division?
A. I'm responsible for defining the top level requirements, and I'm responsible for completing the total system life cycle costs and fee adequacy reports. I'm responsible for analyzing, doing what we call systems analysis of various operating concepts for the Federal Waste Management System, and I'm responsible for maintaining what we call the -- doing baseline management, and then I'm also responsible for international activities.

10

Q. Let me go through those items and make sure I understand what they involve. You said that one of your roles is defining top level requirements. What do you mean by top level requirements?
A. Okay, the way a program is set up is we have level one, which is the top level; level two, which is the project level; and level three, which is the contractor level.
Level one are basically policy requirements that would impact the architecture of the system. In other words, if our director decided he wanted to paint the mountain green, he could have a requirement that says I want that painted green. Okay? Is that clear?
Q. Well, I will ask a few more questions and see if it becomes clear.
A. Okay.
Q. What determines the dividing line between a top level requirement in a requirements document, and what you call the next level down?
A. It can be rather subjective, and I'm not sure that we have the criteria written down specifically. We do have thresholds identified for things that need to raise to the level one

11

Change Control Board, which is the one here in Forrestal which is the purview of the director, and that threshold is something that is more than $500 million -- I can't recall all the specifics of those thresholds, but there are thresholds that exist that are documented that discuss what things go to our level one.
Q. You mentioned something called the Change Control Board. What is that?
A. It's basically a board that's chaired by the director of OCRWM. What we do is we try to manage our system so that we all understand what we are working to. We have a reference system that is basically -- it's a baseline system, and we all understand what the architecture is, what the operating concept is, and if we are to change from that, then that needs to go through a change control process.
Q. Who is on the Change Control Board besides the director?
A. Let's see, right now it would be -- I would be on it; the director of, what you call it, RW 50, it's the Office of Program Management; director of QA; and a Yucca Mountain project manager.

12

Q. What changes have gone through the level one Change Control Board during this year?
A. I don't believe there has been any.
Q. When you say there haven't been any, any that have been signed off on by the director?
A. I don't believe so, not since January.
Q. Have there been any that have been presented to the director but not signed off on?
A. No. Not that I can think of.
Q. What is the last change that has gone through the level one Change Control Board that you can think of?
MR. CRAWFORD: I'm going to instruct you not to answer.
And the privilege that I'm going to assert here is deliberative process.
MR. SHAPIRO: Think about it. I'm asking him changes that have gone through the process.
MR. CRAWFORD: No, you're asking him about proposed changes that have gone to the Change --
MR. SHAPIRO: That have gone through the Change Control Board.
MR. CRAWFORD: Well, I -- so you would



be asking him about proposed changes that have been approved.
MR. SHAPIRO: I'm trying to get an idea of what this body does. What is the last change that has been made through the Change Control Board? Apparently none in the last --
MR. CRAWFORD: Okay, I will let him answer as to a proposed change that has gone through and been signed off on by the director.
A. I believe we did a schedule change to change the date of the site recommendation report from I think it was originally scheduled for last July, July 2001, and we -- there was a proposal to move that back to December, and then a subsequent one to February of 2002, which was approved by the director.
Q. Any other changes that you can recall that have been signed off on by the director?
A. Yes. There have been several. The biggest one was -- not in the last six months, but if you're talking about the last several years, there has been a major design change. If you want me to describe it to you, I can.
Q. Sure.
A. We changed the repository design from



what we call a hot design, where basically the waste packages would heat the entire block of rock to above boiling at Yucca Mountain. The design change was to reduce the heat load on the repository, and to allow some of the rock to remain below boiling so we had to separate drifts underground so that was a design change.
There was a change to add a solar collector to the mountain, to the repository design.
There was a change to add, in the past there has been one, to add DOE spent fuel to our waste stream.
There was another change to add plutonium to the waste stream.
Those are the big ones I remember over the last few years.
Q. You said that one of your roles is defining the top level requirements for the system. What do you do to define the top level requirements of the system?
A. We do evaluations, basically. Say, for example, when we added -- well, let's say we added solar power to it, basically. That's not as good a one, because that -- well, I will just say when



we added solar power, basically the evaluation and so forth was down out at Yucca Mountain: What does it cost to add solar power. What does it do for us. What are the environmental impacts. Basically what we did was review the package that was put together to be sure that package conformed with our orders, our requirements, our procedures for making Change Control Boards.
At the upper level, what we do is we can do what we call system evaluations. Let's say, for example, we are talking about adding DOE spent fuel to the system. Then we can evaluate, take a whole systems approach to what does that do to our system, what does it do to our costs, what does it do to our transportation system, so we put together a package of basically studies that evaluate what this change would mean. And that would go into the decisionmaking process, so you could understand better what that change means.
Q. Let me ask you a couple questions about that change at DOE to add spent fuel to the system.
Do you recall roughly when that change was made?
A. Probably, like, 1997 or something.

with that?
A. Yes.
Q. Is the expectation that the system will be expanded so as to be able to handle a little more than 3,000 MTU spent fuel so as to be able to still accept the 3,000 MTU of commercial spent fuel plus some pro rata amount of the DOE spent fuel at the same time?
MR. CRAWFORD: Objection to the extent it assumes facts not in evidence, and vague.
A. What I can say is that the repository is allowed to hold 70,000 tons. The plan is that 63,000 of that be commercial spent fuel, 7,000 tons of that will be DOE material. DOE will pay for that material out of general funds. That 7,000 tons can be a mixture of spent fuel, it could be high-level waste class, whatever DOE chooses that to be is my understanding of it.
Does that help?
Q. My question was less about the total quantity that the system might accept, but the pace at which the system would accept it. Is it the expectation that the system will accept spent fuel at a rate faster than 3,000 metric tons per year so as to be able to accept the DOE spent fuel

25

and 3,000 tons per year of commercial spent fuel?
MR. CRAWFORD: Objection, based on lack of foundation and vagueness.
A. So should I answer this?
Q. If you can.
MR. CRAWFORD: If you can, and to the extent you understand the question, yes, go ahead and answer it.
A. Well, my understanding is that the total amount of spent fuel in any one year would exceed 3,000 tons by an amount to receive a portion of DOE waste as well.
Q. To have the system accept more than 3,000 tons per year, did that change require any changes in the plans for the system's -- for the system to accept spent fuel, or is the system flexible enough that it can accommodate that extra amount without any changes?
MR. CRAWFORD: Objection, vague, and objection to the extent it lacks foundation.
Now you can answer.
A. I guess the one thing I would say is we hadn't done a detailed design of the repository at the time this thing was made. We had a design that we felt was fairly flexible, and that design

26

has changed today, but it is a long way from a detailed design.
Q. Now, you said that your primary work dealing with these top level changes is doing studies. Are these studies done primarily by contractors or by --
A. Yes, contractors.
Q. How many people work in your division, the engineering and international division?
A. It has varied. When I took over in 1996 it was, like, 13, and now it's only 6.
Q. Was there a deliberate decision to reduce the size of the division?
A. Of the whole office, actually. The whole Washington office has downsized from 150 to 50 or so since, like, '95, '94.
Q. When you say the Washington office, you're referring to the Washington office of the offices of radioactive waste management?
A. Yes.
Q. Can we refer to that the Office of Civilian Radioactive Waste Management as RW?
A. It's fine with me.
Q. Is that reduction from about 150 to 50, is that your understanding that relates to budget

27

cuts?
MR. CRAWFORD: Well, objection to the extent it lacks foundation, and to the extent it calls for speculation.
A. Yes. It wasn't my decision, so I don't have direct knowledge of exactly why that was done.
Q. What do the six people who are left in your division, what do they do?
A. What do they do?
Q. Yes.
A. I have one person that's responsible for the requirements documents themselves. I have -- he does that, plus he oversees the systems studies -- basically what we do in general is we prepare guidance to the contractors. We prepare our budgets. We recommend studies to the contractors. We review their reports. We meet with them to assure they are moving in the direction that we think is consistent with the policy of the program, and we put together briefings to tell the outside world about what we are doing. And all the people that are in my office sort of support that.
I have got one person, his job is to

28

know mostly about the TSLCC and fee adequacy.

I have one person who is responsible for understanding and putting together what we call the total system description, and also he does other things like writes papers for the director.

I have another person who is responsible for making sure that our management of our contract, all the paperwork is done, like the performance evaluations on a monthly basis.

I have another person that is responsible for international cooperation agreements. I actually have another person who is sort of the -- he is sort of our office's expert on transmutation of waste.

Q. Let me just ask a couple questions about those. First, the person on the requirements document, who is that?

A. His name is Mark Senderling.

Q. What would Mr. Senderling do on a day-to-day basis to update the requirements document?

A. Well, the requirements document isn't updated on a day-to-day basis. It is updated maybe once a year, so, you know, that type of work

29

varies depending on if we are doing an update or not.

Let's say we added solar panels. He would basically -- he would be responsible for the wording in that requirements document on adding a requirement to add solar power to Yucca Mountain, and what that would consist of. Either he would develop some specific wording or a contractor might develop that wording, and then he would have to coordinate that with the rest of the program.

In other words, we would send it out for technical review, to assure that everybody can live with it. We will get comments back.

He will be responsible for negotiating the comments and trying to come to common ground and wording that everybody can live with and is consistent with the policy that the director would like to put in place.

Q. I think you might have largely answered another question that I have, but let me ask the question so I'm sure I understand.

What is the role of the requirements document within RW?

A. It is basically to -- it's basically to lay down the major foundation of what we are

30

trying to do, what our goals are. It has elements in it about what the overall program goal is. It will say, for example, our goal is to dispose of commercial spent fuel. It will say our goal is to dispose of DOE spent fuel. It will have -- it will have -- it has a lot of regulatory requirements in it. We have to do that in accordance with these regulations.

And then it also could have, if there is a policy call on how we want to implement the system, a policy call that would impact a designer, for example, that would be in there. And the best example of that right now is solar power. Okay? And then also the one on the -- that I mentioned before about the thermal design. That rose to a policy level call. We could have designed the repository in many different ways. There was a policy call made that we want to allow free drainage between the drifts and not boil the whole mountain.

Q. You say the requirements document represents the department's goals for the system. Is it also fair to say that the requirements document represents the department's plans for how the system will eventually work?

31

MR. CRAWFORD: Objection. Asked and answered. Objection, mischaracterizes his prior testimony.

A. In some cases, yes, I would say it is plans.

Q. But not in all cases the requirements documents doesn't represent plans?

A. I don't think --

MR. CRAWFORD: Objection, asked and answered. Objection, mischaracterizes the prior testimony.

A. I would say it is not comprehensive for every plan that we have.

Q. Well, part of what I'm getting at in my question is, does the department expect to meet the requirements set out in the requirements document?

MR. CRAWFORD: Objection, lack of foundation.

A. I would say we are designing the system -- designing the system that is capable of doing that. Many of those things are outside of our control.

Q. But when something gets into the requirements document, has it been vetted such

32

MR. CRAWFORD: Let me object to the extent of any lack of foundation, to the extent it calls for speculation, and that's all.
A. I don't really know.
Q. Have you ever had occasion to have to get files from the official files that you referred to that are kept in the basement?
A. Yes, I believe I have.
Q. How do you do that? Can you go to the cabinets yourself or do you make a request for documents?
A. I make a request.
Q. There is a particular staff, or at least a staff person that is in charge of getting such requests and getting you a copy of the document.
A. Yes.
Q. Who would that person be?
A. Gladys Ruffin.
Q. Let me go back to your background. At this point I think we have covered most of the period since sometime in '96 when you became division chief of the engineering and international division. Let me just ask to make sure that I haven't missed something.
I think we were covering fairly well

61

what you've done with respect to waste acceptance transportation, at least in the last five, six months when you have been acting director, but if I recall correctly there have been other 90-day periods when you have been acting director of the office when you have had some responsibility for acceptance and transportation.
During those earlier periods what did you do with respect to acceptance and transportation?
A. Primarily I attended staff meetings when it was required for that position, for the person in that position to attend those staff meetings.
Q. Do you recall any issues concerning waste acceptance and transportation came up at those staff meetings?
MR. CRAWFORD: Objection, vague and overbroad.
A. I can't remember anything specifically.
Q. I don't recall if we have covered this: Why was the change made from you rotating as office director to being the full-time acting office director at the beginning of the year?
A. The other person that was in that

62

position retired as well -- the other rotating guy.
Q. That was Mr. Carlson?
A. Yes.
Q. And you said that you became director of the engineering and international division sometime in 1996?
A. Yes. It was actually just called the systems engineering division at that time.
Q. You said at the beginning of '96 you had as many as 13 people working in the division.
A. Right.
Q. What happened to the other -- and that now you have six people. Did the other seven people get RIF'd? What happened to those people?
A. Some of them got RIF'd, four maybe. A couple of them retired, three. That adds up to 13.
Q. What was your position prior to being director of the engineering division?
A. That was the systems engineering division.
Q. I'm sorry.
A. Prior to that I was director of the engineering division.

63

MR. CRAWFORD: There you go.
Q. Let me go forward for a minute. Was there a name change between systems engineering division and engineering and international division?
A. Was there a name change? Say that one more time.
Q. Was the name of your division changed from systems engineering division to engineering and international division?
MR. CRAWFORD: Wait a minute, you have that kind of reversed than what you were trying for. You want to know if there was a name change between division of engineering to systems of engineering and international; is that correct?
MR. SHAPIRO: Let me take it step by step. I'm probably making something simple complicated.
A. I can clarify it.
Q. Okay.
A. 1996 I became responsible for the systems engineering division. It was in a different office. It was in the Office of Program Management. In sometime '98 or '99, I can't remember what, my division was moved over to the

64

Office of Acceptance, Transportation, and Integration. When that was moved -- my division was moved to that other office we added the name International, Systems Engineering and International, scope of work stayed the same. So basically from '96 until now, I have had mostly the same scope of work, mostly the same people except for losing some.

Q. What is your understanding as to why your division was moved from the Office of Program Management to the Office of Acceptance, Transportation, and Integration?

MR. CRAWFORD: Objection to the extent it calls for speculation and lack of foundation.

A. Mainly a balancing of workload between offices.

Q. Prior to the transfer of your division, the Office of Program Management had relatively more work to do than the Office of Acceptance, Transportation and Integration?

MR. CRAWFORD: Objection. Same objections as before.

A. At the same time my division was moved they also changed the name of the office. Before it was the Office of Waste Acceptance, Storage,

65

and Transportation. At the same time my office moved they also changed the name of that office, Okay, to the Office of Acceptance, Transportation, and Integration. And that, the workload of that office, which had its name changed, had diminished.

Q. Do you have an understanding as to whether there was a relationship between taking the storage part off the name of the division and the diminishment in the work of that office?

MR. CRAWFORD: Objection to the extent it lacks foundation and to the extent that it calls for speculation.

A. Yes, there was a relationship.

Q. What was the relationship?

A. We were no longer working on storage.

Q. What was the work that had previously been done on storage?

MR. CRAWFORD: Objection to the extent of lack of foundation and to the extent it calls for speculation.

A. We were working on the interim storage facility.

Q. When did that work stop?

A. About that time, '98 or something like

66

that. Whenever that change occurred around then.

Q. Are you also familiar with the concept monitored retrievable storage?

A. Yes.

Q. There is no work currently being done on monitored retrievable storage, is there?

A. No.

Q. What is your recollection as to when the work on monitored retrievable storage stopped?

MR. CRAWFORD: Objection. Lack of foundation, speculation.

A. About 1995.

Q. When you say "about," was there a specific decision to stop work on monitored retrievable storage?

MR. CRAWFORD: Objection as before, lack of foundation, speculation.

A. I don't recall any specific decision paper.

Q. It was just something that kind of petered out around that time period?

MR. CRAWFORD: Objection, vague.

A. Kind of.

Q. Let me ask more generally, how would you describe how the work on monitored retrievable

67

storage stopped?

MR. CRAWFORD: Objection, lack of foundation, and to the extent it calls for speculation.

A. Stopped. We quit funding the work for it.

Q. When you say we quit funding the work for it, do you mean that RW stopped proposing money for the monitored retrievable system in its budget?

MR. CRAWFORD: Same objections as before.

A. I don't remember the specifics.

Q. We were talking about the reorganization a few moments ago around the '98 time frame. When your division was in the Office of Program Management, who was the office director?

A. Samuel Rousso.

Q. Mr. Rousso is retired?

A. Yes.

Q. Did he retire at the time of that office reorganization?

A. It was a little after that.

Q. I think you mentioned this before but

68

let me be sure I understand. Prior to the time you were director of the systems engineering division in 1996, what was your position?
A. I was director of the engineering division.
Q. How did you come to switch from director of the engineering division to director of the systems engineering division?
A. We had a reorganization and I was directed to do this, or asked to do it.
Q. What office was the engineering division part of?
A. I believe it was called Office of Waste Acceptance, Storage, and Transportation.
Q. When did you start in your position as director of the engineering division?
A. It was 1994.
Q. In that 1994 to 1996 period, what did you do as director of the engineering division?
A. We were responsible for storage and transportation technology development.
Q. And in the '94 to '96 period, who was the office director for the Office of Acceptance, Storage, and Transportation?
A. I think it was Sam Rousso. It was Sam



Rousso.
Q. So in '96 you and Mr. Rousso both changed to the Office of Program Management?
A. That's right. I believe so.
Q. I'm forgetting how this all fits in. You had mentioned previously another office director, Mr. Shelor.
How did he fit in?
A. He was Rousso's deputy in the '94 to '96 time frame, and then subsequent to '96 he was the office director for the new Office of Waste Acceptance, Transportation and -- I don't think it had the Integration name on there. I don't believe it did until my division moved back over.
Q. So between 1994 and 1996 you said your division worked on developing storage and transportation technology. What storage program were you trying to develop technology for?
A. For the MRS, and then later on I think we called it the MRS, we called it interim storage facility or centralized interim storage facility.
Q. And when you say you were developing the technology for that facility, you were trying to design what the facility would look like?



A. Yes.
Q. Were you primarily working with contractors on that?
A. Yes.
Q. How many people were in your division in the 1994 through 1996 time frame?
A. We varied. I think it got up to as high as twelve or so.
Q. What would a low number be for the size of your division in that time frame?
A. Maybe seven or something.
Q. In addition to developing technology for storage, what technology were you trying to develop for transportation?
A. Transportation casks.
Q. Were these transportation casks intended to serve an MRS, or transportation casks intended to serve the repository, or both?
A. It was so they could serve both.
Q. What work were you doing to develop transportation casks?
A. We had a contract with General Atomics, and they were designing a truck cask.
Q. You referred previously to the use of rail cars. At some point the technology changed



from -- let me ask first, did the plan change at some point from using truck casks to rail casks?
A. We were actually doing both. We were also developing a multipurpose canister system that would be on a rail.
Q. The multipurpose canister system, that's the system that was designed to be able to store fuel at a reactor site, transport the fuel, and in the same canister have it disposed of in the repository?
A. Yes.
Q. Other than that multipurpose canister system, in the 1994 to 1996 time frame were you working on any other rail-based transportation systems?
A. No.
Q. The multipurpose canister system, can we use the acronym MPC system? Are you familiar with that?
A. I made it up.
Q. When did work on the MPC system stop?
A. Stop?
'96 time frame.
Q. And again you said, I believe you said previously that the current plan is to use

rail-based transportation. Other than through the MPC, how does the current plan to use -- how did the current plan to use rail-based transportation develop?
A. I'm not sure I understand.
Q. What I'm getting at, it sounds like you've said the only thing you were studying in 1994 to 1996 with respect to rail transportation was the MPC, and I believe you said earlier that the current plan, at least to some extent, is looking at rail-based transportation. And I guess I'm trying to figure out when the current plan got developed using rail-based transportation?
MR. CRAWFORD: You're asking when?
MR. SHAPIRO: Yes.
A. We have been planning to do rail since the beginning of the program, as far as I know, a combination of rail and truck.
Q. Other than the MPC system, what other work has been done since 1994 on the development of a rail transportation option for transporting spent fuel from utilities to a DOE facility?
A. I don't believe any.
Q. Other than the MPC system are you aware of any work that has been done at RW to study use

73

of rail transportation to transport spent fuel from utilities to a DOE facility?
A. Yes.
MR. CRAWFORD: Objection to the extent it lacks foundation and calls for speculation.
You can answer.
Q. What work do you recall being done?
A. There was a design on another transportation cask called a B -- Babcock & Wilcox. I don't know the specifics.
Q. When was that work done?
A. The early '90s.
Q. Let's go back in time, so I have an understanding of your background.
How did you come to be the director of the engineering division in 1994?
A. There was a reorganization and they asked me if I would do that.
Q. You said they asked you. Was there someone in particular?
A. It was either Ron Milner or Lake Barrett.
Q. What was your position prior to being director of the engineering division?
A. I was chief of the facilities

74

development branch.
Q. When did you start in the position as chief of the facilities development branch?
A. I think it was March, 1991.
Q. What part of RW was the facilities development branch part of?
A. I really don't recall the name of it. Some storage transportation organization.
Q. Was the branch part of the division?
A. Yes.
Q. Or the division was part of -- which division was it a part of?
A. I don't remember the name of the division.
Q. Do you remember who was in charge of the division?
A. Yes.
Q. Who?
A. Vic Trebules.
Q. Do you remember who was director of the office in which Mr. Trebules' division was a part of?
A. It was Ron Milner.
Q. What did you do as director of the facilities development branch?

75

A. I was responsible for the design of the MRS, that is the acronym, and also dealing with the Office of the Nuclear Waste Negotiator and dealing with people who were interested in volunteering a site for the MRS.
Q. Well, let's take the second one first. You say your work with the Office of the Nuclear Waste Negotiator. What sort of work would you do with the Office of the Nuclear Waste Negotiator?
A. Well, we -- they wanted us to develop siting guidelines. We worked with them on that. They wanted -- they developed procedures for giving out grants to potential hosts. We worked with them on the development of the procedures for grants. We shared information on how best to talk to potential hosts for a facility. We attended meetings with them.
Q. Well, let's go back to the first part where you said you were responsible for the design of the MRS. What did you do in your role with respect to the design of the MRS?
A. Well, actually Duke Engineering did the design. We were responsible at the DOE office for providing the budget, ensuring they did it consistent with DOE policies, reviewing the

76

design.
Q. Do you recall what the general concept was for the design of the MRS in that '91 to '94 period?
A. Yes. There was six --
MR. CRAWFORD: Objection, best evidence.
Go ahead.
THE WITNESS: What does that mean, he already has it?
MR. SHAPIRO: Potentially, amongst the millions of pages of documents.
MR. CRAWFORD: So you can give your answer.
A. There were six alternatives.
MR. CRAWFORD: Let me object to that, since Duke Engineering did the design, object to the extent it calls for speculation, but go right ahead.
A. As I recall, there was six alternatives that Duke Engineering came up with.
Q. Do you remember what the alternatives were?
MR. CRAWFORD: Objection. Overbroad.
A. To some extent I do, yes.

77

Q. Which alternatives do you recall?
A. I remember they had a pool alternative. I remember they had a vault alternative. They had a concrete cask alternative. They had a metal cask alternative. They had a what we call a NUHOMS alternative.
Q. What does a NUHOMS alternative refer to?
A. It's N-U-H-O-M-S. It refers to a horizontal canister in a concrete bunker.
That's five of the six. I can't --
Q. Did any of these six alternatives that Duke Engineering proposed, did any of those get beyond that concept stage?
MR. CRAWFORD: Objection, vague.
A. No.
Q. RW never began to focus on a particular one of those design concepts as the most likely to be used if the nuclear waste negotiator actually found a site for a MRS?
MR. CRAWFORD: You know I'm going to object to that, vagueness, foundation, and to the extent it also calls for speculation.
A. We didn't like the pool. That's about all I remember.

78

Q. Why didn't you like the pool?
A. It was overly complicated.
I don't have any more to say.
Q. Do you recall how much spent fuel these design concepts were intended to hold?
A. We were looking at different concepts. I think we were looking at 15,000 tons, and there may have been some studies even up to 40,000, but we knew there was a limit in the law.
Q. Was there any study of how fast the various design concepts would receive spent fuel from utilities?
MR. CRAWFORD: Objection, lack of foundation, to the extent it calls for speculation, and best evidence.
A. Really don't recall that specifically.
Q. What did you do prior to becoming chief of the facilities development branch?
A. I was a physical scientist in the, I think it was systems integration branch.
Q. How did you come to change from being a physical scientist in the systems integration branch To becoming a branch chief of the facilities development branch?
A. Actually I think I may have misspoke

79

last time. I believe I was a physical scientist in the facilities development branch for a short period of time before I became the branch chief. It may have been three or four months.
Q. Was that a promotion from being physical scientist to being branch chief?
A. Yes.
Q. How did you come to be promoted?
A. I applied for the job. I was selected.
Q. Do you recall who was branch chief before you?
A. It was Don Alexander.
Q. So prior to being in the facilities development branch you were in the systems integration branch?
A. Yes.
Q. When did you start with the systems integration branch?
A. November '88.
Q. Do you recall what office the systems integration branch was part of?
A. No, I don't.
Q. Let me ask it, was the systems integration branch part of the same division under Mr. Trebules as the --

80

A. No.
Q. No.
A. A lot of reorganizations.
Q. Do you recall who the division director was of the division that the systems integration branch was part of?
A. It was Keith Klein.
Q. And do you recall who the office director was of the office that that division was part of?
A. It was Ralph Stein.
Q. What work did you do in the systems integration branch?
A. I was responsible for systems studies.
Q. What does a systems study?
A. Asked and answered.
Actually, I talked about this.
MR. CRAWFORD: Sustained. Sustained.
A. I told you before what a systems study was.
Q. I might have forgotten or been confused.
MR. CRAWFORD: Be indulgent this once. I won't let you do this again, but just this once tell him again.



A. A systems study is where you look at the entire waste management system, transportation, storage facility and the repository, and you evaluate different operating concepts, and you evaluate it -- we primarily evaluated it from a cost standpoint, or if you have an MRS, if you accept more fuel, if you don't accept fuel.
That sort of thing.
Q. What was your role in doing those studies?
A. I was the DOE, basically the DOE leader for those sort of studies, which meant that I provided guidance letters to the contractors telling them how to do studies. I developed the budget that laid out generally what we were doing, so forth. I coordinated the review of those studies throughout DOE.
Q. Do you recall any particular studies that you worked on during that time?
A. Yes.
Q. Which ones do you recall?
A. I was responsible for one called an MRS systems study.
Q. What was the MRS systems study studying?



