**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**VOLUME IA OF X**
**(Pages A 0047 to A 0108)**

---

**ENERGY NORTHWEST'S CORRECTED APPENDIX IN SUPPORT OF ITS CORRECTED NOTICE OF DESIGNATION OF DEPOSITION AND PRIOR TRIAL TESTIMONY OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO ADMIT PRIOR TESTIMONY INTO EVIDENCE**

---

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
202-639-6000

NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

June 3, 2008

*Attorneys for Plaintiff*

## Table Of Contents To Appendix – Volumes I to X

### Volume I

Documents Cited

DOE's Responses to Utility Plaintiffs' First Set of Interrogatories..........................A 0001

DOE's Responses to Utility Plaintiffs' Joint Supplemental Interrogatories.............A 0013

April 3, 2002 30(b)(6) Notice of Deposition .........................................................A 0028

April 18, 2002 30(b)(6) Notice of Deposition ........................................................A 0033

November 12, 2004 30(b)(6) Notice of Deposition.................................................A 0039

March 2, 2005 30(b)(6) Notice of Deposition ........................................................A 0043

### Volume IA

April 19, 2007 30(b)(6) Notice of Deposition ........................................................A 0047

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 2450874
(Fed. Cl. Sept. 17, 2004) (unpublished)...........................................................A 0050

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, slip. op.
(Fed. Cl. Sept. 21, 2004) (unpublished)...........................................................A 0063

*Wisc. Elec. Power Co. v. United States*, No. 00-697C, slip op.
(Fed. Cl. Aug. 16, 2007) (unpublished)...........................................................A 0073

Defendant's Unopposed Motion to Designate Prior Trial Testimony of
Mr. Robert L. Morgan in System Fuels ..........................................................A 0103

### Volume II

Deposition Transcripts and Trial Testimony Excerpts

Chart of Energy Northwest Deposition and Trial Testimony Designations .............A 0109

Barrett, Lake ..........................................................................................................A 0128
April 22, 2002 ...............................................................................................A 0129
April 23, 2002 ...............................................................................................A 0165
April 26, 2002 ...............................................................................................A 0191
May 8, 2002 ..................................................................................................A 0225
May 10, 2002 ................................................................................................A 0250
May 14, 2002 ................................................................................................A 0278
May 15, 2002 ................................................................................................A 0286

## Volume III


Brownstein, Alan ........ A 0289
- April 9, 2002 ........ A 0290
- April 10, 2002 ........ A 0318
- April 11, 2002 ........ A 0350
- May 23, 2002 ........ A 0363
- June 14, 2002 ........ A 0368

Cole, Billy M. ........ A 0376
- March 12, 2002 ........ A 0377
- March 13, 2002 ........ A 0411
- June 4, 2002 ........ A 0419

Dreyfus, Daniel ........ A 0422
- May 15, 2002 ........ A 0423


## Volume IV


Klein, Susan ........ A 0438
- April 24, 2002 (Rule 30(b)(6)) ........ A 0439
- April 25, 2002 (Rule 30(b)(6)) ........ A 0478

Kouts, Christopher ........ A 0493
- January 30, 2004 ........ A 0494
- February 19, 2004 ........ A 0504
- August 2, 2004 (in the Yankee Atomic Trial Transcript) ........ A 0509
- April 11, 2005 (Rule 30(b)(6)) ........ A 0516
- July 12, 2005 (in the TVA Trial Transcript) ........ A 0532
- October 26, 2005 (in the Southern Nuclear Trial Transcript) ........ A 0538
- June 13, 2006 (in the Pacific Gas Trial Transcript) ........ A 0550
- June 14, 2006 (in the Pacific Gas Trial Transcript) ........ A 0555
- October 11, 2006 ........ A 0571
- January 16, 2007 (in the System Fuels Mississippi Trial Transcript) ........ A 0581
- April 12, 2007 (in the System Fuels Entergy Trial Transcript) ........ A 0585


## Volume V


Kouts, Christopher (continued) ........ A 0612
- May 1, 2007 (Rule 30(b)(6)) ........ A 0612
- May 2, 2007 ........ A 0634

Lawrence, Michael ........ A 0654
- May 20, 2002 ........ A 0655
- May 21, 2002 ........ A 0697
- November 16, 2007 (in the Carolina Power Trial Transcript) ........ A 0712

Milner, Ronald ........ A 0726
May 1, 2002 ........ A 0727

**Volume VI**

Milner, Ronald (continued) ........ A 0762
May 2, 2002 ........ A 0762
May 3, 2002 ........ A 0799
May 7, 2002 ........ A 0814
May 7, 2002 (Afternoon) ........ A 0831
May 8, 2002 ........ A 0838
August 11, 2004 (in the Yankee Atomic Trial Transcript) ........ A 0851

Morgan, Robert ........ A 0866
March 21, 2002 ........ A 0867
March 22, 2002 ........ A 0905
June 25, 2002 ........ A 0913
August 3, 2004 (in the Yankee Atomic Trial Transcript) ........ A 0917

**Volume VII**

Morgan, Robert (continued) ........ A 0925
November 15, 2006 ........ A 0925
November 16, 2006 (in the Northern States Trial Transcript) ........ A 0943
November 13, 2007 (in the Carolina Power Trial Transcript) ........ A 0953

Pollog, Thomas ........ A 0962
April 11, 2002 (Rule 30(b)(6)) ........ A 0963
April 12, 2002 (Rule 30(b)(6)) ........ A 1002
May 15, 2002 (Rule 30(b)(6)) ........ A 1026
May 16, 2002 (Rule 30(b)(6)) ........ A 1046
May 22, 2002 ........ A 1066

**Volume VIII**

Pollog, Thomas (continued) ........ A 1073
August 4, 2004 (in the Yankee Atomic Trial Transcript) ........ A 1073
March 29, 2005 (in the SMUD Trial Transcript) ........ A 1098
July 12, 2005 (in the TVA Trial Transcript) ........ A 1108
October 26, 2005 (in the Southern Nuclear Trial Transcript) ........ A 1115
October 12, 2006 ........ A 1122
November 15, 2006 (in the Northern States Trial Transcript) ........ A 1126

Rosselli, Robert ........ A 1137
April 15, 2002 ........ A 1138
April 16, 2002 ........ A 1168

Rusche, Benard ........ A 1173
May 16, 2002 ........ A 1174
May 17, 2002 ........ A 1197
August 3, 2004 (in the Yankee Atomic Trial Transcript) ........ A 1207

Slater-Thompson, Nancy ........ A 1215
April 21, 1999 ........ A 1216
April 22, 1999 ........ A 1228

**Volume IX**

Slater-Thompson, Nancy (continued) ........ A 1239
June 13, 2002 ........ A 1239

Trebules, Victor ........ A 1255
April 17, 2002 ........ A 1256
April 18, 2002 (Coordinated Discovery) ........ A 1289
April 18, 2002 (Deposition in Yankee Cases ........ A 1305
April 19, 2002 ........ A 1317

Williams, Jeffrey ........ A 1319
June 11, 2002 ........ A 1320
January 22, 2004 ........ A 1340

Zabransky, David ........ A 1368
April 17, 2002 ........ A 1369

**Volume X**

Zabransky, David (continued) ........ A 1401
April 18, 2002 ........ A 1401
April 19, 2002 ........ A 1428
June 5, 2002 ........ A 1440
June 6, 2002 ........ A 1445
August 5, 2004 (in the Yankee Atomic Trial Transcript) ........ A 1449
March 28, 2005 (in the SMUD Trial Transcript) ........ A 1473
March 29, 2005 (in the SMUD Trial Transcript) ........ A 1487
April 12, 2005 (Rule 30(b)(6)) ........ A 1491
July 12, 2005 (in the TVA Trial Transcript) ........ A 1503
October 27, 2005 (in the Southern Nuclear Trial Transcript) ........ A 1508
November 20, 2006 (in the Northern States Trial Transcript) ........ A 1519
October 11, 2007 (in the Wisconsin Electric Trial Transcript) ........ A 1528
October 12, 2007 (in the Wisconsin Electric Trial Transcript) ........ A 1532
November 13, 2007 (in the Carolina Power Trial Transcript) ........ A 1538

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 04-106C<br><br>(Chief Judge Damich) |

NOTICE OF DEPOSITION

Please take notice that, pursuant to Rules 30(a)(1) and 30(b)(6) of the Rules of the Court of Federal Claims, plaintiff Dairyland Power Cooperative will take the deposition of Christopher Kouts upon oral examination before an officer authorized by law to administer oaths, commencing May 1, 2007, at Greenberg Traurig, LLP, 800 Connecticut Avenue, NW, Suite 500, Washington, DC 20006, commencing at 9:00 a.m., or at a time and place agreed upon between counsel for the parties, and continuing from day to day until completed.

Pursuant to RCFC 30(b)(6), defendant United States has designated Mr. Kouts to testify upon its behalf as to the following subjects:

1. The rate(s) of acceptance that DOE planned to use under the Standard Contracts (a) before DOE determined that it would not begin accepting spent fuel in a permanent repository in 1998, and (b) after that time.

2. A reasonable annual rate of acceptance for spent fuel under the Standard Contracts, and the factors to consider in determining a reasonable rate.

3. The earliest date that DOE currently believes that it will begin accepting spent fuel under the Standard Contracts.

Δ π EXHIBIT 11
Deponent Kouts
Date 5-1-07 Rptr. VR
WWW.DEPOBOOK.COM

'DC 371419420v1 4/19/2007

4. The acceptance rate that DOE is planning to use once spent fuel acceptance begins pursuant to the Standard Contracts.

5. The date on which DOE currently plans to complete picking up spent fuel from Dairyland's site.

6. The reasonableness or unreasonableness of Dairyland's expenditures on private fuel storage initiatives.

7. The reasonableness or unreasonableness of Dairyland's storage of its spent fuel in its spent fuel pool during the period subsequent to January 31, 1998.

8. The reasonableness or unreasonableness of Dairyland's study, analysis investigation and implementation of dry storage for its spent fuel during the period subsequent to January 31, 1998.

April 19, 2007

Respectfully submitted,

JERRY STOUCK
Greenberg Traurig, LLP
800 Connecticut Avenue, NW
Suite 500
Washington, DC 20006
(202) 331-3173 (Telephone)
(202) 261-4751 (Facsimile)
*Counsel for Plaintiff*
DAIRYLAND POWER COOPERATIVE

Of Counsel:
Robert L. Shapiro
Kevin E. Stern
GREENBERG TRAURIG, LLP

CERTIFICATE OF SERVICE

I certify that I caused a copy of the foregoing Notice of Deposition be served by facsimile and first class mail this 19th day of April 2007 on:

Russell A. Shultis
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Classification Unit, Eighth Floor
1100 L Street, N.W.
Washington, D.C. 20530

Kevin E. Stern

**H**

Yankee Atomic Elec. Co. v. U.S.
Fed.Cl.,2004.
Only the Westlaw citation is currently available.
United States Court of Federal Claims.
YANKEE ATOMIC ELECTRIC COMPANY, Plaintiff,
v.
THE UNITED STATES, Defendant.
**No. 98-126 C.**

Sept. 17, 2004.

ORDER [FN1]

FN1. This should also be deemed applicable in *Connecticut Yankee v.. United States,* No. 98-154 and *Maine Yankee v. United States,* No. 98-474.MEROW, Senior J.

***1** This matter is before the court on plaintiffs' Bench Memorandum Addressing the Admissibility of Certain Exhibits Prepared by Contractors, to which defendant filed its Response, and plaintiffs filed a Reply Memorandum.

Plaintiffs assert that exhibits charted in Exhibit 1 to the Bench Memorandum are admissible as non-hearsay pursuant to Fed.R.Evid. 801(d)(2) and several other hearsay exceptions. For the most part they are documents of national laboratories and other contractors to the Department of Energy ("DOE") and include analysis of priority for shutdown reactors and other acceptance scenarios, fuel shipment strategies, consideration of failed fuel and delivery commitment schedules, allocations between nuclear utilities, program costs, treatment of greater-than-class C waste ("GTCC"), trading of acceptance rights, and the effects of trading of acceptance rights on transportation-all part of the development of DOE's spent nuclear fuel program.

The documents concerned are relevant to the issues in this litigation. Although the parties commendably reached agreement with respect to the admission of most of the many exhibits offered in this action, defendant objected to numerous contractor documents charted in Exhibit 1 to plaintiffs' Bench Memorandum. Subsequently, the parties stipulated to the admission of these documents, reserving objection as to their use particularly for the truth of the matters asserted therein. *See* Yankee Atomic's Submittal of Admitted Exhibits for Both Parties filed July 30, 2004. Plaintiffs posit: (1) many, if not all, of the documents are public records pursuant to Fed.R.Evid. 803(8); (2) the documents are authorized statements of DOE or statements made by servants or agents of DOE within the scope of that servitude under Fed.R.Evid. 801(d)(2)(C); and (3) two of the documents are ancient and therefore admissible pursuant to Fed.R.Evid. 803(16).

Contesting the asserted public nature of these exhibits, defendant finds fault with plaintiffs' premise that documents generated by national laboratories, such as the Pacific Northwest National Laboratory ("PNNL"),[FN2] are documents of a government agency. Defendant also argues that statements from such entities are not DOE policy which is formed only at the highest levels of the Department. Public records are asserted by defendant to be limited to those classic documents such as reports of convictions, automobile titles, applicants for government firefighting positions, court records, and weather.

FN2. In addition to PNNL, the contractors include Battelle Memorial Institute; Martin Marietta Energy Systems, Inc. and Science Applications International Corp.; TRW Environmental Safety Systems, Inc.; Weston, Rogers & Associates; Pacific Nuclear; E.R. Johnson for Oak Ridge National Laboratory; ERM Program Management Co.; and Lockheed Martin Idaho Technologies, Inc.

*The contractors-who are they?*



© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs assert DOE relies on its contractors to provide highly technical and specialized expertise in formulating DOE's policies and plans under the Nuclear Waste Policy Act ("NWPA") and related statutes and regulations, as well as under the Standard Contract for spent nuclear fuel ("SNF") involved in this litigation. In this regard, defendant asserts plaintiffs have misrepresented the status of documents from PNNL, stating that plaintiffs rely only on a page from the PNNL website which "[f]ar from establishing that PNNL is part of DOE, that page indicates that PNNL performs work for other Government agencies as well as private industry," and is operated for DOE by Battelle, a private contractor. Def. Resp. at 2. "Thus, the Yankees have shown no more reason to believe that PNNL is part of DOE than the Department of Defense or a private company."*Id.*

***2** Initially, the court notes the ".gov" designation of PNNL-www.pnl.gov. The organization is presented as holding governmental status. Absent evidence disassociating the organizations from action as DOE surrogates with governmental-type status, the documents relevant to DOE's spent fuel program from any of these entities have been admitted. Going further, however, a brief foray into PNNL's website reveals that "[r]esearchers at [PNNL], an *Office of Science* laboratory within the U.S. Department of Energy, are advancing the frontiers of scientific knowledge and rapidly translating their discoveries into innovative technologies. *Seewww.pnl.gov* (Last visited August 5, 2004) (link in original). The link to "Office of Science," the scientific advisor to the Secretary of Energy, describes its Director as an Assistant Secretary equivalent, nominated by the President of the United States and confirmed by the Senate. Duties and responsibilities of the Director of the Office of Science include advising the Secretary of Energy "with respect to the well-being and management of the multipurpose laboratories under the jurisdiction of the Department, excluding laboratories that constitute part of the nuclear weapons *www.science.doe.gov/sub/director/statutory Responsibilities.htm* (last visited August 5, 2004), citing 42 U.S.C. § 7139. DOE's Office of Science, Office of Resource Management ("ORM") Fiscal 2005 Year Budget Request to Congress includes approximately $108 million dollars for PNNL. *www.sc.doe.gov/orm/Budget Finance/ Budget Finance main.htm.* p. 29 (last visited August 5 & 6, 2004).

Document authors also include the Idaho National Engineering and Environmental Laboratory ("INEEL").[FN3] DOE's Office of Science "... funds research and development projects conducted at [Idaho National Engineering and six other laboratories], which are overseen by other DOE *www.science.doe.gov/Sub/Organizatio* offices."FN4*n/Map/national labs and userfacilities.htm,* p. 2 (last visited August 12, 2004); *See alsowww.inel.gov/* (Last visited August 11, 2004). As noted by counsel, INEEL is apparently operated by private contractors including Battelle Memorial Institute. The DOE Idaho Operations Office website represents public accessibility to documents from the Idaho Operations Office, its operating contractors, and predecessor organizations. *www.id.doe.gov/FOIA/home.htm.Missouri, ex rel. Garstang v. United States Dept. of Interior,* 297 F.3d 745, 750-51 (8th Cir.2002).

FN3. With respect to the status of Rob Campbell, one of the originators of documents in question, the Idaho Operations Office website has a directory for DOE and for INEEL. There is not a listing for a Rob Campbell under INEEL. Robert A. (Rob) Campbell is listed in the DOE directory as a nuclear engineer in Washington, DC.

FN4. The Office of Science website reports a fiscal year 2005 budget request of $7,261,000 for INEEL, categorized under the Idaho Operations Office total budget request of $8,396,000 inclusive of the INEEL request. *See* FY 2005 Congressional Budget Request for DOE's Office of Sci-



© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ence, p. 25 located at *www.sc.doe.gov/orm/Budget Finance/ Budget Finance main.htm.* (Last visited August 12, 2004).

INEEL provides management and technical services for DOE's spent nuclear fuel program.

