**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**VOLUME III OF X**
**(Pages A 0289 to A 0437)**

---

# ENERGY NORTHWEST'S CORRECTED APPENDIX IN SUPPORT OF ITS CORRECTED NOTICE OF DESIGNATION OF DEPOSITION AND PRIOR TRIAL TESTIMONY OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO ADMIT PRIOR TESTIMONY INTO EVIDENCE

---


NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
202-639-6000


June 3, 2008

*Attorneys for Plaintiff*

# Table Of Contents To Appendix – Volumes I to X

## Volume I

Documents Cited

DOE's Responses to Utility Plaintiffs' First Set of Interrogatories..........................A 0001

DOE's Responses to Utility Plaintiffs' Joint Supplemental Interrogatories.............A 0013

April 3, 2002 30(b)(6) Notice of Deposition ..........................................................A 0028

April 18, 2002 30(b)(6) Notice of Deposition ........................................................A 0033

November 12, 2004 30(b)(6) Notice of Deposition.................................................A 0039

March 2, 2005 30(b)(6) Notice of Deposition ........................................................A 0043

## Volume IA

April 19, 2007 30(b)(6) Notice of Deposition ........................................................A 0047

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 2450874
(Fed. Cl. Sept. 17, 2004) (unpublished)...........................................................A 0050

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, slip. op.
(Fed. Cl. Sept. 21, 2004) (unpublished)...........................................................A 0063

*Wisc. Elec. Power Co. v. United States*, No. 00-697C, slip op.
(Fed. Cl. Aug. 16, 2007) (unpublished)...........................................................A 0073

Defendant's Unopposed Motion to Designate Prior Trial Testimony of
Mr. Robert L. Morgan in System Fuels..........................................................A 0103

## Volume II

Deposition Transcripts and Trial Testimony Excerpts

Chart of Energy Northwest Deposition and Trial Testimony Designations.............A 0109

Barrett, Lake ..........................................................................................................A 0128
April 22, 2002 ..............................................................................................A 0129
April 23, 2002 ..............................................................................................A 0165
April 26, 2002 ..............................................................................................A 0191
May 8, 2002 ..................................................................................................A 0225
May 10, 2002 ................................................................................................A 0250
May 14, 2002 ................................................................................................A 0278
May 15, 2002 ................................................................................................A 0286

## Volume III

Brownstein, Alan ........................................ A 0289
April 9, 2002 ........................................ A 0290
April 10, 2002 ........................................ A 0318
April 11, 2002 ........................................ A 0350
May 23, 2002 ........................................ A 0363
June 14, 2002 ........................................ A 0368

Cole, Billy M. ........................................ A 0376
March 12, 2002 ........................................ A 0377
March 13, 2002 ........................................ A 0411
June 4, 2002 ........................................ A 0419

Dreyfus, Daniel ........................................ A 0422
May 15, 2002 ........................................ A 0423

## Volume IV

Klein, Susan ........................................ A 0438
April 24, 2002 (Rule 30(b)(6)) ........................................ A 0439
April 25, 2002 (Rule 30(b)(6)) ........................................ A 0478

Kouts, Christopher ........................................ A 0493
January 30, 2004 ........................................ A 0494
February 19, 2004 ........................................ A 0504
August 2, 2004 (in the Yankee Atomic Trial Transcript) ........................................ A 0509
April 11, 2005 (Rule 30(b)(6)) ........................................ A 0516
July 12, 2005 (in the TVA Trial Transcript) ........................................ A 0532
October 26, 2005 (in the Southern Nuclear Trial Transcript) ........................................ A 0538
June 13, 2006 (in the Pacific Gas Trial Transcript) ........................................ A 0550
June 14, 2006 (in the Pacific Gas Trial Transcript) ........................................ A 0555
October 11, 2006 ........................................ A 0571
January 16, 2007 (in the System Fuels Mississippi Trial Transcript) ........................................ A 0581
April 12, 2007 (in the System Fuels Entergy Trial Transcript) ........................................ A 0585

## Volume V

Kouts, Christopher (continued) ........................................ A 0612
May 1, 2007 (Rule 30(b)(6)) ........................................ A 0612
May 2, 2007 ........................................ A 0634

Lawrence, Michael ........................................ A 0654
May 20, 2002 ........................................ A 0655
May 21, 2002 ........................................ A 0697
November 16, 2007 (in the Carolina Power Trial Transcript) ........................................ A 0712

Milner, Ronald ........................................................................................A 0726
May 1, 2002 ........................................................................................A 0727

**Volume VI**

Milner, Ronald (continued).........................................................................A 0762
May 2, 2002 ........................................................................................A 0762
May 3, 2002 ........................................................................................A 0799
May 7, 2002 ........................................................................................A 0814
May 7, 2002 (Afternoon) ........................................................................A 0831
May 8, 2002 ........................................................................................A 0838
August 11, 2004 (in the Yankee Atomic Trial Transcript)............................A 0851

Morgan, Robert........................................................................................A 0866
March 21, 2002 ........................................................................................A 0867
March 22, 2002 ........................................................................................A 0905
June 25, 2002 ........................................................................................A 0913
August 3, 2004 (in the Yankee Atomic Trial Transcript)..............................A 0917

**Volume VII**

Morgan, Robert (continued)........................................................................A 0925
November 15, 2006.....................................................................................A 0925
November 16, 2006 (in the Northern States Trial Transcript).......................A 0943
November 13, 2007 (in the Carolina Power Trial Transcript).......................A 0953

Pollog, Thomas ........................................................................................A 0962
April 11, 2002 (Rule 30(b)(6))...................................................................A 0963
April 12, 2002 (Rule 30(b)(6))...................................................................A 1002
May 15, 2002 (Rule 30(b)(6))....................................................................A 1026
May 16, 2002 (Rule 30(b)(6))....................................................................A 1046
May 22, 2002 ........................................................................................A 1066

**Volume VIII**

Pollog, Thomas (continued)........................................................................A 1073
August 4, 2004 (in the Yankee Atomic Trial Transcript)..............................A 1073
March 29, 2005 (in the SMUD Trial Transcript)..........................................A 1098
July 12, 2005 (in the TVA Trial Transcript)................................................A 1108
October 26, 2005 (in the Southern Nuclear Trial Transcript)........................A 1115
October 12, 2006.......................................................................................A 1122
November 15, 2006 (in the Northern States Trial Transcript).......................A 1126

Rosselli, Robert.........................................................................................A 1137
April 15, 2002 ........................................................................................A 1138
April 16, 2002 ........................................................................................A 1168

Rusche, Benard ........................................................................................A 1173
May 16, 2002 ........................................................................................A 1174
May 17, 2002 ........................................................................................A 1197
August 3, 2004 (in the Yankee Atomic Trial Transcript)............................A 1207

Slater-Thompson, Nancy .........................................................................A 1215
April 21, 1999 ........................................................................................A 1216
April 22, 1999 ........................................................................................A 1228

**Volume IX**

Slater-Thompson, Nancy (continued)........................................................A 1239
June 13, 2002 ........................................................................................A 1239

Trebules, Victor ......................................................................................A 1255
April 17, 2002 ........................................................................................A 1256
April 18, 2002 (Coordinated Discovery) ..................................................A 1289
April 18, 2002 (Deposition in Yankee Cases.............................................A 1305
April 19, 2002 ........................................................................................A 1317

Williams, Jeffrey......................................................................................A 1319
June 11, 2002 ........................................................................................A 1320
January 22, 2004 ...................................................................................A 1340

Zabransky, David.....................................................................................A 1368
April 17, 2002 ........................................................................................A 1369

**Volume X**

Zabransky, David (continued) .................................................................A 1401
April 18, 2002 ........................................................................................A 1401
April 19, 2002 ........................................................................................A 1428
June 5, 2002 ..........................................................................................A 1440
June 6, 2002 ..........................................................................................A 1445
August 5, 2004 (in the Yankee Atomic Trial Transcript)............................A 1449
March 28, 2005 (in the SMUD Trial Transcript).........................................A 1473
March 29, 2005 (in the SMUD Trial Transcript).........................................A 1487
April 12, 2005 (Rule 30(b)(6)).................................................................A 1491
July 12, 2005 (in the TVA Trial Transcript)...............................................A 1503
October 27, 2005 (in the Southern Nuclear Trial Transcript).......................A 1508
November 20, 2006 (in the Northern States Trial Transcript).......................A 1519
October 11, 2007 (in the Wisconsin Electric Trial Transcript) ....................A 1528
October 12, 2007 (in the Wisconsin Electric Trial Transcript) ....................A 1532
November 13, 2007 (in the Carolina Power Trial Transcript).......................A 1538

# BROWNSTEIN

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :



(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia
Tuesday, April 9, 2002

Deposition of ALAN BROWNSTEIN, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons



Boulevard, McLean, Virginia 22102-4859, at 9:30 a.m., Tuesday, April 9, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

APPEARANCES: (Continued)

On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:

JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:

DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:

NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350



APPEARANCES: (Continued)

On behalf of the Defendant:

UNITED STATES DEPARTMENT OF JUSTICE
BY: BRYANT S. BANES, ESQ.
RUSSELL A. SHULTIS, ESQ.
1100 L Street, N.W.
Washington, D.C. 20530



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFFS | DEFENDANT |
|---|---|---|
| ALAN BROWNSTEIN | | |
| By Mr. Tomaszczuk | 9 | |

Afternoon Session -- 92


E X H I B I T S


| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 | 44 |
| 2 | 57 |
| 3 | 59 |
| 4 | 74 |
| 5 | 81 |
| 6 | 90 |
| 7 | 111 |
| 8 | 119 |
| 9 | 128 |
| 10 | 152 |
| 11 | 155 |
| 12 | 172 |
| 13 | 180 |
| 14 | 185 |
| 15 | 189 |
| 16 | 192 |





| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 17 | 206 |
| 18 | 209 |
| 19 | 211 |
| 20 | 214 |

P R O C E E D I N G S
Whereupon,
ALAN BROWNSTEIN,
was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER AND LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INCORPORATED, POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, NEBRASKA PUBLIC POWER DISTRICT:
BY MR. TOMASZCZUK:
Q. Mr. Brownstein, would you state your name for the record, please?
A. Alan Brownstein.
Q. And by whom are you employed, sir?
A. Department of Energy.
Q. And what is your title?
A. I'm a director of the Regulatory Coordination Division, and I'm on detail right



now as a special advisor to the, special, senior policy advisor to the director.
Q. You said director of regulatory enforcement division?
A. Regulatory Coordination.
Q. And I'm sorry -- senior policy advisor?
A. Right, to the director; that's a detail right now.
Q. To the director of OCRWM?
A. Of OCRWM.
Q. And that is all within the Department of Energy, correct?
A. Right. Um-hm.
Q. My name is Alex Tomaszczuk. We met prior to going on the record.
I'm counsel for various of the utility plaintiffs in this case.
I'm going to ask some questions about your knowledge with respect to the management of spent nuclear fuel.
If you don't understand my question, please tell me, and I'll try and rephrase it so that --
A. Okay.



Q. You understand it -- okay. And that way, we have a common ground for my questions and your answers.
If at any time you want to take a break, please let me know, and we'll be happy to accommodate that.
I would ask that you not take a break while a question is pending, but once you have answered the question, if at any time you want a break, please just let me know, and we'll accommodate that.
Because the court reporter is here and transcribing your answers, you'll have to answer audibly instead of just nodding your head.
A. Okay.
Q. That won't get picked up on the transcript.
Let me just also say at the outset that there is a protective order in this case which governs the use and dissemination of certain information in the case.
Through the course of your testimony, I expect to hand you various documents and ask you to look at those documents, and I'm going to ask you some questions about them, and I would



ask you to just take a moment here at the outset and review this protective order, and then I'm going to ask you on the record whether you consent to abide by the terms of the protective order.
I think it's fairly straightforward, but why don't we just take a minute now and ask you to do that, okay?
A. Okay.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Mr. Brownstein, you have read the protective order?
A. I have.
Q. And you agree to abide by its terms?
A. I do.
MR. TOMASZCZUK: Counsel, any objection to proceeding?
MR. BANES: No objection.
MR. TOMASZCZUK: Thank you.
BY MR. TOMASZCZUK:
Q. Mr. Brownstein, could you summarize for me your educational background?
A. I have a Bachelors and Masters both in

economics from the Pennsylvania State University.
Q. And what year did you obtain your Bachelors Degree?
A. 1973.
Q. And in what year did you obtain your Masters?
A. 1975.
Q. Did you undertake course work for a Ph.D?
A. I did not.
Q. So you stopped your formal educational training after obtaining your Masters Degree?
A. That's correct.
Q. Can you summarize for me your employment history after graduating from college?
A. I worked at Penn State in a research unit, was a consultant to the Pennsylvania governor's energy council from '75 to '78.
In 1978, I went to, moved to General Public Utilities, and worked there until 1980; 1980 to 1985, I worked for the General Accounting Office, and from 1985 to the present, I have worked for the Department of Energy.



Q. What did you do when you worked at GPU from 1978 to 1980?
A. I was a, I worked on the corporate planning division.
Q. Can you describe for me briefly your duties at that time?
A. Generally we worked on, on planning future resources for the company, generation of resources for the company, doing economic evaluations of power plants, load capacity forecasts.
In general, that was it.
Q. And you said you left GPU in 1980?
A. Yes.
Q. Why did you leave?
A. Opportunities from Washington.
Q. It was at that time that you accepted a position at GAO?
A. Yes.
Q. Okay. And you said you worked at GAO for five years?
A. Yes.
Q. What were your, what was your title at GAO?
A. I was a, I think they called it a



senior evaluator.
I was a electricity specialist they hired me in as.
I don't recall the exact title, but I worked in doing studies involving various electricity policy issues.
Q. To whom did you report at GAO?
A. The top gentleman, first level or --
Q. Who was your immediate supervisor? Why don't we start there?
A. I believe Billy Oakers.
Q. Could you spell the last name for me?
A. Actually I don't remember.
Q. Were you within a, an office at GAO, or a division of GAO?
A. I was, and it was called the energy division I believe.
Oh, actually excuse me -- Energy and Minerals Division.
Q. And why did you leave GAO in 1985?
A. Opportunities at the Energy Department working on this program.
Q. And when you say working on this program, what do you mean by this program?
A. The Office of Civilian Radioactive



Waste Management.
Q. What I referred to earlier as OCRWM?
A. That's correct.
Q. So if I use that acronym, we'll both understand what I'm talking about?
A. OCRWM or RW, yes.
Q. And you have been with OCRWM or RW since 1985?
A. Correct.
Q. To the present day, correct?
A. Correct.
Q. Did you have any involvement or participation in discussions relating to the enactment of the Nuclear Waste Policy Act of 1982?
A. I did not.
Q. Now you were a GAO employee at the time that bill was enacted, right?
A. That's correct.
Q. At GAO, did you have any involvement in the discussions relating to the enactment of that statute?
A. None whatsoever.
Q. Were you aware while you were at GAO that the statute was enacted?

A. No.
Q. Your first awareness of the statute occurred in 1985 when you became a DOE employee?
A. Correct, when I was considering employment at DOE.
Q. While you were at GAO, did you work on spent nuclear fuel issues?
A. No.
Q. Did you work on nuclear issues?
A. Tangentially to the extent that they involved electricity policy issues.
Q. Is it fair to say that your first real involvement with spent nuclear fuel occurred in 1985 when you assumed the job at DOE?
A. Correct.
Q. What caused you to take the job at DOE in 1985?
A. The, really the mission of the program, opportunities; it was a professional promotion at the time, and I was intrigued by the mission of the office and my, potentially my role in that.
Q. What GS position did you assume when you joined DOE in 1985?
A. Fourteen.



Q. And that was a promotion for you at the time?
A. Yes.
Q. And what GS position or SES position are you in now?
A. Fifteen.
Q. And at what point in time did you get promoted from a GS-14 to a 15?
A. In the early '90s; I don't remember the exact date.
It's a GM.
Q. I'm sorry. Say that again.
A. It's a GM-15. It's not an SES position.
Q. It's a GM-15?
A. Yes.
Q. Now you're here today as a Department of Energy employee, correct?
A. Correct.
Q. And you're represented by counsel for the Department of Justice?
A. I am.
Q. Do you hold any professional licenses?
A. I do not.
Q. Subsequent to the receipt of your



Masters Degree from Penn State, have you taken any educational courses or training courses?
A. I have taken many training courses from really every company -- GPU, GAO, DOE -- over the years.
Q. Do you recall what training courses you have taken at DOE?
A. Mostly managerial courses; most recently I took a five-week course which is sort of a step towards the SES.
I didn't bring the exact names or anything, but mostly managerial-type courses.
Q. Have you taken engineering courses?
A. I have not.
Q. Have you ever been deposed before?
A. I have not.
Q. We will try not to make it too terribly unpleasant.
A. I would like to hold you to that.
Q. What did you do to prepare for your deposition here today?
A. I met with Justice Department twice.
Q. Did you review any documents?
A. I reviewed excerpts of the ACR and the contract.



Q. Other than counsel for the Justice Department, did you speak with anyone concerning your deposition?
A. Everyone in the office knew that I was going to be deposed, so it was the subject of many hallway conversations.
You know, in a substantive sense, I think most substantive conversation I had was with Tom Pollog.
When he picked up the documents that I had discovered last week, we had a conversation. He told me partially his experience at a deposition.
That was the most substantive conversation I had.
Q. I'm sorry. Did I understand in your answer to say you discovered some documents last week?
A. Yes.
Q. What documents did you discover?
A. They were what I referred to as the Star Wars chart, which graphically laid out the provisions of the terms of the contract.
Q. And when you say the Star Wars chart, was it one document or more than one document?

A. No.
Q. Did you discuss spent nuclear fuel acceptance rates with anyone other than your counsel?
A. No.
Q. Can you tell me, Mr. Brownstein, what are your duties as the director of regulatory coordination at OCRWM?
A. Responsible for interactions with, with our regulatory agencies, principally the NRC and the EPA, and working closely with our peers at Yucca Mountain and carrying out those responsibilities.
In addition to that, I serve as, in that, serve both working with the, with our west counterparts and as advisor to the director, and doing that, I was responsible for our interactions with the NRC and our pre-licensing activities as well as the lead person responsible for working with EPA and other agencies on the EPA standard.
There were other staff. We had other responsibilities in the division, including things like security and safeguards and Environmental Impact Statement preparation.



Q. When you testified in your previous answer that you were I believe serving with your west counterparts, what did you mean by west counterparts?
A. Our Yucca Mountain project office.
Q. Okay. In your position as director of regulatory coordination, with whom do you work most closely?
A. Within the department?
Q. Yes.
A. In the east, in headquarters, Lake Barrett and Ron Milner; I assume you're talking about superiors, not people that report to me?
Q. Actually I didn't narrow it in that way, but let's talk about superiors first, and then people that would be reporting to you.
A. Superiors, Lake Barrett, Ron Milner; peers, Steve Brocoum in the west; at Yucca Mountain, people that reported to me were Nancy Slater, Nancy Slater Thompson, Chris Einberg.
Q. I'm sorry. Could you spell that last name?
A. Einberg, E-i-n-b-e-r-g; Narendra Mathur, M-a-t-h-u-r, N-a-r-e-n-d-r-a, and there were other people that reported to me that have



since moved on to other positions.
Q. Okay. And are there individuals that are employees of contractors that provide support to DOE with whom you work closely?
A. We're talking about the Regulatory Coordination Division.
Q. Yes.
A. Is that correct?
Q. Correct.
A. I have contractors both at Booz Allen and at the M&O, BSC.
What periods are you talking about?
Q. Why don't we take today? And I'm going to work backwards a little bit.
A. At Booz Allen, my main contracting support is Richard Goffi and his team of people, but mainly Richard, and the current M&O contractor, BSC, would be David Siefkin, but understand I have been on detail for the past eight or nine months, so I have not worked very closely with Siefkin.
Q. Okay. You have been on detail for the last eight or nine months as a senior policy advisor?
A. Right, since July I believe, of last



year.
Q. So since July of 2001?
A. That's correct. It has been longer than eight months, yes.
Q. And since that period, you have been on detail as a senior policy advisor to the director of OCRWM?
A. Correct.
Q. And who has been that person?
A. Lake Barrett.
Q. And is Mr. Barrett still serving as the director of OCRWM?
A. No. He is deputy director.
Q. So are you now reporting to someone else in that, in your capacity as senior policy advisor?
A. The new director was confirmed two or three weeks ago.
Her name is Margaret Chu, C-h-u.
Q. And my question, sir, is are you now reporting to Ms. Chu?
A. Well, my direct, my first level supervisor is Ron Milner.
Q. In your capacity as a senior policy advisor to the director of OCRWM, your first

level supervisor is Mr. Milner?
A. That's correct.
Q. All right.
A. He is the chief operating officer.
Q. And then above him, you report to Mr. Barrett?
A. That's correct. The reporting chain is Milner, Barrett, and now Chu.
Q. And so would it be fair to say that you're also reporting to Ms. Chu at this time?
A. It would be.
Q. What have been your duties as a senior policy advisor to the director of OCRWM?
A. Principally I have been responsible for site recommendation activities.
Q. What do you mean by site recommendation activities?
A. All the work leading up to the Secretary's recommendation to the President and the President's decision to recommend a site for development of deep geologic disposal, which he did in February.
Q. And when you say the site, you're referring to Yucca Mountain, correct?
A. I am.



Q. Now that the President has made that recommendation, do you expect that you're going to stop serving as a senior policy advisor and resume your duties as director of regulatory coordination?
A. The new director's made it clear that she is undergoing an assessment of the organization and will reorganize in the future, so I'll await the outcome of that reorganization.
Q. Have you spoken to the director about your role in the reorganization effort?
A. I have.
Q. And what did you say to her about that subject?
A. We went through last week my background and my interests and opportunities for the future.
Q. And did she say anything to you in that meeting?
A. No. She is meeting with, with all of her senior people, as I understand it, and going through her assessment and input to how she wants to structure the organization in the future.



Q. Is Mr. Barrett retiring?
A. He is.
Q. Are you considering leaving DOE?
A. I am not.
Q. Have you discussed the possibility of leaving DOE with Mr. Barrett?
A. Of my leaving DOE?
Q. Yes.
A. No.
Q. Mr. Brownstein, I would like to go back to 1985 when you first became a DOE employee. Okay?
What position did you assume at that time?
A. Position title in '85 was a nuclear industry specialist.
Q. Do you recall in what month in 1985 you began service at DOE?
A. September.
Q. What were your duties as nuclear industry specialist?
A. I was responsible for implementing the terms of the standard disposal contract.
I ran the, was responsible for the data inputs that we received from the utilities



called the RW-859 information.
I also ran the graduate fellowship program.
Those were my primary responsibilities.
Q. What were your duties with respect to the graduate fellowship program?
A. Running it; I mean I had responsibility for selecting candidates to serve, you know, in the fellowship program, so you know, I was the man responsible for implementing it and running it.
Q. And that's a program under which DOE brings in talented people to work in fellowship positions?
A. We support --
MR. BANES: Objection -- vague.
BY MR. TOMASZCZUK:
Q. Do you understand my question? I'm just trying to get a feel for what the program is.
A. We, we supported 20 fellows a year in their graduate work in fields of importance to our program.
Q. So these would be graduate fellows

working on nuclear engineering projects?
A. It could be. We supported people in, I believe in health physics.
I believe we supported people in policy-related positions, so it was not limited to just engineering.
Q. What were your duties with respect to implementing the terms of the standard disposal contract?
MR. BANES: Objection -- overbroad.
BY MR. TOMASZCZUK:
Q. I believe that's the term that you used.
You said one of your duties was to implement the terms of the standard disposal contract, is that correct?
A. Sure.
Q. And what --
A. Well, let me give examples. The contract required issuance of something called the Annual Capacity Report. That had never been done before, and so as an example, I was responsible for developing that.
I was responsible for interacting with the utilities and answering their questions.



I was responsible for implementing various items as a refund program as we had lost a lawsuit, actually we lost two lawsuits, and I was responsible for refunding money to the utilities, responsible for collecting data on spent fuel from the utilities, the RW-859.
Those are examples.
Q. Did there come a point in time in your career at DOE when you, when your duties changed from your duties that you just described as a nuclear industry specialist?
A. The, the position itself evolved over time.
Let me give a broad outline, see if that's responsive to your question.
Q. Please.
A. In 1985 when I started that position, I was basically a one-person show doing these type of activities with contractor support.
Over time, that position evolved into a branch of which I was the branch chief, and eventually that position evolved into a division, and each time, the responsibilities got a little bit broader.
Q. Okay. Thank you for that. That's



helpful.
When did the duties that you were performing as a specialist evolve into a branch chief position.
A. I do not recall the exact dates. I believe in the late '80s, it went to a branch, and I believe in the early '90s, it went to a division.
I just don't recall the exact times.
Q. And when it became a division, what was the name of the division?
A. Well, let's see. They do this internally.
The branch was called I believe Utility Interface and Logistics Branch.
I'm hesitating because I believe the division underwent several names, and I actually just don't recall it. I have to review my resume.
I didn't do that before I came here.
Q. Does the division, whatever its name, still exist today?
A. It does. I mean it's continued to evolve.
Q. And is it the Regulatory Coordination



Division?
A. It is not.
Q. It is not. Okay. What is its current name, if you know?
A. I don't know. I left, I left that area in early '95.
Q. When you say you left that area, what area are you referring to?
A. I'm sorry. I left the, my, my responsibilities, talk about it broadly, interacting with the utilities, and responsibility for the contract, I left that I believe in March of '95 to go into the division director for the Regulatory Coordination Division.
Over this long span of time, names of divisions have changed and evolved and responsibilities, and I have not kept very closely associated or attached to that.
Q. Okay. You assumed the position of the director of the Regulatory Coordination Division in March of '95?
A. To the best of my recollection.
Q. Okay. That's fair. It has been a little while I understand. All I can ask you is

your best recollection, and I thank you for it.
A. Okay.
Q. So it's fair to say then for roughly a ten-year period, you were responsible for implementing the terms of the standard contract?
A. That's fair.
Q. And in that regard, you were dealing with the utility industry?
A. That's fair.
Q. And in or about March of 1985, your duties changed?
A. '95.
Q. '95 -- I'm sorry.
A. That's correct.
Q. In March of 1995 when you assumed the position of director of regulatory coordination, was that a promotion for you?
A. No.
Q. Was it a lateral move?
A. That's correct.
Q. And why did you make that move?
A. The director asked me to take on those responsibilities, Lake Barrett.
There was, there was other, as I'm thinking back on it, there was other periods.



I did go on an extended detail during that ten-year period as well. It was about eight-month period of which I maintained my existing responsibilities responsible for the contract, but I also served under Lake in a tiger team setting up the quality assurance office.
I don't remember the dates of that.
Q. Had something happened in March of 1995 that caused Mr. Barrett to ask you to take this new position as director of regulatory coordination?
A. I mean you probably need to ask Mr. Barrett about that.
He, he saw other challenges that needed to be met, and he thought that I had the skills and ability to do that and asked me to undertake those responsibilities.
It was a, the way he characterized it, it was a growth opportunity to get a broader perspective on the program.
Q. And did someone assume your position?
A. Yes.
Q. And who was that?
A. Immediately after that, it was Nancy



Slater or Nancy Slater Thompson, and that's the answer.
Q. Ms. Thompson assumed your previous duties when you left in March of 1995?
A. Yes.
Q. Are there aspects of the civilian radioactive waste program that you are particularly familiar with?
A. I don't understand the question.
Q. Okay. I'm trying to get a sense for given your long history and career at DOE, whether there are portions or aspects of the civilian radioactive waste program with which you are more familiar than others and where your areas of expertise lie within the program. That's what I'm trying to find out.
A. Well, during the first ten years, as I said, you know, the area of expertise was on all matters dealing, you know, with aspects of the contract.
Subsequent to that, I evolved into the regulatory world if you will, so became quite familiar with licensing procedures, with the NRC, and with regulatory matters of all, of all types.



Q. That would it be fair to say that in dealing with regulatory matters, you have less contact with the utilities and more contact with the regulatory agencies?
A. In a relative sense, not absolute sense, yes.
Q. You testified, Mr. Brownstein, that you were responsible I believe for preparing the ACRs, is that right?
A. Correct.
Q. Okay. Were there documents other than the ACRs for which you had responsibility to prepare?
A. Over time, responsibility for the Annual Priority Ranking, those were two separate independent -- the Delivery Commitment Schedules, it was a separate document, so those were the two, in the '80s, those were the two documents I was responsible for.
Q. You said the Delivery Commitment Schedule you view as part of that process?
A. Yes, but not as a separate independent report like the ACR and APR.
Q. But you had responsibility for the DCS process?

A. Yes.
Q. Other than the ACRs, the APRs, and the DCS, were there other documents for which you had responsibility to prepare?
A. When you say responsibility to prepare, those never, those two documents didn't exist, so when I say had responsibility to prepare, I mean starting from conceptually to how we're going to do it. Those were unique documents.
I had responsibilities, for instance, on the RW-859 form and worked with utilities in trying to modify that and trying to implement those terms.
The Energy Information Administration was responsible for implementing that, but that in essence worked as a contractor for my office, so we worked closely with the utilities to try to streamline the information that we felt we needed and minimize the burdens on the utilities.
I view that as a different category of document.
Q. You had no role, if I understand your testimony, when you came on the scene, you had



no role in the development of the standard contract?
A. That's correct. The contract had already been promulgated.
I believe we also issued something called a Notice of Inquiry at some point in time, that I was responsible for that, for that process.
Q. Notice of Inquiry with respect to what, do you remember?
A. I haven't gone back to those documents in years.
It was, it was a document seeking public input on our responsibilities with respect to the '98 date.
We issued that, I think we did a Federal Register notice, and we eventually published a report on that.
I don't even recall the times.
Q. Were you referring to the final interpretation issued by DOE in about 1995?
MR. BANES: Objection -- lack of foundation.
BY MR. TOMASZCZUK:
Q. You can say no. I'm just trying to



find out if that's what you had in mind.
A. I would have to see the document.
MR. BANES: He doesn't remember. He just doesn't remember.
THE WITNESS: I mean if you showed me the document, I could tell you whether or -- I don't remember the dates.
MR. TOMASZCZUK: All right.
(There was a pause in the proceedings.)
MR. BANES: Do you want to take a break?
Are you ready to go?
MR. TOMASZCZUK: I'm happy to take a break. If you want to take a short break, that's fine with me.
MR. BANES: Yeah. Sure.
(A recess was taken.)
MR. TOMASZCZUK: Back on the record. Ms. Reporter, I would like you to mark as Brownstein Exhibit No. 1 a document.
It's a Federal Register notice dated April 18th, 1983.
It has in the lower right-hand corner the Bates stamps ADM-001-0648, and it goes



through 0666.
(Brownstein Exhibit No. 1 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Brownstein, I would ask you just to take a minute and look at that document, and then I'm going to ask you a few questions about it.
A. Okay. I'm not going to open it up.
Q. You're not going to open it up?
A. I mean I know the document.
Q. Okay.
A. I know what the document is.
Q. I thought I was facing an unbelievably tough witness here!
A. You want me to take the time to read the document?
Q. Can you identify that document?
A. I can.
Q. All right. What is it?
A. It is the standard disposal contract. I can spend six hours reading it again.
Q. And you're familiar with this document I gather, correct?

A. Um-hm. Yes.
Q. And this is the document that you have worked with basically for a ten-year period from 1985 to 1995, is that correct?
A. Correct.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Do you recall when you first saw the contract?
A. September '85.
Q. And did somebody give it to you?
A. Yes.
Q. And who was that?
A. It was probably Harold Brandt, B-r-a-n-d-t.
Q. And why would Mr. Brandt have given you this document?
A. He had interviewed me for the position and gave me a number of documents to look at as in considering the position.
Q. Was he your supervisor when you became a DOE employee?
A. Correct.
Q. Do you know where he is today?



A. Yes. He continues to work in RW.
Q. Do you know what his title is now?
A. I do not.
Q. Did you have any discussions with Mr. Brandt concerning the substance of the document?
A. Yes.
Q. Okay. Can you relay to me the substance of those discussions?
A. He indicated that part of my responsibilities would be in implementing the terms of the contract with the utilities.
Q. Do you recall anything else that he said to you at that time?
A. No.
Q. And after he gave you the document, did you read it?
A. Yes.
Q. Did you have any reaction that you recall today when you read it for the first time?
A. Interesting.
Q. Anything else?
A. Not that I can recall.
Q. After you read the contract, did you discuss it with anyone at DOE?



MR. BANES: Objection -- vague as to time.
THE WITNESS: What time period are you referring to?
BY MR. TOMASZCZUK:
Q. After you read the contract for the first time, did you then have discussions with personnel at DOE concerning the contract?
A. The time period I'm referring to in answering your previous questions was prior to my employment.
This was during the job interview.
Q. I'm sorry.
A. And so prior to my employment, I don't recall discussing it with anyone other than Mr. Brandt.
Q. Okay. After you became an employee at DOE, what I'm trying to understand is what discussions, if any, did you have with DOE personnel concerning the contract?
MR. BANES: Objection -- vague as to time.
Go ahead.
THE WITNESS: I'm sure I had conversations after I took employment in DOE



with people, a number of people in the department.
I don't -- it's too long ago. I don't remember.
BY MR. TOMASZCZUK:
Q. Okay. Just so we're clear, the timeframe I'm asking you about is September of 1985, right?
A. Right. I have been responding to you into the pre-employment phase.
Subsequent to the employment since this was part of my responsibilities, I'm sure I talked to many people in DOE about this contract, as I did to utilities, you know, after my employment.
I don't recall, you know, specifics of conversations.
Q. After you became a DOE employee, do you recall any conversations you had with Mr. Brandt concerning the contract?
A. Yes.
Q. Okay. Can you relay to me the substance of those conversations, please?
A. Since I was, as I have said, since I was responsible for implementing the terms and

MR. TOMASZCZUK: Ms. Reporter, I'm going to hand you and ask you to mark as Brownstein Exhibit 2 an excerpt of a June 1985 document entitled, "Mission Plan for the Civilian Radioactive Waste Management Program," and I think I can represent it reflects the Table of Contents and the, I believe the first 28 pages of that mission plan.
(Brownstein Exhibit No. 2 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Do you recall that document, Brownstein Exhibit 2?
A. Yes.
Q. And it is an excerpt of the June 1985 mission plan, is that correct?
A. To the best of my recollection, it is.
Q. All right. And you're familiar with this document, are you not?
A. I'm aware of it. I have read pieces of it.
Q. You didn't prepare it, did you?
A. That's correct.
Q. Do you know who did?



A. I do not recall. This is, the date is June '85. It was before my time.
Q. I appreciate that. Do you recall whether you read this document at or about the time you became a DOE employee or shortly thereafter?
A. I believe I read excerpts from it.
Q. Did you use the document to implement the terms of the standard contract?
A. I used -- yes, in part.
Q. And what parts did you use?
A. I used the waste acceptance rates. Hesitation in the response is whether I used the '85 or the subsequent mission plan.
I don't recall which, but I certainly used the mission plan or its predecessor documents for the waste acceptance rates.
Q. Do you know whether there was an earlier version of this mission plan?
A. I don't believe there was.
Q. The reason I ask, sir, is because I believe you used the term this document or its predecessor. I was trying to --
A. Subsequent documents; it's amended documents after. I'm sorry.



Q. Let me hand you, Mr. Brownstein, I'm going to have this marked as Brownstein Exhibit 3, what appears to be Volume 1 of a draft mission plan dated December 20, 1983.
(Brownstein Exhibit No. 3 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Have you ever seen that document before?
A. I cannot recall ever seeing this document.
Q. Can I direct your attention to page 2-1 under the heading II, program strategy?
I would direct your attention to the first paragraph under that heading, program strategy.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Do you see the last two sentences of that paragraph?
A. Yes.
Q. It states, "The waste materials will be accepted in accordance with a Waste



Acceptance Schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998. Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year."
That's what is stated there, correct?
A. Correct.
Q. Was that DOE's policy at the time you became an employee?
A. I've never seen this document.
MR. BANES: Objection -- vague.
THE WITNESS: And I do not believe it reflects the policy.
BY MR. TOMASZCZUK:
Q. It does not reflect the policy?
A. I do not believe it does.
Q. It was not DOE's policy under the contract to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998?
MR. BANES: Objection -- asked and answered.

THE WITNESS: It may have been a goal. I mean I was not with the program and had not seen this document.

May have been a goal, but in terms of the policy with respect to the contract, I don't believe that reflects that.

BY MR. TOMASZCZUK:

Q. And it's your testimony that you haven't seen this document before today as best you can recall?

A. As best I recall, I have not seen this document.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. Let's go back to Brownstein Exhibit 2, which was the June 1985 mission plan.

And I believe you testified if I understood it, Mr. Brownstein, that you used the waste acceptance schedules in the mission plan to implement the terms of the contract?

A. And --

MR. BANES: Objection. Go ahead.

BY MR. TOMASZCZUK:

Q. I understood that to be your



testimony?

A. In the mission plan or the mission plan amendments.

Q. Okay. And how did you go about doing that?

Explain to me what you mean by that.

A. My responsibilities did not include developing a waste acceptance rate that was done by other parts of the program, and in order to complete the things that I was responsible for, we needed a waste acceptance rate, and I used documents available elsewhere in the program.

Q. Who was responsible for developing the waste acceptance rates reflected on page 26 of Exhibit 2?

A. I don't recall. As I testified, this document came out before I was an employee, so I don't know who, who was responsible for that.

I don't recall who was responsible for that.

Q. What office within DOE was responsible for preparing this data, do you know?

A. OCRWM.

Q. Was there a division or branch within OCRWM that was responsible for preparing the



waste acceptance schedule at page 26 of Brownstein 2?

A. There probably was, but I just don't recall.

Q. Do you see the first sentence of this section under the heading 2.7, waste-acceptance schedules, on page 25?

(The witness reviewed the document.)

THE WITNESS: Yes.

BY MR. TOMASZCZUK:

Q. It says, "The DOE is committed to accept waste from the signatories of the standard disposal contracts on a firm schedule that begins no later than January 31, 1998"?

A. Yes.

Q. Is that an accurate statement?

MR. BANES: Objection. Calls for a legal conclusion.

It's vague.

BY MR. TOMASZCZUK:

Q. I'm not asking for your understanding as a, as an attorney.

A. The statement is what it is. You read it correctly.

Q. Is it an accurate statement? Do you



understand my question?

A. I don't.

MR. BANES: Same objection.

BY MR. TOMASZCZK:

Q. Well, is it true that DOE under the contract is committed to accept waste from the signatories of standard disposal contracts on a firm schedule that begins no later than January 31, 1998?

MR. BANES: Objection. Calls for a legal conclusion.

Go ahead.

THE WITNESS: I don't believe that. I believe that this is a, a goal.

I don't believe that it accurately represents what the contract calls for.

BY MR. TOMASZCZUK:

Q. Did you ever discuss that view with anyone?

A. I'm sure that I must have, but I don't recall specifically who or circumstances.

Q. You would at least agree the first sentence doesn't talk about goals, does it?

MR. BANES: Objection -- vague, argumentative.

THE WITNESS: The word goal is not used in the first sentence.
BY MR. TOMASZCZUK:
Q. Do you know to whom this mission plan was disseminated?
A. The document was public. It was all -- it was public, all interested parties, all interested people.
I don't know the mailing list.
Q. Do you know why it was prepared?
A. I believe, I believe it was required under the NWPA.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. There are two tables which appear near the end of this excerpt on pages 26 and 27.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. And are you familiar with these two tables?
A. I have seen them before, generally familiar with them.
Q. Do you know what they purport to



represent?
MR. BANES: Objection -- vague.
THE WITNESS: Two waste acceptance schedules.
BY MR. TOMASZCZUK:
Q. And let's just talk about the table at page, at page 26 first, okay?
A. Okay.
Q. This would appear to me under the column first repository -- do you see that?
A. Um-hm. Yes.
Q. It would show, as I understand it, the table, DOE accepting 400 metric tons of spent fuel in 1998?
A. That's correct.
Q. That's what the table shows you?
A. Yes.
Q. And 400 metric tons in 1999?
A. Yes.
Q. And then 400 metric tons in 2000?
A. Yes.
Q. And then 900 metric tons in 2001?
A. Yes.
Q. Eighteen hundred metric tons in 2002?
A. Yes.



Q. Correct?
A. Correct.
Q. And then 3,000 metric tons in 2003?
A. Correct.
Q. With a steady state acceptance rate of 3,000 metric tons from 2003 through 2021, correct?
A. Correct.
Q. And this same --
MR. BANES: Did you say through 2021?
MR. TOMASZCZUK: Yes.
MR. BANES: All right. Okay.
BY MR. TOMASZCZUK:
Q. And this same document, if I'm understanding correctly, shows a cumulative acceptance of 70,000 metric tons under the heading first repository?
A. Correct.
Q. Okay. And a cumulative spent fuel acceptance of 130,300 metric tons?
A. Could you --
Q. Yes. I was looking under the column cumulative spent fuel acceptance.
Do you see that second from the right?
A. You're talking about in 2031?



Q. Yes.
A. Yes.
Q. Cumulative spent fuel acceptance of 130,300 metric tons by 2031?
A. Correct. Yes.
Q. And then there is this final category spent fuel backlog.
Do you see that?
A. Yes.
Q. Do you understand what that purports to represent?
A. I believe I do.
MR. BANES: Objection -- lack of foundation.
Go ahead.
THE WITNESS: I believe I do. I believe that is the fuel that remains at the utilities during that time. It's the inventory at utilities.
BY MR. TOMASZCZUK:
Q. Which purports to show a backlog of 40,100 metric tons pre-1998?
A. Correct.
Q. And increasing to a figure of 51,100 metric tons as of 2007?

A. In 2007, it's 51,100.
Q. And then in 2008, drops to 51,000, correct?
A. Yes.
Q. And then in 2009, the spent fuel backlog drops to 50,400, correct?
A. No.
Q. I'm sorry. Am I reading it wrong?
A. I believe 700.
Q. I'm sorry -- 2,700?
A. Well, 50,700.
Q. Thank you. In 2010, the spent fuel backlog drops to 50,400?
A. Correct.
Q. In 2011, it drops to 49,000?
A. Correct.
Q. 2012, it drops to 47,100?
A. Yes.
Q. 2013, it drops to 45,300?
A. Yes.
Q. And it continues to drop, does it not, until we get to 800 metric tons by 2030?
A. Actually it increases the following year.
Q. Oh, I'm sorry.



A. No. I'm sorry. You are correct. It continues to decrease, yes. You're right.
Q. Leaving a backlog, spent fuel backlog of 800 metric tons by 2030?
A. Yes.
Q. Wouldn't it be fair to read this document as a reflection of DOE's intent to reduce the spent fuel backlog?
MR. BANES: Objection -- lack of foundation.
It calls for a legal conclusion.
THE WITNESS: Yes.
BY MR. TOMASZCZUK:
Q. It would be fair to read it that way, right?
A. If you read -- read your statement again.
MR. TOMASZCZUK: Could you read it back?
THE REPORTER: Question: "Wouldn't it be fair to read this document as a reflection of DOE's intent to reduce the spent fuel backlog?"
THE WITNESS: That was the DOE's intent, yes.
BY MR. TOMASZCZUK:



Q. Could I direct your attention to the bottom of page 28 of this document?
A. Where specifically?
Q. The very last paragraph is what I was going to direct your attention to.
A. The choice?
Q. Starting the representative, the last paragraph there?
A. Oh.
MR. BANES: You're not limited to that.
BY MR. TOMASZCZUK:
Q. You can absolutely read anything you want.
A. Okay.
(The witness reviewed the document.)
THE WITNESS: Okay. I have read it.
BY MR. TOMASZCZUK:
Q. Okay. Do you see there is a list of objectives at page 29, is that right?
A. Yes.
Q. And can you read the first one for me?
A. "Accept civilian spent fuel at an annual rate that will allow the utilities to maintain orderly operations of their nuclear



power plants, recognizing that oldest spent fuel is of the highest priority for acceptance consistent with DOE's current contracts with the waste generators."
Q. Is that a fair statement of DOE's objectives at the time?
MR. BANES: Objection -- vague. Calls for a legal conclusion.
THE WITNESS: It is. I believe objectives and goal in my mind are the same.
BY MR. TOMASZCZUK:
Q. Do you know whether the mission plan was ever given to any utilities?
MR. BANES: Objection -- lack of foundation.
THE WITNESS: I don't know that it was given to the utilities.
I'm sure it was available to the public.
I don't know if it was specifically given to the utilities.
BY MR. TOMASZCZUK:
Q. Did you ever discuss any aspect of this mission plan with any utility representatives?

Q. Well, I'm not sure I have asked you, at least in this most recent question, to interpret the contract, and it's not my intention to ask you for legal conclusions, but you were here for ten years, as I understand it, responsible for administering the contract, and I think it's fair that, that I should be entitled to ask you some questions about that, and that's what I'm going to purport to do.

Okay?

MR. BANES: I'm not going to prevent you from asking those questions.

I'm just going to preserve my objection for the record because it doesn't, we don't need testimony to interpret the contract.

MR. TOMASZCZUK: Well, we don't agree with that statement of the law, but we don't need to debate it here.

MR. BANES: Okay.

BY MR. TOMASZCZUK:

Q. Do you see the second sentence in this first paragraph, Mr. Brownstein?

A. Yes.

Q. Would you agree or disagree with that sentence as written?



A. Let me just read it again.

Q. Sure.

(The witness reviewed the document.)

THE WITNESS: Okay. I agree it says it discusses it, yes.

BY MR. TOMASZCZUK:

Q. Okay. Was it your understanding that DOE's intention was to begin to dispose of spent fuel at a rate which would allow utilities starting in 1998 to store their discharges in their pools?

MR. BANES: Objection -- vague as to the meaning of intention.

THE WITNESS: I really don't understand the question. I need you to --

BY MR. TOMASZCZUK:

Q. It may not have been very artfully worded.

This document, and in particular the second and third sentences of the first paragraph, as I read them, suggest to me that DOE was considering a commitment to begin in 1998 removing spent fuel at a rate which would be sufficient to allow storage in those pools of subsequent reactor discharges.



That's the subject we're talking about?

A. Yes.

Q. And my question to you is do you agree that that was DOE's intention at or about the time that this document was prepared in July of 1986?

MR. BANES: Objection -- vague.

THE WITNESS: I must tell you that contractor, contractors prepare a number of documents for many different parts of the organization to do many things.

I can agree with what this is. This is separate from the department policy.

Contractors do contractor work, provide input to the department. The department considers that.

So this is a contractor document, not a DOE document, and that's why I'm hesitating in your answers.

BY MR. TOMASZCZUK:

Q. Okay. Was it a goal of DOE at this time, July of 1986, that utilities would not need to expand their storage capacities after 1998?



MR. BANES: Objection -- vague. Go ahead.

THE WITNESS: The best as I recall, the, you know, the goal of the department was, was to have the facilities available as soon as we could and start accepting waste as soon as we could and as much as we could.

That was a goal of the department.

BY MR. TOMASZCZUK:

Q. So it was not a specific goal, that the utilities would not need to expand their storage capacities after 1998?

A. That, that was a goal. That was a goal.

Q. And was that goal communicated to the utilities at any point in time?

A. To the best of my recollection, in, I believe that that may have been communicated in, for example, in Congressional testimony by the director of what the department's goals are.

It may have been reflected in documents.

I would have to look at them. It has been a long time.

(There was a pause in the

Q. I'm going to hand you what should be marked as Brownstein Exhibit 6, and it is the Annual Capacity Report for June 1987.
I believe I already read the Bates numbers into the record, but PA-103152 through PA-103236.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. TOMASZUZCUK:
Q. Are you familiar with this document, Mr. Brownstein?
A. I am.
Q. Did you prepare it?
A. Yes.
Q. Did anyone assist you in its preparation?
A. Yes.
Q. Who helped you prepare it?
A. My prime contractor support was, was, I believe it was PNL, Billy Cole in the lead, and certainly other people within RW.
Q. Who else within RW helped you prepare it?
A. I don't recall specific names. I know I discussed this with other people in RW.



I'm not sure -- Harold Brandt, Ron Milner, Jim Carlson, Keith Klein.
Q. I'm sorry. What was the last name?
A. Keith Klein, Ben Rusche of course; there were probably others, people in the, in the concurrence chain that I knew I would be working with.
Q. What was the purpose of this document?
A. The ACR was the first requirement identified in the, in the standard disposal contract that, that, that we were required to prepare.
Q. So you prepared the document because the contract required its preparation?
A. Yes.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Directing your attention to the summary which appears at small Roman Numeral Five, do you see that?
A. Yes.
Q. Do you see the second paragraph, first sentence reads, "The system configuration used as the basis for this report is defined in the



Mission Plan Amendment"?
A. Yes.
Q. Did you draft that sentence do you know?
A. Whether I wrote the sentence or reviewed the sentence or approved the sentence, I certainly was involved in the sentence.
Q. All right. In any event, you agree with it, correct?
A. Yes.
Q. You're identified at what appears to be page 5 of the document, is that right?
A. Yes.
Q. And you're specifically identified as the person to whom comments on the ACR should be addressed?
A. Yes.
Q. Do you know why you were selected to serve that function?
A. I was responsible for, as I have testified, responsible for implementing terms of the contract, responsible for this document, and it was agreed that in seeking input to, to future ACRs, that I should be the, you know, key person that people should send their comments



to.
Q. Okay. At page 7 of the document appears a section with the heading projected waste acceptance capacity.
Do you see that?
A. Yes.
Q. Do you recall sitting here today whether you drafted this Section 2.0?
A. Again, I was responsible for it. Whether I wrote the words, evaluated the words, redrafted the words, I certainly was involved in the paragraph.
Q. All right. And the first sentence indicates that the schedule, the waste acceptance schedule in this ACR is consistent with the schedule from the mission plan amendment?
A. Correct.
Q. Correct? And that's the mission plan amendment that we previously reviewed, I believe Brownstein Exhibit No. 7? I mean? I'm sorry -- No. 5?
A. Correct.
Q. And this Table 2.1 shows a system receipt rate for year 1998 of 1200 metric tons,

correct?
A. It shows an illustrative acceptance rate of 1200 tons for '98.
Q. Is there some significance to the word illustrative?
A. I believe there is. I direct you back up to the first paragraph, and I'll do another section as well.
It says the schedule will serve as the basis for planning and will be updated annually consistent with the latest forecasts of waste disposal requirements.
So we knew that this was going to change if you -- and we tried to be as clear on that as we could.
In Section 1.1, we talked about what this contract actually required, including that, that set forth the projected annual receiving capacity for the DOE facility or facilities, and it goes on for ten years following the projected commencement of operation in the initial facility.
The next sentence is important. As specified in the contract, the ACR was for planning purposes only and is not contractually



binding on any of the DOE or the purchasers, meaning the utilities.
So illustrative has meaning in my mind.
Q. Is this one of the documents that you reviewed prior to your appearance here today?
A. I reviewed excerpts from it. I did not read the whole document.
Can I just ask a question? The excerpts I reviewed, I'm not sure it was '87. May have been a different one.
It was an ACR, excerpts from an ACR. I cannot tell whether it was the '87 one or subsequent one.
Q. Okay. Thank you for that clarification.
Do you know whether the contract says that the ACR is for planning purposes only?
A. I do.
Q. And what do you know?
A. It, as I just read to you, it is clearly stated in there that the document is for planning purposes only.
Q. And the underlying contract indicates that the ACR is for planning purposes only, does



it not?
A. It does.
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Okay. I'm sorry. It does. It says that in the contract.
BY MR. TOMASZCZUK:
Q. Do you have an understanding of what that term means, planning purposes only?
MR. BANES: Objection. Calls for a legal conclusion.
You can answer.
THE WITNESS: Okay. I believe I do. I believe I did, and I believe I do, and I tried to take my beliefs, the department's beliefs, and write them into this document, which is under, under the entire Chapter One of the document, so we tried to explain what it meant, what its purpose was, what it did, and what it didn't do.
BY MR. TOMASZCZUK:
Q. When you say Chapter One of the document, what were you referring to?
A. The beginning on page 1.
Q. Is there a particular language that



explicates what the term planning purposes means?
MR. BANES: Objection. Calls for a legal conclusion.
You can answer.
THE WITNESS: I believe the key sentence in my mind is under Section 1.1.
The last, the next to last sentence in that first paragraph says as specified in the contract, the ACR is for planning purposes only and thus is not contractually binding on either the DOE or the purchasers.
So it was a planning document.
BY MR. TOMASZCZUK:
Q. Just -- so it's a planning document required by the contract?
A. Yes.
Q. As I understand your testimony; were you under time pressure to get this document out?
A. The contract, if I recall correctly, specified I believe both a, a month and a day and a year for the document I believe.
Q. If I told you the contract in part said beginning not later than July 1, 1987, DOE

I used that in discussing with other people within RW to explain what the contract meant, so I used it for different purposes internally within the organization so that I and others, you know, could carry out our mission consistent with the contract.
Q. Do you know whether any drafts of this were prepared?
A. I'm sure there were.
Q. Do you recall seeing them?
A. Sure. There were -- the first draft, first draft they delivered was not the final draft.
I remember we -- you know, they had drafted things up, and we discussed it. We discussed the content, the layout, you know, how best to make it usable, so yeah, that wasn't the first draft.
Q. Okay, but to the best of your knowledge, this is the quote, unquote, final draft?
A. To the best of my knowledge.
Q. And when you say we discussed it, who was the we?
A. Billy and his people, and they were



responsible for it under my direction.
Q. Okay.
(There was a pause in the proceedings.)
MR. BANES: The draft has been produced. It was produced in the initial production.
MR. TOMASZCZUK: Do you know under what identification?
MR. BANES: Just for the record, I don't have the Bates stamp with me, but it's in there.
BY MR. TOMASZCZUK:
Q. Did any entities provide comments to you on the ACR after it was published?
A. I believe we did get some letters from some of the utilities.
Q. And do you recall the contents of those letters?
A. No, I don't.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Did you ever have any occasion to meet with utility representatives concerning the



acceptance rate schedule referenced in the ACR?
MR. BANES: Objection -- vague. In this ACR?
MR. TOMASZCZUK: Yes.
MR. BANES: Okay. All right.
THE WITNESS: No.
BY MR. TOMASZCZUK:
Q. Do you recall when the first draft of the ACR was prepared?
A. No.
Q. Were drafts of the ACR prepared?
A. Yes.
MR. TOMASZCZUK: Let me ask the reporter to mark another document as Brownstein Exhibit No. 7, and it is, appears to be a letter dated April 28, 1987, to Mr. Christopher Jedrey, and the letter is signed by S. Kraft on behalf of an organization I believe is UNWMG.
(Brownstein Exhibit No. 7 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Do you recall seeing this letter before today?



A. Yes.
Q. And in what context had you seen it before?
A. In my review of carrying out my program responsibilities.
Q. Mr. Jedrey at the time was the contracting officer responsible at DOE for the standard contract?
A. Yes. He was part of procurement. He was the contracting officer.
Q. And did you have occasion to work with him at this time?
A. I did.
Q. Okay. So presumably he gave a copy to you at or about the time you received it?
A. I'm sure he did.
Q. Okay. And did you do anything about the issues identified in this letter?
MR. BANES: Objection -- compound and vague.
BY MR. TOMASZCZUK:
Q. What did you do with this letter after you got a copy of it, if anything?
A. I can't recall whether we responded to it or not, to be frank with you.

I mean I know we worked on and analyzed it. I know it was discussed.
I can't tell you what we did with it. I don't recall.
Do you have the letter we can see?
Q. Did you ever have occasion to discuss the subjects in the letter with the author, Mr. Kraft?
A. I, I spoke to, to Kraft on a relatively regular basis, so I'm sure we discussed at least parts of this at some point, yeah.
Q. Do you recall anything specific with respect to your discussions with Mr. Kraft?
A. That was a long time ago. I don't recall the specific conversations.
I'm sure that I had them with him, but I just don't recall the specifics.
It was a long time ago. I can't even recall what we, as a department, how we responded to it.
Q. Directing your attention to page 2 of the letter?
A. Okay.
Q. The heading A, which is underlined at



the top of the page, there is a reference in that underlined language to performance standards?
A. Yes.
Q. Do you recall that issue being discussed at this time?
A. Generally, I do.
Q. And what do you recall about that subject, if anything?
A. To the best of my recollection, I believe we didn't think that was necessary and was something that the department was not willing to agree to.
We thought the law and the contract were sufficient clarity, so we weren't, as I recall, we weren't amenable to do that, and I'm sure the conversations reflected that.
Q. The DOE was not amenable to the inclusion of performance standards in the contract?
A. Right. We thought they were unnecessary.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:



Q. When you got this letter and saw the reference to performance standards, did you understand that to be milestones in meeting the January 31, 1998 date, or did you have a different understanding of that term?
MR. BANES: Objection -- vague and lack of foundation.
I think the words are additional performance standards.
MR. TOMASZCZUK: I appreciate that. That's fair.
THE WITNESS: Okay. Could you restate the question?
BY MR. TOMASZCZUK:
Q. When you got this copy of this letter from Mr. Kraft, what did you understand the term additional performance standards to mean in your mind?
A. In my mind, they, they wanted us to be clearer in terms of what we were going to do and when we were going to do it than was included in either the NWPA or the contract itself.
We felt both documents were sufficiently clear.
Q. And did you understand the term



additional performance standards to mean milestones for meeting the January 31, 1998 date, or did you understand it to mean something other than that?
MR. BANES: Objection -- compound, vague.
THE WITNESS: In my mind, the January 31st, 1998 date, as I have stated previously, was always a conditional requirement, and it was conditioned clearly both on the law and the contract, on the commencement of the facility operations, and so while we, as I indicated to you earlier today, we had, I think you used the word goals or objectives of accepting fuel as early as possible, that is separate and apart from the contractual, conditional contractual commitment which predicated the acceptance on commencement of facility operations.
That's how I used it.
BY MR. TOMASZCZUK:
Q. Did you understand when you saw the term additional performance standards that the utilities were asking DOE to adopt a minimum acceptance rate for the facility?
A. One of the things that was implied in

the letter that Mr. Kraft was concerned about was in his mind, the department could potentially meet its obligation again in my mind, following commencement of facility operations by accepting a single fuel assembly from a utility, and, and they were concerned about that.

Q. Did you have a view about that issue?

A. We viewed the contract and the law, you know, contain sufficient performance standards.

It was clear that in return for payment, ultimately and conditionally, we would be required to take their waste, and that's the ultimate performance standard.

Everything else were intermediate milestones or goals as opposed to contractual commitments.

Q. Do you know whether the federal Courts of Appeal have adopted your view as to the conditional nature of DOE's performance that you just articulated?

A. They have not, but that is how we, that is what we believed, and that's how we acted really at all times prior to that decision



you referred to.

Q. And what decision did you understand me to be referring to?

A. Whether we had an obligation on January 31st, 1998, whether in fact that was conditional or not.

Q. And you understand now that the courts have concluded that that obligation was not conditional, is that correct?

A. That's correct.

MR. BANES: Calls for a legal conclusion.

THE WITNESS: Sorry. That's correct.

BY MR. TOMASZCZUK:

Q. Do you think the courts were wrong about that?

A. Can I answer that?

MR. BANES: Yeah.

THE WITNESS: My --

MR. BANES: Objection -- irrelevant, but you can answer that.

THE WITNESS: I, my personal opinion is I absolutely believed my interpretation was correct.

And the reason for that is there are



words in the law and there are words in the contract in order for me to agree with that ruling I have to ignore, so yes, I believe I was correct, and I believe I still am.

That's my personal opinion.

(There was a pause in the proceedings.)

MR. TOMASZCZUK: Let's have another document marked as Brownstein Exhibit 8.

It appears to be a, it appears to be a memorandum to file dated June 29, 1987, and it has Mr. Brownstein's name on it.

(Brownstein Exhibit No. 8 was marked for identification.)

THE WITNESS: Okay.

BY MR. TOMASZCZUK:

Q. Do you recall this document?

A. Vaguely.

Q. Did you prepare it?

A. Yes.

Q. That's your signature on the document?

A. It is, and my initials at the bottom.

Q. All right. And in the first paragraph, the document reflects that on June



26, 1987, you met with Mr. Kraft, right?

A. It does.

Q. For purposes of discussing his previous letter?

A. Um-hm.

Q. Brownstein Exhibit No. 7?

A. Right.

Q. All right. Why did you meet with Mr. Kraft to discuss his letter to Mr. Jedrey?

A. I don't recall. Before you showed me this letter, I didn't even recall this memo, so as I testified previously, I knew I had talked with him, but I met on many occasions with Mr. Kraft on a host of contract-related issues.

I don't recall this specific meeting or how we --

Q. And what, why is it that you were meeting with Mr. Kraft on contract issues?

A. He, he represented, he was the director of the Utility Nuclear Waste Management Group, and he represented a large number of utilities who had interests in the contract.

I told you my responsibilities, and that's what -- we had regular interactions over

various contract issues.
Q. Okay. Do you recall who was present at the meeting with Mr. Kraft on June 26, 1987?
A. No.
Q. Do you recall where the meeting took place?
A. No.
Q. Do you recall how long it lasted?
A. No.
Q. Do you recall discussing with Mr. Kraft two issues where DOE could be responsive, namely, issues C and E as reflected on his earlier letter?
A. As I testified before you showed me this letter, I knew I had regular interactions with Mr. Kraft.
I knew I had discussed a lot of issues.
I knew I discussed this at some point in general terms.
I did not even recall this meeting. I did not recall preparing this until you showed it to me.
I don't recall any of the details of that conversation.



I'm sorry.
Q. Does the memorandum accurately reflect the resolution of the meeting?
A. Yes.
MR. BANES: Objection.
THE WITNESS: I wrote the memo, so at the time, that was, that was an accurate understanding of my meeting.
BY MR. TOMASZCZUK:
Q. Okay. Do you know, do you recall why you prepared the memorandum to file?
A. No.
Q. Well, the memorandum appears to reflect that you discussed with Mr. Kraft two issues where, to use your term, DOE could be responsive, right?
A. Yes.
Q. And those would be issues C and E on his April 28, 1987 letter, if I'm understanding this correctly?
A. Correct.
Q. Issue C, as I understand it from looking at his letter, deals with reasonable interest rates on unpaid fees?
A. Correct.



MR. BANES: Object -- irrelevant.
BY MR. TOMASZCZUK:
Q. And issue E refers to liability for damage to shipping casts?
A. Correct.
MR. BANES: Objection -- irrelevant.
BY MR. TOMASZCZUK:
Q. And what positive response were you envisioning at the time you prepared this memo on those issues?
MR. BANES: Objection -- irrelevant, beyond the schedule issues.
You can answer. I'm just laying down the ground rules.
This is kind of a waste of time, but go ahead.
THE WITNESS: I recall the C issue. You know, it really is -- when the utilities were required to pay quarterly in the nuclear waste fund, when those payments were not made on the date required, DOE had the, could penalize, charge late fees.
Those late fees were rather high, exorbitant if you will in one interpretation of the contract, and those charges were, were made



on different occasions to the utilities.
I thought that was, I and others in the department, not all, felt that was something that should be clarified, that that was, you know, unreasonable, and we were willing to enter into some discussions to amend it to, to put some reason into those late fees, so that was a problem at the time, and we were willing to address how to resolve that problem.
BY MR. TOMASZCZUK:
Q. Did, did it ever get resolved in the contract do you know?
A. Not in the contract. It got resolved internally in the department.
Q. And the second issue where a positive response, or I'm sorry, where DOE could be responsive dealt with liability for damage to shipping casks, and do you know how that got resolved, if at all?
A. Yeah. It did not get resolved. We never amended the contract, but as I recall, discussing this with the transportation people, they were -- they didn't have objections to doing it.
Q. The memo indicates that there are

three issues where a positive response would not be forthcoming, right?
A. Yes.
Q. And one of those was issue A, the additional performance standards issue?
A. Yes.
Q. And the issue B dealt with program review and evaluation rights of the purchaser?
A. Yes.
Q. And it dealt with indemnity?
A. Yes.
Q. At the bottom of the memorandum, Brownstein 8, there is a, a line which states, "7/7/87 Followup Discussion with Steve Kraft."
Do you see that?
A. Yes.
Q. And does this last portion of this memorandum reflect the follow-up discussion you had with Mr. Kraft on July 7, 1987?
A. Yes.
Q. And it appears to reflect that on that date, Mr. Kraft informed you that they wanted a formal response to their earlier letter?
A. Yes.
Q. And your last sentence reflects an



impression that you had that they were positioning themselves for quote, unquote, future action, right?
A. Yes.
Q. What about the conversation left you with that impression?
A. I testified before I didn't, don't recall.
This is the best reflection of what I believed at the time, and I have no reason to either add to it or take away from it.
I mean that's what I wrote, and that's what I believed at the time.
I don't recall anything else.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Was it your common or regular practice to prepare memos to file like this?
A. I did it on occasion. It was not common, and it was not regular.
Q. Do you recall other occasions where you prepared such memoranda?
A. In terms of memos to the files?
Q. Yes, like this.



A. Irregardless of the subject?
Q. Well, I guess yes is the answer to my question?
A. Yes, on occasion.
Q. And do you recall the topics with which they dealt?
A. I recall several that dealt with personnel-related matters.
Q. Do you recall any dealing with spent nuclear fuel disposal or acceptance?
A. I do not. I do not even recall this one.
Q. Do you know whether you prepared a memo to file after each of your meetings with Mr. Kraft or not?
A. I am, I am sure that I did not. This was a rare -- I can't, I cannot testify it was the only, but it was rare.
I met with Steve Kraft regularly.
Q. And sitting here today, you don't recall why you prepared this memo after this meeting and follow-up discussion?
A. My conjecture is that this was a formal letter he sent into the contracting officer, and that since it was, it was, it was



dealing with something a little informally submitted that I wanted to be careful since it dealt with legal issues as well as contractual and policy issues that I memorialized that conversation, so it was different than other conversations that I had with him.
Q. Correct me if I'm wrong, but did you not always deal with him on legal and contractual and policy matters?
What else would you have dealt with him on?
A. Well, the distinguishing point of that list was that he had sent in, you know, formal letter to the contracting officer, so because of that distinguishing feature, I'm guessing now that that's why I decided to treat that conversation differently.
MR. TOMASZCZUK: All right. Ms. Reporter, would you mark as Brownstein Exhibit No. 9, that's a copy of a letter from Mr. Jedrey to Mr. Kraft dated October 2, 1987?
(Brownstein Exhibit No. 9 was marked for identification.)
THE WITNESS: I'm anxious to read it.

MR. TOMASZCZUK: I'm sure all the warm and fuzzy feelings are coming back!
THE WITNESS: Yes, sir.
(The witness reviewed the document.)
THE WITNESS: Okay. Before we get into this, I'm going to ask for a five-minute break.
MR. TOMASZCZUK: Absolutely.
THE WITNESS: And then I'll read it.
MR. TOMASZCZUK: That's fine. Any time you want a break, just speak up.
THE WITNESS: Okay. Thank you.
(A recess was taken.)
MR. TOMASZCZUK: Back on the record.
BY MR. TOMASZCZUK:
Q. Mr. Brownstein, I actually want you to go back and look at Exhibit No. 7 for just a moment.
That's the April 28, 1987 letter from Mr. Kraft to Mr. Jedrey.
A. Um-hm.
Q. You should have that handy.
A. Yes.
Q. And directing your attention to page 2, under the heading rationale, there is a



sentence slightly more than halfway through that paragraph which states this language, referring to previous language from Article 2 of the contract, could conceivably be read to permit DOE to accept single fuel assembly in 1998 and no more until decades later.
Do you see that?
A. Yes, I do.
Q. Do you agree with that statement?
A. No, I don't.
Q. And why not?
A. We believe that's, that was not the department's intent, and that's a radical view of the contract.
Q. And it wasn't your view?
A. It was not. It was no one's view at the department.
Q. Going back to Brownstein Exhibit No. 9, and I think we took a break just as I was going to start asking you some questions about this one, do you recall this document?
A. It's, it's been 15 years. I didn't when you asked me before, but I certainly do now.
Thank you for jogging my memory.



Q. And this document appears to be the DOE contracting officer's response to Mr. Kraft's earlier letter, right?
A. It is.
Q. Okay. Did you help prepare this response?
A. Yes, I did.
Q. Did you draft it?
A. Large parts of it, not the entire thing.
Q. Can you identify sitting here today what parts you drafted?
A. How about if I do it the other way, the parts that I know that I did not?
Q. Okay. That's fair. I'll take it that way.
A. I know that I was not the primary author on No. 4 beginning on page 3, nor on No. 5.
Q. So it would be fair to assume then that you had a significant hand in drafting responses delineated 1, 2 and 3?
A. I just -- I want to be clear on one thing.
Q. Of course; take your time.



(The witness reviewed the document.)
THE WITNESS: Not solely, but, but had a large hand in the others, yes.
BY MR. TOMASZCZUK:
Q. Okay. And the first paragraph, the last sentence states, "The Department shares your desire to ensure that the Contract is fair and equitable and that it accurately reflects the intent of the contracting parties."
Do you see that on page 1, first paragraph.
A. Oh, yes.
Q. Last sentence?
A. Yes. I'm sorry. Yes.
Q. And does that accurately reflect a desire of the department at that time?
A. Yes.
Q. What was the intent of the parties at that time concerning the spent nuclear fuel acceptance rate?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Well, in, I believe as I testified behalf before, in the broadest of terms, the utilities were responsible for

funding the system, and that we were responsible ultimately to accept their fuel.
BY MR. TOMASZCZUK:
Q. Directing your attention to page 2 of the document --
A. Um-hm.
Q. Under the heading No. 1, additional performance standards?
A. Yes.
Q. Do you see that? Would you look at the second paragraph under this heading?
(The witness reviewed the document.)
THE WITNESS: Yes.
BY MR. TOMASZCZUK:
Q. Do you recall sitting here today whether you drafted this language in this paragraph?
A. I am sure I played a major role in it.
Q. And Mr. Jedrey is telling Mr. Kraft here in the first sentence of the second paragraph under subheading or under heading one, additional performance standards, quote, "...I can assure you that the Department intends to honor both the letter and spirit of the NWPA and the contract, rather than seek opportunities to



circumvent its obligations"?
A. Yes.
Q. What did you understand by that language, seek opportunities to circumvent its obligations, to mean?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: I believed what it meant was responding to Mr. Kraft's concern about the possibility of us, of the department accepting a single assembly and walking away.
That to me is a trick, and I think the contracting officer was trying to indicate that was, that type of gamesmanship is not what the department was all about.
BY MR. TOMASZCZUK:
Q. And that would constitute circumventing its obligations under the contract?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: That's how I interpret it, that sentence.
We're responding to his specific concern.



BY MR. TOMASZCZUK:
Q. Could you look at the last sentence of this same paragraph under the heading additional performance standards?
A. Yes.
Q. Last phrase in pertinent part says they provide clear evidence that DOE does not intend to meet its contractual obligation by accepting a single assembly?
A. Yes.
Q. Do you see that?
A. Yes.
Q. Is that a true statement?
MR. BANES: Objection. Calls for speculation.
BY MR. TOMASZCZUK:
Q. You can disagree.
A. I do not disagree. I agree with that sentence.
Q. In the intervening language in this paragraph, there's a discussion about schedules illustrating a planned acceptance rate of 1200 MTU for each of the first five years and then an acceleration to 2,650 metric tons thereafter.
Do you see that?



A. I do.
Q. And if my recollection is right, I believe those are the figures that were used in the first ACR which had been published a couple of months prior to this October 1987 letter?
A. They are.
Q. All right. What was your intention or what was the Department of Energy's intention in giving Mr. Kraft that information?
What was he supposed to do with that?
A. This, this was, this entire paragraph is trying to reflect that the department was not only not trying to game the system by accepting a single assembly and walking away, but by demonstrating that the evidence of what our plans were through these other documents clearly showed that we were intending to do something other than take a single assembly.
Q. Was it your intention that the utilities would use or rely on, in any way on that information in preparing their own plans for dealing with their spent nuclear fuel?
A. I believe we addressed that issue in the Annual Capacity Report, and in fact I think it was addressed in the contract itself.

137

The contract said to provide this information for planning purposes recognizing that it would change over time, and so if we went back to the ACR, I think you would see relevant language that addressed what we intended that information to be and not to be.

Q. We saw language that says it's for planning purposes, right?

A. Yes.

Q. And I guess my question to you, Mr. Brownstein, is as a practical matter, what does that mean to a utility that gets it?

What are they supposed to do with it?

MR. BANES: Objection. Calls for speculation.

THE WITNESS: Since the contract was, you know, evolved between two parties, we didn't just write the contract.

The utilities signed it. It was a two-party contract. The utilities wanted information, and they wanted it -- the contract, that's a two-party agreement. The utilities wanted the information to understand, you know, down the road, what our plans were so they can begin their thinking process.

138

They asked for it for planning purposes, not for binding purposes.

That's what we stated in the contract, and that's what we tried do.

We tried to keep them updated on what our plans, recognizing and as we stated in all the documents that those plans would change as laws changed, as situations changed, as the system evolved in developing a very complex system.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. Can I direct your attention to the next page of this response?

A. Sure.

Q. At the top of page 3 in particular, if you would just focus on that paragraph?

(The witness reviewed the document.)

THE WITNESS: Okay.

BY MR. TOMASZCZUK:

Q. Okay. There is a sentence in the middle of the paragraph at the top of page 3 that says that, quote, "The Department will continue to give Purchasers' views due

139

consideration, and utilities will continue to have access to such program documents as the ACR, Mission Plan, Annual Report, System Requirements Documents, Fee Adequacy Report, Congressional budget submittals, and testimony before the Congress."

A. Yes.

Q. What process existed for the department to give purchasers' views due consideration as that phrase is used here in the language I just quoted?

A. I think that comes in many forms. In terms of the contract, we met on a regular basis with utilities to discuss their concerns, and tried to address them.

We reported that in the, in subsequent issues of the ACR.

They would testify before Congress. We would, you know, look at their statements.

There were regular meetings with other parts of RW other than mine, and they, you know, as an example, they would regularly go out to Nevada and -- to look at the Yucca Mountain project.

They met with project people. They

140

made their views known, and I believe there was a, an effort on everybody's part to understand, you know, what their concerns were, what their points were, and try to address them.

I believe we ran this whole program, I think we did, and I think we do today, run this as an open and transparent program, and ignore no one's views, and that's how I interpret due consideration.

Q. Was there any advantage or benefit to be gained by the utilities in having access to program documents and in particular the program documents that are referenced here?

A. I don't understand.

Q. Okay. What was the purpose of giving the utilities access to the program documents such as the ACR, mission plan, annual report, system requirements document?

A. I see.

MR. BANES: Objection. Calls for a legal conclusion in part.

THE WITNESS: I think all those documents describe different aspects of what the program was doing.

In other words, this program was

spending the utilities' money, and the utilities, this was a way to impart, make sure the utilities knew how their money was being spent.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. In the previous page, there is a, this reference to letter and spirit of the NWPA and the contract.

What was the letter and spirit of the NWPA and the contract?

MR. BANES: Objection. Calls for a legal conclusion, and calls for speculation.

THE WITNESS: I believe I have already answered the question actually.

BY MR. TOMASZCZUK:

Q. That it was, that it was to, simply to take one spent fuel rod?

That was the answer that you're referring to?

MR. BANES: Objection. Calls for a legal conclusion.

MR. TOMASZCZUK: I'm trying to clarify what his answer was.



What about that calls for a legal conclusion?

MR. BANES: You're asking him what the letter and the spirit of the NWPA is?

MR. TOMASZCZUK: I was asking him to clarify his previous answer.

MR. BANES: You're asking for a legal conclusion about what the NWPA means.

BY MR. TOMASZCZUK:

Q. Mr. Brownstein, did you understand my last question?

A. I'll respond to you the way I believe I responded to you before.

Q. Okay.

A. In the broadest of terms, the way I understand it is the utilities had the responsibility for paying for the waste management system, and we had an ultimately responsibility to accept the waste.

That's how I answered you before. That's, that's how I understood your question.

Q. All right. So the letter and spirit of the NWPA in the contract was to ultimately dispose of the spent nuclear fuel?

A. Yes.



MR. BANES: Objection. Calls for a legal conclusion.

BY MR. TOMASZCZUK:

Q. What did you mean when you, as I understand your testimony, wrote this phrase the letter and spirit of the NWPA in the contract?

MR. BANES: Objection -- asked and answered.

THE WITNESS: I believe I have responded to you twice already on that.

BY MR. TOMASZUZUK:

Q. Well, could you try it for me one more time?

MR. BANES: I don't think he will. I think he's answered.

MR. TOMASZUZUK: Are you directing him not to answer?

MR. BANES: Yes.

MR. TOMASZUZUK: Okay. We'll mark that one.

BY MR. TOMASZUZUK:

Q. Do you recall the 1987 mission plan and the spent nuclear fuel rates identified in the mission plan?

A. Yes.



Q. Were those rates consistent with the letter and spirit of the NWPA and the contract?

MR. BANES: Objection. Calls for a legal conclusion, and vague.

THE WITNESS: The letter and spirit you're referring to in that paragraph was responding to Mr. Kraft's concern of his letter.

His concern was that the department would fulfill whatever its obligations were through accepting a single assembly.

We tried to address that concern in this paragraph in those words, so --

BY MR. TOMASZCZUK:

Q. And as I understand it, acceptance of one spent fuel rod would not be consistent with the letter and spirit of the NWPA in the contract in your mind?

A. I would agree with that statement.

Q. All right. A little further down on this same page, in paragraph, page 2, there is a reference and a sentence that reads as required by the contract, these schedules will serve as the basis for developing contractually binding Delivery Commitment Schedules in 1991?

A. Yes.

Go ahead.
THE WITNESS: I believe at the time, NESERDA believed they were not covered by the requirements of the Nuclear Waste Policy Act, that they were covered by other statutes, and it was not necessary for them to sign a contract.
The department did not agree with that, and all this is written in correspondence between the two, two organizations.
BY MR. TOMASZCZUK:
Q. And I'm sorry, what was the entity? Can you tell me again what the entity was?
A. NESERDA -- New York State Energy Research and Development Authority, that were the owners of the waste at West Valley.
Q. Did this draft contract ever get finalized?
A. No, and in fact I never used it. This is, as I recall, this is not what I wanted.
You know, I wanted something, you know, far different, but this is, was his first output, as I recall it.
Q. Did this issue with NESERDA get resolved in some way?
MR. BANES: Objection -- irrelevant.



THE WITNESS: I believe it has been resolved over the last one to three years.
BY MR. TOMASZCZUK:
Q. And do you know how?
A. No. Again, in 1995, I didn't continue those responsibilities.
MR. TOMASZCZUK: Ms. Reporter, would you mark as Brownstein Exhibit 20 a memorandum dated October 5th, 1990, from Alan Brownstein to distribution.
It has in the lower right-hand corner the Bates numbers EDB-001-1487 through dash 1515.
(Brownstein Exhibit No. 20 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Do you recall preparing this memorandum?
A. Yes.
Q. And why did you prepare it?
A. This was testified before. When I prepare these documents, they would go through, after I was satisfied with them, they would go



through management review.
This is in fact a cover letter indicating that management review, and you see by the distribution the, the parts of the organization and elsewhere that the document went.
Q. Looking at the distribution list on the second page of the document, are you able to identify whether any of those individuals were the ones responsible for the preparation of the data in the mission plan, in the mission plan amendments that we looked at earlier.
A. Who I would look to is potentially either Tom Isaacs or Jerry Saltzman, S-a-l-t-z-m-a-n.
Q. Is Mr. Isaacs still at DOE?
A. I believe he is at the national lab now, so indirectly he's with DOE.
Q. And what was his position in October of 1990?
A. Show me the organization charts and I'll help you out.
I don't recall specifics.
Q. Do you know what RW-4 was?
A. No. I don't remember, nor RW-5.



Q. And who was Mr. Saltzman?
A. Both Isaacs and Saltzman were senior program managers, but again I would have to associate it with titles and the organizational charts to recall, but they were senior managers.
Q. At about this time, were you still reporting to Mr. Brandt?
A. No.
Q. Who were you reporting to?
A. This distribution list leads me to believe that I was reporting, my first line supervisor was Jim Carlson, and second line was Ron Milner.
Q. And what about this report leads you to so conclude?
A. Okay. My memo, you will see reply to the attention of RW-422?
Q. Um-hm.
A. And 422 indicates that, that I was under RW-42 reporting to Carlson, and all 40s on there reported to RW-40, which was Milner.
Q. It was your standard practice to distribute the preliminary drafts of the ACRs before they were issued in final?
A. Absolutely.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :



(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia
Wednesday, April 10, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,



LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:26 a.m., Wednesday, April 10, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

APPEARANCES: (Continued)

On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:

JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:

DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:

NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350



APPEARANCES: (Continued)

On behalf of the Defendant:

UNITED STATES DEPARTMENT OF JUSTICE
BY: BRYANT S. BANES, ESQ.
RUSSELL A. SHULTIS, ESQ.
1100 L Street, N.W.
Washington, D.C. 20530



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| ALAN BROWNSTEIN | PLAINTIFFS | DEFENDANT |
| By Mr. Tomaszczuk | 250 | |
| By Mr. Banes | | 388 |
| By Mr. Tomaszczuk | 407 | |
| By Mr. Hirsch | 411 | |

Afternoon Session -- 326


E X H I B I T S


| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 21 | 251 |
| 22 | 263 |
| 23 | 273 |
| 24 | 278 |
| 25 | 286 |
| 26 | 296 |
| 27 | 302 |
| 28 | 304 |
| 29 | 312 |
| 30 | 321 |
| 31 | 347 |





| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 32 | 356 |
| 33 | 361 |
| 34 | 364 |
| 35 | 380 |
| 36 | 410 |
| 37 | 414 |
| 38 | 424 |
| 39 | 428 |
| 40 | 428 |
| 41 | 452 |
| 42 | 452 |

director of the Office of Program Management and Administration?
A. Correct.
Q. And that as of that point in time, Mr. Barrett is acting as the office director?
A. Yes. He acted on and off since the early '90s.
Q. And the last page in this document is dated 8/10/99. There are no names associated with the office positions.
I presume at this point in time, you're still acting as director of the Regulatory Coordination Division?
A. Yes.
Q. Does this chart reflect more or less the current structure of the office, or has it changed from what is depicted on here?
A. It's generally the same. We now have something called a Chief Operating Officer and the regulatory coordination, which reports to the office of the director, and I report through the Chief Operating Officer, no longer through the Office of Program Management and Administration.
Q. Let me give you another document, Mr.



Brownstein. It's another organization chart. I believe this was pulled off the Web site, and I would ask the reporter to mark this as Brownstein 22.
(Brownstein Exhibit No. 22 was marked for identification.)
BY MR. TOMASZCZUK:
Q. If I understood your earlier answer, the regulatory -- this chart is not correct because the Regulatory Coordination Division of which you are the current director no longer reports through the Office of Program Management and Administration?
A. There is, there is a sort of a de jure, de facto. They're split here. In fact in the books, it may be like this, but for reporting purposes, for evaluation purposes, for example, I think this is a good indicator, my performance evaluations are no longer done by the Office of Program Management and Administration.
They're done directly by the Chief Operating Officer. My day-to-day first line supervisor is the Chief Operating Officer, so



while the division is listed there, that may be the way it's on the books.
That is not the way it's operated for several years.
Q. Okay. Who is the current head of the Waste Acceptance and Transportation Division?
A. I believe that's Dave Zabransky.
Q. And do you know who heads the Office of Acceptance, Transportation and Integration?
A. On an acting basis, I believe that's Jeff Williams.
I think that was Mr. Carlson, and he just retired.
Q. Okay. And the office deputy director is currently Mr. Barrett?
A. Yes.
Q. And Ms. Chu is now the office director, right?
A. Correct.
Q. And do you know who is going to replace Mr. Barrett when he retires as the office deputy director?
A. We're all waiting to find out that information.
Q. Okay. All right. Thank you.



A. Okay.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. I'm sorry. Mr. Milner is serving as Chief Operating Officer, is that right?
A. That is correct.
Q. Mr. Brownstein, when we adjourned yesterday, I believe we were on Exhibit 20, and I would ask you to get that in front of you.
Again, I just have a few questions further on that one.
A. Okay.
Q. And if I could direct your attention to page 4 of the draft ACR, which is part of Exhibit 20?
A. Okay.
Q. One question I was going to ask you is whether or not the report that's referenced in the second paragraph of page 4, do you see that, on November 29?
A. Yes.
Q. The Secretary submitted a report. Is that the 60-day report that we saw alluded to in one of the documents yesterday?

A. I'm 99 percent sure that it is.
Q. Okay. Did you have a hand in the preparation of that report?
A. At most, my only function in that was a review function.
I certainly was not responsible for it. I did not play a major role in that.
I may have reviewed parts of it, to the best of my recollection.
Q. All right.
A. I actually have to review the document today. I have to see it.
Q. Okay. All right. Based on your recollection, and I realize it has been a while, do you recall that the report as reflected in the narrative on this page showed a significant slip for the expected start of repository operations from the Year 2003 to approximately 2010?
A. I'm reading page 4. That's what page 4 indicates.
Q. And that's consistent with your recollection, your best recollection?
A. Yes.
Q. And then the next sentence states the



current restrictions in the Amendments Act linking the repository and MRS make it impossible for DOE to accept waste at an MRS facility on a schedule that is independent from that of the repository?
A. Correct.
Q. What linkages are being referred to there?
A. The --
MR. BANES: Objection. Calls for a legal conclusion, but you can go ahead.
THE WITNESS: Okay. Well, actually I would have to go back and look at the act.
The act restricted the department on what it could accept, if there was an MRS, what it could accept relative to the process on the repository.
We need to go back and look at the language in the act so I can recall that, but it was clear linkages between the two facilities, so the Congress put restrictions on it, and that's what we were referring to here.
BY MR. TOMASZCZUK:
Q. Were you familiar with those restrictions at the time that it --



A. At the time I was.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Is it your understanding that the linkage was between the construction of the MRS facility and the issuance of a license by the NRC for the construction of a repository?
A. Again, I was quite familiar with all that.
I haven't reviewed that in a long time.
I would be happy to answer your questions if I saw the Amendments Act in front of me.
I'm not sure I should go any further than that.
MR. TOMASZCZUK: Take a one-minute break.
MR. BANES: Okay.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, I would like to have marked as Brownstein Exhibit 23 --
MR. BANES: I think we want to clarify



something before we go much farther.
You have asked a lot of questions trying to, you know, about -- I know what you all are trying, I know you all are trying to find out who -- Mr. Brownstein himself didn't develop the rate that's in the, in the, in the ACRs.
He adopted it from the mission plan as he has testified, and I know you're asking him, you're trying to find out by asking him who did that.
I'm not so sure -- well, Mister, Mr. Brownstein can tell you, but I'm not so sure that you got the answer you're looking for in what we were talking about earlier.
BY MR. TOMASZCZUK:
Q. Do you want to amend your testimony in any way, Mr. Brownstein, based on counsel's statement?
A. Well, let me just make the statement.
Q. Sure.
A. I believe it is consistent with what I said yesterday. It's the best of my recollection.
I do not know and never knew, did know

who, you know, formulated the waste acceptance rate.

I testified I always took that as a given, as an input in my reports, and I just don't know who did it, who was responsible for how it worked, the process.

I was not involved in that, and that's --

MR. BANES: I just want to make it clear he identified a lot of names, and I just want to make it clear that, you know, I just wanted, I wanted it to be clear on the record that all those names aren't necessarily the person that developed the rate.

THE WITNESS: That's true.

MR. BANES: All right, so I mean if you're looking for the person exactly that developed the rate, we have tried to be as thorough as we could in the answers to our interrogatories, so these additional names may not get you anything if you investigate those, so I just want to put that on the record.

THE WITNESS: I just don't know.

BY MR. TOMASZCZUK:

Q. Okay. I believe yesterday you



testified, as I recall it, that Mr. Isaacs may have been responsible for that.

Do you recall saying that?

A. I do. And what I was trying to do when I came up with that answer is in my mind, go through -- I did not have in front of me yesterday organizational charts, and I believe it was, you know, that policy or that outreach division that he had, whatever name. We can go back.

I think they had responsibility for the development of the mission plan because I knew it wasn't the underlying organizations, but within that organization, who did it, and certainly the process of how it was constructed, I'm absolutely blind to. I don't know.

That's what I wanted to clarify.

Q. Do you know whether Mr. Isaacs reported to Mr. Gale?

And you can look at Brownstein Exhibit 21 if it helps, the third page.

A. I know he did not. It's clear on this, on the third page that Tom Isaacs reported to Bill Purcell at that time.

Q. All right, because Mr. Isaacs was the



director of the Repository Coordination Division as depicted on this chart?

A. Right.

Q. So he may or may not have been involved in the preparation of the rates used in the mission plan?

A. You're speaking of the original mission plan?

Q. The nineteen, let's talk about the 1985 mission plan.

A. Yeah. That's before my time, so I don't know.

Q. Right. What about the 1987 amendments?

Looking at any of these charts, does that help you identify which individuals or offices prepared the amendments?

A. Looking at the May '86, to the best of my recollection, it would have been prepared somewhere under the Office of Policy and Outreach.

That's to the best of my recollection.

Q. And do you know who was the director of that office in May of '86?

A. Not from this chart, I don't.



Q. All right.

MR. BANES: If it's helpful, Alex, I just note for the record that Mr. Isaacs is one of the people that we identified in our response as knowledgeable of, as knowledgeable of the contents of the mission plan in '85.

MR. TOMASZCZUK: Okay. I appreciate that.

MR. BANES: Mr. Trebules was another person.

MR. TOMASZCZUK: Okay. Ms. Reporter, please mark as Brownstein 23 a document which I believe I can represent is a copy of the Nuclear Waste Policy Act amendments 1987.

(Brownstein Exhibit No. 23 was marked for identification.)

MR. BANES: Before we start Exhibit 23, I'm just going to make a blanket legal conclusion objection so I don't have to do it for every question.

(The witness reviewed the document.)

MR. TOMASZCZUK: I just note for the record that I think since the term linkages is used in this document, which Mr. Brownstein

prepared the cover memo to and was involved in, I think I have a right to ask him some questions about his understanding of that term, but I understand your objection, and note my position for the record.
MR. BANES: Okay.
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Does this exhibit Brownstein No. 23 refresh your recollection in any way with respect to the subject of linkages as that term is used in Brownstein Exhibit 20?
A. It does. I was referring to the licensing conditions that are, that are listed.
Q. In subparagraph (d) on Brownstein 23?
A. Correct.
Q. And were you referring to all of the conditions, or just some of the conditions that are enumerated there?
A. I certainly -- let's go through them. I'm certainly referring to No. 1.
Q. Okay. And No. (1) states construction of such facility may not begin until the Commission has issued a license for the construction of a repository under Section



10135(d) of this title?
A. Right. And you know, in my mind, I was also referring to (3) and (4), not really (2).
Q. Okay. All right. And (3) refers to a 10,000 metric ton limitation for the MRS?
A. Correct.
Q. And then (4) refers to a total limitation of 15,000 metric tons for the MRS, right?
A. Right. The 10,000 as stated here is linked to the acceptance of fuel at the repository itself, and 15,000 is irregardless of that, the overall limit.
Q. Right. And just stated in sort of layman's terms, what is your understanding of the limitation that you just referred to in (d)(1)?
A. That we could not proceed within an MRS, and MRS -- I'll just use the acronym -- until we had gotten a license from the Nuclear Regulatory Commission.
Q. A license for what?
A. For construction of a repository.
Q. Okay. So in Brownstein Exhibit 20, at



page 4, your understanding is when that term linking is used, that that's a catchall term to encompass at least these three conditions or linkages that you just testified about?
A. That's what I was referring to, yes.
Q. Okay. Do you know whether those linkages were repealed or still exist today?
MR. BANES: Objection. Calls for legal conclusion.
Go ahead, sir.
THE WITNESS: They have never been repealed.
The MRS was never successful. The Office of Negotiators that was established by the Amendments Act never successfully identified an MRS, and so we, the idea, that facility came to an end.
BY MR. TOMASZCZUK:
Q. And was, when was that?
A. I don't recall.
Q. You don't, you have no approximate understanding of when that occurred?
A. There were two, there were two negotiators appointed to implement the Amendments Act.



Both served terms. Both ended their terms unsuccessfully.
I don't recall the dates of those terms.
Q. Would it have been between 1990 and 1995?
A. It would have been.
Q. So somewhere in that timeframe?
A. Yes. That's a guess.
Q. That's fair. I just ask for your best recollection.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. If I said that decision was made in or about December of 1992, would that sound roughly accurate to you?
MR. BANES: Object. It calls for speculation.
THE WITNESS: I would rather stand by my last answer.
BY MR. TOMASZCZUK:
Q. Okay. Let me ask you another question, Mr. Brownstein, about this document.
Could you turn to page 7?

A. Okay.
Q. Do you know whose handwriting that is on this document?
A. No. I can't even distinguish a word.
Q. Okay. Can you tell whether it's your handwriting or not?
A. I can tell that it is not my handwriting.
Q. All right.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, I would like to have marked as Brownstein No. 24 -- I got it right -- the Annual Capacity Report issued in December of 1990.
(Brownstein Exhibit No. 24 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Have you seen this document before today?
A. Yes.
Q. You had a hand in its preparation?
A. I did.
Q. Is this one of the documents you



looked at to prepare for your deposition?
A. I looked at excerpts from an ACR and never read the whole ACR, and I cannot testify that it was in 1990, the ACR.
I have reviewed excerpts of an ACR.
Q. Okay. By the way, did you review any documents last night between the time we adjourned and when we recommenced this morning?
A. No. You wore me out. I did not.
Q. If I could direct your attention to the summary page, Roman Numeral Five, do you recall whether you prepared the summary?
A. I prepared the summary in this document consistent with how I testified yesterday and how all the ACRs were prepared.
Q. Okay. The first paragraph, second sentence states, "This report is currently scheduled to be the last in the series of ACRs to be published by DOE." Okay?
A. Yes.
Q. Do you know why this was scheduled to be the last in the series of ACRs to be published by DOE?
A. Well, they go on to explain in the next sentence consistent at that time with my



understanding of the contract, the ACR was then going to be replaced by the annual Acceptance Priority Ranking report.
Q. So with replacement of the ACR by the APR, there would be no more need for an ACR?
A. Correct.
Q. Okay.
A. That's how I interpreted the contract.
Q. Okay. And the next paragraph appears to reflect what we saw in the draft with respect to an upper and lower bounded waste acceptance schedule, right?
A. Correct.
Q. And those upper and lower bounded schedules are reflected at page 7?
A. They are.
Q. There is no source identified for the lower bounding case in Table 2.2, is there?
A. That's correct.
Q. And do you know what the source of this, of the data on this table was?
A. I don't.
MR. BANES: You are not limited to that page in order to answer that question.
BY MR. TOMASZCZUK:



Q. And I imposed no such limitation in my question.
A. Okay. Let me refresh my memory.
(The witness reviewed the document.)
THE WITNESS: I honestly don't recall. I'm referring back to page 5 in the middle paragraph where we talk about the source for the upper bounding case, and identified that, and have the sentence the lower bounding case requires early MRS siting, but complies with the current 10,000 MTU storage limit part of the repository operation.
That is referring to the linkages that we just talked about, so I do not recall how we were consistent with the 10,000 MTU, but came up with these exact numbers.
I just don't recall that.
BY MR. TOMASZCZUK:
Q. Is it your best recollection that you did not develop the data on this Table 2.2?
(The witness reviewed the document.)
THE WITNESS: I'm hesitating because I'm deeply trying to think about, about how that was developed.
(There was a pause in the

proceedings.)
THE WITNESS: I'm sorry. I just don't recall.
BY MR. TOMASZCZUK:
Q. Okay. In any event. It is true, is it not, that the conditions for the lower bounding case reflected in Table 2.2 never materialized, right?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Could you clarify what you mean?
BY MR. TOMASZCZUK:
Q. Sure. There was no MRS?
A. That's correct.
Q. Right. And the language that you referred to on page 5, it indicates, does it not, that the lower bounding case requires MRS siting, and then refers to the 10,000 MTU storage limitation?
A. That's correct. That process never, never materialized.
Q. So there would be no reason to use the data in Table 2.2 for any purpose now, would there?



MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Well, given what counsel has said, if there was a, miraculously an MRS that became available today, since the Amendments Act was not appealed, as I understand it, an MRS would still be subject to that, but that's -- I'm not a lawyer.
That would be my response.
BY MR. TOMASZCZUK:
Q. Are you aware of any efforts being made to miraculously site an MRS today?
A. Not by the government. The closest thing would be the private fuel storage facility.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. The draft mission plan amendment that's identified as the source for the data in Table 2.1, did that not assume repository operations starting in 2003?
A. I would like to refer back to that document.
Q. Okay.



A. Do I have that?
Q. I don't know. Can we go off the record for a minute?
MR. BANES: Sure.
(A discussion was held off the record.)
MR. TOMASZCZUK: We can go back on.
BY MR. TOMASZCZUK:
Q. This ACR also has two Tables 3.1 and 3.2?
A. Yes.
Q. All right. And 3.1 are the purchaser's annual allocations for the upper bounding case, and 3.2 is the allocations for the lower bounding case, correct?
A. Correct.
Q. And both of these tables are based on an oldest fuel first priority ranking, correct?
A. They are.
Q. And that was consistent with the policy and plan at the time, right?
A. Yes.
Q. Could I ask you to just turn to the cover sheet of this document, Mr. Brownstein, No. 24?



A. Sure.
Q. There is handwritten in the upper right-hand corner the name Payton?
A. Yes.
Q. Do you know who Payton is?
A. Yes.
Q. Who is that?
A. That's Mary Lee Payton, and she worked for me.
Q. She worked for you at this time?
A. Yes.
Q. Is there any substantive reason why her name is handwritten on this document that you know of?
A. No.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. What were Ms. Payton's duties?
A. One of the principal duties she had was overseeing EIA's work for us on the RW-859 form.
She did other things, but that was one of her principal duties.
Q. Okay. Did she keep your official

Q. Did any utilities comment on the draft APR?
A. I honestly can't recall. I have a general impression that we did receive comments, but I'm hard pressed to tell you from who or how many.
I just can't recall.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. And was the, was an APR issued?
A. Yes.
MR. TOMASZCZUK: Ms. Reporter, can you mark as Brownstein No. 27 a document dated December 1991 entitled, "1991 Acceptance Priority Ranking"?
(Brownstein Exhibit No. 27 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Have you seen this document before today?
A. I have.
Q. Did you help prepare it?



A. I did.
Q. Is this a document that you reviewed prior to your deposition?
A. It is not.
Q. Did you prepare the summary narrative which appears at page 3?
A. I'm sure I had a part in preparing or reviewing; certainly responsible for it.
Q. Okay. And what about the data that appears on the subsequent pages?
A. Again, the contractors prepared that data.
Q. I'm sorry. The contractors prepared, provided to DOE the data which DOE then used to prepare the table?
A. The table itself was physically prepared by, by a contractor.
Q. By PNL?
A. Yes, using EIA data.
Q. Okay. And did you review it for accuracy at or about the time it was prepared?
A. I did.
MR. TOMASZCZUK: I propose we take a morning break.
It's eleven o'clock.



MR. BANES: Okay.
(A recess was taken.)
MR. TOMASZCZUK: Back on the record. Ms. Reporter, I would like you to mark as Brownstein No. 28 a copy of the draft 1988 mission plan amendment, and there aren't any Bates numbers on this version.
(Brownstein Exhibit No. 28 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. All right. Mr. Brownstein, you may recall when we were talking about the December 1990 ACR?
A. Yes.
Q. And the December 1990 ACR refers at page 7 and Table 2 dash 1 to this draft mission plan amendment, right?
A. Yes.
Q. And it identifies this draft mission plan amendment as the source for the data in table 2 dash 1 of the 1990 ACR?
A. Correct.
Q. Okay. And I believe you testified



that you may have reviewed but did not prepare any part of the draft 1988 mission plan amendment?
A. Correct.
Q. And let me just ask you, sir, with respect to this particular document, do you know who within OCRWM was responsible for developing?
A. If you go to the page, third page marked to the reader, at the bottom of that page, it indicates that comments should be submitted to Tom Isaacs, so he would have been the person in charge of that.
Q. And that's the same Mr. Isaacs that we saw in one of the organization charts and that you testified about yesterday, correct?
A. Today, right.
Q. Right. And is Mr. Isaacs still at OCRWM?
A. He is not. I believe I testified he is in the DOE family.
I believe he works at the National Lab.
Q. Do you know which one?
A. The West Coast, so it's either Berkeley or Livermore. I forget which one.

certainly indicates to me that this is a very early unreviewed draft document.
BY MR. TOMASZCZUK:
Q. Does it appear to be a draft document to you?
MR. BANES: Objection -- lack of foundation.
Do you want him to guess?
MR. TOMASZCZUK: No. I --
MR. BANES: We can look at this document. He can read it, but if he didn't have a part in it, I don't know if he can say what it means.
BY MR. TOMASZCZUK:
Q. Well, he received a copy of it, didn't you?
A. Yes.
Q. And did you read it at or about the time you, it was sent to you?
A. I probably did.
MR. BANES: Objection -- asked and answered.
He already testified he doesn't remember.
MR. TOMASZCZUK: Mr. Banes, we're



going to be here a long time if you continue to make objections which I consider to be ill-advised and not consistent with the rules of the court.
I would encourage you to make your objection. Fine, go ahead make it.
MR. BANES: Are you just telling me that I just did something inconsistent with the rules of the court?
All I did was ask you to set a foundation for this document.
He doesn't remember it. He didn't write it, and he has testified that he doesn't know what it means other than just reading what it says.
That's a valid objection. If you want to ask him what something means, you need to lay a foundation for it first.
BY MR. TOMASZCZUK:
Q. At or about the time you received this document in August 14th, 1991, did you understand this to be a draft document?
A. This was a, this was, clearly was a contractor document.
Contractors prepare studies all the



time at DOE's direction.
That automatically means to me that it was, it was a, it was something that DOE had not signed off on.
Now whether this was the first draft or the last draft, who knows? But it was a contractor document.
The contractor documents are regularly prepared. They regularly go through extensive review and modification before they're, if they're ever accepted as a DOE document.
Q. After you received the document, did you do anything other than read it?
A. I cannot specifically recall. My normal operation would be to, to read it.
If I had comments, I would make those comments either verbally or in writing. I use both.
Q. And do you recall sitting here today whether you made any comments on this particular document?
A. I honestly cannot recall.
Q. All right.
(There was a pause in the proceedings.)



MR. TOMASZCZUK: Mr. Brownstein, let's mark as, and Ms. Reporter, as Brownstein Exhibit 30 the Annual Capacity Report dated December 1991.
It has on it the Bates stamp numbers HQR-001-2357 through 2373.
(Brownstein Exhibit No. 30 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. And have you seen the document before today?
A. Yes.
Q. And were you responsible for preparing it?
A. Consistent with how I have testified about those documents, yes.
Q. All right. At Roman Numeral Five of the summary, there is a reference to, in the second paragraph, to statutory schedule linkages between the MRS facility and the repository set forth in the Nuclear Waste Policy Act, Nuclear Waste Policy of 1982 -- it looks like the word act is missing -- as amended will be modified.

AFTERNOON SESSION
(1:16 p.m.)
MR. TOMASZCZUK: Back on the record.
THE WITNESS: Yes, sir.
Whereupon,
ALAN BROWNSTEIN,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:
FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER AND LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INCORPORATED, POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, NEBRASKA PUBLIC POWER DISTRICT:
BY MR. TOMASZCZUK:
Q. Good afternoon, Mr. Brownstein. I remind you you're still under oath, but she won't redo the swearing process again.
I think at the break we were looking at the ACR for December 1991, Brownstein Exhibit 30.



I understood your testimony just as we broke to be that the 8,200 metric ton figure was based on the MRS limitations contained in the Nuclear Waste Policy Act amendments, was that right?
A. I said it was consistent with those, that's correct.
Q. And this ACR assumes that an MRS will initiate operations in 1998, is that correct?
A. Yes.
Q. If --
A. We refer to it as commencement of facility operations.
In 1998, facility in my mind includes either an MRS or repository, but yes.
Q. That's reflected on Roman Numeral Five of the summary, right?
A. I was reading off of page 4.
Q. Okay. I'll take it.
A. It's probably in the summary.
Q. All right. I was referring to Roman Numeral Five, second paragraph, sort of the middle of the first sentence there.
A. This is consistent with -- yes.
Q. A site for monitored retrievable



source facility will be obtained, and the facility will initiate operations in 1998.
Do you see that?
A. Actually --
Q. Roman Numeral Five of the summary.
A. Right.
Q. Second paragraph.
A. Um-hm.
Q. Second line of the second paragraph.
A. Right. That is the, that is an assumption. There are a series of assumptions.
Q. Right. And that's one of them, that the MRS --
A. Yes.
Q. Will initiate operations in 1998?
A. Right. It also includes a break in the linkages will be made with the Nuclear Waste Policy Act.
Q. Now the MRS was never sited, is that right?
A. That's correct.
Q. Is the -- and this may relate to the previous answer you just gave -- is the 8200 MTU figure for waste management operations in 1998 consistent with the linkages between the



construction authorization for the repository and the construction authorization for the MRS?
MR. BANES: Objection -- compound, and asks for a legal conclusion.
THE WITNESS: I believe it's consistent with, with the licensing conditions one and three of the, of the Nuclear Waste Policy Act amendments, Exhibit 23.
BY MR. TOMASZCZUK:
Q. And condition one is the linkage between the construction authorization for the repository and for the MRS, is that right?
A. Right.
Q. Okay. Would you then turn to this ACR at page 4?
A. Okay.
Q. And I direct your attention to the second paragraph.
A. Okay.
Q. You can read the paragraph or of course any part of the document you would like.
I would like to direct your attention in particular to the last sentence of the second paragraph on page 4.
(The witness reviewed the document.)

THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Now this seems to say that if the linkages between the construction of the MRS and the construction of the repository are maintained, which is the first linkage as I understand it, that we have been talking about, it is stated here that commencement of facility operations and initial acceptance of DOE, by DOE could not start until at least 2007?
A. That's correct. That's referring to the repository if the law was not changed.
Q. I guess I don't understand then your previous answer.
Perhaps you can explain it to me, where you indicated that the 8,200 MTU figure for WMS operations in 1998 was consistent with the linkages between the construction authorizations for the MRS and the repository.
A. Well, the Amendments Act said that we could not accept I think more than 10,000 until we received the license for construction of the repository.
Q. Right.
A. And I believe -- I need to go back to



another document, but I believe our estimate at the time was that we would not obtain a construction authorization from the NRC until about 2007.
I think that was the basis for that statement.
Q. Right, but if you go back to -- I'm sorry. I didn't want to cut you off.
Go ahead.
A. I mean you need construction authorization, and then you need a separate license from the NRC to, to accept waste, and so I believe that was our estimate of when without the linkage, without the change in the law, that would be the earliest that we could do it, that we can accept the repository.
I'm not sure I understand any inconsistencies there.
Q. I guess my question related to the assumption that's stated in the summary at Roman Numeral Five, which is the facility and the MRS facility initiating operations in 1998.
A. Um-hm.
Q. And my subsequent question to the effect that, you know, is that consistent with



the linkages, the construction linkages, and I understood you to say yes, and I'm trying to reconcile that testimony and that portion of the document with what appears at page 4, which seems to say that if the linkages are maintained, we can't start until 2007.
(The witness reviewed the document.)
THE WITNESS: Well, let's go back in pieces.
If we had an MRS, we could start accepting at an MRS, you know, as early as 1998.
I think that's, there were a series of assumptions associated with that.
BY MR. TOMASZCZUK:
Q. But I understand you to be saying on page 4 that if the linkages were maintained, you couldn't do that --
MR. BANES: Objection. Go ahead.
BY MR. TOMASZCZUK:
Q. In 1998?
MR. BANES: Objection. Calls for a legal conclusion, but you can go ahead.
THE WITNESS: Well, let's go back to the paragraph on page 4.
Let's read it in its entirety.



BY MR. TOMASZCZUK:
Q. Sure.
A. The acceptance rates in Table 2.1 do not reflect an MRS facility schedule linkages with the repository development that were imposed by the Nuclear Waste Policy Act, but are consistent with the 10,000 MTU storage capacity limit contained in NWPA for an MRS facility before repository starts operation.
Okay. So these acceptance rates assumed commencement, assume commencement of facility operations in 1998.
There appears -- I mean there is a series of if then statements for each of these.
Independently, I'm comfortable with them. I understand them.
I'm just trying to understand where this disconnect is that, that you see.
Can we go point out which sentence-by-sentence that you're uncomfortable with?
Q. Let me just -- I'm happy to try and do that.
Let me perhaps get at this another way.

What did you understand either then or now the first sentence of the first, of the second full paragraph at page 4 to be stating, and in particular, the portion that says the acceptance rates in Table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA?
A. Okay.
Q. And you can, of course, read the whole thing in its context, but my question to you is what is meant by that phrase?
MR. BANES: Objection. Calls for a legal conclusion, asked and answered.
THE WITNESS: To me --
MR. BANES: Speaks for itself. Go ahead.
THE WITNESS: To me, it says it assumes that a facility, an MRS facility would be built, and it is only consistent -- and that's a large assumption which is explained in this and other documents about the challenges of constructing an MRS.
It assumes that an MRS will come on line in '98, and it tries to explain the



projected waste acceptance rate by saying we have limited that by the linkage or the limit in the Amendments Act.
And in fact the next, very next sentence says these acceptance rates assume commencement of facility operations in '98, so that part is assumed, and the, and the projected waste acceptance rate is recognized as the legal limit.
BY MR. TOMASZCZUK:
Q. Do you know whether the Secretary of Energy in late 1989 had determined that the repository would not be ready until 2010?
A. I believe we have to go back to the Secretary's, I think we have referred to it as the 60-day report or the reassessment report to review what the Secretary determined.
Q. Okay.
A. I mean if I, I believe, if I recall, one of the documents, I think he talked about 2010, but I would have to go back and review.
Q. That's my recollection as well, but let me ask this question, Mr. Brownstein.
Could commencement of facility operations have occurred in an MRS facility



starting in 1998 if the schedule linkages were not changed?
MR. BANES: Objection. Calls for a legal conclusion.
You can answer.
THE WITNESS: The, the key first step in the ability to begin operations in an MRS in 1998 depended, consistent with the law, depended on this successful completion of the Office of Waste Negotiator established by law and the completion of his mission.
That was the first step.
BY MR. TOMASZCZUK:
Q. Okay. I appreciate that answer. I'm not sure it was responsive to my question, but let me try again.
Could commencement of facility operations have occurred in an MRS starting in 1998 if the schedule linkages were not changed?
MR. BANES: Same objection.
THE WITNESS: If we had an MRS site, and it depended on when we had that site -- there is a stream of assumptions we have to go through.
You know, theoretically possible if we



got the site early enough and we received the appropriate approvals, but there is a host of assumptions in that statement.
(There was a pause in the proceedings.)
THE WITNESS: Let me -- to elaborate on the answer, I'll just read from the ACR.
In the first paragraph, it says DOE recognizes that --
BY MR. TOMASZCZUK:
Q. I'm sorry. What page are you on?
A. I'm on page 4. DOE recognizes that under current conditions, waste acceptance at a DOE facility can begin in 1998 only if the federal government is able to consummate a timely agreement which is enacted in the federal law with a host state or Indian tribe for the siting of an MRS facility. The Office of Nuclear Waste Negotiator, the head of which is a representative of the federal government, appointed by the President, is actively seeking a state or Indian tribe willing to host an MRS facility or geologic repository.
So I believe that statement in the paragraph preceding, you know, it's consistent

with what I just said and explains the assumption and challenges.
Q. And would that agreement that's alluded to in the text of page 4 that you just read from, would that require Congressional approval?
MR. BANES: Objection -- asked and answered.
THE WITNESS: Actually I don't know. We would have to go back to the Nuclear Waste Policy Act, the Amendments Act.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. In the text that you just quoted from, Mr. Brownstein, what did you mean by the parenthetical reference which is enacted into federal law.
(The witness reviewed the document.)
THE WITNESS: I believe I was referring to the provisions of the Nuclear Waste Policy Act amendments.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:



Q. Do you have an understanding as to the acceptance rate that DOE would have sought to operate a repository if it had not breached the standard contract?
A. If it had not what?
Q. Breached the contract.
A. I don't accept the premise.
MR. BANES: Objection.
BY MR. TOMASZCZUK:
Q. You don't accept the premise that DOE breached the contract?
A. I don't.
Q. Do you know whether the Courts of Appeals have determined that issue?
A. Apparently they have.
MR. BANES: The courts have not determined that issue.
They have determined whether the DOE has partially breached the contract, not fully.
MR. TOMASZCZUK: Well, we can pull out the Court of Appeals decision with that.
MR. BANES: I think we could. Why don't we read that into the record, too?
MR. TOMASZCZUK: You'll have your opportunity, Mr. Banes, to examine the witness,



and I encourage you to do so.
If you would like to go into that, we would be delighted to have it happen.
I'm not going to use my time to go into it, but if you want to, feel free.
BY MR. TOMASZCZUK:
Q. Mr. Brownstein, do you understand that the Courts of Appeals have determined that DOE has breached, or to use the language of your counsel, partially breached the contract?
A. Yes.
Q. Okay. And my question to you is do you have an understanding as to the acceptance rate that DOE would have sought to operate the repository if it had not breached the contract?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: The, all the --
MR. BANES: Objection.
THE WITNESS: Acceptance rates under whatever those conditions were never hidden by the department.
They were always published, and they were always updated, and document after document in the ACR and in the mission plan amendments,



and I'm sure in other public documents, whatever is in those documents was our waste acceptance rate at the time with the assumptions associated with it.
BY MR. TOMASZCZUK:
Q. Okay. Now as I understand your current duties, they involve working with EPA and NRC?
Did I understand that correctly?
A. As I testified, since I believe it was July, I have been on a detail with other duties and responsibilities prior to that, that's accurate.
Q. Okay. And did I understand you to have some role in the Environmental Impact Statement preparation?
A. My, my division had a role in that.
Q. Did you say you were the lead person with EPA on that?
A. You're mixing two different subjects.
Q. Okay. I don't mean to, I'm just trying to --
A. Let me --
Q. Understand what you said.
A. Try to clarify; my role had a support

role to the development of the programs.
Environmental Impact Statement, that's one role.
What I was saying before with respect to the EPA is that I had direct responsibilities in the development with both EIA and the NRC for the EPA's standard for radiation protection levels at the repository.
It was 40 CFR 197.
Q. Okay. And in those, in your current capacity, I understand that you were working with your peers out at Yucca Mountain on?
A. On a host of issues.
Q. And what are those issues briefly?
MR. BANES: Objection -- irrelevant.
THE WITNESS: The pre-licensing activities with the NRC was the prime.
I also had responsibilities of working with, with my peers out there on the Environmental Impact Statement as well as, you know, well, well, with the West.
Those are the two largest functions that I had.
BY MR. TOMASZCZUK:
Q. And presumably all that's with the



goal of trying to get a repository approved and built at Yucca Mountain?
A. Completing the mission of the program.
Q. Right. In your view, how likely is it that the repository will be designed and constructed to accept 900 metric tons a year?
MR. BANES: Objection. Calls for speculation; lack of foundation.
THE WITNESS: The question is confusing to me.
Whatever the acceptance, whatever the long term if you will acceptance rate is, whatever that number would be, you would expect a several year ramp-up period.
MR. TOMASZCZUK: Can you read my question back?
THE REPORTER: Question: "In your view, how likely is it that the repository will be designed and constructed to accept 900 metric tons a year?"
MR. BANES: Objection. Calls for speculation; lack of foundation.
THE WITNESS: As a steady state? Is that what your question implies?
BY MR. TOMASZCZUK:



Q. As a steady state, I'll take that answer. That's fine if you want to put that clarification on it to help you answer.
A. I believe we would, I believe that would be a low figure.
I mean every document that you have shown me shows a higher figure than that for steady-state operation.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Mr. Brownstein, going back to the ACR, this 1991 ACR, still on page 4, third paragraph on this page, and there is a reference in the first sentence to Table 2.1. ?
I think I have asked you some questions about that.
A. Yes.
Q. And then the sentence appears this table, that is, the Table 2.1, provides only an approximation of the system throughput rates and is subject to change depending on the system design and configuration and Congressional action regarding the conditions for the siting of an MRS facility?



A. Right.
Q. All right. Now do I understand that at this point in time, the APR had been issued, is that right?
A. The dates are the same month. I cannot recall if one preceded another by a number of days.
Q. Can I get you to turn back to the summary in the ACR?
A. Okay.
Q. At the end of the first paragraph, do you see the sentence that reads the 1991 ACR applies the waste acceptance rates in Table 2.1 to the 1991 APR?
A. Yes.
Q. Resulting in individual purchaser allocations?
A. Um-hm.
Q. That suggests to me that the APR was out before the ACR since the ACR appears to refer to it?
A. I'm indicating to you that looking at both documents, they both have the same month and year on it, and I cannot recall what day within each month each was released.

BY MR. TOMASZCZUK:
Q. Was the 1992 APR subject to revision?
A. I don't understand.
MR. BANES: Objection -- vague.
THE WITNESS: I don't understand the question.
BY MR. TOMASZCZUK:
Q. Okay. Were the acceptance rates embodied in the 1992 APR subject to change?
A. Have you given me a copy of the 1992?
Q. No, I haven't yet.
MR. BANES: You can look at it if you want.
BY MR. TOMASZCZUK:
Q. Do you need it to answer my question?
A. In the context of how previous waste acceptance rates schedules were subject to changes, is that --
Q. In whatever context you would like to fashion your answer.
A. Well, I guess I prefer to see the document to make --
Q. You can't answer my question without seeing the document?
A. I would prefer to --



Q. I understand your preference. My question is can you answer it without seeing the document?
A. I'm trying to give you, you know, my honest answer.
I mean I want to make sure what I said in the APR.
Q. I mean you can --
MR. BANES: You don't have to answer if you can't.
BY MR. TOMASZCZUK:
Q. It's a fairly straightforward question. If you can't answer it without the document, that's fine.
If you can, then I would like your best answer.
A. Okay. For the record, please just repeat the question again.
THE REPORTER: Question: "Were the acceptance rates embodied in the 1992 APR subject to change?"
MR. BANES: Objection -- vague.
THE WITNESS: I am assuming that they were.
BY MR. TOMASZCZUK:



Q. And on what do you base that assumption, Mr. Brownstein?
A. Every document that you have shown me and that I can recall always talks about, always qualifies the waste acceptance rate as projected or preliminary or illustrative subject to change, and referring to many other conditions, whether statutory or other conditions, so that's how I base my answer.
Q. Okay.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, would you mark as Brownstein 32 a document entitled 1992 Annual Capacity Report, Revision 1, has on it a date of May 1993, has the Bates number PA-102592 through 102629?
And I would note this document appears to be marked Revision 1, Mr. Brownstein.
THE WITNESS: Okay.
(Brownstein Exhibit No. 32 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:



Q. Have you seen this document before today?
A. I have seen it.
Q. Did you prepare it?
A. No.
Q. Who did?
A. The person responsible for this one was Nancy Montgomery.
Notice the date and her name in it as opposed to mine as the previous ACRs, the organizational change that we discussed.
Q. Right. She is identified at page 2 of this document?
A. Right.
Q. In previous ACRs, I believe you had been identified as the contact person?
A. Correct.
Q. So you happily passed on those duties to Ms. Montgomery?
A. Actually, to be truthful, at that time, I don't believe the word happily was the right one.
Q. All right -- my poor attempt at humor, sir.
Did you approve the document?

Q. Okay. Are the rankings reflected in this APR subject to change?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: The, there is a discussion about that on page 4 of the document.
BY MR. TOMASZCZUK:
Q. Can you direct me to that?
A. The first full paragraph on page 4.
Q. Um-hm.
A. Talks about changes, potential changes.
Q. And where do you see that language? I'm sorry.
I'm looking at the paragraph. Can you point me to that?
Q. Okay. In the middle of the paragraph, in order to avoid difficulties and subsequently implementing the waste acceptance process and consistent with its May 15th, 1991 communication, all purchasers revisions to future APRs will be addressed as follows.
There is then a series of sentences and explains on how the APR would be changed under different circumstances.



Q. Okay.
A. That also -- I'm sorry -- continues down into the next paragraph as well.
Q. Okay.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Mr. Brownstein, did you have any role to play in connection with the preparation of the instructions for the Delivery Commitment Schedules?
A. Yes, in the same way that -- yes, I did.
Q. Okay. Do you recall when OCRWM began working on Delivery Commitment Schedule instructions?
A. Not specifically.
Q. Would it have been at or about this time? Prior to it?
A. It would have been prior. We would have started thinking about that.
MR. TOMASZCZUK: Okay. Ms. Reporter, can we mark as Brownstein 34 an eight-page document with the heading U.S. Department of Energy instructions for completing the Appendix



C Delivery Commitment Schedule?
(Brownstein Exhibit No. 34 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Have you seen this document before today?
A. Yes.
Q. And can you tell me what role you had to play in its preparation?
A. I believe I played a leading role in preparing this probably with others like Nancy, but I certainly had a hand in this.
Q. Do you, are you able to identify any particular paragraphs that you drafted?
A. No, oh. No. Not by -- I recall going through this a number of times.
Q. You're identified as one of two contact persons at page 4 of the instructions, right?
A. Correct.
Q. Who was Mr. Nick Graham?
A. To the best of my recollection, he worked for the contracting officer at the time.



Q. Did any contractors assist your office in the preparation of this document?
A. Yes.
Q. And do you know who they were?
A. It would have been, it would have been PNL, and it could have been, and it could have been Billy Cole, who may at this time have moved on to JAI Corporation.
If that was the case, I may have gotten dual assistance, but it was PNL and Billy.
Q. Do you recall or do you know whether Mr. McDuffie worked on this?
A. The best of my recollection, he did.
Q. And what was the purpose of this document?
A. It was instructions to the utilities for how to complete Appendix C of the contract, the Delivery Commitment Schedule.
Q. On the first page, I'll refer to these as paragraphs, or maybe they're sections, but in any event, talk about paragraphs, there is a No. 3, when to submit.
Do you see that?
A. Yes, I do.

366

Q. And the first sentence says, "Beginning January 1, 1992, Purchasers shall submit DCSs at least 63 months prior to requested delivery"?
A. Correct.
Q. All right. Why were you giving purchasers that instruction?
A. I believe that comes directly from the standard disposal contract itself.
Q. At this point in time, when was DOE anticipating to begin performance of its obligations under the contract?
A. With all the caveats that we have stated previously, the goal at that time was still as indicated in the ACRs, I believe to begin waste acceptance in '98.
That was a goal, and I tried to distinguish in my mind to you the separation between a goal and a contractual commitment, and further elaborate that I operate under the time that the contractual commitment, irrespective of the court order, of the court decision, was conditional at that time.
Q. Now DOE did not begin performance in January 1998, did they?

367

A. Correct.
Q. And indeed sitting here today, they've not begun performance, isn't that true?
A. That's correct.
Q. When is the, a utility supposed to, given that unfortunate set of circumstances, when is a utility supposed to submit its DCS forms now?
A. Reading from paragraph 3, and I believe this is consistent with the language in the disposal contract, purchaser shall submit the DCSs at least 63 months prior to requested delivery.
Q. So if a utility today requested delivery 63 months from today, it needed to, it is required to submit its DCS today?
MR. BANES: Objection. Calls for legal conclusion.
You may answer.
THE WITNESS: The, the contract laid out a process of a series of interactions between the government and the utilities that would eventually lead to waste acceptance.
It was, it was a choreographed dance if you will.

368

We provide information. They begin the thinking process, and that included the DCSs, all the way up to the FDSs where the FDSs, both sides got serious in terms of things like what cask to bring, what date we should show up.
The contract laid out the terms to, to begin that process.
You would not expect the department to commit to a specific date of a specific month, you know, years ahead of time really for the benefit of the utility because you could not have the government, you could not have the utility saying show up at my door on this particular day at this particular time when they in fact may be going, undergoing a fuel outage so they wouldn't want us to show up.
Our view of the contract was it laid out that process on how we would interact as two bodies, to come together at an appropriate time.
That was the significance in my mind of it, irrespective of a date.
It set those, set that series of procedures on, on how we would interact together.
That's how I interpret the contract.

369

BY MR. TOMASZCZUK:
Q. Okay. And how do those series of procedures apply now where DOE has not yet begun performance and has stated it won't begin until 2010 at the earliest?
MR. BANES: Objection.
THE WITNESS: I have left that area for the last seven years, so I'm not current on in the last seven years, how the office, you know, is prepared to deal with it.
I just don't deal with that set of issues any longer.
BY MR. TOMASZCZUK:
Q. You don't have any ideas about that?
A. I have no idea actually.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Could I direct your attention to the second page of these instructions, Mr. Brownstein, to the paragraph background information, and I direct your attention to subparagraph (c)?
A. Okay.
Q. You see the sentence that reads the

370

process described herein? Let's just start there.
I presume that process is one that you alluded to in your previous answer, right, an elaborate contractual mechanism?
A. Yes.
Q. Assumes, herein assumes that the FWMS -- that's a defined term somewhere?
A. It's federal waste management system.
Q. Thank you -- will be able to accept the purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the 1991 ACR?
A. Correct.
Q. Did you draft that sentence do you know?
A. I can't recall if I drafted that specific sentence.
I certainly agree with it.
Q. And we know that FWMS did not begin in 1998, right?
A. Correct.
Q. So isn't it true, therefore, that the process described herein is no longer applicable?

371

MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Given how I'm interpreting what you have asked, I mean to rephrase that, I don't agree with that.
I mean the process laid out in the contract through the ACR, the APR, the DCSs and the FDSs, you have, in my mind, to be the utilities and also then you have to go through that process at least of the, of the DCSs and the FDSs in order that when waste acceptance does begin, we show up at an agreed-to time with the right equipment and the time that is, that is agreed to by the utilities.
There is still a process that has to be gone through, irrespective of the date.
BY MR. TOMASZCZUK:
Q. But you would agree, would you not, Mr. Brownstein, that at least what you described in this document and these instructions was based on an assumption which has not occurred, correct?
A. That is correct.
Q. Now the reference here to the 1991 ACR, that ACR was a planning document, right?

372

A. Yes.
Q. Okay. And as I understood your testimony, that was distinguishable from the 1991 APR?
A. Yes.
Q. So why, in these instructions, did you refer to the 1991 ACR, a planning document, instead of to the 1991 APR, which I understood to be something more than that?
MR. BANES: You're allowed to read all that if you need to, plus those other two documents.
THE WITNESS: Yeah. I understand that, and I think I do want to go back to that.
BY MR. TOMASZCZUK:
Q. Okay.
A. Okay.
(The witness reviewed the document.)
THE WITNESS: Okay. I just needed to refresh my memory.
The APR --
BY MR. TOMASZCZUK:
Q. Which document are you referring to, just so our record is clear?
A. Sure. I'm sorry -- the 1991 APR.

373

Q. Okay. Hold on. Let me get that.
A. Okay.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Brownstein Exhibit 27 by my recollection?
A. Right, or any APR. We can go to Exhibit 33 as well.
Q. Okay.
A. The point I wanted to make, I have clearly in my testimony tried to distinguish in some way between the ACRs and the APRs.
The, the APRs do not deal, are really not required to deal with waste acceptance rates.
They're, they're intended to deal with, with the purchaser's place in the queue if you will, and I have stated for the last two days, you know, it was very important for the utilities to get this data right because this queue was going to be locked in place, and in fact, you showed me and document earlier that talked about what we would do with future changes because that they were going to be

disruptive for both sides, so this does not deal with waste acceptance rates.

This deals with irrespective of the waste acceptance rates, where the utilities would be in the queue.

MR. BANES: Let the record reflect the witness is referring to the Annual Priority Ranking 1991.

THE WITNESS: 1991 or 1992, they both do the same thing.

MR. BANES: 1992?

THE WITNESS: Yes. In order to fill out a DCS, and in order for them, for the utilities to understand what this unchanging queue, how many should be responsive to the instruction of 63 months and before, you're going to have to make an assumption about a rate.

If the rate, for example, I'm referring to the 1992 APR, if we were going to accept a hundred MTU during the first year, whatever that year was, the only people that would be required under our interpretation to submit a DCS would be the first, first 12 utilities.



So we then had to apply, so the utilities could meet these instructions, a projected waste acceptance rate which is referred to in the 1991 ACR to this unchanging if you will, queue.

Is that responsive to your question?

BY MR. TOMASZCZUK:

Q. I don't know, but I think I understood what you just told me.

Well, if these instructions -- strike that.

Given that DOE has not commenced performance, would you agree that the DCS process has been suspended?

MR. BANES: Objection. Calls for a legal conclusion.

THE WITNESS: I guess suspended is an appropriate word.

It's not ongoing.

BY MR. TOMASZCZUK:

Q. Okay. And assuming that these instructions remain applicable and are not changed, if DOE starts in 2010, isn't it true that the first DCSs per these instructions would be due in 2004?



MR. BANES: Objection. Mischaracterizes the instructions, and calls for a legal conclusion.

THE WITNESS: A lot has occurred in the last seven years.

I would think the person responsible now would want to review what we did, why we did it, and how we did it, and to see, you know, the applicability in sum or in part as to how they're going to proceed.

I wouldn't purport to say that they should take these and throw them out or take them and adopt them in total.

I don't think a responsible manager would use this as input in helping make a decision.

BY MR. TOMASZCZUK:

Q. Changed circumstances might warrant reviewing and revising these to reflect those circumstances, is that fair?

A. I think that is.

Q. If the, as I understand these instructions, if the ACR on which the DCSs are based is a planning document, which I understand it to be, are the DCSs also planning documents?



MR. BANES: Objection. Calls for a legal conclusion.

THE WITNESS: In my mind, they are. In order to get, if we can just set aside a specific date for a second, in order to get the government with the right equipment to be able to get through the gate of the utility at the right time, there has to be planning that takes place.

For example, we need to know years in advance how many BWR and PWR casks we should make sure are available through whatever means.

We ought to know how many truck casks and how many rail casks we ought to have available.

In order to do that, we need to understand whose fuel we're going to accept, so there has to be communication between the utilities and us years in advance in order to, to allow that marriage to occur at the end, irrespective of the date.

I believe -- as you know, I did not negotiate this contract in '83, but I believe that was the intent of the process that was laid which we have talked about the ACR, the APR, the

DCSs and the FDSs.
I think that, in that sense, that's a planning arrangement. That's a way to respond to your question, but I think that is responsive.
BY MR. TOMASZCZUK:
Q. Okay. Mr. Brownstein, did you have a role to play in the preparation of what I'll refer to as the TSLCC reports -- total system life cycle cost reports?
A. No. Again, I may have, consistent with, I may have reviewed drafts, you know, as my responsibilities as a division director or as a branch chief, but in terms of its preparation, no.
Q. Okay. Same question with respect to fee adequacy reports -- did you have a role to play in the preparation of those?
A. At one time in the organization, for one short period of time, I did, but under the time that I had that responsibility, I don't recall that we actually issued it during that time period.
Q. Can you put a year on that activity for me?



A. There was a short period of time under the Bartlett, when Bartlett was director that I had those responsibilities.
Q. Early 1990s, am I right about that?
A. Yes. Yes. I think Dreyfus came on in '94, so it was probably in the '91, '92, '93 time period for a short period of time.
Q. But your best recollection is that while you had those duties, that no such fee adequacy report was issued?
A. That's my recollection. My recollection, I did some work in that, but there was another reorganization and someone else took that, so that's my recollection.
Q. Okay. Did you have a role to play in what I believe you referred to as SRD system requirements documents?
A. I did not except again, to the extent that there were occasions where I was asked to review them, but I had no hand in their preparation.
Q. Do you recall whether PNL was tasked to prepare proposed changes to the standard contract?
A. The best of my recollection, we asked



PNL to do a lot of think pieces, and I would guess that they, that I either asked them to or they did that as one of their pieces, so I would answer yes, to the best of my recollection.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Mr. Brownstein, let me hand first to the court reporter a document dated April 13, 1992, a "Don't say it -- write it" memorandum from Patrick McDuffie, subject, proposed contract changes, and it has Bates stamped in the lower right-hand corner the number CTR-013-1880 through 1923.
(Brownstein Exhibit No. 35 was marked for identification.)
MR. TOMASZCZUK: While you're looking at that, can we go off the record a minute?
(A recess was taken.)
MR. TOMASZCZUK: Back on the record?
MR. BANES: You bet.
BY MR. TOMASZCZUK:
Q. Mr. Brownstein, have you seen Brownstein Exhibit 35 before today?
A. I have seen this or similar document



like it, whether it was one before or after it, so yes, in general.
This specific draft, I'm not absolutely sure.
Q. And I believe you testified before we took the break that you had asked PNL to prepare this?
A. What I was trying to indicate before the break, as I indicated in my previous testimony, we, we asked PNL to do a number of think pieces over time, and it is highly likely that we did ask them to do this.
Whether I did, I'm not sure. We addressed this one to Nancy Montgomery, so Nancy may have directly asked them, but certainly, you know, working for me, so indirectly I would have.
Q. Do you know why this particular think piece, to just your term, was commissioned?
A. Specifically, no. In general, we were working on a number of issues with the utilities, and you know, there is an ACR resolution process which we have talked about, and at different points in time, I'm sure as those discussions proceeded, we, we asked them

Where is that?
A. That's right there.
Q. Let the record reflect that the witness is pointing to a box that has the number 060 in the upper left-hand corner.
And on the far left of the chart, towards the far left of the chart, now there is a dark line here.
A. Right.
Q. What is that dark, what is that dark line supposed to represent? Annual Capacity Report and Annual Priority Ranking?
A. The dark line under the legend indicates the optimum path.
The whole chart is divided basically into two parts which is, which is the first part is if everything went right, this is, this is how the process would go.
And then there were, there were other possibilities, other things that could go, other things that could happen, and what I had asked the contractor to do was to lay out all those other things that could happen and contingencies, and that's what they tried to do here.



Q. Okay. Now --
A. So this was, this was the optimum path. In other words, these were things that had to be done.
Q. Okay. So in order -- now at the end of the chart on the far right is acceptance and delivery, right?
A. Yes. The last box, 059, is spent nuclear fuel received at DOE, yes.
Q. And these dark lines are connected to boxes, consistent with your testimony I assume, that these dark lines are connected to boxes that pursuant to the contract have to occur prior to acceptance occurring?
A. Yes.
Q. Is that correct?
A. Yes.
Q. So Annual Priority Ranking, that would be the first step after the Annual Capacity Report?
A. Yes.
Q. And then there would have to be a DCS to DOE from the purchaser.
A. Yes.
Q. And then the DCS would have to be



reviewed and approved by, reviewed by DOE?
A. Yes. We were required to review it and either approve it or disapprove it.
Q. Over here is the approval, or if it's approved or disapproved, what happens?
A. Let's -- that's the approval.
Q. Okay.
A. I'm just trying to look disapproval. Oh, I see.
Yes, this is for its approval. This is where we -- this is the submittal. This is where we review it. This is where we approve it. This is what we would hope to have happened.
If it got disapproved, then we get down below the dotted line into the contingency. There is disapproval.
Q. Okay. Now down, further down the path here, there is some, or never mind. I'll reserve those questions, but the, the bottom line is for this, that, and does this, does this chart, to the best of your recollection, reflect the process that we're talking about in this Exhibit 26, the second paragraph?
A. It does.



Q. Okay.
A. It's a document I used internally to explain that to people.
Q. Okay. Have a seat, sir. I'm done with that.
(There was a pause in the proceedings.)
BY MR. BANES:
Q. Okay. Sir, did you consider the spent nuclear fuel acceptance rates contained in the mission plan to be contractually binding upon the Department of Energy?
A. No.
MR. TOMASZCZUK: Objection -- leading.
BY MR. BANES:
Q. Did you consider the SNF or high-level waste acceptance rates contained in any of the ACRs to be contractually binding upon DOE?
MR. TOMASZCZUK: Objection -- leading.
THE WITNESS: No.
MR. BANES: Okay.
(There was a pause in the proceedings.)
BY MR. BANES:
Q. Oh, Mr. Brownstein, if you would turn,

A. I wanted to be clear of whether those milestones if you will were associated by time, and I have not done that analysis.
Q. Is it at least fair to say that a number of the activities depicted on this chart have not yet occurred?
A. It is fair to say that.
MR. TOMASZCZUK: I propose so we have a clear record, that we mark this as Brownstein Exhibit No. 37. It is -- 36.
And I propose that we mark this as Exhibit 36 and have it attached to the transcript so the record is clear with respect to my questions about this and the questions of counsel for the government posed to you about this.
MR. BANES: The government joins in that proposal.
(Brownstein Exhibit No. 36 was marked for identification.)
MR. TOMASZCZUK: Great. And with that, I will defer to my able colleague, Mr. Hirsch.
EXAMINATION BY COUNSEL FOR PLAINTIFF



COMMONWEALTH EDISON COMPANY
BY MR. HIRSCH:
Q. Good afternoon, Mr. Brownstein. My name is Norm Hirsch.
I'm an attorney for Commonwealth Edison Company, one of the plaintiffs in this litigation.
I'm going to be asking you a series of questions.
Just like Mr. Tomaszczuk said, if you don't understand a question I'll be asking, please feel free to ask for clarification.
A. Okay. Thank you.
Q. I want to ask you about a couple of questions that Mr. Banes asked you a little while ago.
I believe that you testified in response to a question that it was your understanding that prior to acceptance by the DOE, utilities were responsible for storage of SNF?
Do you recall that?
A. Yes.
Q. And I think we got into this a little yesterday, but it's your understanding I take it



that the D.C. Circuit has now held that the DOE was required to begin SNF acceptance in 1998?
A. I have never read the decision, but that's my understanding of it.
Q. And I believe we also had some testimony from you that it was DOE's objective or goal to eliminate the need for utilities to provide on-site storage after the DOE began acceptance, is that correct?
MR. BANES: Objection -- vague.
THE WITNESS: It's correct, and I used the term and testified to such to distinguish between intent and goal and objectives as opposed to a contractual commitment.
BY MR. HIRSCH:
Q. All right, but the DOE goal or objective was to eliminate the need for utilities to provide on-site storage after the DOE began acceptance of spent nuclear fuel, is that correct?
A. That was a goal.
Q. Now Mr. Banes also asked you a question about whether the mission plans were incorporated in the contract.
Do you recall that?



A. Yes.
Q. Was it your understanding that the mission plans were required to be issued by the Nuclear Waste Policy Act?
A. It is my understanding.
Q. And did you ever have any discussions with individuals at DOE as to what the purpose of that requirement was?
A. The mission plan?
Q. Yes, or the requirement to issue a mission plan in the Nuclear Waste Policy Act.
A. No.
Q. What was your understanding of the purpose of the mission plans?
A. Really very elementary understanding, that, that the law required that we issue a mission plan.
The purpose of the mission plan was to describe what our goals and objectives were, and describe the program in general terms.
Q. And I take it that at least while you were at the DOE, the DOE made an effort to be as accurate as possible in the mission plans in terms of describing what its current plans and objectives were?

A. I believe that's true for all the RW documents.
Since the beginning, I think we've tried as a goal if you will to be an open and transparent program, and to, to try to put as much information out in the public as we could, and make that as accurate as we could.
Q. Okay. So it would be correct to say that the DOE made an effort in the mission plans to be as accurate and informative as possible, is that correct?
A. Yes.
MR. HIRSCH: We're on 37, is that correct?
(Brownstein Exhibit No. 37 was marked for identification.)
BY MR. HIRSCH:
Q. Mr. Brownstein, I have handed you what has been marked as Brownstein Deposition Exhibit 37, which is a two-page document titled, "Questions from Representative Hastert," and then it appears to have answer on it.
It has Bates labels HQR-010-1635 through 1636.



Do you recognize this document, Mr. Brownstein?
A. I don't recall it, but I, it's a document that I would normally prepare and has my name on it, so I would like to get a chance to read it.
Q. Why don't you do that?
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. HIRSCH:
Q. Brownstein Deposition Exhibit 37 was a document you prepared, is that correct?
A. Yes.
Q. And do you recall what the circumstances were that you prepared this document?
A. Under the normal course of business, when a senior program officer testifies, we will get either prehearing or post-hearing questions, and this will be allocated to the subject area expertise, and drafts prepared.
What you're showing me is a draft answer.
From this, of course, I can't, cannot tell what the official answer that went out is.



It would have, normally have gone through many levels of review both within the department and outside the department before it was actually submitted, so I am assuming that this is, this is the initial draft prepared by me.
Q. And do you know for whose signature or testimony this would have been provided?
A. I would have to take a best guess.
Q. And what would that be?
A. That --
MR. BANES: Objection. Calls for speculation.
Go ahead.
THE WITNESS: Okay. The guess would be either the director of RW or the Secretary of Energy.
BY MR. HIRSCH:
Q. And you see the part of the document where it lists question.
I take it from this document that this was a question posed by Representative Hastert?
A. Correct.
Q. And do you see the answer that was apparently drafted, drafted by you says the 1998



target date was identified originally in Section 302 of the Nuclear Waste Policy Act of 1992 and subsequently incorporated in the standard contracts entered into between the Department of Energy?
A. Yes.
Q. And the nuclear utilities; I take it that was a correct statement?
MR. BANES: Calls for a legal conclusion.
THE WITNESS: I believe it to be a correct statement.
BY MR. HIRSCH:
Q. And then you go on to say that, that the '98 date was selected as a compromise.
Do you know what basis you had for making that statement?
A. Yes. Why I said that is at the time the act was passed, there was no, to the best of my understanding at the time, and today, there was no detailed design, and all of the things, all the analysis that would be necessary to, to project and predict when, from a technical perspective if you will, a repository could be built, that's not what the law my understanding

of the law did.
Q. Have you yourself looked at the legislative history of the Nuclear Waste Policy Act?
MR. BANES: Objection -- lack of foundation.
THE WITNESS: I may have looked at excerpts of floor debates.
I'm just trying to recall whether I did that from the, the Amendments Act or from the original act, but I certainly went through some language.
BY MR. HIRSCH:
Q. Right. You didn't make an effort to look through the entire legislative history of the Nuclear Waste Policy Act, correct?
A. No.
Q. Now the last statement in this paragraph, the first page, is "Notwithstanding this explanation and lacking contemporary hindsight, the nuclear utilities undertook long-range planning for the acceptance of their spent fuel by the Department and the need for possible onsite storage based on the 1998 date"?
A. Yes.



Q. What did you mean by lacking the temporary hindsight?
A. What it means to me is the problems and challenges associated with the completion of a facility of this magnitude was clearer on the day this response was written than the day the Nuclear Waste Policy Act was passed.
Q. Is another way of saying that lacking the ability to look into the future?
A. Sure.
MR. BANES: Objection -- asked and answered.
BY MR. HIRSCH:
Q. Then it goes on to say the nuclear utilities undertook long-range planning for the acceptance of their spent fuel by the department and the need for possible on-site storage based on the 1998 date.
When you said that, did you mean that the utilities for planning purposes or long-range planning purposes had assumed that the DOE would begin performing in 1998?
MR. BANES: Objection -- lack of foundation, and calls for speculation.
THE WITNESS: I don't know what the



utilities assumed.
I mean the statement as I wrote it and as I meant it, the utilities started looking from a planning perspective, assuming that DOE would begin acceptance in '98.
It doesn't mean anymore than that.
BY MR. HIRSCH:
Q. Now you said, went on to say by the end of 1998, it is projected that approximately 38,200 metric tons of spent nuclear fuel will be in storage at reactor sites across the country?
A. Um-hm.
Q. Do you know where you got that information?
A. I probably got that from one of two sources.
Probably I either got it from an EIA document, or -- the DOE Energy Information Administration analysis or report, or a PNL document.
Q. Now --
A. To the best of my recollection.
Q. Okay. Thanks. It goes on to say until the federal government begins to accept the spent nuclear fuel from utilities, available



storage capacity at each reactor site will continue to decrease, and other alternatives such as dry storage will be needed.
Do you know what your basis for making that statement was?
A. As each day goes on, spent fuel is produced, and the utilities, as they undergo, have to replace that spent fuel on, on a regular basis.
That spent fuel has to go somewhere on their site, and the first line defense of the utilities if you will is their storage pool, and space was running out in their storage pools, and they were going to have to look at, at alternatives.
Once they looked at alternatives like reracking, they would then have to look at alternatives beyond the storage pool.
Q. So as of the time you wrote this document, you recognized that, that nuclear utilities were running out of, out of space in their storage pools, is that correct?
A. That was no secret. Everyone understood that.
Q. Okay. And then you go on to say, "As

a result, the Nation's ratepayers will be further burdened by additional costs."
It is projected that by 1998, 1650 metric tons from 28 reactors will be in dry storage at 19 different reactor sites in 17 states.
Again, what was your basis for that statement?
A. Again, the same that I responded to you before.
It, to the best of my recollection, it was in the, either in the EIA report or PNL report.
Q. And when you said the nation's ratepayers will be further burdened, what did you mean by that?
A. The utilities, until we accepted the fuel, the storage remained the utility's responsibility.
If the utility needed to do, find storage alternatives like on-site dry storage, that the utility would be responsible for paying, and in turn, that cost, the utilities would then try to recoup that cost of the commissions to the ratepayers.



Q. The last sentence in here says that if the federal government were not to begin accepting the spent fuel by 2010, it is projected that 11,500 MTUs from 82 reactors will be in dry storage at 54 different reactor sites in 30 states.
Again, was that information you got from EIA or PNL?
A. To the best of my recollection, it is.
Q. Have you seen any contemporary estimates of how much spent fuel will be in dry storage if the DOE doesn't begin performing until 2010?
A. I have not looked at that certainly in the last several years.
Q. Do you know if other people at DOE have made an effort to determine that?
A. I would think that they have.
Q. Do you know whose involved in that effort?
A. I would direct you to one of two people.
I would think either Jeff Williams or Dave Zabransky would be knowledgeable about that.



MR. HIRSCH: Mark this 38.
(Brownstein Exhibit No. 38 was marked for identification.)
BY MR. HIRSCH:
Q. Mr. Brownstein, I have handed you what has been marked as Brownstein Deposition Exhibit 38, which is a document titled, "Spent Fuel Acceptance DOE's Process for Change," appears to be authored by you, and it's got Bates labels HQR-010-2386 through 2399.
Do you recognize this document as a document you prepared?
(The witness reviewed the document.)
THE WITNESS: I recall that this document was prepared for me by one of my contracting support people, and I need to go further and tell you that while there is marks in here by me, I don't recall that this is the draft, that this was, this was actually used at this summit.
This is, this is a my recollection is early draft.
The reason I do that is because of the cartoons in here, I believe I decided not to do



that, so I think this is different than the final one, again, to the best of my recollection.
BY MR. HIRSCH:
Q. What contractor would have prepared this document?
A. It would have been, again, either PNL or somebody at JAI, Johnson Associates, you know, Billy Cole.
I'm not sure which one.
Q. And apparently at least as a draft was something that was presented for you to present at the, what was called the Decision Makers' Summit?
A. Sir, that's what it says. I don't recall that.
I gave a lot of speeches. I don't recall that one, but yes, that's what it appears to be.
Q. Let me just ask you what was the Decision Makers' Summit?
A. I have no recollection.
Q. And do you know what the U.S. Radwaste Management entity or group is?
A. I don't.

A. Yes.
Q. Do you recognize that handwriting?
A. Yes, I do.
Q. And whose is that?
A. Mine.
Q. So apparently you did make some effort to modify Brownstein Deposition Exhibit 38, is that correct?
A. Yes.
Q. Can you read what you wrote on page 2396, please?
A. Commonality of interest dash practical aspects.
Another line is TSLCC standing for total system life cycle costs dash B slash C, which indicates to be benefits versus costs.
Next line is do the right thing for utilities and the nation once we know the physical arrangements.
And last, "We're thinking of change. You should be, too."
Q. Mr. Brownstein, if, if -- well, strike that.
MR. BANES: Can we take a break just for a few minutes?



MR. HIRSCH: Sure. That's fine.
(A recess was taken.)
BY MR. HIRSCH:
Q. Mr. Brownstein, will you look back at Brownstein Deposition Exhibit 38?
A. Okay.
Q. Will you look at page 2390? There also appears to be a drawing shown here, and then beneath that, there's some text with four bullet points.
Do you see that?
A. Yes, I do.
Q. Somebody drew through the last bullet point.
Is that something that you did, Mr. Brownstein?
A. I probably would have done that.
Q. And why did you strike determine fees in terms of payment?
A. It is, in my mind, the waste acceptance process, the fees in terms of payment while they're part of the contract, is, is a separate, separate subject from the waste acceptance process.
Q. Look at page 2391. At the top of



2391, there's a, what appears to be a slide called waste acceptance expectation.
Do you see that?
A. Yes.
Q. And beneath it appears to be some commentary on the slide.
Do you see that?
A. Yeah. Could I have a chance to read the whole thing?
Q. Please do.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. HIRSCH:
Q. Okay. You see the commentary under the slide says, "We understand your position."
And the second bullet is "Your need to make near term spent fuel management commitments."
What did that indicate?
MR. BANES: Objection. Calls for speculation; lack of foundation.
THE WITNESS: Well, again, my other caveat notwithstanding of whether I actually gave this, and you know, what the final one was, the way I interpret that is that speaking to a



group of utilities, that they were going to have to, to make those decisions with respect to, you know, additional storage at their sites.
BY MR. HIRSCH:
Q. And what kind of spent fuel decisions or commitments did you understand the utilities were going to have to make?
A. Oh, as an example, commitments to dry storage.
Q. And then the last bullet point on this page is "The hardships resulting from the uncertainties in the start of acceptance."
What did you understand were the hardships to the utilities resulting from the uncertainties in the start-up?
MR. BANES: Objection -- vague. Calls for speculation.
THE WITNESS: To the extent that we could not identify a particular point in time when a facility would commence operations, that would put a burden on the utilities of what, of internal decisions that they needed to make in order to continue to keep their plants running to accommodate the spent fuel, and so this statement recognized -- again, I'm not sure that

hardships is a word that I would have used, but purports to indicate in this draft that the department at least has a recognition if in fact not a clear, in fact a clear understanding of that the utilities have been affected by that.

BY MR. HIRSCH:

Q. The DOE recognized that the uncertainties about when the DOE would start acceptance would cause burdens on the utilities, is that correct?

A. Sure. Yes.

Q. There's a -- strike that. And one of the burdens would be, would it not, having to determine or provide alternative storage, is that correct?

MR. BANES: Objection -- vague.

THE WITNESS: Maybe I can use an example, and the way best way to respond to you, if we were going to be 30 days or 180 days or 360 days beyond a certain date, and then begin the waste acceptance process, the utilities would find a, a low capital cost alternative to accommodate their spent fuel, whether it be reracking or transferring to another facility.

It would not invest in multi-million



dollar investment in dry storage capability.

BY MR. HIRSCH:

Q. But if the DOE was going to miss the acceptance date by a long period, say 12 years, then the utilities might be forced to engage in those high-cost, high-capital alternatives, correct?

MR. BANES: Objection. Calls for speculation.

THE WITNESS: It, it is, it is possible.

Again, we made no secret of this program, where we were and the difficulties of commencing facility operations, and we also made it clear in all the documents that we reviewed that until that time, we believed it was the utilities' responsibility, so you know, that burden exists on the, existed on the utilities.

I should say that responsibility.

BY MR. HIRSCH:

Q. And so in DOE's view, if the government was going to miss the 1998 acceptance date by 20 years say, that entire burden of storing waste was the utilities'?

A. The, the statements, and if necessary,



we can go back in the ACRs as that I recall them, you know, made it clear until we accepted waste, we used that type of statement, or until the facility operations commenced, responsibility for the spent fuel rested with the utilities.

That was our interpretation of the law.

Q. Without going over this too many times, that particular interpretation was rejected, correct?

MR. BANES: Objection -- misleading; calls for legal conclusion.

THE WITNESS: Yes.

BY MR. HIRSCH:

Q. Now Mr. Brownstein, will you look at page 2394 or 2395 of Exhibit 38?

Do you see there is a reference on here to NOI response summary?

A. Yes.

Q. And do you know what the NOI response summary was?

A. I do.

Q. What was it?

A. That refers to a Notice of Inquiry.



Q. Okay. And was that the Notice of Inquiry where the DOE indicated that it didn't believe it had an obligation to start accepting fuel in 1998?

A. I think if we go back to 2393, that tried to summarize what the NOI did.

Q. Okay. And was there a response or a questionnaire that went out with the NOI?

A. Well, to the best of my recollection, we put a Federal Register notice out.

The Federal Register notice asked, you know, a series of statements, and I think it summarized the department's position on some issues, and it asked questions and it sought input on that.

I do not recall whether we used means other than the Federal Register notice.

We may have. And that we, you know, issued a report dealing with all this at the end of it.

Q. Does looking at 2395, does this document show that the department received 593 comments to the effect that the department has already collected over $10 billion and we want what we paid for?

earliest to the latest.
The intent of that was to give us some idea of the age and therefore the characteristics of the fuel that it might consider, so you would, so that is not identifying specific fuel.
That two scenarios, that one in time for an FDS, it would then identify specific fuel and it could be within that range which would be fine, and if it wasn't, then that could be another matter, but it wasn't specific fuel that was identified.
BY MR. HIRSCH:
Q. In the DCS form?
A. Right.
Q. So well, let me put it this way. If a utility identified some fuel from, again, from Reactor A in the DCS form, in the final delivery form, it could identify fuel for pick-up from a different reactor as long as it met the basic contract requirements, is that correct?
MR. BANES: Objection. Calls for legal conclusion.
Go ahead.
THE WITNESS: I probably ought to take



a minute and refresh my memory on the instructions.
MR. HIRSCH: Okay. If you want to look at it, that's fine.
(The witness reviewed the document.)
THE WITNESS: I'm sorry. Now that I have done that, can I ask you to repeat or --
MR. HIRSCH: Can you read it back?
THE REPORTER: Question: "So well, let me put it this way. If a utility identified some fuel from, again, from Reactor A in the DCS form, in the final delivery form, it could identify fuel for pick-up from a different reactor as long as it met the basic contract requirements, is that correct?"
THE WITNESS: I want to agree with the statement, with the only caveat is there could be some situation where that could be problematic, but in general, yes.
BY MR. HIRSCH:
Q. That statement is correct?
A. In general, yes.
(There was a pause in the proceedings.)
MR. HIRSCH: Let me have the court



reporter mark something.
This is an accompanying document to this, so let's go ahead and mark this as 42.
(Brownstein Exhibits Nos. 41 and 42 were marked for identification.)
THE WITNESS: Okay.
BY MR. HIRSCH:
Q. Mr. Brownstein, I have handed you what has been marked as Brownstein Deposition Exhibit 41 and Brownstein Deposition Exhibit 42.
Brownstein Deposition Exhibit 41 is a memorandum for the Secretary from Dan Dreyfus.
It has Bates labels HQR-001-0339 and HQR-001-311 through 312.
Can you identify these documents?
A. Can I?
Q. What they are.
A. Yes.
Q. Can you tell me what you understand they are?
A. Sure. They're, as I said, they're recommendations to the Secretary to approve the department's issuance of a Notice of Inquiry regarding waste acceptance issues.



Q. And did you prepare Exhibit 41 and 42, the text, that is?
A. Yes.
Q. And I guess Exhibit 42 shows that it was approved by the Secretary, is that correct, the Secretary of Energy?
A. Yes.
Q. That would have been Hazel O'Leary, is that right?
A. Yes. That doesn't look like -- yes. Yes.
Q. And on the right-hand column of Exhibit 41, on the second page, everybody signed off on this memo before I guess it went to the Secretary, is that correct?
A. That's correct, um-hm.
Q. You see in the discussion section --
A. Looking at 41 or 42?
Q. I'm sorry. Let's look at 41, the first page.
A. Okay.
Q. On the discussion section, first paragraph, second sentence, it says, "While it is the Department's preliminary view that the Act does not impose a statutory obligation to

accept spent nuclear fuel absent an operational repository or a suitable storage facility constructed under the Act, the Department may have created an expectation that it would begin accepting spent fuel in 1998 through its implementation of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste"?
A. Yes.
Q. What did you mean when you wrote that in this document?
A. To me, the words are clear. The sentence is clear.
I meant what it said.
Q. Well, what had the department done to create an expectation it would begin accepting fuel in 1998?
MR. BANES: Objection. It calls for a legal conclusion.
THE WITNESS: I would argue what we have talked about the last two days in terms of the ACRs and the APRs following the process that was detailed in the contract.
BY MR. HIRSCH:
Q. You mean by issuing the reports like



the mission plans and the ACRs, the DOE had created an expectation it would begin accepting spent fuel in 1998, is that correct?
A. I would not --
MR. BANES: Calls for legal conclusion.
THE WITNESS: No, I would not include the mission plan in that because the mission plan was part of the statute, not part of the contract, but the rest of that statement was accurate.
BY MR. HIRSCH:
Q. All right. So for example, by issuing the ACRs, the department could have created an expectation it would begin accepting spent fuel in 1998, is that correct?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: May have created an expectation.
(There was a pause in the proceedings.)
BY MR. HIRSCH:
Q. At the, under the issue heading at the, on the first page of Exhibit 41 --



A. Okay.
Q. Do you see a reference to eliciting the views of interested parties on several issues, one, they're listed as one, two and three?
A. Yes.
Q. And the third option is options through the nuclear waste fund to offset a portion of the financial burden which may be incurred by utilities in continuing to store spent nuclear fuel at reactor sites beyond 1998, is that right?
A. Yes.
Q. What was your understanding at that time of what the financial burden was to the utilities for storing spent nuclear fuel beyond 1998?
MR. BANES: Objection -- asked and answered, and calls for speculation.
THE WITNESS: Things like adding dry storage to accommodate the spent fuel.
BY MR. HIRSCH:
Q. Mr. Brownstein, did you have any discussions at the DOE that the DOE's inability to start accepting waste could delay reactor



decommissioning?
A. I was aware of that, and you know, over ten years dealing with the subject, I considered I would certainly have had a discussion about that, but I don't recall a specific discussion, but I may have.
Q. Well, let me put it this way. You were aware I take it of the possibility that the DOE's failure to pick up spent nuclear fuel could cause utilities to delay reactor decommissioning, is that correct?
MR. BANES: Objection -- misleading. Calls for speculation.
THE WITNESS: Yes.
BY MR. HIRSCH:
Q. Were you informed of that by utilities?
A. I don't have a specific recollection of that.
Q. Did your contractors study those issues?
A. They may have.
Q. Do you recall any particular studies done by PNL or your other contractors on that issue?

A. I don't, but that's not to say that PNL -- we have seen PNL did a number of think pieces, and that may have been one.
I don't recall a specific document.
(There was a pause in the proceedings.)
BY MR. HIRSCH:
Q. Mr. Brownstein, do you recall that Mr. Tomaszczuk asked you some questions about the statutory linkages between the MRS facility and the repository?
A. I do.
Q. And as I recall, I think this is correct, one of the, one of the linkages you identified was that you couldn't construct an MRS until the NRC issued a license for the permanent repository.
Do you recall that?
A. Yes.
Q. All right. Was there a second linkage between the MRS and the repository that the DOE couldn't select an MRS site until the President recommended the permanent repository site?
MR. BANES: Objection. Calls for a legal conclusion.



You can answer if you remember.
THE WITNESS: I need to reread that act. It's been a while.
BY MR. HIRSCH:
Q. Well, we'll endeavor to get you that.
A. For homework assignment?!
Q. Is it correct that President Bush just about a couple of months ago recommended a permanent repository site?
A. He did.
MR. HIRSCH: Can we go off the record here?
MR. BANES: Sure.
(A discussion was held off the record.)
BY MR. HIRSCH:
Q. Will you look at, look back I should say at Brownstein Deposition Exhibit 32?
That is the 1992 ACR.
A. Okay.
Q. Do you see, I would like to refer you to page 3.
There is a statement that I think we may have seen in one of the earlier reports, but it's also in here, recited in here, that, quote,



if the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that facility operation and initial acceptance of SNF by DOE could not start until at least 2007?
A. Yes.
Q. That was a correct statement at the time, was it not, Mr. Brownstein?
MR. BANES: Objection -- asked and answered.
THE WITNESS: Yes.
BY MR. HIRSCH:
Q. All right. And I think you testified earlier that the, that the rate -- actually I would like you to look back at Brownstein Deposition Exhibit 30 for a minute.
That's the December 1991 ACR.
A. Okay.
Q. Do you see on page 2366 of this document that that contains projected waste acceptance rate?
A. Um-hm. Yes.
Q. And I believe you testified earlier that the rates that were identified in there



were based on or consistent with the statutory limitation on the MRS in the 1987 act amendments, is that correct?
MR. BANES: Objection -- misleading.
THE WITNESS: With respect to the 10,000 MTU limit.
BY MR. HIRSCH:
Q. All right. And is it correct that, and I guess -- and I think you testified to this, that a similar, although slightly different rate was used as the lower bounding case in the prior ACR.
Do you recall that?
A. I recall that.
Q. All right. Apart from the acceptance rate identified in Exhibit 30 in that lower bounding case, is it correct that the DOE had never used that acceptance rate or that type of acceptance rate before?
MR. BANES: Objection -- irrelevant and misleading.
THE WITNESS: When you say that type of acceptance rate, you're referring to 2.1?
BY MR. HIRSCH:
Q. Right. Well, let me clarify it; 2.1

refers to an acceptance rate that after a couple of years, goes up to 900 metric tons a year.
Do you see that?
A. Yes.
Q. And I believe that the lower bounding case example from the previous ACR went up to 875 metric tons.
Do you recall that?
A. Right. I do.
Q. My question is before Exhibit 30 in the prior ACR with the lower bounding case, is it correct that the DOE had never used rates, acceptance rates that low before?
MR. BANES: Objection -- misleading, and lack of foundation.
THE WITNESS: I don't want to speak for -- when you're making a blanket statement DOE never, you know, did, DOE is a large organization.
I can't recall that they did, and this was in response to, to the Amendments Act, so I believe you're right, to the best of my recollection.
BY MR. HIRSCH:
Q. And for example, the rates in the



mission plan were higher than the 1991 ACR, is that correct?
A. Yes.
Q. And the rates in the ACRs before I think it was the 1990 ACR that had the lower bounding case were higher than the rates in Table 2.1, is that correct?
MR. BANES: Objection -- misleading.
THE WITNESS: No. I thought that had a lower total.
BY MR. HIRSCH:
Q. I think I excluded the lower bounding case, but let me rephrase the question.
A. Oh.
Q. If I can find the document.
(There was a pause in the proceedings.)
BY MR. HIRSCH:
Q. Mr. Brownstein, is it correct that the acceptance rates identified in the Annual Capacity Report before December 1990 had a higher acceptance rate than was shown in December 1991 ACR?
A. I believe that's accurate.
Q. All right. And in fact, the December



1990 ACR had an upper bounding case that also had a higher acceptance rate than the 1991 ACR, is that correct?
A. That's I think Exhibit 24.
(The witness reviewed the document.)
THE WITNESS: Now that I have that in front of me, say that one more time.
MR. HIRSCH: Could you read the question?
THE REPORTER: Question: "All right. And in fact, the December 1990 ACR had an upper bounding case that also had a higher acceptance rate than the 1991 ACR, is that correct?"
THE WITNESS: That is not Exhibit 34.
MR. HIRSCH: Exhibit 24 -- I apologize.
(The witness reviewed the document.)
THE WITNESS: Is this 24?
MR. HIRSCH: Yeah.
THE WITNESS: I'm on December. That's what I'm looking at.
Is 1990, you wanted to compare that with, you wanted me to compare, your question was?
MR. HIRSCH: Why don't you read the



question back?
THE WITNESS: Comparing the December '91 ACR I believe?
BY MR. HIRSCH:
Q. Right, right, with the upper bounding case.
A. Right. And I'm trying to find the 1991 ACR.
I have the 1990.
Q. It's 30.
(There was a pause in the proceedings.)
THE WITNESS: Okay. I have that. I'm sorry.
MR. HIRSCH: That's fine. I think you better read the question back.
THE REPORTER: Question: "All right. And in fact, the December 1990 ACR had an upper bounding case that also had a higher acceptance rate than the 1991 ACR, is that correct?"
THE WITNESS: That is correct. I'm sorry.
MR. HIRSCH: That's fine. I think this is probably a good time to stop, and start again tomorrow.

467

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

468

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia
Thursday, April 11, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,

469

LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:38 a.m., Thursday, April 11, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

470

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7901

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

APPEARANCES: (Continued)

On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:

JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:

DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:

NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350



APPEARANCES: (Continued)

On behalf of the Defendant:

UNITED STATES DEPARTMENT OF JUSTICE
BY: BRYANT S. BANES, ESQ.
RUSSELL A. SHULTIS, ESQ.
1100 L Street, N.W.
Washington, D.C. 20530



C O N T E N T S


| WITNESS ALAN BROWNSTEIN | EXAMINATION BY COUNSEL FOR PLAINTIFFS | DEFENDANT |
|---|---|---|
| By Mr. Hirsch | 475 | |
| By Mr. Banes | | 543 |
| By Mr. Hirsch | 557 | |
| By Mr. Neslin | 561 | |
| By Mr. Carney | 641 | |
| By Mr. Handwerker | 647 | |

Afternoon Session -- 561


E X H I B I T S


| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 43 | 479 |
| 44 | 490 |
| 45 | 506 |
| 46 | 514 |
| 47 | 519 |
| 48 | 534 |
| 49 | 538 |
| 50 | 562 |
| 51 | 576 |
| 52 | 589 |
| 53 | 593 |
| 54 | 598 |





| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 55 | 602 |
| 56 | 605 |
| 57 | 607 |
| 58 | 609 |
| 59 | 612 |
| 60 | 617 |
| 61 | 620 |
| 62 | 621 |
| 63 | 634 |
| 64 | 636 |
| 65 | 659 |
| 66 | 671 |
| 67 | 680 |
| 68 | 717 |
| 69 | 728 |
| 70 | 733 |
| 71 | 753 |
| 72 | 754 |
| 73 | 759 |
| 74 | 762 |
| 75 | 763 |
| 76 | 772 |

Certified question: Page 525, line 13

Q. And at a 900 metric ton rate, or excuse me. Strike that.
At a 900 metric ton rate, using that 80,000 total, do you agree that it would take over 80 years to eliminate the backlog of spent fuel and pick it all and remove it all?
MR. BANES: Do you want a calculator?
THE WITNESS: Yeah, if you want me to, yeah. I'm not going to do it in my head.
BY MR. HIRSCH:
Q. I'll give you a piece of paper.
A. Fine.
Q. I think --
MR. BANES: I think the math is fairly clear. I don't think that even needs to be asked.
MR. HIRSCH: Well, I think it's a pretty rough calculation.
MR. BANES: All right.
THE WITNESS: Roughly.
BY MR. HIRSCH:
Q. It would roughly take over 80 years to remove all spent fuel, is that correct?
MR. BANES: Objection -- irrelevant.
THE WITNESS: Yes.



BY MR. HIRSCH:
Q. All right. Do you have an understanding at the time, or strike that.
Do you have an understanding, Mr. Brownstein, of what the DOE considers the optimal period to run the spent fuel program, the length of time?
MR. BANES: Objection -- vague as to what optimal means.
BY MR. HIRSCH:
Q. Let me rephrase the question. Mr. Brownstein, do you have an understanding of what the DOE considers to be the optimal period of time to run the spent fuel disposal program?
MR. BANES: Objection -- vague, and calls for speculation.
THE WITNESS: The only way I would know how to answer that question is to go back, go to our total system life cycle cost documents which estimates the, the time of the program and the costs associated with that, and we, we can do that on -- there's an office that does that on a regular basis.
They assume acceptance rates. They assume the costs associated with everything



from, from the acceptance period, the pre-closure period to the post-closure period.
All costs associated with the program, that's what I would need to, to answer your question, and even then, I don't know that I'm in a position to say that that is optimal, but that would certainly give an indication of what the system is planning for the period for operations of the program.
BY MR. HIRSCH:
Q. So, so I understand the, I think they're called the TSLCC reports?
A. That's correct.
Q. Is that correct?
A. Total system life cycle cost.
Q. The TSLCC costs would show what the DOE's projection of how long the facility or the program should operate, is that correct?
MR. BANES: Objection. Calls for speculation.
THE WITNESS: Yes, but again, I then could not testify whether that includes an optimal rate or some other basis.
BY MR. HIRSCH:
Q. The TSLCC costs would show what the



DOE's projection of how long the program should operate, is that correct?
A. That would be my --
MR. BANES: Objection -- lack of foundation.
THE WITNESS: That would be my understanding.
I don't do the TSLCC report, but that would be my understanding.
MR. HIRSCH: Why don't we take five minutes here?
MR. BANES: Okay.
(A recess was taken.)
(Brownstein Exhibit No. 45 was marked for identification.) ^
BY MR. HIRSCH:
Q. Mr. Brown, I have handed you what has been marked as Brownstein Deposition Exhibit 45, which is a document titled, "Utility and DOE Efforts to Improve the Standard Disposal Contract -- an Experiment in Cooperation."
And it's Bates labeled HQR-043-0592 through 0595.
Do you recognize this as a paper that

you and Mr. Billy Cole authored?
A. Yes.
Q. And where was it presented?
A. I'm not absolutely sure, but based on the format, I would think it was at the International Waste Conference that we held at that time annually.
Now we hold it every several years, and I do not recall what year.
Q. When you say International Waste Conference, what does that mean, or what was that?
A. It was a, one of the engineering groups sponsored a, at one time, a yearly conference to discuss high-level waste issues.
I forget the exact title of the conference. I thought it was something International High-Level Waste Conference, something like that, and for one of those years, we put a paper together and presented it.
Q. When you say one of the engineering groups sponsored this seminar?
A. Like a, well, it wasn't -- it was like a three or four-day conference.
Q. Right.



A. And one of the professional engineering groups; I would be speculating.
Q. And is it fair to say that the purpose of the conference was for engineers who were dealing with spent nuclear fuel issues in various countries to get together to talk about relevant issues?
A. Yes.
Q. I believe in Mr. Morgan's deposition, we had a document that referenced an international conference in Vienna.
Do you know where this conference, where the conference where you presented the paper was held?
A. Probably, most of them that I recall were held in Las Vegas, so it was probably Las Vegas, but I can't be absolutely sure.
Q. And did you and Mr. Cole present Deposition Exhibit 45 at the conference?
A. My recollection is this paper was part of the proceedings, the published proceedings, and I probably made a presentation, you know, using slides, based on.
Q. Do you recall what the year was that you presented this paper?



A. I do not.
Q. You see on the first page of the document, there's a discussion about basically the adoption of a standard contract?
A. What paragraph are you referring to?
Q. I'm referring to the discussion section in the first I think five paragraphs after the discussion heading there, basically the first five paragraphs of the discussion section.
A. Okay.
Q. Do you want to read those to yourself?
A. Sure.
(The witness reviewed the document.)
BY MR. HIRSCH:
Q. Let me know when you're finished reading.
(The witness reviewed the document.)
THE WITNESS: I have read the first five paragraphs.
BY MR. HIRSCH:
Q. Do you see that there's a description in those paragraphs of the process or the way in which the standard contract was adopted?
A. Yes.



Q. And then there's a statement near the bottom of the first page "This process created the perception among many utilities that they had been pressured into signing a contract that appeared unresponsive to their needs, unfair, and inadequate"?
A. Yes.
Q. Do you see that statement? Had you heard comments like that from utility representatives in your position at DOE?
MR. BANES: Objection -- irrelevant.
THE WITNESS: Yes.
BY MR. HIRSCH:
Q. And do you believe that there was some merit to those complaints?
MR. BANES: Same objection.
THE WITNESS: The perception existed. What I tried to describe in these, in these five paragraphs is this covered a very long-term project at the very early stage when, you know, the parts of the system and implementation details were far from known, but the statute required that we do that.
The department did that expeditiously as required by the, by the statute, and I know

those perceptions were out there, and I think some of them had some merit, not all of them.

BY MR. HIRSCH:

Q. Which of the complaints did you think had some merit?

MR. BANES: Objection -- irrelevant.

THE WITNESS: I think the timing aspects, and, and the fact that this had been done via the federal rulemaking process were two complaints that I heard.

BY MR. HIRSCH:

Q. What do you mean by the timing aspect?

A. I believe the law, the statute required that these contracts, in order for a utility to be eligible for disposal services, the statute set a timeframe, which was very short, they had to sign this contract by, and I heard that, you know, a number of utilities would have preferred, you know, individual negotiations as opposed to doing this via rulemaking.

Again, the time that you're asking me about was, was before I was there, so these were, you know, things that I, that I heard.

Q. Well, did you think that some of the



utilities' complaints about the, the short time for I guess promulgation and adoption or execution of the contract had some merit?

MR. BANES: Objection -- irrelevant.

THE WITNESS: I understood them. The law was the law. That's what the law required, and the department implemented it at that time as expeditiously as it could.

BY MR. HIRSCH:

Q. Do you know whether utilities communicated the complaints that you're identifying -- strike that.

Do you know whether the utilities communicated the complaints that you heard prior to the execution of the standard contract?

MR. BANES: Objection -- lack of foundation.

THE WITNESS: They did. I believe they did in responding to the proposed rulemaking.

They certainly, the industry committed their concerns in writing as part of the public record.

BY MR. HIRSCH:

Q. Do you see further down in the



paragraph on page 593, it's, at the top it says, "Adding to the utilities' frustrations was the fact that they were paying into the Nuclear Waste Fund at a rate of approximately $1.5 million per day for service to be rendered by the Department at least 15 years into the future."

A. I do.

Q. Do you know if that $1.5 million figure is still what the utilities are paying or whether it's lower or higher at this point?

A. I do not know that. I know the rate is the same.

I do not know if the, if the 1.5 million per day is correct or not.

Q. Based on current events, that the date that the department is going to begin has now been extended beyond that original 15 years, is that correct?

MR. BANES: Objection. Calls for legal conclusion.

Calls for speculation.

THE WITNESS: Yes.

MR. HIRSCH: Let's mark this as 46.

(Brownstein Exhibit No. 46



was marked for identification.) ^

BY MR. HIRSCH:

Q. Mr. Brownstein, I hand you what's been marked as Brownstein Deposition Exhibit 46, which is a two-page document with a title "ACR Issues Status Report December 31st, 1991," and it has the Bates labels HQR-003-0314 through 0315.

Do you recognize this document, sir?

(The witness reviewed the document.)

THE WITNESS: I don't believe I have ever seen this document, to the best of my recollection.

BY MR. HIRSCH:

Q. I think you testified yesterday about an ACR issue resolution process.

Do you recall that?

A. Yes.

Q. And does this memo appear to be a summary of where people were in the ACR issues resolution process?

MR. BANES: Objection -- lack of foundation.

THE WITNESS: Where they were? I

don't understand where they were.
BY MR. HIRSCH:
Q. Let me strike that. Does Exhibit 46 appear to be essentially a status report regarding the progress of the ACR issues resolution process?
MR. BANES: Same objection.
THE WITNESS: That is what the document purports to show.
BY MR. HIRSCH:
Q. Do you know who prepared this document?
A. I don't recall seeing this, so I don't.
Q. There is a reference in the third paragraph to something called the M&O.
Do you see that?
A. Yes.
Q. Do you know what M&O represents?
A. Yes.
Q. What is M&O?
A. That was the management and operating contractor.
Q. And was that PNL?
A. No. At the time -- I'm looking at the



date at the top.
Q. Which is?
A. December 31st, 1991.
Q. Okay.
A. During that time, the M&O was the principal, and that was TRW.
Q. Does it appear to you that this document, Exhibit 46, was prepared by TRW?
A. I don't know.
Q. Was TRW involved in the ACR issues resolution process?
A. I, I think by this time, they, through one of their subs, they were, one of their subcontractors.
Q. Which subcontractor is that?
A. That would have been JAI.
Q. And by December 1991, was Mr. Billy Cole working for JAI?
A. Yes, to the best of my recollection.
Q. You see in the first sentence of this document, Exhibit 46, it says this standard disposal contract which defines the spent nuclear fuel and high-level radioactive waste acceptance process was unfortunately developed in such a way that the terms and conditions



contained numerous omissions, inconsistencies, ambiguities and contradictions?
A. Yes.
Q. "An OCRWM review of the Standard Disposal Contract identified 34 issues requiring resolution before waste acceptance could begin"?
A. Just a second.
Q. Sure.
(There was a pause in the proceedings.)
THE WITNESS: I'm sorry.
BY MR. HIRSCH:
Q. Would you agree that the standard contract contained omissions, inconsistencies, ambiguities and contradictions?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: To the extent that the issues that the utility representatives and we agreed, which were I think the series of 34, and that is probably the right number, those 34 could be characterized in that grouping.
BY MR. HIRSCH:
Q. There were 34 issues identified in this document?



A. That's what this says. And to the best of my recollection, I think that's accurate.
Q. And so you would agree that there were at least -- strike that.
So you would agree that there were 34 issues that had been identified where there were omissions, inconsistencies, ambiguities or contradictions in the standard contract?
MR. BANES: Objection. Calls for legal conclusion.
THE WITNESS: There were 34 issues that we recognized, we being the department and utilities, that needed to be clarified for whatever the reason.
BY MR. HIRSCH:
Q. And so at minimum, that would have reflected that the standard contract was ambiguous on those issues, isn't that correct?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: No. It could have been, it could have had omissions. It could have had inconsistencies.
I mean there are a host of reasons

why.
BY MR. HIRSCH:
Q. All right. There were 34 issues where there was either an omission, an inconsistency, an ambiguity or a contradiction, is that correct?
MR. BANES: Same objection.
THE WITNESS: To the best of my recollection.
MR. HIRSCH: Mr. Brownstein -- strike that. Let's mark another exhibit.
(Brownstein Exhibit No. 47 was marked for identification.) ^
BY MR. HIRSCH:
Q. Mr. Brownstein, I have handed you what has been marked as Brownstein Deposition Exhibit 47, which is a copy of the March 1995 DOE Acceptance Priority Ranking Annual Capacity Report.
It doesn't appear to have Bates labels.
Do you recognize that this document is a copy of the DOE 1995 APR/ACR?
MR. BANES: Objection -- lack of



foundation.
THE WITNESS: That's what it indicates, yes.
BY MR. HIRSCH:
Q. And did you review the 1995 ACR/APR before it was released?
A. I don't recall.
Q. What was your position in early 1995 at the DOE?
A. Formally I testified that I took on my new responsibilities in March of '95, which is the date of this report, and I can't recall when, when that, when those formal detail papers were signed.
I may have been doing those responsibilities some time before, which is why I have answered your question the way I have.
Q. Is it correct that before a document like Exhibit 47 would be released, it would be circulated in draft form for some period before it was released?
A. It would normally have been circulated for concurrence through the concurrence chain, yes.
Q. And my question is do you think it is



likely that you reviewed a draft before it was issued?
A. I may have. I can't say likely. I may have.
Q. Have you reviewed the document since then?
A. No. This document?
Q. Yes.
A. No.
(There was a pause in the proceedings.)
BY MR. HIRSCH:
Q. Will you look at the bottom of page 3 of the document?
Do you see the statement due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year, years of operation in the system rather than by specific calendar years?
A. I do.
Q. And do you see on the Table 1 on page 4 of the document that instead of specific years for the start of DOE operations, it just says



Year 1, Year 2, Year 3?
A. Yes.
Q. And that was a departure from the previous ACR documents, is that correct?
A. I need to review that decision. Can we go back to the previous one?
Q. Sure.
(There was a pause in the proceedings.)
THE WITNESS: Excuse me. Was that the '92?
MR. HIRSCH: I'm just looking.
MR. HANDWERKER: Exhibit 32.
MR. HIRSCH: Exhibit 32.
(The witness reviewed the document.)
THE WITNESS: Assuming that there was no ACRs between '92 and '95, I agree.
BY MR. HIRSCH:
Q. Well, just for clarification, you were looking at Brownstein Deposition Exhibit 32?
A. Yes.
Q. Is that correct? And Brownstein Deposition Exhibit 32 on Table 2.1 on page 4 shows specific dates for the beginning of DOE acceptance of SNF?

that the allocation occurs?
A. Yes.
Q. So according to the instructions, and I stand corrected if I misstated this earlier, but the utility would look at the most recent ACR to identify what calendar year it had an acceptance allocation in, and then submit a form 63 months before that, is that correct?
A. Yes.
Q. And is it correct that in the 1995 APR/ACR document that the DOE issued, the DOE removed the calendar dates for acceptance by the DOE?
A. Yes.
Q. Now Mr. Brownstein, are you familiar with an individual, I think you mentioned him yesterday, named Jim Carlson?
A. Yes.
Q. And what was Mr. Carlson's role in the program?
A. In what timeframe?
Q. All right. When you started, what was Mr. Carlson's role?
A. In 1985?
Q. Right.



A. We have to go back to the organizational charts again.
MR. HIRSCH: Off the record.
(A discussion was held off the record.)
BY MR. HIRSCH:
Q. Looking at Exhibit 21, why don't you take a minute to look at that?
I guess what I'm trying to get from you, Mr. Brownstein, is just sort of a general understanding of what Mr. Carlson's role in the waste program was.
A. Well --
MR. BANES: Objection. Calls for speculation.
THE WITNESS: He served in many different capacities over the years, varying capacities, so --
BY MR. HIRSCH:
Q. When you started, what was his capacity?
(The witness reviewed the document.)
THE WITNESS: Looking at page 3 of that exhibit marked September '85 --
BY MR. HIRSCH:



Q. Right.
A. It's my recollection that he worked under the Office of Storage and Transportation Systems.
Q. Did he report to Mister is that Hilley?
A. Hilley; well, if my recollection is correct, then he would have reported to Hilley.
I can't recall whether he reported to Klein or to Barrett. You know, under which division?
Q. And the L. Barrett here listed on the September '85 organization chart, is that Mr. Lake Barrett?
A. Yes.
Q. At the time that Mr. Carlson left DOE, do you recall what his responsibilities were?
A. I believe he was in an acting position as acting director of the Office of Acceptance, Transportation and Integration.
Q. Are you referring to a particular page of Exhibit 21?
A. I'm sorry. I was referring to Exhibit 22.
I believe that was the latest that you



presented to me yesterday.
Q. Right. Right. So I'm sorry. Which box on Exhibit 22 are you referring to here?
A. On the third line, the middle box; that's my recollection.
Q. Do you believe that when Mr. Cole left, he was with the Office of Acceptance, * Transportation and Integration?
A. Mr. Carlson.
Q. I'm sorry -- Mr. Carlson.
A. Yes.
Q. And do you know what his position there was?
A. I believe he was the acting office director.
(Brownstein Exhibit No. 48 was marked for identification.) ^
BY MR. HIRSCH:
Q. Mr. Brownstein, I have handed you what has been marked as Brownstein Deposition Exhibit 48, which is essentially a group exhibit showing correspondence between ComEd and the DOE relating to ComEd DCS forms.
In particular, I would like to refer

you to a few pages of this document.
A. Okay.
Q. You see that the first page is a letter from the DOE from Beth Tomasoni to Jeanne Tortorelli at Commonwealth Edison Company transmitting some accepted DCS forms?
A. Yes.
Q. And is that your signature on the forms?
A. On the, on the one marked 0266?
Q. Right.
A. Yes.
Q. And you're listed as the technical representative?
A. Yes.
Q. What does the technical representative signify there?
A. The, really means the program office. In other words, the contracting office is a procurement office not part of the RW program.
It's, they're the ones who technically administer all the contracts or the contracts for the department, and before the contracting officer does it, she has something that is called a COTR -- contracting officer technical



representative.
It, it's just a link between the program and procurement, and I was that person.
Q. And then your signature is also on page 267, which is the next page?
A. Yes.
Q. And then do you see following that is some DCSs that were, DCS forms that were submitted by ComEd in September of '93?
And I believe if you go to the page that is marked CE03746, starting there, it's a little hard because they're not sequentially numbered.
A. Okay. Okay. Let me try -- CE03746.
Q. Right.
A. Okay.
Q. And do you see on, starting on page 3747, there are, there is an approved DCS form, and again there is a signature.
I believe that's your signature as the technical representative?
A. Yes.
Q. And at this time, you're identified as the Chief, Logistics and Utility Interface Branch?



A. Right.
Q. And your signature does also appear on the other forms that are immediately behind that first one we looked at, is that correct?
A. Associated with the December 6 letter, yes.
Q. And then looking further into the document, on the pages starting COF-001-2156?
A. Yes.
Q. Do you see there is more DCS forms submitted by ComEd in 1994?
A. Yes.
Q. And I guess these forms you'll see starting on 2159 were approved by Ms. Slater?
A. Right.
Q. Do you see following those forms, there's a transmittal letter from ComEd from a Ken, Kenneth Petersen to Ms. Tomasoni transmitting DCS forms that were dated September 1995?
A. Yes.
Q. Mr. Brownstein, do you recall ever seeing those forms that were submitted by ComEd in September 1995?
A. No. I had moved on by that time, so I



had not.
Q. I'll represent to you that ComEd didn't receive a response to those 19 September 1995 forms.
Did you, were you ever engaged in any discussions or did you ever have any discussions about what to do with forms ComEd had submitted in September 1995.
A. No, I did not.
MR. HIRSCH: Take five minutes here. I'm almost done.
MR. BANES: Okay.
(A recess was taken.)
BY MR. HIRSCH: Back on the record.
(Brownstein Exhibit No. 49 was marked for identification.) ^
BY MR. HIRSCH:
Q. Mr. Brownstein, I have handed you what has been marked as Brownstein Deposition Exhibit 49, which is a document, it's Bates labeled EDB-002-0562, and it runs through 0618.
Let's go off the record here for a second.
(There was a pause in the

at-reactor storage, it suggests that DOE may elect to allocate acceptance prior to shutdown reactors?
A. Right.
Q. What does that mean to you?
A. Is there a specific question, or the whole --
Q. What is the significance of reaching steady-state operations for the issue of whether shutdown reactors should be granted priority?
A. There will be a time during steady-state operations where we receive more spent nuclear fuel than generated, and therefore, the backlog will no longer be increasing, will be decreasing, and as it is decreasing, this issue will have a different impact on the utilities.
And the suggestion here is that, that during that phase, we, we may want, the contractor is suggesting we consider altering the policy.
Q. What was your view on that issue?
A. My personal view on this?
Q. Yes.
A. My personal view on this is that the



contractor's suggestions for both Phase 1 and Phase 2 were, were reasonable.
Q. Do you recall discussing this issue with others at DOE?
A. Over what time period?
Q. Over any time period, this issue of the distinction between a ramp-up in steady-state operation and granting priority to shutdown reactors.
A. Yeah. Sure. This issue, this issue was discussed with my superiors on other cases.
I have testified, you know, I have discussed this among my staff.
This is an issue that I know came up higher -- I'm going to be hard pressed to over a period of, you know, ten years try to point to specific ones, but did I have these conversations with my superiors on this issue?
I believe that I did.
Q. Do you recall who those superiors were?
A. Well, I know who my superiors were over the time, but I, I don't recall.
Did I have a conversation like this with a Lake Barrett?



At some point, I'm sure that I did.
With a Ron Milner? I'm sure that I did.
With a Sam Rousso? I probably did.
Q. Do you recall what their views were on this issue?
A. As I recall, this issue in a number of ways had come up.
In fact as I think about it, I believe this issue, I think I can give some context.
I think this issue at some point during that ten years had come up in Congressional Q and As, and I was responsible for drafting responses to those, and that certainly would have given me the opportunity to talk about the issue that was raised at that level, both the issue and potential pass-forwards in developing an answer.
And the more I think about it, that probably was the catalyst for those discussions.
Q. Do you recall what views, if any, your superiors expressed to you on this issue?
A. The best way to do that would be to, to go back to the record, public record of how we responded to those Congressional, Congressional answers, and you can certainly



compare that public record with how I have just testified and see if there is any difference, but I think it was pretty consistent.
That's my recollection.
MR. NESLIN: Let's take a five-minute break.
(A recess was taken.)
BY MR. NESLIN:
Q. Mr. Brownstein, if I could ask you to look back to Exhibit 1, which is the contract?
A. Okay.
Q. And I'll refer you to page Bates number ADM-001-0652?
A. Okay.
Q. First column, second paragraph, begins Article VI.B.3.(b)?
A. Um-hm.
Q. Would you read that paragraph?
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. NESLIN:
Q. You're familiar with this --
A. Yes.
Q. Language; and the next to last sentence referring to priority for shutdown

reactors states that this type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity.
Was that a goal of the Department of Energy?
MR. BANES: Objection -- vague.
THE WITNESS: I think it was, it was a goal consistent with other goals that I testified to.
BY MR. NESLIN:
Q. One of the department's objectives consistent with other objectives was to avoid the need for shutdown reactors to wait 20 or 30 years to be decommissioned?
A. Again distinguishing the goal from the contractual commitment, yes.
Q. What did the department do to achieve this particular goal?
(The witness reviewed the document.)
BY MR. NESLIN:
Q. Mr. Brownstein, are you looking for the exchange provision of the contract?
A. No.
(The witness reviewed the document.)



THE WITNESS: I'm looking under, I believe in how we addressed the language that you just referred me to, which was in the preamble of the contract which doesn't have a contract, we need to go back to the contract, and under Article VI.B.1.(b), it says notwithstanding the age of the SNF and/or HLW, priority may, and I'm underscoring the word may, be accorded to any SNF and/or HLW removed from civilian nuclear power reactor that has reached the end of its useful life or has been shut down permanently for whatever reason.
BY MR. NESLIN:
Q. So the department included this provision in the contract.
In your opinion, did the department, has the department done anything else to try to achieve the goal of avoiding the need for shutdown reactors to wait 20 or 30 years to be decommissioned.
MR. BANES: Objection -- vague, irrelevant.
THE WITNESS: The federal government is trying its utmost to follow the statutes and develop, and consistent with the statutes, a



deep geologic disposal facility as rapidly as the law, the courts, and the budget allow, and the regulatory authorities.
BY MR. NESLIN:
Q. No such facility is in place today, correct?
A. That's correct.
Q. And no such facility is expected to be operational for at least eight years, is that correct?
MR. BANES: Objection. Calls for speculation.
THE WITNESS: Not necessarily.
BY MR. NESLIN:
Q. What do you mean by not necessarily?
A. There are conditions that I can envision where that could be advanced.
Q. How would that date be advanced?
A. The Congress could authorize additional funds.
The repository could be constructed in a modular fashion.
There's any number of ways and conditions that with changing circumstances, that could advance.



Q. Is the department currently pursuing those options?
A. The department is certainly evaluating such things as modular construction.
The department every year for as long as I can remember has requested funds for the program, never of which the Congress has fully funded.
Q. Has the department received requests for priority from any shutdown reactors?
A. You have to refresh my memory. We may have gotten a formal request from the company you're representing.
I don't specifically recall. You probably can show me a letter.
Q. Do you recall sitting here today whether the department has received any request for priority from a shutdown reactor?
A. I don't recall, but that doesn't mean that we didn't.
(Brownstein Exhibit No. 63 was marked for identification.) ^
BY MR. NESLIN:
Q. Mr. Brownstein, Exhibit 63 is a

Thank you.
A. Okay.
Q. Are you familiar with the activities of the Monitored Retrievable Storage Commission in 1989?
A. I was aware of it, had some familiarity with it, yes.
Q. What was their responsibility?
A. Their responsibilities were laid out by statute, and I would rather not speculate.
I would rather go back to the statute to do that.
Q. Okay. Did you review, were you -- strike that.
Were you aware of the fact that the Monitored Retrievable Storage Commission issued a report in November of 1989?
A. I have a recollection of that.
Q. Did you review their report after it was issued?
A. I would like to be able to see the report in order to answer your question.
Q. Okay. I would like to have marked as Brownstein Exhibit 69, a document entitled, "Nuclear Waste: Is There a Need for Federal



Interim Storage? U.S. Monitored Retrievable Storage Review Commission Washington D.C.," November 1989.
Bates number, starting Bates number is PA-172230, and I will represent for counsel and the witness that in the interests of saving my strength, I have only printed out the first 26 pages of the document, which consists of the summary of the conclusions and recommendations.
If you need to look at the entire document, which is lengthy, I'll be happy to provide you with a copy of that. Okay.
(Brownstein Exhibit No. 69 was marked for identification.) ^
BY MR. HANDWERKER:
Q. And I will tell you in advance, Mr. Brownstein, you can look at whatever amount of this document you need to refresh your recollection, but I'm going to focus all of my questions on, on the conclusions that are in the front.
(The witness reviewed the document.)
THE WITNESS: I believe that I, I did read this document back then.



BY MR. HANDWERKER:
Q. Okay. Take a look if you would at the page marked with the letters xvi at the bottom.
It's Bates number PA-172244.
A. Okay.
Q. And at the bottom of the first column, under conclusion No. 4, do you see the statement that the schedule linkage presently in the Nuclear Waste Policy Act -- strike that.
The Nuclear Waste policy Amendments Act, open paren, MRS construction may not begin until the Nuclear Regulatory Commission issues a license for the construction of a repository, close paren, would make it impossible for an MRS to be operational more than three years before the repository.
Do you see that?
A. Yes.
Q. Do you agree with that conclusion?
MR. BANES: Objection -- lack of foundation.
THE WITNESS: I'm not, my responsibilities, you know, within RW did not include working on the MRS in terms of technically how you would construct one or how



it would work, so I have no independent basis on which to say I agree or I disagree.
BY MR. HANDWERKER:
Q. That's fair enough. Did you discuss that conclusion with anyone within the Department of Energy that you can recall?
A. To get clarity of this was an accurate statement or not?
Q. Yes. Yes.
A. No. I wouldn't have a basis to challenge the commission.
Q. At this time, in November 1989, is that around the time that the DOE Secretary issued the report, the 60-day report reassessing the nuclear waste program?
A. My recollection is that that 60-day report was issued in '89.
I don't recall when in '89.
Q. And that report, the 60-day report, delayed the opening of the repository from 2003 until 2010, is that correct?
A. I believe that's correct.
Q. And three years prior to 2010 is 2007 obviously, right?
A. That's the way the math works.

Q. Is that the -- you're right.
A. Sorry.
Q. It's pretty obvious. Is that the basis for the inclusion of the 2007 date in the subsequent ACRs that we looked at earlier for the date on which facility operations could begin if the scheduling linkages were not modified or repealed?
MR. BANES: Objection -- lack of foundation.
THE WITNESS: Please show me the statement you're referring to in the ACR.
I'm trying to answer your questions.
BY MR. HANDWERKER:
Q. Take a look at the 1991 ACR, which is Exhibit 30, and in particular, in Brownstein Exhibit 30, could you take a look at page 4, which is Bates Number HQR-001-2365?
A. Okay.
Q. And in the second paragraph, the last sentence which reads, we discussed earlier, if the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and



initial acceptance of SNF by the Department of Energy could not start until at least 2007?
A. Yeah. That's my recollection. That's consistent, so I agree.
Q. Okay. So if the siting linkages between MRS facility construction and repository construction authorization are maintained, then facility operations and initial acceptance of spent nuclear fuel by DOE cannot start more than three years before repository, repository operations start, is that correct?
MR. BANES: Calls for a legal conclusion.
Go ahead.
THE WITNESS: My understanding is the law would have to change on this.
We were following statute.
(There was a pause in the proceedings.)
MR. HANDWERKER: I would like to have marked as Brownstein Exhibit No. 70 a document entitled, "Civilian Radioactive Waste Management Program Plan Volume 1" dated I think December 19th, 1994. Yes.
That is as referenced on the second



page.
It's got the U.S. Department of Energy seal on it, and the first Bates number is SN174276(D) and the final Bates number is SN174362, and I will represent for counsel and for the witness that I have provided to you Volume 1, which is the program overview.
There are two additional volumes.
(Brownstein Exhibit No. 70 was marked for identification) ^
BY MR. HANDWERKER:
Q. Take as much time as you need to familiarize yourself with the program plan, which could take years, right?
Let me ask you as a starting point to help you out do you recognize this document as the December 19th, 1994 program plan?
A. Yes.
Q. And did you review this document at or about the time it was released?
A. I reviewed parts of the document.
Q. Okay. The parts of the document that you reviewed, were they interspersed throughout the program plan, or were they focused on any



particular part?
A. As I recall, they were in a number of different sections, not in one location.
Q. Okay. Did you play any role in preparing any parts of the program plan?
A. I believe that I did.
Q. Which parts did you play a role in preparing?
A. In order to answer that question, I would need to go and look through it.
Q. Okay. Maybe -- go ahead.
A. Those, those sections that describe activities then under my responsibility at the time, which I would have to then look through and show, and that's for preparing, and then I reviewed, you know, other sections as well.
Q. Okay. Maybe when I asked my questions about particular parts, that might help focus on those parts of the program plan that you did prepare.
Okay?
A. I would rather do it that way.
Q. That's fine. Take a look if you would at page X -- I'm sorry. Strike that -- ix -- my Roman Numerals are terrible -- which is Bates

1
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - X
Washington, D.C.
Thursday, May 23, 2002

Deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Thursday, May 23, 2002, the proceedings being taken down by Stenotype by JAN A.



WILLIAMS, RPR, and transcribed under her direction.

APPEARANCES:

On behalf of the Plaintiffs:
JERRY R. STOUCK, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5800

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQ.
RUSSELL A. SHULTIS, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W., Room 12128
Washington, D.C. 20530
202-305-9640



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| ALAN BROWNSTEIN | PLAINTIFFS |
| By Mr. Stouck | 4 |

Afternoon Session - Page 143


E X H I B I T S


| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 77 - Condensed testimony of Alan Brownstein, pages 1 through 781 | 6 |
| 78 - Memo dated 7/23/84 with attachments | 37 |
| 79 - Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting, December 12-15, 1983 | 42 |
| 80 - Memo dated 4/8/83 with attachments | 55 |
| 81 - Proposed Rules, Nuclear Regulatory Commission, 10 CFR Part 61, Disposal of Radioactive Wastes, 5/18/88 | 81 |
| 82 - U.S. Department of Energy, Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste | 157 |




P R O C E E D I N G S

Whereupon,

ALAN BROWNSTEIN,

was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL
FOR PLAINTIFFS

BY MR. STOUCK:

Q. Good morning, Mr. Brownstein. I'm Jerry Stouck, we met briefly before the deposition started. I represent three utility companies in this litigation, Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company.

And I know you have some familiarity with the litigation because you were deposed for three days I think in the so-called common proceedings. I want to start by asking you some questions about your prior testimony just for clarification.

A. Sure.

Q. And maybe some supplementation. So I'm going to hand you and I think we'll mark as -- well, hold on. We're going to start numbering the exhibits

Q. What about the criteria the department would use for approving or disapproving exchanges?
A. That would be something that, you know, the utilities I think would want to understand and work with us on. Without that we were prepared as we did move ahead. We were just trying to do it in a more cooperative fashion. That's my best recollection.
Q. Okay. Well, look at this testimony at the bottom of page 290. You know, maybe I'm misinterpreting, but I thought what you were saying there was that, if you went -- it says, if you went through the entire process, it's conceivable a market could have developed of which DCSs had some value amongst the utilities and those trades occur and subsequent to that a or several utilities change the data on which allocations were based could have caused perturbations really to the utilities, some to us. That's an example. Do you see that?
A. Yes, I do.
Q. So I took that to mean that your expressing the view that, in order to either eliminate or minimize the prospect that the data on which -- I really took that to mean, and maybe this is -- this is what I'm asking about, to mean if the



data on which the exchanges were based might change later, it would be better to have data on which the exchanges were based tied down before the exchanges.
A. That's what I was referring to here. This was referring back to the RW-859 data that the utilities submitted to us. We used that utility submitted data as a basis for consistency in setting the queue.
We tried to get the utilities to take that very seriously before we set the APR because, if for other reasons that were to change in the future, that would have perturbated the -- that could have perturbated the DCS process.
Q. And just give me an understanding of the word perturbated?
A. It would have cause difficulties. That's how I'm --
Q. Okay.
A. I mean I'll try to give you an example. You know, there's a certain order that was set and then a utility came in and said, subsequent to the issuance of the APR, oh, that's not the real data, here is the real situation. And it means that we -- utility A advances now in the queue because they have given us a different date of final discharge, that



would have caused some difficulties.
Q. Well, was one option just to say, sorry, Charlie, you're stuck with the APR as it was originally issued?
MR. CRAWFORD: Objection, vague.
THE WITNESS: There were a number of options. That was one. Another option as I recall is that we could have left some excess -- not allocated the full capacity to allow those situations. We viewed that as really an equity issue. I mean, from the department's perspective, who we took fuel from mattered relatively little.
It mattered a little bit, if you want to go into -- but very little. This was really an equity issue among utilities. And that's why I thought it was advantageous to utilities to try to come together on these because they dealt with these equity matters.
BY MR. STOUCK:
Q. Okay. Thank you. How does the concept of reinsertion of fuel fit into this. Do you understand the term?
A. Yes.
Q. Because my understanding was, and maybe tell me if this is correct, was that consistent with



the APR process that was ongoing and contemplated by the contract, the DOE would make adjustments from time to time in the queue, if you will, the APR ranking, based on reinserted fuel; is that right?
A. Yes. And that was -- as I recall that was one of the issues. To get in the queue, it had to be based on the date of final discharge. Utilities could have, you know, subsequent to its, you know, final discharge date decided for other reasons to reinsert that fuel. And then that fuel which created the place in the queue was no longer -- no longer there. So what do we do. That was an issue.
Q. Was that issue ever resolved?
A. To the best of my recollection somewhere, whether it was in the APR or some instructions, I think we addressed it. I don't recall offhand, but I think we addressed the subject. I don't remember the details. It was published, whatever we did.
Q. Now, you said earlier, when we were talking -- when we were discussing exchanges, that you were aware or the department was aware that these approved DCSs had different value to different utilities?
A. Well, what I said was could have.
Q. Okay. What do you mean by that, why did

you have an understanding, why did the department have the understanding that the approved DCSs could have different value to different utilities?

MR. CRAWFORD: Objection, compound; and objection, vague; objection, foundation.

THE WITNESS: If you take two utilities that had, you know, different places in the queue, their situations on, for instance, their cost of storage could have been different. I'll give you a couple of examples.

Maybe one utility had an early allocation that would have been easy for them to rerack or, you know, they had already made the capital costs for a storage facility or had excess storage capacity within their pool.

The value -- we believed the value of that place in the queue to that utility was less than a utility that, if they did not receive the services in that particular year, they would have had to make a major capital expense. So you can see a natural imbalance to the utilities themselves and the value of receiving fuel at any particular time.

And, if there was that imbalance, we assumed, certainly the contract allowed for, you know, a market to develop. And we were going to then



be a part of that because the contract required us to approve it, when the government has to approve it.

We wanted to be careful how we, quote, interfered with the marketplace. And there were these issues, these technical issues that, if we resolved together, would have -- again, since these were primarily equity issues, not issues of key importance to us, we wanted to do as little as possible in interfering with the market. That was my rationale in how these -- how this subject developed.

BY MR. STOUCK:

Q. And that was a subject that you, that being a subject of exchanges of DCSs, approved DCSs, that was something you certainly had responsibility for?

A. Yes.

Q. And you wanted to be careful in not interfering too much with this marketing DCS exchanges because, as a general proposition, you know markets are good, you wanted to allow the utilities to pursue presumably their self interest in making economic exchanges; is that what was behind it or was there something else behind it?

MR. CRAWFORD: Objection, compound.

THE WITNESS: Markets are efficient. And



the efficiency of that market increases with the amount of information that's available. Whether it be the -- who has got what place in the queue or how the rules are going to be interpreted and applied.

It's one of the reasons we did some -- we went out of our way. When we decided to move forward with the APR process, we did something very strange I think. We went out and published a draft APR and sort of alerted to the utilities as best as we could, hey, we're going to do this, please take a serious look at this.

We tried to do everything we could that the department would minimize its interference in the markets. I hope that's responsive to your question.

BY MR. STOUCK:

Q. That's very responsive. But I guess we're still left with the fact on this same subject that there were these -- it's my understanding that this ACR issue resolution process, and my recollection is 34 or maybe 36, but some number like that, those issues were never resolved, at least many of those issues were never resolved?

MR. CRAWFORD: Objection, overbroad.

THE WITNESS: First of all of those, whether it was 34 or 36, did not -- were not



associated with this particular issue. Let me see. There's another part of the question.

BY MR. STOUCK:

Q. There was some number, yeah. You did what you could with the APR in terms of getting information out to as I understand your testimony sort of lay the groundwork, if you will, to the extent possible for an efficient market mechanism?

A. That was certainly our motive.

Q. Okay. That was your motive in getting this APR out, at least getting the APR out for comment and making sure people took it took seriously, took their obligations to give you the best data you could getting the RW-859s?

A. Right.

Q. But nonetheless, notwithstanding that motive and those actions with respect to the APR, there were, were there not, some number of issues in the issue resolution process that did have a bearing on exchanges or at least could that were not resolved, right?

MR. CRAWFORD: Objection, vague, overbroad.

BY MR. STOUCK:

Q. Is that right?

paragraph, if a purchaser intends to deliver other than standard fuel, the purchaser must submit proposed handling and shipping procedures, and it goes on. So there is where the assumption is made. And then it became the purchasers' responsibility; if they wanted to deliver something other than standard, that the burden would be on them.
Q. At what point in time?
MR. CRAWFORD: I'll object, best evidence.
BY MR. STOUCK:
Q. To provide the appendix E information?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: Subsequent to the DCS.
BY MR. STOUCK:
Q. And do you know whether it was required to be prior to the FDS?
MR. CRAWFORD: Wait a minute. What was that question? Would you read it back, please.
THE REPORTER: "Question: And do you know whether it was required to be prior to the FDS?"
MR. CRAWFORD: Okay. No objection. Yeah, objection, best evidence.
THE WITNESS: I don't think we were more specific -- I don't recall that we were any more specific than what's indicated in 7H.



BY MR. STOUCK:
Q. Okay. Were there ever similar or comparable instructions given to the purchasers regarding completion of final delivery schedules?
A. There were not.
Q. Why is that?
A. At least through March of '95, we were just in the DCS process, in the very -- I mean in the very early stages of addressing FDS issues.
Q. Do you know whether subsequent to your leaving FDS instructions were finalized and given to the purchasers?
MR. CRAWFORD: Objection, calls for speculation.
THE WITNESS: To the best of my knowledge, they were not.
BY MR. STOUCK:
Q. Okay. Now, on page 27 C of these instructions please, Exhibit 34, take a look at that for a moment.
A. Yes. Okay.
Q. It says in the second sentence the process described herein assumes -- well, strike that.
Let's go actually up to 7A and take a look at 7A for a minute. I've got a question about the



last sentence.
A. Okay.
Q. In this last sentence, quote, due to the limited annual acceptance capacity of the FWMS, federal waste management system that stands for?
A. Yes.
Q. Continuing on, reading, only DCSs submitted by purchasers with an allocation in the delivery year will be considered for approval, parentheses, e.g., in order for a purchaser to have a DCS considered for approval for delivery in 1998, the purchaser must have an allocation in 1998, correct?
A. Yes.
Q. Okay. Must have an allocation as shown in the ACR, APR, current at the time of submittal of a delivery commitment schedule, is that what this means?
A. In the APR, yes. Well, in one of those documents, yes.
Q. Right. Okay. Whichever one was current at the time?
A. Yes.
Q. Okay. And so here, in C now, it says, in the second sentence, the process described herein assumes that the FWMS will be able to accept the



purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the 1991 ACR, right?
A. Yes.
Q. Okay. Next sentence, in the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the purchasers. Do you see that?
A. I do.
Q. Those circumstances have changed, right?
A. Yes.
Q. Okay. In other words, DOE did not -- was not able to or in any event did not begin accepting purchasers' SNF beginning in 1998, right?
A. Yes.
Q. And it follows that then that DOE did not begin accepting fuel in 1998 according to the acceptance rate reflected in the '91 ACR, right?
A. Yes.
Q. Okay. So, in light of those changed circumstances, do you have an opinion whether DCSs previously approved by DOE need to be reevaluated by DOE and the purchasers? This sentence says may. I'm asking you whether in your view they need to be?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion; objection, asked and

answered.
THE WITNESS: I would think that we would, I would think both sides would want to do that.
BY MR. STOUCK:
Q. Okay. Why would you think that?
A. We're going to jump from the time period we're talking about to today, for example? Let's not do this year by year. Let's talk about the utilities.
If the utilities had submitted and gotten approved DCSs, and let's say they were very specific about the fuel that they wanted to deliver. Their situation and views on what they want to deliver to us could have substantially changed. And it seems to me that that should give you -- we should in my opinion give the utilities another opportunity to review and see if that's same fuel.
And I especially feel that way because the department has not, you know, procured casks. I may feel differently if casks had been purchased based on that information as an example.
Q. Okay. As an example would you agree with the categorization that that would be a kind of updating of the DCS information to deal with current circumstances?



MR. CRAWFORD: Objection, vague.
THE WITNESS: I think both sides --
MR. CRAWFORD: And to the extent it calls for a legal conclusion.
THE WITNESS: I think both sides should have the opportunity to update that information.
BY MR. STOUCK:
Q. And you gave me an example of a reason why utilities should be given the opportunity?
A. Right.
Q. Can you give an example of reasons why DOE should be given the opportunity to update that information to deal with current circumstances?
A. The department may have better information on the rate or the timing, both of which I would think would influence utilities' decisions.
Q. Right. Well, you recall that the '91 -- excuse me, the '91 ACR -- do you recall the rate in the '91 ACR?
A. No.
Q. This has been previously marked as Exhibit 30. It's the '91 annual capacity report. I have a copy for you and your counsel. You know where to look for the rate, right?
A. Yes.



Q. Page 5. This was the so-called or I'll call it 400, 600, 900, and then 900 steady state rate, right?
A. Right.
Q. And so that is not the acceptance rate that is specified in DOE's current planning documents; is that correct?
MR. CRAWFORD: Objection, vague.
THE WITNESS: I believe you're accurate.
BY MR. STOUCK:
Q. Okay. The current planning documents for the program indicate an acceptance rate that ramps up to a steady state of 3,000 tons per MTU per year?
MR. CRAWFORD: Objection.
THE WITNESS: I don't recall what the rampup rate is, but the steady state I believe is 3,000.
BY MR. STOUCK:
Q. Okay. And so presumably, according to your testimony earlier today, those current planning documents are DOE's current best estimate of what the acceptance rate will be when the program actually starts, correct?
MR. CRAWFORD: Objection, vague; and objection to the extent it mischaracterizes prior



testimony.
THE WITNESS: I believe that's accurate.
BY MR. STOUCK:
Q. Okay. And so that change in projected acceptance rates, is that another reason why in the language -- why in your view, in the language of paragraph 7C of the instructions, Exhibit 34, all DCSs previously approved by DOE need to be reevaluated?
MR. CRAWFORD: Objection to the foundation; objection, asked and answered; objection, vague.
THE WITNESS: I use that as an example. So I agree.
BY MR. STOUCK:
Q. Okay. You used the acceptance rate change as an example?
A. Yes.
Q. We have now got it in more detailed form on the record.
A. That's fine.
Q. Do you expect that others in RW would share your views about this need to reevaluate previously approved DCSs in light of changed circumstances as the instructions contemplate?

246

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Friday, June 14, 2002

Continued deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Friday, June 14, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs:
JERRY R. STOUCK, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5800

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQ.
RUSSELL A. SHULTIS, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W., Room 12128
Washington, D.C. 20530
202-305-9640



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| ALAN BROWNSTEIN | PLAINTIFFS |
| By Mr. Stouck | 250 |
| | DEFENDANT |
| By Mr. Crawford | 437 |
| Afternoon Session - Page 377 | |


E X H I B I T S


| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 83 - Defendant's Witness List | 251 |
| 84 - Withdrawn by counsel | 259 |
| 84 - Preliminary Draft, DCS Review Process, 10/13/92 | 261 |
| 85 - Letter dated 12/22/92 with attachments | 272 |
| 86 - Letter dated 3/13/97 | 290 |
| 87 - Letter dated 9/25/92 with attachments | 294 |
| 88 - Letter dated 12/1/92 with attachments | 298 |
| 89 - Attachment | 304 |
| 90 - Letter dated 1/7/93 with attachments | 307 |
| 91 - Letter dated 4/8/93 with attachments | 308 |
| 92 - Informal Memorandum | 321 |
| 93 - Letter dated 4/28/93 | 328 |
| 94 - Agenda for Conference Call with DOE on Delivery Commitment Schedules, 5/12/93 | 333 |





| | |
|---|---|
| 95 - Memo undated | 334 |


E X H I B I T S (Continued)


| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 96 - Memo undated | 334 |
| 97 - Memo dated 6/14/93 | 340 |
| 98 - Letter dated 6/10/93 | 366 |
| 99 - Letter dated 7/15/93 | 368 |
| 100 - Memo dated 7/8/93 | 370 |
| 101 - Letter dated 7/26/93 with attachment | 372 |
| 102 - Letter dated 2/4/92 | 377 |
| 103 - Letter dated 4/6/92 | 380 |
| 104 - Letter dated 4/25/94 with attachment | 382 |
| 105 - Letter dated 9/28/95 | 383 |
| 106 - Memo dated 3/28/91 with attachments | 408 |
| 107 - Questions for Senator Mathews | 410 |
| 108 - Letter dated 10/19/90 with attachment | 413 |
| 109 - Letter dated 8/22/91 with attachment | 419 |

Q. Do you recognize this document, Mr. Brownstein?
A. I don't recall ever seeing this one.
Q. This is a document that says at the top Preliminary Draft, DCS Review Process, 10/31/92. Do you know if there was written guidance that was ever approved by your office regarding the manner in which delivery commitment schedules should be reviewed?
MR. CRAWFORD: Objection, vague.
THE WITNESS: I just don't recall.
BY MR. STOUCK:
Q. Okay. One way or the other?
A. We obviously went through approving and in some cases disapproving. So I'm sure we had criteria. But I don't recall the document or a document.
Q. Okay.
A. I couldn't point to a document and say this was it. There must have been something, I just don't recall.
Q. Okay. Well, now you don't recall it. But, when you say there must have been something, why is that, is that because you have written guidance on everything, why do you say there must have been something?

262

MR. CRAWFORD: Objection, asked and answered. Let me just say, objection, answered.
THE WITNESS: We went through a process of having to determine whether we're going to approve or disapprove the DCSs. I would have had criteria. I don't recall what kind of document it was.
BY MR. STOUCK:
Q. What was your personal involvement, the nature of your personal involvement in the process of approving or disapproving DCSs?
A. I believe that for a period of time I signed as the approval of DCSs, I mean we testified to this before, as the COTR, the contracting officer's technical representative. So in essence I was the approval or disapproval official for the program.
Q. When I spoke to Mr. Williamson, I deposed Mr. Williamson, Doug Williamson, he told me that he would review these DCSs. And he up through his management I guess made recommendations to the Department of Energy about approval or disapproval. Does that sound right?
A. TRW as a contractor was our support in that area. When you say Doug Williamson, at my level it was Billy Cole, I reported to Billy. So the TRW

263

family would make recommendations after their review, I do recall that.
Q. That's what he said, he would send them up to Billy Cole and Billy Cole would send them up to you. When I asked about the nature of your involvement, I do recall that you testified that you signed as the technical representative.
But what would land on your desk, would an approval -- you know, some document that says we recommend approval, or what would you actually do before you signed that piece of paper, you know, what kind of substantive involvement would you have in this approval or disapproval process, if any?
A. I don't specifically recall now. I may have had my staff review the TRW work. The things that would get my attention were those where it required or was suggesting a disapproval. So I would recall, you know, particularly focusing on that.
If they were recommended for approval, you know, I would probably read it over, you know, make sure -- you know, I would do a cursory review. That was not true for disapprovals, disapprovals received a lot more attention.
Q. Approvals were done on a relatively routine basis, is that what you're saying?

264

MR. CRAWFORD: Objection.
THE WITNESS: Right.
BY MR. STOUCK:
Q. They didn't call for attention at your level?
MR. CRAWFORD: Objection, vague.
BY MR. STOUCK:
Q. That seems to be what you're saying?
A. That's correct.
Q. Now, in this document that you're looking at, No. 84, near the bottom there's a new paragraph. It says WA, which is defined above in the second line as waste acceptance, will then enter the DCS into the processing and approval system, parentheses, PAS, database. Do you see that?
A. Right.
Q. Do you know what that is?
A. I vaguely recall, that was a -- that was a TRW database. It wasn't a DOE database.
Q. Did you have access to it?
MR. CRAWFORD: Objection, vague.
THE WITNESS: If I wanted it, I probably did.
BY MR. STOUCK:
Q. Did you ever use it?

265

MR. STOUCK: Can we mark this as whatever the next number is.
(Brownstein Exhibit No. 86 was marked for identification.)
BY MR. STOUCK:
Q. This is a letter from Beth Tomasoni, contracting officer, to Mr. Lee Hill at Northeast Utilities, March 13, 1997. I appreciate that this is after the period when you stopped working directly on waste acceptance matters. But the first sentence here says, the Department of Energy has received your delivery commitment schedules submitted pursuant to Article V.B of the standard contract. And then it says, the department at this time is not able to approve your DCS submittal. Do you see that?
A. Yes.
Q. Do you know why the department was not able at that time to approve the DCS submittal?
MR. CRAWFORD: Objection to the lack of foundation and to the extent it calls for speculation.
THE WITNESS: I wouldn't have a basis to answer the question. I don't know.
BY MR. STOUCK:
Q. Do you know whether a decision was made

290

within RW to across the board respond to DCS submittals in this way; in other words, to just say that the department is not able to approve?
A. I don't know.
MR. CRAWFORD: Objection, asked and answered, lack of foundation, and to the extent it calls for speculation.
Now give your answer.
THE WITNESS: I have no idea.
BY MR. STOUCK:
Q. You were not involved in any such decision?
A. No.
Q. And you wouldn't know the basis for any such decision if it was made?
A. I have no idea.
Q. Okay. Thank you. And would you give the same answers if I asked you if you knew whether such a decision had been made to not approve final delivery commitment schedules; in other words, if the department was regularly in the practice of sending out letters in response to final delivery schedules that said we are not able at this time to approve, you don't know if that was their practice or not; is that right?

291

MR. CRAWFORD: Let me object to the vagueness; and, based on his prior testimony, I'll object to foundation.
THE WITNESS: I really have no idea. I mean I had other responsibilities.
BY MR. STOUCK:
Q. If such a decision was made, it wasn't made while you were in waste acceptance?
A. That's correct.
Q. And you don't know if the decision was made or not?
A. I do not know.
Q. And wouldn't know any basis for a decision if it was made?
A. Right.
Q. Okay. Thank you. You referred earlier I think, maybe I referred earlier to the fact that -- well, let me just ask this, do you recall that the department disapproved some delivery commitment schedules that had been submitted by Yankee Atomic Electric Company?
MR. CRAWFORD: Objection, vague; objection, foundation and to the extent it calls for speculation.
THE WITNESS: Yes.

292

BY MR. STOUCK:
Q. And do you recall the reasons or reason why those delivery commitment schedules were disapproved?
MR. CRAWFORD: Objection, vague, overbroad, lack of foundation, best evidence.
THE WITNESS: I would rather review the document. But, without reviewing the documents, my recollection is that they asked for DCS approval for greater than their allocation.
BY MR. STOUCK:
Q. Okay. I'm going to show you some documents, I'm not hiding them from you. But before we do that, though, what was the nature of your involvement in the department's consideration of whether or not to approve those delivery commitment schedules that requested acceptance of more than an allocation?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: Well, I'm not sure really what you're asking. I was involved, I recommended disapproval of the DCS, you know, I talked with my management about it, talked with procurement about it, I know that there were meetings with Yankee

293

people who came down. There were as I recall exchanges of letters. So I was extensively involved with that.

BY MR. STOUCK:

Q. Did you attend meetings?

A. Yes.

Q. With Yankee people?

A. Yes.

MR. CRAWFORD: Why don't we take a break before the next exhibit.

MR. STOUCK: Let's go off the record.

(Recess.)

(Brownstein Exhibit No. 87 was marked for identification.)

BY MR. STOUCK:

Q. Mr. Brownstein, you've been handed what's been marked as Exhibit No. 87. This is a letter from R. M. Grube on Yankee Atomic letterhead to DOE contracting officer dated September 25, 1992. Have you seen this before?

A. Yes.

Q. You would have seen this at about the time or after the time it came in?

A. Yes.

Q. How did this come to your attention?

294

A. Well, I'm on the cc list. So sometimes utilities put me on the cc, sometimes I would get it from the contracting officer.

Q. Could I see that. So a copy came directly to you of RW-432?

A. Right, in this case.

Q. Do you recall whether prior to -- and the substance of this is that they're submitting delivery commitment schedules. It says, quote, please note that because the Yankee Nuclear Power Station is permanently shutdown and to facilitate decommissioning, we are requesting that DOE accept all of the spent nuclear fuel in storage at the station over a three year period starting in 1998 as indicated on the DCSs, close quote. Have I read that correctly?

A. Yes.

Q. Okay. Do you recall whether prior to receipt of this correspondence there were discussions between Yankee and DOE about priority acceptance for its spent fuel?

A. I don't recall.

Q. One way or the other?

A. Right. I mean there were discussions. But, in terms of whether it was before this date or

295

after this date, I don't recall that.

Q. Okay. What did you do when you got a copy of this correspondence? And I'm trying to find out, there were discussions, there's a lot of correspondence, we're going to look at that. But I'll trying get a very detailed understanding of exactly how you, Alan Brownstein, responded to or reacted to this letter. What did you do?

A. Are you asking how I reacted or how I responded?

Q. Well, if there's a difference, tell me both.

A. Well, how I responded, I have to go back to whether there are notes that I took. I mean I kept and turned in -- you know, when I had discussions with utilities, I generally wrote them down. And that's part of the record somewhere. And how I specifically responded I don't recall.

How I reacted, I mean I recall that which is clearly they were requesting approval of a DCS that went beyond their allocation. And that was a cause of concern.

Q. Okay.

A. And I don't recall now whether, you know, the flow of paperwork from, you know, the review from

296

TRW, whatever, I mean I knew this was a problem as soon as I saw the letter.

Q. Problem in the sense that it very well could be a basis for disapproval?

A. Yes.

Q. Okay. Well, had a decision been made prior to this time that it would be a basis for disapproval? In other words, I believe the instructions and other documents that we've looked at indicate that the DCSs were to be filled out in such a manner that they matched the allocations in the ACR.

So I mean, at the time this letter came in, was it fairly clear that it was going to be a basis for disapproval or rather was it something that, you know, might well be disapproval, was open to consideration, and let's review this issue?

MR. CRAWFORD: Objection, best evidence.

THE WITNESS: In my mind, and again I do recall that there were, you know, a lot of correspondence again which I have not reviewed. But no, I knew that this was going to be -- you know, when I reviewed it, it was going to be a basis for disapproval.

BY MR. STOUCK:

297

Q. Because a decision had been made prior to this time that the DCSs had to match the allocations?
A. Yes. And I think we were clear -- or as I recall we were clear in that whether in the general or specific instructions. I mean it certainly would not have been a surprise to anyone.
MR. STOUCK: Let's mark this as No. 88, please.
(Brownstein Exhibit No. 88 was marked for identification.)
BY MR. STOUCK:
Q. Okay. Here is a letter that has been marked as Exhibit No. 88, Mr. Brownstein. This is from Linda Strand, contracting officer, to Mr. J. M. Buchheit, Yankee Atomic Electric Company. And it looks like it's dated December 1, 1992, with a received stamp a couple of days or a few days later.
Anyway this is the response to Exhibit No. 87, right? It looks like that?
A. Yes. I just want to a chance to read it.
Okay.
Q. This is a response to the prior exhibit; is that right?
A. Yes.
Q. What involvement did you, Alan Brownstein,

298

have in the preparation of this letter?
MR. CRAWFORD: Objection, vague.
THE WITNESS: At a minimum I reviewed and concurred in it.
BY MR. STOUCK:
Q. Okay. Do you recall anything else?
A. My recollection is that Nancy and I talked rather extensively about it. I think she did the legwork of putting the draft together. I know we discussed an awful lot and then submitted it to -- I suppose we submitted it to our management and then to the contracting officer. So there was time spent on the letter.
Q. When you say submitted to your management, is there a specific individual that that is a reference to?
A. Whoever -- I'm trying to think of who I reported to at the time. I think at this time I probably reported to Jim Carlson. And I probably went to one management chain above that. You know, I don't specifically recall. I know I didn't -- I acted in concert -- I made sure my management was aware of this issue.
Q. And who was one level above Carlson at that time, do you recall?

299

A. I think it was Milner.
Q. Okay. Let's just assume it was Carlson and Milner and obviously we can check that with the charts. But, just for purposes of this discussion, whoever those people were, you went up one level for sure and maybe two?
MR. CRAWFORD: Well, I'll object, asked and answered and to the extent that mischaracterizes what he said.
THE WITNESS: My recollection is that I would have gone -- if, in fact, using the assumption that Carlson was my first line supervisor at the time and Milner was my second, I clearly would have discussed it with both of them, if that was the organizational chain at the time.
BY MR. STOUCK:
Q. What if it was different people? I mean is there something about those two individuals --
A. Well --
MR. CRAWFORD: Well, then I'll object to the mischaracterization of his testimony. I think he went ahead and assumed that. And that was based on the position, not the people.
BY MR. STOUCK:
Q. That's my question. Was it the position

300

or the people? I mean if there were different people there, you might not have gone to both of them?
A. No. Actually I don't recall how high this one got. It's conceivable this one could have gotten above Milner.
MR. CRAWFORD: That was the basis of my first objection, was that he didn't recall.
THE WITNESS: In terms of why I said that about Milner, I've worked closely with Milner since the first day I have been there. And there was frankly little -- when there were decisions to be made, you know, he served a long time as my mentor. I would have discussed these things with him.
BY MR. STOUCK:
Q. Okay. Did this letter, Exhibit No. 88, get more review by your management than other disapproval letters, DCS disapproval letters?
MR. CRAWFORD: Objection, vague.
THE WITNESS: It got more review by me. And, because it was a disapproval, and I can't recall if this was the first disapproval or not, you know, my management, I just can't recall how many chains up, you know, were aware of it and probably reviewed it too.
BY MR. STOUCK:

301

Q. And, on the prior page, when you're describing again -- I apologize, I've only got the one copy of this. But it says that the acceptance rates in table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation. Do you see that?
A. Yes.
Q. Do you know why the entire 10,000 MTU capacity limit was not allocated over the ten year period?
MR. CRAWFORD: Objection, best evidence; objection, asked and answered many times.
THE WITNESS: I don't recall. I was asked that. I don't recall.
BY MR. STOUCK:
Q. Again I'm sorry, I did not recall if you were asked that specific question.
A. I don't recall.
Q. And I take it you don't recall going back to these comments of Mr. Benz which again were on a different document, but you don't recall to whatever extent that inconsistency with the 10,000 MTU limit

418

was being pursued here, why the 10,000 MTU limit was not allocated over the first three or four or five years, why it was not done on a more rapid basis, you just don't recall the basis for that; is that right?
MR. CRAWFORD: Objection, best evidence; objection, asked and answered.
THE WITNESS: Yeah, that's true.
MR. STOUCK: Let me show you another exhibit.
(Brownstein Exhibit No. 109 was marked for identification.)
BY MR. STOUCK:
Q. Exhibit No. 109 is another letter from Mr. Benz on Weston letterhead dated August 22, 1991, addressed to you, subject, review of draft delivery commitment schedule instructions and comments enclosed. It says comments on draft DCS instructions dated August 2, 1991, Ed Benz. These comments are dated August 19, 1991. Do you see that?
A. Yes.
Q. Do you recall these comments?
A. No. I mean obviously they were to me, I got them, but I don't have a specific recollection of them.

419

Q. Okay. At the very end of these comments from Mr. Benz is a paragraph entitled General. Do you see that?
A. Yes.
Q. And it says here suggest addition of text to deal with questions such as what does it mean to have an approved DCS. Do you see that?
A. Yes.
Q. Do you recall that comment?
A. No. I don't specifically recall the document. I got a lot of comments on the instruction.
Q. Do you know whether the instructions as ultimately issued did address the question of what it means to have an approved DCS?
A. I don't believe that we did that.
Q. Okay. Do you recall discussion of that issue or a discussion of whether or not the instructions should address this issue?
A. No. The instructions from our point of view were -- the instructions had to be clear enough that the utilities -- you know, that it made sense, that the utilities can fill them out, fill out the DCSs. You know, broader questions were beyond the scope in my view of instructions for a form.

420

Q. Broader questions like what the significance was of an approved DCS?
A. Sure.
Q. Was that an issue or question that the department as of, you know, August 1991, the time of these comments, had a position on?
MR. CRAWFORD: Objection to the extent of lack of foundation and objection to the extent it calls for speculation.
THE WITNESS: No. My only hesitation, you know, any comments -- whatever the department felt about the DCSs beyond documents that we've been examining here from a policy point of view may have been in response to questions from the Hill. I don't specifically recall them, but it may have. So I don't think we addressed those type of things.
BY MR. STOUCK:
Q. Okay. Just to understand what you're saying, you don't think you addressed those type of things because -- why not?
A. I don't think there was -- nobody was clamoring for it, nobody was asking. I mean they were hypothetical questions. Nobody raised it. It wasn't discussed, at least that's my recollection.
Q. Was that because it was obvious what it

421

meant, I mean is that why it wasn't addressed or rather is it -- maybe it was a legitimate question, but there was no real reason to address it at the time?

MR. CRAWFORD: Objection to the extent it calls for speculation.

THE WITNESS: From my perspective, you know, I was charged with implementing the contract. We did what was necessary to implement that contract. And I don't think we needed to answer, you know, a broader question.

No one was asking broader questions. I mean there's a lot of good comments in here. Broader questions, you just don't need to do it, no one was really asking, there was not really a demand.

BY MR. STOUCK:

Q. At the time, August of 1991, when the instructions for DCSs were being developed, did you, Alan Brownstein, have a good understanding of what it meant to have an approved DCS?

MR. CRAWFORD: Objection to -- never mind.

THE WITNESS: I had an understanding. Whether it was a good understanding or not, I don't know how to judge that.

BY MR. STOUCK:

422

Q. Do you believe that you understood the legal significance of an approved DCS?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

THE WITNESS: I'm not a lawyer.

BY MR. STOUCK:

Q. Well, you're not a lawyer. But at this time you were working on the program and you were working on these matters. And sometimes nonlawyers have understandings of legal things that relate to their jobs. Maybe you did and maybe you didn't, but I don't know that that's responsive to my question. At this time did you have an understanding of the legal significance of an approved DCS?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

THE WITNESS: Probably not, because I don't recall having a discussion with anybody about that.

BY MR. STOUCK:

Q. Okay. What about at some subsequent time prior to the time that you ceased working on these matters? I'm looking for my notes here. I think it was March 1995. Did you have any discussions with anyone that would have given you, Alan Brownstein, an

423

understanding of the legal significance of approved DCSs?

MR. CRAWFORD: Same objection.

THE WITNESS: Not that I recall.

BY MR. STOUCK:

Q. And subsequent to that, in '95, you have had no such discussions; is that right or is that not right?

MR. CRAWFORD: Same objection.

THE WITNESS: I think I testified earlier that I may have reviewed a DOJ, you know, document, a reply.

BY MR. STOUCK:

Q. In this litigation?

A. In this litigation.

Q. Was that subsequent to the last time we were here in this deposition room?

A. No.

Q. It was prior to that?

A. Yes.

Q. Was it prior to your first deposition?

A. Yes.

Q. Do you know whether it was prior to or after the DOJ document was filed in court or was it a DOJ document that was filed in court?

424

MR. CRAWFORD: Objection to the extent it calls for speculation.

THE WITNESS: I reviewed it -- a draft DOJ document. And I testified to that before too.

BY MR. STOUCK:

Q. Okay. Again I really apologize.

A. Yeah.

Q. It's been a long deposition, I just did not recall that. I'm not trying to ask you the same questions over.

A. And I believe, you know, that addressed some of that issue. So that's what jogged my memory.

Q. So based on that you have an understanding or at least at the time you read this you had an understanding of what DOJ's current position about the legal significance of this is?

MR. CRAWFORD: Well, objection, asked and answered and to the extent that that may have mischaracterized anything he previously testified to.

THE WITNESS: There was discussion about --

MR. CRAWFORD: And I'm going to instruct the witness not to reveal anything about any discussions with any DOJ lawyers about any kind of matter discussed with respect to this litigation at

425

all.
THE WITNESS: Okay. Well, that's fine. I think somewhere in that draft there was, you know, some views expressed about what the government's -- Department of Justice's views were with respect to the legal effect of the DCSs. I read those words.
BY MR. STOUCK:
Q. Approximately when was that, do you recall, within the last year?
MR. CRAWFORD: Objection to the extent it calls for speculation.
THE WITNESS: Yeah, within a year, within the last year.
BY MR. STOUCK:
Q. Okay. Can you place it any more specifically than that in time?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: No.
BY MR. STOUCK:
Q. But, prior to reading that draft and prior to whatever discussions grew out of that draft, you had no understanding of the legal significance, you had no discussions with anyone who would have given you any other basis for having any understanding of

426

the legal significance of the DCSs; is that right?
A. That's right. And why I brought that up is because, you know, my reaction was, well, that's interesting, when I read that it was interesting. I never discussed it or thought about that before.
Q. Directing your attention to the very last sentence of Exhibit No. 109, I'll read it, it says what liabilities and obligations on the part of both parties are locked in by the DCS submittal and approval process.
A. Okay.
Q. Now, that's a question that -- you know, the words are different. But it's very similar to this question about the legal significance, is that right, do you agree with that?
A. I agree with your statement.
Q. So, therefore, you had no understanding of what liabilities and obligations on the part of both parties are locked in by the DCS submittal and approval process contemporaneous with this document in August of '91; is that right?
A. That's right.
Q. And you had no understanding about those matters as of the time you stopped working on waste acceptance matters in March 1995?

427

A. That's accurate.
Q. And you had no understanding about those matters at least prior to the time that whatever understanding you gained by reading this draft that you just referred to?
A. That's correct.
(Recess.)
BY MR. STOUCK:
Q. Do you know whether the standard contract or any of these -- not these standard contracts but any of these individual waste acceptance contracts with the utilities were ever amended?
MR. CRAWFORD: Well, object to the extent of lack of foundation and to the extent it would call for speculation.
But go ahead.
MR. STOUCK: I'm not asking for speculation, I'm just asking if he knows if any of them were ever amended.
MR. CRAWFORD: Then maybe my objection is more appropriately objection, vague.
THE WITNESS: Yeah, I believe there were some modifications made. It would be hard for me to tell you what they were. But I remember there were some modifications made.

428

BY MR. STOUCK:
Q. Okay. When, do you recall, was it during your time, before your time, after your time?
A. I believe there were some modifications made during my time.
Q. Okay.
A. And before. I mean some of the contracts I think had -- very few of the contracts had some special language put in.
Q. At the outset?
A. At the outset. In other words, between the time the final rule was adopted and the signing.
Q. Yes.
A. I think we had language in there to accommodate the special ownership arrangements. There may have been others.
Q. Okay. Now, were these changes that you're referring to changes that were made to, say, only one contract or maybe a small group or rather were they changes that were made to every single one of the contracts?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: I interpreted your question before -- the answer is they were to individual contracts. That's why this was a modification signed

429

# COLE

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

1

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia
Tuesday, March 12, 2002

Deposition of BILLY M. COLE, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

2

Boulevard, McLean, Virginia 22102-4859, at 10:30 a.m., Tuesday, March 12, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

3

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
DEVON E. HEWITT, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703)(770-7962)

On behalf of the Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
M. STANFORD BLANTON, ESQ.
Balch & Bingham, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205)251-8100

4

APPEARANCES (Con't)

On behalf of Plaintiff Commonwealth Edison Company:
THEODORE T. EIDUKAS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of Plaintiff Sacramento Municipal Utility District:
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303)(863-2334)

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 14th Street, N.W.
Washington, D.C. 20005-2011

5

(202) 434-1675)

On behalf of the Defendant:

R. ALAN MILLER, ESQ.
ERIN E. POWELL, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C.
(202) 616-0383

ALSO PRESENT
SCOTT VANCE

6

C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFF | DEFENDANT |
|---|---|---|
| Billy M. Cole | | |
| By Ms. Hewitt | 8 | |

Afternoon Session - Page 105


E X H I B I T S


| COLE EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 | 80 |
| 2 | 197 |


7

P R O C E E D I N G S

Whereupon,
BILLY M. COLE,
was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MS. HEWITT:

Q. Good morning, Mr. Cole. My name is Devon Hewitt, and I represent ten of the Plaintiffs in the nuclear utility cases or the spent fuel cases as we call them.

We are here to do your deposition today.

Have you ever had your deposition taken before?

A. No.

Q. Generally what happens is that people ask you questions, and you're required obviously to tell the answers to the best of your recollection truthfully.

Today you will be asked questions by me primarily, but after I'm completed with my questions, other attorneys here representing

8

they sent me out to California. I got interviewed and got hired, and I built, spent the next three years building environmental systems to simulate space for putting reactors into. We launched the reactor, and in that time, I learned more, got more books, learned more about nuclear, about the reactor, everything like that.

Q. I hesitate to ask this, but can you just give me a small summary about what the reactor in space program is, really low level?

A. Very low level?

Q. Yes.

A. Well, at that time, they were looking for a power source for satellites, and it didn't have to be a lot of power.

The first reactor, actually the only reactor that's ever been put up there I think was that first one, only put out 525 watts -- five good light bulbs.

It was a plutonium powered reactor that used beryllium drums as reflectors. The core was only about, oh, probably one foot in diameter and maybe a foot and half tall with a couple hundred PU rods in it.



It was a thermal electric conversion. The heat from that was sent down into thermal electric thermacouples basically, generated heat and generated electricity, very low.

It was physically with all of the cooling, and it was cooled by sodium, liquid metal, and it's, the whole thing stood probably 12 feet tall. Like I said, the reactor sat right on top.

Q. Did you receive any specialized training while you were at Atomics International?

A. No.

Q. And how long did you stay with that company?

A. Three years until they shut the program down.

Q. And what did you do after that?

A. I went looking for a job, and I applied at, since I had been in that field, I applied for a job at Idaho, INEL, Idaho National Engineering Laboratory and Pacific Northwest Laboratory.

I was offered a job at both places. I took the one at Pacific Northwest Laboratory.



Sounded better.

Q. And what position were you hired for initially when you joined?

A. As a laboratory technician to build sodium loop for what -- they were trying to get a contract called the FFTF, the fast flux test reactor, and they had 8,000 people out there, and nobody had any experience with liquid metals, and I walked in the door.

My resume said I had built components for the space reactors, and they were liquid metal cooled, and so I got hired, set up their first liquid metal safety programs for dealing with sodium, built the first sodium loop for the FFTF.

That was one of my first responsibility, and until I decided that the laboratory environment was a dead end street for me professionally, and then moved to become an engineering technician.

Q. You became an engineering technician at PNL or another entity?

A. No. I stayed with PNL for 13 and a half -- no. I'm sorry -- 23 and a half years that go-around. Had probably 15 different jobs



while I was there.

Q. How long were you a laboratory technician?

A. Year, year and a half maybe at PNL.

Q. And then following that position, you moved into the engineering technician position?

A. Um-hm, as a computer programmer and supporting the engineers and emulating whatever they were coming up with, emulate that kind of, all their engineering concepts on computers.

Q. Was this in support of any particular federal program?

A. Oh, God, yes, lots of them. That's what PNL did. It was a prime contractor for the Department of Energy, well, the Atomic Energy Commission first, and then ERDA, and then the Department of Energy, and we had lots of different contracts.

My primary areas that I worked on in that position were looking at the economics of the nuclear power industry related to, you know, you have got to remember it was fledgling back in those days.

We didn't have a lot of reactors, and so we were doing economic analyses does it make

sense to build nuclear power plants versus other sources?
Q. When was this? What period of time?
A. Sixty-four, five, in there.
Q. And --
A. I worked on the PNL, was hired by the Bonneville Power Administration to site nuclear power plants in the Pacific Northwest.
Then I worked on that project, got the sites, all the reactors sited.
This was back when a turnkey thousand megawatt plant was oh, about a hundred million dollars with fuel.
I worked on siting nuclear power plants for Korea.
After a while, I got promoted to the exempt status for the, non-exempt status at the company, became a, what they called a specialist.
Q. When was this?
A. 1970 I think, around that time, maybe a little before.
Q. And your title at that point?
A. Specialist.
Q. And what were you a specialist in?

25

A. I used to tell people that asked that, I would say anything you want.
I just did whatever was necessary.
Q. How long did you hold this position as specialist?
A. Oh, couple of years; then I got promoted to engineering staff, and then to -- couple of years, and then to, promoted to be a scientist and promoted to be a manager.
Most of my career there -- I did various jobs, but you know, most of it related to nuclear power, nuclear electric power one way or the other.
I was the person that developed the spent fuel data base that the government still uses today where the utilities, I think Form 859 or something like that. I can't remember. Is that the form number?
Anyway, the utilities have to fill out, used to fill out every year until things kind of fell apart; originally it was a volunteer -- well, let me back up a little.
In the nineteen, late 1970's, PNL was contracted by the government to develop what was called the commercial radioactive waste

26

management impact statement, and we had to figure out, project into the future how much nuclear power there would be as well as all the supporting requirements for nuclear reprocessing facilities, fabrication facilities, everything, and what its environmental impact would be if we had such a thing.
This was, I don't know, a five or six-year. Program we published the report in around 1980, probably seven-volume thing, very big.
One of the requirements, of course, before you can sit there and determine how much spent fuel is going to be in the future, you have got to have a starting spot, and I decided and one of the things we had to do was trace like 140 isotopes from birth to death and for a hundred thousand year, figure out what's going to happen to them, so I wrote all the computer programs.
Of course I was responsible for that, developing computer programs to emulate the system through life, but one of the other things I did was I said I would like to know how much spent fuel is out there right now, and I have a

27

starting basis for determining where it's going to go, so I contacted probably 14 or 15 people in the, I think at that time, it was ERDA, and * NRC, and I got 14 or 15 different answers.
Nobody seemed to know exactly how much spent fuel was out there, and I couldn't understand that because by it was around early 1970s when I was doing some of that, it was a very fledgling industry and there shouldn't be a lot.
Everything that ever had been generated prior to 1970 had already been reprocessed with the exception of a couple of sticks of old rock point stuff and some gunette stuff that was sitting around, so I decided well, I'm just going to send a survey out to the utilities and ask them these questions how much spent fuel's in the pool, when did it get discharged, and get some basic information about it.
So I developed a survey knowing that it had to be voluntary. I had no authority to do anything like that, so one thing I had to learn in my life was if you want somebody to fill out a blank piece of paper, forget it.

28

Especially if it's not going to pay them to do it, they're going to throw it in the trash.
So what I did, I developed a survey. Then I filled in all the blanks. Whether I knew it or not, I used good engineering judgment, and then I sent it to them, and I said, you know, if this data is wrong, scratch it out.
Well, most people look at that and say you dumb SOB, that's wrong, and they scratch it out and give me the right data, and that's how I originally populated the first data base, and it just took off from there.
And then in 1983, right after the Nuclear Waste Policy Act was passed in the department of -- let's see, what was it called -- Energy Information Administration took over the role and made it official.
Q. Let me take you back to when this project started.
When did you say this project regarding the civilian radioactive waste management program started?
A. That impact statement work, if I remember correctly, we started working on that some time around '5.

29

Q. And what was your position at PNL at that time?
A. By then, I was a specialist, or yeah, I think I was still a specialist.
Q. And what was your role on this project?
A. Primary role was all of the engineering computer applications, did a, developed computer programs to emulate the system.
Q. Who did you report to in this position on this project?
A. Mr. Robert McKee.
Q. And what was his position?
A. He was the program manager.
Q. What entity gave PNL this assignment to do the impact statement?
A. Officially the DOE Richland operations office.
Q. And what was that office? What were the functions of that office?
A. Responsible for the Hanford nuclear reservation and all the activities there.
Pacific Northwest Laboratories was one of the entities that worked there.

30

Q. Did you interact with that office at all while you were working on this project?
A. Oh, yes.
Q. And who did you interact with, if you can recall?
A. Don't remember. It was more administrative, their role.
The technical interaction came from headquarters, DOE headquarters, and like I say, I can't remember if it was DOE or ERDA in those days.
I think by the end, it was DOE.
Q. What does ERDA stand for?
A. I've got to think about that right now -- Energy Research and Development Administration.
It was, only existed a couple of years in between the AEC and DOE.
Every administration has to kind of make its mark, change something, change happy to glad, something like that.
Q. What was the purpose of this impact statement or this project?
A. Just see what the environmental impacts are going to be on this industry.

31

Suppose people went out and build all these reactors to supply all this electricity and build all the associated infrastructure, the fabrication facilities, the mining, the reprocessing, because this was a closed fuel cycle at that time.
Q. Did you address in this project the disposal of spent nuclear fuel?
A. Oh, yes.
Q. And in what way did you address that?
A. Well, we looked at various alternatives.
Besides deep geologic disposal, we looked at seabed disposal.
We looked at shooting the stuff, putting it in orbit around the sun.
We looked at above-ground disposal. We looked at all types of shallow land or above-ground dry wells, casks. We looked at everything there was. It was a big program.
Q. Did you make any recommendations regarding alternatives for disposal of spent nuclear fuel?
A. If I remember right, the recommendation that came out of that report, and

32

this is just, I just think this was right, was that probably the safest thing to do would be reprocess it, vitrify it, and dump it in the ocean, but politically that wouldn't be feasible, and so I think the final recommendation was deep geologic disposal.
Q. Did the report or project address who would be responsible for that disposal function?
A. No.
Q. Mr. Cole, do you have an understanding of the term acceptance rate?
A. Sure.
Q. What is your understanding of that term?
A. It's a rate, a rate meaning, rate means function of, over a period of time, how much something can be taken.
Q. And do you have an understanding of how that term has been used in connection with the civilian radioactive waste management program?
A. Oh, yes.
Q. And how has that term been used, or what is your understanding of the term?
A. It's, acceptance rate in this, for

33

this program is a rate at which spent nuclear fuel could be taken from the utilities by the government.
Q. In the civilian radioactive waste management impact statement, was acceptance rate addressed in any way?
A. Yes, it was. It wasn't at a very high level, not down to details of reactors and utilities and things like that.
It was so much energy was projected to be produced by nuclear over time, and that amount of energy would generate so much spent fuel, and you had to do something with it.
You either reprocessed it or you disposed of it, and it addressed both of those issues as an industry, but it was, also had projections in there that we would probably have two times the amount of spent fuel, maybe, maybe more than that, maybe three times the amount of spent fuel than we wound up projecting today.
It looked like the sky was the limit in those days. People were buying reactors and ordering reactors right and left, and it's going to be great.
So you had all of this industry and

34

all of these megawatts that were going to be generated by nuclear, so in order to have a repository system that would handle all this stuff, you were going to have to have a couple of big repositories probably, you know, something in the neighborhood of three to six thousand tons per year acceptance, but just about the time the report got published, President Carter says no more reprocessing.
All of a sudden, the utilities started having, becoming, fear of becoming constipated, no place to put their fuel.
Q. When was the report published?
A. I think it was 1980.
Q. And do you recall how the acceptance rates that were referred to in that document were developed?
A. Yeah. It was you've got this much stuff you have got to dispose of over a period of time, what makes sense? At what rate can I take the stuff and eventually get rid of it all, and you know, you built a facility size based on that.
You don't build a facility that takes it all in one day because nobody can afford

35

that, and you don't build a facility that takes it over 300 years. That doesn't do anybody any good, so you look at a reasonable period of time, and you iterate a few times and figure out what's, how can I keep the cost down and still get the job done?
And you also don't want to -- you take a bunch at first, and then the only thing you're taking is discharge after that.
You have to make sure you keep up with the discharge, so it was, like I said, it was a, strictly on a high level.
Q. You made reference in your previous response to a reasonable period of time.
I didn't understand that. Could you explain that a little better?
A. Well, yes. You don't want a facility operating beyond the point in time where you predict all the reactor is going to be shutting down and so they're left with fuel sitting around at that point in time.
That was considered reasonable, and it would operate, you know, probably to the end of reactor, reactors', plural, life.
Q. And was there an understanding of how

36

long that would be at that point in time?
A. Clarify that a little bit. It's not a matter of understanding what it would be.
It was a matter of what we, of the various predictions and the various scenarios we developed on what it could be.
Had nothing to do with reality. This was predictions, and it was like if it did this, then this is what you would do.
If it did that, then this is what you would do. That was it.
Q. Is it right to say that, that your earlier answer indicated that the acceptance rate was developed in a way to keep up with the discharge by reactors?
A. That was not the total way it was developed.
That was part of what you tried to achieve.
You want to, you want to make sure that you size your facility big enough so that you can keep up with what's being discharged plus work off some of the backlog, and then at the end of this hypothetical period of time, whatever that is, you drew a line somewhere in



the sand.
You can't say it's going to operate forever. Otherwise your study continues forever.
You draw a line saying okay, we're going to cut the study off here. Everybody shuts down. All these reactors that are operating, they're shut down, and the system dwindles down, the facility closes up.
Q. Now that goal of trying to develop a rate that would keep up with discharges and work off of the backlog, was that a goal that PNL articulated, or was it something that DOE --
A. That was not a goal. You're misinterpreting what this report was about.
The goal was not to establish acceptance rates or anything in that report.
It was a, purely an Environmental Impact Statement. If these things happened, what was the impacts to the environment.
Had nothing to do with acceptance rates. That was just one little, less than 1 percent of the piece of the thing.
Q. But is it accurate to say one of the factors was developing an acceptance rate that



would keep up, to use your term, with discharges and work off the backlog?
A. Sure.
Q. And that factor, was that something that you suggested or PNL suggested be considered in this report, or was that a factor that was indicated to PNL by DOE or another agency?
A. I can't answer that question because it's neither.
It's just part of an analysis that you do. If I do it this way, I've got all this stuff, and it's going to be generated at this rate, and I've got to dispose of it, so I dispose of it. I build a facility to handle it.
It's a hypothetical situation, purely hypothetical, hypothetical repositories, hypothetical reactors. They didn't exist.
Q. To your knowledge, was this the first time an analysis had been done about disposing of spent nuclear fuel?
A. No, it wasn't the first time. There was programs ongoing the government had. I think one was called AFR program, where they were looking at ways of not necessarily



disposing, but AFR meaning away from reactor, how you get maybe central facilities built to handle spent fuel.
Later they called them MRSs and ISFSIs and all this other kind of stuff.
The government had a lot of programs ongoing before that.
This was just the Environmental Impact Statement, what the impacts are going to be to the environment.
There was another study that just preceded that, was kind of started sooner, ended sooner, but was overlapping a little called the GEIS, G-E-I-S, Generic Environmental Impact Statement.
You did a generic, and then you do a specific.
Q. What did you do after this mission plan was or impact statement was published?
A. What did I do after that? In the, this was published I think around 1980.
In the early 1980s, DOE started its, what was called -- the terminology may be incorrect, but it's, it's the implication, the spent fuel management program.

PNL, and I don't remember all the details of the transition, but PNL became the manager of that program for the government, or M&O if you will, whatever they called them, about 1981 some time, '81, '82 in there.
When the program was given to PNL to take over, Mr. Darrell Newman was the first, was the manager of that program, and I was consulted, installed as the deputy manager of the program.
Q. What were your responsibilities as deputy manager of this program?
A. Predominantly some of the things I discussed before; one of the, well, one of the primary things that was going on that we were doing was called the storage requirements report that we were developing for the DOE.
This was DOE's way of trying to find out how big a problem the utilities had after the President had shut down reprocessing, and utilities were complaining to the government that they had problems.
You know, the government screws them there. They were looking to the government to help them out, and so we were doing spent fuel



storage requirements report.
It was based on the information I was getting back from the utilities on this survey I developed, and that's why I was put in charge of that, because I had knowledge in that area.
The utilities would fill this out, tell us how much spent fuel they currently had, when it was discharged.
We got to the point where we knew every stick of spent fuel that was out there by its first name.
We knew everything there, and then they would also give us a ten-year projection of what they're planning to do in the future so we could try to figure out then when they were going to run out of storage space and when they were going to have a problem, and that's what that report did.
It tried to, it was used by DOE to get the Congress basically to say hey, these guys have a problem and here is what the problem is.
Q. Did you work with anybody in the federal government on this project or this report?
A. Oh, yes. It's, federal government



funded it. I mean it was DOE's report.
Q. And who within DOE did you work with?
A. Oh, God. Well, the person DOE Richland operations that was responsible for it was a man named Phil Craig.
I don't know if he's still alive today, but -- and then later, it was, there were other people.
I'm just trying to -- the ones that come to mind, David Langstaff, Dr. Langstaff at Richland operations.
People at headquarters, I don't remember.
Q. Did you have any other functions or responsibilities as deputy manager of the spent fuel management program?
A. Oh, yeah. See, it was in, in 1982, when the government, when the government -- I have got to separate governments here -- when the DOE was trying to help Congress figure out what to do and the development of the Nuclear Waste Policy Act was taking place.
Part of that development was trying to figure out okay, the government is going to step in and try to help the utilities with this



problem because they felt some responsibility.
On the other hand, they're going to tell the utilities you've got to pay for it and we'll try to get it done for you.
One of the things you have to figure out is how much are you going to charge the government?
One of my responsibilities as the manager, not as the technical person, but as the manager was doing the, the fee adequacy analysis, but in the early days, it wasn't called fee adequacy.
What we were calling it then was it was just to develop the fee. How much are you going to charge the utilities?
And you have to come up with a way of figuring out what's reasonable, and you've got to figure out what -- you do analyses on the total system. What's it going to cost to build a system? How long is it going to operate? How much spent fuel are you going to discharge? How much money are you going to need from them and how do you charge them?
Do you charge -- you know, in the case, what it wound up with, of course, as we

all know, is based on electricity generated and sold, not originally and sold, but later and sold. Contract was modified later.

Came up to be in the early days, best analysis at that time, if I remember correctly, was .85 mils per kilowatt hour, so we said one mill should be adequate, and that got, we fed that information to the DOE, and they fed it to Congress.

Q. Did you feed that information to DOE by way of a report or --

A. Oh, yes.

Q. A document?

A. Yes -- report. The man who was responsible for developing that stuff was a Mr. Roger Engel, E-n-g-e-l.

Q. And did you work with Mr. Engel in producing these reports?

A. At the time he produced it, I was working with him.

Later, I became his, quote, manager, but he was mainly responsible for that, and a bunch of other people were responsible for developing that, the original fee.

I don't know if he was even in charge

45

of it at that time. I just know he worked on it.

There were a lot of other people who worked on it. It was a big job.

Q. In developing this fee that DOE would charge to the utilities, was the acceptance rate ever considered?

A. I don't think that rate had a heck of a lot to do with it other than the rate was probably something that people worried about in the total system life cycle cost which you would have to have to do a fee.

Figure out, you know, you've got to figure out what the whole system is going to cost you so you can go back and figure out how much money you need and then how you're going to charge them and what, you know, and what your basis is going to be.

You know, I'm sure they had some rate in there, but it was I'm sure also on an aggregate, you know, just how much spent fuel have we got to, is the industry going to give us?

Q. Do you know who was responsible for coming up with an analysis of the total system

46

life cycle cost?

A. At that time, I don't know specifically.

My guess would have probably been something like Bob McKee or somebody like that, just in the nature of the work, but I'm not really sure.

Q. Did you have any input into this type of analysis?

A. No.

Q. Are you aware or have any knowledge about the acceptance rates that were used in the, developing that answer at that time?

A. I'm -- no, I'm not, I haven't, I don't remember seeing those reports.

I'm, my assumption would be that it was whatever the kinds of rates and stuff that came out of the Environmental Impact Statement because that was all published, you know, something that looked reasonable.

Q. Did PNL or you have any other duties with regards to developing the Nuclear Waste Policy Act?

A. PNL did, but I was still not high enough up the ladder yet that I had a lot to do

47

with the language or anything in the Nuclear Waste Policy Act.

Q. Do you recall who did have that responsibility?

A. Nope.

Q. Other than the storage requirements report and the fee adequacy analysis, did you have any other responsibilities as deputy manager of the spent fuel management program?

A. After the Nuclear Waste Policy Act became law January 7th, 1983, when President Reagan signed it, yes, I did.

Some of the first provisions in there was to go forth and develop a federal interim storage facility concept because the law recognized that you're talking 14, 15 years before you may have a big facility to take this fuel, so it provided a mechanism for some interim storage called the federal interim storage facility, and this was anybody who applied to the NRC for relief could send their fuel to this facility.

It was a separate fee that they had to pay, so our job was to develop, figure out what it was going to cost, how this physically, what,

48

what would this facility look like, what kind of storage mechanisms.

It had to be I think 1900 tons was the maximum rate, the maximum limit that you could store there, and I think it -- so we had to come, you know, our job was to get this report for DOE.

DOE had to turn this report into Congress, and so we did. We came up with the federal interim storage program recommending probably dry well storage would be the most expensive way of doing it, and develop the fee mechanism for charging them for doing it.

Gave it to DOE, and it just sits, sits on the shelf until a utility comes in saying hey, I've got a problem. I need to store fuel.

Q. Do you remember when this report was produced?

A. Eighty-three, to the best of my recollection.

Q. And at that point in time, were you still deputy manager, PNL spent fuel management program?

A. Um-hm.

Q. How long did you hold that position?

49

A. Until late '83 when PNL asked me if I would -- see, in '83, when the Nuclear Waste Policy Act was passed, some of the DOE RW was formed -- didn't exist before.

Q. What does RW refer to?

A. Radioactive waste, but it's DOE's Office of Civilian Radioactive Waste Management is the full term.

Q. And I believe it's used as an acronym?

A. OCRWM, OCRWM -- Office of Civilian Radioactive Waste Management -- anyway, it was formed in '83.

Well, a lot of the people that were brought into DOE RW did not have nuclear backgrounds, especially backgrounds in the civilian area, so I was asked by PNL to take an assignment to Washington, D.C., to open up PNL's waste management office and to help become a tutor for a lot of these DOE people who couldn't spell spent fuel, so I had an office that I set up at, on M Street at 21st and M for PNL, and then I had an office on the seventh floor in the Forrestal Building where I worked daily with the DOE people.

Q. And what position or title did you

50

hold at this time?

A. I don't know. Don't even remember. I've got a stack of business cards I should have brought on all my jobs.

I can't remember what -- specialist in something probably.

Q. And how long did you occupy this position?

A. I was there for probably a year, year and a half, a little over a year.

Let's go less than a year. I don't -- year and four months, something like that.

You can't, when you're on a temporary assignment like that, you're not allowed to stay more than, in those days, more than a year and a half or there's a tax problem because, see, I was on per diem. Well, I was on expenses. They were paying my, making my house payments.

Since I was gone, they paid for a housesitter. They made my rent payments here, and I was making out like a bandit.

Q. And that had to stop?

A. It had to stop. That's right. No. No. You know, you recovered actual expenses, but after a period of time, there was a tax,

51

some kind of liability, and so I left town before the year and a half was up, make sure that it wouldn't be a problem for the company.

Went back to PNL out in Richland, and took over a position of manager of the, I think it was called waste acceptance programs or something like that.

Q. And who did you report to at PNL in that role?

A. Oh, over time, it was two or three different people moved in and out of there.

One of them was Ron Liikala, L-i-i-k-a-l-a.

Another was Jack McElroy. Those were the two I remember.

Q. How long were you manager of waste acceptance at PNL?

A. From middle of '84 -- I'm sorry -- middle of '85 until January '89.

It was waste acceptance transportation, and this is all starting to come back to me now.

The program was office, was waste acceptance transportation and something else. I can't remember.

52

I was responsible -- basically it's a civilian program, so I was put responsible for it.
Q. When you opened up the radioactive waste office here for Richland in 1983, what were your duties during that year and four months you were here in Washington?
A. As I explained, my primary duty was to sit with the DOE people who were, had no real knowledge of the nuclear power industry, and help tutor them, get them up to speed.
Q. Who did you interact with at DOE at that time?
A. Everybody in DOE RW. You get the, get the roster out, and I interacted with everybody, some more than others, but everybody at one point in time.
That was my job, and when they had a problem they couldn't figure out how to solve, they asked me if I could get it solved, and I was liaison back to PNL, to the technical community back there, to instruct them on what DOE needed.
Q. Did you have any role in developing the standard contract?

53

A. No, none other than I explained. Oh, the contract -- no. No. Nope.
Just had a big role in trying to interpret it.
Q. And when did your role trying to interpret the standard contract begin?
A. At July 1983, after the contract was signed by the utilities and became public, we had to, as deputy manager of the program at this time, I had to try to sit down and interpret the contract and figure out what roles and responsibilities were for both sides, and I can keep talking while I fill up my coffee cup.
(There was a pause in the proceedings.)
BY MS. HEWITT:
Q. Did you have any initial impression about the standard contract, Mr. Cole?
MR. MILLER: Objection -- vague.
MS. HEWITT: You can still answer. I'm not sure you can say objections on behalf of a witness you don't represent.
MR. MILLER: I can. I think certainly that I'm entitled to enter objections concerning the form of the question, sure.

54

BY MS. HEWITT:
Q. Did you have any initial impressions, Mr. Cole?
A. My impression of the contract, whether it be initial or later, is the same.
It was put together in haste. It was fraught with ambiguities, contradictions, incorrect statements, but it was pretty damned good under the circumstances.
Q. And what circumstances are you referring to?
A. How quick it had to be put together.
Q. Why did it need to be put together so quickly?
A. Because the law required it. It said you had to have one in place and signed by July something '83.
The Nuclear Waste Policy Act didn't get passed until January 7th, '83.
It was a short period of time to get the right people together, to put it -- and it was my understanding, even though I wasn't part of putting it together, there were people from the government and the utilities both were helping write the language.

55

Consequently, you know, you get a lot of things in there that didn't line up later on.
That was one of the first things I was trying to do was interpret the contract to figure out on a time line basis who was to do what to whom, and that's what we did.
That's how we found these problems, and then we came up with issues, things that need to be resolved because it didn't make any sense.
Q. What didn't make any sense?
A. Some of the things in the contract.
Q. Did you have understanding about whether or not the utilities could or could not sign the contract?
A. It was my impression that they were required to sign the contract. They had no choice.
Q. Why did they have no choice?
A. I don't know. That was my impression. If they wanted this service I guess.
I had just always been told they didn't have a choice.
Sometimes I do what I'm told.
Q. I presume, Mr. Cole, you're familiar

56

Q. And who at DOE did you work with in developing the Annual Capacity Report?
A. Annual, Alan Brownstein.
Q. Anyone else?
A. Not for the development of that report, no; he was my main contact.
Q. Before I get into more depth about the Annual Capacity Report, can you tell me a little bit about the issues that were raised following execution of the standard contracts with regard to what was in or not in the standard contract?
A. I don't know if I quite understand your question.
The issues that we discovered in the contract were not mainly what was in or not in the contract, but where there were contradictions, references to one article referencing another article that didn't exist or referencing an article that obviously was incorrect, or ambiguities or things that needed some clarification because there was not enough information.
Q. And when you use the term we in your prior answer, does that refer to PNL?
A. That refers to me and Mr. McDuffie

65

predominantly.
Q. And could you tell me what you remember about what the nature of those issues were?
A. Oh, God, there was a lot of them. Somewhere you should have a list of those issues.
They wound up -- we started out with like 54 of them and wound up with I think 32 or so.
There was everything from what constitutes -- you know, the contract provided exceptions to the OFF rule.
One was for emergencies. One was for fuel from shutdown reactors, that kind of stuff, and so those kinds of things like what constitutes an emergency, should priority be given to spent fuel from shutdown reactors?
Oh, I remember the first one -- what's the definition of a year was the dumbest one, but there was no definition in there.
What does it mean? You know, minor things like that all the way to it did not really do a good job of delineating the non-fuel components.

66

Did a very poor job of defining what failed fuel was. A lot of it was down in the technical end of things like that, and we had -- like I said, you should have those documents. I turned them over, all those issues.
Q. Did PNL generate those issues?
A. Yes, we generated the issues. Then we would take them to the Department of Energy, in this case, Mr. Brownstein, and we would discuss them with them.
We had rationale. We had background information for each issue.
DOE then would make a decision as to whether this issue was really worth it, you know, worrying about or not, and then they were used in further discussions with the utilities.
Now at some point in time, and it was around '86 or so, we were still working that, another person got involved.
Q. And who was that?
A. Mr. Vance; I think it was around then.
Q. 1986 you said?
A. Yes.
Q. And you're referring to Mr. Scott Vance?

67

A. Right there, yeah.
Q. What was the purpose or intent behind developing this list of issues?
A. As I tried to explain earlier, it was for the purpose of clarifying contradictions, ambiguities and stuff in the contract, so we could figure out roles and responsibilities.
The contract is predominantly set up so that I do something, you do something, I do something, you do something, and there is a time line, and each side, in this case, utilities and the government, had certain roles and responsibilities.
If one did something, then the other one, there is a reaction to that. Did it work?
So we set up a time line, something that was probably about the length of this table, or we drew a line down a little piece of paper the size of this table, put DOE responsibilities on the top, utility responsibilities on the bottom, and then you link them time-wise, and all of a sudden, sometime the links didn't connect, so that became an issue.
Q. Was there an understanding about how

68

these issues would ultimately be resolved?
A. There was a process that was developed called, and it's the dumbest name of anything I ever worked on, the ACR issue resolution process.
Q. What does ACR stand for?
A. Annual Capacity Report; the primary function of going through and looking at the contract roles and responsibilities was when we started developing the Annual Capacity Report, we started finding little problems.
Anyway, we, the government, the DOE set up this in conjunction with the utility representatives which was the predecessor to NEI, the MUDWAMS or whatever the heck that name was back then. I can't remember. Some weird -- it was a collection of words that you couldn't make a reasonable acronym out of, so we called them MUDWAMS.
The utility -- and they were, everybody thought this is a great idea. It was a technical exchange across the table.
The utilities as a group voted to have five people on their side of the table. One would be Chair of this committee, and the DOE



had like about five people, and Mr. Brownstein was head of that, and along with myself, Mr. McDuffie, Mr. Engel, Mr. Vance, Ms. Coles, and we discussed these issues.
We divided the issues into those that were the utilities' responsibilities, basically equity issues. They were the ones needed to resolve these cases of should priority be given to shutdown reactors or what constitutes an emergency because that's their problem.
As we explained, we're truck drivers. We don't care where we go get the stuff. You guys tell us where to be.
And DOE's issues were more programmatic, administrative, those kinds of things, and this was good meetings.
We held these meetings every month, two months, three months at the max, exchanged views, exchanged results.
It was a very healthy process because everybody believed, both sides of the table, and I say sides of the table, this is terminology that people like to use.
In all honesty, about half a day, there was no both sides. Everybody was milling



around. We were all one happy family because everybody was trying to solve the same problem.
Q. Were problems solved by this process?
A. A lot of the issues were resolved, yes.
Q. And how were they resolved?
A. Depending on the nature of the issue, some of them required resolution all the way up to the signature of the director of DOE RW.
Some of them, it was a simple matter of the utilities getting together, canvassing their constituents and saying here is an issue we have got to come up with a resolution for.
For example, I remember one was the priority shutdown reactors.
The utilities' position, although I don't know it ever became formal, was given to us, and it said under no circumstances will priority be given to shutdown reactors.
That was the DOE's combined decision. I mean the utilities' decision.
Q. Do you recall which issues that you dealt with actually received the signatures?
You referred to it as a senior DOE official.



A. No.
Q. Was there an expectation that the results of this process would culminate in an amendment to the standard contract?
A. Ultimately, yes, that was our hope, or you know, whether you had to amend it or not, you know, whether or not it would be amended, if everybody bought into the fact that hey, there is a problem and here is a solution to the problem, some day down the road, collect all these problems and you amend the contract.
In the meantime, though, if everybody agrees, you know what to do.
Q. But the fact that everybody agreed didn't necessarily mean that they were contractually obligated to perform in the way that the agreement reflected?
A. That's probably true, but technically, the technical people were going forth and doing it that way.
Q. Do you recall what other issues were identified as quote, unquote, equity issues?
A. If you give me the list of issues, I will be glad to point them out to you.
I just don't remember them. They

were, we wound up I think with 32.
I said originally there were 54, but after reviewing them, we concluded some of them were no longer issues as we misinterpreted something possibly, or in 90 percent of the cases, it was these two issues are really the same thing and they were combined, but the final set I think was 32.
Q. Did you have responsibility for any issue or issues in particular?
A. All of them; that was my job, identifying the issues, and you know, figuring out who's, how they got done, yes, and I, the utilities took theirs, we took ours.
Some of them were our job to come up with the recommendations for resolution. Some were passed on to other people in the DOE or DOE contractor community because we needed some of their advice on some of them, but most of them, we did.
Q. How long did this process continue?
A. That's a, something I can't specifically remember is when it terminated.
I think it was some time in the early nineties was the last time we had these

73

get-togethers, and I can't remember what the circumstances were.
I was thinking about that last night. I was trying to remember what the circumstances were that caused this thing to stop because it was really healthy, and I don't remember whose side decided to stop it and why, but I enjoyed it.
We were really getting something done I thought.
Q. Did the issue of acceptance rate come up in these discussions on the issues to be resolved with regard to the standard contract?
A. Yes, if I remember. Like I say, if you give me that list of issues, I could point it out.
I think there was one or two issues that related to interpretation, the oldest fuel first and then kind of stuff which impacts not necessarily the rate.
The rate was not an issue, but how you allocate the rate.
Q. And why was rate not an issue?
A. It just wasn't. We had a rate that we were working with. We were told by the program

74

what the rate was going to be at that time. I think a full-blown system, everybody projecting it was going to be 3,000 tons a year ramping up from, I don't know, 600, 1200 tons, something like that, ramp up to 3,000, and that's the rate we dealt with.
Q. When was that rate provided to you or PNL?
A. As soon as the program began, 1983.
Q. And that was provided to you by?
A. By DOE.
Q. And anybody particularly within DOE?
A. No. It was part of the program guidance you get.
Q. Do you recall in what form this program guidance was given to PNL?
A. There is a terminology that the government used back then.
I can't remember what it was called. Just comes in as a set of guidance, go forth and do the following things. Here is how much money you're going to get, and there is a budget process, and you get the guidance, and you go to work trying to interpret the guidance, and you go back to DOE and say this is really what you

75

want? Is this this kind of stuff? And everybody agrees okay, this is what I really meant to say, and go do this, and here is, here is information you need to work with. Here is an acceptance rate, for example.
Q. Did you have any knowledge of how DOE came up with this 3,000 number?
A. Not first-hand, but it is my opinion that it derived from the old commercial radioactive waste management impact statement that a repository could handle, and I think in there they were showing repositories could handle about 3,000 tons a year, and I think that was the basis.
Later somebody said whoa, wait a minute. The impact statement was based on a hypothetical program that was going to take a lot more stuff in, so that may be too high a rate, but that's how it started I think.
Q. Do you know whether or not this rate was the rate that DOE contemplated taking spent nuclear fuel at the time it signed the standard contract?
A. Whether it -- I don't think it was more, as much of a plan at that time as it was

76

a, as a druther, what they would like to do, what they tried to do.

It was a, yeah, I guess you would call it -- it was a planning base, okay? Here is a goal. Let's, what have we got to do to achieve it?

Q. Do you have any knowledge about what either the utilities' or DOE's intentions were with regard to the rate of acceptance when either party signed the standard contract?

A. No. No, nothing to do with signing the contract, no.

Q. But do you have an understanding what the parties thought would likely happen at this time?

A. No, because the contract specified DOE would go away and develop an acceptance rate and publish it in 1986, and it would called the Annual Capacity Report, and the utilities were given, if I remember right, prior to publishing each one, every year the utilities were given advanced copies for comment, and then we would incorporate their comments, and sometimes we had, I remember in some of the early ones, we had appendices which delineated and echoed their

77

comments.

Q. Do you know whether DOE had any guidelines that it relied on in developing the acceptance rate?

A. Like I told you, I think the first acceptance rate came from the commercial radioactive waste management impact statement, which was their document. That's all they had.

I don't know. There may have been some other thing. I was not privy to it.

Q. Are you familiar with a meeting that occurred in December of 1983?

The meeting was titled proceedings of the 1983 civilian radioactive waste management information meeting.

A. I'm not familiar with the report, no.

Q. I'm going to --

A. But the meeting sounds interesting. I'm trying to figure out what meeting it was.

Who was there?

Q. I'm going to give you a couple of excerpts from the report that was issued from that.

A. Who issued the report?

Q. It's the report that says on the title

78

that it was sponsored by U.S. Department of Energy Office of Civilian and Radioactive Waste Management.

A. Sponsored by, but who, was this an -- what's the report number?

Q. There is a number in the upper left-hand corner. I show you the --

A. That makes a difference. What's the report number? Is it EI report?

Q. I don't see that designation, and I don't know if it has -- there is a CONF?

I'll give you this title. Take a look at it. It's got a forward. I've got excerpts, Table of Contents of that meeting, and then I've got a couple of pages from that report which actually excerpt the program overview given by Robert Morgan, so just take a look at it and see if you have any familiarity with this that might refresh your recollection on the top.

A. Like I said, I'm not familiar with the report, but maybe the meeting.

(The witness reviewed the document.)

THE WITNESS: No, I was not party to this.

This was a high-level meeting, Bob

79

Morgan and his staff.

This was not the information meetings I thought it was.

(The witness reviewed the document.)

BY MS. HEWITT:

Q. You can see that there is a portion of that Robert Morgan program overview that I have highlighted?

A. Um-hm.

Q. That indicates --

A. Basic strategy.

Q. Yes. Can you take a look at that?

A. Um-hm. I did.

Q. And we're going to make this probably Billy Cole Exhibit No. 1 to the deposition.

(Cole Exhibit No. 1 was marked for identification.)

BY MS. HEWITT:

Q. Does that strategy sound familiar to you at all?

A. Oh, yeah.

Q. How are you familiar with that strategy?

A. That was a, that was the purpose. The

80

basic purpose of the Nuclear Waste Policy Act was to try to help keep the utilities from having to run out of storage space, so the utilities are in there for generating electricity and not storing fuel.

You know, the government had a responsibility to help them because they, like I said, they stopped reprocessing.

This is a basic strategy, and a part of the primary mission was to try to keep them from having to add more storage.

That was one of the major goals of the program.

Q. Do you know that was one of the major goals of the standard contract?

MR. MILLER: Objection. Lacks foundation.

THE WITNESS: I don't know if the contract had a goal or not.

The contract was roles and responsibilities and who does what to whom and when.

BY MS. HEWITT:

Q. In this testimony, Mr. Morgan states that during the first year of operation of the

81

repository in 1998, comma, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location?

A. That's right.

Q. Do you have any knowledge about whether or not this strategy was used in developing the acceptance rate?

A. At that time, probably not.

Q. What do you mean?

A. I don't think that Mr. Morgan was, I don't think the initial acceptance rate was based on what it was going to take to solve the utilities' problems on spent fuel storage.

That's my own opinion. I think it was purely a rate that you could operate a repository.

I don't think -- it wasn't until later years that we started worrying about whether, you know, specific utilities had problems or not and what, and what would be a reasonable rate for that.

Now recognizing that if you start receiving it for a 3,000 ton system with a ramp-up starting at 1200 tons, there would have

82

been plenty of storage capacity to make sure that the utilities would not need additional storage, so that was, it was secondary because there is plenty capacity there.

If you did it at that rate, that was a rate that a repositor could operate, and by chance, it was plenty to keep the information storage.

The first utility that said he was going to have storage problems turned out not to be the first utility with storage problems, but they were telling us information, but they had legal problems and they couldn't tell us necessarily the whole truth all the time, and so we were planning our program based on the information given to us by the utilities.

You know, the first one that had a storage problem that did something was Virginia Power, but the first one who said he was going to have one was Portland General Electric, and then because they were worrying about some hand ties, they couldn't tell us the truth.

Q. When DOE provided you with the 3,000 rate, did you have an understanding about whether or not DOE believed this would be a rate

83

that would be sufficient to make sure that utilities would not have to have additional storage?

A. I just answered that question -- No, I don't think so.

I think it was the date that a repository could operate, and just so happens that it is, was plenty, and because I know based on the information, that was my job to know how much storage problems these utilities had and when they had them, and there was plenty, but if they were considering all of that, I was not privy and not party to that information.

Q. Initially it was intended there would be two repositories to take spent nuclear fuel?

A. That was the initial thinking in the law, yes.

Q. Why?

A. One in the east, and one to share the burden of, the political burden predominantly, of mostly electricity generate nuclear. Consequently the spent fuel it generates is in the east.

Most of the places where it was probably going to be best to site a repository

84

I don't know if any substantive changes were made.
I don't remember any.
Q. Why don't we take a look at the summary in the Annual Capacity Report dated 1987.
In the fourth line, it says that the Annual Capacity Report was for planning purposes?
A. That's right.
Q. Do you have an understanding of what that term means?
A. Sure.
Q. What does it mean?
A. It means it's for planning. It means you're supposed to use this to go plan in, you know, building, whatever you're going to do.
It's for the utilities and the DOE's contractors to plan its programs.
Q. In your opinion, were the utilities entitled to rely on what was in this plan?
A. At that time, yes. It's for planning purposes. It's not carved in stone because it was going -- it could change, and it did change, and it's always for planning purposes.

93

It's not a commitment.
Q. Um-hm. There is a term in the next line called waste management system.
Do you know what that term refers to?
A. Yeah.
Q. What does it refer to?
A. In this case, it was referring to whatever facilities and transportation infrastructure DOE would come up with in total.
Q. Can you name some aspects of the waste management system?
A. Repository, transportation, interim storage, if it was, quote, to be approved by the government or by the Congress, those were the major facilities.
Q. The second paragraph starts with a reference to system configuration and states that the system configuration used as the basis for this report is that defined in the mission plan amendment?
A. Um-hm.
Q. Do you know what mission plan amendment that term refers to?
A. Yeah. They amended the nuclear waste or they amended the mission plan some time '86

94

or so, and they kept amending the mission plan throughout the program.
Q. What was the mission plan?
A. It was DOE's overall plan on its mission to provide a facility and/or facilities to take the fuel away from the utilities.
Q. Did PNL have any role in developing the mission plan?
A. Yes.
Q. What was PNL's role?
A. I don't know. I wasn't personally involved in it.
Q. Who was?
A. Don't know.
Q. But you know that PNL had some involvement?
A. I know they did because they had involvement in that program. They had their fingers in it for years, yes.
Q. Okay.
A. I'm sure they provided some input to it, but I can't remember which contractor authored the mission plan, or maybe DOE did and just collected information from the various contractors.

95

I don't remember. I didn't work on it.
Q. Further down the paragraph, almost, you know, the last quarter, there is a term, a sentence that reads the allocation of quote, unquote, acceptance rights is currently based on the projected annual capacity of the WNS, WMS to receive SNF and the age of permanently discharged spent fuel as determined from 1985 data?
A. Um-hm.
Q. When it says the projected annual capacity of the WMS to receive SNF, what aspect of the WMS formed the basis for the projected annual capacity?
A. Just this acceptance rate right here -- 1200, 1200, 1200, and 2000.
Q. But that reflected the capacity of what?
A. Of the system in total, the waste management system, it's, its ability to take fuel.
Utilities don't care whether it's a hole in the ground or where it goes or if it's sitting out on a train at four miles an hour

96

specifically efficiency of operations, but efficiency of carrying out provisions of the contract sometimes, but predominantly operational considerations.
Q. Do you recall what some of those efficiency issues might have been?
A. Like I said, if you get that list, I can point them out to you.
I don't.
Q. On page 8, I think it's the only paragraph on that page --
A. Um-hm.
Q. The first sentence says the number of purchasers whose final delivery schedules may be accommodated in any given year will be constrained by the capacity of the WMS to accept SNF?
A. Correct.
Q. Why, why would why would the repository or the WMS operate as a constraint on the utilities?
A. If your capacity is 3,000 tons, and the utilities want to give you 4,000 tons, you can't take it.
It's constrained by the, like this

101

says, it constrained by the capacity of the system.
Q. Was DOE projecting that utilities would want to give DOE spent nuclear fuel in excess of 3,000 metric tons per year?
A. Sure.
Q. Why would that be the case?
A. Because the utility said so.
Q. Why would they have said that?
A. Most of it was informal, but comments that were coming in and stuff on this report, for example, some comments came in says, from some utilities, it said what do you mean I'm only going to get 30 tons acceptance in the first year? I've got a contract that says you're going to come pick up all my fuel in 1998.
I mean, yes, some of them were being, reading and interpreting how they wanted to interpret it and being obstinate like a lot of people can be.
Q. The second sentence in that paragraph says that the acceptance capacity available for allocation through the purchasers will equal the system operating capacity?

102

A. Um-hm.
Q. Unless part of that operating capacity is used to accommodate contingencies?
A. Um-hm. All that means is that if you've got a 3,000 ton capacity, that's all we're going to allocate, and if something comes up, you've got an emergency, you have to interrupt that, if it could handle it without any other problems, fine, but if it's not, it may slip everybody in the queue.
Q. So is it correct to say that DOE developed the acceptance rate based on the capacity of the system to take spent nuclear fuel?
A. Yes. That's exactly what it is.
Q. Was that always its guidelines in developing the acceptance rate do you know?
A. They are equal. The acceptance rate is the, the system capacity is the ability for it to accept spent fuel.
Q. Well, you could have a system capacity that is 3,000, but DOE could choose to accept less than 3,000?
A. That's different.
Q. Why is that different?

103

A. If they chose to accept less than 3,000, then they're not allocating the system capacity, and that's what it said it did.
Wouldn't make much sense to build a facility for 3,000 tons and only take 2,000 tons if you're, unless you're in a ramp-up phase and had problems, and planning, mission plans, things like that don't recognize those kind of contingencies.
You build a 3,000, you operate a 3,000 once you ramp up. Doesn't really recognize the other.
Q. Lunch is ready, so I think this might be a good time, we have been going for about two hours, to take a break.
A. Okay.
MS. HEWITT: Unless somebody disagrees?
Okay. Why don't we take why don't we say 45 minutes for lunch?
Why don't we go off the record?
(Whereupon, at 12:27 p.m., the deposition was recessed, to reconvene at 1:15 p.m. the same day.)

104

AFTERNOON SESSION
(1:17 p.m.)
MS. HEWITT: Why don't we go back on the record?
Whereupon,
BILLY M. COLE,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:
FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MS. HEWITT:
Q. Mr. Cole, I would like to finish up just getting an outline of your professional history.
We sort of got detoured a little bit on the substance of your duties there, but how long did you work on the waste management program for PNL?
A. The period of time that I worked on waste management problems, whether you call it -- the waste management program has some official connotation to it, but working in the waste management area for PNL, probably from early '70s, maybe late '60s, early '70s off and



on.
In those days, I did a lot of other little things in those days, but that's, when I started working on it was probably '68, '69 as a technician writing computer programs.
I also worked on the nuclear powered artificial heart program.
I also built some telescopes up on top of the mountain for the Aurora program.
I also did some work for Rutgers University for PNL in tracking Russian satellites and things like this -- a lot of things.
Q. You had said earlier that you were the manager of waste acceptance at PNL from the middle of 1985 until January 1989, is that right?
A. Probably middle of '85 until January of '89, yes.
Q. What happened in January 1989?
A. I resigned my position at Battelle and left.
Q. Why did you resign?
A. I got a better offer.
Q. And what was that?



A. Vice president of JAI Corporation.
Q. What is JAI Corporation?
A. Johnson Associates, Incorporated, Nuclear Engineering, Beltway bandit.
Q. And what position did you take with them?
A. Vice president.
Q. And what were your responsibilities as vice president?
A. Bring in money.
Q. Did you continue to work on the DOE civilian radioactive waste management program?
A. Yes, I did. I turned around and subcontracted back to PNL.
Q. Did your tasks differ in any way now that you were working for JAI?
A. No, not really. I just was no longer in charge.
I was a subcontractor.
Q. Who did you report to when you were at JAI working on this civilian radioactive waste management program?
A. I think the person that took over for me I believe at that time was Rick Walling, but the man working on most of this stuff for Rick



was Pat McDuffie, so most of my interfaces were with Pat.
Q. And at this time in 1989, who were you interacting with at DOE, if anybody?
A. Alan Brownstein; let's see. What was her name? The people that worked for Alan -- Mary Lou, Mary Lou Payton I think was her name.
Q. And how long, how long were you in the position of vice president at JAI?
A. Well, I'm still. Still there on my business card, even though I'm not very active, but they still, the Board of Directors keeps both me, and I don't refuse it, so that gives me free business cards.
Q. Have you been employed by JAI continuously since 1989?
A. No.
Q. Did there come a point in time where you left JAI?
A. Yes. Yes.
Q. And when was that?
A. August 1993.
Q. And where did you go?
A. I went back to work for PNL, and when I say PNL, I mean Battelle.

Battelle Memorial Institute operated the Pacific Northwest Laboratories for the Department of Energy, so I worked for Battelle, but they contacted me and asked me to open up an office for them in Germantown, Maryland, on the mixed nuclear waste program since I had done one for the spent fuel program, and after some negotiations and some reasoning, had a lot to do with retirement benefits, I accepted, went up and got the office open, got the program started.

A year and a half later in 1995, Secretary O'Leary downsized all the laboratories.

One of the first ways of downsizing was what they called an enhanced retirement package, so they were downsizing PNL.

On the payroll, I was a PNL employee even though I was here in the Washington, D.C. area, and I was eligible, and I took it, so I retired physically formally and finally retired from Battelle in May 30th -- no -- April 30th, 1995.

May 1st, went back to JAI, same position.

109

Q. When you returned to JAI on May 1st of 1995, did you return to work on the civilian radioactive waste management program?
A. Yes, I did. One of the roles when I first went to work for JAI, I was working doing some work still for PNL plus a few others, some classified stuff that I can't talk about, but we did a lot of things.

In 1991, DOE hired a new M&O contractor, management and operating contractor, for the commercial waste management program.

The M&O was no longer PNL. It was TRW.

JAI was one of the teammates with TRW that bid on that contract, and we won it.

I became the manager of the waste acceptance department for the new program. What goes around comes around.
Q. And when you returned in 1995 to JAI, did you resume that role?
A. I resumed that role again, yes, because there was a couple interim managers while I was gone that for one reason or another didn't work out well with DOE, so I came back in.

110

Q. In your role as manager for waste acceptance, either at PNL or at JAI, did you have occasion to participate in all the APRs that were produced by DOE?
A. Yes.
Q. And did you have occasion to participate in the production of all the ACRs produced by DOE?
A. Yes, in one form or another, yes.
Q. What other responsibilities did you have in the mid-1980s at PNL with regard to the waste management program?

You had mentioned the, developing the ACRs as one, one additional task.
A. No. I told you the FIMS, which is the federal interim storage program, F-I-M-S.

Storage requirements report, I was responsible for developing that.

The ACR issue resolution process, there were a lot of other little jobs. We were doing technical jobs like determining what the effects would be on spent fuel in dry storage for long periods of time and with certain types of atmospheres, either oxygen or inert atmospheres and things like this.

111

We had all kinds of the nitties going on.

We also developed the first dry storage cask for testing spent fuel in dry storage called the REA 2023 built by Riddenhall Eggers & Associates. It's still sitting out in Idaho right now with fuel in it.
Q. Did you have any role in developing or producing the fee adequacy reports that were issued by DOE?
A. Yes.
Q. What was your role?
A. My predominant role was as manager responsible for the report.

The man who actually did the work was Roger Engel.

I had to approve it, but typically I approved most anything Roger did. He was good.
Q. Were you responsible for or did you have any role in producing the total system life cycle reports issued by DOE annually after the standard contract was executed?
A. I never had a lot of involvement in the early years of total system life cycle cost stuff.

112

Later years in the nineties, I would feed information to the people that were doing it, things like acceptance rates and things like that.

Q. Did there come a time where you practically retired from JAI?

And I know you say you're still affiliated with them, but I also understand that you're retired now?

A. I keep trying to be retired, yes. February 11th, ninety, is it '99 I think was when the contract that TRW had was over, and I decided well, that's a good time to bow out.

I worked for 50 years. I paid in Social Security for 50 years, and I decided it's time to quit.

Q. So at that, at the point in time where you stopped working on the civilian management waste project or program?

A. Yes.

Q. I would like to go back to the ACR process.

A. Okay.

Q. We talked about the June 1987 ACR report.

113

I am going to give you the next ACR report dated June 1988 that DOE issued.

Just take a glance at it to see if you recognize that as indeed the 1998, 1988 ACR report.

(The witness reviewed the document.)

THE WITNESS: Yes. It's got the blue cover on it.

Yep, that's it.

BY MS. HEWITT:

Q. And are there acceptance rates listed therein?

A. I'm sure there are. Let me find them. Yep.

Q. Now did PNL prepare this 1988 report?

A. Yes.

Q. And did you participate in that preparation of the report?

A. Yes.

Q. How did you secure or come up with the acceptance rates listed in the 1988 report?

A. It says so right here -- source 1988 mission plan amendment.

Q. And did you have any discussions with DOE about using those acceptance rates in the

114

1988 report?

A. Yeah, we had discussions, but this was the mission. This is what we were told to use.

By then, things were changing. It was getting pretty obvious they weren't going to be able to get a facility operating as soon as they wanted. That's why the new date in here.

Q. When did DOE begin to realize that they would not be able to meet the January 31st, 1998 date?

A. I don't remember specifically, but that was recognized in that, and that's why they amended the mission plan.

Q. And that's when, do you recall?

A. Um-um. Does it have a date here? It was the 1998 mission plan, so I guess it was around then.

Q. Do you have knowledge about the nature of that amendment?

A. The only thing I remember was that the program was, start date of the program was going to slip by five years or so.

Just couldn't see how they were going to get there based on all the roadblocks and impediments that kept being thrown at them.

115

Q. Did you have any input or participate in the process of recommending the use of an MRS facility in connection with the waste management system?

A. No. It was not my role to recommend one, no.

Q. Did you participate in any analysis regarding the MRS system?

A. No. I mean I, I believe that the MRS was the solution to the problem.

That was my own personal belief, and I let everybody know that, including DOE and all the other contractors, but not everybody listens to me.

Q. I'm sorry?

A. I just said but not everybody listens to me.

Q. What was the problem that you, that you referred to in your earlier response?

A. Well, that I didn't think, first of all, I didn't think that the Nuclear Waste Policy Act was correctly written.

I thought that the MRS should have been the focus and that the repository deep geologic disposal or whatever final disposition

116

Q. Okay. Can you hand that back to me, please? I think we're done with that.
(There was a pause in the proceedings.)
BY MS. HEWITT:
Q. Mr. Cole, what was your role in developing or producing the 1990 Annual Capacity Report?
A. I was responsible for developing it.
Q. I'm going to hand you a document that's entitled the Annual Capacity Report, a date on it December 1990, and just take a quick look like you have earlier to confirm that is indeed the report that we're speaking about.
(The witness reviewed the document.)
THE WITNESS: Yes.
BY MS. HEWITT:
Q. And if you could locate the page that has the acceptance rates on it? I don't know offhand from here where they appear.
A. Oh, yeah. Upper and lower bounds, yes.
Q. Did you have any role in developing the upper or lower bounds as they are reflected in the 1990 Annual Capacity Report?

121

A. No. Those were fed to us. As you can see, the upper bound was the same from the previous report.
Now they were recognizing they still had a problem and the problem, the rate was the same in the previous report, but the dates changed again.
They were back to 1998 acceptance dates, but they kind of felt they could maybe do that if they had this lower bound, and the lower bound, the basis for the lower bound was what they felt the transportation system could accommodate.
That's where that came from.
Q. And what do you base this knowledge on?
Did you have discussions with DOE about this?
A. Yeah. Yeah. That's where they told me it came from.
Q. And why did transportation suddenly figure in the development of the --
A. Well, if you can't transport the stuff, it doesn't matter how big a facility you have.

122

If you can't get it there, it doesn't matter.
That's the maximum they felt, you know, there was some limits the transportation program started working under.
They felt that they might struggle to do better than this.
Q. And --
A. Why they used that as a lower bound instead of upper bound, I don't know, but that's what they used.
Q. With whom at DOE are you speaking with at this time about the ACR?
A. Mr. Alan Brownstein is responsible for the ACR, but he wasn't the one dictating what had to be down.
He's the messenger. Somebody hired the man.
I think, I think the person responsible for the transportation program and coming up with those numbers, the high-level person at this time I believe was Keith Klein.
He's now director of Richland operations, DOE Richland operations.
Q. Did you ever have occasion to see any

123

documents reflecting transportation limitations on acceptance?
A. I probably did. I just don't remember specifically.
I read everything I could on it.
Q. Do you recall exactly what the technical limitations were on the ability to accept spent nuclear fuel?
A. What I remember, it was how quickly they could get all the casks and infrastructure in place, but I don't -- that's all I remember.
Q. Did the 10,000 annual capacity limit applied to the MRS figure into this acceptance rate at all?
A. Into this one?
Q. Yes.
A. Obviously not. It shows 24,000 here. There is an upper bound.
Q. How about in the lower bound numbers?
A. I don't, I don't think that -- like I said, I think the limitation here was the transportation infrastructure, and the lower bound had nothing to do with facility.
That's my recollection.
Q. Could I see the document back?

124

A. Um-hm. I can't remember all the details on those upper and lower bounds and those, in that particular, that was kind of an anomaly report.

I didn't like it. I didn't like doing it because I didn't think it was good guidance for the utilities, and these were supposed to be guidance documents, but DOE was under some pressure.

We kind of cured the problem I think in the next year's report.

Q. DOE was under pressure from whom?

A. When I say DOE, DOE has lots of people. People that are responsible for getting this report out was under pressure by upper management to get something out, but they, the upper management was concerned with program slippage, what are we going to do about it?

So they had to put something out by -- contract required it, but I think they really wanted to, you know, put something out that didn't have a lot of specificity.

That's my own interpretation.

Q. Did you have any discussions with DOE about whether it was appropriate to issue an ACR

125

given that DOE recognized that the facility would not be available in 1998?

A. No, because the Annual Capacity Report is required under the contract, and it's put out there based on all the knowledge and based on all the planning as a planning document.

There was never any discussion of whether it should be put out.

It was, its contents were always under discussion, of course.

Q. Did you ever have discussions with DOE about the appropriateness of using an upper bounding and a lower bounding case?

A. Yeah. I said I didn't like it.

Q. And to whom did you relay these concerns?

A. To Mr. Brownstein.

Q. And what were their responses or his response?

A. Well, bottom line is this is the way it's going to be done.

I mean I don't remember the details of the conversation.

I just remember I never liked it, and when I don't like something, I tell people, so I

126

know I would have told him.

Q. And why didn't you like it again?

A. Because it's supposed to be a planning document, and there is not enough specificity there for anybody to plan to.

If I were a utility, I couldn't use it.

Q. Why not? Could you be more specific?

A. Because it doesn't tell me how much capacity is going to be available for me in any given year.

It just gives me a range, and I can't plan to that.

That's just my own opinion.

Q. And did DOE ever expressly disagree with your opinion?

A. Obviously; they printed it anyway.

Q. Well, they could have printed it but still agreed that you were, that you had the right opinion.

A. Yeah. There were a lot of people that agreed with it, yeah.

Q. Agreed with your opinion?

A. Yes, most definitely, yes.

Q. Do you recall who --

127

A. No.

Q. Those people were?

A. No. Mr. Brownstein was probably one of them, but his hands were tied, too.

Sometimes politics controls what we do. Reality doesn't. Science doesn't. Politics does.

Sometimes those of us down in the trenches don't know what all the political problems that are going on, either.

Q. I'm going to now turn to the December 1991 annual acceptance, Annual Capacity Report, and is it correct to assume that you had some role in producing that document as well?

A. Yes, I had a role in it.

Q. All right. I'm going to hand you a document entitled Annual Capacity Report with the date 1991 on it, and if you would just confirm that that's the document that we are both speaking about?

(The witness reviewed the document.)

THE WITNESS: Um-hm. That's it.

BY MS. HEWITT:

Q. And I see you have located the page which has the acceptance rates on them?

128

A. Right.
Q. Do you know how those acceptance rates were developed?
A. Yes. I developed them.
Q. And how did you develop those acceptance rates?
A. This was using information out of the nuclear waste policy amendments which made the statement that you couldn't -- well, first of all, back up.

By this point in time, DOE, it basically had the MRS as part of its mission, part of its planning. It was going to be there they were hoping.

And in order to do it, under the requirements of the Nuclear Waste Policy Amendments Act, the act stated if you had an MRS, it could not accept more than 10,000 metric tons of fuel until the repository became either operational or licensed, was something like that.

The mission I think at that point in time showed MRS they could maybe could get one going in 1998, a limited capacity probably.

Repository wouldn't start probably

129

until 2010, 12 years later, so they asked me, you know, what would be a reasonable rate because, you know, we can't build a big full-blown facility to get started, but we would like to make sure that we have something that's useful, so I came up with this rate which recognized the 10,000 ton limit over a 12-year period even though we only published ten years here because that's all that was required in the contract, to publish the first ten years, but if you add the other two years in here, you get another 1800 tons, and you have got 10,000.

It also recognized what the utilities had told us were their storage requirements, their need for out of tool, out of tool storage, recognizing the ability or inability to keep a full core reserve.

Information fed to us through a form they filled out every year called the RW 859; based on that information, in 1998, there was less than 400 tons of allocable storage capacity required on the aggregate by all utilities.

Now this takes us back to my statements earlier about issues of operations versus issues of equity.

130

This is an equity issue. How the utilities might want to divide that up amongst themselves can be their problem, but we would provide enough capacity so that they would not, they as an entity would not have to add any additional storage capacity.

The second year, 1999, they were telling me that it was like 575 tons required.

The third year was 850 or something like that, and from then on out, it was a nominal 850, 950 ton, nominal 900 tons, so I looked at that and says geeze, isn't that kind of nice? I've got 10,000 tons of capacity that I can use over a 12-year period, and lo and behold, I can also lay it out so that the utilities won't have to, if we actually did that, utilities, even though it's not what we were wanting, it's not 3,000 tons, but it is enough to keep them from having to add additional storage.
Q. And why was that a factor in your consideration of developing the acceptance rate?
A. Because that's a, that's the whole purpose of the Nuclear Waste Policy Act was to keep the utilities from having to add new

131

storage so they could keep operating.
Q. And in your opinion, did the standard contract reflect those purposes?
A. Did the contract reflect those purposes?

(There was a pause in the proceedings.)

THE WITNESS: Don't know. Don't know if it had anything to do with the contract as far as purpose goes.

The contract was a mechanism of roles and responsibilities, not purpose.

The act, the Nuclear Waste Policy Act was the purpose.

The contract was a way of implementing it, and that's how this rate came about.

BY MS. HEWITT:
Q. And was it your contention that this was a reasonable rate to you to use?
A. Absolutely; if you can only do a limited amount of capability, it would be nice to do it, so it really helped solve some problems, which was the initial problem they were trying to solve.
Q. And could you state again what that

132

problem was?
A. Keep the utilities from having to add additional storage.
Q. Did DOE consider this to be a reasonable rate?
A. Yes. Obviously they published the report.
Q. Why were you involved in developing the acceptance rate at this juncture since you weren't involved previously?
A. I was asked what I would do, and I also -- well, I can't remember if I was asked or if I went and told them what I would do since I knew they needed something done, and they liked the idea.
They thought well, you know, we can live with this. We have a basis now for our -- all the rates in the past were pulled out of old stuff or sometimes WAGS, came out of the old CRWMS reports, somebody made something out of transportation requirements, but nobody had a real solid basis.
Here was something that says if you can go build a facility, as limited as it is, that still solves a problem and buy you some

133

time to get the bigger facility going, and that's what I, why I approached them with this.
Q. Do you recall reviewing any particular documents with regard to determining what the utility storage requirements were?
A. Sure.
Q. And what are those documents?
A. The spent fuel storage requirements document, which I also published.
Gee, it sounds likes a college professor sitting there reading his own works, teaching from his own books.
Q. How often would this, how often was this document published, the storage requirements document?
A. We did that annually also.
Q. In preparing the 1991 Annual Capacity Report, which storage requirements document would you have reviewed to prepare these acceptance rates?
A. The, whatever the latest one was, but the report itself wasn't what was used.
It was, the information that was used to develop the report was what was used.
It came in on the RW 859. The report,

134

the Annual Capacity Report is a higher level thing.
It kind of shows you in the aggregate what, what the problems are and identifies a few specific utility problems and stuff.
The RW 859 gave us all the specificity of the utilities that had problems and when their problems are going to happen.
This was information provided to us by the utilities under penalty of law. This was accurate, correct information. So they claimed.
Q. And am I correct in understanding that your testimony is that the rates listed in the 1991 Annual Capacity Report were sufficient to address utilities' storage needs in the aggregate?
A. That's correct.
Q. What do you mean by that?
A. If you take all of the utilities that claim they had a storage problem in 1998, and you summed it up, it would have been less than 400 tons of allocable storage required.
Q. Per utility?
A. On the aggregate, total, not per utility -- total, less than 400 tons total for

135

all utilities.
Q. But in fact there may be one utility that had greater than that amount?
A. No.
Q. No?
A. Impossible if it totals less than that.
Q. Okay.
A. None of them had -- if you summed up all the utility allocable storage requirements for those years, it did not exceed 400 tons in 1998.
This is what they told us.
Q. Who is they?
A. The utilities via the form RW 859 under penalty of law.
Q. I'm going to hand you a document that actually has a DOE document number.
It's DOE backslash or RL hyphen 90 hyphen 44.
It's entitled spent fuel storage requirements 1990 through 2040, and it's dated November 1990.
A. Okay.
Q. I'm going to hand it to you and see if

136

A. That's very -- I can't answer that yes or no because as the program slips the date it thinks it can get something started, then the amount of spent fuel in the beginning year that the utilities are going to have to add additional storage for -- excuse me for ending the sentence -- well, is going to increase, so you will get to a point in time, if you don't start the thing until 2010, probably 400 tons is not enough for the first year.

It was based on a 1998 start date, and we could look back in that report and see what it would be in 2010, but I would imagine it's probably more in the neighborhood of thousand, 1200 tons, somewhere in that, additional storage required that year.

See, the reason you didn't worry about it prior to '98, '98 was the date that the contract and the law said DOE had to start providing that capability.

That year if they did 400 tons, they could take care of that problem.

Didn't mean utilities didn't have a problem before that, but under the law, they were required to take care of their own problem

157

before that.

There were some that had to add storage prior to that, that date. A lot of them had to.

Q. Did you have a role in publishing or producing the Annual Capacity Report and acceptance priority ranking that's dated March 1995?

A. My only role in that one was as a reviewer because I was back working at PNL on the mixed nuclear waste program at that time, and I was asked to review the thing before it went to press.

Q. Do you know why this document was published concurrently with the APR, the ACR and the APR were published concurrently as opposed to separately as they had previously?

A. Didn't make any sense to keep them separate.

It's cheaper to do one document, and since the information, since we originally back in the '87, '88, '89 documents, it was one, even though we didn't call it that, it made sense to make one out of it.

Q. I'm going to hand you the APR/ACR

158

dated March 1995 to see if you remember reviewing that document.

(The witness reviewed the document.)

THE WITNESS: Um-hm. Yeah. I think it was kind of a cookie cutter report.

BY MS. HEWITT:

Q. Can you secure or find the page with the acceptance rates on it, please?

A. Um-hm.

Q. Did you have any role in developing those acceptance rates that are included in the March 1995 report?

A. Yeah.

Q. And what was your involvement in securing those acceptance rates?

A. I have already told you; 1991 they were developed, and they were used every year since then.

Q. So those were the same rates?

A. Yeah, 469, yeah.

Q. But in this report, if I remember correctly, they don't have calendar year designation?

A. Right. They finally did year one, year two, year three, yeah.

159

Q. And that was based on your recommendation?

A. I don't know by then. I had recommended earlier. Somebody finally thought it was a good idea I guess, and I, my career, I got a lot of these they finally get around to doing something five years later and I go nanner, nanner, nanner, told you so, I told you so.

Well, that happens in this business. The government moves slower than the contractors want them to.

Q. Do you recall that DOE announced in 1995 that they would not be able to take spent nuclear fuel by the January 31st, 1998 deadline?

A. I think back then they were publicly announcing it, yeah.

Q. Did you have any discussions with DOE about the appropriateness of publishing an APR/ACR given that announcement?

A. No. No. They were still obligated to publish one.

It just, just didn't make a lot of sense to have a report with a date if you couldn't meet the date, and so that's why they

160

long at this rate, can I take everything on a aggregate basis and get the job done? What is it going to cost me?

It was done more at that level.

Q. Did you ever provide information for the total system life cycle reports regarding the acceptance rate?

A. Not regarding acceptance rate, but I did in regarding how much spent fuel would be discharged over time because I was responsible for calculating the amount of spent fuel that would be discharged that the system had to be designed to.

Q. Do you have any knowledge about how the system was designed by DOE?

A. Boy, that's an interesting question, how the system was designed.

Q. The waste management system.

A. Well, the waste management system encompasses thousands of pieces.

Which part of it?

Q. The repository.

A. All right. The repository -- how it was designed -- well, there have been several designs.

169

The first design that was used for all planning purposes was a salt repository.

It was going to have -- spent fuel was going to be taken apart and consolidated into cannisters that would hold about ten metric tons apiece.

These would be put in rooms with boreholes drilled in the rooms in the floors, and these cannisters would be set down in the floors.

All the disassembly hardware would be canned up separately and just used part as backfill and stuff like that.

That was the basic repository design until -- because everybody thought that salt was the best location, and then it became more of a political program instead of a technical program on where could we put this stuff, and so they developed, came up with these three political sites.

One was the Permean Basin in Texas, the Panhandle of Texas, which was a salt dome. The was all on the Hanford reservation, and the tuff at Yucca Mountain.

Q. Did they --

170

A. Two of these were throw-aways.

Q. Which two?

A. The two that got thrown away. The salt got thrown away because it was a lousy storage medium.

The salt got thrown away because it was not on federal land, and the tuff was the only thing left.

Q. Do you know how DOE determined that the repository ultimately built would take or receive 3,000 metric tons of spent fuel a year versus some other number?

A. It was designed to do that. It was designed to accept so many rail casks and/or truck casks in a given year, and unload them and process the fuel and put it in storage container or in, you know, disposal packages, and you build the number of receiving bays.

I think they figured they could do it with three receiving bays, and you design all the stuff so you can take 3,000 tons.

Q. And do you know why they designed it to a 3,000 ton, metric ton annual capacity?

A. It seemed the original, if I remember right, like I said, the original was I think

171

based more on what came out of the old storage, the commercial radioactive waste management impact statement, but in the, the later years, kind of de facto, that appeared to be a pretty good number that if you built a facility and operated it nominally at that rate, it would operate 35, 40 years, and by then, all the reactors had shut down, and you have taken all the fuel and cleaned up the backlog, and that period of time would be about, would be reasonable because the last reactor would shut down in 2038 and you would shut the, close the doors on the repository in 2040 or five years, maybe 45, somewhere, a few years later after you get the last fuel after it's cooled a couple of years, and if you did anything at a faster rate, then you would take a lot up front, and you would be sitting idle for a lot of time and the cost would be too high.

If you did it the slower rate, the utilities would be stuck with storing it on their site too many years after they shut down, so it turned out to be a pretty good number.

Q. Do you know if DOE conducted any analysis on this topic?

172

A. Oh, God, yeah. How about $20 million worth or more?
Every year, somebody did an analysis to make sure that was still a good number, and that was all TSLCC work, things like that.
Q. Did PNL participate in any of these analyses?
A. Yeah, probably. Everybody did. Practically every laboratory out there participated.
Q. And did you personally participate in any of these analyses?
A. No.
Q. And is it your testimony that these analyses concluded uniformly that 3,000 was a good rate to use for designing the repository?
A. Um-hm, based on the latest information on how much spent fuel is projected to be discharged through the life of the program until the last reactor shuts down.
Q. Is there significance to the 35, 40-year timeframe that you referenced in your prior answer?
A. That's when the last reactor shuts down is like 2038, and if you get a repository

173

starting to operate in Year 2000 or so, you operate 35 years, 40 years, then it's all done, and if you're doing 3,000 tons a year, you're taking care of the, what's being discharged, which is nominal 2000 tons a year plus got a little extra to work off the backlog.
Q. Now where did you get the figure 2000 a year being what is discharged?
A. That's what the, that's what the utilities discharge every year.
Q. And was the repository designed to accommodate the discharges?
A. Plus work off the backlog.
Q. Now in the acceptance rates that were used in the acceptance capacity reports, did they reflect what the utilities would discharge or the idea of working off a backlog?
A. I don't know how many times I've got to repeat how that acceptance rate was developed in the Annual Capacity Report.
It was based on if you started the facility in 1998, 400 tons the first year would be adequate to make sure that you at least didn't have to add additional storage in that year, every year, the same.

174

Had nothing to do with 3,000 tons working off backlog or anything.
It was the minimum that could be done to keep them from adding additional storage.
Q. But before that rate was implemented, there was a 3,000, a ramp-up to 3,000?
A. Um-hm.
Q. And is it fair to say that, that when the Annual Capacity Report used the 3,000 metric ton annual acceptance rate, that that reflected what was required to work off what utilities were discharging as well as attacking a backlog?
A. Oh, yes, definitely. I'm sorry. I misinterpreted the question.
Yes.
Q. I'm not always very clear.
A. No. No. That's, that's -- you're absolutely right. That was, that was the initial hope of the program.
Not only did they want to help utilities so they wouldn't have to add additional capacity, they wanted to make sure that you had to work off the backlog.
Otherwise you've got utilities ultimately shutting their reactors down and

175

sitting there storing that fuel for many, many years.
If you only handle a 2,000 ton per year acceptance rate, you would have to operate probably a 60, 70-year repository to finally work off the backlog.
Utilities, that's not what they were paying for.
Q. I'm going to take you back to the fee adequacy discussion we had earlier.
In preparing fee adequacy reports, did PNL or DOE ever consider the impact of the delay on implementing the repository or when DOE would actually take spent nuclear fuel?
A. I'm sure that, that it did impact it, but not directly, because like I said, most of the fee adequacy analysis was based on the TSLCC, which had to use that as a concern when they could operate, how much it's going to cost them each year to operate, when they could get built, et cetera, et cetera, and utilities are lucky because they didn't raise the fee.
They just figured it was not the wisest thing to do at that time.
They could have. The contract allowed

176

it to happen.
(There was a pause in the proceedings.)
BY MS. HEWITT:
Q. Did you have any role in performing environmental assessment of the MRS?
A. No.
Q. If everybody would be okay with this, I suggest we take about a ten-minute break. That will bring us up to three o'clock, and then -- or three o'clock or so, and then we can go hopefully until about five when you're released for the day, Mr. Cole, if that's okay?
A. I'm at your disposal. I can stay here through Saturday morning.
Q. We hope we're not going to be here by Saturday morning.
A. But I didn't bring a sleeping bag!
MS. HEWITT: Okay. We could go off the record.
(A recess was taken.)
BY MS. HEWITT:
Q. Mr. Cole, I would like to just go back and clarify a couple of things that I'm not sure are very clear on the record.

177

A. Okay.
Q. I want to ask you a couple more questions about the acceptance rate which was first introduced I believe in the 1991 Annual Capacity Report.
A. Okay.
Q. And to refresh your recollection, the acceptance rate that was used started in year 1998 with a 400 MTU annual rate and ramped up in about two years up to 900 MTU annual rate, and if I'm correct in my recollection, you stated that you helped develop this acceptance rate that was included in this Annual Capacity Report?
A. It was my -- I developed it personally.
I mean I can't pass that one off to anybody else.
That was my idea.
Q. Okay. The Annual Capacity Report, when it reports this rate, only goes for a period of ten years, right?
A. That's correct.
Q. Was there an understanding or an intention with regard to what an acceptance rate

178

would be following the ten years?
A. No. We never really did one for greater than the ten-year period.
Q. If I remember correctly --
A. Not for the purpose of allocating capacity.
Q. Now you stated earlier that it was your opinion that the 900 MTU annual rate was a reasonable rate in your view, is that right?
A. Yes, based on the information given to us by the utilities.
Q. Do you have an opinion about whether or not it would be a reasonable rate to use for more than ten years?
A. I would have to look at the data given by the utilities, and I could tell you yes or no then, but I can't remember what it was beyond that point in time.
If they were still saying that they didn't need any more capacity than that for additional storage, then it would be reasonable. If they needed more, then it wouldn't be because that was, the bases for that was what could we do at a minimum and still keep them from getting in trouble?

179

Q. Now when we talked about the genesis of the 900 MTU rate and compared it to the numbers in the storage requirements document, I think it was evident from your review that the numbers that were included in the acceptance rate 1991 document were greater than the total storage requirements that were needed, that were reflected in the storage requirements documents?
A. Nominally.
Q. What do you mean by nominally?
A. Well, there may have been one year when it creeped a little more than 900, but most of the years were under 900.
Q. And was there any reason that you chose a figure that was higher than what those rates were in the storage requirements document?
A. Yes.
Q. What was the reason?
A. I had 10,000 tons to divide up over 12 years, and it worked out pretty slick.
If you do 900 tons a year for 11 years, and -- I mean for ten years, and you do four and six, voila, you've got 10,000. I didn't even need my calculator for that one.
Q. You also referred in your earlier

180

answers to, on occasion to program guidance that
you received from DOE?
A. Um-hm.
Q. In what form was that program guidance
provided?
A. Comes in as written guidance.
Q. Were there actual documents that were
provided to PNL with regard to preparation of
the acceptance in the Annual Capacity Report?
A. Yes. Yes. Said to go do it. You
know, program guidance is fairly, oh, sometimes
vague, sometimes with the understanding that you
know what you have to do anyway.
Sometimes you write your own guidance,
give it to DOE, and then they officially give it
to you, but the program guidance in this case
would come in and say the contract specifies da,
da, da, you do this, go develop this report.
Q. Did you ever receive program guidance
in a written form from DOE that instructed you
to use a certain acceptance rate in an Annual
Capacity Report?
A. I don't remember specifically getting
an acceptance rate in written guidance, no.
When the guidance comes in, it comes

181

from DOE headquarters to DOE Richland
operations, from DOE Richland operations to our
contract officer.
It's a contract to contract, and along
with some budget authority, and then it dribbles
down to people like myself as program managers,
and it's usually one or two lines saying what
you're supposed to do, and then you get
together, and you, you as the contractor, start
putting together a more detailed set of, if you
will, guidance, what you really think they want,
and then you echo it back to them.
You meet with them. You get on a
plane, you fly to D.C. and you meet with them
and say here is what I'm proposing to do, is
this really what you had in mind?
And then you start discussing content
and things like this, and they tell you what,
you know, if they have some requirements or not,
and that's when it all happens.
Q. As far as you recall, were there any
written exchanges on the issue of what
acceptance rates to use in the ACR?
A. I don't recall any, but I don't know.
There may have been.

182

I just don't recall.
Q. Earlier you referred to some efforts
that DOE was undertaking to get Congress to do
something about the lack of a repository or
other facilities to take spent nuclear fuel by
1998.
Do you recall any specific actions
dealing with taking with Congress?
A. Several times a year, several, I know
a couple, sometimes more, the director of the
DOE waste management program was called, would
meet, give testimony to Congress about the
status of the program and what was happening,
what the problems were, and what, kind of what
he needed from them.
I mean this is all Congressional
public record and stuff in these meetings, so --
Q. And it was your impression that at
these meetings, they were requesting
Congressional intervention in order to allow
them to fulfill their responsibility?
A. Oh, I don't know how those discussions
go.
It's not so much Congressional
intervention, no.

183

It's Congress wrote the law. Congress
changed the law on them, and they're going in
there and telling them because you changed the
law, this is all I can do. I just want you to
know it.
I don't know what took place
specifically in those meetings.
I just know they happened.
Q. Um-hm. Okay. The last follow-up I
have is that regarding the testimony you gave on
the fee adequacy reports, and you said at one
point in time, the fee was not adequate?
A. That is correct.
Q. Was that ever reported in a report
that PNL produced or that you participated in?
A. No. It was not produced at PNL. That
was produced by, when I was working under the
program, of TRW in '92 or somewhere around then,
and DOE decided not to publish that I think.
I think, well, I'm not sure. I can't
remember now if they -- I know they decided not
to publish the fact that it wasn't adequate.
They may have published a fee adequacy
report saying for right now, it's adequate,
knowing full well it wasn't because they felt

184

A. Came from the Annual Capacity Report, from the one that was published in '91.
Q. And am I right that --
A. I believe.
Q. Am I right that utilities couldn't propose to deliver more than the amount of spent nuclear fuel they were allocated in a particular year?
A. They could propose it, but it would be disapproved.
Q. So is it fair to say that the rights that utilities had to deliver a certain amount of spent nuclear fuel came from the ACR?
A. Yes.
Q. As opposed to from the Delivery Commitment Schedules themselves?
A. No. The Delivery Commitment Schedule's based on the ACR.
It told them, the ACR told them what they had.
This is why in '91, we knew that starting some time soon, I can't remember the dates, they were going to be '93 or so, they're going to be two or three are going to be submitting Delivery Commitment Schedules.

193

That's why we told them, to give them like a three-month comment period and review of the '91 report that said speak now or forever hold your peace.
This is the portion of the capacity that's allocated to your utility, and here is how it was given to you and why it was given to you, and so they knew that information.
Then I can't remember, '92 or '93, they start submitting Delivery Commitment Schedules based on that information.
Q. Now I think you said earlier that the utilities had a reasonable basis to rely on some of the ACR reports, but not on the other ones.
Do you recall that testimony?
A. Yeah, I agree.
Q. And would it be fair to say that for those ACR reports, ACR reports for which they did not have a reasonable basis to rely on, the Delivery Commitment Schedules then were also not reliable documents?
A. The delivery schedule process started out, like I said, I think in '92 or three based on the information out of the '91 report.
At that point in time, everybody felt

194

that that was a good reliable basis. Everything was still fairly on track, or at least DOE kept hoping they could meet that date.
After some time in, oh, I think some time '94, '95 when it, '95 or so when it became apparent that they weren't going to meet the dates, the Delivery Commitment Schedule process was terminated. No longer were required to send them in because they didn't have any meaning anymore.
I'm not that sure of those dates, but it's right in that period of time.
Q. I'm going to hand you a document that I believe you authored when you were at E.R. Johnson & Associates that actually does have a Bates number on it, thank God, and it's -- actually we have two numbers.
One is PA hyphen 222543 is the beginning Bates number, and there is also a PNL number, which is 0081286.
The document is entitled, "Department of Energy Delivery Commitment Schedules for Spent Nuclear Fuel," and it has two names on the document, a Marlies Klose.
A. Marlies Klose.

195

Q. From TRW, and then your name, Billy M. Cole.
Will you take a look at this document and see if it's familiar to you?
(The witness reviewed the document.)
THE WITNESS: Yeah. This was for some technical symposium somewhere.
It was not really considered a document.
It's a presentation.
BY MS. HEWITT:
Q. Did you make the presentation?
A. Probably not; I can't remember when this was.
What's the date?
Q. Well, that was going to be one of my questions.
A. This was probably I'm guessing around '92 or so based on -- all this does is just reiterate and summarize what's in the ACR and how the, how the allocation process worked, and I can't remember what technical meeting this was for.
Q. I'm going to, I would like to make that Cole Exhibit No. 2 to the deposition.

196

(Cole Exhibit No. 2 was marked for identification.)

BY MS. HEWITT:

Q. And I'm going to give you another document which I believe --

A. This must have been around '92 because it references '91 documents.

Q. I believe this document that I'm about to hand you was developed around the same time.

It's on the same topic. It discussed -- the title of the document is status of Delivery Commitment Schedules.

This, it has got your name written on it. It's got Alan Brownstein's name.

It says EEI slash U waste meeting November 6th, 1992.

It also has a Bates number on it CTR hyphen 003 hyphen 1772, and the first part has Alan Brownstein and then your name written, and then attached to this document is a, the same title with your name written in type on it.

A. Yeah. We did up a lot of generic presentation material. And in those days, Alan and I were kind of interchangeable.

197

We would run, if somebody asked can you tell us what this is all about, this program and stuff, and how this process works, and so I would either slip my name in it or he would slip his name in and we would go give the presentation.

This is the same, actually the same, exact same information is in here.

Q. Did you develop the, either of those documents?

A. I was the manager in charge of getting the work done.

People who worked for me developed the information in there, and I reviewed it and said yep, that's correct at that time.

This was just keeping track of the DCSs that came in.

Q. Were you familiar with the instructions that were provided to all fours in connection with the Delivery Commitment Schedule?

A. The instructions that were provided to whom?

Q. To, to the utilities.

(A discussion was held off the record.)

THE WITNESS: It was some, there was some letter or instructions that went out to the utilities from the DOE explaining what they were supposed to do, and give them a sample form I think.

BY MS. HEWITT:

Q. I'm going to give you --

A. I just don't remember.

Q. A copy of the document entitled U.S. Department of Energy instructions for completing the Appendix C Delivery Commitment Schedule general instructions.

And actually I have the document number here which I have covered up, but it's SN 120564.

Why don't you take a look at these pages and see if that seems familiar to you in any way?

(The witness reviewed the document.)

THE WITNESS: Yeah, it's familiar, but I, I wasn't with TRW at that time.

I was off working for PNL again on the mixed waste program, but I know what was in it.

BY MS. HEWITT:

199

Q. Did you have any role actually drafting these instructions?

A. No.

Q. There is a paragraph here that talks about the ACR?

A. Wait a minute. Back up. To be honest, yeah, probably because I think we started drafting those before I left, but it all got completed later.

It was just trying to give guidance to the utilities on how to fill these things out.

Q. Well, there is a section in here that talks about the annual acceptance rates in the ACR, and in particular, it states that the process described herein, and I believe that it refers to the Delivery Commitment Schedule process, assumes that the FWMS will be able to accept the purchaser's SNF beginning in 1998?

A. Correct.

Q. According to the acceptance rate reflected in the ACR; then it goes on to say in the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the purchasers.

Do you recall that at all from the

200

instructions?
A. If that's what they said, that makes sense, yeah, because things can change.
Q. So was the Delivery Commitment Schedule a final commitment by DOE to take the fuel reflected therein from the utility?
MR. MILLER: Lack of foundation.
THE WITNESS: I, my personal belief is that it was a commitment by DOE to take this stuff and a commitment by the utilities to deliver, yes.
And I guess I need to leave it at that because, yes, I think that's true. It is, it did represent a commitment, and I, you know, I know that things changed afterwards.
They couldn't get a facility done in '98, as we all know, and things like that, but it does not excuse an obligation.
Q. What do you mean by that?
A. DOE had an obligation to take something under the contract.
Now how much, that could be debated because it doesn't tell, quote, amounts in the contract.
If you read the language, I think

201

literally they could have taken one spent fuel assembly in and met their obligation.
Q. Was that ever expressed as the intent of DOE?
A. Of course not. Their intent was to get a facility operating in '98, to take the stuff away fast enough so the utilities would not have to add additional storage.
That was the intent.
Q. And do you think that DOE had that intent when they signed the standard contract?
A. Of course.
MR. MILLER: Objection. Calls for the -- lack of foundation.
Sorry.
BY MS. HEWITT:
Q. On what do you base that opinion of yours?
A. They were given that job by Congress, and the job they were given was to, between the DOE and the utilities, to develop a contract and enter into this contract and carry out the roles and responsibilities of the contract, and they went to work trying to do it.
Q. Did you ever have discussions with

202

people at DOE about their obligations under the standard contract in this regard?
A. Oh, of course. Of course I did. I said you guys are liable. You guys are required to take this stuff.
Q. Did they agree?
A. No, not necessarily. Some of them, you know, when you get, when you, when you get somebody in the corner and there is no way out, then they can make other statements.
They can say well, according to this, it says commencement of facility operations, we don't have a facility to operate, so we don't have to do anything, but they were instructed by their legal counsel to say that, in my opinion.
I don't necessarily think that the people I dealt with were technical people.
I don't think necessarily that those were their feelings or words or anything.
It had just gotten to the point where now we have got to fall back on other provisions in the contract, things like I think there were some provisions in here in case you can't do your job, things beyond your control, stuff like that. There are -- all that stuff is in there.

203

Q. Did there come a time where utilities stopped submitting Delivery Commitment Schedules?
A. Yes. I think it was around '95. I think, because I think DOE basically said you don't need to send anymore because that's when things kind of fell apart.
They couldn't make the '98 date, so they didn't have that much meaning anymore.
Q. Can you describe in greater detail what DOE said to utilities in that regard?
A. Nope. Don't know. I wasn't there when I think that stopped. I can't remember specifically the stop date.
It was some time in '95, and if I was there, it was right after I came back from PNL.
The guy who probably has some of the most knowledge on that is a Dr. Williamson.
He was the man responsible for doing the DCSs at TRW. He worked for me -- Douglas Williamson.
Q. But it is your recollection that DOE did instruct the utilities to stop submitting the DCSs?
A. No. They stopped -- I don't know how

204

they stopped.
I don't know if it was under DOE direction or the utilities just decided to stop, why it stopped. I don't know.
I know it stopped. I don't know why. I really don't recall the thing that triggered stopping the DCSs.
Q. Did there come a point in time where it was apparent that submitting the Delivery Commitment Schedules would be a useless exercise in your opinion?
A. In some respects, that's going to have a two-part answer.
I felt that probably should continue the DCSs even if you couldn't make the '98 date if you were to qualify saying that this is your piece of the allocation, whenever the thing starts, so complete the process, and then put it on the shelf for whatever reason made more sense than just quitting to me, but if it was date specific, I could see where people would say hey, this is worthless, waste of time.
Q. And when would that have become apparent to utilities in your opinion?
A. Whenever DOE made a statement that

205

it's not going to meet the '98 date, whenever that was.
I don't know that specific date; some time in the mid-1995 or so when they came out with that, but it would have been nice if you had completed the process, everybody submitted all their schedules, assuming '98 date, and then you put it on the shelf and you change it from '98 to year one, whenever year one is.
(There was a pause in the proceedings.)
BY MS. HEWITT:
Q. If it was changed to year one as you suggested, then how could you know when to submit your DCS if it was required to be submitted 63 months before?
A. Because when the process started, '98 was the date.
DOE could just change it to year one after that.
They were -- you had the whole set for about a five-year period, and then you just put them on the shelf.
(There was a pause in the proceedings.)

206

BY MS. HEWITT:
Q. Were --
A. I never told DOE to do that. Just, you know, just I hate to see something not finished.
Q. There were a number of contractors supporting the civilian radioactive waste management program at DOE, right?
A. Yes.
Q. How would you characterize PNL's role relative to the other contractors that were working with DOE?
A. Depends on the point in time.
Q. Why don't you go through the various segments of time for us?
A. Nuclear Waste Policy Act was passed. PNL was the first management and operating contractor for the DOE's program because they were the ones managing the program before the act was passed for DOE, so they just continued that role.
In 1991, it was turned over to TRW because they felt they needed an integration contractor.
The program was getting big. You had

207

a lot of things going on, and needed, quote, somebody to come in and integrate. That was the superficial reasoning.
The real reasoning is every so often, DOE likes to change, which they did again here just recently.
At the time PNL was the M&O, various other people were also working on the program through PNL, and you know, Oak Ridge, Idaho, Sandia, just a lot of contractors did various pieces, each one thinking he was the one that should be in charge.
Q. But PNL was in charge of that at that point in time?
A. Well, of course. We were formally in charge of the managing the program, but we were instructed also to divy up, give various other labs and contractors pieces of the pie.
For example, I think it was Oak Ridge at that time that had the responsibility for developing the transportation program.
Even though we had the overall management responsibility, they had that piece of it, just that kind of stuff.
Q. And then when TRW took over the role

208

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :

245

(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia
Wednesday, March 13, 2002

Continued deposition of BILLY M. COLE, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons

246

Boulevard, McLean, Virginia 22102-4859, at 10:30 a.m., Wednesday, March 13, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.

247

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
DEVON E. HEWITT, ESQ.
ALEX D. TOMASZCZUK, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703)(770-7962)

On behalf of the Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
M. STANFORD BLANTON, ESQ.
Balch & Bingham, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205)251-8100

248

APPEARANCES (Con't)

On behalf of Plaintiff Commonwealth Edison Company:
THEODORE T. EIDUKAS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of Plaintiff Sacramento Municipal Utility District:
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303)(863-2334)

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 14th Street, N.W.
Washington, D.C. 20005-2011

249

(202) 434-1675)

On behalf of the Defendant:

R. ALAN MILLER, ESQ.
ERIN E. POWELL, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C.
(202) 616-0383

ALSO PRESENT
SCOTT VANCE

250

C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| Billy M. Cole | PLAINTIFF | DEFENDANT |
| By Ms. Hewitt | 259 | |
| By Mr. Blanton | 260 | |
| By Mr. Eidukas | 331 | |
| By Mr. Macdonald | 347 | |
| By Mr. Miller | | 504 |

Afternoon Session - Page 347


E X H I B I T S


| COLE EXHIBIT NO. | PAGE NO. |
|---|---|
| 3 | 381 |
| 4 | 398 |
| 5 | 410 |
| 6 | 442 |
| 7 | 459 |


251

P R O C E E D I N G S

Whereupon,
BILLY M. COLE,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:
FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
BY MS. HEWITT:
Q. Back on the record; good morning, Mr. Cole.
This is day two of your deposition. As I mentioned yesterday afternoon, I was pretty much finished with my questions, and I was going to yield to my esteemed colleagues here around the table to allow them to ask questions, but I did find one document or one e-mail when I was going through some documents last night that I was hoping perhaps you could place in context for me, if you have ever seen it or know anything about it.
I think you're a recipient. The document number, Bates number, there are two that I have.
One is HQR hyphen 061 hyphen 0007, and

252

They just manage contracts. They toss stuff over the fence saying go do this, and you toss the product back.

In the case of DOE, it's hands-on program management, so you work, the contractor becomes extension of staff, and so you work on a daily basis over the phone if you're not physically there or in their face in their office if you are.

Sometimes you write down in document things if it's necessary.

Sometimes you just discuss it and go forward to solve the problem.

The analysis that was done there was based on, as you saw, the information out of the storage department report, which was a published document.

Q. What should we look for if we wanted to try to find whatever you gave Mr. Brownstein reflecting that acceptance rate?

A. I can't even remember what form it was in, so I don't know.

May have just been a piece of paper where I show it to him.

It may have been, I may have just



copied the table out of the back of the storage requirements report and said hey, you know, if we do it this way, we can have an acceptance rate that you might be able to do, still have the utilities, and he bought it.

Q. Okay.

A. They were concerned about getting there just like you guys were concerned about them showing up.

Q. Assume for the purpose of argument with me a minute that there was a legislative prohibition on beginning construction of an MRS until you had a construction permit for the repository.

A. Okay.

Q. Would that have affected either the rates you developed, the schedule you developed, or the viability of it?

A. Yes.

Q. How so?

A. That was, the rate was to accommodate that particular situation from the Nuclear Waste Policy Amendments Act that said you couldn't -- if you had an MRS, and I know they were planning on having one because they were feeling at that



time it was the only way they were going to be able to meet a '98 date, and it could only store 12,000, I mean 10,000 tons, and projected repository operating date was not until 2010, so there was 12 years, that I divided the 10,000 tons up and still was able to show where, if you did it at this rate, it would still be enough acceptance capacity to keep the utilities from having to add additional at-reactor storage on the aggregate.

Q. Okay.

A. And it would then say if you could do that, would say I could build an MRS. It didn't have to be a huge one, but I could get something going.

Q. All right. I didn't make my question clear.

A. Maybe I didn't make my answer clear.

Q. Did you assume in doing that rate, in developing that rate, did you assume that DOE would be able to begin construction of an MRS before DOE received a license to build the repository?

A. I assumed that somehow, DOE was going to be able to have a small interim storage



facility, MRS, whatever, AFR, whatever you wanted to call it, available in '98, and that was part of that, yeah, I assumed, yes, operating in '98.

Somehow they would do it because the getting the license for repository, you had to precede operation of an MRS by a lot of years.

They could get a license for repository much sooner than 2010, of course. They would have to.

That's when the 2010 would be the operating date, so construction would start many years before that and license many years before that, so it was, timing was about right.

Q. What was the estimate on the schedule for the construction of the repository from the date they got their license to build the repository?

A. I do not remember the dates. Don't remember.

Q. I'm still not sure I understand your answer on the development of the rate.

Did you assume that they could not start the repository, I mean -- excuse me -- the MRS construction until they got a repository

contractor, they throw everything away that everybody else ever did and reinvent the wheel, not invented here type attitude, well, we can do better, so it hasn't been used since '91 to my knowledge, maybe '92 while they were developing theirs.

But like I said, Dr. McLeod had such a tremendous memory, he can probably tell you every line of code in it. The guy can tell you when it was used, how it was used, and everything about it probably.

Q. Okay. Can you just -- I'm done with that document then.

Can you just refresh our recollection, I don't recall who Mr. McLeod is.

A. Dr. McLeod is a vice president of JAI Corporation, still working about half time I think on this program, and you can contact him. I don't know his phone number. He's got an office downtown, but you can contact the home office, which is 703-645-0440, and the secretary there can get to him for you, get you a number where you can get him.

I don't know his number down there because they moved offices, and so I don't know.

341

Q. Okay. I appreciate that.

A. He's a good one to talk to. He's also responsible for the later years, couple years ago, or last year, in developing the new projections for the amount of spent fuel that will be discharged to feed to TSLCC, that kind of stuff.

Q. Okay.

A. Got a lot of knowledge.

Q. Good. And then finally, I'm going to ask you just one or two more questions on the 1991 ACR acceptance rates. I would feel left out if I didn't get a chance to ask about it, too!

A. Okay.

MR. MILLER: As long as it's not repetitive hopefully.

THE WITNESS: It's going to be interesting if I haven't heard the question, but go ahead.

BY MR. EIDUKAS:

Q. I'll try to be new.

A. That's all right. I was being facetious.

Q. Okay.

342

MR. MILLER: I wasn't.

THE WITNESS: Oh.

MR. EIDUKAS: I knew that.

BY MR. EIDUKAS:

Q. In developing the 400, 600, 900 MTU rate that appeared for the first time in the 1991 ACR, I believe you testified that you developed that rate by taking a look at what the spent fuel needs of the utilities would be, projected to be in the aggregate?

A. That is correct.

Q. And then try to match that up with the 10,000 MTU that was projected to be available from an MRS that you anticipated to start operating in 1998, is that a fair characterization?

A. That's 90 percent correct. It, basically what I tried to do was to see if, what the storage requirements in the aggregate would be and to see if that 10,000 ton would accommodate it, and when I did the numbers, yeah, it will accommodate it.

Now can it accommodate it on an annual basis, too, and how would I divide it on an annual bases as a receive rate, and that's, that

343

sort of fit.

Q. And you divided the 10,000 up, MTU up over a 12-year period?

A. Right.

Q. And could you again -- I think you probably said this in relation to another question or another context, but where did that 12-year period come from that you were dividing that 10,000 up?

A. That assumption was that --

MR. MILLER: Asked and answered.

THE WITNESS: MRS could get started in 1998 and repository in 2010, and subtract one from the other.

BY MR. EIDUKAS:

Q. Okay. And when you were developing that rate, was it your anticipation that, or strike that.

What did you anticipate would happen to the rate after that 12-year period when a repository was expected to be opened?

A. I did not have an anticipation. That was not my job.

Q. Okay. Did anyone expect, did you expect that the 900 rate would continue past the

344

time when a repository would be opened?
MR. MILLER: Asked and answered.
THE WITNESS: I assumed that if you had a facility operating, that you had a repository, starting in 2010, that after you get some kind of a ramp-up, yeah, you're probably going to be up to 3,000 tons.
How quick, I don't know, but that was an assumption, but I didn't -- that had nothing to do with this analysis on the early day acceptance rate.
BY MR. EIDUKAS:
Q. So when you created that acceptance rate in the 1991 ACR, you did not, you did not anticipate past there -- that was based on the 12-year period and you didn't anticipate --
A. Actually was only 10 years. The ACR only goes for ten years.
I just used the 12 year because that was the -- you couldn't get ten, more than 10,000 tons in an MRS under the law prior to that repository operating, so I divided over those 12 years.
Q. Thank you. And so I guess what I was trying to get at and may have been misphrasing

345

it was you didn't intend or anticipate one way or the other that the 900 rate would continue in perpetuity or indefinitely past that ten-year period?
A. No.
MR. MILLER: Asked and answered.
THE WITNESS: I did not intend that it would, and I assumed that it wouldn't, but that was not even a consideration at that time. Didn't look at it.
MR. EIDUKAS: That's all I have.
MR. MILLER: No questions.
MS. HEWITT: Why don't we break for lunch? And then I think we'll finish up.
MR. CARNEY: I don't have any questions.
MS. HEWITT: So the only remaining attorney asking questions will be Mr. Macdonald.
THE WITNESS: Okay.
MS. HEWITT: Okay. We're off the record.
MR. EIDUKAS: Okay.
(Whereupon, at 12:37 p.m., the deposition was recessed, to reconvene at 1:15 p.m. the same day.)

346

AFTERNOON SESSION
(1:33 p.m.)
Whereupon,
BILLY M. COLE,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:
EXAMINATION BY COUNSEL FOR DEFENDANT
SACRAMENTO MUNICIPAL UTILITY DISTRICT
BY MR. MACDONALD:
Q. Good afternoon, Mr. Cole. We met yesterday.
My name is Tim Macdonald, and I represent Sacramento Municipal Utility District which I will refer to out of habit as SMUD.
A. I know SMUD, yes.
Q. And the same ground rules as have been described to you before -- if you don't understand a question that I ask, please stop me, and I will try to clarify it.
I'm handing you a document entitled spent fuel storage requirements 1990 dash 2040, a November 1990 document that we talked about yesterday.
A. Um-hm.

347

Q. And here is a copy.
MR. MILLER: Oh, thank you.
BY MR. MACDONALD:
Q. And from your prior testimony, this is the document that you have used in coming up with the 1991 ACR acceptance rates, is that correct?
A. I think this was it, yes. Yeah, that looks like it.
Q. And if you flip to B94, which I think is also the page you took a look at yesterday when Devon was questioning you, and this is a chart entitled annual storage requirements by utility, comma, maximum inpool capacity, comma, MTIHM dash no new orders forecast.
And just to clarify for me, that the MTIHM, is that a, essentially the same as what we have been talking about as MTU?
A. For all practical purposes, yes. That's metric tons initial heavy metal.
Q. Okay. And the rates across the bottom of that chart starting in 1998 are 362, 385, 551, 381, 811 on down the line?
A. Um-hm. No. Go ahead. I just noticed the same table exists on page B62. I can't

348

figure out why.
Go ahead.
Q. And these, at least to the best of your recollection, are the numbers you used?
A. I think this was the source, yes.
Q. And you said the acceptance rates that you came up with in the '91 ACR which were 400, 600, 900, 900 on forward, satisfy on an aggregate these needs starting in 1998?
A. Um-hm. Pretty close, yes. Yeah. There is a couple of years when it went a little over 900, some years went under 900, but nominal.
Q. And when you say in the aggregate, explain again what you mean.
A. What I meant was that if you take all the reactors, all the utilities who claim they had reactors that were going to need additional storage capacity beyond what their pools could handle, for example, in 1998, and you add up all that capacity requirement, it was 362 metric tons.
Q. Would the oldest fuel first allocation of acceptance rights satisfy these needs with the rates that you came up with in the 1991 ACR?



A. The concept of oldest fuel first did not have anything to do with developing this rate.
It had that's how you allocate this rate.
Once you have established what your rate is, then you do an allocation based on the age of the fuel.
That did not enter into this.
Q. When you say it didn't enter into it, I guess maybe my question was poorly worded.
One of the, one of the goals or one of the purposes that I thought you said was that the rates you had chosen would allow, would be such that no reactor --
A. Would have to add additional storage in the aggregate.
Q. In the aggregate?
A. Um-hm.
Q. If the acceptance rate, if the acceptance slots were not allocated to those utilities with storage needs, you would have a disconnect there?
A. No. As we said, it was an equity issue. It was if the utilities, we would



provide that amount of storage capacity, we, the DOE, and if some utilities had a need and others didn't have a need, they could work that out as an internal equity issue.
They had DCSs. They could exchange them or do whatever.
Q. Was it your expectation when you came up with the 1991 ACR that that is in fact what would happen to prevent any utility from having to build that reactor storage?
A. No, I did not anticipate that would happen honestly, but it was the, about the only thing we could come up with that looked feasible and a facility that could get started at that point in time where it could do something for the utilities, and the utilities had recognized that any, most of these issues, whether it be emergencies, whether it be shutdown reactors, whether it be whatever issue, was really equity.
They could choose to redistribute that capacity once it has been allocated.
Q. Is it fair to say that without a reallocation --
A. You would need more capacity.
Q. You would need more capacity?



A. Absolutely. If that's where you were going, that's the answer, because without a reallocation, you would have certain utilities that are running out of storage in a given year, others that are not.
You're just not going to -- some of those utilities that are running out of storage did not have allocations in those years, and some utilities that were, that weren't running out of storage did have allocations.
That's just the way the system works. Some were smarter planners, had bigger pools. Some didn't.
Q. When you said they were smarter planners, weren't the pools designed in a much earlier time?
A. On some reactors; the older reactors, yeah, and they were designed to hold initially what, 180 days of fuel, to cool it long enough to send it off to reprocessing, and that didn't happen.
They had to re-rack, so maybe they had more than that. Maybe they had a year, two years worth of storage.
When the later reactors were being

(There was a pause in the proceedings.)
BY MR. MACDONALD:
Q. I'm now handing you the December 1990 without the appendix, so I don't think I have any questions about the appendix.
A. The 1990? I thought you were, the last one you gave me was the '91?
Q. I was. I'm jumbling my documents up. I apologize.
A. Okay. Page 5 you said?
Q. Yes. For the record, you're now looking at the Annual Capacity Report dated December 1991, is that correct?
A. That's correct.
Q. Page 5 reflects the 400, 600, 900 rates that you developed, correct?
A. That's correct.
Q. At the time you developed these rates, you thought that this was achievable under the existing law, is that correct?
A. I thought that it satisfied the existing law.
Whether or not somebody can go out and get this thing built or not was going to be a



function of whether Congress would let them do it and things like this, but if you abide by the existing law, this was how you would have to, this is a way to divide it up.
Q. Did you think this was achievable?
A. That was not my goal. I think it's achievable today if Congress would say go do it, but yes, it's achievable if Congress would let DOE do it.
Q. In your view, did it require changes in the Nuclear Waste Policy Act or the '87 amendments --
A. No.
Q. To achieve this?
A. No. This was to reflect what the '87 amendments had in it, which was this 12 years between the two facilities.
Q. And that is the capacity limit that we have talked about before?
A. Ten thousand tons, yes.
Q. Would you turn to page 4 of the document, please?
And the middle paragraph, would you read for the record the last sentence beginning if the current linkages?



A. If the current linkages between the MRS facility construction and the repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of spent fuel by DOE could not start until at least 2007.
Q. What does that sentence mean to you?
A. Well, it means that the way the law reads, there's certain linkages in there.
If you go by certain dates, it may not be achievable to do the '98.
Q. And do you know what those certain linkages are?
A. I know that they exist, I would have to go back and read the law to see what they are.
Q. Do you agree with this statement that if the current linkages are maintained, the facility operations could not start until at least 2007?
A. I would have to say that it is probably correct because that's what we wrote in there, and nobody is saying anything differently.
I can't say right now whether I agree



with it unless I go back and read the law.
Q. You have no reason, you have no reason to disagree with it?
A. I have no reason to disagree with it. That's a very good possibility that this, take these linkages specific, that may be the case, which says that my earlier statement of how the linkages worked to get the '98 was not true.
Q. And if this statement is correct, it would not be possible to satisfy the 400, 600, 900 rate starting in 1998 that appears on page 5?
A. If this statement is correct, that is true, but the assumptions that people in the trenches were making at that time was they were still hoping to make a '98 date, and they were still hoping to get Congress to do something to do it, but this looks like if you, like what it's saying here is if you follow the letter of the law, there may be some prohibitions of doing that unless they could get the repository licensed sooner, and then, then you can, so this just makes certain assumptions here.
Q. Based on this statement, does it appear that it was, that anyone at DOE or at

Battelle where you were working thought that it could?
A. I was not at Battelle at this time.
Q. I apologize. Where were you in --
A. I was, well, I was, I was with TRW, the subcontract on the TRW at this time in '91.
Wait. When did this get published? Oh, this one -- December of '91. Yeah. I was with TRW starting in February of '91, but it doesn't matter.
This is a DOE document. It comes out, and it makes this statement, and I'm fairly confident that the statement was read over many times by many people before it got published.
Following the letter of the law, based on their current, probably had some charts laid out there getting from here to there, they may have concluded they were going to have a hard time getting anything moving that, as quickly as '98 unless they could get Congress to relieve them of some of these, some limitations somewhere.
That's the way it reads.
Q. Without some change in the law?
A. Yeah.

365

Q. Are you aware or are you familiar with the report of the Monitored Retrievable Storage Review Commission dated November 1, 1989?
A. Just one moment. Excuse me just a minute.
Q. Certainly.
A. Okay. This makes the statement, yes, that these do not reflect the linkages, that they -- okay. Yeah.
What was your question?
Q. Whether you are familiar with the report of the Monitored Retrievable Storage Review Commission that came out?
A. Some parts of it; was that Dr. Dale Klein, and was he on that commission?
Q. Dr. Dale Klein, Dr. Frank Parker.
A. Parker, yeah.
Q. And a Mr. Alex Radin.
A. Radin, yeah; I know Klein and Parker, yeah.
Q. Sitting here today, you have no at least --
A. I can't remember what, what their finding was.
Q. I'm going to hand you a copy of this

366

report of the Monitored Retrievable Storage Review Commission dated November 1, 1989.
It's titled nuclear waste, colon, is there a need for federal interim storage, question mark.
The Bates number is PNL dash 173 dash 1825.
A. Okay.
Q. I'm handing you the Executive Summary. It's a relatively thick document, so you can take a minute to look it over if you would.
(The witness reviewed the document.)
THE WITNESS: Okay.
BY MR. MACDONALD:
Q. If you would turn to the second page of the Executive Summary, and look at the second column, and read for me midway through that second column the paragraph with where, the sentence starting with however?
A. However, the schedule linkage presently in the NWPAA, paren, MRS construction, may not begin until Nuclear Regulatory Commission issues a license for construction of repository, paren, would make it impossible for the MRS to be operational more than three years

367

before the repository.
Q. Does that refresh your recollection as to the linkage in the 1987 amendments to the Nuclear Waste Policy Act?
A. Like I said, this is starting to come back.
Yeah, when I saw this and saw the statements that the linkage puts things in there because that further makes the statement that it does not abide by the linkage in here. Just assumes they can get something going, because one of the things I think the commission recommended was, you know, maybe got to get rid of those linkages. Otherwise we can't do anything.
Q. So without a change in the law, the system or the rates set forward in the '91 ACR were unauthorized to begin in 1998?
A. Don't know if they were unauthorized. I don't necessarily agree with that term.
Q. Would they comply with the 1987 amendments to the Nuclear Waste Policy Act?
A. If DOE, if Congress let DOE go take the fuel and stick it in some of their federal facilities, yes, it would, and that was a small

368

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY, :
(98-126C) (Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY, :
(98-154C) (Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY, :
(98-474C) (Merow, S. J.) :
Plaintiffs, : Discovery
: Judge
v. : (Judge
: Sypolt)
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - - - -x

VOLUME I
Pages 1 - 228

Deposition of BILLY M. COLE, held at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Ninth Floor, Washington, D.C., commencing at 10:30 a.m., Tuesday, June 4, 2002, before Heidi L. Jeffreys, RDR, CRR, Notary Public.

1

A P P E A R A N C E S O F C O U N S E L:
ON BEHALF OF PLAINTIFFS:

FOR YANKEE ATOMIC ELECTRIC POWER COMPANY, CONNEC
YANKEE ATOMIC POWER COMPANY, AND MAINE YANKEE A
POWER COMPANY:

SPRIGGS & HOLLINGSWORTH
BY: JERRY STOUCK, ESQUIRE
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5389

ON BEHALF OF THE DEFENDANTS:
FOR THE UNITED STATES:

U.S. DEPARTMENT OF JUSTICE
BY: HEIDE L. HERRMANN, ESQUIRE
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0290

2

I N D E X

WITNESS


| ON BEHALF OF THE PLAINTIFFS: | Examination by: | Page |
|---|---|---|
| B. M. Cole | Mr. Stouck | 5 |


EXHIBITS


| No. | Description | Page |
|---|---|---|
| 8 | Defendant's witness list | 20 |
| 9 | Deposition transcript | 24 |
| 10 | Memo (Coles to McKee and Wegeng) | 37 |
| 11 | Letter dated 4-11-83 | 112 |
| 12 | CSFM program document | 116 |
| 13 | Article | 118 |
| 14 | Article | 126 |
| 15 | Letter dated 12-15-86 | 129 |
| 16 | Contract | 136 |
| 17 | Letter dated 12-30-86 | 140 |
| 18 | Letter dated 2-8-87 | 151 |
| 19 | Letter dated 3-5-87 | 151 |
| 20 | Memo dated 6-5-87 | 157 |
| 21 | Letter dated 12-22-87 | 169 |
| 22 | Memo dated 10-5-90 | 174 |
| 23 | '89 ACR draft | 174 |
| 24 | Memo dated 8-14-91 | 182 |
| 25 | Letter dated 3-13-97 | 195 |


3

EXHIBITS (Continuing)


| No. | Description | Page |
|---|---|---|
| 26 | Memo dated 4-22-91 | 200 |
| 27 | Memo dated 6-28-91 | 200 |
| 28 | Memo dated 6-18-92 | 202 |
| 29 | Memo dated 6-29-92 | 205 |
| 30 | Letter dated 12-29-92 | 216 |


4

can't remember. Things look -- I agree with you, things look disjointed here.
Q. Okay.
A. Oh, I think we were talking about the total system life cycle costs and this 400, 600 and 900, and I was trying to make a point that really didn't have a heck of a lot to do with the total system life cycle cost.
The total system is over a period of many, many years and billions of dollars, and this gets lost in the noise, this initial rate.
Q. Well -- right. Well, the 4-6-9 is not relevant to the total system life cycle cost, is it?
A. Well, I can't remember if when they did the TSLCC whether they used the -- what they used. I don't remember. But even if they used it, it's only for the first few years, and then you had the facility start operating. The last TSLCC makes the assumption, I think, that the system doesn't start until 2010. They have 4-6-9, and it builds up quick, and when it's all done it's $42 billion, and you close the doors.
Q. Right. Going back to the 4-6-9, though, did 900 -- I thought you just indicated that 900 would not have been the rate for in perpetuity.
A. No, that's correct, it's not.

77

Q. Under the '91 ACR rates that you developed, as you previously testified, when would the 900 rate end or change?
A. Twelve years later, when the repository started operating, back then.
Q. Then what would it be?
A. I don't know what -- because I was only looking at that ten-year period.
Q. But the rate would have gone up?
A. Yes, it would have gone up --
Q. Reflecting that the 4-6-9 was tied to the MRS?
A. To the MRS, that's correct.
Now, in the 2010 concept I don't know. It may be 4-6-9-12. You know, it may go up pretty fast.
Q. Well, there's no MRS today.
A. I know.
Q. So, maybe it would start higher than 4.
A. Or lower?
Q. I don't know.
A. I don't know, either, but it's all hypothetical, anyway. It doesn't matter. There isn't an MRS, and, so...
Q. Anyway, you can't interpret any better than I can this passage on 280?

78

A. TSLCC, the impact of the 4-6-9 on that. And I was trying to make the point that it was irrelevant to that. It didn't matter what the rate was in the first few years in the overall cost of the program.
Q. What is the '91 ACR rate relevant to?
A. In '91 it did make a difference. Today it doesn't.
Q. So, in '91 the 4-6-9 rate was relevant to the then-current TSLCC?
A. Yeah, as far as I know.
Q. I see. Okay.
A. I did not develop the TSLCC in '91. I don't know. I'm assuming they used that rate for the first 12 years and assumed a repository operating, and then you'd come in with probably 12-2-3 or something like that.
Q. Okay. Let's go off for just a second.
(There was a discussion off the record.)
BY MR. STOUCK:
Q. Now, my next question is on page -- hold on.
451, I believe. You say in the middle of page 451, starting on line 16, "The DCS process and approval system was so simple that I can't even imagine

79

we're discussing it."
Do you see that?
A. Uh-huh.
Q. And I guess --
A. But --
Q. Well --
A. It's --
Q. Yeah, take a look at that.
A. Is that me making that statement?
Q. I think so, "The Witness:"
A. Why does it say, "By Mr. MacDonald"?
Q. No, no. On line 16 it says, "The Witness:" -- that's you -- "The DCS process" --
A. Okay.
Q. Well, I mean, does that not -- do you want to amend that or change it or --
A. No, I'm just confused. Who is MacDonald?
Q. MacDonald is one of the lawyers. I think Devin Hewitt started off asking questions, but then at the end other lawyers got a chance to ask. I think this is Tim MacDonald.
I'm just -- can you just explain to me why it is it was so simple that you couldn't even imagine -- I mean, what was so simple about the approval process? Why did you make that statement?

80

since DOE came up with new program plans and things saying, we've got new start dates, and they're saying this is supposed to be 63 months prior to delivery, what's the use of submitting it now?
The other alternative is DOE might have said, you may as well stop submitting it, because it's premature.
Q. This letter doesn't indicate who --
A. It does not.
Q. At least this letter indicates that DOE was not able to approve it, for whatever unspecified reason.
A. It didn't say why, yes. It may have been that there was an error in them. I don't know.
Q. Who would know more about that, do you think?
A. In '97? You'll have to talk to Dave Zabransky, because when he took this over he had a couple of people working for him at that point, and they took over DCS process back from the contract. TRW took it back to DOE, and, so, I don't know what --
Q. Let's assume that the Yucca Mountain Senate vote is negative; in other words, no override of a Nevada veto, okay?
A. Uh-huh.
Q. And let's assume that no disposal -- well,

197

just assume that -- no, let's assume no disposal facility is ever licensed, for whatever reason.
A. Okay.
Q. Maybe they get through the Senate but something else happens.
A. Okay.
Q. And no further delivery commitment schedules are ever submitted.
A. Okay.
Q. The program freezes.
Do you have any understanding in that circumstance -- let me ask this:
Do you have any opinion in that circumstance about whether DOE would still be obligated to accept this?
MS. HERRMANN: Let's get a big old speculation objection, and it calls for a legal conclusion.
THE WITNESS: Your statement -- let me see if I can rephrase it correctly -- is that they decide to shut down all the operations out at Yucca Mountain, do nothing --
BY MR. STOUCK:
Q. For whatever reasons.
A. I don't care what the reasons are, but it's

198

just all shut down.
Q. Yeah.
A. Then, in my opinion, they ought to give the money back to the utilities and the utilities are stuck.
Q. Okay. I guess what I'm really trying to get at is your own understanding of this relationship in light of -- the relationship between the DCSs and the obligation, because I think -- I think you said that, you know, it's a step along the way, it's something that sort of needs to be done to make the process work, but I'm trying to find out if that's the same thing as saying it defines the obligation. In your mind, I'm talking about.
A. In my own mind, it's just a piece of the process, but the process has to -- has a starting spot and then an ending spot. And this process has been interrupted for a lot of reasons, so it has to restart. So, anything that had been done prior, in my opinion, in my own opinion, is null and void. The DCSs that were submitted to me, they are worthless. They should be redone because we don't have a 1998 date anymore. They were based on 63 months prior to acceptance, acceptance beginning on January 31st, '98. That didn't happen.
When we get a new date that somebody can carve in stone and get a little more confidence in, then

199

you start the process again, 63 months prior to. If at that point in time everybody feels 63 months prior to is enough time to -- is enough lead time -- and that's all it was for before, give me five years lead time to figure out that I can be there and pick it up.
Right now it should all be thrown in the trash. It's worthless.
Q. Because it was based on assumptions that are no longer valid?
A. It's based on a program plan that's no longer valid.
Q. Okay.
MR. STOUCK: Why don't you mark these as 26 and 27, please.
(The documents were marked as requested.)
BY MR. STOUCK:
Q. Mr. Cole, Exhibits 26 and 27 are memos from -- I think they're both from Mr. McDuffy and Mr. Vance to Mr. Brownstein and Mr. Langstaff, one dated April 22, 1991, and the other dated June 28, 1991, and these are comments on -- well, let's take one at a time.
Exhibit 26 just says that it's comments on the EEI/UWASTE, U-W-A-S-T-E, preliminary discussion papers on 11 issues under review. These are 11 of the ACR resolution process issues, and my question is simply

200

# DREYFUS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, :
v. : No. 98-126C
THE UNITED STATES, : (Senior Judge Merow)
Defendant. :
- - - - - - - - - - - - - - X

Washington, D.C.
Wednesday, May 15, 2002

Deposition of DANIEL A. DREYFUS, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 9:30 a.m., Wednesday, May 15, 2002, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

1

APPEARANCES:

On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5879

On behalf of the Defendant:
RUSSELL A. SHULTIS, ESQ.
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
Federal Claims Section
1100 L Street, N.W.
Washington, D.C. 20530
202-305-7561

2

C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| DANIEL A. DREYFUS | PLAINTIFF |
| By Mr. Shapiro | |

Afternoon Session - Page ^


E X H I B I T S


| DREYFUS EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 - Memo dated 7/8/93 | 25 |
| 2 - Testimony of Daniel A. Dreyfus before the Senate Committee on Energy and Natural Resources, September 22, 1993 | 53 |
| 3 - Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program | 63 |
| 4 - Memo dated 12/6/93 | 69 |
| 5 - Memo with attachment | 80 |
| 6 - Department of Energy Notice of Inquiry | 85 |
| 7 - Notice of Inquiry on Waste Acceptance Issues | 87 |
| 8 - DOE Notice | 91 |
| 9 - Statement for the Record by Daniel A. Dreyfus dated 6/9/95 | 111 |
| 10 - DOE 1994 Annual Report to Congress | 119 |
| 11 - Letter dated 4/25/94 with attachment | 124 |


3

E X H I B I T S (Continued)


| DREYFUS EXHIBIT NO. | PAGE NO. |
|---|---|
| 12 - Letter dated 6/15/84 with attachments | 135 |
| 13 - 1992 Annual Capacity Report | 140 |
| 14 - Letter dated 9/28/95 | 147 |
| 15 - Letter dated 5/26/94 | 159 |
| 16 - Letter dated 12/20/94 | 163 |
| 17 - Memo dated 3/27/95 with attachments | 178 |


4

P R O C E E D I N G S

Whereupon,

DANIEL A. DREYFUS,

was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL
FOR PLAINTIFF

BY MR. SHAPIRO:

Q. Would you state your name for the record, please.
A. Daniel A. Dreyfus.
Q. Dr. Dreyfus, have you ever had your deposition taken before?
A. I'm not sure. Not recently.
Q. Well, your attorney has probably gone over the procedure with you, but let me just mention it briefly on the record. I'll be asking you a series of questions. We have a court reporter who is taking down your answers. I just ask that you answer truthfully.
And certainly, if you don't understand a question, you don't hear it, whatever, just ask me to clarify and I'll do that. There's no point in trying to answer a question if you don't understand what the

5

question is. It's just that simple.
If you want to take a break at any point, just let us know, we'll stop, really it's a pretty informal proceeding. Do you have any questions about what we're doing today?
A. No, I think I understand.
Q. Have you done anything to prepare for your deposition today?
A. No, not really.
Q. You didn't review any documents?
A. I have not reviewed any documents.
Q. You're represented by the Department of Justice counsel?
A. Department of Justice.
Q. When did you decide to be represented by the Department of Justice for this matter?
A. When I was first notified that I was on the list of potential people to be called for deposition. And I couldn't -- recently, but I'm not sure exactly when.
Q. And, in this past month or two, have you talked about your possible deposition with anybody other than government counsel?
A. No.
Q. Let me ask what you understand what the

6

current case is about, do you have any understanding of what the current case is, what the cases are about that you're being deposed for?
A. Well, I have a general understanding of the cases, but I am not currently informed about the status of the case.
Q. What's your general understanding of what the case is about?
A. Well, when I was director, the original actions were probably initiated, at that time there were a number of cases. I understand that they have been consolidated, but I couldn't tell you the parties to the various consolidations.
And the last that I recall knowing is that fundamentally there are two cases active now of which this is one that is before the court of claims I believe. That's about it, no specifics about contentions or positions.
Q. We'll get into a little bit of the details later on, I just want to get a sense of where we are on that. Why don't we start just with a sense of what your background is, how you got to be director. We'll move through the stages of that pretty quickly, but just to get a bio perhaps starting with where you went to college, that kind of thing. Can you tell me

7

your educational background?
A. You want a 71-year bio. I'm an engineer by training. I have two engineering degrees and a Ph.D. in political science. I have held a number of engineering positions.
My first government job I was a machine gunner in Korea. I worked for the department of -- well, I started out working for Texaco as a construction engineer. Then I went to Alaska where I was a remote site planning engineer for the Corps of Engineers.
I worked for the Department of the Interior. I worked on Capitol Hill for about 12 years. My last position there was staff director of what had become the Senate Energy Committee while I was there.
It was originally the Senate Committee on Interior and Insular Affairs. And then the Senate reorganized in the 1970s and it became the Energy Committee. I was professional staff member there and ultimately the staff director of the Senate Energy Committee.
I left the government for ten or 12 years, worked in the natural gas industry, a research position for the Gas Research Institute. And I was

8

appointed to -- well, I went back into the Department of Energy initially as a special assistant to the Secretary. And that was in 1993, in February.
Q. You mean '83 probably, 1983 or '93?
A. The first Clinton Administration. I got there in February. And I served as a noncareer -- NCS as special assistant to the Secretary until about October of that year, when I was confirmed -- when the nomination was sent up and I was confirmed by the Senate.
And I left there in January of '97, the end of the first term, when the Secretary left, Hazel O'Leary. And I left at that point. I worked for the Smithsonian Institution for a few years, the Museum of Natural History, I was associate director for operations, and then I retired.
Q. I'll just ask about a couple of the highlights there. You worked for the Senate Energy Committee. Can I get a sense of time frame, when were those 12 years roughly?
A. They ended about -- well, they were in the 1970s. I went there about '68 and I left there about '80. I was not there when the act was passed in '82, I was gone before that.
Q. You're referring to the Nuclear Waste

9

Policy Act?
A. That's correct.
Q. During your tenure working for the Senate Energy Committee and its predecessors, did you ever work with any issues dealing with nuclear waste?
A. I was staff director, I essentially worked on everything that was before the committee. There were things before the committee. There was no organization -- the Office of Civilian Radioactive Waste did not exist.
There were things going on, but there were -- things like the Clinch River breeder reactor issues, early discussions about what the options were for long-term disposal. Those sorts of things were before the committee in the late seventies.
Q. What sorts of early discussions was the committee engaged in regarding the ultimate disposal of nuclear waste?
A. At that time there were scientific activities going on, a variety of academic studies and that sort of thing considering everything, deep seabed disposal, long-term monitoring storage, geologic storage, space shots, it was pretty broad gauged, and for the most part academic studies and reports.

10

Q. Did anything rise to the level of being proposed as a bill in Congress that you worked on?
A. My recollection is that there were formative pieces of legislation. None of them came to the point of imminent action in both houses or anything like that.
Q. What was your personal role in working on any of these preliminary proposals for dealing with nuclear waste?
A. Basically a management role of legislation, scheduling, preparation scheduling, review of papers.
Q. Since there wasn't much legislation at that early stage, there wasn't much of a role that you had it sounds like in dealing with nuclear waste issues?
A. No.
Q. And, when you worked for the Natural Gas Institute, did you have any involvement at all with the nuclear industry?
A. I did -- I was -- I'm trying to remember. Vice president for planning essentially, I can't remember the specific title. And I did energy projections, I presided over an economic group that did energy projections.

11

And, of course, since natural gas is associated with electricity, it was that kind of thing, awareness and looking at potential projections of generation, that sort of thing.
Q. If I heard correctly, you said that, when you went into the Department of Energy in 1993, you referred to it as going back into the Department of Energy?
A. No, I went back to the government. But not -- I had no previous involvement with the Department of Energy.
Q. I'm sorry, I might have misunderstood. It's helpful if you wait until I finish asking a question until you begin your answer. That way the court reporter can get a clear record.
How did you come to become Secretary O'Leary's special assistant?
A. Well, I'm not sure I can -- I'm not sure I know. I at the time had been in Washington for a long time. I had a lot of acquaintances on Capitol Hill. I had known Secretary O'Leary professionally when she was in the department or its predecessor organizations at an earlier time.
And several people thought I should be back in the government. And I at that point in my

12

career thought it might be a good idea too. So I was asked and I went. And initially she had just come in and the special assistant position was -- it was staffing a new administration basically. And she had a position in her office and I agreed to take it.
Q. Had you been active in the Clinton campaign?
A. No.
Q. You said you knew Secretary O'Leary previously. How did you know her?
A. She had several appointed positions in the Carter Administration and worked on the Senate committee when I was on the committee staff.
Q. You said you served in the role of special assistant from roughly February to October of 1993. What did you do as special assistant to the Secretary?
A. That was early in the administration. And the department was staffing up. I did whatever needed to be done that morning. It was very general scope job in her office.
Q. How was her office staffed, how many special assistants were there?
A. At that time? I think, for a period of time, I was the only one. Then people came on as

13

they were selected. It was quite a period of time before all of the appointed positions were filled. And, you know, as folks were selected, they showed up. But there were not very many each at the end.
Q. Did you have a particular series of parts of the department for which you were responsible as special assistant as opposed to other parts that some --
A. Not at the beginning. As people came on, assignments sort of congealed and that sort of thing and we began to -- we began to develop a portfolio.
Q. When did you first start to work on matters pertaining to the Office of Civilian Radioactive Waste Management?
A. Well, in a role as a member of the Secretary's office, probably from the outset as they showed up at that level.
Q. Is it all right, for perhaps ease of speaking if nothing else, if we refer to the Office of Civilian Radioactive Waste management as RW?
A. That's all right with me.
Q. Are you familiar with the abbreviation RW?
A. It's my designation for four years, RW, I'm familiar with it, yes.
Q. You state you started working on RW

14

matters almost from the beginning when you became --
A. I worked with those matters that were salient at the time. So, to the extent that they came to the Secretary's office for -- and required staffing, probably, yes.
Q. What sorts of matters did you work on when you were special assistant to the Secretary dealing with RW?
A. I couldn't say. I mean it's been nearly ten years. A sequence of things I worked on on that issue. I couldn't sort out between October and November.
Q. How did you come to be director of RW?
A. I was appointed by the President presumably at the Secretary's desire or certainly acquiescence.
Q. Did you ask for that position?
A. I was interested in it, yes.
Q. Why were you interested in the position?
A. It seemed at the time to be a significant matter. It was -- the program at that point was very much in a situation where management engineering were relevant.
Q. Are you familiar with a term called the plum book?

15

A. Yes, I know what that is.
Q. What's your understanding of what the plum book is?
A. Well, it's a list of what are supposed to be desirable positions in government. I don't think that position was one of them.
Q. Are you familiar with a term called the prune book?
A. Yes, I am.
Q. What's your understanding of what the prune book is?
A. The opposite, those positions which are there but not necessarily desirable.
Q. Did you understand that the position of director of RW was one of the positions in the prune book?
A. Yes.
Q. Yet you were still interested in becoming director?
A. I've done things like that before. Not since.
Q. You viewed it as a worthwhile challenge?
A. I volunteered to go to Korea as well.
Q. Did you view RW as needing particular help, is that part of your interest in becoming

16

director?
A. I viewed the program as a challenge, yes.
Q. Was there any hesitation about your becoming director due to the fact that you had pretty limited background dealing with the nuclear industry and nuclear waste issues?
A. I don't recall any hesitation, no.
Q. You actually became director in October of '83. Do you recall, was there some period of time prior to that time when you were basically the -- it was clear to people that you were going to become the director of RW?
A. When I arrived at the building, there was an acting director who was a career individual with substantial background. And he was the director. For some period of time prior to my confirmation, it was pretty well-known that The White House was considering me, yes, I was doing the preliminary Hill visits and that sort of thing. I don't think it was any secret.
Q. And during that time were you more or less the de facto director or were you still working primarily as the Secretary's special assistant?
A. I was very conscious of my role, the acting director's role. So was the Secretary. So we

17

kept it pretty well sorted out as to who was supposed to do what.
Q. And the acting director, you're referring to Lake Barrett?
A. Lake Barrett was acting when I arrived and until I was confirmed.
Q. And then Mr. Barrett became your deputy director?
A. Yes, he did.
Q. When you became director of RW, how did you view your mission at that time?
A. I'm not sure what you mean, how I did view the mission.
Q. What were your goals as director?
A. My goals as director, my view of the program at that time was that it was intended to provide the necessary information for a major policy decision to be made about the repository. And my goal was to focus the program, the organization to get to that point in an efficient and effective way.
Q. Did you have any other major goals of the program at that time?
A. Well, the program was as it had been, a multifaceted program with a number of concurrent activities. And each of the activities had some end

18

point, some near-term and long-term objectives. Yes, there were a subset of goals. But principally it was the ability to permit a decision on a repository to be made by those who had to make it under the provisions of the act.
Q. And the decision you're referring to or the work you're referring to is what's otherwise been called a characterization of Yucca Mountain, is that a fair description of it?
A. That was the central activity at that time.
Q. What other activities were important to you as director of RW when you came into that position?
A. Well, at that particular time, as I recall we had a research program, we had a program that was still doing conceptual designs of monitored storage sites. We had a responsibility to support the nuclear waste negotiator's office in the event that they brought -- found and brought forward a potential site for a storage or repository facility. We had responsibilities to support them.
And then there was an international coordination program, a variety of other -- a multipurpose canister development program, a number

19

of programs.
Q. Let me ask briefly about the organization of RW and its relationship to the department. Who did you report to during your time as director of RW?
A. I reported to Secretary O'Leary.
Q. Was there an undersecretary of DOE during your tenure as director of RW?
A. There was, yes.
Q. And what was the relationship between your position as director of RW and the position of the undersecretary?
A. The act says that the director reports to the Secretary. And that was the way we did it. There were coordinative meetings, keeping people advised, several including the undersecretary that had other responsibilities. But direct report was to the Secretary.
Q. Who was undersecretary when you were director of RW?
A. We had two. But my problem is trying to remember who held which of the several positions over there. White I believe was the original undersecretary. But I'm not -- there's a deputy and an undersecretary as I recall.
Q. Most departments there's a Secretary, the

20

was the essence of the thing. And I tried to do that.

Q. So, if I understand correctly, it was your view as director that the best way to expedite acceptance of spent fuel and to do it efficiently was to get the Yucca Mountain decision made one way or the other?

MR. SHULTIS: Objection, mischaracterizes prior testimony.

THE WITNESS: I think that focuses the thing a little bit more than the complexity of that situation would provide. But it is the fact that the program at that time did not have authority for interim storage. And the interim storage under the law at that time hinged upon a recommendation of the repository. So the repository was central to any other options that I could perceive as director.

MR. SHAPIRO: Is this a good time for a break.

(Recess.)

(Dreyfus Exhibit No. 2 was marked for identification.)

BY MR. SHAPIRO:

Q. Dr. Dreyfus, I have handed you what we've marked for purposes of identification as Dreyfus 2.



Do you recognize this document?

A. No. What is it? I mean I understand what the title says and I see annual report to Congress below, but I don't know where it came from.

Q. I'll represent to you that this came from a compilation that was part of RW's annual report to Congress. And the particular part, what I've handed to you, was titled Testimony of Daniel A. Dreyfus before the Senate Committee of Energy and Natural Resources, September 22, 1993. And it appears to be prepared testimony that you gave to the Senate committee as it was considering your nomination to become director of RW. Does that refresh your recollection as to what's in this document?

A. Okay. I have read enough of it now. It is I think my prepared statement from my confirmation hearing which I gather was included as an appendix to the annual report to Congress that was sent up at some later date. So yes, I guess I know what it is.

Q. I want to point your attention -- I mean feel free to refer to any part of the two pages that you would like. I'm going to point your attention to a particular section on the second page of this two-page exhibit, the back page of it, Dreyfus 2.

Do you see there are columns, and I'm



looking at the bottom of the first column, where it says, to improve the existing program, at least two considerations should be addressed quickly. The expectation has been that beginning in 1998 the spent fuel at nuclear power plant sites would begin to be accepted by the federal government and removed to a federally operated facility. Do you recall that testimony?

A. Oh, yes.

Q. I want to focus back on the words the expectation has been that beginning in 1998 the federal government would start removing the spent fuel. What was your understanding of what that expectation was?

A. At the time that I did this, my understanding was that the act provided for the Secretary to take -- begin taking -- accepting fuel in '98. That was a provision of the act. And I understood that very well.

The circumstances on this date which was 1993 was that -- and that was the circumstances, that there were a number of important investment decisions pending in utilities and in utility commissions having to do with on-site storage investments that needed to be made.



And the outlook for the federal government to take acceptance was becoming a rather significant question in those proceedings. That was what this alludes to. I think I did earlier this morning mention that.

Q. Now, the expectation that the federal government would start removing spent fuel from utilities in 1998, regarding that expectation, did you have any understanding of how fast the government was expected to start taking spent fuel from utilities in 1998?

MR. SHULTIS: Objection, calls for a legal conclusion. Mr. Dreyfus is not a 30(b)(6) witness.

THE WITNESS: Did I have any understanding of it?

BY MR. SHAPIRO:

Q. Yes.

A. By the time that I prepared this statement, I was aware of the technical aspects of moving waste and accepting of waste and had some sense of the pace of doing that, yes. I don't recall what the contemporary assumptions in the documents were regarding acceptance.

I know that they changed over time and were -- there were schedules and various assumptions

for fee adequacy determinations and that sort of thing. I can't recall what that was. But at the time I'm sure I had a sense of pace, yes.

Q. What was your understanding of what -- let me ask this differently.

Was it your understanding that the pace of spent fuel acceptance was a matter of technical ability of RW to accept the waste?

MR. SHULTIS: Objection, calls for a legal conclusion.

THE WITNESS: If I could make a statement about this document before us, the point of this remark here is not the pace of acceptance but the probable inability to initiate it -- of initiating waste acceptance on the date in the act.

BY MR. SHAPIRO:

Q. You're referring to some meaningful amount of acceptance, though, in 1998 that utilities were concerned about?

MR. SHULTIS: Objection, vague, calls for a legal conclusion.

THE WITNESS: My concern -- this is, of course, my statement to the committee as the nominee. So my view of the situation. What I was saying here essentially is that a lot of people were out there



trying to figure out what they ought to do about on-site storage.

And there was no expression as to what we were going to do. The '98 expectation hung there without further elucidation, at least that was my feeling at the time, and that we needed clarification on that. And I was not focused on how much would be taken in the first year. That question was what was the first year.

So, while I can speak to statements of pace, it has nothing to do with this statement really. This statement was the more difficult matter that nobody had said we that we would not start in '98. And decisions were having to be made predicated on whether we would or not.

So I simply want to draw the distinction that, if you want to talk about the acceptance rate, fine. But that was not the point of this remark.

BY MR. SHAPIRO:

Q. Let me see if I can try to focus in on where I might see the connection. The focus of the remark in your testimony, Dreyfus 2, was that utilities were planning on-site dry storage or other storage of spent fuel in lieu of DOE coming to pick the fuel up, correct?



A. That's correct.

Q. And, to some extent then, how fast DOE might come to pick up the spent fuel might influence how much storage utilities might have to provide or whether they might have to provide storage at all, true?

A. Yes, that's true. But again, if you don't start at all, then the rate is sort of moot. Until you start the rate is not important. At this point there was no -- there had been no expression of when might we start as opposed to '98. That was the essence of what I thought was an important issue.

And I will not refute the fact that once you start how fast you do it is important, that's true, yes. That wasn't what I was aiming at here. We weren't at that level of abstraction, we were back from it aways.

Q. Let me just confirm then from Dreyfus 2, you understood by September of 1993 that utilities were already spending money in anticipation that DOE would not pick up -- start picking up spent fuel in 1998?

MR. SHULTIS: Objection, the document speaks for itself.

THE WITNESS: I don't know that I say for



the utilities that they were spending money in the expectation we would not pick it up. They were spending money on additional storage which most probably they would have had to spend in any event. But I don't know that.

I mean an individual reactor-by-reactor basis, I don't know whether the expenditures were -- at that particular time were because of their expectation in '98 they would not be made. What I was aware of was that there was a good deal of investment going on.

Those making it needed to have some sense of what future they were playing into. And the '98 date was no longer an operational assumption for planning purposes because at that point we were already beyond the ability to do anything by '98 in my judgment.

So that point I thought was important. And I was very conscious of the fact that big bucks were being spent based on planning outlooks without a government statement of what the planning outlook ought to be. That's the essence of those paragraphs.

BY MR. SHAPIRO:

Q. And, in September of 1993, what was your understanding as to what the planning horizon was as

to when DOE might start removing spent fuel from utility sites?
A. My understanding is probably a matter of record because I testified ad nauseam at the time. And that was a very common question, always caveated by if, in fact, the Yucca Mountain characterization proves -- leads to a recommendation.
I cannot recall what might have been the best bet on this date. I believe that planning documents that came out under my auspices suggested a beginning of fuel acceptance in about 2010 or thereabouts, but I haven't looked at those documents recently and I don't remember exactly.
And I don't remember whether that would have been the date in '93. It's the one that sticks in my mind predicated I think on licensing about now of the repository.
Q. And, given that relatively distant time horizon to start accepting spent fuel, issues such as the rate of acceptance once you start were of lesser significance to you as director then, when you were director of RW?
A. They were secondary and not -- I don't know about lesser. It depends on what particular issue is before you at the time. As a technical



matter, in planning a transportation program, they're pretty significant.
So, if that was the day you were talking about transportation, preparation for transportation campaign, then pace is not insignificant and certainly not secondary. They have an important implication on long-term expenditure rates.
So I wouldn't relegate them to I didn't think about it because I was focused on the date. But they were a longer horizon question and of importance I think to everyone secondary to the date. It's zero until you start.
Q. And, focusing on one of the examples you gave, for instance, the budget projection document, you wanted to use the most accurate projection of rate of acceptance in such a document as you could?
A. You're not talking about a budget document for annualized appropriation, you're talking about the long-term?
Q. Long-term budget of the program.
A. And specifically what? The budget profiles we provided for appropriation didn't go that far or get that detailed. But we did look at rates in the context of planning documents for transportation, acceptance at the repository,



technical questions of placement and acceptance above ground facilities at the repository, a variety of other circumstances where we looked at it, yeah.
When we did that, we anticipated trying to be realistic, the best case scenario, the best assumption as to what the pace would be.
Q. When you say best case scenario, best assumption, do you mean the fastest rate or the most accurate projection of what the rate would be?
A. Well, for a financial determination, what you would like is an internally consistent and reasonable view of the future. That would be what -- in a financial outlook, total system life cycle cost we used to call it I think, what will it cost all the way out to closure of the repository.
One seeks a reasonable and internally consistent scenario. With regard to the technical business of the transportation campaign, of course, that gets you into availability of equipment and rational use of the railroads and utilities' individual capabilities to facilitate the acceptance, all of that.
(Dreyfus Exhibit No. 3 was marked for identification.)
BY MR. SHAPIRO:



Q. Dr. Dreyfus, we have handed you what we've marked as Dreyfus 3. Just looking at the cover, do you recognize this document?
A. I know what this is, yeah.
Q. What is this document?
A. Well, this is a total system life cycle cost analysis. And this is the 1995 version.
Q. Let me represent to you also that this is an excerpt of the document. You probably remember the documents can get to be quite thick in their entirety. This is basically the introduction and summary of the document. Dreyfus 3 then is one of these total system life cycle cost studies that you just referred to?
A. Uh-huh.
Q. And what was the purpose of these studies?
A. Well, these studies had several purposes actually. They were part of a planning effort to project the budgetary requirements for the long term. They were one input into the fee sufficiency determination required by the act and a management tool to fundamentally keep track of costs past, current, and future on what the program was doing. And, of course, a basis for responding to the most frequently asked questions in reviews and

Congressional oversight and budgetary oversight and everybody else's oversight.
Q. I want to refer you, Dr. Dreyfus, to page 8 of Dreyfus 3, this excerpt of the September 1995 total system life cycle cost study, specifically to the table marked table 1-2. Do you see that table?
A. Uh-huh.
Q. What is this table supposed to represent?
MR. SHULTIS: Objection, the document speaks for itself.
THE WITNESS: The question that I'm having myself is that the title here says receipt and emplacement rate. And it doesn't say acceptance rate, it says receipt and emplacement rate. And I can no longer recall what that -- what the -- what definitional considerations there might be in that.
Let's see, this was '95. It appears to -- this appears to state the rate of receipt of fuel at the repository. So it would be the transportation rate. It is not clear in this context and the material in here. I'm used to seeing it in a different format which may be a later format.
BY MR. SHAPIRO:
Q. And the receipt rates that are noted in this table 1-2 in Dreyfus 3, those were intended to



be the best estimate of how fast RW would be receiving spent fuel?
MR. SHULTIS: Objection, calls for a legal conclusion. The document speaks for itself.
THE WITNESS: Again I don't recall the definitional aspect of this table and the underlying assumptions associated with this, because they -- the program was evolutionary. And there was some times when there were assumptions that some of this would go to an interim stop before it went to the repository.
I read the words, it says receipt and emplacement. My recollection of the later part of the program was that it was not necessarily emplaced at receipt, but it could be received at a different rate than it was emplaced. So there's a variety of things here that, out of the context of a contemporary briefing, I'm not confident on reading it right.
BY MR. SHAPIRO:
Q. Let me try to help out a little bit. Let me point you to page 1 of this document, Dreyfus 3. The second paragraph on that page, it starts out where it says numerous scenarios could have been selected for cost analysis. The scenario used in



this analysis is a one-repository system without interim storage. Does that statement help clarify what's represented here?
A. It clarifies one question, yes, that they're not talking about interim storage. Well, I would interpret that as to be the transportation rates that we used to develop this expenditure profile. And I have no reason to suppose they wouldn't be the acceptance rates at the utilities, but it doesn't say that.
But, if there's no interim storage, they would arrive at the repository at the rate they are taken from the utilities. So this would have been the rate of acceptance.
Q. And for planning purposes, for a document such as Dreyfus 3, the total system life cycle cost study, you were trying to use the most accurate projections of receipt and acceptances as you could, true?
A. A reasonable one in the context of the way you stand at the time. A reasonable outlook that's internally consistent would be what you would want.
Q. Are you aware of any other projections that RW was using at this time as to how fast it would receive or accept spent fuel from utilities?



A. Those numbers look reasonably familiar as long-range planning numbers.
Q. Just for clarification, for the record, the numbers you're referring to are the numbers at table 1-2?
A. Yes. They are numbers that look to me familiar within reason. They're not exactly the numbers that I remember. But it's a buildup rate that's roughly what I'm used to seeing in the planning documents, contemporary planning documents.
Q. You say the numbers in table 1-2 are not exactly the numbers that you recall. Do you have a specific recollection of different numbers?
A. I only seem to remember the first year being 400 rather than 300 which leads me to believe that some of the others are not the same ones I remember. But there were -- as I said this was an evolutionary program. From time to time things changed.
And these documents were not primary documents, they excerpted -- this particular document borrowed assumptions from other planning documents. I don't know what the initial origins of these numbers were or what the vintage of them were.
I seem to recall the 3,000 and later

steady state situation. I for some reason recall 400 in the first state and I don't know about the interim ones. But they're pretty much what --
Q. But it's your recollection that, when you were director of RW, the planning documents with respect to receipt of utility spent fuel had some ramp-up from the 300 or 400 MTU up to a steady state of 3,000 MTU per year?
A. Yes.
(Dreyfus Exhibit No. 4 was marked for identification.)
BY MR. SHAPIRO:
Q. Dr. Dreyfus, you've been handed what we've had marked as Dreyfus Exhibit 4. Do you recognize this document?
A. I can't say I recognize the document. I know what it is.
Q. What is it?
A. It's an options paper to the Secretary from myself dated 1993.
Q. December 6, 1993?
A. Yes.
Q. What do you mean by an options paper?
A. Well, when I read it, it states that there is an issue. And there are a list of possible

69

near-term policy initiatives. That's what I would call options.
Q. Why would you have sent this memo to the Secretary?
A. Well, I don't specifically recall the memo out of the several years of activity. But I would suppose it was either in response to an inquiry or as an initiative simply calling to the Secretary's attention the fact that we had an issue that we should be addressing.
And I don't recollect whether it was my initiative to bring this to the Secretary or whether I was responding to some written memo or other request for a paper like this.
Q. Down at the bottom of the first page of the memorandum, Dreyfus 4, where it says Discussion, the first issue is waste disposal contracts. Do you see that?
A. Uh-huh.
Q. And discussed in the memorandum are several options for dealing with the waste disposal contracts?
A. Uh-huh.
Q. The first of those under waste disposal contracts is the option where the department could

70

declare its intention to work with appropriate parties to modify the waste disposal contracts to compensate for the government's inability to start accepting waste in 1998. I know you don't recall the specific memorandum, but do you recall a consideration of that particular option?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: These -- let me look one more time at all of them. All of these look like familiar topics of discussion at the time.
BY MR. SHAPIRO.
Q. Let me focus on this first option of giving compensation to parties related to the government's inability to begin accepting waste in 1998. What do you recall about consideration of that option?
MR. SHULTIS: Same objection.
THE WITNESS: What do I recall about it? In what context over a period of time?
BY MR. SHAPIRO:
Q. Let me ask more specifically, why were you considering compensating utilities?
MR. SHULTIS: Objection, calls for a legal conclusion.

71

THE WITNESS: Why did I include it in a memo of options?
BY MR. SHAPIRO:
Q. Yes.
A. Well, first of all it's an obvious possibility. And so I think on the face of it it's obvious. It's been in the context of the discussions right along. There were discussions at the time about it. And it remains I guess to this day one of the possibilities.
Q. Did you believe that utilities should be compensated on account of RW's inability to begin accepting waste in 1998?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: Did I believe it in terms of making a determination about the authority to do it?
BY MR. SHAPIRO:
Q. Just as a policy matter, as an option, were you advocating that policy option?
MR. SHULTIS: Same objection. Also Mr. Dreyfus is not a 30(b)(6) witness.
THE WITNESS: In this memo obviously I did not choose an option. I was laying out those which I thought ought to be on the table. And did I think it

72

Q. When DOE was looking at this economic analysis, were you looking at the costs both to DOE as well as the costs to utilities of handling the spent fuel?
A. I'm not sure there's a distinction. Every individual reactor has its own situation with regard to where the fuel will be when it's picked up and what kind of technology it will be in. And you kind of have to look at it as -- it gets to be a pretty detailed thing.
Q. Was the department trying to minimize both utility costs and the department's costs or was the department just focused on the department's costs?
A. I'm kind of reluctant to pursue -- basically any economic analysis looks at all the costs. And there's nothing in this history that gets to that kind of a determination. In very gross terms, the advantage of that canister was the elimination of rehandling.
And some of the rehandling kind of went away because highly specialized disposal canisters weren't going to travel. So you weren't going to be able to use it for emplacement which at one time was a possibility. You weren't going to have an MRS and you weren't going to use it for temporary storage at

109

that MRS.
When you get down -- depending upon the scenario, you get different kinds of opportunities to multipurpose something. If you can't multipurpose, you don't need a multipurpose canister. So all I'm saying is my recollection of it is that the economics were looking worse rather than better as the program went forward because of changes in the program and changes in the estimates of the cost of the canister.
But the ultimate decision I recall, and again the chronology is old, I mean I'm not -- I think this decision to terminate that program occurred as a result of about a $60 million cut in the program that came overnight without consultation in Congress.
Q. You're referring to the fiscal year '96 budget or something else?
A. I don't remember which one it was, what fiscal year. But in the Congress 60 million of the appropriation was sequestered. And I was confronted with running the program for $60 million less than the plan contemplated. It had to come from someplace. And my priority at the time I put on the Yucca Mountain tunnel.
Q. I'm going to have a document marked and

110

show you a small piece of economic analysis I'm interested in.
(Dreyfus Exhibit No. 9 was marked for identification.)
BY MR. SHAPIRO:
Q. Dr. Dreyfus, you've been handed what we've had marked as Dreyfus Exhibit 9 which appears to be a statement for the record to the U.S. Nuclear Regulatory Commission by yourself. It's dated June 9 of 1995. Do you recall offering statements like this to the NRC?
A. I appeared before the NRC several times, I recall that.
Q. Dr. Dreyfus, I can see you're taking a look at the document. And I'm going to tell you in advance I'm going to focus on one paragraph which is on the second page of this document, the first paragraph following the heading Multipurpose Canister Costs.
A. Okay. I have a sense of it.
Q. Specifically I want to focus on, in the middle of that paragraph, there is a sentence that says the at-reactor cost savings include the reduction in spent fuel operating costs. Do you see that sentence?

111

A. I see it.
Q. Do you recall what sort of spent fuel operating costs were being considered with respect to the MPC costs?
A. No. And, when I read it right now, I'm not sure I understand what it says. I'm sure I did at the time because I wouldn't have read it to the commission without knowing what it says. But I don't know. The implication is that there would be less fuel in the pool, you would use this instead of additional pool capacity. Otherwise I can't follow why the cost of pool storage would be reduced by a canister. I do not follow that logic in this statement.
Q. Was there ever any consideration that use of the MPC concept would permit a shutdown reactor to stop operation of its pool entirely and, thereby, save costs?
A. Well, use of any canister would probably -- if you move it to dry storage, you've removed it from the pool. That's why I don't follow why this canister is -- I can't follow the logic in that sentence at this point in my recollection.
Q. Was the department encouraging the use of dry storage by utilities?

112

MR. SHULTIS: Objection. Mr. Dreyfus is not a 30(b)(6) witness.

THE WITNESS: I don't recall any stance of that kind, but I can't be sure. I just don't remember.

BY MR. SHAPIRO:

Q. Was the department discouraging the use of dry storage by utilities?

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: I think the answer is the same, I don't recall any stance on it. This particular situation here was that this canister would have been licensed by the NRC. And we were before the NRC, as I did at the chairman's invitation, talking about current issues.

One of them was the schedule for licensing and we talked about the canister in that regard. But I don't recall us taking a stance on whether more or less dry storage was appropriate for the utilities.

BY MR. SHAPIRO:

Q. You're aware that some utilities were moving toward dry storage as a means of managing their spent fuel inventories?

A. Oh, yeah.

113

Q. And, if a utility was going to use a canister, it had to be licensed by the NRC?

A. Yes.

Q. Was there ever any consideration of which you were aware when you were director of RW that DOE was not going to accept spent fuel in such NRC licensed canisters from utilities?

MR. SHULTIS: Objection, it calls for a legal conclusion.

THE WITNESS: You want to tell me that one again. I didn't follow it.

BY MR. SHAPIRO:

Q. Was there ever any consideration of which you were aware when you were director of RW that DOE would not accept the spent fuel inside of a dry storage canister that utilities had procured on their own that were licensed by the NRC?

MR. SHULTIS: Same objection.

THE WITNESS: There are a multiplicity of issues about the acceptance of spent fuel which are related to the whole regulatory safety oversight having to do with the characterization of fuel that's in the canister, the pedigree of the fuel, and a determination as to what it is which would affect putting it into a repository.

114

And at some point those certifications have to be made. So, depending on whether you are going to be repackaging along the way -- in other words, what I'm saying is the department would have an interest in what's in a dry storage canister when it comes to pick it up.

The department might have an interest in the technology of the canister if it was intended to travel. But there are regulatory considerations as to what the character of the fuel is.

BY MR. SHAPIRO:

Q. I'm asking I guess not clearly enough something more specific, not sort of the theoretical interest that the department might have had. But, given the fact the department knew that utilities were putting spent fuel in these dry storage canisters, did the department ever consider that, heck, we're not going to be accepting that stuff in canisters, we're not supposed to take canisters, was that ever a consideration?

A. It was always a consideration as to what the condition and character of the fuel would be when you came to acceptance, yes, definitely. And there was conversations continually about that. But not -- but in the context of how do you accomplish what you

115

have to accomplish, both parties being regulated by the commission.

There had to be coordination on what you did with the fuel, if anybody was going to come and move it away, because both parties were going to be regulated by the commission. And there are very critical issues as to knowing precisely what fuel rods and with what characteristics and what age are in particular canisters.

So is that an issue? You bet. There was a lot of concern about, as the utilities went forward and made decisions, what they were doing and what the implications would be for fuel acceptance.

Q. Was the concern then that DOE have an appropriate opportunity to inspect the fuel before it got sealed into the canister?

A. It's a lot more complicated than that.

Q. Was there a concern about the canister itself?

A. If the canister traveled, there would be a concern about that, the transportation vehicle. If it was repackaged -- I mean there are so many different possible scenarios there. And, of course, the multiplication of technologies makes things more difficult because you have to handle them all when

116

the time comes.
So it was a coordination question, a substantial coordination question that everybody knew what everybody was doing and didn't create problems for the future, cost or regulatory.
Q. So you were working with utilities to make sure that it didn't become a problem?
A. Yeah, that was something of a consequence in the coordination with utilities, yes, as they selected technologies, certainly.
Q. So the effort at DOE when you were director was to ensure that there wouldn't ultimately be a problem with DOE taking the spent fuel that utilities had put into the canisters?
A. Yes, that was the objective, was that there would not be a problem. And there were a lot of complicated technical issues as choices were being made.
Q. When you say technical issues, are these engineering type technical issues or were there ever any I think previously you referred to as legal technical issues? When you say technical issues in this context, what are you referring to?
A. In this context there were two kinds of things. One would be the mechanical question of how

117

are we going to deal with the fuel that's in that can and get it into a transportation mode. That's one.
The other one is this pedigree consideration of the characterization of the fuel and the stream of custody that would convince the commission and at a time regulators and others that what was going into the repository was what we said it was. And that is a nontrivial problem.
And, therefore, you can't lose the trace somewhere at the reactor or anywhere else in moving fuel from one container to another. So both of those things are important in managing the right fuel coming out of the pool and putting it into containers.
At a minimum you can cause a lot of additional costs in going back and trying to undo something that didn't get done right. So that is -- it was an important coordination issue, a fair amount of attention given to it in that era.
Q. Do you recall, did you ever get to a problem with respect to this coordination that caused you to think that, gee, we're not going to be able to get it done?
A. Not going to be able to what?
Q. That we're not going to be able to accept

118

the fuel ultimately because we can't get it coordinated?
A. I have no recollection that I ever was aware of an impasse in that regard, no. I was aware of the complexity of the coordination. But I don't remember it as a showstopper of any kind.
(Dreyfus Exhibit No. 10 was marked for identification.)
BY MR. SHAPIRO:
Q. Dr. Dreyfus, you've been handed what we've had marked as Dreyfus Exhibit 10 which says on its cover Fiscal Year 1994 Annual Report to Congress, a Report by the Office of Civilian Radioactive Waste Management. It's dated May of 1995. It's kind of a long document. We're not entirely changing subjects. I'm going to focus on page 34 of the document. And that section starts on page 33 dealing with addressing waste acceptance issues.
A. These are excerpts, they're not continuous I guess. Yes, some of them.
Q. Right.
A. Yes. Where are we?
Q. Page 34. Again I want to focus in on whether or not the Department of Energy was, in fact, encouraging utilities to use dry storage. And the

119

particular phrase that got my interest on that is in the first column on page 34, the third paragraph down, the one that says one storage option is to construct dry storage facilities at reactor sites. The first of these began to operate in 1986 and additional facilities have been put into operation since.
It says dry storage offers the advantage of being passive while pool storage requires more active maintenance. Then it says that the NRC has stated a preference for dry storage. And then the next paragraph says OCRWM has helped utilities develop dry storage technologies.
Does that passage refresh your recollection at all as to whether or not DOE was encouraging utilities to use dry storage to manage their spent fuel?
A. Not really. It says Nuclear Regulatory Commission has stated its preference for dry storage. I presume they were basing that on their view of what was most -- the safest approach at the reactor site which they regulate.
Q. The next paragraph says OCRWM has helped utilities to develop dry storage technologies through cooperative demonstration projects?

120

failed fuel. Does that help refresh your recollection at all?
A. Yes. That part of it I've got. But what defines it across the line I don't recall and I don't recall what the issue is.
Q. Maybe again to represent to you what one of the arguments that the government has been making in the current case between Yankee Atomic and the government is concerns the timing when failed fuel might have been picked up had the government otherwise been picking up spent nuclear fuel. And the argument is that, even if the government was otherwise picking up Yankee Atomic's spent nuclear fuel on a reasonably prompt schedule, that failed fuel might have waited until the end of the line after all utilities' standard fuel. Do you recall any consideration when you were director of RW of the timing of when failed fuel would be accepted from utilities as opposed to the timing of the pickup of other spent fuel?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: No. I mean I can contemplate what the problems might be, but I do not recall a -- I do not recall a specific issue or

177

discussion of that topic. It's not coming back to me.
BY MR. SHAPIRO:
Q. Are you aware of any reason why DOE would not take spent nuclear fuel on the same schedule as -- not take failed fuel on the same schedule as other spent nuclear fuel?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: On a technical basis, I am aware that the characterization of fuel and the ability to describe it and to deal with it in terms of a repository's analyses, all of the complex notions of behavior of fuel in a repository, that this is going to have special considerations, probably special packaging. That seems evident.
So I can see that there could be some sort of issue there, but I do not recall at this moment any discussion of it or any treatment of it at the time I was director, I just don't remember anything specific about it.
MR. SHAPIRO: Let's move to another subject.
(Dreyfus Exhibit No. 17 was marked for identification.)

178

BY MR. SHAPIRO:
Q. Dr. Dreyfus, we have had marked as Dreyfus Exhibit 17 a memorandum dated March 27, 1995, from Samuel Rousso to the director of RW which I assume was you at that time regarding approval of what's called the 1994 acceptance priority ranking and annual capacity report. And behind it is the draft report. Do you have any recollection of this 1994 acceptance priority ranking and annual capacity report that was ultimately published in 1995?
A. I know what it is, yes.
Q. What is the acceptance priority ranking and annual capacity report?
A. I can't give you a definition of what it is that would be technically valid. I just don't remember that much about the requirements of it. So I don't think I should characterize it.
Q. What was your understanding of the purpose of the report, Dreyfus Exhibit 17?
MR. SHULTIS: Objection, the document speaks for itself.
THE WITNESS: Well, the objective of it is to update periodically the planning assumptions regarding the taking of the fuel under the contracts. Beyond that I don't remember what the objectives --

179

the criteria of what the report would contain. I've seen them.
BY MR. SHAPIRO:
Q. The draft report in Dreyfus Exhibit 17 has some handwritten marginalia on it. Is that your writing?
A. No. You mean the markings on the draft report?
Q. Yes.
A. They're not mine.
Q. Do you recognize whose writing that is?
A. No.
Q. I turn your attention to page 5 of the draft, table 1 there. It has projected nominal waste acceptance rates for spent nuclear fuel?
A. Yes.
Q. Do you recall those acceptance rates?
A. No, not specifically. I see a 400 year one as I said earlier was my recollection of the first year.
Q. Going back to Exhibit 3, the TSLCC analysis that we looked at a couple times earlier that had a different table of acceptance rates, looking at Dreyfus 17, this other table, does that help refresh your recollection as to whether there

180

was two different projected acceptance rates?
A. No, I don't know.
MR. SHULTIS: Objection, the documents speak for themselves.
THE WITNESS: I don't know. I'm too away from these two documents to be able to recall what would be the basis of two different schedules. I see that this one now starts with a year one instead of a specific calendar year which recognizes presumably that the specific calendar year has dropped off the radar screen. But I don't know why these rates would be different from the rates in the other report.
BY MR. SHAPIRO:
Q. Which rates were you relying upon in your work as director of RW as to how the program was going to work?
MR. SHULTIS: Objection, assumes facts not in evidence and vague.
THE WITNESS: The numbers that I recall as being more in line with my customary discussions with people, and I haven't looked at my testimony before the Congress, are the numbers in the planning reports that -- they start about like these but go up to 3,000 in an earlier time frame. Which document was it that had the other table in it?

181

BY MR. SHAPIRO:
Q. Exhibit 3, the TSLCC.
A. The TSLCC. That is closer to the schedule that I recall working with the most frequently. And that's a planning document. This may be predicated on some entirely different basis. And I may have known it when I was the director, but I do not know it now.
And, without a staff meeting, I wouldn't be able to reconstruct it out of whole cloth. I see 400, 600, 900. And that other table had in it what? It has 300, 600. I remember, when I looked at it, I thought I remembered 400 for the first number. But a table that goes 400, 600, and then ramps up eventually to a steady state of 3,000 is pretty much what I recall as to the schedule I most frequently was using.
Q. Let me represent to you, without having to go through all the details of this draft annual capacity report and a couple earlier ones, that part of the explanation for the justification of these acceptance rates in the first ten years that totaled 8,200 MTU was that they were limited by the statutory limit on how much spent fuel a monitored retrievable storage system could accept at least prior to

182

licensing of a repository. Do you recall that issue, what the cap was on the size of a monitored retrievable storage system?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: I don't -- I recall there is something there, but I don't recall the specifics of it. There was no monitored retrievable storage system in my planning horizon when I was there. And the other table, of course, presumes going -- the table that's in the planning documents assumes going to a repository that is available.
So that may well be the explanation between the two tables since this one may not make that assumption. But I don't remember. If this is predicated on the assumption of an interim stop and a monitored retrievable storage facility, then maybe that's the recollection. But that's the reason. But I don't know.
BY MR. SHAPIRO:
Q. Would it have made sense to have based a projection of acceptance of spent nuclear fuel on the existence of a monitored retrievable storage system in 1995?
MR. SHULTIS: Objection, calls for a legal

183

conclusion and asks for speculation.
THE WITNESS: I can't put myself back into the context of what was going on when I signed this report. So I don't know whether there was a reason why this one should have been predicated on one thing.
And I don't even know whether these two are contemporaneous without constructing some kind of a diagram of when did they write them. So I really can't respond to why that difference exists, if it does exist, in a contemporaneous situation.
BY MR. SHAPIRO:
Q. But your recollection is that, during your tenure as director of RW, monitored retrievable storage was not an option that was under active consideration?
A. Well, no, one can't say that. It was always under active consideration one way or the other. In the early days, there was a negotiator who was actively seeking a site which, had he found one, might have been in the scenario.
And then, about the time that the negotiator went out of business, Congress started to entertain bills to put a monitored storage facility somewhere in Nevada. All these things were somewhere

184