**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant**.

---

**VOLUME IV OF X**
**(Pages A 0438 to A 0611)**

---

# ENERGY NORTHWEST'S CORRECTED APPENDIX IN SUPPORT OF ITS CORRECTED NOTICE OF DESIGNATION OF DEPOSITION AND PRIOR TRIAL TESTIMONY OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO ADMIT PRIOR TESTIMONY INTO EVIDENCE

---


NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
202-639-6000


June 3, 2008

*Attorneys for Plaintiff*

# Table Of Contents To Appendix – Volumes I to X

## Volume I

Documents Cited

DOE's Responses to Utility Plaintiffs' First Set of Interrogatories..........................A 0001

DOE's Responses to Utility Plaintiffs' Joint Supplemental Interrogatories.............A 0013

April 3, 2002 30(b)(6) Notice of Deposition ..........................................................A 0028

April 18, 2002 30(b)(6) Notice of Deposition ........................................................A 0033

November 12, 2004 30(b)(6) Notice of Deposition.................................................A 0039

March 2, 2005 30(b)(6) Notice of Deposition ........................................................A 0043

## Volume IA

April 19, 2007 30(b)(6) Notice of Deposition ........................................................A 0047

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 2450874
(Fed. Cl. Sept. 17, 2004) (unpublished)...........................................................A 0050

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, slip. op.
(Fed. Cl. Sept. 21, 2004) (unpublished)...........................................................A 0063

*Wisc. Elec. Power Co. v. United States*, No. 00-697C, slip op.
(Fed. Cl. Aug. 16, 2007) (unpublished)...........................................................A 0073

Defendant's Unopposed Motion to Designate Prior Trial Testimony of
Mr. Robert L. Morgan in System Fuels ..........................................................A 0103

## Volume II

Deposition Transcripts and Trial Testimony Excerpts

Chart of Energy Northwest Deposition and Trial Testimony Designations .............A 0109

Barrett, Lake ..........................................................................................................A 0128
April 22, 2002 ..........................................................................................A 0129
April 23, 2002 ..........................................................................................A 0165
April 26, 2002 ..........................................................................................A 0191
May 8, 2002 ...............................................................................................A 0225
May 10, 2002 .............................................................................................A 0250
May 14, 2002 .............................................................................................A 0278
May 15, 2002 .............................................................................................A 0286

## Volume III


Brownstein, Alan ....................A 0289
April 9, 2002 ....................A 0290
April 10, 2002 ....................A 0318
April 11, 2002 ....................A 0350
May 23, 2002 ....................A 0363
June 14, 2002 ....................A 0368

Cole, Billy M. ....................A 0376
March 12, 2002 ....................A 0377
March 13, 2002 ....................A 0411
June 4, 2002 ....................A 0419

Dreyfus, Daniel ....................A 0422
May 15, 2002 ....................A 0423


## Volume IV


Klein, Susan ....................A 0438
April 24, 2002 (Rule 30(b)(6)) ....................A 0439
April 25, 2002 (Rule 30(b)(6)) ....................A 0478

Kouts, Christopher ....................A 0493
January 30, 2004 ....................A 0494
February 19, 2004 ....................A 0504
August 2, 2004 (in the Yankee Atomic Trial Transcript) ....................A 0509
April 11, 2005 (Rule 30(b)(6)) ....................A 0516
July 12, 2005 (in the TVA Trial Transcript) ....................A 0532
October 26, 2005 (in the Southern Nuclear Trial Transcript) ....................A 0538
June 13, 2006 (in the Pacific Gas Trial Transcript) ....................A 0550
June 14, 2006 (in the Pacific Gas Trial Transcript) ....................A 0555
October 11, 2006 ....................A 0571
January 16, 2007 (in the System Fuels Mississippi Trial Transcript) ....................A 0581
April 12, 2007 (in the System Fuels Entergy Trial Transcript) ....................A 0585


## Volume V


Kouts, Christopher (continued) ....................A 0612
May 1, 2007 (Rule 30(b)(6)) ....................A 0612
May 2, 2007 ....................A 0634

Lawrence, Michael ....................A 0654
May 20, 2002 ....................A 0655
May 21, 2002 ....................A 0697
November 16, 2007 (in the Carolina Power Trial Transcript) ....................A 0712

Milner, Ronald ............ A 0726
May 1, 2002 ............ A 0727

**Volume VI**

Milner, Ronald (continued) ............ A 0762
May 2, 2002 ............ A 0762
May 3, 2002 ............ A 0799
May 7, 2002 ............ A 0814
May 7, 2002 (Afternoon) ............ A 0831
May 8, 2002 ............ A 0838
August 11, 2004 (in the Yankee Atomic Trial Transcript) ............ A 0851

Morgan, Robert ............ A 0866
March 21, 2002 ............ A 0867
March 22, 2002 ............ A 0905
June 25, 2002 ............ A 0913
August 3, 2004 (in the Yankee Atomic Trial Transcript) ............ A 0917

**Volume VII**

Morgan, Robert (continued) ............ A 0925
November 15, 2006 ............ A 0925
November 16, 2006 (in the Northern States Trial Transcript) ............ A 0943
November 13, 2007 (in the Carolina Power Trial Transcript) ............ A 0953

Pollog, Thomas ............ A 0962
April 11, 2002 (Rule 30(b)(6)) ............ A 0963
April 12, 2002 (Rule 30(b)(6)) ............ A 1002
May 15, 2002 (Rule 30(b)(6)) ............ A 1026
May 16, 2002 (Rule 30(b)(6)) ............ A 1046
May 22, 2002 ............ A 1066

**Volume VIII**

Pollog, Thomas (continued) ............ A 1073
August 4, 2004 (in the Yankee Atomic Trial Transcript) ............ A 1073
March 29, 2005 (in the SMUD Trial Transcript) ............ A 1098
July 12, 2005 (in the TVA Trial Transcript) ............ A 1108
October 26, 2005 (in the Southern Nuclear Trial Transcript) ............ A 1115
October 12, 2006 ............ A 1122
November 15, 2006 (in the Northern States Trial Transcript) ............ A 1126

Rosselli, Robert ............ A 1137
April 15, 2002 ............ A 1138
April 16, 2002 ............ A 1168

Rusche, Benard ....A 1173
May 16, 2002 ....A 1174
May 17, 2002 ....A 1197
August 3, 2004 (in the Yankee Atomic Trial Transcript)....A 1207

Slater-Thompson, Nancy ....A 1215
April 21, 1999 ....A 1216
April 22, 1999 ....A 1228

**Volume IX**

Slater-Thompson, Nancy (continued)....A 1239
June 13, 2002 ....A 1239

Trebules, Victor ....A 1255
April 17, 2002 ....A 1256
April 18, 2002 (Coordinated Discovery) ....A 1289
April 18, 2002 (Deposition in Yankee Cases....A 1305
April 19, 2002 ....A 1317

Williams, Jeffrey....A 1319
June 11, 2002 ....A 1320
January 22, 2004 ....A 1340

Zabransky, David....A 1368
April 17, 2002 ....A 1369

**Volume X**

Zabransky, David (continued) ....A 1401
April 18, 2002 ....A 1401
April 19, 2002 ....A 1428
June 5, 2002 ....A 1440
June 6, 2002 ....A 1445
August 5, 2004 (in the Yankee Atomic Trial Transcript)....A 1449
March 28, 2005 (in the SMUD Trial Transcript)....A 1473
March 29, 2005 (in the SMUD Trial Transcript)....A 1487
April 12, 2005 (Rule 30(b)(6))....A 1491
July 12, 2005 (in the TVA Trial Transcript)....A 1503
October 27, 2005 (in the Southern Nuclear Trial Transcript)....A 1508
November 20, 2006 (in the Northern States Trial Transcript)....A 1519
October 11, 2007 (in the Wisconsin Electric Trial Transcript) ....A 1528
October 12, 2007 (in the Wisconsin Electric Trial Transcript) ....A 1532
November 13, 2007 (in the Carolina Power Trial Transcript)....A 1538

# KLEIN

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------------X YANKEE ATOMIC ELECTRIC COMPANY :

(98-126C)(Merow, S.J.) : CONNECTICUT YANKEE ATOMIC POWER COMPANY :

(98-154C)(Merow, S.J.) : MAINE YANKEE ATOMIC POWER COMPANY :

(98-474C)(Merow, S.J.) : FLORIDA POWER & LIGHT COMPANY :

(98-483C)(Wilson, J.) : NORTHERN STATES POWER COMPANY :

(98-484C)(Wiese, J.) : DUKE POWER, a Division of DUKE ENERGY CORP.:

(98-485C)(Sypolt, J.) : INDIANA MICHIGAN POWER COMPANY :

(98-486C)(Hodges, J.) : SACRAMENTO MUNICIPAL UTILITY DISTRICT :

(98-488C)(Yock, S.J.) : SOUTHERN NUCLEAR OPERATING COMPANY, et al. :

(98-614C)(Merow, S.J.) : COMMONWEALTH EDISON COMPANY :

(98-621C)(Hewitt, J.) : BOSTON EDISON COMPANY :

(99-447C) (Allegra, J.) : GPU NUCLEAR, INCORPORATED :

(00-440C)(Bush, J.) : WISCONSIN ELECTRIC POWER COMPANY : VOLUME

(00-697C)(Merow, S.J.) : I POWER AUTHORITY OF THE STATE OF NEW YORK :

(00-703C)(Damich, J.) : OMAHA PUBLIC POWER DISTRICT :

(01-115C)(Bush, J.) : NEBRASKA PUBLIC POWER DISTRICT :Discovery

(01-116C)(Sypolt, J.) :Judge: TENNESSEE VALLEY AUTHORITY :(Judge

(01-249C)(Bruggink, J.) :Sypolt)

Plaintiffs, :PAGES

V. :1 - 274

THE UNITED STATES, :

Defendant. :

-------------------------------------------X

Deposition of Susan Klein

Washington, DC

Wednesday, April 24, 2002

Reported by: Denise Dobner Vickery, RMR, CRR

JOB NO. 144539

April 24, 2002

9:37 A.M.

Deposition of Susan Klein, held at the offices of:

Jenner & Block

601 13th Street, NW

12th Floor

Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Norman M. Hirsch, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Alex D. Tomaszczuk, Esq.

Balch & Bingham LLP
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
1275 Pennsylvania Avenue, NW, Tenth Floor
Washington, DC 20004

(202) 347-6000
BY: Kristi L. Remington, Esq.

Arnold & Porter
For the Plaintiff SACRAMENTO MUNICIPAL UTILITY DISTRICT
370 Seventeenth Street, Suite 4500
Denver, CO 80202-1370
(303) 863-2334
BY: Timothy R. Macdonald, Esq.

Perkins Coie LLP
For the Plaintiff WISCONSIN ELECTRIC
607 Fourteenth Street, NW
Washington, DC 20005-2011
(202) 434-1609
BY: Suzette W. Derrevere, Esq.

United States Department of Justice, Civil Division
For the Defendant THE UNITED STATES
Commercial Litigation Branch
Federal Claims Section
1100 L Street, NW



Washington, DC 20530
(202) 307-6288
BY: Erin E. Powell, Esq.
Marian E. Sullivan, Esq.

I N D E X


EXAMINATION OF SUSAN KLEIN PAGE
BY MR. HIRSCH 8

KLEIN DEPOSITION EXHIBITS: PAGE
No. 1 Notice of Deposition. 10
2 Letter of 3-4-92, DOE to Commonwealth Edison. CE03656 through 3664. 42
3 Zabransky 4-17-02 Rough Draft Excerpt. Pages 1 through 52. 97
4 Indiana Michigan Power Company v. DOE Citation, pages 2 through 7. DC Circuit. 102
5 Acceptance Priority Ranking & Annual Capacity Report. March 1995. HQR-039-0597 through 0666. 114
6 Zabransky 4-17-02 Rough Draft Excerpt.





Page 113. 120
7 Letter of 9-25-96, ComEd to DOE. COF-001-2165 through 2172. 123
8 US DOE Appendix C, Commonwealth Edison. 0284 through 0290. 123
9 Letter of 3-13-97, DOE to Commonwealth Edison. CE04064. 129
10 Letter of 9-28-95, ComEd to DOE. COF-001-2141 through 2146. 134
11 Letter of 9-26-97, ComEd to DOE. CE04069 through 4070. 137
12 OCRWM Annual Capacity Report. December 1991. HQR-001-2357 through 2418. 146
13 Letter of 2-14-02, Secretary of Energy to The President. Recommendation by the Secretary of Energy. 167
14 42 Section 10134. Repositories. Pages 753 through 757. 175
15 Viability Assessment of a Repository at Yucca Mountain. Overview. December 1998. 187
16 Analysis of the Total System Life Cycle Cost of the CRWM Program. May 2001. 193





17 Letter of 4-8-02, Governor Guinn to Senator Byrd. Statement of Reasons. 198
18 Statement of Lake H. Barrett, OCRWM, March 14, 2002. 208
19 GAO Report to Congressional Requesters. Nuclear Waste. Yucca Mountain Repository Project. December 2001. GAO-02-191. 215
20 GAO Testimony before the Subcommittee. Nuclear Waste. Yucca Mountain Repository Project. GAO-02-539T. 226
21 YMP.GOV Web site. Timeline/Milestones. 4/20/2002. 232
22 Viability Assessment. Preliminary Design Concept. US DOE OCRWM. Volume 2. 249
23 Analysis of the Total System Life Cycle Cost of the CRWM Program. September 1995. 251
24 CRWMS Management and Operating Contractor. TSLCC for Site Recommendation. Letter Report. February 2002. 259
25 Draft Letter of 10-30-01, CO Rep Waisley to Hess/BSC. CTR-045-1118 through 1121. 267

**Exhibits are attached.

Thereupon,
SUSAN KLEIN
was called for examination, and, after having been duly sworn or affirmed, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR THE PLAINTIFF, COMMONWEALTH EDISON
BY MR. HIRSCH:
Q. Ms. Klein, my name is Norm Hirsch. I'm a lawyer at Jenner & Block in Chicago. I represent Commonwealth Edison Company. I'm going to be asking you some questions today.
If you don't understand a question I've asked, please tell me and I'll try and rephrase it. Otherwise, I'll assume you understood my question.
A. (Nods head).
Q. If you need a break at any point today, please let me know and we'll stop and take a break.
A. (Nods head).
Q. Mr. Zabransky -- I'm sorry.
A. That's okay. You got Zabransky on your brain.
Q. Move from the last deposition.



Ms. Klein, are you aware that there's a protective order in the spent nuclear fuel cases?
A. I think there is, yes.
Q. All right. What I'm going to do is I'm going to hand you a copy of the protective order and I'd like you to take a minute to look at it.
A. Okay.
MR. HIRSCH: Mark that as Exhibit 1.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 1.)
THE WITNESS: (Pause). Okay. I don't fully understand it at this point, but I've read through it.
BY MR. HIRSCH:
Q. Okay. Would you generally agree to abide by the terms in the protective order, Ms. Klein?
A. If something is labeled confidential, yes, I will keep it confidential.
Q. Okay. All right. That's fine.
Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 1 or I'm handing you that document, which is the notice of deposition that was



issued on April 18th for today's Rule 30(b)(6) deposition. And if you look on the exhibit page, you'll see four topics. That's page 5. You see those topics?
A. Yes, I see those topics.
Q. And you understand you're supposed to be the Rule 30(b)(6) designated Department of Energy witness for these four topics?
A. Yes.
Q. What's your current position, Ms. Klein?
A. I'm a senior policy adviser to the Director and Deputy Director of the Office of Civilian Radioactive Waste Management at the Department of Energy.
Q. And how long have you been the senior policy adviser?
A. For about three years.
Q. So, since about 1999?
A. Yes. I was transferred there but detailed back to general counsel for a couple years.
Q. When was your detail back to General Counsel's Office?



A. I think it was '97 that I was transferred to RW, but I was detailed back to general counsel to work with the general counsel at the time on any legal issues and then later on it was limited to issues involving this litigation.
Q. Okay. We'll get back to that in a second. But who do you report to as the senior policy adviser?
A. Lake Barrett. Ron Milner and Lake Barrett.
Q. And Mr. Barrett's current title is?
A. Deputy Director of the Office of Civilian Radioactive Waste Management.
Q. And Mr. Milner's title is?
A. He's the COO, the Chief Operating Officer of the Office of Civilian Radioactive Waste Management at DOE.
Q. And is the Office of Civilian Radioactive Waste Management otherwise known by its acronym as OCRWM?
A. OCRWM, yes, and actually with regard to Ron, I think now I just report to Lake. I was reporting to Ron when he was also Acting Deputy, but now that Margaret is here, to just correct the record. I don't

know how important that is but --
Q. I'm sorry.
A. -- to be perfectly accurate, right now I report to Lake, not to Ron.
Q. Okay.
A. Okay.
Q. And when did you stop reporting to Ron Milner?
A. When Margaret Chu became the Director.
Q. You also report to Ms. Chu?
A. Yes, I do.
Q. Now, it is my understanding that you're a lawyer; is that correct?
A. Yes.
Q. And when did you graduate from college, Ms. Klein?
A. 1971.
Q. And where did you go to law school?
A. Case Western Reserve in Cleveland, Ohio.
Q. And when did you graduate from Case Western?
A. 1974.
Q. And can you give me just a rough outline of what your employment has been after you got out of law



school?
A. I went to work for the United States General Accounting Office. Worked there for three years.
Q. So, from 1974 to?
A. To 1977.
Q. Okay.
A. I wrote decisions of the controller general. And then I left the General Counsel's Office there and went to what was at the time FEA, the Federal Energy Administration, for three months until it became the Department of Energy in 1977.
Q. And have you been at the Department of Energy from 1977 to the present?
A. Yes.
Q. And can you give me the outline of your employment history at the Department of Energy?
A. I worked in general counsel for a couple years. I can't remember the exact number. I don't know how much detail you want, but then from there I went to conservation and at the time it was called conservation and solar. Worked on the residential conservation service program.



Q. Roughly when was that?
A. I think it was probably '80, 1980. I'm not sure. And then 1984, I believe it was, I came to work in the nuclear area. It was when Ronald Reagan was elected. If that was '84, that's when it was.
Q. And what department did you work in in the nuclear?
A. At the time it was called Assistant General Counsel for International Development and Defense Programs.
Q. And what were your responsibilities in that position?
A. The Price Anderson Act, transportation of nuclear materials, the Low Level Waste Policy Act of 1980. That was generally my areas -- those were generally my areas.
Q. And who did you report to when you were in that position?
A. Leon Silverstorm.
Q. And who was he?
A. The Assistant General Counsel for IDDP, International Development and Defense Programs.



Q. Did you have any involvement in the passage of the Nuclear Waste Policy Act of 1982?
A. My office handled it, but it was not under me. There was another lawyer in the office handling it, but she would report on it in staff meetings.
Q. And what office was that at the time?
A. International Development -- well, it might have changed its name. That office changed its name many times. I'm not sure what its name was, but it was the same general group of lawyers. We were reorganized. We became Nuclear Affairs and later on Civilian Nuclear Programs. The defense part was taken out, but...
Q. Okay.
A. I don't remember the exact name during that period.
Q. So there was another lawyer in this Nuclear Affairs Office --
A. Uh-huh.
Q. -- better term, who worked on the Nuclear Waste Policy Act?
A. Yes.

Q. And who was that?
A. Amy Shamora.
Q. Is she still with the Department of Energy?
A. Last I heard, she went back to GAO. We had both actually worked at GAO together, but I don't know if she's retired or what.
Q. And so I wasn't sure. Did you do any work in terms of the Nuclear Waste Policy Act?
A. After its passage, yes.
Q. Okay.
A. Not before its passage.
Q. I see. What kind of work did you do in connection with the Nuclear Waste Policy Act?
A. Price Anderson issues and transportation issues at this time. Later on I did much more, but that's all I did right after passage. I did not work on the standard contract.
Q. Okay.
A. I guess I shouldn't answer your questions before you ask them.
Q. That's fine. When you say you worked on transportation issues, what kind of issues did you



work? What do you mean by that?
A. Well, generally I worked on transportation issues within the department. Our own transportation of nuclear materials, which was under the defense program area, and I interpreted the Department of Transportation regulations and the NRC regulations and our exemption under the Atomic Energy Act. It was really with Price Anderson that I worked with the people in OCRWM.
Q. Okay. So, how long did you work as that in that Assistant General Counsel position?
A. Until I came to RW and I became the Assistant General Counsel of that division eventually.
Q. And when did you become the Assistant General Counsel for RW?
A. I don't remember. I was in that position acting. I came to RW in about -- what did I say? '97. I'd say around '92. I mean, I can -- yeah, '92, approximately.
Q. So, just so I'm clear, from 1984 to roughly 1992 you were in this position as Assistant General Counsel in this office whose name changed but --



A. No.
Q. I'm sorry. Go ahead.
A. I wasn't the Assistant General Counsel from '84 until '92. I was an attorney in that office.
Q. All right. Okay.
A. From '92 to '97 approximately I was the Assistant General Counsel.
Q. All right. For RW?
A. Which means --
Q. In RW; is that right?
A. No. It's in the general --
Q. All right.
A. It's in the General Counsel's Office. We had many clients and RW was one of them, but actually at a certain point in time the whole RW program was moved to the Assistant General Counsel for Environment because we were doing the environmental assessments was the biggest part of the project, and so it was moved there for several years. It was taken out of that office and moved there and then it was moved back to that office.
Q. So, from this period 1984 to 1982 -- '92 --



excuse me -- you were an attorney in this office?
A. Yes.
Q. Of the Assistant General Counsel?
A. That's right.
Q. Whose responsibilities included nuclear affairs?
A. Yes. Absolutely. That's correct.
Q. All right. And when you moved into the position in 1992 of Assistant General Counsel, who did you report to?
A. Jerry Pruzan. He was the deputy general counsel for -- I don't know what they called it -- programs or something.
Q. What did your responsibilities include as the Assistant General Counsel during that period starting in 1992?
A. Interpretation of the Atomic Energy Act. Interpretation of the Nuclear Waste Policy Act. Interpretation of the Low Level Waste Policy Act. And in those capacities, there were many offices that I supported. Environment, safety and health, OCRWM, nuclear energy.

Q. Who did Mr. Pruzan report to?
A. The general counsel.
Q. And that was?
A. I think that was Farrell. I'm not positive.
Q. Farrell?
A. Mike Farrell. I'm not sure. It also was Steve Wakefield. I don't remember.
Q. And how long were you in that position as Assistant General Counsel?
A. I think about five years. I'm not sure, but I think about five years.
Q. So, roughly from 1992 to 1997?
A. Uh-huh. Now, later on I reported to other people. I'm just -- at that time I reported to Jerry Pruzan when I first became.
Q. All right. When you -- as you went along from '92 to '97, who else did you report to?
A. Frank Bay.
Q. Who's he?
A. He was a political appointee. He was and that Jerry Pruzan. They were all political appointees. So they came and went.



Q. I see. All right.
A. And then Mark Schroeder and then --
Q. These people had the title of?
A. Deputy.
Q. Deputy general counsel?
A. For something. It changed around a lot, but... And then after Mark Schroeder was Mary Anne Sullivan, not Marian but Mary Anne Sullivan.
Q. Right. Anybody else that you reported to during that period?
A. Not that I can remember.
Q. And what was Mary Anne Sullivan's title?
A. At the time she was deputy general counsel for something like environment and security. Something like that. And then she became the General Counsel later.
Q. Okay. Now, what position did you take in 1997?
A. The senior policy adviser to RW.
Q. And that's the position you're in now?
A. Yes.
Q. Now, you mentioned that you had a detail?



A. Uh-huh.
Q. Somewhere during this period '97 to the present?
A. Uh-huh.
Q. And when was that detail?
A. 1997 till the end of 1999.
Q. Okay. And what was your detail? What was the position you held?
A. Okay. I was -- I had moved physically. Well, I think the first year I didn't. I don't remember now. But anyway I reported to Mary Anne Sullivan with regard to legal issues, and then when time allowed, I worked on my senior policy adviser hat for Lake Barrett. But I was technically an employee of RW for payroll purposes, et cetera.
Q. All right.
A. And then eventually that changed. So that I didn't work on all legal issues. I just worked on issues related to the spent fuel litigation.
Q. And when did you start working exclusively on issues related to the spent fuel litigation?
A. I don't remember. I think it was the last six months of that period.



Q. So, probably in 1999?
A. Yes. But during that whole period, I worked on the spent fuel litigation.
Q. From '97 to --
A. Yes.
Q. -- '99?
And you say during that detail you reported to Mary Anne Sullivan?
A. Yes. For legal issues I reported to Mary Anne Sullivan.
Q. Okay. And her title at that time was? Had she become --
A. General Counsel.
Q. -- General Counsel?
A. I believe for most of that time anyway.
Q. Was there a particular reason that you were given about why you should serve on the detail?
A. There was nobody else to do it.
Q. I see. All right. Well, were you perceived as having special expertise in the area?
A. Yes. Absolutely.

Q. And that expertise was in what?
A. I worked on this litigation since before. Before it became litigation. I worked on these issues. I was counsel to RW on standard contract issues.
Q. So when you were in this detail from '97 to '99, approximately what percentage of your time did you work on the detail as opposed to your regular job?
A. I would say 75 percent.
Q. And the remaining 25 percent of the time you were working on your job as senior policy adviser?
A. Uh-huh.
MS. POWELL: You have to answer yes for the record.
THE WITNESS: Yes. I'm sorry.
BY MR. HIRSCH:
Q. You can't pick up a nod.
A. Uh-huh doesn't count.
Q. That's right. Thank you.
I think you just mentioned a little while ago that you've been working on standard contract issues for quite a long time?



A. Yes.
Q. When did you start working on the standard contract issues?
A. When Bob Nordhaus was General Counsel, which was about a year after the Clinton Administration. I'm sorry. That's how I figure.
Q. All right. So that would be roughly '93?
A. Uh-huh. Sounds good.
Q. Did somebody ask you to start working on standard contract issues?
A. Yes.
Q. Who was that?
A. Bob Nordhaus.
Q. I'm sorry. What was Mr. --
A. Oh, he was the General Counsel before Mary Anne Sullivan was the General Counsel.
Q. And do you know why he picked you to work on the position?
MS. POWELL: We're getting into attorney-client privilege here. So your who asked is fine, but...
MR. HIRSCH: Well, I think somebody asking



her to take a job isn't the subject of attorney-client privilege.
MS. POWELL: And I'm going to object to -- I didn't object to that question, but now you're going into why he chose and it's being perceived as work product. And, you know.
BY MR. HIRSCH:
Q. Well, did Mr. Nordhaus tell you why he wanted you to work on the standard contract issues?
MS. POWELL: I'm going to -- it's --
THE WITNESS: Should I answer that one? I mean, I have a simple answer, that's all.
MS. POWELL: Okay.
THE WITNESS: That was -- that was in my job description basically. That's what I was. I was the lawyer for RW.
BY MR. HIRSCH:
Q. And what kind of work have you done -- strike that.
Starting in 1993 when you were requested by Bob Nordhaus, what kind of work did you do on standard contract issues?



MS. POWELL: Again, we're getting into work -- I mean, work product privileges? She's here as a 30(b)(6). I understand you have a right to ask background questions with respect to Ms. Klein and I certainly haven't objected to that. You can establish her job history, but we're not offering her -- we're offering her as a 30(b)(6) and you're getting into what the General Counsel's Office did on the standard contract. That's squarely within the work product, attorney-client privilege.
MR. HIRSCH: Well, first of all, to my knowledge there wasn't -- this litigation, spent nuclear fuel litigation wasn't going on during the period that I asked her about. So I don't know how it could be work product. And, secondly, me just asking her what kind of issues she worked on during this period doesn't constitute a request for work product or privileged information.
Are you going to instruct her not to answer? Are you going to let her answer the question?
MS. POWELL: Just because -- the attorney-client work product privilege is not just

limited to this, as you well know. You're getting into what the General Counsel did in 1993 with respect to certain cases and that's part of the work product and attorney-client privilege. You can ask Ms. Klein generally what she worked on and we walked through that and I didn't object, but now you're trying to get into things that fall squarely within the privileges. No problems with background in general description, but you've done that.

MR. HIRSCH: Could you read the last question back.

(Requested material was read.)

BY MR. HIRSCH:

Q. Can you answer that question, please?

MS. POWELL: I'm going to instruct her not to answer.

THE WITNESS: I think it falls into privilege, actually.

MS. POWELL: I'm going to instruct her not to answer.

THE WITNESS: I know I'm not. It does. I think --



BY MR. HIRSCH:

Q. Well, I'm sorry, Ms. Klein, I don't think you want to start offering legal advice in these depositions.

A. No. I mean, I know the answer. So that's why I think but...

Q. Are you going to follow your lawyer's advice not to answer the question?

MS. POWELL: I'm instructing you not to answer.

THE WITNESS: Yes, yes.

MR. HIRSCH: And I hope it's clear for the record, but I think, first of all, this litigation wasn't pending. I don't think there was any litigation pending back in 1993. So this can't be work product and what I asked her didn't call for attorney-client privilege, but move on.

BY MR. HIRSCH:

Q. Your work -- strike that.

In your work as the senior policy adviser, is that primarily legal work or policy work?

A. Well, I'm the liaison with the General



Counsel's Office. We have lots of legal issues in our office, and so I am the liaison with the General Counsel's Office. Plus, I work on the concerns program and other areas.

Q. Well, what is the general job responsibilities of the senior policy adviser?

A. Well, it involves anything that happens to be coming up at the moment. I mean, so I've worked on the Inspector General report looking into bias in the program. I've worked on many employee concerns that raise issues. I mean, I work, I do work on the spent fuel litigation. Not in a legal capacity.

Q. Well, what kind of work do you do on the spent fuel litigation that's not in a legal capacity?

A. I review the briefs that the Justice Department writes.

Q. Any other work along those lines?

A. I'm a 30(b)(6) witness.

Q. Okay. Anything else?

A. I concur in responses to DCS submittals.

Q. When you started out as a senior policy adviser in '97 and recognizing you had this detail



along the way, were you reporting to Lake Barrett?

A. Yes.

Q. Was there anybody else you reported to?

A. Ron Milner. Because Ron Milner was the Acting Deputy Director.

Q. Do you know how long Mr. Milner was the Acting Deputy Director?

A. Whenever Lake is the Acting Director, Ron is the Acting Deputy Director. Many years.

Q. At one point Mr. Dreyfus was the Director; is that correct?

A. This is correct.

Q. He was the Director before Mr. Barrett?

A. Before -- well, in between there's been Ivan Itkin was the Director most recently.

Q. Okay. All right. At any point --

A. Lake has never been the Director I don't think.

Q. He's been the Acting Director?

A. Only the Acting Director.

Q. At any point did you report to Mr. Dreyfus?

A. No. Well, let me think. Let me make sure

33

that I'm saying. No.
Q. Have you ever -- strike that.
Did you ever report to Mr. Itkin?
A. Yes.
Q. When was that?
A. When he was the Director of the program, which was a couple years ago.
Q. In your job as the senior policy adviser, who regularly reports to you?
A. No one.
Q. Are there a group of people who you typically work with in the senior policy adviser position?
A. I work with different people on different issues. Plus, we have a front office staff that meets every day, supports Lake or whoever is the Director at the time in whatever they may need. Which could be some just harebrain thing that Nevada said yesterday and we have to all run around and respond. There's a group of us who do that.
Q. In terms of the standard contract and working on the standard contract, are there people you regularly work with --

34

A. Yes.
Q. -- in that area?
And who would those people be?
A. Dave Zabransky, Tom Pollog and Glenn Gardner.
Q. What's Mr. Gardner's position?
A. He works for Dave Zabransky. I don't know his title.
Q. Anybody else that you work with on the standard contract issue?
A. In RW?
Q. Right.
A. Lake.
Q. Lake Barrett?
A. Yes. No, I can't think of anybody now else.
Q. Do you have an employment GS grade with the government?
A. I'm an SES 4.
Q. And how long have you been an SES 4?
A. A year and a half.
Q. And what were you before that?
A. An SES 3 and then an SES 2 and SES 1.
Q. Okay. Have you reviewed any documents to

35

prepare for your deposition today?
A. Yes.
Q. What have you reviewed?
A. I reviewed some DCS submissions, some of DOE's responses. I reviewed letters from mainly Andy Kadak to the department and Maine Yankee. Priority for shutdown reactors and I reviewed the department's responses. I reviewed the NRC regulations on Greater-Than-Class-C waste. I know I reviewed other things. Oh, I reviewed the contracting officer's 1991 instructions to the purchasers on how to fill out their DCS forms.
Q. Anything else that you can remember?
A. No, I can't think of anything else. No.
Q. Did you review any deposition transcripts before the deposition today?
A. No.
Q. Have you spoken to anyone besides your lawyers from the Department of Justice about your deposition today?
A. Yes.
Q. Who have you spoken to?

36

A. I've spoken to Dave Zabransky, Tom Pollog, Beth Tomasoni, Glenn Gardner, Alyssa Turner, Nancy Slater or Nancy Slater Thomas -- Thompson. I have spoken to Lake Barrett, Alan Brownstein. I think that's it.
Q. Who's Ms. Melissa Turner?
A. Alyssa Turner.
Q. Alyssa Turner?
A. Uh-huh.
Q. Okay. Who's she?
A. At one time she reviewed DCS submittals.
Q. What did you talk to Mr. Zabransky about in terms of your deposition?
MS. POWELL: Okay. You can answer to the extent that attorney-client -- the attorneys were not present, but I'm going to object and instruct you not to answer if the conversations occurred with attorneys present.
THE WITNESS: I'm just trying to think what we talked about when the attorneys weren't present. Just things like "How did it go today? Terrible." That kind of thing.

A. It was about two hours.
Q. And this meeting last week, not the one with Lake Barrett but with Tom Pollog and the other people, how long did that last?
A. I'd say about two hours.
Q. Have you spoken to Nancy Slater Thompson -- is that it?
A. Uh-huh.
Q. Outside of these meetings that you just described about your deposition?
A. No.
Q. What about Mr. Brownstein; have you spoken to Mr. Brownstein outside of these meetings you described where the lawyers were present about your deposition?
A. I think I might have discussed the date or something like that, but nothing else.
Q. And in terms of a discussion you had with Mr. Barrett -- strike that.
Have you had a discussion with Mr. Barrett about your deposition outside the presence of the DOJ lawyers?



A. No.
Q. Why don't we take five minutes here.
A. Okay.
(Recess, 10:18 a.m. to 10:26 a.m.)
(Thereupon, the reporter marked for identification Deposition Exhibit No. 2.)
BY MR. HIRSCH:
Q. Ms. Klein, I have one clarification question. Did you say you were currently an SES 5?
A. 4, 4.
Q. 4; okay. And when did you become an SES 4?
A. I think it was a year and a half ago. Approximately.
Q. And I'm going to reveal my ignorance of government job classifications, but what does SES stand for?
A. Senior Executive Service.
Q. All right. And when you started at DOE, were you in that SES designation?
A. No.
Q. I see.
A. I was a GS 11.



Q. Okay.
A. No, not at DOE. I was a GS 11 at GAO out of law school.
Q. Okay. When you started at DOE, what was your GS level?
A. I don't remember.
Q. Take a guess.
A. 12, 13. I don't know.
Q. All right.
A. 14.
Q. When did you move into the SES category?
A. When I became the Assistant General Counsel for Nuclear I think it was called Nuclear Affairs at time. When I became the Assistant General Counsel of Civilian Nuclear Programs.
Q. And that would have been around --
A. SES 1.
Q. -- 1984?
A. No. 1992.
Q. Oh, I'm sorry. Okay. And you started out in 1992 as an SES 1?
A. Right. Correct.



Q. All right. Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 2, which is a letter from the Department of Energy to R. J. Hanley, contractor administrator at Commonwealth Edison Company, dated March 4, 1992 and then attached to that is US Department of Energy Instructions for Completing Appendix C Delivery Commitment Schedule and this document has Bates label CEO 3656 through 664.
Ms. Klein, do you recognize Klein Deposition Exhibit 2 as the DOE's instructions for filling out DCS forms to utilities?
A. The attachment, yes.
Q. And that the cover letter that is on the first two pages of the exhibit are the cover letter that goes with the instructions; is that correct?
A. I haven't seen this particular one, but it looks like most of them look, yes.
Q. Did you review the DCS instructions at the time that they were first sent out?
A. No.
Q. And when I say DCS instructions, you understand I'm referring to delivery commitment

45

schedule instructions?
A. Yes, I understand that.
Q. All right. Sometimes the lawyers start using acronyms, too.
A. I know.
Q. All right.
A. Even the lawyers.
Q. Do you know when was the first time that you reviewed DCS instructions that had been sent to utilities?
A. I think I might have looked them over before last week, but last week was the only time I really carefully read them.
Q. So last week was the first time you have really carefully gone over the DCS instructions; is that correct?
A. Yes.
Q. All right. Ms. Klein, do you have a general understanding of what the utilities are supposed to do in submitting the DCS forms --
A. Yes.
Q. -- to the DOE?

46

Can you explain to me what your understanding is?
A. They are supposed to tell the department 63 months before their allocation date generally what spent fuel they would like DOE to pick up. They're supposed to put down information to determine the age of the fuel, and I'm trying to remember what else. I mean, there's all sorts of details how you do the contract number and how many ton cask you need, but it's for -- they're generally supposed to inform the department what they expect us to pick up and where.
Q. And how did you arrive at this understanding of what the DCS forms or how the utilities are supposed to submit DCS forms?
MS. POWELL: I'm going to object, beyond the scope, but you can certainly answer the question if you know.
THE WITNESS: Well, I studied the standard contract itself. Not the instructions, but the standard contract. Plus, I talked to Alan Brownstein and Dave Zabransky.
MS. POWELL: I'm going to -- if you're

47

getting into attorney-client --
THE WITNESS: Yeah, okay.
MS. POWELL: -- areas, don't answer.
BY MR. HIRSCH:
Q. Have you talked to Alan Brownstein or Dave Zabransky about the DCS submittal process outside of the presence of the attorneys for the Department of Energy?
A. Can I answer?
MS. POWELL: You can answer whether you talked outside --
THE WITNESS: Oh, yes.
MS. POWELL: -- about the DCS.
THE WITNESS: Yes, I have.
BY MR. HIRSCH:
Q. Okay. And when did you have those discussions?
A. Well, with Alan when I was in the General Counsel's Office I discussed, I don't know if I actually discussed the DCS approval process, but, yes, I did.
MS. POWELL: And I'm just going to caution

48

my witness. I don't know in what capacity you were talking to --
THE WITNESS: In attorney-client capacity.
MS. POWELL: Then to that extent.
THE WITNESS: Okay.
MS. POWELL: You need to not answer.
THE WITNESS: Okay.
BY MR. HIRSCH:
Q. You say you had a discussion with Mr. Brownstein when you were in this detail in the General Counsel's Office; is that correct?
A. No. When I was in the General Counsel's Office.
Q. When you were in the General Counsel's Office.
A. In 1992 through '5. Yeah.
Q. And who initiated that discussion?
MS. POWELL: Again, if it was within the attorney-client privilege, I'm going to instruct you not to answer.
BY MR. HIRSCH:
Q. Well, right now I just asked her who started the conversation or who requested the conversation.

role the DCS forms that are filled out by the utilities play in terms of the Radioactive Waste Management Program?
MS. POWELL: The same objection, beyond the scope, but you can answer.
THE WITNESS: Could you repeat that. Sounds like the same question, but I know there's a different word in there.
BY MR. HIRSCH:
Q. I guess what I'm just getting at, Ms. Klein, is: After the forms are submitted and they're approved, what does the DOE do with the forms? What function do they serve? That's what I'm getting at.
A. They become the legally binding commitment of the department.
Q. Do they have any role in DOE's planning of the spent nuclear fuel program?
MS. POWELL: Same objection, beyond the scope, but you can answer to your personal knowledge.
THE WITNESS: Yes.
BY MR. HIRSCH:
Q. And what role is this?



MS. POWELL: Same objection. You can answer.
THE WITNESS: I'm thinking, actually. I'm thinking because we have -- we're planning for a greater acceptance rate once we begin operation, but those were the planning rates based on an MRS, which was limited by statute to 10,000 metric tons.
BY MR. HIRSCH:
Q. So, is it my understanding that the DOE is now currently planning for a higher acceptance rate than the acceptance rate upon which the DCS forms were originally submitted; is that correct?
A. We're planning for that, but it's for planning purposes, yes.
Q. All right. We're getting into one of the other topics, but what is the rate that the DOE is currently planning on accepting spent nuclear fuel?
A. 400 the first year of operation of a repository. 600 -- just to be sure -- the next year. 1200 the year thereafter. 2,000 the year thereafter. 3,000 the following year and then a steady state 3,000 for 10-year period. I mean, that whole thing covers



10 years.
Q. Will you look back at Klein Deposition Exhibit 2.
A. Uh-huh.
Q. You see on the first page of the general instructions?
A. Uh-huh.
Q. It says on the When to Submit part, and I'm reading the last I think sentence. "For each allocation listed in the 1991 ACR or subsequent ACRs as appropriate, a purchaser must submit at least one DCS for the allocation of at least 63 months prior to the date that the allocation occurs (e.g., if a purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)."
Is it correct that utilities were supposed to submit a DCS form at least 63 months before the utility had an allocation in the latest ACR report from the DOE?
A. Yes.
MS. POWELL: Beyond the scope, but you can answer.



THE WITNESS: Oh.
MS. POWELL: No, you can answer.
THE WITNESS: Yes.
BY MR. HIRSCH:
Q. And I think that you've said earlier that the 1990 -- or strike that.
You recall that the 1991 ACR had an acceptance rate that was based on a ramp-up up to 900 metric tons for the first 10 years?
MS. POWELL: Objection, beyond the scope.
THE WITNESS: I don't know that.
MS. POWELL: But you can answer.
THE WITNESS: I don't know whether it was in 1991. I know -- I don't know what was in 1991.
BY MR. HIRSCH:
Q. Do you know what the 1995 ACR --
A. Yes.
Q. -- had in terms of acceptance rates?
MS. POWELL: Let me -- I'm going to object as to beyond the scope. Just give me a moment.
THE WITNESS: I will be --
MS. POWELL: It's beyond the scope, but

you can answer to your personal knowledge.
BY MR. HIRSCH:
Q. And what was the acceptance rate in the 1995 ACR report from the DOE?
MS. POWELL: Same objection. You can answer.
THE WITNESS: Okay. 400 the first year, 600 the second year, 900 the third year, and then steady state 900, and that was just through the first 10 years of operation.
BY MR. HIRSCH:
Q. So when the utilities started submitting DCS forms, they were relying on whether they had an allocation in what was then I guess the 1991 ACR; is that correct?
MS. POWELL: Objection, beyond the scope. You can answer.
THE WITNESS: Yes, I think. Yeah.
BY MR. HIRSCH:
Q. And I take it from your -- strike that?
Referring to the 1995 ACR rates that you just recited, I take it from your earlier testimony that the



D OE is not planning on using those rates in terms of when it starts accepting spent nuclear fuel?
A. No. Well, once there's an operational repository, we are planning to use the larger rates that were -- that I have mentioned. I don't know if we'll be accepting it outside of a repository. That's yet to be. It depends upon your definition of accept I guess.
Q. Do you know when the last time the DOE used the acceptance rates in the 1995 ACR for planning purposes?
MS. POWELL: Object to beyond the scope. You can answer to your personal knowledge.
THE WITNESS: No, I don't.
BY MR. HIRSCH:
Q. I --
A. I don't know.
Q. Let me say, I don't think this one is beyond the scope because I think it relate to the acceptance rate question.
Well, I take it from your answer that the DOE is not currently planning on using the acceptance rates



stated in the 1995 ACR; is that correct?
A. We are planning to use the larger rates for an operational repository. If for some other reason we would accept it in a different way, we view the 4, 6, 9 as the binding legal obligation.
Q. And why is the 400, 600, 900 considered to be a binding legal obligation?
MS. POWELL: Object again, beyond the scope. You can answer.
THE WITNESS: Those are the rates in the 1995 ACR upon which the current DCSs are based and the department views the DCSs as the binding legal obligation of the department.
BY MR. HIRSCH:
Q. You mean the approved DCS is binding?
A. Approved. Yes, thank you. Approved.
Q. Will you look at page 2 of the general instructions, Ms. Klein.
A. Yes.
Q. And in particular, I'd like you to look at paragraph 7(b) of the instructions.
A. Uh-huh.



Q. You see where it says: "Once a purchaser has an allocation, any SNF owned by the purchaser can be designated for delivery against that allocation. The DCS does not restrict the purchaser to deliver the specified SNF that was the basis for the allocation."
Do those instructions reflect that once a utility had a place in the ACR cue by virtue of the age of its spent nuclear fuel, it could supply any spent nuclear fuel from any reactor as long as it met the basic contract requirements?
MS. POWELL: Objection to beyond the scope. You can answer.
THE WITNESS: Yes, any of their own reactors.
BY MR. HIRSCH:
Q. Their. You mean the utilities' own reactors?
A. I mean that utility's reactor, yeah.
Q. All right. Now, is it also correct that in terms of the DCS instructions that utilities did not have to identify specific fuel assemblies in responding to the DCS instructions?
MS. POWELL: Same objection, but you can

different question, but...
BY MR. HIRSCH:
Q. Are you going to follow your lawyer's advice --
A. Yes.
Q. -- not to answer that question?
Ms. Klein, at some point did the DOE decide to suspend the D CS process?
A. We've never used the word suspend, but, yes, we decided to stop processing them.
Q. Stop processing DCS forms?
A. No. Excuse me. We processed them in a sort. We decided to stop approving or disapproving them.
Q. And when did the DOE make that decision?
A. I think it was around '97. In 1997 early.
Q. Can you give me a month in 1997 when that decision was made?
A. No.
Q. You just --
A. I think early 1997.
Q. In the first three months?
A. Yes, I think in the first three months.



Q. And who was involved in making that decision?
A. The Office of General Counsel, the Office of Procurement whatever. Procurement because it was a contracting officer who was the final sign-off and the Office of Civilian Radioactive Waste Management, OCRWM. I don't know if anybody else was involved.
Q. Okay. When you say the Office of General Counsel, who at the Office of General Counsel was involved in that decision?
A. I can answer that question?
I was involved in that decision, Mary Anne Sullivan was involved in that decision, Eric Fygi was involved in that decision. And I don't remember if Bob -- I think Bob Nordhaus was gone already.
Q. Who was Mr. Fygi?
A. He's the principal Deputy General Counsel and has been for many years.
Q. Principal Deputy General Counsel?
A. Uh-huh.
Q. At DOE?
A. At DOE, uh-huh.
Q. And --



A. F-y-g-i, by the way.
Q. Is Mr. Fygi still in that position?
A. Yes, he is.
Q. And who was involved in the decision from the Office of Procurement?
A. Tomasoni and her supervisors. I don't remember who it was involved. Could have been Jay Cavanaugh. I'm not sure.
Q. Could have been who? I didn't hear you.
A. Jay Cavanaugh, but I'm not sure.
Q. Does Ms. Tomasoni report to Mr. Cavanaugh?
A. She did. I don't know if she still does. He's moved around a lot, but...
Q. What's Ms. Tomasoni's current position with DOE?
A. I believe she's still a contracting officer, but she no longer is our contracting officer. She works on other contracts.
Q. And who was involved in the decision to stop approving DCS forms from the Office of Civilian Radioactive Waste Management otherwise known as OCRWM?
A. Dreyfus was there. I believe it was Dreyfus.



Lake Barrett -- that's Dan Dreyfus. Lake Barrett, Dave Zabransky. I'm just trying to think of who else. I don't think Alan was involved any more at all. I think that's all I can remember at the moment.
Q. Did the Director of OCRWM make the final determination as to the DOE's stopping approving DCS forms?
A. I don't know who made the final determination. There was lots of discussion over a long period of time, and it was the advice of the General Counsel and Beth Tomasoni as the contracting officer technically has to be the one to put her name down and be comfortable with it. And she takes advice from her technical representative, who was at the time Dave Zabransky, who does what Dan Dreyfus tells him, so...
Q. Well, I guess that your answer goes to my next question, which is: Ultimately did the Director of OCRWM have to sign off on the decision to stop approving or disapproving DCS forms?
A. The only people I know who actually had to sign a letter with this was the contracting officer and the technical representative.

77

Q. All right. All right. And I misspoke as to my question or let me rephrase my question. Did the Director of OCRWM have to approve the decision to have the DOE stop approving or disapproving DCS forms?
A. I don't know whether he had to. That's a hard question, but he did approve it.
Q. All right.
A. We all -- it was an elective agreement. We all agreed. There wasn't a disagreement.
Q. Did the Director of OCRWM put anything in writing reflecting his approval of the decision to stop approving DCS forms?
A. I don't know. I don't remember that he did.
Q. Was there a written recommendation made with respect to the DOE stopping the approval or disapproval of DCS forms?
A. There were memos written in the General Counsel's Office --
MS. POWELL: If you can answer, to the extent that it's getting into privileged.
THE WITNESS: -- addressing issues involved in this, but I don't think there was ever -- I

78

don't know. I don't remember that there was ever an action memorandum. Normally if there's some big decision, you send an action memorandum to the Secretary and you get everybody to concur on the bottom. And that's why I say I don't know that Dan Dreyfus had to. The Secretary could have said, "This is the way we're doing it," and that's what happens in the government. But I don't remember that there was an action memorandum on this topic. I don't think there was.
BY MR. HIRSCH:
Q. Do you know whether the decision to stop approving DCS forms was approved by the Secretary of the Department of Energy?
A. I don't know that personally, but my guess is the Secretary was aware of it. That's my guess.
Q. And who was the Secretary back then?
A. I'm trying --
Q. We're talking 1997 I guess.
A. Was that Hazel O'Leary? In 1997.
Q. Would have been either Hazel O'Leary or Bill?
A. Pena was after Hazel O'Leary.

79

Q. Oh, okay.
A. So I don't -- I think my guess is it was Hazel O'Leary, but that's a guess.
Q. Why do you think that the Secretary of the Department of Energy probably signed off on that decision?
MS. POWELL: I object. That's a mischaracterization of what Ms. Klein testified, but you can answer.
THE WITNESS: I was just going to say, I don't think the Secretary signed off on it.
BY MR. HIRSCH:
Q. All right.
A. I think the Secretary was probably made aware through the special assistants. That --
Q. All right.
A. -- this was going on on advice of counsel.
Q. And why do you think that the Secretary of the department was probably made aware of that?
A. Because the General Counsel talks quite frequently with the Secretary about legal issues and informs the Secretary of anything important.

80

Q. Were you ever told that the Secretary of the Department of Energy had signed off on the decision?
A. No. I mean, not that I remember. I don't remember being told that the Secretary had signed off on it, no.
Q. Who made the recommendation to stop approving DCS forms?
A. I believe it was the General Counsel.
Q. And that was Mary Anne Sullivan?
A. Yes. Could have been Bob Nordhaus, but I think not. I think it was Mary Anne.
Q. And what was the reason for the recommendation to stop approving DCS forms?
MS. POWELL: And, again, as we informed you in our letter yesterday, we're going to assert our attorney-client work product privilege over the reasons for this. I understand you need to ask your questions, Mr. Hirsch, but -- to make the record for a future date with Judge Sypolt, but I'm going to instruct the witness not to answer that question.
MR. HIRSCH: Well, as I think we related to Marian yesterday when we got her letter, we don't

agree that the attorney-client privilege is applicable here. It appears to us that the DOE's defense in part is based on its theory that its obligations are limited to approve DCS forms, what Ms. Klein just said.
We now know that the DOE made a conscious decision to stop approving DCS forms and, therefore, I think the government has put squarely at issue the reason that decision was made and we're entitled to find out the reasons for the decision.
Having made a decision, which you claim at least had some legally operative consequences, then we're entitled to find out what the reasons for the decisions are.
Could you read the question back, please.
(Requested material was read.)
MS. POWELL: And it's the same objection and we can make our record, and if the judge orders us to answer, we will certainly do so at a future date, but at this time I'm instructing the witness not to answer.
BY MR. HIRSCH:
Q. You're going to follow your lawyer's



instruction?
A. Yes, I am.
But I have to go to the ladies' room a moment.
MR. HIRSCH: You want to take a break here, that's fine.
(Recess, 11:11 to 11:18 a.m.)
BY MR. HIRSCH:
Q. Ms. Klein, what was the reason that the DOE suspended the approval of DCS forms?
A. I should answer that?
Q. Can you answer without consulting with your attorney?
MS. POWELL: I think she'd like to consult to make sure. We have a lot of privilege issues here. So, I mean obviously --
THE WITNESS: I'm happy to answer if it's not privileged, but I think it's privileged.
(Conferring with counsel).
MR. HIRSCH: Okay. The record should reflect that Ms. Klein is consulting with her attorney.
THE WITNESS: It was on advice of counsel.
BY MR. HIRSCH:



Q. Was there any reason for suspending the DCS process besides advice of counsel?
A. I can answer that from my personal view? Shall I answer? That's not as a 30(b)(6) witness.
Q. Well, I don't know if it is or it isn't, Ms. Klein, but can you answer the question?
A. Okay. Well, all I know is my feeling at the time was -- how shall I put it? In that period it was clear that we were not going to be able to begin acceptance in 1998, and it appeared more up front to not be pretending that we were going to continue to do it. I mean, that was my own view at the time. But I don't know the department's. The reason that I know that the department made the decision was because counsel advised. That's the only DOE position that I know of.
Q. Your position, Ms. Klein, was that the DOE wasn't going to be able to start performing in 1998?
A. Right.
Q. And, therefore, it shouldn't pretend in the DCS process like it was going to start; is that correct?



MS. POWELL: I want to make it clear it's beyond the scope, but you can answer to the best of your knowledge.
MR. HIRSCH: I don't believe it's beyond the scope.
MS. POWELL: You asked her personal knowledge just now.
MR. HIRSCH: Well, I don't recognize that this is beyond the scope. Just so that's clear, but...
THE WITNESS: Repeat your question then. I'm sorry. I got confused with the beyond the scopes here.
BY MR. HIRSCH:
Q. Yeah, that's fine. Your -- strike that.
Ms. Klein, it was your belief as I understand it that the DOE was not going to be able to begin performing in 1998 and, therefore, the DCS process should be suspended because the DOE shouldn't pretend like it was going to start performing in 1998?
MS. POWELL: Okay. The same objection, beyond the scope and vague, but you can answer.

THE WITNESS: Yes.
BY MR. HIRSCH:
Q. All right. And do you know whether that position was also the basis for counsel's recommendation to stop approving DCS forms?
MS. POWELL: And I'm going to again assert the same objection as to the basis for counsel's recommendation is covered by attorney-client work product privilege.
THE WITNESS: And I'm going to follow my lawyer's advice.
BY MR. HIRSCH:
Q. Do you know whether anyone from the White House or the Office of Management and Budget was involved in the decision-making process to suspend the DCS process?
A. I know they were involved at some point in time, but I don't remember where or what or, you know, I remember, but I don't remember their involvement in the DCS process. But it wouldn't surprise me.
Q. Why would it not surprise you?
A. Because we --



MS. POWELL: Same objection, beyond the scope, but you can answer.
THE WITNESS: Because we have a close relationship with the people at OMB who are budget examiners. They like to know what's going on at all times that could affect the department's financial situation.
BY MR. HIRSCH:
Q. And who do you deal with at the department or -- excuse me -- Office of Management and Budget?
A. Right now --
MS. POWELL: Beyond the scope. Go ahead.
BY MR. HIRSCH:
Q. On these issues.
A. Right now John Pfieffer, P-f-i-e-f-f-e-r. Before that it was Steve Goldberg and Gary Bentham. Don't ask me how to spell that.
Q. Back in this early 1997 time frame when the decision was made to suspend the DCS process, who were you dealing with at that time in the Office of Management and Budget?
A. Well, I know Gary was there. Gary Bentham,



and I don't remember if it was Steve Goldberg or John Pfieffer. Might have been John Pfieffer then.
Q. Do you know whether those individuals were informed of the decision?
A. No, I don't know.
MS. SULLIVAN: Can we take a minute?
(Pause.)
BY MR. HIRSCH:
Q. Do you know whether anyone at the White House was informed of the decision to stop approving DCS forms?
A. I don't know.
MS. POWELL: Wait. Well, okay. If you don't know.
THE WITNESS: I don't know.
MS. POWELL: We're getting into substance she doesn't know but, you know.
BY MR. HIRSCH:
Q. Ms. Klein, I think you mentioned a little while ago that you thought that there were some memos prepared regarding the decision to suspend the DCS process. Do you recall that?



A. Do I recall saying that here?
Q. Yes.
A. Yes.
Q. And when were those memos written, roughly?
A. The time frame they were on the suspension of the DCS process?
Q. Right.
A. I'm guessing 1996.
Q. And who wrote those memos?
MS. POWELL: You can answer.
THE WITNESS: Procurement counsel.
BY MR. HIRSCH:
Q. Who was procurement counsel at that time?
A. Should I say that?
I think Janet Barsey.
Q. How do you spell the last name?
A. B-a-r-s-e-y.
Q. And what office was she in?
A. The General Counsel is divided up with various assistant General Counsel. She was for the Assistant General Counsel for Procurement and Financial Assistance. I think it has a different name now.

Sullivan as her advice, and it was communicated to Beth and Doug Baptist, who also was a contracting officer. And Dave Zabransky. I don't remember if it was in a meeting or telephone. I don't remember exactly how, but I don't remember there being any memorandum.
Q. Okay. When you said Beth a minute ago, you meant Beth Tomasoni?
A. Tomasoni, yes.
Q. Do you know whether there was an e-mail prepared informing people about the decision?
A. I would be surprised if there was, but, no, I don't know.
MR. HIRSCH: 3.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 3.)
THE WITNESS: Am I supposed to be reading this?
BY MR. HIRSCH:
Q. Yes.
A. The whole thing?
Q. Let me just identify it for a minute.
A. Okay.



Q. I have a question about a specific part of it, Ms. Klein. If you want to read other parts, you're welcome to.
What I've marked as Klein Deposition Exhibit 3 is a portion of the transcript of the Dave Zabransky deposition that was taken last week. It's from April 17th of last week.
And, Ms. Klein, while you're welcome to read any part of this that you would like, the part that I was going to refer you to is on page 25 and 26.
A. Okay. (Pause.)
Q. Do you --
A. Give me just one moment. I'm a very slow reader.
Q. Please take your time.
A. That's why I'm not going to read the whole document or we'd be here all day.
MS. SULLIVAN: Before you ask your first question about the document, can we have a minute?
THE WITNESS: Okay.
(Discussion off the record.)
THE WITNESS: Okay.



BY MR. HIRSCH:
Q. Do you see on these pages that Mr. Zabransky refers to the decision to stop approving DCS forms?
A. Uh-huh.
Q. And you see that at the top of page 26, Exhibit 3, Mr. Zabransky says, "I believe it," the decision.
A. Right.
Q. "Was tied to a court decision in the Court of Appeals." He says it's "the department's obligation."
A. Uh-huh.
Q. Okay. He said that might have been 1996 and then there's a question.
"Would that be the decision that said paraphrasing -- and nobody is going to hold you to my paraphrase -- that the Department of Energy has an unconditional obligation to begin acceptance of spent fuel in 1998?"
Answer: "To the best of my recollection."
Was there a decision from the DC Circuit in the Indiana Michigan case in 1996 saying that the Department of Energy had an unconditional obligation to



begin accepting spent nuclear fuel in 19 --
MS. POWELL: I'm going to object.
BY MR. HIRSCH:
Q. -- 98?
MS. POWELL: Beyond the scope, but you can answer that.
THE WITNESS: I believe it was 1996. I'm not sure of the year, but there was the Indiana Michigan case that held reciprocal only to the payment of fees. That was the one condition.
BY MR. HIRSCH:
Q. All right. And was the decision to stop approving DCS forms tied to the decision that had come down in the Indiana Michigan case?
MS. POWELL: Again, we're getting into the substance of General Counsel's or the basis for General Counsel's making the recommendation and we assert the attorney work product privilege and instruct the witness not to answer.
MR. HIRSCH: Well, let me just say that I think to the extent that Mr. Zabransky already testified about it, there's been a waiver here and so

among other, in addition to all the other reasons we've discussed, I don't think the attorney-client privilege applies. Are you instructing the witness not to answer?

MS. POWELL: I am. I understand Mr. Zabransky was testifying to the best of his recollection. We stand by our objection and instruct the witness not to answer.

BY MR. HIRSCH:

Q. Are you going to follow your lawyer's advice, Ms. Klein?

A. Yes.

Q. Were there meetings at the Department of Energy regarding how the DOE was going to respond to the Indiana Michigan case after it came down from the DC Circuit?

MS. POWELL: Object to beyond the scope. You can answer.

THE WITNESS: Yes.

BY MR. HIRSCH:

Q. And when were those meetings held?

A. Constantly thereafter.



Q. I don't think we need to mark this as an exhibit, but I'm just going to hand you a copy of the Indiana. Let me give counsel one as well.

MS. POWELL: Could we mark that if it's all right?

MR. HIRSCH: Fine. Go ahead. I'm just going to refer to the date.

THE WITNESS: Yeah, decided July 23rd. Okay.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 4.)

BY MR. HIRSCH:

Q. Okay. Ms. Klein, I've marked as Klein Deposition Exhibit 4 a copy of a printed decision from the United States Court of Appeals for the District of Columbia Circuit in Indiana Michigan Power Company, et al. V. the Department of Energy.

Does this document reflect that the decision came down from the DC Circuit in July of 1996?

A. Yes, it does.

Q. And does that decision help refresh your recollection about what meetings were held following



the decision from the DC Circuit?

A. Yeah, there were. I mean, there were meetings before this and after this. There were lots and lots of meetings. There were so many meetings, I couldn't begin to remember all or with whom. There were meetings with Justice, meetings within GC.

Q. NGC. What is NGC?

A. Within General Counsel.

Q. I'm sorry.

A. GC is General Counsel. Sorry.

Q. I misunderstood you. Was the Indiana Michigan case discussed at any of the meetings you previously testified about regarding the decision to suspend the DCS process?

MS. POWELL: And again I'll object on the basis that you're getting into the substance of attorney-client work product privilege and instruct the witness not to answer the question. And hopefully she'll follow my advice.

BY MR. HIRSCH:

Q. Are you going to follow your lawyer's advice?

A. Yes.



Q. Is it correct that before the Indiana Michigan case came down, the Department of Energy's position was that it did not have a firm obligation to begin picking up spent nuclear fuel in 1998?

MS. POWELL: I'm going to object to beyond the scope and to the extent it calls for a legal conclusion, but you can answer if you know.

THE WITNESS: Yes. We said it was conditioned upon the operation of a repository.

BY MR. HIRSCH:

Q. And that was the position that was rejected by the DC Circuit; is that correct?

A. Yes.

Q. After this decision came down, that's the Indiana Michigan decision, did the department conclude that the previously approved DCS forms represented a binding obligation of the Department of Energy?

MS. POWELL: That's just a time frame. You can answer.

THE WITNESS: Yes.

BY MR. HIRSCH:

Q. And it was after this decision that the DOE

determined to stop approving DCS forms; is that correct?

MS. POWELL: One second. You can answer with respect to the time frame only. I mean to the extent that you're making any connection between the decision and -- the decision in the DC Circuit and DOE's decision, we would object to that. But you can answer.

THE WITNESS: Yeah, it was late '96. So that would be after July '96.

BY MR. HIRSCH:

Q. It was within -- let me put it this way, Ms. Klein. It was within six months of the decision in the Indiana Michigan case that the department decided to stop approving DCS forms; is that correct?

MS. POWELL: That's the same objection, but you can answer that.

THE WITNESS: It was within six months from that decision, but I'm not saying there was a connection.

BY MR. HIRSCH:

Q. Well, Ms. Klein, was there a connection or



not?

MS. POWELL: I'm going to object on the basis that there's attorney-client privilege, work product privilege. We're getting into the reasons, the bases. It was upon advice of General Counsel and to the extent we're getting into the General Counsel's reasons for the decision, I will instruct the witness not to answer.

BY MR. HIRSCH:

Q. Are you going to follow your lawyer's advice?

A. Yes.

Q. Is it correct that the DOE hasn't approved any DCS forms submitted by utilities since early 1997?

A. Yes.

Q. Are you aware that Mr. Zabransky testified last week that the DOE doesn't even review the DCS forms when they -- if they're submitted by utilities?

A. I became aware of it when I read this just now, but I was not aware of it before --

Q. All right.

A. -- reading this exhibit.

Q. Mr. Zabransky's transcript.



A. 3. Yes.

Q. Will you also look at page 36, 37 of Mr. Zabransky's transcript.

A. Are we back to Zabransky?

Q. Back to Exhibit --

A. 3.

Q. -- 3.

A. (Pause). Okay.

Q. I'm going to refer you in particular to page 37.

A. Oh, I just read --

Q. Did I --

A. I read page 35 and 36.

Q. I apologize if I misstated a page. Why don't you go ahead and read page 37.

A. Okay. (Pause).

MS. POWELL: Before you ask your question, Mr. Hirsch, I should have done this earlier when it was marked, but it does appear that this is not the final transcript of Mr. Zabransky. So...

MR. HIRSCH: It is the rough ASCII.

THE WITNESS: It looks pretty rough since



I can't read some of the words, but I think I get the point here.

BY MR. HIRSCH:

Q. All right. What I'm going to refer you to in particular we start at the bottom of page 36.

A. Okay.

Q. And there's a question. "Well, if I'm the utility and I'm trying to decide when I need to -- I think it's -- send in my DCS, how do I determine that?"

Answer: "Based upon the fact in DOE said it doesn't anticipate the repository to operate prior to 2010."

Question: "So under that analysis or interpretation, no DCS would be due as we sit here today; is that correct?"

Answer: "As of this point in time, that's correct."

Do you see that answer?

A. I do see that answer.

Q. Do you agree with Mr. Zabransky that given the current status of the nuclear waste program that there are no DCS forms due from the utilities?

MS. POWELL: I'm going to object to beyond the scope and to the extent it calls for a legal conclusion, but you can answer.
MR. HIRSCH: I don't think it's beyond the scope.
THE WITNESS: So under that analysis. Would you ask your question again.
BY MR. HIRSCH:
Q. I'll rephrase it. Do you agree with Mr. Zabransky's statement in the deposition we just read that at this point in time there are no DCSs due from the utilities to the Department of Energy?
MS. POWELL: Same objection.
THE WITNESS: But not for the reason that he stated in it. Because we're no longer --
BY MR. HIRSCH:
Q. Do you agree?
A. We're no longer approving or disapproving them.
Q. So you agree that there are no DCSs due from the utilities at this point in time; is that correct?
MS. POWELL: I'm going to object to beyond



the scope and to the extent it calls for a legal conclusion, but you can answer.
THE WITNESS: This is my opinion. Because I know I'm here to talk about the department's position and I don't know that the department has a position on this. But it seems to me that since we've been writing everyone and saying we're not able to approve them that they would have a right not to be sending them in.
But that's -- I haven't analyzed the issue or thought about it, to be honest. Or discussed it to get a departmental position on it.
BY MR. HIRSCH:
Q. Well, as far as you're concerned, there aren't any DCSs due from the utilities at this point; is that correct?
MS. POWELL: Same objections.
THE WITNESS: Again, this is my gut reaction. This is the first time I thought about it. So that's my gut reaction is yes, I agree.
BY MR. HIRSCH:
Q. And the reason?



A. It's not the department's position that I know of. So...
Q. Do you know if the department has taken a formal position with respect to this issue?
MS. POWELL: Same objection, but you can answer.
THE WITNESS: No, I don't. This particular twist on this issue has never been presented to get a departmental position on it.
BY MR. HIRSCH:
Q. I'm sorry. I didn't mean to interrupt?
A. That's okay. I finished.
Q. All right. But it's your position that no DCSs are due because the department has stopped approving or disapproving them; is that correct?
MS. POWELL: Same objection.
THE WITNESS: Let me put it this way. If I was a utility, I would continue to send them in. But so I would not -- if the utility called me and asked me for my advice, I'd say just keep going. So I don't really. I have -- as I say, I haven't really analyzed it, but based on the fact that we've been



writing letters and saying we cannot approve it at this time, I could see why a utility would think "why should I bother to send it in," but I don't really. I don't know legally in contract interpretation what the right answer is. I really don't.
BY MR. HIRSCH:
Q. You would understand given the fact that the DCS -- strike that.
You would understand that given that DOE has stopped approving DCS forms that a utility could decide to stop submitting them; is that correct?
A. I could understand.
MS. POWELL: Objection, beyond the scope, leading conclusion, but you can answer.
THE WITNESS: I could understand that, yes.
BY MR. HIRSCH:
Q. And is Mr. Zabransky now the head of the office that's in charge of approving DCS forms?
A. He is the head of -- I forgot what it's called, transportation and waste acceptance. He's the Acting Director of Transportation and Waste Acceptance.

Q. All right. And there was a question: "Does this document anywhere inform the reader about when year 1 is?" Answer: "I have not found such a statement in the document as to what year 1 is."
And I believe that based on your testimony, you haven't identified what year year 1 would be either based on this document; is that correct?
MS. POWELL: Again, I'll object to beyond the scope.
THE WITNESS: I haven't read the whole document in a long time. So I don't know, but I don't -- I don't know what it says as to -- but this table does not tell you.
BY MR. HIRSCH:
Q. Right.
A. This particular table does not.
Q. All right. And we looked at another table on page 4, which is Projected Nominal Acceptance Rates in Exhibit 5, and that doesn't have any years either; is that correct?
A. That's correct.
MS. POWELL: Same objection.



BY MR. HIRSCH:
Q. All right. You see Mr. Zabransky's next or the next question and the answer. Question: "Would it be possible for a utility using that document -- the 1995 ACR -- to determine when its delivery commitment schedule was due?" Answer: "I don't believe so."
A. I see that.
Q. Do you agree with Mr. Zabransky's position on this issue?
MS. POWELL: Again, it's beyond the scope, but you can answer to your personal opinion.
THE WITNESS: I think the utilities all know that 2010 has been our projected date. So, but -- and I have not read this whole document recently. So, but based on those two tables, if you're just looking at those two tables and don't know that our projected date is 2010. But --
BY MR. HIRSCH:
Q. All right.
A. -- we have been quite vocal on 2010.
Q. All right. Well, we'll get to the vocal part in a minute, Ms. Klein, but if the DOE's position



currently is that it's going to start in 2010, would the DCS submissions from the utility be due 63 months before that date?
A. Yes.
MS. POWELL: I'm going to object to beyond the scope. To the extent it calls for legal conclusion, but you can answer that.
THE WITNESS: Yes.
BY MR. HIRSCH:
Q. Why don't we take a lunch break.
A. That's a good idea.
(Recess, 12:08 to 1:07 p.m.)
AFTERNOON SESSION
(Thereupon, the reporter marked for identification Deposition Exhibit No. 7.)
(Thereupon, the reporter marked for identification Deposition Exhibit No. 8.)
(Recess, 1:07 to 1:16 p.m.)
BY MR. HIRSCH:
Q. Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 7, which is a letter from Ken Petersen, Kenneth Petersen at ComEd to Beth



Tomasoni at the Department of Energy dated September 25, 1996, and then attached to the letter are a series of DCS forms and the Bates labels for this document is COF 02165 through 2172.
Ms. Klein, do you recognize Klein Deposition Exhibit 7 to be the DCS forms ComEd submitted for proposed delivery year 2002?
A. I'm just looking for the proposed delivery.
Q. That's line 2.3.
A. Yes. I recognize it.
Q. Do you recall seeing Klein Deposition Exhibit 7 at or about the time it was sent?
A. I don't recall seeing it, but...
Q. All right. I'd like you to look at Klein Deposition Exhibit 8, which you should have in front of you. Klein Deposition Exhibit 8 is the DCS forms submitted by Commonwealth Edison company for year 2002 and these don't have a Bates label. They have the page numbers where we got them, which was from the government appendix to the Summary Judgment Motion in this case, and those appendix pages are 284 through 290.

should have said something.
BY MR. HIRSCH:
Q. Ms. Klein, was there a period in 1995 when the DOE was basically holding DCS forms to decide what to do with them?
A. There was a period, and I don't remember the exact time, but when we did hold them to figure out what to do with them. But as I say, I don't remember the exact time frame. I thought it was '96, but maybe it was. I don't --
Q. You're not sure when that time frame was?
A. No.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 11.)
BY MR. HIRSCH:
Q. Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 11, which is a letter dated September 26, 1997 from Kenneth Petersen at ComEd to Beth Tomasoni, Department of Energy, and attached to that is a DCS form for proposed delivery year 2003.
Ms. Klein, do you recall seeing this document, Exhibit 11, at or about the time it was sent?



A. I don't recall seeing this particular document. I didn't see these documents when they came in. I only saw the DOE responses to them and that would be the time at which this would be in the incoming folder.
Q. All right.
A. In the package.
Q. And when you say these documents, you mean the incoming DCS forms from the utilities?
A. Right. There would be the letter and the attached form in the incoming, and then there would be a proposed response.
Q. And so they wouldn't -- the DCS forms wouldn't cross your desk until there was a proposed response?
A. That's correct.
Q. Is that correct?
A. That's correct.
Q. Ms. Klein, again I'm going to represent to you that Commonwealth Edison Company had not received a response one way or the other to the DCS form that was submitted as part of Klein Deposition Exhibit 11. Do you have an understanding why that's the case?



A. No, I don't have -- I do not understand why that's the case. You have not received a letter that says we cannot -- we are not able to approve?
Q. Not that we're aware of, Ms. Klein.
A. Oh, okay.
Q. Maybe the government has got it somewhere.
Will you look back at the DCS instructions. That's Klein Deposition Exhibit 2.
A. Okay.
Q. And what I'd like you to look at in particular is paragraph 7(c) on page 2. And I'm going to ask you to focus on a second couple of sentences, which read as follows: "The process described herein assumes that the FWMS will be able to accept the purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the 1991 ACR. In the event that such circumstances change, all DCSs previously approved by the DOE may need to be reevaluated by DOE and the purchasers."
Ms. Klein, is it fair to say that the circumstances have changed since this initial submission of DCS forms?



A. Since 1992?
Q. Yeah.
A. Today have the circumstances changed since then?
Q. Yes.
A. Yes.
Q. And for one thing, the DOE is not going to accept purchasers' SNF beginning in 1998, correct?
A. Physically accept it? No.
Q. Well, since we're in 2002, it's correct that the DOE hasn't accepted --
A. Right.
Q. -- any SNF since 1998 to the present; is that correct?
A. Yes. I was just trying to think about the PECO agreement, but no. Yes, we have not accepted.
Q. Well, let me rephrase it to address it.
A. No. I think the answer is that's true; we have not accepted.
Q. Is it correct that the DOE has not removed any SNF from any utility site from 1998 to the present?
A. From 1998 to the present?

Q. Right.
A. I'm pretty positive that's true. I'm just thinking way back. We took TMI, if you will, but, you know, that was way before. Yeah, I can't think of 1998 to the present that we've taken any fuel.
Q. The DOE took some fuel from Three Mile Island?
A. Yes, uh-huh.
Q. And wasn't that --
A. That's when -- I'm sorry. That was a long time ago, though.
Q. And wasn't that actually -- I mean, I thought I saw a document about this. Wasn't that designated to be actually DOE's fuel at that point?
A. Well, when we took it, just like we would under the contract, it became -- your fuel would become ours, too, when we took it.
Q. All right. Apart from taking --
A. Between 1998 and the present, I am not aware of DOE accepting any spent nuclear fuel from a utility and removing it from its site.
Q. All right. And so that's, going back to the paragraph, that's a circumstance that changed from the



submission of the original DCS forms?
A. I just thought about Fort St. Vrain. You see, that's a problem, but that was another story. That wasn't after 1998. Okay.
Q. Okay. So the answer is they haven't removed anything? You, DOE, haven't removed anything --
A. Sorry.
Q. -- from 1998 to the present; is that correct?
A. Yes.
Q. All right. And so that would be a circumstance that would have changed from the time that these original DCS forms were submitted back in the '92 or '93 time frame?
A. Well, you're asking me to interpret the contract and what circumstances changing means, and I think that that's kind of a contract interpretation question. I don't know that I would view that as the reason why circumstances changed.
Q. Well, actually what I'm asking, what we're looking at right now is the instructions, correct?
A. Okay.
Q. All right. And the instructions say that:



"The process described herein assumes that the FWMS will be able to accept the purchasers' SNF beginning in 1998."
A. Right.
Q. You see that?
A. Right.
Q. That hasn't happened?
A. That is very true, yes.
Q. And do you know what it means to say, as it said in this instruction, that the DOE may need to reevaluate the DCS?
MS. POWELL: State that the document speaks for itself, but you can answer.
THE WITNESS: Well, I was not involved in the drafting of the document. So it's hard for me to tell you what was intended when it was drafted. I really was not involved, but I could guess, but you could guess. We could all.
BY MR. HIRSCH:
Q. Well, do you know if the DOE currently has any plans to reevaluate the DCSs that have been previously submitted in light of the change of the date for



performance?
MS. POWELL: I think this goes beyond the scope, but if you have knowledge you can --
THE WITNESS: I don't think we have any particular plans right now as to what we will do, but I expect that we will have to address that.
BY MR. HIRSCH:
Q. Why do you say that you expect that we'll have to address that?
MS. POWELL: Again, beyond the scope, but you can answer if you know.
THE WITNESS: Well, we have suspended the DCS approval process, and it's our obligation to resume it and begin to make these commitments and dispose of the utilities' spent fuel. That's our obligation.
BY MR. HIRSCH:
Q. One thing that you mentioned earlier this morning or in the morning was that the DOE currently plans to remove spent nuclear fuel at a faster rate than the rate identified in the '91 or the '95 ACR. Do you recall that?
A. Yes.

Q. Wouldn't that also cause the DOE to have to reevaluate the DCS forms that had been previously submitted?

MS. POWELL: That's beyond the scope.

THE WITNESS: Not necessarily. I don't think necessarily.

BY MR. HIRSCH:

Q. Well --

A. One of the -- I don't think -- we could still have a legal obligation to pick up a smaller amount, but we would perhaps be picking up more and that way we'd limit, hopefully, our damages by picking up more than is legally obligated and catching up. Let's put it that way. We would like to catch up in a few years.

Q. Well, the utilities who first submitted -- strike that.

And the utilities who submitted DCS forms based on the 1991 ACR were using whatever the allocation that DOE had provided based on the 900 rate, weren't they?

MS. POWELL: Beyond the scope.



THE WITNESS: I know the '95 year. I don't know the numbers in the 1991. So I don't know. I know in 1995. Were they the same? I don't know.

MR. HIRSCH: 12.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 12.)

THE WITNESS: Is this the 1991?

BY MR. HIRSCH:

Q. Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 12, which is a copy of the December 1991 Annual Capacity Report or ACR report from Department of Energy. And in particular I'd ask you to refer to page 9 of the document, which is a table.

Does this Table 3.1 reflect that the DOE was providing allocations to utilities based on a 900 metric ton rate after a two-year ramp-up?

MS. POWELL: I'm going to object to beyond the scope and the document speaks for itself, but you can answer to your personal knowledge.

THE WITNESS: Yes.

BY MR. HIRSCH:

Q. Now, to the extent that a utility submitted a



DCS form based on the allocation it had for a particular year, that was based on the 400, 600, 900 rate; is that correct?

A. Yes, that's correct.

MS. POWELL: And I'll object, beyond the scope, but you can answer.

BY MR. HIRSCH:

Q. Now, if the DOE plans on accepting at a higher rate closer to the 3,000 metric ton rate, would that cause the DOE to reevaluate the DCS forms that had been previously submitted by the utilities?

MS. POWELL: Once again, beyond the scope.

THE WITNESS: Well, it would be required to reevaluate I guess is a fair word. To reevaluate, yes. Whether we would change it or not, I don't know.

BY MR. HIRSCH:

Q. It would be required to reevaluate the DCS forms?

A. That's just my interpretation. It's not -- I don't know the department's position on this. I've never gotten a departmental position.

Q. Well, the DOE isn't planning on telling a



utility that they're basically stuck with whatever allocation they put in based on the 900 rate, even though the DOE is actually using a larger rate, are they?

MS. POWELL: Object to beyond the scope.

MR. HIRSCH: I don't think it is.

THE WITNESS: I don't understand the question.

BY MR. HIRSCH:

Q. Well --

A. What do you mean stuck with? You mean they were not -- well, go ahead.

Q. Well, let me try and give you an example. Let's just take GP. Look back at Table 3.1.

A. Uh-huh.

Q. Take GPU Nuclear there. Do you see there's an allocation there for 31.1?

A. Uh-huh. Yes.

Q. And presumably GPU Nuclear may have -- let's assume that they submitted a DCS form for that first year for 31.1 metric tons.

A. Yes.

Q. All right. Now that the DOE is planning on picking up at a rate which is significantly higher than the 900 metric ton rate, does the DOE intend to take the position that GPU would be limited to the 31 metric tons from the original 1991 ACR?

MS. POWELL: I'm going to object as beyond the scope, calls for speculation and to the extent it calls for a legal conclusion. But if you can answer that.

MR. HIRSCH: It's not beyond the scope, but --

THE WITNESS: As I say, I don't know what DOE's formal position is on this, but we wouldn't necessarily do it through the mechanism of a DCS. We would reevaluate. I don't know that we would amend the DCS. I don't know what we would do, but we would definitely reevaluate and I don't know what we would -- how we would go about taking the more than 31. If we had capacity for more than 31. I don't know the mechanism that we would use.

I doubt we would amend the DCS, to be honest, because we're not interested in increasing our



legal obligation. We're not interested in increasing damages against the government. So I think we would do it in a way that we could pick up more but without being legally obligated.

BY MR. HIRSCH:

Q. So I'm sorry. I wasn't sure what you meant by reevaluate the situation.

A. Well, reevaluate is the word in here.

Q. I see.

A. It says that we would reevaluate and I would -- it seems to me when we get closer to having a facility, we're going to have to relook at the whole process and how to go about it, I mean.

Q. Relook at the whole DCS process?

A. Relook at the standard contract and the DCS process would be part of it because we have stopped processing them and we will need to start processing them again. So it seems to me that we would have to make some adjustments, but what mechanism we would use, I don't think anyone that I know of has thought about it yet.

Q. Well, looking at year 5 --



A. Okay.

Q. -- on the table.

A. GPU?

Q. No, for anybody.

A. For everybody year 5.

Q. Look at year 5. According to year 5, there's allocations for 900 metric tons on here.

A. Uh-huh.

Q. You see that?

A. Uh-huh.

Q. And I believe you testified earlier that the current plan for the DOE is to pick up 3,000 metric tons?

A. Yes, that's correct.

Q. By the fifth year?

A. Yes.

Q. All right. So that's even on my mathematically challenged basis another 2100 metric tons?

A. Yes.

Q. Do you know how the DOE would allocate or determine how it was going to have that additional 2100



tons removed?

A. No, I don't know.

MR. HIRSCH: Off the record.

(Recess, 1:52 to 2:02 p.m.)

BY MR. HIRSCH:

Q. Ms. Klein, when will the Department of Energy start removing fuel from the utilities under the standard contract?

A. Our current plan is 2010.

Q. And would you say that it's more likely than not that the DOE will make that 2010 date?

A. Yes, I would say it is more likely than not.

Q. What's the basis for your -- for that belief?

A. I believe the site will be designated in August, which is the major milestone.

Q. When you say designated in August, do you mean --

A. Congress will override the state's veto.

Q. And just so we are all on the same page and it's clear for the record, Secretary Abraham recommended the site; is that correct?

A. Yes, on February 14th.

get the repository open by the 2010?
A. We plan to submit a license application to the Nuclear Regulatory Commission in 2004.
Q. Is it correct that the Nuclear Waste Policy Act in Section 10134 gives the DOE 90 days to submit a license application to Congress after the President's recommendation for the site becomes final?
A. Should I?
It's not -- after the designation takes effect 90 days. That's what it says, yes.
Q. Right, right. And according to your plan, the designation would take place in August of 2002; is that correct?
A. That's correct.
Q. Why is it that the DOE is not -- or strike that.
I take it from what you're saying that the DOE is not going to make the 90-day deadline for submitting a license application?
A. That's not the current plan is to make the 90 days.
Q. Okay.



A. Some people are actually thinking about that still, but that is the current plan the Secretary testified last week 2004 before Congressman Buyer.
Q. All right. Why is it that the DOE isn't going to be able to make that original statutory 90-day deadline?
A. Well, that -- I mean, that's a legal conclusion, but it's not one that I worked on, okay, but I know it. The General Counsel's Office looked at. They said that is not a requirement that we have to. We do not lose our authority if we don't meet the 90-day deadline. It was to expedite the process and not to slow the process, down and NRC sent us a sufficiency letter as required by the statute and said that we had enough information to go forward with an application. But we have open items that we needed to resolve with them before they wanted to docket it.
Q. So, basically the DOE's position is even if we don't make the 90-day statutory deadline, that doesn't prevent us from submitting a license application?
A. That's correct.
MR. HIRSCH: Let's mark this as 13.



(Thereupon, the reporter marked for identification Deposition Exhibit No. 13.)
BY MR. HIRSCH:
Q. Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 13, which is a cover letter to the President from the Secretary of the Department of Energy dated February 14, 2002, and then attached to that is the Recommendation by the Secretary of Energy Regarding the Suitability of the Yucca Mountain Site for a Repository under the Nuclear Waste Policy Act of 1982.
A. Yes.
Q. Do you recognize this document as the Secretary's cover letter and recommendation for that Yucca Mountain site?
A. Yes.
Q. Did you have a role in preparing Exhibit 13?
A. I reviewed it several times in draft.
Q. Who else was involved in preparing it?
A. Lots of people. Mostly there was a group in the Secretary's office. There is Mike Vogel, who works for our -- the chief scientist for the M&O



contractor, was very involved in it. Christopher Kouts, who works in the front office with me. Alan Brownstein. Lee Otis, the General Counsel. Joe Davis or Davies. Joe Davis I think his name was. And some special assistants in the Secretary's office.
Q. Will you look at page 43 of the recommendation.
A. Uh-huh.
Q. Actually, bear with me. I've given you the wrong page number. Okay. 45.
A. Yes.
Q. You see where the Secretary says in the report: "Our current plans call for final license application at the end of 2004, not 2006"?
A. Yes, I do.
Q. When it says the end of 2004, do you know what month is referred to there?
A. My guess is December.
Q. December of 2004?
A. I don't know for sure, but I think that's -- obviously they purposefully said the end to give some flexibility there, but...

169

Q. All right. And have you been involved in discussions at DOE about when the license application is going to be submitted?
A. Yes.
MS. POWELL: Again, just answer with respect to outside of any privileged conversation.
THE WITNESS: (Nods head).
BY MR. HIRSCH:
Q. And when is it your understanding that the license application is going to be submitted?
A. 2004.
Q. When in 2004?
A. I would guess maybe December just because it says the end, but there is discussion of moving it up if possible. There is discussion.
Q. But as best you can tell, the current plan would be to submit the license application around December '04; is that correct?
A. Yes.
Q. All right. Now, would you look at page 45 of the document. Hopefully I'll have the right --
A. That's the page we're on.

170

Q. Yeah.
A. Okay.
Q. Little further down. Actually, let me refer you to a different page. Page 3 of the document.
A. Not the letter but the document?
Q. Not the letter but the report.
A. Okay.
Q. I apologize. You see the statement in the second or the first full paragraph on page 3 that says: "In short, even if the Yucca Mountain recommendation were accepted today, an estimated minimum of eight more years lies ahead before the site would become operational."
A. Uh-huh.
Q. Do you know what the term estimated minimum of eight more years means?
MS. POWELL: Object to beyond the scope, but if you know, answer.
BY MR. HIRSCH:
Q. That's right within the scope.
A. I can guess what the purpose was of saying that, but I can't tell you. I just know 2010. That

171

gets you to 2010.
Q. All right. Well, you reviewed a draft of this document; is that correct?
A. Yes. I understand the audience that this particular sentence was addressed to and that was --
Q. Who --
A. -- that we're not going to start tomorrow transporting spent fuel around the country. We have time to work out these issues. That was the impetus itself behind these kind of statements.
Q. Well, does the DOE have an estimate of the maximum amount of time that it would take for the site to become operational?
A. I don't think so. We have an estimated date of 2010. That's our date.
Q. But that's referred to as the minimum date, isn't it, here?
A. Well, it is they say minimum date there. That's what it says, an estimated minimum.
Q. Will you look at page 6 of the document. You see in the paragraph right above the 3 heading?
A. Uh-huh.

172

Q. There's a statement there that: "The NWPA by its terms contemplated that the entire process of siting, licensing, and constructing a repository would have been completed more than four years ago, by January 31, 1998." You see that statement?
A. I do.
Q. Do you agree that the Nuclear Waste Policy Act contemplated that process of siting, licensing, and constructing a repository would have been completed by January 1998?
MS. POWELL: I object, beyond the scope and to the extent it calls for a legal conclusion. You can answer.
THE WITNESS: I'm thinking. Yes.
BY MR. HIRSCH:
Q. Ms. Klein, will you look at page 40 -- excuse me -- 19 in the back.
A. 19?
Q. Right. Last paragraph, first sentence says: "This is not an insignificant point" --
A. Wait a minute. Where are you?
Q. I'm sorry. Last --

MS. POWELL: I understand.
MR. HIRSCH: So I do want it understood that if I don't respond to every single one, I'm not agreeing with your position.
BY MR. HIRSCH:
Q. But go ahead and answer.
A. I don't know the answer. I already forgot the question. But when you said it, I know I didn't know the answer.
MR. HIRSCH: All right. Let's read it back.
(Requested material was read.)
THE WITNESS: No, I don't know.
MR. HIRSCH: Let's mark this 16.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 16.)
BY MR. HIRSCH:
Q. Ms. Klein, I've shown you what's been marked as Klein Deposition Exhibit 16, which is a document titled Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program. It's dated May 2001 and it's apparently RW publication



or DOE/RW. It has a designation 0533.
A. Yes.
Q. Let me just ask you. What does the 0533 represent?
A. I have absolutely no idea.
Q. That's fine.
A. I'm sure it's a way to find the document somewhere. I don't know.
Q. Incidentally, I didn't ask you this before. Do the different offices in OCRWM have different designation numbers?
A. This means OCRWM, RW, but, yeah, I mean there are. There's -- but I don't think that's related to this.
Q. No. I'm changing the subject just for a minute.
A. There's RW 40 and there's RW 50 and I don't know which one is which.
Q. All right. What's the designation of the office that you're in now?
A. RW 2 is how I -- my little routing symbol.
Q. All right. Okay.



A. Which means I report directly to the Deputy Director. He's RW 2. Margaret is RW 1.
Q. Okay. Do you recognize Klein Deposition Exhibit 16 as the May 2001 total system life cycle cost report put out by OCRWM?
A. Yeah. I mean, it's labeled that way. I'm not real familiar with the document, but...
Q. Did you review the document before it was issued?
A. I may have.
MS. POWELL: Object. It's beyond the scope, but answer.
THE WITNESS: I may have reviewed pieces of it. I didn't review the whole thing.
BY MR. HIRSCH:
Q. Will you look at page 3-8 at the bottom.
A. Yes.
Q. And in particular this with some cost assumptions. Do you see this?
A. Cost by phase.
Q. Right.
A. Yeah. Historical, future, yes.



Q. All right. Now, let me just ask you in general. Is one of the purposes of the total system life cycle cost reports to determine the total cost of the Nuclear Waste Disposal Program?
MS. POWELL: Objection.
THE WITNESS: Yeah.
MS. POWELL: Beyond the scope, but --
THE WITNESS: Yes.
MS. POWELL: -- you can answer.
BY MR. HIRSCH:
Q. And is one of the reasons that that's done to make a determination whether the fees that are being charged to the utilities are sufficient?
A. I think that's --
MS. POWELL: Same objection. Go ahead.
THE WITNESS: I think that's required by the statute that we do that, yes.
BY MR. HIRSCH:
Q. All right. Now, going back to the bullet points on page 3-8 of Exhibit 16.
A. Uh-huh.
Q. Does this show a construction phase for the

225

together -- RW puts together a budget and gives it to our controller. The department puts together its whole budget, gives it to OMB. It becomes part of the President's budget and it gets released as the President's budget, whenever the budget cycle is. I don't know.

BY MR. HIRSCH:

Q. But to your knowledge, there's been a budget proposal submitted for OCRWM for the fiscal year 2003; is that correct?

A. I think so.

MS. POWELL: Same objection, but you can answer.

THE WITNESS: I think so.

BY MR. HIRSCH:

Q. And do you know whether that budget proposal contains an estimate of the annual expenditures necessary to open Yucca Mountain by 2010?

MS. POWELL: I'm going to object, beyond the scope and to the extent it calls for anything that would be covered by the executive privilege. I don't know.

226

THE WITNESS: My guess if it's been released it will only -- I think it only has 2003. I don't think it goes into anything beyond 2003.

BY MR. HIRSCH:

Q. Is there some other --

A. But I don't know.

Q. Is there some other DOE document which would identify the amount of money that DOE needs appropriated to open the repository by 2010?

A. TSLCC.

MS. POWELL: Same objection, beyond the scope, but...

THE WITNESS: I believe it's in the TSLCC, which is one of these exhibits here.

MR. HIRSCH: 20.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 20.)

BY MR. HIRSCH:

Q. Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 20, which is a document from US General Accounting Office titled Testimony before the Subcommittee on Energy and Air Quality,

227

Committee on Energy and Commerce, House of Representatives, and it's identified for release on delivery March 21, 2002. Apparently it's a statement of Ms. Gary Jones, Director, Natural Resources and Environment.

Have you ever seen this testimony from GAO?

A. No, I have not.

Q. Will you look at page 9 of the document.

A. Yes.

Q. On page 9 there's a statement in the middle of the second paragraph that says: "Third, the four-year construction time period that DOE's current schedule allows may be too short. For example, a contractor hired by DOE to independently review the estimated costs and schedule for the nuclear waste program reported that the four-year construction period was too optimistic and recommended that the construction phase be extended by a year and a half." You see that?

A. I do see that.

Q. Now, I guess you testified earlier that the DOE has now shortened the construction period from four years to two years; is that correct?

228

A. That's the estimate, yes.

Q. All right. And this report says a contractor concluded that four years was too optimistic; is that correct?

A. That's what this says.

Q. All right. And do you know who the contractor hired by the DOE to independently review estimated costs and schedule for the nuclear waste program was?

MS. POWELL: Objection, beyond the scope, but you can answer.

THE WITNESS: I believe I do.

BY MR. HIRSCH:

Q. And who's that?

A. Burns and Roe.

Q. When were they retained?

MS. POWELL: Same objection. You can answer.

THE WITNESS: I don't know exactly when they were retained.

BY MR. HIRSCH:

Q. Well, what was the assignment given to Burns

and Roe?
MS. POWELL: Same objection, but you can answer.
THE WITNESS: I only know this from hearsay, but I mean overhearing people who are involved in this talk about it, but they were to do an independent review of the program. I'm not sure what their whole scope was.
BY MR. HIRSCH:
Q. And do you know when -- was there a written report from Burns and Roe?
MS. POWELL: Same objection. You can answer.
THE WITNESS: I believe there was.
BY MR. HIRSCH:
Q. And did that report conclude that the DOE would take approximately five and a half years to construct the facility?
MS. POWELL: Same objection.
THE WITNESS: I don't know.
BY MR. HIRSCH:
Q. That's what the GAO testimony seems to



indicate, isn't that?
A. That's what the GAO testimony indicates. We do not agree with GAO on many things about the repository program.
MR. HIRSCH: I'm going to make a request that the Burns and Roe report be produced. I don't think we've gotten that produced. We couldn't find it.
MS. SULLIVAN: I'm going to suggest that you at the end of Ms. Klein's deposition, since we have a list growing, that you send me a letter.
BY MR. HIRSCH:
Q. The report goes on to say: "Bechtel anticipates a five-year period of construction between the receipt of construction authorization from NRC and the opening of the repository." Are you aware of such an estimate by Bechtel that it would take five years to construct the facility?
MS. POWELL: Same objection, beyond the scope, but you can answer.
THE WITNESS: No, I'm not aware of one. (Witness conferring with counsel.)



BY MR. HIRSCH:
Q. Will you look at page 10 of the report or the testimony, Klein Deposition Exhibit 20. Do you see at the very top of that page there's a statement in there: "In its August 2001 report on alternative means for financing and managing the program, DOE stated that unless the program's funding is increased, the budget might become the 'determining factor' whether DOE will be able to accept wastes in 2010."
Were you aware or are you aware, Ms. Klein, that the DOE has taken that position?
MS. POWELL: Object to beyond the scope, but you can answer.
THE WITNESS: I worked on that report and I remember emphasizing how important the budget is. I don't remember if we said it was the determining factor or not, but yes, the budget is a big issue.
BY MR. HIRSCH:
Q. And is it correct that it's a big issue because if the DOE doesn't get enough money, it can't open the repository in 2010?
A. That's true.



Q. Would that report that I guess is referenced in the footnote 7 show what the annual level of appropriations the DOE needs to open a repository on time?
A. I don't believe so.
MS. POWELL: I was going to say, beyond the scope but if you know.
THE WITNESS: It's public. You can get that on our Web site and you could see. That's why I don't think it would have a bunch of numbers in it.
BY MR. HIRSCH:
Q. Are you aware that there is a time line on the DOE Web site regarding Yucca Mountain?
MS. POWELL: Objection, beyond the scope, but you can answer.
THE WITNESS: I don't know that there's still one on there, but that doesn't surprise me I guess.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 21.)
BY MR. HIRSCH:
Q. Ms. Klein, I've handed you what's been marked

A. Start permit -- permanent closure. No, it's 21. Excuse me.
Q. 2010.
A. I'm looking at the wrong place. "If licensed, first possible waste acceptance" 2010.
Q. So that's an assumption that if the facility is licensed by the NRC, that's the first possible waste acceptance that can occur?
A. At the repository.
Q. Right.
A. We can't accept it if it's not licensed. We can't accept spent fuel at the repository without a license to possess nuclear material.
Q. And you know what the term first possible waste acceptance is supposed to mean?
MS. POWELL: Object, but if you know.
THE WITNESS: I think it says first possible. I have to look it up. I mean, first possible.
BY MR. HIRSCH:
Q. It also implies that it might not be accepted in 2010, doesn't it?



MS. POWELL: Object. The document speaks for itself, but you can answer.
THE WITNESS: A lot of things could happen. An earthquake could come. We could have another 9/11. I don't know.
BY MR. HIRSCH:
Q. Is there a DOE document which reflects a range of possible dates that the DOE will start accepting fuel from utilities under standard contract?
A. Earlier. Much earlier we were hoping for a 2007 date, but in the last several years it's been 2010. But that was even -- that was just a pie in the sky the 2007, but that was kind of --
Q. The 2007 date was a pie in the sky date?
A. It was a hope. It was something that we would have liked to do, but it required NRC. It required a lot of regulatory action that we weren't sure we could get. So I don't know that we ever published it. It was just we were struggling with trying to figure out how to meet our waste acceptance obligation.
Q. All right. The 2007 projected acceptance date is dead at this point, isn't it?



A. Yeah, I would -- well, it hasn't been discussed that I know of that, I've known about in a long time. The 2007 has not been discussed, no.
Q. And does the fact that it's not been discussed reflect that it's not under consideration?
A. No. The new director is looking at all possibilities, and she's talking to people about accelerating.
Q. Are you aware of any current proposal of the DOE to begin accepting spent nuclear fuel before 2010?
A. Repeat that. Do you have objection in? Repeat the beginning of it. I'm sorry.
Q. Let me restate it. Are you aware of any current proposal by the DOE to begin accepting fuel earlier than 2010?
A. No.
Q. Going back to the question I guess I asked you a little earlier. Is there a DOE document that you've seen that reflects a range of acceptance dates starting in 2010 and including -- or strike that?
Have you reviewed a document at DOE which reflects this range to start removing spent nuclear



fuel from the utilities starting in 2010 and extending to some later date?
MS. POWELL: Objection, vague, but if you can answer.
THE WITNESS: Yeah, I don't understand the question. I think I know what you're asking, but it's -- try one more time.
BY MR. HIRSCH:
Q. All right. I will. Does the DOE have a current estimate that shows that it could start removing fuel spent nuclear fuel in 2010 and then projects out other possible start dates later than 2010?
A. No, not that I'm aware of.
MR. HIRSCH: Why don't we take five minutes here.
(Recess, 4:00 to 4:09 p.m.)
BY MR. HIRSCH:
Q. Ms. Klein, I think we got into this a little earlier, but let me just ask you. What is the Department of Energy's current estimate of the rate that it will begin removing spent nuclear fuel under

the standard contract if it starts performing in 2010?
A. Okay. For planning purposes only, 400 the first year, 600 the second, 1200 the third, 2,000 the fourth, 3,000 the fifth and 3,000 thereafter for the next five years. The whole thing is 10 years, however that calculates to 2019.
Q. And does the DOE anticipate that the 3,000 rate will extend beyond that first 10-year period?
A. We have not addressed that issue that I'm aware of.
Q. Is it correct that there's about 84,000 tons of commercial -- strike that.
Is it correct that the DOE has estimated that there's about 84,000 tons of commercial spent nuclear fuel that will have to be removed during the course of this program?
A. I believe --
MS. POWELL: Objection to beyond the scope, but you can answer.
THE WITNESS: I believe that's what's in the Secretary's statement. I have to go back and check, but sounds right.



BY MR. HIRSCH:
Q. Well, is it correct that the DOE would have to continue performing at the 3,000 period for some period of time -- strike that.
Isn't it correct that the DOE would have to continue performing at 3,000 rate for some period of time after that first initial 10-year period to remove those 83 or 84,000 tons of waste?
MS. POWELL: It's beyond the scope. You can answer.
THE WITNESS: It would require a legislative amendment because right now the Act only authorizes 70,000 metric tons in the first repository. So somebody would have to do something to work this out.
BY MR. HIRSCH:
Q. Well, even to get to the 70,000 tons, that's the limit of the repository.
A. I have to do my math here. 10 --
Q. Isn't it reasonable to assume that the DOE is going to have to continue to perform at a 3,000 metric ton rate after the initial 10-year period in order to



remove waste up to the capacity limit?
MS. POWELL: Same objection.
THE WITNESS: Not --
MS. POWELL: You can answer.
THE WITNESS: Not necessarily. I mean, we do have to eventually dispose of it all, but I don't know that there's a time frame. We have Navy spent fuel and I don't -- I don't know about the time frame, whether it has to be 3,000 -- or excuse me -- the rate, whether it has to continue at 3,000.
BY MR. HIRSCH:
Q. Do you know how long the repository facilities are designed to operate?
MS. POWELL: Same objection, but you can answer if you know.
THE WITNESS: I think it's 25 years.
BY MR. HIRSCH:
Q. Well, given that the repository is only designed to operate for 25 years, isn't it reasonable to assume or fair to assume that the DOE is going to have to continue picking up at a 3,000 rate beyond that first 10-year period?



MS. POWELL: Same objection.
THE WITNESS: I don't know why it has to be at 3,000 rate. That's my -- I don't know that that's the rate at which we will have to be picking up, I mean. I just know that's the way the Act is written. We have to do a report on whether a second repository is appropriate.
BY MR. HIRSCH:
Q. When is the DOE supposed to do that report on the -- let me just finish.
MS. POWELL: Yeah.
BY MR. HIRSCH:
Q. -- on the second repository?
MS. POWELL: Let me object, beyond the scope. You can answer.
THE WITNESS: I don't remember. I'd have to look at the statute, but it's supposed to talk about the need for a second repository.
BY MR. HIRSCH:
Q. Well, focusing on the 3,000 metric ton rate for a minute, do you know what the basis of that rate is?

A. My --
MS. POWELL: Well --
THE WITNESS: You don't have to say anything. I'm just waiting for you to have the opportunity.
My understanding is that at the time we came up with that figure, that was approximately the utility discharge rate and that we took 70,000 metric tons and divided it by 25. Both those reasons gave us the 3,000 and then we had 4, 6, 12, too, as a ramp-up period, less transportation and all that.
BY MR. HIRSCH:
Q. Let's talk about the first reason for a minute. The utility discharge -- strike that.
The DOE had looked at the utility discharge rate?
A. That's what I was informed of. I didn't personally do that.
Q. And is it correct generally that the 3,000 metric ton rate would equal the discharge rate plus some amount to get rid of the backlog of spent nuclear fuel?



MS. POWELL: I'm just going to note for the record that we offered Mr. Pollog on I think -- I think that you're talking about this topic, but you can answer.
THE WITNESS: I don't remember. I wasn't told about the backlog. I was informed that it was based on 3,000 was at the time the average utility discharge rate. So...
BY MR. HIRSCH:
Q. It was your understanding that the --
A. I don't know about the backlog issue at all.
Q. All right.
A. About that that accounted for a backlog.
Q. Is it your understanding that the 3,000 rate would keep up with the utility discharge rate?
A. Yes.
Q. Is that correct?
A. Uh-huh.
Q. And then I guess you mentioned the other reason or rationale. I'm sorry. What was the second rationale?
A. 70,000 metric tons, which is how much we're



authorized to put in the first repository, divided by the life of the repository, which is 25 years.
Q. Gives you about 3,000 metric tons a year?
A. Uh-huh.
Q. Given both of those reasons, are you aware of any reason why the DOE would run the repository at Yucca Mountain at a rate less than 3,000 metric tons?
MS. POWELL: Object to beyond the scope, but you can answer.
THE WITNESS: I understand there are lots of ramp-up issues. There's transportation issues. There's utility interface issues. Casks. I mean, that could affect it, but that was our planning and what we'd like to do is be able to do that at 3,000. But I know there's lots of things that need to be worked out.
BY MR. HIRSCH:
Q. Well, assuming that all the ramp-up issues are resolved including transportation?
A. Uh-huh.
Q. Are you aware of any reason why the DOE wouldn't operate the facility at a 3,000 metric ton



rate --
A. No, I'm not.
Q. -- over the life of the facility?
A. No, I'm not aware of any reason we would not do that.
Q. All right. You got or we saw this maybe a little earlier. In order to open by 2010, does the DOE need to essentially build a rail line from the existing rail line in Nevada to the repository?
MS. POWELL: Objection, beyond the scope, but you can answer.
THE WITNESS: That's one of the possibilities is building a rail line. The other is to have -- I know one of the counties wanted to have some sort of system through there. I think it's Lincoln County, Nevada. To have a transportation truck centrally located site. So we haven't made the decision yet. Mostly rail is our preferred alternative, but we haven't decided the routes and the methods.
BY MR. HIRSCH:
Q. So, well, is there -- is it correct that

there's not currently rail access to Yucca Mountain?
MS. POWELL: Objection, beyond the scope, but you can answer.
THE WITNESS: Yes.
BY MR. HIRSCH:
Q. And do you know how far from the current rail lines Yucca Mountain is?
MS. POWELL: Same objection.
THE WITNESS: No, I don't know.
BY MR. HIRSCH:
Q. So, in order to have rail access to Yucca Mountain, the DOE or its contractors would have to arrange for a rail line to be laid for however long that distance is; is that correct?
MS. POWELL: Same objection.
THE WITNESS: That sounds correct to me, but I'm not positive. But that does sound correct.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 22.)
BY MR. HIRSCH:
Q. Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 22, which is Volume 2 to



the Viability Assessment of a Repository at Yucca Mountain, Preliminary Design Concept for the Repository and Waste Package issued by the Department of Energy, and this was issued apparently in December of 1998. I believe one of our earlier exhibits was Volume 1 to the viability --
A. I think it was the overview.
Q. It was the overview -- you're right -- of the viability assessment from December of '98 and now I've given Volume 2.
Did you see this document at or about the time it was issued?
MS. POWELL: Objection, beyond the scope.
THE WITNESS: I have seen this document at or about the time that it was issued.
BY MR. HIRSCH:
Q. Did you have any role in helping to prepare Exhibit 22?
MS. POWELL: Same objection.
THE WITNESS: No, not that I remember. I'm pretty positive I didn't. I'm looking to see which piece.



BY MR. HIRSCH:
Q. I'm going to -- you can look at whatever part of it you'd like.
A. No, I did look at the overview, but this part I had no input in.
Q. Okay. What I'd like to refer you to is page 3-2 of the document. Do you see on page 32 there's a table Annual Repository Receipt Rates?
A. Uh-huh.
Q. And does this table reflect the 400, 600, 1200, 2,000, 3,000 metric ton rates that you previously identified?
A. Yes.
Q. Does this also show the 3,000 metric ton rate extending on from 2015 till 2032?
A. Yes, it does.
MR. HIRSCH: 23.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 23.)
BY MR. HIRSCH:
Q. Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 23. It's a document



titled Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program dated September 1995, Department of Energy.
Did you review this document at or about the time it was issued?
MS. POWELL: Object to beyond the scope but...
THE WITNESS: I don't remember if I did. I may have.
BY MR. HIRSCH:
Q. Look at page 8 of the document. Look back at page 7, bottom of the page. You see at the last paragraph it says: "The Program Approach assumes that all SNF is stored at utility sites prior to being transported to the MGDS."
And the MGDS is the repository we've been referring to earlier; is that correct?
A. Yes.
Q. And then it says: "No MRS or interim storage facility costs, or storage costs at utility sites are included in this TSLCC analysis." Is it correct as of the date of this report, September '95, that the DOE

was not planning on building an MRS facility?
MS. POWELL: Object to beyond the scope, but if you know, you can answer.
THE WITNESS: I believe that's true, yes. We were not planning.
BY MR. HIRSCH:
Q. All right. And just for the record, an MRS facility is a monitored retrievable storage facility?
A. That's correct.
Q. Will you look at the next page of the document. There's a table there MGDS Receipt/Emplacement Rates.
A. Uh-huh.
Q. Does this table reflect that the DOE would remove spent nuclear fuel at a 3,000 metric ton rate from period 2014 until I think it's 2039?
A. Yes, it does. For planning purposes.
Q. Will you pull back out of your stack there of exhibits Klein Deposition Exhibit 16, please. I've asked you to look back at Klein Deposition Exhibit 16, which is the May 2001 total system life cycle cost report.



Will you look at the table located on page 4-14 of this document. Let me just ask you. Is it correct that Exhibit 16 is the last version of the total system life cycle cost report that the DOE has issued?
MS. POWELL: Objection to beyond the scope, but if you know, you can answer.
THE WITNESS: I believe so.
BY MR. HIRSCH:
Q. And does this table that's part of Exhibit 14 show that the DOE is projecting that it will remove spent nuclear fuel from utilities at a rate of 3,000 metric tons from the period 2014 through 2039?
MS. POWELL: Same objection, but you can answer.
THE WITNESS: Yes. As targets only, yes.
BY MR. HIRSCH:
Q. And then the prior years 2010 through 2013 reflect a 400, 600, 1200, 2,000 ramp-up rate that you provided earlier?
A. Yes.
Q. Is that correct?



A. That's correct.
Q. Do you have any reason to believe that this removal rate that's set out in this table is not the DOE's current estimate for the rate it intends to operate at?
A. I do not know that this is -- this was done in May 2001. I wouldn't know necessarily that the Secretary or the General Counsel or the Under Secretary would be aware of these planning numbers that OCRWM has given. So, and we have never asked the official DOE position on what they plan to do after that 10-year period. So, I mean...
Q. All right. Exhibit 16 --
A. But it is clearly in there as something that OCRWM has said as a target only.
Q. All right. And that Exhibit 16 was released to the public and to Congress and to all utilities?
A. Yes, it was.
Q. Is that correct?
A. Yes, it was.
Q. That Exhibit 16 shows the DOE performing at the 3,000 rate from 2014 through 2039?



A. For planning purposes, yes.
Q. Do you see on page -- well, I'd like you to refer further down on page 4-14. There is a statement in the middle of the third paragraph under the table that says, DOE'S "development and procurement of transportation casks for DOE SNF are not part of the CRWMS."
A. Uh-huh.
Q. You see that statement? I have to go back to my table of acronyms.
A. That means the Civilian Radioactive Waste Management System.
Q. I see. And do you know why the cost of transportation casks is not part of the Civilian Radioactive Waste Management System?
MS. POWELL: It's beyond the scope, but if you know, you can answer.
THE WITNESS: I don't know the answer.
BY MR. HIRSCH:
Q. Is there some other department of DOE that's supposed to pay for those transportation casks?
MS. POWELL: Same objection.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------------X YANKEE ATOMIC ELECTRIC COMPANY :

(98-126C)(Merow, S.J.) : CONNECTICUT YANKEE ATOMIC POWER COMPANY :

(98-154C)(Merow, S.J.) : MAINE YANKEE ATOMIC POWER COMPANY :

(98-474C)(Merow, S.J.) : FLORIDA POWER & LIGHT COMPANY :

(98-483C)(Wilson, J.) : NORTHERN STATES POWER COMPANY :

(98-484C)(Wiese, J.) : DUKE POWER, a Division of DUKE ENERGY CORP.:

(98-485C)(Sypolt, J.) : INDIANA MICHIGAN POWER COMPANY :

(98-486C)(Hodges, J.) : SACRAMENTO MUNICIPAL UTILITY DISTRICT :

(98-488C)(Yock, S.J.) : SOUTHERN NUCLEAR OPERATING COMPANY, et al. :

(98-614C)(Merow, S.J.) : COMMONWEALTH EDISON COMPANY :

(98-621C)(Hewitt, J.) : BOSTON EDISON COMPANY :

(99-447C) (Allegra, J.) : GPU NUCLEAR, INCORPORATED :

(00-440C)(Bush, J.) : WISCONSIN ELECTRIC POWER COMPANY : VOLUME

(00-697C)(Merow, S.J.) : II POWER AUTHORITY OF THE STATE OF NEW YORK :

(00-703C)(Damich, J.) : OMAHA PUBLIC POWER DISTRICT :

(01-115C)(Bush, J.) : NEBRASKA PUBLIC POWER DISTRICT :Discovery

(01-116C)(Sypolt, J.) :Judge: TENNESSEE VALLEY AUTHORITY :(Judge

(01-249C)(Bruggink, J.) :Sypolt)

Plaintiffs, :PAGES

V. :275 - 533

THE UNITED STATES, :

Defendant. :

-------------------------------------------X

Deposition of Susan Klein

Washington, DC

Thursday, April 25, 2002

Reported by: Denise Dobner Vickery, RMR, CRR

JOB NO. 144540

April 25, 2002

9:54 A.M.

Deposition of Susan Klein, held at the offices of:

Jenner & Block

601 13th Street, NW

12th Floor

Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Norman M. Hirsch, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Alex D. Tomaszczuk, Esq.

Balch & Bingham LLP
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
1275 Pennsylvania Avenue, NW, Tenth Floor
Washington, DC 20004

(202) 347-6000
BY: Kristi L. Remington, Esq.

Arnold & Porter
For the Plaintiff SACRAMENTO MUNICIPAL UTILITY DISTRICT
370 Seventeenth Street, Suite 4500
Denver, CO 80202-1370
(303) 863-2334
BY: Timothy R. Macdonald, Esq.

Perkins Coie LLP
For the Plaintiff WISCONSIN ELECTRIC
607 Fourteenth Street, NW
Washington, DC 20005-2011
(202) 434-1609
BY: Suzette W. Derrevere, Esq.

United States Department of Justice, Civil Division
For the Defendant THE UNITED STATES
Commercial Litigation Branch
Federal Claims Section
1100 L Street, NW

279

Washington, DC 20530
(202) 307-6288
BY: Marian E. Sullivan, Esq.
Erin E. Powell, Esq.

I N D E X


EXAMINATION OF SUSAN KLEIN PAGE
BY MR. HIRSCH 283
BY MR. TOMASZCZUK 339
BY MS. REMINGTON 390
BY MR. MACDONALD 408

KLEIN DEPOSITION EXHIBITS: PAGE
No. 26 Analysis of the TSLCC of OCRWMP. December 1998. 283
27 CRWMS Waste Acceptance System Requirements Document. Revision 4. January 2002. 286
28 US NRC Web Site. Pages 1 and 2. 307
29 ICE Review of CRWMP 2001 TSLCC. Burns and Roe. January 2001. 322
30 RW DOE Web Site. NWTRB Presentation.


280


January 30, 2001. Lake Barrett. 329
31 Alternative Means of Financing and Managing CRWMP. August 2001. 333
32 Collection of Approved DCSs for Duke. 0292 through 0317. 356
33 Collection of Approved DCSs for Northern States. 0379 through 0399. 365
34 Interrogatory No. 92 and 93 and Responses. 383
35 Southern Nuclear DCS Notice of September 30, 1996. SN119904(D) through 07. 391
36 Letter of 3-14-97, Southern to Tomasoni. SN120321(D) through 28. 393
37 OCRWM Annual Capacity Report. December 1991. HQR-001-2357 through 2418. 397
38 CFR 10 Part 500 to End. Revised 1/1/02. 423
39 Letter of 4-1-91, Zabransky to Brownstein. CTR-001-1696 through 1714. 427
40 Draft DOE Position on Non-Fuel Assembly Hardware. DF-101718 through 1730. 440
41 Proposed Contract Changes. Revision 0. April 13, 1992. CTR-001-1510 through 1552. 450
42 Don't Say It - Write It Memo of 3-15-95.


281


McDuffie to Vance. DC-101117 through 18. 456
43 Acceptance of Non-Fuel Components and GTCC-Related Issues. DC-102429 through 31. 466
44 Summary Report. June 1995. Technical Issues. SNL-001-0092 through 105. 472
45 Working Draft. WAST Operational Issues Plan and Report. April 9, 1996. YMP-012-1859 through 1909. 483
46 Teleconference Call Summary. SNL-001-0227. 492
47 Issue Paper: Maine Yankee Request for DOE to Observe Loading of GTCC Waste. 500
48 Priority Acceptance for Shutdown Reactors. HQR-088-0104. D. K. Zabransky. 6/27/95. 516
49 Federal Register. April 18, 1983. HQR-038-0001 through 20. 523
50 Don't Say It - Write It Memo of 6-28-91. McDuffie to Langstaff/Brownstein. Recommended DOE Positions on 17 Contract Implementation Issues. 525


**Exhibits are attached.

282

(Thereupon, the reporter marked for identification Deposition Exhibit No. 26.)
Thereupon,
SUSAN KLEIN
was called for examination, and, after having been previously sworn or affirmed, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR THE PLAINTIFF, COMMONWEALTH EDISON
BY MR. HIRSCH:
Q. Good morning, Ms. Klein.
A. Good morning.
Q. Do you understand you're still under oath?
A. Yes.
Q. All right.
MS. SULLIVAN: Excuse me. Mr. Hirsch, before we start today, Ms. Klein would like to clarify something that she testified about yesterday if she might.
MR. HIRSCH: Okay.
THE WITNESS: I went back to my office and checked the record and as to the rates that we would

283

pick up for, they are the same as in the VA that you showed me. You probably want to know what exhibit number that is. And that is in our current requirements document that the 3,000 continues throughout the years as stated in the VA. The viability assessment.
BY MR. HIRSCH:
Q. All right.
A. I think it's now -- that looks like it could be it.
MS. SULLIVAN: 22.
BY MR. HIRSCH:
Q. Volume 2 of the viability assessment.
MS. SULLIVAN: 22.
THE WITNESS: Let's see. It was a page you showed me. Page 3. Yes, that's correct.
BY MR. HIRSCH:
Q. Well, let's hopefully clarify that a little bit. Why don't you look at Klein Deposition Exhibit 22, which is --
A. A new one?
Q. No.

284

A. No.
Q. The one we were just looking at. The volume 2 of the DOE viability assessment from December of '98.
A. Okay. Uh-huh.
Q. And in particular, I think we were looking yesterday at the table on page 3-2.
A. Yes.
Q. And --
A. Those are approximately. I think there was a 1900 not an 1800 in our requirements document.
Q. Okay.
A. But they're based on -- they're based on these receipt rates, annual repository receipt rates in Table 3-1.
Q. And this table shows a receipt rate of 3,000 starting in 2014 and I guess running until 2032 on this --
A. Yes.
Q. -- table?
A. That's correct.
Q. And I'm sorry. Your clarification after checking with your office this morning with respect to

285

the rate was what?
A. Was that the rate here in this Volume 2 of the VA, Exhibit 22, in Table 3-1 is the correct rate for our planning purposes. What we plan, how we plan, the rate at which we plan to accept spent fuel at the repository.
Q. And that is a rate that would ramp up to 3,000 by 2014 and continue on at 3,000 until 2032; is that correct?
A. Yes, that's correct. 2033. Through 2032.
Q. I think you mentioned in your previous answer a system requirements document put out by the DOE?
A. Yes.
MR. HIRSCH: We've previously marked an exhibit which we'll get back to. Let's go ahead and look at that. 27.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 27.)
THE WITNESS: Yes.
BY MR. HIRSCH:
Q. Ms. Klein?
A. Yes.

286

Q. Okay. I've handed you what's been marked as Klein Deposition Exhibit 27, which is a document put out by the Office of Civilian Radioactive Waste Management titled Waste Acceptance System Requirements Document.
A. Uh-huh.
Q. Revision 4 and it's dated January 2002. Are you familiar with this document?
A. No.
Q. Have you seen system requirements documents put out by the Department of Energy?
A. I have seen one, yes, but it wasn't this one.
Q. All right. Was it an earlier version of the system --
A. I've seen actually a later version. I believe it's dated March 2002 and it's not called Waste Acceptance System Requirements Document. It's has a different title.
Q. All right.
A. I don't remember the title.
Q. Do you know what the purpose of the system requirements documents are?

287

A. Well, it's a way of controlling I mean -- and I'm saying this in my layperson's knowledge, but as you see, it says up there QA on the top. And you all probably know how important quality assurance is in the nuclear world and it's all done through requirements documents and making sure everything is done in accordance with requirements and signed off by people, and that is really the requirements document is the requirements. That is what you follow. That's the final word for the moment. They're revised quite frequently. As you can see, this is Revision 4. But there's a process you have to go through to revise them and have everybody concur on them.
Q. So that the requirements document is the document which is supposed to control what or how the program operates?
A. Yes, that's true.
Q. All right. Will you look at page 46 of Exhibit 27.
A. Uh-huh.
Q. Do you see that there's a table here. Estimated Schedule for Acceptance of Commercial and

288

Government-Managed Nuclear Material.
A. Yes.
Q. All right. And I'm going to refer you to the right-hand side, which is the commercial SNF. Do you see that on the table?
A. Yes.
Q. Okay. And at the top hand box it says, Total Projected Quantities and it shows 83,800. That's the projected quantity of spent nuclear fuel from commercial reactors that the DOE anticipates handling under the program; is that correct?
A. That's my understanding, yes.
Q. Okay. And further down you see there's a box following over from Projected Acceptance Schedule and this shows "Accept commercial SNF at the following estimated annual rates." I think it's metric tons per year. It says, "400 in 2010, 600 in 2011, 1200 in 2012, 2,000 in 2013, 3,000 in 2014 through the end of emplacement." You see that there?
A. I do.
Q. Is that the DOE's current expectation regarding the rates that it will perform at when the

289

repository opens?
A. Approximately, yes. As you know, at the end of that there's a lower number at the very end of the whole period, but that is approximately for planning purposes what we expect to be able to accept at the repository. 4, 6, 12, 3, 3, 3, 3.
Q. This shows 3,000 through -- 2014 through the end of emplacement.
A. Yes, but I think at the end of emplacement it actually gets lower in the figures in the document that I saw, which is also in the requirements document. Let's see what footnote H says here. "In later years annual rates may be reduced." Okay. "To match annual utilities' discharges." That explains the difference.
Q. Okay. So the theory in the later years is that the utility discharge rate may go down?
A. That's correct.
Q. Is that correct?
A. Yes.
Q. And so the rate might go down because the utilities are discharging less fuel?
A. That's correct. That's what this footnote

290

says.
Q. All right. But at least until the utility discharge rate goes down, it's the DOE's expectation, is it not, that they're going to continue to pick up 3,000 metric tons?
A. That is the expectation for planning purposes, yes.
Q. Does the DOE consider a 3,000 metric ton acceptance rate to be a reasonable rate to run the spent nuclear fuel program at?
A. I would -- yes.
Q. All right. Will you look at Klein Deposition Exhibit -- the one we just marked and then went on past -- 26.
A. Okay.
Q. In particular, what I'd like to refer you to is page 6 of Exhibit 26.
A. Yes.
Q. You have that there. This page 6 is what I think is labeled as a Time-Phased Cost Summary in Constant 1998 Dollars for the DOE spent nuclear fuel program. You see that?

291

A. Yes, I do.
Q. All right. Have you seen this time line before?
A. Not that I remember.
Q. Does this time line show the construction period for the repository taking approximately five years.
MS. SULLIVAN: Objection, document speaks for itself.
THE WITNESS: It says 2005 to 2010 under construction -- above the word construction.
BY MR. HIRSCH:
Q. All right. So that's about five years?
A. That looks like five years to me.
Q. And that timetable assumes that the DOE would have obtained a license by 2005, does it not?
MS. SULLIVAN: Objection, document --
BY MR. HIRSCH:
Q. Let me clarify rephrase the question. That time line assumes that the DOE would have obtained a license from the NRC to begin construction in 2005, does it not?

292

MS. SULLIVAN: Same objection. Document speaks for itself.
THE WITNESS: Yes. We can't begin construction until we get a license from the NRC.
BY MR. HIRSCH:
Q. And that date is shown on this time line as 2005.
MS. SULLIVAN: Same objection.
THE WITNESS: I don't see that, but I see construction starts in 2005. We have to have a construction authorization licensing. It says 2002 to -- I mean, I don't quite understand these, what all these little things are, but I agree. I mean, in order to begin construction, we need a construction authorization from the Commission.
BY MR. HIRSCH:
Q. All right. I think you mentioned yesterday at some point that the DOE had gotten a report from Bechtel along the lines -- or strike that.
I think you mentioned yesterday that the DOE had some kind of estimate that the facility could be built in two years. Do you recall that?

293

A. I don't know if I said that came from the BSC document. Yes, but there were -- yeah, there is a possibility that once we get the construction authorization, we could construct a facility sufficient to receive waste in two years. There is a -- I don't know if there's -- if it's in a particular planning document, but what I said was that BSC relooked at their figures and they have come up with a baseline of the repository accepting waste in 2010.
Q. Well, that's what I was hoping to find out. To the best of your knowledge, is there a document from Bechtel, Bechtel whatever their name, BSC, whatever we want to call them.
A. Uh-huh.
Q. That says that Bechtel can in two years build a facility sufficient to start receiving waste?
MS. SULLIVAN: Objection, beyond the scope. You can answer.
THE WITNESS: I don't know what the time frames are within there. I don't know whether it's shortened the time to get the license application. I don't know, and I would assume there is a document, but

294

doesn't have very much knowledge about that facility or how it operate or how it's projected to operate.

And so I think on issues like that that related to the specifics of how the DOE would be in a position to start performing in 2010, I think it's our position that she's not -- on some of those issues she's not really knowledgeable about those issues.

MS. SULLIVAN: Anything else?

MR. HIRSCH: I think that was the principal concern that we had about that. Specifics of how the DOE would be in position to start performing in 2010, particularly in light of the testimony that Ms. Klein gave that the DOE isn't likely to get a license application granted to build a facility until the end of '97 or '98.

MR. TOMASZCZUK: 2007.

MR. HIRSCH: I'm sorry. 2007, 2008.

MS. SULLIVAN: Okay. We have nothing that we need to clarify.

EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
NORTHERN STATES POWER COMPANY, ET AL.
BY MR. TOMASZCZUK:

339

Q. Ms. Klein, my name is Alex Tomaszczuk. I'm counsel for various utility plaintiffs which have pending cases at Court of Federal Claims.

I have a few follow-up questions to ask you based on the testimony that I've heard so far. I'll compliment Mr. Hirsch. He was very thorough. I wouldn't say this in his presence, but since he stepped out, he was very thorough and I think I have only a relatively few number of questions for you.

The same ground rules apply that Mr. Hirsch expressed to you at the outset of your deposition. If for some reason you don't understand my question, please let me know that I'll try and rephrase it so that there's common ground and so that we understand your testimony, okay?

A. Yes.

Q. I would like you if you can to identify for me all the assumptions on which your testify that DOE will begin performance in 2010.

A. The assumptions?

Q. Yes.

A. The assumption is that we would have a

340

designation by Congress of the site. That we will have a construction authorization from the Commission, and that we will have a license to receive by -- to receive nuclear material by 2010. All those things have to be accomplished.

Q. If I understood your answer, there were three basic assumptions on which DOE's ability to meet 2010 is based. The first was the designation of the site; is that correct?

A. Uh-huh. Yes.

Q. And the second assumption was the obtaining of an authorization for construction?

A. Yes.

Q. And the third was receiving a license to operate?

A. Yes.

Q. Okay.

A. Those are the three major assumptions.

Q. Are there any other assumptions on which DOE's ability to meet the 2010 date is based?

A. Well, we do need to get funding. We need to -- there can be no injunctions against us by a court.

341

I mean, I could go on about, you know, how the assumptions one has, how they got to work. I think by court, right.

Q. What I'm asking you to do is identify them to the best of your ability.

A. Every one of them? I don't think I'm capable of identifying every one of them. There are big differences between what we plan and hope to happen and what we assume, but I mean we would like to have an alternative means of financing and managing the program, but I don't know that that's a required amended order for us to meet the 2010 date. But that would certainly ease our burden if we could get government cooperation and have our funding mechanism changed. That is a high priority for the program in order to succeed. I think those are the assumptions that I can think of, I mean. Those are the assumptions.

Q. All right. The two that you identified in your -- in the continuation of your answer was first funding and second no injunctions as I understood your testimony?

342

is the Nuclear Waste Disposal Fund and the other is the Defense Waste Disposal Fund. Some of it is appropriated for the purpose of disposing of defense waste. But we use all that money for the program.
BY MR. TOMASZCZUK:
Q. You testified in response to some of the questions posed by Mr. Hirsch that DOE expected for planning purposes when it begins performance to ramp up to 3,000 MTU rate and stay at that steady state rate for a number of years. Do you recall that testimony?
A. Yes, I do.
Q. And that's reflected in various documents that Mr. Hirsch showed you yesterday and today as well?
A. Yes.
Q. And you used that term planning purposes in your answer?
A. Yes.
Q. That intention of DOE to ramp up to the 3,000 MTU rate, is that being used by DOE for purposes other than planning purposes?
A. No, not that I know of.
Q. Is that 3,000 MTU rate the rate that DOE was

351

to use to determine if the fees are sufficient?
MS. SULLIVAN: Objection, beyond the scope. Answer if you know.
THE WITNESS: I don't know. I'd have to look at the TSLCC to know.
BY MR. TOMASZCZUK:
Q. Would you do so. If you need to refer to a document to answer the question, that's fine. TSLCC, Number 16.
A. That's the most recent one. I have a few of them here. And would you repeat the question?
MR. TOMASZCZUK: Ms. Reporter, could you read it back.
(Requested material was read.)
THE WITNESS: (Pause). I haven't found it. I'm working on it.
BY MR. TOMASZCZUK:
Q. That's all right. Take your time.
A. It appears from this document that those are the rates that we assumed in determining the cost of the program.
Q. And did you have a page of the document that

352

you referred to?
A. Well, page 4-14 has the -- actually 4-13 says assumptions about. These are the assumptions on waste acceptance. The table that's on page 4-14. That's what I based my answer on.
Q. All right. Can I just direct your attention also to the letter, which is the third page in Exhibit 16. It's the third page. I think you passed it.
A. Not the iii page you mean. Where is it? There we go.
Q. And you're welcome to read the entire letter. I was going to direct your attention to the third paragraph, first sentence.
A. Okay. I've read the third paragraph, yes.
Q. All right. Could you read the first sentence for me out loud.
A. "The TLSCC analysis provides the basis for assessment of the adequacy of the Nuclear Waste Fund fee as required by the NWPA."
Q. And that's in a letter from Mr. Barrett, right, to the readers?
A. That's correct.

353

Q. All right. So, DOE is using the 3,000 MTU rate for the purposes of determining adequacy of the fee, correct?
MS. SULLIVAN: Objection, beyond the scope and also the document speaks for itself. You can answer the question.
THE WITNESS: Yes.
BY MR. TOMASZCZUK:
Q. They're using that rate basically to design the facility that they're planning to build at Yucca Mountain; is that right?
A. Yes.
Q. They're using it in any number of documents that we've seen here over the last couple of days, correct?
A. Yes.
Q. Wouldn't it be fair to say, Ms. Klein, that the lower rate that DOE is using, that is, the rate that goes up to 900 MTU and stops there, is being used for one purpose and that is for this litigation?
MS. SULLIVAN: Objection, beyond the scope. You can answer as to your personal opinion.

354

rate specified in the ACR or the APR for that time period.
BY MR. TOMASZCZUK:
Q. Well, I think the rate issue is dealt with in Interrogatory number 93, if I understand it. I was asking you about 92.
A. Oh, sorry. I'm sorry. DOE does not contend that it has no obligation.
MS. SULLIVAN: Could I ask the reporter to read the pending question back again, please.
(Requested material was read.)
MS. SULLIVAN: Objection, the document speaks for itself. Objection, beyond the scope. You can answer the question. But I would direct the witness not to testify as to any attorney-client communications regarding the preparation of this Interrogatory response.
THE WITNESS: I'm going to ask you to repeat the question one more time. I'm sorry.
(Requested material was read.)
THE WITNESS: That's not what it says. It says we -- we have not made that contention that it

387

has no obligation, but I don't know that we have ever said that we have that obligation as a department beyond the 10-year period.
BY MR. TOMASZCZUK:
Q. Well, I commend you for dancing on that high wire, but maybe you can just tell me what this answer is communicating to me because, frankly, I don't understand it.
MS. SULLIVAN: Objection.
BY MR. TOMASZCZUK:
Q. What is DOE's position with respect to its obligation to accept spent nuclear fuel from purchasers beyond the 10 years of allocations addressed in the ACR? Can you explain that to me what is DOE's position because I don't understand it in this answer.
MS. SULLIVAN: Objection, the document speaks for itself. Objection to the extent it calls for a legal conclusion. Objection, it's beyond the scope. You can answer the question.
And I would note for the record that to the extent the utility plaintiffs have questions about these Interrogatories, a proper vehicle would be a

388

letter, perhaps a motion with the court, but Ms. Klein is here to testify as to her personal knowledge. If she can.
THE WITNESS: I don't know that the DOE has at this time a position on that.
BY MR. TOMASZCZUK:
Q. Do you have a position?
A. I do.
Q. Can you tell me what it is?
A. My own personal position? Yes.
Q. Yes?
A. Yes, we have an obligation.
MR. TOMASZCZUK: Ms. Klein, I don't have any further questions at this time.
I am going to adjourn your deposition because there are some pending issues with respect to the government's privilege log and documents contained thereon. There were also some instructions not to answer both from questions posed by Mr. Hirsch as well as some questions posed by me, and we're going to reserve the right to look at that and potentially call you back.

389

And subject to that reservation of rights to bring you back, I'm going to adjourn. I want to thank you for your time and participation. It's a pleasure meeting you.
Are you all going to have questions?
MS. SULLIVAN: No.
(Recess, 12:37 to 1:36 p.m.)
(Mr. Tomaszczuk not present.)
AFTERNOON SESSION
EXAMINATION BY COUNSEL FOR THE PLAINTIFFS, SOUTHERN NUCLEAR OPERATING COMPANY, ET AL.
BY MS. REMINGTON:
Q. Good afternoon. My name is Kristi Remington and I represent the Southern Company, and as my colleagues have instructed you earlier --
A. I'm sorry. I can't hear you.
Q. It's one of my problems. If you can't hear me, please let me know. I don't always talk loud enough.
A. Okay.
Q. If you don't understand any of my questions, please ask me to restate and I will. It's just so we

390

A. Yes.
Q. No DOE contractors?
A. No. Fortunately, this was one topic I didn't need to talk to anybody else about.
Q. I believe you testified earlier today that DOE's current position with respect to priority for shutdown is that DOE would not grant priority because it would not be fair to other utilities in the cue. Do you remember that testimony?
A. Yes.
Q. And --
A. At this time.
Q. And at this time. I wanted to explore that for a minute. At this time DOE is not accepting fuel from anyone; is that correct?
A. We're not. We're not accepting it, yes; that's true.
Q. And hasn't been accepting fuel during the time from 1982 -- I'm sorry, strike that.
From 1983 when the utilities signed the contract to the present, DOE has not accepted spent nuclear fuel from utilities, correct?



A. Under the standard contract; that's correct.
Q. Under the standard contract. And so DOE's consideration of granting priority at this time is -- would you describe it as being premature?
A. I guess it's just that we reserve the right to do it if we had a huge repository and we could meet everybody's need and it might seem to be a reasonable thing to do. So, I mean, we may determine once we're operational.
Q. You haven't prejudged and foreclosed the possibility; is that fair to say?
A. That's fair to say.
Q. If the repository were operating at such a rate that granting priority would not harm operating utilities, DOE would consider granting a priority to a shutdown reactor. Is that also fair to say?
A. I think that's fair to say, yes.
MR. MACDONALD: 48.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 48.)
BY MR. MACDONALD:
Q. Ms. Klein, I've handed you a document marked as Exhibit 48, which is entitled "Priority Acceptance for Shutdown Reactors" and it appears to be a memorandum prepared by Dave Zabransky dated 6/27/95. Do you have that before you?



A. Yes, I do.
Q. And it is a memo addressing the question: "Can the department provide priority for the removal of spent fuel from permanently shutdown reactor sites?" Do you see that?
A. Yes, I do.
Q. The middle of the paragraph states that: "In assessing whether or not we would be in a position to provide for priority removal of spent fuel from permanently shutdown reactor sites, we would have to consider the following questions." And then it lists four questions.
"Does the department have the capability to provide for the interim storage or disposal of the spent nuclear fuel? Where is the interim storage or disposal capability located? What is the capacity of the interim storage facility or disposal storage, and a what annual rate can the department accept spent fuel



from the utilities? What expectations may have been created by the department regarding the allocation of spent fuel removal capacity through the publication of the annual capacity report?"
You see those four --
A. Yes, I do.
Q. -- considerations or questions?
Are these the considerations that DOE would use in deciding whether or not to grant priority to shutdown reactors?
A. I mean, they seem reasonable to me, but there could certainly be other ones. There could be others. I don't -- this was something Dave put together. I don't know if anybody else had a view on this. So I don't know. This is a department position, but...
Q. The final sentence at the bottom of this document states: "If the department had the unconstrained capability to provide for the storage or disposal of spent nuclear fuel and if the rate of spent fuel acceptance exceeds the acceptance rates published in the annual capacity report, the department would have the flexibility to address the issue of priority

acceptance of spent nuclear fuel from permanently shutdown reactors." Do you see where I'm reading?
A. I do.
Q. Is that another way of characterizing what you had previously testified to on what --
A. Let -- you mean just a moment ago? Yes. I mean, I agree with this statement and I think that I think it's true. If the department had the end capability to provide the storage and if the rate exceeds the published rate, the department would have the flexibility to address the issue. I think there may be lots of policy considerations that we're not aware of now, but I do think we would have the flexibility to address it.
Q. One of the -- strike that.
Previously you testified that the purpose of the priority provision was to give the department flexibility to move shutdown reactors to the front of the cue if DOE determines it's appropriate. Do you remember that testimony?
A. Yes, I do.
Q. When in your view would it be appropriate to

519

move a shutdown reactor to the front of the acceptance cue.
MS. POWELL: Object to beyond the scope.
THE WITNESS: Well, in my view, there would be in my own personal view.
MS. POWELL: I object to beyond the scope, but you can answer the question.
THE WITNESS: My own personal view. I think that there's concerns to encourage people to shut down and to sort of give people a prize for shutting down. That's one concern. There's another concern on the other side. If you have a property sitting there that could be totally green field, you should be able to move forward and cut your losses and move on. So I think there's lots of different policy issues there that would have to be addressed.
And my guess is that different administrations would have different views on what's the more important policy. So I just think it gives DOE the flexibility to look at these things. But how the department will come out at the time that that flexibility is truly available, it's a guess.

520

BY MR. MACDONALD:
Q. And it's a guess right now because DOE is not currently accepting spent fuel?
A. Yes.
Q. And when DOE begins accepting spent fuel, if it is at a rate that exceeds the rates published in the annual capacity report, DOE could evaluate the policy concerns you've identified?
A. Yes.
Q. And decide whether or not to give priority to shutdown reactors?
A. That's correct.
Q. Is another purpose of the priority for shutdown provision to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity?
A. That is what the department said in its -- I think it's the final standard contract rulemaking. I believe that is what the department said, yes.
Q. That's what the department said in April of 1983 when it published the standard contract?
A. Yes. Yes. I believe there was a commenter

521

who didn't want us to have that provision in there, and in response we said we wanted to keep it for that reason that you just read.
Q. And the reason that I just read was to prevent reactors from waiting 20 or 30 years to be decommissioned after they finished generating electricity?
A. Well, to have the flexibility to do that. I mean, not to necessarily do that, but to have the flexibility to allow them to not have to wait 20 or 30 years to be decommissioned.
Q. Would you agree that one of the reasons that priority provision was included was to prevent reactors from waiting 20 or 30 years to be decommissioned?
A. Yeah. I'd like to see the exact words that we said at the time. If I could.
Q. I'm happy to provide another exhibit.
A. I figure you had it there. Another exhibit.
Q. I'm not going to provide you my notes, however, at this time.
A. I was wondering what you were reading from. I thought it was rulemaking but, no, it was your notes.

522

MR. MACDONALD: Exhibit 49.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 49.)
(Discussion off the record.)
THE WITNESS: I don't know where it is. Do you? Somewhere in here we say.
BY MR. MACDONALD:
Q. If it will help, if it gets us out of here earlier, I will refer you to page 0005 at the bottom, which I believe is the fifth page of the document on the left-hand column, the first full paragraph. And this is referring to Exhibit 49 for the record, the April 18, 1983 Federal Register Notice Publication of the final version of the standard contract.
A. Okay. I have read it. It does say, "This type of priority is necessary to prevent reactors from waiting 20 to 30 years to be decommissioned after they finish generating electricity." You have a question that I'm supposed to be answering? I'm sorry. I forgot where we were.
Q. I believe you were previously testifying that -- strike that.

523

My question is: Was the reason this provision was included, the priority shutdown provision, that is because it was necessary to prevent reactors from waiting 20 or 30 years to be decommissioned?
A. Yes.
Q. And DOE included this provision despite the fact that four commenters recommended the deletion of the provision?
A. Yes, that's correct.
Q. And as you explained I believe earlier, acceptance of fuel from a shutdown reactor would allow that reactor to go to green fields I believe is the word that you used; is that correct?
A. Yes, it would. In most cases, it would allow them to go to green fields, yes.
Q. If DOE had begun accepting fuel in 1998 at a 3,000 MTU rate or a ramp-up, a reasonable ramp-up to a 3,000 MTU rate, do you have an opinion as to whether DOE could have given priority to shutdown reactors without harming or prejudicing the rights of operating utilities.

524

MS. POWELL: Object to beyond the scope, but you can answer.
THE WITNESS: It could have given. I think that would be policy considerations that would be looked at, but it would make it certainly --
BY MR. MACDONALD:
Q. Would have made it easier?
A. Much easier, yes.
(Discussion off the record.)
(Thereupon, the reporter marked for identification Deposition Exhibit No. 50.)
BY MR. MACDONALD:
Q. Ms. Klein, I've just marked -- had marked for you Exhibit 50, which is a memo dated June 28, 1991 from P. N. McDuffie and S. A. Vance to D. C. Langstaff and A. B. Brownstein. Do you have that there before you?
A. Yes, I do.
Q. I believe we discussed earlier Mr. Vance, Scott Vance, who you know; is that right?
A. That's correct.
Q. And Mr. A. B. Brownstein is Alan Brownstein;

525

is that right?
A. Yes.
Q. And you are familiar with Mr. Brownstein?
A. Yes, I am.
Q. And D. C. Langstaff, is that Dave Langstaff?
A. I don't know D. C. Langstaff.
Q. You don't know D. C. Langstaff?
A. I have no idea.
Q. But Mr. Brownstein works -- currently works for OCRWM; is that correct?
A. That's correct.
Q. And he worked for OCRWM in 1991; is that correct?
A. Yes.
Q. To the best of your knowledge?
A. Yes. Sorry.
Q. The subject of this memo is "Recommended DOE positions on 17 contract implementation issues"?
A. Yes.
Q. Please look at as much -- look at as much of the document as you need to, but I'm going to ask you questions about page 5. The first issue at the top of

526

the page, "What approach should DOE use to ensure that purchasers' needs and concerns are addressed during formulation of policy for priority acceptance of SNF from shutdown reactors?" So, please take a minute and read that issue and let me know when you have done so.
A. (Pause). Yeah, I'm ready.
Q. This discussion about priority for shutdown reactors on page 5 of Exhibit 50 discusses a Phase I and Phase II position. Do you see that?
A. I do.
Q. Have you ever heard of this Phase I/Phase II distinction?
A. No, I haven't.
Q. The discussion under Phase II states: "There may be a need to review this position as the WMS matures. When the WMS receipt rate exceeds the aggregate purchasers' annual discharge rates and all purchasers can be assured that they will not need additional at-reactor storage, DOE may elect to allocate acceptance priority to shutdown reactors to facilitate the permanent closure of those sites as soon as possible." Do you see where I'm reading?

527

A. Yes, I do.
Q. Is it -- I guess first, do you agree that if the acceptance rate exceeded the purchasers' discharge rates and all purchasers were assured that they would not need additional at-reactor storage, DOE could elect to allocate priority to shutdown reactors?
A. Yes, I agree.
Q. I wanted to go back just for a minute to clarify some questions from earlier today, and I believe you testified about DOE's position when it published its notice of inquiry in 1994.
Do you remember discussing the notice of inquiry --
A. Yes, I do.
Q. -- with Mr. Tomaszczuk?
And I believe you explained that it was DOE's position at that time in 1994 when it published the NOI that DOE's legal obligation to accept fuel was dependent upon the existence of a facility licensed under the NWPA. Do you recall that testimony?
A. Yes, I do.
Q. And you agree that that was in fact DOE's

528

position as of 1994; is that correct?
A. Whatever date that notice of inquiry was. I guess it was 1994, yes.
Q. And DOE had that position until the position that it had no legal obligation absent a repository until the DC Circuit issued its decision reversing that ruling?
A. That's correct.
Q. So, just so I understand, at that time as of the notice of inquiry, assuming it was 1994, DOE did not take the position that the DCSs were binding obligations; is that correct?
A. We believe they were binding, but they were conditioned upon the existence of a facility licensed under the NWPA.
Q. They were -- the DCSs were binding, but conditioned on a facility licensed.
MS. POWELL: This is beyond the scope, and asked and answered, but go ahead and answer.
THE WITNESS: Yes.
BY MR. MACDONALD:
Q. What does it mean? Maybe you can explain what

529

it means to be binding but dependent on --
A. We couldn't move some --
MS. POWELL: Let him finish the answer -- the question.
BY MR. MACDONALD:
Q. What does it mean to --
A. Sorry.
Q. -- say that the obligation was binding but dependent on the existence of a facility licensed and authorized under the NWPA?
MS. POWELL: Beyond the scope, but you can answer?
THE WITNESS: We couldn't take one utility's position and just take it away from them and say, you know, give it to someone else. That was their position in the cue. If they have an approved DCS for that, they had the right to that as soon as a repository -- as soon as we began operation. That was their right.
BY MR. MACDONALD:
Q. But the legal obligation was dependent on the existence of a facility authorized under the NWPA,

530

# KOUTS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

INDIANA MICHIGAN POWER )
COMPANY, )
Plaintiff, )
v. ) No. 98-486C
THE UNITED STATES, )
Defendant. )
COMMONWEALTH EDISON COMPANY, )
Plaintiff, )
v. ) No. 98-621C
THE UNITED STATES, )
Defendant. )

\- - - - - - - - - - -

DEPOSITION OF CHRISTOPHER ALEXANDER KOUTS

VOLUME I

The deposition of CHRISTOPHER ALEXANDER KOUTS was convened on Friday, January 30, 2004, commencing at 10:21 AM, at the offices of SHAW PITTMAN LLP, 2300 N Street, N.W., Washington, D.C., before Cheryl A. Lord, RPR, CRR, and Notary Public for the District of Columbia.

APPEARANCES



For Plaintiff Indiana Michigan Power Company:
Devon E. Hewitt, Esquire
Jay E. Silberg, Esquire
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, VA 22102-485
(703) 770-7962
For Plaintiff Commonwealth Edison Company:
Christopher Tompkins, Esquire
JENNER & BLOCK LLC
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350

APPEARANCES CONTINUED

For Defendant:
R. Alan Miller, Esquire
Stephen Finn, Esquire
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
1100 L Street, N.W., Room 12000
Washington, D.C. 20530



(202) 616-0383
Also present:
Eileen Supko

CONTENTS

EXAMINATION BY PAGE
Ms. Hewitt 5

EXHIBITS

NO. DESCRIPTION PAGE
1 Nuclear Waste, Nos. GAO-02-765T, 14 pages 114
2 Yucca Mountain Project Status - Exhibits 123
3 Nuclear Waste Disposal, FY 2004 Congressional Budget, pages 565-580 131
4 Testimony Before Congress, 4-7-03 213

PROCEEDINGS

CHRISTOPHER ALEXANDER KOUTS,

a witness called for examination, having been first duly sworn, was examined and testified as follows:



EXAMINATION BY COUNSEL FOR PLAINTIFF
INDIANA MICHIGAN POWER COMPANY
BY MS. HEWITT:

Q. Good morning, Mr. Kouts.
My name is Devon Hewitt, and I represent Indiana Michigan Power Company in this case. I'm a partner at Shaw Pittman, and I'm going to be taking your deposition here today.
Have you ever been deposed before?
A. Yes, I have.
Q. You might, then, know the rules of depositions, but in any event, I'm going to repeat some instructions just so we understand how this might work today.
I'm going to ask you a series of questions, and I ask that you answer them truthfully. If you don't understand a question or how its phrased or how you think I might mean a certain term, I just ask that you ask for clarification or ask that I repeat something so that it's clear to you.

Is that all right?
A. That's fine.
Q. And I'm also accused of speaking too quickly, and occasionally I have a lisp, so again, if anything is not quite understandable to you, just ask me to repeat it. That's totally fine with me.
Is that okay?
A. That's fine.
Q. And again if you'd like to take a break or need a glass of water, or anything that we can do to make this more comfortable for you, please ask.
Will you be willing to do that?
A. Thank you.
Q. Okay. Also, although I'll ask all these questions, your attorney, Mr. Miller, may on occasion object to certain questions that I ask, which is entirely within his right.
However, you are required to answer the question unless he specifically instructs you not to answer.

9

Do you understand that?
A. I understand it.
Q. Okay. I think we'll proceed.
On what occasions have you been deposed before?
A. Once before in 1999, and I don't remember the specific case, but it related to litigation that's ongoing right now with the 1998 date.
Q. Was it related to the litigation that a utility --
A. Yes --
Q. -- brought against DOE --
A. -- it was.
Q. I should ask you to let me finish my question just so the record is clear.
So I'll repeat it.
Was it related to litigation that a utility has brought against DOE that was filed in the Court of Federal Claims?
A. I can't speak to that.
I know it was litigation associated with the utility and the department. I don't know where it was filed. I'm not an attorney.

10

Q. And other than on that occasion, have you ever been deposed before?
A. No.
Q. How long have you worked at DOE?
A. I've worked at the Department of Energy since approximately 1976.
Q. Did you start working at DOE straight out of college or graduate school?
A. No.
Excuse me.
No.
I started working at DOE after I had worked in private industry and at the Environmental Protection Agency.
Q. I'd like to quickly go through your background, and I mean very quickly, because I don't want to take a lot of time to do that.
Can you just quickly tell me what your educational background is.
A. I have 2 degrees in engineering.

11

Q. And where are they from?
A. They are from George Washington University, and I am a licensed professional engineer.
Q. And when did you receive your degrees from GW?
A. My bachelor's degree in chemical engineering was in 1971. My master's degree in engineering mechanics was in 1974.
Q. Do you have any other educational degrees or certificates?
A. Other than the professional engineering license, no.
Q. And what did you do after you finished your education?
A. After I finished my education, I began working at Atlantic Research Corporation. After that I went to a consulting firm for a short period of time in energy-related technologies. And shortly after that, I began my federal employment at the Environmental Protection Agency.

12

Q. How long were you at the Atlantic Research Corporation?
A. Roughly about 2 years.
Q. And would you have started there directly after you received your master's?
A. I finished my master's while I was working there. I was finishing my master's thesis wile I worked for Atlantic Research Corporation.
Q. Where is that corporation located?
A. Where I worked at, it was located in Gainesville, Virginia, and also at their Alexandria, Virginia, offices.
Q. What kind of work do you do for that company?
A. I did thermostructural analysis on graphite rocket nozzles.
Q. Rocket nozzles?
A. That's correct.
Atlantic Research Corporation manufactures various propulsion systems for military application.



Q. And after you left Atlantic Research Corporation, you mentioned you went to a consulting firm.
What was the name of the consulting firm?
Do you recall?
A. Applied Sciences Inc.
Q. And what did you do for that company?
A. Provided support to alternative fuels development basically as a contract to the Navy.
Q. What kind of fuels?
A. These were synthetic petroleum fumes that would be distilled. They were generated from shale oil.
Q. Did any of this work have to do with nuclear fuel or spent nuclear fuel?
A. No, it did not.
Q. How long did you work for Applied Sciences Inc.?
A. For a period of about 3 to 6 months.



Q. And do you recall what year you joined Environmental Protection Agency?
A. I believe it was 1976.
Q. And what position did you first hold at EPA?
A. I was a project officer working on a federal regulation to reduce noise emissions from transportation equipment.
Q. Sounds interesting.
How long did you stay at EPA?
A. Approximately 3 years.
Q. Did you have any other positions at EPA other than project officer for this noise emissions study?
A. No.
Q. Why did you leave Environmental Protection Agency?
A. I received an opportunity or I was selected for a position to work at the Department of Energy that was newly formed.
Q. And what position was that?
A. It was a position that was in an



office called the office of mineral leasing policy development within the office of resource applications at the Department of Energy.
Q. And did you join DOE, then, 1979?
A. Approximately.
Q. And what title did you hold when you joined DOE?
A. I can't recall specifically. I believe it was regulatory specialist.
Q. And what sort of duties did you have in that position?
A. My primary responsibility was to develop a regulation working with the Department of Interior to address royalties from federal oil leases.
Q. And how long did you hold this position?
A. Approximately 1 to 2 years, I believe.
Q. What was the next position you held at DOE?
A. Next position I held at DOE was in

the office of environment, where I worked in an office that dealt with implementation of the National Environmental Policy Act.
Q. Is that also known as NEPA?
A. Yes, it is.
Q. And what were your duties in this position?
A. I was working with nuclear programs within the department and assisting them to meet their obligations under the National Environmental Policy Act.
Q. What title did you hold in this position?
A. I honestly can't recall the specifics of the title. It was related to a specialist who works in NEPA-related activities.
Q. Who was your supervisor in this position?
A. Robert Stern.
Q. What nuclear programs did you work with while you held this position?
A. The office of nuclear waste



isolation was one of them, where I assisted in the development and the review of the generic environmental impact statement on commercially generated wastes. There were also other programs I worked with related to field activities at DOE sites.
Q. How long did you work in this position or this office of environment?
A. Till approximately 1980. I don't remember the specific date.
Q. And then what was your next position at DOE?
A. My next position at DOE was working in the office of conservation and renewable energy where we were responsible for the development of energy from municipal waste.
Q. I have to apologize for my lack of knowledge about energy, but -- and waste, but what is municipal waste?
A. Municipal waste is what you would typically throw away in your garbage that was picked up every couple of days.



Q. And what were your responsibilities with regard to municipal waste?
A. My responsibilities had to do with development, managing -- let's say managing departmental laboratory work, which looked at thermochemical processes to take municipal waste and extract either heat or usable distillates that could be used as a fuel for different substances, for different end uses.
Q. And how long did you hold this position?
A. Oh, I held that position until about 1985, various positions in that area.
Q. Did you during this period, the 1980 to 1985 period, have any participation or relationship with the drafting of the standard contract?
A. No, I did not.
Q. Do you have an understanding of the term standard contract as I used that?
A. I do have an understanding.
Q. What did you do in 1985?



A. 1985, I joined the Office of Civilian Radioactive Waste Management.
Q. And what position did you assume in that office at that time?
A. It was a position in the monitored retrievable storage team.
Q. If I use the term OCRWM to refer to the Office of Civilian Radioactive Waste Management, would you understand what I meant?
A. Yes, I would.
Q. And if I use the term MRS to refer to monitored retrievable storage, would you understand what I meant?
A. Yes, I would.
Q. I think I'll use those terms as we go forward.
A. That's fine.
Q. And what were your functions as part of the MRS team?
A. Initially, it was to develop the needs and feasibility analysis that was a major component of the department's proposal to the

Congress on monitored retrievable storage.
Q. And did your tasks or responsibilities change over time?
A. They evolved to where I was heading the team for a period of time while my direct supervisor was off on other duties.
Q. And who was that?
A. That was James Carlson.
Q. How long did you participate in the MRS team?
A. Approximately 3 years.
Q. Would it be correct to say that you were on this team from 1985 to 1988, approximately?
A. Approximately, yes.
Q. Did you change positions or responsibilities in 1988, approximately?
A. Yes, I did.
Q. And what happened at that time?
A. The office was reorganized, and I was reorganized into a systems integration group.
Q. What does, systems integration,

21

mean?
A. Within the context of the program, it's the group that looks across all 3 major functional areas of the program, waste acceptance, transportation, and disposal, or in that case, there was another function, which was storage, and does cross-cutting analyses to look at efficiencies and effective ways to implement the program.
Q. You mentioned at that time there was a fourth storage.
Is there no longer a fourth component to the waste management system?
A. With the passage of the 1987 amendments act, which null and voided the department's siting proposal of the MRS facility, that had a major impact on future storage-related activities.
However, they remained at a relatively low level up until the time of the development of various facility designs to support legislation that was being considered in

22

Congress on interim storage.
Q. And what about currently?
Is there still a storage element or sector within the program?
A. No, there is not.
Q. When you refer to a waste acceptance portion of the program, and in fact, I don't want to put words in your mouth, what is the term that DOE or OCRWM uses when it talks about the 3 parts, sectors, divisions?
What do they call it within the program?
MR. MILLER: Objection, vague.
But go ahead if you understand.
BY MS. HEWITT:
Q. I don't know what you said when you said that within the program there are 3 -- or 3, used to be 4, and I didn't know whether you said parts or divisions or sectors or -- I don't know what the term is.
I'd like to use the correct term.
A. There are several ways that --

23

several interpretations. I think that the -- we refer to it primarily as functions, the acceptance function, the transportation function, and the disposal function.
BY MS. HEWITT:
Q. Thank you very much.
I always like to be correct.
If you could briefly describe for me what OCRWM views as the waste acceptance function under the program.
A. Briefly, it's interaction with utilities and management of the standard contract with utilities.
Q. And currently, is there a person that is responsible or a leader or supervisor of the waste acceptance function?
A. Yes, there is.
Q. And who is that?
A. It's myself.
Q. Oh.
Could you describe what OCRWM regards as the transportation function within the

24

program?
A. Currently, the definition of the transportation function encompasses the development of equipment and capability to move high-level waste materials from the standard contract holders and DOE sites.
In addition to that, that program is also -- that function is also responsible for the development of infrastructure within the state of Nevada, specifically a rail spur to the Yucca Mountain site.
Q. You mentioned, to move high-level waste.
Is that function also responsible for moving spent nuclear fuel?
A. Yes.
Q. And who was in charge of that function?
A. Director of the office of national transportation is Mr. Gary Lanthrum, L-A-N-T-H-R-U-M.
Q. And if you'd be kind enough to



describe what the disposal function covers within the program.
A. Simplistically, the disposal function is responsible for receiving spent fuel and high-level waste materials from the transportation function at the disposal site preparing it for disposal and emplacing it for disposal, and eventually closing the site.
Q. And who at DOE is in charge of that function?
A. The deputy director of the -- I can't remember the specific title -- the deputy director responsible for the Yucca Mountain project, deputy director of OCRWM, is John Arthur.
Q. Now, is there a separate individual or office that is in charge of ensuring that these 3 functions work together well as a system?
A. Yes, there is.
Q. And what is that office or person?
A. That person manages the office of systems analysis and strategy development.



Q. And is that office also within OCRWM?
A. Yes, it is.
Q. And who is in charge of that office?
A. I am.
Q. Okay. Back to 1988.
When you started in the systems integration group, was the systems integration group similar to the systems analysis and strategy development office that you're currently heading right now?
A. It was a more narrowly defined office. It wasn't an office. It was a branch.
Q. M-hm.
A. So it had similar responsibilities, fewer staff, lesser resources.
Q. How long did you work for the systems integration group?
A. About 3 months.
Q. Oh.
What did you do for those 3 months?
A. We initiated an effort to do a



programwide system study that addressed a variety of issues that were being raised by the monitored retrievable storage commission that had been appointed by Congress.
Q. What happened after 3 months?
A. After 3 months I was promoted to take over the transportation function of the program.
Q. So this still would have been in 1988?
A. Approximately.
Q. Approximately.
And how long were you working on the transportation function of the program?
A. Approximately 3 years.
Q. So until approximately 1991?
A. About.
Q. And what was occurring in the transportation function between 1988 and 1991?
A. There were several initiatives that that branch had under way, the most visible of which was the development of spent fuel

Q. Well, what happened to that effort?
A. Due to budget restrictions, we -- I had to downscope the program and reduce the amount of designs that we were developing. When I left the program, we were down to one primary rail cask and one backup rail cask design and one primary truck cask and one backup truck cask design.
Q. Did you work with contractors or subcontractors in developing the cask design?
A. Cask contractors were under contract to the department for the development of the designs.
Q. And who were they at that time?
A. At the time that I downscoped the program?
Q. At the time that you were working on the development of the design.
A. There were 5 initial contractors for the rail casks. It was Nupac, N-U-P-A-C, NAC Corporation -- Nuclear Assurance Corporation -- and B and W, Babcock & Wilcox. B and W.

33

I'm sorry.
Babcock & Wilson. Make it simple.
Q. I think it's Wilcox.
But B and W is the same.
A. Right.
Q. I think you said there were 5.
A. Correct.
The 2 truck contractors -- I haven't thought about these in a long time.
Q. Your memory is admirable.
A. -- were General Atomics Corporation and Westinghouse Corporation.
Q. And then when you downscoped the program, did you keep 2 of those designs on board or on the shelf, so to speak?
MR. MILLER: Objection, compound.
Go ahead.
A. As I mentioned earlier, we kept one primary design and one backup design for both truck and rail.
BY MS. HEWITT:
Q. And which of those designs did you

34

maintain?
A. We maintained the B and W design and the NAC design as a backup for the rail, and we maintained the General Atomics design for the truck with a backup of the Westinghouse design.
Q. Were these designs ever discussed with utilities or otherwise made public?
A. During the time period which I managed that program, there were multiple occasions where we briefed the public industry on the progress of the effort.
Q. To your knowledge, has anything happened to advance the progress of those designs within DOE?
A. My -- to my knowledge, only one design was eventually completed, which was the General Atomics truck cask design, which was also turned over to them for completion. And the government does not hold any rights to that design any further as far as I know. The other design efforts were terminated.
Q. Do you know whether DOE ever

35

authorized General Atomics to go ahead and manufacture such a cask according to that design?
A. To my knowledge, they have never requested or funded General Atomics to construct a cask according to that design.
Q. Do you know whether General Atomics has manufactured such a cask on its own nickel?
A. I'm unaware that they have.
Q. What did you do in 1991?
A. In 1991, I was transferred to a different office within the program to work on strategic planning-related activities.
Q. What is strategic planning within OCRWM?
A. Essentially long-range vision for the program and evaluating future contingency situations.
Q. In this capacity, did you have occasion to address the contingency of whether or not DOE could take spent nuclear fuel by 1998?
A. To my recollection, we did not address that specific question.

36

Q. What kind of questions did you address?
A. Looking at innovative ways to implement the program in the near term and the long term.
Q. Such as?
A. Redefinition of interpretation of what the Nuclear Waste Policy Act says in certain areas.
Q. For example?
A. Whether given the requirements of the act that the department is required to demonstrate disposal or demonstrate a capability to dispose of materials.
Q. Were there any other issues under the standard contract similar to that that you can recall that you addressed or considered while you were in that office?
A. I didn't think that was an issue under the standard contract that I just mentioned.
Q. Oh, I'm sorry.



A. We did not address issues related to the standard contract. That was for a different area of the program.
Q. I'm sorry.
I didn't mean to mischaracterize your testimony.
A. That's fine.
Q. To clarify, what area of the program did that refer to?
A. Those individuals who worked in the waste acceptance function of the program.
Q. Well, were there other issues like that that you considered that you can recall at this time?
A. Innovative ways to find potential host sites for high-level waste storage or disposal facilities.
Q. Anything else?
A. I can't recall others at this point.
Q. How long were you in this office?
A. Good question.
I was in that office for



approximately I'd say about 2 years.
Q. During this time, did you ever have the opportunity or occasion to address issues that arise under the standard contract?
A. Not that I recall.
Q. During this time, did you ever have occasion or the opportunity to address issues related to the annual capacity reports?
A. Not that I recall.
Q. During this time, did you ever have the opportunity or occasion to address issues related to delivery commitment schedules?
A. Not that I recall.
Q. What did you do in 1992 or 1993?
A. In that time frame, I believe I was -- I became the director of a division that dealt with regulatory coordination activities related to the department's interactions with Nuclear Regulatory Commission.
Q. How long did you hold this position?
A. Approximately a year, year and a half.



Q. You're killing me here.
A. It gets worse.
(Discussion off the record.)
BY MS. HEWITT:
Q. What kind of interactions was DOE having with NRC?
A. To my recollection, at that period of time, the department was interacting with commission staff on issues related to site characterization at Yucca Mountain primarily.
Q. What kind of issues were coming up in that regard?
Were there any major ones that you addressed during your time as director?
MR. MILLER: Objection, vague.
But go ahead if you can answer.
A. I can't remember specifics at this point.
BY MS. HEWITT:
Q. Okay. What happened after you were director of that office, division, whatever?
A. After I was there for about a year

to a year and a half, I was transferred to another position called the planning division, which was a division of staff that directly supported the director of the program, and policy making, strategic planning activities.
Q. So you mentioned that you were supporting the director of the program.
Who was that at this time?
A. At that time, it was Daniel Dreyfus.
Q. Okay. And what were your responsibilities in this office?
A. Simplistically, to make sure that the director had all the information that he needed in order to carry out the functions of his responsibilities.
Q. Was this an SES position?
A. No, it was not.
Q. Do you know what I mean when I say, SES?
For the record, SES means senior executive service; is that right?
A. Correct.



(Discussion off the record.)
BY MS. HEWITT:
Q. How long were you in this division, position?
A. I headed that division for approximately 2 years.
Q. When you were in that position, did you have occasion to become familiar with the civilian radioactive waste management program plan that was issued in December of 1994?
A. Yes, I did.
Q. Did you have any responsibility in drafting it?
A. I managed the effort that produced the document, yes.
Q. When you said you managed the effort, what exactly does that mean?
A. That the staff underneath my direct supervision and with contractor support developed the document, and I supervised and managed the activity.
Q. Did your office produce the



document?
A. It was a publication of the program, not at my specific office.
Q. What I'm trying to get at is: Was the program drafted by the staff in your office or one of the other functions within OCRWM?
A. There was participation from all elements of the program in the drafting of the document.
Q. What office had the responsibility for pulling all that together and producing the document?
A. As I remember, my division at that time did.
Q. Well, what did you do in 1996?
I think we're up to 1996.
Do you recall making a position change around that time?
A. Yes.
I was reorganized into heading another division, which was entitled, storage and energy technology -- or storage and technology



division, as I remember. Yeah.
Q. And you were director of this division?
A. Yes, I was.
Q. And what did this division do?
A. Its primary function was to develop a topical safety analysis report on a centralized interim storage facility that could be implemented should the Congress give the department authorization to -- and a site upon which to build that facility.
Q. My understanding is that Congress never appropriated sufficient funds to do so; is that correct?
A. Congress never passed legislation authorizing the development of such a facility.
Q. How long were you in this position?
A. Roughly about a year and a half to 2 years.
Q. So around 1998, approximately, you took on another position; is that correct?
A. Correct.

Q. And what was that?
A. I was -- well, the office was reorganized, as I remember. The division which I was heading was abolished, and I was transferred to the office -- well, I was -- I became a liaison with the Yucca Mountain project residing in Washington, D.C. My direct supervisor was the project manager of the Yucca Mountain project.
Q. And who was that at the time?
A. At that time, it was Dr. Russ Dyer, D-Y-E-R.
Q. And how long did you function as a liaison with Yucca Mountain?
A. Up until October of 2002.
Q. Oh. A healthy 4 years almost.
So what did you do as liaison?
A. I was responsible for making sure that major products that were produced by the Yucca Mountain project were coordinated and approved through DOE headquarters.
Q. You used the term products.
A. Correct.

45

Q. What do you mean, products?
What do you mean by the term products?
A. By, products, major documents.
I was also responsible for management of a variety of technical issues from a policy level for the project.
Q. Can you give me some examples on some of the major products that Yucca Mountain produced and that you had responsibility to oversee or review during that time?
A. Yes.
Q. Oh, good.
Thank you.
Would you go ahead and do so, please.
A. Certainly.
First of which was the viability assessment that was directed by Congress to be submitted in 1998. The other major products were managing the revisions -- or I should say, managing the regulatory process that ended in the

46

issuance of 10 CFR, part 963, which were the site suitability guidelines that were finalized in late 2001.
In addition to that, I was also responsible for making sure that all site recommendation documents that were a part of the secretary's recommendation to the president were acceptable to senior policymakers within the department.
Q. That's quite impressive.
Anything else?
A. There's a lot more, but the question is, how much do you want me to go into detail?
Q. I obviously don't want minutiae. I confess that I am not familiar with everything that was produced and certainly not familiar with these documents.
In your mind, are those the major things that you addressed during those 4 years?
A. Those are the highlights.
Q. What happened in October 2002?
A. In October 2002, the current

47

director of the office, Dr. Margaret Chu, reorganized, and I assumed on an acting basis the -- being the director of the office of systems analysis and strategy development.
Q. And I take it that you have assumed that position since 2002 until today?
A. It was on an acting basis until approximately August of last year when I was then made permanent in that position.
Q. Congratulations.
A. Thank you.
Q. I think.
And in this position, to whom do you directly report?
A. To the deputy director of the office of program development -- strategy and program development.
Q. And who would that be?
A. Mr. Theodore Garrish.
Q. And who does he report to?
A. He reports to the director of OCRWM, Dr. Margaret Chu.

48

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
---------------------------------x
:
INDIANA MICHIGAN POWER COMPANY, :
:
Plaintiff, :
:
v. : No. 98-486C
:
THE UNITED STATES, :
:
Defendant. :
---------------------------------:
COMMONWEALTH EDISON COMPANY, :
:
Plaintiff, :
:
v. : No. 98-621C
:
THE UNITED STATES, : Volume II
:
Defendant. :



---------------------------------x
Washington, D.C.
Thursday, February 19, 2004
Continued Deposition of

CHRISTOPHER ALEXANDER KOUTS
a witness, called for continued examination by counsel for Plaintiff Indiana Michigan, pursuant to notice and agreement of counsel, beginning at approximately 10:02 a.m., at the law offices of Shaw Pittman, 2300 N Street, Northwest, Washington, D.C., before Shari R. Broussard of Capital Reporting Company, notary public in and for the District of Columbia, when were present on behalf of the respective parties:

APPEARANCES:
On behalf of Plaintiff INDIANA MICHIGAN:
DEVON E. HEWITT, ESQUIRE
Shaw Pittman
1650 Tysons Boulevard
McLean, Virginia 22102-4859



(703) 770-7962
On behalf of Plaintiff COMMONWEALTH EDISON:

DON CASSLING, ESQUIRE
Jenner & Block, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
On behalf of Defendant:

R. ALAN MILLER, ESQUIRE
U.S. Department of Justice
Civil Division
1100 L Street, Northwest
Washington, D.C. 20530
(202) 616-0383
* * * * *

C O N T E N T S

EXAMINATION BY: PAGE
Counsel for Indiana Michigan 266
Counsel for Commonwealth Edison 363
KOUTS DEPOSITION EXHIBITS: * PAGE



No. 5 - Letter from Ekman to Hewitt, 2/12/04 267

No. 6 - Yucca Mountain Project Licensing Strategy 273
No. 7 - Spent Nuclear Fuel & High Level Waste Disposal Decision Plan, 8/03 280
No. 8 - Alternative Facility Design Report Review 317
No. 9 - Defendant's Initial Disclosures 363

No. 10 - Memo from Carlson to Barrett, 1/8/98 384

No. 11 - e-mail from Benz to Pollog, 3/18/02 427

No. 12 - e-mail from Benz to Pollog, 3/18/02 430

No. 13 - DOW OCRWM Comments on Transportation Plan (Confidential/Under Separate Cover) 440
No. 14 - 2001 Design Basis Waste Input Report for License Application 462

KOUTS DEPOSITION EXHIBITS: * PAGE
No. 15 - Contract for Disposal of Spent
Nuclear Fuel 473
No. 16 - Letter from Bauer to Hall, 9/13/85 489

No. 17 - e-mail from Senderling to Barrett,
12/11/00 497
DOCUMENTS REQUESTED TO BE PRODUCED: PAGE
Bechtel Study 406
Operational Waste Stream Assumption for
TSLCC Estimates Document predating 9/00
(Confidential/Under Separate Cover) 456
(*Exhibits attached to transcript.)
* * * * *
P R O C E E D I N G S
WHEREUPON,
CHRISTOPHER ALEXANDER KOUTS
called as a witness, and having been first duly sworn, was examined and testified as follows:
RESUMED EXAMINATION BY COUNSEL FOR
PLAINTIFF INDIANA MICHIGAN
BY MS. HEWITT:



Q Welcome back, Mr. Kouts. We are continuing your deposition and I'm going to remind you that you are still under oath, to tell the truth to the best of your ability, and I'm not going to repeat my instructions I gave you originally. I trust you remember them and will of course stop me if you don't understand a question and stop me if you would like a break, et cetera. You recall all those instructions I take it?
A Yes.
Q I want to ask you if there's any reason you feel you can't testify today. Are you feeling okay, everything is fine?
A I'm fine.
Q Before we start questioning I just want to state for the record that in the time between when we last took your deposition there have been some conversations between counsel for Indiana Michigan and the Department of Justice regarding the status of your deposition and, in particular, your ability to speak on behalf of the Department of Energy with respect to the issue of whether or



not the Department of Energy will be able to take spent nuclear fuel by 2010. And in that regard I have a letter sent to me by John Ekeman on behalf of the Department of Energy that memorializes a conversation that he and I had on February 11th regarding this topic and I'd like to just introduce that as an exhibit to this deposition if I may.
MR. MILLER: It's your deposition.
(Kouts Exhibit Number 5
was marked for identification.)
BY MS. HEWITT:
Q And you can take a look at it. I don't know if you've seen that or may have talked with your counsel about it, but my understanding is that pursuant to our conversation and pursuant to this letter the Department of Justice has agreed to withdraw some objections that they had earlier made with regard to some of your answers to the effect that you did not speak for DOE on these matters. And I will ask you some questions continuing on the topic of whether or not DOE will be able to take spent nuclear fuel from commercial utilities by



2010 and my understanding is that unless I ask you specifically about your personal opinion, that you will be answering on behalf of DOE with respect to those questions. Do you understand that?
A Yes.
Q Also in between your last deposition and the last day of your deposition and today the government has produced a number of documents that I requested, some of which you referred to during your last deposition and some of which refer to some items that you discussed during your last deposition.
One of those documents that you referred to was something called a disposal decision plan. Do you recall that document or plan that you referred to?
A Yes.
Q In the production that was provided to us on actually February 14th, this past Saturday, the government provided to us several charts and I will represent that they looked like a gant chart. Do you know what the term "gant chart" is?

A Because the activity -- the amount of activity of spent nuclear fuel is much higher than greater than class C.
Q Any other reasons?
A No. It's a categorization essentially used by the commission, so that would be a, you know, a -- my sense is that the definition of it is covered in NRC regulations.
Q Turn to the next topic. It refers to failed and/or nonstandard fuel. Again to make sure that we're talking about the same thing as we talk this afternoon, when you use the term "failed fuel," what do you understand that term to mean?
A Fuel in which the cladding -- spent fuel in which the cladding has defects and the amount of the defect is -- can vary.
Q Would you consider failed fuel to be fuel that has greater than pinhole defects in the cladding, for example?
A I don't know. I don't know the specifics of that. I really couldn't say.
Q Do you consider the term "damaged fuel,"

370

as defined by the NRC, to be equivalent to failed fuel?
MR. MILLER: Calls for a regulatory interpretation at best, but go ahead if you know.
THE WITNESS: I think the NRC has a view as to what failed fuel is. I don't know that the department has commented on that or has taken a position as to what the specifics of failed fuel are.
BY MR. CASSLING:
Q And when you use the term "nonstandard fuel," what do you understand that term to mean?
A Other than bare fuel, bare spent fuel, as identified in the standard contract.
Q So anything other than bare spent fuel would be nonstandard fuel?
A Right, that -- that is not failed. Let's put it that way.
Q And first on the topic of MESCS, what does M-E-S-C-S stand for?
A Multi-element sealed canisters.
Q And how does a MESC differ from an MPC?

371

MR. MILLER: Assumes facts not in evidence, foundation, but go ahead.
THE WITNESS: Generically an MPC could be a MESC, but in industry usage my understanding is that MESCS can be either used for storage on rail or for storage on transport. An MPC, multipurpose canister, would be used for storage, transport and disposal.
BY MR. CASSLING:
Q Would you make the same distinction between a MESC and a dual-purpose canister, that is, one that's used just for storage and transport?
A I don't know that there is a distinction. They could -- it's an encompassing term that could incorporate that.
Q So a MESC could be used for storage, correct?
A Correct, yes.
Q And a MESC could be used for transportation as well?
A Yes.
Q Could a MESC also be used for disposal?

372

A If it was determined that it had the capability of being part of the disposal package, yes.
Q When you use the term "cooling time issues," what is your understanding of what that term means or what it refers to?
A In relation to spent nuclear fuel?
Q Yes.
A It has to do with the amount of time that a -- an assembly after it has been used in the reactor has been outside of the reactor in a cooling state, usually in a spent fuel pool.
Q If you look, the government has also identified Mr. Zabransky, Mr. Pollog and Mr. Carlson and Mr. Williams as all having discoverable information regarding MESCS.
Among those individuals, including yourself, which individual has the greatest familiarity with MESCS?
A I'd say it would probably be between Mr. Zabransky and Mr. Pollog.
Q On the issue of failed and/or nonstandard

373

answer if you know.
THE WITNESS: For the statutory limit --
BY MR. CASSLING:
Q Right.
A -- of 70,000 metric tons there will be on the order of 10,000 waste packages.
Q Now, all of our prior discussion has assumed that the NRC will grant your application with no changes.
Now, if the NRC insists on changes to your cask design, you're going to have to push back, first of all, the time in which you start fabrication, correct, until you get a certificate?
A It all depends on the changes that the NRC makes. I would really have to see exactly what the conditions of the license were and whether or not there were any substantial changes that the NRC anticipated.
Q Well, any change that required a design change would require you to wait to begin fabrication until you knew what that design change is, correct?

430

MR. MILLER: Calls for speculation, but go ahead if you know.
THE WITNESS: Some design changes are of less impact than others, if that's what you're referring to.
BY MR. CASSLING:
Q Any design change that would affect the fabrication would require you to delay fabrication until you knew what that design change is?
A Again, that depends.
Q What does that depend on?
A The type of design change. If it's not changing the -- the size of the cylinder and the basic materials or their thicknesses, then certainly the cylinders can be procured. If the -- if a lid or one of the three lids on the waste package has a minor change to it, then that's something that could be accommodated in the fabrication process without any problem. It all depends on -- as to what the NRC's judgment is and comments are on its ultimate approval.
MR. CASSLING: Mark this as the next one,

431

please.
(Kouts Exhibit Number 11 was marked for identification.)
BY MR. CASSLING:
Q What I've handed you as Kouts Exhibit 11 is an e-mail, the first page is an e-mail from Ed Benz to Tom Pollog dated March 18th, 2002 and the subject is "MPC Concept Information Document" and attached to it is a document entitled "Multipurpose Canister for Commercial SNF Concept Information" and its Revision 00. It's dated February 2002.
Now, first of all, have you seen this e-mail before or the attachment?
A No.
Q Now, the date of February 2002 is some years after the date that the department decided to discontinue its involvement in creating an MPC, correct?
A Yes.
Q And this was created by the U.S. Department of Energy if you look at the second page of the document, the attachment, lower right-hand

432

corner.
A I don't know that this was ever issued by the department.
Q But somebody wrote this document and that somebody was somebody at the U.S. Department of Energy, correct?
A Not necessarily.
Q Who would be drafting a document that purports to be coming from the U.S. Department of Energy that is not connected with the Department of Energy other than its contractors, for example?
A This -- this e-mail is sent by one of the department's contractors. I would assume it's being drafted by a contractor.
Q So to revise my question to include contractors, it was drafted either by the Department of Energy or one of its contractors, correct?
MR. MILLER: Calls for speculation. Go ahead.
THE WITNESS: From looking at this e-mail I would presume it was prepared by the contractor,

433

not by the Department of Energy employee.
BY MR. CASSLING:
Q I'm sorry. I didn't mean to interrupt.
It was developed by a contractor employed by the Department of Energy, correct?
A It appears that way, yes.
Q If the Department of Energy has ceased its support of development of an MCP, why does it have a contractor developing a document like this?
A I don't know.
Q Do you know what it was used for?
A No, I don't.
Q And you've never discussed it with Mr. Benz or Mr. Pollog or Mr. Zabransky?
A I have not seen it until you handed it to me right now.
Q And never heard of it before?
A That's correct.
Q Okay.
A It also predated the time that I began to manage this office, so -- I didn't begin to manage this office or take over on an active basis until

434

August of 2002.
Q What did you do at the department prior to that time?
A I worked as a liaison to the Yucca Mountain project. It's in my testimony that I gave earlier.
Q But whatever your position was at this time, you never have seen this or heard of it before?
A That's correct.
MR. CASSLING: Can we go off the record for just a second?
(Discussion off the record)
(Kouts Exhibit Number 12 was marked for identification.)
BY MR. CASSLING:
Q Kouts Number 12, the first page is an e-mail from Ed Benz to Tom Pollog and Dave Zabransky among others. It's dated March 18th, 2002. The subject is "Contract Changes to Implement Canister Acceptance" and attached to it is something that states that it's the standard

435

contract for disposal of spent nuclear fuel, but it's the e-mail to which its attached that makes clear this is really a revision being discussed by DOE.
What I'd like you to do with that identification is first read the e-mail and then you'll see that the e-mail refers to a section of the contract. If you could also read that section of the contract to yourself.
A (Complying.)
Q Have you read through those now?
A Yes.
Q First of all, have you seen this e-mail before?
A No.
Q Have you ever seen the attachment?
A No.
Q Do you know why this modified standard contract document was created?
A No.
Q Do you know whether the DOE is still working on amending the standard contract to allow

436

for acceptance of spent nuclear fuel in canisters?
A To my knowledge the department is not.
Q Have you ever had any discussions with the individuals listed on this e-mail regarding this particular proposal that's contained in Article VI.A.2(c), which begins on Bates numbered page CTR116 0267 of this exhibit?
A No.
Q As director of office of systems analysis and strategy development, which of these individuals on this e-mail work for you directly or indirectly?
A Dave Zabransky and Tom Pollog are federal employees, they are on my staff. Ed Benz, Bob Burgoyne, Connie Barton are contractors which support my office.
Q And refresh my recollection, I apologize, but you testified just a little bit ago you began your current position as director at the office of systems analysis at what time?
A The -- the program was reorganized and as of August 2002 I assumed responsibilities in that

437

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC )
COMPANY, CONNECTICUT YANKEE ) Case Nos.:
ATOMIC POWER COMPANY, and MAINE ) 98-126C
YANKEE ATOMIC POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
V. )
THE UNITED STATES, )
Defendant. )

Courtroom Number 5

National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Monday, August 2, 2004

VOLUME 15

The parties met, pursuant to the notice of the Judge, at 10:03 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
CATHERINE R. BAUMER, ESQ.
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY a
CONNECTICUT YANKEE ATOMIC POWER COMPANY
MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042



APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPA
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

ON BEHALF OF THE DEFENDANT:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

** Index appears at the end of transcript **



P R O C E E D I N G S

MR. STOUCK: Your Honor.
THE COURT: Yes.
MR. STOUCK: Good morning.
THE COURT: Good morning.
MR. STOUCK: I believe I owe the Court and Mr. Lester a response on whether our case is done. It was left sort of dangling on Thursday. And I would like to address that if I may.
THE COURT: Sure.
MR. STOUCK: Okay. And, frankly, it provides an opportunity, I think, to address in a more comprehensive way -- I think we have this 1726 question.
THE COURT: Oh, fine.
MR. STOUCK: And I would like to do that. It's come up most days but it's been a little piecemeal. I want to make sure we've not been whipsawed, on the one hand under a pretrial process that encourages dealing with a lot of details out of court, and then we get to court and then we are told that we really need to have more witnesses here.
So if I could just address our position on this --
THE COURT: Sure.

MR. LESTER: Your Honor, also, I guess, we are prepared to begin our case. And we would start that with a written motion for judgment based on partial findings. This motion is based largely on the exchanges theory that the Yankees had presented as their sole basis upon which they depend to support their damages claim.

Our motion is geared towards the speculative nature of the hypothetical model that Mr. Graves presented and its failure to rely upon contemporaneous documents to support the theories that Mr. Graves announced. And the fact that some of his theories are in fact in conflict with some of the contemporaneous records.

We in our written motion identified case law that supports that and tried to cite some of the transcripts. With the Court's permission we can go ahead and file it electronically. But I have copies of the electronic signatures. And with the Court's permission if I hand the Court these copies, I would ask that it be deemed admitted and that the later electronic filing today will count back to this point in time if that's necessary.

THE COURT: Sure.

MR. LESTER: It's nice and short, Your



Honor.

THE COURT: Okay. I'll defer a ruling on this, get an objection from Plaintiff, which I assume I will, and I'll defer ruling on it for the time being. And do you have a witness that you wish to present?

MR. LESTER: We do, Your Honor. Before we start, though, if we could take just a short five-minute break.

THE COURT: Sure.

MR. LESTER: A short 10-minute break I'm told. But our first witness will be Christopher Kouts from the Department of Energy.

THE COURT: Okay. A little bit after quarter of then.

MR. LESTER: Thank you, Your Honor.

(Whereupon, a recess was taken at 11:37 a.m., and the proceedings reconvened at 11:49 a.m.)

MS. SULLIVAN: Yes, Your Honor, the government calls its first witness, Christopher Kouts.

THE COURT: Okay.

Whereupon,

CHRISTOPHER KOUTS

was called as a witness, and, having first been duly



sworn, was examined and testified as follows:

MS. SULLIVAN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q Good morning, Mr. Kouts. Where are you currently employed?

A I'm currently employed with the Office of Civilian Radioactive Waste Management at the Department of Energy.

Q What is your current position at DOE?

A I'm director of the office of systems analysis and strategy development.

Q What are your responsibilities in your current position?

A Briefly, my office is responsible for analytical activities to determine and to evaluate how the waste management system is being deployed, in other words how the waste acceptance component of the system, how the transportation component and how the repository component can act efficiently.

I also have responsibility for the waste acceptance component, the management of the standard contract with utilities. And I also have safeguards and securities policy, technical baseline management, and a variety of other activities.



Q So do your responsibilities include planning for waste acceptance from the utilities pursuant to the standard contract?

A Yes, they do.

Q How long have you held your current position?

A I was appointed to my current position on an acting basis in October of 2002, and on a permanent basis in July of last year.

Q To whom do you report?

A I report to the deputy director, what we call the deputy director of the east, who is responsible for strategy program development, Mr. Theodore Garrish.

Q And to whom does Mr. Garrish report?

A Mr. Garrish reports to Dr. Margaret Chu, who is the current director of the office.

Q And to whom does Dr. Chu report?

A Dr. Chu reports to the Undersecretary and the Secretary of Energy.

Q When did you first join the Office of Civilian Radioactive Waste Management?

A In the summer of 1985.

Q Would you briefly summarize the positions that you've held within the Office of Civilian

Radioactive Waste Management.
A Okay. I'll attempt to. And I'll try to be brief. My first position was to work on the MRS team, which was a group that was essentially formed to prepare the proposal to Congress on monitored retrievable storage under section 14 of the Nuclear Waste Policy Act.
Then after about 3 years in that position, I moved on and was appointed -- I was in a systems engineering group for a short period of time, a systems integration group. And then I was appointed on an acting basis and on a permanent basis head of the transportation program for the program.
That's for spent fuel and high-level waste and the activities associated with cask development and so forth.
After about 3 years in that position, I moved on to work in strategic planning and contingency planning for the program for several years.
After that, I was appointed director of an office responsible for interactions with the Nuclear Regulatory Commission, all regulatory interactions with them and other regulatory agencies, as well as other duties.
After several years in that position, I was



appointed director of a division that basically supported our front office at the time and the director at that time, who was Dr. Daniel Dreyfus. After several years in that position, I then moved on to a division that developed a topical safety analysis report for a centralized interim storage facility which was intended to be responsive to interim storage legislation that was moving through Congress.
After several years in that position, I then moved on to become a liaison between the Yucca Mountain project, our disposal project, if you will, and headquarters. I also worked for the project director of the Yucca Mountain office and also the director of the overall program.
And working essentially to make sure that major technical and policy products that were produced by the program and by the project were acceptable to the Department, senior management of the Department at the Undersecretary and Secretary level. First of which was the viability assessment that was submitted to Congress in 1998. After that point in time, I worked on site recommendation activities until they were concluded with these, with the President's approval, with the joint resolution of Congress.
Shortly after that I was appointed on an



active basis to this position.
Q Thank you. Would you briefly summarize your educational background for the Court?
A I hold a bachelor's and master's degree from George Washington University. I'm also a licensed professional engineer.
Q Thank you. Mr. Kouts, who is the current management and operations contractor for the Office of Civilian Radioactive Wast Management?
A Bechtel SAIC Corporation.
Q And is Bechtel SAIC Corporation commonly referred to as BSC?
A That is correct.
Q What are the responsibilities of BSC?
A Essentially, they are an operating contractor. We have a variety of activities. Most of our activities are managed by Bechtel SAIC. And they do anything from run the Nevada test site for us, or activities on the Nevada test site to help us assist in preparing a license application to the NRC at this time, as well as other staff functions.
Q Do you use the services of BSC in the work that you do?
A Yes, I do.
Q Is JAI a subcontractor to BSC?



A Yes, they are.
Q Do you use the services of JAI in the work that you do?
A Yes, we do.
Q And how do BSC and JAI help you in the work that you do?
A They conduct studies. In JAI's case in the waste acceptance area of the program.
Q How do you go about assigning work to BSC or JAI for the work that they do?
A Essentially we develop a mutually agreeable annual work plan prior to the beginning of each fiscal year which covers the general areas of their interest or their involvement, if you will, in my area, for instance. Then if there are specific activities that need to be done that seem to fall outside of the work plan, or in terms of what we want to have additional definition, we issue a technical direction letter giving specific instructions as to what we want them to do.
Q Are BSC personnel responsible for supervising their own work?
A Yes, they are.
Q Does BSC or JAI prepare reports in the work that they do for you?

254?
MS. SULLIVAN: May I approach, Your Honor?
THE COURT: Sure. Yes.
MS. SULLIVAN: Your Honor, would you like a copy?
THE COURT: I can use this.
MS. SULLIVAN: Okay.
BY MS. SULLIVAN:
Q Mr. Kouts, what's been put up on the screen and I provided you a paper copy of has been marked as Plaintiffs' Exhibit 254. Do you recognize this document?
A Yes, I do.
Q Would you explain to the Court what this document is.
A This is a, I believe, revision 5 of our parent or our main technical requirements document. It's typically a document that the director of the program owns, and it lays out the technical requirements for the program to implement.
Q And does this document contain information with regard to the design requirements of the repository?
A Yes, it does.
Q Okay. How is this document used by your



office in its waste acceptance function?
A Essentially, it gives us guidance to -- in terms of what the receipt rate of the system would be. It also gives various policy guidance to the program as a whole.
Q Is your office responsible for the preparation of this document?
A I -- yes. I manage changes to this. And I basically do that for the director of the program.
Q Could we go to page 15 of this document, please. Mr. Kouts, are you familiar with the centralized interim storage facility mentioned on this page?
A Yes, I am.
Q How are you familiar with that facility?
A As I mentioned, when I went through my history within the program, I was responsible for developing the design of a centralized interim storage facility that essentially met these requirements.
Q What type of facility did DOE plan to build as the centralized interim storage facility?
A It was a, essentially a canister handling facility that could meet the ramp-up rates identified in -- in table 3 here.
Q Okay. And the rates in table 3, do you have



an understanding as to what the source of those rates was?
A Yes.
MR. STOUCK: Your Honor, can I interpose an objection for the record here. I don't mean to interrupt unduly. But Mr. Kouts was disclosed in the government's witness list to testify about two topics. And I just want to make a record on that. And we can deal with the consequences later. The first one, DOE's plans to begin waste acceptance in 2010. The second was the fact that the Yucca Mountain repository is not being designed to accept GTCC waste.
So I just wanted to have that on the record. And, again, we can deal with questions about whether this is beyond that once we see if it ties up.
MS. SULLIVAN: Would you like me to address that, Your Honor?
THE COURT: If you wish.
MS. SULLIVAN: Or shall I just continue? Your Honor, the tables specifically in this chart are the ones that Dr. Graves or Mr. Graves relied upon. Mr. Kouts has some testimony we believe is important. So I believe it was raised in Plaintiffs' case.
And also, further questions will make clear it's tied in part to the 2010 date.



THE COURT: Okay. Go forward.
MS. SULLIVAN: Thank you, Your Honor.
BY MS. SULLIVAN:
Q Mr. Kouts, what was -- do you have an understanding what the source of the rates were for the facilities that were set forth in this document?
A Yes.
Q And what was your understanding?
A There were several bills that were winding their way through Congress that would have directed the Department, should they have been passed, to deploy a facility to essentially begin to take materials from utilities for storage purposes.
These ramp-up rates were basically rates that were contained in those bills.
Q I'm sorry. Let me just clarify. You say bills were pending in the Department. Did you mean bills pending in Congress?
A Bills pending in Congress.
Q And did you have an understanding as to what the legislation called for, generally?
A The -- the legislation went through a variety of mutations. The initial form of the legislation was for the Department to build a -- an interim storage facility or centralized interim

Q Is DOE currently -- does DOE currently have any plan for acceptance of commercial spent nuclear fuel that does not lead to the repository?
A Not to my knowledge.
Q And how likely is it in your view that Congress would provide relief from the National Environmental Policy Act and the EIS requirements for a DOE operated spent nuclear fuel storage facility?
A That's difficult to say. There have been substantial NEPA reviews already done for the Nevada test site in terms of the repository.
For me to speculate on what Congress might or might not do is very difficult to say.
Q You cannot testify how likely or unlikely it is that that relief would be granted; is that what you're saying?
A I don't have a crystal ball in terms of what Congress might do if they wanted to expedite the acceptance or the receipt, if you will, of commercial fuel.
Q So you can't testify one way or the other how likely it is or unlikely it is that Congress would give relief from the NEPA requirements for DOE operated storage facilities; is that correct?
A I don't really have a basis for speculating



on that. My sense is for the NRC review, that's clearly a requirement for all of our facilities. There might be some consideration being given to an expedited NEPA review. I think that's probably more likely than that exclusion of NRC review.
Q Excuse me for one moment. I'm looking for a document. Excuse me, again. I've got more papers here than I can keep organized.
You referred -- yeah, I was going to skip this.
MR. STOUCK: Your Honor, best laid plans. I turned to the document that we just don't have any other copies of, so I apologize for the interruption. I believe I can work around it and then come back. We're running one over from the office. Let me just take a moment to figure out how to do that.
Well, excuse me for one second. I think I can work around it for at least five or 10 minutes. Again, I apologize.
BY MR. STOUCK:
Q Mr. Kouts, you referred to legislation in the 1990s that would have required or provided for interim storage. Do you recall that?
A Yes, I do.
Q Did the Department of Energy support that



legislation?
A It's not up to the Department of Energy to support legislation. It's up to the administration at the time to support or not support the legislation. At the time, as I remember, the administration in -- the Clinton administration at that time was not supportive of those bills.
Q Okay. Let's go back to DOE first. Did the Secretary of Energy in the Clinton administration take a position on the legislation that would have provided for interim storage in the late '90s that you testified about?
A I believe the -- there were some statements made by Secretary O'Leary that -- public statements that she made that indicated that she was in favor of some kind of legislation to meet the 1998 date.
Q Did she support the legislation that you referred to that was introduced?
A I don't remember specific statements made by the Secretary. I do remember the statements of administrative policy, the SAPs, if you will, that were issued by OMB. But I quite honestly can't remember what Secretary O'Leary might have said in public or in testimony.
Q But you do remember what President Clinton's



position was?
A Yes.
Q What was that? That was that he would veto it, isn't it correct, if it passed?
A That's correct, that's correct.
Q I've got my documents. So if I may approach, Your Honor.
THE COURT: Yeah. Certainly.
MR. STOUCK: This is DX-7112. I've got two copies for the Court. I've got one copy for the witness.
BY MR. STOUCK:
Q Mr. Kouts, this decision plan is a detailed milestone compilation of how the Department of Energy plans to meet the goal of accepting commercial spent nuclear fuel by 2010; isn't that correct?
A This is a milestone dictionary that supports the plan to address that, yes.
Q Milestone dictionary. It contains dozens and dozens of interim milestones that need to be met in order for the 2010 date to hold; isn't that correct?
A Yes.
Q How long did it take to prepare this plan?
A I would say that this was August of 2003,

BY MR. STOUCK:
Q This is on page 2011, Your Honor. This is a copy of the Indiana Michigan trial transcript. And on line 2010 -- page 2010, line 21, does DOE currently plan or have the capability to take -- are you there, Mr. Kouts?
A I'm trying to get there.
Q 2010?
A 2000?
Q 2010.
A Page 2010.
Q Line 21.
A Page 2010. Line 21.
Q Are you there? Mr. Kouts, are you there?
A I'm there.
Q Question, does DOE currently plan or have the capability to take 6,000 metric tons uranium from commercial nuclear power plants in 2011?
Answer: Unless it was canistered, probably not.
That was your testimony under oath in the Indiana Michigan trial, correct?
A Well --
Q Was that your testimony under oath in the Indiana Michigan trial?



MS. SULLIVAN: Objection. Argumentative.
THE WITNESS: Maybe I'm looking at a different page.
BY MR. STOUCK:
Q Let's get an answer to that question first. Was that your testimony under oath? Then we'll find out if you want to change it.
MS. SULLIVAN: Objection. Argumentative. Badgering the witness.
THE COURT: Well, he can read it in context and then decide.
THE WITNESS: Line 21, page 2010. It says does DOE currently plan or have the capability to take 600 metric tons of uranium from commercial nuclear power plants in 2011. And it says unless it was canistered, probably not.
You know, I simply did not remember there were also transportable storage casks.
I would also hasten to the next page, page 2011, where it says it can't take 600 metric tons of uranium in 2011, correct.
And I went through a discussion of the throughput rate of the fuel handling demonstration facility, to the extent that 400 metric tons is to make waste packages.



But I also explained here there is potential for us to take bare fuel at the fuel handling facility if we're putting it in storage only and potentially we can still meet that 600 tons.
So I corrected it on the next page, if you will, that that facility could have the capability of receiving that if we're just going to storage only.
BY MR. STOUCK:
Q I want to change subjects. You understand the term failed fuel -- this is not in the transcript. This is a new subject. We're turning away from 2010. We turning away from canistered fuel. We're turning to a few other things. And I hope I can wrap it up in 10 or 15 minutes.
You understand the term failed fuel to mean fuel that requires special handling at the repository, correct?
MS. SULLIVAN: Objection. Beyond the direct.
THE COURT: That's true.
MR. STOUCK: It's metaphysical, Your Honor. Our view is there is no difference. If he says they're going to meet the 2010 date he's saying they're going to take failed fuel. Or he's not going to take failed fuel.



THE COURT: Well, in that context, in terms of the scheduling, fine, you can continue.
BY MR. STOUCK:
Q You understand the term failed fuel to mean fuel that requires special handling at the repository?
A It has other meanings in NRC, but yes, I understand that context.
Q So, according to your understanding, spent fuel that does not require special handling is not failed, according to your understanding. Is that sort of the definition as far as the repository goes?
A Well, standard in terms of the standard contract is basically bare spent fuel. That essentially would not be failed because it would require us to do special handling at the repository.
So to the extent that failed fuel means it in that sense, yes, I understand.
Q And if it doesn't require special handling, it's not failed. That's your understanding -- according to your understanding?
A If it doesn't require special handling at our facilities, yes.
Q Now, there was -- another subject again, I don't mean to -- I just want to get through some short ones here. I'm turning now to the GAO report that

litigating, you can show this to him to bring out his views. But it doesn't necessarily mean that the commissioners' views would be subject to a finding.

MR. STOUCK: Your Honor, I think the statement in this transcript, which we contend is an admission of party opponent, on page 41 is that "I fear a lot of this reading that I do is driven by lawyers rather than technical types."

And if Commissioner McGaffigan fears that, that is admissible for the proof -- for the truth of the fear. That's -- you know, I mean, so -- yeah, the people have read and Mr. Kouts has read. And if I could just move on to one subject, I'd like to put one other --

MS. SULLIVAN: Your Honor, we reserve our objection to hearsay. It's clear on the statement that Commissioner McGaffigan made there and two pages ahead, this is based on things that he read, he's making statements in an advisory committee meeting. And we reserve our objection.

THE WITNESS: Do you want me to respond to this or --

BY MR. STOUCK:

Q You can get that from your own lawyer on redirect if she so chooses. Let's take a look at



page 42. Commissioner McGaffigan again says: And we have suffered from that ever since. I think he's referring back to the -- if you read through this, to the cancellation of the MPC. And I think it's all partitioned now, and it may well be influenced more by lawyers than by technical types.

Do you see that?

A On page 42.

Q Yeah. Commissioner McGaffigan: And we have suffered from that ever since. And I think it's all partitioned now, and it may well be influenced more by lawyers than by technical types.

A I see that.

Q Are you aware of those concerns being expressed?

A Now that I read them, yes.

Q You weren't aware of those concerns prior to today?

A As I mentioned earlier, I haven't read this cover to cover. I was aware of certain statements made, but I have not reviewed it, no.

Q Have you ever prior to today heard concerns being expressed about lawyers rather than technical types having influence on the program?

A No. I have not.



Q Okay. Mr. Kouts, during the course of your employment at OCRWM, you had no responsibility at any time for administering the standard contract; isn't that right?

A That's not true. Since on an acting basis of -- as I testified earlier, as of October 2002, when I was appointed to this position, my responsibilities include management of the standard contracts.

Q Okay.

A So prior to that time, I think that statement would be correct. Subsequent to that time, it would not be correct.

Q This distinction that you testified to about -- that, as I understood it, there was some distinction that you were referring to to receipt rate and acceptance rate. Do you recall that?

A Yes.

Q When did the Department first draw that distinction?

A I believe it -- it drew it in the -- I think it was reflected in the DCS process that we went through for -- that we went through for the 1998 date.

Q For the '98 date?

A Yes.

Q Okay. Do you know if it was drawn prior to



that? I guess you had no --

A I really -- that's my surmise.

Q Because you had no responsibility for contract matters prior to 2000?

A That's correct.

Q Now if I ask you now just a few questions about GTCC, I think we can wrap it up.

MS. SULLIVAN: Your Honor, we've been going an hour and a half. Are we --

MR. STOUCK: That's fine. I've got a few questions about GTCC. If they want to break, that's fine.

THE COURT: Would you like a break at this point?

THE WITNESS: I can keep going.

MS. SULLIVAN: If the witness is fine, that's fine.

MR. STOUCK: I would be happy to do it.

THE COURT: Go ahead. If you need a break just let us know.

THE WITNESS: Okay. Thank you.

THE COURT: Sure.

BY MR. STOUCK:

Q Actually, I will take a sip of water.

A On second thought, I think a quick break

1

0001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
---------------------------------x
SOUTHERN NUCLEAR OPERATING )
COMPANY, ALABAMA POWER )
COMPANY, and GEORGIA POWER )
COMPANY )
Plaintiffs, ) No. 98-614C
v. )
THE UNITED STATES, )
Defendant. )
---------------------------------x
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
---------------------------------x
SOUTH CAROLINA ELECTRIC & GAS )
COMPANY and SOUTH CAROLINA )
PUBLIC SERVICE AUTHORITY, )
Plaintiffs, ) No. 04-0101C
v. )
THE UNITED STATES OF AMERICA, )
Defendant. )
---------------------------------x

2

Deposition of CHRISTOPHER A. KOUTS
Washington, D.C.
Monday, April 11, 2005
9:26 a.m.

Job No.: 1-53961
Pages 1 - 155
Reported By: Joan V. Cain

Deposition of CHRISTOPHER A. KOUTS, held at the law offices of:

ARNOLD & PORTER
555 Twelfth Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

Pursuant to Notice, before Joan V. Cain, Certified Court Reporter and Notary Public in and for the District of Columbia.

3

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, A
GEORGIA POWER COMPANY:
M. STANFORD BLANTON, ESQUIRE
K.C. HAIRSTON, ESQUIRE
BALCH & BINGHAM, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 226-3417

ON BEHALF OF PLAINTIFFS SOUTH CAROLINA ELECTRIC & GAS COMPANY and SOUTH CAROLINA PUBL
SERVICE AUTHORITY:
CHRISTOPHER TOMPKINS, ESQUIRE
JENNER & BLOCK LLP
One IBM Plaza
Chicago, Illinois 60611-7603
Telephone: (312) 222-9350

4

A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF DEFENDANT:
HEIDE L. HERRMANN, ESQUIRE
STEPHEN FINN, ESQUIRE
JOSHUA E. GARDNER, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION
1100 L Street, Northwest
Washington, D.C. 20530
Telephone: (202) 305-3315

CONTENTS


EXAMINATION OF CHRISTOPHER A. KOUTS PAGE

By Mr. Blanton 7, 147

By Mr. Tompkins 112

By Ms. Herrmann 150


EXHIBITS

(Attached to the Transcript.)


KOUTS DEPOSITION EXHIBITS PAGE

1 Protective Order, 4/8/05 10

2 DOE Report, July 2004 14

3 Letter from Mr. Zabransky to Mr. Cocherell, 7/28/04 31

4 Civilian Radioactive Waste Management System Requirements Document Rev 06 45

5 Letter from Mr. Zabransky to Mr. Cocherell, 12/1/04 50

6 Dr. Chu's Presentation 2/7/05 75

7 Summary of Mr. Garrish's Statement, 3/10/05 82

8 Mr. Garrish's Statement, 3/10/05 105




EXHIBITS CONTINUED

(Attached to the Transcript.)


KOUTS DEPOSITION EXHIBITS PAGE

9 30(b)(6) Notice of Deposition 112

10 Letter from Mr. Zabransky to Mr. Carden, 11/3/04 130

11 Letter from Mr. Detmer to Mr. Johnson with Attachment, 3/4/92 134

12 DOE's Supplemental Privilege Log, December 2004 137

13 Copy of Protective Order, 2/14/05 150




PROCEEDINGS

CHRISTOPHER A. KOUTS

having been sworn, testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, AND GEORGIA POWER COMPANY

BY MR. BLANTON:

Q Mr. Kouts, good morning. My name is Stan Blanton. I'm one of the lawyers representing Southern Nuclear Operating Company in the case of Southern Nuclear Operating Company, Alabama Power Company & Georgia Power Company versus United States of America.

You're here today, as I understand it, pursuant to a Rule 30(b)(6) deposition notice and a personal deposition notice we've served in that case; is that correct?

MS. HERRMANN: Let me just say, just for the record, Mr. Kouts is here today pursuant to a 30(b)(6) deposition notice. We have received an order from the court, dated April 8, 2005, regarding the government's Motion for Protective Order on the



deposition notice that Southern Nuclear served on Mr. Kouts in his individual capacity.

MR. BLANTON: Right.

MS. HERRMANN: And our understanding is that the court has granted the government's Motion for Protective Order, except to the extent that he has decided to allow questioning regarding the -- let me put this right --

MR. BLANTON: Why don't you mark that as Deposition Exhibit 1 to the deposition. We've got a copy of the order. We can make it an exhibit.

MS. HERRMANN: Great. The court talked about the start date for the repository, and so it's our understanding that the date that the Department of Energy now plans to commence SNF disposal given the time frame for the damages to be determined in this litigation keyed to 2010. We understand that to be a proper area for cross-examination in this deposition. We do not understand that Mr. Kouts is here to address any other topics in his personal capacity.

MR. BLANTON: Well, what the court's order

anything you've testified to in any of those cases where your position has changed, where you would change anything you've said?
A No.
Q Other than the 2010 start date, has there been -- is there any issue about which you've testified in any of those previous either depositions or trials where the Department of Energy's position has changed, to your knowledge?
A No.
Q Now, as I understand it, you've been designated as the government's designated witness for the purpose of testifying about the 2004 Annual Priority Ranking & Annual Capacity Report document.
MR. BLANTON: Is that correct, Ms. Herrmann?
MS. HERRMANN: That is correct.
BY MR. BLANTON:
Q Okay. Mr. Kouts, do you understand that you've been designated the government's representative to testify about that subject?
A Yes.



MR. BLANTON: Let's get a copy of that, K.C.
Let's mark that as Kouts' 2.
(Kouts' Deposition Exhibit 2 was marked for identification and was attached to the deposition transcript.)
BY MR. BLANTON:
Q And she'll give you the original, Mr. Kouts.
MS. HERRMANN: Can I get a copy of Kouts' 1?
MR. BLANTON: Yeah.
BY MR. BLANTON:
Q Mr. Kouts, when you've had a chance to familiarize yourself with Kouts 2 in front of you, let me know.
A I'm familiar with it.
Q Could you identify that document, please, sir?
A It's the Acceptance Priority Ranking & Annual Capacity Report that was issued by the Department in July 2004.



Q Who was responsible at the Department of Energy for this document?
MS. HERRMANN: Objection, vague.
BY MR. BLANTON:
Q Can you answer the question?
A The Department of Energy was responsible for it.
Q Well, what individual within the Department of Energy was responsible for this -- for producing this document?
A It was developed by my staff with contractor assistance.
Q Is your title the same as it was when you testified in the Yankee trial?
A Yes, it is.
Q Is your reporting relationship the same?
A Yes, it was -- yes, it is.
Q So you report to Ted Garrish?
A That's correct.
Q Has there been any change in the reporting relationship since -- I don't know if it's doctor or Ms. Chu -- decided to leave the Department of



Energy?
A No, there has not been.
Q So Mr. Garrish is now acting director. Is that his correct title?
A No, it is not.
Q What is his correct title at this point in time?
A It remains what it was before.
Q Which is?
A Deputy director for strategy and program development.
Q So there's no -- is there an acting director?
A No, there is not.
Q Who on your staff worked on the Annual Capacity -- or the Acceptance Priority Ranking & Annual Capacity Report?
A Dave Zabransky and Tom Pollog.
Q What was the purpose of issuing this report in July of '04?
A The purpose was to -- this report was to accompany a letter and was accompanied by a letter

to contract holders to initiate the planning process under the standard contract in anticipation of receiving shipments in 2010.
Q When you refer to the planning process under the standard contract, explain to me what you mean by that.
A Essentially, the Department asked contract holders to submit delivery commitment schedules based on the information provided in the Acceptance Priority Ranking & Annual Capacity Report.
Q When is the last time DOE had issued an Acceptance Priority Ranking & Annual Capacity Report before the July '04 report, if you're aware?
A We issued several. I don't remember exactly the last one. I was not involved at the time in managing that area when they were issued.
Q On page 1 of the document, the first paragraph -- the first sentence of the second paragraph -- strike all that. We're going to start over.
The first sentence of the second paragraph says, "The Standard Contract requires the Department



to issue an annual," and that annual is in a small case, "Acceptance Priority Ranking report and an Annual Capacity Report (ACR)." How often does the standard contract require the Department to issue a document such as has been marked as your Deposition Exhibit 2?
MS. HERRMANN: Objection, calls for a legal conclusion.
BY MR. BLANTON:
Q What's your understanding of the contractual requirement?
A My understanding of the contractual requirement is that if the Department was requesting DCSs, that it would be issued on an annual basis.
Q Why only if the Department was asking for DCSs?
A My own personal view is that the -- there'd be no need for it.
Q Why is that?
A Because the Department would not -- essentially, would be signaling that we were not accepting fuel 63 months prior to the date of -- of



acceptance.
Q I'm sorry. What would signal the Department didn't intend to accept fuel within 63 months?
A The fact that we were not issuing -- or requesting DCSs.
Q So do I understand your testimony correctly then to be that the impetus for the issuance of the Acceptance Priority Ranking & Annual Capacity Report is the Department of Energy's intent to request DCSs?
A That's my understanding.
Q And by DCSs, we mean delivery commitment schedules; is that correct?
A That's correct.
Q And delivery commitment schedules are also addressed in the standard contract; is that correct?
A Yes.
Q Do I also understand from your testimony that it's the Department's position that they will -- that the Department will only request DCSs to be submitted by contract holders when the



Department has an intention to accept fuel within 63 months?
A That's correct. I believe it's 63 months from the year we're going to.
Q Right.
A 63 months from -- prior to the year we're going to accept fuel, not 63 months prior to the point in time that we're going to be accepting fuel.
Q So to help this make sense on the record, as I understand, the standard contract provides that within 63 months of the year in which fuel is to be accepted, the contract holder is to submit a Delivery Commitment Schedule; is that correct?
A The Department will request it. It's up to the contract holder as to whether or not they're going to submit it.
Q Right. And it's the Department of Energy's position that it will only request these delivery commitment schedules within 63 months of the date when the Department of Energy has determined it will accept -- of the year in which the Department of Energy has determined it will accept fuel?

A That's correct.
Q Now, the last sentence in that paragraph says, "As specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers." Do you see that sentence?
A Yes.
Q Has a similar sentence been in each of the other APR and ACR documents, to your knowledge?
A I can't answer that. I don't know.
Q Okay. Is the reference to planning purposes the same thing as what you referred to a minute ago as the purpose of this document being to initiate the planning process?
A Yes.
Q Is the APR/ACR document that's marked as Exhibit 2 to your deposition intended to have any planning function from the utility, contract holder's standpoint?
MS. HERRMANN: Objection, calls for a legal conclusion.
MR. BLANTON: I'm just asking what DOE



intends for its document to -- what purpose its document serves.
A It's to inform the contract holders what priority they have and what the expectations are of the Department in being able to receive materials in any specific year.
Q Does DOE intend for the contract holders to rely on the statements of intent in that document, for lack of a better term, in doing their own on-site storage plan?
A That's a decision on the part of the utilities.
Q Well, is there any document or other statement by DOE on which DOE intends for utilities to rely on doing their own storage plan?
A Not that I'm aware of.
Q If a utility was to forgo developing an on-site storage capability in reliance on what the Department of Energy said in the document that is marked as Exhibit 2 to your deposition and then DOE failed to accept fuel on the schedule that's set forth in Exhibit 2, what would the DOE's position be



with respect to any hardship that utility suffered as a result of having relied on the Acceptance Priority Ranking & Annual Capacity Report?
MS. HERRMANN: I'm sorry, Stan. I just didn't get the whole question. Can you read it back?
(The reporter read the record as requested.)
MS. HERRMANN: Objection, calls for a legal conclusion. Foundation.
BY MR. BLANTON:
Q You may answer, if you know.
A That would -- that would be a question for attorneys. I'm not an attorney.
Q So it's correct then -- or is it correct then that DOE's position is that utilities shouldn't count on the APR/ACR for the purpose of making any on-site storage decisions, because DOE won't take the position that they'll stand behind this document?
MS. HERRMANN: Objection, compound. Foundation.



A A utility's decision is a utility's decision. The Department has no control over what the utilities may or may not do based upon the information that the Department gives them, nor does the Department want any control over that.
BY MR. BLANTON:
Q And if we turn to page 2 of Exhibit 2, Table 1 is entitled "Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel." Do you see where I'm directing you to?
A Yes.
Q Now, do you recall testimony you've given in the previous cases about a distinction between receipt rates and acceptance rates?
A Yes.
Q Are the acceptance -- is acceptance rate the correct term -- based on that prior testimony, is acceptance rate the correct term for what's shown here as being the -- the MTU of spent nuclear fuel that DOE has indicated for each of the years?
A Yes.
Q And as I understand it, acceptance rate in

your nomenclature has contractual significance, as opposed to just the technical capacity of the repository system; is that correct?
A That's correct.
Q Do you know what the source of the acceptance rates shown in Table 1 of Exhibit 2 to your deposition is?
A Yes.
Q What is it?
A It's our systems requirements document.
Q When's the last time one of those -- the systems requirements document has been issued?
A The last revision was issued in September 2004.
Q Okay. So this would have been -- since this document was done in July of '04, it would be based on an earlier revision of the system requirements document?
A That's correct.
Q Do you know what version of the system requirements document this was based on?
A Provision 5.



Q And how did those numbers get into the system requirements document?
A The system requirements document, the parent systems requirements document is a document that's controlled by the director of the program, and any revisions to that document require the director's approval.
Q I understand that. My question is, is the -- are you aware of the -- of the technical basis for these acceptance rates, how they were arrived at?
A They were considered to be an appropriate acceptance rate for the facility capabilities that the Department is designing.
Q Let me rephrase my question and see if I can make it more understandable. For instance for the year 2014, the acceptance rate shown here is 3,000 metric tons, correct?
A Yes.
Q Did somebody sit down and decide, okay, it's going to be 3,000. It's not going to be 2900. It's not going to be 3100. It's going to be 3,000?



A It's based on facility capabilities.
Q Okay. And who would have been responsible for calculating those facility capabilities?
A This is a system requirements document. The requirement is set down and the facilities are designed to meet it. So, therefore, it's an analysis of what's a reasonable maximum rate for the system to receive in any one year, and facilities and transportation capabilities are designed to meet it.
Q Okay. So based on that, my understanding from you is you start out with the number and then the number drives the design; is that correct?
A Yes.
Q And who determined that this acceptance rate was a reasonable maximum acceptance rate for the program?
A I don't know that any one person determined it. There have been a series of analyses over many years that had been done to indicate that that's a reasonable rate -- a maximum rate for the system to operate under.



Q And as I understand your definition of acceptance rate from your prior testimony, this is what DOE intends for it to be its contractual commitment, correct?
A Yes.
Q Now, Appendix A is the acceptance priority ranking in the 2004 report? It starts just a couple pages after the one we were just looking at -- well, I'm sorry. Table 2 is next, and then Appendix A is Acceptance Priority Ranking.
A Mm-hmm. Yes.
Q As I understand it, this is a list of the -- of every contract holder's quantity of spent fuel based on the date of -- permanent discharge from the reactor, correct?
A Yes.
Q Were there any changes from the last APR, whenever it was, to the ranking of fuel that was discharged, say, prior to 1998?
A Purchasers and contract holders had changed; therefore, where Entity A may have had that right, Entity B may now own that right, but the

original allocation to the -- to that fuel still remains. That has not changed.
Q Okay. So that -- whoever owns that right, the rights derive from some spent fuel assembly somewhere, correct?
A Yes.
Q And those spent fuel assemblies are still ranked in the same order they have always been ranked, as far as you know?
A Yes.
Q Okay. And what would cause the owner of that allocation to change? Somebody buys a plant, is that --
A Just redistribution of the industry.
Q And by that you mean somebody buys the plant and all the fuel on the site --
A Yes.
Q -- or something like that? Now, the acceptance capacity allocations in this document are simply an arithmetic calculation of the acceptance rate by the APR; is that correct?
A Yes.



Q Now, in the -- at least in your Commonwealth Edison deposition and possibly others, you gave a good bit of testimony about a milestone schedule --
A Yes.
Q -- that was developed with the end point being opening, I guess, or at least a significant milestone being the opening of the repository; is that correct?
A Yes.
Q You recall that testimony?
A Yes.
Q Now, is that milestone schedule what this -- the commencement date intentions reflected in this APR/ACR is based on?
A Yes.
MR. BLANTON: It's tab 2 in my book, but it's not by your little index.
MR. HAIRSTON: What's the date?
MR. BLANTON: July 28, '04, letter.
BY MR. BLANTON:
Q Did I understand you correctly a second



ago, Mr. Kouts, to say Mr. Dave Zabransky reports to you?
A Yes.
MR. BLANTON: Let's mark that as Exhibit 3.
(Kouts' Deposition Exhibit 3 was marked for identification and was attached to the deposition transcript.)
BY MR. BLANTON:
Q And I think we saw a minute ago in Exhibit 2, Mr. Kouts, and I think you testified that what drove the timing of the issuance of the 2004 ACR/APR was DOE's desire to begin -- recommence the DCS submittal and approval process; is that correct?
A Yes.
Q And you have what's been marked as Exhibit 3 to your deposition in front of you, and -- which is a July 28, 2004, letter to Ron Cocherell at Southern Nuclear Operating Company by David K. Zabransky. Have you ever seen that letter or a similar letter?
A Yes.
Q Did Mr. Zabransky send these letters under



your direction or supervision?
A Yes.
Q Prior to the submittal of this letter to the contract holders, what would -- and, say, between 1998 and July 28 of 2004 -- let's say between January 31 of 1998 and July 28 of 2004, what would DOE have done had a contract holder submitted a Delivery Commitment Schedule to DOE?
MS. HERRMANN: Objection, speculation.
A I don't know.
Q Well, does the contract limit the submission of DCS to only when the DOE asks for them?
A That's a legal question.
Q To your knowledge?
A The contract holder can do whatever it wants in terms of submitting information.
Q Would DOE have processed it prior to July 28th of '04?
MS. HERRMANN: Objection, speculation.
A I don't know.
BY MR. BLANTON:

Q Why did DOE determine to recommence the DCS process in July of '04?
A Because they thought it was -- the Department thought it was appropriate to initiate the planning process in anticipation and receipt of shipments in 2010.
Q Who was involved in that decision?
A I was, Mr. Garrish, and various other senior people within the Department.
Q Do you recall any of their names, other than you and Mr. Garrish?
A Our general counsel was involved. In terms of additional senior management within the Department, that was Mr. Garrish's responsibility. He did not reveal to me who was involved. I take my directions from Mr. Garrish.
Q Now, at the time this July 28 letter was sent, this Exhibit 3 to your deposition, was there an appropriation or a budget request pending before the Congress for the radioactive -- civilian radioactive waste program?
A Yes.



Q What was the amount of that appropriation request?
A I believe it was $880 million.
Q What was the status of that budget request at the time of this letter?
A Congress had not acted on them yet.
Q Had there been any activity in Congress with respect to appropriations to the civilian radioactive waste program as of July of '04? Had one house passed an appropriations bill or a committee issued out a budget?
A I believe the House had issued a mark of 131 million for the program. The Senate had not issued a mark.
Q Now, as of July of '04, what was your understanding as to what a budget shortfall of $750 million would do to your schedule for accepting fuel beginning in 2010?
A Based on the testimony that the director of the program had given to Congress, if we did not receive our funding request for FY 2005, the 2010 date was in jeopardy.



Q And the director of the program at the time was Mrs. Chu, is that right, or Ms. Chu?
A Yes.
Q And as I understand your testimony, she had testified to Congress that if you didn't get the whole 880 million, then the 2010 date was in jeopardy?
A Yes.
Q Did you disagree with that?
A It's not up to me to disagree with the director. That's the policy of the program.
Q Well, personally, did you agree with what she said or disagree with it?
MS. HERRMANN: Objection, relevance.
MR. BLANTON: He knows a lot about this program.
A Best way for me to answer that is if we received 879 million, I still think we could meet 2010. If we received a substantial amount below 880 million, my sense was that that would be a real factor in our ability to meet it.
BY MR. BLANTON:



Q And I presume that you would consider, at least as of July of '04, if you'd gotten the $750 million less that would have been a substantial amount below 880?
A Yes.
Q So at the time this July of '04 letter was issued, the Department was aware that there was a budget problem with meeting the 2010 date. Is that a fair statement?
MS. HERRMANN: Objection, mischaracterizes prior testimony.
A Until Congress acts, we have no budget mark.
BY MR. BLANTON:
Q And as of July, all you knew about what Congress was doing is that one House had given you 750 million less, approximately 20 percent of what you'd asked for?
A That's correct.
Q And there was no doubt in your mind that if that stayed the case, 2010 could not happen; is that right?

A I have no idea what the Environmental Protection Agency will do in response to the court's ruling.
Q Okay.
MR. BLANTON: What are we up to, Number 3 so far?
THE COURT REPORTER: Number 4 is our next number.
MR. BLANTON: That's going to be Kouts' Number 4.
(Kouts' Deposition Exhibit 4 was marked for identification and was attached to the deposition transcript.)
BY MR. BLANTON:
Q Do you recognize the document the court reporter's marked as Exhibit 4 to your deposition, Mr. Kouts?
A Yes.
Q What is that?
A It's the Civilian Radioactive Waste Management System Requirements Document, Rev 6.
Q Is that the document you referred to just a



few minutes ago in your deposition testimony as being the latest revision to the system requirements document for the waste management system?
A Yes.
Q Referring to page 8 of that document, there's a Table 1 entitled "CRWMS Receipt Rates." The CRWMS refers to Civilian Radioactive Management System?
A Yes.
Q Are the receipt rates shown in Table 1 of the column commercial SNF and HLW received annually at repository at least through the period of time covered by the ACR/APR, are those receipt rates identical to the acceptance rates shown in your Exhibit 2 to the APR/ACR?
MS. HERRMANN: Objection. The documents are the best evidence of their contents.
A Yes.
BY MR. BLANTON:
Q Is there any practical difference then between receipt rates and acceptance rates, under your definition?



MS. HERRMANN: Objection, vague.
A They're the same.
BY MR. BLANTON:
Q Is the -- does DOE refer to this as the SRD or the CRD, this document --
A The CRD.
Q -- whatever it is, Kouts' 4? Is that document produced by your organization, the people working under you, or is it produced by somebody else at DOE?
A It's produced by my organization.
Q Who works on the CRD in your organization?
A Mr. Steve Gomberg.
Q I'm sorry. Could you spell that last name?
A G-o-m-b-e-r-g.
Q Was there a particular reason for this revision of the CRD to be issued? Was there some significant change between this version and the previous version?
A The revisions from the previous one are identified in the document.
Q So in order to see the difference between



this document and Rev 5, I would look at the list of revisions and changes listed in page Roman 7 through Roman 9; is that correct?
A No, it's not.
Q All right. So are there changes other than the ones listed in these -- on these pages?
A No.
Q I'm sorry? I asked if this -- if pages 7 through 9, Roman 7 through Roman 9, indicate the changes through the various revisions of the document, and you say that's not correct?
A You said from the previous version.
Q Okay. I should have said the previous versions.
A Yes.
Q Okay. And then it would be correct?
A Yes.
Q So on page Roman 9, does that describe all of the revisions from this document as compared to revision 5?
A It summarizes them, yes.
Q Does Mr. Gomberg report directly to you, or

is there an intermediate level of reporting in between you and he?
A He reports directly to me.
Q What's his title?
A His position description is a general engineer, I believe.
Q And do I understand it correctly that this -- the function of this document is to essentially provide the design requirements to all the different elements of DOE that are involved in either the design or implementation or operation of the radioactive waste management system?
A Yes.
MS. HERRMANN: Mr. Blanton, are we coming to a good place for a break?
MR. BLANTON: I think we're coming to an excellent place for a break, sure. Do you want to take a break?
THE WITNESS: Sure.
(Recessed at 10:37 a.m.)
(Reconvened at 10:48 a.m.)
MR. BLANTON: Mark that Kouts' 5 please, ma'am.



(Kouts' Deposition Exhibit 5 was marked for identification and was attached to the deposition transcript.)
BY MR. BLANTON:
Q Mr. Kouts, do you recognize what's been marked as Exhibit 5 to your deposition?
A Yes.
Q Would you identify that, please?
A It's a letter to Mr. Ronald Cocherell informing him that the resumption of the DSC process was premature.
Q Have you seen either that letter or one like it prior to your deposition today?
A Yes.
Q That again is signed by Mr. Zabransky as contracting officer. Did he also report to you during the December '04 time frame?
A Yes.
Q The second -- well, first of all, back up. Are you aware whether the Department of Energy received any delivery commitment schedules from



Southern Nuclear after the July 28, '04 letter?
A I'm not sure. They could have.
Q Do you know whether this letter went out to everybody -- all contract holders, whether or not they'd received or submitted a DCS?
A My assumption would be that this only went out to those who submitted forms, since lower in the letter it says, "Enclosed with this letter are any original DCS forms that you may have submitted with your response."
Q All right. In the second sentence of that letter states, "However, recent developments relating to the FY 2005 budget along with other issues have led the Department to conclude that the resumption of the DCS process was premature."
Let me ask you first, did you participate in drafting this letter?
A I signed off on it.
Q So you reviewed the finished product, at least, before it went out?
A I approved the finished product before it went out, yes.



Q Do you know if you reviewed or approved any drafts?
A I don't remember.
Q Was the principal author of the letter Mr. Zabransky?
A Yes.
Q What are the recent developments relating to the fiscal year 2005 budget that that sentence refers to?
A I believe that our funding level was in the range of about $579 million.
Q As opposed to the 880 we referred to a minute ago, 880 million?
A That's correct.
Q What impact, if any, did that have on the repository schedule?
A It meant that we would not be able to fund activities, necessary activities that we had planned for FY '05 in anticipation of opening the repository in 2010.
Q Were there specific activities that were going to fall by the wayside as a result of the

case to the Commission for the licensing repository.
Q Okay. And as of December 31st -- excuse me -- December 1, 2004, you had concluded that at least a rational enough possibility that it warranted delaying or suspending the Delivery Commitment Schedule process again?
A That in relation with other issues, yes.
Q Okay. Do you know anything more about the EPA standard as we sit here today on April the 11th, 2005, than you did on December the 1st, 2004?
A Yes.
Q What do you know differently?
A I am aware of public statements made by senior managers at the Environmental Protection Agency indicating that they will issue a draft standard this summer.
Q They indicate what that draft standard would be?
A Not in their public statements.
Q Have you had private conversations with anybody at EPA about what the draft standard will be?



A No.
Q Do you have any expectation as to what the draft standard will be?
A No.
MS. HERRMANN: Objection, speculation.
BY MR. BLANTON:
Q Did the public statements by EPA indicate that it would be consistent with the NAS' recommendations?
A I don't remember.
Q Does DOE anticipate a challenge to the standard if it's not consistent with NAS' recommendations?
MS. HERRMANN: Objection, speculation. Foundation.
A The Department anticipates that whatever challenges are made is in the mind of those who may make the challenges.
BY MR. BLANTON:
Q What did the Department mean by the statement that the resumption of the DCS process was premature, in the letter of December 1, 2004?



A That the Department no longer believed that it could be able to receive fuel in 2010. Therefore, the initiation of the planning process was premature.
Q Did the Department believe -- as of December 1, 2004, did the Department believe that it should have not resumed the process in July of '04?
A No.
Q In the second sentence of this letter -- well, let me back up a minute.
You've mentioned the shortfall in the '05 appropriation. You've mentioned the exhaustion of the appeals of the EPA health and safety standard, and you've mentioned the Commission's failure to act on the appeal to the licensing -- of the Licensing Support Network decision by the Presiding Officer. Were there any other issues that led the Department to conclude that the resumption of the DCS process was premature, other than those?
A You've mischaracterized my previous testimony. The appeal was not the issue. It was the -- of the Department certification process. It



was the rejection of the Department certification by the PAPO board, Preapplication Presiding Officer Board; that was the basis, not the appeal that the Department made.
Q Okay. Well let me start over again. You've mentioned the budget shortfall for FY '05. You've mentioned the exhaustion of the appeals of the EPA rad standard, and you've mentioned the rejection of the certification of the Licensing Support Network as issues that led the Department to conclude that the resumption of the DCS process was premature. Are there any other issues, other than those three, that led the Department to that decision?
A No.
Q Now, could you explain what the impact of the rejection of the Licensing Support Network had?
A By NRC rules, the Department is to certify its collection of documents six months prior to the submission of a license application; therefore, with the rejection of the Department certification, that meant that the license application would have to be

& Gas Company and the South Carolina Public Service Authority in this matter. I have some questions for you. I'm not going to replow the ground that Mr. Blanton touched on this morning. If I ask you the same questions that Mr. Blanton asked, would you give the same answers?

A Yes.

Q Okay. Mr. Kouts, how did you prepare for your deposition today?

A I reviewed documents related to the issuance of the 2004 annual priority ranking and acceptance capacity report -- Acceptance Priority Ranking & Annual Capacity Report.

Q Do you know what documents those were?

A Yes. I believe they were Exhibit 1 -- no. Excuse me -- Exhibit 2 that I was asked about earlier.

Q Okay. Did you review any other documents?

A Yes, I did. I reviewed Exhibit 3 or a similar document, and I also reviewed Exhibit 5.

Q Were there any other documents that are not exhibits here today that you reviewed in preparation



for your deposition?

A Yes, I did.

Q And do you recall what documents those are?

A I recall what one of those documents was, yes.

Q And what is that document?

A It was a letter sent under the signature of Mr. Zabransky to, I believe, a gentleman at the Tennessee Valley Authority, dated November 3rd, which responded to questions related to the DCS process that that contract holder had.

Q Mr. Kouts, the court reporter has put in front of you what's been marked as Kouts' Exhibit 9. It's a 30(b)(6) Notice of Deposition, which we served on behalf of SCE&G and South Carolina Public Service Authority in this case, and it lists a number of topics on Attachment A to Kouts' Exhibit 9. Is it your understanding that you're here today to testify regarding these topics?

A Yes.

Q And that your testimony will be as a representative of DOE?



A Yes.

Q Okay. Okay. Can you look at Kouts' Exhibit 4 please, and if you'd turn to page 1 of the document, under Section 1.2 "Purpose," the second paragraph, there's a sentence which states, "The CRD establishes requirements for the design, development operation of the CRWMS. It is specifically -- it specifically addresses the top-level governing laws and regulations (EG. Nuclear Waste Policy Act, NWPA 10 CFR part 63, 10 CFR part 71, et cetera)." What does this statement mean?

MS. HERRMANN: Objection, foundation.

A The document speaks for itself.

BY MR. TOMPKINS:

Q What's your understanding of what requirements are incorporated into the CRD?

A For the portion that you read, it incorporates specific direction of the Nuclear Waste Policy Act, NRC regulation 10 CFR part 63, which are disposal licensing regulations for the repository. 10 CFR part 71 has to do with the transport of spent fuel and high-level waste materials, et cetera. My



assumptions there is that there are other federal regulations that are also called out that this program has to comply with.

Q Okay. If you'd turn to page 11 of the document, please. Section 3.3.1, "Waste Acceptance Element Requirements," subparagraph B here, there's a reference in the second line of B in the EM/RWMOA (Owendoff -- O-w-e-n-d-o-f-f -- and Barrett 1999.)

Do you know what that's referring to? Is that another document?

MS. HERRMANN: Objection, foundation.

A Yes.

BY MR. TOMPKINS:

Q Okay. What document is that?

A It's a memorandum of understanding between our program and the Office of Environmental Management in relation to materials that will be provided by the Office of Environmental Management for disposal in the repository.

Q Okay. Can you turn to Kouts' Exhibit 2, please? I believe Mr. Blanton asked you some

that is not beyond the scope of our notice. Our notice refers to the allocations. It may specifically refer to the allocations in this particular document; however, I think we both know that our notice is broader than that.
MS. HERRMANN: I think both of us learned in law school that when we're specific, we're specific, and that's what we do. So, seriously, short leash and then we're out of here.
MR. TOMPKINS: Okay.
BY MR. TOMPKINS:
Q If you'd turn to Kouts' Exhibit 5, please. I believe in response to questions from Mr. Blanton you indicated that you did not expect this letter was sent to utilities that did not submit DCS forms after the July 2004 request?
A That's correct, and I certainly answered that, because if you look in the second paragraph it says, "Enclosed with this letter are any original DCS forms that you may have submitted with your response."
Q Do you know if a similar letter was sent to



utilities that did not submit DCS forms?
A I'm not positive about that. It's possible that it was.
Q Okay. Mr. Kouts, Mr. Blanton asked you some questions about the appeal of the D.C. Circuit Court of Appeals' ruling on the EPA issue?
A Yes.
Q Okay. Did DOE itself appeal that ruling?
MS. HERRMANN: Chris, I have to object to the scope again. How does fit into your notice?
MR. TOMPKINS: Our notice does include a topic regarding why DOE elected under topic 3 that resumption of the DCS process was premature, and that covers topics about the reasons why resumption of the DCS process is premature. This is the only question I'm asking about the topic.
MS. HERRMANN: Maybe you could establish a foundation for that then, so we don't have to keep arguing about this.
BY MR. BLANTON:
Q Mr. Kouts, I just have one simple question. Did DOE itself participate in the appeal of that



D.C. Circuit opinion?
MS. HERRMANN: Objection, beyond the scope. You can answer if you can.
A No, it did not.
BY MR. TOMPKINS:
Q Okay. If you can look at Kouts' Exhibit 3, please. I believe you testified that this was the letter that was sent out to utilities requesting DCS submissions in July of 2004?
A That's correct.
Q Okay. And a similar letter was sent to each utility?
A As far as I know, yes.
Q Okay. And those letters attached what's the third page of the exhibit, which were instructions for completing the Appendix C Delivery Commitment Schedule?
A Yes.
Q Have you seen these instructions before?
A Yes, I have.
Q Okay. Do you know who prepared these instructions?



A They were prepared by my staff with contractor support.
Q And who on your staff prepared them?
A Mr. Zabransky and Mr. Pollog.
Q And which contractor would have been involved in its preparation?
A Contractors of Bechtel SAIC Corporation.
Q If you turn to page 2 of the instructions, paragraph 7(a), there's a statement, "DOE recognizes that many purchasers have submitted and DOE has approved DCSs based upon the January 31, 1998, operations date included in the standard contract. Purchasers should submit new DCSs based upon the currently planned operation date of 2010." Do you see that statement?
A Yes.
Q Okay. What -- what is the current status of those prior DCS submissions referred to in paragraph 7(a)?
A My understanding is they're the subject of litigation.
Q What is the Department's position regarding

the effect that new DCS submissions would have on those old DCS submissions?
MS. HERRMANN: Objection, foundation. Calls for a legal conclusion.
A The Department has responded to questions on that issue essentially to the extent that the former DCSs -- before the Department will approve new DCSs under this or under the 2004 APR/ACR report, that essentially an agreement would need to be reached that the former DCSs were no longer under consideration.
BY MR. BLANTON:
Q What do you mean by no longer under consideration?
A That these would supplant -- that the new DCS -- approved DCSs would supplant whatever had occurred in the past.
Q And the prior DCS would no longer have any effect?
A The prior DCS was a planning document, and this DCS would also be a planning document. It basically reflects that this is the most current



planning that the Department has.
Q Okay.
(Kouts' Deposition Exhibit 10 was marked for identification and was attached to the deposition transcript.)
BY MR. TOMPKINS:
Q Mr. Kouts, have you seen this document before?
A Yes, I have.
Q Okay. Is this one of the documents that you said that you reviewed in preparation for your deposition here today?
A Yes.
Q Okay. Who wrote this document?
A I think there were a variety of contributors to the document.
Q Do you know who they were?
A Mr. Zabransky, Mr. Pollog, myself, help from counsel.
Q If you turn to the second page of this document, Mr. Kouts, the last paragraph, there's a statement halfway down the paragraph, "We anticipate



that any new DCSs that are approved will replace rather than supplement the approved DCSs to eliminate any potential confusion regarding the relationship between previously approved DCSs and new DCSs. We will seek prior to approving the new DCSs from any purchasers with previously approved DCSs an agreement in writing that any new DCSs that are approved actually replace rather than supplement the previously approved DCSs. That agreement will be reflected in any future DCS approvals."
Is this the response to this question that you just testified about?
A Yes.
Q Okay. Would -- upon the resumption of the DCS process, would the Department approve any new DCSs without an agreement that they replace the old DCSs?
MS. HERRMANN: Objection, foundation. Speculation.
A That's what the letter says, and that's what the Department's intention is.
BY MR. TOMPKINS:



Q So the Department's intention is to condition approval of new DCSs on an agreement that the old DCSs will be replaced?
MS. HERRMANN: Asked and answered.
A Yes.
BY MR. TOMPKINS:
Q So if a utility does not agree that the new DCS submissions would replace the old DCS submissions, the Department would not approve the new DCS submissions?
MS. HERRMANN: Objection, foundation. Speculation.
A That's what the letter says.
BY MR. TOMPKINS:
Q Is that the position of DOE?
A Yes.
Q Do you know what provision of the contract allows DOE to condition approval of new DCSs based on this agreement?
MS. HERRMANN: Objection, calls for a legal conclusion.
A I wouldn't know.

are actually approved -- that are approved actually replace rather than supplement the previously approved DCSs."

What is the confusion that's referred to in this sentence regarding the previously approved DCSs and the new DCSs?

A I don't know that the Department felt there was -- there was confusion, but the purpose of the sentence was in case there was confusion, to address it in this manner.

Q So the Department was seeking to supplement the prior DCSs or, rather, replace the prior DCSs to address a concern about confusion it didn't know existed?

A Well --

MS. HERRMANN: Objection, mischaracterizes prior testimony. Go ahead.

A Well, the letter is being written in response to an individual who had questions about the status of the previous DCSs. So the letter was intended to -- to provide the Department's perspective in regard to any potential confusion



that existed at that time by the person who wrote the letter. So to the extent that this helped the person's confusion, if he had confusion, that's what the letter was intended to address.

BY MR. TOMPKINS:

Q You've stated that it was DOE's policy that it would not approve new DCSs unless there was an agreement to replace the old DCSs. When did DOE decide to implement that policy?

MS. HERRMANN: Objection, foundation.

BY MR. TOMPKINS:

Q Do you know if it was prior to this letter? Do you know when DOE first issued its letter in July saying, please submit DCSs? Was it their intention back in July of 2004 that to approve any new DCSs, those DCSs would need to replace prior DCSs?

A I think the Department in its July 28th letter provided its perspective, and that perspective was, as I remember, that the former DCSs were the subject of litigation and that this new DCS process was intended to be the planning for 2010. The November 3rd letter was intended to respond to



potential confusion on the part of this individual contract holder who had a perspective of its -- of what the form of DCSs meant to that contract holder. The letter simply clarified the Department's position in that regard.

Q Putting aside the TBA inquiry, if a utility has submitted a DCS in response to Kouts' Exhibit 3, which is the July 28, 2004 letter, would DOE have approved that DCS submittal absent an agreement to replace the prior DCS submissions?

MS. HERRMANN: Objection, foundation. Speculation.

A I don't know.

BY MR. TOMPKINS:

Q Had the Department thought about that issue as of July 28th?

A Yes, it had.

Q And what conclusion had it come to regarding that issue?

A Its conclusion was stated in the letter that we sent out on July 28th, that the former DCSs were the subject of ongoing litigation, that these



DCSs were new DCSs to deal with the planning -- planning for acceptance of spent fuel in 2010.

Q Let's look at that July 28th letter, which is Kouts' Exhibit 3.

A Okay. Here it is.

Q Okay. Can you point me to the place that you're talking about that addresses that issue?

A Well, let's see. No, I cannot.

Q Okay.

A I may have confused the letter -- the original letter with actually the November 3rd letter, because I believe we stated something about that in the November 3rd letter.

Q Okay.

A So I apologize for that confusion.

Q So at the time of Kouts' Exhibit 2, July 28th, aside from whether or not it was addressed in this letter, had DOE reached a conclusion on that topic?

A My understanding is that the Department's view was that this was a new -- that this was a new planning process, that the former ones were the

subject of litigation. This past planning for facilities and time frames that the Department essentially was not -- did not -- or was unable to meet. As a result, those were no longer the planning basis from the standpoint of the Department, and this was to initiate a new planning process based on the Department's understanding of where it was on July 28, 2004.

Q Had the Department at that point determined that the DCSs submitted in response to Kouts' Exhibit 2 would not be approved, absent an agreement to replace the prior DCSs?

A Since the Department hadn't been asked the question, the Department didn't have a position on it.

Q If you'd turn back to Kouts' Exhibit 10, we discussed the concern about potential confusion. Was there any other reason the Department decided to require replacement of the prior DCSs as a condition of approving new DCSs?

MS. HERRMANN: I'm sorry. Could you read that back?



(The reporter read the record as requested.)

MS. HERRMANN: Thanks.

A As I stated earlier, the reason for the letter was to address the potential confusion of this particular contract holder in this regard, and that's why the letter was constructed.

BY MR. TOMPKINS:

Q Okay. So the only reason for this agreement that new DCSs approve old DCSs was because of confusion?

MS. HERRMANN: Objection, vague.

A The reason the letter was written was to clarify the Department's position vis-a-vis the letter that this contract holder had sent in previously.

BY MR. TOMPKINS:

Q If this particular contract holder had not asked this question about the effect on prior DCSs, would the Department have required this agreement to replace prior DCSs?

MS. HERRMANN: Objection, foundation.



Speculation.

A I don't know.

MR. TOMPKINS: That's all the questions I have.

MR. BLANTON: I've got a couple follow-ups on this document.

FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, AND GEORGIA POWER COMPANY

BY MR. BLANTON:

Q If all you were trying to do is answer Mr. Carden's question and address any potential confusion, why didn't you just answer his question rather than requiring him to agree with the Department on its position?

A Because the Department felt that that was the best way to address this issue.

Q Was it the Department's position that this agreement on -- that the new DCSs would replace the previously approved DCSs have any impact on the litigation that's addressed in the paragraph just prior to this -- to this sentence we've been talking



about?

MS. HERRMANN: Objection, vague.

A That's really a legal question.

BY MR. BLANTON:

Q I'm just asking what the Department's intention was.

A I think the Department's intention was to address this issue. The ongoing litigation is the ongoing litigation.

Q So it was not the Department's intention that replacing the old DCS with the new DCS would have any effect on the litigation addressed in the paragraph just previous to the paragraph we're talking about?

MS. HERRMANN: Objection, calls for a legal conclusion.

A The Department's interest here was to make sure that it did not have approved DCSs for greater than the Department could possibly meet those DCSs. So to the extent that you had additional DCSs that were approved in the past, applying that to the DCSs that the Department -- for the Department's capacity

IN THE UNITED STATES COURT OF FEDERAL CLAIM

TENNESSEE VALLEY AUTHORITY, )
Plaintiff, ) Case No. 01-249C
v. )
THE UNITED STATES, )
Defendant. )

Courtroom 4
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, July 12, 2005
Volume 8

The parties met, pursuant to the notice of the Judge, at 10:10 a.m.

BEFORE: THE HONORABLE CHARLES F. LETTOW



APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
PETER K. SHEA, ESQ.
EDWIN W. SMALL, ESQ.
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1499
(865) 632-7319

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
SONIA ORFIELD, ESQ.
SHARON A. SNYDER, ESQ.
KEVIN CRAWFORD, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S
\- - - - -
THE COURT: Good morning. I congratulate our reporter on solving her technical difficulties so promptly. Good job. Do we have any preliminary matters before we continue with the cross-examination of Mr. Kouts?
MR. LO RE: Your Honor, we did have one preliminary matter, and the Court's indulgence, we would like to have a sidebar. Is that possible?
THE COURT: I suppose what we might do -- well, yes, we can always excuse Mr. Kouts temporarily.
MR. LO RE: This is actually something I would prefer is just discussed off --
THE COURT: Let us do this right down by the reporter.
(Discussion off the record.)
THE COURT: The Court thanks counsel and thanks them for their cooperation one with another. With that, Mr. Small, are you ready to continue with your cross-examination?
MR. SMALL: Yes, Your Honor.
Whereupon--
CHRISTOPHER KOUTS



a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:
CROSS-EXAMINATION (Resumed)
BY MR. SMALL:
Q. Good morning, Mr. Kouts.
A. Kouts. Good morning.
Q. I'd like to return first to something you talked about yesterday under the heading M&O contractors. Did I have that right?
A. Yes.
Q. Okay. And what is an M&O contractor again?
A. The M&O designation stands for management and operating contractor.
Q. And I believe you talked about documents that were produced by M&O contractors and how there would be some indication that the Department had approved those documents, is that right?
A. I believe my testimony was to the effect that the contractor document was not accepted by the Department unless it was published under the Department's letterhead with the Department's seal and with the Department's document designation.
Q. Okay. And so a document that did not meet the criteria that you've just testified to would simply be a contractor document, as opposed to a DOE

1565

document, is that correct?
A. That's correct.
Q. And that would indicate that it had not gone through the DOE approval and quality control process, is that correct?
A. It had not gone through a DOE approval and been accepted by the Department as Departmental policy.
Q. Thank you, sir. I want to make sure that we have some of our budget numbers right, and I realized last evening, as I was reviewing things, that I might not have them exactly right, so as I recall your testimony from yesterday, it was that approximately 16 billion is the current balance in the Nuclear Waste Fund, is that correct?
A. Yes.
Q. And that 16 billion current balance would include interest?
A. That's correct.
Q. And so that balance would be composed of both the payments by utilities, plus interest on that balance over the years, is that correct?
A. Yes.
Q. I also looked at the summary document that you have prepared regarding the amounts that have

1566

been appropriated out of the Nuclear Waste Fund over the years, and it looked to me like the total amount that DOE has spent out of that fund is about 6 billion, is that correct?
A. That's approximately correct, yes.
Q. Okay. That would mean that if you add 16 and 6 together, that the total funding to date would be in the range of about 22 billion?
A. For the Nuclear Waste Fund, yes.
Q. Okay. And that would be the total of the amounts paid by the utilities, plus the interest on those amounts?
A. Correct.
Q. About how much of that was paid in by the utilities and about how much would be interest of that 22 billion?
A. I'm trying to recall from memory. I believe the interest is somewhere, of the 16 billion that I mentioned earlier, I believe it's somewhere in the range of about 7 billion.
Q. There was a lot of discussion, I think, yesterday, about an MRS and a repository and about how those two things went together. In some plans, you see those things being sequential, is that correct? Some DOE plans is what I'm referring to.

1567

A. You'd have to explain further what you mean by, "sequential."
Q. In other words, there was an MRS that would operate for some number of years and then a repository would come online only after perhaps 10 years of MRS operation?
A. That was if the repository was delayed. If you look at the early years of the program, we had an MRS operating consistent with the repository in 1998, and then there was an MRS that was to be there in 1998 and a repository in 2003 and et cetera, so there were varying years. I don't believe 10 years was one of the options that we looked at, but that's my recollection of it at least.
Q. Thank you, sir. That was really the point I was trying to make. A repository and an MRS could both open at the same exact time, couldn't it?
A. In the early years of the program and in terms of where we were in the program in the mid-'80s, that was a possibility, yes.
Q. And under that type of scenario, the limitations on MRS capacity would largely not matter, isn't that correct?
A. Well, it depends on what you mean about the limitations don't have any meaning because when the

1568

Department proposed the proposal to Congress, we proposed a 15,000 metric ton limit in order to essentially deal with the concern that an MRS might be a defective repository, so I think the Department's formal position on MRS has always been that it should be limited to a 15,000 metric ton limit and not to exceed that limit.
Q. Yes, sir. I guess what I'm getting at though is, as long as you have a repository up and operating shortly after an MRS, then you could be shifting spent nuclear fuel from the MRS over to the repository, so that the limitation on how much could be stored in an MRS really wouldn't be very much of a problem, would it?
A. As long as you were shipping fuel from an MRS to the repository and you kept the inventory at the MRS under 15,000, yes, I would agree with that statement.
Q. Does DOE have an acceptance rate obligation under the standard contract to the standard contract holders?
A. There's nothing that I'm aware of in the contract that has anything related to a rate at which we will receive materials.
Q. Does that mean your answer would be that

there is no acceptance rate obligation in the standard contract?
A. Not that I'm aware of.
Q. Yesterday, there was talk, and I think you described -- discussed several exhibits that were fee adequacy assessments, is that correct?
A. Yes.
Q. And those fee adequacy assessments refer to the amount of money that's being paid by the utilities into the Nuclear Waste Fund, is that correct?
A. The fee adequacy assessments are prepared in order to determine the adequacy of the fee in terms of the total cost of the program.
Q. Now, those fee adequacy assessments, my understanding, have been done annually from, since the program began in the early '80s, is that correct?
A. There's a requirement in the Nuclear Waste Policy Act that the Secretary review the adequacy of the fee on an annual basis.
Q. And of course, operating utilities like Tennessee Valley Authority are paying fees quarterly under that, aren't they?
A. Yes.
Q. And those fees that are being paid



quarterly are based on nuclear generation?
A. That's correct.
Q. Has the rate that the utilities are paying, that rate per amount of nuclear generation, ever been changed since 1983?
A. No, it has not.
Q. I take it then from your answer that all the fee adequacy assessments have found that the fees being charged are adequate, is that correct?
A. Yes.
Q. And that adequacy is judged in part by the cost reflected in the TSLCCs, isn't that correct?
A. Yes, in part.
Q. And of course, those TSLCCs have assumptions in them about how the systems going to operate, correct?
A. That's correct.
Q. In this litigation, Mr. Kouts, the lawyers sometimes start using terms that the witnesses may not be exactly familiar with. On the other hand, they may be terms that the lawyers have borrowed from the witnesses. One such term is a steady state acceptance rate. Did you have some understanding of what that term might mean?
A. Yes.



Q. Would you please explain what that term would mean to you?
A. Steady state acceptance rate is one where the rate is kept constant over a period of years.
Q. And if I talked about a long-term steady state acceptance rate, would you have an understanding of what that means?
A. Steady state acceptance rate over a long period of time.
Q. Now, has DOE ever published any documents indicating that it planned on a long-term steady state acceptance rate of 900 metric tons a year?
A. You have to define what long-term means.
Q. Well, sir, over, I guess I would say over the life of the program, after an initial ramp-up. Let me, I guess let me go back and ask a few questions to clarify that.
Yesterday, in your testimony, there was some discussion of, of an initial ramp-up. Do you recall that testimony?
A. Yes, I do.
Q. And the concept, at least as I understood it, was that basically, when you start a program, you can't immediately -- or it's not, at least it's not a good idea to plan to immediately go to what you



anticipate the program long-term operational rate would be, but that you'd like a few years to ramp-up to it. Is that a fair statement?
A. Generally, yes.
Q. Okay. And I know we looked at many documents during your testimony yesterday in which the documents indicated that there would be a ramp-up to a steady state rate of 3,000 tons. Do you recall some of those documents?
A. Yes, I do.
Q. In looking over those documents last evening, it looked to me like that virtually all of those documents that ramped up to a steady state 3,000 rate did so in either four or five years; that is to say that the 3,000 rate would be attained in year, operational year five or operational year six, would you say that's correct?
A. Yes.
MR. LO RE: Your Honor?
THE COURT: Mr. Lo Re.
MR. LO RE: I'm going to object and move for that last answer to be stricken on the grounds that it is vague with respect to the, to the term of the documents that are referred to in the question and also with respect to exactly what system we're

talking about here.
MR. SMALL: I'll be happy to clarify and go into detail, Your Honor.
THE COURT: All right. Let's not strike the question and answer, but cover the details on examination, cross-examination and redirect.
MR. LO RE: Fine, Your Honor.
BY MR. SMALL:
Q. I'd like to refer then to some of the exhibits that you referred to yesterday during your cross -- during your examination, both direct and cross perhaps. I think you probably have them all up there with you.
A. Okay.
Q. To the extent you do not, please let me know, and I'll make sure that we furnish them. The first document that I would call your attention to would be Plaintiff's Exhibit 11, and that would be the June 1985 mission plan.
A. Okay.
Q. And if you would, please, turn to the portion of that document that relates to the acceptance rate. I believe that would be page 26 of the document.
A. Okay.



Q. If I'm reading that correctly, it indicates that, "Spent fuel acceptance operations will start in 1998," is that correct?
A. Yes.
Q. And after a ramp-up period, the Department would be taking 3,000 MTUs per year of spent fuel in the sixth year of operation, is that correct?
A. Yes.
Q. I think that's all I have on that exhibit. I would next refer you to Plaintiff's Exhibit 96.
A. I don't believe I have that in my stack here. Oh, here it is.
Q. And that's the February 1985 fee adequacy assessment?
A. Yes.
Q. If you would, please, turn to page three of that document? Is there an acceptance rate indicated on page three?
A. There are two acceptance rates indicated there.
Q. Okay. But in the beginning acceptance rate, it shows a start date of 1998?
A. For the first repository, yes.
Q. Yes, sir, and it shows that there would be a ramp-up to 3,000 tons a year beginning in



operational year six?
A. That's correct.
Q. Thank you, sir. That's all I have on that one. I would next call your attention to Plaintiff's Exhibit 94.
A. Okay.
Q. That should be the April 1986 TSLCC.
A. Yes.
Q. I would refer you to page 14 of that document. Does that document also indicate a 1998 start date of SNF acceptance?
A. Yes.
Q. And does it also indicate a ramp-up to 3,000 tons a year in operational year six?
A. Yes.
Q. Thank you, sir. That's all I have on that document. I would next call your attention to Plaintiff's Exhibit 97.
A. Okay.
Q. That's the March 1986 fee adequacy analysis.
A. Yes.
Q. Call your attention to page four.
A. Yes.
Q. Does that document indicate a spent nuclear



fuel acceptance starting in 1998?
A. Yes.
Q. Does it also indicate a ramp-up to 3,000 tons a year beginning in operational year six?
A. Yes, it does.
Q. Thank you, sir. That's all I have on that document. And just for clarification, when I'm referring to operational year six, I'm of course counting the years since the beginning of acceptance, acceptance operations, is what I'm referring to, is that your understanding?
A. Yes.
Q. I would next call your attention to Plaintiff's Exhibit 20.
A. Okay.
Q. That should be the September 1995 TSLCC.
A. Yes.
Q. I'd like to refer you to page eight of that document.
A. Yes.
Q. That document shows spent nuclear fuel acceptance beginning in year 2010, correct?
A. That's correct.
Q. And it shows a ramp-up to 3,000 tons a year in operational year five, doesn't it?

A. Yes.
Q. I would next call your attention to Plaintiff's Exhibit 25.
A. Okay.
Q. That should be the December 1998 TSLCC.
A. That's correct.
Q. I call your attention to page 15, spent nuclear fuel acceptance rate appear on that page, sir?
A. Yes, it does.
Q. Again, does it show a 2010 start date for spent nuclear fuel acceptance?
A. Yes.
Q. It also shows a ramp-up to 3,000 tons a year beginning in operational year five, doesn't it?
A. Yes, it does.
Q. Thank you, sir. That's all I have for that exhibit. Next call your attention to Plaintiff's Exhibit 29.
A. Okay.
Q. That should be the May 2001 TSLCC, is that correct?
A. That's correct.
Q. I call your attention to page 4-14.
A. Yes.



Q. That also shows a spent nuclear fuel acceptance, doesn't it?
A. Yes, it does.
Q. It shows acceptance beginning in 2010?
A. Yes.
Q. And it shows acceptance ramping up to 3,000 tons a year in operational year five?
A. That's correct.
Q. That's all I have on that document, sir. I would also call your attention to Plaintiff's Exhibit 36.
A. Go ahead.
Q. Call your attention to page two of that document, which should be the July 2004 APR/ACR. Okay. Is that document the July 2004 APR/ACR, sir?
A. Yes, it is.
Q. And on page two, there's a spent nuclear fuel acceptance rate?
A. Yes, there is.
Q. And that shows spent nuclear fuel acceptance starting in 2010?
A. Yes.
Q. And it shows a ramp-up to 3,000 tons a year in operational year five, doesn't it?
A. Yes, it does.



Q. I don't think I've asked you this question, but if I have, I apologize, and I'll say, just say that it's nothing more than I'm asking a second time, and I do apologize if I have. Has the Department ever published a document where it indicated it was going to pick up spent nuclear fuel at the rate of 900 metric tons a year for the life of the program?
MR. LO RE: Your Honor, that's been asked and answered, and I just, rather than put it as an objection, I would just point out that I believe the question was already asked and answered.
THE COURT: Yes, but applying the three strikes rule, I'm not sure it's been asked a third time. The objection is overruled.
THE WITNESS: No.
BY MR. SMALL:
Q. Has the Department ever published a document indicating that it was going to use a 2,100 metric ton per year rate for the life of the program?
A. No.
Q. Now, when I say for the life of the program, I of course did not mean to imply that there would not be a short ramp-up period of, say, five years at the beginning, and I assume that in answering those questions, you made that assumption



as well?
A. As well as the ramp down rate at the end of the operational life of the facility.
Q. Yesterday, in discussing the 1995 ACR/APR, you indicated that there had been some clearance problem in getting it approved for publication. Do you recall that testimony?
A. Yes.
Q. Why was there a clearance problem?
A. I don't know. I wasn't involved at the time. I simply was reflecting on the words that were produced in the document.
Q. In the Department's operational planning documents for the spent nuclear fuel program, are operations based on 40-hour workweeks?
A. Not necessarily.
Q. What are they based on?
A. They're based on a -- it has varied throughout the development of the program in terms of how often you want to operate the facilities, whether you would operate them on a six-day basis with a day off for maintenance, whether or not you would operate them on a straight, over, around-the-clock basis on a shift basis.
So I'd really have to say that that varied

depending on the various designs, the design that we're looking at and the capabilities of the facilities and the expectations of the amount of maintenance associated with the facilities to keep them operational, so I don't think it's a simple 40 on, 40 off kind of exercise.

Q. All right. Would the assumption be reflected in the TSLCCs?

A. Not necessarily; that's a fairly detailed assumption that would not necessarily be reflected there.

Q. Where would that assumption appear?

A. That would appear, from my own perspective, it would appear with, in relation to the designers of the facilities and what their assumptions are for the capabilities of the facilities and how they would be operated.

Q. Of course, you would have to know that in order to do the TSLCCs, wouldn't you?

A. Well, as I mentioned before, the TSLCCs are fairly conservative estimates in terms of the total cost of the program. We typically have leaned over the years on the high-end cost because we're trying to determine whether or not a high-end cost would still be adequate. In other words, the fee would



still be adequate under those conditions.

So in terms of what individual assumptions and what the cost assumptions were, based on the operations of the facilities, I don't know whether it got down into the details of how many shifts were operated in any one year it would have took to do any specific capacity.

Q. I take it then you personally don't know what assumptions were embodied in any particular TSLCC?

A. Not to that level of detail, no.

Q. Would it be fair to say that a primary, not the sole, but a primary purpose of the MRS proposal that DOE made in 1987 was to allow DOE a way to meet the 1998 start date?

A. Yes.

Q. Because without the MRS, it was very unlikely that DOE would meet that 1998 start date, correct?

A. If you remember my testimony from yesterday, and the proposal itself, we stated the repository was not going to be operational until 2003. Therefore, without the MRS available in the 1998 time frame, we would not have a facility available to receive materials in 1998.



Q. I'd like to call your attention, sir, to Defendant's Exhibit 51, which is the June 1987 mission plan minutes.

A. Okay. I've got it.

Q. And I'd like to call your attention to page 63 of that document, sir.

A. Okay.

Q. Do you see the heading, "F3, Contingency Plans"?

A. Yes, I do.

Q. The first sentence under there says, "If the Congress does not approve the MRS facility, the transfer of waste to DOE facilities may not be able to begin in 1998." Did I read that correctly?

A. Yes.

Q. Now, in fact, that very contingency occurred, that is to say the contingency that DOE did not begin in 1998, didn't it, sir?

A. That's correct.

Q. Now, the second sentence says, "The DOE will continue to encourage and expedite the effective use of available storage and the development of necessary additional storage at reactor sites." Did I correctly read that, sir?

A. Yes.



Q. Okay. Now, we know that the contingency occurred, that is to say that DOE was unable to begin in 1998, so my question is, what did DOE do to fulfill that second sentence?

A. Well, I think the Department undertook one action which was to develop a multi-purpose canister system in the '90s to help facilitate the storage at reactor sites, that that would have been a canister that would have been storable, transportable, and disposable in a repository facility, and I think undertook that effort, and due to Congressional budget cuts, we had to terminate that program.

But I would cite that as an example of what we were doing to encourage and expedite the effective use of available storage and development of additional storage at reactor sites. If that system had come into play, it would have facilitated, potentially facilitated the transfer of those materials into the system.

Q. And that's because once a utility loaded spent fuel into an MPC, it could be used for any purposes, is that correct?

A. That's correct. It would limit the, it would potentially limit the amount of additional packaging and handling that the Department would need

-

UNITED STATES

COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING :

COMPANY, ALABAMA POWER COMPANY, :

and GEORGIA POWER COMPANY, :NO. 98-614C

Plaintiffs :

vs. :

THE UNITED STATES, :

Defendant. :

Pages: 1731 through 1933

Place: Washington, D.C.

Date: October 26, 2005

HERITAGE REPORTING CORPORATION

Official Reporters

1220 L Street, N.W., Suite 600

Washington, D.C. 20005-4018

(202) 628-4888

hrc@concentric.net

1731

IN THE UNITED STATES COURT OF FEDERAL CLAIM

SOUTHERN NUCLEAR OPERATING )
COMPANY, ALABAMA POWER )
COMPANY, and GEORGIA POWER ) NO. 98-614C
COMPANY, )
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant )

Courtroom Number 5
Court of Federal Claims
717 Madison Place NW
Washington, D.C.

Wednesday, October 26, 2005

VOLUME 8

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE THE HONORABLE JAMES F. MEROW

1732

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

M. STANFORD BLANTON, ESQ.
K.C. HAIRSTON, ESQ.
S. ALLEN BAKER, JR., ESQ.
Balch & Bingham
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3417

and

RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 12th Street, Northwest
Washington, DC 20004

ON BEHALF OF THE DEFENDANT:

JOHN EKMAN, ESQ.
HEIDE HERRMANN, ESQ.
MARIAN SULLIVAN, ESQ.
JOSHUA E. GARDNER, ESQ.
ALAN LO RE, ESQ.
STEPHEN FINN, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, DC 20530

** Index appears at end of transcript **

1733

P R O C E E D I N G S

_ _ _ _ _

JUDGE MEROW: Please be seated. Mr. Ekman, do you have a witness today, or --

MR. EKMAN: We do. We have a couple witnesses, Your Honor, but before we begin our case, or actually before we call our witnesses, at the start of our case there are a few administrative items to take care of.

First of all, there's still the issue of the government exhibits to which there are no objections. I have a list here which I provided the Plaintiffs last week. With the exception of DX329, which is still on this list, but I've crossed off the list which we're withdrawing, I would ask that to the extent these exhibits have not already been admitted -- and some of them have been. For instance, there's some administrative record documents in here that were admitted -- that the government's exhibits to which there are no objections by Plaintiffs be admitted.

JUDGE MEROW: Yes.

MR. BLANTON: No objection from us on that, Your Honor.

JUDGE MEROW: Okay, the exhibits where

Larry Johnson we'll have to hold on, but we expect we'll be able to get done with them by the time Your Honor needs to leave tomorrow.

JUDGE MEROW: Yes, that would be fine. Also, the conference that I have won't be more than an hour, so we could adjourn 4 to 5 and continue on if we had to.

MR. BLANTON: So I think that means we're only going to have two witnesses today. I thought we were going to have three.

MR. EKMAN: The way we lined it up was -- just guarantees -- we didn't want to tell Mr. Zebransky to be here and then have for some reason the questions go long. It was easier since we can do two and two and be done in the two-day time period. We thought that was easier and more convenient for the witnesses.

MR. BLANTON: I just want to know what's coming.

JUDGE MEROW: Okay.

MR. EKMAN: Great. Thank you, Your Honor. I now turn it over to Ms. Sullivan.

JUDGE MEROW: Okay. Ms. Sullivan?

MS. SULLIVAN: Thank you, Your Honor, good morning. The government would to like to call its



first witness to the stand, Mr. Christopher Kouts. Thank you, Your Honor.

JUDGE MEROW: Are these his exhibits?

MS. SULLIVAN: No, Your Honor, those are not.

JUDGE MEROW: If there's a problem, we can briefly clean them up.

MS. SULLIVAN: He'll have another pile of paper there when he finishes.

CHRISTOPHER ALEXANDER KOUTS

was sworn and testified as follows:

EXAMINATION

BY MS. SULLIVAN:

Q Could you state your full name for the record, please?

A Christopher Alexander Kouts.

Q Mr. Kouts, where are you currently employed?

A At -- in the Office of Civilian Radioactive Waste Management at the Department of Energy.

Q And which office within the Office of Civilian Radioactive Waste Management?

A I'm the director of the Office of Systems



Analysis and Strategy Development.

Q What are your responsibilities in that position?

A Primarily, I deal with the waste acceptance function of the system, the management of the standard contracts with utilities. I'm also responsible for systems analysis, which basically might -- my task there is to make sure that the system, when deployed, will operate effectively and efficiently. In addition, I also have other responsibilities of total system life cycle cost, fee adequacy assessments. I'm also responsible for safeguards and security policy among other activities.

Q And I believe you've testified to this, but let me ask, do your responsibilities include planning for waste acceptance from the utilities?

A Yes, they do.

Q Okay. How long have you held your current position?

A On an acting basis, since I believe October of 2002 and on a permanent basis, July of 2003.

Q And to whom do you report in your current position?

A I report to the principal deputy director,



Mr. Paul Golan.

Q To whom does Mr. Golan report?

A Mr. Golan reports to the director of the program, who in turn reports to the undersecretary and Secretary of Energy.

Q Is there currently a director of the program?

A No, there is not.

Q When did you first join the Office of Civilian Radioactive Waste Management?

A In the summer of 1985.

Q Would you please summarize briefly the positions you've held within the office since you started in 1985?

A Okay. When I first joined the program, I began work as a member of the MRS team. That was a team that was put together to develop the MRS proposal to Congress required under Section 141 of the Nuclear Waste Policy Act. I worked on that for approximately three years.

Then I was appointed to take over the transportation program for the program, overall program, and I managed that for about a three-year time frame.

I then moved on to working on strategic

you talk about an upper bound or something like that, that's typically how engineering calculations are done.

Q Mr. Kouts, you have been handed what's been marked as Defendant's Exhibit 94, actually, an excerpt of Defendant's Exhibit 94. That's also been put on the screen. Can you identify this document for the record?

A Yes. This was a draft mission amendment. I think the interesting point is it's draft. It was never finalized. In September of 1991. This was one that we issued that we never really finalized. We didn't respond to public comments and issue it in final form.

Q Can I direct your attention to page 18 of this document? The first paragraph under "strategy for the MRS facility," if we could highlight that paragraph and if I could ask you to read that paragraph into the record.

A I will do so slowly. "Strategy for the MRS facility. To achieve the objective of timely and adequate waste acceptance, we plan to develop an MRS facility that is to start waste acceptance in 1998. To make this possible, the president's legislative package for the national energy strategy includes a



provision to repeal the schedule linkages established in the Nuclear Waste Policy Act amendments of -- Amendments Act of 1987. This could also be achieved by congressional enactment of a negotiated siting agreement reached through the efforts of the nuclear waste negotiator."

Q Mr. Kouts, how did DOE plan to address the schedule linkages at the time this document was issued?

A Issue legislation, as indicated here, through the President's national energy strategy or through a negotiated siting agreement that would be enacted by Congress by the nuclear waste negotiator.

Q Could I direct your attention to the next page, page 19? If we could highlight that paragraph. Mr. Kouts, could you read that paragraph into the record, please?

A Yes, I can. "Our current plans are based on the statutory storage capacity limits specified in the Amendments Act for an MRS facility sited by the Department of Energy, 10,000 metric tons before the start of waste acceptance at the repository, and 15,000 metric tons at any time thereafter. This capacity would provide enough federal storage between the start of operations at the MRS facility and at the



repository to substantially reduce the need for utilities to add new storage capacity at existing facilities after 1998 and to be able to initiate the orderly decommissioning of reactors."

Q Mr. Kouts, at the time this document was issued, did DOE plan to begin performance in accordance with the capacity limitations imposed by the Nuclear Waste Policy Act amendments?

A Yes, it did.

Q Why did DOE not plan to seek relief from these capacity limits?

A Essentially, the department's position since the submission of the MRS proposal back in 1987 was that you had to have a limitation on the MRS facility in order to make it acceptable to a local government and to a state governor that the facility would not be permanent, and basically, you would move all the material there and never build a repository. So that's why the department held on to the limitations on the MRS facility throughout its pursuit of that facility.

Q And could I direct your attention to page 207 of this document? Schedule -- what is this schedule set forth on page 207?

A This reflects again the planned acceptance



of the department with an MRS facility beginning in 1998.

Q Okay.

A It also, as you can see, the acceptance would not exceed 10,000 tons until the repository was operational in 2010 and no more than 15,000 tons throughout the existence of the MRS facility.

Q Mr. Kouts, are you familiar with the activities that DOE undertook to site an MRS?

A During this time period?

Q Yes.

A Yes. We were essentially supporting the Office of the Nuclear Waste Negotiator in administering a grant program for that office so that funding could be provided to interested parties. At the time, it was primarily Indian tribes who were potentially interested in allowing the siting of such a facility at their reservation.

Q Were the efforts to site an MRS facility successful?

A No, they were not.

Q When did those efforts cease?

A They effectively ceased when the Office of the Nuclear Waste Negotiator essentially ceased to exist, which was approximately five years -- which was

exactly five years after the passage of the Nuclear Waste Policy amendments of 1987.
Q Okay. Defendant's Exhibit 97, please. The Office of the Nuclear Waste Negotiator, when did -- what year was that?
A I believe it was 1992.
Q Okay. Mr. Kouts, I've handed you what's been marked as Defendant's Exhibit 97. Could you identify this document for the record?
A This is another annual capacity report that was issued in December of 1991.
Q Okay. Can I direct your attention to page 5 of this document, please?
A Yes.
Q What is the basis for the rates set forth in this table?
A They reflect essentially a ramp-up to 900 metric tons and holding at that acceptance rate in order not to exceed the capacity at the MRS of more than 10,000, which again was tied to an expected operational date of the repository in 2010.
Q And these rates are the projected receiving capacities for which facility?
A The MRS facility.
Q Mr. Kouts, I've handed you an excerpt of



Plaintiff's Exhibit 23 -- 823. No, sorry. Yeah, 823. I skipped ahead. Can you identify this document for the record?
A Yes. This is an acceptance priority ranking and annual capacity report that was issued by the department in March of 1995.
Q Can I direct your attention to page 4 of this document?
A Yes.
Q Bring up that table there in the middle of the page. Mr. Kouts, what is the basis for the rates set forth on that table?
A They were essentially -- the assumption was we would begin operation at an MRS facility. At this time we're kind of hedging our bets it might not be in 1998. As a result, you're seeing year one, year two, year three, but we're still holding on to the 10,000-ton maximum limitation that an MRS would have.
Q Can we go back to page 3 and the paragraph that ends on that page and continues to the next page? Could you read the portion of that paragraph that's been highlighted?
A Okay. "In the previous ACR, the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a monitored



retrievable storage facility prior to repository operations. Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by years of operation of the system rather than by specific calendar years."
Q Thank you. Why were the years -- going back to the table there on page 4, why were the years not identified in this table?
A Again, because the department was, as indicated in that previous paragraph I read, was uncertain as to when we could deploy the facility. We were not encountering great success with interest in Congress for reducing the linkages or for identifying a site.
Q And what was the uncertainty with regard to the program performance at that time?
A That the time that we had to implement an MRS and have it available, the time period had shrunk to such a small amount that it was not feasible for us to anticipate that it could be operational in 1998.
Q Mr. Kouts, I've handed you, I believe, an excerpt of Plaintiff's Exhibit 23. Can we put that up on the screen? Could you identify this document for the record?



A This is an analysis of the total system life cycle cost of the Civilian Radioactive Waste Management Program. We also refer to the acronym as TSLCC. It was issued in September of 1995.
Q Can I direct your attention to page 2 of this document? And can I ask you to read that paragraph into the record, please?
A "Our national strategy maintains a clear focus on the long-term objective of waste disposal in a geologic repository. The immediate challenge is to provide for the timely acceptance and safe interim storage of spent nuclear fuel from the nation's commercial reactors. In order to accomplish these objectives, the program was restructured in 1994. The program is organized with two," quote-unquote, "business centers, the Yucca Mountain site characterization project and the waste acceptance, storage and transportation, WAST, project, along with a management center that provides integration and management support to the director of OCRWM and the projects.
"Program and project activities were reviewed and focused on near-term interim milestones leading to planned acceptance and in placement of SNF in a geologic repository beginning in 2010. The

repository would have. If you staged it such that you only had to bring on storage initially and have that packaging done later, you could begin acceptance earlier, and that's what the following paragraph on page 5 indicates, that, you know, if you could stage it and there were different technologies that you could pursue, that would allow you to accept fuel at a sooner time period.

Q But the very earliest DOE predicted in this document it could start the MRS with the existing linkages was three years before the start of the repository operations, correct?

A Well, the document indicates possibly as early as 2000 and -- with the existing linkages and in 1998 or even earlier with alternative, less limiting linkages. So I think the department is leaving the door open that we could deploy this facility a lot earlier, even earlier than 1998 if these were addressed.

Q Right. With the existing linkages that are the law of this country right now, the earliest Department of Energy says it could have gotten the MRS in operation is three years before the start of the repository operation?

A With the existing linkages, yes.



Q Now, DOE's estimates -- and I think it kind of jumps off the page from this document, but I'll ask you. DOE's estimates for the construction of the repository from the time it receives construction authorization are two and a half to three years, correct?

A That's not what I recollect. I believe our expectation was that it would take about five years to get the repository operation, the repository operation. It was about a five-year construction period for the repository, so if we received a construction authorization in 1998, the repository would not be operational until 2003.

Q Let me ask you. Maybe I just misunderstood something you said, then. I'll ask you again. From the time you get the construction license, is it DOE's estimate or schedule that it would take approximately two and a half years to construct the facility and get the license to possess spent fuel?

MS. SULLIVAN: Objection, vague as to time frame.

JUDGE MEROW: Do you mean at any time, or --

MR. BLANTON: I guess I'll back up.



BY MR. BLANTON:

Q You have presented testimony in the Indiana Michigan case and in this case regarding DOE's plan to begin repository operations in 2010, correct?

A Yes.

Q And as part of that testimony, I think you provided the DOE's licensing and construction schedule, did you not?

A Yes, but that -- but I would -- you know, we need to look at the time frames involved associated with what the department was planning at what time. When I testified in Indiana Michigan, that was our plan for getting to 2010. What's reflected in the DOE position on the MRS facility was a repository that received a construction authorization in 1998 and began operation in 2003.

Strategy for the development of a repository evolved over time. Where we were in this document in 1989 was different than where we were last year or the year before.

Q So you were projecting, when you testified in this court about the 2010 date, you were projecting a repository construction time of 50 percent of what you were projecting in the late '80s, is that what you're saying?



A Because the design of the repository had evolved and changed as we understood it from 1989, which we had a perspective of then, and to where we were last year in terms of development of where we were for 2010. In an effort to try to get the repository open as early as possible, we looked at deploying very limited facilities initially at the repository, as I testified in Indiana Michigan, in order to get the license to receive and possess as early as possible so we could begin moving site -- fuel on site as quickly as possible in anticipation of 2010.

In June of 1989, we had a totally different program, which reflected that we were going to have an MRS available in 1998, basically that would begin receiving fuel and a repository would be operational in 2003. So I think you can't compare what we were doing when I testified in Indiana Michigan to what we were trying to get to 2010 to where the program was and its plans for repository deployed in 2003.

Q Well, I certainly wasn't trying to confuse you, and I apologize. Appreciate you clearing that up for us.

A Okay.

Q Okay. And if the linkages stayed in place, the MRS wouldn't be available until 2007?
A That's correct.
Q It would operate for three years and would have three years to fill that 10,000 metric tons of capacity up, correct?
A Assuming that -- assuming the facility was designed and you could do it that quickly, which is something that I don't think we ever anticipated with any of our ramp-up rates for a facility, but yes, theoretically, yes.
Q I'm sorry, I didn't mean to speak over you.
A I'm sorry. Theoretically, yes.
Q Let's look back at 2.1.
A Okay.
Q I'm sorry, Kristin, 7. All right. And you're right, you didn't start from a standing start on the ramp-up rate, you started at 1200 metric tons a year with that upper bounding rate, correct?
A That's correct.
Q And then you get to 3,000 in 2003?
A That's correct.
Q All right. Now, your lower bounding rate -- and just to back up and make perfectly clear



that the record's clear, table 2.1, the upper bounding case assumes all of the linkages and limitations on an MRS are eliminated that Congress had imposed.
A That's correct.
Q Okay. Now, table 2.2 just assumes that the schedule linkages are eliminated but the capacity limitations are maintained, correct?
A That's correct.
Q Okay. And it starts in 1998 at 300 and goes to 2007, ramps up to 875 and ends at 2007, correct?
A That's correct.
Q But as the sentence we just read notes, DOE could not perform that schedule as long as the schedule linkages are in place, correct?
A That's correct.
Q Now let's look at Plaintiff's Exhibit 823, which is the 1995 annual capacity report. Got it?
A Yes, I do.
Q All right, sir. All right. Now, you weren't actually involved in the production of the 1995 annual capacity report, were you?
A No, I was not.
Q That wasn't part of your job back then?
A No, it was not. I was a reviewer for the



document, but I did not prepare it.
Q You weren't involved in managing the area that published the ACR?
A That's correct.
Q Now, did I understand your testimony correctly that by March of 1995, the Office of Nuclear Waste Negotiator had been eliminated?
A That's correct. I believe it went out of existence or that office went out of existence in late 1994.
Q And the purpose, as I understand it, of the Office of Nuclear Waste Negotiator was to go out and negotiate with different states to try to get somebody to host a monitored retrievable storage facility. Is that correct?
A That was one of his duties. He was also charged with trying to find a willing host for a repository.
Q Okay. Another thankless job, I'm sure. At any rate, by March of 1995, the Nuclear Waste Negotiator is history?
A That's correct.
Q He doesn't exist anymore?
A That's correct.
Q DOE had not selected a site for the MRS,



correct?
A That's correct. Nor could we under the current construct of the act, since we could not site it until after the repository was sited.
Q Excellent point.
You hadn't selected a site for the repository by 1995 either --
A That's correct.
Q -- correct? So the prospect of an MRS facility anytime close to 1998 was fairly dim by March of 1995, wouldn't you agree with me about that?
A Well, certainly the negotiator went out of existence. There were several bills that were still being actively considered in Congress that would have given the department authority to implement interim storage. Those bills were still in play at the time that this report was written.
Q Glad you mentioned that. Let me ask you about that. There were several pieces of legislation that were calling for interim storage facilities that percolated through the mid to late '90s, correct?
A That's correct.
Q And at that time, President Clinton was in office, correct?
A Yes, he was.

Q And therefore, he appointed the Secretary of Energy, correct?
A He did.
Q Are you aware that the Clinton administration vetoed legislation calling for centralized interim storage when it was passed by both houses of Congress?
A Yes, I am. That was in the year -- I believe it was in 2000 that that occurred.
Q I believe it was too.
All right, so we're back to the ACR, to the Plaintiff's Exhibit 823, and, Your Honor, I've got just a couple of questions about this and then we can maybe take a break.
JUDGE MEROW: Sure.
BY MR. BLANTON:
Q Now, let's look at page 4, the famous year one, year two acceptance rate schedule. Your testimony is not the first time we have talked about this, Mr. Kouts. Don't feel rained on.
A I don't.
Q Now, at this point, DOE is telling the utilities that there's -- there's no -- there's probably not going to be an MRS in 1998, correct?
A Well, I wouldn't want to go beyond what



the document said. I believe in the previous page it said due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual capacity rates are presented by years of operations rather than specific years, so I would refer to the statements in the document which indicates that there is uncertainty regarding 1998.
But that's why we provided the schedule as a year one, year two basis.
Q You certainly didn't think you were going to have an MRS by 1998 back in March of '95, did you, Mr. Kouts?
A Quite honestly, I -- I think I was on the spectrum since I was, I believe, at that time working to develop a topical safety analysis report in anticipation of legislation, I was somewhat optimistic because we were hopeful that that topical safety analysis report would be approved and we would have a path to getting a facility very quickly. So I was monitoring that carefully, and I was hopeful that Congress would do something.
I would also submit to you that besides President Clinton's statements, need to go back to the Secretary of Energy's statements at that time, Secretary O'Leary, where she said in front of Congress



untie my hands. She came from the utility industry.
She was pushing very hard for authority in order to get acceptance of spent fuel earlier than the repository.
So under that auspices and under that general direction of the secretary and general viewpoint of the secretary, we were still actively hopeful that we would get some direction from Congress in order to implement that.
Q Now, by this time -- and we can go -- this is not a memory game. I can find the document, but I've got a lot of documents, I just can't put my hands on it.
By this time, Secretary O'Leary had issued the notice of inquiry on waste acceptance issues, had she not?
A I believe so. I'm not totally familiar with that. I don't know the date, but I believe she had.
Q I'll get it after lunch.
But you're aware that by this time, DOE had announced to the industry we're not coming to get your fuel in 1998 and tell us what you think about it, correct?
A I really can't testify one way or the



other. I don't have the information in front of me.
Q We'll get that document for you after lunch.
A Okay.
Q Now, notwithstanding the difficulties in siting and getting an MRS facility established, this document continues to impose the capacity limitations but not the schedule linkages on the acceptance rate that's contained in the 1995 ACR, correct?
A That's correct.
MR. BLANTON: Your Honor, I'm only two minutes late, but I think this is a great time to take a break.
JUDGE MEROW: Okay. Why don't we take a break and return at 5 past 2.
MR. BLANTON: Thank you, sir.
(Luncheon recess taken from 1:01 PM through 2:06 PM)

- AFTERNOON SESSION -
BY MR. BLANTON:
Q Mr. Kouts, see if you can find Plaintiff's Exhibit 23. I think Ms. Sullivan asked you about that before lunch.
And, Kristin, if I could get it on the viewer.
Now, this, Mr. Kouts, is the analysis of the total system life cycle cost of the Civilian Radioactive Waste Management program as of September '95, is that correct?
A That's correct.
Q Now, I think right before lunch we were talking about the 1995 annual capacity report, which was published in March of '95, and whether or not an MRS was a faint hope at that point in time.
A Uh-huh.
Q My question is: By the time September '95 rolled around and the total system life cycle cost analysis came out in September 1995, the MRS facility was not included as part of the cost of the program, is that correct?
A The -- I have to go back and check the assumptions for this. Certainly, the historical costs would have been included since that has to, but I --



you know, until I really took a look at the document, you know, to verify that --
Q Take a look at page 3. That may answer the question.
A Okay.
Q There's a chart there on the summary of the total system life cycle cost, and as I read it, it includes repository, waste acceptance, storage and transportation, other development and evaluation and payments equal to taxes and benefits, but I don't see anything about a monitored retrievable storage facility there.
A I don't either, so my assumption would be that this does not include MRS in it, that's correct.
Q All right. Now, staying with the same exhibit, Exhibit 23, turn over, if you would, to page 8. And I think Ms. Sullivan asked you about these rates.
A Yes.
Q And those are the rates projected by the Department of Energy in 1995 for a repository, is that correct?
A That's correct.
Q And the rates DOE currently projects are close to that, correct?



A Our ramp-up rates are similar, not identical to this.
Q Not identical?
A Right.
MR. BLANTON: Your Honor, may I approach the witness?
JUDGE MEROW: Yes, surely.
BY MR. BLANTON:
Q Now, we have been looking -- well, I'll give you that and then get back over here by the microphone. Mr. Kouts, I've handed you Plaintiff's Exhibit 24, which is a document entitled "Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program," dated December 1998. Do you have that before you?
A Yes, I do.
Q And if we look at page 15 of that document, there is an acceptance rate schedule.
A Uh-huh.
Q Correct?
A I see it.
Q And that one ramps up from a 400 metric ton rate in the first year up to 3,000 metric tons in the fifth year?
A Fifth year.



Q That's correct?
A That's correct.
Q Now, the rates in the system life cycle cost estimates -- well, strike that.
Let me ask you, what is a system requirements document?
A A systems requirements document basically is a set of technical requirements for the program that is essentially owned by the director of the program. We have a -- what we call a CRWMS, or a civilian radioactive waste management system, a requirements document that's a level one requirements document, that the director of the program controls.
Q The organization within the Office of Civilian Radioactive Waste Management that you head is in charge of putting together or keeping up with the system requirements document, correct?
A The level one document, yes.
MR. BLANTON: Got another exhibit to hand him, Your Honor. May I approach?
JUDGE MEROW: Oh, yes. You have permanent approaching rights.
MR. BLANTON: I appreciate that, Judge. I think going to be walking back and forth quite a bit for the next few minutes.

BY MR. BLANTON:
Q You have before you, Mr. Kouts, Plaintiff's Exhibit 167, which is entitled "Civilian Radioactive Waste Management System Requirements Document, Revision 5, January 1999."
A Yes, I do.
Q Now, first of all, this is a document -- you weren't head of the organization when this document was published, correct?
A Not of the organization that was responsible for this, no.
Q But you are now? You're head of the organization that maintains the current revision of this document?
A That's correct.
Q Now, first of all, if we turn to page 10, put that on the screen, now, Mr. Kouts, it's true, isn't it, that the system requirements document establishes the capabilities of the waste system that's being designed? Isn't that correct?
A It -- I would phrase that as it establishes the design targets for implementation of the system such that the transportation part of the system, the repository part of the system, needs to meet the acceptance rate identified in each of the



years here. It's a design goal for them to achieve that.
Q It's sort of the specifications for the rest of the system to operate by, is that a fair way to characterize it?
A That's correct.
Q Okay. Now, it's true, isn't it, sir, that the rates shown there on page 10 of the system requirements document, Plaintiff's 167, are considered reasonable rates, reasonable acceptance rates for the program to operate under?
A I would agree with that, yes.
Q Okay. And this particular rate that ramps up to 3,000 metric tons and stays at a steady state was determined to be reasonable based on a series of analyses over many years of the program?
A I believe the -- I can't speak to the analyses that indicated this. I think this was a design target for the system. It's been in existence, as you can see, at a steady-state rate since the early days of the program. There have been -- I'm not directly familiar with any specific analyses that were associated with this.
Q But you were aware there were some. You were aware this is based on an analysis?



A I was aware that basically when the requirement was set, people looked at analyses to see how the requirement could be met.
Q Okay.
A But if you're talking about anticipatory analyses, it was a study done that helped set the rate. I'm unaware of any specific analysis that helped set a rate.
Q Maybe I'm confused again. Isn't it true, sir, that there have been a series of analyses over many years that have been done to indicate that the rate shown on that document is a reasonable maximum rate for the system to operate under?
A When you say "reasonable maximum rate for the system to operate under," there have been studies that have looked at higher rates, there have been studies that have looked at lower rates. I mean, I don't know -- it all depends on what your characterization of what reasonable is. I'm not trying to be difficult, it's simply that this -- this has been something that's been within the program for a long time. It's almost accepted as a target for our acceptance.
As I indicated earlier, I don't remember any specific study that said that, you know, looking



at a variety of different rates, this was the right one, as far as I can recollect from my involvement in the program.
MR. BLANTON: I'm going to show him page 27 of his April 11, '05 deposition. Actually, I'll probably start at the bottom of page 26.
MS. SULLIVAN: Okay.
BY MR. BLANTON:
Q Mr. Kouts, I'm going to hand you -- this is a travel copy of the deposition, so it has four pages to a page. Don't read it out loud, just refresh your memory from the bottom of page 26 down through the bottom of page 27.
A Okay, I see it.
Q All right. Now, my question is, as I understand your testimony, somebody decided that the system should operate at a 3,000 metric ton rate, and the system requirements document says we're going to design a facility and a transportation system around that number.
A That's correct.
Q So the number comes first and it drives the design?
A That's correct.
Q All right. And my question is simply:

Isn't it true that the 3,000 metric ton rate that's reflected on that page is a product of analysis within the Department of Energy over many years?
A Well, it -- it may be. I -- I can't remember one specific analysis that said 3,000 metric tons is the right reasonable maximum rate. As I indicated, it actually -- it predated the existence of -- the 3,000 metric ton rate predated my involvement with the program. It was actually being considered before -- in the development of the plan even before that, so maybe in that time frame someone came up with it in relationship to how the repositories would work.
Over the years, it's been more or less accepted. We have looked at greater amounts, lesser amounts over the years, but the requirement hasn't changed. That's probably the best way I can answer that.
Q You keep bouncing around and coming back to 3,000 metric tons, is that right?
A Because we don't have a strong basis, I'd say, for saying it should be higher or should be lower. I have done analyses that indicate that, for instance, a 6,000-ton rate, which means you'd need a lot more capability at the repository, a lot more



capability in the transportation system that would operate for a shorter period of time. But again, the -- as I characterized earlier, it's been something that's been in the program as accepted for a long time, and it exists today in our requirements documents.
Q Now, you also testified before lunch about the proposed interim storage facility. You remember we talked about that?
A Which one?
Q The one that was proposed in legislation that President Clinton vetoed.
A The interim storage facility that was being contemplated by Congress or --
Q Yes, sir, that's the one I'm referring to.
A Yes.
Q Do you still have Plaintiff's Exhibit 23 in front of you?
A Yes, I do.
Q And again, this is the 1995 total system life cycle cost document?
A Yes.
Q I'm sorry. I got the wrong exhibit. It was the one I was just asking you about. My bad. Plaintiff's Exhibit 167.



If you'll turn to page 15 of that document. There is a table 3-3 titled "CISF Receipt Rates." Is the CISF the centralized interim storage facility that you were referring to earlier in your testimony?
A That's correct.
Q And this document or this analysis was included in the 1999 system requirements document because that facility was being considered by Congress at least, correct?
A That's correct, or an interim storage facility was being considered. And this was our concept of how we would deploy it.
Q Okay. And as we can see, that has a -- strike that.
Centralized interim storage facility was really a euphemism for an MRS without scheduled link and capacity linkages, correct?
A To some extent, but it had -- was a much less complicated facility than the original one that we proposed to Congress back in 1987. It was essentially a canistered storage facility that would transfer canisters.
Q It was something more like a utility might have it at site than a big fuel-handling facility,



correct?
A The -- the handling operations were similar to what utility has at site for dry storage purposes, yes.
Q All right, sir. And as we look at this receipt rate, it starts out for the centralized interim storage facility, that starts out at 1200 metric tons a year, then after two years ramps up to 2,000, in the fifth year goes to 2700, then in the sixth year and subsequent goes to 3,000, is that correct?
A That's correct.
Q Were these the receipt rates being proposed in the legislation by Congress, or did DOE establish these?
A I don't believe it was called out specifically in any legislation that I can remember. This was more based on the capabilities of the facility that we were trying to design.
Q So you considered those rates to be reasonable for that facility?
A We consider them to be achievable, yes.
Q Now, I can continue to show you system requirements documents, Mr. Kouts, but will you save time and agree with me that the rate that's reflected

in the September '99 system, or excuse me, January '99 system requirements document, which is in Plaintiff's Exhibit 167, is in the current system requirements document for the -- for the system and has been in every system requirements document in between?
A I believe there have been two revisions since that, and it's been in each one of those, yes. Just to -- I believe the CISF aspects of it were deleted in subsequent documents, but certainly the repository acceptance rates were the same.
Q All right, sir. The repository acceptance rates were really all I was asking about, but I appreciate that.
A Okay.
Q Now, Mr. Kouts, the 3,000 metric ton acceptance rate that we just looked at and discussed as having been in all the system -- the recent system requirements document is also the latest version of the acceptance priority ranking and annual capacity report, is that correct?
A That's correct.
Q Mr. Kouts, this has already been entered in evidence. Plaintiff's Exhibit 14 is a 2004 ACR --
MS. SULLIVAN: Objection, Your Honor. This document goes to DOE's performance in 2010 and



beyond, and as the Court has already ruled, we're here to consider damages up to 2004.
MR. BLANTON: The acceptance rate in this document is the same as the acceptance rate in all the other ones we have been talking about, including it's pretty close to some of the ones that Ms. Sullivan introduced earlier today.
JUDGE MEROW: The document's in evidence. You can ask questions about it. I'll overrule the objection.
MR. BLANTON: Thank you, Your Honor.
BY MR. BLANTON:
Q You are now responsible for publishing the acceptance priority rankings and annual capacity reports, is that correct?
A That's correct.
Q And you, your office, published this one, correct?
A The department did, yes.
Q The department within the Department of Energy? I'm talking about your organization that you head.
A It was developed by people under my -- my management.
Q Mr. Pollog and Mr. Zebransky, to be



specific, correct?
A They were certainly involved, yes.
Q All right. If we look at page 2 of the document, Mr. Kouts, we see again the acceptance rates that start at 400 metric tons in the first year and ramp-up to 3,000 by year five, is that correct?
A That's correct.
Q Those are the same ones that are in the system requirements document and the same ones that are in the TS -- the later TSLCC documents that we looked at, correct?
A That's correct.
Q Now, these rates are what DOE intends to be its contractual commitment to the utilities, correct?
A My understanding is it only becomes a contractual commitment after DCSs are submitted and after the department accepts those DCSs.
Q This document, this particular annual capacity report was published to initiate a DCS, a new round of DCSs, is that correct?
A That's correct.
Q Now, it's a fact, isn't it, Mr. Kouts, that the Department of Energy has taken the position that it will not request DCSs from utilities unless it



has a current plan to commence repository operations within 63 months of the date of the request?
A That's the -- essentially the requirements of the contract, that's correct.
Q So until DOE has a repository, it won't take delivery commitment schedules?
A Until the department is 63 months away from its perspective of when it's going to open a receipt facility, the department would not initiate the process.
Q All right. And until it initiates the process, in your view, it doesn't have a contractual commitment?
A My view and my understanding is that after the department issues this report, that a utility or a contractholder provides a DCS, and until the DCS is accepted by the department, at that point, the obligation -- department incurs an obligation.
Q I understand that. And my question is: If DOE does not have a plan to open and commence operations of the repository within 63 months, it won't initiate that process?
A That's correct.
Q So there's no way for a utility hold -- a utility to have a DCS approved unless the Department

of Energy has a plan to open the repository within 63 months?
A And provides an allocation, you know, specific allocation of what it would be taking from that specific reactor in the first year of operations, yes.
Q But the answer to my question was yes?
A Yes.
Q Now, you consider the acceptance rate shown there on the viewer that's at page 2 of the ACR to be appropriate for the system, correct?
A It -- it's not -- it basically reflects what's in our system requirements document and what our facilities are being designed to. As it indicates in the document, these are not all acceptance rates, and it's based on us expecting to open up the repository in 2010.
Q And you consider them to be appropriate?
A The department considers it to be appropriate because it's in the documents that are guiding the design of our facilities and our transportation equipment.
Q Even better.
MR. BLANTON: One second, Your Honor.
JUDGE MEROW: Certainly.



MR. BLANTON: I think that's all. Thank you, Mr. Kouts.
JUDGE MEROW: Redirect?
MS. SULLIVAN: Yes, Your Honor, but could we have ten minutes so that I could just organize so I could ask five minutes' worth of questions?
JUDGE MEROW: Okay. Return at a little after 20 of.
MS. SULLIVAN: Thank you, Your Honor.
JUDGE MEROW: Uh-huh.
(A recess was taken from 2:30 PM through 2:42 PM)
JUDGE MEROW: Please be seated.
MS. SULLIVAN: Apologize, Your Honor.
JUDGE MEROW: No, no, take your time.

REDIRECT EXAMINATION
BY MS. SULLIVAN:
Q Mr. Kouts, we have put on the screen Plaintiff's Exhibit 14, which I believe you have a copy in front of you, the 2004 ACR.
Let's go to page 2. Next page. If you can, bring those rates forward.
Mr. Kouts, what facility are these rates based upon?



A They are based upon acceptance at a repository at Yucca Mountain.
Q And when is this facility -- when was this facility projected to open at the time this document was issued?
A The year 2010.
Q Dawn, can we go to Defendant's Exhibit 330? Can we go to table -- Defendant's Exhibit 330, the 1990, December 1990 preliminary estimate of total system cost.
Can we go to table A1 at the end? Could you bring that table forward?
Mr. Kouts, Mr. Blanton asked you whether the rates set forth in the technical requirements document that was issued in -- systems requirements document that was issued in 1999 was -- were reasonable. Do you remember that testimony?
A Yes, I do.
Q Mr. Kouts, in your opinion, are the rates set forth on this page reasonable?
A Yes, they're -- they're as reasonable as the other one. They're based on our understanding of the capacities of the facility and our ability to receive fuel with them.
Q Mr. Kouts, what is the total amount of



spent nuclear fuel expected to be generated today?
A Today, it's depending on your assumptions, but probably roughly around about 130,000 metric tons.
Q And are there restrictions on the total capacity of MT that can be accepted at the repository?
A Yes, there are restrictions as placed under the Nuclear Waste Policy Act of no more than 70,000 metric tons in the first repository.
Q Are there currently restrictions on DOE's pursuit of the second repository?
A Right now, we're not authorized to pursue a second repository, as I testified earlier, in that the Secretary of Energy, since the program was terminated with the Nuclear Waste Policy Act alternatives of 1987, the Secretary of Energy is to provide a report to Congress between January 1, 2007 and January 1, 2010 on the need for a second repository.
Q So given the capacity on the current, the first repository and the restrictions on DOE's pursuit of the second repository, what has to happen for DOE to accept the total projected amount of spent nuclear fuel?
A Well, one of two things have to happen. We are either authorized to develop a second

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
------------------------------x
PACIFIC GAS & ELECTRIC :
COMPANY, :No. 04-74C
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. :
------------------------------x
Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, June 13, 2006

VOLUME 7

The parties met, pursuant to the notice of the Judge at 9:03 a.m.

BEFORE THE HONORABLE EMILY C. HEWITT



APPEARANCES:
ON BEHALF OF PLAINTIFF:
JERRY STOUCK, ESQ.
ROBERT L. SHAPIRO, ESQ.
DAVID CALLET, ESQ.
ERIC ROWE, ESQ.
Greenberg Traurig LLP
800 Connecticut Avenue, Northwest, Suite 500
Washington, D.C. 20006
(202) 331-3100

ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ.
ALAN LO RE, ESQ.
HEIDE HERRMANN, ESQ.
SCOTT R. DAMELIN, ESQ.
SHARON A. SNYDER, ESQ.
JOSHUA E. GARDNER, ESQ.
MARIAN SULLIVAN, ESQ
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20036
(202) 514-2000



APPEARANCES (Continued):

ALSO PRESENT: DAVID ZABRANSKY
JANE TAYLOR
GABRIELLE BUTLER

***Index appears at end of transcript***



P R O C E E D I N G S
\- - - - -

THE COURT: We continue with the Plaintiff's case, the last witness, Dr. Cornell. Before we turn to that, are there any housekeeping matters at this time?

MR. EKMAN: Your Honor, the government just wanted to inform the Court that the deposition of Mr. David Duke is scheduled for today at 2:00 by telephone.

THE COURT: All right. And how does that impact the schedule in court? Do you have other persons who are working with that?

MR. EKMAN: Indeed, we do.

THE COURT: Thank you. Plaintiff can call its next witness.

MR. STOUCK: Thank you, Your Honor. Plaintiff calls Professor Brad Cornell.

THE COURT: Mr. Cornell, good morning, sir. When you arrive at the witness chair to my left, before you sit down, if you would indicate that you're ready to take the oath by raising your right hand?

Whereupon--

BRADFORD CORNELL

MR. LO RE: Certainly, Your Honor.
THE COURT: Mr. Christopher Kouts?
THE WITNESS: Yes.
THE COURT: Good afternoon, sir.
THE WITNESS: Good afternoon.
THE COURT: When you arrive at the witness chair, before you sit down and when you're ready to take the oath, please indicate by raising your right hand.
Whereupon--

CHRISTOPHER KOUTS

a witness, called for examination, having been duly sworn, was examined and testified as follows:
THE COURT: Thank you, sir. Please state your full name for the record.
THE WITNESS: Christopher Alexander Kouts.
THE COURT: Mr. Lo Re to examine on direct examination.

DIRECT EXAMINATION

BY MR. LO RE:
Q. Good afternoon, Mr. Kouts.
A. Good afternoon.
THE COURT: Please pour yourself a glass of water, if you'd like.



THE WITNESS: Okay. Thank you.
BY MR. LO RE:
Q. Mr. Kouts, where are you currently employed?
A. I am currently employed with the Office of Civilian Radioactive Waste Management within the U.S. Department of Energy.
Q. What is your title there, sir?
A. I am director of the Office of Waste Management.
Q. And how long have you been in that position?
A. I've been in that position since we reorganized recently, for approximately a month.
Q. Prior to that, what was your title?
A. I was director of the Office of Systems Analysis and Strategy Development.
Q. How long were you in that position?
A. On an acting basis, since October 2002, and on a permanent basis, I believe July of 2003.
Q. Now, what did your responsibilities include when you were in your previous position?



A. They're essentially the same as they are now. I am responsible for the waste acceptance component of the waste management system, which includes management of the standard contracts with utilities and all the activities associated with that, such as testifying in court on certain issues.
The other pieces of my responsibilities include systems analysis for the program, making sure that the various components of the program, the repository, the transportation component, and the waste acceptance component, work effectively and efficiently.
In addition to that, I'm primary coordinator for other DOE programs within the Department, the Office of Environmental Management, that manages most of the defense waste that the country has and also the Naval Nuclear Propulsion Program, which is responsible for providing essentially nuclear power to our nuclear fleet, plus other activities, including safeguards on security policy and other activities as assigned.
Q. And I think you touched on this in



your prior answer, but can you describe for the Court how your responsibilities relate to the execution of the standard contract for the acceptance of spent nuclear fuel and high-level waste?
A. Yes. When the Department chooses a date for the, that it intends -- or year, if you will, that it intends to receive spent fuel from utilities for the purposes of disposal, the process associated with the contract, the delivery commitment schedules, and the final commitment schedules, that would all be managed in my office.
I have several staff who support me in that area. Mr. Zabransky, who's here in court, is a contracting officer, Mr. Pollog also, who will be testifying later. And in that process, any contractual aspects associated with that would be managed through my office.
Q. And to whom do you report at the Department of Energy, sir?
A. I report to the principal deputy director of the program, Mr. Paul Goalen.
Q. And to whom does Mr. Goalen report?
A. Mr. Goalen reports to the recently

named director of the program, Ward Sproat.
Q. And to whom does Mr. Sproat as the director of OCRWM report?
A. He reports to the Undersecretary and the Secretary of Energy and the Deputy Secretary, I should say.
Q. Mr. Kouts, when did you first join -- I'm going to refer shorthand, for the Office of Civilian Radioactive Waste Management, as OCRWM, if that's okay?
A. Sure.
Q. When did you first join OCRWM?
A. I joined in June 1985.
Q. And can you briefly go through your various jobs that you had with OCRWM?
A. I'll endeavor to be brief. My first assignment when I joined the program was to develop the monitored retrievable storage proposal that was a requirement of Section 141 of the Nuclear Waste Policy Act. I worked on that for several years, until that was submitted in 1987. At which point, I worked on integration activities and then was subsequently appointed to be head of our transportation program.



After that, in that position about three years, I was appointed to a division that -- actually, no, I worked for the director's office on contingency planning and strategic planning for a period of time. Then I moved into a division that dealt with interactions, primary interactions with the Nuclear Regulatory Commission and regulatory affairs for the program.
From there, I went to a position that supported the director of the program at that time for all his activities associated with development of testimony, policy papers, and so forth, director of division of the planning division for a few years. Then I accepted a different division, which was responsible for developing an interim storage design, a topical safety analysis report that was to be submitted to the Nuclear Regulatory Commission.
And that was in anticipation that the Department would receive interim storage authority from Congress which was being considered at that time. After that position --
THE COURT: I'm sorry. What time



frame was that in?
THE WITNESS: That was in the mid-90s, from about '95 to about '97.
THE COURT: Thank you.
THE WITNESS: At that point in time, I then accepted a position working essentially for the director's office and for the director of Yucca Mountain project as a liaison, as a technical and policy liaison, and I was responsible essentially for making sure that policy products that were produced and technical products that were produced by the project at that point were acceptable to the Department.
The first was the liability assessment, which was a Congressional deliverable, which we submitted in 1998, and then subsequent to that, I worked on, for several years, until its completion, the site recommendation for Yucca Mountain.
That specific activity required me to be the primary interface with the Secretary's office and the Undersecretary's office in that regard. I was the point person for the program and dealt with virtually all the issues that



occurred up until the point of the Secretary's recommendation.
After the Secretary recommended it to the President on February 14th, then the Secretary and the President subsequently recommended the site to the Congress. I was involved in preparing the Secretary and the Undersecretary for hearings, which were called by Congress. In addition to that --
THE COURT: February 14th of what year.
THE WITNESS: I'm sorry, 2002. The way the Nuclear Waste Policy Act is set up, once the site was recommended, the governor of Nevada had an opportunity to disapprove the site, if he disagreed with it, which he subsequently did.
As a result, there were a series of hearings by Congress to consider the state's veto. And, again, I supported the Secretary and the Undersecretary in those activities up until the point of the President signing the joint resolution of Congress in July of 2002, which essentially affirmed the site selection.
Subsequent to that, shortly

very, very last paragraph, it says, "The representative waste acceptance schedule for the improved performance system," do you see that?
A. Yes, I do.
Q. And then it rolls over to the next paragraph, last paragraph of the bullets, starting with, "it should be emphasized."
A. Yes.
Q. Okay. And could you read that into the record, please?
A. "It should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses."
Q. And what was your understanding of that phrase, sir?
A. Essentially, exactly what it indicates, is that at this point in the program, we were uncertain about what the system would look like, the size of it, the amount of fuel and the materials we were going to be accepting, and we wanted to put everyone



on notice that this was our best guess at that time.
Q. Now, if you look at the paragraph, two paragraphs below, there's a paragraph starting with, "the DOE"?
A. Yes.
Q. And halfway down, maybe three-quarters of the way down, it says, "under the terms." Do you see that sentence?
A. Yes, I do.
Q. Could you read that into the record, please?
A. "Under the terms of the contracts for disposal services that had been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987."
Q. Could you go on, please, next sentence?
A. "In 1991, the DOE will begin to publish firm waste acceptance schedules for individual reactors, including shipment allocations."
Q. And, Mr. Kouts, what was your



understanding of those two sentences?
A. My understanding was that in terms of implementing the contract and making commitments for the Department, in terms of what it would receive in spent fuel or acceptance of spent fuel from utilities, that we were going to be following the process identified in the standard contract, and we would start the delivery commitment schedule process in 1991 in anticipation of 1998 waste receipt from utilities.
Q. Thank you. Mr. Kouts, I'd like to show you another document. This is DX-107.
MR. LO RE: If I may approach, Your Honor?
THE COURT: You may.
BY MR. LO RE:
Q. This document is dated March 1987 and is entitled, "Monitored Retrievable Storage Submission to Congress." Mr. Kouts, are you familiar with this document?
A. Yes, I am.
Q. What is it, sir?
A. It's volume I of the proposal that the Department submitted to Congress in fulfillment



of the requirements of Section 141 of the Nuclear Waste Policy Act to submit a proposal on monitored retrievable storage to the Congress.
Q. Were you involved in the development of this proposal, sir?
A. Yes, I was.
Q. How was that?
A. Essentially, I was actively involved with this volume of the second volume, which was the needs and feasibility analysis and the environmental assessment of the sites and also in the program planning, that was volume III of this.
Q. Now, Mr. Kouts, I'd like to turn to -- I hope you have Bates numbers on this one -- what is marked as the Bates number 311. This is the executive overview, and if you would turn now to the second page of this executive overview, now looking at the paragraph that starts with, the first full paragraph that starts, "The DOE's proposal"?
A. Yes.
Q. It says, "The DOE's proposal was ready for submittal to Congress in February 1986, but

litigation has delayed the submittal for more than a year. Since the planned submittal date, the DOE's Civilian Radioactive Waste Management Program, CRWM, has progressed and undergone various changes.

These changes range from the programmatic changes and proposals outlined in the January 1987 draft mission plan to further refinements of the program's analytical database." Then it goes on, there's a sentence starting with, "the programmatic change." Do you see that?

A. I was following you up to a point. Okay.

Q. And if you could just --

A. I see it, yes.

Q. Through 1998, if you could just read that sentence through the phrase that says, "the first quarter of 1998," could you read that into the record, please?

A. "The programmatic change that most affects the DOE's planning for the MRS facility is an extension of the date for the start of operations at the first repository. This date is extended from January 31, 1998 to 2003 to



allow time to carry out necessary technical program activities and to provide additional opportunity for consultation and cooperation with affected states and Indian tribes.

The revised schedule shows that the DOE expects to receive from the Nuclear Regulatory Commission a construction authorization for the repository by the first quarter of 1998."

Q. Mr. Kouts, what do these sentences that you just read into the record, what does this describe?

A. In the time frame from the point that we were ready to submit the proposal in, I believe, February of 1986, the program had come to the conclusion that we could no longer have the repository operational in 1998, and the repository was going to be delayed five years.

So this essentially reflects the fact that the repository will be delayed five years from the point of operations. Nonetheless, we expected at that point to just -- still to receive a construction authorization for the repository from the Nuclear Regulatory Commission by the first quarter of 1998.



Q. Now, the last sentence here says, "Thus, the MRS facility would be critical to DOE's ability to accept waste for disposal in 1998." What does that mean?

A. If you'll remember the previous waste acceptance schedules for the authorized system, our primary mechanism of meeting the contractual obligation was to have a repository operation. At this point in time, the Department was acknowledging the fact that the only way that we were going to be able to do that now was going to be with an MRS facility.

Q. Now, I did pass over one thing that I read. There's a reference to the top of this paragraph to litigation. What is that referring to?

A. In the first sentence, basically, that refers to the fact that the state of Tennessee essentially went to court and obtained from a district judge a temporary restraining order, which was later turned into an injunction against the Department from submitting the proposal to Congress.

Subsequent to that, it took essentially a year to appeal that decision by



that district court through circuit court, and in the, I believe in the January time frame of 1987, the Supreme Court denied cert on the last appeal by the state of Tennessee, and therefore, the Department was allowed to submit the proposal to Congress.

Q. Now, if you turn to page 315 of the Bates number page of this document, which is also page five of the document?

A. Yes.

Q. There's a paragraph starting with, "some potential adverse." Do you see that?

A. Yes, I do.

Q. That paragraph in the middle of that paragraph, starting with, "to allay such concerns," do you see that?

A. Yes, I do.

Q. Would you read that into the record?

A. Okay. "To allay such concerns and to reinforce this country's unwavering commitment to the geologic repository program, the DOE proposes that the Congress link the start-up of the MRS facility to the schedule of the repository.

No waste may be accepted at the MRS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
------------------------------x
PACIFIC GAS & ELECTRIC :
COMPANY, :No. 04-74C
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. :
------------------------------x
Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday, June 14, 2006

VOLUME 8

The parties met, pursuant to the notice of the Judge at 9:00 a.m.

BEFORE THE HONORABLE EMILY C. HEWITT



APPEARANCES:
ON BEHALF OF PLAINTIFF:
JERRY STOUCK, ESQ.
ROBERT L. SHAPIRO, ESQ.
DAVID CALLET, ESQ.
ERIC ROWE, ESQ.
Greenberg Traurig LLP
800 Connecticut Avenue, Northwest, Suite 500
Washington, D.C. 20006
(202) 331-3100

ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ.
ALAN LO RE, ESQ.
HEIDE HERRMANN, ESQ.
SCOTT R. DAMELIN, ESQ.
SHARON A. SNYDER, ESQ.
JOSHUA E. GARDNER, ESQ.
MARIAN SULLIVAN, ESQ
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20036
(202) 514-2000



APPEARANCES (Continued):

ALSO PRESENT: DAVID ZABRANSKY
JANE TAYLOR
GABRIELLE BUTLER

***Index appears at end of transcript***



P R O C E E D I N G S
- - - - -
THE COURT: We are on the record to continue hearing evidence in the Defendant's case-in-chief. Our witness is Mr. Kouts. The witness continues under oath. Good morning, sir.
THE WITNESS: Good morning.
THE COURT: Mr. Lo Re to continue direct examination.
MR. LO RE: Good morning, Your Honor.
THE COURT: Good morning.
Whereupon--
CHRISTOPHER KOUTS
a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:
DIRECT EXAMINATION(continued)
BY MR. LO RE:
Q. Mr. Kouts, when we broke yesterday, we were looking at DX-114.
MR. LO RE: Which is admitted as PX-97, Your Honor.
BY MR. LO RE:
Q. Mr. Kouts, do you have that document

in front of you?
A. Yes, I do.
Q. Mr. Kouts, I'd like you to turn, please, to page 60 of this document and just to refresh us after hopefully a good night's sleep, what is this document that we're looking at?
A. This was a draft mission plan amendment, excuse me, a final mission plan amendment that was issued in June of 1987, which was a document that updated the mission plan that was issued in 1985 with the latest perspective of the program as to how it was going to be implemented.
Q. And, again, why was the Department issuing this document?
A. There had been major changes in the program since the issuance of the mission plan amendment in 1985, and it was felt this was the best way to communicate those changes to the Congress and to the country, if you will, as to how the program is going to be implemented.
Q. When you say the country, did that include the standard contract holders?
A. Yes, it did.



Q. Mr. Kouts, could you turn your attention to page 60 that I just mentioned? This page is entitled, "Waste Acceptance Schedule, Appendix F." Do you see that?
A. Yes, I do.
Q. Now, the second paragraph, first sentence says, "Like the schedule in the 1985 mission plan, the schedule presented here is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system operating and waste acceptance parameters as the program progresses."
Mr. Kouts, why did the Department include that language?
A. It included this language essentially to indicate to the Congress and to other parties that the Department was still trying to figure out exactly how the system was going to operate, that we understood that there were a variety of uncertainties as to how the program would be implemented and that this was our best estimate at the time, but that estimate could change.



Q. Now, below this, the next paragraph down, there's a paragraph starting with, "under the terms of the contract." Do you see that?
A. Yes, I do.
Q. Would you read that into the record, please?
A. "Under the terms of the contract that has been signed between the DOE and owners and generators of spent fuel and high-level waste, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE for planning purposes beginning in 1987.
In 1991, the DOE is required to begin publishing annual acceptance priority rankings for spent fuel receipt by the DOE. Beginning January 1, 1992, the utilities are to submit to the DOE for approval delivery commitment schedules based on these rankings.
These schedules will form the basis for final delivery schedules to be submitted by the utilities not less than 12 months before the actual delivery dates."
Q. Now, Mr. Kouts, why did the Department include that language as you just read into the



record in this document?
A. The Department included this language in my view, essentially, because we were notifying contract holders and the Congress that we would essentially begin the contractual planning process, if you will, as specified in the contracts, beginning in 1991, by issuing an annual, an APR, an acceptance priority ranking and an annual capacity report from which the utilities would then provide information to us, which we would then have to evaluate and approve, which would then form a basis for a commitment for what the Department would be taking from the utility.
Q. Now, below here, excuse me, at the bottom, there is a heading that says, "F.2, key changes to the waste acceptance schedule." Do you see that?
A. Yes, I do.
Q. And then the sentence reads, "The key changes in F-1 from the corresponding table in the 1985 mission plan (table 2-3) are as follows," and then we'll flip past the actual chart, and there is a list on the next page, which is page 62, there is a number, number of

only facility that the Department felt that it could have to satisfy the contracts.
Q. Mr. Kouts, this document is pretty weighty and pretty long. I would like you to turn to page 163 of this, please. I'm sorry. Before we do that, could we just look very briefly at that F-1 that we've been talking about, which is on page 61? Thank you. And this is the F-1 chart we've been talking about that's described in the pages we just read. It says, "Illustrative waste acceptance schedule." Do you see that?
A. Yes, I do.
Q. Why was this schedule included?
A. This showed essentially, based on our planning and our estimates in, in this time period, which was in, you know, June of 1987, assuming that the MRS was authorized, how the amounts that we would plan to accept the spent fuel and in relation to the repository, et cetera. It also reflected new dates for the second repository, as I remember.
Q. And, again, that illustrative language was included why?
A. Illustrative to indicate that, again,



this was our estimate at the time this document was issued, and given the uncertainties of the program, this could change in the future.
Q. Mr. Kouts, could you turn to page 163 of this document?
A. Okay.
Q. And it says, "Part III, comments on the draft mission plan amendment." Before we talk about these comments, do you recall that there were comments included in this document?
A. Yes, we issued the document for public comment, and this part III of the document essentially is response to comments that we had from the various parties who were interested in the program.
THE COURT: Just for reference, how was this published? Was this in the Federal Register or some other type of publication, if you know?
BY MR. LO RE:
Q. Mr. Kouts?
A. We might have put a notice in the Federal Register about the availability of the document. However, we issued the document as a DOE document and sent it out usually in a mass



mailing, with a letter requesting comments by a certain date.
THE COURT: Thanks.
BY MR. LO RE:
Q. And, Mr. Kouts, what did the Department do upon receipt of those comments?
A. Typically, what we do with a document like this is we go through the comments, identify each of the comments and each of the letters and then make sure we respond to each of those comments in a structured manner.
Q. Now, Mr. Kouts, I'd like to turn your attention now to page 411 of this document. Okay?
A. Yes. Thank you.
Q. Now, this is a letter dated April 3rd, 1987 from the Edison Electric Institute, Mr. Ben Rusche, director of the Office of Civilian Radioactive Waste Management. Mr. Kouts, are you familiar with this document?
A. Yes, I am.
Q. What is it, sir?
A. This is essentially comments from the Edison Electric Institute, which is a trade organization that was in town, in town at that



time, that represented a variety of contract holders to the Department.
Q. I'd like to turn, if you could, please, to page 414, and there's a heading there that says, "Monitored Retrievable Storage." Do you see that?
A. Yes, I do.
Q. And if you could go to the first paragraph under that heading, "DOE has a statutory"?
A. Yes.
Q. And could you read that paragraph into the record, please?
A. "Monitored retrievable storage. DOE has a statutory and contractual obligation to take spent fuel starting in January 1998. The five-year delay in first repository operation to 2003 obviously means the repository will not be available to meet this obligation. The DMPA, draft mission plan amendment, recommends handling this dilemma through use of the MRS.
The MRS, if authorized by Congress, can be available to begin accepting spent fuel by 1998, if not earlier. Previously, EEI/UNWMG/NTG indicated strong support for the

MRS concept for numerous, and still valid, reasons. Now, the MRS is more important to NWPA implementation because it is the only feasible way that DOE can meet its 1998 statutory and contractual obligations."
Q. Now, Mr. Kouts, first, there's a reference there to EEI, then it's "/UNWMG/NTG." Do you know who that is or what that is?
A. Yes, they were various groups, industry related groups that were under the auspices of EEI at that time. I don't remember the exact designation or the acronyms, but that's essentially what that reflects.
Q. Thank you. Now, Mr. Kouts, how did the Department of Energy interpret that paragraph that you just read into the record?
MR. STOUCK: Objection, Your Honor, on a couple of grounds. First, there have been a number of questions about how the Department interpreted, and I don't think that's fair testimony from this witness, but more specifically, Mr. Kouts was asked how did the Department respond to these comments, and his answer was typically --
THE COURT: Hold on, please.



Continue.
MR. STOUCK: So the first point is if we're getting Mr. Kouts' reading of these documents, I just want the record to be clear on that, that that's all we're getting. But my second objection is Mr. Kouts was asked how did the Department respond to these comments, and his answer started with typically, typically, we respond by X, Y, Z.
So I don't know that we have any indication in the record that Mr. Kouts knows anything about how the Department responded to these comments. That's my second objection.
THE COURT: I guess I don't see anything objectionable to -- provided it's established that this is a percipient witness in DOE. You can certainly ask if he knows.
MR. LO RE: Thank you.
BY MR. LO RE:
Q. Mr. Kouts, do you know how DOE interpreted these comments? And I'm specifically talking about that paragraph you just read into the record.
A. The comment reflected the fact --
THE COURT: The question is, do you



know, and that's yes or no.
THE WITNESS: Yes.
THE COURT: That's the question.
MR. LO RE: And how would -- I'm sorry, Your Honor.
THE COURT: That's a question, just to establish that this is a matter within your knowledge and that was what the objection was about, so that's an important question to answer. You may continue.
THE WITNESS: Thank you. The Department agreed with this comment.
BY MR. LO RE:
Q. How did you interpret -- how did the Department interpret what DOE was -- what EEI was saying in this comment?
A. The Department interpreted this comment that the MRS was going to be the only feasible way that DOE can meet its 1998 statutory and contractual obligation, and the Department agreed with that.
Q. Now, Mr. Kouts, the next paragraph down starts with, "one aspect." It says, "One aspect of DOE's MRS strategy is that" -- I'll start again.



"One aspect of DOE's MRS strategy that EEI/UNWMG/NTG cannot agree with is the so-called linkage between an MRS operation and receipt of the NRC construction authorization for the first repository." Do you see that?
A. Yes, I do.
Q. Now, what was your understanding of what EEI was getting at in this comment?
A. I believe the industry was concerned that linking the MRS to the repository and especially construction authorization of the repository in 1998 was, in their mind, an inappropriate thing to do because their perspective was that the first repository would be delayed beyond 1998 for a construction authorization.
And therefore, they were concerned that an MRS then could not operate, and therefore, we could not meet our contractual obligations in 1998.
Q. The paragraph below starts on that page and rolls over to the next page. It says, the very last sentence says, "Spent fuel storage and disposal cannot be left for the last minute." It goes on to say, "Utilities

need to plan years in advance, since the linkage concept advanced by DOE could well leave open to doubt DOE's ability to receive spent fuel by the 1998 deadline.
Utilities would be forced to assume that the MRS would not be available to take deliveries of spent fuel starting in January 1998 and that DOE would therefore be likely to breach its commitment to take delivery of spent fuel starting in January 1998." Do you see that?
A. Yes, I do.
Q. How did the DOE interpret what EEI was saying in that phrase?
A. The planning basis for utilities to plan for spent fuel storage on-site essentially has a long lead time, and without more certainty in the availability of the MRS, in a sense that being linked to the repository that potentially could be delayed, this would force the utilities to make decisions in anticipation of the fact that DOE may not have that MRS available.
And essentially, this comment was putting the Department on notice that the



utilities would have to make their own decisions based on their view on whether or not the MRS is likely to be there, which they're indicating here, if it is tied to the repository, in their view, it would not be.
Q. Mr. Kouts, how do you view the importance of planning for utilities with respect to the acceptance of spent nuclear fuel?
A. I think it's important for them to plan, but my own view is that they have to make their own decisions in terms of what they need to do on their sites. The Department is not involved in that, and that's totally a utility decision.
Q. Now, Mr. Kouts, the bottom of this paragraph, the last sentence reads, "In revising the DMPA for formal submission to Congress, DOE, to demonstrate its commitment to the 1998 date, should delete the linkage between MRS start-up and first repository construction authorization." How did DOE interpret what EEI was saying in that comment?
A. Well, again, this gets to the point that there was concern from EEI that the



linkage would essentially delay MRS start-up, and there comment was that the Department should delete the linkage and not pursue the linkage between MRS start-up and first repository construction authorization.
Q. Now, subsequent to this, what actions, if any, did DOE take with respect to the schedule linkage between the repository and the MRS?
A. The Department did not change its view on the linkage of the MRS to the repository.
Q. Did the Department ever take any action to address that linkage after the statute was passed, the amendments to the Nuclear Waste Policy Act was passed?
A. Yes, it did. In relation to -- this gets into another evolution of the program. However, after the Amendments Act was passed, the Amendments Act did a variety of things. It essentially authorized an MRS facility, but it put a variety of linkages in-between the MRS and the repository.
And I can go through those, if you want, but effectively, it set up the office of the Nuclear Waste Negotiator to help the



Department find a site for an MRS or a repository. And basically, in the next several years, the Department took the strategy that we would use the Nuclear Waste Negotiator to help us find a site.
And if we found the site and a willing host and an agreement was reached between the Nuclear Waste Negotiator and that host, which would have to be approved by Congress, that part of that agreement would be to address the linkages and to change the linkages between the MRS and the repository.
So that was a strategy that the Department took subsequent to this document, in terms of how we were going to address those linkages.
Q. Now, we've talked about the linkages -- or strike that.
We've talked about the schedule linkage between the MRS and the repository. You also talked yesterday about the capacity limit. Do you recall in this document that we're looking at the EEI comments, that EEI commented on the capacity limit that DOE was proposing for the MRS?

A. At that time, that was my understanding, yes.
Q. Is that your understanding today?
A. No, it's not.
Q. Okay. So your understanding has been obtained, your understanding about the contractual obligations has been obtained since June 4, 1999, is that correct?
A. I've learned more about the issue, yes, that's correct.
Q. Your understanding, whatever understandings you have about DOE's contractual obligations under the standard contract, you have obtained since June 4, 1999, correct?
A. That's correct.
Q. Now, you had no responsibility for or involvement with delivery commitment schedules, is that correct?
A. No, that's not correct.
Q. Would you take a look at the transcript again? June 4, 1999, page 163, would you please take a look at it?
A. Sure.
Q. If you take a look, Mr. Kouts, at page 163, on line 14, you were asked the following



question and gave the following answer:
"Did you have any responsibility for or involvement with delivery commitment schedules?
"ANSWER: No, I did not."
Was that your testimony?
A. At that time, it was, yes.
Q. Okay. Have there been -- okay. So your involvement with delivery commitment schedules, if any, was with the 2004 delivery commitment schedules, is that correct?
A. That's correct.
Q. So prior to June 4, 1999, you had no involvement with delivery commitment schedules?
A. Other than reviewing them and reviewing the documents when they went out, if they went out prior to their issuance.
Q. The forms?
A. Not the forms themselves, I'm talking about the documents.
Q. Prior to June 4, 1999?
A. The issuance of ACRs and APRs were documents that, as a matter of course, I did review. I did not review the delivery commitment schedules.



Q. Thank you. And as of June 4, 1999, you did not understand what a delivery commitment schedule is, correct?
A. I was aware of what they were, but in terms of the intricacies of them, no, I was not.
Q. Prior to June 4, 1999, did you understand what a delivery commitment schedule was?
A. I had heard the term. I knew that they existed. I was not intimately involved with their development or their approval.
THE COURT: I'm going to counsel the witness, if it's possible to answer a question yes or no, given the structure of the question --
THE WITNESS: Okay.
THE COURT: -- go ahead and do that. If the answer is unsatisfactory to you, that is to say it would require to be an answer that you think is full, to have some more explanation, ask counsel if you can explain, I'd like to explain, or may I explain.
And counsel may or may not ask you for an explanation, but it signals to the counsel



who had you on direct examination that it's something they may want to go into. Thank you.
BY MR. STOUCK:
Q. Mr. Kouts, as of June 4, the time of this deposition that you've got in your hand, as of June 4, 1999, you would not have been able to testify about the significance of delivery commitment schedules in a case such as this because you did not have enough of an understanding at that time to do that, is that correct?
A. Yes.
Q. Okay. Let's talk a little bit about transportation issues. I believe you testified that part of your long tenure at Department of Energy involved some responsibility for the transportation program, is that correct?
A. That's correct.
Q. And I believed you said you were in charge of the transportation functions, is that right, within OCRWM?
A. Yes.
Q. And what was the time period of that, that you held that responsibility?
A. Approximately 1988 to 1991.

believe that opens new lines of inquiry --
MR. LO RE: Thank you, Your Honor.
THE COURT: -- as if it were direct.
MR. LO RE: Thank you. I appreciate that.
MR. STOUCK: Thank you, Your Honor. Let me see, PX-255 and PX-545. I'm sorry, Your Honor, I'm trying to think about how to do this in the most efficient way.
BY MR. STOUCK:
Q. Let's, Mr. Kouts, let's turn to the subject, let's turn to the MRS subject now and come back to some other things maybe a little bit later. One of the, the Department's initial plans for monitored retrievable storage as reflected in the -- do you have the document? Let's get the document.
MR. STOUCK: Again, I'm sorry, Your Honor. I'm trying to --
BY MR. STOUCK:
Q. Do you have a copy up there?
A. Yes, I do.
THE COURT: So we're on PX-82, the June 1985 final first iteration.
BY MR. STOUCK:



Q. Mr. Kouts, if you will take a look at page 72 of the mission plan, which is Plaintiffs 82, how far does your excerpt go, Mr. Kouts, from the mission plan? Would you just take a look? Because I may ask you --
A. Actually, I misstated. I don't have a mission plan in front of me, but it's on the screen here, at least the page.
Q. Is that satisfactory for you? Or would you like --
A. I can go with the screen.
Q. We can get you a copy. Can you live with the screen? I'd be happy to get you a copy.
A. Actually, it would be useful to have a copy to understand the context of the page.
Q. I'm going to grab up to 180, it's not the whole document, but it's way beyond what we're going to be talking about, okay?
A. Thank you.
Q. Okay. Turn to page 72, please, and apologies again, this is Plaintiff's 82. On page 72, Mr. Kouts, you can see at the top, under 3.2.1.1, the role of an MRS facility, do you see that?



A. Yes, I do.
Q. "The DOE's initial plans for monitored retrievable storage as reflected in the April 1984 mission plan, excuse me, consisted of an MRS facility to provide backup storage capability, should there be significant delays in the availability of a geologic repository." Do you see that?
A. Yes, I do.
Q. And that was true, that is true?
A. That was true as of the April 1984 draft mission plan, yes.
Q. That's an accurate statement of DOE's initial plans for the MRS?
A. Yes.
Q. And an MRS could also, at least as of the time of this mission plan, could provide benefits for the transportation system, correct?
A. As of the time of the 1985 mission plan.
Q. Let's strike the timeframe. An MRS could also provide benefits for the transportation system, correct?
A. An integral MRS could, yes.



Q. And that's reflected here under improvements in system performance. If you look at the paragraph, it reads, "By being centrally located to most reactors, an MRS facility would significantly reduce potential impacts of transportation and would improve the management and control of the transportation function." Do you see that?
A. Yes.
Q. And that's accurate?
A. That paragraph, yes, it is. And may I explain?
Q. Sure.
A. That paragraph goes also on to indicate that, at the bottom of it, that by shipping to the repository consolidated fuel, in other words, the concept of the MRS at that time was that the fuel would be repackaged and consolidated, if you will, pulled out of their assemblies, consolidated, and as a result, you would get substantial reduction in cask miles, if you will, of transportation based upon the integral MRS concept, yes.
Q. And that's reflected in this same paragraph?

A. That's reflected in that paragraph, yes.
Q. And it also says, just following that in the next paragraph, that, "Using an integral MRS facility would simplify" -- I'm reading -- "simplify the design, construction, and operation of a repository facilities," correct?
A. Yes.
Q. And that was also true?
A. Yes.
Q. Okay. And then at the top of the next page, it says, "The integral MRS facility would increase the flexibility of the waste management system by separating the waste acceptance schedule from the capability for waste emplacement." Do you see that?
A. Yes.
Q. And that also was true?
A. Yes.
Q. And then it goes on to say, "The MRS facility would allow the DOE to accept spent fuel without interruption, even if the repository is delayed or its emplacement operations are reduced." Do you see that?
A. Yes.



Q. Also true, correct?
A. Yes.
Q. Then it says, "The MRS facility would safely store spent fuel until the repository was capable of receiving and emplacing it," and that was indeed the plan at that time?
A. Yes.
Q. And moreover, continuing with the same paragraph, "Waste acceptance activities would not be affected by temporary slowdowns or other operational problems that could be experienced at the repository." Do you see that?
A. Yes.
Q. And that was DOE's vision for the MRS as of the time of this mission plan, correct?
A. Yes.
Q. Then it goes on to say, "Consequently, a firm schedule for spent fuel acceptance could be established to accommodate the DOE's contractual commitments to the utilities paying fees into the Nuclear Waste Fund." Do you see that?
A. Yes.
Q. And that was also true?
A. Yes.



Q. And finally, just to round out the paragraph, "In addition, the MRS facility would improve system flexibility by having the capability to serve the second repository if determined to be appropriate." Do you see that?
A. Yes.
Q. Okay. And so in the mid-1980s, before the 1987 amendments, DOE was looking at a facility that had a great deal more capability than the MRS that you were looking at after the '87 amendments, isn't that correct?
A. Yes.
Q. And isn't it also true that an MRS, such as the one that DOE was contemplating at the time of this mission plan, would be able to accept waste at a rate well above 3,000 MTU?
A. No.
Q. Turn to page 80, please. If you look at the sentence that, beginning at the very bottom, "accordingly," and this is in a section entitled, "Basis for the design of the MRS facility." Do you see that?
A. Yes.
Q. Let me read the sentence that I've



directed you to. It starts, "accordingly," at the bottom of page 80, "According" -- no l-y, "According to the current designs being developed for the proposal to Congress, the integral MRS facility would be able to accept waste at a rate of up to 3,600 MTU." Do you see that?
A. Yes, I do.
Q. And that certainly was true also, correct?
A. Yes.
Q. Okay. It goes on, I'm still reading, this is the top of page 81, "This waste acceptance rate could preclude the addition of new at-reactor storage capacity and would allow the orderly removal of aging fuel from reactor sites." Do you see that?
A. Yes.
Q. True statement?
A. That's what the document says, yes.
Q. And it's true?
A. At that time, yes.
Q. And it also says that it, referring to the MRS, is that right, is that your understanding?

2769

A. Yes.
Q. "It could also accommodate the growth of the reactor population forecasted by the Energy Information Administration in its middle growth case." Do you see that?
A. Yes.
Q. And the facility would have sufficient capacity to prepare and ship waste to the first repository and to the second repository if deemed appropriate, correct?
A. Yes.
Q. I'll continue reading. "The design would provide capability to simultaneously accept spent fuel, package the spent fuel for direct shipment to the repository or storage at the MRS facility, retrieve fuel from storage, and ship to the repository." Do you see that?
A. Yes.
Q. And so on, and let me, just for completeness, it goes on to say, "The MRS facility would be designed to simultaneously accept and unload current generation truck or rail shipping casks, disassemble and consolidate spent fuel of nearly all designs, and load into canisters spent fuel of all

2770

current designs.
To prepare waste packages for the repository, the facility would include space in the receiving and handling building to overpack the canister materials if ongoing systems studies confirm this operation to be appropriate at the MRS facility." Do you see that?
A. Yes.
Q. And that was all, again, part of DOE's vision for the MRS as of the time of this mission plan?
A. Yes.
Q. Now, I think, if you take a look at page 17 again, it may be easier just to look at the document. Are you there? Tell me when you're there.
A. Yes.
Q. Page 17 is a reference to the improved performance plan, do you see that?
A. Yes.
Q. And that would be the plan with the MRS?
A. Yes.
Q. There's a listing here of

2771

improvements, just a list of one to two on page 17, but continued to the next page, but the lead-in sentence for that says the following: "The improvements include the following," do you see that?
A. Yes.
Q. And number four on page 18, "Ability to accept significantly larger quantities of waste in the early years of operation, substantially reducing the added costs of providing increased at-reactor storage capabilities." Do you see that?
A. Yes.
Q. And that was certainly one of the attractive features to the program of an MRS at that time?
A. Yes.
Q. And if I could now just direct your attention to page 20, this paragraph, page 19 -- I lost my place. I apologize. Turn back one page, fourth paragraph down, this section is entitled, "Contingency Plans." Do you see that?
A. Yes.
Q. And on the fourth paragraph down, it

2772

says, "The baseline program assumption of course is that the repository is built on schedule," correct?
A. Yes.
Q. And then it says, "Should the repository be substantially delayed, one of two contingency approaches would be pursued. If the MRS facility is authorized by Congress and constructed, it can begin to accept spent fuel in a timely manner and package and store it (up to the authorized storage capacity limit) until a repository becomes operational." Do you see that?
A. Yes.
Q. And then if the MRS facility is not authorized or if it's significantly delayed, increasing quantities of spent fuel will have to be stored at reactor sites, do you see that?
A. Yes.
Q. And that was certainly the Department's view of how the program -- contingencies of what might arise in programs going forward, correct?
A. Yes.
Q. And now, over on page 20, the

concluding paragraph of this section, it's the last paragraph on the page, reads as follows: "Should no repository be constructed and an MRS facility not be authorized, utilities would continue to be responsible for storing the spent fuel at reactor sites." Do you see that?
A. Yes.
Q. And then the next sentence, "In this event, the nation would return to the situation where it had no viable assured method for the permanent disposal of spent nuclear fuel and high-level waste." Do you see that?
A. Yes.
Q. Now, Mr. Kouts, would it be consistent with your understanding of the Department of Energy's contract obligations to Pacific Gas & Electric Company and the other standard contract holders, would it be consistent with those obligations for the nation to be in a situation where it had no viable assured method for the permanent disposal of spent nuclear fuel and high-level waste?
A. In my opinion, no.
Q. Thank you. I think you said here, today, I think you used the same word, but let



me just ask it. The 1987 amendments to the Nuclear Waste Policy Act nulled and voided the Department's MRS proposal submitted under Section 141, is that correct?
A. It null and voided the siting, but it authorized the facility.
Q. Here's my question, the 1987 amendments nulled and voided the Department's monitored retrievable storage proposal as submitted under Section 141, is that correct?
A. That's a fair statement, yes.
Q. Thank you. And back before the null and void, okay, let's go back to the MRS as it was being described in the passages I read for you out of the mission plan, okay?
A. Yes.
Q. That MRS, one of the things that MRS was providing to the overall program and the overall waste acceptance system, I guess, was lag storage. Do you understand the term?
A. Yes.
Q. Okay. Lag storage is a way of -- the purpose of lag storage is to deal with disconnects between the receipt rate and the emplacement rate at a repository, correct?



A. Yes, it also had other purposes besides that, but, yes, that was one of the purposes.
Q. Okay. And so if you were receiving faster than you could emplace in the repository, then there would be a lag storage available for that spent fuel to wait until it would be available to go down to the repository, correct?
A. Yeah.
Q. That was one of the purposes of an MRS?
A. That's correct.
Q. At that time?
A. Yes.
Q. All right. Thank you very much. Now, I need to see, I'm going to turn to another subject, and I'm sorry for a little pause here while I get the documents together, but I'll try to be as efficient as I can be.
All right. Mr. Kouts, you were involved in the design of the MRS facility we were just discussing, correct?
A. Yes.
Q. And the MRS facility that you were



involved in the design of had an acceptance capacity in excess of 3,000 MTUs per year, correct?
A. Yes.
Q. And the more rail casks you receive at an MRS facility, the higher capacity that facility could receive, correct?
A. Yes.
Q. And at the interim storage facility that you were involved with the design of, the acceptance rate, depending on the type of cask you received, the DOE received, varied and could be over 3,000 MTUs per year, correct?
A. Can you repeat the question?
MR. STOUCK: Would you like to read it back?
(The reporter read the record as requested.)
THE WITNESS: Yes.
BY MR. STOUCK:
Q. And at least until, well, as of 1993, a system rate of 3,000 MTU per year had been assumed for planning purposes and the conceptual design of major facilities in the DOE spent fuel program, correct?

A. Yes.
Q. And 3,000 MTU per year is a reasonable acceptance rate for the DOE spent fuel program, correct?
A. A reasonable steady state rate, yes.
Q. And in fact, 3,000 to 4,000 MTU is the preferred -- 3,000 to 4,000 MTU per year of acceptance is the preferred range of acceptance rates for the system, correct?
A. I'm struggling with your word "preferred." I don't know what you mean by that in terms of -- you'll have to give me the context as to what preferred means.
Q. Let's see if a document would help. Could I have PX-187, please? I've got one.
MR. STOUCK: May I approach, Your Honor?
THE COURT: You may.
MR. STOUCK: Again, I apologize for the logistics. Have you got one, Mr. Lo Re?
MR. LO RE: I do.
BY MR. STOUCK:
Q. And have you got one, Mr. Kouts?
A. Yes, I do.
Q. Do you recognize this document? Do



you recognize this document?
A. It looks like a systems analysis prepared by our M&O contractor at the time in August of 1993.
Q. This is the Civilian Radioactive Waste Management system throughput rate analysis dated August 17, 1993, correct?
A. Prepared by the contractor at this time, this is not a DOE document.
Q. Is my statement correct, that's what this is?
A. That's what the title is, yes.
Q. Yes. And it was prepared under a DOE contract?
A. Yes.
Q. And the contract called, among other things, for the contractor to provide this report to DOE, right?
A. Yes.
Q. If you take a look at ix in this document, under, "Conclusions," do you see that?
A. Yes.
Q. The first sentence says, "Based on the foregoing considerations, the preferred range



of throughput rates is from 3,000 MTU per year to 4,000 MTU per year." Do you see that?
A. Yes, I do.
Q. And so my question to you is, that is correct, isn't it?
A. That's what this document states, that's correct.
Q. Okay. I'm asking, Mr. Kouts, is that correct, that that throughput rate is the preferred throughput rate for the system?
A. No.
Q. Oh, okay. If you would turn to page 1-1, under, "Objectives," it says, "the objective," are you with me?
A. Yes.
Q. It says, "The objective of this throughput rate study are to establish a preferred rate or range of rates for acceptance and disposal of spent nuclear fuel." Do you see that?
A. Yes, I do.
Q. And is that your understanding of what the objectives of this study were?
A. That's what the document says, yes.
Q. Is it your understanding that -- do



you have that understanding about the objectives of this study yourself?
A. That's what the document says, yes, I assume that's the objectives it studied.
Q. Okay. And assuming, turning back to the MRS for a moment -- or maybe not for a moment, assuming that DOE got authority for an MRS, DOE could implement the facility very quickly, correct?
A. I'm not trying to be evasive. You would have to give me a sense of what "very quickly" means.
Q. Well, you can't answer the question?
A. I have to understand the context. Does "very quickly" mean one year? Does it mean six months? Does it mean two months? Does it mean one day? You're going to have to give me some perspective as to what "very quickly" means.
Q. Let me try to refresh your recollection.
A. Sure.
Q. See if you believed if DOE had authority to build an MRS, whether you could implement that very quickly. If you would take

and repositories.
Q. Right. Well, let's take a look at -- I very much appreciate your clarification of the deposition answer about the different kinds of MRSes, but just to go back to that point, since I think it's relevant to your last answer.
A. Sure.
Q. If you would take a look at the mission plan, it's PX-82?
A. Sure.
Q. Because my recollection about the mission plan schedule and the MRS that was being talked about there, which was the integrated MRS, right, Mr. Kouts?
A. Yes.
Q. Is that on page -- it's the schedules. I think it's on page 22 or 23 -- 26 and 27. If you look at page 27, which is the improved performance plan, the MRS acceptance starts in 1998 at 3,000 tons a year, correct?
A. No, it does not.
Q. Is that not correct?
A. It starts pre-1998, according to this chart, and in those two years between 1996 and



I would say 1997, we would be ramping up, so what you're seeing here is we ramped up for a period of three years to a period of 3,000 metric tons.
Q. Thank you. I did miss -- it's 3,000 tons in 1998?
A. Correct.
Q. And where do you see on this chart that 2,200 is spread over two years?
A. Well, it says pre-1998, MRS acceptance is 2,200. The plans of the program in the 1985 mission plan amendment were that the MRS would begin operations in 1996, so my assumption is for 1996 and 1997, we would be accepting at lower than a 3,000 metric ton rate, and the total amount that we would receive in those two years would be 2,200 metric tons.
Q. That's your assumption. Can you tell me a technical reason why, this walk before you run, I think I understand, but how about a little more technical explanation of why? The repository, I've heard reference in this, let me -- the repository, I've heard reference to emplacement rates, there might be some constraint on the ability to put fuel into a



mountain. Are you familiar with that?
A. Yes, I am.
Q. What's the technical reason that an MRS could not begin at 2,000 tons or 3,000 tons?
A. Whether or not you're applying this to an MRS or whether or not you're applying it to a repository, the same basic principle still remains in effect. You begin to operate the facility to understand it. Again, these are new facilities. You're building them, you've got new personnel operating them, you've got to develop procedures.
You do a ramp-up, if you will, of capability and acceptance, so that the facility is operated on a safe basis and, also, that it's operated eventually efficiently at the higher level.
Q. Okay. Thank you very much. Now, let's turn, while we're with the mission plan, to page 87, please. As I said a couple of times now, your clarification about the two different kinds of MRSes, but if you recall, we were talking about the mission plan.
I asked you, we read a bunch of



passages, and those were all about this integrated MRS facility. That was DOE's vision as of the time of this mission plan, correct?
A. Yes.
Q. And that was the mission plan that would accept, according to the schedule we just looked at, 2,200 in pre-1998 and 3,000 in 1998, is that right, that's what the schedule says?
A. Yes.
Q. Okay. Now, on page 87, just, I think this is right, but, you know, if you want to look back and satisfy yourself, I think we're talking about that integrated mission plan, and this is kind of the ultimate culmination of a section that talks about that, which begins on page 71, monitored retrievable storage, does that look right?
It's not quite the last paragraph, but it's near the end. It talks about schedule, but we're talking about the integrated MRS at that point, is that right?
A. Yes.
Q. And on page 87, under 3.2.1.6, do you see that, schedule --
A. I'm sorry, I'm not with you, Counsel.

Q. Page 87.
A. Okay. Yes.
Q. Scheduled, are you there?
A. Yes.
Q. The paragraph at the top says, "The estimated time to deploy an integral MRS facility is 8 to 11 years after Congressional authorization." Okay. And this is the clarification from your answer when we were talking about very quickly, do you see that? 8 to 11 years is what was being talked about here for this integrated MRS, correct?
A. Yes.
Q. And it says, "The currently estimated schedule for an MRS facility, if authorized, would allow the DOE to start operations by the end of fiscal year 1996." Do you see that?
A. Yes, I do.
Q. And that correlates with the schedule we just looked at, 2,200, pre-'98, which let's say, for sake of discussion, means starting in '96, 3,000 in 1998, correct, according to the schedule in this plan?
A. Yes.
Q. And then the next sentence says,



"Implementation of MRS, according to this schedule, will provide assurance that the DOE's acceptance of spent fuel in 1998 and subsequent years will be at sufficient rates to meet obligations." Do you see that?
A. Yes, I do.
Q. And that's a reference to the contract obligations, isn't it, Mr. Kouts?
A. I believe so, yes.
Q. Thank you. Now, if you would take -- I want to turn now back to -- oh, one thing, before we leave the mission plan, let me, I believe the whole thing has been entered as Plaintiff's Exhibit 82. I have an excerpt here, which I'll hand first to your counsel and then have a couple for the Court.

MR. STOUCK: If I may, Your Honor, approach? As the Court can imagine, we spent most of lunch trying to organize the documents. I thought I had enough copies. Here's one for the witness.

BY MR. STOUCK:
Q. This is pages 596 and 597 of volume III of the mission plan, Mr. Kouts, I'll make that representation to you, okay?



A. Yes.
Q. And you'll see that it's a letter on -- it's a letter on Pacific Gas & Electric Company letterhead dated July 24, 1984, do you see that?
A. Yes, I do.
Q. And it's Re: Comments on draft mission plan for the Civilian Radioactive Waste Management Program, yes?
A. Yes.
Q. Okay. And you're aware, I think you testified that, or you're certainly aware that the volume III of the '85 mission plan compiled these comments?
A. Yes.
Q. And if I could direct your attention to the third paragraph that starts at the bottom of the first page, excuse me, of this letter, so your understanding is these are PG&E's comments on the '84 draft mission plan, correct?
A. It's taken from that document, yes.
Q. It says in the paragraph I directed your attention to, "Notwithstanding the significant progress achieved to-date by DOE,



we see an even greater challenge ahead." Are you with me?
A. Yes.
Q. I'm continuing. "Of greatest concern to us is the apparent slippage in the schedule set by Congress for an operational storage facility by 1998. Many utilities, including PG&E, have been counting on the availability of the repository in 1998, as mandated by Congress. It is for this commitment that the electric utilities are currently making payments to DOE of 1 mil per kilowatt hour." You still with me?
A. Yes.
Q. I'm on page two now, and I'm continuing. "If the repository is not available at that time, DOE will have had to make alternative plans, since DOE is obligated to accept spent fuel after 1998.

We urge DOE to move expeditiously to recover the schedule and thereby give needed assurance to the utility industry that the facility will be operational as originally planned or, alternatively, that an MRS facility will be available." Do you see that?

acceptance rates illustrated in the mission plan, right?
A. Uh-huh.
Q. And then the DOE has plans to start issuing beginning in July 1987, this is the bottom of the response paragraph, an annual capacity report for planning purposes as required by Article IV.B, IV.B of the contract, with the utilities.
The report will inform utilities of the projected annual receiving capacity and the annual acceptance ranking based on accepting the oldest fuel first the DOE intends to use beginning in 1998, do you see that?
A. Yes.
Q. Do you recall, I believe in your testimony, you talked about the '91 ACR, I think the '95 ACR, do you recall the rates of acceptance that were shown in the '87 ACR?
A. Not offhand.
Q. Okay. Do you know if they were the 400, 600, 900 rates that were later published in the '91 ACR and the '95 ACR?
A. I don't recall.
Q. Don't recall one way or the other?



A. No.
Q. Okay. Well, whatever the rates were, would be the -- what would your understanding be of what the rates are in that '87 plan? Would that be the projected receiving capacity as of 1987 of the DOE waste acceptance program?
A. Well, my sense is that this document had illustrative waste acceptance schedules, and to the extent that they linked up with what the Department issued in 1987, you'd have to do the comparison. I don't have the tables memorized, and I can't comment on them unless they're produced and I can look at them.
Q. I'm going to show you the numbers, but whatever the numbers are, you would agree that that was what DOE was planning for waste acceptance as of that time?
A. They were targets for waste acceptance at that time, that's correct.
Q. Targets for waste acceptance. Well, was that with what the '91 ACR showed targets for waste acceptance at that time?
A. They were general planning numbers, and, yes, they initiated, those were the Department's planning numbers at that time,



that's correct.
Q. And in terms of the, okay, so in terms of the meaning and import and significance of the rates of acceptance shown in the '87 ACR, that would be the same as the meaning in your understanding, meaning and importance and import of the rates of acceptance shown in the '91 and '95 ACRs?
A. Well, not necessarily. May I explain?
Q. Sure.
A. I think in every document that the Department issued that I'm familiar with, there was always a caveat that indicated that these are generally what we think now, and I'm just summarizing and that that may change as we move forward into the future.
So to the extent that those rates modified or evolved from document-to-document indicated a changing in the thoughts and the planning of the Department as of that timeframe.
Q. In terms of planning for waste acceptance?
A. Planning for capabilities of facilities to receive fuel, yes.



Q. Well, let me just refer you to -- this is Plaintiff's Exhibit 96. Let me just have that handed up to you if I may, Mr. Kouts.
MR. STOUCK: And, Your Honor, I do not have an extra copy for the Court.
THE COURT: No problem. It's in the book.
BY MR. STOUCK:
Q. Do you recognize that, Mr. Kouts?
MR. LO RE: Excuse me, Counsel, I would like just a moment to get --
MR. STOUCK: I'm sorry. Sure. Can you see where the rates are? Which page is it? Just for the record, I gave you my own copy, page seven. Do you have that, Mr. Lo Re?
MR. LO RE: Yes, I do.
BY MR. STOUCK:
Q. Do you see the rates there on page seven, Mr. Kouts?
A. Yes, I do.
Q. They show acceptance rates starting in 1998 of 1,200 and then continuing for five years, then 2,000, a rate of 2,000 in year 2003 and then 2,650 after that. Do you see that?
A. Yes, I do.

Q. For a total of 18,600 MTU in the first 10 years?
A. Yes.
Q. What is the basis for those rates, do you know?
A. These were the projections that we had as of June 1987, as to the type of capability that we were claiming in the system.
Q. What facilities were they based on, do you know? Just from your own recollection, the document may say that, but I'm interested. If you don't recall, just tell me you don't recall.
A. My sense is this is 1987, that we've already announced the delay in the operation of the repository, so my assumption is that this would be, at least until 2003, MRS acceptance capabilities or MRS acceptance rates, if you will, planning rates for the first five years.
And then I believe the repository at that point in time, since we're -- I think we'd announced the five-year delay at that point -- the repository would also kick in, in the 2003 timeframe.
Q. Okay. MRS with the linkages of the



'87 Act in place, correct?
A. No. This would be an MRS with the linkages proposed in the MRS proposal.
Q. Okay.
A. Which were different than the ones that came out in the Act.
Q. But different in the respects that you testified?
A. Yes.
Q. But in both cases, your proposal, the DOE proposal linked the MRS to repository construction authorization, correct? There it's a slightly different detail, but it was nevertheless linked to construction?
A. It is a substantially different detail.
Q. Substantially different detail. Let me just make sure -- I'm certainly not trying to mislead you. So your understanding would be, at the time these rates were published, the plan was to go ahead and site, develop, build the MRS, but just not license it until construction authorization?
A. No, we could have it licensed. We simply could not operate it until we had a



construction authorization.
Q. Thank you, again, for that clarification. And why would that difference affect the rates of acceptance? In other words, why would you be able to accept 1,200 MTUs starting in 1998 under the linkages that were proposed, but not in 1991 under the linkages that were enacted?
A. I think the perspective of this document was that the facility, which would have been at this point -- I'm trying to remember. I believe it would have been the, since this is prior to the Amendments Act and after we submitted the proposal, this would still be the integrated MRS facility.
Therefore, that facility was very much more capable, and in terms of receiving capabilities, therefore, that was the perspective of why you could start at 1,200 metric tons.
Q. Thank you.
A. Again, without going back and looking through the basis of this, that's my assessment of the situation at this point.
Q. No. I mean, you seem to be familiar



with these rates of acceptance, right, you testified about the rates of acceptance in the ACRs?
A. Yes.
Q. This is something within your responsibility, correct?
A. Not at the time this document was issued.
Q. What about the '91 ACR, was it at the time that document was issued?
A. I was following this, but I was not responsible specifically for, you know, determining what these rates were. I had an input to it, but I was not the responsible official.
Q. I thought the reason you were testifying today about the '91 and '95 ACRs is it is within your responsibility now to testify about these things, I think, was part of --
A. That's correct.
Q. And about the '87 ACR?
A. Right, based on my understanding and my involvement in the program at that time.
Q. Thanks. Let me just have that back because it's my own copy. Thanks.

Tennessee was unacceptable to Congress. Therefore, the Department was not to pursue that site.

In addition, Congress was unclear, or let's say unpersuaded by the Department's proposal on the integrated MRS concept and therefore set up an MRS review commission which, again, held hearings and provided its own perspective on the type of MRS, what the linkages should be and implementation should be in the waste management system.

Q. After the amendments were passed, what was your understanding of DOE's understanding of the likelihood of meeting the contractual obligation to begin accepting spent nuclear fuel as of January 31, 1998?

A. Well, the only mechanism that the Department potentially had was through an MRS, and in that regard, the MRS linkages had to be modified legislatively in order for the Department to meet its commitment by January 31, 1998, since the repository had moved forward and the schedule for the repository had, was no longer, not in the 1998 timeframe.

Q. And I know you testified about this,



did the Department take any actions to make those linkages, to have those linkages removed?

A. Yes. As identified in the reassessment reports that was submitted to Congress in 1989 under Secretary Watkins' tenure as Secretary of Energy, the Department took an approach to legislatively address the linkages in legislative initiative and also to pursue them through changes in the nuclear waste negotiators, under the auspices of that office, should it be successful in developing or identifying a site.

And as part of the approval of that agreement with that site and that state supposedly to have legislation that would be passed, that would modify those linkages.

Q. Now, the linkages that came out of the amendments, can you describe what they did with respect to the capacity limit for the MRS?

A. Yes. I'll just go back in history. The proposal of the Department with the MRS proposal was to limit the capacity of the MRS to 15,000 metric tons and to link the operation, the initial operation of the MRS facility to the acceptance, or to the receipt



of a construction authorization for the repository.

Congress modified those linkages by indicating that we could not build the MRS until the repository construction authorization was received. We could receive no more than 10,000 tons until the repository was operational and no more than 15,000 tons in total.

Q. Now, I'm going to show you just a few documents, which I'm sure you're thrilled about. Can we look at PX-187, please? This is the, I believe it's the throughput rate analysis. This is the Office of Civilian Radioactive Waste Management throughput analysis, I believe you testified on cross-examination, do you recall that?

A. Yes, I did.

Q. And this is dated August 17th, 1983?

A. Yes.

Q. Who prepared this analysis?

A. TRW, our M&O contractor at the time.

Q. Now, Mr. Kouts, yesterday on direct examination, we talked about the review of M&O contractor work and the acceptance of that work



by DOE. Looking at this document, does it reflect such a review of acceptances occurred?

A. We may have accepted it as a deliverable from the contractor in fulfillment of the need to perform a study, but it does not have an RW symbol or a DOE stamp on it, which indicates this is the contractor's view and not necessarily the Department of Energy's view.

Q. Thank you. You also looked at the 1987 ACR, and I believe that's PX-96. Could we take a look at that, please? Now, if you turn to page two of this document and I believe you testified about the rates as set forth in this document, do you recall that?

A. Yes.

Q. And there is a paragraph, second paragraph down, starting with, "beginning"?

A. Yes.

Q. Would you please read the first sentence of that paragraph into the record?

A. "Beginning in 1991, the ACR acceptance ranking will be converted into an annual priority ranking for the receipt of SNF/HLW."

Q. If you could go on and read the next sentence, please?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - x

SYSTEM FUELS, INC., on its own :
behalf and as agent for SYSTEM ENERGY :
RESOURCES, INC., and SOUTH MISSISSIPPI : No. 03-2624C
ELECTRIC POWER ASSOCIATION, :(Judge Braden)
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. : PAGES 1 - 96

- - - - - - - - - - - - - - - - - - - - x

October 11, 2006
Washington, D.C.

Deposition of CHRISTOPHER KOUTS, held at the offices of Pillsbury, Winthrop, Shaw, Pittman, 2300 N Street, N.W., Washington, D.C., commencing at 9:43 a.m., Wednesday, October 11, 2006, before Elizabeth Mingione, Notary Public.

1

A P P E A R A N C E S O F C O U N S E L:

ON BEHALF OF THE PLAINTIFF:

JAY E. SILBERG, ESQUIRE
PILLSBURY WINTHROP SHAW PITTMAN, LLP
2300 N Street, N.W.
Washington, D.C. 20037-1128
(202) 663-8000

AND

DANIEL S. HERZFELD, ESQUIRE
PILLSBURY WINTHROP SHAW PITTMAN, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7900

ON BEHALF OF THE DEFENDANT, UNITED STATES:

MARIAN E. SULLIVAN, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0277

A L S O P R E S E N T

2

Eileen Supko
Scott Vance

3

C O N T E N T S

WITNESS: CHRISTOPHER KOUTS

EXAMINATION BY: PAGE
Mr. Silberg ................................. 7

4

DEPOSITION EXHIBITS
CHRISTOPHER KOUTS


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| No. 1 | Defendant's Final Witness List, Pages 1 and 3 | 9 |
| No. 2 | Letters Dated January 19, 2001 to Hon. Robert C. Byrd and Hon. Bill Young, from Ivan Itkin, with Attachment | 11 |
| No. 3 | Letter Dated November 15, 1991 to James Howard from John C. Tuck | 17 |
| No. 4 | Letter Dated February 14, 1992 to Hon. Krista Sanda from John Bartlett | 34 |
| No. 5 | Letter Dated May 29, 1992 to James Howard from James Watkins | 45 |
| No. 6 | Letter Dated July 31, 1986 to Prospective Offerors, Two Pages | 60 |
| No. 7 | U.S. DOE Instructions for Completing the Appendix C Delivery Commitment Schedule | 68 |
| No. 8 | Memorandum Dated June 11, 1991, from Ronald Milner | 76 |


5

DEPOSITION EXHIBITS(continued)


| | | |
|---|---|---|
| No. 9 | Excerpt from Transcript Dated Wednesday, June 14, 2006, Before the Honorable Emily C. Hewitt, Pages 02669-02676 | 82 |
| No.10 | Excerpt from Transcript Dated Wednesday, June 14, 2006, Before the Honorable Emily C. Hewitt, Pages 02831-02838 | 83 |
| No.11 | Excerpt from Mission Plan Dated June 1985, Pages HQR-003-1174 to HQR-003-1191 | 89 |


- - -

6

P R O C E E D I N G S

Whereupon,

CHRISTOPHER KOUTS,

having been first duly sworn by Elizabeth Mingione, a Notary Public within and for the District of Columbia, was examined and testified as follows:

- - -

DIRECT EXAMINATION CONDUCTED BY MR. SILBERG:

Q. Good morning, Mr. Kouts. I'm Jay Silberg. I'm counsel for a lot of utility companies in a lot of spent fuel damages litigation. This deposition was noticed I believe in the SFI Arkansas case.

Have you done anything to prepare for the deposition?

A. I have reviewed briefly the testimony that I gave in the PSE&G case. And that's all I've done.

Q. I'm sorry. The PSE&G case?

A. Yes.

Q. What is the PSE&G case?

A. Unless I've gotten the numerals mixed up.

7

PG&E, perhaps that would be better.

Q. Okay. That one I understand.

A. Right.

MS. SULLIVAN: And let me correct the record. This deposition was noticed in SFI Mississippi.

MR. SILBERG: Mississippi. It is what it is. You are correct. Mississippi. Sorry.

BY MR. SILBERG:

Q. Besides the testimony, have you reviewed any documents in connection with preparing for the deposition?

A. No, I have not.

Q. Okay. Have you consulted with anyone prior to the deposition in preparation for it?

A. I met with counsel. Yes.

Q. Did you consult with anyone else?

A. No, I have not.

Q. Okay. I've asked the court reporter to mark a document as Exhibit 1. It's entitled Defendant's Final Witness List in Northern States Power. And it's an excerpt, obviously.

8

authorized the facility with certain conditions. And those conditions tied the licensing, the construction and the operation of the MRS facility to the geologic repository.

So my assumption is that that sentence is referring to those specific aspects, recognizing that the department also had a strategy that assuming we found an acceptable host site, and that a benefits agreement was negotiated by the Office of the Negotiator, that it in the department's mind that linkages would be revisited by Congress and allow the department to proceed to have the facility deployed in the 1998 time frame.

Q. Isn't it true that the Department of Energy proposed the linkages prior to Congress enacting them?

A. The Department of Energy proposed different linkages than what Congress ultimately --

Q. What were the differences? I'm sorry if I cut you off.

A. I believe we, this is to the best of my recollection, again, that in the department's proposal to Congress, the linkages that the department proposed

25

were that the MRS could not begin operation until a construction authorization was received for the geologic repository. And also we also had a limitation I believe on the amount, on the total amount of fuel that would be stored at an MRS which was I believe 15,000 tons.

Congress, when it passed the 1987 amendments, essentially communicated to the department that it could not construct a monitored retrievable storage facility. And I believe it was the actual licensing was tied, the NRC licensing was tied to the actual issuance of a construction authorization for the repository.

In addition, Congress did not allow more than 10,000 tons of material to be sent to the MRS until the repository was in operation. And at that point in time could not exceed 15,000 tons.

Q. Okay. Where did the department first publish its proposed linkages?

A. I believe they were in the MRS proposal that was submitted to Congress in I believe it was in early 1987.

26

Q. And that was the first time the DOE published those?

MS. SULLIVAN: Objection, vague.

A. As I remember, the department was poised to submit the proposal about a year earlier when an injunction was issued by a district court in the state of Tennessee. And to the extent that the information contained in the department's proposal became public, and I believe there were hearings that occurred after that, after the injunction, that might have been discussed. But in terms of a published document, I believe the only one that comes to mind would have been when we submitted the proposal in early 1987.

Q. When you said "hearings" what type of hearings and before what body?

MS. SULLIVAN: Objection, compound.

A. There were a variety of hearings I believe in 1986 associated with oversight of the program, either on the House side or the Senate side. And I believe that the departments intended linkages might have been discussed at those. But to the extent that written material that was communicated to Congress, I

27

believe the proposal was the -- that we submitted in 1987 after we received relief under the injunction, that Supreme Court denied cert at that point. That's when the documents actually went to Congress.

Q. But there were no other DOE documents that reflected that, that had been published?

A. Not to my recollection.

Q. Why did DOE include the linkages in its MRS proposal?

A. The linkages were incorporated to deal with local concerns that were -- that surfaced during our interactions with people in and around Oak Ridge, Tennessee.

Q. Who are the people who in and around Oak Ridge, Tennessee, that you are referring to?

A. I believe there was a task force, and I don't remember the specific name of it, that was set up by local governments that had local officials on it who we interacted with. And I believe they provided us input on their concerns about tying the ability of the MRS to operate and to its capacity limits to the operation of the repository because they did not want

28

Q. And when was that letter sent?
A. I don't know the specific date.
Q. And to whom did he send it?
A. I don't know.
Q. Were you involved in the MRS process in the mid 1990s?
A. No, I was not.
Q. Okay. Were you involved in the waste acceptance process in the mid 1990s?
A. No, I was not.
MS. SULLIVAN: Objection, vague.
- - -
(A document was marked as Deposition Exhibit Number 5)
- - -
BY MR. SILBERG:
Q. I'm asking the reporter to mark a letter dated May 29, 1992 from Admiral James D. Watkins to Mr. James J. Howard, Northern States Power Company. First, do you know who Admiral Watkins is or was?
A. He was the Secretary of Energy at that time.

45

Q. Have you ever seen this letter before?
A. No, I have not.
Q. Do you know who might have prepared it?
MS. SULLIVAN: Objection, foundation.
A. No, I do not.
Q. In the third paragraph, do you know anyone who might have seen it?
MS. SULLIVAN: Objection, foundation, vague.
BY MR. SILBERG:
Q. At the time it was being prepared?
MS. SULLIVAN: Same objections.
A. It would probably have gone through the director of the program.
Q. And at the time who was that?
A. I believe that would still have been Dr. Bartlett.
Q. The third paragraph of the letter states that the department will develop a permanent nuclear waste repository in a timely fashion. Do you understand what a timely fashion means in this letter?
MS. SULLIVAN: Objection, foundation. The document speaks for itself.

46

A. My assumption is that, just as it says in the second page, that timely fashion is 2010. And if you look at the first full paragraph on the second page, it says we expect to start accepting spent fuel at the repository in 2010. So I would assume that's what the secretary means.
Q. And that of course is no longer the department's expectation?
A. That's correct.
Q. Is it still the department's expectation that a permanent repository will commence operation within six years of completion of the NRC reviews, the license application, the language on the top of page 2 of the letter?
MS. SULLIVAN: Objection, relevance.
A. If I am to assume that this means that the department would begin operation of a repository six years after it -- within six years after receipt of a construction authorization, yes.
Q. Okay. The second full paragraph on page 2 of this letter says that the MRS schedule assumes that the nuclear waste negotiator would begin development of a negotiated agreement with the candidate MRS host in the first half of 1993.

47

Was there a candidate MRS host by the first half of 1993?
A. I think there were several hosts by that time.
Q. There were several?
A. Potential hosts.
Q. Was there a candidate MRS host?
A. I don't know specifically what the secretary was referring to or what site the secretary was referring to at that point.
Q. Did the nuclear waste negotiator begin development of a negotiated agreement with the candidate MRS host in the first half of 1993?
MS. SULLIVAN: Objection, foundation, asked and answered.
A. He may have begun it but there was never an agreement that was negotiated.
Q. Do you know who he may have begin it with?
A. No, I do not.

48

Q. Are you aware whether -- I'm sorry. In the third paragraph it refers to formal negotiations between the potential host and the negotiator over the siting of an MRS. To your knowledge did such formal negotiations ever take place?
A. Since I was not intimately involved with the process, I have no way of knowing.
Q. Okay.
A. All I know is that there was no final negotiated agreement that was ever completed.
Q. In the next paragraph, it's the fourth full paragraph on page 2 of the letter it says, "To meet our schedules, we have established specific interim milestones to impose discipline and accountability." Are you familiar with any such milestones?
MS. SULLIVAN: Objection, foundation. The document speaks for itself.
A. My assumption would be that it's the enclosure to the letter that has key MRS program milestones.
Q. Have you ever seen those milestones before?
A. I may have, but they don't specifically

49

come to mind.
Q. Do you know how these milestones were prepared?
A. No, I do not.
Q. Do you know if they appear anywhere else in DOE documents?
A. They may. I don't know.
Q. You were involved in the MRS program at one point in your career at Office of Civilian Radioactive Waste Management. Is that correct?
A. That's correct.
Q. And what was that time period?
A. I believe I left the MRS program in the '88 time frame.
Q. When you left the program, were there milestones for an MRS program?
MS. SULLIVAN: Objection, vague.
A. To the best of my recollection, with the Amendments Act that in 1987 that restructured the approach that the department had to take with MRS, I don't believe that when I left the MRS program that there were any specific milestones other than a desire

50

to still have some kind of facility available in the '98 time frame.
Q. Before the NWPA amendments were there milestones?
A. Yes, there were.
Q. And, for instance, what was the time that it would take under your milestones prior to 1987 amendments to construct an MRS?
MS. SULLIVAN: Objection, vague.
A. The milestones that the department would have pursued assuming the proposal was enacted or accepted by Congress were contained in Volume 3 of the MRS proposal to Congress. And that volume had a program plan and specific milestones for the implementation.
And I don't recall specifically what they were, other than certainly the end point was to have the facility operational in the 1998 time frame.
Q. Okay. Do you recall what type of NRC licensing was contemplated during that period of time?
MS. SULLIVAN: Objection, the document speaks for itself. Vague.

51

A. The assumption on licensing had to do with the types of operations that the MRS as the department proposed was going to undertake. And there were several different NRC parts that had to be addressed. And I don't specifically remember which, but the -- that was again outlined in the MRS proposal in terms of how the department intended to license it.
And I would commend that document to your reading if you are interested in that subject. I can't recall the --
Q. And after the 1987 amendments was there a different licensing strategy?
A. Yes.
MS. SULLIVAN: Objection, vague.
Q. And what was that strategy?
A. As I've testified in various cases, the department evolved beyond the concept of the integral MRS that it proposed initially, which was to be a packaging facility and a storage facility at a central site such as the Oak Ridge River reactor site, which was what was proposed.
Subsequent to the disapproval or the, say,

52

nonapproval of the proposal by Congress, the department evolved more to a storage-only facility and not a packaging facility.
Q. I believe in the Pacific Gas and Electric case you testified that it would take two to three years to build an MRS. Do you recall that?
MS. SULLIVAN: Objection. Ask the witness be provided the testimony he's being asked about.
BY MR. SILBERG:
Q. I'll shorten the question. What is your opinion as to how long it would take to build an MRS?
MS. SULLIVAN: Objection, vague.
A. It depends on the type of facility that you are intending on building.
Q. What about the type of facility that the department was intending on building in the early 1990's time frame?
A. To the best of my recollection, that probably could be constructed in a two- to three-year time period. Yes. Or even sooner, depending on the type of facility that was intended to be operated.
Q. And what about the type of facility that



was intended before the 1987 amendments?
MS. SULLIVAN: Objection, vague.
A. I believe that facility was somewhat larger, had a variety of additional operations, for instance rod consolidation, and again preparation and again containerization, if you will, of disposal-ready packages for any of the three repository sites that at that point were under consideration. So it was a much larger, more involved facility. But I don't remember the specific time frames in which we intended to build that.
Q. Let's get some pages copied and we'll come back to this.
MS. SULLIVAN: We've been going for a little bit more than an hour. Can we take a break?
MR. SILBERG: Oh, sure.
- - -
(Recessed at 10:46 a.m.)
(Reconvened at 10:55 a.m.)
- - -
MS. SULLIVAN: Before we continue with the questioning, I would just like the court reporter to



note Mr. Vance's attendance at this deposition. And I've been told by Mr. Silberg that he's attending as counsel.
MR. SILBERG: Correct.
MS. SULLIVAN: And we'll let it go with that.
BY MR. SILBERG:
Q. Going back to the May 29, 1992 letter from Secretary Watkins, looking at the last page, the MRS program milestones, did DOE complete an environmental assessment of potential sites for the MRS by June 1993?
A. No, he did not.
Q. Did it ever complete such an assessment?
A. I don't believe we did. No.
Q. Did it ever submit a siting recommendation to Congress?
A. No, it did not.
Q. In fact were any of these milestones for the MRS ever met?
A. No, it did not, not to my knowledge.
MS. SULLIVAN: I'm sorry. That last



question was regarding milestones for the MRS?
MR. SILBERG: The MRS. Correct.
BY MR. SILBERG:
Q. Looking at the bottom of the second page, it says, in the last paragraph, "However, should it become clear that our currently planned actions and progress towards the milestones listed in the enclosure will not ensure that the department can accept spent nuclear fuel by 1998, we will take whatever actions are necessary in accordance with the law to meet our obligations under the Nuclear Waste Policy Act."
Can you identify any actions that were taken that fall within the scope of that sentence?
MS. SULLIVAN: Objection, vague.
A. I believe after this time period we initiated a multi-purpose canister program which was intended to potentially provide some relief to the utilities with the use of canisters that would at that time we believed might be disposable. I believe we negotiated an agreement with the PECO agreement to try to address the 1998 issue.

Q. The MPC program which you described, that was subsequent canceled; wasn't it?
A. It was. Yes, it was.
Q. And when did that occur?
A. Sometime in the mid '90s. I don't remember specifically when it was. It had to do -- was tied to appropriations.
Q. And that program, even had it succeeded, would not have allowed fuel to move off utility sites before there was a repository. Is that correct?
MS. SULLIVAN: Objection, vague.
A. That's correct.
Q. On the --
A. The department also continued after, you know, for several years after this letter was sent to still try to site, obtain a site through the office of the negotiator. That was another effort they intended to do.
Q. The top of page 3 it says, "Further, we would seek additional legislative authority if appropriate." Was any such additional legislative authority sought?

57

MS. SULLIVAN: Objection, vague. Letter speaks for itself.
A. I don't recall any but there might have been.
Q. Okay. In the next paragraph on the letter, this is the first full paragraph on page 3, it says, "We conclude that spent fuel proposed to be stored in dry cask storage at Prairie Island will be shipped to an MRS facility within the 25-year-time limit envisioned by the ALJ recommendation," ALJ being Administrative Law Judge.
Do you have any knowledge of any analysis done by DOE to make that -- reach that conclusion?
A. No.
MS. SULLIVAN: Objection, vague. Sorry.
A. I'm not aware of any analysis, but that doesn't mean it doesn't exist.
Q. Have you ever heard of this statement before?
MS. SULLIVAN: Objection, foundation, vague.
A. No.

58

Q. Let's just jump to another topic. In the mid 1980s you had responsibility for development of casks?
A. No. It was the late 1980s.
Q. Sorry. Thank you. In that program what kind of cask designs were -- was DOE looking to develop?
MS. SULLIVAN: Objection, vague.
A. Are you referring to transportation casks?
Q. The casks that you were developing at the time.
MS. SULLIVAN: Objection, vague.
A. In the late 1990s, the department --
Q. I'm sorry, 1980s?
A. 1980s, excuse me, the department had a Cask Systems Development Program to develop transportation casks that were to be used by the program to move spent fuel in the 1998 time frame. We had initially five contracts, two truck casks and three rail casks.
Q. Are you familiar with the RFP that led to that development program?
MS. SULLIVAN: Objection, vague.

59

A. I was not involved in the development of the RFP. I managed -- I took over the program after the contracts were issued.
Q. Okay.

\- - -

(A document was marked as Deposition Exhibit Number 6)

\- - -

BY MR. SILBERG:
Q. The reporter has marked a document dated July 31, 1986, Subject: Request for Proposal RFP number -- a lot of numbers and letters -- for development of from-reactor casks.
Is this the RFP that we were just talking about?
MS. SULLIVAN: Objection, foundation.
A. I assume it's the one you were talking about. Yes.
Q. And this is the basis on which your -- the cask development program that you were responsible for was carried out?
MS. SULLIVAN: Objection, vague,

60

foundation.
A. It appears to be. Yes.
Q. Okay. Look at the last page of the document, the second page of the document titled Award. That states, does it not, that it is anticipated that DOE will negotiate an award, several cost reimbursement type contracts, including that suitable proposals are received more than one in each category; legal weight truck, overweight truck, rail, slash, barge, and dual purpose, paren, transport, slash, storage, closed paren, casks.
Is that what the award was intended to cover?
A. It's what the document says.
Q. Okay. And that document is correct to your knowledge and belief?
A. I have no --
MS. SULLIVAN: Objection, foundation.
A. I have no reason to doubt it.
Q. The cask designs, is it correct that only the truck, one truck cask design was completed of the five that you initially described?

61

A. That's correct.
Q. Could you describe that cask, if you recall?
A. I believe it was intended to be a legal weight truck cask developed by General Atomics that had the capability of moving four pressurized water reactor assemblies per shipment, depending on its burn up and age.
Q. Do you remember the dimensions of the cask approximately? Weight? Size?
A. It was intended to be a legal weight truck cask, which I assume would have been 25 tons or under, length and diameter, you know, I don't remember the specifics. But certainly it has to be a certain length to take a PWR assembly. And, you know, but I don't know exactly the dimensions of the cask. I don't remember it.
Q. Okay. None of the other design efforts were completed, I take it?
MS. SULLIVAN: Objection, vague.
A. They were -- when I managed the program, we carried five for a period of time. And then we

62

reduced the program down, and then to one primary truck, one backup truck design, one primary rail and one backup rail design.
Subsequent to that development effort, I left the program. So that's what I can specifically remember.
Q. Okay. Let's go back to the linkages for a minute. The department recognized, did it not, that to meet the 1998 date that's in the 1989 time frame, that the linkages would need to be removed. Is that correct?
A. That's correct.
Q. Did the department ever submit legislation to Congress to remove the linkages?
A. The department's approach was to have that addressed through a negotiated agreement by the Office of the Negotiator which had to be approved by Congress in which the linkages would have been addressed. So the department looked to the negotiator to do that.
The department, to my knowledge, did not submit any separate legislation on that issue.
Q. Were you involved in the 1991 mission plan,

63

draft mission plan amendment?
MS. SULLIVAN: Objection, vague.
A. I believe I was, and certainly in portions of it, and certainly reviewing the rest of it.
Q. Okay. You recall that that document said that the -- referred to the President's legislative package for the National Energy Strategy?
MS. SULLIVAN: Objection. Document speaks for itself.
A. I don't recall that but it could have.
Q. Are you familiar with the President's legislative package for the National ENERGY Strategy?
MS. SULLIVAN: Objection, foundation.
A. I may have had a familiarity at that time, but my memory fails me at this point.
Q. To your knowledge, did that National Energy Strategy include a provision to repeal the linkages established in the NWPA 1987 amendments?
MS. SULLIVAN: Objection, foundation. The document speaks for itself.
A. I'd have to review the document. I don't know offhand.

64

Q. And when did that take place? When did the withdrawal take place?
A. I don't remember specifically.
Q. Do you remember when it was submitted?
A. Not specifically. I would have to go back and look.
Q. Do you remember general?
A. It was somewhere in the '96, '97 time frame that we submitted it. And subsequent to that, I think I believe we withdrew it.
Q. In the 1995 time frame, was it your understanding that there would not be an MRS in 1998?
MS. SULLIVAN: Objection, vague.
A. Without rather specific congressional guidance, avoiding a variety of implementation steps, that would not have been -- the implementation would not have been possible. And at that point I don't believe there was any legislation that was being considered that would have taken those steps.
So in that time frame it was very -- it was a very, very low probability that an MRS would be available in the 1998 time frame.

73

Q. The term only a faint glimmer?
A. That's --
MS. SULLIVAN: Objection.
BY MR. SILBERG:
Q. Describes it well?
MS. SULLIVAN: Objection, vague, foundation.
A. That's a fair metaphor.
Q. Since its your language from the PG&E.
A. Sounds very good.
Q. I like that. When was the 1995 ACR/APR report published?
MS. SULLIVAN: Objection, vague. Assumes facts not in evidence.
A. I don't remember.
Q. In 1995?
A. I would assume it was in 1995.
Q. You are familiar with the 1995 ACR/APR report?
MS. SULLIVAN: Objection. Assumes facts not in evidence.
A. I believe I've looked at it, yes, in the

74

past.
Q. And do you know what acceptance rate it assumes?
MS. SULLIVAN: Same objection.
A. I'd have to review the document in order to refresh my memory.
Q. Okay. Do you believe that the acceptance rate in that report assumes an MRS?
MS. SULLIVAN: Document speaks for itself, to the extent that there is such a document.
A. I'd have to review the document in order to comment on that question.
Q. Assuming for the moment that it does base its acceptance rate on an MRS, can you explain why DOE would have published that document when at the time there was only a faint glimmer of hope that there would be an MRS?
MS. SULLIVAN: Objection, vague. Assumes facts not in evidence.
A. I'd have to review the document because the answer possibly could be inside it.
Q. But sitting here you can't think of any?

75

MS. SULLIVAN: Same objections.
A. Not offhand. Not without reviewing the document.
Q. Okay. In 1991 who was the director of the Office of Strategic Planning and International Programs in OCRWM? I guess my question is was that you?
A. No.
Q. Okay. Were you working on strategic planning related activities in that time frame 1991?
A. I believe I was.
\- - -
(A document was marked as Deposition Exhibit Number 8)
\- - -
BY MR. SILBERG:
Q. I'm showing you a document which is Exhibit 8, June 11, 1991, a memo from Ronald A. Milner, Associate Director of Storage and Transportation to Director, Office of Strategic Planning and International Programs. Have you ever seen this document before?

76

storage substantially above that amount. There may be contractor documents, but to my recollection we usually did not look above that amount.
Q. You said you usually didn't look above that amount?
A. I'd be happy for you to refresh my memory.
Q. No. You just said usually. I was wondering if you could think of any non usual?
A. Not that comes to mind.
Q. Okay. I think I may only have a few more questions, but if I could just take a minute and consult with our friends here?
MS. SULLIVAN: That's fine.
- - -
(Recessed at 11:42 a.m.)
(Reconvened at 11:51 a.m.)
- - -
MR. SILBERG: I'm handing the reporter portions of a June 1985 mission plan.
- - -
(A document was marked as Deposition Exhibit Number 11)

89

- - -
BY MR. SILBERG:
Q. Do you recognize this document?
A. Yes, I do.
Q. And I copied storage, the MRS, monitor retrievable storage sections of the document which run from pages 71 to 88. On page 87 of this document it refers to under Section 3.2.1.6 that the estimated time to deploy an integral MRS facility is 8 to 11 years after congressional authorization. Was that your view at the time?
A. Since this document -- I entered the program exactly when this document was issued. I believe it was in June of 1985. So it was the program's view and at that point in time, yes.
Q. And did you share that view at that time?
A. Absolutely.
Q. And this document also shows that construction of the -- of this MRS would take about three-and-a-half years or thereabouts. Does that sound right to you?
MS. SULLIVAN: Objection. The document

90

speaks for itself.
A. Looks to me closer to five years.
Q. Five years. Okay. That's construction begun summer '91 to testing of hot systems completed early '96?
MS. SULLIVAN: Objection. Document speaks for itself.
A. That's my assumption.
Q. And we are talking here about I think what you have called an integral MRS facility. Could you just briefly describe what that is?
A. The integral MRS, as the department proposed it, and I'd have to go back and look about what the mission plan said about it, but certainly in the proposal that was submitted to Congress in '87, our view was that the MRS would receive spent fuel, would consolidate fuel rods, and package those fuel rods for -- in a disposal-ready canister that could be utilized either at a repository at Hanford, Washington, at Yucca Mountain, Nevada or at Deaf Smith, Texas.
Q. And how does that compare with later

91

visions of the MRS?
A. It's --
MS. SULLIVAN: Objection, vague.
A. It's a much more complicated facility than a simple storage facility.
Q. At the same page 87 we were looking at before, it says under Section 3.2.1.6, implementation of MRS according to this schedule will provide assurance that the DOE's acceptance of spent fuel in 1998 and subsequent years will be at sufficient rates to meet obligations.
What obligations, what are the obligations you are referring to?
MS. SULLIVAN: Objection. Document speaks for itself.
A. I have no idea.
Q. You don't know what the department meant when it said this?
A. This was prior to the time that the department initiated the APR/ACR development. So I don't know what was contemplated by the authors of this.

92

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------x

SYSTEM FUELS, INC., on its own behalf :
and as agent for SYSTEM ENERGY :
RESOURCES, INC., and SOUTH :No. 03-2624C
MISSISSIPPI ELECTRIC :
POWER ASSOCIATION, :
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. :

-------------------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, January 16, 2007

VOLUME 6

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE SUSAN G. BRADEN



APPEARANCES:
ON BEHALF OF PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ.
JACK Y. CHU, ESQ.
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean, Virginia 22102
(703) 770-7674
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman
2300 N Street, NW
Washington, D.C. 20037
(202) 663-8000

and
L. JAGER SMITH, JR., ESQ.
Wise Carter Child & Caraway, P.A.
600 Heritage Building
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5500



APPEARANCES (Continued:)
ON BEHALF OF THE DEFENDANT:
SHARON A. SNYDER, ESQ.
ALAN J. LO RE, ESQ.
STEPHEN FINN, ESQ.
SCOTT DAMELIN, ESQ.
MARIAN SULLIVAN, ESQ.
U.S. Department of Justice
1100 L Street, NW
Washington, D.C. 20036

(Index appears at end of transcript)



P R O C E E D I N G S

\- - - - -

THE COURT: All right. I have a lot of different papers here. I am sure I have got everything I need. Let me just tell you a little bit about this week's schedule.

I am going to have to break this afternoon about 3:15 for a doctor's appointment at 3:30. It shouldn't -- it is downtown. It shouldn't take me that long. I am hoping I will be back here before 4:30. I'm sorry to do that, but I can work until 7 tonight to make up the time. We will be starting at 9 every other day this week, and I have nothing else during the week that will interfere with our schedule so we can run through. I don't think this -- I'm sorry to do this to you, but that's where we are.

I am ready to begin, unless there is something. I have a lot of different motions, obviously, that have been filed in the last couple of days. I have looked at all of them and I know that we have granted the government's request to put some deposition testimony in. I don't know if you got that or

THE COURT: You need this witness to do that?

MR. SILBERG: I think he is probably the easiest one to use for that purpose, without trying to call a nuclear waste negotiator.

THE COURT: Well, I heard from somebody -- in one of the cases that I heard from the negotiator himself. It had to do Sacramento, was it not?

MR. LO RE: I don't think so. I don't recall that, Your Honor.

THE COURT: I saw somebody. And he told me how excited he was and what a dismal experience it had been.

MR. SILBERG: And as with Mr. Kouts having lived through that, I can agree with both, but there are perhaps four or five questions that can get me to that point, I believe, with Mr. Kouts.

THE COURT: All right.

BY MR. SILBERG:

Q. Mr. Kouts, the nuclear waste negotiator never concluded a negotiation for a volunteered MRS site, did he?



A. No, he did not.

Q. Okay. Did he ever begin to negotiate an agreement with a volunteered site?

A. Essentially Congress cut off the funds to that effort before he was able to do that. And it was unlikely that -- it was unclear that there was a site that was willing to enter into that at that point.

Q. And was there legislation that was proposed after the nuclear waste negotiator went out of existence in Congress that might have authorized an MRS site?

A. There were interim storage bills that were introduced in the House and the Senate, not by the Department, but by, you know, by various representatives and senators to try to have an interim storage facility.

THE COURT: They were looking at an Indian tribe or something, it seems to me, at one point.

THE WITNESS: Yes, that's correct, but there was no legislation submitted by the Department, that's correct.

THE COURT: Right.

BY MR. SILBERG:



Q. And President Clinton who was President at the time, correct?

A. Yes, he was.

Q. And he threatened to veto that legislation, did he not?

A. Yes, he did.

Q. And the legislation was never enacted?

A. Actually, he did veto a piece of legislation that was a very watered-down piece of legislation.

Q. But that legislation never had any interim storage provisions in it?

A. That's correct, it never got that far.

Q. Okay. And with respect to the -- let's go back a minute to the 1991 report. Do you have the instructions?

You are familiar with the instructions that were issued to utilities to submit the delivery commitment schedules?

A. Generally, yes.

Q. If I might, Your Honor. I have handed you a document entitled U.S. Department of Energy instructions for completing the Appendix C, delivery commitment schedule, general instructions.



You are familiar with the document?

A. Yes.

Q. And this, if you look at paragraph 1 of this document, if you could turn on the ELMO. The paragraph 1 of this document says that the delivery commitment schedule provides the purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected federal waste management system acceptance capacity; is that correct?

A. Yes.

Q. So it refers to the utilities' plans, all right?

A. Yes.

Q. And if you look at paragraph 7C of this document on page 5, I flipped one page too far, I think we have a copy that did not copy the even-numbered pages, Your Honor. Excuse me.

I assume the copies that you have are also missing --

MR. LO RE: That's correct.

MR. SILBERG: We will replace those, Your Honor, I apologize. I do have another

assume magically that we can negotiate an acceptable agreement with that site. I am going to assume magically that that agreement will break the schedule linkage, but not the capacity linkage, and I am going to assume magically that Congress is going to adopt that.

THE COURT: Do you have a question for the witness?

MR. SILBERG: I don't think he answered my prior question about --

THE COURT: Why don't you ask it again.

BY MR. SILBERG:

Q. Did DOE void DCSs that had been approved by DOE in the 1990 time frame?

A. I don't recall whether they were voided or not. I think you are responding to the -- your questions seem to be in relation to the planning process that we started in 2004.

Q. No. I am talking about in the 1990s.

A. I don't, I don't really know. I don't. I am not sure.

Q. When you restarted the process in 2004, did you tell the utilities that DCSs that had been approved earlier might need to be



resubmitted?

A. Yes, we did. And there was a rationale for that.

Q. So you didn't assume that because those DCSs had been approved -- submitted by the utilities pursuant to the 1991 ACR, and approved by DOE, that they were obligations of DOE, if you will?

A. Well, yes, we did. Let me explain, Mr. Silberg. The 1991 process assumed an acceptance rate of 4, 6, 9, 9, 9, 9, 9. When we started the 2004 process, we were -- that was in anticipation of having a repository available in the 2010 time frame.

And those acceptance rates were much higher than what we had in 1991 because we weren't constrained by the 10,000 ton limit that we felt we were constrained by in 1991.

So the acceptance rates were much higher for the first ten years of the system. It was five years ramping up to 3,000 metric tons and 3,000 metric tons there up to, up to the point where we received all the fuel.

So where there were DCSs submitted for a relatively small amount of fuel, we were



asking people to resubmit DCSs based on the higher amounts of fuel that we felt that we could take at the repository starting in the 2010 time frame, since it was not constrained, if you will, by the acceptance rate that we had in 1991.

And that was the rationale as to why we wanted resubmission. In point of fact, most purchasers were better off with the new acceptance rates since they were much higher and, therefore, more fuel could come into the system in a shorter time frame.

Q. But the answer to my question is yes, you did tell the purchasers that they ought to forget about their earlier DCSs and resubmit?

MR. LO RE: I am going to object that it is argumentative and inaccurate.

THE COURT: Well, it didn't accurately characterize what he said. I mean, he made a statement and it wasn't that one.

BY MR. SILBERG:

Q. Did DOE ask the purchasers to resubmit DCSs that had been submitted and approved in the 1990s?

A. Yes, we did.



Q. Okay. With respect to the total system life cycle cost study that you talked about, the repository system that you modeled in that study was based on what acceptance rate?

A. I'd have to go back to the document to look at it. My assumption is that if it was strictly a repository, that it was probably a five-year ramp up to 5,000 metric tons.

Q. And the actual design of what we hope will be built in Yucca Mountain, assumes what acceptance rate?

A. It is a five-year ramp up to 5,000 metric tons steady state, as we currently envision it today.

Q. And the MRSs -- the MRS that you were considering in the late 1980s, early 1990s, what was the acceptance rate for that design?

A. In the late '80s and early '90s, we were, as I remember, still constrained by the Amendments Act passage. Before it, before the Amendments Act was passed, we looked at a higher capacity.

Q. And what was -- I'm sorry. And what was that capacity?

A. Well, that was a 15,000 metric ton storage capacity, but its throughput rate was about 3,000 tons per year, at full operation.
Q. Okay. Did you ever change that design?
A. Yes, we did.
Q. In terms of the acceptance rate?
A. Oh, yes, yes, we did. We had the facilities designs we developed in the mid-'90s were substantially less robust, if you will, than the facility that we had originally designed that accompanied the proposal to Congress?
Q. And that was the design that you were working on after the MRS program lapsed, if you will?
A. The designs that -- I'm sorry, I'm trying to answer your question the best that I can. The designs that we had subsequent to the Amendments Act were more simplistic facilities, didn't have the packaging capability, the fuel consolidation capability, if you will, that we had initially proposed in 1985.
So that the designs became more simplistic and much more rapidly deployable, so



should we receive an authorization, should we receive relief, if you will, from the schedule linkages, that we could license and build that facility in a very rapid time frame.
Q. But you never got licensing approval of that design?
A. That's correct, we never submitted a license application, that's correct.
Q. You were asked a few questions about the assumptions you made in the 1995 TSLCC on modeling a repository that would take more than the 70,000 metric ton limit.
A. Yes.
Q. That analysis was not used to establish, in DOE's view, a contractual obligation with anyone, was it?
A. The total system life cycle cost analysis, no, it was not.
MR. SILBERG: If I could have a minute, Your Honor. We have no further questions.
THE COURT: All right. Mr. Lo Re is not finished with you.
THE WITNESS: Oh, I'm sorry. I was so excited.



THE COURT: Hope springs eternal. I know how you feel. What if we both got up and left the room? What would you do?
MR. LO RE: We would still be arguing. Don't take it personally, Mr. Kouts.
THE WITNESS: Sorry.

REDIRECT EXAMINATION

BY MR. LO RE:
Q. No problem. Mr. Kouts, Mr. Silberg just asked you about whether the TSLCC study that you looked at related to contractual obligations. Do you remember that?
A. Yes.
Q. It did relate to the fees that the utilities paid, correct?
A. It was used to assess the adequacy of the fee, yes.
Q. And did they pay this fee personally to the standard contract?
A. They have up until this point, yes.
Q. Now, I would like to turn your attention back to DX-140, which is the '91 ACR. And I think I have, I may have different Bates



numbers here, but I believe that the translation for your document is 3601, 3601. And this is under the heading that's set forth in the previous page, delivery commitment schedules.
And it says, "the information contained on the purchaser's approved DCSs will assist in implementing the waste acceptance process." Do you see that?
A. Yes, I do.
Q. Now, what did you mean by assist in implementing the waste acceptance process?
MR. SILBERG: Your Honor, to the extent that we have the same objections about the document speaks for itself when I tried to ask these questions, it seems to me that objection applies as well here.
THE COURT: Yes, Mr. Lo Re?
MR. LO RE: Well, certainly the words say what they say, Your Honor. And now we have a witness here who is actively engaged in the development of this document or certainly aware of it in his capacity, and Mr. Silberg examined the witness on whether or not the document would, the DCS would assist or somehow

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------x
SYSTEM FUELS, INC., and ENTERGY :
ARKANSAS, INC., :
Plaintiffs, :NO. 03-2623C
vs. :
THE UNITED STATES, :
Defendant. :
-------------------------------------x
Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.

Thursday, April 12, 2007

The parties met, pursuant to the notice of the Judge at 9:03 a.m.

BEFORE THE HONORABLE CHARLES LETTOW



APPEARANCES:
ON BEHALF OF PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ.
JACK Y. CHU, ESQ.
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean, Virginia 22102
(703) 770-7674
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
and
L. JAGER SMITH, JR., ESQ.
Wise Carter Child & Caraway, P.A.
600 Heritage Building
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5500



APPEARANCES (Continued:)
ON BEHALF OF THE DEFENDANT:
JOSHUA E. GARDNER, ESQ.
MARIAN SULLIVAN, ESQ.
ALAN J. LO RE, ESQ.
SCOTT DAMELIN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

***Index appears at end of transcript***



P R O C E E D I N G S
- - - - - (9:03 a.m.)
THE COURT: Welcome back. The Court appreciates the organization and care with which the site visit was undertaken and successfully accomplished. Is there anything preliminarily this morning before we begin, Mr. Gardner?
MR. GARDNER: Not from the government, Your Honor.
THE COURT: Mr. Tomaszczuk?
MR. TOMASZCZUK: Nor from Plaintiffs.
THE COURT: All right. Yes?
MR. GARDNER: And the government would call its next witness, Christopher Kouts.
THE COURT: Thank you very much. Mr. Kouts, you're familiar with the process, if you'd approach the bench and stop and raise your right hand to be sworn?
THE WITNESS: Yes, sir.
Whereupon--
CHRISTOPHER KOUTS
a witness, called for examination, having been duly sworn, was examined and testified as follows:
THE COURT: Thank you. Please be

seated. And before you begin, please state your full name for the record.

THE WITNESS: Yes, sir. My name's Christopher Alexander Kouts.

THE COURT: Thank you. You may proceed.

MS. SULLIVAN: Good morning, Your Honor.

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q. Mr. Kouts, where are you currently employed?

A. I'm currently employed within the Office of Civilian Radioactive Waste Management at the U.S. Department of Energy.

Q. And what is your position with the Department of Energy?

A. I am director of the Waste Management Office within the Office of Civilian Radioactive Waste Management.

Q. And what are your responsibilities in that position?

A. I am responsible for the waste acceptance aspects of the system, including management of the standard contract. I'm also



responsible for systems analysis and basically coordination with other DOE programs on DOE waste materials.

Q. And your responsibilities include planning for waste acceptance from the utilities pursuant to the standard contract?

A. Yes, they do.

Q. How long have you held your current position?

A. These duties I've been responsible for on an acting basis and then, later on, a permanent basis since, I believe, October of 2002.

Q. Could you bring the microphone just a little closer to you?

A. Okay.

Q. Thank you. When did you first join the Office of Civilian Radioactive Waste Management?

A. In June of 1985.

Q. Would you please summarize the positions you've held within the office since that time, briefly?

A. All right. I began my employment at the Office of Civilian Radioactive Waste



Management in the MRS development team. That was a group that was intended, that essentially developed the monitored retrievable storage proposal to Congress in compliance with Section 141 of the Nuclear Waste Policy Act. I worked in that position for approximately three years, held a brief position in integration activities for about a month or two and then was appointed to head the office's transportation program.

I held that office for about three years, and then I worked on strategic and contingency plans for the program, that's in the early '90s now, for a period of time. After that, I was appointed to take over a division that dealt with regulatory coordination with the Nuclear Regulatory Commission and all interactions of the program with the NRC.

After that, I accepted a division that supported the director at that time, Dr. Daniel Dreyfus, who was the political appointee at that time for a period of years. After that position, I moved on to take over a division that developed a topical safety analysis report on centralized air and storage, which was an



effort to essentially expedite the licensing and eventual, hopefully, deployment of an interim storage facility in anticipation of legislation that was being considered in Congress at that time, that was somewhere in the mid-'90s.

Shortly after that, I became -- kind of an interesting job, which was I was a liaison between the Yucca Mountain project in Nevada and DOE headquarters, and I had basically two masters, the head of the Yucca Mountain project and also the director of the program.

And my responsibilities in that position, which lasted about five years, were essentially to make sure that any major technical and policy products that came out of the program were fully coordinated and, policy wise, correct with the implementation of the Yucca Mountain project.

The major activities I was involved in during that time period had to do with the viability assessment that was submitted and -- that was required by Congress to be submitted in 1998, and then after that, until

2002, I worked on the development and the implementation of the Yucca Mountain site recommendation process, working closely with the Undersecretary's office and the Secretary of Energy's office through his recommendation to the President and supported them through hearings in the 2002 timeframe up until the point that the President assigned the joint resolution of Congress, essentially identifying the Yucca Mountain site as the site for the repository.

After that, I was appointed on an acting basis to the position that generally I'm in right now, and that was in roughly October 2002.

Q. Thank you. What is your educational background?

A. I have a Bachelor's and a Master's in mechanical engineering, and I'm a licensed professional engineer.

Q. I'd like to look at our first document, Defendant's Exhibit 49.

MS. SULLIVAN: And it's also, Your Honor, PX-187, and both were admitted for completeness. Your Honor, may I approach?



THE COURT: Yes, certainly.

BY MS. SULLIVAN:

Q. Mr. Kouts, I've handed you just an excerpt of what is a three-volume document. Could you identify the document from which this excerpt is taken for the record?

A. Yes, this is the mission plan for the Civilian Radioactive Waste Management Program. It was a document that was required to be developed by the Nuclear Waste Policy Act.

Q. Were you at DOE at the time that this document was issued?

A. I joined DOE in the month that this document was issued.

Q. Did you review this document when you joined the Office of Civilian Radioactive Waste Management?

A. Yes, I did. It was the blueprint for the implementation of the program at that time.

Q. And did you use it in the work that you do?

A. Yes, I did.

Q. Could we please go to page 25 of this document, Bates number ending 1129? And there's a table on that page titled,



"Assumptions About Geologic Repositories." It's also on the screen.

A. Okay.

Q. Mr. Kouts, at the time this document was issued, how many repositories did DOE plan to bring online?

A. At that time in the program, we were planning on developing two repositories.

Q. And why was that?

A. Well, essentially, with the 70,000 metric ton limit on the first repository, you needed two repositories in order to essentially dispose of all the anticipated commercial and defense waste that the program has to deal with.

Q. At the time the 1985 mission plan was issued, when was DOE planning to begin operations at each of these repositories?

A. The first repository was to begin operations by January 31, 1998, and the second repository, I believe, was about five years after that.

Q. Mr. Kouts, could I direct your attention to the paragraph below this section that we have excerpted on the screen, under



waste acceptance schedules, and there's a paragraph that begins "on the basis"?

A. Yes.

Q. Could you read that paragraph? It continues to page 28, and I'll just have you read through the end of that sentence that continues on page 28.

A. Okay. "On the basis of the integrated system approach described in the improved performance plan (section 2.3), the DOE has identified many possible waste acceptance schedules depending on the size and the operating characteristics of the system facilities."

Q. Actually, let me have you stop right there. What did this paragraph reflect about DOE's planning at this point in the program?

A. Well, at this point in the program, in 1985, which was essentially three years after the passage of the Act, the heading of the designs, many of the capabilities of the facilities were still in a very preliminary planning stage, so what the Department was indicating by this statement was, essentially, that we were still learning, and we were still

anticipation of repository construction and operation.
Q. I'd like to now provide you what's been marked as Defendant's Exhibit 57, again, an excerpt of that document.
MS. SULLIVAN: May I approach, Your Honor?
THE COURT: Yes.
BY MS. SULLIVAN:
Q. Mr. Kouts, could you identify Defendant's Exhibit 57 -- or the excerpt from which, the document from which this excerpt is taken?
A. Yes, I can. This is the, I think, only finalized program mission plan amendment. If you remember, the mission plan was required by the Act to provide a road map in terms of how we were going to implement the program, and at this point in time, it was felt that since there were some major changes to the program, that we needed to provide an amendment to the mission plan. And this document has essentially that amendment, along with comments on the draft amendment that was issued prior to this and the Department's responses to those



comments.
Q. Were you involved in the preparation of this document?
A. I believe I was involved in reviewing it. I might have been involved in responding to comments related to MRS issues.
Q. And what was your position within the program at the time this document was issued?
A. I was still working as part of the MRS team.
MS. SULLIVAN: Your Honor, at this time, we would move for admission of Defendant's Exhibit 57.
MR. SILBERG: No objection.
THE COURT: Admitted.
(Defendant Exhibit Number DX-57 was received in evidence.)
BY MS. SULLIVAN:
Q. Could I direct your attention to page six of this document, the paragraph that begins, "as already mentioned," if you could read that paragraph into the record, please?
A. "As already mentioned, several important milestones have been achieved. However, the experience gained in achieving



those milestones and advances in the technical planning of the program, coupled with the decrease in the budget for fiscal 1987 and uncertainty about fiscal year 1988, have led the DOE to reassess and rebaseline the program for the first repository and to revise its schedule, see table one.
The new schedule shows a five-year extension of the date for waste acceptance at the first repository, from 1998 to 2003. As explained later, the DOE could nonetheless start accepting waste in 1998 at an MRS facility."
Q. What was the state of DOE's planning at the time this document was issued?
A. Essentially, that the MRS was going to be our only vehicle to receive materials in the 1998 timeframe and that that had to be linked to the repository's beginning operation in 2003.
Q. How did DOE's budget appropriations affect this program plan?
MR. SILBERG: Objection, Your Honor, relevance.
THE COURT: Again, the Court will hear



this evidence. It is not now relevant, but it may be.
MS. SULLIVAN: Your Honor, with count two of Arkansas's complaint, they've made allegations with regard to DOE's budget, budgets and whether or not DOE's failure to act has been the result of inadequate funds. That's, in part, a reason for presenting this evidence.
THE COURT: Is that the good-faith claim?
MR. SILBERG: I don't believe there's any reference to budgets. The good-faith claim doesn't deal with the physical Yucca Mountain program. It deals with the waste acceptance and the handling of the ACRs and the DCSes. It does not deal with whether or not Yucca Mountain was constructed, whether they had enough money for Yucca Mountain, whether there were quality assurance problems with Yucca Mountain.
Those were not relevant to a good-faith and fair dealing claim, and we've not made any allegations to that.
MS. SULLIVAN: Your Honor, I have

recommendation of the site 10 to 12 years away, didn't make a lot of sense to the Department, and as a result, that's why we didn't implement that.

Q. But you assumed in the 1991 ACR and other places that Congress would change the law to allow an MRS to go forward. Why didn't you make that same assumption with respect to a DOE siting process?

A. Well, if you remember the 1989 reassessment report of the Secretary, essentially, the policy of the Department was we were going to work through the Nuclear Waste Negotiator to obtain a site, and that was the expectation in the 1991 APR/ACR, and that was the strategy that the Department was embarking on at that time.

We were focusing our efforts on supporting the Negotiator to provide a site to us, so we could make 1998 operations. We were not embarking on our own siting activities.

Q. So you determined -- or the Department determined that DOE siting efforts would not be reasonable?

A. The Secretary, in his reassessment



report, basically made the determination that the Department did not have a lot of success in its MRS sitings and therefore wanted to -- he directed that the Department not involve itself in that and rely on the third-party efforts of the Nuclear Waste Negotiator.

Q. We'll get back to what those were in a little bit. I'm just working backwards through your testimony. You described the TSLCC process and the fee adequacy process, and I think you said that, and I think you said the acceptance rate was a component of the TSLCC, but not a major one, is that right?

A. As I remember my testimony, Ms. Sullivan asked me the question about acceptance rates for the first 10 to 15 years into the system and whether or not that was a major driver in the total system life cycle cost estimate, and my answer to that was that it was a component, but it was not a major driver.

Q. Okay. So the acceptance rates for the first 15 years are an input into the TSLCC analysis, is that correct?

A. That's correct.



Q. And in the most recent TSLCC analysis, what was the acceptance rate that the Department assumed for the first 15 years?

MS. SULLIVAN: Objection, relevance, Your Honor, with regard to the most recent TSLCC, it's beyond the scope of the consideration of damages for the Court.

THE COURT: You agree that these things have to be done annually, is that correct?

MS. SULLIVAN: Yes, Your Honor.

THE COURT: Overruled.

MS. SULLIVAN: Thank you, Your Honor.

THE WITNESS: For our most recent estimate, we looked at a repository initiating operations in the year 2017 and essentially ramping up to a 3000 metric ton per year level in the, either the fifth or the sixth year and 3000 tons thereafter.

BY MR. SILBERG:

Q. And what was the prior TSLCC before -- when was this most recent one done, and this is this year.

A. We do annual assessments, and actually, we've been doing parametric analyses



because we haven't published one since, I believe, the 2001 timeframe, for a variety of reasons, but the last parametric analysis that we did assumed the 2017 start date.

Q. Okay. And when was that, just --

A. That supported a -- an internal memorandum to the Secretary that was submitted to the Secretary's office in December of last year.

Q. And before that, the next prior one was in 2001, is that what you said?

A. No, the previous -- as I said, we do this on an annual basis.

Q. I see.

A. So the previous year, we would have done a similar analysis and provided our perspective to the Secretary at that time.

Q. And the previous one also used the same five-year, six-year ramp-up to 3000 MTU?

A. I'll have to go back, and I believe, if we go back to 2004, 2005, 6 and 7, I believe, 2005, we made some assumptions, since we didn't have a schedule, 2004, we're -- then 2003, we go back to the 2010 start date.

Q. I'm really just focusing on the

acceptance rate and not the date --
A. Right.
Q. -- on which you start.
A. For the acceptance rates for those analyses, it basically had a ramp-up, after a five-year ramp-up period, to a 3000 metric ton rate.
Q. Did there ever come a time when the Department used the 900 metric ton rate in its TSLCC analyses for the first 15 years?
A. For those analyses that you just asked me?
Q. Yes.
A. No. May I explain?
Q. Well, yes, go ahead.
A. Well, the reason why we didn't is because there's no constraint on the repository in terms of limitation on its capacity, similar to what the MRS was, so in a repository only system, there is no restraint. So we have an acceptance rate of 3000 metric tons as a steady state rate because, in the fifth year, which is, you know, an engineering ramp-up period because there's no constraint on the implementation of that facility.



Q. Now, did you ever do a TSLCC type analysis that included the MRS?
A. Did the program do it?
Q. Yes.
A. Or did I personally do it?
Q. Did the program do it?
A. Yes, the program did do that.
Q. And when was that done?
A. That would have been done when an MRS was an active component of the system, which would have been in the late '80s, '90s, up until the point that, I believe, in 1985, where we essentially removed the MRS, since it didn't appear it was going to be implemented.
Q. You mean 1995?
A. 1995, I'm sorry, that's correct.
Q. Now, in those reports, did you assume that the program would operate at a 900 metric ton rate during the first 15 years or the first 10 years of that period of time?
A. I'd have to go back and review those reports, but my sense is that what all total system life cycle cost estimates do is take the baseline for the program at that time, so to the extent that there was an acceptance rate in



a mission plan amendment or whatever, we would have utilized whatever acceptance rate currently exists in the baseline of the program.
So my expectation would have been that those total system life cycle cost estimates during that time period would have been reflected and have that constraint, since that was the policy of the program at that time.
MS. SULLIVAN: Excuse me, Your Honor, I'm not sure that the witness has said he doesn't recall anything. I'm not clear on what's being refreshed by showing him previous trial testimony.
THE COURT: Well, I think -- all right. I can guess what Mr. Silberg is doing, and so can you, Ms. Sullivan, but let's find out.
MS. SULLIVAN: Very good, Your Honor.
BY MR. SILBERG:
Q. Do you remember testifying about the 1995 TSLCC report in prior cases, Mr. Kouts?
A. I believe I remember testifying about a preliminary TSLCC report that was issued in late 1995, yes.



Q. And it's your understanding that the late 1995 TSLCC used repository acceptance rates and not MRS acceptance rates?
A. You know, I'd have to go back and look at the report. If we had made a decision at that time that the MRS was not going to be available, then we would have focused primarily on the repository only acceptance rate.
Q. But at that time, you were still relying, were you not, on the 1995 ACR report, which assumed a repository?
A. I believe that was issued earlier in the year than that preliminary report on total system life cycle costs was issued.
Q. Now, isn't it -- so between the March issuance of the 1995 ACR and the issuance later in the year, you changed the program to delete the MRS?
A. I didn't change the program. The analysts who were doing the total system life cycle cost at that time made a different assumption in terms of their analytical assumption basis.
Q. But the 3000 acceptance rate is something that's been in the program for a long

that could occur was at the MRS.
MS. SULLIVAN: Your Honor, we're hearing Mr. Silberg testify.
THE COURT: Well, the Court has already heard this testimony, and it has looked at the planning documents and knows what they say and knows what Mr. Kouts has been addressing in his testimony. I honestly fail to see the inconsistency here.
MR. SILBERG: Okay.
BY MR. SILBERG:
Q. Mr. Kouts, I think at the beginning of your testimony, when you were talking about the 1965 mission plan?
A. 1985.
Q. I'm sorry, 1985 mission plan, you quoted some language which I believe was on page 29, let me see if I can find that, that talks about system as an approximation, do you remember that testimony?
A. Yes, I do.
Q. And if we look back at page --
THE COURT: Now, are you referring to -- I guess it's DX-49.
MR. SILBERG: DX-49, page 29.



BY MR. SILBERG:
Q. And when you say, reading from that paragraph, "This schedule is only an approximation of how the system may operate and is subject to considerable variation." Now, you would acknowledge that this same approximation language also appeared in the 1987 ACR? Should we look at that?
A. Similar language appeared there, yes.
Q. And the same similar language appeared in the 1988 ACR?
A. I'd have to review the document, but my expectation would be that it would be there.
Q. And similar language appeared in the 1990 ACR?
A. Same answer, yes.
Q. And similar language appeared in the 1991 ACR?
A. I'd have to review the 1991 ACR to recollect my memory.
Q. Look at Plaintiff's Exhibit 168. Call your attention to page four, in the third paragraph, second sentence, it says, "This table provides only an approximation of system throughput rate and is subject to change,



depending on systems design and configuration."
A. Yes, I see it.
Q. And the table that that's referring to is the table on the next page, table 2.1.
A. That's correct.
Q. And it's also true that the instructions that DOE issued in 1991 or 1992 to submit DCSes, the instructions that they issued to utilities included similar language, isn't that the case?
A. I --
MS. SULLIVAN: Objection, Your Honor, beyond the scope of direct.
THE COURT: Overruled.
BY MR. SILBERG:
Q. This is Plaintiff's Exhibit 294. I call your attention to paragraph 7(c).
MS. SULLIVAN: Excuse me, Counsel, could I just get a copy of that?
MR. SILBERG: Sure.
MS. SULLIVAN: Just a moment. Thank you, Counsel.
BY MR. SILBERG:
Q. And if you looked at paragraph 7(c), the first sentence there also says that, "The



annual acceptance rates in the 1991 ACR provide an approximation of the FWMS acceptance capacity and are for planning purposes," is that correct?
A. That's correct.
Q. And it's a true, is it not, that the approximation language appears in the 1995 ACR report?
A. Yes, it does.
Q. Okay. And it's a true, is it not, that the same language appears in the instructions that DOE sent to utilities in 2004, do you recall that as well?
MS. SULLIVAN: Objection, Your Honor, again, beyond the scope and relevance.
THE COURT: Overruled.
THE WITNESS: Yes, it does.
BY MR. SILBERG:
Q. Now, you'll agree, won't you, that all of the ACRs states that the ACR is for planning purposes, is that correct?
A. On the ones we discussed, yes.
Q. Are there any that don't say that?
A. I would have to go through each one of them to make sure, but my assumption would be

that similar language would exist.
Q. Okay. And that would include the 1991 ACR?
A. Yes.
Q. And the 1995 ACR?
A. Yes.
Q. And even the 2004 APR/ACR?
A. Yes.
Q. And that same language appears in the instructions, the two sets of instructions that DOE issued in 1991 and 2004?
A. Yes.
Q. And it's true, is it not, that all of the ACRs state that they are not to be considered contractually binding, isn't that correct?
A. I'd have to go back and look at the individual ACRs and verify that fact, but my perspective is that they probably should not indicate that they are contractually binding.
Q. Well, do they affirmatively indicate they are not contractually binding?
A. Again, I'd have to go and review each of the documents. I'm sure the 2004 did not, and that was the one I was specifically



directed -- that I specifically directed the development of.
Q. I'm sorry, that one says it is not contractually binding?
A. That's correct.
Q. Well, let's just look at one or two, and then maybe we can move on. Let's look at the first one, which is 1987, which is Defendant's Exhibit 56. I'm calling your attention to the top of page two, on the fourth line, I guess it's the sixth line, it says, "As specified in the contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the purchasers," is that correct?
A. That's correct.
Q. And you remember that language being in the 1991 ACR?
A. Not specifically, I'll be happy to review it. Actually, I found it for you, Mr. Silberg, it's in the bottom of page one.
Q. Right, so that does appear in the 1991. Do you have any reason to believe that this language doesn't appear in all of them?
A. No.



Q. Is there anything in any of the ACRs that say that the delivery commitment schedule is contractually binding?
A. I don't believe so, but I'd have to review the documents to know for sure, to assure myself of that, but my expectation would be that there would be nothing in those documents to indicate that.
Q. And it's also true, is it not, that all the DCSes say that DOE will further define and specify system operating and waste acceptance parameters as the program progresses, do you remember that language in all of the DCSes?
A. Yes.
THE COURT: Ms. Sullivan.
MS. SULLIVAN: Objection, Your Honor, beyond the scope of the direct. We haven't laid any foundation for Mr. Kouts' testimony about this, and also vague.
THE COURT: Well, overruled. The DCSes are part and parcel of the exercise and the natural outgrowth of the ACRs.
MS. SULLIVAN: I don't disagree, Your Honor, and also, my objection is more the



reference to generally all the DCSes, rather than --
THE COURT: Oh, that's true.
MS. SULLIVAN: Than providing specifics.
MR. SILBERG: I can go through the one, I was trying to short-circuit the process.
BY MR. SILBERG:
Q. Is it true, Mr. Kouts, that all the DCSes include a statement to the effect that DOE will further define and specify system operating and waste acceptance parameters as the program progresses?
THE COURT: Ms. Sullivan.
MS. SULLIVAN: Same objection, and I'm not clear, is he actually saying that the DCSes themselves say that?
MR. SILBERG: I'm sorry, the ACRs, if I said DCSes --
THE COURT: Well, now, we're getting confused. I think you might be talking about either the ACRs or the instructions for the DCSes, but not --
MR. SILBERG: In this case, if I said DCS, strike that, I meant to say ACRs. I

apologize for the confusion.
MS. SULLIVAN: Thank you, Your Honor.
THE COURT: Thank you.
THE WITNESS: ACRs, yes.
BY MR. SILBERG:
Q. And is it true that, at least starting in the 1990 ACR, that DOE said it would inform purchasers at the earliest feasible time when it had further defined and specified system operating and waste acceptance parameters?
A. I would have to review the document verify that.
Q. Well, let's take a look at, as an example, the 1991 ACR report, which, what number are we using for that?
THE COURT: PX-168.
BY MR. SILBERG:
Q. PX-168, and ask you to look at page four, second paragraph, the third sentence.
A. The first paragraph, third sentence, which is, starts with, "DOE recognizes that"?
Q. Let me see if I'm in the right -- third paragraph?
A. Third paragraph.
Q. Third sentence. "DOE will further



define and specify system operating waste acceptance parameters as the program progresses and inform purchases accordingly at the earliest feasible time"?
A. I see that, yes.
Q. And that same language was in the 1992 ACR, to your knowledge?
A. I would have to review it, and my assumption would be that probably similar language is incorporated into it.
Q. And do you have any reason to doubt that some of the language appears in all the other ACRs?
A. Usually, the documents were fairly consistent among themselves.
Q. Now, in March 1995, DOE issued an ACR that assumed an MRS, is that correct?
A. Yes.
Q. And assumes acceptance at an MRS rate of 900 metric tons per year?
A. And a steady state rate of 900 metric tons per year, yes.
Q. Right. Now, when did DOE inform utilities that the MRS and the waste acceptance parameters of an MRS were no longer operative?



A. I don't know the answer to that question.
Q. Did it ever?
A. I don't know the answer.
Q. Now, the 1991 ACR reaches the conclusion that a 900 metric ton rate is appropriate by assuming that the linkage tying MRS operation and Yucca Mountain construction authorization is lifted by Congress, is that right?
A. Yes.
Q. And that never happened?
A. No, it did not.
Q. Now, other DOE reports also made similar assumptions, did it not?
MS. SULLIVAN: Objection, vague.
THE COURT: Sustained.
BY MR. SILBERG:
Q. In the 1990 ACR, DOE recognized that meeting a 1998 date would require Congressional breaking of linkages, isn't that correct?
A. I assume the document, if it was reflective of a 1998 acceptance, would basically have had the assumption that the linkages, schedule linkages were modified.



Q. Okay. Now, did the 1995 ACR have any reference to the linkages?
A. I don't know, I'd have to review the document to --
Q. Could you take a quick look-through?
A. Sure.
THE COURT: PX-222?
MR. SILBERG: Yes, Your Honor.
THE WITNESS: In answer to your question, at the bottom of page three, I see, "Due to the uncertainty associated with the date of commencement of operation of the Waste Management System, the annual nominal waste rates are presented by years of operation of a system, rather than specific calendar years."
So it does go on to say, "The projected nominal acceptance rates also reflect the capacity limit imposed by the Act in terms of the schedule linkages." This goes on to explain that, prior to the statements that I read or the sentences that I read, that the previous ones indicated that we were going to begin the waste acceptance in 1998, but, again, due to the uncertainty, we went out to a year one, year two concept.

So since there was no discussion about when this year might be, it's kind of hard, that might have been implicit with what was intended by the document, but it doesn't specifically state it.

BY MR. SILBERG:

Q. So in 1995, DOE was assuming that this one linkage, the capacity link would remain, but made no assumption as to the schedule linkage, and in fact, because there are no dates, the schedule linkage is irrelevant, is that a good summary?

A. I don't know that I would agree with that characterization. I think it does indicate that, certainly, 1998 is in question, but the only way you're going to have a facility available before 2010 is to somehow have the schedule linkages addressed. So I think, although this doesn't specifically address the schedule linkages, it's implicit in its discussion, my perspective is it's implicit in its discussion.

And it's following the same concept that we would implement an MRS, assuming we got authorization for -- or a site, if you will,



and specific direction to do that, as well as the schedule linkages were removed, although it doesn't state that, my sense is that that's what the general intent of the document was.

Q. But there's nothing in there that makes that assumption, that assumption went away after the 1991 ACR?

A. I don't think it went away after the 1991 ACR. I think it was still carried within the program. I think this document is just reflecting the uncertainty in 1998 operations, but still an expectation that there was a potential for having the facility available in, you know, several years after 1998, still well in advance of 2010 operations of the repository.

Q. But DOE never undertook any steps since the Negotiator was out of business in 1995, never took, never undertook any steps either to recreate the Negotiator or to undertake its own siting program?

A. We didn't undertake those specific steps, but as I testified earlier, I was involved in my efforts within the program to develop a design for a facility that could be



deployed very quickly, assuming that legislation was passed.

So although the Negotiator went away, and that was unsuccessful, and there was Congressional direction also, as you may remember, that basically directed the Department to no longer issue certain grants for the Negotiator, that was done the previous year, but the Department still, as a contingency, it was also developing that topic of safety in its analysis report, and I had personal knowledge of that since I was one of the people in the program that was doing that.

Q. But you weren't looking for a site?

A. No, we were not looking for a site at that time, that's correct.

Q. In September of 1991, it's correct, is it not, that the General Accounting Office issued a study on the MRS facility, are you familiar with that study?

A. I remember the issuance of the study. I don't remember the specifics of it. I'd be happy to review it, if you have it available.

Q. I do, Plaintiff's Exhibit 198. I've handed you a document, GAO/RCDE, 91-194, U.S.



General Accounting Office report to Congressional requestors, September 1991, entitled, "Nuclear waste operation of monitored retrievable storage facility is unlikely by 1998." Is this the document you're reflecting on?

A. Yes.

Q. And calling your attention to page five of that document --

MS. SULLIVAN: I'm sorry, Mr. Silberg, I'd like to lodge a foundation objection, Your Honor. This is a report by GAO, a different branch. There's been no foundation laid for Mr. Kouts' testimony about this document.

MR. SILBERG: Mr. Kouts said he was aware of the document, and I believe he said that.

THE COURT: He did say that. That's about as far as we've gotten.

BY MR. SILBERG:

Q. Mr. Kouts, you're aware of the General Accounting Office?

A. Yes, I am.

Q. Can you tell us what it is?

A. It's essentially an office that

supports requests for Congressional review and for individual review of different aspects of the government.

Q. Are you aware that DOE regularly receives reports by GAO?

A. Yes, I am.

Q. And are you aware that DOE received this report by GAO?

A. I assumed it received it, yes.

MR. SILBERG: Your Honor, I would ask admission of this document.

MS. SULLIVAN: Your Honor, there's still been no foundation laid that Mr. Kouts is the proper witness to talk about this document, and he's not a 30(b)(6) witness with regard to the Department of Energy's views on this document, and, again, it's a Congressional document. He's not the proper witness.

THE COURT: The Court can ask about three questions and solve all this, but I'm reluctant to do so. Mr. Silberg, why don't you ask those three questions? Well, let me start with the first one. Mr. Kouts, what were your responsibilities in September of 1991?

THE WITNESS: In September of 1991, I



was supporting strategic and contingency planning for the program.

THE COURT: Did that include an MRS?

THE WITNESS: Yes, generally looking at, certainly, the contingency of having an MRS available, yes.

THE COURT: Now, Mr. Silberg, I've gotten you started.

BY MR. SILBERG:

Q. And in the context of that, were you aware at that time or thereafter of this report?

A. Yes, I believe I read it when it was issued.

Q. And this report deals with GAO's analysis of the MRS program?

A. My assumption is that its an analysis primarily of the schedule aspects of an MRS, yes.

MR. SILBERG: I repeat the request.

THE COURT: Ms. Sullivan?

MS. SULLIVAN: The only foundation is that Mr. Kouts read the report at the time it was issued, not that he had any involvement in it, contributed to it, we would renew our



foundation objection.

THE COURT: Well, except that this is, the GAO might be an arm of Congress, but it's still part of the government, and as a consequence of that --

MS. SULLIVAN: Your Honor --

THE COURT: I'm sorry, go ahead.

MS. SULLIVAN: I'm not sure the report of GAO can be construed as admissions against the administrative branch.

THE COURT: It can't.

MS. SULLIVAN: Okay.

THE COURT: It can't, I don't think there's any doubt about that. But on the other hand, at least, at least there's not in the Court's mind, I might be wrong, I basically agree with you, but on the other hand, there is a public record and a report.

MS. SULLIVAN: I think that's true, Your Honor, my concern goes to Mr. Kouts being the proper witness to talk about this, and I'll draw a parallel to my direct examination where I asked him about the MRS Commission report, where Mr. Kouts was directly involved in the activities of the MRS Commission from the DOE



side, and I asked him based on that knowledge.

I don't think we've established the foundation for the admission of, in his testimony, about this document, in the same vein that I did with that report.

THE COURT: Well, it might be admissible under Federal Rule of Evidence 803(a). That doesn't mean that Mr. Kouts agrees with it or agrees with all the statements or assumptions.

MS. SULLIVAN: Or is the proper witness to talk about it.

THE COURT: Well, it was part of his responsibilities to know about these things at the time, that's why -- I'm sorry to help counsel out, but that's why I asked the two questions I did. I find it very hard not to help counsel out, but the objection is actually overruled.

MS. SULLIVAN: Thank you, Your Honor.

THE COURT: Now, you move for admissibility.

MR. SILBERG: I do.

THE COURT: It's admitted under Federal Rule of Evidence 803(a). That's not to

say that Mr. Kouts doesn't agree with it or disagree with it.
BY MR. SILBERG:
Q. Calling your attention to page five, which has a Bates number of 1344 on the bottom, in the middle paragraph, this indicates that GAO's conclusion, and I'll read, is highly -- "believes it is highly unlikely that DOE can develop an MRS facility by 1998." Is that GAO's conclusion?
A. That's what the document says.
Q. And did DOE understand that to be GAO's conclusion at the time?
MS. SULLIVAN: Objection, Your Honor, I don't think we've laid a foundation that Mr. Kouts knew how DOE viewed this document.
THE COURT: Well, he might have. That's the point. I'll just correct the record, page five is actually 1344. And where are you on page five, Mr. Silberg?
MR. SILBERG: In the middle paragraph, matters for Congressional consideration.
THE COURT: All right. Thank you.
MR. SILBERG: First sentence.
THE COURT: Now, let's focus your



question.
BY MR. SILBERG:
Q. When you read this report, Mr. Kouts, did you understand this to set forth GAO's position that it believes it was highly unlikely that DOE can develop an MRS facility by 1998?
A. Yes.
Q. Thank you. And if you'd look back at pages three and four of this report, from the bottom paragraph, when you read that report, was it your understanding that GAO's reasons for its conclusions were that a 1998 date depended on, in part, on the Negotiator completing and DOE approving a siting agreement for an MRS by the end of 1992?
A. No, as I read the report, it was Congress approving the Negotiator's efforts, not the Department approving.
Q. And that's the sentence that begins the fourth line in that paragraph, "DOE's plans depend on the Negotiator's completing and Congress' approving a siting agreement by the end of 1992. That would permit early development of an MRS facility"?



A. That's correct.
THE COURT: Now, Mr. Silberg, I hate to stop you in mid-course, but it's 12:00, and I think we ought to stop now for our luncheon break, and we can resume and find out whether Mr. Kouts agrees with these assessments. Ms. Sullivan?
MS. SULLIVAN: That's fine, Your Honor.
THE COURT: Mr. Kouts, do you mind if we take a luncheon recess at this point?
THE WITNESS: Not at all.
THE COURT: All right. Thank you very much. We're in recess for one hour for lunch.
(Whereupon, at 12:01 p.m., a lunch recess was taken.)



A F T E R N O O N  S E S S I O N
(1:07 p.m.)
THE COURT: Mr. Silberg, you may proceed.
MR. SILBERG: Thank you, Your Honor.
BY MR. SILBERG:
Q. Mr. Kouts, we were talking about the GAO report of 1991, Plaintiff's Exhibit 198, and if I could ask you to turn to page three of that report? I think, just before we broke for lunch, we were talking about the first of the GAO's reasons for its conclusion that an MRS by 1998 was highly unlikely.
And if you look down on the bottom paragraph, Bates 1342, I think we -- on Bates page 1342, GAO says that, "DOE's plans depend on the Negotiator completing and Congress approving siting agreement by the end of 1992. That would permit early development of an MRS facility."
Now, the Negotiator did not complete the siting agreement by the end of 1992, did it?
A. No, it did not.
Q. Okay. Did it ever complete a siting

agreement?
A. No, we did not.
Q. Second part of that argument says that, and in the next sentence, GAO states, "Because the Negotiator expects the process to take considerable time, he does not believe that these activities could be completed by then," meaning 1990 and 1992. And that, in fact, turned out to be the case, isn't that correct?
A. That's correct.
Q. The second reason that GAO provided in this report for concluding that it was highly unlikely to have an MRS by 1998 was that affected states strongly opposed DOE's siting activities for an MRS facility. Do you see that on the bottom of page 1342, the last line continuing over?
A. Yes, I do.
Q. And that was certainly correct, was it not, that Tennessee opposed the MRS in that facility?
A. Yes, the state of Tennessee did.
Q. Opposed the siting of that facility in Tennessee?



A. Yes.
Q. And that Nevada vigorously opposes Yucca Mountain?
A. That's correct.
Q. And then it goes on at the end of that top paragraph of 1343, GAO says, "Finally, Congress would have to rescind, as DOE has requested, the links between the MRS facility and repository schedules to prevent the facility from adversely affecting the incentive to complete a repository." And Congress never took such action, did it?
A. No, it has not to this date.
Q. Was such a bill in the 1991 to 1995 timeframe, was such a bill ever reported out of committee?
A. Not that I'm aware of.
Q. And after 1995, did DOE ever ask the administration to propose legislation to allow it to undertake siting of an MRS?
A. From my perspective in the program, I'm unaware of any such request.
Q. And we agreed that no agreement with a candidate site was ever negotiated, that's correct?



A. That's correct.
Q. So you don't know what assurances a candidate host site might have required with such an agreement?
A. That's correct, although in your document on page two here, in that same paragraph that you've been focusing on, it was the view that, if you look at the bottom of page two, I believe.
Q. What's the Bates number on that?
A. Page three, I'm sorry, it's the Bates 1342, it does say in the last full sentence on that page that, "The Negotiator also believes that any prospective host for the facility would require some type of assurance that the MRS facility would not become a permanent substitute for the repository."
Q. But those assurances might not have been restricted at -- might not have been as restrictive as the restrictions in the linkages as they existed in the 1987 amendments?
THE COURT: Ms. Sullivan.
MS. SULLIVAN: Objection, speculation.
THE COURT: Mr. Kouts, you may answer, if you know.



THE WITNESS: I have no way of knowing.
BY MR. SILBERG:
Q. Isn't it true -- well, Mr. Kouts, you were involved with discussions with the host communities around the Clinch River site, weren't you?
A. Yes.
Q. In connection with the DOE proposal for an MRS that was submitted to Congress ultimately in 1986 or 1987?
A. Yes.
Q. And isn't it true that in those discussions, that people at Clinch River actually proposed linkages that were less restrictive than the ones that DOE ultimately proposed?
A. I'd have to go back and review it. In general, I think the Department was in general agreement with the local hosts, but I'd have to go back and look at the specific recommendations of the Clinch River task force, if you will, for the MRS facility.
Q. Isn't it true that those recommendations, and we've talked about it in

other testimony, included operation up to a 3000 metric ton limit, even though the repository had not yet been licensed?

MS. SULLIVAN: Objection, Your Honor, vague as to those recommendations. I'm not sure if he's talking about DOE's or somebody else's.

MR. SILBERG: We're talking about the Clinch River task force, the local people's recommendations to DOE.

THE COURT: Thank you for clarifying. The objection then is overruled with the qualification.

THE WITNESS: I'm trying to understand your question, Mr. Silberg. Are you referring to a 3000 ton.

BY MR. SILBERG:

Q. I believe it was a 300 ton capacity limit prior to the repository being licensed.

A. That could be true. I'd have to, again, I'd have to review those specific documents. I just don't have a specific recollection. I remember they did have a capacity limit. I don't remember the specifics of it.



Q. Okay. And if we turn for a minute to page 22 of this document, which is Bates 1361, and let me, about halfway down that paragraph, you see the sentence that starts, "the Negotiator told us"?

A. Yes.

Q. Could you just read that into the record, please?

A. "The Negotiator told us that, even with a very aggressive effort, it is unlikely that he can negotiate and gain approval of an agreement by late 1992."

Q. And do you disagree with the statement that's attributed to the Negotiator?

A. I have no basis to disagree with it.

Q. So you would agree that it would have been --

THE COURT: Ms. Sullivan.

MS. SULLIVAN: Objection, Your Honor, the question implicates hearsay because the Negotiator said something in the document, and he's being asked about that statement.

THE COURT: Well, there's an objection, but it's based on the fact that the report is reciting what the Negotiator's



position was, and I'm not sure that Mr. Kouts would have personal knowledge of what the Negotiator's position was.

BY MR. SILBERG:

Q. Did you have dealings with the Nuclear Waste Negotiator in this timeframe?

A. I did have some interactions with his staff on occasion, but it was not on a regular basis.

Q. Are you aware of what he believed to be the likelihood that he could negotiate an agreement with the host community?

MS. SULLIVAN: Your Honor.

THE COURT: Ms. Sullivan.

MS. SULLIVAN: It's still a hearsay objection, and speculation.

THE COURT: Well, that's not actually -- are you aware of what he believed? He could become aware of it through all sorts of means, so it's not a hearsay objection.

MS. SULLIVAN: Thank you, Your Honor.

THE WITNESS: I have no recollection of what the Negotiator was specifically planning on at that point in time. I'm just reflecting what the document here is, and



that's, I have no reason to doubt the GAO's presentation here, but I don't have any confirming information in my memory that that was the case.

BY MR. SILBERG:

Q. Did DOE take issue with this statement when it received the GAO report?

A. All I can do is go back to the statement in the document here, which said that this -- I believe it's on page, regarding agency comments on page 1344, page five of the document, Bates number 1344, where it basically said that GAO discussed the facts in the report with DOE officials, who generally agreed with their accuracy. But I have no knowledge as to whether or not that was a specific fact that the Department attested to its accuracy.

Q. But you're not aware of DOE taking issue with the statement, are you?

THE COURT: Ms. Sullivan.

MS. SULLIVAN: Well, foundation, I think that's what Mr. Kouts just testified to.

THE COURT: Well, yes, but it's the second time it's been asked. Let's find out.

THE WITNESS: Could you repeat the

MR. SILBERG: And I'll get to that, I was just trying to set the scene for that question.
THE COURT: Well, the Court is at a real disadvantage here, it neither has the document nor the transcript. Why don't you ask Mr. Kouts if he recalls testifying about the document first, and then let's go from there.
BY MR. SILBERG:
Q. Mr. Kouts, do you remember testifying in the Northern States Power case about a report prepared by the Clinch River MRS task force?
A. Yes, I do.
Q. And that task force was composed of citizens in that area, governmental officials in that area?
A. Yes, it was.
Q. And having looked at this transcript, does this refresh your recollection as to the nature of the linkage that was proposed by that task force on MRS operation?
A. Yes.
Q. And as refreshed, do you now recall that the Clinch River task force proposed that



the MRS be allowed to go into operation, even though Yucca Mountain had not been, or a repository had not been licensed?
A. The portion of the testimony that I reviewed had to do with the 300 ton limit that you asked me about and you showed me in that trial, and that's what the substance of my testimony was. I'd have to look at the other linkage to see whether or not any linkages that that task force had in relation to the operation of the facility, to see whether that was consistent or inconsistent.
Q. Well, why don't you tell us what you remember of the 300 metric ton linkage, and maybe that will short-circuit this process?
A. Essentially, that they were recommending that no more than 300 metric tons, that the facility be licensed for no more acceptance than 300 metric tons total.
Q. And was that limit tied to the status of the repository at all?
A. I don't know the answer to that question. I'd have to go back and look at the specifics of the recommendations of the task force.



Q. Can I draw your attention to transcript 3399, at line 23, carrying over to page 3400, at line 4?
THE COURT: Now, you don't have a question pending, Mr. Kouts. Let's wait for it.
BY MR. SILBERG:
Q. And having looked at that, does that refresh your recollection as to whether there was a linkage between operation up to a 300 metric ton capacity limit and the repository licensing?
A. My testimony indicates that, and I believe it does.
Q. And what was the nature of that linkage, if you could briefly summarize it, in your recollection?
A. Honestly, Mr. Silberg, I don't remember the specifics of it, and I've testified to it in that trial because I had the document in front of me, and I could interpret it, but I don't have that in my specific recollection.
Q. Is your recollection that the linkage would have allowed MRS to go into operation,



even though the repository had not been licensed for no more than 300 metric tons?
A. According to my testimony in that trial, yes. I, again, I have no reason to doubt myself, but I had the document in front of me at that time.
Q. If we could look at Plaintiff's Exhibit 295 --
MR. SILBERG: Handing the witness Plaintiff's Exhibit 295.
BY MR. SILBERG:
Q. Could you describe this letter please, Mr. Kouts?
A. It's a letter from the Secretary of Energy, and first of all, it's dated May 29th, 1992. It's under Secretary of Energy's letterhead. It's signed by the Secretary of Energy at that time, James D. Watkins, and it's a letter to Mr. James J. Howard, who was chairman and chief executive officer of Northern States Power Company.
Q. And do you recognize this letter?
A. I believe I've seen it before, yes.
Q. Do you recognize Mr. Watkins' signature?

A. Yes, I do believe I recognize the Secretary's signature.

MR. SILBERG: Your Honor, I'd ask that this document be admitted as Plaintiff's Exhibit 295.

MS. SULLIVAN: Objection, Your Honor, on foundation. We haven't established when he's seen it, whether he had any opportunity -- responsibility for its preparation or its review, and also a relevance objection, it's a letter that's sent to Northern States Power.

THE COURT: Sustained.

BY MR. SILBERG:

Q. When did you become aware of this letter, Mr. Kouts?

A. I believe it was in, either a deposition or at a trial, but not contemporaneously with the development of the letter itself.

Q. The letter, if you look to the -- it's the fourth page of this exhibit, contains a, it says, "key MRS program milestones." Are you familiar with MRS program milestones that the Department had promulgated at or about this time?



MS. SULLIVAN: Excuse me.

THE WITNESS: Generally, yes.

MS. SULLIVAN: Your Honor, is the witness being examined about this document? Because I don't think it's been moved into evidence.

THE COURT: No, I think, but on the other hand, this is just a general reference to the program milestones. It isn't detailed as to what those program milestones are, so that's allowable.

MS. SULLIVAN: Thank you, Your Honor.

BY MR. SILBERG:

Q. And are those milestones what the DOE had in mind for the program as of May 1992?

MS. SULLIVAN: Objection, Your Honor, vague as to "those milestones."

MR. SILBERG: I'm talking about the milestones on this page.

MS. SULLIVAN: That's my objection, Your Honor, he's being asked about a document that hasn't been moved into evidence.

THE COURT: That's right, but he's being asked essentially to acknowledge and verify something that is on an attachment to a



letter. That's permissible because the actual substance of it isn't in evidence yet. He's just asking whether that reflects his understanding of what was contemporaneously in DOE's contemplation.

MS. SULLIVAN: Your Honor, that wasn't the question that Mr. Silberg asked, and if that's the question, if Your Honor's question is the question he wants to ask --

THE COURT: That's what I think Mr. Silberg ought to have been driving at.

MS. SULLIVAN: If that's the question, then I will sit down.

BY MR. SILBERG:

Q. You can answer the question.

A. Could you repeat the question?

THE COURT: Let's start all over again. Ask a question, Mr. Silberg.

BY MR. SILBERG:

Q. Did the program milestones, to your knowledge, Mr. Kouts, reflect the MRS program milestones adopted by the Department or adopted by the Department at or around May 1992?

MS. SULLIVAN: Objection, vague. Are we talking about the milestones on this page?



MR. SILBERG: We are indeed.

THE COURT: Thank you.

THE WITNESS: Could you read the question back to me, please?

(The reporter read the record as requested.)

THE WITNESS: Yes.

MR. SILBERG: Your Honor, I would ask that this page of the document be admitted as -- we can make it Plaintiff's Exhibit 295-A.

MS. SULLIVAN: Your Honor, clearly, it's labeled, "enclosure." It's an attachment to the document. I fear that putting this single page in without any context, there will not be a proper foundation for the document for admission, basis for admission of it.

THE COURT: Well --

MR. SILBERG: The witness has already --

THE COURT: I have a small problem along those lines, but there is a fax tag line at the top of the page that provides a date, it's some context for this.

MR. SILBERG: The witness' testimony provides that context as well, Your Honor.

Q. Was a copy of this letter in the program files at DOE?
MS. SULLIVAN: Objection, calls for speculation. I don't know that the witness has any knowledge as to where.
THE COURT: Well, we'll find out. We'll find out. If Mr. Kouts knows, he'll tell us.
THE WITNESS: My perspective is that this document is probably archived somewhere in our records management system.
BY MR. SILBERG:
Q. Have you ever had the occasion to discuss the contents of this document with anyone at DOE?
A. No.
Q. None of the information in here, you've ever discussed with anyone at DOE?
THE COURT: That's not exactly what you asked, Mr. Silberg, you asked about this letter. Why don't we focus on this particular attachment, would you, please? I'm afraid we're taking a little time over matters we don't need to know about.
MR. SILBERG: I thought I asked him if



he agreed with the contents of this attachment.
THE COURT: And he said yes.
MR. SILBERG: And I thought --
THE COURT: Well, why don't you ask him, just basically, how he came to his understanding that he agreed with it, was he preparing milestones at that time, was he familiar with the process and so on, why don't we just do that? And let's find out what happened.
BY MR. SILBERG:
Q. How were you familiar with the milestones of the MRS program at this point in time?
A. At this point in time, which would have been in May of 1992, I believe I was working in this, the strategic planning and contingency planning for the program, and I was fully aware of program schedules and specifics of, the specific schedules related to the implementation of the facilities that we were intending to deploy.
Q. And did you discuss those schedules as they were being prepared?
A. Did I discuss them with other staff



within the program?
Q. Yes.
A. Yes, I probably did.
Q. Did you have a role in preparing the schedules themselves?
A. I had a role in reviewing the schedules from my position, but I don't know that I was specifically involved in the development of them.
Q. And the schedules that you reviewed conformed to the milestones that are set forth on the page that we're looking at in this letter?
A. Generally, yes.
THE COURT: Mr. Silberg?
MR. SILBERG: I would repeat my request that it be admitted.
THE COURT: Ms. Sullivan?
MS. SULLIVAN: Your Honor, we'll withdraw our objection.
THE COURT: All right.
MS. SULLIVAN: Your Honor, just to make it clear, to this page of the exhibit.
THE COURT: Yes, it's only this page, this page, I'm trying to figure out how to



describe it. It, at the bottom right, has notation SSM0076758, it's probably a DOE file number.
MS. SULLIVAN: Actually, Your Honor, I think that's a Plaintiff's designation.
THE COURT: Oh, it is?
MS. SULLIVAN: Yes.
THE COURT: Well, that's what it is, and that particular page is admitted as PX-295-A.
(Plaintiff Exhibit Number PX-295-A was received in evidence.)
MR. SILBERG: Thank you.
BY MR. SILBERG:
Q. Mr. Kouts, the first of these milestones reads, "complete environmental assessment of potential sites," and the date of that is June 1993. Were such environmental assessments completed by June of 1993?
A. No.
Q. Were such environmental assessments ever started, preparation of those, were they ever started?
A. Possibly, but I, I'm not sure, we might have begun some work on some of them, but

certainly, they were never completed.
Q. The next milestone, which is the same date, June of 1993, was, "submit siting recommendation to Congress." Was that milestone met in June of 1993?
A. No, it was not.
Q. Was it ever met?
A. No.
Q. And I presume, therefore, that none of the other milestones set forth in this letter were met at that time or met on the schedule set forth on this exhibit?
A. That's correct.
Q. And is it also true that none of these milestones were ever met?
A. Are you talking about the entire page?
Q. No, we're just talking about the MRS program milestones.
A. For the MRS, that's correct, they were not.
Q. The Yucca Mountain milestones, are you familiar with those as well?
A. Yes.
Q. Were any of those milestones met on the schedule that's laid forth here?



A. Possibly, yes, I believe we might have started the ESF facility in November of 1993. Again, I'd have to check that we did.
Q. What is the ESF?
A. The exploratory studies facility, this was the, the construction of the five-mile tunnel within Yucca Mountain that we utilized for our site characterization efforts, and this has to do with the collar/portal construction, and that milestone may have been met on or around that date. I'm not specifically certain. In addition, I'm pretty sure we started in situ tests generally in the '95 timeframe, so that milestone might have been met.
We probably also started repository designs somewhere around June 1996. EIS notice of intent and EIS preparation, I can't attest to the accuracy of it, but that was in the same general timeframe that we did start the EIS process for Yucca Mountain, and also, we did start EIS preparation in that general timeframe. It might have been later in '98, the site recommendation to the president occurred in February of 2002, so that was



delayed beyond the April 2001 date here.
And the other milestones for the rest of the repository here were not met.
Q. And the current schedule for submitting license application to NRC, which shows here as a milestone of October 2001, the current date for that is 2008, is that correct?
A. No later than --
MS. SULLIVAN: Just relevance, Your Honor.
THE COURT: Nonetheless, overruled.
THE WITNESS: No later than June 30th, 2008, that's correct.
BY MR. SILBERG:
Q. Why did the program create the MRS milestone?
MS. SULLIVAN: Objection, vague. My concern is, is he asking about these milestones? I don't know that he knows about these milestones.
MR. SILBERG: I was talking about the MRS milestone.
THE COURT: I think he testified he did, so the objection is overruled. Mr. Kouts, you may answer.



THE WITNESS: Why were they created? They were created as a project management tool, to basically provide a plan for how we would implement the program.
BY MR. SILBERG:
Q. And when these milestones were not met, what did DOE do, since the first one was not met in June of 1983, what did DOE do?
A. In June of 1993? You said 1983.
Q. I'm sorry, '93?
A. What did DOE do? We still continued to support the Office of the Negotiator to try to attempt to get a MRS site and try to implement the MRS, even though this schedule was very challenged.
Q. I can show you a letter dated December 17, 1992.
THE COURT: Does it have an exhibit number?
MR. SILBERG: I'm sorry, yes, it does. It's Plaintiff's Exhibit 82.
THE COURT: PX-82.
BY MR. SILBERG:
Q. Can you describe the document I've handed to you, Mr. Kouts?

3511

A. Yes, it is a letter on Secretary of Energy's letterhead --
Q. Oh, I'm sorry.
THE COURT: It's fine. You may proceed.
BY MR. SILBERG:
Q. Thank you.
A. It's a letter on Secretary of Energy letterhead, signed by the Secretary of Energy to the Honorable J. Bennet Johnston, who was chairman of the Committee on Energy and Natural Resources in the United States Senate. And it provides the Secretary's strategy for providing a new strategy, as the document indicates, to provide spent nuclear fuel interim storage in 1998.
Q. And are you familiar with this letter?
A. I believe I've seen it before, that's correct.
Q. Were you involved in its preparation?
A. I don't believe I was, no.
Q. Were you involved in its review?
A. Possibly the attachment, yes, I might have reviewed it. It's consistent with the strategy of the program at that time.

3512

Q. Were you involved in the development of a new strategy to provide interim SNF storage in 1998?
A. Well, to the extent I was in the program and to the extent that the Secretary provided new direction, certainly, I was involved in its implementation.
Q. And would a copy of this letter be in the program files?
A. My perspective is that it probably should be in our record system somewhere, yes.
Q. Would it be in your personal files?
A. I don't believe so, no.
Q. And this letter, your role in reviewing the attachment, to the extent you did, that would have been in connection with your duties at that time in the office?
A. That's correct.
MR. SILBERG: I would move to admit Plaintiff's Exhibit 82.
MS. SULLIVAN: No objection, Your Honor.
THE COURT: Admitted.
(Plaintiff Exhibit Number PX-82 was received in evidence.)

3513

BY MR. SILBERG:
Q. The second paragraph in the cover letter refers to the Secretary's new strategy to provide SNF interim storage in 1998. What was the old strategy?
A. Well, the old strategy was to rely on the efforts of the Negotiator, and to the extent that those efforts were not becoming efficacious, the Department was going to look at potentially some alternative routes that would require legislation.
Q. And could you describe the new strategy?
A. Well, first of all, the Department wanted to, at this point, develop a multi-purpose canister system, and I'm looking at page two of the new strategy, and that essentially, as the document indicates, would simplify the design of a storage facility and would somewhat standardize the handling of spent fuel in storage transport and disposal modes.
And also, the Department was going to start looking at potentially using federal government sites for interim storage, but

3514

essentially, that would require new legislation, and that would have to be provided by Congress. In addition, there's some discussion here about budget adjustments, to try to provide more access to the Nuclear Waste Fund, and essentially looking at, according to this, looking at some kind of compensation for delay costs to utilities and so forth.
Q. I call your attention to page two in the sixth paragraph. Read the first sentence of that, please.
A. Okay. That's under potential compensation for delay costs?
Q. No, it's under standardized container system.
A. I thought you said the sixth paragraph.
Q. I did.
A. Okay. I look at that as being the third full paragraph, but maybe your document is different than mine. The first sentence under there?
Q. Yes.
A. "The Department will immediately refocus spent fuel container design

activities" --
Q. No, no, it's the sixth paragraph on that page, it would be the third paragraph in that section, paragraph starting, "current work"?
A. Okay. "Current work on MRS facility siting will be terminated, and design work will be redirected toward the module or canister concept."
Q. So as of December 1992, DOE was terminating MRS siting, is that correct?
A. That's what the document says, yes.
Q. And you're familiar with the strategy that was adopted at that time?
A. Yes, however, there were still continuing MRS activities after this letter was sent to Congress.
Q. Were they MRS facility siting activities?
A. Not MRS facility siting activities, but there still was design work that went on, and as I testified earlier, we did continue to develop a design that could be developed anywhere and implement it quickly, even in the mid-'90s.



Q. But you never had a site for it?
A. But we never had a site, that's correct.
Q. Did the NRC ever approve that design?
A. The topical safety analysis report was withdrawn in the late 1990s, primarily because the Department felt that the NRC should not expend its resources on reviewing a facility that was not essentially going to be implemented.
Q. Let's look at the first page of the attachment. This was something you would have reviewed at the time it was being prepared?
A. Generally, yes.
Q. And look at the second paragraph on the second sentence, would you read that? It says, "in May 1992."
A. "In May 1992, in a letter to Northern States Power, the Department stated that it would assess progress in implementing that plan and report the results of its assessment to Congress in January 1993."
Q. And is that the letter that we were talking about before, the May 29, 1992 letter to NSP?



A. I assume so. I don't know if there was another letter that was sent to NSP in May, but certainly, the previous letter was May 29th, so it very likely is that letter.
Q. But to your knowledge, there was no other letter, was there?
A. To my knowledge, no.
Q. And you would have read this about the time this document was sent out?
A. I probably would have, yes.
MR. SILBERG: Your Honor, I would, again, ask that the entire Plaintiff's Exhibit 295 be admitted.
MS. SULLIVAN: Your Honor, we still haven't established that he knew anything about the letter itself. There's a reference to it in this other document, Defendant's Exhibit 82, but that doesn't establish the foundation necessary for the admission of the previous exhibit.
THE COURT: That objection is well-taken. The Court will not admit the other portions of PX-295.
BY MR. SILBERG:
Q. On page one in the second paragraph --



I'm sorry, the fourth paragraph, could you read the second sentence in that says, "that office has not been able"?
A. "That office has not been able to identify a viable candidate site that can be recommended to Congress by June 1993 and that will permit spent fuel receipt by January 1998 as planned."
Q. The office that's referred to there is the Nuclear Waste Negotiator office?
A. That's correct.
Q. And do you agree that that was true at that time?
A. The Office of the Negotiator was still continuing for another year, and this was the Secretary's perspective that that was the case. It was certainly unlikely at that point that it appeared that the Negotiator was going to be successful.
Q. But you're not challenging the Secretary's statement to Congress that the Negotiator had not been able to find a site that would permit spent fuel receipt by January 1998?
A. I'm not challenging the Secretary's

perspective, no.
Q. And the Secretary speaks for the entire Department?
A. Yes, he does.
Q. Including the Office of Civilian Radioactive Waste Management?
A. Yes, he does.
Q. On page two of that document, in paragraph one, the second sentence says, "The Department has prepared a generic schedule showing the actions necessary to utilize a government site or sites by that time." Do you see that sentence?
A. Yes, I do.
Q. The reference to "by that time" is to January 1998, is that your understanding?
A. That's correct.
Q. What did that schedule say?
A. I'd have to actually review that schedule. It doesn't pop into my memory right away. This document goes on to say that it's going to be, essentially, that path is going to have to require some kind of legislation, since in the next paragraph, it says, "The Department should be authorized and required by the



Congress to select candidate federal sites by December 31, 1993."
So if, following through on the perspective here, a schedule was to be provided and submitted to the Congress by December 31, 1993.
Q. And do you know what was submitted to Congress in 1993?
A. I believe there was a change over in administrations at that time, and I don't remember specifically what was submitted, I would have to review the record to see if something was submitted.
Q. But the Department was not authorized or required by Congress to select candidate federal sites by December 31, 1993?
A. Not to my knowledge, no.
Q. And to do that would have taken Congressional action?
A. That's my perspective, yes.
Q. And to change the linkage that allowed a 1998 MRS after 1987 would have taken Congressional action?
A. Yes.
Q. And you assumed that you would be



successful with that Congressional action, is that correct?
A. I don't know what the Secretary assumed, and my sense is he would not have provided such a plan to Congress unless his perspective was that that would be seriously considered by the Congress, so my sense is that that was the Secretary's belief at that time.
Q. But did he assume favorable Congressional action?
MS. SULLIVAN: Objection, speculation, foundation as to the Secretary's belief.
THE COURT: Sustained.
BY MR. SILBERG:
Q. Did you assume favorable Congressional action to changing the linkage while you were reviewing the 1991 ACR?
A. I believe the 1991 ACR was based on the premise that there would have been a removal of the schedule linkages in the MRS, so that was certainly my assumption when I reviewed that document, and my sense is that was the perspective of the Department when it issued it.
Q. But you don't know what the basis for



that premise was, do you?
A. Well, back in 1991, we had an active program with the Nuclear Waste Negotiator, and we were supporting that office's efforts to identify a facility, site for that facility, so my sense is that the premise for it and the assumption was that the Negotiator was going to be successful.
Q. So you, A, assumed the Negotiator would be successful, is that correct --
A. Yes.
Q. -- in finding a site? B, that he would negotiate an agreement with a volunteer host community that would contain linkages that would allow the assumption that's made in the 1991 ACR, is that correct?
A. That's correct.
Q. And then you assumed that Congress would enact that agreement into law, is that correct?
A. That's correct.
Q. And you assumed that an application would be filed for that facility with the NRC?
A. A license application, yes, that's correct.

Q. And you assumed that the NRC would favorably review that application?
A. That's correct.
Q. And you assumed that that favorable review of the application would be completed before January 31, 1998?
A. That's correct. In addition, the assumption was that we were going to have the budget to implement the program and that there would be no litigation that would slow us down along the way, so there were a variety of assumptions that played into it, in addition to the ones that you identified.
Q. And you assumed, if the NRC issued a favorable licensing decision, that that would not be held up by litigation?
A. That was the operating assumption of the program at the time.
Q. And you assumed that if the license was not held up by litigation, that you could construct the facility and have it operational by January 31, 1998?
A. That's correct.
Q. And is there a document which explains the basis for all those favorable assumptions?



A. Not one that comes to mind, no.
Q. Let me just go back through some of the things you said on direct. When you were talking about the 1985 mission plan, which is DX-49 and that single page at the end, page 381, do you remember that page in the last paragraph that you read?
A. Let me pull it out, just to refresh my memory.
Q. Can we put it on Elmo, just to -- in the last paragraph, you were talking about the statement that if DOE fails to meet the schedule shown in table 9-2 or 9-3, then additional capacity, storage capacity needed to accommodate the delay in schedule will be provided by the DOE possibly at at-reactor sites.
And the schedule we were talking about there in table 9-2 or 9-3 was starting in 1998 and ramping up to 3000 metric tons per year, over five years, and then 6000?
A. I believe that was in the, in 9-2 and 9-3, that was for the authorized and the improved performance system, and the first repository would ramp up to that level in the



sixth year, and the second repository would also ramp up in its seventh year of operation, so that was a total of 6000 metric tons in for, I believe, table 9-2, so I'm looking at a different table.
Q. Is it your understanding that tables 2-2 and 2-3, which were attached to the excerpt that was distributed, are the same as tables 9-2 and 9-3?
A. That's what my assumption would be, yes.
Q. So those tables both assume that, in the authorized system, that one starts in 1998, DOE starts accepting in 1998, ramping up to 3000 in the sixth year, is that right?
A. That's correct, yeah.
Q. Now, let's go back to this language. This says if that schedule isn't met, then DOE -- additional storage capacity will be provided by DOE. That lack isn't conditioned, doesn't say, "may be," doesn't say, "should be," it says, "will be provided," doesn't it?
A. That's what it says.
Q. And on your direct, you said, well, DOE didn't have any authority to do that under



the statute?
A. That's correct.
Q. Do I recall your testimony correctly?
A. I do recall that.
Q. DOE could have assumed that Congress would change the law to give them that authority, couldn't it?
A. At that point in the program, I don't think we were contemplating changes in the Act. This was 1985, this was the original mission plan of the Department. The Department basically felt it could implement the Act as it was provided, so I guess I would question the premise of your question that the Department was already looking at changes to the law, and the assumption of the statement was that there would be changes to the law.
Q. It was your testimony that said it would require changes to the law, there's nothing in here that says changes to the law required, is it?
A. That's correct. My interpretation of the law and the original law before the Amendments Act is that we would have needed legislation, assuming we didn't have a facility

MS. SULLIVAN: And, Your Honor, just as a note, we presented the same chart in TVA, and you did present it.

THE COURT: I understand. It's familiar to me.

MS. SULLIVAN: Okay.

MR. SILBERG: As I read these provisions, I don't see anything there that deals with budget requests and nothing that deals with appropriations, and as I said, to the extent that the government wants to avoid getting into this, I have stipulated that our issue on good-faith and fair dealing goes not to the question of whether they had enough money to go forward with the project, but whether the waste acceptance program was being gamed, and I think the evidence is clear, it was.

THE COURT: DX-279 is admitted as a summary.

(Defendant Exhibit Number DX-279 was received in evidence.)

MS. SULLIVAN: Your Honor, I do have some redirect, but I don't know when --

THE COURT: I was just pausing for a



moment to let Mr. Silberg collect his papers.

MS. SULLIVAN: I just didn't know what the Court's preference was for the timing of the afternoon break.

THE COURT: I thought we might go until about 3:00, but it depends, do you have a preference? And Mr. Kouts may have a preference too.

THE WITNESS: I could continue.

MS. SULLIVAN: Your Honor, if we could take our break now, I could shorten what I need to do with Mr. Kouts on redirect.

THE COURT: Mr. Silberg, do you mind if we take a break here?

MR. SILBERG: I absolutely do not, Your Honor.

THE COURT: You absolutely do not. Well, if you'd all wait just a moment, as I hadn't anticipated breaking right this minute, just so I can walk out of here. 15-minute recess.

MS. SULLIVAN: Thank you, Your Honor.

THE COURT: Thank you very much.

(Whereupon, a short recess was taken.)

THE COURT: Ms. Sullivan, you may



proceed.

MS. SULLIVAN: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS SULLIVAN:

Q. Mr. Kouts, do you remember why President Clinton vetoed the legislation that you were discussing with Mr. Silberg?

MR. SILBERG: Objection, incorrectly characterizes his testimony.

THE COURT: Right. I can help you out, Ms. Sullivan.

MS. SULLIVAN: I'm sorry, I missed that.

THE COURT: It's just that President Clinton said he would veto it if it were passed by Congress. It's not that he actually did it. That was enough.

BY MS. SULLIVAN:

Q. Mr. Kouts, do you recall why President Clinton said he would veto --

MR. SILBERG: Objection, lack of foundation, if this witness can't talk about things from a DOE perspective on cross-examination, I'm not sure why he can talk about it on redirect.



THE COURT: Well, President Clinton might have expressed a view, but in any event, we'll see what happens. Overruled.

THE WITNESS: My recollection of the President's objection to the deployment of interim storage was that he believed that -- I believe it was related to the fact that the program should focus its efforts on a repository and site a repository prior to the time that an interim storage site was ultimately selected, as I remember the general argument put forth, I believe, by the administration at that time.

So he was not supportive of interim storage until there was a repository site identified, and I think there were several other things that were being considered that were part of it, but that's, to the best of my recollection, what the objections were.

BY MS SULLIVAN:

Q. And when was the site for Yucca Mountain finally recommended?

A. It was recommended by Secretary Abraham in February of 2002.

Q. And when, the legislation that you

were discussing with Mr. Silberg that President Clinton said he would veto, when was that legislation being considered?
A. In the mid-'90s, and let me just also, several of the pieces of legislation would have identified Yucca Mountain, and I probably should have, should have clarified my previous comment, would have identified Yucca Mountain as the site where we should move these materials, and that's what was contained in several of the industry bills.
And the President was of a view that, before you would move materials there, you had to make sure that was the ultimate repository site, and until that occurred, he would not be supportive of interim storage at Yucca Mountain. That's the best, to my recollection, of his objections to it.
Q. Thank you. Mr. Kouts, you also talked, during cross-examination with Mr. Silberg, about the DOE's, the fact that DOE did not initiate siting efforts, while the Office of the Nuclear Waste Negotiator was also conducting such efforts, do you recall that testimony?



A. Yes.
Q. Would it have made sense for DOE to initiate siting efforts at the same time that the Nuclear Waste Negotiator was looking for a site?
A. My perspective is, no, it would have been confusing, to say the least, to have both the Department and the Negotiator trying to identify sites. In addition to that, if you remember in my testimony on the 1989 reassessment report, essentially, the Secretary felt that the Department's efforts were not, did not meet with success, and it was probably best for a third party to try to implement that area of the program, which was siting at either a repository or developing a siting agreement for a repository or an MRS facility.
Q. Now, Mr. Silberg also discussed with you recent analysis, the recent analysis, TSLCC analysis performed by your office in 2006. Do you recall that testimony?
A. Yes, I do.
Q. And I believe you testified that the assumptions on that, for part of that study, included beginning of repository operations in



the year 2017 and ramping up a repository facility to a 3000 steady state rate, is that correct?
A. That's correct.
Q. Okay. So under the assumptions, the rate of acceptance by the program would be, between 1998 and 2017 would be zero, correct?
A. That's correct.
Q. And has the collection of fees changed between when the program was projecting a system accepting at a steady state rate of 6000 MTU to one where not projecting system acceptance beginning until 2017?
A. No, it has not.
Q. Why not?
A. Essentially, because, as I testified earlier, that acceptance rate is not necessarily a main driver of the overall cost of the program, so whether it's 6000 metric tons or 3000 metric tons, based on the analysis that we did back then and the analysis we're doing now, the fee is still adequate to cover the costs of the program.
Q. Thank you. Mr. Kouts, Mr. Silberg asked you about TSLCC studies that reflected



the 900 MTU rate of acceptance in the MRS prior to 2010. Do you recall that discussion?
A. Yes, I did.
Q. And you recall the document that did contain those assumptions?
A. Not specifically, but I'd be happy for you to refresh my memory.
Q. That's what I want to do.
MS SULLIVAN: Could we look at, Your Honor, what has been admitted already as Plaintiff's Exhibit 173? I am going to show the witness what's been marked as Defendant's 76, but they're the same exhibit. And if I may approach?
THE COURT: Certainly.
BY MS SULLIVAN:
Q. Mr. Kouts, could you identify this document for the record?
A. Yes, the title of it is, "Preliminary estimates of the total system cost for the restructured program, an addendum to the May 1989 analysis of the total system life cycle cost for the Civilian Radioactive Waste Management Program," it's dated December 1990.
Q. Could I direct your attention to page

limiting your answer to counsel's last question, to the limits of your knowledge, you would agree, would you not, that there were people in DOE who were knowledgeable about that subject matter, who had information that you would not necessarily be privy to?
MS. SULLIVAN: Objection, vague and speculation. I think he testified he didn't know.
THE COURT: Overruled.
THE WITNESS: Can you repeat the question, please?
(The reporter read the record as requested.)
THE WITNESS: Yes.
BY MR. SILBERG:
Q. Are you familiar with the DCS process?
A. Yes.
Q. It's correct, is it not, that after DOE issued the 1995 ACR report, the year following it, basically stopped processing DCSes?
MS. SULLIVAN: Beyond the scope of direct and redirect, Your Honor.
THE COURT: Overruled.



THE WITNESS: I believe I am aware that the Department stopped responding to DCSes after a certain period of time. That is correct.
BY MR. SILBERG:
Q. And do you know why?
A. I was not involved directly in the areas of the program, so I couldn't really say at that point in time.
Q. Wasn't this part of waste acceptance?
A. It was part of waste acceptance, but I was not working in waste acceptance at that time. This was in 1995.
Q. When were you working in waste acceptance?
A. I began working in waste acceptance in October of 2002.
Q. And when you began working in waste acceptance in October of 2002, did you go back and familiarize yourself with how the process had run prior to that time?
A. To a certain extent, but the details that you're suggesting, I did not go back and review.
Q. And you indicated that President



Clinton's position on the MRS was that it shouldn't go forward, but rather should focus on the repository. Did I summarize your understanding of that correctly?
A. No.
Q. Could you correct me? I apologize if I mischaracterized it.
A. Yes, I believe that what I testified to was the reason why the President was threatening a veto of interim storage legislation that was progressing through Congress at the time, and that legislation would have had an interim storage facility sited at the Yucca Mountain site in Nevada on that test site.
And I believe the President's position at that time was that, until the site was designated and it was determined that that was going to be a repository site, and it might have also been until that site is licensed, that it didn't, that he could not support a bill that would put fuel there, since that may not be the ultimate disposition point or disposal site for spent fuel. That's where I believe my testimony was.



Q. Isn't it true that there was legislation pending at that time which provided for sites other than Nevada for interim storage?
A. There might have been, but most of the energy associated with those bills was in trying to designate a site in Nevada.
Q. But their bills were broader than that, to your knowledge?
A. I believe some of them were, yes.
Q. And the President's veto threat covered the spectrum of those bills, did it not?
A. Generally, yes.
Q. Now, President Clinton took office in January of 1993, is that correct?
A. That's correct.
Q. And what was his position on interim storage when he took office?
MS. SULLIVAN: Speculation, Your Honor.
THE COURT: Again, Mr. Kouts might know of his own personal knowledge. Overruled.
THE WITNESS: My recollection is I don't know that there was a specific position

on the part of the President at that point in time. I did know that he had a personal interest in the program and was following it very closely, but I did not, at that point in time, understand his perspective on interim storage at that time, based to the best of my knowledge.
BY MR. SILBERG:
Q. At the beginning of that administration, I believe the Secretary of Energy would have been Hazel O'Leary, is that correct?
A. Hazel O'Leary was our Secretary of Energy, first Secretary of Energy under President Clinton, that's correct.
Q. And do you know what her position was on interim storage?
A. She was very supportive of it.
Q. Under what conditions?
A. I have to say my memory fails me on that subject, but I do know the Secretary was supportive of trying to have interim storage.
Q. You talked about the early, switching to another topic, TSLCCs, and you talked about a collection of fees that was originally based



on acceptance of 6000 metric tons?
A. Uh-huh.
Q. At the time that study was done, the projected inventory of spent fuel was what, do you remember about the size of the projected spent fuel inventory?
A. Well, if you go back to the original mission plan, I believe we were looking at a total of about 130,000 metric tons of spent fuel, which was well in excess of the statutory limit of Yucca Mountain, which is why we were looking into a repository program.
Q. So when we're talking about a collection of fees based on a 6000 metric ton rate, that was really tied to a 130,000 metric ton inventory, is that correct?
A. That's correct. It would have been for disposal of all the materials.
Q. And by the late 1980s, that projected inventory had been significantly reduced, is that correct?
A. By the late '80s, it had gone down, and then with license reactor extensions, it's gone back up.
Q. What was it in the late '80s?



A. I'd have to look at the documents, it was probably in the, you know, I'm just guessing at this point, probably the 80, 90,000 ton range.
Q. That would be my recollection as well. You said, talking about the GAO report, that the GAO was somewhat more pessimistic than DOE was and DOE was somewhat more optimistic than GAO was.
A. That's correct.
Q. GAO's pessimism turned out to be fairly correct, didn't it?
A. Yes, it did.
Q. You said that the Negotiator, the Nuclear Waste Negotiator sunset in 1994?
A. That's correct.
Q. Did DOE seek to introduce legislation to extend the lifetime of the Nuclear Waste Negotiator?
MS. SULLIVAN: Objection, Your Honor, asked and answered on cross.
THE COURT: Overruled.
THE WITNESS: No, the administration did not submit legislation in extending the life of the Negotiator, to my knowledge.



BY MR. SILBERG:
Q. You talked about DOE continuing to support the Nuclear Waste Negotiator after the December 1992 letter announcing that DOE was terminating its MRS siting work. Can you tell us about how much money DOE spent supporting the Nuclear Waste Negotiator in 1993, 1994, before they went out of business?
A. I really don't remember what the specifics of that were. You'd have to go back to the budget submissions for those years.
Q. You'd agree it was a fairly small amount of money?
MS. SULLIVAN: Objection, foundation, vague, and asked and answered. I think he testified he didn't know.
THE COURT: In the words of Senator Dirkson, a million here, a million there, a billion here, and a billion there, small is relative.
BY MR. SILBERG:
Q. Compared to the overall budget for the waste program, would you say it was a few percent at most?
MS. SULLIVAN: Objection, foundation.

I believe he testified he didn't know. He'd have to review the documents.
THE COURT: Well, we've just gone through all of these authorizations. I think Mr. Kouts might be quite capable of answering this question. Overruled.
THE WITNESS: I believe it would be a small percentage. I don't know whether it was two or three, but it would probably be a small percentage of the overall program budget of those years.
MR. SILBERG: I have no further questions.
THE COURT: Ms. Sullivan.
MS. SULLIVAN: I have one question, Your Honor -- two questions, Your Honor.
THE COURT: That's fine.

REDIRECT EXAMINATION

BY MS. SULLIVAN:
Q. One, what was the size of DOE's overall budget for the program in the timeframe that you were just discussing with Mr. Silberg?
A. Well, referring to the summary exhibit, in the 1993 timeframe, it was somewhere -- I'll talk about appropriations,



1993 and '94, it was in the, I'd say 370 to 380 million dollars.
Q. And Mr. Silberg asked you what the projected inventory for spent nuclear fuel was at the time of the 1985 mission plan, and I believe you testified it was about 130,000, and it declined in the late '80s. And then I think you were going to testify about the current projections. Could you tell us what the current projection is for the total amount of spent nuclear fuel that is expected to be generated by utilities?
A. Currently, if you assume that all existing reactors receive life extensions and not counting new reactors that may or may not be built, we're probably looking at about 130,000 metric tons for the existing fleet, and then on top of that, you have to add the defense materials, so just looking at commercial spent fuel, it's remarkably similar to that initial estimate back in 1985.
Q. And that estimate of 130,000 metric tons, is that an input to the TSLCC reports that you perform?
A. Generally, yes. What we do with



the -- as long as I've been under, as long as I've been managing this, we look at the inventory that we project based on the life extensions that the NRC has approved, up until the year of that analysis. So we may be in the 120 range right now, and we'll up that as more license renewals are approved, but generally, we take a more conservative view of that analysis, based on the actual existence of the life extension.
So we're probably under 130,000 tons right now, but if you look at all life extensions, it's 130,000.
MS. SULLIVAN: Your Honor, one more question.
BY MS. SULLIVAN:
Q. Mr. Kouts, do you know what percentage of DOE's budget went to activities to support the Nuclear Waste Negotiator before Senator Johnston's, the letter to Senator Johnston sent by the Secretary at the end of 1992?
A. It was never a huge percentage of the budget. It was always a relatively small percentage of the budget. So, again, I don't know the specific figures, but it's in the,



it's certainly, my sense is it was under 10 percent of the overall budget in any one year.
MS. SULLIVAN: Thank you, Your Honor, nothing further.
THE COURT: Thank you, Ms. Sullivan.
MR. SILBERG: One quick question.

RECROSS-EXAMINATION

BY MR. SILBERG:
Q. In the late 1980s, 1991 through 1995 timeframe, DOE's estimate of the inventory was closer to the 80,000 metric tons than the 130,000 metric tons?
A. I really don't know, Mr. Silberg. I know that, you know, it was probably going higher than the 80 to 90,000, that was back in the late '80s, and it might have been up to a hundred thousand, a little bit more, but my perspective is that license extensions began to become a reality at that point. So the simple answer to your question is I don't know specifically. I really couldn't answer that question.
Q. But it's true that the first license extension was not authorized by the NRC until 1999, isn't that correct?