**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant**.

---

**VOLUME VI OF X**
**(Pages A 0762 to A 0924)**

---

# ENERGY NORTHWEST'S CORRECTED APPENDIX IN SUPPORT OF ITS CORRECTED NOTICE OF DESIGNATION OF DEPOSITION AND PRIOR TRIAL TESTIMONY OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO ADMIT PRIOR TESTIMONY INTO EVIDENCE

---


NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
202-639-6000


June 3, 2008

*Attorneys for Plaintiff*

# Table Of Contents To Appendix – Volumes I to X

## Volume I

Documents Cited

DOE's Responses to Utility Plaintiffs' First Set of Interrogatories..........................A 0001

DOE's Responses to Utility Plaintiffs' Joint Supplemental Interrogatories.............A 0013

April 3, 2002 30(b)(6) Notice of Deposition ..........................................................A 0028

April 18, 2002 30(b)(6) Notice of Deposition ........................................................A 0033

November 12, 2004 30(b)(6) Notice of Deposition.................................................A 0039

March 2, 2005 30(b)(6) Notice of Deposition ........................................................A 0043

## Volume IA

April 19, 2007 30(b)(6) Notice of Deposition ........................................................A 0047

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 2450874
(Fed. Cl. Sept. 17, 2004) (unpublished)...........................................................A 0050

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, slip. op.
(Fed. Cl. Sept. 21, 2004) (unpublished)...........................................................A 0063

*Wisc. Elec. Power Co. v. United States*, No. 00-697C, slip op.
(Fed. Cl. Aug. 16, 2007) (unpublished)...........................................................A 0073

Defendant's Unopposed Motion to Designate Prior Trial Testimony of
Mr. Robert L. Morgan in System Fuels ..........................................................A 0103

## Volume II

Deposition Transcripts and Trial Testimony Excerpts

Chart of Energy Northwest Deposition and Trial Testimony Designations .............A 0109

Barrett, Lake ..........................................................................................................A 0128
April 22, 2002 .........................................................................................A 0129
April 23, 2002 .........................................................................................A 0165
April 26, 2002 .........................................................................................A 0191
May 8, 2002 ............................................................................................A 0225
May 10, 2002 ..........................................................................................A 0250
May 14, 2002 ..........................................................................................A 0278
May 15, 2002 ..........................................................................................A 0286

## Volume III

Brownstein, Alan ........ A 0289
April 9, 2002 ........ A 0290
April 10, 2002 ........ A 0318
April 11, 2002 ........ A 0350
May 23, 2002 ........ A 0363
June 14, 2002 ........ A 0368

Cole, Billy M. ........ A 0376
March 12, 2002 ........ A 0377
March 13, 2002 ........ A 0411
June 4, 2002 ........ A 0419

Dreyfus, Daniel ........ A 0422
May 15, 2002 ........ A 0423

## Volume IV

Klein, Susan ........ A 0438
April 24, 2002 (Rule 30(b)(6)) ........ A 0439
April 25, 2002 (Rule 30(b)(6)) ........ A 0478

Kouts, Christopher ........ A 0493
January 30, 2004 ........ A 0494
February 19, 2004 ........ A 0504
August 2, 2004 (in the Yankee Atomic Trial Transcript) ........ A 0509
April 11, 2005 (Rule 30(b)(6)) ........ A 0516
July 12, 2005 (in the TVA Trial Transcript) ........ A 0532
October 26, 2005 (in the Southern Nuclear Trial Transcript) ........ A 0538
June 13, 2006 (in the Pacific Gas Trial Transcript) ........ A 0550
June 14, 2006 (in the Pacific Gas Trial Transcript) ........ A 0555
October 11, 2006 ........ A 0571
January 16, 2007 (in the System Fuels Mississippi Trial Transcript) ........ A 0581
April 12, 2007 (in the System Fuels Entergy Trial Transcript) ........ A 0585

## Volume V

Kouts, Christopher (continued) ........ A 0612
May 1, 2007 (Rule 30(b)(6)) ........ A 0612
May 2, 2007 ........ A 0634

Lawrence, Michael ........ A 0654
May 20, 2002 ........ A 0655
May 21, 2002 ........ A 0697
November 16, 2007 (in the Carolina Power Trial Transcript) ........ A 0712

Milner, Ronald ........ A 0726
May 1, 2002 ........ A 0727

## Volume VI

Milner, Ronald (continued) ........ A 0762
May 2, 2002 ........ A 0762
May 3, 2002 ........ A 0799
May 7, 2002 ........ A 0814
May 7, 2002 (Afternoon) ........ A 0831
May 8, 2002 ........ A 0838
August 11, 2004 (in the Yankee Atomic Trial Transcript) ........ A 0851

Morgan, Robert ........ A 0866
March 21, 2002 ........ A 0867
March 22, 2002 ........ A 0905
June 25, 2002 ........ A 0913
August 3, 2004 (in the Yankee Atomic Trial Transcript) ........ A 0917

## Volume VII

Morgan, Robert (continued) ........ A 0925
November 15, 2006 ........ A 0925
November 16, 2006 (in the Northern States Trial Transcript) ........ A 0943
November 13, 2007 (in the Carolina Power Trial Transcript) ........ A 0953

Pollog, Thomas ........ A 0962
April 11, 2002 (Rule 30(b)(6)) ........ A 0963
April 12, 2002 (Rule 30(b)(6)) ........ A 1002
May 15, 2002 (Rule 30(b)(6)) ........ A 1026
May 16, 2002 (Rule 30(b)(6)) ........ A 1046
May 22, 2002 ........ A 1066

## Volume VIII

Pollog, Thomas (continued) ........ A 1073
August 4, 2004 (in the Yankee Atomic Trial Transcript) ........ A 1073
March 29, 2005 (in the SMUD Trial Transcript) ........ A 1098
July 12, 2005 (in the TVA Trial Transcript) ........ A 1108
October 26, 2005 (in the Southern Nuclear Trial Transcript) ........ A 1115
October 12, 2006 ........ A 1122
November 15, 2006 (in the Northern States Trial Transcript) ........ A 1126

Rosselli, Robert ........ A 1137
April 15, 2002 ........ A 1138
April 16, 2002 ........ A 1168

Rusche, Benard ....................A 1173
May 16, 2002 ....................A 1174
May 17, 2002 ....................A 1197
August 3, 2004 (in the Yankee Atomic Trial Transcript)....................A 1207

Slater-Thompson, Nancy ....................A 1215
April 21, 1999 ....................A 1216
April 22, 1999 ....................A 1228

## Volume IX

Slater-Thompson, Nancy (continued)....................A 1239
June 13, 2002 ....................A 1239

Trebules, Victor ....................A 1255
April 17, 2002 ....................A 1256
April 18, 2002 (Coordinated Discovery) ....................A 1289
April 18, 2002 (Deposition in Yankee Cases....................A 1305
April 19, 2002 ....................A 1317

Williams, Jeffrey....................A 1319
June 11, 2002 ....................A 1320
January 22, 2004 ....................A 1340

Zabransky, David....................A 1368
April 17, 2002 ....................A 1369

## Volume X

Zabransky, David (continued) ....................A 1401
April 18, 2002 ....................A 1401
April 19, 2002 ....................A 1428
June 5, 2002 ....................A 1440
June 6, 2002 ....................A 1445
August 5, 2004 (in the Yankee Atomic Trial Transcript)....................A 1449
March 28, 2005 (in the SMUD Trial Transcript)....................A 1473
March 29, 2005 (in the SMUD Trial Transcript)....................A 1487
April 12, 2005 (Rule 30(b)(6))....................A 1491
July 12, 2005 (in the TVA Trial Transcript)....................A 1503
October 27, 2005 (in the Southern Nuclear Trial Transcript)....................A 1508
November 20, 2006 (in the Northern States Trial Transcript)....................A 1519
October 11, 2007 (in the Wisconsin Electric Trial Transcript) ....................A 1528
October 12, 2007 (in the Wisconsin Electric Trial Transcript) ....................A 1532
November 13, 2007 (in the Carolina Power Trial Transcript)....................A 1538

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :



(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)

McLean, Virginia
Thursday, May 2, 2002

Continued deposition of RONALD A. MILNER, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons



Boulevard, McLean, Virginia 22102-4859, at 9:51 a.m., Thursday, May 2, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

APPEARANCES: (Continued)

On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:

RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of Plaintiff Wisconsin Electric Power Company:

SUZETTE W. DERREVERE, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1609

On behalf of Plaintiff Commonwealth Edison Company:

CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

201

APPEARANCES: (Continued)

On behalf of Plaintiff Yankee Atomic Electric Company:

PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

On behalf of the Defendant:

RUSSELL A. SHULTIS, ESQ.
HEIDE L. HERRMANN, ESQ.
United States Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561

202

C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFFS | DEFENDANT |
|---|---|---|
| RONALD A. MILNER | | |
| By Mr. Tomaszczuk | 205 | |

Afternoon Session -- 272


E X H I B I T S


| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| 21 | 206 |
| 22 | 209 |
| 23 | 211 |
| 24 | 214 |
| 25 | 218 |
| 26 | 220 |
| 27 | 224 |
| 28 | 254 |
| 29 | 258 |
| 30 | 261 |
| 31 | 274 |
| 32 | 279 |
| 33 | 279 |
| 34 | 287 |
| 35 | 292 |
| 36 | 293 |


203


| MILNER EXHIBIT NO. (Continued) | PAGE NO. |
|---|---|
| 37 | 300 |
| 38 | 306 |
| 39 | 306 |
| 40 | 314 |
| 41 | 325 |
| 42 | 328 |
| 43 | 335 |
| 44 | 338 |
| 45 | 342 |
| 46 | 350 |
| 47 | 354 |
| 48 | 356 |
| 49 | 375 |
| 50 | 380 |
| 51 | 389 |


204

PROCEEDINGS
MR. TOMASZCZUK: Back on the record.
Whereupon,
RONALD A. MILNER,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:
FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER AND LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INCORPORATED, POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, NEBRASKA PUBLIC POWER DISTRICT:
BY MR. TOMASZCZUK:
Q. Good morning, Mr. Milner.
A. Good morning.
Q. The same ground rules apply as yesterday, and you're still under oath?
A. Okay.
Q. Between when we adjourned yesterday and this morning, did you discuss your deposition testimony with anyone?

205

A. I did not.
Q. Prior to the commencement of your deposition yesterday, did you review any deposition transcripts?
A. No.
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Exhibit 21 the Mission Plan, draft Mission Plan, the draft Mission Plan dated April 1984?
(Milner Exhibit No. 21 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Just so the record is clear, Mr. Milner, this is an excerpt of Volume 1.
A. Okay.
Q. As opposed to the entire document, which is a voluminous document.
A. Yes, it was.
Q. Mr. Milner, is this the, an excerpt of the Mission Plan that you reviewed when you became an OCRWM employee in 1984?
A. It's unlikely I would have reviewed this particular draft since it was basically at the time I came on board with the program.

206

Q. You think there is another draft that you reviewed?
A. There probably was a subsequent one, but I'm not certain.
Q. Well, let me just represent that this is the only draft of the Mission Plan of which I'm aware.
A. Okay.
Q. Of which I believe we have possession.
A. I'm not aware of another, but --
Q. Could I direct your attention to page 2-2 in the upper right-hand corner?
This, on this page appears a table entitled waste acceptance schedule?
A. Correct.
Q. And it appears to contemplate two repositories?
A. It appears to, yes, that's correct.
Q. And the first repository has a spent nuclear fuel acceptance rate starting at 400 metric tons in 1998?
A. Yes.
Q. And ramps up to 3,000 metric tons in the sixth year of operation?
A. Correct.

207

Q. And then stays at that steady-state figure of 3,000 metric tons until 2025 I believe?
A. Appears to, yes.
Q. And does this chart reflect in your view, DOE's intentions at the time with respect to the acceptance of spent nuclear fuel at a geologic repository?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: Judging by the fact that it's contained in the draft of the Mission Plan Amendment, I would assume that that was the department's plan at that time.
BY MR. TOMASZCZUK:
Q. Now I believe you testified yesterday that you joined OCRWM at or about the time that this Mission Plan was issued, right, April of 1984?
A. Correct.
Q. And as I think we saw yesterday, the final version of the Mission Plan was issued in June of 1985, right?
A. I believe that was correct, yes.

208

different repository receipt rates initially for the first and second repository, right?
A. It does, correct.
Q. But in both instances, those receipt rates hit 3,000 metric tons per year in the sixth year of operations?
A. That's correct.
Q. And it's indicated here that that receipt rate will remain at 3,000 metric tons for a period of time thereafter?
A. Yes, it's indicated here.
Q. Do the receipt rates on page 4 of this document accurately reflect DOE's intentions at the time with respect to repository receipt rates for spent nuclear fuel?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: Again, it was listed as a, an assumption underlying this report, so that would have been a reflection of DOE's goal at the time.
BY MR. TOMASZCZUK:
Q. Are you aware as of this point in time, March of 1986, of any other documents

213

published by OCRWM which would have stated or suggested different repository receipt rates?
A. At that point in time, not that I can recall.
Q. Is it fair to assume that if there were such accounts, you would have known about them?
A. Yes. I think that would be true.
MR. TOMASZCZUK: Ms. Reporter, could you mark as Milner 24 the Volume 1 of the TSLCC analysis dated April 1986?
(Milner Exhibit No. 24 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with this exhibit Milner No. 24?
A. I believe I would have been, yes.
Q. And did you have a role in the preparation of this document?
A. Likely I would have.
Q. And can you state for me what that role would have been?
A. Again, it would have been a review and approval.

214

Q. You would have reviewed it, edited drafts, and approved the final version?
A. Correct.
Q. I have to say with the benefit of hindsight sitting here sixteen years later that these reports suggest to me that they were prepared with a great deal of thought and care.
Is that a sort of a fair characterization do you think?
A. We certainly attempted to do that at that time.
Q. And they also reflect in my layman's view a substantial amount of detail about the costs and anticipated costs of the system?
A. Correct.
Q. Can I direct your attention to page 14.
And this table at page 14, Table 2-2, identifies key assumptions for the TSLCC analysis, right?
A. Correct.
Q. And directing your attention to the repository design receipt rate there in the middle of the page?
A. Um-hm. Yes.

215

Q. This would appear to indicate to me that the repository design receipt rate that DOE intended at the time was 3,000 metric tons per year of spent fuel and 400 metric tons equivalent per year of defense high-level waste?
A. That's correct. It does indicate that it would begin, Phase 1 facility of the repository would begin at a rate of 400, but steady state to 3,000.
Q. And does the text here accurately reflect DOE's intentions at the time with respect to repository design receipt rate?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: Again, judging that it was, by the fact that it was listed as an assumption, that would have been the program's goal at that time.
BY MR. TOMASZCZUK:
Q. Are you aware of any other documents published in or about April of 1986 when this report was issued that would indicate a different intention by DOE with respect to repository design receipt rates?

216

MR. SHULTIS: Objection. Calls for a legal conclusion.
Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: At this point in time, I don't recall any I was aware of at that point in time.
BY MR. TOMASZCZUK:
Q. Isn't it true, Mr. Milner, that the DOE's intentions with respect to repository design receipt rates have stayed constant over the years at 3,000 metric tons?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: It indicates that the steady-state rate stayed at 3,000, yes.
BY MR. TOMASZCZUK:
Q. And that hasn't changed really in 16 years, has it?
MR. SHULTIS: The same objection.
THE WITNESS: Would appear not to have.
MR. TOMASZCZUK: Give me just one second.
THE WITNESS: Sure.

217

(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, could you mark as Milner Exhibit 25 the fee adequacy report dated June 1987?
(Milner Exhibit No. 25 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with this document?
A. Yes, I probably was.
Q. Did you have a role in its preparation?
A. Likely I did.
Q. And would your role have been reviewing drafts, making editorial comments, and approving the final?
A. It would have been.
Q. Could I direct your attention to pages 4 and 5 of the document?
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Here also we see a listing in bullet point format of principal assumptions which

218

underlie the fee adequacy report?
A. Correct.
Q. I don't see a bullet assumption, at least one stated on these two pages for repository receipt rates as we saw on the March 1986 fee adequacy assessment report, Milner Exhibit 23.
A. I don't, either.
Q. Do you know why that is?
A. No, I don't.
Q. Do you have any understanding sitting here today as to the repository receipt rate assumption which was the basis for this report?
A. I don't recall, no.
Q. Do you have any reason to believe that it would have been different in any way from the assumptions identified in the 1986 fee adequacy report?
MR. SHULTIS: Objection -- asked and answered.
THE WITNESS: Not that I can recall.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner 26 the June 1987 TSLCC analysis?

219

(Milner Exhibit No. 26 was marked for identification.)
BY MR. TOMASZCZUK:
Q. And Mr. Milner, are you familiar with this document?
A. Likely I was, yes. I don't recall specifically.
Q. Did you have a role to play in its preparation?
A. Probably I did.
Q. And that role was similar to your role with respect to the other TSLCC reports and fee adequacy reports I have asked you about?
A. Correct.
Q. Could I direct your attention, sir, to pages 23 and 24 of the document?
And on these pages, we have a listing of key assumptions which underlie the TSLCC analysis?
A. Yes.
Q. And at the bottom of 23 and the top of 24, there is a discussion regarding repository design receipt rate, correct?
A. That's correct.

220

Q. And at the end of that discussion,
it's indicated that -- I'm sorry. Strike that.
This discussion appears at this point
in time still to contemplate two repositories,
is that right?
A. It appears to, yes.
Q. And the spent nuclear fuel design
receipt rate for both of those ramps up to 3,000
MTU and then maintains that at a steady state
for a period of years, is that correct?
A. That's correct.
Q. And does or do those design receipt
rates accurately reflect DOE's intentions at the
time with respect to repository design receipt
rates?
MR. SHULTIS: Objection. Calls for a
legal conclusion.
Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: As an assumption in this
report, that would have indicated the program's
goal, yes.
BY MR. TOMASZCZUK:
Q. As of this point in time, June of
1987, are you aware of any other documents
published by DOE which would indicate or suggest

221

a different intention with respect to repository
design receipt rates?
A. Not that I can recall.
MR. SHULTIS: Same objections.
BY MR. TOMASZCZUK:
Q. And if there were such documents, it
would be probably fair for me to assume you
would know about them?
A. I would have hoped so.
(There was a pause in the
proceedings.)
BY MR. TOMASZCZUK:
Q. I meant to ask you, Mr. Milner, with
respect to these two previous exhibits, the
TSLCC reports and fee adequacy report for 1987,
they were both published in June of that year?
At least that's what is indicated on
the cover page of both documents.
Look at the last two exhibits.
A. Yes. Um-hm.
Q. And was there an intention at this
time to issue these reports at or about the same
point in time do you know?
MR. SHULTIS: Objection as to
intention.

222

BY MR. TOMASZCZUK:
Q. That's a very inartfully phrased
question.
Did you have an understanding that
these reports ought to go out at the same point
in time?
A. I don't recall any specific intention
to time the reports exactly, no.
The TSLCC, as I had indicated, is
input data to the fee adequacy.
Beyond that, should get wrapped up
into the departmental publication schedules, and
sometimes the TSLCC will actually be published
first, the fee adequacy a month or so later.
I guess in this case, they came out at
the same time.
I noticed in the previous case, the
TSLCC actually came out a month after.
Q. And I was simply trying to find out
why those publications' schedules were what they
were, and I noticed here they came out at the
same point in time.
A. Yeah -- not that I can recall any
particular reason other than when it gets into
the publication line.

223

Q. Vagaries of dealing with the printer I
gather?
A. Yes.
MR. TOMASZCZUK: Ms. Reporter, could
we mark as Milner Exhibit 27 the TSLCC report
for May 1989?
(Milner Exhibit No. 27
was marked for
identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, have you seen this
document before today?
A. I don't recall specifically, but I'm
certain I did.
Q. And would your role with respect to
this document have been the same as you
previously testified for previous TSLCC and fee
adequacy reports?
A. I believe so.
Q. Reviewed it, made editorial comments
on drafts, and approved the final?
A. I believe so.
Q. Can I direct your attention to page
2-14 of the document?
(The witness reviewed the document.)

224

BY MR. TOMASZCZUK:
Q. And at the bottom of this page, there is a Table 2-4, which appears under the general category of assumptions about the repositories, correct?
A. Correct.
Q. And this table graphically depicts ramp-up rates for the spent nuclear fuel storage facilities?
A. That's correct.
Q. And in all instances, it appears that the facilities ramp up to 3,000 metric tons by the sixth year of their respective operations, correct?
A. It appears to be, yes, correct.
Q. Mr. Milner, this chart at page 2-14, as I understand it, is just the depiction of what was expected to happen through the first six years of operations?
A. That appears to be the case, yes.
Q. And it suggests that there are more complete acceptance schedules in Appendix A, right?
Do you see that?
MR. SHULTIS: Objection. The document

225

speaks for itself.
BY MR. TOMASZCZUK:
Q. I was referring to the text at, which immediately precedes Table 2-4.
A. Yes, that's what it says here.
Q. Could I ask you to look at Appendix A, which is three quarters of the way through the document?
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Do you -- strike that. Are you able to explain to me, Mr. Milner, these tables which appear at Appendix A under the heading waste acceptance tables?
A. I believe I can.
Q. Okay. Can you walk me through these Tables A1 through Tables A5 and explain to me your understanding of the information conveyed by these tables?
A. Okay. I believe this particular document looked at several different cases as to how a system would operate.
It looked at different EIA cases as far as the projections of spent fuel discharge, so the first table indicates that it was based

226

on the EIA no new orders case, assuming all that the fuel disposed of was in-tact assemblies.
Q. And that -- I'm sorry. Go ahead.
A. Table A2 --
Q. Can I ask you about Table A1 before you move on?
A. Certainly.
Q. What do you mean by no new orders, or what is meant by no new orders?
A. At the time, the Energy Information Administration published projections of spent fuel discharges on an annual cumulative basis.
Because it estimated the number of reactors that would be operating at any given time, which was a future projection, they projected a series of cases.
I don't recall all the exact number of cases or what the names were, but one assumed a number of new plants would be ordered and come on line, and another case or two assumed lesser amount of new reactors would be ordered and brought on line.
And the no new orders case assumed that there were no new reactors that came on line from that point forward.

227

Q. All right. And the reference here to end of reactor life case, can you explain that for me?
A. End of reactor life, I believe that was the terminology used for the assumption that once a reactor reached its, the end of its original licensing date, which I think was typically 40 years, that that reactor would shut down rather than attempt to renew and extend its license.
Q. And finally, you referred to in-tact fuel disposal.
What is meant by that?
A. Okay. Spent fuel assembly contains obviously the spent fuel rods as well as hardware in a certain spacing, so in-tact fuel disposal would assume that you took that assembly as it came out of the reactor and disposed of it as it was.
Q. Is dealing with an in-tact fuel assembly more efficient and economical than a non-in-tact fuel assembly?
MR. SHULTIS: Objection -- vague.
THE WITNESS: I would say that both modes, both in tact and consolidated, which

228

would be the other, they're pros and cons.
In terms of the overall number of fuel canisters that you would ultimately have to deal with, you would certainly have more if you disposed of it in tact.
BY MR. TOMASZCZUK:
Q. And this table considered in the aggregate appears to reflect an acceptance rate which ramps up to 3,000 and then maintains that steady-state acceptance rate for a number of years, is that fair?
A. That's correct, yes.
Q. All right. Let's go to Table A-2, please.
A. Um-hm.
Q. Is this the same as Table A-1 except it assumes consolidated fuel disposal instead of in-tact fuel disposal?
A. That's correct.
Q. Here also it appears to me that the ramp-up rates in each instance go to -- there is a ramp-up period, and then the acceptance rate goes to 3,000 in each instance and maintains it at that steady-state figure of 3,000 for a number of years?



A. That's correct.
Q. And can you explain to me your understanding of Table A-3?
A. Table A-3 I guess differs from Table A-1 in that it has assumes a two repository system versus a one repository system.
Q. Here again, it appears that the table in the aggregate reflects for the systems referenced on it a ramp-up period getting to 3,000 metric tons and then staying at 3,000 metric tons as a steady-state acceptance rate figure for a number of years, correct?
A. That's correct.
Q. What about Table A-4?
A. I guess same assumptions as Table A-3 except consolidated fuel.
Q. All right. And here again, the table appears to indicate a ramp-up period, then the spent nuclear fuel acceptance rate of 3,000 metric tons per year for a number of years?
A. That's correct.
Q. And then that brings us to Table A-5. Can you explain to me your understanding of this table?
A. Table A-5 I guess is similar to Table



A-4 except that it utilizes EIA upper reference case projections for spent fuel discharge.
Q. Okay. And can you explain to me the difference between the upper reference case and the no new orders case?
A. Well, in very general terms, the upper reference case would have assumed that there are new reactors ordered and on line from that point some time in the future, but I don't recall numbers.
Q. And this table also shows a ramp-up to a 3,000 though metric ton, right, and that maintaining at a steady-state figure for a number of years, right?
A. Correct.
Q. Mr. Milner, did you prepare these tables?
A. No, I did not.
Q. Do you know who did?
A. No, I don't.
Q. Do these tables accurately reflect DOE's intentions at the time with respect to spent nuclear fuel waste acceptance schedules?
MR. SHULTIS: Objection. Calls for a legal conclusion.



Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: Well, again, given that they are assumptions for different cases, depending on which case was assumed, yes, it would have reflected DOE's goal.
BY MR. TOMASZCZUK:
Q. At or about this point in time, May 1989, are you aware of any documents published by DOE which would have indicated a design rate other than 3,000 metric tons for the steady-state operation?
A. No, not that I can recall.
Q. And would I be fair in assuming that if there were such documents, you would be aware of them?
A. I certainly would have hoped so.
MR. TOMASZCZUK: This could be off the record.
(A discussion was held off the record.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, I would now like you to get in front of you Exhibit 20, which was the last exhibit that we marked yesterday, but we adjourned and I didn't ask you any questions

about it.
And this was the November 1989 report to Congress on reassessment of the Civilian Radioactive Waste Management Program.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with this report?
A. Yes, I am.
Q. Did you prepare it?
A. I did not.
Q. Did you prepare any portions of it?
A. No, I did not prepare any portions of it.
Q. Okay. Do you know why the report was prepared?
A. I do. Actually it indicated in here the report, well, appropriations for that year I guess.
Appropriations Act for 1990 I believe directed us to submit this report.
Q. The report indicates that Congress asked for this I gather because of its concerns about endemic schedule slips, problems in management structure, and lack of integrated

233

contractor efforts?
MR. SHULTIS: Objection. The document speaks for itself.
BY MR. TOMASZCZUK:
Q. Were you aware at this time, Mr. Milner, of Congress' concerns about these issues?
A. Yes, I was.
Q. And in your view, were these concerns fairly stated here on this page iii in the forward?
A. My understanding, Congress' concerns are adequately or accurately depicted here.
Q. Did you have occasion to discuss this report with other OCRWM employees at or about the time it was prepared?
A. I don't specifically recall, but I, likely I did, yes.
Q. I'm sorry if I asked you think. I didn't think I did, but do you know who prepared this report?
A. No, I don't. I don't recall.
Q. Could I direct your attention to the Executive Summary?
It starts at Roman Numeral page 7.

234

(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. And directing your attention to the second paragraph?
A. Um-hm.
Q. At or about this time, had the Secretary of Energy completed an extensive review of the OCRWM program?
A. Yes, he had.
Q. And do you know what that review entailed or how it was conducted?
A. Very vaguely, I recall staff of the Secretary's office working with staff of the program office and reviewing the program situation.
Q. When you say staff of the program office --
A. Staff of OCRWM.
Q. Staff of OCRWM -- and which staff of OCRWM were you referring to in your answer?
A. I don't recall specific names. A number of people were involved.
Q. Were you involved?
A. I was involved.
Q. Did you have meetings with staff of

235

the Secretary's office concerning the Secretary's review of OCRWM?
A. As I recall, at the time, I met more with our senior OCRWM staff, not the Secretary's office staff.
Q. And who did you meet with?
A. Let's see. I recall meeting with Lake Barrett.
I'm not talking one-on-one meetings. I'm talking group meetings -- Lake Barrett.
Certainly there would have been the director of the Office of Program Management, whatever it was called at that time, the Geologic Repository Office, Storage and Transportation Office.
I can't recall who they were at that point in time offhand.
Q. If we looked at the organizational chart, would that help you identify who was --
A. It would.
Q. Participating in these discussions?
A. It would.
(The witness reviewed the document.)
THE WITNESS: Okay. It would have been directors of the four offices that existed

236

been provided to us. At least I'm not aware of it.
I would ask if it has not been provided to us that we be given a copy promptly, or if it has been provided, if you could tell me where it is in the document production, that would be appreciated.
Do you want to take a short break? I have got a few more questions on this document.
Do you want me to finish with the, with the document?
THE WITNESS: Either way.
MR. TOMASZCZUK: Why don't we take a break?
MR. SHULTIS: Okay.
(A recess was taken.)
MR. TOMASZCZUK: Back on the record.
BY MR. TOMASZCZUK:
Q. Mr. Milner, I was asking you about Milner Exhibit 20 at the break, and I have a few more questions on that document.
A. Okay.
Q. Still in the Executive Summary, on the first page of the Executive Summary, in the fourth paragraph --

245

A. Um-hm.
Q. There is a sentence that states for the first time since the passage of the Nuclear Waste Policy Act, the program has put together a schedule based on a realistic assessment of technology durations and past experience.
That suggests to me that the previous schedules were not based on a realistic assessment of activity durations and past experience.
Do you agree with that?
MR. SHULTIS: Objection. That's a characterization.
(The witness reviewed the document.)
THE WITNESS: I guess I would agree with that.
BY MR. TOMASZCZUK:
Q. That the previous schedules were not realistic, were not a realistic assessment of activity durations and past experience?
A. Well, I believe that some of the earlier schedules were endeavoring to meet the 1998 date, subsequently 2003 date, and I think probably assumed some activities could be done in a shorter time than realism would indicate.

246

Q. This paragraph, the next sentence of this paragraph goes on to state that this schedule shows a significant slip for the expected start of repository operations from the Year 2003 to approximately 2010, correct?
A. Correct. It does.
Q. And did you agree with this change in the schedule and slippage of the expected start of repository operations from 2003 to approximately 2010?
A. Personally I did, yes.
Q. Do you believe today that repository operations will start in 2010?
MR. SHULTIS: Objection -- asked and answered.
THE WITNESS: At this point in time, I believe that's a realistic goal, yes.
BY MR. TOMASZCZUK:
Q. Continuing on in the Executive Summary, there's a reference at Roman Numerals Nine and Ten to monitored retrievable storage.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. And my question to you is was it true at the time that the linkages between the

247

repository and the MRS program made it impossible for DOE to accept waste at an MRS facility on its schedule that was independent from that of the repository?
A. That's correct.
Q. Was it at or about this time, Mr. Milner, that you began working or were detailed to work on the MRS siting effort?
A. Roughly that time; I believe it might have been slightly afterward.
Q. Within several months of this report do you think?
A. I don't recall. Certainly within a year or so.
Q. Were you involved in the DOE's efforts to work with the Congress to modify the linkages between the repository and the MRS facility?
A. I was not.
Q. Did you believe at the time that if the linkage were modified, that waste acceptance at an MRS facility could begin by 1998?
A. My personal opinion was yes.
Q. Was it also your opinion that if the linkages were not modified, that waste acceptance could not begin at an MRS facility by

248

1998?
A. Correct.
Q. Can I direct your attention to page 5 of the document, Mr. Milner?
This Section 2.5 deals with contractor support, and near the bottom of the page, it is suggested that the number of contractors was reduced from 13 to 8?
A. It states that, yes.
Q. Right. And how many contractors are involved now on OCRWM's part?
A. I don't know the exact number. We have two principal contractors, Booz Allen Hamilton, who is our support services contractor, Bechtel SAIC, who is our M&O contractor.
I believe there are several smaller contracts.
There is a contract in the QA area. Beyond that, there's several. I don't recall the number of small contracts at Yucca Mountain.
Q. The number of eight contractors, is that roughly accurate with respect to today's operations or not?
A. I can't say for sure. I believe it

249

would be a smaller number if you consider even the contractor that provides the Don Johns at the site.
Q. Can I direct your attention to page 8 of this document?
In the second paragraph, it is indicated in the, that DOE proposed in the draft Mission Plan Amendment that the start of repository operations would be delayed by five years until 2003, right?
A. That's correct.
Q. And now in this document, we see a further delay from 2003 to 2010?
A. That's correct.
Q. Can I direct your attention to page 12, actually the bottom of page 11 and the top of 12, schedule for the MRS facility?
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Near the end of this heading on the, under schedule for the MRS facility, it's stated if the current linkages to the repository are maintained, additional delay of five years would result with start-up estimated at 2007 for the basic MRS facility.

250

Do you know, Mr. Milner, how that 2007 date was derived?
A. Given the linkages that were in place and still are in place, an MRS facility could not be sited until the repository site was selected, so I believe that date would have been arrived at by determining a date for repository site approval.
At that point, an MRS site could be approved and then design and construction of the MRS.
I don't recall the durations. That would have been the basis for that date.
Q. What date was assumed for repository site approval for purposes of deriving this 2007 date?
A. I don't recall. It is likely listed in the schedule somewhere.
Q. Can I direct your attention to the chart on page 10, the previous page 10?
A. Um-hm.
Q. Using that chart, are you able to identify the date for repository site approval that was used in estimating 2007 for start-up of the basic MRS facility?

251

A. This schedule indicates the site recommendation submittal to the president in April of 01.
Q. This schedule of activities that appears at page 10, was it in your view accurate at the time it was published?
A. That was certainly the program's goal at that point in time.
Q. I appreciate that answer. I'm not quite sure it was responsive to my question.
Could you reread the question and answer back?
THE REPORTER: Question: "This schedule of activities that appears at page 10, was it in your view accurate at the time it was published?"
Answer: "That was certainly the program's goal at that point in time."
MR. SHULTIS: I think it's responsive.
MR. TOMASZCZUK: I'm sorry. I just didn't hear what you said.
MR. SHULTIS: I think his answer was responsive.
BY MR. TOMASZCZUK:
Q. You believe that the schedule

252

BY MR. TOMASZCZUK:
Q. Did you discuss that with Mr. Danker or Mr. Beeman?
A. Not with Mr. Beeman. I don't recall discussing it with Mr. Danger, but it's possible that I did.
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Exhibit 30 a draft OCRWM program change control board document, change proposal, and I thought it was dated, and I can't find the date at this moment, but it may be embodied in the document somewhere.
(Milner Exhibit No. 30 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with this document?
A. I don't recall it offhand.
Q. You're identified in the lower left-hand corner as the originator, is that right?
A. That's correct.
Q. And were you indeed the originator?
A. Apparently I was.

261

Q. Do you know why this document was prepared?
A. Well, again, I don't recall the document specifically, but from reading through it, it indicates that we were establishing waste acceptance schedule according to this had been for a period of time briefly TBD.
Q. I'm sorry. What do you mean by TBD?
A. To be determined.
Q. And on what basis do you give that testimony?
A. I thought I saw that indicated in here.
Q. Okay. Well, if you could point me to where that's indicated?
A. In first page, block 8, change description and justification description of the change states that change the waste acceptance schedule table from TBD status to a numerical table for use in design studies.
Q. Did you prepare this document?
MR. SHULTIS: Objection -- asked and answered.
THE WITNESS: Not that I can recall.
BY MR. TOMASZCZUK:

262

Q. Are you aware of someone else who might have prepared it?
MR. SHULTIS: Same objection.
THE WITNESS: No, I'm not.
BY MR. TOMASZCZUK:
Q. Do you know why you're identified as the originator?
A. Probably would have been prepared under my direction.
Q. But you can't recall who did it?
A. But I don't recall the document, so I don't recall who did it.
Q. Do you know when it was prepared?
A. No, I don't. I cannot find a date.
Q. If I said it was prepared in 1990, would that sound right to you?
MR. SHULTIS: Objection. Calls for speculation, asked and answered.
THE WITNESS: I could only guess that that would be a rough timeframe.
BY MR. TOMASZCZUK:
Q. There is a reference here at the top of the first page to waste management system requirements, WMSR.
What is or are the waste management

263

system requirements?
A. It's an upper level, upper level in terms of not great detail, laying down the requirements for waste management system.
It's in essence a document that other documents would flow from in more detail, which would ultimately be used by designers of the system or components of the system.
Q. Is it the same as a system requirements document?
A. I believe the current name for that document is systems requirement document.
Q. So your understanding is that the WMSR preceded the SRD?
A. That's my understanding, yeah.
Q. Do you know when the change was made from referring to the document as a WMSR to begin to refer to it as an SRD?
A. No, I don't.
Q. Attachment 1 contains a table of spent nuclear fuel acceptance rates and appears to be roughly consistent with those in previous documents that we have seen, correct?
A. That's correct.
Q. And in particular, it depicts a, the

264

repository spent nuclear fuel acceptance rate commencing in 2010 at a rate of 400 metric tons, and then ramping up to 3,000 metric tons in the sixth year of operation?
A. That's correct.
Q. And then maintaining at a 3,000 metric ton rate for 20 years?
A. Approximately, yes.
Q. Does this Attachment 1 accurately reflect DOE's intentions with respect to spent nuclear fuel acceptance at or about the time it was prepared?
MR. SHULTIS: Objection. Calls for a legal conclusion.
Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I don't recall that it did.
This is a draft document. I don't recall it ever being finalized.
BY MR. TOMASZCZUK:
Q. Do you know whether it was finalized or not?
A. I don't recall.
Q. It may have been? You just don't remember?

265

A. Correct.
Q. Can I direct your attention to Attachment 2, which is the third page of the document?
The first sentence states the inclusion of a waste acceptance schedule per se need not be justified in DCP since it is an essential system requirement.
What is meant by that sentence?
MR. SHULTIS: Objection. Calls for speculation.
THE WITNESS: My interpretation at this point would be that a waste acceptance schedule, as it indicates, is essential because you need to know what rates you're designing to for transportation, receipt handling facilities and so forth.
BY MR. TOMASZCZUK:
Q. In item 6 on this page, there is a reference to a levelized MRS acceptance rate after 2014 below 3,000 metric tons to allow MRS inventory to be gradually reduced as soon as repository reaches maximum acceptance rate, paren, 3,000 metric tons?
A. Correct.

266

Q. Does 3,000 metric tons reflect the maximum acceptance rate for the repository?
MR. SHULTIS: Objection. Calls for -- mischaracterizes the document.
Calls for speculation.
THE WITNESS: I believe at that point in time, the 3,000 metric tons steady-state receipt rate at the repository was the program goal.
BY MR. TOMASZCZUK:
Q. That reference is to the same 3,000 rate that we saw in Attachment 1 and we have seen in other documents, correct?
A. I believe so.
Q. And that rate is also referenced in item 8 on this same page?
A. Correct.
Q. Mr. Milner, this is the type of document that was initiated as a result of the reassessment in 1989, is that correct?
MR. SHULTIS: Objection -- lack of foundation, assumes facts not in evidence.
BY MR. TOMASZCZUK:
Q. Do you understand my question?
A. Yes, I think I do. I believe that

267

would have been the case.
Q. And this document was prepared in essence to control the baseline, to use your terms, is that what's --
A. Correct.
Q. Driving this? Thank you. Can I ask you to look at Attachment 3, which has the heading impact analysis?
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. There are four impacts that appear to be set forth here.
The first one is, quote, a positive technical impact created by determining a necessary system requirement.
Do you agree that adoption of the waste acceptance schedule would create a positive technical impact?
A. I agree that determining a waste acceptance schedule is a positive impact, yes.
Q. And you previously testified that a waste acceptance schedule was a necessary system requirement?
A. Correct.
Q. The second item states, quote,

268

potentially significant technical impact
associated with discussing policy position with
utilities related to waste acceptance basis,
paren, i.e., spillover priority basis versus
oldest fuel first priority basis.
Can you tell me, sir, what that means?
A. No, I can't. Parenthetical, I believe
there were discussions at the time should
priority be given to reactors that were running
out of pool storage space versus what had been
in the contract I believe as the oldest fuel
first priority.
Q. The next item states a positive
schedule impact by allowing design requirements
and related documents to proceed.
That seems to me to be related to the
first point above, right?
A. That would be my interpretation of
that, yes.
Q. And then finally, quote, relatively
minor cost and schedule impacts associated with
modifying the other program documents affected
by new waste acceptance schedule.
And do you know what other program
documents are being referred to in this item?

269

MR. SHULTIS: Objection. Calls for
speculation.
THE WITNESS: No. I can't recall
specifically.
There's a hierarchy of program
documents.
Certainly the waste management system
requirements and now the systems requirements
document is more on the upper level.
There is various lower-level documents
that I can't recall the names.
BY MR. TOMASZCZUK:
Q. Would a TSLCC report be a lower-level
document in this hierarchy?
A. No. No.
Q. Well, would it be an upper-level
document in the hierarchy?
A. No.
Q. It's not in the hierarchy at all?
A. It's not in the control document
hierarchy, that's correct.
Q. I see. Can you identify for me any of
the documents in the control document hierarchy
as you use that term?
A. Systems requirements document.

270

Q. And that's it?
A. I believe there is a document entitled
waste acceptance systems requirement document.
My recollection is that that sets down
more waste form, waste characteristic
requirements for acceptance.
I cannot recall others offhand.
Q. Was it important to try and ensure
that the waste acceptance schedules that were
being used in the various OCRWM documents were
consistent?
MR. SHULTIS: Objection -- vague.
THE WITNESS: I believe so, yes.
MR. TOMASZCZUK: Do you want to take a
lunch break?
MR. SHULTIS: Sure.
(Whereupon, at 12:02 p.m., the
deposition was recessed, to reconvene at 1:00
p.m. the same day.)

271

AFTERNOON SESSION
(1:08 p.m.)
MR. TOMASZCZUK: Back on the record.
Whereupon,
RONALD A. MILNER,
the witness on the stand at the time of recess,
having been previously duly sworn, was further
examined and testified as follows:
FURTHER EXAMINATION BY COUNSEL FOR
PLAINTIFFS FLORIDA POWER AND LIGHT
COMPANY, NORTHERN STATES POWER
COMPANY, DUKE POWER, INDIANA MICHIGAN
POWER COMPANY, BOSTON EDISON COMPANY,
GPU NUCLEAR, INCORPORATED, POWER
AUTHORITY OF THE STATE OF NEW YORK,
OMAHA PUBLIC POWER DISTRICT, NEBRASKA
PUBLIC POWER DISTRICT:
BY MR. TOMASZCZUK:
Q. Good afternoon, Mr. Milner.
A. Good afternoon.
Q. Still the same ground rules in effect?
A. Okay.
Q. At the break, we were looking at
Milner Exhibit 30, and I just have a couple of
follow-up questions on that.

272

A. Okay.
Q. Before we move on -- can I ask you to look at Attachment 2?
A. Um-hm.
Q. And the second item there is a reference to an MRS strategy paper.
Do you see that?
A. I do, yes.
Q. Do you know what MRS strategy paper is being referred to there?
A. I don't recall that, no.
Q. Do you know whether the MRS team on which you worked prepared such a strategy paper?
A. I don't believe so.
Q. The proposed waste acceptance schedule embodied in this document indicates that one of its objectives as reflected in this second item is to substantially reduce the need for utilities to add new storage capacity after 1998 and to initiate the orderly decommissioning of reactor.
Do you know why that was an objective?
A. Specifically, I don't, but I think it had been long a goal of the program to do that, to try to reduce the amount of storage that

273

would be needed, certainly ultimately to decommission a reactor.
MS. HERRMANN: Alex, before you go on to the next document, just for the record, you were referring to the program plan before he took a lunch break.
It looks like you may have found it, but we wanted to let you know that it is on the Web.
MR. TOMASZCZUK: Thank you. We had some difficulty apparently getting it off the Web, but we have found it, and I'm going to ask the witness about it a little later.
MS. HERRMANN: Okay. Great.
MR. TOMASZCZUK: Thank you. Ms. Reporter, could you mark as Milner Exhibit 31 a memorandum dated October 5, 1990?
Preliminary draft of the 1990 Annual Capacity Report is the subject.
It's a memo drafted by Alan Brownstein.
(Milner Exhibit No. 31 was marked for identification.)
BY MR. TOMASZCZUK:

274

Q. Mr. Milner, you're shown as receiving a copy of this document on the distribution list which appears at the second page.
A. Um-hm. Yes.
Q. Do you remember receiving a copy of this document in or about October 1990?
A. I don't specifically recall that, no.
Q. Do you recall the subjects which are addressed in Mr. Brownstein's cover memorandum?
A. Vaguely, I do, yes.
Q. It indicates the 1989 ACR, among other things, was not published because it was determined that publishing the ACR prior to developing revised waste acceptance schedules based on the reassessment would not be useful for planning purposes, right?
A. Um-hm.
Q. I think yesterday I showed you the draft 1989 ACR?
A. I believe so.
Q. Right. And does this refresh your recollection as to whether or not a final ACR was published in 1989?
A. Apparently it was not, yeah.
Q. And further on in this paragraph, Mr.

275

Brownstein indicates that it's important that the department issue another ACR since we need to meet contract deliverable deadlines to the extent possible, and the contract requires the priority ranking information to be converted into a binding document on April 1, 1991?
A. Um-hm.
Q. Did you view the ACR as a contract deliverable?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: In my opinion, the ACR was called for in the standard contract.
BY MR. TOMASZCZUK:
Q. So the answer to my question is yes?
A. Yes.
MS. HERRMANN: Same objection.
BY MR. TOMASZCZUK:
Q. And do you understand that the contract requires the priority ranking information to be converted into a binding document on April 1, 1991?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: Yes, in my opinion.

276

BY MR. TOMASZCZUK:
Q. Did you discuss these issues with Mr. Brownstein at any time?
A. I'm certain I must have. I don't recall.
Q. You don't recall any discussions with him about these subjects?
A. Not specifically.
Q. End of the second paragraph, it goes on to state therefore, this report utilizes two bounding cases to reflect a reasonable range of acceptance rates wherein the adopted rate is likely to fall.
Are you familiar with this concept of two bounding cases?
A. Well, in general terms, concept of bounding cases, yes.
Q. What is your understanding of those terms or that term?
A. You would have a higher and a lower case, and likely would be somewhere in the middle, somewhere in between at least.
Q. And why did OCRWM develop a higher and lower bounding case?
MS. HERRMANN: Objection --

277

foundation.
BY MR. TOMASZCZUK:
Q. Or upper and lower bounding case?
A. I don't recall at the time.
Q. Do you recall now?
A. I don't recall now.
Q. Did you play any role in the development of the upper and lower bounding cases?
MS. HERRMANN: Objection -- vague.
THE WITNESS: I don't recall having that, no.
BY MR. TOMASZCZUK:
Q. Do you know who did develop the upper and lower bounding cases?
A. Not specifically, no. It certainly was under Mr. Brownstein's direction, but I don't know specifically who.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner 32 an action memorandum dated December 21, 1990, approval for publication of the 1990 Annual Capacity Report, authored by Ronald A. Milner?

278

And while we're at it, why don't we mark as Milner 33 the Annual Capacity Report dated December 1990.
(Milner Exhibits Nos. 32 & 33 were marked for identification.)
BY MR. TOMASZCZUK:
Q. Did you draft the memorandum that we have marked as Milner Exhibit 32?
A. I don't recall having drafted it, no.
Q. Did somebody else draft it?
A. Somebody else probably drafted it.
Q. You reviewed it and approved it?
A. Correct.
Q. Do you know who drafted it?
A. I don't know for certain, although my copy appears to be a copy of the yellow concurrence chain for a letter, and that would indicate Mr. Pollog drafted it.
Q. He reported to you at this time?
A. Correct.
Q. Did you understand that the information in the ACR was for planning purposes only?
A. Yes.

279

Q. And was scheduled to be replaced by a contractually binding annual Acceptance Priority Ranking report on April 1991?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: Yes. Yes.
BY MR. TOMASZCZUK:
Q. The first sentence of the second paragraph under the heading discussion states since the last waste acceptance schedule has not yet been approved, and this is the last opportunity -- I'm sorry. I think I read that inaccurately. Let me try again.
Since the waste acceptance schedule has not yet been approved and this is the last opportunity according to the terms of the contract for an ACR to be issued, upper and lower bounding waste acceptance rates were used to provide the required information.
Can you explain that sentence to me?
MS. HERRMANN: Objection -- foundation.
BY MR. TOMASZCZUK:
Q. Or for me?
A. Well, apparently at this point in

280

time, because of program schedule changes, we had not approved a new waste acceptance schedule, and therefore we utilized the upper and lower bounding case to bracket so to speak what the likely schedule would ultimately be.
Q. What waste acceptance schedule is being referred to in the sentence, do you know?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: I don't understand the question.
BY MR. TOMASZCZUK:
Q. All right. Well, I don't know how to ask it a different way, but let me try and get at it.
Do you have an understanding of what the term waste acceptance schedule as used in this sentence means?
A. I have an understanding of what the term waste acceptance schedule means, yes.
Q. Okay. Could you relay that to me?
A. Which is the rate at which we would accept waste from the utilities.
Q. We have seen a waste acceptance schedule published in any number of documents

281

that I have asked you about yesterday and today, right?
A. That's correct.
Q. Is this reference to waste acceptance schedule a different schedule?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: As I indicated, apparently at this point in time, because of program schedule changes, we had not prepared a new waste acceptance schedule, so we used the bounding cases.
BY MR. TOMASZCZUK:
Q. I'm sorry.
A. So the waste acceptance schedule I think that is being referred to here is one that had not yet been approved.
Q. But isn't it true that as of this point in time, DOE had issued and you had approved a number of waste acceptance schedules in various documents?
A. I think that's correct.
Q. So given that fact, I'm struggling to understand what the reference to waste acceptance schedule means here.

282

MS. HERRMANN: Objection -- form.
BY MR. TOMASZCZUK:
Q. And if you can elucidate it for me in some way that I can understand it, that would be much appreciated.
A. Well, going by the information that's available in this particular memo in the paragraph above that, apparently we had advised the contract holders, the utilities, generally that we were developing a revised waste acceptance schedule based on the Secretary's reassessment of the program.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. That reassessment of the program was Exhibit 20 as I recall?
A. I believe 20 is correct.
Q. It was dated November 1989, and do you know whether subsequent to the reassessment published in November 1989 and prior to this memorandum of December 21, 1990, waste acceptance schedules were published by OCRWM?
A. I'm sorry. Would you repeat that?
MR. TOMASZCZUK: Could you read that

283

back?
THE REPORTER: Question: "It was dated November 1989, and do you know whether subsequent to the reassessment published in November 1989 and prior to this memorandum of December 21, 1990, waste acceptance schedules were published by OCRWM?"
THE WITNESS: I don't believe so.
BY MR. TOMASZCZUK:
Q. The upper and lower bounding cases assumed availability of an MRS, correct?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: Reading further in this memo, it indicates that the lower bounding case included an MRS and included the storage limits upper bounding case which would have been a higher acceptance rate, I assume, appears that it assumed that the schedule linkages on the MRS were assumed to have been removed.
BY MR. TOMASZCZUK:
Q. And those upper and lower bounding cases are reflected at page 7 of the 1990 ACR which I have marked as Milner Exhibit 33?
A. Yes, it appears to be.

284

Suggest using 1,000 2,000, 3,000, 4,000, 5,000 and 6,000.
So do I understand that your concern was with the use of numbers and increments other than hundreds?
A. Well, I think my concern at that point was that using a number like 1430 for a projection into the future indicated far more precision than was actually in that number.
Q. Was one of your roles at this time to ensure that the spent nuclear fuel acceptance rates that were being used in various OCRWM documents were consistent?
A. No, that was not my, one of my roles at that time.
Q. Was that one of your concerns?
A. Yes, that would be fair to say.
Q. That was something you were trying to keep an eye on so to speak?
A. Yes.
Q. And that was a concern because you believed that OCRWM ought to speak with uniformity on those questions?
A. From a corporate sense, I believe that the program should, all elements of the program

313

should work off the same assumptions.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner 40 a memorandum dated December 20, 1991, authored by Mr. Milner?
And it's an action memorandum approval for publication of the 1991 ACR.
(Milner Exhibit No. 40 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Do you recall this memorandum, Mr. Milner?
A. I don't specifically, no.
Q. Did you prepare it?
A. It's unlikely that I would have prepared it.
Q. Somebody prepared it for you and you viewed it and approved it?
A. That's correct.
Q. Do you know who prepared it?
A. No, I don't.
Q. As of this point in time, December 20, 1991, did you still believe that a MRS facility

314

could be cited?
A. Yes, I did.
Q. Was the MRS team still working at this time?
A. I don't believe it was, no.
Q. Who was working on siting an MRS at this point?
A. My organization.
Q. And when you say your organization, you mean the Office of Storage and Transportation?
A. That's correct.
Q. I may have misunderstood, but -- and if I did, correct me -- I thought I heard you say yesterday that when the MRS team was disbanded, that that effectively ended DOE's plans to site an MRS.
Did I misunderstand that?
MS. HERRMANN: Objection to the extent that it mischaracterizes prior testimony.
BY MR. TOMASZCZUK:
Q. I don't want to mischaracterize what you said.
I want to understand it correctly.
A. If, if I said or alluded to that, I

315

was in error.
The MRS team was disbanded I guess essentially at the time that I became the acting associate director for storage and transportation.
I don't recall specifically. That may have been incident to organizational change, but nonetheless, the Storage and Transportation Office subsumed the duties of the MRS team, and volunteer MRS siting effort continued at that time.
Q. And that effort was ongoing as of December 20, 1991?
A. I believe it was, yes.
Q. Who in your office was working on that issue?
A. I believe Victor Trebules was, Jeffrey Williams.
Offhand I don't recall the rest of the employees there.
Q. Were you working that issue as well?
A. I was.
Q. How much of your time were you spending on DOE's efforts to site an MRS?
MS. HERRMANN: Objection -- vague.

316

THE WITNESS: I would have to estimate 40 to 30 -- 30 to 40 percent of my time.
BY MR. TOMASZCZUK:
Q. And that level of activity continued until when?
A. Probably some time later, until 1992 perhaps.
I don't recall precisely -- approximately six months after the administration changed.
Q. When you say the administration changed, you're referring to a Presidential election?
A. Correct.
Q. So six months after a November election roughly?
A. Roughly six months after a January swearing in.
Q. Okay.
A. But very approximate.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. In this memo, under the heading discussion, the last sentence of the first

317

paragraph states the ACR applies a waste acceptance rate to the APR resulting in individual allocations to the contract holders of FWMS capacity.
Do you know who made the decision to utilize the ACR, in this instance, the 1991 ACR, to apply a waste acceptance rate to the APR?
A. I don't know that there was an individual that made that decision.
It was the process basically. The ACR was simply an annual capacity of the system's acceptance, an estimate without regard to which utilities were first, second and so forth, and how much was the first utility going to deliver and so forth, so as this indicates, the capacities listed in the ACR were applied to the priority ranking in the APR.
The result was that you had a priority listing by utility and by fuel quantity in the different years what the estimated acceptance rate would be.
Q. The memo goes on to state at the bottom of the page, the last paragraph, the 1991 ACR differs from the previously published ACRs for two reasons. First, while the information

318

in the ACR has traditionally been used for planning purposes only, the allocations in the 1991 ACR will also serve as the basis for submission of Delivery Commitment Schedules by the contract holders.
Do you know who made the decision to use the allocations in the 1991 ACR as the basis for submission of DCSs by the contract holders?
A. No, I don't.
Q. Do you know whether that decision was authorized by or set forth in the standard contract itself?
MS. HERRMANN: Objection. Calls for a legal conclusion.
Standard contract is the best evidence of its contents.
THE WITNESS: I'm fairly certain that the standard contract doesn't specify a 1991 ACR.
BY MR. TOMASZCZUK:
Q. Does it specify using the allocations in any ACR as the basis for submission of DCSs do you know?
MS. HERRMANN: Same objections.
THE WITNESS: Best of my recollection,

319

it does.
BY MR. TOMASZCZUK:
Q. It does?
A. It does.
Q. Could you identify for me where in the contract you find that language or direction?
A. I could try.
Q. Thank you.
MS. HERRMANN: Could you give him an exhibit number?
MR. TOMASZCZUK: I can -- No. 3, Milner deposition Exhibit No. 3.
(The witness reviewed the document.)
MS. HERRMANN: While he's looking, let me just object again it calls for a legal conclusion, and best evidence.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. If it helps you at all, Mr. Milner, Delivery Commitment Schedules are addressed in Article V. Maybe that's where you're looking, but --
A. Yes, that's where I'm looking.
(The witness reviewed the document.)
THE WITNESS: And I do not see ACRs

320

referenced there.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. Have you finished your answer, Mr. Milner, or do you want more time?
A. Another minute.
Q. Sure.
(The witness reviewed the document.)
MS. HERRMANN: Could we have the question read back just so that I'm clear?
THE REPORTER: Question: "Could you identify for me where in the contract you find that language or direction?"
MS. HERRMANN: If it speeds things up at all, could I refer him to another section?
MR. TOMASZCZUK: Sure.
MS. HERRMANN: Or are we just hunting? Do you want him to hunt?
MR. TOMASZCZUK: No, I don't want him to hunt.
MS. HERRMANN: Okay -- right before Article V.
THE WITNESS: Yes. Actually I was just reading that paragraph 5.
Yes, it references both the ACR and

321

the APR.
BY MR. TOMASZCZUK:
Q. I'm sorry. Where are you referring to now?
A. Immediately above Article V; it's labeled paragraphs 5A and B.
Q. Um-hm. Has a reference to the APR and the ACR?
A. Correct.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. But no tie-in between the DCS and the ACR, right?
MS. HERRMANN: Same objection.
THE WITNESS: The Article V, paragraph B doesn't specifically reference the ACR.
However, the APR might be very useful since it contains no quantities.
BY MR. TOMASZCZUK:
Q. The last sentence on this page states these DCSs which will provide planning information for waste acceptance activities may be submitted to the department as early as January 1, 1992.
Were the DCSs to be contractually

322

binding, or were they for planning purposes?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I'm not actually certain.
BY MR. TOMASZCZUK:
Q. You don't know?
A. I don't know.
Q. Turning the page to reference at the top of this page to the upper and lower bounding waste acceptance rates that we saw in the 1990 ACR, and then the memo goes on to state, quote, although no annual acceptance rate has been baselined, and let me just stop you there, or let me stop myself there.
What do you mean by baselined as that term is used here?
A. Finally approved.
Q. The memo goes on to state the 1991 ACR uses a single acceptance rate that is very similar to the lower bounding rate in the 1990 ACR. While not stated in the ACR, this rate was selected because it is theoretically sufficient to eliminate in the aggregate the need for at-reactor out-of-pool storage starting in 1998.

323

What did you mean by using the term theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in 1998?
A. One of the goals at that point in time, assuming an MRS began operating in 1998, that we would at least accept waste at a rate sufficient to keep a utility from having to build additional dry storage.
Theoretically it refers to all of that as based on projections of spent fuel discharge.
Q. Does theoretically as used here mean mathematically?
A. My understanding of the way it's used here is that theoretically being based on projections of spent fuel discharge was not an exactly calculated number because it's a projection.
Q. Were you familiar with those projected discharge rates?
A. At the time, I would have been, yes.
Q. But you're not familiar with them now?
A. I can't recall what they were at that time, no.
I can't recall what they are right

324

now.
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Exhibit 41 the 1991 -- give me just a minute. I want the 1991 ACR, but I will need a moment.
THE WITNESS: Okay.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: While we're waiting, why don't we go ahead and use the 1991 and have marked the 1991 APR.
This should be marked as Milner 41.
(Milner Exhibit No. 41 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with what has been marked as Milner deposition Exhibit 41, the 1991 APR?
A. In general terms, yes.
Q. Was your office responsible for preparing and issuing this?
A. I believe it was.
Q. And what was the purpose of this document?

325

MS. HERRMANN: Objection -- vague.
THE WITNESS: It was essentially to inform the utilities, inform the utilities of --
BY MR. TOMASZCZUK:
Q. Thank you.
A. Determination as to who would be first, second, third, what the queue would be.
Q. And the discharge data that you were at one time familiar with is contained in this document?
A. These are the actual discharges, yes.
Q. As opposed to projected discharges?
A. Correct.
Q. And how were the projected discharge, how was the projected discharge information compiled by OCRWM or DOE?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: It was compiled from data provided on a form called RW-859 provided by the utilities, individual utilities.
BY MR. TOMASZCZUK:
Q. And on that form, utilities were asked to project their discharge information into the future?

326

A. Yes. They were requested to project discharges.
They were also requested to provide information, actual discharges.
Q. So when you stated in your memo Milner Exhibit 40 that the rate was selected because it is theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in 1998, you were referring to a, an assessment of all the projected discharges for 1998?
A. Well, actually the projected discharges from 1998 and beyond.
Q. And it was, was it simply a, a matter of adding the projected discharges for each year based on the RW-859 forms and then seeing what that totaled?
A. Correct.
Q. And do you recall what the projected discharge information for 1998 was?
A. No, I don't.
MR. TOMASZCZUK: I have now the 1991 ACRs. It's amazing.
Can we mark it as Exhibit 42?
(Milner Exhibit No. 42

327

was marked for identification.)
BY MR. TOMASZCZUK:
Q. Can I direct your attention, Mr. Milner, to page 5 of this document?
This table is the single acceptance rate that's referenced in your memo Milner Exhibit 40?
A. I believe it is.
Q. And do you know who compiled this rate?
A. Specifically, I don't know who, no.
Q. Can you explain for me what the number 400 SNF for 1998 represents as regards your statement in the memo that the rates selected was theoretically sufficient to eliminate the need for additional at-reactor out-of-pool storage?
MS. HERRMANN: Objection -- vague.
THE WITNESS: I would assume that the projection of fuel discharges versus what could be stored in the pool versus what would have had to have been put into dry storage, the amount that would have had to go, projected to be placed in dry storage was less than 400 MTUs.

328

MR. TOMASZCZUK: I'm sorry. Could you read that back?
THE REPORTER: Answer: "I would assume that the projection of fuel discharges versus what could be stored in the pool versus what would have had to have been put into dry storage, the amount that would have had to go, projected to be placed in dry storage was less than 400 MTUs."
BY MR. TOMASZCZUK:
Q. I'm not sure I understood your answer, so let me ask some follow-up.
Are you saying that the 400 figure represents the amount, the amount of spent nuclear fuel considering all the nuclear industry that would have had to have been placed in dry storage in fiscal or in Year 1998?
A. The number would have had to have been less than the 400, yes.
Q. 399 or less?
A. Or less, yes.
Q. So this Table 2.1 assumes that utilities would have been placing fuel in their spent fuel pools, correct?
A. That's correct.

329

Q. And the same question with respect to 1999 -- the number 600 represents the amount of spent nuclear fuel in the aggregate that would have been or would have had to have been placed in dry storage?
A. No. The number would have been less than 600.
Q. 599 or less?
A. I don't recall what the projections were.
Q. Do you know whether this table is based on any assumptions with respect to reracking?
MS. HERRMANN: Objection -- vague.
THE WITNESS: No, I don't know.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Can I ask you to look at the ACR, the summary page, Mr. Milner?
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. The end of the first paragraph indicates that the 1991 ACR applies the waste acceptance rates in Table 2.1 to the 1991 APR,

330

resulting in individual purchaser allocations, right?
A. Correct.
Q. And then further down this paragraph, or in the next paragraph about three quarters of the way down it's stated the annual acceptance rates provide an approximation of the system through-put and are subject to change as the program progresses, correct?
A. Correct.
Q. So that seems to be saying that the rates in the ACR are subject to change?
A. It would seem to say that, yes.
Q. And if that is so, would that not impact the APR?
A. I don't believe it would impact the APR since that was simply a priority ranking.
Q. Well, isn't the 1991 ACR used to develop the allocations in the APR?
A. The allocations I believe to be used for DCS.
Q. Well, I'm sorry. Go back and look at the sentence at the bottom of the first paragraph starting the 1991 ACR applies the waste acceptance rates in Table 2.1 to the 1991

331

APR.
A. Um-hm.
Q. Resulting in individual purchaser allocations -- what do you understand that sentence to be, to mean?
A. I understand that to mean that it takes the, the priority ranking which is contained in the APR and blends that with the capacity rates contained in the ACR to come up with a priority ranking that does have annual capacities by utility.
Q. All right.
A. Annual acceptance rates by utility.
Q. And if the rates in the ACR change, doesn't that necessarily mean that the APR is subject to change also?
MS. HERRMANN: Objection -- asked and answered.
MR. TOMASZCZUK: Well, it's been asked. I'm not sure it's been answered.
THE WITNESS: Priority doesn't change even if the acceptance rate changes.
Utility that's first in line is still first in line even if the rates change.
BY MR. TOMASZCZUK:

332

Q. But the individual allocations for the utilities would change, would they not?
A. Absolutely, yes.
Q. Were you responsible, Mr. Milner, for the development of the instructions for the Delivery Commitment Schedules?
A. I would have been I believe, yes.
Q. And did your office play a role in the review of Delivery Commitment Schedules?
A. It did.
Q. And it was your understanding that beginning in January of 1992, the purchasers, the utilities could submit Delivery Commitment Schedules?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: That was my belief, yes.
BY MR. TOMASZCZUK:
Q. Can I ask you to look at page 4 of the ACR?
And I direct your attention to the second paragraph.
At the end of the second paragraph, the sentence reads, quote, if the current linkages between MRS facility construction and

333

repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007?
A. Correct.
Q. Was that a true statement?
A. That was the best projection at the time, yes.
Q. You believed it to be true?
A. Yes, I did, at that time.
Q. I have to make a quick phone call. Can we take a five-minute break?
Is that okay? Do you want longer? Do you want ten? Want to take a ten-minute break?
A. That sounds good.
Q. Fine.
(A recess was taken.)
MR. TOMASZCZUK: Back on the record.
BY MR. TOMASZCZUK:
Q. Mr. Milner, the rates contained at page 5 of the 1991 ACR, Milner Exhibit 42, those rates are based on use of an MRS, correct?
A. That's correct.
Q. And that MRS, one of the assumptions is that MRS also has placed on it certain

334

statutory linkages or restrictions?
A. That's correct.
Q. At the time that this document was prepared, December 1991, OCRWM had other documents reflecting the design capacity of the geologic repository, is that right?
A. Correct. I believe so.
Q. And those documents reflected a steady-state spent nuclear fuel acceptance schedule of 3,000 MTU?
A. I believe that's correct, yeah.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Could we mark as Milner Exhibit 43 the general instructions issued by the Department of Energy for completing DCS forms?
(Milner Exhibit No. 43 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Are you familiar with these instructions, Mr. Milner?
A. In general terms, yes.
Q. Your office was responsible for

335

preparing them?
A. I believe that is correct.
Q. Do you know who in your office actually did that work?
A. Specifically who prepared it, I don't recall.
Q. Did you review and approve these instructions prior to their issuance?
A. I don't recall having done that, but it's most likely that I did.
Q. The second paragraph of the instructions indicates that the DCS should be submitted by all purchasers with allocations in the 1991 ACR or subsequent ACRs as appropriate, right?
A. Correct.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. And there is a reference to Article V.B of the standard contract after that direction, correct?
A. Correct.
Q. And that's the section that we looked at earlier I believe, right?

336

A. I believe so, yes.
Q. And that's entitled Delivery Commitment Schedule, that section Article V.B?
Does that sound right? If you can get it in front of you, that's fine.
It would be Milner Exhibit 3.
(The witness reviewed the document.)
THE WITNESS: That's correct.
BY MR. TOMASZCZUK:
Q. Okay, but there is, as you previously testified, no reference, at least none that you could identify, to ACRs in Article V.B, right?
A. That's correct.
Q. Were you aware of that fact at the time these instructions were issued?
A. I probably was, yes.
Q. Did you have any discussions with anyone at OCRWM about that?
A. I don't recall that, no.
Q. At or about the time that these instructions were issued and the 1991 ACR was issued, did you have any discussions with any utilities concerning the information contained in those documents?
MS. HERRMANN: Objection -- vague.

337

THE WITNESS: I don't recall specifically.
It's likely I did. It's likely I had discussions with industry representatives.
Whether they were utility representatives or association representatives, I don't know.
BY MR. TOMASZCZUK:
Q. You think it's likely you had such discussions, but you can't recall any of the details about them?
A. That's correct.
MR. TOMASZCZUK: Let's mark as Milner 44 an action memorandum from Mr. Milner requesting approval of the publication of the 1992 APR and 1992 ACR.
(Milner Exhibit No. 44 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Do you recall this memorandum, Mr. Milner?
A. Not specifically, I don't, no.
Q. Do you know who the director of the office of, who the director of OCRWM was at this

338

point in time?
A. I don't recall. I see no date in this.
Q. Well, there are various dates in the approval boxes.
Let me ask you do you think, was Mr. Barrett acting as the OCRWM director as of this point in time.
A. Okay. It appears that he may have been, yes.
This would have been right about the point in time where the political appointee would have departed, so yes, potentially he was the --
Q. There would have been a Presidential election in the fall of '92?
A. Right.
Q. And change of administration would have triggered a new appointment for the position of director of OCRWM?
A. That certainly would have triggered a departure of the previous director.
Oftentimes there were some time delay in a new director coming on board.
Q. That's fair. And Mr. Barrett appears

339

to be signing for this in the right-hand corner of page 2 as RW-1?
A. Okay. And I see the February date, so yes, it was likely he was the acting director at that point.
Q. Okay. So do I understand your testimony that you gave previously to be as of this point in time, the efforts to site an MRS facility were dead?
A. I don't believe that was the case at this point in time.
Q. It was still kicking?
A. I believe so, yes.
Q. And why do you say that?
A. My recollection was that we continued the effort for some period of time after the change of administration, and roughly that was a six-month period, but I don't recall with any precision.
Q. All right. This document reflects that there is no significant difference between the APR published in 1991 and the APR published in 1992.
Do you see that?
A. Yes, I do. That appears to be what is

340

indicated.
Q. But the ACR differs because since it is being published separately from the APR, there is no longer a need for an appendix to the ACR?
A. Yes. That's what it states here.
Q. There is a reference here at the bottom of this memo to purchaser, some purchasers expressing a concern about slippages in the waste acceptance schedule beyond 1998, right?
A. Correct.
Q. As of about this point in time, were you concerned that the utilities might bring litigation against the department for these slippages in the waste acceptance schedule?
A. I was not personally concerned, no.
Q. That issue hadn't come up on your radar screen so to speak?
A. No.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Exhibit 45 a memorandum dated February 23, 1993, from Ronald Milner to Chris

341

Kouts, subject, back-up material for new RW initiatives?
(Milner Exhibit No. 45 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, do you recall this memorandum?
A. I do, yes.
Q. What do you recall about it?
MS. HERRMANN: Objection -- vague.
THE WITNESS: I recall I was out the day it got signed.
At this point in time, and it is indicated in there, the nuclear waste negotiator was not having any success in securing a volunteer site.
The program had begun looking at possible alternatives, things that could be done.
We began looking at the potential for doing a federal siting initiative for a volunteer MRS host location.
I guess that had come about to some extent from interactions with some of the

342

potential interested host locations during nuclear waste negotiator phase, that they may be interested in dealing directly with the federal government.
We began discussing the possibility of federal government rather than the nuclear waste, the Department of Energy actually other than the nuclear waste negotiator attempting to negotiate a volunteer site.
At that time, the department had underway as indicated here a multi-purpose canister program which was attempting to develop a system wherein the, a utility could load fuel in a canister which would then be placed in a storage overpack at the reactor or at a storage facility, federal storage facility.
Could be removed from that storage overpack, placed into a transport overpack, shipped, ultimately placed into a disposal overpack, the idea being you would never have to open it again.
I don't recall what private opportunities refers to, nor the utility compensation initiative, reading further.
BY MR. TOMASZCZUK:

343

Q. Okay. The federal negotiated siting effort that you described, that was separate and distinct from the MRS siting efforts, is that correct?
A. Well, it was, it was aimed at siting an MRS.
It was separate and distinct from the nuclear waste negotiator efforts. Would have been.
I don't -- the Secretary of Energy ultimately never approved that initiative.
Q. The Secretary of Energy did not approve the federal siting initiative that's referenced here?
A. Yes. That's, the best of my recollection, that's correct.
Q. And do you know when that decision was made?
A. No, I don't.
Q. Some time in 1993 do you think?
A. That would be roughly the correct timeframe.
Q. And as of this point in time, it looked like the nuclear waste negotiator was not going to be successful?

344

A. Certainly had not been successful to that point.
Q. Why were you sending this memo to Mr. Kouts?
A. I don't specifically recall. He probably was preparing some information for the director.
Q. What was Mr. Kouts' role at this point in time, do you know?
A. He was a -- I'm not sure what his title would have been, but in essence he would have been a special assistant, program front office, the director's office.
Q. Did the multi-canister initiative bear fruit?
A. In my personal opinion, it did because I think some private efforts picked up on that concept.
It never bore fruit in the sense that I don't believe there is a current package that can do all three -- storage, transport and disposal.
Certainly there are packages that can do storage and transport.
I don't recall which appropriations

345

act, but again, the department was directed to terminate the NPC program.
Q. Was DOE at that time considering compensating for utilities, compensating utilities in the event of a delay in waste acceptance?
MS. HERRMANN: Objection -- foundation.
THE WITNESS: I didn't recall that was the case.
I think the compensation that was referred to here related -- I'm guessing.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. I'm referring to the last page of this memo.
A. Correct.
(The witness reviewed the document.)
THE WITNESS: It would appear that we were.
I certainly recall discussions of providing multi-purpose canisters if they had been developed to utilities as a form of compensation.
BY MR. TOMASZCZUK:

346

Q. All right. That's the second option that was being considered at the time.
The first option was providing direct financial compensation, correct?
A. That's correct. As stated here, yes.
Q. Do you know why DOE was considering these options?
MS. HERRMANN: Objection -- foundation.
(The witness reviewed the document.)
MS. HERRMANN: Speculation.
THE WITNESS: I can only go by what is stated here, which is that the contingency in the event that we did not make the '98 date.
BY MR. TOMASZCZUK:
Q. I presume DOE would not have embarked upon this consideration unless someone had a concern that they weren't going to make 1998?
MS. HERRMANN: Objection -- foundation.
BY MR. TOMASZCZUK:
Q. Is that fair?
MS. HERRMANN: Speculation.
THE WITNESS: I think it's fair to say that prudency required you to do contingency

347

planning.
BY MR. TOMASZCZUK:
Q. You mean you had doubts about making 1998 at this point in time, didn't you?
A. I guess at that point in time, I was becoming concerned that we may not be able to site an MRS, which would then not have permitted a '98 acceptance date.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. It was DOE's position at this time that it did not have an unconditional obligation to accept spent nuclear fuel by January 31, 1998, correct?
MS. HERRMANN: Objection. Mr. Milner is not a 30(b)(6) witness, and calls for a legal conclusion.
THE WITNESS: I believe that that's correct.
BY MR. TOMASZCZUK:
Q. Do you know whether the courts have subsequently rejected that position?
A. I do.
Q. Of DOE?

348

proceedings.)
BY MR. TOMASZCZUK:
Q. In the section on discussion, it's stated in part that the department may have created an expectation that it would begin accepting spent fuel in 1998 through its implementation of the standard contract.
Did you agree with that statement?
A. That we may have created an expectation, yes.
Q. Yes. The text of the discussion section of the memo goes on to state that you, the Secretary of Energy, as I understand it, directed the program to explore with utilities and other interested parties options for offsetting a portion of the financial burden associated with the costs incurred through continued on-site storage resulting from delays in currently projected waste acceptance schedules.
It was well recognized within your office that a delay in meeting the 1998 date would cause the utilities to incur additional nuclear fuel storage costs?
A. That's correct.

353

(There was a pause in the proceedings.)
MR. TOMASZCZUK: Can we mark as Milner Exhibit 47 a Federal Register notice dated May 25th, 1994, published by OCRWM?
(Milner Exhibit No. 47 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Do you recall this notice, Mr. Milner?
A. I do, yes.
Q. Did you draft it?
A. I did not draft it.
Q. Did you review it and approve it as it worked its way through OCRWM?
A. I certainly reviewed it. Approval authority was not mine for this.
Q. In the Federal Register, the second page of the document, the middle column, starting with respect to, do you see that?
A. Yes.
Q. There is a discussion about DOE's efforts to site an MRS, right?
(The witness reviewed the document.)
THE WITNESS: Yes.

354

BY MR. TOMASZCZUK:
Q. And the notice in part says that there is significant challenges associated with siting any facility of this type. Thus far neither the efforts of the department nor any other organization, including the Office of the Nuclear Waste Negotiator, have achieved the level of success needed to realize significant progress in locating and developing a site by 1998, right?
A. Correct.
Q. So it is fair to say that at least as of this point in time, the MRS efforts were, had proven unsuccessful?
A. That's correct.
Q. And there was no reason for optimism that an MRS would be cited by 1998?
A. Well, there could be an operation by 1998 certainly.
Q. It could be?
A. No. I say that there was no reason for optimism that an MRS could be operational by 1998.
Q. And the notice deals with other subjects, but it also addresses the subject of

355

interim storage, right?
A. Correct.
Q. And I gather that interim storage was a concept that was being considered in lieu of an MRS, is that right?
A. An MRS in essence was interim storage.
Q. When you use those two terms, you think of them as being the same thing basically?
A. I do, yes.
Q. Would you like to take a little break?
A. Fine with me.
(A recess was taken.)
MR. TOMASZCZUK: Ms. Reporter, could we have marked as Milner Exhibit 48 a set of briefing charts entitled interim storage options presented by R.A. Milner originally I gather on February 8, 1994, and then revised on March 8, 1994?
(Milner Exhibit No. 48 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, do you recall this document?
A. I do, um-hm.

356

Q. Is this something that you prepared?
A. I don't believe I prepared it, no.
Q. Someone prepared it for you?
A. Yes.
Q. This appears to be a briefing to Mr. Dreyfus, who was then the director of OCRWM?
A. Correct.
Q. Do you know when he assumed the position of director?
A. I don't recall exactly, no.
Q. Summer of 1993 sound about right?
A. That would sound about right somewhere, somewhere, yeah.
Q. Okay. And this was a briefing that you presented to him orally?
A. Correct.
Q. Using an overhead projector?
A. Probably; I don't recall.
Q. Do you -- and the briefing took place on February 8, 1994?
A. Presume it did. I don't recall specifically.
Q. Do you know why, or was it revised then on March 8, 1994?
A. I don't recall.



Q. You don't recall any revisions that were made to the briefing after you gave it initially?
A. Not offhand, I don't, no.
Q. Okay. And the briefing was to address options for interim storage?
A. Correct.
Q. And do you know why you were giving this briefing?
A. My recollection was that I wanted to essentially provide him with information on state-by-state projected discharges, essentially the storage situation at the different reactors, and explore ways on how we might move forward or if we should move forward with interim storage.
Q. The third page of the document contains a listing of topics to be covered?
A. Um-hm.
Q. And there is a summary of issues followed by current status of at-reactor storage?
A. Um-hm.
Q. And then the third bullet, at-reactor storage requirements without MRS in system, and why was that topic being covered at this point



in time?
A. To provide him with information on how much fuel would be in storage at the different reactors if we did not begin accepting an MRS.
Q. So at least as of February of 1994, OCRWM was concerned about the possibility that an MRS might not be sited?
A. We were certainly doing contingency planning for that, yes.
Q. And the fifth bullet states impacts of no MRS?
A. Yes.
Q. Can I get you to look at the summary of issues, next page?
Can you explain the first bullet for me?
A. Besides having lousy grammar, it says that at-reactor dry storage will increase significantly by 2010.
Q. And when you say, there is a phrase be required in 32 states, do you mean that -- what do you mean by that?
A. I think the projection at this time was that there would be reactors in 32 different states that would require some sort of dry



storage by the Year 2010.
Q. Because their spent fuel pools could not handle the anticipated spent nuclear fuel discharges as of that point in time?
A. Correct.
Q. And the next bullet says utilities having to deploy at-reactor storage of spent nuclear fuel will incur significant non-reimbursable costs while still being burdened with the responsibility of maintaining the storage.
True statement at the time you wrote it?
A. Yes.
Q. And then the third issue was Congressional action is necessary to site a federal interim storage facility as soon as possible, correct?
A. Correct.
Q. What type of Congressional action was envisioned?
A. Well, legislation, authorization to federally site it in a storage facility.
Somewhat prior to this, as we had talked earlier, we had begun to explore federal

initiatives for siting an MRS or interim storage facility under the belief that the department had the authority under the current act to do that.
I believe that the department's general counsel subsequently determined that the department did not have that authority, additional legislation was required.
Q. So as of this point in time, a federal interim storage facility could not be sited without Congressional authorization?
A. That was the position of the general counsel I believe.
Q. Did you agree or disagree with that position?
MR. SHULTIS: Objection. Calls for a legal conclusion. Also might be privileged.
So you're asking his opinion of what the general counsel's office told him to do?
MR. TOMASZCZUK: I asked him whether he agreed or disagreed.
MR. SHULTIS: His personal opinion?
MR. TOMASZCZUK: Yes.
MR. SHULTIS: Okay. You can answer.
THE WITNESS: My personal opinion is I

361

agreed with that.
BY MR. TOMASZCZUK:
Q. The document then has a whole series of charts depicting the situation as I understand it in various states, right, with respect to spent nuclear fuel storage?
A. Correct.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Were some states in worse or in worse positions than others with respect to their need for spent nuclear fuel storage facilities?
A. I think some, certainly some reactors were, then were in worse shape than others.
Q. Do you have some recollection here today as to which reactors were in the worst shape so to speak?
A. Well, certainly Oconee had dry storage at the time, or was in the process of planning at least.
I don't recall actually when it went into operation. Oconee was; Surrey Nuclear Power at that time.
Those are two that come to mind at

362

that time.
Q. Is Oconee operated by Duke?
A. Correct.
Q. And Surrey's operated by Virginia Power?
A. Virginia Power.
Q. Can I direct your attention back to page 51 of this document?
This is the identification as I understand it of the consequences, potential consequences of no MRS?
A. Yes.
Q. First is the fuel stays where it is until repository commences operation, currently scheduled for 2010?
A. Correct.
Q. All right. Utilities may sue DOE for failure to perform according to standard contract, no waste acceptance in 1998.
So at least as of this point in time, isn't it true, Mr. Milner, that you were aware of that possibility that utilities could bring suit against the department for its failure to perform according to the standard contract?
MR. SHULTIS: Objection. Calls for

363

speculation.
THE WITNESS: Apparently so.
MR. TOMASZCZUK: I just want to note for the record I don't know what about that question asked the witness to speculate.
MR. SHULTIS: You're asking him to speculate about what utilities would do as far as bringing a lawsuit.
MR. TOMASZCZUK: Can you read the question back?
THE REPORTER: Question: "All right. Utilities may sue DOE for failure to perform according to standard contract, no waste acceptance in 1998.
"So at least as of this point in time, isn't it true, Mr. Milner, that you were aware of that possibility that utilities could bring suit against the department for its failure to perform according to the standard contract?"
BY MR. TOMASZCZUK:
Q. My question, Mr. Milner, was not asking you to speculate as to what the utilities might do.
I was asking about your understanding as to whether at this point in time, there was a

364

risk that utilities would sue DOE for failure to perform according to the standard contract.
MR. SHULTIS: The same objection.
THE WITNESS: In my opinion, there was that possibility.
BY MR. TOMASZCZUK:
Q. All right. That's why you wrote this bullet, right?
A. That's correct.
Q. As risk storage pools are filled, utilities must resort to additional at-reactor storage.
I think that's another consequence?
A. Correct.
Q. This next one, venders provide and continue to develop at-reactor dry storage technology, technologies that may prove incompatible with the repository.
Was that a concern of yours at this time?
A. It was, yes.
Q. Next potential consequence, loss of system flexibility. MRS provides storage buffer preceding repository and allows for truck only reactor sites to ship their fuel.

365

I'm not sure I understand that one. Can you explain it?
A. Storage buffer, I guess I would think of that as almost a surge tank in the system where you're shipping fuel from reactors, from multi-reactors ultimately to a repository which must receive it, repackage it, and place it in a repository, and my opinion, MRS provided a buffer or a surge tank to the system that if something were to occur at the repository that necessitated, for example, slowdown briefly of acceptance, you have a buffer.
Truck only reactor sites refers to some reactor sites that don't have rail capability.
Q. Okay. Next consequence, shutdown reactors must maintain their spent fuel pools or dry storage facilities for a longer time, causing utility costs to increase.
Was that a true statement?
A. I believe so, yes.
Q. Are there costs associated with requiring shutdown reactors to maintain their spent nuclear fuels, spent fuel pools or dry storage facilities for a longer time?

366

A. There are costs associated with that, yes.
Q. Next consequence, reopening of 10 CFR Part 50 license for some sites deploying dry storage may create other licensing problems, resulting in earlier shutdown of reactor.
I'm not sure I understand this potential consequence.
Can you explain it for me?
A. Well, Part 50 license, of course, being the operating, NRC's operating license which it issues to the reactor.
I think that, that at that time, there was some concern that certain instances, and I can't recall the specifics, or particular reactors, but certain instances, there was the potential that Part 50 license might have to be reopened which interventions and so forth could have caused reactor shutdowns.
Q. Yet another page of potential consequences from no MRS, TSLCC, paren, plus utility, close paren, costs increase by about one billion without MRS if repository starts operation in 2010.
Can you explain what was meant by that?
A. I believe that statement was looking at not only the federal costs, but the costs of utility storage, and the estimate at that time was that considering both of those costs, increase was a billion dollars for that delay.
Q. And those costs would increase by about 2.5 billion if the repository did not open until 2020?
A. That's what it states here, yes.
Q. I think I understand the last consequence that's stated here.
Did Mr. Dreyfus have any reaction to these consequences when you presented them to him?
A. The only reaction I seem to recall is that he felt it was unlikely we would get legislation, the authority to site a federal interim storage facility.
Q. Did he explain to you why he felt that way?
A. I don't recall that he did, no.
Q. Did you share his pessimism as to that subject?
A. I did.

368

Q. And then on the following pages, as I understand this document, Mr. Milner, there are options for interim storage which you summarize and then review, is that right?
A. Yes.
Q. And there are, as I understand it, four options which were, which are considered in this paper?
A. Appears to be, yes.
Q. Did you, in making the presentation, favor one option over the others?
A. I don't recall that I did, no.
Q. There is a chart entitled summary of analysis at page 57.
Do you see that?
A. Yes.
Q. And the first option, at-reactor storage, right?
A. Correct.
Q. And in the cost column, it appears to indicate that this would have the highest total system life cycle cost?
A. It does.
Q. Of the four options, this would be the most expensive?

369

A. Yes, according to this.
Q. Second bullet under that column says no benefit payments.
Do you know what that refers to?
A. I believe there is either a provision in the act, or I can't be certain that it's in the act, but there certainly was discussion on the part of Congress that the government might provide benefit payments to an entity that signed an agreement to host the repository site, and I believe the same is true for an MRS in differing amounts.
Q. If you found a volunteer so to speak, then the, there might be payments that would have to be made to that volunteer?
A. Correct. Correct.
Q. And indeed volunteer is the next option that's identified.
Is that the, the MRS system that we have been discussing in some of the previous documents.
A. Yes, I believe so.
Q. And then the third option is federal, and that is the federal interim storage option?
A. I believe so, yeah.

370

Q. Which I believe you indicated in your testimony a few moments ago that concluded that would require legislation?
A. Correct.
Q. Last then, the last storage option is Congressionally directed, and I'm not sure I understand this option.
What was meant by that?
A. I think that the thought there was the Congress simply designated a site.
Q. Of these options, the lowest cost that would also require legislation?
A. Yes.
Q. I suppose that's implicit in the term Congressionally directed?
A. True.
Q. And then you list assumptions. Then you go through each of these options I gather in a little more detail.
Look at the page 59, please.
A. Um-hm.
Q. And this option is at-reactor/ISFSI sites.
I mean this option is basically where we are today, is it not?

371

A. That's correct.
Q. Now MRS in-system utilities are responsible for spent fuel storage. Fuel could be stored on site, transshipped or private ISFSIs developed to meet needs. May or may not include compensation.
Costs, lower NWF, I presume that's nuclear waste fund?
A. Correct.
Q. Costs since the MRS is not built and no benefit payments are made, utilities will optimize individual solutions to minimize their costs. Compensation will increase nuclear waste fund costs.
And by that, I presume you meant compensation to the utilities?
A. Correct.
Q. Longer at-reactor storage time results in high TSLCC.
And it is true, is it not, Mr. Milner, that longer at-reactor storage time results in high TSLCC?
A. I believe it does, yes.
Q. Continuing on to the next page, page 60, schedule, it states here that this scenario

372

is the default case.
What was meant by that?
A. Default case, if none of the other options were viable, that was the default. That was essentially a no federal action case.
Q. All right. And that's sort of where we are today, right?
A. That's correct.
Q. And then institutional, continued at-reactor storage will lead to local and state discontent.
Were you aware of such discontent at or about this time?
A. I think at about that time, there was the beginnings of some concern on the parts of states and local governments of not removing the spent fuel, in addition to the utilities' concerns.
Q. However, at-reactor storage eliminates MRS siting problems. At-reactor storage could be contested, resulting in inability to move spent fuel from reactor pool, eventually causing early reactor shutdown.
At this time, were you concerned that the inability to move spent fuel from the

373

reactor pool might cause some reactors to shut down early.
A. Yes.
Q. Is that still a concern today?
A. No.
Q. Why not?
A. Reactors seem to have been able to get licenses or license amendments to construct dry storage, and it has not seemed to be as problematic as was feared at the time.
Q. Do you know whether that's true in Minnesota?
A. There are exceptions.
Q. Failure of DOE to perform according to standard contract may lead to litigation after 1998.
And that was a concern of yours at this time, right?
A. Yes.
Q. Did you discuss that concern about DOE's failure to perform might lead to litigation with others at OCRWM?
A. Not that I specifically recall.
Q. Did Mr. Dreyfus have any reaction to that statement when you presented it in February

374

of '94?
A. Very general terms, I think he thought that almost anything could lead to litigation at any time.
Q. And then finally, compensation to utilities for at-reactor storage may make this option more acceptable.
Was that discussed at this briefing in February of '94?
A. I believe it was.
Q. Do you know what was said about that?
A. Other than the statement, no, I don't recall.
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Deposition Exhibit 49 a memorandum dated November 28, 1994, from Ron Milner, subject, draft TSLCC assumption package?
And I omitted 1995 draft TSLCC 1995 assumption package.
(Milner Exhibit No. 49 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, do you recall this document?

375

A. In general terms, I do, yes.
Q. Okay. Now you have signed this cover memo as the acting director, Office of Program Management and Integration, right?
A. Correct.
Q. So as of this point in time, you left the position of director of Office of Storage and Transportation?
A. That's correct.
Q. And as acting director of this office, you're then back involved in the TSLCC review, editing and approval process I gather?
A. That's correct.
Q. And I'm sure you were delighted to be back in it!
A. Absolutely.
Q. Do you know, Mr. Milner, whose handwriting appears on this first page of Milner 49?
A. No, I don't.
Q. It's not your writing?
A. It's not my writing, no.
Q. Except for the signature, it's not your writing?
A. Except for the signature, except for

376

the signature.
Q. Did Carl Connor and George Reiling work for you?
A. They did at this point in time, yes.
Q. They were assigned to the Office of Program Management and Integration?
A. I believe that's correct, yeah.
Q. Can I ask you, Mr. Milner, to look at page 14 of the document?
And the table at page 14 appears to reflect a delivery spent nuclear fuel ramp-up rate?
A. It does.
Q. And it appears to show an initial receipt of spent nuclear fuel at a rate of 300 metric tons?
A. That's correct.
Q. And then ramps up to 3,000 metric tons in the fifth year of operation?
A. That's what is indicated, yes.
Q. And as of this point in time, there was still a second repository on the table being considered?
A. There was a possibility of a second repository.

377

One was not actively under consideration.
Q. All right. The reason I asked the question is because Section 6.2 on the following page has ramp-up rates for a second repository?
A. Yes.
Q. And then finally, we have Section 6.3, which is the repository in a single repository system, and a listing of waste acceptance ramp-up rates in that table, right?
A. Correct.
Q. And that table shows a, an initial acceptance rate of 300 metric tons and then ramping up to 3,000 metric tons in 2014, correct?
A. Correct.
Q. And then staying at that steady-state 3,000 metric ton rate for a period of 25 years?
A. Correct.
Q. Am I correct in understanding that at least as of November of '94, if not sooner, the MRS siting effort was dead?
A. We no longer assumed an MRS in the system, that's true, and for all intents and purposes, yes, it was dead.

378

Q. Give me just one second.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Am I correct in understanding, Mr. Milner, that you were circulating this draft assumptions package to the various recipients of your memo to ensure that those affected offices within OCRWM would have the chance to review the data and concur in it?
A. Correct.
Q. And you were doing that, among other reasons, for purposes of trying to develop consistency in the OCRWM documents?
A. Correct.
Q. Do you recall whether any of the recipients of the memo provided comments to you or your office on --
A. I don't recall, no.
Q. Now these ramp-up rates are substantially different from those in the 1991 ACR, is that right?
A. They are different, yes.
Q. So at least insofar as the ACR was concerned, and the other documents, they were

379

using different rates?
A. I thought you referenced the 1991.
Q. Yes, I did. I'm sorry.
A. Yeah, the rate was different in this 1994 assumption than it was in the 1991 ACR.
Q. The rates in the 1991 ACR assumed an MRS, right?
A. I believe it did.
Q. And these rates do not?
A. Correct.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner Deposition Exhibit 50 the Civilian Radioactive Waste Management Program Plan, Volume 1, Program Overview?
The date is December 19th, 1994. You have to go to the second page to tell that.
(Milner Exhibit No. 50 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with this document?
A. I am.
Q. Did you have a role to play in its preparation?

380

Q. Is he still with the department?
A. No, he is not.
Q. Is he retired?
A. Yes, he has.
Q. Do you know where he is today?
A. I believe he lives in Springfield, Virginia.
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Exhibit 51 the March 1995 APR ACR?
(Milner Exhibit No. 51 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Are you familiar with this document, Mr. Milner?
A. In general terms, yes.
Q. Did your office prepare the document?
A. It did not.
Q. Do you know which office within OCRWM did prepare it?
A. I believe this was still being prepared at that time in the Office of Storage and Transportation.
Q. So Mister, this would have been Mr.

389

Shelor's office that prepared it?
A. I believe so.
Q. Now at some point in time, you came back to that office, that is, the Office of Waste Acceptance, Storage and Transportation, is that right?
A. That's correct.
Q. But that would have been after this APR/ACR was published?
A. I believe it was.
Q. Notwithstanding the fact that your office didn't publish this, did you have occasion to review this and sign off on it before it was published?
A. I don't recall specifically, but it's likely that I would have concurred in it.
Q. Can I ask you to look at page 1 of the document? And the second paragraph is what I'm going to ask you a few questions about.
There is a reference to the APR and the ACR?
A. Um-hm.
Q. And then there is a sentence in the middle of the paragraph which states the ACR applies projected nominal acceptance rates for

390

the system to the priority ranking and the APR, resulting in individual allocations for the owners and generators expressed in metric tons of uranium.
Do you have an understanding of what is meant by the phrase nominal acceptance rates in that sentence.
A. No. I don't know.
Q. Did you have any discussions with any OCRWM employees concerning what was meant by that phrase nominal acceptance rates?
A. Not that I recall.
Q. The last sentence of this paragraph states as specified in the standard contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers, right?
That's what it says?
A. That's correct.
Q. Did I understand your testimony earlier, Mr. Milner, to be that the DCSs represented a binding commitment of the parties?
A. That was my opinion, yes.
Q. And the DCSs as indicated by this paragraph, are based on the capacity allocations

391

as listed in the ACR, right?
A. Correct.
Q. Can you explain to me how it is that if the ACRs which form the basis for the DCSs are not binding, that the DCSs are binding?
MR. SHULTIS: Objection. Calls for a legal opinion.
THE WITNESS: The DCSs were submitted by the utilities to the department based upon the information in the ACR, the allocations.
Then the department would either approve or disapprove those, and if approved, then in my opinion, that became a binding agreement.
A utility could certainly choose to submit a DCS which reflected lower amounts than were contained in the ACR.
BY MR. TOMASZCZUK:
Q. Is there any reason of which you're aware why a utility would do that?
A. None that I know of.
Q. Wouldn't it be in the utility's interest to try and put as much fuel as they could in the DCS to get that fuel moved off site?

392

MR. SHULTIS: Calls for speculation.
THE WITNESS: If I were a utility fuel manager, I would have.
BY MR. TOMASZCZUK:
Q. Can I ask you to look back at the DCS instructions?
We looked at those this afternoon -- 43.
And in particular, I was going to ask you to look at, Mr. Milner, paragraph 7C.
(The witness reviewed the document.)
BY MR. TOMASZCZUK:
Q. And this paragraph reflects in the first sentence that the rates in the ACR provide an approximation and are for planning purposes, right?
A. Correct.
Q. And then the next sentence, there is an assumption stated that the waste management system will begin acceptance of spent nuclear fuel in 1998, correct?
A. Correct.
Q. And then there is this third sentence in the event that such circumstances change, all DCSs previously approved by DOE may need to be

393

re-evaluated by DOE and the purchasers.
What was meant by that?
MR. SHULTIS: Objection. Calls for speculation.
THE WITNESS: Well, the program and the department position had always been that acceptance of spent fuel was conditioned upon having the facility available to accept it, and if those conditions changed, DCSs would have to be re-evaluated in terms of start of acceptance.
BY MR. TOMASZCZUK:
Q. So if circumstances changed, the DCSs wouldn't be binding?
MR. SHULTIS: Objection. Calls for a legal conclusion.
THE WITNESS: If there was no facility available to accept the fuel in 1998, which ultimately there was not, then yes, they would have to be re-evaluated.
BY MR. TOMASZCZUK:
Q. Do you know whether the Delivery Commitment Schedules once approved were subject to adjustment plus or minus 20 percent in final delivery schedules?
A. I don't recall that. I simply don't

394

know.
Q. Does that sound correct or incorrect to you?
A. I have no recollection of a 20 percent.
BY MR. TOMASZCZUK:
Q. Are you looking at the contract?
A. Yes, I am.
Q. If you would direct your attention to Article V.B.2?
A. Okay -- 20 percent.
Q. It seems to indicate that the quantities of spent nuclear fuel and high-level waste can be adjusted plus or minus 20 percent, right?
A. That does say that, yes.
Q. So the DCSs could change if circumstances changed, right?
A. That's correct.
Q. And they, and the amounts of fuel in the DCSs could be adjusted plus or minus 20 percent per the contract?
MR. SHULTIS: Objection. Calls for a legal conclusion unless you're just asking him to read the contract.

395

BY MR. TOMASZCZUK:
Q. I'll delete the reference to the contract in my question.
The DCS spent nuclear fuel information could be adjusted plus or minus 20 percent, right.
A. This is what I read in the contract, that's correct.
Q. Fine. Mr. Milner, were you surprised to see that reference in the contract?
A. That I did not recall it, yes.
Q. Does it change your view about the binding commitment reflected in the DCS?
MR. SHULTIS: Objection. Calls for a legal conclusion.
THE WITNESS: I guess in my interpretation of a commitment, not necessarily.
I think my interpretation of the delivery commitment was that it was a best estimate, good-faith commitment on the quantity and timing, and as I read this, neither the department nor the purchaser -- well, okay -- just the purchaser can adjust it up or down, so it's his option.
I guess I would interpret that to mean

396

it's less binding on the utility than it was on the department.
BY MR. TOMASZCZUK:
Q. There is a discussion, Mr. Milner, at the second page of the '95 APR and ACR which I want to direct your attention to.
And in particular, ask you to look at the paragraph that begins at the bottom of page 2, and it would appear to suggest that there was a delay in issuing the '93 ACR and APR, right?
A. Apparently so.
Q. And were you, do you have any knowledge as to why that '93 ACR and APR was delayed?
A. No, I don't.
Q. But in any event, the text goes on to indicate that that information was, is combined with this '95 APR/ACR, right?
A. That's correct.
Q. And it goes on to state that the department has decided to, in the interests of easing its administrative burdens, it has decided to issue a consolidated APR/ACR report for '94 and subsequent years?
A. Correct.

397

Q. And do you know, Mr. Milner, whether this was the, this document that has been marked as Milner Exhibit 51 was the last APR/ACR issued by the department?
A. I believe it was.
Q. Do you know why no APRs/ACRs have been issued after March of '95?
A. I don't offhand recall, no. I would presume nothing has changed, so it wasn't reissued.
Q. Now as of, certainly as of this point in time, March of '95, the department's efforts to site an MRS had stopped, right?
A. Basically, yes.
Q. Do you know whether the acceptance rates reflected in Table 1 at page 4 of this document assume an MRS or not?
A. I believe they do not.
Q. And what is the basis for that belief?
A. Just my general recollection at the time that we did not assume an MRS facility in the system.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:

398

Q. These rates are identical, are they not, to those contained at Table 2.1 in the 1991 ACR?
MR. SHULTIS: What exhibit is that?
MR. TOMASZCZUK: Exhibit 42.
(The witness reviewed the document.)
THE WITNESS: I'm sorry. What was the table number?
BY MR. TOMASZCZUK:
Q. The Table 2.1 in the '91 ACR at page 5.
A. Okay.
(The witness reviewed the document.)
THE WITNESS: Yes, they are the same.
BY MR. TOMASZCZUK:
Q. And indeed the text under Section 1.2 at page 3 of the '95 ACR/APR?
A. I'm sorry. Page what?
Q. Page 3, I'm at page 3 of Milner Exhibit 51, under Section 1.2.
A. Um-hm.
Q. And it says in the previous ACR in pertinent part the projected nominal acceptance rate was based on the assumption of SNF acceptance beginning in 1998 at a monitored

399

retrievable storage facility prior to repository operations?
A. Correct.
Q. So they're saying the previous ACR had the rates based on an MRS, right?
A. That's correct.
Q. And the next sentence goes on to say due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by years of operation of the system rather than by specific calendar years.
And we can see that if you compare the '91 ACR with the '95 ACR?
A. Correct.
Q. Right?
A. Correct.
Q. But isn't it true, Mr. Milner, that the '95 APR/ACR continued the practice of the previous ACR indeed going back to 1991 of basing a rate with an assumption that an MRS would be operating prior to repository operations?
MR. SHULTIS: Objection -- asked and answered.

400

THE WITNESS: I don't know if the rates are the same, but I'm not sure what the question really is.

MR. TOMASZCZUK: Can you read my question back?

THE REPORTER: Question: "But isn't it true, Mr. Milner, that the '95 APR/ACR continued the practice of the previous ACR indeed going back to 1991 of basing a rate with an assumption that an MRS would be operating prior to repository operations?"

MR. SHULTIS: Same objection; the document speaks for itself.

THE WITNESS: The rates are the same. The '95 document does not assume an MRS in the system.

MR. TOMASZCZUK: I'm sorry. Could you read that back for me?

THE REPORTER: Answer: "The rates are the same. The '95 document does not assume an MRS in the system."

BY MR. TOMASZCZUK:

Q. Can I direct your attention to the text at the top of page 4 of the '95 ACR/APR?

A. I stand corrected. It appears that it



does.

Q. It appears that these rates are based on the existence of an MRS?

A. Apparently so.

MR. TOMASZCZUK: It's 6:20.

(Whereupon, at 6:20 p.m., the deposition was recessed, to reconvene at 9:00 a.m. May 3, 2002.)

---------------------------

RONALD A. MILNER

SUBSCRIBED AND SWORN to before me this----------

day of-------------------------------, 20------.

---------------------------

NOTARY PUBLIC

My commission expires:



CERTIFICATE OF NOTARY PUBLIC

I, Catherine S. Boyd, the Notary Public before whom the proceeding occurred, pages through , do hereby certify that the witness was duly sworn, that the testimony of said witness was taken by me and thereafter reduced to this typewritten transcript under my supervision, that said transcript is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to this proceeding, and further, that I am not a relative or an employee of any attorney or counsel employed by the parties thereto, or financially or otherwise interested in the outcome of the proceeding, or any action involved therewith.

Witness my signature and seal:

CATHERINE S. BOYD
Notary Public in and for
The Commonwealth of Virginia

My commission expires:
February 28, 2006

404

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY, : (98-126C)
CONNECTICUT YANKEE ATOMIC POWER COMPANY : (98-154(
MAINE YANKEE ATOMIC POWER COMPANY : (98-474C)
FLORIDA POWER & LIGHT COMPANY : (98-483C)
NORTHERN STATES POWER COMPANY : (98-484C)
DUKE POWER, A Division of DUKE : ENERGY CORP. (98-48
INDIANA MICHIGAN POWER COMPANY : (98-486C)
SACRAMENTO MUNICIPAL UTILITY DISTRICT : (98-488C)
SOUTHERN NUCLEAR OPERATING COMPANY, : et al., (98-61
COMMONWEALTH EDISON COMPANY : (98-621C)
BOSTON EDISON COMPANY : (99-447C)
GPU NUCLEAR, INCORPORATED : (00-440C)
WISCONSIN ELECTRIC POWER COMPANY, : (00-697C)
POWER AUTHORITY OF THE STATE OF : NEW YORK (00-7
OMAHA PUBLIC POWER DISTRICT : (01-115C)
NEBRASKA PUBLIC POWER DISTRICT : (01-116C)
TENNESSEE VALLEY AUTHORITY : (01-249C)
Plaintiffs, : v. :
UNITED STATES OF AMERICA, : Defendant. :
- - - - - - - - - - - - - - - - - - - - X Washington, D.C.
Friday, May 3, 2002

Continued Deposition of RONALD MILNER, a witness herein, called for examination by counsel for



Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, 1650 Tysons Boulevard, McLean, Virginia, at 9:15 a.m., Friday, May 3, 2002, and the proceedings being taken down by Stenotype by CYNTHIA R. SIMMONS, RMR, CRR, and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority of the State of New York, Omaha Public Power District, and Nebraska Public Power District:

ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7940

On behalf of the Plaintiffs Yankee Atomic, Maine Yankee and Connecticut Yankee:

PETER SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Ninth Floor
Washington, D. C. 20005-3305
(202) 898-5821



APPEARANCES (Continued):

On behalf of the Plaintiff Wisconsin Electric Power Company:

DONALD J. CARNEY, ESQ.
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D. C. 20005-2011
(202) 434-1690

On behalf of the Plaintiff Southern Nuclear Power:

RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5160

On behalf of the Plaintiff Sacramento Municipal Utility District:

DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

APPEARANCES (Continued):

On behalf of the Plaintiff Commonwealth Edison Company:
CHRISTOPHER P. TOMPKINS, ESQ.
Jenner & Block, LLP
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of the Defendant:
RUSSELL A. SHULTIS, ESQ.
HEIDE L. HERRMANN, ESQ.
United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D. C. 20530
(202) 305-7561



C O N T E N T S

WITNESS: RONALD MILNER

EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, ET AL.
By Mr. Tomaszczuk 410

EXAMINATION BY COUNSEL FOR PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT
By Mr. Neslin 415

EXAMINATION BY COUNSEL FOR PLAINTIFF COMMONWEALTH EDISON
Mr. Tompkins 524

Afternoon Session - Page 524

E X H I B I T S

| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| 52 | 427 |
| 53 | 440 |
| 54 | 449 |
| 55 | 455 |
| 56 | 460 |
| 57 | 470 |



E X H I B I T S (Continued)

| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| 58 | 472 |
| 59 | 477 |
| 60 | 480 |
| 61 | 491 |
| 62 | 497 |
| 63 | 505 |
| 64 | 510 |
| 65 | 515 |
| 66 | 526 |
| 67 | 530 |
| 68 | 532 |
| 69 | 535 |
| 70 | 541 |
| 71 | 548 |
| 72 | 552 |
| 73 | 570 |
| 74 | 577 |

* All exhibits retained by counsel.



P R O C E E D I N G S

Whereupon,
RONALD MILNER,
was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified further as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, ET AL.
BY MR. TOMASZCZUK:

Q. Mr. Milner, good morning.
A. Good morning.
Q. Same ground rules as applied to the previous day's deposition.
A. Correct. Okay.
Q. And I have just a few follow-up questions on the document that we were reviewing yesterday, the 1995 APR/ACR and I intend to ask you those questions and then I'm going to adjourn my questions and allow one of the other counsel, two of the other counsel who have travel commitments later today to proceed with their questions of you. And then after they've completed their questioning, then I will pick back up again and try and finish your deposition.
And because that is a slight variant from the procedures in the case, I would just ask counsel

for the government to indicate their consent to that, and let me also add that we appreciate the courtesy in that slight variant from the standard procedures.
MR. SHULTIS: You're very welcome and we have no problem with the change in the procedures.
BY MR. TOMASZCZUK:
Q. Mr. Milner, you recall, we had the March 1995, APR, ACR out late in the day yesterday?
A. I do.
Q. And if I could direct your attention to page 4 in the document. This is the table with the projected acceptance rate for spent nuclear fuel?
A. Correct.
Q. Do you know what that term nominal means in the title of this table?
A. I don't know for certain. I believe nominal refers to, in essence the number being a rounded number. You would intend to pick up a cask load from a particular utility rather than one assembly or two assemblies perhaps. You could easily, with that kind of a philosophy, end up with an odd number, 401.2 kind of number. So I think that nominal refers to simply a rounded number. I'm not certain of that but that's my understanding.
Q. This -- I'm sorry. Were you finished with

411

your answer?
A. Yes.
Q. This table as I understood your testimony yesterday reflects the, and adopts the MRS capacity limits, correct?
A. I believe it does, yes.
Q. And those MRS capacity limits are essentially imposed on the geologic repository here, is that right?
MR. SHULTIS: Objection as to characterization.
THE WITNESS: I can't answer -- I don't know.
BY MR. TOMASZCZUK:
Q. I mean, we know as of this point in time there was no MRS in the works, correct?
A. I believe we had determined yesterday that this particular APR ACR did assume an MRS.
Q. But did we also not determine that as of this point in time all work at DOE on an MRS siting had stopped?
A. That's correct.
Q. And isn't it true that as of this point in time the only work for a spent nuclear fuel storage facility was for a geologic repository?

412

A. On the part of the government -- on the part of DOE, that's correct.
Q. So doesn't this document reflect DOE's decision to impose the MRS capacity limits on its plans for a geologic repository?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I don't know.
BY MR. TOMASZCZUK:
Q. You don't know?
A. I don't know.
Q. Does that seem a fair inference from reading the document and understanding what was happening at the time?
MR. SHULTIS: Same objection.
THE WITNESS: To the best of my recollection there were discussions on pending legislation occurring at this time in the Congress relative to interim storage and I think this document attempted to reflect a potential for interim storage facility.
BY MR. TOMASZCZUK:
Q. An interim storage facility as reflected in your testimony yesterday would have required legislation as I understood it, right?

413

A. Correct.
Q. Do you know whether this document refers to such interim storage anywhere?
A. Well, if I recall correctly you had pointed me to some language that indicated it did. I believe that's page 3 and the top of page 4.
Q. And I'm sorry, what language were you referring to there, Mr. Milner? I didn't see a reference to interim storage but maybe I'm missing it.
A. I think the reference cites monitored retrievable storage.
Q. And in your view those concepts were the same, interim and monitored retrieval storage?
A. Yes.
Q. But interim storage would have required additional legislation whereas there was already legislation on the books with respect to an MRS, correct?
A. To site an MRS facility would have required additional legislation if it were to be sited prior to site approval of a repository.
Q. That would have required an amendment to the Nuclear Waste Policy Act amendments?
A. Correct.

414

A. No.
Q. I thought that you testified that you also considered the potential for brokering exchanges between utilities?
A. Yeah, as a concept, yes.
Q. What do you mean, what do you mean by as a concept?
A. We were -- well, looking at the concept of was it appropriate for the Department to do that sort of thing.
Q. What was your opinion?
A. My personal opinion was that it potentially could serve a useful purpose if the utilities desired such an activity.
Q. And what do you mean by useful purpose, what would that purpose be?
A. Well, certainly one purpose could have been if one utility that was needing to build a dry storage that was farther down in the queue, and another utility that had a higher priority that either didn't at that particular time or perhaps even life of plant storage, which I don't recall anybody was that high in the queue that they had life of plant, but you could preclude the need for constructing dry storage if such an exchange were

447

made.
Q. And that would be beneficial to the utilities?
A. Certainly to the utility that would have had to build the dry storage.
Q. Would it also be beneficial to the program?
A. Not necessarily, no.
Q. When you refer to brokering, what do you mean by that?
A. If we had done comparisons and saw a situation where, as I just described, that occurred, I guess one concept might have been that we would contacted both utilities and inquired as to their interest in exchange and trying to bring it about.
Q. Was this concept memorialized or documented in any way?
A. Not that I recall, no.
Q. Do you recall any documents discussing how this brokering might work?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: Not that I recall other than what we just looked at.
BY MR. NESLIN:

448

Q. Do you recall discussing this brokering concept with anyone else at DOE?
A. Not specifically. I probably discussed it with members of my staff.
Q. The same members of your staff that you identified previously?
A. Yes, including them.
(Milner Exhibit No. 54 was marked for identification.)
BY MR. NESLIN:
Q. Mr. Milner, you've been handed Exhibit 54 which is a March 31st, 1994 letter from James Blandford to you and an attachment consisting of a preliminary draft of a document entitled, DCS Exchange Review Criteria, First Set of Time Phased Review Criteria.
Are you familiar with this document?
A. I don't specifically recall it.
Q. Do you recall it generally?
MR. SHULTIS: Asked and answered.
THE WITNESS: No.
BY MR. NESLIN:
Q. Who was Mr. Blandford?
A. My recollection was that he was Mr. Vawter's predecessor in that position at the M&O.

449

Q. So he would have been your primary contact at the M&O?
A. Correct.
Q. You would have communicated with Mr. Blandford?
A. Correct.
Q. And do you know what Mr. Blandford's doing now?
A. I have no idea.
Q. Do you know where he is located today?
A. No, not at all.
Q. You see the first sentence of the letter states, The attached draft report presents the first set of time phased DCS exchange review criteria to be used by the Department and its contractors in reviewing DCS exchange requests submitted by purchasers.
Do you know, were such exchange review criteria ever adopted by the Department?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I don't recall them being adopted, no.
BY MR. NESLIN:
Q. Do you recall work being done by the

450

of spent fuel from other sites?
A. I believe it would. If over some period of time the Department were to -- according to the priority ranking, the ACR of 1995, since that combined both, one utility would expect to have X number of MTUs removed from their reactor within some specified time period. So if a portion of that allocation was given to another reactor, it would not be as timely.
Q. But would a portion of that allocation have to be given to another reactor if in fact the receipt rate exceeded the discharge rate?
A. Certainly.
Q. Why do you say that?
A. Any time there's a finite amount of fuel being accepted, and that finite amount of fuel is allocated amongst the utilities in the queue, whatever that number may be, if you reallocate that, a portion of that, to other utilities farther down in the queue, you're certainly impacting that.
Q. Would you disagree with criterion 3 here that granting priority can be shown to avoid the establishment of an otherwise unneeded reactor site storage facility?
A. I don't completely agree with that.



Q. And how do you disagree with it?
A. If a reactor is shutting down, presumably it has all of its spent fuel stored on site either in the pool or dry storage or a combination thereof. That storage exists when the reactor shuts down. Since no more fuel is being generated by the reactor I'm not sure what additional storage would be established.
Q. Would you agree that it would avoid the need to continue an otherwise unneeded reactor site storage facility?
A. I would.
Q. And the next item states that granting priority can be shown to be clearly cost effective for consumers from the standpoint of timely decommissioning?
A. I would agree with that.
Q. And the last item is that granting priority can be shown to support the national policy of efficient operation of the country's waste management system.
A. I can neither agree or disagree with that. I'm not quite sure what that means.
Q. You don't understand --
A. Correct.



Q. -- the criteria?
A. Correct.
Q. Do you know whether you or Mr. Barrett responded to this letter by Mr. Grube?
A. I don't recall for certain, I don't believe we did.
Q. Do you know whether the Department has ever adopted any criteria for making decisions on shutdown reactors?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I don't recall. I don't believe.
BY MR. NESLIN:
Q. You're not aware of it?
MR. SHULTIS: Same objection.
THE WITNESS: I'm not aware of it, no.
BY MR. NESLIN:
Q. Do you believe you would have been aware of it if such criteria had been developed?
A. I think I would have.
(Milner Exhibit No. 62 was marked for identification.)
BY MR. NESLIN:
Q. Mr. Milner, Exhibit 62 is a letter from



you to Dr. Andrew Kadak dated June 16th, 1994. Are you familiar with this letter?
A. I vaguely remember this letter, yes.
Q. Did you draft this letter?
A. I don't believe I did.
Q. But you would have reviewed and approved it?
A. Certainly.
Q. And the purpose of this letter was to respond to certain questions that Yankee Atomic had raised with the Department?
A. Apparently so, yes.
Q. Is that your recollection?
A. Yes.
Q. In the second paragraph of the first page, the first sentence reads that, "In designing the waste management system, the Department and the nuclear utilities share mutual goals of initiating federal acceptance of spent nuclear fuel as soon as possible and accommodating economic and physical situations confronting utilities such as yours."
What did you mean by mutual goals of initiating federal acceptance of spent nuclear fuel as soon as possible?
A. I think both the Federal Government, the

program and the utilities had a goal of taking fuel off the sites as soon as possible, to begin to take fuel off the sites as soon as possible.
Q. And what did you mean by accommodating economic and physical situations confronting utilities such as yours?
A. I think there was a goal to at least mitigate the economic situation relative to cost of storage, but I don't know what physical situation meant.
Q. What was meant by utilities such as yours? Were you referring to shutdown, utilities with shutdown reactors?
A. I don't recall. Likely that would have been the case.
Q. So you've testified that Department had an interest in mitigating the economic situation confronting such utilities. What do you mean by mitigating the economic situation for them?
A. Well, I don't know that -- hypothetically I don't know whether the condition of the economic situation could be totally alleviated, but potentially at least you could mitigate it.
Q. How?
A. Well, I guess one example I might think of

499

was that the Department entered into a cooperative program with the Rancho Seco reactor to demonstrate dry storage on site and assist that utility in off-loading at least a portion of its pool and storing it in multi-purpose canisters or what was hoped to be multi-purpose canisters on site. Potentially allowing the utility to decommission the pool.
Q. And how did the Department cooperate with Rancho Seco?
A. Providing funding.
Q. Do you recall what portion of the funding was provided for that project?
A. I don't recall. I believe the Department paid for two or three of the storage canisters and casks but I don't recall.
Q. And you say this would potentially allow the utility to decommission the fuel on site?
A. If you stored enough of the fuel, yeah.
Q. Was that an objective the Department had?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I think the Department desired to mitigate to the extent we could, you know.
BY MR. NESLIN:

500

Q. By mitigate do you mean allow timely decommissioning of these pools to the extent you could?
A. If that were possible, yes. I believe the Department was given specific authority to do that for SMUD. I believe the opinion of the Department's counsel was we did not have the authority to do that on a general basis.
Q. When you say the Department was given authority, what do you mean by that?
A. Legislation.
MR. SHULTIS: Objection, calls for a legal conclusion.
BY MR. NESLIN:
Q. You used the Rancho Seco as an example of how the Department might mitigate these effects, are there other examples that comes to mind here?
A. That was the only example because that one we were given authority to do.
Q. If I could ask you to turn to the first page of the attachment, Mr. Milner.
You see at the bottom half of this page, the top of the following page, you respond to a question which asks how are you going to grant priority acceptance of spent fuel from permanently

501

shutdown plants as permitted in our contract? Could you review what your response was?
A. Sure.
Q. Mr. Milner, the end of this response notes that article Roman V.E of the standard contract includes a provision allowing utilities to adjust their positions in the acceptance queue by exchanging acceptance allocations among themselves?
A. That's correct.
Q. And it then goes on to say that, "The Department encourages Yankee Atomic Electric Company to exercise their contractual right to exchange allocations with other interactive utilities." What did you mean by that?
A. What it says. We encouraged the Yankee Rowe or Yankee Atomic to exercise their rights under contract to enter into an exchange agreement with another utility.
Q. That was something that could address the problems facing a shutdown reactor?
A. Certainly.
Q. That by exchanging their place in the queue they could move up in the queue through the exchange provision?
A. Correct.

502

to reserve my right to reopen the deposition pending the resolution of certain outstanding discovery issues between the plaintiffs and the government regarding the government's obligation to produce additional documents in this case. So subject to that reservation, I'm done.

MR. SHULTIS: Thank you. Of course we oppose that. Thanks very much.

(Whereupon, at 1:00 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 2:00 p.m., this same day.)

523

AFTERNOON SESSION

(2:00 p.m.)

Whereupon,

RONALD MILNER,

the witness testifying at the time of recess, having been previously duly sworn, was further examined and testified further as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF COMMONWEALTH EDISON

BY MR. TOMPKINS:

Q. Good afternoon, Mr. Milner. My name is Chris Tompkins. I'm from the law firm of Jenner & Block. We represent Commonwealth Edison. Before I start, I just wanted to state the same ground rules as before should apply, if you have any questions about any of my questions, something you don't understand, let me know.

And like I said, I'm hoping to keep this within two hours or so, so hopefully we can move along pretty quickly. You are currently the COO of OCWRM?

A. Correct.

Q. In that position, do you have a fairly good handle on the current state of the Nuclear Waste Fund?

524

A. I think I do.

Q. Okay. Just a ballpark estimate, could you tell me how much money utilities have paid into the fund since 1982?

A. Just as a ballpark, I think it's something in the neighborhood of 10, 11 billion.

Q. 10, 11 billion. Now, all these utilities paid this money to OCWRM on the expectation that they would receive a service, is that your perception?

A. That's my perception, yes.

Q. And that they would receive the service of removal of waste from their reactor sites?

A. Correct.

Q. Now, is it reasonable to assume that these utilities upon paying this fee have some sort of expectation that this waste will be taken away in a timely manner, and they won't have to expend further money to deal with this waste in addition to what they've already paid to the Federal Government?

A. I think they certainly had an expectation that the waste would be removed in a timely manner. I think some utilities would have had to assume that they would continue to pay storage costs in some form or another.

Q. Sure. But I mean in general, utilities

525

didn't enter into this thing expecting to have to spend additional billions to store waste that they're already paying the government to take away?

MR. SHULTIS: Objection, calls for speculation.

THE WITNESS: Yeah, I don't know what the utilities may have anticipated in terms of how much they would have to spend. They certainly prudently indicated they would spend some expenditures,.

BY MR. TOMPKINS:

Q. Well, they had to continue to store the waste through 1998, at the very least?

A. At the very least.

Q. I'd like to show you what we are marking Milner Exhibit 66.

(Milner Exhibit No. 66 was marked for identification.)

BY MR. TOMPKINS:

Q. Do you recognize this document?

A. Yes.

Q. Is this a statement that you prepared to the Minnesota State Legislature, back in 1994?

A. Without reading through it entirely --

Q. Sure.

A. -- just judging by the cover I think it

526

was probably a statement that I presented to them.
Q. Okay. So someone else would have prepared your remarks and then you would have gone out there and given them?
A. Correct.
Q. But they do represent your viewpoints at that time?
A. If it's in fact the statement that I presented, yes, it would have.
Q. Okay. I'd like to call your attention to the first page and the second paragraph of the first page, in fact the last sentence which reads, "The Secretary of Energy has stated the Department has at least a moral obligation to meet the 1998 waste acceptance date specified in the act." Did you deliver this statement to the Minnesota State Legislature?
A. I believe I did.
Q. Was this the Secretary of Energy's view of the Department's obligation at that time?
MR. SHULTIS: Objection, document speaks for itself.
THE WITNESS: I believe the Secretary at that time had made that statement.
BY MR. TOMPKINS:

527

Q. Had made that statement. Do you know what sort of discussion there had been within OCWRM about the Secretary's statement of the Department's moral obligation?
A. No, I don't recall.
Q. Did you share the view of the Secretary that the Department had a moral obligation to accept waste?
A. I did.
Q. You did, okay. Why at this time was this termed as a moral obligation versus a legal obligation?
MR. SHULTIS: Objection, calls for a legal conclusion.
THE WITNESS: My opinion was that as was held by, I think, the program and I believe the Department that the Department's obligation under the contract was to begin accepting waste in 1998 conditioned upon the availability of a facility. But certainly given past program schedules and documents, I think we felt it was a moral obligation at least.
BY MR. TOMPKINS:
Q. I believe you testified yesterday that you joined the Department in around April of '84?
A. I joined the program.

528

Q. The program.
A. In April of '84.
Q. April of '84. At that time, were you aware of any efforts to modify the standard contract?
A. Yes, when I came on board there was a proposed modification of the standard contract.
Q. And do you know what that modification consisted of?
A. I don't recall, no.
Q. Don't recall. Do you know who was in charge of making the modification within the program?
MR. SHULTIS: Objection, assumes facts not in evidence.
THE WITNESS: Well, I believe there was a group involved in drafting the modification.
BY MR. TOMPKINS:
Q. Do you recall any of the individuals who were members of that group?
A. Let's see, from the program, I believe there was an individual by the name of George Chaconas.
Q. And what was his position at the time?
A. I don't recall what his title was but he was in essence the one managing -- although that's not a good turn, the standard contract at that time.

529

There was an individual from the procurement office, J. Cavanaugh. There was an individual from the office of general counsel, Elliot Winnick. And I believe there might have been an individual or two from the Energy Information Administration since they provided the data for the program.
Q. Do you recall who initiated this development of modifications, whether it was the utility industry or if it was the Department or the program?
A. That amendment had been initiated before I joined and no, I don't recall.
Q. Okay. I would like to show you what's being marked Milner Exhibit 67.
(Milner Exhibit No. 67 was marked for identification.)
MR. TOMPKINS: It was previously marked as an exhibit in Robert Morgan's deposition so just for consistency's sake we're using the same letter.
MR. SHULTIS: Okay.
BY MR. TOMPKINS:
Q. I'd like to give you a chance to read over the letter before I ask any questions on it.
Now, in the second paragraph, about halfway through, there's a sentence that says, "To

530

rate modifications which were being discussed at the time?
MR. SHULTIS: Objection, calls for speculation. Assumes facts not in evidence.
THE WITNESS: I don't know.
BY MR. TOMPKINS:
Q. You don't know. Certainly this does indicate that someone within the program was looking at that issue, though?
MR. SHULTIS: Objection, mischaracterizes the document. Calls for speculation.
THE WITNESS: To me it also indicates whoever M.R. Shay was wrote that.
BY MR. TOMPKINS:
Q. I'd like to talk to you about page 030-0039 and the following pages. Do you have any understanding of what they're referring to when M.R. Shay states, Preclude tran shipments between reactors?
A. To me the term tran shipment between reactors means just that, that one reactor may ship some of its spent fuel to the storage pool at another one of its reactors.
Q. Do you know what the reference is to 1/4 core and 1/3 core, would that be a reference to full

551

core reserve capacity in the pool, or --
A. I don't know.
Q. We previously marked -- I believe it was Wednesday we previously marked the 1987 mission plan amendment or actually one of the appendixes to it. This is also an excerpt of that same mission plan amendment. It's just a portion of the text rather than the appendix we looked at previously.
(Milner Exhibit No. 72 was marked for identification.)
BY MR. TOMPKINS:
Q. I believe you testified yesterday that you had some involvement in preparing this mission plan amendment?
A. I believe I would have, yeah.
Q. Okay. I'd like to call your attention to page 6 of this excerpt. The third full paragraph under extension of the schedule for the first repository, this indicates that at this time the program in OCWRM was projecting a delay in start of repository operations from 1998 to 2003; is that correct?
A. That's what's indicated here, yes.
Q. Okay. It indicates that this five-year extension is necessary for technical planning in the

552

program?
A. I don't see where it refers to technical planning.
Q. Okay.
A. It seems to indicate that the schedule was certainly due to budget reductions.
Q. Are you aware of any other reasons why the schedule would have slipped at this point?
MR. SHULTIS: Objection, mischaracterizes the document.
THE WITNESS: No, not offhand, I don't recall.
BY MR. TOMPKINS:
Q. Also in this same paragraph this amendment indicates as explained later, the DOE could nonetheless start accepting waste in 1998 in an MRS facility. Was this consistent with DOE planning at the time in 1987?
A. I believe it was.
Q. So they were going to operate an MRS from 1998 until about 2003 when a repository opened?
A. I think the intention was that the MRS would continue operating beyond 2003.
Q. In fact the MRS was intended to be an integral part of the whole waste acceptance system?

553

A. Yes.
Q. It wasn't intended to operate alone or as a permanent place for storage in disposal?
A. No.
Q. I'd like to talk to you about page 12 now, in particular the last full paragraph or actually the last paragraph which goes on to the next page under the heading MRS facility. It stays that on March 31st, 1987 the DOE submitted to Congress a proposal for construction of an MRS facility. To allay concerns that the MRS facility could become a substitute for a permanent repository whose development remains the highest priority, DOE asked Congress to limit the MRS storage capacity to 15,000 metric tons of uranium and to specify that the MRS cannot start receiving fuel until a construction authorization for the repository has been received from the Nuclear Regulatory Commission.
Is this an accurate statement that the DOE was the organization that requested the linkages between the repository and the MRS?
MR. SHULTIS: Objection, the document speaks for itself.
THE WITNESS: Certainly the DOE was the entity that requested Congress, my recollection of

554

the origins of those linkages were at that time, DOE was developing a site specific proposal for an MRS facility, actually at the old Clinch River Breeder reactor site at Oak Ridge, and I believe the local community had requested the Department insert those linkages.
BY MR. TOMPKINS:
Q. The capacity limit of 15,000 metric tons, do you know where the Department would have come up with that number?
A. I believe that was the request or recommendation of the local community at the time.
Q. At the time as we saw in the previous page this was assuming that the MRS would operate for only about five years prior to being able to move additional waste from the MRS and start feeding into the repository?
A. It was intended to operate for five years before it began shipping waste and it certainly was going to operate longer than five years.
Q. But over the course of that five years, would this limit on the capacity of 15,000 metric tons have been a significant restraint on the ability of the Department to operate this facility?
A. It certainly would have been a constraint.

555

15,000, I believe, was the limit wherein the capacity could never exceed that of the MRS.
Q. However, if divided over the course of five years, this capacity doesn't exceed amounts that the DOE had previously projected that it was going to be receiving on an annual basis?
A. That's correct.
Q. In fact that would equal exactly 3,000 metric tons a year which had previously been the steady state operation under previous projections?
A. That's correct. Whether that was a mathematical coincidence, I don't know.
Q. You don't know. If you could, I'd like you to look again at Milner Exhibit 20, which is the 1989 reassessment.
I'd like to talk about pages romanette viii and x, under the heading Monitor Retrievable Storage.
Now this reassessment states that the primary objective is still to develop a licensed geological repository for permanent disposal. Is that correct?
A. That's correct.
Q. So the repository was still central in OCWRM's planning and still was not intending to use

556

an MRS as a location for permanent disposal?
A. That's correct.
Q. Moving from the bottom of page 9 to 10 it says that "the DOE cannot meet the anticipated schedule set forth in the act for repository by 1998. Furthermore the current linkages between the repository and the MRS program make it impossible for the DOE to accept waste in an MRS facility on a schedule that is independent from that of the repository. Therefore, the DOE plans to work with Congress to modify the current linkages between the repository and the MRS facility, to embark on aggressive program, develop an integrated MRS facility for spent fuel."
The Department was now proposing to modify half of the linkages between the repository and the MRS, is that what this is indicating?
A. That's what it's indicating, yes.
Q. Okay. Was actually changing the construction part of the schedule, so that construction and siting of an MRS could happen independent of the repository licensing and construction?
A. Correct. That was what was being indicated here.

557

Q. Turning to page 11 and 12, in particular the first full paragraph in the top of page 12, this indicates that the linkages weren't changed. The repository wouldn't open until, rather the MRS, I'm sorry I misspoke, would not be able to open until 2007, three years prior to the start of operations of a repository.
Is that true?
A. That's what's stated here, yes.
Q. And you agree with that, that without modifications of the linkages the MRS couldn't open until 2007?
A. Yeah, I would have agreed that that was pretty unlikely.
Q. So the Department's plan at this time was to accept waste in 1998 through operation of an MRS, but it would expand the schedule over which the MRS would operate from the five years before the repository started operation it was projected in 1987 to 12 years at this time?
A. Yeah, it would have been 12 years if an MRS had started operation in '98.
Q. And it would continue to operate obviously with the repository after that?
A. Yeah.

558

Q. I'd like to look back at Milner Exhibit 42. And the acceptance rates that are in table 2.1.
A. Do you have a page number?
Q. Yeah, it's on page 5, sorry.
Now, this rate is significantly different than prior projections that you've looked at over the course of this deposition in the last two days?
MR. SHULTIS: Objection as to characterization.
THE WITNESS: Significantly different to some, identical to others.
BY MR. TOMPKINS:
Q. Well, the previous rates that were in various documents showed steady state operation upwards of 3,000 metric tons a year?
MR. SHULTIS: Objection, vague.
BY MR. TOMPKINS:
Q. Is that correct?
A. I believe most previous documents, all previous documents, I guess, showed a steady state of 3,000.
Q. And this rate is?
A. I don't know that this table indicates what the steady state was, I don't know if it carries through to steady state.

559

Q. Over the course of this roughly 10-year period however, it only ramps up to 900 metric tons?
A. That's correct.
Q. Are you aware of the basis for this rate?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: No.
BY MR. TOMPKINS:
Q. Are you aware of whether or not the only reason for the ramp-up at this rate is the capacity restrictions on the MRS in the 1987 amendments to the Nuclear Waste Policy Act?
MR. SHULTIS: Objection, asked and answered.
THE WITNESS: I'm aware that the capacity limitations on the MRS were certainly a factor.
BY MR. TOMPKINS:
Q. Is there any other reason why the MRS would have to operate at a rate as low as 900 metric tons?
MR. SHULTIS: Objection, calls for speculation. Asked and answered.
THE WITNESS: No, I don't know of any other reason.
BY MR. TOMPKINS:
Q. I'd like to go back to Milner Exhibit 34, which is the December 1990 preliminary estimates for the total system costs of the restructured program. In particular, I'd like to talk to you about page 10. I'm correct that you previously testified that you would have been involved in development of this report, at least in a supervisory level?

560

MR. SHULTIS: I'm sorry, could you --
THE REPORTER: "Question: I'd like to go back to Milner Exhibit 34, which is the December 1990 preliminary estimates for the total system costs of the restructured program. In particular, I'd like to talk to you about page 10. I'm correct that you previously testified that you would have been involved in development of this report, at least in a supervisory level?"
THE WITNESS: I believe that's true.
BY MR. TOMPKINS:
Q. The last sentence of the second to last paragraph here states, "This analysis continues to assume, however, that the capacity limits on the MRS facility of 10,000 metric tons prior to the start of operations at the repository and 15,000 metric tons hereafter" or actually "thereafter," I'm sorry -- "as imposed by the amendments act remain in effect."
These are the same limits that we had previously been talking about in the amendments act?

561

A. Yes.
Q. Okay. In the next paragraph, it stays that due to the fact that the spent fuel acceptance at the MRS facility begins 12 years earlier than the repository, the MRS facility is forced to operate below its design acceptance rate until the repository has ramped up to its full design acceptance rate in order to remain within the capacity limits imposed by the amendment act.
Does this indicate that the MRS facility was actually designed to have a higher capacity than it could accept based on the amendments act?
A. In my opinion, that's what it indicates.
Q. So in reality the amendments are the sole reason for having a lower rate during this 12-year period accepted at an MRS?
MR. SHULTIS: Objection, mischaracterizes -- assumes facts not in evidence and I think mischaracterizes prior testimony.
THE WITNESS: I can't think of other reasons offhand.
MR. TOMPKINS: We've been going a little bit more than an hour. Why don't we take a 10-minute break or so.

562

(Recess.)
BY MR. TOMPKINS:
Q. Mr. Milner, welcome back from the break. Just one final question on this total system cost document, I'd like to look at appendix A, table A-1.
MR. SHULTIS: This is number 34.
MR. TOMPKINS: Yes, Milner Exhibit 34.
BY MR. TOMPKINS:
Q. I noticed that the acceptance schedule here continues beyond 2010 and then ramps up to approximately 3,000 by -- 3,000 MTU by 2015?
A. Correct.
Q. Am I correct in assuming that the Department of Energy was not intending to accept waste until only 2010 and then reconfigure their program somehow and not accept waste after that?
A. I'm not sure I understand that question.
Q. Well, even under these rates which are projected in this document and which show up in some of the annual capacity reports in the mid '90s, the Department wasn't intending to start acceptance in 1998 and accept only for 10 years, was it?
A. In total?
Q. Yes, in total?
A. No.



Q. In fact, under its plans in the early '90s, it planned on continuing to accept waste subsequent to 2010 and beyond and at that time have a repository in place to accept waste?
A. Correct.
Q. And in fact once the repository was operating in addition to the MRS, the rates would increase even further beyond the 900 rate which was in place during the 1998 to 2009 period but ramp up to 3,000 MTU a year?
A. That's correct.
Q. Okay, thank you. Mr. Milner, I know you moved from transportation into the budget related offices back and forth a little bit during the '90s, but are you aware of whether or not utilities have submitted DCS forms during the '90s and those have been approved?
A. I'm aware that they did and some were approved, yes.
Q. Some were approved. All those DCS submissions were approved under the assumption that we were operating under a schedule where waste acceptance would start in 1998, is that correct?
MR. SHULTIS: Objection, calls for speculation and probably a legal conclusion.



THE WITNESS: I believe that they assumed an MRS would begin operation in '98.
BY MR. TOMPKINS:
Q. Now, it's not. OCWRM and the Department isn't anticipating any acceptance will begin until at least 2010, is that correct?
A. That's correct.
Q. And at that time it's going to be in a repository and there's no MRS that's part of a system?
A. At the current time, that's correct.
Q. At the current time. Do you know what's going to happen to the DCS forms that have already been approved?
MR. SHULTIS: Objection, calls for a legal conclusion. Speculation.
THE WITNESS: I don't understand what you mean by what will happen to.
BY MR. TOMPKINS:
Q. Well, if a utility submitted its first DCS form in 1992 it would have submitted it on the basis of an allocation that they were expecting in 1998; isn't that correct?
A. That's correct.
MR. SHULTIS: Objection, calls for



speculation.
BY MR. TOMPKINS:
Q. And that would have been at this 900 rate that was anticipated for the MRS constrained operations?
MR. SHULTIS: Same objection.
THE WITNESS: I believe in the first year the rate was 400.
BY MR. TOMPKINS:
Q. 400. So any utilities allocations will necessarily have changed for the year 2010, when the repository operations commence. Or many of them will have. I should rephrase, let me not say all, because first of all the rate will be higher at the repository and the acceptance schedules have changed?
MR. SHULTIS: Objection, calls for speculation.
THE WITNESS: I don't understand the question.
BY MR. TOMPKINS:
Q. I don't think I understand it myself so I'll rephrase it a little bit.
If a utility such as Commonwealth Edison had an allocation under 400 metric ton rate for 1998, under the planning for the MRS operation in 1998,

would that allocation be different for operations that begin in 2010 but at a 1,200 rate?
MR. SHULTIS: Objection, calls for a legal conclusion. Speculation.
THE WITNESS: I'm still not following the question. If you're asking if a utility had an allocation in year one of operation, and that allocation was based on year one being 1998, and the year 2010 being year 12, currently 2010 would be year one and it would be the allocation that would have existed for 1998.
BY MR. TOMPKINS:
Q. I'm actually more interested in the fact that the rate would have changed in between those two periods and that there would have been a 400 rate under the planning that was anticipated for 1998 and that the rate would be somewhere around 1,200 for the year 2010. So the fact that the rate was higher would mean all the utilities' allocations would change?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.
THE WITNESS: If I'm understanding the question correctly, the allocation in 2010 which currently is year one of operation would be different

567

than the allocation for 2010 that would have existed for a 1989 year one start of operation.
BY MR. TOMPKINS:
Q. And that's because the program would be accepting more waste in year one under one plan than versus the other?
MR. SHULTIS: Same objections.
THE WITNESS: I don't --
BY MR. TOMPKINS:
Q. It's been a long couple days, I think.
A. I believe year one in 1990, that year one was 400 MTUs, and currently year one is 400 MTUs.
Q. You mean under planning for 2010 year one's still going to be 400 MTUs?
A. Yes.
Q. It is. I stand corrected. But over the course of later years the current projections call for a ramp-up to 3,000 metric tons versus just 900 over the first five years of the program?
A. Yes.
MR. SHULTIS: Objection.
THE WITNESS: This schedules call for a ramp-up to a steady state of 3,000 MTUs.
BY MR. TOMPKINS:
Q. So in the later years, under prior

568

planning which was occurring in 1992 when the rate was 900, the rate would be 3,000 in actuality under current OCWRM plans for acceptance?
MR. SHULTIS: Objection, vague.
THE WITNESS: And not understandable. I'm sorry.
BY MR. TOMPKINS:
Q. Well, you testified that under current planning by 2014, which would be the fourth year of the repository, the rate will ramp up to 3,000 metric tons.
A. Yes, that's what's indicated here.
Q. Okay?
MR. SHULTIS: I'm sorry, were you asking about current planning?
MR. TOMPKINS: Yes.
THE WITNESS: Oh.
MR. SHULTIS: Okay. Do you want to answer again? Do you want to ask that question again, Chris? Because when Mr. Milner was responding he was looking at the 1990 TSLCC.
MR. TOMPKINS: Okay. I actually, just to make this easier.
THE WITNESS: I was -- you were asking me in the previous question a question on this document.

569

MR. TOMPKINS: No, no, I'm sorry. Well, that explains all the confusion because it really has been a long week. I'd like to mark this as Milner Exhibit 73.
(Milner Exhibit No. 73 was marked for identification.)
BY MR. TOMPKINS:
Q. This is the total system life cycle cost report which was issued in May of 2001, is that correct?
A. Correct.
Q. Would you have been involved in preparing this report or overseeing its preparation?
A. I would have -- no, I would have concurred in it before it was finally released.
Q. This is the most recent Total System Life Cycle Cost. I understand there was a letter update in 2002, but for the actual Fuller report this is the last one that's been issued by the Department?
A. I believe that's true.
Q. I'd like to refer your attention to page 4-14. Table 4-1 represents some acceptance rates. Are these the acceptance rates that the Department is currently forecasting for waste acceptance beginning in 2010?

570

MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I believe these are the Department's current goals for waste acceptance.
BY MR. TOMPKINS:
Q. Under this plan, the Department will be accepting 3,000 metric tons of waste per year beginning in 2014, am I reading the chart correctly?
A. That's certainly what's indicated, yes.
Q. And that would be the fourth year of operation of the program?
A. Yes. That would be the fourth year of the operation of the repository, not the program, yeah. Actually it is the fifth year.
Q. Fifth year, okay.
A. Engineers can't do math.
Q. Lawyers can't either. If you look back at the prior exhibit, Milner Exhibit 34, we were just discussing, this is the acceptance schedule that was being anticipated when the Department thought that they were going to have an MRS in place by 1998?
MR. SHULTIS: Objection to characterization. Also Mr. Milner is not a 30(b)(6) witness.
THE WITNESS: I believe that's the case.
BY MR. TOMPKINS:

571

Q. Okay. In this schedule, the fifth year of operation which would be 2003, it projects 900 metric tons would be accepted in that year?
A. That's correct.
Q. That's correct, okay. And utilities in the early '90s, when they submitted DCS forms, submitted forms based on this schedule, or one roughly like it?
A. I believe that's correct.
Q. Okay. And so they would have submitted DCS forms for the fifth year assuming a 900 metric ton rate?
A. That's correct.
MR. SHULTIS: Objection, calls for speculation.
THE WITNESS: So now in actuality, if current projections hold, instead of -- instead of receiving only 900 metric tons the Department will be receiving 3,000 metric tons.
MR. SHULTIS: Objection. I'm sorry; go ahead.
THE WITNESS: State that again. Or ask that again.
BY MR. TOMPKINS:
Q. Sure, under prior planning with the MRS

572

facility that started in 1998, a utility would have submitted a DCS form assuming a 900 ton metric rate?
A. For the fifth year of operation.
Q. For the fifth year of operations, right?
A. Correct.
Q. Now, in reality, there's actually going to be, in the fifth year of actual operations as currently projected, beginning in 2010 there's going to be 3,000 metric tons that are accepted.
MR. SHULTIS: Objection, mischaracter -- assumes facts not in evidence and Chris, I'm having a hard time with your question insofar as you're asking about in reality and about projections. They're two different things. Can you help me out there?
BY MR. TOMPKINS:
Q. Sure. Current projections for forecasts and what utilities are planning, or rather, the Department is currently planning on receiving in the year 2010 is 3,000 metric tons for the fifth year of operation of the repository. This 3,000 metric tons is higher in the fifth year of operations than under prior plans?
A. Correct.
Q. So because of this difference, when the

573

Department goes and prepares an APR, all the allocations for the fifth year will be different than they were originally in the '90s?
A. Yes, okay.
Q. Okay. So a utility that submitted a DCS for an allocation based on the rates in the early '90s may have a different allocation under current forecasts?
MR. SHULTIS: Calls for speculation.
THE WITNESS: I would assume, yes.
BY MR. TOMPKINS:
Q. Okay. Do you know what the Department is, or the program OCWRM is currently planning on doing about the fact that the allocations may be different with the DCS forms? Are they going to go back and have utilities prepare a new DCS form based on these rates?
A. Actually we've not addressed that yet.
MR. SHULTIS: Objection.
BY MR. TOMPKINS:
Q. Haven't addressed it. Would it be reasonable to assume that utilities will have that option?
MR. SHULTIS: Objection, calls for speculation. Mr. Milner's not a 30(b)(6) witness.

574

THE WITNESS: The Department simply has not addressed that yet. We decided we should probably focus our efforts on getting a site first and then work out the details.

BY MR. TOMPKINS:

Q. I'd like to turn your attention back to Milner Exhibit 43 which are the DCS instructions.

Under the general instructions which start on page one and go on page two, item 7C, we had discussed this yesterday but I just want to now apply this to the situation we've just been talking about. It states that in the event that such circumstances change, all DCS's previously approved by DOE may need to be reevaluated by DOE and the purchaser.

Would this type of change of allocation be the type of event that may implicate this instruction?

MR. SHULTIS: Objection, calls for a legal conclusion and also speculation.

THE WITNESS: In my opinion it would.

BY MR. TOMPKINS:

Q. One final question on this DCS form and I believe you testified about this earlier too. Instruction 7B states that once a purchaser has an allocation, any SNF owned by the purchaser can be designated for delivery against the allocation. Is

575

that saying that a utility does not have to deliver the fuel that its allocation was based on?

MR. SHULTIS: Objection, calls for a legal conclusion. The document speaks for itself.

THE WITNESS: In my opinion that's stating that it does not have to deliver the fuel that gave it its place in the queue.

BY MR. TOMPKINS:

Q. Now once it allocates fuel on a DCS form or a range of fuel, as the case may be, what's your understanding of which fuel it has to actually deliver after the DCS form has been approved?

MR. SHULTIS: Objection, asked and answered.

THE WITNESS: Yeah. I don't think it specifies what fuel, as long as it's over five years old.

BY MR. TOMPKINS:

Q. Okay. Thank you. So a utility could deliver any fuel over five years when it came to actually accepting that fuel, even if it designated different fuel on the DCS?

A. That's my understanding.

Q. That's your understanding. If that's the case, I think I only have one last exhibit to go over with you, Mr. Milner.

576

I'd like to mark this document as Milner Exhibit 74.

(Milner Exhibit No. 74 was marked for identification.)

BY MR. TOMPKINS:

Q. This is a letter by Robert Bauer, is this the same Robert Bauer we've been discussing earlier?

A. Yes.

Q. Were you involved in the preparation of this letter or had you seen it before?

A. I don't recall.

Q. The last sentence of the second paragraph states that, "Failed fuel canned in a container provided by or approved by the Department also will be subject to the same scheduling procedures as other spent fuel." Is Mr. Bauer saying in this letter that once a failed fuel, once a failed fuel assembly is placed in an approved container, it will be treated just like standard fuel?

MR. SHULTIS: Objection, calls for a legal conclusion, also asks for speculation.

THE WITNESS: Let me read the context here.

MR. TOMPKINS: Sure.

THE WITNESS: It appears that it does, however I seem to recall a provision in the contract

577

that failed fuel was considered nonstandard fuel which may have a different scheduling.

BY MR. TOMPKINS:

Q. Do you have any knowledge of whether this statement is consistent with current OCWRM planning?

MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.

THE WITNESS: I don't recall any current discussions about failed fuel treatment.

MR. TOMPKINS: I think that's all I have, subject to the right to continue the deposition with Mr. Milner pending resolution of discovery issues.

MR. SHULTIS: Sure. We continue to object to those. I think we're done then for the day.

(Whereupon, at 4:00 p.m., the taking of the instant deposition ceased.)

____________________________
Signature of the Witness

SUBSCRIBED AND SWORN to before me this _______ day of _______________, 20_____.

____________________________
Notary Public

My Commission Expires:________________

579

578

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER ) Volume IV
COMPANY ) Washington, D.C.
(98-154C)(Merow, S.J.) ) Tuesday
MAINE YANKEE ATOMIC POWER COMPANY) May 7, 2002
(98-474C)(Merow, S.J.), et al., )
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - -)

Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:30 a.m., Tuesday, May 7, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

579

APPEARANCES:

On behalf of Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority for the State of New York, Omaha Public Power District, Nebraska Public Power District, and PSEG Nuclear L.L.C.:

ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7612

On behalf of Plaintiffs Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company:

PETER J. SKALABAN JR., ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

580

APPEARANCES CONTINUED:

On behalf of Plaintiff Sacramento Municipal Utility District:

TIMOTHY R. MacDONALD, ESQ.
(Appearing in the AM session only.)
ARNOLD & PORTER
370 17th Street, Suite 4500
Denver, CO 80202-1370
(303) 863-2334

On behalf of Plaintiff Southern Nuclear Operating Company, et al.:

RONALD A. SCHECHTER, ESQ.
ARNOLD & PORTER
555 12th Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5000

581

APPEARANCES CONTINUED:

On behalf of Plaintiff Wisconsin Electric Power Company:

SUZETTE W. DERREVERE, ESQ.
(Appearing in the AM session only.)
JENNIFER MacLEAN, ESQ.
(Appearing in the PM session only.)
PERKINS COIE LLP
607 14th Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1690

On behalf of Defendant:

RUSSELL A. SHULTIS, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
Federal Claims Section
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561

582

C O N T E N T S

WITNESS EXAMINATION
PAGE NO.
RONALD A. MILNER
By Mr. Tomaszczuk 586
By Mr. Schecter 689
Afternoon Session 654

E X H I B I T S

MILNER EXHIBIT NO. PAGE NO.
75 Memorandum, Nos.
DB0000124-125 587
76 Letter, and attachments,
Nos. 0379-399 590
77 Letter, and attachments,
Nos. 0292317 602
78 Federal Register,
pages 21793-21798 604
79 Other Wastes/Nuclear Materials:
A. General Overview,
Nos. YMP-012-1493-494 610
80 Memorandum, and attachments,
Nos. HQR-057-1493-569 616
81 Analysis of the Total System
Life Cycle Cost of the

583

E X H I B I T S C O N T I N U E D

MILNER EXHIBIT NO. PAGE NO.
Civilian Radioactive Waste
Management Program, Nos.
HQR-025-5075-139 628
82 Nuclear Waste Fund Fee Adequacy,
Nos. PA-176267-282 634
83 1996 Acceptance Priority Ranking
and Annual Capacity Report,
September 1997, Nos.
CTR-027-0001-085 638
84 Program Plan, Revision 2,
July 1998, Nos. YMP-001-0885-945 641
85 Civilian Radioactive Waste
Management System Total System
Description, Revision 01,
October 1998, Nos. PA-206300-335 646
86 Analysis of the Total System
Life Cycle Cost of the Civilian
Radioactive Waste Management
Program, December 1998, Nos.
HQR-036-0006-086 651
87 Nuclear Waste Fund Fee Adequacy:
An Assessment, December 1998,
Nos. PA-195781-821 654

584

E X H I B I T S C O N T I N U E D

MILNER EXHIBIT NO. PAGE NO.
88 Program Plan, Revision 3,
February 2000, Nos.
HQR-043-3798-882 658
89 Nuclear Waste Fund Fee Adequacy:
An Assessment, May 2001 666
90 Nuclear Waste, Technical,
Schedule, and Cost Uncertainties
of the Yucca Mountain Repository
Project 670
91 Total System Life Cycle Cost
for Site Recommendation Letter
Report, February 2002 674
92 Letter, 2-14-02
93 Statement of Lake H. Barrett,
3-14-02 678
94 Certification of Ronald Milner,
4-18-02, and attachment 681
95 Independent Cost Estimate (ICE)
Review, January 2001 683

585

P R O C E E D I N G S

Whereupon,

RONALD A. MILNER

was called as a witness by counsel for Plaintiffs, and, having been duly sworn by the Notary Public, was examined and testified as follows:

FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS
FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES PC
COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMI
BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER
AUTHORITY FOR THE STATE OF NEW YORK, OMAHA PUBLI
POWER DISTRICT, NEBRASKA PUBLIC POWER DISTRICT, AN
PSEG NUCLEAR L.L.C.

BY MR. TOMASZCZUK:

Q. Mr. Milner, good morning.
A. Good morning.
Q. Nice to see you begin. Thanks for coming back.
A. You too.
Q. I have some additional questions to ask you. I would expect to get through those this morning. I have some additional documents I want to ask you about.
Same ground rules as applied to the other day's questioning. If you have any questions or

586

don't understand my question, let me know.
A. Okay.
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner 75 a memorandum for director, RW 1, from Samuel Russo, subject, approve for publication the attached 1994 APR and ACR.
(Milner Exhibit No. 75 was marked for identification.)
BY MR. TOMASZCZUK:
Q. And Mr. Milner, do you recall this document?
A. Not specifically, I don't, no.
Q. Do you see your -- what appear to be your initials and your name in the column on the second page?
A. Right, concurrence chain.
Q. Right, concurrence chain. Thank you.
This appears to be a memorandum which sought approval from the director for publication of the APR/ACR; is that right?
A. Yes, m-hm.
Q. And I believe that it had attached to it some version of the APR/ACR, which was ultimately published in March of 1995?

587

A. Apparently so, yeah.
Q. And I believe that was Milner Exhibit 51. You can get that in front of you if you'd like.
And let me just say for the record, we're in a different locale this morning, but I believe all of the exhibits that have been previously marked are here and are present and available if you may need to refer to them in any of your testimony today.
My question to you is, there appears to be the notation handwritten next to your name, with comment.
Do you see that?
A. I do, yeah.
Q. Is that your handwriting, sir?
A. Actually very difficult to tell. I would assume so, but it doesn't look exactly like mine.
(Mr. MacDonald entered the room.)
BY MR. TOMASZCZUK:
Q. Do you know what comment you made on a draft of the APR/ACR that was appended to this document?
A. I have no idea.
Q. You agree that this notation appears to reflect that you had some comment on the draft?
A. I think it does, yes.

588

Q. But no present recollection as to what you had to say?
A. I don't recall. It could have been very minor. I don't know.
Q. Would there be some written record of what your comment was?
A. Typically the way the process works is, when the document is circulated and there's a comment, it's unlikely that that comment had been retained in the handwritten form, but I don't know for sure.
Q. Did Mr. Zabransky work for you at this point in time?
A. He did not, no.
Q. Do you recall, Mr. Milner, what your position was at or about the time you would have commented on this draft APR/ACR?
A. Judging by the code indication there, I -- it's likely I would have been director of the office of program management integration.
Q. And that's suggested to you by the designation, RW 30?
A. Correct.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner Exhibit 76 a series of DCS forms and

589

related correspondence between the department of energy and Northern States Power Company.
BY MR. TOMASZCZUK:
Q. And I can represent that these documents were appended to one of the government's motions for summary judgment in this case, and I've put them together as one document just for purposes of facilitating your review. I have some questions for you about this packet.
(Milner Exhibit No. 76 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, do you recall seeing any of these documents before today?
A. I've certainly seen the DCSs before, and I don't recall these specific ones.
Q. You've certainly seen the generic DCS form but don't recall seeing the specific Northern States DCS forms?
A. Correct.
Q. Would you have seen these at or about the time they were submitted by Northern States Power Company?
A. Likely I would not have, no.

590

Q. And why is that?
A. In at least the later ones in the '97, '98 time frame, I believe at that point in time, I was acting deputy director, so -- of the program, so that would have been handled by an office below that level.
Q. It would have been below your radar screen, so to speak?
A. Correct.
Q. What about the early ones that were recently submitted and approved in the 19- --
A. Potentially earlier.
Q. -- '95?
These fairly reflect, do they not, a series of DCS forms and some approvals of those by the department of energy?
A. Yes.
MR. SHULTIS: Objection as to characterization.
BY MR. TOMASZCZUK:
Q. You can disagree with me if you'd like, sir.
Is that a fair characterization?
MR. SHULTIS: Same objection.
A. I believe that they were reflecting

591

approval of DCSs, yes.
BY MR. TOMASZCZUK:
Q. Right. Can I direct your attention to the document with the Bates page number 0385 on it about a third of the way through. And if I could direct your attention, Mr. Milner, to the double asterisks on the right-hand side of the page and the notation that appears there.
A. Yes.
Q. Do you know who placed that language on this DCS form?
A. Specific person, no, I don't know who that would have been.
Q. Do you recall any discussions with any OCRWM personnel concerning this language?
A. In general terms, yes. It certainly was the program office opinion that delivery date was conditioned upon having an operational facility, be it a storage or a depository.
Q. Do you know who drafted this language?
A. Specifically, no, I don't.
Q. Similar language appears in the cover letter on the previous page, 0384, the bottom of the first paragraph.
A. Yes.

592

Q. And do you know whether Ms. Tomasoni drafted this language, or do you have reason to believe someone else drafted it?
MR. SHULTIS: Objection, asked and answered.
A. I don't know who drafted this specific language.
BY MR. TOMASZCZUK:
Q. The language was drafted by somebody at DOE, was it not?
A. I think that's safe to assume.
Q. Can I direct your attention, Mr. Milner, to a little further in the packet, Bates page 390. And I want to direct your attention to the bottom section, section 4.0, notification of DOE action.
Do you see that?
A. I do.
Q. All right. And it appears to me that this DCS was originally approved by both the technical representative and the contracting officer. Correct?
MR. SHULTIS: Objection, calls for speculation.
A. Difficult to tell from here. It would appear that the contracting officer's name has been crossed out, and I can't tell whether the "void"

593

written there reflects the entire line or the date.
BY MR. TOMASZCZUK:
Q. Well, does it appear to you from looking at the document that Ms. Tomasoni originally approved this DCS on January 14, 1997?
MR. SHULTIS: Same objection.
A. Difficult to tell. It appears that that may have been the case.
BY MR. TOMASZCZUK:
Q. And that Mr. Zabransky had approved it slightly earlier, on or about December 30, 1996?
MR. SHULTIS: Same objection.
A. Appears to be the case.
BY MR. TOMASZCZUK:
Q. And that Mr. Zabransky's approval was voided on February 27th of 1997?
A. That's what appears to be here, yes.
MR. SHULTIS: Same objection.
BY MR. TOMASZCZUK:
Q. And that Ms. Tomasoni's approval was voided on what appears to be March 13, 1997?
MR. SHULTIS: Same objection.
A. I can't make out that date at all.
BY MR. TOMASZCZUK:
Q. Okay. Look at the letter on the previous

594

page, 0389.
A. Okay.
Q. That letter is dated March 13th, 1997. Correct?
A. Correct.
Q. And in this letter, Ms. Tomasoni advises Northern States Power Company that the department was not able to approve its DCS submittal?
A. Correct.
MR. SHULTIS: Objection. The document speaks for itself.
BY MR. TOMASZCZUK:
Q. And Ms. Tomasoni in the letter advised Northern States Power Company that the department was waiting until further notice. The contract requirement you provided provides schedule within 30 days.
That's what's indicated here?
A. Yes.
Q. Do you know on what authority Mr. Zabransky and Ms. Tomasoni voided their previous approvals of the DCS?
MR. SHULTIS: Objection as to characterization and calls for speculation.
A. No, I don't.

595

BY MR. TOMASZCZUK:
Q. Were you involved in any discussions concerning the decision by OCRWM to void the DCS that had previously been approved by Mr. Zabransky and Ms. Tomasoni?
MR. SHULTIS: Same objections.
A. I don't recall the specific DCS. I believe at that time, the department had indicated that it likely was going to be delayed in starting the system operations and were soliciting the views of -- seems to be indicated in the third paragraph, were soliciting the views of the contract holders on how the delay could be accommodated.
BY MR. TOMASZCZUK:
Q. And in conjunction with that, OCRWM made a decision not to approve DCS forms?
A. Yes. I think that was held in abeyance until the views were received.
Q. The decision not to approve DCS forms is being held in abeyance even to this day, is it not?
A. That's correct.
Q. So that decision has been held in abeyance basically since March of 1997?
A. I believe so.
Q. Now, you said it was held in abeyance

596

pending the views of the contractor holders with respect to the delay?
A. Correct. That's my recollection.
Q. Were those views provided?
A. I think to some extent they were, yes. I don't recall the number of comments or the totality of the contract holders submitting views.
Q. So if views were provided and the DCS forms were being held in abeyance pending receipt of those, why are they still being held in abeyance?
MR. SHULTIS: Objection, assumes facts not in evidence, calls for speculation.
A. I don't know specifically. I guess my personal view is that until we had a more definitive schedule, which is certainly contingent upon actual approval of a site for repository, it didn't appear appropriate to continue approval.
BY MR. TOMASZCZUK:
Q. And as of this date, the schedule remains sufficiently indefinite such that you can't approve DCS forms?
MR. SHULTIS: Objection as to characterization.
A. Well, my personal opinion is -- we talked the other day about the schedule in the 2010 date,

597

and I indicated that I think that's an achievable schedule, but I also indicated there are many challenges between now and that date, many of those areas of which are not within the department's control.
BY MR. TOMASZCZUK:
Q. So is it your view that DCS forms can be approved now or not?
A. My personal opinion is that it's not appropriate to approve them until we have at least a site for a repository approved.
Q. And when you say, a site for repository approved, approved by the Congress?
Is that what you're referring to?
A. By the Congress. Correct.
Q. After that occurs, is it your expectation that OCRWM will begin approving DCS forms?
MR. SHULTIS: Objection, calls for speculation.
A. I believe -- in my opinion, that would certainly be a trigger to start doing that.
BY MR. TOMASZCZUK:
Q. Can I direct your attention, Mr. Milner, a little further back in this packet to page -- Bates page 395 and 396.

598

know the person.
Q. Is it fair to say, Mr. Milner, that confusion exists today even with DOE as to what constitutes GTCC and how to deal with it?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.
A. I don't know -- well, I specifically don't know, but my belief is that GTCC is defined by NRC regulations depending on radioactivity level. The department may not have fully characterized all of its waste to determine what is and what isn't GTCC within the definitions provided by the NRC.
BY MR. TOMASZCZUK:
Q. And that circumstance causes confusion about what to do with GTCC and where to put it.
Is that fair?
MR. SHULTIS: Same objections.
A. No, I don't know that that creates confusion as to where to put it.
BY MR. TOMASZCZUK:
Q. It's clear in your mind?
A. As to where to put it?
No, it's not. That has not been decided to the best of my knowledge.
MR. TOMASZCZUK: Do you want to take five?

615

Take a short break?
THE WITNESS: Doesn't matter to me.
MR. TOMASZCZUK: Let's take a short break. Sure. We've been going about an hour. Take ten minutes.
(Recess.)
MR. TOMASZCZUK: Back on the record.
Ms. Reporter, could we mark as Milner Exhibit 80 a memorandum from Mr. Milner, subject, total system life cycle cost, 1995 assumptions package, with an attachment.
(Milner Exhibit No. 80 was marked for identification.)
BY MR. TOMASZCZUK:
Q. And Mr. Milner, let me represent to you that this is similar to Exhibit -- I believe Exhibit 49, which I previously asked you about. Exhibit 49, I believe, was a draft of this document, which appears to be a final assumptions package. And you're welcome to get both of them in front of you if you'd like to.
Mr. Milner, have you seen this Exhibit Milner 80 prior to today?
A. I don't recall seeing it, no.

616

Q. That's your name that appears on the cover. Right?
A. That's my typed name on the cover, yes.
Q. Do you know whether you approved the issuance of this memorandum and the accompanying TSLCC '95 assumptions package?
A. I don't recall whether or not I did. And in simply looking at the concurrence chain, there's no indication that I initialed off on that. I don't recall.
Q. Do you have some reason to believe that you did not approve this -- the issuance of this memo and the attached assumptions?
A. I don't recall either approving or disapproving the issuance.
Q. The issuance of TSLCC reports was now within your area of responsibility as director of the office of program management and integration. Right?
A. It would have been.
Q. Right. Did Mr. Riling whose name is referenced on the second page of this document work for you?
A. He did.
Q. And this would appear to indicate that this memo was initially prepared by him in February of '95?
A. It would appear so, m-hm.
Q. February 16, 1995, to be specific. Right?
A. It would appear so, yes.
Q. Could I direct your attention to the tables which appear at pages 14 and 15 of the attachment, and what is your understanding, Mr. Milner, of what these tables on these pages represent?
A. It appears that the tables show a delivery rate for a first repository, a second repository, and a single repository system.
Q. And the first table at 6.1 shows the spent nuclear fuel acceptance rates for a first repository and a two repository system?
A. I believe that's the case, yes.
Q. And it shows the repository beginning to accept spent nuclear fuel in 2010, and then ramping up to 3,000 MTU in the sixth year of operations -- fifth year of operations?
A. It does.
Q. And then maintaining that 3,000 MTU rate for a period of slightly less than 20 years, it looks like?
A. Through the year 2032, apparently, yes.

617

618

Q. Starting at a 3,000 rate in 2014 and then staying at that rate until 2032?
A. Yes, that's what's shown here.
Q. And then the second table, 6.2, is for a second repository and a two repository system. Right?
A. Correct.
Q. And then the third table, which is introduced at the bottom of page 14 and then actually appears on page 15, is a single repository and a single repository system?
A. Correct.
Q. And this shows a rampup rate starting at 300 metric tons in 2010. Correct?
A. Yes.
Q. And then going to 3,000 metric tons in 2014, the projected fifth year of operations?
A. Correct.
Q. And then staying at that steady state, 3,000 metric-ton figure, for 24 years, approximately. Right?
A. 2039, yes.
Q. Now, these tables were prepared assuming no MRS system; is that right?
A. I believe that's the case.

619

Q. Can I direct your attention to page 3, section 5, and in particular, section 5.2.
A. Okay. That would indicate no MRS was assumed.
Q. Right. You're referring to the parenthetical, no MRS system, which appears at 5.2?
A. Correct.
Q. Now, going back to the cover memo, this memo says that, attached is the final TSLCC assumptions package. Right?
A. It does.
Q. And it indicates that the major assumptions were reviewed with you, I presume the recipients of the package, in December of 1994. Correct?
A. It does.
Q. And am I correct in understanding that that would appear to be a reference to Milner Exhibit 49, which I had previously asked you about?
A. It would appear so.
Q. So the draft TSLCC assumptions were circulated by you in or about December of 1994. Correct?
A. Correct.
Q. And then you got comments back?

620

A. Presumably, m-hm.
Q. Well, this says that, and their comments have been incorporated as appropriate. Right?
You see that on the cover memo?
A. M-hm.
Q. So you received comments back and then circulated a final TSLCC assumptions package?
A. I don't know I can infer that from this since there's no indication of a date or an approval on it.
Q. Well, there is indication of a date on the second page, February 16, '95. Right?
A. When Mr. Riling would have prepared it, yes. Whether or not I actually sent this memo, I just don't recall.
Q. Well, this is the only version that I have.
And you have no reason to believe you didn't send it, do you?
A. I can recall no reason why I did not.
Q. And it's fair to assume, is it not, given that this had gone through some drafts, that at least as of February 1995, OCRWM was not expecting to site an MRS system?
MR. SHULTIS: Objection. Mr. Milner is

621

not a 30(b)(6) witness, calls for speculation, the document speaks for itself.
A. Certainly this package did not assume an MRS in the system.
BY MR. TOMASZCZUK:
Q. And do you know why the package did not assume an MRS system?
A. No, I don't.
MR. SHULTIS: Same objection.
BY MR. TOMASZCZUK:
Q. Was it because as of this point in time, OCRWM had essentially concluded an MRS was not going to be sited?
MR. SHULTIS: Same objection, asked and answered.
A. I don't know that OCRWM had concluded one was not going to be sited. I think at that point in time, OCRWM concluded we didn't have any authority to site one without being tied to a repository schedule.
BY MR. TOMASZCZUK:
Q. The rates that I asked about at -- reflected in the tables at 14 and 15, those are consistent with rates we've seen in other OCRWM-published documents, such as previous TSLCC reports and fee adequacy reports. Right?

622

A. They look roughly the same.
Q. And in particular the rampup to 3,000 and then maintaining a 3,000 MTU steady state acceptance rate, certainly that figure has been used in previous documents?
A. Certainly the 3,000 has been used. Yes, it's a steady state.
Q. Fairly consistently.
Isn't that true?
A. Yes.
Q. Can I ask you to look at Exhibit 51, Mr. Milner. This is the March 1995 APR/ACR.
A. Yes.
Q. Now, this document appears to have been issued roughly one month after the TSLCC assumptions package was circulated. Right?
A. It was issued a few months after the draft was circulated. I don't know when the final was actually circulated.
Q. But at least the draft reflected in Milner Exhibit 80 appears to have been circulated or at least prepared in February of '95. Right?
A. All's I can infer from here is that it was prepared in February of '95.
Q. And it reflects a revised draft from one

623

which had been previously circulated in December of '94. Correct?
A. Yes.
Q. And the attachment to Exhibit 80, as you've testified, was based on the assumption of no MRS system and either a single or dual geologic repository. Right?
A. I'm sorry. Can you repeat that question?
MR. TOMASZCZUK: Could you read it back.
(The reporter read the last question.)
A. Yeah. The previous one was no MRS.
BY MR. TOMASZCZUK:
Q. So is it fair looking now with the benefit of this Exhibit 80 to conclude that the acceptance rates reflected on Milner 51 dated March of 1995 are based on a no MRS system?
A. I guess you could assume that.
Q. And what is being done in Milner 51 is taking the statutory restrictions on an MRS and applying those restrictions to a geologic repository, which is all that OCRWM was really considering at the time?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation, and Mr. Milner is

624

not a 30(b)(6) witness. He's testified that he did not put the document -- Exhibit 51 together, so it calls for speculation.
A. The acceptance rates are similar.
BY MR. TOMASZCZUK:
Q. They are?
A. Similar.
Q. In what respect?
A. Let's see, one has delivery rate in the single repository system in the first year of operation of 300. The other has 400. The second year 600. The other one has 600.
Q. The rampup rates are remarkably different, aren't they?
A. They are different.
MR. TOMASZCZUK: Could you read my question two questions ago, because I don't think I got a responsive answer.
(The reporter read the record as follows:
"Question: And what is being done in Milner 51 is taking the statutory restrictions on an MRS and applying those restrictions to a geologic repository, which is all that OCRWM

625

was really considering at the time?")
MR. SHULTIS: Same objections.
A. In reading further on Exhibit 51, apparently at that point in time, there was some pending Congressional action on the conditions for siting, constructing, operating an MRS or interim storage facility -- use those terms interchangeably -- so I can only infer from that that under the potential of some Congressional action for siting a facility, those same rates were used.
BY MR. TOMASZCZUK:
Q. Mr. Milner, you testified I believe on several occasions that one of your concerns was to try and maintain some uniformity as I understood your testimony with respect to the various spent nuclear fuel acceptance rates embodied in OCRWM documents. Right?
A. Well, certainly one of my concerns was to try to ensure that the program was using the same set of assumptions, the program was consistently using the same numbers, if you will.
Q. And is it not true that the spent nuclear fuel steady state rates in these two documents prepared at roughly the same periods of time --

626

during the same periods of time are quite inconsistent. Right?
A. Steady state rates?
MR. SHULTIS: Objection.
BY MR. TOMASZCZUK:
Q. Do you understand what I mean by that term?
A. I know what you mean by, steady state rate, yeah.
Q. And is it not true that the -- that those steady state rates in these two documents prepared roughly within one month of each other are quite different?
A. Well, Exhibit 51 goes through ten years of operation. I can't tell whether that was the steady state rate at that point or not.
Q. Do I understand table one in the 1995 APR/ACR to show a rampup in year three to 900 metric tons and then to remain constant through the next seven years?
A. That's what's indicated in table one, yes.
Q. And the tables which appear on Milner 80 show in each instance rampups to 3,000 metric tons and then staying at that rate for at least 15 if not more years?

627

A. Correct.
Q. And aren't those quite dissimilar rampup rates or steady state rates?
A. 900 and 3,000 are certainly different numbers. I can't infer from ten years of operation whether that was intended to show a steady state of operation. I do not believe it was.
Q. So if this chart had been projected onward at Milner 51, higher numbers would have appeared for years 11 and beyond?
MR. SHULTIS: Calls for speculation.
A. In my opinion, higher numbers would have shown up in later years. Whether it's year 11, I don't recall.
BY MR. TOMASZCZUK:
Q. And why is that your view, sir?
MR. SHULTIS: Objection, calls for speculation.
A. Well, my recollection is that in most scenarios, steady state operation was going to be 3,000.
MR. TOMASZCZUK: Ms. Reporter, can we mark as Milner Exhibit 81 the 19- -- September 1995 TSLCC analysis.
(Milner Exhibit No. 81

628

was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, you're welcome to take as much time as you want to review it. Just let me know when you're ready.
A. Okay.
Q. Would your office have been responsible for the preparation and issuance of this report in or about September of 1995?
A. I believe it would have.
Q. As of that moment, you were still the director of program management and integration?
A. I believe that was the case.
Q. And that office was responsible for issuance of the TSLCC reports as I understood your testimony?
A. Yes.
Q. And this appears to be now the final TSLCC report; is that right?
A. It looks to be, yes.
Q. For 1995.
Could I direct your attention, Mr. Milner, to page 7 at the bottom of the page?
A. M-hm.

629

Q. And do you want to just read to yourself the last paragraph there at the bottom of page 7.
A. Okay.
Q. Why was the decision made in this report not to include MRS or interim storage facility costs in the TSLCC analysis as reflected in this paragraph?
A. In my recollection, there was nothing definitive for an MRS at that point in time, so we simply didn't include it.
Q. And nor were any interim storage facility costs included. Right?
A. Correct.
Q. For the same reason?
A. Yes.
Q. That nothing was definitive at that point in time?
A. Right.
Q. Could I direct your attention, Mr. Milner, on the next page.
And this table appears to depict spent nuclear fuel acceptance rates, as I understand it?
A. It does.
Q. And indeed it depicts the rates which underlie this TSLCC report. Correct?
A. Yes.

630

Q. And the repository as reflected in this table is expected to start operation in 2010 and to take 3,000 metric tons of spent nuclear fuel in that year?
A. In the year 2010, I think it's expected to take 300.
Q. Did I say 3,000?
A. Yes.
Q. I misspoke. I meant 300. Thank you.
And 600 metric tons in 2011?
A. Yes.
Q. 1200 in 2012?
A. Correct.
Q. 2,000 in 2013?
A. Correct.
Q. And then 3,000 in 2014, the fifth year of operations. Right?
A. Right.
Q. And that 3,000 metric-ton rate is to be maintained for 22 years, approximately?
A. Through the year 2039.
Q. From 2015 through 2039?
A. Correct.
Q. Do you know why these rates are reflected on this table in this document?

631

A. They were the receipt rates that were assumed for purposes of costing at that point in time, costing out the system.
Q. And those rates are consistent with those we've seen in previous TSLCC and fee adequacy reports. Right?
A. I believe they were.
Q. And these rates accurately reflect, do they not, DOE's system design plans?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
A. Well, they certainly reflect the assumptions that underlie this TSLCC, which I would assume were the department's goals at the time.
BY MR. TOMASZCZUK:
Q. And these rates are fairly consistent, are they not, with DOE's current design for a geologic repository at Yucca Mountain?
A. I believe they are.
Q. This table starts in year 2010 and goes to year 2040 as I understand it. Right?
A. Correct.
Q. So it depicts 30 years of operation of a geologic repository?
A. Apparently so, yes.

632

Q. And do you know why that period is reflected in this table, that is, the 30-year period?
A. My recollection is that at that point in time -- I'd have to check the math to see -- that that was probably the time at which we would have accepted 20,000 metric tons -- I'm sorry -- 70,000 metric tons into the repository.
Q. It was never DOE's intention to operate a repository for only ten years, was it?
MR. SHULTIS: Objection.
A. For only ten years?
BY MR. TOMASZCZUK:
Q. Yes.
MR. SHULTIS: Calls for a legal conclusion.
BY MR. TOMASZCZUK:
Q. I'm sorry. You said no?
A. No, no.
Q. It has been DOE's intentions to operate a repository from anywhere between 30 and 100 years; is that right?
MR. SHULTIS: Objection, calls for a legal conclusion. Mr. Milner is not a 30(b)(6) witness.
A. I guess if you mean by the term operating in the process of accepting waste, approximately 30

633

years. If you mean by operating the repository until it was actually finally closed, that's certainly a longer period of time.
BY MR. TOMASZCZUK:
Q. Thank you for that refinement of a not very artful question.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner Exhibit 82 the fee adequacy assessment dated October 1996.
(Milner Exhibit No. 82 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, do you recall this fee adequacy assessment dated October 1996?
A. I don't specifically, no.
Q. Did you or your office have any role to play in its preparation?
A. I believe I did not.
Q. It's a good thing we have these organizational charts. Right?
A. Yes.
Q. And why do you say that, Mr. Milner?
A. Because from Exhibit 1, in September of 1996, I had changed positions, the office of waste

634

Q. The next milestone that's identified here is, submit license application amendment to receive and possess waste FY 2008?
A. Correct.
Q. And do you expect that to be accomplished in FY 2008?
A. No, I don't.
Q. And has that milestone slipped?
A. It has.
Q. To what -- by what date do you expect that milestone to be accomplished?
A. I guess best of my recollection we're looking at late 2009.
Q. And the final milestone that's identified here in this section is, commence waste acceptance and emplacement. It has the parenthetical after that heading, FY 2010.
Do you expect that to be accomplished in fiscal year 2010?
A. I do.
Q. And that's your expectation even though every other milestone that we've just identified has slipped by at least a year or more?
A. That's correct.
Q. And how is it that that milestone will be

663

met even though these other milestones are already behind schedule in your view?
A. I think in recent years our planning in terms of how to construct the repository, how to initiate operation of the repository have been further developed, further refined. I think older schedules assumed a somewhat lengthy in essence training phase before you actually began receiving waste. Once the repository was constructed but before you actually began receiving waste, it would be in essence a lengthy training period for operators.
I think we determined that that can be done in a shorter period of time. There were quite a number of the various construction activities which had originally been planned to be accomplished sequentially. I believe now we can accomplish a number of those in parallel, reducing construction time. We're continually at this point in time looking at ways where we could further shorten the period.
Q. This program plan that we were just looking at basically envisions a five-year period for construction through the commencement of spent nuclear fuel in the repository?

664

A. I think it envisions a three-year construction period.
Q. It says -- if you look at page 12, start repository construction in 2005.
A. I'm sorry. I'm sorry. I'm thinking current schedule versus -- yes, five years.
Q. Are there plans to amend this program plan, revision three, dated February 2000?
A. Yes.
Q. Is a draft revision in the works?
A. Draft has not yet been prepared, but that will begin shortly.
Q. And would I be correct in understanding that that draft will indicate a shorter time frame for repository construction?
A. That would be my thought at the time, yes, at this time.
Q. And it will shorten the time for repository construction by about half.
Did I understand that?
A. From five years, to, yeah, two and a half, three years.
Q. Have any studies been prepared assessing the feasibility of shortening the construction time from five years to two and a half years?

665

A. I don't know that there's any published documents that -- a study per se. I don't know that there's any published documents. Certainly that's been looked at and continues to be looked at as part of the design process.
Q. Has the DOE selected a contractor for -- to construct the repository at Yucca Mountain?
A. No.
Q. Do you know whether that contract would be awarded through competition or otherwise?
A. Well, the final contracting strategy hasn't been decided upon yet.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner 89 the May 2001 fee adequacy assessment.
(Milner Exhibit No. 89 was marked for identification.)
BY MR. TOMASZCZUK:
Q. And Mr. Milner, could you also look at what I understand has been marked as Milner Exhibit 73, which is the May 2001 TSLCC analysis, Milner 73.
Let me just ask you with respect to Milner Exhibit 73, is this the last TSLCC report that's been prepared, Mr. Milner?

666

Do you know?
A. It probably is, yes.
Q. And you would have reviewed, commented on drafts, and then approved the final?
A. Yes.
Q. All right. Can I ask you to look at page 4, dash, 14?
MR. SHULTIS: On 73?
MR. TOMASZCZUK: Yes, of Milner Exhibit 73.
A. M-hm.
BY MR. TOMASZCZUK:
Q. And this table 4. -- 4, dash, 1 depicts acceptance rates for commercial spent nuclear fuel. Correct?
A. Correct.
Q. And we see rates on this table similar to those in various other TSLCC fee adequacy and other reports. Right?
A. Correct.
Q. Showing an initial emplacement rate of 400 metric tons in 2010. Correct?
A. Correct.
Q. And then ramping up to 3,000 metric tons in 2014?

667

A. Correct.
Q. And then staying at that rate -- that 3,000 metric-ton steady state rate through 2039 per this table?
A. Correct.
Q. There's a note which appears under this table.
Do you know who drafted that note?
A. No, I don't.
Q. Do you know why that note was put in under this table?
A. No, I don't.
Q. Do you know whether this note was placed in here as a result of direction by Mr. Barrett that any rates beyond those reflected in the May -- or the March 1995 APR/ACR had had this language --
MR. SHULTIS: Objection, asked and answered.
BY MR. TOMASZCZUK:
Q. -- accompanying it?
A. I don't know.
Q. The rates reflected on this table 4, dash, 1 were used for purposes of preparing the accompanying fee adequacy report issued in May of 2001; is that right?

668

A. I believe that would be correct.
Q. And indeed, the fee adequacy report, Milner 89, references the TSLCC report, Milner 73, at page 1. Right?
A. Yes.
Q. And the conclusion of this fee adequacy report is that the 1 mil per kilowatt hour fee is adequate?
A. Correct, at that point in time, m-hm.
Q. Mr. Milner, is work being done now on a TSLCC report for 2002?
A. It's in the very early stages, yes.
Q. And same question with respect to a fee adequacy report for 2002?
A. Well, that would follow the work on the TSLCC.
Q. Generally, as I understand it, the work on the TSLCC is done, and then that is used to prepare the fee adequacy report?
A. Correct.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner Exhibit 90 a GAO report dated December 2001 entitled, nuclear waste, technical schedule and cost uncertainties of the Yucca Mountain repository project.

669

(Milner Exhibit No. 90 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, are you familiar with this GAO report which I've had marked as Milner Exhibit 90?
A. I am.
Q. And I gather you've read the report?
A. Yes.
Q. And did you provide comments back to GAO on the report?
A. I think I was involved in at least the reviewing, comments back on it.
Q. I'm sorry. You were involved in OCRWM's comments back to GAO?
A. Correct.
Q. And approving the release of those comments back to GAO?
A. Correct.
Q. Can I refer you back to the heading on page 2, results in brief. And as I understand the narrative which accompanies these results in brief, the GAO indicates some substantial skepticism with respect to DOE's ability to meet the schedule that it has laid out in other documents for siting a

670

Q. Did you participate in drafting any of it?
A. I did not.
Q. Did you review and approve it prior to its transmission to the president?
A. I did not.
Q. Did you see it before it went to the president?
A. I did not.
Q. And at this time, you're the -- in February, you were the chief operating officer. Correct?
A. That's correct.
Q. I gather that you saw other documents that accompanied this letter when it was transmitted?
A. Yes.
Q. But not this letter itself?
A. That's correct.
Q. Did you see it at any time prior to today?
A. Yes.
Q. So you saw it after it was sent and before today, just so I'm clear?
A. Yes, that's correct.
Q. Did somebody give you a copy of it after it was sent?
A. Yes.



Q. And who gave you a copy?
A. I guess it was Mr. Barrett.
Q. What did he say to you when he gave it to you?
A. This is a copy of the letter the secretary sent to the president.
Q. Nothing more colorful than that?
A. Nothing more colorful than that.
Q. Can I direct your attention to page 4. The very last paragraph on this page as I understand the letter is the formal recommendation of the secretary of energy to the president recommending Yucca Mountain. Right?
A. Correct.
Q. Can I direct your attention to the sentence which precedes that, starting with, not.
Do you see that?
A. Yes.
Q. Read that to yourself.
A. Yes.
Q. And this sentence states, quotes: Not completing the site designation process and moving forward to licensing the development of a repository as Congress mandated almost 20 years ago would be an irresponsible dereliction of duty.



Do you agree with that statement?
A. Yes, I do.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner Exhibit 93 a statement of Lake Barrett to the -- strike that -- a statement of Lake Barrett dated March 14, 2002, presented to an FY 2003 appropriations hearing, committee of the Congress.
(Milner Exhibit No. 93 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Have you seen this statement prior to today?
A. Yes, I have.
Q. Did you assist in its preparation?
A. I reviewed it.
Q. You reviewed it, provided comments, and approved its issuance?
A. Well, provided comments.
Q. But you didn't approve its issuance?
A. No. Approval was the person delivering the statement.
Q. Did you provide any comments on a draft of the document?
A. I believe I did.



Q. Do you recall what those comments were?
A. No, I don't. I do recall they were not substantive in nature.
Q. Do I understand that Mr. Barrett made an oral presentation which accompanied this written statement on or about March 14th?
A. Yes.
Q. Did you accompany him when he was appearing before the Congress on March 14th?
A. I believe I did.
Q. He had you with him during the testimony he gave?
A. Yeah, in the audience.
Q. All right. Do you recall whether Mr. Barrett said anything to the Congress about spent nuclear fuel acceptance rates for the repository that the department is planning to construct at Yucca Mountain?
A. I recall some discussion back and forth between Mr. Barrett and one of the members regarding acceptance.
Q. And what do you recall about the nature of that back and forth?
A. It's -- my recollection was that there was some discussion in terms of how long it would take to

empty the spent fuel from all the reactor sites at various acceptance rates.
Q. And what did Mr. Barrett say in response to that question?
A. I think there was a variety of questions and a variety of responses.
Q. Did he indicate during his discussion that DOE expected to use a 3,000 metric-ton steady state rate for spent nuclear fuel at the repository?
A. I believe he did.
Q. And that would have been consistent with the rate we've seen for steady state acceptance of spent nuclear fuel in any number of other documents. Correct?
A. Yes.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner Exhibit 94 a certification signed by Mr. Milner dated April 18th, 2002, which accompanied certain interrogatory responses, which were transmitted on or about April 16th of 2002 in connection with these spent nuclear fuel cases pending at the Court of Federal Claims.
(Milner Exhibit No. 94 was marked for identification.)

683

BY MR. TOMASZCZUK:
Q. Mr. Milner, that's your signature that appears underneath this certification. Right?
A. That's correct.
Q. And did you review the responses to interrogatories 81, 88, and 97 at or about the time you signed this certification?
A. I did.
Q. Did you have occasion to read Mr. Morgan's deposition transcript prior to signing the certification?
A. I did not.
Q. There's a reference here in the response to interrogatory 81 at the bottom of the page in a sentence which starts, as Mr. Morgan explained at his deposition.
Do you see that?
A. Yes.
Q. Do I gather that someone else told you about what Mr. Morgan stated at his deposition for purposes of enabling you to sign the certification?
A. That's my recollection, at least that portion.
Q. Because you weren't there and you haven't read the transcript. Right?

684

A. Correct.
Q. Can I direct your attention, Mr. Milner, to this last interrogatory, 97. There's a reference here to a task force assembled for purposes of reviewing the acceptance rate term of the standard contract.
Do you see that in the interrogatory itself?
A. Yeah, in the interrogatory, yes.
Q. All right. And then in the answer, it's stated that -- there's an identification of individuals that may have been members of a group that examined the acceptance rate term of the standard contract. Right?
A. Yes.
Q. And you are one of those individuals.
Indeed, you're the first one mentioned?
A. Correct.
Q. Can you tell me when this group examined the acceptance rate term of the standard contract?
When was this group performing its work?
A. This particular group would have been in the late '84, early '85 time frame, I guess.
Q. This would have been shortly after you arrived at OCRWM. Right?

685

A. That's correct.
Q. And why was this group conducting this examination of the acceptance rate term of the standard contract?
A. Well, at that particular point in time, I'm not even sure what acceptance rate term means here. There was a task force that we discussed earlier in these proceedings that were looking at a variety of contractual issues.
I don't recall there being any acceptance rate in the term that we're currently using it. I don't know what acceptance rate term means.
Q. Well, that language appears in the answer, so --
A. Yes, it does.
Q. At the time you reviewed the answer and signed the certification, what did you understand acceptance rate term to mean?
MR. SHULTIS: Objection. The interrogatory also says, we objected to that term in our response.
MR. TOMASZCZUK: I won't agree with many of your other objections, counsel, but I'll note that that objection was stated in the interrogatory response.

686

been responsible for the receive rates in these documents?
A. I don't recall, no.
Q. Would it have been Mr. Tribulis (phonetic)?
A. He would have prepared the mission plan, but he would not have prepared the receipt rates.
Q. And you have no idea anyone who worked on -- who would have been responsible for this?
A. I can't recall, no.
Q. Okay. I think we're done with these two. A couple more.
26 and 27, please. And if you could -- when you get --
(Discussion off the record.)
BY MR. SCHECHTER:
Q. You got 26 and 27?
A. Yes.
Q. Could you flip to page 24 in Exhibit 26, and just for the record, Exhibit 26 is the June '87 TSLCC report, and 27 is May '89. Okay?
A. Correct.
Q. Okay. I'm just making the record clear.
Do you have that page?
A. 24?

703

Q. Yes. And in 27, could you flip to schedule A 1, which is after page 9.7 -- 9, dash, 7. Excuse me.
Now, if you look on page 24 of Exhibit 26, it reflects an MRS startup date of 1998, does it not?
A. I'm sorry. In which one now?
Q. Exhibit 26, page 24.
A. M-hm.
Q. Third item from the bottom, MRS startup date, 1998.
A. Okay.
Q. Were you involved in the MRS activities at this point in time?
A. Not at that point in time, no.
Q. Not in 1987?
A. Correct.
Q. You see that reflects a startup date for the MRS of 1998. If you look at Exhibit 27, at pages A 1 and A 2, it reflects MRS startup dates of 2000 and 2003.
Can you explain why the MRS startup dates first of all changed from 1987 to 1989?
A. No.
Q. Do you recall anything in the program --
A. No.

704

Q. -- that might have done that?
A. No.
Q. The Nuclear Waste Policy Act amendments wouldn't have affected the projections on when the MRS would start?
MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.
A. Not that I can recall.
BY MR. SCHECHTER:
Q. Okay. And can you explain why the May 1989 TSLCC report has two different startup dates for the MRS facility?
A. No, I can't.
Q. Okay. Ask you a few questions, Mr. Milner, about what happened in the MRS world in the mid-1990s.
You were involved at that point in time, were you not?
A. In the mid-1990s, yeah, I guess I still was.
Q. Okay. In the budget cycle for fiscal year 1994, Congress eliminated funding for the proposal -- next round of proposals for the MRS volunteer sites, did they not?
A. It sounds like the right time frame for

705

it. I don't recall the exact year.
Q. If Mr. Barrett testified that that was the case, you wouldn't disagree with him on that, would you?
A. No.
Q. Okay. And if he testified that because of that that was the end of 1998 from a practical sense, and he says, achieving the date January 31, 1998, was not very practicable after the final decision of the fiscal 1994 budget.
Do you have any reason to disagree with that?
MR. SHULTIS: Objection, vague, calls for speculation.
A. I guess if I could characterize more the optimism or lack thereof of the program, certainly after that, we were not as optimis- -- at least I was not as optimistic about an MRS.
BY MR. SCHECHTER:
Q. There were two Indian tribes that were at least working their way through the process at that point; isn't that correct?
A. There were two Indian tribes, and there was also one county. I don't recall time frames, whether the county had dropped out at that point or

706

not.
Q. And the effect of the Congressional action at that time was to end the activities of those two or three possible sites?
MR. SHULTIS: Objection, calls for speculation.
A. It certainly cut off the funding.
BY MR. SCHECHTER:
Q. Would you agree with Mr. Barrett if he testified at page 653 of his deposition that the voluntary MRS was basically doomed in 1994?
MR. SHULTIS: Objection, asked and answered.
A. Again, I think it's a matter of various people's opinions and optimism. It certainly looked more dismal than it did before then.
BY MR. SCHECHTER:
Q. You were less optimistic?
A. I was less optimistic, but perhaps more optimistic --
Q. -- than Mr. Barrett.
What happened to the nuclear waste negotiator?
Do you know?
What happened to that position?

707

A. It eventually -- I can't recall -- I guess that had a sunset provision to it if I'm remembering correctly, but I don't recall for sure. It certainly went away.
Q. Let me see if Exhibit 84 can help you here. Exhibit 84 is the July 1998 program plan, and if you would flip to page 2 and look at the second-to-last sentence above, program organization, and I'll read that: The negotiator was unable to secure a volunteer host for a repository storage facility before the office's authority expired in January 1995.
Does that refresh your recollection?
A. Yep.
Q. He was out of business in January of 1995; is that correct?
A. Yeah.
Q. And prior to that time, was the department engaged in any siting activities independent of a negotiator?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
BY MR. SCHECHTER:
Q. If you know.
A. Simultaneously with the negotiator?

708

Q. Yes.
A. No.
Q. Well, now, in terms of efforts going forward for an MRS or interim storage, there was a change of administrations January 20th, 1993. Correct?
A. Sounds right.
Q. When the Clinton administration came in, they were opposed to interim storage, were they not?
MR. SHULTIS: Objection, calls for speculation.
A. I had never had a member of the administration state that to me.
BY MR. SCHECHTER:
Q. Take a look at page 12, please, and look at the second and third sentences in the paragraph under, waste acceptance storage and transportation project.
I'll read them into the record: Since the 1996 revised program plan was issued, bills were passed in the Senate and the House of Representatives that would authorize the siting and construction of an interim storage facility to receive waste prior to 2010. The administration opposed such legislation.
Does that refresh your recollection on

709

what the administration's position was?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
A. My recollection --
MR. SHULTIS: The document speaks for itself.
MR. SCHECTER: I'm asking if it refreshes his recollection on something he didn't recall.
A. My recollection was that the administration's stated position was that they opposed siting an interim storage facility until they -- whatever the exact words were, but more progress was made on the repository.
BY MR. SCHECHTER:
Q. But there was no interim storage facility authorized at that time?
MR. SHULTIS: Same objection,.
BY MR. SCHECHTER:
Q. There was no site for an interim?
A. There was no site for an interim, correct.
Q. And the negotiator was out of business?
A. Correct.
Q. And the folks who were proposing to be volunteers weren't funded?
A. Correct.

710

Q. Okay. Now, we've talked about the volume limitations so to speak, that were in the NWPA amendments, 10,000 and 15,000 tied to two different circumstances. Correct?
A. Correct.
Q. And those were volunteer limitations that related solely to the MRS?
A. Correct.
Q. There was no volume -- there was a 70,000 MTU volume limitation on the repository?
A. Correct.
Q. Can you think of any programmatic reason that one would apply the MRS volunteer limitations to the repository?
MR. SHULTIS: Objection, vague.
BY MR. SCHECHTER:
Q. For any reasons.
A. No, not that I can think of.
Q. In fact, the TSLCCs don't apply those limitations?
They have the rampup to 3,000?
A. M-hm.
Q. Okay. Sitting here today, you can't think of any particular reasons that you'd do that?
A. Which number are you speaking of?

711

Q. I'm sorry.
Any reason to apply for example a 10,000 MTU or a 15,000 MTU limit to the permanent repository.
A. In terms of total capacity?
Q. Yes.
A. No.
Q. Or capacity over a period of time.
A. No.
Q. Okay. I want to turn back just for a minute to Milner 88.
You got it?
A. Yep.
Q. And I want to ask you a couple of questions on pages 11 and 12, if I may. And I want to -- was it your testimony that the activity -- last activity on page 11, developments of middle license application FY 2002 would be done in FY 2004?
A. In the year 2004.
Q. So it might be calendar year 2004, which is actually fiscal year 2005. Correct?
A. The latter part, yeah.
Q. In fact, the report that went to the president said that the license application would be submitted at the end of 2004?

712

A. Correct.
Q. So it's really fiscal year 2005. Okay. I just wanted to clarify that.
Turn to page 12 for a minute, if you would. Now, as I understand it, this page shows at least two activities that have to be completed before the last activity, commence waste acceptance and emplacement can begin.
One is construction has got to be completed. Correct?
A. Correct.
Q. And the other is that you've got to have a license application amendment granted by the NRC or approved?
A. Correct.
Q. Okay. And I believe your testimony was that the present plan was to submit the license application amendment in late 2009.
Now, is that fiscal or calendar?
A. Well, I was I think characterizing that as the best of my recollection, because I could not really recall what our current schedule is for the amendment, so I -- later in '09, I don't know whether that would cross over into a different fiscal year or not.

713

Q. Thank you.
Now, under the schedule that's shown here, February 2000 schedule, the plan is to give the NRC two years to review and approve that proposal. Correct -- that amendment?
A. That's the time there. I don't recall whether we assumed that they would take the whole two years or not, because as best I can recall, we would build into this schedule a somewhat lengthy training phase, if you will, before we actually began receipt.
Q. Has the department advised the NRC that that application is going to be submitted in late 2009, presuming that's the date to the best of your recollection rather than fiscal year 2008?
MR. SHULTIS: Objection, Mr. Milner is not a 30(b)(6) witness.
A. I don't know whether we've advised them on that date or not.
BY MR. SCHECHTER:
Q. And you described in your testimony that you thought it was realistic to cut the construction period considerably, whatever the number was, from five years to two and a half years.
Is that roughly right?
A. Correct.

714

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER )
COMPANY )
(98-154C)(Merow, S.J.) ) Volume I
MAINE YANKEE ATOMIC POWER COMPANY) Washington, D.C.
(98-474C)(Merow, S.J.) ) Tuesday
Plaintiffs, ) May 7, 2002
v. )
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - -)

Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 3:48 p.m., Tuesday, May 7, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

1

APPEARANCES:

On behalf of Plaintiffs:

PETER J. SKALABAN JR., ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

On behalf of Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Inc., Power Authority for the State of New York, Omaha Public Power District, Nebraska Public Power District, and PSEG Nuclear L.L.C.:

DANIEL S. HERZFELD, ESQ.
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7612

2

APPEARANCES CONTINUED:

On behalf of Defendant:

RUSSELL A. SHULTIS, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
Federal Claims Section
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561

3

C O N T E N T S


| WITNESS | EXAMINATION PAGE NO. |
| --- | --- |
| RONALD A. MILNER | |
| By Mr. Skalaban | 5 |


E X H I B I T S

(No exhibits were marked.)

4

P R O C E E D I N G S
Whereupon,
RONALD A. MILNER
was called as a witness by counsel for Plaintiffs, and, having been duly sworn by the Notary Public, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. SKALABAN:
Q. Hello, Mr. Milner. My name is Pete Skalaban. I represent Yankee Atomic Electric Company, Connecticut Yankee Atomic Power Company, and Maine Yankee Atomic Power Company in this litigation.
I'd like to apply the same general ground rules that occurred in the common deposition. If you don't understand a question, if you can let me know, and I'll try to clarify it.
A. All right.
Q. And that way, we can have a common understanding for my questions and your answer.
A. Fine.
Q. If you need a break at any time, please let me know. I'll be happy to stop. I just request that the break doesn't occur when a question is pending.
Is that okay?

5

A. Fine by me.
Q. Okay. And also, if I ask you a question and it occurs to you subsequently, perhaps when we're looking at another exhibit or what have you, that the answer was incomplete -- your prior answer was incomplete or inaccurate in some way, can you let me know so that we get a true and accurate record?
A. Certainly.
Q. Thank you.
Mr. Schecter was asking you about a schedule for accepting wastes at the repository. And there was one answer I didn't quite understand, and I wanted to go over it.
I believe you were talking about the facility would have an ability to take a canister out of a transportation overpack and place a canister in a storage overpack and that this might accelerate the ability of the repository to accept fuel.
Did I understand that correctly?
A. Well, what I was speaking of was, some of the fuels certainly will arrive at the repository site in dual-purpose canisters. That canister has the ability to be removed from its transport overpack and placed into a storage overpack.
Certainly there's a relatively -- in

6

relative terms, a simple matter.
Q. All right. And that's something you're planning to do, the department is planning to do with the repository, to accept the canister fuel and put it into storage overpacks?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
A. My understanding is that we're planning on having the capability to accept canisters, canistered fuel. There will be certainly an ability to store some fuel aboveground for some period of time. I didn't intend to characterize that as the department's plan to do that initially.
BY MR. SKALABAN:
Q. But it's what you expect to happen?
MR. SHULTIS: Objection, calls for speculation.
A. No, I don't expect it to happen or not to happen. It's an ability.
BY MR. SKALABAN:
Q. Okay. But if I understand your answer, you -- the department's plan is to accept canistered fuel and possibly put it in storage overpacks before it goes in the repository?
MR. SHULTIS: Objection, calls for

7

speculation.
A. The characterization is that we expect to receive canistered fuel. We expect to have the ability to store -- I don't think you can infer that the plan is it will go directly to storage and then later to a repository.
BY MR. SKALABAN:
Q. And the fuel in the canisters, would that be from canisters from different dry storage systems that different utilities have been implementing across the country?
A. Well, when I say, dual-purpose canister, it's a canister that's been approved by the NRC for both transport and storage, and then they could be utilized in different storage modes.
Q. And what are some of the canisters that you're aware of that have been licensed for dual storage and transportation?
A. I can't recall the designations now. I believe there's at least one or two that have currently been approved, perhaps more.
Q. Such as the NAC, N-A-C?
A. Yeah, I believe that's one of them.
Q. So the canistered fuel would be fuel that different utilities had put in systems like the NAC

8

speaks for itself.
A. This document states that the more significant linkage -- the more significant linkage is the construction.
BY MR. SKALABAN:
Q. And is that because the MRS can't begin to be built until the department has received authorization to begin building the repository?
MR. SHULTIS: Same objection.
A. Well, certainly that linkage states that, that they cannot begin construction of an MRS until you begin construction of a repository, yes.
BY MR. SKALABAN:
Q. If we can take a moment -- or actually, let me just ask you: Do you have a sense of what the -- from your time that you were at the program after the NWPA Amendments Act was passed, do you have a sense of what the department estimated that when it could build a -- I'm sorry -- when it could start waste acceptance in an MRS -- strike that.
Let me try to ask a better question.
When you started -- I'm sorry.
Following the amendments act, did you have a sense of what the time gap would be between -- given this construction linkage in the statute when

13

an MRS could come online and when a statute would come online, what the likely time gap between those would be in view of the statutory construction linkage?
MR. SHULTIS: Objection, calls for speculation and possibly a legal conclusion.
A. I'm trying to recall at that time -- I don't recall what the schedule assumptions were offhand at that point.
BY MR. SKALABAN:
Q. Well, let's take a look at Milner Exhibit 18.
MR. SHULTIS: Are we done with 27?
MR. SKALABAN: For the time being. You may want to leave it handy.
BY MR. SKALABAN:
Q. Milner Exhibit 18, which is the draft 1988 mission plan amendment from June 1988. And if you could turn to page 10, sir, and the document has a Bates number PNL, dash, 029, dash, 1253.
And there's -- in the middle of the page, middle paragraph, it begins: The DOE is confident that the system authorized by the Congress is prudent, reasonable, and workable, period. Schedules based on meeting the requirements in the amendment

14

act show that the MRS facility should be available no later than 2003, and the repository will begin accepting waste in 2003.
Do you see that, sir?
A. Yes, I do.
Q. Does that suggest to you at that time that the department estimated that the MRS -- or that given the schedule linkages, the MRS would be online at approximately the same time the repository would be?
MR. SHULTIS: Objection. The document speaks for itself.
A. That's what it suggests, yes.
BY MR. SKALABAN:
Q. I'd like to call your attention to page 20. And in the second full paragraph, it begins: The DOE believes that it may be possible to shorten the time between the start of MRS construction and the start of waste acceptance by developing the MRS in phases.
Do you see that, sir?
A. I do.
Q. So does that indicate to you given that -- given the statement -- and if you need to take time to read the paragraph in full -- but does this

15

suggest to you that June 1988 -- in the draft 1988 mission plan amendment, the department's best estimate was that the MRS would be online at the -- or could begin to accept waste at the same time as the repository, which would be 2003, or possibly as this paragraph indicates, that time might be able to be shortened a bit?
MR. SHULTIS: Objection. The document speaks for itself. Also, Mr. Milner is not a 30(b)(6) witness.
A. Yeah. This suggests several things, that the MRS that I think was being envisioned at that point in time did more than receive and store. It did -- as indicated here, loading fuel into canisters, possibly spent fuel consolidation, and so forth.
And so if you constructed just the receipt and storage portion of the facility, that that would certainly shorten the time between the start of construction and start of operation. I don't believe this mission plan -- well, okay.
I guess it did. So, yeah, m-hm, yes.
BY MR. SKALABAN:
Q. Okay. So they would come -- the best estimate was that they would come -- or begin -- both

16

facilities would be able to accept waste at the same time the department might be able to shorten or speed up the MRS somewhat?
A. Correct.
Q. I'd like to call your attention while we're on this document just to page 18 for a moment. In the bottom paragraph it says: The DOE recognizes that under current conditions waste acceptance as a waste management facility cannot begin in 1998. Furthermore the delay in repository schedule and the linkages between the schedule and key milestones in the siting and construction of an MRS facility make it unlikely that the DOE will be able to start accepting waste significantly before 2003.
Do you agree that this accurately describes DOE's beliefs at the time of June 1988?
MR. SHULTIS: Objection. The document speaks for itself.
A. I believe it does, at least the department's opinions given the linkages.
BY MR. SKALABAN:
Q. And would it be fair that for a purchaser -- and what I mean by that, someone who has -- utility has executed a standard contract -- would it be fair for a purchaser to read that to



assume that the department is not going it make the 1998 date and is unlikely to start accepting waste significantly before 2003?
MR. SHULTIS: Objection, calls for speculation, asking for a legal conclusion.
A. Well, I think to me this would indicate that the department was being candid in terms of its views of a schedule at that point in time.
How the purchasers would interpret that, I can't say.
BY MR. SKALABAN:
Q. And in "candid," you mean you're giving them a frank opinion that it's unlikely -- or that they cannot begin in 1988 and it's unlikely to begin much before 2003?
MR. SHULTIS: Objection, asked and answered.
A. Yeah, I believe so.
(Discussion off the record.)
MR. SKALABAN: Put on the record that I intended to say 1998.
BY MR. SKALABAN:
Q. And that doesn't change any of your answers, I assume?
A. I assumed that myself.



Q. Now, Mr. Milner, actually to perhaps speed things up a little bit, there are three exhibits I'd like to ask you about, and they're 20, 33, and 42.
BY MR. SKALABAN:
Q. Now, on No. -- Exhibit 20, which is, report to Congress on reassessment of the Civilian Radioactive Waste Management program, dated November 1989 -- 20 -- if you could turn for a moment to page 7 -- or roman numeral seven, the executive summary section.
The fourth paragraph down refers to the secretary's comprehensive review of the schedule for repository-related activities, and it states, quotes: This schedule shows a significant slip for the expected start of repository operations from the year 2003 to approximately 2010.
And this I assume accurately reflects the department's position at this time, November 1989, when it reported to Congress that it anticipated that a repository would not be available until 2010?
A. Yes.
MR. SHULTIS: Objection. The document speaks for itself.
BY MR. SKALABAN:
Q. And your answer to that question was, yes?



A. In November of 1989 that certainly reflected the department's opinion -- position.
Q. Now, on page 12, in the first full paragraph, it again refers to the statutory linkages between the MRS and the repository. And it states in the second sentence, quotes: If the current statutory linkages to the repository are maintained, an additional delay of five years would result, with startup estimated at 2007 for the basic MRS facility.
Does this suggest that at this time DOE's best estimate of the earliest time that it could begin an MRS operation in view of the scheduled linkages was 2007?
A. I think it reflects the department's view at the time, yes. If the linkages remained in place, that would be the startup date.
Q. At that time the department was estimating a gap between -- in view of the statutory linkages a gap of three years between when the repository would be operational and when the MRS would be operational?
A. Yes, that appears to be the case, yeah.
Q. Okay. Do you have any reason to believe that the department could have accelerated that three-year -- the ability of the MRS to be online three years before the repository any further under

the scheduled linkages?
MR. SHULTIS: Objection, calls for speculation.
A. I don't know.
BY MR. SKALABAN:
Q. Was there any talk that you were aware of that instead of three years, maybe you could have the MRS online in four years?
MR. SHULTIS: Same objection.
A. Take a year longer?
BY MR. SKALABAN:
Q. Well, a year earlier.
A. Extend the time delta to four years. I don't recall.
Q. I mean, this was at this time the department's best estimate --
A. Yes.
Q. -- of how quickly it could get an MRS up and running under the current statutory linkages?
A. Correct, correct.
Q. And, sir, if you could, please, turn to Milner 33, which for the record is the annual capacity report of December 1990, beginning with a Bates number of HQ 0002486.
A. I'm sorry. What was the page number



again?
MR. SHULTIS: That was just the cover. Right?
MR. SKALABAN: Yep.
A. Okay.
BY MR. SKALABAN:
Q. And here again, sir, on page 5, you see that the beginning paragraph, the last sentence of the beginning paragraph appears to estimate the possibility that the MRS could be ready three years prior to the repository operations.
Is that fair?
A. Correct.
Q. And that would again be the department's best estimate of when it could feasibly get an MRS up and running before a repository?
A. Yes.
MR. SHULTIS: The document speaks for itself.
BY MR. SKALABAN:
Q. And we did look at this document before, and there was the upper and lower bounding case?
A. I believe that's true, yeah.
Q. I just want to call your attention in the first full paragraph on page 4 -- almost in the



middle of the paragraph, it refers to the lower bounding case, and it says: The lower bounding case represents a receipt rate that would be in compliance with the amendments act restriction on storage limits at an MRS before a repository starts operations.
Do you see that?
A. Yes.
Q. And then it goes on to say that: However, this case assumes removal of the schedule linkages with the repository imposed by the amendments act.
In view of that passage, it's fair to say that the lower bounding rate in the lower capacity report, which for your reference can be found on page 7, is based on a change -- is based on a change in the law?
MR. SHULTIS: Objection, calls for a legal conclusion.
A. Yes, because it removed one of the linkages.
BY MR. SKALABAN:
Q. It would require the removal -- a Congressional -- a law, a change in the law to remove some of the -- the scheduling?
A. That's correct.
Q. If we could turn to Milner 42, which is



the December 1991 annual capacity report, on page 4, it has what appears to me a similar estimate on when an MRS facility could be available to start spent fuel acceptance in view of the schedule linkages between an MRS and the operation of a repository.
Do you see that in the middle paragraph?
A. I do.
Q. And here again like in the 1990 annual capacity report the department is estimating that the time -- that it could not start MRS facility operations until at least 2007 in view of the statutory schedule linkage?
A. Correct.
Q. And again, at this point in time, the repository was anticipated to be in operation in 2010, so the department here is figuring that at the earliest -- and I'm focusing on the language, until at least 2007, the earliest that an MRS could be available to accept spent fuel before a repository could be available to accept spent fuel would be three years?
MR. SHULTIS: Objection. The document speaks for itself.
BY MR. SKALABAN:
Q. Is that fair?

A. Correct.
Q. Now, sir, on page 5, there are the waste acceptance rates for the 1991 ACR.
Do you see that, sir?
A. Yes.
Q. And this is a waste acceptance schedule that is based on the assumption of again like the 1990 ACR a change in the law?
A. Correct. I think at that point in time, it was envisioned that if the nuclear waste negotiator were successful in finding a volunteer site for an MRS that that volunteer host would certainly support a change in the schedule linkage.
Q. And it would still, however, would still require Congress to change the law, presumably the president to sign the law or --
A. Correct.
Q. -- or an override veto, but it would require a change in law to make the schedule linkages go away?
A. Correct.
Q. Now, this waste acceptance schedule on page 5, which is based on the absence of the schedule linkages in the statute, these were the basis for the DCS submittals; is that correct?

25

A. I believe.
MR. SHULTIS: Objection, calls for a legal conclusion.
BY MR. SKALABAN:
Q. If I could turn your attention to -- okay. Thank you.
If I could turn your attention to page 2. It talks about beginning in January 1992 the purchaser may submit delivery commitment schedules. It goes on to say that the purchaser's allocations for each delivery year are presented in tables A 1 through A 10 in appendix A and should be used as the basis for submitting DCSs.
Do you see that?
A. I see that.
Q. And the purchaser's allocations were based upon this table on page 5, this waste acceptance schedule on page 5, is that correct?
And if you need more time to go -- look through the whole document, please -- please take all the time you need. And if it helps you answer the question, I can refer you to page 9, where the total -- the total rates are stated at the bottom.
A. Okay. It would appear to be the case, yes.

26

MR. SHULTIS: Objection. The document speaks to tables that I don't think are attached. I don't find in this A 1 through A 10 appendix A. I don't see appendix A here.
MR. SKALABAN: Okay. Well, at least that's a fair comment. I don't think -- my copy does not have that -- the appendix either.
BY MR. SKALABAN:
Q. But at least viewing page 5 and page 9 -- page 9 is a table 3.1 that says, summary of purchaser's annual allocations; is that correct?
MR. SHULTIS: That's on page 9?
MR. SKALABAN: Yes.
A. Yes, that's what -- the title of the table.
BY MR. SKALABAN:
Q. And at the bottom, there are acceptance rates for different years of the system, and the 400, 600, 900 forward.
A. Correct.
Q. And those are the same acceptance rates that appear on table 2.1 on page 5, same aggregate acceptance rates?
A. Same aggregate, yes.
Q. And so is it fair to say it was the

27

department's position at the time that the delivery commitment schedule submitted by purchasers had to be based upon the waste acceptance schedule reflected here on page 5?
MR. SHULTIS: Objection. The document speaks for itself, Mr. Milner is not a 30(b)(6) witness, and calling for a legal conclusion.
A. In my opinion, that's what this states, yes.
BY MR. SKALABAN:
Q. And then also, sir, if you could please take out Exhibit 43. And on page -- for the record, Exhibit 43 is the DCS instructions. It's entitled, United States Department of Energy instructions for completing the appendix C delivery commitment schedule general instructions.
And item two, it says, who should submit. And it states there, the DCS should be submitted by all purchasers with allocations in the 1991 annual capacity report.
And that further suggests, does it not, that the department was requiring the purchasers to use this waste acceptance schedule here on page 5 of the -- of Milner 42 as well as the individual breakdown of allocations which appear on page 9 of

28

the 1991 ACR?
MR. SHULTIS: Objection. The document speaks for itself, calls for a legal conclusion.
A. In my opinion, that's what it states.
BY MR. SKALABAN:
Q. And if I could turn your attention to the specific instruction portion of this document, Milner 43 of the DCS instructions, there's a paragraph entitled, 2.7, on page 6. And if you could just take a moment to read paragraph 2.7.
A. Okay.
Q. This paragraph says -- or -- I'm sorry. In the second sentence of this paragraph after a comma, it states, quote: The total quantity of SNF designated for delivery must not exceed the allocation in the ACR, semicolon, exceeding the allocation will result in the approval of the DCS.
MR. SHULTIS: Objection, mischaracterizes the document.
MR. SKALABAN: Oh, I'm sorry. Okay. Thank you, counsel.
BY MR. SKALABAN:
Q. Exceeding the allocation will result in the disapproval of the DCS.
And doesn't this part 2.7 further confirm

29

that the department will require the purchasers to follow the waste acceptance schedule in page 5 and page 9 of the 1991 ACR?
MR. SHULTIS: Objection. The document speaks for itself, Mr. Milner is not a 30(b)(6) witness, calls for a legal conclusion.
A. In my opinion, that's what it says -- indicating here.
BY MR. SKALABAN:
Q. And is therefore, assuming that purchasers followed the instructions and submitted DCSs on the basis of the 1991 ACR -- the delivery commitment schedules would then be based upon a waste acceptance schedule that was not consistent with the Nuclear Waste Policy Act?
MR. SHULTIS: Objection, calls for a legal conclusion and -- objection, calls for a legal conclusion, and also Mr. Milner is not a 30(b)(6) witness.
MR. SKALABAN:
Q. Specifically to give you further clarification, I mean the Nuclear Waste Policy Act schedule linkages between the MRS and the repository.
MR. SHULTIS: Same objections.
BY MR. SKALABAN:

30

Q. The DCSs were -- do you understand my question?
A. No, I don't.
Q. I mean, assuming then, that the purchasers followed the instructions and submitted DCSs based on the schedules in the 1991 annual capacity report, then the DCSs would be based upon a waste acceptance schedule that was inconsistent with the statutory linkages in the Nuclear Waste Policy Act?
MR. SHULTIS: Objection. It calls for a legal conclusion.
A. You're talking schedule linkage?
BY MR. SKALABAN:
Q. Yes, sir.
A. Well, I just don't view it as inconsistent in the sense that certainly in my opinion at the time there was a possibility of that schedule linkage being removed.
Q. But it was -- but the schedule linkage was there?
A. Yes.
Q. And so as the law then existed and as it exists now, because I don't believe -- scratch that.
As the law then existed, the DCSs were based on a waste acceptance schedule that was

31

inconsistent with the Nuclear Waste Policy Act's schedule linkages as they existed at this time?
A. Sitting here today looking at that, that would be my opinion.
Q. And to your knowledge, the schedule linkages have never been changed. There's -- I'm sorry.
Let me ask a more artful question.
There hasn't been a change in the law removing those schedule linkages?
A. No, there has not.
Q. Mr. Milner, if you could just give me a general overview of how -- as the chief operating officer of OCRWM, how you envision the actual overall process of waste acceptance, transportation, disposal unfolding when it begins in approximately -- as you anticipate in 2010, an overview, just kind of a general overview of the process.
How do you envision that working?
MR. SHULTIS: I'm sorry. Which process?
MR. SKALABAN: The process of the -- well, let's say the real logistical process of sort of waste acceptance, transportation, disposal.
BY MR. SKALABAN:
Q. How do you envision that happening in

32

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER )
COMPANY ) Volume II
(98-154C)(Merow, S.J.) ) Washington, D.C.
MAINE YANKEE ATOMIC POWER COMPANY) Wednesday
(98-474C)(Merow, S.J.) ) May 8, 2002
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - -)

Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:20 a.m., Wednesday, May 8, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

47

APPEARANCES:

On behalf of Plaintiffs:

PETER J. SKALABAN JR., ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5821

On behalf of Defendant:

RUSSELL A. SHULTIS, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
Federal Claims Section
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7561

48

C O N T E N T S


| WITNESS | EXAMINATION PAGE NO. |
|---|---|
| RONALD A. MILNER | |
| By Mr. Skalaban | 51 |
| Afternoon Session | 159 |


E X H I B I T S


| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| 96 1992 Annual Capacity Report, Nos. HQ002314-352 | 61 |
| 97 Letter, 9-25-92, and attachments, Nos. YDK008922-229 | 68 |
| 98 Letter, 4-20-94, No. YDK-005-0417 | 120 |
| 99 Letter, 9-29-92, and attachments, various MOF and MPA numbers | 160 |
| 100 Letter, 9-25-92, and attachments, Nos. CDB006458-6437, and various other numbers | 166 |
| 101 10 CFR 61.55, Waste | |


49

E X H I B I T S C O N T I N U E D


| MILNER EXHIBIT NO. | PAGE NO. |
|---|---|
| Classification | 186 |
| 102 Nuclear Waste Technical Review Board Full Board Meeting, 1-11-94, Nos. YDK-013-0001-035 | 216 |
| 103 Memorandum, 3-8-94, and attachments, Nos. HQR-028-2747-762 | 221 |
| 104 Memorandum, Nos. HQR-058-0330-331 | 223 |
| 105 Defendant's Proposed Stipulation of Facts, Case No. 98-126C | 226 |
| 106 Letter, 7-15-98, Nos. HQR-041-0600-601 | 276 |
| 107 Memorandum, Nos. EL-115711-713 | 277 |
| 108 Letter, 7-30-93, and attachments, Nos. HQ0013568-578 | 283 |


50

Q. And I believe you testified earlier that that was -- even though the MPC program had been canceled, that that was a positive that came out of it, is that industry did look and develop this technology?
A. In my opinion, that was a positive, yeah.
Q. And I mean, if it's not going to be compatible with the waste management system that RW is developing, then that wouldn't be a positive, would it?
A. That would be a negative. That's right.
Q. And so I mean as you sit here today, are you aware of any DOE plans to cut off that kind of technology from the system and not integrate it into the system?
MR. SHULTIS: Objection, asked and answered.
A. I think the department is certainly considering that it may have to open those canisters.
BY MR. SKALABAN:
Q. So at this point in time, there's a possibility in your mind that the DOE is not going to integrate multipurpose canisters into its system?
A. I think that's a mischaracterization. We're certainly going to be able to integrate and



handle multipurpose canisters. The decision as to whether or not that canister gets disposed of in the repository is not the department's decision. That's the Nuclear Regulatory Commission's decision.
Q. I see. Again, I'm not trying to mischaracterize. I'm trying to understand.
A. Yeah.
Q. And again -- so if I understand correctly, I mean, it's your understanding, I mean, as COO of OCRWM, that the system is going to accept those kind of canisters.
It's just a matter of whether or not for disposal the NRC will let you dispose of them as is or in an overpack, I guess?
A. Correct.
Q. You're not planning to go just cut that technology off and kind of leave the utilities hanging so to speak?
A. No.
MR. SKALABAN: I'd like to mark as Milner Exhibit 96 the 1992 annual capacity report.
BY MR. SKALABAN:
Q. And Mr. Milner, if you can look at this, and also Milner 51, which is the 1995 annual capacity report, and Milner 42. So the numbers are 42, 51,



and 96.
(Milner Exhibit No.96 was marked for identification.)
BY MR. SKALABAN:
Q. And Mr. Milner, before we start on these documents, I want to ask you a followup about what we just talked about. And I understand your testimony to be it's not the department's intent to not accept this kind of multipurpose canister technology that's being implemented by utilities.
It plans to accept those kind of waste packages?
A. That's correct.
MR. SHULTIS: Objection, calls for a legal conclusion.
BY MR. SKALABAN:
Q. And if you weren't going to do that, that would potentially create some very serious problems for the industry, wouldn't it?
MR. SHULTIS: Objection, calls for speculation.
A. If we were not going to accept multipurpose canisters, I think it would certainly cause some problems for the utilities. They would



have to remove the fuel from those canisters before it could be loaded into a transport cask.
BY MR. SKALABAN:
Q. Could it possibly create -- or do you think it could create problems with getting license -- or license extensions for nuclear power plants, or possibly impact the utilities' ability to implement dry storage at all?
MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.
A. My personal opinion, I don't believe that it would cause a problem in terms of implementing dry storage. Again personal opinion, I don't believe that it would affect the ability to get a license renewal, but that's really an NRC realm there.
BY MR. SKALABAN:
Q. And why is that your opinion?
A. Just based on my limited knowledge of the area. I can't particularly envision it would cause a problem in terms of a license renewal. And I can't envision why it would cause a problem with dry storage.
Q. Well, do you think it would cause some heartburn and potential anger from state Public Utility Commissions?

year one allocation.
A. Yes.
Q. What is your understanding of what the department was trying to convey with that sentence?
MR. SHULTIS: Objection, calls for speculation. The document speaks for itself.
A. Well, sitting here reading this now, I think the contracting officer is saying that -- once again asking Yankee to submit its DCS in accordance with the instructions for the DCSs within 30 days of that date, and if one was not received, at that time the contracting officer would decide what was the status of Yankee's year one allocation.
BY MR. SKALABAN:
Q. Does that indicate to you that they're telling the Yankee -- or indicating to Yankee Atomic that if they didn't follow the DCS instructions that Yankee Atomic was going to lose its allocation?
MR. SHULTIS: Objection, asked and answered, calls for a legal conclusion.
A. My personal opinion, I wouldn't infer that from that paragraph, which is simply saying that the decision would be made. I can only guess that the decision could be -- it would be approved or disapproved.

107

BY MR. SKALABAN:
Q. Do you have any reason to believe sitting here that the contracting officer would have approved a DCS that was similar to Yankee's previous DCSs and that didn't follow the letter of the instructions?
MR. SHULTIS: Calls for speculation.
A. I have no reason to believe what -- which way the contracting officer would go.
BY MR. SKALABAN:
Q. Did you have any discussions with the contracting officer at this time about the dispute between Yankee and the department?
A. I can't recall specifically. I guess in general terms, I recall some discussions about Yankee's request for priority, the dispute, so to speak, but I don't recall discussing what the contracting officer's final decision might be.
Q. What do you remember about the conversations that you did have on the issue?
A. Again, in general terms that Yankee was requesting priority that the -- under the contract the department believed oldest fuel first was the ranking. Even under that, we weren't affording priority to shut down the reactors. If that changed, then the situation would change.

108

Q. Anything else?
A. Not that I can recall offhand, no.
Q. I mean, sitting here today, do you really believe that if Yankee Atomic had submitted a third DCS submittal again not following the letter of instructions that there was any chance that the department was going to approve it?
MR. SHULTIS: Objection, calls for speculation, asked and answered.
A. Again, I don't know ultimately what the contracting officer would have done. I don't have any reason to believe since nothing had changed that it would be approved.
BY MR. SKALABAN:
Q. In fact, when you look at the DCS's instructions, Milner 43, it's pretty clear in section 2.7 that the total quantity of SNF designated for delivery must not exceed the allocation in the ACR. Exceeding the allocation will result in disapproval of the DCS?
A. Yes. I recall that it states that.
Q. I mean, that's a pretty clear command, isn't it?
A. I believe it is.
Q. And so you wouldn't have any reason to --

109

I mean, do you have any reason to believe that the department was going to consider deviations to that command in this process?
MR. SHULTIS: Objection, asked and answered.
A. As I had indicated, no, I don't have any reason to believe that.
BY MR. SKALABAN:
Q. And if we turn to the next document in the series, there's -- it's a July 26, 1993, letter also from Mr. Buchheit. And beginning of this letter states that: Attached is the Yankee Atomic -- or I'm sorry -- the Yankee delivery commitment schedule for year one showing the allocation for delivery to DOE to be the same as detailed in the annual capacity report, open paren, ACR, close paren, period. We are filing this DCS under protest and only because of concern that failure to file as mandated by DOE will result in Yankee losing its place in year one of the DOE acceptance schedule.
Do you recall reviewing this letter?
A. No, I don't recall.
Q. Mr. Brownstein is copied on this letter.
A. M-hm.
Q. Do you recall having any discussions with

110

schedule at that point. It did not disapprove it. It just did not act on it, did not approve it.

BY MR. SKALABAN:

Q. Was the department intending to convey to purchasers at this time that the DCS and final delivery commitment schedule process had been in effect suspended?

MR. SHULTIS: Objection. The document speaks for itself, calls for a legal conclusion, and Mr. Milner is not a 30(b)(6) witness.

A. Well, I guess in my opinion, the -- when you got to the point of final delivery schedules, you then specified specific dates. Since the department didn't have a facility in operation, it felt that it couldn't approve or disapprove final schedules since we didn't know when a facility would be in operation.

BY MR. SKALABAN:

Q. Well, would DCSs in your view be binding if no final delivery schedule had been finalized?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. I guess my understanding of the process of the contract is that, no, if a final delivery schedule had not been approved, then nothing in the DCS binds either party to accept or deliver waste on

155

a specified date.

BY MR. SKALABAN:

Q. So if no final delivery commitment schedules had been approved for Yankee Atomic, Maine Yankee, or Connecticut Yankee, there would be no binding commitments on either party?

MR. SHULTIS: Objection, calls for a legal conclusion.

BY MR. SKALABAN:

Q. Either DOE or Maine Yankee, Connecticut Yankee, on Yankee Atomic?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. I don't understand the question.

BY MR. SKALABAN:

Q. Well, if I -- following up on your last answer and if I understood it, what you just testified to was that if an FDS had never been approved, there wouldn't be a binding commitment between Yankee Atomic and the department, and I'm asking, would that hold true for Connecticut Yankee and Maine Yankee if they never had a final commitment delivery schedule approved for the department?

MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.

156

A. Well, I'm still not clear on the question, but I think, whatever, it would hold true for the different Yankees as well as other utilities.

Was there a binding agreement in effect, my personal opinion, there was. That's called the contract.

Was there a binding commitment for a specific year, I don't in my opinion believe so.

BY MR. SKALABAN:

Q. Was there a binding commitment for an amount?

MR. SHULTIS: Objection, calls for a legal conclusion.

A. I think the annual capacity report giving priority ranking was certainly the department's intended goal. I think both of those indicated that there was -- were for planning purposes.

BY MR. SKALABAN:

Q. So there wasn't -- unless there's final DCSs approved, there is no binding commitment.

These are just goals and planning purposes documents?

MR. SHULTIS: Objection.

BY MR. SKALABAN:

Q. The ACR, the APR, the preliminary DCSs?

157

MR. SHULTIS: Objection, calls for a legal conclusion.

A. Yeah. In my opinion, they were for planning purposes, yes.

And I guess again in my opinion, I fail to see how you could commit to something when you didn't have a facility to take something to.

(Whereupon, at 12:35 p.m., the deposition in the above-entitled matter was recessed, to reconvene at 1:37 p.m., this same day.)

158

Thank you for clarifying.
But there's nothing in this provision B 1 that references an annual capacity report. It does talk about a priority ranking, but there's nothing about the annual capacity report in the DCS provision.
MR. SHULTIS: Objection. The document speaks for itself, asked and answered.
A. Unless I'm totally remembering wrong, I believe the contract does reference annual capacity reports and annual priority rankings.
BY MR. SKALABAN:
Q. I'm just talking about this provision B 1.
MR. SHULTIS: Same objections.
A. I believe I've responded to that already.
BY MR. SKALABAN:
Q. Okay. So it's your view that this provision that purchasers shall submit to DOE the delivery commitment schedules which identify all SNF that they wish to deliver is tied to the annual capacity report?
A. That's my view.
Q. And in your view, it's not susceptible to another interpretation?
MR. SHULTIS: Same objection, asked and

215

answered, mischaracterizes prior testimony.
A. In my view, no.
MR. SKALABAN: I'd like to mark as Exhibit I believe it's 102 --
(Milner Exhibit No. 102 was marked for identification.)
MR. SKALABAN: This is a document entitled, U.S. Department of Energy, Office of Civilian Radioactive Waste Management, nuclear waste technical review board, full board meeting, subject, update on the multipurpose canister concept, presenter, Ronald A. Milner, and it's dated July 11th, 1994.
MR. SHULTIS: Actually -- I'm sorry. It says, January 11th.
MR. SKALABAN: Thank you. January 11th, 1994.
BY MR. SKALABAN:
Q. Do you remember giving this presentation?
A. Vaguely, I do, yeah.
Q. Can you tell me about what the purpose of the presentation was?
A. No. My recollection, it was just what the subject says, to update the TRB on the multipurpose

216

canister concept at that time.
Q. And who is the nuclear waste technical review board?
A. The nuclear waste technical review board is a body which as I recall was established -- the body in general was established by the Nuclear Waste Policy Amendments Act. They are a body of essentially 11 members which are nominated I believe by the National Academy of Sciences and appointed by the president to oversee the technical aspects of the OCRWM program, and they provide reports to the Congress.
Q. Are you a member of the board?
A. Oh, no. They are an independent body independent from the department.
Q. Now, at this presentation, would this be open to the public?
A. Yes, I believe virtually all of the board meetings are open to the public.
Q. And what's the purpose of the review board?
I think you just said they report to Congress.
A. I don't recall the exact wording from the act -- I believe it was the amendments act -- it

217

essentially created an oversight body over the program, and they are to in essence review and provide recommendations on various technical aspects of the program to the Congress.
Q. I'd like to call your attention to page 19. I'm hoping you can explain for me some of the bullet points that are there. That page is entitled, programmatic risks and contingency analysis.
A. M-hm.
Q. And it references contingencies evaluated for the MPC system.
Can you tell me what this is about, what contingencies were evaluated for MPC?
A. My recollection of that, which is very vague, but looking at some of the different contingencies there, probably related to the numbers of canisters that had to be dealt with, but I don't really recall.
Q. Do you know what was being referred to here with -- under the, dash, impact of transportation after storage uncertainty, what that contingency was?
A. My recollection of that, that it -- at this point in time, I don't believe NRC had certified any canister for transport subsequent to extended

218

storage. In other words, if a canister was loaded at the reactor site and stored for some period of time, I think at that point, there was no canister that was certified by the NRC that could subsequently be transported.
Q. I see. And that has changed, hasn't it?
A. It has now, yes.
Q. The canisters have been licensed for transportation?
A. Correct.
Q. And so when you're talking about programmatic risk measured as economic impact, there's a bullet point there for MPC not transportable after storage.
That's the concern you were just talking about?
A. Yes.
Q. And on the next page, page 20, in this first bullet point, it lists some concept benefits.
What does that mean, sited as motivation for work?
I don't understand that.
A. Well, at this point in time, I'm not sure I do either, but I would infer that these were reviewed as some potential system benefits which,

219

therefore, would provide some impetus or motivation for the department or others to develop an MPC system.
Q. And so these listed under that bullet point -- these are advantages of an MPC system, whether it's developed by the department or by others?
A. Yes.
Q. And you agree that these are advantages of the system, of an MPC canister system?
A. My personal opinion -- well, I didn't read all of them, but, yeah, I would agree those are advantages.
Q. Are there any major disadvantages of canisters, of using canisters in the program that you're aware of?
A. Certainly a disadvantage that it -- I could see would be that if ultimately no canister could be simply placed in a waste package and in the repository, then the department would have to open those canisters and repackage that fuel, which would probably to some degree increase the handling on DOE's part that would be required.
Certainly if there were widespread use of a canister system that ultimately could not be used

220

for disposal, you've created a fairly large secondary waste stream to deal with canisters.
Q. Any other disadvantages that you can think of?
A. Not offhand, no.
Q. And at this point, if I understand -- again I don't want to -- I want to make sure I'm correctly testifying -- or correctly representing your prior testimony -- at least currently the department's plans are to accept canister systems and to dispose of them if possible?
A. Certainly the department plans to accept canister systems. The department certainly hopes to be able to dispose of those. Obviously, we would prefer not to have to open them and create another waste stream.
MR. SKALABAN: Let me go ahead and mark this. I believe we're on Exhibit 102; is that correct?
MR. SHULTIS: 103.
MR. SKALABAN: Thanks.
(Milner Exhibit No. 103 was marked for identification.)
BY MR. SKALABAN:

221

Q. 103 is a memo from Mr. Ronald Milner dated March 8, 1994, to a series of people listed on a distribution list, and it contains an attachment. And the subject of the memo is, modification of the CRWMS program baseline to a multipurpose canister-based system.
Are you familiar with this document, Mr. Milner?
A. I am, yes.
Q. What was the purpose of this document?
A. Essentially, as it's stated here, that this was advising staff within the program that the director of the program had approved a change to the baseline to incorporate multipurpose canisters into the baseline.
Q. And what does that mean, to be incorporated into the baseline?
A. That means that essentially that we expect and would accept canisters into the system. That was part of the operation that we envisioned.
Q. Was the intent of this at this time to actually furnish multipurpose canisters to all of the utilities?
A. To the best of my recollection, time frames are unclear. Certainly at one point, which

222

would be this approximate time frame, the department gave consideration to furnishing multipurpose canisters to utilities as a potential means to mitigate any delays. Whether it was actually this exact time frame, I can't recall.
Certainly what this baseline change is dealing with is not the provision of canisters to anyone. It's simply a change in the baseline so that as part of the design process, designers will begin to take into account multipurpose canisters in the design of the system.
Q. And is that baseline still in effect?
A. I believe it is.
MR. SKALABAN: If I could mark now as Exhibit 104.
(Milner Exhibit No. 104 was marked for identification.)
BY MR. SKALABAN:
Q. Can you tell me what this -- and just for the record, 104 is a memo, although I will indicate there's no approval signature on the memo, but it appears to be a memo from Mr. Milner to Daniel Dreyfus, the director of OCRWM.
Do you recall this memo?

223

A. I do vaguely, yes.
Q. Did you send it Mr. Dreyfus?
A. My recollection is that I did.
Q. And what was the purpose of the memo?
A. Essentially to get the formal approval of the director to terminate funding for the MPC development program.
Q. And was this in response to Congressional appropriations?
A. It was.
Q. So the effect of this memorandum is that the department was no longer going to directly fund the development of MPCs?
A. Correct.
Q. Now, the second page, it says that the -- at the top: The technical and operational objectives and advantages of standard canistered SNF defined in the attached MPC approval memo are still applicable.
Recognizing that I don't have the attached memo, but at that time, do you agree with that statement that the general -- or do you agree with that generally that technical and operational objectives and advantages of standard canister SNF would still be applicable?
A. Yeah, I do.

224

Q. And it says at the very bottom: The program will continue actions that are necessary to encourage private industry development and utilization of casks, slash, canister technologies that provide the technical and operational objectives and advantages that were anticipated with the MPC.
Do you see that?
A. Yes.
Q. And that was your understanding of the program -- of a program goal at that time?
A. Yes.
Q. And to this day, does the program -- is -- are -- excuse me. Scratch that.
To this date, is the department still encouraging the development and utilization of cask/canister technologies?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness.
A. I believe it is. I guess I would add that at least in my opinion the work that DOE had done on MPC technology development I think provided the seed and the impetus which ultimately resulted in at least a couple of canister systems being so far certified for storage and transportation.
BY MR. SKALABAN:

225

Q. Such as some of the NAC systems?
A. Yeah.
Q. And that's a positive development?
A. It is.
MR. SKALABAN: I'd like to mark defendant's proposed stipulation of fact as Exhibit 105.
(Milner Exhibit No. 105 was marked for identification.)
BY MR. SKALABAN:
Q. I'm going to represent to you, Mr. Milner, that this is the government's proposed statements of fact in the Yankee Atomic litigation.
Do you -- have you ever reviewed or seen this document?
A. I don't recall that I did, no.
Q. Do you recall or have you reviewed any pleadings in this litigation or filings in this litigation other than interrogatories that we talked about yesterday?
A. I have not.
Q. And I'm sorry. Let me clarify my question also a little bit: What I'm saying, in this litigation, I'm not limiting it just to Yankee

226

Atomic. I'm talking about the spent fuel litigation generally.
Outside of those interrogatories, do you recall reviewing any spent fuel pleadings or filings?
A. I don't recall that I did, no.
Q. I'd like to call your attention to page 58. And in little part A, little part B, little part C, it refers to Yankee Atomic's election to use the NAC MPC storage system, Connecticut Yankee's election to use the NAC MPC storage system, and Maine Yankee's election to use the NAC UMS storage system.
Now, let me ask you first, do you have any reason to disagree with the government's proposed factual findings there?
A. That Yankee Atomic used that storage system?
Q. Yeah, or that Connecticut Yankee or Maine Yankee does.
A. Take a minute to read the rest.
(Pause.)
A. I don't have any reason to believe that that's not correct, no.
BY MR. SKALABAN:
Q. And each of those storage systems referred to there, the NAC MPC, the NAC -- and the NAC UMS, to

227

your understanding, are those canister systems that are an outgrowth of what we've just been talking about, the multipurpose canister program that DOE was looking at?
A. Actually, I'm not familiar with the designation UMS. Certainly the NAC MPC is -- my understanding suggests a canister system.
Q. Okay. So you're -- just with respect to the NAC UMS, you're just not sure if that is a multipurpose canister-type system?
A. Yes.
Q. Now, here the assertion is made that it is a multipurpose element sealed canister.
Does that suggest to you that it's a canister-type system?
I'm talking about the Maine Yankee part.
A. Yeah. It suggests that certainly. I've simply indicated I had not heard the term UMS before.
Q. Now, part 114, can you take a look at that paragraph.
(Pause.)
BY MR. SKALABAN:
Q. Do you agree with that?
MR. SHULTIS: Objection, calls for a legal conclusion.

228

A. To the best of my recollection, there is no provision in the contract that requires disposal of a canister.
BY MR. SKALABAN:
Q. Is there anything in the contract to your recollection that excludes acceptance of a canister?
MR. SHULTIS: Same objection.
A. In my recollection, nothing excludes it. That's my opinion.
BY MR. SKALABAN:
Q. So is the contract kind of open on the issue of whether or not a canister has to be accepted?
MR. SHULTIS: Objection, calls for a legal conclusion, asked and answered.
A. You know, in my opinion -- well, in fact, when the contract was written and executed, there were no such things as multipurpose canisters, so I would have been surprised if they'd been referenced in the contract in one way or another.
BY MR. SKALABAN:
Q. Can you take a look at proposed finding of fact 145, which is on page 70 of this document.
Mr. Milner, what I'd like to ask you first is, as a general matter, do you think it's an

229

unreasonable decision generally for Yankee Atomic to have put its spent fuel in a multipurpose canister?
MR. SHULTIS: Objection, calls for a legal conclusion, asks for speculation.
A. I don't believe I know the answer to that.
BY MR. SKALABAN:
Q. How about with respect to Connecticut Yankee and Maine Yankee?
Do you think it's unreasonable for them to put their spent fuel into multipurpose canisters?
MR. SHULTIS: Same objections.
A. Likewise.
BY MR. SKALABAN:
Q. And for all three companies, do you have any reason to believe at all that it would be an unreasonable thing to do?
MR. SHULTIS: Same objections, asks for a legal conclusion, calls for speculation.
A. No. Likewise.
BY MR. SKALABAN:
Q. So you have no reason to believe that that's an unreasonable thing for them to do?
MR. SHULTIS: Same objections, asked and answered.
A. I'm saying I don't know all the facts

230

BY MR. SKALABAN:
Q. And I assume as long as you've been at RW, that's been the goal of or the objective of RW is to dispose of high-level waste spent nuclear fuel in accordance with the act?
A. Correct.
Q. And that has been RW's intent throughout the time you've been there?
A. Correct.
Q. Does the contract implement -- do you understand the contract to be implementing the NWPA?
A. I believe it does, yes.
MR. SHULTIS: Objection, calls for a legal conclusion.
BY MR. SKALABAN:
Q. And therefore in your view, is it important that the contract be consistent with the act?
MR. SHULTIS: Same objection.
A. Yes.
BY MR. SKALABAN:
Q. And that the contract should be implemented in a way that's consistent with the act.
That's important?
MR. SHULTIS: Same objection.



A. In my opinion, yes.
BY MR. SKALABAN:
Q. If I could take your attention briefly to Milner Exhibit 20. And page 8 in this document is a report to Congress from the department of energy, and it's dated November 1999, and I'd like to call your attention to page 8.
Does it state at the top of page 8 that the Nuclear Waste Policy Act of 1982 required the DOE to begin taking title to spent fuel and high-level waste after the start of repository operations, comma, which were expected to be begin no later than January 31, 1998?
A. It does state that.
Q. Was that the department's understanding of the requirements of the Nuclear Waste Policy Act in -- after it was passed when you were there 1984 or 1985?
MR. SHULTIS: Objection. Mr. Milner is not a 30(b)(6) witness, also calls for a legal conclusion.
A. In my opinion, this states that the department's objective was that it would begin to start accepting spent fuel and high-level waste once a facility was available, a repository, and at that



time, we certainly did expect there -- and the objective that it would begin in January 1998.
BY MR. SKALABAN:
Q. Did you have an understanding in 1984, 1985 that the act required DOE to have a repository available to accept fuel in January 31, 1998?
MR. SHULTIS: Same objection, asked and answered.
A. Well, in my opinion, the act anticipated that spent fuel would begin to be accepted in January of 1998, but also in my opinion, that was conditioned on having a facility available.
BY MR. SKALABAN:
Q. So in 1984, 1985, 1986, the early years that you were with the program, was it your understanding that the department's view of the act was that it didn't have to begin acceptance in January 31, 1998?
MR. SHULTIS: Same objections, asked and answered.
A. I think I stated that it -- my belief was that that date was conditioned on having a facility available, and at that point in time the department's goal was to have a facility available.
BY MR. SKALABAN:



Q. If I could call to your attention Milner 18.
For the record this is the draft 1988 mission plan amendment.
If you could take a look at page 16. In the section 2.24, transportation, in the second paragraph under that heading in the second sentence it says: The casks to be developed for shipments from reactors will differ from the casks currently used for spent fuel shipments in that they will have considerably greater capacities.
Do you see that?
A. I do.
Q. Does that reflect the department's intent at the time to either directly develop or encourage the development of larger-capacity casks?
MR. SHULTIS: Objection. The document speaks for itself.
A. I believe at that point in time, the department was involved in development effort to develop higher-capacity casks.
BY MR. SKALABAN:
Q. So that was -- the department was intending to use greater-capacity casks in its program?

A. The department certainly had an objective to utilize higher-capacity casks.
Q. And it still has that objective today?
A. Certainly.
Q. What are the reasons for that?
A. Utilization of higher-capacity casks, you make less shipments.
Q. And so it's more cost-effective?
A. Yes.
Q. And there's less repetitive visits to individual utility sites?
A. Correct.
Q. What's the estimated average turnaround time for one rail cask trip to a reactor to a repository?
A. I don't recall.
Q. Would a month sound right, or is it longer than that?
A. I guess to me a month would be to the best of my recollection. It may be a little on the high side, but I really don't recall.
Q. You're thinking it could be a quicker turnaround time from a trip from the repository to a site and like a complete round-trip?
A. My recollection is, the estimate is a

263

little bit less than that, but again I really don't recall.
Q. If I wanted to find out the answer to that question, who would I ask in the department?
A. Well, I believe that the estimates of turnaround times and so forth are embodied somewhere in the TSLCC analysis. Whether it's specifically stated in the published report, I don't recall. The person responsible for the TSLCC analysis is currently the acting director of the -- I forget what we call it now -- acceptance transportation and integration office.
Q. And who is that?
A. That's Jeff Williams.
Q. Does the department anticipate any problems handling higher burnup fuel?
What I mean by that is fuel --
A. I understand the term higher burnup, yeah.
MR. SHULTIS: Objection, vague.
A. I guess I'm vaguely aware that somebody has raised the question as to whether or not there would be any difficulty in handling higher burnup fuel. I don't recall any specifics or any specific concern.
BY MR. SKALABAN:

264

Q. And in general hasn't the industry been moving towards higher burnup fuels in general matter because that reduces the amount of spent fuel generated?
A. It has.
Q. And as you sit here today, do you have any reason to believe that the department would have difficulties handling fuel burned up to say levels of 50,000?
A. The only -- in a general term, I don't know of any reason why the department would not handle higher burnup fuel. I think one potential difficulty that comes to mind is that higher burnup fuel could potentially have the effect of reducing the capacity of a transport cask.
Q. One way of possibly dealing with that would be mixing within a particular transportation cask some higher and some lower burned-up fuel?
A. Yes, that's a potential, sure.
Q. And still reach a full cask?
A. Potentially, yeah. You have to look at the specifics there.
Q. Sure. And if I could call your attention to Milner Exhibit 12.
For the record this is the 1987 annual

265

capacity report.
I'd like to call your attention to the -- inside the first page, there's a letter from Ben Rusche, or a statement signed by Mr. Rusche.
Do you see that there's a statement there where Mr. Rusche says: Even more importantly, comma, it activates a mechanism through which contract holders can express their views on how the waste management system can achieve maximum efficiency while assuring equity among the parties?
What did Mr. Rusche mean to your knowledge about achieving maximum efficiency?
MR. SHULTIS: Objection, calls for a legal conclusion, calls for speculation.
A. I don't know what specifically what Mr. Rusche was referring to. I can form an opinion in my own mind at this point in time reading that that the start of issuing this document indicated to the utilities at that time what the capacity in the rankings plans were, and that could be the basis for comment on how efficiencies might be improved
BY MR. SKALABAN:
Q. Has it been the objective of OCRWM to operate the waste management system in a way that can achieve maximum efficiency?

266

A. Yes.
Q. And that's been an objective throughout your time in RW?
A. Yeah, I believe it has.
Q. And when you consider efficiency in operating the waste management system, is it also proper in your view to take into account utility costs?
A. My personal opinion, that should be a consideration.
Q. And that would be particularly appropriate given that it is a full-cost recovery contract?
A. Well, I don't know that I would blend those two ideas together. Full-cost recovery only refers to the DOE expenditures. Full-cost recovery doesn't consider utility costs.
Q. Do you think given it is a full-cost recovery contract and program that it puts some kind of responsibility on the department to operate it in a way where practicable to minimize utility costs?
MR. SHULTIS: Objection, mischaracterizes prior testimony, asked and answered.
A. In my personal opinion, I think it -- the department should and in fact I think the department did consider utility costs, and that's factored in

267

many decisions what the impacts would be on utility costs.
BY MR. SKALABAN:
Q. And that consideration of utility cost has been a constant through your tenure at RW?
MR. SHULTIS: Objection, asked and answered.
A. In my mind, it has.
BY MR. SKALABAN:
Q. Now, in considering utility exchanges, what was the department's position if you have a utility that has an allocation for example that doesn't perfectly match up?
For example, you have a utility one year that has an allocation of 20 MTUs, another one that has an allocation of ten MTUs in a later year, and they want to swap that ten-MTU allocation. The first utility with the allocation of 20 would then be swapping away for example ten MTUs, but still hold a ten-MTU allocation.
Would that sort of partial trade, if you will, not a trade of exactly the same allocations, be permissible in the department's view?
MR. SHULTIS: Objection, calls for speculation, Mr. Milner is not a 30(b)(6) witness,

268

asks for a legal conclusion.
A. Well, since no exchange request or swapping request had ever been made, I can't really say how the department would have ultimately dealt with that. My personal opinion was that a partial trade like that would work.
BY MR. SKALABAN:
Q. Because as a practical matter, it would be coincidence or not very likely that any utility would have the exact same allocation in two different years. Right?
MR. SHULTIS: Same objections.
A. I believe that's true. I'd have to look at the allocations there, but I believe that's true.
BY MR. SKALABAN:
Q. I mean, I think that that's a fair characterization, more likely than not, they're not, and so to have a swap -- to be able to have swaps in the system, the partial trades would need to be allowed?
A. In my opinion, yes.
Q. And that wouldn't be a problem, would it, because the utility could just resubmit new DCSs to reflect that change?
MR. SHULTIS: Same objections, calls for a

269

legal conclusion, asks for speculation.
A. Yeah. Again, in my personal opinion, because the department had never received a request, in my opinion, that would make sense.
BY MR. SKALABAN:
Q. And you do not have any reason to believe that that would be a problem for the department?
MR. SHULTIS: Same objections.
A. Other than some slight increase in administrative burden, I have no reason to believe that.
MR. SKALABAN: Let's go off the record for a second.
(Discussion off the record.)
MR. SKALABAN: Back on the record.
BY MR. SKALABAN:
Q. You agree that commercial nuclear power has been used in the United States for a long period of time?
A. Yes.
Q. And is there a history of -- history available of shipping consistent quantities of spent fuel from reactor sites to commercial and governments facilities?
A. There's certainly been large numbers of

270

nuclear shipments within the country. I don't know that there's been large number of shipments from reactors to government facilities. There certainly has been some small amounts of that that I'm aware of, at least within this country.
Q. And has there been a lot of shipments of foreign fuel?
I mean, are you aware that spent fuel has been shipped in large quantities in foreign countries?
A. Yes.
Q. In fact, I believe countries such as Britain, France, Japan, and Russia reprocess spent fuel, don't they?
A. France and Britain reprocess spent fuel. Germany, Japan, I believe others ship their fuel to one of those two countries for reprocessing or have in the past at least.
Q. So in view of that, there's been substantial amounts of spent fuel transportation shipments abroad?
A. Yes.
Q. Would you have any reason to disagree with an opinion that through 1998 more than 100,000 MTUs of spent fuel has been shipped by road, rail, and sea

271

outside of the United States?
A. I certainly don't recall the number, but I don't have any reason to disagree with that.
Q. And in view of the history of spent fuel transportation in this country and the substantial body of spent fuel transportation abroad, would the sort of history and experiences of those -- of that spent fuel transportation have been something that DOE would have drawn upon if it had performed in 1998?
MR. SHULTIS: Objection, calls for speculation.
BY MR. SKALABAN:
Q. Well, let me say this, I mean, that history of transportation here and abroad, is that something that DOE draws upon now in planning its spent fuel transportation program?
A. I'm not sure I understand what you mean by, draw upon.
Q. I mean, in the history and experience within this country and abroad, does RW use any of that information and experience --
A. Well, we're certainly aware of experiences and shipments that have been accomplished in other countries, yeah. In terms of for example casks, I

272

don't know that any of the casks used for shipments have been certified by the United States Nuclear Regulatory Commission, but certainly we're aware of what's been done and utilize that information.
Q. Would you agree with the opinion that with sufficient advance planning, DOE could develop the casks or casks for nonstandard fuel, failed fuel, and GTCC waste and obtain the necessary licenses from the NRC --
MR. SHULTIS: Objection, calls for speculation, asks for a legal conclusion.
BY MR. SKALABAN:
Q. -- to perform in 1998 if it had been able to do so?
MR. SHULTIS: Same objection.
A. Transport casks, you're referring to?
BY MR. SKALABAN:
Q. M-hm.
A. Certainly transport casks could have been developed and in fact I believe were developed that were certified by the NRC for transport of spent fuel. I guess in my recollection, I don't know of any that had been developed for failed fuel or GTCC. I can't offhand at this point -- I have no reason to believe at this point that that couldn't have been

273

done.
Q. And in the period of 1991 approximately through part of 1994 when you were the director of storage and transport, did you have any concerns at that time?
And I believe you had testified previously that at that time you still believed DOE could make 1998?
A. M-hm.
Q. Did you have any -- during that '91 through '94 time period, did you have any concerns that the transportation system wouldn't be able to be in place if you were going to perform in 1998?
A. No, I didn't.
Q. In view of the documents that we've been seeing about the department's current plans or current objectives to reach a steady state of 3,000 MTUs shortly after the beginning of repository operations in approximately 2010, do you have any reason to believe that the department can't develop a corresponding transportation system that can take that 3,000 MTU a year?
MR. SHULTIS: Objection, asked and answered.
A. No, I see no reason why a transportation

274

system can't be developed to eventually handle 3,000 MTUs.
BY MR. SKALABAN:
Q. And how about if the department had been performing in 1998?
Do you think it could have developed a transportation system that could have handled 3,000 MTUs in 1998 or within a few years thereafter?
MR. SHULTIS: Objection, asked and answered.
A. It had never been the department's plan to begin accepting 3,000 MTUs in 1998, but according to the schedule that existed, I don't recall what the year that we ramped up to 3,000 was, but, yes, I think the system could have been developed.
BY MR. SKALABAN:
Q. A system could have been developed in 1998 after a reasonable rampup that would have been capable of handling 3,000 MTU?
A. A system could have been developed with a rampup which began in 1998 and ultimately have ended up with 3,000 MTU whatever that year was, yes, I believe that a system could have been developed.
Q. Because for example from the early mission plans, we see rampup period beginning in 1998 and

275

within a few years thereafter making 3,000 MTU.
A. M-hm.
Q. Again on that kind of schedule, you wouldn't see a problem on making -- on developing a transportation system to do that?
A. Developing a transportation system? No. Because that's simply -- how many MTU you can handle relates strictly to how many casks trailers and railcars there are.
MR. SKALABAN: Off the record briefly.
(Discussion off the record.)
MR. SKALABAN: I'd like to mark Exhibit 106.
(Milner Exhibit No. 106 was marked for identification.)
BY MR. SKALABAN:
Q. Mr. Milner, I'd like to call your attention -- this is a letter that's actually signed by you for Lake Barrett, and it's dated July 15, 1998.
A. I just received it, so if I can take a moment.
Q. Sure. Please.
(Pause.)

276

A. Okay.
BY MR. SKALABAN:
Q. I just want to call your attention to the last sentence in this letter dated July 15, 1998, the last sentence in the third full paragraph.
It states that: Due to the delay in opening a disposal facility, the department has been unable to finalize the schedules.
Does that further confirm your recollection that the department was unable to -- or stopped processing -- scratch that.
Does that further confirm your recollection of that the department was unable to finalize schedules because of the delay in opening a disposal facility?
MR. SHULTIS: Objection, vague, calls for a legal conclusion, asked and answered, document speaks for itself.
A. Yes, in my opinion, it does.
MR. SKALABAN: And I believe this will be Exhibit 107.
(Milner Exhibit No. 107 was marked for identification.)
BY MR. SKALABAN:

277

Q. Mr. Milner, can you identify for the record what is Exhibit 107?
A. Appears to be a memo from myself to then acting director Lake Barrett requesting his approval of a letter from the contracting officer to Yankee denying priority acceptance.
Q. Now, in the second paragraph in the background section, it indicates that the director committed to subject this issue, shutdown priority, to rule making to clarify how this provision of the contract should be implemented; is that right?
A. That's what it states, yes.
Q. And in view of that, does that confirm for you that the DOE had told Yankee Atomic that the issue of shutdown priority was going to be addressed by rule making?
A. Yes, I believe so.
Q. In fact it goes on a little bit further here and says that: Secretary O'Leary reaffirmed our intent to clarify this issue through rule making in response to a question from Congressman Gallo.
Do you see that?
A. Yes.
Q. Do you recall that exchange between Secretary O'Leary and Congressman Gallo?

278

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC ) Case Nos.
COMPANY, CONNECTICUT YANKEE ) 98-126C
ATOMIC POWER COMPANY, and MAINE ) 98-154C
YANKEE ATOMIC POWER COMPANY, ) 98-474C
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant. )

Courtroom Number 5

National Courts Building
717 Madison Street, Northwest
Washington, D.C.

Wednesday, August 11, 2004

VOLUME 21

The parties met, pursuant to the notice of the Judge, at 10:06 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
SPRIGGS & HOLLINGSWORTH
1350 I Street, N.W.
Washington, DC 20005
(202) 898-5800

ON BEHALF OF THE UNITED STATES:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
(202) 305-7562

*** Index appears at end of transcript ***



P R O C E E D I N G S
_ _ _ _ _
JUDGE MEROW: Ms. Herrmann?
MS. HERRMANN: Ready to continue with Mr. Buchheit, Your Honor?
MR. STOUCK: I've got a couple of preliminary points if I could mention it, Your Honor.
JUDGE MEROW: Sure.
MR. STOUCK: One is we do want to get to the exhibits that came up yesterday. We do want to get to the exhibits from yesterday. I've looked at the transcript and we're certainly ready to deal with those. We're not proposing at this moment because we would like to get finished with Mr. Buchheit, but either between witnesses or at the end of the day.
JUDGE MEROW: Fine.
MR. STOUCK: That's number one. Number two, also, I would like today to address the counterclaim, the motion to amend the counterclaim, which we've given some thought to.
Thirdly, one thing I need to take care of right now, on the question of notice and documents, as I was looking back over the transcript thinking about the exhibit issues, I noticed that little colloquy and I just didn't want there to be any remaining



misunderstanding. We certainly have worked well, you know, for six years and don't want to run into a misunderstanding now. There's really two rules: one is disclosure and the other is cross-examination.
There certainly may be documents that we want to show the government's witnesses that we don't want to show the government's lawyers the night before and, you know, unless we get some different direction, we're not intending to do that, and I just don't want to be vilified again if that comes up, because I think it might.
JUDGE MEROW: Okay.
MR. LESTER: I think we addressed this several times. The issue here is the difference between impeachment documents and documents which the plaintiffs are going to ask be introduced as substantive evidence. We did not play this kind of game when we were doing our cross-examination. We didn't pull out unidentified exhibits and then just sort of pop them in during the cross-examination, then say please admit this as a substantive exhibit. We didn't do that.
We identified our exhibits, and if and when we identified that there's an exhibit on our may-use list that we're going to want to introduce as

memo to which the plaintiffs have referred that Mr. Rusch had -- that has Mr. Rusch's name on it in fact somehow goes with the concurrence on the prior page.

With that understanding, we will not object to this series of documents being admitted as a single exhibit.

JUDGE MEROW: Well, okay. Then with that explanation, Plaintiff's Exhibit 1972 is admitted into evidence.

(PX Exhibit 1972 was received in evidence.)

MR. LESTER: I've been told, Your Honor, the prior exhibit the plaintiffs had tried to introduce was Plaintiff's Exhibit 1951, and I understand that that exhibit's being withdrawn and that it will not be admitted here.

MR. SHAPIRO: That's correct, Your Honor. That was subsumed within the larger one.

JUDGE MEROW: Okay. 1951 is considered withdrawn. Does that take up our prelunch -- anything else?

MR. STOUCK: Take up the other matters at the end of the day.

JUDGE MEROW: Fair enough. We'll break



for lunch. And what time?

MR. LESTER: I'm told Mr. Milner cannot be here until 2 o'clock, so if we could resume at 2, that would be great.

JUDGE MEROW: Okay, we'll resume at 2 o'clock.

(Luncheon recess taken from 12:40 p.m. through 2:06 p.m.)

- AFTERNOON SESSION -

MS. SULLIVAN: Government's ready to call its next witness.

JUDGE MEROW: Fine.

MS. SULLIVAN: We call Ronald Milner to the stand, please.

(The witness was sworn.)

MS. SULLIVAN: Thank you, Your Honor.

RONALD MILNER

was sworn and testified as follows:

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q Good afternoon, Mr. Milner.
A Good afternoon.
Q Mr. Milner, are you currently employed in the Office of Civilian Radioactive Waste Management at the Department of Energy?



A Yes, I am.
Q What is your current position?
A Chief operating officer.
Q What are your responsibilities as chief operating officer?
A I assist the deputy director for strategy and program development in the day-to-day management of that office.
Q And do you report to the deputy director?
A Yes, I do.
Q And who is the department director?
A Ted Gerrish.
Q Does anybody report to you?
A Not directly.
Q How long have you served as chief operating officer?
A In total, about four years.
Q When did you first join the Office of Civilian Radioactive Waste Management?
A I believe it was April of '84.
Q What was your first position? And I'm going to refer to it as RW, if that's all right.
A Okay.
Q What was your first position with RW?
A I was the branch chief of the



organization.
Q What were your responsibilities in that position?
A Preparation of total system life cycle cost, adequacy analyses and the first mission plan.
Q What position did you next hold in RW?
A I was a division director.
Q And what were your responsibilities in that position?
A Budget, human resources, total system life cycle costs, fee adequacy analyses.
Q And what position did you next hold in RW?
A Next, I was first acting director and then permanent director of the Office of Storage and Transportation.
Q And do you remember when you became acting director of the Office of Storage and Transportation?
A Roughly 1990.
Q And how long did you serve as director of the Office of Storage and Transportation?
A About four years.
Q What were your responsibilities as acting and then director of the Office of Storage and Transportation?
A Management of the MRS monitor to treatable

storage program, transportation program, waste acceptance issues, such as preparation of the annual capacity reports, processing of delivery commitment schedules and so forth.
Q You said that you were responsible for management of the MRS process. What specifically were you doing?
A At that point in time, we were attempting to find a volunteer site to construct an MRS.
Q Do you recall, was Dr. Bartlett the director of the program while were you the acting director and director of the Office of Storage and Transportation?
A Yes, he was.
Q Did you report to Dr. Bartlett?
A Yes.
Q After serving as the director of office -- of storage and transportation, what position did you next hold?
A Director of the Office of Program Management and Integration.
Q And what were your responsibilities in that position?
A The program's budget, human resources, preparation of total system life cycle costs and fee



adequacy analysis.
Q Did you also have responsibility for regulatory interface with the NRC?
A Yes, uh-huh.
Q And then what position did you hold next after you were director of program management and integration?
A After that, I was appointed the acting deputy director of the program.
Q Do you recall approximately when that was?
A I believe that was 1996.
Q And how many times have you served as deputy director of the program?
A I was acting deputy two different times.
Q And what time periods were those?
A It was '96 through '99, roughly, and then 2001 through 2002, roughly.
Q What position did you hold in between these periods that you were data director?
A Chief operating officer.
Q And were your responsibilities as the chief operating officer then substantially the same as they are today?
A Substantially the same, yes.
Q And then in 2002, is that when you became



chief operating officer again?
A Yes, uh-huh.
Q Mr. Milner, prior to joining RW, where were you employed?
A With the Department of Energy with the -- first with the Strategic Petroleum Reserve and then with the Office of Conservation and Renewable Energy.
Q Prior to becoming a DOE employee, where were you employed?
A Prior to that, I served eight years as a Naval officer.
Q Mr. Milner, do you hold a Bachelor's degree?
A Yes, I do.
Q In what?
A Mechanical engineering.
Q Where did you obtain that degree?
A University of Mississippi.
Q When?
A 1966.
Q And do you also hold a Master's degree?
A I do.
Q In what subject?
A Also mechanical engineering.
Q When did you obtain that degree?



A 1967.
Q Was that also from the University of Mississippi?
A Yes.
Q Can we have Plaintiff's Exhibit 95, please?
MS. SULLIVAN: May I approach?
JUDGE MEROW: Sure.
MS. SULLIVAN: We're going to look at several different pages of this exhibit, so I'd like to provide copies to the Court as well.
JUDGE MEROW: All right.
MS. SULLIVAN: Plaintiff's Exhibit 95 is a multivolume set. What I provided to the Court and the witness is simply an excerpt of that document.
BY MS. SULLIVAN:
Q Mr. Milner, do you have water there? Do you want a cup of water?
A Yeah, that would be great.
MS. SULLIVAN: Could I get a cup of water for the witness, Your Honor?
JUDGE MEROW: Of course.
BY MS. SULLIVAN:
Q Mr. Milner, do you recognize the document that I've handed to you and put up on the computer

Q Thank you. Mr. Milner, did DOE evaluate possible contingencies in the mission plan?
A Yes, it did.
Q Can we go to page 20 of this document? Can you highlight the text on the page? Mr. Milner, could you read the highlighted sentence?
A Should no repository be constructed and an MRS facility not be authorized, utilities would continue to be responsible for storing the spent fuel at reactor sites.
Q Was one of the contingencies that DOE evaluated in the mission plan the possibility that DOE could not construct either an MRS or a repository?
A Yes, it certainly was.
Q Mr. Milner, I believe you testified that DOE prepared the mission plan because it was a requirement of the NWPA.
A That's correct.
Q Okay. Do you remember whether there was specific statutory provision that went to the mission plan?
A I believe there was, yes.
Q Mr. Milner, I've handed you an excerpt from Title 42 of the US Code, Section 10-221, which is titled mission plan. Do you recognize this provision



to be the provision that sets forth the requirements of the mission plan?
A Yes, I do.
Q Mr. Milner, did you have an understanding as to whether this provision contained a requirement for the mission plan to set forth a specific acceptance rate?
A I did not.
Q Why did DOE include acceptance rates in the mission plan?
A Well, one of the requirements for the mission plan was to provide an estimation of -- of how long the repository would be in operation before it was closed. To do that, you had to assume an acceptance rate, so there were acceptance rates assumed in the mission plan as examples of how the -- the program might be operated.
Q Thank you.
And that requirement, is that set forth on -- as your understanding of that requirement is set forth in paragraph 9, A9 of this provision?
A Yes.
Q Thank you.
Could we go back to Plaintiff's Exhibit 95, please? Page 26. Mr. Milner, for some



reason our electronic copy -- I checked it against the paper copy. For some reason, it's turned. I don't know why we turned it but it's -- same information is there. I think the information just got squeezed.
Mr. Milner, do you recognize the schedule that's set forth on page 26 of the mission plan?
A Yes. That was an example of -- of how the authorized system might operate.
Q How many repositories did DOE assume would be constructed at the time the mission plan was prepared?
A Two.
Q Can we go to page 29? Can you bring up the first full paragraph under the numbered paragraphs?
Mr. Milner, can you read that section, that highlighted material?
A It should be emphasized that this schedule is only an approximation of how the system may operate and is subject to considerable variation. The DOE will further define and specify the system acceptance parameters as the program progresses.
Q Mr. Milner, does that paragraph accord with your recollection regarding the schedule set forth in the mission plan?



A Yes, it does.
Q Could we bring up the last paragraph on this page and, Mr. Milner, would you read the last two sentences that are highlighted there?
A Under the terms of the contracts for disposal services that have been signed between the DOE and the utilities, an annual capacity report with projected annual receiving capacities and rankings will be issued by the DOE beginning in 1987. In 1991 the DOE will begin to publish firm waste acceptance schedules for individual reactors, including shipment allocations.
Q Mr. Milner, what was your understanding of the term "firm waste acceptance schedules" as that term's used in that paragraph?
A That would be the schedules that DOE was committing to to accept the waste.
Q Did DOE publish, if I recall, waste acceptance schedules in 1991?
A Yes, it did.
Q Where were those schedules set forth in the annual capacity report for that year? And what were utilities to do with these schedules set forth in the annual capacity report?
A They were to utilize those to develop

their delivery commitment schedules, DCSs, for submittal to the department.
Q And which office within DOE prepared the 1991 ACR?
A The Office of Civilian Radioactive Waste Management.
Q And which office within RW?
A The Office of Storage and Transportation.
Q That was your office?
A Yes, it was.
Q Mr. Milner, in your various positions within DOE, have you had responsibility for preparing total system life cycle costs?
A Yes, I have.
Q Have you also had responsibility for preparing what are referred to as fee adequacy studies?
A Yes.
Q Could you explain to the Court what a total system life cycle cost is, or a TSLCC?
A It was a -- an estimate at any given time of -- of the total costs of -- of the entire waste management system from identifying sites, characterizing sites through construction operation of the system and -- and ultimately decommissioning.



Q Decommissioning of what?
A Of the repository facilities.
Q What is a fee adequacy study?
A The fee adequacy studies using the -- the cost estimates as a basis attempted to analyze whether or not the fee that was being paid by the utilities was adequate to cover the -- the costs.
Q Why is a TSLCC, or total system life cycle cost report, prepared?
A Well, one, it's -- it's good to keep track of the estimate of the program costs but principally is -- is input to the fee adequacy analysis.
Q And why are fee adequacy studies prepared?
A They're mandated by the act.
Q By the Nuclear --
A Waste Policy Act.
Q Are there assumptions made for the preparation of a TSLCC?
A Yes, there are.
Q What is the basis for those assumptions?
A They were the current program planning bases at the time.
Q Has DOE changed the assumptions that form the basis for TSLCCs over time?
A Yes.



Q Can we have Plaintiff's Exhibit 248, please?
Mr. Milner, I've handed you what's been marked as Plaintiff's Exhibit 248. Do you recognize this document?
A Yes, I do.
Q Could you tell the Court what the document is?
A Well, it -- again, it's -- the title basically says preliminary estimate of the restructured program, which was an addendum to a prior -- prior TSLCC analysis.
Q Were you involved in the preparation of this document?
A No, I was not.
Q Okay. Are you familiar with this document based upon your work with other TSLCCs?
A Yes.
Q Can we go to page 1, please? Can we bring out the first paragraph on the page and highlight the third sentence?
Mr. Milner, would you read the highlighted portion into the record, please?
A The primary use for the total system life cycle costs, TSLCC, analysis is to provide cost data



necessary for determining whether the fees paid by the waste generators will be sufficient to fully cover the costs of the program, parentheses, the fee adequacy analysis.
Q Okay, thank you. For our court reporter, as you read things, you can take your time. Thank you.
Mr. Milner, the sentence that you read, does -- just read, does that sentence accord with your understanding as to the purpose of the TSLCC?
A Yes, it does.
Q Can we go to page 2, please? And in the first full paragraph, bring that out. The first two sentences.
Mr. Milner, would you please read those -- the highlighted material into the record?
A It must be recognized that the waste management program is continually evolving. The TSLCC estimates represent snapshots in time which incorporated all available and appropriate information on program activities up to a specific point in -- specific point in time in order to develop comprehensive set of cost estimates for the system.
Q Mr. Milner, do you agree with that statement regarding the nature of TSLCCs?

Q At the time you prepared this memo, were you responsible for MRS siting activities?
A Yes.
Q And approximately at the time of this memo, approximately how much time did you devote to MRS siting activities?
A Oh, probably something like 30 or 40 percent of my time.
Q Can we highlight the second paragraph in the background, please? We haven't highlighted that, but could you read the portion that's been blown up into the record?
A The 1990 ACR stated that it would be the last ACR to be issued and would be replaced by the acceptance priority ranking, parentheses APR. However, based on discussions with contract holders and their representatives, the department elected to continue to publish the ACR. This change in plans was conveyed to contractholders in a May 15, 1991 from -- letter from the department's contracting officer.
Q Thank you.
Mr. Milner, does that sentence accord with your recollection of DOE's decision regarding the issuance of the 1991 ACR?
A Yes, it does.



Q Can we go to the second page of this document? Actually, can we stop that for a second? Mr. Milner, is that your signature on that page?
A Yes, it is.
Q Do you recognize the other signature to be that of Mr. -- Dr. Bartlett?
A Yes.
Q Now, could we bring up the first paragraph and highlight the second sentence? Mr. Milner, could you read that highlighted portion into the record?
A While not stated in the ACR, this rate was selected because it is theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in 1998.
Q Mr. Milner, what was your understanding as to the -- about the rates that were contained in the 1991 ACR with regard to meeting any additional at-reactor storage needs?
A Well, if -- if you looked at, as it says in the aggregate, you looked at each utility and what their projected spent fuel discharges would be, what their pool storage capacities would be and you aggregated the shortcomings, this rate would have in the aggregate prevented any further need for out-of-pool storage.



Q Okay. Plaintiff's Exhibit 629, please? Mr. Milner, you've been provided with a copy of Plaintiff's Exhibit 629. Do you recognize this document?
A Yes, I do.
Q Would you identify it for the Court, please?
A Yes. It was my memo to the director, Dr. Bartlett, seeking his approval to issue for comment a draft of the annual acceptance priority ranking.
Q Okay. Can we go to the second page of this document? Do you recognize that to be your signature on that page?
A Yes.
Q Could we go back to the first page? Would you bring up the third paragraph, the second paragraph under "discussion"? Mr. Milner, could you read that portion into the record, please?
A The publication of the APR begins the contractually binding waste acceptance process. The APR will be used in conjunction with waste acceptance rates to be published in the 1991 annual capacity report, parentheses ACR, as the basis for purchasers to submit delivery commitment schedules, parentheses



DCS, beginning in January 1992 for the department's approval. In turn, purchasers will have the opportunity to exchange approved DCSs, also subject to departmental approval.
Q Thank you.
Mr. Milner, does this statement that you just read accord with your understanding as to how firm waste acceptance schedules were to be established with individual utilities?
A It does, yes.
Q Mr. Milner, are you familiar with DOE's plans for the steady-state acceptance rate?
A I believe I am, yes.
Q What is that rate that you're familiar with?
A The steady-state acceptance rate, the design rate, if you will, of the system is 3,000 metric tons per year.
Q Thank you. During your tenure at DOE, has DOE assumed any other design rate for the repository?
A No.
Q During your tenure at DOE, are you aware of any planning basis by which -- by DOE in which DOE has assumed a three-year ramp-up period to a steady-state rate of 3,000 MTU?

A No, not that I'm aware.
Q At the time DOE issued the 1991 ACR, was DOE planning to accept waste at a 3,000 MTU rate beginning in 1998?
A No.
Q Why not?
A At -- at that time, we assumed that an MRS would be operational in the system. The MRS had a capacity limit of 10,000 metric tons, so a ramp-up rate was designed such that you would not exceed that rate before the repository began operation.
Q Mr. Milner, during Dr. Bartlett's tenure as director, do you recall consideration of the idea that DOE should remove all five-year-old cooled fuel from shutdown reactors?
A What I recall is Dr. Bartlett on occasion mentioning that gee, that would be something that would be good to do or that perhaps we might should look at. I would characterize it as thinking out loud, I guess, really.
Q Do you recall receiving any direction from Dr. Bartlett to implement an acceptance rate that would have allowed all five-year-old cooled fuel to be removed from shutdown reactors?
A No.



Q Would you have been responsible during Dr. Bartlett's tenure for determining what such an acceptance rate would be if you had been directed to develop one?
A I -- I would have, yes.
Q Mr. Milner, do you recall attending industry meeting -- sorry, attending meetings with utility representatives with Dr. Bartlett?
A Yes.
Q Was attending utility meetings with Dr. Bartlett among your responsibilities?
A It was, yes.
Q Do you recall any meetings at which utility representatives expressed great interest in pursuing exchanges?
A No.
MS. SULLIVAN: One moment, Your Honor. Your Honor, I have nothing further at this time. I would move for admission of Plaintiff's Exhibit 629. That's an exhibit that was on Plaintiff's may-use list. I notified Mr. Shapiro the night before last that we expected that we might use it with Mr. Milner. Mr. Milner's identified the document and authenticated it.
MR. SHAPIRO: We have no objection, Your



Honor.
JUDGE MEROW: Plaintiff's 629 is admitted in evidence.
(PX Exhibit 629 was received in evidence.)
MS. SULLIVAN: Thank you, Your Honor. Might we have a break for the witness?
MR. SHAPIRO: Certainly.
JUDGE MEROW: Do you want to take a -- sure. Return about -- on the hour?
MR. SHAPIRO: 3 o'clock?
JUDGE MEROW: 3 o'clock.
MS. SULLIVAN: Thank you, Your Honor.
(Recess taken from 2:47 p.m. through 3:03 p.m.)
JUDGE MEROW: Mr. Shapiro?
MR. SHAPIRO: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SHAPIRO:
Q My name is Robert Shapiro.
A Uh-huh.
Q I'd like to start out asking you some questions about the rate of acceptance. You discussed that topic in various planning documents in your direct examination.
Now, if I understand correctly, the



Department of Energy's purpose in publishing the information contained in documents like the mission plan was for utilities to use it for -- for planning purposes, correct?
A Well, in the mission plan at -- at that time, since it was the very beginning of the program, we were simply trying to illustrate how a system might operate. I think at that stage of the game, it was too early to say you could use that for planning purposes.
Q What about the mission plan amendment?
A Oh, I think that might have been suitable for some very early planning.
Q And let me turn to the TSLCC. One of the objectives of the TSLCC report is to make cost estimates that reflect as closely as possible the most current Department of Energy program strategy for -- for meeting the -- the legislative milestones, correct?
A True.
Q And one of your concerns has been to try to ensure that the program is using the same set of numbers and the same assumptions in various documents, correct?
A Well, if you're talking about from -- from

as the various TSLCCs progressed over the years, no, certainly the assumptions changed depending on the circumstances.
Q No, not the same -- not to be consistent across all the TSLCCs, but at any one time, the department's documents, the -- the program plan, the TSLCC, the fee adequacy report, they would all have the same set of assumptions?
A We would hope so.
Q And you thought it was important that all of the -- the OCRWM entities be using the same assumptions with respect to the acceptance rate for spent nuclear fuel, right?
A Yes, yes.
Q In fact, when you reviewed and approved some of these documents that you discussed, one of the purposes for your review was to ensure that the documents accurately reflected what you understood to be the Department of Energy's position at the time with respect to issues such as the acceptance rate, correct?
A Correct.
Q Now, at the time you joined Office of Civilian Radioactive Waste Management, it was your understanding that the intent of the department was to



work off the backlog of spent nuclear fuel stored in utilities. True?
A Well, at the time I joined the department, since -- again, very early stages of the program, we were in the very early stages of planning the program, trying to identify potential sites and so forth. I don't know that we -- we had evolved to talking about working off the backlog at that point. Obviously, at some point in time you would hope that you would work off the backlog.
Q But at the time you joined the program, your understanding was the intent was to work off the backlog?
A Well, the intent was ultimately to accept all spent fuel from the utilities.
Q Do you recall having your deposition taken over a number of days?
A Oh, yes.
Q One of those was back on May 1st of 2002, a little more than two years ago.
A Two and a half years ago, roughly, uh-huh.
Q I'm sure you endeavored to testify accurately.
A Yes.
Q Truthfully.



A Yes.
Q I want to ask you about a question and answer that you gave at that time, reading on May 1st, page 73.
MS. SULLIVAN: Could the witness be provided a copy of the deposition?
MR. SHAPIRO: If he needs one. I'm trying to be quick about it.
THE WITNESS: Given that it was approximately two and a half years ago, I probably wouldn't know the context in which the question and answer were given.
BY MR. SHAPIRO:
Q Would you like to see a copy?
A Yes.
Q Sure enough.
As it turns out, May 1st is the first tab in your binder. Page 73, if you look, there are four pages per page the way it's printed out. Are you on page 73 Mr. Milner?
A Yes, uh-huh.
Q I'm going to start reading at line 10, and my question is, were you not asked the following question and give the following answer?
Question: And was that a fair statement



of DOE's intentions at or about the time to work off the backlog of spent nuclear fuel that utilities were storing?
There was an objection by Mr. Shultis.
You answered: Well, at this specific point in time, I don't know what the department's intent was. At the point I joined the program, my understanding of the intent was to work off the backlog.
That was your testimony, Mr. Milner?
A Yes, if I could have a moment to look at the -- the context.
Q I'm just asking about your testimony. And that was your -- your honest testimony?
A Yes.
Q Now, it's true that the Department of Energy's intentions with respect to the repository design receipt rates had stayed constant pretty much to the present day, 3,000 MTU per year?
A I'm sorry, would you repeat that?
Q It's true, is it not, that the Department of Energy's intentions with respect to the repository design receipt rates have stayed constant to the present day, 3,000 MTU per year?
A Yes, uh-huh.

Q And that -- that 3,000 MTU steady-state acceptance rate has been used fairly consistently in the OCRWM published documents, correct?
A As far as the steady-state rate, yes.
Q And that's a reasonable rate?
A Yes, I think so.
Q Now, you testified, I believe it was about Defendant's Exhibit 23, the memorandum for approval of the 1991 annual capacity report.
A Uh-huh.
Q And there's one little aspect I wanted to ask you about that. Part of that annual capacity report -- we have copies of that available if you need to review that. Part of that had a slow acceptance rate because of some of the limitations that were imposed by the alternative set. Do you recall that?
A Correct.
Q But you were asked to read part of that memorandum that said: Nonetheless, that lower rate was theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in -- in 1998.
A Uh-huh.
Q Could you explain for us how -- how that analysis was done, how you reached that conclusion?



A Well, if -- if you took each utility, what its -- its projected spent fuel discharges were, what its pool capacity was, its remaining pool capacity when it would run out of capacity and -- and you did that for each utility, then you took the overflow, if I can call it that, from pool storage, in the aggregate, that would be the amount of -- of dry storage that would be needed across the industry and our rate would have in the aggregate prevented the need for additional storage.
However, that -- that didn't address the fact that -- that where the utility that was running out of storage in the queue and at what time their -- their waste would be accepted.
Q So that analysis ignored the oldest rule first priority scheme?
A No, it didn't ignore the oldest fuel first.
Q Well, how did it -- I thought you just said that it didn't take into account where the utility was in the queue.
A Where the utility that was running out of the storage was in the queue.
Q So how would that acceptance rate be sufficient to help that utility that was running out



of space?
A I think I said that in the aggregate, it would prevent additional at-reactor storage but not necessarily for each specific utility and in fact, that was not the case.
Q So there -- there would be utilities that would have to add additional at-reactor storage?
A Yes.
Q What about shutdown reactors? Would that lower rate contemplated in the 1991 annual capacity report do anything for shutdown reactors?
MS. SULLIVAN: Objection, vague.
BY MR. SHAPIRO:
Q Do you understand the question, Mr. Milner?
A No, I'm sorry. Repeat the question.
Q Would the lower rate contemplated in the 1991 annual capacity report, would that be sufficient to handle the spent fuel removal needs of shutdown reactors?
A Well, I'm not -- I'm not sure in what sense you mean that, because we did base everything on oldest fuel first if -- if a shutdown reactor had the oldest fuel, I suppose it could have handled it, but I don't suppose that was the case in all situations.



Q So with the lower acceptance rate in the 1991 annual capacity report, a shutdown reactor might -- might still have to store spent fuel for an extended period of time?
A Yes.
Q So that annual -- that lower rate in the 1991 annual capacity report would not have been sufficient to handle the needs of shutdown reactors?
A Again, in the aggregate it would have been sufficient. Looking at each utility, no.
Q I'd like to ask you a few questions about monitor retrieval storage. You testified about that a little bit. We discussed also some of these limitations in Department of Energy's ability to accept spent fuel in light of the amendments passed in 1987 that provided linkages between monitored retrievable storage and progress in repository. Are you aware of that?
A Right.
Q It's the Department of Energy that requested those -- that those linkages be put into the amendment set, correct?
A Well, no. I believe -- as I recall, earlier in the program, the -- the department was attempting to develop a -- a MRS facility at a site in

Tennessee, the -- the former Clinch River breeder reactor site. As I recall, discussions and negotiations with the host community at that time gave rise to those linkages, and Congress simply chose to carry forward those linkages when it authorized an MRS in the amendment side.

Q It wasn't the Department of Energy that requested those linkages?

A I don't recall that to be the case.

Q Let's go back to your -- your deposition. I want to ask you about May -- a statement you made at May 3rd. Do you want to follow along in your binder? Tab 3. If you could turn to page 554, and were you not asked the following question and gave the following answer starting on line 5? It's a little bit long.

I'd like to talk to you about page 12 now, in particular the last full paragraph, or actually the last paragraph which goes on to the next page under the heading MRS facilities. It says that on March 31, 1987, the DOE submitted to Congress the proposal for construction of an MRS facility to allay concerns that the MRS facility could become a substitute for a permanent repository whose development remains the highest priority. DOE asked Congress to limit the MRS



storage capacity to 15,000 metric tons of uranium and to specify that the MRS cannot start receiving fuel until the construction authorization for the repository has been received from the Nuclear Regulatory Commission.

Is this an accurate statement, that the DOE was the organization that requested the linkages between the repository and the MRS?

And there was an objection and you answered: Certainly, the DOE was the entity that requested Congress. My recollection of the origins of those linkages were at the time DOE was developing a site-specific proposal for an MRS facility, actually, the old Clinch River breeder reactor site in Oak Ridge, and I believe the local community had requested the department insert those linkages.

MS. SULLIVAN: Objection. The statement that's just been read into the record isn't inconsistent with what Mr. Milner testified to.

MR. SHAPIRO: That can be brought out in redirect. I certainly believe that he denied that it was the department that asked for those linkages.

THE WITNESS: If I could clarify.

JUDGE MEROW: Yes.

A I misunderstood your statement because I



thought you asked me if the department had requested those linkages be placed in the legislation. We had requested those linkages when we submitted an MRS proposal for the Clinch River breeder reactor site not to be placed in the amendment set.

Q Nevertheless, it was the Department of Energy that requested it.

A In its proposal for the Clinch River site.

JUDGE MEROW: Is that to satisfy community?

THE WITNESS: That was to satisfy community concerns, yes.

BY MR. SHAPIRO:

Q We're going back, Mr. Milner, to this 1987 time frame. It was the Department of Energy's plan to start accepting waste at a monitored retrievable storage facility in 1998 and to open a repository in 2003?

A In the '87 time frame, I believe that was correct.

Q And the MRS was intended to be an integral part of the whole waste acceptance system, correct?

A Yes, I believe so.

Q It wasn't intended to be a -- a -- a standalone system or as a permanent replacement for



storage and disposal?

A Correct.

Q And fast-forward a little bit to June of '88. By that time, the Department of Energy believed that the linkages between the -- the schedule and the key milestones in siting the construction of an MRS facility made it unlikely that the department would be able to start accepting waste significantly before 2003, isn't that correct?

A At a -- at a repository?

Q At any facility.

A At any facility?

Q Linkages.

A Yes, I believe that was the case.

Q And as of November 1989 -- and that was the time that report to Congress on reassessment of the program -- it was the Department of Energy's position that a repository would not be available until 2010, correct?

A Correct.

Q It was also the Department of Energy's view at that time that if the statutory linkages remained in place, that the MRS operations would not begin until 2007, correct?

A Correct.

Q And that's because that -- that three-year difference between repository and MRS opening, that represented the department's best estimate of how quickly it could get an MRS up and running given the linkages?
A Correct.
Q Now, you believed at the time of that November 1989 report to Congress on the reassessment of the Civilian Radioactive Waste Management Program that if the statutory linkages were modified, that the department could begin to accept waste beginning in 1998?
A Yes.
Q And by 1991, you believe that if the linkages between the MRS construction and the repository authorization were maintained so the initial acceptance by DOE could not begin until 2007?
A Correct.
Q And ultimately, the DOE abandoned its effort to site an MRS sometime roughly between 1991 and 1994?
A Yeah, I think it was probably closer to 1994.
Q And even by February of 1994, RW was doing contingency planning for the possibility that an MRS



might not be sited at all. True?
A I don't recall that, but potentially.
Q Well, let me ask you again about your deposition. And this was a short one. Let me ask you if you recall the following question and giving the following answer. Page 359 if counsel wants to follow.
MS. SULLIVAN: Which day?
MR. SHAPIRO: It's May 2.
BY MR. SHAPIRO:
Q Are you on that page, Mr. Milner?
A Yes, sir.
Q Start on line 5. Do you recall being asked the following question and giving the following answer?
Question: So at least as of February of 1994, OCRWM was concerned about the possibility that an MRS might not be sited?
Answer: We were certainly doing contingency planning for that, yes.
That was your testimony, Mr. Milner?
A Yes, it was.
Q And that was accurate testimony?
A Yes, at the time.
Q Do you have a different opinion now,



Mr. Milner?
A Well, that was two and a half years ago. I have different recollections than what I did two and a half years ago, but no, that would be accurate.
Q Now, as of December 1994, that -- the end of that year, there was no development work on an interim storage facility, was there, Mr. Milner?
A By that time no, I don't believe so.
Q And DOE has no current plans to site an MRS?
A No.
Q Do you believe that -- that an MRS would have offered a better opportunity for the department of meeting the objective of accepting waste by 1998?
A Yes, I do.
Q I'm going to turn to the subject of delivery commitment schedules. You touched on that a little bit during your direct testimony. I'd like to ask you two questions. First, you would agree that if there was no facility to accept fuel in 1998, then the delivery commitment schedules that were entered into between utilities and the department would not be binding and would have to be reevaluated, true?
A Well, I certainly recall discussions as to what would -- what would happen in that case and yeah,



I think we would have certainly had to reevaluate what would have occurred.
Q So the delivery commitment schedules could change if circumstances change?
A Potentially, that would have to be evaluated, yes.
Q If circumstances change, the DCSs could change. True?
A I'd have to know what the circumstances were before I knew whether they would change or not.
Q In your opinion, the delivery commitments were really best estimates, good-faith commitments on quantity and timing?
A No, I viewed the DCSs as a binding commitment.
Q Let me go back to your deposition again, once again May 2, the same day that we were at, this time page 396. Have you found that page, Mr. Milner?
A Yes, I have.
Q I'm going to start on line 12. Do you recall being asked the following question and giving the following answer?
Question: Does it change your view about the binding commitment reflected in the DCS? There was an objection from Mr. Shultis.

Your answer: I guess in my terms of a commitment, not necessarily. I think my interpretation of the delivery commitment was that it was a best estimate, good-faith commitment on the quantity and timing, and as I read this, neither the department nor the purchaser -- well, okay, just the purchaser can adjust it up or down, so it's his option. I guess I would interpret that to mean it's less binding on the utility than it was on the department.

That was your truthful testimony, Mr. Milner?

A Yes, it was.

MS. SULLIVAN: Objection. It's taking the statement out of context, but I'll address that on redirect.

BY MR. SHAPIRO:

Q It's your opinion, Mr. Milner, that it's not appropriate to approve -- not appropriate for the department to approve delivery commitment schedule forms until the department has a site for a repository approved, correct?

A I'm sorry, repeat that question.

Q It's your opinion that it's not appropriate for the Department of Energy to approve



delivery commitment schedule forms until the department has a site for a repository approved. True?

A No, no.

Q Let's go back to your deposition once again, this time May 7th and tab 4. There are two tabs. Page 598.

A I can't find the page.

Q Are you in tab 4, Mr. Milner?

A Thought I was. Okay.

Q I'm going to start on line 7, and my question for you is, were you asked the following question and gave the following answer?

Question: So is it your view that the DCSs forms can be approved now or not?

And your answer: My personal opinion is that it's not appropriate to include them until we have at least a site for a repository approved.

That was your answer?

A Correct.

Q And that was your -- your correct answer?

A In -- in looking earlier in the testimony, I think the context at that time was at that particular point in time, we had suspended processing of -- of the DCSs, and I believe the questions at that



time were going to should we restart processing the DCSs, and at that time, two and a half years ago, my answer was no.

Q Because you thought that was inappropriate because the department didn't have a site approved for a repository. True?

A Because the schedules were indefinite, yes, we had -- we had already approved DCSs for the first ten years of operation and we -- we in my opinion at that time, given that context, should wait until our schedules firmed up a bit more before we processed additional ones.

Q Once site approval occurs, you expect the department to begin approving delivery commitment schedule forms once again, don't you?

A Yes, uh-huh.

Q I want to ask you about those delivery commitment schedule forms that you said were approved following the publication of the 1991 annual capacity report.

A Uh-huh.

Q Now, those -- the DCSs that were submitted after the 1991 annual capacity report, they were based on waste acceptance schedule that was inconsistent with the Nuclear Waste Policy Act schedule linkages as



they existed at the time they were submitted for approval, weren't they?

MS. SULLIVAN: Objection, calls for a legal conclusion as to the terms of the NWPA.

MR. SHAPIRO: I'd like to get Mr. Milner's understanding.

JUDGE MEROW: I'll overrule the objection. You may answer the question if you have -- you have the background, I think, to do it, so --

THE WITNESS: I'm sorry, repeat the question, inconsistent with --

BY MR. SHAPIRO:

Q The -- the DCSs submitted after the 1991 annual capacity report, they were based upon a waste acceptance schedule that was inconsistent with the Nuclear Waste Policy Amendment Act's schedule linkages as they existed at that time, the -- at the time those -- those forms were submitted, weren't they?

A No, I don't believe they were.

JUDGE MEROW: I guess the question is you couldn't accept quantities until you had an approved repository.

THE WITNESS: Repository.

JUDGE MEROW: The schedule showed quantities, you know, without taking that into

interest in the timely decommissioning of shutdown reactors. True?
A Yes, uh-huh.
Q And allowing shutdown reactors to decommission in a timely manner has been an objective of the department's. True?
A I wouldn't say so much an objective, but certainly an interest of the department.
Q But what's the distinction there that you're drawing between objective and interest?
A Objective would be something we would vigorously pursue, and interest is something that we would support if -- if it was consistent with the program planning.
Q Didn't the department have an objective of allowing shutdown reactors to decommission in a timely manner?
A The program did not have an objective in that definition of -- of allowing them to shut down, timely manner. Certainly an interest in doing so.
Q Well, let's go back to your deposition, Mr. Milner, this time on May 3rd, which is tab 3 of your binder. And I'm looking at page 419 within that tab. Have you found that page, Mr. Milner?
A Yes, uh-huh.



Q I'm going to start on line 15 and ask you were you asked the following question and gave the following answer.
Question: My question isn't about asking granting priority, my question is simply did the department have an objective of allowing shutdown reactors to decommission in a timely manner?
Objection by Mr. Shultis.
Your answer: It did, yes.
Then one more question: And would that remain an objective of the department's today?
And your answer: I believe so.
That was your truthful testimony, Mr. Milner?
A Yes, it was, as was also my earlier truthful testimony where I indicated it was not so much an objective as a case where the department preferred not to preclude that ability.
Q Okay. It's been a goal of the department's to minimize storage cost of all reactors including shutdowns. True, Mr. Milner?
A Yes, certainly a consideration that we would like to have seen.
Q Are you drawing a distinction between consideration and a goal?



A Yes, yes.
Q Has it been a goal of the department's to minimize storage costs for all reactors, including shutdowns?
A I guess in that sense, yes. Yes, we would certainly do what we could to minimize storage costs.
Q In fact, you believe it's long been a goal of the program to try to reduce the amount of storage that would be needed and ultimately to decommission reactors. True?
A Yes, uh-huh.
Q The water program and utilities have a goal of taking fuel off sites as soon as possible. True?
A Yes.
Q In fact, going back to the MRS for a moment, you were specifically concerned about the effects of not having an MRS facility on shutdown reactors, weren't you?
A I'm sorry?
Q You were concerned about the effects of not having an MRS facility on shutdown reactors, weren't you?
A I was certainly concerned about the effects on -- on all reactors of not having an MRS and



delaying the start of waste acceptance.
Q Including the effect on shutdown reactors?
A Yes, yes.
Q And others at the department shared that concern?
A I believe so.
Q Because of the department's not having -- not beginning to accept waste -- excuse me, let me restart that.
Because of the department's not having an MRS facility, that would force shutdown reactors to maintain their spent fuel pools or storage facilities for a longer time period. You understood that?
A Yes, uh-huh.
Q Your recollection is that as of 1990, the department had not yet determined whether priority would be accorded shutdown reactors or, if priority is granted, under what specific -- specific circumstances it would be?
A I believe at that time, we -- we had not completed what we called the issue resolution process and so I -- I think that's correct, yes, we had not made a final determination.
Q And, in fact, there has been no final decision on whether or not priority for shutdown

reactors will be granted?
A Well, I mean, at that time we were discussing what -- what possible amendments there might be to the -- to the contract through the issue resolution process, which was a -- a lengthy discussion between the department and utilities.
The standard contract gives priority to oldest fuel first, and consideration was given, again in collaboration and discussion with the utilities, as to whether that should be changed or in any way modified. And in 1990 I believe we had not concluded that process so then had not made any determination as to whether we would or would not change the contract. Ultimately, the determination was made not to change the contract and to continue with oldest fuel first as a priority.
Q So it's your understanding, Mr. Milner, that the contract would have to be changed in order to provide the option of providing priority to shutdown reactors?
A Well, I believe the contract says that -- that you may give priority to shutdown reactors but it -- it does state oldest fuel first as the main consideration, I believe.
Q Let me go back to my initial question. So



the option is -- is there in the contract -- and I'm reading focusing on what the department's plans are with respect to that option in -- in the contract.
And isn't it true that there has been no final decision on whether or not such priority will be granted? Is that not true?
A Yes, I think that is not true, that -- that we have determined that we will -- we use oldest fuel first as the means for establishing the queue, and have.
Q Let me go back to your -- your deposition once again, Mr. Milner. Tab 3, May 3rd, page 474. Have you found that page, Mr. Milner?
A Yes, sir, I have.
Q If you would look on -- starting on line 23, were you not asked the following question and gave the following answer?
Question: Are you saying that the department's not decided whether or not it would accord priority to a shutdown reactor, or are you saying that the department has decided that it would not grant priority to any shutdown reactors?
Objection by Mr. Shultis.
And your answer: Well, I think that there has been no final decision as to whether or not,



although it is not under active discussion.
That was your truthful testimony, Mr. Milner?
A It was.
Q You can't think of any other reason other than equity to other utilities why the Department of Energy would be unwilling to grant priority to shutdown reactors. True?
A I think that's the principal reason, equity, yes. I can't think of any others offhand, no.
Q Granting shutdown priority avoids the need to continue otherwise unneeded reactor site storage or shutdown reactors?
A It does.
Q And granting shutdown priority can be shown to be clearly cost-effective for consumers from the standpoint of timely decommission. True?
A Certainly -- certainly cost-effective for the consumers of -- of that particular utility.
Q And in your opinion, the department would have looked favorably on exchange requests from shutdown reactors?
A Yes, I think in general terms, I think -- I think we would have. Certainly would have to see the -- the terms of an exchange request but we never



received any.
Q Finally on this topic, Mr. Milner, it's -- in your opinion, just taken in isolation and without other considerations, it would be desirable not to have utilities who have completed decommissioning to have to incur operations and maintenance expenses for 20 years to watch over spent fuel casks on their sites?
A Certainly, I would think that would be desirable.
Q You mentioned a couple times, Mr. Milner, that -- I think it came up in your direct testimony that you don't recall utilities asking about exchanges of approved delivery commitment schedules. I want to ask you just a few questions about that topic.
First of all, if an exchange request were consistent with the department's transportation capabilities and acceptance capacity for a given delivery year in your opinion, that request would have been approved. True?
A I think so, yeah. Again, you'd have to look at the specifics of a request but yes, I wouldn't see why it would not be.
Q You recall maintaining a list of approved delivery commitment schedules and comparing it to a

list of utilities that might be running out-of-pool space and utilities with sufficient pool space and considering brokering something between those utilities?
A Yeah, certainly we maintained a list of the approved DCSs, we knew the status of utilities' pool storage, and there had been some general discussion about brokering exchanges should -- should utilities desire that.
Q You believe that brokering exchanges for utilities could serve a useful purpose?
A Yeah, I -- I think it could have.
Q And one of those purposes would be potentially precluding the need for -- for dry storage?
A Yes, uh-huh.
Q At one point, the department was planning for the possibility of exchange requests and began looking at criteria for approving or disapproving them?
A Yeah, I think again we -- we started looking at if -- if we got exchange requests, what would be the criteria, how would we handle them, but again, we never -- never received any.
Q By 1994 you envisioned that swap market



would develop that could accommodate Yankee Atomic's spent fuel?
A I could have envisioned that, yes.
Q In fact, you did envision that, didn't you?
A I seem to have some recollection of that, yes.
Q And others at the department held that belief as well, didn't they?
A I think so, I think so.
Q But you have thought that the uncertainty of the department meeting the 1998 acceptance date had the ability to hinder that swap market from ultimately developing?
A Yes.
Q You believed that as a practical matter, it would -- I'm sorry, I cut off that question. If I could have a moment, Your Honor?
JUDGE MEROW: Surely.
MR. SHAPIRO: Apologize for that delay. We have no further questions.
JUDGE MEROW: Any redirect?
MS. SULLIVAN: Yes, Your Honor. May we take a break? I don't think we're going to go very long this afternoon.



JUDGE MEROW: Take a ten-minute break? Is that enough?
MS. SULLIVAN: Yes, thank you.
JUDGE MEROW: Back on the hour then.
MS. SULLIVAN: Okay, thank you.
(Recess taken from 3:48 p.m. through 4:06 p.m.)
MS. SULLIVAN: I apologize, Your Honor.
JUDGE MEROW: Oh, no problem. Continue when ready.
MS. SULLIVAN: Thank you.
Your Honor, I'd first like to ask a couple questions that have been raised in a pleading that Plaintiff's counsel has filed, I believe, today that I meant to make part of my direct. Certainly, Mr. Shapiro can cross-examine on those questions.

REDIRECT EXAMINATION

BY MS. SULLIVAN:
Q Mr. Milner, do you know what the Pacific National Laboratory is?
A It's one of the national laboratories in the DOE system.
Q And who runs PNL?
A A contractor, an M and O contractor.
Q And what does an M and O contractor do, to



your understanding?
A In the indication of a lab, they operate the entire lab.
Q Has PNL done work for the Office of Civilian Radioactive Waste Management?
A It has, yes, uh-huh.
Q Okay. And are the reports that PNL has provided for the Office of Civilian Radioactive Waste Management the statements of DOE?
A No, they -- they would be treated like another contractor, any other contractor report.
Q And how is that?
A Which is input to -- to the department for -- for consideration.
Q Thank you.
Mr. Milner, could -- could I direct your attention -- do you have the binder of your deposition in front of you?
A Yes.
Q Could you go to the first tab and just have one -- the first day of your deposition, May 1st, page 73. Okay. Do you have that in front of you?
A Yes, uh-huh.
Q And Mr. Shapiro asked you about a statement that you had made at your deposition

# MORGAN

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY )
CONNECTICUT YANKEE ATOMIC POWER COMPANY )
MAINE YANKEE ATOMIC POWER COMPANY )
FLORIDA POWER & LIGHT COMPANY )
NORTHERN STATES POWER COMPANY )
DUKE POWER, A Division of DUKE ENERGY CORP.)
INDIANA MICHIGAN POWER COMPANY )
SACRAMENTO MUNICIPAL UTILITY DISTRICT )
SOUTHERN NUCLEAR OPERATING COMPANY, et al. )
COMMONWEALTH EDISON COMPANY )
BOSTON EDISON COMPANY )
GPU NUCLEAR, INCORPORATED )
WISCONSIN ELECTRIC POWER COMPANY )
POWER AUTHORITY OF THE STATE OF NEW YORK )
OMAHA PUBLIC POWER DISTRICT )
NEBRASKA PUBLIC POWER DISTRICT )
TENNESSEE VALLEY AUTHORITY, )
Plaintiffs, )
v. )
UNITED STATES, )
Defendant. )

DEPOSITION OF ROBERT L. MORGAN

March 21 and 22, 2002 Volume 1, Pgs. 1 - 212

1

Case Nos.: 98-126C, 98-154C, 98-474C, 98-483C, 98-484C, 98-485C, 98-486C, 98-488C, 98-614C, 98-621C, 99-447C, 00-440C, 00-697C, 00-703C, 01-115C, 01-116C, 01-249C

THE DEPOSITION OF ROBERT L. MORGAN was taken as a witness on behalf of the Plaintiffs, pursuant to Rules of the Court of Federal Claims, at 9:30 a.m. on Thursday, the 21st day of March 2002, at the Eugene Hilton Hotel, 66 East 6th Avenue, in the City of Eugene, County of Lane, State of Oregon, before Eleanor G. Knapp, CSR-RPR, Certified Shorthand Reporter in and for the State of Oregon.

APPEARANCES

For Plaintiffs Southern Nuclear Operating Company, et al.:
BALCH & BINGHAM LLP
Attorneys at Law
1710 Sixth Avenue North
Birmingham, Alabama 35203
205/251-8100
BY: MR. M. STANFORD BLANTON
MR. K.C. HAIRSTON

2

A P P E A R A N C E S
(continued)

For Plaintiff Commonwealth Edison Company:
JENNER & BLOCK, LLC
Attorneys at Law
One IBM Plaza
Chicago, Illinois 60611-7603
312/222-9350
BY: MR. NORMAN M. HIRSCH

For Plaintiff Wisconsin Electric:
PERKINS COIE LLP
Attorneys at Law
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
206/583-8419
BY: MR. RICHARD W. OEHLER

(continued)

3

A P P E A R A N C E S

For Plaintiffs Florida Power & Light, et al.:
SHAW PITTMAN LLP
Attorneys at Law
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703/770-7940
BY: MR. ALEX D. TOMASZCZUK

For Plaintiff Sacramento Municipal Utility District:
ARNOLD & PORTER
Attorneys at Law
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
303/863-2301
BY: MR. DAVID S. NESLIN

(continued)

4

A P P E A R A N C E S

For the Defendant:
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division / Commercial Litigation
1100 L. Street, N.W.
Washington, D.C. 20530
202/353-0516
BY: MR. BRYANT S. BANES
MS. HEIDE L. HERRMANN
MR. R. ALAN MILLER

Reported by:
ELEANOR G. KNAPP, CSR-RPR
C & C COURT REPORTING
EUGENE 541/485-0111
SALEM 503/362-9193
TOLL FREE 800/344-0983

5

I N D E X


| WITNESS | VOL. 1 | VOL. 2 |
|---|---|---|
| ROBERT L. MORGAN | | |
| By Mr. Blanton | 9, 173 | |
| By Mr. Banes | 169 | |
| By Mr. Hirsch | 176 | 221, 242 |
| By Mr. Banes | | 241 |
| By Mr. Tomaszczuk | | 243 |
| By Mr. Banes | | 301 |
| By Mr. Neslin | | 304 |

EXHIBITS:

| FOR IDENTIFICATION | MARKED/REFERRED |
|---|---|
| 1 Organizational charts | 25/25,64,79,311 |
| 2 Proceedings for the 1983 Civilian Radioactive Waste Management Information Meeting | 38/38,47,170, 239 |
| 3 Standard Contract, Proposed Rulemaking | 67/67,76,137, 228 |
| 4 Standard Contract, Final Rule | 76/76,84,90,105,109, 130,138,301,304,313 |
| 5 Report on Financing | 93/93,102,104 |


(continued)

6

I N D E X

EXHIBITS:


| FOR IDENTIFICATION | MARKED/REFERRED |
|---|---|
| 6 3/4/93 letter from Alabama Power | 106/106 |
| 7 4/8/83 memorandum re: final rulemaking | 117/117,284 |
| 8 9/7/84 letter to Senator Johnston | 144/144,180, 184 |
| 9 12/20/83 cover letter to Edison Electric | 149/149 |
| 10 12/20/83 draft, Mission Plan | 149/150,162,177, 221,224,261 |
| 11 Mission Plan, Volumes I and II | 159/159,162 |
| 12 U.S. Dept. of Energy's Spent Fuel Storage Policy and Activities | 185/185,190 |
| 13 1/28/83 memo, Morgan to staff | 194/194,227 |
| 14 3/1/83, Morgan's testimony before Congress | 199/199 |
| 15 5/20/83 letter to Morgan from Edison Electric Institute | 201/201 |
| 16 6/17/83 letter from Morgan to Edison Electric Institute | 201/202 |
| 17 FY 1984 Program Guidance for NWF Evaluations | 204/205,226 |


(continued)

7

I N D E X

EXHIBITS:


| FOR IDENTIFICATION | MARKED/REFERRED |
|---|---|
| 18 6/21/83 memo to Secretary re: MRS | 229/229,274 |
| 19 Remarks before IAEA, 10/12/83 | 230/231 |
| 20 Letter to Governor Alexander | 275/275,279 |
| 21 Draft letter to Governor Bryan | 278/278 |
| 22 3/3/83 letter from Northwest States Power Company | 281/281,301 |
| 23 2/8/83 comments from Duke Power Company | 282/283 |


INSTRUCTIONS NOT TO ANSWER:

Page 143, line 15 QUESTION: Would treating situations in which a delivery is needed to permit licensed reactor operations to continue a purpose of the Nuclear Waste Policy Act?

Page 179, line 15 QUESTION: Was Table II-1 in this document the schedule or the acceptance rate that DOE had determined at that point was sufficient to prevent the utilities from having to provide additional on-site storage after 1998?

8

ROBERT L. MORGAN,
as a witness on behalf of Plaintiffs Southern Nuclear Operating Company, et al., having been first duly sworn to testify the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION
BY MR. BLANTON:
Q. Mr. Morgan, we met off the record. My name is Stan Blanton. I am a lawyer representing Alabama Power Company, Georgia Power Company, and Southern Nuclear Operating Company in litigation pending in the United States Court of Federal Claims styled Yankee Atomic Electric Company, et al., v. United States. We're in a consolidated discovery proceeding, and your deposition is being taken in that proceeding.
MR. HIRSCH: You mean "coordinated"?
MR. BLANTON: Coordinated. Whatever. What did I say? Consolidated? Strike "consolidated." Coordinated.
BY MR. BLANTON:

9

Q. I understand you are being represented today by Mr. Banes and the other Government lawyers. Is that correct?
A. That's correct.
Q. In the course of your deposition today, you'll most likely be shown documents that are subject to a protective order jointly entered by the parties in this litigation restricting the disclosure of the contents of material that's been marked confidential.
I understand that you have not had an opportunity to review that order, so what I'm going to do now is hand you the pleading titled Joint Motion for Entry of Agreement and Protective Order. Attached to that as Exhibit A is an agreement and protective order, and I specifically direct your attention to page 3, paragraph 5, of the order and ask if you would review that, please, sir.
A. All right.
Q. All right, sir. Have you read the order?
A. Yes, I have.
Q. Have you got any questions about it?
A. None.

10

Q. Do you agree to maintain the confidentiality of any documents you are shown today?
A. Yes.
Q. Have you ever had your deposition taken before today?
A. Yes.
Q. So you know that the court reporter here is going to take down your answers. And you need to answer my questions verbally. She can't take down nods or shakes of the head.
A. I understand.
Q. Do you also understand that if I ask you a question that you either don't understand or that you think in some way mischaracterizes something you have said previously, you have the right to stop me, make me restate my question until you have one you understand and can answer correctly?
A. I understand.
Q. Any time you want to take a break today, as long as there's not a pending question, just let me know and we can take a break.
A. Fine.

11

Q. Are you currently employed, Mr. Morgan?
A. No.
Q. Are you retired?
A. Yes.
Q. How long have you been retired?
A. I retired from the Government in 1988, worked for a small 8(a) company in Washington, D.C., for five years after that, and have consulted with several people and companies up until last year.
Q. Let's go backwards. Who have you consulted for since you worked for the 8(a) company? Let me ask you a different way since that rocked you back in your chair.
A. There are numerous companies and corporations.
Q. On what subjects have you consulted?
A. Mainly defense program activities within the Department of Energy.
Q. Have you consulted for any electric utilities that you know of?
A. Yes.
Q. Who are they?
A. It was the V.G. Sumner plant in

12

South Caroline when they were proposing to use their reactor for tritium production.
Q. All right, sir. Anybody else?
A. Any other utilities?
Q. Yes, sir.
A. None.
Q. Have you consulted at all with the United States Department of Energy?
A. Indirectly for their contractors.
Q. For which DOE contractors have you consulted?
A. Kaiser in Los Alamos. Sandia in Albuquerque. I can't recall of any other directly for Department of Energy.
Q. Since you left the 8(a) company, have you consulted with any entity on issues that involve the management, storage, or disposal of spent nuclear fuel?
A. I have not.
Q. What was the 8(a) company that you worked for?
A. Meta, M-e-t-a.
Q. What business is it in?
A. We were doing environmental assessments for the Department of Energy.

13

Q. And the years you worked for Meta, that was 1988 through 1993? Is my math right?
A. I think there was a year in between -- or two years that I consulted. I started working for them in 1990 and ended in 1995.
Q. Did any of your work for Meta involve spent nuclear fuel in any way?
A. It did not.
Q. Is there a two-year period between '88 and '90 when you also consulted? Did I understand that correctly?
A. Yes. That's correct.
Q. Did any of your consulting work during that period involve spent nuclear fuel?
A. No.
Q. Did any of that work -- was any of that work for electric utilities during that period of time?
A. I think it was that period of time that I did the consulting at the V.G. Sumner plant.
Q. On tritium production?
A. Yes. I'm not sure of the dates.
Q. Does that take us back to the date of your retirement from the Government?

14

A. Yes.
Q. What was your position when you retired from the Government?
A. Manager, the Savannah River Operations Office in Aiken, South Carolina.
Q. What does the Savannah River site -- What is the Savannah River site?
A. What is it?
Q. Yes, sir. What is it?
A. It's basically a material production site for the production of plutonium and tritium for nuclear weapons. It ran four production reactors, two separation canyons, waste tank area, and tritium loading facilities.
Q. Are there other resource and development activities that go on at Savannah River other than weapons production?
A. No.
Q. How long were you in that job?
A. Seven years.
Q. So that takes us back to 1981?
A. That's correct. No. Excuse me. Eight years. Eight years as manager, then seven years as deputy manager. So I was at Savannah River for 15 years.

15

During that period I had various details to Washington, D.C., where I commuted.
Q. Describe for me, if you would, what a "detail" is in U.S. Government parlance?
A. A detail is an assignment to a specific job at another location.
Q. Check my math, but in some form or fashion you were at Savannah River either as manager or deputy manager from 1973 to 1988. Is that accurate?
A. '73 to '88. Yes. Yes, that's correct.
Q. What details were you assigned to during that 15-year period away from Savannah River?
A. Acting Assistant Secretary for Defense Programs on two occasions.
Q. Do you remember the dates?
A. No, I don't.
Q. All right, sir.
A. I think I can construct that for you. The first time was in February after the inauguration of President Reagan. And I held that job for about six months until a political appointment was made.

16

Then was detailed to Washington just after the passage of the Nuclear Waste Policy Act from February -- I guess it was 1983 -- through the about one-year period.

I was again detailed as Acting Assistant Secretary for Defense Programs, again awaiting a new appointee in that position, and that lasted for approximately six months.

Q. What was the scope of your authority as Acting Assistant Secretary for Defense Programs? What does that include?

A. The entire weapons complex, which included the laboratories -- Sandia, Livermore, Los Alamos -- and all the weapon production facilities, which included Savannah River; Rocky Flats; Richland; Oak Ridge, Tennessee. And that's all I can -- oh, Pantex plant in Amarillo and Bendix plant in Kansas City. Approximately about a $5 billion operation.

Q. After your detail to -- your second detail as Acting Assistant Secretary for Defense Programs, did you return to Savannah River?

A. Yes, I did.

Q. And did you stay at Savannah River until your retirement?

17

A. That's correct.

Q. There were no further details after that?

A. No.

Q. As Acting Assistant Secretary for Defense Programs, were you involved at all in the issues of spent nuclear fuel management or storage?

A. Only the spent nuclear fuel from the defense program activities. Nothing to do with commercial fuel.

Q. All right. At that time was defense spent fuel intended to be part of the DOE program that was initiated under the Nuclear Waste Policy Act?

A. During the last detail, that's correct.

Q. That would have been from the first quarter of '84 until --

A. Mid -- until mid --

Q. I didn't get how long that lasted.

A. I think that one was about six months.

Q. As manager of the Savannah River site, did you also have some involvement with

18

spent fuel produced in weapons production?

A. Yes.

Q. In that job did you have any involvement in the DOE spent fuel program at all?

A. The commercial spent --

Q. Yes, sir.

A. None.

Q. All right. Prior to Savannah River, just briefly describe your career for me, prior to 1973.

A. I had graduated from the Military Academy in 1952, was commissioned, spent 13 years in the Army Corps of Engineers.

First assignment was the Korean War; second in Japan; third, 82nd Airborne at Fort Bragg; fourth was a year in Indonesia as a special assistant to the Ambassador for Civic Action; and then resigned my commission in 1965 and went to work for the DOE -- or the Atomic Energy Commission at that time.

Q. What was your job at the AEC?

A. Director of the heavy water organic tool reactor program at Savannah River for one year from '65 to '66.

19

1966, I joined the reactor development program, Canoga Park, California, and stayed there seven years.

And then in '73 went to work for Savannah River.

Q. Are you an engineer by training?

A. Yes. The Army Corps of Engineers sent me to MIT for two years, and I have a master's in civil and a master's in nuclear.

MR. OHLER: What was that last master's in, sir?

THE WITNESS: Nuclear engineering.

BY MR. BLANTON:

Q. During your time in the Service, were you involved in nuclear weapons issues?

MR. BANES: Objection. Irrelevant.

A. I was not. I had a detail of four years to the Atomic Energy Commission in Idaho Falls in reactor development for Army reactor programs.

BY MR. BLANTON:

Q. Mr. Morgan, have you talked to anybody other than your attorneys today to

20

prepare for this deposition?
A. I made a call -- After I first got a call from someone that said some lawyers were looking for me and that I should call a lawyer in Washington before I call that lawyer -- all he knew was about the Nuclear Waste Policy Act.
I called Mike Lawrence, and he told me there was litigation and he had a deposition. And that was the extent of that discussion.
Q. I'm sorry. I didn't understand what Mike Lawrence said about a deposition.
A. He said he had been deposed regarding a lawsuit and that it was regarding the Nuclear Waste Policy Act. No further details were discussed.
Q. When was that conversation, if you recall?
A. Prior to my call to the lawyers in Washington, DOE.
Q. Weeks? Months? Or how long ago was it, do you think?
A. I have no idea. Probably three months, four months, something like that.
Q. Did Mr. Lawrence tell you anything about the issues --

21

A. No.
Q. -- in the case?
A. No.
Q. Did he tell you anything about -- Did he say that he had been deposed?
A. Yes.
Q. Did he tell you what he had been asked?
A. No.
Q. Have you looked at any documents in preparation for your deposition today?
A. Yes.
Q. What documents have you looked at?
A. The documents given to me by counsel.
Q. You recall what they were?
A. I have them with me.
Q. Okay.
A. Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting, December 12th through 15th, dated February 1984.
December 20 memorandum of 1991, Approval of Publication of the 1991 Annual Capacity Report.

22

A compilation of comments from various utilities relative to the contract with the utilities.
And then the last item was the Federal Register of Monday, April 18th, 1983, Part II, Department of Energy.
And I happened to find in my files the old Public Law 97-425, January 7, 1983.
Q. Is that the Nuclear Waste Policy Act?
A. Yes.
Q. Do you have any other personal files that involve the Nuclear Waste Policy Act other than just the old copy of the Act?
A. That's it.
Q. Do you recall having seen any of these other documents before preparing for your deposition today? Do you recall seeing them at the time they were published?
A. I did review them during the time that I was acting as director.
Q. How about -- I think you mentioned the 1991 cover letter to the ACR.
A. Yes.
Q. Did you mention that?

23

A. December 20th, 1991?
Q. Yes, sir.
A. Had I seen this?
Q. Had you seen that before preparing for your deposition?
A. No. No.
Q. Have you told me now about all the documents you've looked at?
A. Yes.
Q. Mr. Morgan, at the time you were detailed to DOE just after the passage of the Nuclear Waste Policy Act, what was your title?
A. Director, Nuclear Waste Project Office, as I recall.
Q. What were your duties?
A. Implementation of the Nuclear Waste Policy Act within DOE.
Q. At some point in time did the name of the office become Office of Civilian Radioactive Waste Management?
A. Yes. That was when the political appointee was confirmed by the Senate. So it was after -- it was -- when I left, the name changed.
Q. Do you recall who the political

24

appointee was?
A. Ben Rusche.
(Deposition Exhibit No. 1
marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, I've handed you a document that's been marked Exhibit 1 to your deposition. And it's a five-page document, I believe, and the first page of it is titled Office of Civilian Radioactive Waste Management, and has a box -- an organizational chart on the first page.
And the top box says Director of Office of Civilian Radioactive Waste Management, and by the side it has R.L. Morgan (A). Do you see that?
A. Yes.
Q. Do you recall at what point in time this -- Do you recall whether this organizational chart was ever correct? Was there an organization that that accurately reflects?
A. It was my impression that I was there during the time it was the Nuclear Waste Project Office. But evidently I am incorrect

25

because this shows it as the Office of Civilian Radioactive Waste Management, which I know it changed into. But I thought it was after I left.
Q. Regardless of what they called -- what the name of the office was, does that organization look like the one that was there when you were acting director?
A. Absolutely.
Q. Mr. Morgan, who would have been in the box just above you on this org chart? Who did you report to during the time you were acting director of OCRWM?
A. Secretary of Energy, Donald Hodel.
Q. Do you recall whether you had some sort of delegation of authority from Secretary Hodel, formal delegation of authority with respect to the program?
A. I don't understand the question.
Q. Was there a piece of paper saying this is what your authority is within the Department of Energy signed by the Secretary of Energy?
A. I don't recall.
Q. What did you understand your scope

26

of responsibilities and authority to be?
A. The entire Nuclear Waste Policy Act activities within the department.
Q. Did you have decision-making authority?
A. Yes.
Q. Mr. Morgan, let me get you to look at the page of Exhibit 1 which is marked -- you see these numbers in the top right-hand corner that have SN on them?
A. Yes.
Q. Let me get you to turn to SN010809, which has Office of Management at the top of it.
A. Yes.
Q. You see that? You see all those? At the top of the document it has Associate Director, and it has R.M. Rosselli by the side of it, and then his deputy is H.F. Perry, and then a Finance Division, Operation Division, and Management Division with what appear to be acting heads in each one of those boxes. Is that correct?
A. Yes. Yes.
Q. Below that there are a series of bullets that are below each one of the

27

divisions. Is that right?
A. Yes.
Q. And, for instance, under Operations Division, there is a bullet on the top that says "Coordinate OCRWM Mission Plan."
A. Yes.
Q. My question is: Are there names of people that are associated with each one of those bullets, people who were in charge of each one of these items that are listed as bullets on this organizational chart during the time you were there?
A. I didn't go down to that level below the division level.
Looking at the assignments, I'm sure in some cases there was a collaborative effort and in some cases people had a lead on it.
But I looked to the division directors.
Q. All right, sir. Did all of those functions eventually report up through Mr. Rosselli and eventually to you while you were there?
A. That's correct.
Q. Were there -- still focusing on the

28

can't recall whether I had unanimity in certain things, but I would say that not everyone felt the same way about every part of the Act.
So I was ultimately responsible for the definition of what was in there.
BY MR. BLANTON:
Q. What did you decide it meant?
A. Pardon?
Q. What did you decide that the Act meant?
MR. BANES: Objection. Vague. Compound.
A. I really don't understand the question. In other words, the Act as written is what we tried to implement. And there were some interpretations, and we interpreted it a given way.
BY MR. BLANTON:
Q. What problem did you determine that the Act was attempting to solve?
A. What problem?
Q. What problem? Or was there a problem that the Act was trying to solve?
A. Yes, the storage of the nuclear waste from the commercial establishment. That's

37

what the whole act was about.
(Deposition Exhibit No. 2 marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, I've handed you a document marked Exhibit 2 to your deposition, the first page of which is titled Proceedings of the 1983 Civilian Radioactive Waste Information Management Meeting, December 12 through 15, 1983, Washington, D.C., and then it has February 1984 below that.
And then following that we've included the forward and table of contents but we've not included all the papers listed in the table of contents. But we have included the last two pages titled Program Overview. Do you see that in the document?
A. Yes.
Q. First of all, when we -- In reviewing the cover of the document, there are two dates on it. One is December 12 through 15 of '83, and one is February of 1984. Do you know what those two dates refer to?
A. The February 1984 is the date it was published.

38

Q. And December of '83?
A. The December 12 through 15 of '83 was the time that the meeting took place.
Q. Do you recall this meeting?
A. Yes.
Q. Did you go? Were you there?
A. Yes.
Q. What was the purpose of the meeting?
A. It was basically, as I recall, an information as to what we were doing within DOE and what were some of the issues that we were looking at. And it was basically an overview for those that had interest, including the utilities.
Q. All right, sir. Now, at the time of this meeting, what had happened in the program since the passage of the Act? What progress had you made toward implementing the Act at this point?
A. Okay. The first -- within the first month there were letters that I had the Secretary sign to all the governors as to the process we were about.
We had completed the draft contract as required with the utilities.

39

Then we had resolved those issues and the Federal Register notice that I referred to before.
And the rest of it was just getting a mission plan outlined as to what our goals were and how we intended to get there.
That was the purpose of this meeting, an information meeting.
Q. And for context, the Act was signed by the President in January of '83. Is that right?
A. That's correct.
Q. So you had -- at the time of this meeting, you had been in your job in the Office of Civilian Radioactive Waste Management -- or Nuclear Waste Office or whatever it was -- basically a year?
A. Just about. It was February that I -- that I recall being asked to take the job. I don't have the dates. Close to a year.
Q. Turning to the page of the exhibit that's marked SN069599, it has the title Program Overview, and then under that it has Robert Morgan, Acting Director of Civilian Radioactive Waste Management. Was that you?

40

A. Yes.
Q. Did you write this paper?
A. I gave the first initial outline, it was filled in, and then I reviewed it.
Q. Who filled it in for you?
A. As I recall, it was Mike Lawrence and other people on the staff.
Q. Did they produce drafts and then bring the draft back to you and you would edit it and give it back to them?
A. I think it was just the one sequence that we used. I'm not sure. But I think I outlined it. We gave it to the people. They sent in the information. I reviewed it and edited it and presented it.
Q. So do I understand correctly that you actually addressed the group verbally and said what's in this paper?
A. That's my recollection.
Q. Who were the attendees at this meeting?
A. I have no idea.
Q. In general. Was it open to the public?
A. Utilities. Utilities, people from



the Hill, staffers. It was an open meeting.
Q. Let me direct your attention, Mr. Morgan, to the seventh paragraph. That paragraph starts, "I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend to do." Do you see that?
A. Yes.
Q. I'm going to give you a chance to read that whole paragraph before I ask you any questions about it.
(Pause.)
A. All right.
Q. The fourth and fifth sentences of that paragraph say, "In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act."
My question is: With respect to what DOE was required to do in January of 1998, what did you believe at this time was the intent of the Act?
A. We put a mission plan together to where hopefully -- again, this was in the



mission plan. I think it's summarized in the last paragraph of the statement on the next page.
Q. What was the source of your understanding of what the intent of the Act was?
A. I don't recall.
Q. The last two sentences of the -- what did I say that was, the seventh paragraph? -- states that, "The basic strategy which we've outlined in the mission plan is that beginning in 1998 utilities will not have to provide any additional storage facilities on site."
Do you see that sentence?
A. Yes.
Q. How did that basic strategy come about?
A. That was my input.
Q. Why did you decide that that was the strategy?
A. That's what I felt was the intent of the Congress. And I think listening to some of the staffers is how I got to that conclusion. But it was my conclusion.
Q. And did the drafts or the outline of the mission plan -- Strike that. Do I



understand you correct that the mission plan, in the state it was when you left, was designed to implement that strategy?
A. That's correct.
Q. So in your view as director of the program, was the mission plan -- Strike that.
Did the mission plan, when you left as director, effectuate the intent of Congress as expressed in the Nuclear Waste Policy Act in your view?
A. I believe so.
Could I add a couple of things to the answer of "I believe so"? There was not uananimity within Congress on the mission plan. I was getting stones from both sides of the aisle and from both houses on the Hill -- or the House and the Senate.
And I felt that as long as we are getting stoned from both directions that we were about in the right place.
So I don't think that I can state what the intent of Congress was. I can tell you that the intent of Congress was not unanimous. Some of the members of the Senate wanted me to put more emphasis on the MRS program, monitored

retrievable storage, because they felt a repository would not be approved by 1998, whereas other people said, "Don't go with the MRS. Put all your effort onto the repository program."

So there was a balancing act that we -- we made compromises as to what was in that mission plan to hit the middle of the road, I guess is the best way to describe it. And I don't think that it really had a full consensus by the House and Senate as to what their intent was.

Do you understand what I'm saying?

Q. Let me ask you a question and I'll see. You can answer my question, and I'll figure that out.

You got conflicting statements from members of Congress --

A. Yes.

Q. -- based on the tactics, for lack of a better word, outlined in the mission plan for meeting the goal.

A. Yes.

Q. Not on the goal.

MR. BANES: Objection. Vague.

45

A. Well, the goal -- I think that there was -- you know, our goal was to get a repository in by 1998. And there were some members of Congress that said, "Put all the emphasis on an MRS" so that there was a conflict in the goals.

BY MR. BLANTON:

Q. All right, sir. Did the people who said, "Focus on an MRS," was their purpose that you won't be able to get a repository done, so you won't be able to move fuel by '98?

MR. BANES: Objection. Lack of foundation.

A. I cannot -- I cannot, you know, attribute any background or what they felt about it. I just don't know.

BY MR. BLANTON:

Q. As the head of the -- or the acting director of the Civilian Radioactive Waste Management Program, you determined that, as far as your office was concerned, the mission plan at the time you left was the proper way to accomplish the goals?

A. Yes.

(A discussion was had off the

46

record.)

BY MR. BLANTON:

Q. Back on the record. Mr. Morgan, still looking at Morgan Exhibit 2 and still looking at the seventh paragraph of your Program Overview, the last sentence says, "During the first year of operation" -- the last sentence of the seventh paragraph says, "During the first year of operation of the repository, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location."

At this point in time, did you know what that rate was in terms of what quantity of fuel in a year?

MR. BANES: Objection. Calls for a legal conclusion. Go ahead.

A. As I recall, we generally knew the discharge rates from the reactors. There was information available to us. And I recall that there was a company in Atlanta -- and I can't remember the company -- that provided that information. They had it in their database.

BY MR. BLANTON:

Q. Not NAC, is it?

47

A. Could have been.

Q. So as far as you were concerned, was the rate that was sufficient such that no utility would have to add further storage facilities either on site or at another location, was that rate equivalent to the discharge rate?

A. You notice the next paragraph?

Q. Yes, sir.

A. It says, "So by the year 2000 or 2001, we should be accepting in the repository the amount of fuel as being . . . ."

Q. Right?

A. So there was a time from '98 to 2001, and in '98 the utilities would be making commitments or possibly commitments for dry storage that would be delivered in the 2000, 2001, but that they wouldn't have to make new commitments for ordering, in that time lag, of commitment to additional storage and then actually having that storage.

So we're talking about hopefully -- In other words, when you start receiving fuel in '98, we're not going to be at full run. There's a start-up lag time. So we felt by the year

48

2000 or 2001 that we would be meeting the discharge rate.
Q. During your meeting with Congressional staffers when you first received this detail, did the subject of what the rate under the Act should be come up?
MR. BANES: Objection. Irrelevant.
A. I don't recall.
BY MR. BLANTON:
Q. Do you recall what process you went through at DOE internally in arriving at the plan that during the first year of operation we should be -- of the repository in 1998 we should be receiving fuel at a rate so that no utility would have to add any further storage facilities?
Do you recall what the process in DOE was to arrive at that?
A. That was debated and discussed within my staff there. And that was my conclusion.
Q. Okay. Who worked on that issue beside yourself?
A. I would say all the first level

49

people. I believe in a -- what you would call a collaborative approach to management. I like to have the input discussed before I make a decision.
Q. And by first level people, you are referring to the people who were your direct reports on that organizational chart?
A. Yes, plus Mike Lawrence and McElvey.
Q. Where is Mike Lawrence now? Do you know where he lives?
A. In Richland, Washington.
Q. Does he still work for the Department of Energy as far as you know?
A. No.
Q. Is he retired?
A. No.
Q. Do you know who he worked works for?
A. PNL.
MR. BLANTON: Off the record.
(A discussion was had off the record.)
BY MR. BLANTON:
Q. Do you recall how far in advance of this meeting on December 12 through 15th that DOE arrived -- and really you arrived at this

50

strategy of picking up fuel at a rate such that utilities would not have to add storage space after 1998?
A. Do I recall?
Q. How far in advance of this December 12 through 15 meeting.
A. I think it was quite some time.
Q. Was it something that evolved over time from the time you got there?
A. Yes.
Q. If I could, let me back up for a second and ask you: Did formal notices go out to various stakeholders about this meeting? Do you recall how it was advertised?
A. There's a certain requirement that I can't recall which says all the stakeholders -- the states, utilities -- had to be involved in a notice. And I believe -- well, I believe that that was accomplished.
Q. All right, sir. It says it was sponsored by the U.S. Department of Energy. Did the Department of Energy fund the meeting?
A. Yes.
Q. Do you recall where it was held? Was it at DOE headquarters, or was it at

51

someplace else?
A. It was someplace else, as I recall.
Q. Do you know whether you ever discussed the issues that are set out in this Program Overview and specifically the issues discussed in paragraphs seven and eight of the Program Overview?
A. Issues?
Q. Do you recall whether you ever discussed the subject matter in the seventh and eighth paragraph of this Program Overview regarding the intent of the Nuclear Waste Policy Act and the strategy and the mission plan with the Secretary of Energy?
A. Oh, yes.
Q. Did you review this paper with him before you presented it at these proceedings?
A. I had reviewed the initial schedule, a layout of the program, with him in order to get from Point A to 1998.
And in that discussion I do recall saying that this was extremely optimistic, as stated on the next page, that there were many things that were impediments to getting there -- NRC licensing, siting, the siting criteria,

52

litigation. We had, as I recall, three lawsuits in the period of time that I was acting director -- some of which could cause delays.

The fact that we were dealing with three different media -- basalt, tuff, and salt. Excavation in salt is a lot quicker and easier than excavation in basalt.

So that the characterization by 1987 we thought was an extremely difficult milestone to meet. So there were many uncertainties that we had to face. And we tried to put a schedule together balancing all those and saying, yeah, if it works, this is how you are going to do it.

Q. When you say the schedule, do you mean the schedule for the development of the various facilities described in the Act?

A. The schedule to accept fuel in 1998 I considered extremely optimistic.

Q. Did you ever discuss with him your characterization of the intent of the Nuclear Waste Policy Act?

A. In an overall basis, but not specifics. You know, in other words, we are going to accept fuel in 1998. That was the goal.

53

Q. All right, sir.

A. And I discussed with him the schedule, all the items that had to be implemented and laid out in a PERT network in order to get there. You had to do A before you do B. And sometimes B defines back to A, so that you do a logic network to get there. And that was discussed with him.

Q. Did you discuss with him your strategy that beginning in 1998 utilities would not have to provide any additional storage facilities on site?

A. I don't recall.

Q. Based on your conversations with the Secretary of Energy at the time, did you feel that the Program Overview as you gave it in these proceedings in December of 1983 were consistent with his views of the Nuclear Waste Policy Act?

MR. BANES: Objection. Lack of foundation.

A. That's presumption on my part, you know. But overall, trying to accept fuel in 1998, that was discussed with him. But again, I described that as a very optimistic schedule.

54

BY MR. BLANTON:

Q. But he agreed with it?

A. He didn't object to it, to me.

Q. How did DOE go about developing the standard contract?

A. That was a consensus between my office, contracts, and legal.

Q. Was there a team that did the drafting? Do you recall who the specific individuals were?

A. I believe Rosselli was one of the members, but I don't think he was the only one.

Q. Can you describe how the process worked? Would somebody generate a draft and then circulate it and take comments, or what happened?

A. Yes.

MR. BANES: Objection as to form. Go ahead.

A. There were several discussions that we had in resolution of some of the items.

BY MR. BLANTON:

Q. Do you recall any specific items that were discussed?

A. Oh, boy.

55

MR. BANES: Objection to the extent it requests discussions with counsel. Don't answer those questions, sir.

THE WITNESS: Pardon?

MR. BANES: Don't answer it insofar as it requests discussions with counsel.

A. I know that we discussed the -- how to deal with the fuel that was already discharged as to the fact that some of it was low exposure fuel and some was high exposure fuel, that we had to charge an average of one mill per kilowatt for that.

But we felt that those people that had failed fuel elements that we would have to insert in the repository required a greater amount of effort on our part than those that had high exposure.

In other words, digging the hole, encasing it in the repository, took X amount of dollars to do that. So the only thing that you can do is --

Basically, a repository is heat-loaded limited so that you could put the less exposed fuel closer together. But you still had to excavate and drill for those as you

56

would any of the high-use fuel.

That was -- that was litigated after the final rule by General Electric. And my recollection is that we prevailed and the judge decided in our favor. That was one of the items discussed.

The other item discussed was the rate of acceptance, whether we should have a rate of acceptance or not. And it was decided that we would not put in a rate of acceptance in the contract.

Those are two areas that I recall specifically at this time. I think there were others.

BY MR. BLANTON:

Q. What do you recall about the discussions regarding putting in a rate of acceptance, other than it was -- what the decision was?

A. Well, with the uncertainties and the optimistic schedule that we were looking at, we felt it was inappropriate to commit to a rate at this time in a contract.

Q. Did you view the contract as a mechanism for implementing the intent of

57

Congress?

A. Absolutely. That was specified in the Act.

Q. Do you recall any other issues, other than the issue on -- that was litigated with GE and the rate of acceptance?

MR. BANES: Objection. Compound.

A. The gross versus net charged to the utility.

BY MR. BLANTON:

Q. Let me ask you another question. We may be able to short-circuit this. Are all the issues that -- do you recall discussing any issues internally in DOE during the contract formation that are not addressed in the notice of rulemaking on the standard contract?

A. No. We only dealt with the comments that we received and resolved. We didn't have any further discussion.

Q. At the time the contract was executed, was your view regarding the intent of Congress in enacting the Nuclear Waste Policy Act the same as it was when you addressed that issue in the Program Overview?

A. One is a contract; the other is a

58

mission plan. Two different entities. And a mission plan is laying out how to get there.

With the uncertainties that we had facing us in the program, I didn't think it was realistic to include a rate. And there was no objection to that that I know of.

Q. Let me ask the question in a slightly different way. I understand your testimony to be -- and correct me if I'm wrong -- that at the time you gave the Program Overview statement in December of 1983, that it was your view that the intent of Congress in passing the Act was that beginning in 1998 utilities would not have to provide any additional storage facilities on site.

A. No. That wasn't -- The intent was clearly -- you know, they said to accept fuel in 1998. And there was no rate specified.

Q. What was -- so what was the source of your plan to -- as expressed in the Program Overview that beginning in 1998 utilities will not have to provide any additional storage facilities? Why did you say that?

A. Because I thought it made sense. And this is one of the things that was not

59

defined by Congress in a conference report, which I don't think I could have gotten consensus as to putting a rate in that Congress would agree to.

Q. Was eliminating the need for utilities to add storage facilities on site beginning in 1998 DOE's purpose in drafting the contract the way it drafted it?

A. There was no mention of rate in the contract, no acceptance rate.

And again, I'll say that it was an optimistic schedule presented in the mission plan. And your reference to accepting rate or no new facilities for on-site storage -- again, I'd like to call attention to the fact that in that same testimony I talked about the 2000, 2001, rather than 1998, of matching the discharge so that commitments would be made in '97, '98 for additional storage that would come on line in the 2000 and 2001 period.

Q. I'm still not sure I understand that.

MR. BANES: Objection. Vague.

BY MR. BLANTON:

Q. What's the difference between --

60

Strike that. How do you reconcile "utilities will not have to provide any additional storage facilities on site beginning in 1998" with the following paragraph, then?
MR. BANES: Objection. Asked and answered.
THE WITNESS: Do I answer it?
MR. BANES: You can if you want to. I'm just objecting.
A. Okay. It takes time from making a commitment until those storage facilities are available. The utilities, in good prudence, would have ordered additional facilities on site in '97, '98, that would come on line in 2001 or 2002.
So that at that point we would be matching the discharge rate so that they would be making no new commitments after 1998.
Do you understand what I'm saying?
BY MR. BLANTON:
Q. I think I see what you're saying.
A. There's a lead time for licensing, the actual construction, all the things that you are fully aware of.
Q. And to go back to a couple of



questions ago: Was that plan, as expressed in that paragraph you just referred to, DOE's purpose in drafting the standard contract the way it drafted it?
MR. BANES: Objection. Asked and answered.
A. No. This was a mission plan. The contract was sent out months before that, before we were even working on schedules. The contract was required to be in place, what, some 60, 90 days after the enactment? I don't know the date, but there is a requirement in there.
That was too early to tell what we were doing. In other words, the contract had no rate in it.
BY MR. BLANTON:
Q. Was there any way to calculate a rate in the contract -- from the contract?
MR. BANES: Objection. Calls for a legal conclusion. You can answer that, sir.
A. Could you repeat the question?
BY MR. BLANTON:
Q. You say there was no rate in the contract. Was there any way to calculate a rate in the contract?



MR. BANES: Same objection.
A. No. The rate of acceptance is what I'm talking about. How would you calculate that?
BY MR. BLANTON:
Q. Well, that's my question. If you can't, then the answer is no.
MR. BANES: Objection. Vague. Do you understand it, sir?
THE WITNESS: No.
BY MR. BLANTON:
Q. Is there any way to calculate an acceptance rate from the contract? You say there is not one expressly stated in there. Is there any way to calculate one?
MR. BANES: Objection. Vague.
A. No.
BY MR. BLANTON:
Q. Which came first, the preparation -- or the work on the mission plan or the work on the contract? Or did they start at the same time?
MR. BANES: Objection. Compound.
A. I don't recall. But, you know, the -- I -- in my estimation, recollection, I



believe we were working on things in parallel over the entire items in the Act. So I would say they were -- you know, best of my recollection, that they would be in parallel.
BY MR. BLANTON:
Q. Do you know whether the people who were working on the mission plan were different than the people working on the contract? Or were they the same?
A. The mission plan included far more people than were involved in the contract.
Q. Did both of those functions report through Mr. Rosselli up to you?
A. No. No.
Q. Did either one of them report up through Mr. Rosselli to you?
A. The contract was probably more lead by Rosselli. The mission plan was more lead by Bennett.
Q. I'm going to get you to look back at Exhibit 1 to your deposition.
A. All right.
Q. And looking at the Office of Management page, the first bullet under Operations Division, which reports up through

Mr. Rosselli, has "Coordinate OCRWM mission plan." Is that wrong?
A. No. That's correct. But Bennett had all the information that -- or most of the information that goes into it. They had the MRS activity, which was not under Bennett, also going into it so that the Operation Division got this input and put it together.
In other words, it says "coordinate." It doesn't say, "You are responsible for preparing every part of it."
Q. I understand. How did the drafts of the mission plan come to you? Did they come to you through Mr. Bennett or through Mr. Rosselli?
A. The document, you know, the preparation, the final preparation after discussion came from the Operations Division. The discussions included the entire top level staff.
Q. All right, sir. Which division had the responsibility for the contract as far as OCRWM was concerned?
A. My recollection was it was under Rosselli.
Q. And it appears to be Operations --

65

next-to-the-last bullet under Operations?
A. Right.
Q. So both the mission plan and the contract came through Operations, through Mr. Rosselli, to you? Am I understanding that correctly? Understanding that other people had input into the mission plan.
A. Yes.
Q. Who is Mr. Head, Mr. C.R. Head? What is his name, first name?
A. I don't recall.
Q. Do you know where he is now?
A. No, I don't.
Q. At the time the standard contract was drafted, did you know what the discharge rate of spent nuclear fuel was going to be in 1998?
A. We had an idea, yes.
Q. What factors was it dependent on, the rate of spent nuclear fuel discharge? What was that dependent on?
A. Experience from the reactors in previous years.
Q. Did it depend on the growth rate in new reactors?

66

A. There were no new reactors planned. There were some coming on line, as I recall, but nothing new had been ordered, as I recall.
Q. Do you recall an upper-bound case, a mid-level case, and a no-growth case being reviewed by DOE in terms of projecting what the quantities of spent nuclear fuel would be in 1998 and forward?
A. I think that NAC had those numbers. I just don't recall.
(Deposition Exhibit No. 3 marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, the court reporter has marked as Exhibit 3 to your deposition a February 4, 1983 Federal Register notice titled Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste. And the action under the title says "Notice of proposed rulemaking."
Have you seen that document before?
A. I'm sure that I saw it at the time it went out.
Q. This is not one of the documents you reviewed in preparation for your deposition. Is

67

that correct?
A. That's correct.
Q. You reviewed the final contract rule.
A. I don't know and I cannot say whether I reviewed the final rulemaking in the process of preparing the testimony or discussion that we had on December 12 through 14th or whatever it was.
Q. I didn't make my question clear. In preparation for your deposition today, you have not reviewed this proposed rulemaking?
A. That is correct.
Q. But you did review the final rulemaking in preparation for your deposition today?
A. Yes.
Q. This document has several sections under a heading marked Supplementary Information. Do you see that on the first page, top of the first page of text?
A. Right.
Q. It would be page ADM-001-0669 in the stamp at the bottom of the page.
A. Right.

68

Q. And that Supplementary Information covers Legislative Background and then Proposed Rule and then Comment Procedures and then Procedural Requirements. Do you see all those?
A. Yes.
Q. When you were the acting director of the Office of Civilian Radioactive Waste Management, how would materials such as that included in this notice of proposed rulemaking and described in that Supplementary Information section be prepared?
A. Okay. I think I reported into the -- this Office of Nuclear Waste Policy, whatever, about the time -- I think it was early February. I don't know if I reviewed this specific document before it went out. I don't think I did because of the timing.
I reviewed the comments and the final rulemaking, but I cannot say whether I participated in this. I just don't believe I did.
Q. So the draft contract would have been prepared prior to the time you came on board?
A. I believe that to be the case.

69

Q. All right, sir. Do you recall whether there was a -- there were time constraints in the Nuclear Waste Policy Act on the preparation and execution of the contracts?
A. Yes.
Q. What were they?
A. I think it was 90 days, but I'd have to refer to the Act.
Q. Regardless of what they were, were you operating under time pressure to get the draft contract done and the final contract done?
A. Yes, sir. We were operating under time pressure the entire time.
Q. Did that affect the way you drafted the contract, the amount of time you had available?
MR. BANES: Objection. Vague.
A. I don't think I drafted this contract. I don't think I was there during the time of that.
BY MR. BLANTON:
Q. Do you know who at DOE was responsible for preparation of this material?
MR. BANES: Objection. Lack of foundation.

70

A. In my opinion, it would have been the Assistant Secretary for Nuclear Energy who was running the program prior to my detail -- my detail assignment.
BY MR. BLANTON:
Q. Who was that?
A. Shelby Brewer.
Q. Do you know whether, as part of the process of becoming acquainted with the program, whether you reviewed this notice of proposed rulemaking?
A. I don't believe that I did. I reviewed the -- I reviewed it when the comments came in and the comment resolution process and to the final rulemaking.
Q. Okay.
A. I didn't specifically review this document until the comments came in.
Q. Did you use this document in responding to the comments in some fashion?
A. The comments were specifically to items in the contract, so I would have to review those items where there were comments coming in.
Q. Okay. On the far right-hand column of the notice -- of the first page of the notice

71

of proposed rulemaking, in the paragraph that begins, "The proposed standard contract would establish the rights and duties of the U.S. Department of Energy and the owners and generators of SNF and HLW" -- Do you see that?
A. I'm there.
Q. The last sentence of that paragraph states, "The Act directs DOE to begin repository operations no later than January 31, 1998."
A. That's correct.
Q. Did that continue to be the position of the Department of Energy throughout the time you were there, that that's what the Act directed DOE to do?
A. Yes.
Q. What rights did the contract establish on the part of the owners and generators of SNF and HLW in your view?
MR. BANES: Objection. Vague and overbroad.
A. I'd have to read the document to ascertain that. I don't recall.
BY MR. BLANTON:
Q. Well, in general?
MR. BANES: Objection. Asked and

72

answered.
BY MR. BLANTON:
Q. Did the utilities have a right to expect anything?
MR. BANES: Objection. Argumentative, asked and answered.
A. He objected. Do I still answer it?
BY MR. BLANTON:
Q. I would appreciate it if you would.
MR. BANES: I wouldn't answer that.
BY MR. BLANTON:
Q. So you are not going to answer that question on the advice of your counsel?
MR. BANES: You just asked him whether they could expect anything. He has already answered: The rights and obligations are defined by the contract.
Let's look at the contract if you want to ask him specific questions about it.
MR. BLANTON: I just want to make it clear on the record, I've asked the question and you are telling him not to answer. That's all I'm asking. Is that where we are?
MR. BANES: That's not what



you're asking.
MR. BLANTON: Well, the record will reflect what the question is.
MR. BANES: Let's move on.
A. What's the question again? What rights do the utilities expect from the contract?
BY MR. BLANTON:
Q. What do the utilities have a right to expect from the contract?
MR. BANES: That wasn't the question. That's a new question.
MR. BLANTON: Okay. I'll ask that one.
MR. BANES: Asked and answered.
A. By signing the contract, they were allowed to continue operation.
BY MR. BLANTON:
Q. How so?
A. NRC. They were required to sign it for continuation of the license, in my understanding. And I don't know what else is specifically in the contract.
BY MR. BLANTON:
Q. On the second page of the notice of



proposed rulemaking, which is page -0670, there's a reference in the last paragraph before the heading that says II, Proposed Rule. It says, "DOE determined that it would be most appropriate to develop the proposed . . . contract through rulemaking" --
Do you see that?
A. Yes, I see that.
Q. It says, "DOE determined that it would be most appropriate to develop the proposed standard contract through rulemaking because the process presents the best opportunity for interested persons, particularly the affected parties, to participate in developing the standard contract which will be used in DOE's nuclear waste disposal activities."
Was there any other reason other than that to do it as a rulemaking?
A. I don't believe I participated in this. I think you should ask the people that prepared this what the intent was.
Q. Do you recall being involved in any discussions with respect -- in response to the comments about whether or not rulemaking was the



appropriate mechanism for doing the contract?
A. That was already in process. It had already been done, and I was dealing with the comments that came in on the rulemaking.
Do you understand what I'm saying? I don't think I can address anything in this -- this Part IV that you've handed me as R. Morgan Exhibit No. 3.
Q. All right, sir. Well, let's get out the final rule, then. Okay.
(Deposition Exhibit No. 4 marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, you have before you Exhibit 4 to your deposition, which is a Federal Register notice dated Monday April 18, 1983, titled Department of Energy Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste. Do you recognize that document?
A. Yes.
Q. This is the document that you reviewed in preparation for your deposition. Is that right?
A. Yes. I had a copy of this prior to

the deposition.
Q. Do you recall what the process was for the preparation of this document? Who participated?
A. Specifically, there are three people: Rosselli, Cavanagh, and Winnick. They are specifically listed for further information contact. They had the lead of putting together the response.
Q. Mr. Rosselli reported to you. Did either of the other two people report to you?
A. No, they did not.
Q. Did you participate in any discussions with either of the other two -- without talking to me about what you talked about with --
A. I'm sure I did.
Q. -- Mr. Winnick.
A. I'm sure we had resolution meetings when not only these people were present but others.
Q. What other people would be present during resolution meetings?
A. Oh, boy. Mike Lawrence. And then I -- the one that reports to Rosselli that had the

77

lead for that which you have in the organization chart listing responsibilities, the division director.
Q. Mr. Head?
A. Yes.
Q. Let me make sure my memory is right. Mr. Head, C.R. Head?
A. That's correct.
Q. And just describe for the record, if you would, how resolution meetings would come about.
A. They would review the comment that came in against the paragraph, and then the proposed response or resolution of that comment in the final rule.
Q. All right, sir. Were these regular meetings that were held at a particular time every week, or were they ad hoc, or how would they come about?
A. Basically they were ad hoc. There was not a time -- time to review that. When various sections were prepared, they were reviewed.
Q. Were the people involved ad hoc as well?

78

A. In some cases, yes. Like a Bennett would be involved on some issues and not on others.
Q. Were different contract issues assigned to different people?
A. I think they were referred to various people that fed back in to Head.
Q. What was the basis for the referral to a particular person?
A. The organizational responsibilities, as defined in the org chart.
I would like to add that there is not a date on that organization chart that you have showed me as --
Q. No, sir. There's not.
A. -- Exhibit 1. So I'm not sure just, you know, the date of when things happened and when people were on board.
I know that Bob Bauer, as a for instance, was not there during the early formation of the program. I brought him in from the Chicago office at a later point in time, but I don't remember that exact date.
But I do know that Mr. Head was there during this process, as was Rosselli,

79

Bennett, and Lawrence.
But I would -- I just -- I'm cautious as to did this person have that responsibility at the time we're talking about. I just don't have an organization chart with me for that date.
Q. I understand. Does the fact that Mr. Bauer is shown as Associate Director, Storage and Systems Development, indicate to you that this org chart was later in your tenure as acting director than earlier?
A. Yes. I do not believe that he was there in this process to the best of my recollection. I just have a problem being specific to that organization chart when it doesn't have a date.
Q. I understand. Let me ask you a question this way. Other than Mr. Bauer, are you confident that the other individuals listed on the first page of this org chart that's marked as Exhibit 1 to your deposition were there throughout your tenure as director?
A. Yes.
Q. And were they there in the jobs shown on the organizational chart?

80

what the life cycle cost of the system was?
A. No. It was not a consideration.
(Deposition Exhibit No. 5
marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, I've handed you a document marked Exhibit 5 to your deposition. And it's titled Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste, and it's dated July 1983. And it appears to be a United States Department of Energy document.
And it's -- At the top of it, it says Office of the Secretary of Nuclear Waste Policy Act Project Office. Was that your office before the name changed?
A. Yes.
Q. And in July of '83 you were acting director. Is that correct?
A. Yes.
Q. Do you recall having seen this document before?
A. I do not recall.
Q. Let me refer you to page 1 of the document. And first of all, take as long as you

93

want to. Don't let me rush you. Take as long as you want to to look at it. Tell me when you are ready for me to ask you a question.
A. Go ahead.
Q. All right. On page 1 of the document under Section 1, Introduction and Summary, 1.1 Background, the last sentence of the paragraph says, "This report evaluates whether collection of the fee will provide sufficient revenues to offset the costs of disposal of commercially generated spent nuclear fuel and solidified high-level radioactive waste produced from reprocessing such fuel."
Do you see that?
A. Yes.
Q. Was that one of the requirements of the Nuclear Waste Policy Act, that DOE evaluate the fee from time to time to see if it was sufficient to cover the costs of the program?
A. Yes.
Q. Let me get you to refer to page 9, which has Table 3-1, Key Reference Case Assumptions is its title.
(Conference between
Mr. Blanton and Mr. Hirsch

94

out of the hearing of the
reporter.)
BY MR. BLANTON:
Q. I skipped ahead of where I should have skipped. Let me get you to go back to page 8.
A. Page 8?
Q. Yes, sir.
A. All right.
Q. Under Reference Case and Assumptions, Section 3.1.
MR. BANES: You are not limited to reading just that if you need further context.
BY MR. BLANTON:
Q. Yeah. Read whatever you want to.
(Pause.)
A. Okay.
Q. The first paragraph on page 8 says, "The key assumptions used to estimate and project life-cycle program costs under the reference case are listed in Table 3-1."
And then the next paragraph -- Do you see that, that I just read?
A. Yes.

95

Q. And then the next -- the second paragraph under Section 3.2 on the same page says, "It is assumed that each of the two geologic repositories will begin receiving either spent fuel discharge or reprocessing waste in 1998 and 2002 respectively. Each repository has a design receipt rate of 3,000 metric tons a year, although a receiving rate of 1,800 metric tons annually is assumed for the first five years."
Do you see where I read that from?
A. Yes.
Q. The question is: What relevance do those assumptions have to the total life-cycle costs of the system?
MR. BANES: Objection. Vague.
A. I do not understand your question.
BY MR. BLANTON:
Q. Do you know what "reference case" refers to as used in this report?
MR. BANES: Objection. Lack of foundation.
A. I don't understand that question.
BY MR. BLANTON:
Q. All right. Let me ask you this

96

question, then. Do you know how the total life-cycle costs of the DOE waste management system were estimated for the purposes of determining whether the fee was adequate to cover them?
A. I don't know. I don't recall.
Q. Does it appear to you from reading this that the receipt rate, the projected receipt rate, was a factor in calculating or projecting that cost?
MR. BANES: Objection. Calls for speculation and lack of foundation.
A. I would conclude from reading this that that is the case.
BY MR. BLANTON:
Q. Do you ever recall being involved in a decision while you were director of the Nuclear Waste Policy Act Project Office or the Office of Civilian Radioactive Waste Management about what receipt rates should be included in any estimates of life-cycle costs?
A. I do not recall any specific discussions regarding what was to be used in this cost estimation. That's all I can say.
Q. All right. Do you have an

97

understanding as we sit here today of how the nuclear waste fee was supposed to work?
A. The fee of one mill per kilowatt was a number given to us by Congress and that we were required to forecast whether that was adequate or not.
The conclusion that I participated in was that it was adequate at the time I was there.
Q. Was that decision based on some estimate of the costs of the program that somebody presented?
A. It was primarily reviewed for our current and projected years, not through the life-cycle costs, from my standpoint. I was looking at the near-term requirements. That was my concern.
I was very bluntly told by Congress not to try to get any modification or change anything in the first year.
Q. Who told you that?
A. One of the Congressional staffers. If I changed anything or opened it up, it would -- they felt would substantially hurt the program because of the divergence of opinion as

98

to what was to be covered in the Act legally.
Q. Did the Act provide for adjustments both up and down in the fee?
A. In my mind, they did.
Q. What would cause a downward adjustment in the fee?
MR. BANES: Objection. Calls for speculation. Go ahead. It's also outside the scope of the schedule issues.
A. Yeah. When I look at this, I have reviewed exposition salt mines in Germany as to how they were excavated versus some of the tunneling in granite in Sweden and what we expected in the basalt excavations. And the prices were extremely wide.
If we went into a salt dome, I believe there may have been a reduction. I don't know. But it would cost less for the Government to open a salt repository than a basalt or tuff repository.
BY MR. BLANTON:
Q. Would the cost of operating the repository change with the quantity of fuel you received at it each year?
MR. BANES: Objection. Calls for

99

speculation.
A. In my opinion, you would have potentially, you know, to excavate and mine and deposit fuel in a salt mine, you could work several drifts at the same time. So it would not change the cost of the down- -- down-hole activities.
It would increase the elevator cycles. And as to whether, you know, you could handle that with the -- with one lift versus two, that was yet to be decided. And I think that the number of elements going in per day, I think you could handle it with one lift.
Q. How about such things as transportation costs and other operating costs as opposed to construction costs? Would those vary?
A. You would probably have to have --
MR. BANES: Objection. Relevance.
A. You would have to have a larger inventory of casks to move more fuel. But the actual expense of the transportation of that would be the same. In other words, after the initial investment of casks, that would be the

100

only difference in my mind.
BY MR. BLANTON:
Q. How about the amount of time that the repository stayed open before it was closed? Would that affect the life-cycle cost of it?
A. It's potential.
Q. Does that -- does the amount of time that the repository stayed open relate to the receipt rate?
A. Of course.
Q. How so?
A. Well, if you receive more -- You are going to -- you are limited by the number of metric tons you can have in the first and second repository. If you bring it in quicker, you can close it up quicker.
Q. Which would retire -- Excuse me.
A. That's obvious.
Q. And that, in turn, would affect the cost?
MR. BANES: Objection. Calls for speculation. Irrelevant.
A. It has the potential in my mind of affecting the cost. But that could be up or down.

101

BY MR. BLANTON:
Q. Is that the reason -- all of these issues we've been talking about, is that the reason a Reference Case Material Flows such as shown in Table 11 (sic) was included in this report, marked Exhibit 5?
MR. BANES: Objection. Lack of foundation. Calls for speculation.
A. Please repeat the question. I'm sorry.
BY MR. BLANTON:
Q. Is the effect of the receipt rate at the repository or in the system -- Strike that.
Is the effect of the receipt rate on cost of the system the reason a table such as 3-3 would be in your report on financing the disposal of commercial spent nuclear fuel?
MR. BANES: Same objection.
A. I think this was the case. I don't recall whether it has alternates or, in other words, sensitivity analysis whether this rate goes up or not. I don't know if that's in this report or not. I do not recall that.
BY MR. BLANTON:
Q. But would that be the reason it's in

102

the report, because receipt rate has an effect on cost?
MR. BANES: Objection. Lack of foundation.
A. This was a case based on these numbers. I don't know if there was sensitivity analysis made relative to whether those -- if the rate changed, what that would do to the cost.
This was a -- what I'm looking at right now is a one-case basis.
BY MR. BLANTON:
Q. What other reason would there be for including the Reference Case Material Flows table in this report, other than to make some assumptions about the cost of the system?
MR. BANES: Objection as to form. Lack of foundation.
A. This was an estimate of cost that reviewed the life-cycle costs under given conditions.
I did not focus on this report because of a preconception that I was not going to change the one mill per kilowatt rate during the first year.

103

BY MR. BLANTON:
Q. I think the question was, though: Is there any other reason, other than a projection of cost, for these numbers to be in the document?
A. That's the basis that they used for calculating the cost. I don't know if a sensitivity analysis was done relative to changing those numbers.
Q. All right, sir. Are you aware of whether in July of '83, when this report that's marked Exhibit 5 to your deposition was produced, whether there was within the Department of Energy any reference case other than the one shown in Table 3-3?
MR. BANES: Objection. Irrelevant.
A. I have no recollection.
BY MR. BLANTON:
Q. Was there any consideration in July of '83 within the Department of Energy regarding the acceptance of less than the amounts shown in Table 3-3?
MR. BANES: Objection. Asked and answered.

104

A. I have no recollection.
BY MR. BLANTON:
Q. Let me refer you back to Exhibit 4 now, which is the final rulemaking, and get you to look with me at the second page of that document. It's got page 16591 up in the upper right-hand corner.
A. Yes.
Q. In the second full paragraph in the far left-hand column, there's a paragraph that says, "A new second 'Whereas' clause relating to the responsibility of DOE to take title to SNF or HLW 'as expeditiously as practicable,' has been added to the following language of the Act." And then in a parenthetical it has a citation of the Nuclear Waste Policy Act.
Do you see that?
A. Yes.
Q. Do you recall any of the discussions that led to the inclusion of the second "Whereas" clause that that refers to?
A. This is what the mission plan was trying to do; in other words, get to the acceptance. That was a goal established. And this was part of that goal.

105

Q. Do you recall whether any of the commenters suggested inclusion of that clause?
A. In order for it to be changed, there would have to be a comment.
Q. Okay. So you --
A. I don't think there were any changes made that had not been commented on either in the written or the oral comment period.
Q. So if there is a change from the proposed contract to the standard contract, that tells us there was a comment on that change. Is that right?
A. That would be my assumption.
Q. DOE did not change anything just of its own volition?
A. Not to my knowledge.
(Deposition Exhibit No. 6 marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, the court reporter has handed you a document marked Exhibit 6 to your deposition, which is a letter dated March 4, 1983, from F. L. Clayton, Senior Vice President, Alabama Power Company, I presume to you, Robert Morgan, Project Director, Nuclear Waste Policy

106

Act.
A. Yes.
Q. Take your time, review that letter, and let me know when you're ready for me to ask you a question.
(Pause.)
A. All right.
Q. All right, sir. On the numbered page 8 of that letter --
A. Yes?
Q. -- there's a paragraph 7 that says Spent Fuel Receipt Rate at DOE Facility.
A. Yes, I've read that.
Q. Do you recall receiving comments -- either this comment or comments like it in the comment process on the contract?
A. There were many comments, as you know. And we collectively reviewed those comments.
And I can see from paragraph 7 that "as expeditiously as practicable" is in this paragraph. And that was -- and the contract was modified to make that statement.
Q. All right, sir.
A. I mean this is -- Never mind.

107

Q. Go ahead.
A. Never mind.
Q. You see the sentence in paragraph 7 that says, "In this regard, we would like to emphasize the importance of the annual receipt rate of the disposal facility being designed, to the extent practicable, to be commensurate with the levels of spent fuel being generated annually and the need to also reduce the backlog of spent fuel as expeditiously as possible."
A. Yes.
Q. "Consistent with Section 302(a)(5) of the Act, the contract should express the intent of DOE to take title to spent nuclear fuel as expeditiously as practicable upon request of the generator or owner."
Did the sentence that says "In this regard, we would like to emphasize the importance of the annual receipt rate of the disposal facility being designed, to the extent practicable, to be commensurate with the levels of spent nuclear fuel being generated annually and the need to also reduce the backlog of spent fuel as expeditiously as possible" -- was that the goal of DOE in implementing the

108

program?
MR. BANES: Objection. Vague.
A. That was basically in my statement of December which said we'd like to catch up with the generating rate in the 2001 period or that time frame.
BY MR. BLANTON:
Q. All right.
A. So that's -- The design of the facility is to accommodate that. It doesn't say when. We would like to have that -- the repository not only take the generating rate but, more than that, to get rid of the backlog. That was the intent of sizing the facility. And that hasn't changed.
Q. Let me get you to take a look at Defendant's Exhibit 4, again, and get you to refer to page 16598.
A. Yes.
Q. If you would just read to yourself the paragraph that says, "Similarly, seven commenters addressed the DOE performance standards . . . ."
(Pause.)
A. Yes.



Q. At the seventh line from the bottom of that paragraph, it says, "The 1998 date is called for in the Act, and we believe it to be a realistic date." Do you see that?
A. Yes.
Q. Was that a true statement at the time that the final contract was issued?
A. That's, again, what I testified in December, that it was an optimistic date but that we believed that we could meet it barring intervention and all the other uncertainties that the Act had.
Q. But at this particular time, DOE believed it was realistic?
A. Optimistically realistic.
Q. I don't see "optimistic" in the sentence. Do you?
MR. BANES: Objection. Argumentative.
A. That's in my statement of December 12.
BY MR. BLANTON:
Q. The next sentence says, "Our performance will be judged by meeting this date." Could you elaborate on that, what that



means?
A. Exactly what it says.
Q. What, in your view, was DOE's performance?
A. Meeting that date.
Q. By doing what?
A. Accepting spent fuel in 1998.
Q. What quantity of spent fuel in 1998 would have satisfied DOE's obligation as stated in that?
MR. BANES: Objection. Calls for a legal conclusion.
A. As I said in the December 12th, that if we accepted one spent fuel element in 1998, we would have met the requirements of the Act as specified, but we did not think that was the intent of the Act.
So the answer to the question, one spent fuel element.
BY MR. BLANTON:
Q. What did you think the intent of the Act was?
MR. BANES: Objection. Irrelevant. Calls for a legal conclusion.
A. I have no idea. That's drawing a



conclusion. I didn't participate in the preparation of that Act.
BY MR. BLANTON:
Q. Well, as the director of the program, was the intent of Congress a factor in what you did?
A. Absolutely.
Q. And what was your working definition of what the intent of Congress was as to the quantity of spent fuel that should be accepted?
MR. BANES: Objection. Calls for a legal conclusion. Irrelevant.
A. Yeah. I can only read intent as to what the words required in the Act, which required the acceptance in 1988 of -- or 1998 of spent fuel.
And as I said on the 12th, to meet that, those words, would be one spent fuel element. That was my comment then. It's the same.
BY MR. BLANTON:
Q. I don't want to argue with you about it, but you said in the next sentence that was not the intent of Congress. And my question is directed to what was your understanding what the

period.
BY MR. BLANTON:
Q. Do you think your strategy was consistent with the Act, though?
MR. BANES: Objection. Calls for a legal conclusion. Go ahead.
A. The Act specified that I accept spent fuel in 1998. Regarding that, yes, it was consistent with that.
BY MR. BLANTON:
Q. How about the goal of utilities not having to add storage facilities after 1998? Was that consistent with the Act?
A. I don't think it specifies that. The Act doesn't specify that.
Q. Did you think it was inconsistent with the Act?
A. I did not think it was inconsistent with the Act. But the Act didn't require it.
(Deposition Exhibit No. 7 marked for identification.)
BY MR. BLANTON:
Q. We've marked as Exhibit 7 to your deposition a memorandum dated April 8, 1983. It has as the subject, Action Memorandum, Final

117

Rulemaking on Standard Contract for Nuclear Waste Disposal, the second page of which has a signature line, Robert L. Morgan, Project Director, Nuclear Waste Policy Act Project Office.
Do you recognize that?
A. Yes, sir.
Q. Did you draft that memorandum?
A. I signed that memorandum.
Q. Did somebody draft it for you? Or do you know?
A. I don't recall.
Q. Attached to it are three tabs, Tab A, Tab B, Tab C, and Tab D. Do you see those?
A. Yes.
Q. Do you recall how those tabs would have been produced during the time that you were at the Department of Energy -- excuse me -- during the time that you were at the Nuclear Waste Project Office?
A. Do I recall how?
Q. How they -- the process for producing these descriptions of the contract.
MR. BANES: Objection. Compound.
A. The process is -- My recollection

118

would be that it came from Rosselli's office for my approval.
BY MR. BLANTON:
Q. Let me just back up and ask you: What was the purpose of this memorandum to the Secretary?
A. The purpose of this memorandum was to get approval from the Secretary in order to publish the final rulemaking. That's what I wanted.
Q. And the tabs, the purpose of the tabs are to describe the contract to the Secretary? Is that correct?
A. I think it really gives him background of what was happening in defining what was in the contract. Tab B covers those. Tab C is the time sequence of events in the process.
Q. What is Tab A? What is that intended to do?
A. That says Disposal Fund Contract.
Q. I guess my question is: What is the difference between Tab A and Tab B, which is Section by Section Contract Analysis?
A. Tab A is a summary. And then Tab B

119

is the section by section contract analysis. That's what it reads.
Q. Looking at Tab B, Section by Section Contract Analysis, there's a section that is titled Scope of the Contract. Do you see that?
A. Yes.
Q. The last sentence of that section says, "The contract services shall commence not later than January 31, 1998, and continue until disposal of all SNF and/or HLW accepted by DOE hereunder." Do you see where I just read?
A. Yes.
Q. Now, you told us a minute ago what you thought "disposal services" meant. Does "contract services" mean the same thing to you as used in that contract? Does "contract services" mean acceptance of spent fuel from utilities?
A. Yes.
Q. What does the phrase "continue until disposal of all SNF and/or HLW accepted by DOE hereunder" mean? What does that mean?
A. That this continues until all the spent fuel is removed from the commercial reactors and from DOE, high-level waste.
Q. Does that mean that DOE would not

120

have any knowledge or thought at the time what would cause you not to approve it?
A. No. We had no idea.
Q. Does this indicate that Secretary Hodel approved the publication of the standard contract?
MR. BANES: Objection.
A. I beg your pardon?
BY MR. BLANTON:
Q. Does it indicate that Secretary Hodel approved the publication of the standard contract as a final rule?
A. Of course. That's the approval signature on page 2 of my memorandum. I asked him to approve it, and he did.
Q. Did you have any conversation with him about it, or did you just send this memorandum to him and he approved it?
A. I don't recall. But I had several conversations with the Secretary, and I think this is one significant enough that I would have. But I don't specifically recall it. I'm sorry.
Q. Now, Tab D lists eight policy issues that were addressed. Is that all the policy

125

issues that were addressed during the comment period?
A. These are the ones that we considered significant that the Secretary should be aware of.
Q. Do you recall any insignificant ones? Anytime you say "significant" to a lawyer, you are going to get asked what's insignificant.
A. Well, I think there was one relative to the last item we covered from Alabama, was it not? "As expeditiously as practicable," that was a change that was made, and I don't see that referenced here. I think that's an example of what I would consider insignificant.
Q. Why did you consider that insignificant?
A. Because it wasn't -- I don't believe that the Secretary wants to see everything. And those things that are important I should call to his attention. That's what I've done in this memorandum.
Q. How did you determine, though, what was insignificant and what wasn't?
A. Policy issues. That's what I have

126

in here. Policy issues. "As expeditiously as practicable" is not a policy issue in my humble opinion.
Q. You are going to have to help me with that one. Why? Why is that not a policy issue?
A. Because it's a given in my mind. We're going to do it as fast as we can in any event. And he was aware of that.
Q. Is the fact that it conformed the contract to the language of the Act a factor in whether it was significant or insignificant?
A. Wait a minute. Excuse me. Everything is consistent with the Act. Everything in here is consistent with the Act or it wouldn't -- wouldn't have gone out of the final rulemaking. We wouldn't put anything in the rulemaking that was inconsistent with it in our opinion.
Q. Okay. Does that go for the mission plan, too? Would you put anything in the mission plan that you thought was inconsistent with the Act?
A. No.
Q. Would you put anything in the

127

mission plan that you thought was inconsistent with the contract?
A. In the mission plan we established rates. In the contract -- rates of acceptance.
In the contract we did not.
Q. But in your view, were the rates in the mission plan inconsistent with the contract?
MR. BANES: Objection. Calls for a legal conclusion.
BY MR. BLANTON:
Q. Let me rephrase my question.
MR. BANES: Also, I'd point out this line of questioning has already been asked and answered.
BY MR. BLANTON:
Q. Were the rates in the mission plan the way DOE intended to perform its obligations under the contract?
MR. BANES: Objection. Vague as to time.
BY MR. BLANTON:
Q. At the time you were there.
A. The mission plan was a plan; the contract was a contract. They were both consistent with the Nuclear Waste Policy Act.

128

Q. Were the obligations of DOE under the contract a factor in the development of the mission plan?
A. Could you rephrase that question?
Q. Well, when you developed the mission plan --
A. Yes.
Q. -- was the performance of the contract what you were trying to accomplish through the mission plan?
A. You are trying desperately to get me to say that we had an obligation under the contract to accept fuel at a given rate. We did not.
And what's in the mission plan is not what's in the contract. We set the mission plan as an ideal goal that we wanted to meet. Okay?
Q. Did you understand that the utilities also wanted you to meet that goal?
A. Oh, yes.
MR. BANES: Objection. Argumentative.
BY MR. BLANTON:
Q. Did you understand that at the time

129

the contracts were signed?
MR. BANES: Objection. Irrelevant.
A. We had those comments from the utilities and chose not to accept and put in the contract a given rate. That was a -- that was a clear understanding on our part -- on my part.
BY MR. BLANTON:
Q. Well, then what was the objective of the mission plan? If it wasn't to perform the contract, what was the objective?
A. It was our goals that we were trying to reach in conformance with the Nuclear Waste Policy Act.
Q. Mr. Morgan, I've lost may place. I'll be with you in a minute. Let's go back to Exhibit 4, which is my Tab 2. Let me refer you to page 16591.
A. Right.
Q. In the middle column there is a paragraph that says, "The definition of 'DOE facility'" --
A. Yes.
Q. -- "was expanded to expressly state, in accordance with the Act, that there may be an

130

interim storage facility (or facilities) which DOE may utilize prior to emplacement in a repository. "
A. Yes.
Q. Would that definition have included a monitored retrievable storage facility?
A. Yes.
Q. What was the purpose of expanding the definition of DOE facility? I understand what that says, but what goal were you trying to reach by expanding the term?
A. It's saying that in order to comply with the Act we may have to operate a monitored retrievable storage facility to meet the '98 date.
Q. Might it also have been possible to use a, quote, DOE facility to accept fuel before the 1998 date?
MR. BANES: Objection. Calls for a legal conclusion and speculation.
A. I don't think it limited that we couldn't accept it before. But it certainly said we wanted to accept it by January 31st, 1998. So that could be before.
BY MR. BLANTON:

131

Q. Was there any -- At the time you were director of the program, was there any distinction between a monitored retrievable storage facility and a repository in terms of how much fuel DOE could accept in a given year?
MR. BANES: Objection. Calls for a legal conclusion.
A. I -- I have no recollection of -- you know, it was -- In my mind, the monitored retrievable storage was the fall-back position on a repository. In other words, if you couldn't get the repository done, then you had the capability of having monitored retrievable storage to accept fuel.
BY MR. BLANTON:
Q. Going further down that page under Article II, Scope, there's a sentence that says, "This clause was amended to more closely reflect the statutory language found in Section 302(a)(1) of the Act, as well as the fact that the services to be provided would occur in the future."
What I'd like for you to do is refer to Article II of the contract -- and I suppose you are going to need to compare that to Article

132

repository.
BY MR. BLANTON:
Q. The provision of the proposed rule you just referred to a minute ago under Article II, Scope, on page 5459 of Defendant's -- excuse me -- of Plaintiffs' Exhibit 3 says, "In exchange for these services, Purchasers will pay fees established in the contract."
My question is: At the time you were director of the program, did you view the fees being paid by the utilities as being in exchange for the services being provided under the contract?
A. Yes.
Q. And what were the services that the utilities were paying for?
MR. BANES: Objection. Asked and answered. Calls for a legal conclusion.
A. The scope -- the scope says we will accept spent fuel for -- from the commercial reactors and put it in the repository. And it would be on a full cost recovery basis. And if it cost more than the 1 mill per kilowatt, we would have to adjust the fees.
BY MR. BLANTON:

137

Q. What did the utilities get?
MR. BANES: Objection. Asked and answered.
A. Disposal of commercial spent fuel.
BY MR. BLANTON:
Q. When?
A. Beg your pardon?
Q. When?
MR. BANES: Objection.
A. Beginning January 31st, 1998.
THE WITNESS: Excuse me.
MR. BANES: Sorry.
BY MR. BLANTON:
Q. And continuing as expeditiously as possible?
MR. BANES: Objection. Misleading. Calls for a legal conclusion.
A. I think that that is stated in the contract, "as expeditiously as possible." I recall that was someplace.
BY MR. BLANTON:
Q. All right, sir. Let me get you to look at the next page of the final rule and the standard contract. I guess it's your Exhibit 4.
A. Right. Page?

138

Q. 16592.
A. 16592.
Q. Up there in the upper left-hand corner.
A. Okay.
Q. Down at the next-to-the-last paragraph on the far left-hand column, it says, "In addition, at the request of a substantial number of commenters, a new provision has been added as subparagraph IV.B.5(b), which states that DOE will issue 'an annual report for planning purposes . . . setting forth the projected annual receiving capacity for the DOE facility.'" Do you see that?
A. Yes.
Q. Why was a report like that not in the proposed rule? Do you know?
A. This was added, it says, at the request of a substantial number of commenters as a new provision. In other words, this was -- this was in response to comments we had received.
We could not commit to a rate in the contract, but we would establish an annual report for planning purposes so that people

139

would know what to plan on.
Q. Okay.
A. The utilities would know what to plan on.
Q. Is this the Annual Capacity Report? Is that what that ended up being called?
A. Yes. Yes.
Q. Was that document included in the contract for any purpose other than planning?
A. No.
Q. In the discussions about whether to include that provision in the contract dealing with the Annual Capacity Report, was there any discussion within your office about whether that report was necessary other than because the utilities asked for it?
MR. BANES: Objection as to form. Vague.
A. There were discussions, as I recall, that in the response to the commenters we felt that they should have as much notice as possible as to when we knew what we would accept and when, for their planning purposes, so they knew what they had to provide for on-site storage.
In other words, this is a heads-up

140

document to where they can properly plan their activities until we get the repository going. That was the whole intent of this change, as I recall.

Q. All right, sir. Staying on that same page, there is a -- down at the bottom there's a reference to the lack of definition of the term "emergency delivery." Do you see that?

A. Yes, I see that.

Q. And then the next sentence after that says, "One situation which would receive consideration is one in which a delivery is needed to permit licensed reactor operations to continue." Do you see that?

A. Yes.

Q. What was the basis for DOE's thinking about why that particular situation would satisfy the emergency -- might satisfy the emergency delivery definition?

MR. BANES: Objection. Calls for speculation.

BY MR. BLANTON:

Q. Well, to the extent you know.

A. Well, I think that -- You know, I don't recall specific discussions on this, but

141

sitting here today, it makes sense that we wanted to keep reactors operating and that that would be considered an emergency situation.

In other words, if they had to discharge fuel from a core and they didn't have a full core reserve, that we would maybe accept fuel from -- as an emergency basis from that reactor so they could continue with a full core reserve capacity.

It makes sense to me sitting here today.

BY MR. BLANTON:

Q. Was an emergency delivery an exception to the normal priority --

A. Yes.

Q. -- rights under the contract?

A. Yes.

Q. Was keeping reactors from having to shut down because of lack of storage space for spent fuel a purpose of the contract -- of the whole contract?

MR. BANES: Objection. Calls for a legal conclusion.

A. I don't think anywhere in the Nuclear Waste Policy Act is there any statement

142

regarding continued operation of commercial reactors.

BY MR. BLANTON:

Q. My question was: Was that a purpose of the contract? Was that one of your purposes as director of DOE Office of --

A. As I recall, the purpose of the contract was to comply with the Nuclear Waste Policy Act.

Q. Would treating situations in which a delivery is needed to permit licensed reactor operations to continue a purpose of the Nuclear Waste Policy Act?

MR. BANES: Objection. Asked and answered. Don't answer that.

MR. BLANTON (to the Reporter): Would you index for me the questions that didn't get answered?

MR. BANES: That question has already been answered. I've been very, very lenient on that, but I'm not going to be lenient on it anymore. We have a limited amount of time here.

Let's take a break.

MR. BLANTON: Okay.

143

(A recess was taken.)

BY MR. BLANTON:

Q. Mr. Morgan, during your tenure as director -- or acting director of the Nuclear Waste Project Office, was there consideration of amending the standard contract to include a waste acceptance schedule?

A. No. I do not recall it. There were discussions on that because of the requests and the comments we'd received.

Q. Were you involved -- Let me just show you this letter, the Hodel letter from Senator Johnston.

(Deposition Exhibit No. 8 marked for identification.)

BY MR. BLANTON:

Q. Mr. Morgan, I have marked as Exhibit 8 to your deposition a letter dated September 7, 1984, from Donald Paul Hodel to J. Bennett Johnston.

And my question is: Do you recall having been involved in an exchange of letters from Johnston and Secretary Hodel relating to the Nuclear Waste Policy Act?

A. This is dated after I had left, so I

144

A. I have no recollection.
BY MR. BLANTON:
Q. Are you aware of any analysis by DOE of the cost of storing fuel at the reactor site if the repository was delayed?
MR. BANES: Objection. Irrelevant. Beyond the schedule issues.
A. I don't recall.
BY MR. BLANTON:
Q. Do you recall what stage the mission plan was in at the time you left?
A. I believe it was in draft.
Q. There are several drafts. Do you remember which draft was being worked on?
A. I have no idea.
Q. I'm going to show one to you.
(Deposition Exhibit Nos. 9 and 10 marked for identification.)
BY MR. BLANTON:
Q. Mr. Morgan, we've handed you a document marked Exhibit 9, which is a cover letter dated December 20, 1983, to Russell Stanford, who is identified as the Program Manager, Utility Nuclear Waste Management Group,

149

and signed by you.
And it says it's enclosing the draft -- most recent working draft of the mission plan that's being prepared. And it's dated December 20, 1983.
And then Exhibit 10 is a document titled Civilian Radioactive Waste Management Program Mission Plan, Volume One, Overview and Program Plans, also dated December 20, 1983.
Do you see those?
A. Yes.
Q. Was this cover letter the cover letter for this version of the mission plan, as far as you can tell?
A. Yes. As far as I can tell.
Q. Was this, this 1983 draft, was it the first draft of the mission plan that you are aware of? Or was there one previous to this?
A. I just don't know.
Q. Okay.
A. I believe this is the first one that was disseminated outside of DOE. Whether there were earlier drafts -- I assume there may have been, but not distributed. You understand what I'm saying?

150

Q. There might have been working drafts of this document, but this is the first one circulated to the public?
A. That's my feeling regarding it.
Q. What was your involvement in the production of this document?
A. Review. My responsibility to send it out, so I have to accept what's in it.
Q. I think you mentioned earlier in your deposition who all was involved in preparation of the mission plan. Would that have applied to this document?
A. Yes.
Q. Was there any approval authority above you for the mission plan? Did the Secretary have to approve it?
A. No. I think I advised him that I was sending it out as a matter of information. He did not review it.
Q. Did you advise him of -- in general of the contents of it, what was said?
A. I don't believe I did.
Q. What is meant by "firm schedule" in the third paragraph of page 1-1?
A. That would be an acceptance

151

schedule.
Q. Do you recall who within your office would have been responsible for writing the introduction to this?
A. I have no idea. Probably Head. Head probably.
Q. Mr. Head, the division director?
A. Yes. He's the one that was responsible for putting it together. And he is referenced on page 2 of my cover letter.
Q. The second paragraph or -- Excuse me. Go to page 2-1. Beg your pardon. Page 2-1.
A. Yes.
Q. If it helps, it's -45172 of the stamped number.
A. Got it.
Q. The second paragraph of that Program Strategy says, "The Department does not intend to delay or postpone the acceptance of civilian radioactive wastes even if a permanent geologic repository is not completed by January 1998."
What went into that decision?
A. The MRS.
Q. Is there a difference in the term "delay" or "postpone" in that sentence? Do

152

those mean the same thing, or do they mean different things, "delay" and "postpone"?
A. My answer to that would only be speculation. I'm sorry.
Q. Was that an accurate statement of what the Department's intention was?
MR. BANES: Objection. Vague as to time.
BY MR. BLANTON:
Q. At the time you were there.
A. We had an MRS program while I was there. And we would accept fuel in the MRS program by January 19 -- or January 31st, 1998, if we didn't have a repository. That was our plan. That was our goal.
Q. Take a look at Table II-1, Waste Acceptance Schedule.
A. Yes.
Q. Do you recall who developed that schedule?
A. No, I don't. I think this is the same schedule we talked about before.
Q. In the financing document?
A. Yes.
Q. Did you approve that schedule going

153

into the mission plan?
A. Yes.
Q. Do you recall having any conversations with anybody about it?
A. I'm sure we had discussions about it, but I can't recall any because this was one of the things we put in there based, you know, on the financial thing and the goal of the mission plan.
Q. Was there any discussion about whether this schedule or a different one should go into the mission plan, that you recall?
A. We had several discussions on what to put in the mission plan. And I don't recall, you know, other numbers. But there were discussions regarding this type of table.
Q. Referring back to this page 2-1, which is stamped SN045172 --
A. Right.
Q. -- the last sentence of that document -- of that page says, "Until 1998, each utility will be responsible for providing its own additional on-site interim storage, unless the utility applies for and is certified for the Federal Interim Storage Program." Do you see

154

that?
A. Yes.
Q. Is there an Interim Storage Program provided for in the Nuclear Waste Policy Act?
A. I don't recall.
Q. Was it your understanding that after 1998 utilities were not responsible for providing their own additional on-site interim storage?
MR. BANES: Objection. Calls for a legal conclusion.
A. Discussions were that until we took possession of the fuel FOB at the reactors, that they were responsible for storage on site.
BY MR. BLANTON:
Q. Did you understand that was to occur in 1998?
MR. BANES: Objection. Asked and answered.
A. We discussed earlier that -- in my discussion, the presentation in December, that it would be about 2001 when we would match that rate.
We go back to this discussion of they did not have to order new things in '98,

155

but they would -- we would not match the discharge rate until 2000, 2001.
So there is an inference, clearly, that they may have commitments and there would be delivery of reactor storage in 2000, 2001 that had been ordered in '98, the same issue we talked about earlier.
Q. Right. What I'm trying to understand is what this last sentence of this page means, then.
A. Again, this is the mission plan. And what we were trying to do, our goal, was to accept fuel from the reactors in 1998, and by 2001 we would match the discharge rate. That's what the goal was.
Q. Did you approve this sentence that says, "Until 1998, each utility will be responsible for providing its own additional on-site interim storage"?
A. I approved the document -- as a planning document.
Q. Let me get you to look at page 2-2. And really, from the bottom of that page and the paragraph that starts, "While the Department's acceptance rate in the initial five

156

connection with the program with them?
A. That's correct.
Q. Were you involved in any way, shape, or form with the amendments to the Nuclear Waste Policy Act in 1987?
A. No. No.
Q. Didn't even know what they were?
A. I didn't know what they were until it happened. I had no foreknowledge.
Q. In your job as Assistant Secretary for Defense Programs, were you a potential customer of DOE -- of the Civilian Radioactive Waste Program?
A. Yes.
Q. After the '87 amendments?
A. I was a potential customer while I was Acting Assistant Secretary to Defense Programs because of the fact that the repository may take defense waste fuel. That was in the Act.
Q. Right.
A. And that's covered in the draft mission plan.
Q. You looked like you were taking a breath and about to say something else.

165

A. I have nothing further to say.
Being a potential customer, then there was a question of what -- of fees that they were going to charge me as -- for defense programs. And I deferred any discussion of those fees while I was Acting Assistant Secretary.
Q. You deferred because of?
A. I didn't want to pay any fees.
Q. Okay. Not because of some conflict of interest or anything?
A. No.
Q. You just didn't talk about it.
A. It would take funds away from the Office of Defense Programs.
Q. What was the mechanism for the program to collect fees from your organization?
A. There wasn't. And I don't believe there is now. I have no knowledge.
Q. Do you recall when you -- during the time you were manager of Defense Programs, doing any analysis or having an analysis done of when or at what rate you could expect defense waste to be removed?
A. We purposely, while I was --

166

MR. BANES: Objection. Irrelevant. Go ahead.
A. Let me just say this. We were authorized for the defense waste processing facility at Savannah River, and we were making interim storage facilities to handle the defense waste after it was reprocessed. And we designed modular interim storage facilities to take care of all of the defense waste.
In other words, we were planning on-site storage until these things were resolved. In other words, we were ahead of the system in interim storage of our own fuel.
BY MR. BLANTON:
Q. Mr. Morgan, as we sit here today, do you have any knowledge of how the delivery commitment schedule was supposed to work under the standard contract?
A. I understand, you know, that they were going to issue the, what do you call it, the acceptance -- annual acceptance report. Other than saying that that was the way it was going to happen, but had not happened while I was there.
Q. Was there any process under way to

167

help define how the DCS process would work while you were there?
A. After approval, as I recall, it was planned -- I recall -- it was planned that when the site selection was approved, then we'd have a firm schedule and would then present an acceptance schedule.
Q. When you say site selection, you are referring to --
A. Of the repository.
Q. -- the repository site?
A. Or approval of an MRS construction.
Q. Why was the repository site selection -- or the site selection a key to that?
A. Well, the site selection and approval then allows you a firm date in order to -- then it's a schedule that you know. In other words, I would not want to make any commitment on acceptance until there was a date that you could accept fuel on a known basis either in an MRS or a repository.
Q. So do I understand you to be saying that without a firm date, there wasn't any reason to send in or for DOE to look at, a

168

delivery commitment schedule?
A. That's correct.
MR. BANES: Objection. Calls for a legal conclusion.
BY MR. BLANTON:
Q. Go ahead, sir. Would you say that's correct?
A. Until we had a schedule that I knew that we could meet, I was not going to commit to an acceptance schedule. That was my position that prevailed at the time that I was there.
Q. My question is about the delivery commitment schedule. Would your answer be the same about a delivery commitment schedule?
BY MR. BLANTON:
A. The delivery or acceptance schedule is the same in my opinion.
MR. BLANTON: Why don't we take a short break.
(A recess was taken.)

EXAMINATION
BY MR. BANES:
Q. Mr. Morgan, earlier you stated that in your position as head of the Office of

169

Civilian Radioactive Waste Management, you believed that your job was to implement the Nuclear Waste Policy Act as written. Is that correct?
A. That's correct.
Q. If you could turn to Exhibit 2 for a minute, sir, earlier when you were discussing with Mr. Blanton the -- let's see -- on the second column in the paragraph that starts "I would like to talk a little bit about the strategy as laid out in the mission plan," does this paragraph discuss -- is this paragraph focused on the mission plan?
MR. BLANTON: Object to leading.
A. Yes.
BY MR. BANES:
Q. Now, in the third sentence it says, "Technically, the Act does not specify how much waste or spent fuel we must be receiving at that time," referencing back to January 1st, 1998. And then it says, "In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act."
That was your understanding of what the words of the Act itself required?

170

A. Yes.
Q. All right. Now, with respect to -- you used the words "goals" and "strategy" several times when you were discussing the remainder of that paragraph, including what -- the rate that's discussed in there. Do you see that part?
A. Yes.
Q. Now -- Let's see. Did you believe that the Nuclear Waste Policy Act obligated the Department of Energy to any particular rate of acceptance?
A. No.
MR. BLANTON: Object. Document speaks for itself.
BY MR. BANES:
Q. Did you believe that -- Was it your intent in the mission plan to obligate the Department of Energy to any particular rate of acceptance?
A. No.
MR. BLANTON: Object.
BY MR. BANES:
Q. And did the Department of Energy obligate itself to any particular rate of

171

acceptance in the standard contract?
A. No.
MR. BLANTON: Object. The document speaks for itself.
BY MR. BANES:
Q. To your knowledge, did the standard contract contain the mechanism for establishing a rate of spent fuel acceptance at a later time?
MR. HIRSCH: Objection. Leading.
A. That's my understanding.
BY MR. BANES:
Q. All right. Now, on Exhibit 2, again, sir, you used the phrase "intent of the Act" there. But is it fair to say that in your discussions with members of Congress and staffers that there was not unanimity about what the intent of the Nuclear Waste Policy Act was beyond its wording?
MR. BLANTON: Objection. Leading.
MR. HIRSCH: Objection. Leading.
A. That's correct.
MR. BANES: I think Mr. Blanton objects during this time.
MR. HIRSCH: That's fine. Happy

172

to have him object.
MR. BLANTON: Mr. Hirsch has my proxy.
BY MR. BANES:
Q. One final question, Mr. Morgan. Have you purported to speak on behalf of Congress today?
A. No, I have not.
MR. BANES: Thank you, sir. I have no further questions.
MR. BLANTON: Now do I get to do rebuttal? Is anybody familiar enough with the procedures in this room?
MR. OEHLER: Yeah.
MR. MILLER: I've got it if you want to look at it.
MR. BLANTON: If you all don't have any objection to me asking one or two, I'll just do it.

FURTHER EXAMINATION

BY MR. BLANTON:
Q. Mr. Morgan, are you aware of anything in the Nuclear Waste Policy Act that says anything about DOE accepting one spent fuel



assembly in 1998?
A. No.
Q. Was there anything that DOE was doing or that your office was doing subsequent to the enactment of the Act that had as its goal accepting one spent nuclear fuel assembly and no more in January of 1998?
A. No.
Q. Did you believe that accepting one spent nuclear fuel assembly would accomplish what Congress intended in enacting the Act?
MR. BANES: Objection. Lack of foundation. Calls for a legal conclusion.
A. I have no idea what the intent of Congress was regarding the rate of acceptance. When I read the Nuclear Waste Policy Act, the words specified accept spent fuel on January 31st, 1998. One could construe that one fuel element would meet that requirement.
BY MR. BLANTON:
Q. Is the statement in Exhibit 2 in your Program Overview, was that statement that ". . . we did not believe that that" -- referring to accepting one spent fuel element -- "meets the intent of the Act" -- was that



statement a true statement at the time you made it?
A. There was clearly a divergence of opinion in dealing with no conference report on that act. And I would get varying answers.
And clearly there was no rate requirement other than to accept fuel in 1998. It didn't say one, two, three, or four.
And in my interpretation -- When I said the intent, I should have said the intent of some members in Congress. Okay? Do you understand what I'm saying?
Q. My question is: What was your belief about the intent of Congress at the time you stated in this Proceedings of the 1983 Radioactive Waste Management Information meeting that acceptance of one spent fuel element in 1998 would not meet the intent of the Act?
Was that your belief at the time?
MR. BANES: Objection. Asked and answered.
A. Repeat the question.
BY MR. BLANTON:
Q. Let me rephrase it. As director of the Office of Nuclear Waste Policy Act



Programs --
A. Whatever.
Q. -- whatever it was, was it your interpretation of the Act, of the intent of the Act, that acceptance of one spent fuel assembly would not meet the intent of the Act?
A. I interpreted the Act that accepting one would meet the written word of the Act. I did not believe that that was the full intent of Congress.
MR. BLANTON: Thank you, sir. Now I guess it ping-pongs back to you now.
MR. BANES: I don't have any further questions.
MR. MILLER: Paragraph A in the procedures, it provides for direct, cross, direct, cross,

EXAMINATION

BY MR. HIRSCH:
Q. Mr. Morgan, my name is Norm Hirsch. I'm a lawyer for Commonwealth Edison Company, which is a plaintiff in these cases.
Let me ask you, just off the bat, during the time that you had responsibility for

BY MR. HIRSCH:
Q. You're not sure?
A. No. I'm making an assumption.
Q. You know that this paper, Exhibit 12, was submitted to the Department of Energy. Correct?
A. I don't know that, but I assume that it was.
Q. That's fine.
A. I'm sorry.
Q. After you submitted the paper, did you receive any follow-up or feedback in terms of additional work?
MR. BANES: Objection. Irrelevant. Beyond the scope of the schedule issues.
A. I don't recall. Okay. If you look at page -0962, "The Administration submitted such legislation in February" --
BY MR. HIRSCH:
Q. I'm sorry. Where are you looking?
A. Under Legislative Status, fifth line down: "The Administration submitted such legislation in February 1979" -- da-da, da-da -- and then talks about the Senate bill and the

193

96th Congress. So definitely it was after '79. Right? One could make that assumption. I'm trying to put a date on this.
Q. I appreciate that. Based on that reference, it looks like this document, Exhibit 12, was submitted sometime after February 1979.
A. That's correct. And I don't know how it was used, if at all.
(Deposition Exhibit No. 13 marked for identification.)
BY MR. HIRSCH:
Q. Mr. Morgan, I've handed you what's been marked as Morgan Deposition 13 which is a United States Department of Energy memorandum dated January 28th, 1983. It's got Bates label EDB-003-0855 through -0856.
Is this a memo that you sent out as the Project Director to all Nuclear Waste Policy Act Project Office personnel?
A. Can I read it first?
Q. Please do.
(Pause.)
A. What's the question?
(The question appearing on page 194, lines 17 - 19, was read as follows:

194

QUESTION: Is this a memo that you sent out as the Project Director to all Nuclear Waste Policy Act Project Office personnel?)
A. Yes. Yes.
BY MR. HIRSCH:
Q. And would that have been basically everybody who was working in the project office?
A. In looking at the date and the time, it appears that I arrived on or close or about the 28th of January, because this is the basic organizational letter establishing this Nuclear Waste Project Office under the Secretary and the transfer of people from Shelby Brewer to the Nuclear Waste Policy Act office.
Q. So this memo, Exhibit 13, was something that you sent out after you assumed your position as the project director?
A. Probably the day that I assumed. This would be initial agreement with the Secretary that I would be able to select from the existing organization within Shelby Brewer's organization those that I wanted working for me in the Nuclear Waste Policy Act Office.
I did not accept all the people that

195

were in that organization at the time.
Q. I think you referred to this earlier. When you were asked to be the head of this program office --
A. Yes.
Q. -- you said that you went and talked to people about the organization of the office. Do you recall that?
A. Yes.
Q. Is it fair to say that one of the things or -- Strike that.
Did you talk to Secretary Hodel about the organization of the office?
A. I talked to Earl Geldea, who was Special Assistant or -- I'd say Special Assistant to the Secretary. And he is the one that I discussed conditions that I would like to have before the Secretary announced it on the following Monday.
Q. I take it that one of the conditions that you requested was that you got to pick the people who you wanted in the office who previously worked --
A. Yes.
Q. -- under the Assistant Secretary.

196

Is that correct?
A. Yes. And that the office would be removed from -- out from under Shelby Brewer.
Q. So let me restate that. So another condition that you requested and that was accepted was that your office would be removed out from under Mr. Brewer and would be a direct report to Secretary Hodel. Is that correct?
A. That's correct.
Q. And is it fair to characterize Exhibit 13 as what amounted to marching orders to the people in your new project office?
A. Basically, yes.
Q. Do you see in the last line of the memo on page 2 you say, "I solicit your full support and cooperation so that the major national objectives of the Nuclear Waste Policy Act of 1982 can be implemented effectively and on time"?
What did you consider the major national objectives of the Nuclear Waste Policy Act to be?
A. To accept the nuclear fuel from commercial reactors, to eliminate the problem of any regulatory shutdown.



Q. Well, when you say an objective was to accept commercial -- spent nuclear fuel from commercial nuclear reactors, was the objective to begin that waste acceptance from utilities in January 1998 as provided in the Nuclear Waste Policy Act?
A. Yes.
MR. BANES: Objection. Calls for a legal conclusion. Asked and answered.
BY MR. HIRSCH:
Q. You answered my question yes?
A. Yes.
Q. You also mentioned a major objective as eliminating regulatory shutdowns.
A. Yeah.
Q. What do you mean by "regulatory shutdown"?
A. When people ran out of full core reserve, they wouldn't be licensed.
Q. So we're all on the same page, can you explain what you mean by "full core reserve"?
MR. BANES: Asked and answered.
A. My understanding of full core reserve is that the reactor basins could accept



a full core unloading from the reactor core into the storage area. That's my understanding of full core reserve.
(Deposition Exhibit No. 14 marked for identification.)
BY MR. HIRSCH:
Q. Mr. Morgan, I've handed you what's been marked as Morgan Deposition Exhibit 14. It's a document titled Testimony of Robert L. Morgan, Project Director, Nuclear Waste Policy Act Project Office, U.S. Department of Energy, before the Subcommittee on Energy and Water Development, Senate Committee on Appropriation, March 1st, 1983. And it contains Bates labels EDB-002-0324 through -0345.
Do you recognize Morgan Deposition Exhibit 14 as written testimony you provided to the Senate Committee on Appropriation -- excuse me -- before the Subcommittee on Energy and Water Development of the Senate Committee on Appropriation on March 1st, 1983?
A. Yes.
Q. Did you prepare this testimony?
A. I outlined it. It was prepared. I reviewed it. I modified it, and then submitted



it.
Q. Do you know who prepared the draft after they got your outline?
A. No. But I'll say that it was reviewed by all the senior staff.
Q. When you say "the senior staff," you mean the direct reports on the organizational chart that we looked at earlier. Is that correct?
A. Yes. That's correct.
Q. Do you know if Secretary Hodel would have looked or did look at this testimony?
A. There is a process by which all written testimony is reviewed within the Department prior to submittal to Congress. I don't know if Secretary Hodel actually reviewed this or not.
These are submitted, in my recollection, to the Office of Congressional Affairs. And they do the vetting, if you will, or they send it to who they believe should see it.
Q. You see on page -- starting on page 4 or page -0329 at the bottom there's a discussion that begins, "Regarding the Nuclear

Waste Policy Act of 1982"?
A. Yes.
Q. And then you see at the bottom of page -0330, that's page 5 of the testimony, there's a bulleted statement that reads, "In return for payment of fees, DOE will dispose of nuclear waste beginning no later than January 1998." Do you see that?
A. Yes.
Q. At the time that you submitted this testimony to Congress, was that statement a correct reflection of what you believed the Nuclear Waste Policy Act required?
A. Yes.
MR. BANES: Objection. Asked and answered.
(Deposition Exhibit Nos. 15 and 16 marked for identification.)
BY MR. HIRSCH:
Q. Mr. Morgan, I've handed you what's been marked as Morgan Deposition 15, which is a letter dated May 20th, 1983, to you from John Kearney, Senior Vice President of Edison Electric Institute.



A. Yes.
Q. Do you recall seeing this letter at or about the time it was sent?
A. I don't recall, but I'm sure I did because I responded to it.
Q. All right. Did you know Mr. Kearney?
A. Not personally.
Q. Had you had any discussions with Mr. Kearney regarding the standard contract before you got this letter?
A. I don't recall.
Q. All right. Well, let's look at your response. Morgan Deposition Exhibit 16 is a letter dated June 17th, 1983, to Mr. Kearney from yourself. It's got the Bates label ZAB-001-1462.
A. Yes.
Q. Exhibit 16 is your letter in response to Mr. Kearney's letter, which is Exhibit 15. Is that correct?
A. Yes.
Q. Did you prepare the letter, or did someone prepare it for you?
A. I don't know if I outlined this one.



But most letters were prepared for me, and I reviewed and signed. I accept fully what's in the letter as my position.
Q. You see there's a reference in the second paragraph of your letter to the issues raised in Mr. Kearney's letter including the lack of standards for the Department of Energy's performance. You see that reference?
A. Yes.
Q. And then you say, I believe in the next full sentence, "We believe that we adequately addressed all the industry concerns in the rule at that time."
What did you mean by "adequately addressed" the industry's concerns in the rule?
A. We considered every comment and addressed those comments as to whether we accepted or rejected the comments. And that, to me, means adequately addressed.
Q. The next paragraph down you say, at the beginning, "Recognizing the stringent time constraints the Act has imposed on the Department, we clearly cannot reexamine any issue of concern to the utilities prior to the June 30th, 1983 deadline."



A. Yes.
MR. BANES: Objection. Misleading.
MR. HIRSCH: All right. Well, I don't want to be misleading. Let me restate the question.
BY MR. HIRSCH:
Q. You see the reference in the first sentence in the first paragraph there, Mr. Morgan?
A. Yes.
Q. What did you mean by "stringent time constraints in the Act"?
A. Well, in this case, all the contracts had to be signed by June 30th. That was specified in the Act.
And here we're dealing with a letter that was received May 20th and responded to on June 17th.
Q. And as I think you mentioned earlier, basically, the utilities, if they wanted to continue operating, had to sign the contract. Is that correct?
A. That's what's in the Act.
(Deposition Exhibit No. 17

marked for identification.)
BY MR. HIRSCH:
Q. Mr. Morgan, I've handed you what's been marked as Morgan Deposition Exhibit 17, which is a document with Bates label PNL-021-0234 through -0268.
And it's titled FY -- I take it that means fiscal year -- 1984 Program Guidance for NWF Evaluations.
Why don't you take a minute to look at the document.
(Pause.)
A. Okay.
Q. Do you recognize Morgan Deposition Exhibit 17?
A. What do you mean by "recognize"?
Q. All right. Is this a document -- Strike that. Do you recall seeing this document at or about the time it was submitted?
A. I don't recall --
MR. BANES: Objection. Assumes facts not in evidence.
A. -- seeing this specific document, but I understand what it is.
BY MR. HIRSCH:

205

Q. What is your understanding of what this document is?
A. This is program guidance relative to the adequacy of the one mill per kilowatt hour fee, and it's directed to Pacific Northwest Laboratories.
Q. So is it correct --
A. This is what we wanted them to do in FY '84.
Q. Is it correct that this document basically was the marching orders to PNL to evaluate the fee adequacy issue?
A. That's my understanding in looking at this document.
Q. And you see the first page, at the bottom there's a reference to -- well, it says WMD:Mel Shupe.
A. Yes.
Q. Who is Mel Shupe? Do you remember?
A. I really don't recall.
Q. Do you know what the reference to WMD is?
A. No.
Q. Will you turn to the second page of the document, page -0235, titled Detailed

206

Analysis Plan for the Fee Adequacy Report. It says at the top, "This is a draft plan for the financial analysis that will be performed by PNL for preparation of the annual Fee Adequacy Report. This analysis will rely heavily on cost estimates provided by Roy F. Weston Company and on interactions with DOE/HQ." I assume that means headquarters.
A. Yes.
Q. And what role had Roy Weston played --
A. Roy Weston --
Q. Let me finish. -- in the process up to this point?
A. Excuse me.
Q. Thank you.
A. Roy F. Weston Company was selected by the Nuclear Waste Project Office to be the support contractor for the office.
Q. What does it mean to be the support contractor for the office?
A. To provide technical help, assistance, et cetera, for the implementation of the Nuclear Waste Policy Act.
Support contractors are commonly

207

used by headquarters and some of the field offices to perform tasks as designated.
Q. Would PNL also have been a support contractor, or did they have a different role?
A. They had a different role, but they provided technical support also for the office but from the field location at Richland.
Q. You see in the second paragraph it says -- of the page -0235, "The Fee Adequacy Report will present an analysis of projected performance of the Nuclear Waste Fund. It will make a recommendation concerning the adequacy of the one mill per kilowatt hour disposal fee."
A. Right.
Q. That task was something that the DOE had been charged by Congress to do under the Nuclear Waste Policy Act. Is that correct?
A. Yes.
MR. BANES: Objection. Asked and answered.
BY MR. HIRSCH:
Q. You see, then, at the beginning of the third paragraph it says, "The planning base used for this analysis is consistent with the draft DOE Civilian Waste Management Program

208

Mission Plan. The underlying premise is that DOE will accept waste in 1998 at a rate sufficient so no additional utility-owned storage capacity is required during the first five years. Therefore, the acceptance rate will be at least equal the utility spent fuel discharge rate." You see that statement?
A. Yes.
Q. And that premise was the premise that PNL was given to make this determination regarding fee adequacy. Is that correct?
A. Yes.
Q. And, in fact, that premise was the DOE's policy at the time. Isn't that correct?
MR. BANES: Objection.
A. It was the mission plan goal, planning document. I don't think it was policy. Okay? There's a difference in my mind between planning and policy.
MR. BANES: He has explained that difference about four times now.
MR. HIRSCH: Did I ask him a question?
MR. BANES: I mean, we are getting dangerously close -- I'm just going to



state for the record my objection, if you don't mind.
MR. HIRSCH: Fine.
MR. BANES: If we are going to go over the same language in different documents, I consider that the same question.
BY MR. HIRSCH:
Q. Do you see -- Why don't you look at page -0238 of this document, Mr. Morgan.
A. Got it.
Q. You see there's a heading there, Repository Deployment Variations?
A. Yes.
Q. Why don't you read those two paragraphs to yourself for a minute.
(Pause.)
A. Yes.
Q. Did you see the statement, "To meet the planed DOE waste acceptance schedule, the MRS must have the same receiving rate as the replaced repository or repositories, i.e., 3,000 MTU maximum receipt rate if the delay is longer than five years, and a total capacity of 3,000 metric tons for each year of delay."
Did you read that statement to



indicate that the DOE planned waste acceptance schedule was to accept 3,000 metric tons per year --
A. I think the --
MR. BANES: Objection.
THE REPORTER: I can only take one at a time.
BY MR. HIRSCH:
Q. I have to finish the question, and then Mr. Banes can object, and then you can answer. I apologize, but otherwise she's got three people talking.
A. All right.
Q. Did you understand the statement that I just read from this document to mean that the DOE planned waste acceptance schedule was to accept 3,000 metric tons per year by the sixth year after the repository opened and 3,000 tons per year after that?
MR. BANES: Objection. Asked and answered.
You don't have to answer it if you don't want to. You've answered it several times.
MR. HIRSCH: He has not answered



this question.
A. I'll say it again. This is consistent with what we have already discussed relative to the mission plan. So that's correct. It was in the plan. It was in the mission plan. This is definitely consistent with the mission plan.
BY MR. HIRSCH:
Q. So the rate that's described on page -238 is the same rate that was identified in the mission plan. Is that correct?
A. Yes. That's my understanding. We've been through that.
Q. All right. We won't do it anymore.
A. Thank you. I'm sorry.
MR. HIRSCH: Why don't we take a break here.
(The deposition was adjourned at 5:30 p.m. and resumed at 8:00 a.m. on Friday, March 22, 2002. The transcript of proceedings is continued in Volume 2.)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY )
CONNECTICUT YANKEE ATOMIC POWER COMPANY )
MAINE YANKEE ATOMIC POWER COMPANY )
FLORIDA POWER & LIGHT COMPANY )
NORTHERN STATES POWER COMPANY )
DUKE POWER, A Division of DUKE ENERGY CORP.)
INDIANA MICHIGAN POWER COMPANY )
SACRAMENTO MUNICIPAL UTILITY DISTRICT )
SOUTHERN NUCLEAR OPERATING COMPANY, et al. )
COMMONWEALTH EDISON COMPANY )
BOSTON EDISON COMPANY )
GPU NUCLEAR, INCORPORATED )
WISCONSIN ELECTRIC POWER COMPANY )
POWER AUTHORITY OF THE STATE OF NEW YORK )
OMAHA PUBLIC POWER DISTRICT )
NEBRASKA PUBLIC POWER DISTRICT )
TENNESSEE VALLEY AUTHORITY, )
Plaintiffs, )
v. )
UNITED STATES, )
Defendant. )

DEPOSITION OF ROBERT L. MORGAN

March 21 and 22, 2002 Volume 2, Pg 213 - 330

213

Case Nos.: 98-126C, 98-154C, 98-474C, 98-483C, 98-484C, 98-485C, 98-486C, 98-488C, 98-614C, 98-621C, 99-447C, 00-440C, 00-697C, 00-703C, 01-115C, 01-116C, 01-249C

THE DEPOSITION OF ROBERT L. MORGAN was taken as a witness on behalf of the Plaintiffs, pursuant to Rules of the Court of Federal Claims, at 9:30 a.m. on Thursday, the 21st day of March 2002, at the Eugene Hilton Hotel, 66 East 6th Avenue, in the City of Eugene, County of Lane, State of Oregon, before Eleanor G. Knapp, CSR-RPR, Certified Shorthand Reporter in and for the State of Oregon.

APPEARANCES

For Plaintiffs Southern Nuclear Operating Company, et al.:
BALCH & BINGHAM LLP
Attorneys at Law
1710 Sixth Avenue North
Birmingham, Alabama 35203
205/251-8100
BY: MR. M. STANFORD BLANTON
MR. K.C. HAIRSTON

214

A P P E A R A N C E S
(continued)

For Plaintiff Commonwealth Edison Company:
JENNER & BLOCK, LLC
Attorneys at Law
One IBM Plaza
Chicago, Illinois 60611-7603
312/222-9350
BY: MR. NORMAN M. HIRSCH

For Plaintiff Wisconsin Electric:
PERKINS COIE LLP
Attorneys at Law
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
206/583-8419
BY: MR. RICHARD W. OEHLER

(continued)

215

A P P E A R A N C E S

For Plaintiffs Florida Power & Light, et al.:
SHAW PITTMAN LLP
Attorneys at Law
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703/770-7940
BY: MR. ALEX D. TOMASZCZUK

For Plaintiff Sacramento Municipal Utility District:
ARNOLD & PORTER
Attorneys at Law
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
303/863-2301
BY: MR. DAVID S. NESLIN

(continued)

216

A P P E A R A N C E S

For the Defendant:
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division / Commercial Litigation
1100 L. Street, N.W.
Washington, D.C. 20530
202/353-0516
BY: MR. BRYANT S. BANES
MS. HEIDE L. HERRMANN
MR. R. ALAN MILLER

Reported by:
ELEANOR G. KNAPP, CSR-RPR
C & C COURT REPORTING
EUGENE 541/485-0111
SALEM 503/362-9193
TOLL FREE 800/344-0983

217

I N D E X

| WITNESS | VOL. 1 | VOL. 2 |
|---|---|---|
| ROBERT L. MORGAN | | |
| By Mr. Blanton | 9, 173 | |
| By Mr. Banes | 169 | |
| By Mr. Hirsch | 176 | 221, 242 |
| By Mr. Banes | | 241 |
| By Mr. Tomaszczuk | | 243 |
| By Mr. Banes | | 301 |
| By Mr. Neslin | | 304 |

EXHIBITS:

| FOR IDENTIFICATION | MARKED/REFERRED |
|---|---|
| 1 Organizational charts | 25/25,64,79,311 |
| 2 Proceedings for the 1983 Civilian Radioactive Waste Management Information Meeting | 38/38,47,170, 239 |
| 3 Standard Contract, Proposed Rulemaking | 67/67,76,137, 228 |
| 4 Standard Contract, Final Rule | 76/76,84,90,105,109, 130,138,301,304,313 |
| 5 Report on Financing | 93/93,102,104 |

(continued)

218

I N D E X

EXHIBITS:

| FOR IDENTIFICATION | MARKED/REFERRED |
|---|---|
| 6 3/4/93 letter from Alabama Power | 106/106 |
| 7 4/8/83 memorandum re: final rulemaking | 117/117,284 |
| 8 9/7/84 letter to Senator Johnston | 144/144,180, 184 |
| 9 12/20/83 cover letter to Edison Electric | 149/149 |
| 10 12/20/83 draft, Mission Plan | 149/150,162,177, 221,224,261 |
| 11 Mission Plan, Volumes I and II | 159/159,162 |
| 12 U.S. Dept. of Energy's Spent Fuel Storage Policy and Activities | 185/185,190 |
| 13 1/28/83 memo, Morgan to staff | 194/194,227 |
| 14 3/1/83, Morgan's testimony before Congress | 199/199 |
| 15 5/20/83 letter to Morgan from Edison Electric Institute | 201/201 |
| 16 6/17/83 letter from Morgan to Edison Electric Institute | 201/202 |
| 17 FY 1984 Program Guidance for NWF Evaluations | 204/205,226 |

(continued)

219

I N D E X

EXHIBITS:

| FOR IDENTIFICATION | MARKED/REFERRED |
|---|---|
| 18 6/21/83 memo to Secretary re: MRS | 229/229,274 |
| 19 Remarks before IAEA, 10/12/83 | 230/231 |
| 20 Letter to Governor Alexander | 275/275,279 |
| 21 Draft letter to Governor Bryan | 278/278 |
| 22 3/3/83 letter from Northwest States Power Company | 281/281,301 |
| 23 2/8/83 comments from Duke Power Company | 282/283 |

INSTRUCTIONS NOT TO ANSWER:

Page 143, line 15 QUESTION: Would treating situations in which a delivery is needed to permit licensed reactor operations to continue a purpose of the Nuclear Waste Policy Act?

Page 179, line 15 QUESTION: Was Table II-1 in this document the schedule or the acceptance rate that DOE had determined at that point was sufficient to prevent the utilities from having to provide additional on-site storage after 1998?

220

(The deposition was resumed
on Friday, March 22, 2002,
at 8:00 a.m. as follows:)
MR. BANES: We've had an opportunity to review the excerpts of the testimony.
While we think that the question concerning Table II-1 is just the same question that's been asked before in a different context regarding acceptance rate, we will allow the question at this time, although we would caution the Plaintiffs' counsel that there was an agreement not to be repetitive in this case, and we will enforce that agreement. Thank you.

EXAMINATION
BY MR. HIRSCH:
Q. Okay. Mr. Morgan, do you recall that we were talking about Morgan Deposition Exhibit 10, the December 20th, 1983 draft mission plan, yesterday?
A. Yes.
Q. Can you refer to Table II-1, the Waste Acceptance Table -- or Schedule in that document. Do you see that table?

221

A. Yes.
Q. Was Table II-1 in Exhibit 10 the schedule of the acceptance rate that DOE had determined at that point was sufficient to prevent the utilities from having to provide additional on-site storage after January '98.
MR. BANES: Objection. Calls for speculation. You can answer, sir.
A. When I look at the table -- you see the backlog, the far column on the right?
The backlog does increase through the year -- up until 2003, so that it would be speculative on my part to say specifically there would be no requirement for any reactor to have additional storage.
Do you understand my answer?
Q. Well, I'm not sure I do, Mr. Morgan. You are saying that because there is an increasing backlog for some period you are not sure whether --
A. That's correct.
Q. -- utilities wouldn't have to provide additional storage?
A. That's correct. Specific.
Q. I'm sorry. Specific? What do you

222

mean?
A. A specific utility, a specific reactor. It would be speculation on my part whether any one of them would need additional on-site storage.
Q. All right. Recognizing that there might be an individual utility that might need on-site storage, is it true that Table II-1 was the acceptance rate that DOE had generally determined was sufficient to prevent the utilities from having to provide additional on-site storage after January of 1998?
MR. BANES: Objection. Calls for speculation.
A. You know, clearly this says that initially the first repository acceptance is at a low rate for the first five years and then jumps up to 3,000. Those are numbers that were used in planning.
Certainly the first year of operation would have much less than that number, and there would be a gradual growth in my mind.
This was used as a mission plan that we were shooting for in the Nuclear Waste Policy Act. And there is an increase in the backlog

223

through the year -- through the year 2003.
BY MR. HIRSCH:
Q. When you said -- I think you said, at some point, a low rate. Does this show that in the -- does the table show that in the first five years the rate is 1800 metric tons per year?
A. That's what it says.
Q. Would you look back at page 1-1 -- excuse me -- at page 2-1 of the document, Exhibit 10.
A. Got it.
Q. You see in the first paragraph there is this statement, next-to-last sentence, "The waste materials will be accepted in accordance with a waste acceptance schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31st, 1998"?
A. That's what it says.
Q. All right. Will you look on the next page, 2-2.
A. Yes.
Q. At the top it says, "Based on the

224

criteria described above, the Department has prepared a waste acceptance schedule which specifies in the aggregate the quantities of commercial nuclear wastes that the program will accept beginning in 1998. This schedule is presented in Table II-1."
Do you see that statement?
A. Yes, I see that.
Q. Isn't one of the criteria identified, in fact, on the previous page that the waste materials would be accepted in accordance with a schedule designed to provide an acceptance rate such --
A. Yes.
Q. Let me just finish. -- such that no utility would have to provide additional storage after January 1998?
A. That's what the document says.
Q. Well, one of the criteria that the department used in preparing Table II-1 was that generally no utility would have to provide on-site storage after January '98. Isn't that correct?
A. That's correct.
MR. BANES: Objection.

225

BY MR. HIRSCH:
Q. All right. Mr. Morgan, you also were asked some questions -- or I asked you some questions, to be more specific, about Morgan Deposition Exhibit 17. Can you pull that document?
A. Yes.
Q. Do you recall we were discussing yesterday that this document was generally intended to provide marching orders to PNL regarding preparation of a fee adequacy study?
MR. BANES: Objection. Lack of foundation.
A. Yes.
BY MR. HIRSCH:
Q. Is it correct that the guidance that DOE provided to PNL directed them to evaluate the one mill per kilowatt hour charged under the contract based on the goal of the mission plan that DOE would accept waste at a rate sufficient so that the utilities would not have to provide additional storage after January of '98?
MR. BANES: Objection as to form. Lack of foundation. Calls for speculation.
BY MR. HIRSCH:

226

Q. You can answer.
A. Repeat the question, please.
(The question appearing at page 226, lines 16 - 22, was read as follows:)
QUESTION: Is it correct that the guidance that DOE provided to PNL directed them to evaluate the one mill per kilowatt hour charged under the contract based on the goal of the mission plan that DOE would accept waste at a rate sufficient so that the utilities would not have to provide additional storage after January of '98?)
MR. BANES: Same objection.
A. Yes.
BY MR. HIRSCH:
Q. Mr. Morgan, will you look at Morgan Deposition Exhibit 13.
A. Yes.
Q. I just want to refer you to the date here. This was a memo we were looking at yesterday that you sent out on January 28, 1983. And I believe you testified yesterday that you assumed that you had assumed or taken the

227

position as the head of the project office for spent fuel by this date, January 28th.
A. That's correct.
Q. Now, I don't know -- maybe we need to get out the document -- but if you look at Exhibit 3, you'll see that the notice of proposed rulemaking for the standard contract was dated February 4th, 1983.
A. Yes.
Q. Do those two documents indicate to you that you would have seen the notice of proposed rulemaking on the standard contract before it was sent out?
MR. BANES: Objection. Asked and answered.
A. I don't recall. There is a process time of sending or submitting something to the Federal Register for publication, and that's normally -- I don't know what that delay is, but in my recollection, it's something like a week that when a document leaves the Department there's a delay before the publication.
And that was published on that date, but I do not recall seeing that before it left the office -- while I was in the office.

228

BY MR. HIRSCH:
Q. All right. Assuming that you were in the office, the head of the office by January 28th, 1983, do you think it's likely that someone who worked for you at that point would have shown you the notice of proposed rulemaking before February 4th, 1983?
MR. BANES: Objection. Asked and answered. He has already testified he didn't see it.
A. I don't recall seeing it.
(Deposition Exhibit No. 18 marked for identification.)
BY MR. HIRSCH:
Q. Mr. Morgan, I've handed you what's been marked as Morgan Deposition Exhibit 18, which is a two-page memo dated June 21st, 1983, along with some attachments. And it has Bates label PNL-001-1524 through -1549.
A. Yes.
Q. Is that your signature at the bottom of the second page of this document?
A. Yes.
Q. So this would have been a memo that you sent to the Secretary of Energy on or about

229

this date?
A. Yes.
Q. And the memo related to the proposal for a monitored retrievable storage system. Is that correct?
A. That's correct.
Q. If you look at the bottom of the second page of the document, I think you'll see a reference that says prepared by S-10:JHCarlson. And it's got some numbers after that. Do you see that?
A. Yes, I see that.
Q. Is that James Carlson?
A. I have no recollection.
Q. Do you know whether an individual named James Carlson or Jim Carlson worked in your department?
A. The symbol S-10 would tell me they would not be working for me.
Q. What does that indicate?
A. I believe it's a person in the Secretary's office. That was a symbol, as I recall, for people that were assigned to the Secretary's office.
Q. Do you know a Jim Carlson who worked

230

on spent fuel issues?
A. I don't recall.
(Deposition Exhibit No. 19 marked for identification.)
BY MR. HIRSCH:
Q. Mr. Morgan, I've handed you what's been marked as Morgan Deposition Exhibit 19, which is a document titled Remarks by Robert L. Morgan, Acting Director, Office of Civilian Radioactive Waste Management, U.S. Department of Energy, Before the International Atomic Energy Agency, Vienna, Austria, October 12th, 1983. And the Bates label is EDB-003-1642 through -1650.
Mr. Morgan, is this the text of some prepared remarks that you presented to the International Atomic Energy Agency --
A. I believe that.
Q. Let me finish. -- on or about October 12th, 1983?
A. I believe that's correct.
Q. Do you recall how it was that you were invited to this conference?
A. I accompanied Secretary Hodel to this conference at his request.

231

Q. And why -- Did he indicate why he wanted you to come along with him?
A. I don't recall.
Q. At the time in 1983, to the best of your recollection, was the International Atomic Energy Agency addressing issues regarding what to do with spent fuel?
A. I think this was to provide information to the IAEA of what our mission plan and program was about.
Q. When you say "our," you mean the DOE mission plan program?
A. Yes.
Q. Did the IAEA meet on a regular basis?
A. Annually.
Q. Did you attend any meetings besides the one that's identified in this document?
A. Meetings of the IAEA?
Q. Yes.
A. This is the only meeting of the IAEA that I attended.
Q. In your subsequent positions with the Government, did you go to any IAEA meetings?
A. Not that I recall.

232

Q. Do they usually meet in Vienna, Austria?
A. Yes.
Q. Did Secretary Hodel make a presentation at that meeting, to the best of your recollection?
A. I believe that he did, but I'm not sure.
Q. Who, generally, would attend the meetings of the International Atomic Energy Agency?
A. The Secretary of Energy.
Q. I mean, who would be the attendees from other countries?
A. The head of their atomic energy activities. It was a high-level meeting of all the member states, if you will, of the IAEA.
Q. In this set of remarks, did you accurately attempt to describe what the DOE policy was regarding spent fuel at that time?
MR. BANES: Objection. Have you had time to look at the document, sir?
THE WITNESS: I don't know what's in the document.
BY MR. HIRSCH:



Q. Please take a look at the document.
(Pause.)
THE WITNESS: Can I go off the record for just a moment?
MR. HIRSCH: Sure.
(A discussion was had off the record.)
BY MR. HIRSCH:
Q. Mr. Morgan, in an effort to get you out of here and speed things along, let me just ask you some specific questions of the document, if that's all right with you.
A. Fine.
Q. Will you look at page -1644 of the document, first full -- second full paragraph.
A. -1644?
Q. That's the little page at the bottom --
A. Yes.
Q. -- page number. You see there's a reference in the middle to studies and explorations in the different media? And then there's a sentence that says, "However, while the responsibility for permanent disposal of this waste has rested with our Federal



Government since the Atomic Energy Act of 1954 was enacted, until recently, major obstacles have existed in the United States which have impeded the successful disposal of nuclear waste."
Is it correct that the U.S. Government had the responsibility for the permanent disposal of spent nuclear fuel since the Atomic Energy Act of 1954 was enacted?
MR. BANES: Objection. Calls for a legal conclusion and irrelevant.
A. I'd have to read the Atomic Energy Act of 1954 to -- otherwise it would be speculation. I'm sorry.
But these are the words that I used.
BY MR. HIRSCH:
Q. You made that statement to the leaders or the high-level people present at the International Atomic Energy Agency meeting. Is that correct?
A. Yes, that is correct.
Q. And presumably you wouldn't have made that statement if you didn't think it was correct. Right?
A. That's correct.



Q. Then you say at the bottom of the same page, reading from the last sentence, ". . . late last year, the United States Congress passed legislation to bring to an end years of indecision on how to solve the problem." Do you see that statement?
A. Yes.
Q. And the problem was the problem of disposing of spent fuel. Correct?
A. Yes.
Q. And was it your view at the time that the Nuclear Waste Policy Act was intended to end years of indecision --
A. That's correct.
Q. -- on how to solve the problem of disposal of spent fuel?
A. Yes. That's correct.
Q. Will you look at page -1646 at the bottom.
A. Yes.
Q. Do you see at the top of that page it says, "The Department of Energy has the responsibility to provide for the permanent disposal of high-level radioactive waste such as spent nuclear fuel or reprocessed spent nuclear

fuel"?
A. Yes.
Q. "The Act strengthened this responsibility and confirmed the nation's commitment to nuclear waste disposal and to the role of the states and the public in the process leading to permanent disposal."
A. Yes.
Q. What did you mean that the Nuclear Waste Policy Act had strengthened the responsibility for disposal of spent fuel?
A. It clearly set out goals and a requirement for the Department of Energy. The Nuclear Waste Policy Act set out the processes and timetable and commitments, which we didn't have before that.
Q. Will you look at page -1647.
A. Yes.
Q. You see the third paragraph on that page, second sentence, that says, "The Commission has three to four years to approve the application, and once we receive the construction license, construction will begin with the mandated target to begin accepting waste by 1999"?

237

A. Yes.
Q. And that's -- when it talks about the application and the construction license, that's referring to the geologic repository. Is that correct?
A. Yes.
MR. BANES: Objection. Irrelevant.
BY MR. HIRSCH:
Q. And the mandated target to begin accepting waste by 1998 was the target mandated by the Nuclear Waste Policy Act. Is that correct?
A. That's correct.
MR. BANES: Objection. Calls for a legal conclusion.
BY MR. HIRSCH:
Q. Mr. Morgan, is the Government or -- Strike that. Mr. Morgan, are the Government lawyers present today representing you in this deposition?
A. Yes.
MR. BANES: Objection. Asked and answered.
BY MR. HIRSCH:

238

Q. Did you meet with them before the deposition?
A. I had a telephone call from them, and then I met with them for dinner night before last.
Q. So that would have been Wednesday night?
A. Wednesday evening.
Q. You recall yesterday morning we had about -- I think about an hour when we started the deposition at 9:30 and then we took a break?
A. Yes.
Q. Do you recall that?
A. Yes.
Q. Did you speak with the lawyers for the Government during that break between the first hour and when we resumed?
A. I'm sure I did.
Q. Did you talk about Exhibit 2 to the deposition?
MR. BANES: Objection. I'm not going to let him answer that.
MR. HIRSCH: I'm not going to ask him any other questions.
MR. BANES: Okay.

239

A. I don't recall.
BY MR. HIRSCH:
Q. But you are fairly certain that you did have a discussion with the Government attorneys during that break yesterday morning?
A. I have met with them at every break.
Q. All right.
A. But I cannot say that in any one there were specific items covered.
MR. HIRSCH: All right. At this point, I don't have any additional questions for Mr. Morgan.
However, there are outstanding issues in this case relating to the privilege log that the Government provided and other documents that the utilities have requested from the Government. So I am reserving my right to ask additional questions at a later time.
MR. BANES: Okay.
MR. HIRSCH: Thank you, Mr. Morgan.
MR. BANES: I have a few questions. And we would reserve the right to reopen the deposition depending upon what additional matters you want to address, whether

240

A. Yes.
Q. Do you recall, sitting here today, other members of your staff who were involved in --
A. Bennett.
MR. BANES: Objection. Irrelevant.
BY MR. NESLIN:
Q. Anyone else?
A. McElvey and Morgan.
Q. Mr. Bennett, would his participation have been directed at particular issues?
A. Yes. He was responsible for the geologic repository, so that anything mentioning the repository, he participated in.
Q. And Mr. McElvey?
A. Overall. Total.
Q. If we could return to page 16593 of Exhibit 4, sir, the same paragraph we were discussing --
A. 16593?
Q. 16593, first full paragraph, first column.
A. Right.
Q. This states that priority for

313

shutdown reactors "is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity."
Does that -- Would you agree with that? Did you agree with that at the time?
A. Yes.
Q. What did you mean, "necessary to prevent them from waiting 20 to 30 years"?
A. We didn't want to hold up D and D of a reactor site.
Q. "D and D" referring to?
A. Decommissioning and -- what's the -- I don't remember the acronym. Shutting down the reactor.
Q. Was that one of your objectives, to avoid --
MR. BANES: Objection. Vague.
BY MR. NESLIN:
Q. -- to avoid holding up --
A. A utility from D and D?
Q. Yes.
A. Decommissioning. We didn't want to do that.
Q. That was an objective of yours?

314

A. Yes.
Q. Not to. Now if we could turn to page 16602.
A. Yes.
Q. The bottom of the first column, Article VI.B.1(b). Do you see that at the bottom of the page?
A. Yes.
Q. This is the provision that allows a priority for shutdown reactors. Correct?
MR. BANES: Objection. Calls for a legal conclusion.
A. I believe that's correct.
BY MR. NESLIN:
Q. Did you have -- Strike that. How did you expect the Department of Energy to apply this provision?
MR. BANES: Objection. Calls for speculation.
BY MR. NESLIN:
Q. Do you understand my question?
A. Unless faced with the issue, I can't tell you how we would resolve it.
Q. Did you have any criteria in mind for when priority would have been accorded to a

315

shutdown reactor?
A. No. I think that would have been speculative to do that.
Q. Did you have any expectation as to under what circumstances a shutdown reactor might be accorded priority?
MR. BANES: Objection. Calls for speculation.
A. Yeah. No. Not that I recall.
BY MR. NESLIN:
Q. Mr. Morgan, you decided to retain this provision over the opposition of several commenters?
A. I believe it was four. Four. I think that's what's in the statement.
Q. Would that mean that you would not have believed it was appropriate to deny a priority request simply because certain utilities might have opposed it?
MR. BANES: Objection. Calls for speculation.
A. I don't understand.
BY MR. NESLIN:
Q. Do you understand my question?
A. I don't understand.

316

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------X

YANKEE ATOMIC ELECTRIC :
COMPANY, CONNECTICUT YANKEE :
ATOMIC POWER COMPANY, MAINE :
YANKEE ATOMIC POWER COMPANY,:
Plaintiffs, :
v. : No. 98-126C
UNITED STATES OF AMERICA, : 98-154C
Defendant. : 98-474C

----------------------------X

Eugene, Oregon
Monday, June 25, 2002

Deposition of ROBERT L. MORGAN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by DEBORAH SOLHEIM, Oregon Certified Shorthand Reporter, at 9:25 a.m., June 25, 2002, and the proceedings taken down by DEBORAH SOLHEIM, CRR, with computer-aided transcription and prepared under her direction.

1

APPEARANCES:

On behalf of the Plaintiffs
JERRY STOUCK, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Ninth Floor
Washington, D.C. 20005-3305
(202) 898-5800

On behalf of the Defendant:
R. ALAN MILLER, ESQ.
United States Department of Justice
Civil Division
1100 L. Street, N.W.
Washington, D.C. 20530
(202) 305-7594

2

CONTENTS


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFFS |
|---|---|
| ROBERT L. MORGAN | |
| By Mr. Stouck | Page 5 |

Afternoon Session - Page 91


EXHIBITS


| EXHIBIT | | PAGE |
|---|---|---|
| 24 | Organization Chart, DB 100228 | 16 |
| 25 | 1-24-83 Eileen Peerless memo, TV 1226-1235 | 47 |
| 26 | 1-21-83 letter to Dillon from Hobart, SP 109687-701 | 47 |
| 27 | 5-3-83 DOE hearing transcript, DC 107987-108041 | 52 |
| 28 | 4-29-83 letter to Yankee Atomic Electric from Keefe, RA 103094-96 | 63 |
| 29 | 5-27-83 letter to Yankee Atomic Electric from Keefe, RA 103207-210 | 63 |
| 30 | 1-28-83 DOE memorandum, DE 106951-55 | 80 |
| 31 | 8-19-83 DOE memorandum, DE 106917-919 | 80 |
| 32 | 5-21-84 DOE letter to Senator Johnston, from Rabben, DE 105113-123 | 80 |
| 33 | 3-4-83 letter to Morgan from Soucy, PA 189728-732 | 102 |


3


| | | |
|---|---|---|
| 34 | 3-3-83 letter to Morgan from Erk, CDB 021 0180-0184 | 105 |
| 35 | 5-23-78 letter to Holloway and Askew from Morgan, DE 104744-746 | 106 |
| 36 | 8-19-83 letter to Yankee Atomic Electric from Morgan, YDK 026 102921-924 | 111 |
| 37 | 10-26-83 letter to Morgan from Davis, DER 002 2095-97 | 116 |
| 38 | 5-13-83 statement of Robert L. Morgan, DE 100456-474 | 121 |
| 39 | Defendant's witness list | 125 |
| 40 | 9-15-83 DOE memorandum from Williamson, PNL 173 1282-1288 | 147 |
| 41 | 12-22-83 DOE memorandum from Charles Head, HQZ 19870304.0814.0001-02; EDB 004 1963-1969 | 160 |
| 42 | 4-9-84 letter to Frei from Bates, ZAB 001 1304-1308 | 163 |


4

A. Yes.
Q. It says, "After I first got a call from someone that said some lawyers were looking for me and that I should call a lawyer in Washington" -- do you see that?
A. Yes.
Q. -- "before I called that lawyer."
It was just unclear to me. Was that a suggestion that you call the Department of Justice lawyers?
A. No, it was a Department of Energy lawyer that was looking for me. And I think that name is listed somewhere in the deposition.
Q. Okay. So that was just part of the process of finding you.
A. Yes.
Q. Okay. I wasn't clear if there was a suggestion that you contact your own lawyer.
A. No.
Q. Okay.
A. They gave me the name, or the name of the person that was looking for me, and I called that person.
Q. Fine. Thank you.
You were questioned, I think rather



extensively in the prior sessions, about acceptance rates in the contract.
A. Yes.
Q. Do you recall that?
A. Yes.
Q. And as I said, I do not intend to go over the same ground again. But there were a couple of questions in that area that were not answered, at least to my satisfaction, by the transcript.
So if I could direct your attention to page 57. And actually, the question, I believe, begins way back on page 55 at the very bottom. And you can look back at the reference. But line 23 of page 55 says, "Do you recall any specific items that were discussed," and this is in the context of developing a standard contract.
And then on page 57.
A. Right.
Q. Are you there?
A. Yeah.
Q. Let me show you what I'm interested in, and you can look at whatever you like.
A. What line, please?
Q. Seven?
A. Okay.



Q. "The other time discussed was the rate of acceptance, whether we should have a rate of acceptance or not. And it was decided that we would not put in a rate of acceptance in the contract."
Do you see that?
A. Yes.
Q. Okay. And there's a couple of references to this. I'm going to point your attention to them and then ask my follow-up question.
On page 130 --
A. 130?
Q. 130. On line 4, this is in the context of discussing comments that you got from various utilities on the notice of proposed rulemaking for the standard contract. Your answer here was, "We had those comments from the utilities."
And you can look back and see it was a reference to comments about acceptance rates and what not.
"We had those comments from the utilities and chose not to accept and put in the contract a given rate."
Do you see that?
A. Yes.
Q. And there are other references in this



transcript.
My question for you is, why at that time in early 1984 when you were developing the standard contract, why did the department decide not to put into the standard contract a specific provision or a specific rate, you know, specify a rate of acceptance in the contract?
A. Okay. It was not required by the Nuclear Waste Policy Act. And we felt that there were uncertainties as to the schedule, potential litigation, the site selection of the repository, not knowing what media it would be in. Certainly excavation in granite is going to take longer than excavation in salt. And there were uncertainties relative to NRC licensing.
And we felt it was inappropriate at that time, because of the uncertainties in meeting the schedule when we had no designs of a facility, that there's no way that I could commit to an acceptance rate.
Q. Okay. When you say uncertainties as to schedule in your answer --
A. Yes.
Q. -- you're referring to uncertainties as to the schedule for developing the repository or other facilities?
A. Yes.

Q. Okay. Did you anticipate at that time that there would come a time when the department would be in a position to commit to a specific rate?
A. Yes.
Q. Okay. And when would that time come? I mean, not the date, but what would have to occur for that time to arrive when a schedule could be committed to?
A. I think when the licensing requirements were established, when a specific site was selected, one could then consider an acceptance rate.
Q. Okay. And that, as far as you were concerned in 1983, was at some indefinite point in the future?
A. It was several years off, in my mind.
Q. Okay. Thank you.
And this was -- what you've just told me, were these considerations discussed at that time in connection with this question of should we put a specific rate in the contract?
A. Yes.
Q. Okay. Within DOE and those that were working with on you developing this contract.
A. Yes.
Q. Okay.
A. That's my understanding.
Q. Okay.

13

A. My recollection.
Q. Thank you.
You referred -- and I'm not sure we need to actually refer to the transcript here. But you testified in several places -- I can show you some, but let me just mention the subject -- about the role that Mr. Head -- Charlie Head, I think his first name was, Charles or Charlie.
A. Right. Yes.
Q. The role that he played in the development of the standard contract.
For whatever reasons, when we took Mr. Head's deposition subsequent to your last deposition sessions, his testimony -- I was not there, but I'm told by one of my colleagues that his testimony was that to the best of his recollection, he was not involved at all in the development of the standard contract.
And so I just wanted to mention that to you. It's 20 years ago. And recollections are sometimes different. But in light of that testimony that I'm telling you that he gave, is it possible that the role that you recall Mr. Head playing in the development of this contract was instead played by one of these other individuals on the Exhibit 1 organization chart, or someone else involved?

14

MR. MILLER: Objection to the extent that it mischaracterizes his prior testimony or that of Mr. Head.
Go ahead.
THE WITNESS: I don't have the organization chart in front of me.
BY MR. STOUCK:
Q. Okay. I can get that for you.
One of the perks in my job, in flying around and taking depositionis, is I get to carry a lot of documents around with me. I wish I were a larger stockholder in Federal Express than I am.
MR. MILLER: This is Exhibit 1 from his prior deposition.
MR. STOUCK: Thank you.
THE WITNESS: There is not a date on this organization chart. I believe this organization chart came later than the time that we were preparing the initial contract for the utilities.
BY MR. STOUCK:
Q. All right.
A. You know, if he said he did not, then I would assume he did not.
Q. Well, okay. It could be recollections.
But that doesn't refresh -- the fact that he

15

testified that he did not, or I'm reporting that to you, that doesn't refresh your recollection at all about whether there's some other person you might have been referring to?
A. Oh. There was no question that Rosselli, Yanoski, Mike Lawrence, John McElvey, and Bill Bennett were all -- participated in the initial contract.
Q. Okay. I apologize that I've only got one copy of this. But let's go ahead and mark this as No. 24.
This is an organization chart that is dated May 23, 1983. So that's roughly contemporaneous. The final rule was dated April 18. So it's about six weeks later.
Let's go ahead and mark this. I'm sorry that I've only got one copy. I have multiple copies of most everything else with me. We'll just have to work with that.
(Morgan Exhibit No. 24 was marked for identification.)
BY MR. STOUCK:
Q. That's been marked Exhibit No. 24.
A. Under the business operations waste fund, Bob Rosselli, I do not see a breakdown of that organization. And there is not, that I see, any mention of Mr. Head's name in the organization. I don't see it.

16

process for setting a schedule worked; is that right?
You knew it was in the future, but did you have an understanding of how the process was going to work when it did kick in?
A. I didn't deal with it.
Q. Okay.
A. I just didn't deal with it. That was not a focus of my attention.
Q. Okay. Did you -- can you identify for me someone on Exhibit 1 or elsewhere who at that time in 1983 and '84 did deal with it?
A. No.
Q. Was there anyone who was dealing with it at that time?
A. I don't know.
Q. Okay. But if there was, you don't know who they are.
A. That's right. That was not on my scope.
Q. All righty. Take a look at -- do you have Exhibit 4?
A. Yes.
Q. This is the final rulemaking.
A. Yes.
Q. Actually -- yeah, let's take a look at Exhibit 4, which is the final rulemaking.

133

If you turn to page -- I'm looking at the numbers on the bottom now. Let's see here.
Okay. It's COF 0011078. Are you there?
A. Yes.
Q. Okay. This is actually the part of the Federal Register notice where the actual text of the contract is included. That starts on 1072. That's where the beginning of the text is. And here we are on 1078. It's part of the text of the contract. At the top it says appendix C, delivery commitment schedule.
A. Yes.
Q. Okay. And I asked you just a couple of minutes ago if you knew what a delivery commitment schedule was.
This is a form that's attached as appendix C to the standard contract in the Federal Register. And remember, there was a question before about -- there was a change to this. They added a proposed delivery date. Do you remember that in one of the letters that I showed you?
A. Yes.
Q. Okay. Looking at this now, do you know what function this delivery commitment schedule served in the course of implementing the contracts?
MR. MILLER: Calls for a legal conclusion.

134

But go ahead.
THE WITNESS: This was a delivery commitment schedule that was provided by the utilities. It did not commit acceptance by DOE.
BY MR. STOUCK:
Q. Okay. And why is it that the Department of Energy was interested in a delivery commitment by the utilities?
A. They wanted to know what was out there that we had to deal with.
Q. And when, I guess.
A. Yes.
Q. And why did DOE want to know that?
A. For background information.
Q. Okay. Are you familiar with contracts for reprocessing, the way they work? When Savannah River would enter into a contract with somebody to reprocess something, are you familiar with generally the way those contracts work?
A. Yes.
Q. Okay. In those reprocessing contracts, do you know whether there is typically a provision for the owner of the fuel to commit to deliveries of the fuel at specified times to the reprocessor?
A. What we reprocessed at Savannah River was fuel

135

that was owned by the government on loan of the Atoms for Peace program Eisenhower initiated. And that we demanded a schedule to fit in with our reprocessing at Savannah River that would allow us to stage that in to where it would not interfere with our defense program requirements for reprocessing.
Q. Okay. And I think the net of that -- don't let me mischaracterize, but I think the net of that is that yes, you were interested in getting a commitment from the deliverer of the fuel to deliver it at a time that would be convenient or workable for the reprocessor. Do you understand my question? Let me start over.
What I'm trying to find out is whether you know whether in contracts for reprocessing services there are typically included -- whether you know this or not. If you don't know, just tell me you don't know.
But do you know whether or not there are typically included, in contracts for reprocessing services, provisions by which the person who is providing the fuel for reprocessing commits to provide that fuel on a certain schedule so that the reprocessor can plan its reprocessing operations?
MR. MILLER: Calls for a legal conclusion and speculation.

136

IN THE UNITED STATES COURT OF FEDERAL CLAIM

YANKEE ATOMIC ELECTRIC COMPANY, )
CONNECTICUT YANKEE ATOMIC POWER )Case Nos.:
COMPANY, and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
)
THE UNITED STATES, )
Defendant. )

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Tuesday, August 3, 2004
Volume 16

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPAN
CONNECTICUT YANKEE ATOMIC POWER COMPANY a
YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPAN
CONNECTICUT YANKEE ATOMIC POWER COMPANY:
MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)



APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COM
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S

\- - - - -

MR. MILLER: Your Honor, we appreciate the Court's indulgence in letting us get our thoughts together over the evening hours. I just have one additional question for Mr. Morgan on my direct examination.

THE COURT: Go ahead, whenever you're ready.

Whereupon--

ROBERT MORGAN

a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:

DIRECT EXAMINATION (Resumed)

BY MR. MILLER:

Q. All right. Sir, if we could go back on Plaintiff's 678. Mr. Morgan, you recall we talked about this exhibit yesterday in your testimony?
A. Yes.
Q. And you recall this document, do you not?
A. Yes.
Q. Mr. Morgan, you recognize this, do you not, as the second page of the statement you made at the December 1983 information meeting?
A. Yes.

Q. Sir, if you can, just reading from the one-sentence paragraph that begins, "This is our basic strategy," do you see that?
A. Yes.
Q. If you could just read that to the end of the page, the rest of the page, please, sir and then let me know when you're done.
A. I'm done.
Q. Could you just explain to the Court, Mr. Morgan, what it was you were trying to convey in this last part of your statement?
A. I was trying to convey that, although the schedules we felt were very tight, it was our intent to meet the requirements of the Nuclear Waste Policy Act and receive fuel in January 1988.
Q. I'm sorry, sir, you said January 19 --
A. 1998.
Q. All right, sir.
A. And that even though it was tight, we had the alternative to kick in, which was the monitored retrievable storage program, and that would be the back up. We were also trying to do everything we could relative to the repository by doing as many things in parallel as we could to reduce the schedule.



Q. All right, sir, and so that's what you were trying to convey as a result of your, of the last part of your statement there?
A. Yes.
Q. All right, sir.
MR. MILLER: No further questions at this time, Your Honor.
THE COURT: Okay. Cross-examination.
MR. MILLER: Mr. Morgan, do you need some water up there?
THE WITNESS: I would appreciate it.
MR. MILLER: All right.
CROSS-EXAMINATION
BY MR. SHAPIRO:
Q. Good morning, Mr. Morgan.
A. Good morning.
Q. I have a few questions for you. Let me start off about, and I just want to confirm something I think I understood from your direct testimony. You first got a copy and read the Nuclear Waste Policy Act after the Secretary asked you to take your deposition, is that right?
A. That's correct.
Q. So you weren't involved at all in the development of that Act?



A. That's correct.
Q. And after your approximately one-year tenure as acting director of the Nuclear Waste Project Office, you didn't follow what happened with the nuclear waste program after that time, did you?
A. No, I was busy with other activities.
Q. And you didn't subsequently consult with any entity on issues that involved commercial spent nuclear fuel?
A. I think that when Mr. Rusche was appointed, we shared an apartment in Washington, D.C. and to say that we never talked about the Nuclear Waste Policy Act would be incorrect.
Q. But other than your informal interactions with Mr. Rusche?
A. That's correct.
Q. Now, you spoke a number of times in your direct examination, Mr. Morgan, about what you did not agree to in terms of putting into the contract, but actually, while you were at the Nuclear Waste Project Office, the Department of Energy never really defined how the scheduling process for accepting spent fuel would work, isn't that true?
A. I believe that was in the appendices of the contract.



Q. But while you were there, did the project office define how the scheduling process would work?
A. Well, that was defined in the contract.
Q. I want to ask you a few questions about the contract in just a moment. Mr. Morgan, while you were acting director, did you deal with actual pickups of spent nuclear fuel and high-level waste?
A. Did I deal with the acceptance of fuel?
Q. Right.
A. We accepted no fuel during the time that I was there.
Q. So you didn't have occasion to deal with those issues?
A. That's correct.
Q. Now, you were not actually involved in the decision to develop the standard contract on rule-making, were you? You weren't the one who decided to use a notice and comment rule-making process to develop the project?
A. No, that had started before I arrived.
Q. And in fact, you don't know why, in fact, the Nuclear Waste Policy Act even specified that the program would be pursued through contracts, do you?
A. I didn't, I don't understand the question.
Q. The Nuclear Waste Policy Act directs that

the program be pursued through contracts, you understand that?
A. Yes, yes.
Q. But you don't know why that provision was put into the Nuclear Waste Policy Act?
A. No.
Q. And I think you mentioned this in direct, but, again, I just want to make sure I have this clarified. You were not involved in the development of the one mill per kilowatt-hour fee, were you?
A. I was not.
Q. And you don't know how that fee was established for disposal services under the contract?
A. I was not.
Q. Yet, as acting director of the program, you were the one who had full authority and responsibility to implement the Act?
A. That's correct.
Q. And since the Act left any number of areas to be defined later, you were the one, as acting director, who had the final say in the ultimate responsibility for the definition of what was going to be in the Act?
A. No, what I did is interpret the Act and tried to conform to what was in the Act.



Q. So you were the one who was ultimately responsible though for what was going to be in there, in terms of the program though, weren't you?
A. I was responsible for establishing a program to meet the requirements of the Act.
Q. And you had decision-making authority, correct?
A. Yes, I did.
Q. I want to go back over a couple of those documents that Mr. Miller walked you through yesterday. I have just a few issues that I want to ask you about regarding those. You had testified yesterday that you thought that, at the time of, that the contracts were entered into in June of 1983, that it was too early to be talking about specific acceptance rates. Do you recall that testimony that you gave?
A. Yes.
Q. But at the same time, in June of 1983, didn't you publish the report on financing disposal of commercial spent nuclear fuel, that's Plaintiffs' Exhibit 978 that you discussed yesterday. Do you recall that document?
A. I'd like to see the document, if I can, please.



Q. Do you still have that in front of you, or do you need another copy? We can get you another copy. Mr. Morgan, do you recall testifying about this document yesterday, Plaintiff's Exhibit 978, the report on financing?
MR. MILLER: I don't believe that, on direct testimony, I asked Mr. Morgan about this document.
THE WITNESS: I did not see this document yesterday.
BY MR. SHAPIRO:
Q. I could check the transcript, but I'm pretty sure we talked about the same document. We may have a different cover page on it, but if you turn -- from the copying service, but I believe it's the same document. Nevertheless, if I could ask you a few questions about it, Mr. Morgan?
If you turn the, from the cover, from the copying service, you see that this is a report on financing, the disposal of commercial spent nuclear fuel and processed high-level radioactive waste. Do you see that, Mr. Morgan?
A. Yes.
Q. And in the upper left-hand corner, it says it was published in June 1983 of that same cover.



A. Yes.
Q. And you were acting director of the program at that time?
A. Yes.
Q. And if you'd turn past the table of contents to the first page, at the top, it says, "Introductory Summary."
A. Yes.
Q. And if you look at the first paragraph there, and I'll read to you the second sentence just to put in context this document, it says, "This report evaluates whether collection of the fee will provide sufficient revenues to offset the cost of disposal of commercially generated spent nuclear fuel and solidified high-level radioactive waste produced from reprocessing such fuel." Do you recall that?
A. I see that.
Q. Do you recall the need to put together a report like this when you were acting director?
A. This was required after a year of operation of the Nuclear Waste Policy Act, and I don't believe this was published or transmitted beyond, I did not sign this, this is from Bill Sprecher and Robert Benning, and I don't know where this was distributed and how.

Q. But nevertheless, Mr. Morgan, the subject to make sure that the fee will provide sufficient revenues to cover the program, that was important, wasn't it?
A. Yes.
Q. And that was something that would have concerned you when you were acting director of the program?
A. It was required by the Act to assess the one mill per kilowatt after a year.
Q. Well, this document actually came out in June 1983, closer to six months, didn't it?
A. That's what it says. I don't know if it was published at that point in time or if it was published later.
Q. And this document was prepared after extensive analyses, wasn't it?
MR. MILLER: Objection, Your Honor, foundation, the witness said he hadn't seen the document.
BY MR. SHAPIRO:
Q. You were director of the program, weren't you?
A. Yes.
Q. Well, if I could turn your attention to the



third paragraph on the first page, the same page we're looking at, I'll read that first sentence of that paragraph to you. "This report presents the results of extensive analyses that explore the cost of implementing a nuclear waste disposal program."
A. Yes.
Q. Do you recall such analyses?
A. I don't recall such analyses. This was not required by the Act until one year after the Act was enacted.
Q. But it was important, whenever the timing was, to make sure you got the analysis right to make sure the fee covered the cost of the program, wasn't it?
A. That's correct.
Q. If I could ask you to turn your attention to page 11 of this document, do you see that, Mr. Morgan?
A. Yes.
Q. And on this page, in fact, there is a reference case for receipt of spent nuclear fuel by the government. It's shown there in that, in this table?
A. That's correct.
Q. And this was part of the analysis that



determined whether or not that fee was going to be adequate?
A. I testified regarding this table, which is, I believe, the exact same numbers that were in the mission plan, and that's what I testified to yesterday.
Q. And you thought that these numbers were reasonable for purposes of the analysis of making sure that the fee was adequate?
A. At this time, it was.
Q. And other than the acceptance rate shown on this table on page 11 of Plaintiff's Exhibit 971, there is not another reference case for waste acceptance, other than this one, when you were acting director, was there?
A. This table was published in the mission plan that came out in December 1983.
Q. And this was, and the acceptance rate that's shown here, roughly 1,800 MTU per year for the first five years and then 3,000 MTU thereafter, that was really the only acceptance reference piece --
A. That was a reference case we were using at the time.
Q. You certainly weren't looking at any reference case that would accept lesser amounts of



spent fuel, were you, than what's indicated here in 978?
A. No, but I do recall that the mission plan that was finally submitted the following year by Mike Lawrence had reduced numbers in it.
Q. Well, I suspect we'll get to that mission plan when we get to Mr. Lawrence or even Mr. Rusche following your testimony, Mr. Morgan.
A. Fine.
Q. I appreciate your help with that document. I want to turn now to a slightly different subject. Actually, it really concerns the document that Mr. Miller just asked you about, but let me ask you a few questions before we turn to that document.
It was your belief, when you were acting director, that the Department of Energy should adopt a strategy such that no utility would have to plan or construct additional at-reactor storage after 1998, isn't that correct?
A. That's correct. Let me just add that there would, there might have to have been contracts by the utilities entered into prior to January 1998 where construction would be going on after that date, so that there would be no new contracts required by the utilities. That was our intent.

Q. Okay. Let me ask you, you had testified yesterday that you wouldn't make private or public statements about an appropriate rate of acceptance. Do you recall that testimony?
A. Yes, I do.
Q. But if you recall, and I'm referring now again to Plaintiff's Exhibit 678 that Mr. Miller just asked you about and you testified about quite a bit yesterday, this document, program overview, is in fact a written version of a public statement talking about appropriate amount of waste acceptance, isn't it?
A. That was our goal and the intent of trying to be responsive to the Nuclear Waste Policy Act.
Q. And so in this document, you told utilities that, in 1998, DOE would be receiving spent fuel at a rate such that no utility would have to add any storage after that time, correct?
A. That was our goal. That was not a commitment. The mission plan, which I was referencing, is an informational document, not a contract document.
Q. But you wouldn't have made these statements in this program overview on Plaintiff's Exhibit 678 if you didn't think it was appropriate to do so, did



you?
A. Of course not.
Q. And it was your conclusion that the Department should take spent fuel that fast from utilities because you understood that to be the intent of Congress in the Nuclear Waste Policy Act?
A. That was my understanding.
Q. And not only did you think that was the intent of Congress, but you expressed the plan to accept waste from utilities fast enough by 1998 that the utilities would not have to provide any additional storage facilities because you, yourself, thought it made sense, didn't you?
A. That's correct. And you will note that in the mission plan, there is an increase of a backlog during the first few years. If you want to raise that table from the mission plan, I can show you.
Q. We're going to get to that. I appreciate your offer to do that, Mr. Morgan. And I want to ask you about that backlog issue as well. But I want to ask just one or two more questions about your conclusion that you should accept spent fuel from utilities fast enough for them to avoid adding additional at-reactor storage.
That in addition to believing that this



made sense, you reached that conclusion, even though that wasn't something that was defined by Congress in a conference report, did you?
A. It was not defined by conference -- by the Congress.
Q. And you also, you reached that conclusion, you were in charge of the program, and you reached that conclusion yourself, but you did that along with consultation with the Secretary of Energy, didn't you?
A. No, I reached that conclusion by myself.
Q. Do you recall testifying about this issue at your deposition, Mr. Morgan?
A. Yes.
Q. And you had your deposition taken on, it was back more than two years ago now, March 21st, 2002.
A. I believe that's correct.
Q. Let me read a question and answer from that deposition and see if that refreshes your recollection on this issue, reading from page 52 from that transcript. There's a question:
"Do you recall whether you ever discussed the subject matter in the seventh and eighth paragraphs in this program overview regarding the



intent of the Nuclear Waste Policy Act and the strategy and the mission plan with the Secretary of Energy?
"Answer: Oh, yes."
Do you recall that testimony --
MR. MILLER: Your Honor, could the witness have the deposition transcript that's being quoted to him, so he can have an opportunity to review it?
BY MR. SHAPIRO:
Q. Do you need a copy of that?
A. No, I don't. You asked me if the Secretary approved it?
Q. No, I just asked if you consulted with the Secretary.
A. I consulted with the Secretary relative to the overall program that we were defining. As to whether he specifically approved anything, that was, I was responsible for that, and my discussions with the Secretary were for information. I was responsible.
Q. Now, yesterday, Mr. Morgan, you testified that it would have been inappropriate for utilities, and specifically Mr. Loring Mills. Do you recall testifying about your conversations with Mr. Mills?
A. Yes, I recall.

Q. And you testified that Mr. Mills wanted to have involvement in the development of the program, but you thought it was inappropriate for Mr. Mills and the industry to have that involvement, didn't you?
A. That's correct.
Q. But you included the goal in your program overview of removing spent fuel from utilities fast enough so that they wouldn't have to add additional storage, in part because it was your understanding that at that time that's what utilities wanted out of the contract, isn't that true?
A. Yes.
Q. And you testified that you never told Mr. Mills or anyone that DOE should accept waste fast enough to meet the discharge rate coming out of reactors and then ultimately to work off the backlog. Do you recall that testimony?
A. Yes.
Q. I want to turn your attention back to this program overview, Plaintiff's 678, and I think much of the relevant language has been read, but I want to ask you to consider one other paragraph in the document that I don't think has been read so far and see if that refreshes your recollection on this



issue. Do you still have that document in front of you, Mr. Morgan?
A. Which document is that?
Q. It's the --
A. This report?
Q. The proceedings, it has a sticker, Plaintiff's Exhibit 678.
A. No, I don't have that document.
Q. If you could turn to page 11 of that document, please, Mr. Morgan?
A. Yes.
Q. And I'll read it for you. I'm going to start reading the last paragraph that starts at the bottom of the second column there, but you can follow along with me. Do you see that paragraph?
A. Yes.
Q. "After the initial operation of the repository through the first few years, we would" --
A. Wait, wait, hold it, which paragraph is that on page 11?
Q. The last one on the bottom of the second --
A. Oh, okay.
Q. -- column. "We would anticipate that the rate of acceptance of fuel should be the rate of discharge from the reactors that are in operation at



the time, so by the year 2000 or 2001, we should be accepting in the repository the amount of fuel as being discharged from the reactors."
A. Yes.
Q. "It is anticipated that, at that point, it would look at bringing home the second repository. According to the Act, the second repository follows the first repository by four or five years. We are looking at the sensitivity of that sequence, and we may use the second repository to start working on the backlog of fuel."
A. That's correct, and that's what's shown in the mission plan, on table 2.
Q. So you did think it appropriate to have enough waste acceptance capability to meet the backlog from, meet the discharge rate from utilities?
A. Of course.
Q. And work off the backlog?
A. Yes.
Q. You've mentioned the mission plan a couple times, Mr. Morgan. I want to get to that issue now. And you referred to this, but I just want to confirm, the final mission plan came out after you left?
A. That's correct. I was responsible for the preparation and distribution of the draft.



Q. And when you were acting director, you determined that the contents of the mission plan, that that was the proper way to accomplish the goals of the Nuclear Waste Policy Act, correct?
A. Correct.
Q. And you wouldn't have put anything in the mission plan that you thought was inconsistent with the Act, correct?
A. Correct.
Q. You were responsible for every word in the mission plan at some level?
A. Correct.
Q. And the mission plan was the primary planning document for the program, correct?
A. Correct.
Q. In fact, as far as acceptance rate is concerned, which is what we've been spending a lot of time on the last couple days, you viewed the rates set out in the mission plan as the ideal goal of what DOE wanted to meet in accepting spent fuel from contract holders, correct?
A. I believe that's correct. I don't have a copy of the mission plan in front of me.
Q. We'll get that in front of you if we get to that, Mr. Morgan, don't worry about that. Why don't

we get to that now since you've asked for it? I don't want to deny you the document. As you'll see, this one is marked Plaintiff's Exhibit 636.
A. Correct.
Q. And we were starting to talk about the acceptance rates, which you spoke about to some extent yesterday, and those were on a table on page 2-3. Do you see that table?
A. Yes.
Q. And do you see the acceptance rate that's indicated there, again, it's 1,800 MTU for five years and then 3,000 MTU thereafter?
A. Yes.
Q. And you thought that was a reasonable acceptance rate for the program, correct?
A. At that time, yes.
Q. And this acceptance rate, again, the 1,800 MTU for five years and 3,000 MTU thereafter, this acceptance rate in the draft mission plan was intended to be enough, as you indicated earlier, to avoid the need for additional at-reactor storage after January 31, 1998, correct?
MR. MILLER: Objection, asked and answered numerous times.
THE COURT: Well, one more time won't hurt.



I'm going to overrule the objection. If you will answer?
THE WITNESS: Again, you will note that when the first repository opens in 1998, there is still, on the right-hand column, an increase in the backlog, and that, when I testified earlier, I believe said that there would be no need for additional commitments for construction of on-site storage facilities, but that there would be some commitments that would be in construction during that time, after 1998.
BY MR. SHAPIRO:
Q. You couldn't solve all of the problems that utilities would have in storing spent fuel, but you could solve a lot of them, is that what you're saying?
A. That was our attempt.
Q. The bottom line is that, in your opinion, DOE should perform the removal of spent nuclear fuel as fast as it reasonably could, didn't you?
A. I believe that was the intent of Congress and the Act.
Q. I want to switch subjects just a little bit to the kinds of things that the program was intended to accept. I want to focus on high-level waste. Was



your understanding that the standard contract's definition of high-level waste covered waste from utilities that they had taken from the core of their reactors that the NRC considered high-level waste, correct?
A. The Act says that, if the NRC defines core components as high-level waste, they will be accepted in the repository. They have to be defined as high-level waste by NRC.
Q. I want to get to your understanding, Mr. Morgan.
A. That was my understanding of what was in the Act.
Q. Let me ask you just a couple more questions. Wasn't it your understanding that this high-level waste included material that utilities had taken from their core, including shrouds, holders, end caps?
A. At that time, there had not been a definition by NRC that this was to be considered high-level waste, so I did not consider it. I believe it was still GTCC.
Q. I'm going to turn back to your deposition again, and this is on a different day. And here, I have a question and answer that's a little bit longer



than the last one. Maybe it would make sense to put that in front of you, so we can make sure we're all on the same page, June 25th of 2002. Mr. Morgan, I'm going to refer you to page 24.
A. At which tab?
Q. The June 25th tab, the last one.
A. What page, please?
Q. 24.
A. Yes.
Q. And I'll read it for you. It's a little bit long. I'm going to start on line 13 where a question begins. It starts:
"Okay. And then starting on line 11, your next answer, you said this, 'This to me deals with some of the high-level waste that some of the utilities had taken from their core that the Nuclear Regulatory Commission considered defined as high-level waste' or maybe defining, it might be a transcription error."
"My question is, Can you tell me just a little bit more about what you had in mind with this phrase 'high-level waste' that some of the utilities had taken from their core? What materials are we talking about?"
And your answer, "Some of the material that

is not a fuel element is highly radioactive. These are some of the shrouds, the holders, the end caps, things such as that, that the Nuclear Regulatory made a decision as to what those specific items were. There was no question in my mind that the fuel was high-level radioactive waste, and there was an extension of that, that the Nuclear Regulatory Commission defined as high-level waste. That's what I'm referring to here."

Do you recall that testimony?

A. I believe that's just what I said.

Q. That you're referring to --

A. If the Nuclear Regulatory Commission defined it as high-level waste, it would have to be considered in the repository. At that time, they had not made that decision, but those were the words in the Act.

Q. And the material that you're referring to is the material from the core, the shrouds, the holders, the end caps, correct?

A. That's correct.

Q. Go to a -- done with that subject. Want to go to a different subject, Mr. Morgan?

A. Fine.

Q. Again, on the acceptance and, now, focusing



really on spent nuclear fuel, and I think you touched on this yesterday, but there might have been confusion. There are a couple different provisions in the contract about the order of acceptance of spent nuclear fuel, and I want to make sure we're talking about the right one. I'm going to ask you about the provision that permits giving priority acceptance to nuclear power plants that are permanently shut down. You're familiar with that provision?

A. I recall.

Q. And you participated in the decision to keep that provision for priority for shutdown reactors in the contract, isn't that true?

A. That's true.

Q. And you agreed with that provision, correct?

A. If I didn't agree, it wouldn't have been in there, excuse me.

Q. And you agreed with keeping that provision because you didn't want to hold up decommissioning and decontamination at the reactor sites of those shutdown reactors?

A. Yes.

Q. And that was an objective of yours,



correct?

A. I wanted to keep open the option of accepting shutdown reactor fuel. That was not a commitment to accept it, but it was an option that we had, if the reactor shut down and if there was a decommissioning starting, that we should consider accepting fuel from shutdown reactors on a priority basis.

Q. And you wanted that option available because it was an objective of yours not to hold up decommissioning and decontamination on reactors?

A. Absolutely.

Q. And you personally thought it was prudent to get the spent fuel out of those utilities so they could get on with that D&D process, correct?

A. I wanted to make sure the option was open and available under the Act.

Q. Then another option that was discussed yesterday during your direct testimony was exchanges of approved delivery commitment schedules?

A. Correct.

Q. You recall that subject coming up?

A. Yes, I recall.

Q. And you recall the discussion that the Department of Energy intended to be reasonable



regarding its right to approve or disapprove exchange requests?

A. That's correct.

Q. And by being reasonable, this meant that the Department would approve exchange requests if at all possible, that's your understanding?

A. That's correct. The fuel had to meet acceptance criteria as a first consideration.

Q. But at the time you were acting director, you had not established any criteria reasons as to why an exchange request would be denied, true?

A. Other than meeting the acceptance criteria, five year old and things that were in the Act.

Q. Sure.

MR. SHAPIRO: If we could have a moment, Your Honor?

THE COURT: Yes, take whatever time you need.

MR. SHAPIRO: Mr. Morgan, I appreciate your time. I don't have any further questions for you. I just want to clear up, Your Honor, one point of confusion that maybe I had on Plaintiff's Exhibit 678 was the, I believe, the excerpt of that proceeding, from what I'm told by my colleagues, is the government used their Exhibit 1, which is the entire