**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**VOLUME VII OF X**
**(Pages A 0925 to A 1072)**

---

# ENERGY NORTHWEST'S CORRECTED APPENDIX IN SUPPORT OF ITS CORRECTED NOTICE OF DESIGNATION OF DEPOSITION AND PRIOR TRIAL TESTIMONY OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO ADMIT PRIOR TESTIMONY INTO EVIDENCE

---


NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
202-639-6000


June 3, 2008

*Attorneys for Plaintiff*

# Table Of Contents To Appendix – Volumes I to X

## Volume I

Documents Cited

DOE's Responses to Utility Plaintiffs' First Set of Interrogatories.......................... A 0001

DOE's Responses to Utility Plaintiffs' Joint Supplemental Interrogatories............. A 0013

April 3, 2002 30(b)(6) Notice of Deposition .......................................................... A 0028

April 18, 2002 30(b)(6) Notice of Deposition ........................................................ A 0033

November 12, 2004 30(b)(6) Notice of Deposition................................................. A 0039

March 2, 2005 30(b)(6) Notice of Deposition ........................................................ A 0043

## Volume IA

April 19, 2007 30(b)(6) Notice of Deposition ........................................................ A 0047

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 2450874
(Fed. Cl. Sept. 17, 2004) (unpublished)........................................................... A 0050

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, slip. op.
(Fed. Cl. Sept. 21, 2004) (unpublished)........................................................... A 0063

*Wisc. Elec. Power Co. v. United States*, No. 00-697C, slip op.
(Fed. Cl. Aug. 16, 2007) (unpublished)........................................................... A 0073

Defendant's Unopposed Motion to Designate Prior Trial Testimony of
Mr. Robert L. Morgan in System Fuels .......................................................... A 0103

## Volume II

Deposition Transcripts and Trial Testimony Excerpts

Chart of Energy Northwest Deposition and Trial Testimony Designations ............. A 0109

Barrett, Lake ........................................................................................................... A 0128
April 22, 2002 ....................................................................................... A 0129
April 23, 2002 ....................................................................................... A 0165
April 26, 2002 ....................................................................................... A 0191
May 8, 2002 .......................................................................................... A 0225
May 10, 2002 ........................................................................................ A 0250
May 14, 2002 ........................................................................................ A 0278
May 15, 2002 ........................................................................................ A 0286

## Volume III

Brownstein, Alan ....................A 0289
April 9, 2002 ....................A 0290
April 10, 2002 ....................A 0318
April 11, 2002 ....................A 0350
May 23, 2002 ....................A 0363
June 14, 2002 ....................A 0368

Cole, Billy M. ....................A 0376
March 12, 2002 ....................A 0377
March 13, 2002 ....................A 0411
June 4, 2002 ....................A 0419

Dreyfus, Daniel ....................A 0422
May 15, 2002 ....................A 0423

## Volume IV

Klein, Susan ....................A 0438
April 24, 2002 (Rule 30(b)(6)) ....................A 0439
April 25, 2002 (Rule 30(b)(6)) ....................A 0478

Kouts, Christopher ....................A 0493
January 30, 2004 ....................A 0494
February 19, 2004 ....................A 0504
August 2, 2004 (in the Yankee Atomic Trial Transcript) ....................A 0509
April 11, 2005 (Rule 30(b)(6)) ....................A 0516
July 12, 2005 (in the TVA Trial Transcript) ....................A 0532
October 26, 2005 (in the Southern Nuclear Trial Transcript) ....................A 0538
June 13, 2006 (in the Pacific Gas Trial Transcript) ....................A 0550
June 14, 2006 (in the Pacific Gas Trial Transcript) ....................A 0555
October 11, 2006 ....................A 0571
January 16, 2007 (in the System Fuels Mississippi Trial Transcript) ....................A 0581
April 12, 2007 (in the System Fuels Entergy Trial Transcript) ....................A 0585

## Volume V

Kouts, Christopher (continued) ....................A 0612
May 1, 2007 (Rule 30(b)(6)) ....................A 0612
May 2, 2007 ....................A 0634

Lawrence, Michael ....................A 0654
May 20, 2002 ....................A 0655
May 21, 2002 ....................A 0697
November 16, 2007 (in the Carolina Power Trial Transcript) ....................A 0712

Milner, Ronald ........................................ A 0726
May 1, 2002 ........................................ A 0727

**Volume VI**

Milner, Ronald (continued) ........................................ A 0762
May 2, 2002 ........................................ A 0762
May 3, 2002 ........................................ A 0799
May 7, 2002 ........................................ A 0814
May 7, 2002 (Afternoon) ........................................ A 0831
May 8, 2002 ........................................ A 0838
August 11, 2004 (in the Yankee Atomic Trial Transcript) ........................................ A 0851

Morgan, Robert ........................................ A 0866
March 21, 2002 ........................................ A 0867
March 22, 2002 ........................................ A 0905
June 25, 2002 ........................................ A 0913
August 3, 2004 (in the Yankee Atomic Trial Transcript) ........................................ A 0917

**Volume VII**

Morgan, Robert (continued) ........................................ A 0925
November 15, 2006 ........................................ A 0925
November 16, 2006 (in the Northern States Trial Transcript) ........................................ A 0943
November 13, 2007 (in the Carolina Power Trial Transcript) ........................................ A 0953

Pollog, Thomas ........................................ A 0962
April 11, 2002 (Rule 30(b)(6)) ........................................ A 0963
April 12, 2002 (Rule 30(b)(6)) ........................................ A 1002
May 15, 2002 (Rule 30(b)(6)) ........................................ A 1026
May 16, 2002 (Rule 30(b)(6)) ........................................ A 1046
May 22, 2002 ........................................ A 1066

**Volume VIII**

Pollog, Thomas (continued) ........................................ A 1073
August 4, 2004 (in the Yankee Atomic Trial Transcript) ........................................ A 1073
March 29, 2005 (in the SMUD Trial Transcript) ........................................ A 1098
July 12, 2005 (in the TVA Trial Transcript) ........................................ A 1108
October 26, 2005 (in the Southern Nuclear Trial Transcript) ........................................ A 1115
October 12, 2006 ........................................ A 1122
November 15, 2006 (in the Northern States Trial Transcript) ........................................ A 1126

Rosselli, Robert ........................................ A 1137
April 15, 2002 ........................................ A 1138
April 16, 2002 ........................................ A 1168

Rusche, Benard ........................................A 1173
May 16, 2002 ........................................A 1174
May 17, 2002 ........................................A 1197
August 3, 2004 (in the Yankee Atomic Trial Transcript)........A 1207

Slater-Thompson, Nancy ........................................A 1215
April 21, 1999 ........................................A 1216
April 22, 1999 ........................................A 1228

**Volume IX**

Slater-Thompson, Nancy (continued)........................A 1239
June 13, 2002 ........................................A 1239

Trebules, Victor ........................................A 1255
April 17, 2002 ........................................A 1256
April 18, 2002 (Coordinated Discovery) ........................A 1289
April 18, 2002 (Deposition in Yankee Cases........................A 1305
April 19, 2002 ........................................A 1317

Williams, Jeffrey........................................A 1319
June 11, 2002 ........................................A 1320
January 22, 2004 ........................................A 1340

Zabransky, David........................................A 1368
April 17, 2002 ........................................A 1369

**Volume X**

Zabransky, David (continued) ........................................A 1401
April 18, 2002 ........................................A 1401
April 19, 2002 ........................................A 1428
June 5, 2002 ........................................A 1440
June 6, 2002 ........................................A 1445
August 5, 2004 (in the Yankee Atomic Trial Transcript)........A 1449
March 28, 2005 (in the SMUD Trial Transcript)....................A 1473
March 29, 2005 (in the SMUD Trial Transcript)....................A 1487
April 12, 2005 (Rule 30(b)(6))........................................A 1491
July 12, 2005 (in the TVA Trial Transcript)........................A 1503
October 27, 2005 (in the Southern Nuclear Trial Transcript)........A 1508
November 20, 2006 (in the Northern States Trial Transcript)........A 1519
October 11, 2007 (in the Wisconsin Electric Trial Transcript) ........A 1528
October 12, 2007 (in the Wisconsin Electric Trial Transcript) ........A 1532
November 13, 2007 (in the Carolina Power Trial Transcript)........A 1538

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------X

NORTHERN STATES POWER :
COMPANY, :
Plaintiff, : No. 98-484C
v. : (Senior Judge Wiese)
UNITED STATES OF AMERICA, :
Defendant. :

---------------------------------X

Washington, D.C.
Wednesday, November 15, 2006

Deposition of ROBERT L. MORGAN, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn by DENNIS A. DINKEL, a Notary Public in and for the District of Columbia, taken at the offices of Pillsbury Winthrop Shaw Pittman LLP, 2300 N Street, N.W., Washington, D.C. at 3:32 p.m., Wednesday, November 15, 2006, and the proceedings being taken down by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and transcribed under his direction.



APPEARANCES:

On behalf of the Plaintiff:

ALEX D. TOMASZCZUK, ESQ.
JAY E. SILBERG, ESQ.
DANIEL S. HERZFELD, ESQ.
Pillsbury Winthrop Shaw Pittman LLP
1300 N Street, N.W.
Washington, DC 20037
Phone: 202-663-8000

KERRY C. KOEP, ESQ.
Xcel Energy
414 Nicollet Mall
Minneapolis, MN 55401
Phone: 612-215-4583



APPEARANCES: (CONT.)

On behalf of the Defendant:

MARIAN E. SULLIVAN, ESQ.
Civil Division, U.S. Department of Justice
1100 L Street, N.W.
Washington, DC 20530
Phone: 202-307-6288



C O N T E N T S


| WITNESS | PAGE |
|---|---|
| ROBERT L. MORGAN | |
| EXAMINATION BY COUNSEL FOR PLAINTIFF | 6 |


EXHIBITS


| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Morgan 1 | Excerpt from proceedings, December of 1983, Program Overview Question Marked | 16 |
| Morgan 2 | Document dated March 3, 1983, from Northern States Power Company to Mr. Robert Morgan | 64 |
| Morgan 3 | Federal Register notice dated Monday, April 18, 1983 | 79 |
| Morgan 4 | Comments on contract for disposal of spent nuclear fuel and/or high level waste | 99 |
| Morgan 5 | "Comments" cover letter from Mississippi Power and Light Company to Mr. Robert | 101 |

EXHIBITS (CONT.)

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Morgan 6 | Document dated March 7, 1983 from Edison Electric Institute to Mr. Robert Morgan, from John Kearney, senior vice president Morgan dated March 4, 1983 | 102 |
| Morgan 7 | Excerpt of a document dated December 20, 1983, draft of the Civilian Radioactive Waste Management program mission plan | 110 |

** Exhibits retained by counsel



P R O C E E D I N G S

Whereupon,

ROBERT L. MORGAN,

mailing address at P.O. Box 2589, Monument, Colorado was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. TOMASZCZUK:

Q. Would you state your name for the record, please.
A. Robert L. Morgan.
Q. What is your address, Mr. Morgan?
A. Post office box 2589, Monument, Colorado, 80132.
Q. Are you employed, sir?
A. No, I'm retired.
Q. And since what date have you been retired?
A. I retired from the Department of Energy in 1988.
Q. Okay.
A. And retired from a small business firm in



1995.
Q. And what was the name of the small business firm?
A. Meta, M-e-t-a.
Q. Mr. Morgan, I understand you've been deposed before. Indeed, I had occasion to participate in a deposition of you approximately four years ago?
A. That's correct.
Q. And I presume you understand the ground rules of a deposition. I'm going to ask you questions. You need to answer orally. If you don't understand my question, let me know. If you want to take a break, let me know.
Other than that, I think we'll try to get through this as quickly and expeditiously as we can. I want to thank you for appearing here today. I know you just came back from a trip. We appreciate your time.
A. Okay.
Q. Tell me a little bit about what you did at Meta?



A. I was the program manager for environmental impact statements for DOE for environmental management, and then became chief operating official.
Q. Was that in Washington, D.C.?
A. Yes. Well, it was Alexandria, I believe.
Q. Washington, D.C. metropolitan area?
A. Yes.
Q. Would I be correct in stating that Meta was an environmental consulting firm?
A. It was, yes.
Q. If there was some hesitancy in your answer, you want to add or amend, feel free to do so.
A. No. No. That's fine.
Q. All right. Since 1995 when you left Meta, you've been fully retired?
A. I still do consulting.
Q. For whom do you consult?
A. Gurley SMSI.
Q. All right.
A. They're located in Los Alamos.
Q. Any other entities for whom you consult?

A. I've consulted with Foster Wheeler in Oak Ridge. That's all I can recall right now.
Q. Are you represented by counsel here today?
A. Yes.
Q. And that would be Ms. Sullivan?
A. Yes.
Q. All right. Are you serving as a consultant to the Department of Energy or the Department of Justice in connection with your testimony here today?
A. No.
Q. Okay. Are you being reimbursed for your costs or expenses in connection with your appearance here today?
A. Yes.
Q. Are you receiving any fees other than reimbursement for costs or expenses?
A. Yes.
Q. Okay. What fees are you receiving for participating here?
A. For preparation time.
Q. How much are you being paid for



preparation time?
A. $125 an hour.
Q. And are you being paid at that same rate for your time to travel here as well?
A. No.
Q. Are you being paid at the 125 dollar per hour rate for the time you actually spend testifying?
A. No.
Q. When you say preparation time, what do you mean?
A. Reviewing my previous testimony.
Q. How did you go about doing that?
A. I received copies of my testimony and reviewed it.
Q. Okay. You received copies of your previous testimony from Ms. Sullivan?
A. Yes.
MS. SULLIVAN: I caution the witness not to discuss the substance of any conversations that we had --
THE WITNESS: I beg your pardon.
MS. SULLIVAN: -- not to discuss the



substance of any conversations that we have had. Those are privileged.
BY MR. TOMAZCZUK:
Q. What testimony have you reviewed? What previous testimony have you reviewed?
MS. SULLIVAN: Let me ask a clarifying question. Are you asking for -- in preparation for his deposition today?
BY MR. TOMAZCZUK:
Q. I was asking more broadly than that. We can start in connection with your deposition here today.
A. I received copies of testimony from two previous cases, and I also reviewed copies of my deposition in 2002 that I had kept from that deposition.
Q. And the testimony in the two previous cases, do you recall which cases --
A. No, I don't.
Q. Would one be the Yankee case?
MS. SULLIVAN: Answer to the best of your knowledge. I'm not testifying here.



THE WITNESS: I believe so. I believe the other was TVA.
BY MR. TOMAZCZUK:
Q. All right. Mr. Morgan, if I understand the facts correctly, and I may not have them perfectly correct, you also testified in the Pacific Gas & Electric case; is that correct?
A. Correct.
Q. Have you had occasion to review your testimony in that case?
A. I don't recall.
Q. That testimony was summer of 2006?
A. I think -- I don't recall.
Q. You may have reviewed it, but you're not sure.
A. That's correct.
Q. Let me ask you, Mr. Morgan. What did you do to prepare for your deposition here today?
A. Nothing.
Q. When did you last have occasion to review your previous testimony, either deposition or trial testimony?

A. Would you repeat the question, please?
Q. Absolutely. I was trying to find out when you last had occasion to review any of your previous testimony, be it in trial or at deposition?
A. This last week.
Q. While you were traveling, as I understand it?
A. I received it before I traveled to Europe, and I reviewed it since I came back.
Q. When you say you reviewed "it" --
A. The previous testimony.
Q. So you reviewed it before you left the country and then you just reviewed it recently?
A. That's correct.
Q. Upon your return?
A. Yes.
Q. Why did you do that?
A. In preparation for testimony tomorrow.
Q. Okay. So you didn't read it in connection with your deposition here today, but you read it in preparation for testimony tomorrow?
A. That's correct.



Q. By the way, you may not know this -- this can be off the record.
(Discussion off the record.)
MR. TOMASZCZUK: Back on the record.
BY MR. TOMAZCZUK:
Q. Mr. Morgan, did you have any reactions to or did you draw any conclusions upon the testimony that you reviewed recently?
A. No.
Q. Was there any portion of the testimony that you reviewed that you thought was inaccurate or that you wanted to change or amend?
A. No.
Q. You hesitated for a moment. Were you not sure about your answer?
A. Well, there was testimony in the last trial that I had discussed a specific issue with the Secretary of Energy. In the deposition in 2002, I said yes. That testimony, I said no.
Q. So I've also had occasion to read that testimony. Which is the most accurate answer as best you can recall?



A. I probably did.
Q. My recollection of the question was whether or not you discussed with the Secretary of Energy the comments the utilities submitted in response to the promulgation of the draft standard contract?
A. Yes.
Q. And it's your testimony today that you think you probably discussed that with him?
A. That's correct.
Q. Let's go ahead and mark a document, okay, and I have some questions. I know you've seen this document before. I haven't had occasion to ask you about this one. I have a few questions. If we can mark this as Morgan Deposition Exhibit No. 1?
Mr. Morgan, this is a two-page document. It is excerpted from proceedings which occurred in or about December of 1983, and the heading on the document says program overview, and you are identified as the acting director of the Office of Civilian Radioactive Waste Management.
(A document was marked for



identification as Exhibit No. Morgan 1.)
MS. SULLIVAN: I'd note for the record this was an exhibit to Mr. Morgan's previous deposition.
MR. TOMASZCZUK: I'm sure it was.
BY MR. TOMAZCZUK:
Q. Mr. Morgan, are you familiar with this document?
A. Yes.
Q. And let me just get a little background first before I ask you some questions about the particulars.
You served as the acting director of what is now known as the Office of Civilian Radioactive Waste Management for a period of approximately one year; is that right?
A. That's correct.
Q. You assumed that position in or about February of 1983?
A. I believe it was January, but February is fine.

Q. And you stayed in that position for approximately one year?
A. That's correct.
Q. And you were, as I understand it, detailed to serve as the acting director; is that correct?
A. That's correct.
Q. And just so I'm clear, who detailed you or requested that you take this position?
A. Secretary Hodel.
Q. And from where were you detailed?
A. From the Savannah River operations office.
Q. And do you know why you were detailed to take the position of acting director of OCRWM?
MR. TOMASZCZUK: Sorry. My pen ran out of ink.
THE WITNESS: I really don't understand the question.
BY MR. TOMASZCZUK:
Q. Let me rephrase it. You said Secretary Hodel detailed you from your position to become the acting director of OCRWM?
A. That's correct.



Q. Do you have an understanding why you were selected to leave your position at Savannah River and to take the acting director position of OCRWM?
A. You'll have to ask him.
Q. You have no knowledge about that?
A. No. I believe that I made an offhand comment in a deposition -- which may or may not be correct --
Q. Well, I'm not sure -- I have re-read that deposition. I'm not sure I read the particulars of that comment.
A. You said because I was a good guy, making a smart-aleck comment.
Q. Did you have any questions for Secretary Hodel at the time he detailed you to the acting director position?
A. I was notified I think on a Thursday that the Secretary wanted to name me as director, acting director. And I responded to, I believe it was Earl Gelde, the special assistant, I'd like time to think about it. And he said that the Secretary intended to announce it on Monday morning at the staff meeting.



So I suggested to Earl that if there be several conditions imposed, that I would accept.
Q. What were the conditions?
A. Separate office. That I would not report to Assistant Secretary for Nuclear Energy. That I could name the people who would be on my staff from that office. Also office space. And secretarial services.
Q. Why was it -- I'm sorry. Did you finish your answer?
A. I think that's about what I can recall at the moment.
Q. Why did you request that you not report to the Office of the Assistant Secretary?
A. Because the Act said it would be an independent office, and I wanted to make sure that that was the case.
Q. When you say "the Act," you are referring to the Nuclear Waste Policy Act?
A. Yes.
Q. Had you had occasion prior to being tapped by Secretary Hodel to read the Act?



A. No.
Q. After you got the phone call on the Thursday --
A. I was in Washington, D.C. at the time. It was not a phone call.
Q. I see. Okay.
Did you then have occasion to read the Act?
A. Yes, of course.
Q. You were in Washington at the time on other official business?
A. Yes. I was on travel at the time.
Q. All right. At the time you were also living in Savannah River, would I understand that correctly?
A. That's correct. I was living in Aiken, South Carolina.
Q. So you had to go back to Aiken and move yourself up here to take the position?
A. I was on temporary duty, and I kept my home in South Carolina and traveled to accommodate this requirement.

25

storage after 1998?"
THE WITNESS: No.
MS. SULLIVAN: Same objection.
BY MR. TOMAZCZUK:
Q. That was not one of the purposes of the Act, in your view?
MS. SULLIVAN: Same objections.
THE WITNESS: That's correct.
BY MR. TOMAZCZUK:
Q. All right. Let's look at what's been marked as Morgan Deposition Exhibit No. 1.
You are familiar with this document, correct?
A. Yes.
Q. This is a document that you actually prepared; is that right?
A. Yes.
Q. And if I understand your prior testimony, Mr. Morgan, you prepared this in writing and then actually spoke about this document at the conference which was held in or about December of 1983?
A. That's correct.

26

MS. SULLIVAN: Objection. Compound.
THE WITNESS: That's correct.
BY MR. TOMAZCZUK:
Q. All right. And I am going to direct your attention -- take a minute and read it if you'd like.
A. No. I don't need to.
Q. Okay. All right.
I was going to direct your attention to the first page, right-hand column, and the second to the last paragraph, starting with "I would like..."
A. Yes.
Q. All right. In the third sentence of that paragraph, you state, "Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time."
A. That's correct.
Q. All right. And "at that time" meaning January 1, 1998, correct?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. You can answer.
THE WITNESS: Repeat the question.
BY MR. TOMAZCZUK:

27

Q. "At that time" refers to January 1, 1998? The phrase at the very end of the sentence I just read, "at that time," does that refer to the date in the previous sentence, January 1, 1998?
A. Yes.
Q. Thank you. You go on to state, in fact, if we accepted one spent fuel in 1998, we would technically be in accordance with the Act?
A. Yes.
Q. Do you believe that to be true?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
MR. TOMASZCZUK: Let me say for the record, I'm not asking you for legal conclusions. You're not an attorney. I'm asking for your understanding of this language that you wrote in or about 1983.
THE WITNESS: That was a bounding requirement. In other words, you would accept fuel, one element being at one end. And at the other end of that spectrum would be to the following statement, which was to accept it at the rate of discharge.

28

Those were bounding conditions that we were looking at at that point in time.
BY MR. TOMAZCZUK:
Q. What do you mean by bounding conditions?
A. Well, one, what was written in the Act is accept fuel in 1998. So I could accept one or I could accept at the limit of discharge from the utilities. That was the spectrum that we were dealing with.
Q. Okay. And what was your view as to the intent of the Congress in enacting the statute with respect to those boundaries?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. And I have to say, notwithstanding Mr. Tomaszczuk's understanding that he's not asking you to make legal conclusions, you're not a lawyer, I do need to put the objections on the record. I'm making the objections. Then you can answer the question. Thank you.
You can ask the question be read back.
THE WITNESS: For me to say what the intent of Congress is would be inappropriate, because

the various views that I was hearing from Congress, some were talking about solely using an MRS for storage of fuel. Others were talking about a repository.

It would be inappropriate for me to try to describe the intent of Congress.

BY MR. TOMAZCZUK:

Q. And you had no understanding about the intent of the Congress in enacting the statute?

MS. SULLIVAN: Objection. To the extent -- withdraw that.

THE WITNESS: I would say that that would be a difficult thing for me to determine. The intent of Congress as a whole, because I was hearing different views from various sides of the House and Senate.

BY MR. TOMAZCZUK:

Q. That's fair. And I'm just trying to understand what you're understanding of the intent was. Are you saying that you could not discern the intent because you were getting conflicting signals?

A. That's correct. I was getting conflicting



signals.

Q. All right.

MS. SULLIVAN: Can we go off the record?

MR. TOMASZCZUK: Sure.

MS. SULLIVAN: Just two minutes. I'm sorry.

(Discussion off the record.)

BY MR. TOMAZCZUK:

Q. You were talking about these two boundaries or bounds, one being one spent fuel rod, and the other being what I understood to be the discharge rate?

A. Yes.

Q. All right. Did you ever look at taking a rate or accepting fuel at a rate greater than the discharge rate while you were the acting director?

A. Yes.

Q. Okay.

A. That was in the mission plan which you have a copy of.

Q. Okay. Why did you do that, if you had these two bounds?



A. To work off the backlog.

MS. SULLIVAN: Mr. Morgan, I would ask, so the court reporter can take the questions, let Mr. Tomaszczuk ask the question, let me -- let me have a chance to object. Then you can provide the answer. I understand you'd like to get this over with. It makes the job easier for the court reporter. Thank you.

BY MR. TOMAZCZUK:

Q. Did you understand at the time that the Department of Energy had an obligation under the Nuclear Waste Policy Act to take all of the utilities' spent nuclear fuel over some period of time?

A. Yes.

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

THE WITNESS: Yes.

MS. SULLIVAN: Thank you.

BY MR. TOMAZCZUK:

Q. Going back to Morgan Deposition Exhibit No. 1, continuing on in the paragraph on the



right-hand column, just to go back where I was, "In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act."

And why did you believe that accepting one spent fuel element would not meet the intent of the Act?

MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

THE WITNESS: It said we have to accept fuel January 1998. To meet that requirement would be to accept one fuel element. Common sense says that that is not the intent of Congress.

The utilities wanted an acceptance rate equal to the discharge rate. And going back, that was the bounding conditions that we were looking at.

We were trying to put together a strategy, a plan that would take care of the discharge rate that we could see.

BY MR. TOMAZCZUK:

Q. And why were you attempting to do that?

MS. SULLIVAN: Objection. Vague.
THE WITNESS: That was what the interpretation -- our interpretation of the maximum program that we could comply with.
BY MR. TOMAZCZUK:
Q. Reading on in the same paragraph of the same document, Morgan Deposition Exhibit No. 1, the text continues, "The basic strategy which we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage facilities on site."
A. Okay.
Q. And --
MS. SULLIVAN: Let him ask the question.
BY MR. TOMAZCZUK:
Q. You wrote that sentence, correct?
A. Yes.
Q. You were the acting director at the time?
A. That's correct.
Q. This reflects your view at the time; is that fair?
A. That reflects what we were trying to



accomplish in the mission plan.
Q. Does it also reflect what you were trying to accomplish as the director of the program?
A. Yes.
Q. And is it your view that that strategy comported with the intent of Congress in enacting the statute?
MS. SULLIVAN: Objection. Legal conclusion.
THE WITNESS: That was basically what the utilities wanted us to achieve. That was, again, the bounding condition, from one to the acceptance rate which would be at the discharge rate.
BY MR. TOMAZCZUK:
Q. I appreciate that. But my question was, this strategy which you've articulated, namely that beginning in 1998, utilities will not have to provide any additional storage facilities on site, does that strategy comport with your understanding of the intent of Congress in enacting the Nuclear Waste Policy Act?
MS. SULLIVAN: Objection. Legal



conclusion. Asked and answered.
THE WITNESS: I do not know the intent of Congress. I think I've discussed that earlier. It was impossible for me to determine what the intent of Congress was.
BY MR. TOMAZCZUK:
Q. Do you think the strategy that I've just read that you adopted was inconsistent in any way --
A. No.
Q. -- with Congress' --
MS. SULLIVAN: Mr. Morgan, let Mr. Tomaszczuk finish.
THE WITNESS: Excuse me.
BY MR. TOMAZCZUK:
Q. Was inconsistent in any way with Congress' intent in enacting the Nuclear Waste Policy Act?
MS. SULLIVAN: Legal conclusion.
THE WITNESS: No.
BY MR. TOMAZCZUK:
Q. And in the last sentence of this section of the program overview that you authored, it stated, "During the first year of operation of the



repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location."
A. That's not entirely correct. If you look at the program plan, the mission plan, you will see that there was an increase of the backlog for the first three or four years. The intent was that they would not have to make further commitments for on site storage in 1998, but they would have already provided contracts for those that they would not have to make any additional long-term commitments in 1998. There is a difference.
Q. So this last sentence that I read from the program overview that you drafted is not quite correct?
A. That's correct. And that's in the mission plan that came out subsequent to this meeting.
Q. Earlier in your testimony, Mr. Morgan, I think you used the term or words to the effect that the maximum program that DOE could comply with, or words to that effect. I understood you to be using

communities?
A. Yes.
Q. Were you concerned about individual states enacting legislation that would make more difficult your efforts on -- as the head of OCRWM to site facilities in individual states?
MS. SULLIVAN: Objection. Vague. Objection to the extent it calls for a legal conclusion.
THE WITNESS: There was a process outlined in the Nuclear Waste Policy Act that if a specific area was selected, that there was a process that the states could go through in an objection to that.
And yes, I anticipated objections.
BY MR. TOMAZCZUK:
Q. And my particular question was whether you anticipated that a state might actually enact legislation in that state that would make it more difficult for you to select that state or location as a state for a -- a disposal facility?
A. That was --
MS. SULLIVAN: Are you finished?



MR. TOMASZCZUK: I was through. Thank you, Ms. Sullivan.
MS. SULLIVAN: Same objections.
THE WITNESS: That was certainly a condition.
BY MR. TOMAZCZUK:
Q. I'm sorry?
A. That was certainly a condition.
Q. When you say it was certainly a condition, you mean it was certainly a concern of yours?
A. Yes.
Q. And turning to the next page of what's been marked as Morgan Deposition Exhibit No. 1, if I could direct your attention, Mr. Morgan, to what is the third full paragraph, it starts -- you can read the whole second page if you like. I was going to ask you about the sentence that starts, "We have learned a lot in the consultation process..."
Do you see that?
A. Yes.
Q. You go on to state in the program overview, "There are some very difficult issues that



have been identified and we are attempting to work with the states in the resolution of those issues."
A. Yes.
Q. Does that describe the consultation process that you were engaged in and the concerns that states were expressing about siting a facility in their states?
MS. SULLIVAN: Objection. Vague. Objection. Compound.
THE WITNESS: Yes.
BY MR. TOMAZCZUK:
Q. Then, Mr. Morgan, just the last paragraph of this document. You state, "To summarize, the basic strategy is to have a repository in operation in 1998." You go on to state, "We will, however, keep a parallel program going on an MRS, so that if a repository is not available by 1998 or if Congress decides to authorize the construction of an MRS prior to that time, we will be able to comply with the law to begin accepting waste in 1998."
And just for the record, what is an MRS?
A. Monitored retrievable storage.



Q. And is it fair to say that this program overview reflects that you were thinking about an MRS at or about the time you delivered this paper and talk?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: The answer is yes. That was required by the Nuclear Waste Policy Act, that we would have the alternative program of an MRS.
BY MR. TOMAZCZUK:
Q. Can I ask you, Mr. Morgan, during the year that you were serving as acting director, how much time did you spend on the permanent repository versus the MRS? Do you have some sense about that?
A. 90 percent of it was on the repository. We were trying to accommodate the requirement of 1998 for a repository. An MRS would kick in if we ran into problems. I believed that during the time I was there, there was adequate time to get to an MRS at a later point in time. So the majority of my effort was on a repository.
Q. Did you feel that that was a doable task?
MS. SULLIVAN: Objection. Vague.

THE WITNESS: It was --
BY MR. TOMAZCZUK:
Q. Do you understand my question?
MS. SULLIVAN: Same objection.
THE WITNESS: I believe that it was a very optimistic situation, and that because of the uncertainties that I've discussed with you earlier, NRC licensing, intervention, change of law, Congress, state intervention, and litigation from -- I think we had three lawsuits during the period of time that I was acting director -- as an indication of problems that we would have.
BY MR. TOMAZCZUK:
Q. All right. So you viewed the 1998 date as optimistic?
A. That's correct. That's clearly stated, I believe, in this document.
Q. Did you feel that it was capable of -- that you were capable and that your organization was capable of meeting it?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: If all went well, yes. But



my feeling was that all was not going to go well. I was concerned. And that's one of the reasons why I would not agree to an acceptance rate from the utilities.
MS. SULLIVAN: Excuse me. We've been going for about an hour. Would this be a good time for a break?
MR. TOMASZCZUK: Sure. Absolutely. Want to take a break?
(Recess.)
BY MR. TOMAZCZUK:
Q. Back on the record.
Mr. Morgan, with respect to your consultations with local jurisdictions, did you have an understanding that those local jurisdictions were less opposed to an MRS which they viewed as temporary as compared against the siting of a permanent repository?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: I think there were equal objections, as later shown in Tennessee relative to Clinch River being considered as an MRS. I believe



that then Vice President Gore objected to that and that was removed from consideration.
BY MR. TOMAZCZUK:
Q. So it is your view that the states and local jurisdictions didn't distinguish between an MRS and a permanent repository in their level of opposition?
A. I think they distinguished between the two, but I think the opposition was there in both cases.
Q. Did you understand at this time, namely back in 1983 when you were serving as the acting head of OCRWM that the MRS was going to be a temporary storage site?
A. Yes.
Q. And even though you only spent 10 percent of your time, as I understood it, on the MRS initiatives, in your consultations with the states and local officials or the state and local officials with whom you met, did you communicate that to them, namely that the MRS was going to be temporary?
MS. SULLIVAN: Objection. Vague.



THE WITNESS: I don't recall.
But it was implied. The whole state of monitored and retrievable storage was that it would be retrieved and sent to a repository when the repository was complete. That was my understanding.
BY MR. TOMAZCZUK:
Q. If I understood your prior testimony correctly, you were serving as the acting director of OCRWM when the draft contract was initially published in or about February of 1984?
A. Yes.
MR. TOMASZCZUK: Did I misspeak?
MS. SULLIVAN: Yes. You said '84.
MR. TOMASZCZUK: '83. Thank you.
BY MR. TOMAZCZUK:
Q. Did you have a role to play in the preparing of that draft contract that was published in February of '83?
A. No, I did not.
Q. That work had -- I'm sorry. Go ahead, sir.
A. There's a certain delay time between the

Q. How many sets of NSP comments have you reviewed?
A. How many what?
Q. Sets of comments of -- provided by Northern States Power Company have you reviewed?
MS. SULLIVAN: Objection. Vague. Assumes facts not in evidence.
BY MR. TOMAZCZUK:
Q. Do you understand my question?
A. No.
Q. You said you reviewed comments provided by Northern States Power Company in response to the Federal Register notice?
A. Yes.
Q. Was that one set of comments? Or more than that?
A. I don't recall.
Q. Okay. Did you review any comments provided by Mississippi Power & Light Company in response to the Federal Register notice issued in or about February of 1983?
MS. SULLIVAN: Are you asking him in



preparation for his deposition here today?
MR. TOMASZCZUK: Yes.
MS. SULLIVAN: His deposition is also noticed in the Mississippi and Arkansas case.
MR. TOMASZCZUK: Yes. That's the question I'm asking.
BY MR. TOMAZCZUK:
Q. First of all, do you understand?
A. When I was director, okay, I think there were something like 85 sets of comments that we received. I reviewed all of those as director.
Q. Okay.
A. Okay. Do I specifically recall Mississippi or the Florida Power & Light? The answer is at this point in time, no.
Q. That's fair enough.
A. I don't know what you're driving at.
Q. What documents did you review in preparation for your deposition here today?
A. None.
MS. SULLIVAN: I think he answered that question.



BY MR. TOMAZCZUK:
Q. None? Okay.
You reviewed documents in connection with preparation for your trial testimony tomorrow?
A. Yes.
Q. Is that correct?
Is one of the documents you reviewed in preparation for your trial testimony tomorrow the comments submitted by Mississippi Power & Light Company in response to the Federal Register notice issued in or about February 1983?
MS. SULLIVAN: And I'm going to direct the witness not to answer. I don't see how you're entitled to know what he may or may not testify about tomorrow. That is work product.
MR. TOMASZCZUK: I'm not asking him -- so the record is clear -- what he's going to testify about. I'm asking him whether you reviewed a document.
MS. SULLIVAN: That would be in preparation for trial testimony which would be my work with the witness prior to trial, which is work



product.
MR. TOMASZCZUK: Okay.
MS. SULLIVAN: I think you would lodge the same objection if we were allowed to depose one of your witnesses on the eve of that witness's trial testimony.
MR. TOMASZCZUK: Let's mark as Morgan Deposition Exhibit No. 2, a document dated March 3, 1983, from Northern States Power Company to Mr. Robert Morgan.
(A document was marked for identification as Exhibit No. Morgan 2.)
BY MR. TOMAZCZUK:
Q. Have you seen this document before, Mr. Morgan?
A. As a result of my time spent --
Q. You can just answer yes or no.
MS. SULLIVAN: Thank you. Mr. Morgan, I'm instructing you not to answer as to the substance of any discussions we may have had this morning with regard to any documents that you may be asked about

in this deposition.
BY MR. TOMAZCZUK:
Q. My question, Mr. Morgan, was, have you seen this document before today?
A. I would have to say yes.
Q. Okay. And what do you understand this document to be?
A. Comments from Northern States Power Company to me dated March 3, 1983 as a result of the Federal Register notice.
Q. And if I understood your previous testimony, you would have received -- you would have reviewed these comments at or about the time they were submitted in March of 1983?
A. Yes.
Q. And you personally reviewed every set of comments that came in?
A. Yes.
Q. And what did you understand these comments to be saying to you with respect to the Federal Register notice and the draft contract?
MS. SULLIVAN: Objection. Vague.



Compound.
THE WITNESS: These were comments they had relative to the Federal Register draft notice of the contract.
BY MR. TOMAZCZUK:
Q. Okay. I'm going to go through each of these.
A. All right.
Q. Okay. And this goes on for about five pages. It has 20 comments, is that right? Is that your understanding?
A. Yes.
Q. Okay. First one is entitled DOE commitment?
A. Yes.
Q. All right. And what did you understand NSP's comments with respect to DOE's commitment to be with respect -- as reflected in this document?
MS. SULLIVAN: Objection. Vague. Best evidence. The document speaks for itself.
MR. TOMASZCZUK: The document does speak for itself, but it doesn't speak to this witness's



understanding of it, which is why I'm asking this question.
THE WITNESS: This is a performance standard.
BY MR. TOMAZCZUK:
Q. Okay. What do you mean by that?
A. Acceptance rate of fuel. A commitment by DOE to accept fuel at a given rate in the future.
Q. And where do you see a reference to an acceptance rate in this first comment?
A. It says, "further, the contract should have a clear statement of intent that DOE shall incur a contract obligation to take delivery of fuel."
That's --
Q. You are referring to the third paragraph?
A. Yes.
Q. Of comment one?
A. Yes.
Q. All right. The language you read states, "Further, the contract should have a clear statement of intent that DOE shall incur a contract obligation to take delivery of all spent fuel."



That's what you just read back to me?
A. Right.
Q. My question to you, sir, is, where does that refer to any acceptance rate?
MS. SULLIVAN: Objection. The document speaks for itself.
THE WITNESS: The entire three paragraphs, one says acceptance commitments as a binding obligation placed upon DOE. That means an acceptance rate in my mind. Come on.
BY MR. TOMAZCZUK:
Q. Delivery commitments means an acceptance rate in your mind?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: Acceptance commitments as a binding obligation placed upon DOE.
BY MR. TOMAZCZUK:
Q. I'm sorry, sir. Where are you reading?
A. In the first paragraph of that same -- taken in context of the whole thing. This says that you want an acceptance rate of -- in the contract of -- for DOE to accept at a rate as a given

77

BY MR. TOMAZCZUK:
Q. That was intended as a planning document for utilities?
A. Yes.
MS. SULLIVAN: Objection. Vague.
BY MR. TOMAZCZUK:
Q. Did it confer any document on OCRWM or the Department of Energy?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Vague.
THE WITNESS: Ask your question again. I'm sorry.
BY MR. TOMAZCZUK:
Q. Did this annual acceptance allocation report, you said it was for --
A. Planning --
Q. -- planning purposes for utilities. My question was, did it confer any benefit on OCRWM or DOE?
MS. SULLIVAN: Same objection.
THE WITNESS: Did it incur a benefit?
BY MR. TOMAZCZUK:

78

Q. Yes.
A. I think it provided a benefit to the utilities.
Q. Okay. But not to DOE? DOE couldn't care less one way or the other?
MS. SULLIVAN: Objection.
THE WITNESS: No. No. Come on.
MS. SULLIVAN: Objection to the extent it mischaracterizes the witness's testimony.
BY MR. TOMAZCZUK:
Q. Mr. Morgan, I'm not trying to mischaracterize. I just want to understand.
A. As I said earlier, acceptance rates -- there were many uncertainties that the program had. As I recall, it was 1987 that the President had to make a recommendation on site selection.
In other words, to the best of my recollection, at that point in time, you would have additional information of down hole exploration, licensing requirements. And it would be easier at that point in time, because you would have a reduction of the uncertainties in the program.

79

And you could make commitments at a later point in time that I did not want to make in 1983.
Is that clear?
Q. I understand your testimony.
A. Thank you.
MS. SULLIVAN: Do you need a break?
THE WITNESS: No.
MR. TOMASZCZUK: I just need a second.
MS. SULLIVAN: Do you want a break?
MR. TOMASZCZUK: No.
MS. SULLIVAN: Apparently, I'm offering breaks. Are we off the record?
(Discussion off the record.)
MR. TOMASZCZUK: Let's mark as Morgan Deposition Exhibit No. 3, a Federal Register notice dated Monday, April 18, 1983.
(A document was marked for identification as Exhibit No. Morgan 3.)
BY MR. TOMAZCZUK:
Q. Mr. Morgan, before I go on to Exhibit 3, this notion of an annual acceptance allocation

80

report, did that, in your view, have anything to do with an acceptance rate?
A. Yes. For planning.
Q. And what was the difference between an annual acceptance allocation report and an acceptance rate?
A. What is the correlation?
Q. Or relation between those two concepts?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: The '87 acceptance rate was a planning document that the Department of Energy was to present to the utilities. In my view, the strategy that we had published in the mission plan was a strategy -- this is what we would like to do. This is -- that bounding situation.
I assumed by 1987, that there would be a refinement of that. A refinement of the acceptance rate planning that the utilities could use for planning purposes.
BY MR. TOMAZCZUK:
Q. Do I understand that the Department of Energy placed into the contract the annual acceptance

allocations at the request of the utilities?
A. They did not, in my understanding.
Q. They did that for their own reasons?
A. No. For updated -- update for planning for the utilities. It was not a part of the contract.
Q. I'm sorry. I'm not sure I understand your testimony. I need to.
We just looked at -- let's go back. Before we get on to this third document, let's go back and look at Exhibit 2, page 3.
Paragraph 11, this is the discussion of annual acceptance allocation reports, correct?
A. Right.
Q. Now, I understand that in this set of comments, NSP is asking the Department of Energy to issue these annual acceptance allocation reports starting not later than April 1, 1984?
A. Right.
Q. And the Department of Energy did not accept at least the April 1, 1984 date?
A. That's correct.



Q. But they did -- the Department of Energy did place into the contract a reference to annual --
A. They placed into the Federal Register, I believe.
Q. All right. That's fair. I'll take that. Thank you.
A. Okay. In 1987.
Q. Correct.
A. And that -- and the following sentence, these reports are necessary to provide Northern States with an adequate planning horizon for interim storage. That was what the intent was.
Q. The intent was to enable utilities like Northern States --
A. Right --
Q. -- to be able to plan for interim storage?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
THE WITNESS: Yes.
BY MR. TOMAZCZUK:
Q. Now, what does that intent have to do, if anything, with an acceptance rate?



MS. SULLIVAN: Objection. Vague.
THE WITNESS: The acceptance allocation report says we're going to accept fuel at a given rate or requirement, and that would -- the utilities could use then that number for their planning of interim storage. I mean, that's what this document says.
BY MR. TOMAZCZUK:
Q. Well, I'm sorry, but I didn't see anything in this section 11 of these comments that refers to an acceptance rate which is why I'm asking this question.
MS. SULLIVAN: Objection. Document speaks for itself. You can answer.
MR. TOMASZCZUK: Let me ask you.
BY MR. TOMAZCZUK:
Q. Do you see anything about an acceptance rate in comment 11?
MS. SULLIVAN: Objection. Document speaks for itself.
THE WITNESS: When it says acceptance allocation reports, that means an acceptance rate.



Acceptance allocation means I'm going to accept something at a -- at an allocated rate.
BY MR. TOMAZCZUK:
Q. So your understanding is that as promulgated in the Federal Register, the Department of Energy was going to publish a rate in 1987?
A. It would issue an annual acceptance allocation starting in April 1, 1987, in order for the utilities to adequately plan for interim storage requirements.
Q. And that allocation report would contain a rate, an acceptance rate?
MS. SULLIVAN: Objection. Asked and answered.
THE WITNESS: It would -- it would state an annual acceptance allocation.
BY MR. TOMAZCZUK:
Q. And does that include an acceptance rate? That's my question.
A. In my understanding, yes.
Q. Okay. So the Department of Energy would publish an acceptance rate in 1987?

85

MS. SULLIVAN: Objection. Asked and answered.
THE WITNESS: That's my assumption.
BY MR. TOMAZCZUK:
Q. And on what do you base that, sir?
A. What's been written in the Federal Register.
Q. Okay. And when you say that would be used for planning purposes for interim storage, what do you mean by the term "interim storage"?
A. Interim storage at the utility.
Q. Okay. So a utility would take this 1987 document and how would that help a given utility, be it NSP --
A. Say we're going to accept --
MS. SULLIVAN: Let him finish asking his question.
BY MR. TOMAZCZUK:
Q. How would that help a given utility for planning --
A. It would --
Q. -- for planning purposes --

86

MS. SULLIVAN: Objection. Speculation. Vague.
THE WITNESS: It would tell the utility what DOE was going to accept from them. And, therefore, they could then plan interim on-site storage requirements, based on that number.
BY MR. TOMAZCZUK:
Q. And how do you know they would need interim on-site storage requirements?
MS. SULLIVAN: Objection. Vague.
BY MR. TOMAZCZUK:
Q. I mean they might or might not; is that correct?
A. Yes.
Q. Because they might have enough capacity in the pool that they wouldn't need any --
A. That's correct.
Q. -- interim on-site storage requirements?
MS. SULLIVAN: Objection. Speculation.
THE WITNESS: That's correct.
BY MR. TOMAZCZUK:
Q. But if they were running out of capacity

87

in their pool, then they might; is that your understanding?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: That's my understanding.
BY MR. TOMAZCZUK:
Q. Was the rate that was to be published in 1987 going to be binding on anyone?
MS. SULLIVAN: Objection. Calls for a legal conclusion. Vague.
THE WITNESS: Not to my knowledge. It was not a part of the contract.
BY MR. TOMAZCZUK:
Q. The acceptance rate was not part of the contract?
A. That's correct.
Q. So the report that was to be published in 1987 was not to be binding on either party?
MS. SULLIVAN: Objection. Vague. To the extent it calls for a legal conclusion.
THE WITNESS: I have no idea.
BY MR. TOMAZCZUK:
Q. You don't know whether it would be binding

88

on either party or not?
A. No.
MS. SULLIVAN: Counsel, we've been going for another hour. Could we take a break?
MR. TOMASZCZUK: Okay.
(Recess.)
BY MR. TOMAZCZUK:
Q. Mr. Morgan, this annual acceptance allocation report, do you know whether it wound up being called an annual capacity report?
A. I'd have to look at the Federal Register to determine that.
Q. Okay. Well, you have the Federal Register there. It is Exhibit 3.
A. You want me to start at the beginning and read it all or do you want to point me to a specific --
Q. Well, I believe if you look at section 5 of the draft standard contract, you will find it. But you are welcome to look at any and all parts of this, recognizing that it's not the most legible of exhibits.

A. And what page is that on, please?
Q. Let me state for the record, first of all, this is a copy of the government's Exhibit in the Northern States case and in particular it is Exhibit 2 -- U.S. government Exhibit 2.02.
Let's see if I can find a page for you.
MS. SULLIVAN: I'm sorry. What are you referring to?
BY MR. TOMAZCZUK:
Q. My question was whether annual acceptance allocation reports actually wound up being called annual capacity reports; and then he asked me where that was in the contract.
MS. SULLIVAN: Can I offer help?
MR. TOMASZCZUK: Absolutely.
MS. SULLIVAN: If you look at the Bates number at the bottom 0083.
MR. TOMASZCZUK: Thank you, counsel.
MS. SULLIVAN: Since Mr. Tomaszczuk and I are much more familiar with this contract right now.
(Pause.)
BY MR. TOMAZCZUK:



Q. Mr. Morgan, it may help a little bit, it is in the middle column there, I believe?
A. And that's --
MS. SULLIVAN: I'm sorry.
THE WITNESS: Beginning in April 1, 1991, DOE shall issue an annual acceptance priority ranking for fuel. That's different from the '87 requirement.
BY MR. TOMAZCZUK:
Q. Right. If you go down one more paragraph, sir?
A. All right. Annual capacity report. Right.
Q. Right. First of all, my question is this reference in Exhibit 2 to annual acceptance allocation reports, as it was adopted in the Federal Register draft contract, wound up being called annual capacity reports?
A. Yes.
Q. Okay. And these reports were for no other purpose than planning purposes, correct?
A. That's my understanding.
Q. And, Mr. Morgan, you weren't actually



involved in the preparation of any annual capacity reports, were you?
A. No.
Q. And you weren't involved in the preparation of any of the annual acceptance priority rankings which are referred to --
A. That's correct, I was not involved in that.
Q. Which were referred to in the immediately preceding paragraph? You were not involved in the preparation of those?
A. Correct.
Q. This standard contract embodied in the Federal Register notice that I've handed you, Exhibit 3, the utilities had to sign that contract to continue operating; isn't that correct?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
THE WITNESS: That's my understanding.
BY MR. TOMAZCZUK:
Q. What is your understanding of the consequences to a nuclear utility that did not sign



it?
MS. SULLIVAN: Same objection.
THE WITNESS: They operate under NRC regulations, and it would be an NRC determination whether they continued operation or not. It was not a DOE decision.
BY MR. TOMAZCZUK:
Q. Is it your understanding if a utility failed to sign, there might be adverse consequences flowing from the NRC, not from DOE; is that fair?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Vague.
THE WITNESS: That's my understanding.
MR. TOMASZCZUK: Are you okay? Do you want coffee or water?
THE WITNESS: No, I'm fine.
BY MR. TOMAZCZUK:
Q. Mr. Morgan, did you understand that the annual acceptance priority ranking, which has the 1991 date attached to it that we just looked at, does that also relate in some way to the acceptance rate, do you know?

hearing their views, and I think that their comments -- and I don't even recall the date of the meeting. It was their comments.
Q. Their comments on the draft standard contract?
A. That's my recollection.
Q. At the meeting, was the subject of an acceptance rate discussed?
A. Specifically, I don't recall. All I remember is a meeting with a whole bunch of the utility representatives and it related to the Nuclear Waste Policy Act; and I think it was -- I don't know.
Q. All right.
MR. TOMASZCZUK: Let's mark as Morgan Deposition Exhibit No. 7 -- Mr. Morgan, in the interests of not killing any more trees than necessary today, this is an excerpt of a document dated December 20, 1983, and it is a draft of the Civilian Radioactive Waste Management program mission plan.
THE WITNESS: Yes.
MR. TOMASZCZUK: This excerpt essentially



consists of the first few pages of that draft plan. Okay?
THE WITNESS: Fine.
(A document was marked for identification as Exhibit No. Morgan 7.)
BY MR. TOMASZCZUK:
Q. Do you recognize this document, Mr. Morgan?
A. Yes.
Q. This is a draft mission plan, an excerpt of a draft mission plan dated December 20, 1983?
A. That's correct.
Q. You were involved in the preparation of this document?
A. Yes, I was.
Q. Just for the record, what was your role in the preparation of this document?
A. I reviewed it and authorized its publication. I own it.
Q. You own it?
A. Yes.



Q. By that you mean, you were, as the acting director of OCRWM, you were the individual responsible for its promulgation?
A. That's correct.
Q. All right.
Can I direct your attention to the page that's marked 1-1 in the upper right-hand corner?
A. All right.
Q. In particular, I want to direct your attention, if I can, to the paragraph that's at the bottom of the page?
A. Yes.
Q. For the record, this paragraph states, "Every activity specified in the Mission Plan is targeted toward one fundamental objective: To accept commercial high level radioactive waste for safe management, storage, and permanent disposal on a firm schedule beginning not later than January 31, 1998."
A. Yes.
Q. That language is underscored, correct?
A. Yes.



Q. Why is the language underscored there?
A. Because that's what we targeted this mission plan to do.
Q. Okay.
A. And this -- the mission plan was a requirement of the Nuclear Waste Policy Act.
Q. All right. The paragraph goes on to state, "Further, the waste acceptance schedule will, initially, preclude the need for additional at-reactor storage after January 31, 1998 and, ultimately, remove from at-reactor storage all waste that is more than 5 years old."
And did you also take responsibility for this sentence of the paragraph I just read?
A. Yes.
Q. And does this reflect your strategy as head of the program to preclude the need for additional at-reactor storage after January 31, 1998?
A. Yes.
Q. And ultimately to remove from at-reactor storage all waste more than five years old?
A. Yes.

Q. Why did you include this last sentence of the introduction -- page 1-1 of the introduction that I read?
A. That was our target.
Q. The use of the word "ultimately" in that last sentence, did you have an understanding as to what time period ultimately refers to?
A. I think it was around 2020, looking at the schedule.
Q. Okay. And you're at table -- Roman 2-1, waste acceptance schedule?
A. Yes. Yes.
Q. And why do you say 2020 in response to my question, Mr. Morgan?
A. Because that's where we were working down the -- the backlog.
Q. I see. So that shows that in 2020, the remaining backlog is essentially --
A. Well, 23 MTUs but there's a comment, energy information didn't have anything beyond 2020. But it was to work down the inventory to get it to the five-year decay period. Ultimately would be



after 2020.
Q. Now, this -- what was the purpose of this waste acceptance schedule?
MS. SULLIVAN: Objection. Vague.
THE WITNESS: What was the purpose of the waste acceptance --
BY MR. TOMAZCZUK:
Q. What was the purpose of this waste acceptance schedule that appears at table 2-1?
A. The purpose -- this was what we were attempting to accomplish, our targeted plan for the program.
Q. And this schedule, as I understand it, shows a first repository in the fifth column over; is that right?
A. First repository acceptance MTUs, 1998, 1800.
Q. Then it ramps up to 3,000 in the --
A. Fifth year. Or sixth year.
Q. Sixth year.
And it stays at 3,000 for a period of years through 2021, if I'm reading this correctly?



MS. SULLIVAN: Objection. Document speaks for itself.
THE WITNESS: I believe you're reading it correctly.
BY MR. TOMAZCZUK:
Q. Okay. And the next column is second repository acceptance MTU?
A. Yes.
Q. Can you explain that column for me?
A. That would be the acceptance from a second repository.
Q. And that second repository was not going to be operational per this schedule until 2003; am I reading this correctly?
MS. SULLIVAN: Objection. Document speaks for itself.
THE WITNESS: I believe that's correct.
BY MR. TOMAZCZUK:
Q. And the second repository also ramps up to 3,000 metric tons in the sixth year of operation of that second repository?
MS. SULLIVAN: Objection. Document speaks



for itself.
THE WITNESS: Yes.
BY MR. TOMAZCZUK:
Q. And why, Mr. Morgan, was a second repository being contemplated at the time that this was prepared?
A. There was a limit of the total acceptance in the first repository of some given number of metric tons. It was a limit in the Nuclear Waste Policy Act, and in order to meet the backlog requirements and discharge rate, we needed a second repository, and we felt that it should come on about 2003. Best schedule.
Q. Do you have an understanding as to why both the first and second repository ramp up to 3,000 metric tons in their sixth respective years of operation?
A. That was the design goal that we had at that time.
Q. And what was that goal predicated upon?
A. The discharge rate from the reactors plus what we felt a designed repository could handle.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff,) Case No.
v. ) 98-484C
THE UNITED STATES, )
Defendant.)

National Courts Building
717 Madison Place NW
Washington, D.C.

Thursday, November 16, 2006
Volume 13

The parties met, pursuant to the notice of the Judge, at 10:43 a.m.

BEFORE: THE HONORABLE JOHN P. WIESE



APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Pillsbury Winthrop Shaw Pittman LLP
14th Floor
McLean, Virginia 22102
(703) 770-7940
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, Northwest
Washington, DC 20037-1122
(202) 663-8063



APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
HEIDE HERRMANN, ESQ.
JOSHUA GARDNER, ESQ.
STEPHEN FINN, ESQ.
ANDREW P. AVERBACH, ESQ.
JOHN EKMAN, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

(Index appears at end of transcript)



P R O C E E D I N G S
\- - - - -

THE COURT: Let us go on the record. Mr. Tomaszczuk, do we have any preliminary matters?

MR. TOMASZCZUK: Not for the Plaintiff, Your Honor, I think we sorted out the witness availability problem, and so far as Plaintiffs are concerned, we're ready to go forward.

THE COURT: Excellent. Ms. Herrmann?

MS. HERRMANN: Good morning, Your Honor, we're ready as well.

THE COURT: You're ready as well, so that brings forward Mister?

MS. SULLIVAN: Mr. Morgan, Your Honor.

THE COURT: I see we're switching from Mr. Leonard.

MS. SULLIVAN: Mr. Morgan needs to leave today.

THE COURT: We'll have Mr. Morgan on the stand very promptly and make sure he leaves today.

MS. SULLIVAN: Thank you.

THE COURT: Please be seated.

Mr. Morgan, I'd like you to state your name in full, spell your last name for the reporter, and give the reporter your home address.
THE WITNESS: Robert L. Morgan, M-o-r-g-a-n. My home address is 18470 Glenthorne Lane, Glenthorne is one word with an E on the end, Monument, Colorado, 80132.
THE COURT: You may question, Ms. Sullivan.
MS. SULLIVAN: Thank you, Your Honor. Good morning, Your Honor.
Whereupon--
ROBERT L. MORGAN
a witness, called for examination, having been duly sworn, was examined and testified as follows:
DIRECT EXAMINATION
BY MS. SULLIVAN:
Q. Good morning, Mr. Morgan. Mr. Morgan, when did you serve as director of the Office of Civilian Radioactive Waste Management?
A. I was acting director from January of 1983 until approximately January 1984.
Q. And how were you selected to be the director?
A. I was directed by Secretary Hodel.



Q. And as director, to whom did you report?
A. The Secretary.
Q. How many years were you employed by DOE or its predecessor agencies?
A. I joined the Atomic Energy Commission in 1965 and retired in 1988.
Q. And when you retired, you were with DOE?
A. Yes.
Q. Do you hold a Bachelor's degree?
A. Yes.
Q. From where?
A. United States Military Academy.
Q. And what is your degree in?
A. Military engineering.
Q. And when did you receive that degree?
A. 1952.
Q. And do you also hold a Master's degree?
A. Yes, I do.
Q. From where?
A. From Massachusetts Institute of Technology.
Q. And what is your Master's degree, what



subject?
A. I have a Master's in civil engineering and a Master's in nuclear engineering.
Q. And when did you receive those degrees?
A. 1959.
Q. Mr. Morgan, did you also serve in the Army?
A. Yes, I did.
Q. For how long?
A. 13 years.
Q. And after you left the Army, where were you first employed?
A. At Savannah River operations office.
Q. And was that as an employee of the Atomic Energy Commission at that time?
A. Yes.
Q. Would you please summarize briefly your positions from the time you joined the Atomic Energy Commission until you retired from DOE?
A. I was a director of the heavy water organic cooled reactor division at Savannah River, then I was transferred to Canoga Park in 1966. I stayed there until 1973 as a senior



site representative for reactor development and technology. In 1973, I was selected as deputy manager for Savannah River operations office. I held that job until 1980. Then I was selected as manager of that office and had that job until I retired.
Q. And when you served as the director, the acting director of the Office of Civilian Radioactive Waste Management, where were you -- where did that fit in your history with DOE?
A. That was a detail in 1983, but I still was the manager of the Savannah River operations office, but I was located in Washington, D.C.
Q. Thank you. And I'm not sure if we gave the dates that you were acting director of the office.
A. 1983, January, until January 1984, I believe.
Q. Thank you. And what have you done since you retired from DOE in 1988?
A. I worked for -- or I consulted from 1988 to 1990, then I went to work for a small 8A firm in Washington, D.C., called Meta, we were doing environmental impact statements for

Department of Energy, and I resigned or retired from that job in 1995, and I've been consulting since.
Q. And who do you consult with?
A. Right now, it's primarily SMSI at Los Alamos National Laboratory.
Q. Thank you. Mr. Morgan, turning now to your time as the acting director of the Office of Civilian Radioactive Waste Management, what was accomplished during the year you were acting director?
A. The first thing, we sent out letters to the appropriate governors that were affected by the Nuclear Waste Policy Act. We then dealt with the rule-making Federal Register for the contract, and then we put out the draft mission plan in December of that year, and in the meantime, we were trying to manage the program.
Q. What was the status of the development of the standard contract when you arrived in the office?
A. As I recall, the first notice of Federal Register was published in February, early February. Due to the time lag of submittal, I had not seen that until it was



published.
Q. And when you say, "time lag of submittal," what do you mean?
A. From the time the Department submits a requirement to the Federal Register, there's a time delay from the time it's submitted until it's published.
Q. What happened in the development of the standard contract after you arrived?
A. We received comments from utilities, states, affected Indian tribes, and we tried to resolve those comments and issues and finally issued the final rule-making.
Q. Do you recall meeting with utility representatives prior to the publication of the final standard contract?
A. Yes.
Q. With whom did you meet?
A. I met with GE, Westinghouse, Edison Electric Institute, and there were a number of utilities represented at a meeting there, plus I met with individuals from EEI.
Q. Okay. And who were the individuals from EEI that you met with?
A. Loring Mills.



Q. And what do you recall regarding your conversations with Mr. Mills?
A. Mr. Mills was repeating to me the comments that they had submitted and wanted to ensure that we had an acceptance rate in the contract.
Q. And do you recall what you told Mr. Mills with regard to his request?
A. I denied his request.
Q. Why was that?
A. Primarily because of the uncertainties in the program, there were technical issues, there were licensing issues, NRC had not issued licensing requirements for the repository. We felt it was an intense process requirement. We were concerned about litigation, political activities, and potential changes in legislation, so we felt that it would be inappropriate for me to commit to any acceptance rate in the contract.
Q. Mr. Mills, you mentioned litigation -- Mr. Morgan, excuse me, you mentioned litigation. Were there lawsuits filed against DOE regarding the activities of the program while you were director?



A. As I recall, there were three lawsuits.
Q. Mr. Morgan, I placed, before we started this morning, two binders that you see there on the desk. Would you please briefly take a look at those binders, just open them up and see what they are?
MS. SULLIVAN: Your Honor, I placed the contents of DX-2 in the binders before Mr. Morgan because of the volume. I'm not planning on providing -- Plaintiff's counsel has DX-2. I plan to discuss specific parts of DX-2 with Mr. Morgan, but I'd first like to have him talk about the entire exhibit.
THE COURT: Very good.
BY MS. SULLIVAN:
Q. Mr. Morgan, did you have an opportunity to review the binders that have been placed before you --
A. Yes.
Q. -- that are Defendant's Exhibit 2 before we began today?
A. Yes.
Q. What are the documents in the binders, that are in those binders?

A. It's the administrative record of the rule-making regarding the contract.
Q. Do you recall receiving these documents, the documents that comprised Defendant's Exhibit 2, in the course of the development of the standard contract?
A. Yes.
Q. Why did you receive these documents?
A. Why did I receive them? Because they were requested in the Federal Register notice, and they were requested to me as the acting director.
Q. Do you recall reviewing the comments submitted in response to the Federal Register notice?
A. Yes.
Q. Did you review all the comments submitted?
A. Yes.
Q. Why?
A. Because it was my responsibility to resolve these comments.
Q. Thank you.
MS. SULLIVAN: Your Honor, at this time, the government would move for the



admission of Defendant's Exhibit 2, which is the administrative record to the rule-making for the standard contract that is at issue in this case.

THE COURT: Are we going to go through the entirety of that record, Ms. Sullivan?

MS. SULLIVAN: No, Your Honor. There are three or four specific sets of comments that I will discuss with Mr. Morgan. However, because the record really is the record of the standard contract, it should be considered together as a complete document, and that's the bases for our seeking admission of the entire set of comments.

THE COURT: But you recall the Court's concern originally was that any requested finding, post-trial requested finding would have to be limited to either the testimony of a witness or an exhibit that was the subject of questioning in court, so I have no problem with your, with the admission of the entire record, but recognize that you won't be able later to draw upon exhibits or any part of that record that is not really the subject of testimony in court.



MS. SULLIVAN: We understand the Court's direction with regard to post-trial findings and briefing in this matter.

THE COURT: With that, Mr. Tomaszczuk?

MR. TOMASZCZUK: Subject to that caveat, Your Honor, that addresses one of the concerns I have, and I would just like to interpose for the record a relevance objection. A number of these comments relate to utilities whose cases may be pending before other judges of this court in other cases. Other comments are submitted by entities that we've heard absolutely nothing about.

I don't know what possible relevance those comments may have to this court's interpretation of the contract. It seems to me that what's at issue in this case is the actual signed version of the contract, Plaintiff's Exhibits 56, 57, and 58, and these comments, while they may be interesting to the government, I don't think inform this court's determination of the issues in dispute here, namely, what does the contract say and what are the rights of the parties under the contract as executed by the parties.



This is all precontractual material which has no relevance to the Court's determination of what I believe are the central issues in the case.

THE COURT: Except for the extent, Mr. Tomaszczuk, it would inform us all as to why there was resistance on the part of DOE to include an acceptance rate. We've already been through that in brief, but if I understood Ms. Sullivan, her view was -- I guess it's the sanctity of the administrative record that she wishes to preserve.

I'll admit it with the understanding, however, that if it's not addressed in court, that is to say specifically addressed in court, I won't pay a very attentive eye to any requested finding based on the matter in the administrative record that is not the subject of testimony.

MS. SULLIVAN: Understood, Your Honor, we would note this is a conformed contract. It is a standardized contract with all of the parties that submitted comments. However, I would, I really do understand the Court's guidance with regard to Mr. Tomaszczuk's point,

BY MS. SULLIVAN:
Q. Mr. Morgan, do you agree with the paragraph that I've just read?
A. Yes.
Q. Why is that?
A. Because that's basically what we have resolved in the rule-making, the '87 and the '91 date, and it shows that TVA understood that.
Q. Thank you, Mr. Morgan. I'd like to now hand you an excerpt of Plaintiff's Exhibit 286.
MS. SULLIVAN: Your Honor, Plaintiff's Exhibit 286 has been previously admitted. It is a much larger, I think a 300-page document. I have just provided Mr. Morgan with an excerpt of that document.
BY MS. SULLIVAN:
Q. Mr. Morgan, do you recognize Plaintiff's Exhibit 286 to be the compendium of the proceedings of the 1983 Civilian Radioactive Waste Management information meeting --
A. Yes.
Q. -- held in December of 1983?



A. Yes, I do.
Q. And if I could turn your attention to the second page of the excerpt, which I've handed you, which is marked as pages 11 and 12 of that document, could you identify these pages for the record?
A. Yes. This is the program overview that I gave at that proceeding.
Q. Okay. Let me ask you, first of all, Mr. Morgan, after the contract was issued in the Federal Register and the contracts were signed, what did you next focus upon as the director of the Office of Civilian Radioactive Waste Management?
A. The mission plan.
Q. And do you recall this meeting in December of 1983?
A. Yes, I do.
Q. What was the purpose of the meeting?
A. It was an information meeting for the utilities and interested parties.
Q. And who do you recall attended the meeting? Actually, let me ask you, did you attend the meeting?
A. Yes, I did.



Q. Who else do you recall attended the meeting?
A. Several utilities, I believe States attended it and some private individuals.
Q. I'd like to direct your attention to the paragraph in the second column, the right-hand column that begins, "I would like to talk a little bit," and I'll read that into the record. "I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend to do or do. I think most of you know that the Act requires that we receive waste from the utilities by January 1st, 1998.
Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time. In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we do not believe that that meets the intent of the Act.
The basic strategy which we've outlined in the mission plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site. During



the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at another location."
Mr. Morgan, do you recall this portion of your statement?
A. Yes, I do.
Q. Why did you make this statement?
A. What we were trying to do is outline, again, the bounds of what was in the Nuclear Waste Policy Act of the one bookend being accepting a fuel element and then the other, outside of that, would be accepting fuel at a rate that would be in requirement for further storage facilities at a site.
Q. Mr. Morgan, why was the draft mission plan prepared?
A. It was, I believe, issued in December of 1993.
Q. I'm sorry. I asked you why it was prepared.
A. Oh, it's required by the Nuclear Waste Policy Act.
Q. And what was the purpose of the

the reactors. That was not a DOE initiative.
BY MR. TOMASZCZUK:
Q. That's a fair qualification, but your understanding was that if NSP didn't sign the contract, it would essentially have to shut down the Prairie Island and Monticello plants?
A. It's my understanding that NRC probably would require them to shut down, but I can't, you know, state what NRC would do.
Q. Now, as I understand it, you served as acting director for a period of about one year, is that right?
A. That's correct.
Q. And you were never confirmed by the Senate as the director of the Office of Civilian Radioactive Waste Management?
A. That is correct.
Q. And after you left the program in or about January of 1984, you had no involvement in DOE's development of the program, isn't that correct?
A. That's correct.
Q. And that means you had no involvement in the promulgation of annual capacity reports?
A. That's correct.



Q. And you had no involvement in the promulgation of acceptance priority rankings?
A. That's correct.
Q. You had no involvement in the promulgation of delivery commitment schedules?
A. That's correct.
Q. You had no involvement in the promulgation of delivery commitment schedule instructions?
A. That's correct.
Q. Now, during that one-year period that you were acting director -- and when I use the term "OCRWM," you'll understand what I mean?
A. Yes, sir.
Q. You spent, as I understood your testimony, most of your time working on the repository, is that right?
A. That's correct.
Q. And indeed, you testified yesterday in your deposition that about 90 percent of your time was spent on repository efforts and 10 percent was spent on MRS activities?
A. That's correct.
Q. And as I understood your testimony both yesterday and here this morning, one of



the activities you personally worked on was consultations with the states?
A. Yes.
Q. And you sent letters to governors, as I understood it?
A. Yes.
Q. And you also --
A. In fact, that was the first requirement under the Nuclear Waste Policy Act, letters had to go out within X number of days, and I can't recall what that was, but that was a first official correspondence that we got out.
Q. And as I understood it, you were also, as I understood your testimony, you were also working on consultations with Indian tribes?
A. Yes.
Q. And you were also consulting with local authorities around the country?
A. Yes.
Q. And you did that in part because it was required by the Nuclear Waste Policy Act?
A. Yes.
Q. And in the course of conducting that activity, you consulted with officials in,



among other states, Washington, the state of Washington?
A. Correct.
Q. Nevada?
A. Correct.
Q. Texas?
A. Yes.
Q. And Louisiana?
A. Yes.
Q. And isn't it fair to say that those officials were interested in having you not cite any spent nuclear facilities in their state, is that fair?
A. I think that's a fair statement.
Q. And it would be fair to say that in 1983, when you were acting as acting director of OCRWM, you were aware that there was opposition in local communities to the storage of any spent nuclear fuel in those communities?
A. That's correct.
Q. And you were actually concerned that a state might actually enact legislation that could make it more difficult for you to select that state as a site for a disposal facility, isn't that correct?

to be judged by meeting this date, that DOE's failed in its performance?

MS. SULLIVAN: Objection, Your Honor, same objection, the issue is not about whether or not we met the 1998. We acknowledged we did not meet the 1998 date.

THE COURT: Yes, but we've had this question several times in the past, and it goes to the question of what constitutes performance under this contract. It seems to be DOE's position that it breached the contract by not meeting the date, but yet that performance, having never been specified with any certainty itself, has not been breached. There's an awkward problem there, so that's a long way of saying I've allowed this question to be asked and answered many times, and I shall again.

MS. SULLIVAN: Yes, Your Honor. Thank you.

BY MR. TOMASZCZUK:

Q. I'll bet you forgot the question.

A. Exactly.

MR. TOMASZCZUK: Ms. Reporter, could you read that one back?

(The reporter read the record as requested.)



THE WITNESS: Yes.

BY MR. TOMASZCZUK:

Q. Now, Mr. Morgan, on direct examination, I understood you to say, correct me if I'm wrong, that in this paragraph we're looking at, starting with the word "similarly" that's up on the screen, you understood that the Department of Energy was rejecting the utility's request to adopt a particular acceptance rate, did I understand that?

A. Yes, and that's performance standards, and that's in several of the letters it received, it's under performance standards that a rate of acceptance was covered, and that's what we meant in this performance standards.

Q. Now, you would agree that this paragraph doesn't say anything about a particular acceptance rate, does it?

A. In my mind, the performance standards commented on by the utilities, I believe there was seven of them, several -- it was in the area of performance standards that this was raised, and that's what we were dealing with in this entire paragraph.



Q. Well, performance standards could also mean meeting the 1998 date, isn't that correct?

A. What I'm referring to or what I referred to at the time is the performance standards of an acceptance rate.

Q. And you would agree with me, Mr. Morgan, that there's no reference to the words "acceptance rate" in this paragraph or DOE's rejection of such an acceptance rate?

A. We objected to the performance standards which we interpreted because of the letters that we received, that it was under performance standards that they had raised the acceptance rate, and that's what this paragraph is dealing with.

Q. The proceedings of the 1983 meeting, I was going to ask you some questions about that, and that's Plaintiff's Exhibit 286.

A. Yes.

Q. And as I understand it, Mr. Morgan, you actually prepared this program overview, is that right?

A. Yes.

Q. And you both prepared the written words on the text, and you presented it orally in this meeting in or about December of 1983?



A. Yes.

Q. And this document reflected your intent as the head of the program with respect to how the program was going to work, correct?

A. Yeah.

Q. And there were various utility representatives in attendance at this meeting right?

A. Yes.

Q. And it was your intent to provide them accurate information at the meeting?

A. Yes.

Q. And directing your attention to the first page of the overview, page 11 is the text page that appears at the bottom, and I'd like to look at that paragraph on the right-hand column, starting with, "I would like."

A. Yes.

Q. And the sentence that begins, "technically," do you see that?

A. Yes.

Q. "Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time," and then it goes on to

say, "In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act."
A. Yes.
Q. And I'd like to ask you some questions about that. Is there a -- strike that.
What, in your view, would meet the intent of the Act, if one assembly pick-up does not?
A. If you read the following sentence: "However, we did not believe that this meets the intent of the Act."
Q. Would two assemblies meet the intent of the Act?
THE COURT: I think, Mr. Tomaszczuk, the witness didn't hear your question.
MR. TOMASZCZUK: I'm sorry.
THE COURT: It was phrased obliquely, given the text that we were looking at, so go back, look at your questions, Mr. Tomaszczuk, and then rephrase it, and then we'll start again.
BY MR. TOMASZCZUK:
Q. All right. Mr. Morgan, in this highlighted text, you say here that one spent



fuel element in 1998, you opined that if you did that, you would be technically in accordance with the Act, right?
A. Yes.
Q. And then the next sentence says, "However, we did not believe that that meets the intent of the Act," right?
A. Yes.
Q. So you're telling industry here at this meeting that if you picked up one, that would not meet the intent of the Act?
A. That's correct.
Q. How about if you picked up two?
A. No.
Q. How about 10?
A. We started on this looking at the one fuel element as one bounding limit of the program. We looked at the other end or the bounding, which would be accepting fuel at the rate of discharge, plus the work down to the backlog, okay? So we were trying to get in the mission plan as far to that right as we could. That was the intent we were trying to do.
I don't know what the intent of the Act was, but my interpretation of it was within



those two bounds.
Q. And then your interpretation was revealed in the next sentence when you talked about the strategy, right?
A. Right.
Q. And why don't you read that for us?
A. "The basic strategy which we have outlined in the mission plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site."
Q. And that was the strategy that you adopted and told the utilities about at this meeting, correct?
A. Yes.
Q. And that strategy, in your view, was consistent with your understanding of the purposes of the Act, is that correct?
MS. SULLIVAN: Objection, Your Honor, legal conclusion to the extent he's being asked to interpret the Act, and mischaracterizes his prior testimony.
THE COURT: The objection is overruled. This gentleman was the acting director, the first director, he is setting out the philosophies of the program, and he has



said he really doesn't know what the intent of the Congress is, but he, by virtue of his position, is obliged to give some meaning to the statute. It's the same problem we all find ourselves in now, so this is a very fair question to ask this particular witness.
MS. SULLIVAN: Thank you, Your Honor.
THE COURT: Now, there, again, Mr. Tomaszczuk, I'm sure the witness has forgotten the question.
MR. TOMASZCZUK: And I'm going to ask, once again, the court reporter to read it back.
(The reporter read the record as requested.)
THE COURT: Now, the strategy that was being referred to, Mr. Morgan, is the strategy that is outlined in your statement as read by Mr. Tomaszczuk. So take a moment to look at the highlighted text on the screen, that is the question that Mr. Tomaszczuk has put to you.
THE WITNESS: Okay. The answer is yes.
THE COURT: Okay.
BY MR. TOMASZCZUK:
Q. And then in this last sentence,

Mr. Morgan, you were embellishing upon that strategy, were you not?
A. Yes.
Q. And you were telling utilities, "During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at another location," and it was fair for utilities to rely on your statement in that regard, wasn't it?
A. That's what our strategy was at the time. Following down below, it says, hey, we will be able to start working off the backlog in here, I said when we opened the second repository, and that's what is then in the sheet on the mission plan, which came out subsequent to this meeting.
Q. All right. Well, let's look at the mission plan.
A. Fine.
Q. And that is Plaintiff's Exhibit 275, and that's the thicker document Ms. Sullivan handed to you.
A. Yes, I have it.



Q. And as I understand it, Mr. Morgan, you were responsible for the preparation of this first draft mission plan?
A. Yes, I was.
Q. And this document was actually required by Congress in the Nuclear Waste Policy Act?
A. Yes.
Q. And would it be fair to say, sir, that in this mission plan, you were trying to effect the intent of Congress in enacting the statute as you understood it?
A. Yes.
Q. Let me turn first to page 2-2 of this document and in the third paragraph there and the second sentence starting, "in 1991."
A. Yes.
Q. And I believe Ms. Sullivan asked you some questions about this particular sentence?
A. I believe so.
Q. Are you okay?
A. Yes.
Q. Ms. Sullivan asked you some questions about this?
A. Yes.



Q. And this reference to 1991, that assumes that the Department of Energy is going to commence performance in 1998, right?
A. Yes.
Q. Now, the next -- let's just skip over the chart for a minute and go to page 2-4, and I'm not sure Ms. Sullivan, I know she asked you some questions about the text at the bottom of the previous page. I'm not sure she asked you about this text at the top of page 2-4 of the draft mission plan.
But this goes on to say, in the first full sentence at the top of page 2-4, "The planning basis assumes that, after 1998, individual utilities who actually realize this need will arrange for the right to ship spent fuel to the Department from a utility who is next in the queue in shipment allocation (subject to prior approval by the Department, based on submittal of a request no less than six months prior to the scheduled delivery date)."
And then it goes on to say, "The use of such brokering arrangements should prevent the need for any utility to expand on-site



storage and minimize transshipments." Do you see that?
A. Yes.
Q. And in essence, here, you were sanctioning, if you will, the use of exchanges after the program was up and running?
A. Yes.
Q. And the Department understood that the use of exchanges was another vehicle that would allow the utilities to avoid the need for at-reactor storage?
A. Yes.
Q. Now, let's look at the table that appears on the page which separates those two pages we're taking a look at, table 2-1, and this schedule, Mr. Morgan, as I understand it, shows both a first and second repository, is that correct?
A. That's correct.
Q. And it shows an acceptance rate of a first repository starting in 1998 at an acceptance rate of 1800 metric tons?
A. Yes.
Q. And then it ramps up in the sixth year of performance to 3000 metric tons?

A. Yes.
Q. And that continues through 2021, is that correct?
A. Yes.
Q. And then the second repository per this chart does not come online until 2003, is that right?
A. That's correct.
Q. And it also starts at a rate of 1800?
A. Yes.
Q. Sorry about your nasty cough. It also starts at 1800 and then ramps up to 3000 metric tons in the sixth year of performance, is that right?
A. Yes.
Q. And at the time you published this draft mission plan, you were intending to effectuate the intent of Congress, as you understood it, in enacting the Nuclear Waste Policy Act, correct?
A. Yes.
Q. And that intent is also embodied in the last column, is it not, the remaining backlog column?
A. Yes.



Q. And here, this shows a backlog in metric tons of 40,809 tons?
A. Yes.
Q. And then it actually increases for a few years, do you see that?
A. That's correct.
Q. And can you explain why that's so -- why it actually increases for a few years?
A. Because the discharge rate in the first column is greater than the acceptance rate in the repository.
Q. So the discharge rates are greater than the 1800 metric tons of pick-up contemplated by the operation of the first repository?
A. Yeah.
Q. And that starts to change in the sixth year of contract performance, is that right?
A. Yes, in 2003, we actually start working off the backlog.
Q. And then that backlog continues to decrease for a period of 17-plus years?
A. Right.
Q. Did anyone from Congress ever tell you that they disagreed with the rates reflected in



this mission plan?
A. Not to my knowledge. This was a draft mission plan, it. Had not gone out in final form. It went out for comments, and I believe that there were, you know, many comments received on this plan after my departure. And there was a revision of the plan after I left. To my knowledge, by the time I left, there was not any comments from Congress relative to this mission plan.
MR. TOMASZCZUK: Can I just have a moment, Your Honor?
THE COURT: Yes.
MR. TOMASZCZUK: Thank you, Mr. Morgan, no further questions.
THE COURT: Thank you, Mr. Tomaszczuk. Ms. Sullivan?
MS. SULLIVAN: Your Honor, I have three questions.

REDIRECT EXAMINATION

BY MS. SULLIVAN:
Q. Mr. Morgan, how does the term "expeditiously as practicable" relate to the bounding that you discussed both in your direct and in the cross testimony?



A. That's kind of in-between the two bookends.
Q. And how does that language, "expeditiously as practicable," comport with your understanding of the intent of the NWPA?
A. It complied to the NWPA.
Q. And the draft mission plan which you said you were attempting to effectuate the intent of Congress, did that intent require a particular acceptance rate?
MR. TOMASZCZUK: Objection, leading.
THE COURT: I'm going to allow the question. We're deep into the only issue that counts, at least for this morning. You may answer that question. But I think you should restate it, Ms. Sullivan.
MS. SULLIVAN: Sure, Your Honor, just --
THE COURT: Just restate the question.
BY MS. SULLIVAN:
Q. The draft mission plan, you were attempting to effectuate the intent of Congress, is what you testified with regard to Mr. Tomaszczuk's questions?
A. Yes.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------------------------x
CAROLINA POWER & LIGHT COMPANY and :
FLORIDA POWER CORPORATION, :
Plaintiffs, :No. 04-37C
vs. :
THE UNITED STATES, :
Defendant. :
-----------------------------------x
Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, November 13, 2007
Volume 6

The parties met, pursuant to the notice of the Judge at 9:31 a.m.

BEFORE THE HONORABLE THOMAS C. WHEELER



APPEARANCES:
ON BEHALF OF PLAINTIFFS:
Arnold Bradley Fagg, ESQUIRE
Paul Bessette, ESQUIRE
Linda Eaton, ESQUIRE
David Kerr, ESQUIRE
Morgan, Lewis & Bockius
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-5191

ON BEHALF OF THE DEFENDANT:
Andrew P. Averbach, ESQUIRE
Christopher J. Carney, ESQUIRE
Marian Sullivan, ESQUIRE
Lisa Donahue, ESQUIRE
U. S. Department of Justice, Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
12th Floor
Washington, D.C. 20530
(202) 353-0527

(Index appears at end of transcript)



P R O C E E D I N G S
(9:31 a.m.)
THE COURT: We're on the record this morning for day number 6 in the trial of Carolina Power, et al. versus United States. Mr. Fagg, who's up next this morning?
MR. FAGG: We have no preliminaries and we would call to the stand, Your Honor, Robert Morgan.
THE COURT: All right. Please come forward, sir.
Whereupon--
ROBERT L. MORGAN
a witness, called for examination, having been duly sworn, was examined and testified as follows:
DIRECT EXAMINATION
BY MR. FAGG:
Q. Good morning, Mr. Morgan.
A. Good morning.
Q. Can you see and hear me okay?
A. Yes.
Q. Mr. Morgan, you and I had never met before about 15 minutes ago; is that correct?
A. Correct.
Q. I'd like you to introduce yourself, if



you could, to the Court. Could you spell your name for the record?
A. Robert L. Morgan, R-O-B-E-R-T, L, M-O-R-G-A-N.
Q. And are you currently employed, Mr. Morgan?
A. No.
Q. Could you -- retired?
A. Yes.
Q. Could you briefly walk through your professional career, if you could, starting after college?
A. I graduated from the Military Academy in 1952. Entered the Army Corps of Engineers. First assignment was in Fort Lewis. Then in Korea. Came back to the 82nd Airborne Division after Korea. I resigned my commission in 1965 and joined Atomic Energy Commission, started there in Savannah River operations office as a division director for the heavy water organic cooled reactor program.
Transferred to Southern California at the liquid metal engineering center in 1966, stayed there until 1973. 1973, I was selected as deputy manager of Savannah River operations

office, and then promoted to manager in 1980. And I had retired from the Department of Energy at that time in 1988.
I -- during the time I was manager, I had several details in Washington, D.C.
Q. Okay. And one of those details, and the reason you keep getting called back to the stand, is it not, was your role as a director of what became the Office of Civilian Radioactive Waste Management; is that correct?
A. Correct.
Q. When were you in that position, Mr. Morgan?
A. January 1983 until, I believe it was January 1984.
Q. And after January of 1984, did you continue to have any direct involvement in the DOE's program of civilian radioactive waste management?
A. No, I was transferred or had another detail as Acting Assistant Secretary for Defense Programs after I finished my job in OCRWM.
Q. OCRWM, and just for the clarity of the record and the judge, OCRWM is OCRM, Office of



Civilian Radioactive Waste Management?
A. That's correct.
Q. I think I missed one word in there, but that's what we're talking about?
A. Correct, yes.
Q. And just again, to be clear, you were not around and involved at the time of the 1987 amendments to the Nuclear Waste Policy Act, correct?
A. That's correct.
Q. And you were not involved in how those amendments were interpreted or applied by the Department of Energy, correct?
A. That's correct.
Q. And you were not around at the time the Department of Energy began to issue delivery commitment schedules, correct?
A. Correct.
Q. And you were not around at the time the Department of Energy began to issue either acceptance capacity reports or acceptance priority rankings, correct?
A. Correct.
Q. And you're represented by the U.S. Department of Justice today, correct?



A. Yes.
Q. Are you being compensated by the Department of Justice for your time today?
A. I'm compensated for the $40 a day for the witness.
Q. But you're no longer being paid by the hour to review your testimony or otherwise prepare?
A. I'm paid for preparation of testimony.
Q. Okay. $125 an hour, correct?
A. That's correct.
Q. And when you prepare for that testimony, you look at documents or look at your prior testimony?
A. Yes.
Q. Okay. Mr. Morgan, I'd like to talk with you some about some documents, most of which I'm certain you've seen before.
MR. FAGG: Permission to approach, Your Honor?
THE COURT: Yes.
BY MR. FAGG:
Q. And we'll be going to Plaintiffs' Exhibit 19. Mr. Morgan, I've handed you what's been marked as Plaintiffs' Exhibit 19, you've



seen this document before, correct?
A. Yes.
Q. Okay. And this document is an excerpt from a much larger document containing speeches and presentations presented at a conference in Washington, D.C. in December of 1983, correct?
A. Correct.
Q. And you were one of the presenters at that conference, correct?
A. Yes.
Q. And the excerpt that I've handed you is a written statement of remarks that you gave at that conference?
A. Yes.
Q. Correct?
A. Yes.
MR. FAGG: Your Honor, we would move Plaintiffs' Exhibit 19.
MS. SULLIVAN: Good morning, Your Honor.
THE COURT: Good morning.
MS. SULLIVAN: We had objected to Plaintiffs' Exhibit 19 because it, in fact, is not complete. The complete transcript of the proceedings is found at DX-41, and we would ask

that the Court admit DX-41 instead of PX-19.
THE COURT: Mr. Fagg.
MR. FAGG: It's a phone book sized document, Your Honor, and this is the only piece we're going to talk about. We have no objection if the Court wants to have the larger document in the record. I don't think it's necessary.
THE COURT: Well, I think what I may do is to admit both documents into evidence, Plaintiffs' Exhibit 19 and Defendant's Exhibit 41, those exhibits are admitted.
(Plaintiffs' Exhibit Number PX-19 was received in evidence.)
(Defendant's Exhibit Number DX-41 was received in evidence.)
MS. SULLIVAN: Thank you, Your Honor.
THE COURT: And either side may refer to either one as they wish.
MR. FAGG: Thank you, Your Honor.
BY MR. FAGG:
Q. Back to our proceedings in December 1983, Mr. Morgan, this was an open forum; is that correct?
A. Correct.



Q. Utilities were there, correct?
A. I believe they were.
Q. Okay. And after the forum, this document or the excerpt that I've shown you was published and distributed; is that correct?
A. Correct.
Q. Okay. I'd like to turn to, I guess it's page 11 of the excerpt that I've given you. And there's a Bates number, and I'm sure you've become familiar with Bates numbers by this point, but 599 at the lower corner. And the upper page, it says, program overview, and it has your name there, Robert Morgan. Are you with me, sir?
A. Yes.
Q. And again, just for the record, this page and the following page are essentially the written version of the statements you gave orally in December 1983, correct?
A. Correct.
Q. Okay. I'd like to direct your attention, if we could, to the second column on that page, and the sort of fourth full paragraph in that column. And I'm going to read a portion of that into the record, and



then ask you some questions about it.
"I would like to talk a little bit about the strategy as laid out in the mission plan and what we intend," it doesn't say to, but I presume to "do. I think most of you know that the Act requires that we receive waste from the utilities by January 1st, 1998. Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time. In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act."
Let's stop right there, if we could, Mr. Morgan. First question, does that fairly characterize the remarks you gave in December of 1983?
A. Yes, it does.
Q. And those were true statements to the best of your knowledge at the time you gave them, correct?
A. Yes.
Q. Okay. And you believed that it made sense that Congress didn't intend for you to



only take one assembly starting in 1998, correct?
A. Correct.
Q. Okay. I mean, common sense tells us that, doesn't it, Mr. Morgan?
A. Well, looking at the intent of the entire Act, it was to dispose of all the spent fuel from the commercial reactors. That was the intent clearly stated in the Act. With accepting one fuel element, one could not reach that goal.
Q. And you thought these statements were appropriate at the time you gave them, correct, Mr. Morgan?
A. Correct.
Q. Let's move on to the balance of that paragraph. It goes on to say, "the basic strategy which we've outlined in the mission plan is that beginning in 1998, utilities will not have to provide any additional storage facilities on-site during the first year of operation of the repository. In 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on-site or at another

right?
A. Yes.
Q. And then they had to be signed in June, right?
A. Correct.
Q. Okay.
A. So after April, we were not working in parallel on the contract and the mission plan, that was what I was trying to clarify earlier.
Q. And that wasn't really clear from what we just read, was it? I'll withdraw the question.
Let's move on, Mr. Morgan. I'd like to go back now to what you have in front of you as Plaintiffs' Exhibit 17, do you have that document?
A. Yes.
Q. Okay. Again, back to the draft mission plan from 1983, are you with me?
A. Yes.
Q. Okay. And the purpose of this document was to outline the plan that the DOE was going to proceed on to try to accomplish the intent of the Nuclear Waste Policy Act, correct?



A. What we felt was the intent of the Nuclear Waste Policy Act.
Q. And you view this --
A. I cannot attribute intent to Congress.
Q. Well, you've testified and you've stated on multiple occasions, haven't you, Mr. Morgan, what you believe the intent to be?
A. What I believe the intent to be, but I don't know that that was clearly an intent of Congress.
Q. And I'm just asking about what you know, Mr. Morgan, do you understand that?
A. Yes, sir.
Q. Okay. You viewed this document as a proper way to accomplish the goals of the Nuclear Waste Policy Act, correct?
A. The goals or strategy that we were attempting to comply with.
Q. Okay. You were responsible for this document, correct?
A. Yes, sir.
Q. You owned this document, correct?
A. Yes, sir.
Q. And in some sense, every word in this document is your responsibility, correct?



A. Yes.
Q. All right. You wouldn't put anything in here that was inconsistent with the Nuclear Waste Policy Act, would you?
A. Not to my knowledge.
Q. You don't know that you did, do you?
A. I don't believe that I did.
Q. Let's look at a couple of provisions in this document, if we could, Mr. Morgan. And let's go to what was Bates-labeled 172. And at the end of the first paragraph, under program strategy, are you with me, Mr. Morgan?
A. Page 172.
Q. There's a lot of numbers on this document. One of them is 172, 45172?
A. Yes, I'm on that page.
Q. Thank you. I'd like to read into the record the last two sentences, I guess, of the first paragraph. It says, "the waste materials will be accepted in accordance with a waste acceptance schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31st, 1998. Subsequently, the acceptance rate will be equal



to or greater than the actual discharge rate of spent fuel each year."
And that was a true statement of your intent at the time this document was issued in December of 1983, correct?
A. Correct.
Q. And the waste acceptance schedule, do you see that reference with all initial caps, initial capital letters, waste acceptance schedule?
A. Yes.
Q. Okay. That's referring, is it not, to the schedule that appears two pages further on in the draft, 174, right?
A. Yes. I might add that if you look at this table, we tried -- the strategy was to accept fuel at the discharge rate in 1998. We were unable to do that. And you will note in the remaining backlog actually increases from 1998 until 2003, when we start working down the backlog. So there was -- we were trying to get to the strategy, but the plan did not meet that total strategy.
Q. Okay. But after 2003, you do start working off the backlog?

A. Yes, sir.
Q. And that -- working off the backlog means you're accepting more fuel than the industry is discharging, correct?
A. Yes, sir.
Q. And your point, as I take it, is that didn't happen in this schedule until about 2003?
A. That's correct.
Q. But again, do you view that as inconsistent with the statement we just read into the record?
A. It was a strategy which we read in, which was read into the record which says, accept fuel at the discharge rate of the reactors in 1998. Clearly this acceptance schedule does not meet that requirement, so the plan did not meet the strategy that we had stated earlier.
Q. Okay. Mr. Morgan, let's ask you a couple of questions about that. What was the discharge rate of utilities -- well, let me back up. The rates reflected on this table -- and I'm at page 174, are you with me?
A. Yes.



Q. Okay. The discharge rates from utilities are based upon data that your office, or its predecessors, had acquired from utilities, correct?
A. Yes.
Q. And it was based upon projections of future activities, new plants, if you will, if they came on line, correct?
A. I believe it included -- I don't know if there were any other reactors coming on line after that date, but if there were, they would have been included.
Q. Okay. And looking down at the annual spent fuel generation, the first column of that table, it starts, the first item appears in column, for 1998, it says, "2739." Do you see that?
A. Yes.
Q. Okay. And the cumulative acceptance during 1998 is 1800, do you see that?
A. Yes.
Q. And so the point of your testimony a moment ago is that 1800 is less than 2700, correct?
A. That's correct.



Q. But moving on down, the next year, it's 2865 for spent fuel generation, correct?
A. Yes.
Q. Okay. And again, the first repository acceptance is 1800, correct?
A. Correct.
Q. But if we keep on going down to 2003, the annual spent fuel generation is again about 2700, correct?
A. Correct.
Q. And the first repository acceptance rate is 3000, correct?
A. Correct.
Q. And from that point on, the plan reflected in this document is accepting more spent nuclear fuel than is being generated by the industry, correct?
A. That is correct.
Q. Thank you, Mr. Morgan. The rates here, you thought these to be reasonable at the time, correct?
MS. SULLIVAN: Objection, vague.
THE COURT: Can you rephrase, counsel?
BY MR. FAGG:
Q. Certainly. The rates that were



developed on this chart that we were looking at, were developed under your direction, correct?
A. Yes.
Q. And you thought these rates to be reasonable at the time you published this in December of 1983, correct?
A. Correct.
Q. And looking at the steady state acceptance rate of a first repository, which after the ramp-up gets to 3000 MTUs per year, that rate is based upon discharge rates of reactors plus what a repository could handle, correct?
A. I don't understand that question.
Q. Let me try to rephrase it. I'm asking about the 3000 rate for the first repository?
A. Yes.
Q. Are you with me? And my question is, to your understanding, the development of that 3000 number depended upon at least two things, right? It depended upon discharge rates of the industry and an assessment of what a repository could handle, correct?
A. It was based on what the repository

could handle in the preliminary design.
Q. Let me ask you to turn back a page, Mr. Morgan. And just a couple of clauses I want to ask you about, Mr. Morgan. In the middle paragraph, it says, under terms of the utility contracts for disposal services, and I'm at the second full paragraph and the last sentence. Are you with me?
A. Yes, I'm with you.
Q. An annual capacity report with projected annual receiving capacities and rankings will be issued by the Department for planning purposes, beginning in 1987. Are you with me there?
A. Yes.
Q. Now, as we talked about earlier, you weren't around in 1987, so you never saw what was, in fact, done in 1987, correct?
A. That's correct.
Q. But at the time this document was issued when you were around, the capacities that were intended by the program were the capacities reflected on the following page in that chart, correct?
A. Could you restate that again? I'm



sorry.
Q. Certainly. And my apologies. I am speaking fast and my apologies for that, Mr. Morgan. Let's try having the court reporter read it back. And if not, I'll rephrase it.
THE REPORTER: "Question: But at the time this document was issued when you were around, the capacities that were intended by the program were the capacities reflected on the following page in that chart, correct?"
THE WITNESS: Correct.
BY MR. FAGG:
Q. Let's move down the next paragraph, there's a reference to another date in the second sentence, Mr. Morgan, and it says, "in 1991, DOE will begin publishing firm individual utility acceptance schedules in accordance with the contracts, including shipment allocations."
And the same couple of questions again, you weren't around or involved in 1991, correct?
A. I was not involved.
Q. Okay. And --
A. Correct.



Q. And in 1983, when you were around, the reference here to acceptance schedules, the schedules that you're talking about are on this next page, correct?
A. The schedules that were on the previous page, acceptance rate, was looking at what we were trying to accomplish as a goal in our plan.
Q. And -- I'm sorry.
A. That -- we did not have a design for the facility, we did not have a licensing application, the 1987 date was reflective of the time that we would be in a site selection, the 1991 date was reflecting when we would be going to NRC for a licensing process.
We would have better knowledge of the design of the facility and what we could do. And at that time, at this time, I felt that that was a reasonable date that we could make commitments for an acceptance rate.
Q. I appreciate all of that, Mr. Morgan. And let's just be clear, there's no design today, okay, there's no -- so I'm really just asking you about 1983. And let's make sure my question is clear. In 1983, with all the



qualifications you just described, the schedule that you're contemplating is the one reflected in this document, correct?
MS. SULLIVAN: Objection.
BY MR. FAGG:
Q. There's no other schedule?
MS. SULLIVAN: Asked and answered, mischaracterizes the testimony and the document.
THE COURT: Overruled, I'll take his answer.
THE WITNESS: This was the plan, our planned acceptance rate in 1983.
BY MR. FAGG:
Q. Okay. One more paragraph on this document that I'd like to ask you about, Mr. Morgan, is the last paragraph on this page, and it carries over after we skip the chart that we've been talking about to the following page.
And I will just try to read it, so the court reporter can understand it here at a modest rate of pace, and ask you a couple questions about it. "While the Department's acceptance rate during the initial five years

the December draft of the mission plan,
correct?
A. I believe that table 3.3 accurately
and fully reflects what was in the mission
plan.
Q. And just a couple of these to
highlight and make sure we have this correct
for the record.
THE COURT: Is this 3.3 or 3.1?
BY MR. FAGG:
Q. I'm talking about -- I'm sorry, table
3.1. And I guess, let's be clear on that.
Thank you, Your Honor.
Mr. Morgan, you referred to table 3-3?
A. Yes, sir.
Q. Okay. And can you identify the Bates
label down at the bottom of the page that
you're referring to?
A. 2741.
Q. And when you indicated a moment ago
that you thought those accurately captured the
December 1983 mission plan, that's what you
were referring to?
A. Yes.
Q. Okay. I'd like to go back two pages



to the words, being a lawyer I'm more
comfortable with the words than the numbers,
table 3-1.
Are you with me?
A. Yes.
Q. And just a couple of these I'd like to
confirm with you, Mr. Morgan. The reference
case assumptions, number one refers to two
geologic repositories, correct?
A. Correct.
Q. Design capacity of 72,000 metric tons
and there's a footnote pointing out that the
Act imposes a 70,000 limit, correct?
A. Correct.
Q. And then number three, let's call that
out, repository design receipt rates, first 5
years at 1800 MT per year, next 21 years at
3000 MT per year.
And again, that's consistent with both
the table two pages over and the chart in the
prior document, correct?
A. Correct.
Q. Okay. And moving down to case
assumption number 10, no monitored retrievable
storage. That was the reference case at this



time in July of 1983, correct?
A. That's the reference case in this
document. I did not sign this document.
Q. Came out of your office, though,
correct?
A. I did not sign this document.
Q. My question is, it came out of the
office you were the head of?
A. It came out of a person who worked in
the Nuclear Waste Policy Act office at that
time, yes.
Q. And you were the head of the Nuclear
Waste Policy Act office at that time, correct?
A. Yes, yes.
Q. Let's spend some time talking,
Mr. Morgan, if we could, about the contract.
You agree it's a binding contract, correct?
MS. SULLIVAN: Objection, legal
conclusion.
THE COURT: Well, I think I'll take
his understanding, so you can answer the
question.
THE WITNESS: Yes.
BY MR. FAGG:
Q. And you agree that the utilities



effectively had no choice but to sign the
contract or the NRC would shut them down,
correct?
MS. SULLIVAN: Objection, vague.
THE COURT: Overruled.
THE WITNESS: Yes.
BY MR. FAGG:
Q. Do you understand the question?
A. Yes.
Q. Okay. You had to have a contract or
at least be in good faith negotiations or you
couldn't amend your license, correct?
A. That was what was in the Nuclear Waste
Policy Act.
Q. Okay. Now, let me make sure I have
the chronology right. You joined in about
January, late January of '83; is that correct?
A. Yes.
Q. The Federal Register notice that went
out with the draft contract was about February
of 1983?
A. Correct.
Q. So you weren't particularly involved
in the development of that initial contract,
that initial draft contract that went to the

Federal Register, right?
A. I did not see the -- that Federal Register notice until it was published.
Q. Okay, and --
A. There was a delay time from the time you submit something for publication, and then when it's actually published. I sincerely believed that, in fact, I would have to testify that I did not send this draft to the Federal Register.
Q. Okay.
A. I had not seen it at that time.
Q. Okay. But it was published, went out, in or around February of 1983, correct?
A. Correct.
Q. And you invited comments or your office invited comments, correct?
A. Correct.
Q. And the comments poured in, didn't they?
A. Yes.
Q. Okay. And we -- if we got all the comments, it would fill up a few notebooks, wouldn't it?
A. Yes.



Q. Okay. People in your office assessed those comments, correct?
A. Correct.
Q. Okay. And ultimately, a final standard contract was published and we'll look at that in a moment, but your recollection is in or around April of 1983, correct?
A. Correct.
Q. Okay. You recall that EEI and some utilities asked for a more explicit statement about the pickup rate obligations, correct?
A. Correct.
Q. And you've testified that it would have been unconscionable to put such a rate in the contract, correct?
A. Correct.
Q. Now, Mr. Morgan, I've been looking --
A. May I clarify that unconscionable?
Q. Let me ask you a few questions and then if you need to, perhaps you can, and you'll certainly also get a chance with Ms. Sullivan.
A. Yes.
MS. SULLIVAN: Your Honor, I'd like the witness to be allowed to complete his



answer if that's necessary.
MR. FAGG: I'm sorry, I didn't understand it was to complete an answer, I thought it was to supplement.
THE COURT: I'll take his clarification, and then you can follow up, Counsel.
MR. FAGG: Thank you, Mr. Morgan. Please clarify.
THE WITNESS: If I had committed to an acceptance rate at this time without a mission plan even published I believe I should have been fired for malfeasance, because I had no justification for committing the government to a binding contract when there was insufficient information to back it up. That's why I say it's unconscionable.
BY MR. FAGG:
Q. And, again, EEI and at least some utilities, though, asked for a more explicit statement, whether it was a numeric rate or an acknowledgment that you were going to pick up at greater than the industry discharges, you recall those statements, right?
A. Yes.



Q. And you recall testifying about your reactions to those statements, right?
A. Yes.
Q. And I think your testimony -- and correct me if I'm mischaracterizing this, because I wasn't there -- but the effect was you denied those requests, right?
A. Correct.
Q. I've been looking for a piece of paper, Mr. Morgan, that uses the word denied. Are you aware of any piece of paper that says we've considered your request and it's denied during the time in 1983 and '84 when you were in charge of the program?
A. In the final Register notice of April, we dealt with it on performance in the performance article, and saying that we would accept fuel as expeditiously as practicable, I believe were the words.
Q. Okay.
A. And that was how we -- how we dealt with that rate. We would do the best we could to accept fuel at the highest rate possible.
Q. Okay. And thank you, Mr. Morgan, and we're going to look at that, and I do want to

question of DOE performance standards, but if there's another provision that we ought to be looking at, please let me know.
A. I guess that was where I had used the word, or where I had recognized the performance standard.
Q. Okay.
A. In that paragraph.
Q. Okay. And again, in this paragraph, where you say "we will be judged by meeting this date" the date being the 1998 date, correct?
A. Yes.
Q. One more document, if I could, Mr. Morgan.
MR. FAGG: If I may approach, Your Honor?
THE COURT: Yes.
BY MR. FAGG:
Q. For the record, I'm handing you, Mr. Morgan, what we've marked as Plaintiffs' Exhibit 13. And I apologize for the small and hard to read type face on that document, Mr. Morgan. It's the only copy we have. But that's your signature on that document,



correct?
A. Correct.
Q. We would offer Plaintiffs' Exhibit 13?
MS. SULLIVAN: No objection, Your Honor.
THE COURT: Plaintiffs' Exhibit 13, is admitted.
(Plaintiffs' Exhibit Number PX-13 was received in evidence.)
BY MR. FAGG:
Q. Again, Mr. Morgan, I've been looking for this document that says denied or unconscionable or refused, and I haven't found it. But I did find this document, and this is a letter you wrote back to Mr. Kearney at EEI, correct?
A. Correct.
Q. And you refer in this letter, in the second full paragraph, you state, "as you are aware, all of the issues that you raised in your letter, specifically, a lack of standards for the Department of Energy's (DOE) performance," let's stop with that one. It then goes on, but that's the one I think we're talking about here. Then you go on to say,



"were addressed in the preamble to the April 18th, 1983 final rule."
Do you see that?
A. Yes.
Q. Is that referring to the paragraph we were just looking at?
A. I believe so.
Q. And the following sentence says, "we believe that we adequately addressed all of the industry's concerns in the rule at that time."
The statement that you made and signed on or about June 17th, 1983?
A. Yes. Yes.
Q. And moving down to the next paragraph, it says, "recognizing the stringent time constraints the Act has imposed on the Department, we clearly cannot re-examine any issue of concern to the utilities prior to the June 30th, 1983 deadline."
You would agree even today that there were stringent time constraints, correct, Mr. Morgan?
A. Yes.
Q. Okay. I have no further questions, thank you, Mr. Morgan, for your time.



Appreciate it.
THE COURT: All right, Ms. Sullivan.
MS. SULLIVAN: Yes, Your Honor.
THE COURT: Cross-examine.
THE WITNESS: Can I just make a statement, Your Honor?
THE COURT: Not without a question.
THE WITNESS: All right.
THE COURT: Sorry.
MS. SULLIVAN: May I approach, Your Honor?
THE COURT: Yes.
MS. SULLIVAN: And may I give the witness a cup of water?
THE COURT: Oh, definitely.
MS. SULLIVAN: Good morning, Your Honor.
THE COURT: Good morning.
CROSS-EXAMINATION
BY MS. SULLIVAN:
Q. Mr. Morgan, just a couple additional things about your background. How were you selected to be the first director of the office that was to become the Office of Civilian Radioactive Waste Management?

# POLLOG

IN THE UNITED STATES COURT OF FEDERAL CLAIMS - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY : (98-126c) (Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER : COMPANY, (98-154C) (Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY : (98-483C) (WILSON, J.) :
NORTHERN STATES POWER COMPANY : (98-484c (Wiese, J.) :
DUKE POWER, A Division of DUKE : ENERGY CORP. (98-485C) (Sypolt, J.):
INDIANA MICHIGAN POWER COMPANY : (98-486C) (Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY : DISTRICT (98-488c) (Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY : et. al. (98-488c) (Yock, S.J.) :
COMMONWEALTH EDISON COMPANY : (98-621c) (Hewitt, J.) :
BOSTON EDISON COMPANY : (99-447C) (Allegra, J.) :
GPU NUCLEAR, INCORPORATED : (00-440C) (Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY : (00-697C) (Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF : NEW YORK (00-703C) (Damich, J.) :
OMAHA PUBLIC POWER DISTRICT : (01-115C) (Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT : (01-116C) (Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY : (01-249C) (Bruggink, J.) :
Plaintiff, : :
vs : :
THE UNITED STATES, : Defendant. :
- - - - - - - - - - - - - - - - - - -x
McLean, Virginia Thursday, April 11, 2002

Deposition of:

THOMAS POLLOG,

the witness, called for examination by counsel for the defendant, pursuant to notice and agreement, commencing at 10:10 a.m., at the offices of Shaw, Pittman, 1650 Tysons Boulevard, McLean, Virginia, before Linda C. Marshall, RPR, a Notary Public in and for the Commonwealth of Virginia, when were present on behalf of the respective parties:

APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District, Nebraska Public Power District: DEVON E. HEWITT, ESQUIRE

JACK CHEW, ESQUIRE Shaw, Pittman, LLP

1650 Tysons Boulevard McLean, Virginia 22102-4859

703-770-7962

On behalf of the Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power: KRISTI L. REMINGTON, ESQUIRE

Balch & Bingham, LLP Tenth Floor,

1275 Pennsylvania Avenue, N.W. Washington, D.C. 20004

202-347-6000

APPEARANCES CONT'D:

On behalf of Plaintiff Commonwealth Edison Company:

THEODORE T. EIDUKAS, ESQUIRE Jenner & Block, LLC
One IBM Plaza Chicago, Illinois 50511-7603
312-222-9350

On behalf of Plaintiff SAcramento Municipal Utility District:

TIMOTHY R. MACDONALD, ESQUIRE Arnold & Porter
Suite 4500 370 Seventeenth Street
Denver, CO 80202-1370

On behalf of Plaintiff Wisconsin Electric Power Company:

SUZETTE W. DERREVERE, ESQUIRE Perkins Coie, LLP
607 14th Street, N.W. Washington, D.C. 20005-2011
202-434-1675

On behalf of the Defendant: MARIAN SULLIVAN, ESQUIRE

ERIN POWELL, ESQUIRE U.S. Department of Justice
Civil Division 1100 L Street, N.W.
Washington, D.C. 202-514-7300

I-N-D-E-X


| Witness: | Page |
|---|---|
| Thomas Pollog | |
| Examination by Ms. Hewitt | 5 |


E-X-H-I-B-I-T-S


| | Page |
|---|---|
| No. 1 - | 20 |
| No. 2 - | 28 |
| No. 3 - | 44 |
| No. 4 - | 71 |
| No. 5 - | 103 |
| No. 6 - | 112 |
| No. 7 - | 122 |
| No. 9 - | 164 |

Q What is his current position?
A I don't know.
Q What was he doing for DOE when he worked on this illustrative waste acceptance schedule?
A He was working for a company called Weston and I don't know specifically what he was doing at that time.
Q Did Weston participate in the drafting of the 1985 Mission Plan?
A According to what Mike told me, yes.
Q Mr. Pollog, when did you start working at DOE?
A November of 1988.
Q What was your appointment previous to that?
A I was in graduate school.
Q Was working at DOE your first job out of graduate school?
A Out of graduate school, yes.
Q And what position did you have with DOE when you started in 1988?
A I believe the position description was either general engineer or nuclear engineer.
Q And in what division of DOE or

9

department?
A It was in the systems development branch of the RW, Office of Radioactive Device Management.
Q And who did you report to in that position?
A Charles Head.
Q And what were your duties generally in that position?
A We were tasked with developing dry storage for spent fuel.
Q Does that have to do with canisters?
A A canister can be part of a dry storage system, yes.
Q How long did you have this position?
A Approximately six months.
Q And what position did you have after that?
A After that I was assigned to the systems integration branch.
Q And who did you report to in that position?
A William Danker.
Q What position did you hold in the systems integration branch?

10

A It was either general engineer or nuclear engineer. I forget the specific job description.
Q And what were your duties in that position?
A To develop the technical baseline for the RW program. I use RW to indicate the Office of Radioactive Device Management.
Q And what do you mean by the term technical baseline?
A The technical requirement is part of the baseline. Develop the appropriate requirements, functional responsibilities and organizations needed to incorporate these requirements in the design of our waste management system.
Q Did that include developing technical requirements for the repository?
A We did not develop the requirements. We would just identify the requirements that the specific part of the program had to meet and we would assign them to specific organizations.
Q Can you give me an example, because I don't think I quite understand?
A For example, the transportation part of

11

the group, we would go through a 10 CFR 71 and say, okay, this part of 10 CFR 71, which are transportation requirements by the NRC, you need to incorporate in the design of our system.
Q And how long were you in this position?
A Approximately a year.
Q So, I think that brings us almost to 1990?
A Yes.
Q Is that about right? What did you do after that?
A I was assigned to, I believe, the utility interface and logistics branch.
Q And what did you do in this capacity?
A We were basically implementing the standard contract for DOE.
Q And who did you report to?
A Alan Brownstein.
Q Who else was on your -- in that branch or team?
A When I first joined it? When I left it. At what point in time?
Q When you first joined it.
A Alan was the branch chief, Mary Lee Payton, myself, and Eric Swenson.

12

Q What was Mary Lee Payton's role?
A I believe she dealt with the fee collection, fee verification issues.
Q And you mentioned Eric Swenson?
A Yes.
Q Can you spell his last name?
A S W E N S O N.
Q And what was his role?
A He did the -- he was doing the FICA reports, FICA initiative, facility interface capability assessment.
Q What were your duties in this position or in this branch?
A They were assigned to me by Mr. Brownstein as needed to support him on any contractual issues related to dealing with the utilities on the -- that were contained in this standard contract, other than what Miss Payton or Mr. Swenson were doing.
Q And how long were you working for this branch or Mr. Brownstein?
A I worked from approximately 1990 to the end of '91, early '92.
Q When you left, were there different individuals in this branch?

13

A I don't think so.
Q And what happened in 1992?
A I took a three-year leave of absence.
Q And I understand you went to Austria; is that right?
A That's correct.
Q That's a wonderful place.
Did you return to DOE then in 1995?
A Yes.
Q And what division or department of DOE did you return to?
A It was still RW. I worked for the engineering division.
Q And who did you report to?
A Jeffrey Williams.
Q And what were your duties in that position?
A We were managing the MPC, Multi Purpose Canister Program and the GA, General Thomas Cast Development Program, were the major responsibilities. There were other minor ones, but they were the two major initiatives I was involved with at that time.
Q And how long did you hold this position?

14

A Until the fall of '96.
Q And did you take on a new position?
A Yes.
Q And what was that?
A I was assigned to the waste acceptance team.
Q And who comprised that team?
A When?
Q When you joined in '96?
A That would have been Mr. Zabransky, who was the team leader, myself, William Floyd and Mary Lee Payton.
Q What were your duties on the team?
A To support Mr. Zabransky in any of the contract issues that were ongoing, other than what Mr. Floyd and Ms. Payton were doing.
Q Did Mr. Floyd have any specific responsibilities?
A Yes.
Q And what were they?
A He was our safeguards expert.
Q Safeguards?
A Yes.
Q What are safeguards?
A Safeguards for nuclear material,

15

preventing theft and diversion for parties we're not favorable to.
Q And Ms. Payton, what were her responsibilities?
A The same. Yet, she was still working on the fee verification issues, collection.
Q How long did you hold this position?
A Until now.
Q And you currently hold that position today?
A Yes.
Q Mr. Pollog, did you have any personal role in drafting the standard contract?
A No.
Q Did you have any personal role in drafting or participating in the ACRs? Are you familiar with the term ACR?
A Which ACRs?
Q Any of them.
A I believe I was involved in production of the 1991 ACRs.
Q Any other ACRs?
A I don't believe so.
Q And what did you do with regard to the 1991 ACRs?

16

A Basically, review the draft we had to received from our contractors.
Q What contractor was that?
A I believe it would have been -- I forget if it was either P&L or TRW at that time.
Q And what was your role in reviewing the document?
A Read it, made suggestions, corrections, anything that I felt was appropriate. Direct my comments to our contractor at the time, resolve my comments.
Q Do you recall whether you made any comment or raised any questions with regard to the acceptance rates in regard to the 1991 ACR?
A I don't recall.
Q You passed your comments back to the contractor? Is that what your testimony was?
A Yes.
Q Did you relay any comments to anybody else at DOE?
A I probably went over it with Mr. Brownstein. I don't recall specifically, but that would have been how I would have done things normally.
Q Did you have any role in drafting any

17

of the instructions given to purchasers of the standard contract with regard to the delivery commitment schedules?
A It would have been the same as for the '91 ACRs. I probably would have reviewed them, commented on them, given comments back to the contractor, discussed any comments with Mr. Brownstein.
Q Do you have any immediate recollection of having done that with regard to the delivery?
A No.
Q Did you have any role drafting or participating in production of the 1985 Mission Plan?
A No.
Q Did you have any role in drafting or participating in production of the 1987 Mission Plan Amendment?
A No.
Q Did you have a role in drafting or did you participate in the production of the MRS submission to Congress?
A No.
Q Did you have a role in drafting or participate in the production of the RFP that was

18

issued by DOE for transportation and waste?
A No.
Q Did you have a role in drafting or participate in the production of any of the, what I call, TSLCC documents? Are you familiar with that acronym?
A I am familiar with the acronym?
Q And did you have a role in drafting or participate in production of those documents?
A No.
Q Did you have a role in drafting any aspect of the fee adequacy reports?
A No.
Q Did you participate at all in their production?
A I believe I may have been asked to comment on one of the reports when it was going through the draft preparation stage.
Q And why would you have been asked to comment on one of the reports?
A Typically, how we work is when a document is getting ready -- prior to being produced, it will be sent to effective organizations within the RW program for comments. And I believe I was asked to comment on one of

19

them during this period prior to it being submitted for concurrence and approval.
Q Do you remember which one?
A No.
Q Do you remember the nature of your comments?
A No.
Q Probably should have done this earlier, but for the record, you're appearing here today pursuant to Notice of Deposition, and you're appearing as a representative designated by the Government with respect to certain topics; isn't that correct?
A Yes.
Q And I'm going to -- hopefully, I have with me copies of the 30(b)6 deposition notice that we provided.
Why don't you take a look at that. Hopefully, it should be the correct one.
(Discussion held off the record.)
(Whereupon, Pollog Deposition Exhibit No. 1 was marked for identification.)
BY MS. HEWITT:
Q Here is the 30(B)6 notice that the court reporter has identified now as Exhibit 1 to

20

your deposition. And I just want to confirm that that's the one the DOE provided and those are the topics that you're prepared to speak about today?
A Yes.
Q You can keep that for a second.
Back to a former question. Did you have any role in drafting any of the specifications or design requirement documents for the repository?
A I don't believe so.
Q I'm going to ask you some questions about the acceptance rates in the standard contract and then going forward, which really starts with topic number six on the list. Sort of working backwards.
Does the standard contract specify the rate at which DOE would take SNF and/HLW from utilities when it began to take spent nuclear fuel or high level waste from utilities?
A No.
Q Why was an acceptance rate not included in the standard contract?
A I don't know.
Q Was that topic raised when the standard contract was being negotiated?

21

A I don't know.
Q What was DOE's intent with regard to the rate it would take spent nuclear fuel and/or high level waste from utilities when it began to actually take it from utilities pursuant to the standard contract?
MS. SULLIVAN: Objection, vague.
BY MS. HEWITT:
Q What was DOE's intent at the time it executed the contract as to what the acceptance rate would be or how fast it would take SNF from utilities when it began to implement the program?
A Can you repeat that for me just one more time? I'm sorry.
MS. HEWITT: Why don't we have the court reporter read the question back.
Maybe I'll read it back.
BY MS. HEWITT:
Q What was DOE's intent at the time it executed the standard contract with regard to the rate of acceptance it would implement once it began the program it started taking spent nuclear fuel from utilities?
A What was DOE's intent at the time the

22

standard contract was enacted?
I don't know what their intent was at the time the standard contract was enacted.
Q Did there come a time where DOE developed some sort of plan about how fast it would take spent nuclear fuel from utilities once it implemented the program?
A DOE published many documents that included acceptance rates in them that were used for illustrative purposes only. If that's what you mean by their intent, then yes, there were documents produced after the standard contract was enacted that would contain illustrative potential acceptance rates.
Q When DOE executed the standard contract, did it have a plan with regard to how fast it would take spent nuclear fuel from utilities when it began to actually do so?
A When -- I don't know what DOE's intent was as it enacted the standard contract.
Q When DOE enacted the standard contract, was there a plan to develop an acceptance rate?
A I don't know when DOE enacted the standard contract or if it had a plan in mind to develop acceptance rates. The contract had

23

certain requirements on it to do certain actions. I don't know if it calls for them to do that, but I'd have to look at the contract to see what the exact wording is in the contract.
Q Are you familiar with the Nuclear Waste Policy Act?
A Yes.
Q What's the purpose of the Nuclear Waste Policy Act?
MS. SULLIVAN: Objection, calls for conclusions as to statutory intent.
You can answer the question, if you know.
THE WITNESS: It would take me quite a while to answer. Essentially, to set up the Office of Radioactive Waste Management and a program for dealing with spent nuclear fuel.
BY MS. HEWITT:
Q And why was a program needed to deal with spent nuclear fuel?
A Why was a program -- I'm just speculating here. What the government's and Congress', and the president's intent was in 1983. If you want to speculate on what the president and Congress' intent was, I can.

24

Q Do you have any knowledge as to what the purpose or intent was behind the Act?
MS. SULLIVAN: Same objection.
THE WITNESS: I have no personal knowledge of what Congress intended or the president intended.
BY MS. HEWITT:
Q Have you discussed possibly the purposes of the Nuclear Waste Policy Act in doing your duties, particularly in regard to implementing the standard contract?
A Yes.
Q And in that capacity, what is your knowledge of the -- what the purpose of the Nuclear Waste Policy Act is?
A Can you repeat that again for me? I'm a little confused. I'm sorry.
Q Well, I think you answered that you did have occasion to discuss the purposes of the Nuclear Waste Policy Act in performing your duties when implementing the standard contract.
A Mm-hmm.
Q In that regard my question is, what are the purposes you understood the Nuclear Waste Policy Act were in performing your duties?

25

A My best recollection is the Nuclear Waste Policy Act told the department to develop a standard contract for the utilities. And that's where the requirement for the -- for us actually having a standard contract came from.
So, it basically was a driving force or the reason why we had the standard contract.
Q Do you know when the first acceptance rate was published after the standard contract was executed?
A The first one after it was executed? I don't know which one was the first one that was published after the standard contract was executed.
Q What was the first one that you recall perhaps?
A The first one that I can recall, I believe, is a draft -- let's see. Probably would be the Mission Plan. If you --
Now, when you say standard contract, what was your term, executed?
Q Yes.
A What do you mean by that?
Q Signed by parties.
A Okay. That's a different date than

26

when it was published in the public register.
Q That's right. It was signed at various dates, but I think they all had to be signed by June, 1983, I think, around that time.
Does the difference -- does that make a difference in one of your prior answers?
A No. Prior answer? No. That's why I'm hesitating. I'm trying to keep the dates straight in my mind.
The first thing I can recall that was done after the standard contracts were actually signed by the utilities, and if that was June, approximately of 1983, the first I can remember would be a draft December, 1983 Mission Plan.
Q December, 1983.
A I believe that's the correct date.
Q Were there acceptance rates published before that time?
A By whom?
Q By DOE?
A I believe so.
Q In what kind of document, do you recall?
A I think there is one -- the report on financing for disposing of commercial spent full,

27

processed high level waste, high radioactive waste.
Q Do you recall whether there was an acceptance rate published before this particular document in 1983 by DOE?
A I don't recall.
Q Were there acceptance rates published in documents produced by contractors for DOE?
A I know of no specific ones.
Q I'm going to give you a copy of the standard contract, Mr. Pollog. Actually, this is my copy.
MS. SULLIVAN: Are you making this an exhibit?
MS. HEWITT: I'm going to wait and see. Probably not, but let him use it if he wants.
MS. SULLIVAN: Are you going to ask him questions about it?
MS. HEWITT: Yes.
MS. SULLIVAN: Can we mark it then so --
MS. HEWITT: Sure.
(Whereupon, Pollog Deposition Exhibit No. 2 was marked for identification.)
BY MS. HEWITT:

28

BY MS. HEWITT:
Q Further down in Article 5, there's a section addressing delivery commitment schedules. Are you familiar with that term?
A Yes.
Q What is a delivery commitment schedule?
A That is Appendix C to the standard contract.
Q And can you describe it?
A I can read it for you if you like.
Q Can you describe in your own words what it is?
A Let me look at it first.
Q Certainly.
A Delivery commitment schedule is a commitment on both the purchasers' and DOE's, when they're both signed, part to commit parties to delivering a range of spent fuel in a year from a specific site.
Q When did the delivery commitment schedules have to be submitted to DOE by the purchasers?
A That would depend upon where their allocation is.
Q How would that influence when they

33

needed to submit their delivery commitment schedules?
A Because the delivery commitment schedules are to be submitted 63 months prior to the year of delivery.
Q Why 63 months?
A I don't know.
Q And when you made reference to the term, year of delivery, are you referring to a calendar year of delivery?
A Yes. Not specifically any, you know, year, but a 12-month period corresponds to something from January to December. Not specifically any specific year, but a 12-month period.
Q Let me ask you the question then. They would have to know what the calendar year is in order to be able to back out 63 months, right? It would have to be, for example, year 2000?
A Yes.
Q It would have to be a calendar, a number of years?
A Yes.
Q Because you're aware, obviously, that DOE had at one point published ACRs in calendar

34

years which were not used?
A Yes.
Q Once a delivery commitment schedule was submitted to DOE, what was DOE's role in reviewing them?
A They would be reviewed to see if they had the proper information on them.
Q What do you mean by proper information?
A They identified a location that the purchaser actually owned or had a site at; if the amount of fuel identified in that schedule, the MTU's would correspond to an actual allocation they had. If it was the right type of fuel, for example, BWR or PWR fuel they owned.
Q Anything else?
A Nothing that comes to mind.
Q When you answered that it had to correspond to an allocation that they had, what are you referring to?
A The amount of fuel in the DCS that they were submitting it for had to correspond to an allocation in the ACR. Not just the '88 ACR, but the '91 ACR.
Q Did that requirement come from the contract, the standard contract?

35

MS. SULLIVAN: Objection, vague.
BY MS. HEWITT:
Q Did the requirements that the DCS correspond to an allocation in the ACR come from the standard contract?
A I'd have to read through the standard contract and see.
Q Why don't you take a look at the standard contract.
A I believe so.
Q And what in the standard contract makes you say so?
A Well, the standard contract sets up a process for both parties to follow. And if you follow through the process, the only thing we can use to really compare if the allocation is correct is the process sets up the requirements for us to compare if the allocation is correct from what they submit and what the ACR says.
Q I'm not sure that's responsive to my earlier question. Does the standard contract require offerors to deliver commitment schedules based on the allocations identified in the ACR?
A Okay. Now, I think what you said now may be a little different. I interpret it

36

1987.
Q Right, okay. But that's not under the delivery commitment schedule process?
A True.
Q Okay. I guess we'll have to go over this testimony a little bit. You said in delivery commitment schedules, the purchasers would include proper information, which included identified location of the fuels and corresponding to the allocations in the ACR?
A Yes.
Q And you mentioned the right kind of fuel?
A Yes.
Q And you said PWR versus?
A BWR.
Q And that is boiled water reactor versus?
A Pressurized water reactor versus boiling water --
Q And did they also have to include the quantity of fuel they're going to deliver?
A I believe so.
Let's look at the -- they would identify the metric tons of uranium initial and

41

number of assemblies.
Q Why did DOE need this information?
A We would use that information to try and develop a transportation program.
Q And when you said transportation program, what are you referring to specifically?
A A group of hardware essentially; casks, whatever associated with equipment, yokes, lifting equipment, transporters, receipt facilities to transport spent fuel from purchasers to a DOE facility. Whatever is included with that regarding hardware; and also, planning systems.
Q What do you mean by planning systems?
A Well, you have X amount of casks and you try and maximize your fleet. So you don't want to have ten purchasers needing the same cask at the same day. So you prefer to have, you know, the minimum number of casks as possible, so you try to plan most efficiently to use your system.
Q Now, did DOE have the ability to reject DCSs that were submitted by purchasers?
A Yes.
Q And on what basis could they reject

42

them?
A If they believed there's information that was incorrect on them.
Q And how would they determine that?
A Oh, you would compare the allocation that the utilities put down on their DCS to see if it was correct in comparison with what was in the ACR, '91 ACR.
We could see if they put down a facility that they didn't own. If they put down a pressurized water fuel and this utility only owned boiling water reactor fuel.
If they put down a range of discharge dates that don't correspond to any fuel they have range of discharge dates within.
Q What happened after DOE rejected a delivery commitment schedule submitted by a purchaser?
A They would return it to the purchaser.
Q And what is the purchaser supposed to do at that point?
A Re-submit the DCS.
Q With what -- why would they have to re-submit the DCS?
A If they wanted to have it approved,

43

they would have to re-submit it.
Q Was there a point in time in which the DOE and the purchaser would negotiate mutually acceptable delivery commitment schedules?
A Yes.
Q And what time would that occur?
A Let me read the process here to refresh my memory.
That would come after, providing there was a second disapproval.
Q And what would the negotiations entail? How would that work?
A The parties would come together and try and sit down and discuss the issues and reach an agreement.
Q And if they couldn't reach an agreement, what would happen?
A Speculative. I don't know of any case of that happening.
Q I'm going to hand you a copy of the DCS instructions that were distributed by DOE to offerors. We'll make this Exhibit 3 to the deposition.
(Whereupon, Pollog Deposition Exhibit No. 3 was marked for identification.)

44

BY MS. HEWITT:
Q Have you ever seen this document before, Mr. Pollog?
A Yes.
Q Did you have any role in drafting the document?
A Can you explain for me by drafting, you mean actual writing? You mean any part in the eventual development?
Q Why don't we say the latter.
A Yes.
Q What was your role in the development of this document?
A I believe I've seen draft versions submitted by DOE to contractors and provided comments.
Q Do you remember what kind of comments you provided?
A No.
Q Was this document distributed to purchasers in preparation for them submitting their DCSs?
A Yes.
Q And it was distributed by DOE, correct?
A Yes.



Q If you'd take a look at page two, background information, in particular paragraph 7C.
A Did you say 7C?
Q Yes. The paragraph starts, annual acceptance rate since the ACR --
A Mm-hmm.
Q There's reference there to FWMS, that acronym.
A Federal Waste Management System.
Q And what does that refer to?
A That is the entire waste management system; the transportation, any storage system that would be part of the system and their repository.
Q What does the term, acceptance capacity mean in that sentence?
A That would be the capacity or the amount of spent fuel that would flow through the system in any given year.
Q Does the term capacity mean the physical limitations of the system to take spent nuclear fuel?
A Can you explain that for me a little better?



Q I don't think I can explain it any better than that. I mean, what's your confusion?
A You mean maximum physical limitations?
Q Yes, I mean capacity.
A Yes, I would say, yes.
Q The outermost ability to, you know, handle something. So, yes, the maximum limitations.
A Yes.
Q Okay. It was a physical constraint is what I'm trying to determine.
A I would say so.
Q Yes. The second sentence in that paragraph says, The process described herein, and I take by that it means the DCS process, assumes that the FWMS system will be able to accept the SNF beginning in 1998.
Why is that assumption important to these instructions?
A Because the contract requires the purchasers to start submitting DCS forms 63 months prior to delivery year. And you needed to know what your delivery year is. You just subtract 63 months prior to your delivery year so you had to know when the process started.



Q And if the process did not begin in 1998, what would be the significance then of the DCS process?
A The significance? I think it would be -- the significance is the same either way, if it starts in '98 or not.
Q Well, this sentence indicates that this process, the DCS process, depends on it starting in 1998?
A Yes.
Q What would happen if delivery or acceptance of spent nuclear fuel did not happen in 1998? What would happen to the process?
A Process, I'm going say, just for the sake -- assume later than that, the DCS process would start later than that.
Q What if there's no date given for when it would start?
A Let me read the contract.
Theoretically it could start --
Q What could start?
A The DCS process.
Q Even if there was no date for when DOE would come to actually take spent nuclear fuel?
A Yes.

Q How would that be?
A Purchaser has a right to start filling out DCSs in 1992.
Q Even if they don't get a date for allocation?
A If they want to submit a DCS, they could have done that. We would have disapproved it most likely, but --
Q So that process would have more than likely been futile?
A Yes. Or DCSs may have needed to be re-evaluated at a later time.
Q Yes. I note that your counsel pointed that paragraph out to you, that sentence.
What does that mean, they would be re-evaluated by DOE?
A If they had submitted them and they were correct, we could have went from where they were. I mean, started with that as a DCS, that is correct. It would not have needed to be modified.
If it's something that would be incorrect on it, then we would have to -- we could not start at that point in time.
Q Incorrect. That means if DOE changed

49

its mind as to when it would actually come and get the fuel, then those DCSs would be modified?
A Yes.
Q So if a DCS was approved by DOE, that didn't mean it was binding on DOE?
A We thought it was our -- it was binding.
Q Why would it be binding?
A We signed a delivery commitment schedule to provide such a service in such a year. Purchaser signed a DCS to offer certain fuel in a certain year, and we signed that we would provide a service to pick up that fuel in that year. Signed by the contracting officer for the department.
Q But if DOE decided to change the year in which it would come and get the fuel, it could go back and re-evaluate the DCSs; isn't that right?
A Yes.
Q So therefore, it wasn't a final binding statement?
A We believe it was our binding responsibility.
Q Notwithstanding the fact that you could

50

go back and change it afterwards?
A Yes.
Q Could you in a final delivery schedule change the location of where you would deliver your fuel from to DOE?
MS. SULLIVAN: Objection, vague.
BY MS. HEWITT:
Q Are you familiar with the term final delivery schedule?
A Yes.
Q And what is a final delivery schedule?
A That is appendix --
Let me see what the contract says. Appendix D to the standard contract.
Q And what's the purpose of the final delivery schedule?
A It was where the purchasers would designate a specific time frame 12 months prior to actual date of delivery.
Q In the final delivery schedule, did you have to reflect the same location from where the spent nuclear fuel would be delivered to the DOE, as you specified in your delivery commitment schedule?
MS. SULLIVAN: Objection, vague.

51

MS. HEWITT: Did you understand the question?
THE WITNESS: Yes.
We never developed instructions for submitting DCSs, so that's speculative at this time.
BY MS. HEWITT:
Q I'm talking about final delivery schedule, not DCSs?
A I understand the question.
MS. SULLIVAN: I believe you misspoke. You said DCSs.
THE WITNESS: I'm sorry. We never developed instructions or any review criteria for an FDS, so any response would be speculative.
BY MS. HEWITT:
Q Did the standard contract contemplate that the final delivery schedules would take precedence over delivery schedules?
MS. SULLIVAN: Objection, calls for legal conclusion.
You can answer, if you know.
THE WITNESS: I have to read through the final delivery schedule provision of the contract.

52

MS. HEWITT: I would have hoped you would have done that in preparation of this deposition, Mr. Pollog.
MS. SULLIVAN: You asked him for a legal conclusion. He can answer it if he knows.
THE WITNESS: I don't see any language in the standard contract that says FDS should take precedence over DCS.
BY MS. HEWITT:
Q How did DOE interpret that section of the contract regarding final delivery schedules?
MS. SULLIVAN: Same objection.
You can answer, if you know.
MS. HEWITT: That's not a legal conclusion. It's a question of fact.
MS. SULLIVAN: You're asking him how they interpret it. Interpretation is a legal conclusion.
BY MS. HEWITT:
Q How did they actually view this provision?
It's not a legal conclusion. The Court determines a legal conclusion. How it actually acted in accordance with the contract document is fact.

53

MS. SULLIVAN: If you want to know what DOE interprets to be the purpose of the final delivery commitment schedule, that's within the scope of the deposition and he is prepared to answer.
MS. HEWITT: Well, that's the question I just asked him.
MS. SULLIVAN: No, it's not. You asked how they interpret the standard contract.
BY MS. HEWITT:
Q What was DOE's view of the final delivery commitment schedule?
A It was to provide us with the location, type of cask required, number of assemblies per cask, shipping log, metric tons uranium, discharge dates, and purchaser's first estimate of delivery.
Q Did DOE consider whether or not utilities could change the locations or types of fuel they would submit in the final delivery schedules?
A Not to my knowledge.
Q Why did they never consider these issues?
A We didn't approve -- we didn't process

54

any -- we had not processed any final delivery schedules.
Q Did DOE discuss at any time how they would consider final delivery schedules or final delivery schedules?
A Not to my knowledge.
Q Is it your testimony that DOE never discussed the criteria for approving or disapproving final delivery schedules?
A It's my testimony that I know of no such discussions.
Q What would be the difference between a final delivery schedule and delivery commitment schedule?
A Very little. The only real difference is purchasers' delivery first -- delivery first estimate as opposed to a delivery year.
Q What's the difference. I don't understand the difference.
A In the DCS they identified a delivery year. You know, 1999, 2000, 2003. In the FDS, they actually specify a range of dates that they want us to come between; May 1st, 1999 to May 15th, 1999.
Q And do you know whether DOE could

55

reject those dates?
A No, I don't know if we could.
Q And you don't know whether or not purchasers could request a different fuel be delivered in an allocation of their final delivery schedule?
A No, I do not.
Q And you don't know whether or not purchasers could designate a different location from where that fuel would be delivered?
A No, I don't.
Q And you don't know whether or not the quantity could be different in the final delivery schedule than what was in the delivery commitment schedule?
A No, I do not.
Q So, is it your testimony that the only difference between the final delivery schedule and the delivery commitment schedule in the standard contract was the dates for delivery of spent nuclear fuel?
A The only difference that I see in Appendixes C and D of the standard contract are that --
Q And you don't have any knowledge about

56

Q But it was your testimony that DOE couldn't change its commitment as expressed in the delivery commitment schedule?
A Yes.
Q We noted on the instruction though that if the year in which DOE would begin the program or begin taking spent nuclear fuel changed, the instructions at least appeared to allow DOE to change the year it would come and get the fuel designated in the delivery commitment schedule; is that right?
A Well, I think it says, In the event that such circumstances change, all DCSs approved by DOE may need to be re-evaluated by DOE and the purchasers.
We would re-evaluate them. That's what we stated we could do.
Q And does that give DOE the opportunity to change the date at which it would come take the spent nuclear fuel from utilities?
A I don't think that's ever been evaluated.
Q You don't think what has ever been evaluated?
A If we evaluated, we could change the

61

date based upon the statement that's here.
Q Is it your testimony that DOE would never consider changing the date?
A My testimony is, I don't know that it's ever been evaluated whether we could change the date in the delivery commitment schedule consistent with the statement here.
Q I'm asking you what DOE's view is, whether they could change the commitment schedule?
A I don't know. I mean, I have not thought about that question before, if we could.
Q You don't know the answer?
A No, I've never thought of that question before. I know of no discussion concerning that.
Q But you don't have an answer as to what DOE's position is in that regard?
A I don't.
Q Why would they re-evaluate them if they weren't going to consider to change the date?
A Can you say it again slower this time?
Q Why would DOE re-evaluate, as they indicated they might do in this instruction, if they weren't going to change something about the delivery commitment schedule, presumably the

62

date?
A There were other things we might seek from purchasers.
Q Such as?
A There were other things on the DCSs, like whether they would ship by truck, rail or barge. I mean, there were certain things that we might find beneficial for the system, such as doing more rail shipment as opposed to more truck shipment.
Q And is it your testimony that DOE would seek to change that term or requirement in the DCS?
A I wouldn't say we would seek to change it. We would seek to negotiate it with the utility or purchaser if we had a wish for something that would be beneficial for the system.
Q But how would that relate to changing the dates from 1998 to some time later?
A I don't think it would relate to that.
Q And of course, what the sentence says is if the circumstances change with regard to 1998, then they would re-evaluate. So it suggests the re-evaluation would be based on

63

changing the date, not on other circumstances.
A Okay. Is that a question?
Q Yes. My question is, you said they would re-evaluate them based on these other issues. But that sentence talks about re-evaluation with regards to the date, which you previously said doesn't relate to these other issues you mentioned.
A Okay. So is there a question there?
Q So, my question is, the re-evaluation that's referenced in this instruction would be based on the changing of the dates, not on transportation issues as you identified?
A Is that a question?
Q Yes, that is a question.
A What's the question?
Q Can you repeat the question?
(Whereupon, the question was read by the court reporter as requested.)
THE WITNESS: Yes.
BY MS. HEWITT:
Q The DCSs were a reflection of allocations awarded purchasers in the ACRs; is that correct?
A I wouldn't use awarded.

64

deponent.
MS. HEWITT: Well, I think this comes within the DCS process.
MS. SULLIVAN: Topic 3, DOE's responses to DCS form submitted by utility plaintiffs, including DOE's decision to stop approving such DCS forms.
I read that question as being within Topic 3 and Mr. Pollog is not prepared to answer that question today. It will be answered by another deponent.
BY MS. HEWITT:
Q Do you have any personal knowledge about disapproval of the DCS process? For DCSs submitted by offerors, by purchasers?
A I know we stopped submitting them.
Q Why did DOE stop submitting them?
MS. SULLIVAN: Objection. That's another Rule 30(b)6 witness --
MS. HEWITT: I can ask about his personal knowledge.
MS. SULLIVAN: It's beyond the scope of the Rule 30(b)6 deposition.
MS. HEWITT: I don't think it is, and I think I can ask about his personal knowledge.



He's here and you can ask a 30(B)6 witness about their personal knowledge on topics that are relavant to the 30(B)6 topics. This is a DCS process.
MS. SULLIVAN: We need to stop. I need to call Harv and see if we're going to let this continue.
MS. HEWITT: Okay.
(Brief recess.)
MS. SULLIVAN: We will allow this line of questioning to proceed, but with the objection that this is beyond the topics Mr. Pollog is prepared to discuss and he's answering only as to his personal knowledge.
BY MS. HEWITT:
Q Okay. Mr. Pollog, I believe you testified that you -- that DOE stopped approving or disapproving DCSs submitted by purchasers. And I had asked you -- the question pending was, why?
A Why did we stop approving DCSs?
Q Yes.
A We did it on instructions from the Department of Energy's general counsel.
Q Did you discuss the substance of this



answer with your counsel after you left this room?
A No.
Q And you don't know why the -- those instructions were given?
A No, I do not.
Q Okay. I'm going to ask you some questions now after the APRs and ACRs that were issued by DOE. But first I want to take a look at the 1987 ACR. I'm going to ask questions about all these documents.
Do you want them all to be exhibits? I think we'll be on Exhibit Number 4.
(Whereupon, Pollog Deposition Exhibit No. 4 was marked for identification.)
BY MS. HEWITT:
Q Are you familiar with this document?
A Yes.
Q Did you participate in any way in the production of this document by DOE?
A No.
Q I'd like to turn your attention to the Table 2.1 on page seven of this exhibit. And in particular, with regard to the system receipt rate that's used in that table. Do you see that



term?
A Yes.
Q What does the term, system receipt rate mean?
A In general? You're asking what the term system receipt rate means or as applies to this document?
Q As it applies to this document?
A As applies to this document is an approximation of how -- I'll use the term we used earlier, FWMS, Federal Waste Management System, may operate. Recognizing there are uncertainties that would allow -- may not be the one that's actually used.
Q Is there a difference between a receipt rate and acceptance rate?
A I don't believe so.
Q And does the receipt rate here reflect the maximum physical capacity of the system?
A It would reflect potentially a system capacity, design capacity that would be operating at its maximum.
Q And as the term receipt rate is used in this document, your testimony is that it refers to the system, including transportation and the

repository or the final facility in which SNF would be in place?
A I would say the entire system; the transportation, potentially storage. That's what we're looking at here, because we're looking at MRS activities at that time and potentially, repository, but the full system and not any one aspect of it.
Q How were these figures developed? And by figures, I refer to the 1200 and 2000, 2650 figures on the right hand side of Table 2.1.
A They were taken from the 1987 Mission Plan.
Q Okay. Can I ask what you're referring to?
A I'm referring to several pages of notes in my possession.
Q And what are those notes from?
A In preparation for this deposition, I reviewed documents listed in item one. I can state them, if you want or just --
Q No, I'm familiar with item one.
A And I made several notes on those documents.
Q Okay. We'd like to get a copy of those

73

notes, please.
A Sure, sure.
Q But I don't need them right now.
A Okay.
Q And why were they extracted from the Mission Plan? Did you say Mission Plan or Mission Plan Amendment?
A I said 1987 Mission Plan, but I meant Mission Plan Amendment.
Q I wanted to clarify that. Why were they taken from that document?
A When ACRs are put together, they were generally never meant to be lead for system return receipt rates. We always took receipt rates from other published documents that were --
The DOE hopes and goals were included in the 1987 Mission Plan, and we took it from there and placed into the ACR. Excuse me, the 1987 ACR.
Q And how were the numbers developed in the 1987 Mission Plan Amendment?
A Well, they were just to show an illustrative schedule as consistent with contract requirement for after commencement of facility operations not later than January 31st, 1998.

74

And they reflect DOE's current plans for development of an improved performance waste management system.
MS. HEWITT: Let the record reflect the witness is reading from his notes.
BY MS. HEWITT:
Q And those notes were taken from what document?
A The 1987 Mission Plan Amendment.
Q Why were those numbers chosen?
A I believe for several reasons. This is based upon the improved performance waste management system, which is a system including acceptance at an MRS.
And I believe it's still incorporated with two repositories at that time. We were looking at 140,000 MTUs of spent fuel to be generated for the history of nuclear power. The total amount of generation was anticipated to be approximately 140,000 MTUs.
Q What time period is that over?
A Forever.
Q Forever? How can you know there's going to be 140,000?
A The DOE Office of Energy Information

75

Administration makes projections about this.
Q Okay.
A There were two repositories to be developed at this time. So the decision was to basically -- 70,000 metric tons of uranium in each repository.
So we looked at basically a 20, 25 year lifetime for equipment; casks, hardware needed to operate at these facilities. And we took 70,000 and divided it by 20, 25 years to come up with approximately 3,000. That's for the steady state rate of the 2650.
The 2650 comes from -- it comes to 3,000, but at this instance we're looking at an MRS. The MRS at this time was anticipated --
We were looking at a site in Tennessee that would be an eastern MRS. So the Eastern sites would be shipping to an MRS. The western sites would be shipping straight from the reactor to repository.
If you look in the mix in the generation rates of where reactors are and how they would come in, approximately 2650 would be mostly the eastern --
Where the reactors are, how the fuel is

76

characterizing in Nevada.
Q And the other legal constraints that you were referring to in your earlier answer?
A At this point in time, I don't think there were any other legal constraints.
Q What about financial constraints?
A Budget, what budget we could get from Congress, and what the cost of the program would be.
Q In coming up with these acceptance rates included in the Mission Plan Amendment and also in Table 2.1, did DOE consider the storage capabilities or capacities that purchasers had on site for spent nuclear fuel?
A Yes.
Q And how did they take that consideration into account?
A DOE in its entirety -- I'm not sure if this was done by RW or Energy Information Administration -- projected the annual discharge rate at reactors in aggregate.
And they also knew what the in-pool storage capacity was for those reactors. And we were able to determine how much SNF in excess of that would be needed; how much excess storage

93

would be needed in an approximate, very approximate manner.
Q Do you know where the information regarding projected annual discharge rate of utilities was collected or reflected?
A Yes.
Q What document or what study or --
A The collection, I believe, would have been done through what we've referred to in DOE as the RWA 59 Form. I believe the official title, I'm not positive about this, is the Nuclear Fuel Data Form. I could be wrong, but it's something like that.
Q And were there any other documents published or produced by DOE or a DOE contractor that took that information and catalogued it or otherwise produced it in another fashion?
A There was at certain times in the program.
Q What was the title of that document or what were those documents?
A I don't recall the exact title. There was a spent fuel storage requirements document.
Q And who published that, do you recall?
A I believe EIA did publish one, although

94

there may have been more, but I think EIA published one. I'm not sure if that was the title of theirs.
Q And were there separate documents published or produced reflecting in-pool storage capacity or was that also in these documents that you talked about earlier?
A I believe it was in separate document.
Q And what document or documents would reflect in-pool storage?
A I believe it would be the in-pool spent fuel storage document. There was one document. I'm not sure. May have been a second one. I don't recall. One was entitled -- at least one was called spent fuel storage requirements.
Q Okay. From these documents I think you testified that DOE could determine the excess storage that was needed for SNF by utilities; is that right?
A I would say DOE was able to approximate how much out of pool -- what the excess would have been.
Q And so --
A Excess of what a utility could store in their pool.

95

Q And so how was that information used by DOE?
A It had various uses, I would guess, over periods of time. When?
Q How was it used, for example, in regards to developing an acceptance rate?
A There were points in time that one of the goals of the program was to develop a system where the acceptance rates would account -- would alleviate the purchasers' need to have storage outside of their pools.
Q And what point in time was this the goal of the program?
A I believe in the mid-eighties.
Q Mid-eighties?
A Yeah.
Q Was there a different goal before the mid-eighties?
A I don't know.
Q Was this DOE's goal when it signed the standard contract?
A I don't know.
Q Was there a different goal after the mid-eighties?
A I would say so, yes.

96

Q And what was that goal after the mid-eighties?
A Well, essentially, what happened was these acceptance rates that were generated in mid-eighties were based on several goals.
One was to alleviate the need for excessive storage capacity for utilities. Also, we looked at the, as I described earlier, the 70,000 metric tons at a reactor and divided it by what we thought was the anticipated lifetime of the facility and come up with the 3,000. They were fairly approximate for a while.
After the mid-eighties, these 3,000 MTU rates sort of became our design objectives. So I'm not saying our goal changed per se, but we didn't reflect it as a goal of the program anymore.
Q Was there a new goal for the program?
A Regarding?
Q The acceptance rate.
A Eventually, there was, yes.
Q What was that goal?
A Well, that would have been we had new constraints put on us regarding the Nuclear Waste Policy Amendments Act. I will refer to it as the



NWPAA for future discussion, if that's okay.
Q And how did that affect, I guess, goal of the acceptance rates?
A Eventually, it would reduce it significantly.
Q Is there a -- is it your testimony that although the acceptance rates were reduced that the 3,000 MTU remained the design objective?
A Yes.
Q I thought that's what I heard you say. And when you refer to design objective, are you talking about design of the repository?
A Design of the full system.
Q And the 3,000 MTU on an annual basis remained the design objective for the full system because it reflected the two goals that you talked about earlier; the goal of the 70,000 divided by 20 or 25 years ameliorating the need for on-site storage by utilities.
A Can you repeat that again? I want to make sure I heard what you said.
Q It was a long sentence, but I'll try to get it exactly right.
You mentioned that the design objective for the fuel system remained 3,000 MTU on an



annual basis. And my question was, did it remain the design objective for the full system because of the goals that were articulated earlier as the basis for the 3,000 MTU?
A I don't know why it remained.
Q With regard to the acceptance rates that are included in Table 2.1, did these acceptance rates reflect the goal, the goals you articulated earlier; one of which was trying to ameliorate the need for additional storage on site for bigger utilities?
A Yes.
Q And how exactly did the acceptance rates address that?
A It was -- if you looked at what the anticipated generation rate was and the excess storage needs that there would be, it was thought to essentially approximate each other. They weren't exact, but they were in the approximate.
Q Okay. You used two terms here, the excess needs and then the generation?
A Yeah.
Q I'm sorry. What does that term mean?
A Generation would be the amount of spent fuel generated. I'll use rate in a given year, X



MTUs of spent fuel generated in any year.
Q And that combined with the excess need is the other term you used?
A Right.
Q And the excess needs, could you define that as you used the term?
A Needs would be in -- when a utility's spent nuclear fuel pool filled up and they needed to start going to additional storage measures outside of traditional spent fuel storage in the pool.
Q So it's your testimony that those needs, plus the generation rate on an annual basis, came up with a rate that approximated these rates included in Table 2.1?
A Yes.
Q Would that be the case for every year or just the latter years or?
A The latter years.
Q Do you know what the excess needs, plus the generation rate figure is, approximately?
A Not off the top of my head.
Q I don't know it either. How would one figure that out?
A We had, as I said, spent fuel storage

requirements that were being generated throughout the history of the program and they were included in those documents.

Q But you would try to take those two figures, add those up and come up with an approximate rate per year; is that right? Is that how you would do it?

A Yes, yes.

Q And is it your testimony that you believe or do you believe that it approximated the latter years, the 2650?

A In a general range, yes.

Q In the general range, okay.

Do you know whether or not in order to alleviate concerns with additional storage capacity by purchasers, whether they would have to exchange delivery commitment schedules under this acceptance rate, the 2650, in order to make sure every purchaser's storage needs were met? Do you understand my question?

A Oh, I understand it.

Q It was complicated, but I thought I made it pretty specific.

A No, I understand what you're saying.

I believe there was some consideration

101

given towards that.

Q And do you know whether or not that -- whether or not exchanges would have had to occur in order to satisfy each purchaser's storage needs under this acceptance rate, 2650?

A I believe so.

MS. HEWITT: I think this might be a good time to break, if that's okay with you guys.

(Whereupon, at 12:20 p.m. a recess was taken, and the proceedings resumed at 1:20 p.m.)

AFTERNOON SESSION

BY MS. HEWITT:

Q Good afternoon, Mr. Pollog. We'll continue and move hopefully quickly through the rest of this deposition.

I'm going to go back and take a more chronological approach because it appears a lot of these are building blocks for one another.

I'm going to ask you first about the -- what's been titled, Proceedings of the 1983 Civilian Radioactive Waste Management Meeting, dated December, 1983.

And in particular, I'm going to give you an excerpt from the written documents related to that meeting.

102

And in particular, this excerpt is entitled, Program Fuel Review, by Robert Morgan, who was then the acting director of Civilian Radioactive Waste Management. And we'll mark this Exhibit Number 5.

(Whereupon, Pollog Deposition Exhibit No. 5 was marked for identification.)

BY MS. HEWITT:

Q Take a look at that document. Are you familiar with this document? Have you had occasion to look at it before, Mr. Pollog?

A Yes.

Q And as you can see, there is obviously a section here that's highlighted. Unfortunately, it's the only copy we had last night when I was trying to prepare for this deposition.

If you want to just review that paragraph, it talks about, quote unquote, basic strategy in which -- we, we on behalf of Mr. Morgan and I imagine he means the DOE, has outlined an admission plan.

Would you take a look at that and I'll ask you about that paragraph?

A Yes.

103

MS. POWELL: That's on page 11, right?

MS. HEWITT: Yes, page 11.

BY MS. HEWITT:

Q Have you had chance to look that over?

A Yes.

Q There's a reference in this paragraph to a Mission Plan?

A Yes.

Q What's the Mission Plan that's being referred to in that paragraph?

A I don't know which specific one he's referring to since I don't see a date on the paper.

Q Was there a Mission Plan issued around this time, 1983?

A The earliest known Mission Plan that I am familiar with is a draft Mission Plan that is dated, I believe, December. I believe it was the 20th, but I'm not positive that's the exact date, December, 1983.

Q Do you know whether or not the Mission Plan he's referring to here is referring to that draft Mission Plan?

A No, I do not.

Q The strategy that is described herein

104

talks about utilities not having to supply any additional storage facilities on site. Was that DOE's strategy or goal of the program at this time?
A I believe that was an objective of the program.
Q Do you know whether that was an objective of the program at the time the Nuclear Waste Policy Act was enacted?
A I do not know what the objective of the program was when the Nuclear Waste Policy Act was enacted.
Q And do you know whether or not this was the same objective of the program at the time the standard contracts were executed?
A I don't know what the objective of the program was at the time the standard contracts were enacted.
Q Now, the first element of this goal as mentioned in that paragraph is that they -- that DOE should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location. Do you see that?
A Yes.

105

Q And how would DOE determine what that rate would be?
A I would guess that they would again use the 859 data, which I believe was being collected at that point in time and look at what the generation of spent fuel was, the projections based on what was also in the 859 dated, and the EIA projections for nuclear energy, electricity generated from nuclear power plants for the future.
Q And the next paragraph it says that the -- it says, actually, that the rate of acceptance of fuel -- I think it's supposed to read, rate of acceptance of fuel would be the rate of discharge of reactors in action at that time.
Is that rate going to be different than the rate made reference to in the prior sentence? I'm just trying to understand all the different rates.
A I'm not sure of the exact rate, what was expected in 1983, if that was the time frame this document was published. But I would suspect, yes, it probably is the same.
Q Let me ask the question again, because I don't think that's right, but maybe I'm wrong.

106

The rate that is sufficient to make sure that utilities don't have to add further storage facilities, is that rate the same thing as a discharge rate?
A No.
Q Okay. That's what I thought. Now, what is the difference between the two?
A Okay. Discharge rate is just what is removed from all of reactors on a yearly basis.
Q And the other rate, there's not a nice little term for it, but the rate that would insure that no utility would have to add any further storage facilities, how is that rate determined?
A You would look at what the on-site storage capacity in-pool is of each reactor. You would see what the -- how much fuel is in storage in that reactor. You would take what's discharged from that reactor. And then you would see if there is -- if it can still fit in the pool. Then it would be zero for that facility.
If the pool is full, then excess of fuel capacity would have to go in some other type of storage.
Eventually, they may equal if all pools

107

were ever filled. Everything that would be discharged would have to go into dry storage.
Q I understand. Thanks. Makes it a little clearer for me.
The reference there is made to further storage facilities either on-site or at another location. What was in DOE's mind in terms of what types of further storage or sometimes you see the term additional storage capability. What were they thinking in terms of what other storage facilities would be available to utilities?
A You're referring to the last sentence of the paragraph that's highlighted.
Q Yes.
A No utility would have to add further storage facilities either on-site or at another location?
Q Yes.
A I guess that would mean that some utilities have -- a utility may have more than one reactor, so they may want to ship from one reactor to another reactor.
Q And would that be considered further storage?
A Could be.

108

Q What about re-racking? Are you familiar with that term?
A Yes.
Q Is re-racking additional storage or further storage as contemplated herein?
A I would not consider it.
Q What did DOE consider it?
A I would say DOE would not consider that additional storage at another location. I would not consider it, nor would DOE consider it storage at another location.
Q What about further storage on-site?
A I would think it's also not included, further storage on-site.
Q Do you know whether DOE ever considered this aspect of what was considered further storage or additional storage?
A I'm not sure what you mean DOE considered.
Q I mean, did DOE ever state this, define further storage or additional storage?
MS. POWELL: I'll object to beyond the scope, but if you know the answer.
THE WITNESS: I don't know if they ever officially examined what was meant by the last

109

part of the last sentence in this paper, further storage locations either on-site or at another location.
BY MS. HEWITT:
Q And it says in almost the very last sentence on that page 11 that DOE anticipated by the year 2000 or 2001 that they would be accepting fuel in an amount equal to the discharge rate; is that right?
A Yes.
Q And so is it fair to say that they anticipated, DOE anticipated that they would ramp-up to a rate equal that would the discharge rate within a few years, 1998 to 2001, being three years?
A Yes.
Q Okay. Do you know how long Robert Morgan held this position?
A Approximately.
Q How long?
A I believe one year.
Q One year. And during his tenure, was there a actual director of the Civilian Radioactive Waste Management Program?
MS. POWELL: Object again to being

110

beyond the scope.
If you know the answer.
THE WITNESS: I'm not sure what you're asking.
BY MS. HEWITT:
Q Well, at the top of this document, it says that he was acting director of Civilian Radioactive Waste Management. I was wondering whether there was a director, I guess.
I guess there wasn't a director if he was acting director at that time, but was there a director before him?
A He was acting director at that time, so there was no director at the same time he was acting director.
Q Okay.
A Prior to his taking that position, there -- he was there at the origin of the program and there was no Office of Civilian Radioactive Waste Management prior to the Nuclear Waste Policy Act. And it took a period of time to actually be an Office of Civilian Radioactive Waste Management.
Q Okay. Why don't we take a look at the report on financing of spent nuclear fuel and

111

high level waste disposal.
We'll mark this as Exhibit 6.
(Whereupon, Pollog Deposition Exhibit No. 6 was marked for identification.)
BY MS. HEWITT:
Q Are you familiar with this document, Mr. Pollog?
A Yes.
Q What was the purpose of this document?
A I believe it was an analysis determining how to finance the Office of Radioactive Waste Management.
Q And did the acceptance rate as we used the term during the deposition, did that factor into the analysis?
A I believe so.
Q I think if you'd take a look at Table 3.1, it talks about key reference case assumptions. You see that table?
A Yes, I do.
Q You see number three which talks about the repository design receipts rates?
A Yes, I do.
Q Okay. Following Table 3.1 there's Table 3.2, which is entitled Nuclear Electric

112

Forecast and then Table 3.3, which is the reference case material flows. See those two tables?
A Yes, I do.
Q Can you explain to me how these all work together? I think you've addressed some of these figures before and I'm hoping they'll all come together now.
A The three tables?
Q Yeah, 3.1, 3.2 and 3.3. I believe they are related, but you can tell me if they're not. In particular, I'm referring to the design receipt rates.
A You're referring to the design receipt rates on Table 1, Number 3.
Q Table 3-1.
A Table 3-1.
Q Right.
A Number three.
Q Yes, I'm sorry.
Let me ask you a preliminary question. Is there any relationship between the design receipt rate identified in Table 3-1 and Tables 3-2 and Table 3-3?
A Yes, there is a relationship between

113

Table 3-1, number three and Table 3-3.
Q And what is the relationship?
A If you look at number three, Table 3-1, it states repository design receipt rates, first five years at 1800 MT per year. Next 21 years at 3,000 MT per year.
That would be the same as the second column in Table 3-3 under repository one.
Q Okay. How were these numbers derived, the 1800 and the 3,000 numbers?
A I believe they were derived similar to discussion we had earlier this morning. That is, you looked at the Table 3-1, number two, repository design capacity. 72,000 metric tons, that would be for each facility.
If you look at Table 3-3, repository one and two, they both operate for approximately 25 years. If you look at -- if you divide 72,000 metric tons by approximately three -- 25 years, you get approximately 3,000 metric tons per year.
Q Why was 72,000 chosen as the repository design capacity limit?
A I would believe that if you go to Table 3-2 --
Q Yes.

114

A Fourth column.
Q Okay.
A The very bottom.
Q Yes. Is the column you're referring to entitled cumulative spent fuel discharge?
A Correct. And it says 144,000.
Q Is this the figure that you were -- similar to the 140,000 figure you were referring to earlier this morning?
A Yes.
Q And the time period that you were referring to in which you didn't really know the end date, is it fair to say the end date being used is 2014?
A For this analysis here, yes.
Q You don't know if a different end date was used for the 1987 ACR we were talking about this morning?
A I would expect they would use the later end dates because the forecast done by EIA was done for 20 years.
Q And so, I think my pending question was, how was 70,000 or 72,000, why was that used as the capacity limit for the repository? And you were pointing out this column.

115

A I don't know where that number 72,000 came from at this point in time. The only recollection I have is that I believe the Nuclear Waste Policy Act, which was enacted already had a 70,000 metric ton limit for the first repository.
Q So, does the fourth column on Table 3.2 have anything to do with the 72,000 metric ton limit on the repository design?
A I believe if you divide it by two for two repositories, you will get 72,000 metric tons per repository.
Q And you testified you thought it had a limit of 70,000?
A Yes.
Q And do you have any reason or basis to understand why repository limit in these two documents was 72 versus 70,000?
MS. POWELL: Calls for a legal, but --
THE WITNESS: No.
BY MS. HEWITT:
Q What does column three on Table 3.3 depict?
A Annual spent fuel discharges, I believe, from commercial nuclear reactors.
Q And this is the same as the discharge

116

rate we were talking about earlier?
A I believe so.
Q And when we were talking about the 1987 ACR, I believe you testified that one of the objectives in the acceptance rates that were put in that particular document was to cover the discharge or encompass the discharge rate of utilities; is that right?
A Yes.
Q And if we were to compare those acceptance rates, when we compare them to this column, would that be the right figure to look at?
A Yes. Actually, discharges plus excess capacity needed in addition to the other pool storage is on hand.
Q So it would be a number that would be in excess of those listed here in this column?
A Less than what's listed here.
Q Okay. Explain that for me. I'm not understanding.
A Again, you would take the capacity of the spent fuel pools and you would subtract that from that column. And what's in excess of that pool would be going into dry storage.



Q Thank you for explaining to me. So it would be incorrect to take just a blank comparison between this column and the acceptance rates in the 1987 ACR to compare whether or not you're actually covering the spent fuel storage needs of the utilities?
A The excess spent fuel -- it's the spent fuel storage needs in excess of their pool storage.
Q You need to know what their pool storage is and work that number in this column before you come up with an accurate comparison number; is that right?
A Yes.
Q Thank you. It's coming much clearer to me.
In using these acceptance rates in this particular document, was a concern or an objective of the acceptance rates herein to meet the needs of utilities to avoid additional on-site storage?
A At what point in time?
Q At the point in time this document was issued.
A I believe so.



Q And that would be consistent with what you said one of the objectives was of the 1987 ACR?
A I believe so.
Q You flipped through this document to a table on page 35, Table 6-2, comparison of key parameters. There is a reference to a 1978 preliminary estimate of the charge for spent fuel storage and disposal services. The receipt rate included in that study, apparently, starts at 1800, but then ramp up to 5,000 metric tons. Do you know why 5,000 was used in that study?
A No, I don't.
Q And then there's a reference to another report that's dated 1980, another report on the fee for spent nuclear fuel storage. Do you know whether DOE issued this report, the 1980 report?
A I would guess so since the reference is DOE slash SR-0006, which would indicate to me it's probably a DOE report.
Q Do you know what SR-0006 refers to?
A I believe SR refers to Savannah River and I do not know what 0006 refers to.
Q What about the 1977 document, the ET designation, do you know what that might refer



to?
A No, I don't.
Q In the 1980 report, the receipt rate that's indicated in that report apparently is 6,000 metric tons per year. Do you know on what basis that number was used?
A No, I do not.
Q In this particular document, if you go back to Table 3.3, I think, there is a ramp-up from 1800 to 3,000 reflected for both the repository one and repository two on Table 3.3; is that correct?
A Yes.
Q And I know you testified earlier about the ramp-up that was indicated in the 1987 APR -- I mean, ACR rather. Do you have any knowledge about why 1800 was chosen as the ramp-up level here in this particular document?
A Only that it's approximately one half of the steady state system capacity. Other than that, that's the only knowledge I have.
Q On Table 3.1, instead of using the term acceptance rate, which we have used today, there's another term used called repository design receipt rate. What is the difference

between repository design receipt rate and a system receipt rate, which we've seen the term used in the 1987 ACR?
A System could encompass receipt at an MRS. Repository encompass receipt only at the repository.
Q And system receipt rate, I think you testified, also encompasses transportation aspect of the waste management system as well; is that correct?
A Yes.
Q And a repository design receipt rate would not take that into account?
A Yes, it would take it into account.
Q It would take that into account?
A You have to transport it from reactor to get it to repository.
Q So the only difference between repository design receipt rate and a system design receipt rate would be the role of the MRS. Is that what you're saying?
A For the most part.
Q Is there some other difference I'm not picking up on?
A There could be a minor difference.

121

When you say repository receipt rate, there could be two receipt rates at a repository. One is a receipt that's coming through the door and the second could be an in-placement rate.
It could be storage at the repository itself. And the difference between what's taken and put into placement right away, it may be a difference between what is accepted at the gate at the repository and what's actually been placed underground. That difference would be lag storage as we referred to at the repository that is separate from an MRS.
Q And when we use the term acceptance rate or when the DOE uses the term acceptance rate, what does it mean? Does it mean the repository receipt rate or a system design receipt rate? What does it mean?
A System.
Q System design receipt rate. Thank you. No more question on this document.
This will be Exhibit Number 7.
(Whereupon, Pollog Deposition Exhibit No. 7 was marked for identification.)
BY MS. HEWITT:
Q Are you familiar with this document,

122

Mr. Pollog?
A Yes.
Q You had a chance to read it before this deposition?
A Yes.
Q Why don't we look at page one in the upper right hand corner and in the section titled introduction.
The last paragraph of that page indicates that the --
MS. POWELL: Can we wait a second until he's there.
MS. HEWITT: I'm sorry.
BY MS. HEWITT:
Q The last paragraph on that page talks about the one fundamental objective of the activities of the Mission Plan. And that is as set forth in the underlined portion, To accept commercial high level radioactive waste for safe management, storage and permanent disposal on a firm schedule beginning not later than January 31st, 1998. Do you see that provision?
A Yes, I do.
Q What does the term, firm schedule, mean as used in that phrase?

123

A I would say it refers to a real schedule.
Q What do you mean by real?
A A real one that purchasers could expect to see DOE operating to.
Q Does that definition also include a schedule that utilities could rely on?
A To the extent considering the legal, technical and financial considerations, it was one they could use to plan upon.
Q The term used in here, the firm schedule from -- indicates that that is different from some other type of schedule. What other kind of schedule would you implement if it's not a firm schedule?
A I don't know.
Q Do you have any knowledge about why the term, firm, was included in this document to describe the schedule?
A No, I do not.
Q In the next sentence it indicated that the schedule -- I guess, another objective of the schedule would be to preclude need for additional reactor storage after January 31st, 1998 and ultimately remove from reactor storage all waste

124

more than five years old. Do you see that phrase?
A Yes.
Q Is that consistent with what you have testified to be objective in the mid-eighties of the Nuclear Waste Management Program?
A Yes. Actually, that's one of the objectives.
Q And is it fair to say that this was a objective of DOE at the time this Mission Plan was -- this draft of the Mission Plan was produced?
A Yes.
Q There's reference in this sentence to, remove from reactor storage all fuel more than five years old. That's a little different specification than what we talked about earlier. What is that in reference to?
A I believe that that refers to standard fuel that is defined in the standard contract.
Q And that definition includes a time limit on it or --
A The standard contract designates standard fuel amongst other things as being older than five years old.

125

Q If you flip to program strategy section of this document found on page 2-1, in the latter half of the first paragraph, again it talks about the waste acceptance schedule and the way it was designed.
The last sentence indicates the acceptance rate will be equal to or greater than actual discharge rate of spent fuel each year. Do you see that sentence?
A Yes, I do.
Q Is that similar to the discharges rate we've been talking about with regard to the previous acceptance rates in the previous documents?
A Yes, that's true.
Q My goal here is to just try to make sure we're talking about the same thing in every document because I'm not as familiar with the definition as I think you are.
If you could turn next to page 2.2, 2-2 rather, bottom of the page. The paragraph starts at the bottom of the page with while -- there's a discussion in there that the acceptance rates in the aggregate avoids the need for utilities to provide additional on-site storage after 1998.

126

But then the paragraph goes on to explain why that might not be the case for each individual utility. Can you explain that for me? I think we touched on it before, but I want to make sure I understand it.
A Yes, I can.
Q Go ahead.
A If you look at the nuclear industry in total and you add up all the spent fuel from all reactors, what was going to be disposed of in -- discharged in a year and you add up the total pool storage capacity. Not the individual, the total in the aggregate, I think is what we're talking here, the objective was to accept more spent fuel than what the aggregate delta was between what was being generated and what was going to need to go into some type of out of pool storage.
So if the industry in total, the amount that was needed was 3,000, for example, metric tons of uranium in any given year --
For example, say, 2003. If the discharge rate at the utilities would exceed what their pool storage capacity was by 3,000, we wanted to be able to accept that difference.

127

Q Okay.
A Considering the industry, any aggregate as a whole industry. Not looking at specific purchaser versus purchaser versus purchaser.
Q Now, wasn't DOE concerned that a individual purchaser would run out of storage room though and may have to shut down?
A I can't say what DOE was concerned about in 1983.
Q But they didn't take that consideration into account?
A I believe it says here that individual utilities who actually realized this need -- excuse me. Find the right --
It is possible that an individual utility may face a need for expanded storage due to the timing of its shipment allocation. So it did state there that an individual utility may face expanded storage.
Q And how is a utility suppose to address that?
A That would have been for the utility to decide.
Q But the document goes on to talk about exchanges. Do you have any knowledge of that,

128

how the exchange process would work to help out utilities?
MS. POWELL: Objection. This is beyond the scope. We'll have somebody else testify to this, but if you're asking about this personal knowledge --
MS. HEWITT: I'm asking about how the acceptance rate would address needs of utilities to address on-site storage. I believe this document states it would be addressed through exchanges. I don't know, but that's seems to be within the idea of the acceptance rate.
But do you have any knowledge on this? Apparently not.
A Yes.
Q You do? Okay. What is your knowledge on the issue of exchanges and how this would meet the individual utility needs?
A If an individual utility had an allocation, allocation wasn't sufficient for their dry storage need, they could seek to trade a future allocation that they had for a current one someone else had to alleviate their dry storage need.
Q Is there any other way that utilities

129

could address their on-site storage needs that wouldn't warrant address by the acceptance rate?
A Yes.
Q How?
A They can re-rack. They can trans-ship.
Q Anything else?
A They could do -- although it's not feasible currently, at this time it was being looked at -- rod consolidation.
Q And is it your testimony that that would not constitute additional storage requirements as that term has been used in these documents?
MS. POWELL: That's beyond the scope, but if you can answer.
THE WITNESS: Repeat that again for me. Because of her objection, I'm a little confused.
BY MS. HEWITT:
Q The documents say that the acceptance rate was implemented in part to avoid the need for utilities to make additional plans for additional on-site storage.
The way -- the method you talked about them avoiding, you know, shut down, would those be considered additional methods for on-site

130

storage?
A They would be methods that utilities would not need to build dry on-site storage for.
Q But it would be in addition to what they would have in their spent fuel pools?
A It would be utilizing your spent fuel pools in different ways.
Q On page 2-6, in the middle of the first paragraph, there is a discussion about the second repository and the purpose of it. There's an indication that one of the purposes was to allow the backlog of spent fuel to be more rapidly eliminated. What does the term backlog of spent fuel refer to in that sentence?
A That would be -- refer to, I believe, spent fuel that may have to go into dry storage.
Q So, does that term mean that, that it has to be a dry storage in order to be considered a backlog?
MS. POWELL: Objection, vague.
BY MS. HEWITT:
Q I don't think I understood your first answer. Is your answer that backlog refers to fuel that's in dry storage?
A Yes.

131

Q Take a look at Table 2, Roman Numeral II-1, on page 2-3. This is a table entitled, waste acceptance schedule. Take a look at this table.
A Yes.
Q There is a column entitled first repository acceptance rate. And it starts with 1800 in 1998 and ramps up to 3,000, I believe, in year 2003. What is the basis of this acceptance rate used in this document?
A I believe it is the same two reasons that we discussed earlier. Number one being looking at the total amount of fuel that would go to any one repository and the operating lifetime.
And number two being trying to match it with the annual spent fuel generated and/or need for dry storage rates.
Q I'd like to go over these columns once again. Some seem familiar to me, but some of them are not.
After the year column, the first column is the annual spent fuel generation rate. Is that similar to the columns that we've seen before entitled, spent fuel generation?
A If I might look at Exhibit 6.

132

Q What does that figure represent?
A The cumulative spent fuel generated, period, dry or wet storage, irregardless of storage technique.
Q So in the last column where it's titled remaining backlog and you got the same figure, 40,809, is that the amount of fuel in dry storage or in wet storage as well?
A That would be in any type of storage.
Q Any type of storage.
Okay. Why is the term backlog used there different than the way you defined backlog before?
A Most likely because I was in error when I defined it before.
Q Again, I'm just trying to understand the terms. So can you now having seen this re-evaluate for me what backlog was used by DOE?
A I would say for purposes of this report and this table, and the text we've examined, it means spent fuel that is in storage regardless of storage technique.
Q There is a note on this table, note number two. The bottom says, waste accepted during 1998 through 2002 will come, quote,

137

preferentially from most reactors which would otherwise have insufficient on-site storage. What does that mean?
A That means ideally we prefer to reduce the need for on-site storage other than in-pool and we prefer to take fuel from those reactors that have reached their limit for in-pool storage.
Q But wasn't your testimony earlier that utilities had to abide by their allocations and annual priority ranking of utilities in submitting DCSs for spent nuclear fuel?
A Yes.
Q And that priority ranking and allocations reflected in ACR did not necessarily reflect utilities that didn't have on-site storage being earlier in the queue than later?
A Correct.
Q So, although this indicates that DOE preferred to have from reactors that otherwise have insufficient storage, the ACR and APR didn't reflect that; is that right?
A Yes.
Q Was there a -- what's the next draft of the 1985 Mission Plan you're aware of after 1983?

138

A I believe there was an April, 1984 version.
Q We have seen reference to, I believe, a January, 1984 draft of the Mission Plan. Are you aware of such a draft existing?
A I'm aware of a document that's dated -- when I searched for that document on our RIS (ph) web, it came up with a February 10, 1984 Mission Plan, which was essentially a compilation of comments and questions about the Mission Plan or response to the Mission Plan. It wasn't -- I don't call it a draft Mission Plan. I think the document was entitled, responses to Mission Plan, 1983 Mission Plan.
Q Okay.
A It was, I think, a question and answer format.
Q All right. I just wanted to clear that up because we couldn't find a draft of the Mission Plan being entitled -- you know, as a whole Mission Plan, and I was wondering if there was one out there we missed.
Let's take a look at the 1984 draft that you referenced and that we have. We'll mark this as Exhibit 8. Are you familiar with this

139

document, Mr. Pollog?
A Yes.
Q I'd like to ask you some questions about the acceptance rates here. Let me first ask you a question about the introduction, page 1-1 in particular regarding the program objectives that are listed. The third program objective --
MS. POWELL: Would you wait until he gets there one second.
THE WITNESS: I don't have a 1-1.
MS. SULLIVAN: It's on the back.
BY MS. HEWITT:
Q You see the section entitled, program objectives?
A Yes, I do.
Q And the third program objective refers to acceptance of waste for disposal by January 31st, 1998, in accordance with the schedule provided for in the department's disposal contracts.
What does that term, acceptance schedule, refer to? Is there a acceptance schedule in the disposal contracts?
A No.

140

Q We can flip next to page 2.1, which is the next page over. First paragraph, the -- I don't know, maybe fourth sentence, six lines down says, Acceptance rate is based on the in-placement capacity currently projected for the two plan geologic repositories.
My question is -- again, I want to make sure the term in-placement capacity, is that different than system design capacity that we've seen referenced in earlier documents?
A The term can be different in the sense that, as I described earlier, you can receive it as the repository and not necessarily in place underground at the same time.
However, I believe the way it's used here in this sentence to be the same as repository receipt rate. But you may see other places in other documents problematically that have different in-placement rates and receipt rates at a repository.
Q And to that extent then, is the manner in which the acceptance rate was designated on this document similar to the way the acceptance rates were developed for the prior documents we've talked about?

141

A I believe so.
Q Okay. And the next paragraph in that introductory section under program strategy, it discusses the approach. And the approach here is said to insure that all the owners and generators of spent nuclear fuel and high level waste will be able to establish firm planning schedules for the disposition of their radioactive waste sufficiently early to determine their on-site in term storage needs.
My question is, is this the same objective that was referred to when the terms, firm schedule, was used in the prior iteration of this document?
A I believe so.
Q And what is the term, sufficiently early to determine their on-site in term storage needs? What is that addressing or reflecting?
A I would say that means that they wouldn't have to wait until the very last minute when their pool is filled to determine whether they need to build dry storage, re-rack their pool, trans-ship pool or make any other spent fuel management decisions.
Q And why was timeliness relevant or

142

important in this context?
A The department's objective was to let the utilities know early enough so they wouldn't be in a situation where their pool is full and they had to make a decision.
Q Take a look at Table 2. I think it's one, but I'm not exactly clear. The Xerox copy is not very clear. It's entitled waste acceptance schedule. It looks very similar to the one we just talked about in the earlier draft of the Mission Plan, but I want to make sure that it is similar and that the columns represent the same sort of columns we were talking about earlier.
Can you let me know whether the same definitions and terms we've used with respect to the earlier table in the 1983 draft of this document, whether these are the same terms that are used in this table?
A I believe they are.
Q And included in two of these columns are repository acceptance rates. The term repository acceptance rates used in these columns, is that equal to what's called the in-placement rate in the earlier pages of this

143

document?
A I believe so.
Q In this case there's a ramp-up rate of 400 MTUs on an annual basis, to 900 MTUs, then to 1800, and then to 3,000. This is different than we've seen in some of the earlier documents. What accounts for the difference?
A I believe what happened was when we issued the draft December, 1983 Mission Plan, we received comments from interested parties. And I believe the interested parties commented that our ramp-up rate was too ambitious and would not be easily achievable. And in response to those comments, I think they decided to decrease acceptance in the first few years.
Q Okay. Other than that, the -- is the reasons for using 1800 and 3,000 as the ultimate acceptance rate the same as the reasons that we've discussed for the use of these rates in earlier documents?
A Yes.
Q And just so the record is clear, can you tell me again what those reasons are?
A Number one reason being, if you'll look at the capacity for both repositories and the

144

total amount of spent fuel that would need to be disposed of, you look at the total amount, 140, the capacity for each repository would be approximately 70,000.

You look at the operating lifetime of each repository being approximately 25 years, including the ramp-up rate. If you divide 70,000 by 25, you come to approximately 3,000 metric tons.

The second reason would be it was the objective for the department to alleviate or lessen any need for out of pool storage for the utilities, but considering the challenges that the program had to meet from the financial, legal and technical perspectives.

Q Take a look at page -- I think it's, it's 10-8 at the bottom. I don't know if this is chapter ten, but it's fairly far back in the document. It talks about the cost estimation?

A Ten slash.

Q Ten hyphen eight. It talks about the cost estimating assumptions used in this Mission Plan. And about the, I don't know, seventh bullet down or sixth bullet down says annual waste acceptance rate for each repository is 1800

145

MTUs for the first five years and 3,000 MTUs thereafter.

Do you know why those figures are different than figures used earlier in the document, which reflect the ramp-up of rate 1800?

A I'm not sure, but I would speculate that change wasn't made in this document. Somebody just didn't catch this in the editing part.

Q All right. That's all I have on this document.

(Brief recess.)

BY MS. HEWITT:

Q I'm going to ask you some questions about the Mission Plan Amendment, which was referred to in the 1987 ACR. Not one of the documents spelled out, but at least I had some trouble understanding some of the things you were talking about in the ACR, so I went and got the Mission Plan Amendment.

I'm not giving you the whole thing. I'm giving you actually what's called, part one, which is entitled, Mission Plan Amendment.

Part two is, the record of responses to comments on the draft Mission Plan Amendment. So

146

rather than copy the whole thing, I just copied part one. And I think this is Exhibit Number 8, 9.

(Whereupon, Pollog Deposition Exhibit No. 9 was marked for identification.)

BY MS. HEWITT:

Q Have you had the opportunity to review this document before, Mr. Pollog?

A I believe some time in the past I have looked at this. Not recently, but --

Q I think you testified earlier that the acceptance rates used in the 1987 ACR came from the acceptance rates used in the Mission Plan Amendment; is that correct?

A Yes.

Q I looked through this document and I believe that the schedule and acceptance rates are addressed in Appendix F to this document, and starts at page 60 at the bottom of the page toward the end of the document. In particular, you can take a look at Table F-1?

A Yes.

Q You probably have the 1987 Annual Capacity Report there in front of you. It's One of the exhibits. Can you take a look and see,

147

point out to me what columns the numbers are taken from in the '87 ACR.

A Exhibit 4.

Q Is there a correlation between the system receipt rate identified in Table 2.1 of the ACR, 1987 ACR and any of the columns listed here on Table F-1?

A Yes.

Q And where is the correlations? Can you point that out for me please?

A Yes. If you'll look at, I believe it's the ninth column under total system acceptance, first part says -- there's two columns under total system acceptance.

First one is spent fuel and it goes 1200, 1200, 1200 all the way down to 2650 in year 2007. And I believe it's the same as in Table 2.1 in the 1987 ACR.

Q Okay. Can you explain the numbers in the earlier columns, particularly with regard to MRS facility, first repository and second repository?

A I believe so.

Q Why don't we start with the first column after the calendar years. Spent fuel

148

A Pardon.
Q Are you familiar with this document?
A Yes, I am.
Q Would you take a look at Table 2.1 on page five. It contains an acceptance rate or something called an illustrative waste acceptance schedule. Are you there?
A Yes.
Q What is the basis for the acceptance rates included in this table?
A 1988 Mission Plan Amendment.
Q And do you know how the numbers were derived to be included in the draft 1998 Mission Plan Amendments?
A I have not reviewed the '88 Mission Plan Amendment.
Q Do you know how this plan derived, this acceptance plan in this table 1988?
A The numbers included came from the '88 Mission Plan Amendment. I didn't look to see how the numbers in the amendment were derived.
Q So you don't know how these numbers were derived by the Department of Energy?
A That's correct.
Q This acceptance rate schedule included

157

in table 2.1 starts in the year 2003 whereas the previous acceptance capacity report included a schedule started in 1998. What was the reasons for shifting from 1998 to 2003 as a start date for acceptance?
A I believe it was the start of the repository was delayed. Official announcement for the start of repository shifting from 1998 to 2003 had been announced.
Q Were the acceptance rates included in 2.1 reflective of the receipt rate at the repository or at an MRS?
A I would have to see what the draft 1988 Mission Plan stated regarding what is the basis of those rates.
Q I'm going to hand you Annual Capacity Report dated 1990.
MS. POWELL: Off the record.
(Discussion held off the record.)
BY MS. HEWITT:
Q Are you familiar with this document, Mr. Pollog?
A Yes.
Q I think you've already turned to page seven, which includes two tables. One is a -- is

158

entitled, projected waste acceptance rate for spent nuclear fuel for the, quote unquote, upper bounding case.
And then a projected waste acceptance rate for spent nuclear fuel for the, quote unquote, lower bounding case.
The first question I want to ask with regard to these two tables is, in this table or these two tables, the date of acceptance begins in year 1998, which is the departure from what we saw in the earlier ACR where the date of acceptance began, I think, in year 2003.
Why is the date back to 1998 in this ACR?
A I would assume because this included an MRS in the waste -- the Federal Waste Management System, the system itself.
Q Do you know or are you assuming?
A I believe so.
Q Why were there two, quote unquote, cases presented in this ACR, which is a departure from the way the acceptance rate has been published in the earlier ACRs?
A The 1987 Nuclear Waste Policy Amendments Act put new restrictions on the

159

program. That is a 10,000 metric ton uranium unit for MRS prior to repository operations.
This required us to start envisioning different scenarios. This was to incorporate restrictions placed upon -- the legal restrictions placed upon us by Nuclear Waste Policy Amendments Act of 1987.
Q Do they both of them reflect legal restrictions, both of them on page seven?
A Table 2.2 does reflect the restrictions. Table 2.1 reflects that the 10,000 metric ton uranium limit or linkage, because the MRS or repository operations is removed.
Q And why did DOE include two versions as opposed to just including one that reflected the legal restrictions?
A To inform purchasers that if we were to proceed along operating under a system with an MRS and operating under the existing systems placed upon us by the Nuclear Waste Policy Act, here is the scenario that might occur.
If we were successful or if there was an MRS, and we were able to remove those restrictions, here is another scenario you might be able to see. This may happen.

160

Q Was DOE trying to remove those restrictions, legal restrictions?
A No.
Q The legal restrictions that you're referring to, is it correct to say that those restrictions referred to the linkage between MRS operation and having a construction permit for the repository?
A That's part of it.
Q What other legal restrictions are there?
A I believe there is a capacity limit for an MRS of 10,000 MTUs prior to operations at a repository.
Q Do you know what the basis of the numbers included in 2.1, the acceptance rate numbers included in 2.1, what the basis is of those numbers?
A The draft Mission Plan Amendment. And I don't -- have not reviewed the draft Mission Plan Amendment dated June, 1998 recently.
Q So you have no information on how these numbers were derived for inclusion in Table 2.1 either?
A No other than coming from the draft

161

Mission Plan.
Q And is it your testimony that the numbers included under SNF -- under the SNF column of Table 2.2, those reflect the legal restrictions imposed by the Nuclear Waste Policy Act Amendments of 1987?
A Yes.
Q And exactly how did those legal restrictions impact these numbers?
A Well, we had a 10,000-ton limit. We were looking at start-up of a repository at this time around 2010. So, we basically did the math. You can operate for ten years, 12 years prior to operation.
You divide 10,000 by ten, it's a little bit more 11 or 12, and you come up with basically a rate of around 900 with a ramp-up rate.
Q Did the numbers or the acceptance rate numbers included in Table 2.2, did they address the needs of utilities to avoid additional on-site storage after January 31st, 1998?
A No.
Q Who at DOE would have the responsibility for approving the final acceptance rate numbers included in the ACRs?

162

A Do you want everybody or --
Q Is there -- to use a term, where does the buck stop? I mean, who is the ultimate approver or most senior person to approve acceptance rates?
MS. POWELL: Objection, vague as to time frame.
BY MS. HEWITT:
Q Well, for example, with regard to this particular annual capacity report, who would be the DOE official who would have ultimate responsibility of approval over acceptance rates in this document?
A I could only tell you who in the Office of Radioactive Waste Management. I do not know if it went beyond the head, the director of the Office of Radioactive Waste Management. It may have, but I don't recall.
Q Would it have gone up to the radioactive -- head of Radioactive Waste Management office?
A I believe so.
Q Would that have been the procedure for the prior acceptance rate for 1987 and 1988 Annual Capacity Reports?

163

A I believe so.
Q And was that the procedure as far as you know following with all the other Annual Capacity Reports issued by DOE?
A I believe that's true.
Q Going to hand you Annual Capacity Report dated December, 1991, and I'll have it marked for the record first.
(Whereupon, Pollog Deposition Exhibit No. 9 was marked for identification.)
BY MS. HEWITT:
Q Have you had an opportunity to look at this document?
A I have.
Q Have you seen it before?
A I have.
Q I'd like you to turn to page five, which I believe you already turned to, and Table 2.1, titled Projected Waste Acceptance Rates for spent nuclear fuel. What was the basis for the rates included in this ACR?
A It is prior year's ACR just rounded.
Q Why did DOE round -- first of all, what do you mean by rounding?
A Eight seventy-five was rounded to nine

164

ranking?
A I'll use an example. You are Exlon and you are Intergy. We put all of your rankings in the same report, all of your discharges in the same report. We didn't issue a specific ranking report for Exlon and a specific ranking report for Intergy. All of the purchasers went into the same report, so you got ranked together.
Q Was there any discretion that DOE could use in establishing the acceptance priority ranking?
A No.
Q Why is that? Why was there no discretion involved by DOE in establishing acceptance priority ranking?
A Contract says, we should establish it based on off oldest fuel first by dates of discharge.
Q So is it fair to say that the annual priority ranking documents issued by DOE was just a reflection of the mathematical calculation of dates of discharge and ordering them in chronological fashion?
A Dates and also included are particular rank amounts. But the chronological parts came

169

by date and date only.
Q Okay. When was the first time that DOE began to allocate acceptance slots, if you understand that term, acceptance slots to utilities based upon acceptance priority ranking?
A Based on the contractually requirement of a 1991 APR, the first allocation slots as you used the term, we called them allocations, would have been in the 1991 ACR.
Q And so can you show me where that's reflected here in this document?
A Table 3.1.
Q Is there a page number?
A Yeah, nine.
Q And is it fair to say the purchasers that are listed -- well, the purchasers listed in the left hand column are listed by, it appears, alphabetical order, not by priority ranking; is that correct?
A Yes.
Q So, in order to determine what their priority ranking would be, would you have to look somewhere else in this document or another document?
A No, you'd look right in this table.

170

Q How would you do that?
A You would go year one, year two across the top and you could see what year you had an allocation in. If you looking for allocation, if you looking for rankings, that would be another document.
Q So, for example, in year one, Commonwealth Edison, and Connecticut Yankee both have allocations in year one; is that correct?
A Yes.
Q And is there a priority between Commonwealth Edison and Connecticut Yankee with respect to when their fuel would be taken in year one?
A No.
Q And would that be true for any of the utilities who have allocations in year one?
A Yes.
Q Was it your testimony that the APR document was required by the standard contract?
A Yes.
Q And is there a difference in significance between the APR document and the ACR document published by DOE relative to the standard contract?

171

A I'm not sure how to answer that. They're both required by their contract. They're both documents that we produced that we need, that we use. I'm not sure any one is more significant than the other.
I can't answer, because you need -- both of them are needed in order to develop a system.
The APR, you can't do an ACR without an APR.
Q But you can do an APR without an ACR?
A Yes.
Q I'm going to hand to you the 1992 Annual Capacity Report, which oddly is dated March, 1993. Take a look at that document? Are you familiar with this document?
A Yes.
Q Do you know why this document was published in 1993 rather than 1992?
A I believe so.
Q Why?
A DOE's concurrence process sometimes is very slow. It just took months for all the people who had to sign off on it to sign off on it.

172

with the operation of the repository or the construction of the repository?
A The operation of the repository.
Q Operation of the repository. And does this sentence on page three indicate otherwise?
A There are linkages in addition to the one I've stated about the 10,000 MTU limit that reflect into when the MRS becomes operational and excepting it. So it does not reflect all of the linkages in the Amendments Act of '87.
Q Which doesn't it -- does it reflect?
A It reflects the 10,000 MTU capacity limit prior to repository operations. In addition to that limit -- in addition to that linkage, there are additional linkages also in the Amendments Act that it does not reflect.
Q Now, going back through -- because I don't think that was clear with regard to some of the other capacity reports. Would that be true of the prior version '92 Annual Capacity Report, which includes the exact same numbers on page 4, Table 2.1?
A Yes, that would be true of the Exhibit 13.
Q Okay. And if we go back then to 1991

177

and in particular I'm referring to page five?
A That would be true also of Exhibit 12.
Q Okay. Is that 1991?
A That is December, 1991 Annual Capacity Report.
Q And then let's look at December, 1990. And this is on page seven and there's an upper bounding case and a lower bounding case.
I think you testified that you did not know how the numbers were derived for the upper binding case, but with regard to the lower bounding case which linkages were reflected in those numbers, if any?
A It would also be true for Exhibit 11.
Q So -- and that's 1990?
A That's December, 1990.
Q So, if Table 2.2 only reflects the capacity limitations on the MRS and none of the other linkages that were found in the Nuclear Waste Policy Amendments Act of 1987?
A Yes.
Q I'm going to hand you the ACR Combined Report for 1995, which we'll also mark as an exhibit. I'm pretty sure you're familiar with this document as well.

178

And I believe the -- are you familiar with this document?
A Yes, I am.
Q And I believe the table that includes projected waste acceptance rates is on page four of the document.
First question I have for you is, the numbers for the acceptance rate for SNF located on Table 1, how were those numbers developed?
A Talking about Table 1 of page four?
Q Yes.
A They were taken from prior years or the prior ACR.
Q And so they reflected the capacity limitation on the MRS that were imposed by Nuclear Waste Policy Amendments Act of 1987; is that correct?
A That's correct.
Q In the year column for the first time, there is not a calendar year designated, but rather a year with a sequential numbers in between from one to ten. Why was this change made in this ACR from prior ACRs?
A A decision was made to change. I don't recall the exact reason or know the exact reason,

179

but someone in the process of developing said, let's change this from year one -- 1998 to year one, year two, et cetera.
Q Based upon these designations, was a utility able to submit a delivery commitment schedule based on these designations in the ACR?
A The utility was able to submit a delivery commitment schedule based on prior ACRs. Based on this ACR, no, they would not be able to.
Q At the point that this ACR was issued by DOE, was or did DOE know whether an MRS would be up and running in 1998?
A I believe by this time no official statement had been made regarding whether an MRS would be up and running by 1998. We did not officially say it would not or would not be.
Q But did DOE know whether an MRS would be viable by 1998, by the time it issued this ACR?
A I don't think any final decision had been made regarding whether an MRS would be up and viable by 1998, by the time this ACR was issued.
Q That wasn't my question. My question is did people at DOE know whether an MRS would be

180

up and available by 1998?
A I don't think they knew if one would be available or not at that point in time.
Q Do you know what is involved in getting an MRS up and running, available to take fuel?
A Yes.
Q What sort of preliminary actions are needed to do that?
A Finding a site.
MS. POWELL: I'll object to beyond the scope.
But if you can answer from your personal knowledge.
MS. HEWITT: I'll just also mention that the MRS submission to Congress, the MRS proposal is one of the documents that he's supposed to talk about and obviously encompasses the MRS plan.
THE WITNESS: Finding a site, designing it, building it, licensing it, many other -- you know, purchasing transportation program, designing a transportation program.
BY MS. HEWITT:
Q And did DOE have any estimate about how long that process would take?

181

A I believe they did.
Q And what was the estimate?
A If I remember correctly, the last estimate I saw was approximately five years, seven years.
Q Pardon me?
A Five to seven years.
Q And had -- what was the first step in that process of getting an MRS ready, up and running?
A Finding a site.
Q And had DOE found a site by December, 1995 or by the time this ACR was issued in 1995?
A No.
Q Had DOE found a site by the time the APR was issued in 1993?
A APR or ACR?
Q ACR, I'm sorry. You're absolutely right?
A No.
Q And had DOE found a site by the time the APR was issued in 1991.
A APR or ACR?
Q Did I say APR? I meant ACR, but they were both issued in 1991?

182

A Yes, they were issued in 1991.
No, there was no site designated or found by -- in 1991.
Q So in other words, to have an MRS up and running using the shorter time frame, five years, from 1998, then DOE would have had to have a site by at least 1993; is that correct?
A Partially.
Q Why is that partially correct?
A There were certain options being examined. We could fast track licensing process, do a modular design, except in dual purpose systems where we wouldn't have to have storage systems actually built on-site that would reduce the time needed for developing a full MRS, including all the things you would need if you were not using dual purpose systems and you did not need to get licensing from NRC.
Q And that would reduce the time from seven years to five, or from five years to something less than five years.
A If I remember correctly, I think the fastest I saw for an expedited process with modular design, which is basically accepting a dual purpose system such that would be stored

183

on-site. I think I saw somewhere where they were able to do it in about three years.
Q So by 1995 then, if that process hadn't been started, then it was very unlikely that an MRS would be up and running by 1998?
MS. POWELL: Again, I'll object. You can answer as to your personal knowledge, but this is way beyond the scope of what you've been asking.
The documents referred to in your exhibit is marked 1987, and you're only talking about acceptance rates.
He can answer as to his personal knowledge, but --
BY MS. HEWITT:
Q Well, acceptance rates included in the 1995 ACR APR assume an MRS in operation in 1998. So to the extent that that's an assumption that was faulty --
MS. POWELL: I'm not stopping him from answering the question. My objection is it's beyond the scope.
MS. HEWITT: Okay.
BY MS. HEWITT:
Q Why don't we take a look at the 19 MRS

184

Submission to Congress. Actually, let's take a look at the fee adequacy report. I'm going to hand you a document entitled Nuclear Waste Funds Fee Adequacy dated March, 1986. Have you seen this document before, Mr. Pollog?
A Yes.
Q Can you just summarize what the purpose of this document is?
A The standard contract required utilities to pay a ongoing fee of one mil per kilowatt hour of electricity generated and sold.
I believe the Nuclear Waste Policy Act requires the secretary to make evaluation as to whether that fee is adequate. This reflects one of those valuations.
Q Did the acceptance rate factor into this evaluation?
A Yes.
Q And how did the acceptance rate factor into the evaluation?
A As part of developing what the cost of the program would be, you would need to determine what the cost of your transportation program is, how many cast you would need. And that's directly related to what your acceptance rate is

185

going to be.
How big of a handling facility you would need at a repository or MRS is directly related or proportional to the acceptance rate.
So purchasing of equipment, how much and when would relate to determining whether a fee was adequate or not.
Q And would this report be submitted to purchasers, or was there another audience?
A It was not required by the contract, I don't believe. I think it was required by the Nuclear Waste Policy Act.
So, I believe it was generally distributed to any interested parties which could -- probably did, but I don't know as a fact, did include distribution to purchasers. But there was a regular distribution for program documents like this that probably, but I'm not 100 percent sure, included purchasers.
Q Would this document have been submitted to Congress?
A Possibly.
Q In page four of this document, there are assumptions identified that were relied on for this assessment. And particularly on the top

186

of page four, there are receipt rates identified for a first repository and then a second repository. Do you see those receipt rates?
A Yes, I do.
Q What was the basis for these receipt rates that are included in this document?
A I believe they were the 1985 Mission Plan.
Q And again, to make the record clear with respect to this document, those rates reflected, if I recall correctly, dual objectives by DOE?
A Yes.
Q And one of those objectives was insuring that the amount of spent nuclear fuel discharged, aggregate utilities was ultimately disposed of in a repository.
A I don't believe so.
Q Why don't use your words. Explain those dual objectives again.
A I believe it was to eliminate the need or potentially eliminate the need for additional on-site storage capacity. That was one.
The second was the -- looking at the 70,000 MTUs per repository and the operational

187

period of approximately 25 years. You divide 70,000 by 25 comes to 3,000.
Q There was a latter one I was describing which was not accurate, but appreciate your clarifying that.
At the bottom of the first sentence on the second paragraph on that page.
A Say that again.
Q Yes, the first sentence in the second paragraph on that page 4. It says that the ongoing fee revenue of spent fuel projections used in this analysis were derived from estimates of net electricity generation and spent fuel discharges prepared in 1985 by a EIA.
Would that be the same sort of numbers we talked about with respect to spent fuel discharges and electricity generation when we were talking about the 1985 Mission Plan?
A They are related.
Q Would they have been different?
A They are related. I mean, one is proportional to the other.
Q When you're talking about they're related, what two are related?
A The spent fuel projections and

188

One of the references identified, I think it's the fifth reference, is the standard contract for disposal of spent nuclear fuel. What we've been referring to as the standard contract. Did the standard contract require that a fund fee adequacy assessment be issued, do you know?

A I don't believe so.

Q Okay. We've already got this exhibit marked. I'm handing you the monitored retrievable storage submission to Congress dated 1987. And actually handing you volume one, which is entitled proposal. Have you had occasion to look at this document before, Mr. Pollog?

A Yes.

Q Take a look at page one, the executive overview. I have just a question. I don't know if you know what the reference means here, but the last sentence says, Facility recommended in this proposal would be capable of performing all the functions specified by the Act. And then they designate a section.

Do you know what functions are specified in that section of the Act?

A No, I don't.

Q On page three of this document, they --

193

the document identifies the advantages of the MRS facility and sets them out in specific paragraphs.

The first paragraph talks about improvement of system development. And at the end of that paragraph, there's a statement that the early accomplishment of these separable steps of waste management process would significantly enhance accomplishment in the operation of the total system.

The reference to enhance confidence, what does that mean?

A I believe that approximately at this time, which we were considering or may have already made an announcement concerning delaying the schedule for start-up of the repository, pushing it back from 1998 to 2003.

So, if there were an MRS in this system, there would be more confidence that we could start accepting waste in 1998.

Q On page five, which I think is still part of the general executive overview in the second full paragraph on that page in the middle, part of this proposal is that Congress link the start-up of the MRS facility to the schedule of

194

the repository.

And in particular, that no waste may be accepted at the MRS facility until construction authorization or the first repository is received from the NRC.

Is it fair to say from this statement that it was DOE that actually proposed the linkage that served as the legal restriction on the acceptance rates that were used and published after the Nuclear Waste Policy Amendments Act of 1987.

A You just said too much for me there. Can you repeat it or --

(Whereupon, the last question was read by the court reporter as requested.)

THE WITNESS: Yes, I would say that's a fair statement.

BY MS. HEWITT:

Q If you take a look at page 20 under the section called 3.3.1, Waste Acceptance, it says here that -- in the first paragraph that full scale operation of an MRS at a rate of about 2500 to 3,000 MTU per year would be achieved by 2004. Do you see that statement?

A Yes.

195

Q Is that consistent with the MRS projections that were include in the 1985 Mission Plan?

A I'd have to look at the Mission Plan, 1985 Mission Plan to be certain. This is the '84 draft. Are you using the '84 draft or '85 Mission Plan for your question.

Q I was using the April draft of the '85 Mission Plan. There's only two drafts of it.

A There was an '83 draft, an '84 draft and an '85 Mission Plan.

Q Well, I was actually looking in the 1984 draft, but that doesn't include the MRS.

Let me think for a second where I found those. Well, I'll come back to that. I had the wrong document in mind, but I won't waste your time. I'll do that at a break.

Later in that paragraph it says that, however, spent fuel from western reactors could be shipped to MRS facility if necessary to meet contractual obligations.

What does that reference mean in that paragraph?

A Reference to what?

Q Contractual obligations?

196

A The 1998. January 31st, 1998 dates.
Q And was that a concern because western reactors weren't being proposed to have their fuel shipped prior to 1998?
A Well, as part of the MRS system as we discussed earlier that the plan was to serve service just eastern reactors. So, yes, I would believe that would be to address the concerns of the western reactors.
Q Page 22, a section called, accelerated waste acceptance from utilities. In this section, right in the first sentence it says, The MRS facility since it began operations in 1998, the rate acceptance rate of the waste management system would start exceeding reactor discharge rates eight years earlier than would otherwise be possible. And it goes on to say, Without a MRS facility up to 13,500 MTU temporary storage capacity would be needed and about 45 reactors by the year 2000 when the repository would start operating?
MS. POWELL: I think you misread that second --
MS. HEWITT: What did I say?
MS. POWELL: Two thousand.



MS. HEWITT: I'm sorry. I meant to say 2003.
BY MS. HEWITT:
Q With respect to the first sentence, it's the specific conclusion that it's hard for my mind to get to immediately.
Why would the waste acceptance rates of the waste system exceed reactor discharge earlier than otherwise would be possible?
A Give me a second to read this again myself.
Okay. I understand.
Q Hopefully you can explain to me, because I don't understand.
A Yeah. I believe it means that if you look at a system without repository. And you looked at a system with an MRS -- a system with only a repository, and you looked at a system with an MRS and a repository, we could be accepting at a rate eight years earlier where we actually have a rate higher than what the discharge rates are.
Q Is because the repository is not operating until 12 years after the MRS?
A It's because of the timing of the



opening of an MRS and a repository.
Q How do you come up with the eight year figure?
A I don't know for sure. I would have to look at the specific rates of generation, rates needed for dry storage, rates of acceptance at an MRS and rates of acceptance at a repository.
Q Could you explain in more detail how the analysis would go, because we can look at those numbers and say, but how did you come up with this specific conclusion. What are components of the analysis?
A You would take, first of all, the rates of generation at the utilities. And you would also try and determine from that the on-site dry storage needs we talked about earlier.
Q Right.
A And you would get a number. And you would get -- that's the number you have to take out, take away. And here is your capacity for taking it away.
You can except it as MRS, you can accept it as a repository. With an MRS in the system, we could be at acceptance rate. Eight years earlier than it would be if we just had



repository only to start receiving reactor discharges.
Q Is that because the MRS would be up and running eight years before a repository?
A However many years. But just with a MRS in this system as they propose it right here and with the schedule for the repository.
By including the MRS in the system, you can reach a point where waste management acceptance rate is greater than the discharge rates eight years earlier.
Q And then the next sentence says that you would need 13,500 MTUs of new storage capacity of 45 reactors by year 2000.
From that statement is 13,500 aggregate for the 45 reactors. Do you understand that?
A Yes, I believe I understand it.
Q And would that be storage capacity in excess of what's available on their spent nuclear fuel pools?
A That would be my interpretation.
Q Okay. Take a look at page 27 under section entitled, Proceed with potential problematic impact.
On the second paragraph in the middle

of the page, it talks about the 15,000 MTU capacity of the MRS facility, the proposed limitation of 15,000 MTU.
It says, this capacity is sufficient to offset potential storage short falls at reactors for possibly five years. But it is less than one-third of the spent fuel inventory expected by year 2000.
Unfortunately this sentence is a little above my head as well. So I was wondering if you can explain what it means. And I can break it down if you like, but if you could explain it more detail?
A By the year 2,000, at this point in time which is 1986 or '87.
Q Eighty-seven.
A Its was projected that there would be a total of approximately 45,000 MTUs of spent fuel generated. So if we have a limit of 15,000, that's the one-third -- that's less than one-third of the spent fuel inventory expected by year 2000.
Q What about this first part of the sentence?
A Which parts are you referring to

201

specifically?
Q The offset of -- that occurs for approximately five years?
A Okay. I believe that would be referring to the additional need for storage in addition to what can be stored at the pools.
Q Okay.
A So for five years they believe they can reduce their limit for additional at reactor dry storage.
Q Okay. And if you divide 15,000 by five that's 3,000 on an annual basis, right?
A Yeah, but I'm not sure that that's related.
Q Okay. That's what I'm asking, are they related? Because if, if this -- if 15,000 per five years at 3,000 a year, and is it suffice it to say that that's enough to offset potential storage shortfalls at reactors? That's what it appears to say, but I'm trying to understand if that's what is means?
A I would agree with that.
Q Okay. I'm going give you the second volume of this MRS submission to Congress. And the second volume is the environmental assessment

202

and it's actually a very large document.
I've only excerpted, I think, the first couple of chapters and some appendices. So not all the pages are included, but it was a very voluminous document.
Have you looked at the document?
A Yes, I have.
Q Are you familiar with the document?
A Yes, I am.
Q On page 1.3 and page numbers appear in the middle of the bottom of the page, top of that page. 1.3, and they do flip over, some of them.
It talks about determining what the appropriate overall quantity spent fuel to accept each year at the MRS. And they talk about short term and long term objectives in this paragraph.
The short term objective that's identified is to provide relief to utilities with potential at reactor storage problems.
And then the long term objective is implementing an acceptance rate that should be sufficient to deplete the backlog of spent fuel at reactors.
Are these the same objectives that DOE had with regard to implementing the acceptance

203

rates that were in the 1987 ACR, for example --
A Yes.
Q On page 1.7, this proposal talks about, under a title called waste acceptance, it says the waste acceptance rate would be closely coupled to the rate that the repository can place the waste.
Again, I want to ask you about whether there's a difference, at least, with regard to this document between acceptance rates and in-placement rates.
In some context, I think you testified they were the same. I'm just wondering in this context whether there's a difference here.
A There is a difference here.
Q And what's the difference here that may not have been in prior documents?
A This talks about actual, I believe placement of waster under ground.
Q Take a look at page 2.7 and this is a section entitled, Development of Spent Fuel Acceptance Capabilities.
A Page 2.7?
Q Yes. I'm actually looking at the third paragraph. The first sentence in the third

204

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) :
DUKE POWER, A Division of DUKE ENERGY CORP. :
(98-485C)(Sypolt, J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(98-477C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :



(98-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - - - X

Discovery Judge (Judge Sypolt)
McLean, Virginia
Friday, April 12, 2002
VOLUME II

Continued deposition of THOMAS POLLOG, a (30)(B)(6) witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness having been previously sworn, taken at the offices of Shaw



Pittman, 1650 Tysons Boulevard, 14th Floor, McLean, Virginia, at 9:00 a.m., Friday, April 2, 2002, and the proceedings being taken down by Stenotype by BRYAN WAYNE, RPR, and transcribed under his direction.

APPEARANCES:

On behalf of Plaintiff Northern States Power:
DEVON HEWITT, ESQ.
JACK Y. CHU, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard, 14th Floor
McLean, Virginia 22102-4859
703-770-7901

On behalf of Plaintiff Commonwealth Edison:
THEODORE T. EIDUKAS, ESQ.
Jenner & Block
One IBM Plaza
Chicago, Illinois 60611-7603
312-923-2829



APPEARANCES: (Continued)

On behalf of Plaintiff Wisconsin Electric:
SUZETTE W. DERREVERE, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
202-434-1609

On behalf of Southern Nuclear Operating Company:
KRISTI L. REMINGTON, ESQ.
Balch & Bingham, LLP
Tenth Floor
1275 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
202-347-6000

On behalf of Sacramento Municipal Utility District:
TIMOTHY P. MACDONALD, ESQ.,
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303) 863-2334

APPEARANCES (Continued)

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C. 20530
202-514-7300

5

C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| THOMAS POLLOG | NORTHERN STATES POWER | |
| By Ms. Hewitt | | 8 |
| | COMMONWEALTH EDISON | |
| By Mr. Eidukas | | 18 |
| | SACRAMENTO MUNICIPAL UTILITY DISTRICT | |
| By Mr. Macdonald | | 33 |
| | DEFENDANT UNITED STATES | |
| By Ms. Sullivan | | 160 |
| | SOUTHERN NUCLEAR OPERATING CO. | |
| By Ms. Remington | | 162 |

Afternoon Session - Page 115


E X H I B I T S


| POLLOG EXHIBIT NO. | PAGE NO. |
|---|---|
| 19 - 1985 Mission Plan | 10 |
| 20 - 1984 Mission Plan | 32 |
| 21 - Mission Plan Strategy Memo, 9/15/83 | 60 |
| 22 - Excerpt of Government's Brief | 87 |
| 23 - DOE Notice, 5/25/94 | 100 |
| 24 - DOE Notice, 5/3/95 | 105 |
| 25 - 1988 Draft Mission Plan Amendment | 128 |
| 26 - Analysis of TSLCC of CRWMP | 146 |


6

E X H I B I T S (Continued)


| POLLOG EXHIBIT NO. | PAGE NO. |
|---|---|
| 27 - 1995 APR ACR | 154 |
| 28 - 1996 APR ACR | 157 |
| 29 - Georgia Power Letter to Robert Morgan | 163 |
| 30 - Protest of 1998 Mission Plan & ACR | 168 |
| 31 - Letter, Certified Mail, 9/9/88 | 173 |
| 32 - Handwritten Notes | 173 |


7

P R O C E E D I N G S

Whereupon,

THOMAS POLLOG,

was called as a witness by counsel for Plaintiff, and having been previously sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF
NORTHERN STATES POWER
BY MS. HEWITT:

Q. Morning, Mr. Pollog. We're going to continue my portion of your questioning. As I mentioned yesterday, I apologize, but we didn't have one of the documents available that was identified on your list, and I do want to ask you about that, but hopefully it won't take very long?

MS. SULLIVAN: Before you do that, Mr. Pollog would like to clarify something from his testimony yesterday. Is that all right?

MS. HEWITT: Okay.

THE WITNESS: Yes. I want to clarify concerning the relationship and the importance and the differences between the DCS and the FDS process. Okay, the DCSs and FDSs are of approximately the same influence in a multi-step process that was looked upon going forward for waste acceptance. The

8

difference between the DCS and FDS, there's only two. The DCS, the purchasers and DOE agreed to delivery on a specific year, a calendar year.
Whereas in the FDS the purchaser would identify a range of dates within that year as wide as they want to, could be days or weeks, and DCS if the Department would agree that they would be committing to a specific range of day. So it would narrow down from a full calendar year to a lesser range of dates within that year will be the one difference.
And the second difference where the DCSs are potential low changeable or exchangeable where other utilities, whereas an FDS is not exchangeable.
BY MS. HEWITT:
Q. Is your testimony otherwise that all the information -- if you didn't exchange your DCS. All the information that you included in the DCS had to be the same information in the FDS?
A. That's not my testimony.
Q. Do you know the answer to that?
A. The answer to that is the Department had never decided if everything in a DCS had to be included in an FDS.
Q. Okay. I'm going to ask you about the 1985

9

mission plan. I'll mark it.
(Pollog Exhibit No. 19 was marked for identification.)
MS. SULLIVAN: Is this an excerpt or volume 1?
MS. HEWITT: No. This is volume 1. And actually it's only chapter -- I guess it's only volume 1. I didn't have everything.
MS. SULLIVAN: That's fine.
MS. HEWITT: Actually, I think it's just chapters 1 and 2.
MS. SULLIVAN: Good.
BY MS. HEWITT:
Q. But what I handed you is pages 1 through 29, so make sure you have 29 pages.
(Witness reviewing document)
A. Actually there seems to be --
Q. There's some on your right there?
A. Yeah. These come at the end. Actually page 14 seems to be missing. Let me check one more time.
Q. Okay.
(Witness reviewing document)
MS. SULLIVAN: Yeah.
MS. HEWITT: Page 14's missing?

10

MS. SULLIVAN: That's fine. We can change that later, just note it right now.
MS. HEWITT: Well, yes, page 14 is missing from mine as well.
MS. SULLIVAN: Did you have questions about it.
MS. HEWITT: No. I don't have questions from page 14, but I don't know why -- it might be in the actual original document. In any event, we don't have any questions about page 14. And I apologize. Here's the stapler. Other than that, we are a very sophisticated law firm. We provide extensive resources for our clients.
BY MS. HEWITT:
Q. Anyway, what I'd like to ask you about is the waste acceptance schedules that are included in this document.
Have you had a chance to look at this document before, Mr. Pollog?
A. Yes, I have.
Q. In particular, I think there's a table at the very end on page 26. Have you found that table? It's Table 2-2.
A. Yes, I have.
Q. Set forth here are acceptance rates for

11

repository, first repository and second repository. In particular, I'd like you to look at the spent fuel column under the first repository.
Do you know the basis for the acceptance rate figures listed therein?
A. Are you referring to the section under first repository, spent fuel starting with No. 400 in 1998.
Q. Yes, I am.
A. Yes, I am.
Q. And what is the basis of those acceptance rates?
A. The basis would be twofold, or two parts. One would be, again, we anticipated two repositories of total amount of spent fuel approximately 130 to 140,000 MTUs with equal amounts in both repositories and that number being approximately 70,000 dividing the operational life of approximately 25 years, you get approximately 3000 per year as a steady state rate with a several-year ramp up rate in the early years. It would be part 1.
The second reason for that would be again to try and keep up with spent fuel discharges and the need for alleviating the need for additional on-site dry storage at the purchaser sites.

12

Q. And these were the same reasons for the acceptance rates that were included in prior drafts of the mission, this mission plan, is that correct?
A. I believe so.
Q. And we may have discussed this yesterday with regard to the drafts, but the ramp-up rates from 400 in the first three years to 900 and then 1800, why were the numbers segregated that way for the ramp-up years?
A. Can you explain for me what you mean by segregated?
Q. Yes. Why was 400 chosen for the first three years and then 900 for the fourth year and then 1800 for the fifth year?
A. Okay. Originally we had suggested an earlier drafted mission plan, 1800 metric tons per year for the ramp-up period. I believe we received public comments, the document mission plan itself, including the schedules and one of the comments or several, I'm not sure how many, stated that they thought that would be an overly ambitious ramp up rate to go from zero to 1800 in your first year and suggested scaling back which way were initial ramp up would be.
In response to those comments, I think the



decision was made to reduce the ramp up the numbers in the early years in order to get the system going from basically zero up to the 3000.
Q. Do you know why it was broken down to 400 and then 900 and then 1800? There seems to be a relationship between those numbers but I would rather not guess.
A. I think they were just approximately doubling every -- you do a couple of years at 400 and you double that and get comfortable with that and you double that again until you reach your essential steady state rate.
Q. Okay. If you take a look at the next chart that follows that on page 27, Table 2-3, have you located that chart?
A. Yes.
Q. What is the difference between this chart and the prior chart that we just were discussing?
A. This chart is for improved performance system which includes an MRS in the waste management system.
Q. Okay. And is the idea that the waste would be transferred first to an MRS before going to a repository? Is that what this chart reflects?
A. Let me examine it for a second.



(Witness reviewing document)
MS. HEWITT: Can we go off the record for a second?
(Discussion off the record)
THE WITNESS: I believe this chart includes a system where waste would first go in the first, from pre-'98 through 2005, if I'm reading this across correctly. To an MRS and then to the first repository and then starting I believe in 2006, waste would still be going to an MRS to a first repository and some of it would be going straight to a second repository. Some would be going to an MRS and some would be going to a second repository, starting in I believe if I'm reading this chart correctly, 2006. Yeah, I believe 2006.
MS. SULLIVAN: Are --
BY MS. HEWITT:
Q. What is the basis for the acceptance rates that are listed here for the MRS?
A. I believe the basis is the 3000 again comes from the two objectives we had discussed just a few minutes ago, the first one being looking at how much was going to eventually, to the first repository being the 70,000 MTUs, taking that number and looking at the lifetime -- anticipated lifetime for the MRS



repository for approximately 25 years dividing 75,000 by 25 and reaching an approximate number of 3000 per year in steady state and the second being the goal to alleviate the additional need for dry storage or out of full storage at a facility, at a purchaser's facility.
Q. How come there's not a ramp up rate for the MRS acceptance?
A. Well, I believe there is. If you look at the pre-'98, it doesn't give specific years. It just says pre-'98. So I believe that includes more than one year, the 2200 number.
Q. I see. And do you know when this assumes the MRS would be operational or able to take spent nuclear fuel?
A. I believe it was based on starting in 1996.
Q. I don't think I have any more questions for you Mr. Pollog. I will turn it over to my colleagues. I will note for the record that you did yesterday not know some basis for some of the rates in the ACRs which was supposed to be part of your responsibility, so I'm not going to end my questioning and just keep it open. And I don't know whether they're going to bring you back to speak on

that after you've learned more about it or have another witness for that, but there were a couple of areas that you didn't know any information about. So I just reserve that right on an examination basis for a 30(b)(6) witness, whoever that might be.

MS. SULLIVAN: Well, we would object to that because the topics asked for the basis for the ACR rates and he told you they were found in other published documents up until 1991 and was able to explain from 1991 where those rates came from and he did walk you through the mission plan for 1997, although that was not a document and was able to track that back. So we would object to any -- but let's leave it on record right now and we can ask Judge Sypolt.

BY MS. HEWITT:

Q. Let me just clarify. I'm just talking about the rates that appear on two ACRs based on the 1998 mission plan when he said he did not look at and did not know the basis of those generations?

A. The topics set forth the rates in the ACRs. And as the ACRs say, they were found in the mission plans.

MS. HEWITT: But that's all he could say.

MS. SULLIVAN: Then you did put the 1997

17

mission plan draft amendment in front of him. He was able to.

MS. HEWITT: But he said he had not reviewed the 1998, so --

MS. SULLIVAN: He said he hadn't reviewed the 1998 mission plan.

MS. HEWITT: He did say he had reviewed that.

MS. SULLIVAN: Not recently.

MS. HEWITT: Well, he had reviewed it. Anyway, I'm going to reserve the right. We can discuss that later.

MS. SULLIVAN: Well, we will object and let Judge Sypolt decide. Can we take a few minutes to see if we have any cross?

MS. HEWITT: Sure.

(Recess)

MS. SULLIVAN: Okay. Who's next?

MR. EIDUKAS: I think I'll go next.

EXAMINATION BY COUNSEL FOR PLAINTIFF COMMONWEALTH EDISON

BY MR. EIDUKAS:

Q. Good morning, Mr. Pollog, my name is Ted Eidukas. I represent Commonwealth Edison.

A. Good morning.

18

Q. My question is yesterday we had some discussion about plans for spent fuel being sent to the MRS or the repository based on whether they were western reactors or eastern reactors. And I just had a clarifying question.

Was there a specific dividing line as to what was a western reactor and what was an eastern reactor?

A. I know of no dividing line between western and eastern reactors.

Q. So there was no designations made or assignments made as to whether this reactor is an eastern or western?

A. As far as I know, there were no designations made from this reactor is eastern and this reactor is western.

Q. Okay, thank you.

Yesterday you gave some testimony about the 1995 ACR APR and the acceptance schedule present in that document. And I don't remember what exhibit it was, if you want to look at it. But I believe that was the -- and I believe that is an acceptance schedule that uses rather than calendar years, it uses years 1 through 10?

A. Correct.

19

Q. And just to be -- and I believe you testified that -- and correct me if I'm wrong, but I believe you testified that utilities would be unable to submit DCS based on that schedule because there were no calendar years given but rather years 1 through 10.

A. Yes, I did.

Q. Does the DOE have a position on whether or not after the publication of that ACR, that schedule, does the DOE have a position as to whether purchasers were obligated or required to submit DCSs after that point?

A. We had informed purchasers that at this point in time we weren't going to be further processing schedules starting in 19 -- I believe it was the end of '96. Then after we started, we did not believe it was necessary for purchasers to further submit DCSs.

Q. I'm done with that document. You can put that aside for now. In testifying about the basis for the acceptance schedules found, the acceptance rates found in a lot of these documents, you've testified that there were two objectives or principles that underlied the rate.

One was -- and I'm going to focus on what

20

I believe you characterized as the first objective being the -- I can have you say that again, but let me see if I understand it.

You believe that each repository would accept up to approximately 70,000 MTU of spent fuel, and then you took the -- you also anticipated that there would be approximately 25-year operational life? And I'm not sure if operational life is the word you've used, and then I'll let you correct me. Operational period or operational life of the facility or the program and by taking and dividing 25 into 70,000, you got approximately a steady rate of 3000.

Is that an accurate paraphrasing of what you've testified or perhaps if you want to --

A. I would say that's close enough.

Q. Close enough, Okay. The 25 years for the anticipated operational life of the facility, could you just clarify again what that 25 years represents?

A. I believe it represents what was anticipated in normal lifetime of the equipment that would be used in one of these facilities such as transportation casks, handling equipment, any type of hardware that was going to need to be purchased to operate the facility was thought to have about an

21

operational life before you would need to basically just get rid of it and buy new stuff of 25 years.

Q. So the 3000, or the rate that was generated by looking at that, the rate was based on the calculation or the estimation that the life of this equipment would be about 25 years, not vice versa? I sense by your expression they were as clear as mud?

A. The vice versa, I wasn't sure.

Q. Sorry. In other words, as I understand it, the DOE in developing this acceptance schedule or this acceptance rate didn't approach it in the manner of we want a rate of 3000 and then let's calculate what the life of this equipment would be.

Rather, they took the 70,000 MTU limit or what they felt would be the limit on the acceptance, what the repository would accept and then looked at the life of the equipment, what they expected the life of the equipment would be and took those numbers and then came up with the 3000, not the other way around.

A. We looked at what the life of the equipment was and not -- and then divided the total anticipated capacity to determine the rate. We didn't look at the rate first. We did not look at

22

the rate first and then back calculate what the life of the equipment would be.

Q. Okay. I think that expressed what I was trying to say. Was there any expectation by the DOE that the program would last longer than this 25 years? In other words, that they would have to go out and buy a new set of this equipment?

A. Well, if you look at the early documents, it actually includes two repositories. So the first one would be operating for approximately 25 years and then the second one coming on line or starting several years, I'm thinking -- it varied at different points of permanence, but I'm going to say approximately 10 years after the first one so that would be 25 years past, so you're talking approximately 35 years or so.

Q. At each repository, was there any expectation that at each of the repository there would be a replacement of the equipment so that each repository would be operating for more than 25 years?

A. I don't believe so. Well, let me just clarify that. When you say operation, you mean you're still going to be done after no more fuels come in after the repository. The acceptance part of files coming into the gate was expected to last 25

23

years.

There are additional requirements such as everything would not necessarily be in place within that 25 year period of time. It would take a little bit longer to work off the backlog, and I believe the nuclear policy act specifies we have to provide a 50-year retreatability, capability at the repository. So there would be certain activities going on to fulfill those statutory requirements. But regarding I think accepting fuels through the front gate and doing what we need to do to get into placement would last 25 years plus a few additional years to work off any lag fuel storage.

Q. I think with that clarification we're still on the same page as far as what I meant by operational life and what you said in your earlier testimony -- just to clarify, when you were talking about operational life of the equipment, you've been referring to the operation life of the acceptance equipment?

A. For the most part, yes.

Q. Briefly look at the 1997 annual capacity report. And again, it should be one of the middle -- or early documents, No. 4.

A. Okay.

24

contract which is Exhibit 2 there you base your personal opinion on, your personal opinion that the DOE accepting one spent fuel element in 1998 would comply with its obligations under that contract.
MS. SULLIVAN: Objection. Calls for a legal conclusion. You can answer as to your own personal opinion.
THE WITNESS: Just give me a few minutes here to look through this.
MR. EIDUKAS: Sure.
(Witness reviewing document.)
THE WITNESS: Okay, I'm ready. I would refer to two parts, I believe. One is in subpart B 96111 on page 521 of Exhibit 2. The whereas section, it's last full paragraph in 9611, "Whereas DOE has responsibility following commencement of operation of a repository to take title to spent fuel of highly radioactive waste as expeditiously as possible upon request of the generator owner of such waste or spent nuclear fuel."
And I would also look at article 2, scope, on page 523 and 524. I would look at the top of page 524 which starts with the first full sentence, "The service provided by DOE under its contract should begin after commencement of facility operations not



later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from a civilian nuclear power reactor specified in appendix A annexed hereto and made a part here of has been disposed of."
BY MR. EIDUKAS:
Q. And just to clarify, is there anything else in the standard contract itself upon which you base your opinion that accepting only one spent fuel element in 1998 would comply with it?
MS. SULLIVAN: Same objection.
THE WITNESS: Nothing I can find right now or what's in there.
BY MR. EIDUKAS:
Q. I know you testified you didn't have any specific conversation. A specific conversation about this opinion you had over the course of 14 years.
Do you recall anyone disagrees with this opinion of yours?
A. I do not recall at this time what the response was to my stating that.
Q. Do you have an opinion as to whether or not accepting only one spent fuel element in 1998 would be consistent with the intent of the Nuclear Waste Policy Act?
MS. SULLIVAN: Objection to the extent it



calls for a legal conclusion regarding the intent of the act. You can answer as to your own personal opinion.
THE WITNESS: I don't have an opinion on that.
BY MR. EIDUKAS:
Q. Do you have an opinion as to whether or not the DOE accepting only one spent fuel element in 1998 would be consistent with the intention of the parties to the standard contract?
MS. SULLIVAN: Same objection. You can answer.
THE WITNESS: Can you define for me intention of the parties of standard contract? What you mean by that?
BY MR. EIDUKAS:
Q. What the parties -- what the DOE as one party and the purchasers as the other parties when they sign a contract, what they expected the DOE's performance would be in terms of acceptance of spent fuel beginning in 1998.
MS. SULLIVAN: Objection to the extent it calls for legal conclusion regarding the intent of the standard contract. You can answer.
THE WITNESS: I believe that was



inconsistent with the intention of the parties to the standard contract.
BY MR. EIDUKAS:
Q. So did you say inconsistent?
A. Inconsistent.
MR. EIDUKAS: Let's go off the record for a second.
(Discussion off the record)
(Pollog Exhibit No. 20 was marked for identification.)
BY MR. EIDUKAS:
Q. Mr. Pollog, I've had marked and handed to you as Exhibit 20. It's certain pages from the April 1984 draft of the volume 1 of the mission plan. And you'll notice it's only certain pages there, but they're in the order that was produced to us from this litigation and you'll notice that there's some handwriting in the margin and some underlining.
My question to you is whether or not you know whose handwriting that is on that document.
A. I do not recognize the handwriting. I'm trying to recall if I recognize any participator in the program with the initials EBM and --
Q. And sorry to interrupt you because on the first page in the upper right-hand corner, there's a

conversation with outside of counsel was Mike Conroy.
BY MR. MACDONALD:
Q. So at these discussions that you may have had with certain of the people we just described where this principle was discussed, counsel was present at all those discussions?
A. All discussions except for the one that I had with Mike Conroy.
Q. And to your knowledge, there are no documents that you reviewed that reflect this principle?
A. Correct.
Q. Do you know if there are any documents that DOE produced in this litigation that reflect this principle?
A. I don't know.
Q. When did DOE determine that it would not begin accepting SNF in 1998 at a permanent repository roughly?
A. I believe the first time we published that that we wouldn't be receiving SNF at a permanent repository in 1998 was either -- I believe it was the '87 mission plan amendment but it also could have been the '88 draft amendment. It was either one of those two.

41

Q. So by either 1987 or 1988, DOE had determined that it wouldn't begin accepting SNF at the repository in 1998?
A. Yes.
Q. Prior to that time, were there any DOE studies suggesting an acceptance rate of 900 MTU?
MS. SULLIVAN: Objection. Vague. 1900 MTU, what time period?
MR. MACDONALD: Did you understand the question?
THE WITNESS: Are you saying 1900 MTUs per year?
MR. MACDONALD: I'm sorry. I thought I said 900 MTUs.
THE WITNESS: 900 MTUs on a yearly basis?
MR. MACDONALD: Yes.
THE WITNESS: On a steady state basis not just given any year?
MR. MACDONALD: That's right. With a reasonable ramp-up period.
THE WITNESS: Steady state acceptance rate of 900 MTUs. I don't know of any.
BY MR. MACDONALD:
Q. You don't know of any DOE studies before 1998 in which DOE intended to operate its facilities

42

with a steady state acceptance rate of 900 MTU per year?
A. I'm sorry. Maybe you misspoke or maybe I misheard you. You say before 1998?
Q. I may have said that. If I did, I apologize. I'm trying in my head to refer to 1988.
A. Okay. If you're asking me do I know of any studies that were prior to 1998 that this steady --
Q. 1988.
A. 1988, excuse me, with steady state acceptance rate of 900 MTUs, I do not recall any.
Q. Are you aware of any studies where DOE planned on accepting fuel at a repository at less than a 3000 MTU per year steady state rate?
MS. SULLIVAN: Objection, vague.
MS HEWLITT: Before 1998?
MR. MACDONALD: At any time.
THE WITNESS: I am not aware of any studies that stated that the steady state acceptance rate at a repository would be less than -- other than in the ramp-up period, less than 3000 MTUs per year.
BY MR. MACDONALD:
Q. And the question is sort of convoluted, so I apologize. Another way of putting that is assuming

43

the operation of a repository DOE planned on a 3000 MTU per year steady state rate, is that correct?
MS. SULLIVAN: Objection, vague.
THE WITNESS: No. I would say that's not correct.
BY MR. MACDONALD:
Q. Okay. In what way is it not correct?
A. I think if you look at documents such as the 91 ACR, 95 ACR, we looked at steady state rates of 900.
Q. Were either of those ACRs based on accepting fuel at the repository at the time during the period where the rate was 900 MTU?
MS. SULLIVAN: Objection, vague.
THE WITNESS: Can you restate that for me?
MR. MACDONALD: Could you read the question back?
THE REPORTER: "Question: Were either of those ACRs based on accepting fuel at the repository at the time during the period where the rate was 900 MTU?"
THE WITNESS: I don't believe so.
BY MR. MACDONALD:
Q. Maybe my earlier question was inartful, then. Assuming an operation at a repository, not an

44

MRS, did DOE plan to use a 3000 MTU acceptance rate once it ramped up to a steady state?
A. I believe so.
MS. SULLIVAN: Can I have a --
(Counsel conferring with witness)
BY MR. MACDONALD:
Q. Mr. Pollog, I'd like to ask you a couple of questions about the '83 draft mission plan which you have looked at previously and it should be Exhibit 7. I'd like you to turn to page 2-3.
For the record, this is a table that Ms. Hewett asked you about yesterday entitled Waste Acceptance Schedule, is that right?
A. I believe so.
Q. One of the questions that Ms. Hewett asked you before about -- she asked about this third column discharge from decommisioned reactors, and I believe your testimony was you didn't think this had or was related to the acceptance rate in any way?
A. Correct.
Q. Do you know why this table includes information about the discharge rate from decommissioned reactors?
MS. SULLIVAN: Objection. Asked and answered. You can answer it again if you remember.

45

THE WITNESS: No, I don't.
BY MR. MACDONALD:
Q. Are you aware of a provision in the standard contract that provides authority to DOE to give shutdown reactors a priority in the acceptance of SNF?
A. I'm aware of a provision that DOE may provide priority for shutdown reactors.
Q. Do you know why that provision was put in the standard contract?
A. No, I do not.
Q. Would you turn to page 2-5?
A. The same document?
Q. Same document. The first full paragraph on page 2-5 begins, "The main plan and primary effort is to have an operating geologic repository in 1998."
Do you see that?
A. Yes.
Q. As of December 20, 1983, the date of this document, was it DOE's main plan and primary effort to have a repository?
MS. SULLIVAN: Objection. Beyond the scope. You can answer if you know.
THE WITNESS: I believe it was the objective of the Department to have a repository

46

operating by 1998.
BY MR. MACDONALD:
Q. Would you turn to page 3-B-12. It's a ways in the back.
A. 3-B-12?
Q. Yes. And in particular, if you would look at the paragraph B entitled Licensing.
A. Yes. I'm there.
Q. I had some questions about this which maybe you will be able to explain. This paragraph states that, "It has been estimated that the Nuclear Regulatory Commission would require two-and-a-half years to review and monitor retrievable storage facility licensing application."
Can you explain to me what would go into that estimate of why it would take two-and-a-half years for the NRC to review an NRS licensing application?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: I must admit I'm not that familiar with NRC licensing regarding a facility, so I can't explain to you why it would take two-and-a-half years to do that.
BY MR. MACDONALD:

47

Q. Is the 2.5 year time period consistent with your current understanding of how long the NRC would take to license an MRS?
MS. SULLIVAN: Same objection.
THE WITNESS: My current understanding is based on work that was done I believe a CISF, centralized interim storage facility submittal we sent to NRC in the late 1990s, and I believe the licensing time approximates that.
BY MR. MACDONALD:
Q. And what was again the CISF proposal that you're talking about?
MS. SULLIVAN: Same.
THE WITNESS: Centralized interim storage facility.
BY MR. MACDONALD:
Q. And you worked on that proposal in what period of time?
A. I did not work on that proposal.
Q. When was that proposal sent in?
MS. SULLIVAN: Same objection.
THE WITNESS: I believe in the late '90s, mid to late '90s.
BY MR. MACDONALD:
Q. If you didn't work on it, how are you

48

aware of the time that the study estimated for NRC approval of an MRS license?
A. I believe I picked a copy up just for some general light reading one afternoon.
Q. You're an engineer at heart. Do you know who did work on that?
MS. SULLIVAN: Same objection.
THE WITNESS: Yes, I do.
BY MR. MACDONALD:
Q. Who was that?
MS. SULLIVAN: Same objection.
THE WITNESS: Dan Kane, K-a-n-e.
BY MR. MACDONALD:
Q. In 1983, did DOE anticipate that utilities would have to build additional on-site storage facilities?
A. I believe so, yes.
Q. Did DOE anticipate the utilities would have to about the additional on-site storage facilities after 1998?
A. I believe so.
Q. Why do you believe so?
A. Because we believe utilities would need to build additional on-site storage facilities by the mid-'90s.

49

Q. Would they -- I think my question may have been poorly worded. DOE anticipated that the utilities would have to build storage in the mid-'90s.
Did DOE anticipate that utilities would have to build storage after January 31, 1998?
MS. SULLIVAN: I'm going to object to this as beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: You're talking about 1983?
MR. MACDONALD: Correct.
THE WITNESS: I think DOE anticipated at that time that it was possible that utilities would need to build additional on-site storage after 1998. If DOE did not start accepting fuel by that date, by that time frame. DOE believed it was also possible but difficult to speculate that far even if we did accept fuel starting in 1998, if utilities would need to build additional on-site storage because we hoped to take rates who reduced the need, but that would be in a perfect world with perfect trading and one could not speculate how an exchange process would work 20 years in the future.
BY MR. MACDONALD:
Q. But the waste acceptance schedule in 1983

50

was designed so that no utility would have to provide additional on-site storage after January 31, 1998?
MS. SULLIVAN: Objection, vague. It was designed as I've testified, two things in mind. One thing was to hopefully reduce or if in a perfect world eliminate the need for additional on-site storage, and it was also designed with the objectives we talked about earlier, and that is a 70,000 MTU limit at a repository divided by 25 years and you come to the number of approximately 3000. It had two objectives I think regarding -- or two reasons why that rate was chosen.
BY MR. MACDONALD:
Q. Would you turn to page 2.1 of the same document, the 1983 draft mission plan?
A. You said 2.1?
Q. Yeah, 2-1. And in the first paragraph, this document states, "The waste materials will be accepted in accordance with a waste acceptance schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage capacity after January 31, 1998."
So my question is was the waste acceptance schedule "Designed to provide an acceptance rate in

51

the first five years such that no utility will have to provide additional storage capacity after January 31, 1998?"
A. Yes.
Q. Do you know why this document doesn't discuss or mention the second objective that you had talked about, the 25-year life of the operations?
A. No, I do not.
Q. I'd like to talk briefly about the 1984 draft mission plan which should be Exhibit 8. Conveniently, I'd like you to turn also to page 2-1 of this document, the 1984 draft mission plan. And in particular I wanted to ask a few questions about the language that Ms. Hewett identified yesterday for you in the second paragraph. In specific, the first sentence which talks about providing owners and generators of SNF with planning schedules sufficiently early to determine their on-site interim storage needs.
What's your understanding of what "sufficiently early" in that sentence means?
MS. SULLIVAN: Objection. Asked and answered. You can answer again if you recall your answer.
THE WITNESS: I'm having trouble finding

52

sufficiently early. Can you point it out to me?
MR. MACDONALD: It's the second paragraph, the fourth line.
THE WITNESS: Oh, I'm sorry. I'm looking under A. I believe that would mean they would not have to be in a situation where their spent fuel pool was full before they had to make a decision about what they were going to do next.
BY MR. MACDONALD:
Q. And we talked a little bit about this yesterday, but I just want to clarify it. The reason the utilities need advanced notice is because if DOE was not going to pick up fuel starting in 1998, the utilities would need to make arrangements for storage on their own, is that correct?
MS. SULLIVAN: Objection, beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: They would have to make arrangements.
BY MR. MACDONALD:
Q. Would those arrangements potentially entail building additional dry storage facilities?
MS. SULLIVAN: Same objection.
THE WITNESS: It could.
BY MR. MACDONALD:

53

Q. And how long would it take a utility, the process, to construct additional on-site dry storage facilities?
MS. SULLIVAN: Same objection.
THE WITNESS: What point in time are you talking about? In 19 --
MR. MACDONALD: 1995.
THE WITNESS: Currently?
MR. MACDONALD: Let's start with 1995.
THE WITNESS: I would guess around five years.
BY MR. MACDONALD:
Q. It would take a utility in 1995 approximately five years beginning to end for the process of constructing licensing additional on-site dry storage facilities?
MS. SULLIVAN: Same objection.
THE WITNESS: No. I wouldn't say that what you said.
BY MR. MACDONALD:
Q. I'm sorry, I'm not an engineer. Maybe you can describe to me what the five-year estimate was based on?
MS. SULLIVAN: Same objection.
THE WITNESS: From the time they decide

54

we're going to need to pursue that approach to the time they have a loaded system -- dry system in their facility.
BY MR. MACDONALD:
Q. That was the five-year period?
A. Yes.
Q. Do you know if utilities in 1995 in fact made the decision to construct -- whether some utilities made the decision to construct additional on-site dry storage?
MS. SULLIVAN: Objection. Beyond the scope. You can answer to your personal knowledge.
THE WITNESS: I don't recall if any utilities made a decision in 1995 to proceed with dry on-site storage. There may have been, but I have not committed to memory the actions of the approximate 100 different contracts that are controlled by 70 different contract holders at this time.
BY MR. MACDONALD:
Q. Do you know if some utilities have now constructed today or in the process of constructing additional on-site dry storage facilities at their site?
MS. SULLIVAN: Same objection.
THE WITNESS: Yes.

55

BY MR. MACDONALD:
Q. If you turn to page 2-2 on that same document, the 1984 draft mission plan, the acceptance rate in Table 2-2 or on page 2-2, again, is a 400, 900, 1800, 3000 ramp-up to a steady state of 3000 in 2003, is that correct?
A. Yes.
Q. Would you turn to page 9-6? I'm sorry, you can turn to page 9-5. I don't mean to be repetitive, but just to clarify, this is another table with the waste acceptance schedule that has the same 400, 900, 1800, 3000 ramp-up, is that correct?
A. Yes.
Q. And at the time in 1984 it was DOE's plan to use these acceptance rates if it could operate, open the repository in 1998?
MS. SULLIVAN: Objection. Asked and answered. Objection, compound. You can answer it.
THE WITNESS: It was DOE's objective to operate under acceptance rates in this table considering the challenges that lay ahead of us financially, technically, legally.
BY MR. MACDONALD:
Q. What would have happened -- in 1984, what was DOE's plan if it did not meet this schedule set

56

out in table 9-2?
MS. SULLIVAN: Objection. Beyond the scope. You can answer if you know.
THE WITNESS: I don't know if there was a plan in 1994 or what would happen --
MR. MACDONALD: 1984.
THE WITNESS: I'm sorry, 1984, if DOE did not meet this schedule.
BY MR. MACDONALD:
Q. Would you turn to page 9-6. And page 9-6 says that, "Waste acceptance at the first repository scheduled to start in 1998. The waste acceptance schedule for the first and second repositories is given in table 9-2," is what we just talked about.
The following sentence says, "The reactor storage capacity required by this waste acceptance schedule will have to be provided by the electrical utilities that own the spent fuel, and then the next sentence says, However, if the Department fails to meet the schedule shown in table 9-2, then the additional storage capacity needed to accommodate the delay in schedule will be provided by the Department possibly at reactor sites."
MS. SULLIVAN: Before you ask a question, do you have a question about the document?

57

THE WITNESS: No.
MS. SULLIVAN: Okay. Sorry.
BY MR. MACDONALD:
Q. Does that final sentence which states that the Department would provide storage if they didn't meet the rates we just talked about refresh your recollection as to DOE's plans or intentions if it couldn't meet the schedule?
A. Yes, it does.
Q. And how does it refresh your recollection?
A. I do recall now some verbiage, and I'm not sure how early it appeared in any of the mission plans or other like documents that DOE had suggested a possibility of acceptance at the reactor sites.
Q. And describe for me what that means, acceptance at the reactor sites.
MS. SULLIVAN: Objection. Beyond the scope. You can answer to your personal knowledge.
THE WITNESS: The utility would transfer title to their spent fuel to the Department of Energy at the sites and the spent fuel would not leave that site. It would essentially become DOE owned or DOE titled spent fuel inside the boundaries of that reactor site.
BY MR. MACDONALD:

58

Q. And so DOE would be paying for the cost of that storage?
MS. SULLIVAN: Same objection.
I don't know if they ever considered who would be paying the bill at that point in time. It was one of the possibilities considered.
BY MR. MACDONALD:
Q. This sentence appears to say that the additional storage capacity "will be provided by the Department." Presumably, at least the literal language of this, would you agree, suggests that it would be DOE's responsibility?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: I guess one could interpret it that way, yes. If I remember, I think one of the thing that was mentioned in documents of this time period was possibly providing them a canister or cask-based system for them to use on their site provided by DOE.
BY MR. MACDONALD:
Q. And would one of the reasons for this for possibly doing that, providing utilities canisters or storage casks to accomplish the first goal or what we have talked about as the first, one of the two goals,

59

the first goal being so that no utility has to build additional on-site storage after 1998?
MS. SULLIVAN: Same objection.
THE WITNESS: I'm not sure if it's necessarily related to that or if it's related to just not meeting the '98 date.
BY MR. MACDONALD:
Q. Explain the difference between those.
MS. SULLIVAN: Same objection.
THE WITNESS: Okay. You can have a situation where utility even if we came on the schedule we proposed still may have needed and we didn't meet our responsibility that was -- we didn't meet our objectives. A specific utility may still have needed to have dry on-site storage.
BY MR. MACDONALD:
Q. And you started to say responsibility that DOE didn't meet its responsibility?
A. I don't know.
MR. MACDONALD: I'd like to have this document marked as Exhibit 21.
(Pollog Exhibit No. 21 was marked for identification.)
BY MR. MACDONALD:
Q. For the record, I'm handing you a document

60

dated September 15, 1983 titled Mission Plan Strategy. And it's a memo from Richard Williamson to a collection of people at DOE, including Robert Morgan, who at the time would have been acting director of RW, is that right?

A. I believe it would have been either Robert Morgan or Mike Lawrence, but I'm not positive which one.

Q. Mike Lawrence is also listed on the distribution of receiving this memo?

A. Yes.

Q. Do you know who Richard H. Williamson, the author of the memo is?

A. No.

MS. SULLIVAN: Do you need an opportunity to look at this document for a minute?

MR. MACDONALD: Yeah. I'm going to ask you some questions on it. Take as much time as you need to look at it.

(Witness reviewing document)

BY MR. MACDONALD:

Q. Have you reviewed the document?

A. Yes.

Q. If you would turn to the second page first to clarify. After reviewing this, does this appear

61

to be an internal DOE memo discussing the strategy for the 1983 draft mission plan?

A. It is a -- it appears to be an internal DOE memo with I would say recommendations for the mission plan.

Q. And this is based on the date, the 1983 mission plan, which came out in December of 1983?

A. I would guess so.

Q. The second page midway down has the heading Waste Acceptance Schedule. Do you see that?

A. Yes.

Q. And the first bullet under there says "as an initial planning base, DOE will accept spent fuel and the quantities indicated in table" and then there's a blank. "Shipment allocations will be made on a quarterly basis."

It then continues, "The central criteria for this schedule is: An acceptance rate during the first time five years such that no utility would have to build additional storage facilities. After 1998, the second bullet is an acceptance rate after the first five years equivalent to the actual rate of utility discharge rate of spent fuel each year."

What is meant by the term central criteria?

62

A. I would say main criteria.

Q. So the main criteria for the schedule are two points listed here: An acceptancy rate such that no utility would have to build additional storage, that's in the first five years after 1998? Sorry. That was very inartful. Strike that. An acceptance rate during the first time years so that no utility would have to build additional storage.

That's the first main criteria, and the second main criteria is an acceptance rate after the first five years equivalent to the utility discharge rate, is that correct?

A. That's what's stated here.

Q. Do you know why there's no mention of the principle that we've discussed for the last day and a half that the acceptance rate would be based on this 25-year notion, the operating life of the equipment?

A. No, I don't.

Q. Based on this document in 1983, does it appear that that was a main criteria for developing the acceptance rate?

A. What was a main criteria?

Q. This principle that the rate was developed based on the estimated 25-year operating life of the facilities.

63

A. I'm not following you fully here. Let me ask, try and clarify. Are you asking me did DOE use the principle of 70,000 divided by 25 years as one of the main criteria for developing the 3000 MTU steady state acceptance rate? Is that what you're saying?

Q. I am.

A. I believe, yes, it still was.

Q. Why does this document suggest that the central criteria which you described meant main criteria not list that principle?

A. This was a suggestion from an individual who I don't even believe was associated with the RW program.

Q. What was the suggestion?

A. The central criteria stated here you just spoke of.

Q. So you're suggesting that Richard Williamson who wrote this memo was not connected to the RW program at the time that he wrote this?

A. There was no RW program at the time he wrote this. All right? It didn't come into being until I believe 1994. The precursor organization to the RW program at that point in time I believe was called Nuclear Waste Act -- Nuclear Waste Policy Act program office. I do not believe -- I've never seen

64

and also object that the document speaks for itself.
THE WITNESS: It seems to represent the guidance of the latest planning session, whatever that means. And I don't know who was involved in it. And I don't know if anyone on the distribution list was involved in it.
BY MR. MACDONALD:
Q. Would you look at page 3 of the document which has a page number notation 2 on the top, second page of the memo. And look at the bottom last bullet that says, "If by 1984, it is known that the federal repository will be delayed, but by an expected period of less than two years, then DOE will take either or both of those two actions to be able to accept fuel in 1998: And the first action is design the size of the buffer storage to accommodate spent fuel accepted from the utilities and the second option is DOE will take title to the spent fuel, have it placed in dry storage casks and pay a rental fee to the utility to store the casks on site at the reactor."
You testified previously that you had some recollection of discussions or some understanding that DOE considered providing storage at the utility sites if it did not meet the 1998 date, is that correct?



A. Yes.
MS. SULLIVAN: Objection beyond the scope. Can you answer to your personal knowledge. Also objection mischaracterizes his previous testimony.
BY MR. MACDONALD:
Q. And when we discussed that, no that DOE would provide, I think as you said, casks or containers to the utilities, I ask you whether or not there were discussions about who would pay for that.
Do you remember those discussions?
MS. SULLIVAN: Same objection.
THE WITNESS: I remember your stating that.
BY MR. MACDONALD:
Q. Maybe my recollection is not right. I thought you told me that there were -- you remember potential plans of DOE providing casks or containers to utilities for storage at the reactor sites.
A. Something to that effect.
Q. This last option here suggests that DOE considered paying a rental fee to the utility to store the casks on site at the reactor.
Do you have any recollection of that potential?
MS. SULLIVAN: Objection. Beyond the



scope. You can answer as to your personal knowledge.
THE WITNESS: I don't recall in I had seen anywhere if DOE considered paying any rental fees for the utility. It is possible I may have but I don't recall those specific words.
BY MR. MACDONALD:
Q. Beyond the specific words, do you remember the general concept?
MS. SULLIVAN: Same objection.
THE WITNESS: Yeah. The general concept I recall was providing purchasers casks or on-site storage systems for their usage.
BY MR. MACDONALD:
Q. And if DOE was providing them, DOE was paying for purchasing providing those casks or containers to the utilities?
MS. SULLIVAN: Same objection. And also objection, vague.
THE WITNESS: That was considered in the discussion of this. It wasn't a verbal discussion; a written discussion.
BY MR. MACDONALD:
Q. Where would this written discussion be?
MS. SULLIVAN: Same objection.
THE WITNESS: I believe I saw in early



drafts of the mission plan, actually.
BY MR. MACDONALD:
Q. Early drafts of which mission plan?
A. The ones already discussed here.
Q. The 1983 mission plan, the 1984 draft mission plan?
A. Or '85 or -- yes.
Q. Would you look at page 3 of this memo and it's a little bit hard to tell, but look at the second bullet that says, "The current best schedule estimate of first repository operation is 2002, four years later than the initial fuel acceptance date."
Do you know whether as of September 15, 1983, the date of this memo, DOE was already planning for a four-year slippage in the repository?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: I do not know.
MR. MACDONALD: I think we're done with that.
BY MR. MACDONALD:
Q. The acceptance rate at an MRS facility, is there any reason that rate couldn't be 3000 MTU per year from a technical standpoint?
MS. SULLIVAN: Objection, vague.

THE WITNESS: Probably not. As long as you're talking about steady state right now.
BY MR. MACDONALD:
Q. In the 1987 ACR which you can grab out, it's Exhibit 4, had an acceptance rate of ramping up to 2650, is that correct?
MS. SULLIVAN: Objection. Are you referring to the acceptance rate on page 7 of this document?
MR. MACDONALD: I am.
MS. SULLIVAN: Okay.
THE WITNESS: Yes.
BY MR. MACDONALD:
Q. And this 2650 acceptance rate was based on acceptance at an MRS, is that correct?
MS. SULLIVAN: Objection. Asked and answered. You can answer.
THE WITNESS: The basis for getting this rate into this document was the OCRWM mission plan and I would have to review the 1987 mission plan to tell you what the basis those for numbers are.
BY MR. MACDONALD:
Q. All right. I thought we did that yesterday. If you would look at Exhibit 9, my question was, what was the basis for the 2650

73

acceptance rate in the 1987 ACR, and you said in order to understand or answer that question you needed to look at the 1987 mission plan.
So looking at the 1987 mission plan --
MS. SULLIVAN: Objection. I think your question was whether or not that rate was based on acceptance in an MRS, and Mr. Pollog said he would have to review the mission plan amendment to determine the answer.
BY MR. MACDONALD:
Q. I'm not sure if there was a question pending, but I will restate either one of the two questions. Which is, first, what is the basis for the acceptance rate in the 1987 ACR?
MS. SULLIVAN: Objection. Asked and answered. You can answer it again.
THE WITNESS: The Table 2-1 in the 1987 ACR was taken from the OCRWM mission plan amendment 1987. Now, the schedule in table F1 of that mission plan amendment is, if you start with the far left column and you look at 1998 and go to all the receipts at the MRS facility, first repository, second repository, is based upon inclusion of an MRS in the system.
BY MR. MACDONALD:

74

Q. In 1998 under the 1987 ACR, where would the first 1200 MTU of fuel go?
A. Can you repeat? Because there was a 1988 -- I want to make sure I have the right dates you were asking for.
Q. I just want to clarify, we're still talking about the 1987 ACR and under that ACR what was the plan for acceptance for the fuel in 1998. Where would it go? What was the plan for where it would go?
A. In 1998? Or '88?
Q. 1998 because I don't think there was a plan for accepting fuel until 1998.
A. Okay. I understand what you're saying. I wasn't quite understanding. Are you asking me how we would allocate acceptance capacity -- how did we allocate acceptance capacity in the 1987 ACR for acceptance capacity to be started in 1998?
Q. Yes.
A. Okay. It was based upon -- well, it would have been based upon allocating oldest fuel first is how we allocate acceptance capacity.
MS. SULLIVAN: I think he's asking you a different question.
MR. MACDONALD: I'll try to rephrase it.

75

THE WITNESS: All right.
BY MR. MACDONALD:
Q. Physically where would the fuel go this first year of acceptance? Was it planned to go to a repository? Was it planned to go to an MRS?
A. I don't think it states in the ACR where it was planned to go at that time.
Q. Does it state in the 1987 mission plan where it states?
A. I believe so.
Q. You testified that the rates in the ACR were based on the mission plan, is that correct?
A. I the said rates that were in the 1987 were just taken out of this document and moved into the ACR. Strictly numerical numbers. Just the numbers themselves were taken out of this document and placed into this document.
MS. SULLIVAN: Do you want to clarify which documents?
THE WITNESS: They were taken out of table F1 from the draft -- not the draft. The 1987 mission plan amendment, the numbers, and they were placed into table 2-1 of the 1987 ACR.
BY MR. MACDONALD:
Q. So in the ACR you're saying there was no

76

A. There's nothing in this documents that suggests that we had a binding obligation to pick up spent fuel based on approved DCSs. The document does not state used DCSs. So there's nothing in here that suggests that belief.

MR. MACDONALD: I'm going to hand you Exhibit 24.

(Pollog Exhibit No. 24 was marked for identification.)

BY MR. MACDONALD:

Q. Exhibit 24, which I've just handed you is a notice from the Department of Energy or a copy of a notice from the Department of Energy dated Wednesday, May 3, 1995. The action listed in the notice states, "Department of Energy final interpretation of nuclear waste acceptance issues."

You can take as much time as you need to review this.

(Witness reviewing document)

BY MR. MACDONALD:

Q. Have you had an opportunity to fully review that document?

A. Yes.

Q. Does this document appear to be DOE's final interpretation of the preliminary notice that

105

we were just talking about?

A. Yes.

Q. Have you ever reviewed this document before?

A. No.

Q. Have you ever discussed this document or the principles outlined in it with anyone before?

MS. SULLIVAN: Object to these questions, beyond the scope of the deposition. You can answer as to your personal knowledge.

THE WITNESS: No.

BY MR. MACDONALD:

Q. What is DOE's conclusion in this document as of May 3, 1995 with respect to its obligation to pick up spent fuel in 1998?

MS. SULLIVAN: Objection as beyond the scope and also the document speaks for itself. You can speak to your personal knowledge.

THE WITNESS: I can read for you a summary if you like. If you want me to do that, I'd be happy to sit here and read into the record the summary.

BY MR. MACDONALD:

Q. Instead of doing that, would you turn to page 4 of the document? It's actually the third page, but listed as page 4 in the upper right-hand

106

corner. Right above the Roman Numeral or the letter A, the last paragraph states that, "After considering the views of the commenters, the provisions of the act, and its legislative history, and the terms and conditions of the standard contract, DOE has concluded that it does not have a legal obligation under either the act or the standard contract to begin disposal of SNF by January 31, 1998, in the absence of a repository or interim storage facility constructed under the act."

Do you see where it says that?

A. Yes.

Q. Are you aware that as of May 3, 1995, that was DOE's conclusion?

MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.

THE WITNESS: Am I aware of that now or was I aware of that in 1995? What is your question?

BY MR. MACDONALD:

Q. Were you aware of that in 1995 first?

MS. SULLIVAN: Same objection.

THE WITNESS: No.

BY MR. MACDONALD:

Q. Were you aware of that at any point before this deposition?

107

MS. SULLIVAN: Same objection.

THE WITNESS: I vaguely recall conversations about what we stated in the final rule. When you say aware, I recall conversations to that effect. I don't recall specifics of who they were with or when they were, but I do recall hearing what the final rule stated.

BY MR. MACDONALD:

Q. And what do you recall hearing the final rule state it?

MS. SULLIVAN: Objection. Beyond the scope. Also objection to the extent it calls for attorney-client -- disclosure of attorney-client privileged information. You can answer as to your personal knowledge.

THE WITNESS: I can reread that last paragraph of Section 3 if you like, but that's what I recall.

BY MR. MACDONALD:

Q. Okay. You do recall hearing that DOE had concluded that it does not have a legal obligation under the act or the contract to begin disposal of fuel by '98?

A. Yes.

Q. And you don't remember when you may have

108

heard that conclusion?
A. I recall no specific conversations with any individual at any point in time concerning that conversation.
Q. Roughly what period of time?
A. I would say somewhere in the mid-95 to '96 time frame.
Q. If DOE had concluded that it had no legal obligation to accept fuel in January 1998, how could it have been DOE's belief at that time that DCSs were -- that DCSs legally obligated them to pick up fuel in 1998?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Also objection as argumentative. You can answer the question.
THE WITNESS: Because we still had signed and approved DCSs signed by the purchasers and signed by DOE's contracting officer. Since we had signed and approved DCSs we still had an obligation to fulfill what was in those DCSs, our part of the DCS.
BY MR. MACDONALD:
Q. Is that what this statement suggests?
A. No.
Q. Does this statement suggest the opposite?
A. The statement says nothing about signed

109

and approved DCSs.
Q. But it states that DOE has no obligation to begin accepting fuel in 1998.
A. Yes. It states that, what you just said.
Q. Looking at the DCS instructions again, which I believe you still have in front of you, again, little paragraph sub C.
A. Are you on page 2?
Q. I am, I'm sorry. The second sentence states that, "The process described herein assumes that the FWMS will be able to accept the purchasers' SNF beginning in 1998 according to the acceptance rate listed in the ACR." We've discussed that previously, correct?
A. Yes.
Q. And in the event that the waste management system can't begin accepting fuel in '98, the DCS will be reevaluated by both DOE and the purchasers, correct?
A. May be reevaluated by both DOE and the purchasers.
Q. And the final interpretation in fact states that there will not be acceptance of SNF in 1998, correct?
MS. SULLIVAN: Objection. I think you're

110

mischaracterizing the document.
THE WITNESS: I don't believe it states that.
BY MR. MACDONALD:
Q. What do you believe that it states?
A. Were you talking about the May 3 -- were you talking about Exhibit 24?
Q. The May 3, 1995, Department of Energy final interpretation, yes.
A. I believe it states that "DOE has concluded that it does not have unconditional statutory or contractual obligation to accept high-level waste and spent fuel beginning January 31, 1998 in the absence of a repository or interim storage facility constructed under the Nuclear Waste Policy Act of 1982 as amended."
Q. Okay. And my question was, does this final interpretation state that DOE would not be able to begin accepting fuel in 1998?
A. I don't believe it does.
Q. If you turn to page 3 for me, the second page of the document with page 3 at the top, and follow along the paragraph near the top beginning it states "Although the Act originally envisioned that a geologic repository would be in operation, DOE would

111

be prepared to begin acceptance of SNF by January 31, 1998, it since has become apparent that neither a repository nor an interim storage facility constructed under the Act will be available in 1998."
So my question is does that change your view on whether or not this document and DOE's position at the time was it would not be able to begin accepting fuel in 1998?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: Yes.
BY MR. MACDONALD:
Q. If you would turn to the APR ACR dated March 1985. I believe it's Exhibit 15.
MS. SULLIVAN: How much longer are we going to go? Can we get a break for lunch?
MR. MACDONALD: Yeah. Let me ask some questions about this and then we can break for lunch.
BY MR. MACDONALD:
Q. If you would turn to page 4 of this document, I guess I would ask the same question with respect to this ACR APR, and you can review it if you need to the first four or five pages, but does this document suggest anywhere that DOE believed as of March 1995 that DCSs were contract contractually

112

BY MR. MACDONALD:
Q. Does DOE -- strike that. DOE is currently continuing plans for acceptance of waste developing program plans for acceptance of waste at Yucca Mountain beginning in 2002, is that correct?
MS. SULLIVAN: Objection. Beyond the scope. You can answer the question as to your personal knowledge.
THE WITNESS: Yes, that's correct.
BY MR. MACDONALD:
Q. In developing those plans, is DOE currently planning to use the approved DCSs for the basis of acceptance starting in 2010?
MS. SULLIVAN: Same objection.
THE WITNESS: We have not had discussions as to how we will begin acceptance in 2010, but we've always believed that the commitment -- we did have a commitment to a legal contractually binding commitment to accept the fuel that is designated on the submitted and approved DCSs.
BY MR. MACDONALD:
Q. Have you participated in any planning or conversations in which DOE discussed modifying the entire DCS and FDS process for acceptance for Yucca Mountain?



A. Yes.
Q. You have participated in discussions about modifying the DCS and FDS process?
A. Yes.
Q. Tell me generally the nature of those conversations or that plan.
A. The contract as it's written is difficult to implement because we do not get a great deal of information from utilities until the last part of the waste acceptance process starting with DCS, FCS, I believe comes in 60 days prior to delivery.
Information on the appendix F would most likely be needed by us in order to select the most appropriate transportation cask, and we would have a desire to try and get some of that information a little bit earlier than 60 days prior to delivery to allow us to operate maybe a little more efficient transportation program.
Q. Would utilities that had allocations in the first 10 years based on the '91 ACR who do not have approved DCSs, will they have acceptance rates assuming repository operation in 2010?
MS. SULLIVAN: Objection. Calls for speculation. You can answer the question.
THE WITNESS: We did not discuss that



issue.
BY MR. MACDONALD:
Q. Have you been involved with presentations, either preparing them or listening to them in which Lake Barrett discussed overhauling the DCS-FDS process?
A. I would not say it in those words, so no.
Q. Well, I apologize, I'm not trying to characterize it. What's a better way to characterize?
MS. SULLIVAN: Objection, vague.
THE WITNESS: We, the waste acceptance team, had discussions with Lake Barrett about what we think we needed for waste acceptance transportation program planning and what was supplied by the current contract. Lake didn't -- I would not say discussed anything but more but listened to what our concerns were.
BY MR. MACDONALD:
Q. Do you know in the current program plan what the rate of acceptance DOE is planning to use for the repository when it opens in 2010?
MS. SULLIVAN: Objection. Beyond the scope. That's covered in another topic, but you can answer as to your personal knowledge.



THE WITNESS: This may sound bad, but I don't usually read the program plans.
BY MR. MACDONALD:
Q. Let me ask it a different way. Do you have any knowledge as to the DOE's plan for the rate at which it will accept fuel beginning in 2010?
MS. SULLIVAN: Same objection. You may answer as to your personal knowledge.
THE WITNESS: Yes, I do.
BY MR. MACDONALD:
Q. Okay. And tell me what that rate DOE is planning to use when it begins operation in 2010.
A. I will use what I refer to and is commonly referred to in the RW program as a document called a CRD, which is I believe an acronym for Office of Civilian Radioactive Waste Management System Requirements Document.
Q. SRD then?
A. CRD. It doesn't make sense, but it's called a CRD. Stands for Civilian Requirements Document.
Q. Gotcha.
A. This is the overall systems requirements document. That document I believe specifies a design rate for the repository yucca mountain of 4, 6,

12, -- excuse me. 400, 600, 1200, 2000, 3000, starting in 2010 and 2011 being 600, 2012 being 1200, 2013 being -- you understand what I'm saying.
Q. So it's 400, 600, 1200?
A. 2000.
Q. 2000.
A. 3000.
Q. 3000 by the fifth year?
A. Yes.
Q. And then operating at a steady state 3000 going forward after that?
A. Yes.
Q. And what year is the -- what's the most recent CRD document that you're aware of?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
I believe 2001, although it could be 2000.
BY MR. MACDONALD:
Q. And if the program operated with the acceptance rates in the systems requirement document that you're referring to at 400, 600, 1200, 2000, then at 3000 steady state, the DCSs -- the approved DCSs wouldn't fit that schedule, would they?
A. I would say they would fit it very well.
Q. And why would you say that when the DCSs

121

were submitted based on a schedule that was 400 ramping up to a 900 steady?
A. Because in every year they're less than what the design rate of the facility would be, so they would fit very well in with the design rate of the facility.
Q. If the approved DCSs have a maximum allocation of 900 and you're suggesting the steady state receipt by the third -- oh, I'm sorry. Even by the third year, the acceptance rate would be 1200, how would DOE allocate the additional, in the third year 300, in the fourth year 1100, and by the fifth year the additional 2100 MTU above the 900 MTU on which the DCSs were?
MS. SULLIVAN: Objection. Calls for speculation. You can answer.
THE WITNESS: No decision has been made on that at this point in time.
BY MR. MACDONALD:
Q. No decision is made, but has that issue been considered, to your knowledge?
A. We have had a general discussion on how would we allocate the additional acceptance capacity. No one has recommended -- it's sort of like, we need to think about how we would do this but we have never

122

done it. It was an issue raised but never discussed or researched or analyzed. It's one of those things we need to do in the future.
Q. And you need to do it because the allocation under the expected planned rate exceeds the DCS -- the rates upon which DCSs were approved?
A. It would need to be looked at depending upon several factors. One of the ones you mentioned is included in that.
Q. What are the other factors?
A. Basically even though we're designing a system to a certain rate, we don't know -- or we won't know until a later point in time what rate we're actually going to be operating under because of the financial considerations that the program is always subject to. Even though we would want to design it to X, based on congressional funding, we may only get half of what we need and we may have to do it at some rate less than X.
Q. Do you have a concern that it will not -- the system will not be able to begin accepting fuel in 2010?
MS. SULLIVAN: Objection, beyond the scope. You may answer as to your personal knowledge.
THE WITNESS: Every year our budget

123

hearings are difficult, so when it comes to getting the budget, we need to do the job we want to do or are trying to do. It's a concern.
BY MR. MACDONALD:
Q. Do you know if DOE's currently off of its critical path plan for operating in 2010?
MS. SULLIVAN: Objection. Beyond the scope. You may answer as to your personal knowledge.
THE WITNESS: I must admit I know the term critical path, but I don't know what it is specifically.
BY MR. MACDONALD:
Q. Do you know if there have been any slippage in the milestones for accomplishing the 2010 date?
MS. SULLIVAN: Same objection.
THE WITNESS: I don't believe there have since we just issued an SR basically on time and we're moving forward with license application preparation, but I'm not the best person to talk to concerning the critical path. Because as I stated, I've heard the term, I don't know what comprises it, I don't know what the milestones are.
BY MR. MACDONALD:
Q. If DOE's obligation is to accept fuel as

124

for the acceptance rates contained in this document that formed the basis for the rates contained in the 1988 ACR?"
THE WITNESS: All right. The basis for the rates on page 19 Table 2-2 in the draft 1988 mission plan amendment, or bases are, it's a two-part system with an MRS and repository. Two-part maybe is a poor choice, but it's a system of two MRS and one repository only beginning acceptance in 2003 with all fuel received at the MRS facility, and then 400 MTUs being shipped from the MRS to the repository, the remainder staying in storage at the MRS facility.
It will remain this way with all fuel received at the MRS until 2008, when fuel from nearby reactors will go straight from the reactors to the repository. And then the remainder of the material will still come from the MRS facility.
BY MR. MACDONALD:
Q. Okay. The last portion of that is what I believe you talked about yesterday as the western fuel strategy?
A. Yes. I probably should have said nearby, but it's the same for the purpose I think of our discussion here.
Q. And do you know why this schedule is --

129

this acceptance rate schedule is based on receipt beginning in 2003?
A. Yes.
Q. Explain why.
A. Yeah. That would be the Nuclear Waste Policy Act amendments of 1987 and it posts linkages on an MRS facility to the, what's designated here or stated here as the first repository.
Q. And when you say established linkages, could you explain more specifically what the linkages are that required a start date of 2003 for the MRS?
A. Yes, I could.
Q. Great. Would you do so?
A. Yes, I will. A certain action at an MRS is linked to an action at the repository. So before one action could happen, something else had to happen. And operations and activities at the MRS were linked to actions or accomplishments at the repository.
Q. Do you remember if one of them was that construction of an MRS could not begin until the NRC had issued a license for construction of the repository?
A. I believe that's correct.
Q. In layman's terms and I'll try to state

130

that, and please correct me if I'm wrong, that means DOE can't begin to build the MRS until the NRC has licensed the repository, is that correct?
A. I don't think licensed is the correct word. My belief is that it's linked to a construction authorization.
Q. And when you say which is, what is linked to construction authorization --
A. Is that a question?
Q. My question is -- I didn't understand your statement, so I'm saying what is it that was linked to construction authorization?
A. I thought it was -- I would have to see what the amendment act stated to be positive, but I believe it was either acceptance or construction or some activity at the MRS itself. I can amend my answer by reading what's above section 2.4 of the draft mission plan. And it states here, "The construction of the MRS facility may not begin until NRC has issued a construction authorization for the repository."
Q. And you're reading from what page?
A. 18 No. 2.
Q. So until the NRC has issued a construction authorization, do you know if a construction

131

authorization is different than a construction license?
A. I don't know what a construction license is.
Q. What is a construction authorization?
A. That's a okay or authorization to go ahead to construct a facility.
Q. And that has not occurred at present, has it?
A. No, it has not.
Q. And the other restriction or one of the other restrictions in the 1987 amendments is that an MRS site may not be selected until the Secretary of Energy has recommended the approval of the repository site to the President, is that correct? I'm also reading from page 18.
A. That appears to be correct, yes.
Q. So moving back to the waste acceptance schedule on page 19 at this time, DOE -- this time being 1988 -- DOE anticipated that it could not begin receiving fuel at an MRS earlier than 2003, correct?
A. Yes.
Q. I'd like to ask some questions about the 1991 ACR. Before we go to that, let me just ask you a few questions about the 1990 ACR. There is upward

132

bounding case and lower bounding case. The upper bounding case has the same acceptance rate as the 1988 ACR with different beginning year of acceptance, is that correct? I'll let you grab the 1988. It should be on page 5.
A. Yes, I believe that's correct.
Q. So the ramp-up and the rate to 3000 MTU is the same in, the year in the 1988 ACR was beginning in 2003 and the year for the 1990 upper bound is beginning in 1998, is that correct?
A. Yes.
Q. Do you know why that changed?
A. Yes.
Q. Could you tell me?
A. Yes. The 1987 Nuclear Waste Policy Amendments Act.
Q. And how did that change between June of 1988 and December of 1990?
A. How did what change?
Q. Well, your testimony I believe is that the reason the dates change from the 1988 ACR to the 1990 upper bound is because of the 1987 amendments. And I thought that you had previously testified, and it would make sense, that the June 1988 ACR was developed with the knowledge and understanding that

133

the 1987 amendments act had already come into existence.
A. Yes. Maybe I misspoke. I might be getting my '88s and '90s ACRs mixed up here.
Q. Not a problem.
A. The '88 ACR incorporated the Nuclear Waste Policy Amendments Act provisions on an MRS. The one that's referenced in the draft of the 1988 amendments plan. Is that what you're asking?
Q. No. That's what I understood your testimony a few minutes ago, that this 1988 ACR incorporated restrictions from the 1987 amendments act. And I'm now asking why for the next ACR, December 1990, it still gives the source for the rates in the 1990 ACR as the same 1988 draft mission plan, but the year that DOE was planned to begin acceptance has changed to 1998, whereas in the 1988 ACR the beginning date was 2003. And I'm just asking -- I don't understand where that change -- why that change occurred?
A. I think it occurred simply to -- they made an assumption that some of the linkages would be removed by Congress. Or they suggested -- this is a potential rate, considering some of the linkages in place by the amendments act in '87 would be removed.

134

Q. Okay. So the beginning of acceptance in 1998 in the December 1998 ACR is based on the assumption that Congress would change the law, correct?
A. Yes.
Q. And if Congress didn't change the law, the 19-- if Congress didn't change the 1987 amendments act, removed the linkages, then this schedule could not be accomplished, correct?
A. Yes.
Q. Let's talk briefly about Table 2.2. This shows acceptance beginning in 1998 at a 300 MTU rate ramping up to an 875 rate, is that correct?
A. Yes.
Q. Were these rates also based on the assumption that Congress would change certain of the linkages in the 1987 amendments act?
A. Yes.
Q. So without a change in the law, the schedule in Table 2.2 of the 1990 ACR also could not be accomplished, is that correct?
A. Yes.
Q. Do you know if the 875 rate in Table 2.2 was based on any limitation imposed by the transportation aspect of the delivery of SNF?

135

A. I believe the 875 was as a direct result of the 10,000-MTU limit on the capacity of the MRS only.
Q. So it didn't relate to transportation concerns, to your knowledge?
A. To my knowledge, it did not relate to transportation concerns.
Q. Let's turn briefly to the 1991 ACR. Ask again, for the record, those rates reflected on page 5 are 400 MTU beginning in 1998 ramping up to a 900 MTU rate, is that correct?
A. Yes.
Q. And like the rates in the 1990 ACR this rate could not be accomplished without a change in the law, is that correct?
A. That is correct.
Q. Is it fair to say that this acceptance rate is not authorized by the statute, okay way of putting it?
MS. SULLIVAN: Objection. Calls for a legal conclusion. You may answer the question.
THE WITNESS: I am not sure I'd use those words, but I would say it's inconsistent with the Nuclear Waste Policy Act as amended in 1987.
BY MR. MACDONALD:

136

Q. The schedule is inconsistent with the amendments act?
A. I would say that, yes.
Q. What would a schedule that was consistent with the amendment acts have looked like at this time?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge. And objection, vague as to time frame.
THE WITNESS: That would take me a little while. I would have to go through all the specific linkages in the amendments act in 1987 and also the congressional authorization process. So it would probably take me a couple of hours to sit there to do that, and try and determine it. It would take a while. I'd have to read it and then try to understand it and then reread it and try and understand it.
BY MR. MACDONALD:
Q. When would the earliest that, assuming no changes in the law, when, at this time in 1991, what is the earliest that DOE could have begun accepting spent fuel assuming the linkages stayed the same?
MS. SULLIVAN: Objection, beyond the scope. You can answer as to your personal knowledge.

137

THE WITNESS: I can give you an answer, but it would be speculative again. Because I would have to read the law and the amendments act and the MRS process that's cited therein. There was a nuclear waste negotiator part of it, and it would take me several hours to review all those things and give you what I thought was an accurate answer.
BY MR. MACDONALD:
Q. Would you turn to page 4 of the 1991 ACR and read that middle, the last sentence of the middle paragraph that says, "If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007."
My question is, is that consistent with your understanding of the earliest that DOE could perform if the linkages remained the same?
A. That probably is.
Q. So a schedule authorized or consistent with the amendments act at this time, 1991, would have shown zero MTU in 1998, zero MTU in 1999, zero MTU all the way until 2007 at which time some amount of SNF could have been accepted, is that correct?

138

MS. SULLIVAN: Objection. Calls for a legal conclusion as to what's allowed by the law. You can answer as to your personal knowledge.
THE WITNESS: Were you asking me a schedule consistent with the Nuclear Waste Policy Amendments Act of 1987 or something else?
BY MR. MACDONALD:
Q. No, that's what I'm asking.
A. I would agree with what you said, then.
Q. That would be a schedule with zero acceptance until 2007, correct?
A. Yes.
Q. If that was the schedule consistent -- that would be a schedule consistent with the '87 amendments act, why didn't DOE publish that as a possible schedule?
A. I believe DOE hoped to have success in finding an MRS and accepting waste at an earlier date.
Q. And that hope was based on Congress changing the law, correct?
A. It was based on several things, amongst which would be Congress changing the law.
Q. And if it was based on, at least in part a requirement that Congress change the law, why didn't

139

DOE also believe that Congress would change the law to eliminate the capacity limit of the MRS?
MS. SULLIVAN: Objection, vague.
THE WITNESS: Can you say that again for me or can you read it again for me?
THE REPORTER: "Question: And if it was based on at least in part a requirement that Congress change the law, why didn't DOE also believe that Congress would change the law to eliminate the capacity limit of the MRS?"
THE WITNESS: I don't know why they didn't consider removing the -- limit the 10,000 MTU capacity limit.
BY MR. MACDONALD:
Q. In the 1990 ACR which we just talked about, the upper bounding case ramping up to a 3000 rate and beginning acceptance in 1998, that does assume changing the capacity limit and the schedule linkage, is that correct?
A. Yes.
Q. And DOE eliminated that option or that consideration of that schedule when it published the 1991 ACR, correct?
A. Yes.
Q. And you testified earlier that the DCSs

140

were submitted based on the allocations in the 1991 ACR, correct?
A. Yes.
Q. Why would the DCSs submitted based on acceptance rates that were inconsistent with the statute be binding?
MS. SULLIVAN: Objection. Calls for legal conclusion. You can answer it if you know.
THE WITNESS: Because they're assigned by purchasers, contracting officers and the Department of Energy's contracting officer. The contracting officer binds the government.
BY MR. MACDONALD:
Q. Even though at this time without a change in the law DOE could not accomplish that schedule?
MS. SULLIVAN: Same objection.
THE WITNESS: Yes.
BY MR. MACDONALD:
Q. Is it your testimony that the contracting officer can bind the government to obligations that are inconsistent with federal law?
MS. SULLIVAN: Objection. Calls for a legal conclusion. You can answer as to your personal knowledge.
THE WITNESS: I don't know the answer to

141

that.
BY MR. MACDONALD:
Q. Let's look at the 1992 ACR. Should be Exhibit 13.
A. You say '92?
Q. I did. It's dated March 1993. And if we could just quickly look at that acceptance rate on page 4 it's the same rate that was in the 1991 ACR, is that correct?
A. Yes.
Q. Again, this was an acceptance rate that was inconsistent with the 1987 amendments act?
A. Yes.
Q. Now if we could turn to the 1995 ACR which is Exhibit 15. And the acceptance rates set forth on page 4 have the same rate as the 1992 ACR and it appears to me that the only difference is that rather than having 1998, 1999 going forward has changed from year 1 to year 10, is that correct?
MS. SULLIVAN: Objection. Asked and answered.
THE WITNESS: If you're referring to Table 2.1 in Exhibit 13 and Table 1 in Exhibit 15, that's correct.
BY MR. MACDONALD:

142

Q. And if you testified about this yesterday, I apologize, but can you explain to me the reason for this change to year one, year two, year three, rather than a specific date?
MS. SULLIVAN: Objection. Asked and answered yesterday.
THE WITNESS: I believe during the comment draft, persons, the people who were commenting on it prior to it being published are, a suggestion was made it should be changed from 1998 to year 1, et cetera, year 2, et cetera. That suggestion was adopted and a change was made.
BY MR. MACDONALD:
Q. Do you know as of the date this was published, the 1995 ACR, whether it was still DOE's plan to -- strike that. This rate, the 400, 600, 900 rate was originally based on an MRS opening in 1998 and a repository opening in 2010, is that correct?
A. Yes.
Q. Do you know in 1995 whether it was still DOE's intention to operate an MRS beginning in 1998?
A. I'm just going to read the text here for a minute or two if that's okay.
Q. Sure. That would be great.
(Witness reviewing document.)

143

MS. SULLIVAN: Are you ready?
THE WITNESS: Yeah.
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.
THE WITNESS: Then I'm going to ask again if you can or the reporter can read the question again to make sure I understand.
THE REPORTER: "Question: Do you know in 1995 whether it was still DOE's intention to operate an MRS beginning in 1998?"
MS. SULLIVAN: Same objection.
THE WITNESS: The text says "due to the uncertainty associated with the date of commencement of operation of the waste management system, annual nominal waste acceptance rates are presented by years of operation of a system rather than by specific calendar years."
So I believe the uncertainty had entered into the Department's mind whether the operation of an MRS could start in 1998.
BY MR. MACDONALD:
Q. Do you know if the nuclear waste negotiator was still looking for a site for an MRS in 1995?
MS. SULLIVAN: Objection. Beyond the

144

scope. You can answer as to your personal knowledge.
THE WITNESS: I'm not positive, but I believe by '95 he no longer was, but I could easily be wrong.
BY MR. MACDONALD:
Q. If in fact DOE was not planning to operate an MRS in 1998, why would it maintain the 400 ramp-up to 900 rates in this ACR?
A. It basically took the rates from the prior ACRs.
Q. Even if it wasn't planning to begin with an MRS at this point in time?
MS. SULLIVAN: Objection. Asked and answered.
THE WITNESS: Even with the increased uncertainty in an MRS project, yes.
BY MR. MACDONALD:
Q. I believe you testified yesterday you were at least familiar with the total system life cycle cost documents that DOE published, is that correct?
A. Yes.
Q. Otherwise known as the TSLCCs?
A. Yes.
MR. MACDONALD: I'm going to hand you Exhibit 26.

145

(Pollog Exhibit No. 26 was marked for identification.)
MS. SULLIVAN: I'm going to object to this exhibit as being beyond the scope. It's not among the documents listed in the deposition notice and is not covered by any of the topics. So you can answer any questions to this document as to your personal knowledge.
BY MR. MACDONALD:
Q. And you don't have to look at the whole thing, but if you would turn to page 8 of this document. And on page 8 there is a Receipt/Emplacement Rate or acceptance rate table that begins in the year 2010 with 300 MTU ramping up to 600, 1200, 2000, and then 3000 by the fifth year, is that correct?
A. Yes.
Q. Do you know whether in September 1995 that was DOE's plan for the acceptance rate that it intended to use?
A. I don't know.
Q. Do you know why it would have been included in this analysis of the total system life cycle cost?
MS. SULLIVAN: Objection. Beyond the

146

scope. You may answer the question.
THE WITNESS: I don't know.
BY MR. MACDONALD:
Q. Do you know why this analysis did not use the 400, 600, 900, as set forth in the March 1995 ACR?
MS. SULLIVAN: Same objection.
THE WITNESS: I don't know.
BY MR. MACDONALD:
Q. Is this acceptance rate with one modification on the first rate consistent with what you described as the expected planned acceptance rate in the CRD document?
MS. SULLIVAN: Same objection, and I believe you're mischaracterizing the rate set forth on page 8. You can answer the question.
THE WITNESS: It is, with one exception in the year 2010, seems to be consistent with the CRD rate.
BY MR. MACDONALD:
Q. And the CRD rate is what you earlier testified the current planning document for how DOE will begin accepting in 2010, correct?
MS. SULLIVAN: Objection. Beyond the scope. You can answer as to your personal knowledge.

147

THE WITNESS: Correct.
BY MR. MACDONALD:
Q. The acceptance rates, if you'd turn just quickly to the '91 ACR for me. The acceptance rates contained in the '91 ACR, and I know we've gone through this but I just have to ask -- I want to establish this one point here. The 400, 600, 900 were based on an MRS in 1998 and a repository in 2010, correct?
A. I believe so. I'm not 100 percent sure about the repository in 2010, but I believe that's correct. But again I'm not a hundred percent sure about the repository start date you stated.
Q. At least these rates, the 400, 600, 900 were based on an MRS, not a repository?
A. Yes.
Q. And these are the same rates that are in subsequent ACRs, 400, 600, 900?
MS. SULLIVAN: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. MACDONALD:
Q. Do you know if these rates being based on an MRS are consistent with the requirements of the standard contract?

148

1

1
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.), :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - - - X
Discovery Judge (Judge Sypolt)
Washington, D.C.
Wednesday, May 15, 2002

Deposition of THOMAS POLLOG, a (30)(B)(6) witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness having been duly sworn by BRYAN WAYNE, Notary Public for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:30 a.m., Wednesday, May 15, 2002, and the

2

proceedings being taken down by Stenotype by BRYAN WAYNE, RPR, and transcribed under his direction.

APPEARANCES:

On behalf of Plaintiffs Yankee Atomic, Connecticut Yankee, and Maine Yankee:
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5821

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Room 12128
Washington, D.C. 20530
202-305-9640

3

C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFFS |
|---|---|
| THOMAS POLLOG | |
| By Mr. Skalaban: | 4 |

Afternoon Session - Page 123


E X H I B I T S


| POLLOG EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 - Letter, 3/1/99, Lester to Stock, Shapiro | 8 |
| 2 - Standard Contract | 127 |
| 3 - Government's Witness List | 167 |
| 4 - Copy of 1990 ACR | 169 |
| 5 - 1991 ACR | 171 |
| 6 - Unspecified Doc., Contains APR | 208 |
| 7 - Nancy Montgomery Document, Identifies 35 Issues With Std. Contract Needing Correction | 251 |


* All exhibits retained by counsel.

4

P R O C E E D I N G S

Whereupon,
THOMAS POLLOG,
was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. SKALABAN:

Q. Hello, Mr. Pollog. My name is Pete Skalaban. I represent Yankee Atomic, Maine Yankee, and Connecticut Yankee in the spent fuel litigation. I understand you've been deposed twice in the litigation. Prior to that, have you ever been deposed?
A. Three times, and no, prior to that I have not been deposed.
Q. And the three times was in connection with this spent fuel litigation?
A. Yes.
Q. There was a 30(b)(6) deposition on document issues, is that correct?
A. Yes.
Q. There was a 30(b)(6) deposition on certain other issues, is that correct?

Q. How about revising?
A. Revising, no.
Q. Did you have a hand in preparing when the last revision was issued?
A. I was given a copy of it and asked to give comments on it.
Q. What office of RW is responsible for publishing that document?
A. I believe it's the office of acceptance, transportation, integration, systems integration division. Or division of systems integration.
Q. And presently you work at which office of RW?
A. Office acceptance, transportation and integration, division of waste acceptance and transportation.
Q. So this office of systems integration is kind of a co-equal office?
MR. CRAWFORD: Objection, vague.
THE WITNESS: Are you referring to in the office of acceptance transportation and integration?
MR. SKALABAN: Yes.
THE WITNESS: Yes, correct. There are two divisions in -- I'll refer to the office of acceptance transportation, integration as RW40.



There are two divisions in RW40. One is RW44, and one is RW46. Waste acceptance and transportation is RW44, and the other is division of systems integration. I believe it is also some international programs and that is RW46. And for the benefit of us here, I'm refer to them in the future as RW44, and RW46 if that's fine with you.
MR. SKALABAN: That's fine with me.
BY MR. SKALABAN:
Q. What's your understanding of what the -- well, let me ask this: What is your understanding of the duties of RW 44 to be?
A. Waste acceptance and transportation.
Q. And how about for RW46?
A. Integration and international programs.
Q. What does integration mean to you?
A. That is, they are the keepers or in charge of the technical baseline, performing activities that affect all different parts of the organization such as design basis waste stream.
Q. Do you know who, when they put together RW -- I mean, actually let me ask a better question. RW46, do they actually draft the design basis waste stream document?
A. RW46 or our contractors, their



contractors.
Q. Who's the head of RW44?
A. The acting division director is David Zabransky.
Q. How about for RW46?
A. Jeff Williams.
Q. And how about for -- who's the overall head of RW40?
A. Acting is Jeff Williams.
Q. Is RW44 under Mr. Zabransky, does that have any further divisions?
A. There are two teams in RW 44.
Q. And what are those teams?
A. Waste acceptance and transportation.
Q. Number one is waste acceptance, number two is transportation?
A. Correct.
Q. And who is the head of the waste acceptance team?
A. Mr. Zabransky.
Q. So he's the team leader?
A. Correct.
Q. And who works for Mr. Zabransky?
A. Myself, Marcus Popa, Glenn Gardner, and Dorothy Callier, C-a-l-l-i-e-r.



Q. Now, did someone named Mary Lee Payton used to work there?
A. Yes.
Q. And she's no longer with RW?
A. Correct.
Q. What does Marcus Popa do?
A. Oh, let me add one more name to that list to. John V-l-a-h-a-k-u-s. He is and still on paper part of RW44, but he's temporarily detailed to another part of the organization.
Q. Do you know what he's doing?
A. Yeah.
Q. Can you tell me?
A. Yeah. He's working on detail to our regulatory compliance group, which I believe is RW52 but I'm not positive of that, that routing symbol.
Q. How about Glenn Gardner? What's he working on?
A. He handles incoming DCS's, putting the response letter back to them. He handles general correspondence for us for anyone who may write in.
Q. So if there's an issue of waste -- the Department gets a letter on waste acceptance, it would in the first instance go to Mr. -- or be routed to Mr. Gardner?

33

A. No.
Q. Okay. When you get a letter from the outside, say from a utility that deals with a waste acceptance issue, what typically happens with that?
A. Depends on who they send it to.
Q. There's no sort of procedure to make sure it gets to Mr. Zabransky's attention or someone underneath him?
A. Again, it depends on who it goes to. If it goes to Mr. Zabransky, obviously he handles it. If it goes to the Secretary of Energy, there is a procedure I suppose, but I'm not sure what that is.
Q. Okay.
A. If it comes to the contracting officer, that's another.
Q. Now, you said Mr. Gardner handles incoming DCS's?
A. Yes.
Q. Are there incoming DCS's?
A. Yes.
Q. And who is issuing -- or who is submitting the incoming DCS's?
A. Utilities. And FDS's also.
Q. And to your knowledge, have DCS's and FDS's come in this year?

34

A. I have not seen any, but I'm not involved in the normal procedure of receiving them and preparing a response.
Q. How about last year, 2001?
A. I believe so.
Q. Do you know what utilities are submitting -- sorry. Let me ask a better question. Do you know if utilities are submitting DCS's or FDS's?
A. When?
Q. 2001 or 2002.
A. I don't recall any specific ones that are still doing that.
Q. How about in the year 2000? Do you know whether any utilities submitted DCS's or FDS's in the year 2000?
A. I believe so.
Q. And again, same question. Did you hear which utilities it was?
A. I heard, but I just don't recall.
Q. How about for 1999? Do you know whether any utilities submitted at DCS's or FDS's in 1999?
A. I believe so.
Q. Do you know what Mr. Gardner's doing with these DCS's or FDS's that may have been submitted in the period of 1999 to 2002?

35

MR. CRAWFORD: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. What is he doing?
A. Prepares a response.
Q. Do you know what the response says?
A. Yes.
Q. What does it say?
A. The Department is not approving DCS submittals at this time.
Q. Is it the same thing with FDS's?
A. Yes.
Q. Are you ever asked to review the letters back to the utilities that say the Department is not approving DCS's or FDS's at this time?
A. On occasion.
Q. Is it a standard form letter, or do they differ?
A. Usually a standard form letter.
Q. Do you recall any occasion where there was deviations from the standard form letter?
A. Yes.
Q. And what were the occasions -- what was occurring that --

36

A. I don't recall any specifics, but on occasion a utility may take that opportunity to ask us additional questions other than just submitting the DCS. So if it needed additional response other than the standard form, I might be asked to help in the production or review what the response was.
Q. How frequently have there been letters that deviated from the Department's standard form letter saying that you're not approving or reviewing DCS's or FDS's? How often up does that occur?
A. Once, twice a year.
Q. Have you identified any sort of themes behind those letters that require some kind of deviation?
A. Nothing that I can recall right now specifically.
Q. Is the utility looking for guidance for rate proceedings, perhaps?
MR. CRAWFORD: Objection. Asked and answered.
BY MR. SKALABAN:
Q. Does that ring a bell?
A. Can you say that again to me just to make sure I understand?
Q. Would an example of something that causes

a deviation to the standard form letter be a utility asking for information assisting in a FERC rate filing?

MR. CRAWFORD: Objection to the extent it calls for speculation.

THE WITNESS: That's vaguely familiar, but I'm not sure if it was part of a DCS. It may have been, but I can't testify that that was one of them.

BY MR. SKALABAN:

Q. And to make sure I understand your prior testimony correctly, the essence of the standard form letter is that the Department is not approving or reviewing DCS's or FDS's, as may be appropriate, at this time?

A. Yes.

Q. Given these form letters that go out, would you expect the utilities to continue to submit FDS's or DCS's?

A. I have no expectations of what the utilities will or won't do regarding that.

Q. Do you know whether the Department has ever invited them to continue submitting DCS's or FDS's in any of these correspondence that go out regarding the submittals?

A. I don't believe we've ever invited them to



do that.

Q. Or made any suggestion that the utilities should continue to submit these DCS's or FDS's?

A. I don't recall we've ever suggested whether they should or shouldn't, but I think we've stated that we were, to the effect, and I'm not sure of the exact words, but waive any obligation they have to resubmit a DCS at this time.

Q. So I imagine that doesn't occupy a lot of Mr. Gardner's time, this activity of processing DCS's and FDS's?

MR. CRAWFORD: Objection to the form of the question.

THE WITNESS: I don't know.

BY MR. SKALABAN:

Q. Okay. So outside of handling incoming DCS's, your understanding is he does general correspondence relating to waste acceptance?

A. I don't think I said that.

Q. Okay. Well, tell me what he does outside of handling incoming DCS's?

A. He's handling general correspondence. It may or may not be related to waste acceptance.

Q. Okay. Does he do anything else?

A. From time to time, he is asked to do



certain specific projects.

Q. What kind of projects?

A. Whatever is deemed necessary by Mr. Zabransky.

Q. How about Dorothy Callier? What does she do?

A. Dorothy recently joined us from our Las Vegas, Nevada office last fall. So she is spending the majority of her time working on transportation planning from a contractual point of view and also some time on administrative matters with the contract. Standard contract I'm referring to now.

Q. And what do you mean by transportation planning from a contractual point of view?

A. If the Senate overrides the Governor of Nevada's veto and the program moves forward, we have to serious planning regarding transportation and we are trying to decide most appropriate way to do this, if that will be done through the RSC approach we had worked on earlier or if there will be direct procurement from the government to specific transportation contractors or if we'll do it through our M&O or another contractual mechanism.

Q. So the record is clear, can you tell me what the RSC is and what the M&O is?



A. The RSC is a regional servicing contractor. It was an approach that was looked at several years ago for transportation. M&O refers to management and operations contractor. At this point in time that is BSC, which is I believe short for Bechtel/SAIC Corporation.

Q. So when you say transportation planning from a contractual point of view, it's relating to the actual contracting for implementing the transportation portion of the program as opposed to dealing with the standard contract?

A. Yes.

Q. And at this point RW has not entered into any contracts for any transportation systems?

A. I believe that's correct.

Q. Now, you mentioned that Ms. Callier does administrative matters for the standard contract. What does that entail to your understanding?

A. Oh, helping out with general correspondence to purchasers, returning phone calls when they have questions regarding day-to-day activities.

Q. Is she authorized to issue correspondence on her own, or does she have to have that reviewed by someone higher up such as Mr. Zabransky?

Q. What did you do at that time?
A. I took a leave of absence.
Q. It says detail to IAEA. What is that?
A. International Atomic Energy Agency.
Q. And that agency is completely separate from RW?
A. Yes.
Q. Is it separate from DOE?
A. Yes.
Q. And what is it?
A. It's part of the United Nations.
Q. And how long were you there?
A. Through the end of 1995.
Q. So in January 1995 you came back to work for the logistics and utility interface branch?
A. No.
Q. So is Exhibit 1 in error in that respect?
(Witness reviewing document.)
A. Yes and no.
Q. Okay. Can you explain to me what you mean by that?
A. Yes. I think on paper I was still part of the logistics and utilities interface branch but I was detailed and was working for the engineering division at that time. The final paperwork to get me



from one to the other had not been completed and what the Department will do is just detail a person from one assignment or one group to another. So I think probably on paper that is correct, but in actual activities, when I returned in 1995 I was actually working in the engineering division.
Q. Okay. Well, that may help me reconcile your earlier testimony with Exhibit 1.
A. That's probably true for that too because there is always several months or longer delay between reorganization, between when you actually leave one organization and start another one.
Q. So in the engineering division if I understand correctly based on your prior testimony you were working for Jeff Williams and you were managing the MPC program?
A. Amongst other things, yes.
Q. And that detail was from January 1995 to approximately the fall of 1996?
A. Yes.
Q. Do you remember specifically when in the fall of '96 you stopped working on the detail to the engineering division?
A. Not the specific day, but I believe it was the month of September for some reason, and again,



I'm not -- could be October, could be August, but approximately September of '96. And again, I think it says February '97 here because that's when official paperwork went through where I was no longer in the engineering division. I was probably detailed to the waste acceptance team but just not officially there via paperwork.
Q. Just for the sake of the record, you're referring to Exhibit 1?
A. Yes, I am.
Q. On page 8?
A. That's right.
Q. So when you were working in this period from January '95 to approximately September '96 for the engineering division and reporting to Jeff Williams, you were working on the MPC program and what else?
A. The General Atomics Cask Development Program.
Q. What did your work involve at the MPC program?
A. Essentially I was the DOE project manager for the MPC. It was reviewing activities there regarding whether designs were being done regarding filling the proposal that Westinghouse had submitted,



whether they were on time, any other issues, are they on schedule, on cost, on time, consistent with the design specifications that they had submitted in their response to request for proposal.
Q. So Westinghouse had been awarded a contract related to the MPC program?
A. Yes.
Q. And what did their contract entail?
A. Designing an MPC to the specs in the RFP, and I don't recall if it actually took it to licensing or not, but it was designed and potentially licensing the MPC.
Q. And for the record, can you explain what an MPC is?
A. Multipurpose canister or cask, tri-purpose used for disposal, transportation, and storage.
Q. And was Westinghouse developing a canister or cask system?
A. Canister-based system.
Q. Were they developing any overpacks to go with that canister-based system?
A. Yes.
Q. And what were those overpacks?
A. Transportation, storage, and a transfer cask overpack.

Q. How about a disposal overpack?
A. I don't believe so. That was to fit in the disposal -- waste disposal package that the Department was developing.
Q. So simultaneously as you were working as the project manager on the MPC program with Westinghouse, the Department was developing a disposal overpack?
A. We were designing a waste disposal package.
Q. And the intent was that the waste disposal package would serve as an overpack for the canister that Westinghouse was building?
A. Yes.
Q. Who was involved in the waste package design effort?
MR. CRAWFORD: I object to the form. I'm just going to object to the form of that.
THE WITNESS: The only individual I remember was involved was Tom D-o-e-r-r-i-n-g.
BY MR. SKALABAN:
Q. Do you remember what Mr. Doerring's position was at RW?
A. He was not in RW.
Q. Who did he work for?



A. At the time he was part of the M&O, and I don't know if he actually worked for TRW or Framaton or one of the -- which specific consortium of companies was part of the M&O at that time.
Q. Was there a particular office of RW or branch of RW that was looking -- or that was managing this effort to design a waste disposal package?
A. Yes.
Q. And what branch was that?
A. That would have been an office in our Las Vegas office.
Q. When you say the Las Vegas office, what does that -- does it have a more formal title to that?
A. Yucca Mountain site characterization office. I will call it YMSCO if that's okay if it comes up in the future -- Y-M-S-C-O is how it's usually seen -- in the future.
Q. Is that the main Nevada office?
A. For RW, yes.
Q. Are there any other RW offices in Nevada?
A. Not to my knowledge.
Q. Is there a Yucca Mountain site project office?
A. I don't know. It may be called different



things by different people.
Q. When you were at project manager, did you have a lot of -- did you have any interface with Mr. Doerring on the waste package design?
A. Very little.
Q. Do you know who's responsible for seeing that the designs of the Westinghouse MPC and the waste package would be compatible?
A. Yes.
Q. Who was that?
A. It would be Jim Clark.
Q. And was Jim Clark with DOE?
A. No.
Q. He was a contractor?
A. Yes.
Q. Do you remember if --
A. Yes.
Q. Can you tell me?
A. Yes. JAI.
Q. And would he have been reporting to Jeff Williams or to someone at the Las Vegas office?
A. Neither.
Q. Who would he have been reporting to?
A. He would have been reporting to the M&O east coast manager.



Q. And do you recall who the M&O was at this time?
A. Yes. It was TRW.
Q. TRW. And who is TRW reporting to on accordation between the MPC and the waste package design at DOE?
A. Myself or Jeff Williams. Or Bill Lake.
Q. Why was the Department interested in designing an MPC?
A. Several reasons.
Q. Can you tell me what they are?
A. I believe they saw it as a method for reducing the handling of spent fuel once it's loaded into the canister that it would never need to be handled bare again, thus reducing occupational exposures for all parties; utility and government or government contractor. I believe there was also some discussion about whether we could use MPCs or supplying MPCs to purchasers as an option if there was a delay in meeting the 1998 date.
Q. And were you involved in those -- were you personally involved in those discussions about whether MPC should be supplied to the purchasers as a form of compensation for meeting the 1998 date?
A. No.

MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony.
THE WITNESS: No.
BY MR. SKALABAN:
Q. Was that a fair characterization of what you had just testified to, in terms of supplying MPCs to the purchasers would be some sort of compensation?
A. I wouldn't say compensation.
Q. How would you characterize it?
MR. CRAWFORD: Objection to the extent it might call for a legal conclusion.
THE WITNESS: One way we could meet our '98 date would be to supply the purchasers -- or meet waste acceptance starting January 31, 1998, would be to supply them MPCs.
BY MR. SKALABAN:
Q. Is it your understanding that that would satisfy the requirements of the contract?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
THE WITNESS: Have no idea.
BY MR. SKALABAN:
Q. Now, reasons you gave me for why the Department was pursuing the MPC was method of reducing the handling of bare fuel, number one, and



number two, something that could be given to the utilities in view of the delay in meeting the 1998 date. Were there any other reasons?
A. Not to my knowledge.
Q. How about any benefits from a transportation perspective?
A. Could have been, but I don't recall that being mentioned to me when I started on this.
Q. What were the general physical characteristics of the canister that Westinghouse was designing for the Department?
A. It was big.
Q. Do you have a sense of how many MTUs of spent fuel was capable of handling?
A. Yes.
Q. What was that?
A. Approximately 10.
Q. This would be a rail or this canister would need to be transported by a rail cask?
A. I believe that was the intent.
Q. Was the cask being designed to accommodate failed fuel?
A. I don't recall any discussions relating to failed fuel in the canister ever.
Q. Is it possible it could have been designed



to accommodate that?
MR. CRAWFORD: Objection, foundation.
THE WITNESS: Just as easy, would it be possible to design not to accommodate that. I don't know.
MR. SKALABAN: You just don't know?
THE WITNESS: I don't know.
BY MR. SKALABAN:
Q. What was the maximum burn up of the spent fuel facilities that would be put in the canister?
A. I don't recall the specific number. And again, it would probably depend on what the initial enrichment was to.
Q. Do you have a sense of whether it was being designed to accommodate higher burn-up fuel that was being generated by utilities?
MR. CRAWFORD: Objection. Facts not in evidence.
THE WITNESS: I don't know what you mean by higher burn-up fuel.
BY MR. SKALABAN:
Q. Do you have an understanding of whether utilities have been burning up their fuel to higher levels as time progressed in the '80s and '90s?
MR. CRAWFORD: Objection, vague.



THE WITNESS: I understand utilities are increasing the burn-up of their fuel.
BY MR. SKALABAN:
Q. Do you have an understanding whether higher burn-up fuel generates less spent fuel?
A. Theoretically, higher burn-up fuel should use up in aggregate, industry wide, less spent fuel.
Q. Do you know whether the Department ever encouraged facilities to burn their fuel up at higher levels?
A. I have no knowledge of the Department ever expressing any preference for types of burn-ups, what the utilities should be doing from an operational point of view regarding burn-ups.
Q. If utilities were burning their fuel to higher levels there would be less overall spent fuel for the Department to handle, is that correct?
A. In theory in the aggregate, that's probably correct.
Q. What are the -- just in your general sense of having worked in the industry what is a high level of burn-up for fuel?
MR. CRAWFORD: Objection, vague.
THE WITNESS: When I, Tom Pollog, hear higher burn-up, I think of generally fuel that is

burned up more than 45,000 megawatt days per metric ton of uranium. Other people may have different definitions.

BY MR. SKALABAN:

Q. Do you have any reason to believe that the MPC that was being developed wouldn't be able to accommodate full burned up to the level of 45,000?

A. I don't recall what the burn-up limitations were on the MPC at this time.

Q. My question actually was do you have any reason to believe that it wasn't designed to accommodate fuel of a greater burn-up than the level of 45,000?

MR. CRAWFORD: Objection. Asked and answered.

THE WITNESS: Again I just don't recall what the burn-up limitations were. I don't know.

BY MR. SKALABAN:

Q. So you don't have a reason to believe that it wasn't?

MR. CRAWFORD: Objection. Asked and answered. And best evidence.

THE WITNESS: I have no reason to believe it was nor wasn't.

BY MR. SKALABAN:



Q. And approximately September of 1996 you stopped working on the MPC design. Why was that?

A. Are you referring to me working on it or the Department of Energy?

Q. You first, please.

A. Well, I believe we stopped working on it prior to that. Department of Energy.

Q. When did the Department of Energy stop working on the MPC program?

A. I believe it was about two or three months prior to the date you mentioned.

Q. Approximately summer of '96?

A. Yeah. Early summer.

Q. What was your understanding of why the Department stopped working on the MPC program?

A. At that point in time I think -- I hope I have my dates right. That would have been for fiscal year 1996 we sustained a massive budget cut where it got reduced by almost one half, and the decision was made that we were going to take the money that was given to us in the budget and emphasize Yucca Mountain -- activities at Yucca Mountain.

Q. So would those budget cuts have been -- would the decision to cut the budget, I assume that's made by Congress?



A. Yes.

Q. And that would have been made in September of '95?

A. September or October. I forget what the budget process was that year. We may have been under continuing resolution for a month or two. But late summer/fall of '95.

Q. And so those budget cuts would be taking effect January 1, 1996?

A. No. They would have been taken into effect as soon as the budget was passed which could have been January -- I don't remember when the budget was passed for FY 96. It could have been September, could have been October, could have been November of '95.

Q. So approximately late 1995 the MPC program was cut?

A. Approximately late '95 a decision was made we were going to take the funding that Congress had given us to emphasize Yucca Mountain and not pursue many other activities, one of which was the MPC.

Q. But you continued to work on the MPC program?

A. A certain portion of I believe the prior year's budget was already set aside for the phase 1



or -- I forget how we phase it, phase 1 or phase 2 or phase A or phase B, that portion of the MPC project. So funding was already available for the initial phase which was the design phase of the MPC. And when the budget cut -- when we saw the budget cut for the following year, the decision was made we were not going to follow up with any of the additional phases or later stages of the MPC program.

Q. So that kept you working on the MPC program into 1996, the finishing of phase 1?

A. Phase 1 or phase A, whatever it was called. Yes, that's correct.

Q. So then your work in that respect finished up in approximately September of '96?

MR. CRAWFORD: Objection, mischaracterizes prior testimony. Asked and answered.

THE WITNESS: I believe it was finished up before September of '96, but it could have been some additional details that were going on a little bit later than that into September, but I just don't recall if it was June, July, August, or September.

BY MR. SKALABAN:

Q. And what were the types of things as that program was transitioning out, what kind of new duties and responsibilities were you undertaking?

member of the staff will be retiring soon, so whenever Mr. Zabransky needed help in waste acceptancy, covered a variety of topics.
Q. How about DCS processing?
A. I don't believe I ever processed, reviewed or did anything with the DCS processing other than time to time or on occasion being asked to just review a form letter.
Q. So that would have been to give input to Mr. Zabransky?
A. Yes. Or Mr. Carlson.
Q. Or Mr. Shelor? Were they the directors of the different areas of --
A. That was the chain of command. Mr. Zabransky was directly above me and then Mr. Carlson and then Mr. Shelor.
Q. Is Mr. Shelor still there at RW?
A. He has retired.
Q. How about Mr. Carlson?
A. He has retired.
Q. Now, when you started working with waste acceptance and transportation division in the fall of 1996, did you actually move offices or otherwise -- did you move offices?
A. No.



Q. So you were in your same office, you were just detailed to a different branch?
A. Yes.
Q. Were you involved in any discussions about whether to continue processing DCS's in the fall of '96?
A. No.
Q. Are you aware of whether the Department was considering that?
A. When?
Q. In the fall of '96.
A. No.
Q. Do you know when the Department stopped processing -- actually stopped reviewing or approving DCS's or FDS's?
A. Approximately.
Q. And when was that?
A. It was either at the end of '96 or early '97.
MR. CRAWFORD: I'm going to object to your question as being compound.
BY MR. SKALABAN:
Q. Well, to your knowledge has there been any distinction from the Department's point of view between approving or stopping the approval and review



of DCS's and stopping the approval and review of FDS's?
A. Can you say that for me one more time? I'm sorry.
Q. Sure. Can you read that back?
THE REPORTER: "Question: Well, to your knowledge has there been any distinction from the Department's point of view between approving or stopping the approval and review of DCS's and stopping the approval and review of FDS's?"
BY MR. SKALABAN:
Q. Do you understand my question?
MR. CRAWFORD: Let me object to it as compound.
THE WITNESS: I think so.
BY MR. SKALABAN:
Q. Let me try to rephrase.
A. The question's not the problem. Maybe if you rephrase -- yeah.
Q. What I'm trying to drive at is do you have any awareness of the Department drawing any distinction between stopping the review and approval of DCS's and stopping the review and approval of final DCS's.
A. No.



Q. And if I understand your testimony correctly, you were not involved in any discussions in the late '96/early '97 time frame regarding whether or not the Department should be continuing to approve or disapprove FDS's or DCS's?
A. I was not involved in any of those discussions about what they should be doing or shouldn't be doing regarding DCS's.
Q. And consequently you were not involved in any final decision on that matter?
A. Correct.
Q. Do you have any understanding of why the Department stopped the process of reviewing and approving FDS's or DCS's?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. What is that understanding?
A. This was based upon discussions I had at a later point in time. It was just to limit our liability. It wasn't information that was conveyed to me during that time period.
Q. And when you say it was a later time period, was that in preparation for being a 30(b)(6)

witness?
A. No.
Q. Was that understanding conveyed to you sometime between the end of -- I'm sorry, the beginning of '97 and when you started testifying as a 30(b)(6) witness? Was it sometime in between there?
A. Yes.
Q. Do you remember who conveyed that to you?
A. I believe it was either Mr. Zabransky or Ms. Susan Klein. K-l-e-i-n.
Q. Did they go into any more detail other than limiting liability?
A. No.
Q. Did you express any opinion on that?
A. No.
Q. Now, you talked about some of the things you've been involved in as part of the waste acceptance transportation division since the fall of '96 as being you had involvement with RWA 59, the verification plan, the fee verification. Anything else you can think of?
A. Some minor issues with ACRs, APRs.
Q. What were those minor issues with the ACRs and APRs?
A. Our M&O produced draft ACR APR I believe



in both '96 and '97.
Q. And why was that an issue?
A. It wasn't an issue.
Q. Well, what happened with the draft '96 ACR and APR?
A. Nothing.
Q. Did someone tell the M&O to stop -- to not produce it?
MR. CRAWFORD: Objection, vague and mischaracterizes his prior testimony.
THE WITNESS: I'm not sure what you're asking me.
BY MR. SKALABAN:
Q. Okay. Well, what happened with the draft '96 ACR APR? Why wasn't it published?
A. You say '96 one?
Q. The draft '96 one.
A. The draft, I believe it wasn't published upon my recommendation to Mr. Zabransky.
Q. And why did you recommend that to Mr. Zabransky?
A. Because the data for the '97 one was going to be coming very soon. We got the '96 data late in the cycle and there was still special problems with data reconciliation. So I said to Mr. Zabransky, why



don't we hold off in doing any new ones because the newest data will be coming in shortly.
Q. And what was the data that you were referring to?
A. This would have been the 859 data which is used as the basis for the APR.
Q. And then do you know is that the reason why there was no ACR APR in '96?
A. To the best of my knowledge, yes.
Q. How about the 1997 APR? Why wasn't that published?
A. A decision was made that it would no longer be appropriate to publish additional ACR APRs past the 1995 one at that point in time.
Q. When was that decision made?
A. It would have been in -- I'm pretty sure it was in '97. I don't know specifically what time frame.
Q. What was the basis of that decision?
MR. CRAWFORD: Objection, foundation.
THE WITNESS: I don't recall. I believe Mr. Zabransky said to me we're not going to do one now or at this time.
BY MR. SKALABAN:
Q. Did he tell you why?



A. I believe so.
Q. What did he tell you?
A. He said it would probably never be approved by Office of General Counsel publishing this at this time. So why waste the effort and they probably wouldn't let us publish it.
Q. Did he give you any indication why it wouldn't be approved?
A. No.
Q. Do you have any other understanding at all why a 1997 ACR and APR was not published?
MR. CRAWFORD: Objection to the extent it calls for speculation.
THE WITNESS: None other than what I testified to.
BY MR. SKALABAN:
Q. And you're referring to what Mr. Zabransky told you in that answer?
A. Yes. When your boss says we shouldn't do this, I say okay.
Q. Now, how about more recently? What are the types of things you've been working on?
A. Sitting in rooms like this answering questions like this.
Q. Okay.

understanding.
A. Technically I have an understanding of what we want to do. Implementation-wise, I do not.
Q. Okay. What's your understanding technically?
A. Technically is to further refine the criteria, to make sure our dimensions are going to work at the final design for repository at Yucca Mountain, that they're going to fit in well with any transportation system that we hope to develop, that it will work well within what the purchasers are doing. Basically we have a set of criteria that are going to be viable for all interested parties.
Q. And it's the Department's plan at this time to accommodate the different canisters that are being used by utilities to implement dry storage?
A. It's Department's plan to try and develop a standard canister spec or criteria for including into the contract material in multi-element canisters. And we're trying to do this to include as many waste forms as possible while still incorporating those into the design of the facilities at Yucca Mountain.
Q. When you say as many waste forms as possible, you're talking about different canister



systems that are being deployed?
A. Yes.
Q. Can you think of any major canister systems that are either already designed or licensed from commercial vendors that are excluded by your criteria?
A. Yes.
Q. Can you tell me what those vendors and canisters are?
A. Only one comes to mind right now and that is the TN-68.
Q. And how is that excluded?
A. The cask and canister itself are fine. The problem I think is the impact limiters they're using on the transportation casks are so wide they would be above the plate B and plate F restrictions for unrestricted interchange on rail lines. It's just too wide to transport on a rail line for unrestricted transport.
Q. I see. So it's a problem with it being that particular canister design to actually be transported by rail?
A. No, it can be transported by rail.
Q. But there are certain rail lines it's not going to be able to be used on?



A. Using the current impact limiter design that they have, I don't think you could transport that, I believe in terms of unrestricted to the rail lines. You can still transport it, but I don't think it could be done in an unrestricted manner. So that canister may or may not be able to be developed as a standard canister where we could take it on the schedule proposed by utilities similar to standard fuel.
Q. And that's the intent of the project you've been working on?
A. Yes.
Q. To get a standard set of criteria that will apply to canistered fuel so it can be taken on the same schedule as other standard fuel?
A. Taken on the schedule proposed by the utilities.
Q. So correct with that addition, right?
A. Yes. Now, we believe there's a decent chance that the impact limiters might be able to be redesigned with a different material where it would be not quite as wide. But again, we haven't looked at it in any depth, but it's possible.
Q. How about the NAC multipurpose canister system? Are you familiar with that one?



A. A little bit.
Q. Does it meet your criteria?
A. I'm not 100 percent sure if it does, but my belief is it does. Again, I'm not 100 percent sure, because we looked at so many systems and there's so many dimensions and so many things you have to compare back and forth. Not so much one, but we're doing half a dozen or 10 of these different ones, it's hard to remember every specific of every canister design. But for some reason the TN 68 does stick out in my mind because of the width of the impact limiters.
Q. So you're working on, if I understand correctly, I just want to make sure I do, you've been working on it from this technical implementation side of it looking at what are the proper criteria, looking at different canister designs that are already available and coming up with a standard set of physical criteria that can be used to accept these canisters on the normal schedule?
A. On the schedule proposed by the purchasers, yes.
Q. And if I understand correctly, you're not involved with actually implementing any changes in the contract to do that?

reconstituted in a different way, it may have an effect.
Q. Assuming the failed fuels are put into reconstituted assembly such that it can be handled as any other assembly, then do you see it as a problem of being accepted on the same schedule of other standard fuel?
MR. CRAWFORD: Objection. Mischaracterizes the prior testimony.
THE WITNESS: Most likely not. I don't want see a problem with it. Other factors would have to be looked into, like when it was reconstituted, it was 20 years ago and what the shape is now, but in general I don't see any major concern.
BY MR. SKALABAN:
Q. Now, you said that you've been -- one of the other things you've looked at is failed fuel. Can you tell me about that work?
A. Yes. Standard contract also contains a category of failed fuel. Unfortunately, it doesn't contain criteria for stating whether something is failed or not failed or intact. We would like to be able to give purchasers guidance in that area for making that determination.
Q. So your work in this area is fleshing out



the existing provisions on failed fuel?
A. I would say my work in this area --
MR. CRAWFORD: Objection, vague.
THE WITNESS: I would say my work in this area is from a preliminary stage trying to determine what type of criteria we could possibly put into a contract that would allow the purchasers to make a determination for designated fuel as failed or standard.
BY MR. SKALABAN:
Q. Is any of your work designed to facilitate the acceptance of failed fuel? And you understand that I mean by that?
A. I believe so.
Q. As opposed to just identifying whether it's failed or not.
A. I guess one could argue theoretically if it's easier to identify, it's easier to eventually accept it. So from that perspective, I guess yes it would probably be true.
Q. What are the Department's current plans for accepting failed fuel?
A. Failed fuel will be accepted.
Q. Do you expect it will be accepted on the same schedule as other fuel?



A. Possibly.
Q. And why wouldn't it?
A. If that would present some type of special handling need at a repository. Again, trying to limit to the extent possible occupational exposures seen by individuals working at a receiving facility.
Q. What do you mean by special handling?
A. We will have receiving lines at a handling facility. If incoming waste could be received through one of the normal receiving facilities without any special activity needed to be done, that would be basically normal handling. If it has to be taken off the line and handled in a way other than our normal receipt lines, that would be special handling.
Q. And what is the Department's plans on when fuel that's required to undergo some special handling, when would that be accepted in the schedule?
MR. CRAWFORD: Objection, vague. Foundation.
THE WITNESS: I don't know.
BY MR. SKALABAN:
Q. So your work isn't involved in that in any way?



A. From a receipt at the repository -- I don't know.
Q. How about from a contractual perspective?
MR. CRAWFORD: Objection, vague.
BY MR. SKALABAN:
Q. Do you have any understanding of what happens to fuel that requires special handling under the contract?
A. Yes.
MR. CRAWFORD: Objection to the except it calls for legal conclusion.
BY MR. SKALABAN:
Q. Can you tell me what that understanding is?
A. It's subject to the late acceptance.
Q. It's subject to but not necessarily going to be under delayed acceptance?
MR. CRAWFORD: Objection. Asked and answered. Argumentative and foundation.
THE WITNESS: It's subject to delay but may not necessarily be delayed. It would be dependent upon what the receiving capabilities are at the receipt facility.
BY MR. SKALABAN:
Q. Do you have an understanding of what the

A. That would be putting acceptance rates in the ACRs.
Q. And when did you start work on that?
A. I believe the first would have been the 1991 ACR.
Q. Do you recall having any work or having any involvement in the preparation of the 1990 ACR that preceded that?
A. I don't believe so.
MR. SKALABAN: Let me mark as Exhibit Pollog 4 the 1990 ACR.
(Pollog Exhibit No. 4 was marked for identification.)
BY MR. SKALABAN:
Q. If you could just take a moment to review this 1990 ACR and see if it confirms for you whether or not you worked on this particular ACR.
(Witness reviewing document.)
BY MR. SKALABAN:
Q. Now having had an opportunity to review Pollog Exhibit 4 which is the December 1990 ACR, do you recall having involvement in preparation of this ACR?
A. I don't believe I did.
Q. Were you at the office of logistics and



utility interface at that time or was this right before?
A. I believe as this was getting completed, I was just starting in that position.
Q. Would this have been one of the first documents that you reviewed when you became part of the logistics and utility interface branch?
A. Possibly. I don't recall if I did or not. I may have reviewed it, but I don't recall at this time.
Q. So as best as you can recall, your first involvement with the ACR in preparing the ACR was the 1991 ACR?
A. Yes.
Q. And what did you do with regard to the preparation of the 1991 ACR?
A. A draft version of it would have been done by our contractors. They would have transmitted that to Department of Energy, Mr. Brownstein. I would have reviewed the draft, commented on it, resolved my comments with the contractor, possibly discussed my comments with Mr. Brownstein. Most likely would have, but I am not sure -- I don't recall sitting down and talking with him about my specific comments.
Q. And then after that what would happen?



Would the contractor prepare another draft?
A. Yes.
Q. Do you remember when the process began for the 1991 ACR?
A. Not specifically.
MR. SKALABAN: Let me mark as Pollog Exhibit No. 5 the 1991 ACR.
(Pollog Exhibit No. 5 was marked for identification.)
(Witness reviewing document.)
BY MR. SKALABAN:
Q. And this document is familiar to you?
A. Yes.
Q. And this is the 1991 ACR that you helped prepare?
A. Yes.
Q. And is this correct as it reflects in the date that it was issued sometime in December 1991?
A. I believe so.
Q. When did you first start work in 1990 -- did you start work in 1991 on this?
A. Exhibit No. 5?
Q. Yes.
A. I don't recall the exact time. The only thing I can suggest is generally speaking I know how



long these documents take to get done from beginning to publication.
Q. And about how long is that?
A. Something like this I would say three to four months.
Q. So that suggests to you that you probably started work on this document in the fall of 1991?
A. Probably --
MR. CRAWFORD: Objection. Mischaracterizes prior testimony.
THE WITNESS: Probably late summer.
BY MR. SKALABAN:
Q. Now, what else do you recall about your involvement in preparing this? If I understand your prior testimony you just gave me, you received a draft version from the contractor through Mr. Brownstein, reviewed it, commented on it, and discussed your comments with the contractor, is that correct?
A. Yes.
Q. What would you have done after that? Or let me ask you this instead: What was the next step in the evolution of this document?
A. After all comments had been addressed by the waste acceptance staff members who were reviewing

A. We probably had the Office of General Counsel between those two individuals and the next level down. They would want to see general counsel had signed off prior to their review and approval.
Q. Do you know who came up with on Pollog No. 5 the acceptance rates that appear on page 5?
A. You're referring to an individual?
Q. Yeah.
A. I don't know specifically who said put these in here. My guess would be Mr. Brownstein. He would have gave the initial direction for the contractors to produce a document with general information he wanted into it.
Q. Did you make the -- so it wasn't you who made the decision to use these particular rates?
A. I did not make a decision.
Q. What was your understanding of why -- I'm sorry. You did not make a decision as to these rates?
A. Correct.
Q. What was your understanding of why these particular rates were chosen? And for the record, they are 400 in 1998, 600 in 1999, and then beginning of the year 2000 to 2007, 900 MTUs a year.
MR. CRAWFORD: Objection, foundation.



THE WITNESS: My understanding for the basis of those rates was --
MR. CRAWFORD: Objection to the extent it calls for speculation.
THE WITNESS: -- compliance with the Nuclear Waste Policy Amendments Act of 1987.
BY MR. SKALABAN:
Q. How were these rates compliant with the Nuclear Waste Policy Act of 1987 as amended?
A. I believe there is a 10,000 metric ton limit at the repository. I'm trying to remember the exact wording now. Prior to operation -- no. 10,000 MTU limit at a MRS prior to beginning of operation at the repository. The repository was scheduled to begin in 2010. So if you add up the cumulative total of S&F acceptance through 2007 and you added 900 more for 2008, 2009, that brings you to 10,000 metric tons and compliance with the 10,000 MTU limit on the MRS.
Q. Were these rates consistent with the schedule linkages in the Nuclear Policy Act amendments?
MR. CRAWFORD: Objection, vague.
THE WITNESS: I believe not. I believe they assumed linkages would be modified by Congress.
BY MR. SKALABAN:



Q. If the repository was slated to begin in 2010 and the linkages were not removed, did you have any understanding at this time of when an MRS could be available?
A. It would be later than --
MR. CRAWFORD: Objection to the extent it calls for speculation.
THE WITNESS: It would have to be later than 1998. And I forget specifically what the linkages state, but several years later than that.
BY MR. SKALABAN:
Q. Does 2007 sound right to you as the earliest time the Department estimated that it could have an MRS available if the schedule linkages of the MWPAA were not removed?
MR. CRAWFORD: Objection to the except it calls for speculation. Foundation.
THE WITNESS: Two dates sound familiar. One is 2004 and one is 2007.
BY MR. SKALABAN:
Q. And what's the -- why does 2004 pop in your head?
A. I forget if the linkages were tied to license application or construction permit or construction authorization by the NRC. There's some



linkages tied into acceptance and the schedule for operation of the repository and I just forget right now which one it was.
Q. Well, let's take a look at Pollog No. 4 which is the earlier ACR for the prior year. Now on page 4 of that document in the last paragraph, and it's three sentences down, it says, "The current restrictions in the Amendments Act linking the repository and MRS make it impossible for DOE to accept waste at an MRS facility on a schedule that is independent from that of the repository." Do you see that part?
A. Yes.
Q. And do you agree with that?
A. Yes.
Q. And that was your understanding as you were preparing the 1991 ACR.
A. Yes.
Q. And you see in the same paragraph but in the next page, page 5, last sentence states, "If the current linkages to the repository are maintained, it is estimated that commencement of facility operations and initial acceptance of SNF/HLW by DOE would not start until 2007." Do you see that?
A. Yes.

Q. Now, does that indicate to you that the Department's estimate of when it could get an MRS up and running in view of the MWPAA linkages was 2007?
A. If the linkages were maintained, yes.
Q. So the Department's estimate at the time you were preparing the 1991 ACR, their best estimate of the earliest time they could get an MRS available prior to a repository under the existing MWPAA schedule linkages was three years ahead of the repository?
A. Is that a question?
Q. Is that true?
A. If the linkages were maintained, yes, that is true.
Q. Turning back to Pollog 5 which is the annual capacity report 1991, page 5, we see the projected waste acceptance rates. And were these the basis of the DCS submittals that were going to be submitted by purchasers?
A. Yes.
Q. Do you know at the time of the preparation of the ACR, was it the Department's intent that any DCS submittals that did not comply with the ACR would be rejected?
MR. CRAWFORD: Objection, foundation.



THE WITNESS: I think the Department's position was that DCS submittals that did not comply with the ACR and the DCS instructions would be rejected.
BY MR. SKALABAN:
Q. And one of the ways that they would not comply with the ACR DCS submittal and instructions is reflected on page 8, if the purchasers included an allocation that was greater than -- the allocation submitted in their DCS's an allocation that was greater than their allocation contained on table 3.1 on page 8? Is that correct?
A. Yes.
MR. CRAWFORD: Well, your pages are -- 3.1 on page 9.
MR. SKALABAN: Thank you, Counsel, for correcting that. That doesn't change your answer, I assume?
THE WITNESS: No.
BY MR. SKALABAN:
Q. Now, during the preparation of the ACR, was there any discussion about whether or not the waste acceptance rates should be inconsistent -- well, do you agree then that these waste acceptance rates reflected on the page 5 of this table are



inconsistent with the schedule linkages as they existed at the time, 1991?
A. Yes.
Q. And was there any discussion within the Department about whether they should be using a waste acceptance schedule that was inconsistent with the MWPAA?
A. Not to my knowledge.
Q. Do you have a belief or opinion why that was?
MR. CRAWFORD: Objection to the extent it calls for speculation. Objection to the foundation.
THE WITNESS: Yeah, I have an opinion.
BY MR. SKALABAN:
Q. Can you share that with me, please?
A. Yeah.
MR. CRAWFORD: Same objection.
THE WITNESS: At that point in time it was believed that the only viable way for us to start accepting waste in 1998 at a DOE facility was through an MRS, and if the negotiator proved successful, Congress would remove the linkages.
BY MR. SKALABAN:
Q. So those were based upon Congress changing the law?



A. Yes.
Q. And this schedule was predicated on Congress changing the law? And by this, excuse me, I'm referring to Table 2.1 on page 5.
A. This schedule is predicated upon Congress altering the linkages in the '87 amendments act.
Q. Was there any discussion at the time of the development of this ACR about the likelihood of Congress doing that?
A. Not to my knowledge.
Q. During the -- actually at any time that you were with RW, did you have any discussions with anyone about what would happen -- did you have any -- scratch that. Did you have any discussions with anyone at RW about what rate this waste acceptance schedule would continue on beginning in 2008? And again, I'm referring to page 5 of the 1991 ACA.
A. I believe so.
Q. And who did you have those discussions with?
A. I don't recall any specific discussions, just general vague recollections of discussions like that with -- I can't remember any specific person. I could speculate who it would be with, but that's not a fact.

to the electricity generating operations at all to be loading casks?
A. Probably not. I don't see why it would.
Q. Wouldn't loading casks take staff away from their other duties at the plant?
A. Yes.
Q. So you can't foresee a situation where an operating utility wouldn't want to not have a large amount of spent fuel pickups in any given year?
A. I think there are a little too many negatives in there for me to understand what you're asking, so can you repeat it for me?
Q. What I'm asking is can you foresee a situation where an operating utility, once they have been able to remove enough spent fuel to keep under full core reserve, where they would not want to be bothered by pickups of spent fuel?
A. I guess --
MR. CRAWFORD: Objection to the extent it calls for speculation. Or just to the foundation.
THE WITNESS: I guess that's possible, but I don't think it's likely.
BY MR. SKALABAN:
Q. And so it's your belief that an operating reactor is going to want to get fuel removed as



quickly as possible regardless of whether it needs to have that fuel removed to avoid storage costs?
A. Storage costs or just public perception they want to get the material off the sites.
Q. And again, I'm trying to understand what the basis is for your belief that public perception would be an overriding factor in the thinking of operating utilities?
MR. CRAWFORD: I would object to the extent it mischaracterizes testimony.
THE WITNESS: I believe it's in their interest to have the DOE accepting material and moving it off site. The public would most likely not view that facility as a permanent storage location and allow continued operation over a longer period of time if DOE is operating and accepting waste and moving it off site.
BY MR. SKALABAN:
Q. So you're saying -- I mean, is it your opinion that a utility is going to want to hold on to its allocations no matter what because of this public perception?
A. Amongst other reasons, yeah. That's my opinion. Again, it's not a fact, but that's my opinion.



Q. And I'm trying to get at what the basis for your opinion is?
A. Discussions with utilities.
Q. And you can't recall any of those discussions?
A. Not with any specific utility who said to me this is our, you know, this is an issue. But it's come up several times in general discussions with utilities.
Q. And you don't remember who those utilities are?
A. Not off the top of my head.
Q. You don't remember when these discussions were?
A. I would say over the last five years, when I started doing most acceptance issues and started becoming more active involved with utilities.
Q. So these discussions would have occurred after it was clear DOE was not going to meet the 1998 date, wasn't going to perform until 2010 at the earliest?
A. Some.
Q. Do you remember discussions before then?
A. Possibly. I have no specific recollections of specific discussions. They could



have occurred prior to that or they could have occurred after that.
Q. Well, in the fall of 1996 when you started working for waste acceptance and transportation, isn't it true that it was well accepted by everyone that DOE was not going to make the 1998 date and they weren't going to start until 2010?
A. I'm not sure I would say well accepted. I mean I think some people still hoped it was possible, although highly unlikely, but it was possible.
Q. Who do you -- I mean, who still believed it was possible?
A. I don't recall any specific names, but we were doing work regarding interim storage facilities. There were pieces of legislation that had been introduced that could have shortened times necessary for developing monitored retrievable storage and other things like that.
Q. Well, in the fall of 1996, there was no MRS site, that's correct?
A. Yes.
Q. There was no funding to develop an MRS site?
A. Yes.
Q. That's true, there was no funding?

A. Correct.
Q. There was no transportation system in place?
A. There was no RW transportation system in place.
Q. There was -- when you say no RW transportation system in place, what other transportation systems are you referring to?
A. There are private casks available to be leased.
Q. So there's no MRS site, no funding, no RW transportation system in place and there were people at RW who still believed they could make the January 1998 date?
A. They believed that it was possible, although highly unlikely.
Q. Were you one of those people?
A. No.
Q. Can you name for me who did?
A. I don't recall the specific names.
Q. Did they ever tell you how they envisioned it would happen?
A. If I remember, again I'm not recalling specific conversations, through using DOE facilities for storage or through congressional actions



specifically not designating a site and certain activities have to occur by a certain date.
Q. Are you aware of any utility that believed in the fall of 1996 that DOE was going to make the 1998 date?
A. No.
Q. Or anything close to it?
A. Depends on how you define anything close.
Q. About 2002, 2003.
A. I can't speak for whatever utility believed as of -- what would occur in 2002 or 2003.
Q. Isn't it pretty clear that absent a dramatic change in the law and a dramatic change in the program there was going to be no performance by DOE prior to 2010? And I'm talking the fall of 1996 time frame.
A. I would not say that.
Q. Okay. Where do you think I'm wrong?
A. I question your word dramatic. I mean, pieces of legislation were introduced I believe in both the House and Senate that would accelerate DOE acceptance, accelerate having acceptance prior to 2010 at a storage facility. I believe one even received 64 or 65 votes in the Senate, so was it possible? Yes. I think some people believed that it



could have happened.
Q. And which legislation are you referring to?
A. There was a Senate bill, and I can't remember the name of it, and there was a House bill, for some reason HR 10 -- I don't remember the legislation names, but there was a bill in the House and the Senate. I think one was called the Upton Towns bill and I forget what the Senate bill was. But there was actually a vote on it and it was passed I believe like 65 to 35 or 34, but that's as far as it went. I think the President said he would have vetoed that bill if it went any farther, if the House had passed it.
Q. And what time period was this?
A. I don't recall. It could have been between '96, '97, '98, and '99. Somewhere in there. In the mid to late 90s. It was several years in a row there were several pieces of legislation introduced.
Q. What was the target date for acceptance in that legislation?
A. I don't recall.
Q. Do you think if Congress passed legislation specifying a deal where DOE had to accept



waste in one of these interim bills it would have happened?
MR. CRAWFORD: Objection to the extent it calls for speculation.
THE WITNESS: If Congress passed it and the President didn't veto it and he approved it and -- yeah. I think it could have happened.
BY MR. SKALABAN:
Q. But that's what happened in 1982, isn't it?
A. Yeah, I guess so.
Q. And we didn't make 1998.
A. Obviously. That's why we're here.
Q. So now when you these conversations with utility representatives that you can't specifically recollect, relating to whether they would ever give away their allocation slots, this was happening in an environment where it was very clear DOE was not going to make 1998 and it was very unlikely that DOE performed in near future, is that correct?
MR. CRAWFORD: Objection to the extent it mischaracterizes his prior testimony.
THE WITNESS: I would agree with that.
BY MR. SKALABAN:
Q. Now, do you think uncertainty in DOE's

241

as long as they generate power. If costs go up they may have to pay more proportionally on an MTU basis for every assembly that's accepted.
Q. So wouldn't they want General Atomics' fuel to be picked up as cheaply as possible?
A. In the case of General Atomics they may, since it probably only is one cask's worth. It would be one shipment most likely, in one cask. So you would never go there and take a tenth of a cask, a tenth of a cask, a tenth of a cask load. So that cask isn't -- using that cask for the General Atomics unit isn't going to deprive anyone else of a cask shipment from their facility.
Q. Well, let's look at, for example, Dairy Land Power. You have .8 MTUs, 6 MTUs, 3 MTUs, 3.9, 3.4, 1.5, 3.3. Do you see that?
A. Yes.
Q. Spread out over different years?
A. Yes.
Q. Do you think DOE would come to Dairy Land just to pick up .8 MTUs?
A. Possibly, because it might be one cask load. I'd have to see what the MTU per assembly is and how that would fit into one cask. They have a unique design I believe, Dairy Land. They have a

242

shorter BWR fuel. It's a little bit unique in design. I'm not sure how that would fit into the current casks, but it would -- you would have to see how that would fit into a specific cask.
Q. Is DOE concerned at all about minimizing utility reactor storage costs?
A. Concerned in the sense we would prefer to see it happen, but not so concerned where we're planning our system on that.
Q. So there's no -- it's not a consideration in your plan?
A. It's not a consideration in planning of our system.
Q. Is it a worthy -- I mean, is it one of their objectives?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: At one point in time it was one of our objectives.
BY MR. SKALABAN:
Q. What changed to make it no longer an objective?
A. I think our objective now is just to get a system operating, period, that works.
Q. So the delaying in 1998 has impacted that

243

objective?
MR. CRAWFORD: Objection.
THE WITNESS: I wouldn't say that.
BY MR. SKALABAN:
Q. Okay. Would you explain that for me a little further?
A. The technical difficulties at Yucca Mountain, the technical difficulties in moving forward with the program and especially the financial difficulties based upon our lack of resources from Congress has made our lives very difficult in achieving any type of cost effective program.
Q. Now, do you think -- let's stay with the example of Dairy Land for a moment. It shows under the ACR schedule here, 21.9 MTUs picked up over 10 years, is that correct?
A. Yes.
Q. Now, it's showing DOE having to take seven trips to do that according to the OFF '95 ACR schedule, is that correct?
A. Yes.
Q. Do you think it would be more cost effective for DOE keeping equal the annual aggregate acceptance rates across the board, do you think it would be more effective, cost effective for DOE if

244

they removed that 21.9 MTU in three trips rather than seven?
MR. CRAWFORD: Objection, foundation, and objection relevance.
THE WITNESS: Probably, yes.
BY MR. SKALABAN:
Q. So if the program has limited resources, wouldn't the program want to encourage a way to limit the frequency of the shipments to an individual reactor site while still taking the same amount of MTUs?
MR. CRAWFORD: Objection, vague, objection, assumes facts not in evidence.
THE WITNESS: We would like to but the program still has to work with them in the confines of the contract and the equity issue is among all contract holders. Again, you're talking about robbing Peter to pay Paul. So if you're taking from one, you're giving to another.
BY MR. SKALABAN:
Q. Well, I'm not talking about -- I guess that's your opinion of shutdown priority, is that right?
A. Yes.
Q. Okay. But I'm not talking about shutdown

249

in connection with this?
A. Attending the meetings, developing DOE positions, reviewing DOE positions developed by contractors.
Q. Did you review any utility positions?
A. Yes.
Q. Who were the contractors that were involved in this?
A. Mr. Cole. Mr. Vance, I believe, I'm not positive, but I'm pretty sure. Mr. McDuffy. I believe they were the primary contractors who worked on it.
Q. And how often did you meet with the utilities?
A. Not very often. I think I may have attended three or four meetings over a period of almost two years.
Q. About how much of your time did this ACR -- working in connection with the ACR issue resolution process, how much time did that occupy of yours on a percentage basis, would you say?
MR. CRAWFORD: Objection, vague.
THE WITNESS: It would depend upon the time. When are you specifically asking me about?
BY MR. SKALABAN:

250

Q. Well, let's start with when you worked in the -- again, worked for Mr. Brownstein in the utility interface logistics branch in 1989.
A. I'm going to approximate 5 to 10 percent of my time on average. Some months maybe 20 percent, some months less than that.
Q. And so when you started to work for Mr. Brownstein in late '90, it was approximately 5 to 10 percent of your time?
A. On average.
Q. How about in '91?
A. Similar.
Q. How about in '92?
A. I don't think I participated in anything in '92 because I was only working for Mr. Brownstein January through March, through late March, and I don't remember participating in any activities with the ACR --
Q. Okay.
A. -- issues resolution team.
Q. That's right. Because you left -- so you think it's January to March '92 you left for Austria?
A. Correct.
Q. So 1992 it wouldn't have been a factor?
A. To the best of my recollection it was not

251

a factor. Almost three months.
Q. And how about when you came back -- well, actually is the waste acceptance team, is that sort of an evolutionary office to the utility interface and logistics branch?
A. Yes.
Q. So when you came to -- returned to waste acceptance in late fall of '96, there was no ACR issue resolution process ongoing, was there?
A. There was no process ongoing.
Q. So it's fair to say the extent of your involvement in the ACR issue resolution process would have been late 1990 and through 1991?
A. Yes.
Q. And do you recall during this period of late '90 through 1991 about how many meetings did you have with utility representatives?
A. I would say three or four. Could have been as many as five, but I doubt it was any more than that.
Q. Okay.
MR. SKALABAN: Let's mark as Pollog Exhibit 7.
(Pollog Exhibit No. 7 was marked for identification.)

252

BY MR. SKALABAN:
Q. Are you familiar with this document?
A. No.
Q. You've never seen it before?
A. I have never seen it before.
Q. Does it indicate to you that it was prepared by Nancy Montgomery who, I believe is she now Nancy Slater?
A. Yes. That's why I was chuckling because when I refer to Nancy Slater, it's Nancy Montgomery on this document.
Q. Does this indicate to you that it was prepared by her or under her direction?
A. Under her direction or prepared by her, yes.
Q. And it says here that the Department of Energy has identified 35 issues associated with the standard contract which need to be resolved to ensure that the waste management system can achieve maximum efficiency while attempting to ensure equity among the waste owners. Do you see that in the abstract beginning of this document?
A. Yes.
Q. Is that what your understanding of the permanent of the ACR issue resolution process was?

A. Basically yes.
Q. Do you disagree at all with that sentence?
MR. CRAWFORD: Objection. Best evidence.
THE WITNESS: I'm not sure how much it was to achieve maximum efficiency. It was an arbitrative, but I don't think we ever sought to achieve maximum efficiency.
BY MR. SKALABAN:
Q. Do you know why? Do you have any reason to know why that got into a DOE document?
MR. CRAWFORD: Objection to the extent it calls for speculation.
THE WITNESS: No, I don't.
BY MR. SKALABAN:
Q. But it was a DOE objective to achieve efficiency, at least in the '80s and perhaps early '90s?
A. Yes.
MR. CRAWFORD: Objection, vague.
BY MR. SKALABAN:
Q. And would that efficiency extend beyond just DOE's operations and also include utility needs?
MR. CRAWFORD: Objection, vague.
THE WITNESS: Well, it would be good if we could do things that are in both parties' interest



that minimize cost for both the Department and the utilities.
BY MR. SKALABAN:
Q. And at the time of the ACR issue resolution process, or at least your involvement of it in late 1991 -- late '90 and '91 -- was it your understanding that an objective of the Department was to achieve efficiency for both the Department and its operations and in for the utilities and their on-site storage needs?
A. It was a goal that we could do things that would be beneficial to both parties.
Q. If you could look at page 2 of this document, the standard contract issues. See in the second sentence -- well, do you agree with the first sentence?
A. I believe. So I'm not positive about the six months but it sounds right. But I essentially believe it's correct.
Q. Just for the record, that reads, "Since the MWPA required that the contracting process be completed within six months, many outstanding issues still existed when these contracts were signed."
MR. CRAWFORD: Objection to the sidebar, objection to the form.



BY MR. SKALABAN:
Q. Well, do you agree with me I correctly read what the first sentence said here, Mr. Brownstein?
MR. CRAWFORD: Objection to the form of that.
MR. SKALABAN: I'm sorry; I apologize, Mr. Pollog. It's getting a little late in the day.
THE WITNESS: He's a little older than me if you ever met him.
MR. SKALABAN: I do apologize.
BY MR. SKALABAN:
Q. Do you agree with what I just read in the record is the first sentence? Did I correctly state what's here?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. Now, the next sentence says, "DOE recognized that the standard contract contained insufficient detail in certain areas to effectively implement the waste acceptance process." Do you just agree with that?
A. Yes.
Q. And do you agree that DOE wanted to try to



resolve the issues so the waste management system could achieve maximum efficiency while attempting to ensure equity?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: I think DOE wanted to resolve a lot of these issues and be more efficient and ensure equity among the waste owners. The maximum efficiency, I never saw that as one of our overriding goals is to be maximally efficient.
BY MR. SKALABAN:
Q. But to be efficient was?
A. As far as could be achieved while maintaining or assuring equity among the waste owners.
Q. There's a list here of 35 contract-related issues which require resolution prior to waste acceptance. Are you familiar with this list? And take all the time you need to go through it.
A. Yeah. I believe I am. I in the past thought there was 34 and I'm not sure what the 35th one was here. But it's either 34 and there's an error here or they added one they were not aware of at the time. But I'm familiar with most of these issues.

0274

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.), :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, May 16, 2002

Continued deposition of THOMAS POLLOG, a 30(b)(6) witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness having been previously sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 9:30 a.m., Thursday, May 16, 2002, and the proceedings being taken down by Stenotype by BRYAN WAYNE, RPR, and transcribed under his direction.

274

APPEARANCES:

On behalf of Plaintiffs Yankee Atomic, Connecticut Yankee, and Maine Yankee:
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5821

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W., Room 12128
Washington, D.C. 20530
202-305-9640

275

C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFFS |
|---|---|
| THOMAS POLLOG | |
| By Mr. Skalaban | 277 |

Afternoon Session - Page 379


E X H I B I T S


| POLLOG EXHIBIT NO. | PAGE NO. |
|---|---|
| 8 Annual Capacity Report | 278 |
| 9 Instruction Sheet | 316 |
| 10 Memorandum w/attachment, 9/29/87 | 336 |
| 11 Letter w/attachment, 9/29/87 | 365 |
| 12 Memo, 6/28/91 | 373 |
| 13 Memo, 5/21/91 | 379 |
| 14 Letter w/attachment, 9/25/92 | 405 |
| 15 Letter w/attachment, 9/29/92 | 405 |
| 16 Letter w/attachment, 9/25/92 | 405 |
| 17 Expert Report of Edward C. Abbott | 444 |


276

P R O C E E D I N G S

Whereupon,
THOMAS POLLOG,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MR. SKALABAN:
Q. Mr. Pollog, did you have an understanding of whether or not the ACR issue resolution process which you participated in for approximately a year, year and a half, was that binding?
MR. CRAWFORD: Objection, vague. And objection to the extent it might call for a legal conclusion of some sort.
THE WITNESS: I didn't believe so.
BY MR. SKALABAN:
Q. Do you know if anyone at the Department had the opinion that the exchanges and discussions between the utility representatives and the Department representatives were any conclusions that might have been reached between those two bodies was a binding commitment?
MR. CRAWFORD: Objection, vague.

277

Speculation. Foundation.
THE WITNESS: I don't recall having any conversations with anybody in the Department about whether those conversations were -- or agreements were binding.
BY MR. SKALABAN:
Q. Was it the Department's expectation that any understandings or agreements that may have been reached through that process would ultimately have to be implemented by amendments to the contract?
MR. CRAWFORD: Objection, foundation and to the extent it calls for a legal conclusion.
THE WITNESS: My best memory of that was to implement agreements between the parties would require contractual amendments.
MR. SKALABAN: Mark this as Pollog Exhibit 8.
(Pollog Exhibit No. 8 was marked for identification.)
BY MR. SKALABAN:
Q. Mr. Pollog, can you identify this document for the record?
A. It appears to be a copy of the June 1988 annual capacity report.
Q. If you could turn to page 10 of this

278

document, and there's a section 4.0 regarding the annual capacity report issue resolution process. Do you see that?
A. Yes.
Q. If you could read the last two sentences of that paragraph. You don't have to read it out loud, just to yourself?
A. The first paragraph in section 4.0 or the second paragraph?
Q. The first paragraph last few sentences.
(Witness reviewing document.)
A. Okay.
Q. Now, that paragraph first sentence that I referred to you states, "The staff to staff technical exchanges are neither contractual negotiations nor binding agreements." Does that confirm what you just testified to that it was your understanding that the discussions going on between the utility representatives and the DOE representatives were not binding?
A. Basically.
Q. Do you have any reason to believe any agreements or understandings that might have been reached during this process would in effect be a binding agreement?

279

MR. CRAWFORD: Objection, asked and answered. Objection to the extent it calls for a legal conclusion.
THE WITNESS: No.
BY MR. SKALABAN:
Q. Here in this paragraph it also references "The last year's ACR indicated that many issues will require analysis and resolutions that the waste management system can achieve maximum efficiency while attempting to assure equity among the parties." That was your understanding of what the goal of the ACR issue resolution process was?
MR. CRAWFORD: Objection, asked and answered. Objection, mischaracterizes prior testimony.
THE WITNESS: I believe I testified yesterday I thought the goal was to reach consensus agreement on the 34, 35 issues that were identified by the parties.
BY MR. SKALABAN:
Q. With the end goal of achieving efficiency and equity?
A. Trying to achieve some efficiency, yes, and while preserving equity among the contract holders.

280

Q. Now, if I understand what you testified to yesterday, overall the Department had an objective of implementing the program in an efficient way for both the Department in its operations and for the purchasers in regards to their storage needs, is that correct?
MR. CRAWFORD: Objection, asked and answered. Objection, mischaracterizes prior testimony.
THE WITNESS: The Department had a goal in trying to achieve efficiency while maintaining or preserving equity among the contract holders.
BY MR. SKALABAN:
Q. And if I understand your testimony from yesterday correctly, there was a point where the Department no longer has a goal of achieving efficiency for the purchasers?
A. Well, we would still like to be efficient, but first we would want to get a system going first. And our primary goal right now is to get Yucca Mountain through the site recommendation process and congressional approval process, and then if Congress especially the Senate right now approves Yucca Mountain, then to try to develop a system. And would it be nice if it's efficient? Yes, but our goal is

281

discussions on this issue that it would be inefficient to take half cask loads or partially full cask loads?
MR. CRAWFORD: Objection, vague. Objection, foundation.
THE WITNESS: Yeah, I would say so. In consideration where some other things too.
BY MR. SKALABAN:
Q. What are some of the other things?
A. The contract also allows I think purchasers -- I'll have to read close again to exactly refresh my memory -- a plus or minus 20 percent adjustment in their allocation. I think we had hoped to tie cask grounding up with a plus or minus 20 percent adjustment.
Q. Did you understand that -- was your understanding that provision of plus or minus 20 percent and -- was your understanding of that provision that purchasers had the right to do that?
MR. CRAWFORD: Objection, vague, foundation.
THE WITNESS: I would have to read what the contract exactly says, the text in that area.
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion, sorry, go ahead.

290

THE WITNESS: What the contract says for that. But I believe that the purchasers have the right to adjust -- and I forget what the impact term is, their allocation, their DCS allocation, or something in the process, make a 20 percent adjustment somewhere along the way.
BY MR. SKALABAN:
Q. Well, let's take out Pollog Exhibit 2 which is the standard contract. If I can refer you to article 5 B, which is entitled delivery commitment schedule.
A. Do you have the page number?
Q. And the page at the bottom is 525.
A. And it was which one again?
Q. It's Roman V B part 2.
A. Right.
Q. Okay. Now, in that part of the contract that I've just referred to says, "Purchasers shall have the right to adjust the quantities of SNF in or HLW plus or minus 20 percent." And it goes on to say until the submission of the final delivery schedule. What was your understanding of that provision?
A. Simply what it says. The purchasers have the right to adjust quantities of SNF by plus or minus 20 percent.

291

Q. So if a purchaser wanted to up to the point of submitting their final commitment delivery schedule, they could take a DCS and they had the right to adjust the quantity of MTU up or down 20 percent?
MR. CRAWFORD: Let me object to best evidence.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. Now, this is phrased in terms of the purchaser's right. Did you have any understanding of whether or not DOE could veto that action by the purchaser?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
BY MR. SKALABAN:
Q. I'm asking for your understanding of the contract provision.
A. My understanding is we had no right to veto any such adjustments.
Q. And if the purchaser made that adjustment, where would that ultimately show up, in the final commitment delivery schedule?
A. That's a good question. I don't know. It may show -- it would have to show up in the final

292

delivery schedule. Whether they would have to identify it prior to that in a revised DCS, I don't know.
Q. Now, if we look at the final delivery schedule provision, are you familiar with that provision? And that is for the record, article Roman 5 capital C.
A. Yes.
Q. Does this provision provide for another negotiation process between DOE and the purchaser?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: What do you mean when you say negotiation?
MR. SKALABAN: A process of negotiation over a final delivery schedule. Is it your understanding that that's provided for by this provision in the contract?
MR. CRAWFORD: Same objection.
THE WITNESS: If a FDS is disapproved, there is a process for negotiation following that disapproval.
BY MR. SKALABAN:
Q. Now, is it your understanding that -- let me ask you your view. Is there anything in this article V C final delivery schedule which precludes a

293

purchaser from requesting in its final delivery schedule more MTUs or a greater amount of MTUs than are specified in its DCS?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: Are you asking me does anything in this article preclude a purchaser from requesting something different than what was in their DCS?
MR. SKALABAN: Yes. And I'm specifically I'm talking about more MTU.
THE WITNESS: Anything in general, though?
MR. SKALABAN: Okay. Let's ask the question anything.
THE WITNESS: I don't see anything that would preclude them from submitting an FDS that is different from their DCS.
BY MR. SKALABAN:
Q. And how about if a -- and I guess that would hold true then if a purchaser wanted to submit an FDS having twice as much fuel and MTU as was on its original delivery commitment schedule?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: They can certainly submit an FDS with anything on it that they want to put.
BY MR. SKALABAN:

294

Q. And if the Department rejected that, then there would be a process of negotiation?
A. I believe so.
Q. If I can turn your attention back to Pollog Exhibit 7 which is the standard contract issue resolution process paper that we've been talking about periodically, on page 3 in the first column -- and there's a series of bullet points there, it's actually bullet point 8 or 9 down, it refers to dual purpose casks and multi-element sealed canisters respectively. Do you see that?
A. Yes.
Q. What was your understanding of these two issues as they were being discussed in the ACR issue resolution process?
A. My best memory of this, and this is not very clear right now because of all of the things that have happened since then, is that the Department's position was that canistered fuel, again as I discussed yesterday, was not covered by the contract. The contract only covered bare spent fuel.
Q. If it was not covered by the contract, what was your understanding of why the Department was talking to purchasers about this issue?
MR. CRAWFORD: Well, objection.

295

Foundation.
BY MR. SKALABAN:
Q. Do you recall when you were working in the ACR issue resolution process that this was an issue that was discussed between the Department and the utilities?
A. I recall that this was an issue. I do not recall any specific discussions in the ACR issues resolution process about this.
Q. Now, these 34 list of issues, they were initially generated by DOE, is that correct?
MR. CRAWFORD: Objection, vague and objection foundation.
THE WITNESS: That's another good question. I don't know. I thought they were generated by both DOE and the purchasers, but I'm not sure.
BY MR. SKALABAN:
Q. Now, during the ACR issue resolution process, do you recall DOE ever telling the purchasers that they better not employ dual purpose casks or multi-element sealed canisters because DOE wouldn't accept them?
A. No.
Q. And was the purpose of these discussions

296

with the industry DOE's view on these issues to try to generate some criteria or reach some common understanding on how these canisters and dual purpose casks could be accommodated and accepted into DOE's waste management system?
MR. CRAWFORD: Objection, foundation.
THE WITNESS: That and many other things.
BY MR. SKALABAN:
Q. Okay. And can you help me with the other things you're referring to?
A. Other 30 some-odd issues.
Q. But that was your understanding of the purpose of the discussion of these two issues --
MR. CRAWFORD: Objection, foundation.
MR. SKALABAN: -- was to come up with some criteria and common understanding of how Dee can accept these waste forms into the system.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. And if you go down three bullet points after the MESC, the one we've been looking at, there's a bullet point that says, "Should DOE promulgate canister specifications and acceptance criteria for failed fueled canisters." Do you remember what that issue was about?

297

the contract?
MR. CRAWFORD: Objection, foundation.
THE WITNESS: DOE disagreed with that interpretation, yes.
BY MR. SKALABAN:
Q. Do you think that's a reasonable interpretation of the contract that those utilities held?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
MR. SKALABAN: Regarding the all SNF?
THE WITNESS: No.
BY MR. SKALABAN:
Q. And why don't you think so?
A. If every purchaser interpreted it that way, in year one every purchaser would expect us to come and we would literally go from zero to 10, 20, 30,000 MTUs in year one of the system. And it's just -- I would say it's impossible for DOE to ramp up from zero to 20,000 MTUs within one given year.
Q. Well, if a purchaser put down as much as they wished to deliver and it was more than DOE wanted to give them, couldn't they engage in a negotiation process?
A. Yes.

314

Q. Now, is it your understanding that the DCS instructions required that purchasers follow DOE's interpretation of this provision of the contract?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
THE WITNESS: I believe so.
BY MR. SKALABAN:
Q. And perhaps to be a little more clear, it required purchasers to use the allocation that DOE had set in the 1991 ACR for their DCS submittals?
MR. CRAWFORD: Same objection.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. And if the purchasers did not follow that instruction, DOE would disapprove the DCSs?
MR. CRAWFORD: Same objection. Best evidence.
THE WITNESS: Possibly.
BY MR. SKALABAN:
Q. Were you involved in the drafting of the DCS instructions?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: I believe so.
BY MR. SKALABAN:

315

Q. What do you recall doing?
A. Similar to what I testified yesterday for the development of the ACR. I would draft a set of instructions from the contract, I would develop them, review them, discuss them with the contractor and/or Mr. Brownstein and other waste acceptance staff and contractors, provided comments, resolved comments hopefully, and then follow a similar pattern to the ACR, production of the ACR.
Q. Do you recall having substantive input on the terms of the instructions?
A. I don't recall at this point in time what my input was to the instructions.
(Pollog Exhibit No. 9 was marked for identification.)
BY MR. SKALABAN:
Q. The court reporter has handed you Pollog Exhibit 9. Can you identify this document for the record?
A. It appears to be the instructions for completing appendix C delivery commitments schedule put out by the Department of Energy. For the purposes of this discussion I'll refer to it as the DCS instructions if everybody's agreeable to that.
Q. Please. On the DCS instructions, can you

316

look at page 6, and there's a section 2.7, and it refers to metric tons of Uranium. Can you take a moment to review that section?
(Witness reviewing document.)
A. Okay.
Q. Have you had an opportunity to review that section?
A. Yes.
Q. This section instructions 2.7, in your view, is it pretty clear that -- excuse me. In your view it's clear that DOE is saying that if a purchaser exceeds its allocation in the 1991 ACR, DOE is going to disapprove the DCS?
MR. CRAWFORD: Objection, vague, and objection best evidence.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. And that was your understanding of what was going to happen if a purchaser submitted a DCS that exceeded the MTUs allocation in the 1991 ACR?
A. Yes.
Q. When you were formulating the instructions, do you remember any discussions about whether that was a proper instruction to give the purchasers?

317

the ACR, but they do refer to the APR.
BY MR. SKALABAN:
Q. Now, were the DCS instructions filling in a gap in the contract between the ACR and the DCSs and their relationship?
MR. CRAWFORD: Objection, best evidence and objection to the foundation.
THE WITNESS: I think one could argue that, yes.
BY MR. SKALABAN:
Q. And your understanding of deliver commitment schedule provisions that are provided for in the contract, again, not divorced from the instructions, do they in your view provide for the Department to set in the Department's discretion what the purchaser's allocation must be?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: When viewing contract in total, yes.
BY MR. SKALABAN:
Q. When you say viewing it in total -- okay. Let me back up for a second. So you agree that this provision on delivery commitment schedules standing alone does not provide the Department the discretion to set the allocation of each purchaser?

322

MR. CRAWFORD: Objection, best evidence.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. You agree with me on that?
A. Yes.
Q. What do you base your on the contract as a whole interpretation? Can you point to me what your view is based upon?
A. If you read the contract at least for the waste acceptance process that it sets up with the Department producing an ACR starting in 1997 and then an APR in 1991 and then purchasers starting to submit DCSs in '92, I think it lays out different activities of points of time. And when you look at these as an entire process, I think that's where we got the impression or view that the 1991 ACR should be used by purchasers to fill out their DCSs, the allocations from the 1991.
Q. Now, you're essentially making an inference from different provisions of the contract. The contract doesn't expressly tie these together, does it?
A. Objection, best evidence.
Q. In your view.
A. The phrase we use is connects the dots.

323

Q. And can you explain that for me?
A. It gives an activity to occur over a period of time and they're not necessarily all connected very clearly. So we're trying to connect the different activities into one complete process.
Q. So from the language of the contract, the connection is not stated clearly between the different activities?
MR. CRAWFORD: Objection, mischaracterizes prior testimony.
THE WITNESS: Not all the time.
BY MR. SKALABAN:
Q. And how about this connection of ACR, APR, DCS, ACR must be the basis for the DCS? Are the lines connecting those different dots expressly stated in the contract in your view?
MR. CRAWFORD: Objection, best evidence. Objection to the -- that's all.
THE WITNESS: That's certainly subject to interpretation. My view is certain areas it's very clear; in other areas it's not quite as clear. For this specific area we're discussing right now, I think it's pretty clear but maybe not explicitly clear.
BY MR. SKALABAN:

324

Q. Do you think it's something that's subject to debate?
MR. CRAWFORD: Objection, mischaracterizes prior testimony.
BY MR. SKALABAN:
Q. Let me ask a better question. Could reasonable minds differ on your view on this?
A. I don't want to get into a reasonable minds belief.
MR. CRAWFORD: Objection to the vagueness.
THE WITNESS: That's a difficult question, again, because I don't want to start saying people are reasonable, what their minds are. But I think it's pretty clear in my mind what's intended by it. I would not necessarily want to say a person is unreasonable or had an unreasonable mind if they disagreed with me.
MR. SKALABAN: Okay. Let's go off the record.
(Recess.)
BY MR. SKALABAN:
Q. Mr. Pollog, as part of the ACR issue resolution process, do you remember any Yankee utilities agrees with Department's interpretation of all SNF and wishes-to-deliver that we've been talking

325

about this morning?
MR. CRAWFORD: Objection, foundation.
THE WITNESS: I have no specific recollection of the Yankee positions in the ACR issues resolution process.
BY MR. SKALABAN:
Q. And that goes for all of the issues?
A. Essentially goes for all of the utilities and all of the issues; I just do not recall what specific utility and what specific position on any of the issues.
Q. And so you have no recollection then of whether or not the Yankee utilities agreed with the Department's interpretation that it could require the utilities to fill out their DCSs in accordance with the 1991 ACR?
A. I have no recollection.
Q. Now, the DCS instructions we've been looking, at I want to call your attention to page 2 of those instructions. In particular, if you could take a moment to please review part 7(c). What was your understanding of this provision of the statement that the 1991 ACR provides an approximation of the federal waste management systems acceptance capacity?
MR. CRAWFORD: Objection, best evidence.

326

THE WITNESS: I think it's self-explanatory. It provides an approximate number of what our capacity will be.
BY MR. SKALABAN:
Q. And how about the indication that the 1991 ACR's for planning purposes. What did you understand that to mean?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: It could allow both purchasers and Department to start the planning process for waste acceptance.
BY MR. SKALABAN:
Q. Now, this provision 7(c) in the DCS instructions also says that the process described herein assumes that the FWMS will be able to accept the purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the 1991 ACR." Do you see that?
A. Yes.
Q. What was your understanding of this portion of the instructions?
MR. CRAWFORD: Objection. Best evidence.
THE WITNESS: My understanding is just what it says. We assume we will be able to begin waste acceptance in 1998 in accordance with the 1991

327

ACC.
BY MR. SKALABAN:
Q. There's a process described here. Is that referring to DCS process?
A. The whole waste acceptance process, I believe. That's how I would interpret it.
Q. And was it on this assumption -- was it your understanding that it was under this assumption reflected here that the DCS process was going to be undertaken?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: I'm not sure what you're asking.
BY MR. SKALABAN:
Q. Is it your understanding that the DCS process outlined in the instructions was going to be based on the assumption that DOE would begin performance in 1998?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. Now, the next sentence it says, "In the event that such circumstances change all DCSs previously approved by DOE may need to be reevaluated by DOE and the purchasers." Do you see that?

328

A. Yes.
Q. What do you understand DOE to be conveying here in those instructions as someone who worked on preparation of these instructions?
MR. CRAWFORD: Objection. Best evidence.
THE WITNESS: I don't recall.
BY MR. SKALABAN:
Q. Does this last sentence suggest to you that if DOE is unable to make the 1998 date that the DCSs could be reevaluated by DOE and the purchasers?
A. Possibly.
Q. Does that suggest to you that the DCSs that were being submitted by the purchasers were not going to be binding on the purchasers and the Department?
MR. CRAWFORD: Objection, best evidence and to the extent it may mischaracterize anything he said before.
THE WITNESS: Not really.
BY MR. SKALABAN:
Q. You don't view this sentence as being a qualification on the binding nature -- and if I understand your prior testimony, you believe the DCSs to be binding. You don't understand this sentence to be a qualification on whether or not the DCSs are

329

binding?
MR. CRAWFORD: Objection, mischaracterizes and objection vague.
THE WITNESS: Not really.
BY MR. SKALABAN:
Q. Why not?
A. I just don't.
Q. Do you know why this sentence was placed in these instructions?
A. No.
Q. You have no recollection of any discussions about this sentence and why it appeared in the DCS instructions?
A. No.
Q. Does this sentence suggest to you that the DCSs were subject to change if the circumstances upon which -- scratch that. Does this sentence suggest that the DCSs were subject to change if the assumption upon which they were based which was a performance in 1998 and according to the acceptance rates reflected in the 1991 ACR did not come to fruition?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: Possibly.
BY MR. SKALABAN:

330

Q. Can you think of any other reason why DOE would have put this last sentence in the DCS instructions?
A. Yes.
Q. Why?
A. Possibly we could have had more acceptance capacity to allocate, so we could have increased the number of MTUs the purchaser could have potentially received in a given year. Other factors too such as purchasers indicated on their DCSs the preferred shipping mode, and I think I stated yesterday our preferred shipping mode was going to be rail and if somebody indicated truck on that and we could have found a way to ship by rail we may try to negotiate with the purchaser to do a rail shipment.
Q. Does this last sentence as well as the assumption referred to in this part 7(c) indicate in your view that the DCSs were not going to be a final binding commitment on the Department and the utilities?
MR. CRAWFORD: Objection, best evidence. Objection to the extent it calls for a legal conclusion.
THE WITNESS: No, it does not indicate that to me.

331

BY MR. SKALABAN:
Q. Do you think in your personal view that a purchaser reading this section 7(c) could be of the view that the DCSs were not a final binding commitment between DOE and the purchasers?
MR. CRAWFORD: Objection to the extent it calls for speculation.
THE WITNESS: I would hate to speculate on how a purchaser interprets this. Is it possible? Yeah, probably.
BY MR. SKALABAN:
Q. That would be a reasonable interpretation of this provision, 7(c)?
MR. CRAWFORD: Objection to the extent it mischaracterizes prior testimony. Objection to the vagueness of that, and objection to the foundation.
THE WITNESS: I really don't want to get into a reasonableness debate, what's reasonable and what isn't. I don't know.
BY MR. SKALABAN:
Q. Do you know whether the Department ever held the view that DCSs submitted by purchasers and approved by the Department based on these instructions were in fact not binding because circumstances changed with respect to the 1998 date?

332

MR. CRAWFORD: Objection to the extent it calls for speculation, objection to the foundation, and objection to the extent it calls for a legal conclusion.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. And when did the Department hold that view?
A. I believe when they were involved -- and I might have this wrong -- in the Indiana-Michigan case whereas we believed that if we had not started commencement of the facility operations we had no obligation whatsoever under the contract. So we have nos, period.
Q. So at that point in time the Department did not view the DCSs that were submitted by the purchasers and approved by the Department as binding commitments between the purchasers and the Department?
A. Well, I don't want to speak for the full Department, because I don't know what the Department's view and the Office of General Counsel's view and the Secretary of Energy's view was, but certain people, I don't recall any specific names, you had a view that without commencement of facility

333

operations we had no contractual obligation.
Q. Well, wouldn't that be the whole Department's view if it was submitted as part of the notice of inquiry and the Department's final interpretation? Are you familiar with the notice of inquiry and the Department's final interpretation of 1995?
A. Yes.
Q. Given the Department issued a final interpretation, doesn't that establish that the Department took the view that it was not bound by these DCSs submitted pursuant to these objections at that time?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
THE WITNESS: I think the Department's view was that it had no contractual obligation without commencement of facility obligation to provide waste acceptance services starting in 1998.
BY MR. SKALABAN:
Q. So necessarily the DCSs submitted and approved by the Department pursuant to these instructions in the Department's view did not create any binding obligations on the Department?
MR. CRAWFORD: Objection to the extent it

334

calls for speculation. Objection to the extent it calls for a legal conclusion.
THE WITNESS: There were I believe people who had that view, yes.
BY MR. SKALABAN:
Q. And you did testify to that earlier, but what I'm trying to drive at is if the Department is taking a formal position in its final interpretation of 1995 that it has no binding obligation to the utilities, doesn't that necessarily mean that the Department's position, not just the position of a few people, was that the DCSs submitted and approved were not binding?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
THE WITNESS: I believe the Department's position -- and again I'm not positive this is the right case -- but Indiana-Michigan case was there was no contractual commitment to begin in 1998 waste acceptance operations without commencement of the facility operations. That's what I know about what the Department's position was.
BY MR. SKALABAN:
Q. And that would necessarily mean that these DCSs submitted to these instructions were not

335

binding?
MR. CRAWFORD: Objection, mischaracterizes prior testimony. And objection, asked and answered. Objection to the extent it calls for a legal conclusion.
THE WITNESS: I don't know.
BY MR. SKALABAN:
Q. Do you recall this provision 7(c) having any part of it being motivated out of concern of making the 1998 date?
MR. CRAWFORD: Objection, asked and answered. Objection to the extent it calls for speculation.
THE WITNESS: I'll repeat what I believe I said earlier. I have no specific recollections of discussions concerning section 7(c) of Exhibit 9.
(Pollog Exhibit No. 10 was marked for identification.)
BY MR. SKALABAN:
Q. Are you familiar with this document, Mr. Pollog?
A. Parts of it.
Q. Who is Mr. Harold Brandt who signed the cover letter attached to this document?
A. In 1987, he was the director of the

336

management systems and support division.
Q. And who is Ed Kay?
A. In 1987 in September I believe, and I'm not positive, Ed Kay was the deputy director for all of RW.
Q. If you look to the summary section of this document it has a Bates number of CTR 037-0310. Is this a part of the document that you're familiar with?
A. No.
Q. And on this page I've just referenced, it states, "The ACR also indicated that DOE explicitly recognized that the contract may not provide sufficient detail and guidance to enable either DOE or the utilities to carry out all of the contractual responsibilities." Do you agree with that statement?
A. Yes.
Q. Now, is the relationship between the ACR and the DCSs that we've been talking about this morning, is that an area where the contract did not provide sufficient detail and guidance?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: Are you asking me my opinion

337

Q. Was it an objective of DOE's to allow purchasers to optimize their SNF management strategies?
MR. CRAWFORD: Objection to the extent it calls for speculation.
THE WITNESS: I'm not sure our objective was to allow purchasers to optimize their SNF management strategies. I don't know.
BY MR. SKALABAN:
Q. What would you say was an objective to allow purchasers to efficiently plan their SNF or to arrange their SNF management on site in an efficient way?
MR. CRAWFORD: Same objection. Vague.
THE WITNESS: I don't recall being in any discussions where we planned what we were going to do based on purchasers being efficient in managing their SNF.
BY MR. SKALABAN:
Q. Well, recognizing that you may not have been in any discussions in that matter, do you still have a view whether that was an objective of the Department's?
A. At what point in time?
Q. Does it make a difference to your answer?

346

A. Yeah, I think so.
Q. Okay. Well, let's start with the late '80s, early '90s.
A. I believe the stated Department's position in the mid to late '80s was it was trying to eliminate any aggregated need for dry storage by purchasers. I think as the program went along further we always thought that was a good goal, but we realized that would be more and more difficult to achieve.
Q. And is that because of slippage of the '98 date?
A. That was for many reasons but I guess primarily to the technical aspects of the Yucca Mountain project.
Q. And what do you mean by that?
A. It was extremely difficult to get all the site characterization data that we needed considering the budget pressures we were under.
Q. And how would that affect an objective of facilitating purchasers' efficient use of their storage resources?
MR. CRAWFORD: Well, objection to the assumption of facts not in evidence.
THE WITNESS: It affected how fast we

347

could move forward with site recommendation, licensing for a potential repository.
BY MR. SKALABAN:
Q. If I could call your attention to page 12-13 of this document, there's a discussion of shutdown reactors.
(Witness reviewing document.)
A. Okay.
Q. In particular I want to call your attention to the sentence that says, "If acceptance priorities given a shutdown reactor, commitment and final delivery schedules will be substantially altered." That sentence begins on page 12 and ends on page 13 of this document. Do you see that sentence?
A. Yes.
Q. Do you agree with that sentence?
A. Possibly.
Q. What would be your possible area of disagreement?
A. It would depend on when shutdown priority would have been given. If it would have been given prior to the DCS process starting, then I don't see how it would alter it. And the same with the FDS process.

348

Q. And if priority was given after DCSs had been approved, then this sentence is accurate that DCSs would be substantially altered?
A. Yes.
Q. Does this reflect the -- did the Department have the view that DCSs once submitted and approved could be altered?
A. When?
Q. If a decision was made to give shutdown reactors priority?
A. When? When this document was written?
Q. Well, let's say when you were working at RW.
A. You want me to go from 1998 until present?
Q. Yeah.
MR. CRAWFORD: Well, I think you may have misstated that.
MR. SKALABAN: 1988. Thank you. 19 to the present.
THE WITNESS: And what was your question again? I'm sorry.
BY MR. SKALABAN:
Q. Sure. Did the Department have the view that if approved DCS could subsequently be altered by a grant of priority to a shutdown reactor?

349

about a specific situation, but in the aggregate there would be less need for dry storage if the Department was accepting at a higher rate.
Q. So there would be a lot of utilities in your view to have their -- and I believe this is what we just talked about previously -- would have their needs satisfied simply by following the queue in the acceptance schedule such as this in the upper bounding case, is that right?
A. Probably. I was trying to say it was the aggregate need for dry storage on an industry-wide basis would be lower if the Department was accepting at a higher rate.
Q. Do you know whether the acceptance rates in the 1991 ACR upon which the DCSs were based, were those sufficient in the aggregate to avoid additional reactor storage?
A. I don't know factually if they were or not, but my belief is most likely not. I would have to see the actual numbers of spent fuel discharges, spent fuel pool sizes, discharge projections, and compare them with the acceptance rates to make a factual determination on that.
Q. And you know I'm referring to the 400, 600, 900 rate when I ask that question?

390

A. Yes.
Q. Now, under the upper bounding case we see here in Exhibit 4, if a lot of utilities' needs are being satisfied, which is what you would expect if this waste schedule was implemented, is that fair?
A. Yes.
Q. Then wouldn't there be a fair amount of sellers who could sell away excess allocations that they did not need to avoid on-site storage cost?
MR. CRAWFORD: Well, let me object to the foundation for that and the vagueness of it.
BY MR. SKALABAN:
Q. And when I'm saying sellers, I'm talking about the exchange process.
A. If you follow that thinking, there would most likely be utilities in a position where they would have excess capacity, excess capacity being defined as capacity in their spent fuel pool that would not be filled prior to needing dry storage. So they could still discharge reactors and not need dry storage under the higher acceptance rates. Is that clear?
Q. Yeah. And for those utilities, what would be the disincentive for them not to sell away or exchange -- scratch that. For those utilities, what

391

would be the disincentive for them not to exchange in return for compensation their excess allocations that they don't need?
MR. CRAWFORD: I object to the vagueness and the foundation.
THE WITNESS: I'm going to say what I said, I think yesterday and a little while ago. I just did not think from a public perception point of view any utility would move down in the queue. It's bad -- it looks bad from a public perception point of view. Any material, even if it didn't cause additional dry storage would be staying in the site for a longer period of time than it needed to have been.
BY MR. SKALABAN:
Q. Now, if we look at the upper bounding case that's here in Exhibit 4, if the Department was following this schedule, they would be removing, is it fair to say, a fairly large quantity of spent fuel from the industry on an annual basis?
MR. CRAWFORD: Objection, vague.
THE WITNESS: I would agree with that statement.
BY MR. SKALABAN:
Q. Do you think this is an aggressive

392

schedule? Would this be a schedule that would be meetable for the Department -- or something the Department could meet if it had adequate resources?
MR. CRAWFORD: Objection, compound.
THE WITNESS: In the early years I think it's overly aggressive for the ramp-up period of time. For the steady states, I think that's probably doable, considering our understanding adequate resources are available.
BY MR. SKALABAN:
Q. And in fact, the steady state rate of 3000 is what the Department is planning to perform at to this day after a small ramp-up period. Isn't that correct?
MR. CRAWFORD: Objection, vague.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. Do you have any reason to believe that the authors of the 1990 annual capacity report believe that this acceptance rate here in the upper bounding case was not achievable?
A. No.
Q. If the Department is performing at the rate set forth here in the upper bounding case beginning in 1998 as is depicted on this table, do

393

Department, is there any problem from the Department's point of view on having them simply issue another DCS for the five MTUs that are remaining?

MR. CRAWFORD: Same objections as before.

THE WITNESS: As long as the purchaser maintained the left-over DCS at the facility that they originally intended to by their original DCS and if logistically all things were essentially equal, I don't think it would cause any severe perturbations to the system that could not be handled.

BY MR. SKALABAN:

Q. So in that situation do you think the Department would go ahead and approve that exchange?

MR. CRAWFORD: Objection, speculation.

THE WITNESS: It would be more likely to be approved.

BY MR. SKALABAN:

Q. Well, if there were logistically no problem from the Department's point of view with accommodating the swap of the five MTUs, what would the Department base its disapproval on?

A. Again, I'm going to state what I just said and that is if the purchaser with the larger amount maintained their left-over at the facility it

402

originally intended the Department to service and if the logistics -- did not cause any logistical perturbations in the system, it most likely would have been approved.

Q. As far as your understanding at the time you worked on these issues, the Department wasn't going to withhold approval simply based on the fact that a new DCS for the remainder would have to be issued?

MR. CRAWFORD: I'll object to the foundation.

THE WITNESS: I don't think that issue, at least when I was there, was ever discussed.

BY MR. SKALABAN:

Q. You agree with me it's being discussed in this paper?

A. Yes.

Q. And it appears at least these authors did not foresee that being a problem?

MR. CRAWFORD: Objection, best evidence.

THE WITNESS: From what appears only in this document, yes. I don't know if the other opinions or other documents are inconsistent with this, but from looking strictly at this paragraph in this document, I would agree.

403

BY MR. SKALABAN:

Q. And are you aware of any other documents where the Department concluded that it would be sensible to deny an exchange simply because a DCS for the remainder would have to be executed?

A. No.

Q. Anyone at the Department ever tell you that that's what the Department should do? Did you ever hear anyone at the Department expressing the opinion that they should deny exchanges simply because -- or solely because it would require another DCS to be executed for the remainder?

A. I don't recall any such statement.

Q. Would you be surprised if someone expressed that opinion?

MR. CRAWFORD: Objection to the foundation.

THE WITNESS: No.

BY MR. SKALABAN:

Q. And why is that?

A. It just wouldn't surprise me.

MR. SKALABAN: I'd like to mark as Exhibit 14 a collection of DCS correspondence between Yankee Atomic and the Department of Energy. Pollog Exhibit 15, collection of DCS correspondence between Maine

404

Yankee and the Department of Energy. And then as Exhibit 16, I would like to mark a collection of correspondence between Connecticut Yankee and the Department of Energy relating to DCSs.

(Pollog Exhibit Nos. 14-16 marked for identification.)

BY MR. SKALABAN:

Q. Mr. Pollog, looking at Exhibit 14, the first two letters in Exhibit 14, the correspondence between Yankee Atomic and the Department of Energy begins with the letter dated September 25 from R.M. Grube to the Department of Energy contracting officer and the letter dated December 1, 1992 from DOE contracting officer back to Mr. Buchheit of Yankee Atomic. Do you see that?

A. Yes.

Q. Now, you were not at RW at the time of this correspondence?

A. Correct.

Q. And if you take a look at the Department of Energy letter dated December 1, 1992, from Linda Strand, it indicates in the first page of this letter, the last paragraph, that the DCSs submitted by Yankee Atomic have been disapproved. Do you see that?

405

A. Yes.
Q. Were you involved at all in the consideration of disapproval of any Yankee Atomic DCSs?
A. No.
Q. Were you involved at all in any negotiations between Yankee Atomic and the Department of Energy regarding its delivery commitment schedules?
A. No.
Q. Now, if you look several pages into this collection of letters, if you could turn to Bates number YDK 022819.
MR. CRAWFORD: Do you have a clear indication of the Bates number? They ran off on our page. Could you just give us some indication of what you're looking for?
MR. SKALABAN: Okay. I apologize for that.
MR. CRAWFORD: That's all right.
MR. SKALABAN: It's a January 31, 1995 letter. And these letters should be in chronological order, from Mr. Buchheit to Ms. Beth Tomasoni.
BY MR. SKALABAN:
Q. This is a letter signed by Mr. J.M.

406

Buchheit to Ms. Beth Tomasoni and it's copied to Mr. Brownstein. Do you see that?
A. Yes.
Q. And highlighted here it says, "We are once again filing this DCS under protest." Did you have any involvement in consideration of any DCSs that Yankee Atomic was filing under protest?
A. I don't believe so.
Q. Now this, if I recall correctly, was approximately the time that you came back to DOE?
A. Yes.
Q. But at that time you had no involvement with waste acceptance issues because you were working for Mr. Williams, is that correct?
A. Yes.
Q. Now, a few pages further in the series there's a letter under Department of Energy letterhead from Ms. Beth Tomasoni to Mr. J.M. Buchheit, field engineer Yankee Atomic, and there's a stamp dated March 5, 1996 on it. This one is Bates numbered YDK 023077.
Now, that letter indicates that a copy of the approved DCS is enclosed for your records. If you go to the next Bates numbered document in the series, it is a DCS that is -- does that appear to be

407

a DCS that is signed by the Department of Energy?
A. Yes.
Q. And I recognize the handwriting may be a little difficult to read, but do you recognize whose signature that is?
A. Are you talking under section 3 or section 4?
Q. Section 4.
A. I believe I recognize both signatures.
Q. And whose signatures are they?
A. Under technical representative that I believe is David Zabransky, and under contracting officer I believe that's Beth Tomasoni.
Q. Now, on this DCS, there's a notation that the proposed delivery date is dependent upon the existence of an operational repository or an interim storage facility constructed under the act. Do you know who put that notation on the DCS we're looking at?
A. Are you asking me if I know the specific person who put that on there?
Q. Fair enough. I'm not asking actually who may have typed that on there, but who caused that language to appear on this piece of paper? Under whose direction would this legend have appeared?

408

MR. CRAWFORD: You're asking him if he knows?
MR. SKALABAN: If he knows.
THE WITNESS: Sort of.
BY MR. SKALABAN:
Q. Okay. Well, tell me what you mean by sort of.
A. To the best of my knowledge it wasn't any one individual who said put this on here; it was a combination of organizations.
Q. And who were the organizations?
A. It would have been the waste acceptance team which I believe was headed by Mr. Zabransky at that time on advice from the Department of Energy's Office of General Counsel.
Q. Do you know whether the waste acceptance team and the Office of General Counsel directed the contracting officer to put that language on the DCS?
A. I'm not certain, but I believe --
MR. CRAWFORD: Let me object to the foundation.
THE WITNESS: I'm not certain, but I believe they did not direct the contracting officer to do that.
BY MR. SKALABAN:

409

Q. Is it your understanding that the contracting officer -- I think I'm trying to reconcile the testimony you've just given me, the last two answers. So the contracting officer put this legend, or directed this legend to be put on the DCS under her own initiative?

MR. CRAWFORD: Objection, mischaracterizes prior testimony.

THE WITNESS: I don't believe I testified to that.

BY MR. SKALABAN:

Q. Okay. I'm just trying to understand what your testimony is on this. Was it that Mr. Zabransky or the waste acceptance team and the Office of General Counsel requested the contracting officer to put this language on the DCS and the contracting officer caused that language to be placed on the DCS?

A. I don't believe so.

Q. Okay. So can you maybe help me out a little bit and tell me the evolution of how this language got on the DCS as you understand it?

A. My best understanding of it --

MR. CRAWFORD: Wait a minute. I won't object. Go ahead. Let me just object to the form, but go ahead.

410

THE WITNESS: My best understanding of it was the language was put on by the waste acceptance team on advice from Department of Energy's Office of General Counsel.

BY MR. SKALABAN:

Q. And is it your understanding -- did the CO approve of that language being placed on the DCS?

MR. CRAWFORD: Object to the extent it calls for speculation.

BY MR. SKALABAN:

Q. To the extent you know?

MR. CRAWFORD: Object to the extent it calls for speculation and best evidence.

THE WITNESS: I don't know what the CO's opinion or response was to that language being put on there.

BY MR. SKALABAN:

Q. But it clearly made it onto the DCS?

A. Clearly.

Q. What is your understanding of the purpose of this language being included on the DCS?

MR. CRAWFORD: Objection, best evidence. Objection to the extent it calls for speculation.

THE WITNESS: The Department believed that it had an obligation to accept the amount of fuel on

411

this approved DCS in the year proposed by the purchaser, but it also believed at this time that the Department's obligation was conditional based upon the existence of an operational repository interim storage facility constructed under the act and wanted to clarify that point to the purchaser.

BY MR. SKALABAN:

Q. Was the Department conditioning its approval of the DCS upon the existence of an operational repository or an interim storage facility constructed by the act?

MR. CRAWFORD: Objection, asked and answered.

THE WITNESS: I'm not sure what you mean.

BY MR. SKALABAN:

Q. It says here the proposed delivery date is dependent upon the existence of an operational repository or an interim storage facility constructed under the act. And the use of the term dependent, is this a conditional document or a conditional obligation on the part of the purchasers and DOE? Was that the intent of putting that language on?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

THE WITNESS: I think -- I'm going to say

412

what I said before. The Department believed it had that obligation to accept a certain amount of metric tons of uranium that was identified by the purchaser. It had an obligation to accept that amount in the delivery proposed here, but that obligation was conditional based upon the existence of an operational repository or an interim storage facility constructed under the act.

BY MR. SKALABAN:

Q. So given the Department stating that the delivery date is dependent upon the existence of an operational repository, does that mean in your view that this DCS is not effective for 2001 since there's no operational repository or storage facility available or was available in 2001?

MR. CRAWFORD: Objection, vague and objection to the foundation.

THE WITNESS: No.

BY MR. SKALABAN:

Q. And what was the -- then what effect did this language have?

A. Right now?

MR. CRAWFORD: Objection, vague.

BY MR. SKALABAN:

Q. Well, what did the -- what was your

413

understanding of the effect of this language if it did not make the delivery date in 2001 contingent on the existence of a repository?
MR. CRAWFORD: Objection, vague. Objection, asked and answered.
THE WITNESS: Effect when? Now or at the time it was added?
BY MR. SKALABAN:
Q. It's effect now in 2001 -- you agree with me the proposed delivery date is 2001?
A. Yes.
Q. And you agree with me that there is in existence no operational repository or interim storage facility, there was none of those in 2001?
A. Correct. I agree with that.
Q. So isn't the Department's proposed delivery date of -- well, isn't the 2001 delivery date specified in this DCS binding, based on the legend placed on the DCS?
MR. CRAWFORD: Objection on the foundation.
THE WITNESS: I believe it is still binding.
BY MR. SKALABAN:
Q. For 2001?

414

A. Yes.
Q. And why do you still believe that, in view of the Department's the "proposed delivery date is dependent on the existence of an operational repository or interim storage facility?"
MR. CRAWFORD: Object to the extent it calls for a legal conclusion.
THE WITNESS: The court told us that our belief that we did not have an obligation absent an operating facility in 1998 was incorrect, and we still had an obligation regardless whether there was a facility operating or not. I believe in Indiana-Michigan but I'm not a lawyer so don't quote me, but I believe that's the case. But I'm not sure.
BY MR. SKALABAN:
Q. So the Department's original intent was to create a nonbinding conditional DCS for 2001, is that correct?
MR. CRAWFORD: Objection to the vagueness of that. Objection to the extent it calls for a legal conclusion.
THE WITNESS: When you say original intent, when are you talking about?
BY MR. SKALABAN:
Q. Okay, the date is fuzzy on here, but let's

415

assume it's '96. Let's say in early 1996 when it put this legend on the DCS, by putting this legend saying the delivery date is dependent upon the existence of the facility, the Department's original intent at this time was to create a conditional nonbinding DCS.
MR. CRAWFORD: Objection to the extent it calls for speculation or a legal conclusion, but you can go ahead and answer.
THE WITNESS: I think that the Department's intent was to condition the proposed delivery year at this time.
BY MR. SKALABAN:
Q. And that was the purpose of putting this legend on the DCS?
MR. CRAWFORD: Objection. Asked and answered.
THE WITNESS: It was to put a condition on the proposed delivery year on the existence of an operational repository or an interim storage facility constructed under the act.
BY MR. SKALABAN:
Q. And the condition that we've been talking about and that's reflected here has been realized, so regardless of what the court said, doesn't that make this DCS nonbinding?

416

MR. CRAWFORD: Objection to the foundation of that and to the vagueness of it and to the extent it calls for a legal conclusion.
THE WITNESS: I don't believe so. I believe what the court said is what we're operating under now.
BY MR. SKALABAN:
Q. So even though the original intent was to rate a conditional approved DCS and that condition has been realized, it's now the Department's position that despite the fact that it intended to create a conditional DCS, that DCS is now still in effect for 2001?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, asked and answered.
THE WITNESS: The court corrected our erroneous thinking.
BY MR. SKALABAN:
Q. Did the court correct -- did the court change the conditional -- or did the court say what was originally intended by the Department to be conditional DCSs are now nonconditional and binding?
MR. CRAWFORD: Objection to the foundation of that, objection to the extent it calls for a legal

417

of our discussion was we would not address this issue at this time. We'd just send him a standard form letter saying we're not able to approve your FDS submittal at this time.

Q. And in looking at this letter dated March 11, 1997 does this look to you to be the standard form letter that the Department would send out in response to final delivery commitment schedules submitted by utilities?

A. Yes and no.

Q. Okay. How does it appear similar in your view and how does it differ?

A. Paragraphs 1, 2, and 4 are similar, and paragraph 3 I think was just inserted for a short period of time.

Q. Ms. Tomasoni is referencing your letter of December 17, 1996. Do you know, was it about approximately that time when the Department stopped processing DCSs and FDSs?

A. Approximately.

Q. And so this paragraph 3 appeared in the standard form letters for a period of time but then stopped appearing?

A. My seeing it here is the first time I've seen this paragraph. I was not in the habit of

422

reviewing all the standard responses to the FDSs and DCSs throughout this time period. My remembrance of what the standard response is of these is paragraphs 1, 2, and 4 here. So I do not know if this paragraph 3 was included in other responses during this period of time or if it was strictly for Yankee or if it was done for six months, two months or 12 months following the December 17, 1996 letter.

Q. Were you involved in any discussions at RW about whether or not the DCS and FDS process should be suspended?

MR. CRAWFORD: Objection, asked and answered.

THE WITNESS: That would depend on how you define discussions.

BY MR. SKALABAN:

Q. What do you mean by that?

A. Well, I was involved in one conversation regarding this, and what's a discussion to you may not be a discussion to me.

Q. Okay, fair enough. What do you remember about that conversation?

A. Mr. Zabransky stopped in my office and said we're no longer approving DCSs, and I said okay, why? And he said the Office of General Counsel has

423

advised us so. And I said fine.

Q. Okay. And other than that conversation that you can recall with Mr. Zabransky, you were not involved in any sort of strategy or other conversations or any other formulation of the Department's decision regarding whether to continue to review and approve DCSs or FDSs?

A. You are correct. I was not involved in anything other than that brief conversation that Mr. Zabransky that I had.

Q. And since that time has Mr. Zabransky or anyone else ever elaborated to you what the basis of this decision was?

MR. CRAWFORD: Well, objection, asked and answered. Objection, vague.

THE WITNESS: Yes.

BY MR. SKALABAN:

Q. And can you tell me what you were told?

A. Those conversations were attended by counsel.

MR. CRAWFORD: Well, I'll instruct you not to talk about them.

BY MR. SKALABAN:

Q. And are you going to -- I'd like an answer to my question. Are you going to follow the

424

instruction of your counsel and not answer?

A. Yes.

Q. If you could turn for a moment to Exhibit 16 which is the Maine Yankee -- or I'm sorry. Exhibit 15, Maine Yankee. And you see towards the back of this collection of correspondence there's a letter dated May 11, 1998, from Mr. Michael Thomas, vice president/treasurer of Maine Yankee at the time to Ms. Beth Tomasoni.

Do you see in the first paragraph the letter that notwithstanding the provisions of the approved delivery schedule, by this letter Maine Yankee is requesting an allocation for a larger quantity of acceptance than specified in the final delivery schedule. Our request -- well, let me -- it goes forward to say "specifically we request an allocation of up to 1,136 assemblies for delivery in 1999. We further request an allocation of 81 for 2001 and 217 for 2002." Do you see that?

A. Yes.

Q. Do you know whether the -- did you have any discussions about -- scratch that. Did you have any involvement in consideration of Maine Yankee's request in connection with its final delivery schedule submission?

425

A. Yes.
Q. And what was your involvement in this request by Maine Yankee?
A. I believe Mr. Zabransky and I discussed the letter.
Q. Do you remember what your conversation, what was said in that conversation?
A. Before or after we stopped laughing?
Q. Okay. How about before you started laughing?
A. Well, we started laughing from the very beginning.
Q. And why were you and Mr. Zabransky laughing about Maine Yankee's final delivery commitment schedule submission?
A. We thought it was funny.
Q. Can you elaborate why you think it was humorous?
A. Because the Department has had this discussion with the Yankees, I believe, several times in the past and they just keep asking us the same question regardless of how many times we told them what our position was regarding requests for capacity greater than what was in the 1991 ACR.
Q. Now, you realize Maine Yankee is a

426

different company from Yankee Atomic, is that correct?
A. Yes.
Q. Do you remember whether you had conversations with Maine Yankee prior to this time about shutdown priority?
A. I don't recall. I might be confusing the Yankees, Maine and Yankee Atomic.
Q. So after you stopped laughing, what did you do about this letter?
A. I believe Mr. Zabransky requested Mr. Gardner to develop the standard form response to respond to this.
Q. And the standard form response, is that the Department was not going to consider Maine Yankee's request?
A. It's what's included in Exhibit 15, the final page, the letter from Beth Tomasoni dated June 15, 1998.
Q. So if I understand correctly, you and Mr. Zabransky reviewed the letter then requested that Mr. Gardner prepare a form letter to respond to Mr. Michael Thomas of Maine Yankee and then gave it to Beth Tomasoni for her signature?
A. Sort of.

427

Q. Did I sort of misstate the process wrong?
A. Yes. Mr. Zabransky requested Mr. Gardner to prepare the response. I did not have anything to do with that.
Q. And then Mr. Gardner would forward that to Ms. Tomasoni for her signature?
A. Yes.
Q. So as you understand it, when the CO put the signature on the letter prepared under the direction of Mr. Zabransky, did you understand that the Department would not be considering Maine Yankee's request for shutdown priority?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. And did you understand the Department would not be considering at all the approval or disapproval of Maine Yankee's final delivery schedule submission?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. If we could take a look at Exhibit 16, which is correspondence between Connecticut Yankee and Department of Energy relating to DCSs. If you

428

could just turn your attention to a letter dated from September 26, 1997 from Lee Hill. Does that letter appear to be a delivery commitment schedule on behalf of Connecticut Yankee?
A. Yes.
Q. Do you recall having any involvement at all, any consideration of this delivery commitment schedule submission by Connecticut -- on behalf of Connecticut Yankee?
A. No.
Q. There's a letter from Ms. Tomasoni to Mr. Hill dated January 13, 1998. Does this appear to be a response to Mr. Hill's letter of September 26, 1997?
MR. CRAWFORD: Objection to the foundation of that.
THE WITNESS: Yes.
MR. CRAWFORD: I'll withdraw my last objection.
BY MR. SKALABAN:
Q. And do you understand this letter from Ms. Tomasoni to be advising Connecticut Yankee that they are not going to review or approve Connecticut Yankee's DCS submittal at this time?
MR. CRAWFORD: Objection, best evidence.

429

THE WITNESS: Yes.
BY MR. SKALABAN:
Q. And that was the purpose of the letter?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. Now, we've reviewed several letters from the Department of Energy, the time frame of 1997-1998 where they are telling the Yankee utilities that they will not consider submissions of DCSs or FDSs. Is that correct?
A. Yes.
Q. Would you expect at this time that the Yankee utilities would continue to forward DCSs and FDSs to the Department of Energy?
MR. CRAWFORD: Objection to the extent it calls for speculation.
THE WITNESS: Did I expect that the Yankees would continue to submit DCSs?
BY MR. SKALABAN:
Q. And FDSs after the issuance of these letters from the Department of Energy.
A. Yes.
Q. And why?
A. I just thought they would continue to do

430

it for legal reasons, that they were still trying to follow what the contract said they should be doing.
Q. Now, if purchasers after receiving letters from the Department saying they would not consider submitted DCSs and FDSs, what was the contractual effect in your view if the purchasers did not continue to submit DCSs or FDSs?
MR. CRAWFORD: Well, let me object to the foundation and object to the extent it calls for a legal conclusion.
THE WITNESS: Are you referring to the time period after they had received the letter with paragraph 2 -- that includes words that are like paragraph 2?
MR. CRAWFORD: You want to be more specific in your answer.
THE WITNESS: Paragraph 2 of the January 13, 1998 letter from Beth Tomasoni to Lee Hill?
BY MR. SKALABAN:
Q. Which states for the record, "The Department is not able at this time to approve your DCS submittal. Consequently, the Department waives until further notice the contract requirement that you provide a revised schedule within 30 days." Now, that is a standard form paragraph that has appeared

431

in all of the DCS and FDS letters from the Department that states they're not going to consider a DCS or FDS submittal respectively, is that correct?
A. Starting in approximately 19 -- late '96 or early '97, yes.
Q. Now, in your view what would be the contractual effect after receiving one of these letters from the Department if the utility did not continue to submit DCSs or FDSs over time?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
THE WITNESS: The contractual consequences for the purchaser?
BY MR. SKALABAN:
Q. Yes.
A. None.
Q. In your view, the Department of Energy's bound to those DCSs that it approved, is that correct?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. Now, if a purchaser, for example, submitted DCSs in 1998, 2000, 2001 that were approved

432

but then for their 2002 submittal, for example, they received one of these standard form letters, what would be in your view the extent of the Department's obligation to that purchaser for the years 2002, 2003, and 2004 forward?
MR. CRAWFORD: Let me object to the foundation and to the extent it calls for a legal conclusion.
THE WITNESS: You're going a little bit too fast here for me. Can you just say what you said again? I'm sorry. But you're bringing up a different concept here I don't think I've considered. So I'd like to hear it a second time.
MR. CRAWFORD: They may have been the reason for my foundation objection, but let's hear it again.
BY MR. SKALABAN:
Q. Let's use a hypothetical example. No particular utility, I'm talking about. The utility submits a DCS to the Department in 1998. They submit another one in -- for 1999 in 1998. For the year -- say their next allocation is 2001 -- actually, to make this a little more productive, let's step back for a minute and let's get out the 1995 ACR so my question can be a little clearer.

433

A. It's Exhibit 6?
Q. Yes. Turn to Pollog Exhibit 6, Table 2.
MR. CRAWFORD: Let's take a Yankee.
MR. SKALABAN: Okay. Let's take Connecticut Yankee.
BY MR. SKALABAN:
Q. Now, hypothetically speaking, taking Connecticut Yankee's allocation out, set forth in the 1995 ACR. Let's say that Connecticut Yankee submitted and there was approved DCS for 1998 for 65.5 MTUs and then in 1999 Connecticut Yankee -- or for 1999 Connecticut Yankee submitted and the Department approved a DCS for 22.5 MTU.
A. For delivery years 1998 and 1999 there are approved DCSs for 65 and 22 plus a little more MTUs? Okay.
Q. And then let's again assume for the year 2000, for delivery year 2000, Connecticut Yankee submitted a third DCS which was approved by the Department for 19.8 MTUs for delivery in 2000. Now, let's also assume for purposes of this question that Connecticut Yankee submitted a DCS for the delivery year 2001 for 21.8 MTUs and the Department issued one of its standard form letters that we've been looking at and said that they were not going to consider that



DCS submittal at this time.
A. You mean similar to the letter we were just discussing in Exhibit 16?
Q. Yes.
A. Okay.
Q. Now, if I understand your testimony correctly, Connecticut Yankee and the Department are still bound at this time in your view to 65.5 MTUs for 1998, 22.5 MTUs for 1999, 19.8 MTUs for 2000. What is the extent of the Department of Energy's obligations to Connecticut Yankee for year four where they did not consider the DCS submittal?
MR. CRAWFORD: Now, let me just object to the legal conclusion or to the extent it calls for a legal conclusion.
THE WITNESS: I do not believe we have any obligation for the 2001 -- for the DCS that was submitted for proposed delivery year 2001 for the -- if I have this correctly, 21.9 MTUs?
BY MR. SKALABAN:
Q. It appears to be 21.8.
A. Oh, I'm sorry, 21.8. Yes, I believe we have no obligation for that.
Q. And how about year five or actually let me ask this: How about 2002? What would the Department



of Energy's obligation to Connecticut Yankee be for 2002?
A. Had they estimated a DCS for that amount in 2002?
Q. Does it matter for you to answer it?
A. No. I don't have an opinion.
Q. You don't have an opinion regardless of whether Connecticut Yankee did or did not submit a DCS?
A. Correct.
Q. And would the same answer hold true for 2003?
MR. CRAWFORD: To this one I'll object to the extent it calls for a legal conclusion and I'll just have a running objection on this hypothetical.
MR. SKALABAN: That's fine for the purpose of our hypothetical question, the objection will be noted.
THE WITNESS: Yes. I would say we did not have an obligation for 2003.
BY MR. SKALABAN:
Q. And how about for 2004 which would be year six?
A. Same answer.
Q. I'm sorry. It would be for 2003. But I



assume it's the same answer?
A. Yes.
Q. And Mr. Pollog, would your answers be the same that the Department would have no obligation to Connecticut Yankee in 2004, 2005, 2006, and 2007?
A. Yes. Realizing there is no allocation, I believe, for year 2004 in this exhibit, Exhibit No. 6.
Q. So in your view, once the Department of Energy stopped processing DCSs it stopped its obligations to the Yankee utilities?
MR. CRAWFORD: Same objection.
BY MR. SKALABAN:
Q. Under the contract.
A. Yes.
Q. Now, we've used this exhibit, the 1995 ACR for the purposes of a hypothetical question projecting out to 2007. How about for years beyond that? In your view -- and now I'm talking outside of the hypothetical box here. In your view, does the Department of Energy have any obligation to Connecticut Yankee, Maine Yankee, or Yankee Atomic for the years 2008 forward?
MR. CRAWFORD: Same objection.
THE WITNESS: It's a big question. My

view is probably not.
BY MR. SKALABAN:
Q. And why do you say probably not?
A. There are no allocations beyond year 2007, and if there were, we still wouldn't be approving the DCSs for them.
Q. So even if the Department did not begin performance until say 2025, there would still be no obligation to Connecticut Yankee, Yankee Atomic or Maine Yankee beyond the specific approved DCSs issued by the Department?
MR. CRAWFORD: Same objection.
THE WITNESS: Correct. I believe there would be no obligation, understanding you're using the negative. So I just want to make sure. I was saying correct to what you thought you were saying and what I thought you were saying. I believe there would be no obligation.
BY MR. SKALABAN:
Q. No obligation indefinitely beyond that reflected in the approved DCSs?
MR. CRAWFORD: Same objection.
THE WITNESS: Yes. No obligation indefinitely.
BY MR. SKALABAN:



Q. So is it your view that by stopping the approval of the DCSs the Department could unilaterally cut off its obligations to all purchasers?
MR. CRAWFORD: Same objection.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. Does the contract -- is there any provision of the contract upon which you base your review?
A. Not specifically that I can think of now, no.
Q. Do you believe that that's consistent with the parties -- what the utilities and DOE had in mind when the contracts were signed in 1983?
A. I don't think I can testify to what the utilities and the Department had in mind in 1983.
Q. Do you think that's consistent with the intent of the MWPA as you understand it?
MR. CRAWFORD: Objection. Same objection.
THE WITNESS: Did you say the intent or objective of the MWPA?
MR. SKALABAN: Could you read back my question?
THE REPORTER: "Question: Do you think



that's consistent with the intent of the MWPA as you understand it?"
THE WITNESS: I don't know. I honestly don't know.
MR. SKALABAN: Off the record.
(Recess.)
BY MR. SKALABAN:
Q. Have you reviewed pleadings submitted by the Department of Energy in this litigation?
MR. CRAWFORD: Objection, vague.
THE WITNESS: Some. I don't know if I've reviewed them all or what percentage of them.
BY MR. SKALABAN:
Q. Do you remember reviewing any pretrial submissions in the Yankee utility cases?
A. Possibly. I mean, I couldn't tell you the difference between a pleading and a pretrial submission or any other legal document by its correct name.
Q. How about have you reviewed an expert report submitted by Edward Abbott in the Connecticut Yankee, Maine Yankee, Yankee Atomic cases?
A. Yes, I have.
Q. Let me represent to you that the report is dated February 28, 2002. Did you review the report



of Mr. Abbott prior to that time?
A. Can you give me the date one more time, please?
Q. Sure. February 28, 2002.
A. I believe so, yes.
Q. Do you know if you reviewed a draft of his report?
A. Yes.
Q. And when did you review it?
A. I believe I reviewed -- I can't give you an exact time frame, but I would say either late last year or early this year.
Q. Now, do you have a recollection how long Mr. Abbott's report was when you reviewed it?
A. Yes.
Q. Can you tell me what you recall about that?
A. It was, I believe, approximately 80 pages.
Q. How did you come about getting his report? Draft report.
A. I understand what you're asking me. I never received a copy of his draft report.
Q. Do you remember -- Okay. I thought you had just testified that you had reviewed a version or you had reviewed his report prior to February 28,

506
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - - - - - - X
Washington, D.C.
Wednesday, May 22, 2002

Continued deposition of THOMAS POLLOG, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness having been previously duly, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 9:40 a.m., Wednesday, May 22, 2002, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs:
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5800

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W., Room 12128
Washington, D.C. 20530
202-305-9640



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| THOMAS POLLOG | PLAINTIFFS |
| By Mr. Skalaban | 509 |
| Afternoon Session - Page 585 | |


E X H I B I T S


| POLLOG EXHIBIT NO. | PAGE NO. |
|---|---|
| 18 - Spent Fuel, Government Responsive Document Collections, 2/15/02 | 551 |
| 19 - ID. Number: 001 through 034 | 554 |
| 20 - Letter dated 3/26/93 with attachments | 575 |
| 21 - ORNL, Acceptance of Failed SNF Assemblies by the Federal Waste Management System | 585 |
| 22 - Standard Contract Working Group with attachments | 599 |
| 23 - Ivan Itkin, 10/16-10/22/00 Calendar | 607 |
| 24 - Ivan Itkin, 10/23-10/29/00 Calendar | 610 |
| 25 - Memo dated 12/20/91 with attachments | 620 |
| 26 - Letter dated 4/1/91 with attachments | 643 |
| 27 - Memo dated 6/11/91 | 649 |
| 28 - Handwritten note | 651 |
| 29 - Memo dated 9/18/90 | 657 |
| 30 - Cost Estimates of Operating Onsite Spent Fuel Pools After Final Reactor Shutdown, 8/91 | 661 |





| | |
|---|---|
| 31 - Handwritten notes | 670 |


P R O C E E D I N G S

MR. SKALABAN: Why don't you swear the witness in since we've had a long break.
Whereupon,
THOMAS POLLOG,
was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified as follows:
MR. CRAWFORD: At the at the outset, Pete, let me just state that Mr. Pollog wishes to correct some statements made in his prior deposition transcript or in his prior testimony.
EXAMINATION BY COUNSEL
FOR PLAINTIFFS (RESUMED)
BY MR. SKALABAN:
Q. Would you like to go ahead and do that now?
A. Yes. I believe it was Thursday, I testified concerning several conversations I had, telecons concerning I guess one of the exhibits, I forget the number, but I believe we'll refer to it as the Abbott report. I stated I had conversations with Mr. Abbott concerning draft versions of that. And now I am not sure whether I talked with Mr. Abbott or

this exhibit, Pollog 18, with respect to the PNL documents?
A. Yes.
Q. Let me ask you this question, do you know, does the government have any more information about where these documents came from that's more specific than Pacific Northwest Laboratories?
MR. CRAWFORD: I instruct him not to answer.
BY MR. SKALABAN:
Q. Are you going to follow the instruction of your counsel and not provide an answer to my question?
A. Yes.
Q. Do you know an answer to my question?
A. I'm not sure.
MR. SKALABAN: Let's mark this as Pollog Exhibit 19.
(Pollog Exhibit No. 19 was marked for identification.)
BY MR. SKALABAN:
Q. You've been handed, Mr. Pollog, a document marked Pollog Exhibit 19. It has a Bates number of CTR 0001227 and it goes on from there for about 17 pages. Do you have that in front of you?

554

A. Yes.
Q. Do you recognize the handwriting on the top of the first page of this document?
A. Possibly.
Q. Whose handwriting do you think that may be?
MR. CRAWFORD: Objection to the extent it calls for speculation.
THE WITNESS: I'm guessing now, and I would guess that's Mr. Brownstein's.
BY MR. SKALABAN:
Q. Do you remember any conversations with Mr. Brownstein or anyone else about whether or not the contract envisioned MPCs?
MR. CRAWFORD: Objection, overbroad; objection to the extent it calls for a legal conclusion.
THE WITNESS: No, if you're referring to MPCs as multipurpose canisters, the tripurpose system, the answer is no.
BY MR. SKALABAN:
Q. Did multipurpose canisters exist either as a concept or in fact in 1983 to your knowledge?
A. I don't believe so. I'm not 100 percent sure about what everybody in the industry thought at

555

that time. But to my knowledge, no, they didn't.
Q. Do you believe that the contract deals with multipurpose canisters one way or another?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion, objection to the foundation.
THE WITNESS: I'm not sure what you mean, deals with multipurpose canisters one way or another. Could you be more specific in what you mean and hopefully I can answer your question.
BY MR. SKALABAN:
Q. Does the contract address in any way the treatment of multipurpose canisters?
MR. CRAWFORD: Same objection as before, but add vague.
THE WITNESS: I don't believe so.
BY MR. SKALABAN:
Q. So in your understanding it doesn't, for instance, say multipurpose canisters are or are not standard fuel?
MR. CRAWFORD: Objection, best evidence; objection to the extent it calls for a legal conclusion.
THE WITNESS: It's my belief that multipurpose canisters are a waste form not covered

556

by the contract.
BY MR. SKALABAN:
Q. And why do you believe that? And you're welcome to take a look at a copy of the contract. It's already been marked in your deposition.
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Do you remember that exhibit number?
MR. SKALABAN: Off the record.
(Discussion off the record.)
MR. SKALABAN: Back on the record.
THE WITNESS: Okay. It's my belief the contract only covers bare spent fuel and possibly single element canisterized fuel.
BY MR. SKALABAN:
Q. And is there a particular provision of the contract on which you base that belief?
A. It's my belief based on what's in appendix E to the contract.
Q. And is there a specific part of appendix E upon which you rely in forming that opinion?
A. No.
Q. Is there any part of appendix E that addresses multipurpose canisters?
MR. CRAWFORD: Objection, best evidence.

557

THE WITNESS: No.
BY MR. SKALABAN:
Q. Is there any part of appendix E that addresses dual purpose canisters?
A. No.
Q. Now, when you look at the definition of standard fuel, it refers to paragraph B, does it not?
A. Yes.
Q. And what's your understanding of the purpose of paragraph B?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion; objection, best evidence.
THE WITNESS: It provides the maximum physical dimensions of fuel that we are to receive as standard.
BY MR. SKALABAN:
Q. Now, if fuel contained within a canister meets these nominal physical dimensions, why wouldn't the canistered fuel be considered standard fuel?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
THE WITNESS: Since the fuel is in a canister, it's no longer standard fuel. It's a -- canisterized fuel is not covered by the contract.

558

Canisterized multielement fuel we believe is not covered by the contract.
BY MR. SKALABAN:
Q. And is there a part of appendix E that states that?
MR. CRAWFORD: Objection, asked and answered; objection to the extent it calls for a legal conclusion.
THE WITNESS: Not specifically, no.
BY MR. SKALABAN:
Q. And is that surprising to you, given that multipurpose canisters were not a concept to the best of your knowledge in 1983?
MR. CRAWFORD: Objection, vague; objection to the extent it calls for a legal conclusion.
THE WITNESS: No, that is not surprising to me.
BY MR. SKALABAN:
Q. How about dual purpose canisters, was that -- to the best your knowledge, was that a concept that was -- the industry had developed in 1983?
MR. CRAWFORD: Objection, vague; objection, foundation.
THE WITNESS: I do not believe the

559

industry had started considering dual purpose canisters in 1983.
BY MR. SKALABAN:
Q. Now, you mentioned that you thought -- again correct me if my statement is wrong in any way. But you mentioned that I guess your belief is you're unsure whether or not single element canister fuel is or is not covered; is that a fair statement of what your belief is?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. I just want to make sure we're working from the same page. Now, what part of the contract -- can you point me to any particular part of the contract that you think is relevant to this question or this open question of whether single element canister fuel is or is not covered?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: I think one might be able to argue that single element canisterized assemblies might be covered under the definition of failed fuel F-3 encapsulated.

560

BY MR. SKALABAN:
Q. Were single element canisters for failed fuel in existence in 1983?
MR. CRAWFORD: Objection, foundation.
THE WITNESS: I don't know for sure. I would guess, it's purely speculative, yes, probably.
BY MR. SKALABAN:
Q. Now, looking at Exhibit 19, if you could turn to page 13 in the original document, and for the record that has a Bates number of CTR 0001239.
If you could take a minute please to review ID No. 26.
MR. CRAWFORD: You need to indicate when you're finished.
THE WITNESS: I'm finished reviewing this.
BY MR. SKALABAN:
Q. Thank you. What's your understanding of the issue that's being talked about here in ID No. 26?
MR. CRAWFORD: Objection, foundation; objection to the extent it calls for speculation.
THE WITNESS: My understanding is should DOE provide purchasers with criteria for single element canisters for failed fuel.
BY MR. SKALABAN:

561

A. I think it's purchasers, contract holders, question mark, be consistent. And then I can't read the last two lines. And purchasers is circled.
Q. Now, on page 597, and for the record it's HQR 0000597, DOE has elected to continue publication of the ACR as a planning document, and as a planning document appears to be crossed out. And there's also a comment on the right-hand margin. Do you see that?
A. Yes.
Q. Do you know why the as a planning document was crossed out?
A. No.
Q. And do you know what that comment is saying on the right-hand margin there?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: The last three lines I believe are needed for planning purposes, but I can't read the first two. It might be if. The first two I'm just not sure.
BY MR. SKALABAN:
Q. Do you recall anything about that, any changes in the document in that area?
A. No.
Q. How about 598, there's a comment on the top right-hand margin. Can you read what that says?

642

MR. CRAWFORD: Objection, best evidence.
THE WITNESS: I think that's no and then purchasers services from DOE or owners and generators of spent nuclear fuel and high-level waste.
BY MR. SKALABAN:
Q. Are you able to make that comment out clearly?
A. No.
MR. CRAWFORD: Objection, vague.
BY MR. SKALABAN:
Q. Do you have an understanding of what's being said in that comment?
A. No.
MR. CRAWFORD: Let's take a little break.
(Recess.)
MR. SKALABAN: Mark this please as Exhibit 26.
(Pollog Exhibit No. 26 was marked for identification.)
BY MR. SKALABAN:
Q. The court reporter has handed you an Exhibit 26 which is a letter from David Zabransky to Alan Brownstein dated April 1, 1991. Mr. Zabransky was not working for DOE at the time?
A. Correct.

643

Q. Do you remember having dealings with Mr. Zabransky during the ACR issue resolution process?
A. Yes.
Q. And was he a member of the utility working group during the ACR issue resolution process?
A. Yes.
Q. Did you ever ask Mr. Zabransky what was going on in the utility's thoughts during the ACR issue resolution process?
MR. CRAWFORD: Objection, vague.
THE WITNESS: At what point in time?
BY MR. SKALABAN:
Q. Just any point in time since he came to work for the Department of Energy.
A. Since he came to work for DOE?
Q. Yes.
A. Yeah.
Q. And did he tell you anything about any of the issues from the purchasers' side of view?
MR. CRAWFORD: Objection, vague and overbroad.
THE WITNESS: Probably.
BY MR. SKALABAN:
Q. Do you recall any issues specifically he

644

told you about? I realize there were 34 issues and I don't really want to run down the whole list so I'm just asking you.
MR. CRAWFORD: Let me just object, vague and overbroad.
THE WITNESS: I have no specific recollections of whether he would state what utility positions would have been on specific issues. If we had a discussion about each and every one of them, I might recall a utility position on one or two of them. But right now, off the top of my head, I don't have any specific recollection.
BY MR. SKALABAN:
Q. If you would turn to Bates No. CTR 0001700. Does this indicate to you that the purchasers' position on April 1, 1991, was that DOE should accept licensed dual purpose casks as a standard fuel classification?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. And you recall that being their position at the time, the utilities' position?
MR. CRAWFORD: Objection, best evidence and to the extent it calls for speculation.

645

THE WITNESS: Not specifically.
BY MR. SKALABAN:
Q. Have you ever talked about that specific issue with Mr. Zabransky with respect to what the utilities thought at the time?
A. Not that I can recall.
Q. Do you know whether this is still the utilities' -- do you believe this is still the utilities' position?
MR. CRAWFORD: Objection to the extent it calls for speculation.
THE WITNESS: Yeah, probably.
BY MR. SKALABAN:
Q. Now, at this time you were still working on the ACR issue resolution process. What was your reaction to this utility position?
A. As best as I can recall, if I was a utility, this is something I would ask for.
Q. And what was your view of it from DOE's side of the table?
A. It was an issue we could work with.
Q. When you say an issue you could work with, it was DOE's view that this would be an issue that they would work with the purchasers to implement the purchasers' position?

646

MR. CRAWFORD: Well, objection, vague.
BY MR. SKALABAN:
Q. Do you understand what I'm asking?
A. Yes. This issue when thought of as the whole process is something that we could work with, if I'm making myself clear.
Q. Could you elaborate a little bit.
A. The ACR issues resolution process would entail, you know, give-and-take on both sides. And, as part of a larger picture, making a modification somehow or another to a contract, this is one that we felt we could deal with.
Q. This, the acceptance of licensed dual purpose casks as a standard fuel classification was something that DOE could live with?
MR. CRAWFORD: Well, objection to the characterization as being in conflict with his prior testimony.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. How about the next page, CTR 0001701, there's a discussion there on multielement sealed canisters. Do you remember at the time that it was the position of the utilities that DOE should accept licensed multielement sealed canisters as a standard

647

fuel classification?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: Vaguely, yes.
BY MR. SKALABAN:
Q. And, from DOE's side of the table, what do you recall DOE's view being of that purchaser position?
A. Similar to the one I just stated for the prior issue we just discussed, in the context of modifying the contract, this is something we could probably handle in a cooperative manner with both sides, making agreements.
Q. And the acceptance of licensed multielement sealed canisters as a standard fuel classification was something DOE could live with?
MR. CRAWFORD: Objection, vague.
THE WITNESS: When viewed in a broader scope of changes, yes.
BY MR. SKALABAN:
Q. Do you remember any opposition at DOE to this position at this '90, '91, time frame?
A. No.
Q. How about today?
MR. CRAWFORD: Objection, foundation; objection to the extent it calls for speculation.

648

THE WITNESS: Within certain limitations I think we agree with that.
BY MR. SKALABAN:
Q. That DOE should accept licensed multielement sealed canisters as a standard fuel classification?
A. Within certain limitations, yes.
Q. And can you just elaborate for me what the limitations are that you're referring to?
A. Yeah. If in the future somebody develops a system like this that is extremely heavy or extremely large and presents great difficulties in transporting or lifting or handling on a regular basis, then I think some people at the surface facility or in the transportation program may not agree with that.
MR. SKALABAN: Mark Pollog Exhibit 27.
(Pollog Exhibit No. 27 was marked for identification.)
MR. SKALABAN:
Q. This exhibit is a document from Mr. Scott Vance addressed to Mr. Tom Pollog. It has a Bates No. CTR 0001738. Do you recognize this document, Mr. Pollog?
A. I don't specifically recall this document.

649

optimum. I don't recall the word preferred associated with any throughput rate study. It may have been, but the word just does not ring a bell to me, when I associate it with a throughput rate study. But again possible.

BY MR. SKALABAN:

Q. Could that be part of the evaluation that's being referred to here?

MR. SKALABAN: Objection to the extent it calls for speculation; objection, foundation and vague.

THE WITNESS: I don't know.

MR. SKALABAN:

Q. Do you know whether DOE had or does DOE have any views on a preferable throughput rate for the system?

MR. CRAWFORD: Wait a minute. Objection, vague.

Go ahead.

THE WITNESS: Again there are throughput rate studies that have been done. I'm not sure if it ever labeled one preferred or preferable or optimum. It could have been. I don't recall those words associated with those reports. But again it doesn't mean it hasn't been, I just don't recall.

666

BY MR. SKALABAN:

Q. Do you ever recall hearing or having any awareness of a 3,000 to 4,000 MTU rate being a preferable throughput -- the preferable throughput rate for the system?

A. I recall a study where it looked at 3,000 and 4,000 along with other rates I believe. And the analysis indicated that 3,000 was the rate that was suggested to be used.

Q. And what do you recall why that was suggested as a rate to be used, was that because it was an optimal rate or effective rate, what do you recall about that?

MR. CRAWFORD: Objection, vague.

THE WITNESS: I recall the 3,000 was the rate recommended. Again the reasons I believe had to do with more cask utilization than anything else. And it may have been the preferred, it may have been the optimal.

But I just don't recall specifically, you know -- all I remember is a recommended rate, I believe it was 3,000, and it had its reasons and they were basically transportation related and cask utilization related. So it was a recommended rate. Whether it was optimal or preferred I don't recall.

667

Possibly, but I'm not sure.

MR. CRAWFORD: Objection, best evidence.

BY MR. SKALABAN:

Q. And is it a widely held view within DOE that a 3,000 MTU is the preferred rate for the system?

MR. CRAWFORD: Objection, vague.

THE WITNESS: I would say that 3,000 MTU was widely viewed as the steady state rate we hoped to achieve. Again preferred is -- I'm not sure is the right word.

For whatever reason I think most people assumed 3,000 is a steady state rate based upon work that has been done in the past to indicate that this was probably most suitable for us concerning whatever reason, different people will have different reasons. And I gave you some, and that's from what I remember mostly related to transportation operations and cask utilization.

BY MR. SKALABAN:

Q. Do you know, is there any camp within DOE that disagrees with the 3,000 MTU rate as a rate to be used as the steady state throughput rate?

MR. CRAWFORD: Objection, vague.

THE WITNESS: Not to my knowledge.

668

BY MR. SKALABAN:

Q. And that answer holds true for both currently and back in the time period when the systems rate studies were being done?

A. That's true currently. I feel I can't give you a good answer for the time period when the systems rate studies were being done because it's not something I discussed on any regular basis with the employees who were around then and working on this. And we have had great turnover since then and I don't know -- I just don't know what their opinions would have been.

Q. Fair enough. How about the '90, '91, time period, would your answer hold true for that time period?

A. Same answer. There were a lot of people that were working on this that I was not familiar with what their views were and I would not feel comfortable speculating as to what their opinions were as to what rate we should be accepting at.

Q. How about when you came back to work in waste acceptance at the end of '96, does your answer hold true for the time period of '96 forward?

MR. CRAWFORD: Objection to the extent it calls for speculation.

669

BY MR. SKALABAN:
Q. And that's correct, DOE is not witnessing fuel inspections or fuel loadings into dry storage casks at this time?
A. Yes.
Q. And that's a cost saving move?
MR. CRAWFORD: Objection to the foundation; objection to speculation.
THE WITNESS: Amongst other things.
BY MR. SKALABAN:
Q. And what other reasons why you wouldn't be witnessing fuel loadings into dry cask storage systems?
A. Well, we could add very little usefulness to doing that. NRC is the regulator for storage and transportation. And, if somebody wants to see that it's being done properly for those activities, they should check with the NRC, not us.
Q. Do you recall a 1998 Dwight Shelor letter dealing with multiple purpose canister specs?
A. I believe so.
Q. Do you remember what the overall thrust of that letter was?
A. If I'm thinking about the same letter you are, yes.

678

Q. Okay. Can you tell me what you recall about the 1998 Shelor letter on MPC specs?
MR. CRAWFORD: Let me just object to best evidence.
But you can give your recollection.
THE WITNESS: Again, if it's the same letter we're both thinking about, it should have withdrawn the MPC spec for cask designers to be working to and indicated that we planned to work with designers in the future when the program becomes more mature.
BY MR. SKALABAN:
Q. Do you have an understanding of why DOE withdrew the MPC spec at that time?
A. Yes.
MR. CRAWFORD: Objection, foundation.
BY MR. SKALABAN:
Q. Can you tell me what your understanding was?
A. Well, the MPC spec was done for the MPC project that occurred in the prior years to that which was '95, '96, '97. And, since we were no longer going to be funding that project, it was no longer feasible to maintain that design.
Q. Any other reasons that you can recall or

679

that you have an understanding of why DOE withdrew that spec?
A. No.
Q. At the meeting with the Yankee representatives in January of 2000, did you or Mr. Zabransky advise Yankee that dual purpose canisters licensed by the NRC for transport would be fine for transport to the repository?
MR. CRAWFORD: Objection to the extent it calls for speculation.
THE WITNESS: Again I have no specific recollection of either one of us saying that. But that sounds consistent with our position at the time.
BY MR. SKALABAN:
Q. Is that still your position?
A. Essentially.
Q. And, if I understand your prior testimony, DOE's view at this time is that it plans to accept into the waste management system fuel that's been put into dual purpose canisters?
MR. CRAWFORD: Objection to the foundation.
THE WITNESS: Close. DOE plans to initiate the steps that would make it possible to take dual purpose canisters as a standard fuel form

680

defined by contract into the waste management system.
BY MR. SKALABAN:
Q. And it's your expectation that that will happen once spent fuel acceptance begins? And what I mean by that, I'm talking about acceptance of dual purpose canisters as a standard fuel form.
A. It's my hope that we can do that prior to waste acceptance actually beginning.
Q. Do you expect that that will happen prior to waste acceptance beginning?
MR. CRAWFORD: Objection to the extent it calls for speculation; objection, vague.
THE WITNESS: Expects may be too strong. I certainly hope it does. I certainly think it's possible. An expectation? Probably.
BY MR. SKALABAN:
Q. Probably?
A. Yeah.
Q. So in your view more than 50 percent likely that it will be accepted as a standard form?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: Yes.
BY MR. SKALABAN:
Q. How many e-mails do you have on your

681