**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**VOLUME VIII OF X**
**(Pages A 1073 to A 1238)**

---

**ENERGY NORTHWEST'S CORRECTED APPENDIX IN SUPPORT OF ITS CORRECTED NOTICE OF DESIGNATION OF DEPOSITION AND PRIOR TRIAL TESTIMONY OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO ADMIT PRIOR TESTIMONY INTO EVIDENCE**

---

NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
202-639-6000

June 3, 2008

*Attorneys for Plaintiff*

# Table Of Contents To Appendix – Volumes I to X

## Volume I

Documents Cited

DOE's Responses to Utility Plaintiffs' First Set of Interrogatories..........................A 0001

DOE's Responses to Utility Plaintiffs' Joint Supplemental Interrogatories.............A 0013

April 3, 2002 30(b)(6) Notice of Deposition ..........................................................A 0028

April 18, 2002 30(b)(6) Notice of Deposition ........................................................A 0033

November 12, 2004 30(b)(6) Notice of Deposition.................................................A 0039

March 2, 2005 30(b)(6) Notice of Deposition ........................................................A 0043

## Volume IA

April 19, 2007 30(b)(6) Notice of Deposition ........................................................A 0047

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 2450874 (Fed. Cl. Sept. 17, 2004) (unpublished)...........................................................A 0050

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, slip. op. (Fed. Cl. Sept. 21, 2004) (unpublished)...........................................................A 0063

*Wisc. Elec. Power Co. v. United States*, No. 00-697C, slip op. (Fed. Cl. Aug. 16, 2007) (unpublished) ..........................................................A 0073

Defendant's Unopposed Motion to Designate Prior Trial Testimony of Mr. Robert L. Morgan in System Fuels ..........................................................A 0103

## Volume II

Deposition Transcripts and Trial Testimony Excerpts

Chart of Energy Northwest Deposition and Trial Testimony Designations .............A 0109

Barrett, Lake ...........................................................................................................A 0128
- April 22, 2002 ..............................................................................................A 0129
- April 23, 2002 ..............................................................................................A 0165
- April 26, 2002 ..............................................................................................A 0191
- May 8, 2002 ..................................................................................................A 0225
- May 10, 2002 ................................................................................................A 0250
- May 14, 2002 ................................................................................................A 0278
- May 15, 2002 ................................................................................................A 0286

## Volume III

Brownstein, Alan ....................A 0289
April 9, 2002 ....................A 0290
April 10, 2002 ....................A 0318
April 11, 2002 ....................A 0350
May 23, 2002 ....................A 0363
June 14, 2002 ....................A 0368

Cole, Billy M. ....................A 0376
March 12, 2002 ....................A 0377
March 13, 2002 ....................A 0411
June 4, 2002 ....................A 0419

Dreyfus, Daniel ....................A 0422
May 15, 2002 ....................A 0423

## Volume IV

Klein, Susan ....................A 0438
April 24, 2002 (Rule 30(b)(6)) ....................A 0439
April 25, 2002 (Rule 30(b)(6)) ....................A 0478

Kouts, Christopher ....................A 0493
January 30, 2004 ....................A 0494
February 19, 2004 ....................A 0504
August 2, 2004 (in the Yankee Atomic Trial Transcript) ....................A 0509
April 11, 2005 (Rule 30(b)(6)) ....................A 0516
July 12, 2005 (in the TVA Trial Transcript) ....................A 0532
October 26, 2005 (in the Southern Nuclear Trial Transcript) ....................A 0538
June 13, 2006 (in the Pacific Gas Trial Transcript) ....................A 0550
June 14, 2006 (in the Pacific Gas Trial Transcript) ....................A 0555
October 11, 2006 ....................A 0571
January 16, 2007 (in the System Fuels Mississippi Trial Transcript) ....................A 0581
April 12, 2007 (in the System Fuels Entergy Trial Transcript) ....................A 0585

## Volume V

Kouts, Christopher (continued) ....................A 0612
May 1, 2007 (Rule 30(b)(6)) ....................A 0612
May 2, 2007 ....................A 0634

Lawrence, Michael ....................A 0654
May 20, 2002 ....................A 0655
May 21, 2002 ....................A 0697
November 16, 2007 (in the Carolina Power Trial Transcript) ....................A 0712

Milner, Ronald ........ A 0726
May 1, 2002 ........ A 0727

**Volume VI**

Milner, Ronald (continued) ........ A 0762
May 2, 2002 ........ A 0762
May 3, 2002 ........ A 0799
May 7, 2002 ........ A 0814
May 7, 2002 (Afternoon) ........ A 0831
May 8, 2002 ........ A 0838
August 11, 2004 (in the Yankee Atomic Trial Transcript) ........ A 0851

Morgan, Robert ........ A 0866
March 21, 2002 ........ A 0867
March 22, 2002 ........ A 0905
June 25, 2002 ........ A 0913
August 3, 2004 (in the Yankee Atomic Trial Transcript) ........ A 0917

**Volume VII**

Morgan, Robert (continued) ........ A 0925
November 15, 2006 ........ A 0925
November 16, 2006 (in the Northern States Trial Transcript) ........ A 0943
November 13, 2007 (in the Carolina Power Trial Transcript) ........ A 0953

Pollog, Thomas ........ A 0962
April 11, 2002 (Rule 30(b)(6)) ........ A 0963
April 12, 2002 (Rule 30(b)(6)) ........ A 1002
May 15, 2002 (Rule 30(b)(6)) ........ A 1026
May 16, 2002 (Rule 30(b)(6)) ........ A 1046
May 22, 2002 ........ A 1066

**Volume VIII**

Pollog, Thomas (continued) ........ A 1073
August 4, 2004 (in the Yankee Atomic Trial Transcript) ........ A 1073
March 29, 2005 (in the SMUD Trial Transcript) ........ A 1098
July 12, 2005 (in the TVA Trial Transcript) ........ A 1108
October 26, 2005 (in the Southern Nuclear Trial Transcript) ........ A 1115
October 12, 2006 ........ A 1122
November 15, 2006 (in the Northern States Trial Transcript) ........ A 1126

Rosselli, Robert ........ A 1137
April 15, 2002 ........ A 1138
April 16, 2002 ........ A 1168

Rusche, Benard ........................................................................................A 1173
May 16, 2002 ........................................................................................A 1174
May 17, 2002 ........................................................................................A 1197
August 3, 2004 (in the Yankee Atomic Trial Transcript)..............................A 1207

Slater-Thompson, Nancy ...........................................................................A 1215
April 21, 1999 ........................................................................................A 1216
April 22, 1999 ........................................................................................A 1228

**Volume IX**

Slater-Thompson, Nancy (continued)...........................................................A 1239
June 13, 2002 ........................................................................................A 1239

Trebules, Victor ........................................................................................A 1255
April 17, 2002 ........................................................................................A 1256
April 18, 2002 (Coordinated Discovery) ......................................................A 1289
April 18, 2002 (Deposition in Yankee Cases................................................A 1305
April 19, 2002 ........................................................................................A 1317

Williams, Jeffrey........................................................................................A 1319
June 11, 2002 ........................................................................................A 1320
January 22, 2004 ....................................................................................A 1340

Zabransky, David........................................................................................A 1368
April 17, 2002 ........................................................................................A 1369

**Volume X**

Zabransky, David (continued) ....................................................................A 1401
April 18, 2002 ........................................................................................A 1401
April 19, 2002 ........................................................................................A 1428
June 5, 2002 ..........................................................................................A 1440
June 6, 2002 ..........................................................................................A 1445
August 5, 2004 (in the Yankee Atomic Trial Transcript)..............................A 1449
March 28, 2005 (in the SMUD Trial Transcript)...........................................A 1473
March 29, 2005 (in the SMUD Trial Transcript)...........................................A 1487
April 12, 2005 (Rule 30(b)(6))...................................................................A 1491
July 12, 2005 (in the TVA Trial Transcript)................................................A 1503
October 27, 2005 (in the Southern Nuclear Trial Transcript)........................A 1508
November 20, 2006 (in the Northern States Trial Transcript).......................A 1519
October 11, 2007 (in the Wisconsin Electric Trial Transcript) .....................A 1528
October 12, 2007 (in the Wisconsin Electric Trial Transcript) .....................A 1532
November 13, 2007 (in the Carolina Power Trial Transcript).......................A 1538

IN THE UNITED STATES COURT OF FEDERAL CLAIM

YANKEE ATOMIC ELECTRIC COMPANY, )
CONNECTICUT YANKEE ATOMIC POWER )Case Nos.:
COMPANY, and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
)
THE UNITED STATES, )
Defendant. )

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Wednesday, August 4, 2004
Volume 17

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPAN
CONNECTICUT YANKEE ATOMIC POWER COMPANY a
YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPAN
CONNECTICUT YANKEE ATOMIC POWER COMPANY:
MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)



APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COM
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S

\- - - - -

THE COURT: Another witness today?

MR. STOUCK: Your Honor, I've got a couple of preliminary matters very briefly, if I may. Sorry to interrupt, but it's really just for the record, if I can just stay here. Mr. Lester mentioned a couple of days ago that we had filed a list of all of the documents that had been admitted -- exhibits that had been admitted by the Court, either because they were on one or the other exhibit list and not objected to and, therefore, admitted at the pretrial conference, or because they were admitted during the course of our case.

And he said that he thought the list was fine, if I recall correctly, except there were four documents on there that he, I'm not exactly sure what he said, my recollection is they may have been on the government's list and so forth, but they wanted to withdraw them, and I said I'd take a look at that.

And I just want to address that because the, I've looked at the documents, a couple of them are contracts, one is a contract between Yankee Atomic and Duke Engineering, that's Defendant's 261, one is a contract between Maine Yankee and Securitas,

I also thought, this is interesting, there were a lot of worlds in this case, a lot of scenarios, but I guess we have an additional scenario now where the government came, and we were supposed to pay, but we'll deal with it when we see the papers.

THE COURT: I did ask a couple of questions on the fee in terms of the claim because it concerned me at the time as to what to do with the situation. I didn't know whether I would have to do something sua sponte or raise it, so I'm glad someone has raised the thing formally, and we can resolve exactly what the status is.

Obviously, the issue is, if you don't come, is it an item of damage? I mean, could it be a, or the question is really in the circumstances that we have here, is it owed or isn't it, at this point. Is it an item that you offset against the damages, if there are any damages, or is it something that you could claim independently at this point?

MR. LESTER: And I think, in the motion, we'll talk about it.

THE COURT: Yeah.

MR. LESTER: But it's really the idea, you know, a damages award is to place the Plaintiff in a



position it would have been in had performance occurred. If performance had occurred, the Plaintiff would have had to pay the fee. So by retaining the fee and being able to invest it and make money off of it, it's actually in a better position than it would have been if the Court awards damages, and we compensate the Plaintiff monetarily for the delays, and they're keeping the fee, that would actually place them in a better position than they would have been, so that's the theory.

THE COURT: I take it that's only on two of the claims?

MR. LESTER: Only on two, Yankee Atomic has paid a one-time fee, so it's not an issue in that case.

THE COURT: Well, another issue.

MR. LESTER: Your Honor, I thought things were getting a little dull, and I just wanted to keep it exciting.

THE COURT: Well, I think it's good to raise the issues because, obviously, notice of appeal has been filed in Indiana Michigan, so that's going to the Circuit, and I assume that whatever we do here will end up in the Circuit, unless people decide to settle, which is always an option.



MR. LESTER: And, Your Honor, we are raising the issues in other cases where the fee has not been paid --

THE COURT: So it's a good idea -- right.

MR. LESTER: -- so for consistency's sake, I think it's also important to raise it here.

THE COURT: It's a good idea to get as many issues as we can up to the Circuit in that regard. Okay. Thank you for the information.

MS. SULLIVAN: Your Honor, the government calls its next witness, Thomas E. Pollog.

Whereupon--

THOMAS E. POLLOG

a witness, called for examination, having been duly sworn, was examined and testified as follows:

MS. SULLIVAN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q. Good morning, Mr. Pollog.
A. Good morning.
Q. Mr. Pollog, are you currently employed at the Department of Energy?
A. Yes, I am.
Q. And to what office within the Department of Energy are you currently assigned?



A. I work in the Office of Civilian Radioactive Waste Management, the Office of Systems Analysis and Strategy Development.
Q. What are your current responsibilities?
A. Generally, I'm assigned to implement a standard contract between the Department of Energy and the contract holders.
Q. How long have you been in your current position?
A. Approximately eight years.
Q. So when did you join the Office?
A. The Office I'm currently in? That Office was formed in October of 2002, but my responsibilities were the same in the prior organization.
Q. And when did you join the prior organization?
A. September of 1996.
Q. Prior to September of 1996, did you serve in the Office that had responsibility for the waste acceptance function at DOE?
A. Yes, I did. In 1990, '91 and early '92, I was in the Office that performs the same functions.
Q. Mr. Pollog, do you also serve as the contracting officer's technical representative?

A. Yes, I do, in an unofficial capacity.
Q. When did you assume the responsibilities of the contracting officer's technical representation?
A. When Mr. Zabransky assumed responsibilities of the contracting officer, which I believe was in the summer of 2002, I was unofficially assigned responsibilities of the contracting officer's technical representative.
Q. What are the responsibilities of the contracting officer's technical representative?
A. To provide the contracting officer with any technical expertise or guidance he needs in implementing the standard contract.
Q. To whom do you report?
A. I report to Christopher Kouts.
Q. And to whom does Mr. Kouts report?
A. Mr. Kouts reports to Theodore Garrish.
Q. To whom does Mr. Garrish report?
A. And Mr. Garrish reports to Dr. Margaret Choo, director of our program.
Q. Do you hold a Bachelor's degree?
A. Yes, I do I have a Bachelor of Science in Nuclear Engineering that I received in 1981 from Penn State University.
Q. Do you hold a Master's degree?



A. Yes, I do. I received a Master's of Science from Clemson University in Environmental Systems Engineering in 1988.
Q. Can you pull up Defendant's Exhibit 24, please?
MS. SULLIVAN: Your Honor, may I approach?
THE COURT: Yes, of course.
MS. SULLIVAN: And, Your Honor, I know you usually use the computer, but we're going to use this copy a lot, so I'd like to give copies to you and your clerk as well.
MR. STOUCK: Thank you very much.
BY MS. SULLIVAN:
Q. Mr. Pollog, do you recognize what's been marked as Defendant's Exhibit 24?
A. Yes, I do.
Q. Could you tell the Court what this document is?
A. This is the 1991 annual capacity report that was developed by the Office of Civilian Radioactive Waste Management.
Q. What is the purpose, or was the purpose of the -- sorry. And is the annual capacity report commonly referred to as the ACR?
A. Yes, that's how we commonly refer to it.



Q. What was the purpose of the 1991 ACR?
A. It was to provide the contract holders what would be the waste acceptance capacity of the Federal Waste Management System and to provide them also with the allocations that they will need for filling out their delivery commitment schedules.
Q. Were you involved in the preparation of the 1991 ACR?
A. Yes, I was.
Q. And I believe you've already said this, but which office within DOE prepared this document?
A. It was the Office of Civilian Radioactive Waste Management.
Q. Thank you. Did the contracting office have any role in the preparation of the 1991 ACR?
A. Yes, they had a minor role in the preparation of the document.
Q. And what was their minor role?
A. After we had developed a draft version of it, we sent it around to several organizations for comment, and I believe they submitted some minor comments to us on the document prior to its being finalized.
Q. Was the 1991 ACR sent out by the contracting officer?



A. Yes, it was. It was sent out to all contract holders under the signature of the contracting officer.
Q. Mr. Pollog, could I direct your attention to page five of this document, please? Mr. Pollog, what is the information set forth in table 2.1 on page five of this document?
A. These are the projected waste acceptance rates starting in 1998 and going through 2007.
Q. How were these rates developed?
A. They were based primarily on the Nuclear Waste Policy Amendments Act of 1987 and restrictions placed on a monitored retrievable storage system in that Act.
Q. Could we go to Defendant's Exhibit 23? Mr. Pollog, you've been handed what's been marked as Defendant's Exhibit 23. Do you recognize this document?
A. Yes, I do.
Q. Could you explain to the Court what it is?
A. Yeah, it's an action memo from Ronald Milner, who is the associate director for the storage and transportation division at that time, to John Bartlett, seeking his approval for the publication of the 1991 annual capacity report.

Defendant's Exhibit 544, which I believe Mr. Stouck maintains his objections, and Plaintiffs' Exhibit 92, which we pulled from the Plaintiffs' may use list.

That is the 1990 ACR. Plaintiffs' objections to Defendant's Exhibit 544 were authenticity and hearsay. I believe Mr. Pollog has authenticated the document and provided testimony as to what it constitutes.

MR. STOUCK: Your Honor, our position on that would be that the Court ought to at least reserve a ruling on admissibility until I get to question Mr. Pollog about it, and then it may be as the Court was intimating, that all this is, is a bunch of arithmetic. And if that's the case, perhaps we can get over the difficulty. But I would like to have a chance to question him before the ruling.

THE COURT: I'll reserve ruling until cross is over on 544.

MS. SULLIVAN: Okay. Do you have any objection to Plaintiffs' Exhibit 92?

MR. STOUCK: No.

THE COURT: Plaintiffs' Exhibit 92 is admitted in evidence.

(Plaintiffs' Exhibit Number PX-92 was received in evidence.)



MS. SULLIVAN: Your Honor, thank you, we have no further questions.

MR. STOUCK: Can we take a short break, Your Honor?

THE COURT: Yes.

MR. STOUCK: 10 minutes.

THE COURT: Okay. Half-past, we'll be back at half-past.

(Whereupon, a short recess was taken.)

THE COURT: Mr. Stouck, whenever you're ready.

MR. STOUCK: Thank you, Your Honor. And I guess what I'd like to propose, if I may, Mr. Pollog has been deposed many times in this case and in common proceedings and in other cases, and there's a lot of material out there, and what I'd like to do is, since he's the only witness the government has scheduled for today, is start a little bit of cross-examination, but then take a lunch break probably earlier than usual.

And if I go back, and even if we take a longer break, since the day seems to be a short one for everyone, I think if it's one of those situations where the more time I can spend organizing the balance of my questioning, I can assure you that it's



going to make it more efficient and shorter.

THE COURT: Whatever is best for your purposes is fine.

MR. STOUCK: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. STOUCK:

Q. Good morning, Mr. Pollog. It's still morning. The questions about the fees which were near the end of your direct examination, I believe you testified, what did you say was the amount that Connecticut Yankee owes under the contract to DOE?

A. I believe the one-time fee, plus interest, as of June 30th, 2004, is approximately $153 million.

Q. You say, "plus interest." Does that figure you're giving include interest or not include interest?

A. It does include the interest.

Q. And interest is included in the other figure you gave for Maine Yankee?

A. That is correct.

Q. And what was that?

A. It was I believe approximately $159 million, including interest.

Q. And how does interest run?

A. I think it's based upon the 13 week T-bill



rate.

Q. From what date?

A. I believe from either when the contract was signed or when they started making their first payment.

Q. In preparing these ACR documents that you testified about, does the Department of Energy use contractors, you know, do contractors participate in the process of preparing these?

A. Yes.

Q. Is Oak Ridge National Lab a part of DOE?

A. Yes.

Q. All right. Just going through your, some of your background here, if I may, if I understood your testimony, in 1990, you were assigned to the utility interface and logistics branch, is that right?

A. Yes, that's correct.

Q. And you reported to Alan Brownstein?

A. That is correct.

Q. And I don't think you said this, but I understand that, in 1992, you took a three-year leave of absence and went to Austria?

A. That's correct, also.

Q. And did not work at all on OCRWM matters?

A. Not directly, no.
Q. And then you returned to DOE in 1995?
A. Yes, that's correct.
Q. You worked in the engineering division?
A. Yes.
Q. And in 1996, I think you did testify you were reassigned to what part of OCRWM?
A. The Waste Acceptance Group.
Q. Which is led by Mr. Zabransky?
A. In 1996, it was led by Mr. Zabransky, yes, that's correct.
Q. And does he not head that team anymore?
A. Well, we don't have teams now. Mr. Zabransky and I perform waste acceptance functions for Mr. Kouts.
Q. In 1996, what, just tell us, what did the waste acceptance team do? Were they accepting waste?
A. No, we managed and implemented the standard contract.
Q. That was the basis for all of that team?
A. Yes.
Q. You had no personal role in drafting the standard contract, of course, since you weren't there at that time, right?
A. Correct.



Q. And you've had no role in drafting or developing TSLCC documents?
A. I've had a minor role. I think I reviewed a couple of them over the years, but I never actually wrote them, but I think I did review draft TSLCCs.
Q. And you had no role in drafting or developing fee adequacy reports, is that right?
A. That is correct. I may have reviewed one or two, but I never actually wrote them, just received draft versions of them, was asked to comment on them.
Q. And you've had no role in drafting any specifications or design requirement documents for the repository?
A. That is correct.
Q. And you don't know why an acceptance rate was not included in the standard contract, isn't that also right?
A. That's correct.
Q. And you don't know whether the issue of an acceptance rate was even raised when the standard contract was negotiated, is that right?
A. I don't think so.
Q. Okay. What's wrong about that statement that I made?



A. I think I saw some correspondence from interested parties or utilities commenting on the first version of the standard contract that was published in the Federal Register, and I think one or two of those may have commented that acceptance rates should have been included.
MR. STOUCK: Actually, could I just pause for one second. I've got a question. Excuse me, Your Honor.
THE COURT: Sure.
MR. STOUCK: All this voluminous material I've been reviewing, I'm trying to boil down. I apologize, Your Honor. I'm sorry, Mr. Pollog. I'll be with you in just a moment.
BY MR. STOUCK:
Q. Let's turn to this, and, again, apologies, I just need a moment here.
MR. STOUCK: Again, Your Honor, forgive me, hold on one sec.
BY MR. STOUCK:
Q. Now, in '90 and '91, Mr. Pollog, when you were reporting to Mr. Brownstein, you had no responsibility to make any determinations about what provisions of the standard contract meant, isn't that right?



A. I didn't hear the last thing you said. Could you repeat that for me, please?
Q. You had no responsibility to make any determinations on what the provisions of the standard contract meant in that time period in '90 and '91, isn't that right?
A. I would provide advice to Mr. Brownstein on any questions he would have, or what I thought my understanding was, of provisions of the standard contract.
Q. But you were not responsible for making the determination about what it meant, isn't that right?
A. Well, the contracting officer is responsible for making the final determinations on what the contract means. Mr. Brownstein would have given advice to the contracting officer, and Mr. Brownstein, on many occasions, asked me what my understanding was of a provision or term of the contract, yes, I mean --
Q. But you were not responsible for making determinations about what the standard contract meant, isn't that right?
A. Again, I think, as I said, I think the contracting officer makes the final determination on what any provision on the standard contract says, on

advice of the contracting officer's technical representative, who would ask me many times what I thought something might have meant.
Q. And you were not the contracting officer at that time?
A. No, I wasn't.
Q. Now, let's take a look at Defendant's 30.001, this letter to Mr. Buchheit you were asked about that encloses the instructions, the DCS instructions. Do you have that in front of you?
A. Yes, I do.
Q. These are the instructions that were provided to the contract holders, looks like in about March 1992 by the Department, right?
A. Yes.
Q. And you were involved in that process?
A. Yes, I was.
Q. And these instructions provide, basically instruct the contract holders that -- well, let's take a look at it, on page two, under paragraph 7A.
A. Are you on the instructions or the letter?
Q. I'm on the instructions, page 2, paragraph 7A. Do you have that?
A. Yes, I do.
Q. It says, basically, "The Department of



Energy instructed the utilities that they were required to fill out their DCSes in a manner that conformed to the allocation shown in the '91 ACR." Isn't that right?
A. Yes.
Q. And if they didn't do that, the DOE would not even consider the DCSes for approval?
A. The DCS, if they didn't conform to the allocations, the DCS would have been disapproved.
Q. Would not have even been considered for approval, is I think what the wording here is. Does that ring a bell with you?
A. Not specifically.
Q. Let's take a look at it, paragraph 7A, last sentence. Are you there?
A. Yes.
Q. It says, "Due to the limited annual acceptance capacity of the FWMS, only DCSes submitted by purchasers with an allocation in the delivery year will be considered for approval." Is that the instruction that was given?
A. That's what the paragraph reads.
Q. Now, you're also aware, I'm sure, that it's the Department of Energy's position in this litigation that those DCSes that were submitted are



binding?
A. Yes, I'm aware of that.
Q. And that's your personal view as well?
A. Yes.
Q. And you've testified about that extensively in some of these depositions that I mentioned?
A. Yes, I have.
Q. And do you know whether that's the Department's official, the Department of Energy's official position?
A. Yes.
Q. It is. Well, my next question for you is, isn't that position something that has been made up entirely for this litigation?
A. Not to my knowledge, it's not there, hasn't been made up for this litigation.
Q. Do you know if Mr. Brownstein had that view in 1990 or '91 when you worked for him in connection with this '91 ACR; in other words, that DCSes were binding?
A. I believe Mr. Brownstein's view was the DCS was not binding if a facility hadn't commenced operations in 1998.
Q. That was the position, that's what he told you in 1991 what his position was?



A. If I remember correctly, yes. I think he caveated the binding nature of the DCS on a facility commencing operations in 1998.
Q. But you definitely discussed this subject with Mr. Brownstein, of DCSes being binding or not, in the 1990, '91 time period?
A. I believe so.
Q. And you're clear, in your mind, that he had a view about whether or not DCSes were binding or not?
A. I'm not 100 percent clear, but that's my best recollection of a conversation we had some 13, 14 odd years ago.
Q. Well, he was your boss, so presumably, you did talk with him about these things?
A. Yes, we talked about many contract issues 13, 14 years ago, and I have a recollection of some of them better than others.
Q. I'm not asking about specific request conversations. I'm asking you whether it's your testimony that Mr. Brownstein, in 1990 and '91, had a view of his own about whether or not DCSes that had been submitted by the utilities were binding.
A. Yes, and I think I testified that I think Mr. Brownstein's view was there was a caveat on the

THE COURT: Overruled. You can answer the question.
THE WITNESS: No, it didn't surprise me.
BY MR. STOUCK:
Q. Why didn't it surprise you?
A. Because not everyone in the Department held the same view.
Q. So your view being different from Ms. Slater's view is just a divergence of views?
A. Yes.
Q. And you can't testify those views were right?
A. I think a court's already decided what's right.
Q. Are you aware of that testimony she gave that I mentioned?
A. Which testimony that who gave?
Q. That Ms. Slater doesn't recall, and she testified in her deposition, I just wanted to know if you're aware of this, that she didn't recall anyone, either within DOE or the industry, who thought the delivery commitment schedules were binding on either party?
A. I think I've seen a demonstrative in the Indiana Michigan case that had Ms. Slater quoted



saying certain things to that effect.
Q. So you were aware of that part of her testimony?
A. I saw a demonstrative in the court in the Indiana Michigan case which had a statement from Ms. Slater to that effect.
Q. So you were aware that she testified?
A. I'm aware they got it from somewhere. I don't know where they got it from, but I'm aware they had a demonstrative in the courtroom that stated something to that effect in the Indiana Michigan case.
Q. Let's move on to something else. In the instructions -- actually, Mr. Pollog, I'm asking for a little indulgence, as I mentioned at the outset, because of the uncertain nature of exactly what you were going to testify about. I was prepared for some other things. Let me try and zero in on where we are.
In these instructions, take a look back, if you would, at Exhibit 30.001. That's the letter to Mr. Buchheit. If you take a look at page two again, it says, in paragraph C, let me read it for you, it says, "The annual acceptance rates in the 1991 ACR provide an approximation of the FWMS acceptance



capacity and are for planning purposes." Do you see that?
A. Yes, I do.
Q. Then it says, "The process described herein assumes that the FWMS will be able to accept the purchasers' SNF beginning in 1998, according to the acceptance rate reflected in the 1991 ACR." Do you see that?
A. Yes, I do.
Q. Have I read that correctly?
A. I believe so.
Q. And then it says, "In the event that such circumstances change, all DCSes previously approved by DOE may need to be reevaluated by DOE and the purchasers." Do you see that?
A. Yes, I do.
Q. Do you expect that the previously approved DCSes are going to be reevaluated by DOE in light of the fact that those circumstances did change, or at least the '98 date circumstance changed?
A. I believe the DCSes that were signed still maintained their validity from the sense that the Department was liable for the material that it committed to accept at that time period.
Q. Do you expect them to be reevaluated in



light of the fact that, in light of the fact that the '98 date circumstance did change?
A. I think we're going to foresee a time when we start waste acceptance in another path, but I think those DCSes still maintain a commitment by the Department to have accepted that material in that time period.
Q. We're going foresee a time when we start waste acceptance in another path, is that what you said?
A. Yes.
Q. Does that mean that those DCSes that were submitted and approved in the 1990s are going to be reevaluated?
A. I think the Department maintains we still have a liability for those DCSes.
Q. And I'm just trying to find out, does that mean they are going to be reevaluated or not going to be reevaluated?
A. It means the Department maintains we still have a liability for those DCSes.
Q. Would you be surprised if the Department gave instructions to utilities, I don't know, this month, to submit new DCSes that related to the same allocations or similar allocations of the same fuel

that are described in the DCSes that were submitted in the '90s? Would that surprise you?
A. No, it wouldn't surprise me.
Q. Would you consider that a reevaluation of those previous DCSes?
A. No.
Q. Why not?
A. I don't.
Q. Can you explain why?
A. I just don't consider that a reevaluation of the DCSes.
Q. Suppose in compliance with these new instructions -- well, let's get them out on the table. Can I have those, so I can introduce them? I'd like to ask you about them, not to keep everybody -- the 1995 ACR is not the last ACR that DOE has published, isn't that right?
A. That is correct.
Q. Right. There's a new one dated July 2004, which just came out this week, or this month, dated this month. This is August, last month, July of 2004. Isn't that right, Mr. Pollog?
A. That's correct.
Q. Were you involved in preparing it?
A. Yes, I was.



Q. What was your involvement in preparing it?
A. I helped draft the document, helped get it through the concurrence process, mail it out to the contract holders.
Q. I've marked it Plaintiffs' 1952. Is this the, does this look like the document we're discussing?
A. Yes, it does.
Q. It's got the date on the front. Can you give us a little more specificity about exactly when this was issued?
A. I believe it was issued in July of 2004. It was sent out in the last week or two of July.
Q. And there were instructions that accompanied this?
A. A set of DCS instructions did accompany this document, that's correct.
Q. I've marked those Plaintiffs' 1953. I'd like to hand those out. Did you have a role in -- well, first of all, let's just identify for the record, Plaintiffs' 1953 is the new instruction. It's a letter addressed to Mr. Michael Thomas, vice president and treasurer of Maine Yankee Atomic Power Company, July 28th, 2004, from Dave Zabransky on DOE letterhead. Do you see that?



A. Yes, I do.
Q. These are the instructions you just mentioned?
A. That is correct. These are the instructions that were transmitted to the contract holders in late July.
Q. And if you turn to page two of this June 2004 annual acceptance rate, you'll see projected waste acceptance rates starting in 2010.
A. Can you tell me where you are again, please?
Q. Page two of the ACR.
A. Of the ACR, sorry, I was in the instructions. Yes, I'm there.
Q. And then on page, those are, what are those rates?
A. They are the projected nominal waste acceptance rates for spent fuel starting in 2010 and going through 2019.
Q. Is that what DOE actually plans to do starting in 2010, is that your understanding?
A. Yes, that is my understanding.
Q. And what's that understanding based on?
A. That's what we're currently planning to do. That's what our system is baselined to.



Q. And the next page is what, page three, what is that?
A. That is table 2, "Summary of Purchaser's Annual Allocations."
Q. Oldest Fuel First allocated in the way you testified on your direct testimony, except with a different ramp-up and acceptance rate, right?
A. And also some minor changes made to reinsertions of some reactor fuel that, in the past, may have been designated as permanently discharged and was reinserted. So there are some minor changes to the actual queue based on the reinsertions.
Q. But just to be clear, for example, if you take a look at page three, if you look at Yankee Atomic, the bottom left there, the 9.9 in 2010?
A. Yes.
Q. That's the same fuel, isn't it, that's on the first box of Yankee Atomic's allocations in the ACRs that we looked at previously?
A. The same fuel that earned the allocation in the boxes we looked at earlier earned this allocation here.
Q. Right. And the instructions that you just sent out, the Department of Energy just sent out, asks utilities -- invite utilities, let's put it that

way, to submit new DCSes, right?
A. Yes.
Q. And they are instructed similar to the '91 or '92 instructions to fill out those DCSes in accordance with the allocations shown on page three in the July 2004 ACR, right?
A. That's correct.
Q. Let's say Maine Yankee were to do that -- or Yankee Atomic's the example. Let's say Yankee Atomic were to fill out a DCS in response to your latest letter, and they write down that 9.9 MTU that's right here in this box on page three, and the Department approves it, okay. Do you think the Department would consider approving it?
A. We'll consider approving it.
Q. Okay. And let's say the Department does approve it. Are you with me?
A. Yes.
Q. Is the previous DCS, and assume there's a previous DCS, I think it's been entered into evidence that Yankee Atomic filled out for that same 9.9 allocation, would you, in my hypothetical where the new DCS is approved, you know, this month, next month, would the prior DCS still be binding, in your view?



A. The commitment the Department made, I think, is still a binding commitment.
Q. Well, why would, why are you asking Yankee Atomic to go through this exercise again?
A. Because not everybody has the same allocation every year, and Yankee's going to have different allocations in other years.
THE COURT: Well, what if they change the assemblies that they listed in the first ACR, and they change to a different 9.9 assembly structure?
THE WITNESS: The assemblies just earn you your allocation, Your Honor. The purchasers can use them as they see fit.
THE COURT: But there's a binding obligation to accept the particular assembly scheduled, in your view --
THE WITNESS: Well, see, the --
THE COURT: -- I take it.
THE WITNESS: The DCS contains a range of assemblies, so the purchasers don't commit to delivering actual assemblies until the Appendix F process, which is 60 days prior to delivery.
THE COURT: So they could switch any time prior to --
THE WITNESS: Yes.



THE COURT: -- delivery?
THE WITNESS: Yes. The Appendix F is where the purchasers actually tell us what specific assemblies they want us to come and accept on that DCS. So they identify in the DCS, here's a range we want to give you. And then they'll further narrow down that process into the Appendix F stage, which comes 60 days prior to, here are the specific assemblies we plan to give you under this allocation.
THE COURT: People testified that one reason the OFF system was used was that that would tend to lower the heat load in the repository if you had Oldest Fuel First, the implication being that the oldest fuel would be delivered first. But that isn't, according to your view, what they would necessarily do?
THE WITNESS: The contract allows the purchasers to submit any fuel or designate any fuel they own for acceptance. Now, the contract further breaks it down. There's something called standard fuel and other than standard fuel.
THE COURT: Right.
THE WITNESS: Standard fuel is fuel that is five years old, or it's older than five years old. The Department, with the contract --



THE COURT: Some of these are way older than that at this point.
THE WITNESS: That's right. Some of it's very old, Your Honor.
THE COURT: Right.
THE WITNESS: The contract gives the Department the ability to delay the acceptance of nonstandard fuel. So, I mean, it's advantageous for the Department in many instances to receive the oldest fuel. But we're designing a system basically to meet the terms and conditions of the contract, which is we may have to take some fuel that's not quite as old as we would like when it actually comes to repository and may need to get stored on-site prior to being placed inside the repository.
THE COURT: So the utilities might want to get rid of their hottest fuel first?
THE WITNESS: That's certainly a concern, Your Honor, because there are instances where they, it may be beneficial for them to get rid of the hotter stuff prior to the older stuff.
MR. STOUCK: Let me just, and, again, Your Honor, I think if I could, if we could take a lunch break, I know I could get a little better organized, but let me just finish up with one thing, and we'll

A F T E R N O O N S E S S I O N
(2:04 p.m.)
MR. STOUCK: Your Honor, thank you for that. I do hope we can be a little more efficient. I'm just using the last couple minutes of break here. Finishing off the efficiency.
THE COURT: Okay, fine.
BY MR. STOUCK:
Q. Good afternoon, Mr. Pollog.
A. Good afternoon.
Q. Just one, perhaps, minor point that I wanted to clear up from this morning before we move on. You told me this morning that the contracting officer had a responsibility for making determinations about what the standard contract meant. Do you recall that?
A. Yes.
Q. You told me at your deposition, or you told us, Mr. Skalaban's here with me, at your deposition in May of 2002, that it was Mr. Brownstein who had the responsibility to make any determinations on what provisions of the contract meant. Do you recall that?
MS. SULLIVAN: Objection. Can we ask the witness be shown the statement?



MR. STOUCK: I'm asking him if he recalls it. If he recalls it and says yes, then I think we're done.
THE WITNESS: Not specifically, I don't recall that.
BY MR. STOUCK:
Q. You don't recall that testimony?
A. I don't explicitly recall making that statement in my deposition.
Q. Let's show it to you then. In fact, there might be some more testimony, so in an abundance of caution, I will hand out the whole package now. There's a number of depositions, transcripts here, Mr. Pollog. If you would take a look behind tab five -- I'm sorry, that's wrong, behind tab four, on page 63, bottom of 63, the last line of page 60. If you can let me know when you're there?
A. Can you repeat those pages for me again?
Q. Tab four, page 63.
A. Yes, I'm there.
Q. You see there are four on the page, it's actually page 17, but page 63 of the deposition, do you see that?
A. Yes.
Q. Line 25, "Was part of your function, in



working with Mr. Brownstein on these matters, was part of your function reading and trying to understand the standard contract?
"Yes.
"Did you have responsibility to issue or make any determinations on what the provision of the contract meant?"
And your answer was on line nine, "No, Mr. Brownstein may have asked my opinion, but he was the branch chief for logistics and utility interface that was responsible for making the determinations." Do you see that?
A. Yes, I do.
Q. That was your testimony?
A. Apparently so.
Q. That was your testimony then?
A. Yes, it was.
Q. Okay. Now, let's talk a little bit more about DCSes. Is it correct that DOE received some DCS and FDS submittals from utilities in the '98, '99, 2001 time frame?
A. Yes, we did.
Q. And DOE wrote back to those utilities saying it was not approving any DCSes or FDSes at that time, right?



A. Some words to that effect, yes.
Q. And you were not involved in discussions about whether to continue processing DCSes in the fall of '96 or '97?
A. No, I was not.
Q. Right. But you were involved, to some extent, your duties and responsibilities for the waste acceptance and transportation division did involve, to some extent, processing DCSes, is that right?
A. To some minor extent, yes.
Q. Okay. Do you know when the Department stopped processing or stopped reviewing and approving DCSes or FDSes?
A. I believe I do.
Q. When was that?
A. I believe it was either the end of 1996 or in the very beginning of 1997.
Q. And your understanding is that the Department of Energy stopped processing these DCS and FDS submittals to limit its contractual liability, isn't that right?
MS. SULLIVAN: Objection, legal conclusion.
THE WITNESS: I'm not sure.
THE COURT: What's the objection?

MS. SULLIVAN: It was asking for a legal conclusion.
THE COURT: Oh.
MR. STOUCK: I asked for his understanding.
THE COURT: If you have an understanding, you can answer. I'll overrule the objection.
THE WITNESS: I wasn't told that, I don't believe, by anybody, but that was my understanding of the situation.
BY MR. STOUCK:
Q. That was your understanding?
A. I believe that was.
Q. Were you told anything at the time about why the Department of Energy had decided to stop processing and approving DCSes and FDSes?
A. I believe so.
Q. Pardon me?
A. I believe so.
Q. Yeah, you were told that counsel told the Department to stop doing that, is that right?
A. I believe counsel advised the Office of Civilian Radioactive Waste Management and the contracting officer to do that, yes.
Q. Counsel told Mr. Zabransky to do that, and Mr. Zabransky told you that counsel had told him to



do that, is that right?
A. I said I believe they advised us to do it, not told us to do that.
Q. Okay. Counsel advised Mr. Zabransky to stop processing these documents, and Mr. Zabransky told you that counsel had advised him of that?
A. I don't know if counsel advised Mr. Zabransky or other program personnel in RW directly. I don't know how the conversation between counsel and the Office of Civilian Radioactive Waste Management actually occurred, but the bottom line is Mr. Zabransky told me that, on advice of counsel, we're going to stop processing them. I don't know if he was told directly by counsel or through his superiors.
Q. But in any event, the advice came from counsel?
A. Yes.
Q. And the purpose was to limit the Department's liability?
A. That was my understanding.
Q. And you have no personal view on whether stopping the DCS process was a proper thing to do under the contract, right?
A. No, I do not have any personal view.



Q. And Mr. Zabransky also told you that the Department of Energy would not publish an ACR in 1997 because it probably would never be approved by the Office of General Counsel, isn't that correct?
A. I believe that is correct.
Q. Now, we were talking about a sentence in the instructions before lunch, the business about if these circumstances changed, they could be reevaluated. Do you recall that? It's Exhibit Number 030.001, if you want to get that in front of you and take a look at it.
I want to ask you one or two more questions about that sentence. This is on page two, the last sentence of 7C, I believe. Do you recall that?
A. Yes, I recall that conversation we had this morning.
Q. Do you know what the Department of Energy was attempting to convey to contract holders through that sentence?
A. I have no specific recollection of what we were intending to convey in 1992 when we wrote that sentence, no.
Q. Do you know why the sentence was placed in the instructions?
A. I don't recall at this time why it was



placed in the instructions in 1992.
Q. Did you know in 1992?
A. I may have.
Q. But you can't tell us today?
A. I don't recall right now why we did that in 1992, no.
Q. And you didn't recall at your deposition, which was two years ago, either, right?
A. I don't recall if I recalled in my deposition two years ago or not.
Q. Well, let's find out. Take a look at tab five, page, I believe it's 328, but it might be 329, let me just take a look, 330, excuse me, line 10. Let me know when you're there behind tab five.
A. I am there.
Q. "You have no recollection of any discussions about this sentence, and why it appeared in the DCS instructions?" Do you see that?
A. Yes, I do.
Q. And your answer was, "No," correct?
A. That's correct.
Q. So you didn't recall it then, you don't recall it today?
A. That is correct.
Q. Right, thanks. This is just for the

record, this is the May 16, 2002 deposition transcript. All right.
In fact, though, you do know that the Department of Energy originally held the view that DCSes were not binding because circumstances could change with respect to the 1998 date, correct?
A. I've seen language to that extent.
Q. Seen language?
A. Yeah, I think so.
Q. Well, you testified at your deposition that you knew that was a true statement, that the Department held the view at one time that DCSes submitted by purchasers and approved by the Department of Energy based on these instructions were in fact not binding because circumstances changed with respect to the 1998 date, isn't that --
MS. SULLIVAN: Objection, Your Honor, it's unclear whether Mr. Stouck is trying to refresh the witness' recollection or trying to impeach the witness or just wants to discuss with the witness the testimony. May I ask that the witness be shown the deposition testimony that he's being asked about?
MR. STOUCK: If he remembers testifying to that effect, Your Honor, I think we can save time by not doing it. That's what I'm trying to accomplish.



If he doesn't recall, then I'm certainly going to show it to him, but I'd like to know if he recalls holding the view that, or knowing that the Department held that view that these DCSes were not binding.
THE WITNESS: As I stated that I think I've seen that language at some point in time.
BY MR. STOUCK:
Q. You know that the Department held that view at one time?
A. I think that's appeared in some document that we've published in the past.
Q. So you do know that the Department held the view at one time that these DCSes, even though approved, were not binding?
A. I think I've seen that text published in some documents in the past, yes.
Q. And that was the Department's view?
A. That was the view placed in that document, yes.
Q. Of the Department?
A. Of whatever that document was.
Q. So you don't know, as we're sitting here, whether the Department --
A. I would have to see the document to refresh my memory, I guess.



Q. Let's start with your deposition, Mr. Pollog. Again, behind -- and then we'll get to the documents. It's behind tab five again, 332, page 332. It may have bled over to 333, but let's take a look around there, bottom of page 332, line 20.
"Do you know whether the Department ever held the view that DCSes submitted by purchasers and approved by the Department based on these instructions were in fact not binding because circumstances changed with respect to the 1998 date?"
Do you see that?
A. Yes, I do.
Q. And at the top of the next page, you say, yes, you did know, and you went on to explain. But you did know at the time of this deposition that the Department held that view, correct?
A. Yes, and I think I also explained that this was something that came out of the Indiana Michigan case, where we believed that if we had not started commencement of facility operations, we were under no obligation under the contract.
Q. So necessarily, DCS -- that was the Indiana Michigan case from the D.C. Circuit, do you know?
A. I believe so.
Q. Prior to that decision, the Department had



published the view, its view that it had no obligation under the Nuclear Waste Policy Act or these contracts to the utilities in the absence of a repository, is that your understanding?
A. I believe they published something to that extent. I'm not sure of the exact words, but I think they published, we didn't have an obligation to begin in 1998, absent commencement of facility operations.
Q. And prior to the Indiana Michigan decision, that was the Department's view of its obligations?
A. Yeah, that absent the start of or commencement of facility operations, we didn't have an obligation in 1998.
Q. And so necessarily, DCSes submitted before 1996, before the Indiana Michigan decision that we're talking about now, the Department must have viewed those as also conditional in not creating any binding commitments, isn't that right?
A. I don't think so.
Q. Well, let's take a look at what you told us at the deposition.
A. Okay.
Q. Same page, 334 -- I mean, same tab, 334, bottom of page, line 20. Do you see that?
"Necessarily, the DCSes submitted and

approved by the Department pursuant to these instructions, in the Department's view, did not create any binding obligations?" Do you see that question?
A. I'm sorry, can you read that for me?
Q. Bottom of page 334, line 20.
A. Yes.
Q. "Necessarily, the DCSes submitted and approved by the Department pursuant to these instructions, in the Department's view, did not create any binding obligations." And then your answer at the top of page 335, "There were, I believe, people who held that view."
A. Yes, I see that.
MS. SULLIVAN: Your Honor, I'm going to interpose the same objection that's there in the transcript of the deposition, that this really goes to the legal conclusion as to discovery of the Department's obligations starting in 1998.
THE COURT: Okay.
MR. STOUCK: That's all I've got there, Your Honor. I think the testimony is fairly clear and putting it all together with the Indiana Michigan decision, but let me move on to something else. I'm happy to do that.



BY MR. STOUCK:
Q. I guess, just to be clear here, let me just ask the question, prior to that Indiana Michigan decision, was it the Department's view that DCSes that were approved were or were not conditionally binding? Were they binding, or were they only binding on the condition that you eventually have a repository?
A. I thought the Department's view was that they were binding.
Q. Can I have Defendant's Exhibit 30.018 and 30.020? Now, Defendant's Exhibit 30.018, if you would look at that one first, do you see that?
A. Which one, please?
Q. It's the one, the bottom right, there's a sticker that says 030.018.
A. 18?
Q. It's a letter from Beth Tomasoni, contracting officer, on Department of Energy letterhead, to Mr. J.M. Buchheit at Yankee Atomic, June 14, 1995. Do you see that?
A. Yes, I do.
Q. And it says, in the last sentence of the first paragraph of that letter, the following: "The proposed delivery date is dependent upon the



existence of an operational repository or an interim storage facility constructed under the Act." Do you see that?
A. Yes, I do.
Q. Was that the Department's view at the time?
A. Yes.
Q. Okay. And on the attached, if you look at the DCS, it's actually stamped on there the same language, "The proposed delivery date is dependent upon the existence of an operational repository or an interim storage facility constructed under the Act."
A. Yes, I see that.
Q. And doesn't that mean that the Department at that time viewed these as conditional, not as binding, but as conditional?
A. I think --
MS. SULLIVAN: Objection, legal conclusion.
MR. STOUCK: I'm asking for his understanding, Your Honor.
THE COURT: Overruled for the understanding, if he has an understanding.
THE WITNESS: I think my understanding was they can view the date as conditional, but not the obligation to take that amount of fuel.
BY MR. STOUCK:



Q. And if you take a look at 030.020, it's got the same language, and you would say the same thing?
A. Let me read it first, okay?
Q. Sure, I'm sorry. I'll show you the language. It's the last sentence of the first paragraph and then the stamped legend on the exhibits.
A. Yes, it says the same thing.
Q. DOE received a final DCS submittal from Maine Yankee requesting that its fuel be taken in three years, faster than the allocations that were shown in the then current ACRs, isn't that right, do you recall that?
A. No, I don't recall that.
Q. You don't recall that?
A. No, I don't.
Q. Let me have 29.005. We had some testimony about something similar from Yankee Atomic, I think, but this is a letter from Mr. Michael E. Thomas, vice president, on Maine Yankee letterhead, to Ms. Beth Tomasoni, contracting officer, Department of Energy, May 11, 1998. Is that what you have before you?
A. Yes, I do.
Q. Okay. And if you look sort of at the second half of the first paragraph there, it says,

"Notwithstanding the provisions of the approved delivery commitment schedule by this letter, Maine Yankee is requesting an allocation for a larger quantity of acceptance than specified in the final delivery schedule." The phrasing is a little awkward, but the request is based on shutdown priority and so forth. Do you see that?
A. Yes, I do.
Q. Do you recall it now?
A. Vaguely, now, yeah.
Q. What do you recall about it? Do you recall that after you and Mr. Zabransky stopped laughing about this, Mr. Zabransky directed that the standard form response go out?
A. Yes.
Q. You do recall that?
A. Yes.
Q. Why were you laughing?
A. It was an issue we had discussed several times with different parties, and they keep coming back and asking us the same questions. We tell them, The answer hasn't changed from the last time you asked us, it probably won't change the next time you ask us. So our lives are a little tedious sometimes, and sometimes we look for little things like this to



make our day a little brighter.
And this served the purpose that day. It made our day a little brighter because it's a topic we opined on many times with different parties. They seemed to not like the answer and kept asking us the same question.
Q. And you thought that was funny?
A. Yeah, at times, it was humorous.
Q. And DOE did not consider at all the approval or disapproval of this final delivery schedule, isn't that right?
A. That's correct.
Q. And in 1997 or 1998, the Department sent all three Yankee facilities letters saying DOE would not consider any further DCS or FDS submissions, correct?
A. I have no specific recollection of that, but I would not be surprised if that happened.
Q. Those letters went out to many utilities?
A. Not many, but they went out to quite a few utilities.
Q. That was the Department's position at that time, was that you were not going to consider any further DCSes or FDS submissions, isn't that right?
A. That's right.



Q. Okay. And it was your view at the time -- let me ask it this way, it is your view that once DOE stopped processing DCSes, it stopped. It had no further obligations to Yankee Atomic, is that right?
A. Yes.
Q. So DOE has no obligations to Yankee Atomic, assuming there's no approved DCS in these years, in 2002, 2003, 2004?
MS. SULLIVAN: Objection, legal conclusion.
MR. STOUCK: I'm asking for his understanding.
MS. SULLIVAN: That's fine with that clarification. That wasn't in the original question.
BY MR. STOUCK:
Q. That's your understanding?
A. Yes, that is my understanding, assuming that they had indeed allocations for the years you mentioned in your question.
Q. And if DOE did not begin performing until 2025, then it's your understanding the Department would still have no obligation to Connecticut Yankee, Yankee Atomic or Maine Yankee, beyond an obligation to pick up the fuel that's described in approved delivery commitment schedules, is that right?
A. Yes, that's correct.



Q. So your view is that, by stopping the approval of the DCSes, your understanding is that the Department could unilaterally cut off its obligations to all purchasers, correct?
A. Yes.
Q. What is that based on, Mr. Pollog? Is that based on the contract instructions we've talked about or some language in the contract? Where does it say, this is my question, that the approved DCSes are the limit of DOE's obligation?
A. Can you repeat that again? Because I didn't quite catch the last part of your question, that was confusing me a little bit.
Q. As I understand what you're saying, DOE is obligated to pick up spent nuclear fuel that's described in an approved delivery commitment schedule, right?
A. I think I've testified to that, yes.
Q. And your understanding is, if there's spent fuel out there that is not described in an approved delivery commitment schedule, then DOE has no obligation to pick that up?
A. Yes, that was my belief.
Q. Skip over the first part. Let's assume you're right, that they have an obligation to pick up

the fuel that's described in an approved delivery commitment schedule, and we can find some basis for that somewhere. Take that off the table. With respect to that other fuel that's not described in approved delivery commitment schedule, what do you base your -- on what do you base your understanding that there's no obligation as to that fuel? Got the question?

A. I think so.

Q. And I was just suggesting maybe it's the instructions, maybe it's the contract, maybe it's something else, but I'd like to hear your answer.

A. It's just my belief, since there was no signed document obligating DOE to pick up that specific fuel, that we didn't have an obligation to accept that fuel.

Q. Any other basis than your belief?

A. No.

Q. Now, the acceptance rate in the 1991 ACR that you testified about, that was not consistent -- I think you actually you may have said this on your direct, but let me just ask anyway. That was not consistent with the schedule linkages that Congress placed in the Nuclear Waste Policy Act of 1987, correct?



MS. SULLIVAN: Objection, legal conclusion. Whether it's consistent or not with the NWPA amendments, it's a legal conclusion. If he could just ask for the witness' understanding to these legal matters?

MR. STOUCK: That's fine, Your Honor. And I would accept that qualification to my questions. I am asking the witness for his understanding. I am certainly looking to the Court, as Ms. Sullivan is, for the legal guidance.

THE COURT: If you know.

THE WITNESS: I think it's not consistent with all of the languages in the Nuclear Waste Policy Amendments Act. It is consistent with some, but not all.

BY MR. STOUCK:

Q. It's consistent with the 10,000 ton limitation, but not with the other two languages, correct?

A. I believe that's correct.

Q. And the rate that was set out in the 1991 ACR that you testified about could not be accomplished by the Department of Energy without a change in the law, isn't that right?

A. I believe that's correct, yes.



Q. Now, when preparing, would you -- well, let me ask this question first. When preparing the 1991 ACR, is it your understanding that the Department's best estimate of the earliest time it could accept waste at an MRS, prior to the operation of a repository, under the schedule linkages, was three years ahead of the repository, do you recall that?

A. I believe that's correct, yes.

Q. So given those linkages, the earliest you could start an MRS would be three years before opening the repository?

A. I believe there is a linkage between the construction of the MRS and construction authorization being issued by NRC with the repository, yes, I think that's correct.

Q. Excuse me, I didn't mean to interrupt. A three-year delay approximately?

A. I believe that's correct, yes.

Q. Was that your understanding at the time that the '91 ACR was prepared?

A. Yes, it was.

Q. Now, so at that time, the repository was projected to open in 2010?

A. I believe, yes, in 1991, the repository was projected to open in 2010, so I think what you said



is correct, yes.

Q. And therefore, the MRS couldn't open until there was construction authorization for the repository, right, under the Act?

A. I believe linkage between the construction of the MRS and the construction authorization of the repository led one to believe that what you said was correct, yes.

Q. So if the 1991 ACR set a schedule, if it were to set forth a schedule that was fully consistent with the '87 Amendments Act, it would have shown zero acceptance until 2007, correct?

MS. SULLIVAN: Objection, legal conclusion.

BY MR. STOUCK:

Q. Isn't that your understanding?

MS. SULLIVAN: Thank you.

THE WITNESS: If we would have maintained consistency with all the linkages, yes, I think that would be correct.

BY MR. STOUCK:

Q. So in other words, the '91 ACR assumed that there would have to be a change in the law in order to accomplish the rate set forth therein?

A. Yes, the 1991 assumed we would receive some congressional relief on that linkage.

Q. And you don't know why the Department of Energy did not consider the possibility that Congress might remove the capacity limitation in preparing the '91 ACR?
A. No, I do not know why Congress would or would not consider that.
Q. Just one more set of questions about this, if I could have Plaintiff's 54, please? This is the June '88 annual capacity report.
THE COURT: Do you know why DOE, in the '91 ACR, set forth a constant rate, rather than say -- I take it that the reduction in rates was because of the capacity limitation in the MRS.?
THE WITNESS: That's correct, Your Honor.
THE COURT: So why would there be a constantly lowered rate instead of just filling it up quickly and letting it sit there?
THE WITNESS: Because I believe that would just have been probably quite a bit of a waste of resources in the sense that you would move all of this fuel and have to procure all this transportation cask and transportation equipment to move a large amount early on, and then when you'd reached your 10,000 metric ton limit the materials, the casks, the equipment would all just sit idle, including handling



facilities and potentially people at the facility.
So instead of buying the lot and using it for a couple years and then letting it sit for whatever period of time it may be, try and spread out the movement of the fuel, the acceptance, over a longer period of time, so it just allows you a better use of your equipment. You don't have to buy as much stuff if you're moving a little bit every year, as opposed to a lot earlier and then letting it sit.
THE COURT: All right.
BY MR. STOUCK:
Q. This is Plaintiff's Exhibit 54. But just in further response, or relevant to, I think, the Court's questions, Mr. Pollog, the Department could not, the Department in 1998 could not have picked up 400 tons under the linkages that were then part of the Amendments Act, isn't that right?
A. Yes, that is correct. With the, if we maintain, or if Congress maintained the current linkages that were in the Nuclear Waste Policy Amendments Act of 1987, we could not have picked up the 400 tons in 1998.
Q. And probably could not have picked it up until three years before 2010 or thereabouts?
A. Or thereabouts, yes, without any



Congressional relief.
Q. Do you recognize this document that's been marked as Plaintiff's 54?
A. Yes, I do. It's the 1988 annual capacity report produced by the Office of Civilian Radioactive Waste Management.
Q. And June '88 is after the enactment of the '87 Amendments Act, right?
A. I believe so.
Q. So those linkages we talked about were in force when this document was issued?
A. Yes, I believe so.
Q. Take a look at page five, please. There's a table 2.1, illustrative waste acceptance schedule. Do you see that?
A. Yes, I do.
Q. And it shows 2003, 1,200 MTU; 2004, 1,200 MTU; 2005, 2,000 MTU; 2006, 2,000 MTU; 2007, 2,700 MTU; and 2008, 3,000 MTU. And isn't it correct that this document reflected the Department of Energy's view of how the program was going to be implemented with an MRS and with repository and with the schedule linkages in place?
A. Can I just have a moment to read this?
Q. Sure. Please take all the time you need,



but not to, if you look at the top of the page, it may help you. The first new sentence on page five says this: "Although the draft mission plan amendment projects a five-year delay in WMS operation, the projected waste acceptance rate has been increased because it is assumed that the MRS facility and the repository will commence operation simultaneously."
So maybe that's helpful, maybe it's not, but take whatever time you need and let me know when you're ready for a question.
A. Yes, it appears -- if you're ready.
Q. Okay. So do you remember the question?
A. I think so. This schedule assumed that both the MRS and the repository would be starting at the same time, is that correct?
Q. This, no, my question was -- well, let's have it read back, rather than trying to rephrase it. I think I --
(The reporter read the record as requested.)
THE WITNESS: I believe that's correct, yes.
BY MR. STOUCK:
Q. And so in 1990, you don't know what led the

Department to, in a sense, ignore the linkages and depart downward substantially from these acceptance rate in the 1991 ACR, do you, Mr. Pollog?
A. Well, I think the 1990 ACR --
Q. I'm sorry, '91, I meant to say.
A. Oh, I'm sorry.
Q. I apologize. I'm not quite as conversant with these documents as you are. You don't know why the '91 document departed downwards significantly from these projected acceptance rates by ignoring the linkages, isn't that right, you don't know the reason?
A. I think the Department used the rates they did in the 1991 ACR, they took the lower bounding case from the 1990 ACR and also tried to maintain the 10,000 MTU statutory limit and hoped that they would receive Congressional relief on the construction linkages.
Q. That's not a reason why they departed. Right here in 1988, with the Amendments Act in place, the Department projected a much higher rate of acceptance with the linkages in place. You don't know why the Department of Energy departed from that substantially downward in 1991, do you?
MS. SULLIVAN: Objection, argumentative.



THE COURT: He either knows, or he doesn't know. So you can answer, if you know.
THE WITNESS: I'm not sure, Your Honor. I think it also has to do with, between 1988 and the 1991 ACR, the repository also got delayed another seven years. I think we're talking about a 2003 start date at the time of this document. And in 1991, we already believed that the repository wouldn't start before 2010.
BY MR. STOUCK:
Q. Okay. But you are aware that, in the Amendments Act, it was very clear that your understanding is that Congress was clear that it did not want the MRS to become a substitute, long-term substitute for a repository, correct?
A. Yes, I believe I had that understanding.
Q. All right. And let's move on then to another subject, if we can. To your knowledge, Mr. Pollog, there is no group in the Department of Energy that disagrees that the 3,000 MTU rate is the rate that's to be used as a steady state throughput rate in the program, correct?
A. Are you asking me within all of Department of Energy or the Office of Civilian Radioactive Waste Management?



Q. There's no group within DOE that disagrees that that is the appropriate way to -- there's no group within DOE that disagrees that the 3,000 MTU rate is the appropriate rate to use as the steady state throughput rate, isn't that right?
A. Are you talking about today or any point in time throughout the Department of Energy or the Office of Civilian Radioactive Waste Management?
Q. Well, let's take them one at a time. Start with today.
A. Today, I'm not aware of any organization within the Department of Energy, or group, I can use group, who disagrees with that.
Q. Would your answer be different if we went to some different time period?
A. Possibly.
Q. Well, do you know if there was a group that disagreed any time from -- can you testify as to whether there was any group within DOE, organizational group, that since the time of the Nuclear Waste Policy Act until today, that disagreed that the 3,000 MTU rate was the appropriate steady state acceptance rate?
A. Well, I've only been an employee at DOE since '88, and I can't answer for times prior to



that. And even since then, I haven't interfaced with all the parts of DOE, but I think possibly in the early '90s, people thought the appropriate rate may have been the one stated in the 1991 ACR.
Q. As the steady state rate for the program?
A. Until a repository was operating, yes.
Q. What about after a repository was operating?
A. After the repository was operating, I would think people would be more inclined to agree with the 3,000 metric ton rate.
Q. Part of your response was, I thought I understood this from your direct part too, you have some responsibilities for following or monitoring or working with the information that the Department of Energy has about discharge rates from utilities, is that right?
A. Not quite.
Q. Okay. What's wrong with my statement?
A. Well, the Office of Civilian Radioactive Waste Management basically manages that project, so the data is collected by another group, but we're the one who manage the efforts. I say we are the ones who collect that data and use it.
Q. Okay. So your familiarity with that data

turn to a subject that's different, again, if I may, in a different document, if we need it. You are not aware of any failed fuel that would be technically infeasible for DOE to handle and dispose of when it begins performance of this program, isn't that right?
A. Are you asking me if I'm aware of any specific failed fuel or failed fuel in general?
Q. I'm asking about failed fuel in general. You cannot give any reason why it would be technically infeasible for the Department to handle and dispose of failed fuel when it begins performance?
A. Given sufficient time and budget resources, I would probably agree with that statement. It would depend greatly on what the budget is for designing, building, constructing, licensing the facility. If we had essentially unlimited budget, yes, I would agree with that statement.
MS. SULLIVAN: Your Honor, I would object to the topic of failed fuel as being beyond the scope of direct.
MR. STOUCK: Not in our conception of things, Your Honor.
MS. SULLIVAN: I understand Mr. Stouck's metaphysical relationship to the scope of direct, but



I just wanted to make the objection for the record.
THE COURT: The objection is noted.
MS. SULLIVAN: Thank you, Your Honor.
THE COURT: Overruled, but --
MR. STOUCK: Thank you, Your Honor.
MS. SULLIVAN: That's what I figured.
MR. STOUCK: Excuse me for one second, Mr. Pollog. I will be with you just in one moment, I apologize.
BY MR. STOUCK:
Q. That's not the answer that you gave me, or that you gave us at your May 15, 2002 deposition. Do you recall what answer you gave there?
A. Something to the effect that we had to have significant or -- we needed to budget in order to do something like that.
Q. The answer I have is, "No." Let's take a look at it and see if you recall that testimony. It's tab four, 5/15/2002.
A. What was the page again, please?
Q. 165, on line 16. Tell me when you're there, Mr. Pollog.
A. I'm there.
Q. "Do you have any reason why it would be technically infeasible for the Department to handle



and dispose of failed fuel when it begins performance presumably in 2010?" Do you see that?
A. Yes, I do.
Q. Mr. Crawford objected, and your answer on line 21 was, "No." And then just for completeness, let's go on and see what else you said. Is that right, that was your testimony then?
A. Yes, it was.
Q. The next question was, "Is it your belief that the engineering and technical basis exists to accept that and dispose of that failed fuel?" Do you see that?
A. No, I don't.
Q. It's the next question, line 23 at the bottom of 165.
A. Okay.
Q. "Is it your belief that the engineering and technical basis exists to be able to accept that and dispose of that failed fuel?" Do you see it?
A. Yes, I do.
Q. And your answer was, "Most likely." Do you see that?
A. Yes, I do.
Q. And you went on, "I would like to qualify that just because I'm not familiar with every failed



fuel assembly that's out there. There may be something out there that would cause special problems I'm not aware of, but in general, I think you can engineer around most situations, given sufficient resources." Do you see that?
A. Yes, I do.
Q. And that was your testimony?
A. Yes, it was. It's also my testimony in this deposition summary that we needed sufficient budget resources too.
Q. Okay. But there's no technical reason why the Department couldn't begin accepting failed fuel, isn't that right?
A. I think I testified, given sufficient budget resources, we could probably engineer a solution to most failed fuel assemblies.
Q. And you have worked on developing criteria that would apply to spent nuclear fuel that's placed in canisters, so that the canisters can be taken on the same schedule as other spent fuel by DOE, isn't that right, you've worked on that?
MS. SULLIVAN: Objection, again, beyond the scope of direct.
THE COURT: We're talking about scheduling, so I guess I'll overrule that as well.

MS. SULLIVAN: Thank you, Your Honor.
THE WITNESS: Yes, that's correct.
BY MR. STOUCK:
Q. And your belief is that the NAC multi-purpose canister system -- let me broaden that, NAC multi-purpose canister systems meet the criteria that you're developing, isn't that right?
A. I think my belief was, several years ago, when we had an early draft version of this, that NAC multi-purpose system you were describing fit the dimensional envelope that was in that draft table that we had developed, or draft criteria or set of standards.
Q. That's not the answer you gave at your deposition in May 2002. When you say, "several years ago," is May 2002 within your several years ago?
A. I think the canister standards table was developed in the 2000, 2001 time frame.
Q. Okay.
A. And I think I was asked this in 2002.
Q. Right. And at that time, the NAC multi-purpose canister systems met the criteria that would apply to canister fuel, so it could be taken on the same schedule as other standard fuel, correct?
A. It met the draft standards that we had



developed, yes, that is correct.
Q. At that time?
A. Yes.
Q. And you worked on those standards?
A. Yes, I did.
Q. At that time, it was also your view that it was more likely than not that such fuel would be accepted in canisters as a standard fuel form, right?
A. Assuming a contract holder would negotiate an amendment to their contract to make canistered fuel or fuel in multi-assembly canisters an acceptable waste form, yes, that is correct.
Q. Now, you also agree, don't you, that it was a DOE objective to achieve efficiency in this spent fuel removal program, at least in the 1980s and probably into the -- at least early 1990s, don't you agree?
MS. SULLIVAN: Objection, vague.
THE WITNESS: I think that was all --
THE COURT: Excuse me, I didn't hear the --
MS. SULLIVAN: Objection, vague, Your Honor. I don't know what he's talking about with the term "efficiency."
THE COURT: Do you understand?
THE WITNESS: In a very general, broad



sense, but I'm not sure how I can put any specifics on that, but generally speaking, I guess.
THE COURT: Okay.
BY MR. STOUCK:
Q. Do you agree, do you remember the question? Do you want me to rephrase it?
A. Yeah, I remember the question. I think it's always been a goal of the Department to operate the system efficiently.
Q. An objective?
A. A goal.
Q. Is there a difference?
A. It's always been a goal of the Department to try and operate the system efficiently.
Q. How about an objective?
A. A goal of ours.
Q. I'm just curious, "objective" was the word at the deposition, so is there a difference?
A. I don't know. Is there a -- to me? Probably not.
Q. And that efficiency would extend beyond just DOE's operations and also would include utility needs, in your view, isn't that right?
MS. SULLIVAN: Objection, vague as to what "that efficiency" means.



THE COURT: You mean the, the utility would have to be efficient as well?
MR. STOUCK: Of course, I'm asking for his understanding, but he testified about this extensively, and I would just like to have the Court hear the benefit of it.
THE WITNESS: Okay. I think I mean both parties, contract holders and the Department, would agree that if we can operate with efficiency for both sides, it's beneficial for everyone.
BY MR. STOUCK:
Q. And minimize costs for both sides?
A. If we could do that, yes, that would be beneficial.
Q. Okay. And you agree that, at least at one point in time during the course of this program since the Nuclear Waste Policy Act was enacted, DOE had the objective of minimizing utility reactor storage costs, right?
A. I believe words to that effect were published in mission plans in the 1980s, yes.
Q. And I'm trying to wrap this up, but I've got one question, or a couple questions, I'm looking for them in my notes here.
There was one exhibit -- let me get my copy

of the exhibit that you were asked about by
Ms. Sullivan, if I may. It's Defendant's Exhibit 23.
Would you take a look at that? It's a memorandum
from Mr. Milner to the director, and I think she
called your attention to a sentence on page two.
Let's take a look at it again, last sentence of the
carryover paragraph. Are you there?
A. You said the last sentence?
Q. The last sentence, it starts, "While not
stated in the ACR," do you see that?
A. Yes, I do.
Q. "While not stated in the ACR, this rate was
selected because it is theoretically sufficient to
eliminate in the aggregate the need for additional
at-reactor out of pool storage starting in 1998." Do
you see that?
A. Yes, I see that sentence.
Q. Do you agree that's a consequence of that
rate? Do you know if that's true?
A. Are you asking me, is the statement
correct? I'm not sure exactly what you're asking me.
The word "consequence" there, I wasn't quite sure
what you meant.
Q. I'm asking if you know that that rate is
sufficient to eliminate in the aggregate the need for



at-reactor out of pool storage starting in 1998?
A. I believe I have seen something in the past
that showed where in the aggregate, if that rate was
used, that it would eliminate the need for additional
at-reactor storage.
Q. Do you remember when you saw that?
A. No, I don't.
Q. Do you remember what it was that you saw?
A. Yeah, I think it was a chart or table
broken out by year showing the need for additional
at-reactor storage.
Q. Do you know who prepared it?
A. My best recollection was Billy Cole, but
I'm not positive about that.
Q. Do you know what the assumptions were that
went into that analysis?
A. No, I don't.
Q. Can you tell me any one of them?
A. I would be guessing. I have certain
beliefs, but I don't know any of the assumptions that
went into the analysis.
Q. Do you remember testifying at your
deposition, Mr. Pollog, when you were asked this
question, that you don't know factually if those
rates were adequate or not to accomplish that



purpose, "but my belief is most likely not." Do you
recall that testimony?
A. Not specifically.
Q. Let's take a look at it. It's behind tab
five, page 390. Are you there?
A. I'm on page 390, yes.
Q. Line 13, are you there?
A. Yes, I am here.
Q. "Do you know whether the acceptance rates
in the 1991 ACR upon which the DCSes were based, were
those sufficient in the aggregate to avoid additional
reactor storage?" Do you see that?
A. Yes, I do.
Q. And your answer was, "I don't know
factually if they were or not, but my belief is most
likely not." Do you see that?
A. Yes, I do.
Q. That was your testimony?
A. Yes, it was my testimony.
Q. And then you went on to say, "I would have
to see the actual numbers on spent fuel discharges,
spent fuel pool sizes, discharge projections, and
compare them with the acceptance rates to make a
factual determination on that." Do you see that?
A. Yes, I do see that.



Q. Since that testimony, have you looked at
those actual numbers?
A. I think I have seen actual numbers, and I
don't recall if it was since the testimony, or I just
remembered something now that I didn't recall at my
deposition, but I do recall seeing some numbers
broken out in its chart on a year by year basis
showing the need for additional at-reactor storage,
comparing it to the 469 rate, showing that the 469
rate in the aggregate probably could accommodate or
eliminate the need for additional at-reactor storage.
Q. But you don't know what that document was?
A. No, I don't.
Q. But let me go back to my question. You
said you would have to see actual numbers before you
could make a factual determination on that, right?
A. That's what my testimony says, yes.
Q. Did you look at those actual numbers of
spent fuel discharges?
A. As I just testified, I think I saw a chart
which showed the actual numbers of additional
at-reactor storage needs based on a year by year
basis, comparing it with the 469 acceptance rate.
Q. I'm asking a different question. You told
us at your deposition that, before you could make any

decrease in projected discharges?
A. Yes.
Q. Can you think of any other factor at that time frame that would have an impact?
A. Increasing enrichments.
Q. Anything else?
A. Not that I can think of now.
Q. And this trend of shutdowns, how many shutdowns were in the trend? We've got three in this courtroom, so you don't need to name those. Can you name any others?
A. I think there are 18 shutdown reactors right now.
Q. In the late 1990s?
A. No, no, total of 18 shutdown reactors.
Q. I want to know which ones you include in your trend.
A. It wasn't just a trend of shutdown. It was also, EIA was projecting an economic analysis that facilities would shut down, not necessarily that they did, but they were seeing, that was part of the EIA's energy projection, that nuclear energy would be decreasing because of the economics of the situation.
Q. And that turned out not to be right?
A. That turned out not to be right.



Q. Because of relicensing?
A. Because fuel got cheaper, other energy sources got more expensive, and utilities became more efficient. The operating capacity of the factors increased quite a bit from the early '80s to present. They're running the same plants harder and longer now, and they're run more efficiently now.
Q. Do you know whether the TMI incident in 1979 had any effect at all on the Department's estimates on fuel discharges in subsequent years?
A. No, I don't.
Q. You don't know whether that influenced the amount of fuel that the Department expected to be discharged subsequent to that incident?
A. No, I don't.
Q. Do you know whether the TMI incident had any effect on the construction or orders for nuclear power plants?
A. I would guess it probably decreased the interest in building new power plants by utilities.
Q. Decreased?
A. Yes.
Q. But you're not aware of whether there's an effect or what effect that might be on the Department's estimates of future fuel discharges



after '79?
A. I haven't seen departments estimates in the mid to late '70s to early 80s, probably the first one I saw was '83, '84 time frame. So pre-TMI, I have not seen any estimates of what the spent fuel generation rate would be, or the amounts, the amount of plants, or the nuclear energy projected capacity.
Q. Of the ones that you have seen in the 1990s, do you know whether the TMI incident had any effect on the projected levels of discharges in the '90s?
A. I don't think TMI had any effect in the 1990s on any projected levels of discharges.
MR. STOUCK: I have no further questions, Your Honor.
THE COURT: Any redirect?
MS. SULLIVAN: Yes, Your Honor, but may we take a break?
THE COURT: Sure.
MS. SULLIVAN: May we take a little bit more than 10 minutes, maybe come back at 20 minutes of four?
THE COURT: Sure, whatever you need. Quarter of?
MS. SULLIVAN: That would be great, thank



you. We won't be long. We'll still make it an early day.
THE COURT: Fine.
(Whereupon, a short recess was taken.)
MR. STOUCK: Just for one second, Your Honor, before we start here. I am very sorry about this, it was not intentional, but I actually do have one or two more questions, or I can do them now, or for efficiency's sake, do them at the end, when I may have some others.
MS. SULLIVAN: I prefer for him to finish his cross.
MR. STOUCK: It's really just very minor, I'm sorry, and then I guess there's also some exhibit issues which I omitted to take care of.
THE COURT: All right.
MR. STOUCK: But this will not take long.
BY MR. STOUCK:
Q. Mr. Pollog, just a couple of quick things. On this sentence in the instructions that we talked about, about circumstances changing, do you recall that?
A. Yes, I do.
Q. And if you want to look at it, it's marked Exhibit 30.001. But isn't it true that, although you

don't know why that clause was placed in the DCS instructions, you think one possible reason is that DOE, if DOE, it was to provide for a situation where if DOE had more capacity to allocate, it could have increased the number of MTUs that particular purchasers would be allocated?
A. That's certainly, could be used in consideration with this clause, yes.
Q. Well, that's one possible explanation you gave at your deposition, do you recall that?
A. Not specifically at this point in time.
Q. You do think that's one possible explanation?
A. Yes, I think that could certainly be used in considering this clause, yes.
Q. That there might be additional capacity later to allocate it?
A. That's certainly consideration, yes.
Q. And that appears in fact to be what happened with this July 2004 ACR. There's additional allocation that the DOE wishes to allocate, additional capacity that the DOE wishes to allocate, and now, they're asking for new DCSes, is that right?
A. The acceptance rates in the 2000 ACR are greater than the ones that were in the '91 ACR or '95



ACR, yes, that is correct.
Q. So there's more capacity to allocate?
A. The acceptance rates and, hence, the capacity is larger in the 2000 ACR than it was in the earlier one, yes.
Q. Does that mean there's more capacity to allocate now?
A. Yes, I would say so.
Q. So that's consistent with your one possible use of that sentence, maybe there will be more capacity to allocate later, we have more capacity to allocate later in the 2004 ACR, right?
A. The capacity allocation is larger in the 2000 ACR, yes, that's true.
Q. Now, also just very briefly, on the question of shutdown priority, you do agree that it's always possible that DOE may grant priority in the future, right?
A. DOE does allow DOE to grant shutdown priority to reactors, yes, that is true.
Q. You agree that it's always possible that DOE may grant that in the future, right?
A. Yes.
Q. And you also mentioned in your deposition, I just want to make sure this is true, that Homeland



Security is interested in this subject of shutdown priority also, isn't it?
A. I'm not sure if Homeland Security is, but I think somebody in the Department of Energy had a Homeland Security question or issue about this, that's correct.
Q. You were asked by DOE upper management to make various assumptions on how we could service shutdown reactors in a very timely manner to reduce the number of potential terrorist targets, correct?
A. Yes, that's correct.
Q. And in particular, upper management at DOE was interested in how fast the Department could service completely shutdown facilities to reduce the number of terrorist targets and at what rate you would have to do it, right?
A. That sounds familiar. I'm not sure of all the specific details, but, yes, that's familiar.
Q. And then lastly, there has been some discussion at DOE that you're aware of and were involved in about potentially predicting DCS exchanges, right?
A. Yes, I've heard certain initiatives in the past.
Q. Okay. And do you recall whether you



testified about that at your deposition, that subject?
A. Some of the issues, I'm sure, I don't recall everything that I testified about that.
Q. And does this sound right to you, that as part of that discussion, people were speculating that we may not have to have enough casks if utility X, Y and Z traded with utility A, B and C, and they all wanted service at the same month. It was more of a speculative exercise than anything else with contractors with too much time and too much money on their hands. Is that right?
A. Yes.
MR. STOUCK: I have nothing further, Your Honor.
MS. SULLIVAN: You had some exhibit issues.
MR. STOUCK: Oh, yeah. I'm so eager to have Mr. Pollog free to go on his way. Yes, I do. The two, we had thought we were going to be hearing, I would like to move into evidence these Plaintiffs' exhibits, although if the two, the new ACR and the new instructions, I had thought we were going to hear testimony about that from the other side.
And I guess, if they're planning to do that with Mr. Zabransky tomorrow, that's fine. But for a

by the Department of Energy's Office of Civilian Radioactive Waste Management will have a number like that, and it will look like all the ACRs that we've discussed here, and APR, you'll see a similar number or similar logo like that on each document.

Q. Thank you. Mr. Pollog, during cross-examination, you were asked about some draft standards or draft criteria for the acceptance of canistered fuel. Do you remember that testimony?

A. Yes, I do.

Q. Did you develop draft criteria for the acceptance of canistered fuel?

A. Yes, I participated in an effort by myself and a couple of contractors to develop those standard canister criteria.

Q. Why did you do that?

A. We had been asked by several contract holders about the acceptability of canistered fuel; that is, fuel that's in multi-assembly canisters. And we had already responded that this was not a waste form currently covered by the contract, and a contract holder would need to seek modification to their contract to have this waste form included.

But we indicated to them that we would initiate the actions necessary to make this an



acceptable waste form. And following on in that commitment that we had made, we start developing these standards.

Q. And when did you work on these draft criteria?

A. I believe it was in the 2000, 2001 time frame.

Q. Were these criteria ever formalized?

A. No, they were not.

Q. Mr. Pollog, Mr. Stouck also discussed with you the fact that efficiency is a goal of the program. Do you remember that testimony?

A. Yes, I do.

Q. Can the goal of efficiency trump Oldest Fuel First as the method by which RW allocates acceptance capacity?

A. I have never been of the belief of that. I've always believed we had to operate under the terms of the contract. The contract states we allocate acceptance capacity via Oldest Fuel First, and I've never seen anything to the contrary suggesting that something otherwise be used.

Q. Mr. Pollog, could I ask you to pull out Plaintiffs' Exhibit 7, which Mr. Stouck talked to you about, which is titled, "Preliminary Estimate of the



Charge for Spent Fuel Storage and Disposal Services."

A. Did you say 7?

Q. Yes.

A. Okay.

Q. Do you have that in front of you? And just first, on the front cover, the cover bears a date of July 1978. Do you have an understanding that this was, this document was prepared several years before the enactment of the Nuclear Waste Policy Act?

A. Yes, it was prepared before the Nuclear Waste Policy Act was enacted.

Q. Can I direct your attention, please, to Roman Numeral page IV, which is titled at the top, "Forward." Do you have that in front of you?

A. Yes, I do.

Q. Could I ask you to read the third paragraph on that page, please?

A. "The report does not establish new policy, and it does not commit DOE to any specific program, schedule or charge. No scenario or case is to be considered. Most important, no methodology is to be considered definitive, and no charge is to be considered most likely or to represent a proposed charge."

Q. Thank you. And could I direct your



attention to page four of this document, which is Bates number ending in 7416?

A. Did you say page four?

Q. Yes, page four.

A. Okay

Q. Could you read the first two sentences on that page?

A. "DOE expects to provide NRC licensed interim storage in the form of AFR water basins prior to the availability of a terminal repository. Initial storage capacity is expected to be available to receive fuel in 1983."

Q. Thank you, Mr. Pollog. Mr. Pollog, do you know what an AFR water basin is?

A. No, I do not.

Q. Could I direct your attention to Plaintiffs' Exhibit 1959, which is entitled, "Department of Energy Report on Fee for Spent Nuclear Fuel Storage and Disposal Services." Do you have that in front of you?

A. Yes, I'm there.

Q. Again, I'd like to direct your attention to the date on the front cover, which is October 1980. Do you have an understanding as to whether this was before the NWPA was enacted?

THE WITNESS: Yes, Your Honor.
THE COURT: But I take it that -- well, if you were going to grant priority for a shutdown reactor, a particular shutdown reactor, would you do the same process?
THE WITNESS: I don't believe we'd need to modify any contract if we were to grant priority for any shutdown reactor.
THE COURT: You would just assign an allocation?
THE WITNESS: Yes, Your Honor. The contract does give us the ability to grant priority for a shutdown reactor. Like I just suggested, we've been asked about that several times, and we've always been consistent in our answer that we're not going to grant it at this point in time because of the equity issue among all the contract holders.
THE COURT: So you wouldn't consider it a necessity to do an amending of all contracts to allow that, you could do it on an individual basis?
THE WITNESS: For matters like the canister standard, yes, we could do that on an individual basis, and that would be what we would hope to do in the future.
THE COURT: There's been a good deal of



testimony about transportation questions for spent fuel from utilities to DOE. And on the question of efficiency, is there any considerations about taking some kind of action which would not strictly comply with OFF in order to gain efficiencies in picking up fuel of more quantities, say, to eliminate returns for plants, multiple returns to plants for small quantities, than the allocation might otherwise call for?
THE WITNESS: Partially, Your Honor. We've looked at potentially modifying the DCS system where, instead of it applying to one year, it applies for multiple years. So the, it's a delivery day, or year of delivery. Instead of changing the year, it would be a block of time, two or three years.
So we're still trying to keep the OFF allocation method and the process that's in the contract, we're trying to become a little more efficient by making the year of delivery several years of delivery and then operating within a block, instead of one calendar year or -- block of years, instead of one calendar year. Yes, we have thought about that.
THE COURT: And the potential for exchanges would still apply?



THE WITNESS: I would imagine so, sir, yes.
THE COURT: I think that's all I -- that's all I have, if that raises any question someone wants to pursue.
MS. SULLIVAN: One moment, Your Honor.
THE COURT: Surely.
MR. STOUCK: Got a couple, Your Honor.
MS. SULLIVAN: Your Honor, just one question.
THE COURT: Sure.
BY MS. SULLIVAN:
Q. Mr. Pollog, the question that the Court just asked you about being more efficient, and your answer about picking up on a multiple-year schedule rather than a single-year schedule.
A. Yes.
Q. Do you have an understanding as to whether that would require a contract modification?
A. I believe it would, yes.
MS. SULLIVAN: Nothing further, Your Honor, thank you.
MR. STOUCK: Yes, Your Honor, thank you.

RECROSS-EXAMINATION

BY MR. STOUCK:
Q. Actually, I'm trying to figure out how to



do this. The Court has asked a number of questions about --
THE COURT: By the way, I should have mentioned, whenever I ask a question, counsel can object.
MR. LESTER: Now, you tell us.
THE COURT: I should have mentioned that before, but I know that sometimes you don't deliberately go into a subject for good reasons, and if I ask a question that both counsel, for good reasons, don't want covered, I expect an objection in that regard.
MS. SULLIVAN: They're all good questions, Your Honor.
THE COURT: In the future, please ask.
MR. STOUCK: They're the best questions, Your Honor, along with the fact that we don't have to stand up, Your Honor.
BY MR. STOUCK:
Q. Just on the funding issue, which the Court has asked about over a number of days, I think many people in this room understand this, and it's not particularly controversial, and maybe the Court understands this as well, but maybe we can do it this way.

On the nuclear, the collections into the Nuclear Waste Fund since 1983, Mr. Pollog, and I don't know if you're the best person to do this, but since it's come up, do you know approximately the total amount that's come into the Fund since 1983?
A. I think so.
Q. And I realize you may not have been prepared for it, but approximately how much has been collected?
A. I think it's approximately $20 billion.
Q. Does that include interest or not interest?
A. I don't know the answer to that. I think it does, but I'm not positive about that.
Q. And I'm certainly not up on the latest on this. The numbers I had in mind were like $9 billion in fees and 5 or 6 in interest, but the numbers are out there somewhere. But I guess my real question is, do you know, I mean, you do know that not all of that has been appropriated to this program?
A. Yes, I am quite aware of that.
Q. Do you know how much of the total amount that's been collected approximately has not been appropriated to this program?
A. Approximately, I'd say it's less than half.
Q. Less than half has been appropriated to the



program?
A. That's my best recollection, but I'm not the expert on that.
Q. Billions and billions of collections from the utilities have not been appropriated to this program?
A. That's my understanding.
Q. And then just on the -- do you know what happens to that money?
A. Not really.
THE COURT: It's like Social Security, I guess.
MR. STOUCK: What's that?
THE COURT: It's like Social Security.
MR. STOUCK: And the Court may understand that. I thought since the questions had come up, we would just put it in the record. That's certainly my understanding.
BY MR. STOUCK:
Q. Is that your understanding?
A. It's something like the Social Security trust Fund, I believe.
Q. Now, on this question of the canisters that the Court raised, what's the basis for your understanding that a contract amendment would be the



answer? Is there something in the contract that says that?
A. Well, the contract doesn't currently state anything regarding canistered multi-element canister material. It only discusses bare spent nuclear fuel.
Q. Does the word "bare" appear in the contract?
A. I'm not sure. I think it does, but I'm not positive.
Q. Well, do you know whether canisters are addressed in the contract one way or the other?
A. I do not believe the word "canister" is in the contract.
Q. So it's silent about that matter?
A. That is my understanding, yes.
Q. All right. Do you know that Ivan Itkin -- do you know who Ivan Itkin was?
A. Yes, I do.
Q. And do you know that Ivan Itkin gave assurances to the governor of Maine, in connection with some correspondence involving Maine Yankee, that the contracts did in fact cover canistered fuel?
A. No, I'm not familiar with that.
Q. You're not aware of that?
A. I'm not familiar with what you just said.



Q. Let's take a look at it. This is Plaintiffs' 1013. This is a letter on Department of Energy letterhead, Mr. Pollog, from Ivan Itkin, director, to a Gus King, Junior, the honorable governor of Maine, May 3rd, 2000. Is that what you have before you?
A. Yes.
Q. Now, if you look at the third paragraph, it says this: "Your letter also requests that the Commission," referring, I think if you read -- you want to take a look at this letter? Have you seen this letter before?
A. I don't recall it, but I may have seen it.
Q. I didn't mean to spring it on you. Would you like to read it?
A. Yeah, sure.
Q. Did you have a chance to read it?
A. I'm still reading.
Q. I'm sorry, sure. I apologize. Just let me know when you're ready.
A. Yeah, I'm ready.
Q. Are you familiar with the subject addressed in this letter?
A. Yes, I'm vaguely familiar with the subject. Actually, I'm quite, yeah, I'm familiar with the

1826

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------------------------x

SACRAMENTO MUNICIPAL UTILITY :

DISTRICT, :

:NO. 98-488C

Plaintiff :

vs. :

UNITED STATES, :

Defendant. :

-------------------------------- :

Courtroom 5

National Courts Building

715 Madison Place

Washington, D.C.

Tuesday, March 29, 2005

VOLUME 7

The parties met, pursuant to the notice of the Judge at 9:00 a.m.

BEFORE THE HONORABLE SUSAN G. BRADEN

APPEARANCES:

ON BEHALF OF PLAINTIFF:

DAVID S. NESLIN, ESQ.
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter LLP
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

HOWARD N. CAYNE, ESQ.
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5656

APPEARANCES (Continued:)

ON BEHALF OF THE DEFENDANT:

ALAN J. LO RE, ESQ.
JOSHUA E. GARDNER, ESQ.
TODD J. COCHRAN, ESQ.
SCOTT DAMELIN, ESQ.
RUSSELL SHULTIS, ESQ.
ELIZABETH THOMAS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

ALSO PRESENT:

STEVEN M. COHN, ESQ.
STEVE J. REDEKER
THOMAS POLLOG

***Index appears at end of transcript***

1962

documents in the binders?

MR. LO RE: Yes, ma'am, I misspoke.

THE COURT: The binders are not going to be useful for anything.

MR. LO RE: As well as -- yes, thank you.

THE COURT: Any problem with that?

MR. NESLIN: No, Your Honor.

THE COURT: They're in. I think I also told you my practice is, before I issue an opinion, I'm going to draft an order for both of you to decide what's in the record, so you'll have plenty of time if you forget something.

MR. LO RE: That's fine.

MR. NESLIN: Your Honor, and from a reciprocal standpoint, I think we would make a similar motion with respect to the binders that we've tendered for our witnesses, Mr. Shetler, Mr. Redeker, Mr. Field, Ms. Holst.

THE COURT: You want all the documents in the binders?

MR. NESLIN: Yes, Ferreira, our three experts, Ms. Supko, Mr. Brinig, and Mr. Stuart, and our cross-examination exhibits for Mr. Zabransky.

THE COURT: Mr. Lo Re, I assume you have no difficulty with that?



1963

MR. LO RE: None at all, and I commend co-counsel doing that off the top of his head. I have a list.

THE COURT: He wanted to move in his binders too.

MR. LO RE: The binders, right. The documents for, that the government used with Mr. Ferreira and also with Mr. Zabransky, and obviously with respect to the documents that Plaintiffs are moving in, those would, of course, be subject to any objections that we placed on the record.

THE COURT: Right. That's the rule we've worked out, okay.

MR. LO RE: And, Your Honor, just one other thing, we have binders for our last witness, it will be Mr. Hamal, or at least our last expert.

THE COURT: Is he an expert, as well?

MR. LO RE: Yes, he is.

THE COURT: Okay.

MR. LO RE: He will be on, on Friday, per our schedule.

THE COURT: Okay.

MR. LO RE: And we're going to give you those binders now. And then Mr. Gardener will



1964

conduct the examination, Your Honor.

THE COURT: All right.

MR. GARDNER: Your Honor, the government would now call Mr. Thomas Pollog.

THE COURT: Very well. Good afternoon, Mr. Pollog.

THE WITNESS: Good afternoon, Your Honor.

THE COURT: Can you raise your right hand?

Whereupon--

THOMAS POLLOG

a witness, called for examination, having been duly sworn, was examined and testified as follows:

THE COURT: Very well, have a seat. And get started.

DIRECT EXAMINATION

BY MR. GARDNER:

Q. Good afternoon, Mr. Pollog.

A. Good afternoon.

Q. Could you please state your name and business address for the record, please?

A. Thomas Pollog, and my address is Offices of Civilian Radioactive Waste Management, 1000 Independence Avenue, SW, Washington, D.C., 20585.

Q. And I think you just said this, but where are you currently employed?



1965

A. I am employed in the Department of Energy in the Office of Civilian Radioactive Waste Management.

Q. Okay. And to whom within the office are you currently assigned, or to what office within the Department of Energy?

A. That would be the Office of Civilian Radioactive Waste Management, and within that office, the Office of Systems Analysis and Strategy Development.

Q. And what are your current job responsibilities?

A. I'm in the waste acceptance group or -- I perform a waste acceptance function, and that is to implement the standard contract.

Q. And how long have you been in your current position, Mr. Pollog?

A. In this organization, for two years, the Office of Systems Analysis and Strategy Development was formed in 2002, late 2002.

Q. And prior to your current position, where were you employed?

A. I was performing the same function, but just in a different office. I started doing this in 1996, I believe.

1966

Q. And prior to 1996, where were you employed?
A. I was still at the office of Civilian Radioactive Waste Management, but I was in the engineering division.
Q. And what were your job responsibilities at that point in time?
A. Basically, developing technologies, that would be the transportation cask program, which at that point was just the GA4/9 cask, and also the MPC program.
Q. Okay. And when did you first begin your employment with the Department of Energy, Mr. Pollog?
A. 1988.
Q. And have you been continuously employed with the Department of Energy from 1988 to the present?
A. Yes and no. I have been employed, but I did take a three-year leave of absence in 1992, 1993, and 1994. Technically, I was still a DOE employee, but just on leave of absence.
Q. And where were you at that point in time?
A. I accepted an assignment with the International Atomic Energy Agency in Vienna, Austria for those three years.
Q. Now, back in the 1990, '91, '92 time



1967

frame --
THE COURT: Can we just get some background on his educational background before we get on?
MR. GARDNER: Sure, I was actually going to do that next. We can jump ahead.
THE COURT: That's fine, I want to know what his background is.
MR. GARDNER: Not a problem
BY MR. GARDNER:
Q. Mr. Pollog, can you tell the Court about your post high school education?
A. Yes, in 1981, I received a Bachelor of Science degree for Nuclear Engineering from Penn State University, and in 1988, I received a Master's of Science in Environmental Engineering from Clemson University.
Q. Thank you. Back in the 1990, '91 and '92 time frame, to whom in DOE did you report to?
A. My direct supervisor at that time was Alan Brownstein.
Q. And what is Alan, what was Alan Brownstein's position back in 1990, '91 and '92?
A. He was the branch chief for the utility interface and logistics group. Essentially, we were the people who worked for, on the waste acceptance



1968

part of the project.
Q. And you referenced your responsibilities currently with respect to the standard contract. Do you also serve as the contracting officer's technical representative?
A. Yes, I do, in an unofficial capacity.
Q. And what does that mean, sir?
A. I perform the function, but I have never officially received that appointment, so it's never been made official, but I just perform the function.
Q. And specifically, what functions do you serve as the contracting officer's technical representative, what exactly do you do in that role?
A. I advise the contracting officer on all technical issues related to implementing the standard contract.
Q. I see. And for how long have you held this, I guess, unofficial role as the contracting officer's technical representative?
A. Since 2002.
Q. And currently, to whom do you report at DOE?
A. Chris Kouts.
Q. And what is Mr. Kouts' position at the Department of Energy?



1969

A. He is the director of the Office of Systems Analysis and Strategy Development.
Q. Okay. And to whom does Mr. Kouts currently report to?
A. Ted Garrish.
Q. And what is Mr. Garrish's current position?
A. He is the deputy director for the Office of Civilian Radioactive Waste Management.
Q. Okay. Mr. Pollog, I'd like to show you, and you should have a binder right in front of you, I'd like to show you DX-290.
THE COURT: Was he previously in the Navy, is this the same Ted Garrish that was in --
THE WITNESS: Not to my knowledge, Your Honor, but I don't know.
THE COURT: All right.
MR. GARDNER: You will be meeting one of Mr. Garrish's employees later today, so you may be able to find that out.
THE COURT: Okay.
BY MR. GARDNER:
Q. Mr. Pollog, do you recognize this document?
A. Yes, I do.
Q. And for the record, what is this document?
A. This is the 1991 annual capacity report.

2026

you can go through the same exercise. Do you see what I'm saying?

MR. MACDONALD: Very well, Your Honor.

THE COURT: But, you know, if you want to emphasize some points to me from the document, or you can do it during argument later on or in a brief, you don't need him for the document, is what I'm saying.

BY MR. MACDONALD:

Q. Mr. Pollog, to your knowledge, there is no group within DOE today that disagrees that a 3000-ton rate is the appropriate rate to use as a steady state acceptance rate, isn't that correct?

THE COURT: I'm going to sustain the objection which is coming, I am sure, unless the bureaucracy has changed, that there are people on every floor of every department, someplace, that disagree with something that's been done. It doesn't make any difference what a group of people within the bureaucracy think. The issue is, what is the official Department position?

MR. MACDONALD: Well, Your Honor --

THE COURT: Or those in the position of authority to bind the Department.

MR. MACDONALD: I understand that, Your Honor, I think the question includes those within



2027

Mr. Pollog's knowledge. He has testified on this, this very topic previously.

THE COURT: Do you know whether, do you know if there are people within the Department that disagree with the Department's official position?

THE WITNESS: Well, I can't speak for everybody, but I don't know of anyone who raised objections to that.

THE COURT: All right.

BY MR. MACDONALD:

Q. Who disagrees with the 3000-ton rate as the appropriate steady state rate?

A. Just, are you talking about right now or throughout the history of the program?

Q. Let's start with right now, sir.

A. Okay. Right now, I know of no one who disagrees with that rate.

Q. And do you know of anyone throughout the life of the program, sir?

A. Nothing comes to mind, but I am sure at some point in time, someone disagreed with that. For example, when we put together the '91 ACR, we used a lower rate because we thought it was more appropriate for acceptance at a MRS. I guess the question sort of brings to mind, are you talking about a



2028

repository-based system or an MRS-based system, or some combination thereof?

It's a very broad question, and without more information, I can't really refine my answer very well for you.

Q. Sir, when you prepared the 1991, when you were involved in the preparation of the 1991 ACR, was it DOE's plan to operate its facilities on a 900-ton steady state basis?

A. It was DOE's plans for the year 1998 through 2010 -- or, excuse me, 2007, to operate at a 4, 6, 9 continuous rate, yes.

Q. Let's take a look at the 1991 ACR, sir. Mr. Gardner asked you a series of questions about it. It's Defendant's Exhibit 290 in your original binder.

A. You said in the Defendant's binder?

Q. The binder that Mr. Gardner provided to you.

A. It's not in yours?

Q. That's correct. And let me clean one answer, one thing up, Mr. Pollog, in your last answer, you specified that it was DOE 's plan to operate at the 4, 6, 9 number through 2007. What was DOE's plan at the time, in your view, as to how it would operate after 2007, sir?



2029

A. I don't recall many specific discussions about that, but I, my best memory is I thought we would operate at 900 in 2008 and 900 in 2009. After that, I just don't recall what we were planning. It could have been increased because of a repository coming online, but I don't have a good recollection right now of what we planned in 1991 for repository acceptance rates for 2010 and beyond.

Q. Do you have any reason to disagree that it was a 3000-ton rate, sir?

MR. GARDNER: Your Honor, objection, he just said he didn't recall.

THE COURT: Just a minute. I missed that. He did say, I do not recall, yeah, he said he's got three, "I don't recalls," and don't have a good recollection within the answer. So you asked him, however, you didn't use the 3000-ton rate first, he was talking about 900. What's the basis for your objection?

MR. GARDNER: He -- Mr. Pollog just testified that he didn't recall, with any sort of specificity, after 1997, what the projected rates were going to be. Then Mr. Macdonald said, do you have any reason to disagree that it's a 3000-ton rate? Mr. Pollog testified he doesn't recall what

2030

the rate would have been.

THE COURT: Well, what do you recall? Why don't we try it that way?

THE WITNESS: I don't have a great recollection of what we were planning back there. My best memory is, at the repository, we would have had some type of ramp-up rate and steady state rate. 3000 probably was it, but I don't have a specific recollection if that was the number, but historically, throughout the program, I think, generally speaking, that was considered the likely steady state rate for the repository.

THE COURT: Okay.

THE WITNESS: I have no specific recollection right now, but that's most likely.

BY MR. MACDONALD:

Q. Mr. Pollog, you talked about the schedule set forth in the 1991 ACR, and that is on page five of Defendant's Exhibit 290, and I believe you talked about this in your last several answers as a plan that DOE had to operate the system, is that right?

A. Yes, that's correct.

Q. The schedule set forth on page five of the 1991 ACR was inconsistent with the 1987 Amendments Act, isn't that right, sir?



2031

A. Certain provisions of it, yes, that's correct.

Q. Let me be clear, the schedule set forth on this page five of the 1991 ACR was inconsistent with the 1987 amendments, correct?

A. It was inconsistent with at least one of the provisions of the 1987 Nuclear Waste Policy Amendments Act, yes.

Q. And what provision is that, sir?

A. I believe that was the provision that restricted start of operations of the MRS to not before construction authorization issuance by the Nuclear Regulatory Commission.

Q. And if this ACR were to reflect a schedule fully consistent with the 1987 amendments, it would show zero acceptance until 2007, is that right?

A. I believe that's correct, yes.

Q. And that's because a repository had been delayed until at least 2010 at this point?

A. I believe that's correct too. If I might adjust one point to that, that's assuming no other legislation was passed in the interim.

Q. So the schedule set forth on page five of the 1991 ACR would require a change in the law in order to be accomplished, is that right?



2032

A. Yes, that's correct.

Q. In preparing this schedule, Mr. Pollog, the Department of Energy only assumed that the schedule restriction would be abolished by Congress, is that right, as opposed to the capacity limitation?

A. Probably, I think that's correct. I'm trying to think -- there's several restrictions in the Nuclear Waste Policy Act. I'm trying to remember of any other restrictions that were imposed besides the schedule one we were assuming at the time, but I don't believe so, but I don't -- I believe you're correct.

THE COURT: We spent a little bit of time with the prior witness, and you were in the room, talking about the restrictions that Congress placed on it, so I thought, you know, do you have any recollection?

THE WITNESS: No, Your Honor.

THE COURT: He had about five or six things he ticked off.

THE WITNESS: Exactly, Your Honor, I was just going through my head right now of other restrictions, and I was trying to remember --

THE COURT: But there were others?

THE WITNESS: Yes, and I was trying to



2033

remember if we assumed anything else. I don't believe we did.

BY MR. MACDONALD:

Q. Mr. Pollog, you don't know why the Department of Energy, in promulgating the schedule set forth on page five of the 1991 ACR, assumed that only the schedule linkage would be abolished, do you?

THE COURT: I think the question is kind of confusing. Why don't you say, do you, do you know? You started out, "You don't know."

MR. MACDONALD: Very well, let me just rephrase that.

THE COURT: It's confusing the way it's phrased.

BY MR. MACDONALD:

Q. Mr. Pollog, do you know why --

THE COURT: There you go.

BY MR. MACDONALD:

Q. -- the Department of Energy assumed that only the schedule linkage would be abolished by Congress in publishing the schedule set forth on page five of the 1991 ACR?

A. I believe so.

Q. Why is that, sir?

A. Because the schedule linkage, if it was

2034

abolished, would allow us to start waste acceptance in 1998.

Q. Let me ask a follow-up question. Why did the Department of Energy assume that only the schedule linkage would be abolished, sir?

A. Because we saw that as one of the main impediments to accepting waste in 1998 at an MRS.

Q. Sir, you don't know how important the schedule linkage was when it was passed by Congress in the 1987 amendments, correct?

THE COURT: Important to whom?

MR. GARDNER: Objection.

THE COURT: Well, I -- okay.

MR. GARDNER: I was going to say objection, speculation, and vague. I'm not quite sure what Mr. Macdonald's getting at. If he's trying to ask any point to Congress, obviously, Mr. Pollog can't testify to that.

THE COURT: Right. And the, we know from the prior witness that there were a handful of different restrictions, and if you can use the word "restriction," rather than "linkage," in your questions, I think that's certainly helpful to me when I go back to look at it, and probably any other human being in the world that doesn't speak in



2035

bureacratese. "Linkage" doesn't mean a thing.

It's a restriction. Congress placed a group of restrictions. This was one of them. I don't know whether -- do you know if Congress felt, based on what the Department felt, that they believed that this was the most important, it was the biggest one for a practical matter, from your perspective?

THE WITNESS: Right. I don't know what Congress intended in 1987. I was in graduate school at the time, and I wasn't really concerned about this program at that time.

THE COURT: And actually, the answer to that is in Congressional history someplace, maybe, maybe not. Help me out now a little bit on the relevance, what is the point of your examination at this point, what lessons do I need to take from what you're doing?

MR. MACDONALD: Well, Your Honor, again, this is a, the government has raised an issue about what they believed a binding process that was set forth in the ACRs and combined with the APRs and combined with the DCS, which, again, I know Your Honor has ruled on the delivery commitment schedules, and we feel like their, the government's position, the argument they have made and the testimony they



2036

elicited on direct are an effort to try to get facts into the record, that they can argue somehow this was a "gotcha" process where utilities, SMUD and every other utility, submitted schedules.

And that this is now --

THE COURT: And as soon as they did that, they amended the contract?

MR. MACDONALD: Correct.

THE COURT: That's the government -- all right. Even though I say that's not, that's not what the law says.

MR. MACDONALD: Very well.

THE COURT: And the issue on review will be on the law and not on this factual development, which is, you know, the contract has an integration clause in it, that's the end of the answer.

MR. MACDONALD: Correct, Your Honor, the other point is that at this time, when they're issuing schedules, they're also giving notice to the world and the utility industry that they are not going to be able to meet the 1998 date.

THE COURT: Okay. That's an important thing to establish in the record.

MR. MACDONALD: Correct.

THE COURT: Which is when it was that you



2037

knew for sure they weren't going anywhere, they weren't coming to get the waste.

MR. MACDONALD: And if I could just turn the witness' attention to page four of this same exhibit, Number 290, the 1991 ACR?

BY MR. MACDONALD:

Q. And Mr. Gardner, I think, had you read the entire paragraph, the middle paragraph on page four into the record, Mr. Pollog. I'd like to focus your attention on the last sentence of that paragraph, and I'd ask you to read that into the record, sir.

A. Certainly. "If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of spent nuclear fuel by DOE could not start until at least 2007."

Q. And you were responsible in getting the concurrence chain completed on the 1991 ACR, is that correct, Mr. Pollog?

A. Yes, that's correct.

Q. Your boss at the time was Mr. Alan Brownstein, is that right?

A. Yes, that's correct.

Q. He was ultimately responsible for issuing

this document, is that right?
A. Yes, it fell under his responsibility as the branch chief, certain functions or tasks, so management would look to him, upper management would look to him to complete his tasks.
Q. Did Mr. Brownstein ever tell you that the reason for including the 900-ton rate, we were just discussing in the 1991 ACR, was to limit the Department of Energy's obligations to pick up waste from utilities, sir?
A. No.
Q. Did anyone else ever tell you that, sir?
A. No.
Q. Mr. Pollog, was it DOE's plan for an MRS to become a long-term substitute for the repository?
MR. GARDNER: Your Honor, my only objection, if we could just be clear as to time frames, it might help out for the record.
BY MR. MACDONALD:
Q. At any time, sir?
A. I don't believe so.
Q. In 1989, DOE slipped the start date for the repository from 2003 until 2010, is that right?
A. I believe that's correct. I'm not sure of the exact day and month, but it's approximately



correct, yes. I don't recall a specific time frame going back that far.
Q. Let's take a look, Mr. Pollog, at Plaintiff's Exhibit 169, which is a November -- it's in the cross binder.
A. Can you give me that number once again, Counselor?
Q. It is 169, Mr. Pollog, and for the record, this is a November 1989 report to Congress on reassessment of the Civilian Radioactive Waste Management Program. Have you seen this document before, sir?
A. Probably. I have no specific recollection of seeing it, but since I was employed there at the time, I probably saw a version of it, or a final version of it.
Q. If I could turn your attention to VII? It's Bates page 1448 at the bottom.
A. Can you give me the Bates number again, please? I'm getting confused with the Roman numbers.
Q. It is 1448. And if I could direct your attention to the fourth paragraph and ask you to read the second and third sentences into the record, sir?
A. Starting with, "For the first time"?
Q. Correct.



A. "For the first time since the passage of the Nuclear Waste Policy Act, the program has put together a schedule based on a realistic assessment of activities, duration, and past experience. The schedule shows significant slip for the expected part of repository operations from the year 2003 to approximately 2010."
Q. Mr. Pollog, if you would turn to page 12 of this 1989 reassessment?
A. This is Bates 1463, is that right?
Q. That's correct. And before I ask you a question on this page, sir, did you have any role in the, putting together a schedule based on a realistic assessment of the activities, durations, and past experience that's referenced in this exhibit?
A. Nothing that I recall.
Q. On page 12, sir, the first full paragraph begins, "If a site cannot be obtained." Do you see that?
A. Yes, I do.
Q. If you'd look at the sentence, the second sentence states, "If the current statutory linkages to the repository are maintained, an additional delay of five years would result with start-up estimated at 2007 for the basic MRS facility." Do you see that?



A. Yes, I do.
Q. That is similar language that we have seen in the 1991 ACR, is that correct?
A. Similar, but I don't think it's quite the same.
Q. It projects that the estimated start-up for an MRS would be 2007, is that right?
A. Yes, that part, I think, is the same, and it's correct.
Q. And these linkages have never been abolished -- strike that.
These restrictions have never been abolished, have they?
A. No, I believe the restrictions have never been abolished.
Q. And they were put in place by the 1987 amendments, correct?
A. Yes, I believe that's correct.
Q. Not contained in the original act, the 1982 Nuclear Waste Policy Act?
A. Yes, that's correct.
THE COURT: That's what the amendments were, the amendments were the restrictions?
THE WITNESS: Yes, Your Honor.
BY MR. MACDONALD:

2046

5, 50.9 metric tons of uranium; year 6, 30.1 metric tons of uranium; and in year 9, 82 metric tons of uranium.
Q. That's a total MTU of approximately 228 tons?
A. Yes, that's correct.
Q. I'd ask you to turn back one page, Mr. Pollog, page 10, under 3.3, "Alternative Allocation Methodologies," and the second sentence states, "DOE is currently examining how expanding the allocation period, e.g., to 18-36 months, would affect WMS operating efficiency." Do you see that, sir?
A. Yes, I do.
Q. Could you describe for me what that sentence, what concept that sentence is referring to?
A. I have no recollection of what this sentence was referring to at that point in time. I could tell you what I think it means now, but at that point in time, I have no recollection of any examination being done in this area.
Q. Did you have any involvement in the preparation of the December 1990 ACR, sir?
A. I think I did.
Q. But you don't recall anyone at DOE in that



2047

time frame examining the expansion of allocation periods, for example, the 18 to 36 months?
A. I don't recall.
Q. Have you, sir, in the past five years, been looking at the concept of transportation campaigns in your work at Department of Energy?
A. Yes, I have.
Q. You think those would be a good idea when Department of Energy actually picks up fuel, correct?
A. Possibly.
Q. It's something that the Department of Energy would like to see, correct?
A. Possibly.
Q. And you say, "possibly," sir. Is it something that you think would be an efficient method of accepting fuel from utilities?
A. Again, possibly.
Q. Sir, if you'd look at the top of page 10, the second sentence, could you read the second sentence into the record?
A. Starting with, "The capacity"?
Q. Correct.
A. "The capacity available for allocation to the purchasers will be equal to the WMS operating capacity, unless part of that operating capacity is



2048

reserved to accommodate contingencies (e.g., emergencies)."
Q. Mr. Pollog, do you -- what do you recall about the concept embodied in that sentence?
A. Simply, that the contract doesn't give DOE or allow DOE to accommodate emergency situations.
Q. And at this time, DOE was planning to allocate the entire capacity of the WMS system to the purchasers, is that correct?
A. Yes, that's correct.
THE COURT: At this time, you mean in 1983?
MR. MACDONALD: This document, Your Honor, is --
THE WITNESS: I take it 1990, when the document was written, Your Honor.
THE COURT: 1990?
THE WITNESS: That's what my answer referred to, just so the Court is clear.
THE COURT: Okay.
THE WITNESS: And that's what you were intending, Counselor, correct, 1990?
BY MR. MACDONALD:
Q. That's correct. And it's true today, isn't it, that DOE plans to allocate its entire capacity to the purchasers, correct?



2049

A. Yes.
Q. Whatever that capacity is?
A. Correct.
Q. And I believe you testified about this earlier, but let me be clear, your current plans are to have a capacity of 3000 tons acceptance, is that right, per year?
A. I believe the repository is being designed for a steady state acceptance rate of 3000 metric tons per year, yes.
Q. Sir, that's not going to be a precise amount every year, right at 3000, is it?
A. I don't know, I mean, I don't know the answer to that, probably not, but close.
Q. Likely, it could be 3100, one year; 2950, another year, sir?
MR. GARDNER: Your Honor, I'm just going to object --
THE COURT: Sustained.
MR. GARDNER: Thank you.
BY MR. MACDONALD:
Q. Mr. Pollog, I'd like to direct your attention to Plaintiff's Exhibit 3 --
THE COURT: Just to clarify, I mean, he didn't choose those numbers, you chose the numbers.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

TENNESSEE VALLEY AUTHORITY, )

Plaintiff, ) Case No. 01-249C

v. )

THE UNITED STATES, )

Defendant. )

---

Courtroom 4

National Courts Building

717 Madison Place NW

Washington, D.C.

Tuesday, July 12, 2005

Volume 8

The parties met, pursuant to the notice of the Judge, at 10:10 a.m.

BEFORE: THE HONORABLE CHARLES F. LETTOW

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

PETER K. SHEA, ESQ.
EDWIN W. SMALL, ESQ.
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1499
(865) 632-7319

ON BEHALF OF THE DEFENDANT:

ALAN J. LO RE, ESQ.
SONIA ORFIELD, ESQ.
SHARON A. SNYDER, ESQ.
KEVIN CRAWFORD, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***

you.
THE COURT: Mr. Pollog, do I have your name correctly?
THE WITNESS: Yes, Your Honor.
THE COURT: Ms. Snyder, are you ready to call Mr. Pollog?
MS. SNYDER: Yes, Your Honor. The government calls Mr. Thomas Pollog.
THE COURT: Thank you. Mr. Pollog, if you would approach the bench and if you would raise your right hand to be sworn as a witness?
Whereupon--
THOMAS POLLOG
a witness, called for examination, having been duly sworn, was examined and testified as follows:
THE WITNESS: Yes, I do.
THE COURT: Please be seated in the witness stand. And, Mr. Pollog, before Ms. Snyder begins, would you please state your full name for the record?
THE WITNESS: Thomas Edward Pollog.
THE COURT: Thank you.
MS. SNYDER: Your Honor, may I approach the witness, please?
THE COURT: Yes, certainly.
MS. SNYDER: Thank you.



THE COURT: While we're getting organized, Mr. Small, Mr. Shea, whose witness is this?
MR. SMALL: I'll be handling this witness, Your Honor.
THE COURT: Thank you.
DIRECT EXAMINATION
BY MS. SNYDER:
Q. Good morning, Mr. Pollog.
A. Good morning.
Q. You've stated your full name for the record, is that right?
A. Yes.
Q. All right. Are you currently employed at the Department of Energy?
A. Yes, I am.
Q. And what office within the Department of Energy are you currently assigned?
A. I am in the Office of Civilian Radioactive Waste Management and, within that, the Office of Systems Analysis and Strategy Development.
Q. And what are your current responsibilities?
A. I work in the waste acceptance area. I'm the contracting officer's technical representative, assisting in the implementation of the standard contract.



Q. Do you have a position title?
A. Yes, nuclear engineer.
Q. And how long have you been in that position?
A. Within the current organization, for almost three years, but performing the same function in our prior organization, which was prior to our reorganization, since 1996.
Q. So approximately eight years?
A. That's correct.
Q. And when did you join the office?
A. The Office of Civilian Radioactive Waste Management?
Q. Yes.
A. 1988.
Q. And prior to September 1996, did you serve in the office that had responsibility for waste acceptance function at DOE?
A. Yes, I had a period from 1990 to 1992, I was performing a similar role.
Q. And did you have similar responsibilities during that time period?
A. Yes, I did.
Q. And were you a nuclear engineer also?
A. Yes.



Q. And from 1992 to 1995, you took a leave of absence from DOE, is that right?
A. That's correct.
Q. And where did you go?
A. I went to the International Atomic Energy Agency in Vienna, Austria.
Q. And just briefly, what were you doing there?
A. The regulations that govern the transportation of radioactive material throughout the world are based on the IAEA recommendations. The IAEA was undergoing a major revision to the transportation regulations, and I was on a leave of absence supporting the IAEA activities in developing the new transportation of radioactive material regulations.
Q. And you returned to DOE in 1995, is that right?
A. That's correct.
Q. And you were assigned to what division when you immediately returned in 1995?
A. The engineering division.
Q. And you currently also serve as a contracting officer's technical representative, is that right?

A. That's correct.
Q. And when did you assume those responsibilities?
A. I believe it was 2002.
Q. And can you describe what responsibilities you have in that position, please?
A. I provide technical advice to the contracting officer on all issues related to the standard contract.
Q. And who do you report to directly?
A. My immediate superior is Christopher Kouts.
Q. And Mr. Kouts reports to whom?
A. I believe he reports to Mr. Paul Golan.
Q. And what is his position?
A. He is the principal deputy director for the Office of Civilian Radioactive Waste Management.
Q. And turning briefly to your educational background, do you hold a Bachelor of Science?
A. Yes, I have a Bachelor of Science in nuclear engineering from Penn State University, that I received in 1981.
Q. And do you also have a Master's degree?
A. Yes, I have a Master's of Science in environmental systems engineering, which I received from Clemson University in 1988.



Q. Any other further educational degrees?
A. No, I do not.
Q. Mr. Pollog, would you turn to Defendant's Exhibit DX-76, please? And you'll find that both in the materials that I handed you, as well as on the screen, whichever is more convenient for you. Do you recognize the document?
A. Yes, I do.
Q. What is this?
A. This is the 1991 annual capacity report.
Q. And what was the purpose of this report?
A. This document was to provide all contract holders with their allocations that they would use to begin submitting delivery commitment schedules to the Department.
Q. And were you involved in the preparation of DX-76, the 1991 annual capacity report?
A. Yes, I was.
Q. Would you please describe your involvement to the Court?
A. I had the primary responsibility for having this document completed, published, and approved within the Department.
Q. And who had final responsibility for approving the document?



A. Well, that would have been my boss at the time, Mr. Brownstein, who assigned me the task, and then ultimate responsibility would have been with our director at the time, which would have been Mr. John Bartlett.
Q. And which specific office within DOE prepared this document?
A. This was prepared by the Office of Civilian Radioactive Waste Management.
Q. And do you sometimes call that OCRWM?
A. Yes, we do.
Q. All right. So if we call the office OCRWM, you'll recognize what that means?
A. Yes, I will.
Q. All right. Thank you. What role did the contracting office have in preparing the 1991 annual capacity report?
A. They had a minor role. As part of the approval process, we sent this document out to various parts of DOE. Basically, the organizations that were affected, we sent it to them for their comments. We received comments from them and would have resolved those comments prior to its publication.
Q. And was it published as an official DOE



document?
A. Yes, it was.
Q. And was it sent to contract holders?
A. Yes, it was.
Q. And who at DOE sent out the 1991 annual capacity report to contract holders?
A. It would have been sent out under the signature of the contracting officer.
Q. Would you please go to page five of DX-76? And would you please tell the Court what information is set forth in table 2.1 on page five?
A. These are the projected waste acceptance rates that the Department planned to operate under.
Q. And how were these rates developed?
A. They were developed to be consistent with the 1987 nuclear -- the Amendments Act to the nuclear waste -- the Nuclear Waste Policy Amendments Act of 1987.
Q. And you said that they were designed to be in compliance with the Amendments Act. What do you mean by that?
A. The '87 Amendments Act had a 10,000 metric ton capacity limit on a MRS, monitored retrievable storage facility, prior to operation of the repository in it, and we intended to comply with that

THE WITNESS: Yes, Your Honor, that's fine with me.
THE COURT: All right. Thank you very much. We're in recess for one hour.
(Whereupon, at 12:32 p.m., a lunch recess was taken.)



AFTERNOON SESSION
(1:32 p.m.)
THE COURT: Mr. Small, I believe when we took our luncheon break, you were about ready to cross-examine Mr. Pollog.
MR. SMALL: That's correct, Your Honor.
THE COURT: You may proceed.
CROSS-EXAMINATION
BY MR. SMALL:
Q. Mr. Pollog, the first thing I would just like to ask a couple questions about would be the rates that appear in the 1991 annual capacity report, which was DX-76. Do you recall that document, sir?
A. Yes, I do.
Q. Okay. And the acceptance rates in that document were 400 for the first year, 600 for the second year, and then 900 for the remaining years of the first 10 years, is that correct?
A. Yes, that's correct.
Q. Now, if I understand things correctly, in your testimony, there was the '87 amendments to the Nuclear Waste Policy Act that led to those 1991 ACR rates, is that correct?
A. They led to the 1991 ACR rates, yes.
Q. Now, in 1995, DOE published a combined



acceptance priority ranking and annual capacity report, is that correct?
A. Yes.
Q. And the rates in that report were the same as the rates in the 1991 annual capacity report, correct?
A. Yes.
Q. Okay. And I believe, if I recall correctly, I made a note, your testimony was that there was no reason to change the rates?
A. I believe I said no reason or no basis to change the rates.
Q. Okay. But now, the 1991 ACR rates contemplated a system beginning with an MRS, didn't it?
A. Yes.
Q. Okay. But by 1995, hadn't the MRS concept been discarded?
THE COURT: Ms. Snyder?
MS. SNYDER: I'm sorry. Objection, foundation, assumes facts not in evidence. I'm sorry.
THE COURT: Overruled. You may answer.
THE WITNESS: Okay. Not fully, partially, but not fully.



BY MR. SMALL:
Q. There was no MRS included in the 1995 TSLCC, was there?
A. I don't know.
Q. Now, in the 1995 APR/ACR, there was some discussion about updating that document, wasn't there?
A. I believe so.
Q. I believe you read some of that discussion in your direct testimony, didn't you?
A. Yes.
Q. About how it was going to be kept updated annually through a loose-leaf publication system?
A. Yes.
Q. Was it kept updated annually through a loose-leaf publication system?
A. Annually, no.
Q. Was it ever updated at all prior to 2004?
A. We never completed another ACR in the period between '95 and 2004.
Q. And that's because your understanding that the office of general counsel probably would not approve publication of an ACR?
MS. SNYDER: Objection, Your Honor, speculation.

THE COURT: The objection is overruled, to the extent, Mr. Pollog, you can answer the question of your own personal knowledge.
THE WITNESS: That is consistent with my personal knowledge, yes.
BY MR. SMALL:
Q. That is consistent with your personal knowledge?
A. Yes.
Q. Okay. And in fact, your boss told you, your boss, Mr. Zabransky, told you that the Department of Energy would not publish an ACR in 1997 because it probably would never be approved by the general counsel, is that correct?
THE COURT: Ms. Snyder?
MS. SNYDER: Objection, assumes facts not in evidence.
THE COURT: Well, I think that's exactly the point of the question, to get some facts in evidence.
MR. SMALL: Your Honor.
THE COURT: Yes, Mr. Small, the problem is the way you framed the question. I'm not having any difficulty with Ms. Snyder's objection. I'm having difficulty with another ground for objection to the



question that is not yet stated. I hate to -- Ms. Snyder?
MS. SNYDER: Your Honor, it calls for hearsay.
THE COURT: Yes, it does. Sustained on that ground.
BY MR. SMALL:
Q. Mr. Pollog, I'd like to call your attention to an exhibit that was marked during your direct examination, Defendant's Exhibit 78. Do you have that, sir?
A. Yes, I do.
Q. Defendant's Exhibit 78 is a December 20, 1991 memorandum recommending approval for publication of the 1991 ACR?
A. Yes.
Q. Okay. And did you work on this document, Defendant's Exhibit 78?
A. I was involved in its preparation. I'm not sure exactly what I did, but I was most likely involved somehow in it or may have given an initial draft, may have reviewed an initial draft. I somehow saw this document in the preparation process.
Q. Are you familiar with it?
A. Yes.



Q. I'd like to draw your attention to page two of the document, the last sentence in the first paragraph there, the sentence reads, "While not stated in the ACR, this rate was selected because it is theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage starting in 1998." Do you see that sentence, sir?
A. Yes, I do.
Q. Are you familiar with it?
A. Yes, I am.
Q. The reference to the rate being theoretically sufficient to eliminate in the aggregate the need for additional at-reactor out-of-pool storage, that's a reference to an important goal of the program, wasn't it?
A. At times, it was stated as one of the goals of the program. I'm not sure, at this point in time, it was one of the important goals of the program, but historically, if you look at all the documents the program produced and all the goals we had at periods of time, I think that was stated at certain points in time to be a goal of the program.
In 1991, when this was written, I wouldn't call it an important goal. It was something that



would have been good to do, but it wasn't something that we actively sought to do.
Q. Okay. Nevertheless, the memorandum though states that that rate was selected because of that purpose, isn't that correct?
A. That's what the words say, yes.
Q. Well, do you have any reason to believe that that's inaccurate?
A. No, but I believe what I testified to earlier, the primary rate the goals were selected were in compliance with the 1987 Amendments Act, and in addition to meeting the 10,000 metric ton limit, it also achieved this, the primary reason for selection was compliance with the Amendments Act of 1987.
Q. Okay. Now, this goal of eliminating additional at-reactor, out-of-pool storage starting in '98, how would that be achieved at the rates stated in the '91 ACR?
A. I'm not sure what you're asking me. Can you help me a little bit?
Q. Okay. How would that be achieved by the utilities, the meeting of that goal, no additional at-reactor out-of-pool storage beginning in '98, given the rate that was stated in the '91 ACR?

A. I believe the rates that were stated in the '91 ACR provides sufficient capacity in the aggregate for the utility industry, that they would not need to build additional at-reactor storage if they were to trade amongst themselves, so people who needed storage could have traded with people who did not need additional storage.
Q. Thank you, sir. And I take it that that analysis was performed for the first 10 years since that was the time period for those rates?
A. That is consistent with my memory.
Q. Would the 900 rate present the need for additional storage if that was the rate that continued until end of program?
A. I don't recall ever seeing an analysis of that.
Q. Well, sir, earlier, you testified, I believe, that the industry was generating -- discharging about 2,000 tons a year, is that correct?
A. Yes.
Q. So if pickups were only 900 tons a year, then the capacity that the utilities had would run out at some point in time, correct?
A. Assuming no changes to their pools, no shutdowns, no changes in spent fuel management, yes,



that's probably correct.
Q. And all of those things that you just mentioned could affect future discharges, correct?
A. I'm not sure they would affect future discharges.
Q. Those combination of things would affect the need for additional storage capacity?
A. Yes, I would agree with that.
Q. Now, in your direct testimony, I believe you stated that, in the aggregate, an acceptance rate of 2,100 tons a year would keep up with discharges, is that correct?
A. Yes, I did. Yes.
Q. Would that also eliminate the need for, in the aggregate, additional storage?
A. Theoretically, it should.
Q. Okay. Again, that would be assuming exchanges among utilities?
A. Yes.
Q. Does DOE have a preference in how the spent nuclear fuel transportation system is run?
MS. SNYDER: Your Honor, objection, outside the scope of direct.
THE COURT: Just a moment. It's not, the question is not outside the scope. I want to check



something.
MS. SNYDER: Your Honor, also calls for speculation on the part of DOE.
THE COURT: Now, that it might. Again, just let me look at something, please. Overruled. You may go ahead and answer.
THE WITNESS: I don't really do much with the transportation program right now. I haven't for several years. It is my understanding, in the past, DOE had expressed a preference for doing rail transportation, if that's what you're asking.
BY MR. SMALL:
Q. Thank you, sir. I'd like to now turn my questions to what in your direct testimony you referred to as the DOE model. Do I correctly understand that you did some DOE model runs specifically for this litigation?
A. Yes.
Q. And who were those runs done for, do you know?
A. I was directed to do them, or asked to do them by the Department of Justice.
Q. Do you know, who did you give them to once you had them done?
A. I believe Sharon Snyder.



Q. Do you know what was eventually done with those runs?
A. No, I don't.
Q. Do you know the purpose for which you were asked to do those runs?
A. Basically, yes.
Q. What was the purpose?
A. It was to evaluate when the TVA facilities would need to go to dry storage.
Q. Now, did you do those runs at any specific acceptance rate?
A. No.
Q. Okay. Let me back up, I suppose, and ask this question. When we talk about doing a run, what does the "run" consist of in terms of output information?
A. Projected future discharges of spent nuclear fuel by the utility industry.
Q. Only projected discharges?
A. For what we did involving this case for this trial, yes.
Q. Okay. Did you do two different kinds of discharges, one using what's been called TVA projections and another called DOE projections?
A. Yes.

UNITED STATES

COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING :
COMPANY, ALABAMA POWER COMPANY, :
and GEORGIA POWER COMPANY, :NO. 98-614C
Plaintiffs :
vs. :
THE UNITED STATES, :
Defendant. :

Pages: 1731 through 1933

Place: Washington, D.C.

Date: October 26, 2005

HERITAGE REPORTING CORPORATION
Official Reporters
1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net



IN THE UNITED STATES COURT OF FEDERAL CLAIM

SOUTHERN NUCLEAR OPERATING )
COMPANY, ALABAMA POWER )
COMPANY, and GEORGIA POWER ) NO. 98-614C
COMPANY, )
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant )

Courtroom Number 5
Court of Federal Claims
717 Madison Place NW
Washington, D.C.

Wednesday, October 26, 2005

VOLUME 8

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE THE HONORABLE JAMES F. MEROW



APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:

M. STANFORD BLANTON, ESQ.
K.C. HAIRSTON, ESQ.
S. ALLEN BAKER, JR., ESQ.
Balch & Bingham
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3417
and
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 12th Street, Northwest
Washington, DC 20004

ON BEHALF OF THE DEFENDANT:

JOHN EKMAN, ESQ.
HEIDE HERRMANN, ESQ.
MARIAN SULLIVAN, ESQ.
JOSHUA E. GARDNER, ESQ.
ALAN LO RE, ESQ.
STEPHEN FINN, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, DC 20530

** Index appears at end of transcript **



P R O C E E D I N G S

_ _ _ _ _

JUDGE MEROW: Please be seated. Mr. Ekman, do you have a witness today, or --

MR. EKMAN: We do. We have a couple witnesses, Your Honor, but before we begin our case, or actually before we call our witnesses, at the start of our case there are a few administrative items to take care of.

First of all, there's still the issue of the government exhibits to which there are no objections. I have a list here which I provided the Plaintiffs last week. With the exception of DX329, which is still on this list, but I've crossed off the list which we're withdrawing, I would ask that to the extent these exhibits have not already been admitted -- and some of them have been. For instance, there's some administrative record documents in here that were admitted -- that the government's exhibits to which there are no objections by Plaintiffs be admitted.

JUDGE MEROW: Yes.

MR. BLANTON: No objection from us on that, Your Honor.

JUDGE MEROW: Okay, the exhibits where

repository or the capacity limitation on Yucca Mountain is lifted, legislative.
Q And for the purposes of preparing current total system life cycle cost reports, how much do you -- how much does DOE assume -- how much total spent nuclear fuel does DOE assume will be generated?
A We basically take the position in the total system life cycle costs that the amount of fuel is based on the amount of approved license extensions, and that's probably somewhere around the order of 120 to -- somewhere around 120,000 metric tons of spent nuclear fuel at this point.
MS. SULLIVAN: One moment, Your Honor.
JUDGE MEROW: Sure.
MS. SULLIVAN: We have nothing further, Your Honor.
JUDGE MEROW: All right.
MR. BLANTON: I'm going to have one more, Your Honor, just if I could take one minute.
JUDGE MEROW: Sure.
MR. BLANTON: Can we put Defendant's Exhibit 330 back up on the screen, please.



RECROSS-EXAMINATION
BY MR. BLANTON:
Q Do you still have 330 in front of you?
A Yes.
Q That's the preliminary estimate of the total system cost.
A Yes, I have it.
Q And -- thank you, Kristin.
Is that what we were looking at? That's table A1 that's on the screen. Can you find A1 in the documents you have in front of you?
A I have it.
Q You've got it but I don't. Hold on one second. All right. Again, this is another one of the schedules that shows the MRS operating for ten years before the repository opens, correct?
A I believe for about 12 years before the repository opens.
Q 12 years? Let's look at page 10. I don't know who I'm supposed to look at. Dueling computers here. Let's look at the paragraph that starts "the methodologies used."
A I see it.
Q It says, "In calculating the logistics, it was assumed that DOE is able to work with Congress to



modify the current linkages between the repository and the MRS facility in order to allow the MRS facility to begin accepting waste in 1998." Do you see that?
A Yes.
Q Are those the same linkages that we have been talking about that prevent the MRS from going into operation until the construction operation for the repository is received?
A I believe it cannot be constructed until the construction authorization for the repository is received, yes.
Q Well taken. You can't start to build the MRS until you've received the construction authorization?
A For the repository, correct.
Q This document assumes those away?
A That's correct.
Q And those have not been repealed by Congress?
A They have not.
Q So regardless of whether those rates that we looked at a minute ago are reasonable, they are not permitted under the law, correct?
A They're -- the facility's not authorized, and until the linkages are removed, you could not



deploy the facility, that's correct.
MR. BLANTON: Thank you.
MS. SULLIVAN: Nothing further, Your Honor.
JUDGE MEROW: Thank you very much for your testimony.
(The witness stood aside.)
MR. BLANTON: Your Honor, can I try to recover some of my documents up there?
JUDGE MEROW: Yes.
MR. BLANTON: It may not look like it, but we're copy-poor over here.
JUDGE MEROW: No need to have more expense than we need to.
MR. GARDNER: Good afternoon, Your Honor.

THOMAS POLLOG
was sworn and testified as follows:
DIRECT EXAMINATION
BY MR. GARDNER:
Q Mr. Pollog, could you please state your name for the record.
A Thomas Pollog.
Q Mr. Pollog, where are you currently employed?

A At the Department of Energy in the Office of Civilian Radioactive Waste Management.
Q And where within the Office of Civilian Radioactive Waste Management are you employed?
A In the Office of Systems Analysis and Strategy Development.
Q How long have you been in that position?
A I have been in that office for about four years.
Q And what are your current responsibilities?
A I work in the waste acceptance team. I am the contracting officer's technical representative assigned to basically implement the terms and conditions of the standard contract.
Q And when did you assume the responsibilities of the contracting officer's technical representative?
A Approximately three years ago.
Q To whom do you report?
A Chris Kouts.
Q Could you describe the other positions and responsibilities you've held while working at the Department of Energy?
A Yes. I started there in 1988, and my



first one to two years I worked in the systems development group working on developing dry storage technologies. After that, I went into the systems integration group, which was responsible for developing the technical baseline for the Office of Civilian Radioactive Waste Management program.
After that, I took a three-year leave of absence, and when I came back from my leave of absence, I went back to the Office of Civilian Radioactive Waste Management and I was in the engineering division, responsible for developing transportation and storage technologies. And starting in the fall of 1996, I'd been working in the waste acceptance area until present.
Q I think you just mentioned a three-year leave of absence. What were you doing during that time period?
A I took an assignment with the International Atomic Energy Agency in Vienna, Austria.
Q Could you please tell the Court your educational background?
A Yes. I have a Bachelor's of Science in nuclear engineering from Pennsylvania State University, I have a Master of Science in environmental engineering from Clemson University.



Q And when did you receive those degrees, sir?
A I received my bachelor's in 1981, and I received my master's in 1988.
MR. GARDNER: Dawn, could you please put up DX97, please? Your Honor, may I approach the witness?
JUDGE MEROW: Yes. You have permanent approaching rights.
MR. GARDNER: Yes.
BY MR. GARDNER:
Q It's also on the screen for your convenience, if you'd prefer to look at that. Could you identify this document for the record?
A Yes. This is the 1991 annual capacity report.
Q Were you involved in the preparation of the 1991 ACR, or annual capacity report?
A Yes, I was.
Q What involvement did you have?
A I had direct organizational responsibility for the production, concurrence, approval, publication of this document.
Q What was the purpose of the 1991 ACR?
A It was to provide to purchasers the



allocations they will need to fill out the delivery commitment schedules.
Q Dawn, could you please turn to page 5.
Mr. Pollog, we put up on the screen table 2.1 on page 5 of the 1991 ACR. What's the information set forth on this table?
A These are the projected waste acceptance rates for spent fuel starting in 1998 going through 2007.
Q And what were the rates in the 1991 ACR represented here in table 2.1, what were they based upon?
A They were based upon receipt at a MRS-monitored refuelable storage facility, and in compliance with the 1987 Nuclear Waste Policy Amendments Act, there was a 10,000 metric ton statutory limit on the capacity prior to, I think, construction authorization. It was to comply with that 10,000 metric ton statutory limitation.
Q Dawn, could you please put up DX98?
Mr. Pollog, I just handed you Defendant's Exhibit 98. Do you recognize this document?
A Yes, I do.
Q And what is this document?
A This is an action memo seeking the

subject to change depending on how circumstances changed.
A This was intended to be a bilateral modification to the DCS that both parties would attempt to agree to a change, yes.
Q All right, sir. And they -- in other words, the DCS that is authorized by the Nuclear Waste Policy Act was never intended to be a firm contract number that the DOE was bound by as well as the purchaser?
A Well, I've always believed that an approved DCS was a firm commitment on both parties for a certain action. That's always been my belief.
Q All right. Sir, it's true, though, that that view is not shared by everybody within the Department of Energy. Isn't that a fair statement?
A I guess it depends on what time frame you're asking about.
Q Well, let's talk about in the early '90s.
A I think that's probably true, then. It wasn't shared by everybody in the department.
Q Okay. It just happens to be your personal belief that it is?
A That's correct.
Q The -- is it also your belief that the



Department of Energy had no obligation beyond an approved DCS to pick up any spent nuclear fuel?
A I never contemplated that before, but I -- I don't know.
Q Well, do you believe that if the DCS process -- that by stopping the DCS process, that the Department of Energy could unilaterally terminate its obligations to all the utilities?
A I'm not a person that can give you an answer. I never really contemplated that, and I don't know what the answer is.
Q You don't know either way on that?
A No, I don't. I've never really thought about that.
Q All right, sir.
JUDGE MEROW: Would the 2004 request for DCSs which was eventually entered, did they ask for new DCSs even though they were outstanding?
THE WITNESS: Yes, it did, Your Honor.
BY MR. BAKER:
Q And on that point, you -- has a request been sent out by the Department of Energy to -- for the utilities to send in new DCSs?
A Are you talking about the 2004 or since the 2004?



Q 2000 -- 2004.
A In 2004, yes, we did publish a new ACR, APR and DCS instructions and we requested new DCSs.
Q All right, sir. Now, correct me if I'm wrong, but isn't the current policy of the Department of Energy that they will not go -- restart the DCS process until there is a date certain for the commencement of a repository?
A I believe that's correct.
Q Okay. And as we speak --
A I have been told that. I can't remember who told me that, but I believe that to be correct.
Q All right. As we sit here today, there is no start date for a permanent repository?
A Not that I'm aware of.
Q So the DCS process, the restarting of the DCS process really hasn't happened, has it?
A We have not restarted it since the one we restarted last year.
Q So a minute ago when you said that requests had been sent out for DCSs -- well, I'm confused. That didn't -- has that happened or has it not happened?
A It happened in 2004, in July, I believe. Later that year, we returned all the submitted DCSs to



the purchasers who had submitted them, saying that due to circumstances that have changed, we are no longer going to restart the process.
Q Okay. All right, sir. So as we speak, as we sit here today in this courtroom, there is no start date for the repository and there is no restarting of the DCS process?
A That is correct.
Q The -- isn't it true, sir, that the 1991 ACR rates that you testified to on direct examination setting forth the -- I think it was the 900 metric tons that goes into an MRS -- do you recall that testimony?
A Yes, I do.
Q -- that that rate that you testified to would not be sufficient in the aggregate to avoid any -- to avoid at-reactor storage by the purchasers?
A I thought I saw an analysis, and I think it was also brought up in the action memo seeking approval for publication of the DCS where we stated I think aggregate would be sufficient to eliminate the need for additional at-reactor storage.
Q Then you didn't do any such analysis?
A No, I did not.
Q But you have testified, have you not, in

deposition, that the '91 ACR rates would not be sufficient in the aggregate to avoid at-reactor storage?
MR. GARDNER: I'd like to lodge an objection here. I don't know if he means by 1991 rate a flat 900 rate for all time or if he means a different type of 900 rate, one that ultimately ramps up to 3,000. I think for Mr. Pollog's sake, if we could be clear as to what type of 1991 rate you're talking about.
MR. BAKER: I'm talking about the rates that were set forth, the MRS rates that were set forth in the '91 ACR.
JUDGE MEROW: Do you mean the document that said they'd be sufficient in the aggregate or no out-of-reactor store -- out-of-pool storage, I guess, or something to that effect?
BY MR. BAKER:
Q Yeah, to reiterate, my question was that you said that there are no studies that you have generated or put together that show that that rate would be adequate to -- to avoid the at-reactor storage of the purchasers.
A I believe that's correct. I did not generate any studies that would indicate that.



Q The projections or the two demonstratives, let's talk about that a second. The 1983 projections on Pollog demonstrative number two, 1983 had 140,000 metric tons of uranium in the aggregate. Is that correct?
A Yes.
Q And this was pulled, what, from the '83 mission plan?
A Could have been. It was available in several documents, could have been an '83 mission plan, could have been some other document of that genre.
Q And then you show that in the -- if you would, I guess go ahead and pull up that -- oh, you don't have it. Sorry. That Pollog demonstrative number 2. Yeah.
All right, sir, the early to mid '90s, it goes back down, or goes down to 83,000 tons. And what did you attribute that to, or did you?
A Well, we attributed it to -- at that point in time, you were seeing the phenomenon of reactors shutting down early, and we expected other reactors potentially to do that. I shouldn't say "we." The Department of Energy's Energy Information Administration, who makes the energy projections,



nuclear energy projections, expected other reactors also to shut down early, so we expected there'd be less reactors operating than there now are, and that's why we expected to see the number decrease.
Q And currently, it's back up to -- anticipated to be 130,000 metric tons?
A Yes.
Q Throughout this period of time -- you're covering a time frame of the early '80s up to today, correct?
A Yes.
Q And throughout that whole period of time, the non-MRS steady rate of acceptance after ramp-ups and all of the Department of Energy publications that I have seen in this trial, and I'm sure you have, has shown 3,000 metric tons per year, hasn't it? Let me qualify -- again, the non-MRS designated rate.
MR. GARDNER: Your Honor, I'm loath to object here but, you know, Mr. Pollog has not been here through all of trial. I don't know if Mr. Pollog knows the document Mr. Baker has seen. If he could simply rephrase the question, I think that might be appropriate.
JUDGE MEROW: Well, he may not know.
MR. BAKER: I'll rephrase it.



BY MR. BAKER:
Q Mr. Pollog, the -- you've seen the documents that set forth -- the Department of Energy documents that set forth the annual acceptance rate needed for the goals of the program, that is, to pick up the discharge of the purchasers' reactors and work off the backlog, and that rate being 3,000 metric tons. You've seen documents that say that, have you not?
A Yes, I've seen many documents where we used as a steady-state acceptance rate 3,000 metric tons of uranium per year.
Q And that 3,000 of -- steady rate of 3,000 metric tons started back in the early 1980s with the first draft 1983 draft mission plan, did it not?
A Well, I don't recall what the draft '83 mission plan states, but it probably started around that time frame, yeah. That probably sounds -- it sounds right.
Q All right. Well, let's go -- back to 35, Kristin.
This is the draft -- do you recognize this was the document we started off with?
A Yes.
Q The draft mission plan of 1983,

Q You were involved?
A -- directly in the development of this document, that's correct.
Q Okay. And this is, of course, as we talked about, assumes the MRS?
A That's correct.
Q This is what was going to be done because the repository wasn't ready and didn't look like it was going to be ready in 1991, did it, by 1998?
A That's correct.
Q And so this rate that you have -- had something to do with putting together, isn't it true, sir, that it assumes swaps amongst the various purchasers?
A Just a couple things. I didn't put this rate together. We used a rate that was used by our program at the time, so we didn't generate the rate. We used what was common rate for our program. So we weren't generating rates, we were taking rates that were being used by the program.
Q Okay. Well, but this -- this chart that we see here, this table of the projected waste acceptance rate for spent nuclear fuel, table 2.1 in the 1991 ACR, it -- the -- to meet the needs, to meet the needs of our objectives of the whole waste



program, that is, to pick up the fuel that is being discharged by the purchasers' reactors and work off any backlog, that assumed that the -- rate here assumed that there would be swapping and trading of acceptance allocations amongst the utilities?
A To eliminate in the aggregate the need for additional at-reactor storage wasn't a goal or an objective of our program at this time; however, to theoretically do that, yes, you would have had to have had exchanges of approved DCSs by the utilities to accomplish that.
Q Okay. And all of those swaps and exchanges of acceptance allocations had to be approved by the Department of Energy?
A In order for there to be an exchange of approved delivery commitment schedules, department would have unilateral approval authority over those exchanges, yes, that's correct.
Q Unilateral?
A Yes.
Q Okay. And if someone wanted to swap an allocation, for example, to avoid having to build dry cask storage, that would have to be run by the Department of Energy first?
A Yes, if they wanted to swap approved



delivery commitment schedules, they would have had to seek our approval, that's correct.
Q Okay. All right, sir. And back at this time, the discharge rate for -- the aggregate discharge rate was about 2,000 metric tons a year?
A I would guess at this point in time it was probably a little higher than that, because in the early '80s, it was 3,000 and now we have 2,000, and we have had 2,000 for the past five or the ten years. It was probably a -- between those two numbers, the 3,000 and 2,000, trending closer to the 2,000.
Q Well, at 2,000, or whatever the number that was a little higher, I don't think you've quantified it -- did you?
A I didn't quantify it, no, because it wasn't a step function. Didn't drop from 3,000 to 2,000.
Q But it was close -- excuse me?
A Trending from one number to the other, but it was most likely closer to the 2,000 at that point in time.
Q But at the 2,000 metric ton discharge rate, it goes -- the utility capacity would run out if the pickups were only at 900 metric tons a year, correct?



A I don't know what you're asking.
Q The 2000 metric ton rate was being discharged from -- on the aggregate from the utilities who were trying to have their spent nuclear fuel picked up by DOE. There was about 2,000 tons. We've established that, correct, in the '91 time frame?
A A little bit more than, but for argument's sake, for discussion's sake, we can say 2,000 now and that will probably work just as well.
Q And the capacity of the utilities to take this discharge was going to quickly -- was going to not be serviced by this rate that is shown on table 2.1, was it?
MR. GARDNER: Your Honor, I object. I'm not really sure I understand Mr. Baker's question. I think it's still vague.
JUDGE MEROW: I think he's commenting on the fact that the 2,000 discharge rate means you're putting 2,000 metric tons into the storage system but you're only taking out 900. And the question is will that eventually lead to a situation where somebody's going to have to build some additional storage.
MR. BAKER: I like the judge's question.
THE WITNESS: Should I answer that, Your Honor?

JUDGE MEROW: Yes.
MR. BAKER: Very articulate man.
THE WITNESS: Eventually, yes, that is what indeed would happen eventually. I think, you know, the discussion here was for this period of time. 1998 through 2007, this rate would be sufficient to eliminate in the aggregate, again, the need for additional at-reactor storage. Once you proceeded past the 2007 time frame, then you're going to be in that situation.
BY MR. BAKER:
Q And the 2007 time frame, it stops because you're looking at a -- at this time, you were looking at a 2010 startup date for the repository?
A No, we stopped in 2007 because the contract says the ACR should provide the annual allocations for ten years following --
Q I follow you.
A -- the start of facility operations, so to be consistent with the term of the contract, that's why we went through 2007.
Q All right, sir. Mr. Pollog, isn't it true that today, or at least as of 2004, that the groups within the Department of Energy believe that this 3,000 metric ton rate is the appropriate steady-state



throughput rate for the picking up of spent nuclear fuel at the purchasers' reactors?
A I really don't want to speak for groups within the Department of Energy. I could, you know, speak for myself, but I'm -- it's difficult for me to speak for the whole groups within the Department of Energy.
Q Well, then, speaking for yourself, then.
A I think if you have a repository-based system, an acceptance rate between 2,000 and 3,000 is a reasonable rate.
Q The 2,000 rate, between 2,000 and 3,000, 2,000's just going to meet -- if it's 2,000, it's just going to meet the discharge rate and not work off the backlog, though. We know that?
A Yes.
Q Okay. So you have to have a higher rate to work off the back load and also do it in time so that reactors can timely decommission, correct?
MR. GARDNER: Your Honor, I'm sorry, I've got to object again. I don't know what "timely decommissioning" means. I think that's vague. Maybe we can compact the question a little bit so that --
JUDGE MEROW: That's a term that's used throughout the DOE documents.



MR. GARDNER: I'd represent I'm not sure it's through all the DOE documents. I think there's a couple early on, and if Mr. Pollog knows what he means by "timely," of course he can answer. I think the question is slightly vague.
JUDGE MEROW: I'd be interested in the answer to that too, as to what was considered to be a timely decommissioning. In other words, was the idea that they wouldn't have to have stored fuel on site when their decommissioning period started, in other words, or --
THE WITNESS: How I would interpret that, Your Honor --
JUDGE MEROW: The contract says there could be priority for shutdown reactors, but that's an issue that's --
THE WITNESS: Yes.
JUDGE MEROW: -- unresolved.
THE WITNESS: Timely decommissioning, I would interpret that to be if you have a situation where the reactor is shut down, they're completed with decommission, they've hauled away the last of the reactor vessel hardware, all the other infrastructure that's there and the only thing left would be the spent fuel, so to prevent a situation where your only



thing left on that site is the spent fuel.
JUDGE MEROW: But under the current, apparently, DOE interpretation, they would still stick with OFF, oldest fuel first, even in that situation.
THE WITNESS: Yes, Your Honor. We have always had that position from, you know, start, because you get into a situation when you start getting priority for shutdowns of you're basically taking from one to give to another. It's an equity issue amongst the utilities. We've always said this.
However the utilities want to divvy things up, we'll be willing to work with you on that, but the utility industry themselves could never come to an agreement of how to handle the situation. So we said, you know, it's an equity issue amongst the utilities, and until we hear other, we're just going to stick with the OFF, or oldest fuel first, allocation method, because you're taking a right that somebody has and you're giving it to somebody else because our acceptance capacity in any given year is limited. It's not unlimited, so we can't invent or make more acceptance capacity.
Our system can only handle X, so much, whether it's 3,000 or some other number. If we give priority for shutdown out of that 3,000, we're taking

UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
SYSTEM FUELS, INC., on its own )
behalf and as agent for SYSTEM )
ENERGY RESOURCES, INC. and SOUTH )
MISSISSIPPI ELECTRIC POWER ASSO., ) No. 03-2624C
Plaintiff, )
v. )
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - - x
Washington, D.C.
Thursday, October 12, 2006

Deposition of THOMAS E. POLLOG, called for examination by counsel for Plaintiff in the above-entitled matter, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of PILLSBURY WINTHROP SHAW PITTMAN LLP, 2300 N Street, N.W., Washington, D.C., at 9:33 a.m., and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR.

1

APPEARANCES:

On behalf of Plaintiff:
DANIEL S. HERZFELD, ESQ.
PILLSBURY WINTHROP SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7900

On behalf of Defendant:
MARIAN E. SULLIVAN, ESQ.
LISA DONAHUE, ESQ.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
National Courts Section
1100 L Street, N.W., Room 10150
Washington, D.C. 20005
(202) 307-6288

ALSO PRESENT:
Eileen Supko and Kurt Espiritu

2

C O N T E N T S


| WITNESS | EXAMINATION PAGE NO. |
|---|---|
| THOMAS E. POLLOG | |
| By Mr. Herzfeld | 4 |
| By Ms. Sullivan | 79 |


E X H I B I T S
(Exhibits attached.)


| POLLOG EXHIBIT NO. | PAGE NO. |
|---|---|
| No. 1 Draft Report, Plaintiff's Exhibit 1021 | 6 |
| No. 2 Letter, 1-19-01, and attachments, Nos. NSP-0001824-34 | 12 |
| No. 3 Letter, 8-19-04, and attachments | 46 |
| No. 4 Acceptance Priority Ranking & Annual Capacity Report, July 2004 | 53 |
| No. 5 Letter, 5-29-92, Nos. NSP-0100674-77 | 61 |
| No. 6 Letter, 1-21-04 | 62 |


3

P R O C E E D I N G S

Whereupon,
THOMAS E. POLLOG
was called as a witness by counsel for Plaintiff, and, having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. HERZFELD:

Q. Good morning, Mr. Pollog. We met just briefly off the record.
I think you generally know the ground rules for depositions, so I probably won't go over them. I know you've been deposed several times in this litigation.
One question I have for you is: Have you done anything to prepare for this deposition?
A. Yes.
Q. What did you do?
A. I read one letter.
Q. One letter.

4

What letter did you read?
A. A letter that the department sent to TVA in late 2004.
Q. Do you remember anything else about that letter, what it involved?
A. Yeah.
They had a question concerning the DCS process at that time.
Q. And that was regarding reopening of the DCS process in 2004?
A. Yes.
Q. We'll probably come back to that in a little bit.
So that's the only document you reviewed?
A. Yes.
Q. Did you meet with counsel?
A. Yes.
Q. For how long?
A. One hour.
Q. Was it Ms. Sullivan?
A. Yes.
Q. Just to confirm your background since the

5

last time you were deposed or gave testimony: Are you still a nuclear engineer and the contracting officer's technical representative within the Department of Energy's Office of Civilian Radioactive Waste Management?
A. Yes.
Q. Okay. Might as well jump right into the stack of documents.
(Pollog Exhibit No. 1 was marked for identification.)
BY MR. HERZFELD:
Q. First question I have for you -- and please feel free to take some time to look at it if you need to -- do you recognize this document?
(Pause.)
A. Yes.
BY MR. HERZFELD:
Q. What is it?
A. It is a draft report concerning long-term spent fuel management options available to Xcel Prairie Island nuclear plants.

6

Q. What was your role in preparing this if any?
A. I had the organizational responsibility for getting this completed for the Office of Civilian Radioactive Waste Management. My supervisors at that time probably would have been directly responsibility to management, but I was assigned that task by my supervisors.
Q. So you were the direct person at DOE who was in charge of the study.
Would that be a fair assessment?
A. Yes.
Q. Okay. And just to restate what you said: You do remember this draft?
A. No, I don't remember this draft per se.
I remember the report being done. I remember the final report. I'm sure there were drafts that were done. This specific document I don't recall.
Q. Let me ask you a question.
If I can direct your attention to the second-to-the-last line, I'll read it and you can

7

read along with me in your head: The record indicates that after consideration of the available alternatives --
A. Excuse me.
Which section?
Q. Page 1, section 2, second-to-last line from the bottom of the page.
The record indicates that after consideration of the available alternatives, Xcel concluded as has DOE that under the current state and federal laws governing the disposition of SNF at Prairie Island, the only alternative that provides a reasonable chance of success relative to maintaining the ability to continue operations is the shipment to the Private Fuel Storage facility.
Did you write that phrase?
MS. SULLIVAN: Objection, relevance.
A. Probably not.
BY MR. HERZFELD:
Q. Do you know who did?
A. I believe so.
Q. Who wrote it?

8

1998 start date.
Q. Okay. You knew this one was coming.
MR. HERZFELD: Have the court reporter mark this document.
(Pollog Exhibit No. 4 was marked for identification.)
BY MR. HERZFELD:
Q. Let me just ask just regarding the instructions.
What did DOE plan to do with the old DCSes if somebody submitted new DCSes?
MS. SULLIVAN: Objection, vague.
A. Well, we gave direction regarding that in that TVA letter I mentioned at the beginning of my deposition.
BY MR. HERZFELD:
Q. And what was the direction in that letter?
MS. SULLIVAN: Objection.
The document speaks for itself, vague.
A. The DCSes replace, not supplement, the original DCSes that have been submitted.

53

BY MR. HERZFELD:
Q. First let me ask: Pollog exhibit number 4, do you recognize this document?
A. Yes.
Q. What is it?
A. It's the 2004 annual capacity report acceptance priority ranking.
Q. And what role did you have regarding this document?
MS. SULLIVAN: Enter a standing objection to the relevance of this document and any questions about it.
A. I reviewed it, and I believe helped with getting it approved.
BY MR. HERZFELD:
Q. Do you know who prepared the document?
MS. SULLIVAN: Objection, vague.
A. Yes.
BY MR. HERZFELD:
Q. Who prepared the document?
MS. SULLIVAN: Objection, vague.
A. Different parts were prepared by different

54

people.
BY MR. HERZFELD:
Q. If you can just go through and tell me who prepared what part, that would be great.
A. I believe Mr. Zabransky was the primary author of the written text. And then the tables -- table 2 and the appendices were probably produced by someone at BSC, either Ed Benz or Connie Barton.
Q. And why did DOE issue this document?
MS. SULLIVAN: Objection, vague.
A. For the same reason I gave earlier about the DCS process, and that is the 2010 start date and the 63 months -- I can restate it if you would like, or if you just want to use my answer from the earlier --
BY MR. HERZFELD:
Q. That's fine.
I don't want to have to make you restate all of that, but I just wanted to confirm that.
I'd like to direct your attention to page 2 of this document.
Does this document include a steady state

55

acceptance rate of 3,000 MTU per year after a 5-year rampup period for the nominal waste acceptance rates?
MS. SULLIVAN: Objection.
The document speaks for itself.
A. Yes.
BY MR. HERZFELD:
Q. Do you know if that is the acceptance design capacity of the waste acceptance system designed by your office?
MS. SULLIVAN: Objection, vague.
A. I believe the system is being designed for that acceptance rate, if that's the question you asked me.
I'm not sure exactly what you asked me.
BY MR. HERZFELD:
Q. I think that's the question I'm asking, which is, what's your design -- what is your design basis for -- strike that.
Let me ask it this way: Is the 3,000 MTU steady state rate what you're using as your basis to be the design capacity of the waste acceptance system?

56

A. I believe so.
Q. Has the 3,000 MTU steady state rate always been the basis for the design of the system?
MS. SULLIVAN: Objection, vague.
A. No.
BY MR. HERZFELD:
Q. When was it not?
MS. SULLIVAN: Objection, vague.
A. Through the early to mid-'90s we went to a lower rate when we were looking at an MRS-based system. I think in the '80s, there may have been higher rates when we were looking at a 2-repository system.
So again it depends on what system you're talking about at what point in time and history of the program.
BY MR. HERZFELD:
Q. Let me ask: Do you know if DOE assumes that a 3,000 MTU steady state rate will be the through-put rate that the system will ultimately operate at?
MS. SULLIVAN: Objection, vague,

57

relevance, and we're going within the testimony that he's already given in the coordinated discovery depositions, so I'll let counsel ask a couple more questions, but he was our witness on several depositions with regard to acceptance rate and the historical acceptance rates assumed by the program.
So you're treading on ground that we agreed would not be part of this deposition.
MR. HERZFELD: I intend to not go too enough into this.
MS. SULLIVAN: What was the question again?
(The reporter read the last question.)
MS. SULLIVAN: Objection, vague.
A. I believe so.
BY MR. HERZFELD:
Q. Let me ask about table 1 in the -- what has been marked as Pollog exhibit 4, the -- what I'll refer to as the 2004 APR-ACR.
Is that -- do you know where the table 1 came from?

58

MS. SULLIVAN: Objection, vague.
A. I believe so.
BY MR. HERZFELD:
Q. And where did it come from?
A. I think at the time this document was produced, the CRWMS system requirements document used a baseline acceptance rate -- or used these baseline acceptance rates.
Q. Do you know who prepared this table in particular?
A. I believe Mr. Zabransky.
Q. Do you know why the 900 steady state rate wasn't used in this particular document?
MS. SULLIVAN: Objection, vague.
A. Yes.
BY MR. HERZFELD:
Q. Why wasn't it used?
A. This document was based upon acceptance at a repository. The 900 MTU rate was based upon an acceptance at an MRS.
BY MR. HERZFELD:
Q. Let me ask about the 900 rate.

59

Would the 900 rate -- would that have been sufficient to have reduced in the aggregate the need for additional at-reactor storage in 1998?
MS. SULLIVAN: I'm going to direct the witness not to answer.
It's the subject of extensive testimony by Mr. Pollog in the coordinated discovery depositions and beyond the scope of this deposition.
MR. HERZFELD: Actually I'm not sure it's in his depositions.
MS. SULLIVAN: It was certainly fair game at his depositions, so you had the opportunity to ask at those depositions.
MR. HERZFELD: The reason why I asked the question is because the first we learned that this was his belief was actually on the stand at one of the trials and trial transcript.
MS. SULLIVAN: But the government's position with regard to the 900 rate was certainly at issue when his depositions were taken in coordinated discovery, and he was -- you were able to ask him about that at that time, and that's beyond the scope.

60

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff ) Case No.
vs. ) 98-484C
THE UNITED STATES, )
Defendant. )

Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.

Wednesday, November 15, 2006

VOLUME 12

The parties met, pursuant to the notice of the Judge, at 10:01 a.m.

BEFORE: THE HONORABLE JOHN P. WIESE



APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD,, ESQ.
Pillsbury Winthrop Shaw Pittman, LLP
1650 Tysons Boulevard, 14th Floor
McLean, Virginia 22102-4859
(703) 770-7900
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman, LLP
2300 N Street, N.W.
Washington, D.C. 20037-1122
(202) 663-8063



APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
HEIDE HERRMANN, ESQ.
JOSHUA GARDNER, ESQ.
STEPHEN FINN, ESQ.
ANDREW P. AVERBACH, ESQ.
JOHN EKMAN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

(Index appears at end of transcript)



P R O C E E D I N G S
- - - - - -

THE COURT: We can go on the record. Any preliminary matters? Mr. Tomaszczuk.

MR. TOMASZCZUK: None from the plaintiff, Your Honor. Good morning.

THE COURT: Ms. Herrmann, good morning.

MS. HERRMANN: Good morning, Your Honor. None from the Government.

THE COURT: Very well. Then we will move on with the Government's next witness. Is that right?

MS. SULLIVAN: Yes. Good morning, Your Honor.

THE COURT: Good morning.

MS. SULLIVAN: We'd like to call Mr. Thomas Pollog to the stand.

THE COURT: Mr. Pollog. Will you take the stand for us, please. And the reporter needs to know that the questioning will be by Ms. Sullivan.

MS. SULLIVAN: Thank you, Your Honor.

Whereupon,

THOMAS E. POLLOG

was called as a witness, and, having first been duly sworn, was examined and testified as follows:
THE COURT: Please be seated. I would like you to state your name in full, spell your last name, and give the reporter your home address.
THE WITNESS: Thomas Edward Pollog, P-O-L-L-O-G.
THE COURT: And I'm going to ask you to back away from the mic just a little bit.
THE WITNESS: My home address is 4208 40th Street North, Arlington, Virginia 22207.
DIRECT EXAMINATION
BY MS. SULLIVAN:
Q Mr. Pollog, good morning. Where are you currently employed?
A I'm employed at the Department of Energy in the Office of Civilian Radioactive Waste Management.
Q And what position do you currently hold at DOE?
A I'm a nuclear engineer in the Office of Waste Management.
Q How long have you been in your current position?



A In -- as the current organization is structured, probably 6 months, but performing the same function since 1996.
Q What are your current responsibilities?
A Assist in the implementation of the Standard Contract with the utilities.
Q Do you also serve as the contracting officer's technical representative?
A Yes, I do. On an unofficial basis.
Q And when did you assume the responsibilities of the contracting officer's technical representative?
A I believe that was in 2002.
Q And what are the responsibilities of the contracting officer's technical representative?
A To provide the contracting officer technical advice concerning implementation of the terms and conditions of the contract.
Q To whom do you report?
A Christopher Kouts.
Q And would you please describe briefly your post-high school educational background.
A Yes. I received a bachelor of science degree in nuclear engineering from the Pennsylvania State University. I received a



master's of science in environmental systems engineering from Clemson University.
Q And when did you receive those degrees?
A I received my bachelor's in 1981 and my master's in 1988.
Q After graduating, receiving your master's in 1988, where were you employed?
A I accepted a position in the Office of Civilian Radioactive Waste Management.
Q And which -- was there a specific office within the Office of Civilian Radioactive Waste Management?
A Yes. I was in the systems development branch.
Q And what were the responsibilities of that office?
A To develop systems to assist the utilities in spent fuel management.
Q And how long were you in that office?
A For approximately 6 months.
Q And then where did you go?
A Then I was assigned in the systems integration branch. I was in that position for approximately about a year, year and a half. And in that position, we developed the technical



baseline for the -- our program.
Q And after you left -- and when did you leave the systems integration branch?
A In middle or latter part of 1990. And then I joined the utility interface and logistics branch, which is -- performed the waste acceptance function for the organization. So I was moving waste acceptance issues from that point on, until 1992.
Q And where did you go in 1992?
A I took a three-year leave of absence from the Department of Energy and accepted an assignment with the International Atomic Energy Agency in Vienna, Austria. And that lasted until the end of 1994.
Q And at the end of 1994, did you return to DOE?
A Yes, I did. I returned to the engineering division, which we were responsible for producing technologies for use by -- for our program. Essentially I was working on the cask development program and the MPC program.
Q And how long were you with that office?
A Approximately a year and a half.
Q And then where did you go?

A I went back to working in the waste acceptance area.
Q And is that the position that you've held to the present day?
A Yes.
Q Thank you. Mr. Pollog, I would like to hand you Plaintiff's Exhibit 56.
MS. SULLIVAN: May I approach, Your Honor?
THE COURT: Yes, you may. I think we have 56 memorized. All of us do.
MS. SULLIVAN: We should. It's the contract.
And, Your Honor, 56 of course has been admitted.
BY MS. SULLIVAN:
Q Mr. Pollog, would you identify Plaintiff's Exhibit 56 for the record.
A Yeah. It is a copy of the contract for disposal of spent nuclear fuel and/or high-level radioactive waste between United States Department of Energy and Northern States Power for their Prairie Island nuclear generating plant.
Q Mr. Pollog, can I direct your attention to page 10 of the Standard Contract. And can I



ask you to read paragraphs 5(a) and 5(b) into the record?
A Beginning on April 1st, 1991, DOE shall issue an annual Acceptance Priority Ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraphs B and D of Article V, and paragraph B.3 of Article VI hereof.
(b): Beginning not later than July 1st, 1987, DOE shall issue an Annual Capacity Report for planning purposes. This report shall set forth the projected annual receiving capacity for DOE facilities and the annual priority ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for 10 years following the projected commencement of the operation of the initial DOE facility.
Q Mr. Pollog, have you been involved in DOE's efforts to implement these provisions of the Standard Contract?



A Yes, I have.
Q How have you been involved?
A I was involved in producing the first APR, Acceptance Priority Ranking, and also the 1991 Annual Capacity Report, and the 2004 Annual Capacity Report.
Q And the 2004 Annual Capacity Report, was it also an Acceptance Priority Ranking?
A Yes.
Q Mr. Pollog, could I direct your attention to page 11 of the Standard Contract. Would you please read paragraph B1 into the record.
A Delivery Commitment Schedules, in the form set forth in Appendix C annexed hereto and made a part hereof, for delivery of SNF and/or HLW shall be furnished to DOE by purchaser. After DOE has issued proposed Acceptance Priority Ranking, as described in paragraph B.5 of Article IV hereof, beginning January 1st, 1992, purchaser shall submit to DOE Delivery Commitment Schedules which shall identify all SNF and/or HLW the purchaser wishes to deliver to DOE beginning 63 months thereafter. DOE shall approve or disapprove such schedules within 3 months after



receipt. In the event of disapproval, DOE shall advise the purchaser in writing of the reasons for such disapproval and request a revised schedule from the purchaser to be submitted to DOE within 30 days after receipt of DOE's notice of disapproval.
Q Mr. Pollog, have you been involved in DOE's efforts to implement this provision of the contract?
A Yes, I have.
Q How have you been involved?
A In 1991, I was involved in developing the original DCS instructions.
In 2004 I was involved in drafting DCS instructions again. And when I returned to the waste acceptance area in the '96, '97 time period through present, I'm involved in responding to occasional requests when a DCS is submitted by purchaser.
Q Okay. Mr. Pollog, I would now like to hand you Defendant's Exhibit 108.
MS. SULLIVAN: May I approach, Your Honor?
THE COURT: Yes, you may. It probably would be a good time to invoke the Gardner

page 10 of the contract. And in particular you read in 5 (a) and 5 (b), paragraphs 5 (a) and (b) on this page.
At one point in time -- maybe I misunderstood you. I thought you said something to the effect that DOE is not required to annually publish an ACR or APR. Or sometime that obligation would end. Did I misunderstand you?
A I don't think it was said about an obligation. It was more about what was necessitated by operating.
Q Okay.
A For both parties fulfilling their obligations.
Q Okay. Let me point you to some language in the contract and maybe that will clarify. The first line of 5 (a) says: Beginning on April 1, 1991, DOE shall issue an annual Acceptance Priority Ranking for receipt of SNF and/or HLW at the DOE repository.
Doesn't that indicate that it would be something that would be published annually?
A Not necessarily.
Q Not necessarily. Okay. Yet. Nevertheless, you do an APR and ACR, you have



published them since 1991; is that correct?
A Yes.
Q Okay. And when you said "not necessarily," why do you say not necessarily?
A Because the term "annual" there modifies Acceptance Priority Ranking. If it modified issue, it would be annually, adverb. It's an adjective here. It doesn't say it should be issued annually. To issue. That's why I was saying not necessarily.
Q So there's an ambiguity there.
A It could be, yeah. I've heard arguments both ways.
Q And would you say the same thing with regard to 5 (b)?
A Yes.
Q Okay. You can put that away for now.
And during your direct examination, you and Ms. Sullivan discussed the linkages from the 1987 Amendments Act. When I refer to the Amendments Act, I'm referring to the Nuclear Waste Policy Amendments Act of 1987. Do you recall that discussion?
A Yes, I do.
Q So you're familiar with those linkages



in the 1987 Amendments Act?
A Yes.
Q And it's your understanding that the rate that is in the 1991 ACR is not consistent with the schedule linkages that Congress placed in that, correct?
A That's correct.
Q Specifically, the 1991 ACR is consistent with the requirement that no more than 10,000 MTUs be placed in the facility. But it is not consistent with the requirement that the construction on the facility could not begin until the Commission issued a license. And by "the Commission," I mean the Nuclear Regulatory Commission, issued a license for the construction of a repository. Is that correct?
A That's correct.
Q And because of this inconsistency, the rate that was in the 1991 ACR could not be accomplished by the Department of Energy without a change in law; isn't that right?
A Yes.
Q When the 1991 ACR was published, is it your understanding that the Department's best estimate of the earliest time it could accept



waste at an MRS prior to the operation of the repository under the schedule linkages was 3 years ahead of waste acceptance at the repository?
A Yeah. About that.
Q You say "about that."
A Yeah. The 2007 time frame. It depends on when you start. If you're talking three and a half or in the middle of 2010 or the end of 2010. So around 3 years.
Q Roughly 3 years?
A Yes. Right.
Q So given those linkages, the earliest you could start an MRS would be 3 years before opening the repository, roughly 3 years?
A Yes.
Q And when the 1991 ACR was published, the Department projected the repository would begin operation in 2010, correct?
A Yes.
Q So if the Department expected to open the repository in 2010, and it could not accept waste at the MRS more than 3 years prior to that without a change in law removing the linkages --
THE COURT: Sir.
MR. HERZFELD: Sorry, am I going too

fast?
THE COURT: There is no way the reporter can take it down that quickly. If you are reading the question, please read it so that she can take it down.
MR. HERZFELD: Sure. I'm sorry, Your Honor. I'll start over.
BY MR. HERZFELD:
Q I think you may have answered this question but just to be sure I've got it.
So if the Department expected to open the repository in 2010, and it could not accept waste at the MRS more than 3 years prior to that without a change in the law removing the linkages, it could not have accepted waste at an MRS before 2007; is that correct, or roughly thereabouts?
A Yes.
Q And if I could have you retrieve DX-108, which is the Annual Capacity Report from 1991. And, particularly, if I could have you turn to page 4. And that's HQR -- well, there are various Bates numbers on here. I'll refer to the bottom one. HQR-002-0806.
Do you have that?
A Yes.



MR. HERZFELD: Your Honor, do you have that?
THE COURT: I will be there in a moment, Mr. Herzfeld. I am there.
MR. HERZFELD: Thank you, Your Honor.
BY MR. HERZFELD:
Q So in fact, the 1991 ACR actually says this, doesn't it? And if I could read to you from the second paragraph, the last sentence, it says: If the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that the commencement of facility operations and initial acceptance of SNF by DOE could not start until at least 2007.
Did I read that correctly?
A I believe so.
Q And if I can have you turn to the next page. So based on your understanding of the statutory linkages that existed in 1991 between the operation of a repository and the operation of an MRS, if the 1991 ACR developed the schedule fully consistent with the 1987 amendments to the Nuclear Waste Policy Act, your understanding is the schedule would have shown zero acceptance



until 2007, correct?
MS. SULLIVAN: Objection, Your Honor. Mischaracterizes the witness' testimony.
THE COURT: Well, I'm -- I think we'll let the witness answer the question because that's certainly how I understood the testimony. And so the witness can clarify any misunderstanding that's embodied in the question.
MS. SULLIVAN: Thank you, Your Honor.
THE COURT: Would you like it back again?
THE WITNESS: Yes, please, Your Honor.
MR. HERZFELD: Could I have the court reporter read it back.
(The reporter read the record as requested.)
THE COURT: Now, do you understand that question, Mr. Pollog?
THE WITNESS: Yes, I do, Your Honor.
THE COURT: All right. Can you clarify the basis for the projections as we see them in table 2.1 of Defendant's 108, on page 5?
THE WITNESS: Yes, Your Honor.
Yes. That's correct. It would have shown first acceptance starting in 2007.



BY MR. HERZFELD:
Q And each of these, for example, it would have been essentially zero running down until you get to 2007. Would that be correct?
A Well, I would say we wouldn't even show '98, '99. We would just start 2007, 2008, for 10 years down. We wouldn't have put 20 years worth of waste acceptance in this table. We only would have put 10 years, as is required by the contract. So it wouldn't show zero. It would show year. And it would be 2007, 400; 2008, 600; 2009, 900.
Q Sure. So I think you've answered my question, which is: If this is fully consistent with the linkages, then the schedule would reflect zero?
THE COURT: For 1998?
MR. HERZFELD: For 1998, '99, 2000, 2001, 2002, 2003, 2004, 2005 and 2006.
THE WITNESS: Well, again, I'll just repeat what I said. There would be no '98, '99 in there. It would start at year 2007. So there wouldn't be any '98, zero. '99, zero. There would be -- the first year under column year would be 2007 and it would show 400. The second year

would not be 1999. It would be 2008 and that would be 600.
The contract doesn't say project 20 years worth of receiving capacity. It says project 10 years. We wouldn't start projecting 10 years prior. We wouldn't project 20 years' worth if the first 10 years was zero. It would just start at 2007 with 400. There would be no '98, zero; '99, zero. It would just say 2007, 400; 2008, 600.
BY MR. HERZFELD:
Q Okay.
A Et cetera.
Q But in order for the schedule in the 1991 ACR to apply, it would have required a change in law, correct?
A Yes.
Q And was that law changed?
A Not to my knowledge.
Q And those linkages weren't, in fact, removed?
A That's correct.
Q And wouldn't you agree that, by the time the 1991 ACR was published in December 1991, it was unlikely that an MRS would be sited by 1998?



A I would disagree with that.
Q Okay. If I could have you grab binder number 55.
MS. SULLIVAN: What exhibit, counsel?
MR. HERZFELD: I'll get there. 288.
THE COURT: So I can understand the last exchange between counsel and the witness, are you saying, Mr. Pollog, that the Annual Capacity Report, in particular the schedule that we just looked at, assumes that the linkage between the repository and the MRS facility, as set forth in the amendments to the Nuclear Waste Policy Act, would be relieved or changed through later legislation?
THE WITNESS: Yes, Your Honor.
BY MR. HERZFELD:
Q And Mr. Pollog, do you have the document? Or do you have the binder. It should be to your right.
A One of these?
Q It's not the blue ones. It's the one with the white spine.
A Okay.
Q It's binder 55. Exhibit 288.
A I'm with you, Counselor.



Q Okay. If I could have you turn to page 31. First of all, let's identify this report. This is a GAO report entitled: Nuclear Waste, Operation of Monitored Retrievable Storage Facility is Unlikely By 1998.
Have I identified the document correctly?
A Yes. I believe so.
Q And if I could have you turn to page 31. Now, you had disagreed with me that an MRS was unlikely in 1991 -- or to open in 1998. Is that correct?
A Yes.
Q GAO disagreed, didn't it? And I could read -- and if I can, I could read a passage in and maybe that will help.
MS. SULLIVAN: Objection, Your Honor. I don't think he's laid a foundation as to whether this witness has even seen this document before.
THE COURT: Let's establish that, Mr. Herzfeld.
MR. HERZFELD: Your Honor, I don't know that it needs to be established. It's mainly for impeachment purposes. He has stated that it was likely in 1998. And I'm trying to establish that



it was pretty well known it was unlikely.
MS. SULLIVAN: Your Honor, I understand --
MR. HERZFELD: And it was --
THE COURT: I'm not sure the GAO's report goes beyond its conclusions, which, in turn, reflect its opinions. And I doubt very much that there was anybody at GAO who stood any closer to this program than the witness we now have on the stand.
So I would have to respect the difference of opinion. And it certainly doesn't impeach his testimony to say that GAO had a different conclusion, any more than the GAO's decisions on law are -- would be seen as violative of subsequent decisions by this Court.
So if you want to explore why he disagreed with your conclusion, that would be appropriate. This exhibit, however, is not the way to do it.
BY MR. HERZFELD:
Q Okay. Well let me first ask. Do you know if you've ever seen this report before?
A I don't believe I have until yesterday, when it was presented to Mr. Kouts in his

himself.
MR. HERZFELD: It's also -- the same identical question was asked of him and he answered it differently.
THE COURT: Yes. Ms. Sullivan is correct. So let's take it off the screen.
Mr. Pollog, would you look at the transcript page that you've been referred to and see if that leads you to a different conclusion with respect to the answer you last gave to Counsel's question.
THE WITNESS: Okay.
THE COURT: And I would suggest or ask that you go back before the immediate question to which -- to which your attention is now being addressed, read several questions prior to that. Read up to and through the....
Now, Mr. Herzfeld, your question to the witness -- I'm sorry, Mr. Pollog, have you finished?
THE WITNESS: Yes.
THE COURT: Your question to the witness was what?
BY MR. HERZFELD:
Q Was it your view that once DOE ceased



considering DCSs and no longer approved them, that DOE had no further obligations to purchasers for providing disposal services in those years?
And if I may --
THE COURT: You may.
BY MR. HERZFELD:
Q -- read into the record the top of page 4010.
MS. SULLIVAN: Excuse me, Your Honor. Is this now for impeachment? Is that the -- is he still refreshing the recollection of the witness? I don't understand what's been identified as inconsistent.
THE COURT: I think what Mr. Herzfeld means to bring out is that the witness gave a different answer to the same question in the earlier trial.
And I think perhaps to get to the end of this as quickly as possible, we should simply ask the witness whether the answer you gave at the time in the Yankee Atomic case is different from the answer you've given today?
THE WITNESS: A little bit, Your Honor, but not significantly.
THE COURT: Can you, therefore, explain



what you see is the difference?
THE WITNESS: Yeah. I said, I think, earlier, to Mr. Herzfeld's question, we had no specific obligation tied to a specific year. In general, we are still obligated eventually to take all the material that's covered by their contract. So we have this general obligation to take all material covered by the contract. But it's not tied to any specific action, any specific time. So it stopped at a specific time period.
THE COURT: What stopped? The commitment or the obligation?
THE WITNESS: The obligation to perform in a specific time period, 2003, 2004, 2007. So obligation that was tied to a specific performance in a specific year was stopped. I think that's consistent with what I said in my earlier testimony in the Yankee's case.
But what I've added on here is, generally speaking, the Department still has an obligation to take all material that's still covered by contract. I'm not saying what the time frame for that obligation will be. But we still have to eventually accept for disposal all that material.



I think the question here was talking about us trying to separate acceptance by a certain date in a certain period as different from the general obligation to fulfill our obligations under the contract eventually.
THE COURT: Does that satisfy what you need, Mr. Herzfeld?
MR. HERZFELD: I'm not sure it does, but let me -- if I can soldier on, I think I might be able to clarify what I'm getting at.
BY MR. HERZFELD:
Q Let's say, suppose that DOE is unable to begin waste acceptance until 2025 or, for that matter, 2017 as is now projected, your understanding is that DOE would have no obligation to purchasers unless they had approved DCSs; is that correct?
A Yes. Well, no obligation to perform in a specific time period, 2012 or 2017 or 2020. We have an obligation to eventually accept all of their material.
Q I'm sorry. Could you read back the answer.
(The reporter read the record as requested.)

BY MR. HERZFELD:
Q So is it your view that, by stopping the approval of DCSs, your understanding is that the Department of Energy could unilaterally cut off its obligations to all purchasers; is that correct?
A No. I don't think that's what I said. I'm trying to specify -- we've cut off our obligation to perform waste acceptance in a certain time period. All material still covered by that contract is the material we will eventually be obligated to take.
Q That's not the question I'm asking. I'm asking for the time period between now and 2025. Could you unilaterally cut off your obligations by cutting off the approval of the DCSs?
MS. SULLIVAN: Your Honor, I'm troubled by Mr. Herzfeld's question. It seems to be introducing an element of bad faith into what DOE -- what Mr. Pollog has explained why DOE did what it did with regard to the suspension of the DCS process.
THE COURT: Ms. Sullivan, I think what we're doing here is probing the legal significance of the delivery-commitment schedule process. And



what we're examining is this witness' understanding of how the fulfillment of its contract responsibilities can exist side by side with the suspension of the delivery-commitment schedule process.
MS. SULLIVAN: Understood, Your Honor. Thank you.
THE COURT: So that's where we are.
MS. SULLIVAN: That's fine, Your Honor.
MR. HERZFELD: Okay. Now I am going to hopefully introduce this into evidence because --
THE COURT: I'm not sure that we got the last question answered.
MR. HERZFELD: He did not answer. Well, then I guess I would -- if I could ask you to answer the last question. If you could read it back.
(The reporter read the record as requested.)
THE WITNESS: Well, that's what we believe we did, so yes.
BY MR. HERZFELD:
Q So the answer is, yes, that you could unilaterally cut off your obligations by no longer approving DCSs?



A That's what we try to do, yes.
Q Thank you.
THE COURT: What do you mean by obligation? What do you understand the term obligation to mean in the context of counsel's question to you?
THE WITNESS: I'm referring to a specific obligation to take a specific amount of material in a specific period. This has to be taken, these 10 metric tons of uranium in 2003 or 2007. A specific commitment to accept a specific amount of material by a specific time period. That's what I believe he's asking me.
BY MR. HERZFELD:
Q So if I understand your answer correctly, the DCS just commits you to the amount of fuel. It doesn't actually commit to the time period.
So, for example, if DOE didn't begin performing until 2025, it would have no obligation -- no contractual obligation?
A The DCS --
MS. SULLIVAN: One moment, Your Honor. Your Honor, we'll just let the question go. Thank you.



THE WITNESS: The DCS does contain a time period. It has a year on it. So it has a year and an amount.
BY MR. HERZFELD:
Q Okay. And I must have misunderstood your answer. Because I thought you said it was a definite commitment to the amount but not the year?
A No. I said year and amount because they're both clearly on the DCS form.
Q So let me shift gears just slightly and ask you, is your understanding of the purpose of DOE stopping the approval of DCSs was to limit DOE's liability?
MS. SULLIVAN: Objection to the extent it calls for legal conclusion. The question could be his understanding as to the effect or something. Your Honor, limiting liability, that's a province for the general counsel's office.
THE COURT: All right. With that modification --
MR. HERZFELD: I don't think -- I think I said, is it your understanding that the purpose of stopping the approval of DCSs was to limit DOE's liability?

THE COURT: You may answer that question. Yes.
THE WITNESS: Yes.
BY MR. HERZFELD:
Q Okay. If I could get you to turn your attention to Plaintiff's Exhibit 334, which is binder 62.
A This was 330? What was the number again?
Q Binder 62. Plaintiff's Exhibit 334.
Now, do you recognize this document?
A Yes.
Q And do you recognize it to be the 2004 DCS instructions that accompanied the 2004 APR/ACR?
A Yes.
Q And you drafted this document, correct?
A Yes.
Q And if I could direct your attention to page 2, paragraph 7 (a). And if I could have you read into the record the last two sentences of paragraph 7 (a).
MS. SULLIVAN: Your Honor, if I could just -- I understand the Court's ruling when this issue was discussed with Mr. Kouts yesterday. But



if we could just enter a standing objection for the relevance of this document, given it was 2004 and past the time of the issues that are before the Court with the damages.
I understand what the Court said yesterday about how this interplays, but we have concerns about the relevance of the 2004 ACR process.
THE COURT: Well, I think I probably said yesterday that it helps explore the nature of the commitment that DOE sees coming out of the delivery commitment -- delivery -- DCS process, yes.
If that's not what I said yesterday, that's what I should have said yesterday. But that's where we are with this.
MS. SULLIVAN: And I understand that that's why the Court allowed it yesterday and will allow it today.
THE COURT: All right.
MS. SULLIVAN: We have concerns about the relevance of the documents and the questions with regard to, specifically, the 2004 process.
THE COURT: Okay. We're not looking at 2004. We're really exploring the nature of the



legal relationship growing out of the DCS.
MS. SULLIVAN: Thank you, Your Honor.
BY MR. HERZFELD:
Q Okay. If I could have you just read in the last two sentences of paragraph 7 (a). And it's on page 2 of Plaintiff's Exhibit 334.
A DOE recognizes that many purchasers have submitted and DOE has approved DCSs based upon the January 31, 1998 operations date included in the Standard Contract. Purchasers should submit new DCSs based upon the currently planned operation date of 2010.
Q And do I understand correctly, in separate correspondence, DOE also stated that the new DCSs would replace, not supplement the original DCSs that have been submitted; isn't that correct?
A Yes.
MR. HERZFELD: Now, Your Honor, it's about five till 1:00. I've probably got about 15, 20 minutes, maybe half an hour more. We can break for lunch. I can come back and finish up.
THE COURT: Let's do that. Let's come back at 10 after 2:00.



(Whereupon, at 12:57 p.m., the hearing was recessed, to be reconvened at 2:10 p.m. this same day.)

THE COURT: By all means, proceed.
REDIRECT EXAMINATION
BY MS. SULLIVAN:
Q Mr. Pollog, could I ask you to look at the exhibit that we were just looking at, PX-1019.
And could I direct your attention to page 3 of that document, ending Bates Number 1829.
THE COURT: Madam Reporter, you may be correcting this, but I said "by all means, please proceed."
THE COURT REPORTER: Yes. That's what I have.
THE COURT: Okay.
BY MS. SULLIVAN:
Q Mr. Pollog, are you on that page?
A Yes.
Q May I ask you to please read paragraph -- the second paragraph under the conference report language that begins "in identifying."
A In identifying the potential alternatives available to NSP for addressing Prairie Island spent fuel management, Department has not attempted to interpret any laws enacted by the state of Minnesota that may govern decisions



regarding implementation of any alternative. Furthermore, the Department takes no position on the degree to which any of these alternatives may be or have been applied at Prairie Island, nor the degree to which they may be effective, alone or in combination, in extending the duration of the operation of the Prairie Island Units 1 and 2.
Q Thank you. Mr. Pollog, if you had been asked to perform a similar analysis for another plant owned by another utility, would your list of options have been different?
A Possibly, yes.
Q Could it have been the same list of options?
MR. HERZFELD: Objection. Asked and answered. And leading.
THE COURT: I sustain that objection.
BY MS. SULLIVAN:
Q Mr. Pollog, did you discuss the situation at NSP with anyone at NSP prior to the preparation of this report?
A No, we did not.
Q Okay. What is the status of PFS today?
MR. HERZFELD: Objection. Calls for speculation. And relevance.



THE COURT: I'm assuming, since the witness exhibited knowledge of the existence of a private full storage facility at the time that report was authored in '01, I'm assuming that he is able to answer the question today regarding that facility status.
MS. SULLIVAN: Your Honor, I can lay a foundation for the question and then ask it.
THE COURT: This witness has put out in his report as among the alternatives that Northern States may rely upon the availability of a private storage facility. That exhibits his knowledge of that facility and, thus, the relevance and permissibility of the question asked.
MR. HERZFELD: We withdraw our objection.
BY MS. SULLIVAN:
Q Mr. Pollog, what is the status of PFS today?
A As far as I know, it's dead right now.
THE COURT: As far as I know, it is what, Mr. Pollog?
THE WITNESS: Dead.
THE COURT: Okay.
MR. HERZFELD: Thank you. I didn't hear



him either, Your Honor.
BY MS. SULLIVAN:
Q Mr. Pollog, do you recall you testified on cross --
THE COURT: Excuse me. May I interrupt?
MS. SULLIVAN: Yes.
THE COURT: How did you learn about the private fuel storage facility in the first instance?
THE WITNESS: The initiative was in nuclear periodicals.
THE COURT: I see.
THE WITNESS: Journals. There was discussions of it in different conferences, seminars throughout the nuclear industry, seminars, symposiums, conferences concerning spent fuel management in the nuclear industry.
THE COURT: I see.
BY MS. SULLIVAN:
Q Is this the same source for your current understanding is the current status of PFS?
A Yes.
Q Mr. Pollog, during questioning by Mr. Herzfeld, there was an exchange with regard to DOE's -- whether Department of Energy was

attempting to limit its liability to the suspension of the DCS process. What did you mean when you testified about limiting liability?
A Well, the DCSs were an obligation the Department had entered into. If we stopped approving them, we were essentially stopping our liability -- we were not increasing it any more than we already had incurred.
Q Was the process suspended to limit or reduce DOE's liability in this case?
A I don't know the answer because I don't know what the status was of all of NSP's DCSs if they had been submitted or not, the ones that they were able to submit, that is. So if they had DCSs that they still could have submitted to the Department, then it would have done that, yes. It would, we believe, limited our liability in this case.
Q Were you trying to reduce the amount DOE would pay due to its delay in accepting the amounts covered by approved DCSs?
A Yes. When I say approved, I mean one -- if it wasn't approved, then it was -- there was no liability anymore. We would not have an obligation for that.



Q If it wasn't approved?
A Correct. So not for the ones that already were approved. We were trying to see that no more were approved.
Q Mr. Pollog, what do you understand to be the -- the -- for the DCSs that were approved, that NSP may hold, what is DOE's obligation on those DCSs?
A Whatever is contained in the delivery-commitment schedule itself, for a certain amount of fuel that we should have picked up in a time period that is indicated on that DCS. Each DCS has an allocation and a time, a year. So our liability is what is contained in those DCSs.
Q Did DOE or did you suspend the DCS process in attempt to bolster the importance of the 1991 ACR?
A No.
Q Does this -- does the suspension of the DCS process relate in any way to the issuance of the 1991 ACR?
MR. HERZFELD: Objection. Leading.
THE COURT: The objection is overruled.
THE WITNESS: No.
BY MS. SULLIVAN:



THE COURT: Mr. Pollog, what do you mean by liability? In particular, what do you mean by limit liability? You used those words. And you say: Well, we suspended the DCS process with a view to limiting our liability.
Liability means what in that sentence?
THE WITNESS: The damage caused to the plaintiff by our delay in not picking up the material that we had obligated ourselves to picking up on that DCS form.
THE COURT: Okay.
MS. SULLIVAN: One moment, Your Honor.
BY MS. SULLIVAN:
Q In suspending the DCS process, was DOE attempting to limit the obligations DOE had to begin acceptance in 1998?
MR. HERZFELD: Objection. Leading. And I believe this question has been asked and answered several times.
THE COURT: The objection is overruled. But I guess I should tell you both, this is not the witness through which to explore this particular issue. This witness believes that DOE has an ongoing obligation to render performance under this contract. And this witness sees these



DCSs as engaging that performance obligation in time periods.
To the extent there is no DCS out there, there is no then-present obligation to pick up. But the witness is not saying that this eliminates our liability for the remainder of the contract.
It's altogether inappropriate to be asking what are the essential legal questions in this case of a witness who has no legal training and who is not charged with defining the meaning of this contract from the standpoint of law. That goes both to your questions, Ms. Sullivan, and those that Mr. Herzfeld has put to this witness. This really extends to all questions of that character to any lay witness.
MS. SULLIVAN: Understood, Your Honor, thank you.
MR. HERZFELD: If I could address that.
THE COURT: You may.
MR. HERZFELD: Judge Lettow, in the TVA case, did not base his breach finding on the 1998 date. I believe he based his breach finding on this testimony and other testimony from DOE witnesses, saying they stopped the DCS process, they failed to approve the DCS process, and they

# ROSSELLI

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY CONNECTICUT YANKEE ATOMIC POWER COMPANY
MAINE YANKEE ATOMIC POWER COMPANY FLORIDA POWER & LIGHT COMPANY
NORTHERN STATES POWER COMPANY DUKE POWER, A Division of DUKE ENERGY CORP.
INDIANA MICHIGAN POWER COMPANY SACRAMENTO MUNICIPAL UTILITY DISTRICT
SOUTHERN NUCLEAR OPERATING COMPANY, et al. COMMONWEALTH EDISON COMPANY
BOSTON EDISON COMPANY GPU NUCLEAR, INCORPORATED WISCONSIN
ELECTRIC POWER COMPANY POWER AUTHORITY OF THE STATE OF NEW YORK
OMAHA PUBLIC POWER DISTRICT NEBRASKA PUBLIC POWER DISTRICT
TENNESSEE VALLEY AUTHORITY,

Plaintiffs, vs. Case Nos. 98-126C, 98-154C, 98-474C
98-483C, 98-484C, 98-485C 98-486C, 98-488C, 98-614C
98-621C, 99-447C, 00-440C UNITED STATES, 00-697C, 00-703C, 01-115C
01-116C, 01-249C DEFENDANT.

________________________

VOLUME I DEPOSITION OF ROBERT M. ROSSELLI

Taken on behalf of Sacrament Municipal Utility District April 15, 2002

- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 15, 2002, commencing at the hour of 9:34 a.m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington.

RICHLAND, WASHINGTON,
MONDAY, APRIL 15, 2002,
9:34 a.m.
ROBERT M. ROSSELLI,
having been first duly sworn, was examined and testified as follows:
EXAMINATION
BY-MR.NESLIN:
Q. Mr. Rosselli, my name is Dave Neslin. I'm an attorney representing the Sacramento Municipal Utility District in certain litigation that's pending in the U.S. Court of Federal Claims in Washington, D.C. And as part of that litigation, we're undertaking certain coordinated discovery. And your deposition is being taken as part of that discovery. You're being represented by attorneys here today?
A. Yes, I am.
Q. And those would be attorneys from the Department of Justice?
A. Yes, they are.
Q. In the course of your deposition, you're going to be shown certain documents. And some of these documents may be subject to a confidentiality or protective order that has been

5

entered into in the litigation. So what I would like to do is hand you a copy of a pleading titled Joint Motion for Entry of Agreement and Protective Order, and ask you to turn to page 3. Take a look at paragraph 5, if you would.
Sir, do you agree to maintain the confidentiality of any documents you're shown as part of your deposition?
A. I do.
MR. LESTER: That would be limited to documents that are subject to the confidentiality protective order. Is that correct?
MR. NESLIN: With that clarification, certainly.
BY MR. NESLIN:
Q. Mr. Rosselli, have you had your deposition taken before?
A. No.
Q. Well, during the course of this deposition, I'll be asking you questions. Some of the other attorneys for other plaintiffs may ask you questions as well. You'll need to answer audibly so that the court reporter can

6

take down your answers. And she will prepare a transcript of the questions and answers which will be shown to you so that you can correct any mistranscriptions.
It's very important that you answer accurately and completely. If you don't understand my question, please tell me, and I'll restate my question. And it will be important that you answer audibly, because she can't take down nods of the head. So if I ask a question and you don't ask me to clarify, I'll assume that you understand the question and that you're answering completely. Is that fair?
A. Yes.
Q. If you would like to take a break at any time, let me know, and we'll take a break. Fair enough?
A. Yes.
Q. You said that you haven't had your deposition taken before. Correct?
A. Yes.
Q. Have you testified in court before?
A. On this matter?
Q. Not on this matter. On any matter.
A. No. Could I ask who else is being

7

represented, before we get started? Is that -- you said you were with Sacramento Utility?
Q. Well, there are a number of other utilities who have brought lawsuits against the federal government. And a number of those utilities are represented by co-counsel here. And we can go over that with you at a break, if that would be helpful.
A. Okay.
MR. LESTER: Actually -- I mean, for Mr. Rosselli's purpose, could we just go ahead and introduce the people on the record and the utilities that they represent?
MR. NESLIN: That's fine.
MR. LESTER: It will just take a minute.
MR. HERZFELD: My name is Dan Herzfeld, and I represent Florida Power and Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear Inc., Power Authority of the State of New York, Omaha Public Power District, and Nebraska Public Power District in the coordinated discovery. We also represent PSE&G Nuclear as well, which may or may not be

8

in the "discovery," as I understand.
MR. LESTER: I think that's added onto the --
MR. HERZFELD: Okay.
MR. HAIRSTON: I'm K. C. Hairston with the law firm of Balch & Bingham. And I represent Alabama Power, Georgia Power, and Southern Nuclear.
MR. SKALABAN: I'm Pete Skalaban. I represent Yankee Atomic, Maine Yankee, Connecticut Yankee. We are monitoring this deposition today. We are not entering our appearance in it. We have noticed you, Mr. Rosselli, for a deposition tomorrow, which we plan to take after this is concluded.
MR. CASSLING: My name is Don Cassling with the law firm of Jenner & Block in Chicago. We represent Commonwealth Edison Company.
THE WITNESS: Thank you.
BY MR. NESLIN:
Q. Mr. Rosselli, did you do anything to prepare for this deposition?
A. Yes.
Q. What was that?

9

A. Read some of the material that the Justice Department gave me.
Q. What materials did the Justice Department provide to you? Did you bring the materials with you here today?
A. Yes.
Q. Did the Justice Department provide any materials to you that you did not bring with you here today?
A. No.
Q. Did you discuss your deposition with the attorneys for the Department of Justice?
A. Specifically, in what context?
Q. Did you discuss the deposition with the attorneys for the Department of Justice?
A. In terms of what it is and what's going to be expected --
Q. Yes.
A. -- of me, yes.
Q. Did you discuss the deposition with anyone at the Department of Energy?
A. No.
Q. Did you discuss the deposition with anyone else?
A. No.

10

Q. Could you briefly describe for me your education at the college and graduate levels, if any?
A. I have a bachelor of administration with a major in business from Baltimoreles College (Phonetic) in Brie, Ohio. And I have an MBA in management from Michigan State University.
Q. And what were the years that you graduated? That you received your degrees?
A. I got my BA in 1966, June '66, and my MBA on 12-67.
Q. Would you briefly describe your employment history following your education?
A. Basically, I have 36, 37 years with working for the United States Government, except for three years when I was in the military from '68 to '71. It's been spent with the Department of Energy or its predecessor organizations.
Q. Which branch of the military were you in?
A. I was in the United States Army in the edgemond general corps.
Q. When you left the army, you went to work for a predecessor at the Department of

11

Energy?
A. Really, I went to work with a predecessor of the Department of Energy before I went into the army. But then I spent eight months, was drafted, spent three years basically in the army, then had re-employment rights back to a predecessor of the Department of Energy.
Q. What was your first position at the Department of Energy, before you went into the service?
A. I was a management intern working with the space nuclear propulsion office in Cleveland, Ohio. Basically, it was a job that I was learning the administrative aspects of federal government and those particular programs -- contracts, personnel, budget, finance.
Q. And when you returned from the army, did you go back to the same position?
A. No.
Q. What position did you go to work at?
A. When I came back, I was re-employed at a predecessor of the Department of Energy in Washington, D.C. in their Germantown office.
Q. And what was your position?
A. I was a personnel specialist, I believe,

12

and I worked basically in three areas. I did personnel policy work. I did personnel operations work. And I did -- I guess it was personnel training and development work.
Q. And what title did you have at that point?
A. I believe it was personnel specialist.
Q. And do you recall the name of the agency that you were working for at that point?
A. It was the Atomic Energy Commission at that point.
Q. And was there a particular office or branch that you were working in?
A. It was the division of personnel.
Q. How long did you work there?
A. In that organization?
Q. Yes, sir. In the division of personnel at the Atomic Energy Commission?
A. I came back in 1971. To the best of my recollection, I left there in 1974.
Q. Where did you go then?
A. I went to the office of Magnetic Fusion Energy.
Q. And was that still within the Atomic Energy Commission?

13

A. Yes, it was.
Q. And what was your position at the office of Magnetic Fusion Energy?
A. I was a management specialist, and my responsibilities there included budget formulation and execution, accounting control, contract administration, organizational development and human resources management, information resource management.
Q. And how long did you work at the office of Magnetic Fusion Energy?
A. To the best of my knowledge, it was 1979.
Q. And why did you leave that position?
A. If I remember correctly, I was downgraded from a 15 to a 14, and I wanted to get my 15 back, so I moved to a higher level.
Q. Why had you been downgraded?
A. They just felt that the job wasn't supportive of the grade.
Q. So what was your next position?
A. To the best of my knowledge, my next position was a management analyst in the -- and I don't remember what exactly it was called. But it was the defense programs area. And I had

14

similar responsibilities as I had in magnetic fusion where I was working in the administrative side in human resources, contracts, budget, finance.
Q. And how long did you work in that position?
A. I vaguely remember maybe six months or so. And within the -- under the same general, you know, leadership, I was transferred to the nuclear reactors division, and I did the same thing in support of nuclear reactors.
Q. You did administrative work?
A. Yes.
Q. Working on --
A. Budgets --
Q. -- budgets?
A. -- finance, contracts, human resources organization development.
Q. Why were you transferred to the nuclear reactors division? Do you know?
A. Just they had an opening, and they reassigned me there, because may skills matched what they needed.
Q. And was all of this work to this point in Washington, D.C.?

15

A. Yes, it was. Germantown, Maryland to be specific.
Q. How long were you at the nuclear reactors division in that position?
A. I'm only going to guess. To the best of my knowledge, it was probably maybe around a year. And then I transferred, still within that same organizational component, broad organizational component, to the -- I think it was the office of civilian waste. And they did both -- at that time they did civilian waste and defense waste. And I think my title was something like executive assistant or something like that. But I did the same type of work as I previously had been doing. Just it was oriented not toward reactors. It was oriented toward waste management.
Q. Now, is this the first point at which you began working on waste management issues for the Government, or had you had certain responsibilities in that area prior to that point?
A. I think it's fair to say that this was the first time that I got substantively involved on waste management sites.

16

Q. And this would be sometime around 1980, 1981?
A. Yes, it was around that time. I think it was a couple of years doing that before, roughly a couple of years before the Nuclear Waste Policy Act passed.
Q. And how long were you in that position?
A. I'm going, to the best of my knowledge, say it was about a couple of years, year-and-a-half to two years.
Q. And what was your next position?
A. Director, I believe it was called the resource management division in the office of Civilian Radioactive Waste Management.
Q. And what were your responsibilities as director of that division?
A. There were organizational development, human resources management, contract administration, information resources, budget and finance.
Q. And did you have people working for you in that position?
A. Yes, I did.
Q. Approximately how many? Do you recall?
A. No, I don't.



Q. More than 10?
A. Yes.
Q. More than 20?
A. I really don't remember.
Q. How long did you hold that position?
A. Until 1984.
Q. Let me back up a step. You'd been an executive assistant in the office of civilian waste. Then, you became director of resource management division at the office of Civilian Radioactive Waste Management. Why did you take that position? What led to that change of position?
A. To the best of my recollection, sometime in the span of the -- while I was working in the waste program, initially, they had both defense and commercial waste in that same organization. Then they split out. At some point in there, they split out the defense waste, and essentially what we were working on was the civilian side. And so when the Waste Policy Act passed, they just grabbed that entity that was commercial and gave us a new name.
Q. You were doing the same work?
A. Essentially, it was the same work, yes,



it was.
Q. And you said you held that position until 1984?
A. That's right. May of '84.
Q. And what happened then?
A. I transferred to the Richland operations office here in Richland, Washington.
Q. Now, when you were working as director of the resource management division, was that in Germantown or in the Washington, D.C. area as well?
A. It was a split operation. We had some folks in both locations. I was located in Washington, D.C. in the Forrestal Building.
Q. And in May 1984, you transferred to Richland?
A. Yes.
Q. And what position did you transfer to?
A. Assistant manager for administration.
Q. Administration of what?
A. Administrative services. So I had responsibility for human resources, contract infrastructure, and information resources, budget and finance.
Q. And why did you transfer?



A. Opportunity. It was a promotion.
Q. Now, were you still at that point working in the office of Civilian Radioactive Waste Management, or was this a separate --
A. No, I transferred. I cut my ties with the Civilian Radioactive Waste Management and transferred here. Reassignment I think they called it in the personnel action.
Q. That was May of 1984?
A. Yes.
Q. And how long did you hold your position as assistant manager for administrative services in Richland?
A. Until May of 1994.
Q. And what happened then?
A. I was reassigned here locally to be assistant manager for science and technology.
Q. Is that also at the Richland facility?
A. Yes.
Q. What were your responsibilities as assistant manager of science and technology?
A. I was responsible for the contract management of the Battelle Pacific Northwest National Lab contract.
Q. And what was the reason for that change

in 1994?
A. Career broadening.
Q. And how long did you hold that position?
A. I held that position for five years until 1999. Around May 1999 roughly.
Q. And what happened then?
A. I was asked by the current manager to help him, who was a new manager, with his reorganization. And I spent about three months on that and became -- I was reassigned to be deputy manager for business services at that point, sometime in the September, October time frame.
Q. And what were your responsibilities as deputy manager for business services?
A. I had all the administrative activities -- budget, finance, human resources, procurement. I had responsibility for the infrastructure. I had responsibility for the office of special concerns. I had responsibility for, what we called, the future outcome, it's economic development aspects and how we support community economics, the development. Initially, I had responsibility for the laboratory, Pacific Northwest National Laboratory.

21

Q. How long were you in this position?
A. Until current.
Q. Is that your current position today?
A. Yes, it is.
Q. Mr. Rosselli, after the time that you left the office of Civilian Radioactive Waste Management, which you estimated was approximately May of 1984, in your other positions within the department, have you had any involvement in waste management issues?
A. Yes.
Q. Would you explain what that was?
A. Here at Hanford we have high-level waste, mixed waste, low-level waste that we receive, treat, and store, you know, on site. So it's part of our ongoing operation. And though I'm not, you know, directly involved, it's not within my responsibility to manage those particular activities. I, as far as my management responsibility from an administrative standpoint, support the activities that go on, whether it's giving them budget of finance support, contract support, bringing people to do the job, that kind of thing. So I provide administrative support to the waste management

22

operations as they are occurring on site today.
Q. And I understand that with respect to the Hanford site. Have you had any involvement or participation in the Department's spent nuclear fuel program, as it applies to various utilities?
A. Could you repeat that again for me please?
Q. Have you had any involvement or participation in the Department's spent nuclear fuel program, as it applies to the various utilities?
MR. LESTER: Objection, vague.
BY MR. NESLIN:
Q. Do you understand the question?
A. Yes.
Q. Can you answer the question?
MR. LESTER: Go ahead.
THE WITNESS: Yes. When I was assistant manager for science and technology, there was an individual on the staff that was managing some of the remaining aspects of support. We, here in the Richland office, were given to the OCRWM program. And I mean, he worked for me. The person worked for me.

23

Q. What support was the Richland office providing for the OCRWM program? Do you recall?
A. To the best of my knowledge, the support -- well, let me back up, because at one point in time, the Richland office was a potential site for a repository in the basalt media. And about the time I was in the program, actively in the program, they had started an exploratory shaft here on site.
So it was at that point an integral part of the office's portfolio. In addition to that, the Pacific Northwest National Laboratory, they have a lot of expertise in nuclear matters having to do -- one area having to do with spent nuclear fuel. So they were providing -- the laboratory was providing to the Washington, D.C. office of Civilian Waste Management support, technical support, as it related to spent nuclear fuel.
Q. Are you referring to Battelle, Pacific Northwest Labs?
A. Yes. Battelle is the parent company.
Q. So Pacific Northwest Labs was doing contracting work for OCRWM?
A. Um-hmm.

24

Q. Correct?
A. Yes. To the best of my knowledge, that is true.
Q. And that work was being supervised here in Richland?
A. I don't know. I don't know the answer to that one, and if I may explain why. Different programs do things differently in terms of management of the laboratory. Some of them, headquarters manages the investigator directly. In other cases, they'll delegate to the field office to do it. I can't honestly remember how the civilian -- you know, how it was being done and whether there was some support in Richland, or was it being done directly out of headquarters. I don't remember.
Q. Did you, yourself, have any responsibility for overseeing the work that PNL was doing here in connection with OCRWM and the OCRWM program?
A. Not directly, no.
Q. Were you familiar with it? Were you aware of it?
A. Yes, I was.
Q. The specifics? Or just the fact that

25

they were doing work?
A. I knew they were doing work. I couldn't tell, you know, the exact tests that were ongoing. I could tell you that, you know, they were working -- one area they were working for was in the spent nuclear fuel.
Q. I'd like to back up to your work for the office of civilian waste. You said it was approximately 1980, 1981 that you were working for them as an executive assistant. What were your responsibilities in that position?
A. The responsibilities, as I remember, had to do with budget formulation, execution, organizational development, and human resources. I guess the best thing I can remember now is answering correspondence. We used to get a lot of letters from folks where we were characterizing, and I can't remember, maybe the best example at Canyon Lands. A lot of folks would say, how could you go in and try to destroy a beautiful area like Canyon Lands? So we were responding to those letters.
Q. What were the activities at that office during that period of time? What was that office focusing on?

26

A. Well, the principal focus had to do with management of civilian nuclear waste. And they were working on some of the repository efforts, characterization of sites for repository. They also had activities having to do with remedial actions -- cleaning up sites where the department had used in the military production environment, old uranium, mill tailing sites, formerly utilized facilities where they had processed the ores, et cetera. And West Valley was also in the jurisdiction of that particular program and the cleanup efforts associated with West Valley.
Q. Was the office working on the legislation that became the Nuclear Waste Policy Act?
A. Yes, it was.
Q. Were you involved in that?
A. Not directly, no.
Q. You say you were not involved directly. How were you involved?
A. Just getting information on the progress that was being made toward framing the legislation.
Q. Who was overseeing the legislative effort for the office?

27

A. The director of the office.
Q. Who was that?
A. Mr. Frank Kaufman.
Q. Excuse me?
A. Mr. Frank Kaufman.
Q. Where there others at the office who were involved in attempting to develop that legislation?
A. Yes, there was.
Q. Do you recall who those individuals were?
A. Mr. Wade Ballard. That's the extent of my --
Q. What was Mr. Ballard's position?
A. He was the, I don't know if they called them assistant directors then or associate directors, but he reported to the director, Frank Kaufman. And he was responsible for the repository development program.
Q. What kind of work were they doing on the legislation?
A. Specifically, I don't recall. I don't really know specifically what they were doing.
Q. Did you, yourself, have any discussions of the legislation with Mr. Kaufman, or Mr.

28

Ballard, or others at the office?
A. Yes.
Q. Do you recall what those conversations involved?
A. More it was information -- you know, getting information from them. How's it going? You know, is it going to happen? Isn't it going to happen? That kind of thing.
Q. Were they looking for input from you on any of the issues relating to the legislation?
A. To the best of my remembrance, no.
Q. Did you have any discussions with legislative staff, congressional staff regarding the legislation?
A. To the best of my knowledge, no. But I do recall going to a meeting, you know, being involved sitting in a meeting where there was some discussion. It wasn't so much legislative staff, it was more lobbying staff, I guess.
Q. Do you recall when that meeting would have taken place?
A. No, I don't.
Q. Do you recall where it took place?
A. No, I don't.
Q. Do you recall who else was there on the

29

part of the Government?
A. I do recall Mr. Kaufman was there.
Q. Anyone else?
A. Not to my memory.
Q. Do you recall who was there from outside the government? You mentioned lobbyists. Do you recall anyone particularly?
A. Yes, I do.
Q. Who would that be?
A. Ed Davis from AMEC.
Q. And what is AMEC?
A. To the best of my knowledge, American Nuclear Energy Counsel, I believe.
Q. Anyone else that you recall being there?
A. Not that I recall, no.
Q. And what was discussed at the meeting?
A. The legislation and the status of the legislation. Again, what were the prospects? Was it going to pass or wasn't it going to pass?
MR. LESTER: Would you mind if we took a break for a moment, so I can get some more coffee?
MR. NESLIN: Sure. Let's take 10 minutes.
(Recess.)

30

(Whereupon, a document entitled Office of Civilian Radioactive Waste Management was marked Exhibit-1.)
BY MR. NESLIN:
Q. Mr. Rosselli, you're being handed what's been marked Exhibit 1 to your deposition. It's a series of organizational charts which bear Bates SN010806 through 010810. Could you review the first chart? Mr. Rosselli, would this be a chart depicting the organizational structure of the office of Civilian Radioactive Waste Management during the time that you worked within that office?
A. Yes.
Q. And during what years would that have been?
A. 1982 to 1984.
Q. And this identifies you as Associate Director, Management. You would have held that position throughout that period?
A. Yes.
Q. And it identifies certain responsibilities. The first is coordinating financial management. What did that mean?
A. First of all, it meant developing the

31

budget for the program, justifying the budgetary needs, and then involvement in the execution of the budget. Second part, it meant the financial control. And the third part had to do with setting up the fund.
Q. The Waste Fund?
A. The Waste Fund, yeah. And operating the Waste Fund.
Q. The second bullet refers to evaluating fee adequacy. What did that involve?
A. Well, the legislation gave a -- it set the fee at one mill per kilowatt hour. And there was a requirement in the legislation that once yearly, we would evaluate whether that was an appropriate fee.
Q. And you were responsible for overseeing that evaluation?
A. Yes.
Q. Did you conduct that evaluation yourself, or did other people conduct that at your direction?
A. It was the latter.
Q. Who undertook that work?
A. To be honest, I don't recall specifically.

32

Q. Do you recall that annual evaluations were performed during the period that you held this position?
A. I do recall at least one while I held that position, yes.
Q. Do you recall whether that work was done by the Department of Energy employees or by outside contractors?
A. No, I don't recall specifically.
Q. The next bullet refers to providing management support. What did that involve?
A. That involved the organizational development, putting together the organizational structure here that you see, and the functional statements that go with it. It involved human resources, recruiting, placement, promoting, you know, folks. It involved information, resource management, and the systems we would use. I'm going to put the -- in this one, the development of the contract with the utilities.
Q. Were you responsible for developing the contract?
A. Yes.
Q. And then, the last item is, coordinate the OCRWM Mission Plan. What does that refer

33

to?
A. There was, again, a requirement in the legislation that on a yearly basis, we would do a Mission Plan. And it encompassed the totality organization. So we had responsibility, my organization had responsibility for putting it all together, and we would work with the rest of the organizational entities in getting the information to include in there.
Q. Did you, in this position, report directly to the director of the office of Civilian Radioactive Waste Management?
A. Yes, I did.
Q. This chart identifies a J. W. Bennett as associate director for Geological Repository Deployment. Did Mr. Bennett hold that position throughout the period of time that you were employed in the office?
A. Yes, he did.
Q. And it identifies an R. H. Bauer as associate director for storage and systems development. And, again, did he hold that position during the entire time you were in the office?
A. I don't remember if he was there the

34

whole time.
Q. Do you recall who would have succeeded him in the position, or who he might have succeeded him, if there was another person in that position?
A. I don't remember who succeeded him.
Q. This also identifies a J. O. McElvey, as the Director of Institutional Relations Staff. Did he hold that position during the entire time that you were at the office?
A. To the best of my recollection, I believe he did, yes.
Q. And it shows R. L. Morgan as director of the office. Was Mr. Morgan the director during the entire period that you were there?
A. No, he wasn't.
Q. Who else held that position while you were in the office?
A. A gentleman by the name of Ben Rusche.
Q. Did Mr. Rusche follow or precede Mr. Morgan?
A. He followed Mr. Morgan.
Q. Do you recall about when?
A. No, I don't.
Q. And it identifies an M. J. Lawrence as

35

deputy director of the office. Did Mr. Lawrence hold that position throughout the entire time that you were at the office?
A. Yes, he did.
Q. Were there any other associate directors not reflected on this chart or any other subgroupings not reflected on this chart?
A. To the best of my recollection, no.
Q. If I could direct you to the next to the last page captioned Office of Management.
A. Okay.
Q. And ask you to take a look at that. Mr. Rosselli, does this chart depict the organization of the management during the period that you served as associate director?
A. To the best of my knowledge, it does.
Q. And does this reflect the division of responsibilities within the office of management?
A. To the best of my recollection, it does.
Q. Do you recall how many people were part of the office of management?
A. No, I do not.
Q. This indicates that a J. E. Yanoski was in charge of the finance division?
A. Yes, he was.

36

Q. Had he gone to work for anyone else?
A. I do not know.
Q. Do you know where Mr. Head is?
A. Yes. Mr. Head is still working in the office of Environmental Management in the Forrestal building.
Q. In Washington, D.C.?
A. Yes.
Q. And Mr. Brandt?
A. Mr. Brandt I believe retired.
Q. And do you know where he would be located today?
A. No, I don't.
Q. And in the office of management you were located back in Washington, D.C.?
A. Yes. Although the -- as I mentioned earlier, we had a split operation. And the finance division they were in Germantown.
Q. Mr. Rosselli, had you joined the office of Civilian Radioactive Waste Management before or after the NWPA was enacted?
A. Right after.
Q. And upon joining the office, what did you spend most of your time doing? What were your most important responsibilities at that

41

point?
A. To the best of my recollection, I was helping getting the organization, you know, developed and set up and getting the manpower transferred into the organization that we needed to do the job.
Secondly, the act had a couple of things that I had responsibility in that were front end loaded. That was the contract and getting the contract developed and signed by June 30 of '83.
And the third thing that went along with that was establishing the fund mechanism.
Q. How did you familiarize yourself with what the act required?
A. Well, I started by reading it.
Q. Did you do anything else?
A. Read the act. Read the legislative history to the degree it existed. And to the best of my knowledge, that's about it. And then started to live it.
Q. Had the department prepared any overviews or any briefing information that you relied upon?
A. I don't remember specifically, no.

42

Q. You mentioned that one of the things you worked on initially was the development of the standard contract. What was your role in the development of that contract?
A. I was the head of, let me call it a special project team, that had responsibility to see that the contract was developed in the time frame specified in the contract that would allow sufficient time for the utilities to, you know, be able to review and sign it.
Q. Special contract team. Who else was on that team?
A. There were two other individuals that were party to the team. Mr. Jay Cavanaugh who was from the office of procurement, and a Mr. Elliott Winneck, who was from the office of chief counsel.
Q. Who established the team?
A. I did, to what I remember.
Q. When did you begin working on the contract?
A. To the best of my knowledge, there -- well, I guess I don't remember the exact time frame we started working on it.
Q. Let me ask this. I'll represent to you

43

that the act was passed January 7th of 1983. Had you begun work on the contract prior to the time that the act passed?
A. No.
Q. So it would have been after the time that the act passed?
A. Yes.
Q. Therefore, sometime after January 7th of 1983?
A. Right.
Q. How did your team, your special contract team function?
MR. LESTER: I believe he called it a special project team.
MR. NESLIN: Sorry if I misspoke.
BY MR. NESLIN:
Q. The three-person team that you mentioned earlier, how did that function?
A. We got together, and we talked about what our objectives were. And then we would draw on various people in either the office of OCWRM -- I assume it's okay for me to say OCRWM without -- okay. The folks within OCRWM to support us and assist us. We would draw from

44

model?
A. I don't remember. I don't recall.
Q. Did you try to base it upon any particular documentation?
A. I do not recall.
Q. You mentioned that you received input and comment from the electric industry. Do you recall who provided that comment to you?
A. There were a number of sources. And what I do remember is that there were, you know, private utilities, and they were represented by EEI. There were public utilities, and I can't remember the APA, I think it was, but I don't want to swear to that. And there was also rural utilities. And then there were, I'll call them the public, you know, interest, you know, groups. And we received and interacted in the -- from time-to-time with all of those entities.
Q. And was that something that you decided to do, or did you receive direction to interact with these groups from your superiors?
A. I don't recall whether I was directed, or I did it myself. But I do know that we had a short time frame to get this done, and that

49

the legislation didn't outline everything that needed to be outlined. So we had to work together to get this thing, you know, developed. And that what we embarked upon was getting the widest amount of input we could from relevant parties.
Q. And when you say, "we had to work together to get this contract developed," are you referring to the department and the industry, utility industry?
A. Yes.
Q. Do you recall why the contract was developed as a regulation?
A. Yes. At initial point, we were looking at what we thought was a daunting task of trying to get a contract with each of the utilities, some who owned one or more reactors. And we felt it would be impossible in the time frame given to do that. So what we decided to do is go to a standardized contract and publish it in the federal register so that everybody could give comment, and we could react to it and come up with one instrument that everybody could use.
Q. Well, I understand from that answer why

50

you would want a standardized contract. But then why publish it as a regulation and adopt it as a regulation?
A. That I don't recall.
Q. You could have a standardized contract without it being a regulation, couldn't you?
MR. LESTER: Object --
THE WITNESS: I don't know the answer to that.
BY MR. NESLIN:
Q. Let me ask it this way. Other than helping to insure that there was simply one standardized form of contract, do you recall any other reason why the standard contract ended up being published as a regulation?
A. No.
Q. Do you recall who made the decision to publish it as a regulation?
A. No.
Q. You've mentioned time constraints in your testimony. Is it fair to say that you were operating under time pressure in developing this contract?
A. Yes.
Q. And these were time pressures created by

51

the legislation itself?
A. Yes.
(Whereupon, a document entitled Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste was marked Exhibit-2.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed what's been marked Exhibit 2 to your deposition. It's a document entitled Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste that's stamped draft and annotated with the words, "EEI's unsolicited comments on." Do you recall receiving comments from EEI on an early draft of the contract?
A. Yes.
Q. Do you recall receiving these comments?
A. I need to look at them.
Q. Please.
A. Could you repeat your question again now?
Q. Let me ask you a new question. Ignoring the annotations, does this appear to be an early draft of the standard contract?
A. Yes.

52

Q. Do you recall receiving an early draft of the standard contract back from EEI with comments or annotations?
A. Yes.
Q. Is this document the annotated draft that you received back from EEI?
A. That I do not recall.
Q. But you do recall EEI providing you written documentation or comments on a written draft?
A. Yes.
Q. And did you or your office provide an early draft of the standard contract to EEI for the purpose of obtaining comments?
A. Yes.
Q. Did you provide an early draft to other representatives of the utility industry for this purpose?
A. Yes.
Q. Did you receive back comments from other utility representatives?
A. To the best of my knowledge, yes.
Q. Why did you provide these early drafts to the industry for comment?
A. To go back to an earlier statement, we

53

were under a tight time frame that there was -- the legislation or statute, itself, and the legislative history, itself, certainly did not provide all the answers. We were working collaboratively with all the parties to develop a contract that people could find acceptable to the Government and the utilities.
Q. So providing an early draft to the industry for comment was part of your effort to work with the industry?
A. Yes.
Q. And to work with the industry to develop a contract that would be mutually acceptable to both sides?
A. Yes.
(Whereupon, a document entitled Proposed Rules, Department of Energy was marked Exhibit-3.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed what's marked as Exhibit 3 to your deposition. This is an electronic version of a notice of proposed rule making that was published in the federal register on February 4th, 1983. Are you familiar with such a public notice?

54

A. Yes.
Q. That was a notice of the proposed contract, proposed standard contract?
A. Yes.
Q. And the purpose of that was to solicit public comment on the proposed contract?
A. Yes.
Q. And this is a process that occurred after the iterative process that we've been discussing between the department and the utility industry?
A. Yes.
Q. Pre-publication. Correct?
A. Yes.
Q. If I could ask you to turn to page 4. Well, Mr. Rosselli, the first few pages of this notice include some background information. If you look on page 3, there is a heading Roman I, Legislative Background. On page 5, there is a heading Roman II, Proposed Rule and provides some summary information on the rule. Do you recall who drafted this background information?
A. No, I do not.
Q. Do you recall who approved the publication of this proposed rule for the

55

department?
A. No, I don't.
Q. It would have been approved by someone at the Department senior to you, before it was published in the federal register?
A. Excuse me?
Q. Sure.
MR. LESTER: Why don't we take a break for a couple of minutes so Mr. Rosselli can ask me the question he wants to ask me.
MR. NESLIN: That's fine. Should we break for five minutes?
MR. LESTER: That's fine.
(Recess.)
MR. NESLIN: Can you read back the last question?
(Record read.)
MR. LESTER: Objection, leading.
THE WITNESS: I don't recall.
BY MR. NESLIN:
Q. If I could ask you to turn to page 4. The paragraph is hard to identify here. I apologize for that. But you'll see after the number 6, the second paragraph below that begins, "The proposed standard contract." Do you see

56

MR. LESTER: Objection, leading.
THE WITNESS: Some, yes.
BY MR. NESLIN:
Q. Mr. Rosselli, what was the process that you followed in attempting to develop a final contract after the publication of Exhibit 3?
MR. LESTER: Objection, vague.
THE WITNESS: To the best of my recollection, the process was, we received comments on the draft contract. We evaluated those comments. And we framed our final rule.
BY MR. NESLIN:
Q. Who evaluated the comments?
A. The team that I referred to before had the principal responsibility to review the comments.
Q. And that would be you, Mr. Cavanaugh, and Mr. Winneck?
A. Yes, sir.
Q. If I could direct you back to Exhibit 3 for a moment, Mr. Rosselli. You see on the bottom of the first page with a heading for further information contact. First page, sir. The very bottom of the page.
A. Yes.

65

Q. It references you at the office of terminal waste disposal and remedial action. Is that where you were working at this point in time?
A. No.
Q. Do you know why it would provide that as a reference point for you?
A. I imagine it's just an error.
Q. You were working at OCRWM at that point?
A. Yes, I was.
Q. Let's go back. And you, Mr. Cavanaugh, and Mr. Winneck had reviewed the comments that had been submitted. Correct?
A. Yes.
MR. LESTER: Objection, leading.
BY MR. NESLIN:
Q. You modified the contract in some respects in response to comments?
MR. LESTER: Objection, leading.
THE WITNESS: Yes, we did.
BY MR. NESLIN:
Q. Did you continue to meet or confer with representatives of the utility industry following the public comment period?
A. Yes, we did. To the best of my

66

recollection.
Q. Were you meeting with the same representatives that you identified previously?
A. Point of clarity, I didn't identify anybody specifically earlier.
Q. You mentioned that you met with or conferred with EEI. I believe one or two other entities on behalf of --
A. Okay APA and the rules, et cetera?
Q. Yes.
A. To the best of my recollection, yes.
Q. And you continued to meet with them, because you continued to seek to work with them to come up with a final standard contract that would be mutually acceptable to both sides?
MR. LESTER: Objection, leading.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. Do you recall any issues where you and Mr. Cavanaugh or Mr. Winneck disagreed over how an issue should be resolved?
A. No, I don't.
Q. Your recollection is that you three were in agreement on the resolution of all of the issues raised during the public comment period?

67

MR. LESTER: Objection, leading. Misstates his prior testimony.
THE WITNESS: When we published the final rule, we were in agreement, yes.
(Whereupon, a document entitled U. S. Department of Energy memorandum was marked Exhibit-4.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed what's been marked as Exhibit 4 to your deposition. It's a Department of Energy memorandum entitled, Action Memorandum on Final Rule Making on Standard Contract for Nuclear Waste Disposal dated April 8th of 1983. Are you familiar with this document?
A. Yes.
Q. Did you help to prepare this document?
A. The best of my knowledge, in all probability, yes.
Q. What do you mean by that?
A. I think I did have a hand in preparing this document.
Q. Do you recall who else participated in preparing this document?
A. Not specifically, no.

68

Q. Would Mr. Cavanaugh or Mr. Winneck have participated in this?
A. To the best of my knowledge, they probably did.
Q. If I could direct your attention to the first page Bates number ZAB-001-0893, under the heading Discussion, the last sentence states, "Eight general policy issues arose from the comments, and we appropriately resolved these issues." Do you know what's meant be, "general policy issues?"
MR. LESTER: Objection. Calls for speculation.
THE WITNESS: Generally, yes.
BY MR. NESLIN:
Q. What's meant by the term, "general policy issues," in this document?
A. It had to do with positions the Department would take with respect to its interactions with the utility community on the contract.
Q. Were these the most important issues?
A. Yes.
Q. And you included this in the briefing memorandum to the secretary so that the secretary

69

would be familiar with these issues?
A. Yes.
Q. If I could ask you to turn to page ZAB-001-0899 through 0902. So those would be the last four pages of the document. Are these the general policy issues, to your recollection?
A. To the best of my recollection, they are.
Q. Now, I don't see any reference in these issues to the receipt rate at which the Department would receive spent nuclear fuel from the utilities. Do you know why that's the case?
A. To the best of my knowledge, I don't recall that being an issue from the Government's standpoint.
Q. It was not an issue from the Government's standpoint?
A. Yes.
Q. Do you recall it being an issue from the industry standpoint?
A. To my knowledge, no, I don't recall.
Q. You don't recall the issue coming up?
A. Yes. There were -- I mean, I do recall it coming up from the utility standpoint.

70

Q. You say it wasn't an issue from the Government's standpoint. Why was it not an issue from the Government's standpoint?
A. Because at the point in time of drafting this particular document, the Government wasn't in position to contemplate or set any type of receipt or acceptance rate.
Q. Why do you say that?
A. At this particular point in time, there wasn't a repository site that was selected. The facilities, you know, that would be needed to support the repository, you know, weren't designed or built. It was just too early. There were a lot of technical issues, you know, still on the table that had to be resolved and worked through.
Q. Did the Government have any criteria in mind for the rate at which it would receive spent nuclear fuel at this point in time?
MR. LESTER: Objection, vague.
THE WITNESS: To the best of my recollection, I do not recall.
BY MR. LESTER:
Q. So would it be your testimony, then, that the Government at this point in time did

71

not have a view as to the rate it would receive spent nuclear fuel from the utilities?
MR. LESTER: Objection. Vague as to the term -- not defining the word, the Government.
BY MR. NESLIN:
Q. Can you answer my question, sir?
A. Yes, we did not have a view.
Q. If you did not have a view, then, you did not have a position on the rate at which spent nuclear fuel would be received by the Government either. Is that correct?
MR. LESTER: Objection, leading.
THE WITNESS: To the best of my knowledge, that is correct.
BY MR. NESLIN:
Q. Now, one of these issues -- enumerated as issue number seven on page 0901, 0902 refers to utilities' rights to audit the waste disposal fund. Do you want to review that paragraph, sir? Mr. Rosselli, by audit is this issue referring to a financial audit of the fund?
A. It's broader than a financial audit.
Q. What else was encompassed by this issue?
A. It was a management audit.

72

Q. Let me back up then. What was the importance of the 1998 date for you as you understood it?
MR. MILLER: Objection, vague. And I believe asked and answered. Go ahead.
THE WITNESS: That was the date specified in the statute that the Government would have a repository available to accept spent nuclear fuel or high-level waste.
BY MR. NESLIN:
Q. Did that date enable utilities to plan for the disposal of their spent nuclear fuel?
MR. MILLER: Objection. Calls for speculation.
THE WITNESS: I don't know.
MR. LESTER: Lacks foundation.
THE WITNESS: I don't know the answer to that from a utility perspective.
BY MR. NESLIN:
Q. You don't know whether having a specific date by which the Department would begin accepting spent nuclear fuel would allow utilities to make plans regarding the disposal of their fuel?
MR. MILLER: Same objections.

93

THE WITNESS: Having a repository available on January 1st, 1998 was only one step having to do with delivery of it. You had to have a rank ordering. You had to, you know, develop a delivery commitment schedule. All things that would occur after or just before. I guess, there was a timetable when they would first do it, so much better planning would come subsequent, you know, to this contract signing.
BY MR. NESLIN:
Q. There would be additional planning?
A. Right.
Q. But was it still intended in developing this contract, did you anticipate that the Department would begin receiving spent nuclear fuel from the utilities in January of 1998?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: Yes.
MR. NESLIN: You may answer.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. And isn't that, in fact, what the utilities were receiving in return for the fees

94

they were paying to the Department?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. And they were paying hundreds of millions of dollars to the Department. Correct?
A. Yes.
Q. And in return, the Department was to begin picking up their spent nuclear fuel January of 1998. Correct?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: Yes.
(Whereupon, a document entitled Department of Energy and signed by Rovert M. Rosselli was marked Exhibit-7.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed what's marked as Exhibit 7 to your deposition. It's a cover letter from you, and attached to it is a report on financing the disposal of commercial spent nuclear fuel and processed high-level radioactive waste. Do you recall this document?
A. Yes.

95

Q. Was this document prepared as part of the fee-adequacy assessment?
A. I don't recall.
Q. Do you recall why it was prepared?
A. Yes.
Q. Why was it prepared?
A. To evaluate the income that would be received into the fund from the utilities for the amount of spent nuclear fuel or high-level waste that was generated based on the amount of electricity that was produced against the estimated programmatic cost to characterize, design and build the repository associated facilities, waste forms, et cetera.
Q. How did that differ from the fee-adequacy assessment process?
A. I don't recall if there was much difference. I really don't.
Q. If I could direct your attention to Bates numbered page PNL02802022. Do you generally recall the process that was followed in this document in estimating the cost of operating the waste management system programmatically?
A. Do I recall?
Q. Generally, the process that was followed?

96

A. No, I don't.
Q. Do you recall, was it based upon a reference case? A set of assumptions regarding how the waste management system would operate?
MR. MILLER: Objection. Asked and answered.
THE WITNESS: No, I don't.
BY MR. NESLIN:
Q. Well, let me direct your attention to Bates PNL-028-2022. This is a table "3-1, Key Reference Case Assumptions. Item one. Number of geological repositories - 2." Would that refer to the number of geological repositories that were anticipated be part of the program?
MR. MILLER: Objection. Calls for a legal conclusion. Document speaks for itself.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. At that time, did you anticipate that there would be two geological repositories as part of the program?
A. No.
Q. What was your expectation regarding the number of geological repositories that would be

97

part of the program?
A. At the time, there definitely would be one.
Q. Why does this document use two as it's key reference case assumptions?
A. Because at the time, there were two site characterization efforts going on in the totality. One had to do with a first repository. And that was looking at the media of salt, both dome imbedded, tough and basalt.
And then, there was a fledgling second repository program that was particularly looking at granite as the median in multiple states. But it was a smaller program at that particular point in time. And there was no real assurances whether it was going to go forward or not.
Q. Item three here says that the repository design receipt rates for the first five years is at 1,800 metric tons per year. And the next 21 years of 3,000 metric tons per year. Do you see that?
A. Yes.
Q. Was that the Department's projected repository design receipt rates at the time this

98

report was prepared?
A. Based on the assumptions of this case, yes.
Q. Do you know where those -- well, I guess -- okay. I ask you to turn to page 2024 table 3.3. This is table 3.3 Reference Case Material Flows. And you'll see various columns. Repository 1, Repository 2, Total to the Government, Cumulative. Was this reference case used in estimating the cost of the program?
A. I don't specifically remember.
Q. Do you know who prepared this projection of material flows at the two repositories?
A. This was done by Pacific Northwest National Laboratory.
Q. Do you know who at Pacific Northwest?
A. I do not recall.
Q. Do you know what the basis of these numbers in this table are? By numbers, I'm referring to the receipt rates of 1,800 for a five-year period and then 3,000 thereafter?
A. Specifically, no. The difference in the totals was that you had a start-up cost. That's why it was less than what you got. Once 2003 came, you were at full production

99

capability.
Q. Was this work that was done under your supervision?
A. Yes.
Q. Did you review this report, before it was circulated for comment?
A. Yes.
Q. Did you agree with these numbers?
A. I don't recall.
Q. Did you consider these numbers to be reasonable at the time?
A. I don't recall.
Q. Did you consider them to be achievable at the time?
A. I don't recall.
Q. Do you recall the Department using other receipt rates for purpose of calculating the programmatic costs?
A. No, I don't.
Q. Would these numbers reflect your office's best estimate at that point in time, as to the rates at which SNF would be received by the Department?
A. I don't recall.
Q. Would it have been -- I appreciate that

100

A. Yes, he would.
Q. Can you think of anyone else, sitting here today, at the Department who would have been involved in the fee adequacy analysis process?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: No.
BY MR. NESLIN:
Q. Do you recall any of the Department's contractors being involved in that process?
A. Yes. Pacific Northwest National Lab was involved in that process.
Q. Who at Pacific Northwest National Lab would have been involved?
A. I don't recall the specific individuals.
(Whereupon, a document entitled Business Operations and Waste Fund (BOWF) Steering Committee was marked Exhibit-11.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed Exhibit 11 which is a memorandum from you to Mike Lawrence, William Bennett and Ed Hanrahan dated July 15th, 1983, with various attachments. Could you read the memorandum? You don't need to

117

read the attachments at this point.
A. Okay.
Q. Mr. Rosselli, do you remember what the purpose of this memorandum was?
A. No, I don't.
Q. You appear to be setting up a management system for your -- or a business operations and waste fund steering committee. Do you recall that?
A. No, I don't.
Q. You don't recall developing such a committee?
A. No, I don't.
Q. The last paragraph of this cover memo states that -- the second sentence, "It is clearly time to instill a degree of coordination in our various activities, and it can only be done with your help." Were you concerned in July of 1983 that the offices activities were not coordinated?
A. I don't recall.
Q. Let me ask you to turn to page PNL-021-0219. There is several pages of handwritten information here. Do you recognize the handwriting?

118

A. No, I don't.
Q. Is that your handwriting?
A. No, it isn't.
Q. Let me direct you to PNL-021-0223. This is a handwritten chart. Do you recognize this handwriting?
A. No, I don't.
Q. It's not your handwriting?
A. No, it's not.
Q. You earlier testified that you participated in developing the Mission Plan?
A. Yes.
Q. What was your role in the development of the Mission Plan?
A. To see that a product was prepared.
Q. Were you in charge of the Mission Plan preparation?
A. Yes.
Q. During what period, did you work on the Mission Plan?
A. Well, based on my recollection, it was in the latter part of my tenure in the office.
Q. Do you recall working on the Mission Plan at the same time you were working on the standard contract?

119

A. No, I don't recall.
Q. You just don't recall one way or the other?
A. I don't recall one way or the other. As far as I can remember from a priority standpoint, we set up the organization. We worked on the fund mechanism and the contract about the same time. And I believe fee adequacy stuff and Mission Plan, kind of, followed. But if there was overlap and how much overlap, I can't recall.
Q. Who else worked on the Mission Plan development?
A. Well, certainly Mr. Head, but beyond that, I just couldn't tell you.
Q. Do you recall whether Mr. Yanoski worked on it?
A. I don't remember.
Q. Mr. Perry?
A. I don't remember.
Q. Do you recall whether people in other branches such as Mr. Bennett, or Mr. Bauer, or Mr. McElvey worked on it?
MR. LESTER: Objection. Asked and answered.

120

keeping with the Department of Energy's continuing commitment to inform public utility companies and other interested parties of all aspects of DOE's civilian radioactive waste management program."
Was this letter and the attached report, in fact, forwarded to utility companies?
A. To the best of my knowledge, it was.
Q. And was it sent for the purpose of informing them of all aspects of DOE civilian radioactive waste management programs?
MR. MILLER: Objection -- withdrawn.
THE WITNESS: That was the stated intent, yes.
BY MR. NESLIN:
Q. Is that your recollection?
A. That was my recollection, yes.
Q. If we could go back to Exhibit 12, the cover memo from Mr. Williamson. The first sentence states that, "Attached is a revised Mission Plan strategy overview based on the discussions in our last planning session."
Do you recall whether you and others in the Department had planning sessions to

133

work on the Mission Plan or the Mission Plan strategy?
A. I do not recall.
Q. Do you recall meeting with the individuals listed, under distribution on this memo, with respect to the Mission Plan strategy?
A. I do not recall.
Q. Assuming that planning sessions were held regarding the Mission Plan strategy, would it have been your practice or the Department's practice to prepare minutes of those planning sessions?
A. Based on my personal experience, you know, normally, you don't have minutes of meetings that you hold, no.
Q. Would there have been any documentation prepared regarding such meetings?
A. I don't recall.
(Whereupon, a document entitled Civilian Radioactive Waste Management Program Mission Plan was marked Exhibit-13.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed Exhibit 13 to your deposition. It's a document entitled, Civilian Radioactive Waste Management

134

Program Mission Plan, Volume I, Overview and Current Program Plans, December 20, 1983. And it includes in large type "draft." You were still at OCWRM in December of 1983. Correct?
A. Yes, I was.
Q. Do you recall a draft of the Mission Plan being produced on or about December 20th of 1983?
A. No, I don't.
Q. Do you recall when the first draft of the Mission Plan was prepared?
A. No, I don't.
Q. Can you think, is there any documentation that might refresh your recollection as to when the first draft of the Mission Plan was prepared?
A. Only this Exhibit 13.
Q. If you would turn to page 1-1 of the exhibit, under introduction, the third paragraph. Could you review that paragraph to yourself?
Mr. Rosselli, the first sentence states that, "Every activity specified in the Mission Plan is targeted toward one fundamental objective: to accept commercial high-level radioactive waste for safe management,

135

storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998."
Was it your understanding that that was OCRWM's fundamental objective?
A. Yes.
Q. What do you mean by firm schedule?
MR. MILLER: Objection. Calls for speculation and a legal interpretation and legal conclusion.
MR. NESLIN: You may answer.
THE WITNESS: Oh --
MR. MILLER: Oh, I'm sorry, yes. Please. Remember you can answer, except when I tell you don't answer that.
THE WITNESS: Okay. Firm schedule, based upon my recollection, would be the delivery commitment schedules.
BY MR. NESLIN:
Q. So your recollection that the reference to "firm schedule" refers to the delivery commitment schedules?
A. That's correct.
Q. The next sentence states that, "The waste acceptance schedule will initially preclude

136

the need for additional at-reactor storage after January 31, 1998, and ultimately, removed from at-reactor storage all waste that is more than five years old."
Do you recall, was that one of the intended objectives of the waste acceptance schedule included in the draft Mission Plan that is, "To preclude the need for additional at-reactor storage after January 31, 1998?"
A. I don't recall.
Q. Do you recall why this language was included in the draft Mission Plan?
A. No, I don't.
Q. You were responsible for preparing the draft Mission Plan. Is that correct?
A. Yes.
Q. It was prepared under your supervision?
A. Yes.
Q. Would you have reviewed this draft of the Mission Plan?
A. Yes.
Q. Would you have approved its circulation in this form?
A. To the best of my recollection, yes.
Q. So would you have agreed with the

137

statement in that sentence that, "The waste acceptance schedule will initially preclude the at-reactor storage after January 31, 1998?"
A. As a planning basis, yes.
Q. What do you mean, "as a planning basis?"
A. The Mission Plan was the plan relative to how we would respond to the requirements of the Act.
Q. And what is a plan? What's the significance of describing it as a plan, sir?
A. It's a road map in terms of how you anticipate getting from point A to point B and what are assumptions you have built into that to make that plan possible.
Q. But that road map did reflect DOE's intention for how it would get from point A to point B at that point in time, didn't it?
A. That's correct.
Q. This was accurate to the best of your understanding at that point in time?
A. That is correct.
Q. You considered it to be reasonable?
A. I considered it to be accurate at that point in time, yes.
Q. If you could go to page 2-1 Program

138

Strategy, the next to the last sentence in the first paragraph, sir, states, "The waste materials will be accepted in accordance with a waste acceptance schedule designed to provide an acceptance rate in the first 5 years, such that no utility will or have to provide additional storage capacity after January 31, 1998." You would have reviewed that language, wouldn't you?
A. Presumably so, yes.
Q. You would have approved that at that point in time for purposes of circulation, wouldn't you?
A. Yes.
Q. You would have consider that to be accurate at that point in time?
A. Yes.
Q. The next sentence states that, "Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year." And again, you would have considered that to be accurate at that point in time?
A. Yes.
Q. The last sentence on this page, page 2-1, "Until 1998, each utility will be

139

responsible for providing its own additional on-site interim storage, unless the utility applies for and is certified for the federal interim storage program." Do you see that?
A. Yes.
Q. Was it your understanding that after 1998, the Department of Energy would become responsible for providing or eliminating the need for additional on-site storage?
A. Yes.
Q. If I could direct you to page 2-2, the last paragraph on this page which carries over to the top of page 2-4. Could you review that paragraph, sir? You've reviewed that paragraph, Mr. Rosselli?
A. Yes, I have.
Q. Does this paragraph refresh your recollection, at all, about the purpose or perceived benefits of the exchange provision in the contract?
A. Yes.
Q. How does that refresh your recollection?
A. To the point that after 1998, the utilities would not have to build on-site storage. They could rely upon the Government to

140

either accept the fuel for disposal or provide some other means.
Q. And exchanges would help to implement the objective?
A. Apparently, that's what it says, yes.
Q. So would it be fair to say that exchanges would help DOE to realize at least one of the objectives set forth in this Mission Plan, that is, avoiding the need for utilities to add at-reactor storage after 1998?
A. Relative to the planning basis, yes.
Q. You say, "the planning basis." But that planning basis would reflect the Department of Energy's intention at that point in time?
A. Yes.
MR. MILLER: Objection. Calls for speculation and a legal conclusion.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. If you turn back to table 2-1, preceding page. Do you see that table, sir?
A. Yes, I do.
Q. The table is captioned, Waste Acceptance Schedule. Do you see that?
A. Yes.

141

Q. And it, again, shows two repositories in operation. Correct?
A. Yes.
Q. First repository coming on line in 1998. Correct?
A. That's right.
Q. Second repository coming on in 2003?
A. Yes.
Q. Each repository operating or receiving waste at a rate of 1,800 MTU for a period of five years. Correct?
A. Yes.
Q. And then receiving waste at a rate of 3,000 MTU thereafter. Correct?
A. Yes.
Q. And this table indicates that those rates would be sufficient to meet the annual discharge rate from both operating reactors and also decommissioned reactors beginning in 2003. Do you see the line for 2003?
A. Yes.
Q. Would you agree with my characterization?
A. Would you say it again for me please?
Q. This table indicates that the Department's waste acceptance schedule would

142

receive waste -- it would meet the annual discharge rate from both operating reactors and decommissioned reactors beginning in 2003?
A. Yes. The two repositories could receive 4800. Discharge rate is something like 3500 so, yes.
Q. That's a discharge rate from both operating and decommissioned reactors?
A. That's correct.
Q. Do you recall who prepared this table?
A. No, I don't.
Q. Do you know what the basis of this table was?
A. No, I don't.
Q. But this table stated the Department's intention regarding its waste acceptance schedule as of December 1983. Correct?
MR. MILLER: Objection. Calls for speculation and a legal interpretation.
THE WITNESS: It stated the Department's plan, the intention at that time.
BY MR. NESLIN:
Q. You would agree it stated the Department's intention at that point in time?
MR. MILLER: Same objections.

143

THE WITNESS: The Department's plan at that point in time.
BY MR. NESLIN:
Q. Did the Department's plan reflect its intention?
A. Yes.
Q. And again, you reviewed this part of the document -- you would have reviewed this part of the document?
A. Yes.
Q. And you would have approved it for purposes of circulation?
A. I either would have approved it or recommended approval for the director of the office.
(Whereupon, a document entitled Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting was marked Exhibit-14.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed Exhibit 14 to your deposition. This is a document entitled Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting, December 12 through 15, 1983, Washington, D.C.

144

If you would turn -- and I'll represent this is not the entire document. It's an excerpt from the document. Pages 1112, which are program overview, it's a presentation given by Robert Morgan.

Do you recall Mr. Morgan giving a presentation in December 12 to 15, 1983, regarding the implementation of the Nuclear Waste Policy Act?

A. No, I don't.

Q. I'll ask you to review page SNO69599 please. Have you reviewed the first page, Mr. Rosselli?

A. Yes.

Q. Do you recall having any input into this presentation by Mr. Morgan?

A. No, I don't.

Q. Did you recall reviewing this program overview in any form?

A. I probably did.

Q. Why do you say you probably did?

A. Because the first paragraph had a lot of the accomplishments that my group was involved in.

Q. And I note that the second column talks

145

at some length about the draft Mission Plan. And you would have been responsible for the draft Mission Plan as well, sir?

A. Yes, that's correct.

Q. The first paragraph in the second column states that, "We've just received the preliminary draft of Volume I of the Mission Plan. And we hope to have this available to interested parties in the states and others by Christmas." Would that be referring to Exhibit 13?

A. That's my assumption, yes.

Q. Do you recall that the first draft of the Mission Plan was, in fact, circulated to interested parties, states, and others?

A. I don't recall.

Q. Do you recall whether it was circulated outside the Department?

A. I don't recall.

Q. Mr. Rosselli, I direct you to the fourth paragraph of the second column. Third sentence reads, "Technically the Act does not specify how much waste of spent fuel we must begin receiving at that time. In fact, if we accepted one spent fuel element in 1998, we would technically be in accordance with the Act. However, we did

146

not believe that that meets the intent of the Act." Do you see that language?

A. Yes, I do.

Q. Would you agree that accepting one spent fuel element in 1998 would not meet the intent of the Act?

A. Yes.

Q. That would not comply with the Department's obligations under the Act?

MR. MILLER: Objection. Calls for speculation and a legal conclusion.

THE WITNESS: Yeah. I don't recall the specific language in the Act.

BY MR. NESLIN:

Q. But my question was, would the Department receiving a -- with the Department accepting a single spent fuel element in 1998, would that have complied with the Department's obligations under the Act, as you understood them?

MR. MILLER: Same objections.

THE WITNESS: Well, technically, I would assume that our obligation was to start accepting spent fuel by 1998, January 1998. So if we took one, we would be meeting our

147

obligation under the Act.

BY MR. NESLIN:

Q. Is that all the Act required the Department to do, is to accept one spent fuel assembly, sir?

MR. MILLER: Same objection.

THE WITNESS: I do not believe that the Act was specific in terms of one or many.

BY MR. NESLIN:

Q. But I'm asking you about the intent behind the Act. You had an understanding of the intent behind the Act in preparing the contract and working on the Mission Plan, didn't you?

A. Yeah. I don't think the intent was that if we only accept one. And I think that Mr. Morgan stated that here in a public address.

Q. You would agree with what Mr. Morgan said here?

A. Yes. Yes, I would.

Q. It goes on to the say that, "The basic strategy which we've outlined in the Mission Plan is that, beginning in 1998, utilities will not have to provide any additional storage facilities on-site." Is that a true statement?

148

A. That is.
Q. And was that, in fact, what the utilities were paying for?
MR. MILLER: Objection. Calls for speculation and a legal interpretation.
BY MR. NESLIN:
Q. Do you understand my question, sir?
A. I think the utilities were paying for disposal services.
Q. And were they paying for disposal services sufficient that they would not have to add additional storage on site?
MR. MILLER: Same objections.
THE WITNESS: After 1998, yes.
BY MR. NESLIN:
Q. You would agree?
A. Yes.
Q. If I could direct you to the next paragraph, second sentence states that, "So by the year 2000 or 2001, we should be accepting in the repository the amount of fuel as being discharged from the reactors." Is that a true statement, to your knowledge?
A. I don't recall.
Q. Well, he's stating that by 2000 or 2001,

149

you would be accepting spent nuclear fuel at the same rate as that being discharged by the reactors. Is that your understanding?
MR. MILLER: Asked and answered.
THE WITNESS: Yes, I don't recall.
BY MR. NESLIN:
Q. The next page, page SNO69600 states that, "It is anticipated that at that point it would look at bringing home the second repository." It's referring to the years 2000 and 2001. That would be the effect of the waste acceptance schedule set forth in table 2-1, Exhibit 13, wouldn't it?
MR. MILLER: Objection. Calls for a legal conclusion. Document speaks for itself.
THE WITNESS: Could you repeat your question again please.
MR. NESLIN: Could you read the question back to the witness?
(Record read.)
THE WITNESS: Well, that doesn't have the second repository -- 2-1 doesn't have the second repository receiving until 2003. So

150

he's off a little bit in timing, but the intent, I think, is the same.
BY MR. NESLIN:
Q. Well, if you would read the balance of that paragraph, Mr. Rosselli.
A. Okay.
Q. This indicates that by approximately 2001/2001, that time period, there may be some reactors which have reached the end of their designed life time and will have to be shutting down. And that the second repository could receive the fuel from the basins of those reactors so that they could go through the appropriate decommissioning aspects. Do you see that?
A. Yes.
Q. Does that refresh your recollection regarding the intended purpose or application of the paragraph in the final contract dealing with shutdown reactors and priority for shutdown reactors?
A. No, it doesn't.
Q. Do you recall any discussions regarding the effect of the Mission Plan schedule on shutdown reactors?

151

A. No, I don't.
MR. MILLER: Do you mind if we take a break now, Dave, since you're in between documents?
(Recess.)
(Whereupon, a letter from Robert Morgan to Russell Stanford of the Edison Electric Institute was marked Exhibit-15 marked.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed Exhibit 15 which is a December 20, 1983 letter from Robert Morgan to Russell Stanford of the Edison Electric Institute. Could you review the letter?
A. Oh, okay.
Q. Mr. Rosselli, does this document refresh your recollection regarding whether Exhibit 13, the December 20, 1983 draft Mission Plan was circulated for comment to the utilities?
A. I don't remember.
Q. If you could look at the first sentence, it states that, "The enclosure to this letter is the first volume of the most recent working draft of the Mission Plan." Do you see that?
A. Um-hmm.
Q. Does that appear to refer to Exhibit 13?

152

MR. MILLER: Objection. Calls for speculation.
THE WITNESS: I don't know the answer to your question.
BY MR. NESLIN:
Q. Do you recall there being multiple drafts of the Mission Plan in December of 1983?
A. I don't recall.
Q. Well, does this letter indicate that the Department circulated a draft of the Mission Plan on or about December 20th to Edison Electric Institute?
A. From the context of this letter, it appears that that is true.
Q. Would you have been involved in that process, sir?
A. I don't remember.
Q. And does this letter indicate that the Department would have requested comment from the Edison Electric Institute on the then current draft of the Mission Plan?
A. Based upon the last paragraph, that is correct.
Q. Does this letter also indicate that the Department would have similarly sought comment

153

from other federal agencies, congress, state government, Indian tribes, utilities and nuclear industries?
MR. MILLER: Document speaks for itself.
THE WITNESS: Based on the first paragraph, yes, it does.
(Whereupon, a statement of Michael J. Lawrence, acting director, Office of Civilian Radioactive Waste Management, Department of Energy, was marked Exhibit-16.)
BY MR. NESLIN:
Q. Mr. Rosselli, Exhibit 16 is a statement of Michael J. Lawrence, acting director, Office of Civilian Radioactive Waste Management, Department of Energy, before the Subcommittee on Energy Conservation and Power, of the House Committee on Energy and Commerce, dated February 22, 1984.
Do you recall acting director, Lawrence, appearing before such a subcommittee on or about February 22 of 1984?
A. I don't recall, no.
Q. If you could glance at the document and tell me whether you recall reviewing this

154

document at any time in the past. Do you recall reviewing this testimony?
A. No, I don't.
Q. Mr. Rosselli, do you recall participating in the preparation of testimony for Mr. Lawrence at any time?
A. No, I don't.
Q. Do you recall participating in the preparation of other congressional testimony during the time that you were at OCWRM?
MR. MILLER: Objection, vague.
THE WITNESS: No, I don't.
BY MR. NESLIN:
Q. If you could look at page PNL-173-0226. The first paragraph of the -- let me back up. This page is captioned, Summary of Statement by Michael J. Lawrence. First paragraph discusses the budgeting process for OCRWM. Do you see that?
A. Yes.
Q. And if you skip down to the third paragraph, it talks about various accomplishments that have occurred since the passage of the NWPA. And these include establishing a fee collection system. Do you see that, the second

155

bullet?
A. Yes.
Q. And contracting with the nuclear utilities is the third bullet. Do you see that?
A. Yes.
Q. And this testimony was given on February 22nd, 1984. That would have been the period at which you were still at OCRWM. Is that correct?
A. Yes.
Q. Given the fact that Mr. Lawrence was discussing the budgeting process and the fee collection process and the contracting process, do you believe that you would have reviewed this testimony before it was given?
MR. MILLER: Objection. Asked and answered.
MR. NESLIN: You may answer if you can.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. Because he was discussing various facets of the program that you were in charge of?
A. Yes.

156

Q. If we could turn to page PNL-173-0228. If I could ask you to review the last -- point you to the last paragraph of the text of this page which states that, "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule" -- well, let me back up. The preceeding sentence states that, "The programs activities are fashioned on the fundamental objective of the Nuclear Waste Policy Act of 1982, which is: to accept high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998."

The next sentence goes on to say, "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998, and ultimately, remove all eligible waste from at-reactor storage." Do you see that language?

A. Yes.

Q. Would you agree with that language?

A. Yes.



Q. Did that language state the Department of Energy's position in February of 1984, to your knowledge?

A. Yes.

Q. Would it be fair to say that as of February 1994, the Department believed that an appropriate waste acceptance schedule would preclude the need for additional at-reactor storage after January of 1998?

A. Yes.

Q. And would it be fair to say that the Department believed that such a schedule would reflect the intent behind the Act?

MR. MILLER: Objection. Calls for a legal conclusion, speculation.

THE WITNESS: What do you mean by the word "intent?"

BY MR. NESLIN:

Q. The intent of congress. Well, let me -- the intent of congress in enacting the Act?

MR. LESTER: Same objection.

THE WITNESS: The intent of congress was what?

BY MR. NESLIN:

Q. In enacting the Act?



A. Was what?

Q. To provide that the utilities would not need to store additional waste at reactors after January 1998? In other words, that the Department would be responsible for addressing the waste generation following January of 1998?

MR. MILLER: Same objection, vague.

THE WITNESS: I need to clarify a point on this. And maybe it extends back to some of the previous discussions we had on the Mission Plan. I think it's important to recognize it was the intent of the Mission Plan, okay? In terms of how we -- and the Mission Plan was to define how we would carry out the provisions of the Nuclear Waste Policy Act. So it was the intent of the plan that described how we were going to accommodate the needs of the utilities.

In no way, shape, or form was it a contractual intent that we would make all the things happen that was in the Mission Plan.

BY MR. NESLIN:

Q. But it reflected the Department's intent at that point in time?



MR. MILLER: Objection. Same --

BY MR. NESLIN:

Q. In administering the program?

MR. MILLER: Same objection.

THE WITNESS: Again, I have to go back, and in your definition, it was an intent of the Mission Plan, not a contractual intent. And I think we have to go back to previous questions that you asked me on this. I think the distinction is extremely important here.

BY MR. NESLIN:

Q. Let me back up. That intent reflected, whether you call it a plan or contract, it reflected what the Department intended to do as of that point in time. Do you understand my question?

MR. MILLER: Same objections.

THE WITNESS: The intent of the plan in terms of how we would carry out the Nuclear Waste Policy Act, was to have a repository in place in 1998 and begin receiving spent nuclear fuel from reactors on a schedule that would preclude -- that would match their

generation rate and, you know, which would then preclude them from having to build additional on-site storage capacity. That's different from contractual intent.
BY MR. NESLIN:
Q. What do you mean by contractual intent?
A. What do I mean by contractual intent?
Q. Yes, sir.
A. Contractual intent was, I guess, the quid pro quo between, you know, two parties that in exchange for the utilities paying us one mill per kilowatt hour, we would provide a disposal facility to receive and dispose of their spent nuclear fuel.
Q. And what's the basis of that understanding? Where does that understanding come from, sir?
A. That understanding came out of the Department and negotiation of the contract.
Q. So what was, in your mind, the contractual intent? Do you recall that issue?
MR. MILLER: Objection. Asked and answered. Calls for a legal conclusion.
BY MR. NESLIN:
Q. What were the utilities receiving in

161

return for paying the one mill? Making the one mill payment?
MR. MILLER: Objection. Asked and answered.
THE WITNESS: Disposal services.
BY MR. NESLIN:
Q. Disposal services beginning in January of 1998?
MR. MILLER: Objection. Asked and answered. Calls for a legal conclusion.
BY MR. NESLIN:
Q. Is that correct?
A. Yes.
Q. And disposal of substantial amounts of spent nuclear fuel?
MR. LESTER: Same objections.
THE WITNESS: That doesn't talk about the amounts at all.
BY MR. NESLIN:
Q. Well, sir, you -- if we go back to Exhibit 14, second column.
A. Page?
Q. Page SNO69599. Mr. Morgan's testifying or a portion of Mr. Morgan's presentation in which he talks about the fact that he did not

162

believe that accepting one spent fuel element would meet the intent of the Act. Do you see that language?
A. Yes.
Q. And you would agree with that. Correct?
A. Based upon the plan I would agree with that.
Q. Mr. Rosselli, did you discuss any of your prior testimony with your counsel during the last break?
MR. MILLER: Don't answer that. Objection. Calls for privileged communication.
MR. NESLIN: I'm not asking what was said. I'm simply asking whether he discussed his prior testimony.
MR. MILLER: The substance of our discussions with Mr. Rosselli are subject to attorney/client privilege, and don't answer that.
MR. NESLIN: You're instructing the witness not to answer?
MR. MILLER: That's correct.
(Whereupon, a document entitled Battelle, Human Affairs Research Centers was marked Exhibit-17.)
BY MR. NESLIN:

163

Q. Mr. Morgan, Exhibit 17 is a memorandum from Thomas Overcast and Susan Carney at Battelle to Emmett Moore?
MR. LESTER: I think it's Mr. Rosselli.
MR. MILLER: Yeah, you misspoke and said Mr. Morgan.
MR. NESLIN: Mr. Rosselli. Excuse me. I'd like to direct you to page 2 of that document. PNL-117-3152 under heading 3.0, DOE Considers Temporary At-reactor Storage. Would you read those two paragraphs please?
BY MR. NESLIN:
Q. Mr. Rosselli, in the first paragraph, it refers to you speaking at, "An Atomic Industrial Forum Conference in Atlanta." Do you see that?
A. Yes.
Q. Do you remember participating in such a conference?
A. No, I don't.
Q. Do you recall during the time that you were at OCRWM making any presentations to outside groups on the waste management program?
A. Yes, I do. I remember being in the same forum as the conference that Mr. Morgan

164

spoke at, I believe in Washington, D.C.
Q. That was the proceedings of the 1983 Civilian Radioactive Waste Management information meeting?
A. I believe so.
Q. In December of 1983?
A. I think so, yes.
Q. Do you recall what the subject of your participation was?
A. I vaguely remember it had to do with the Waste Fund and the operation of the Waste Fund.
Q. Did you prepare a written paper that you submitted?
A. Oh, what I remember, yes.
Q. And did you appear and actually present the paper and give a speech?
A. I gave a speech.
Q. Did you retain a copy of that paper?
A. No.
Q. Your remarks?
A. No.
Q. Do you know who might have a copy of those remarks?
A. No.

165

Q. You say that it addressed the Waste Fund. What aspect of the waste fund did you address?
A. I don't remember the specifics at this point.
Q. What do you remember about it?
A. Very little outside of the fact that I was on the docket to speak.
Q. Do you recall making any other presentations regarding the waste management system during the period that you were at OCRWM?
A. To the last public forum, no, I don't.
Q. And in paragraph 3.0 on page PNL-117-3152 in the second paragraph the last sentence states or attributes to you the statement that, "DOE plans to provide the capability to accept waste at the reactor site in accordance with the waste acceptance schedule so that utilities will not be required to continue adding additional storage capacity beyond 1998." Do you see that?
A. Yes.
Q. Does that refresh your recollection at all?
A. I don't remember the speech. I do

166

remember internal discussions in the Department to be consistent with the Mission Plan that said, utilities would not have to, at their own cost, build additional on-site storage. That we were looking at options, should a repository be delayed beyond 1998. And these were some of the, you know, options that were under consideration.
Q. And internal discussions among who?
A. DOE, OCRWM staff. Specifically, I couldn't remember and tell you.
Q. Would it have been senior staff at your level?
MR. LESTER: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. And did you agree with that view that DOE should be accepting waste -- or that DOE planned to accept waste at a rate such that utilities would not be required to add storage after 1998?
A. That was consistent with, you know, the Mission Plan that we were putting together and the intent of that plan.

167

Q. You agree with that?
A. Yes.
Q. You say that DOE was looking at certain options. Are you referring to the options discussed in the preceeding sentences of this document?
A. Yes.
Q. That's at-reactor cask storage and a monitored retrievable storage system?
A. Yes.
Q. Were there other options that DOE was considering?
A. I honestly don't remember that.
Q. DOE would pay for the implementation of those options?
A. Yes. Let me -- yes, we would. Because we were going to build a monitor retrievable storage out of the -- yes. So whether it was casks at reactor sites or shipment to an interim storage facility, yes.
Q. And the effect of that would be that individual utilities would not have to add storage after 1998?
A. Yes.
Q. Or incur any costs associated with

168

additional storage needs after 1998?
A. That's the assumption, yes.
Q. Do you recall discussing those options with the utilities themselves?
A. I don't recall, no.
(Whereupon, a document entitled Program Strategy and dated February 29, 1984 was marked Exhibit-18.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed a document captioned, Program Strategy with a draft and the date of 2-29-84. And a designation RW-30 on the first page. Do you know what RW-30 refers to?
A. If I remember correctly, that was the geological repository organizational unit. Bill Bennett's unit.
Q. Mr. Bennett's unit?
A. I believe so, from my memory.
Q. Do you recognize the annotations on this document? The handwriting?
A. No, I don't recognize the handwriting.
Q. Do you recognize this document? Have you reviewed this document before? Is it familiar to you?

169

MR. LESTER: Objection, compound.
BY MR. NESLIN:
Q. Do you recall reviewing this document before?
A. No.
(Whereupon, a document entitled United States Government Memorandum and dated June 4, 1984 was marked Exhibit-19.)
BY MR. NESLIN:
Q. Mr. Rosselli, Exhibit 19 is a memorandum from William Bennett to various individuals dated June 4, 1984. You see the first sentence in this document. It sates that, "An OCRWM program wide is under way to assess the existing spent fuel disposal contract?"
A. Yes.
Q. Do you recall such an effort?
A. No, I don't.
Q. Do you recall reviewing this memorandum previously? I note that you're listed as a CC.
A. No. I left in May, so I didn't get this document.
Q. The next sentence in the document states that, "As part of this effort, we have had our

170

technical support contractor, Weston, review the spent fuel disposal contract to determine if any additional provisions or revisions will be required to assure that it meets our program's technical acceptance requirements." Do you see that?
A. Yes.
Q. Do you recall Weston undertaking such a review?
A. No, I don't.
Q. Do you recall other reviews of the contract being undertaken after the time that it was adopted in final form and before the time that you left OCRWM?
A. No, I don't. By the way, if I could correct an earlier statement. Seeing these RW10, 20, 30's, when I say it was geologic repository RW-30, it wasn't. It was the interim storage.
Q. That was the section for --
A. Exhibit 18.
Q. -- storage and systems development?
A. Yes.
Q. Under Mr. Bauer?
A. Yes. That's RW-30.
Q. So that would indicate that Exhibit 18

171

draft was prepared by Mr. Bauer?
A. Or his organization. It's within his organization.
(Whereupon, a document bearing Bates SNO44976 was marked Exhibit-20.)
MR. NESLIN: Mr. Rosselli, Exhibit 20 a press release. Could you review it please.
MR. MILLER: Dave, I object to your characterization of the document, okay?
BY MR. NESLIN:
Q. Mr. Rosselli, do you recall discussions within the Department about revisions to the standard contract?
MR. MILLER: Objection. Asked and answered.
THE WITNESS: No.
BY MR. NESLIN:
Q. Does this document refresh your recollection about that issue in any way?
A. No.
Q. The fourth paragraph from the bottom says that, "Rusche said the primary purpose of revising the contracts was to assure utilities that they will not have to build more 'swimming

172

pools,' for temporarily storing the wastes beyond 1998." Do you recall any discussions with Mr. Rusche on that issue?
A. No.
Q. Do you recall seeing this document previously?
A. No.
Q. If there was an internal process to evaluate revisions to the contract during the time that you were at OCRWM, would you have been part of that process as associate director of management?
A. Yes.
Q. Sitting here today, you have no recollection that such a process was under way before you left?
MR. MILLER: Asked and answered.
THE WITNESS: No.
MR. NESLIN: Let's take a break. Five minutes.
MR. LESTER: Sure.
(Recess.)
(Whereupon, a document dated June 21, 1984 to Secretary Hodel was marked as Exhibit-21.)

173

BY MR. NESLIN:
Q. Mr. Rosselli, Exhibit 21 is a letter from Senator Bennett Johnston to Secretary Hodel, dated June 21st, 1984. Now, I note that this does post date the time that you've testified you left OCRWM. In looking at this, do you have any recollection of this letter?
A. No, I don't.
Q. Mr. Rosselli, the last paragraph on the first page, Senator Johnston expresses concern over the fact that the nuclear waste program is going to cost utility rate payers billions of dollars and that there was a need to provide assurance that the Department would begin -- further assurance regarding the fact that the Department would begin receiving nuclear waste on a specific schedule. Do you recall --
MR. MILLER: Objection to the characterization of that paragraph.
BY MR. NESLIN:
Q. Do you recall during your tenure at OCRWM concerns being expressed by members of the senate or congress regarding the Department's ability to perform under the contract?
MR. MILLER: Objection, vague.

174

THE WITNESS: No, I don't.
BY MR. NESLIN:
Q. Do you recall any concerns being expressed by Congress regarding the implementation of the contract during your tenure at OCRWM?
A. No, I don't.
(Whereupon, a document dated September 7, 1984 was marked Exhibit-22.)
BY MR. NESLIN:
Q. Mr. Rosselli, Exhibit 22 is a letter from Secretary Hodel back to Senator Johnston dated September 7, 1984. Would you review that letter please. Do you recall reviewing this document before?
A. No.
Q. Does this refresh your recollection in any way regarding any discussions that you may have been party to within the Department concerning changes or amendments to the standard contract?
A. No.
Q. Do you have any knowledge why the Department did not incorporate into the contract's provisions which specified the minimum amount of spent fuel and waste which the

175

Department will be obligated to accept not later than January 31, 1998, as Secretary Hodel suggests would occur?
A. No.
(Whereupon, a document entitled The Mission Plan: Volume I, Overview and Current Program Plans was marked Exhibit-23.)
BY MR. NESLIN:
Q. Mr. Rosselli, Exhibit 23 is a document captioned, The Mission Plan: Volume I, Overview and Current Program Plans by Robert M. Rosselli. Four Fuel Cycle Conference '84, Atomic Industrial Forum, Inc., Westin Peachtree Plaza, Atlanta, Georgia. April 3, 1984. Could you review the first three pages?
Does this refresh your recollection, at all, regarding whether you participated at the fuel cycle conference in April 1984 in Atlanta, Georgia?
A. I must have, yes.
Q. Does it refresh your recollection? Do you have any memory of it?
A. Yes, I do.
Q. What do you remember about it, sir?
A. I gave a speech.

176

Q. Do you recall what the purpose of the conference or program was?
A. No, I don't.
Q. Do you recall what groups or individuals might have attended the conference?
A. No, I don't.
Q. Do you recall that your speech involved the Mission Plan?
A. Until seeing this, no, I didn't.
Q. Upon seeing it, you now recall it involved the Mission Plan?
A. Yes, I do.
Q. If I could direct you to page 5 of this document. The paragraph under program strategy. If you could review that paragraph. It carries over on to page 6.
A. Okay.
Q. Have you had a chance to review it, Mr. Rosselli?
A. Yeah. The first paragraph on page 6 through the first paragraph on page 7.
Q. Yes, under Program Strategy. The second sentence under Program Strategy states that, "Keep in mind that the fundamental objective of the program is to begin accepting civilian

177

radioactive waste on a firm schedule by January 31, 1998." Do you see that?
A. Yes.
Q. Those were your words, sir?
MR. MILLER: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. You believe that to be true?
A. Yes.
Q. The next sentence states that, "A key point here is that the Department does not intend to delay or postpone the schedule of acceptance, even if a permanent geologic repository cannot be completed by that time." Those, too, are your words?
MR. MILLER: Same objections.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. You consider them to be true?
A. Yes.
Q. And if a permanent geologic repository could not be completed by January 1998, that was the strategy at that time, to attempt to accommodate storage needs through its federal

178

interim storage or a monitored retrievable storage facility?
A. It was the plan that if the repository wasn't ready, they were looking at other alternatives like at-reactor storage or a monitored retrievable storage.
Q. By the "plan," do you mean DOE's plan?
A. Yes, our Mission Plan.
Q. The top of page 6, the last sentence in the carry-over paragraph, "This approach is designed to ensure that all utilities will be able to establish firm planning schedules for the disposition of their radioactive wastes early enough to determine their on-site interim storage needs prior to 1998." Those, too, were your words?
A. Yes.
Q. You consider those to be accurate, at the time you wrote them?
A. Yes.
Q. What did you mean by, "utilities establishing firm planning schedules?"
A. Delivery commitments.
Q. And it was your expectation that this would enable them to on-site interim storage

179

needs prior to 1998?
MR. MILLER: Objection. Asked and answered.
THE WITNESS: Yes.
BY MR. NESLIN:
Q. And by prior, you're referring to the period prior to 1998?
A. Yes.
Q. After 1998 the Department would either begin receiving such waste or would implement some interim measure, such as interim storage or a monitored retrievable storage facility?
MR. MILLER: Objection. Mischaracterizes the document.
MR. NESLIN: You may answer, sir.
THE WITNESS: It was in the Department's plan that after 1998 they would provide some capability, whether it was at the reactor site or some other means to store the waste.
BY MR. NESLIN:
Q. So that in any event, the utilities would not have to provide additional waste on-site after 1998?

180

A. Additional storage capacity on-site after 1998, yes.
Q. Do you recall what the purpose of discussing the Mission Plan at this conference was?
MR. MILLER: Objection. Asked and answered.
THE WITNESS: The purpose was that we wanted to, as we said earlier, we wanted to be open to our constituency. And the draft had been put out. We were going to sort off the final draft, as they called it. And this was an opportunity to summarize where we were at that particular point.
Q. To provide information to the industry?
A. Yes.
Q. On the Mission Plan?
A. Yes.
Q. Do you know who else worked on this presentation? Did anyone else work on it?
A. I don't know the answer to that.
Q. Would it have been reviewed or approved by anyone else in the Department?
A. I don't remember.
Q. Do you remember any practice that

181

someone discussing the program at a conference of this sort would have to secure approval from anyone at the Department?
A. The normal procedure within the Department at that time was that, if given this was a major speech, it would be reviewed by some other parties.
Q. Who would those other parties have been?
A. Public affairs would be an example. Within your own internal program office, they would look at it for factual accuracies.
Q. Anyone else?
A. Not to my remembrance.
Q. Would you assume that such a review was done here?
A. Yes.
Q. What was the purpose of providing information on the draft Mission Plan to the industry?
MR. MILLER: Objection. Asked and answered at least three or four times.
THE WITNESS: To inform them of our plans?
BY MR. NESLIN:
Q. Did you intend for them to use this

182

information in their own planning?
A. I don't recall that being -- whether that was the intended purpose or not.
Q. You have no recollection, sitting here today?
A. No.
Q. When you refer to the Mission Plan being a planning document, are you referring to planning both by the Department and by the utilities which are contract -- parties to the contracts with the Department?
MR. MILLER: Objection. Asked and answered.
THE WITNESS: This is a planning document that the Department was using to define how we would be carrying out the statute, the provisions of the statute.
BY MR. NESLIN:
Q. Did you anticipate that the utilities would use it as well?
MR. MILLER: Objection. Asked and answered.
BY MR. NESLIN:
Q. Or to understand how the Department would be carrying out its responsibilities?

183

MR. MILLER: Same objections.
THE WITNESS: I didn't anticipate one way or the other what the utilities would do.
BY MR. NESLIN:
Q. Well, if you had no expectation as to how they would use it, why did you provide it to them?
MR. MILLER: Objection. Asked and answered at least three or four or five times now.
THE WITNESS: It was a clear open policy within the office to talk about our plans. What folks did with that is out of my control.
BY MR. NESLIN:
Q. But you were providing the information to them. Is that it?
A. Yes, we were.
MR. NESLIN: Can we go off the record here?
(Discussion off the record).
(Whereupon, the deposition recessed at 5:39 p.m.)

185

184

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY CONNECTICUT YANKEE ATOMIC POWER COMPANY
MAINE YANKEE ATOMIC POWER COMPANY FLORIDA POWER & LIGHT COMPANY
NORTHERN STATES POWER COMPANY DUKE POWER, A Division of DUKE ENERGY CORP.
INDIANA MICHIGAN POWER COMPANY SACRAMENTO MUNICIPAL UTILITY DISTRICT
SOUTHERN NUCLEAR OPERATING COMPANY, et al. COMMONWEALTH EDISON COMPANY
BOSTON EDISON COMPANY GPU NUCLEAR, INCORPORATED WISCONSIN
ELECTRIC POWER COMPANY POWER AUTHORITY OF THE STATE OF NEW YORK
OMAHA PUBLIC POWER DISTRICT NEBRASKA PUBLIC POWER DISTRICT
TENNESSEE VALLEY AUTHORITY,

Plaintiffs, vs. Case Nos. 98-126C, 98-154C, 98-474C
98-483C, 98-484C, 98-485C 98-486C, 98-488C, 98-614C
UNITED STATES, 98-621C, 99-447C, 00-440C 00-697C, 00-703C, 01-115C
01-116C, 01-249C DEFENDANT.

________________________

VOLUME II DEPOSITION OF ROBERT M. ROSSELLI

Taken on behalf of Sacrament Municipal Utility District April 16, 2002

\- - -

BE IT REMEMBERED THAT, pursuant to the Washington Rules of Civil Procedure, the deposition of Robert M. Rosselli was taken before Marta M. Rice, a Certified Shorthand Reporter, and a Notary Public for the State of Washington, on April 16, 2002, commencing at the hour of 9:07 a.m., the proceedings being reported at the Hampton Inn, 486 West Bradley, Richland, Washington.

APPEARANCES

ARNOLD & PORTER
BY: DAVID S. NESLIN
370 Seventeenth Street
Denver Colorado 80202-1370
303-863-2301
E-mail: David_Neslin@aporter.com
Appearing on behalf of Sacramento Municipal Utility

SHAW PITTMAN
BY; DANIEL S. HERZFELD
1650 Tysons Boulevard
McLean, Virginia 22102-4859
703-770-7612
E-mail: Daniel.herzfeld@shawpittman.com
Appearing on behalf of Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear Inc., Power Authority of the state of New York, Omaha Public Power District, and Nebraska Public Power District

BALCH & BINGHAM

BY: K. C. HAIRSTON
1710 Sixth Avenue North
Birmingham, Alabama 35203
205-251-8100
E-mail: Kchairston@balch.com
Appearing on behalf of Alabama Power, Georgia
Power, and Southern Nuclear

JENNER & BLOCK
BY: DONALD R. CASSLING
One IBM Plaza
Chicago, Illinois 60611-7603
312-222-9350
E-mail: Dcassling@jenner.com
Appearing on behalf of Commonwealth Edison
Company

U.S. Department OF JUSTICE
CIVIL DIVISION
BY: HAROLD D. LESTER, JR. and R. ALAN MILLER
1100 L. Street, N.W.
Washington, D.C. 20530
202-307-6288
E-mail: harv.lester@usdoj.gov
alan.miller@usdoj.gov

Also Present:

Peter J. Skalaban, Jr.

RICHLAND, WASHINGTON,
APRIL 16, 2002,
9:07 a.m.
EXAMINATION
BY-MR.NESLIN:
Q. Mr. Rosselli, I remind you that you're still under oath from yesterday. Do you understand?
A. Yes.
Q. And we'll follow the same ground rules that we discussed in the beginning of your deposition yesterday, okay. Do you recall?
A. Yes.
Q. Have you discussed your deposition with anyone since the time that we broke yesterday and this morning?
A. No.
Q. I'd like to clarify one point that we discussed yesterday afternoon with respect to Exhibit 13, the December 20, 1983 draft of the Mission Plan. Mr. Rosselli, am I correct that this draft does reflect the intent of the Department, as you understood it at the time it was issued?
A. The intent of the Department as it

190

relates to its plans to fulfill the requirements of the statute, yes.
Q. It reflects how the Department expected to fulfill it's requirements under the statute?
A. Yes.
(Whereupon, a document entitled Mission Plan for the Civilian Radioactive Waste Management Program, dated April of 1984 was marked Exhibit-24.)
BY MR. NESLIN:
Q. Mr. Rosselli, you've been handed what's been marked Exhibit 24 to your deposition. This document is entitled Mission Plan for the Civilian Radioactive Waste Management Program dated April of 1984. Would you have been responsible for the preparation of this document, sir? And let me clarify that this is not the entire document. It's simply, I believe, the first two chapters of a much lengthier document.
A. Given the fact that the Mission Plan was under my responsibility, I would conclude, yes.
Q. And you were still at OCRWM as of April 1984?
A. Yes, I was.
Q. Would you have reviewed this before it

191

was published in this form?
A. I don't recall.
Q. Sir, as you've testified that you would have been responsible for the preparation of the Mission Plan, apparently a Mission Plan, this April draft, was prepared, was published. Pages 1 and 2 indicate that it was circulated to various parties by the Department. Based upon that, would you believe that you would have reviewed it before it was circulated?
A. The transmittal letter on this thing is dated May 2nd, '84. And I do not recall when I started to actually disengage. If memory serves me correctly, I was here in Richland in the first part of May. And so I don't recall the extent and degree of my actual review of this before it went out.
Q. Do you recall reviewing drafts of the Mission Plan subsequent to December 20th of 1983?
A. Yes, I did. I have reviewed those documents. Those are per all your documents.
Q. And I'm talking about drafts after, that were prepared after Exhibit 13?
A. No, I don't recall that. I just don't recall.

192

Q. Do you recall the process that the Department followed in going from the December 20th, 1983 draft to the April 1984 draft?
A. Specifically, no, I don't recall the exact process.
Q. Do you recall anything about the process?
A. No, I don't.
Q. Do you recall who was involved in attempting to revise the plan?
A. Specifically, no.
Q. I believe you testified yesterday that the Mission Plan work was coordinated by Mr. Head in the operations division?
A. That's correct.
Q. Would Mr. Head have been involved in the preparation of the April 1984 draft?
A. Yes. I can only assume, you know, at this point in time, given the functional responsibilities of that organization and the fact that it fell under my responsibility that, you know, there was a process, and those players were involved from the initial draft to the second draft to the final.
Q. If I could direct you to page 2-1 of

193

# RUSCHE

UNITED STATES COURT OF FEDERAL CLAIMS
YANKEE ATOMIC ELECTRONIC ) CA NO. 98-126C
COMPANY, )
PLAINTIFF, )
)
VS. )
)
THE UNITED STATES, )
DEFENDANT. )
______________________________)
)
MAINE YANKEE ATOMIC POWER ) CA NO. 98-474C
COMPANY, )
PLAINTIFF, )
)
VS. )
)
THE UNITED STATES, )
DEFENDANT. )
______________________________)
)
CONNECTICUT YANKEE ATOMIC ) CA NO. 98-154C
POWER COMPANY, )
PLAINTIFF, )
)

2

VS. )
)
THE UNITED STATES, )
DEFENDANT. )
______________________________)

Deposition on oral examination of BEN RUSCHE, VOLUME 1, reported by Brad H. Thomas, Certified Realtime Reporter and Notary Public in and for the State of South Carolina; said deposition taken pursuant to notice of deposition and in accordance with the Federal Rules of Civil Procedure, at the Sheraton Hotel, 2100 Bush River Road, Columbia, South Carolina, commencing on Thursday, May 16, 2002, at the hour of 9:20 a.m.

2 Appearances: Representing the Plaintiffs: JERRY STOUCK, ESQUI

3

This deposition is taken in accordance with the Federal Rules of Civil Procedure.

It is agreed and stipulated by the deponent and respective counsel that the reading and signing of the deposition by the deponent is expressly not waived.

Whereupon:

BEN RUSCHE, being duly sworn and cautioned to speak the truth, the whole truth and nothing but the truth, testifies as follows:

EXAMINATION

4

BY MR. STOUCK:
Q. Good morning, Mr. Rusche. We have met before, and we greeted briefly before the deposition started. Have you been deposed before?
A. I believe I have.
Q. Okay. Do you recall when?
A. Not for this purpose.
Q. I understand.
A. I think I had -- I was in an arbitration proceeding in the last year.
Q. Within the last year?
A. Yes. For a company which I'm associated with.
Q. Okay. Prior to that had you been deposed?
A. I don't believe so.
Q. Okay. Well, let me just briefly go over some of the ground rules. I'm going to be asking you --
A. May I have a pad in case I want to jot down something?
Q. Sure. Have you got one? Because I've got a spare.
A. I think I've got one.
Q. Okay. If you've been through it within

5

the last year, you're kind of an old pro, but I'm going to be asking you a series of questions. And we want your best answers.

If you don't understand one of my questions or if you need a clarification, please feel free to ask. And if you -- otherwise I'm going to assume that you understand the questions. Okay?

A. Yes.

Q. And it's very informal, as you can tell. So if you would like a break for any reason at any time, just let me know, or if there's anything else we can do for you during the course of the day, we'll try to accommodate you. Sometimes -- is Mr. Miller representing you here today?

A. He is indeed.

Q. Okay. He may object to some of my questions. And that happens from time to time, but you are obliged to answer the questions after the objection is noted, unless he instructs you not to answer. And that may happen from time to time. I don't know. If he instructs you not to answer, then fine, but if he objects, after the objection is stated, you should answer the

6

question. And I think that's about it. What have you done to prepare for this deposition?

A. Well, I got a copy of the subpoena about a week ago, I guess.

Q. Okay.

A. Beyond musing in my mind as to the subject matter and the circumstances, nothing.

Q. Okay. Haven't reviewed any documents?

A. I have reviewed the NWPA. I have a copy of the Act.

Q. Okay.

A. And I have reviewed a bound volume of testimony on the Amendments Act, of which I was a major participant before I left the Department.

Q. Okay. And that was testimony given to Congress?

A. Yes.

Q. Okay. Any other documents that you reviewed in preparation for today?

A. No.

Q. Okay. Did you meet with Mr. Miller?

A. Yesterday for the first time.

Q. Okay. And about how long did that meeting last?

A. Thirty minutes.

7

Q. Okay. And when did Mr. Miller's and the Department of Justice's representation of you as counsel begin?

A. I don't remember the exact date. I'm sure it's -- I'm sure it's in the record. I don't have it.

Q. Was it prior to the time a week ago when you got the subpoena?

A. Yes. Yes.

Q. And just tell me the circumstances of how that representation was arranged. Was there a phone call or --

A. I believe that -- I believe you called me after the original suit had been decided, and you and I had a brief conversation, which was purely social.

And sometime thereafter, I don't know -- I can't predict or can't recall exactly when, apparently a potential witness list was provided to the Department.

And it was out of that activity that I got a call from the Justice Department suggesting or telling me that my name was on the witness list and that I had the option to have a member of the Department or the Department represent me. This

8

is some -- certainly some weeks, if not months ago. I can't tell you --

Q. Okay. I was going to ask whether it was several years ago?

A. No. No. No. No. No. No. No.

Q. It was within the last six months, you think?

A. As best I can recall.

Q. Okay. Now, prior to that time when the government or someone from the government called you and indicated that your name had appeared on the witness list and offered you the option of representation, which apparently you took up?

A. I did. I did.

Q. Prior to that time did you have any discussions with anyone from the Department of Justice or the Department of Energy about this litigation?

A. No.

Q. Okay. All right.

A. Excuse me. I just -- I thought I -- if it's not inappropriate, you may see my face reddening. I take Niacin in copious quantities. And I take it in the morning, and I forgot to bring it for lunch, and at lunch. I'm taking

9

about 1,500 milligrams.
And I'm one of the people that tolerate it well, but you may see my face appear to be flaming. And if you do, it is Niacin and not your presence.
Q. Well, I'll tell you something. I appreciate that, but I'm color-blind. And so I didn't even notice it.
A. You may see the thermal aura that's around me.
Q. You look nice and tan to me, and I didn't even notice it, but thanks for pointing that out.
Is there anything about that medication or any other medication you are on that would prevent you from giving your best answers?
A. Absolutely not. It's purely my choice.
Q. All right. I would like to ask you about your professional experiences. And I happen to have --
MR. STOUCK: Well, can you mark this as, I guess, Exhibit 1 to this deposition.
(Exhibit No. 1 was marked for identification.)
Q. (Mr. Stouck) Mr. Rusche, you've been

10

handed a document that's been marked Exhibit 1. It appears to be a resume or vita for you. It's dated November 1997. Do you recognize this?
A. 19 what?
Q. It's dated at the top of the first page November 1997.
A. Yes, 1997.
Q. Do you recognize this?
A. Yes, I do.
Q. Did you prepare this?
A. Yes.
Q. Okay.
A. It is not current.
Q. Right. I understand that. Let's try to bring it current. We'll try to bring it current in the course of our discussion here, but would you -- I guess on Pages -- there's a chronological -- the first couple pages are qualitative, I'll call it, the first page and a half, but then there's a chronological listing of your positions that starts on Page 2 and continues on Page 3 and continues on Page -- over all the way almost to the very end.
Would you just take whatever time you need to look at that. And I think we can save a

11

lot of time here with questions if you can just tell me that that's either accurate or point out the respects in which it may not be accurate.
A. It's accurate up to the date that it includes.
Q. All right. Well, let's start there with the date that it includes is 1996 dash. It says you were president of Management & Technical Resources, Inc. Is that still your position?
A. It is one of them, yes.
Q. It's one of them. Okay. So you still hold that position. And if you were to update this -- and also it indicates here, it's still an open matter, that you are chairman Law/Spear, S-p-e-a-r, LLC. Do you still hold that position?
A. No. The LLC was closed about six months ago.
Q. All right. And the business no longer exists?
A. Correct.
Q. Okay. So do you hold any other positions besides president of Management & Technical Resources?
A. Yes.
Q. All right.

12

A. I'm on the board of directors of the Swedish nuclear company called STUDSVIK, S-T-U-D-S-V-I-K, Inc., which is a U.S. subsidiary of a parent corporation, STUDSVIK AB in Sweden.
I'm on the Nuclear Advisory Council for the governor of the State of South Carolina. And it is called the Nuclear Advisory Council.
Q. Okay.
A. As a -- the vehicle Management & Technical Resources, Inc. is my consulting company, and I have several contracts through MTR.
Q. All right. And what -- anything else that you can think of?
A. Let me just think a minute. I think all the other things that I'm doing, I'm doing through MTR.
Q. All right. So I think you just may have answered this question, but this Management Technical Resources you described as your consulting company, would you say generally you are employed in the consulting business?
A. Beg your pardon?
Q. Are you today generally employed in a consulting business? Is that what you do for a living?

13

A. On a part-time basis, yes.
Q. Part-time basis?
A. Yes. It's far from full-time.
Q. And the other part-time is what? Are you --
A. My wife's husband and my son's father and so forth.
Q. Play golf?
A. I occasionally go out, but some would argue whether I play.
Q. All right. What business is this Swedish nuclear company in? And are they -- is it a generating company?
A. No. They are a waste treatment company.
Q. Waste treatment?
A. Yes.
Q. All right. Waste meaning spent nuclear fuel?
A. No.
Q. All right. What kind of waste?
A. Primarily irradiated materials, in particular reactor effluents, resins. And in Europe -- they are probably the largest provider of such services to Europe, things like contaminated materials from construction, resins,

14

and such things.
Q. Low-level waste?
A. Well, some of it is greater than Class C.
Q. All right. What about high-level radioactive waste from reprocessing facilities? Is that part of -- is part of the business of the Swedish company dealing with that material?
A. So far as I know, not so.
Q. All right. And does this Swedish company have any business operations in the United States?
A. Yes.
Q. Okay. Same business?
A. Treatment of -- primarily the treatment of resins from power reactors.
Q. Nuclear power reactors?
A. Yes.
Q. All right. And so the Swedish company has customers that are domestic U.S. nuclear generating companies?
A. Absolutely.
Q. All right. Now, this Nuclear Advisory Council for the governor of the State of South Carolina, what does that Advisory Council do?

15

A. It meets at least at the call of the governor. And we have generally met, since it's been reconstituted, about once a quarter. It responds to requests from the governor and/or his energy office and staff to conduct appraisals, evaluations, or considerations.
And on our own initiative, that is the initiative of the Council itself, may engage in discussions or considerations which could end up with comments or recommendations to the governor based on our collective knowledge.
Q. About what kinds of matters?
A. Just about anything that has radiation attached to it or nuclear attached to it.
Q. Okay. Including disposal issues?
A. Disposal issues. Barnwell, for example, as a disposal site. Savannah River, which has been a major consideration for the last months, years, couple years -- well, I guess I've -- the Council was only recently reconstituted. And that's in the last year and a half or so.
Q. Okay.
A. Let's see. Savannah River has occupied a fair amount of the Council's time because of plutonium movements in the complex. Barnwell, the

16

most recent issue was the long-term care provisions for Barnwell in the Atlantic Compact now.
Q. Okay. What is the concern about the plutonium movements at Savannah River?
MR. MILLER: Objection. Vague.
Q. (Mr. Stouck) You may answer.
A. Savannah River is a very large facility, a nuclear facility in South Carolina, and thus is a major economic as well as operational factor.
The consideration that is the most current one is the -- goes to the Department's proposals and plans for addressing the whole complex and optimizing the storage and treatment of materials in the past as well as preparations for the future.
And the issue for plutonium is the interest in moving plutonium from some of the sites elsewhere in the country where they have been under -- where plutonium has been a factor and collecting plutonium in one place for further treatment.
And Savannah River is a site which has been at least suggested, if not proposed, for treating some of that plutonium in a number of

17

Q. Well, that may answer my next question, which is why did you leave? Because you -- the deal was you were going to come for a couple of years and start the system and then leave?
A. Correct.
Q. And you did and then you left?
A. Then I went back to DuPont.
Q. But that was the arrangement from the time you started the position?
A. From the beginning, yes.
Q. Went back to DuPont in Wilmington. And then apparently in 1978 came back to South Carolina?
A. Yes.
Q. As the executive director of the South Carolina Energy Research Institute?
A. Correct.
Q. And what is that? What was at that time that organization and what did they do? What did it do?
A. It was an organization that was formed by a group of private companies with some -- I suspect some interest, if not suggestion, by the governor, who was then Jim Edwards, that the State needed to have some activity of this sort, but not

30

government.
It was a purely private venture. And so a group of corporations banded together and established the Institute and invited me to become its first director.
Q. Okay. When you say activity of this sort, your resume says --
A. Everything, but nuclear. We did nothing nuclear.
Q. Okay. Research, promotion?
A. Research, industrial research for efficiency improvement, safety improvements, all uses of energy and efficiencies and such things.
Q. Okay. And then you were asked, according to your resume, to do some work at Three Mile Island?
A. Yes.
Q. All right. It says requested -- your resume says requested by industry and government?
A. Yes.
Q. To direct waste management activities. Can you specific -- tell me more specifically how it is that you came to direct the -- is it correct that you -- yeah, director. Came to direct the clean-up activities at Three Mile Island? Did you

31

get a phone call?
MR. MILLER: Objection. Compound.
Q. (Mr. Stouck) Did you get another phone call or how did it happen?
A. The chairman of my board of directors at the Research Institute was Bill Lee, who was also one of the leading members of the nuclear industry.
And when the event occurred I was invited, if not directed, to be ready. And within a few days I was on the site. This private institute and its directors responded to the industry's interest and need and sent me there.
Q. Okay. So it was largely -- or at least Bill Lee had a role in arranging for your directorship?
A. Absolutely. Absolutely.
Q. Okay. Now, you mentioned Jim Edwards. How did you come to know the Governor Jim Edwards?
A. Yes. The Honorable Jim Edwards.
Q. The Honorable Jim Edwards. You mentioned him in connection with your work with this South Carolina Energy Research Institute. How did you come to know Mr. Edwards?
Was it at -- let me ask another

32

question. I'm sorry. Was it at that time that you first came to know him in '78 to '80 or --
A. I had known him earlier. Before I went to Washington I was kept, in a very casual way some would say, involved in public service. I was school board chairman in Aiken for a number of years. And the Governor -- had occasions to get to know the Governor through that circumstance.
Q. Okay. Then after Three Mile Island what was -- after Three Mile Island you went to work at the Department of Energy in Washington, it looks like, in 1981?
A. Let me see what you're looking at here.
Q. This is on Page 3 near the bottom. I'm working my way up.
A. Yes. Again, Secretary Edwards or the Governor had been a part of the Reagan team and was appointed Secretary of Energy. And I was, I guess the right term still is, a Schedule C appointee to serve as his special assistant for policy and programs.
Q. Right. And did you have any particular duties or responsibilities there or were you just the -- I mean, were you focused on nuclear matters or was it just generally --

33

A. Primarily nuclear matters.
Q. Okay. Were there other special assistants that focused on other matters for him?
A. He had one -- a second special assistant who was focused on management.
Q. Okay. And now if you look at this page and go up, there are -- it's a little unclear to me exactly what happened here in the '81, '82, '83 period because there are several, I guess, jobs. There are several positions listed with concurrent and overlapping dates. Do you see that?
A. Yes.
Q. Okay. Could you just explain to me how all that worked? It looks like you were at -- if you go up to the top of Page 3, it says special assistant to the Secretary '81 to '83. And then -- but there are also some other matters you did during that period. So what was going on there? Were you -- or was there some problem with --
A. The first entry related to the transition period.
Q. By first you mean the one that's lower down the page?
A. Lower down. And the -- I think the upper entry is probably just an oversight on my

34

part, and it's probably a duplicative entry in that sense.
However, the NRC Task Group, which I participated in, was while I was still in the Department. And it was a group on improving cost and effective operations in the government that was chaired by Roger Milliken and a fellow who was the president of Dow Chemical, I believe. It was one of President Reagan's early attempts to try to bring industrial management considerations into the government.
Q. Okay.
A. And I was a part of the private sector survey on cost and management control related to the operations of NRC and FERC.
Q. The agencies?
A. The agencies.
Q. Okay.
A. So this group was evaluating the effectiveness of the operations. And I was engaged in that activity along with several other people.
Q. Okay. Then it looks like you consulted -- and so after the -- you were on the Reagan transition team at the Energy Department? Is

35

that --
A. Yes.
Q. Then you left that, it looks like, and did some consulting for a couple years?
A. Yes.
Q. Which leads us up to one of the more prominent topics for today, which is how is it that you came to be the director of the Office of Civilian Radioactive Waste Management?
A. I received a call from Don Hodel, and said he would like to discuss some matters with me. And out of that discussion, over a period of some weeks or a month or two, came to the conclusion that he wanted to recommend to the President that I be appointed. And I agreed, eventually.
Q. Okay. Were there other names that he discussed with you of other people for that position?
A. He asked for my advice, if I had any other names. And there must have been a list of a thousand names that floated around. Nobody in -- no other particular name.
Q. Okay. So you did not recommend any other name?

36

A. I did not.
Q. Okay. Did you recommend yourself? Is this something you wanted at that time?
A. I gave very serious consideration to it. And I -- my original intent had been to -- I was and the conclusion was I had completed my public service, but -- to some extent because when I was there with Secretary Edwards the subject had become a major subject, that is the need for some way to begin to deal with this matter.
So it was no -- it was not an unfamiliar subject. And the fact that Congress and the Department had made progress in the time that I had been gone was certainly something that I had an interest in. I would -- I didn't have an interest to the extent that I was -- that I sought the job for sure.
Q. You didn't call Secretary Hodel?
A. I did not.
Q. He called you. But it lead to -- the discussions led to you being appointed?
A. Yes.
Q. Okay. Now, let me pick up on something you just said. At the time -- I think this is what you were referring to.

37

When you were on this -- what I refer to as the Reagan transition team, the '81, '82 entry on Page 2 of the resume at the Department of Energy, disposal of spent nuclear fuel and high-level waste was a subject of interest to the Department at that time?
A. Sure.
Q. Okay. And that was something that you looked at or worked on or thought about in the course of these transition activities?
MR. MILLER: Objection. Compound.
THE WITNESS: Only in the most general sense. The subject -- the subject had always -- has always been an interest of mine because of my many years at Savannah River.
And waste management at Savannah River from 1953 forward was a major factor. And I had occasion and interest and participation in many of those activities. So the subject was sort of grafted in my memory.
Q. (Mr. Stouck) All right. So you were aware of it at the transition time?
A. Sure.
Q. But it was not something you actively worked on?

38

A. Absolutely.
Q. So, I guess, were you involved -- because in the industry at that time there was this issue of what to do with these kinds of wastes now that reprocessing was not going on in this country, right?
A. Right.
Q. So it was a big issue problem -- you know, it was a big issue in the industry and you were interested in it to that extent?
A. And aware of it.
Q. And aware of it. Okay. But you did not, or did you, work at all on any legislative activities leading to the enactment of the Nuclear Waste Policy Act?
MR. MILLER: Objection. Compound.
THE WITNESS: What does that mean?
MR. MILLER: Go ahead. Go ahead and answer.
THE WITNESS: I did not, other than being aware with the Secretary that it was a matter that needed urgent attention.
Q. (Mr. Stouck) So during '81, '82 you were aware or is it true that the legislation was being developed at that time, do you know, or --

39

A. I do not know, but I presume so.
Q. But you weren't working on it?
A. I was not.
Q. Directly?
A. Not directly.
Q. Or indirectly?
A. Or indirectly.
Q. Okay. Back up to you were appointed as director of OCRWM, I believe, in early 1984; is that right? Do you recall when you started?
A. When I started or when the appointment was?
Q. Well, when was the appointment? Let's start with that.
A. I think it was in January of '84 that I visited the White House. And the appointment followed thereafter.
Q. And when did you actually start working?
A. March, I believe, of '84 I was confirmed.
Q. Okay. And can you tell me generally -- we're going to come back to some of these things and go into a little more detail, but from 1984 -- when did you leave the Department? I think you said -- earlier today you said early 1988, I think

40

is what you said?
A. I believe -- I believe that my actual retirement date from the Department was late November of '87.
Q. Okay. Well, starting in March of 1984, you know, when you started as director can you just tell me first generally, and as I say we'll come back to some of these things in more detail, but what were your major duties? What were you working on, let's say, when you first got there? What was the task?
A. I think the most explicit statement that I could refer to would be my confirmation statement.
Q. Okay. You want to take a look at it?
A. No. I know what I said, but that is about as succinct as I -- that's what I understood and knew to be the case and that's what I gave attention to.
Q. Okay. Well, let's take a look at it anyway.
MR. STOUCK: Let's mark it as No. 2.
(Exhibit No. 2 was marked for identification.)
(Off-the-record discussion.)

41

Q. (Mr. Stouck) You've been handed a document, Mr. Rusche. It says Confirmation Statement, Bernard C. Rusche, May 17, 1984. It's about five pages long. Would you take a look at it. And my first question is going to be what is this? So --
A. It appears to be a copy of my confirmation statement obtained from some source.
Q. Okay. Confirmation statement meaning is this a statement that you submitted to a committee in Congress in connection with your confirmation?
A. It was my oral testimony as well as the document submitted at the hearing for my confirmation.
Q. All right. Now, excuse me for one second.
MR. STOUCK: Can we mark this as No. 3, please.
(Exhibit No. 3 was marked for identification.)
Q. (Mr. Stouck) Now you've been handed a document marked as Exhibit No. 3. It's another copy of this confirmation statement, seems to be, Mr. Rusche, but it's got some handwriting on it. Looks like it might have been a draft that

42

somebody was changing. Do you see that?
A. I have a piece of paper.
Q. Okay. Is that your handwriting on Exhibit No. 3?
A. Absolutely not.
Q. Okay. Do you know whose it is?
A. No, I don't know whose it is.
Q. Okay. Did you -- did you prepare your own statement? Did you prepare this yourself?
A. Yes.
Q. Okay. Did you have help? Do you recall having help?
A. Yes. I had a secretary who typed it. I had subjects that I looked at in various references and so forth to bring myself up to date between the couple of years I had been gone from the Department.
Q. Okay. But you didn't have -- but you drafted this statement yourself with no substantive assistance? Is that your recollection?
A. Substantive is a very questionable word. What do you mean by substantive?
Q. Well, do you recall getting comments from other people?

43

A. Sure.
Q. So this handwriting was somebody -- it's not yours. It may have been comments that somebody proposed to you. And if they are reflected --
A. If I had to guess, which I realize is a dangerous thing to do --
Q. I love it. Let's do it.
MR. MILLER: Objection. Calls for speculation.
Q. (Mr. Stouck) If you had to guess, what would you guess?
MR. MILLER: Same objection.
THE WITNESS: My guess is that this may have been a copy that someone annotated after I gave the presentation to the Committee.
Q. (Mr. Stouck) Why would somebody do it after you gave it to them?
A. To put it in the record.
Q. I see. Okay. To put it in the Congressional record?
A. I notice this is a PNL document. And PNL was active in many respects in developing records.
Q. Okay. But in any event --

44

A. To the best of my knowledge, I've never seen this annotated copy, but it sounds like words I might have changed to some sort verbally.
Q. Fine. Thank you. All right. Let's stick with Exhibit 2 then. And let me ask you some questions about it, if I may. Okay. On Page -- let's see. The page numbers are at the top and are kind of small, but I'm looking at Page 3.
Do you want to take a -- please take a couple minutes to review this, if you want. Or, you know, if you don't want, my question is this. It says at the bottom of Page 3, "Moving ahead is a matter of national urgency because:" Do you see that?
A. I do indeed.
Q. Okay. Take a look -- and then there's a list of Paragraphs 1 and 2?
A. Beg your pardon?
Q. After the because -- there's two becauses, and there's one and two.
A. Yes.
Q. Is that -- as you read that now, does that sort of cover it? Is there anything you would add to why you believed at that time that moving ahead with this program was a matter of

45

national urgency?
A. What was your question?
Q. My question is does one and two sort of cover it? Is there anything you -- does this cover the reasons why you thought at that time --
A. Yes.
Q. -- that moving ahead --
A. Yes.
Q. Anything substantial that you would add to what's written there and what you told Congress about the reasons why moving ahead with the program at that time was a matter of national urgency?
A. No.
Q. All right. Now, in No. 2 says that the federal government from the beginning of the Atomic Age has been given the -- I'm sorry. Well, I read -- the sentence says that the federal government from the beginning of the Atomic Age has been given the responsibility for eventual disposal of high-level radioactive waste and spent fuel. Do you see that?
A. I do.
Q. Okay. And this statement was given after the enactment of the Nuclear Waste Policy

46

Act?
A. Yes.
Q. Okay. Which was signed into law in, I believe, early January?
A. Early January, that's right.
Q. 1983. So is it your understanding that that statute carried forward this federal responsibility for eventual disposal of high-level radioactive waste and spent fuel?
MR. MILLER: Objection. Calls for a legal interpretation. Go ahead.
THE WITNESS: Yeah.
Q. (Mr. Stouck) Would you say that -- well, okay. Do you have a copy of this confirmation statement yourself? When was the last time -- when was the last time you saw this?
A. This?
Q. Yeah.
A. Oh, I guess, maybe six months or a year ago I had some occasion that I was just going through my file and saw it.
Q. So you have a copy at home?
A. I don't know that I have a copy in this exact form, but I have a form that I believe is the same as this.

47

Q. Okay. Do you have -- when you say in your file, do you have files in your possession that relate to your work as director of the Office of Civilian Radioactive Waste Management?
A. The only files I have are those that I referred to, which are -- is my confirmation file, which is a notebook that has the material that I amassed looking at and which gave rise to this statement.
Q. Okay. No other files about your work for the Department? You left them there?
A. Absolutely. Absolutely.
Q. All right. So this statement outlines the task at hand when you joined the Department. And what was the --
A. As I saw it.
Q. As you saw it. And what did you -- what did you actually do when you got there? I mean, what was the first thing that you recall working on?
MR. MILLER: Objection. Vague.
THE WITNESS: I smile because the first -- when I came back from the hearing there were a group of Indians waiting to speak to me. And I spoke to them, Nez Perz and somebody else from

48

Hanford.
Q. (Mr. Stouck) What did you speak to the Indians about?
A. They said, "We want to get to know you well and have an opportunity to work with you."
Q. Okay. Do you recall the mission plan? Does that term have meaning to you?
A. Sure.
Q. Okay. What was the mission plan?
A. The mission plan was an effort to put in place some plan or concepts that were worth pursuing as the program got going.
Q. Okay. Would you agree that the mission -- was the mission plan -- was development of the mission plan underway when you got to the office?
A. I don't know.
Q. Don't know? Don't recall or don't know?
A. Neither. Both.
Q. Okay.
A. I don't know and -- don't know now and I didn't know then as far as to that particular question.
Q. Okay. Was the mission plan something that you yourself worked on, you know, drafting? As opposed to -- well, before the mission plan was

49

issued I take it that you would have approved it because you were the director of the office; is that right?
A. Yes.
Q. Okay. So to that extent you worked on the mission plan, correct? You signed off on it?
A. Yes.
Q. Okay. Did you though -- beyond that did you actively work on drafting any substantive sections of the mission plan?
A. No.
Q. That was done at a staff level?
A. Yes.
Q. Okay. Did you work -- did you play any coordinating role, you know, in organizing or coordinating the various people who were working on drafting the mission plan?
A. In some very limited sense in that as director I was interested in everything that was going on in the office. And I would get a -- I'm sure there must have been occasions in which in some staff meeting or staff meetings or maybe even topical meetings that the subject was visited to keep me apprised of the fact that work was going on.



Q. Okay. Do you recall if there was an individual who was in some sense in charge of managing the work of getting the mission plan developed?
A. I'm sure there was such a person, but I don't -- I don't recall a name.
Q. Okay. Do you know if it was Victor Trebules? Does that name ring a bell?
A. Vic Trebules was certainly a member of the staff. And he well could have been that person, but I don't recall it as that.
Q. All right. What would you say the -- so the mission plan was not a major focus of your personal effort at the -- you know, your personal work at the Department when you got there did not involve a lot of your own time working on the mission plan; is that right?
A. Major has two connotations. Tell me what you mean by major.
Q. Well, time. Amount of time spent.
A. It certainly occupied some briefing time occasionally, but not -- it was not a dominant feature. There were so many things going on.
Q. Was there something -- and again I'm trying to distinguish this sort of early -- when



you first got there, first year let's say, is there something that stands out in your mind as the dominant feature of your own work? What were you primarily focused on?
A. Selection of sites.
Q. Okay. And did that remain true throughout your tenure?
A. Absolutely.
Q. Okay. That was your major focus as director of the Department?
A. Getting the work done in the field.
Q. In terms of selection of sites?
A. Well, selection and then hopefully investigation.
Q. Okay. All right. Now, do you recall that there was an amendment to the mission plan in 1987?
A. Now that you've mentioned it, I can -- I can acknowledge that there -- I would say probably.
Q. Okay. I take it from your answer that your -- the amount of personal work and time and attention that you devoted to that mission plan amendment was --
A. Secondary.



Q. Well, it was comparable to the amount of time what we just discussed for the original mission plan?
A. Yes. Yes.
Q. Okay. All right. And again we're going to come back to some of these things and maybe some things in between.
Well, what about the 1987 amendments to the Nuclear Waste Policy Act? Do you recall those?
A. I recall that they were and that they were a matter of consideration.
Q. Do you recall what the substance of those statutory amendments was?
A. In a general way.
Q. Okay. What do you recall in a general way?
A. There were several issues that had to be addressed related to siting, relating to relationships with the states, dealing with the MRS. And I believe by that time it had become quite apparent that the 1998 objective date that was in the original Act was non-functional.
Q. Okay. And --
A. Beg your pardon?

A. To the best of my recollection, he was. And Morgan was a long-time friend.
Q. Of yours?
A. Yes.
Q. Okay. What had been accomplished by that office under Bob Morgan's direction prior to your arrival in terms of implementation of the Nuclear Waste Policy Act?
A. I can't really answer that in any substantive way. Morgan and I talked a lot. I talked to other people as soon as I got there. And the best I could tell was that the beginnings had been made to starting to look at the functions and how and some organization and so forth. In fact, Morgan and I roomed together for about four or five months until I moved my family up.
Q. In Washington?
A. In Washington. So we had -- we had countless hours of which have we talked about this, that, and the other. And I just don't have a panoply of what had been done that I can lay out and say this was done and that was done.
I think Bob deserved a huge amount of credit in that transitional period. And to this day he remains one of my great friends, but also

66

has my admiration as a person who has done tremendous public service, as well as some other things that we're both aware of.
Q. Did he -- was there an organization -- there was an organization in place when you got there?
A. There was something there. And I don't really recall just what it was.
Q. Do you recall about how many people when you got there?
A. I have no idea right now.
Q. No idea? 10? 50? 200?
A. If I had to guess, but guessing is probably not a good thing to do.
Q. Well, do it anyway, if you can.
A. It was not a large number.
Q. What was Mike Lawrence's role at that time when you started?
A. And that I don't really recall. I recall him much more as a friend than I do the functionary, as it were.
Q. Okay. Do you recall any other people, other than Morgan or Lawrence, as being involved with the -- I think you referred -- just not to mischaracterize. I thought you said your

67

understanding was that Mike Lawrence was not directly involved?
A. And I don't really recall just how he was involved. I know he was related to the activity to some extent, but I don't really recall.
Q. Okay. But Morgan was involved because he was in charge?
A. Morgan was certainly involved.
Q. Right. And just for the record here, you were the first presidentially-appointed director of the office?
A. Correct.
Q. Do you recall any other individuals who were involved in the program at that time when you got there?
A. No.
Q. Okay. Do you recall a fellow named Fiore, F-i-o-r-e?
A. Yes.
Q. Okay. Who is that? What do you recall about that person?
A. All I recall about him is what he did later after I got there. I knew -- I believe it's Mark Fiore, is it not? But I'm not sure of that.

68

Q. I can tell you in a second.
A. Mark -- that may not be right either.
Q. James. Jim.
A. Jim Fiore, yeah. He was in -- he was in the program.
Q. What did he do later? You say you remember what he did later. Later at OCRWM?
A. Yes.
Q. Okay. What do you recall that he did at OCRWM?
A. I don't recall his exact title.
Q. But you --
A. I believe he was in one of the three or four sections that we had.
Q. All right. That's all you recall about him? I thought you said something about you recalled him from what he did later?
A. Just that he was there later.
Q. Oh, I see. You don't know if he was there right at the beginning when you got there?
A. I don't really recall that.
Q. Okay. What about a fellow named Winnick? Winnick?
A. I have no recollection of that name.
Q. How about Shelor, S-h-e-l-o-r?

69

Q. Page 34. Essentially the last page -- next to the last page.
A. All right. Okay.
Q. The paragraph that begins, "In summary."
A. Yes.
Q. Do you see that? Just read that for me. Actually let me read it into the record just so we'll have --
A. All right.
Q. I'll read it out loud. "In summary, Madam Chairman" -- by the way, do you recall who the chairman of the Department was -- I mean, the chairman of the Committee at that time?
A. I would -- I can't think of -- the Congress lady from Tennessee is my recollection. I'll think of her name in a minute.
Q. Okay. Well, we can obviously find that out somewhere.
A. Yes.
Q. It says, "In summary, Madam Chairman, the FY 1986 budget request for spending authority under the Nuclear Waste Fund and for appropriations under the Civilian Radioactive Waste R&D budget are designed to carry out an integrated waste management program in an

150

efficient and effective manner and to achieve the 1998 mandate of the Nuclear Waste Policy Act, that is, to have in place a comprehensive and functional waste disposal system to begin receiving spent fuel." Do you see that?
A. I do.
Q. Okay. And so at the time you gave this testimony, Mr. Rusche, was it your understanding that it was the mandate -- that there was a 1998 mandate of the Nuclear Waste Policy Act and that mandate was to have in place a comprehensive and functional waste disposal system to begin receiving spent fuel?
A. In that sense, yes. The Act was unmistakable in its language. And this sentence is consistent with that.
Q. Okay. When you say the Act was unmistakable in its language --
A. That is the Act provided that the Department begin receiving waste by that time.
Q. Okay. And the -- I'm sorry. Were you finished?
A. That's it.
Q. And the budget that you presented to Congress at this time as reflected in this

151

testimony was designed to, as it says, carry out an integrated waste management program in an efficient and effective manner to achieve that mandate, correct?
A. Uh-huh. Yes.
Q. All right. Now, let's take a look at another document.
MR. STOUCK: Can you mark this as No. 10.
(Exhibit No. 10 was marked for identification.)
Q. (Mr. Stouck) By the way, before you look at that let me just ask you this. You were fishing for a name earlier when we were talking about the mission plan, somebody who was actively involved in preparing it. I asked you about Victor Trebules. Do you remember that?
A. Uh-huh.
Q. Was the name that you were thinking of Charlie Head as someone who was involved? No?
A. That's not the name I was trying to -- the name I was trying to think of. And I'm sorry. You may even have encountered it, but he was one of the three or four assistant directors I had.

152

Q. Okay. Well, maybe we'll come across it in one of these documents.
A. It wasn't Charlie Head.
Q. Do you recall Mr. Head?
A. Yes.
Q. What was his role?
A. I couldn't give you a very specific definition. He was involved in that activity.
Q. Meaning RW?
A. Yes. Yes.
Q. Okay. Take a look at what's been marked as Exhibit No. 10, please. And this is an excerpt from, as it says on the front cover, Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting, December 12-15, 1983.
The date of the document, at least as shown on the front cover, is February 1984. It says that these proceedings were sponsored by the U.S. Department of Energy.
And then, as I indicated, it's an excerpt and would jump to Pages 11 and 12. I'm going to have a couple of questions for you. The Bates numbers are SNO 69588 and then it skips to 599 and 600. Is that the document you have?
A. No. Mine has SNO 69599.

153

Q. Didn't I say that? Did I misspeak?
A. You said 588.
Q. On the first page. 588 is the cover.
A. Okay.
Q. Then we skip a few pages and we get to 599.
A. Yes, that's correct. I misunderstood you then.
Q. That's quite all right. Now, on Page 599 this is a couple of pages that is titled at the top Program Overview and it indicates that this was prepared by or given by evidently at these proceedings Robert Morgan, acting director of Civilian Radioactive Waste Management. Do you see that?
A. Yes.
Q. Now, I'd like to direct your attention to -- we're still on Page 599. The right-hand column. It's the fourth new paragraph down. It says, "I would like to talk a little bit about the strategy." Do you see that?
A. Yes.
Q. "As laid out in the mission plan and what we intend to do"?
A. Yes.

154

Q. Okay. And then the next sentence says, "I think most of you know that the Act requires that we receive waste from the utilities by January 1, 1998." Do you see that?
A. Yes.
Q. Now, having seen the previous document and having now seen this document, has your recollection about your own understanding of the requirements of the Act and the 1998 date been refreshed or changed at all? I mean, would you -- that's the first question.
A. As to the requirements of the Act, there's no misunderstanding. The Act made an unequivocal statement to that effect.
Q. And the effect being?
A. To accept fuel in 1998.
Q. Okay. And that was your understanding when you joined RW as the director?
A. That was my understanding of what the Act said, yes.
Q. And throughout your tenure?
A. Beg your pardon?
Q. And throughout your tenure as the director that was your understanding of the Act? The Act didn't change -- well, let me ask you.

155

Was that your understanding throughout your tenure?
A. As to what the Act said, that is correct.
Q. Okay. Thank you. Now, let's go to the next sentence. It says, "Technically, the Act does not specify how much waste or spent fuel we must begin receiving at that time." Is that consistent with your understanding about the Act?
A. I think yes.
Q. All right.
A. It's non-specific with respect to quantity.
Q. Okay. "In fact" -- I'm reading, continuing -- "if we accepted one spent fuel element in 1998 we would technically be in accordance with the Act." Do you know if that's true one way or the other?
A. I don't know whether it's true. I would say, just looking at the language from this distant vantage point, it would be hard to exclude that from being true. The Act doesn't say how much and how fast, so far as I can recall.
Q. But you don't know one way or the other whether technically one fuel element would be in

156

accordance with the Act?
A. Certainly in a legal context I don't know.
Q. All right. Now, the next sentence says this, "However, we did not believe that that meets the intent of the Act."
Is that consistent with the understanding you had in 1984 when you joined the Department, that accepting one fuel rod by 1998 would not be -- would not meet the intent of the Act?
A. I think I would agree.
Q. Okay. Let's read the next sentence. It says, "The basic strategy which we've outlined in the mission plan, is that beginning in 1998, utilities will not have to provide any additional storage facilities on site."
Is that -- this sentence refers to the mission plan, but is that strategy consistent with your understanding of the strategy laid down by the statute, that beginning in 1998 utilities will not have to provide any additional storage facilities on site?
A. I could not agree with that conclusion, nor did I ever hear anybody in my -- there's

157

nobody in my hearing ever made that statement that -- the first statement I have heard made, that if you can take one, you have satisfied the intent of the Act.
Q. Well, it doesn't say the intent.
A. Well, satisfied the Act.
Q. Okay.
A. And I've heard that statement made more than once.
Q. Okay.
A. I can't enumerate how many and how often, but the second statement, that the thought that because of the Act utilities would not have to provide any additional storage facilities after 1998, I have never seen or heard in my recollection.
Q. Okay. And so does that mean that that was not your understanding at the time you joined the Department in 1984?
A. That there would not have to be any further storage?
Q. That that was the strategy?
A. Wait a minute. Well, strategy --
Q. See, the sentence here says, "The strategy which we've outlined in the mission plan

158

is that beginning in 1998 utilities will not have to provide any additional storage facilities on site."
A. I never was a party to such a statement, so far as I know. You may find something to the contrary, but I cannot -- I never recall that being the case.
Q. Okay. And you don't recall there being a strategy to facilitate utilities avoiding additional storage in 1998?
A. Certainly that was a -- that was an intent or a strategy in a sense, but strategy needs to be put in the context of some reality. And in my -- in my time and my awareness that would -- that was just a completely unreasonable expectation.
Q. Okay. When you say it was a strategy --
A. In my own mind.
Q. Fine. Thank you. You say it was a strategy in a sense. In what sense was it a strategy?
A. Because the statute said we'll begin receiving fuel in 1998. In that sense then I can't deny that.
Q. In that sense there was a strategy of

159

allowing utilities to avoid additional storage on site?
A. I think this statement is trying -- is attempting to say that that strategy was the one that was then being applied or being -- that was understood as the objective of the operation.
Q. Okay. And my question is simply was that your understanding at the time in 1984 that that was the strategy?
A. In 1984 in my mind?
Q. That that was the strategy?
A. Yes, I can agree that was the strategy.
Q. Okay. And what about the next sentence here, "During the first year of operation of repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location," do you agree that that or do you not agree that that was part of the strategy at the time you were there?
A. In my perception and recollection, I can never remember that being a discussed point or strategy.
Q. Okay. Well, but you do agree that the prior sentence or at least you do agree, I think,

160

in connection with discussion with the prior sentence that there was a strategy of -- tied to the '98 date and commencement of activities, there was a strategy of allowing utilities to avoid additional on site storage? I thought --
A. No.
Q. You didn't agree with that?
A. No. I thought I said that the strategy that I see articulated here and in the context of the Act, as I understood it, that it's not inconceivable that one would say that it was the strategy of the Department to begin receiving fuel at an unidentified rate.
And the sentence earlier on, one fuel, kind of sounds ludicrous, one fuel element, but it was clearly not -- and I cannot recall ever having a discussion that would say that the purpose of the 1998 date was to preempt the necessity for any future storage capacity in any of the utilities.
Q. That was not your understanding in 1984?
A. That's right.
Q. So avoiding some additional on site storage capacity after '98 was part of the strategy, but preempting any possible on site storage facility for utilities after 1998 was not

161

identification.)
Q. (Mr. Stouck) All right. Mr. Rusche, you've been handed a document which is marked Exhibit No. 11 on United States Department of Energy memorandum stationery, date October 7, 1983, subject Review of OCRWM Mission Plan Working Draft.
The copy is not very good, but I think it says to Phillip Craig, director of Commercial Spent Fuel Management Program Office. And on the back it's signed by Mike Lawrence, correct? That's the document you have?
A. Yes.
Q. And it says --
A. That's interesting. That's the first time I can recall seeing Mike's title.
Q. Acting deputy director. And this, of course, is prior to your arrival?
A. Yes. But I was not completely unaware of the fact that there was something there and that Secretary Edwards and I had been very, what shall I say, if not instrumental, at least had a strong view that this course -- that there needed an RWM or something of that sort.
Q. Right. Because, as you said before, it

166

was a big issue, a big problem for the industry?
A. No question about that.
Q. All right. Now, the first sentence here says, "The attachment to this memo," which, of course, is not attached. This is just the cover memo.
A. Sure.
Q. It says, "The attachment to this memo is the latest working draft of the Mission Plan for the Office of Civilian Radioactive Waste Management." Do you see that?
A. Yes.
Q. And it goes on, "This draft is far from the finished product that we will make available for public review and comment."
This indicates that the -- obviously that the mission plan drafting process was in process before you arrived?
A. Certainly.
Q. Were you aware of that?
A. Yes.
Q. Okay. When you got there you were aware that it was in process?
A. I was aware that there was an activity -- there was a document called a mission plan and

167

an activity associated with it.
Q. Okay. In the second paragraph this document asks the -- whoever the distributees were to review it and return comments to Mr. Head. Do you see that?
A. Yes.
Q. Does that refresh your recollection at all about what his role was?
A. Well, it doesn't refresh it so much as tell me.
Q. Okay. Okay. You don't know any more than what you see on this paper?
A. I remember his name.
Q. Okay.
A. I did not -- until I see this here, I didn't realize that's what he was doing. At least I don't recall realizing it, if I did.
Q. Okay. And then just the last sentence in that paragraph, it says, "If any areas exist in which the portions of the program discussed in the Draft Mission Plan for which you are responsible do not meet the requirements of the Act, please identify proposed corrective actions wherever possible, or provide as convincing a rationale as possible to support the action we propose to

168

take." Do you see that?
A. Yes.
Q. So you would agree that that suggests that there was an objective here to have the mission plan meet the requirements of the Act?
A. Yes.
Q. All right. Okay. Well, let's move forward in time a little bit and take a look at --
(Off-the-record discussion.)
(Exhibit No. 12 was marked for identification.)
Q. (Mr. Stouck) Okay. We've now handed you a document that's marked Exhibit No. 12, Mr. Rusche.
A. Yes.
Q. It's stamped Draft on the front. It says, "Civilian Radioactive Waste Management Program Mission Plan, Volume I, Overview and Current Program Plans, December 20, 1983."
A. Yes.
Q. Bates number CTR-042-1065 through 1191. Is that what you have?
A. I believe that's right.
Q. Okay. Now, this is dated a couple of months after the memorandum we just reviewed. So

169

I think it's fair to say it's unclear whether this was the draft that was forwarded with the memo, but it may not have been certainly. Probably wasn't, but may have been.
My question though is this is getting pretty close to the time -- not terribly close. If you joined RW in May '84, it's getting closer in time to your arrival, but my question is looking at this, through this, whether you believe that when you did join RW and started working you saw this draft?
A. I really -- I can't recall any specific instance in seeing it. I can't deny that I -- somebody may have showed it to me at some point, but if you'll recall, in our discussion in December of 1983 I was not either involved, nor identified for involvement.
And if indeed I saw it, it would have been maybe somebody handed me a stack of documents and said, "These are things you might ought to look at sometime."
Q. When you arrived in May?
A. When I arrived in May.
Q. Okay. But you have no recollection?
A. I don't have any recollection of it.

170

Q. Okay. Let's take a look though at the very first page of text, I think, under Introduction.
A. Okay.
Q. The last paragraph on that page. It says that, "Every activity specified in the Mission Plan is targeted toward one fundamental objective: to accept commercial high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998.
Further, the waste acceptance schedule will, initially, preclude the need for additional at-reactor storage after January 31, 1998 and" -- ultimately misspelled -- "utimately, remove from at-reactor storage all waste that is more than 5-years old." Do you see that?
A. I do.
Q. Okay. Seeing this in this draft mission plan, do you now recall that that was a fundamental objective of the nuclear waste program at that time?
A. I can't say with respect to the program. I can say that it seems consistent with the Act.

171

Q. Okay.
A. But I really don't have any basis for guessing whether the -- I think -- excuse me. May I answer in a slightly different way?
You say was it consistent with the -- was the program consistent with that statement, I believe is the question you asked, or would you care to rephrase that?
Q. Why don't we have it re-read just to be perfectly clear.
A. All right.
MR. STOUCK: What was my last question?
(The Court Reporter read the record as requested.)
MR. MILLER: Objection. Calls for speculation. Go ahead.
THE WITNESS: What I was going to say was that there's no question in my mind that the mention of the January 31, 1998, date is consistent with the Act.
As to whether or not it is -- the program at that moment was designed or aimed or stated to have confidence in being able to meet that, I can't really say. I have an opinion about it, but there's no point in giving you my opinion.

172

Q. (Mr. Stouck) Okay. Let's put the opinions aside at least for a moment. Maybe we'll come back to it.
But my question is this paragraph that I just read refers to the mission plan and the activities specified in the mission plan being targeted toward one fundamental objective. And then it --
A. Yes.
Q. -- describes what the objective is.
A. Yes.
Q. And then there's a further sentence also. I'm simply asking whether this paragraph refreshes your recollection about whether or not this, meaning what's stated here in this paragraph, was at that time a fundamental objective of the program?
MR. MILLER: Objection. Calls for speculation.
THE WITNESS: I can only respond by saying this is what those who were there wrote.
Q. (Mr. Stouck) Okay. So beyond that, you have no answer to my question?
A. I don't know how I can answer any further.

173

Q. Okay. Do you have an opinion about whether -- you mentioned opinion, and I don't remember exactly in what context, but do you have an opinion about whether this was a fundamental objective to the program at the time you arrived, these sentences we just read?
A. Well, you're asking for do I have -- did I have an opinion. In the light of what I then knew about the Act and the program when I arrived, I had serious questions as to whether that statement could be justified, that is -- that is was there enough data or information that would give confidence that a statement like that was even rationale.
Q. Are you done?
A. Yes.
MR. STOUCK: Can we go off the record.
(Off-the-record discussion.)
Q. (Mr. Stouck) When you say you had series doubts or series questions about whether that statement could be justified, you're referring to whether the objective could be achieved, right?
A. Yes.
Q. Okay. But that's a -- is that -- I'm



not asking whether it could be achieved. I'm asking whether it was an objective, whether it was a fundamental objective of the program at that time, as stated here, to do these things in this paragraph; in other words, to accept commercial high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998. Was that a fundamental objective of the program at the time you got there, regardless of its achievability?
MR. MILLER: Asked and answered.
THE WITNESS: I would -- I would only suggest that it needs to be put alongside the verbiage in the Act itself. And I'm speaking from my memory that the statement in the Act is not nearly that expansive. I think the Act literally says begin receiving fuel in January, whatever it is, of 1998.
Q. (Mr. Stouck) Right. But you joined the Department of Energy as the head of the program office that was charged with implementing the Act, right?
A. Yes.
Q. And in the course of implementing the



Act there was -- we're going to get to the final mission plan, by the way. A mission plan was developed, which you testified was important. Whether or not it was required by the statute --
A. Yes.
Q. -- you had to have it or it was a good idea to have it in order to guide your mission?
A. Yes.
Q. Okay. So you were implementing the statute. And I'm not asking you at this point about what the statute may or may not have required as a legal matter.
What I'm asking you is whether there was an objective, a fundamental strategy -- or fundamental objective, excuse me, is the term used here.
Was there a fundamental objective of the program that included the elements that are stated here? Is it -- you know, do you recall? Is it your understanding? What can you tell me about that? Do you know? Do you not know?
MR. MILLER: Objection. Calls for speculation. Asked and answered.
THE WITNESS: I think the only thing I can say is that this statement is more expansive



than I would have guessed one would have made at that time, but I have no knowledge of it.
The Act was the piece of paper that was put in front of me when I was invited to consider taking the position.
Q. (Mr. Stouck) Okay. Just let me clarify the question. This statement, you say, is more expansive than I would have guessed. As we sit here today?
A. Yes.
Q. Okay. But you weren't at -- you weren't there at the time this was written?
A. I certainly was not.
Q. And I could probably find out more from the people who did write this?
A. That's correct. And, for that matter, this is the first time that I recall that I have seen this. It certainly preceded my then imminent arrival.
Q. Okay. Let's turn to Page -- a couple of pages. At the top it says 2-1, Program Strategy. Would you please take a couple of moments or whatever time you need to review the first -- well, to review what's on this page.
A. Okay.

Q. (Mr. Stouck) What is it?
A. My opinion is it will.
Q. Do you have -- okay.
A. By virtue of no other alternative it has that's practical or relevant.
Q. Okay. Do you have an opinion about the time frame in which that will happen?
A. I'm just not that familiar with things. Again that's real speculation.
Q. Okay.
A. I think -- if I can just add this one statement. I think if the Senate follows the House and this characterization of Yucca proceeds, I think in a year or two we'll have a much better feeling for the timing primarily from the regulatory involvement.
Q. Is it your testimony that -- I mean, to summarize some things you've said, is it your testimony that at the time you took the job at RW in your view the prospects for achieving the objective of starting fuel acceptance in 1998 were highly uncertain?
A. Highly unlikely.
Q. Highly unlikely? That was your view when you took the job?

218

A. Yes.
Q. And the reasons it was highly unlikely were?
A. Well, excuse me. I should re-answer that. When I took the job, the moment I got there I did not have the insight that I did after I had been there awhile. And so I really ought to put that context slightly different.
Q. What do you mean by awhile? How long did it take you to get this insight?
A. A couple years.
Q. Okay.
A. Primarily because of the relationships of the states.
Q. So after a couple of years it was your view that it was highly unlikely that the '98 date could be achieved?
A. Yes. In fact, early on it was -- it just seemed like a heroic effort to start with, but after those two years it just became, to me, fairly clear.
Q. Okay. But that was not your view at the time you took the job?
A. I did not have that experience at the time.

219

Q. At the time you took the job did you believe it was an achievable goal?
A. My objective was to do the best I could.
Q. Okay. Did you have any understanding about the achievability of the '98 date objective when you took the job?
A. Well, I believe so in that I placed emphasis in my testimony at the confirmation hearing that I thought an MRS was absolutely essential to have a chance to meet any of those kinds of commitments.
Q. So your view when you took the job was that with an MRS there was a chance?
A. There might be a chance.
Q. There might be a chance?
A. Yes.
Q. Okay.
A. And I can't put a probability on it.
Q. Okay. Well --
A. But it certainly enhanced the likelihood of meeting the objectives of the Act.
Q. Did it make it more likely than not?
A. Yes.
Q. If you could get an MRS?
A. Yes.

220

Q. And that was your view?
A. In my opinion.
Q. In your opinion at the time you took the job?
A. Yes.
Q. Okay. Did you have an opinion at the time you took the job about the likelihood of achieving the '98 date without an MRS?
A. I had an opinion. And my opinion was it was highly unlikely.
Q. Okay. And those opinions were formed from experiences obviously that you had before you took the job, just from an awareness of the industry?
A. And largely -- in large extent that's correct.
Q. Okay. Unfortunately, this is a big one, but let's mark it anyway. This is the final mission plan. We finally get to the real --
A. Which I'm sure I haven't seen. What date is that?
Q. June 1985.
A. June '85?
Q. Yeah.
A. Well, I should have seen that one.

221

Q. Right.
A. I probably even signed it.
Q. Let's find out.
MR. STOUCK: Why don't you mark it for me.
(Off-the-record discussion.)
(Exhibit No. 15 was marked for identification.)
Q. (Mr. Stouck) Mr. Rusche, you have been handed -- actually this is only Volume I of the mission -- it's titled Mission Plan for the Civilian Radioactive Waste Management Program, Volume I, which on the front cover, as it indicates, Overview and Current Program Plans.
Wait a minute. That's not right. This is -- find out what my own exhibit is. I believe this is Volume I and II. Let me just make sure that's right.
MR. MILLER: It's only Volume I.
MR. STOUCK: It's only Volume I?
Q. (Mr. Stouck) Right. Well, yeah, I remember this now. It's Parts I and II. Part II starts on DB-105450. And the title of what's labeled Part II is Information Required by the Nuclear Waste Policy Act, which on the cover --

222

okay. Yes, you're right. Okay. This is Volume I only.
MR. MILLER: Two parts to Volume I.
MR. STOUCK: Two parts to Volume I. Thank you.
Q. (Mr. Stouck) Mission Plan for the Civilian Radioactive Waste Management Program, Volume I, June 1995.
MR. MILLER: '85.
Q. (Mr. Stouck) '85. June 1985. And let's use actually the other numbers for identification. HQ0005264, I believe this to be consecutive, it certainly should be, through 5796. And certainly the official exhibit will indicate if it's not all the way consecutive. Is that the document that you have in front of you?
A. I believe so.
Q. Okay. Now, if you open the cover, Mr. Rusche, you will see a transmittal letter from you to members of Congress and other recipients. Do you see that?
A. I do.
Q. And is that your signature?
A. It sure is.
Q. Okay.

223

(Off-the-record discussion.)
THE WITNESS: That's much better. Yes. Say it again.
Q. (Mr. Stouck) Well, I just -- there's no question.
A. That is my signature, yes.
Q. All right. Now, we've been through the drafts and some of the background before you got there and it went out for public comment and we've been talking about this for awhile.
Now seeing this, can you tell me anything more about the role that you played in the preparation of this document?
And take -- it's a big document. If you want to take a few moments to review it or look through the table of contents or look at the contents itself, please take all the time you need.
A. This would make interesting bedtime reading. My recollection is that I was well aware of the obligation to prepare this version of the mission plan. And the group that worked on it were some of the people that we've seen, plus perhaps some others. And I can't really go any further with respect to naming names, but I was --

224

I was certainly aware of the activity that was underway.
I was impressed by the amount of effort that people put into such things as this, but this -- I believe this issue -- what was the date on this? June of '85. I had been in the office just one year.
And I was -- I was kept aware during that -- some portion of that time that such an effort was underway and that we had the obligation under the Act to provide this revision or version or whatever you want to call it.
And I had briefings from time to time on one thing or another. And my specific memory of what and when I just cannot recall. I would acknowledge at the outset that I have not read every page of it.
Q. Ever?
A. Ever.
Q. That was going to be one of my questions. Would you have read this before it was finalized?
A. I would have -- I had a -- I'm sure I had a chance to look over it. And I probably did like I did most documents that were prepared by

225

lifetime.
In my opinion, it was one of the -- it is one of the most challenging programs that's been undertaken in a long time in this country.
Q. Right. At the time though -- I wanted to go back to this statement that you made that even by this time, meaning June 1985, the program as outlined in the Act had been revised or redefined or consideration of change or some --
A. Features had been under consideration for sure.
Q. And some had even been changed, but there were others under consideration. There was something significant going on that was -- because it was now an anathema and it wasn't an anathema when the Act --
A. That's correct.
Q. Okay. So something had happened?
A. Well, experience.
Q. Okay. Well, what I'm asking you is at the time you joined the Department in May 1984, at that time do you believe that the program -- by that time, not necessarily that you knew it then because you had just started, but in light of what you learned in the course of your duties at RW and



in light of what you know as we sit here today, looking back on May of 1984, which was a year before this mission plan, do you believe at that time, by that time, May of 1984 when you joined RW, even by that time the program as outlined in the Act had been redefined or changed or --
A. Or was being.
Q. -- was being in a significant way?
A. It was in some sort of evolutionary process.
Q. Yes. So that's yes?
A. Yes.
Q. Okay.
A. Even then.
Q. Okay. Why?
A. Because the parties that were active in the program or active or associated with the program or to whom this program applied had such different views about the values, the circumstances, and the time. I can even recall -- and this is voluntary.
THE WITNESS: And, Mr. Advisor, if you want me to stop, tell me. But I just can't overlook the fact that even with the NRC I had -- I had countless meetings with the Commission.



And the Commission was itself continually reviewing the requirement that there had to be a reasonable expectation that there was going to be a waste treatment system in place at some reasonable time in the future.
And it would -- the state interactions particularly then, and I think from my long distant view now have continued, still make it very challenging.
Q. (Mr. Stouck) Okay. What I want to talk about now is what you mean when you talk about the program as originally outlined in the Act before experience and whatever else led to these changes, consideration of change, revision, revised, whatever. Go back to your -- I want to talk about your understanding of what the program originally outlined in the Act, what you meant when you referred to that.
Okay. Now, would you agree that the statements that we looked at in some of the prior documents about -- let me refer specifically -- the draft mission plan in December 1983 about --
A. Yes.
Q. -- an objective of -- on Page 1-1 to accept commercial -- each activity specified in



the mission plan, at least this draft, is targeted toward one fundamental objective, to achieve -- to accept commercial high-level radioactive waste for safe management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998.
Further, the waste acceptance schedule will initially preclude the need for additional at-reactor storage after January 31, 1998, and ultimately remove from at-reactor storage all waste that is more than five years old. You recall those kinds of statements we talked about at some length?
A. I do.
Q. Would you agree that those statements are consistent with what you referred to as the program originally outlined in the Act before these changes that we've more recently been talking about in this deposition?
A. I think some of the details are not mentioned in the Act, but I think the thrust of those discussions, those statements, to me seem to be more a statement or recitation of what the Act says than what the staff, if I can use that term, concluded ought to be done.

Q. Later?
A. Later.
Q. After these changes?
A. Or at any time. That is the Act -- the Act is not a very detailed prescription of what is to be done. There's a lot of stuff of how things have fit together and so forth, as I recall it, but the prescription in the Act, as acts, I think, generally want to be, is objective oriented, not implementation oriented.
Q. Okay. And these statements, like the one I just read to you and we discussed earlier, would you agree are consistent with the --
A. To some extent --
Q. -- objectives in it?
A. -- they are consistent with what was then visualized in the Act as important objectives.
Q. Initially?
A. Yes.
Q. Okay. But as time went on the implementation got more complicated?
A. Well, not only the implementation got more complicated, but the ability to even achieve the objectives, I think, was called into question.

246

Q. Even by the time you joined?
A. By the time I -- certainly by the time I had been there when this occurred.
Q. Meaning the draft mission plan?
A. Yes.
Q. Okay.
A. And this, I think, was an attempt to try to -- try to preserve as much as of the original inferences drawn from the Act as could be while further stating or giving voice to some of the exigencies that have become more evident as the program unfolded.
Q. Okay. So would you agree then with this, that if we were interested in learning or getting the best understanding that we could get of the original objectives of the Act, that we should look to documents and statements that are pretty close in time to the enactment of the Act, that is 1983, such as some of the ones that are out on the table here, and that as time went on the interpretations of the objectives of the Act got, I'll use the word, clouded by these other considerations of complexities and difficulties and eventually anathema? Would you agree with that?

247

A. I think I probably would agree with that statement. I might have used shaped rather than clouded.
Q. Okay.
A. But I think they carry the same connotation. In my experience in several other areas, not this particular piece of legislation, but in other pieces of legislation that I dealt with would suggest that this program created by the legislation was more susceptible to that flavor than many pieces of legislation that I have seen because of the complexity of the technical issues, the complexity of the interactive issues between the multiple parties that are involved.
Q. Any other reasons?
A. Well, those two stand out. And the technical complexity exacerbates both of those factors. That is you can't predict very well. You're looking at science and engineering that's not heretofore well practiced. And all of them just complicate the issue.
Q. What other experiences do you have, just briefly, that -- I know you've got a lot of experience, obviously as reflected on your resume, which is in the record, but can you just give me a couple examples of other experiences that you've had that lead you to draw this conclusion about the particular susceptibility, if I'm understanding, of this program to these forces?

248

A. Well, I don't know of any that apply directly to this program, but I can think of analogues in other circumstances.
Q. Yeah, that's --
A. I can think of one. Waste tanks at Savannah River or at Hanford. When the AE program began, when the Act was adopted in the early '50s, it was -- at the time the work began at Hanford I was too young to even be aware of it, but I became aware of it later, and certainly at Savannah River when I went down in 1953, that dealing with waste was a very, very major technical, political, and social issue. And it is today, here more than 50 years later, at both of those sites.
By waste I mean nuclear waste, the residue from the reprocessing operations or the other waste efforts that derive from manufacture of fuel and so forth.
And I think that that experience is somewhat reflective of this kind of program in which the inability to predict an outcome with

249

of things.
You did not mention funding shortfalls. And I was curious about that. But I take it from the testimony you've just given, that that was also a factor? Or not? I mean, is it --
A. Yes, it was a factor. It just did not -- at the point I recall our dialogue on that subject I guess I made an inappropriate assumption that the budget and financing were not technical factors per se. And I just didn't introduce it in the discussion at that point.
Q. But it was another factor?
A. It was a factor. I can't point to a specific instance in which if we had $50 million more, we would have been a year ahead. The program was just not that -- not that explicit, from my recollection.
Q. All right. Well, from your recollection though -- strike that. Do you believe that given adequate funding, adequate funding -- I guess the question I'm about to ask is could money solve the problem?
If given adequate funding, could RW have achieved the objective of accepting -- well, whatever these original objectives were starting

294

by '98?
MR. MILLER: Calls for speculation. Go ahead.
THE WITNESS: I would say that the matters that were the biggest impediment and still are, and they are not amenable to -- funding is not a very effective manner for dealing with them, which is the interaction with the states, the tribes, and so forth.
Q. (Mr. Stouck) Okay. Take a look at Page 385 now, please. And I know it's getting late in the day. I'm going to try to wrap up very promptly.
A. 385?
Q. 385. Under -- there's a -- it says Chapter 10, Costs of Managing Commercial Radioactive Waste. Do you see that?
A. Yes.
Q. And there's apparently a quotation -- no. No. No. Forget the quotation. Under the Introduction, 10.1, it says, "As part of its continuing evaluation of the adequacy of the revenues raised by the Nuclear Waste Fund against the expenses of the waste-management program, the DOE maintains a cost-estimating capability.

295

The most recent cost estimates for the entire program are contained in a January 1985 report entitled Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program." Do you see that?
A. Yes.
Q. Do you recall, during the time you were there, these total system -- or this or any other total system life cycle cost study?
A. That there were such studies?
Q. Yes.
A. Indeed I do.
Q. You do recall those?
A. Yes. I don't recall the details of it at the moment, but I recall that they were done.
Q. Would they have come to your attention?
A. Certainly come to my attention from the standpoint of awareness that there may have been an implication of shortfall or something or other in some analysis that was done, but it was so hypothetical at the time that it was -- particularly early on, that it was not a factor that you could really deal with.
Q. Do you know why they were done?
A. For the purpose of -- my perception at

296

the moment was, and I think it was that then, was that it was an attempt to confirm that the mill per kilowatt hour tariff was providing enough funding for the program to proceed as best we could.
And it turns out that there were some cases of circumstances in which that -- early on that that might not have been as clear as it became, but the problem was not the funding. The problem was the appropriations.
Q. Okay. Now, on Page 396 there is a section titled Storage Costs. And it says, "This section presents the cost estimates for the storage activities required in the 5-year and 10-year repository-delay cases." Do you see that?
A. Yes.
Q. All right. Were you aware at the time that your agency, RW, was studying cost impacts on utilities of delays beyond 1998 in implementing the program? Were you aware of that at the time?
A. In a general sense, yes.
Q. Okay.
A. It was not a secret, for sure.
Q. Okay. So you were aware that RW was studying the cost impacts on utilities of delays

297

beyond '98. Okay. What was the reason for that analysis? It wasn't related to fees. What was the reason?
A. The perception was the probability of meeting the '98 date was vanishing.
Q. And so there would be cost impacts on the utilities?
A. Certainly. It's going to extend the time at which the waste acceptance activities and so forth that were programmed in the Act could be implemented.
Q. And that would have a cost impact on utilities?
A. On the whole program. Not just on the utilities, but on the whole program.
Q. Well, I'm focused on the impacts on utilities.
A. Yes. And studying the impact on utilities was an appropriate thing to look at, but that was not the only impact on that activity is the point I'm making.
Q. That is fair enough. What was the cost impact on utilities?
A. I don't remember.
Q. Not the dollar amount, but what kinds of

298

costs are we talking about?
A. You mean what produced the costs?
Q. Yes.
A. Either making modifications to fuel pools or going to dry storage or some such -- some such corrective actions to temporize the circumstance.
Q. And you were aware that that was being studied at the time you were there?
A. Yes.
Q. And what was the purpose of those studies, of, you know, the study of the cost impacts on utilities?
A. I think it was just a prudent thing to do in the whole planning cycle. It was not something that we had any -- as I recall, we had any direct mechanism for preventing or altering; that is, the cause of the circumstance that might give rise to that feature which produced the cost impact. It seemed to me like it was a prudent management tool to have in hand when I go to talk to somebody in Congress.
Q. Okay.
A. And did when and if the occasion arose.
Q. Okay. So it was useful in advancing the

299

goals of the program by pointing out to people that there would be these cost impacts and maybe they could be avoided if the program got going? Is that what you're saying?
A. That certainly would be one way to look at it, but the cost impacts from the delay were many other than just on the utilities, but I think it was important for the Department, who had the obligation under the nominal contracts, which I didn't really think of as a contract, but under the circumstance to estimate those costs.
Q. And at least one thing that you as the director did with those costs is you used them to try to encourage --
A. Move ahead.
Q. And avoiding those costs?
A. That would have certainly been one hoped for outcome.
Q. Well, that would have been one outcome if the program -- those costs would have been avoided?
A. Yes.
Q. So quantifying the costs allowed you to make a more effective statement?
A. More rationale, yes.

300

Q. On balance?
A. Yes.
Q. Quantifying those costs would allow you to make a more effective statement about the good that could be done in financial terms if the program were brought to the point where it actually started operating?
A. Correct.
MR. STOUCK: Thank you very much. Why don't we quit for the day.
Further Deponent sayeth not.
(Whereupon, the taking of the deposition adjourned at 5:17 p.m.)
Sigature of Witness _______________ Notary Public ______________

301

304
UNITED STATES COURT OF FEDERAL CLAIMS
YANKEE ATOMIC ELECTRONIC ) CA NO. 98-126C
COMPANY, ) PLAINTIFF, )
) VS. )
) THE UNITED STATES, )
DEFENDANT. ) ___________________________)
) MAINE YANKEE ATOMIC POWER ) CA NO. 98
COMPANY, ) PLAINTIFF, )
) VS. )
) THE UNITED STATES, )
DEFENDANT. ) ___________________________)
) CONNECTICUT YANKEE ATOMIC ) CA NO. 98
POWER COMPANY, ) PLAINTIFF, )
) VS. )
) THE UNITED STATES, )
DEFENDANT. ) ___________________________)

Deposition on oral examination of BEN RUSCHE, VOLUME 2, reported by Brad H. Thomas, Certified Realtime Reporter and Notary Public in and for the State of South Carolina; said deposition taken pursuant to notice of deposition and in accordance with the Federal Rules of Civil Procedure, at the Sheraton Hotel, 2100 Bush River Road, Columbia, South Carolina, commencing on Friday, May 17,

304

2002, at the hour of 8:28 a.m. Appearances: Representing

306 CONTENTS (Deposition of Ben Rusche) Page Exhibit Index

This deposition is taken in accordance with the Federal Rules of Civil Procedure.

It is agreed and stipulated by the deponent and respective counsel that the reading and signing of the deposition by the deponent is expressly not waived.

Whereupon:

BEN RUSCHE, being duly sworn and cautioned to speak the truth, the whole truth and nothing but the truth, testifies as follows:

CONTINUED EXAMINATION

BY MR. STOUCK:

305

Q. Good morning, Mr. Rusche.
A. To you too, sir.
Q. And you understand, of course, that you are still under oath?
A. I do.
Q. Now, having thought about and talked about these things at some length yesterday, probably for the first time for you in awhile, is there anything that you've thought about overnight, any of your answers, any things that you've told me, any clarifications, supplementation that you would like to make before we get started?
A. I can't think of anything.
Q. Okay. And have you talked with anyone other than your counsel about your testimony since we last met?
A. My wife asked me whether I was involved. And I did speak to her.
Q. Okay. Other than that?
A. No.
Q. Okay. Now, I've been thinking about your testimony yesterday. And I just would like to, you know, try to summarize or at least try to get clear on exactly where we are with this whole

306

business about scheduling and intent and strategy.
So let me see if I understand correctly what you have told me because there's been lots of testimony about it. You understand that the Act, the Nuclear Waste Policy Act, requires the start of waste acceptance by January 31, 1998, right?
A. That's correct.
Q. That's clear?
A. Unmistakable.
Q. Okay. But regarding the intent of the Act with respect to the -- the intent of the Act with respect to the schedule for pick-up after 1998, you don't know what that intent was; is that correct?
MR. MILLER: Objection. Calls --
Q. (Mr. Stouck) The intent of the Act with respect to the schedule for pick-up after January 31, 1998?
MR. MILLER: Objection. Calls for speculation.
Q. (Mr. Stouck) Is my recollection of what you told me, that you don't know what the original intent of the Act was with respect to the schedule after they start picking up?
A. Well, I think the simple answer is, no,

307

these are all done on the computers.
MR. MILLER: Well, these are certainly. Actually I still have a Bates stamp in my desk at my office. I think they are still making them.
MR. STOUCK: Really?
MR. MILLER: But you're right. These were computer added.
THE WITNESS: SP has another connotation to me outside this context. And I just was -- it just tickled my memory.
Q. (Mr. Stouck) There's a code for those. I cannot tell you what SP means.
A. I'm sorry. I didn't mean to distract you.
Q. Sure. Take a look at this schedule though that's on Page 9.
A. Yes. Yes.
MR. MILLER: I thought you said Page 8?
THE WITNESS: You did say Page 8.
Q. (Mr. Stouck) I'm sorry. Eight. You know --
A. Would you rather look at 9?
Q. No. Let's look at 8. It's more interesting. It's a table that's entitled Schedule for the First Repository?



A. Yes.
Q. And you'll see, if you look down near the bottom, that the schedule that's in this plan calls for the start of construction of the first repository in 1998. Do you see that?
A. Yes.
Q. Which is five years later than in the '85 mission plan?
A. Yes.
Q. Okay. And then, likewise, the completion would be five years later, as we saw in that sentence that you called my attention to previously?
A. Yes.
Q. Okay. Do you recall what the relationship between the start of construction of the first repository and the commencement of operations of the MRS was or whether there was a relationship between that?
MR. MILLER: Asked and answered yesterday, I believe.
THE WITNESS: Whatever the case was yesterday, I guess my response to the question, the relationship was that the MRS was certainly -- it would have been possible to construct the MRS



in a more timely fashion, therefore bringing it into operation.
And, two, that its relationship to the repositories, and I believe this document, I don't know that I saw in here somewhere, but I had reached -- I, the Department, had reached an agreement with Congress, and particularly a committee in Congress, that the MRS, whose function we're talking about and for that purpose, was -- needed to have certain restrictions placed on it so that it did not become the substitute for the repository.
And therefore the capacity of the MRS was restricted purely by -- it was an arbitrary or -- a restriction to prevent this potential or possible substitutionary idea, but when -- that is that the repository would take the place -- I mean, an MRS would take the place of the repository and just allow you to keep pushing the repository off.
Q. (Mr. Stouck) Right. But as we sit here today you apparently don't -- I mean, do you or do you not recall whether there was some legal or practical or technical linkage between the start of construction of the repository on the one hand



and on the other the commencement of operations of the MRS?
MR. MILLER: Objection. Compound.
Q. (Mr. Stouck) It's a question about your recollection.
MR. MILLER: Same objection.
THE WITNESS: I seem to have a recollection that there was a relationship out of this same element in Congress, that the MRS construction could not begin until there was some -- I mean, the MRS operation, I believe it was, could not begin unless there had been a construction permit. And I can't remember whether the process started or -- I think it was granted by NRC.
So there was some coupling to again serve that objective of being an integral part of the system without becoming a substitution for -- goodness, this is so distracting. I see this head right behind yours in that mirror and it just keeps going around and --
MR. STOUCK: Let's go off the record for a second.
(Off-the-record discussion.)
(The Court Reporter read the record as

requested.)
Q. (Mr. Stouck) Substitution for?
A. For the repository. And I think that's the recollection that I now have. And I think it would -- that one was a pretty explicit set of interactions with one of the committees.
Q. Was that linkage -- let's call it a linkage.
A. In that sense, yes.
Q. Was that linkage between the repository and the MRS, do you recall, part of the same legislative package that also imposed the capacity limitation?
A. I just don't -- I don't recall that.
Q. Don't recall?
A. It could have been, but I don't recall that.
Q. Okay. But do you recall legislative discussions of both issues? You just --
A. I don't really have a clear picture of --
Q. You recall that there were legislative --
A. There were. They were very intense.
Q. Okay. So if this linkage that you just

332

-- what I call a linkage, that you just described between the grant of the construction permit for the repository and the commencement of operations of the MRS was, in fact, enacted, then this schedule that we're looking at on Page 8 or that we were looking at on Page 8 which shows on a modified basis in the center column that the repository would start construction in 1998 would be consistent with the commencement of a plan for the commencement of MRS operations in 1998 if construction of the repository were started and if this linkage, in fact, existed the way you --
A. I think that's right.
Q. Okay. Now, let me ask this. If it's your understanding that the '98 date was not a firm commitment -- if you're looking at something, I would be happy to wait, if you want to review this.
A. No. I just happened to see this --
Q. Please. I'll hold my question.
A. -- on the following page. On Page 10 of the text there under an MRS, I just saw this as I flipped over.
Q. Okay. What does it say?
A. It makes somewhat the same points we

333

just made.
Q. Well, I will tell you it's my understanding that the capacity limitation and that the link -- what I call the linkage was, in fact, enacted into law. So your recollection on those points is, I think, reasonably accurate.
A. Okay.
Q. If the '98 date was not a firm commitment, okay, which I think is what you've been telling me, in your mind it was not a firm commitment, or is that --
A. There's no question of what the Act said.
Q. Okay.
A. But I do believe that the discussions that were underway during the time I was there with Congress and with the states and with the interested parties and I'm sure with the industry, industry's primary interaction may have been more in and through the scheduling and programming for acceptance, all of those -- I think all of those parties, in my recollection, had a clear picture that the '98 date was -- though statutorily established unequivocally, was very difficult -- would be very difficult to achieve and in most

334

environments that I was in from a practical standpoint was unachievable because of the vagaries of the program and the interactions, notwithstanding commitments to try and do and so forth.
Q. Okay. Well, I guess then if I were -- why was the -- and the answer you just gave concerns the time period when you were at RW, right?
A. Yes. And really concerns me.
Q. Your view?
A. Yes.
Q. Ben Rusche?
A. Yes.
Q. Okay. Now, I guess, why was the Department attempting to meet the '98 date?
A. Because the Act required it.
Q. Okay.
A. Or specified it, whatever you want to --
Q. That was the source of the motivation to try?
A. Yes.
Q. You had a statutory requirement?
A. Yes.
Q. Okay. Okay.

335

MR. STOUCK: Let's mark this as No. 17.
(Exhibit No. 17 was marked for identification.)
Q. (Mr. Stouck) Mr. Rusche, you've been handed a one-page document which has Bates No. SN044976. This appears to be an AP wire story. It's not dated. I will tell you it came to me from the files of a utility company called Southern Companies. Do you know that company or have you heard of it?
A. Yeah. It's been succeeded by other companies now.
Q. Okay.
A. But yes.
Q. All right. That's where I got this. Why don't you take a moment to review it. Actually there is a date at the bottom. I apologize. June 13, 1984.
MR. STOUCK: Can we go off the record for a second.
(Off-the-record discussion.)
Q. (Mr. Stouck) Have you had an opportunity to review it?
A. Uh-huh.
Q. Okay. This date that I just mentioned,

336

June -- have you seen this before?
A. I don't think so, but apparently I was there.
Q. Well, do you recall a press conference -- this is about a month -- less than a month after that Congressional statement we looked at yesterday. So it's obviously shortly after you became the director, correct?
A. I had so many press conferences -- yeah, I had many press conferences, but I can't -- I don't recall this one specifically.
Q. Okay. Well, do you recall one -- was there a press conference that sort of announced you to the world?
A. I just don't remember.
Q. Don't remember. Okay. In the second paragraph there's a statement, it's not in quotations in this story, but it uses the word said. Well, let me read it.
It says, "Ben Rusche, the new director of the Energy Department's Civilian Radioactive Waste Management Office, said government contracts with owners of the nation's 80 nuclear plants are being revised to include the guarantee," reference to the guarantee mentioned in the first paragraph

337

to begin taking fuel by 1998. Do you see that?
A. Uh-huh.
Q. Do you recall making that statement?
A. No. But I don't doubt it.
Q. Okay. You don't doubt having made that statement?
A. I'm sure I was probably a good quote, a legitimate quote, or an actual quote maybe I should say.
Q. Well, there's an actual quote in the next paragraph.
A. Yes.
Q. It says, "'The Department is obliged to begin receiving spent fuel in 1998 whether or not a repository is in place,' Rusche told reporters Tuesday." Do you see that?
A. I do.
Q. Okay. And you have no reason to doubt that you made that statement?
A. No.
Q. Okay. And if you made that statement, I take it you believed it at the time?
A. I'm sure I did.
Q. Okay.
A. I was pretty naive though at the time.

338

Q. Okay.
A. I also note the following paragraph, that industry folks doubted it too.
Q. Yes. Well, the doubt there though is concerning the first repository?
A. Yes.
Q. But, as we know, repositories was not the only way to meet the '98 date?
A. Well, and I went on -- and even at this early date the picture in my mind was that down, I guess, toward the bottom where I mention --
Q. The MRS?
A. -- MRS, yes.
Q. Now, there's a reference at the bottom to Mr. Lawrence. Do you see that in the last paragraph?
A. I do.
Q. And according to this story, "Mr. Lawrence had resisted pressure from Senator Johnston and the utility industry to proceed simultaneously with both an underground dump and an above-ground facility capable of storing the wastes for 50 to 100 years."
And I understand that to be a reference to, on the one hand, the repository and, on the

339

other hand, the MRS. Is that reasonable?
A. I would too.
Q. Do you recall Mr. Lawrence's resistance to the simultaneous development of an MRS?
A. No. In fact, this is the first time I've ever heard such a thing attributed to Lawrence, at least in my recollection.
On the other hand, the dialogue with Bennett Johnston, whether my contact with Bennett began the day Mike walked away or not, my dialogue with Johnston was extensive. And we've touched on this in many contexts here.
Q. And what was -- do you recall what was Johnston's -- Senator Johnston's view about the MRS?
A. He was the No. 1 promoter.
Q. Okay. But you just don't recall at this point what Lawrence's views were about the MRS or do you believe this is incorrect, correct, or you just don't recall?
A. I have -- I don't recall Mike's view on the subject, nor being made -- in fact, I was not aware, at least as far as I can recall, of this. I don't think Bennett ever talked to me to that effect.

340

Q. Of this meaning Lawrence's resistance?
A. Yes. I never had that dialogue with Johnston. The Senator and I had many discussions soon after I was there. And in part -- and my view on the MRS is unequivocal in my confirmation statement and I think it remained consistent throughout the time I was there.
Q. Okay. And Johnston, Senator Johnston, was, you say, the No. 1 supporter?
A. Yes.
Q. And what's your understanding of why he was such a strong proponent of the MRS concept?
A. I think he was just pragmatic.
Q. Okay. Meaning?
A. Meaning that the odyssey to first identify sites and then go through the licensing process for a repository was just a very challenging task and the timing was just not very predictable.
And an MRS was a fairly standard sort of construction at a place people could see and there were circumstances which you could surround it with which were much more tolerable.
I shared that view not because of the Senator. In fact, I'm not sure I had any

341

discussion with the Senator on the subject before I was confirmed.
If you recall, when I was confirmed Senator McClure was still chairman of the Committee, the Energy Committee. Senator Johnston was the ranking minority member. So Senator McClure, I think I'll use the word, advisedly commanded my time of such things, but I still had interaction with Senator Johnston.
Q. And then at some point he became the chairman?
A. The next year when the Senate changed minorities -- I mean, majorities, yes.
Q. And minorities?
A. Huh?
Q. And minorities?
A. Yes. Both parties. Both segments changed.
MR. STOUCK: Okay. Let's mark this, please, as --
(Off-the-record discussion.)
Q. (Mr. Stouck) You say that you had lots of press conferences. Was there a particular individual who assisted you with press relations in RW or at the Department generally that you

342

recall?
A. Well, I had -- eventually there was. Early on I was sufficiently transitional in even how to do business in that environment, that it took me awhile to get a direct office staff assembled.
And we did end up with a group that I can't recall its name, but it was something like the -- I certainly can't remember the title precisely, but it was a group that reported directly to me that helped me with policy.
And it had people, I think, that -- eventually Roger Gale was the leader of that office. And it had people with press and public relations.
Ginger King became maybe after a year or two, year and a half or so, the person that was most directly helpful, but she even had a staff of several people.
Q. Okay. Here is -- we're going to mark No. 18.
(Exhibit No. 18 was marked for identification.)
Q. (Mr. Stouck) This is -- it's another statement presented to this time a Senate

343

better words, an administrative -- director of the administrative activities. He was not a technical guy, as I recall. And subsequently -- I mean, he was a very capable fellow. He tended to be somewhat reserved and didn't get out front a lot.
And if I'm not mistaken, and this is somewhat speculative, but I think that after I left there was a transitional period as to what to do, who and how and whatnot. And I think Sam may have even been an acting director of RW for a period, a short period of time.
Q. He stayed on after you left, anyway?
A. Yes. To the best of my knowledge, that's right.
Q. All right.
(Off-the-record discussion.)
MR. STOUCK: Let's mark this as the next, 21.
(Exhibit No. 21 was marked for identification.)
Q. (Mr. Stouck) I'm not going to go through all 100 plus sessions with Congressional committees, but here is another one for you.
A. Sure.
Q. What's been marked Exhibit No. 21 is

364

actually, I will say at the outset, we'll go through it, it's an incomplete copy of a statement of -- on the cover it says Statement of Ben C. Rusche, Director, and so forth --
MR. STOUCK: Off the record.
(Off-the-record discussion.)
Q. (Mr. Stouck) Before the Committee on Energy and Natural Resources, United States Senate, April 29, 1987.
And if you turn the page, it looks like the first page -- "Mr. Chairman and Members of the Committee," is the first page. Then the next page is numbered three, next page is numbered five, seven, nine.
A. Looks like half the pages are missing.
Q. 11, 13. But then we have 14. And then at the end --
A. Eighteen.
Q. -- 18 and 16. So those are sort of reversed. But if you also take a close look, you will see that the Bates numbers are consecutive.
A. All right.
Q. So I will tell you that this is the way that we got the document and it's the only version that I have, but --

365

A. I would like to suggest that that's not the way the testimony was presented, but that's somewhat speculative.
Q. Okay. On the first page though it says, "I appreciate" -- but do you -- you don't doubt you gave this testimony?
A. No.
Q. "I appreciate the opportunity to appear before you today to discuss the Department of Energy's proposal for Monitored Retrievable Storage." So that seems to be the subject of this testimony.
Okay. Now, and I do apologize for not having a complete document, but I just don't. On Page 7, Mr. Rusche, there's a paragraph that starts in the middle of the page. Let me read the first few sentences into the record.
"Since the MRS proposal was prepared over a year ago, the Department has revised its estimate of when the first geologic repository can be operational from 1998 to 2003, as presented in the January 1987 draft Amendment to the June 1985 Mission Plan. The MRS will allow the Department to begin receiving waste by 1998." Do you see that?

366

A. I do.
Q. Okay. So that's what you told Congress?
A. Yes.
Q. In April of 1987?
A. Yes.
Q. Okay. And if you would turn now to the page that's marked 13.
A. Okay.
Q. There's a paragraph that starts there a few lines down. And again let me read a few sentences into the record.
"The net cost to the total system is about $1.5 billion because of savings incurred at the repository and in the transportation system. The costs borne by the utility rate payers would be offset by savings in at-reactor storage cost; these costs would be" --
A. Could be avoided.
Q. It says would be avoided.
A. Yes.
Q. Would be avoided. "The costs borne by the utility rate payers would be offset by savings in at-reactor storage cost; these costs would be avoided because an MRS facility would allow DOE to accept spent fuel at an earlier time." Do you see

367

that?
A. Yes.
Q. So that was an argument in favor of proceeding with the MRS facility that you made to Congress in 1987?
A. I did.
Q. That the savings in at-reactor storage costs for utilities resulted from earlier commencement of operations of the program would offset -- largely offset the increased costs that were added by the implementation of the MRS? Yes?
A. Yes.
Q. Okay. Now, on Page 16 we see at the very bottom there's a paragraph that starts, "The NWPA."
A. Uh-huh.
Q. Do you see that?
A. Uh-huh.
Q. Let me read this one. "The NWPA finds that 'a national problem has been created by the accumulation of spent fuel from nuclear reactors' and that the 'Federal Government has the responsibility to provide for the permanent disposal'. Adding additional operator burdens and complexity at the reactor sites would be



inconsistent with these findings which serve as a basis for the NWPA." Do you see that?
A. I do.
Q. And I've read it correctly?
A. Yes.
Q. And that was your view in 1987?
A. Yes.
Q. And that was what you told Congress?
A. Yes.
Q. And is that your view today?
A. Yes.
Q. And why is it that adding additional burdens and complexity at the reactor sites would be inconsistent with those findings from the NWPA that are quoted here?
A. Well, I think the simple answer would be that the magnitude of the problem is strongly proportional to the amount of fuel.
Q. Magnitude of the problem at the sites?
A. Yes. And to the extent that the inventory of fuel at the site is reduced or maintained in a -- or prevented from growing contributes to relief on the problem.
Q. Would you agree that the burdens that are referred to here and that implicitly or



explicitly you're referring to in your testimony about this paragraph, burdens are primarily cost burdens, added cost of storage?
MR. MILLER: As referred to the previous paragraph?
THE WITNESS: Show me where you're -- let me be sure the words you're reading.
Q. (Mr. Stouck) Right here. It says, "Adding additional operator burdens and complexity at the reactor sites."
I'm asking what your understanding of the burdens and complexity at reactor sites are. You know, if there's more fuel there -- you say it's proportional to inventory. I mean, my question is are we talking primarily about the cost burden to the utility of storing that fuel?
A. Let me look at this.
Q. Sure. I'm not sure that helps, but --
A. I believe the relative statement -- relative improvement, if I read this paragraph correctly, is to suggest that the kinds of activities that would surely be done at an MRS, which is dedicated to that objective, that is consolidating fuel and so forth, is much better done at the MRS than at reactor facilities, which



are primarily equipped in general for storage of active fuel assemblies, and that the equipment that it would take to turn a spent fuel basin or a spent fuel operation into that kind of consolidation and work would be better done at a specialized facility like an MRS rather than at dozens or whatever individual facilities.
Q. Okay. There are operational burdens?
A. Operation --
Q. As well as cost burdens?
A. Yes.
Q. Okay. But what's the burden of consolidation at a utility site if it's not just added cost? I mean, are there technical burdens?
A. Well, I think, at least in my mind, it would be that the operations carried out in a spent fuel handling building of this sort are -- put it that a spent fuel handling building for any reactor that I know of now, both by space and by situation, is not nearly as well equipped as one would expect to find in an MRS.
It's both the operational effectiveness, the safety, the efficiencies that could be achieved much better at an MRS than in umpteen individual fuel handling buildings with reactors

around the complex.
Q. So you do not agree then, I take it, or do you, that the burdens to utilities of having increased inventory on site resulting from the failure of the Department of Energy to take it away is primarily a cost burden?
That's the question. Do you agree that it's primarily a cost -- there may be these -- you just referred to some other burdens. There may be yet additional burdens. My question is is the burden, in your view, primarily a cost burden or is it not primarily a cost burden?
MR. MILLER: So your question, Jerry, if I can clarify --
MR. STOUCK: Has nothing to do with --
MR. MILLER: -- is irrespective of the language --
MR. STOUCK: Has nothing --
MR. MILLER: -- in this Exhibit 21 that you were previously referring to?
MR. STOUCK: Has nothing to do with the testimony.
MR. MILLER: Okay. Objection. Calls for speculation.
THE WITNESS: If I may -- still talking

372

about this document?
Q. (Mr. Stouck) Sure. Okay. Please.
A. Look at the paragraph -- next to the last paragraph on Page 16.
Q. Right.
A. The last page.
Q. Yes.
A. Where the statement of finding that a national problem has been created by the accumulation of spent fuel. National problem is a very non-specific statement.
My personal view would be that the national problem that's created is perhaps of two types. One is just the fact that spent fuel basins have finite storage capacity. Re-racking and other such treatments are costly and safe obviously because they are regulated by NRC, but there is an incremental movement in the direction away from maximum safety.
Q. All right.
A. Not unacceptable, by any means. There are ways to rack and re-rack and preserve criticality margins, but it does call for and do things that basins weren't originally intended for.

373

Q. All right.
A. And secondarily I think this is suggesting that if indeed one has to -- gets to the place, for example, that you have to disassemble fuel elements, that you're going to, in effect, package fuel elements, that it would be much better -- that's an operation that the basins are generally not well equipped to do or to do it you would have to add cost and equipment that's not nominally there.
Q. In the last part of your answer are you referring to consolidation?
A. Yes.
Q. Rod consolidation?
A. Yes.
Q. Okay. At the time you were head of RW was it clear that rod consolidation was going to be a part of the program?
A. I don't have any recollection of that, but I think that the passage of time moved inevitably in that direction.
Q. Well, do you know whether today the plan is to consolidate rods before putting them in the repository?
A. I don't know today.

374

Q. Okay. Now, let's go back to this testimony, this sentence that we looked at before, "Adding additional" --
A. Which page are you on?
Q. I'm on Page 16.
A. All right.
Q. The last sentence of the last full paragraph, "Adding additional operator burdens and complexity at the reactor sites would be inconsistent with these findings," referring to the quoted findings from the NWPA, "which serve as a basis for the NWPA." Do you see that sentence?
A. I do.
Q. Okay. Now, without going back a whole couple of days of testimony, don't you agree that an objective of the program at the time you were there was to avoid adding additional -- avoid additional operator burdens and complexity at the reactor sites consistent with these findings of -- you know, that are quoted here, that that was an objective of the program, to avoid adding additional operator burdens and complexity? And how would they be avoided? Through the movement of fuel. That that was an objective?
A. Yes.

375

Q. Okay. And, in fact, that the objective -- the entire objective of the program was to -- strike that. Let me ask it this way. In fact, that the -- no. Just strike it.
A. Since you have raised that question, could I make a statement?
Q. Okay.
A. I think that when you talk about the objective of the whole NWPA was first to improve the safety of the system from a public health and safety standpoint.
Q. Okay.
A. When you get to talking about things like we're talking about here, these are relevant factors in what you do and how fast you move and so forth, but the objective was to move this potentially -- move the fuel which had certain safety potential, small though they be in storage, to a more safe and secure circumstance.
Q. Okay.
A. And that's clearly the first objective. The way you do it obviously calls for an attempt to optimize or be prudent in what you do. And so I think that the idea of getting the fuel out of the basins is the first objective.

376

What you have to do on the way to get it there, whether it's through an MRS or through repackaging in a facility, become optimization considerations to me. That is, the objective is to get that fuel out of the basins into more secure storage.
Q. That was the purpose of the NWPA in your mind?
A. Yes. Yes.
Q. As you understood it at the time you were director?
A. Yes.
Q. And that purpose included removing all of the nation's commercial spent fuel, right?
A. Eventually.
Q. Eventually. At some time. But there's no question that the purpose of the Act, in your mind, included removing all of the fuel from the commercial industry?
A. Yes. That a basin is not an appropriate permanent storage facility for an indefinite future.
Q. Okay.
(Off-the-record discussion.)
Q. (Mr. Stouck) Just from what you just

377

said, Mr. Rusche, I mean, you know, that's your understanding of what the purpose was, I mean, doesn't it follow -- if safety was a concern or was the concern -- is that -- I mean, you're not saying it was the only concern, but it was a primary concern? Is that --
A. Long-term safety.
Q. Okay. Right. Right. Doesn't it follow from what you just said that sooner is better than later?
I mean, I think you even referred indirectly to optimization. I mean, you know, without -- I mean, as an objective if you're trying to remove all the fuel for these good public policy purposes, I mean, do you disagree that sooner is better than later?
A. I believe that's too broad a statement because the ability to handle fuel elements just removed from the reactor for storage -- I mean, for shipping and handling is not necessarily better done at such a facility. That I think all of the experience the Commission has had, NRC has had, is that it's safe to store fuel elements in a pool for awhile.
And one of the reasons it's safe and

378

desirable to do this is to allow the decay and heat generation rate to fall to a level in which the more extensive handling processes that would be associated with an MRS or with a repository are reduced.
So I think that there is a mixture -- or I would tune the statement you just made that the best thing you could do would be to come directly from the discharge machine to a cask and ship it.
Q. Well, I didn't say that.
A. No, you did not.
Q. I'm asking as --
A. But that was the implication.
Q. I'm asking as a general --
A. At least that's --
Q. No, that wasn't my implication. My question is simply as a general proposition do you or do you not agree, consistent with your understanding of the purposes of the Act that you just laid out for me, do you or do you not agree that as a general proposition sooner is better than later with respect to removal of spent fuel from nuclear utility sites?
MR. MILLER: Objection. Vague.
THE WITNESS: With the added caveat that

379

sooner does not start the instant of discharge, that there is an attenuation period that is appropriate and better done, in fact, appropriately done in a fuel pool basin.
Q. (Mr. Stouck) Fine. Subject to that, your answer is yes?
A. Yes.
Q. Thank you. Okay. Do you have an understanding of the term --
A. Are we through with this?
Q. Yeah, we're done with that, for now anyway, maybe forever. Do you have an understanding of the -- I am going to -- I've already instructed somebody to find a complete copy of that. So if you're --
A. It would be interesting.
Q. If it's one of the documents that --
A. It may be exactly the way I presented it. I hope not.
Q. Do you have an understanding -- well, before I turn to that, during your time working at RW do you recall any personal direct dealings with Yankee Atomic Electric Company personnel?
A. With the exception of one reservation that I can't recall right now, I can't get a clear

380

picture, I don't recall any interaction or direct discussion with the exception of one person.
And I have a clear picture that there was a fellow up there that I came to know through some mechanism more personally than professionally, but who I came to know. And he may have visited me more than once.
Q. You don't recall that individual's name?
A. I can't recall his name. Ed something. Oh, goodness. He finally became one of the senior managers. I think I met him in the early '60s when I was still at Savannah River just about the time Part 100 was written. I participated in that to some extent. And we went up to the Yankee reactor.
Q. Okay.
A. But other than that, I don't recall any.
Q. And you say that was more personal than professional?
A. Well, it started from a personal relationship, but I think that it -- as I recall, it persisted as an acquaintance. And he probably -- and I have a recollection that he visited me when I was in RW.
I have no idea of the subject matter.

381

It could have been purely personal, but that's the only contact that I know that I can recall I ever had of a personal nature.
Q. Okay. And you think that person's first name was Ed?
A. I think.
Q. Okay. Okay. Do you know Andy Kadak?
A. No.
Q. Okay. Same question with respect to when you were at RW did you have any personal direct dealings with either Connecticut Yankee Atomic Power Company or Maine Yankee Atomic Power Company?
A. I do not recall any.
Q. Okay. Do you recall any personal direct dealings with any nuclear power company?
A. Any?
Q. Yeah.
A. Yes.
Q. Okay. Was it something that you did, you know, on more than an isolated basis, this something being meet with these people? You know, let's start with meet --
A. I would say it was very occasional, that the industry generally spoke to me through

382

EEI or whatever -- ANEC or whatever it was.
Q. But once in awhile a utility executive would either write to you or come to see you?
A. Yes.
Q. About some matter related to the program?
A. Yes.
Q. You say it was very occasional? I mean, that was your --
A. I can't be very specific. It was certainly not an anticipated weekly or monthly kind of thing.
Q. Okay. Do you have an understanding of the term greater than Class C waste?
A. I believe I do.
Q. Okay. What's your understanding?
A. Class C waste is defined in the Atomic Energy Act -- excuse me -- in NRC regulations as a particular kind of waste which meets certain -- and I don't have the numerical numbers in my head, but it's the most radioactive of those kinds of classes of waste and requires more explicit and careful storage conditions and handling conditions.
Q. That's Class C?

383

IN THE UNITED STATES COURT OF FEDERAL CLAIM

YANKEE ATOMIC ELECTRIC COMPANY, )
CONNECTICUT YANKEE ATOMIC POWER )Case Nos.:
COMPANY, and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
)
THE UNITED STATES, )
Defendant. )

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Tuesday, August 3, 2004
Volume 16

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPAN
CONNECTICUT YANKEE ATOMIC POWER COMPANY a
YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPAN
CONNECTICUT YANKEE ATOMIC POWER COMPANY:
MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)



APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COM
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S
\- - - - -
MR. MILLER: Your Honor, we appreciate the Court's indulgence in letting us get our thoughts together over the evening hours. I just have one additional question for Mr. Morgan on my direct examination.
THE COURT: Go ahead, whenever you're ready.
Whereupon--
ROBERT MORGAN
a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:
DIRECT EXAMINATION (Resumed)
BY MR. MILLER:
Q. All right. Sir, if we could go back on Plaintiff's 678. Mr. Morgan, you recall we talked about this exhibit yesterday in your testimony?
A. Yes.
Q. And you recall this document, do you not?
A. Yes.
Q. Mr. Morgan, you recognize this, do you not, as the second page of the statement you made at the December 1983 information meeting?
A. Yes.

proceeding, there might have been a little bit of confusion on that point.

But ultimately, we're talking about the same relevancy. Thank you for your time.

THE WITNESS: You're welcome.

THE COURT: Any redirect?

MR. MILLER: Short redirect, Your Honor.

THE COURT: One more round here.

REDIRECT EXAMINATION

BY MR. MILLER:

Q. You thought you were going to get away, didn't you, Mr. Morgan?

THE COURT: I don't blame you, you want to go back to Oregon, I think.

THE WITNESS: I now live in Colorado.

THE COURT: Oh, Colorado.

BY MR. MILLER:

Q. Mr. Morgan, did DOE elect not to put a rate of acceptance in the standard contract?

A. Yes.

Q. Was that a deliberate choice on your part?

A. Yes.

Q. Did DOE feel -- well, can you tell me why you didn't, that you didn't put a specific rate of acceptance in the contract?



A. I felt that it, because of the uncertainties of the program, which I've discussed earlier, the NRC licensing process characterization, the R&D and other activities, that I thought it was not prudent to put an acceptance rate in the contract.

Q. And what about your knowledge of the technical or technological or scientific capabilities that you were going to have to have at the repository, did you know what those were at that time?

A. Not in total because of the fact that NRC had not identified the requirements for licensing.

Q. Okay.

A. And quite honestly --

Q. I'm sorry.

A. Geologists are great. It's a historical science, not a predictive science, and they can tell you what happened five million years ago, but they won't tell you what's going to happen tomorrow, and that was a problem that we had to deal with.

Q. So that was a concern of yours?

A. Yes, that was a concern of mine.

Q. In your mind, I'm sorry, in your mind, was this program a first of its kind of project?



A. Yes.

Q. Was it possible for DOE to predict, in 1983, what rates they would be able to use in accepting fuel in 1998?

A. No.

Q. Based on your understanding of the Act, the NWPA, did it require that DOE accept spent nuclear fuel and high-level waste starting in '98 at a rate that would preclude utilities from adding further storage facilities on-site?

A. No, that was not part of the Act.

Q. Was that a program goal that you had at the time you were director --

A. That was a program goal that we identified in the mission plan.

Q. And is that a goal that DOE specifically declined to put in the contract?

A. Yes. I must say that we hadn't identified, at the time the contract was signed or prepared, we had not identified the acceptance rates that we later included in the mission plan. We hadn't gotten that far at the time of the contract. The Act required that we have the utilities sign a contract by June 30th, 1983, and we had not gotten to any design, conceptual design on the repository at that time.



Q. All right, sir. In your mind, Mr. Morgan, what's the difference between a program goal and a contractual requirement?

A. They were totally separate. The contract was the agreement between DOE and the utilities, and the program goal was our best efforts at meeting the requirements of the Act. They were totally different.

MR. MILLER: I have no further questions, Your Honor. Thank you, Mr. Morgan.

THE COURT: Anything further?

MR. SHAPIRO: Nothing further, Your Honor.

THE COURT: All right. You're excused, and thank you very much for your testimony.

THE WITNESS: Thank you, sir.

MR. MILLER: Your Honor, the government calls, as its next witness, Mr. Benard Rusche.

Whereupon--

BENARD C. RUSCHE

a witness, called for examination, having been duly sworn, was examined and testified as follows:

THE COURT: Just take a seat.

DIRECT EXAMINATION

BY MR. MILLER:

Q. Are you all set, Mr. Rusche?

A. Raring to go.
Q. Would you state your full name for the record, please, sir?
A. My name is Benard Clements Rusche.
Q. All right, sir. And, Mr. Rusche, you are the former first presidentially appointed and confirmed director of the Office of Civilian Radioactive Waste Management, are you not?
A. Correct.
Q. We'll talk a little bit about that, as you might guess. But first, could you tell me what your college degree, what field that was in and when you obtained that?
A. My college degree was in Physics. I obtained a BS in Physics from Tennessee Polytechnic Institute in 1953.
Q. Okay, sir. And what was your first job after graduating from the Polytechnic Institute?
A. Two weeks after graduation, I joined the Savannah River site as an experimental physicist in the technical division.
Q. And what was the status of the Savannah River site at the time you joined the Savannah River?
A. Under construction, had been under construction for, I guess late '51, since late '51,



and the site, the first production reactor was scheduled to go critical by the end of the year in 1953. And the position, or the opportunity at which I became involved was an experimental physics effort to provide assurance that the physics calculations and predictions and designs for that first production reactor were acceptable.
Q. All right, sir. And did in fact the reactor go online as you had anticipated?
A. Indeed, it did, but we made special efforts to assure that it would by actually taking that first charge critical in the experimental reactor, so we had pretty high confidence.
Q. All right, sir. Well, how long did you remain employed at Savannah River?
A. I was at Savannah River from 1953 to '58.
Q. All right, sir. Would you just tell us what, if any, progression of jobs you had during that time period?
A. In 1958, I decided to take a slight diversion and join Lockheed Nuclear Products, which was an aircraft company's attempt to get itself into the nuclear business and spent two years and then returned to Savannah River and stayed at Savannah River until 1975.



Q. Okay, sir. And what job did you take up when you returned to Savannah River in about 1960, right?
A. Yes, yes.
Q. I'm sorry.
A. In 1960, the government had raised the prospect of possibly using heavy water reactors for some civilian purposes, as contrasted with the production purposes at Savannah River. And to that extent, a test reactor was built called the heavy water components test reactor, and I was assigned the physics responsibility for that design, along with a number of others, and subsequently, the operation of that reactor from the standpoint of its physics connotations.
Q. All right, sir.
A. And soon thereafter, it became evident that issues related to the environment were taking greater importance in the concept, or in the context of both the government and the general population.

And I was appointed, after about two or two and a half years in the HWCTR activity, as the director of a new study group which was aimed at both reactor safety dynamics, as well as environmental effects, and continued that for a couple years, as I



recall, and then formed a reactor safety group, which was associated with the activities of predicting operations, understanding the site and the interaction between the reactors, their effluence and their potential for other facts or factors, and continued in that rule until 1975.

I had, in that time, I guess I had a group of maybe about 25 or 30 physicists or chemists or engineers that were in the group that I was leading. And in 1975, I was invited by the Nuclear Regulatory Commission to join the Commission on a leave of absence from Dupont, and I was appointed the first director of the office of Nuclear Reactor Regulation, in which I stayed two years, as agreed.
Q. And what were your responsibilities as the first director of nuclear regulation for the NRC?
A. The Nuclear Regulatory Commission had just been born in the Energy Reorganization Act of 1970. I think it was either late '73 or '74. And it was to, the goal was first to attempt to establish a context in which commercial nuclear power could be regulated for the safety of the public and of the industry as well, and to develop the appropriate protocols, procedures, designs and so forth.

And I had the opportunity of being involved

number of opportunities I had to either misspeak or be misquoted or misunderstood.
And I'm sure I did it many times. But it, the point I'm making is that the explicit circumstance and context just has to be clearly annotated.
Q. Sure. Well, let's put it into context, I'm asking --
A. Certainly.
Q. -- in the context of the mission plan.
A. Certainly.
Q. And why don't we put a copy of that in front of you?
A. Fine.
Q. And I hope it won't become confusing. I think that, in the direct examination, they used the Defendant's exhibit number. We've got copies with Plaintiffs' Exhibit Number 95 on it. It's ultimately all the same document.
A. Do we get credit for the amount of paper that we can dispose of?
THE COURT: We have to file an environmental impact statement, I think.
THE WITNESS: That would be an interesting exercise, wouldn't it, sir?



BY MR. SHAPIRO:
Q. Fortunately, the paper is recyclable.
A. This is a good exercise.
Q. This is actually only volume one of the three.
A. Which one is this?
Q. This is volume one.
A. Of which year? Of which year, '75, '78?
Q. Well, if you'll look in the front cover, it's June of 1985.
A. June of '85, yes.
Q. This is the one that you signed as director?
A. I believe I did. It was just after I was confirmed.
Q. And now, if you'll turn a couple pages into it, that is your cover memo to Congress?
A. It is, indeed.
Q. So this is the one that you signed?
A. Yes, nobody could forge that signature.
Q. If I could ask you to turn to page six of this document.
A. VI?
Q. No, Arabic Numeral 6?
A. Thank you.



Q. There's a section there that starts in the middle, "1.3, Policy Goals and Program Objectives."
A. Got it.
Q. And if you recall my prior question was one of the policy goals that the program be conducted in a cost-effective manner, and to put it into context, if you turn to the fourth of those policy goals at the bottom of the page there.
A. Yes.
Q. So in fact, the program must be conducted in a cost-effective manner with full cost recovery?
A. Yes.
Q. You agreed with that?
A. I believe that was the Congressional mandate.
Q. And you agreed with it as well?
A. Yes, this is the mission plan, and that was our objective, at least that was my interpretation of it. You know, cost-effectiveness varies depending on the context in which you're looking at it.
Q. I want to ask about another area of cost --
A. All right.
Q. -- you were considering in the mission plan. When you were director, you were aware that RW, OCWRM, the Department you were director of, was



studying the cost impact on utilities on delayed acceptance of spent fuel by the Department of Energy beyond 1998, is that correct?
A. I'm sure that must have been so. I would have expected that to be so.
Q. And you knew that those cost impacts included the cost of making modifications to their spent fuel pools, to add room or to add dry storage, correct?
A. It could have.
Q. I want to ask you about a few other things in the mission plan, specifically to make sure that we do all understand what the program objectives were, the program strategy. If you could turn to page 15 of the document?
A. All right.
Q. And what I'm getting at, you see, again, introduction under program strategy, there's a number of paragraphs.
A. Yes.
Q. And the third one notes that, "The program must be conducted in a financially responsible, cost-effective manner and on the basis of full cost recovery." You see that?
A. Yes.

Q. And you agreed with that statement?
A. Yeah, that's what Congress mandated.
Q. And you agree with it as well?
A. I do too.
Q. And the next one down, "In accordance with the above goals, the program must vigorously pursue the X-directive to begin accepting spent fuel and high-level waste for disposal no later than January 31, 1998 and to continue dispose of the waste in a highly efficient manner consistent with the continued orderly operation of the nation's nuclear power generation plants." You agreed with that statement, true?
A. Particularly denoting the first word of the second line.
Q. "Pursue"?
A. Yes.
Q. You agree that that objective should be pursued?
A. Absolutely, I just don't want it to be misconstrued to accomplish.
Q. Sure, but you want --
A. We were not able to guarantee accomplishment, but we could guarantee pursuit.
Q. Ultimately, the Department did not



accomplish the goal of accepting spent fuel by 1998?
A. That's right. In fact, I even told the committee I doubted that could be done, if you'll recall.
Q. And I do want to get to that, but I want to first finish with --
A. All right.
Q. -- the mission plan. Next item of interest I want to direct your attention to is on page 17.
A. 17, all right, sir.
Q. If you'll recall with Mr. Miller, he asked a little bit about the waste acceptance schedules in this plan, do you recall -- there were actually two different waste acceptance schedules discussed in the mission plan, correct?
A. I really don't know.
Q. Well, if I could direct your attention then to page 17.
A. All right.
Q. In the middle.
A. All right.
Q. One of those is the improved performance plan.
A. Uh-huh.
Q. Let me read that paragraph for you and see



if that refreshes your recollection. "The improved performance plan reflects the opportunities built into the Act to evaluate options for enhancing the authorized plan in meeting the requirements in the Act.
Careful analyses of the provisions of the Act and programatic options are shown that increased confidence, and improved performance can be achieved by emphasizing system integration, that is, by considering all of the elements of the program as part of a single optimized, as a unit, to best meet the program requirements." Do you see that language?
A. I hear it as well.
Q. And that indicates that this mission plan that you signed did include an approved performance plan, do you recall that?
A. I'm sure it did, yes, but I can't point to the incremental improvement indicated by something that I'm just not that familiar with.
Q. You don't recall --
A. But I know the title, "Improved in Performance Plan," was appropriate for the circumstances.
Q. Do you recall the particular improvements that were in mind?



A. No.
Q. Let me see if we can refresh your recollection about that. Let's discuss starting on that same page.
A. All right.
Q. And actually, the last sentence of the bottom of that next paragraph says, "The improvements include the following," and there's some numbered paragraphs.
A. 2.2 does it visually, Figure 2.2 on the next page.
Q. That's correct. I want to ask, I want to focus your attention on two or three of these particular improvements.
A. All right.
Q. Number two on the bottom of page 17, "The Increased reliability and flexibility in operating the system in an integrated cost-effective manner by incorporating an additional facility that can regulate the flow of waste to the repository."
A. I'm sorry, is that item two you're reading?
Q. Yes, item two, bottom of page 17.
A. I'm sorry, go ahead.
Q. "The increased reliability and flexibility in operating the system in an integrated

cost-effective manner by incorporating an additional facility that can regulate the flow of waste through the repository." Do you recall that advantage to the improved performance plan?
A. Certainly potential advantage.
Q. And then going on to page 18, number three, "Improve confidence in DOE's ability to meet schedules, particularly in beginning to accept quantities of waste no later than January 31, 1998, an integral MRS facility will be scheduled for initial operation as early as 1986." Do you recall that improvement?
A. That was a potential improvement, yes.
Q. And you agreed with that?
A. Yes, my testimony on MRS is unequivocal.
Q. And the next one down, "Ability to accept significantly larger quantities of waste in the early years of operation, substantially reducing the added cost of providing increase at-reactor storage capabilities." You agree that was another improvement of the improved performance plan?
A. That would certainly contribute to improved performance.
Q. And there are, actually, the way the document is structured, there are some additional



advantages to the improved performance plan that are mentioned later on that I want to also ask you about to see if you agree with these. If you could turn to page 28 of the document?
A. All right.
Q. Beginning with the third paragraph down there on page 28, it says, "A comparison of the two acceptance schedules," and by the way, those are on the preceding two pages, the one for the improved performance plan and the authorized system, if you want to refer to those, "shows the following advantages to the improved performance plan over the authorized plan for the acceptance of civilian spent fuel.
The first one is spent fuel acceptance. It can begin as soon as the interval MRS facility begins operation, possibly one or two years ahead of the repository." Do you agree with that?
A. It certainly had the potential.
Q. And the second one down, "System waste acceptance rates with the integral MRS facility ramp-up and reach the design level sooner, thus easing the problem of spent fuel storage during the critical years around 1998." Do you agree with that advantage?



A. Presuming the design included those features, yes.
Q. Well, that was the intent --
A. Yes.
Q. -- of the improvement performance plan?
A. Yes.
Q. And in fact, the third advantage listed down there is in the particular example depicted in the preceding table, "Spent fuel backlog after 1998 never exceeds the cumulative spent fuel inventory in 1998. In other words, with the exception of a few years just before the start-up of the second repository, the acceptance rate matches or exceeds the rate of spent fuel generation after 1998." Do you agree with that statement?
A. In retrospect, I would delete the fourth word in the second line, in that I never use "never." And that I think that was a poor choice of words. I didn't write it, but I think that is, has an absolutism to it that is just inconsistent with any kind of reality.
But other than that, yes, I think the principle that is there, certainly, I agree with. But I did sign it, even though it's there. I never do things like that though anymore.



Q. And finally, I want to point your attention down to the bottom of this page. It says that, "The representative waste acceptance schedule for the improved performance system described in this chapter is designed to achieve the following DOE objectives," it goes on to the next page.
And I think you were asked about part of this page. I want to direct your attention to the first of those listed objectives, and it says that, "It is to accept civilian spent fuel at an annual rate that will allow the utilities to maintain orderly operations of their nuclear power plants, recognizing that the oldest spent fuel will have the highest priority for acceptance, consistent with DOE's current contracts with waste generators." Do you agree with that objective?
A. Uh-huh, yes. Excuse me.
Q. So in general, it would be fair to say that the waste acceptance schedule in the improved performance plan would have been a reasonable way to proceed, correct?
A. It appears to be. I think that was the view at the time we wrote the report.
Q. You mentioned the -- I'm sorry, Mr. Rusche, you're still looking at the documents. Is there

anything else you wanted to -- I didn't want to interrupt you.
THE WITNESS: Your Honor, may I speak?
THE COURT: Yes.
THE WITNESS: I think item three is one that deserves at least a moment's recognition on page 29, which has to do with the defense waste acceptance element in considering the effectiveness of the plan and activities. At that time, I think that we had a pretty fuzzy idea about how defense waste was going to be dealt with.
I believe this was before the President, the Secretary had recommended, and the President had agreed they would have a single repository, if I'm not mistaken. I think that's the right sequence. Isn't that right? I don't think we had made that decision at the time this was issued.
And I think that the point I want to at least inject into our discussion is that we had essentially no idea at that time what the defense waste implications were going to be. And I think since I have now had, I'm chairman of the governor's nuclear advisory council in the state, and I think I'm working at Savannah River again, I spent so much time down there on this very point.



And I think that that, what shall I say, the conditionality of that statement then I believe, in our limited knowledge, was well-intended, but I would say today that there is perhaps a considerably larger spectrum of possibilities and prospects which may have impact on what we're talking about.
And that's perhaps out of, it may not be germane to this particular discussion, but I think it just goes to point out that we have learned a lot since the days that this was published, and we have learned that we don't know even as much as we thought we knew then in some cases. I hope that's not inappropriate.
BY MR. SHAPIRO:
Q. No, not at all.
A. Good.
Q. But if I understand what you're saying correctly, you're pointing out that yet another advantage of the improved performance plan is it had the capability to ensure that there wouldn't be conflicts between taking waste from commercial reactors and the defense side waste, correct?
A. That was an objective. What I'm saying is, accomplishing that objective, maybe we haven't gotten there yet, so to speak, but that may be more



challenging than we thought at the time, and sure still is the right objective, but the degree and how we do that is a matter of very intense activity right now.
Q. We may find that we need even more, a more robust system than was considered even when this mission plan was prepared?
A. It's entirely possible, or it may invite other things we didn't even think about in those days. Excuse me for injecting that, but the reality is there.
Q. I appreciate that, Mr. Rusche. I want to turn to another subject you mentioned in your direct testimony, the MRS, monitored retrievable storage system, which if I recall correctly, it was important to you when you were director?
A. It was indeed.
Q. Because you thought it was improbable that you were going to have a repository operating by 1998, correct?
A. You're more optimistic than I was even.
Q. But it was your opinion when you were director that the Department could meet the 1998 date if Congress approved of the MRS, true?
A. Well, it was certainly my opinion that that



was the best chance that we had. I'm not sure that we could guarantee it because the features of the MRS were not immediately and, at that point, were not fully described, then you could have a place that had room for an extra cask or something or other and call it an MRS. But I was talking about a fully functional MRS with the kind of things that I was thinking about.
Q. And that fully functioning MRS --
A. Would have certainly been an asset, in my opinion.
Q. And you think it was more likely than not that the Department could have met the 1998 deadline?
A. It certainly improved the chances by a very large amount.
Q. And I believe you just said that you urged Congress to approve of the MRS, and one of your reasons for doing that was to enable utilities to avoid the cost of additional at-reactor storage, true?
A. (Witness nods head.)
Q. I'm sorry, you have to give an auditory answer.
A. I'm sorry. Yes.
Q. And another of your reasons for urging

Congress to approve of the MRS was in fact to prevent reactors from becoming de facto long-term storage sites, correct?
A. Yes, although we've had extensive experience that shows that long-term storage at reactor sites is pretty effective and did not, has not given reason for concerns that we might have had then at least. I think the design of the reactors, the design of the fuel, the operation of the utilities has proven to be perhaps even, what shall I say, more professional, more appropriate than we might have thought in 1984.
I think we still were in a relatively early time. You'll recall I was involved in some of the NRC licensing, and I think that we had some fuel approved questions when I was in NRC. But I think fuel approved chemistry and arrangements and materials that are being used in fuel and so forth have turned out to be more robust than many thought might be.
That doesn't take away from the statement we're talking about. It just means that it would have been that much better anyway.
Q. And utilities were still incurring the cost to provide that long-term storage, correct?



A. And still paying the mill per kilowatt-hour. And presumably, the public service commissions or whatever you call them in each plant were granting that allowance.
Q. Now, finally, I want to ask you about a particular kind of waste that you were looking at taking care of as a part of the RW program. When you were director, you authorized an internal memorandum saying that it was your intent that reactor hardware would be disposed of in the repository, correct?
A. I don't remember such a memorandum, but it doesn't surprise me.
Q. Let me show it to you. We marked it as Plaintiffs' Exhibit 1951. If you take a look at the first page of this exhibit, Mr. Rusche, it looks like a concurrence page, and that's your signature on it?
A. Yes.
Q. And the next page is the memorandum, and it looks like initials there rather than --
A. Looks like somebody forged it to me.
Q. You think they would have forged it, or might it have been --
A. They may have called and said, Could I put your initials on it? That's probably what they did.
Q. Since you had signed the concurrence memo



above?
A. Yes.
Q. And I want to direct your attention to the -- let me read the first couple paragraphs in the memorandum. "We concur on the subject report to Congress, and the subject line is 'Report on Greater than Class C Low-Level Waste.' We had the following points, but our concurrence is not conditional on their incorporation."
And the first of those points, "It is our present intent that reactor hardware would be disposed of in the repository. At any rate, we do not think it necessary to introduce this as a question which should concern Congress at this point." Did you authorize this statement?
A. I sure did authorize somebody to put my initials on it. I would say, in retrospect, at this point, I think that "reactor hardware" has such a broad connotation that both of us would probably agree what we're thinking hardware is, but it would have probably been better if that had been somewhat constrained to a particular type or something, but it doesn't change the inference of the matter.
Q. And that was your understanding when you were director of the program?



A. Yes. Although I would say -- excuse me, I shouldn't go to that point. I should wait for you to ask me something else.
MR. SHAPIRO: If I could have a moment, Your Honor?
Thank you, Mr. Rusche.
THE WITNESS: Yes, sir.
MR. SHAPIRO: I have no further questions for you.
THE WITNESS: Thank you, sir.
THE COURT: Any redirect?
MR. MILLER: Your Honor, I do have some short redirect. Could I ask for about a 10-minute break before I begin that?
THE COURT: Sure. Return about 25 of.
MR. MILLER: Thank you, Your Honor.
(Whereupon, a short recess was taken.)

REDIRECT EXAMINATION

BY MR. MILLER:
Q. All right, Mr. Rusche. I believe Mr. Shapiro asked you a number of questions about the program goal to run the program cost -- I'm sorry, cost-effectively or cost-efficiently. Do you recall that?
A. I think so.

# SLATER-THOMPSON

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - X

Washington, D.C.
Wednesday, April 21, 1999

Deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 10:10 a.m., Wednesday, April 21, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

1

APPEARANCES:

On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQ.
JERRY STOUCK, ESQ.
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5854

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, N.W.
Room 10150
Washington, D.C. 20530
(202) 307-6289

2

C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFF |
|---|---|
| NANCY H. SLATER | |
| By Mr. Shapiro | 4 |
| Afternoon session - 94 | |


E X H I B I T S


| SLATER EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 - Letter dated 3/1/99 | 50 |
| 2 - Letter dated 4/28/87 | 82 |
| 3 - Memo dated 6/29/87 | 95 |
| 4 - Letter dated 10/2/87 | 97 |
| 5 - Letter dated 11/10/87 | 99 |
| 6 - Standard Contract Issue Resolution Process | 122 |
| 7 - Preliminary Draft dated 12/19/92 | 152 |
| 8 - Handwritten documents dated 8/29/91 | 161 |
| 9 - Memo dated 6/18/92 | 171 |
| 10 - Preliminary Draft dated 12/22/92 | 175 |
| 11 - Preliminary Draft dated 12/19/92 | 177 |
| 12 - Fax dated 9/1/93 | 181 |
| 13 - Spent Fuel Acceptance Scenarios devoted to Shutdown Reactors dated 10/89 | 185 |
| 14 - Letter dated 1/26/93 | 191 |
| 15 - Fax dated 6/2/94 | 194 |
| 16 - Memo dated 7/25/94 | 199 |


3

P R O C E E D I N G S

Whereupon,
NANCY H. SLATER,
was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL
FOR PLAINTIFF
BY MR. SHAPIRO:

Q. Would you state your name for the record, please.
A. Nancy H. Slater.
Q. Ms. Slater, my name is Robert Shapiro, we're here for your deposition. Have you ever had your deposition taken before?
A. No.
Q. Do you have some understanding of what's going to happen today?
A. Yes.
Q. What do you understand is going to happen today?
A. I understand that I'm going to be a factual deponent and that you're interested in asking me questions about my knowledge of the waste acceptance area during the time I was in

4

waste acceptance.
Q. And let me tell you just briefly procedurally how it will work. I'll be asking you a series of questions and you will be expected to answer the questions. As we discussed even before we went on the record, the court reporter is taking everything down and we'll get a written transcript of everything that's said today. Do you understand that?
A. Yes.
Q. And it will also be helpful for the court reporter's purposes so we get a clean transcript if you will respond as you just did.
A. Verbally.
Q. A nice verbal answer, yes or no or whatever the appropriate response might be.
A. I understand.
Q. Also I would ask, if you don't understand one of my questions, you're not sure what I'm asking in one of my questions, if you would please ask me to rephrase it rather than trying to answer a question you're not sure what the question is.
A. Will do.
Q. I appreciate that. Where do you work?

5

A. At the U.S. Department of Energy in the Office of Civilian Radioactive Waste Management in the Regulatory Coordination Division.
Q. What's your job title there?
A. Team leader.
Q. And what are you a team leader of?
A. The entire division basically. I serve in lieu of a deputy division director. And we deal with the regulatory concerns between the program and the Nuclear Regulatory Commission, the EPA, National Academy of Science, and dealings with the Nuclear Waste Technical Review Board.
Q. When you say you deal with regulatory concerns of EPA, NRC, and the other agencies, what do you do on a day-to-day basis vis-a-vis the NRC?
A. Let's see, a typical example would be the fact that we are involved in developing safeguards and security policy guidelines for the eventual acceptance and disposal of a variety of waste forms. And those policy guidelines will be translated into actual waste acceptance criteria by another group.
And the waste owners will then have to

6

assure that the waste they deliver falls within the boundary parameters established by the guidelines with one exception, there will be no new requirements imposed on the utilities because the standard contract is quite clear in terms of what can be asked for and what cannot.
Q. And so you're constantly working with EPA, NRC in developing various guidelines that they're going to be using?
A. Right, reporting on progress in the program and quality assurance issues, things like that.
Q. How many people are in this division?
A. I don't know, I have to count. Six.
Q. And who heads up the division?
A. Alan Brownstein, he's the division director.
Q. And what is this the division of?
A. Regulatory Coordination.
Q. It's the Regulatory Coordination Division. Is this a division of a larger office?
A. It would be the office of -- we have reorganized, we have new names for everything. But it would be the program management and integration function.

7

Q. What is the program management and integration function?
A. These are in one division the budget folks, in another division the information management folks, it might be human resource folks in another division. And we are the division -- the only division within that group that has any technical or policy responsibilities. There is a separate office, there are two offices, in the other office is acceptance and transportation integration.
Q. And who heads up the program management and integration office?
A. Let's see, that would be Dwight Shelor.
Q. How long have you been a team leader in the Regulatory Coordination Division?
A. Let's see, I moved in late '95. About three and a half years, almost four years.
Q. Since that move three and a half, four years ago, have there been any other reorganizations within your office?
A. Within my particular Office of Program Management?
Q. Well, let me start with the Regulatory

8

Coordination Division. Has there been any reorganization within that division?
A. Yes, because, in fact, we had a RIF last year. And we RIF'd two people out of the division, one of whom was a team leader. Our roles and responsibilities did not change.
Q. When you had two team leaders, was there any division as to what the two team leaders were leading?
A. Yes.
Q. What were the two team leaders leading at that point?
A. The other team leader was leading environmental regulatory issues and issues dealing with the Nuclear Waste Technical Review Board. And my function was primarily Nuclear Regulatory Commission interface.
Q. And now you're basically team leader for all of them?
A. Doing it all.
Q. In that same three and a half to four year time span since you've been in your current position, has there been any other reorganization at the office, the Office of Program Management and Integration?

9

A. Yes, as a matter of fact, up until December -- actually January 1 of this year, the two offices would have had two associate directors. One retired and so the remaining office director now manages both. That was Dwight Shelor.
Q. And who was the associate director that left?
A. Samuel Rousso.
Q. Before Mr. Rousso left, how did they have it divided up?
A. Mr. Rousso would have had program management and Mr. Shelor had acceptance and transportation. Let's see. Yes, that's right.
Q. Maybe I misunderstood. So this is within the Office of Program Management and Integration that's now headed up by Mr. Shelor?
A. There were two offices. Samuel Rousso headed the management group, basically management functions, Dwight Shelor headed the acceptance and transportation group. Samuel Rousso retired. Both offices continue to exist. But now Dwight Shelor manages both.
Q. I see. And above the office level the next thing you get to is the Office of Civilian

10

Radioactive Waste Management itself?
A. Is the deputy director and the director, it's the highest level.
Q. And has there been any other organizations within the -- reorganizations within the whole RW organization besides the ones that you've just mentioned in the last three and a half to four years?
A. To be honest with you, I try not to keep track of that. We play musical chairs. And I believe that the systems integration group may have moved from program management to acceptance and transportation.
Q. Three and a half years ago, when you came into your current position, what position did you have previously?
A. Prior to that I was the team leader in waste acceptance.
Q. And waste acceptance was part of what division at that time?
A. Well, it was a division, waste acceptance was a division.
Q. And who was director of the division at that time?
A. We had acting directors. I served as

11

acting director for awhile, Linda Desell served as acting director for a very short period because the director before that had gone to regulatory coordination, and that's Alan Brownstein.
Q. Let me make sure I understand. So your last position before taking your current position was actual acting director?
A. No. We were rotating -- after Alan left to go to regulatory coordination, we were asked if we would like to take the position. And no one was eager to take the position including me. So we were rotating acting division directors.
And I got the first shot in the barrel. And then Linda Desell got the second shot in the barrel. So, once I ceased as the acting division director, I simply devolved to my team leader position which is what I was when I left to come to regulatory coordination.
Q. How come nobody was anxious to be the boss, the division director?
A. Personally? I have no knowledge of anyone else's reasons, but my personal reasons are family considerations. My family comes

12

first. I'm at that time in life where I'm not sure I want to put my feet on that little treadmill.
Q. And the division director job had a lot of demands on it that would have interfered with family?
A. Yes.
Q. Do you have any idea as to why other people didn't want to be division director?
A. None.
Q. How was that position eventually filled?
A. How did they fill it. They backfilled -- and I'm not even sure exactly how it came about getting the new division director. But the current division director was an old division director from way back when, Jim Carlson.
Q. When you say they backfilled, what do you mean by backfilled?
A. Internally, they moved someone internally into the position as opposed to bringing someone in from outside the program.
Q. Do you remember roughly what years you were a team leader in the waste acceptance

13

division?
A. Let's see. I joined DOE in August 1991. And at that time we had branch chiefs. And Alan Brownstein was the branch chief. I honestly do not remember precisely when the department decided it would no longer have branch chiefs, it would rename them and it would create division directors and team leaders.
And I would have to guess -- I'd have to go back and look to make sure, but my recollection is it might have been around 1993, 1994.
Q. What is a team leader?
A. Team leader is responsible for individual contributions, being a subject matter expert in some areas or a particular area, responsible for managing the entire team, eliminating obstacles, giving people a fresh look by stepping outside the box they're standing in, trying to solve the problem. So they're a little bit of both, technical worker and manager.
Q. But technically a team leader is not a supervisor?
A. No, no. Unfortunately you have the responsibilities but not the privileges of

14

writing evaluations, signing leave slips, that kind of thing.
Q. That position is that of the division director?
A. Right.
Q. When you were team leader of waste acceptance roughly somewhere around 1993 to '95, who was on your team?
A. I have to do this by going around the room. Phil Smith, Bill Floyd, Mary Lee Payton, Kristin Svinicki, John Vlahakis, and I would consider my secretary to be part of the team as well, Deborah Evans.
Q. Were there any changes in the team during your tenure as team leader?
A. Yes. In fact, we hired Dave Zabransky. And, when Dave came into the division, we reorganized the division with two team leaders and divided the work load up.
Q. Why did that happen?
A. It was certainly a more efficient way to operate. And, to be quite frank, I was overloaded with too much work.
Q. When did that reorganization take place?

15

A. I don't recall precisely, I'd have to refresh my memory. I don't remember when Dave came.
Q. And, when it got divided up, how was it divided up?
A. Let's see. I know that I kept the responsibility for safeguards and security for data collection and for integration with other DOE offices. This is waste acceptance criteria type work. And the financial and contractual responsibilities went to Dave.
Q. What do you mean by financial and contractual?
A. Fees paid by the utilities into the Nuclear Waste Fund.
Q. What about issues such as like figuring out how fast DOE was going to be taking spent fuel, going to be accepting spent fuel, whose team would that kind of issue come under?
A. It was not my team and I don't know if that was Dave's team or not. But it was not my responsibility.
Q. And, as to working on issues in terms of the schedule for acceptance amongst the various utilities as to whose spent fuel will be

16

taken and in what order, which team would have handled that?
A. Prior to Dave's tenure, I would have. With the advent of Dave, Dave would have.
Q. Now, you mentioned a number of people on your team. These were the people on your team before Mr. Zabransky joined?
A. Right.
Q. Who was on your team after he joined?
A. Kristin Svinicki, Mary Lee Payton, and Bill Floyd. My recollection is that John Vlahakis may have floated between the two teams sort of as the overflow person.
Q. And Phil Smith then was with Mr. Zabransky?
A. Yes, and would have been responsible for the fees, and I'm not precisely sure what else Dave had assigned him.
Q. Did anyone else work with Mr. Zabransky?
A. Not to my knowledge.
Q. Who would have handled the scheduling issues that we talked about earlier?
A. In terms of acceptance rates?
Q. Right.

17

A. That would have been Dave Zabransky.
Q. He would have done that personally?
A. Uh-huh.
Q. You said you became a team leader roughly 1993?
A. When they renamed the branch chiefs is what happened. This was the government move to eliminate a level of management.
Q. So, prior to that time, what was your position?
A. No formal title per se. My job description I believe reads industrial specialist nuclear.
Q. And that was the title that you had when you came into DOE in 1991?
A. Right.
Q. And what branch were you in?
A. At the time I think it was called logistics and utility interface, if my memory serves me well.
Q. And the branch was part of a division?
A. Right. And I do not recall what the division would have been. I don't remember.
Q. And the division would have been part of an office?

18

A. An office, right.
Q. What office would it have been part of?
A. I don't know, I think they may have called it the waste acceptance storage and transportation office. But again I don't commit things like that to memory. I feel there are organization charts that I can go pull to look it up.
Q. And, between 1991 and 1993, Mr. Brownstein was the branch chief?
A. Yes.
Q. And after 1993 Mr. Brownstein became division director?
A. Director.
Q. And, between '91 and '93, do you recall who was the division director?
A. Jim Carlson.
Q. And then who was the office director above Mr. Carlson?
A. Ron Milner.
Q. What were your duties in this 1991 to 1993 period when you were an industrial specialist?
A. I was involved in the preparation of the annual capacity report, the acceptance

19

priority ranking, answering questions both internal and external about the terms and conditions of the contract. Let's see. And whatever else may have arisen at the time.
I know, when we came in, we were on the tail end of a rulemaking, net versus gross, as sold was that clarification. So I wrapped part of that up. I believe I terminated a couple of nonutility contracts at the contract holder's request because they either no longer had the material or had, in fact, in one case I believe sold it to the government.
Q. Do you remember any other issues you worked on during that period?
A. '91 to '93, I think we began to discuss delivery commitment schedules at that point. Would that be about right? That would be about right.
Q. That would also have included exchange of approved delivery commitment schedules?
A. Actually my recollection is that we discussed exchanges not concurrently, because there was the opportunity to do that a little later. And it was more important given the timing requirement in the contract to have that

20

guidance issue.
Q. And guidance as to what to do with the delivery commitment schedules themselves?
A. How to fill them out, instructions. I believe, if I'm not incorrect, that that's an OMB reviewed form. And you know that process, that takes time and there must be instructions on how to complete the form.
Q. What was the time concern?
A. I believe the contract requires delivery commitment schedules to be submitted by the purchaser 63 months in advance of the year in which they have an allocation. So back it out from 1998, and they would have been submitting in '92, late '92.
Q. Are there any other issues that you recall working on in the '91 to '93 period?
A. Let's see. I know we addressed priority for shutdown reactors. And nothing else comes to mind right now.
Q. What about the period '93 to '95, what issues did you work on?
A. During that time period, I believe I worked on delivery commitment schedule exchanges, many of the same things from '91 and '93, the

21

acceptance, priority ranking, the annual capacity report, DCS review and approval.
We began conversations about final delivery schedules and what would be included in those, safeguards and security, and that was policy development. I know that I worked on numerous reviews of system baseline documents, system requirements documents primarily from a waste acceptance standpoint. And I know we kept working on priority for shutdown reactors.
Q. Let me ask you to clarify what you mean by just a couple of these categories. Safeguards and security, what was involved with safeguards and security?
A. NRC regulations require that a licensee have in place a safeguards and security system. And that means physical security as in physical protection. And that physical protection is based on the attractiveness of the material, would someone want to steal it to make a bomb.
They also require as another subelement material control and accounting. That is that, if you as a utility tell me that you're giving me ten MTU, you have to provide me with some documentation to give me confidence that you are;

22

because, once I accept it, I'm going to have to swear and affirm to the NRC that I've got ten MTU.
And what we were working with the utilities to do, and it was an iterative process, it was lots of help and lot of involvement from the utility as well, was a process that would not impose an undo burden on them to do something that they weren't currently doing.
For example, they would address material control and accounting issues through calculation, burnup, for example, but they would not measure. And measurements would have been an operational impact. So we were looking for ways to get what we needed to accomplish without disrupting their operations. So there were lots of people talking to each other about that.
Q. You said you reviewed a number of what you called system baseline or system requirements documents. What's a system baseline document?
A. I guess the simplest way to describe it would be that these are the overall driving requirements for the design and operation of a repository. They are, in fact, obtained from legislation, regulation, and that's probably the

23

basis for them.
That then is expanded on in a subcure document, further expanded on eventually in specification or design drawing or something like that. So the upper level, the upper tier documents, funny you call them upper tier and you call them baseline, but same thing.
Q. And you say system requirements document, is that just another name for the same thing or is that something else?
A. No, that would be another name for the same thing.
Q. So, if I understand, from your perspective what was your involvement in looking at those documents?
A. The primary document was -- I guess they have a new acronym now. The old acronym was CRD. And it was the overarching requirements document for the entire system, regardless of whether or not that was waste acceptance, transportation, storage, or disposal.
That document was then devolved into a system requirements document, an SRD, for each of those individual elements. There would have been an SRD for waste acceptance, an SRD for

24

Q. Did your view get general agreement at DOE?
A. Yes.
Q. And, as far as you understand, what is the current DOE view on accepting fuel?
A. I couldn't speak for the current view.
Q. But at least, as of the time you left the waste acceptance office, that was the view of that office?
A. Yes.
Q. If I understand correctly, this is part of the issue of what is nonstandard fuel?
A. Right.
Q. Can you characterize then, at the time you were in that waste acceptance office, what was DOE's view as to what nonstandard fuel was or is?
A. You're stretching my recollection now. I don't honestly recall. I'd have to go back and look at definitions within the contract.
Q. After you got to DOE, how often do you recall there being meetings between DOE and utilities on this ACR resolution process?
A. I don't recall a number, I really don't.

121

Q. But they were pretty much on an ad hoc basis?
A. Yes.
Q. Just to clarify what I mean by ad hoc, you didn't have quarterly meetings?
A. Once a month or once a week, no.
Q. Just when an issue came up that was ripe for being addressed?
A. It was addressed.
(Slater Exhibit No. 6 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater, you've just been handed what we've had marked as Slater Exhibit 6. Do you recognize this document?
A. Vaguely.
Q. Can you tell us what it is?
A. Can you give me a moment to refresh my memory.
Q. Sure.
A. Okay. Without reading through the entire paper, yes, this is a general summary of the ACR issue resolution process, the nature and scope of the issues that require interpretation, clarification, resolution, and a brief address on

122

certain of those issues of what that is likely to be.
Q. Did you draft this document?
A. No, I did not.
Q. Do you recall who did?
A. Yes, Dave Jones did.
Q. You would have reviewed this document?
A. Yes.
Q. And there are three names at the top of the first page of Exhibit 6. Mr. Jones, you, and Mr. Cole?
A. Billy Cole, yes.
Q. What was Mr. Jones' and Mr. Cole's roles?
A. They were consultants to the -- I guess it was logistics to our branch or our division depending on whether or not we had been renamed at that point. But yes.
Q. Exhibit 6 was a document written by Mr. Jones, the contractor, on behalf of your division?
A. No. It was a document that was authored on behalf of E.R. Johnson Associates for presentation at a conference. And in general we have a DOE author on papers like this. We then

123

have the right to review. And so that's the way this works. No, this was not authored at the request of DOE.
Q. Do you recall what the purpose of the conference was or the nature of the paper?
A. No, I do not.
Q. So you would have reviewed this document, Exhibit 6, as the DOE author to check for accuracy from DOE's perspective?
A. Yes.
Q. Do you see I guess at the bottom of the first page, there looks to be a page number, 757?
A. Yes.
Q. Which suggests this might have been part of a larger compilation?
A. The proceedings from the meeting perhaps.
Q. That was the question I was going to ask, do you know what this might be from a compilation of?
A. I would speculate that it is from a compilation. Which compilation I couldn't say.
Q. In your role as the reviewing author for DOE, is that a fair characterization of your role with respect to this document?

124

A. As the reviewer for the document, yes. There may have been other reviewers as well.
Q. Do you recall making any editorial changes?
A. No, I don't specifically recall making changes.
Q. You don't recall any significant dispute as to what would go into the contents?
A. I don't recall whether there was a specific dispute or not.
Q. If you would look at the first sentence of the document, the abstract, there's a reference to 35 issues that need to be resolved to ensure that the waste management system can achieve maximum efficiency while attempting to ensure equity among the waste owners?
A. Yes.
Q. When you reviewed this document, what was your understanding of what was meant by maximum efficiency?
A. Maximum efficiency is another way of expressing a desire to optimize the system. The system accepts as much waste as possible because you're scheduling appropriately, you're managing your operations so that it doesn't back up at the

125

gate, there's no confusion, when it comes time to ship, about what can be shipped and how it will be shipped. So maximizing efficiency for not only the DOE system but the utilities as well.
Q. Does maximum efficiency also relate to issues of economics and cost?
A. It may.
Q. It may but not necessarily?
A. But not necessarily.
Q. And the reference to equity among waste owners, what was your understanding of what that term was referring to?
A. Equity among waste owners, that all those who pay into the waste fund are entitled to services under the contract and that those purchasers are entitled to the same treatment, each and every one of them, no special treatment because you make more money, you're a bigger utility, that kind of thing.
Q. And these two goals, maximum efficiency and ensuring equity, these were commonly understood goals that DOE had for the system?
A. I don't know about whether or not DOE had those goals. I know that we in that branch or division at the time did have that goal. And

126

I believe that those goals were shared by the utility industry.
Q. There's also reference in that sentence that DOE came up with a list of 35 areas in which they would like to clarify the contract?
A. Yes.
Q. And previously you had mentioned that I guess the utilities and DOE sort of came up with their formalized list of issues. The 35 issues that are talked about in Exhibit 6, that's DOE's list?
A. That's the compiled list. That's the utility issues and the DOE issues.
Q. Do you have any recollection of what portion of that might have come initially from DOE as opposed to the utilities?
A. No, no specific recollection.
Q. A point of clarification to something I've seen elsewhere. Mr. Cole to your knowledge has always worked for E.R. Johnson?
A. No, he hasn't. As a matter of fact, he worked for Pacific Northwest Labs, PNL, I believe he worked for PNL before he worked for E.R. Johnson as a subcontractor to TRW.
Q. First with PNL, Pacific Northwest Labs,

127

what's PNL's relationship to the Department of Energy?
A. I really couldn't say because his involvement with the waste program as part of PNL predated my time.
Q. And E.R. Johnson at the time of your involvement with DOE with the waste program, E.R. Johnson was a subcontractor of TRW?
A. Right.
Q. I've also seen the acronym JAI. Is that an acronym for Johnson Associates, Inc.?
A. Yes.
Q. Have you heard of that acronym JAI?
A. Yes.
Q. And that's what you understand it to be?
A. Yes.
Q. If you could turn to it's page 759 in the compilation of Exhibit 6, at the bottom there's a number that begins DB, it's DB-110123. Do you see that page?
A. Yes.
Q. After this set of bullet points, there's a sentence that says these issues can be categorized into two distinct groups, equity and

128

reorganization.
Q. But otherwise it's basically the same group?
A. Yes. I do believe there was a separate transportation program at the time that UNWMG existed. And I do not recall the name of the law firm that managed that, but I believe that was consolidated with UWASTE.
Q. If you could turn to page 761 in the compilation. Do you see the first issue listed as being of a priority to DOE was whether or not there should be any exceptions to the oldest fuel first priority ranking; do you recall that issue?
A. Yes. The issue there was do I have to give you my oldest fuel. And, from the utility perspective, I have fuel in my pool, I have fuel in the lower forty. I would prefer to give you the newer fuel which is in my pool and free up space there, I'm not interested in giving you the stuff I've already canned.
So, if my oldest fuel is what earns me a place in the ranking based on its discharge dates, must I give that you fuel that earned the ranking. And the answer was no. That fuel earns you a space in the ranking. But on your DCS you



tell us that you want to give us a range of fuels; and, as long as it meets those minimum conditions, five-year-old being the biggest one.
So that's what OFF was about, because it could have been interpreted -- this was the utility perspective. It could have been interpreted to mean that I had to give you the precise fuel that earned me the slot in the ranking.
Q. I think I understand. Let me point your attention to particular language in the middle of that column. Right about in the middle, it says the resolution of this issue will focus on clarifying that the application of the OFF principle is used only in establishing the acceptance priority ranking, and as such, there should be no exceptions.
Then the next sentence says, any basis other than OFF would result in inequitable assignment of acceptance capacity among the purchasers. Why would that be if you just said that utilities, they've already earned their spot in the queue?
A. No, I think you're not reading that in the proper context. What they're saying is that



an acceptance priority ranking on any other basis than oldest fuel first on an industry-wide basis would not be equitable. That's what it's saying.
Q. And what was your understanding as to why that would not be equitable?
A. From a DOE perspective, we believe that oldest fuel first applied to the industry as a whole, not to each individual utility.
Q. Is the equity issue to be more specific the same one that we've discussed I guess with respect to the priority for shutdown plants issue, the concern that, if you didn't use the strict oldest fuel first priority ranking, then a utility might somehow incur unexpected storage costs for spent fuel?
A. Yes. And those who have been paying into the fund the longest have had the longest and largest financial obligation and should have their fuel removed first. And the consensus of the industry as I understand it was that was true, they agreed.
Q. And the concern again with the need to have to create more away-from-reactor storage space was linked to the concern at the 1998 date



for starting acceptance of spent fuel, that that might well not be met?
A. Yes.
Q. Especially by this 1991, 1992 time frame, that was even clearer than it was earlier?
A. I personally would agree with that.
Q. Would DOE's waste acceptance office that you were part of in '91, '92, would that office have had the same view?
A. I can't speak for anyone else in that office. I can speak for myself. And I will tell you that that was my personal perspective in that office.
Q. Can you recall anyone in that office having a different perspective?
A. No. I can't recall anyone in that office specifically having a similar perspective.
Q. What about Mr. Brownstein, do you recall what his perspective was on the likelihood of making the '98 date?
A. I'm trying to think if we had specific discussions on that. I believe that Mr. Brownstein and I did have discussions on the '98 date, significantly after the '91, '92 time

address one issue, that you would go to rulemaking to address the entire suite of issues, some of which could take longer to resolve than others. So a timing issue.
Q. The timing issue being that DOE wanted to wait before going further on this issue until other issues were more ripe?
A. Until we completed the effort, the ACR issue resolution process, and been able to go to rulemaking with a more complete set of changes.
(Slater Exhibit No. 8 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater, you've been handed what we've had marked as Slater Exhibit 8. Do you recognize this document?
A. No, I don't recall this. This is my handwriting. And these appear to be the meeting minutes from a standard contract task force that would have been a utility group task force in August 29, 1991, five days after I joined DOE.
And it looks like it focuses on completing DCS's. And I believe you will note in item 3 that we discussed that range of discharge dates which was one of the issues that was

161

unclear.
Q. You said that Slater Exhibit 8 that you're looking at looks to be minutes of a meeting of utilities. Why would you have attended the meeting if you were already at DOE at that point?
A. You recall that we discussed instructions for completing the DCS form. Prior to formalizing the instructions for completing the DCS form, we would have met with the standard contract task force, the utilities, because we had provided them with a copy of the instructions and asked them to review it, asked them if they had any questions, and agreed to discuss the form with them so that we were not imposing something that was unclear and would not work.
And this meeting appears to have done just that, because, if I am reviewing this correctly, starting at item 4, page 3, paragraph 1, page 3 paragraph 3, page 4 at the top, these are all what appear to be pages of the procedure.
Q. Let me also confirm something that I think you said earlier, that Slater Exhibit 8, the first page of it looks to be a sign-in sheet for a meeting?

162

A. Yes.
Q. And the subsequent pages appear to be your own minutes or notes of that meeting?
A. My notes for suggested changes, because, in fact, if you look, it says page 4 at the top, article VB, spell it out. And what does approval mean, it has to be signed. So this is exactly what this one is. This was to receive the comments that the utilities had on the DCS procedure and the form itself and go back and review them and then incorporate them.
Q. When you say the DCS procedure, you mean the instructions given to --
A. Instructions.
Q. Given to utilities on how to complete the DCS?
A. Right.
Q. On the second page of Slater Exhibit 8, you have it looks like certain items or issues 1, 2, 3, 4. Could you tell me what the second one is talking about?
A. Let me read it for a moment.
Okay. Submission of the first DCS's was timed, it's explicitly mandated in the contract, 63 months prior to the delivery year,

163

and assumes that delivery would commence in 1998, January 31, '98.
If 1998 were not the year when delivery commenced, utilities would have submitted DCS's for 1998. The question was do they get to go back now and revise their DCS's or are they just overcome by events, are they calendar year specific or year one, is it 1998 or year one.
Q. Year one of what?
A. Of any range of dates. So, if it were year one, no one would have to revise anything. If it's 1998, do I make them go back and revise all their DCS's, do I -- if they have to go back and revise their DCS's, can I revise a DCS or would I have to treat it as an exchange in a given year. So there were procedural questions about that, and that's what this issue is discussing.
Q. You say year one, you mean year one of DOE's acceptance of spent fuel under the waste acceptance system?
A. Yes.
Q. The instructions for the delivery commitment schedules, did they require utilities to not request delivery of more spent fuel than

164

was provided for in their allocation in the published annual priority report?
A. Yes, that would have been the basis for rejection of the DCS.
Q. Was there any discussion of that instruction at this meeting?
A. I don't specifically recall that.
Q. You don't specifically recall that instruction being discussed at any such meetings?
A. No, because I know that, when I was on the utility side, we clearly understand that you weren't supposed to go ask for more than you were entitled to.
Q. What was the point then of the delivery commitment scheduling process if everyone was entitled to a certain amount and everyone knew what that amount was and you couldn't ask for more than that amount? Couldn't DOE have just written -- they knew what the delivery commitment schedules were going to be requesting, didn't they? What was the point of the process?
A. Again, because it's not as clear as you think it is, if there were no DCS exchange process, you might perhaps be correct. But, assuming that people could exchange positions in

165

the queue, could exchange BWR fuel for PWR fuel, could exchange ten-year-old fuel for five-year-old fuel, it could make a very great difference to how you manage your acceptance process.
The DCS was supposed to be a heads-up from the utilities about the type of fuel they would be delivering to us. The utilities didn't want to do that. They did not want to commit themselves to a specific discharge date because they were concerned that, if they did that, they would lock themselves in and there would be no opportunity to deliver anything else.
So in the end it wasn't much of a heads-up because they had tremendous ranges. In fact, there was a discussion that they would like to include in that range of discharge dates fuel that had not even been discharged at the time the form was submitted because obviously five years later, if it were four-year-old fuel, now it would be nine-year-old fuel.
So again, you know, the heads-up that it was supposed to be in the end turned out to be not much of a heads-up at all. But by completing the DCS -- you had to have a signed DCS in order

166

to exchange. So, by completing and filing the DCS, you were providing yourself with a future instrument to adjust your position in the queue.
Q. But, other than actually coming up with a formalized signed piece of paper, pretty much anyone looking at the process could have predicted what any given utility's DCS was going to look like?
A. I would say that I could predict looking at the APR who was going to deliver -- this is absent an exchange process. Who was going to deliver and how much they were going to deliver. I couldn't predict what they were going to deliver, the age of it, that was just not possible.
Q. As far as the age, what you're saying is most of the utilities were fairly vague as to indicating how old the fuel was that they intended to deliver anyway?
A. They provided a tremendous range so that they would have the flexibility to pick what they wanted when it came time to deliver. And for us, you know, we wanted to know because there are limits. There's the certificate of compliance for each cask and there are I believe

167

thermal load limits, radiation level limits. And that is dependent on the age and burnup of the fuel.
So, if you're trying to schedule acceptance of fuel, you to a certain extent arrive at the number of casks you need to deliver by the type of fuel you're going to pick up. So we had thought we would get a heads-up on what we would be picking up and that would permit the department to plan out its transportation program. It didn't quite work out that way.
Q. The DCS process would also I guess have allowed a utility to request delivery of less fuel than their allocation?
A. Yes. Let's assume that someone -- I don't believe this was the case. But let's suppose someone was permitted to discharge -- to deliver one fuel assembly in year one. Remember, every time you deliver fuel, you disrupt your operations in order to do that. So the utility would likely ask themselves is it worth it to me to deliver one assembly.
Q. Do you recall, did any utility submit proposed delivery commitment schedules requesting delivery of less than their full allocation?

168

A. No, I don't recall anybody doing that. And, in fact, I recall, as a member of the industry and a DOE employee, that one of the things we both recognized is that it would make no sense for a utility to ship one assembly or for DOE to send a cask for one assembly; that, in fact, it would make more sense to send the cask and permit the utility to fully load the cask and then debit their allocation for a subsequent year.

This was a plus or minus 20 percent rule. And you'll see that all through these documents there was a certain amount of give-and-take on the utility's part and on the department's part in terms of again maximizing the efficiencies of the system and of the utility's operations as well.

Q. There were a number of things in your answer. You said that utilities and DOE recognize it would be inefficient to have DOE come and, let's say, pick up one fuel rod; but, at the same time, you said you don't recall any utility not requesting their full allocation for every year even if that allocation might have only been for one fuel rod?

169

A. And my understanding of that is that again, in light of the DCS exchange process, that slot in the queue was worth something. If you did not submit a DCS, it was worth nothing. So, even if you had one assembly, you would submit the DCS for that assembly.

And actually it was done on an MTU basis. So you would submit for your allocation and perhaps you would elect later on to exchange places with someone else, sell your slot in the queue, there were a number of options that the utilities discussed.

Q. Were the entitlements to or the allocations for delivery in each year, were they cumulative such that, if you looked strictly at the APR and the utility, let's say, had a right to five MTU in the first year and another five in the second year, could they request nothing in the first year and ten in the second year?

A. No.

Q. So, if they didn't request the five in the first year, they lost it?

A. That's it. Remember, if I have a system capacity of X in year two, I would then have a request for capacity of X plus five. So

170

who would I deny in year two.

Q. And so that utility, if they didn't request it to be delivered in year one, that first five MTU, when would they ever get the opportunity to get it delivered? Or they wouldn't?

A. They just slip down the queue. The next year would roll around and they would get their allocation, and that's the way it would work. Now, conceivably -- we did not have this circumstance. But conceivably, if someone said I don't want to deliver this year, you would reapportion that capacity.

Q. But it just never came up?

A. It never came up. And I honestly cannot envision a circumstance where it would

(Slater Exhibit No. 9 was marked for identification.)

BY MR. SHAPIRO:

Q. Ms. Slater, I'm showing you what's been marked as Slater Exhibit 9. Do you recognize this document?

A. Yes, I do.

Q. Can you tell us what it is, please.

A. This is a memo from our contractor to

171

me that states that they have developed a proposed schedule for drafting positions on these 35 issues. And it provides me with a list of issues that they do believe are ripe for resolution at that time.

And it tells me that they're anticipating a marathon session to resolve my comments as well as those of others. And, assuming that we can resolve them, they had anticipated that we would have these issues laid to bed by July.

Q. In the middle of the page, there's a sentence or I guess an opening up of the list, it says, my understanding is that the following issues will be finalized during a certain period. What did you understand this memo to mean by finalized?

A. That we would have a path forward, for example, on DCS exchanges, that we would have conceptually agreed what an exchange was and how it might be accomplished, but the procedure to accomplish it might not necessarily be in place. So, on some of this, it's as simple as yes, I think we're going to head in that direction, but you still have to travel that path between here

172

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, : Case No. 98-126C
v. : Senior Judge
: Merow
THE UNITED STATES, :
Defendant. :
- - - - - - - - - - - - - - - X

Washington, D.C.
Thursday, April 22, 1999

Continued deposition of NANCY H. SLATER, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., at 2:10 p.m., Thursday, April 22, 1999, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.

206

APPEARANCES:

On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQ.
SUSAN SACHS, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5854

On behalf of the Defendant:
MARIAN E. SULLIVAN, ESQ.
Trial Attorney
Commercial Litigation Branch
U.S. Department of Justice
1100 L Street, N.W.
Room 10150
Washington, D.C. 20530
(202) 307-6289

207

C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| NANCY H. SLATER | PLAINTIFF |
| By Mr. Shapiro | 209 |


E X H I B I T S


| SLATER EXHIBIT NO. | PAGE NO. |
|---|---|
| 17 - Memo dated 8/5/94 | 209 |
| 18 - Memo dated 5/16/90 with attachments | 215 |
| 19 - Letter dated 2/10/95 with attachments | 221 |
| 20 - Memo dated 6/24/93 | 233 |
| 21 - Letter dated 6/24/93 | 249 |
| 22 - Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste dated 6/22/83 | 254 |
| 23 - Acceptance Priority Ranking & Annual Capacity Report dated March 1995 | 275 |
| 24 - Complaint | 306 |


208

P R O C E E D I N G S

Whereupon,
NANCY H. SLATER,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:

EXAMINATION BY COUNSEL
FOR PLAINTIFF - RESUMED
BY MR. SHAPIRO:

Q. Ms. Slater, we're here for the continuation of your deposition. You understand you're still under oath?
A. Yes.
Q. Do you understand that?
A. Yes, I do.
Q. You may recall at the end of yesterday we were talking about exchanges of approved delivery commitment schedules?
A. Yes.
Q. I want to just have a few more questions on that subject. Let me have another document marked and show it to you.
(Slater Exhibit No. 17 was marked for identification.)
BY MR. SHAPIRO:

209

that page on the transportation issue. Perhaps if you could take a look at that whole page and let me try to rephrase my question. What I'm trying to get at is, by the time this issue got to this level of draft, was the plan still to base the decision on whether or not to approve a proposed exchange of delivery commitment schedules on the transportation plan that would have been created based on the queue as opposed to a transportation plan based on anticipated exchanges?
A. Yes, it would have been based on approved delivery commitment schedules.
Q. Do you recall any discussions or considerations at this stage of the process on transportation plan or acceptance plan or any other plan for that matter being based upon anticipated exchanges as opposed to approved delivery commitment schedules?
A. I don't recall myself having any significant thoughts about that, because my intention was that it be based on approved DCS's. I cannot speak for the transportation people.
Q. You just don't know what was going on

226

with them?
A. Right.
Q. And, other than Bill Teer who you mentioned earlier, you can't tell us anyone else we might talk to who might be able to give us more information on that issue, on what was being done in the transportation area?
A. I seem to recall that Jim Carlson at DOE might have been involved.
Q. Anyone else?
A. I can't recall.
Q. Now, is your recollection that ultimately a final draft was developed of this document, evaluation of delivery commitment schedule exchange requests?
A. I believe it was.
Q. Do you have a sense of when that final document was prepared?
A. No, I really don't.
Q. This draft says it was prepared by TRW. It would have been your expectation that the final would also been prepared by TRW?
A. Yes.
Q. And the transmittal letter for that draft is from a James Blandford at TRW. Do you

227

recall Mr. Blandford?
A. Yes, I do.
Q. Was he directly involved in that project?
A. Not directly. He would probably have been the equivalent of Sam Rousso who was our office director. So there were probably -- there was at least one, if not two levels of supervision below Mr. Blandford.
Q. Who at TRW would have been most directly involved in putting together the final document?
A. I believe it would have been Bill Teer and Jim Clark.
Q. Let's turn to a different subject. We touched on this a little bit yesterday. You said that utilities beginning 63 months prior to January 31, 1998, had to submit their initial proposed delivery commitment schedules?
A. Yes.
Q. Do you recall that amongst those was Yankee Atomic?
A. I vaguely recall that. I don't really -- I couldn't give you the details.
Q. Do you recall that Yankee Atomic,

228

that's Yankee Atomic Electric Company, requested to deliver more spent fuel in the first few years of the program starting after January 31, 1998, than was provided for in their allocation in the annual priority report?
A. Yes, I do.
Q. And do you recall there was a number of pieces of correspondence back and forth between DOE and Yankee Atomic on that issue?
A. Yes.
Q. What was your role in that process?
A. I was responsible at the time for performing an initial review, higher level review of the DCS's when they came in. I would have been responsible for communicating to the utility, drafting the letter that would go back to the utility that would explain why their DCS was being rejected. A specific basis for that rejection would have been provided.
Those letters would have been reviewed by the contracting officer. And I don't recall who signed the letters.
Q. Who else would have been involved in that process?
A. Our M&O would have been involved in

229

that process. And, because of the changes in hats and the time frames we're talking about, I can't recall who specifically. But our M&O would have also reviewed the DCS's according to the procedure that was drafted and approved and discussed with the utilities. In addition to the contracting officer, Alan Brownstein.
Q. What would Mr. Brownstein's role have been?
A. Consistent with my role to perform the review, I would have made a recommendation and supported it to Mr. Brownstein. And he would have evaluated whether or not he thought my determination was accurate and reasonable.
Q. Anyone else involved?
A. Not that I recall.
Q. Now, you described your initial review of the submitted delivery commitment schedule, if I heard correctly, as a higher level review?
A. Right.
Q. What do you moan by higher level review?
A. To be precise, if you did not have an allocation in the year in which you submitted a DCS, that was a showstopper; if you exceeded your

230

allocation for that particular year, that was a showstopper; no additional review required because it was a fundamental flaw in the DCS that was submitted.
Q. What else would be involved in your review?
A. Making sure that the appropriate people who could bind the utility did, in fact, sign the DCS because, remember, it's a contract, and that basically the form was complete. If we asked for discharge date, you recall we had the discussion about specific discharge date versus range of discharge dates, at least some discharge date was included in that blank. So a very top level review.
Q. You said the M&O would also do a review. What would be involved in their review that would have been different than the review that you were doing?
A. I don't recall. I believe that, if we went back to the procedure, we could determine that precisely.
Q. When you say the procedure, you're referring to the --
A. DCS review.

231

Q. And that's different than the -- because we also talked about the instructions for utilities to complete the delivery commitment schedule?
A. Yes.
Q. So there was instructions for the utilities to complete the delivery commitment schedule?
A. Yes.
Q. And then there was separate document procedures for DOE and its M&O contractor to review those delivery commitment schedules once they were submitted?
A. Yes. And, because there are contractually mandated time frames for accomplishing the review and any required revisions, there was a procedure to make sure that none of us missed those dates.
Q. Did DOE always make those dates?
A. To the best of my recollection, yes.
Q. Do you recall ever missing any of those dates?
A. I don't recall.
Q. Do you recall any discussion on any difficulties making any of the required response

232

dates?
A. I don't recall any of those discussions either.
(Slater Exhibit No. 20 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater you've been handed what we've had marked as Slater Exhibit 20. If you'll take a look at it and tell us if you recognize it?
A. I see I was the originator as well as my concurrence initials that I would have drafted this memo. Could I have a moment to review it?
Q. Sure.
A. I remember it well.
Q. First let me ask you something that you mentioned about the document. You said that you were the originator. What on the document tells that you you're the originator?
A. If you turn to the very last page, you will see at the bottom left hand the designator RW:432 which would have been the branch number, colon, N. Slater. That indicates that I'm the originator of the document.
The DE would indicate the secretary

233

that typed the letter. I suspect that was probably my extension at the time, 8320, and then the date on which it was originated.
Q. While we're on that subject, you said RW-432 indicated the branch you were in at that time?
A. Right.
Q. I think I think I've also seen the number RW-44 next to your name. What did RW-44 indicate?
A. Forty-three was always I believe the utility and logistics interface bran. And 44, after the machinations we discussed about no more branch chiefs, would have been the waste acceptance division.
Q. You said you remember this memorandum well. Why do you remember it well?
A. When I got to page 2 of the letter, read that we had communicated to Yankee that their DCS's were disapproved and communicated precisely for what reason and gave them the contractually mandated period to correct their DCS's and they resubmitted precisely the same DCS's, I remembered that well. It seemed rather intransigent to me at the time.

234

Q. Let me ask you, at the top of that second page of Slater Exhibit 20, it says on June 4, 1993, RW-432 and PR-322 and GC-34 met with Yankee. Were you part of that meeting?
A. I believe I was.
Q. Do you recall who else was at the meeting?
A. Let me look at the date on this just to be sure.
Yes, I was part of the meeting. And I remember distinctly because my youngest was graduating from kindergarten and the meeting ran on and on and I didn't get to do kindergarten graduation.
I believe Alan Brownstein was present. I don't recall who the contracting officer was at the time. And I don't recall who was there from GC.
Q. So the PR-322, was that the contracting officer?
A. That was the contracting officer's office, right.
Q. What did PR stand for?
A. Procurement and something.
Q. And GC stood for general counsel?

235

A. General counsel.
Q. Thirty-four was a particular part of the general counsel's office?
A. I believe that was the section in the general counsel's office that supported the contracting officer directly.
Q. Do you recall who was there for Yankee Atomic?
A. Not specifically. I believe that Mr. Grube might have been present. I am not sure if Mr. Kadak was present or not. And Mr. Buchheit.
Q. Who was Mr. Grube?
A. Rudy Grube, I don't recall which Yankee, I don't recall.
Q. But you mentioned he was a representative for one of the Yankees?
A. I believe so.
Q. Do you recall what his role was?
A. No. It was a rather free-form discussion on the issue of granting priority for shutdown reactors.
Q. And Mr. Kadak, do you remember what his role was?
A. Same thing. A very insistent role as

236

you might well expect, I do remember that, very insistent.
Q. And Mr. Buchheit, do you remember his role?
A. Quite the same.
Q. All three of these gentlemen were representatives of Yankee Atomic?
A. I believe so. My recollection on that is fuzzy, but my recollection on the issue is not.
Q. I'm sure you don't remember exactly, but you said the discussion went on and on. Can you tell us generally what was discussed at length?
A. I do recall that again, as you might expect, Yankee's position was that priority for shutdown reactors should be granted. My position was that, although the contract says that we may, the contract does not specifically say that we will, and that it is an industry equity issue.
And I do specifically remember asking the Yankee representatives which specific utility they would like me to remove from the queue in the first year to accommodate them given that the capacity was fixed, particularly given that their

237

position was that acceptance priority for shutdown reactors was good for the industry.
And I was rather dubious that good for the industry would be good for those utilities that got bumped out of the queue to accommodate them. I do distinctly remember that portion of the conversation. And the conversation just continued in that same vein with no one making any movement on the Yankee side of the table to budge from their initial position.
Q. Did they respond to your inquiry?
A. No, they didn't. And I think, when they continued, I do recall that, when they continued to make the same point, that I encouraged them to go back and come back with the names of two utilities who would be willing to give up their slot in the queue and not ship in the first year or the second year or the third year so that they could ship.
And I do recall there was some laughter around the table because there was a recognition that would be a very difficult thing to do. No one in a room full of utilities was going to raise their hand and say pick me.
I do recall that we discussed DCS



exchanges. But again, you know, that's the same concept, you have to convince another utility to exchange places with you.
Q. What was the nature of the discussion on delivery commitment exchanges?
A. That they should feel free to avail themselves of their contractually provided option, that guidance for engaging in an exchange was available, and that, if they needed any additional clarification, we would be happy to provide it.
Q. Did you have what could be termed the lead role for DOE in these discussions?
A. I don't know that I would precisely call it the lead role so much as the most vocal role.
Q. What role would the contracting officer have had in these discussions?
A. If there were questions about the specific contract provisions as opposed to the specific issue, the contracting officer would have been there to keep us on track, make sure that we were interpreting the contract correctly, everyone was interpreting the contract correctly. And we would have discussed these



issues with the contracting officer prior to having attended the meeting. No surprises.
Q. How did the meeting on June 4, 1993, discussed at the top of page 2 of Slater Exhibit 20, how did that meeting conclude?
A. The meeting concluded with everyone agreeing to disagree. And Yankee's position did not shift, had not shifted one iota, they were still insisting on acceptance priority for shutdown reactors.
And I believe, as you'll see in the next paragraph on page 2, that on June 10 they wrote to the contracting officer restating their position. So no movement, insistence, and that was the end of it, there was no movement at all.
Q. This entire document, Slater Exhibit 20, this is intended to be a recommendation to the director of the program to take a certain action?
A. Yes. I cannot recall the specific timetable contained in the contract for the process that says submit the DCS, review the DCS, disapprove, resubmit, but it's a limited time frame.
And it was apparent to me that that



process had been exhausted, that we had discussed it, corresponded, there would be no additional movement. And I recommended to him that consistent with the contract he send Yankee a letter that disapproved their DCS's.
And actually it would have been a letter from the contracting officer, but that went through a review chain. And, because this was the first time we had ever disapproved a DCS, to me that was a fairly significant step. And it was fairly apparent through the negotiations that it was going to continue to be an open issue that would not be resolved immediately.
Q. And, when you say this would have been the first time that DOE would have disapproved a DCS, the first page of this memo notes that already on December 1 there had been a disapproval of the DCS. What's the difference in the kind of disapproval that you're taking about that was being recommended in this memorandum?
A. If you recall, in the contract there's an initial submittal of the DCS and it's reviewed. When it is rejected, it is sent back to the utility with an explanation that says I cannot approve your DCS because you, A, don't

have an allocation in this year or, B, you've exceeded the allocation to which you're entitled, you need to provide me with a DCS that is consistent with the terms and conditions of the standard contract, and we understand those to mean.

Yankee resubmitted and submitted identical DCS's. So this is discussing that second letter, because that would -- from the department. The second letter from Yankee submitting the same DCS's would have kicked us into let's sit down and talk about this and try to understand why we don't seem to be able to come to closure on this issue.

So this was at the end of that process. There is a formal response required. And it is a final decision, if you will.

Q. Now, I want to point your attention to the second page of this memorandum, one of the points in the middle, where it says submitting acceptable DCS's would not preclude their rights under the contract should the department subsequent to rulemaking grant such priorities. Do you see that?

A. Yes.

242

Q. What was meant there?

A. Oh, I recall that precisely. Yankee's concern as expressed to us was that, well, suppose I submit a DCS to you, suppose I have a ten MTU allocation in the first year, I don't recall what it was precisely. I really want to empty my site in five years.

And that would mean that I need to submit a DCS to you for 100 MTU. If I go ahead and submit a ten MTU DCS to you now, does that mean after rulemaking, if everyone could agree that priority should be afforded to shutdown reactors, that I could still only deliver ten MTU.

And our response to them was no. Submitting an accurate DCS now does not preclude you from availing yourselves of the opportunity to ship additional fuel, more than ten MTU, were the decision made that priority should be afforded to shutdown reactors.

And the reason for doing this in rulemaking is again, as I have stated over and over again, this is a utility equity issue. And both, while I was at the utilities and at the DOE, I was personally involved and personally

243

aware that the utility industry did not support priority for shutdown reactors. In fact, their stated consensus position was that priority should not be afforded to shutdown reactors.

Q. So it was not intended that the delivery commitment schedule process be a gotcha process?

A. A static process.

Q. Right, that, gee, you only requested five and now, even though we can accommodate 20, you've wanted all along to do 20, we're not going to let you because you only asked for five, that was not the intention?

A. That's correct, it was not our intention to do that.

Q. And we might have covered this yesterday, but let me just make sure it's clear, that the delivery commitment schedule was intended to indicate how much spent fuel the utility wanted to deliver up to the limit of their allocation?

A. In part, because recall that the discharge date of the fuel earned you a slot in the acceptance priority ranking, but the fuel you could actually deliver did not have to be the

244

fuel that earned you the slot.

So simply going to the APR and drawing a line at 300 MTU wasn't a good way of predicting what you were likely to get, because people who had older plants might decide to put their older plant's fuel in dry storage and might want to empty the pools at some of the younger plants.

So the DCS was intended to provide us with an indication of the age of the fuel, the location of the fuel. Multiplant utilities could deliver from any site as long as they met the conditions established in the standard contract.

So it wasn't as clear as looking at the APR. The DCS was intended to provide a little bit more sound information for planning purposes.

Q. Focusing just on quantity then, the DCS was not intended to indicate what quantity the utility really wanted to deliver, it was limited to the allocation provided in the APR?

A. Right. Now, theoretically they could have delivered -- they could have said, jeez, I don't want to disrupt my operations and I'm not going to deliver at all. But they could not ask for -- they could not have more than what they

245

were allocated because of the equity issue. There's only so much system capacity. If I accept more from someone else, I accept less from someone else.
Q. And then briefly I want to point your attention to the next sentence on page 2 of Slater Exhibit 20 that says they have the contractual right to exchange allocations with other interested utilities, what was that referring to?
A. That's the DCS exchanges. They have the contractual right to exchange their slot in the queue with someone else in the queue and conceivably either obtain the ability to deliver in a year in which they weren't originally scheduled to deliver or obtain the ability to deliver more than they were scheduled to deliver.
Q. And so the availability of the right to exchange was being offered to the director of the program as another justification as to why it was appropriate to deny the priority request that Yankee Atomic was making, because they had the right to accomplish what they wanted through the exchange process?
A. Yes.



Q. Perhaps if you could turn to page 3 of Slater Exhibit 20. And, on the right-hand side, it has that long list of concurrences. Could you run down that and tell me what was the role of the various people in that concurrence chain.
A. You know my role, I'm the originator, the technical lead, if you will. Alan Brownstein would have been the branch chief. Jim Carlson would have been the -- I think we called them divisions then, division director.
Q. It says RW-43, that was his division, Mr. Carlson's division?
A. Forty-three, right.
Q. What division would that have been?
A. I don't recall the name specifically. We've shifted names so many times.
Q. But approximately what --
A. Waste acceptance and transportation perhaps. Ron Milner would have been the office director.
Q. And that RW-40 is the designation for that office?
A. For that office. Dick Nelson and Jerry Saltzman would have been in what we called the front office as support directly to the director



of the program.
Q. And their office is indicated as RW-2?
A. Yes. And Lake Barrett as RW-1, and I cannot make out the last one, I can't make the last one out. I believe it's Charlie Smith. And again that would have been front office support, support directly to the director of the program.
Q. So the director is the only one with RW-1?
A. Yes.
Q. And his support people are RW-2?
A. Yes. The deputy director of the program, for example, would be an RW-2 and there are usually two or three others who are support directly to the director.
Q. And you had pointed out previously an indication noting that you were the originator of the document. And there's a line below that, Correspondence Reviewer. What's the role of the correspondence reviewer?
A. I don't recall.
Q. And the concurrence line, there's no indication of a review by the contracting officer. Why would that have been?
A. That depends on the version of this



that you pulled from the files. In fact, I have right now unrelated to this case a version of a document to review. I have a concurrence sheet and I will be concurring for myself and for the division director. It will be an attachment to a separate records package that, when put together with this, will form a complete picture.
Q. So there may have been another version of this memo with a concurrence by the contracting officer?
A. It would have been the same version of this memo that would have gone over separately for concurrence in another office because that would speed the process.
(Slater Exhibit No. 21 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater, you've been handed what's been marked as Slater Exhibit 21. If you could take a look and tell us if you recognize this document?
A. Okay. I believe this is the letter that would ultimately have been sent to Yankee, to Mr. Buchheit, that would have been the result of the director's approval to communicate with

Q. Let's turn to a different topic. Annual capacity reports, what role did you have in the development of annual capacity reports?
A. Let's see. We have to go back and recognize that I didn't have any role in the development of the initial acceptance priority ranking or annual capacity report.
So in large part again these were contractually mandated activities that carried over from year to year and, unless something unusual had happened during the year, by and large looked much the same one year as they did the next.
I do recall that the ACR issue resolution process was a change reflected from one year to the next, but I honestly can't recall what year that would be. And, of course, the acceptance priority ranking would change every year as it was a rolling list of discharge fuel during the preceding year.
Q. What role would the contractors have had in the development of each annual capacity report?
A. That varied from year to year and it varied from section to section within the report

270

itself. During the year in which I decided to combine the acceptance priority ranking in the ACR for economies, if you will, the contractor -- actually we need to start at the beginning.
The Energy Information Administration, EIA, collects data from utilities on their fuel. They do this via a form called the RW-859. And that form is part of the contract and as is the requirement to submit the data.
The data is then input to a computer program and is ranked by discharge date. Contractors assist EIA, EIA assists us in performing that function. So the actual ranking would have been provided to us by the contractor, very much a plug-and-chuck type operation.
I don't recall whether there were significant text portions to the APR, but then I wouldn't expect that those would change much with the exception of identifying any changes to prior years that had already been published.
Those changes could have occurred because utilities redesignated what comprised a batch of fuel. They might have removed an assembly and substituted a different assembly which had a different MTU value which could

271

change the amount of fuel discharge on a specific date in that batch. So we explained those differences.
The ACR, the tables that included the utilities and their allocations for the first ten years, would have been based on the APR. And those tables would likely have been generated by the contractor and reviewed by us. In fact, I do distinctly remember sitting down with contractors and doing a line-by-line comparison of the APR with the previous year and the ACR tables as well. So it was very much a collaborative process.
The text in the ACR, if there were changes, again depending on the content of the particular portion of the text, could have easily been drafted by me, it could have easily been drafted by a contractor for me subject to my review.
Q. Now, the annual capacity report as the name may suggest was to indicate the annual quantity of spent fuel that RW expected to take in each year of the program?
A. There is a section in the contract that deals with the annual capacity report and sets

272

out its scope. I don't precisely recall which section in the contract discusses the annual capacity report.
Q. If you want to turn to page 10, the paragraph above Article V. Is that what you were referring to?
A. Yes, because it establishes it as a document for planning purposes only because there is a recognition that system capacity could change up or down.
Q. So the annual capacity report was not intended to be binding on the parties?
A. It was not intended to be absolute in the sense that again it's a planning document. And DOE, and I distinctly remember saying this and I distinctly remember it being said to me when I was on the utility side, DOE had always stated that, if we were able to improve the system capacity, then the ACR would reflect those improvements in system capacity.
And the APR would be used to readjust which utilities, when, and how much fuel. So, as a planning document, planning documents are subject to change.
And the ACR as I understood it was to

273

communicate to the utilities what DOE believed was the likely receipt rate at a repository, the likely acceptance rate, and to accept who was likely to deliver during the first ten years of system operation based on the APR.
Q. What was the first ACR that you were involved in?
A. Let's see. I joined DOE in August of '91, and I don't recall which ACR that was. But I would probably have been involved in the ACR starting on the ACR that was issued in '92.
Q. What would your role have been in determining that amount that DOE was going to tell utilities DOE was expecting to -- what they expected the annual receiving rate for the facilities to be, what would your role have been in that?
A. None, nothing.
Q. Who would have made that determination?
A. I don't recall who precisely made the determination because I believe those receipt rates were established in ACR's prior to my advent with the program. And there were no changes in those receipt rates for this document that I'm aware of. So the document -- the

274

receipt rates were the receipt rates.
Q. So, during your whole tenure working on the ACR's, the receipt rates stayed the same?
A. I don't recall whether they did or they didn't. I believe they did stay the same.
Q. What was the last ACR that you would have worked on?
A. The last ACR I worked on was the ACR that -- I believe was the ACR that I combined with the APR, to issue it as a document contained in a notebook rather than two separate hardbound documents, because the intention was to go through, since a lot of it doesn't change from year to year, and simply do a page insert and delete. It would mean we would get them out more expeditiously and utilities wouldn't have to chuck an old version and redo a new version.
(Slater Exhibit No. 23 was marked for identification.)
BY MR. SHAPIRO:
Q. Ms. Slater, you have now been handed what's been marked as Slater Exhibit 23. Would you generally tell us if you recognize this document?
A. Oh, indeed I do.

275

Q. Could you tell us what it is?
A. It is the combined version of the acceptance priority ranking and the annual capacity report.
Q. If you would turn to page 4 of that document. Do you see a table marked table 1?
A. Yes.
Q. Is that the table that one would call the annual capacity report part of the report?
A. The projected annual receipt rate, yes.
Q. Do you recall that the text here in Slater Exhibit 23 discusses that these receipt rates are linked to a statutory limit on the size of an MRS?
A. That sounds vaguely familiar. But I do not recall specifically, I have no detailed knowledge.
Q. Do you recall any work on the language of that text?
A. No, I don't recall personally having worked on the language, that portion of the language.
Q. Who would have worked on that portion of the language?

276

A. I can't recall.
Q. Do you have any idea who would have?
A. No. I believe the way I was used to doing this was I would have communicated with my M&O counterpart who would have then brought in whatever resources he or she needed to accomplish the work. And I did not always know who those people were. So that's why I really can't say who precisely did.
Q. But it would have been someone with the M&O contract?
A. Most likely.
Q. Would there have been another office within RW or another division, branch within RW that would have been involved in that part of the text?
A. Yes. And I'm not sure whether it would have been transportation or storage.
Q. But one of those two --
A. Might have.
Q. Do you recall this issue of the limit on the size of the MRS and the impact of that limit on DOE's projected nominal waste acceptance rates?
A. As I said, vaguely, but not enough to

277

Q. But there might have been some instances like the General Atomics instance, for example, where 20 percent movement might not be enough to get you to the next whole cask?
A. Right.
Q. And what was the expectation in that kind of instance?
A. Where, for example, they might not have had -- let's assume they had 10 percent of one cask in the first year. Now, I can't say whether it would definitely have been they didn't get a cask because they didn't even have a percentage of a cask to ship in a particular year.
I can't say how that would have been implemented because again it would depend on system capacity at the time, size of the cask at the time, maybe small casks are available.
I know there are two -- I think there are two element casks which means that maybe they could have shipped in one cask that year. And, if all that was available was a large cask, maybe not. The plus or minus 20 percent was intended to give not only the DOE but the industry some flexibility in how much they delivered.
Q. But, except for this perhaps unusual

282

example where the plus or minus 20 percent doesn't give you enough flexibility to get to a whole cask, the thought was you get to a whole cask amount and that's the amount that each utility gets to deliver each year?
A. Right. And I believe that's why we portrayed these projected nominal waste acceptance rates in table 1 on page 4, because there was the clear understanding that, if we rounded up in a cask, the actual amount in any given year might, in fact, say for year one be 410 MTU. That's a nominal change, it's in what I would call the noise band. So I think that that's an accurate assessment.
Q. To the best of your understanding from your work in RW at the time that this exhibit was put out, did RW really expect that acceptances would occur in the order indicated on this table, page 6 of Slater Exhibit 23?
A. Let me see if I understand your question. Are you asking me did we believe, for example, in year one that Commonwealth Edison would deliver first and then Connecticut Yankee would deliver next?
Q. No. Let me rephrase the question.

283

Let's focus on Yankee Atomic perhaps as an example. Was it really expected that DOE would pick up from Yankee Atomic 9.9 MTU in the first year or at least as you get closest to a full cask that's 9.9 MTU and then it would stop in the first year and come back in year two, come back for another 10.1, year three come back for 9.7, year four come back for 8.7, and then do nothing in year five and then have to come back yet again in year six for 9.4 strictly as it's indicated on this chart?
A. Yes, that would be my strict understanding of this table, yes.
Q. But was that also how DOE expected the program to work?
A. My understanding of how the program would work again, if you accept the premise of the round up or round down for full cask loads, might mean that in any given year, again the following year is debited for the additional amount, that you might actually complete pickup ahead of schedule if you made the optimistic assumption that you were always rounding up.
There was some discussion about campaigning. Do you understand what I mean by

284

campaigning?
Q. I think I do. But if you could explain it for the record.
A. Campaigning would be that we might like to select rather than the first year as the basis for delivery the first three years and in large chunks work off three years of fuel for one utility, work off three years of fuel for the next.
And this was subject to negotiation with the utilities obviously because this is not the unilateral right as I understand it of DOE to do this. And in the second year accept the first year and the second year and the third year from another utility.
This was discussed with the utilities and it was discussed as a matter of fact when I was part of the utility industry. And the utilities were not averse to considering that because again it's an operational consideration for them.
Do I want you to come to my facility every year and disrupt my operations because I won't be doing anything while we're loading fuel or would I rather say don't come the first year,

285

show up the second year and take my first year, my second year, and maybe my third year.
So that was discussed when I was in the industry. And I don't know where that went after that. So I have a recollection that the precise schedule laid out in here, alterations to that schedule were discussed by the utilities.
Q. And the campaign was premised in part I think as you said on the notion that it would be more efficient for utilities to have pickups done in larger amounts than in a series of smaller amounts?
A. In fewer years actually, in fewer years, so that you weren't showing up every year with the consequent interruption of operation.
Q. And it was --
A. I think it was DOE's understanding that it would result in -- might result in efficiencies for the DOE transportation system as well. So my recollection is that there were discussions on both sides about efficiencies for both sides by campaign. But I'm not the expert on campaigning and you would have to talk to the transportation folks about that.
Q. Let me ask a couple questions on that

286

just so I make sure I understood what you were saying. The efficiency from DOE's perspective to campaigning would be, once you got the transportation campaign going, it was more efficient to keep it going at one time than to stop it and start it five different times or a number of different times, it doesn't have to be five?
A. I don't recall the details. I do recall that some of the efficiencies included not having to retrain personnel on the specifics of that site three years in a row because you might not have the same personnel at the same site again.
So there were efficiencies to be obtained from that. And that's the one that really sticks in my mind. I'm sure there were others, but again I'm not the transportation expert.
Q. Do you recall discussions of this notion of campaigning after you got to DOE?
A. I am aware that the issue was evaluated, but I was not part of those evaluations. So I have no knowledge of what was involved in the evaluation inputs, outputs,

287

anything like that.
MR. SHAPIRO: Can we go off the record.
(Recess.)
MR. SHAPIRO: Back on the record.
BY MR. SHAPIRO:
Q. So, once you got to DOE, you weren't personally involved in any discussions on campaigning?
A. No, because that was deemed to be a transportation related issue as opposed to a waste acceptance issue. Now, had transportation wanted to pursue campaigning, they would have come back to waste acceptance and, as the contact point for the utilities, it would have been waste acceptance responsibility to discuss it with the utilities as part of the ACR issue resolution process. That's essentially how it would have worked.
Q. Do you recall whether or not there were, in fact, discussions on campaigning even if you weren't personally involved?
A. No, I don't.
Q. Who would have been involved in such discussions if they were, in fact, going on for

288

such consideration of campaigning?
A. I don't recall who specifically was in the transportation group at that time. In fact, I'm having a tough time recalling who the transportation division director was. I really don't know.
Q. Going back to this table 2 in Slater Exhibit 23, other than the notion of campaigning, do you recall any other ways in which DOE or utilities for that matter might have expected that actual acceptances of spent fuel might occur in an order different than what is depicted on this table?
A. Plus or minus 20 percent rounding, campaigning, DCS exchanges, because, if exchanges occurred, although the amount wouldn't change, the individual utility that would be serviced in that year would. So that would have represented a departure from what's published in here.
Q. And it was generally anticipated that there would be some amount of DCS exchanges?
A. Yes, I did anticipate that there would be some amount of DCS exchanges.
Q. You said that was your expectation. To what extent did you understand that that

289