**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant**.

---

**VOLUME X OF X**
**(Pages A 1401 to A 1547)**

---

**ENERGY NORTHWEST'S CORRECTED APPENDIX IN SUPPORT OF ITS CORRECTED NOTICE OF DESIGNATION OF DEPOSITION AND PRIOR TRIAL TESTIMONY OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO ADMIT PRIOR TESTIMONY INTO EVIDENCE**

---

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
202-639-6000

NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

June 3, 2008

*Attorneys for Plaintiff*

# Table Of Contents To Appendix – Volumes I to X

## Volume I

Documents Cited

DOE's Responses to Utility Plaintiffs' First Set of Interrogatories..........................A 0001

DOE's Responses to Utility Plaintiffs' Joint Supplemental Interrogatories.............A 0013

April 3, 2002 30(b)(6) Notice of Deposition .........................................................A 0028

April 18, 2002 30(b)(6) Notice of Deposition .......................................................A 0033

November 12, 2004 30(b)(6) Notice of Deposition................................................A 0039

March 2, 2005 30(b)(6) Notice of Deposition .......................................................A 0043

## Volume IA

April 19, 2007 30(b)(6) Notice of Deposition .......................................................A 0047

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 2450874
(Fed. Cl. Sept. 17, 2004) (unpublished)...........................................................A 0050

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, slip. op.
(Fed. Cl. Sept. 21, 2004) (unpublished)...........................................................A 0063

*Wisc. Elec. Power Co. v. United States*, No. 00-697C, slip op.
(Fed. Cl. Aug. 16, 2007) (unpublished)...........................................................A 0073

Defendant's Unopposed Motion to Designate Prior Trial Testimony of
Mr. Robert L. Morgan in System Fuels ..........................................................A 0103

## Volume II

Deposition Transcripts and Trial Testimony Excerpts

Chart of Energy Northwest Deposition and Trial Testimony Designations .............A 0109

Barrett, Lake ..........................................................................................................A 0128
April 22, 2002 ...............................................................................................A 0129
April 23, 2002 ...............................................................................................A 0165
April 26, 2002 ...............................................................................................A 0191
May 8, 2002 ..................................................................................................A 0225
May 10, 2002 ................................................................................................A 0250
May 14, 2002 ................................................................................................A 0278
May 15, 2002 ................................................................................................A 0286

## Volume III

Brownstein, Alan ....................A 0289
April 9, 2002 ....................A 0290
April 10, 2002 ....................A 0318
April 11, 2002 ....................A 0350
May 23, 2002 ....................A 0363
June 14, 2002 ....................A 0368

Cole, Billy M. ....................A 0376
March 12, 2002 ....................A 0377
March 13, 2002 ....................A 0411
June 4, 2002 ....................A 0419

Dreyfus, Daniel ....................A 0422
May 15, 2002 ....................A 0423

## Volume IV

Klein, Susan ....................A 0438
April 24, 2002 (Rule 30(b)(6))....................A 0439
April 25, 2002 (Rule 30(b)(6))....................A 0478

Kouts, Christopher ....................A 0493
January 30, 2004 ....................A 0494
February 19, 2004 ....................A 0504
August 2, 2004 (in the Yankee Atomic Trial Transcript) ....................A 0509
April 11, 2005 (Rule 30(b)(6))....................A 0516
July 12, 2005 (in the TVA Trial Transcript)....................A 0532
October 26, 2005 (in the Southern Nuclear Trial Transcript)....................A 0538
June 13, 2006 (in the Pacific Gas Trial Transcript) ....................A 0550
June 14, 2006 (in the Pacific Gas Trial Transcript) ....................A 0555
October 11, 2006....................A 0571
January 16, 2007 (in the System Fuels Mississippi Trial Transcript)....................A 0581
April 12, 2007 (in the System Fuels Entergy Trial Transcript) ....................A 0585

## Volume V

Kouts, Christopher (continued)....................A 0612
May 1, 2007 (Rule 30(b)(6))....................A 0612
May 2, 2007 ....................A 0634

Lawrence, Michael....................A 0654
May 20, 2002 ....................A 0655
May 21, 2002 ....................A 0697
November 16, 2007 (in the Carolina Power Trial Transcript)....................A 0712

Milner, Ronald ........................................ A 0726
May 1, 2002 ........................................ A 0727

### Volume VI

Milner, Ronald (continued) ........................................ A 0762
May 2, 2002 ........................................ A 0762
May 3, 2002 ........................................ A 0799
May 7, 2002 ........................................ A 0814
May 7, 2002 (Afternoon) ........................................ A 0831
May 8, 2002 ........................................ A 0838
August 11, 2004 (in the Yankee Atomic Trial Transcript) ........................................ A 0851

Morgan, Robert ........................................ A 0866
March 21, 2002 ........................................ A 0867
March 22, 2002 ........................................ A 0905
June 25, 2002 ........................................ A 0913
August 3, 2004 (in the Yankee Atomic Trial Transcript) ........................................ A 0917

### Volume VII

Morgan, Robert (continued) ........................................ A 0925
November 15, 2006 ........................................ A 0925
November 16, 2006 (in the Northern States Trial Transcript) ........................................ A 0943
November 13, 2007 (in the Carolina Power Trial Transcript) ........................................ A 0953

Pollog, Thomas ........................................ A 0962
April 11, 2002 (Rule 30(b)(6)) ........................................ A 0963
April 12, 2002 (Rule 30(b)(6)) ........................................ A 1002
May 15, 2002 (Rule 30(b)(6)) ........................................ A 1026
May 16, 2002 (Rule 30(b)(6)) ........................................ A 1046
May 22, 2002 ........................................ A 1066

### Volume VIII

Pollog, Thomas (continued) ........................................ A 1073
August 4, 2004 (in the Yankee Atomic Trial Transcript) ........................................ A 1073
March 29, 2005 (in the SMUD Trial Transcript) ........................................ A 1098
July 12, 2005 (in the TVA Trial Transcript) ........................................ A 1108
October 26, 2005 (in the Southern Nuclear Trial Transcript) ........................................ A 1115
October 12, 2006 ........................................ A 1122
November 15, 2006 (in the Northern States Trial Transcript) ........................................ A 1126

Rosselli, Robert ........................................ A 1137
April 15, 2002 ........................................ A 1138
April 16, 2002 ........................................ A 1168

Rusche, Benard ........................................................................................A 1173
May 16, 2002 ........................................................................................A 1174
May 17, 2002 ........................................................................................A 1197
August 3, 2004 (in the Yankee Atomic Trial Transcript).............................A 1207

Slater-Thompson, Nancy ............................................................................A 1215
April 21, 1999 ........................................................................................A 1216
April 22, 1999 ........................................................................................A 1228

## Volume IX

Slater-Thompson, Nancy (continued).........................................................A 1239
June 13, 2002 ........................................................................................A 1239

Trebules, Victor ........................................................................................A 1255
April 17, 2002 ........................................................................................A 1256
April 18, 2002 (Coordinated Discovery) ....................................................A 1289
April 18, 2002 (Deposition in Yankee Cases...............................................A 1305
April 19, 2002 ........................................................................................A 1317

Williams, Jeffrey........................................................................................A 1319
June 11, 2002 ........................................................................................A 1320
January 22, 2004 ....................................................................................A 1340

Zabransky, David.......................................................................................A 1368
April 17, 2002 ........................................................................................A 1369

## Volume X

Zabransky, David (continued) ....................................................................A 1401
April 18, 2002 ........................................................................................A 1401
April 19, 2002 ........................................................................................A 1428
June 5, 2002 ...........................................................................................A 1440
June 6, 2002 ...........................................................................................A 1445
August 5, 2004 (in the Yankee Atomic Trial Transcript).............................A 1449
March 28, 2005 (in the SMUD Trial Transcript)..........................................A 1473
March 29, 2005 (in the SMUD Trial Transcript)..........................................A 1487
April 12, 2005 (Rule 30(b)(6))....................................................................A 1491
July 12, 2005 (in the TVA Trial Transcript)................................................A 1503
October 27, 2005 (in the Southern Nuclear Trial Transcript).......................A 1508
November 20, 2006 (in the Northern States Trial Transcript).......................A 1519
October 11, 2007 (in the Wisconsin Electric Trial Transcript) .....................A 1528
October 12, 2007 (in the Wisconsin Electric Trial Transcript) .....................A 1532
November 13, 2007 (in the Carolina Power Trial Transcript).......................A 1538

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Continued Deposition of DAVID ZABRANSKY
Washington, D.C.
Thursday, April 18, 2002
9:44 a.m.

Job No.: 112597-2
Pages 227 through 459, Volume 2
Reported by: Diane Gomez, RPR

227

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X

228

Continued Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.

229

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORI' OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

230

CONTENTS


| EXAMINATION OF DAVID ZABRANSKY | PAGE |
|---|---|
| By Mr. Blanton | 238 |
| By Mr. Oehler | 385 |
| By Mr. Olsen | 415 |
| By Mr. Hirsch | 416 |


EXHIBITS

(Attached to the Transcript)


| ZABRANSKY DEPOSITION EXHIBIT | PAGE |
|---|---|
| 29 Letter dated 2/2/94 from D. Zabransky to the EIA | 239 |
| 30 Document dated 9/21/92 to the U.S. Department of Energy | 241 |
| 31 Department of Energy document | 256 |
| 32 Letter from D. Zabransky to A. Brownstein | 275 |
| 33 1987 Annual Capacity Report | 295 |
| 34 6/88 Annual Capacity Report | 304 |
| 35 12/90 Annual Capacity Report | 317 |
| 36 1991 Annual Capacity Report | 326 |


235

EXHIBITS CONTINUED

(Attached to the Transcript)


| ZABRANSKY DEPOSITION EXHIBIT | PAGE |
|---|---|
| 37 1994 Acceptance Priority Ranking and Annual Capacity Report | 334 |
| 38 Draft transmittal letter from S. Rousso to D. Dreyfus | 363 |
| 39 Analysis of a Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program | 365 |
| 40 1998 TSLCC | 370 |
| 41 "Basis for the Viability Assessment and TSLCC Cost Estimate Operational Waste Stream" | 374 |
| 42 "Civilian Radioactive Waste Management System Requirements" | 375 |
| 43 Letter dated 12/17/96 from B. Tomasoni to J. Miller | 378 |
| 44 FDS Submittal dated 12/18/75 | 399 |
| 45 Letter from B. Tomasoni to D. Jones | 401 |
| 46 Draft letter with handwritten notations | 402 |


236

EXHIBITS CONTINUED

(Attached to the Transcript)


| ZABRANSKY DEPOSITION EXHIBIT | PAGE |
|---|---|
| 47 Memo from D. Baptist to D. Zabransky | 407 |
| 48 "Status of Delivery Commitment Schedules" | 421 |
| 49 Correspondence between Commonwealth Edison and the Department of Energy | 427 |
| 50 Letter dated 10/25/95 from J. Blanford to S. Rousso | 432 |


237

PROCEEDINGS

DAVID ZABRANSKY

having been previously sworn, testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COM and GEORGIA POWER COMPANY

BY MR. BLANTON:

Q Mr. Zabransky, this is the second day of your deposition. The same ground rules apply today as applied yesterday. If I ask you something you don't understand, stop me and ask me to restate my question. If I mischaracterize something you said, stop me and correct me. Will you do that?

A Yes, I will.

Q Can you, before we get started with the substance, tell us something about your educational background, where you went to college, what you got a degree in?

A I graduated from Marquette University with a Bachelor of Science in civil engineering.

Q Did you go straight to work after that?

A I was working while I went to Marquette.

238

acceptance group within DOE developed a technical position on what DOE should do with dry cask storage casks and canisters to the extent they exist that are licensed for shipping and transport?
MR. OLSEN: Objection. Vague.
A We haven't finished evaluating what we might propose to do. We haven't finished evaluating.
Q Take a look at Table 3-2 at the end of your letter to --
A I don't think -- I don't recollect the letter I sent that these tables were attached to it.
Q Okay.
A So I don't know where these tables necessarily came from.
Q Okay.
MR. BLANTON: That's all I've got for the time being.
MR. OLSEN: Okay.
(There is a recess from the record.)
Q Just a couple of follow-ups from that last conversation, discussion we were having, Mr. Zabransky. A minute ago I think you said that

287

part of the industry discussion on failed fuel was whether -- how to define it and whether the -- I'm paraphrasing your answer, but whether the sort of classic definition of failed fuel should apply or should failed fuel just be fuel that requires special handling. Is that an accurate paraphrase of what you said?
A What I said was that rather than the definition used for operational purposes for running a reactor, there was a definition that should be based more upon what's required to handle fuel for storage, transport, and disposal.
Q What is the operational definition of failed fuel?
A Operational, from a reactor standpoint?
Q Whatever you just said. However you just meant it.
A Okay. From an operational standpoint, from a reactor operational standpoint is one that would have assembly that would allow leakage of radioactive materials with the gases and particulates into the reactor coolant system. It would be a very small

288

leak, small hole that would have no effect on the handling of the assembly but render it unsuitable for continued irradiation.
Q We were laughing a minute ago about me trying to describe to everybody, during the break, about casks and canisters, and I think I would like to get you to describe for all of our benefit the technologies used in storing spent fuel outside spent-fuel pools at reactor sites today. Do you need a more specific question than that to answer that question?
A No, I don't think so. I mean, you're asking me -- let me restate the question -- is that you want me to describe in general terms the types, current types of technologies available to store commercial spent fuel, what is called dry.
Q Right.
A Out of the pool.
Q Right.
A And in that case you can either use a -- there's basically dry storage casks. And two types that exist are either kind that would allow -- would

289

require assembly be placed in an inner steel canister, multiple assembly with some very thick shielding lids on them and then sealed, welded shut, evacuated, backfilled with an inert gas, placed in a storage module of some type, whether a vertical concrete cylinder or horizontal concrete, call it mausoleum, although no one likes to call it that, mausoleum, and store horizontally or vertically. Or one could store it in a cask that has no canister but merely is bolted shut once the assemblies are placed inside.
Q Okay.
A Or one can store it in a dry well system that Foster Wheeler has licensed that allows I think individual assemblies be placed in canisters and then put it in a way where they're cooled by passive air.
Q Are there such things as dual-purpose canisters?
A I wouldn't categorize them that way.
Q Okay. How about dual-purpose casks?
A I think there are such things that I would characterize as dual-purpose cask systems.
Q What does that mean? Describe that.

290

A That to me would be a system that would have one purpose being storage, one purpose being transport, and would be comprised of the inner canister as we just talked about, the overpack for storage, whether it's horizontal or vertical, and an additional overpack for transport.

Q The overpack for storage being the concrete cylinder you described a minute ago?

A Concrete cylinder or a mausoleum, whatever.

Q Okay. And is there an additional overpack or a different overpack for transportation with the dual-purpose cask?

A For that kind of system it's a different overpack. There's also dual-purpose casks that don't have canisters, that are just transportable and storable.

Q Okay. From a technical standpoint does the type of -- and I'm limiting myself to standard fuel right now. From a technical standpoint does the type of dry storage system being used by a utility have any impact on DOE in terms of receiving that utility's spent fuel?

291

MR. OLSEN: Objection. Vague.

A The type of storage should have no impact on the integrity or quality of the spent fuel that, when removed from the cask, DOE would receive.

Q Okay. Is it DOE's current plan to remove fuel from the casks rather than to use the casks, assuming they're licensed for transport?

A It's DOE current plan to accept spent fuel, not to accept the containers that they're stored in.

Q Okay. Does that mean that DOE will need to procure a transport system for the spent fuel?

MR. OLSEN: Objection to the extent it calls for a legal conclusion.

Q Technically. I'm trying to understand how the process work?

A The answer is yes, and let me amplify the last question. The department has had discussions with utilities and has corresponded with utilities and expressed its programmatic intent to discuss including in a contract amendment dual-purpose systems licensed for storage and transport as acceptable waste forms, and the department intends to do that. In a contract

292

amendment.

So those casks, when the contract is amended, it's our intent to have -- the program has expressed that intent and to then include those as acceptable waste forms under the contract.

Q Okay. What difference does it make to the utility whether or not DOE accepts those systems, the storage systems in use by the utility as a waste form or not?

A The difference it makes to the utility is the same difference it makes to the department is that if the department doesn't take them the utility will have to unload that material and dispose of that cask.

Q Okay.

A If the department takes them we will have to unload that material and dispose of that cask.

Q Okay. Is that because the casks at the current time are not licensed for disposal?

A They're not licensed for disposal.

Q What is the status of the contract amendment process by which the contract would be amended to specify that the storage systems would be

293

accepted as spent fuel?

A We've never had -- at this point we've never had discussions with the utilities on that issue.

Q I'm sorry, I must have misunderstood your earlier testimony. I thought you said that you had decided to amend the contract?

A We offered to enter into discussions to amend the contract.

Q Has any decision been made by DOE with respect to amending the contract to accept the dry storage systems?

A We've offered to enter into discussions to amend the contract, but we haven't done it yet.

Q And the reason for my question, you said you offered to discuss it but not offered to amend it. Do you see the distinction in my question?

A I think I would have to read the letter that was sent out in 1993. It's available to everybody. It says offer to begin -- offer to initiate the contract modification to include this. But, again, we need to look at that. We haven't

294

what -- I can surmise what the comment refers to.
Q Was that part of the ACR issue resolution process? Was that one of the issues?
A That issue would have been dealt with in the issue relating to the -- in essence it's a similar one to the single-assembly can situation. It's referring to a single-element-sized canister that would be analogous to outlines; shape, size, form of spent fuel assembly, that these rods or hardware pieces could be put into so they could continue to be stored in the spent-fuel pool.
Q Okay. The first sentence of the response says "DOE agrees that specifications or standards are desirable to ensure that any purchaser-furnished canisters would be compatible with the DOE-furnished shipping cask." Is that still DOE's position?
A For these canisters, yes.
Q Has DOE done anything in that respect? Has DOE furnished any specifications?
A No, DOE has not.
Q In your work at Wisconsin Electric or on behalf of the UNWMG did you do any analysis of the

315

acceptance rates in the June of 1988 -- I keep saying '98 -- June of 1988 annual capacity report?
MR. OLSEN: Objection, relevance.
A I don't recollect.
Q Do you recall on the industry side whether you ever analyzed any of the acceptance rates in the annual capacity reports to determine what the impact would be on industry storage requirements?
MR. OLSEN: Objection, vague.
Q Do you understand my question, Mr. Zabransky?
A I believe so. I believe that the organizations, whether it was and I don't know what time it would have been done, would have been more than likely had one of their consultants perform analysis to look at what it would mean, yes.
Q Did you do that yourself?
A No, I did not.
Q Were you concerned at the time about whether the acceptance rates would be adequate to eliminate the need for Wisconsin Electric to store fuel outside its pool?

316

MR. OLSEN: Objection, relevance.
A I don't recollect.
Q Do you recall ever doing an analysis to determine what the aggregate acceptance rate would have to be in order for Wisconsin Electric to not have to store fuel outside its pool?
A I don't recall at this time, no.
(Deposition Exhibit Zabransky 35 was marked for identification and was attached to the transcript.)
Q We have marked as Exhibit 35 the December 1990 annual capacity report.
Do you recognize that document?
A I've seen it before.
Q In what context did you see the document?
A I'm sure I saw it when it was sent to Wisconsin Electric in 1990, and I've seen it on a shelf since then.
Q I'll ask you the same question I asked you about the earlier ones. Have you ever used any of these documents in the course of your duties at DOE?
A No.

317

Q Look on page four.
MR. OLSEN: Roman numeral?
MR. BLANTON: Regular page four.
Q 2.0, Waste Acceptance Projections is at the top of the page. Do you recall in the course of your work with Wisconsin Electric and the UNWMG or UWASTE, whichever it was at the time, discussions regarding why there were two acceptance projections in the 1990 ACR?
MR. OLSEN: Objection, relevance.
A I don't know the discussions as to why they were in here. I'm sure there were discussions as to a reaction of how we would like the lower bound rate, which we didn't like.
Q Why didn't you like the lower bound rate?
A Because it was a lower bound rate. We wanted a higher rate.
Q What impact did that have on the utilities?
MR. OLSEN: Objection. Foundation.
A It would have removed fuel slower from the sites.
Q Okay. And why was that upsetting to you?

318

A We didn't want to have to store it.
Q Did you feel like you had a contract with DOE that provided that you shouldn't have to store it?
MR. OLSEN: Objection, calls for a legal conclusion.
A I don't know that it provided never have to store any of it, but I was hoping to store as little as possible.
Q In this first paragraph under Waste Acceptance Projections it says, The upper bounding case is representative of the receipt rates of the -- excuse me. The upper bounding case is representative of the receipt rate of a WMS that is not restricted by MRS storage capacity limits of 10,000 MTU before repository operations and a maximum of 15,000 MTU at any time as imposed by the amendment side. This case is also not restricted by the MRS site selection and construction schedule linkages with the repository imposed by the amendments act. It says, The lower bounding case represents a receipt rate that would be in compliance with the amendments act restrictions on storage limits at an MRS before repository starts

319

operation. However, this case assumes removal of the schedule linkages with repository imposed by the amendments act.
And the question I have is do you have any idea why the Department of Energy made a distinction in the two cases between the statutory restrictions assumed for each case?
A No, I don't.
Q Do you have any idea why the Department of Energy would have for the lower bounding case assumed away the schedule restrictions but not the storage limits?
MR. OLSEN: Objection, foundation.
A No, I don't.
Q Am I interpreting that correctly, does that appear to be what they've done -- what this document says to you?
A That's what it appears they've done.
Q Going down to the last paragraph of page four, the third sentence from the bottom of the page says "The current restrictions in the amendments act linking repository and MRS make it impossible for DOE

320

to accept waste at an MRS facility on a schedule that is independent from that of the repository." Is that still the case?
MR. OLSEN: Objection to the extent it calls for a legal conclusion.
A I don't know what the current status is of our -- of an authority for MRS.
Q Do you know why it was impossible to accept waste at an MRS facility on a schedule that was independent from the repository?
MR. OLSEN: Objection to the extent it calls for a legal conclusion.
A There were linkages that required the MRS -- that prohibited the MRS until certain repository events happened. I'm not sure what they were specifically.
Q Okay. The sentence before the one I just read says "This schedule, based on a realistic assessment of activity durations and past experience, shows a significant slip for the start of repository operations from year 2003 to approximately 2010." Based on the schedule linkages described in the next

321

sentence, do you have any knowledge of when an MRS could have started operations given that the repository schedule had already slipped to 2010?
MR. OLSEN: Objection, vague. Objection, foundation.
Q Do you understand my question?
A I don't know the specific linkages that were in existence at the time, so I can't answer that question.
Q Do you now --
A No.
Q -- know that?
A I would have to -- I don't know. I wasn't there. I don't know how they got to that conclusion. Can I reconstruct it? I'd be speculating.
Q In any event, was it clear to you after receiving this document from the Department of Energy that the schedule in the document that showed 1200 MTU of fuel being accepted in 1998 on the one case and 300 MTU of fuel under the other case, that neither of those schedules could be achieved under the current situation?

322

MR. OLSEN: Objection. Vague.
A It was clear to me that things had to happen for anything like that to happen, that the assumptions DOE made for whatever reason they made them had to come to pass.
Q Okay. And that they had not come to pass as of 1990?
A That's correct, they had not.
Q Are you aware that they've ever come to pass?
A I don't believe they did.
Q Do you know what things had to happen in order for those assumptions to come true?
A No, not specifically. But they didn't build an MRS, and they didn't start accepting waste.
MR. BLANTON: Are you ready to break?
MR. OLSEN: Yeah, I was about to say this might be a good time to break for lunch.
(A luncheon recess is taken.)

323

AFTERNOON SESSION
MR. OLSEN: We're back on the record. Mr. Zabransky would like to clarify one of the answers he gave earlier today.
A When you asked me with respect to these documents if I used them in my work at DOE my answer was no, but that was with respect to my job at DOE. That was not with respect to preparing with counsel for litigation. So I have looked at these preparing with counsel for litigation pulling documents and going through files.
Q Okay. In your real job you haven't used them?
A No.
Q As contrasted from your litigation job which is being the brains behind the DOE. Is that right?
A Supporting counsel.
Q Before the break you mentioned that you did not believe that there was a contractual obligation to publish more than one annual capacity report provided the annual capacity report had data for ten years' worth of operation. Is that correct? Did I understand your testimony correctly?
A I believe that's what I said, yes.
Q What provision is there then in the contract for the preparation of delivery commitment schedules for spent fuel that does not appear on that first ten-year schedule?
MR. OLSEN: Objection, calls for a legal conclusion. Objection, asked and answered.
A There is no provision. The DCSs aren't due until five years before the receipt, 63 months prior to date of receipt.
Q If you didn't have fuel in the first ten years of the ACR and DOE didn't publish an ACR except for the first ten years, how would you ever know when the receipt of fuel other than that first ten years was?
MR. OLSEN: Objection, calls for a legal conclusion. Objection, asked and answered. I think we went over this yesterday.
MR. BLANTON: Different topic.
A It was my belief that DOE would publish an ACR that would add a year on, so, in other words, you would have the first ten years, then you would have the 11th year, then the 12th year, then the 13th year. So eventually all the fuel would be covered by an ACR.
Q Does it make any sense to suggest that only one ACR would be published?
A For the first ten years, yes. That covers the first ten-year period. It covers enough for planning purposes and for committing to delivery commitment schedules which are five years out.
Q Additional ACRs would have to be published for additional years?
MR. OLSEN: Objection.
A For periods beyond the first ten years.
Q Otherwise the system wouldn't work. Is that right?
A That's a true statement. I agree.
Q Is the last exhibit you have 35?
A Yeah, the '98 is 35, correct.
(Deposition Exhibit Zabransky 36 was marked for identification and was attached to the transcript.)

324 325 326

Q I've marked the 1986 version of the annual capacity report -- excuse me, the 1991 version of the annual capacity report as Exhibit 36 to your deposition.
A Okay.
Q Take a look at that and see if you recognize it.
A I recognize it, yes.
Q You were still at Wisconsin Electric when this was issued. Is that right?
A Yes, I was.
Q Did Wisconsin Electric use this document for planning purposes?
A I believe it did.
Q In what way?
A By estimating that DOE would begin acceptance in 1998 in these quantities and when it would need additional spent nuclear fuel capacity.
Q In doing that did Wisconsin Electric take into account the assumptions in the document?
A I think we took into account the table that appeared in the document and just looked at the

327

allocations.
Q On page Roman numeral V of the document which is -- do you have an SN Bates stamp on yours?
MR. OLSEN: We have a PA.
A Oh, I see. Summary?
Q Yeah. This is on the summary. I think we looked at some of this language yesterday. The annual acceptance rates provide an approximation of the system through-put and are subject to change as the program progresses. Given that the rates were subject to change, what value were they to Wisconsin Electric for planning purposes?
A They were the current planning basis that the department had put out, and it was one that we were using to see what it meant to us. I mean, it was the document that one had to use if one wanted to say what does it look like this year, recognizing it could change.
Q The sentence two sentences above what I just read from repeats the idea that we've already talked about in the other ones that say the statutory -- the acceptance rates assume that the

328

statutory schedule linkages between the MRS facility and the repository set forth in the Nuclear Waste Policy Act of 1982 as amended will be modified. Did you understand that under the current situation the acceptance rates in this document could not be achieved because of the schedule linkages?
A I understood there was a linkage that restricted the ability to perform on this schedule and that it needed to be modified. I don't know exactly how -- what it was and how it had to be modified. But, yes, there was a linkage.
Q And you understood that without something happening with respect to the linkage what this report provides for acceptance rates couldn't happen?
MR. OLSEN: Objection, foundation; and it calls for a legal conclusion.
A It was my understanding that this was DOE's estimate that things needed to occur, but this was still the current estimate that they were using.
Q Did you place any reliance on this document in terms of Wisconsin Electric's planning for spent fuel storage, on-site spent fuel storage capacity?

329

MR. OLSEN: Objection, vague. Sorry, I didn't mean to interrupt you.
Q Do you understand my question?
A Yes, I think -- place reliance on the document that I factored this into our considerations and planning?
Q Did you forego any spent fuel, on-site spent fuel storage planning at Wisconsin Electric based on what this document suggested DOE would accept from Wisconsin Electric beginning in 1998?
A Well, since I needed to do planning prior to 1998 anyway, as my recollection serves me, I factored that, the fact that I needed to do something prior to 1998, and I looked at this and I factored it all together.
Q In doing that analysis, what weight did you give to the likelihood that DOE would show up in 1998 and accept spent fuel from Wisconsin Electric based on this document?
A At that point in time I basically had concluded that I needed to factor in, to create a system that would allow me to develop modular,

330

progressive storage because I couldn't determine exactly how much storage I needed.
Q Did you conclude that you couldn't depend on this document for purposes of your own internal planning?
MR. OLSEN: Objection, vague.
A I concluded that I couldn't rely upon the rates in this document for continued operation of my plant.
Q I think that's a different answer than the question I asked, though. Did you, for the purposes of determining how much spent fuel storage capacity you needed to install at Wisconsin Electric, what weight did you give the acceptance rates contained in this document and the commencement date contained in this document?
A It was a consideration. I don't know exactly what weight was given since we needed storage prior to the date that the service was to commence anyway.
Q Did you say it was or was not?
A It was a consideration, but since we needed

331

storage prior to 1998, it was one of the factors that was considered, that DOE could show up and remove spent fuel. But, then again, maybe they weren't going to. It needed to be factored in accordingly.
Q See the middle -- and I'm looking at page Arabic numeral 4 under 2.0, Waste Acceptance Projections of the document. Paragraph begins with Acceptance Rates and ends with 2007.
A Uh-huh.
Q First of all, do you know why the Department of Energy eliminated the upper bounding case where both schedule restrictions and capacity restrictions on the MRS that was contained in the 1990 ACR was eliminated from the 1991 ACR?
MR. OLSEN: Objection, foundation.
A I don't know why they did that.
Q Do you know why in this document the DOE assumed away the schedule linkages but not the capacity limit?
MR. OLSEN: Objection.
Q For MRS?
MR. OLSEN: Foundation.

332

A I do not know why they assumed away the schedule and not the capacity.
Q Do you know how the Department of Energy concluded that if the linkages, the schedule linkages were not eliminated that the initial acceptance of SNF by DOE could not start until at least 2007?
MR. OLSEN: Objection. Foundation.
A No, I do not know how they concluded that.
Q Have you done any such analysis in your work at the Department of Energy?
A No, I do not do that.
Q What was Wisconsin Electric's reaction to the December 1991 annual capacity report? You mentioned that they didn't like the lower rate in the 1990.
A I think the general attitude was that this was not what we wanted to see. Obviously we liked the higher rates better. We wanted DOE to perform faster.
Q Did you express that in any way to DOE?
A I don't recall. We talked yesterday, you've seen other letters that came out from Wisconsin Electric. I don't know if there was one for this

333

specific exercise or for other exercises.
Q Okay. Do you know whether the EEI responded to -- or any other nuclear industry group responded to the ACR in a formal way?
A I don't know.
(Deposition Exhibit Zabransky 37 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, we've marked as Zabransky Exhibit 37 a document titled 1994 Acceptance Priority Ranking and Annual Capacity Report, and it's dated March 1995. And it has a Bates number of EDB-001-0136. Do you recognize that document?
A I don't recognize this version of the document. I believe it's -- I don't really recognize it, but yes.
Q Does it appear to be a draft?
A It appears to be a draft.
Q And have you ever seen the draft?
A I'm sure I've seen a draft. I'm not sure I've ever seen this copy of a draft.
Q Do you recognize any of the handwritten

334

notes, who those are the notes of, in the margins of the document?

A No, I don't.

Q Did you participate in the drafting of the 1995 annual -- or acceptance priority ranking and annual capacity report?

A Yes, I did.

Q What was your role in drafting that document?

A Well, at that point in time the contractor delivered a draft document. I put it in the review process. Comments were received back to the contractor and they incorporated the comments, and I prepared the document.

Q Who was the M&O contractor at that time?

A That was TRW.

Q Was there a particular person at TRW that was most involved in that?

A I don't know who specifically it was at the time. Could have been either Billy Cole, Bill Teer. One of them perhaps.

Q Okay. Was there ever a discussion within

335

the Department of Energy regarding whether or not an annual capacity report should be issued in 1995 given the uncertainty in the commencement date of the program at that point?

MR. OLSEN: Objection, foundation.

A I don't recall discussion of that type.

Q Do you recall any suggestion by anybody that, We don't know when we're going to be able to perform so we shouldn't be putting out an annual capacity report?

A I don't recall discussion of that, no.

Q Look on page one of this document that's marked Zabransky 37. And the last sentence says "As specified in the standard contract the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers." It appears someone has lined that out and someone else has written in "STET" in the margin next to it.

A Or the same person. I don't know who did either or.

Q Do you recall any discussion about whether or not that sentence should be in the '95 ACR?

336

A Can I speak to my counsel for a second?

Q Sure.

(The witness and Mr. Olsen confer.)

MR. OLSEN: I've just had a conversation with Mr. Zabransky, and I'm going to direct him not to answer that question because it will require him to reveal attorney/client information.

MR. BLANTON: About whether or not there was a discussion? I haven't asked him yet what the contents of the discussion are, but all I'm asking is whether there was a discussion.

MR. OLSEN: He can answer the question whether there was a discussion.

A I believe there was a discussion on that sentence.

Q Was that discussion with counsel?

A I believe it was.

Q Who was the counsel you discussed it with?

MR. OLSEN: I'm going to direct him not to answer that question.

MR. BLANTON: The identity of his counsel is not privileged.

337

MR. OLSEN: Which of his lawyers told him to do that is privileged.

MR. BLANTON: Told him to do what?

MR. OLSEN: His counsel is the Department of Energy's general counsel's office and the Department of Justice. The identity of the counsel who told him this is privileged.

MR. BLANTON: I don't think that's right. I don't think that's a correct statement of what the law is.

Q Mr. Zabransky, are you going to refuse to answer that question based on your counsel's advice?

A I guess so.

Q Okay. Did you discuss with anybody outside the presence of your counsel whether or not that sentence should be in the 1995 ACR?

A I don't recall.

Q Who else was involved on the part of DOE in the drafting of the 1995 ACR other than the people you've mentioned at TRW, you, and Department of Energy counsel?

A I believe Nancy Slater could have been

338

involved, and Alan Brownstein may have been involved in this as well.
Q Do you recall whether you discussed this with Mr. Brownstein or Ms. Slater?
A Not outside of the discussions that we had with counsel.
Q You see the margin notes below the STET on the right-hand corner? They have a big X through them.
A I see them. Okay.
Q Appears to me to say, "This is not stated in contract and is a conclusion we have not yet reached or resolved."
A That's what it appears to say.
Q Do you recognize that handwriting?
A Not really, no.
Q Do you know what that refers to?
A It's pointing to that sentence. I presume it's pointing to that sentence. I don't know if it is or isn't.
Q Do you know what that means?
A No. I could speculate it means as to the

339

deletion of that sentence or not, but I don't know.
Q Is there a statement in the standard contract about whether or not the ACRs are contractually binding?
A I believe there is under Article --
Q 4.B.5, is that it?
A 4.B.5 -- I don't see it there. I guess not. I don't see that statement in that provision at this time.
Q Okay. Do you know what the origin of that statement in the earlier ACRs was, where that came from?
A No. It was in there from the first ACR.
Q Okay. Did you ever have a conversation with the contracting officer about that statement?
A No, I didn't, not with Ms. Tomasoni.
Q How about with any of the previous contracting officers?
A I didn't work with any previous contracting officers.
Q How about any contracting officer since then?

340

A Never come up.
Q The statement was eventually in the '95 ACR, correct?
A I would have to look, but I believe it is.
Q It's marked as Exhibit 5, and you might as well get it out because that's the next one on the list.
A It's in there, yes.
Q Look on page four of the document that's marked Exhibit 37.
A That's this one. Okay.
Q Do you recall why the -- or was the passage relating to the civilian radioactive waste management program plan deleted from the final document?
A I would have to look.
It appears to have, yeah.
Q It was deleted?
A Yes, it was.
Q Do you know why?
A No.
Q There's a statement at the end of that passage that says "Although the program plan does not

341

include a monitored retrievable storage facility, the existing storage capacity restriction imposed by the act is still in effect." Do you see where I'm reading?
A I see the cross-out.
Q Yeah. It's crossed out. Did that come out of the '95 ACR?
A Did that --
Q Was that statement in the '95 ACR?
MR. OLSEN: I just want to note for the record an objection that the 1995 ACR speaks for itself as to whether or not somewhere in this entire document this paragraph appears.
Q Well, do you know why you took all this stuff out?
MR. OLSEN: Objection. Assumes facts not in evidence.
A I don't know what version this was, who prepared it, who reviewed it. So the fact that it exists, I don't know whose document it was or at what state of play this was. This could have been a contractor-developed internal document that we never

342

saw.
Q Do you know whether the '95 ACR that the Department of Energy issued assumed that the existing storage capacity restrictions imposed by the Nuclear Waste Policy Act of 1987 were still in effect even though the program plan did not include a monitored retrievable storage facility?
A It assumed that the limitations were still in effect. I don't know for a fact that the program did not include a monitored retrievable storage facility.
Q How did you pick the rates that went into the '95 ACR?
MR. OLSEN: Objection, foundation.
A They were the same rates that were in the previous ACR.
Q Okay. Was there any analysis done of whether the rates should change or stay the same from the previous ACR?
A I don't believe so.
Q Was there any discussion about whether the rates should go up or down?

343

A I don't recollect that there was.
Q Just cut and paste? Is that how you did the '95?
A '95 was pretty much a reissue of the previous document from the ACR perspective. The APR changed.
Q There's a sentence circled on this page that says "Due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by years of operation of the system rather than by specific calendar years." Do you see that?
A I see that.
Q And somebody has written out to the margin "move to page three." Do you see that?
A Okay.
Q And if you look at page three of the document it looks like there's an arrow for an insert, that says "insert page four." Do you see that?
A I see that.
Q What were the uncertainties associated with

344

the date of commencement of the operation of the waste management system at this point in time?
A At that point in time in 1994 I believe the negotiator's office had been terminated. There was no active program looking for a voluntary MRS, and it became less certain that there was -- there was great uncertainty with respect to the '98 date.
Q More certain that there would not be an MRS by 1998?
A That's a fair statement.
Q Is that a fair statement?
A That's a fair statement.
Q Do you recall any discussions within the Department of Energy about whether or not dates should be eliminated from the acceptance allocations in the '95 ACR?
A Yes, I recall that discussion.
Q Who was that with?
A With Mr. Brownstein and Ms. Slater.
Q And yourself?
A And myself.
Q Can you tell me who said what?

345

A I believe there was -- Ms. Slater advocated removing dates, to my recollection, going back to how the ACRs used to be.
Q Had there ever been one without dates on the years of allocations?
A I believe so. Let me check. Like this one here which says, Year one, Year two, Year three.
Q Let me see.
MR. OLSEN: Let the record reflect that Mr. Zabransky has pointed to exhibit number --
MR. BLANTON: Zabransky 36, which is the December 1991 ACR.
A And the 1990 ACR also has year one, year two, year three.
Q Look at page five of Zabransky 36.
A Okay.
Q There's a table there that has the rates for each year starting in 1998. Is that correct?
A There is, yes.
Q And we can go through this process, but do you remember that all the other ACRs have a similar table?

346

A I'll look, but let me verify.
Yes, other ones do.
Q And is there any such table in the '95 ACR?
A No, there isn't.
Q So that's a change from previous ACRs?
A The change was to remove the years from Table 1 of this document, yes.
Q And why was that done?
A Discussion centered around the uncertainty with when year one would be.
Q And the uncertainty regarding when year one would be resulted from what?
A When a facility would be in operations.
Q You say you and Mr. Brownstein and Ms. Slater discussed this issue. Is that right?
A Yes.
Q Did anybody take the opposite view that the years should stay in the ACR?
A I'm sure it was a discussion that had other viewpoints. I don't know who took what view, but eventually the dates came out.
Q What was the issue? Why would not they

347

have come out?
A Why would not they have come out?
Q Why would they not have come out of the ACR given that you didn't know when you would start?
A I can't recollect all the details of the conversation. One view was to leave it in the way it was. Another view was to take it out, change it. And Ms. Slater prevailed. I believe that's how that happened.
Q Okay.
A That's my recollection of the situation.
Q I refer to Exhibit 5 of your deposition, which is the '95 ACR. You got it right in front of you.
A Okay.
Q Does that document anywhere inform the reader about when year one is?
MR. OLSEN: Objection. The document speaks for itself.
A I have not found such a statement in the document as to what year year one is.
Q Would it be possible for a utility using

348

that document to determine when its delivery commitment schedule was due?
MR. OLSEN: Objection, foundation.
A I don't believe so.
Q Are the rates contained in the 1995 ACR the rates DOE currently plans to use when and if it commences spent fuel acceptance?
A The rates contained in the ACR, '95 ACR, were predicated upon some elimination or some restriction on performance. DOE's current plans assume a repository and assume no restrictions on performance and, no, these are not the same rates that we currently plan after the operation of the repository.
Q So the restrictions on -- or the amount of the rate is dependent on the restrictions on performance?
MR. OLSEN: Objection. Calls for a legal conclusion.
MR. BLANTON: I'm just making sure I understood his last answer.
A As the document states, and let me find it

349

here -- well, it's based upon 8200 tons. That number the first ten years was predicated on some restriction in capacity.
Q Are there no capacity restrictions now because no MRS is assumed?
MR. OLSEN: Objection, calls for a legal conclusion.
A The planning basis right now is for a repository, so there would be no statutory restrictions on annual capacity. There still is a statutory limit on total capacity of 70,000 metric tons.
Q Well, and when you say the planning is based on a repository, you mean a repository with no MRS, correct?
A Currently the planning basis for the program does not include a monitored retrievable storage facility.
Q Okay. When did the planning basis convert from one including a monitored retrievable storage facility to one including only a repository?
A Don't know exactly. That would have been

350

sometime in the mid-nineties.
MR. OLSEN: Stan, I think Dave needs a short little break. Would this be a good time?
MR. BLANTON: Sure.
(There is a recess from the record.)
Q If you would look back at page four of Exhibit 37. Do you have that in front of you?
A Yes, I do.
Q Do you recognize whose handwriting that is at the bottom of the page that's marked out, has a sentence that says "the waste management system" and then I can't -- I'm not sure what the rest -- envisions --
A I don't.
Q Any idea who wrote that?
A No, I don't. It's like the rest of the -- appears to be the same writing as whoever wrote the rest of it, and I don't know who that is or where this document came from.
Q Okay. Referring back to -- it's easier for us to both have the same language -- Exhibit 5, do the uncertainties associated with the date of commencement

351

of operation of the waste management system have anything to do with DOE's decision to stop processing DCS submittals?
MR. OLSEN: Objection. Vague.
A I don't think that this statement here and this discussion here had anything to do with that decision.
Q Okay. So the fact that you don't know when you could start to accept waste had anything to do with the DCS process being suspended?
A I think the decision to suspend the process had to do with the determination that there was a commitment and that there was an uncertainty as to date, but it's not tied to this document at this time.
Q I'm not asking if it's tied to the document. I'm asking if just the uncertainties associated with when a facility will be available is the reason you determined to suspend the DCS process?
MR. OLSEN: Objection. Vague.
A Again, as I answered yesterday, there was a discussion; we were advised to suspend the DCS process for a number of reasons by counsel.

352

Q Well, as -- did I interrupt your answer?
A No.
Q And as I understand it, you're taking the position that your liability to the utilities is limited by the suspension of the DCS process. Isn't it a fact?
MR. OLSEN: Objection, assumes facts not in evidence, and objection to the extent it calls for a legal conclusion.
A I'm not -- I don't know what position you're referring to.
Q You told me yesterday the first hour of your deposition that unless a utility has an approved DCS that the department has no obligation to that utility.
A I did say that, yes.
Q Because of the suspension of the DCS process it's impossible for a utility to have a DCS approved, correct?
A That's correct.
Q Why has the department suspended the DCS process?

353

MR. OLSEN: Objection. I believe this was asked and answered.
MR. BLANTON: No, he said on advice of counsel, and I think we're entitled to know why the DCS process has been suspended.
A I'll answer the question. I think the belief was that approving DCSs committed the department to that obligation, and the decision was to suspend that commitment.
Q What was the problem with committing the department to that obligation?
MR. OLSEN: Objection to the extent it calls for a legal conclusion.
A Again, counsel advised us it would be appropriate, it would be the correct move to stop processing the DCSs.
Q So you wouldn't have that obligation?
MR. OLSEN: I want to direct the witness not to answer to the extent that you're going to have to reveal attorney/client privileged conversations. Also calls for speculation.
MR. BLANTON: I think you put whatever the

354

motivation was behind suspending the DCS process I think is right in issue, and I think we're entitled to know that. I mean, your filings in all the cases suggest that nobody has -- that DOE doesn't have an obligation to anybody that doesn't have an approved DCS. The witness has testified to that. He also testified that the DCS process has been suspended. I think we're entitled to know why, even if it is on advice of counsel. I think we're entitled to know what the advice was. I'm asking the question.

MR. OLSEN: And I'm instructing him if he has to reveal the specific advice from a lawyer that I'm directing him not to answer the question.

Q Mr. Zabransky, are you refusing to answer that question on the advice of your lawyer?

THE WITNESS: Can I speak to my lawyer for a second?

Q Well, I would like to have an answer to that question. Are you going to tell me whether you're going to refuse or not after you talk to him?

A I would like to talk to him first, if that's okay with you.

355

Q Okay.

MR. OLSEN: Would you like to step outside?

THE WITNESS: Yes.

MR. OLSEN: Please go off the record while we step outside.

(The witness and Mr. Olsen and Mr. Crawford confer outside the room.)

A I'm not going to answer the question.

Q Okay. At some point in order for the system to operate will the DCS process have to be recommenced?

A At some point the DCS process will have to be recommenced in order for the system to operate, yes.

Q Will that have to be at least 63 months before the repository is scheduled to commence operations?

MR. OLSEN: Objection to the extent it calls for a legal conclusion.

A It would be my understanding that that would be the appropriate time.

Q Will that be your technical advice to the

356

contracting officer?

A That would be my technical advice.

Q Do you understand that the DCS process will be suspended until 63 months before the commencement of repository operations?

MR. OLSEN: Objection. Calls for speculation.

A I don't have that understanding. I don't think anybody's made that decision at this point.

Q What was the MPC program?

A The MPC program was a multipurpose canister program and it was an effort the department had, I believe beginning in -- I don't know if it was '92, '91, that time frame, to develop a -- I would say a system that would be suitable for storage, transport, and disposal.

Q How would that work?

MR. OLSEN: Objection, vague.

Q Do you understand my question?

A You're asking me how technically it would work?

Q Well, what would the process be? Assuming

357

an MPC were developed, how would the department use it?

A The MPC program was developed while I was still at Wisconsin Electric. My understanding as to how the department was thinking at that time was that it would develop a canister-based system that would be suitable, as I said, for storage, transport, and disposal and would allow them to be deployed at utility sites for storage prior to pickup and ultimately to place them directly in the repository.

Q Was the MPC system envisioned to be an alternative to a monitored retrievable storage facility?

A It was my belief and my understanding that it was viewed as a way of -- their way at that time of trying to meet the '98 date by deploying canisters as opposed to removing fuel.

Q Okay. But if the fuel is going to be stored on the utility site, there wouldn't be any need for an MRS. Is that correct?

A That's true.

Q Was that the thinking at the time?

358

A I think the thinking at that time was that the MRS was not going anyplace.
Q And that was still back when you were at Wisconsin Electric?
A Yes.
Q Was that also the thinking when you prepared the 1995 annual capacity report, that the MRS process wasn't going anywhere?
A I believe by that point in time the MRS process had ceased.
Q Okay. And why in the 1995 annual capacity report did you continue to impose the MRS capacity limitations on the acceptance rate?
A There was no discussion of changing the rates that were in the ACRs from the previous years, so I don't recall why -- there was no specific why -- it was not a discussion to change them.
Q Well, if an MRS was not in the plans, then those capacity limitations would not apply, would they?
MR. OLSEN: Objection to the extent it calls for a legal conclusion.

359

A The capacity limitations were on the MRS. If the MRS was not -- not in the system, there would be no constraints, but there also would be no facility to which to move fuel.
Q Okay. On page four of Exhibit 5 to your deposition, at the top of the page it says "The projected nominal acceptance rate also reflects the capacity limit imposed by the act on such a storage facility prior to repository operations." Why is that sentence in the document if the MRS was not part of the department's plan at that particular time?
A Because they did -- they do reflect that.
Q Well, I guess the better question is why were the limits imposed if the MRS wasn't a part of the plan?
MR. OLSEN: Objection, asked and answered.
MR. BLANTON: Well, asked.
A This rate was left in the document from the previous version. No one discussed changing the rates.
Q What does nominal acceptance rate mean? What does the word "nominal" mean there?

360

A Nominal historically in all these documents is used to reflect the fact that in any given year, if you look at the detail tables, it's not exactly any of the numbers, it's somewhere around the numbers. It's either 402 or 607 or 898. So there's not -- there's a rounding, so it's a nominal number of about 400 or about 900.
Q Refer to the 1991 annual capacity report. I'm not sure what --
MR. OLSEN: I think it's 36.
Q Turn to page five.
A I'm on page five.
Q Table 2.1. The table is entitled Projected Waste Acceptance Rates for Spent Nuclear Fuel, and in Exhibit 5 on Table 1 it's "projected nominal waste acceptance rates for spent nuclear fuel." Do you know why you inserted the word "nominal" from '91 into the '95 document?
A To clarify the point that in any given year it wasn't exactly that number. It was around 900 or around 600, because again the individual allocations in the table don't add up, as you go back in the

361

document, to exactly those numbers. If I can point you, for instance, to page B.15.
Q Of '91?
A Of Exhibit 5.
Q Okay.
A Which is Table B-6.
Q I don't have it in front of me.
A This one here.
Q Okay.
A Look at the bottom of the page. It will have a number of 901.7 as opposed to exactly 900. So the summary table was annotated to reflect that it was nominally 900.
Q Okay. The statement after that sentence says "The department will continue to process" -- I'm back on page four of Exhibit 5. It says "The department will continue to process DCS submittals on an annual basis." Do you know how long after this document was published that the decision was made to suspend the DCS process?
A I believe it was sometime over a year later.

362

Q Did the Department of Energy at any point starting with the time this document was published, March 1995, referring to Zabransky Exhibit 5, starting in March 1995 did the Department of Energy ever use the acceptance rates published in that document for its own planning purposes, for the purposes of planning for the operation of the waste management system?
A The Department of Energy never used these rates for the planning for the operation of a repository facility.
Q I'm not asking -- not my question.
A Okay. Repeat the question.
Q Did you ever use these rates beginning in March of 1995 for the planning for the federal waste management system?
A No, we did not.
Q Let me show you Exhibit 38.
(Deposition Exhibit Zabransky 38 was marked for identification and was attached to the transcript.)
Q Which is unsigned, but it has "official

363

file copy" on the second page and has your name down at the bottom of the second page. Do you know what this document is?
A This is a draft of a transmittal letter that would have gone from Sam Rousso to the director, who at that time was Dan Dreyfus, recommending approval for the publication of the '95 ACR. I believe that's what it is. The '94 -- '94 ACR, published in March '95.
Q Is that document the one that's marked Exhibit 5?
A That's what this document refers to, yes.
Q And all those initials to the right-hand side indicate various approvals of the document?
A Right, to that point in time.
Q Okay. Why did the Department of Energy publish a document to be used as the basis for delivery commitment schedules using rates which it was not using itself for the purpose of planning the system?
A The department carried over the rates it had in the previous ACR and did not change them.

364

Q Was the department trying to minimize the commitments it had to utilities who were parties to the standard contracts in using this document, in using Exhibit 5?
A I believe that that was a consideration.
Q Were there any other considerations that you can think of for using those rates?
A There was no other basis to develop any other rates at that point in time.
(Deposition Exhibit Zabransky 39 was marked for identification and was attached to the transcript.)
Q We have marked as Exhibit 39 to your deposition, Mr. Zabransky, a document entitled Analysis of a Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program. Are you familiar with that document?
A I've seen this document. I'm not familiar with it, but I know what it is.
Q Did you participate in any way, shape or form in either providing any of the information for the document or helping draft it?

365

A No, I don't believe I did.
Q Do you use it in the course of your duties in the Department of Energy?
A I don't use this document in the course of my duties, no.
Q Let me refer you to page eight of Exhibit 39, Mr. Zabransky.
A Okay.
Q You found it before I did.
A I found it.
Q Do you know where those receipt and placement rates came from?
A I don't know specifically where they came from, no.
Q As far as you know, were those the rates that the DOE was using for planning purposes as of September of 1995?
MR. OLSEN: Objection, vague.
Q Do you understand my question, Mr. Zabransky?
A Those were the rates that were used to cost out a repository and its operations that were used in

366

A Potential cost of similar settlements. Would have come out of my group of people that developed that.
Q Based on the amount of spent fuel out there at utility sites?
A Based on implementation of similar settlements at other places, yes.
Q Have you provided any advice regarding acceptance rates to be employed in any of those settlements?
A In any of the settlements or in the settlement?
Q Well, I guess since there's only been one, the, but any proposed --
MR. OLSEN: Objection to the extent it's going to call the witness to reveal information disclosed in the course of settlement negotiations.
A I participated in the negotiations of the settlement.
Q Take a look at page 15 of Exhibit 40 to your deposition, which is the analysis of the total system life cycle cost of the civilian radioactive

371

waste management program, December 1998.
A Uh-huh.
Q Do you see those acceptance rates on page 15?
A Yes, I see them.
Q Are those the bases for the total system life cycle cost estimate that was done in 1998?
A I have to read the document, but I believe it is.
Q Do you know where those rates came from, how they were developed?
A I believe they feed into this document from the systems requirements documents.
Q Okay.
A Which is a higher level program requirements document.
Q What is the purpose of the system requirements document?
A The purpose of that document is to -- I'm not a systems engineer -- at DOE is to define the requirements for the rest of the federal waste management system as to what it needs to do.

372

Q When you say the rest of the federal waste management system, is there some part that it doesn't apply to?
A Well, for the federal waste management system, yes.
Q And do you recognize these rates as the rates that are in the system requirements document?
A They appear to be. I would have to verify but they appear to be the rates that are in the CRD at this point.
Q Do you know how those rates came to be developed?
A No, I do not know how they came to be developed. I know that -- in this document and the CRD, no.
Q I'll ask it a different way. Do you know what the rationale is for a particular rate in a particular year?
A I would defer to the engineers that have looked at this and determined this is something they could accomplish. Also to the policy or the people who have approved the CRD and said it's something we

373

think we can accomplish.
Q To your knowledge does this also assume the acceptance rates at a repository?
MR. OLSEN: Objection. The document speaks for itself.
A The entire document presumes a repository in 2010.
Q Before I make this an exhibit I'm just going to ask you, are you familiar, do you know whether you're familiar with a document titled Basis for the Viability Assessment and TSLCC Cost Estimate Operational Waste Stream? I'll show it to you.
A Sounds like a catchy title.
(Deposition Exhibit Zabransky 41 was marked for identification and was attached to the transcript.)
A Yes, I'm familiar with this document.
Q What is that document?
A This document is a report done by our contractors. TRW announced similar documents done by Bechtel that attempt to simulate how fuel might be -- what type and -- what types of fuels might be received

374

when at a repository so that the designers can design accordingly.
Q Does that document provide the input for any other document as the title may suggest?
A It would be a basis for further design work and further analysis, yes.
(Deposition Exhibit Zabransky 42 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, Exhibit 42, Civilian Radioactive Waste Management System Requirements Document, Revision 5 dated May 2000. Is that the document you referred to a little while ago as being the source of the acceptance rates and the total system life cycle cost estimate?
A This should be the source of the requirements for the entire program that would be reflected in the life cycle cost, yes.
Q Look at page ten of the document if you would. See Table 1 titled CRWMS Receipt Rates?
A Yes, I do.
Q Are those the rates that currently serve as

375

the planning basis for DOE for the purpose of the civilian radioactive waste management system?
A These are the rates that serve as the planning basis for the repository, correct.
Q Did you do anything in connection with the development of those rates?
A No, I don't think I did.
Q Do you have any disagreement with those rates?
MR. OLSEN: Objection, vague.
Q Do you think those rates are reasonable?
MR. OLSEN: Objection, vague and to the extent it calls for a legal conclusion.
A From a technical perspective, these are reasonable rates.
Q Who at the Department of Energy works on the civilian radioactive waste management system requirements document? Can you tell us a person?
A Well, it's under Jeff Williams' program and his staff would work on it.
Q All right.
A It's ultimately approved by the director.

376

Q All right, sir.
A Can we take five minutes?
Q Sure.
(There is a recess from the record.)
Q Mr. Zabransky, could you pull out Exhibit 2 to your deposition. It's the letter dated September 30, 1996, from R. G. Cocherell to Mr. Doug Baptist, contracting officer. I know that you were copied on that document.
A Yes, I was.
Q See that?
A Uh-huh.
Q The second paragraph of this letter says, "The attached meets the notice obligations under the spent fuel disposal services contracts but does not indicate Southern Nuclear's acceptance of the removal rates contained in the current ACR. Southern Nuclear believes the current rates are too low and are therefore inadequate." Do you see where I've read?
A Uh-huh.
Q That's a yes?
A Yes, sorry. I see that.

377

Q Did the Department of Energy do anything with respect to the statement in that paragraph? Did they respond to that in any way?
A I don't believe so.
Q When you found Exhibit 2, did you see Exhibit 3?
A Yes.
Q That's the letter from probably March 17th from Ms. Tomasoni, March something of 1997?
A Yeah, it's the 13th.
Q Is that the only response you're aware of from the Department of Energy to this letter that's marked Exhibit 2?
A I believe so.
(Deposition Exhibit Zabransky 43 was marked for identification and was attached to the transcript.)
Q Let me show you Zabransky Exhibit 43, which is a letter to James H. Miller, III, to Beth Tomasoni, Reference: Response of Southern Nuclear Operating Company on behalf of Alabama Power Company and Georgia Power Company to your letter of December 17, 1996.

378

Justice has identified as withheld on the grounds of privilege are produced and after we have an opportunity to review documents recently produced to us by the Department of Justice and after certain instructions not to respond which occurred earlier in this deposition are resolved. Thank you very much for your time, Mr. Zabransky.

MR. OLSEN: And we would like to put on the record that the government will object and does object to this deposition being held open.

(There is a recess from the record.)

EXAMINATION BY COUNSEL FOR DEFENDANT THE UNITED STATES

BY MR. OLSEN:

Q Mr. Zabransky, I really have just one question to be asking you here. Yesterday you indicated that it made, I think the phrase was no sense to accept fuel at a small rate at a repository or MRS. What did you mean by that statement?

A I meant from a programmatic perspective, from an operational perspective it made no sense to accept a small amount of fuel at a repository, MRS

415

assuming that there were no constraints on the acceptance capacity of those facilities.

MR. OLSEN: Okay. I have no further.

MR. BLANTON: Subject to all of my reservations and everybody else's.

MR. OLSEN: Exactly. Subject to all of our objections to your reservations.

EXAMINATION BY COUNSEL FOR PLAINTIFF COMMONWEALTH EDISON COMPANY

BY MR. HIRSCH:

Q Good afternoon. My name is Norm Hirsch. I'm a lawyer for Commonwealth Edison Company, one of the plaintiffs in this case.

Let me refer you back or I'm wondering if you could get back in front of you Zabransky Exhibit 4.

A This one right here.

Q Wow, right on top. The instructions for the DCS forms. We went over a little bit of this yesterday or today, I'm losing track, but I want to ask you a question about it.

A Okay.

416

Q Would you refer to the first page of the document, the "when to submit" paragraph?

A Yes.

Q It says, "Beginning January 1st, 1992, purchasers shall submit DCSs at least 63 months prior to requested delivery," and then it refers the purchasers to the 1991 ACR or the subsequent ACR as appropriate.

A Uh-huh.

Q Do you see that?

A I do.

Q Is it correct that a utility did not have to submit a DCS form for fuel that did not have an allocation in a particular year 63 months before the year of that allocation?

MR. OLSEN: Objection to the extent it calls for a legal conclusion. Objection also because it's vague.

A Can you repeat that.

(The record is read.)

A I don't understand.

Q Let me rephrase it.

417

A Okay.

Q Maybe the best way to do it is to give you a specific example.

A Okay.

Q Let's suppose that a utility did not have a particular allocation going off the 1991 ACR for the year 2000. You follow me so far?

A Yes. So there's no allocation in the year 2000.

Q So a utility would not need to submit a DCS, going back 63 months in 1994, correct?

MR. OLSEN: Objection to the extent it calls for a legal conclusion.

A Well, what would they --

MR. OLSEN: I want to object because it's vague.

A Okay. I guess I'm at a loss to understand what they would submit it for if there was no allocation.

Q All right. Let me -- sorry about this, but the utilities were supposed to submit allocations 63 months before the year of their allocation in the ACR.

418

Is that correct?
MR. OLSEN: Objection. Calls for a legal conclusion. Objection, vague.
Q Do you want her to read the question back?
A Well, the instructions say they should submit them 63 months prior to the year.
Q Right.
A Okay. For that allocation.
Q And a utility wasn't required to submit DCS forms more than 63 months in advance, was it?
MR. OLSEN: Objection. Calls for a legal conclusion.
A Nothing requires it to be more than -- it says at least 63 months.
Q And as I understand it, you testified earlier that Wisconsin Electric went ahead and submitted ten years worth of DCS forms the first year. Is that correct?
A That's correct.
Q But that wasn't what was required by the DCS instructions, was it?
MR. OLSEN: Objection to the extent it

419

calls for a legal conclusion.
A The instructions say at least 63 months.
Q Right. Could you -- and so it wasn't required to submit all your DCS allocations the first year, was it?
A No, it wasn't required.
Q All right.
MR. OLSEN: And objection, legal conclusion, and also best evidence. The instructions speak for themselves.
Q And is it correct that with a few exceptions, like Wisconsin Electric, most of the utilities who submitted DCS forms did so on a rolling basis of 63 months before their ACR allocation. Is that correct?
A I don't know. I couldn't classify it as most or whatever. A substantial number submitted them all up front. I don't know the exact percentage.
Q Can you identify who submitted all -- what utilities submitted all their allocations up front?
A I couldn't do that without reviewing the records of who submitted DCSs and had them approved.

420

But that -- I think it was quite a few; I'm just not quite sure of the number.
Q Did you review at some point the number of utilities that had submitted their allocations all at one time?
MR. OLSEN: Objection, instruct the witness to not answer this question to the extent it will require the revealing of attorney/client or attorney work product.
Q Subject to that qualification, can you answer the question?
A I mean, there were records kept as to who had allocations and who had approved DCSs, so not that there was an effort to determine anything, but records were kept.
MR. HIRSCH: Let's go off the record for one second.
(Off the record.)
(Deposition Exhibit Zabransky 48 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, I've handed you what's been

421

marked as Zabransky Deposition Exhibit 48, which is a document with Bates label CTR 0031772 through 1787 titled Status of Delivery Commitment Schedules, EEI UWASTE Meeting, November 6, 1992. And it has the name Alan Brownstein on it, although it appears to be crossed out and there's a handwritten note Billy Cole. Have you ever seen this document before?
A No.
Q Do you recall being in an EEI UWASTE meeting in November 1992 where there was a presentation from the DOE regarding the status of delivery commitment schedules?
A I don't recall, no.
Q And who is Mr. Cole?
A Mr. Cole was the manager of the waste acceptance department at the M&O at the time. TRW.
Q Would he have been responsible for collecting information on DCSs that were submitted?
A He would have been, his group would have been involved with the assisting in the processing of DCSs.
Q After you joined the DOE did you see

422

A From memory, I would have to go back -- I would have to go back and review the files. I couldn't do that -- I can speculate. I could guess at one, but I would be guessing. I would have to review my files.
Q Sitting here today you can't identify other utilities besides Wisconsin Electric that submitted all their forms at one time?
A Not from memory, no.
Q And I think you said earlier that under the DCS instructions the utilities didn't have to submit all their -- all their DCS forms for all their years of allocations at one time?
A That's correct, they didn't need to.
(Deposition Exhibit Zabransky 49 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, I've handed you what's been marked as Zabransky Deposition Exhibit 49, and I will represent to you that this is a group exhibit representing correspondence between Commonwealth Edison Company and the Department of Energy regarding

427

Com Ed's submission of DCS forms.
What I would like to do is refer you -- well, let's start off on the first page, page 3673. Does this reflect that Com Ed submitted DCS forms for its allocation starting in 1998?
A That's what this does apparently, yes.
Q And does the following letter and documents contained on pages 265, 266 and 267 indicate that those forms, DCS forms were approved?
MR. OLSEN: Which numbers did you say?
MR. HIRSCH: The numbers at the bottom are 265, 266 and 267.
A The letter indicates that the attached forms don't show that, but it could just be the Xeroxing.
Q Well, the page 266 shows Alan Brownstein and Beth Tomasoni's signature right?
A On form number -01.
Q That's page 266?
A Correct.
Q And 267 I guess that's form 02 shows I guess Alan Brownstein's signature?

428

A Right. Which means that one wasn't approved if that's all that's there.
Q Well --
A I'm just observing the documents.
Q All right. Do you have any reason to believe that this particular DCS form sitting here today was not approved?
A No reason to believe that.
Q And when you look at the pages that begin CTR 006-1500 through 1504, are those DCS forms that Com Ed submitted along with a transmittal letter for the year 1999?
A Correct.
Q And do pages Bates labeled CEO 0746 through 0750 reflect that those forms were approved by the DOE?
A Yes.
Q And do you see on pages COF 02156 through 2164 Com Ed's submission of DCS forms along with a transmittal letter from Ken Peterson for the year 2000?
MR. OLSEN: Objection. What were the --

429

just -- could you clarify the numbers again. At least I think the version --
MR. HIRSCH: There's a break.
MR. OLSEN: There's a break.
A What we've got is Ken's transmittal letter and we have copies of the I believe -- no, we got a break. No, maybe not. Okay, we got a break.
Q Let me ask you, looking at page 2159 through 2164, do these reflect DCS forms that Com Ed submitted for the year 2000 that were approved by the DOE?
A Yes.
Q And now I'm going to refer you to the next set of documents COF 0012141. This is all still in Zabransky Exhibit 49.
A Okay.
Q There's a cover letter dated September 28, 1995, from Mr. Ken Peterson at Com Ed and attached to that are some DCS forms for the year 2001.
A Yes.
Q Now, these forms that I've just identified starting at 2041 through 2046 came in after you had

430

become the team leader at waste acceptance. Is that correct?
A That's correct.
Q Do you recall seeing these forms?
A Not specifically, no. I've looked at them now. I don't recall -- I did not recall them before I looked at them right now.
Q I'm going to represent to you, Mr. Zabransky, that the Bates labels on these documents reflect that they were produced to us, to Com Ed by the government.
A Okay.
Q Do you have any reason to believe that these particular DCS forms were not submitted to the DOE?
A I have no reason to believe that.
Q Mr. Zabransky, I'm going to represent to you that the best of our information the DCS forms that we've just been looking at, 2142 through 2146, were never acted on one way or the other by the DOE. In other words, Com Ed never received a response. Do you have any information about why or how that could



have occurred?
A No, I have no information why or how that could have occurred that they didn't receive any response.
(Deposition Exhibit Zabransky 50 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, I've handed you what's been marked as Zabransky Deposition Exhibit 50, which is a letter from James Blanford at TRW to a Mr. Sam Rousso at the Office of Civilian Radioactive Waste Management. It's dated October 25th, 1995. The Bates labels are CTR 0240033 through 0040. And you see that you're copied on this document?
A Yes, I was.
Q And do you see that the document says the attached subject report provides the status of the delivery commitment schedules received as of October 15th, 1995?
A Yes.
Q The changes from the previous report consist of adding the data and status of the following



new DCS submittals.
A Okay.
Q Does Exhibit 50 reflect that TRW and the DOE received the DCS forms which were part of Com Ed Exhibit 49 at pages 2142 through 2146?
A Yes, this letter reflects that they were received by the government and provided to TRW.
Q What was the purpose of providing DCS forms to TRW?
A They assisted in the review of the forms.
Q All right. Mr. Zabransky, I would like you to go back to Zabransky Dep Exhibit 49 and specifically we're going to move on to the pages that are marked COF 01 starting on 2165.
A Okay.
Q Through 2172.
A Okay.
Q Do these documents I've just identified represent DCS forms that Com Ed submitted for the year 2002 along with the transmittal letter dated September 25th, 1996, from Ken Peterson at Com Ed?
A They do.



Q All right. Mr. Zabransky, I would like to refer you to the next few pages of Zabransky Dep Exhibit 49 which are some pages marked at the bottom 284 through 290. Do you see those pages?
A Yes.
Q And for information purposes I'll say that we got these pages from the government's appendix to the summary judgment motion they filed in the case.
Do you see that these documents from 284 through 291 were the Com Ed DCS forms submitted for the year 2002?
A Correct.
Q And will you look at the bottom of the first form at page 284.
A Uh-huh.
Q Is there a notation of DOE action at the bottom of that section --
A Yes.
Q -- of that form?
A Yes, there is. I approved these from a technical perspective and forwarded them through the process to the contracting officer for final approval.

Q Whose signature is that as the technical representative?
A That's mine.
Q And so what would be the procedure for you to review these as the technical officer?
A Ensure they comply with the delivery instructions from a technical perspective and, if so satisfied, would have forwarded them from my office with a draft letter back to the purchaser through counsel to the contracting officer.
Q And to your knowledge that's what you did with respect to these forms?
A To my knowledge that's what I did.
Q And what is the C-O-T-R designation there?
A That's contracting officer's technical representative.
Q And that was you?
A That was me.
Q And then there's a handwritten note to the right-hand side of this notification of DOE action. Can you read that for me?
A It says, "Void, DKZ, 2/27/97."

435

Q Is there another note underneath that? DK --
A That's my name.
Q Zabransky?
A I signed it.
Q And there's something like DU -- is that still part of your name?
A That's part of my name.
Q And that's what you dated 2/27?
A '97, correct.
Q Can you tell me what the circumstances were that caused you to void your earlier determination to recommend approval of these forms?
MR. OLSEN: I just want to object to the extent that he can do so without revealing any privileged communications.
A Further steps in the review process indicated to me, advised me that this was the appropriate action to take.
Q What further steps in the reviewing process are you referring to?
A When this went through counsel.

436

Q Did you submit the forms to counsel?
A Routinely the letters all go through counsel for their signature.
Q I see. Which counsel would these forms have gone to at the time?
MR. OLSEN: Objection. I instruct the witness not to answer that question because it's seeks privileged information.
Q Are you going to follow your lawyer's advice not to answer the question?
A Yes.
MR. HIRSCH: As I think has been reflected earlier, I don't think the identity of the lawyer is privileged. But I guess we'll sort this out later.
Q Did the lawyer instruct you to void or to write "void" on these forms?
MR. OLSEN: Objection. That one is privileged. Everybody knows that what the lawyer instructed him to do you can't ask him about. I'm instructing the witness not to answer the question.
Q And you're going to follow your counsel's advice, is that correct, Mr. Zabransky?

437

A I will follow his advice.
Q Was a decision to write "void" on these forms part of the decision I think you mentioned earlier to suspend the DCS process at the recommendation or the instruct of counsel?
MR. OLSEN: Sorry, could you repeat the question.
(The record is read.)
MR. OLSEN: I direct the witness not to answer the question to the extent that doing so would reveal what counsel told him. If you can answer the question without saying what counsel told you.
MR. HIRSCH: Let me rephrase.
MR. OLSEN: Okay.
Q I believe you testified earlier, Mr. Zabransky, that the DCS process was suspended based on instruction of counsel. Do you recall that?
A I think I said that, yes.
Q And that that occurred I think around the time of the Indiana Michigan decision in 1996?
A I'm not sure. Yeah, whatever decision it was, there was a precipitant event.

438

Q And you think that was in 1996?
A That time frame, yes, I think.
Q And my question for you is was the decision to write "void" on these Com Ed forms, DCS forms, part of that general determination to suspend the DCS process?
A It was a result of the suspension of the process.
Q Did you have any discussions with nonlawyers at the DOE about your having written "void" on DCS forms?
A No, I don't think so.
Q Were there other DCS forms besides the Com Ed forms that were initially approved and then you went back and voided?
MR. OLSEN: Objection, assumes facts not in evidence and calls for a legal conclusion.
MR. HIRSCH: I asked him if there were.
Q You can answer.
A I think there are. I'm not sure which ones.
Q Do you know approximately how many forms --

439

A No.
Q -- you would have voided at the time?
A I do not know.
Q Will you look at the next page of the document, Exhibit 49, which is a March 13th, 1997, letter from Beth Tomasoni to Mr. Michael Wallace at Com Ed. Do you see that?
A Yes.
Q Would you have reviewed this letter at or before the time it went out?
A I would have participated in drafting a version of this letter, yes.
Q I think we looked earlier at a letter to Southern Nuclear around the same time, indicating that the department was not able to approve its DCS submittal. Does this letter appear to be pretty much identical to that letter?
A I don't know if it's identical.
MR. BLANTON: Exhibit 3 I think.
MR. OLSEN: Three? Okay. Thank you.
A Looks to be identical to me.
Q Well, let me just clarify. You're now

440

looking at Deposition Exhibit 3 and you're comparing it with the letter that's part of Zabransky Dep Exhibit 49 dated March 13th, 1997?
A That's correct.
Q And the letters appear identical. Is that correct?
A They appear identical.
Q And so the letter that was sent to Michael Wallace at Com Ed dated March 13th, 1997, was a result of this determination by counsel to suspend the DCS process. Is that correct?
MR. OLSEN: Could I have the question read back.
(The record is read.)
MR. OLSEN: You can answer.
A Yes.
Q Will you look at the last three pages of Zabransky Deposition Exhibit 49?
A The last three pages?
Q Right.
A These three?
Q Right.

441

MR. OLSEN: 64, 69 and 70.
MR. HIRSCH: Right.
MR. OLSEN: Okay.
A Okay.
Q Actually, I would like you to look at the last two pages.
A Okay.
Q 69 and 70. Do pages 69 and 70 reflect that Com Ed submitted a DCS form for the year 2003?
A That's what it reflects.
Q All right. And I take it from your earlier testimony that this DCS form would not have been reviewed. Is that correct?
A It would not have been processed, right.
Q And to your knowledge, just to clarify, the DCS form Com Ed submitted was not processed or reviewed. Is that correct?
A Not to my knowledge.
Q Will you refer back to Zabransky Dep Exhibit 4, please.
MR. OLSEN: The instructions?
MR. HIRSCH: Right.

442

idea of the fuel that would be provided.
Q Well, is it correct, Mr. Zabransky, that Wisconsin Electric didn't provide much of an idea of what fuel would be provided? Is that correct?
A They provided the information they had available, which is they would select later on from that inventory.
Q And that was the inventory over 29 years?
A That's correct.
Q I think you also said where people expected us to go and what they expected us to do. Do you recall that?
A I think I just said that, yeah.
Q What do you mean "what they expected us to do"?
A Approximately how much fuel that we'll pick up. And this at least says the maximum number of assemblies it could be.
Q Well, when you identified the maximum number of assemblies, did you have a sense of what percentage range that could include?
MR. OLSEN: Objection, vague. And

451

objection, foundation.
A No. We based it on the directions that say what's the maximum number it could be for assemblies that hadn't yet even been discharged or purchased.
Q So Wisconsin Electric was submitting DCS forms for fuel that it hadn't purchased yet. Is that correct?
A It's correct to my knowledge that by 1993 we hadn't purchased the fuel that was in the reactor as of 2001.
Q How long in advance of putting a fuel in a reactor would the utility purchase the fuel, based on your experience at Wisconsin Electric?
A Fuel designs are probably set two years ahead of time, three years ahead of time.
Q So generally you would arrange a purchase of fuel two or three years ahead of time that went into the reactor?
A That's when you would set the final design, two years or so, three years ahead of time.
Q Now, I believe this got discussed a little earlier, but is it also correct that under the

452

contract a utility could submit up to 20 percent more fuel in terms of metric tons than the amount that it had identified on a DCS form?
MR. OLSEN: Objection to the extent it calls for a legal conclusion. And objection, it's vague.
A If you're saying that could a utility when it put forth its FDS used the adjustment of plus or minus 20 percent provided for in the contract, the answer is yes.
Q And the adjustment of 20 percent up or down is an adjustment by weight. Is that correct?
A By MTU.
Q Okay. And MTU is metric tons?
A Metric tons of uranium, yes.
MR. OLSEN: Can we go off the record for one second.
(There is a discussion off the record.)
Q Once a utility had submitted a DCS form that had been approved by the DOE for a particular range of fuel at a reactor, could the utility submit, when it came time to submit the final delivery

453

schedule, fuel in a different range or from a different reactor?
MR. OLSEN: Objection to the extent it calls for a legal conclusion. And I believe this question has been asked and answered already.
A It was DOE's position that the FDS needed to be a subset of the DCS.
Q And where is that provided in the DCS instructions?
A It's not provided in the DCS instructions.
Q Well, where is it provided in the contract?
MR. OLSEN: Objection. The contract speaks for itself.
A The contracting officer has discretion for the basis of approval or disapproval.
Q Well, Mr. Zabransky, is it correct that the contract did not specifically address the issue of whether a utility could provide different fuel than fuel identified in a DCS form?
MR. OLSEN: Objection. The contract speaks for itself, and objection to the extent it calls for a legal conclusion.

454

A The DCS provision is in the contract as it's written.
Q And does that DCS provision address the specific question that I've identified?
A It does not.
MR. OLSEN: Objection to the extent it calls for a legal conclusion and objection to it's vague.
MR. HIRSCH: All right. Now that you've finished the objection, why don't we take a break here and start tomorrow morning.
MR. OLSEN: Okay.
(Signature having not been waived, the deposition of David Zabransky was concluded at 5:32 p.m.)

ACKNOWLEDGMENT OF DEPONENT

I, David Zabransky, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

_____________________ ______________________

455

(DATE) (SIGNATURE)

456

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLI(

I, Diane Gomez, Registered Professional Reporter, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 18th day of April 2002.

My commission expires:
June 14, 2005

________________________
NOTARY PUBLIC IN AND FOR
THE DISTRICT OF COLUMBIA

457

E R R A T A S H E E T

IN RE: YANKEE ATOMIC v. UNITED STATES

RETURN BY: ________________________________________

| PAGE | LINE | CORRECTION AND REASON |
|---|---|---|
| ____ | ____ | __________________________________ |
| ____ | ____ | __________________________________ |
| ____ | ____ | __________________________________ |
| ____ | ____ | __________________________________ |
| ____ | ____ | __________________________________ |
| ____ | ____ | __________________________________ |
| ____ | ____ | __________________________________ |
| ____ | ____ | __________________________________ |
| ____ | ____ | __________________________________ |
| ____ | ____ | __________________________________ |
| ____ | ____ | __________________________________ |
| ____ | ____ | __________________________________ |
| ____ | ____ | __________________________________ |
| ____ | ____ | __________________________________ |
| ____ | ____ | __________________________________ |
| ____ | ____ | __________________________________ |

______________ __________________________________
(DATE) (SIGNATURE)

458

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Continued Deposition of DAVID ZABRANSKY
Washington, D. C.
Friday, April 19, 2002
10:03 a.m.

Job No.: 12597-3
Pages 460 through 722 - Volume 3
Reported by: Diane Gomez, RPR

460

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X

461

Continued Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

462

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORI' OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:
JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

463

A P P E A R A N C E S  C O N T I N U E D

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFF COMMONWEALTH EDISON COMPANY:

NORMAN M. HIRSCH, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

464

A P P E A R A N C E S  C O N T I N U E D

ON BEHALF OF PLAINTIFF WISCONSIN ELECTRIC POWER COMPANY:

RICHARD W. OEHLER, ESQUIRE
PERKINS COIE LLP
1201 Third Avenue, 40th Floor
Seattle, Washington 98101-3099
(206) 583-8419

ON BEHALF OF DEFENDANT UNITED STATES:

MARIAN E. SULLIVAN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #10150
Washington, D. C. 20530
(202) 307-6288

465

A P P E A R A N C E S  C O N T I N U E D

ON BEHALF OF DEFENDANT UNITED STATES:

WILLIAM L. OLSEN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Room #7002
Washington, D. C. 20530
(202) 305-7594

466

C O N T E N T S


| EXAMINATION OF DAVID ZABRANSKY | PAGE |
|---|---|
| By Mr. Hirsch | 471 |
| By Mr. Tomaszczuk | 565 |
| By Mr. Macdonald | 641 |


E X H I B I T S

(Attached to the Transcript)


| ZABRANSKY DEPOSITION EXHIBIT | PAGE |
|---|---|
| 51 CTR 0440723 through 0743 | 480 |
| 52 Preliminary Draft OCRWM Position Issue No. 2, Oldest Fuel First v. Waste Selected for Delivery CTR 0131268 through 1273 | 496 |
| 53 E-mail from D. Shelor to J. Carlson dated 9/16/98, CTR 004-0263 | 533 |
| 54 Presentation to APC, EDB 0020584 - 0020602 | 536 |
| 55 Letter to N. Slater from E. Benz EDB 002056 - 618 | 538 |


467

E X H I B I T S C O N T I N U E D

(Attached to the Transcript)


| ZABRANSKY DEPOSITION EXHIBIT | PAGE |
|---|---|
| 56 Waste Acceptance Issues, D. Zabransky presentation to Transportation Coordination Working Group dated 6/6/95 | 541 |
| 57 Two e-mails, HQR 0292321 | 545 |
| 58 OPPD DCS forms and correspondence | 585 |
| 59 GPU DCS forms and correspondence | 600 |
| 60 NYPA DCS forms and correspondence | 606 |
| 61 Duke Power Company DCS forms and correspondence | 612 |
| 62 Boston Edison DCS forms and correspondence | 616 |
| 63 Northern States Power Company DCS forms and correspondence | 619 |
| 64 Indiana Michigan DCS forms and correspondence | 626 |
| 65 Excerpt from Code of Federal Regulations, 10 CFR Section 61.55 | 665 |


468

E X H I B I T S C O N T I N U E D

(Attached to the Transcript)


| ZABRANSKY DEPOSITION EXHIBIT | PAGE |
|---|---|
| 66 Fax titled Acceptance of Nonfuel Components and GTCC-Regulated Issues, dated 12/13/94 | 673 |
| 67 Letter dated 12/13/85 to J. Hall from R. Bauer | 676 |
| 68 Letter dated 3/1/91 from DOE to D. Zabransky | 678 |
| 69 "DOE Acceptance of Dual-Purpose Canisters" | 681 |
| 70 "Priority Acceptance for Shut Down Reactors" dated 6/27/95 | 691 |
| 71 Spent Fuel Privilege Log | 712 |


469

P R O C E E D I N G S

DAVID ZABRANSKY

having been previously sworn, testified as follows:

MR. OLSEN: Mr. Zabransky has something that he would like to clarify from the end of yesterday's deposition.

MR. HIRSCH: Okay. Before he does that, I would like to make one remark unrelated to whatever clarification he has.

MR. OLSEN: Okay.

MR. HIRSCH: And then I don't have any problem with him doing that. It won't relate to what he has to say.

As I recall, toward the end of the day yesterday there was an exchange between counsel and myself and Mr. Olsen about Mr. Olsen's assertion of privilege and instructing the witness not to answer, and I believe that Mr. Olsen made a remark that we all know that advice of counsel is privileged. And although I don't think it's probably necessary, just so there's no ambiguity here, as Mr. Blanton reflected in his remarks, we don't agree that advice of counsel

470

is always privileged and in particular we believe that, particularly with respect to the issue of the treatment of DCSs, advice of counsel may be an issue in this case and therefore may not be privileged. And also we're not sure that some of the communications with attorneys actually represented advice of counsel. That's the sum of my clarification.

EXAMINATION BY COUNSEL FOR PLAINTIFF
COMMONWEALTH EDISON COMPANY

BY MR. HIRSCH:

Q Okay, Mr. Zabransky, did you have something you wanted to tell us?

A Yes. I would just like to clarify a point that I made yesterday that with respect to the relationship of the FDS and the DCS, the point I would like to make is that the contract does contain a provision that ties the FDS to the DCS and, in fact, says that the FDS for the delivery of SNF is covered by an approved DCS, so there is a relationship in the contract between the DCS and the FDS.

Q All right. You want to point me to the provision of the contract you're talking about?

471

A Probably. I'm sure we discussed the reason we were doing this. I think -- well...
Q Do you recall what, if anything, he said about it?
A Not specifically what he said in this case.
Q Has it been part of your job responsibilities for the last few years to prepare an analysis of what costs the utilities are incurring by virtue of the DOE's failure to start picking up spent fuel in 1998?
A I think the purpose of this analysis was to try to figure out what the basis was for the NEI NARUC analysis that came up with different numbers and look at parameters to see if we could replicate what they came up with.
Q Okay. I understand that. But my question was has it been part of your job responsibility for the last few years to prepare an analysis of what costs the utilities are incurring by virtue of the DOE's failure to begin picking up spent fuel in 1998?
MR. OLSEN: Objection. To the extent you can answer the question without revealing either

548

settlement negotiations or attorney/client conversations, you can answer the question.
A The answer is yes. I've been responsible for developing, quantifying numbers to assist in either settlement discussions or in discussions with attorneys or counsel. The answer is yes, I've been doing that.
Q And what was the NEI, do you remember what the NEI NARUC analysis was that was referred to there?
A Specifically I don't know. They had a -- I recollect they had a number they were putting out that everyone wanted to figure out why they were getting that number.
Q And Buz Gibson and Marc Rose are the people who prepared this analysis. Is that right?
A At the time this was done, Buz Gibson and Marc Rose were working in the M&O and would have done this work for me.
Q At the M&O. And that's the contractor?
A Correct.
Q That's Bechtel?
A No, at this point that was TRW.

549

Q Okay. I lose track of the M&O contractor. In February '97 the M&O contractor was TRW?
A Correct.
Q And those two gentlemen work for TRW?
A Yes, they do.
Q Do you know if they're still -- or do you know where they are now?
A No, I do not.
Q And where does Jeff Williams or where did Jeff Williams work at this time?
A Jeff Williams would have worked at this time as the division director for the systems integration division. It may have had a different title, but it's essentially where he is now.
Q And do you know why he was involved in this e-mail?
A Why was he copied in?
Q Yeah.
A Because Buz Gibson generally worked for Jeff.
Q And Dong Kim, did he work for you?
A No.

550

Q Where does he work?
A Dong Kim is a -- I'm not sure what his title is but he's a senior advisor in the office of the director.
Q Office of the director of the office of civilian radioactive waste management?
A That is correct.
Q If you look at the first paragraph or the paragraph that I guess is the fourth up from the bottom, the one that begins, "As we discussed last evening."
A Okay.
Q You see there's a reference to the NARUC NEI analysis, and then it says, "In there," I think it should be t-h-e-i-r, "analysis they assume that in the delayed acceptance cases that when DOE acceptance begins there's no increase in the acceptance rates from the ACR rates."
A Uh-huh.
Q Semicolon. "So each year of delay adds a year to each utility storage needs and dramatically increases the post-shutdown storage costs."

551

A Okay. I see that.
Q So it was your understanding at that time that this NARUC analysis used the same rates as the ACR rates for the time when the DOE actually started performance?
MR. OLSEN: Objection, vague. Objection, foundation.
A I take this sentence to mean that, without remembering the specific analysis, but what that means to me now reading it this way is that they would have maintained the 900 tons a year forever.
Q And I take it you disagreed with that analysis?
A The analysis we did assumed that, once the repository was operating, that it operated, as it says, at the rates in the program plan.
Q And those rates were what?
A I don't recollect the exact numbers.
Q Would those rates in the program plan be the rates we looked at yesterday in the TSLCC reports or the system requirements document?
MR. OLSEN: Objection, compound.

552

Objection, calls for speculation.
A To the extent that they were contemporary with this program plan they should have been.
Q And so, again, I take it that you disagreed with an analysis that would have continued DOE performance indefinitely at 900 metric tons. Is that correct, Mr. Zabransky?
MR. OLSEN: Objection. Calls for speculation.
A After the operation of the repository, yes.
Q And so in this analysis the DOE assumed that the repository was going to open and that it would operate at whatever the then current program rates were. Is that correct?
MR. OLSEN: Objection. Calls for speculation.
A That's correct.
Q And then you say, "As you can see, the impact of using higher acceptance rates is that in the earlier years it actually costs the utilities less overall than if the program had begun in 1998 at the ACR rates." What did you mean by that?

553

A Well, that meant in the earlier years the utility costs impact is negative.
Q And how could utility cost impact be negative?
MR. OLSEN: Objection. Calls for speculation.
A By doing this analysis you will determine that it would be negative if you assume what these assumptions were.
Q What does it mean to have a negative cost impact?
A That they would have spent less money under this scenario than if we had started the other way.
Q And the DOE scenario that you're describing here is the DOE starting in 1998 at the ACR rates and then ramping up to the program rates when the repository opened in 2010?
MR. OLSEN: Objection, calls for speculation.
A No.
MR. OLSEN: Objection. I don't think that's what the document says.

554

A That's not what this document says.
Q Well, maybe I don't -- I didn't understand your previous answer. For purposes of determining this cost impact what assumptions did his analysis make?
A That the repository's available in 2002, 2004, 2008 or 2010.
Q All right. Thank you.
And so using -- and when the repository opens in one of those projected dates, the assumption was that the repository would operate at the program rates. Is that correct?
A At the rates that are being planned for operation after the opening of the repository.
Q And those rates ramp up to 3,000 by approximately five years?
MR. OLSEN: Objection. Calls for speculation.
A I would have to review the documents but it sounds to be about right.
Q And so by the time you get to 2006 on this document there is a positive I'll say utility cost

555

state "The proposed delivery date is dependent upon the existence of an operational repository or an interim storage facility constructed under the act."
A Yes.
Q And do you know the source, Mr. Zabransky, of those notations?
A Not specifically, no.
Q Did you place those notations on these DCS forms?
A I did not.
Q Did I understand your testimony, Mr. Zabransky, to be that the DCSs represented binding commitments by DOE and the affected utility?
A That is my belief, yes. Approved DCSs.
Q And per the instructions those DCSs were to be based on, Zabransky Number 4, the instructions. And I want to direct your attention if I can, Mr. Zabransky, to Exhibit 4, the instructions, and in particular the second paragraph on page one.
MS. SULLIVAN: Here. Look at the right exhibit.
A Second paragraph on page one?

628

Q Yes.
A Who should submit?
Q Yes. And that says "The DCS should be submitted by all purchasers with allocations in the 1991 ACR or subsequent ACRs as appropriate as specified in Article 5.B of the standard contract."
A That's what it says, yes.
Q And do I understand that instruction to be that in completing the DCS forms the utilities were to use the information contained in the 1991 ACR, which is Zabransky Exhibit 36?
MS. SULLIVAN: Objection. The document speaks for itself.
A That's what it says, yes.
Q Okay. And could you get Exhibit 36 in front of you, Zabransky 36. It's the 1991 ACR.
A Okay. Okay.
Q And in Zabransky Exhibit 36 the allocations that are referred to, as I understand the instructions, is that the Table 3.1 that appears at page nine?
A That's a summary of the allocations, yes.

629

Yes. Table 3.1 on page nine.
Q Yes.
A Yes.
Q All right. And so the utility is to use this table and submit its DCS, and once it's approved it's binding, as I understand your testimony?
A That's my belief, yes.
Q Can I direct your attention to page one of this Exhibit 36.
A Yes.
Q You see the Section 1.1 there towards the bottom?
A Yes.
Q And can you read the last two lines there at the bottom of this page one?
A Beginning with "although"?
Q Starting with "as specified."
A "As specified in the standard contract, the ACR is for planning purposes only and thus is not contractually binding on either DOE or the purchasers."
Q And my question to you, sir, is given that

630

language, if the ACR is for planning purposes only and the DCS is based on the ACR, how can the DCS be binding?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Answer the question to your knowledge.
A The contracting officer chose to use the ARC when he gave instructions as to how to approve the DCS and entered into a binding commitment.
Q Was the data in the ACR subject to change?
MS. SULLIVAN: Objection, vague.
A I'm not sure what you mean.
Q Were the allocations in the ACRs as reflected, for example, in Table 3.1 at page nine of Zabransky 36 subject to change?
A If you're asking me did the allocations in ACRs change between ACRs, the answer to that is yes.
Q So the commitment reflected at the DCSs was subject to change. Would that be a fair statement?
A No. That upon signature by the contracting officer became a firm commitment for that quantity, even if DOE changed it.

631

Q Mr. Zabransky, in Exhibit 5, can I direct your attention to page six. Given the department's decision to suspend the DCS approval process in or about February or March of 1997, was there any need for any utility to submit DCS approval forms after that date?
MS. SULLIVAN: Objection, vague. Objection to the extent it calls for a legal conclusion.
A I don't know that the department ever told utilities not to continue to submit. So whether there was need or not was up to the utility from their perspective.
Q The Department of Energy did tell utilities in or about March 13th, 1997, that they were -- that it, the Department of Energy, was no longer going to act upon DCS forms. Isn't that true?
A At that time, yes.
Q And has that direction changed since March 13th, 1997?
MS. SULLIVAN: Objection, vague.
A That position has not changed.
Q And has the department approved any DCS

636

forms submitted after March 13th, 1997?
A Not to my knowledge.
Q And you would know if they had, would you not?
A I would hope I would.
Q Now, I understood your testimony to be that DOE's current intention is to begin contract performance in 2010?
A That's DOE's current plans.
Q And if I could direct your attention to page six of Exhibit 5, do you have that?
A Yes.
Q So in interpreting this table, is it fair that year one should now be read to mean year 2010?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A That's a way of interpreting this table.
Q Is there any other way to interpret it?
A I'm sure there are. I don't know.
Q Can you tell me what they are?
A Interpret year one to be any year you want but I don't know how else -- it seems reasonable from

637

your statement that year one was the first year of operations.
Q And your testimony is, as I understand it, that DOE's current intention is to begin performance in 2010?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A That's DOE's current plans, are repository plans commence in 2010.
Q And you would agree this the last APR ACR that was published by DOE, correct?
A Yes, I would agree with that.
Q Are you aware of any other guidance, instruction, memoranda or other information provided by DOE to the utilities concerning how to utilize this table and the instructions for purposes of determining when to submit a DCS?
A No, I'm not.
Q Do you have an understanding of the term "nonbreach world."
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. And it's also beyond

638

the scope but I'll allow him to answer.
A I have heard the term used, and I believe I have an understanding of it.
Q Can you tell me, sir, what your understanding of it is?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. You can answer the question.
A My understanding is what would have happened had DOE not breached its obligation to begin performance in 1998.
Q And do you have an understanding, sir, as to what rate DOE would use for acceptance of spent nuclear fuel in the nonbreach world?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. You can answer the question.
A Had DOE begun performance in '98 as originally anticipated, at an interim storage facility, it would have been the rates in the ACR.
Q You understand the term "nonbreach world" to assume an interim storage facility?

639

cover all those components necessarily.
Q When you say it doesn't cover all of those components necessarily, could it cover some of those components?
A I don't --
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A Again I'm going to state, those components are not the result of reprocessing. And those components have not been found by the commission to determine by rule that requires permanent isolation. In effect the commission recently has found that those components for storage purposes are spent fuel under its revisions to 10 CFR Part 72.
Q Explain what you mean by the answer you just gave, if you would?
A That the commission recently amended 10 CFR Part 72 to allow the storage of GTCC CTRR at ISFSIs, independent spent nuclear fuel storage installations, and specifically excluded these nonfuel bearing components from the GTCC category and labeled them as spent fuel.

664

Q When you say they specifically excluded them from the category of GTCC, what do you understand the definition of GTCC to be?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A I would look at the NRC's definition of what greater than Class C waste is, but it's a technical list of radionucleides above certain characteristics, and I'm not versed in telling you what those characteristics are.
(Deposition Exhibit Zabransky 65 was marked for identification and was attached to the transcript.)
Q Mr. Zabransky, I've handed you what has been marked as Zabransky Exhibit 65 and it is an excerpt from the Code of Federal Regulations, 10 CFR Section 61.55. Do you have that there in front of you?
A Yes, I do.
Q Is this the regulations you're referring to regarding the characteristics of what makes the characteristics of Class C waste?

665

A I believe so. I've never really read these or focused upon these because I've never worked with low-level waste, and this is greater than Class C low-level waste.
Q You've never looked at this Code of Federal Regulations before?
A Not -- no, I really haven't looked at it. I've seen it in passing but I've never really read it. Again, from a utility perspective it was spent fuel. I didn't care about the Class C category. Again, I may have read this, looked at it. I am not a nuclear engineer so I have not focused on the half lives of nickel and cobalt and cesium and whatever, I guess estraunium. So this is not my area of expertise. I can't interpret it.
Q Mr. Zabransky, I believe you testified two days ago, and I apologize if you did, but let me ask the question. Do you have any recollection of discussions about modifying the standard contract to change the definition of high-level waste?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, to the

666

extent it requires testimony as to discussions with counsel. I direct the witness not to answer regarding any discussions with counsel.
A I have no recollection of doing that, no.
Q You were not involved in any efforts to modify the standard contract to change the definition of high-level waste?
A No, I was not.
Q In Mr. Tomaszczuk's questions I believe you stated that the contracting officer decided to base the DCS instructions on the ACR in 1991. Is that right?
A That's --
MS. SULLIVAN: Objection. I believe it mischaracterizes his previous testimony.
Q Mr. Zabransky.
A It's my understanding that's what the contracting officer based the submittal of DCSs upon in 1991, but in 1991, of course, I received those instructions as a utility.
Q I understand. I just wanted to make sure I understood your testimony.

667

A Yes.
Q Do you know why the contracting officer based the DCS instructions on the ACR rather than the APR?
A The APR doesn't contain anything to base it upon. The APR is merely a listing of fuel assemblies.
Q The APR is a listing of fuel assemblies ranked by the oldest fuel at the beginning and going forward. Is that right?
A Correct.
Q And the ACR takes that ranking and uses a particular acceptance rate to determine allocations. Is that right?
A That's correct. So, by extension, the ACR is based on the APR.
Q The standard contract provided for an ACR beginning in 1987. Is that correct?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A The standard contract in article -- in Article B -- or Article 4.B.2 -- 4.B -- 4.B.5.B requires that DOE begin publishing ACR not later than

668

July 1st, 1987, yes.
Q And was the APR to be published subsequent to the ACR?
A Yes, it was.
Q Did DOE state that the APR was to replace the ACR?
A No. In fact, if I recollect, when DOE published the APR, it told utilities to check the values because they would be used in the ACR.
Q Look at Exhibit 33 for me.
A What does it look like?
Q It's the 1997 ACR.
A Okay.
Q I'm going to ask you to look at page two, numeric page two with a Bates label PA 103158 and ask you to look at the paragraph that states, "Beginning in 1991, the ACR acceptance ranking will be converted into an annual priority ranking for receipt of SNF HLW. In 1992 based on this priority ranking the purchasers will submit to DOE for approval delivery commitment schedules identifying the SNF HLW purchasers propose to deliver." Do you see that?

669

A Yes, I do.
Q What does it mean that the ACR will be converted into an APR?
MS. SULLIVAN: Objection. The document speaks for itself.
A And it doesn't say that. It says the ACR acceptance ranking. What that refers to is this Table B-1 in this document where DOE had put together a table that wasn't an APR but used an illustrative example of how it would work, and that was converted into the APR which was subsequently used as the basis for developing the ACR.
Q So what you're referring to is a table in this 1987 ACR, and that table will be converted into the APR for receipt of SNF?
A That's what was done.
Q Was the APR based on receipt at an interim storage facility or a repository?
MS. SULLIVAN: Objection, vague.
A The APR is based upon the age of the fuel and nothing more.
Q You can look at the contract again. If you

670

would look at Article 4.B.5.A, which states, "Beginning on April 1, 1981, DOE shall issue an annual acceptance priority ranking APR. For receipt of SNF and/or HLW at the DOE repository." Do you see that?
A Correct.
Q Do you know what that means, specifically the "at the DOE repository"?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. It says DOE repository. I've taken it to mean DOE facility pursuant to the act, but it's basically still a listing.
Q When you say you've taken it to mean DOE facility, why is that?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.
A That's what I've taken it to mean.
Q Do you know if others at DOE have also taken the words "DOE repository" here to mean DOE facility?
A I don't know.
Q Have you ever had discussions with anyone at DOE about the meaning of those words?

671

since I didn't have any BWR fuel.
Q And this was sent to you from Ron Milner at DOE?
A It was sent to me from Ron Milner at DOE.
Q And why would he have sent this to you? Was it in your role as the coordinator for the ACR issue resolution process?
A I believe so.
Q And if you would look at page two of this letter.
A Yes.
Q Mr. Milner states that, "As we proceed with final cask design I am requesting your assistance in developing and implementing a plan to obtain the necessary data." There's a paren there, "To ensure cask design and envelope dimensions can accommodate this fuel, this plan should address all fuel types and anticipated physical conditions to ensure system compatibility." Do you know whether it was DOE's plan at this time, 1991, to address all fuel types?
A You would have to ask Mr. Milner what his plans were in 1991.

680

Q You have no reason to disagree with the statement he may in the letter to you that this was their plan?
A I have no reason to disagree with what the letter says.
Q The letter asks for your assistance in developing and implementing a plan. Did you assist him in that?
MS. SULLIVAN: Objection, vague.
A No, specifically I don't think I specifically did that. The group I'm sure met with DOE a number of times and tried to work towards getting information. I don't know how that was ever concluded. I don't recollect. This was also copied to Mr. John Vincent of GPU Nuclear who was also a member of the group, and I'm sure we had subsequent meetings to try to address these issues.
(Deposition Exhibit Zabransky 69 was marked for identification and was attached to the transcript.)
MS. SULLIVAN: Question about the exhibit. Is this -- was this just one page or is this meant to

681

be an excerpt from a larger document?
MR. MACDONALD: This is the first page of a document with the Bates range HQR 0602141.
MS. SULLIVAN: So there is a larger document to which this belongs?
MR. MACDONALD: I believe that is correct. The reason there is a staple missing is because I stapled it to itself last night about 11 p.m.
Q Mr. Zabransky, I've handed you Exhibit 69 which has on the top of it DOE Acceptance of SNF in Dual-Purpose Canisters. Do you have it there in front of you?
A Yes, I do.
Q And it appears to be a quote from Lake Barrett dated September 2, 1993. And it states, "Once the Nuclear Regulatory Commission has certified Sacramento Utility District transport storage system, the department would be willing to initiate the appropriate actions to include such system as an acceptable waste form under the terms of the standard contract." Do you see that?
A I see that.

682

Q Is this statement consistent with your recollection of the letter you mentioned yesterday from Mr. Barrett?
MS. SULLIVAN: Objection, vague. Objection, foundation.
A From my recollection I believe this is -- this may be the statement from the letter that I reviewed in the letter, yes.
Q When DOE states -- assume that DOE, Mr. Barrett stated that the department would be willing to initiate the appropriate actions to include such a system as an acceptable waste form what that means?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion. Objection, vague.
A I believe it means a negotiation of an acceptable contract modification between the parties to make -- to include this as an acceptable waste form.
Q Do you know if that has -- if in fact the parties have negotiated contract modification?
A I have not negotiate --

683

MS. SULLIVAN: Objection, vague.
A I have not negotiated a contract modification with any party.
Q Although you said earlier you were involved with discussions with people at SMUD regarding a contract modification for dual-purpose canisters. Is that right?
A We had discussions. I wouldn't classify the discussions as reaching the level of a negotiation of an amendment.
Q How would you classify the discussions?
A I would classify them as exploratory technical discussions.
Q And what were you exploring?
MS. SULLIVAN: Objection, vague.
A We were exploring what both parties thought would be required in an amendment. But we weren't negotiating an amendment.
Q What was DOE's position with respect to what would be required in an amendment?
MS. SULLIVAN: Objection to the extent it calls for a legal conclusion.

684

A Among other things, DOE would want to come up with an amendment that would also do other things DOE would like to do as part of a contract amendment.
Q Could you give me examples?
A I could.
Q Would you?
A We would like to consider different scheduling processes that may take place instead of the current scheduling process. But, again, this document says here that we would be willing to initiate appropriate actions which would be a negotiation of a modification that would have to be deemed by the contracting officer to be in the best interest of the government.
Q Do you know whether SMUD went ahead with the construction or procurement of a dual-purpose canister system?
A I believe SMUD participated in a cooperative program with the Department of Energy where the department funded parts of the SMUD development and procurement.
Q So the answer to my question as to whether

685

SMUD went ahead, as far as you know they did?
A Yes, they did.
Q And DOE participated in a cooperative agreement with SMUD?
A Yes, they did.
Q And DOE contributed money to the purchase of a dual-purpose canister system?
A To the development of the -- yeah, I don't know what the money specifically went for. They helped develop the program, yes.
Q Some DOE funds were used for developing the dual-purpose canister system that SMUD was developing?
A I believe that's the case, yes.
Q Did DOE encourage SMUD to develop the dual-purpose canister system to the best of your knowledge?
MS. SULLIVAN: Objection, vague.
A I don't know specifically. I wasn't at DOE at the time. You would have to ask somebody who was at the DOE the nature of the discussions and the nature of the interactions.
Q Do you know when DOE and SMUD entered into

686

the cooperative agreement?
A Not specifically. I think it was prior to this date but I'm not sure.
Q You mentioned that DOE might want a modification of the scheduling issue as one possible example.
A There are a number of provisions that DOE would like to discuss with contract holders that would be in DOE's interest, yes.
Q Could you be more specific?
A DOE would like a commitment earlier than one year prior to delivery as to the exact location of the spent fuel that's going to be shipped.
Q Are you or have you been working recently, the last year or two, on changing the process by which utilities or developing a new process by which utilities will deliver their SNF to DOE?
A Over the last --
MS. SULLIVAN: Objection. Vague.
A Well, what do you mean a new process?
Q For instance, you just mentioned that DOE would like to have more than one year notice.

687

A Uh-huh.
Q And that is part of the process for accepting SNF from the utilities?
A Over the last several years we've had discussions and intermittently have thought about and in some cases drafted I believe practice or potential ways where that process could be different as have the utilities we discussed it with.
Q Is another change that DOE is considering shipping campaigns?
A DOE has brought that up, as has the industry, as something that might make sense for both parties.
Q Can you describe to me what a shipping campaign is?
A A shipping campaign would be -- would be a situation whereas opposed to removing pursuant to the OFF basis one cask this year, one cask next year, one cask the third year, perhaps take three casks out at a different time within that period because it would make sense for both parties to do it that way.
Q And why would it makes sense for DOE to do

688

it that way?
A Because DOE would have to mobilize for each of those individual shipping campaigns.
Q Because they wouldn't have to?
A Because we would have to mobilize for individual campaigns as opposed to one campaign, which would be more burdensome on DOE.
Q I think I understand your answer. It would be more burdensome to go to --
A Three different times to the same place rather than one time, yes.
Q And it would be more burdensome. Would shipping campaigns be another way of reducing the cost to DOE because of the fixed costs that are associated with going to a utility's site? Each time you go there are certain fixed costs. So if you can go once rather than three times there's a potential cost savings?
MS. SULLIVAN: Objection, compound. Objection relevance.
A There could be but there doesn't necessarily have to be, depending on how cask

689

utilization might be affected. So it's not a given but it's a potential.
Q And how would it benefit the utilities to have shipping campaigns?
MS. SULLIVAN: Objection, relevance.
A A similar fashion, they wouldn't have to prepare personnel and equipment for three individual activities. They could do it one time.
Q It would -- you would have fewer disruptions to the utilities' operations, one time in three years rather than three times in three years?
MS. SULLIVAN: Objection, vague. Objection, relevance.
A That's a way of putting it, yes.
Q What other changes to the schedule have you discussed?
MS. SULLIVAN: Objection, vague.
A Again, from the top of my head, from recollection the ones that pop out to me are a campaigning type situation and a firmer notice earlier as to where the fuel will be coming from and what the fuel would be.

690

Q Any changes to the DCS process?
A I don't know that the DCS process would have to be changed. I haven't -- we hadn't thought that through. We have thought through the fact that we needed a firmer commitment earlier. But, again, this would be in a modification agreed to by both parties. The current contract would stay in place otherwise.
MR. MACDONALD: I'm going to hand you Zabransky Exhibit 70.
(Deposition Exhibit Zabransky 70 was marked for identification and was attached to the transcript.)
MS. SULLIVAN: Can we have a second.
(The witness and Ms. Sullivan confer.)
Q I've handed you a document marked Zabransky Exhibit 70 which has a title Priority Acceptance for Shut Down Reactors and the question, Can the department provide priority for the remove of spent fuel from permanently shut down reactor sites? Do you see that?
A I see that.

691

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

* * * * * * * *
YANKEE ATOMIC ELECTRIC *
COMPANY, MAINE YANKEE ATOMIC
POWER CO., and CONNECTICUT *
YANKEE ATOMIC POWER CO.
Plaintiffs *
vs. * No. 98-126C,
98-474C, 98-154C
UNITED STATES OF AMERICA * Senior Judge Merrow
Defendant *
* * * * * * * * VOLUME ONE

CONTAINS PORTIONS SUBJECT TO PROTECTIVE ORDER

The deposition of DAVID ZABRANSKY was taken on Wednesday, June 5, 2002, commencing at 10:05 a.m., at the law offices of Spriggs & Hollingsworth, Ninth Floor, 1350 Eye Street, N.W., Washington, D.C., before Leslie L. Schneider, a Notary Public in and for the District of Columbia.

1

APPEARANCES:

Robert L. Shapiro, Esquire
David Sobel, Summer Intern
Spriggs & Hollingsworth
1350 Eye Street, N.W.
Washington, D.C. 20005-3305
e-mail: rshapiro@spriggs.com
(202) 898-5879
On behalf of the Plaintiffs

Kevin B. Crawford, Esquire
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Room 7002
Washington, D.C. 20530
e-mail: Kevin.Crawford@usdoj.gov
(202) 305-7594
On behalf of the Defendant

2

APPEARANCES (cont'd.)

Donald J. Carney, Esquire
Perkins & Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2911
e-mail: carnd@perkinscoie.com
(202) 434-1675
On behalf of Wisconsin Electric
Power Company

3

I N D E X
Deposition of David Zabransky
6-05-02


| Examination by: | Page |
|---|---|
| Mr. Shapiro | 3 |

* * *

| Exhibits | | Page |
|---|---|---|
| 1 | Letter, 9/26/97, to USDOE from Mr. Buchheit | 131 |
| 2 | Standard Contract | 137 |
| 3 | Standard Contract Briefing to OMB | 146 |
| 4 | Annual Acceptance Priority Ranking and ACR for March 1995 | 155 |
| 5 | Letter, 10/19/90, from Mr. Benz to Mr. Brownstein | 176 |
| 6 | 1991 Annual Capacity Report | 182 |


4

P R O C E E D I N G S
\- - - - - - - -
WHEREUPON --
DAVID ZABRANSKY,
the Witness herein, called for examination by the Plaintiffs, having been duly sworn, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
BY MR. SHAPIRO:
Q. Would you state your name for the record, please.
A. David Zabransky.
Q. Good morning, Mr. Zabransky. My name is Robert Shapiro. I apologize for our delay in getting started today. Actually, before we get too far into it, I know that Mr. Carney wanted to say something.
MR. CARNEY: Right. I just want to say on the record, good morning, Mr. Zabransky, my name is Don Carney, I'm representing Wisconsin Electric Power Company today. As Mr. Ohler represents you during a prior deposition, Wisconsin Electric does not waive the attorney-client privilege and therefore instructing you on behalf of Wisconsin Electric,

5

to the extent it comes up, not to reveal any advice of counsel that you were provided as an Wisconsin Electric employee.
BY MR. SHAPIRO:
Q. Mr. Zabransky, have you reviewed your transcript from your prior deposition in the spent fuel cases?
A. Not completely, no.
Q. Maybe I should take a step back. I think you understood what I was referring to, but did you understand what I meant by the deposition in the spent fuel cases?
A. I guess, now that you restate the question, I was presuming you meant the recent depositions I gave which were in the last couple of months.
Q. In April of 2002?
A. I guess so, yes, and the answer is no, I haven't reviewed all of them yet, no.
Q. From what you have reviewed and from your recollection of that deposition, would you want to change any of the answers that you gave in the prior deposition now that you think about it?
A. I don't believe so from what I have read so far.

6

Q. Can we rely on the questions and your answers in that deposition here so that we don't have to repeat the same material?
A. Again, I've only looked at the first day-and-a-half worth of documents, but so far it looked fine except for a few spellings.
Q. Since your depositions in April, have you done anything to prepare for your deposition today?
A. No, other than talking to counsel this morning, a few minutes yesterday, just about the times of the deposition, no, I really haven't done anything in preparation.
Q. You haven't reviewed any further documents?
A. No, I haven't.
Q. Are you still Acting Division Chief?
A. Acting Division Director, yes.
Q. Acting Division Director. Is there a time when you expect that status to change to a non-acting, the regular Division Director?
A. I have no expectations.
Q. What's the process for that?
A. I don't know.
Q. Do you have any interest in becoming

7

the permanent Division Director?
MR. CRAWFORD: Objection, vague.
A. I don't know. I haven't thought about it.
Q. Your immediate supervisor is still Jeff Williams?
A. That's correct.
Q. And he is the Acting Director?
A. Acting Office Director.
Q. Acting Office Director. Do you have any idea when that status might change to a permanent status?
MR. CRAWFORD: Objection to the extent it calls for speculation.
A. No.
Q. Is there any discussion within OCRWM to when these various acting positions might become more permanent?
A. I don't know. Not that I have been part of.
Q. Were personnel changes waiting on Mr. Barrett's departure which would enable people to move up rather than be in acting positions?
MR. CRAWFORD: Objection, lack of foundation, and to the extent it calls for

8

basically -- I'm not sure we got very far, about how to make it work in a way that would be better for both DOE and the utilities with respect to annualized pick-ups versus multi-year pick-ups. So instead of coming three times in three years to pick up ten tons at a time, to come one time sometime over the three-year period and pick up 30 tons as an example. It would be easier for us and easier for them.

Q. Was any language ever drafted to address the campaigning issue?

A. I don't recollect we got to the point of drafting language on that. I think we discussed concepts of how it could be done, but I don't know that we ever did language on that. I think they may have done language on that.

Q. You said some issues were -- some amendment issues were desired by DOE and others by utilities. How would you characterize campaigning?

A. I think that was mutually something we both thought of -- that we think would have served both of our interests.

Q. You mentioned the dual purpose potential amendment to the contract to cover dual

89

purpose casks.

A. Uh-huh.

Q. What was the nature of that amendment that was being considered?

A. Coming up with a way of following up with what Mr. Barrett had said he would attempt to do back in the early '90s which was to propose a contract amendment to include that as an acceptable waste form. We were talking about how that could be done and what would need to be done to cause that to happen and how you define an acceptable dual purpose cask from a perhaps standard dual purpose cask.

Q. Was any language ever drafted to further consider a contract amendment concerning dual purpose casks?

A. I don't recollect specifically whether it was or wasn't. There were words or considerations as to what the technical parameters might be, but I don't know if there was contract language developed.

Q. What concerns did DOE have with respect to dual purpose casks with amending the contracts to include dual purpose casks as an acceptable waste form?

90

A. I'm not sure I understand your question.

Q. Did DOE have any concerns that designating dual purpose casks as an acceptable waste form would cause problems for DOE?

A. Yes.

Q. What problems was RW concerned about?

A. I was concerned about handling problems, unloading problems, disposal problems that weren't originally envisioned in the contract.

Q. What sort of handling was DOE concerned with?

A. How to cut these open, get the fuel out. Most of them were welded shut.

Q. How did DOE otherwise anticipate that spent fuel would arrive at the DOE facility?

A. In a cask provided by DOE for transportation. That would be a bolted closed transportation cask. We'd merely cut, unbolt it, take the fuel out and reuse the cask.

Q. Did DOE ever design this bolt open transportation cask?

A. That was years to do.

MR. CRAWFORD: Objection to the

91

foundation and to the vagueness.

A. I'm not sure even in DOE design they exist today. They've existed for 50 years -- 40 years.

Q. Has DOE ever picked a bolted open type cask for use in transportation for its waste management system?

MR. CRAWFORD: Objection to the vagueness of that.

A. I'm not sure. Do you mean DOE picked?

Q. You said that -- is the correct terminology in this instance cask or canister by the way, the bolted open --

A. It's transportation cask as envisioned under the contract. Not a canister.

Q. What is the difference between a cask and a canister?

A. A cask is designed to hold fuel. A canister is a welded closed system that holds multiple assemblies. It fits inside a cask.

Q. The contract doesn't say, does it, that DOE shall pick up spent fuel using a bolted open cask, does it?

MR. CRAWFORD: Objection, best evidence.

92

A. I think the contract gives DOE responsibility for providing the casks.
Q. What's the basis of your understanding that DOE's intent under the contract was to use a bolted open cask for that purpose?
MR. CRAWFORD: Objection to the extent that mischaracterizes his testimony.
A. I'm not sure what DOE's intent was because I wasn't at DOE at the time, but nothing else existed at the time except bolted closed casks, so I don't know how they could have intended to use anything else.
Q. Let me focus on the time when you were at waste acceptance, did DOE have a particular plan at that time for what sort of cask or canister it would use to accept spent fuel from utilities?
A. DOE's plans are DOE's plans. Right now we're planning potentially to accept all kinds of things from utilities, but contractually we don't think that they're covered at this point in time other than bare fuel, b-a-r-e, and that's why we've discussed the possibility -- the need for amendments since the early '90s with the utilities.

93

Q. Let must just focus again on what DOE's plans have been to the extent you have knowledge of them since you have been at DOE. Since you have been at DOE, has DOE ever had a plan to use a bolted open transportation cask?
A. Absolutely.
Q. Is there a particular brand of transportation cask that's part of that plan?
MR. CRAWFORD: Objection, lack of foundation and vagueness.
A. I'm not sure there's a particular brand, but inevitably we need to use truck casks such as the GA-4, the GA-9 which are bolted closed, and inevitably we'll use large rail casks that are bolted closed, but there's no reason to weld fuel for transportation.
Q. The welding occurs when a container is also being used for storage?
A. It doesn't need to be but some utilities have used systems that required welded canisters, others haven't.
Q. And the Department's current plan is to accept waste that is in welded shut containers?
MR. CRAWFORD: Objection.
A. No, the DOE system is designed to do so

94

if we effect contract modifications to make them acceptable waste forms. It's not our plan to do so in the absence of contract modification.
Q. Let me just take one step at a time. Does DOE have plans to accept spent fuel that's in welded canisters?
MR. CRAWFORD: Objection to the vagueness.
A. Not in the absence of a contract modification, no.
Q. Why do you need to add the modifier not in the absence of a contract modification?
MR. CRAWFORD: Objection, asked and answered.
A. Because you're mischaracterizing what I said. What I said is we'll develop facilities capable of doing it. We recognize that it's not covered under the contract. We recognize it potentially adds new and expensive steps of opening and disposal that we hadn't factored into our plans and we would consider doing so if we effected a contract modification that benefited both parties.
Q. So DOE's planning facilities to be able to accept spent fuel that's in welded containers?

95

MR. CRAWFORD: Objection, mischaracterizes his prior testimony. And objection, vague and lacks foundation.
A. We're planning to develop the capabilities. Whether we implement that or not is another question.
Q. How long has the planning to develop the capability to accept spent fuel in welded containers been going on at DOE?
A. I would say that's been going on since the early '90s when Mr. Barrett made a commitment to work on a contract modification to do such a thing.
Q. How has the absence of a contract amendment to date affected the development of the plans for such facilities?
A. The plan --
MR. CRAWFORD: Objection to the extent it calls for speculation.
A. Right now the plans are conceptual so I don't know if it's affected anything at this point. We haven't built anything or licensed anything.
Q. But before you build it or license it, you've got to develop the plan for it?

96

A. Yes.
Q. When you say that the plans are just conceptual, what do you mean by that, as opposed to what?
A. There's no detail design, final design I think at this point. That's getting out of my area. I don't get into the design process. We're at the conceptual design phase.
Q. What's your role concerning the development of plans of facilities to accept spent fuel in welded containers?
A. My only role is to verify or to make sure that they are considering that option, should we effect a contract modification to make them an acceptable waste form.
Q. Has anyone at DOE ever told you that even if we ultimately develop the physical capability to accept spent fuel in a welded container, if we don't have different words in the contract amendment, we're not going to use those facilities?
A. It's not covered by the contract right now so no. I mean --
Q. That wasn't my question.
A. I understand what you're saying.

97

Q. My question is has somebody told you that?
A. No one has told me we're specifically developing those facilities at this point either, besides the conceptual stage. But no, I've never been told that specifically.
Q. Have you been told that generally?
A. I have been told we need a contract amendment to make them acceptable waste form or they would not be accepted under the contract.
Q. Who has told you that?
A. That's been the common understanding, and I guess we beyond that, I've had discussions with counsel which I don't want to go into.
Q. Why don't you want to go into that?
A. He's going to tell me not to.
MR. CRAWFORD: Because I'm going to tell him not to answer if you ask that.
Q. We got into this a little bit before of trying to figure out what happened to some of these contract amendment considerations. The contract amendment concerning scheduling, you said there was language drafted but nothing much happened and it was discussed with the likes of NEI but then nothing much happened from there?

98

A. Well, again you're mischaracterizing. There was no contract amendment regarding scheduling. There was a contract amendment that covered a number of issues inclusively, not separately but inclusively, and they had to all be dealt with together.
Q. But there was language drafted on scheduling and others?
A. There was language on scheduling as part of the comprehensive amendment. I don't know that we drafted language on other issues. That language was discussed. I'm not sure we ever shared any drafts, I don't think we did. We discussed the concepts, here's what we're concerned about in scheduling.
Q. Why didn't you share the draft with NEI?
A. We didn't reach that point in discussions before the discussions ceased.
Q. Had you drafted the language before the discussions ceased?
A. I don't know. I don't recollect the exact timing on that.
Q. What do you mean by the discussions ceased?

99

A. NEI decided not to talk about this anymore.
Q. Steve Kraft told you he didn't want to talk about it?
MR. CRAWFORD: Objection, asked and answered.
A. NEI.
Q. Who was it at NEI that told you they didn't want to talk about it?
A. It was decided as a group as far as I understand, they didn't want to talk about this.
Q. How did you develop this understanding of NEI's position?
A. I don't know who exactly told me, but between staff and utilities, they said we're not going to talk about this right now.
Q. Did individual utilities tell you that they didn't want to talk about an amendment to the contract?
MR. CRAWFORD: Objection, asked and answered.
A. We had discussions after that with the individual utilities.
Q. Which individual utilities?
A. After that point in time, I believe

100

208
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC :
COMPANY, MAINE YANKEE ATOMIC :
POWER CO., and CONNECTICUT :
YANKEE ATOMIC POWER CO., : Case No. 98-126C,
Plaintiff, : 98-474C, 98-154C
vs. : (Senior Judge Merrow)
UNITED STATES OF AMERICA, :
Defendant. :
- - - - - - - - - - - - - - - X
Washington, D.C.
Thursday, June 6, 2002

Deposition of DAVE ZABRANSKY, Volume II, a witness herein, called for examination by counsel for the Plaintiff in the above-entitled matter, pursuant to notice, the witness being duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., commencing at 9:32 a.m., Thursday, June 6, 2002, and the proceedings being taken down by Stenotype by CAPPY HALLOCK, RPR-CRR, and transcribed under her direction.

CONTAINS CONFIDENTIAL INFORMATION

208

PURSUANT TO THE PROTECTIVE ORDER
APPEARANCES:
On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQUIRE
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5839

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQUIRE
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7594

On behalf of Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins & Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2911
(202) 434-1675

209

Reported by: Cappy Hallock, RPR-CRR

C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| DAVE ZABRANSKY | PLAINTIFF |
| By Mr. Shapiro | 212 |
| By Mr. Carney | 387 |
| Afternoon Session - Page 281 | |


E X H I B I T S


| ZABRANSKY EXHIBIT NO. | | PAGE NO. |
|---|---|---|
| 7 | 4-18-02 Deposition Excerpt | 243 |
| 8 | 7-19-93 letter, Tomasoni to Buchheit | 261 |
| 9 | 9-28-95 letter, Dreyfus to Kadak | 266 |
| 10 | 1-28-00 letter, Zabransky to Thomas | 315 |
| 11 | 9-29-00 letter, Zabransky to Zinke | 318 |
| 12 | Instructions for Completing the Appendix C | 339 |
| 13 | 12-17-96 letter, Tomasoni to Kadak | 368 |
| 14 | 6-3-97 letter, Tomasoni to Buchheit with attachments | 371 |
| 15 | 12-16-97 letter, Fugi to Schiffer | 375 |


210

P R O C E E D I N G S
- - - - - -
WHEREUPON --
DAVE ZABRANSKY,
was called as a witness by counsel for Plaintiff, having been previously duly sworn, was examined and testified further as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFF (Continued)
BY MR. SHAPIRO:
Q. Mr. Zabransky, welcome back. You are here for your second day of your deposition in the Yankee cases. Before moving back to where we were in our discussion, looking through my notes yesterday evening there were a few areas that I want to go back to and clean up things that I think I might have missed in our earlier discussion.
If you recall, we talked about some of the people who you work with. I think briefly we mentioned at this point you report to Jeff Williams, and I think I had asked you about your interaction with your prior supervisor, Mr. Carlson, but I had not asked you about your interaction with Mr. Williams and I wanted to go

211

been agreed to.
Q. I'm not sure, what does it mean to have an obligation to do something if a party never has to do it?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to the extent it assumes facts not in evidence. Objection to the extent it calls for speculation.
A. Both parties have obligations, and the utility has an obligation to submit and get a DCS under the contract, so the DOE's obligation is to get rid of the spent fuel per the schedule as determined by the parties. The process is laid out in the contract.
Q. Suppose the utility submits a proposed delivery commitment schedule, the contracting officer disapproved it. The utility can resubmit it, the contracting officer can disapprove it again.
A. Yes.
Q. The parties will negotiate those are all steps in the delivery commitment schedule process --
MR. CRAWFORD: You all are walking all over each other. I don't know when a question is

240

ending and when the answer is being given. Both of you better straighten up.
Don't answer until he is finished with his question.
And you don't walk on his answer, to the extent it is an answer. Go ahead.
BY MR. SHAPIRO:
Q. It is your understanding that the negotiation is the last step in the delivery commitment schedule process in Article 5B --
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion and objection, best evidence.
A. That's the last step, the parties try to do mutual negotiation, yes.
Q. So if you get through that last step and there is still no schedule, are you saying the department still doesn't have an obligation to pick up that utility's spent fuel?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection, best evidence.
A. I never said that. I said there was no schedule at that point. Then the utility should go to the Contract Board of Appeals and

241

seek to remedy this problem.
THE WITNESS: I would like to take a break if that's okay.
MR. SHAPIRO: This is a good time.
(Recess taken -- 10:16 a.m.)
(After recess -- 10:32 a.m.)
(Zabransky Deposition Exhibit Number 7 was marked for identification and attached to the transcript.)
BY MR. SHAPIRO:
Q. Mr. Zabransky, you have been handed what has been marked for purposes of identification as Exhibit 7. This exhibit is actually a brief excerpt from one of the days of your deposition in what we call the coordinated discovery, and I have had this handed to you because, at least I think that one answer that you had given me today, and perhaps even yesterday, at least on its face seems to be inconsistent with my interpretation of something that you said in this prior deposition, and I wanted to ask about that and perhaps clear that up.
And I guess this has four or five pages of the transcript. I'm particularly interested in, I guess in the last page of the

242

exhibit, Page 365 of the transcript reference. The question at the top was, "Was the department trying to minimize the commitments it had to utilities who were parties to the Standard Contracts in using this document, in using Exhibit 5?"
And I don't know if you have had a chance to read further, but in the excerpt Exhibit 5 is referring to the 1995 ACR. Your answer in that prior deposition was, "I believe that that was a consideration."
Is that still your recollection about the 1995 ACR?
MR. CRAWFORD: Objection to the lack of foundation. And objection to the extent it calls for a legal conclusion.
A. If you're asking me was it my opinion that they were trying, the department was trying to minimize its obligations by using the ACR? That's still my belief. I believe they were trying to do that.
Q. So when you said, I think earlier today, that you didn't know what the basis was for the rates in the 1995 ACR, what you meant was you don't know but that's not inconsistent with having

243

a belief about what you think might be part of the basis. Does that reconcile the two statements?
MR. CRAWFORD: Same objection.
A. I think so.
Q. Why did you think the department was trying to minimize the commitments it had to utilities by using the acceptance rates that it used in the 1995 ACR?
MR. CRAWFORD: Same objections.
A. Why did I have that belief? Because I just had that belief that they had started to realize there was a commitment being made.
Q. There wasn't anything in particular that anyone at DOE said that contributed to you having that belief?
MR. CRAWFORD: Objection, vague, and the same objections as before: Lack of foundation, and to the extent it calls for a legal conclusion.
A. I can't recall anything specific.
Q. Looking again at Page 365 of the former transcript, once again right below where I read before you were asked, "Were there any other considerations that you can think of for using those rates?" your answer was, "There was no other

244

basis to develop any other rates at that point in time."
Did you mean that the only basis for the rates in the 1995 ACR was to minimize the department's commitments?
MR. CRAWFORD: Objection to the lack of foundation. Objection to the extent it calls for a legal conclusion.
A. No. I think what I'm saying there, it was my belief or my knowledge was I didn't know what other basis they would use for rates at that point in time.
Q. All right.
Mr. Zabransky, I want to turn back to where we had been at the end of the day yesterday. We were talking about delivery commitment schedule cost estimates, and I believe we ended up with a discussion about whether the department has used the information in approved delivery commitment schedules for planning purposes, and I believe we ended up with the understanding that to your knowledge they haven't. Maybe they did at some point prior to your arrival at the Department of Energy, but you don't have any knowledge of the department using that information since you have

245

been there.
Looking forward, could the department use the information in the currently approved delivery commitment schedules for planning?
A. Could it? Yes.
Q. What would be the use of the information, the currently approved delivery commitment schedules, given that the department's current plan is for a waste acceptance system with a repository that will have acceptance rates that are significantly different from those that were the basis of the approved delivery commitment schedules?
MR. CRAWFORD: Objection, lack of foundation. Objection to the extent it calls for speculation.
A. I wouldn't see any good use for it. You didn't ask me if they should use it, you asked me if they could use it.
Q. You wouldn't recommend that the department use the information or the currently approved delivery commitment schedules for planning at this time?
A. It's my belief, my personal belief that we need to renegotiate those with the

246

contractholders as was stated would be done when the initial DCS directions were sent out.
Q. Why do you believe the department has to renegotiate those approved delivery commitment schedules?
A. Because one, we said it would, the department said it would; and two, I think the utilities should have the option of deciding if it's -- their plans have changed. Perhaps they want different locations to be serviced.
Q. What about the amount of acceptance? If the department in fact moves forward with the repository in 2010 with acceptance rates consistent with its plans for a repository, should utilities with currently approved delivery commitment schedules be able to renegotiate for larger amounts of acceptance consistent with the capacity of the repository?
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion. Objection to the extent it calls for speculation.
A. And again, if the department winds up with a larger facility that actually operates that way, and the contracting officer feels comfortable to committing to quantities for a larger facility,

247

that can be a subject of renegotiation.
Q. Would it be in the department's interest to renegotiate the currently approved delivery commitment schedules?
MR. CRAWFORD: Objection to the lack of foundation. Objection to the extent it calls for a legal conclusion.
A. I can't speak for the department. I think I would recommend that it be done.
Q. Why would you recommend that the department renegotiate the currently approved delivery commitment schedules?
A. To give the purchasers the opportunity to revisit decisions they had made as to where they wanted to be serviced and in what years and in what order.
Q. Can you think of any advantages to the government of renegotiating the currently approved delivery commitment schedules?
A. Other than being responsive to the needs of its customers, I don't know that there is a big advantage except that we said we would.
Q. What about from a transportation campaign aspect? I believe you testified that there can be advantages to the program using

248

transportation campaigns.
MR. CRAWFORD: Objection to the extent that mischaracterizes the prior testimony. Objection, assumes facts not in evidence. Objection to the vagueness of the question.
A. Again, I believe that I said that transportation campaigning might be advantageous to both parties, but I don't see how that relates to renegotiation of DCSs.
Q. Well, the currently approved delivery commitment schedules would require the department to go to those utilities and pick up relatively small amounts of spent fuel, wouldn't it?
A. Breaks down allocation on an annual basis, but that would stay the same through renegotiation unless the contract were modified. I'm only talking about renegotiating the DCSs.
Q. Wouldn't renegotiated DCSs entail having larger quantities of spent fuel which would permit larger transportation campaigns?
A. Not necessarily.
MR. CRAWFORD: Objection to the extent it assumes facts not in evidence. Objection to the extent it involves speculation. Objection, calls for a legal conclusion.

249

A. The answer is the same, I don't see exactly what they are talking about. You can't speculate as to that. You don't know who discharges what in what year so you are assuming something without a basis for assuming it.
Q. How can a utility's allocation be smaller if the overall acceptance rates would be larger in any given year?
A. I didn't say smaller, but you can't say bigger in a given year. It's based on when a utility discharges its fuel and who else discharges that year.
Q. In reality the allocation would be bigger if acceptance rates are larger, wouldn't they?
MR. CRAWFORD: Objection to the extent it assumes facts not in evidence. Objection to the extent it calls for speculation.
A. And average has nothing to do with campaigning when this is an annualized basis. You look at the specific annual years and see what happens.
Q. Let's turn to a slightly different subject. We may come back to that one later.
You recall yesterday we talked about

250

potential purposes of the delivery commitment schedule process. We discussed the planning purpose. You also said another purpose of the delivery commitment schedule process was to bind the parties. How does that binding process work.
MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.
A. I mean, I'm not sure what you're asking, how does that process work?
MR. CRAWFORD: Objection, best evidence.
A. The contract says that the utilities will submit the draft DCS. It will be approved or disapproved. That will be the basis for disapproval resolution. How does it bind the parties? I'm not sure what you mean.
Q. Why don't we talk through some of the steps.
It is your understanding that the contracting officer gets to publish the Annual Capacity Report that sets forth the maximum allocations that utilities would be entitled to?
A. I'm not certain --
MR. CRAWFORD: Well, objection to the extent that it mischaracterizes many peoples'

251

IN THE UNITED STATES COURT OF FEDERAL CLAIM

YANKEE ATOMIC ELECTRIC COMPANY, )
CONNECTICUT YANKEE ATOMIC POWER )Case Nos.:
COMPANY, and MAINE YANKEE ATOMIC ) 98-126C
POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
)
THE UNITED STATES, )
Defendant. )

Courtroom 5
National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Thursday, August 5, 2004
Volume 18

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPAN
CONNECTICUT YANKEE ATOMIC POWER COMPANY a
YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
VIVEK K. HATTI, ESQ
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPAN
CONNECTICUT YANKEE ATOMIC POWER COMPANY:
MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042

(Appearances Continued on the Next Page.)



APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COM
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

On Behalf of the Defendant:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S
\- - - - -
MS. SULLIVAN: Good morning, Your Honor. We're ready to call our next witness unless there's anything we need to handle preliminarily.
THE COURT: Okay.
MS. SULLIVAN: The government calls David Zabransky.
Whereupon--
DAVID ZABRANSKY
a witness, called for examination, having been duly sworn, was examined and testified as follows:
DIRECT EXAMINATION
BY MS. SULLIVAN:
Q. Good morning, Mr. Zabransky. Are you currently employed at the Department of Energy?
A. Yes, I am.
Q. And to what office within the Department of Energy are you currently assigned?
A. I'm in the Office of Civilian Radioactive Waste Management, and I work in the Office of Systems Analysis and Strategy Development within that office.
Q. What are your current responsibilities?
A. I report to Chris Kouts, and I work on issues related to the standard contract, other

technical issues on commercial waste acceptance, waste acceptance issues, and I serve as the contracting officer for the standard contracts.
Q. You testified you report to Mr. Kouts. Do you know who Mr. Kouts reports to?
A. Yes, Mr. Kouts reports to Ted Garrish, the deputy director.
Q. And to whom does Mr. Garrish report?
A. Mr. Garrish reports to Dr. Choo, the director of the program.
Q. When did you become the contracting officer?
A. I believe it was in July of 2002.
Q. Have you also served as the technical representative to the contracting officer?
A. Yes, I have.
Q. And when did you serve as the technical representative to the contracting officer?
A. From, I believe, around 1995 through July of 2002.
Q. And what were your responsibilities as the contracting officer's technical representative?
A. To provide technical advice to the contracting officer on issues relating to administration of the standard contract.



Q. When did you join DOE?
A. I came to DOE in 1994, I believe July of 1994.
Q. Prior to joining DOE, where were you employed?
A. I was employed by Wisconsin Electric Power Company in Milwaukee, Wisconsin.
Q. How long were you employed by Wisconsin Electric Power Company?
A. I started there in 1978 and left in 1994.
Q. What was your position at Wisconsin Electric Power Company when you left?
A. When I left Wisconsin Electric in 1994, I was the manager of nuclear fuel services.
Q. Did your responsibilities as manager of nuclear fuel services include administering Wisconsin Electric's standard contract with Department of Energy?
A. Yes, my responsibilities were for all the contracts that the nuclear power department had for fuel and fuel disposal, as well as analysis of fuel designs and storage of spent fuel at Point Beach.
Q. Mr. Zabransky, do you hold a Bachelor's degree?
A. Yes, I do.



Q. In what?
A. I have a Bachelor's in Civil Engineering from Marquette University in Milwaukee, Wisconsin.
Q. And when did you receive that degree?
A. 1980.
Q. As part of your duties at Wisconsin Electric Power Company, were you familiar with the annual capacity reports and acceptance priority ranks issued by DOE?
A. Yes, I was.
Q. What did you understand to be the purpose of those documents?
A. The purpose of the documents, as I understood it, was to set forth the acceptance allocations to each contract holder the Department was going to have in its facilities for disposal of spent fuel.
Q. At the time you were at Wisconsin Electric, were you also familiar with what are known as delivery commitment schedules or DCSes?
A. Yes, I was.
Q. And what did you understand to be the function of a DCS?
A. When I was at Wisconsin Electric, it was my understanding that DCSes, delivery commitment



schedules, were the mechanism, the contractual mechanism, by which utilities took the allocations that were allocated to them and conveyed to DOE that they wanted that service, what particular reactor and what year and what range of fuel, and made a commitment to the government to provide that fuel for pickup.
Q. And at the time you were at Wisconsin Electric, were you responsible for completing DCSes and submitting them to DOE on behalf of Wisconsin Electric?
A. My organization was responsible for preparing the DCSes, and they were subsequently submitted by my organization. They were signed off by a vice president of nuclear power, but we did all the work for the preparation and transmittal of those documents.
Q. Thank you. Can we have Defendant's Exhibit 24, please?
MS. SULLIVAN: May I approach, Your Honor?
THE COURT: Yes, sure.
BY MS. SULLIVAN:
Q. Mr. Zabransky, you've been handed what's been marked as Defendant's Exhibit 24. Do you recognize this document?

A. Yes, I do.
Q. Could you explain to the Court what this document is?
A. This is the 1991 ACR that was used as the basis for the submittals made by Wisconsin Electric of DCSes, I believe, in 1992.
Q. Could you turn to page nine of this document, table 3.1? Mr. Zabransky, did you or did your organization at Wisconsin Electric use the information contained on this chart in the submission of its DCSes?
A. Yes, Wisconsin Electric DCSes that were submitted in 1992 relied upon the acceptance allocations that are in this table, third line up from the bottom.
Q. Could we highlight that line, please? Is that the line that you're referring to that I've highlighted on the screen?
A. Yes, it is.
Q. I believe you've already testified that Wisconsin Electric submitted DCSes in 1992. Was that your testimony?
A. I believe it was in 1992.
Q. Okay. Do you recall how many DCSes Wisconsin Electric submitted in 1992?



A. The company submitted DCSes for each of the 10 allocations that are put forth in this table.
Q. And why did WEPCO submit DCSes for each of those allocations?
A. It was our belief that the DCSes represented a commitment, and the company had reached a conclusion or a position that it wanted to get them into the government and have them sign them before something happened that would cause them to cease signing them for some reason in the future, so it was seen as a good thing to do, to get these signed pieces of paper back from the government.
Q. Were the DCSes that WEPCO submitted approved by the government?
A. They were eventually approved, the initial submittal was -- I think a number were sent back for numbering errors, but ultimately, they were all approved with no changes to substance, just to the numbers that were put upon them.
Q. Was 1992 the earliest opportunity that Wisconsin Electric had to submit its DCSes?
A. I believe that was the first opportunity after the government started the process, I think earlier in 1992, and provided the forms and the instructions as to how to fill them out, so it was 63



months prior to 1998, and that's really when the process was started by the government.
Q. Turning now to your time at DOE, when you came to DOE, did you have responsibility for reviewing and approving DCSes submitted by utilities?
A. When I became the COTR in 1995, I acted as the individual that reviewed them and gave the contracting officer technical recommendations as to whether they should be approved or not.
Q. And when would you recommend approval of DCSes?
A. The DCSes were approved as long as they were complete and the allocations put forth on them were consistent with the allocations in the ACRs that provided the allocation to the utility. So generally, it was a review of completeness and compliance with the allocation size.
Q. Did you recommend approval or disapproval of all DCSes that were submitted after you became the COTR?
A. I think there were a few that were eventually approved or initially not approved because of numbering errors or other administrative errors, but beyond that, yes, they were all generally approved through the period of time that we processed



them.
Q. Was there a time at which DOE stopped processing these DCSes?
A. Yes, I believe it was in early '97. It's hard to remember the exact year that the Department stopped processing DCSes. We did acknowledge that we had received them, but we no longer processed them. We neither approved or disapproved them.
Q. Who made the decision to stop processing DCSes?
A. I think the decision was made by the contracting officer on the advice of counsel.
Q. Can we pull up DX-29.002?
MS. SULLIVAN: One moment, Your Honor.
THE COURT: Sure.
MS. SULLIVAN: Your Honor, this is two exhibits with multiple pages. I'd like to provide copies to the Court.
BY MS. SULLIVAN:
Q. Mr. Zabransky, I've actually handed you copies of what have been marked as Defendant's Exhibit 29.002 and 29.003. Do you recognize these documents?
A. I do.
Q. Do you recognize these documents to be a

4119

set of DCS submittals from Maine Yankee?
A. Yes, 29.002 is a set of submittals from Maine Yankee to the Department of Energy, in September of '92, for allocations for Maine Yankee.
Q. And what is 29.003?
A. 29.003 is the approved DCSes being sent back by the contracting officer to Maine Yankee.
Q. Okay. And you were not involved in the processing of these DCSes?
A. I was not at DOE at the time, no.
Q. And just based on your review of the document, is it your understanding that Maine Yankee submitted DCSes for all of its allocations in the first 10 years in 1992?
A. From review of this document and review of the '91 ACR, this appears to be a DCS for each of the allocations that Maine Yankee had in the '91 time frame that they could have submitted in 1992, yes.
Q. Okay. And looking at 29.003, is it your understanding that these DCSes were approved by DOE?
A. Looking at the exhibit, yes, they all seem to have been approved by DOE.
Q. Thank you. Mr. Zabransky, are you familiar with the former industry organization known as the Utility Nuclear Waste Management Group?

4120

A. I am familiar with the organization known as the Utility Nuclear Waste Management Group, also known as UNWMG.
Q. Was Wisconsin Electric a member of UNWMG while you were there?
A. Yes, Wisconsin Electric was a member of UNWMG when I was employed at Wisconsin Electric.
Q. And did you represent Wisconsin Electric at meetings of UNWMG?
A. I was a representative of Wisconsin Electric at meetings of UNWMG, yes, I was.
Q. What did you understand to be the purpose of UNWMG?
A. UNWMG was a organization within, I believe, Edison Electric Institute that was set up to work on issues related to nuclear waste disposal, interfaces with DOE. It was an organization to facilitate industry involvement on those topics.
Q. Are you familiar with the process commonly referred to as the ACR issue resolution process?
A. Yes, I am.
Q. What was the ACR issue resolution process?
A. The ACR issue resolution process was a group, subgroup that was set up within the UNWMG, a high-level waste working group, which focused on

4121

dialogue with the Department of Energy on issues related to interpretations of the standard contract.
Q. And did you participate in the ACR issue resolution process on behalf of Wisconsin Electric while you were there?
A. Yes, I did.
Q. Mr. Zabransky, was one of the issues considered during this process whether priority should be granted to shutdown reactors?
A. That issue was an issue that was brought up and talked about as an issue that the group should consider and develop a position on, but it's my recollection that we never did develop a consensus position on that issue.
Q. And why was that?
A. There was no consensus position reached. There were utilities who felt that priority should be granted to shutdown reactors. There were utilities that held very strong positions that it shouldn't be granted to shutdown reactors. And it was impossible to come up with a position that all could endorse.
Q. Did UNWMG report this inability to come to a consensus to DOE?
A. I believe it did, and I think that was not one of the issues we ultimately put on the table to

4122

talk about because of our inability to come up with a meaningful position. I don't think we ever conveyed a consensus position to them.
Q. Do you recall meetings, industry meetings, in which Yankee Atomic lobbied other nuclear reactor companies for priority for shutdown reactors?
A. I recall there were industry meetings where representatives from Yankee made their case for priority acceptance for shutdown reactors to the group, and there was discussion about the merits and other ways of approaching that within the group.
Q. Do you recall the outcome of these meetings?
A. I think the outcome was that the group never reached any consensus on that position.
MS. SULLIVAN: Your Honor, we don't have an electronic version of this, so I'll hand that out to the Court too. Your Honor, Plaintiffs' Exhibit 81 was an exhibit that was on Plaintiffs' may use list. I provided notice to Mr. Shapiro yesterday or last evening after we concluded court that we were possibly going to use it with Mr. Zabransky today.
BY MS. SULLIVAN:
Q. Mr. Zabransky, do you recognize what's been marked as Plaintiffs' Exhibit 81?

A. Yes, this is a transmittal that I signed, not on behalf of Wisconsin Electric, but on behalf of the utility -- the EEI, at this point it was called. UNWMG became a difficult name to pronounce, so they changed the name to UWaste for Utility Waste, and this is the same group and a different name.
And this is a transmittal letter that I forwarded to the Department of Energy, on behalf of the high-level waste management working group, that put forth positions that the industry was circulating and coming up with a number of what we'll call the ACR issues.
Q. Mr. Zabransky -- thank you.
Mr. Zabransky, are you familiar with what are referred to as multi-element sealed canisters or MESCs?
A. I'm familiar with MESCs as they're used in the industry, yes.
Q. What are MESCs?
A. MESCs are sealed canisters, usually welded shut canisters that contain a multiple number of fuel assemblies in the PWR-type, somewhere between 24 and 32, in the BWR, significantly more, up to 60 or so. But they hold a number of fuel assemblies. They're also put into overpacks for storage or



transportation.
Q. We've heard testimony that each of the Yankee Plaintiffs have either the NAC-UMS or NAC-STC systems. Are you generally familiar with these systems?
A. I believe from what I've read in the press, I'm familiar from what I've read in the press and other releases from NAC on those issues in this case.
Q. Are these systems MESCs, as you understand that term?
A. I believe that they are.
Q. Do you have an understanding as to whether MESCs are currently an acceptable waste form pursuant to the standard contract?
A. It's my understanding that they're not currently acceptable waste forms under the standard contract.
Q. Has DOE communicated with standard contract holders regarding the acceptability of MESCs under the standard contract?
A. I believe there have been a number of written communications between the standard contract holders and DOE on that issue over the years.
Q. Can we have Defendant's Exhibit 343, please? Mr. Zabransky, you've been handed what's



been marked as Defendant's Exhibit 343. Do you recognize this document?
A. Yes, I do.
Q. Could you explain to the Court what this document is?
A. This is a letter that was sent from the Department of Energy to Sacramento Municipal Utility District, also known as SMUD, responding to their letter that was requesting the Department to come and witness the loading of their storage systems, which were MESCs, in the spring of 2001.
Q. Could we just go to the second page of this document? And you signed this document, correct?
A. I did, yes.
Q. Can we go back to the first page? Mr. Zabransky, is this one of the communications with standard contract holders to which you were just referring?
A. It's one of them, yeah, there were a series of them over the years.
Q. Could we highlight the second paragraph of the letter, please? Mr. Zabransky, would you please read the portion of the letter that's been excerpted?
A. "Your letter also raises several other questions related to the Department's acceptance of



Nuclear Regulatory Commission's certified dual purpose storage/transport systems under the disposal contract between SMUD and the Department.
As you have indicated, the Department has previously stated its willingness to initiate the appropriate actions to include such dual purpose storage/transport systems as acceptable waste forms under the terms of the disposal contract."
Q. Thank you. Mr. Zabransky, what will be necessary to make MESCs an acceptable waste form, pursuant to the contract?
A. The contract will have to be modified to include this as an acceptable waste form as part of a contract modification process.
Q. Is there any further technical analysis that needs to be undertaken?
A. Yes, we'll need to do further work as we, the repository is designing advances and the licensing process goes forth. There may be restrictions in our ability to receive certain types of canisters under certain conditions that need to be factored into that development of a contract modification.
Q. Do DOE's current requirements documents for the repository discuss whether the repository will be

designed to accept MESCs?
A. Yes, they do.
Q. Why is that?
A. The requirements documents require the contractor designing the facilities and developing the license application to include the capability in the facilities to handle multi-element sealed canisters, so that if the Department were to execute these contract amendments, we'd be able to actually implement them.
Q. Can we highlight the fifth paragraph of this letter on the second page? Could you read that portion of the letter, please?
A. "It is our current expectation that after receipt at the repository, dual purpose systems will be opened and the spent nuclear fuel removed for placement in a waste disposal package, unless the internal canister can be demonstrated and Nuclear Regulatory Commission licensed as part of the final waste disposal package assembly.
Therefore, in order for a dual purpose system to be classified as standard, we anticipate that, at a minimum, it must provide that the spent nuclear fuel stored allows for its unloading and handling like an intact fuel assembly.



Dual purpose systems that cannot be unloaded and handled in the same manner as an intact assembly will be classified as nonstandard under the terms of the contract."
Q. The first sentence refers to, discusses the waste disposal package and the NRC, or the NRC license. Is that part of the technical analysis to which you were just discussing?
A. That's one of the issues that has to get looked at, as to whether this canister can be directly disposable, or if it needs to be reopened and repackaged when it's received at the repository.
Q. Has a decision been made as to the schedule upon which DOE will accept MESCs?
A. No, I'm not aware that any decision has been made on the schedule as to which we would accept MESCs.
Q. And when can a schedule for the acceptance of MESCs be determined?
A. As I said, I think before, until we get the license and the utilities actually licensed, and we know what its capabilities are, and we know if there are any technical limitations or technical specifications that limit our ability to open cans or facility limitations as to how many cans we can open



at once, we won't be in a position to determine what schedule we can work on.
Q. And the license that you're referring to, when does DOE expect to receive that license?
A. You really wouldn't know the final details of that until you receive the license to receive and possess right before the repository was ready to open. I'm not sure what the schedule is for that without reviewing other documents, but it's subsequent to the receipt of the construction authorization.
Q. Was the subject of MESCs part of the ACR issue resolution process?
A. I believe it was, yes.
Q. Why was that?
A. It was an issue that the utilities identified, and I think DOE mutually agreed with the utilities that it needed resolution because they didn't appear to be covered under the contract.
Q. Could we go back to Plaintiffs' Exhibit 81? Which we don't have on computer. Could I direct your attention to the page that is Bates-numbered ending in 1703?
A. Yes.
Q. And could you read the issues stated there?



A. The issue stated there is, "Should Appendix E be amended to include multi-element sealed canisters as either a standard or nonstandard SNF classification."
Q. And I think you've already explained this. This document contains issues that the industry wanted to discuss with DOE?
A. It contained issues, and it contained industry positions that we thought DOE should adopt.
Q. While you were at Wisconsin Electric, did you understand that MESCs were not an acceptable waste form, pursuant to the contract?
A. That was my understanding, yes.
Q. What is the effect of the -- or do you have an understanding as to what the effect of the fact that MESCs are currently not an acceptable waste form would have upon utilities?
A. Well, it's my understanding that if the issue isn't resolved through a contract amendment, that the effect of MESCs not being an acceptable waste form would be that the utilities would either have to remove the fuel from those canisters and put it in the DOE provided transportation casks as their fuel or amend their contracts to allow it as a acceptable waste form.

acceptance capacity to meet individual utility needs, without the overt involvement of the Department."
Q. Did you have an understanding as to what that, what was intended by that sentence at the time this letter was prepared?
A. My understanding was that Dr. Dreyfus was trying to convey to Dr. Kadak that we thought that they could arrange their own exchanges amongst themselves, and that they didn't need us to arrange them on their behalf, and the DOE didn't need to reallocate acceptance capacity. That could be done by utilities amongst themselves, pursuant to the exchange provision.
Q. I'm sorry, did you have something else?
A. Subject to DOE's approval.
Q. Did you have an understanding that this language was intended to indicate that DOE would approve all exchanges?
A. I don't believe it indicates that, no. It just says that we wouldn't be overtly involved by arranging for the exchanges, but it couldn't imply, didn't imply that DOE would approve every exchange put forth.
Q. And do you have a belief as to whether DOE could indicate, at the time this letter was



approved -- at the time the letter was prepared, whether DOE could indicate whether it would approve all exchanges?
A. I don't think DOE could do that at that time, and I'm not sure DOE could do that today. Exchanges would have to be looked at in the context and time frame that they're submitted because, until you see what's actually being done and look at where the system is and what equipment exists and what analysis is done, you really can't put forth a blanket approval for all exchanges.
Q. You just said, "what equipment exists." What specifically about the equipment has to be looked at?
A. Well, if an exchange was between two utilities, and one utility had a boiling water reactor, BWR, another had a pressurized water reactor, a PWR, depending on when the exchange was put forth, the Department may not have the right cask. You need different transportation casks for the two different fuel types.
We might not have the right waste package in place at Yucca Mountain because you need different waste packages for the different fuel types. So depending upon when all that capability was needed



and how it was changed by the exchange, you'd have to look at that. Those were just a few of the things you'd have to look at.
Q. Whether training had been conducted prior to an exchange request being granted, is that something that would have to be looked at?
A. Well, training is another action, and that would be training not only of the personnel at the utility site and the personnel at Yucca Mountain for receiving different fuel types, if it hadn't already been covered, but training for emergency responders along transportation routes. The Department has to provide, under Section 180C, for funding for emergency responders to ensure they're trained to respond to any transportation incidents.
And if an exchange took place between a utility in one region of the country where we had already trained people, but was putting forth an exchange in another region where we hadn't done training, it may not be possible to accommodate that on a short time frame.
Q. Does DOE, as this letter indicates, expect utilities to exchange DCSes?
A. DOE continues to expect the utilities will exchange DCSes, yes.



Q. And does DOE encourage utilities to exchange DCSes?
A. I think DOE has been encouraging the utilities to exchange DCSes under the provisions of the contract since DCSes were created back in the early '90s, yes.
Q. As contracting officer, would you have the responsibility for approving exchange requests?
A. Yes, I would, now.
Q. And do you expect that DOE will be able to approve all exchange requests?
A. I think DOE would approve exchange requests that we can accommodate without adversely affecting or impacting others that we have an obligation to pick up fuel from. So to the extent we can accommodate them, I think we'd approve them, yes.
Q. Do you have an understanding as to how an exchange request might adversely affect another purchaser?
A. Well, again, in the example we talked about with the PWR and BWR in transportation casks, if the exchange would cause us to move a resource, a PWR cask, to facilitate the exchange, it may be that that cask now becomes unavailable for the next utility that should have been served with its PWR fuel.

4143

So we'd have to make sure that we just didn't take from one utility to advance to another one, and then wind up not being able to serve that utility that had already been in line.
Q. Mr. Zabransky, does the Office of Civilian Radioactive Waste Management try to manage the waste management program in an efficient and cost-effective manner?
A. I think, as federal employees, we always try to do our jobs in an efficient, cost-effective manner. It's a goal of the program to operate in an efficient, cost-effective manner, and I think we do things to try to ensure that happens.
Q. What types of things does RW do to try to manage the program in an efficient and cost-effective manner?
A. Typical things like procurements are done in a competitive fashion, to invest value for government whenever possible. And when we look at planning the system, we try to plan a system that meets the needs we have to take into account from our utility customers, but to be reasonable in doing it, so we don't overbuild systems that don't get utilized.
Q. Does this goal of being efficient and

4144

cost-effective translate into a specific acceptance rate?
A. No, it doesn't, that I know of.
Q. Do you understand the term "full cost recovery" as that term is applied to the waste management system?
A. Yes, I do.
Q. What does that term mean to you?
A. Well, to me, that term means that the users of the system, those who we have contracts with, pay the full cost of us developing and operating the system, which includes developing the transportation equipment, the facility, Yucca Mountain, and ultimately closing that facility in the future, and those costs are all borne by the users.
MS. SULLIVAN: One moment, Your Honor. Nothing further at this time, Your Honor. I would move for admission of Plaintiffs' Exhibit 81, which was the letter that Mr. Zabransky sent to Alan Brownstein.
THE WITNESS: Your Honor, if I could take just a two-minute break?
MS. SULLIVAN: Hang on just a minute.
THE WITNESS: Sorry.
MS. SULLIVAN: Let's do this.

4145

MR. SHAPIRO: Your Honor, we don't have any objection to the admission of Plaintiffs' Exhibit 81, although we would want to check to make sure that there aren't any additional documents that should appropriately be considered along with this one in order to have a complete record of this, but as far as this document goes, we don't have any objection.
THE COURT: Plaintiffs' Exhibit 81 is admitted.
(Plaintiffs' Exhibit Number PX-81 was received in evidence.)
MS. SULLIVAN: Thank you, Your Honor.
THE COURT: Why don't we take a break, 10 minutes?
MS. SULLIVAN: That's fine.
(Whereupon, a short recess was taken.)
MR. SHAPIRO: Good morning, Your Honor.
CROSS-EXAMINATION
BY MR. SHAPIRO:
Q. Good morning, Mr. Zabransky.
A. Good morning.
Q. I'd like to start with some questions about the delivery commitment schedule process. I believe you testified that starting in the 1997 time frame, the Department of Energy stopped approving or

4146

disapproving delivery commitment schedules proposed by utilities?
A. Yes, and I think it was in early '97, we stopped processing the submittals from utilities.
Q. And DOE also stopped processing approvals or disapprovals of submittals of final delivery schedules from utilities?
A. We never processed any, so we never started those.
Q. And instead, DOE sent letters to utilities responding to those proposed final delivery commitment -- final delivery schedules stating they were being neither approved nor disapproved, isn't that correct?
A. I believe that's correct, yes.
Q. But the contract doesn't contain language that provides DOE that option to be either approving or disapproving, isn't that correct?
A. That's correct.
Q. And it was your opinion at the time, as contracting officer's technical representative, that the contracting provide that option, correct?
A. I was a technical representative. I didn't make contract interpretations as to what it provided or didn't provide with respect to provisions, but,

no, I didn't think it provided that provision at that time.
Q. And the reason that the Department took the position of neither approving nor disapproving delivery commitment schedules or final delivery schedules is because the Department's lawyers advised OCRWM to take no action?
A. No, the Department's lawyers advised the contracting officer.
Q. And that was done on the advice of counsel?
A. Yes, but they advised the contracting officer, not OCRWM.
Q. But ultimately, it was the lawyers that caused that to happen, counsel?
A. Counsel's advice to the contracting officer was that they no longer approve DCSes, so, yes, I would say.
Q. And because of the advice that the contracting officer, DOE, received from the lawyers, at this point, the Department has not reviewed delivery commitment schedules since early 1997, since then, has it?
A. It hasn't reviewed any since then for allocations that were predicated upon the '98 acceptance date, no.



Q. And since the Department has stopped reviewing delivery commitment schedules, there's been no way for a utility to get a delivery commitment schedule approved, at least not until the Department has issued its July 2004 annual capacity report last week, isn't that correct?
A. That's correct.
Q. And it is the Department's position that utilities must submit delivery commitment schedules based on the most recent annual capacity report?
A. And I guess -- the Department's position is that, yes, the DCSes should be based upon the most recent annual capacity report for the period of time that's covered, yes.
Q. I believe you said in your direct examination, Mr. Zabransky, that when you were at WEPCO and also when you were the contracting officer's technical representative, it was your understanding that delivery commitment schedules, that utilities could only place on those the amount of fuel that they, for which they had an allocation in that most current ACR. Was that your testimony?
A. I think I said that, yes.
Q. But there's nothing in the standard contract itself that limits the amount of fuel that a



utility can put on a proposed delivery commitment schedule. That limitation just was imposed by the contracting officer in the latter one, wasn't it?
A. Well, the contracting officer provided guidance as to how to interpret and complete the DCS scheduling process. Was it unilateral, yes, they sent a letter out saying, Here's how it should be done. When I was at Wisconsin Electric, we did it that way, and I think most utilities did it that way. I don't think anybody protested the fact that it shouldn't be done that way.
Q. And there's nothing in the contract that provides that interpretation that comes from the contracting officer?
A. But it's the contracting officer's job to interpret the contract for administration purposes.
Q. I'm not sure that you answered, before I move on, I'm not sure you answered my last question. Mr. Zabransky, you're the current contracting officer, correct?
A. Yes, I am.
Q. Is there something in the contract that provides that utilities can only list on delivery commitment schedules the amount of fuel set forth in an ACR allocation?



MS. SULLIVAN: Objection, asked and answered. I believe he did answer that question.
THE WITNESS: I've answered that and said no.
BY MR. SHAPIRO:
Q. Now, we discussed just a moment ago, Mr. Zabransky, that the Department has stopped approving final delivery commitment schedules. The Department did receive some proposed final delivery commitment schedules, isn't that correct?
MS. SULLIVAN: Objection, mischaracterizes the witness' testimony.
THE WITNESS: I think I said the Department has never processed or approved any FDSes, and, yes, utilities sent some in for deliveries in 1998, 1999, I believe.
BY MR. SHAPIRO:
Q. And the decision to stop approving delivery commitment schedules and never to start processing final delivery commitment schedules, that was based on a belief by DOE that approving those delivery commitment schedules would commit the Department to an obligation, and the Department didn't want to do that?
A. I believe that the Department, the basis

for the decision to stop processing was based upon a belief that the DCSes were binding commitments, and we should not enter into binding commitments that we know we couldn't meet at that point in time.
Q. And in fact, not only did the Department stop approving those delivery commitment schedules and not even start processing final delivery schedules because of its desire not to commit itself, but on the advice of counsel, you actually went back and voided some previously approved delivery commitment schedules, isn't that correct?
A. There were a number of documents that were in the process of being approved, but had never been transmitted to the utilities. So these were documents that because, again, all correspondence goes through a review and legal review, was part of that review, that were in the system to be processed, that I had signed off on and sent on to the contracting officer, and that the contracting officer, in some cases, had signed off on, but had never been transmitted.
And prior to the final transmittal to the utilities, the review was, it was concluded that those should not be processed, and they were voided.
Q. But nevertheless, if I understand what



you've just said correctly, there were indeed some delivery commitment schedules submitted by utilities that reached not only your approval as contracting officer's technical representative, but the final sign-off by the contracting officer, and yours might have been the final sign-off in some occasions, yet nevertheless, those final approvals were voided?
A. Well, again, my approval as COTR would have just merely advised the contracting officer the form was ready for her to approve, so it wouldn't have been final in any case if I had signed off on it. There were a few that Beth Tomasoni, I believe was the CO at the time, signed off on, that prior to transmittal, she rescinded.
Q. And you would not have taken the action to void those except under the direction of counsel, correct?
A. Counsel provided us advice that it would no longer be appropriate to keep signing those documents, yes.
Q. And that's why you voided those?
A. Yes.
Q. And although counsel instructed you to void your signature on some of those approved delivery commitment schedules, isn't it correct that you would



not presume that once you had received an approved document, that it could be voided unilaterally by the Department, isn't that correct?
MS. SULLIVAN: Objection, mischaracterizes the witness' previous testimony.
THE COURT: When you say, when the utility had received it or?
BY MR. SHAPIRO:
Q. No, I'm talking about simply, once the Department, once Mr. Zabransky and the contracting officer have approved it, that Mr. Zabransky's belief that, is that, but for the advice of counsel, that the Department was not free simply to void those unilaterally?
A. But, again, the Department never communicated its approval. The documents never left the Department. They were, the ones that the CO voided were voided before they were ever transmitted. The approval never really took place from that perspective.
Q. But you would not presume once you had received an approved document that it could be voided unilaterally?
THE COURT: I don't get the "received an approved document."



THE WITNESS: I'm not sure who's receiving what in your question.
THE COURT: What do you mean by "received an approved document"?
BY MR. SHAPIRO:
Q. If you get back from the contracting officer an approved document, an approved delivery commitment schedule, you wouldn't think that you could simply void that, would you?
A. I didn't void her signature. She voided her signature.
Q. Didn't you void some delivery commitment schedules yourself, some approved delivery commitment schedules yourself?
A. I only voided my signature, to my knowledge.
Q. And did your signature appear on the approved delivery commitment schedule?
A. Yes.
Q. And you voided that?
A. The contracting officer decided not to transmit and execute the final approved DCS, and we voided them, yes.
Q. And you voided your own signature as well?
A. I did, yes.

THE COURT: Does any of this relate to a delivery commitment schedule binding the Plaintiffs, or is this --

MR. SHAPIRO: No, it goes, Your Honor, to Mr. Zabransky's testimony that he thinks that the delivery commitment schedules have some significance, that they were binding, he thought, when they were at WEPCO, and they're important at DOE.

But it would seem that the Department also feels that they can void them at the Department's whim, and that they're otherwise subject to counsel's direction to the Department not to grant them at all. That's the line of questioning.

THE COURT: I just wanted to make sure you weren't talking about Yankee Atomic or Connecticut Yankee or Maine Yankee DCS.

MR. SHAPIRO: I don't believe any of those were voided.

THE WITNESS: And, again, I think you mischaracterized what I said. The Department didn't void any DCSes that were approved and sent out and received by utilities. It recognized that once they received them, they were approved, and they had those approved DCSes. It ceased sending them out.

It ceased the approval process in



mid-process. Transmittal letters transmitting them to the utilities were never signed, and they were never sent out by the contracting officer.

BY MR. SHAPIRO:

Q. Now, approved delivery commitment schedules are of limited value, aren't they? For example, despite having approved delivery commitment schedules when you were at WEPCO, you didn't rely on those approved delivery commitment schedules as a solution for WEPCO's near term fuel storage needs, did you?

A. When I was at WEPCO and we were contemplating needing additional storage in the '92 time frame when those schedules came up, I think it was our belief that there was some uncertainty as to whether the Department would actually come forth and perform in 1998.

And as a result, we built into our thinking for storage at Point Beach, that we needed to have reliance to keep the plan operating on our own ability to store the spent fuel. And that the commitments that we have from the Department of Energy, we were glad we happened to sign them, because we thought there might be some recourse someday, but we weren't going to rely on them to put the plant in jeopardy.



So, again, we relied on them in the effect they were a contractual commitment, but we also made sure we had the capability to maintain the plant in operation in case the Department didn't follow through or wasn't able to follow through on that commitment.

Q. So the answer to my question is, yes, WEPCO did not rely on its approved delivery commitment schedules to provide for its, a solution for its near term spent fuel storage needs?

A. And I think that sort of mischaracterized what I said, is we went and got off as soon as we could as many commitments as we could, in case they would, for some reason, stop processing them, so we had some recourse, pursuant to the contract. But, yes, we also built facilities that made sure that, in case something happened, we weren't putting our facilities in jeopardy.

Q. Well, the reason I'm asking the question more than once is I'm not sure you're answering my question. You're concerned about putting in a caveat that I don't understand, Mr. Zabransky.

So the bottom line is that, notwithstanding the fact that WEPCO had approved delivery commitment schedules and maybe had some recourse down the line,



WEPCO didn't rely on those to provide for its near term spent fuel storage needs, correct?

A. And I think, like I said, the answer is, yes, it has no -- as would anybody else with a valuable asset that needed to make it operate, continue to operate, wouldn't put it in jeopardy solely on something beyond its control.

Q. And isn't it true that when DOE approved delivery commitment schedules, that it conditioned the approvals on the existence of a repository?

A. I think there was a point in time where DOE did that. The original DCSes in the early years, and I don't know when it changed, did not contain that conditioned statement.

Q. Well, what about the ones at WEPCO?

A. Those --

Q. That was one of the reasons you didn't rely on those is because DOE conditioned those, isn't that correct?

A. I don't believe those contained any kind of conditional statement.

Q. But others did contain conditions?

A. At some point, that was the Department's policy or was advised a statement saying these were conditioned upon the existence of the facility

constructed under the Act, yes.
Q. Now, for the currently approved delivery commitment schedules, the ones that, before the last week's ACR and new delivery commitment schedule instructions came out, isn't it true that you don't see any good use for the information on those approved delivery commitment schedules because the Department's current plan for its waste management system uses different acceptance rates than those upon which the earlier delivery commitment schedules were based?
A. I think your statement is partially correct. It's true that our current plans in the ACR that we just put out last week are for greater acceptance rates beginning in 2010 through 2019 then in the first 10 years of the previous ACR, but it's also correct that some of the information provided by the utilities may no longer be valid, and they may have other plans for what they wish to have done beginning in 2010.
Q. So the bottom line, again, the real crux of my question is that you wouldn't see any good use for the information on the currently approved delivery commitment schedules?
A. Those supported operations beginning in



1998. I don't think they're valid for use supporting operations in 2010.
Q. And it's your belief that DOE has to renegotiate those delivery commitment schedules, isn't that correct?
MS. SULLIVAN: Objection, vague. Which delivery commitment schedules are we talking about?
MR. SHAPIRO: The previously approved delivery commitment schedules.
THE WITNESS: I think the disposition of those needs to be resolved. We haven't resolved in the Department how to address that yet, but the DCSes that would be coming in under the APR that we issued last week for 2010 would be for the same fuel that were covered by the DCSes that came in previously. So we'd have to resolve that with the utilities, yes.
THE COURT: Before I forget it, do you agree with Mr. Pollog that the DCSes, well, the allocation under the capacity report is strictly for an allocation of quantity and that you can, the utility can substitute any fuel, they can list any fuel?
THE WITNESS: On the DCS?
THE COURT: On the DCS.
THE WITNESS: Yeah, I believe, I agree with



Tom, and that was a position I held when I was at the utility and which DOE has put forth, that the age of the fuel, the allocation really gives you a place in line, a ticket. And when it comes time to proffer your DCS and actually deliver fuel, it's any fuel that meets the criteria under the contract.
THE COURT: I guess I was kind of misled. On page 15 of Defendant's Exhibit 7, which is the contract, in article, I think it was Article V -- no, Article VI.
THE WITNESS: Article VI, sir?
THE COURT: Article VI, B1(a).
THE WITNESS: B(1)(a)?
THE COURT: B(1)(a), it says, "DOE would first accept from purchaser the oldest SNF and/or HLW for disposal in the view of facilities accepted otherwise provided in paragraph B, D and E."
THE WITNESS: Yes.
THE COURT: And B, D and E talk about exchanges or things like that, so I assume the contract required the utility to deliver the oldest fuel they had first.
THE WITNESS: I think this is another case where the contracting officer issued in her directions the guidance that utilities were free to



submit, or free to put forth any spent fuel they had that met the criteria as spent fuel under the contract and, again, explained that the allocation provision really made sense.
And that it gave you a place in line, but then let you manage your fuel inventories as you saw appropriate, so that was another clarification that was also, I believe, in the instruction transmittal letters from the DCSes.
BY MR. SHAPIRO:
Q. I want to get one more concern with the delivery commitment schedules, Mr. Zabransky. Under the contract, utilities have the express right to vary the quantities of spent fuel and high-level waste that DOE would pick up by 20 percent from the amounts on those approved delivery commitment schedules at many point before issuance of the final delivery schedule, isn't that correct?
A. I believe that's correct, yes.
Q. But if everybody adjusts their allocation upward by 20 percent, so that the quantity to be accepted is more than the total acceptance rate that the Department has planned for that year, you don't know how the Department would accommodate that contract work, do you?

A. The Department would be obligated to. We'd have to figure out some way to either store more fuel, work nights and weekends, work 24-hour shifts, whatever it took, but the contract gives the utilities rights to do that. Once we sign the DCSes, if they adjust them, we'll have to live with them.
Q. But you don't know how the Department would manage to accommodate that, do you?
A. I just said, Mr. Shapiro, we'd work back shifts, we'd work weekends, we'd park stuff, but it's our obligation to figure that out when and if it happens.
THE COURT: Would that possibly have any impact on accepting canistered fuel? For instance, if a number of canisters resulted in, say, being 10 percent over the allocation, if you accepted canistered fuel?
THE WITNESS: I think canistered fuel, one of the issues with that is if we have to accept it and repackage it immediately, which could be the case, that could severely limit the throughput of the facilities, so that would have to be factored into that.
THE COURT: If you didn't have to reopen them and just, the total quantity might not exactly



match the allocation.
THE WITNESS: And that's one of the reasons I think that provision was put in there for, was that originally there was an understanding that the allocation was a very precise number to the nearest tenth of a ton, but that could result in a less than full cask, two and a half casks, which didn't make a lot of sense, and that by adjusting it plus or minus 20 percent was one way of dealing with that.
BY MR. SHAPIRO:
Q. I wanted to make sure I understood your last testimony correctly, Mr. Zabransky. So you're saying -- and let's take the current, the most recent ACR that ramps up to an acceptance rate of 3,000 MTUs per year?
A. Yes, it does.
Q. And let's say we're in one of those years with 3,000 MTUs acceptance and utilities with allocations and the allocations that are provided for under that ACR and APR and instructions that were sent along with them would equal that 3,000 MTU, wouldn't it?
A. Yes, it does.
Q. And so if all those utilities bumped up the amounts they want to deliver by 20 percent, and the



Department would have to handle roughly 3,600 MTUs?
A. Yes, it would.
Q. And it's your testimony that the Department would have the capability to manage to do that?
A. No, my testimony was the Department was aware of that when it issued the ACR, and we'll deal with that, that should have come to pass. It doesn't have the capabilities today, but it would have to get them.
Q. So the Department could get those capabilities?
A. I don't see any reason why it couldn't.
Q. I want to ask you just a couple of questions about annual capacity reports, just mentioned the most recent one, the one that was sent out last week, when is spent fuel presumed to start to be picked up by the Department in that annual capacity report?
A. The report issued last week supports operations beginning in 2010.
Q. Is that the date provided in the annual capacity report, or is it like the earlier one that just had a year one instead of an actual year assigned?
A. I believe that report, and I'm doing it



from memory, has a table that shows 400 tons of acceptance in 2010.
Q. I want to ask you a question or two about the prior ACR. That's the one that was issued in 1995.
A. Okay.
Q. Now, the rates in that annual capacity report, you can pull that out if you don't recall it, but the rates in that annual capacity report are considerably smaller than the acceptance rates in last week's July 2004 annual capacity report, isn't that true?
A. Those rates, I believe, were 400, 600 and then 900 through the balance of the 10-year period, yes, they're smaller.
Q. And isn't it true that the Department was trying to minimize its obligations to utilities by using those rates in the 1995 ACR?
A. That may have been one of the considerations that went into that. There was no plans for a repository before 2010 at that point in time, and there was no change from the prior 4, 6, 9, 9, 9 acceptance rates in the '95 ACR, yes.
Q. I'm not asking just what may have been. Is it your opinion the Department was trying to minimize

its obligations by putting in those rates in the 1995 ACR?
A. In my opinion, that was probably one of the things being thought about, yes.
Q. I'm still not quite getting a complete answer to my question. I think you qualified your last answer that said that was probably one of the considerations minimizing the Department's obligations. Wasn't it your opinion that the Department indeed was trying to minimize its obligations?
MS. SULLIVAN: Objection, asked and answered, argumentative.
THE WITNESS: And I think I said, yes, they were, but I'm not sure that was the only consideration for those rates.
BY MR. SHAPIRO:
Q. Now I, want to turn back to your time when you were at WEPCO and looking at ACRs in that time period. Again, we can pull one of these out, but you recall some of those annual capacity reports noted right on there that the ACR's for planning purposes only, and it's not contractually binding on either the Department or purchasers?
A. I believe they all say that, including the



current one.
Q. And when you were at WEPCO, you concluded from that, that WEPCO could not rely on the department to actually accept the fuel based on the ACR, isn't that correct?
A. I believe that WEPCO needed to execute DCSes and have them approved to have any commitment from the government.
Q. You couldn't rely on the ACR?
A. The ACR was the basis for the DCS, no, there's nothing to rely upon an ACR. It's a report.
Q. Now, we've talked about a couple different acceptance rates for the Department to receive spent fuel from utilities. There's the one that ramps up to 3,000 MTU and the current ACR. You believe that acceptance rate is reasonable, don't you?
A. That's the rate that's in our requirements documents, the facilities are being designed for, and that's the rate the Department has put forth as its willing to commit to in the new ACR, yes.
Q. So you believe that the acceptance rate in the 19 -- in the 2004 ACR is reasonable?
A. I believe that the rate in the ACR which presumes we'll have Yucca Mountain up and running is reasonable, yes.



Q. And, again, turning back to your time when you were at WEPCO, much earlier on in the process, you believe that a reasonable acceptance rate would have been one that would have reflected the aggregate rate of discharges, plus some amount of work-off, isn't that correct?
A. I believe that's the case, yes.
Q. And it's your personal opinion that an appropriate rate of acceptance under the standard contract would be a rate which kept pace with discharges and removed some of the backlog, that's correct?
A. Again, to the extent that's accomplishable, I think that's an appropriate thing for the Department to commit to.
Q. And you do think that is accomplishable by the Department?
A. That's the current plans for 2010, the Department's planning to accomplish it, yes.
Q. And, again, turning back to your time at WEPCO, when you were there, it was your position and understanding that an acceptance rate that ramped up to 3,000 MTU would be such a rate that was sufficient to work off the backlog and the discharges in a reasonable time frame?



A. That would have been the company's desire and my desire, yes.
Q. And it was your position and WEPCO's position when you were there that the Department had to be prepared to accept spent fuel from the utilities on a schedule which would obviate the construction of deployment of additional at-reactor storage capacity after January 31, 1998?
A. I believe that's the position we communicated to the Department in response to some of their mission plans, yes.
Q. You believe that's the position that you communicated, or you're unsure?
A. I believe it is. I mean, you're asking me for something that happened 20 years ago, but I think that's we said, yes.
Q. I think we may have that document. Let's confirm.
A. Okay.
Q. Mr. Zabransky, you're being handed what is actually an excerpt from what we have been calling here Plaintiffs' Exhibit 95, which is the complete three volume set of the 1985 mission plan. And you may know or recall the third volume of that set includes, I believe, all of the comments sent in by

utilities on the draft mission plan.
And what we have here at pages 593 and 594 of volume three of Plaintiffs' Exhibit 95 is a July 6th, 1984 letter from WEPCO to Charles Head. Do you recognize this letter?
A. I've seen it in, I think, in prior depositions. I'm not sure I recognize it from the time.
Q. These are WEPCO's comments --
A. Yes, they are --
Q. -- to the draft mission plan?
A. They appear to be, yes. They are.
Q. Well, let's take a look to see if it confirms your understanding that you had about WEPCO's position at the time. If you look at the bottom of the first page, it says in the indented portion, "DOE must be prepared to accept spent fuel from utilities on a schedule which will obviate the construction or deployment of additional at-reactor storage capacity after January 31, 1998."
A. I see that, yes.
Q. And you agreed with that statement?
A. Yes, that's what the WEPCO put forth as its position in July of 1984.
Q. And if you would turn to the second page of



the comments, the comment that's numbered number 2, the top paragraph on the page, it says that, "The DOE repository program should be carried out in a cost-effective manner which protects the interest of those who are required to pay for it.
In other words, DOE should not permit itself to give in to expediency in making decisions or taking actions with significant cost schedule implications." You agreed with that statement?
A. I agreed with it then, and I think we operate the program that way now.
Q. Let's switch subjects, Mr. Zabransky. You talked about failed fuel during your direct examination. It's your understanding that the Yucca Mountain facility is going to be prepared to handle failed fuel to the extent it handles like an individual fuel assembly with normal handling equipment, isn't that correct?
A. That's, again, I don't know what it's actually going to be able to do. The goal is to try to handle failed fuel that -- restate your question. I'm not sure I caught it. Can you repeat the question?
Q. Your understanding is that the Yucca Mountain facility will be prepared to handle failed



fuel to the extent it handles like an individual fuel assembly with normal handling equipment isn't that correct?
A. Well, I think I said in my answer, it's more than just handling equipment. It's all the facility capabilities are there so they can handle failed fuel without any additional requirements. So to the extent that failed fuel behaves in all aspects like intact fuel or standard fuel, then there should be no reason it couldn't.
Q. And in fact, almost all utilities, nuclear utilities, have some amount of failed fuel, isn't that correct?
A. I think most have it. I don't know the exact quantities or characteristics at each utility, no, but, yes, most have it.
Q. And as far as the delivery commitment schedule process goes, the delivery commitment schedules, they treat failed fuel just like any other fuel, isn't that correct?
A. No, I don't believe it's the case.
Q. And when a utility proposes a delivery commitment schedule, do they indicate failed fuel differently on that?
A. No, but I think in the instructions that



were provided to the utilities that I've always operated under, the DCSes presume all the fuel is standard. So to the extent DOE's being informed fuel is going to be delivered, it assumes it's going to be standard, unless it's informed otherwise, subject to the approval of DCS.
Q. I think that's my question. The delivery commitment schedule paperwork doesn't distinguish between standard fuel and failed fuel?
A. You said, your question to me was, does it treat it the same as, and the answer is, it assumes it's not failed, it assumes it's standard.
Q. So the process treats them the same?
A. No, it excludes failed fuel. It assumes it's standard fuel.
Q. How does the delivery commitment schedule, we could pull one out, but where does the delivery commitment schedule exclude failed fuel?
A. I believe the instructions that were provided instructed the utility, informed the utility that DOE would assume that everything on that schedule was standard fuel, and that it was the obligation of the utility to inform DOE otherwise.
Q. On the proposed delivery commitment schedule?

A. Subsequent to, at some point in time, yes.
Q. But not on the proposed delivery commitment schedule?
A. That was merely for an acceptance of that amount of standard fuel from that utility.
Q. So on the proposed delivery commitment schedule, the utility was not obligated to note whether or not that quantity of fuel was failed or not?
A. Because it had already been told it was going to be assumed by DOE it wasn't failed, it was standard, in the instructions that were provided.
Q. If you could just answer the question on the proposed delivery commitment schedule, the utility was not obligated to note whether or not the fuel represented in that schedule was failed?
A. No, the complete answer to the question is because DOE had already informed them that the fuel would be assumed to be standard.
THE COURT: How would they schedule failed fuel? Would they have to put in a separate DCS?
THE WITNESS: Well, the process that was envisioned is that when the facility decided it wanted to deliver failed fuel, or fuel it knew that wasn't standard, it would have to tell DOE, here's



what I want to deliver, and here's exactly what this fuel entails.
DOE has a process within the contract that when a utility informs it that they want to deliver other than standard fuel, the utility puts forth an exact description of the fuel and the issues, we'd have to evaluate that within a 60-day period and inform them whether or not we could accept it on the agreed-to schedule or what adjustments would need to be made to the schedule, so we could accommodate that failed fuel or that nonstandard fuel.
THE COURT: That notification might include in a statement that, in our approved DCS of such and such a date, the following failed fuel.
THE WITNESS: It could, but then DOE might not approve it for normal scheduling at that point in time. So that would have been something that would have factored into the approval process, if we knew that's what was happening.
But the approach that was taken was it was an assumption that this is just starting the scheduling process, we'll deal with the particulars of the exact fuel assemblies later, and until we know the circumstances of a specific type of failed fuel or nonstandard fuel, we can't give a blanket there's



no issues here.
THE COURT: When in the process did the utility have to actually list the specific assemblies?
THE WITNESS: We really don't get to that level until I think a year, or 60 days before, when we start tightening up the allocations. The DCSes could be for broad ranges of fuels. The FDSes, which comes a year before, can narrow that down, but the specific fuel assemblies, excuse me, aren't due until 60 days before.
THE COURT: Before actual pickup?
THE WITNESS: Delivery, yes.
THE COURT: Well, they couldn't, at that point, tell you it's failed fuel because you have 60 days or something, and there's notice to respond or something?
THE WITNESS: Right. So by that point in time, we should have worked out all the procedural requirements. It could affect the shipping cask. It could affect the receipt facilities. Those get worked out between the DCS and the final pickup process.
THE COURT: I don't know if that helps.
MR. SHAPIRO: I think it does help some,



Your Honor, just to make sure we can confirm Mr. Zabransky's understanding.
BY MR. SHAPIRO:
Q. So the delivery commitment schedule form itself, we can show you one if you need it, that form doesn't even have a place on it to indicate whether or not the fuel is failed, does it?
A. No, it doesn't. Again, Mr. Shapiro, that's because going into it, the Department assumed and put the utilities on notice that it would presume it was all standard. So then to give them a place to check "failed" would be kind of inappropriate, since we've already said it's all standard from an assumption purpose.
Q. Well, do your instructions say that the utility is filling out its form incorrectly if some of that fuel happens to be failed? You're just saying that it makes an assumption?
A. Yes, I am. So going into it, we're committing to pick up that amount of standard fuel.
Q. Well, let me turn back then to the annual capacity report that provides allocations to utilities.
A. Yes.
Q. And we can get you a copy of that if you

need it. But you're familiar with the annual capacity report, the one sent out last week?

A. I'm familiar with it, yes.

MS. SULLIVAN: I would ask that the witness be provided a copy of the report since he's already testified he was going from memory when he answered the previous question. If there are specific questions about the document, it's appropriate to hand the witness a copy.

MR. SHAPIRO: It's Plaintiffs' Exhibit 1952.

BY MR. SHAPIRO:

Q. And why don't we turn to page three in Plaintiffs' Exhibit 1952, the summary of purchaser's annual allocations? Now, this table, the summary of purchaser's annual allocations, this lists the amount of spent fuel that the Department is allocating that each utility, the amount that the Department will pick up in each year?

A. That's correct.

Q. And this allocation is not limited, there's nowhere in this document where it says this allocation is limited to fuel that is not failed, does it?

A. No, this is a complete allocation to that



utility in a given year.

Q. And let me turn back to issues about the acceptance of failed fuel. Other than technical handling reasons, there were other reasons for not accepting failed fuel on the same schedule as standard fuel, isn't that correct?

A. I think that's a simplification, but some of those technical handling reasons can be pretty significant.

Q. Well, under the contract's definition of failed fuel, you would interpret the phrase "special handling" to mean fuel that requires handling with equipment other than the fuel handling tool that otherwise accompanies regular fuel assemblies, isn't that correct?

A. That's one requirement that may kick in with respect to failed fuel, yes.

Q. But isn't that how you would define "ordinary handling"?

A. Excuse me, the word what?

Q. Ordinary handling.

A. Again, no, I'd go farther than that. For instance, the receipt facility at Yucca Mountain could handle failed fuel in an entirely different location than it would handle intact fuel, so it may



need to be scheduled to entirely different facilities if we knew it was failed ahead of time, and we'd have to address that.

That's special handling. It may require totally different procedures if it's failed. That's also special handling.

Q. Do you recall having your deposition taken in the Indiana Michigan case earlier this year?

A. I recall many depositions. I think I had 13 days of depositions.

Q. And you had one earlier this year in the Indiana Michigan case?

A. I think I did, yes.

Q. And you took an oath much like you did this morning?

A. Yes.

Q. And you told the truth?

A. Yes, I did.

Q. And you testified accurately?

A. Yes, I did.

Q. And weren't you asked the following question and give the following answer:

"How would you define 'ordinary handling'?"

You gave an answer, "Spent fuel is handled with a fuel handling tool. Anything more than that



is not ordinary." Isn't that your correct answer?

A. And, again, that's one type of ordinary handling.

Q. Isn't that your correct answer?

A. I'd like to see the deposition.

MS. SULLIVAN: Objection, I ask that the witness be provided with a copy of the deposition he's being asked about.

THE WITNESS: I'd like to see it.

MR. SHAPIRO: Certainly.

MS. SULLIVAN: Which deposition is this?

MR. SHAPIRO: This is January 29th.

MS. SULLIVAN: Thank you.

BY MR. SHAPIRO:

Q. We're handing out binders. It's tab 10 in the binder. We must have missed a couple days somehow, Mr. Zabransky.

A. A couple days.

Q. And I was reading from page 297, down at the bottom.

A. 297, oh.

Q. There are four pages on a page, it's near the end, down at line 20. It says, "How would you define 'ordinary handling'?

"ANSWER: Spent fuel is handled with a fuel

handling tool. Anything more than that is not ordinary."
That's your truthful testimony, isn't it, Mr. Zabransky?
A. Well, again, I think if you read before that, you'll see how that's I defined it when I was at Wisconsin Electric.
Q. So you changed your definition?
A. Absolutely, I have. When I was at Wisconsin Electric in the '80s and early '90s, that's what I thought should have been the requirement. Since I've been at DOE and I've been kind of aware of the issues related to the receipt of spent fuel at Yucca Mountain, I'm aware of the fact that there's other issues related to failed fuel that might be broader than just mere mechanical transfer.
Q. If failed fuel requires no special handling, it must be taken on the same schedule as standard fuel, isn't that correct?
A. I think the provision you're referring to in the contract which requires the utilities to inform DOE of the type of failure and the nature of the failure says that if there's no technical issue, if we have no technical reason that we can't take it, doesn't require special handling, that there be no



reason to delay it, that's a correct statement.
Q. So if it doesn't require, if failed fuel doesn't require special handling, it must be taken on the same schedule as standard fuel, correct?
A. I think that's fine. I agree with that, yes.
Q. And isn't it possible that, for example, a fuel assembly could have radioactive leakage and still not require special handling?
A. It's possible that it could and not require, it's possible it could and could require special handling, so you can't say, right now, with respect to a hypothetical type of failure, what will happen to it.
Q. And you have mentioned concerns about the handling of failed fuel at Yucca Mountain. But you don't work on how failed fuel would be handled at Yucca Mountain, do you?
A. I have discussions with the designers at Yucca Mountain who are working on the design receipt facilities who have expressed concerns about that, yes.
Q. But that's not something that you worked on, is it?
A. I think, you know, do I design it? No. Do



I interface with the designers in Mr. Kouts' organization to ensure that we can accommodate their needs and they understand exactly what they have to design for? Yes, I do.
Q. Let me ask you about another deposition that you gave, this one a couple years earlier, January 6th, of 2002. Do you want to look at it in the binder?
A. Sure.
Q. This one should be on tab seven.
MS. SULLIVAN: Mr. Shapiro, I think you misstated. It's June 6th, not January 6th.
MR. SHAPIRO: I'm sorry, if I misspoke, June 6th, yes.
BY MR. SHAPIRO:
Q. And if you would look on page 332, line 18, weren't you asked the following question and give the following answer:
"QUESTION: I'm asking what the Department's plans are. Is failed fuel something that -- is planning for how failed fuel would be handled at the repository something you work on?
"ANSWER: No, it wouldn't be."
That's your truthful answer, isn't it, Mr. Zabransky?



A. It was as of June 6th, 2002.
MS. SULLIVAN: Objection. For completeness, I ask the next question and answer be read into the record.
THE COURT: You can read it in, if you wish.
MS. SULLIVAN: That's fine. I'll do that on redirect. Thank you, Your Honor.
THE COURT: Okay.
BY MR. SHAPIRO:
Q. I'd like to turn at this point to a different subject. Mr. Zabransky, you gave some testimony about multi-element sealed canisters and containers that could be used to handle spent fuel, and I want to turn to that subject.
A. Okay.
Q. Isn't it true that the Department plans to use different waste packages for different kinds of fuel at Yucca Mountain?
A. I believe the LA, and this is, again, an area that I'm aware of only in passing terms, contains four, five, maybe six different types of waste packages, correct.
Q. And this is due at least in part because the Department is planning to accept different waste

with different characteristics from utilities, correct?

A. The Department has, is planning on and part of the requirements are to accept DOE spent fuels, DOE high-level waste and Naval spent fuel, yes.

Q. And once at Yucca Mountain, the Department's plan is to repackage the waste in whatever container it comes in into a disposal waste package, isn't that correct?

A. Well, again, not for all materials, no.

Q. For utility materials, for utility spent fuel?

A. My understanding is that the waste packages being designed for commercial spent fuels are for bare, not canistered, not multi-canistered, bare PWR and BWR fuel assemblies.

Q. That's my point, Mr. Zabransky, so that the department's firm plan is that if the Department receives, as you termed it, bare PWR or BWR spent fuel -- first of all, when you say, "bare," the Department isn't receiving a flatbed truck with bare assemblies like the one we have in the courtroom, it's receiving those in a transportation cask, isn't that correct?

A. That's correct.



Q. And the plan is to take those, as you termed them, bare assemblies out of the transportation cask and put it into a disposal container, isn't that correct?

A. The lid would be taken off the transportation cask, and the assemblies would be taken out and transferred to a disposal package, yes.

Q. So the Department is planning to repackage the waste in disposal packages, correct?

A. It's planning to unbolt the lid and take the fuel out and repackage it, yes.

Q. And I believe you testified in the direct examination, but let me just confirm that the Department's current plans for Yucca Mountain include the capability of accepting canistered spent fuel, or as you've phrased it, spent fuel in MESCs from utilities at Yucca Mountain, isn't that correct?

A. It's my understanding, from my review, sitting in a design review meeting of facilities being planned for Yucca Mountain, that there will be a space where a MESC can be taken and reopened, but not on a routine basis, not a normal throughput activity. So, yes, the contractors are including the capability to do that, but not as a normal course of operations.



Q. And I believe you testified that the reason that it's not being made part of normal operations is simply because there's a need for a contract amendment, an amendment to the standard contract, is that correct?

MS. SULLIVAN: Objection, mischaracterizes the witness' testimony.

THE WITNESS: I don't believe I said that.

THE COURT: Okay. Your question asked whether he did testify, and the witness has answered.

MS. SULLIVAN: Thank you, Your Honor.

BY MR. SHAPIRO:

Q. Isn't the contract amendment what's preventing DOE from accepting spent fuel from utilities in multi-element sealed canisters in these dual purpose containers?

A. That's the reason we're not accepting them, but that's not the question you just proffered to me.

Q. Well, let me just focus on that. So you're saying that is the reason why you're not planning to accept them?

A. Well, that and the fact that it's a big burden on the system to accept them and repackage them.

Q. But in fact, the Department considered



making the modifications to the standard contract in order to accept multi-element sealed containers, the dual purpose containers, isn't that correct?

A. We're willing to talk about that. The Department's position was, yes, we're willing to talk about that, along with other contract modifications that would be to our benefit.

Q. But the Department is not pursuing contract modifications, isn't that correct, Mr. Zabransky?

A. I think it's not exactly true. We're not doing anything actively right now. We'd be happy to pursue them, but there's no utility that's come forth and said, We agree with you that these aren't covered, let's modify the contract. It takes two to have a modification.

Q. Isn't it your understanding that the Department decided not to pursue contract modifications further from the input of counsel?

A. I think that we're sitting around, and, again, we're happy to talk to anybody at any time. I don't know that counsel ever directed us to not talk to utilities. There were just no work that needed to be done at that point, so I'm not sure what you're referring to.

THE COURT: Could you sort of maybe -- I

assume there's some coordination between DOE and the Nuclear Regulatory Commission, and the Nuclear Regulatory Commission is licensing these dry storage facilities which have sealed containers, generally, I assume, in them, and also decommissioning of the plant, which correct me if I'm wrong, but I assume eliminates the ability to actually reopen the sealed container, at that point, and do anything with them, other than just put them on a truck and send them to the repository.

As such, is it your view that the Nuclear Regulatory Commission licensing these facilities is just assuming that DOE would have to accept these containers, assuming there's no alternative?

THE WITNESS: Well, again, I think it's an awkward situation to be in, but, yeah, I think NRC has nearly done its technical review. At least technically, their reviews are limited to, does it meet its requirements to be safe during transport and storage. And having done that, they'll license it.

THE COURT: And I assume the ceiling is necessary for safety and for storage.

THE WITNESS: Right. But they require the utilities be able to demonstrate how they would open them, if they needed to remove the contents. So,



yes, it's a situation where these things have been approved for storage, but there hasn't been closure on the issue of will they be subsequently accepted by DOE, pursuant to the contract.

THE COURT: Do you know of any way that they could be reopened on-site?

THE WITNESS: It would require, you know, just from a general background, there would have to be some type of facility, maybe a modest facility constructed, that would allow them to be cut open and repackaged, much as we're going to have to do when we receive them at Yucca Mountain.

THE COURT: So it would be another cost aspect?

THE WITNESS: Uh-huh.

THE COURT: Okay.

BY MR. SHAPIRO:

Q. But your ultimate expectation, Mr. Zabransky, is that DOE is going to be accepting some canistered spent fuel from utilities?

A. I believe that we'll eventually reach an accommodation with a utility or more than one utility to come up with a contract amendment and accept some canisters, yes.

THE COURT: Is there any ability to alter



the fee under those circumstances?

THE WITNESS: At this point, it doesn't look like it, no. We don't charge a given utility for its express individual cost.

THE COURT: So what --

THE WITNESS: We charge a uniform fee for everybody.

THE COURT: Oh.

BY MR. SHAPIRO:

Q. And I just want to confirm something I think we covered a little bit before, but I want to make sure I have your understanding that originally the Department anticipated that spent fuel would arrive at the DOE facility from utilities in a vaulted transportation only cask that DOE was to provide to utilities?

A. When you say, "originally," what do you mean, "originally"?

Q. Well, since the beginning of the, since 1983, has that been your understanding?

A. I don't know what DOE presumed before I got there in '94, but as long as I've been there, it's always been that there would be a transportation cask, and I'm not aware of any transportation casks other than bolted/closed.



THE COURT: Just in case I forget, is Appendix F to the contract, if you're aware of that, the first requirement for a detailed description of the fuel assemblies?

THE WITNESS: Well, let me get a copy of that. I believe that's the first time the utilities have to describe the assemblies they're going to provide.

THE COURT: And also any damage to --

THE WITNESS: Right. But there's also a provision, and bear with me while I try to find it.

THE COURT: That's a 60-day before shipping date.

THE WITNESS: Right. But under Article VI, 2(b), that we talked about earlier, it basically tells the purchaser there that they need to obtain delivery and procedural confirmation prior to delivery and designate it, describe it to DOE. So the timing of that is sometime before the Appendix F, so at that point in time, you can be sure that fuel can be accommodated.

THE COURT: As a practical matter?

THE WITNESS: Uh-huh.

BY MR. SHAPIRO:

Q. Mr. Zabransky, while we're still on this

subject of the multi-element sealed canisters, this was a subject that was addressed in Plaintiffs' Exhibit 81 that you spoke about in your direct examination, do you still have that in front of you?
A. Yes, I do now, thank you.
Q. Plaintiffs' Exhibit 81 is the April 1, 1991 letter that you sent as chairman of the UWaste high-level waste management working group to the Department?
A. Yes, it is.
Q. If you would turn to page, it's near the, about in the middle, it has a Bates number at the bottom, 1701.
A. Okay.
Q. And the position at the bottom that the utilities, you as chairman of that group submitted to the Department, was that DOE should accept licensed multi -element sealed canisters as a standard fuel classification?
A. Is that the right -- oh, I'm sorry.
MS. SULLIVAN: Which page?
THE WITNESS: What Bates number are you on?
THE COURT: I think that's the wrong page.
MR. SHAPIRO: I have 1701, CTR 0001701.
MS. SULLIVAN: There's two different



numbers on the page. We're looking at the big Bates number, 1703.
MR. SHAPIRO: Somehow we must have different copies of the same exhibit. I only have one Bates numbers.
MR. STOUCK: Ours only has one number on it, one Bates number.
MS. SULLIVAN: Oh, you're using your copies, I understand.
MR. SHAPIRO: We would hope that when we have an exhibit all the copies are the same. Let's make sure we're all on the same page, Your Honor.
BY MR. SHAPIRO:
Q. And, Mr. Zabransky, we are looking at Plaintiffs' Exhibit 81, and there's a page that, I guess the version you have has three different sets of Bates numbers in the bottom right-hand corner, and two of them say, "1703," and one of them says, "1701." Have you found that page?
A. I found that page, yes.
MS. SULLIVAN: I apologize for the confusion.
THE COURT: Is it the issue 022?
MR. SHAPIRO: 23, Your Honor.
THE COURT: I'm on the wrong page. Okay,



got it.
BY MR. SHAPIRO:
Q. And the position that the utilities in the UWaste high-level waste working group, you as chairman, Mr. Zabransky, presented to the Department, was that DOE should accept licensed multi-element fuel canisters as a standard fuel assembly classification?
A. That's the position that was put forth to the Department, yes.
Q. And it was perceived as an equity issue among utilities, and at that time, the use of canisters, it says, "shall not entail either additional charge or credits to the utilities." That was your position?
A. And, again, that was the utility industry's position as to how DOE should go forth, and this was, I would call it our opening foray into negotiations. Recognizing we needed to amend something, we started big.
Q. And if you actually turn to the prior page, the one that the Court was looking at previously, this one has ID number 022 at the top. The issue is, this one is dual purpose cask is the standard fuel classification, and once again, the utilities'



position, including yourself, Mr. Zabransky, was that DOE should accept licensed dual purpose casks as a standard fuel classification?
A. Well, again, let me clarify one thing, just because I transmitted these letters doesn't mean I agree with every position in this document. On this position, I agree. This was where the utility position was back then, that this should be a standard waste form, and that the contract should be amended to include it as a standard waste form.
Q. Well, I thought you testified earlier, Mr. Zabransky, that you wouldn't have transmitted a position from the industry to DOE unless there was a consensus. This is a consensus position, isn't it?
A. The way we defined consensus was a lot of people -- nobody agreed with everything in this industry, but these were ones people could live with, so whether we agreed specifically at WEPCO about any of these positions, on the whole, we moved forward.
So some of these utilities didn't agree with it individually, but the package was one everybody could endorse. I didn't have a problem with this position. This is one I agreed with back then, that this should be the case.
Q. And while we're on this document,

Mr. Zabransky, if we could turn to one other issue that concerns one of our prior conversations about failed fuel, maybe the Court is correct, it's easiest to go by ID number, it's number 26 at the top of the page.

And once again, the consensus position there is that if the purchaser furnished failed fuel canister that meets DOE established functional specifications for size and handling, they should be assigned the same acceptance priority as standard fuel, that was the consensus position?

A. That was the initial position as to what DOE should do, yes.

Q. And back to the subject of the multi-element sealed canisters -- by the way, Mr. Zabransky, I've sort of been using these terms interchangeably, the dual purpose system and the multi-element sealed canister system. Are those terms interchangeable to you, or are you drawing a distinction?

A. I would draw a distinction.

Q. What's the distinction you're drawing?

A. Dual purpose system, as described in this paper here and as I would use it, is the bolted/closed storage transport system. It doesn't



require a canister, doesn't require welding for either sealing or cutting open to remove the fuel. A MESC involves some type of canister that needs to be opened inside the cask to access the fuel.

MS. SULLIVAN: Excuse me, Mr. Shapiro, we've been going a little bit over an hour, and I know from Mr. Zabransky's depositions, he needs to take a break in a little bit. Is that all right, are you at a stopping place where we could do that?

MR. SHAPIRO: Sure.

MS. SULLIVAN: Is that all right, Your Honor?

THE COURT: Sure. Why don't we come back at 25 after?

MS. SULLIVAN: Thank you, Your Honor.

(Whereupon, a short recess was taken.)

THE COURT: Mr. Shapiro.

MR. SHAPIRO: Thank you, Your Honor.

BY MR. SHAPIRO:

Q. Mr. Zabransky, I think I alluded to you right at the break, I don't think we have a whole lot more to go. Before I get to my last subject, I want to go back to something we spoke about, that excerpt from Plaintiffs' Exhibit 95, the WEPCO comments on the draft mission plan.



I think I sort of stopped short when we were going through one of the paragraphs. I want to make sure that we don't leave your understanding, your beliefs concerning WEPCO's comments incomplete. Do you have that letter back in front of you, Mr. Zabransky?

A. Yes, I do.

Q. Back on the first page, that first comment, I think I read the first sentence, let me go to the remaining part of that comment.

It says, "While operation of the first repository by that date, January 31, 1998, at a capacity of 3,000 MTU per year would be the preferred means of accomplishing such an objective, it is essential that DOE firmly commit to employ whatever means are necessary to commence acceptance of spent fuel from utilities on or before the January 31, 1998 date." You agreed with that statement?

A. Yes, that was the company's position, and I agreed with it too.

Q. Last subject I'd like to get to, Mr. Zabransky, is exchanges of approved delivery commitment schedules you spoke about in your direct examination.

A. Right.



Q. It's your understanding, isn't it, that the exchange provision was put into the contract, so that utilities would be afforded the flexibility in managing their inventories of spent fuel, isn't that correct?

MS. SULLIVAN: Objection, foundation.

BY MR. SHAPIRO:

Q. I'm asking for your understanding.

MS. SULLIVAN: As long as it's an understanding after the time of the contract. I don't think we've established he has any understanding as of the time of the contract or as the contract formation.

THE COURT: I think he testified his experience at Wisconsin gave him an understanding, but if you have any problem with the question --

THE WITNESS: Well, my understanding comes from after, when the contract was formulated. It was, by the time I was involved with the contract, it was a fait accompli, so exactly why it was put in, my understanding isn't from my personal experience.

BY MR. SHAPIRO:

Q. I'm focusing just generally on what is your understanding why that was put in there.

A. Well, it's in there, I think it's in there

facilities being planned include capabilities to do some of that. There's not normal operations, but there is a capacity to open canisters.
Q. If such a facility is built at Yucca Mountain, who bears the cost of that facility?
A. All utilities that, all utilities bear the cost of that facility.
Q. And if canisters are instead opened at the utility prior to the delivery of fuel to DOE, who bears the cost of opening those canisters?
A. The utility that has the canister.
Q. Do you know whether all utilities currently have sealed canisters?
A. I don't believe that all utilities currently have sealed canisters.
MS. SULLIVAN: One moment, Your Honor. Nothing further, Your Honor. Thank you.
THE COURT: Any recross?
MR. SHAPIRO: Just a couple questions, Your Honor.
THE COURT: Sure.

RECROSS EXAMINATION

BY MR. SHAPIRO:
Q. Let's take the last issue first, Mr. Zabransky. How many utilities, in your



understanding, have these multi-element sealed canisters?
A. I don't have a number in my head that I can give you without looking at data. No, I don't know the number.
Q. Well, surely, you've made some general estimate consistent with your responsibilities at Office of Civilian Radioactive Waste Management, and let's take it out a few years. By 2010, how many utilities would you expect to have these multi-element sealed canisters?
A. Mr. Shapiro, I don't know that answer without reviewing documents. I don't know it in my head.
Q. Could it be half the industry?
A. I can't tell you that, Mr. Shapiro.
Q. So it could be as high as half the industry, you don't know?
A. No, I didn't say that. I said I don't know, without reviewing documents.
Q. So you can't say it'll be less than half the industry?
A. I can't say that either, Mr. Shapiro.
Q. Well, that's the kind of thing that your office would make projections of, isn't it?



A. We made projections of that, yes.
Q. I want to go back to the point where you've said multiple times that it's your view it would require a formal contract amendment for the Department to handle multi-element sealed canisters. It really goes back to some question that the judge had, where there seemed to be some ambiguity in the exchange provision, which the contracting officer used to interpret the contract to say that utilities had the right to determine which spent fuel to actually deliver.
There's no contract amendment to make that determination, was there? The contracting officer just did it, isn't that true?
A. The contracting officer could do that, yes, did do that.
Q. Couldn't the contracting officer simply interpret the current contract to permit receipt of multi-element sealed canisters without some formal contract amendment?
A. I can't give you that answer. I can't draw a legal conclusion. I don't know.
Q. You're the contracting officer, aren't you?
A. And I would seek guidance from counsel before I took any action, Mr. Shapiro. I'm not a



lawyer.
Q. But can you see any reason why you couldn't just interpret that multi-element sealed canisters should be accepted under the contract that will be used by a substantial amount of the industry?
A. Again, I'd have to check with the program, but, again, we'd be in a situation where we might be obligating the government to greater cost and greater burdens, so I don't know that that could be done that simply.
Q. You said you have to check with counsel. Is that Department of Justice counsel or Department of Energy counsel?
A. No, I check with my counsel at the Department of Energy. I don't check with the Department of Justice counsel.
Q. And why would you have to check with counsel on making some part of the contract work better?
A. I always check with counsel before I take actions pursuant to the contract as a matter of routine business.
Q. Let me switch subjects, Mr. Zabransky. You spoke very briefly about the 1995 annual capacity report, but your only involvement with that report

A. There's also defects or potential concerns with lack of spacers, torn grid straps, anything that might impact the overall integrity may be an issue that has to be looked at and will be looked at, as the license is developed.

Q. That may be an issue that has to be looked at --

A. Yes.

Q. -- or will have to be looked at? Do you know that these issues are going to have to be dealt with or may the result be that there's actually no problem with these -- with things like clouding?

A. Mr. Shapiro, I can't tell you yes, and I can't tell you no, so until we get a license and know what the facility does, I can't answer the question.

THE COURT: Mr. Zabransky, do you know if NRC requires -- in licensing for a dry storage facility, like the one pictured there, requires a sealed system as opposed to bolted?

THE WITNESS: No, the NRC is licensed under Part 72, both sealed/welded canisters, as well as bolted storage casks, so both are licensed pursuant to their requirement. They have a functional requirement that you can't allow any leakage to the environment, and it's up to the engineer to meet that



in any way he chooses to.

THE COURT: Okay.

MR. SHAPIRO: Nothing further, Your Honor.

THE COURT: Nothing further.

MS. SULLIVAN: Nothing further, Your Honor, thank you.

THE COURT: You're excused. Thank you very much for your testimony.

THE WITNESS: Thank you very much, sir. Have a good day.

THE COURT: I take it we're adjourned until Monday?

MR. LESTER: Monday at 10:00 a.m., Your Honor, yes.

THE COURT: Okay. We're adjourned until Monday morning at 10:00 a.m.

(Whereupon, at 1:28 p.m., the trial was recessed, to reconvene at 10:00 a.m., on Monday, August 9, 2004.)



C O N T E N T S.



| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| DAVID ZABRANSKY | 4110 | 4145 | 4216 | 4227 |



E X H I B I T S



| EXHIBIT NO: | MARKED | RECEIVED |
|---|---|---|
| Plaintiffs | | |
| PX-81................................4145 | | |





CERTIFICATE OF REPORTER

DOCKET NOS.: 98-126C, 98-154C, 98-474C
CASE TITLE: Yankee Atomic Electric v. U.S
HEARING DATE: August 5, 2004
LOCATION: Washington, D.C

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: 8/5/04

_______________________________

Cynthia Simmons, RMR, CRR
Official Reporter
Heritage Corporation
Suite 600
1220 L Street, N.W.
Washington,D.C. 20005-4019

4239

1464

IN THE UNITED STATES COURT OF FEDERAL CLAIM

--------------------------------x

SACRAMENTO MUNICIPAL UTILITY :
DISTRICT, :
:NO. 98-488C
Plaintiff :
vs. :
UNITED STATES, :
Defendant. :
-------------------------------- :

Courtroom 5
National Courts Building
715 Madison Place
Washington, D.C.

Monday, March 28, 2005

VOLUME 6

The parties met, pursuant to the notice of the Judge at 9:39 a.m.

BEFORE THE HONORABLE SUSAN G. BRADEN



1465

APPEARANCES:

ON BEHALF OF PLAINTIFF:
DAVID S. NESLIN, ESQ.
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter LLP
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

HOWARD N. CAYNE, ESQ.
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5656



1466

APPEARANCES (Continued:)

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
JOSHUA E. GARDNER, ESQ.
TODD J. COCHRAN, ESQ.
SCOTT DAMELIN, ESQ.
RUSSELL SHULTIS, ESQ.
ELIZABETH THOMAS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

ALSO PRESENT:
STEVEN M. COHN, ESQ.
STEVE J. REDEKER
THOMAS POLLOG

**Index appears at end of transcript***



1467

P R O C E E D I N G S

\- - - - -

THE CLERK: All rise. The United States Court of Federal Claims is now in session, the Honorable Susan G. Braden presiding.

MR. LO RE: Your Honor, I know the Plaintiffs are going to put on Ms. Supko. It looks like Mr. Neslin may have some housekeeping matters, we do also.

MR. NESLIN: Your Honor, we have an additional demonstrative to add to our demonstrative book, Number 78.

THE COURT: And you'll be working with this, this morning?

MR. NESLIN: I don't believe this morning. This is actually a chart from Mr. Stuart's expert report we may be referring to later during the day or this week.

THE COURT: Well, it's going to be interesting to know why it's relevant.

MR. NESLIN: It relates to Mr. Stuart's opinion regarding campaigning that was the subject of some of his testimony Friday.

THE COURT: It doesn't really matter what happens in the U.K. and France.

1588

storage, and you should pay us for the dry storage. And then in '98, SMUD files a complaint. So I think there have been repeated notices here. I seem to have etched into the argument and eaten into some of the time, and I apologize for that.

MR. LO RE: Your Honor, very briefly, just to respond to two points, with respect to the '94 and the '97 --

THE COURT: I need to look at the documents. All I'll just say is whatever we saw last week in the document record was prior to the breach, I believe, I believe. I may be wrong about one of the letters.

MR. NESLIN: Excuse me, Your Honor.

MR. LO RE: No, Your Honor, that's right.

THE COURT: I may have been wrong with the dates. I was taking notes while we were going through those, and I don't remember notice being given after the breach.

MR. NESLIN: Your Honor, the complaint is a notice. I mean, the complaint we --

THE COURT: Yes, it certainly is a notice.

MR. NESLIN: It says, we're holding you accountable for these costs, and that occurred after the breach.



1589

THE COURT: Okay.

MR. LO RE: Your Honor, no need to really belabor this. The point is this company made their decision to go with dry storage in the early '90s at the latest. All of the events that we're talking about now happened years later. There is a serious causation issue here. I've mentioned it once before in context to the 52(c), we're prepared to raise it again.

Also, with respect to the notices that went out in '96, I believe, is the letter that Mr. Neslin just referred to, that happened two years before the breach, as the Court has found. Your Honor, just one other issue, just to preserve the record, I would at this time, now that Mr. Stuart and Ms. Supko have testified, I would like to renew the government's motion to strike that portion of their testimony related to the exchanges.

THE COURT: Right. And as I told you before, I'm not going to strike it. It's where it is, and your records, you're protected to argue that on appeal, if for some reason I do something with it that you don't like.

MR. LO RE: Thank you.

THE COURT: If I don't, then you won't



1590

hear --

MR. LO RE: That's all, we just wanted to make the record clear on that.

THE COURT: Okay.

MR. LO RE: If there's nothing further, Your Honor?

THE COURT: No.

MR. LO RE: The government would like to call it its first witness.

THE COURT: Let's go.

MR. LO RE: The government calls Mr. David Zabransky to the stand.

THE COURT: While you're doing that, I want you to clear up -- we decided the issue of notice, but there are some problems, and so what I need to have you do, you need to pull out, through the record, the written evidence that you have showing the efforts that you have made, pursuant to the contract, and I would be interested in your Federal Circuit argument, but after the breach, before the breach is one issue, after the breach, once the breach happens, that's when the provisions of notice really do kick in, and I want to see what you've got in the record.

Very well, okay. Good afternoon.



1591

Whereupon--

DAVID ZABRANSKY

a witness, called for examination, having been duly sworn, was examined and testified as follows:

THE COURT: May I offer you a Diet Dr. Pepper?

THE WITNESS: No thanks.

THE COURT: That's all I have to offer today. Mr. Lo Re?

MR. LO RE: Would you like some water, Mr. Zabransky, before we get started?

THE COURT: Do we have notebooks for this witness?

MR. LO RE: Yes, we do. Your Honor, while we're handing out notebooks, just so I don't forget, these are the notebooks for our first expert, Mr. McGrath.

THE COURT: Okay. When is he coming on?

MR. LO RE: We're hoping to put him on Wednesday afternoon.

THE COURT: I'll be prepared then.

MR. LO RE: Thank you.

THE COURT: Thank you for giving me the notice for that too. The passing of the notebooks is a very important ritual.

1592
DIRECT EXAMINATION
BY MR. LO RE:
Q. Mr. Zabransky, good afternoon.
A. Good afternoon.
Q. Could you please state your full name and business address for the record?
A. My name is David Kevin Zabransky. My business address is 1000 Independence Avenue, Southwest, Washington, D.C.
Q. And who is your current employer, sir?
A. The U.S. Department of Energy.
Q. Mr. Zabransky, could you provide to the Court your post high school education, please?
A. After high school, I went to college. I graduated from Marquette University in Milwaukee, Wisconsin, in 1980, with a degree in Civil and Environmental Engineering.
Q. Now, you mentioned that you are currently employed by the Department of Energy. What office are you in, sir?
A. I'm currently in the office of systems analysis and strategy development within the Office of Civilian Radioactive Waste Management.
Q. Is that office also referred to as OCRWM?
A. It's referred to as OCRWM and also as RW.



1593
Q. Now, what are your current responsibilities, sir?
A. Currently, I'm a nuclear industry specialist. I act as a contracting officer for the standard contract between the Department and the utilities, and I also do systems analysis and other strategy development activities for my boss, Mr. Kouts.
Q. And how long have you been employed by the DOE?
A. I came to DOE in 1994, so a little, almost 11 years.
Q. And how long have you actually been a contracting officer?
A. I took that over, I believe, in 2002, summer of 2002.
Q. And before that, what was your title?
A. Before that, I was still a nuclear industry specialist, but I also served as the contracting officer's technical representative from about 1995 until about 2002.
Q. Now, Mr. Zabransky, as the contracting officer, what are your specific responsibilities?
A. At this point, I administer the contract between the Department and the utilities, provide



1594
correspondence to the utilities, oversee the collection of the payments and any other processing that's required under the contract.
Q. Now, I want to back up and talk about the time that -- your employment prior to coming to DOE. Before you came to DOE, where did you work, sir?
A. I worked for Wisconsin Electric Power Company in Milwaukee, Wisconsin.
Q. And what were your titles there?
A. When I left Wisconsin Electric, I was the manager of nuclear fuel services. I started there in 1980 -- actually, in '78, in the fossil department and went to nuclear power in 1980 as a civil engineer, and in 1984, I began working within the contracts administration group in the nuclear fuels area, and when I left, I was overseeing the contracting activities for nuclear fuel.
Q. Now, Mr. Zabransky, while you were at WEPCO, did you have any responsibilities regarding the administration of WEPCO's standard contract for the acceptance of spent nuclear fuel with DOE?
A. Yes, that was one of the contracts that was in my area. We did all the nuclear fuel contracts, uranium, processing, and ultimately the disposal contract.



1595
Q. Now, Mr. Zabransky, do you have any familiarity with the DCS process?
A. Yes, I do. The DCS process is the process under the contract where utilities first notify the Department of their schedules, of the scheduling process, first step in the scheduling process for delivery of spent fuel. It takes place approximately five years, I believe, 63 months prior to the year of delivery.
Q. Now, what happens before, if you know, sir, before that DCS is submitted by the utility?
A. Well, before the DCS can be submitted, the Department has to issue an annual capacity report, also known as an ACR, which lists the allocation for each utility and each year, and prior to the ACR, the Department has to prepare an acceptance priority ranking.
MR. CAYNE: Objection, Your Honor, excuse me, Mr. Zabransky, the question's calling for a legal conclusion.
THE COURT: Well, it says, what happens before the DCS is submitted by the utility? How is that a legal issue?
MR. CAYNE: Your Honor, there are legal contractual interpretation issues here as to --

1600
latest --
THE COURT: Mr. Lo Re, do you have a question to pick up here?
MR. LO RE: Yes, Your Honor. I'm happy to pick up here.
BY MR. LO RE:
Q. Let's speak in general terms, Mr. Zabransky. You talked a little bit about the APR process. And could you elaborate on, after the APR process had been completed, what happens after that?
THE COURT: This is when you get the data from the companies?
THE WITNESS: Yes.
THE COURT: That tells you how much fuel there is out there to be picked up?
THE WITNESS: And what age it was discharged, that's put in this ordinal ranking called the APR.
THE COURT: All right.
THE WITNESS: After that, once the Department determines what its annual acceptance capacity is going to be, that list is chopped up in annual chunks in the ACR.
THE COURT: And how do you determine how much you can pick up in a year?



1601
THE WITNESS: That's information that's provided to my area by other parts of the program. Those were actually either designing facilities or in policy position to determine what the capabilities are going to be, so if the first amount is 400 tons or 500 tons.
THE COURT: Right.
THE WITNESS: The first 400 tons would be chopped off, and that would be the first year's allocation.
THE COURT: Now, do you take the oldest fuel? I don't understand how that works within the clumping.
THE WITNESS: Yes, within the year, there's no ordinal relationship, so the first year, there's 400 tons, let's say, that get first-year allocations. There's no priority within the year as to who gets the first allocation.
THE COURT: Why is that?
THE WITNESS: That's done later in the scheduling process under the FDS part of the process. The DCS, which is what this feeds, only allocates acceptance to the year, and the DCS only covers a year of performance.
THE COURT: And so later on, within the



1602
400, is going to be, you're going to figure out within the 400 what's the oldest?
THE WITNESS: Well, later on, there's another step in the process called the FDS, the final delivery schedule, that comes closer to the time of pickup, where the utilities would then propose what their pickup window is, so they may say I want to go between June and August.
THE COURT: But I'm looking at the oldest fuel first issue.
THE WITNESS: Right. Well, the Department, prior to my getting there, always chose its oldest fuel within a year, so there's no ordinal -- the oldest fuel in that year doesn't have to go first, as long as everything in that year is the first 400 oldest tons.
THE COURT: All right.
THE WITNESS: And then operationally, the utilities would select the dates they choose to run.
BY MR. LO RE:
Q. Now, I believe that part of this was in your response to Judge Braden's question, but just so the record is clear, after the ACR process has been completed, Mr. Zabransky, what happens next?
A. Well, the ACR process, when I was in



1603
private industry in, I believe 1991 time frame, that's when the ACR came out, and the contracting officer basically initiated the DCS process and told the utilities to use that ACR as the basis for the --
MR. CAYNE: Objection, Your Honor. The witness is testifying about things that happened at the Department of Energy, Your Honor, when the witness just stated he was in private industry in 1991.
THE COURT: All right.
BY MR. LO RE:
Q. Let's be clear, what I'd like to do is talk about the process generally, Mr. Zabransky, and then we're going to spend some time talking about it while you were in private industry in the utility industry. So let's just talk in general terms now for the Court's --
A. Okay.
Q. -- convenience. After --
THE COURT: I'm just trying to learn the process.
THE WITNESS: I understand.
THE COURT: Right now.
BY MR. LO RE:
Q. After the, after the ACR is submitted,

1644
respect to the issue of MESCs?
A. Well, basically, the way this demonstrative is laid out is that it identifies, on the left-hand side, in the red areas, what DOE considers not to be acceptable under the contract right now, which is anything other than spent fuel and high-level waste.
Q. Now, while we're looking at this chart, next to the box that says, "Dual-Purpose Storage Transportation Systems," there's casks and MESCs, and then the next box to the right says, "LLW, GTCC, Class C, Class A/B." And what does that mean, sir?
MR. CAYNE: Objection, Your Honor, to the use of the chart with this witness. This whole chart represents, Your Honor, a legal conclusion, the government's legal position for purposes of this litigation that any of the casks or canisters used by SMUD for any of the utilities listed on the various charts you saw, Your Honor, last week, are not acceptable under the contract, strictly legal interpretation, Your Honor.
THE COURT: I see that. Who prepared the chart, Mr. Lo Re?
BY MR. LO RE:
Q. Mr. Zabransky, do you know who prepared this chart?



1645
A. I think Mr. Pollog prepared the chart.
Q. Were you involved in the preparation of this chart?
A. I was involved, yes.
THE COURT: Was it prepared for litigation?
MR. LO RE: It was prepared --
THE WITNESS: For counsel.
MR. LO RE: Within the last week, Your Honor, yes. And to be clear, we are not moving this chart into evidence. This is simply to show a depiction of the, of the acceptability of the material at issue in this case, including the canistered fuel, GTCC, and the failed fuel.
MR. CAYNE: Your Honor, we would object that any testimony from this witness that casks or canisters used by SMUD or by Exelon or Southern Nuclear or every entity on the charts we went through last week are not acceptable under the contract. Any testimony like that would be legal conclusions offered by this witness and not appropriate, Your Honor.
THE COURT: Well, tell me what the technical problems are, about whether they're acceptable under the contract, what's the technical problem with dual-purpose storage? Is it because it



1646
lays horizontally and not vertically?
THE WITNESS: That's one issue with this one particular dual-purpose system, but other ones that don't have that, that still go vertically, again, the process would be that we would have to cut those open, which is a time-consuming process.
THE COURT: Because the casks themselves are not --
THE WITNESS: Disposable.
THE COURT: -- strong enough or durable enough for the time period that you're going to need to have them under the desert?
THE WITNESS: Right, correct. They won't be licensed by the Commission. They're not the same approach we're taking to get them licensed for long-term isolation.
THE COURT: And when -- but you don't even have something licensed yet for that?
THE WITNESS: Right, we do not. We have a design, we have a safety analysis report that's being prepared for submittal, hopefully, later this year, but the approach is laid out and is based upon many years of work.
MR. LO RE: Your Honor, if I just may be heard on the standing objection, with respect to



1647
contract interpretation, I would point out to the Court that Mr. Zabransky is the contracting officer, and I believe that he has testified that his job is to implement this contract, so to the extent that he is looking at the contract, I think, frankly, that there are few people better suited to interpret the DOE's position with respect to the contract.
THE COURT: I didn't bar the testimony. I just wanted to try to ask it in a way that I thought would be less objectionable --
MR. LO RE: I appreciate --
THE COURT: -- than the way that you had done it.
MR. LO RE: -- that, Your Honor, but I just needed to make that statement for the record.
THE COURT: All right, now that you have that off your chest.
MR. LO RE: Thank you, Your Honor.
BY MR. LO RE:
Q. Now, Mr. Zabransky, there's a reference here to GTCC, Class C, Class A/B, LLW. What is that, sir?
A. Those are different types of low-level radioactive wastes.
Q. And why are they on this chart?

1696
known about it when you wrote 1298, is that correct?
THE WITNESS: I didn't know about this letter, Your Honor.
THE COURT: Okay. There's your answer.
MR. CAYNE: Okay. Your Honor, and I understood, excuse me, that the witness did not, had not seen the letter. I was just trying to determine whether anyone in the Department had reported to the witness the assurance reflected in this letter, whether he had learned of it.
THE COURT: Had you heard about any special deal that was made for SMUD?
THE WITNESS: I don't think this was a special deal for SMUD. I've heard, and, again, the Department's position, I believe, has been that we would be willing to discuss a contract modification to include this as a separate waste form.
THE COURT: And that's what appropriate action means?
THE WITNESS: Yes.
THE COURT: It's the same thing as something you had mentioned, I think, in your letter.
THE WITNESS: Yes.
THE COURT: Is it not?
THE WITNESS: That it was not currently



1697
covered by the contract, but we were willing to discuss a contract modification to include it.
THE COURT: Right, okay. I take it that that was still the Department's position, if they want to renegotiate the contract, you're willing to revisit this issue?
THE WITNESS: Yes.
BY MR. CAYNE:
Q. Mr. Barrett, would you please turn to Plaintiff's Exhibit, in Volume 2, 678?
MR. LO RE: Just so the record is clear, Counselor, I think you misspoke on the witness' name.
THE COURT: I'm sorry, what?
BY MR. CAYNE:
Q. Mr. Zabransky, if I misspoke --
THE COURT: What document are we looking for now?
MR. CAYNE: Plaintiff's Exhibit 678.
BY MR. CAYNE:
Q. Have you seen --
THE COURT: That's another letter to Mr. Redeker, and that is, let me just double-check against -- that is four, this is one that came in-between, okay.
BY MR. CAYNE:



1698
Q. Is this a letter you executed, Mr. Zabransky?
A. Yes, it is.
THE COURT: This is 678?
MR. CAYNE: Correct, Your Honor.
BY MR. CAYNE:
Q. And did you draft this letter?
A. I think I did, yes.
THE COURT: Do you need time to take a look at it?
THE WITNESS: I need to take a look at it, yes.
BY MR. CAYNE:
Q. Please let me know when you're done, Mr. Zabransky.
A. Okay.
Q. For what purpose did you write this letter?
A. As it says in the first paragraph, I believe I was responding to Mr. Redeker's letter of January 22nd.
Q. And at the beginning, you're telling Mr. Redeker that you have no plans to observe the loading activities at Rancho Seco, correct?
A. That's correct.
Q. That's the loading of the dual-purpose



1699
spent fuel canisters, is that what that's referring to?
A. The loading that they were going to go into dry storage, yes, those.
Q. And am I correct that several years earlier, you had indicated to SMUD that you did want to observe those activities?
A. I don't recall that, no.
Q. Okay. I'll come back to that. Now, in the second paragraph, your letter states that, "As you have indicated, the Department has previously stated its willingness to initiate the appropriate actions to include such dual-purpose storage transport system as acceptable waste forms under the terms of the disposal contract." Do you see that?
A. Yes.
Q. What did you mean in that sentence?
A. That we would take steps to do that, we would be willing to, we would take steps to renegotiate the contract.
Q. Now, did you say that, make that same statement or representation in Exhibit, Defendant's Exhibit 1298, your letter to Mr. Redeker, dated September 25th, 2003?
A. No, I think we were a little clearer at

1700
this point in time to explain that it was not covered by the contract.
Q. You were a little clearer which point in time?
A. In the September 25th, 2003 letter, we changed our "currently not an acceptable waste form and not covered by the contract" to make it a little more clear that that was our position, since there seemed to be some confusion.
Q. And why did you make it clearer in the 2003 letter from your April 6th, 2001 letter?
A. We were still getting letters that presumed, that acted like it was covered under the contract, and I think at that point in time it was decided to make the letter a little more clear.
Q. Did anything happen internally in your department between these two letters that caused you to make the September 2003 letter, in your words, more clear?
A. Not that I can recall.
Q. Okay. Can you return to Plaintiff's Exhibit 678, Mr. Zabransky?
A. Okay.
Q. Are you there, sir?
A. I believe, so yes.



1701
Q. And how is this whole process tied into -- is this whole process we're talking about here tied into licensing of the repository?
A. Ultimately it has to be, yes.
Q. And the repository hasn't been licensed yet, is that correct, sir?
A. It has not.
Q. Has the license been filed?
A. No, it hasn't.
Q. When will the license application be filed?
A. I can't speak to the exact date. I think the Department is hopeful it could be later this year.
Q. How does the licensing process relate to the issues you're dealing with in Plaintiff's 678 and Defendant's Exhibit 1298, Mr. Zabransky?
A. Well, if we're not licensed to receive certain types of containers or systems, we wouldn't be able to accommodate them under the contract.
Q. So is the problem that, because you haven't been licensed yet, you don't know what your abilities or inabilities will be?
A. That's one of the issues. It's difficult to identify exactly what will be normal and what's going to be covered by the license until we actually



1702
receive it from the Commission.
Q. Had the Department complied with the contract and began, begun picking up spent fuel on January 31st, 1998, would you have been licensed then, would you be able to answer these questions, make these determinations?
MR. LO RE: Objection, calls for speculation.
THE COURT: Sustained.
BY MR. CAYNE:
Q. Could you return to Exhibit 678, Mr. Zabransky, please?
A. Yes.
Q. The final paragraph on the first page states, "While the Department continues to believe in the overall benefits that may accrue to a multi-purpose storage transport disposal system, we are unable at this time to complete final design and acceptance criteria for the disposability aspects of such a system for commercial spent nuclear fuel." Do you see that?
A. Yes.
Q. What were you referring to as the overall benefits that may accrue to a multi-purpose storage transport disposal system, sir?



1703
A. That, from an engineering standpoint, from a purely engineering and handling standpoint, it would be nice to have a container that you could load at the utility site, transport to a repository, and subsequently bury it without having to reopen it. That's called a multi-purpose system, as opposed to a dual-purpose system.
Q. Do any multi-purpose systems exist today?
A. I do not believe they do.
THE COURT: And you need it to be vertical as well, right?
THE WITNESS: That's in the --
THE COURT: If it's going to Yucca?
THE WITNESS: That's a separate issue that might be addressable, but we don't know at this point.
BY MR. CAYNE:
Q. Let me turn your attention, Mr. Zabransky, to Plaintiff's Exhibit -- I take it, it's the same volume -- well, on the point, on horizontal versus vertical, that the Judge just mentioned, am I correct that spent fuel produced by the United States Navy will be stored at the repository, Yucca Mountain?
A. No --
THE COURT: It's stored someplace else now,

1704

1704
isn't it?
THE WITNESS: You're incorrect.
BY MR. CAYNE:
Q. Is that being picked up by the Department of Energy?
A. No, it's not.
Q. Do you have any -- how is that fuel being handled?
A. That fuel is being stored in Idaho by the Navy in containers and will ultimately be delivered to the Department of Energy at Yucca Mountain.
Q. Okay. And what type of containers is the United States Navy using, sir?
A. Actually, they are licensing their own multi-purpose disposal container that will never need to be opened.
THE COURT: But they're making their own?
THE WITNESS: They're making their own.
THE COURT: It's not available for sale?
THE WITNESS: It wouldn't be usable for commercial spent fuel.
BY MR. CAYNE:
Q. Are they horizontal or vertical?
A. When they reach Yucca Mountain, they're vertical.

1705

1705
THE COURT: They'll have to be vertical. Do you know what they are now?
THE WITNESS: I have no idea how they're stored in Idaho.
BY MR. CAYNE:
Q. Mr. Zabransky, could you, as I -- let's return, let's go to Plaintiff's Exhibit 697, please, sir.
THE COURT: What I'm hearing from you is that, right now, no one really could purchase something that could be usable at Yucca because you have no idea what would --
THE WITNESS: We have no idea, it hasn't been licensed, and whether our ideas are proven to be licensable is another question.
BY MR. CAYNE:
Q. And does that, the Judge's question, Mr. Zabransky, and your answer, would your answer apply to failed fuel also on issues, on how failed fuel would be accepted?
THE COURT: Well, that's if it's accepted.
THE WITNESS: Well, I think the, I'm not sure that it's the same question.
THE COURT: No, they're different questions, you're right.

1706

1706
BY MR. CAYNE:
Q. We'll come back to that, Mr. Zabransky. Can you turn to Exhibit 697?
A. Okay.
Q. Can you identify this exhibit? That's your name on the first page, correct?
A. Yes, it is.
Q. And who is Ed Benz?
A. Ed Benz is a contractor that works for the Department of Energy.
Q. Okay. And it's also written to Mr. Thomas Pollog. Who's Mr. Pollog?
A. Mr. Pollog works with me in the Office of Systems Analysis and Strategy Development.
Q. And there's a CC to a Robert Burgoyne. Who is that?
A. Mr. Burgoyne is another contractor that works for the Department of Energy.
Q. Now, on the, next to "Body," it says, "The attached contains some musings that were inspired by the contract change table for your consideration and perhaps discussion at tomorrow's meeting." Did I read that correctly?
A. Where are you reading that?
Q. On, to the right of the entry, "Body"?

1707

1707
A. Oh, I'm on the wrong -- sorry.
Q. The first page of the exhibit, sir.
A. Please forgive me. Okay, yes, I see that.
Q. And I just read the entry next to "Body," correct, do you see that, sir?
A. Yes, I read that.
Q. Okay. And go two pages in, please, to 0415. Are you there, Mr. Zabransky?
A. Yes, I am.
Q. And, again, the date of this memo is July 31st, 2001, correct?
A. Yes.
Q. Okay. Now, the first paragraph -- well, there's an entry there that says, "Contract change discussions." Do you see that?
A. Yes.
Q. And it says, "Utilities' overriding want is reliable service. Start date and dependable service after that. On the other hand, DOE is reluctant to make firm commitments to schedules because of potential legal exposure. Suggest that some alternative interim scheduling scheme be devised that would allow things to move toward providing service while limiting the DOE's legal exposure ." Do you see that?

1764

A. Yes.

Q. But what I was referring you to is, what I'd like to ask you is, how is that consistent with your statement at the end of paragraph one that, "Unfortunately, due to ongoing litigation between SMUD and the Department, the Department's ability to proceed with any contract modification is limited"?

A. I think that ties with the last sentence in the second paragraph, which basically says that, because litigation, we've got to figure out how to do this because we've been under discovery requests with everybody and their brother to turn over every document about everything we ever talk about, and the problems we've had with some utilities has been they haven't been willing to talk to us, knowing that whatever we talk about had to be turned over.

And we were trying to make that very clear, this limits our ability to talk in a confidential fashion.

MR. LO RE: Your Honor, Mr. Zabransky has now been on the stand for close to two hours.

THE COURT: Take a break, it's fine with me.

(Whereupon, a short recess was taken.)

BY MR. CAYNE:



1765

Q. Mr. Zabransky?

A. Yes.

Q. Are you familiar with the Oyster Creek facility?

A. Other than the fact I know it's an old boiling water reactor locator in New Jersey, I've never been there and don't have much familiarity with the BWR.

Q. Is the spent fuel held at that facility held in horizontal canisters similar to SMUD's?

A. I think it is, but I don't know for certain.

Q. And has DOE advised Oyster Creek or its owner whether DOE will accept canisters from that facility?

A. DOE has advised all the contract holders that it's not covered under the contract.

Q. And it has advised Oyster Creek that their horizontal canisters are not covered under the contract?

A. No, it's told Exelon nothing different than we've told everybody else though.

Q. Does DOE -- is DOE planning or developing plans internally to accept the dual-purpose storage canisters at Oyster Creek? Is DOE planning to accept



1766

them, putting aside what you've told Oyster Creek?

A. Other than what we were doing by telling the contractor to make sure he designs in a requirement to the extent possible, no, nothing specific for Oyster Creek.

Q. Tell me what you meant by what you just said.

A. We've asked the contractor to design facilities that are capability of accepting dual-purpose systems, so that should we reach a contract modification we can actually follow through and do it.

Q. What contract are you referring to?

A. Right now, it's BSC, Bechtel SAIC, LLC, which is the M&O contractor for Yucca Mountain.

Q. And how have you communicated to that contractor your desire that the repository be constructed in a way that spent fuel in horizontal dual-purpose canisters can be accepted?

A. No, I didn't say that. I said that we've informed them to be able to accept the family of canisters and the family of dual-purpose casks, and that shows up in our requirements documents.

Q. What does your requirements document say about that?



1767

A. It says to design the facilities to accept these types of systems.

Q. What do you mean by, "family," what's in the "family"?

A. I don't know what's specifically in the requirements document.

Q. That's not something you draft?

A. No.

Q. Under this requirement document, the dual-purpose canisters at Oyster Creek could be accepted, correct?

A. No, I didn't say that. We've given them instructions to design facilities to do that. So far, they haven't come up with a way of doing it for horizontal canisters.

Q. And assuming that they do come up with a way to satisfy the design requirement imposed by the Department of Energy, then the Oyster Creek dual-purpose canisters can be accepted, correct?

THE COURT: Mr. Lo Re?

MR. LO RE: Objection, calls for speculation.

THE COURT: It is, and it's getting a bit argumentative. Maybe you can --

MR. CAYNE: Could we just have the answer

1768
to that question, Your Honor?
THE COURT: Sure.
THE WITNESS: And I guess what I'm saying is that if the facilities can technically accommodate it and if there's a contract modification with Exelon, then, yes, they can be accepted.
BY MR. CAYNE:
Q. And in the same manner, the dual-purpose canisters at SMUD could be accepted, correct?
A. If we can solve the technical issues and if there's a contract modification, they could be accepted.
Q. Has the design, has the design process, Mr. Zabransky, has it been completed for vertical canisters?
A. Far enough to know that they'll, that the whole facility is operated in a vertical orientation, yes.
Q. But it's not completed, it's still in process?
A. The buildings have been laid out. The cranes have been laid out. Everything gets handled vertically, so it's not completed, no, but we know enough about the layout to know that it's going to be vertically based.



1769
Q. Do you know if the SMUD canisters would be loaded and unloaded vertically?
A. It's my understanding --
THE COURT: This is at Yucca Mountain?
THE WITNESS: At Yucca --
MR. CAYNE: No, Rancho Seco.
MR. LO RE: Objection, Your Honor, this assumes facts not in evidence.
THE WITNESS: I have a general understanding of how they work.
BY MR. CAYNE:
Q. And do you know if the SMUD canisters at Rancho Seco are loaded and unloaded vertically?
A. The fuel is placed into them while they're vertical, then they're put in a horizontal configuration, at which point there's no way to take them out and pick them up vertically anymore.
THE COURT: Why is that?
THE WITNESS: There's no lifting pinion, as far as I know, on the end of the canister that's sufficient to hold its weight. The lid is designed to push and pull, but there's really no attachment point on the outer lid that can be attached to a crane and lifted out of the transportation cask.
THE COURT: But a crane took it out of the



1770
pool and put it in other places.
THE WITNESS: But the, yes, but the lifting lugs are inside the canister and gets sealed over by a lid, so we are looking into that, but it's not resolved yet.
THE COURT: So it might be that you could put a little cap or something on there and then be able to lift it possibly?
THE WITNESS: We've asked the vendors, we have a proposal out to the vendors to ask them, is there any way you could figure out of doing this with your canisters? But we haven't finished that activity yet.
THE COURT: When are they supposed to get back in touch with you about that?
THE WITNESS: The bid packages just went out very recently, so probably won't be done for a while.
BY MR. CAYNE:
Q. Bid packages went out for what, sir?
A. Analysis for the usability of currently licensed systems at Yucca Mountain for aging.
Q. Mr. Zabransky, pointing you to the demonstrative we used last week called, "Dual-Purpose Dry Storage Facilities in U.S.," can you see that?



1771
A. Yes.
Q. The first entry is for Exelon/Dresden 1, 2, 3, HI-STAR, HI-STORM?
A. Yes.
Q. Is that, to your knowledge, a dual-purpose canister?
A. I believe --
Q. Does that facility use dual-purpose canisters?
A. I believe that is a dual-purpose canister, and if they're using them, I believe the answer's yes.
Q. Vertical or horizontal?
A. Vertical.
Q. Vertical. The next one under it, Mr. Zabransky, Exelon/Peach Bottom, 2, 3. Are you familiar if that's a dual-purpose canister?
A. No, it's not.
Q. Amor General Oyster Creek, you see that NUHOMS-61BT?
A. Okay, yes.
Q. Is that a dual-purpose canister?
A. Yes, it is.
Q. Vertical or horizontal?
A. Horizontal.

1772
Q. Duke Energy, at the bottom, you see that Oconee 1, 2, 3?
A. Oconee.
Q. Yeah.
A. Yes.
Q. Is that dual-purpose?
A. Yes, it is.
Q. Horizontal or vertical?
A. It's horizontal.
Q. The one above it, Dominion Generation?
A. Uh-huh.
Q. Is it dual-purpose, dual-purpose canister?
A. I believe that one is, I'm not -- yeah, I believe it's a pressurized transportable high heat, yes.
Q. And is that horizontal or vertical?
A. It's horizontal.
Q. And you were just looking at North Anna 1 and 2?
A. Okay.
Q. How about Dominion Generation/Surry 1 and 2?
A. Yes, I see it.
Q. Dual-purpose canister?
A. It's expected to be, according to that



1773
chart. It's not there yet.
Q. Okay. And is that vertical or horizontal?
A. That's horizontal.
Q. Constellation Nuclear/Calvert Cliffs 1 and 2, do you see that?
A. Okay.
Q. Is that dual-purpose canister system?
A. I believe that is.
Q. Do you have a belief whether it's vertical or horizontal?
A. All the NUHOMS are horizontal.
Q. They're all, and so, then with respect to the NUHOMS, they would all, all the utilities, in your view, would be in the same position as SMUD, in your view, that the Department has not agreed to accept these yet, is that your position?
A. I believe it's with every one on that list, we haven't agreed to accept any of those dual-purpose systems.
THE COURT: Under the contract?
THE WITNESS: Under the contract.
THE COURT: It doesn't mean you won't perhaps in the future, if the contract has been renegotiated and perhaps you can figure out some technical way of lifting it?



1774
THE WITNESS: Yes, that's correct.
THE COURT: Okay.
BY MR. CAYNE:
Q. Are there other utilities that have dual-purpose canister systems, Mr. Zabransky, that are not on that demonstrative, to your knowledge?
A. Oh, I couldn't venture a guess, given your extensive list. I don't know.
Q. Based on your work as contracting officer, you can't tell if we're missing any on this list?
A. Based on my 50-year-old memory, no, I can't remember.
Q. Could you turn to Plaintiff's Exhibit 537, Mr. Zabransky? Are you there, Mr. Zabransky?
A. Yes, I am.
Q. Okay. This is a statement of Lake Barrett, acting director to the Subcommittee on Energy and Power of the House of Representatives, dated April 29th, '97, correct?
A. That's what it says, yes.
Q. Okay. And can you turn to page five?
A. Okay.
THE COURT: Counsel, I'm sorry, which binder number is that in?
MR. CAYNE: Your Honor, it is number two of



1775
three.
THE COURT: Two of three?
MR. CAYNE: Correct.
BY MR. CAYNE:
Q. Are you there?
A. Yes, I am.
Q. Can you turn to page five? And there's an entry for waste acceptance.
A. Okay.
Q. And do you see it says, in the second sentence, it says, "Earlier this month Secretary Pena met with representatives of the utility industry, environmental organizations, and state public utility commissions to discuss ways of mitigating the impacts of the delay. These discussions were constructive." Do you see that?
A. Yes, I do.
Q. Did you participate in those discussions?
A. I did not participate in the discussions, I don't recall, no.
Q. Did you brief the Secretary with respect to those discussions?
THE COURT: He was acting director.
MR. CAYNE: I'm talking about Secretary Pena, Your Honor.

1804
THE COURT: This is in your noticed argument, I see.
MR. CAYNE: Yes.
THE COURT: Okay.
MR. CAYNE: And obviously, they have specific information about SMUD here, Your Honor.
THE COURT: Right.
MR. CAYNE: And about the other utilities.
THE COURT: But that's a different issue than what you do, what someone else knows is different than what you do.
MR. CAYNE: Your Honor, I believe that a lot of this information would have come directly from SMUD, and that's what I was trying to inquire about, and that's the reason, Your Honor.
THE COURT: We're fine to let you do that.
MR. CAYNE: Could I restate the last question then?
THE COURT: You may. You may.
BY MR. CAYNE:
Q. Mr. Zabransky, do you know whether Mr. Pollog or anyone else at the Department of Energy directed the contractors who obtained the information for this document to contact utilities directly?
A. I do not.



1805
Q. Thank you.
THE COURT: And this document was prepared after there was a lawsuit filed?
THE WITNESS: It continues to be prepared today.
THE COURT: Right. So it's unlikely that you would have him talking to the enemy in that sense.
BY MR. CAYNE:
Q. Did your office, Mr. Zabransky, use the information of the type reflected in Plaintiff's Exhibit 675 to determine the Department's potential liability to the utilities for the breach of contract?
THE COURT: Sustained.
MR. LO RE: Thank you, Your Honor.
MR. CAYNE: Your Honor, may I, for the record, ask why that objection was sustained?
THE COURT: You just asked him a legal question, to determine the Department's potential liability. They're arguing they had no liability.
MR. CAYNE: Your Honor, let me get to the next document then, and the Court will see where I'm going.
THE COURT: All right.



1806
BY MR. CAYNE:
Q. Mr. Zabransky, could you please turn to Plaintiff's Exhibit 626? Are you there, sir?
A. Yes, I'm there.
Q. And the first page says, "Parametric Analysis For Future Program Costs Scenarios," September 16th, 1999.
A. Okay.
Q. And it has Lake Barrett's name, correct?
A. Correct.
Q. And was he the acting director of the, your department at this time?
A. Yes, he was.
Q. Okay. And if I could turn your attention --
THE COURT: Have you seen the document before?
THE WITNESS: I recall a document, I'm not sure it was this one, but I recall a document like this that was used to brief OMB.
THE COURT: Okay.
BY MR. CAYNE:
Q. To brief who?
A. OMB.
Q. Mr. Zabransky, take whatever time you need



1807
to look at the document to refresh your recollection, but what I want to ask you about, the information I'd like to ask you about appears on page 21, are you there?
A. Yes, okay.
Q. Okay. This says, "Take title cost assumptions," and there is an entry for dry storage facility start-up, do you see that, 10 million dollars?
A. Now, you're on page?
Q. 21, Bates number 5090.
A. I don't have that on my 21.
THE COURT: I don't either. The witness and I have the same document.
MR. CAYNE: I'm on Exhibit 625, Your Honor.
THE WITNESS: 626, you said.
BY MR. CAYNE:
Q. Then I misspoke, I apologize, Plaintiff's Exhibit 625, sorry, sir, and Bates number 5090.
A. So we're on page 21 of this document?
Q. Yes.
A. Okay.
Q. Are you there? And then you see it says, "Take title cost assumptions"?
A. Yes.

1808
Q. Now, how did your office use the information in this document, particularly on this page, to brief OMB or for any other purpose?
MR. LO RE: Your Honor, I'm going to object on foundation grounds. Mr. Zabransky has not testified that he is familiar with where these data came from. I believe he only --
THE COURT: We can ask some questions about it then. Why don't you do that?
BY MR. CAYNE:
Q. Mr. Zabransky, and, again, as I said, feel free to look at the whole document to put it into context, but my first question is, where did the information on page 21 come from? For example, it says, "10 million dollars for dry storage facility start-up." Do you see that?
A. Yes.
Q. Where did that figure come from?
A. I believe, quite frankly, Mr. Pollog, myself, based upon advice we received from other parties, like our contractors, decided this was an appropriate number, based upon my past experience and what I was reading things were costing in the paper.
Q. So dry storage facility start-up, that entry refers to what?



1809
A. Building a facility.
Q. What kind of a facility?
A. A dry storage facility, this is a very general, not specific exercise. This is, this was done to try to at the time, as you pointed out earlier, Secretary Richardson was interested in a take title proposal. This was fleshing out what it might cost to take title, so it was done, by necessity, very generally.
Q. And am I correct, sir, and I don't think I have the document here, but if you don't recall, I'll get the document tomorrow, did you prepare similar analyses in earlier years with different and lower figures?
A. I don't recall. These figures, we adjusted periodically.
Q. Okay. And how often did you prepare this chart?
A. This is the only time I did this chart.
Q. Well, you said you adjusted periodically, I thought.
A. Well, you asked me if my estimates or assumptions as to what it costs to adjust to -- if some of these are adjusted, and the answer is, they would be, based upon what we're observing people are



1810
saying they're paying for things in papers and other things.
Q. Do you see the next entry, "Dry Storage Operations"? What is that referring to?
A. That's the cost to operate a stand-alone dry storage facility, and this was a DOE kind of cost. We looked at this as DOE take title, so as I recall, that's what we estimated it would take us to maintain the facility.
Q. So in other words, to put it in context, if DOE had settled this litigation by taking title to Rancho Seco, if these numbers had applied to that, this would mean your estimate was it would take 5 million dollars to operate the Rancho Seco dry storage facility, the ISFSI?
MR. LO RE: Objection, Your Honor, calls for speculation, assumes facts not in evidence.
THE WITNESS: No, I didn't say that. I said that's what we figured DOE's costs would be, recognizing that DOE does nothing as cheaply as the private sector.
BY MR. CAYNE:
Q. Do you see the next entry, "Storage Casks"?
A. Uh-huh.
Q. $100 per KG?



1811
A. Yes.
Q. Now, I had to check this myself, I'm embarrassed, but am I correct that an MTU is equal to 1000 KG?
A. Yes.
Q. Okay. So what would the costs for storage casks be if you were looking at 229 MTU under this, under these assumptions?
A. I'd have to get a calculator. I recall it was like a -- boy --
Q. I'll get a calculator, sir.
A. Then you can calculate it.
MR. CAYNE: Your Honor, may I hand the witness a calculator?
THE COURT: Sure.
BY MR. CAYNE:
Q. Under this assumption from, this is from 2002, Mr. Zabransky -- excuse me, 1999, from September 16th, 1999, based on this assumption of $100 per KG, how much would it cost to build, construct storage casks capable of holding 229 metric ton units?
A. Well, let's see, if I did that right, it's 100 times 1000, times -- is that right? So $100 per kilogram, times 1000 kilograms per metric ton, times

1812
229, 2 point -- that's too many zeros. $22,900,000, I believe.
Q. And so then the total under those, under these assumptions on Exhibit 625, as of September 1999, the total assumed cost to start up a dry storage facility, together with storage casks to hold -- sufficient to hold 229 metric ton units, would be a little north of 32 million dollars, as of 1999, correct?
A. Yes.
Q. Okay. And do you recall, the information for your estimates on the storage cask costs, who developed that information?
A. Again, I think myself and Mr. Pollog, based upon information we obtained from contractors and what we had read in papers and other filings, this was a good average number, and it included building incremental pads and everything else. So it wasn't just the storage cask, per se, it was just a general number, since this isn't any specific analysis to any specific type of cask, any specific facility, any specific location.
Q. But you said it's a good, what was your phrase, good average number?
A. General number, it was a good number for --



1813
THE COURT: It's a back of an envelope number he's doing, basically, for the purposes of bean counters at OMB.
THE WITNESS: Yes.
BY MR. CAYNE:
Q. But the contractors you spoke to, who were the contractors?
A. I would have spoken to Mr. Benz and -- probably Mr. Benz at that point in time.
Q. You said you looked at filings?
A. We had looked at FERC filings from other people, and we had looked at, in the past, I had bought casks, I had designed and had filed for a facility, so I had some general knowledge of this.
Q. So in 1999, you thought this was a reasonable rough calculation of the costs to build a dry storage facility and storage casks to hold, as we said in my example, 229 metric ton units, correct?
A. Yes.
Q. Thank you. Could you turn to the next page, please, page 22?
A. Okay.
Q. Bates 5091.
A. Yes.
Q. Do you see there are a number of, the top



1814
of the chart says, "Cumulative Take Title (MTUs)," do you see that?
A. Yes.
Q. And there are a number of lines?
A. Yes.
Q. The bottom line says, "ACR Cumulative"?
A. Yes.
Q. First, can you explain to me what this chart is? And then we can break down what these individual lines are.
A. Okay. These, this is the chart that goes to show that, under a scenario where DOE would take title, under different acceptance rates or different take title rates, how much it would ultimately take title to.
Q. What is the line, "ACR Cumulative"?
(6:00 p.m.)
THE WITNESS: That's 46999 for 10 years, and no more, it's 8200 tons.
BY MR. CAYNE:
Q. And what is, "ACR-E Cumulative"?
A. That's 46999999 extended, ad nauseam.
Q. Well, why does the first entry end -- not go up after, it looks like 2007, am I reading that right?



1815
A. Yes, because it stops in 2007.
Q. And why does it stop in 2007?
A. Because that's all that was published in the ACR.
Q. Was it your view that the Department's obligation didn't go beyond that?
A. This is an illustrative example.
MR. LO RE: Objection, Your Honor.
THE COURT: Sustained.
BY MR. CAYNE:
Q. Mr. Zabransky, what is, did you already say what the top line is? If you did, I apologize.
A. The top line?
Q. The line for, "Utility Legal Claim Cumulative"?
A. That was the claim that utilities had made in litigation, that the rates should be the rates used in DOE planning documents.
Q. And what's, "Fitzgerald Cumulative"?
A. That was a rate put forth by Senator Fitzgerald at one point in time.
Q. Rate put forth in what context, do you know?
A. I don't know if he had proposed legislation or he was talking about proposed legislation.

1826
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
--------------------------------x
SACRAMENTO MUNICIPAL UTILITY :
DISTRICT, :
:NO. 98-488C
Plaintiff :
vs. :
UNITED STATES, :
Defendant. :
-------------------------------- :
Courtroom 5
National Courts Building
715 Madison Place
Washington, D.C.

Tuesday, March 29, 2005

VOLUME 7

The parties met, pursuant to the notice of the Judge at 9:00 a.m.

BEFORE THE HONORABLE SUSAN G. BRADEN



1827
APPEARANCES:
ON BEHALF OF PLAINTIFF:
DAVID S. NESLIN, ESQ.
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter LLP
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

HOWARD N. CAYNE, ESQ.
Arnold & Porter LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-5656



1828
APPEARANCES (Continued:)

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
JOSHUA E. GARDNER, ESQ.
TODD J. COCHRAN, ESQ.
SCOTT DAMELIN, ESQ.
RUSSELL SHULTIS, ESQ.
ELIZABETH THOMAS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

ALSO PRESENT:
STEVEN M. COHN, ESQ.
STEVE J. REDEKER
THOMAS POLLOG

***Index appears at end of transcript***



1829
P R O C E E D I N G S
- - - - - -
THE COURT: Let's go.
Whereupon--
DAVID ZABRANSKY
a witness, called for examination, having previously been duly sworn, was examined and testified further as follows:
CROSS-EXAMINATION (Resumed)
BY MR. CAYNE:
Q. Good morning, Mr. Zabransky.
A. Good morning.
Q. I'd like to turn your attention to Plaintiff's Exhibit 121. I believe that will be in the first binder, one out of three. Do you have that document before you, sir?
A. Yes, I see it.
Q. And is this document a memorandum from you to -- was this a memorandum from you, sir?
A. It's an e-mail from me to Mr. -- I believe it's Auke Piersma.
Q. And who is that person?
A. Mr. Piersma used to be with a group called Public Citizen.
Q. And there's also a CC?
A. Yes.

1910

THE COURT: Well, you can do that, but I want to be sure he's careful enough to read the transcript before he gives an answer. Do you want to mark this as an exhibit?

MR. CAYNE: Yes, Your Honor. Do we know what number?

THE COURT: I think you're at 2004.

MR. NESLIN: 1004, Your Honor.

THE COURT: I think.

MR. LO RE: Your Honor, are we going to mark the entire transcript here?

THE COURT: You know, I don't know, it's up to the --

MR. LO RE: We would object to --

MR. CAYNE: We would mark the entire transcript, Your Honor.

THE COURT: Well, I think his objection goes to the fact that the witness is here, unless you think everything he's testified to is a problem and inconsistent.

MR. LO RE: Yes, Your Honor, in fact, this goes directly to the effort that Plaintiffs made to designate pages and pages of Mr. Zabransky's testimony. I would say this is a backdoor way apparently of getting all that testimony into the



1911

record in this case and --

THE COURT: Well, why don't you refresh his recollection first? Then we'll go to the specific area you want to impeach him with, if you have it, and then we'll mark that.

MR. CAYNE: And, Your Honor, we can go through, there are a number of areas in this beyond what we're dealing with right now that I still want to deal with this witness on, and my plan was not to mark the whole thing and go through it basically issue-by-issue, it's just a matter of time, but I'm more than happy to go through it issue-by-issue.

THE COURT: Okay.

BY MR. CAYNE:

Q. Mr. Zabransky, did you appear as a witness in the Yankee Atomic trial this summer, by Yankee Atomic, it's Yankee Atomic Power Company versus United States?

A. I think, yeah, it was in 2004, yes.

Q. And you were sworn to testify?

A. Yes, I was.

Q. And you appeared before Judge Merow?

A. Yes, I was.

Q. And you swore to testify honestly, correct, sir?



1912

A. Yes, I did.

Q. Okay. And could I refresh, and look at any parts of the transcript you would like to, but I specifically am going to ask you about, Mr. Zabransky, and take your time to read it, and let me know when you're done, and I won't ask until you're done reading, is I'd like to turn your attention to transcript page 4166 and 4167, could you please read that and anything else you need to put it in context and tell me after you're completed, sir?

A. Okay.

Q. Now, does reading that transcript refresh your recollection whether you have taken in the past a sworn position whether the Department of Energy was trying to minimize its obligations to utilities by using the acceptance rates that were used in the 1995 ACR for which you bore responsibility?

A. I think, as it says in the transcript, my opinion was I thought they were trying to, but I've never heard them say that. As of that point in time, they thought they had a conditional obligation, that obligation wasn't really complete, unless there was a repository constructed under the Act. So this says my opinion was that, but I don't recall anyone at DOE telling me that that's why they were doing things.



1913

Q. Were you, yourself, an official at the Department of Energy at this time?

A. I was an eight-month employee at the Department of Energy, so, no, I was not an official at the Department of Energy.

Q. What was the basis for your opinion, sir?

A. Because I felt they had an obligation before I came to the Department of Energy and I saw this as a way of trying to manage an obligation, if you had an obligation and you had a question about meeting it, you didn't make it bigger than you had to. Now, that's what I would have done, but that was my opinion.

Q. What do you mean you thought they had an obligation before? You felt they had what obligation before?

A. I think I testified yesterday that when I was at Wisconsin Electric, we thought that there was a obligation on the part of the Department of Energy to begin picking up fuel in 1998.

Q. And at that time, did you believe the obligation was at a level of 3000 MTU?

A. No, I didn't. I believe it was what we signed up to in the DCSes, sir.

Q. Sir, did you believe, back when you were at

1914
Wisconsin Power, that a reasonable acceptance rate would have been a rate that reflected the aggregate rate of discharges of the industry, plus some amount of work off?
A. Absolutely.
Q. And what does that mean, in your mind?
A. What it equates to simply is about 3000 metric tons a year, sir, I believe that would have been a reasonable acceptance rate.
Q. So you believe that a reasonable acceptance rate was 3000 MTU per year, correct?
A. I believe that.
Q. Thank you, sir. And turning to transcript page 4167, you indicated that you weren't sure whether there were any other reasons, other than to limit liability, that --
THE COURT: Sustained.
MR. LO RE: Thank you, Your Honor.
BY MR. CAYNE:
Q. Mr. Zabransky --
THE COURT: I don't see the word "liability" anywhere on the page, counsel.
BY MR. CAYNE:
Q. Mr. Zabransky, am I correct, and does this transcript, particularly page 4167, refresh your



1915
recollection that at the time of the Yankee trial, you were unable to identify any reasons for the Department's use of the acceptance chart in the 1995 ACR, other than constituting an effort to minimize the Department's obligations?
A. Again, that was my opinion. I couldn't recall any other specific reasons.
THE COURT: I see you, Mr. Lo Re, do you want to talk about something? I mean, I think he corrected his characterization of the witness' testimony. That was my problem.
MR. LO RE: That's fine.
THE COURT: Do you have an additional problem?
MR. LO RE: That's fine. I am just going to state for the record that I think we are passing the refresh the witness' recollection.
THE COURT: He's trying to impeach him, I know that.
MR. LO RE: Clearly, Your Honor. Thank you.
THE COURT: I mean, typically, what you do is, you know, is that you ask him what he knows. If he says he doesn't remember, then you read the question and the answers as they appear in the



1916
transcript, and you ask him, do you remember giving, being asked that question and giving that answer? You've kind of slopped over the formalities here. But why don't you continue with your next question?
MR. CAYNE: Thank you, Your Honor. I'd like to turn the witness' attention to Plaintiff's Demonstrative number 33. I'm going to put it on the overhead.
BY MR. CAYNE:
Q. Do you have that document, Mr. Zabransky?
THE COURT: It's the big black binder. It's the one that has the plastic. That's the acceptance rate announcements and teeny-weeny print at the bottom. Let me know if you can read it because I can't.
BY MR. CAYNE:
Q. Mr. Zabransky, do you have the exhibit in front of you?
A. Yes, I do.
THE COURT: Do you have a magnifying glass? I really cannot see the bottom print at all. If you don't, I'll bring one. No, I've got glasses, that's not the issue. I read better with the glasses off. For distance, it's fine.
MR. CAYNE: I can read the entries into the



1917
record, Your Honor.
THE COURT: When you get to the little print, tell me what it says.
BY MR. CAYNE:
Q. Mr. Zabransky, I want to ask you some questions about this demonstrative exhibit covering the period of time that you were at the Department of Energy. And what this is intended to reflect, Mr. Zabransky, is acceptance rate announcements by the Department of Energy, and you'll see it starts in 1995 with the ACR, the 1995 acceptance priority ranking and annual capacity report, which is Plaintiff's Exhibit 396, and the analysis of the total life cycle costs of the Civilian Radioactive Waste Management Program, which is Plaintiff's Exhibit 429.
And this is intended to reflect that those two documents reflected an announced acceptance rate of 900 MTU per year. Do you see that, sir?
A. Yes, I see what it says.
Q. And do you agree with me that those two documents reflected an announced acceptance rate by the Department of 900 --
THE COURT: Mr. Lo Re?
MR. LO RE: Your Honor, I'm going to object

1918

to this question on the grounds that Mr. Zabransky has not seen these documents. To the extent that Mr. Cayne would like to examine him about it, I think it's only fair that Mr. Zabransky be shown the documents.

BY MR. CAYNE:

Q. Let's turn to the underlying documents. And let's, first on, let's go through them one-by-one, Mr. Zabransky.

A. Sure.

Q. The PE-396, I believe you've looked at that, but please put it in front, please take another look at it if you need to?

THE COURT: This is 1990?

MR. CAYNE: 1995, Your Honor. The 1995 acceptance priority ranking, I believe this is the document the witness indicated that he had responsibility for.

THE WITNESS: It's got --

BY MR. CAYNE:

Q. And am I correct that that document announced an annual acceptance rate, or projected an annual acceptance rate of starting -- actually, it started with less than 100 a year, and it ratcheted up, in about year, 4 to 900 MTU per year?



1919

A. You're correct, sir.

Q. Okay. And let's turn to the next document, PE-429, that is the analysis of the total system life cycle cost of the Civilian Radioactive Waste Management Program. And, again, that's PE-429.

A. PE-429, I don't have a PE-429, we don't have that.

Q. We don't have that in our binder, my apologies, sir.

THE COURT: Let me ask you, Counsel, what point do you want to make from this line of questioning? I assume, basically, the DOE changed their acceptance rates. We see that in the chart.

MR. CAYNE: Your Honor, that's all I want, is --

THE COURT: And the witness, do you dispute the fact that DOE changed its acceptance rates in 19 -- looks like 1987? 1990, and '91 and '92 and '93 and '94 and '95, but then they went and resumed basically some place mid-'95 back up to 3000.

THE WITNESS: I believe, speaking from '95 on, I believe that that reflects accurately what's in the planning documents, yes.

THE COURT: All right.

THE WITNESS: Before that, I can't speak.



1920

THE COURT: Do you know why they had lower rates, significantly lower rates in 1990 than 1995?

THE WITNESS: Only what I, you know, I wasn't at DOE then, but my understanding was they were basing it on their expectations for MRS.

THE COURT: All right.

THE WITNESS: But --

THE COURT: Is there anything else more to learn from this document?

MR. CAYNE: No, Your Honor.

THE COURT: Okay. The witness is leaving at 12:30.

MR. CAYNE: He's been excused for 12:30.

THE COURT: He asked yesterday. I didn't realize that we were going to be going along like this. We used 20 minutes this morning with argument.

MR. CAYNE: Okay, Your Honor.

THE COURT: So that's why I'm kind of trying to focus you on what's important here.

MR. CAYNE: I'll move as quickly as I can, Your Honor.

THE COURT: Yeah, to what's important.

MR. CAYNE: I'll see if I can drop anything.

THE COURT: It's not that the point is --



1921

let's focus on what's relevant, what's important. He's not been resisting you, just ask him directly what you want to know.

MR. CAYNE: I'm sorry, I didn't hear what you said.

THE COURT: Ask him what you want to know about something, rather than beating around the bush to get there. He hasn't resisted.

BY MR. CAYNE:

Q. Did you, did the new process of DCS issuances begin in 2004?

A. Yes, in 2004 --

MR. LO RE: Your Honor, I will not object to the witness answering this question. Go ahead.

THE WITNESS: Oh, okay. 2004, based upon the Department's expectation that the repository would be available in 2010, I was instructed to resume the DCS scheduling process so that utilities could submit DCSes for 2010, 63 months prior to 2010.

BY MR. CAYNE:

Q. And did you issue -- and if you could turn to Plaintiff's Exhibit 772, please, and I'll ask who instructed you to rebegin the process, sir?

MR. LO RE: Your Honor, I will object to the continuing line of questions about this as being

0001
IN THE UNITED STATES COURT OF FEDERAL CLAIMS
---------------------------------x
SOUTHERN NUCLEAR OPERATING )
COMPANY, ALABAMA POWER )
COMPANY, and GEORGIA POWER )
COMPANY, )
Plaintiffs, ) No. 98-614C
v. )
THE UNITED STATES, )
Defendant. )
---------------------------------x

Deposition of DAVID ZABRANSKY
Washington, D.C.
Tuesday, April 12, 2005
9:33 a.m.

Job No.: 1-53967
Pages 1 - 99
Reported By: Joan V. Cain



Deposition of DAVID ZABRANSKY, held at the law offices of:

ARNOLD & PORTER
555 Twelfth Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

Pursuant to Notice, before Joan V. Cain, Certified Court Reporter and Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, A GEORGIA POWER COMPANY:
M. STANFORD BLANTON, ESQUIRE
K.C. HAIRSTON, ESQUIRE
BALCH & BINGHAM, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 226-3417

ON BEHALF OF DEFENDANT:
HEIDE L. HERRMANN, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION
1100 L Street, Northwest
Washington, D.C. 20530
Telephone: (202) 305-3315



C O N T E N T S


| EXAMINATION OF DAVID ZABRANSKY | PAGE |
|---|---|
| By Mr. Blanton | 6 |


E X H I B I T S
(Attached to the Transcript.)


| ZABRANSKY DEPOSITION EXHIBITS | PAGE |
|---|---|
| 1 Protective Order, 4/8/05 | 11 |
| 2 DOE Report, July 2004 | 12 |
| 3 Letter from Mr. Zabransky to Mr. Cocherell, 7/28/04 | 16 |
| 4 Civilian Radioactive Waste Management System Requirements Document Rev 06 | 49 |
| 5 Letter from Mr. Zabransky to Mr. Cocherell, 12/1/04 | 26 |
| 7 Summary of Mr. Garrish's Statement, 3/10/05 | 31 |
| 10 Letter from Mr. Zabransky to Mr. Carden, 11/3/04 | 23 |
| 13 Copy of Protective Order Filed 2/14/05 | 76 |

E X H I B I T S C O N T I N U E D
(Attached to the Transcript.)

| ZABRANSKY DEPOSITION EXHIBITS | | PAGE |
|---|---|---|
| 14 | Document Titled Casks Suitable for Use, 3/14/03 | 64 |
| 15 | Letter from Mr. Cocherell to Mr. Watkins, 3/29/01 | 69 |
| 16 | Strategic Plan for Transportation of Spent Nuclear Fuel, 11/18/03 | 70 |
| 17 | E-mail to Mr. Kouts with Attachment, 11/14/03 | 77 |
| 18 | E-mail Chain | 90 |



P R O C E E D I N G S
DAVID ZABRANSKY
having been sworn, testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, AND GEORGIA POWER COMPANY
BY MR. BLANTON:
Q Mr. Zabransky, good morning. My name's Stan Blanton. I represent Southern Nuclear Operating Company, Alabama Power Company & Georgia Power Company and each of those three companies against the United States of America regarding the spent fuel litigation.
We've met before because I've deposed you before. Welcome back to the witness chair.
A Nice to see you again.
Q It's not my intention to replow old ground today. I'm not going to ask you about things I or anybody else have already asked you unless there's something in any of that previous testimony that you'd like to change or take back. Is there anything you want to change or take back?



A Not to my knowledge. I haven't reviewed the previous testimony. I don't know of anything offhand right now.
Q You know from the times your deposition's been taken before, is I'll ask you questions and you're entitled to have a question that you understand and can answer. So if I ask you a question that you don't understand or you feel I've misstated the facts in some way, will you stop me and ask me to rephrase my question?
A Yes, I will.
Q And will you give verbal answers so the court reporter can take down your answers?
A I will try to, and if I don't, please remind me, and I will clarify.
Q And you're physically well and able to testify today?
A I think so. A little tired, but I'm okay.
Q Okay. We're in the same boat then?
A Yeah.
Q What is your current position at -- I assume you're employed by the Department of Energy;



is that right?
A Yes, I am.
Q What's your current position?
A I work for Chris Kouts in the Office of Systems Analysis and Strategy Development I think it's called now.
Q Do you have a title or position description?
A I am a nuclear industry specialist, and I also act as the contracting officer for the contracts, the standard contracts.
Q That was my next question, you're still the contracting officer for Southern Nuclear's contract with -- or actually for Alabama Power and Georgia Power's contracts with the federal government for high-level waste in spent nuclear fuel?
A That's correct.
Q You mentioned that you had not reviewed your testimony from either the last deposition or any previous trial testimony; is that correct?
A Not for this deposition, no.
Q What if anything had you reviewed in

preparing for this deposition?
A In preparing for this deposition, I looked to see if there was anything that would have aided me in addressing the subject of the 30(b)(6) deposition and didn't find anything.
Q What do you understand that you have been designated to testify about pursuant to our 30(b)(6) deposition notice?
A Well, I understand that the topic that I recall off the top of my head is the government's plans to pick up spent fuel from Hatch, Farleigh, or Vogtle. I believe that's V-o-g-t-l-e; is that correct?
Q I get it wrong about 50 percent of the time as well. I'm not going to go on the record as to how it's spelled. VEGT is what I call it.
MR. BLANTON: Ms. Herrmann, is there any other topic that Mr. Zabransky's being designated to testify about?
MS. HERRMANN: Yes. We heard from Mr. Kouts yesterday with regard to the 2004 APR/ACR. Mr. Zabransky is here to talk about any plans that



may exist for picking up Southern Nuclear's fuel, and the third topic that the judge ordered, which is the equipment that may have been available for start of pick-up in 1998.
BY MR. BLANTON:
Q All right, sir. Do you also understand that you've been designated by the government to testify about the government's position as to what equipment it would have used in 1998 had it performed to pick up and transport spent nuclear fuel?
A From Hatch, Farleigh, and Vogtle, yes, I do.
Q And in addition to that, Mr. Zabransky, we've noticed your deposition in your personal capacity to ask you questions about things that have happened since the last time you testified in the program. The government filed a Motion for Protective Order as to that deposition notice, and the court has ruled and, with counsel's agreement, we'll make the court's order an exhibit to your deposition. We marked this copy as exhibit Kouts' 1



yesterday in Mr. Kouts' deposition, and I propose we mark that as Zabransky 1 in your deposition.
MS. HERRMANN: That's fine with me.
MR. BLANTON: And we'll make photocopies of those and attach them to the transcript after we get through today.
(Zabransky Deposition Exhibit 1 was marked for identification and was attached to the deposition transcript.)
BY MR. BLANTON:
Q Mr. Zabransky, have your job duties changed since you last testified -- since you testified in the Yankee trial?
A When was that?
Q August of '04.
A No, I don't believe so.
Q All right. I'm going to show you what was marked as Exhibit 2 to Mr. Kouts' deposition yesterday, and it will be marked as Exhibit 2 to your deposition as well, and it is entitled the Acceptance Priority Ranking & Annual Capacity Report for the U.S. Department of Energy, July 2004.



(Zabransky Deposition Exhibit 2 was marked for identification and was attached to the deposition transcript.)
BY MR. BLANTON:
Q Have you seen that document before?
A Yes, I have.
Q Did you have a role in preparing or issuing that document?
MS. HERRMANN: Before you answer, let me just -- I will object beyond the scope, because I don't believe -- since Mr. Zabransky is not the 30(b)(6) witness that's here to testify about the 2004 APR, and I don't believe the judge's order contemplates asking him about this. I'll just object beyond the scope. Go ahead, if you remember the question.
A Did I have a role --
MR. BLANTON: Well, just for the record, I don't agree with your characterization of what the judge has told us we can ask, but I don't understand you to be telling him he can't answer the question.
MS. HERRMANN: That's correct. And I think

we have the same disagreement that we did yesterday, but, you know, hopefully there's not going to be a lot of rehashing, and so we can get through this without arguing about it.
BY MR. BLANTON:
Q Now, have we sufficiently erased any memory of the question from your mind? The question was, what was your role, if any, in the preparation of the APR/ACR for 2004?
A Mr. Pollog, who works with me, prepared the document, and my role was primarily to take this document and send it out to the contract holders, as the basis for DCSs.
Q So you were more or less a conduit for Mr. Pollog to the contract holders. You didn't write any of the words or review or revise any of the language in the ACR/APR?
A I think I may have commented on it, but I don't know specifically what comments I would have had or what exact word changes we would have made. Tom and I worked on this, but he did all the work.
Q Do you know where the acceptance rates in



Table 1 on page 2 of the report came from?
A Those were provided to us, myself and Tom, by Mr. Kouts.
Q Do you know what the basis of those rates were?
A I believe they're the same rates that are in the program planning documents.
Q Have you yourself done anything to arrive at particular acceptance rates that should be included either in the program planning documents or in the ACR/APR?
A I have not.
Q Do you have any role in the planning either for the submission of the license application or in any other aspect of the development of the repository?
A In assisting Mr. Kouts, I have -- I reviewed documents at times at his request to look at them for technical issues, but, no, not really, no direct role.
Q Is your primary responsibility interacting with contract holders concerning the administration



of a contract?
A It's one of my responsibilities.
Q Okay. As I understand your testimony, you don't have a role in preparing the license application?
A No, I do not.
Q I also understand, from your testimony, you don't have a role in either the design or causing the construction of the repository to go forward; is that correct?
A The only role we have in design would be in Mr. Kouts's office, the area of integration to look at how the pieces of the program fit together and to advise the director's office as to other issues that may be arising, if any. But, no, with respect to the design itself or construction, no, I do not.
Q When you use the word "integration," could you be more specific or maybe elaborate on what you mean by that?
A That would be how the repository designs are compatible with the transportation designs are compatible with waste forms that may exist or



materials in spent fuel in general.
Q I'm going to show you what was marked as Exhibit 3 to Mr. Kouts' deposition yesterday, and we'll mark it as Exhibit 3 to yours as well.
(Zabransky Deposition Exhibit 3 was marked for identification and was attached to the deposition transcript.)
BY MR. BLANTON:
Q Hold on. Let me make sure I get a note on the -- Exhibit 3 to your deposition will be a July 28, 2004, letter to Mr. Ron Cocherell, I think signed by you. Do you recognize that?
A This specific letter, no, but I recall this was a general letter that was sent out on July 28th to the contract holders transmitting the APR/ACR.
Q Was your role in preparing and sending that letter similar to the role you had in the issuance of the APR/ACR? Somebody told you to do it and so you sent it out, or did you have -- was your role more substantive in the decision to reinitiate the DCS process?
A Well, the program schedule called for

repository operations to begin in 2010, when this letter was sent out, and as a result of that, after discussion with Mr. Kouts, I was directed that it was time to restart the DCS process for the 2010 acceptance.
Q And do you have -- at the time you sent out that letter, what was your understanding as to whether the 2010 -- whether DOE was on schedule to meet the 2010 date or not?
MS. HERRMANN: Objection, foundation.
BY MR. BLANTON:
Q Did you have an understanding as to whether DOE was on schedule to meet the 2010 date or not?
A At the time this letter was sent out, my understanding was that we were.
Q Okay. How did you get that understanding?
A Discussions with Mr. Kouts.
Q In general, are your understandings about the progress toward -- that DOE is making toward the commencement of repository operations generally based on information you've received from Mr. Kouts?
A Yes.



Q Had you received any DCSs from a utility between the times DOE suspended the -- last suspended the DCS process in this July 28 letter?
A I believe so.
Q Do you recall from who?
A No, I don't.
Q What did DOE do with those DCSs?
A We didn't process them, and sent a letter back to the utilities saying we weren't processing them.
Q And did you return the documents too, or did you keep the documents?
A I don't recall where the documents are.
Q How would it be possible to figure out what utilities sent you those DCSs? Just by looking at your correspondence to see who you wrote back to?
A That would be a way, I presume, yes.
Q Does that correspondence still exist, as far as you know?
A I presume it does. I don't know for sure.
Q Why did DOE refuse to process those DCSs?
MS. HERRMANN: Objection, foundation.



THE WITNESS: Are you done?
MS. HERRMANN: Mm-hmm.
A At the time, it became clear that it was no longer appropriate to continue to process those DCSs.
BY MR. BLANTON:
Q Why was it no longer appropriate?
A At that time, DOE's commitment became clear, and there was discussion within the Department prior to that that the commitment was conditional, and I think in which case -- whatever case it was in the latter part of '96, it became clear it was an unconditional commitment, and given the fact that the schedule didn't call for the repository to be open at the time the DCS was being submitted for, it was no longer appropriate.
Q And I'm not asking about legal positions, because we've talked about those in your previous depositions, but do I understand what you're telling me is you didn't process those DCSs because you didn't have a scheduled start date for the repository?



A It wouldn't make sense to sign a DCS for 2007 when there wasn't going to be any operations in 2007.
Q Do you recall when the DCSs you received requested DOE to pick up the fuel?
A I don't.
Q Now, as of July 28 of '04, DOE had scheduled 2010 as the start date for the repository for quite some time; had it not?
A Yes.
MS. HERRMANN: Objection, vague.
A It had been -- 2010 had been scheduled for a couple years, yes, several years.
BY MR. BLANTON:
Q Do you recall when you received these DCSs prior to July 28 of '04 whether -- and after the last time the process was suspended -- we're talking about that interim period between the suspension -- the first suspension of the DCS process on July 28.
Do you recall whether the scheduled date for the repository opening had been set at 2010?
A I believe it was 2010, during that period

of time.
Q And so why wouldn't -- why did DOE not process those DCSs, based on the 2010 schedule?
A I believe they were submitted for years prior to 2010, so we didn't.
Q I'm sorry. So you what?
A So we didn't process them, because they were for prior to 2010.
Q So is it correct that it's DOE's position that it will only process DCSs where the DCSs conform to DOE's schedule for opening the repository? Is that what you're telling me?
A Well, since a DCS is a commitment to pick up fuel in a certain year, we'd only process it in good faith when we had the ability to pick it up in that year.
Q And that wasn't my question. The question is, if a DCS requests pickup prior to DOE's scheduled date for the repository opening, DOE has refused to process it; is that right?
A DOE couldn't perform, so it would make no sense to process it.



Q I'm not asking for the reason. I'm asking for the DOE position.
A And I think out of context, it doesn't make sense, but the reason is that there was no way to perform. It wouldn't make sense to do it.
Q And so DOE has not processed DCSs when they requested performance prior to DOE's scheduled repository opening date; is that correct?
A DOE hasn't processed them when it couldn't follow through on the commitment to perform, yeah.
Q And you're saying the only way for DOE to perform is to have a repository open, correct?
A That's the only way I'm aware of right now, yes.
Q How many DCSs did you receive in response to your July 28, '04, letter? Do you recall?
A I don't recall.
Q Was it tens, or one or two, or 20, or do you recall?
A It was many. I'm not sure of the number.
Q I'm going to ask you a question about an exhibit a little out of order, but I would suggest



we just keep the numbers in the same order as Kouts just to avoid confusion.
MS. HERRMANN: That would probably make sense.
BY MR. BLANTON:
Q I'm going to show you a document that was marked as Exhibit 10 to Mr. Kouts' deposition and that we'll mark as Exhibit 10 to your deposition.
(Zabransky Deposition Exhibit 10 was marked for identification and was attached to the deposition transcript.)
BY MR. BLANTON:
Q It's a letter that bears your name to Mr. John B. Carden, III, who's the contract manager for TBA, and the letter's dated November 3, 2004. Do you recall that letter?
A I vaguely recall this letter, yes.
Q What was the occasion for -- is that your signature on the letter?
A Yes, it is.
Q What was the occasion for you writing that letter to Mr. Carden?



A I was responding to his prior letter.
Q As of the date you sent the July 28 letter requesting people to resubmit DCSs, what was DOE's position as to the status of the DCSs that had been previously submitted and approved?
A Our position of starting the process again was that rather than just taking the last set of DCSs that had been approved and moving them forth 12 years to 2010, was that we wanted to give the contract holders the opportunity to look at where they wanted their fuel picked up. If they chose to have it picked up in the same place, they could say use the old DCSs, or they could submit a new DCS for the same place or for a different place.
So our position was that those were for 1998, and we would deal with whatever legal ramifications were with the 1998 DCSs, but that with respect to 2010, the opportunity existed for both of us to plan differently, and we had to start the process again.
Q Okay. So do I understand you correctly that if somebody had an approved DCS that they

you did not have any responsibility in terms of either developing the budget request or analyzing the impact of -- of that appropriation?
A Yes, the answer's the same.
Q Okay. You didn't have any responsibility?
A No, I did not.
Q What other issues led the Department to conclude that the resumption of the DCS process was premature, other than the 2005 budget?
A I'm not sure what else went into the change in the schedule. My primary focus was that the 2010 schedule had been changed. I don't recall specifically what other issues were alluded to.
Q Are all those -- strike that.
Are the impact of whatever those issues were on the schedule somebody else's job within DOE, not yours?
A That's correct.
Q Do you have any responsibility regarding the fiscal year 2006 budget request for DOE?
A No, I do not.
Q Do you know whether a schedule exists at



the present time for the opening of a repository?
A I'm not aware of any schedule at this time that exists, no.
Q In your interactions with contract holders, have any of them asked you when is DOE going to come pick up my fuel?
A In any specific time frame?
Q Since August of '04.
A I don't recall specifically, no, but, again, at this point in time, I don't have a schedule myself, so I don't -- I wouldn't be able to give them an answer.
Q Are you aware of anything that a utility could do to try to predict when DOE will come pick up their fuel for the purpose of planning their own onsite storage capability?
MS. HERRMANN: Objection, foundation. Speculation.
A I don't know what utilities could do, no.
BY MR. BLANTON:
Q I think we know from your previous testimony, you used to work for a utility and



managed spent fuel, right?
A That's correct.
Q And knowing what you know now in your role at DOE and knowing what -- based on your experience as a utility spent fuel manager, you don't know how a utility would plan for when DOE would perform, correct?
A I don't know how they could tell with certainty when DOE would perform. I don't know how they would plan. That's a different issue.
Q Mr. Zabransky, we're going to mark as Exhibit 7 to your deposition what was marked as Exhibit 7 to Mr. Kouts' deposition, which is a 15-page document, and the first page of it is entitled summary statement of Theodore J. Garrish, deputy director office of civilian radioactive waste management, U.S. Department of Energy subcommittee on the energy and air quality committee on energy and commerce, U.S. House of Representatives, March 10, 2005.
(Zabransky Deposition Exhibit 7 was marked for identification and was attached to the



deposition transcript.)
BY MR. BLANTON:
Q Have you ever seen that document before?
A I believe I've seen this, yes.
Q Did you participate in providing any of the information that's included in Mr. Garrish's testimony?
A Can you be more specific as to which information?
Q Anything. If you tell me you know of something, I'll ask you about it.
A I participated in giving certain factoids that are in here, such as how much utilities have paid into the Nuclear Waste Fund.
Q Okay. Do you know what the source of the statement in Mr. Garrish's testimony that says the government has estimated the damages due commercial utilities can be approximately 2.3 -- excuse me. I'm going to start that over again.
Do you know what the source of Mr. Garrish's testimony is that says, the government has estimated that the damages due commercial

Q Yes, sir, first full paragraph.
A You have to ask Mr. Garrish. I believe he's the source.
Q That's not you?
A No.
Q Have you provided any information or done any work within the Department of Energy concerning the revision of the funding mechanism that Mr. Garrish discusses in his testimony --
A No.
Q -- for the program? Do you know anything about that?
MS. HERRMANN: Objection, vague.
A Other than the fact that the government is seeking some way to get access to the funds without appropriations, I don't know the details. That's budget details that I don't get involved with.
BY MR. BLANTON:
Q Okay. Have you been designated as the government's witness to respond to questions concerning DOE's position or knowledge as to what kind of equipment, including what kind of



transportation casks or other associated equipment DOE would have used had it been in a position to perform in 1998? I think we testified earlier that you understand that you've been designated for that purpose.
A That's true.
Q Do you know what kind of equipment, in terms of casks or canisters that DOE would have used in 1998 had it been in a position to perform?
A It's my understanding DOE never determined that.
Q Do you know what options would have been available to DOE in that regard?
A The last option DOE looked at with respect to that, I believe in '96 time frame, was the use of a regional servicing contractor known as an RSC that would have performed the function of transportation and waste acceptance on behalf of the department, and I believe it was the Department's vision of that concept that the contractor would have selected the appropriate casks.
Q Did DOE have particular transportation and



storage technologies that they used in estimating the total life cycle cost of the -- of the repository system? Do you understand my question?
A I -- there's some assumptions made in the TSLCC, total system life cycle costs as to -- but I believe they're pretty generic.
Q For instance, just as a for instance, did -- did DOE ever estimate the comparative cost of, say, using welded casks versus bolted casks for waste acceptance and transportation?
A No, I don't think DOE's estimates don't get to that level of detail.
Q Okay. And can you here today tell me whether -- in 1998 whether DOE would have used a welded or a bolted cask had it shown up to pick up fuel in 1998?
A I can tell you DOE made no decisions as to what it was going to use in 1998.
Q Are there technical reasons why one type of transportation cask versus another would have made more sense had DOE had been in a position to perform?



A Are we talking 1998 or --
Q Yeah, and going forward.
A I mean --
MS. HERRMANN: Going forward how far? I'm sorry. Just --
BY MR. BLANTON:
Q Say the first ten years. 1998 through 2008.
A I think the technical reasons that exist today would have existed back then, which is that their fuel casks that are easier for us to repackage into waste packages than canister casks, from a technical perspective.
Q All right. But my question is about what kind of technology DOE would have used to transport the fuel from the site to the repository and any associated storage?
MS. HERRMANN: I'm going to object, asked and answered, because he's already said there was no decision made on that.
A But you asked me then what -- are there differences in technologies that would have made one

easier to use than the other?
Q By DOE.
A And the answer is, yes, there are differences in technology that would have made one easier to use than the other by DOE. The bare fuel casks would have been easier to use by DOE.
Q Okay. And what are the physical characteristics of a bare fuel cask? Is it bolted? Is it welded? Are they both bolted and welded?
A They're bolted.
Q How many assemblies do they hold?
A It varies. I don't know the exact numbers.
Q Is there a range of sizes of bare fuel casks?
A Yes.
Q What's the smallest, in terms of number of assemblies one will hold, and what's the largest you're aware of?
A I believe one up to 68.
Q Has DOE done any work to determine what the optimal size of a bare fuel cask would be for its use in accepting fuel from contract holders?



A In 1998?
Q Well, since you say the same technical reasons why today, I'd say up to today.
A No, DOE hasn't done anything on that that I'm aware of.
Q Do you have a personal opinion about that?
A Do I have a personal opinion? I think personal opinion will be that a lot of what's used will have to be compatible with the contract holder's sites, and different sites have different capabilities, but that's my personal opinion.
Q So there may be a range of storage technologies that are used -- or transportation technologies used based on what you find at a particular contract holder's site; is that correct?
A I think that's a -- from a personal perspective, that's a reasonable expectation.
Q Do you know anything about Southern's sites in terms of the technological aspects of either their storage technologies or how those sites might fit with various, you know, transportation technologies DOE might use?



A I personally don't have any direct knowledge of that other than what I may have read in the papers. I think they use Holtec casks for storage. But are we talking '98 or are we talking today? I mean, that's another -- I'm not quite sure -- what the government knew in '98, I have no idea.
Q Well, in 1998 they didn't have any Holtec casks, correct?
A I'll take your word for it. I don't know.
Q If all the utility's fuel is in their spent fuel storage pool as opposed to in dry cask storage, is there any reason why the government couldn't use bare cask -- or bare fuel cask such as you've described earlier in your testimony?
A I can't think of a reason, if it was all in the pool.
Q So is it correct that the main thing that complicates the use of which transportation technology DOE uses is whether or not they have -- a utility has spent fuel in dry storage and in wet storage?



A I'm not sure that complicates the use of technology by DOE.
Q What else is there about the site that could drive DOE to one technology versus another one? Because I understood you to say compatibility with the particular peculiarities of the site --
A Can you define technology?
Q What kind of casks DOE was using -- what kind of --
A What size?
Q I hesitate to use the term "casks" because it may be something else. What kind of storage technology and transportation technology DOE would use to put the fuel in and take it away to wherever it was going to take it?
A DOE used the same technology at all sites, bare fuel shipping casks.
Q What did you mean when you said that it would be a reasonable assumption that DOE would have to use technology that would be compatible with the contract holder's site?
A For instance, a contract holder, at least

one of them perhaps, has a crane that can only handle a 25-ton cask. It would be a small shipping cask. Others have cranes that can handle 70-ton casks. That would be a medium-sized shipping cask. Others have cranes that can handle 125-ton casks. That would be a large shipping cask.
Q Okay. All of which -- but in your formulation, all of those would have been bare fuel casks, just different sizes?
A That's DOE's current plans, yes.
Q Okay. And it's a reasonable assumption on your part to think that DOE will acquire and use the size cask that's compatible with whatever lifting equipment the utility has available?
MS. HERRMANN: DOE will or DOE would have? Are you talking 1998 or are you talking 2010?
MR. BLANTON: He said the same considerations apply to both.
MS. HERRMANN: I think it would help, especially since your 30(b)(6) notice covers the 1998 period if we make clear what time period we're talking about.



BY MR. BLANTON:
Q Well, I'll ask about 1998, but I'll ask if the same considerations applied now and then, but I don't think it matters.
A Well, you asked me what considerations apply to the difficulties for DOE to use canistered fuel versus not canistered fuel. Those I said were the same. That's a DOE issue.
Q I'm not sure I understood that answer. What do you mean when you say that's a DOE issue?
A Because DOE has to -- if DOE were to take canisters, DOE would have to cut all those canisters open and dispose of them to take the fuel out to repackage it. That's not related to transportation.
Q Okay. If all of a utility's fuel was in wet storage when DOE showed up to pick it up in 1998, had it shown up to pick it up in 1998, would there have been any issue involved -- or any difficulty involved in DOE using bare fuel storage casks for that fuel?
A First of all, they're transportation casks.
Q Thank you.



A Okay. And the difficulties, again, could have been -- and I can't speak without knowing the specifics, the cask would have to be licensed for the fuel the utility wanted picked up, and the utility would have to be capable of handling the cask.
Q And assuming those two things -- so we're assuming the cask was certified to transport the type of fuel the utility had and that the lifting equipment were capable of manipulating the DOE cask, DOE would have used a bare fuel cask?
A Yes, and it would have been a DOE cask that would have been also compatible with DOE's facilities.
Q Okay. And I believe your testimony is that that would have been a bolted cask, correct?
A Those are the only type of bare fuel casks I'm aware of, yes.
Q Okay. And I don't know if we got an answer to what size cask it would be.
A I can't answer that question.
Q And by size I mean in terms of number of



assemblies it would hold.
A I don't know.
MS. HERRMANN: Mr. Blanton, are we coming toward a good break time?
MR. BLANTON: Yeah, probably so, and we don't have very much longer.
MS. HERRMANN: Maybe take ten?
MR. BLANTON: Yeah, that's fine.
(Recessed at 10:32 a.m.)
(Reconvened at 10:39 a.m.)
BY MR. BLANTON:
Q Mr. Zabransky, we've been talking about technologies that DOE might or might not have used in 1998 to pick up spent nuclear fuel, particularly spent nuclear fuel in pools. Does DOE have a plan for how it intends to pick up any of Southern Nuclear's or its co-owners' -- well, strike the co-owners -- either Alabama Power or Georgia Power Company's spent fuel that is stored in dry casks at their reactor sites?
A I'm not aware of any such plan that DOE has.

Q I'll show you what's been marked as Exhibit No. 4 to Mr. Kouts' deposition, and we'll mark it as Exhibit 4 to your deposition. The title of it is Civilian Radioactive Management System Requirements Document, Revision 6.

(Zabransky Deposition Exhibit 4 was marked for identification and was attached to the deposition transcript.)

BY MR. BLANTON:

Q Are you familiar with that document?

A I'm familiar with the document in general. I'm not familiar with this specific revision. I don't read the document regularly. I know it exists.

Q Oh, come on, Mr. Zabransky. You don't read the system requirements document regularly? What's an empty life you must lead.

A Not this empty.

Q All right. On page 7, Roman 7, little Roman 7, right near the front of it, there's a revision change and description in rev 2 DCN 01 June 1996, there is a revision change description that



says, provides notice to users on MPC policy change. I.e., the CRWMS will accept and accommodate a variety of casks/cannister systems for current commercial SNF which are currently available or being developed. These may be individual spent fuel assemblies or single, dual, or triple-purpose cask or canister systems. Do you see that?

A Yes, I do.

Q First of all, who are the users that refers to?

A I believe the users referred to are users of this requirements document.

Q And who are they?

A Those would be internal program participants.

Q What does that language I just read mean in terms of the capability of the CRWMS?

A Well, the direction here being given to the users, and the users are the, in essence, the designers of repository facilities, and systems is that their systems should be capable of accommodating a variety of cask/canister systems for



commercial SNF which are currently available or are being developed.

Q Does that include the Holtec cask and canister system such as is used by Southern Nuclear at the Hatch site?

A I can't say that it does or doesn't, from this language.

Q Is there anything in that language that excludes the Holtec cask and canister system?

A I can't say that it does or doesn't.

Q Look on page 9 of the document. Letter F says, CRWMS facility shall be capable of opening sealed storage/transportable commercial canisters handling the SNF and managing associated site and generated waste streams. Do you see what I've just read from?

A Yes, I do.

Q Can you translate that into lay language for me?

A Again, as given as direction to designers and engineers, this says that their facilities should be capable of opening commercial dual-purpose



canisters. Should the Department decide to modify contract to include them, that to follow through on those contract modifications, the facilities would have to have those capabilities.

Q Now, I don't see anything about modifying contracts in there. Is that something you added?

A Engineers and designers wouldn't have to worry about that.

Q So that modifying contract stuff is something you added, not something that's written in the document, correct?

A This document isn't for anybody but an engineer or designer who doesn't care about that.

Q And there's nothing in there about modifying contracts?

A No, but that puts the statement in context.

Q Now, what is a dual-purpose canister, I think you used that term?

A That would be a storage transport commercial canister.

Q Are you familiar with a Holtec canister that is a storage transport system?

A I believe they have one.
Q Do you know what the name of it is?
A I don't know if it's Hi-Star or Hi-Storm. Some trade name.
Q Do you know if Southern Nuclear has any of those on any of their sites?
A I don't know specifically. I think they might, but I don't know specifically.
Q Now, just above F in E is the language, CRWMS elements and facilities shall be capable of accommodating a range of storage and transportation technologies including multipurpose, dual-purpose, and single-purpose canisters, as well as bare SNF assemblies. Can you translate that into English for me?
A I think it fits well with F which said they should be able to open them. This says that they should be able to handle them.
Q Okay. What's the difference between a multipurpose and a dual-purpose?
A I believe multipurpose as used here is a storage transport and disposable capable canister,



and dual purpose would be storage and transport, or dual purpose could be storage and disposal.
Q Okay. So it's not -- the dual and multi is not intended to designate any one particular use, but just more than one use?
A Yes, but multipurpose would have to include disposability.
Q Okay. And then single-purpose, which is the next one, could be a storage only, a transport only, or a disposal only, I assume; is that correct?
A I think the only logical interpretation of this single-purpose would be a storage only that might be used at Yucca Mountain. It couldn't be transported there.
Q So do I take from this that the direction to the repository -- or I shouldn't say repository, the waste management system designers and planners, is to be able to accommodate a wide variety of storage systems that might be in use on reactor sites currently?
A Well, the purpose is to not -- since no decisions have been made, to make sure that the



engineers don't wind up making decisions that DOE hasn't made yet; so, therefore, they need to accommodate things that could be included should DOE decide to include them or not include them.
Q And those things that could be included include a range of storage and transportation and technologies including multipurpose, dual purpose, and single-purpose canisters, correct?
A That's what the document says, yes.
Q And you mentioned a minute ago that it was a DOE issue to open -- if a utility had fuel in a canister such as in a cask and canister system, that it would be DOE's issue to open that canister at the repository?
A That's not what I said exactly.
Q Okay. Well tell me exactly what you said. I'm not intending to paraphrase. I'm just not able to quote you.
A I think what I said was that should DOE decide to accept that canister and transport it to the repository, DOE would then have to open that canister and dispose of it and repackage the fuel.



Q Okay. If DOE decided not to do that, what is the -- how would DOE go about picking up the fuel?
MS. HERRMANN: Objection, speculation.
A DOE would pick up the fuel.
BY MR. BLANTON:
Q The bare fuel?
A Yes.
Q If DOE insisted on bare fuel, what would have to happen in order for DOE to do that if the fuel had already been put in a dry cask storage container?
A I presume the utility would have to unpackage the canister.
Q What would the utility have to do in order to do that?
A I can't -- I don't know specifically.
Q I assume that they can't just send a couple guys out there and start cutting it open?
A I'm sure they have procedures in place for that. I think those procedures are required by the NRC. I don't know what they are.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

TENNESSEE VALLEY AUTHORITY, )

Plaintiff, ) Case No. 01-249C

v. )

THE UNITED STATES, )

Defendant. )

---

Courtroom 4

National Courts Building

717 Madison Place NW

Washington, D.C.

Tuesday, July 12, 2005

Volume 8

The parties met, pursuant to the notice of the Judge, at 10:10 a.m.

BEFORE: THE HONORABLE CHARLES F. LETTOW

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

PETER K. SHEA, ESQ.
EDWIN W. SMALL, ESQ.
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1499
(865) 632-7319

ON BEHALF OF THE DEFENDANT:

ALAN J. LO RE, ESQ.
SONIA ORFIELD, ESQ.
SHARON A. SNYDER, ESQ.
KEVIN CRAWFORD, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***

published?
A. No, I was not.
Q. Did you review it at any time while it was being, while it was in its draft format?
A. No, I did not.
Q. One moment. Shifting to the DOE model that you assisted in preparing the projections for in this litigation, do you have an opinion as to whether the TVA projections are more accurate than the DOE projections?
A. When DOE projects, we try to do things on an industry wide basis, not trying to take in any specific nuances for a specific utility. I believe a utility is a much better predictor of their own discharges than the Department could be when we're looking, we're trying to do this on an industry wide basis, so I believe TVA would have, would be a better predictor of their own projections than we would be.
Q. And to your knowledge, has TVA ever phoned up the DOE and asked about its own projections, its own spent nuclear fuel projections since you've been there?
A. No.
MS. SNYDER: That's all I have, Your Honor.
THE COURT: Thank you. Mr. Small, any



recross?
MR. SMALL: Nothing further, Your Honor.
THE COURT: Mr. Pollog, I'm about to excuse you. I can't do it immediately. There is a minuscule chance that you would be called as a rebuttal witness. I'm about to read you an instruction from a portion of the Federal Rules of Evidence. I don't expect you to know the particular Rule of Evidence, but I think you'll understand the instruction once I read it to you. If you don't though, please don't hesitate to ask.
THE WITNESS: Okay.
THE COURT: The parties have requested, as they are entitled to under Federal Rules of Evidence 615, and it is -- you might know it from not having been present in the courtroom during the testimony of other witnesses, that each fact witness be excluded from the courtroom, so that the witness can give his or her testimony fresh without being either distracted by or influenced by the testimony of others.
My order to you is that until this trial concludes, at which time, you can learn from counsel, that you not discuss your testimony with anyone who either is or could be a witness, and if you have any



questions about who could be a witness, you may ask counsel. And the trial should -- well, counsel can give you an idea. They have a better idea than the Court does when the trial will be concluded. Does that help, Mr. Pollog?
THE WITNESS: Yes, Your Honor.
THE COURT: Thank you very much. And I'll excuse you now and with appreciation for your appearing here today and for your testimony, thank you. Mr. Lo Re?
MR. LO RE: Yes, Your Honor, the government is prepared to call its next witness.
THE COURT: Yes.
MR. LO RE: Your Honor, the government calls to the stand Mr. David Zabransky.
THE COURT: Mr. Zabransky, you know what to do?
THE WITNESS: I believe so.
Whereupon--
DAVID ZABRANSKY
a witness, called for examination, having been duly sworn, was examined and testified as follows:
THE COURT: Mr. Zabransky, if you would please take a seat in the witness stand?
THE WITNESS: Yes, sir.



THE COURT: And if you would please state your full name for the record?
THE WITNESS: My name is --
THE COURT: You might need some help to clear various documents and impediments.
THE WITNESS: My name is David Kevin Zabransky.
DIRECT EXAMINATION
BY MR. LO RE:
Q. Good afternoon, Mr. Zabransky.
A. Good afternoon, Mr. Lo Re.
Q. Mr. Zabransky, could you please tell us where you are currently employed?
A. I'm currently employed at the Department of Energy in the Office of Civilian Radioactive Waste Management.
Q. And what are your current responsibilities in that office?
A. Currently, I work in the Office of System Analysis and Strategy Development for Mr. Kouts, and I work on a number of waste acceptance and systems analysis issues, as well as acting as a contracting officer for the standard contract.
Q. And how long have you been in that position, sir?

Q. And why did the Department make that decision?
A. Well, at that point in time, it was clear that, one, the DCSes were still coming in for given years like 2003, 2004. It was clear we weren't going to have a facility, and it was also clear that it wasn't appropriate to any longer keep signing up to commitments that we knew we couldn't meet, so it would have been inappropriate to keep processing them, given that we weren't going to be able to follow through.
Q. And when you say, "it was clear we weren't going to have a facility," what do you mean by that?
A. Well, there was no, at that point in time, the repository was 2010, there was no -- I think we had had some efforts at interim storage legislation that hadn't come to fruition, and nothing was on the horizon that was going to intervene with an interim facility, so it was, and it was clear these were binding commitments at that point in time, and it was no longer appropriate to keep saying, yes, we'll be there in this given year, so we ceased processing at that point in time.
Q. Now, after the suspension of the DCS process in 1997, Mr. Zabransky, to your knowledge,



did DOE ever recommence the ACR process?
A. Yes, it did.
Q. And when was that?
A. In July of 2004, in anticipation of 2010 repository operations.
Q. Why don't we take a look at that? Could we pull up PX-36, please?
THE COURT: Mr. Lo Re, Mr. Shea, before we do that, the Court has several questions. I'm really hesitant to ask them now, but if I don't, I'm afraid they'll get lost in the shuffle.
MR. LO RE: That's fine, Your Honor.
THE COURT: I ordinarily would wait a while, especially for this kind of question, but when I ask it, you may object. If you even don't like the subject, you may object, let alone the form of the question. Mr. Zabransky, when, as precisely as you can give a time, did DOE suspend the DCS process?
THE WITNESS: My recollection is that it was early in the year, calendar year of 1997.
THE COURT: That was an assumption embedded in a couple of questions from Mr. Lo Re, what is the best of your recollection as to the circumstances in which the Department reached that decision?
THE WITNESS: The best of my recollection



was that the Department had been of the opinion that the DCS commitments were conditional and conditioned upon the existence of a facility constructed under the Act, and that after a court ruling, I believe in Indiana Michigan, the one case, that it was clear that that was not the case.
The Department's preliminary position was they were conditional obligations and not absolutes. It was not going to be sustained or was overturned, and at that point in time, it was no longer appropriate to enter into these binding obligations because we couldn't fulfill them.
THE COURT: From your prior testimony about PX-19, that is the 1994 ACR issued in March of 1995, and the TSLCC issued in September of 1995, you indicated that DOE had suspended the DCS -- or abandoned the MRS concept in 1995, is that correct?
THE WITNESS: That was my understanding, yes.
THE COURT: Sometime between March and September?
THE WITNESS: Sometime between the completion of that document, maybe prior to publication, but sometime between the '94 ACR and September of '95, yes.



THE COURT: Do you know when that was?
THE WITNESS: No, I do not know.
THE COURT: Do you know who made that decision?
THE WITNESS: I don't know. Mr. Kouts would have been in a better position to answer that than I am.
THE COURT: Why didn't the -- well, here's another question. You answered a question earlier that the repository system without interim storage was to open in 2010, is that correct?
THE WITNESS: Yes, that was on the schedule, yes.
THE COURT: And when was that schedule adopted?
THE WITNESS: I believe that was adopted prior to the 1991 ACR because that was the basis for the 12 years of -- the assumption was that the MRS would begin in 1998, and the repository would commence in 2010, and that would give you the 10,000 tons over that 12-year period, so that had to occur sometime around or prior to the '91 ACR.
THE COURT: My question is really a simple one. Why didn't DOE abandon the -- or suspend the DCS process after it had abandoned the MRS concept in

1995?
THE WITNESS: And I guess my answer is that DOE, at that point, had formed the opinion that the process -- the DCSes were conditional, that that's why it went to year one, as opposed to 1998. That's also why, I believe, it was informing the contract holders that it considered the DCSes to be conditioned upon the existence of a facility constructed under the Act, and that position turned out not to be appropriate.
THE COURT: Because of the set of court decisions that said it?
THE WITNESS: Right, the world was different.
THE COURT: Thank you very much. I understand.
BY MR. LO RE:
Q. And just so we're clear, as a follow-up, the condition was what?
A. I believe, and I'm doing this from memory, was I think something to the effect of conditioned upon the existence of a facility constructed under the Act, so --
Q. And would that include an MRS?
A. It would have been an MRS, some interim



storage facility constructed under the Act or repository, so that's what DOE's position was for that point in time.
Q. Mr. Zabransky, I was asking you about the recommencement of the ACR process -- or, excuse me, the DCS process. Why don't we take a look at what's been marked and admitted as PX-36, please? Mr. Zabransky, are you familiar with this document?
A. Yes, I am.
Q. And what is it, sir?
A. This was the ACR/APR that was issued in July of 2004.
Q. And did you have any personal involvement in this?
A. Yes, I did.
Q. What was that?
A. Myself and Mr. Pollog, in essence, drafted the text and caused this to be created.
Q. And why was DOE issuing the ACR in July of 2004?
A. DOE, at that point, believed that it would have a repository operational in calendar year 2010, and to allow the utilities to start the planning process consistent with the contract, which says 63 months before the year of delivery, it was



appropriate to restart this process in 2004.
Q. Why don't we take a look at page two of this document? It's under the title, "Basis For the Annual Capacity Report," and there's a sentence right in the middle of that first paragraph, it says, "The projected nominal acceptance rate is based on the assumption of SNF acceptance beginning in 2001 at the Yucca Mountain geologic repository." Do you see that?
A. I believe you mean 2010.
Q. Excuse me, thank you, "2010 at the Yucca Mountain geologic repository," do you see that?
A. Yes, I do.
Q. And what was the basis for that assumption?
A. That was the program's planning basis management, and the Department believed that that was an accomplishable date, and that was our current plan.
Q. And the rates that are depicted, starting with 400, 600, 1,200, 2,000, and then 3,000 on, how do those rates comport with the rates from the 1994 ACR that was issued in March '95 that we've been talking about?
A. Well, again, they're totally different rates and for totally different years, in essence.



This is an unconstrained repository system, doesn't reflect any MRS or MRS limitations, so they're much higher than the rates that we used in the prior document.
Q. Now, Mr. Zabransky, after the issuance of the 2004 DCS, were there any changes to the programmatic assumptions for the Waste Management System?
A. Yes, there were.
Q. And what were they?
A. Subsequent to this, during the FY '05 budget deliberations, it became clear that the program wasn't going to get the money that Dr. Choo, who was then director, had requested, the President had requested in the President's budget, and that the schedules were predicated upon receipt of the funding that was requested, and because that funding didn't come through, as Dr. Choo had testified, the schedule was no longer attainable.
There was some other things that occurred also having to do with the licensing support network and the timing required for submittal of the LA and other things like the implications of the EPA standard remand, but primarily, my recollection was that the budget issue was one that no longer made it

-

UNITED STATES

COURT OF FEDERAL CLAIMS

SOUTHERN NUCLEAR OPERATING :
COMPANY, ALABAMA POWER COMPANY, :
and GEORGIA POWER COMPANY, :NO. 98-614C
Plaintiffs :
vs. :
THE UNITED STATES, :
Defendant. :

Pages: 1934 through 2173

Place: Washington, D.C.

Date: October 27, 2005

HERITAGE REPORTING CORPORATION

Official Reporters

1220 L Street, N.W., Suite 600

Washington, D.C. 20005-4018

(202) 628-4888

hrc@concentric.net

1934

IN THE UNITED STATES COURT OF FEDERAL CLAIM

SOUTHERN NUCLEAR OPERATING )
COMPANY, ALABAMA POWER )
COMPANY, and GEORGIA POWER ) NO. 98-614C
COMPANY, )
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant )

Courtroom Number 5
Court of Federal Claims
717 Madison Place NW
Washington, D.C.

Thursday, October 27, 2005

VOLUME 9

The parties met, pursuant to the notice of the Judge, at 9:00 a.m.

BEFORE THE HONORABLE JAMES F. MEROW

1935

APPEARANCES:

ON BEHALF OF THE PLAINTIFFS:
M. STANFORD BLANTON, ESQ.
K.C. HAIRSTON, ESQ.
S. ALLEN BAKER, JR., ESQ.
Balch & Bingham
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205) 226-3417
and
RONALD A. SCHECHTER, ESQ.
Arnold & Porter
555 12th Street, Northwest
Washington, DC 20004

ON BEHALF OF THE DEFENDANT:
JOHN EKMAN, ESQ.
HEIDE HERRMANN, ESQ.
MARIAN SULLIVAN, ESQ.
JOSHUA E. GARDNER, ESQ.
ALAN LO RE, ESQ.
STEPHEN FINN, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, DC 20530

** Index appears at end of transcript **

1936

P R O C E E D I N G S

_ _ _ _ _

JUDGE MEROW: Please be seated. Sorry for the delay. An hour and 15 minutes is apparently not enough for commuting. Well, Ms. Sullivan?

MS. SULLIVAN: Good morning, Your Honor. Unless Mr. Blanton has anything, we have our next witness.

MR. BLANTON: Nothing from us, Your Honor.

MS. SULLIVAN: Your Honor, the government calls David Zebransky to the stand, please.

DAVID K. ZEBRANSKY

was sworn and testified as follows:

EXAMINATION

BY MS. SULLIVAN:

Q All set?

A Sure.

Q Okay. Good morning, Mr. Zebransky. Could you state your full name for the record, please?

A My name is David K. Zebransky.

Q Mr. Zebransky, where are you currently employed?

A I'm employed by the U.S. Department of Energy in Washington, DC.

Q And what office do you work in at the Department of Energy?
A I work in the Office of Civilian and Radioactive Waste Management and in that office, in the Office of Systems Analysis and Strategy Development.
Q And what position do you hold in that office?
A I'm currently a nuclear industry specialist.
Q And what are your responsibilities as a nuclear industry specialist?
A To provide technical input and -- on nuclear issues to my boss on issues of strategy development and systems analysis.
Q And to whom do you report?
A To Mr. Christopher Kouts.
Q Are you also the contracting officer for the standard contracts between DOE and the nuclear utilities?
A Yes, I am.
Q When did you become the contracting officer?
A I believe around July of 2002.
Q Have you also served as the technical



representative to the contracting officer?
A Yes, I did.
Q And what were your responsibilities as the technical representative to the contracting officer?
A To provide technical advice to the contracting officer on issues under the standard contract.
Q When did you join DOE?
A July of 1994.
Q Prior to joining DOE, where were you employed?
A Wisconsin Electric Power Company, Milwaukee, Wisconsin.
Q Is Wisconsin Electric Power Company also known as WEPCO?
A Yes, it is.
Q How long were you employed by WEPCO?
A I joined them in 1978, and I left there in 1994.
Q And what positions did you hold while you were at WEPCO?
A Over the years, I held a number of technical positions in engineering. I started out as a design technician, that's where I had my degree, then civil engineer, and I ultimately wound up being



in the nuclear fuel department where I was a contract administrator, project engineer, senior project engineer and then ultimately manager of nuclear fuel services.
Q Did your responsibilities at WEPCO include administering WEPCO's standard contract with DOE?
A From the time I was in the nuclear fuels area, I was contract administrator on, yes, they did.
Q Do you hold a bachelor's degree?
A Yes, I do.
Q In what?
A In civil and environmental engineering.
Q When did you obtain at a degree?
A 1980.
Q Mr. Zebransky, as part of your duties at WEPCO, were you familiar with the annual capacity reports and acceptance priority rankings issued by DOE?
A Yes, I was.
Q At the time you were at WEPCO, what did you understand the function of these documents to be?
A Well, taken individually, the acceptance priority ranking, which I believe you asked me about, was the chronological listing of spent fuel that was discharged at DOE -- that was discharged. Department



of Energy would publish this list, and it was the basis for the oldest fuel first priority queue. The annual capacity report took that queue and, based upon DOE's acceptance rates, divvied it up into individual annual allocations for each utility.
Q At the time you were at WEPCO, were you also familiar with what are known as delivery commitment schedules or DCSs?
A Yes, when I was at WEPCO, we submitted DCSs when the process started.
Q And what did you understand to be the function of a DCS?
A Well, I understood that they were to start the planning process to let the government know what the utility wanted to deliver, from where and what type of spent fuel and basically, from our perspective, to bind the government to pick it up. It was a commitment to deliver on our part and for them to pick up on their part, that fuel in that year.
Q And at the time you were at WEPCO -- I believe you testified to this, but were you responsible for completing DCSs and submitting them to DOE on behalf of WEPCO?
A Yes. When they were submitted by the company, it was under my group that did that and

Yeah, early January '97.
Q And what event precipitated the decision to suspend the approval of DCSs?
A I believe the Indiana Michigan court decision, which was in late 1996, influenced DOE's decision to stop processing DCSs.
Q Who made the decision to stop processing the DCSs?
A The contracting officer did on the advice of counsel.
Q In your role as contracting officer today, do you have reason to be familiar with the DCSs that have been approved by DOE to date?
A Yes, I've -- when I took over that position, I inherited a lot of files and went through a lot of them trying to figure out what's there, so between that and other activities over the last several years, I've reviewed, I believe, virtually all the DCSs that are in the files.
MS. SULLIVAN: Your Honor, because the next exhibit is so small, we'd like to use a larger size of it, have Mr. Zebransky come off the stand and talk to the poster board, if that's acceptable.
JUDGE MEROW: Sure.
MS. SULLIVAN: Thank you. Just a minute



while we move this over.
BY MS. SULLIVAN:
Q Actually, stay up there for one second. Let me ask you a couple questions.
A Absolutely.
Q Mr. Zebransky, we've put up on the easel and handed you a copy of Defendant's Exhibit 337, what's been marked as Defendant's Exhibit 337. Can you identify this chart for the record?
A This chart is a listing of the DCSs that the department received -- well, it's a listening of all the allocations in the first ten years, beginning in 1998, and all the purchasers, and it also signifies which purchasers submitted DCSs and the status of those DCSs.
Q Could you explain the shading of the numbers on the chart?
A Yes. The darkest shading, the darkest gray are those DCSs that were submitted and approved. The medium gray, I guess we call it is the DCSs that were submitted and not approved because the department suspended the process. Those are ones where we actually found the letters, that we had not approved them, so that's -- these are all based on what we found in our records.



The lightest gray are those that were submitted, and we don't appear to have any documentation as to what happened with them.
Q And the numbers that are not shaded at all, where there are just numbers, what does that indicate?
A Those are allocations where we don't have any indication that a DCS was ever submitted.
Q Okay. And have you reviewed all of the DCSs that were submitted or approved as depicted on this chart?
A Yes, I have.
Q Okay. Do you want to come down and talk --
A Yes, I will.
Q -- talk to the chart.
A Okay.
Q Mr. Zebransky, how many purchasers submitted DCSs for allocations projected in 1998?
A Well, in 1998, there were 15 purchasers that had allocations, and all 15 submitted DCSs and received approved DCSs.
Q Okay. And how many purchasers submitted DCSs for allocations projected in 1999?
A I believe in 1999 there were 23 purchase



allocations, and all 23 submitted DCSs and received approved DCSs.
Q How many purchasers submitted DCSs for allocations projected for the year 2000?
A I believe that year there were 25 purchasers that submitted them, and all 25 received approved DCSs.
Q For the year 2000, all of them?
A 2000? Well, yes, because 25 submitted them. DOE apparently didn't submit a DCS for that year.
Q And what is the DOE line? What is that fuel that's indicated on that line?
A That line covers fuel that's currently in DOE's possession that was formerly of commercial origin, so it's fuel that was at West Valley, fuel that was brought into the DOE program for research and development purposes. It's also grain fuel. So it's miscellaneous bits and pieces of fuel that are stored at various DOE locations but originally came from commercial reactors.
Q How many purchasers submitted DCS allocations -- how many purchasers had allocations projected for the year 2001?
A In that year, there were 33 purchases of

allocations.
Q And how many of those purchasers submitted DCSs?
A 29 did, 29 submitted DCSs.
Q And how many purchasers' DCSs were approved?
A Let me clarify. Twenty-nine submitted them. Twenty-six were approved. Two, I can't find any record of. Commonwealth Edison, Connecticut Yankee as to their disposition. The one submitted by Georgia Power was actually submitted a year later and was not approved because it was in the -- came in in the time frame where we suspended processing.
Q And the DCSs that were required to be submitted pursuant to the contract for year four, or the year 2001, what year were those DCSs required to be submitted?
A They would have been due by September 30th of 1995.
Q Okay. Were these DCSs, the ones that were submitted in the September 1995 time frame, were those DCSs that you would have reviewed as the contracting officer's technical representative?
A Yes.
Q Now, I believe you testified at the time



you were at WEPCO you submitted DCSs for all the allocations that WEPCO had in 1992 and that all these DCSs were approved, is that correct?
A That's correct and that's the third line up from the bottom. You can see it's black all the way across. That's the full ten years were approved.
Q How many other utilities submitted DCSs for all of the allocations in the 1991 ACR that were then approved by DOE?
A There were eight other contract holders that submitted DCSs for the entire set of allocations they had in the first ten years.
Q Could you identify those on the chart?
A Yes, I could. Dairyland Power Cooperative, Florida Power and Light, General Atomics, Indiana Michigan Power Company, Maine Yankee, going down to here, Sacramento Municipal Utility District, Vermont Yankee, Wisconsin Electric.
Q Thank you.
How many purchasers are identified on this chart, total?
A This chart identifies 60 purchasers that are the original purchasers that showed up in the 1991 ACR.
Q And how many purchasers had allocations



for the first -- in the first ten years in the --
A Forty-three of the 60 had allocations in the first ten years.
Q Okay. Thank you. Could we have Defendant's Exhibit 198? Mr. Zebransky, you've been handed a copy of Defendant's Exhibit 198. Could you identify this document for the record?
A This document appears to be correspondence from Southern Nuclear to the department dated October 21, 1996, that is transmitting revised delivery commitment schedules.
Q Can I direct your attention, please, to the second page of this document, the middle of the page? Do you see your name on this page?
A Yes, I do.
Q And would you have received a copy of this letter in DCS submittal?
A I believe I would have received a copy, yes.
Q Okay. And the DCSs that accompany this letter, were these DCSs approved?
A No, I -- no, they were not.
Q Why not?
A These DCSs in particular were in the time period that we suspended processing DCSs.



Q Okay. Can we go to Defendant's Exhibit 203? Mr. Zebransky, you've been handed Defendant's Exhibit 203. Could you identify this document for the record?
A This appears to be a letter from DOE to Southern Nuclear dated March '97.
Q Okay. And what was the purpose of this letter?
A Purpose was to inform Southern Nuclear that the department was not going to be processing the DCSs it had submitted in 1996.
Q So was this the response to the DCS mills we just looked at?
A Yes, I believe it was.
Q Did other utilities receive this same letter?
A Very similar letters, yes.
Q Mr. Zebransky, since you have been at DOE, have you also been responsible for the issuance of annual capacity report?
A Yes, I was involved with the 1994 report and the 2004 report.
Q Okay. Could we have Plaintiff's Exhibit 823, please? Mr. Zebransky, could you identify Plaintiff's Exhibit 823 for the record?

JUDGE MEROW: Okay. 337, it is --
MS. SULLIVAN: Yes, Your Honor.
JUDGE MEROW: -- is admitted in evidence.
(DX Exhibit 337 was received in evidence.)
MS. SULLIVAN: Thank you, Your Honor.
THE WITNESS: Excuse me. Could we take a five-minute break?
MR. BLANTON: I was about to ask for the same thing.
JUDGE MEROW: About ten minutes do you think? Back at 20 after.
MS. SULLIVAN: Thank you, Your Honor.
(A recess was taken from 10:09 AM through 10:24 AM)
JUDGE MEROW: Please be seated. Mr. Blanton.
MR. BLANTON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BLANTON:
Q Mr. Zebransky, good morning.
A Good morning.
Q I'm Stan Blanton. I represent Southern Nuclear and Alabama Power and Georgia Power Company and have just a few questions for you.



We can put it back up on the easel if you need to refresh your recollection, but -- I think I heard you testify about one year, but on your Defendant's Exhibit 337 -- do you have that chart in front of you? This is all the DCSs that were submitted and approved or not processed or lost or whatever, right?
A Perhaps, yes, sir.
Q And do I understand you correctly that DOE, the United States Department of Energy, had allocations in the years 2000, 2001, 2002, 2003, 2004 and 2006 and 2007 and they didn't submit DCSs for any of those?
A That's what I've observed, yes.
Q They know something everybody else didn't know?
A I can't tell you, sir. I don't know who would have been responsible for that.
Q That 2000 DCS would have been due in 1994, is that right?
A Yes, it would have been.
Q That about the same time the Office of Waste negotiator was eliminated?
A I don't know specifically. It could have been. That wasn't something I really paid a lot of



attention about at the time.
Q Okay. At any rate, DOE didn't submit -- does DOE have a contract?
A DOE doesn't have a contract. The way this has been done, this is done under a memorandum of agreement, a memorandum of understanding between parts of DOE, so this is -- pursuant to that, someone should have, in another part of DOE, submitted a document. They didn't.
Q So but at any rate, as of 1994, DOE quit submitting DCSs?
A Yes. Someone somewhere didn't do what they should have done, that's correct.
Q Now, you testified a good bit about your time at WEPCO, and I want to ask you just another question or two.
A Yes, sir.
Q Have you got Defendant's Exhibit 66 still there in front of you?
MS. SULLIVAN: I'm sorry, counsel, which number?
MR. BLANTON: Defendant's Exhibit 66. I'm not going to try to say it, a UNWMG 1987 document.
THE WITNESS: Okay, sir, I've got it.
BY MR. BLANTON:



Q And if we turn to the first page of the meeting notes, June 4, 1987, that's got a Bates number of 38297 on it.
A 38297.
Q Does somebody have it on the -- all I want to do is ask Mr. Zebransky, if we go down through this list of issues that the task force was talking about, as of 1987, there's a list of bullets and a list of issues, correct?
A That's what it says, yes.
Q And that's what the task force did, they got together and talked about things involved in maybe disputes or, if not disputes, just issues that were unclear about the standard contract?
A Questions, right.
Q And DOE's 1998 statutory obligation as of 1987 was one of those, correct?
A I think that was an ongoing issue with the industry, yes.
Q Okay. And the issue being DOE taking the position it didn't have to perform in 1998 absent a repository or other facility being available?
A I don't know that that's what DOE had taken at the time, but -- I think the industry was looking for a clear statement of obligation from DOE.

actually tried to look at, because it was getting more visibility at that time because of our dry fuel storage activities, what those rates might actually be and what that would mean with the longevity of fuel on site.
Q Of course, DOE had also reduced the rates it was projecting to accept fuel at at that time too, correct?
A That was based upon the rates that were presumption -- predicated upon an MRS in the system, yes.
Q Now, you've still got the 2004 ACR in front of you, I think, don't you?
A Yes.
Q And I've got it somewhere before me.
A I do.
Q And we've looked at the acceptance rate in this. It's on page 4, I think. No, wrong again. 2.
A 2.
Q What's what we've come to refer to as the 3,000 metric ton rate in this case, correct?
A I --
Q The 3,000 metric steady-state rate?
A Correct.
Q It's in the planning documents the



department uses to plan the system?
A That's what this is, yes.
Q And has been in the planning documents that the department uses to plan the system since 1995 or '6, correct?
A I believe that the system for repository has used these numbers probably back to that time frame. I'm not sure exactly when, but for quite a while.
Q All right. Now, you and Mr. Pollog, I think, prepared, actually prepared this document, Plaintiff's Exhibit 14, correct?
A We did, yes.
Q And Mr. Kouts was in here testifying yesterday. Mr. Kouts is your boss?
A He is.
Q And Mr. Kouts provided you with those rates to include in this ACR, correct?
A He did.
Q In your personal opinion, you believe that's a reasonable acceptance rate for the system to operate at, don't you, the one reflected in this 2004 ACR?
A Yes. Again, like I've said before and I'll say again, is that if one were looking at what a



reasonable rate to remove fuel from spent -- from nuclear sites in a reasonable time frame is, this rate is reasonable. That's why we continue to use it for repository design.
Q All right, sir. Now let's talk about the 1991 ACR, which you've discussed.
A Yes.
Q This was the first one that DOE asked utilities to submit DCSs based on. That's poor grammar, Judge, I'm sorry, but I got to the middle of that sentence and couldn't find a way out of it.
This is the first ACR, this Exhibit 97 is the first ACR that was used to prepare DCSs?
A That's correct.
Q Now, the rate -- and we had a lot of testimony about the MRS schedule linkages yesterday.
A Okay.
Q You know what I'm referring to when I talk about the MRS schedule linkages?
A I'm aware of them generally, yes.
Q MRS can't be -- construction on the MRS can't start until the repository has received a construction authorization, correct?
A That's my understanding, yes.
Q And, of course, the repository's never



received a construction -- or the DOE has never received a construction authorization for repository up to today, correct?
A That's correct also.
Q So the rates in this 1991 ACR are based on an assumption that those linkages don't exist, correct?
A I don't know that. To go back and review the document as to what it says.
Q All right. Let me refer you to page 4 and we'll highlight that middle paragraph.
A Okay.
Q Does that refresh your recollection about whether or not these rates are based on an assumption that the schedule linkages between the MRS and the repository are eliminated by Congress?
A I think the, yes, this basically, as we read it, my recollection is that what I have been told is that DOE was assuming that if there was a negotiated MRS, that part of the negotiation process between the volunteer site and the negotiator would be to remove the schedule linkage.
Q But you know those linkages have never been removed?
A There's never been a voluntary MRS

identified either.
Q And Congress isn't -- the linkages are in the United States Code, correct? They are in the law. They're in the Nuclear Waste Policy Act?
A Nuclear Waste Policy Act amendments, yes.
Q So Congress would have to do that?
A Yes.
Q The President would have to sign it?
A Yes.
Q And that hasn't happened?
A Not to my knowledge, no.
Q So to the extent that the rates on page 5 of the 1991 ACR --
A Yes.
Q -- are based on an assumption that an MRS could be constructed and operate for ten years without the repository having received a construction authorization, they're inconsistent with your understanding of the linkages between the MRS and the repository in the Nuclear Waste Policy Act, correct?
A Yes, they're inconsistent, but they also make the assumption that that linkage would get removed.
Q And the other thing I want to ask you about, I don't know which one of these UNWMG documents



it was. If you want to refresh your recollection, I'll dig it out, but there was one document that you testified about that referred to the 1991 ACR being binding or contractually binding. Do you remember -- do you recall that?
A I read that in the document, yes.
Q Look at page 1 of the 1991 ACR. Let's look at the -- highlight the last sentence, and it will go on to page 2. Could you read that beginning with "as specified"?
A "As specified in the standard contract, the ACR's for planning purposes only. It is thus not contractually binding on either DOE or the purchasers."
Q So DOE didn't think the 1991 was -- ACR was contractually binding, right?
A Well, again, as I've explained, DOE didn't think the DCSs were, they thought they were conditional commitments. The ACR in itself is a planning document. It's when it was used by the contracting officer as the basis for the DCSs that it started the contractual process.
Q Okay. And that was -- you skipped to my next question. DOE didn't consider the DCSs binding, is that your testimony?



A I think DOE erroneously considered them to be deconditional commitments.
Q Erroneously, in your judgment?
A I always thought that was erroneous. I just work there.
Q In fact, when you were at WEPCO, that's what you were trying to do when you submitted these ten DCSs for all ten years, you were just trying to get DOE on the hook, right?
A Yes.
Q Yeah. And I -- I feel kind of silly asking this question, but none of these people who have approved DCSs have had one stick of spent fuel picked up, have they?
A Not that I have been told about, no.
Q Now, do you still have Ron Cocherell's letter to -- of October 21, '96 to just US DOE? Oh, Mr. Baptist on -- Defendant's Exhibit 198. Do you still have that up there?
A I do, sir.
Q And that was Southern Nuclear submitting a DCS for Plant Hatch, correct?
A Excuse me. Yes, for 2001 and 2002.
Q Now, if you look at the last page of that, or the second page of that letter, you see the



paragraph that starts with "the attached"?
A Yes, I see that paragraph.
Q It says, "The attached meets the notice obligations under the spent fuel disposal services contracts but does not indicate Southern Nuclear's acceptance of the removal rates contained in the current ACR. Southern Nuclear believes the ACR rates are too low and are therefore inadequate."
Do you see where it that is?
A I see that.
Q Now, the only response Southern Nuclear got to Defendant's Exhibit 198 was Plaintiff's Exhibit 181, which you have before you, correct? That's the letter from you to Ron Cocherell dated December 1 -- no, I'm sorry, wrong exhibit. Not trying to -- 203. 203, can we just put that on the screen, because I'm without it, Defendant's 203. Yes, sir, thank you.
Okay, this is a letter from Ms. Tomasoni back to Mr. Cocherell in response to the DCS submittal, correct?
A That's correct.
Q As far as you know, that's the only response Department of Energy ever made to Mr. Cocherell's letter, correct?
A That's correct.

Q Now, at the time Mr. Cocherell submitted his letter in 1996, the most recent ACR was the one for 1994 that was dated March of 1995, is that correct?
A That's correct.
Q And purchasers were supposed to base DCSs on the most recent ACR. That was kind of the rule DOE imposed, isn't that right?
A That's what the contracting officer told them, yes.
Q Okay. Now, this 1995 ACR, you have testified about it and you participated in putting that together, correct?
A I participated in getting it published.
Q And we're talking about Plaintiff's Exhibit 823, if you've got it. Probably don't need it, but you can get it if you want it.
A If you say that's the number, I believe it, okay.
Q At the time this was submitted, you were the contract officer's technical representative? Was that your title?
A Not at that time, no.
Q Oh, you weren't?
A No, not yet.



Q What were you?
A I'm not quite sure what I was.
Q Can't remember?
A I was something at DOE but not the --
Q But at any rate, you were involved in this?
A I had this published, yes.
Q In producing this document.
Now, this 1995 ACR has the same acceptance rate that the previous ones did, correct?
A That's correct.
Q That the 1991 did?
A It does, yes.
Q All right. And as we've already discussed, that 1991 ACR rate was -- well, maybe we haven't. The 1991 rate was constrained by the capacity limitations of the -- in the Nuclear Waste Policy Act on the MRS facility, correct?
A That's my understanding, yes.
Q That's the 10,000 metric ton limit?
A 10,000 metric tons prior to the beginning of operations of the repository.
Q Right. So what DOE did, basically, was take that 10,000 metric ton capacity limit and divide it by 10 or 12 and came up with something around 900?



A Yeah.
Q I don't think the math works precisely, but that's -- that was the idea, correct?
A Yes, after a ramp-up, yes.
Q Okay. Now, as we've also mentioned, although it reflected those capacity limitations, that rate did not reflect the schedule linkages on the repository and the MRS, right?
A That assumed the schedule linkages were waived, yes.
Q Were waived?
A For the '98 date, right.
Q And this rate does the same thing. This rate is based on the same rate that was in that '91 ACR, correct, that's in Plaintiff's Exhibit 823?
A It does, makes the same assumption on the elimination of the schedule linkage, yes.
Q Okay. So this assumes acceptance at an MRS for ten years without a repository, correct?
A I think it basically assumes that, yes.
Q And when I say "this," I'm talking about the '95 ACR, which is Plaintiff's Exhibit 823.
A Okay, yes.
Q All right. That was supposed to be the basis for the submittal of these -- of DCSs after



1994?
A Correct.
Q Now, it's a fact, though, isn't it, Mr. Zebransky, that as of 1994, there was no active MRS program at the Department of Energy?
A I don't -- can't answer that question. I don't know what was -- the status of the MRS program at the Department of Energy at that point in time.
Q Are you sure? Are you sure you don't know that by the time the '95 ACR, the MRS process had ceased?
A Again, I wasn't working in that process. I don't know exactly what they were up to. It was sort of winding down, but I don't know if it had ceased or died. It certainly was becoming less lively or less active than it was previously.
Q Let me show you -- you remember three years ago when I took your deposition?
A No, other than I enjoyed your company, no, I don't.
Q I enjoyed yours too. I'm going to just ask if something will refresh your memory about this.
MS. SULLIVAN: Counsel, what day?
MR. BLANTON: It's April 18, '02.
THE WITNESS: Three and a half years ago.

MR. BLANTON: And I'm going to show him page 359. Kristin, we don't need to put it up yet.
THE WITNESS: Page 359.
MR. BLANTON: 359.
BY MR. BLANTON:
Q Look at lines 6 through 10, and I'll just ask you again if you don't know that by the time the 1995 ACR was issued, that the MRS process had ceased.
A I believe at that time I answered that I believe it had. Now, I don't know that that's correct or right or wrong answer. That was my belief. Others could tell you more as to what they knew, who were working on it. I wasn't working on it.
Q At any rate, you were fairly certain by 1995 that there was not going to be an MRS in 1998, weren't you, Mr. Zebransky?
A I believe I had my doubts, and I believe the department was sufficiently uncertain that they went to this year one, year two as opposed to 1998, yes.
Q In fact, shortly after the publication of the 1995 ACR, the planning basis for the waste system shifted from an MRS and repository system to a repository-only system, did it not?
A At some date afterwards, yes, it did.



Q Fairly soon afterwards?
A I don't know how soon after. Mr. Kouts would be better to answer that question than me.
Q Okay. Now, if the MRS were not going to be a part of the waste system, the capacity limits in the 1987 Nuclear Waste Policy Act amendments wouldn't be a constraint on the acceptance rate now, would they?
A I believe that's the case, and that's why they're not a constraint on the current requirements documents.
Q DOE never used the acceptance rates in that document, Plaintiff's Exhibit 823, to plan anything regarding the actual operation of the waste system, did it?
A Not of a repository. I can't speak to what they used prior to '94 or the '94 time frame. I wasn't there.
Q It's true, isn't it, Mr. Zebransky, that in leaving that 900 metric ton rate in this 1995 ACR, the intention of the Department of Energy was to try to minimize its liability to contract holders?
A I think I've said that I'm sure that that was one of the things they must have been thinking about, but there was also no other rate they could



have put in there in the short term. They had no other plans at that time, in '94, other than the MRS. It was still the planning basis and it was changed later.
Q Might have been no other rate, but the reason they left the rate they did leave in there is they're trying to minimize their liability to contract holders, correct?
A And again, I think my opinion was that I'm sure that factored in their minds. Keep in mind they also thought that their liability was conditioned upon the existence of the facility.
Q It sure wasn't because they thought an MRS was going to be available in 1998, was it?
A I can't tell you what they thought. I mean, these are numbers that were program planning basis at the time.
Q Now, the DCS process was also suspended in order to limit the department's liability and commitments to its contract holders, wasn't it?
A I think after the Indiana Michigan decision came out and people understood that these were firm commitments that it was no longer appropriate to continue to make them, and I'm sure that someone who advised the contracting officer



thought it was appropriate to no longer make commitments you couldn't keep.
Q And, in fact, there wasn't any way to tell when a DCS was even due under the year one, year two scheme in the 1995 ACR, was there?
A I think most utilities presumed it was due in the calendar year in the operations they were putting the DCS in for. I never received any questions about that when I was at DOE.
Q But there wasn't any way to tell what year one was?
A People had to interpret that, I guess.
Q I think you already testified, but when you suspended the DCS process in 1997, you did so on advice of counsel?
A Well, the contracting officer suspended it and, yes, counsel advised the contracting officer to --
Q I was using the royal "we" there to refer to DOE.
A Okay.
Q Excuse me.
A That's fine. I believe counsel was involved in that decision.
Q And DOE has not reviewed a DCS since 1997,

correct?
A Not that I'm aware of.
Q Even when you resumed the process in 2004, you didn't review any DCSs during that six-month period?
A Well, we didn't receive any until October of that year.
Q And didn't review those?
A Received them, we made sure they were complete, we looked at them, we were ready to process them and the decision was made to not process them.
Q Send them back?
A Right, that's correct.
Q So I think the record's fairly clear, but just to make it completely clear, it's been impossible since 1997 for a contract holder to have a approved DCS, correct?
A I think that's a fair statement.
Q And Department of Energy has made the decision it will not process DCS submitted for pickup in any year prior to a year in which it scheduled the repository to commence operations, correct?
A Could you -- could you repeat that?
Q I'll try again. That was a long question. DOE has decided that it will not process any DCS



submitted in advance of 63 months prior to the scheduled date of repository commencement?
A I think it's fair to say DOE has decided it will not commit to a pickup of spent fuel at a date it doesn't know it can meet.
Q So DOE is continuing, in essence, to limit its -- trying to limit its liability to the existence of a repository?
A DOE is, I think, more practically limiting its planning and its commitments to a date it knows it can have a facility. It would be inappropriate to commit to picking up fuel when we know we don't have a facility to pick it up at.
Q We may be playing word games, but it's not going to enter into a commitment to a utility prior to having a repository commencement date, correct?
A I think that's a -- yes, we will not commit to pick up fuel if we know we can't pick it up.
Q So it's continuing to try to limit its liability to the existence of a repository, correct?
A I don't think that's what I'm saying. I'm saying that it would be inappropriate to say we'll pick fuel up on date X when we know we can't do that.
Q At any rate, you're not going to commit anything until you have a repository commencement



date?
A Until there is an operational date that the department cannot -- can stand behind, I don't believe that we're going to initiate the process again.
MR. BLANTON: Your Honor, if I could have two minutes to make sure I didn't have something buried in here that I wanted to ask that I've forgotten --
JUDGE MEROW: Sure, take whatever time you need.
BY MR. BLANTON:
Q Mr. Zebransky, I'm going to hand you Plaintiff's Exhibit 183.
MR. BLANTON: Your Honor, may I approach?
JUDGE MEROW: Yes, yes, of course.
THE WITNESS: Thank you, sir.
BY MR. BLANTON:
Q Plaintiff's Exhibit 183. Mr. Zebransky, I've handed you what's been marked Plaintiff's Exhibit 183. Do you recognize that document? I think it's already in evidence.
A Well, it says it's a statement of Ted Garrish. I presume it is. I don't really recognize it, but I believe it must have been Mr. Garrish's



statement of March 10, 2005.
Q Did you provide input to Mr. Garrish for his statement?
A I provided input to those preparing Mr. Garrish's statement, yes.
Q About one, two, three, four down, fourth paragraph down, the statement says that "60 lawsuits are pending in the U.S. Court of Federal Claims for damages for failure of government to meet that obligation in 1998. The government has estimated damages due commercial utilities could be approximately 2- to $3 billion if the department began operations in 2010. Each year of delay after 2010 could cost the government an additional $500 million in damages."
See that?
A I see that.
Q Did you provide the analysis for that, those numbers?
MS. SULLIVAN: Your Honor, I'm going to have to object to these questions. I believe this issue came up in Mr. Zebransky's issue in this matter, and we asserted privilege over the work that Mr. Zebransky did on -- at the direction of counsel with regard to the preparation of this statement,

REDIRECT EXAMINATION
BY MS. SULLIVAN:
Q Mr. Zebransky, I'd like to go back to Defendant's Exhibit 337, which is the chart that you testified to with regard to the DCSs, if you want to put that in front of you.
A Yes.
Q And I just want to ask you about the allocations for DOE that Mr. Blanton asked you about on direct -- I mean, on cross, excuse me.
A Yes, sir -- ma'am.
Q What is the effect of DOE not submitting DCSs for beginning in the -- beginning with year three, year four and so on? What is the effect that that has?
A I'm not sure what effect that has at this point on DOE. I mean, the issue there is, my knowledge is basically that the first two years, the first two DCSs were submitted within the RW program because that was fuel RW managed. The other DCSs -- the other allocations were spread outside -- throughout the organization, out of the agency, and I presume people just didn't do what they were supposed to do. I don't -- the effect is that at some point -- again, I'm not sure there is an effect. I don't know,



to answer that question.
Q Okay.
JUDGE MEROW: Is it your understanding that if someone doesn't submit an allocation, say, for one year, does the allocation roll over to -- can it be included in --
THE WITNESS: I guess the question that you submitted late, does that mean you forfeited it? And I think you'd have to look at that on a case-by-case basis. It depends how late, depends what else has happened, I think.
MS. SULLIVAN: You got to where I was trying to go. No further questions.
JUDGE MEROW: Okay. Any further cross?
MR. BLANTON: No, sir.
JUDGE MEROW: Okay, you're excused. Thank you very much for your testimony.
THE WITNESS: Thank you, sir.
(The witness stood aside.)
MR. EKMAN: If we could take a short break, and we can put Dr. Neuberger on the stand.
JUDGE MEROW: What do you need, 20 after, or ...
MR. EKMAN: 20 after would be great.
JUDGE MEROW: Okay.



(A recess was taken from 11:06 AM through 11:20 AM)
JUDGE MEROW: Please be seated. Mr. Ekman?
MR. EKMAN: Good morning. Before I call our next witness, the government would like to withdraw its request to admit DX23. Yesterday I provided a list of exhibits, and we're withdrawing DX23.
JUDGE MEROW: Okay.
MR. EKMAN: Your Honor, the government calls Dr. Jonathan Neuberger.

DR. JONATHAN A. NEUBERGER
was sworn and testified as follows:
EXAMINATION
BY MR. EKMAN:
Q Good morning, Dr. Neuberger.
A Good morning.
Q Could you state your full name and address for the record?
A Jonathan A. Neuberger, N-E-U-B-E-R-G-E-R. My address, 361 28th Street San Francisco, California.
Q And where are you currently employed?
A I am senior vice president at the



consulting firm Economists, Incorporated.
Q And could you tell the Court what Economists, Incorporated does?
A We are a small economic consulting firm, approximately 35 professionals. We provide a variety of economic analysis services to clients engaged in litigation, regulatory proceedings and other matters.
Q And where do you-all have offices?
A Our main office, our home office is here in Washington, DC, on New Hampshire Avenue, and we have another office in Emeryville, California.
Q And you work out of the Emeryville office?
A That's correct.
Q Could you tell the Court where and when you attended college?
A I attended Georgetown University from 1974 to 1978 here in Washington, DC.
Q You earned a bachelor's degree?
A I did.
Q In what area?
A My bachelor's degree is a Bachelor of Science in international relations with a concentration in international economics.
Q After college, did you attend graduate school?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

NORTHERN STATES POWER COMPANY, )
Plaintiff,) Case No.
v. ) 98-484C
THE UNITED STATES, )
Defendant.)

National Courts Building
717 Madison Place NW
Washington, D.C.

Monday, November 20, 2006
Volume 15

The parties met, pursuant to the notice of the Judge, at 10:29 a.m.

BEFORE: THE HONORABLE JOHN P. WIESE



APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Pillsbury Winthrop Shaw Pittman LLP
14th Floor
McLean, Virginia 22102
(703) 770-7940
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, Northwest
Washington, DC 20037-1122
(202) 663-8063



APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
HEIDE HERRMANN, ESQ.
JOSHUA GARDNER, ESQ.
STEPHEN FINN, ESQ.
ANDREW P. AVERBACH, ESQ.
JOHN EKMAN, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

(Index appears at end of transcript)



P R O C E E D I N G S

\- - - - -

THE COURT: Let us go on the record. We convene proceedings this morning for the continuation of the trial in Northern States Power v. United States, and the case number is 98-484C. Mr. Tomaszczuk, are there any preliminary matters?

MR. TOMASZCZUK: No, Your Honor, good morning. None from Plaintiff.

THE COURT: Good morning, thank you. Ms. Herrmann?

MS. HERRMANN: Good morning, Your Honor.

THE COURT: Good morning.

MS. HERRMANN: No preliminaries for the government.

THE COURT: Excellent. Mr. Lo Re, good morning.

MR. LO RE: Good morning, Your Honor.

THE COURT: Good morning, Mr. Zabransky.

THE WITNESS: Good morning, Your Honor.

THE COURT: You did go home over the

of DOE, is that right?
A. Those were employees of the USGS, correct, they were contractors.
Q. You used the term "LA." What does that mean?
A. That's license application.
MR. LO RE: Thank you. Thank you, Your Honor.
MR. EKMAN: Your Honor, may I approach to hand up some binders to the witness?
THE COURT: Of course. Since this is the last week, why don't we have a continuous approach, right, it is the last week, isn't it?
MR. LO RE: We do have Mr. Gardner here, Your Honor.
THE COURT: One never can be sure under those circumstances.
MR. TOMASZCZUK: It's certainly our intention that this would be the last week, Your Honor.

CROSS-EXAMINATION

BY MR. TOMASZCZUK:
Q. Good morning, Mr. Zabransky.
A. Good morning.
Q. That last series of questions and



answers you had with the Court, is it true that the allegation with respect to the USGS personnel was that some data had been falsified in connection with the Yucca Mountain license application work?
A. I don't recall that. I recall that the question was that they were, in essence, playing loose with some of the QA procedures and maybe falsifying QA documentation, but I don't recall the data was falsified.
Q. I'll take that qualification. Now, Mr. Zabransky, you testified in the Yankee cases, is that right?
A. Yes, I did.
Q. And you testified in the Sacramento Municipal Utility District case?
A. Yes, I did.
Q. And you testified in the Tennessee Valley Authority case, correct?
A. Yes, I did.
Q. And you testified in the Southern case?
A. Yes, I did.
Q. And you testified most recently in the Pacific Gas & Electric case?



A. Yes, I did.
Q. So by my reckoning, this is the sixth spent nuclear fuel case in which you've testified at trial, correct?
A. I guess so, yes.
Q. This demonstrative that was just used and admitted, subject to some caveats, do you have that handy? And, Mr. Zabransky, did you actually prepare this demonstrative?
A. No, I did not.
Q. Someone else did?
A. Yes.
Q. The demonstrative is based on a 900 metric ton acceptance rate, is that right?
A. This is based upon the 1991 through 1994 ACRs, I believe, yes.
Q. And those -- I'm sorry.
A. That's fine.
Q. Did you finish your answer?
A. Yes.
Q. And those ACRs are, in turn, based on a 900 metric ton rate, is that correct?
A. The first year is 400, the second year is 600, and the balance of the years is 900, that's correct.



Q. Thank you for that clarification. My question was somewhat imprecise. Those ACRs are based on a ramp-up to 900 and maintaining a 900 rate to year 10, correct?
A. That's correct.
Q. And the allocations that are evidenced in the column on the right-hand side ACR allocation total, in turn, reflect a ramp-up to 900 and then staying at 900 through year 10, correct?
A. That's correct. It's 8,200 tons over the first 10 years.
Q. Now, by my reckoning, even if you assume the 900-ton rate on which this chart is based, Northern States Power Company, the Plaintiff here, has the fifth most allocations in terms of ranking, would that be your assessment?
A. I'd have to look. I never checked that, but --
Q. I might have missed one, it might be six.
A. They have 318, it looks like.
Q. Yes.
A. And Philadelphia has more, and that's

one, and TVA has more, that's two. Virginia has more, that's three, Florida has more, that's four, Duke has more, that's five, Commonwealth has more, that's six, so it looks like they have the seventh place ranking, I believe, unless I missed one.
Q. Northern States Power ranks seventh on the list, even assuming that 900 metric ton rate allocation, correct?
A. For the first 10 years, according to this list, yes.
Q. Out of how many, seventh out of how many total are listed on this chart?
A. Okay. I'll count that, I believe there's -- let me count it, I believe there's 60, but it's a quick counting.
Q. So Northern States is seventh out of 60?
A. For the first 10 years on this chart, yes.
Q. And the chart only goes out 10 years, is that right?
A. That's correct, yes.
Q. Now, it's not your understanding that DOE's performance obligations stop at year 10,



is it?
A. DOE's ultimate obligation is to pick up all the spent fuel.
Q. Let's go over a little bit, Mr. Zabransky, about the timeframe after you became -- or what I understand after you became COTR, and if I understood your testimony, there was a letter sent out to all of the utilities in or about March of 1997, in which the process was suspended, that is, the DCS process was suspended?
A. It was late '96, early '97, I'm not sure exactly when it went out.
Q. Can I get you to look at a document, it's in one of the binders up there, it's Exhibit Number 589A, and I think it would be in, if the document gods are working today, it would be in binder 83.
A. It's under tab 589A?
Q. Yes, sir.
A. My binder is blank.
Q. Maybe Mr. Herzfeld can use the approach pass and see if he can find it. Mr. Zabransky, are you with me?
A. I am, yes.



Q. And do you see the document which appears to be a March 13th, 1997 letter?
A. I do.
Q. And that letter is directed to Mr. EL Watzl, vice president nuclear generation, Northern States Power Company, correct?
A. I do. Yes, it is.
Q. And the letter is signed, might have to scroll down a little bit, signed by Ms. Tomasoni, the contracting officer?
A. That's correct.
MR. TOMASZCZUK: And, Your Honor, for the record, this document was previously admitted during the testimony of one of the witnesses in Minnesota, I'm not sure which one.
BY MR. TOMASZCZUK:
Q. Can you read the second paragraph for us into the record, Mr. Zabransky?
A. Yes. "The Department is not able at this time to approve your DCS submittal. Consequently, the Department hereby waives until further notice the contract requirement that you provide a revised schedule within 30 days."
Q. And you saw this letter at or about



the time it was sent, correct?
A. I believe that's the case, yes.
Q. And you were serving as the contracting officer's technical representative at or about this time?
A. Yes, I was.
Q. And a letter like this was sent to all of the utilities which had signed the standard contracts with the Department of Energy?
A. I don't believe so.
Q. You don't believe a letter like this was sent to other utilities?
A. I believe it was sent to other utilities, yes.
Q. But not to all of them?
A. I don't believe to all of them, no.
Q. You would at least agree that Northern States got one, correct?
A. They've got this one, yes.
Q. And this letter was essentially suspending the DCS process in or about March of 1997, correct?
A. Yes.
Q. And you did not agree, did you, sir, with the decision to suspend the DCS process at

this time?
A. I don't recall that I agreed or disagreed with us, there was a lot of discussion about it, I believe that, ultimately, this was the right thing to do, but because we couldn't follow to the commitments, it wasn't clear to me this was the best way to do this, but this is how we did it.
Q. And isn't it true, Mr. Zabransky, that based on your view of the DCSes as you articulated in testimony on Friday and, again, here today, isn't it true that you understood the Department had an obligation to approve DCSes that had been submitted in accordance with the DCS instructions?
A. I said, I think, on Friday that the COTR, if they met the technical requirements, I would recommend them for approval. On the other hand, it wasn't clear to me we could continue to approve documents when we knew we couldn't follow through with the services being requested.
Q. And isn't it true, Mr. Zabransky, that the decision to suspend DCSes, that was not your recommendation, right?



A. Again, my recollection was that my recommendation was -- or my belief was we needed to do something. Ultimately, the Department decided to do this. Beth made this final determination, and it was based upon advice they were given by those in the Department that give her advice on these types of matters.
Q. But it was not your recommendation that this was the appropriate course of action, correct?
MR. LO RE: Your Honor, I'd like to lodge an objection here. I'm not sure exactly what this line of questions is leading to. I think we have a clearly established record as to what the Department did and how Mr. Zabransky worked in that process, and his personal opinions, I don't know how those happen to be relevant to the inquiry at hand.
THE COURT: Well, Mr. Tomaszczuk is not really so much exploring the witness' personal opinions as the mechanics and decision processes that lay behind the decisions to suspend the DCS process. This witness was in a unique position to give us those facts,



Mr. Lo Re.
MR. LO RE: And, Your Honor, based on that, we would withdraw the objection with respect to the mechanics, that's fine. Thank you.
THE WITNESS: Well, again, I think the question was -- I wasn't asked for a recommendation as to how to do this. I brought an issue up, and that needed to be done, and I was not -- I was a technical representative. This was an issue that was dealt with by the legal group.
BY MR. TOMASZCZUK:
Q. And in point of fact, isn't it true, Mr. Zabransky, that the decision to suspend DCSes was made on advice of counsel, is that right?
A. I believe that's true, yes.
Q. And counsel made that recommendation to essentially limit DOE's liability to the utilities, correct?
A. Well, again, I mean if that's the effect of it, the answer was we couldn't do these things anymore, so whether you'd call that limiting liability, that's certainly what



comes out of not signing up to do things, you know, you can't do, but it's also not appropriate to sign up to do things you know you can't do.
Q. And in point of fact, since that direction came from counsel in or about March of 1997, DOE has not approved any DCSes, have they?
A. No, because DOE has not been in a position to follow through on commitments it would make if it approved the DCS since that time.
Q. And, indeed, it's not possible for any utility, Northern States or anyone else on this list, to obtain an approved DCS, isn't that correct?
A. Until DOE is in a position to actually be able to perform at a given schedule, it's not appropriate or possible to do that.
Q. So in the real world, these DCSes, approved or not, are not worth very much sitting here today, are they?
MR. LO RE: Your Honor, I'm going to object on the ground that that is argumentative, it also assumes facts not in

evidence, and I would ask that --

THE COURT: Well, we can at least get the witness' evaluation of where this matter stands from his point of view. I'm not sure that it's going to carry into the Court's ultimate decision, but, again, we have an individual that has some views on this process and its implications, and so I think we can follow up from that thought and ask him to answer the last question.

MR. LO RE: And that's fine, Your Honor, although I would just say, for the record, that Mr. Zabransky has previously testified about his understanding of the importance of the approved DCSes.

THE COURT: He certainly has. He certainly has.

MR. TOMASZCZUK: Which is precisely why I asked the question I do.

THE COURT: Well, I was going to say that, so you may answer the question, if you still remember it, Mr. Zabransky.

THE WITNESS: Can you repeat the question?

MR. TOMASZCZUK: Ms. Reporter, could



you read it back?

(The reporter read the record as requested.)

THE WITNESS: Well, again, in the real world, I mean, once DOE begins to perform and if nobody's changed the DCS, the ones that exist are the ones we're going to work to, so a utility may want to change what's on a DCS because circumstances have changed, but other than that, if it's not changed, we're going to dust those files off and we're going to, you know, basically go into service in accordance with those queues.

If the rates change, we'll have to re-evaluate what to do with that, and the utility will have to talk to us, but the first year, the rates are the same, and the second year, the rates are the same.

BY MR. TOMASZCZUK:

Q. All the utilities that have approved DCSes, those DCSes are based on the 400, 600 ramping up to 900 and then staying at 900 through year 10, correct?

A. That's correct.

THE COURT: Would it be fair to say,



Mr. Zabransky, that you see the DCSes at this juncture as representing performance commitments that have been suspended?

THE WITNESS: Yeah, I believe that's the case.

BY MR. TOMASZCZUK:

Q. Isn't it true, Mr. Zabransky, that any new DCSes that are approved will replace, rather than supplement any previously approved DCSes?

A. I believe that's what we told the contract holders when we started the process, so that if indeed Wisconsin Electric wanted to send a new DCS in for year one, that we would agree with them that this replaced the existing DCS, and it didn't mean that they had two allocations for year one.

THE COURT: But if in fact Wisconsin were not to respond to any request and indicate any change in its prior allocation, then you would continue to see the original DCS as in force and suspended?

THE WITNESS: As their commitment to us and we would follow through at a later date and follow through.



THE COURT: And in turn, your commitment to them?

THE WITNESS: Yes.

BY MR. TOMASZCZUK:

Q. And isn't it true, Mr. Zabransky, that the, jumping ahead seven years to 2004, the 2004 APR/ACR has a totally different set of rates than those set forth in either the 1991 ACR or the 1995 ACR, correct?

A. No, it's not totally true.

Q. You would agree that the 2004 APR/ACR uses rates which ramp-up to 3000 in or about the sixth year of anticipated performance and stay at 3000 for a period of years?

A. Yes, it starts at 400 tons the first year, 600 tons the second year, and then ramps up to 3000 because it was based on the operation of a repository beginning in 2010 at Yucca Mountain.

Q. And let's look at what adoption of those rates would mean both for Northern States Power Company and for your former employer, Wisconsin Electric, and I believe this would be Plaintiff's Exhibit 163. And if I can get us to refer to page three of table 2 of that

document, do you have it, Mr. Zabransky, the 2004 APR/ACR?
A. I do.
Q. And it would be KRG NSP 03601.
A. Okay. That's correct.
Q. And this is the document which you worked on, which was issued in the summer of 2004, correct?
A. That's correct.
Q. And in this document, DOE was telling utilities this is the latest plan for our performance of the contract, correct?
A. Yes.
Q. And if you look at the allocations for --
MR. TOMASZCZUK: And, Your Honor, this has been previously admitted as, well, Plaintiff's Exhibit 163.
BY MR. TOMASZCZUK:
Q. If you look at the allocations for Northern States Power? And what does that say to you with respect to their allocations for the first 10 years of performance?
A. It says to me that, based upon a repository operations, without the restraint of



an MRS, that their first 10 years would have us ramping up to quantities that were greater than our earlier plans for performance of an MRS.
Q. Indeed, more than double, correct? 687.6 metric tons per this chart, correct?
A. For this chart, that looks to be true, correct, yes.
Q. As compared to 318.54 metric tons, as reflected in the Demonstrative Number 1?
A. Yes, but this is beginning in 2010 in a repository, and the other chart was for 1998 for performance at an MRS.
Q. And to the extent that new DCSes are submitted, utilities can use these metric ton rates reflected at table two of Plaintiff's Exhibit 163, correct?
A. I would assume they would do that, yes.
Q. And there would be absolutely no reason for them not to use these rates, correct?
A. I can't think of any.
Q. And what happens to the tonnages of your former employer, Wisconsin Electric, do you recall?



A. I believe that the first two are the same, and then they begin to increase.
Q. All right. So on Demonstrative Number 1, if I'm reading it correctly, Wisconsin Electric had ACR allocations based on the 900 rate of 227.94, correct?
A. That's correct.
Q. And in this 2004 document, they have allocations of 422.5, correct?
A. That's correct.
Q. An increase of almost 200 metric tons over the first 10 years of anticipated performance?
A. That's correct.
Q. And there wouldn't be any reason for Wisconsin Electric to use their old allocations instead of these new ones, is there?
MR. LO RE: Your Honor, I'm going to object on the grounds that this calls for speculation.
MR. TOMASZCZUK: He worked there for --
THE COURT: It's a very interesting question that's being pursued right now. It really is an elaboration of this witness' view



of the nature of the commitments subsumed in the DCSes.
MR. LO RE: Thank you, Your Honor.
THE WITNESS: Well, again, for the first two years, the quantities are the same, so when they chose to change those or not would be up to them. Beyond that, they've been afforded more allocations, so I presume if I were them, I would be sending in a new one and asking to replace my old one with a new one for a larger quantity.
BY MR. TOMASZCZUK:
Q. And there would be absolutely no reason for them not to do that, correct?
A. And, again, I can't think of any, sitting here right now.
Q. I believe you testified this morning, Mr. Zabransky, that once these DCSes were signed and approved, they couldn't be changed, that's what I wrote down.
A. I think I testified once they were approved, they couldn't be changed without both parties agreeing to change them.
Q. Let's look at the next page of this Exhibit 398A, shall we?

A. I don't recall if they were sent back or just the letter was sent back.
Q. Well, we know that the letter was sent back because there's the previous document, Exhibit 589-A is a letter to Northern States, correct?
A. Yes.
Q. Doesn't indicate whether there were any enclosures with that letter, does it?
A. No, it doesn't.
Q. Isn't it in point of fact true that the Department of Energy did not want to provide this voided DCS to Northern States Power?
A. I don't recall any specific discussion as to whether enclosures were made or shouldn't be made.
Q. Did you ever undertake to give Northern States Power a copy of this voided DCS?
A. I don't believe they were asked for one.
Q. I'm sorry, I didn't hear you.
A. I don't believe they ever asked for one.



Q. Is it your understanding that they had an obligation to ask for a voided DCS?
A. It said if they had any questions on this matter, they should contact me, I don't recall they ever did, that was in the letter that was sent to them.
Q. Didn't the cover letter advise Northern States that the DCS had been voided?
A. It advised them that we were not approving DCSes at this time.
Q. Isn't it true, Mr. Zabransky, that this document, this voided DCS reflects DOE unilaterally changing a signed, purportedly binding, document on its own?
A. I don't think it does. Again, I'm not a lawyer, but we never sent it back to them, it was stopped before they received the approved DCS, it never reached them. It was our intention to stop the process, is my understanding.
Q. Now, in completing DCS forms, utilities had to follow the instructions that the Department of Energy provided, correct?
A. I believe they did, yes.
Q. You believe they had to follow the



instructions that the Department of Energy provided, correct?
A. I believe they should have, not everybody did.
Q. And those instructions which guided both NSP's completion of this form and any other utility that filled out this form, those instructions directed the utilities to use the allocations in the underlying ACR, correct?
A. I believe that's correct, yes.
Q. And the utility that asked for allocations beyond those specified in the ACR would not have had its DCS approved, correct?
A. That's my understanding. I don't believe it ever happened while I was there, but I believe it happened before I arrived. Utilities had asked for larger allocations, and those were not approved.
Q. Do you know whether the New York Power Authority asked for allocations in excess of those accorded to it by the 1991 ACR?
A. I believe they were one of the utilities that did that, yes.
Q. And that the Department of Energy rejected New York Power Authority's DCS because



those allocations exceeded those in the 1991 ACR?
A. I believe that's what I recall, yes.
Q. Now, Mr. Zabransky, you've read the contract in this case, right?
A. That's correct.
Q. Now, the contract, as opposed to the DCS instructions, it does not state that a utility is precluded from seeking delivery of spent nuclear fuel greater than its ACR allocations, correct?
A. I don't think the contract speaks to that point.
Q. So this requirement that utilities utilize the rates in the 1991 ACR, that's based on the instructions that DOE issued, not the contract, correct?
A. That was based upon the contracting officer's guidance on how to prepare the DCSes and how we were going to allocate the limited capacity we had for acceptance.
Q. And that guidance is embodied in the instructions, not in the contract, correct?
A. It was the contracting officer's interpretation of how they were going to do

business, correct.
Q. And, indeed, there's nothing in the contract about issuance of the instructions which accompanied the 1991 ACR, correct?
A. The contractor says there'll be a DCS process. The contract doesn't stipulate the details of the process. Those were provided by the contracting officer.
Q. And instructions?
A. Yes.
Q. Now, the contract actually says, even after a DCS has been submitted, a utility may request an increase in its allocations, or a decrease in its allocations, plus or minus 20 percent, correct?
A. The contract says that, correct.
Q. And under the contract, DOE would have to honor such a request, correct?
A. We'd have to review such a request, correct.
THE COURT: What do you understand the word "honor" to mean to counsel's last question to you, Mr. Zabransky?
THE WITNESS: Well, counsel asked me, for the utility to request an additional



quantity, the answer is they could request it, and DOE would have to review their request and see if it could accommodate it.
THE COURT: But you don't see the request as giving rise to an obligation to fulfill that request?
THE WITNESS: Not without DOE's concurrence that it could meet it, I mean, it would just be nonsensical to have everybody ask for 20 percent more of a finite system.
THE COURT: Okay. Thank you.
BY MR. TOMASZCZUK:
Q. So DOE's obligations under the contract are contingent upon whether it can meet them?
A. DOE's obligations under the contract are to pick up the spent fuel. DOE can't commit to do things that it physically can't do without -- the case you bring up is if the utility asked for 20 percent more, the only way to accommodate utilities doing that is to take it away from another utility. There's only a certain amount of capacity that the DOE facilities will have.
So without taking from Peter, we can't



give it to Paul.
Q. That understanding you just expressed, was that your view when you were deposed in these cases in 2002?
MR. LO RE: Your Honor, I'm going to object on the grounds that this is not evidence. If Mr. Tomaszczuk is attempting to impeach, then I don't think this is a proper way to impeach by reference to --
THE COURT: I think it's an appropriate question, Mr. Lo Re. We want to know if the view of this witness has remained consistent, and I believe he's entitled to ask that question. If there's a reason to believe there's a difference between present testimony and past testimony, the witness should be shown a basis for that.
MR. LO RE: And that's exactly our concern, Your Honor. If Mr. Tomaszczuk has some testimony he wants to show him, then we would ask, rather than to read it in, you know, an interpretation by an attorney of what somebody said.
THE COURT: I know. I know. This is always trouble, but let's proceed one step at a



time. We'll go forward with the question. If we don't get an answer that everybody understands, then we'll go to the document and call out the prior testimony to the witness' attention.
THE WITNESS: Could I get a little water?
MR. TOMASZCZUK: Absolutely.
(The reporter read the record as requested.)
THE WITNESS: I believe it's been my view from back in the '80s that the plus or minus 20 percent was an issue that couldn't unilaterally be implemented by either party. I'm not sure if in many, many, many days of deposition, if I didn't express that totally clearly, but, again, from a physical standpoint, it would be nonsensical that, unilaterally, everybody could ask for, even if it was a 3000-ton facility, 3000 tons per year.
That would mean you would have to have 3600 tons. If we built 3600, then they'd ask for 4200, so there always had to be some agreement between the parties, quite frankly, Mr. Tomaszczuk, I don't know if sometime in the

last six years I wasn't clear on that.
THE COURT: I think we've seen sufficient examples this morning to lead us to understand that questions and answers might not always mean what they seem to mean on first hearing, so without a further exploration by a court or somebody else in the courtroom, we can sometimes wind up with a record that gives us a very misleading understanding of the witness' testimony.
BY MR. TOMASZCZUK:
Q. In your answer you just provided, Mr. Zabransky, you alluded to your tenure at Wisconsin Electric or WEPCO, correct? And you were there for a period of more than 10 years, if my notes are accurate, right?
A. More than 10 years, yes.
Q. And just could you refresh my and the Court's recollection as to the period, the years when you started at WEPCO and when you left there?
A. I started in 1978, and I left in 1994.
Q. So you were there for 16 years?
A. Yes.
Q. And while you were at WEPCO, you



believed that a reasonable acceptance rate under this contract or WEPCO's contract would have been one that would have reflected the aggregate rate of discharges, plus some amount of working off the backlog, isn't that correct?
A. I believe that at the time that, yeah, I mean, let me clarify that, given an unconstrained world, a world where there was nothing artificial stopping the system, that would be a good goal for DOE to try to reach.
Q. And while you were at WEPCO, what was your understanding as to the aggregate rate of discharges among the utilities that had contracts with DOE?
A. The aggregate rate of discharges has sort of stayed the same for the last 20-odd years, and I think it's nominally about 2000 tons per year on a steady state basis, 2000 metric tons of spent fuel.
Q. And so if all of the utilities that had standard contracts had gotten approved DCSes and changed those DCSes and increased them by 20 percent, that would have increased the requirements on the system by how many metric tons?



A. I don't understand your question.
Q. All right. That may not have been a very good question. If all of the utilities who had approved DCSes decided to increase their DCS allocations by 20 percent and you assumed that their discharges on an annual basis were about 2000, wouldn't that mean that the system would have to be at or above 2400 MTUs on annual basis to accommodate that?
A. Well, again, the DCSes that were proffered and approved were based upon the 900-ton system, so I don't think their statement is true.
Q. If it had been assumed that the 2004 rates apply, okay?
A. That was a 3000-ton system.
Q. All right. And what I'm trying to get at is if the system at some point was -- a period where it was ramping up to 3000, but had been at 2000, isn't it true that if all of the utilities had increased their DCSes by 20 percent, that would have required DOE to have a system that could handle 2400 metric tons per year?
A. That's what that sort of says, but,



Mr. Tomaszczuk, the reason it was 2000 on the way to 3000 was it was only physically capable of 2000. And when it's 3000, it's physically capable of 3000, not 3600?
Q. And the Department's current plans, as reflected in the 2004 APR/ACR, is to have a system that will ramp-up to 3000 metric tons in the sixth year of performance, is that correct?
A. That's correct.
Q. And that system would easily accommodate all of the discharges of the standard contract holders, correct?
A. Well, again, the DCSes that we looked for, for the sixth year, were for 3000 tons, so, yes, that's more than the 2000 that are currently discharged.
Q. And once the system ramps up to 3000, that would also accommodate some increases in the DCSes that utilities submitted?
A. No, that's not true.
Q. Okay. Let's look at the 2004 ACR/APR instructions, and I believe that would be Exhibit 334, should be binder 62, Mr. Zabransky.
A. And the number was?

5447

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------x

WISCONSIN ELECTRIC POWER COMPANY, :
Plaintiffs, :
vs. :NO. 00-697C
THE UNITED STATES, :
Defendant. :

-------------------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Thursday, October 11, 2007
Volume 23

The parties met, pursuant to the notice of the Judge at 10:05 a.m.

BEFORE THE HONORABLE JAMES MEROW



APPEARANCES:

ON BEHALF OF PLAINTIFFS:
RICHARD OEHLER, ESQ.
JAY GRIFFITHS, ESQ.
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101
(206) 359-8000
and
EMILY POULIN, ESQ.
DONALD CARNEY, ESQ.
MARY ROSE HUGHES, ESQ.
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005
(202) 628-6600



APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
SHARON SNYDER, ESQ.
RUSSELL SHULTIS, ESQ.
STEPHEN FINN, ESQ.
SONIA ORFIELD, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

(Index appears at end of transcript)



P R O C E E D I N G S

(10:05 a.m.)

MS. SNYDER: Your Honor.

THE COURT: Yes.

MS. SNYDER: Before Ms. Orfield gets started, the government has one housekeeping matter that we'd like to discuss with the Court, if we may just briefly.

THE COURT: Sure.

MS. SNYDER: We are very mindful of the Court's interest in moving the case along, given the fact that we're going to be needing to move to another courtroom next week, which if that happens, you know, means we're going to have to move all this electronic equipment, it's going to be quite a headache for everyone involved, I think. In addition, obviously, we're now into our fifth week of trial.

The government is trying to move our case along, we would very much like to be finished tomorrow by the end of the day. Now, having said that, what we would propose is going a little later today to give us a little more time to complete testimony, whatever the Court, you know, deems reasonable, 6:30, we'd

Q. You would agree with me, wouldn't you, that the NRC reviews the adequacy of 50.59s?
A. The NRC reviews -- gets, as I said a notification about the ones that were done, I'm not sure to what extent the NRC actually conducts any kind of review on them. They can do whatever they want with them, it could be a minor review, it could be another review, it could be whatever. They get a notice about them every couple of years. They then review them to the extent that they want to.
MR. CARNEY: Thank you very much, Mr. Brewer.
THE COURT: Any further questions?
MS. ORFIELD: Nothing, Your Honor.
THE COURT: You're excused. And thank you very much for your testimony.
THE WITNESS: Thank you, sir.
MS. SNYDER: Your Honor, the government calls Mr. David Zabransky. Your Honor, we're going to take another two-minute break.
THE COURT: Oh, okay.
(Whereupon, a short recess was taken.)
MS. SNYDER: I believe you're still



sworn in, is that right?
THE WITNESS: Okay.
THE COURT: Yes.
Whereupon--
DAVID ZABRANSKY
a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:
DIRECT EXAMINATION
BY MS. SNYDER:
Q. Mr. Zabransky, good afternoon.
A. Good afternoon -- good evening.
Q. I want to ask you some employment questions we went over before, but it was quite some time, so I want to set the stage. Where are you currently employed?
A. I'm employed at the Department of Energy in Washington, D.C.
Q. And what's your current position?
A. Nuclear utility specialist in the Office of Civilian Radioactive Waste Management.
Q. Are you also a contracting officer for the standard contract?
A. Yes, I serve as the contracting



officer for the standard disposal contracts.
Q. And what are your responsibilities in your current position, generally?
A. Aside from the contract activities, I also am responsible for other technical waste acceptance issues for other noncommercial spent fuels and high-level waste materials from the Department of Energy and from the Navy and other technical programmatic issues, such as the transportation aging and disposal canister, the TAD.
I guess I developed the technical requirements for that, and I'm working on the procurement for the designs, as well as other policy and analysis issues that come up.
Q. And to whom do you currently report?
A. I report to Christopher Kouts.
Q. And when did you become the contracting officer for the standard contract, I'm sorry?
A. I believe it was in the middle of 2002, I think.
Q. And you have also served as the technical representative to the contracting officer or COTR, when was that position?



A. I believe I started doing that sometime after a couple of, a year or so after I came, I believe it might have been '95 or '96 until 2002.
Q. And what were your responsibilities in that position?
A. To provide technical advice to the contracting officer of the standard contract.
Q. And you were employed by WEPCO from approximately 1978 to July of 1994, is that right?
A. That's correct.
Q. And then you joined the DOE approximately in July of 1994?
A. That's correct.
Q. Okay. I want to start by asking you some questions about the repository and MRS program at DOE, when you first started your employment there in July of 1994, and I wanted to hand you DX-584.
MS. SNYDER: And I believe that's in evidence, Your Honor?
BY MS. SNYDER:
Q. Mr. Zabransky, do you recognize DX-584?

No further questions.
THE COURT: Do you need some time?
MR. OEHLER: Yeah, I mean, we're not going to finish in 10 minutes, Your Honor.
THE COURT: Well, let's go forward and see. You can take, what, 10 minutes?
MR. OEHLER: Yeah, I also want to talk to Mr. Lo Re.
THE COURT: Take whatever time you need. I'd like to go a little bit further tonight just on time, but not necessarily until 7:00, but --
MR. OEHLER: Okay.
THE COURT: Assuming everyone is able to do so.
MS. SNYDER: That would be great, Your Honor, thank you.
THE COURT: Okay. And the reporter's still with us.
(Whereupon, a short recess was taken.)
(6:00 p.m.)
MR. OEHLER: May I proceed, Your Honor?
THE COURT: Sure.
CROSS-EXAMINATION



BY MR. OEHLER:
Q. Good afternoon, Mr. Zabransky.
A. Good evening, Mr. Oehler.
Q. Yes, good evening, Mr. Zabransky. I'd like to talk to you about some acceptance rate issues. Would it make any sense for DOE to accept spent fuel at a rate pursuant to which it would take decades to remove all the spent fuel from the plant sites after they ceased operation?
A. It would make sense to pick it up as fast as practicable.
Q. I'm not sure that answered my question. My specific question was would it make sense for DOE to accept fuel at a rate pursuant to which it would take decades to remove all the spent fuel from the plant sites after they ceased operation?
A. And, again, to the extent that you can pick it up as quickly as possible, you'd do that, as long as there were no restrictions on that.
Q. And when you say, "no restrictions," then, if there are restrictions, then there's no -- then it no longer makes sense to pick up



at thatrate, is that what you're saying?
A. It makes sense to do the best you can do, Mr. Oehler, is what I'm saying, so in the abstract of faster is better, faster is better.
MR. OEHLER: One moment, Your Honor. I don't think --
THE COURT: What date are you looking for?
MR. OEHLER: April 17th, 2002. Counsel, do you have your copies from before?
MS. SNYDER: Yes.
BY MR. OEHLER:
Q. Now, Mr. Zabransky?
A. Yes, sir.
Q. Do you recall having your deposition taken in what we've referred to as the consolidated discovery?
A. I believe I recall it.
Q. And at that time, you were under oath, is that correct?
A. I was, sir, yes.
Q. And at that time, you stated your positions accurately to the best of your knowledge and belief, is that correct?



A. I believe I did, sir, yes.
Q. Let me ask you to turn to page 158. And I'm going to read the following, line 5:
"QUESTION: Would it make any sense to have a repository or an MRS and accept fuel at such a small rate that it took decades to remove it from the plant sites?
"MR. CRAWFORD: Objection, to the extent it assumes facts not in evidence.
"ANSWER: It wouldn't have made sense to the industry, no.
"QUESTION: Would it have made sense to anyone, would it have made sense to DOE?
"ANSWER: No."
Did I read that correctly?
A. You did, you did.
Q. Do you recall discussing earlier in this trial the linkages in the 1987 Nuclear Waste Policy Amendment -- Nuclear Waste Policy Act Amendments?
A. I think so.
Q. And just to make sure we're on the same page, what were the linkages regarding between an MRS and a repository in the 1987 NWPA amendments?

A. That's the assumption DOE had been making since before I arrived at DOE, yes.
Q. And those capacity limitations are really only relevant to an MRS. Without an MRS, there would have been, they would not have been that capacity restraint, correct?
A. Without an MRS, there would have been no capacity restraint, there would have been no acceptance either because the repository wasn't scheduled to be on line until 2010.
Q. Now, the 1995 APR/ACR rates that we looked at, they've never been used for the planning of the Federal Waste Management System, have they?
A. And I think, I know -- the answer is they were used for the planning of the MRS. When you say the Federal Waste Management System, they were never used for the repository.
Q. Let me be a little clearer. Beginning in March of 1995, when the 1995 APR/ACR was issued, DOE was not using those rates for the planning of the Federal Waste Management System, were they?
A. No, my understanding at the time, when



I was deposed, was no, but I was -- found out later that they were still pursuing the MRS, so my answer at that time was not correct, the answer was, yes, through the latter part of '95, they were still pursuing an MRS.
Q. And when do you state that they "stopped pursuing an MRS"?
A. I understood it was now to be the latter part of '95.
THE COURT: If there were no capacity limitations on the MRS, there's no reason why the MRS could not have had a steady rate of 3000 MTU, after a ramp-up?
THE WITNESS: No, and I think the earlier MRSes -- I don't know if that's a word -- prior to the amendments did have higher capacities.
BY MR. OEHLER:
Q. I want to go back and make sure I understand the use of the rates in the APR/ACR. Was one of the considerations minimizing DOE's potential obligation to utilities under the standard contract?
A. I think we talked about this earlier with Ms. Snyder, but the answer that I gave was



that it fully allocated what DOE thought it could do, so the extent it minimized the obligations as to what it could possibly do, the answer is yes.
Q. One moment. Now, going back to this 2004 annual capacity report?
A. Yes.
Q. The acceptance rate numbers that were here, where did they come from?
A. Where did they come from?
Q. Let me be more specific.
A. Okay.
Q. Did those rates come out of the program system requirements document?
A. I believe they are consistent with that, yes.
Q. I'm sorry. My question was slightly different, not whether they were consistent, is that the source of the rates, the Civilian Radioactive Waste Management System requirements document, is that the source of these rates?
A. I'm trying to figure out if that's the right way of putting it, that document has the planning basis for the program, I don't know if



they're the source of the rates, I would say the source was that the director of the program told me that's the numbers she was planning on using, it would be consistent with that requirements document, so whether they're the source or she's the source, I don't know, but they're consistent with the rates in the CRWMS requirements document, the CRD.
Q. Now, can you explain the purpose of the system requirements in the Civilian Radioactive Waste Management System document?
A. I can explain it to the best of my ability. It's something that I don't really work on, but it sets the high-level requirements for the design of the system, so it gives instruction to those working on the system that this is how we want you to design this. So for instance, in this specific case, that flows down to the contractors who are doing the engineering work, and their instructions are to design a facility that can have this capability.
Q. And does this system then reference the Yucca Mountain repository in the transportation and in the other aspects of the

5718

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------------------x

WISCONSIN ELECTRIC POWER COMPANY, :
Plaintiffs, :
vs. :NO. 00-697C
THE UNITED STATES, :
Defendant. :

-------------------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Friday, October 12, 2007
Volume 24

The parties met, pursuant to the notice of the Judge at 9:32 a.m.

BEFORE THE HONORABLE JAMES MEROW



APPEARANCES:

ON BEHALF OF PLAINTIFFS:
RICHARD OEHLER, ESQ.
JAY GRIFFITHS, ESQ.
Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, Washington 98101
(206) 359-8000
and
EMILY POULIN, ESQ.
DONALD CARNEY, ESQ.
MARY ROSE HUGHES, ESQ.
Perkins Coie LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005
(202) 628-6600



APPEARANCES CONTINUED:

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
SHARON SNYDER, ESQ.
RUSSELL SHULTIS, ESQ.
STEPHEN FINN, ESQ.
SONIA ORFIELD, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

(Index appears at end of transcript)



P R O C E E D I N G S

(9:32 a.m.)

MR. OEHLER: Good morning, Your Honor.
THE COURT: Good morning, Mr. Oehler.
MR. OEHLER: May I begin?
THE COURT: I guess you're on tap today.
MR. OEHLER: Yes, Your Honor.
Whereupon--

DAVID ZABRANSKY

a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:

CROSS-EXAMINATION (Continued)

BY MR. OEHLER:
Q. Good morning, Mr. Zabransky.
A. Good morning.
Q. Do you recall discussing delivery commitment schedules with government counsel yesterday?
A. I guess so, yes.
Q. But you're familiar with delivery commitment schedules, obviously?
A. Yes.
Q. When you joined DOE in July 1994, did

you review prior DCSes as part of your job?
A. Not right away, but at some point, I reviewed prior DCSes.
Q. It's your recollection that DOE stopped reviewing DCS submittals subsequent to the decision of the U.S. Court of Appeals for the D.C. Circuit in the Indiana Michigan case, is that correct?
A. I believe that's correct, yes.
Q. And that decision was made at the direction of counsel, correct?
A. Yes.
Q. Do you recall that DOE sent out letters to the utilities in March of 1997 in which DOE notified the utilities that it would not be able to approve their DCS submittals and that DOE waived the contract requirement that utilities provide a revised DCS schedule within 30 days?
A. With the clarification that that was not sent to all utilities, it was only sent to utilities in response to their submittals to DCSes.
MR. OEHLER: And can we hand him 916?
BY MR. OEHLER:



Q. Do you have 916, Plaintiff's Exhibit 916? And let me know when you're there.
A. I'm there.
MR. OEHLER: And government counsel?
MS. SNYDER: 916?
MR. OEHLER: Correct.
MS. SNYDER: I'm there.
BY MR. OEHLER:
Q. And do you recognize this document?
A. It's a letter that was sent in this case to Southern, but I'm not sure I recognize this specific one, but it's letter that was sent in response to their submittal of a DCS.
MR. OEHLER: One moment. Your Honor, my understanding is that Plaintiff's Exhibit 916 is admitted into evidence.
THE COURT: Yes, correct.
BY MR. OEHLER:
Q. And is this an example of the letter in which DOE is telling the utilities that it will no longer approve DCS submittals?
A. Well, again, this is a letter in response to their submittal to -- with the clarification that it's not an announcement, it's not a response, and it's a specific one to



this timeframe, yes, that's what this is.
Q. Thank you. And at this period of time were you the COTR?
A. I believe I was, yes.
Q. And was a letter like this sent to a number of utilities?
A. As I said, it was sent to utilities in response to their submittal of DCSes, I don't know the exact number.
Q. More than five?
A. Could have been, I don't know the exact number.
Q. And since the process was stopped, has DOE approved or disapproved any DCSes submitted by utilities?
A. I think, as this letter says, that DOE's taken no action since this point in time, up until the 2004 DCS process, which was also suspended.
Q. And, again, staying with this time period -- actually, let me rephrase that.
And the DCSes have neither been approved or disapproved based on the advice of counsel, is that correct?
A. Well, again, based upon the advice of



counsel and the ruling of the Court, that these were not conditional commitments and since these were for periods of times we couldn't perform, it didn't appear appropriate to continue to honor the process, and Ms. Tomasini, on the advice of counsel, stopped the process.
Q. And you're not aware of any reason for not processing the DCSes, other than the advice of counsel, is that correct?
A. Well, as I just said, the reason not to process them right now is that we're not in a position to follow through on making a commitment to pick up fuel in a period of time we know we can't pick it up.
Q. But the reason that the process was suspended was based on advice of counsel, is that correct?
MS. SNYDER: That's been asked and answered now, I think, maybe three or four times, objection.
MR. OEHLER: Well, I think he's giving inconsistent answers, Your Honor.
THE COURT: Well --
MS. SNYDER: Objection, Your Honor.

stopped pursuing contract modifications partly as a result of discussions with legal counsel, correct."
Did I read that accurately, Mr. Zabransky?
A. Yes, but let me just say that --
Q. I'm not asking you another question at this time, Mr. Zabransky. I'm sure your counsel can address that if they'd like to.
THE COURT: Do you know if they're contemplating individual amendments with utilities to cover the circumstances of each utility or a general amendment to the standard contract which would cover all utilities -- or covering canistered fuel? Or --
THE WITNESS: I think -- I'll go -- I guess I can discuss this, the Department at this point is considering an amendment that, although somewhat general, would be tailored to each specific utility and would address the acceptance of canisters, as well as the consideration the Department would like to see in return for that.
BY MR. OEHLER:
Q. If a utility wanted to purchase casks



today that are going to be used at Yucca Mountain, how would a utility go about that?
A. Today, I don't think that would be possible, to purchase a cask that's going to be used at Yucca Mountain.
Q. We looked at the PG&E trial testimony, and I wanted to ask you, are you familiar with PG&E's Humboldt Bay Nuclear Plant?
A. Only from what I may have seen on a website and I've never been there.
Q. Well, do you know whether PG&E intends to decommission the Humboldt Bay Plant?
A. I believe that's their plans, I'm not sure of the details.
Q. And do you agree that it was reasonable for PG&E to pursue the storage of spent fuel and dual purpose canisters at its Humboldt Bay Plant in order to decommission a spent fuel pool?
MS. SNYDER: Objection, relevance.
THE WITNESS: Again, I'm not sure that --
THE COURT: Hold on. There's an objection.
THE WITNESS: Sorry.



MR. OEHLER: The government has argued that they should not compensate Wisconsin Electric for a portion of the cost of dual purpose casks. Mr. Zabransky has testified regarding this issue, in the PG&E trial, regarding his understanding of what would be acceptable behavior, and I'm asking him questions on that line, whether it be reasonable for a contractor, in those circumstances that I'll describe in a moment, to purchase dual purpose casks.
THE COURT: Okay. I'll overrule the objection. I guess it has relevance.
MR. OEHLER: And could we read that question, Ms. Reporter?
(The reporter read the record as requested.)
THE WITNESS: And again, that may or may not be reasonable. It depends on the circumstances. I'm not sure what the exact circumstances might have been.
BY MR. OEHLER:
Q. Would you say it was not unreasonable?
A. And, again, Mr. Oehler, it depends what the alternatives were and what the costs



were.
Q. Let me ask you to turn now to Plaintiff's Exhibit 448.
A. I'm sorry, I don't appear to have that.
MR. OEHLER: Okay. And, Your Honor, I believe that Plaintiff's Exhibit 448 is admitted in evidence.
BY MR. OEHLER:
Q. And let me know when you're there.
A. I'm there.
MR. OEHLER: Government counsel?
MS. SNYDER: Yes.
BY MR. OEHLER:
Q. Can you identify this document for us, Mr. Zabransky?
A. It's something I haven't seen in a while. I believe this was, as it says on the cover, this is a scope of work I believe, a draft RFP for the acquisition of waste acceptance and transportation services that was prepared in the '96 timeframe.
Q. And at that time, you were working in the Office of Waste Acceptance Storage and Transportation, correct?

Q. And would those be referred to as dual purpose systems?
A. Yes.
Q. And let me ask you to go to the standard contract, which is Plaintiff's Exhibit 41.
A. Okay.
Q. And I'd like you to turn to appendix E that begins on page Bates number 2179.
A. Okay.
Q. I'm sorry, I just wanted you to refer to the definition of standard fuel, just wanted to refresh your recollection on that. Do you see the fuel category identification?
A. Yes.
Q. And do you see the reference to standard fuel?
A. Yes.
Q. Let me ask you to go back to the draft RFP then, and in that RFP, go back to that page you're on, page 25.
A. Okay.
Q. Looking at these things together, meaning what we just looked at, the definition of standard fuel and the provision we just



looked at here, is it your understanding that DOE contemplated incorporation of storage transport systems into the standard contract as a standard waste form?
A. I think we've talked about DOE was considering contract modifications, and the contract modifications would have had to, among other things, amend appendix E to include what DOE would consider to be a standard dual purpose canister.
MR. OEHLER: One moment, Your Honor. Your Honor, just give me a moment, I want to make sure this was covered by another witness.
BY MR. OEHLER:
Q. Let me ask you to turn to Plaintiff's Exhibit 594.
A. Okay.
MR. OEHLER: Your Honor, my understanding is that Plaintiff's Exhibit 594 is admitted in evidence.
THE COURT: Correct.
MR. OEHLER: Hold on a second. We're just double-checking on that. Yeah, we believe it is in evidence, Your Honor.
THE COURT: Yes, it is.



MR. OEHLER: Thank you.
BY MR. OEHLER:
Q. Do you recognize Plaintiff's Exhibit 594?
A. I believe I signed this letter, yes.
Q. And what is it?
A. I think it's a letter responding to Mr. Redeker at SMUD in response to his letter of January 22nd, 2001.
Q. And what's the date of the response?
A. April 6th, 2001.
Q. And can I direct your attention to the third paragraph that begins, "as requested"?
A. Okay.
Q. And I'm going to ask you to read this paragraph for the Court.
A. Yes. "As requested in your letter, in accordance with the commitment made in our previous correspondence, the Department will initiate actions to include storage systems certified by the commission for both transportation and storage (dual purpose systems) as acceptable waste forms under the disposal contract with SMUD.
We are in the process of identifying



the extent of and methods for effecting such contract modifications, including development of specifications that may be placed on standard "dual purpose systems," where standard refers to canistered spent nuclear fuel that could be accepted as if it were standard spent nuclear fuel under the contract."
Q. And then just to go back to something you said, I know you said you signed the letter. I assume you also were involved in the review of this letter before it was sent out?
A. Yes.
Q. And you agree with its contents?
A. Yes.
Q. Do you recall Private Fuel Storage being a potential alternative for fuel storage for utilities?
A. Can you be more precise as to what you want me to recall, when?
Q. Okay. Let's talk about Wisconsin Electric. Do you recall Private Fuel Storage being a potential alternative for fuel storage at Wisconsin Electric if the PSCW did not approve Wisconsin Electric's ISFSI application?
A. I don't belief PFS, Private Fuel

A. Got another one.
Q. 298?
THE COURT: That's admitted.
(Plaintiff Exhibit Number PX-298 was received in evidence.)
MR. OEHLER: Okay. Let me ask you one other question, Your Honor, you have that as admitted, 298?
THE COURT: Mr. Zabransky's presentation?
MR. OEHLER: Yes.
THE COURT: Yes.
MR. OEHLER: Okay. Thank you.
MS. SNYDER: Your Honor, with respect to going back to 248, I know that DX-248 was admitted.
THE COURT: That could be it.
MS. SNYDER: Did you check to see if it was PX-248 that you were --
THE COURT: I may have put it on the wrong list, that's possible.
MS. SNYDER: I just want to make sure the record is clear on it.
THE COURT: I have DX-248 admitted as well.



MS. SNYDER: And PX-248?
THE COURT: Yeah, I could have made a mistake.
MS. SNYDER: I just wanted to make sure that we were clear.
THE COURT: Put it down on both lists.
BY MR. OEHLER:
Q. Now, I think 298 is admitted so I'll put that one aside.
A. Okay.
Q. And then Plaintiff's Exhibit 972.
A. And that one, you're going to have to help me with.
Q. This is one I think we might be able to straighten out. Our list says it was not objected to, but we don't show it as actually being admitted, 972. Perhaps the government could check their list. Do you have it as admitted, Your Honor?
THE COURT: No, I don't have it as admitted.
MR. OEHLER: And I guess --
MS. SNYDER: We don't have an objection.
THE COURT: Okay. 972 is admitted.



MR. OEHLER: Thank you, Your Honor.
(Plaintiff Exhibit Number PX-972 was received in evidence.)
BY MR. OEHLER:
Q. Mr. Zabransky, while you were at Wisconsin Electric, was it your belief that DOE had an obligation under the standard contract to accept fuel in significant quantities?
A. Yes, more than one assemblies, quantities that were appreciable, yeah.
Q. And was it also your understanding that, if DOE accepted significant quantities of spent fuel, that Wisconsin Electric would not have to add storage space outside the pool?
A. And, again, I think that's a question that, when you look at over time, I mean, at a point in time when that was not going to be the case, so it depends when that was, Mr. Oehler, but the best of all worlds would have been DOE picking up enough spent nuclear fuel so it wouldn't have needed additional storage space at Point Beach, yes.
Q. Let me ask you a more general question -- one moment. There was a document that was discussed before, and I had a question



about it, Plaintiff's Exhibit 117.
MR. OEHLER: I believe this is admitted in evidence, Your Honor.
THE COURT: Yes, it is.
MR. OEHLER: Your Honor, let me take a minute. I want to be certain that I've got the right document. I just wanted to -- this is the document.
BY MR. OEHLER:
Q. So let me ask you to just briefly review it, and then I'm going to direct your attention, your name's referenced on the second page.
A. Okay.
Q. And let's go to the second page, if we can, on Trial Director, and let's blow up the first full paragraph. Now, this talks about, looking at the first two sentences, Mr. Zabransky, this talks about you as the chairman of the group indicated there leading a discussion regarding the draft UNWMG response to the DOE 1987 draft mission plan, do you see that?
A. Okay. Yes.
Q. And do you recall this meeting?

A. I have no reason not to believe what it says in the notes is what happened, I don't recall this is the meeting, no.
Q. Do you recall working on any industry response to the 1987 draft DOE mission plan amendment?
A. I believe I must have.
Q. And midway through that paragraph, and I'll highlight it for you in a second, and let me ask you to read the highlighted sentence for the Court.
A. Sure. "A principal concern of the group was the need to emphasize DOE's obligation to begin accepting spent fuel in significant quantities in 1998."
Q. Thank you. Do you recall what was the source of the industry's position that DOE had an obligation to accept spent fuel in significant quantities in 1998?
A. Well, I mean, this whole -- that topic was a topic that was always discussed at these meetings, and in fact, in the same meeting on page five, we talk about how Mr. Silberg has prepared a letter to the contracting officer that goes along with the same points requesting



that he agree to that as part of a contract modification or interpretation or, et cetera, so that was a common theme of the discussions we had.
Q. Let's stay on page two, if we could. The sentence says that, "DOE has an obligation to begin accepting spent fuel in significant quantities in 1998," correct?
A. That's what it says.
Q. And my question was, what was the source of the industry's position on that issue?
A. I'm not sure how to answer source, that was the industry's position, it was always the industry position, as long as -- or as soon as I got involved with it, that was their position, so I'm not sure I can tell you what the source was, unless I'm not understanding what you're asking me.
MR. OEHLER: Your Honor, what I suggest at this point is that we take a two-minute break. I just want to review my notes.
THE COURT: Sure.
MR. OEHLER: And see if I have any



other questions.
THE COURT: Fine. I'll stay in place.
MR. OEHLER: Thank you, Your Honor.
MS. SNYDER: Your Honor, why don't we take 10 minutes? Mr. Oehler can organize his notes and, the government can get ready to redirect, we can go right into that when Mr. Oehler is finished. Does that sound reasonable?
MR. OEHLER: Yeah, that's fine.
THE COURT: We'll take 10 minutes, then and return at 20 minutes of.
(Whereupon, a short recess was taken.)
THE COURT: Mr. Oehler.
MR. OEHLER: Your Honor, we have no further questions of Mr. Zabransky.
THE COURT: Any redirect.
MS. SNYDER: Just a few questions, Your Honor.
THE COURT: Sure. Or recross, I guess it is.
MS. SNYDER: No, I think it is redirect.
THE COURT: That's right. Government's case this time.



REDIRECT EXAMINATION
BY MS. SNYDER:
Q. Mr. Zabransky, can you take a look at PX-117? I think you just looked at that with Mr. Oehler.
A. 117?
Q. Yes.
A. Absolutely.
Q. Are you there?
A. Yes, I am.
Q. And Mr. Oehler pointed out to you a quote on the -- a section on the second page of the document, where you said that a principal concern was the need to emphasize DOE's obligation to begin accepting spent fuel in significant quantities in 1998, do you recall that?
A. Well, that's what it says in that sentence. It doesn't say that I said it. It was a discussion of the group, and this is a synopsis of the discussion.
Q. Sure. And when you say that was a discussion of the group, what do you mean by that?
A. Well, as it says in the first

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------------------------x

CAROLINA POWER & LIGHT COMPANY and :

FLORIDA POWER CORPORATION, :

Plaintiffs, :No. 04-37C

vs. :

THE UNITED STATES, :

Defendant. :

-----------------------------------x

Courtroom 6

National Courts Building

717 Madison Place NW

Washington, D.C.

Tuesday, November 13, 2007

Volume 6

The parties met, pursuant to the notice of the Judge at 9:31 a.m.

BEFORE THE HONORABLE THOMAS C. WHEELER

APPEARANCES:

ON BEHALF OF PLAINTIFFS:

Arnold Bradley Fagg, ESQUIRE
Paul Bessette, ESQUIRE
Linda Eaton, ESQUIRE
David Kerr, ESQUIRE
Morgan, Lewis & Bockius
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-5191

ON BEHALF OF THE DEFENDANT:

Andrew P. Averbach, ESQUIRE
Christopher J. Carney, ESQUIRE
Marian Sullivan, ESQUIRE
Lisa Donahue, ESQUIRE
U. S. Department of Justice, Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
12th Floor
Washington, D.C. 20530
(202) 353-0527

(Index appears at end of transcript)

third column is titled annual spent fuel discharge (metric tons). What is the information that is set forth in that column?
A. What is the what?
Q. Information that is set forth in that column?
A. That would be the discharge from utilities.
Q. And what was the source of the information?
A. The utilities.
Q. Mr. Morgan, do you have Plaintiffs' Exhibit 13?
MS. SULLIVAN: Oh, Your Honor, I believe I misspoke, I was just asking Mr. Morgan about table 3-2, and my colleagues tell me I referenced it as 3-0, and I don't want the record --
THE COURT: I thought you said 3-2, but I could be mistaken.
MS. SULLIVAN: Just so the record is clear.
THE COURT: All right.
MS. SULLIVAN: Thank you, Your Honor.
BY MS. SULLIVAN:



Q. Mr. Morgan, do you have Plaintiffs' Exhibit 13, it's the single page, the letter from you to Mr. Kearney?
A. Yes.
Q. And Mr. Morgan, the first page of your letter references a letter dated May 20th, 1983, do you see that?
A. Yes.
Q. Is Plaintiffs' Exhibit 13 your response to that May 20th letter?
A. I beg your pardon?
Q. Is your response, which is Plaintiffs' Exhibit 13 that we're looking at, a response to the May 20th, 1983 letter?
A. Yes, and I'd like to note that this was after the final rule-making.
Q. And the final rule-making, when was that issued?
A. In April.
Q. And what's the significance of the fact that this is after the final rule-making was issued?
A. Well, the ruling had gone through the process, and they were again raising issues that were dealt with earlier. And there was a



mention of time constraint in this letter. And this -- time left to get the contract signed was June 30th. And that was extremely tight in the schedule.
And we felt that we should not alter the rule-making at this time, because it would have been impossible to meet the June 30th date. There are provisions in the contract that they can be opened at a later point in time.
Q. Thank you.
MS. SULLIVAN: One moment, Your Honor. Your Honor, I have no further questions. Thank you, Mr. Morgan.
THE COURT: All right. Any redirect?
MR. FAGG: We have no further questions for Mr. Morgan. I want to thank you for your time, sir.
THE WITNESS: You're welcome.
THE COURT: Mr. Morgan, on behalf of the Court, I want to express my appreciation for your coming here today and providing your testimony.
THE WITNESS: Thank you, sir.
THE COURT: You are dismissed.



MR. FAGG: Our next witness is going to be David Zabransky. If we could maybe just have a moment to shift gears, and I don't know if you want to take an early lunch or not.
THE COURT: Why don't we press ahead. We'll go until about 12:30.
Please come forward, sir.
Whereupon--
DAVID ZABRANSKY
a witness, called for examination, having been duly sworn, was examined and testified as follows:
THE COURT: Please be seated.
DIRECT EXAMINATION
BY MR. FAGG:
Q. Hello, Mr. Zabransky.
A. Good morning.
Q. How are you?
A. Good afternoon. Fine.
Q. Did you have a good weekend?
A. Sure.
Q. I had to work, but that's all right.
A. Me, too.
Q. Can I get you to spell your name for the record, sir?
A. Yes, my name is David Zabransky,

Z-A-B-R-A-N-S-K-Y.
Q. And you are employed by who, sir?
A. Department of Energy.
Q. And how long have you been with Department of Energy?
A. Since July of 1994.
Q. And how were you employed prior to coming to the Department of Energy.
A. How was I employed?
Q. I'm sorry, yes, by whom were you employed?
A. Wisconsin Electric Power Company.
Q. And does that referred to sometimes as WEPCO?
A. Yes, it is.
Q. And how long were you at WEPCO?
A. I believe from 1978 through 1994.
Q. And just a little bit again for additional background, from '78 to '94, were you involved in the nuclear operations at WEPCO?
A. Not the entire time, no.
Q. Can I just ask you if you can summarize for the Court your professional employment history starting in 1978?



A. Okay. Yes, in '78, I joined WEPCO. I was a design technician and was going to school. And once I graduated, I received a bachelor of science in civil engineering from Marquette University, and Wisconsin Electric moved me to the nuclear projects office, nuclear power department, where I took over the position as the civil engineer in charge of the Point Beach nuclear plant.
And then after some period of time, sometime in the mid-'90s, mid-'94 -- excuse me, '84, '85, I moved from the civil engineering area to the fuels area. And became the contract administrator for nuclear fuel and stayed in that area through '94. When I left, I was the manager for nuclear fuel services.
Q. And so from the '84, '85 time period until you came to DOE, you said you were contract administrator in the fuels area, do I have that right?
A. I started as that. I moved on to other jobs in the fuels area. When I left, I was in charge of the fuels area.
Q. And among your duties were involvements with the DOE standard contract,



correct?
A. That's correct.
Q. Okay. You have testified a number of times in these proceedings, is that fair to say, Mr. Zabransky?
A. I think that's fair to say, yes.
Q. You are the contracting officer, correct?
A. I am at this point in time, yes.
Q. And that's for, in particular, the DOE standard contract with Carolina Power & Light and Florida Power Corporation, correct?
A. For all the contracts. Those would be included, yes.
Q. The ones of interest here today, those two, you're the contracting officer for DOE, correct?
A. That's correct.
Q. What do you understand your authority to be as a contracting officer?
A. To implement the provisions of contract on behalf of the government.
Q. You're familiar with the government's positions regarding that contract, correct?
A. I presume so.



Q. Let's talk a little bit about some of those positions, Mr. Zabransky. Isn't it the government's position that its only contractual obligations are those reflected in approved delivery commitment schedules?
MS. SULLIVAN: Objection, legal conclusion, foundation.
THE COURT: I'll take his understanding. Overruled.
THE WITNESS: Well, it's my belief that the government's position is that we have an obligation to pick up all the spent fuel, DCSes that have been approved are the ones for which we've established and committed to a schedule, but that the obligation exists to dispose of all the spent fuel.
BY MR. FAGG:
Q. And an obligation to start taking spent fuel in 1998, correct?
A. I believe there was a contractual obligation to begin accepting spent fuel in 1998.
Q. And how much fuel starting in 1998?
A. How much fuel? The amount of fuel that we were obligated to pick up in 1998, I

believe, was defined by the approved delivery commitment schedules.
Q. Okay. So we're winding back around. I think what I'm hearing is this is a yes to my question, are the government's obligations defined, in your view, by approved delivery commitment schedules?
MS. SULLIVAN: Objection, Your Honor, mischaracterizes the witness's testimony.
THE COURT: Overruled. You may answer.
BY MR. FAGG:
Q. Do you need it read back?
THE REPORTER: "Question: So we're winding back around. I think what I'm hearing is this is a yes to my question, are the government's obligations defined, in your view, by approved delivery commitment schedules?"
THE WITNESS: And again, I think that to the extent that there's a given amount in a given year, that would be true. But the obligation extends to disposing of all the spent fuel.
BY MR. FAGG:
Q. And I'm -- I appreciate that. And I'm



focused on given amounts in given years, and are we on the same page that it's your understanding that if there's no approved delivery commitment schedules, there's no enforceable contractual obligation for any amount in that year?
A. I guess we could go that far. I'm not sure that I've ever -- I mean, that defines the extent that we scheduled for delivery. I believe that's the case.
MR. FAGG: If I could approach, Your Honor?
THE COURT: Yes.
BY MR. FAGG:
Q. And let's go to Defendant's Exhibit 300. Mr. Zabransky, I'm -- I've just handed you what we've marked as Defendant's Exhibit 300. It's in evidence in the case already. And I'm going to ask you to look at page 4 of that document. I'll represent to you this is a 30(b)(6) notice served by the government upon my clients, Carolina Power & Light and Florida Power Corporation.
Did you have any input into the pickup rates identified in item 8 here, Mr. Zabransky?



THE COURT: I'm sorry, counsel, I don't seem to have that document.
MR. FAGG: I have extras here, Your Honor. May I approach?
THE COURT: Yes. My last binder of Defendant's Exhibits stops at 329. Oh, this is 300, right, I was just at the wrong tab. Sorry.
MS. SULLIVAN: And Your Honor, I wanted to lodge an objection once the Court had --
THE COURT: Let me catch up to you. Your objection?
MS. SULLIVAN: Foundation, Your Honor. I don't think we've established that the witness has ever seen this document before.
MR. FAGG: I thought that was my question. Maybe I can back up and rephrase.
THE COURT: Try this again.
BY MR. FAGG:
Q. Sure. Mr. Zabransky, have you ever seen this document?
A. I don't recall I ever have.
Q. Do you recall, separate and apart from this document, providing any input to the



Department of Justice regarding definitions of acceptance rate criteria for purposes of this lawsuit?
A. Not that I recall.
Q. So going back to our approved DCSes, you would agree with me that DOE quit approving DCSes at a certain point in 1996, '97, correct?
A. I'd agree late 1996, yes.
Q. And based upon what we've talked about a couple of moments ago, after DOE quit approving DCSes, a position you've described, there's no obligation for any particular amount of fuel in any particular year, is that a fair statement?
MS. SULLIVAN: Objection, Your Honor, legal conclusion, and mischaracterizes the witness's testimony.
THE COURT: Well, he is the contracting officer, so I'll take his answer.
THE WITNESS: Again, I think at this point, we had not agreed to a schedule to pick up fuel, so I don't think that schedule has been established for fuels beyond those approved DCSes.
BY MR. FAGG:

Q. So if there's no DCS approved by DOE, no contractual obligation for any fuel in that year, correct, that's your view?
A. I believe that's the case, yes.
Q. Now, in the past -- well, let me just go back. Let's explore this just a bit more. If DOE had never approved a DCS, there would be no enforceable obligations, correct?
MS. SULLIVAN: Objection, Your Honor, speculation.
THE COURT: I'll take his answer. Overruled.
THE WITNESS: And again, I think the fact that DOE would have not begun in 1998 would have been an issue. But with respect to what allocations would have been missed, I don't know at that point in time how those would be defined.
BY MR. FAGG:
Q. And let me just make sure I'm understanding this. The only enforceable obligation is an approved DCS, and my question, I guess, is just logically, if there's no approved DCS, no enforceable obligation, nor any particular amount in any particular year,



fair characterization of your position?
A. I think that's the case, yes.
Q. You've testified before in the past, haven't you, Mr. Zabransky, that you yourself view DOE's interpretation of DCSes as conditional commitments as an erroneous interpretation, correct?
A. That I view their interpretation as those being conditional as erroneous, that's what your question was?
Q. Yes.
A. Yes, I don't believe I ever personally agreed with that position.
Q. The DCS forms, okay, the way that process was administered by DOE during the period when it was ongoing in the mid-1990s, utilities had no discretion regarding how many MTUs they could put in those DCS forms, correct?
A. They had discretion, yes.
Q. They couldn't exceed the amount allotted to them, could they?
A. That's correct.
Q. That limitation is not in the contract, correct, Mr. Zabransky?



A. No, that -- the process for completing DCSes was conveyed to the purchasers of -- utilities by the contracting officer, I believe back in 1992.
Q. Okay. And that came from the then contracting officer at the time in those instructions, the limits on the DCS process, correct?
A. That's correct.
MR. FAGG: If I may approach, Your Honor?
THE COURT: Yes.
BY MR. FAGG:
Q. And we're going to go to Plaintiffs' Exhibit 53. And not too much time with this document, but you're familiar with this document, right, Mr. Zabransky?
A. Yes, I saw it when I was at Wisconsin Electric.
Q. And you've subsequently testified about this document on probably a couple of occasions, correct?
A. Probably.
Q. Just so we're clear, this document includes acceptance rates based upon an assumed



amendment of the Nuclear Waste Policy Act, correct?
A. Well, it includes acceptance rates that were predicated upon capacity limits of an MRS. Those were based upon existing amendments to the Nuclear Waste Policy Act.
Q. And it includes projected start dates of 1998?
A. It does, yes.
Q. And to get to that 1998 start date, it includes an assumed amendment of linkages contained in the Nuclear Waste Policy Act, correct?
A. It assumes that in the siting of a voluntary MRS, that the voluntary process would include the waiver of the linkages on timing, yes.
Q. Okay. And just to -- if we could turn to page 803, Bates-labeled -- one of the many Bates labels on this document -- it is page 1.
Okay. And I'd like to draw your attention to the last sentence on that page, "as specified in the standard contract, the ACR is for planning purposes only, and thus is not contractually binding on either DOE or the

civilian radioactive waste management?
A. Since 1995, a lot of things have happened since '95. '95, in this timeframe, I was working in the waste acceptance area, I'm not sure what it was called back then. I think it might have been called the office of waste acceptance storage and transportation, because it still was focusing on the MRS storage facilities. And my function was just as a -- I think at that point, I might have been the COTR on this contract.
Q. I apologize for interrupting. Can we define that acronym?
A. That would be the contracting officer's technical representative. I think I became that sometime either in late '95, early '96, I'm not sure what the timeframe was. And then I've been with that same basic office through various incarnations and names since that point in time, and had different changing and altering responsibilities. But the constant theme that I've always worked on the standard contracts.
Q. Thank you. And back to my original question, which may not have been clear. After



1995, DOE did not use these 900 aggregate MTU pickup rates in the real world for purposes of planning, for example, transportation systems or technical acceptance capacities or matters like that, is that a fair statement?
MS. SULLIVAN: Objection, Your Honor, same objection to foundation.
THE COURT: Overruled.
THE WITNESS: And I think there is a point in time in late '95, sometime in '95, where, yes, DOE then began planning only for a repository. I'm not sure when in '95 that was, it was later in '95.
BY MR. FAGG:
Q. And I think we alluded to earlier, Mr. Zabransky, at some point, DOE ceased approving delivery commitment schedules, correct?
A. That's correct.
MR. FAGG: If I may approach, Your Honor?
THE COURT: Yes.
BY MR. FAGG:
Q. Plaintiffs' Exhibit 78. Plaintiffs' Exhibit 78 is already in evidence, but let me



ask you, Mr. Zabransky, you're familiar -- well, first, let's identify that for the record. What is Plaintiffs' Exhibit 78?
A. It's a letter from Beth Tomasoni to Dan Poteralski at Carolina Power & Light.
Q. And Beth Tomasoni was a predecessor to you as the contracting officer on the DOE contracts?
A. That's correct.
Q. And at this time, were you the COTR?
A. I believe I was, yes.
Q. And you're aware that letters substantially similar to this one went out to all utilities in around this timeframe, is that a fair statement?
A. They didn't go to all utilities, no.
Q. Most utilities?
A. Only utilities that had submitted DCSes.
Q. So for utilities that had submitted DCSes starting in or around March of 1997, DOE was no longer approving those DCSes?
A. They were not processing them, that's right.
Q. Nor were they approving them, were



they?
A. That's true.
Q. The reason that DOE was no longer processing these DCSes was because counsel advised you not to process the DCSes, correct?
A. The reason was that we had the court decision that told the Department that its position that these were conditioned on the existence of the facility was incorrect. And in light of that contract advice, counsel advised the contracting officer that it would be inappropriate to continue to approve these.
Q. You're not aware of any other reason, beyond the advice of counsel, for DOE not to process or approve the DCS forms, correct?
A. Well, again, it didn't make sense to approve a form that said we were going to pick fuel up in '99, 2000, 2001, and to go through a process of scheduling that when we knew we weren't going to do that, when it wasn't conditional. So I think it -- besides counsel's advice, it just didn't make sense.
Q. So when it was conditional, you could do it because it really wasn't an obligation on DOE's part, right?

A. It was an obligation that was conditioned on the facility in DOE's mind, yes.
Q. Mr. Zabransky, DOE published another ACR in 2004, correct?
A. That's correct.
MR. FAGG: May I approach, Your Honor?
THE COURT: Yes.
BY MR. FAGG:
Q. Plaintiffs' Exhibit 128. And, Mr. Zabransky, Plaintiffs' Exhibit 128 is, in fact, the July 2004 ACR and APR, is that a true statement, correct?
A. It appears to be, yes.
Q. And no ACR nor any APR was issued by the Department of Energy in between these two documents we've just looked at, correct?
A. That's correct.
Q. And when this document was issued, DOE asked for additional delivery commitment schedules, correct?
A. I believe it asked the contract holders to submit DCSes based upon this ACR for performance beginning in 2010, yes.
Q. And you've anticipated my next question. 2010 start date assumed by this



document?
A. That's correct.
Q. And this document, based upon not an MRS, but a repository, correct?
A. That's correct.
Q. And based upon a ramp-up to a 3000 MTU per year rate, correct?
A. I believe that's correct, yes.
Q. And shortly thereafter, DOE suspended the DCS process, correct?
A. I think it was five or six months thereafter, but yes.
Q. And returned all the DCSes that you'd gotten in the interim, correct?
A. That's correct.
Q. And never approved any DCSes submitted during this round starting in 2004, correct?
A. Well, again, those were -- well, those were for performance beginning in 2010. Between this issuance and the December letter, the program determined it couldn't meet the 2010 date. So again, it wouldn't have been appropriate to schedule deliveries for 2010. It wasn't going to happen.
Q. My question was just you never



approved the DCS, correct?
A. That's correct.
Q. Since 1997, it's been impossible for a utility to have an approved DCS, correct?
A. Since we've suspended the process, no one's had an approved DCS, that's correct.
Q. And based upon your testimony this morning, no commitment by DOE during those years for any particular acceptance of any particular amount of spent nuclear fuel, do I have that right?
A. I believe we've made no further commitments, that's correct.
Q. Let's talk a little bit about planned performance. DOE has not identified what cask it's going to use at the Carolina Power & Light or Florida Power Corp. plants, correct?
A. Not to my knowledge, no.
Q. I mean, more to the point, no cask size has been identified by DOE for the Robinson Plant, correct?
A. I don't believe that's the case. I don't believe we have, but I don't work in that area.
Q. Okay. But as the contracting officer,



you're not aware that DOE has identified under the contract the casks that would be supplied to accept fuel in the current plan date, which was what, 2017 -- I'm sorry, that was compound. Let me break that up.
What's the current expectation for commencement of performance by DOE?
MS. SULLIVAN: Objection, Your Honor, relevance.
THE COURT: Overruled.
THE WITNESS: I believe the best possible date is 2017.
BY MR. FAGG:
Q. Okay. And DOE has not identified what cask it's going to show up with to the Robinson Plant in 2017, correct?
A. Not at this time, no.
Q. And they didn't do it in 1998 either, correct?
A. I don't believe so, no.
Q. Mr. Zabransky, you testified about your involvement in the industry both with WEPCO prior to joining DOE, and with DOE since 1994. Been in the industry a significant amount of time, correct?

A. I guess so.
Q. And you developed some of your own personal opinions about what a reasonable and appropriate acceptance rate would be, haven't you?
A. Yes.
MS. SULLIVAN: Objection, vague.
THE COURT: Can you put a time on this, Counsel?
BY MR. FAGG:
Q. Sure. During the time when you thought there was going to be an operating repository, Mr. Zabransky, you viewed a rate that would have reflected the aggregate rate of discharges by utilities, plus some amount of working off the backlog as a reasonable rate, correct?
MS. SULLIVAN: Objection, Your Honor, vague as to the term reasonable.
THE COURT: Overruled.
THE WITNESS: And again, I think given what you've stated, that if it was a repository system, that a reasonable rate would -- as you said -- keep pace with discharges and work off the backlog. That seems reasonable.



BY MR. FAGG:
Q. And stated slightly differently, your own opinion is that a rate that would have kept pace with the industry discharges and removed some amount of backlog would have been an appropriate rate, correct?
A. In a case without constraints, I agree, yes.
Q. Reasonable and appropriate, correct?
A. As I said, in an unconstrained case, that would be fine.
Q. Industry discharges at a rate of about 2000 MTUs per year; is that correct?
A. That's correct.
Q. And acceptance rate of 3000 MTUs per year does what we've just talked about, in a general sense, doesn't it? It keeps up with the industry discharges and starts working off the backlog, correct?
A. Yes.
Q. Thank you. No further questions.
THE COURT: All right. Ms. Sullivan, cross-examination.
MS. SULLIVAN: Yes, Your Honor.



CROSS-EXAMINATION
BY MS. SULLIVAN:
Q. Mr. Zabransky.
A. Ms. Sullivan.
Q. Following up on counsel's last question first, does a rate of 2100, an acceptance rate of 2100 MTU also meet the generation rate plus begin to work off the backlog?
A. It does.
Q. And I believe that your -- in response to questions from counsel about the 3000 rate, you reference in an unconstrained system, what do you mean by unconstrained?
A. Well, again, I think the caveat was that a repository, a repository doesn't have any limitations as to capacity or annual capacity limits. It's basically an engineering function. In the MRS world, the DOE was operating under there was a constraint placed on the capacity of the MRS.
Q. Talking a little bit more about your experience in industry, Mr. Zabransky, at the time that you were at Wisconsin Electric, were you responsible for completing delivery commitment schedules on behalf of Wisconsin



Electric?
A. I was responsible for having them prepared and they were signed off by a vice president.
Q. And did, in fact, Wisconsin Electric submit DCSes while you were there?
A. Yes, they did.
Q. How many did they submit?
A. I believe for every allocation we have, which I think was 10 years worth.
Q. And were those DCSes approved by the Department of Energy?
A. Yes, they were.
Q. And why did you submit or have prepared delivery commitment schedules for the first 10 years for Wisconsin Electric while you were there?
A. Again, from a company perspective, we saw them as commitments on the part of the government. We wanted to get as many of those as we could as soon as possible.
Q. And what did you understand to be the function of a delivery commitment schedule?
A. Well, besides allowing utility to claim its allocation, it also starts the

that an ACR APR will be issued again?
A. I believe there will be one.
Q. And will you again, if you're the contracting officer, resume the delivery commitment schedule process?
A. To support -- if that's the date is 2017, yes, to support that, DOE will resume the process.
Q. And why will you resume that process?
A. That's the way to schedule for those deliveries, that's what the contract calls for, to use that process.
MS. SULLIVAN: One moment, Your Honor. Nothing further, Your Honor.
THE COURT: All right, thank you. Any redirect.
MR. FAGG: Just a couple of moments Your Honor.
THE COURT: Okay.

REDIRECT EXAMINATION

BY MR. FAGG:
Q. Thank you, Mr. Zabransky. Just picking up on that last exchange, if 2017 turns out not to be the date, you're not going to start the ACR and DCS process, correct?



A. If it's not -- no, that's not true. We'll start the process to support the date when we know what the date is.
Q. And if that date, as we get closer, turns out to be 2025, that's the date you'll use?
A. That's correct.
Q. And until then, there's not going to be any approved DCSes, right?
A. I don't believe so.
Q. Just a couple of things, Mr. Zabransky. Ms. Sullivan showed you Florida Power Corp.'s delivery commitment schedules, and we talked about cask weights and cask types, do you recall that?
A. Yes.
Q. Did DOE ever go out and buy a cask for Crystal River?
A. For Crystal River specifically? No. DOE did initiate cask procurement and cask design activities that would have included those cask types.
Q. Okay.
A. But it's been premature to spend the money to buy casks.



Q. DOE never bought a cask for Robinson, correct?
A. No.
Q. You're aware -- or are you aware that a pick up rate is not at issue with respect to the Crystal River claims in this case, do you have any knowledge of that?
A. No.
Q. Let's go back, if I could just orient you back to 1994. Just when you came to the DOE. And I think you testified with Ms. Sullivan that you took over the -- and I don't mean to characterize it, but the completion and issuance of the 1994 ACR that ultimately was issued in March of 1995, and in front of you as Plaintiffs' Exhibit 60. Are you with me on the timeframe?
A. Yes.
Q. During that period in late '94, early '95, the nuclear waste negotiator was no longer actively seeking a site for an MRS, correct?
MS. SULLIVAN: Objection, foundation.
THE WITNESS: I don't know that --
THE COURT: Overruled.
THE WITNESS: I don't know that I know



that specifically. I wasn't working in that area.
BY MR. FAGG:
Q. Okay. There weren't any bills pending in Congress to remove the linkages between an MRS and a permanent repository at that time period, were there?
MS. SULLIVAN: Objection, foundation.
THE COURT: You can answer if you know. If not --
THE WITNESS: Again, I don't know. I'd just gotten to DOE. I was busy enough trying to find the cafeteria and the restroom, to try to get this document published.
BY MR. FAGG:
Q. Fair enough. And do you have a recollection that President Clinton at that time had threatened to veto any legislation that removed those linkages between the MRS and any permanent repository, any knowledge of that?
MS. SULLIVAN: Same objection, Your Honor.
THE WITNESS: Not specifically, no.
BY MR. FAGG: