**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# ENERGY NORTHWEST'S RESPONSE TO MOTION IN LIMINE TO EXCLUDE REBUTTAL TESTIMONY OF ERIC BUSH

---


NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
1099 New York Avenue, NW
Suite 900
Washington, D.C. 20001
(202) 639-6000


June 30, 2008

*Attorneys for Plaintiff*

# Table Of Contents

Table Of Contents ..... ii

Table Of Contents To Appendix ..... iii

Table Of Authorities ..... iv

Introduction ..... 1

I. Factual Background. ..... 3

A. The Agreed Methodology For Calculating Energy Northwest's Dry SNF Storage Damages And The Principal Damages Dispute ..... 3

B. Overview Of The Testimony To Which Mr. Bush's Rebuttal Testimony Responds: Mr. Stuart's Experience And Opinions. ..... 4

C. Mr. Bush's Qualifications And Opinions. ..... 7

II. Mr. Bush's Rebuttal and Critique Of Mr. Stuart's Opinion Is Admissible. ..... 10

A. The Challenge To Mr. Bush's Observation That Mr. Stuart Assumed The Wrong Number Of Spaces To Be Gained By A Re-Rack Is Meritless. ..... 11

B. Mr. Stuart's Opinions Regarding Non-Breach Costs Cannot Be Justified Merely By His Experience And Should Therefore Be Excluded, But If They Are Not, It Is Proper For Mr. Bush To Criticize Those Opinions Without Performing The Analysis Himself. ..... 13

Conclusion ..... 19

## Table Of Contents To Appendix

Excerpts from the RCFC 30(b)(6) Deposition of Christopher Kouts (June 12, 2008) ............ A 001

Notice of RCFC 30(b)(6) Deposition ............ A 011

*Dairyland Power Coop. v. United States*, No. 04-0106C, slip op.
(Fed. Cl. June 20, 2008) ............ A 013

Excerpts from Defendant's Response To Plaintiff's Motion To Exclude The Testimony Of
Jonathan A. Neuberger n *Dairyland Power Coop. v. United States*, No. 04-0106C
(Fed. Cl. May 15, 2008), Dkt. No. 279 ............ A 036

*Bacardi & Co., Ltd. v. N.Y. Lighter Co., Inc.*, No 97-CV-7140, 2000 WL 298915
(E.D.N.Y. Mar. 15, 2000) ............ A 047

*In re Blech Sec. Litig.*, No. 94-CV-7696, 2003 WL 1610775
(S.D.N.Y. Mar. 26, 2003) ............ A 053

## Table Of Authorities

**Cases**

*Bacardi & Co., Ltd. v. N.Y. Lighter Co., Inc.*, No 97-CV-7140, 2000 WL 298915 (E.D.N.Y. Mar. 15, 2000) ............ 18

*Baumholser v. Amax Coal Co.*, 630 F.2d 550 (7th Cir. 1980) ............ 15

*Dairyland Power Coop. v. United States*, No. 04-0106C, slip op. (Fed. Cl. June 20, 2008) . 11, 18

*In re Blech Sec. Litig.*, No. 94-CV-7696, 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) ............ 18

*Smith v. Wal-Mart Stores*, 537 F. Supp. 2d 1302 (N.D. Ga. 2008) ............ 18

**Rules**

Fed. R. Evid. 702 ............ 10

Fed. R. Evid. 703 ............ 15

## Introduction

The Government's motion to exclude testimony proffered by plaintiff Energy Northwest ("EN") from Eric Bush to rebut certain proffered testimony from the Government's expert, Charles L. Stuart, raises two issues. ***First***, the Government seeks to bar an opinion Mr. Bush offers in rebuttal to Mr. Stuart's argument that EN should have re-racked its spent fuel pool before it implemented dry cask storage. In that opinion, Mr. Bush raises the following criticisms: (1) that Mr. Stuart assumes a cell count increase that is physically impossible, and (2) that Holtec would have quickly informed EN of the actual number of cells it could obtain in a re-rack. Both of these criticisms are based on Mr. Bush's experience at Holtec International, where he worked on over 40 spent fuel rack projects.

The Government challenges the admissibility of this testimony even though it does not challenge (and cannot challenge) Mr. Bush's conclusion in his initial expert report regarding the total number of additional spaces or cells that EN could have added if it had re-racked its spent fuel pool. Indeed, in its Motion, the Government concedes that Mr. Stuart "does not challenge Mr. Bush's opinion that had EN re-racked its spent fuel pool it would not have gained as many as 1,818 storage locations." (Mot. at 12.) Instead, the Government makes the baseless assertion that, in arguing that EN should have ***decided on and implemented a different mitigation decision, the Government not only is entitled to rely on a critical factual assumption that it concedes is untrue, but to strike expert rebuttal testimony to the contrary***. Because there is absolutely no legal authority supporting this illogical argument, this Court should reject it.