MR. CRAWFORD: Objection, best evidence.
A. That means you have it already, right?
It was a study to evaluate whether or not we would like to have an MRS in the system, and if so what would it do.
Q. Do you recall the basic conclusion of that study?
MR. CRAWFORD: Objection, best evidence, lack of foundation, to the extent it calls for speculation.
Q. DOE's position was that an MRS was a good idea, and that it should be a storage-only MRS.
Q. When you say storage only, what would the alternative be?
A. Rod consolidation, packaging facility.
Q. Why was the MRS considered to be a good idea?
MR. CRAWFORD: Objection, lack of foundation, to the extent it calls for speculation, best evidence.
A. Okay. To facilitate the acceptance of waste.
Q. Was one of the ways the MRS would



facilitate the acceptance of waste by, was by providing greater assurance that DOE would be able to start accepting waste from utilities in 1998?
MR. CRAWFORD: Objection, vague. Objection, lack of foundation. Objection, to the extent it calls for speculation. Objection -- well, that's it.
You can answer.
A. I thought we had a better chance to receive waste sooner with an MRS facility.
Q. Did you also believe that you would be able to accept waste faster with an MRS facility?
MR. CRAWFORD: Objection, asked and answered, and objection to the extent it mischaracterizes what his testimony was.
A. Faster than what?
MR. CRAWFORD: I'm sorry, objection vague should have been added. Sorry.
Q. Faster than if DOE did not use an MRS as part of its waste management system.
MR. CRAWFORD: Still objection vague, and the other objections I mentioned.
A. I would say it would be faster than not having any facility.
Q. Would it also be faster than a

Q. Why was 900 the limit of what you could have and stay within the limits of the -- I assume you are referring to the Nuclear Waste Policy Act amendments?
MR. CRAWFORD: Objection to the lack of foundation and to the extent it calls for a legal conclusion.
A. The limits in the Nuclear Waste Policy Act were 10,000 tons prior to operation of a repository. And if you had an MRS approximately ten years prior to a repository, that's about all you could take per year and stay within that 10,000 ton limit.
Q. You mentioned you used that 900 MTU rate as one of the values in a study about a modular design. What was the purpose of that modular -- maybe I'm misstating --
A. Let me clarify. That's a study that is ongoing right now, okay, so I haven't read the final report.
Q. Is that study being done for your office?
A. Yes.
Q. What is the purpose of that study?
A. The purpose of the study is to

105

basically see, to see what we can do in terms of waste acceptance with less money.
Q. I hope we are not talking about two different studies. You had mentioned a study that looked at I believe a high acceptance rate of 3600 and a low one which you thought was 900. Is this the same study that is looking at what to do with less money?
A. Yes. That's the one we are doing right now. Okay?
Q. How could you accept 3600 metric tons a year with less money?
MR. CRAWFORD: Objection to the lack of foundation and to the extent it calls for speculation.
A. We have mischaracterized this a little bit. The study is to look at what we could do with both less money and more money, okay? Does that help a little bit?
Q. That helps.
I think you also referred to the study's, or tell me, maybe I have got this mixed up and you are referring to a different study, to the modular design of the system?
A. We have been doing modular designs for

106

three or four years. Reports are on our website, two of the reports.
Q. What does modular design refer to?
A. It refers to taking a building and breaking it into pieces.
Q. Is the idea behind these studies that the system would be built in stages?
A. Yes, that is the idea.
MR. SHAPIRO: Let's mark this as Exhibit 1.
(Williams Deposition Exhibit No. 1 was marked for identification.)
BY MR. SHAPIRO:
Q. Mr. Williams, we have had handed to you what has been marked for purposes of identification as Exhibit 1 to your deposition. We will be going through a number of documents today to help generate our discussion. I would like you to take a look at this exhibit and tell me if you recognize it.
A. I don't remember it specifically. I recognize -- yes, I probably would have done this. This is obviously my writing.
Q. Do you remember something called, on

107

the first page of Exhibit 1 that says it is MRS Systems Studies Summary Report and Additional Analyses.
Do you remember doing something called the MRS Systems Studies?
A. Yes. I don't see it on Page 1 but -- oh, this Page 1.
Q. I'm sorry, the cover page.
A. The cover page. Yes. Yes, I do.
Q. What we are the MRS Systems Studies?
MR. CRAWFORD: Objection. Asked and answered.
A. I described this to you earlier.
Q. So this is an example, this is a summary report of those analyses that you referred to earlier?
A. That's right.
Q. You might have described this earlier, but do you recall what INMM stands for?
A. Asked and answered. Institute of Nuclear Materials Management.
Q. What is the Institute of Nuclear Materials and Management?
A. Good question. I know they hold meetings twice a year. That's about all I know

108

about them.
Q. Exhibit 1, is this a draft of a presentation that you were making to that seminar or that institute at one of their seminars?
A. What it looks like to me, it's the presentation that I gave, and the writing on it are my talking points to myself to help me as I went through the presentation.
Q. Do you recall why you spoke to this group?
A. They asked me to.
Q. Do you speak to the INMM on a regular basis?
A. I have spoke to them several times. They have a meeting once a year in Washington.
Q. What was your understanding, at least for the seminar that is the subject of Exhibit 1, what was your understanding as to what that group wanted to know?
MR. CRAWFORD: Objection to the extent it calls for speculation, to the foundation.
A. They are just interested in what DOE is doing in general.
Q. Mr. Williams, I would like to turn your attention to the page, I will refer to it as the

109

one that ends in the number 201. You will see a number which we refer to as a Bates number, a serial number for the pages at the bottom.
A. This has these things all upside down and backwards. Okay, this one, 201 Tasks.
Q. MRS Tasks.
A. Right.
Q. I want to ask you about one of your, I guess, handwritten talking points, it looks like the next to the last one. Can you read what that says there? It looks like "Based on current designs."
A. "Based on current designs all configurations can meet 3,000 MTU. More redundancy with MRS." Then in parentheses it looks like "equipment failure."
Q. What was the significance that all configurations could meet 3,000 metric tons?
MR. CRAWFORD: Objection, vague.
A. What do you mean, what was the significance?
Q. Why did you make that a talking point?
MR. CRAWFORD: I'm sorry, go ahead.
A. I guess I would say 3,000 tons had been our planning limit for a while.

110

Q. When you say the planning limit, what do you mean by limit?
A. Well, I shouldn't say limit. I guess I should say it was a planned acceptance rate at steady state.
Q. Do you know where that 3,000 MTU planning steady state, where that came from?
A. No, not really.
Q. Other than in the recent study that we just talked about, we have looked at steady state rates that could be achieved with more or less money, have you ever had occasion to revisit the 3,000 MTU number to see if that's the right number?
MR. CRAWFORD: Objection, vague.
A. I don't recall a study that I did specifically related to that, to address that issue.
Q. Do you recall during your tenure at DOE if anybody else has done such a study to see if the 3,000 MTU rate is the appropriate rate for DOE to have as a steady state acceptance rate?
MR. CRAWFORD: Objection, vague.
A. I believe there may have been such a study.

111

Q. Who would have done that?
A. It would have been TRW.
Q. What part of RW would have been looking at that?
A. I think it would have been under the systems group.
Q. What time frame do you recall that study being done?
A. It was when I was in the systems group which was between, as I said before, let's see, '91 through '96, somewhere in that range.
Q. Do you recall the conclusion of that study?
MR. CRAWFORD: Well, objection, best evidence. Objection to the foundation. Objection to the extent it calls for speculation.
A. Yes. It would be speculation. I'm sorry, I don't remember exactly.
Q. Do you recall was that study actually completed?
MR. CRAWFORD: Same objections.
A. I don't really have specific details on that.
Q. Do you have a recollection of what the name of the study might be that you're thinking

112

Q. I guess the bottom line is you don't really recall why the upper bound was dropped?
A. No.
Q. What about, I don't know if you still have the 1990 report tables in front of you, there is some differences between the lower bounding rate, acceptance rates, in the 1990 Annual Capacity Report, and the acceptance rate projections in the 1991 report.
A. I noticed those.
Q. Do you have any recollection as to what accounts for those differences?
A. No, I don't.
(Williams Deposition Exhibit No. 5 was marked for identification.)
BY MR. SHAPIRO:
Q. Mr. Williams, you have been handed what has been marked as Exhibit 5, which is the Acceptance Priority Ranking and Annual Capacity Report dated March 1995. I will represent to you that there was an Annual Capacity Report dated 1992 that I skipped. I can point your attention to it, Page 4 of Exhibit 5, which has a table similar to one we just looked at. It has the same

149

acceptance rates as those noted in the 1991 Annual Capacity Report. Do you have any recollection about the decision to maintain the same acceptance rates numbers in the 1995 report?
MR. CRAWFORD: Objection to the lack of foundation, to the extent it calls for speculation.
A. No, I don't.
Q. Now, this report is dated March 1995. Do you recall was an MRS still a viable concept by March of 1995?
MR. CRAWFORD: Objection, lack of foundation and to the extent it calls for speculation. Objection to the vagueness.
THE WITNESS: Want to do it some more?
MR. CRAWFORD: No, that's it.
A. I would say it was still being evaluated, or a predecessor of the MRS which might have been called interim spent fuel storage.
Q. When you say the MRS was still being evaluated, what do you mean by evaluated?
A. In 1995 I believe the Office of the Nuclear Waste Negotiator was still in business, and we were still, I think, hopeful that he was going to find a site. We had a design that was

150

done, and we were still supporting his efforts. I think.
Q. You said you had a design that was done. What -- I know we talked previously about six alternatives.
A. Right. That's what we had. And actually, yes, we had done some sort of refinements of it by this point in time.
Q. When you say refinements, what do you mean?
A. Well, there was some additional work on looking at some of those six alternatives in terms of costs and so forth. I really don't recall exactly what they all were, but they were -- there were bills being passed at the time in Congress about doing storage facilities, so I believe there was bills in '9 -- I can't remember all the dates, '93, '94, '95, '96 Congress was putting forth storage bills.
Q. I want to go back to the concept, and I know it was sort of in my preface talking about the Annual Capacity Reports, am I correct in my recollection that you testified that during the period of pretty much throughout the 1990s when you were studying the DOE waste acceptance system

151

you were pretty consistently using an acceptance rate of 3,000 metric tons per year?
MR. CRAWFORD: Objection to the vagueness.
A. I guess which specific study are you talking about?
Q. I'm referring generally, whether you're talking about -- maybe we can go through the various kinds of studies. We talked about system requirements documents, total system life cycle cost reports, total system descriptions. Haven't those all consistently used an acceptance rate that ramped up to a 3,000 MTU steady state acceptance rate?
A. I would say yes. There was a reference case, I would say it was 3,000 tons per year.
Q. Can you explain why the RW was using that 3,000 MTU reference case in those studies, yet was projecting an acceptance rate that ramped up to 900 MTU per year in these last few Annual Capacity Reports?
MR. CRAWFORD: Objection to the lack of foundation, to the extent it calls for speculation.
A. My recollection is that 3,000 tons

152

didn't ramp up until, 3,000 tons until after the
repository was operational which was later than
this period of time.
Q. Well, actually at least the 1995 Annual Capacity Report, let me refer you back to Page 4 of the exhibit. I will represent to you, as otherwise explained in the text, it says, due to uncertainty the system will start, and they didn't even use specific calendar years, they went to year one, year two, that kind of system.
A. Okay.
Q. Does that refresh your recollection as to what might account for using the two different acceptance rate scenarios?
MR. CRAWFORD: Again I will have the same objection to foundation, to the extent it calls for speculation.
A. I'm not sure how to answer that question. You want to try a different one or the other one the same way or something?
Q. When you say you don't know how to answer --
A. I'm confused. I'm confused. Okay?
Q. I don't want you to be confused. You may not know the answer, but I don't want you to

153

be confused.
A. I was confused by the question and I'm not sure I know the answer.
Q. I don't know the answer, I'm not just asking an argumentative question.
Do you know what accounts for the difference between the 3,000 MTU acceptance rate being used in the system requirements documents and the other studies we referred to a moment ago and the 900 MTU acceptance rate in the 1995 Annual Capacity Report?
A. The 900 rate really comes from an MRS in the system, if an MRS is operational prior to a repository. As to why they put this in here in this way in this Annual Capacity Report, you know, I don't know the answer to that.
Q. Now, currently you don't expect -- let me rephrase that.
Currently DOE or RW is not anticipating that its waste management system will include an MRS prior to the commencement of its operations?
A. That's right.
Q. Do you know or do you recall when RW first started that understanding that its waste management system would not have an MRS as part of

154

it prior to the commencement of repository operations?
MR. CRAWFORD: Objection to the lack of foundation and to the extent it calls for speculation.
A. To tell you the truth, I can't remember if the 1995 TSLCC report has it in or not, and I guess I would go and look at that, you know, to see if it was still in the 1995 report. I just can't remember. It was not in the 1998 TSLCC report.
Q. Can you think of any documents between 1995 and 1998 that would also help you pinpoint whether or not the MRS was part of RW's expectations?
MR. CRAWFORD: Objection. Overbroad.
A. We reorganized then between them to remove storage from the title of that office. In 1998, I believe we did that.
Q. Well, then, certainly by your recollection is that certainly by 1998 RW's expectation was that its waste management system would not include an MRS prior to repository operations?
A. Yes. It might have been '99, and then

155

like I said, the President vetoed those bills. What was going on then was Congress was passing bills, and we worked for the President. The President said he is going to override the vetoes -- I mean he is going to veto it. We didn't know whether there was going to be an override or not, and so here we are, we are trying to figure out is MRS going to be here or not. We didn't know.
Q. When you said the President threatened to veto the bills, you are referring to various pieces of legislation in the 1990s to provide for interim storage?
A. Yes.
Q. There was one referring to the concept of centralized interim storage?
A. Right. Right.
Q. In your mind was there a difference between centralized interim storage and monitored retrievable storage?
A. In my mind?
Q. Yes.
A. No.
Q. Within RW generally was there a difference between centralized storage and

156

MR. CRAWFORD: Objection, asked and answered.
(Williams Deposition Exhibit No. 8 was marked for identification.)
BY MR. SHAPIRO:
Q. Mr. Williams, handing you what has been marked as Exhibit 8, it's a memorandum that appears to be dated April 10th, 1992 from W.A. Lemeshewsky to Distribution, which is on the next page. You appear to be listed on the distribution sheet. And the memorandum appears to be distributing the study that we just referred to to the people on the distribution sheet, including yourself.
Do you have an understanding as to why you were getting a copy of this report, how it related to your work?
A. Well, I was involved in doing the MRS design at the time, so I can see how it would be related.
Q. Do you recall the interim study analysis of oldest fuel first acceptance having any impact on the work that you were doing?
A. No.

161

Q. Okay, then we won't waste more time on that.
MR. CRAWFORD: As it should be.
Can we take a break at this point?
MR. SHAPIRO: Sure.
(Recess taken -- 3:32 p.m.)
(After recess -- 3:45 p.m.)
MR. SHAPIRO: Let's turn to a new document.
(Williams Deposition Exhibit No. 9 was marked for identification.)
BY MR. SHAPIRO:
Q. Mr. Williams, you have been handed what has been marked as Exhibit 9. It's a memorandum dated October 5, 1990. It is from Alan Brownstein to a distribution list. It appears to be distributing what is termed a preliminary draft of the 1990 Annual Capacity Report. We discussed the final report a little bit earlier. I want to actually just ask a question on the -- direct your attention to this letter, a statement that it makes.
In the top paragraph, I guess it is the last sentence in that paragraph, "While the

162

information contained in the ACR will not be contractually binding until 1991, the report represents a major contract deliverable."
Do you have any recollection as to what that statement meant to you about the ACR not being contractually binding until 1991?
MR. CRAWFORD: Object to the foundation, and to the extent it calls for a legal conclusion, and to the extent it calls for speculation.
A. I don't recall seeing that before, even though it was sent to me. I never thought about it before right now.
I don't really want to speculate on it.
Q. In general, do you recall making any comments on the draft 1990 Annual Capacity Report?
A. I don't recall any. Is there any evidence that I did?
Q. No.
A. Okay.
Q. Do you know what role you had in the review of the 1990 Annual Capacity Report?
MR. CRAWFORD: Objection to the extent it assumes facts not in evidence.
A. No. I really don't remember at all.
I'm not even sure what position I was

163

in at the time.
Q. The distribution list on the second page of the exhibit --
A. Yes, it has got 412.
Q. I don't recall what 412 stood for.
A. What I'm thinking is when I was in that facilities development branch I may have been the acting director then, but I don't recall. I didn't think I was acting all the way from October until I don't think I got the job until March. It's possible, though.
But like I said, I don't recall making any comments on it.
(Williams Deposition Exhibit No. 10 was marked for identification.)
BY MR. SHAPIRO:
Q. Mr. Williams, you have been handed what has been marked as Exhibit 10. It looks to be an article titled Multipurpose Canisters as an Alternative for Transportation and Disposal of Spent Nuclear Fuel. There are several authors mentioned, you being one of them.
Do you recall participating in the preparation of this article?

164

A. Yes.
Q. Why did you help to prepare this article, Exhibit 10?
A. Why did I help? Okay. This one doesn't seem to have a date on here, does there? My guess is it was probably '92 or '93.
Q. I do not see a date.
A. Okay. Well, I was the DOE person who was responsible for this study that was done by our contractor.
Q. The second page of the exhibit right at the top there is a header that seems to say Radioactive Waste Management. Is that -- all I have got is the article itself. Do you know is the radioactive waste management, is that supposed to reflect the publication in which this article appeared or the chapter in which it appeared? Do you have any recollection what that is?
A. I really don't. I'm sorry.
Q. Do you recall what publication this article --
A. No, I don't. I don't.
Q. Mr. Williams, there are page numbers at the top of the exhibit in the 800s. I would like to point your attention to 821.

165

A. I think this comes from our International Radioactive Waste Conference, is where I believe this is from. There is a publication of things that, papers that were presented at that conference.
Okay, go ahead. I'm sorry.
Q. That's the page I want to point your attention to, but let me get a little bit of background first.
Do you recall what the point of the article was, Exhibit 10?
MR. CRAWFORD: Objection, vague. Objection, best evidence.
A. Do I recall?
Q. What the purpose of the article was.
A. In general?
Q. Yes.
A. It was to inform people of a study we did on the feasibility of using multipurpose canisters in our system.
Q. In fact, would it be fair to say that the article supported consideration of multipurpose canisters, noted advantages to a system that included use of multipurpose canisters?

166

MR. CRAWFORD: Objection, best evidence.
A. I think that's probably true.
Q. Again, on Page 821, what I want to point your attention to is the second paragraph on the left-hand column, referred to as Contract Issues. It says there that "The impacts of the MPC concept on the 10 CFR 961 Waste Acceptance Contracts were identified as modifications of previously identified issues. While none of these issues appears insurmountable and may be assisted in the resolution by utilities support for the MPC system, the MPC does introduce new issues to be resolved."
Do you recall consideration of the relationship of the MPC and the contracts?
A. Yes.
MR. CRAWFORD: Objection, vague.
Q. I might have used this term before, but I want to make sure we are on the same page. Are you familiar with the term Standard Contract?
A. Yes.
Q. Those are the contracts being referred to as the 10 CFR 961 Waste Acceptance Contracts.
A. Yes.

167

Q. What do you recall was the relationship between the MPC concept and those contracts?
A. MPC was not an acceptable waste form under the contract.
Q. What was the basis of your understanding that the MPC concept was not an acceptable waste form under the contracts?
MR. CRAWFORD: Object to the extent it calls for a legal conclusion.
A. The contract describes what standard fuel is and it talks about other types, other forms, but nowhere does it talk about large canisters like this. They were contemplated when the contract was written, so they weren't included in the contract. Our understanding was the contract would need to be modified and our understanding was since this could be advantageous to the utilities they may be willing to enter into contract modifications.
Q. Have you ever read the Standard Contract?
A. Yes.
Q. When was the last time you read the Standard Contract, or a part of the Standard Contract?

168

to be a contract revision. And MPCs are similar to some of those other things that were being discussed.

Q. What is your understanding of what a multiple element sealed canister is?

A. What is my understanding of what it is?

Q. Yes.

MR. CRAWFORD: Objection to the lack of foundation and to the extent it calls for speculation.

A. My understanding is that it's a large canister, which at the time the term was coined it either held seven PWR assemblies or 24 for the larger one. It's a stainless steel canister. It has a basket, a stainless steel framework in which you put assemblies, and it is welded closed. And then it is placed into storage.

Q. And would you understand that utilities are currently using MESCs to store spent fuel?

MR. CRAWFORD: Objection.

THE WITNESS: Sorry.

Q. And some of these MESCs that utilities are using are also intended and licensed for transport of the spent fuel from the utility to a DOE facility?

173

MR. CRAWFORD: Objection to the extent it calls for speculation, and to the extent there has been no foundation.

A. Yes, I believe the intent is to license those. Some of those have them licensed, I believe, for a transport and storage center.

Q. Is it your understanding that RW is planning to accept the MESCs?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion and to the extent it calls for speculation.

A. I think I had said that our system logistics would contemplate that that type of material, those type of technologies would come into the system, yes.

Q. What do you mean by system logistics?

A. Well, to do a total system life cycle cost we have to understand how the material flows, how it is transported, what is transported in what type of casks, and we assume that fuel is received in canisters, that some of the fuel is received at the repository in dual purpose canisters.

Q. And that's one of the assumptions that is embedded within the TSLCCs?

A. I believe so, yes.

174

Q. Do you know how long that has been one of the assumptions within the TSLCC?

A. I would say fairly recently, probably just the last TSLCC. Maybe the 1999 one, I'm not sure. I would have to go back and double-check.

Q. Do you know why that change has been made to the TSLCC, to include an expectation that the system would expect dual purpose canisters?

MR. CRAWFORD: Objection to the extent it calls for speculation, to the lack of foundation.

A. They didn't exist previously, now they do.

Q. Since dual purpose canisters have been in use by utilities, has there ever been discussion within RW of RW not accepting waste in such canisters from utilities?

A. Sure.

Q. How has that come up?

A. Well, why should we bother to accept waste from utilities when they are suing us, when it's not under the Standard Contract, right? I mean, why would I do something to help out a shutdown reactor that has got canisters there when they are suing us, when, on the other hand, we can

175

stand back and say our contract doesn't have to accept it. You figure out how to get it in this cask that we bring to you.

Q. What is the context of those discussions that you just referred to?

A. They are just people talking in the halls or whatever, you know. No formal meetings or notes on it.

Q. Has there ever been -- beyond a discussion in the hallways, has there ever been any more formal consideration within RW of not accepting spent fuel from utilities that is in dual purpose canisters?

MR. CRAWFORD: Objection, vague.

A. There is a general recognition that spent fuel in canisters is not an acceptable waste form, and that something would have to change in order to allow us to accept it. The expectation is that engineeringwise and economically it makes sense to make that change, so the expectation is that somehow a change would be made, because it would be better for everybody, everybody that's involved.

Q. I understand from what you just said why you think it would be better for utilities.

176

on the top, because it would be an irregular cut, I imagine.
Q. You said that the most recent total system life cycle cost study has an expectation that the system would accept MESCs. Do you recall how that study addressed the cost impact to the system of accepting MESCs?
MR. CRAWFORD: Let me object to that to the extent it mischaracterizes what he said and to the foundation, to the extent it calls for speculation.
A. No, I can't really address it specifically.
Q. Do you have any recollection at all as to how the TSLCC report addressed the cost of dealing with MESCs?
A. Other than costing out the facility in which to open it up, no, I really can't.
Q. What about the cost of dealing with the MESC after the spent fuel has been taken out? Do you recall what the expectation is for purposes of the TSLCC report, what would happen to that waste?
MR. CRAWFORD: Objection to the foundation, to the extent it calls for speculation.

181

A. I know there has been -- I have heard discussions, I don't know exactly how it is dealt with.
Q. Would it be fair to say, though, that the bottom line is that the cost impact of dealing with MESCs has not been deemed to be large enough to materially impact the fee adequacy determination?
MR. CRAWFORD: Objection to the extent it mischaracterizes the prior testimony. Objection to the foundation. Objection to the extent it calls for speculation. Objection, best evidence.
A. Yes, I don't think it impacts the fee adequacy. We have a large margin right now.
Q. When you say you have a large margin, you mean that the current projections are that revenues are going to significantly exceed the total system life cycle cost?
A. The revenues plus the economic return on investment, which is a big driver, actually, based on last year's projections so economic conditions are different now so we will have to see what happens.
(Williams Deposition

182

Exhibit No. 11 was marked for identification.)
BY MR. SHAPIRO:
Q. Mr. Williams, you have been handed what has been marked Exhibit 11. It is titled TSLCC and Fee Adequacy Summary, Office of Management and Budget Briefing. It has your name on it and the date November 1998.
Do you recall this document?
A. Not specifically, but it -- again I recognize the handwriting on there.
Q. That's your handwriting?
A. Yes.
Q. Do you recall making a presentation to the Office of Management and Budget about the TSLCC and Fee Adequacy Summary?
A. I don't know. I made so many presentations that I -- I don't specifically recall it. If someone said I did it, I would believe them. I mean this all looks familiar.
Q. Would you have prepared a briefing like this yourself or would a document like this have been prepared for you by a contractor?
A. Well, normally the way it works is a contractor prepares it and I go over it and

183

usually make significant changes, additions, subtractions and so forth, but they are the ones that are actually putting it into the PowerPoint format.
Q. Is that what is called the M&O contractor that does that for you?
A. Yes, which would have been TRW at this time.
Q. While we are on that subject, the current M&O contractor is now Bechtel?
A. Yes, BSC.
Q. Other than dealing with different names and some different people, has the change in M&O contractors had any difference in what you do, the day-to-day basis?
A. What I do?
MR. CRAWFORD: Objection.
Q. What you do.
MR. CRAWFORD: Objection, vague.
A. No.
Q. I'm sorry?
A. No. No.
MR. CRAWFORD: Robert, let's take a break. I want to confer with somebody about this document before I allow anything further on it. I

184

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COMMONWEALTH EDISON COMPANY, )
Plaintiff, )
v. ) No. 98-621C
UNITED STATES, )
Defendant. )

- - - - - - - - - - -

DEPOSITION OF JEFFREY WILLIAMS

Thursday, January 22, 2004

Reported by: Lori Goodin Mackenzie, RPR
Job No: 157857

6

The deposition of JEFFREY WILLIAMS was convened on Thursday, January 22, 2004, commencing at 8:35 a.m., at the offices of Jenner & Block, 601 13th Street, N.W., 12th Floor, Washington, D.C., before Lori Goodin Mackenzie, Registered Professional Reporter, Realtime Reporter, and Notary Public for the District of Columbia.