Established in 1949 as the National Reactor Testing Station, the INEEL was once the site of the world's largest concentration of nuclear reactors. Fifty-two test reactors-most of them first-of-a-kind-were built and operated, including the Navy's first prototype nuclear propulsion-plant. Of these, three are still operating .... The INEEL provides specialized management, applied research, systems analysis, proof-of-concept engineering, technological support, and related services for various offices of the Department of Energy (DOE). [Those services include the] Spent Nuclear Fuel Program:

***3** The Spent Nuclear Fuel Program consists of the National Spent Nuclear Fuel Program and the INEEL Spent Nuclear Fuel Program. The National Spent Nuclear Fuel Program provides a coordination and integration role in defining and ensuring resolution of the issues for disposition of DOE-owned spent nuclear fuel in the geologic repository, including quantification of the DOE spent nuclear fuel inventory. The National Spent Nuclear Fuel Program provides quality assurance certification of the DOE complex spent nuclear fuel programs.

*www.inel.gov/about* (Last visited August 12, 2004), p. 3.

To a significant, if not exclusive extent, DOE's activities, duties and responsibilities under the NWPA, have been and are conducted through its national laboratories and management and operation ("M & O") contractors. *See Westinghouse Electric Co. v. United States,* 1997 WL 1068204 at *2 (Fed.Cl.1997) ("Unlike a typical Government contract through which the Government obtains products and services to assist it in carrying out its mission, DOE uses the M & O contract to conduct its mission.").*See also*42 U.S.C. § 10222(d) authorizing the Secretary of Energy to expend funds for nongeneric research, development and demonstration activities under the Act and "the costs associated with acquisition, design, modification, replacement, operation, and construction of facilities at a repository site," and 42 U.S.C. § 7257(authorizing the Secretary of Energy to "acquire, construct, improve, repair, operate, and maintain laboratories ....") and 42 U .S.C. § 7139(a) and (b)(3) (authorizing the Director of DOE's Office of Science to advise the Secretary of Energy "with respect to the well-being and management of the multipurpose laboratories under the jurisdiction of the Department."). Witness testimony was not to the contrary. Dr. Bartlett, former director of the Office of Civilian Radioactive Waste Management ("OCRWM") within DOE testified that OCRWM's work was performed by M & O contractors with oversight from DOE.[FN5]

FN5. Dr. Bartlett testified at trial:

Q. Dr. Bartlett, as I mentioned when I described the cover of this document, it was prepared by the management and operations contractor at that time. When you were director, to what extent did you and OCRWM rely upon studies prepared by the management and operations contractor such as this one?

A. All of the work is done by the-by the support contractors. That's what they're there for. The Department of Energy has-OCRWM itself has about 65 employees. The program has about 5,000 employees if you look at it this way. These are contractor people.

The M & O organizes all of them, but it includes activities within Sandia National Laboratories, Los Alamos National Laboratory, Livermore National Laboratory, the U.S. Geological Survey.



© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> And a lot of the engineering is done by, at our time, the TRW Systems, M & O contractor, management and operations contractor.
>
> The work is done by those folks. And the job of the DOE people is to oversight that, do the program planning, give them guidance and direction for what their activities should be.
>
> Trial Tr. at 615:24-616:22.

With this background, the court examines whether these contractor documents can be relied upon for the truth of the matters asserted therein.

*Public records*

Hearsay, an out-of-court statement, is generally inadmissible for the truth of its contents since cross-examination at trial is not possible. Generally, deference is given to personal appearance at trial with cross-examination.Fed.R.Evid. 801 and 802. Notwithstanding the general rule, however, some out-of-court statements are excluded from this prohibition because "under certain circumstances, a statement, although it is hearsay, may still possess circumstantial guarantees of trustworthiness sufficient to justify its admission as evidence."*Moss v. Ole South Real Estates, Inc.*, 933 F.2d 1300, 1305 (5th Cir.1991), citing *Rock v. Huffco Gas & Oil Co.*, 922 F.2d 272, 280 (5th Cir.1991).

Rule 803 excludes several categories of evidence from the hearsay ban, including data compilations of the activities by and of a public agency.Fed.R.Evid. 803(8)(A) provides in relevant part that "[t]he following are not excluded by the hearsay rule, even though the declarant is available as a witness: ... (8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency,...." The Advisory Committee Notes explain that "[j]ustification for the exception is the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record."*See Moss,* 933 F.2d at 1305,*citing Bradford Trust Co. v. Merrill Lynch, Pierce, Fenner and Smith,* 805 F.2d 49, 54 (2nd Cir.1986) ("Rule 803(8) 'is premised on the assumption that public officials perform their duties properly without motive or interest other than to submit accurate and fair reports." ').

***4** Since the assurance of accuracy is generally greater for public records than for private business records, the proponent is usually not required to establish their admissibility through foundation testimony.[FN6] Rule 803 documents are non-hearsay and admissible regardless of the availability of the declarant. As *Weinstein's Federal Evidence* explains: "[n]early all of the exceptions [to the hearsay rule in rule 803] represent types of hearsay evidence that judicial experience reveals have sufficient reliability to justify consideration by the trier of fact with or without the presence of the declarant and regardless of whether the declarant is absent, that absence can be explained." 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* at 803-1 (Joseph M. McLaughlin ed., 2d ed.2004). This treatment is premised on both the underlying trustworthiness of public documents as well as the desire to avoid calling a government official to attest to the same.*Vanadium Corp. v. Fidelity & Deposit Co.*, 159 F.2d 105, 109 (2nd Cir.1947) (inconvenience would result if testimony from government officials was required; an official duty provides circumstantial probability of trustworthiness).*See generally Standard Havens Products, Inc. v. Gencor Industries,* 953 F.2d 1360, 1371-72 (Fed.Cir.1991) (upholding admission of patent Certificate of Correction under public record exception to the hearsay rule).

> FN6. Though foundational testimony is generally not required, "... a custodian or other qualified witness must testify if questions have been raised about the manner in which the records were made or kept...." 5



© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* § 803.10[2], pp. 803-92.

Admissibility is presumed and the burden of proof is on the party opposing introduction. *Columbia First Bank FSB v. United States,* 58 Fed. Cl. 333, 339 (Fed.Cl.2003) (quoting *Weinstein's Federal Evidence* § 803.10[2] ).*See also Coast Fed. Bank, FSB v. United States,* 48 Fed. Cl. 402, 446 (2000)*rev'd,*309 F.3d 1353 (Fed.Cir.2002), *vacated by*320 F.3d 1338 (Fed.Cir.2003), *aff'd en banc,*323 F.3d 1035 (Fed.Cir.2003) (noting that "the rule shifts the burden of demonstrating 'lack of trustworthiness' to the opponent of the evidence once it is established that the evidence is in fact a public record") (citing *Johnson v. City of Pleasanton,* 982 F.2d 350, 352 (9th Cir.1992) and *Zeus Enterprises, Inc. v. Alphin Aircraft, Inc.,* 190 F.3d 238, 241 (4th Cir.1999) (explaining that under Rule 803(8), admission is presumed as a matter of course absent sufficient negative factors of untrustworthiness for which the opponent of admission bears the burden of proof). Although presumptively admissible, there are ample possible arguments for exclusion. Fed.R.Evid. 803(8) advisory committee's note (The rule "assumes admissibility in the first instance but with ample provision for escape if sufficient negative factors are present.").

Plaintiffs contend that most of the documents are maintained in DOE files or on government websites and are public records of DOE that "set [ ] forth the activities of" DOE.[FN7]

FN7. Plaintiffs state that "... except for a few exhibits (PX0148, PX0163, PX0169, PX0172, PX0184, PX01845, PX0856, PX1156 and PX1157), the challenged documents were kept in files either at DOE's headquarters or at Pacific Northwest National Laboratory, or are maintained on the government's RIS-Web or at the National Technical Information Service's website, *www.ntis.gov.* a central resource of government-funded scientific, technical, engineering, and business related information."Pls.' Reply, pp. 6-7.

Public agency under Rule 803(8)(A) is construed broadly and extends to quasi-public entities. In *Erickson v. Baxter Healthcare, Inc.,* 151 F.Supp.2d 952 (N.D.Ill.2001) a report from the Institute of Medicine, a private subsidiary of the National Academy of Sciences, also a private entity, was admitted under Rule 803(8), the court reasoning that the Academy was a quasi-public entity created by Act of Congress specifically to conduct investigations for and report to Congress, and the subject report was within that mandate. The agency's legal duty to provide reports whenever called upon by Congress supplied the requisite " 'indicia of reliability commensurate with a public entity.'" 151 F.Supp.2d at 967, citing Michael H. Grahman, *Federal Practice & Proc.: Evid.* § 7049. at 476 (Interim ed.2000) and *Gilbrook v. City of Westminster,* 177 F.3d 839, 848, 858 (9th Cir.1999) (admitting report of citizens' committee appointed by city counsel as a public record). In *United States v. Davis,* 826 F.Supp. 617, 621 (D.R.I.1993), a report of a contractor on behalf of the Environmental Protection Agency ("EPA") as to the nature and extent of environmental contamination at a hazardous waste site was admitted under Fed.R.Evid. 803(8)(C) as a report of a public agency.[FN8] *See also Watts v. City of Hartford,* 2004 WL 717132 at *4, n. 8 (D.Conn.2004) ("A non-governmental entity may be deemed a public agency for purposes of this exception when it has an ongoing legal duty to provide the government with information or when it is a quasi-public entity created by the government to service its needs.") (citations omitted).*See also Ellis v. International Playtex, Inc.,* 745 F.2d 292, 301 (4th Cir.1984) (admitting studies of the Center for Disease Control, a branch of the United States Department of Health and Human Services, as well as a study conducted by state health departments, as public offices), *Dynasciences Corp. v. United States,* 214 Ct.Cl. 643 (1977) (upholding admission of performance reports furnished to the Renegotiation Board by procuring agencies), and *United*



© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*States v. Tyson,* 1986 WL 9250 at *8 (E.D.Pa.1986) (noting that the inclusion of reports of independent contractors in a report of a governmental agency did not preclude application of the Rule).

> FN8. Although *United States v. Davis,* 826 F.Supp. 617 (D.R.I.1993) and other authorities cited herein involve other subsections of Rule 803(8), construction of "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies" is common to the court's focus here on subsection (A) "the activities of the office or agency."Furthermore, to the extent that the documents in question here fall under subsection (C) as "... factual findings resulting from an investigation made pursuant to authority granted by law ...." the cases are directly analogous.

***5** Moreover, it is not necessary that the government agency have firsthand knowledge of all matters contained in the records as long as the agency has " 'firsthand knowledge *of the investigation....*" ' *United States v. Davis,* 826 F.Supp. 617, 621, n. 19 (D.R.I.1993), *citing Robbins v. Whelan,* 653 F.2d 47, 52 (1st Cir.1981).*See Matter of Oil Spill by the Amoco Cadiz,* 954 F.2d 1279, 1308 (7th Cir.1992) (describing Rule 803(8) as admitting multilevel hearsay and noting that the Rule does not require the document be kept in the course of a regularly conducted activity). Personal knowledge is satisfied if a colleague or subordinate has knowledge. *Weinstein's Federal Evidence* § 803.10[3](a). The Supreme Court in *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) concluded that opinions or conclusions derived from data contained in a report are admissible under 803(8)(C). 488 U.S. at 161-62. *See also Robbins v. Whelan,* 653 F.2d 47, 52 (1st Cir.1981) (rejecting an argument that firsthand knowledge was lacking in a Department of Transportation compilation of data provided by car manufacturers, and admitting the compilation under Rule 803(8)(C)). Moreover, any tentative findings and statistical compilations contained in the documents do not preclude application of the Rule. *Ellis v. Int'l Playtex, Inc.,* 745 F.2d at 301.

Defendant cites *Marsee v. United States Tobacco Co.,* 866 F.2d 319 (10th Cir.1989) in support of its assertion that contractor documents should not be admitted under Fed.R.Evid. 803(8).*Marsee* upheld the exclusion of reports from the International Agency for Research on Cancer and the National Institute of Health as hearsay because they did not qualify under several hearsay exceptions including Rule 803(8)(C). That Rule declares as non hearsay "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness."(emphasis supplied).*Marsee* applied subsection (C), concluding that "[n]either document reflects the findings of a government agency authorized by law to report on the adverse health effect of smokeless tobacco." 866 F.2d at 325, emphasis added. The case does not address subsection (A) analyzed by the court here. Of note is the trial court decision, *Marsee v. United States Tobacco Co.,* 639 F.Supp. 466, 470 (W.D.Okla.1986), which admitted a Report of the Surgeon General's Advisory Committee as an "authoritative, exhaustive study by a public agency ..." under Fed.R.Evid. 803(8)(C).

*Zeus Enterprise, Inc. v. Alphin Aircraft, Inc.,* 190 F.3d 238, 241 (4th Cir.1999) cited by defendant, concluded that the decision of an administrative law judge ("ALJ") fit within 803(8)(C) over objection that the ALJ's decision was not the result of an "investigation" as Rule 803(8)(C) requires. The analysis here is not that the contractor documents were the result of an investigation; the focus is whether they are records, reports or data compilations of any kind of a public agency. Likewise, *Hawthorne Partners v. AT & T Technologies, Inc.,*

A 0055

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 63054 (N.D.Ill.1994), cited by defendant, is distinguishable. In *Hawthorne Partners,* at issue was the admission of a preliminary report prepared by PRC Environmental Management, Inc. a private contractor hired by the EPA. Amidst questions of reliability because one of the parties had a role in the creation of the preliminary report, the court found the document did not fit the definition of public record under Rule 803(8) and lacked sufficient trustworthiness under the escape clause of Rule 803(8)(C) (providing for admission under the preceding subsections "... unless the sources of information or other circumstances indicate lack of trustworthiness."). Exclusion under Fed.R.Evid. 403 due to potential improper influence on a jury that outweighed the probative value of the preliminary report, was also cited.

***6** Defendant also cites *Smith v. Isuzu Motors Ltd.,* 137 F.3d 859 (5th Cir.1998) in support of its argument that the documents are preliminary or interim evaluation of staff members and thus cannot fall within the hearsay exception of 803(8)(A). By way of background, *Smith* was a products liability case concerning the safety of the Isuzu Trooper. A Congressman requested that the National Highway Traffic Safety Administration ("NHTSA") establish stability standards for certain types of passenger vehicles. Although the NHTSA rejected the request, plaintiffs sought to introduce a memorandum from NHTSA staff members that supported plaintiffs' liability theory. Noting that Fed.R.Evid. 803(8)(C) is a hearsay exception for "factual findings resulting from an investigation made pursuant to authority granted by law" absent indicia of untrustworthiness, *Smith* rejected admission of those pre-investigation documents under Fed.R.Evid. 803(8)(A), reasoning that if preliminary investigative reports were allowed under 803(8)(A), then 803(8)(C)-factual findings of an investigation-would be eviscerated. "If memoranda reflecting the preliminary opinions of agency staff members were admissible under Rule 803(8)(A), then Rule 803(8)(C)'s limitations would be meaningless." 137 F.3d at 862.

Likewise, defendant's reliance on *Blue Water Environmental, Inc. v. United States,* 60 Fed. Cl. 48 (2004) is unavailing. In *Blue Water Environmental,* the court held that a private contractor operating Brookhaven National Laboratory under an M & O contract with DOE was not a federal agency under the Tucker Act. Accordingly, the court held it lacked jurisdiction over a bid protest by a disappointed subcontractor "without reaching the issue of whether DOE's supervision of [the contractor's activities] might qualify as federal actions for other purposes."60 Fed. Cl. at 52. Similarly, *United States v. Orleans,* 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976), cited by defendant, held a contractor was not a federal agency for purposes of the Federal Tort Claims Act. Questions of whether a contractor is a federal agency under the Tucker Act or the Federal Tort Claims Act are not the same as the court's evidentiary inquiry here.

In this case, the records, reports, statements or data compilations, in any form, to the extent they are the activities of the DOE, are construed broadly to include those activities done by national laboratories at the behest of DOE and within the parameters thereof. The court is mindful of defendant's point that some of the documents contain a disclaimer that the views are those of the contractor/author, not of any government agency, a position that is relevant to the court's analysis of whether the documents are separately admissible as admissions of DOE, but not dispositive on their admissibility as public records. DOE cannot bifurcate its responsibilities for SNF and/or high level waste ("HLW") disposal by utilizing its M & O contractors to develop DOE's spent nuclear fuel program. Contracting statutory and regulatory responsibility does not eliminate the underlying public nature of these documents. *Erickson v. Baxter Healthcare, Inc.,* 151 F.Supp.2d 952, 967 (N.D.Ill.2001); *Watts v. City of Hartford,* 2004 WL 717132 at * 4 (D.Conn.2004); *United States v. Davis,* 826 F.Supp. 617, 621 (D.R.I.1992).*See also United States v. Lykes Bros. S.S. Co.,* 432 F.2d 1076, 1079-80 (5th Cir.1970)("[T]he duty to prepare the report can be



© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

delegated, under government regulations, to an independent agency or to a foreign government without the report losing its character, when submitted through the appropriate United States agency, as a report of a 'department or agency of the United States." '); *United States v. Summit Equip. & Supplies, Inc.*, 805 F.Supp. 1422, 1425, 1429-30 (N.D.Ohio 1992) (admitting the report of on-site coordinator and an EPA contractor who assisted in evaluating the extent of the contamination as public records); *McGonigle v. Combs*, 968 F.2d 810, 825 (9th Cir.1992) (declining to find error in the trial court's admission of a file memorandum written by a member of the staff of Kentucky's Director of Securities), and *Butkin Precision Mfg. Corp. v. United States*, 211 Ct.Cl. 110, 544 F.2d 499, 506 (Ct.Cl.1976) (affirming finding based on reports by government officials to the Renegotiation Board in the regular course of their and its business, citing Fed.R.Evid. 801(d)(2) [admission of a party opponent] and 803(8)[public records, reports, and data compilations of public agencies setting forth activities of that agency] ).