***Second***, the Government seeks to bar Mr. Bush's observation that Mr. Stuart does not apply necessary engineering analysis of the hypothetical costs EN would have incurred to load Mr. Stuart's even more hypothetical DOE-supplied cask. However, that argument puts the Government in a dilemma. The dilemma is summed up by the expression, "good for the goose,

good for the gander." The basic problem the Government faces is that its criticisms apply with far greater force to Mr. Stuart's testimony, to whom Mr. Bush responds, than to Mr. Bush's rebuttal testimony. Essentially, the Government contends that Mr. Bush's testimony, which is a critique of certain of Mr. Stuart's opinions, should be excluded because it does not reflect a methodology other than Mr. Bush's experience. But the Government's position is troublesome for it because the criticized testimony by Mr. Stuart ***also*** has no methodology other than Mr. Stuart's experience.

That is more problematic for the Government than for EN for three reasons. First, EN does not need to admit Mr. Bush's testimony regarding cask-loading issues if Mr. Stuart's testimony is excluded, as EN's pending cross-motion seeks. But the exclusion of both Mr. Stuart's testimony and Mr. Bush's rebuttal testimony would leave the Government with a failure of proof on certain offsets it has claimed to EN's damages claim. Second, to the extent that knowledge and experience can provide a basis for the identical topic of Mr. Stuart's affirmative testimony, and Mr. Bush's critiquing rebuttal testimony, there can be no doubt whatsoever that Mr. Bush has relevant and extensive experience with the topic of his testimony – unlike Mr. Stuart who has ***no*** experience specific to the topic of his proffered testimony, dry cask storage systems. Third, as Your Honor has ruled, the standard that applies to testimony offered as a critique by Mr. Bush is less exacting than for affirmative testimony by Mr. Stuart. Mr. Bush need not perform his own independent analysis in order to point out the flaws in Mr. Stuart's analysis.

## I. Factual Background.

### A. The Agreed Methodology For Calculating Energy Northwest's Dry SNF Storage Damages And The Principal Damages Dispute.

As Your Honor knows, this is a case against the Government for breach of the Standard Contract for the Removal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (the "Standard Contract"). The Court has entered a finding of liability against the Government, and the remaining issue is damages. The principal item of damages EN seeks is costs related to the procurement of additional storage for its SNF made necessary because of DOE's breach of the Standard Contract. In this case, Energy Northwest ultimately determined in 1999 that the best way for it to obtain additional storage was to construct an Independent Spent Fuel Storage Installation ("ISFSI") at its Columbia Generating Station ("Columbia") and store SNF in dry storage casks, which it since has done. The experts disclosed by EN and by the Government are in general agreement about the overall methodology appropriate to determine whether a specific cost EN incurred for the ISFSI project is recoverable as damages. Essentially, the parties agree that any cost that was incurred in the "breach scenario" as a result of the DOE's failure to perform under the Standard Contract but not in the "non-breach scenario" constitutes damages EN suffered.

While the parties' experts are in agreement about the general conceptual method for calculating damages, there are disputes over the specifics of applying that method in this case.[1] The Government's most significant argument in this regard is that EN should not have used dry storage – or rather that EN should not have implemented dry storage ***yet***. The Government contends that, even though dry storage would have eventually been necessary, EN should have

[1] As the Court may recall, there is an overall dispute about what the Government's obligations to accept SNF in the non-breach world would have been, and how that relates to the causation of EN's damages. That overall dispute is not at issue in this motion.

first used a different technology – a re-rack of EN's SNF wet storage pool – and then used dry storage and built an ISFSI, because it would have been less expensive on a net present value-basis.[2]

The Government also asserts that EN's damages should be reduced by expenses it alleges EN has avoided by not having to load hypothetical DOE-supplied casks in the non-breach world. In an attempt to prove those reductions, as described below, the Government proffers testimony from Charles Stuart, who attempts to estimate the costs of certain items EN would have incurred in the non-breach world by using, as a proxy, the cost of certain items related to cask loading in EN's own damages claim.