7

APPEARANCES

For Plaintiff:
DONALD R. CASSLING, Esquire
Jenner & Block, LLP
One IBM Plaza
New York, New York 60611-7603
312-222-9350

For Defendant:
STEPHEN FINN, Esquire
U.S. Department of Justice
Commercial Litigation Branch
ATTN: Classification Unit
8th Floor
Washington, D.C. 20530
202-307-6288

8

CONTENTS


| EXAMINATION BY | PAGE |
|---|---|
| Mr. Cassling | 6 |


EXHIBITS


| NO. DESCRIPTION | PAGE |
|---|---|
| 1Defendant's Initial Disclosures | 6 |
| 2MPC Update | 11 |
| 3 Standard contract executed by Commonwealth Edison Company, and United States | 21 |
| 4 Document called Spent Fuel Project Office, Interim Staff Guidance 1, Revision 1, Damaged Fuel | 29 |
| 5Certificate of Compliance for Spent Fuel Storage Casks | 33 |
| 6 Document, Classification of Spent Nuclear Fuel | 70 |
| 7Letter dated September 13th, 1985 | 72 |
| 8Document entitled Description of Basic MPC Concepts dated January 27, 1994 | 81 |
| 9Document dated March 6, 1996 | 172 |
| 10Multi-Purpose Canister Project Overview | 187 |


9

EXHIBITS CONTINUED

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 11 | Multi-Purpose Canister Storage | 212 |
| 12 | Waste acceptance systems requirements document | 222 |
| 13 | Report to the Committee on Appropriations dated January 2001 | 243 |
| 14 | E-mail and document attached entitled Assumptions for Design Basis Waste Input | 251 |
| 15 | Cover letter with attached document, Design Basis Waste Input Assumptions for License Application dated August 2001 | 254 |
| 16 | Operational Waste Stream Assumption for TSLCC Estimates, dated September 2000 | 261 |
| 17 | Document entitled Role of Multi-Purpose Canisters in the Management of Spent Nuclear Fuel | 264 |



PROCEEDINGS

JEFFREY WILLIAMS,

a witness called for examination, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. CASSLING:

Q. Good morning Mr. Williams, I am Don Cassling. I am representing the plaintiff in the case. Let me just, by way of introduction, let's just mark this as Williams Exhibit No. 1.

(Williams Exhibit no. 1 was marked for identification.)

BY MR. CASSLING:

Q. The reason I am taking your deposition this morning is that you were disclosed by the Defendant, the United States, as someone with discoverable information regarding MESCs, M-E-S-C-S, technical issues.

And this is, Williams Exhibit 1 is Defendant's Initial Disclosures.

Now, so, most of the questions I am



going to ask you today are going to be involved with that issue.

Before we get started on the substance of the deposition can you tell me what you did to prepare for today's deposition?

A. I didn't do anything.

Q. Okay. Now, you have been deposed at least three separate times, or at least on three days before this; is that correct?

A. Yes, this is the third deposition, fourth day, I think.

Q. Right. And two days with the Yankee case, and one day in the Indiana/Michigan case; is that correct?

A. Yes, that is right.

Q. All right. Now, you have been deposed in those and you have given a lot of deposition testimony by way of background.

And I don't want to waste a lot of your time just repeating everything that is in there.

But, I assume when you were asked



questions in those depositions about what your past duties were, your titles, that sort of background information, what you said in response to those questions was accurate; is that correct?

A. Yes.

Q. Okay. Now, what is your current position at the DOE?

A. Currently I am the acting director for the Office of Science and Technology and International.

Q. Okay. Now, in the mid-'90s, you had responsibility for a program involving developing MPCs; is that correct?

A. Yes.

Q. And what was your title and your responsibilities during that time period?

A. I had two different positions and two different titles while we were developing the MPC program. The first one started in maybe '91 or '92. I was the chief of the facilities development branch.

And the second position, I believe

began around 1995, was, I was the director of the engineering division.

Q. Okay. And what, if you had to describe the difference in the responsibilities in those two positions, how would you describe that?

A. While I was chief of the facilities development branch, the primary emphasis was on developing an interim storage facility, a temporary storage facility.

When we went to the engineering development, or the engineering division, it was a reorganization where the primary emphasis was on development of technologies, such as the multi-purpose canister and transportation casks.

The multiple purpose canister program was initiated while I was in the facilities development branch.

Q. Okay. So, you started the facilities development branch working with, I believe it is called an MRS; is that right?

A. Yes, that is right.



Q. And that is the interim storage facility?

A. Yes.

Q. And so work on the MPC began while you were there, and then you moved into your second position, and you in essence took control over development, over that development project?

A. Yes. There was a reorganization, I believe it was in 1995, and you are right. I initiated work on the MPC while I was working on the MRS as chief of the facilities development branch.

And, after the reorganization, when I became the director of the engineering division, the MPC work fell under my responsibility then, as well as some other work related to transportation.

Q. Okay. Now, since we are going to be talking about MESCs, and MPCs, and dual purpose casks and various things, let's make sure that when we are using the terms we are both talking about the same thing.



Let me get one document here. I think this will help us.

(Williams Exhibit no. 2 was marked for identification.)

BY MR. CASSLING:

Q. I have handed you, Mr. Williams, Williams Exhibit No. 2, which is titled MPC Update. It appears to be authored by you and presented to the Southern States Energy Board.

If you turn to Page 4 of this document, it is a page titled MPC Study, Definition of MPC.

And it says, the very first line says: Also called universal canister, multiple element sealed canister, MESC, and multi-purpose unit, MPU.

My question to you is, is an MPU and a universal canister, and a MESC, and an MPC, are those all the same things?

A. My view today, after having worked on them for several years, is that the MESC is not the same thing.



Q. Okay. With respect to each one of these terms that are here, and also add one more, dual purpose cask, tell me what you understand today each one of those to be, and the differences between each one so that when we talk about them in the rest of the deposition, we are using the same, we will be meaning the same things.

A. Okay. Start with multi-purpose canister.

Q. And that is an MPC, correct?

A. MPC, multi-purpose canister. My definition of multi-purpose canister is a thin walled stainless steel canister, thin walled meaning a half-inch or an inch thick that holds several spent fuel assemblies, and the canister can be used for storage, and it would be licensed by the NRC under their 10 CFR Part 72.

It would be used also for transportation, and it would be licensed by the NRC under 10 CFR 71.

And, thirdly, it would also be used

for disposal and would be licensed under what is as 10 CFR Part 63 by the Nuclear Regulatory Commission. And that canister would be used with overpacks designed specifically for storage, and a different overpack designed specifically for transportation, and the third overpack designed specifically for disposal.
Q. Let's stop there for just a minute so that the record is clear.
When you use the word overpack, what do you mean?
A. It is another material that the canister is placed inside of that is usually, it is a thicker material.
For storage, it could be metal, or we were focusing on a concrete overpack for storage. For transportation, it would definitely be a metal container into which the canister would be placed inside of that metal canister that would provide protection, shielding during transportation.
The third overpack for disposal

18

would be a metal container that would contain the characteristics that are necessary to prevent corrosion, for the long term.
Long-term I mean 10,000 years, in the disposal environment.
Q. Now, the third overpack, the one for disposal and necessary to prevent corrosion.
First of all, is that also made of metal?
A. Yes.
Q. And is the obligation to get the license for that fall on the utility, or on the DOE? And the license from NRC is what I am referring to, of course.
A. It would fall on the DOE.
Q. Okay. You also mentioned that there are three separate overpacks, one for storage, one transportation and one for disposal.
With respect to the overpack for storage, is that the obligation of the DOE or is that the obligation of the utility to get that from the NRC?

19

MR. FINN: Objection, calls for legal conclusion.
BY MR. CASSLING:
Q. You can answer any question unless he instructs you not to answer.
Just for the record, I will assume that if he instructs you not, if your counsel instructs you not to answer that you will follow his instruction.
That way I don't have to continually ask that question during the course of the deposition.
Is that the case, you will follow his instruction not to answer, if he instructs you?
A. Yes, I will follow his instructions.
Q. Thank you. Anyway, you were explaining about whose obligation it is to get the overpack for storage, the license for that, from the NRC.
A. My understanding is that it is the utility's responsibility to get the storage

20

license for storage at a utility, and that is what is taking place today.
With the multi-purpose canister program, we were pursuing that on our own, along with, in coordination with the utilities. That is what we were doing with the multi-purpose canister program, but that that was unique.
Q. Okay. The transportation overpack, was that the responsibility of the utility to go and get the license from the NRC, or is that the responsibility of DOE?
A. DOE.
Q. Okay. Now, you mentioned that there were three overpacks, one for each of those purposes.
Is there ever a situations where you can have the same overpack for both storage and transportation?
A. Yes, it is possible. That is not the way we were proceeding, though.
Q. Have any utilities done that, to your knowledge?

21

A. I believe that they have now. I haven't followed exactly the technology over the last few years.

I believe that maybe Holtec has one, but I am not really sure.

Q. Okay. Now, we started out this line of questioning to make sure we understood the different definitions. You have talked now about an MPC.

Let's address a universal -- well, first let's address a MESC, what is the difference between an MPC and a MESC?

A. My understanding of a MESC today is that a MESC is simply the storage canister only.

It is a thin walled, and when I mean thin, again, a half to an inch thick, stainless steal or carbon steel canister that the purpose is only for storage.

It is not for transportation, and it is not for disposal.

Q. Okay. And a dual purpose canister is what?



A. My understanding of a dual purpose canister is a canister that would be certified for storage and then also for transportation.

Q. But not for disposal?

A. Not for disposal. I would like to clarify, some people have used dual purpose to talk about storage and disposal, or transportation and disposal, but the common terminology is for storage and transportation.

Q. So, if I, during the rest of this deposition refer to a dual purpose canister, you will understand that I am talking about one for use for storage and transportation?

A. Yes.

Q. Okay. Now, a universal canister, am I correct that that is, your current view is that would be the same as an MPC?

A. Similar. I think that was a term that was used in the 1980s and the difference in my mind between a universal canister and a multi-purpose canister would be that a universal canister didn't necessarily have the work with



overpacks.

In other words, you can have one container used for storage, you use it for transportation, and you use it for disposal. But it is not a canister system, where you take the canister out of overpacks.

Q. So, universal -- I want to make sure I understand it.

The universal canister would get rid of the need to have overpacks?

A. It could. I mean, these are terms that have been loosely thrown around, I would say, but I think the origination of the universal canister came out of testimony that was related to the monitored retrieval storage facility. And that initial use, my recollection is, that it was a container that would be used without overpacks.

Q. Okay. Now, you talked about the need to have three separate overpacks. One each for storage, transportation and disposal.

Is there a need for three separate overpacks, regardless of whether you are talking



about dual purpose canister, MESCs or MPCs?

Let me ask the question to make it less complex, because that wasn't a well phrased question.

A. Okay.

Q. Are there any situations in which you can use the same overpack for both storage and transportation?

A. I could imagine, yes, you could. That is not the way we were designing the multi-purpose canister at the time.

Q. Are you aware of whether any utilities currently are using the same overpack for both storage and transportation?

A. I think you asked that before and I think I answered that I think that maybe Holtec has designed one, a metal storage overpack that can also be used for transportation.

But, I am, I just haven't followed that technology closely the last couple of years.

Q. Do you know whether that technology has been licensed by the NRC?

your understanding, the language that the DOE uses to justify why it would treat other than standard fuel on a different schedule than standard fuel, correct?
A. It would seem that way.
Q. And Mr. Hall goes on to say that we believe that the original intent of the contract language with respect to fuel classification was not to exclude any existing commercial fuel elements in this fashion.
Do you see that?
A. Yes.
Q. So, that when Mr. Bauer responded to Mr. Hall with this language in the second paragraph of his September 13th letter, he appeared to be agreeing with Mr. Hall's conclusions regarding the standard contract; would you agree?
MR. FINN: Objection, document speaks for itself.
A. It appears that way.
(Williams Exhibit no. 8 was

86

marked for identification.)
BY MR. CASSLING:
Q. This document is entitled Description of Basic MPC Concepts dated January 27, 1994, presented by you to the INMM Spent Fuel Management Seminar, No. 11.
What is the INMM?
A. Institute of Nuclear Materials Management.
Q. And, at the time, it shows that you were chief of the facilities development branch.
This was, at the very beginning of our deposition today, this was the job you had before you became director of the MPC program; is that correct?
A. It was before I became director of the engineering division. While in the facilities development branch, I was given the responsibility for developing this MPC concept.
Q. Okay. You will see some handwritten notes on the front page and there are other notes throughout.

87

Do you recognize the handwriting?
A. Yes.
Q. And whose is that?
A. It is mine.
Q. Okay. If you will turn the page, it says MPC history. First, on the bottom of the page, the note begins to the extent practicable, and a little bit of it is cut off.
But, can you tell me, to the best of your ability, what that handwritten note says?
A. It looks like what I am doing is quoting a regulation, an NRC regulation: To the extent practicable in the design of storage casks, consideration should be given to the compatibility with removal of stored fuel from a reactor site transportation, and ultimate disposition by DOE.
Q. Okay. If you look at the right-hand side of the page, you will see a handwritten note that refers to dry cask storage study.
What does that note refer to?
A. That is a study that the DOE did, I

88

believe it was published in 1989, maybe, I think. It was done in response to a requirement in the Nuclear Waste Policy Amendments Act, which was passed in the early 1987.
And the document came out in draft in 1988 and '89 that discussed dry storage, costs associated with it, different types of technology, and also who was responsible for developing dry storage at utility sites.
Q. Was that prepared by E. R. Johnson?
A. Well, it was a DOE document. I don't think so. I think it was a PNL, I believe, was the main author.
Q. Do you remember what the conclusions of the study were?
A. I think the conclusions were that it was technically feasible to store fuel in a variety of different technologies.
There were conclusions reached with respect to cost and there was also a conclusion, I believe, that the nuclear waste fund shouldn't be used for dry storage at reactors.

89

And that the, it is the utility's responsibility to provide for that dry storage at reactors until DOE can accept fuel.
Q. Do you remember what the basis for that conclusion was?
A. I thought it was a legal reading of the law.
Q. Okay. Do you know whether the conclusions of that dry cask storage study are -- do you believe they are still valid today?
A. My understanding, based on some of the court cases and litigation that is going on, is that they are still valid.
Q. You have a handwritten note also on the right-hand side of the page that looks like report to Pres said we should study.
What does that note refer to?
A. Oh, I think what it refers to is a -- let me just see. Report to Pres -- oh, over here. Okay.
I think what it is referring to is the Nuclear Waste Technical Review Board prepared

90

annual reports that go to the President. They might go to Congress, that might be an error. They either go to Congress or the President.
Q. President of the United States?
A. Yes. And I believe what I am saying there is somewhere in that report, the Nuclear Waste Technical Review Board recommended that DOE evaluate ways to minimize handling spent fuel.
Q. And the MPC program was one of the ways you were looking into doing exactly that?
A. Yes.
Q. Now, on the left-hand side of the page you say there is a note that says: State of, I assume that is Tennessee, dual purpose.
What does that refer to?
A. The State of Tennessee in reviewing the MRS proposal --
Q. Which is the temporary disposal facility.
A. No.
Q. I am sorry, what is it, temporary storage facility?

91

A. MRS stands for monitored retrieveable storage, which is above ground storage which could be used, it is not disposal.
Q. Right.
A. In the 1980s we evaluated that and we recommended that a facility be developed in Tennessee.
And the State of Tennessee reviewed that report and I believe what they said is DOE should consider use of dual purpose casks as opposed to building a monitored retrieveable storage facility in their state.
Q. Because they didn't want an MRS in their state?
A. Yes. I would imagine that is true.
Q. But, the MRS program eventually was abandoned, correct?
A. Yes.
Q. There never was an MRS developed.
A. Yes, that is right.
Q. Okay. Then you refer to several DOE studies of dual purpose.

92

What does that refer to?
A. I can't recall exactly. But, we, commissioned, I remember one specifically done by Sandia, I guess, on dual purpose casks.
Basically, I think what I am saying there is DOE has evaluated the use of dual purpose casks on several occasions.
Q. Okay. Were those also done by E. R. Johnson, or by some other group?
A. Yes. I believe E. R. Johnson did one, and, like I said, I believe also Sandia National Labs did one.
I can't remember specifically which reports were done by who.
Q. And when you wrote this note and used the word dual purpose, did you mean dual purpose in the same way we have been talking about it today, that is, for storage and transport, but not for disposal?
A. Yes.
Q. And when you use the term MPC in this presentation, did you mean it the same way

93

that we are talking about today, that is three purposes, storage, transportation, and disposal?
A. Yes.
Q. Okay. Now, below that you have a handwritten note that says: Prior to this we did a study.
And that looks to be prior to your DOE feasibility study completed in March of 1993; is that correct?
Am I reading that note correctly?
A. Yes. I think you are. I can't read what is in here, which might be helpful. I don't know. But --
Q. I think that is bleed through from another page is what you are looking at.
A. Prior to this we did a study. I don't recall exactly what I had in mind when I wrote that.
I recall a study in 1990-91 time, maybe the '89, that was similar to MPC. That might have been what I was referring to.
Q. Okay. If you were going to bring

94

this MPC history up to date currently, what would you add to this chart?
MR. FINN: Objection, vague.
THE WITNESS: Conceptual Assignment Report, September of 1993.
We completed this work, we did a DOE report on that, that has a DOE number. We then went out and developed a specification and we bid that out.
We developed a timeline for developing multi-purpose canisters. We went out with a request for proposals -- actually TRW did it as a subcontract to us.
We had several companies bid on that, I believe it was five. We awarded a contract --
BY MR. CASSLING:
Q. To Westinghouse, right?
A. -- to Westinghouse, to develop the multi-purpose canister. And I believe it was $14, $20 million, I am not sure.
And then --

95

Q. Can we stop there for a second. When you awarded the contract to Westinghouse, do you recall, was there some reason why you didn't award it to more than one company?
A. Yes.
Q. What was that reason?
A. I don't know whether this is procurement.
MR. FINN: It is covered under the confidentiality, the protective order and agreement that the court issued. You can go forward.
THE WITNESS: Okay. My recollection is we had five companies bid on this, Westinghouse -- I don't know that you need to know the names, Holtec was one of them. B&W.
And we had an estimate of what we thought it would cost to develop this design and certification MPC, the estimate was developed by TRW.
And we had budgeted a certain amount of money, I can't remember what we had budgeted,

96

maybe on the order of $25 million. My recollection is the bids came in quite a bit higher than what we had, what TRW had estimated. And we had to make a decision whether to -- I suggested that we go back and change what we were asking for it, to lower the costs.
Management, at the time, said no, let's go forward with basically only one. We tried to get in a second company that did have a lower cost.
And for one reason or the other they weren't rated very high. I believe they were rated the highest, but they did have a low cost.
And we wanted to get them in to increase competition, or increase the number of companies that were working on this.
And a decision was made somewhere along the line, it may have been by our general counsel, to not do that, that we couldn't award more than one. We couldn't award a second contract to the low cost bidder that was rated low.

97

MR. FINN: Just for the record, I want to clarify. Under the, my understanding of the protective order and agreement in place in this case for discovery is under Paragraph 2 requires one of the parties to label material business confidential.

MR. CASSLING: Do you want to do it on the record that is fine?

MR. FINN: Yes. And to the extent that Mr. Williams has testified to any procurement matters, particularly DOE, we would consider that to be business confidential material.

MR. CASSLING: What I would ask you, when we get the transcript from her, just let me know which pages we are talking about.

And then maybe we can do that on the transcript itself so it is clear, so somebody in the future seeing it doesn't inadvertently do something they shouldn't do.

MR. FINN: Right.

BY MR. CASSLING:



Q. In your opinion, Mr. Williams, did the inability to get more than one company to work on developing the MPC have some impact on the ultimate failure of this project?

A. Yes.

Q. And explain that to me, what the impact was.

A. Well, I felt, always, from the beginning, that we needed to have, we needed to have the people that were in the business working on this, and we needed to have more than one.

There were several vendors that were out there doing this. And that if we didn't do that, it was set up for failure.

And because basically, if DOE only hired one company and we were indeed going to provide all of the storage for all of the utilities, that it would run the other companies out of business.

And there would be a reduction of competition, and so, the premise was, in my mind, having more than one company work on this was



really the only way it could succeed.

Q. And as part of the reason for that, that, in order for it to succeed, the MPC program had to address a number of different interests. For example, different utilities and their interests, public health and safety, the DOE's interests for ultimate long-term disposal, at least those three, correct?

A. I think public health and safety would be handled whether there was one or a lot of companies. I mean, it is going to be safe no matter what. So, I don't think that was a driver.

It was primarily that there was these companies that were out there in the business. I felt it best that they stay in business and that they continue to compete against one another.

And I felt if we could develop a specification that could be used by several different companies to develop competing concepts or competing technologies that would be better



for the future.

Q. And having, I guess my point is, having competing companies would help ensure that the different or competing interests involved in developing the spec for this MPC would be more likely to be achieved through having competition; is that correct?

A. I think that is probably a fair characterization, yes.

Q. Okay. And when was the decision made to go only with Westinghouse in developing an MPC?

A. I believe it was about, it was May or June of 1995. I hope I don't have the year off by one year, 1996. I think it was May of 1995.

Q. So, in your view, once that decision was made, it basically doomed the success of the MPC program?

A. Well, I guess I didn't stand up at that point and say it was doomed. I certainly wanted to have more than one company.

I recognized the vulnerability of it, and especially by hiring Westinghouse, who really wasn't in the business at the time.

So, as opposed to the other companies that were in the business. So, you know, I didn't go around saying that it was doomed. I tried to make it work.

Q. But, with the benefit of hindsight, would you agree that once that decision was made, that basically it doomed the MPC program?

A. That helped, yes.

Q. Okay. If you would turn to the next page, Page 5, Conceptual Design Report, can you please explain this page, what it is purporting to say?

A. Basically what I am saying here is I am just telling, it is saying that a conceptual design report was developed and these are the things that were covered in that conceptual design report.

Q. Okay. And, again, when you multi-purpose canister, when you use that term

102

here, when you were using it then you were using it as you are here today, for the three purposes?

A. Yes.

Q. Turn to the next page, Supporting Studies.

Is this a list of the studies that DOE commissioned to show that the MPC program was, A, necessary, and B, would work?

A. I would say maybe not necessary, but I would say that they are the reports that were used to provide additional information for the conceptual design to help us evaluate whether or not it would work, and evaluate what was the best way to make it work.

Q. Okay. And at the time you made this presentation, in January of '94, these studies had convinced you that the MPC program could work; is that correct?

A. Yes.

Q. Now, if you look at, towards the bottom of the page, it refers to at-reactor dry storage issues.

103

What are -- do you remember what that study was, and who prepared it, and when?

A. I don't recall it specifically, but it probably had to do with -- well, geeze, I am sorry. I am not really recalling the details of that report.

Q. How about the last one, Evaluation Alternative Cask Canister Systems, do you recall who prepared that report?

A. Well, all of these reports were done by TRW, I believe. Unless they had hired some subcontractors, or their team members, such as E. R. Johnson, but they were all under our TRW contract.

Q. Given that the purpose of this presentation in this exhibit was for multiple purpose canisters, when you talk about, at the bottom, the study dealing with evaluation alternative cask canister systems, was that study referring to different types of MPCs, or was it referring to, or was it discussing MPCs versus other types of casks and canisters?

104

A. You know, I am really having a hard time remembering. I think we looked at different sizes and so forth, different ways of doing the cask canister system.

We may have looked at not a canister system, but a cask system at the time. But, I am sorry, I really don't recall the details of that.

Q. There is a handwritten note at the bottom that is cut off. I can see a word that looks like results of all of the studies at the end, but I can't read the whole thing.

Can you decipher that?

A. All I can read is I won't present results of all of the studies.

Q. Oh, mine is cut off and yours is not.

A. And that is probably why I don't remember all of these, because I didn't present the details of them.

Q. All right. If you turn two pages down to Page 8. It is called Approved Dry Storage Technologies.

105

Now, when you used the word approved, do you mean to say these are dry storage technologies that have been approved by the NRC?
A. Yes.
Q. Okay. And to your knowledge, does ConEd use an approved dry storage technology?
A. To my knowledge, which isn't specific, I believe that they do have an approved dry storage technology.
Q. Okay. If you turn to Page 11, titled: DOE Acceptance of SNF and Dual Purpose Canisters, and this, I believe is a quote from Blake Barrett, acting director of Office of Civilian Radioactive Waste Management.
Am I correct that that is a quote from him?
MR. FINN: Objection, the document speaks for itself.
THE WITNESS: Yes.
BY MR. CASSLING:
Q. Now, the quote refers to Sacramento



Municipal Utility District's, SMUD for short, Transport Storage System.
Is it your understanding that the transport storage system is the same thing as a dual purpose cask system?
A. Yes.
Q. And was this what you were referring to earlier, this statement, when you said that the DOE would be willing to take steps to make sure that dual purpose casks were incorporated as acceptable waste for the repository?
A. I don't think I said that exactly like that. But, in the earlier discussion around that subject, yes, I was referring to this quote which comes from that letter to Sacramento Municipal Utility District.
Q. Okay. So this quote comes from the letter that Mr. Barrett wrote. And is that stamped date September 2nd, 1993, I believe it is, is that the date of the letter?
A. I would believe that it is. I mean it sounds like the right time. I don't have that



letter here.
Q. Okay. Do you have an understanding of what he meant, Mr. Barrett, when he said that the department would initiate appropriate actions to include such a system as acceptable waste form under the terms of the standard contract.
MR. FINN: Objection, speculation, calls for legal conclusion.
THE WITNESS: My understanding is you would, DOE would have interaction with the utilities, and if we needed to, change the contract.
If we reached that agreement among all of the utilities, as we discussed before, you know, if all of the utilities agreed that there was, it was acceptable for DOE to incur those extra costs to accommodate this system, then we would proceed to make whatever changes would be necessary, such as a contract change.
BY MR. CASSLING:
Q. Okay. If you would turn to Page 10, Compatibility Concerns.