***7** Counsel for defendant represented that at least some of the SNF operations involved in the documents at issue are conducted by a hybrid of governmental and private individuals or organizations. To the extent that defendant has established that a document was completely privately maintained-that is, was not located (or ever located) in DOE or the national laboratory files, admission will not extend to the truth of the contents. However, to the extent the documents are from PNNL, INEEL or other national laboratory files, constitute the activities of that office or agency, are otherwise relevant, and were duly received by DOE, their admission shall, in appropriate context, extend to the truth of the contents under Fed.R.Evid. 803(8) as "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency ..." FN9

FN9. Defendant did not argue proffered documents of PNNL were not of "activities" of PNNL.

Defendant predicts that if so-called contractor documents are construed as public documents under Fed.R.Evid. 803(8), all sorts of extraneous data from a contractor could be inserted into government files, creating irrelevant litigation fodder. Application of the Rule in this instance, however, is not so productive of dross. A document generated by a contractor at DOE's behest must first of all be relevant. It also must be a record, report, statement, or compilation of data "in any form" "of" FN10 the agency. The court has allowed the admission of relevant documents that were (1) located in DOE files; (2) were (or are) the activities of DOE; and (3) do not contain any indicia of untrustworthiness.

FN10. It would perhaps be hyper-technical to note that the Rule includes as public documents data compilations in any form "of" not "by" the agency, the latter perhaps a more exclusive proposition.

Defendant argues that allowing contractor documents to be admissible as public documents would create a "ridiculous" result because, under plaintiffs' theory, all documents generated by a construction contractor under contract to build a federal courthouse would become "public records" and a contractor could potentially generate documents that could be used against the government in litigation. The "contractors" involved in the instant document issues are in no way analogous to a contractor who bids for and obtains a contract to construct a building. The documents indicate that the contractor personnel who operate DOE facilities are functionally indistinguishable from the DOE employees who request and use their research or drafting input. They are more akin to contract employees of DOE. *See United States v. Hopkins,* 427 U.S. 123, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976). There is no way courthouse construction contractor employees would be performing court work in an equivalent manner. Data compilations, records, reports or statements "of" public offices or agencies "setting forth" the activities of that agency are within the



© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

scope of the hearsay exception. The qualifier "of" does not mean that data compilations, records, reports and statements must in all situations have been authored by the public office or agency-just that they must have emanated therefrom. These are "... documents generated or collected by the national government in the course of its public functions."*In re Oil Spill by the Amoco Cadiz,* 954 F.2d at 1309. Here the documents produced by and from the government files as categorized by the Bates stamps satisfy that requirement.

***8** Moreover, in many situations, the documents are referred to, or data is used in other government documents, adding both to their reliability and their authenticity. *See United States v. Davis,* 826 F.Supp. 617, 620 (D.R.I.1993) (draft investigative report by government contractor regarding the nature and extent of contamination at a hazardous waste disposal site was what its proponent claimed, citing Fed.R.Evid. 901(a) and (6)(7)),[FN11] *Gilbrook v. City of Westminster,* 177 F.3d 839, 858 (9th Cir.1999) (noting the presumption that public records are authentic and trustworthy with the burden on the opponent of the evidence to present "enough negative factors to persuade a court that a report should not be admitted.").

> FN11.Fed.R.Evid. 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."Among the illustrative, but not limited, examples are "a purported public record, report, statement, or date compilation, in any form [ ] from the public office where items of this nature are kept."Fed.R.Evid. 901(b)(7).

Any reliance on contractor documents for a proposed finding(s) of fact may also require an accompanying discussion of the matters discussed herein. In that regard, data, opinion or other matters contained in a contractor document does not, however, necessarily serve to establish DOE policy. Nevertheless, such data, opinion, or other matter may be probative on, or appropriate evidence of, DOE's knowledge or the reasonableness of the data, opinion, or other matter.

*Authorized statements*

Plaintiffs also advocate the contractor documents under Fed.R.Evid. 801(d)(2) as admissions of defendant under either subsection (C) ("a statement by a person authorized by the party to make a statement concerning the subject") or subsection (D) ("a statement by the party's agent or servant concerning a matter within the scope of the agency or employment made during the existence of the relationship").[FN12] Plaintiffs insist that the contractors were "authorized" to make the statements concerning the subjects in the reports in the sense that they were specifically requested to perform work for DOE, matters which are not in dispute.[FN13] Defendant counters that authorization to do work is not the same as authorization to make binding admissions on behalf of DOE. Defendant argues that a request for technical recommendations does not stamp the imprimatur of the government on the resulting work product.

> FN12. In relevant part, Fed.R.Evid. 801(d)(2) provides:
>
> (d) Statements which are not hearsay. A statement is not hearsay if-
>
> ...
>
> (2) Admission by party-opponent. The statement is offered against a party and is ... (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, ...



© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN13. Indeed, Defendant's Response to Plaintiff's Bench Memorandum Addressing the Admissibility of Certain Exhibits Prepared by Contractors, which asserts that M & O contractors do not make DOE policy, admits that these contractors provided advice, input, suggestions and recommendations to the Department.

" '[A]dmissions [by a party-opponent] are outside the framework of hearsay exceptions, classed as nonhearsay, and excluded from the hearsay rule." ' FN14*The Globe Savings Bank, F.S.B. v. United States,* 61 Fed. Cl. 91, 94 (2004), citing 2 Charles McCormick, *McCormick on Evidence* § 254, at 137 (John W. Strong ed., 5th ed.1999). "It is a 'widely accepted rule that admissions of a party-opponent under Rule 801(d)(2) are accorded generous treatment in determinations of admissibility." ' *Id.,* at 96-97, *citing Aliotta v. National R.R. Passenger Corp.,* 315 F.3d 756, 761 (7th Cir.2003).

FN14." 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."Fed.R.Evid. 801(c).

*Westfed Holdings, Inc. v. United States,* 55 Fed. Cl. 544, 564-65 (2003) held that statements by a subsidiary were not admissions of the parent under Fed.R.Evid. 801(d)(2)(D) as there was no demonstration that the parent exercised sufficient control to establish an agency relationship, and no showing that the parent authorized the subsidiary to speak on its behalf. Similarly, due to lack of control on direction, no agency relationship was found between Westfed and its independent and other consultants to warrant introduction of their reports as party admissions. *See also Columbia First Bank, F.S.B. v. United States,* 58 Fed. Cl. 333, 340-41 (2003) (noting that to justify admission under Rules 803(d)(2)(D) an agency relationship must be established and the statement must have been made during the existence and scope of that relationship).*But see Coast Federal Bank, F.S.B. v. United States,* 48 Fed. Cl. 402, 228 (2000) (admitting reports from Goldman Sachs & Co. and plaintiff's external auditor as Rule 803(d)(2)(D) party admissions), and *Globe Savings Bank, supra,* (admitting deposition testimony of the former director of the Analysis and Evaluation Division of the Federal Savings and Loan Insurance Corporation under this Rule).

***9** On the issue of agency and authorization, plaintiffs cite trial testimony of Dr. Bartlett, former director of the Office of Civilian Radioactive Waste Management ("OCRWM") within DOE that the M & O contractors were authorized by the Department to make statements concerning the subjects addressed in studies. The dispute, however, is not really whether the work was authorized-these contractors did not research unilaterally. The question is whether the conclusions and recommendations therein were authorized positions of DOE under agency principles, or "only" technical input requisite to DOE's formulation of its policies and statements.FN15

FN15."This report was prepared as an account of work sponsored by an agency of the United States Government."PX0169. Trial testimony concerning the contractual relationship between Bechtel SAIC Company ("BSC"), OCRWM's current M & O contractor, explained that contractors assist DOE in the latter's work through an annual work plan augmented by technical direction letters should additional work be needed. The M & O contractors supervise their own work and prepare reports. Trial. Tr. at 3449:5-3450:1.

Under defendant's reasoning, the difference, if any, between one who is authorized to bind his or her principal on a matter, and one who is authorized to make a statement concerning a matter-a dubious distinction described in *Glendale* as a murky eddie-may be more imagined than real. Rule 801(d)(2)(D) is not limited to "agents," but also to "servants." Their statements made within the scope of their servitude fall within the Rule. Thus, discounting the



© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

typical response that the author is not authorized to speak or bind the party against whom admission is sought, Michael H. Graham, *Handbook of Federal Evidence* § 801.23 (5th ed.2001) explains:

The obvious difficulty with applying strict agency principles is that agents or servants are very rarely authorized to make damaging statements-the truck driver is hired to drive, not to talk. However as a result of the fact that it also seemed unreasonable to deny admission to inculpatory statements by the driver about the driving he was hired to do in light of the probable reliability of such statements, courts often stretched to find a basis for admissibility.

In recognition of the reliability and reasonableness of admitting such statements, Rule 801(d)(2)(D) declares statements of an agent or servant concerning a matter within the scope of his agency or employment to be defined as not hearsay if made during the existence of the relationship. Authority to speak is thus no longer of concern; all that is required is that the statement concern a matter within the scope of the agency or employment, and that the agent or servant still be employed at the time of making the statement. A statement meeting the requirement of Rule 801(d)(2)(D) is not made inadmissible simply because the statement was made to the employer and not a third person.

Graham at 168-78, extensive footnotes omitted.

Recognizing there are instances when representatives or agents can speak for the government, defendant cites as distinguishable, *Glendale Federal Bank, F.S.B. v. United States,* 39 Fed. Cl. 422, 452 (1997). In *Glendale,* the experts were on the government's witness list, so it was evident that their opinions in the case were consistent with the government as the sponsoring party. By designating them as experts, the government conferred agency on the designated experts and agreed to be bound by their statements. Absent evidence of adoption of the specific statements, data or position by DOE, defendant argues that neither 801(d)(2)(C) (authorized statement), nor 801(d)(2)(D) (statement by agent within the scope of agency), apply.

***10** A contract can create agency. *Rotec Indus. Inc. v. Mitsubishi Corp.,* 215 F.3d 1246, 1256 (Fed.Cir.2000) (citing *Chemtool Inc. v. Lubrication Technologies, Inc.,* 148 F.3d 742, 745 (7th Cir.1998) ("Although 'an agency relationship can be created by contract or conduct, not all contracts create agency relationships and not all conduct creates agency relationships." '). Citing *Condus v. Howard Savings Bank,* 986 F.Supp. 914, 916 (D.N.J.1997), plaintiffs recognize that contractors can either be agents, or non-agents, depending on the particular terms of the contract. Indeed, as plaintiffs point out, Battelle, one of the contractors in this case, was described as DOE's agent in the latter's 1981 experimental program for the underground storage of nuclear waste. *Paul v. Federal Mine Safety and Health Review Com'n,* 812 F.2d 717, 718 (D.C.Cir.1987). Here, due to the unique relationship between DOE and its contractors-who essentially perform DOE's governmental function of research for the development of the spent nuclear fuel program-these contractors are agents plaintiffs argue, citing *Westinghouse Electric Corp.,* 1997 WL 1068204 at *2 (noting the uniqueness of the DOE M & 0 contracts which involve use of government facilities, a long-term relationship between the M & O contractor and DOE with a close connection between the work and DOE's mission, and work that is substantially separate from other business of the contractor); *Michaels v. Michaels,* 767 F.2d 1185, 1201 (7th Cir.1985) (finding telexes by broker to a potential buyer of a closely held corporation to be admissions by an agent).

Defendant's reliance on *Kirk v. Raymark Industries, Inc.,* 61 F.3d 147, 163-64 (3rd Cir.1995) is not dispositive. *Kirk* focused on whether or not a non-testifying expert (a presumably impartial examiner), while undeniably retained by a party, is not necessarily authorized to make admissions against the party until such time as a decision is made by that party to call that expert at trial, citing Michael H. Graham, *Federal Practice and Procedure: Evid-*



© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*ence* § 6722, at 502(Interim Edition 1992) (the authority of the agent to speak as to a subject must be established at trial).*Reid Bros. Logging Co.v. Ketchikan Pulp Co.*, 699 F.2d 1292 (9th Cir.1983) although cited by defendant, supports the admission of the contractor documents. In *Reid Bros.*, a report was prepared by an employee of the Oji Paper Company of Japan, a shareholder of Alaska Pulp Company, the parent company of defendant Alaska Lumber and Pulp Company, at the latter's request. The report was circulated to defendant's officers and managers. Accordingly, there was no question that the author was authorized to make statements concerning these matters and the admission of the report under Rule 801(d)(2)(C) was found to be proper.[FN16]

FN16.*Reid* also noted that there was no requirement that an authorized statement be communicated to a third party. 699 F.2d 1307, n. 25; citations included Advisory Committee Notes.

There is authority that it is not necessary that the speaker communicate to other than his or her employer in order for the statement to be a binding admission against the latter. *See Theriot v. J. Ray McDermott & Co., Inc.*, 742 F.2d 877, 882 (5th Cir.1984) (finding statement made only to the principal himself is nevertheless admissible against the principal under this section) and Michael H. Graham, *Handbook of Federal Evidence* § 801.22, pp. 166-67, n.9. *See also Rollins v. Board of Governors for Higher Educ.*, 761 F.Supp. 939, 942-43 (D.R.I.1991) (finding a report prepared at defendant's request admissible as a statement authorized by the party, even if it was not prepared for consumption outside the Department).

***11** While plaintiffs' position in this regard is not without support, the court need not reach the separate admissibility of contractor documents under Rule 801. As "servants," direct employees of DOE could make binding admissions as to matters within their employment duties, and there may be no good reason to not afford the same evidentiary treatment to the contractors here. Any distinction between a nuclear physicist preparing tonnage estimates for DOE under a direct employment contract versus the M & O contracts here is questionable, and at best a matter of degree. On the other hand, while trial involved a myriad of issues to be resolved, the particular agency or servant relationship, and the extent of any authorization by the DOE to these contractors to make admissions on their behalf, counsel against finding statements made in these documents to be "admissions" by the DOE absent specific evidence that the contractual relationship included binding the government in this regard. These contractors were retained under unique circumstances to perform DOE's function, provided critical and essential data and input to DOE, and operate and manage the national laboratories for and on behalf of DOE. In a very real sense, these contractors performed DOE's statutory mission, or at a minimum provided the technical input to perform the same. Perhaps the murkiness in the waters of this Rule lies in the intertwining of the use of the words "admission by party-opponent" to denote the hearsay exception of Rule 801(d)(2), then described as a "statement" authorized by the party (here, the contractors were authorized to make the reports but those reports may not necessarily be admissions), or a "statement" by an agent or servant within the scope of that servitude (here, as servants the contractors made reports that also may not necessarily be admissions).[FN17] Admissions and statements are not necessarily the same. As a result, the court does not rule on the admissibility of the contractor documents under Rule 801(2), but reserves the issue for consideration with respect to any objection(s) made to specific proposed finding(s).

FN17. The Advisory Committee Notes state that: "[n]o authority is required for the general proposition that a statement authorized by a party to be made should have the status of an admission by the party."

*Business records, ancient documents and the like*

Plaintiffs also argue the documents are admissible



© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for their truth as business records under Fed.R.Evid. 803(8) (records of regularly conducted activity) or Fed.R.Evid. 801(d)(2)(B) (a statement of which defendant has manifested an adoption or a belief in its truth). Two of the documents, PX0641, dated February 2, 1984 (the authenticity of which is challenged by defendant) and PX0968, dated April 27, 1984, are independently admissible as ancient documents under Fed. R. Evid 803(a), plaintiffs urge.

The court reserves ruling on remaining alternative theories to the extent that admissibility for truth is addressed herein, but reserves the issue(s) for consideration with respect to any objection(s) made to specific proposed findings(s).

Accordingly, for the reasons stated above, it is ORDERED that:

***12** (1) Plaintiffs shall promptly electronically file the Bench Memorandum Addressing the Admissibility of Certain Exhibits dated July 12, 2004, and tendered to the court during trial proceedings, which Memorandum shall upon receipt be deemed filed *nunc pro tunc* (July 12, 2004);

(2) Proposed findings and objections to proposed findings, filed by the parties, shall clearly indicate, in the supporting record citations, any reliance on the contractor generated documents discussed herein.

Fed.Cl.,2004.
Yankee Atomic Elec. Co. v. U.S.
Not Reported in Fed.Cl., 2004 WL 2450874 (Fed.Cl.)

END OF DOCUMENT



© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:04-cv-00126-JDM Document 1-3 Filed 06/21/2004 Page 1 of 16

# In the United States Court of Federal Claims

No. 98-126 C

(Filed September 21, 2004)

******************************

| | |
|---|---|
| YANKEE ATOMIC | * |
| ELECTRIC COMPANY, | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| Defendant. | * |

******************************

**ORDER**[1/]

This matter is before the court on plaintiffs' Motion for Leave to File Designated Deposition Testimony as Substantive Evidence Pursuant to RCFC 32(a)(2); Motion for Leave to File Designated Deposition Testimony as Substantive Evidence and Rebuttal Evidence Pursuant to RCFC 32 and Federal Rules of Evidence 801(d)(2)(D); and Motion for Leave to File a Corrected Copy of its July 7, 2004 Motion for Leave to File Designated Deposition Testimony as Substantive Evidence. Defendant filed a Response to Plaintiff's Motions to Introduce Deposition Testimony and, to the Extent that Plaintiff's Motion is Granted, Submission of Defendant's Counter-Designations and Objections. Plaintiffs filed a Reply.