### B. Overview Of The Testimony To Which Mr. Bush's Rebuttal Testimony Responds: Mr. Stuart's Experience And Opinions.

While the Government's Motion is directed at the rebuttal testimony from Eric Bush, in evaluating the Government's criticisms, it is important to have in mind the testimony to which Mr. Bush's rebuttal testimony responds: testimony from Charles Stuart. Mr. Stuart has been disclosed by the Government as a purported expert witness on certain technical (i.e., not economic) issues. Mr. Stuart's testimony is the subject of a separate motion in limine EN has filed.[3]

---

[2] While this is the Government's position, it is not accurate. We have filed a separate motion in limine to exclude the testimony of the Government's expert on this issue, Raymond Hartman, Ph.D., and explain in that motion that Dr. Hartman's opinions are inadmissible and incorrect. (Dkt. No. 111.)

[3] Consequently, some of the following discussion is also contained in EN's motion. (Dkt. No. 112.) However, we believe it would be more convenient to the Court to include a portion of that discussion here. To avoid unnecessary duplication of material appended to all pending motions in limine, references herein to "C.App. x" refer to the Energy Northwest's Consolidated Appendix in Support Of Its Three Motions To Exclude The Government's Proffered Experts. Citations to "S.App. x" refer to the supplementary material included in the appendix to this response to the Government's motion to exclude testimony from Mr. Bush.

Mr. Stuart, who is now a consultant, was a long-time, but mid-level, nuclear power industry employee. He has one degree, a Bachelor of Science in Physics, and has had no publications in the last 10 years. Mr. Stuart has held titles in the nuclear industry such as "Manager," division "Director," "Superintendent," and "Assistant Plant Manager." Mr. Stuart has never, for example, been a chief operations officer at a particular nuclear power plant, a chief nuclear officer, a chief executive officer, or anything of the sort. Furthermore, Mr. Stuart has no meaningful prior education or experience with dry storage casks. That is, it is undisputed that Mr. Stuart:

- Has never procured casks or advised utilities about procuring casks;[4]
- Has never been at a utility that loaded casks and has never had direct experience in supervising or being responsible for loading spent fuel storage or shipping casks;[5]
- Has never had experience in building or supervising the building of an ISFSI;[6] and
- Has never managed a re-rack project at anything other than a remote supervisory level and does not have the technical expertise that would allow him to determine how much additional storage re-racking a particular spent fuel pool could provide.[7]

In this case, Mr. Stuart also does not purport to have engaged in any specific ***technical*** methodology to reach the opinions he proffers. For example, Mr. Stuart does not purport to have run any calculations to reach his conclusions, or performed any physical tests. Instead, Mr. Stuart asserts that the basis for his opinions is his "knowledge and experience." (Stuart Rpt. at 2, C.App. 83; Stuart Dep. at 132, C.App. 439.) In describing that knowledge and experience,

[4] Stuart Dep. at 31, 37, 50, 70-71, 73-75, 81-84, 185-86, 194; C.App. 414, 415, 419, 424-25, 426-427, 452-53, 455.
[5] *Id.*
[6] *Id.*
[7] Stuart Dep. at 31, 37, 50, 55-64, 70, 180-181; C.App. 414, 415, 419, 420-422, 424, 451.

he mentions "general design and processes of nuclear power plants," "applicable nuclear industry requirements," "application of those requirements in the field," and his "education and training as a senior reactor operator." (*Id*. at 4, C.App. 82.) But as he then lays out his opinions based on his education and experience, Mr. Stuart does not identify any experience he may have had with any particular issue on which he offers an opinion. (*Id*. *passim.*)

As relevant to this Motion, the Government hopes to rely on Mr. Stuart's proffered testimony to support two of its arguments. ***First***, the Government will argue that EN should have re-racked its spent fuel pool *before* proceeding to dry storage based in part on Mr. Stuart's assertion that this is what he would have done. The Government makes this argument despite the fact that each of its experts acknowledge that EN will eventually be forced to implement dry cask storage. ***Second***, the Government will argue that EN's damages must be reduced by certain costs the Government asserts would have been incurred in the non-breach world. The Government's proposed reductions are based on Mr. Stuart's speculation about the type of cask DOE would have used in the non-breach world and on his further supposition that, based on his assumed cask, the cost of certain breach world activities can be used as proxies for plant modifications and loading activities in the non-beach world. The Government also makes this argument notwithstanding the fact that EN *will still incur* these costs when DOE eventually performs.

Mr. Stuart offers three opinions in support of these arguments:

- Relying on the assumption that a full re-rack would have gained 1,818 additional spaces, Mr. Stuart opines that "A full rerack would have been a viable, reasonable and lower cost option for ENW to expand the existing storage capability" and would have been Mr.

Stuart's "preferred option." (Stuart Rep. at 7, 9, C.App. 85, 87.) (We refer to this as Mr. Stuart's "Re-Rack First Opinion.")