Now, the first line here says: Existing storage casks not licensed for transportation or disposal.
That would, that blanket statement would not be true today, would it?
A. That is right. That is my understanding, it would not be true today.
Q. And that is because certain casks, such as some of the Holtec casks, are licensed both for transportation and storage.
A. Yes, that is my understanding.
Q. But, no casks are yet licensed for disposal; is that correct?
A. Yes. That is my understanding.
Q. And the reason for that is that you can't license them until Yucca Mountain has been opened up?
Or what is the reason why, to your knowledge, why there is not a license for disposal of casks yet?
A. There is no incentive for the utilities -- well, maybe that is not true.

No utility has pursued licensing it for disposal, probably because they wouldn't know how to do it. That they wouldn't be capable of doing it.

DOE hasn't pursued licensing anything for disposal. There is not a specific provision for licensing any kind of canisters separate from the repository license.

With the MPC concept we have reached an agreement with NRC to develop a report that they would review and they wouldn't license it, but they would comment on it and provide what we called the no-objection letter.

Q. Did you ever receive a no-objection letter?

A. No. We stopped the development of the report when we stopped the MPC program.

Q. And the obligation, to your understanding, to develop, or to get a license for disposal canister lies with the DOE and not the utilities, correct?

MR. FINN: Objection, calls for a legal conclusion.

THE WITNESS: Yes. My understanding is DOE is responsible for getting disposal licenses.

BY MR. CASSLING:

Q. Are they, to your knowledge, are they currently seeking a disposal license?

A. Yes.

Q. What is the status of that, to your knowledge?

A. The license application is under development right now and it is scheduled to be completed in December of this year, 2004, to be submitted to the Nuclear Regulatory Commission.

At the same, time we are putting together our, what we call our LSN, our licensing support network to support that, and that is supposed to be completed this summer.

So, efforts are ongoing to submit that license application to NRC.

Q. Tell me what the license support network is and what it does.

A. Okay. I am not really an expert on that. But, my understanding is that it is all materials that could be used in a licensing proceeding which would support or be relevant to the license application that is going in, supporting reports, supporting documents, even e-mails and so forth.

Q. Getting all of the documents together?

A. Yes, right, yes.

Q. Do you have -- before the license application is actually filed with the NRC, does the DOE have ongoing discussions with the NRC about what the application should contain?

A. Yes.

Q. Does that happen on a regular basis?

A. Yes.

MR. FINN: Objection, vague.

BY MR. CASSLING:

Q. How frequently does DOE staff and the NRC staff meet about the license application?

A. Well, again, this isn't my area of expertise. But, I know we have identified 290 or some (sic) key technical issues that are being discussed prior to the license application that are related to that license application.

And meetings take place, I would say monthly, that are open to the public.

Q. To your knowledge, do any of the, have any of those discussions addressed the ability of the DOE to take spent nuclear fuel that is in dual purpose canisters?

MR. FINN: Objection, he is not a 30(b)(6) witness.

MR. CASSLING: Just to his knowledge. If he doesn't know he doesn't know.

THE WITNESS: Yes. I haven't been involved in those discussions. The only ones that I have been involved in with NRC related to something similar to that would be the MPC concept, in the mid-'90s.

BY MR. CASSLING:

Q. And since then you have had no involvement with the NRC?

A. Not related to dual purpose casks.
I have had some involvement, yes.
Q. What has your involvement with the
NRC been?
A. Primarily I have given them
briefings and discussions related to the
development of a staged repository or a phased
repository, or sometimes we call it a modular
repository development program.
Q. Explain what you mean by those
terms.
A. Okay. This was work I did
subsequent to working on multiple purpose
canister when I was in a job where I was the
director of the Systems Engineering Division.
And there we evaluated building the
repository in small pieces in order to start the
program faster than if we would build it all in
one big piece and then getting acceptance, if you
will.
And each one of those terms when I
said phased, or modular, or staged, they are all

114

the same kind of terms for that incremental
approach to building the repository service
facility and underground in order to facilitate
the initiation of operations.
Q. Did any of those discussions that
you had with NRC staff involve discussions
concerning the type of cask or canister that
would be used for transportation of spent nuclear
fuel?
A. No. I can't remember that they did.
Q. Did any involve issues of dry cask
storage at the utilities?
A. No.
Q. Did any involve the method by which
spent nuclear fuel contained in dry cask storage
at the utilities would be prepared for transport
to the repository?
A. No.
Q. Did any involve how the spent
nuclear fuel should be classified?
A. No.
Q. Did any involve the type of disposal

115

canister that would be used at the repository?
A. No.
Q. Okay. If you would turn to Page 14,
title of which is Multi-Purpose Canister MPC
System.
Am I correct in assuming that this
page is meant to show, by drawings, the three
purposes served by the multi-purpose canister?
A. Yes.
Q. And a MESC would differ from what is
depicted here in that it would only be a canister
for storage purposes, so it would only do what is
shown at the very top of this page; is that
correct?
A. Yes.
Q. Would a MESC look different than
what is depicted at the very top of the page?
A. Yes. It could look slightly
different. The internals of a MESC would
probably be different.
Those three lids on there may be
different. We had a -- the way you welded it

116

closed.
The primary difference is, is that
you may have to change that MESC to be able to
certify it for transportation and storage.
Once it is sealed and closed from
the outside, they could look very similar.
Q. Okay. Turn to the next page,
Page 15, System Operating Concept.
Can you tell me what this page is
intended to describe?
A. I guess it is describing how we did
our evaluation of using multi-purpose canisters
in our OCRWM Waste Management System, in our, how
we -- how the system would operate if
multi-purpose canisters were to be incorporated.
Q. Okay. At the top of the page it
says that MPCs are seal welded with the intention
of not opening.
Why is it important to seal weld
MPC's as opposed to bolting them shut?
MR. FINN: Objection, foundation.
THE WITNESS: Well, actually we

117

evaluated welding versus bolting of MPCs, and had
a bit of discussion.
It was probably even evaluated in
some of those reports that we referred to earlier
on with supporting documents.
And I can't recall exactly why we
came down with, why we felt sealed welding was
better. I think the answer, you probably could
have done it either way.
We evaluated both, and we came to
the conclusion that welding was best and what we
preferred.
BY MR. CASSLING:
Q. Well, it helps prevent corrosion of
the materials inside, doesn't it, as opposed to
bolting?
A. No, not necessarily.
Q. Does it help to -- what are the
advantages, sealed welding as compared to using
bolts?
A. You know, I really don't remember
the consideration. It seemed to me that bolting

118

was more of a difficult thing to put in place for
this internal canister, needed additional metal
at the top to be able to manufacture the bolt
holes.
I really don't recall the arguments
of why, specifically why we went to, why we
decided welded closed was the best way to go.
Q. Is it true that using welding rather
than bolts is a better protection against
tampering with the seal?
It is easier to detect tampering?
A. Yes, that would be true.
Q. Isn't it true that welding -- well,
let me ask you this: Isn't it true that in some
of these casks for storage within the canisters,
that they will inject inert gas of some sort into
the canister?
A. Yes.
Q. And isn't it true that a weld is
more likely to prevent escape or leaking of that
inert gas than a bolted canister would be?
A. I am not sure that that is

119

necessarily true. The bolted casks could have
seals on them to be able to meet the requirement
to maintain that inert gas, as well as the
seal -- as well as the welded sealed canister.
You could potentially even lose gas
from a welded seal canister, I believe. So, I
don't believe that that was a driving factor in
the decision.
Q. And you don't remember any other
driving factors?
A. I really don't, I really don't.
Q. At the bottom of that page, you have
a statement: MPC was compatible with disposal
system.
Is it your current belief that an
MPC is compatible with a disposal system?
A. Well, that is the whole premise
behind an MPC, is that it is compatible with a
disposal system.
Q. If it is developed correctly, and
all of the other things?
A. Right, right. And that is how we

120

evaluated the concept, was that it, we developed
a conceptual design.
And in our conceptual evaluation of
the system, it was compatible with our disposal
system.
Q. So you are saying basically that
this is your wish list, this is what an MPC
should be if it was operating properly. It
should be compatible, it was a goal.
A. That's right. And that is the way
we did our evaluation. In other words, when we
costed it out, we assumed that it was compatible
with the disposal system.
Q. All right. Now on the next page it
is entitled: Multi-purpose Cask/Canister
Alternatives.
And this lists a single purpose cask
system, dual purpose cask system, dual purpose
canister system, multi-purpose cask system, and
multi-purpose canister system.
Can you first explain, so the record
is clear, the difference between a cask system

121

and a canister system.
A. Yes, I can. A cask system would be simply a metal canister. In the transportation sense it would most likely be metal, where spent fuel assemblies are placed directly into that metal canister, or that metal cask, I mean, metal cask.
And the cask would be bolted closed as opposed to a canister system where you would take a thinner walled canister, like a half inch to an inch, and you would place spent fuel assemblies in that.
And then you would weld it closed and you would take the whole canister and place it into a transportation cask, or what might also be called an overpack.
Q. So, a cask is always by definition welded closed, and a canister is always -- excuse me, I've got it backwards.
A cask is always, by definition. Bolted closed, and a canister is always, by definition, welded closed?



A. I would say generally. However, we did evaluate the bolting of a canister for an MPC.
We came to the conclusion that it should be welded. And my understanding of everything in the industry today is that they are welded.
There may be some new concepts since I started to work on this where they have bolted them. I haven't seen that, though, as far as I know.
But, the canisters, that I know of, are welded closed.
Q. Are you aware of any utilities that are using a dual purpose cask system?
A. Yes.
Q. And what utilities are there?
A. It is the TN40 at Prairie Island, I believe. I may be wrong on that, but that is my understanding.
And there may be one other one that is now using a TN40. I haven't kept up with



exactly what has been going on within the last few years. I know it has been changing.
Q. Other than the TN40, are there other utilities that use dual purpose systems, using the dual purpose canister systems?
A. Yes. My understanding is the majority of them are using the canister systems. The reason being, the same reason we did, it is more cost effective.
Q. Each of those utilities that are using the dual purpose canister systems are welding the canisters shut; is that correct?
A. That is my understanding, yes.
Q. Okay. And a MESC, if you were to put a MESC on this somewhere on this chart, am I correct in assuming that it would be a subset of the very first column, that is, as a single purpose system used solely for storage?
A. Yes. And that is what was developed first on, the first canister systems were what we called MESCs, which were multi-element sealed canisters that were placed in storage overpacks



made of concrete only for the purposes of storage.
Q. Okay.
A. Hopefully maybe some day they could become transportable. But, there was no intention to do that in the near term.
Q. And were MESCs welded or bolted shut?
A. They were welded.
Q. If you would turn to the next page, comparison of system alternatives. And you --
A. Which page are we on now?
Q. Very next.
A. All right.
Q. The Life Cycle Cost row, what does that purport to show?
A. I think what we are doing there is comparing it against the, what we call the reference system, or the single purpose cask system where we had a cask, a transportation cask that would only serve to transport and a waste package that would only be to dispose.

Q. Uh-huh.
A. So, there is always some sort of dose associated with that cask. So, at the utility, once they pull that out, there will be people around there watching it to make sure that it is working properly, and the crane is working properly, and that it gets loaded on the truck properly.
So, there is a dose associated with that operation.
Q. If I am going to use a dual purpose cask, for example, with dry storage, if I had to, if I am a utility, before I could transport it, if I was required by the DOE to take the spent fuel out of the dual purpose cask and put it in the spent fuel pool for loading into a transportation cask, I would increase the exposure to my workers, would I not?
A. Yes.
Q. Whereas if I use, as a utility, a dual purpose cask and then I am permitted to send it directly as a transportation cask, without

146

taking it out, and then it is unwelded remotely in a hot -- I am sorry I have to keep asking you what the term is, the hot --
A. Hot cell.
Q. -- hot cell at the repository, that unwelding is done remotely, correct?
A. Yes.
Q. So, I am not increasing any radiation exposure to workers at the unwelding stage for transfer to a disposal cask, correct?
A. Well, there is -- if you compare, if you look at the repository and you compare the handling of a cask that has a canister in it that has to be cut open versus a cask that doesn't have a canister, through that whole process there is probably more dose associated with the canister, because of just the handling of the canister, that will have some residual radioactivity in it potentially.
I am not an expert in that area, but my intuition would tell me that the handling of the canister, the unloading, the cutting, and

147

that whole process, and doing something with that canister, would probably result in a higher dose than just handling a straight -- a straight cask that doesn't have a canister in it.
Q. But, assuming the use of dry cask storage, and a dual purpose cask for dry cask storage, whatever additional exposure you might have at the repository end is going to be more than offset by avoiding the additional exposure requiring you to take spent fuel out of the dual purpose cask and put it back in the spent fuel and then reload it into a new transportation cask, correct?
A. Probably, I think that is a fair estimate, because probably if you are doing it in many locations around the country, hopefully we would have a better way to do that at one centralized facility, to lower dose in a more efficient manner, yes. I would think so.
MR. CASSLING: Why don't we take a break for lunch.
(Recess -- 11:44 a.m.-12:08 p.m.)

148

BY MR. CASSLING:
Q. Okay. Can you turn in this document to -- it is about halfway through, and I don't see the page. I think it is Page 27.
There is not a number on there. But if you find Page 28, it is right before. It is called Key Trades.
A. Yes.
Q. Does this purport to show the various tradeoffs between alternatives you were faced with in deciding how to proceed with the MPC program?
A. Yes.
Q. And if you drew a box around one of the alternatives, does that signify that is the choice you made between these alternatives?
A. Yes.
Q. So, for example, on the MPC closure, you put a box around welded as compared to bolted.
So the alternative that you chose at that time you felt it would be better to have a

149

welded closure than a bolted closure; is that correct?
A. Yes.
Q. And the rationale for that is that it would minimize storage monitoring, as one of the rationales?
A. Yes.
Q. And what does that mean, it would minimize storage monitoring?
Why would it minimize storage monitoring to have a welded MPC closure?
A. Well, if you look at, at the time there was a canister-based system at CCONEE, C-C-O-N-E-E, and there is a bolted concept at Virginia Power, at the Surrey plant.
And the Surrey plant, on the bolted one they had lots of additional detectors to determine whether it was leaking or not.
So, reflecting on what we said earlier, maybe you are right, is that the inert gas would stay better in the welded one at least as far as NRC's monitoring requirements, now that



I think about it more.
So, that is primarily it. It is more of an active system to monitor a bolted closure than it is a welded closure. A welded closure they don't have any of the instrumentation or anything.
They are not really monitoring the internal gas pressure.
Q. So, to that extent it is simpler and less complex to deal with a welded closure than a bolted closure?
A. I would say yes, that is what they thought at the time and that is probably still true today.
Q. Now the second reason given for that is the crevice corrosion concern? What does that mean?
A. Well, I think that had to do with how long the canister would maintain its integrity in a disposal environment.
And with the bolted closure, there was more potential for initiating corrosion in



some sort of indentation that may be in the canister.
Q. You were making a gesture with your hands, was that to show the bolt actually fitting into the canisters?
A. Yes.
Q. So that the corrosion would occur where the bolt was actually screwed into the canister, is that what you were attempting to show?
A. That is what I was attempting to show. And I believe that is what was probably behind that statement there.
Q. Okay. Under criticality and thermal on this same page, I have seen the term criticality come up time and again in a bunch of these documents.
Can you tell me what criticality means when you use these in other studies, and other DOE documents?
A. Yes. When you get a bunch of several spent fuel assemblies together in a close



array you need to make sure it doesn't go critical.
And what that means is it starts basically a chain reaction where it starts the fission process going, which is what happens in the nuclear reactor.
But, when you take the spent fuel out and you put it into a storage container or a transportation container, you have to make sure that that doesn't happen.
Q. Right. And, even if it reacted, it is a controlled reaction, right?
A. Yes, as compared to an uncontrolled reaction, right.
Q. Under that same column it talks about a burn-up credit for large PWR MPC, is PWR is pressurized water reactor; is that right?
A. Yes.
Q. Have I got that correct?
A. Yes.
Q. And what is the burn-up credit for large PWR MPC mean?

which would cause you to put fewer assemblies in a package, which would mean you would need more transports, or by adding material in there that costs a lot of money, special neutron absorbers.

Q. And, again, if I understood you correctly the burn-up credit doesn't really require you to do anything, all it is doing is recognizing the reality of what the actual age and thermal characteristics of the fuel really are.

A. That's right.

Q. Whereas the other criticality approach that you are talking about make an unrealistic assumption about what the thermal characteristics are and then require you to implement mechanical means of reducing that, those thermal characteristics, is that accurate?

A. Yes, that is. And NRC is concerned about potential misloading something. In other words, you could put in something this wasn't as burned up as what you thought it was.

And once it gets out -- the biggest



issue is out in the transportation environment, because once it is out of an NRC-controlled area, it falls into a river or whatever, you want to be extra certain that it doesn't go critical.

Q. So you are really talking about a margin of error is what you are really talking about.

A. Yes.

Q. Page 33, the criticality control strategy.

What is a flux trap design for transportation?

A. It is basically putting a space between the spent fuel assemblies. The spent fuel assemblies are square in cross-section, and long.

And if you, you build a flux trap in basically what you are doing is you are putting a space in between the spent fuel assemblies that could get filled with water with could slow down neutrons, and they call it a flux trap.

So, anyway -- that is good enough.



Q. And what is a probalistic based performance assessment?

Does that just mean making educated guess essential about how a particular strategy is going to work?

A. Well, it is taking into account probability of something happening. For -- let's see, I am just reading this.

Okay, for long-term disposal, at the point -- at the time we were doing this, you could show that, we thought you might be able to show that you could meet the disposal criticality requirement by saying the probability of it going critical is really very small, as opposed to the transportation area they won't let you do that. It is deterministic.

You've got to really show that you can do it. And the repository thing you could say, the repository environment, you could say, well, there will never be any water there, the probability of water being there is so small.

The probability of filling up a



package with water is so small that we are going to write it off and it will be okay. You have to get the NRC to agree to that.

Q. Got ya. Immediately above that when you say MPC could be designed for moderator displacement using filler material, what does that mean?

A. Okay. What you are talking about there is in a canister there is a lot of void space between the spent fuel assemblies, even within the spent fuel assemblies.

And what is, the package won't go critical unless you have water there.

And so basically if you fill up that MPC, you fill up that void space with something, some kind of material, you can't get any water in it. So, that is a different type of approach.

Q. Okay. Page 37, Contingencies. Is it true today that an MPC is not implacable?

A. Is it true today that an MPC is not implacable, is that what you asked?

Q. Yes.

A. Well, today there is no MPCs, because as we said before, none of them have been certified or licensed by NRC. So, there -- really, one doesn't exist.

Q. How about a dual purpose cask, same answer?

A. Right. There is nothing that is implacable today because nobody has pursued getting NRC approval to -- I mean nobody has gotten NRC approval to implace anything, or dispose of anything.

Q. Second bullet point says an MPC not transportable after long-term storage.

Would that also be true of the current dual purpose systems in operation?

A. What this is, is basically we were looking at what happens if an MPC is not transportable after long-term storage, why might that happen, and what is the impact of that happening?

So, basically, we were looking at contingencies, and there could be something that

166

would happen today that could cause a dual purpose cask not to be transportable.

For example, maybe somebody has transported one and during transportation it broke, and there was some sort of failure mechanism that wasn't realized when it was originally designed.

NRC comes out with a new rule and says we are not going to allow this to be transported anymore because they break.

So, that could be a scenario, probably unlikely.

Q. Are you aware of any currently licensed dual purpose casks or canisters that are not transportable after long-term storage?

A. The answer is no, if, when you say dual purpose cask you mean they are certified by the NRC for transportation and for storage.

Q. Yes. That is what I mean.

A. There are some people that call their containers multi-purpose or dual purpose, when they haven't had that certification.

167

Q. Your assumption was correct, I was talking about certified by the NRC.

Look at the next page at reactor storage issues, the very final bullet point, MPCs reduce at-reactor storage costs for utilities.

Is that statement true as well of dual purpose casks?

A. Well, I believe, if I am recalling this accurately, is that what we were doing there was in this scenario, as we evaluated it, the DOE was providing multi-purpose canisters to utilities.

So, basically the utilities wouldn't have to pay for that storage container so their cost would be reduced. I guess if DOE was to provide dual purpose casks or containers, their costs would be reduced as well.

Q. So the only thing you were referring to there was the fact that it was provided at DOE expense, not the utility's?

A. Right. Yes, I believe that that is what that was.

168

Q. Okay. If you would turn the page to 39, it is a continuation of that reactor storage issues.

The very first bullet point says: Delays in implementing MPC system decreases potential benefits to federal system and utilities. Why is that?

A. Because if the 1993, and this was 1994 when this was done, the assumption was beginning in 1998 we would be providing these multi-purpose canisters to utilities and, therefore, the benefit to the utilities would be they don't need to develop their own storage.

They didn't need to go out and do their own licensing. They would have something that is provided to them. So, that is the benefit to them.

The benefit to the federal system would be the benefits of using a compatible thing that you don't need to make many transfers for.

And I think I would caveat this by saying that those benefits only accrue, as we

169

discussed before, when you need the storage.
I mean, just providing an MPC to a utility that doesn't need it, it doesn't provide a lot of benefit.
Q. Following up on that, to the extent that a utility is using dry cask storage, using a dual purpose cask because the DOE has not started to pick up spent nuclear fuel in 1998, would you agree that there are still benefits to using a dual purpose cask because it minimizes the number of times the fuel has to be handled?
A. Are you asking whether there are benefits to the utilities for using a dual purpose cask?
Q. Let's start with the utilities first.
A. I would say yes, there are probably benefits, and that is the additional cost probably isn't too great to get those benefits.
So I would say to the utilities there is a benefit, especially where they can close their pool and shut down a reactor, like at

170

Dresden or at Rancho Seco, or one that was shut down earlier, Yankee.
And even if they don't shut down their reactor, the benefit of not having to go through the operation of going back into the pool and reloading it, I would say that is a benefit as well.
Q. And the last one you just mentioned is also a public health and safety benefit, correct?
A. Probably lower dose. I mean, they are going to be safe no matter what you do. They are going to be licensed and it will be a safe operation, whether you go back in the pool or you don't go back in the pool.
Q. Are there benefits to DOE by minimizing the number of times fuel has to be handled using a dual purpose cask?
A. Well, if it is a dual purpose canister and you receive it at DOE, it is not a benefit, because you have to open that canister and go through additional steps.

171

If it was disposable, then it would be a different situation. But, if it was simply a transportable storage canister that has to go through additional handling at the DOE facility to open it up and reload it to a waste package, I would say no, there are probably not benefits, it is probably a detriment.
Q. Turn to page 43. It is potential implementation schedule. Obviously this schedule didn't come to pass as drafted here.
Could you go through and do two things for me: Number one, tell me what did come to pass, in accordance with this schedule; and then tell me what didn't.
A. Well, there was a decision to proceed, I am not sure exactly when that took place. But, it was a formal decision and we did.
We issued the RFP, like I said I don't remember whether that was exactly the spring or it might have been a little bit later.
We awarded, we didn't award multiple contracts, but we awarded one contract, and I

172

think it was, like as I said before, probably May, 1995, or June, as opposed to 1994.
We were doing actually it turned out we had to do an EIS instead of an EA.
Q. What is the difference between the two?
A. One is called an environmental analysis and the other is an environmental impact statement.
I can't really refer, to quote you the regulations to what the differences, but EIS is, it is a bigger document, it is more analysis, more public involvement. It is a bigger deal.
Q. Okay.
A. As I recall, we issued a draft maybe of the EIS. We didn't issue a final EIS.
The MP -- Westinghouse went ahead and completed their design and afterward a decision had been made to stop the process.
We paid them to complete that design that we had signed the contract for, the first phase of it which went through the design

173

certification.
We did not do -- we didn't submit the application to NRC. I think Westinghouse maybe did that on their own, actually. There is an EIS there.
I am not sure why this says EA, but it was late '95 for EIS or late '96. Normally it is a draft EIS and a final.
And so, yes, then the rest of it didn't really happen either. The NRC certificate of compliance, we didn't pursue it, and obviously we didn't begin to deploy MPCs.
Q. Okay. What was the date approximately when you just abandoned the MPC project?
A. It was -- well, I think the decision was probably made August/September '95. I think it was really nailed down after we got our budget for '96.
And so it was from the August through the fall of '95. However, we did allow Westinghouse to continue to complete that



design which took probably until maybe a year from, maybe summer of '96, something like that, maybe they completed their design, however we weren't providing more funds for it through '96.
Q. But the design that Westinghouse came up with, you didn't seek NRC license for, or did you?
A. No, we didn't.
Q. And who made the decision to quit funding the program?
A. Dan Dryfuss.
Q. And what was his position?
A. He was a director of the program.
Q. Okay. Was that decision made because Congress cut off the funds from the program, or was that decision made in-house at DOE to stop funding the program?
A. My recollection -- I don't know exactly what was in Dan's mind, but my recollection of what happened in the summer of '95, it was related to our budget in '96, was that in one of the House appropriation bills



there was some language in there that said, that basically said DOE is directed to not continue this program anymore, because it is best handled by the utilities.
And at the same time we were getting a large reduction in our budget. My recollection is that that language was never signed. It was, I think it was a House appropriations bill or a House report, preliminary thing before the final budget.
However, that was, I think that Dan Dryfuss took that as a sign that this is what Congress wanted when they put the final budget into place which cut, which was a significant cut in our budget, even though the final language wasn't, the MPC termination language or the, you know, don't work on that program language was not in the final appropriations bill.
It was in the precursor to it which was consistent with our budget cut.
Q. One of the things you have just mentioned in this answer was that the MPC program



the DOE felt would be better handled in the future by the utilities.
To the extent that is -- did I understand your answer correctly first?
A. No.
Q. Okay.
A. That was in Congress' appropriation language. That is not what DOE said.
Q. Okay.
A. That is what Congress said in their appropriation language was that this is a program that would be best pursued by the utilities -- or by private industry, I think, not utilities, private industry.
Q. Okay.
(Williams Exhibit no. 9 was marked for identification.)
BY MR. CASSLING:
Q. Mr. Williams, I have handed you a document dated March 6, 1996 that you gave to NEI entitled Capability of Storage and Transport Cask/Canister Systems.