Plaintiffs seek to introduce as substantive evidence certain deposition testimony from several individuals including a witness designated by the defendant under Rule 30(b)(6) of the Rules of the Court of Federal Claims ("RCFC"), and high-level officials in the Office of Civilian Radioactive Waste Management ("OCRWM") at the Department of Energy ("DOE") during the relevant periods of inquiry. Asserted admissibility of deposition transcripts falls under several categories, including: (1) testimony of an individual designated by defendant admissible under RCFC 30(b)(6); (2) testimony by high-level government officials who were officers, directors, or managing agents admissible "for any purpose" under RCFC 32(a)(2); and testimony

---

[1/] This shall also be deemed applicable in *Connecticut Yankee v. United States,* No. 98-154 and *Maine Yankee v. United States*, No. 98-474.

admissible under RCFC 32 as well as Rule 801(d)(2)(D) of the Federal Rules of Evidence ("Fed. R. Evid."). These categories will be examined in turn.

**Designated witness:**

Susan Klein was designated as a Rule 30(b)(6)[2/] witness concerning DOE's obligation to accept greater-than-class-C ("GTCC") waste, the Standard Contract's provision for priority for shut-down reactors, and other topics.[3/] At the time of her deposition, numerous portions of which plaintiffs seek to introduce as substantive evidence, Ms. Klein was a senior policy adviser to the Director and Deputy Director of OCRWM at DOE. Pls.' Mot. Ex. 2.

Defendant objects to at least some of the targeted deposition testimony of Ms. Klein as going beyond the scope of her RCFC 30(b)(6) designation, objections raised repeatedly during her deposition defendant states.

---

[2/] The applicable subsection of RCFC 30(b)(6) provides:

> A party may in the party's notice. . . name as the deponent a . . . governmental agency and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the persons will testify.

[3/] The designated matters were:

3. DOE's responses to DCS (delivery commitment schedules) submitted by the utility plaintiffs, including DOE's decision to stop approving such DCS forms.

5. DOE's consideration of its obligation to accept Greater-Than-Class-C waste.

7. The date that DOE currently believes that it will begin accepting fuel under the Standard Contract and the acceptance rate that DOE is planning to use once acceptance begins.

9. The role and purpose of the provision on priority for shutdown reactors in the performance of the Standard Contract.

Pls.' Mot. Ex. 5, p. 5, parenthetical supplied.

Plaintiffs reply that most of Ms. Klein's testimony was not subject to objection as to scope. To the extent that her testimony went beyond that scope, as a senior policy advisor, her testimony in that regard is independently admissible as a party admission under Fed. R. Evid. 801(d)(2)(D), a matter discussed hereinafter. To the extent questioning went beyond the scope of the Rule 30(b)(6) designation, or is not otherwise admissible under this Order, the court will subsequently address appropriate objections, including objections lodged at the deposition, in the context of any proposed finding, or objection to a proposed finding, citing those portions of Ms. Klein's testimony for record support.

**Officer, director, or managing agent:**

Introduction of portions of the deposition of Lake Barrett, former Deputy Director of OCRWM, and Ronald Milner, former Chief Operating Officer is also sought. Plaintiffs assert that OCRWM is the arm of DOE charged with carrying out the functions of the Secretary under the Nuclear Waste Policy Act, 42 U.S.C. § 10224[4/] and 42 U.S.C. § 10131(b)(2). As Deputy Director and Chief Operating Officer, Mr. Barrett and Mr. Milner were the second and third ranking officers at OCRWM. Pls' Mot. Ex. 6. Mr. Barrett had been the Acting Director or Deputy Director of OCRWM since 1993 and had "ultimate responsibility" for OCRWM's annual capacity reports (" ACRs") and delivery commitment schedules, matters relevant to theories advanced in this litigation according to plaintiffs. Mr. Milner was responsible for managing the operational aspects of OCRWM, such as personnel, contracts, publications (including the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program), and fee adequacy reports. Based on the foregoing, plaintiffs submit that the deposition testimony of Mr. Barrett and Mr. Milner is admissible "for any purpose" under RCFC 32(a)(2)[5/] because these individuals were

---

[4/]Under 42 U.S.C. § 10224(a), OCRWM was established within DOE; the Director of OCRWM is responsible for carrying out the functions of the Secretary.

[5/]In relevant part the Rule provides:

> **(a) Use of Depositions**. At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or

(continued...)

"at the time of taking the deposition . . . an officer, director, or managing agent" of a defendant.

Defendant did not dispute plaintiffs' characterization of the representative authority of these two witnesses. Accordingly, admission as directors, officers or managing agents of DOE is appropriate. RCFC 32(a)(2); *Globe Savings Bank, F.S.B. v. United States*, 61 Fed. Cl. 91, 97-98 (2004). *See also* Fed. R. Evid. 801(d)(2)(C) and (D) (admission as party admissions) discussed *infra*.

**RCFC 32 and Fed. R. Evid. 801(d)(2)(D):**

Plaintiffs also request the designation of additional deposition testimony as party admissions under RCFC 32 and Fed. R. Evid. 801(d)(2)(D), including certain depositions in rebuttal. RCFC 32(a)(1) provides that "[a]ny deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness, or for any other purpose permitted by the Federal Rules of Evidence."

As substantive evidence, plaintiffs proffer deposition testimony from Robert Campbell, who at the time of his deposition was a program manager employed at DOE's Office of Environmental Management, with responsibility for GTCC waste issues; also Alan Brownstein, who at the time of his deposition was a DOE senior policy advisor to Lake Barrett, then Deputy Director of OCRWM. Mr. Brownstein began his employment as a nuclear industry specialist in the Spent Fuel Program where he was responsible for various schedule issues such as creating the ACRs. He later served as the branch chief and then division leader. During 1985 -1995 he was responsible for dealing with the utility industry and implementing the terms of the

---

[5/](...continued)
who had reasonable notice thereof, in accordance with any of the following provisions:

. . .

> (2) The deposition of a party or of anyone who at the time of taking the deposition was an officer, director, or managing agent, or a person designated under RCFC 30(b)(6) or 31(a) to testify on behalf of a public or private corporation, partnership or association or governmental agency which is a party may be used by an adverse party for any purpose.

RCFC 32(a)(2).

Standard Contract. He was identified by defendant as one of the eight most knowledgeable individuals at DOE on various schedule issues.

Plaintiffs also seek to admit deposition testimony of Nancy Slater-Thompson who joined DOE's Spent Fuel Program in August of 1991, and was employed in its Regulatory Coordination Division at the time of her depositions. From 1991 until 1995, she participated in the preparation of ACRs and annual priority rankings ("APRs") and was involved in the Standard Contract's provisions for exchanges and priority for shutdown reactors. She also responded to questions internally and externally regarding the terms and conditions of the contracts. She was identified by defendant as one of the eight most knowledgeable individuals at DOE on exchanges of allocations, the acceptance rate and other schedule-related issues.

Plaintiffs also request the designation of additional deposition excerpts from Ronald Milner and Lake Barrett. Finally, plaintiffs seek to admit deposition testimony of Victor Trebules who had worked for DOE (formerly the Atomic Energy Commission) since 1972, and was working for DOE at the date of his deposition. He was responsible for coordinating the preparation of DOE's 1985 Mission Plan and his proffered deposition testimony concerns his work in preparing the Mission Plan. As possible rebuttal evidence, plaintiffs also submit deposition segments from Brownstein, Milner and Slater-Thompson.

Admission of these depositions is premised on their characterization as admissions by agents or servants of the government, testifying as to matters within the scope of their employment or agency. As such, they are non-hearsay party admissions under Fed. R. Evid. 801(d)(1)(2)(d) which provides in pertinent part:

> **(d) Statements which are not hearsay.** A statement is not hearsay if–
> . . .
> (2) Admission by party-opponent. The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, . . . .

"[I]f 'the deponent is an agent, his statement falls into category (D) and we need not determine whether or not he was 'authorized' to speak.'" *Hughes v. United States*, No. 90-878C, slip op. at 3 (Fed. Cl. April 26, 2004), *citing Glendale Fed. Bank, F.S.B. v. United States*, 39 Fed. Cl. 422, 424 (1997).

Plaintiffs assert that the proffered deposition transcripts of these government employees and officials are admissible under Fed. R. Evid. 801(d)(2)(D) because the statements are: (1) offered against defendant (an objective subsumed by the nature of plaintiffs' request); (2) concern matters within the scope of the deponent's employment with defendant (the witnesses all worked for the government and were questioned about that work); and (3) were made while the deponent was employed by defendant, even if the deponent was employed in a different capacity at the time of the deposition. By way of illustration, plaintiffs cite *Globe Savings Bank, supra* where the court applied Rule 801(d)(2)(D) to admit the deposition of a former employee of the Federal Savings and Loan Insurance Corporation ("FSLIC") who was with another federal agency at the time of his deposition.

> It is immaterial that at the time of Mr. Reidhill's deposition FSLIC no longer existed and that he was head of the Policy Research Section of the FDIC. The Rule expressly concerns the declarant's relationship with the party-opponent, which in this case is the United States, not a particular agency.

61 Fed. Cl. at 97, extensive citations omitted. Plaintiffs then list seriatim, the various governmental officials who were deposed and their respective positions, urging the admissibility of the proffered deposition transcripts under these precepts.

Defendant asserts plaintiffs have not overcome the preference for live testimony or met their burden to "show cause" under RCFC App. A ¶ 15(b). That provision of RCFC Appendix A, Case Management Procedure, provides in pertinent part that:

> Any party intending to present substantive evidence by way of deposition testimony, **other than as provided by Federal Rule of Evidence 801(d)**, shall serve and file a separate motion for leave to file the transcript of this testimony. The motion shall show cause why the deposition testimony should be admitted and identify specifically the portions of the transcript(s) the party intends to use at trial. See RCFC

32(a)(2) & (3). If the motion is granted, only those portions of the transcript may be filed.

RCFC, App. A, ¶ 15(b), emphasis added.

First of all, Rule 801(d)(which includes the admission by party-opponent as non-hearsay applied by the court here) is specifically excepted from the "cause" requirement for admission of a deposition excerpt. Secondly, plaintiffs point out, Appendix G, the predecessor to Appendix A, governs these proceeding. This is not entirely accurate. Specifically, in lieu of Appendix G, the court instituted specific pretrial exchanges to assist in obtaining a just, speedy and inexpensive determination of the issues in this litigation. *See Order*, Nov. 4, 1989. Deposition designations are not among the topics addressed in the Order.

However, addressing defendant's objections, citing preference for live testimony and the fact that all of the witnesses except one are located in Washington, DC,[6/] defendant objects to plaintiffs' planned reliance on deposition testimony. Defendant relies upon numerous case and treatise authority, as well as the provision in RCFC 32 that the court may allow the introduction of deposition testimony unless "it is not in the interests of justice, *with due regard to the importance of presenting the testimony of witnesses orally in open court . . .*" RCFC 32(a)(3)(E)(ii)(emphasis supplied). Authorities cited include 8A Wright, Miller, & Marcus, *Federal Practice and Procedure* § 2142 at 158 (2d ed. 1994)(discussing Rule 32 of the Federal Rules of Civil Procedure) and Fed. R. Evid. 804(b)(1), Advisory Committee Notes (1972)("testimony given on the stand in person is preferred over hearsay," and "tradition, founded in experience, uniformly favors production of the witness if he is available," because the "opportunity to observe demeanor is what in a large measure confers depth and meaning upon oath and cross-examination.").

Defendant also objects to the great number of deposition designations plaintiffs made that came on the eve of trial, thus diverting attention from trial preparation in a prejudicial manner. Each deposition segment had to be reviewed and counter-designations of the same deposition noted where later testimony more fully explained that proffered. Alternatively, defendant proffers its own list of counter-designations

[6/]One of the deponents resides in Nevada but would have been subject to the court's national jurisdiction.

should plaintiffs' designations be allowed. Finally, defendant requests that objections contained in the deposition snippets be ruled upon in any consideration thereof.

The cost savings plaintiffs assert result from the use of deposition excerpts are illusory defendant also argues, as the court will have to read all the material and rule on the objections cited therein. See RCFC 32(d)(3)(A)("Objections to the competency of a witness or to the competency, relevancy, or materiality of testimony are not waived by failure to make them before or during the taking of the deposition, unless the ground of the objection is one which might have been obviated or removed if present at that time.").

Defendant also objects to plaintiffs' designation of rebuttal depositions, asserting that rebuttal evidence is limited to matters that were not clearly anticipated or could not have been foreseen. Specifically, plaintiffs should not be allowed to designate as rebuttal evidence the depositions of Mr. Brownstein, Mr. Milner and Ms. Slater-Thompson. According to defendant, these deposition transcripts concern the DCS process, a matter that plaintiffs could have presented in their case-in-chief but did not. Noting that defendant's arguments in this regard could not have been unforeseen, it is argued that plaintiffs should not be given a second chance by augmenting its affirmative case-in-chief. Because plaintiffs were aware of these issues, defendant asserts the evidence should have been admitted in plaintiffs' case-in-chief and rebuttal admission is asserted to be not appropriate.

In reply, plaintiffs note that defendant's objection to the use of deposition designations was vetted with the court and essentially rejected at the Pre-Trial Conference, resulting in a schedule for the submission of designations.

Defendant's reliance on the preference for live testimony was recently rejected in *Globe Savings*, where the court stated that availability of a witness to present live testimony was irrelevant to the admissibility of party-opponent admissions:

> [t]he general rule that the witness must be shown unavailable for testifying in court does not apply to a party's use of his *party-opponent's deposition* . . . – for the simple reason that every statement of an opponent may be used against him as an *admission* without calling him . . .; the opponent's sworn statement, though called a deposition, is no less an admission than any other statement of his.

61 Fed. Cl. at 95, citing 5 *Wigmore on Evidence* § 1415, at 243 (alteration and emphasis in original). Deposition testimony of employees/agents of defendant as to the nature and extent of that work falls squarely within this Rule. *See Hughes v. United States*, *supra* at 2-3 (admitting depositions of employees of the Office of Thrift Supervision under Rule 801(d)(2)(D)); *Columbia First Bank, F.S.B. v. United States,* 58 Fed. Cl. 333, 341 (2003), and *Ryan-Walsh, Inc. v. United States*, 39 Fed. Cl. 305, 306 (1997).

These witnesses were represented at their depositions; defendant has submitted its counter-designations. Concerning burden, the designations were submitted pursuant to the court's scheduling order. Consideration of the transcripts as augmented by counter-designations and resolution of the objections contained therein would not necessarily lengthen court consideration or increase the burden of resolution. To the extent findings are proposed or disputed based on any deposition testimony for which objections were made, those objections will receive appropriate consideration.

Plaintiffs' response to defendant's rebuttal evidence objections is to note that this disclosure was made in advance of trial. Indeed trial commenced on July 12, 2004, and plaintiffs' motion was filed on July 7, 2004, and modified on July 12, 2004. Disclosure was not untimely. Defendant was on notice of the designations and could have responded either by calling the witness during defendant's case or filing counter-designations (which was done here). Moreover, while the court has previously declined to adopt defendant's argument with respect to the ACR and DCS process,[7/] defendant presented this argument in its case-in-chief. Accordingly, the rebuttal use of the designated deposition testimony of Alan Brownstein and Nancy Slater-Thompson, designated as two of eight most knowledgeable persons in DOE regarding DCSs, will be allowed.

As for defendant's counter-designations, plaintiffs assert they are overbroad and exceed the scope of Fed. R. Evid. 106 which allows for additional testimony for completeness. In one instance, defendant counter-designated twenty pages of deposition testimony. Too much, plaintiff laments.

---

[7/] *See* Order of June 26, 2003, adopting in relevant part *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 663 (2003)(stating that the "Standard Contract, including specifically the ACR and DCS process, does not contain or create a SNF acceptance rate").

Fed. R. Evid. 106 provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought, in fairness, to be considered contemporaneously with it." The need and extent for each counter-designation (and in some instances plaintiffs' additional reactive counter-counter-designations), and objections in the deposition transcript, are best addressed, if necessary, at such time as specific finding(s) are proposed based on the proffered testimony at issue.

Accordingly, for the reasons stated above, it is **ORDERED** that:

(1) Plaintiffs' Motion for Leave to File Designated Deposition Testimony as Substantive Evidence Pursuant to RCFC 32(a)(2), filed June 28, 2004, is **GRANTED**, to the extent discussed above;

(2) Plaintiffs' Motion for Leave to File a Corrected Copy of its July 7, 2004 Motion for Leave to File Designated Deposition Testimony as Substantive Evidence, is **GRANTED,** and the corrected Motion is **deemed filed;**

(3) Plaintiffs' Corrected Motion for Leave to File Designated Deposition Testimony as Substantive Evidence, filed July 14, 2004, is **GRANTED**, to the extent discussed above; and

(4) Defendant's Counter-Designations contained within defendant's Response to Plaintiffs' Motions to Introduce Deposition Testimony, filed on July 29, 2004, are **GRANTED,** to the extent discussed above.

s/ James F. Merow
James F. Merow
Senior Judge

# In the United States Court of Federal Claims

No. 00-697 C
**(FILED UNDER SEAL August 16, 2007)**[1/]

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

## ORDER

This is one of a series of some fifty pending cases involving contracts between the Department of Energy ("DOE") and nuclear electric utilities for the disposal of spent nuclear fuel ("SNF"). Citing *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) and *Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000), defendant was found liable for partial breach of contract for failure to commence acceptance and disposal of SNF by January 31, 1998, and Plaintiff's Motion for Partial Summary Judgment on liability was granted. (Order of October 8, 2004, Dkt. 172.) Trial on damages will commence on September 10, 2007. Before the court are:

(1) Defendant's Motion *in Limine* to Exclude from Trial Exhibits Prepared by Government Contractors ("Contractors Motion");

(2) Defendant's Motion *in Limine* to Exclude the Testimony of Plaintiff's Expert Witness, Ms. Eileen M. Supko, Regarding the Impact of the Rate of Acceptance Under the Standard Contract ("Supko Motion");

---

[1/] Because it addresses documents submitted under seal, this Order is **sealed**. By motion or stipulation, parties shall submit any proposed redactions on or before **August 27, 2007**. Until that date, and pending resolution of any disagreements concerning proposed redactions, this Order shall not be publically available.