- "[W]hile the specific cask, or casks, that DOE would have used at a specific utility site [had the DOE commenced performance in 1998 in the non-breach scenario] cannot be positively identified, it is possible, understanding the technology in the but-for world period, to identify the range of size and type of cask that could have been used." (Stuart Rep. at 10, C.App. 88.) Mr. Stuart then goes on to opine that certain spent fuel storage casks employed by utilities at ISFSIs in the "real world" can be used as "proxies for available but-for world shipping casks and can be used to determine but-for world activities." (Stuart Rep. at 12, C.App. 11.) (We refer to this as Mr. Stuart's "Hypothetical Cask Opinion.")
- Based on Mr. Stuart's opinion regarding the casks DOE would have used, Mr. Stuart opines that in the process of loading the DOE's-supplied transport casks:
  - Certain plant and site modifications would have been performed in the non-breach world had DOE performed. (Stuart Rep. at 14-18, C.App. 92-96.)
  - EN would have incurred costs loading his hypothetical DOE-supplied casks in the non-breach world. (Stuart Rep. at 18-23, C.App. 96-101.)

(We refer to these collectively as Mr. Stuart's "Hypothetical DOE Loading Opinions".) EN has moved to exclude these opinions, and that cross-motion is pending. (Dkt No. 112.)

**C. Mr. Bush's Qualifications And Opinions.**

EN has disclosed Eric Bush as its technical expert. Mr. Bush has extensive experience with SNF storage options, including re-racking of SNF storage pools, and dry SNF storage, or ISFSIs. After receiving a Bachelor of Science degree in Civil Construction Engineering

Technology in 1992, Mr. Bush worked for 13 years for Holtec International, a firm that provides (among other things) SNF storage technologies, including SNF pool re-racks, ISFSIs, and the casks for ISFSIs. (In fact, Holtec International is the firm from which EN obtained its dry storage technology in this case.) Mr. Bush describes his experience with SNF storage pools while at Holtec as follows:

> While working for Holtec International from 1993 to 2006 my responsibilities included field implementation of spent fuel pool reracks and rack expansions, project management of spent fuel pool reracks and rack expansions, generating feasibility studies associated with pool reracking and rack expansions, pool rerack and rack expansion sales and marketing, performance of fuel pool dimension surveys, and neutron attenuation testing (Blackness Testing).
>
> In my various positions at Holtec I worked on all aspects of rack expansion and reracks from conception to implementation. My responsibilities included evaluating feasibility of various rack expansions and reracking scenarios and related analyses such as conceptual design of rack configurations, spent fuel criticality, thermal-hydraulics and spent fuel pool cooling, seismic issues, and structural issues. In addition, I served as a project manager for multiple rerack projects and oversaw licensing, fabrication, implementation of rack expansion and reracking projects. Finally, in my roles in sales and marketing, I was responsible for interfacing with Holtec customers on all of these issues.

(Bush Rpt. at 5-6, C.App. 44-45.) In his report, Mr. Bush lists more than 40 re-rack or rack expansion projects he worked on at while at Holtec. (Bush Rpt. at 6-9, C.App. 45-48.)

Mr. Bush also has extensive experience with dry storage projects. After his experience at Holtec, Mr. Bush joined Enercon Services, Inc. in April 2006. Mr. Bush describes his experience there:

> My responsibilities as an Enercon Project Manager have included performing ISFSI siting studies, ISFSI geotechnical assessments, cask crane upgrade assessments, fuel handling building assessments, and plant modification assessments associated with implementing dry fuel storage casks. I have also prepared and presented proposals for ISFSI design and engineering at numerous

> plants. Finally, when assisting Enercon's Business Development efforts, I have been responsible for interfacing with potential Enercon ISFSI customers on all of these issues.

(Bush Rebuttal Rpt. at 4, C.App. 268.)

The Government has ***not*** challenged Mr. Bush's qualifications, or the admissibility of Mr. Bush's opening report. That opening report concluded (among other things) that it was technically feasible to obtain additional SNF storage at EN, through various measures, including by re-racking EN's SNF storage pool. Specifically, with respect to the Re-Rack First Opinion, Mr. Bush determined that EN could have performed a re-rack of its SNF storage pool and obtained a total of 1,392 additional spaces for SNF assemblies. Not only has the Government not challenged this opinion, but its experts have embraced and relied upon it.