Now, if you can turn to the first page of the presentation, are these four -- well, are the first four bullet points examples of casks or canisters that have received approval from the NRC?

A. It looks to me that what they are, are ones that were at least submitted to NRC. I don't know whether they had been approved at the time of the presentation, but they had been submitted to NRC, because it says docket number for the top three.

And then the fourth one, the Westinghouse MPC, I am not sure what the C-L-I-N means. I just don't remember.

Q. Is that last one, the Westinghouse MPC, the one that you have been talking about which is the MPC you asked them to develop?

A. Yes.

Q. So, the last one is for three purposes, storage, transport and disposal, right?

A. Yes.

Q. Are the first three just for dual

178

purpose canisters for both storage and transportation?

A. The vendor, Nuclear Assurance Corporation, the second one is New Homes, and the third one is Holtec, they may have hoped that they would be used for disposal as well. I think they were submitted to the NRC for storage and transportation only. So, I would call them dual purpose.

Q. Okay. Now, the next page is entitled: Cask/Canister Limiting Characteristics.

Please explain what this page is intending to show.

A. Okay. I think where we are going to go with this is that there are facility limitations, the first bullet there, facility limitations refers to utilities.

And that many utilities have, they have cranes to pick up heavy loads. And everybody -- not everybody -- it is public knowledge what their crane capability is.

179

So, what we are looking to do here is to look at what type of crane they have and see whether or not they can handle those canisters or casks that we are evaluating, that is the first one.

The second one is physical dimensions, there may be some utilities that can only get a certain size canister through the doors or whatever they have at their facilities. That is the second dimension.

The next one is fuel type. There are lots of different fuel types and so, some of those designs may be designs for a certain set of fuel types.

So, we are trying to evaluate these, what we call limiting characteristics against those cask capacities. And these were the major limiting characteristics that were evaluated.

Both from looking at the facility, and then looking at the fuel itself, to see whether or not -- how much of the fuel is out there and how much of the facilities, whether

180

those casks could pick up a lot of it or a little bit, or how much they could pick up of the existing, or the projected fuel.

Q. To make sure I understand, in other words it goes, the page prior when you say the four casks evaluated, you are talking about these four listed on the immediately prior page.

And what you did was you went, presumably you had, DOE had an interest in making sure that whatever cask was used could be used by as many possible utilities as possible, correct?

A. Yes.

Q. And so when you say facility limitations, as you said, you are interested in looking at which one of these casks, given the various limitations the utilities had and how much weight they could pick up with their cranes, how big the spent fuel rods would be, what type of fuel it would be, which one of these casks could be used at the greatest number of utilities possible.

A. That is right.

181

it shows you is the Westinghouse design has greater capability than Holtec and NAC and Vectra. Holtec and NAC have more capabilities than Vectra.
Q. Okay. The initial enrichment access is showing, I assume U235 is Uranium 235?
A. Yes. That is how enriched the fuel is when it was fresh and manufactured, how much 235 isotope there was compared to 238.
The percentage of 235, which is the fissionable Uranium isotope.
Q. And burn-up is consistent with our discussion earlier which shows how much the actual fuel characteristics are after partial burn-up of the fuel.
A. Right. So, this shows how long the fuel is burned up. And so if you look at this chart, this chart is only related to reactivity which is related to the bottom number of Uranium enrichment, but it doesn't relate to how much is burned up. That is why that is a vertical line.
Q. And the Y axis there, zero to five,

186

five to 10, 10 to 15, those are years?
A. Yes. Or they are gigawatt days per metric ton is what they are.
Q. Okay.
A. And that 5 to 10 is 5,000 -- well, yes, five gigawatt days, yes, right, the gigawatt takes place. So, the gigawatt days per metric ton, which is basically how much has been burned up.
Q. Okay. If you go a couple of pages down to 4249, Evaluation of Heat Rate on Fuel Acceptance.
Is this chart interpreted the same way, that is, everything to the left of the lines is what that particular cask can handle?
A. I think this one is probably different. It doesn't have -- I think it is probably everything to the right of the line is acceptable, everything to the left of the line is not acceptable.
Q. Okay.
A. Left and high, right and low.

187

Q. Okay. I notice that the "X" axis here, SNF cooling time in years, zero to four, five to 10, 10 to 14, and then the burn-up is the gigawatt days per metric ton units, but that is using the same, exactly the same unit numbers.
Is that just coincidence? In other, words, it is zero to four, five to 10, 10 to 14, just like it is on the other axis?
A. Yes. That is just coincidence.
Q. Okay.
A. So, yes. It is years on the bottom right, yes.
Q. And the next to the last page, Summary of Capabilities/Cask Limitations, can you tell me what this page is intended to show?
A. Okay, yes. It is just comparing the potential for, each one of those categories, there is 119 reactors or facilities, and it shows how many of those facilities can be handled by each one of the casks.
And then the next column over shows the percent of the total amount of spent fuel

188

based on reactivity, and then it is a summary of what we just said before. It is earlier in the presentation, I mean.
The next one is the percent of fuel that can be handled based on heat rate, and then based on facilities.
And you add all of those together, it is not an additive function, but you look at each one of those casks and you see what their capability is compared to the total number of spent fuel in the very last column on the right.
So the 100 percent of the spent fuel that will be out there in 2010 that is at least five years old, you can see the NAC-STC will only be able to handle 16 percent of it.
MP 187 would only be able to handle 11 percent of it. The HiStar, 43 percent of it, and the Westinghouse MPC, 77 percent of it.
Q. But, by definition, an MPC could also serve as a dual purpose cask, right?
A. Yes.
Q. If the Westinghouse MPC was so far

189

superior to these other, to these dual purpose casks and canisters, why did it, why was it never pursued, if not by the DOE, then by utilities?

MR. FINN: Objection, calls for speculation.

BY MR. CASSLING:

Q. If you know.

A. Well, it wasn't pursued by the DOE because we quit funding all of the work we did in that area and focused on the repository from '97, '98, '99, and basically defunded the whole transportation storage part of our program.

And followed the direction -- not the direction, but the language that was in that appropriations bill that said that this work is best left to the private industry.

Why it wasn't pursued by the utility industry, I couldn't tell you specifically exactly what each utility decided.

However, if you were a utility and you had to pick between an MP 187 and a HiStar 100, or between an MP 187 and a Westinghouse MPC,

190

you wouldn't care whether it can be handled in all of the rest of the facilities, the only thing you would care about is whether it serves your needs and what the cost to you is.

So, there was probably, I am sure there probably was a greater cost to develop an MPC, to develop a Westinghouse canister to buy one because it had that capability to serve a lot of needs.

So, it was longer, it had less fuel in it. For criticality reasons, it had extra material in it to get heat out. So, yes, it had a greater capability, however it cost more.

So, if you are an individual utility, you want to look at your own needs. You say what is the best deal for me, to meet my needs. You don't care about meeting everybody's needs.

Q. In other words, the Westinghouse MPC was more expensive than any of the other three alternatives?

A. That is my guess, yes.

191

Q. Okay.

(Recess -- 1:04-1:07 p.m.)

(Williams Exhibit no. 10 was marked for identification.)

BY MR. CASSLING:

Q. Mr. Williams, this is a document entitled multi-purpose canister Project Overview, a presentation made by you to the INMM Spent Fuel Management Seminar No. 12, between January 11th and January 13th of 1995.

If you look at the three pages beginning at page, the last four digits in the Bates number, 2812 through 2814, these are three charts showing first, states with at-reactor dry storage in December of 1993, and states needing at-reactor dry storage in 2000, assuming no MRS 2010 repository.

And then states needing at-reactor dry storage in 2010, assuming no MRS 2010 repository.

If you go to the second of these pages, that is the states needing at-reactor dry

192

storage in 2000, how accurate did your projections come?

Would they overstate or understate the number of states needing at-reactor dry storage in 2000?

A. I don't know. I think it is probably fairly close. I really don't know.

Q. If you were making the prediction for dry storage needed in 2010 today, would you make any changes to this chart on page 2814?

A. I don't have any knowledge that would specifically lead me to change this right now, that I know of.

Q. You have a handwritten note on Page 2814 that says will get worse if -- I don't know if that is now or no movement by 2010.

Could you tell me what you meant by that note.

A. It is probably supposed to be no. It might have been no waste movement by 2010.

To tell you the truth, I am really not sure what that means, unless I meant to write

193

down 2020. It doesn't make a lot of sense to me looking back on it now.
Q. That is because -- it doesn't make sense because it is on the chart that purports to show what is going on in 2010.
A. Yes. The whole scenario is if there is no movement until 2010. So, I don't know why I wrote -- maybe what I was just, maybe that was probably a talking point to myself to say that as I went through these charts, here is what the situation is in 1993, in 2020, or in 2000 it will be this way, there will be a certain situation, and it even gets worse in 2010. That is probably what I meant to say.
Q. Was the purpose of these three charts to show that the longer there is a delay in the beginning of DOE pickup of spent nuclear fuel, the more need there will be for utilities to implement dry storage?
A. Yes.
Q. On page 2817, and, again, I am referring to the last four digits of the Bates



number, you have a handwritten note that says wide variety, and I believe that is shorthand below for no standardization, is that correct?
A. Yes.
Q. And what do you mean by that?
A. What I was referring to is that if you had an MPC concept like we were trying to develop, is that we would have, we would end up using that for the majority of the storage, and it would be one size sort of fits all.
And without DOE doing that, each individual utility, or individual site, was going off and developing their own technology, and they are all different. Some are stand up, some sit on their side, some are vaults.
So, it is, basically, there is no standardization. It is like trying to put Coke cans that are all different sizes into one Coke machine.
Q. And so what you were saying by that note, you would expect that without DOE guidance and oversight, each utility will pick a system



that best fits its own economic and safety needs; is that right?
MR. FINN: Objection to the extent it mischaracterizes prior testimony.
THE WITNESS: I would say that is fairly accurate, that what I believed at the time, I mean.
BY MR. CASSLING:
Q. And that problem gets worse the longer the DOE delays pickup with spent nuclear fuel, simply because you need more dry storage as your chart shows, correct?
A. That is right.
Q. If you go to the next page, Page 2818. The title of this page is Compatibility of Dry Storage Systems with Waste Management System.
The very last bullet point says:
Need to return to spent fuel pool for reloading.
Now, as we have previously discussed that is true with respect to MESCs that are storage only, but not necessarily true with regard to licensed dual purpose casks, correct?



A. That is correct. When this was made there was, none of the ones I was talking about were dual purpose. And I don't think there was any licensed at the time.
Q. Okay. And your third bullet point says no consideration given to waste management system.
Now, to the extent the utilities now used licensed dual purpose casks, that is no longer true, correct?
A. I would say there is some consideration. However, like we have just talked about, there are several different kinds of dual purpose casks.
And the canister based one, and there is one type, and the TN type is another type. And there are different sizes and different shapes.
If somebody was going to go in from day one and say how are we best going to work this, you look at the whole waste management system as opposed to your own individual utility.

The utilities now putting dual purpose casks in says they are considering the need to transport, but probably not the whole big picture.
Q. Well, the utilities can't address the disposal aspect of it, correct, because that is done by the DOE?
A. That's right. They can't. But they also, even if you put disposal aside, you could look at it, what is the best way to run this thing from the system perspective, assuming you know there is 103 reactors that are out there.
Q. Right.
A. There might be one technology that is best for everybody, or one size and shape, or, as opposed to each individual utility deciding this is the best dual purpose system for me, the Holtec, or this is the best dual system for me which is BNFL, do you know what I am saying?
Q. But, if in the process of choosing the dry storage system that is best for the utility, they are doing, they are trying to



minimize the damages they would suffer --
A. Yes.
Q. -- they would choose one of the factors, you would expect the one they would choose would be the one that is cheapest for them, correct?
A. Yes, right. When you are going out to buy a car, you won't consider a car that is best for everybody, you would consider what is best for yourself.
Q. Okay. And, in fact, you have the handwritten note on this page that says this is completely logical for utilities.
I assume that is what you are referring to, correct?
A. Yes.
Q. Now you say, however, DOE received lots of pressure to do something about this.
Who did you receive pressure from?
A. I think some of the things in the history that we talked about before, Nuclear Waste Technical Review Board, saying that NRC



putting it in their regulations, State of Tennessee, I gave another presentation one time where you went through sort of the history of where a lot of this was raised, different sources.
Q. If you would turn to Page 2823, which is a pie chart titled Potential Utility Use of MPCs.
I just wanted to make sure when you refer to MPCs on this page, are you referring to MPCs, the three-purpose casks that we have been talking about, or are you referring to dual purpose casks or MESCs?
A. I was referring to our system evaluation of MPCs. You might be able to do the same thing for dual purpose casks, or even MESCs, but this was basically showing how many utilities could use what type of MPC, whether it was a large 125 ton MPC, which is in the grayish color, or the smaller MPC which is in the white.
At that time, we felt that 12 percent of the reactors, or 13 of the reactors



couldn't use either one of the MPCs, at that point in time, because of crane capabilities.
Q. Okay. Now, if you go to Page 2824, Benefits of MPC system.
An MPC system, one of the benefits is that it allows the same package to be used for assembly loading, at-reactor storage, transportation to repository, MRS storage, and disposal.
Now, the dual purpose cask satisfies, has the first three benefits, correct?
A. Even potentially the fourth one, too.
Q. If we had an MRS?
A. Right, yes.
Q. So, you would agree?
A. Yes.
Q. Okay. And I would like to go to the next page, 2825, continuing to talk about the benefits of the MPC system.
A dual purpose cask also has this benefit, the first one, the reduced handling of

individual spent fuel assemblies, correct?
A. Yes.
Q. And, it has the second one on this page, lower total system life cost, correct?
A. That is what our analysis showed at the time, yes.
Q. And the third benefit, it has the benefit of offset utility costs for reactor storage.
A. Yes.
Q. Now, I am assuming, based on your prior testimony, that it would be your position that the dual purpose cask doesn't have the benefit of a standardized design, because there are more than one licensed dual purpose casks; is that correct?
A. Yes.
Q. But I would also assume that you would agree that the next benefit, reduction in low level radiological waste generation also applies to dual purpose casks.
A. No.

202

Q. Why is that?
A. Because the dual purpose, the Holtec or the MP 187 you have to open up that canister and then you've got to throw that canister away as low level waste generation.
Q. Okay. How about the final benefit that allows early spent fuel decommission, to the extent that it can also be used for storage, that can also apply to dual purpose casks, right?
A. Yes. I don't know that this was known for sure at the time, but, yes, you are right.
Q. If you go to the next page, 2826, Containment. You say MPC has no containment function in disposal.
I had previously understood your testimony to be that a true MPC would be used, in addition to its storage and transportation functions, for a disposal function, is that not true?
A. That is true.
Q. Then what does this sentence mean?

203

A. Okay. What that refers to is the way we did the evaluation was that containing spent fuel for the long-term, the way we did the evaluation was we didn't need to count on that MPC itself, that thin-walled stainless steel canister that was welded shut.
We put it into a disposal overpack or what we know is known as a waste package, and so we didn't, we were basically saying that that disposal overpack is going to provide the containment that we need.
The reason we did that was that we just felt it would be another regulatory hurdle to try and convince the nuclear regulatory commission that, for containment purposes, that MPC had to provide that containment function.
Now, it has, the MPC has other functions that worked in conjunction with the overpack, the waste package overpack, and it, and we are disposing of it, okay. We are directly, we would have directly disposed of it under that concept.

204

Whereas with one that is not designed for disposal, maybe because of criticality, or thermal considerations, or maybe too many assemblies, those we would have to open up.
The ones, the dual purpose casks that aren't designed for that disposal function.
Q. But, here you are talking about an MPC not a dual purpose cask, right?
A. Here we are talking about an MPC. And all I am referring to is the containment aspect of it.
In other words, when we license a repository, you have to show the dose out for 10,000 years, or out for 100,000, or even a million years, you have to show the dose to the public that would result from disposing of this waste.
In our concept at the time, we would dispose of the MPC, it would become part of the waste package, but for containing that waste, for the containment period, we weren't taking credit

205

of who is involved in that project, and what is being done on that issue?

A. I really don't know specifically. Tom Pollock may be involved. And I saw, I read, I may have been misunderstanding as to exactly what was taking place in that study, because I recently read one of their studies and it had to do with more of an evaluation of using multi-purpose canisters in general as opposed to turning dual purpose into multi-purpose.

So, I haven't seen anything new come out on it. So, I haven't asked anybody where it stands. I am involved in other things these days. So, I really don't have any specific knowledge, or even general knowledge.

Q. Okay. I guess my final question is what are your current duties and what are you currently involved in at the DOE?

A. Okay. My current job is I am responsible for, I am the acting director for I guess you call it the Office of Science and Technology and International.

274

And science and technology is really an area, it is a new area that our director is trying to initiate to do long-term evaluations of how to do the repository better and cheaper.

Good example would be the current design of the repository assumes we are going to use a metal for what we call the drip shields, something we will emplace at the end of the repository life, which is the year 2100.

That metal will cost $6 billion, maybe there is something we can learn about how the repository operates, or we can learn about metals, in general, that would reduce that cost.

That is an example of one thing we do in the science and technology area. Basically it is a new area where we are looking for ideas to do new studies on.

The international area is an area that I have been involved in for a long time which is really dealing with other countries that are also trying to develop repositories and developing bilateral agreements with them, trying

275

to look for opportunities to share data information, to better understand how repositives will behave.

And, for example, the under secretary is going on a trip to India in the near future. So we are trying to determine what sort of opportunities are there with India to collaborate on this.

There are 33 countries around the world that have nuclear power, and they all have nuclear waste, and they all will need to do something with their waste. And, so we are all in it together.

And, so, international aspect there is a lot of coordination, a lot of sharing, and a lot of activity associated with that.

Q. In your efforts to make the repository come into being and being run more efficiently and those sorts of things, is there a mechanism in place where you share that information with the utilities on a regular basis?

276

A. We haven't yet. It is basically a new program. And we just last year we started funding it.

Basically what we did was we provided money to our national labs, not through our normal contractors, but to Lawrence Livermore National Lab, Lawrence Berkeley, the different labs to do studies.

We are just now getting some preliminary results and we haven't shared that specifically with any utilities.

Just yesterday or two days ago one of our guys gave a presentation to the Nuclear Waste Technical Review Board which was a status on the program.

So, that is what we have done outside to -- the public utilities will attend that.

Q. On a similar issue, are you aware of any efforts to discuss with the utilities the issue of any contract amendments necessary to do some of the things we have discussed during

277

# ZABRANSKY

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Deposition of DAVID ZABRANSKY
Washington, D.C.
Wednesday, April 17, 2002
9:38 a.m.

Job No.: 12597-1
Pages 1 through 226, Volume 1
Reported by: Diane Gomez, RPR



DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X



Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORI' OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

CONTENTS


EXAMINATION OF DAVE ZABRANSKY PAGE
By Mr. Blanton 13


EXHIBITS

(Attached to the Transcript)


ZABRANSKY DEPOSITION EXHIBIT PAGE
1 Federal Register Notice dated 4/18/83, "Standard Contract for Disposal of Spent Nuclear Fuel" 28
2 Letter dated 9/30/96 from R. Cocherell 34
3 Letter from B. Tomasoni to R. Cocherell 39
4 Instructions for Completing Appendix C Delivery Commitment Schedule 43
5 1995 Acceptance Priority Ranking and Annual Capacity Report 44
6 Federal Register Notice dated 2/4/83 65
7 Final Interpretation of DOE's Nuclear Waste Acceptance Issues 67




EXHIBITS CONTINUED

(Attached to the Transcript)


ZABRANSKY DEPOSITION EXHIBIT PAGE
8 1984 Civilian Radioactive Waste Program Mission Plan 83
9 1985 Civilian Radioactive Waste Program Mission Plan 98
10 Excerpts from 1985 Mission Plan 114
11 "FWMS Cases Requested by the DOE HQ" 123
12 Proposed Contract Changes, Revision O, 4/13/92 124
13 "Index to Tables of Issues Related to the Standard Contract" 127
14 Document, "Disposal Contract Modifications" dated 10/22/84 130
15 Document from files of D. Zabransky 138
16 Document with Subject: Potential Modifications to the Standard Disposal Contract 139
17 Meeting Notes dated 3/25/87 142
18 Letter from J. Kearney to B. Rusche 150




EXHIBITS CONTINUED

(Attached to the Transcript)


ZABRANSKY DEPOSITION EXHIBIT PAGE
19 Letter dated 4/28/87 from S. Kraft to C. Jedrey 164
20 Letter dated 10/2/87 from C. Jedrey to S. Kraft 166
21 Statement of Sol Burstein dated 3/19/87 171
22 Documents from the Wisconsin Production 173
23 Letter dated 8/29/88 from J. Kearney to C. Kay 179
24 UWASTE Presentation dated 5/16/89 189
25 UWASTE Report dated 2/16/90 193
26 Preliminary Projection of Spent Fuel Acceptance Rate 197
27 Letter dated 2/16/94 from S. Parker to D. Dums 199
28 Document dated 3/31/92, "ACR Response Team Meeting" 214




PROCEEDINGS

DAVID ZABRANSKY

having been duly sworn, testified as follows:

MR. BLANTON: Before I start asking Mr. Zabransky questions, I want to put on the record an understanding we have with the government's counsel that Mr. Zabransky's deposition has been noticed both as a fact witness and he's been designated by the government, as I understand it, as the government's 30(b)(6) representative as to certain topics. Somebody want to tell me --

MR. OLSEN: I believe topics eight and ten.

MR. BLANTON: Eight and ten of the plaintiff's deposition notice under Rule 30(b)(6).

What we have agreed to do is essentially conduct Mr. Zabransky's fact deposition first and all the lawyers will have their chance to ask Mr. Zabransky questions regarding his fact deposition, and then we will take his deposition on the topics as to which he's been designated the government's representative under Rule 30(b)(6).

MR. CRAWFORD: That sounds exactly like

what we've agreed to. And you might want to put the 30(b)(6) deposition under separate cover.

MR. BLANTON: Which is okay by me, too.

EXAMINATION BY COUNSEL FOR PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COM and GEORGIA POWER COMPANY

BY MR. BLANTON:

Q Mr. Zabransky, my name is Stan Blanton. I'm counsel to Southern Nuclear Operating Company, Alabama Power Company, and Georgia Power Company in litigation filed by those companies against the United States in the Federal Court of Claims on the standard contract for disposal of spent nuclear fuel and high-level waste within the Department of Energy.

We're taking your deposition today under coordinated discovery proceedings that exist in the Federal Court of Claims amongst other nuclear as well as other companies. And these other lawyers sitting here at the table represent other companies that have filed similar complaints against the Department of Energy.

What I would like to do today is ask you a



series of questions and perhaps show you some documents and ask you questions about those documents. If I at any time ask you a question that you don't understand, I want you to stop me and make me rephrase my question so you understand it. Will you do that for me?

A Yes, I will.

Q If I in trying to ask a question attempt to repeat some testimony you've given and you feel that I've mischaracterized your testimony, I would like for you to stop me and make me properly characterize what you feel your testimony has been as well. Will you do that?

A Yes.

Q The parties to this coordinated discovery proceeding have entered into something called a joint motion for entry of agreement and protective order, and attached to that is an agreement and protective order -- and by "parties" I mean all the utilities and the government -- which deals with the protection of confidential information in general. Have you had a chance to review that protective order?



A No, I haven't.

Q Okay. I've handed you and your lawyers a copy of the protective order --

A One moment.

Q What I would like for you to do is to take as long as you need to to review the protective order, and then when you get through reviewing it I'm going to ask you if you agree to abide by its terms concerning the protection of confidential information that might be disclosed to you during the course of deposition.

A Okay.

Q Have you reviewed the terms of the order governing the protection of confidential information that might be revealed to you during the course of the deposition?

A Yes.

Q Do you agree to abide by the terms of the order --

A Yes.

Q -- with respect to that information?

Okay. Thank you.



Mr. Zabransky, have you ever had your deposition taken before?

A Once, yes.

Q Then you know this lady at the end of the table is the court reporter and she's going to take down everything you say and everything I say and that she can't take down nods and that you and I need not talk at the same time or she'll get up and leave. Do you understand that?

A Yes.

Q Mr. Zabransky, what is your current position?

A Currently I'm the acting director of the Waste Acceptance and Transportation Division, Department of Energy, Office of Civilian Radioactive Waste Management.

Q How long have you been in that position?

A I believe since sometime in January, early January. This year.

Q Are you acting director because somebody who used to be the director left --

A Yes.

Q -- and has not been replaced?
A Yes.
Q Who is that person?
A James Carlson.
Q What was your position before you became acting director?
A Team leader, waste acceptance.
Q Who did you report to when you were team leader of waste acceptance?
A James Carlson.
Q Who do you report to now?
A Jeff Williams.
Q What is Mr. Williams' title?
A The acting director of the Office of Acceptance, Transportation, and Integration.
Q Do you know who Mr. Williams reports to?
A I believe he reports to the director and the deputy director of the program.
Q So in your current job there's essentially one level of organization between you and the deputy director of the program. Is that accurate?
A That's correct.