(3) Defendant's Motion for Partial Summary Judgment Regarding Plaintiff's Claim for Prejudgment Interest ("Cost of Capital Motion"); and

(4) Defendant's Motion to Strike Plaintiff's Deposition and Trial Testimony Designations and, in the Alternative, Motion *in Limine* to Preclude Reliance Upon Those Designations as Substantive Evidence Pursuant to RCFC 32(a) and Federal Rule of Evidence 801(d)(2) ("Deposition and Trial Testimony Designations Motion").

Plaintiff's filed Responses and defendant filed Replies.

**Contractors Motion**

According to defendant, included in plaintiff's Exhibit List filed December 18, 2006, are twenty-seven documents authored by companies under contract with DOE to develop a repository or other facility to store SNF – performance required by DOE under the Standard Contract. Authors include: Pacific Northwest Laboratories ("PNL"); Martin Marietta Energy Systems, Inc. ("Martin Marietta"); TRW Environmental Safety Systems, Inc. ("TRW"), and Battelle Memorial Institute ("Battelle").

Defendant seeks to preclude admission of these exhibits because:

(1) These contractors were hired to give advice, not to make policy decisions. They are not part of DOE, and their writings, some of which were never seen by DOE, are not government documents;

(2) The documents are not admissible under Fed. R. Evid. 803(8)(A) because they are not records, reports, statements, or data compilations of public officers or agencies setting forth the activities of the office or agency;

> (A) they are not public documents because DOE's contractors are not agents of the government; and
>
> (B) they were not prepared or adopted by DOE, so they are not public records or reports of DOE's activities;

(3) The contractor documents are not records of regularly conducted activity under Fed. R. Evid. 803(6);

(4) The contractors were not authorized to speak on DOE's behalf, so are not admissible under Fed. R. Evid. 801(d)(2)(C) or 801(d)(2)(D) as admissions of DOE;

(5) DOE has not adopted any statement contained therein, so they are not admissible under Fed. R. Evid. 801(d)(2)(B); and

(6) While some of the documents may be "ancient" (more than twenty years old), hearsay statements therein are not admissible.

Pointing to the critical role of DOE's contractors, plaintiff cites to the denial of substantially similar motions in *Pacific Gas and Electric Co. v. United States*, 73 Fed. Cl. 333, 439 (2006) and *Yankee Atomic Electric Co. v. United States*, 2004 WL 2450874 (Fed. Cl. Sept. 17, 2004). Plaintiff argues these documents are admissible under (1) Fed. R. Evid. 803(8)(a) as public records or reports of DOE's activities; (2) Fed. R. Evid. 801(d)(2)(C) as statements authorized by DOE; (3) Fed. R. Evid. 801(d)(2)(D) as statements of agents or servants of DOE; (4) Fed. R. Evid. 801(d)(2)(B) as documents in which DOE has "manifested an adoption or belief;" (5) Fed. R. Evid. 803(6) as business records; and/or (6) Fed. R. Evid. 803(16) as "ancient documents." Plaintiff also points out that some of the challenged documents are not contractor documents, and asserts that any objection that a document is a "draft" goes to its weight, not its admissibility.

In pursuit of its contractual responsibilities for which nuclear utilities were and are paying, DOE entered into management and operations ("M & O") contracts with highly-skilled entities, including national laboratories, authors of the contractor documents. To a significant extent, DOE's performance of its responsibilities under the Nuclear Waste Policy Act ("NWPA") and the Standard Contracts has been conducted through M & O contractors. *Yankee Atomic*, 2004 WL 245087, at *3. Plaintiff cites the trial testimony of Dr. John Bartlett, former Director of the Office of Civilian Radioactive Waste Management ("OCRWM"), that OCRWM had about 65 employees; its M & O contractor (then TRW Systems), with about 5,000 employees, did DOE's work. As noted by the undersigned's prior decision in *Yankee Atomic*, PNL, located in Richland, Washington, is one of ten national laboratories managed by DOE's Office of Science. PNL provides scientific and technical research

and "currently has approximately 4,200 staff members and a business volume of $750 million . . . . Battelle has operated [PNL] for DOE and its predecessors since 1965." www.pnl.gov/about (last visited July 27, 2007). *See Yankee Atomic*, 2004 WL 245087, at *2 (noting PNL's ".gov" web address and the Office of Science' fiscal 2005 budget request of $108 million for PNL); *Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332, 336 n.1 & 362 n.27 (2006) (granting in part a motion to file designated trial and deposition testimony as substantive evidence pursuant to Fed. R. Evid. 801(d) and RCFC 32(a), including that of "Mr. Michael Lawrence, Associate Laboratory Director for Energy Science & Technology at DOE's Pacific Northwest National Laboratory," and citing an April 1984 memorandum authored by Battelle, "DOE consultant").

Without prejudging (particularly since only parts of only some of the documents are provided), but in order to possibly narrow disagreements and encourage stipulations concerning admissibility, the court notes the following from plaintiff's Exhibit List:

1. PX55: January 24, 1984, "Memo from Fletcher (Battelle [PNL]) to Hall re: Revised Waste Acceptance Schedule from Draft Mission Plan." (Def.'s Contractors Mot., App. 1.) Neither Hall nor Fletcher are identified. The document is ancient. Fed. R. Evid. 803(16).

2. PX70: September 1, 1984, "DOE, 1984 Annual Review of the 1.0 Mill per kWh Waste Disposal Fee (PNL-5241), prepared by [PNL]." (Def.'s Contractors Mot., App. 1) The document is ancient and recites that it was prepared by PNL, operated by Battelle, under contract with DOE. (Pl.'s Resp. to Def's Contractors Mot., App. 3.)

3. PX101: "1986 Annual Review of the Adequacy of the 1.0 mill per kWh Waste Disposal Fee." (Def.'s Contractors Mot., App. 1.) The document is ancient and contains the same representation, that it was prepared by PNL, operated by Battelle, under contract with DOE. (*Id*. at App. 5-6.)

4. PX121: April 27, 1984,[2] Final Draft of "Preliminary Analysis of the Total System Life Cycle Cost of the Civilian High-Level Radioactive Waste Disposal Program," prepared under contract by Roy F. Weston, Inc. for OCRWM. The document page provided has DOE's seal on the lower right-hand corner. (*Id.* at App. 7.) The document is ancient.

5. PX131: "1987 Annual Review of the Adequacy of the 1.0 mill per kWh Waste Disposal Fee," dated July 1987 prepared by PNL. It contains the same representation as PX101, that it was prepared by PNL, operated by Battelle, under contract with DOE. (*Id*. at App. 8-9.) By the time of trial, the document will be ancient.

6. PX196: May, 1990 "Commercial Spent Fuel Management and Concrete Cask Testing Programs Monthly Progress Report" was prepared by PNL, operated by Battelle, under contract with DOE. (*Id*. at App. 10-11.)

7. PX197: May 1, 1990, "Facility Interface Capacity Assessment (FICA) Project, Cask-Handling Assessment Point Beach Units 1 and 2." (Def.'s Contractors Mot., App. 1.) Other than an entry on plaintiff's Exhibit List, no part of this document was provided.

8. PX215: January 1, 1991, "Determination of Cost Effective Waste Management System Receipt Rates" by PNL operated by Battelle for DOE and noted as (1) presented at the Second Annual High-Level Radioactive Waste Management Conference, Las Vegas, Nevada, April 28 - May 3, 1991; and (2) "supported" by DOE. (Pl.'s Resp. to Contractors Mot., App. 12-13.)

9. PX223: June 28, 1991, "Memo from McDuffie to Langstaff Re: Recommended DOE Positions on 18 Contract Implementation Issues." (Def.'s Contractors Mot., App. 1.) Other than its entry on plaintiff's Exhibit List attached to defendant's Contractors Motion, no part of this document was provided, nor is the author or recipient identified.

10. PX230: September 1, 1991, "Martin Marietta Energy Systems, Inc., Site and Facility Waste Transportation Services Planning Document, Point Beach Nuclear

---

[2] Plaintiff's Exhibit List records the document's date as April 27, 1987. The date is April 27, 1984. (Pl.'s Resp. to Contractors Mot., App. 7.)

Plant Unit 1, Wisconsin Electric Power Company, Draft, Revision 0." (Def.'s Contractors Mot., App. 1.) Other than its entry on plaintiff's Exhibit List, no part of this document was provided. Martin Marietta Energy Systems, Inc. was or is one of DOE's contractors. *Yankee Atomic Elec. Co. v. United States*, 2004 WL 2450874, *1 n.2. *See* www.oakridge.doe.gov/ornlseb/General%20Information%20Files/Small%20 Business%20Subcontracting%20Plan.htm (last visited July 19, 2007) (reporting that Martin Marietta Energy Systems, Inc. was awarded a contract in 1984 to manage and operate three Oakridge sites).

11. PX341: June 3, 1994, "Request for Proposal (RFP) for the Multi-Purpose Canister (MPC) System" by TRW, M & O Contractor for OCRWM. (Pl.'s Resp. to Contractors Mot., App. 14-17.) TRW was, or is, one of DOE's M & O contractors. *Yankee Atomic*, 2004 WL 2450874, *1 n.2, *3 n.5.

12. PX361: November 11, 1994, Clearance Request for Public Release of Information for material entitled "Lessons Learned From the DCS Process," signed by TRW. (Pl.'s Resp. to Contractors Mot., App. 18-19.)

13. PX396: October 25, 1995, letter from Blumford ("TRW") to Rousso ("DOE") regarding monthly status report on Delivery Commitment Schedules ("DCSs"). Other than its entry on plaintiff's Exhibit List, no part of this document was provided.

14. PX564: December 1, 1999, "Report to Update Total System Life Cycle Cost Estimate for Site Recommendation/License Application" prepared by TRW for DOE. (Pl.'s Resp. to Contractors Mot., App. 20-21.)

15. PX593: April 1, 2001, "Independent Cost Estimate Review of the Civilian Radioactive Waste Management Program 2000 Total Life Cycle Cost for DOE, OCRWM." (Def.'s Contractors Mot., App. 2.) Other than its entry on plaintiff's Exhibit List, no part of this document was provided.

16. PX774: undated PNL memorandum "re: Need for Maintenance of Full Core Reserve." (Def.'s Contractors Mot., App. 2.) Other than its entry on plaintiff's Exhibit List, no part of this document was provided.

17. PX912: February 26, 1984, memorandum "re: MRS Institutional Report." (Def.'s Contractors Mot., App. 2.) Other than its entry on plaintiff's Exhibit List, no part of this document was provided.

18. PX918: June 11, 1998, "Basis for the VA and TSLCC [Total System Life Cycle Costs] Cost Estimate Operational Waste Stream" prepared by TRW under contract with DOE/OCRWM. (Pl.'s Resp. to Contractors Mot., App. 22.)

19. PX922: October 19, 1990, "[l]etter from E.F. Benz to A. Brownstein, OCRWM DOE, re: Review of Draft Annual Capacity Report." (Def.'s Contractors Mot., App. 2.) No other information was provided.

20. PX923: "Spent Fuel Acceptance Rate." (Def.'s Contractors Mot., App. 2.) No other information was provided.

21. PX928: June 28, 1991, "Memo from P.A. McDuffie/ S.A. Vance to D.C. Langstaff/ A.B. Brownstein re: Recommended DOE Positions on 17 Contract Implementation Issues." (Def.'s Contractors Mot., App. 2.) No other information was provided.

22. PX931: May 22, 1991, "Memo from P. A. McDuffie/ S. A. Vance to A. B. Brownstein/ D. C. Langstaff re: Comments on EEI/UWASTE Positions on Eleven Issues." (Def.'s Contractors Mot., App. 2.) No further information was provided.

23. PX937: "1984 Annual Review of the Adequacy of the 1-Mill/KWH Waste Disposal Fee" dated September, 1984 prepared by PNL for DOE. (Pl.'s Resp. to Contractors Mot., App. 23.) The document is ancient.

24. PX938: "CRWMS [Civilian Radioactive Waste Management System] Program Baseline Change – Justification for Changing to a Multipurpose Canister-Based System." (Def.'s Contractors Mot., App. 2.) No other information was provided.

25. PX940: March 12, 1984, "Memorandum from R. Liikala (Battelle) to Distribution re: Waste Management Program Strategy, attachment." (Def.'s Contractors Mot., App. 2.) The document is ancient. No further information was provided.

26. PX952: May 25, 2000, "Document entitled Commercial Spent Nuclear Fuel Additional Storage Installations, Plans and Requirements." (Def.'s Contractors Mot., App. 2.) No additional information was provided.

27. PX969: February 2002 "Total System Life Cycle Cost for Site Recommendation Letter Report," prepared by Bechtel SAIC Company for DOE. (Pl.'s Resp. to Contractors Mot., App. 24-25.) There was testimony at the *Yankee Atomic* trial that Bechtel SAIC Company was OCRWM's M & O contractor. *See Yankee Atomic*, 2004 WL 2450874, at *9 n.15.

"A motion *in limine* is a preliminary motion that serves a gatekeeping function and permits the trial judge to eliminate from further consideration evidentiary submissions that clearly would be inadmissable for any purpose." *PR Contractors, Inc. v. United States*, 69 Fed. Cl. 468, 469 (2006). However, "'[s]ome evidentiary submissions [] cannot be evaluated accurately or sufficiently by the trial judge in such a procedural environment.'" *Id.* at 469-70 (alterations in original) (citing *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997)).

From the *Yankee Atomic* case, the court is generally familiar with M & O contractor documents in this context. However, the evidentiary rulings in that case concerning contractor documents were made in connection with trial proceedings. Although the DOE contractors are the same, required foundation, authenticity and other evidentiary requisites must be established for each document in this case, absent stipulation. In this regard, contractor documents may be relevant not only on planning, but also on issues of foreseeability, commercial reasonableness, or what performance was possible, reasonable or probable. Factors cited by defendant, including DOE's knowledge or possession of the document, the scope of the authoring contractor's employment, etc. are fact-intensive inquiries, best vented at trial. The court is not ruling on the admissibility of these documents, either individually or collectively. These determinations await trial. However, because the wholesale exclusion of these documents has not been established, and they are best evaluated at trial after appropriate foundations have been laid, the Contractors Motion *in limine* is denied without prejudice to renewal during, or after, trial to the extent a contractor document is proposed for admission, or cited as support for a proposed factual finding.

**Supko Motion**

Defendant seeks to preclude the testimony of Ms. Eileen Supko, one of plaintiff's proffered expert witnesses. Ms. Supko testified as an expert in several SNF trials to date, including before the undersigned.[3/] Applying different annual rates, Ms. Supko opines on the impact of those rates on two criteria identified by plaintiff's counsel: (1) the aggregate amount of additional at-reactor storage capacity that nuclear utilities would need to continue operations after January 31, 1998, and (2) the ability of utilities to "timely" decommission (permanently shut down) their nuclear power plants. Defendant objects to her testimony in this regard as not relevant, not based on a reliable or testable methodology, and inconsistent with plaintiff's theory of DOE's contractual obligations. Reasonableness of any particular rate is simply not an issue in this case according to defendant. As Ms. Supko admits no expertise in construing the Standard Contract or the NWPA, and is not offering an opinion as to how DOE would have performed, her expertise and opinion would not be helpful to the court, the hallmark of, and reason for, expert testimony, defendant argues.

Plaintiff counters that under the Rule 702 of the Federal Rules of Evidence, Ms. Supko's expert analysis and opinions, applying her specialized knowledge regarding SNF storage by commercial nuclear utilities, will assist the court "in understanding the practical implications of the acceptance rates that the parties have proffered in this damages case." (Pl.'s Resp. to Supko Mot., 2.)