The Government's challenge is instead to three aspects of Mr. Bush's rebuttal report to portions of Mr. Stuart's report. ***First***, Mr. Bush pointed out that Mr. Stuart's analysis relies on a Holtec initial estimate that incorrectly assumed that an additional 1,818 SNF assemblies could be obtained in a re-rack, when in fact physical limitations in the Columbia spent fuel pool indisputably make it impossible to add more than 1,392 spaces. In that connection, Mr. Bush observed that the limit on the number of cells would have been identified by a spent fuel pool dimensional survey conducted before a re-rack design was even undertaken. ***Second***, Mr. Bush explained that Mr. Stuart could not properly reach his conclusions regarding the hypothetical need to have made certain plant modifications in the non-breach scenario because to perform that analysis properly, Mr. Stuart would have needed to conduct engineering analysis he did not perform, and would need more information than he assumed about the hypothetical DOE cask. ***Third***, Mr. Bush made the same observation about the cask loading costs that Mr. Stuart concluded would have been incurred if DOE had loaded casks in the non-breach world – that is, without more information concerning the casks DOE would have used (information that is

unavailable), it was not possible to perform the analysis properly. The Government's Motion seeks to exclude each of these opinions.

## II. Mr. Bush's Rebuttal and Critique Of Mr. Stuart's Opinion Is Admissible.

There is essential agreement on the legal standards recited in the Government's Motion (at 5-11). We agree that:

- The Court has the authority to grant a motion in limine to exclude evidence;
- Expert testimony must be both reliable and relevant under Federal Rule of Evidence 702;
- Expert testimony must be helpful to the trier of fact to resolve an issue in dispute; and
- An expert's methodology must be reliable.

Indeed, we have cited these same standards in our motions in limine directed at the Government's proffered experts, and as we show in those motions, the Government's experts do not make the grade.

On the other hand, assuming that the Court determines that the Government may offer testimony from Mr. Stuart, each of the challenged aspects of Mr. Bush's testimony in response is also clearly admissible. ***First***, the challenge to Mr. Bush's opinion that Mr. Stuart did not accurately determine the amount of space that could be gained (at 11-13) does not reflect a flaw in Mr. Bush's testimony or any factual disagreement with it, but instead is based on the Government's gravely flawed legal argument about what is relevant in this case. ***Second***, the challenge to Mr. Bush's critique of Mr. Stuart's conclusions concerning whether plant modifications would have been necessary in the non-breach world, and whether certain cask loading costs would have been incurred in the non-breach world (at 13-21), fails to recognize that Mr. Bush has far more experience than Mr. Stuart to reach conclusions on those issues, and that, as Your Honor recently concluded, it is legitimate for an expert to critique another expert's

analysis without performing that analysis himself. *See Dairyland Power Coop. v. United States*, No. 04-0106C, slip op. at 16-17 (Fed. Cl. June 20, 2008) (S.App. 28-29).

### A. The Challenge To Mr. Bush's Observation That Mr. Stuart Assumed The Wrong Number Of Spaces To Be Gained By A Re-Rack Is Meritless.

The Government's first challenge is to this statement in Mr. Bush's report: "it appears that [Mr. Stuart] did not consider pertinent parameters to determine how much permanent storage capacity could actually by gained in the CGS [Columbia] spent fuel pool." The Government contends (at 12) that this is a mischaracterization of Mr. Stuart's analysis and is not helpful to the Court. But this is more of an attempt to advance the Government's legal arguments than a criticism of Mr. Bush's testimony. Here are the relevant facts:

- Mr. Bush's opening report, which the Government does not challenge, concluded that, as a matter of engineering and physics, a re-rack of the Columbia SNF storage pool could have obtained a maximum of 1,392 additional spaces;
- The Government and Mr. Stuart ***do not*** "challenge Mr. Bush's opinion that, had ENW re-racked its SNF pool, it would not have gained as many as 1,818 storage locations" or Mr. Bush's qualifications to offer this opinion (Mot at. 12); ***but***
- In rendering his opinion that EN should have re-racked before proceeding to construct dry storage, Mr. Stuart assumes – contrary to the undisputed fact – that EN ***could have*** obtained 1,818 additional spaces; and
- The Government then uses Mr. Stuart's opinion based on the 1,818 assumption to assert that EN's damages should be reduced on the theory that EN should have ***actually proceeded with a re-rack.***