Q Am I understanding you?
When did you become team leader of waste acceptance?
A I believe that's when I came to the government in '94 was my original position. I think that's what it was back then.
Q Do you recall a date more specific than just 1994 when you joined the government?
A I believe it was July 8th or 10th, whatever the Monday was after the Fourth of July that year.
Q What did you do before that?
A Worked for Wisconsin Electric Power Company.
Q What was your last position with Wisconsin Electric?
A I was manager of nuclear fuel services.
Q And I may slip up sometime during the next two days and call Wisconsin Electric WEPCO.
A Same thing.
Q But the court reporter likes to know acronyms for real-time.
How long were you manager of nuclear fuel



services at Wisconsin Electric?
A It was a couple of years, maybe since '91. I'm not sure of the exact date.
Q And what did you do before that?
A I was a project engineer in nuclear fuel for a number of years.
Q Did you begin your career with Wisconsin Electric?
MR. CRAWFORD: Objection. Vague.
Q Well, did you have a job between your graduation from college and -- well, did you graduate from college?
A Yes.
Q Did you have a job between graduation from college and joining Wisconsin Electric?
A No.
Q All right. How about just tell me all the positions you had with Wisconsin Electric and the dates of them as best you can.
A After my graduation?
Q Right.
A After graduation I was a civil engineer in



the nuclear power department, which would have been sometime in 1980.
Q Okay.
A And I became a project engineer, nuclear power department, sometime after that. I believe in around '84 I became a contract administrator for nuclear fuel.
Q That was in 1984?
A Yeah, sometime around '84. Sometime after that I became a project engineer for nuclear fuel, and then I believe in '91 or thereabouts I was the manager of nuclear fuel services.
Q As the contract administrator for nuclear fuel, what were your duties?
A My duties were to negotiate and administer all the contracts for the procurement of nuclear fuel commodities for the Point Beach nuclear plant.
Q When you were in that position was the standard contract for disposal of spent nuclear fuel in your area of responsibility?
A Yes.
Q And that job started in 1984 did you say?

A I believe it was around '84, yes.
Q In your previous position as project engineer for nuclear fuel, did you have any responsibilities with respect to nuclear fuel contracts?
MR. CRAWFORD: Objection as to whether it properly characterizes his prior testimony.
MR. BLANTON: Okay.
Q Well, don't let me mischaracterize your testimony.
What were your responsibilities as project engineer for nuclear fuel?
A As project manager of nuclear fuel I had responsibilities for the contracts as well as some other functions such as nuclear material accountability, economic forecasting, rate case development.
Q The project engineer job came after your contract administrator job?
A That's correct.
Q Is that what I fouled up? Okay.
I should have asked in your civil



engineering job did you have any connection with nuclear fuel contracts and specifically the standard contract for disposal of spent nuclear fuel?
A No.
Q What were your responsibilities when you were manager of nuclear fuel -- services? Did I say that right?
A That's correct. Same as project engineer but also included transient analysis, core-design activities, spent-fuel storage activities.
Q Did the project engineers and contract administrators for nuclear fuel report to you when you were manager --
A Yes.
Q -- of nuclear fuel services?
All right. What were your areas of responsibility when you became the team leader for waste acceptance for the Department of Energy?
A Primary responsibility was issues and management of the standard contract and utility interface.
Q What all sorts of things did that include?



A It included the day-to-day administration of the contract, overview of the payment and verification process, acting as the contracting officer's technical representative, contacts with utilities as required to facilitate contract administration.
Q What was the difference between your responsibilities and the contracting officer's responsibilities with respect to the standard contract in that job?
A I provided technical input to the contracting officer for their consideration in making determinations under the contract.
Q Did your responsibilities as team leader stay in general the same from 1994 until January when you became acting director?
A They expanded in that I became responsible for other DOE activities related to other portions of the waste stream that would go to Yucca Mountain, for instance the interface, the activities related to the acceptance of government-owned materials.
Q Was there a particular time when they



expanded or was it a gradual process?
A I think it was a gradual process that expanded over time as people left and systems -- things evolved.
Q Okay.
A We went through a downsizing, and as a result there were fewer people and the same work.
Q Was there a particular time when the downsizing occurred?
A I think -- no, I don't recollect. There was a particular time where there was a reduction in force, but there was no particular time where it addressed this. People just moved to different places as a result of that.
Q Okay. How have your duties changed with your most recent position?
A I am responsible for the transportation aspects now also.
Q Are you still responsible for all the other stuff that you were responsible for?
A Yes.
Q Is there somebody else in the team leader

spot now?
A No.
Q Have those two positions been combined or is the team leader spot just vacant?
A I'm still a team leader for waste acceptance. I'm just the acting director of the division.
Q Have you done anything to prepare for your deposition today?
A I've reviewed the contract. In preparation for my 30(b)(6) deposition I've reviewed documents provided to me by counsel. And I've had discussion with counsel.
Q Have you had any discussions with anybody other than your counsel to prepare?
A I've had discussions with Nancy Slater in conjunction with counsel. In preparation for my 30(b)(6) deposition.
Q Okay. I'm not asking you about the 30(b)(6) deposition right now, just your fact deposition.
A Okay.



Q Have you had conversations with Nancy Slater outside the presence of counsel about your fact deposition?
A No.
Q How about with anybody else outside the presence of counsel about your fact deposition?
A No.
Q Have you reviewed any documents other than the standard contract?
A Not in preparation for my fact deposition.
Q Have you reviewed the complaints in the case, or any of them?
A No.
Q Have you reviewed any of the briefs filed by either of the parties?
A No.
I'd like to clarify my last answer.
Q Okay.
A I've not reviewed any briefs, complaints, or filings as -- in preparation for my deposition. Over the course of my job over the last years I've reviewed them and read them. I haven't reviewed them



recently.
Q Okay. You say "over the last years." There have been several lawsuits over the standard contract. Is that correct?
A That's correct.
Q And some of those have been in the Court of Appeals for the District of Columbia circuit, and some of them have been in the Court of Federal Claims. Are you aware of that?
A I'm aware of that.
Q Do you know whether you've read any of the briefs filed in the cases currently pending in the Court of Federal Claims?
MR. CRAWFORD: Well, let me object to this line as getting into areas of privilege. I mean --
MR. BLANTON: You served them on us.
MR. CRAWFORD: Right.
MR. BLANTON: They're not privileged.
MR. CRAWFORD: Well, whatever he's done in reviewing them and so forth, but, I mean, your question is proper as to with respect to what he's reviewed in terms of preparing for his deposition, but



his other work on the case I would think is privileged.
Q You're obviously aware today of what you've read in the past. Is that correct?
A In the past counsel has provided me some -- some of the briefs. Some of the complaints. I'm not sure all of them or which ones, and asked me to take a look at certain parts of them and comment. But I don't know which ones in particular. I can't recollect.
(Deposition Exhibit Zabransky 1 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, I'm handing you a document that's been marked as Exhibit 1 to your deposition, which, if all goes well, is a Federal Register notice dated Monday, April 18, 1983, entitled Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste. And after some background material there is what purports to be a form of the standard contract for disposal of spent nuclear fuel and/or high-level radioactive waste. Do

you see that?
A Yes.
Q Is that the contract or the form of contract that you reviewed in preparation for your deposition?
A This is the form of the contract. I may have reviewed a later version of this, I believe a '91 or a '92 version of this that was in the Federal Register that has modifications.
Q Okay. What modifications were done in 1991, can you tell me off the top of your head?
A In general there were modifications related to electricity generated and sold and allowances for credits or reductions due to energy losses not delivered to the ultimate consumer as a result of the litigation.
Q All those deal with how the fee is calculated? Is that correct?
A That's correct.
Q Are there any other differences that you know of between the standard contract that was promulgated in 1983 and the one that was contained or



the one you reviewed?
A Not that I recollect.
Q Have you seen this version of the contract before?
A Yes, I have.
Q What is the Department of Energy's obligation under that contract with respect to the quantity and rate of spent fuel acceptance?
MR. CRAWFORD: Objection. Calls for a legal conclusion.
A There's no rate of acceptance established in the contract.
Q Are you saying the Department of Energy does not have any obligation with respect to the rate of spent nuclear fuel acceptance?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A I'm saying that the contract does not contain the rate.
Q And my question is what is the department's obligation under the contract with respect to the quantity of spent fuel it would accept in a particular



year from the utilities?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A As a result of the contract the Department of Energy's obligation is as it appears on the approved delivery commitment schedules.
Q If a utility does not have an approved delivery commitment schedule, is it your testimony then that the DOE does not have any obligation to pick up spent fuel from that utility?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A With respect -- if there's not a delivery commitment schedule approved for a given year, there's no obligation for that given year.
Q How does a utility go about getting a delivery commitment schedule approved?
A The contract stipulates how the utility does that.
Q When is the last time the Department of Energy approved a delivery commitment schedule?
A I don't recollect the exact date.



Q Has it had delivery commitment schedules submitted to it that it has neither approved or disapproved?
A That's correct.
Q Why is that?
MR. CRAWFORD: Objection. Vague.
Q Are you responsible for deciding whether a delivery commitment schedule gets approved or not?
A I'm responsible for reviewing them and making a technical recommendation to the contracting officer.
Q Do you know why delivery commitment schedules that have been submitted have not been approved or disapproved?
MR. CRAWFORD: Objection. Vague.
MR. BLANTON: I was asking if he knew.
MR. CRAWFORD: I know. Which DCS are you talking about?
MR. BLANTON: Any DCS.
MR. CRAWFORD: Well, objection. Vague.
A Repeat the question you asked me?
Q Do you know why any DCS that has been

submitted but has not been approved or disapproved, do you know why that has been done?

MR. CRAWFORD: Objection. Vague.

A Yes.

Q Would you tell me?

A On the advice of counsel.

Q On the advice of counsel they've neither been approved or disapproved?

MR. CRAWFORD: Objection. Compound.

Q I'm just trying to make sure I understand your answer, Mr. Zabransky.

A They have not been processed. They've not been approved or disapproved on the advice of counsel.

Q As I understand your testimony, you provide technical advice to the contracting officer on various issues regarding interaction with holders of standard contracts. Is that accurate?

A That's correct.

Q Now, do you have any authority on your own to take actions with respect to delivery commitment schedules, or does the contracting officer take action based on whatever advice the contracting officer



gives?

A The contracting officer takes the final action. I would make a recommendation.

MR. BLANTON: Let's mark that as number 2.

(Deposition Exhibit Zabransky 2 was marked for identification and was attached to the transcript.)

Q Mr. Zabransky, I'm going to show you what's been marked as Exhibit 2 to your deposition, which is a letter dated September 30, 1996, from R.G. Cocherell, and his name is spelled C-o-c-h-e-r-e-l-l. He's manager of nuclear fuel services at Southern Nuclear Operating Company. Take a look at that letter.

For your information, I just note that you are copied on there as an "attention to."

A Uh-huh.

Q Do you recall whether you've ever seen this letter or not?

A I don't recall this specific letter.

Q What does this appear to be to you?

A This appears to be a submittal of delivery



commitment schedules to the contracting officer by Southern Nuclear Operating Company.

Q All right. Let me refer you just for a minute to the attachment to the letter which is titled U.S. Department of Energy Appendix C Delivery Commitment Schedule. Do you see that?

A Yes.

MR. CRAWFORD: Let me just ask you, Stan, they appear to be the same. There are two attachments that are marked identically. Are they the same? They appear to be.

No, maybe not.

MR. BLANTON: They're two different Bates numbers.

THE WITNESS: They're different.

MR. BLANTON: That's the way they were in our file.

MR. CRAWFORD: And the cover letter indicates there are six copies of DCSs. It doesn't indicate which one's original, which ones are copies or not. Is this thing complete?

MR. BLANTON: It's complete the way it is



in our file.

MR. CRAWFORD: Okay. I got you. Well, it might be helpful to the witness then just to note that there are two different DCSs.

MR. BLANTON: Okay.

Q You see what your lawyer is referring to? You got a DCS identification number on the first page that ends in 901 and one that ends in 902 on the second page.

A Yes.

Q What I wanted to ask you about is you see in the top left and right-hand corners of the form, the DCS form --

A Uh-huh.

Q -- there is -- on the left-hand side there's something that says NWPA-830 C and it says revised 9/10/93, which I take to mean September 10, '93. Is that what you take that to mean?

A I take it to be the date September 10th, 1993.

Q And on the right-hand corner of the document it has OMB number 1901-0260, and under that

it has "expires 5/31/97." Do you see that?
A Yes, I see that.
Q What do you take that to mean?
A That's the date that this forms expires from OMB clearance.
Q Okay. Are you aware of whether or not this form has been re -- what has to happen in order for this to be a valid form if it expires?
A I'm aware --
Q Not talking about this particular document here but this form.
A I understand your question. I'm aware of what has to happen for this form to be renewed.
Q Has it been renewed since May 31, '97?
A I don't know.
Q How would we find that out?
A We would ask the person who does this.
Q Who does this?
A On my staff, Mr. Pollog is -- oversees ensuring that forms are renewed, and he has that done for him by the Energy Information Administration.
Q Okay. Could we also then ask the Energy



Information Administration whether this particular form has been renewed or when the last time it was renewed was?
A Yes, we could.
Q Okay. What is the process in the Department of Energy in your area when a utility sends in a letter containing delivery commitment schedules such as this?
A The process is -- has been to review the schedule and make a recommendation to the contracting officer. Per the direction of counsel, we have not been reviewing these documents.
Q So you don't even review them now?
A We don't review the documents. We do not process them at this time.
Q Is there --
A One of my staff actually does look at it and makes sure there's no questions, and then we file them, but we don't perform a review or make a recommendation to the contracting officer.
Q Are you aware of any reason other than this, the lawyers told us not to do that, that you



don't do it?
A No.
(Deposition Exhibit Zabransky 3 was marked for identification and was attached to the transcript.)
Q Do you know when the practice of not reviewing the DCS submittals started?
A I don't recollect the specific date.
Q How about a year?
A I believe it was tied to a court decision in the Court of Appeals, the department's obligation.
Q Okay.
A That might have been 1996.
Q Okay. Would that be the decision that said, paraphrasing, and nobody's going to hold you to my paraphrase, that the Department of Energy has an unconditional obligation to begin acceptance of spent fuel in 1998?
A To the best of my recollection.
Q Okay. And subsequent to that decision it's your recollection that the department at that time stopped reviewing delivery commitment schedules,



submittals?
MR. CRAWFORD: Objection. Vague.
Q Did you understand my question?
A You asked me if subsequent to that decision is that what caused us or is that the time that we stopped reviewing at the direction of counsel, delivery commitment schedules.
Q You asked it better than I did.
A And the answer to that question is that's -- yes.
Q All right. Let me show you what's been marked as Exhibit 3 to your deposition. I think I've already given your counsel a copy of it.
MR. CRAWFORD: Yes.
Q That is a letter, operating from memory, from Ms. Tomasoni, is that correct, back to Mr. Cocherell?
A Yes, it is.
Q Do you recall seeing that letter or similar letters?
A I recall seeing --
MR. CRAWFORD: Objection. Compound.

Q Do you recall seeing that letter?
A I don't recall the specific letter.
Q Do you recall seeing letters like that?
A I've seen -- yes, I have seen letters like this.
Q Is that a standard form letter that the Department of Energy sends in response to DCS submittals?
MR. CRAWFORD: Well, objection. Vague.
Q Is Exhibit 3 to your deposition a standard form letter that the Department of Energy sends in response to DCS submittals?
MR. CRAWFORD: Objection. Vague.
A A letter of this type has been sent in response to most of the submittals since we stopped processing them.
Q Okay. And that letter indicates that the DCSs submitted by Southern Nuclear cannot be approved or that the department is unable to approve them. Is that correct?
MR. CRAWFORD: Objection. Best evidence.
A The letter says what it says.



Q I'm sorry. It does not say "unable." It says "Not able at this time to approve your DCS submittal." Is that correct?
A That's what the letter says.
Q Given the Department of Energy's current practice, is there any way for a utility to get a DCS approved at the current time?
A Under the current guidance, no.
Q And that guidance has been the same since the decision in 1996 that the Department of Energy had an unconditional obligation to accept spent fuel in 1998. Is that correct?
A That is my recollection.
Q Now, let me get you to look back at number two again. And referring you to DCS identification of the document with that DCS identification number that ends in 901, how does the utility know how many metric tons of uranium to put in line 2.5?
MR. CRAWFORD: Objection to the extent it calls for speculation.
Q If you know.
A I don't know how Southern Nuclear knows.



Q Well, let me rephrase my question then. Has the Department of Energy given instructions to utilities as to how they should complete these delivery commitment schedule forms?
A Yes, it has.
Q And what are those instructions with respect to the quantities of spent nuclear fuel that are included on a particular delivery commitment schedule?
MR. CRAWFORD: Objection. Best evidence.
A I would have to review the instructions to find out exactly what it says.
(Deposition Exhibit Zabransky 4 was marked for identification and was attached to the transcript.)
Q All right, sir, I'm going to hand you what's been marked as Exhibit 4 to your deposition, which is titled U.S. Department of Energy Instructions for Completing the Appendix C Delivery Commitment Schedule General Instructions. There's one for your lawyer.
A Okay.



Q All right, sir. Do those instructions indicate how a utility is to complete the delivery commitment schedule?
A Yes.
Q Do they indicate how the utility is to quantify on the delivery commitment schedule the amount of spent nuclear fuel that's to be picked up in a particular year?
A Yes.
Q What do they say about that?
A They say in instruction 7A, When submitting DCSs purchasers should base their DCSs on allocations contained in the latest annual capacity report, ACR.
Q All right. What is the latest annual capacity report? When was the latest annual capacity report issued?
A I believe it was issued in March of '95.
Q Okay.
(Deposition Exhibit Zabransky 5 was marked for identification and was attached to the transcript.)
Q Let me show you what I've marked as Exhibit

5.
Zabransky Exhibit 5 is a document titled Acceptance Priority Ranking and Annual Capacity Report, and it's dated March 1995, is it not?
A Yes, I believe it is. It's hard to read but...
Q Is that the last annual capacity report the Department of Energy has published?
A Yes, it is.
Q Let me get you to take a look at page six of that annual capacity report. What is that?
A Page six contains Table 2, Summary Of Purchaser's Annual Allocations.
Q All right. Is that the document that's referred to in the instructions for completing the DCS that the utility is supposed to use to determine what quantity of fuel is inserted in a DCS for a particular year?
A That's a summary of the information.
Q Okay. There are only ten years on that document. Is that correct?
A That's correct.



Q That's not all the spent fuel covered by standard contracts?
MR. CRAWFORD: Objection.
Q Is it? Do you know whether all the spent fuel covered by standard contracts is reflected on Table 2 of Exhibit 5?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A If you're asking me if the total quantity of spent fuel generated to date and expected to be generated by reactors covered by the contract is contained within this table, the answer is no.
Q All right, sir. How would a utility who has spent fuel that's not contained on Table 2 of Exhibit 5 to your deposition fill out a DCS for that fuel?
A They would not be able to.
Q Okay. Has the Department of Energy ever published anything, any document, that would inform a utility that had spent fuel that's not in DOE's initial ten-year schedule as reflected on this document, how they would include that fuel on a



delivery commitment schedule?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
Q Do you understand my question, Mr. Zabransky?
A Your question was has the Department of Energy published anything that would give guidance to a utility as to how to fill out a DCS beyond this first ten-year schedule.
Q Yes, sir.
A The answer is no.
Q Is it your position that under the standard contract a utility has no right to have that fuel picked up under the standard contract?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A That's not my position.
Q Well, what is your position with respect to utilities who have fuel that does not show up on this ten-year schedule?
A My position is that that fuel would show up on subsequent schedules after the first ten years of



operations.
Q But those utilities don't have approved DCSs, do they?
A DCSs aren't due until 63 months prior to the date of pickup. Date of pickup is now anticipated to be no sooner than 2010.
Q So how does whether or not the utility has an approved DCS affect its rights under the contract?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A The department has not committed to pick up fuel on a certain date at a certain rate other than as it showed in the approved DCSs. Its obligation to remove fuel exists, but not on a specific date or a specific rate.
Q Does the Department of Energy have any plans to publish another annual capacity report at any particular time?
A I don't know what the department's plans are.
Q Are you aware of any plans to publish an additional annual capacity report?

A I am not aware of any plans.
Q Let me get you to take a look back at the instructions --
MR. BLANTON: Jeff, do you have a copy of those?
Q Can I refer you to paragraph 7C of Exhibit 4 to your deposition.
MR. CRAWFORD: The highlighted portion?
MR. BLANTON: The part in green.
Q Do you see that?
A Yes, I see it.
Q Take as long as you need to review that.
A I've reviewed it.
Q Okay. That statement says "The process described herein" -- I assume referring to the instruction -- "assumes that the FWMS" -- which stands for what?
A I believe it's Federal Waste Management System.
Q -- "that the federal waste management system will be able to accept the purchaser's SNF" -- which stands for spent nuclear fuel, I believe --



"beginning in 1998 according to the acceptance rate reflected in the ACR. In the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the purchasers."
Do you see that?
A Yes, I see that.
Q Why would DOE need to reevaluate previously approved DCSs in the event that they did not commence spent fuel acceptance beginning in 1998?
A DOE and the purchasers would need to reevaluate that because when DOE did begin commencement of operations it wouldn't necessarily be the case that the purchaser would want that same fuel picked up from that same reactor.
Q Okay. Has DOE reevaluated any of the previously approved DCSs?
A DOE has not.
Q Does DOE consider that it has the right to change the quantities or to reevaluate the quantities of spent fuel contained on the DCSs?
MR. CRAWFORD: Let me object to that as a



mischaracterization of what he just testified to.
MR. BLANTON: I'm just asking. I wasn't suggesting he said that. I was just asking a question.
A DOE -- as it says, DOE believes that the previously approved DCSs need to be reevaluated by DOE and the purchasers. Can't be unilaterally modified.
Q Okay. As I understand your testimony from a minute ago, and I think we have the contract here if you would like to review that, the DCS would be due 63 months in advance of the delivery date? Is that right?
A 63 months prior to the year of delivery.
Q Okay. And the year of delivery is what's shown in the ACR. Is that correct?
A Year of delivery now is when the repository operates.
Q Well, if I'm the utility and I'm trying to decide when I need to send in my DCS, how do I determine that?
A Based upon the fact that DOE has said it doesn't anticipate the repository to operate prior to



2010.
Q So under that analysis or interpretation no DCSs would be due as we sit here today. Is that correct?
A As of this point in time, that's correct.
Q Okay. Have you had any conversations with utilities to that effect?
A Not that I recollect.
Q What if a repository never gets built, does the Department of Energy have any obligation under the contract to anybody?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to speculation.
Q I'm trying to understand your testimony about what the DOE's obligation is.
MR. CRAWFORD: Well, objection to the extent it mischaracterizes any of his prior testimony.
A The department has an obligation to accept and dispose the spent fuel. The court has determined it should have been done in 1998, but the rate and the schedule is as established by the DCS process. So --

that's it.
Q So without a DCS is it your testimony that without a DCS process there can be no rate under the contract?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion, and asked and answered.
A It's my belief that an approved DCS is required to establish a rate and date for acceptance.
Q All right, sir. Are you aware of any plans that the Department of Energy has to recommence the process of reviewing and processing delivery commitment schedules?
A I am not.
Q And as long as that condition exists, do I understand your testimony to be that the Department of Energy has no obligation with respect to the rate of spent fuel acceptance?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A No further obligation than that already established in approved DCSs.
Q All right. Which means that utilities who



don't have spent fuel in that first ten years could never have had an obligation with respect to rate. Is that right?
MR. CRAWFORD: Objection. Mischaracterizes prior testimony. Objection to the extent it calls for a legal conclusion. Asked and answered.
A To the extent they don't have an approved DCS, that would be the case.
Q Okay. What reasons would purchasers have for wanting to reevaluate DCSs based on the failure to begin acceptance in 1998, to your knowledge?
A I'd have to speculate as to what they would consider if they wanted to --
Q Well, based on your experience at WEPCO what would the considerations be?
MR. CRAWFORD: Well, objection to the extent it calls for speculation or assumes facts not in evidence.
Q Well, you said that you were at WEPCO when WEPCO submitted delivery commitment schedules, weren't you?
A Yes, I was.



Q And those were approved, weren't they?
A Yes, they were.
Q Based on what you know about the submittal of those DCSs, what purpose would a utility have for wanting to reevaluate a DCS?
MR. CRAWFORD: Same objection.
A I can't speak for WEPCO, but DCSs in general contain fuel ranges that would be proffered for delivery by the utility to the Department of Energy. It could be the case -- again we're speculating -- that the fuel range on the original DCS that was submitted and approved would no longer be the fuel they wished to deliver because something else had been done to it, like we put in dry storage. And then, therefore, it would not be in that utility's best interest perhaps to take that fuel and offer it to the delivery but instead to offer different fuel. So it may wish to evaluate that DCS.
Q Was the primary purpose of the DCS process to identify which fuel of a given allocation the utility wanted to deliver to DOE?
MR. CRAWFORD: Objection. Vague.



Q Do you understand my question?
A There are many purposes for the DCS process. One of them was to identify the range of fuels the utility may wish to deliver.
Q I don't understand what you mean by "range of fuels." Could you explain that?
A Yes, I could.
Q Will you?
A Yes, I will. Fuel from a given reactor -- one of the purposes is to identify the range of fuels. Fuels from a given reactor require different shipping equipment, shipping casks, depending upon when it was discharged, how highly it was enriched, how highly it was burned, how long it's been postreactor basically. So fuel of a certain class wouldn't necessarily be fungible from a technical standpoint with fuel of a different class. So one of the purposes of the DCS was to establish for DOE's planning to fulfill the need to supply a cask suitable for the utility's use was to identify what fuel the utility wished to have moved. And the fuel that would be moved ultimately would be a subset of the fuel specified on the DCS.

Q Okay. As implemented by DOE, was the purpose ever to determine the quantity of spent nuclear fuel?
A Yes.
Q How so?
A By taking the MTUs and also by asking them to provide the number of assemblies that could be contained in those MTUs.
Q The way the process was implemented by DOE, did the utility have any discretion about how many MTUs to put in the DCS?
A No.
Q So that was dictated by the Department of Energy.
A The MTUs was as per the instructions from the ACR. The number of assemblies contained was to some extent the utility's discretion.
Q Okay. Let me get you to look back at Exhibit 1 to your deposition and specifically Article 5.B of the standard contract.
Does Article 5.B deal with a delivery commitment schedule process?