Ms. Supko has more than twenty years of experience in the nuclear industry, with emphasis on storage and disposal of SNF. She holds a Bachelor of Science degree in Nuclear Engineering from Pennsylvania State University, and her

---

[3/] Ms. Supko was qualified as an expert witness in *Northern States Power Co. v. United States*, No. 98-484C (Wiese, J.) (Pl.'s Resp. to Supko Mot., App. 35-36) (qualifying on issues of acceptance rate, spent fuel management, spent fuel transportation and utility treatment of those issues), in *Southern Nuclear Operating Co. v. United States*, No. 98-614C (Merow, J.) (Pl.'s Resp. to Supko Mot., App. 35-36 (qualifying on DOE's nuclear waste management program, storage and disposal of SNF, modeling of acceptance rates, and allocations of SNF acceptance rights), in *Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639, 646-47 (2004) (Hodges, J.) (accepting as expert on acceptance rates, SNF storage and licensing). Briefing available electronically indicates she also testified at the trials in *System Fuels, Inc. v. United States*, No. 03-2624C (Braden, J.) and *System Fuels, Inc. v. United States*, No. 03-2623C (Lettow, J.).

employment and professional background is outlined in her expert report. She is not being offered as an expert in determining DOE's obligations under the Standard Contract, which is a matter for the court. Rather, her modeling of the effect of different acceptance rates on the industry involves specialized knowledge that may be of assistance to the court. Defendant's specific objection in this regard is that the four alternative acceptance scenarios she applied are not found in any DOE document. Regardless, the application of various rates industry-wide can be of assistance to the court, not necessarily in construing DOE's contract obligations, but in resolving causation, foreseeability, reasonableness or windfall. In any event, however, her opinions and applications do not supplant the court's role as interpreter of legal obligations herein. *Pacific Gas and Electric Co. v. United States*, 73 Fed. Cl. 333, 433 (2006) ("Expert testimony is not objectionable simply because it embraces an ultimate issue to be decided by the court."). Defendant's objections to her methodology and support, or lack thereof, and the asserted inconsistencies in her calculations and applications, can be vented in cross-examination, with resulting impact on the weight the court may give to her opinion(s) and analysis. The Supko motion is **denied** without prejudice to renewal at trial.

## Cost of Capital Motion

Defendant's motion for partial summary judgment titles a category of plaintiff's claimed damages as prejudgment interest. Plaintiff calls it weighted average cost of capital. Regardless of its label, these costs are included in the report of plaintiff's expert witnesses, Richard Sieracki, Chief Executive Office, and Kenneth Metcalfe, President, of the Kenrich Group, LLC ("Kenrich").[4/] (Pl.'s Resp. to Cost of Capital Mot., App. 1-22.) Defendant asserts the report presents plaintiff's damages in nominal[5/] or actual dollars ($48.4 million) and then adjusts that number upwards by more than forty million dollars to reflect the time value of money, to arrive at

---

[4/] Defendant has not objected to the qualifications of these experts.

[5/] "Nominal dollars retain their *number* over time, while real dollars retain their *value*." *Sandstrom v. Principi*, 358 F.3d 1376, 1377 n.1 (Fed. Cir. 2004) (emphasis in original) (rejecting claim that cost of living adjustment was not prejudgment interest). "[O]ne nominal dollar in 1969 . . . remained one nominal dollar in 1996 . . . . One real dollar in 1969, however, would retain its purchasing power, and would have been worth between four and five nominal dollars by 1996." *Id. See also District of Columbia v. United States*, 67 Fed. Cl. 292, 344 (2005) (inflationary increase would violate statutory bar).

Case 1:00-cv-00697-EJD Document 1343 Filed 08/16/2008 Page 42 of 67

"2007 dollars" ($91 million). Under the undisputed material facts, this increase is the substantive equivalent of prejudgment interest, defendant alleges, and since prejudgment interest is barred by statute, 28 U.S.C. § 2516(a), as a matter of law, defendant is entitled to a judgment of dismissal of this component of damages.

While agreeing that prejudgment interest is statutorily barred, plaintiff asserts its claim here is for the actual expense of raising the millions of dollars to pay for the additional SNF storage needed because of DOE's delay(s) in commencing performance. Plaintiff asserts it incurred costs to finance its mitigation expenditures including the construction of an Independent Spent Fuel Storage Installation ("ISFSI"). Costs were financed through the company's general capital structure, from public capital markets, not specific loans. Rates used to attract public funds were established by the Wisconsin Public Service Commission.

Consequential cost of capital resulting from a partial breach differs from prejudgment interest and is not barred as a matter of law, plaintiff adds, because: (1) weighted average cost of capital is the real economic cost of capital spent on SNF storage; while prejudgment interest is a statutory addition to all damages or costs; (2) weighted average cost of capital varies from year to year, while the rate of prejudgment interest remains constant regardless of capital market fluctuations; and (3) prejudgment interest is most often calculated as simple, not compound. Plaintiff concludes that: (1) recovery of its costs of financing is not precluded as a matter of law, and (2) sufficient material facts have been submitted that such costs were incurred; accordingly, defendant's motion for partial summary judgment should be denied.

Prejudgment interest against the United States is precluded by 28 U.S.C. § 2516(a) (2000).[6] In *England v. Contel Advanced Systems, Inc.*, the Federal Circuit construed the "no-interest rule" broadly:

> [T]he force of the no-interest rule cannot be avoided simply by devising a new name for an old institution: "[T]he character or nature of 'interest'

---

[6] 28 U.S.C. § 2516(a) provides:
(a) Interest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof.

cannot be changed by calling it 'damages,' 'loss,' 'earned increment,' 'just compensation,' 'discount,' 'offset,' or 'penalty,' or any other term, because it is still interest and the no-interest rule applies to it."

384 F.3d 1372, 1379 (Fed. Cir. 2004) (citing *Library of Congress v. Shaw*, 478 U.S. 310, 321 (1986) (alterations in original) (quoting *United States v. Mescalero Apache Tribe*, 207 Ct. Cl. 369, 518 F.2d 1309, 1322 (1975)). *See also Columbia First Bank v. United States*, 54 Fed. Cl. 693, 699 (2002) (rejecting plaintiffs' claim for $4.4 million to "'compensat[e] the plaintiff for the lost use of the money for the intervening period'" because of the ban on prejudgment interest) (alteration in original) (record citations omitted).

However, there is a difference between interest *on* a claim (*i.e.*, prejudgment interest which begins accruing when a claim arises and continues through the pendency of the action) vice interest *as* a claim – such as interest actually paid to obtain capital to mitigate a breach or as a consequence of a breach, the latter being recoverable. "[The] distinction 'between interest as an element of damages and "interest on a claim"' is well-recognized." *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 163 (2002), *aff'd in relevant part*, 407 F.3d 1352 (Fed. Cir. 2005).[7/] *See also Centex Corp. v. United States*, 55 Fed. Cl. 381, 390 (2003), *aff'd*, 395 F.3d 1283 (Fed. Cir. 2005) ("Courts frequently distinguish, however, between 'interest *on* a claim,' generally precluded by the statute, and 'interest *as* a claim' which courts

---

[7/] Defendant is also mistaken in claiming error in plaintiff's reliance on *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135 (2002) and in asserting that two cases cited therein are "inapposite to an analysis of whether waiver of sovereign immunity exists that would permit [plaintiff] to recover its [weighted average cost of capital] damages from the Government pursuant to the no-interest rule." (Def.'s Reply at 4-5 n.3.) While the two cases cited do not concern the statutory ban on prejudgment interest against the United States, both cases do concern statutory bans on prejudgment interest, and both award consequential increased financing costs, rejecting claims an award would violate a statutory bar. *Pacific Gas and Electric Co. v. Howard P. Foley Co.*, Civ. No. 85-2922SW, 1993 WL 299219, at *4 (N.D. Calif. July 27, 1993) (rejecting claim that cost of capital was prejudgment interest barred by statute in private antitrust or RICO actions, commenting "[t]he mere fact that [] damage can be computed in terms of 'interest' does not make it impermissible prejudgment interest"); *United Power Ass'n v. L. K. Comstock & Co.*, Civ. No. 3-89, 1992 WL 402906, at *8 (D. Minn. Oct. 27, 1992) (similar).

may treat as an element of compensation. For that reason, . . . foreseeable financing costs can be an element of expectancy damages.").

Accordingly, financing costs are not interest and have been awarded in appropriate circumstances. "The Court of Federal Claims properly determined that the breach of the forbearances was a substantial factor in Bluebonnet's increased financing costs because it forced Bluebonnet to raise capital at a time when FIRREA had made investments in thrifts riskier and considerably less attractive." *Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348, 1356 (Fed. Cir. 2001). Financing costs have been included in mitigation damages. *Old Stone Corp. v. United States*, 450 F.3d 1360, 1368 (Fed. Cir. 2006), *cert. denied*, 127 S.Ct. 1831 (2007). *See also LaSalle Talman Bank, F.S.B. v. United States*, 462 F.3d 1331, 1334-35 (Fed. Cir. 2006) (noting that all raised capital has a cost); *LaSalle Talman Bank v. United States*, 317 F.3d 1363, 1374-75 (Fed. Cir. 2003) (noting that "capital is not 'costless,'" and concluding the trial court erred in not allowing recovery of costs incurred in obtaining equity capital, because "the cost of capital does not depend on whether payment is made as debt, or out of anticipated future earnings."); *Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1582 (Fed. Cir. 1994) ("Although interest on equity capital is not recoverable, a contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract."). *Cf. J.D. Hedin Constr. Co. v. United States*, 456 F.2d 1315, 1330 (Fed. Cir. 1972) ("Interest paid on bank loans made because of financial stringency resulting from a breach by the [g]overnment of a contract between it and the borrower is not recoverable as an item of damage.")

Foreseeable costs of obtaining financing because of the government's breach are recoverable. *Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348, 1354-58 (Fed. Cir. 2001). Defendant asserts *Bluebonnet* is distinguishable, limited to its facts – a contract was to infuse funds into an acquired thrift. (Def.'s Reply to Cost of Capital Mot., 4.) *Bluebonnet*, however, is not so factually limited; neither is its holding. While the underlying Assistance Agreement in *Bluebonnet* included the government's agreement to provide financial assistance, including promissory notes, asset coverage and yield maintenance, the government also agreed that for ten years the thrift could maintain regulatory capital at levels lower than required by regulation and could include subordinated debt in calculating required regulatory capital. Dividend forbearances would cover the costs of the acquisition. Passage of FIRREA breached the regulatory capital and dividend forbearances, which led to the thrift's

search for capital, at a cost. "The Court of Federal Claims properly determined that the breach of the forbearances was a substantial factor in Bluebonnet's increased financing costs . . . ." 266 F.3d at 1356. The Federal Circuit did not carve out the narrow allowance defendant urges.

Recoverability of incurred financing costs as a result of a government breach of contract was recently reiterated:

> In *Bluebonnet*, this court affirmed the Court of Federal Claims' finding that it was foreseeable that a thrift would be 'forced to seek even more capital to meet heightened regulatory requirements' and that it was also foreseeable that the costs and risks associated with meeting these requirements would have other negative economic consequences such as 'increas[ing] the costs of securing debt or equity financing.' 266 F.3d at 1356; *see also Home Sav. [of America, FSB v. United States*, 399 F.3d 1341,] [] 1355 (Fed. Cir. 2005); *cf. S. Cal. Fed. Sav. v. United States*, 422 F.3d 1319, 1336-37 (Fed. Cir. 2005).

*Citizens Fed. Sav. Bank v. United States*, 474 F.3d 1314, 1321 (Fed. Cir. 2007) (first alteration in original).

Both parties cite *Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515 (2006), *appeal dismissed*, 188 Fed. Appx. 1006 (2006) – plaintiff in reliance; defendant asserting error. *Tennessee Valley Authority*, another SNF case, included in mitigation damages a category of costs referred to as an Allowance for Funds Used During Construction ("AFUDC"). For rate-making purposes, AFUDC was added to the amount of capital used on construction projects to compensate for the cost of those funds. This industry-wide practice is consistent with FERC regulations. 18 C.F.R. pt. 101 Uniform System of Accounts Prescribed for Public Utilities and Licensees Subject to the Provisions of the Federal Power Act, Electric Plant Instructions, ¶ 3.A(17) (AFUDC "includes the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate on other funds when so used."). "TVA's cost of capital is equal to the interest rate that it pays on debt; as an entity of the federal government, TVA finances capital projects either through operating cash flows or through debt, and has no equity." 69 Fed. Cl. at 541. TVA's AFDUC was the average monthly interest charge on its short-term and long-term debts allocated to different projects based on the percentage of that project's

capital cost to the total capital projects of the plant. *Id.* Accordingly, a percentage of the total AFUDC was added to the costs of TVA's mitigating efforts. As the court there observed:

> Building the dry storage facilities required that TVA muster the financial resources to do so. The AFUDC represents the costs TVA incurred in so doing. The record is bereft of any evidence that TVA had sufficient financial resources derived from its cash flow to fund the tens of millions of dollars that were required for the dry storage facilities.

69 Fed. Cl. at 542. Likewise, here, defendant does not suggest that plaintiff had sufficient cash flow to pay the millions required to construct dry storage.

*Tennessee Valley* relied upon *Wickham Contracting Co. v. Fisher*, 12 F.3d 1574 (Fed. Cir. 1994). Under the Contracts Disputes Act ("CDA"), 41 U.S.C. § 607(g)(1) (1988), in *Wickham*, the non-breaching party sought to include in recovery of damages for the government's payment delay, interest on equity capital used to cover expenses. "Although interest on equity capital is not recoverable, a contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract." 12 F.3d at 1582 (citing *Gevyn Constr. Corp. v. United States*, 827 F.2d 752, 754 (Fed. Cir. 1987) (applying 28 U.S.C. § 2516(a)).

*Tennessee Valley Authority* rejected the government's argument that a match between capital expenditures and a specific debt instrument was necessary for any recovery, holding that TVA's general debt costs, allocated by the size of the mitigation projects was sufficient. 69 Fed. Cl. at 541-42.

In *Richlin Security Service Co. v. Chertoff,* 437 F.3d 1296 (Fed. Cir.), *cert. denied*, 127 S.Ct. 253 (2006)[8/] the Federal Circuit, applying the CDA, held that a contractor could not recover interest on amounts paid by agency to discharge back wage liability because the contractor had not actually paid any interest. "[I]nterest is allowable only when the contractor has incurred a cost of money to finance [the] additional work." 437 F.3d at 1301 (quotations omitted) (second alteration in

[8/] The Federal Circuit's *Richlin* decision was issued on January 31, 2006, the same date as the CFC's decision in *Tennessee Valley.*

original). Actual out-of-pocket expenditure was described as a Congressional "bright-line rule for the computation of interest." 437 F.3d at 1302. The "changed work either must be directly traced to a specific loan or a necessity for increased borrowing must be shown to have been required by extra work or delay caused by the government." *Gevyn Constr. Corp. v. United States*, 827 F.2d 752, 754 (Fed. Cir. 1987). "In the latter situation, the allowance of interest depend[s] upon a specific showing that the course of borrowing was affected by the change in question, i.e., that apart from the normal borrowing pattern, there was a necessity to borrow specifically due to the change in question." *Singer Co. Librascope Div. v. United States*, 215 Ct. Cl. 281, 322, 568 F.2d 695, 718 (1977); *Framlau Corp. v. United States*, 215 Ct. Cl. 185, 198, 568 F.2d 687, 694 (1977) (To recover interest, plaintiff must establish that it was "forced to borrow to perform the changed work," and "prove what part, if any, of its large borrowings were attributable to compensable changes.") (footnote omitted); *Bell v. United States*, 186 Ct. Cl. 189, 404 F.2d 975, 984 (1968) (allowing a contractor to recover interest on borrowing caused by government changes to contract); *Dravo Corp. v. United States*, 219 Ct. Cl. 416, 427, 594 F.2d 842, 847 (1979) ("[I]t is clear that this court still holds to the view that direct tracing to a specific loan or necessity for increased borrowing is still required to be proven in order for a contractor to recover for interest costs under an equitable adjustment theory.").

Defendant has not established that, as a matter of law, under the undisputed material facts, plaintiff's claims for increased financing costs are prejudgment interest under 28 U.S.C. § 2516(a).

The Kenrich report quantifies plaintiff's claimed damages from 1998 through 2005, in both nominal and in "2007 dollars." The two categories are described in various ways, some supportive of defendant's position that the time-adjusted claim represents inflation, the time value of money – in short, interest, or its surrogate. The categories are described as "the nominal dollar and present value estimate of costs incurred by [plaintiff] in excess of those costs that would have been incurred if DOE disposed of spent fuel from the nuclear industry in 1998, at the assumed rate of acceptance." (Pl.'s Resp. to Cost of Capital Mot., App. 7.) "Nominal dollars are unadjusted for the effects of financing or the time value of money." (*Id*. at n.10.) In other parts of the report, however, actual out-of-pocket costs are described. "[P]ast damages are restated in 2007 dollars by applying [plaintiff's] after-tax weighted average cost of capital from the middle of each year in which damages were incurred

through March 27, 2007, *appropriately increasing past damages to account for the utility's financing costs*." (*Id.* at App. 8 n.13, emphasis supplied.)

> An additional element of past damages is the increased financing costs associated with the money spent by [plaintiff] to address the impacts of DOE's failure to pick up spent fuel from the nuclear industry in 1998. [Plaintiff] has had to finance the costs that it has incurred because of DOE's failure to perform in accordance with its contractual obligations from the time those costs were incurred. [Plaintiff's] after-tax weighted average cost of capital rates were used to calculate [plaintiff's] increased financing costs. The applicable annual rates were applied to the total nominal damages incurred each year from the middle of that year through March 27, 2007.

(*Id.* at App. 17.)

Mr. Metcalfe testified in deposition that plaintiff's weighted average cost of capital was calculated after-tax, because most of these mitigating expenses were deducted from income. "If you use a pre-tax rate, you would be overcompensating the plaintiff in this case. The pretax rate would be higher." (*Id.* at App. 25.) Without the cost of capital adjustment, "plaintiff is not made whole[;] . . . it spent money that it otherwise would not have spent. That money has a value including this pure time value of money, including inflation, since the dollars the utility spent are not worth what they were when they spent them, and including risk factors." (*Id.* at App. 25-26.) Mr. Metcalfe testified these risk factors were market-place driven. Plaintiff is a public, regulated utility that seeks both debt and equity capital from public markets.[9/] Rates for equity capital are approved by the Wisconsin Public Utility Commission and paid to investors who purchase common or preferred stock. Components of weighted average cost of capital include expenses of common equity, preferred stock, long-term debt and short-term debt. (*Id. at* App. 43.) "[Plaintiff's] weighted average costs of capital mean that its financing costs are greater than it otherwise would have had." (*Id.* at App. 58.)