With these facts in mind, the basic dispute is as follows. The Government's position is that it is proper to use the 1,818 figure in critiquing EN's determination to proceed with dry cask

storage because that was "the information available to ENW" when it made that determination. (Mot. at 12.) But the Government's position is wrong for two reasons. ***First***, the Government's position is not an abstract challenge to the way EN made its mitigation decision or to the information on which relied. Instead, the Government is affirmatively contending that EN made the wrong decision – that instead of building an ISFSI ***it should have made and implemented a different decision***: to re-rack first before building an ISFSI. (Hartman Rpt. at 1, C.App. 120; Johnson Rpt. at 9-10, C.App. 195-96.) But Stuart's (and Hartman's) re-rack first conclusion is expressly based on the conclusion that there were 1,818 additional cells available – an assumption that Mr. Bush has demonstrated is incorrect, and that the Government does not dispute. (Bush Rebuttal Rpt. at 4-6, C.App. 268-70; Stuart Dep. at 141-142, C.App. 441-42; 147, C.App. 442-43; 180-180, C.App. 451; 198-99, C.App. 456.) Quite simply, the Government cannot seek to bar an expert who even it admits is qualified from offering an opinion that the Government's proposed re-rack-first option would not realize the benefits it asserts.

***Second***, even if, contrary to fact, the Government could rely on the preliminary estimates available to EN prior to a dimensional study, Mr. Stuart's use of the 1,818 estimate is still unsupported by the facts of the case. During its decision-making process, EN also possessed, and considered, preliminary estimates of the additional capacity that could be gained by a re-rack that were lower than 1,818 and much closer (1,350-1,620 assemblies) to the technically feasible capacity identified by Mr. Bush. (Larkin 6/15/95 Rpt. at 11-13, C.App. 562-64.) Yet, Mr. Stuart (and Dr. Hartman) chose to ignore those lower estimates. In light of these facts, the Government's complaint that Mr. Bush should not be able to criticize Mr. Stuart for making an

assumption that is indisputably contrary to fact is groundless.[8]

For similar reasons, the Court should reject the Government's contention (at 12) that Mr. Bush should not be allowed to testify that EN would have quickly discovered the true number of additional cells that was possible – 1,392 – if preparations for a re-rack had proceeded. The Government essentially wants to pretend, for Mr. Stuart's analysis, that the only event at issue was the decision-making process. But, as stated, the Government's other experts all testified that their opinions were based on the concept that EN should not only have ***decided*** to perform a re-rack, but that EN should have gone ahead and ***actually performed*** a re-rack. And there is no doubt that by virtue of his 13 years of experience working on re-rack projects, Mr. Bush is qualified to conclude that the "next step" for Holtec would have been to perform a dimensional analysis to determine the actual number of cells that could be installed in the pool. Consequently, an analysis that relies on the assumption that a re-rack should be performed to obtain 1,818 additional spaces is flawed when it is undisputed that the re-rack could have only gained 1,392 spaces.

**B. Mr. Stuart's Opinions Regarding Non-Breach Costs Cannot Be Justified Merely By His Experience And Should Therefore Be Excluded, But If They Are Not, It Is Proper For Mr. Bush To Criticize Those Opinions Without Performing The Analysis Himself.**

Our response to the Government's attack on Mr. Bush's critique of Mr. Stuart's assertions regarding what costs would also have been incurred in the hypothetical non-breach scenario must begin with Mr. Stuart's assertions. We have moved to exclude those assertions (Dkt. No. 112) and will not repeat all of our arguments here. But two points must be made.

[8] Indeed, use of the 1,818 number is crucial to the Government's theory because, as EN's Expert Michael Emmert demonstrates, this single error in Dr. Hartman's analysis overstates the benefits of re-racking prior to moving to dry cask storage by over $4.8 million. (Emmert Rebuttal Rpt. at 10, C.App. 233.)

First, Mr. Stuart simply has ***no relevant dry cask storage experience – none.*** He simply cannot justify opinions on what modifications would have been required to the plant, and what cask loading procedures would have been required, by experience he has had with prior dry cask storage projects. *See supra* note 4. Second, in reaching all of his opinions about what modifications would have been necessary in the hypothetical non-breach scenario and about cask loading costs, Mr. Stuart did not engage in any articulated methodology that relied on anything other than EN documents and his general experience in the nuclear industry. (*See* Energy Northwest's Mot. In Limine To Exclude The Opinion Testimony Of Charles L. Stuart, Dkt. No. 112, at 15-16.)

Consequently, the Government's request for relief should be denied for three reasons. ***First***, the Government's arguments against Mr. Bush's critique of Mr. Stuart's conclusions actually require the exclusion of Mr. Stuart's conclusions. We agree that the kind of conclusions Mr. Stuart reached must, as the Government contends of Mr. Bush's opinions, be supported by a methodology. Mr. Stuart has not conducted any engineering analysis and admits that he does not have the technical expertise to do so. When that same standard is applied to the Government's witness, he will not be able to testify because he has not engaged in any methodology. And with Mr. Stuart's testimony excluded, there is no need for the Court to rule on the admissibility of testimony from Mr. Bush that EN has offered solely to rebut Mr. Stuart's testimony.