A Yes, it does.
Q Where in Article 5.B does the contract limit the quantity of spent nuclear fuel the utility can put on a DCS to the amount in the ACR?
A It doesn't.
Q Where did that requirement come from?
A That requirement came from the contracting officer when the contracting officer transmitted the instructions for completing DCSs to the utilities.
Q Under the process as you understand it, during the period of time when DOE processed delivery commitment schedules, if a DCS came to the Department of Energy or submitted to the Department of Energy and had a quantity of spent fuel that was greater than that shown in the ACR, what happened?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to foundation.
A When DOE was processing DCSs, if the DCS contained a quantity of SNF -- MTUs greater than that in the current ACR, it was more than likely rejected by DOE, sent back by the contracting officer as



disapproved.
Q Now, I have referred you to Article 5.B of the standard contract and asked you about any relationship between the DCS and the ACR in there. But I want to be fair. Is there anyplace else in the standard contract that authorizes the rejection of a DCS because it does not match the quantity of spent nuclear fuel in an ACR?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A The process for filling out DCSs was transmitted with the contract instructions, I believe. I am not aware of other provisions in the contract that deal with the ACR and the DCS process.
Q All right. When did DCS forms first begin to be submitted, if you know?
A I don't have an exact date.
Q Early nineties?
That's a question.
A It would have been the early nineties. My recollection would have been -- from my experience at WEPCO it would have been 63 months -- no later than 63



months prior to January 31st, 1998, or January 1st, 1998.
Q Okay.
A Sometime in September of '92.
Q Okay. At that point in time was there a general understanding in the utility industry and the department -- well, strike utility industry. In the Department of Energy as far as you know about whether a repository was going to be available in 1998?
A I wasn't at the Department of Energy in '92 so I don't know what the general understanding was at the Department of Energy.
Q What was the general understanding in the utility industry?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A I don't know.
Q What did you think?
MR. CRAWFORD: Objection to the foundation.
Q What did you think in 1992 about whether or not there was going to be a repository in 1998, Mr. Zabransky?

A Mr. Zabransky thought in 1992 that there was still a possibility for a monitored retrievable storage facility by 1998.

Q But not a repository?

A But not a repository.

Q Okay. What had to happen in order for a monitored retrievable storage facility to be available by 1998 as of 1992?

MR. CRAWFORD: Objection to the extent it calls for speculation. Objection, foundation.

A I don't know the exact steps that would have been required.

Q Okay. Now, as I understand your testimony, you were not involved in any standard contract issues at the time the standard contract was promulgated. Is that correct?

A That is correct.

Q Let me back up from my line of questioning. I just started to ask the question that just got passed to me.

Do you recall when you concluded that there would be no spent fuel acceptance in 1998?



MR. CRAWFORD: What was your question again? Hang on, I just --

Q I assume you concluded at some point that there would be no spent fuel acceptance in 1998. Is that right?

A Yeah. Obviously at some point I concluded that wasn't going to happen.

Q When did you conclude that, do you recall?

A No, I don't recall exactly when that was.

Q Were you involved in any way in any of the activity that led up to the passage of the Nuclear Waste Policy Act of 1982?

A No, I was not.

Q Were you involved in the process that led to the promulgation of the standard contract in 1983?

A No, I was not.

Q Did you review the standard contract for either Wisconsin Electric or any utility industry group during the period between the time it was proposed and the time it became final?

A No, I did not.

Q Were you privy to any conversations between the Department of Energy and utilities about the standard contract during that period of time?



A During -- before it became final?

Q Between the February to June '83 time frame.

A No, I was not.

MR. CRAWFORD: Stan, is this an appropriate time to take a break?

MR. BLANTON: It's a fine time to take a break.

(There is a recess from the record.)

Q Mr. Zabransky, I got another couple of questions I need to ask you about Exhibit 5, which is the annual capacity report for 1995.

A Okay.

Q The last sentence of page one of the document says "As specified in the standard contract the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers."

And then if I could refer you over to page four. And referring to Table 1, the projected nominal acceptance rates for spent nuclear fuel, the second sentence after Table 1 says "This table provides only an approximation of system throughput rates and is subject to change depending on congressional action regarding the conditions for site and construction, operation of an interim storage facility, if any, the repository, and the system design and configuration."



Do you see where I've read from?

A Yes, I do.

Q What would happen to the DCS if DOE changed the waste acceptance rates set forth in the ACR upon which the DCS was based?

MR. CRAWFORD: Objection. Vague. Objection to the extent it calls for a legal conclusion.

Q Do you understand my question?

A Which DCS?

Q The ones that have been approved.

A The ones that have been approved by the contracting officer are binding.

Q Whether or not the ACR changes?

A That's correct.

Q Okay. Where would the -- if not from you or your -- and when I say you, I mean you or your group. If not from you or your group, where would the contracting officer receive technical input on acceptance rates from within OCRWM?
MR. CRAWFORD: Objection to vagueness and it's foundation primarily.
Q Do you understand my question?
A You're asking me who would have told the contracting officer, who would advise the contracting officer as to appropriate acceptance rates to utilize?
Q Correct.
MR. CRAWFORD: Same objection.
Q He's objecting to your questions now.
A What can I do?
It's my belief that would have come from the program's director who would have approved the ACR.
Q Who within the program would have done the initial work on the acceptance rates in the ACR?
A I don't know.
Q Not you?



A Not me.
Q Let's look back at the Exhibit 1 to your deposition, which is the Federal Register notice of the standard contract. Referring you to the first page of the standard contract, the second "whereas" clause which reads, Whereas DOE has the responsibility following commencement and operation -- the commencement of operation of a repository to take title to spent nuclear fuel or high-level radioactive waste involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel. Do you see that?
MR. CRAWFORD: Where are you?
A It's on this page here.
Q Right at the first of the contract, the preamble, whereas clauses.
MR. CRAWFORD: Which one are we on?
MR. BLANTON: The second one.
A Okay. I'm reading the second whereas clause.
Q Do you have a working definition at the Department of Energy as to what that clause requires



the Department of Energy to do?
MR. CRAWFORD: Objection, foundation. Objection to the extent it calls for a legal conclusion.
A I'm not sure what you mean by "working definition."
Q Well, in exercising your responsibilities with respect to the standard contract, what is meant by the requirement that DOE take title to spent nuclear fuel or high-level radioactive waste as expeditiously as practicable?
A After commencement of repository?
Q However you define it.
MR. CRAWFORD: Same objection.
A Under the contract, responsibility is to issue an ACR, an APR, and the ACR is based upon the anticipated receiving capacity of the facilities. That's my responsibility.
Q All right. Do you have an understanding as to how fast "as expeditiously as practicable" is as applied to the receipt of spent fuel by DOE?
MR. CRAWFORD: Objection to the extent it



calls for a legal conclusion.
A No, I don't.
Q Same page, Article 2, Scope. The last sentence of Article 2 says "The services to be provided by DOE under this contract shall begin after commencement of facility operations not later than January 31, 1998, and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of." Do you see that sentence?
A Yes, I see it.
Q Do you have a working definition as to what the services -- well, as to what "continue until such time as SNF or HLW from the civilian nuclear power reactor specified in Appendix A" means?
MR. CRAWFORD: Well, objection, vagueness. Objection to the extent it calls for a legal conclusion.
A I have a personal interpretation as to what that means.
Q What is that?

A It means that we will continue -- the contract will continue until all the fuel is removed from the reactor designated in the contract.
Q Have you ever heard it expressed at the Department of Energy that DOE could have complied with the contract by accepting one spent fuel assembly in 1998 and then essentially stopping?
A If you're asking me have I heard somebody say that, the answer to that question is yes.
Q Who have you heard say that?
A I don't recall.
Q Are you aware of whether or not that's the position of the Department of Energy with respect to the performance of the contract?
A I'm not aware that that's the position of the Department of Energy.
Q Do you think the opposite is the case?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
Q Go ahead.
A I don't know the position of the Department of Energy with respect to that provision -- that



statement.
Q Okay. Do you personally think that's a reasonable interpretation of the standard contract?
MR. CRAWFORD: Objection, relevance. Objection to the extent it calls for a legal conclusion. Objection, best evidence.
A If you're asking my personal opinion?
Q Yes, sir.
A My personal opinion is no.
Q That's not a reasonable interpretation of the contract?
A That's not -- yeah, that's my personal opinion.
Q We sort of had a conversation rather than a question and answer there, so is your personal opinion that a position that says DOE could have accepted one spent fuel assembly in 1998 and stopped is not a reasonable interpretation of the contract? Is that correct?
MR. CRAWFORD: Same objections as before.
A That's my personal opinion.
Q Okay. Are you aware of DOE ever taking any



action in connection with the implementation or the administration of the contract that was based on that interpretation?
A I'm not aware of any such action.
Q Are you aware of what problem Congress was trying to solve when it passed the Nuclear Waste Policy Act? Or do you have an opinion about that?
MR. CRAWFORD: Objection to the extent it calls for speculation.
Q You've been in this industry for how long?
A A long time. I have -- I'm not aware of what Congress was doing specifically in 1983. It was not on my radar screen. I have an opinion that they were trying to close the back end of the fuel cycle.
Q And you're going to have to put that into laymen's terms for those of us who don't speak in terms of the fuel cycle.
A Provide a mechanism by which fuel could be disposed of. And removed from reactors.
Q Were there other ways to dispose of spent nuclear fuel other than that or at least to remove fuel from the reactor and store it other than that



provided for in the Nuclear Waste Policy Act?
MR. CRAWFORD: Objection. Foundation. Objection, vagueness.
Q Well --
A I'm not sure what the question is.
Q Well, the question is, the Nuclear Waste Policy Act calls for deep geologic disposal. Is that right?
A Yes, it does.
Q That's not the only way utilities could manage spent nuclear fuel, is it?
MR. CRAWFORD: Objection to the vagueness.
A Manage or dispose of?
Q Manage.
MR. CRAWFORD: Objection. Vagueness.
A There's many ways of managing fuel.
Q They could store it on site?
A That's a way of managing fuel. That's an option, yes. But the Nuclear Waste Policy Act provides for the disposal of fuel.
Q Was one of the purposes of the act to minimize the degree to which utilities had to store

A Uh-huh.
Q Number three under Program Objectives says "To assure acceptance of waste for disposal by January 31, 1998, in accordance with the acceptance schedule provided for in the department's disposal contracts and in conformance with the Nuclear Waste Policy Act of 1982." Do you see that?
A I see that.
Q What acceptance schedule is that referring to, do you know?
MR. CRAWFORD: Objection. Foundation.
A No, I don't know. I would have to read the document to determine that.
Q Is there an acceptance schedule provided for in the disposal contracts, to your knowledge?
A Not to my knowledge.
Q Do you know what waste acceptance, or what acceptance schedule would be in conformance with the Nuclear Waste Policy Act of 1982?
MR. CRAWFORD: Objection. Foundation. Objection, asked and answered.
A The act doesn't contain a schedule, so I



don't know what this is referring to.
Q Let me get you to look now under Program Strategy, Section A, Waste Acceptance Schedule. The first paragraph says that "Based on the approach previously described, the department has prepared a waste acceptance schedule which specifies in the aggregate the quantities of commercial nuclear waste that the department will accept beginning in 1998." Do you see where I've read from?
A I see where you read from, yes.
Q And then Table 2-1 contains a waste acceptance schedule. Do you see that?
A I see that.
Q Do you recall when you first became acquainted with the contract waste acceptance schedule that had rates that approached 3,000 metric tons a year within the first five or six years of operation of the program?
A I don't think -- I don't recall that when I first became acquainted with the contract I was concerned or even observed those schedules. I don't recall it.



Q Okay. Well, what as Wisconsin Electric's contract administrator did you think you were buying when you paid your fees to the government under the contract?
MR. CRAWFORD: Objection. Foundation. Objection to the extent it calls for a legal conclusion.
A As a Wisconsin Electric employee I thought we were buying disposal services for the fuel from Point Beach.
Q Did you think it had anything to do with when the government would come pick up your fuel and how much of it they would pick up when they came?
A At that point in time the belief was that it would begin in 1998. I don't recall at that point in time focusing on the rates.
Q Have you ever focused on the rate in any job you've had?
A Yes.
Q Which one?
A Wisconsin Electric.
Q Okay. Do you recall conversations in those



days among utilities regarding whether the contract meant that utilities would not have to add additional storage space after 1998 to store spent fuel?
A I've never had such a belief. I don't recall those specific conversations. I can't attest that others didn't have that belief. I never had that belief.
Q Well, did you have any concept of what it was that the government was going to do other than at some distant undefined point in the future dispose of your spent fuel?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, argumentative.
A I believe that it would fulfill the contract, which is dispose of the spent fuel, and the process was established in the contract. But I don't recollect focusing on the rate in the mid-eighties.
Q Did you have any idea or opinion about how long that was supposed to take for the government to remove the spent fuel from WEPCO's plant site?
MR. CRAWFORD: Objection. Vagueness.

Objection to the extent it calls for a legal conclusion.

A Are you asking me on a regular basis or an absolute basis?

Q On an absolute basis.

A I think, again, this is a personal opinion as to what I recollect was that I believe at that point in time utilities thought -- I thought that the fuel would be gone in a reasonable amount of time after the reactor ceased operations.

Q What's a reasonable amount of time?

A My view at that time would have been, you know, five to ten years. As a personal view. At that time.

Q What was the basis for your belief that WEPCO's fuel would be gone in five to ten years after the reactor ceased operations?

MR. CRAWFORD: Objection to relevance.

A My basis at that time would have been that we -- I still thought that a repository or a central facility would have been possible by '98 and that it would have been possible to build a system sufficient



to cause the fuel to be worked off in a reasonable time frame. It was predicated upon there being a repository facility in the '98 time frame.

Q Okay. What about having the repository made it possible for DOE to pick up the fuel at a rate that would have removed it from the site within five to ten years after the reactor ceased operations? What rates were reasonable if a repository existed as you expected?

MR. CRAWFORD: Objection. Vagueness. Objection, speculation. Objection, foundation. Objection -- well, that's all I'm going to do.

MR. BLANTON: That's all he can think of.

Q I didn't ask you if your lawyer told you so. He didn't have that one.

MR. CRAWFORD: Objection to side bar.

A It would have been my personal opinion at the time that a rate that would have been reasonable would have reflected the aggregate rate of discharges plus some amount of workoff.

Q Okay. So that --

A In an unconstrained situation. You asked



me also what about a repository made that possible was that there would be a place to take it.

Q Okay. And so I make sure I understand the dynamics that just went into that answer, you got every nuclear plant in the country has spent fuel that's been generated prior to 1998, correct?

A Correct.

Q And that's the backlog you were talking about working off?

A That's correct.

Q And then in every year, including '98 and in the future, every utility is generating new spent fuel every year.

A That's correct.

MR. CRAWFORD: Objection to speculation, and objection to foundation.

Q Every nuclear plant that's operating generates spent fuel, does it not?

A Yes. That's a true statement.

Q If it can't take spent fuel out of its reactor, it has to shut down, correct?

MR. CRAWFORD: Objection to the foundation.



Q Do you know that to be a fact?

A Eventually that would be the case.

Q All right. And as I understand your answer, you believe that if a repository was available, a rate was achievable and reasonable, that would allow DOE to pick up spent fuel in an amount that removed the current year's discharges plus some amount of the backlog. Is that right?

MR. CRAWFORD: Objection, vagueness. Objection to the extent it calls for a legal conclusion.

Q Is that what you just told me?

A What I told you from a -- my personal opinion would have been that a rate that would have done that, which kept pace with discharges and to remove some amount of the backlog, would have been an appropriate rate.

Q And then the backlog under your scenario that you've described would have been eliminated sometime within five, ten years after the reactor ceased operation, so there's no spent fuel on site. Is that right?

A That was my expectation.
Q Okay. Well, I'm still not sure I understand what the source of your expectation was. Where did you get that expectation?
A Where did I get the expectation. I'm trying to understand your question. Why did I believe that to be the case?
Q Yes, sir.
A Because -- I believe that to be the case because of my knowledge of what reactors discharged on an aggregate basis, and assuming a '98 start for a repository, what inventories might have been like and how long it would take to work them off. It's a mathematical equation basically.
Q Where did you get your understanding about the DOE side of the equation, how fast it would have been -- or what rate would be reasonable for DOE to take the fuel?
MR. CRAWFORD: Well, let me object to the vagueness of that and the fact that it mischaracterizes his prior testimony.
Q I didn't mean to mischaracterize your



testimony. I'm trying to be accurate.
MR. CRAWFORD: I was dealing with the DOE side of it.
A From my perspective at that time as a utility employee observing the department's programs -- the department's programs, and I'm not sure in which documents, certain documents would have stated a programmatic intent of developing a system of that magnitude.
Q Is the Nuclear Waste Policy Act the authority for the department's program?
MR. CRAWFORD: Objection. Vagueness.
A The legal authority for the program?
Q Yeah.
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A I'm not a lawyer so I don't know. I believe so.
Q Well, is there a distinction in your mind between the DOE's program and the standard contract?
A Yes.
Q What is it?



A The program could have goals that go beyond its contractual commitments.
Q Are you aware of whether DOE's program went beyond its contractual commitments?
MR. CRAWFORD: Objection, vagueness as to time.
MR. BLANTON: Well, contractual commitments at the time it signed the contract.
MR. CRAWFORD: Objection. Foundation.
A I don't know.
Q You don't know?
A I don't know.
MR. CRAWFORD: Stan, if you're about to move into other area, would this be a good time to take a lunch break?
MR. BLANTON: Why don't we do the '85 plan and then we can take a lunch break.
MR. CRAWFORD: Okay.
(Off the record discussion.)
Q All right. Exhibit 9 to your deposition is a copy of Volume 1 -- oh, is it all of them? Volume 1, 2, and 3, for your reading enjoyment, of the



mission plan for the Civilian Radioactive Waste Management Program.
A Thank you. Should I start?
Q Yeah. Take as long as you need to review that document.
Do you recall whether you were involved in reviewing and/or commenting on the mission plan for either Wisconsin Electric or any industry group?
A I don't recall ever doing it for an industry group. If I did it for Wisconsin Electric, I believe our comments would have been submitted. And I don't necessarily recall that, but it would be evident if it was submitted.
Q Has your work at the Department of Energy caused you to have to review the mission plans for any reason?
A No. Well, other than at the request of counsel in the past --
Q Other than for the purpose of defending litigation.
A No.
Q Let me get you to look at page 15.

MR. CRAWFORD: Objection to the vagueness of the question.
A I recall it was one of their strategies. And that's what this section is entitled, Program Strategy.
Q Do you recall that whether or not a repository was available was not intended to have any effect on the acceptance rate?
A That was the program's strategy, the program's plan, yes.
Q In Exhibit 9 on page 593 of Volume 3 --
A Oh, that's this one here. Hold on.
Q The big, big one.
MR. CRAWFORD: 141648.
MR. HANDWERKER: 141648.
Q If we're all on the same page, the letter you should be looking at is a July 6, 1984, letter on Wisconsin Electric Power Company stationery to Charles Head, acting director. Is that what you're looking at?
A That's what I'm looking at.
Q And it appears to have been written by or



signed by C. W. Fay, vice president nuclear power?
A Uh-huh.
Q As of July 6, 1984, were you a contract administrator at WEPCO?
A I believe I was. I'm not certain, but I could have been.
Q Do you know whether you assisted in the preparation of this letter?
A I believe I assisted in the preparation of this letter.
Q Is it familiar to you?
A I've seen it before.
Q Okay. Well, when is the last time you've seen it, do you recall?
A The last time I've seen it may have been when we were preparing for litigation a year or so ago. Prior to that I hadn't seen it since --
Q July 6, 1984?
A Right, probably.
Q Under comment one, you see the numbered comments?
A I see them.



Q It says "DOE must be prepared to accept spent fuel from utilities on a schedule which will obviate the construction or deployment of additional reactor storage capacity after January 31, 1998." Do you see that sentence?
A I see that.
Q Do you know what that comment was based on?
A That was Wisconsin Electric's belief that that's what should be done.
Q Did you write that comment?
A I don't know if I wrote that comment. I participated in this, the development of this letter, Howard Shimon, myself, who was my boss at the time, probably wrote this together. And I'm sure it went through other concurrences and changes before it reached Bud Fay, C.W. Fay.
Q Was it Wisconsin Electric's position at the time that that was the DOE's contractual obligation?
A It says that that's what the DOE should do. I'm not sure that I would say it says contractual obligation.
Q It says that's what DOE must do?



A Must do. But I don't think -- I don't recollect it ever being discussed in the context of contractual obligations. It was what the program must do on the program mission plan.
Q Did you agree with that statement at the time the letter was sent?
A That was the company's position. I'm not sure I had a position, whether I agreed or disagreed with it. I don't recollect.
Q The next sentence of comment one says "While operation of the first repository by that date at a capacity of 3,000 MTU per year would be the preferred means of accomplishing such an objective, it is essential that DOE firmly commit to employ whatever means are necessary to commence acceptance of spent fuel from utilities on or before the June 31, 1998 date." Do you see that?
A Yes, I see that.
Q Do you recall whether or not you participated in authoring that sentence?
A I don't recall to what extent I did or not.
Q Was that your position at the time this

letter was sent?
A That was my position at the time the letter was sent, and that was the company's position, that the program should commit to whatever it needed to do to cause this to happen.
Q What's the basis for the 3,000 MTU per year? That's M as in man, T as in ton, and U as in uranium. Also M as in metric.
A Again, that's I believe as I talked to earlier, I spoke to earlier, is the -- my understanding, and I think it was the general understanding at the time that 3,000 tons a year would be a sufficient rate to work off the backlog and the discharges in a reasonable time frame.
Q Now, at this point in time were you participating in any industry groups that you mentioned earlier?
A I may have just started. I mean, I would have been a neophyte in this end of the business at that point in time, having just come over from being a civil engineer to the wonderful world of nuclear fuel.
Q Do you see in the first paragraph where it



says "Wisconsin Electric has reviewed the draft mission plan issued by DOE and it has participated in the formulation of comments prepared by Edison Electric Institute, Utility Nuclear Waste Management Group, and the Electric Utility Companies Nuclear Transportation Group"?
A I see that.
Q Do you know whether you were the WEPCO representative for that participation?
A I know I definitely wasn't for the EUCNTG, and I'm not sure whether I was or wasn't for the UNWMG.
Q Who would have been if you not?
A Howard Shimon.
Q Could you spell his last name, please.
A S-h-i-m-o-n.
MR. HANDWERKER: Volume 3, page 32, which is Bates PA 141086.
Q That should be a July 9, 1984, letter to Charles Head?
A Uh-huh.
Q From Mr. John J. Kearney, vice president of



Edison Electric Institute. Are we looking at the same document?
A I believe we are.
Q Having had a chance to review that document, do you recall whether you've seen this letter before?
A Having looked at the front page and gone no further, I've seen it in preparation for litigation over the last several years, and I don't recall whether or not I saw it in 1984. I could have seen it in 1984.
Q Does this appear to be the same letter referenced in Wisconsin Electric's letter of July 6 where they say, We endorse the comments of all these groups?
A Hold on.
It appears to be the same letter referred to in the July 6th, '94 -- 1984 letter. Yes.
Q Look at enclosure one to the EEI letter, which has a page number 36 on the bottom on mine?
A Enclosure one?
Q Enclosure one should be titled Waste



Acceptance Schedule Interim Storage and Waste Generation Rate?
A I see that.
Q Take a second and look at it, if you would.
A Any particular portion or the entire --
Q That's about a page and a quarter. I ask if you would --
A That's fine.
Okay. I've read enclosure one.
Q Do you recall participating in conversations in industry groups where the issues discussed in enclosure one were discussed?
A I don't believe I would have done it at the time enclosure one was developed. I think I would have been too new on that job to have done that as a participation in industry groups.
Q Do you recall this essentially being the position of the industry at the time you became involved with respect to waste acceptance?
A Reading now that it was, I'm not sure I recall specifically, but, yes, this is consistent with whatever partial memories I had that enclosure one was

and the industry that became known as the ACR issue resolution process. I don't know when it began exactly. My recollection is sometime in the '86ish time frame, '87ish time frame. But I don't have knowledge as to when it started.

Q Would the ACR issue resolution process have dealt with changes to the contract?

A It would have dealt with issues that the utilities as a group and DOE thought required discussion for clarification. It could have resulted in changes to the contract.

Q Okay. Do you recall what those issues were?

A Specifically, no. There were 30-something-odd issues I believe, but I don't recall offhand what they were.

Q Do you recall ever any discussion -- and I'm looking at the first page of Exhibit 12 to your deposition where in the whereas clause it has "Whereas the DOE has responsibility following the commencement of operation of a repository," and has a change indicated and has "delete the word 'repository' and



insert the phrase 'DOE facility.'" do you remember that ever being a subject of the ACR issues task force?

A It was not.

Q Or, excuse me, ACR issue resolution process?

A I don't -- I don't recall it as one of the issues, no.

Q Do you recall in any other context a question regarding changing the word "repository" to "DOE facility" in that clause?

A I do not recall that.

Q Even since you've been at DOE?

A No, do not recall.

MR. CRAWFORD: Can we take a break?

MR. BLANTON: Yeah, we sure can.

(There is a recess from the record.)

Q Mr. Zabransky, Exhibit 13 to your deposition is a document entitled Index to Tables of Issues Related to the Standard Contract and has a Bates number CTR 0060139 at the bottom. And goes from 0139 to 0174 on the Bates numbers.



(Deposition Exhibit Zabransky 13 was marked for identification and was attached to the transcript.)

Q Do you recognize this document?

A I don't recognize this specific document, no.

Q Do you recognize any of the issues as issues that the ACR issues resolution process addressed?

A This appears to be some of the issues, if not all the issues -- some of the issues that were developed as part of the ACR issue resolution team meeting the DOE process, whatever you want to call it.

Q Can you tell, based on your experience at DOE, what the function of this particular document is? Is this a particular type of document that gets generated in the course of processing changes to a contract at DOE?

A No, I don't know what the function of this document is.