---

[9/] Mr. Metcalfe also testified that Wisconsin Energy, a holding company, holds all the common stock of plaintiff. (*Id.,* App. 28-29.)

Historical components and calculations of plaintiff's capital structure from 1975 through 2000 were submitted with its Response, except for years 1994 and 1999, years in which the prior ratios and costs were used. The after-tax weighted average cost of capital goes through 2005. Apparently, there were no rate cases from 2000 until 2006. (*Id.* at App. 77-78.)

Plaintiff also submits an excerpt of the deposition of Ione Straub, Nuclear Power Department Budget Coordinator at the time plaintiff constructed the ISFSI. For the time period of 1989 through July of 1996, "the company issues commercial paper daily to cover its cash flow needs, so any costs that the company would incur would primarily be met with some form of – require some form of financing." (Pl.'s Resp. to Cost of Capital Motion, App. 82.) On the other hand, she testified that because funds were used to finance these mitigating projects, plaintiff and its ratepayers lost earning opportunities.

> [I]f the company would not have had to incur the charges associated with these projects, it would have been able to use those funds to go out and, if it had additional funds, to procure commercial paper or some other means to which it would have accrued some earnings, so there's alternatives to using the funds for this project. Lost opportunity, if you will, that the company lost by virtue of having to build these casks in the facility.

(*Id.* at App. 83-84.) In short, rates were higher because funds used for mitigation could have earned income.

David Ackerman, plaintiff's business consultant, testified in deposition that plaintiff's capital costs are financed proportionately with debt and equity capital. (*Id.* at App. 74, 78.) Operations and maintenance costs, and to a certain extent fuel expenses, are paid from rate revenue. (*Id.* at App. 75.)

In response to Interrogatory No. 63, after objections, plaintiff responded to inquiry as to the source, date and amount of funded capital:

> [Plaintiff] generally does not conduct financings for specific projects, and did not do so with respect to the ISFSI project. Therefore, all capital costs incurred by [plaintiff] were financed at the overall cost of

> capital, as detailed in Binder C, "Cost of Capital." The increased financing costs included in [plaintiff's] damage claim are based on the company's overall costs of capital as determined and authorized in rate cases by [plaintiff's] primary regulatory agency, the Public Service Commission of Wisconsin ("PSCW").

(*Id.* at App. 63-64.)

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986). Summary judgment will not be granted "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The court must resolve all reasonable inferences in favor of the nonmoving party. *Id.* at 255. The burden on the moving party is to demonstrate that there is no genuine issue of material fact, and may be discharged upon a showing "that there is an absence of evidence to support the nonmoving party's case." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed. Cir. 1987) (quoting *Celotex,* 106 S.Ct. at 2554). The burden then shifts to the nonmoving party to produce evidence setting forth specific facts of a genuine issue for trial. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 249-50, 256; *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 627 (Fed. Cir. 1984) (holding that the nonmovant "must set out, usually in an affidavit by one with knowledge of specific facts, what specific evidence could be offered at trial."). To create "a genuine issue of fact, the nonmovant must do more than present some evidence on an issue it asserts is disputed." *Avia Group Int'l v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1560 (Fed. Cir. 1988).

Plaintiff has set forth sufficient genuine issues of material facts such as to preclude summary dismissal of its claim for costs of raising capital. *California Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1350 (Fed. Cir. 2001) (reversing summary judgment on lost profits, because the existence and amount of economic damages are factual matters, not amenable to summary adjudication if there are genuine issues of material fact). Defendant did not meet its burden of establishing

that recovery of actual costs incurred to raise the capital needed to fund the mitigating efforts is precluded as a matter of law.

**Deposition and Trial Testimony Designations Motion**

Plaintiff's Deposition and Trial Testimony Designations filed December 18, 2006 (Dkt. 256), asserts the identified testimony transcript pages are from government agents and employees, are of statements concerning matters within the scope of their employment or agency, and therefore, are admissions of a party-opponent, admissible under Rule 801(d)(2)(D) of the Federal Rules of Evidence and *Globe Savings Bank, FSB v. United States*, 61 Fed. Cl. 91, 96-97 (2004).

Defendant moved to strike the designations and, alternatively to preclude their admission. Defendant argues admission should have been sought by motion, not notice,[10/] and in any event, the designations do not meet the requisites of Rule 801(d)(2)(D). If not stricken, the court should first rule on any objections defendant has to the admissibility of each particular statement, any admitted statement should be read into the record by plaintiff, and then defendant could read any counter-designations to complete the record.[11/]

Defendant's assertions that admission of deposition testimony requires witness unavailability, and counters the general preference for live testimony, are rejected. To admit statements of a party-opponent, plaintiff need not establish the witness is unavailable. Neither is the general preference for live testimony a consideration in this context. "Under [Rule 801(d)(2)(D)], the proffering party need not prove that the witness is unavailable nor does the party need also to invoke RCFC 32(a)(2) regarding admissibility of deposition testimony." *Rodriguez v. United States*, 69 Fed. Cl. 487, 494 n.8 (2006) (citing *Globe Sav. Bank,* 69 Fed. Cl. at 94-97). Likewise, in *Long Island Savings Bank, F.S.B. v. United States*, 63 Fed. Cl. 157, 164 (2004), the

---

[10/] Under RCFC, Appendix A, paragraph 15(b), "[a]ny party intending to present substantive evidence by way of deposition testimony, other than as provided by Fed. R. Evid. 801(d), shall serve and file a separate motion for leave to file the transcript of such testimony." To the extent required, the court construes plaintiff's Deposition and Trial Testimony Designations as a motion.

[11/] Defendant notes that deposition excerpts were required to be read into the record in the *Tennessee Valley Authority* and *Systems Fuels, Inc.* (No. 03-2623C) trials. (Def.'s Dep. Designation Mot. at 19, n.10.)

court noted a party "need not demonstrate that any of the declarants whose deposition testimony it seeks to admit at trial pursuant to Fed. R. Evid. 801(d)(2)(D) will be unavailable as witnesses at trial," and the "common law's preference for live testimony has no bearing on the use of party admissions as evidence." *Id.* at 163.

To be admissible under Rule 801(d)(2)(D), a statement must: (1) be offered against a party; (2) concern a matter within the scope of the employment with or for the party against whom the statement is offered; and (3) be made "during the existence of [his or her] relationship" with the United States. *Globe Savings*, 61 Fed. Cl. at 97 (citing cases). "It is a 'widely accepted rule that admissions of a party-opponent under Rule 801(d)(2) are accorded generous treatment in determinations of admissibility.'" *Id*. at 96 (citing *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 761 (7th Cir. 2003)).

Defendant does not dispute that plaintiff seeks to offer statements "against" defendant, satisfying the first requirement. As for the second, defendant argues that the witnesses were not authorized to make binding "admissions" on behalf of the government, and plaintiff has not matched the job descriptions for each witness with the statement sought to be admitted. Thirdly, that some of the witnesses were not employed by the government at the time of their depositions, defendant concludes, prevents their use.

An "admission" of a party-opponent, in this context, is broader than an "admission" of liability or other legal conclusion. Illustratively, "yes, we owe the money" may generally be a binding legal admission and conclusion; but, in determining whether a statement is hearsay, "admissions" are statements made in furtherance of the deponent's government job or contract. "Simply put, to qualify as an admission, the statement need only be related to the declarant's duties." 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 801.33[2][c], 801-74.3 (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2007). "A statement is not hearsay if – . . . the statement is offered against a party and is . . . a statement by a person authorized by the party to make a statement concerning the subject." Fed. R. Evid. 801(d)(2)(D). In this context, a witness is authorized to make statements within the scope of his or her governmental responsibilities. "[I]n order to constitute an admission under FED. R. EVID. 801(d)(2)(D), the statements of the agent must concern a matter within the scope of the agency, made during the relationship." *First Annapolis Bancorp, Inc. v. United States*, 72 Fed. Cl. 369, 376 (2006) (citing *Nekolny*

*v. Painter*, 653 F.2d 1164, 1171-72 (7th Cir. 1981)). *See also Rodriguez*, 69 Fed. Cl. at 493 n.8; *PR Contractors, Inc. v. United States*, 69 Fed. Cl. 468, 473 (2006).

Defendant concedes that the following twelve of the seventeen[12/] witnesses were employed by DOE or the Nuclear Regulatory Commission ("NRC") at the time of their trial or deposition testimony:

1. Mr. Lake Barrett,
2. Mr. Alan Brownstein,
3. Ms. Tammy Croote,
4. Ms. Susan Klein,
5. Mr. Christopher Kouts,
6. Mr. Ronald Milner,
7. Mr. Thomas Pollog,
8. Mr. Peter Rabideau,
9. Mr. Robert Roselli,
10. Ms. Nancy Slater (Thompson),
11. Mr. Victor Trebules,
12. Mr. David Zabransky.

Nevertheless, defendant argues, their designated testimony must concern matters within the scope of their duties for DOE's OCRWM or NRC, and that foundational requisite is missing. Defendant points out that in *Globe* and *Long Island*, the court required the plaintiffs match the subject matter of the designated deposition testimony with the deponent's job or position description.[13/] In response, plaintiff asserts that depositions of all of these witnesses concerned their work with either DOE's OCRWM or NRC. Presumably, deposition testimony that may not have been designated or other knowledge covers these concerns, and foundational issues can be

[12/] Defendant's Motion states deposition or trial testimony of **nineteen** present or former government or government contractor employees was proffered. Plaintiff's Deposition and Trial Testimony Designations, filed December 18, 2006, Dkt. 256, Attachment A, lists **seventeen.** Tammy Croote and Peter Rabideau are on defendant's list, but not on plaintiff's Designation. (*Cf.* Def.'s Dep. Designation Mot., 2 n.1 with Pl.'s Dep. and Trial Test. Designation, Dkt. 256, filed Dec. 18, 2006.) Counsel should address this matter at the Pretrial Conference.

[13/] In *Long Island*, the court matched job descriptions with proffered testimony. 63 Fed. Cl. at 164 n.15.

resolved through cooperation of counsel before trial. These designations are not stricken.

As for five individuals, Messrs. Kouts, Pollog, Rabideau and Zabransky and Ms. Croote – "whom the government expects to call in its case-in-chief, the designation of deposition testimony may not be necessary. *Sacramento Mun. Util. Dist. v. United States*, No. 98-488C, Order at 2 (Fed. Cl. March 16, 2005) (unpublished) (denying motion to designate prior testimony of witnesses who were scheduled to testify at trial.) Accordingly, in the event defendant calls any of these witnesses, Plaintiff's Deposition and Trial Testimony Designations as to Messrs. Kouts, Pollog, Rabideau and Zabransky and Ms. Croote, which the court construes as a motion, is **denied** and is otherwise **deferred** as set forth herein.

The following are four government officials who testified in deposition or trial in other SNF cases about their roles in the formation of the Standard Contract, the passage of the NWPA and early DOE planning in the 1980s and early 1990s, but were not federally employed at the time of deposition, twenty-some years later.

Michael Lawrence was Acting Director of OCRWM, Deputy Director of the NWPA Project Office at the time the Standard Contracts were signed, and Associate Laboratory Director for Energy Science and Technology at DOE's Pacific Northwest National Laboratory. *Southern Nuclear Operating Co. v. United States*, __ Fed. Cl. __, 2007 WL 2005164, at *15 (July 9, 2007); *Pacific Gas and Electric*, 73 Fed. Cl. at 389; *Yankee Atomic*, 73 Fed. Cl. at 266; *Sacramento Mun. Util. Dist.*, 70 Fed. Cl. at 336 n.1. He was also identified in response to interrogatories in this case, among "DOE Personnel" who were "involved with and may have knowledge of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste contained within the notice of proposed rule-making at 48 Fed. Reg. 5458 (Fed. [sic] 4, 1983)." (Pl.'s Resp. to Dep. Designation Mot., Exh. A, unn.3.)

Robert Morgan, was Director of the Nuclear Waste Policy Act Office, the precursor to the Office of Civilian Radioactive Waste Management within DOE from January 1983 to January 1984. He testified in at least four prior SNF trials. *Yankee Atomic*, *Tennessee Valley Authority*, *Pacific Gas and Electric,* and the recent trial in *Northern States Power Co. v. United States*, No. 98-484C (Fed. Cl.) where he testified on November 16, 2006. Def's Unopposed Mot. to Designate Prior Test. of Mr. Robert L. Morgan at 1-2, *Systems Fuels, Inc. v. United States*, No. 03-2623C (Fed. Cl. Jan. 5, 2007). In *Southern Nuclear*, defendant also designated prior trial

testimony of Mr. Morgan. Def.'s Objection to Pls.' Designations of Dep. and Trial Test. at 9, *Southern Nuclear Operating Co. v. United States*, No. 98-614C (Fed. Cl. Mar. 16, 2006). In two other SNF cases, defendant's unopposed Motions to Designate Prior Trial Testimony of Mr. Morgan, citing Mr. Morgan's retirement from federal service in 1988, the passage of time and his extensive prior testimony, were granted. Order, *System Fuels, Inc. v. United States*, No. 03-2624C (Fed. Cl. January 8, 2007) and Order, *System Fuels, Inc. v. United States*, No. 03-2623C (Fed. Cl. January 8, 2007).

Dr. Daniel Dreyfus also held high-level positions at DOE, including Director of DOE's Office of Civilian Radioactive Waste Management – a position requiring Presidential appointment and Senate confirmation. While he was retired at the time of his deposition, presumably his testimony, including the segments plaintiff wishes to admit, concern his work for DOE. Dr. Dreyfus is also on plaintiff's witness list.

Bernard Rusche was the "former first presidentially appointed and confirmed director of the Office of Civilian Radioactive Waste Management . . . ." (Pl.'s Resp. to Mot. to Strike, Exh. C, *Yankee* Trial Transcript Excerpt at 3697.) Defendant's witness list in *Yankee Atomic* included Benard Rusche:

> Mr. Rusche, former Director of the Office of Civilian Radioactive Waste Management, will provide testimony about the implementation of the NWPA and the 1987 Amendments to the NWPA, including the issuance and content of the 1985 Mission Plan and 1987 Mission Plan Amendment, the issuance and content of the ACRs, and the technical, legal, and political obstacles to the implementation of the NWPA, as well as other relevant matters.

(Pl.'s Resp. to Dep. Designation Mot., Exh. B, 7.)

Defendant cites cases for the general rule that the employment or contractual relationship must have been intact at the time of the statement, or here, the deposition. For example in *Young v. James Green Mgt., Inc.,* 327 F.3d 616, 622-23 (7th Cir. 2003), in a letter, an employee resigned because of illegal racially discriminatory acts he was asked to perform, and referred any questions to his attorney. Plaintiffs sought to admit this letter as evidence of racial discrimination. "The district court determined that the letter was not admissible under this provision. We cannot say

that, in light of the totality of the circumstances, this ruling was an abuse of discretion. [The resigning employee's] assertions regarding discrimination were not made during the existence of his employment relationship [with defendant]. [The resigning employee's] letter of resignation is not admissible under Rule 801(d)(2)(D) because the justification for the rule simply is not present in this situation." 327 F.3d at 622.

Assuming the prior sworn testimony of these individuals concerned matters within the scope of their government employment or agency (indeed, that is why they were deposed - they were not questioned about their retirement plans), does their retirement or civilian employment at the time of their deposition change the evidentiary nature of their sworn testimony? While plaintiff does not advocate this position, and cites no authority therefore, it seems eminently reasonable in this case as to these former high-level government officials regarding matters that occurred in the 1980s and 1990s when they held those positions. Also, concerns have been raised about duplicative testimony, age and travel restrictions. For example, Mr. Morgan retired from the government in 1988 and does not live in close proximity. Deposition testimony of these witnesses has been admitted in other SNF cases, and efficiency would encourage at least the limited use of depositions. The court has heard live testimony of several of these witnesses in prior SNF trials. Defendant does not suggest any bias.

Presumably recognizing these four individuals were not federally-employed at the time of their depositions, plaintiff cites alternatively, Rule 801(d)(2)(c) which defines as non-hearsay statements of a party-opponent if the statements are (1) offered against a party opponent, and (2) the statement is by a person "authorized by the party to make a statement concerning the subject." Again, neither the unavailability of the witness not the general preference for live testimony, prevents admission.

These four individuals are not authorized to make statements on the government's behalf and plaintiff did not meet its burden in this regard, defendant replies. The court's determinations of agency here are not based upon the mere fact that these individuals were listed as having knowledge. They held high-level positions, and the court assumes the testimony tendered concerns their work done within the course and scope of those positions. For example, the deposition designation of Mr. Lawrence concerns his congressional testimony in 1984 after the contracts in issue were signed. Apparently, he was chosen or had authority to testify

to Congress about the contracts and/or early program developments. That his Congressional testimony was shortly after the contracts were signed does not alter the court's conclusion in this regard. Likewise, Mr. Morgan's deposition testimony concerning his presentation to the nuclear industry after the contracts were signed exemplifies his authority. That his public representation of DOE was after the contracts were signed goes to the weight of his statements, not the admissibility. Moreover, any statements he made on DOE's behalf concerning early program developments may be relevant. Certainly, government officials who testify before Congressional hearings on DOE's behalf, represent DOE at industry conferences, were "authorized" to say what they said. Defendant apparently concedes that at least Mr. Dreyfus, who held a series of senior positions within DOE and was staff director for the Senate Energy Committee "was authorized to make statements on behalf of DOE when he was employed by DOE does not make him an "agent" of DOE for the purposes of his deposition testimony given many years after he left Government service." (Def.'s Reply to Dep. Designation Mot., at 5-6.) Presumably, the subject deposition testimony concerns his time when he was so authorized, and not his activities after he left government service. That these gentlemen were authorized agents, deposed after that agency ended, but about that agency, goes to the weight of those statements, not their non-hearsay character.