***Second***, to the extent the Court rules that opinions on necessary plant modifications and cask loading costs can be based exclusively on experience, there is no plausible justification for admitting Mr. Stuart's testimony but not Mr. Bush's. Mr. Stuart has no experience that could possibly permit him to render the opinions he has given – what modifications would be required to accommodate cask loading, and what activities would be involved in cask loading. Mr. Stuart

has never procured casks or advised utilities about procuring casks, never been at a utility that loaded casks, never had direct experience in supervising or being responsible for loading spent fuel storage or shipping casks, and never had experience in building or supervising building an ISFSI. *See supra* note 7. In contrast, Mr. Bush has experience performing ISFSI siting studies, ISFSI geotechnical assessments, cask crane upgrade assessments, fuel handling building assessments, *and plant modification assessments associated with implementing dry fuel storage casks*. (Bush Rebuttal Rpt. at 4, C.App. 268.) Mr. Bush has the experience to opine – as he has done – on what factors would have to be considered and analyzed to determine whether certain plant modifications, and certain cask loading costs, would have been necessary had EN decided to re-rack.[9]

This point regarding the relative ability of the two experts to render opinions was graphically illustrated by the recent Rule 30(b)(6) deposition testimony by the Government on cask issues. In his report, Mr. Stuart, in making assumptions regarding EN's non-breach world cask loading costs, assumed that the costs of loading his hypothetical DOE-supplied casks would have been the same as the costs EN has incurred to load its Holtec-supplied casks. (Stuart Rpt. at 18-22, C.App. 96-100.) Mr. Bush pointed out that Mr. Stuart's analysis ignored certain key

[9] Similarly, the Government's suggestion that Mr. Bush should not be permitted to testify because he relies on information gathered while assisting utilities with their own dry cask storage projects is plainly incorrect. In the first instance, Mr. Bush's reliance on information gathered through direct involvement in dry cask storage projects for utilities is plainly more credible than Mr. Stuart's generic industry experience. However, Federal Rule of Evidence 703 also states "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." Fed. R. Evid. 703. This includes reliance on information that might otherwise be considered hearsay. *Baumholser v. Amax Coal Co.*, 630 F.2d 550 (7th Cir. 1980).

issues, including whether the cask would be welded or bolted shut.[10] (Bush Rebuttal Rpt. at 11-12, C.App. at 275-76.) However, Mr. Kouts, the Government's recent Rule 30(b)(6) representative witness, testified that the DOE would not use welded casks like that employed by Holtec to remove and transport SNF. (6/12/2008 Christopher Kouts 30(b)(6) Dep. at 63-64, S.App. 6; RCFC 30(b)(6) Deposition Notice Topic 5, S.App. 12.)

The Government's other specific criticisms are equally misplaced. The Government, for example, criticizes Mr. Bush's observation that the specific requirements of each cask's certificate of compliance[11] would have to be examined to determine required modifications because they assert Mr. Bush did not perform this analysis. (Mot. at 14.) But that argument is incorrect for two reasons. First, because the DOE-supplied cask Mr. Stuart assumes is hypothetical, there are no certificate of compliance requirements to review for such cask or casks. Second, even for the casks that Mr. Stuart proposes using as proxies, Mr. Bush is pointing out that Mr. Stuart did not consider the certificate of compliance requirements of those proxy casks in reaching his ***affirmative*** opinion about the need for certain modifications. Mr. Bush is not offering his own affirmative opinion regarding the impact of certificate of compliance requirements. Rather, Mr. Bush is pointing out that it is necessary to preform an analysis – something that Mr. Stuart failed to do – and that in Mr. Bush's experience different cask systems often require different modifications.

The same can be said of each of the Government's criticisms of Mr. Bush regarding

---

[10] Holtec casks are welded shut requiring less operational loading time, potentially resulting in increased costs over a hypothetical DOE-supplied cask. (Bush Rebuttal Rpt. at 11, C.App. 275.)