Q Let me get you to look for a second at -- it's going to be -- the Bates number at the bottom of



the page is going to be CTR -- excuse me. That's not right either. CTR 0060158. This is talking generally about the purchaser's right to adjust the quantities of SNF and HLW plus or minus 20 percent from its delivery commitment schedule.

A Yes.

Q Do you remember that being an issue in the ACR issues resolution process?

A That was an issue that was identified.

Q Could you describe what the issue was?

A Well, the issue that was identified by DOE was that -- and again, I was not at the DOE at the time, but as DOE identified the issue for our discussion was that how was that going to work and what did that mean. And how would that be -- how would that affect transportation cask planning and procurement. So it was a scheduling and procurement and cask availability issue that they wanted to discuss.

Q And the "that" being the option of the purchaser to adjust the quantities listed in the DCS by 20 percent? When you say "that," is that what

you're referring to?
A To adjust the DCS number in the FDS plus or minus 20 percent.
Q How does DOE take that into account, that right into account in connection with the limit on the quantity of fuel that can go on a DCS?
A It doesn't. I don't -- I believe the adjustment goes to the FDS.
Q Okay. What happens if everybody increases their quantities on their DCS by 20 percent and it ends up being the total quantity would be more than the acceptance rate in the ACR?
A That was the issue DOE identified that they needed to work through.
Q Do you recall how that was resolved?
A It wasn't resolved.
Q Has it ever been resolved?
A Not to my knowledge.
Q Does that issue reflect an inconsistency between the contract and the practice of DOE of limiting the quantities in DCSs to the allocations in the ACR?



A I would have to go review the contract.
Q Okay.
(Deposition Exhibit Zabransky 14 was marked for identification and was attached to the transcript.)
A The contract states that the purchaser shall have the right to adjust the quantities of SNF and/or high-level waste plus or minus 20 percent and the delivery schedule up to two months until the submission of the final delivery schedule.
Q Is the 20 percent 20 percent of the amount shown on its approved DCS?
A I believe the answer is yes.
Q Okay.
A The amount on the approved DCS.
Q I think you testified earlier that if a DCS was submitted that had a quantity different than the allocation in the most recent ACR, that that DCS would most likely not be approved?
A That's what I --
Q Am I following you?
A That's correct.



Q So my question is, is the limit on the DCS to the ACR quantities inconsistent with that provision that allows the purchaser a 20 percent increase over the DCS amounts?
A My understanding in my reading of this provision is that they could adjust the amount of the approved DCS.
Q Without respect to what was in the ACR?
A They could adjust the amount as the contract says in the approved DCS plus or minus 20 percent.
Q So is it correct then that the amount in the approved DCS was not binding on the customer, on the utility, to the extent it could adjust it under the term of the contract?
A Plus or minus 20 percent, that's correct.
MR. CRAWFORD: Let me object to that to the extent it sought a legal conclusion.
Q Has DOE had the occasion to process any request to increase the quantities on approved DCSs?
A To my knowledge, not subject to this provision, no.



Q Well, in any other way, has anybody asked to increase the quantity in a DCS that's already been approved?
A No. Not to my recollection.
Q Is there any limit until the submission of the final delivery schedule on when the quantities can be adjusted?
A As the contract says, it states in the last sentence of Article 5.B.2 "Until the submission of the final delivery schedule."
Q So is it correct that DOE could approve the DCS on day one, and on day two the utility could change the quantity in the DCS by 20 percent?
A Or decrease it by -- yes, plus or minus 20 percent.
Q And could do that at any time up until the final delivery commitment schedules are issued?
A That's what the contract says.
Q But had a utility submitted a delivery commitment schedule in the first instance that was in excess of the ACR quantities, DOE would reject it?
A That is my understanding.

followed to attempt to modify the contract to insert a waste acceptance schedule?
MR. CRAWFORD: Objection to the vagueness of the context there.
You can answer to the best of your knowledge.
Q Well, let me strike that question.
The last sentence of this section says "After this evaluation is completed, DOE will be in a position to enter into the contract amendment process with utilities to add this new provision." And the question is are you aware of anything that ever happened in that regard?
MR. CRAWFORD: Objection. Foundation.
A As again being at Wisconsin Electric I was never involved with anything with that regard, to add a contract provision which specifies the minimum amount of spent fuel or waste acceptance.
Q Have you learned since you've been at DOE that any such process occurred?
A I have not.
Q Or even of these discussions since you've



been at DOE?
A No, I've not discussed this or learned of this or dealt with this since I've been at DOE.
(Deposition Exhibit Zabransky 17 was marked for identification and was attached to the transcript.)
Q In connection, Mr. Zabransky, with your work in various industry groups that had to do with the spent-fuel issue, did you take any leadership positions in any of those groups, on task forces or committees?
A I believe I did.
Q Do you recall the Program Strategy and Schedule Task Force?
A No, I don't.
Q You don't recall being chairman of the program strategy?
A That one I don't. No, actually I don't. Must have been a long time ago.
Q Well, what do you recall having been --
A Let's see, I think there was the high-level waste working group at UWASTE and UNWMG and the EPRI



spent fuel -- whatever the heck they called it, task force, whatever group they called theirs. And for awhile I chaired the ACR response team. But that one I don't recollect.
Q Okay. Do you recall being a member of the High-Level Waste Spent-Fuel Storage Working Group?
A Yes. At UNWMG?
Q Yes. And Mr. Tomonto --
A Bob Tomonto from Florida Power & Light.
Q -- from FP&L maybe was the chairman?
A Yes.
Q We had marked as Exhibit 17 to your deposition some meeting notes dated March 25, 1987, of the Utility Nuclear Waste Management Group High-Level Waste Spent-Fuel Storage Working Group. The first question I have is prior to 1987 do you recall any leadership positions you had taken in the UNWMG?
A I don't recall.
Q Assuming since you can't remember this one can you remember an earlier one.
A No, I don't remember this one so -- I don't recall anything prior to this.



Q The second page of that letter discusses a "Mr. D. Zabransky, chairman of the Program, Strategy, and Task Force, led the group in a discussion of the draft UNWMG response to DOE about the draft mission plan amendment issue January 28, 1987." Do you see that?
A I see that. Yes, sir.
Q After you have a chance to read that paragraph, do you recall being at that meeting?
A I don't recall this specific meeting, no.
Q Do you recall working on the comments to the draft or response to the draft mission plan amendment issued in 1987 on behalf of Wisconsin Electric or EEI or --
A Not specifically, no.
Q -- anybody else?
A No, I don't specifically recall that, no.
Q According to this document it says "A principal concern of the group was the need to emphasize DOE's obligation to begin accepting spent fuel in significant quantities in 1998."
A Yes.

Q What, if anything, do you recall about the concern the group had in that regard with the draft mission plan amendment?
A With respect to this specific amendment, draft amendment, I don't recall. In general I think it was a concern of the industry and Wisconsin Electric and others that DOE was not -- had not been forceful enough in committing to a date and a rate. And people wanted a firmer commitment because they felt a commitment was lacking.
Q This says "As recommended by the Program Strategy and Schedule Task Force, it was the consensus of the group that UNWMG express itself in sterner language in its response to DOE." Do you recall what that refers to?
A I presume what it refers to, reading through in here, is that we sent them a strong letter with our comments saying -- expressing our displeasure as an industry group.
Q Was it your position that a stern letter should be sent to -- your position personally a stern letter should be sent to DOE on this issue?



MR. CRAWFORD: Objection. Foundation.
A I believe so.
Q Okay. It says "Subsequent to the meeting, revisions were made to the draft EEI UNWMG letter, and the comments were transmitted to DOE on April 3, 1987." Does that indicate that there was already a draft of the letter, of an EEI UNWMG letter, available and you didn't think it was strong enough?
A I think the purpose of the discussion was to that effect, yes, having read this paragraph.
Q Does reviewing this jog your memory at all about what the Program Strategy and Schedule Task Force did?
A No. There were many task forces.
Q Okay. Who did you work with principally in your work with UNWMG? Was it other industry people or was it trade association people or both?
A Both.
Q Who would the trade association people have been?
A The constant would have been Steve Kraft.
Q Okay.



A There were other people that came and went depending upon the time frame. And again in '87 I don't know if that would have been Brian Farrell or Nancy Slater.
Q How about in the industry?
A Membership on the group changed. Bob Tomonto was there. Greg Snipes from Duke. John Vincent from GPU, General Utilities at the time. Other people would come and go. There were several active utilities that were always involved, and there were people that came and went.
Q Do you recall what the source of your position was that DOE had an obligation to accept spent fuel in significant quantities in 1998?
A That was the industry's position.
Q Yeah, but based on what?
A Based upon what the industry wanted DOE to do.
Q Well, this doesn't say the industry wants DOE to do it. It says DOE has an obligation to.
A That was our position.
Q Based on what?



A Based on that was our position they had an obligation.
Q Where did their obligation come from?
A I can't answer that. That was the industry position.
Q Do you have any reason to doubt that you led this discussion as described in these minutes?
A I have no reason to doubt that.
Q Do you recall whether either in connection with your work with UNWMG or Wisconsin Electric you spoke in terms of a DOE obligation to accept fuel in significant quantities as opposed to --
A I don't recall that specifically.
Q -- as opposed to your hope that they would?
A I think it was my belief, my personal belief, that they had to.
Q Okay. Because of the contract?
MR. CRAWFORD: Objection to the extent that it calls for a legal conclusion.
A Because I had a contract. That was my personal belief.
Q Now, this indicates that a letter was sent

based on this meeting?
A That's what it says.
Q Am I reading that correctly?
A That's what it appears to say.
Q Do you have any idea what you meant by using the term "significant quantities" in 1998 --
MR. CRAWFORD: Objection.
Q -- as used in the minutes marked Zabransky Exhibit 17?
MR. CRAWFORD: Objection. Assumes facts not in evidence.
A I wouldn't know the specific number that I meant at that point in time, but it would have been, from my perspective at that point in time, enough so that I wouldn't have had trouble at my plant. That was my concern.
Q And trouble, define how --
A Having to do with spent fuel that I didn't need to deal with. That was my position, the company's position in 1987.
Q Having to add storage space outside your pool?



A That was the industry position, yes.
Q And you agreed with it?
A Sure. Yes.
(Deposition Exhibit Zabransky 18 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, I'm going to hand you what's been marked as Zabransky Exhibit 18 which is page 411 through -- what? I can't tell.
A 417, 18, 19?
Q I can't tell. It's a letter, the signature sign is John J. Kearney, Senior Vice President, Edison Electric Institute, a letter to Ben C. Rusche on the draft mission plan amendment. Take a second and review that if you want to.
A In its entirety?
MR. CRAWFORD: Let's get on the record just kind of where this thing was pulled out of.
MR. HANDWERKER: It's from the 1987 mission plan, June '87 mission plan amendment. It's 411 through 418 of the comments.
Q If it helps you, I'm not going to ask you



anything after page four -- well, wait a minute. Maybe I will.
MR. CRAWFORD: Don't tie yourself down.
MR. BLANTON: As a matter of fact, I think I will.
(There is a recess from the record.)
Q Have you had a chance to review number 18, Exhibit 18 to your deposition, Mr. Zabransky?
A Yes, sir.
Q Is this letter the letter that resulted from the meeting that we just talked about that was Exhibit 17 to your deposition? It refers to comments that were transmitted to DOE on April 3, 1987?
A It appears to be.
Q Do you know if you, in connection with your work with the UNWMG, participated in drafting these comments?
A I did not participate in drafting these comments.
Q Did you review and comment on the comments before they went in?
A I would have, yes.



Q Okay. Do you recall whether you disagreed with any of these comments?
A I did not, to my knowledge, disagree with any comments as far as I'm aware.
Q On page 417 of the comments they say "A significant change between the mission plan DMPA" -- which I assume refers to the draft mission plan amendment -- "occurs in the magnitude, time of, and rate at which DOE will accept spent fuel." Do you see that?
A Uh-huh.
Q Do you recall any discussions about the content of that particular paragraph among the UNWMG members?
A Not specifically about that particular paragraph, no.
Q Are you aware of whether what is expressed in this paragraph is generally the same subject matter as what you discussed in the meeting on March 25th, 1987, as chairman of the Program Strategy and Schedule Task Force?
A I have no reason to believe it isn't a

157

spent fuel.
Q Look at page 414 of the document. Talking about monitored retrievable storage facility.
A Uh-huh.
Q The last sentence of that paragraph says "Now the MRS is more important to NWPA implementation because it is the only feasible way that DOE can meet its 1998 statutory and contractual obligation."
Why was the MRS important to the DOE's ability to meet its contractual obligation?
MR. CRAWFORD: Objection. Foundation.
A Why did the industry say this -- why was that the industry position? Is that what you're asking me?
Q Well, do you think that's not correct now? Do you think the position you took in 1987 is not correct?
A But this -- okay. Why did the industry believe in 1998 or at that point in time why the only way to meet the contractual and statutory obligation was to have an MRS?
Q Did you believe that then?

158

A Yes, I did.
Q Why?
A Because there was no way they could have built a repository by 1998 at this point in time.
Q Would it have made any sense to have a repository or an MRS and accept fuel at such a small rate that it took decades to remove it from the plant sites?
MR. CRAWFORD: Objection to the extent it assumes facts not in evidence.
A It wouldn't have made sense to the industry, no.
Q Would it have made sense to anyone? Would it have made sense to DOE?
A No.
Q Doesn't the longer you take to remove the fuel the more it costs?
A I can't make that conclusion.
Q Certainly the longer you operate a repository and MRS the more it costs to operate. Is that a fair statement?
A That could be a fair statement, but there's

159

a lot of facts that need to be considered.
Q All other things being equal, it costs less to run one for 40 years than to run one for 90?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A Speculating that all other things are being equal, that would be a true statement. But all other things are never equal.
Q Was there anything that caused you to agree with the comments in the draft mission plan or in these EEI comments other than the fact that you happen to work in the electric utility industry?
A I'm not sure what you're asking me. Is there anything that caused me --
Q I'm asking did you come to the conclusion that these comments were correct based on your own judgment or just based on the fact that that's what your employer thought?
A Given the information I had available to me, I believed these comments. I still do believe these comments given the information I had available to me.

160

Q Are you aware of any information that you have now that you didn't have then that calls these comments into question?
MR. CRAWFORD: Objection. Vague.
A My personal opinion is that these comments were valid then, and as customer of DOE, as a member of the industry, this was my industry position as to what they should be doing pursuant to our relationship.
Q I guess my question is, Mr. Zabransky, don't take this the wrong way, but were you posturing or did you really believe what was in here?
A I believe these things, sure.
Q And do you believe them now?
A Do I believe specifically which comments now?
Q Do you believe at the time these were written that all the -- do you believe now that at the time these were written they were all valid comments?
MR. CRAWFORD: Objection. Vague.
A I believe now that at the time these were written these were all valid comments.

Q Do you know how long the repository receiving facilities at Yucca Mountain are designed to operate?
A At this time we haven't finalized a design. There are design requirements that appear in the systems requirements documents that give the designers guidance as to how long they must have the facility operational. Those are -- it's also predicated on the fact that the contracts run as long as the nuclear plants run, if not longer. So as soon as we know how long you're going to run nuclear plants, we can then have an idea how long the facilities have to operate.
Q Well, is there any assumption in the system requirements regarding how long after the last plant shuts down the repository is scheduled to operate?
A There are assumptions in the systems requirements documents for planning bases that postulate the length of operation assuming a beginning of acceptance of a repository in 2010. I do not know specifically what those numbers are.
Q Okay. I don't remember whether you told me or not. Are you aware of anything that -- any facts



now that makes these comments on April 3, 1987, inaccurate?
MR. CRAWFORD: Objection. Vague. Objection, relevance.
A Facts now that are in existence that weren't in existence at this point in time where that there is an MRS linkage. MRS couldn't be constructed as these comments suggested.
Q Okay. And you're referring to -- okay, anything else before I ask follow-up on that?
A Other comments in here, if you want to go specifically one by one, with respect to quantities and things like that are no longer valid. But --
Q Why are they no longer valid?
A Because the industry no longer projects it's going to generate 79,000 tons of spent fuel.
Q They project less now?
A More now.
Q More?
A So, I mean, this document is 15 years old. It was valid then. Certain assumptions that went into its preparation are no longer valid.



Q Okay. The linkages that you're referring to that would have prevented the MRS development in the way it's suggested in Zabransky 18, are you referring to the linkages in the Nuclear Waste Policy Act amendments of 1987?
A That's correct.
Q Other than the Nuclear Waste Policy Act amendments of 1987, is there any other reason why an MRS could not be developed the way it's envisioned to have been -- it should be developed in Zabransky 18?
A By 1998 as envisioned here, all -- were there no linkages, there still would be the issue of siting and development of a facility, just as there is with a repository.
Q Okay. But I thought I understood you to say that it could not be developed because of the linkages.
A And again this presumed -- this called for an MRS by '98. Even without linkages there's no assurance one could have been developed by '98.
Q No assurance, but as I understand your testimony the linkages made development of an MRS as



envisioned in Zabransky 18 impossible?
A That's correct.
Q Okay. Is there anything else other than the linkages that make it impossible, to your knowledge?
A Not that I'm aware of, no.
Q And again the linkages we're talking about are the ones contained in the 1987 amendments to the Nuclear Waste Policy Act?
A Correct.
MR. CRAWFORD: Are you going to move on to another exhibit at this point?
MR. BLANTON: Let me see. Yeah.
MR. CRAWFORD: Okay.
MR. BLANTON: Kind of the same general subject but another exhibit.
MR. CRAWFORD: Let's give Dave a break.
(There is a recess from the record.)
(Deposition Exhibit Zabransky 19 was marked for identification and was attached to the transcript.)

beginning January 31, 1998. While we are aware of the delays experienced to date in the OCRWM program and schedule, we expect DOE to take immediate actions to ensure these contractual obligations can and will be fulfilled."

What was the basis for your statement that DOE had a contractual commitment to accept spent fuel specifically from Point Beach beginning January 31, 1998?

MR. CRAWFORD: Objection. Relevance.

A Well, my lawyers told me there was a contractual obligation. I believed them. And Point Beach had among the oldest fuel in the country. It would have been the first year. Of any allocation scheme.

Q Do you know where Point Beach's fuel ranked in the priority ranking?

A Do I know where it is today without looking? No. Did I know where it was then? Yes.

Q Well, was it the first one? Were you first in line?

A Not the first in line, no.



Q Okay. And so my question is the basis for your -- and January 31, 1998, was the date, correct?

A That was the date, yes.

Q So my question is what was the basis of your comment that DOE was supposed to show up at Point Beach on the date and pick up fuel?

MR. CRAWFORD: Objection. Relevance.

A That was the company's position.

Q You wrote this letter, didn't you?

A I wrote this letter. I relayed the company's position.

Q Or did somebody other than yourself come up with this idea?

MR. CRAWFORD: Objection. Foundation.

A I don't know.

Q Did you believe that DOE had a contractual commitment to accept spent fuel from Point Beach beginning January 31, 1998?

A I believe they had a commitment to begin in the year of January 31st, 1998. I believe we were in the first year of allocations, yes.

Q Well, at this point in time were there any



allocations, August 26 of '88?

A There had been an APR in '87 I believe that ranked fuel.

Q But you don't know what the basis for your position was that on the first day of fuel acceptance they were supposed to show up at Point Beach?

A I don't recollect, no.

Q But do you agree with me -- am I misreading it, is that what it says?

A That's what the letter says.

(Deposition Exhibit Zabransky 23 was marked for identification and was attached to the transcript.)

Q Exhibit 23 to your deposition is a letter dated August 29, 1988, to Charles E. Kay, acting director of Office of Civilian Radioactive Waste Management, from John Kearney, senior vice president of EEI. Do you recall having seen this document before, now that you see it before you?

A I'm still reviewing it.

Q Okay.

A I may have seen this. I still have no



recollection of this particular document.

Q Okay. Are these comments, as comments go, aggressive with respect to DOE's position in the draft mission plan amendments?

MR. CRAWFORD: Objection. Vague.

A I'm not sure what you mean by "aggressive."

Q Well, they talk about EEI being dismayed and concerned with DOE's seeming lack of concern and things that are --

A They appear to express a higher level of frustration than earlier documents.

Q Well said. Thank you.

Is it likely that you would have adopted comments expressing this level of frustration without having reviewed them first?

MR. CRAWFORD: Objection. Foundation. Objection, vague. Objection, relevance.

A It's unlikely the company would have adopted comments without reviewing them when it was frustrated.

Q Who is Isaacs?

A I believe it's Tom Isaacs, who used to work

at DOE.
Q Do you know what that indicates when there's a name such as Isaacs and on the third page Rousso written out beside a comment?
A It would depend on where this document came from, whose document this was. I mean, I could speculate as to what it might mean, but I would be speculating.
MR. CRAWFORD: Don't speculate.
Q The third page of Mr. Kearney's letter says "Just as DOE must continue to develop and maintain the technical credibility of the waste program so, too, must DOE develop and maintain the credibility of its statutory obligation and contractual commitments to those that must rely on and are paying for DOE's high-level radioactive waste disposal services." Do you know what contractual commitments he's referring to?
A I believe as I stated previously, the industry believed there were contractual commitments with respect to the '98 date, as we were advised by our counsel. And I'm sure our counsel drafted this



section of this letter.
Q And later as advised by the D.C. Circuit Court of Appeals, I guess?
MR. CRAWFORD: Objection, relevance. Objection, argumentative.
Q Page one of the additional comments addresses Waste Acceptance Schedule Adoption. Do you see where I'm referring to?
A Yes, I see that section.
Q The first paragraph of that section says, Section 302 of the nuclear waste policy act reflects a "bargain" that Congress struck between DOE and those that generate high-level waste. Nuclear utilities and their consumers pay the cost for disposing of spent nuclear fuel they generate by paying the one-time disposal charge. And then there's a parenthetical into the nuclear waste fund, and in exchange the DOE is to begin disposing of that spent fuel beginning not later than January 31, 1998.
MR. CRAWFORD: I think it says January 13, 1980.
Q Well, actually it says January 31, 1988.



We were both wrong.
MR. CRAWFORD: Right, right.
MR. BLANTON: They correct themselves and say 1998 further down in the document.
MR. CRAWFORD: Oh, that's good.
Q Do you recall the concept of the Nuclear Waste Policy Act being a bargain between the utilities and DOE being something that you talked about in the utility nuclear waste management group?
MR. CRAWFORD: Objection. Relevance. Objection to the extent it calls for a legal conclusion.
A I believe the concept of there being a bargain was -- a bargain was something that was discussed among the utilities, yes.
Q And the bargain was what?
A The utilities paid and DOE disposed beginning January 31st, 1998.
Q Look at page three of the additional comments. The last sentence before Repository Schedule says "DOE's inaction will force utilities to devise ways to store spent fuel themselves beyond the



acceptance schedule mandated by the NWPA. Because of the costs involved in storing spent fuel beyond 1998, utilities may need to seek recovery of those costs from DOE-and not necessarily from nuclear waste fund." Was the idea, as late as 1988 when you were involved in the UNWMG, that part of the bargain included that a utility would not, in exchange for their fees that they had paid, they would not have to devise ways to store spent fuel themselves beyond the acceptance schedule mandated by the NWPA?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to the extent that it assumes facts not in evidence. That's it.
A I believe --
MR. CRAWFORD: Objection. Foundation.
Go ahead. Sorry.
THE WITNESS: That's okay.
A I believe what the sentence says is that if utilities need to devise ways of storing spent fuel we would hold DOE responsible for the costs. I don't think -- I didn't think that we wouldn't have to do that. And I didn't think even if DOE performed they

wouldn't have to do that necessarily. So this statement says that if utilities have to devise ways of storing spent fuel we would seek to recover those costs from DOE. That's the position I think is being transmitted in this sentence.

Q Based on what? What was going to be your theory that you were entitled to recover those costs from DOE?

A I'm not a lawyer. That's what -- my lawyers would have prepared this. We would have agreed with the lawyers. I don't know the theory. You can ask my lawyers at the time, some of whom are -- Jay Silberg would have done this. He would have made that statement.

Q Did you disagree with the statement?

A I didn't disagree with my lawyers. I'm not a lawyer.

Q Back on page two of the EEI comments there's first a quote from a letter from Secretary Hodel to Senator Johnston that says "The department will accept spent fuel in 1998 whether or not a repository is in operation." Do you see that?



A I see that, yes.

Q And the next paragraph says that "the NWPA completely ignores the statutory requirement to accept waste on a timely schedule." And then the next paragraph after that has 2.5 written in handwriting out to the left of it. Says "This departure from the NWPA's obligations is completely unacceptable. Wholly apart from the statutory obligation and contractual commitments, it is simply unfair for DOE to collect from utilities and their consumers billions of dollars without equivalent performance by DOE of its part of the bargain." What was "equivalent performance by DOE of its part of the bargain"? What does that mean?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

A I would speculate what the writer of this sentence meant. I mean, I didn't write this sentence. I don't disagree with the sentiment. I know what I think it means, but I don't know what the person who wrote this means.

Q Well, what did you think it meant when you adopted it from Wisconsin Electric?



MR. CRAWFORD: Objection. Foundation.

A I think it expressed a frustration that we had sensed, as you see throughout this letter, that DOE had come to the conclusion that there was no obligation and that it was unfair that we had signed a contract and they had determined there was no obligation.

Q I think my question was what did you think performance by DOE of its part of the bargain would consist of?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

A To begin accepting spent fuel by January 31st, 1998, as stated in that sentence.

Q In what quantities?

A I don't think I thought about that at that point in time.

Q Was the fact of the matter that at this point in time that the 1998 date was in such question that people were focused on that rather than rate?

A I think as you read this letter it's focused on the commencement of operations.



Q You can't accept quantities without accepting -- without having something to accept it at, right?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to the foundation.

A You have -- can't accept quantities without having something?

Q Without starting in the first place.

A That's a true statement.

Q Do you recall an organization called UWASTE?

A Yes, I do.

Q What was that?

A That was the successor to UNWMG.

Q Was there a particular reason you all changed from UNWMG to UWASTE?

A Nobody could say UNWMG.

Q Good choice. I congratulate your judgment on that one.

What was the systems integration committee, task force, group, of the high-level waste working