Under the circumstances of this SNF litigation, under either Rule 801(d)(2)(C) or (D), and alternatively, under Rule 807 and RCFC 32(a)(3)(f), the court will not preclude the admission of these deposition designations. Accordingly, defendant's Motion to Strike and Motion in Limine on Rule 801(d)(2)(D) grounds is **denied**. *Air Land Forwarders, Inc. v. United States*, 172 F.3d 1338, 1344 (Fed. Cir. 1999) (noting "significant additional assurances of reliability" may allow admissibility under Rule 807, the residual exception to the hearsay rule); *Kinser v. Gehl Co.*, 184 F.3d 1259, 1275 (10th Cir. 1999) ("Although Burrough had retired at the time of these depositions, he continued to perform consulting services for Gehl on projects he had overseen during his full-time tenure with the company. Moreover, prior to being deposed in this case, current project engineer Viesselmann met with Burrough to review the former structure of Gehl's engineering department and the evolution of Gehl's closed-throat balers' designs. The preceding facts, both of which were established through Viesselmann's testimony, constitute independent and sufficient corroboration of Burrough's authority to make statements on behalf of Gehl and/or the scope of Burrough's employment. Because the topics discussed in Burrough's deposition excerpts all concerned events and policies occurring during his

employment, the district court did not err in admitting this testimony pursuant to Rule 801(d)(2).").

After arguing plaintiff should not be able to admit trial testimony of Mr. Morgan from the trials in *Tennessee Valley Authority, Yankee Atomic, Pacific Gas and Electric*, and most recently, *Northern States Power Co. v. United States*, No. 98-484C (Fed. Cl.)[14/] or excerpts from his deposition, defendant turns around and requests that Mr. Morgan's prior trial testimony be admitted in defendant's case, citing RCFC 32(a). Mr. Morgan was deposed extensively in early coordinated discovery proceedings and has testified in four trials. Plaintiffs in all SNF cases presumably have had, and still have, similar motives to query Mr. Morgan about his recollection of the formation of the Standard Contract some twenty years ago – the same standardized contract shared by all plaintiffs, and the same breach by DOE. "The breach involved all the utilities that had signed the contract – the entire nuclear electric industry." *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000). Plaintiff objects, asserting it had no opportunity to cross-examine Mr. Morgan in the three prior SNF cases cited, and Mr. Morgan is needed to authenticate "the substantial number of documents on the Government's exhibit list, which documents were apparently submitted to him when DOE developed the Standard Contract." Plaintiff did, however, take Mr. Morgan's deposition and designated testimony from his deposition taken in this case on March 21, 2002; March 22, 2002; June 25, 2002; August 3, 2004; July 14, 2005 and November 15, 2006. Plaintiff does not suggest any questions that were not asked or any opportunity to fully vent at these depositions, nor does plaintiff suggest that counsel in any of the three prior trials did not adequately examine Mr. Morgan, nor that counsels' interests were other than co-extensive, nor that plaintiff has some additional party-specific area of questioning Mr. Morgan about events that occurred more than twenty years ago. While there may be some factual differences that may have affected the breath or vigor of examination by plaintiffs' counsel in these other matter, plaintiff does not suggest such. As negotiations are continuing between counsel on stipulations as to authentication of certain documents, presumably consensus can be reached in this regard.

---

[14/] In *System Fuels, Inc. v. United States*, No. 03-2623C (Fed. Cl.) and *System Fuels, Inc. v. United States*, No. 03-2624C (Fed. Cl.), the court granted defendant's motion to designate the entirety of Mr. Morgan's testimony from *Northern States* as substantive evidence.

As for the statements of the remaining witnesses whose depositions were designated, defendant objects because the deponent or witness was a government contractor. In this regard, the court adopts the reasoning of the court in *Pacific Gas and Electric Co. v. United States*, 73 Fed. Cl. 333, 439 (2006) that contractor documents, in addition to being admissible under Fed. R. Evid. 803(A) (as "[r]ecords, reports, statements, or data compilations, in any from, of public offices or agencies, setting forth (A) the activities of the office or agency," were non-hearsay admissions of parties. That testimony and not documents are the subject of inquiry here does not alter the result. The same Rule is cited in both cases. *See also Beck v. Haik*, 377 F.3d 624, 639-40 (6th Cir. 2004). Accordingly, the deposition excerpts of Messrs. Edward Benz, Billy Cole and Patrick McDuffie are not precluded.

The question is not, as defendant suggests, whether the contractor was authorized to make admissions on behalf or, or bind, the government. Again, an admission is not as to legal liability. In this context, an "admission" may be that the design rate or other input or analysis used by the contractor within the scope of its contract with DOE was "X". Of course, data either directly or indirectly, must have been conveyed to DOE. That two of the deposition witnesses were retired at the time of their deposition, goes to the weight of those statements, not their nonhearsay character.[15]

Rather, the inquiry is "whether (a) statements made by DOE contractors were beneficial to, and offered by, plaintiff, and (b) such statement were 'authorized by the party to make a statement concerning the subject." *Pacific Gas and Electric Co. v. United States*, 73 Fed. Cl. 333, 440 (2006) (citing *Yankee Atomic*, 2004 WL 2450874, at *8) ("recognizing that the 'authorized' nature of statements made by contractors in performing work for DOE [was] 'not in dispute'"). As the court in *Pacific Gas and Electric Co.* observed, the contractors were "'authorized'" – indeed, in some cases, contracted by DOE to make such statements. *Id.* These contractors were hired by DOE to do DOE's work. To the extent that any statement was made was inconsistent with DOE's position, contrary evidence or argument can be advanced.

---

[15] Mr. Cole is on defendant's witness list. Accordingly, the court defers admission of his testimony, pending defendant's decision to call him as a witness. If he is, to the extent that defendant may object that cross-examination goes beyond the scope of direct, the court will allow cross-examination into the areas of the deposition designation, with re-direct, etc. as appropriate.

Before any of plaintiff's designations should be allowed, defendant asks that the court first rule on its objections to each particular designation, and then, to the extent that the court admits any designated testimony, the court should consider first, defendant's counter-designations. Plaintiff objects to the nature of some of defendant's objections. Any objections made at the time the deposition was taken are preserved. To the extent a designation or counter-designation is cited as support for a finding, any objections as to lack of foundation, etc. may then be raised. Plaintiff's objection to defendant's counter-designations will be addressed, to the extent required, at such time as plaintiff's deposition designations are cited in post-trial briefing in support of a factual finding. Any issues concerning exhibits referred to in deposition testimony will have to be resolved in that event.

Defendant asks that any deposition designations be read into the record which would encourage reduction in volume. Defendant asserts that the court's order that designations be read aloud in *Systems Fuels, Inc. v. United States*, No. 03-2623C (Fed. Cl.) significantly reduced volume. Another advantage is that objections can be ruled on upon offering the testimony, and defendant could then offer and read its counter designations, which would streamline the court's consideration of the same. If the court orders designated testimony be read into the record, plaintiff is prepared to stipulate that designations read into the record in *Tennessee Valley* and *Systems Fuels*, would not have to be read into the record again. Defendant objects to wholesale adoption of testimony in prior cases, arguing that "[h]aving opposed repeatedly any effort to consolidate these cases in the past, WEPCO cannot now seek 'consolidation' for the purpose of avoiding the need to read into the record the testimony that it seeks to designate as substantive evidence in this case." (Def.'s Reply at 14.) By limiting deposition designations to those cited in support of a proposed finding, the number may be reduced. Also, as the court has previously encouraged stipulations of facts (and continues to encourage the same), record size may also be lessened. Accordingly, the request that deposition designations be read into the record, is denied. RCFC 32(c) ("Except as otherwise directed by the court, a party offering deposition testimony pursuant to this rule may offer it in stenographic or nonstenographic for. . . ."). *Cf. Long Island Savings Bank, FSB v. United States*, 63 Fed. Cl. at 166.

Upon representation that some of the witnesses whose testimony has been designated may testify at trial, and upon consideration of the foregoing, deposition designations of any witness called to testify at trial will be disregarded. In that event,

the court will allow cross-examination, re-direct, etc. to go beyond direct to address designated areas. *Pacific Gas and Electric,* 73 Fed. Cl. at 442 (striking deposition designations not relied upon by parties in post-trial briefing), *Renda Marine, Inc. v. United States*, 66 Fed. Cl. 639, 645 (2005) (citing *United States v. Int'l Bus. Machs. Corp.*, 90 F.R.D. 377, 382 (S.D.N.Y. 1981) (disregarding designated deposition testimony of witnesses who testified at trial); Order at 2, *Sacramento Mun. Util. Dist. v. United States*, No. 98-488C (Fed. Cl. March 16, 2005) (denying motion to designate prior testimony of witnesses who were to testify at trial).

Accordingly, it is **ORDERED**:

(1) Defendant's Contractors Motion is **DENIED** without prejudice to renewal during, or after trial, as set forth above, to the extent a contractor document is proposed for admission, or cited as support for a proposed finding;

(2) Defendant's Supko Motion is **DENIED** without prejudice;

(3) Defendant's Cost of Capital Motion is **DENIED;** and

(4) Defendant's Deposition and Trial Testimony Designations Motion is **GRANTED in part, DENIED in part and DEFERRED** as set forth above.

s/ James F. Merow
James F. Merow
Senior Judge

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SYSTEM FUELS, INC., and<br>ENTERGY ARKANSAS, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 03-2623C<br>(Judge Lettow) |

DEFENDANT'S UNOPPOSED MOTION TO DESIGNATE
PRIOR TRIAL TESTIMONY OF MR. ROBERT L. MORGAN

Defendant, the United States, respectfully requests that it be allowed to designate the trial testimony of Mr. Robert L. Morgan from the recent trial conducted in Northern States Power Co. v. United States, Fed. Cl. No. 98-484C. Allowing the designation of this testimony would preclude the need to have Mr. Morgan, who retired from Federal service almost 20 years ago, appear to testify in another spent nuclear fuel ("SNF") case. Plaintiff, System Fuels, Inc. ("SFI"), is not prejudiced by the designation of this testimony because its counsel, Mr. Alex Tomaszczuk, Pillsbury Winthrop Shaw Pittman LLC, cross-examined Mr. Morgan during his testimony in Northern States, and the Government's designation of testimony includes the full-text of that cross-examination. Counsel for SFI, Mr. Alex Tomaszczuk, has represented that SFI does not oppose this designation of testimony. The transcript of the testimony that the Government seeks to designate is attached to this motion.

BACKGROUND

Mr. Morgan was the director of the Nuclear Waste Policy Act Office, the precursor to the Office of Civilian Radioactive Waste Management ("OCRWM") within the Department of

Energy ("DOE"), from January 1983 to January 1984. Tr. 3779:15-19.[1] During that time, he was responsible for the review of comments on the draft Standard Contract, the response to those comments in the promulgation of the Standard Contract in the Federal Register, and the development of the December 1983 draft of the Mission Plan, which was published in final form in June 1985. Tr. 3781:8-13; 3825:9-3827-24. After he left OCRWM, Mr. Morgan had no involvement in or responsibility for commercial spent nuclear fuel matters for DOE. Tr. 3864:18-22. Mr. Morgan retired from the Federal Government in 1988. Tr. 3777:4-7.

Mr. Morgan was deposed about his responsibilities as Director between January 1983 and January 1984 during three days of deposition conducted in 2002. Counsel for SFI, Mr. Tomaszczuk, participated in these depositions upon behalf of several other SNF plaintiffs and questioned Mr. Morgan himself. After those depositions, Mr. Morgan testified in three different SNF trials before the Court – Yankee Atomic Electric Co. v. United States, No. 98-126C (Fed. Cl.) (Merow, S.J.); Tennessee Valley Authority v. United States, No. 01-115C (Fed. Cl.) (Lettow, J.); and Pacific Gas & Electric Co. v. United States, Nos. 04-74C & 04-75C (Fed. Cl.) (Hewitt, J.).[2]

In July 2006, counsel for SFI requested the opportunity to "update" his deposition of Mr. Morgan and the Government's other fact witnesses who had testified in previous SNF trials before the Court. In response to the Government's motion for a protective order seeking to preclude this deposition of Mr. Morgan filed in System Fuels, Inc. v. United States, No. 03-

[1] "Tr. __" refers to the transcript of Mr. Morgan's testimony, which is attached to this motion.

[2] The Government designated trial testimony for Mr. Morgan in the trial conducted in Southern Nuclear Operating Co. v. United States, No. 98-614C (Fed. Cl.)(Merow, S.J.).

2624C (Fed. Cl.) ("SFI-Mississippi"), the Court ordered that SFI's counsel be allowed a three-hour deposition in Monument, Colorado (where Mr. Morgan lives), if the Government intended to call Mr. Morgan at trial in that matter. Subsequently, the Government decided to call Mr. Morgan at trial in Northern States, and the Court in that case ordered that plaintiff's counsel, Mr. Tomaszczuk, be allowed to re-depose Mr. Morgan in Washington, D.C., on the eve of Mr. Morgan's testimony in that case.[3] Mr. Tomaszczuk deposed Mr. Morgan on November 15, 2006, in a single deposition that the parties agreed would be captioned as taken in this case, Northern States, and SFI-Mississippi, which is currently pending before Judge Braden. During this deposition, Mr. Tomaszczuk asked questions related to this case, to Northern States, and to SFI-Mississippi.

Mr. Morgan testified in Northern States on November 16, 2006, and was cross-examined by Mr. Tomaszczuk, who is also counsel for Northern States Power Company. Accordingly, counsel for SFI has had a full and fair opportunity to cross-examine Mr. Morgan during the trial in Northern States and the Government's designation of Mr. Morgan includes that cross-examination.

## ARGUMENT

This Court's rules are designed to ensure the "just, speedy, and inexpensive" determination of every action. RCFC 1. Similarly, RCFC 32(a) permits the use of deposition testimony, in lieu of live testimony, when a witness "is at a greater distance than 100 miles from the place of hearing" unless other factors not present here should preclude that use, RCFC

[3] Northern States Power Company had been a party to the previous deposition of Mr. Morgan in 2002.

32(a)(3)(E), or when, "upon application and notice, . . . such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used."

In this instance, we seek permission to submit Mr. Morgan's trial testimony from another SNF case as his testimony in this case. Mr. Morgan, who retired from Federal service almost 20 years ago, has repeatedly been required to testify in depositions and at trial in various SNF cases, even though his testimony has related to precisely the same issue in every case: that is, the development of the Standard Contract and the degree to which the parties were able to agree upon a rate of SNF acceptance applicable to that contract. Although RCFC 32 applies specifically to deposition testimony, the rationale behind that rule applies equally to the trial testimony in other SNF cases in the circumstances here, where all of the plaintiffs in the 66 SNF cases that were originally pending before this Court have had similar motives and where the cases all involve the same issues, including the development of the same standardized contract, the interpretation of the same contract terms, and the same alleged non-performance by DOE. Particularly where, as here, the plaintiff does not oppose our request to allow Mr. Morgan relief from the need repeatedly to testify in various trials regarding the same topics and the same underlying facts, where the same plaintiff's counsel represents the plaintiffs in both this case and the case in which the designated trial testimony from Mr. Morgan was taken, where the witness in question retired from Federal service almost 20 years ago, and where the witness has already been required to testify repeatedly regarding the same topics upon which he would testify here, the Court should exercise its discretion to permit us to rely upon Mr. Morgan's recent trial

testimony in Northern States in this case instead of requiring Mr. Morgan to testify yet again in another SNF case.

The burden to Mr. Morgan of having to travel to Washington D.C. to testify in yet another trial is great. The Government originally requested that the Court consolidate the SNF cases, in part to permit for coordinated discovery and to permit former Federal employees, like Mr. Morgan, to testify once, and only once, regarding matters that are relevant in all of the SNF cases. The SNF plaintiffs successfully opposed the Government's request, and, as a result, Mr. Morgan, who was involved in the formation of the Standard Contract at issue in this case, has now testified in the trial of the four cases. Given Mr. Morgan's age, the fact that he retired from Federal service almost 20 years ago, and the fact that counsel for SFI has had a full and fair opportunity to cross-examine Mr. Morgan about the testimony that the Government has designated, the Court should allow the Government to designate Mr. Morgan's testimony from the recent trial in Northern States, rather than make Mr. Morgan appear in person to testify again.

## CONCLUSION

For the foregoing reasons, the Government requests that it be allowed to designate the entirety of Mr. Morgan's testimony in Northern States as substantive evidence in this case.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/ Joshua E. Gardner
JOSHUA E. GARDNER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, NW
Washington, D.C. 20530
Tel: (202) 305-7583
Fax: (202) 307-2503

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

KEVIN B. CRAWFORD
SCOTT E. DAMELIN
LISA L. DONAHUE
JOHN C. EKMAN
MARIAN E. SULLIVAN
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530

January 5, 2007

Attorneys for Defendant