[11] As EN argues in its motion in limine to bar the testimony of Charles Stuart, determining how a cask will interface with a particular plant is not as simple as consulting generic NRC regulations. (Dkt. No. 112 at 22.) Rather, each cask has a certificate of compliance that describes how that cask is designed to meet general NRC performance standards, and lists numerous requirements for use of a cask that must be analyzed before a cask may be used at any particular utility site.

staging and loading procedures for the hypothetical casks, the shape of the hypothetical casks, the need for a HERMIT device for the hypothetical casks, the center of gravity for the hypothetical casks and the material characteristics of those casks. Namely, for each of these points:

- Mr. Bush's considerable experience with dry storage – as compared to Mr. Stuart's complete lack of experience – permits him to say that these factors are relevant and that Mr. Stuart failed to properly consider those factors; and
- The burden was on Mr. Stuart, who is offering an affirmative opinion about the non-breach world, to analyze these items, not Mr. Bush to determine how they may impact the use of a particular cask at a particular site.

***Third***, the Government overlooks that, in criticizing another expert's opinions, it is ***not*** necessary for the criticizing expert to perform the full analysis the expert opines the criticized expert should have performed. That is the situation here. Mr. Bush's basic point is that Mr. Stuart does not know enough about the characteristics of the cask that DOE would have used had it performed its contractual obligations starting in 1998 for Mr. Stuart to determine whether the same plant modifications would have been required if DOE had performed. As DOE points out, based on his actual experience analyzing these identical issues for Enercon clients, Mr. Bush identifies the unknowns that Mr. Stuart should have considered before rendering his opinion. (Bush Rebuttal Rpt. at 6-8, C.App. at 270-272.) Mr. Bush's point is that ***any*** such opinion would be inherently flawed and unreliable because too many important factors (which Mr. Bush's experience tells him must be considered) remain unknown.

Given this basic difference – between an affirmative opinion, as Mr. Stuart purports to provide, and a criticism that other factors should have been considered in reaching an opinion, as

Mr. Bush offers – the Government's argument that Mr. Bush failed to perform a full analysis is misplaced. Indeed, in the *Dairyland* case pending before Your Honor, the Government made the contrary argument. In that case, the Government asserted: "As an initial matter, contrary to Dairyland's novel and unsupported contention, courts ***have routinely allowed expert critiques of damages models without offering an alternative model***." (Def.'s Resp. To Pl.'s Mot. to Exclude Testimony of Jonathan Neuberger, *Dairyland Power Coop. v. United States*, No. 04-0106C (Fed. Cl.), Dkt. No. 279 at 21 (emphasis supplied) (S.App 38).) We agree, as it appears Your Honor did, in rejecting the identical argument the Government makes here, and holding that an expert offered to critique another expert need not have performed his own full-fledged analysis of the issue. *See Dairyland*, No. 04-0106C, slip op. at 16-17 (S.App. 28-29) (even without his own competing model, the critiquing expert's opinion "is a reliable and relevant critique of the modeling used by [the critiqued expert]").

Indeed, numerous other courts have held the same thing. *See, e.g., Bacardi & Co., Ltd. v. N.Y. Lighter Co., Inc.*, No 97-CV-7140, 2000 WL 298915, at *6 (E.D.N.Y. Mar. 15, 2000). "Courts have often allowed expert testimony for the sole purpose of critiquing and thereby helping to explain the work of an expert witness retained by another party." *In re Blech Sec. Litig.*, No. 94-CV-7696, 2003 WL 1610775, at *20 (S.D.N.Y. Mar. 26, 2003). A specific study by Plaintiff's rebuttal expert is not necessary to make relevant or reliable the expert's testimony criticizing the opposing expert's assumptions. *See Smith v. Wal-Mart Stores*, 537 F. Supp. 2d 1302, 1324-25 & n.22 (N.D. Ga. 2008). Consequently, although Mr. Stuart's affirmative testimony is not based on a reliable method and should be excluded, Mr. Bush may offer a criticism of that method without performing his own competing analysis.

**Conclusion**

For the foregoing reasons, and those stated in our motion to exclude the testimony of Mr. Stuart, the Court should deny the Government's motion to exclude Mr. Bush's rebuttal opinions.

Dated: June 30, 2008

Respectfully submitted,

s/ Norman M. Hirsch
NORMAN M. HIRSCH
Jenner & Block LLP
330 N Wabash Avenue
Chicago, IL 60611
(312) 923-2782 telephone
(312) 840-7782 facsimile

OF COUNSEL:

David A. Handzo
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
(202) 639-6000

William D. Heinz
David Jiménez-Ekman
Christopher Tompkins
April A. Otterberg
Jenner & Block LLP
330 N Wabash Avenue
Chicago, IL 60611
(312) 222-9350

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of June 2008, a copy of the foregoing Energy Northwest's Response To Motion In Limine To Exclude Rebuttal Testimony Of Eric Bush was filed electronically with the Court's CM/ECF system. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Norman M. Hirsch