**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# ENERGY NORTHWEST'S APPENDIX IN SUPPORT OF ITS RESPONSE TO MOTION IN LIMINE TO EXCLUDE REBUTTAL TESTIMONY OF ERIC BUSH

---

NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
202-639-6000

June 30, 2008

*Attorneys for Plaintiff*

# Table Of Contents To Appendix

Excerpts from the RCFC 30(b)(6) Deposition of Christopher Kouts (June 12, 2008)............A 001

Notice of RCFC 30(b)(6) Deposition ..........................................................................A 011

*Dairyland Power Coop. v. United States*, No. 04-0106C, slip op. (Fed. Cl. June 20, 2008)..........................................................................................A 013

Excerpts from Defendant's Response To Plaintiff's Motion To Exclude The Testimony Of Jonathan A. Neuberger n *Dairyland Power Coop. v. United States*, No. 04-0106C (Fed. Cl. May 15, 2008), Dkt. No. 279 ..........................................................A 036

*Bacardi & Co., Ltd. v. N.Y. Lighter Co., Inc.*, No 97-CV-7140, 2000 WL 298915 (E.D.N.Y. Mar. 15, 2000) ..........................................................................A 047

*In re Blech Sec. Litig.*, No. 94-CV-7696, 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) ..........................................................................A 053

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------x

| | | |
|---|---|---|
| ENERGY NORTHWEST, | : | |
| Plaintiff, | : | |
| -vs- | : | Case No. 04-10C |
| UNITED STATES OF AMERICA, | : | |
| Defendant. | : | PAGES 1 - 123 |

------------------------------x

30(b)(6) Deposition of Christopher A. Kouts

Washington, D.C.

Thursday, June 12, 2008

Reported by: Tammy S. Newton

JOB NO. 187874





55c0c1eb-0a4e-4dc1-b45e-36a57ec779b4

June 12, 2008
9:00 a.m.

Deposition of Christopher A. Kouts held at the offices of:

Jenner & Block
1099 New York Avenue, N.W.
Washington, D.C.

Pursuant to notice, before Tammy S. Newton, a Notary Public in and for the District of Columbia.



APPEARANCES

For the Plaintiff:
DAVID JIMENEZ-EKMAN, ESQUIRE
Jenner & Block, LLP
One IBM Plaza
Chicago, Illinois 60611
(312) 923-2782

For the Defendant:
ANDREW P. AVERBACH, ESQUIRE
SHARON A. SNYDER, ESQUIRE
Department of Justice
Commercial Litigation Branch
1100 L Street, N.W., Room 11012
Washington, D.C. 20530
(202) 353-0527

Also Present:
Colby Block, Intern



C O N T E N T S


| EXAMINATION OF CHRISTOPHER A. KOUTS BY: | PAGE |
|---|---|
| Mr. Jimenez-Ekman | 5 |
| Mr. Averbach | 110 |
| Mr. Jimenez-Ekman | 113 |

| DEPOSITION EXHIBITS: | FOR ID: |
|---|---|
| No. 1 - 30(b)(6) Notice of Deposition | 5 |
| No. 2 - Expert Report Prepared by Eileen Supko | 5 |
| No. 3 - Acceptance Priority Ranking and Annual Capacity Report | 19 |
| No. 4 - Preliminary Estimates of the Total System Costs for the Restructured Program | 37 |
| No. 5 - Summary Report | 75 |
| No. 6 - Letter Dated December 17, 1992 | 103 |


(All exhibits attached to transcript.)



Thereupon,
Christopher A. Kouts,
was called for examination by counsel for the Plaintiff, and, after having been sworn by the notary, was examined and testified as follows:

(Deposition Exhibit No. 1 was marked for identification and attached to the transcript.)

(Deposition Exhibit No. 2 was marked for identification and attached to the transcript.)

EXAMINATION BY COUNSEL FOR THE PLAINTIFF
BY MR. JIMENEZ-EKMAN:

Q Good morning, Mr. Kouts. My name is David Jimenez-Ekman. We met a little bit more than a year ago, I think, although I didn't ask you any questions at the Dairyland deposition. I understand that you're here today as the Department of Energy's designated Rule 30(b)(6) designated witness; is that correct?
A Yes.
Q I'm going to show you what's been marked as Exhibit 1.
A I see it.
Q Have you seen Exhibit 1 before?







55c0c1eb-0a4e-4dc1-b45e-36a57ec779b4

A I've seen versions of it. Not this specific version, but I have seen the questions that are identified here.

MR. AVERBACH: Let me clarify on the record. We showed him the copy of the unamended one that didn't have the dates and whatnot. But he has seen these specific topics that are set forth here.

BY MR. JIMENEZ-EKMAN:

Q And what, if anything, did you do, Mr. Kouts, to prepare to be the department's Rule 30(b)(6) witness on the topics listed on the third page of Exhibit 1?

A I met with counsel and discussed them.

Q Who did you meet with?

A Mr. Averbach and Sharon, I forgot your last name.

MS. SNYDER: Snyder.

THE WITNESS: And Lisa's last name is?

MR. AVERBACH: Donohue.

THE WITNESS: Those were the three attorneys with the Justice Department.

BY MR. JIMENEZ-EKMAN:



Q Did you meet with anyone else?

A No.

Q Was anyone else present for the meeting?

A No.

Q How long did you meet with them?

A I believe for about two hours.

Q When did you meet them?

A Last week.

Q Did you review any documents to prepare for your role as a representative of the Department of Energy in this deposition?

A I reviewed documents that counsel provided me.

Q Do you remember any of those documents?

A They were essentially some of the depositions and some of the testimony that I had given in the past.

Q So they showed you prior testimony that you had given. Do you remember what prior testimony they showed you?

A Specifically, I don't remember the specific instances. I leafed through them, you know,



basically. But, you know, I couldn't give you the specifics. If counsel wants to provide you those specifics, they can later, but I don't have it with me.

Q Do you remember any -- any particular testimony?

A I believe there was some -- I believe some of the transcripts I looked at were related to the Dairyland trial -- the Dairyland case, if you will. Beyond that, I don't have any specifics.

Q Do you remember any other documents besides your prior testimony that counsel showed you during preparation for the deposition today?

A There were, I believe, some correspondence between the Justice Department and your firm. But beyond that, no.

Q Do you remember the general subject matter of the correspondence between Department of Justice and Jenner & Block?

A I believe it had to do with some discussion about the topics that I would testify on and whether or not the previous depositions and testimony that I



had given in court essentially addressed those subjects, and the tenor of the correspondence, as I remember, that in many cases this has already been gone over many times before, and they did not understand the need for me to have this deposition or that I hadn't already answered these questions in the past.

To the best of my memory, that's what those documents contained.

Q Do you remember reviewing any other documents in preparation for your deposition?

A No.

Q Did you consult with anybody at the Department of Energy who was not an attorney to gather any factual or other information to answer the questions that are listed in Topic -- I'm sorry -- in Exhibit 1?

A I talked to Mr. Zabransky about cask capacities and so forth, but beyond that, no.

Q So Mr. Zabransky was the only other person you consulted to prepare for your deposition today?

A That's correct.







55c0c1eb-0a4e-4dc1-b45e-36a57ec779b4

Page 10

Q When did you talk to Mr. Zabransky?
A Well, I talked to Mr. Zabransky every day. On this particular subject, I believe it was sometime last week.
Q And how long did you talk to him?
A On that subject, probably for about 10 seconds.
Q That's a pretty short conversation.
Yes, and I'm sorry. You made a good distinction. On that particular topic, that is relating to your preparation for this deposition, can you tell -- can you, please, state what you said to Mr. Zabransky and Mr. Zabransky said to you.
A It was whether or not my understanding of potential cask capacities was consistent with his understanding, and the answer was yes.
Q And what did you tell him your understanding of potential cask capacities was?
A It's related to, I believe, Question No. 5, which had to do with the weights and the capacities, if you will, of casks that might have been available in the time frame associated with when Energy

Page 11

Northwest might have been serviced by the department.
Q And you told him your understanding, and he confirmed that?
A I gave him my perspective, and he agreed it was consistent with his perspective.
Q What was the perspective that you gave him? What did you tell him?
A Essentially, to the extent that there might have been rail casks available ranging from about 100 tons to 125 tons in hook weight and that the cask capacities, at least from a BWR facility, which I believe is what your client's facility is, would range anywhere from 44 assemblies to 68 assemblies.
Q And he said that was -- in his view, that was accurate?
A In his view, that was consistent with his understanding of casks that might had been available had the department had the capacity to receive fuel at some future time.
Q Did you discuss with Mr. Zabransky any other topic relating to your preparation for your deposition today?

Page 12

A No.
Q I'll move on to Topic 1 of Exhibit 1 listed on the third page, which is, quote, "Energy Northwest's acceptance allocation had DOE commenced waste acceptance under the Standard Contract on January 31st, 1998," end quote.
Did I read that right, sir?
A Yes.
Q Mr. Kouts, has the DOE ever determined the amount of spent nuclear fuel it would have picked up from Energy Northwest and the schedule for picking it up had the DOE commenced performance under the Standard Contract on January 31st, 1998?
A No.
Q Why not?
A Basically, it was beyond the planning horizon of the department.
Q And it remains beyond the planning horizon of the department?
A Yes.
Q Do you know, for purposes of this litigation, whether the department has any position on

Page 13

the acceptance, allocation, or amount of SNF it would have picked up and the schedule for picking it up from Energy Northwest?
MR. AVERBACH: I'm going to object to the extent that calls for a legal conclusion. It's also, I believe, vague.
THE WITNESS: Can you repeat the question.
(The record was read by the reporter.)
THE WITNESS: No.
BY MR. JIMENEZ-EKMAN:
Q So from a programmatic perspective, the department does not have a position on that; is that correct?
MR. AVERBACH: Objection; vague.
THE WITNESS: The department has no plans. It has no position.
BY MR. JIMENEZ-EKMAN:
Q And it has no position on what it would have done had it commenced performance and January 31st, 1998, correct?
MR. AVERBACH: Objection; vague and mischaracterizes his testimony.







55c0c1eb-0a4e-4dc1-b45e-36a57ec779b4

Page 58

with the Nuclear Regulatory Commission. And the proceedings will not begin formally until and unless the Nuclear Regulatory Commission completes its acceptance review and dockets the license application.
Q And Nevada has sent letters opposing the docketing of that application, correct?
A Yes.
Q The re-baselining of the program that you've described as going on now, that's happened several times over the history of the program, correct?
A Yes.
Q Originally, as specified in the NWPA, the department intended to commence waste acceptance in 1998, correct?
A Correct.
Q And --
MR. AVERBACH: If you're going to ask more questions about what has happened previously, I'm going to object as beyond the scope.
BY MR. JIMENEZ-EKMAN:
Q I think we can move on to Topic 5, which

Page 59

is, quote, "The type of casks and any other ancillary equipment DOE would have used to accept SNF from Energy Northwest under the Standard Contract had it commenced performance on January 31st, 1998, including without limitation: (a) the capacity of the cask in number of SNF assemblies; (b) the weight of the cask prior to loading; (c) the approximate weight of the casks when fully loaded with SNF assemblies; and (d) whether the cask closure would have been bolted or welded," end quote.
Did I read that correctly?
A Yes.
Q Other than your conversation with Mr. Zabransky, you didn't -- did you do anything else to prepare specifically for this question?
A No.
Q Did you go back and review any historical documents of the department or anything else?
A No.
Q Did the department ever make any determination regarding the type of casks and ancillary equipment it would have used to accept SNF

Page 60

from Energy Northwest under the Standard Contract if it had begun performance in 1998?
A No. The department undertook no specific analysis on that subject.
Q And that's -- I just want to make sure that the record is clear. My question was as of 1998, and I want to make sure that your answer was also that that analysis had not been taken as of 1998, correct?
A That's correct.
Q So the DOE did not, as of 1998, make a determination as to the capacity of the casks in number of SNF assemblies it would have used at Energy Northwest, correct?
A As I indicated, it did not undertake any analysis, their projections of the types of casks that could have been available beyond the 10-year period. I mean, there's certainly opportunities to conjecture as to what might be available under that time frame and to the extent that would have a great deal to do on the capabilities of the facility.
But assuming it's a rail facility, and assuming it's a BWR facility, a boiling water reactor

Page 61

facility, you can make projections as to the types of casks and capacities that could have been servicing that particular reactor. It could at least provide a range as to what it might be.
Q The department did not, in fact, do that, correct?
A No, it did not.
Q I think you indicated the phrase opportunity for conjecture?
A Yeah.
Q That's what it would have been, correct?
A Correct.
Q So as to the weight of the casks prior to loading, it would have been conjecture as to what the department would have used beginning in 1998, correct?
A Well, that's a separate question about what we would have been using in 1998.
Q For Energy Northwest?
A For Energy Northwest, according to the department's evaluation, you were not contained in the first 10 years -- Energy Northwest was not contained in the first 10 years of operation. So you would have







55c0c1eb-0a4e-4dc1-b45e-36a57ec779b4

to project what casks might be available in the 2008-and-beyond time frame in terms of what -- what transportation, rail transportation casks might be available. The department -- that was beyond the department's planning horizon, certainly.
Q So the department's never done that?
A It's never done a formal analysis, no.
Q Has it done an informal analysis?
A The -- there is knowledge within the department as to the range, if you will, of casks that might have been available in that time frame for a BWR reactor. But did the department plan on it? No. Was it expecting it? No. But certainly the department's aware of what would be available in the industry and could project about the types of casks that could be used at a reactor, if you were shipping in the 2010 -- 2000-and-beyond time frame.
Q It could have done that, but because it was beyond the planning horizon --
A -- it didn't need to.
Q So it did not, in fact, do it?
A No, it do not.



Q Same answer for the approximate weight of the casks when fully loaded with SNF assemblies? That was never determined by the department prior to 1998, correct?
A That's correct.
Q And never analyzed before 1998, correct
A Other than knowledge of what casks would potentially have been available, no.
Q And whether the cask closure that would have been used at the end starting in 1998, that was also never determined or analyzed by the department prior to 1998, correct?
MR. AVERBACH: I'm sorry. Were you attempting to read or paraphrase Subsection D there?
BY MR. JIMENEZ-EKMAN:
Q Do you understand the question, Mr. Kouts?
A Yes. The department --
MR. AVERBACH: I object on the ground that it's vague.
THE WITNESS: The department's expectations would not be a welded closure. It would be a bolted closure, since the department's view is that it would



be providing transportation casks, and no transportation casks that currently exist are welded, to have welded closures. They all have bolted closures.
BY MR. JIMENEZ-EKMAN:
Q So as you sit here today, the expectation would be that it would be bolted closures?
A That's correct.
Q Was that analysis undertaken prior to 1998?
A There was no analysis, since there weren't any welded casks.
Q What about, sir, the center of gravity of casks? Did the department analyze or determine the nature of the center of gravities of casks that would have been used at EN prior to 1998 if the department had begun performance in 1998?
A No.
Q Same question with respect to the diameter of the casks.
A That's correct. The answer is no.
Q I'm going to read you a statement, sir, and I'm going to ask you whether the department agrees or



disagrees with this. Quote, "DOE has not identified the particular cask that it will use to accept SNF from Energy Northwest. DOE's current efforts are focused upon development of the transportation, aging, and disposable canister system specifications and TAD canisters. DOE has not determined whether these tag designs will be usable at EN."
MR. AVERBACH: I'll object on the ground it's beyond the scope of the deposition notice. I'll also object on the grounds it's a compound question.
THE WITNESS: The department's development of the transportation aging and disposal canisters is intended to service as wide an applicability in the industry as possible. It would be the department's expectation that the TADS that are under development, assuming that there was a rail reactor, that these could be handled and would be utilized at the vast majority of reactors that can handle rail casks. And its program is designed to make sure that that eventuality occurs.
BY MR. JIMENEZ-EKMAN:
Q I'm going to take your counsel's advice and







55c0c1eb-0a4e-4dc1-b45e-36a57ec779b4

break it up. I'm going to start with the first sentence. Quote, "DOE has not identified the particular casks that it will use to accept SNF from Energy Northwest," end quote. Agree or disagree?
MR. AVERBACH: Objection.
THE WITNESS: The department needs a time frame.
MR. AVERBACH: Excuse me. Objection; vague, beyond the scope of the deposition notice.
THE WITNESS: I -- the department needs for clarity, if you will, to understand the context of your question.
BY MR. JIMENEZ-EKMAN:
Q Well, the DOE -- let me put it this way. It's correct, isn't it, that the DOE has never identified the particular cask that it will use to accept SNF from Energy Northwest?
A Yes.
Q It's also correct that the department has not determined whether the TAD designs will be usable at EN in particular or not, correct?
MR. AVERBACH: Objection; beyond the scope



of the deposition notice.
THE WITNESS: The department has not undertaken that specific analysis. However, the expectation of the department in the development of the TAD, that would be broadly applicable to all utilities who have rail cask capability.
BY MR. JIMENEZ-EKMAN:
Q But the department has not determined one way or another, specifically with respect to Energy Northwest and its particular facilities and physical plant, whether or not the TAD design will work there, correct?
MR. AVERBACH: Objection; asked and answered.
THE WITNESS: Yes.
BY MR. JIMENEZ-EKMAN:
Q Now, the TAD design is not finalized yet, correct?
MR. AVERBACH: Objection; beyond the scope.
THE WITNESS: Correct.
BY MR. JIMENEZ-EKMAN:
Q In fact, the contract for design was



awarded last month, in May 2008, correct?
MR. AVERBACH: Same objection.
THE WITNESS: There were two contracts awarded.
BY MR. JIMENEZ-EKMAN:
Q When were those contracts awarded?
A I don't have the specific date. They were awarded last month.
Q At this time, the department has issued performance standards, correct?
MR. AVERBACH: Objection; vague and beyond the scope. To the extent we're asking -- you're asking about TADS, I interpose a continuing objection.
THE WITNESS: Performance specifications.
BY MR. JIMENEZ-EKMAN:
Q A performance specification differs from a final design, correct?
A Yes.
Q When is it the department's expectation that the final design for the TAD will be completed?
A Applications for TAD-related technology will be submitted to the Nuclear Regulatory Commission



toward the end of next year. At that point in time, the designs would have been mature enough for the NRC to make any judgment as to the safety of them and whether or not they comply with 10 CFR Part 71 and 10 CFR Part 72, along with the equipment associated with it.
Q And at the time that the application is submitted, it then -- the design remains subject to revision based on the result of the NRC proceedings, correct?
MR. AVERBACH: Objection; beyond the scope.
THE WITNESS: Yes.
BY MR. JIMENEZ-EKMAN:
Q Now, is it true that the TAD will likely require additional shielding and have lower capacity than commercially available NPCs?
MR. AVERBACH: Same objection.
THE WITNESS: Lower capacity, yes. Additional shielding, no.
BY MR. JIMENEZ-EKMAN:
Q Is it possible for the department to say, with respect to the casks that it would have used to







55c0c1eb-0a4e-4dc1-b45e-36a57ec779b4

pick up fuel from EN if it had started in 1998, whether it's more likely than not that the casks would have held between 56 and 68 assemblies?

MR. AVERBACH: Objection; vague.

THE WITNESS: I'd say the estimate would have been anywhere between -- if the department did estimate, would be anywhere between 44 and 68.

BY MR. JIMENEZ-EKMAN:

Q So if -- based on your current knowledge base, the department's current knowledge base, if the department had engaged in that process, that would have been the department's estimate?

A To the extent that a projection was needed, that essentially was the range of casks that were projected to be available in that general time frame, which related to 44 BWRs or up to 68 BWRs.

Q Is it possible to say, in that time frame in 1998, that it is more likely than not that whatever container used would have been cylindrical?

MR. AVERBACH: Objection; vague.

THE WITNESS: Yeah, I would agree.

BY MR. JIMENEZ-EKMAN:



Q Is it possible for the department to say whether -- if it had commenced performance under the Standard Contract in 1998, whether the cask used to pick up fuel from Energy Northwest would have been between 177 and 208 inches in diameter?

MR. AVERBACH: Calls for speculation.

THE WITNESS: Without more information as to the specifics of the casks that might be have been available, no, the department would not go that far.

BY MR. JIMENEZ-EKMAN:

Q And would it have -- I'm sorry. Would it have been possible to say -- I apologize, Mr. Kouts. My last question should have referred to the length of the cask as opposed to the diameter. Does that change your answer at all?

MR. AVERBACH: Do you need the question read back?

THE WITNESS: No. That's a general -- those are general lengths. It could be a range. It could be less. It could be more. But, you know, around that range I would say.

BY MR. JIMENEZ-EKMAN:



Q Now, I'm going to ask you about diameter. Is it possible for the department to say that it's more likely than not that the cask DOE would have used to pick up spent nuclear fuel from Energy Northwest in 1998 would have had a diameter between 86 and 98 inches?

MR. AVERBACH: Objection; beyond the scope.

THE WITNESS: Again, I answer that the same way I answered the length. Without looking at the specifics of the casks that had the capacities of between 44 and 68 and reviewing them, you know, the department really couldn't say. That also depends on their certificate of certification, if you will, or certificate of compliance within the Nuclear Regulatory Commission and the specific designs of those casks. So to the extent the department had those to review, then they would be able to comment on them.

BY MR. JIMENEZ-EKMAN:

Q Is it possible for the department to say whether it is more likely than not that the cask DOE would have used to pick up spent nuclear fuel, if DOE



had commenced performance in 1998, would have weighed, when loaded, between 208,000 pounds and 277,000 pounds?

MR. AVERBACH: Objection; calls for speculation, lack of foundation.

THE WITNESS: Again, without looking specifically at the certificates of compliance and understanding the specifics of the casks, the department wouldn't speculate. It would probably be in a similar range, but it could be slightly different. I don't know.

BY MR. JIMENEZ-EKMAN:

Q Could have been higher; could have been lower, depending on specifics?

A Correct.

Q And those specifics, because the department did not commence performance in 1998, were never determined, correct?

MR. AVERBACH: Objection; outside the scope.

THE WITNESS: They were never analyzed, that's correct.







55c0c1eb-0a4e-4dc1-b45e-36a57ec779b4

BY MR. JIMENEZ-EKMAN:
Q They were never analyzed, and I guess I'm using "determine" as the next step. Because they were never analyzed, they were certainly never determined, correct?
A That's correct.
Q Now, you made a couple of references to the rail cask issue with -- I'm sorry -- a couple of references that the TAD should be usable in a broad swath of plants that can accept rail casks, correct?
A That's correct.
Q Did the department ever make a determination, or has it ever made a determination, about whether it would use a truck or rail cask to accept SNF from Energy Northwest?
MR. AVERBACH: Objection; outside the scope.
THE WITNESS: No, it has not. The department's position would be that the -- they would try to provide the highest capacity cask it had available that could be serviced by that individual reactor in order to minimize the amount of loadings



and also handlings at the repository. So to the extent the department was biased in terms of what it would provide, it would want to provide the highest capacity cask, as well as, probably, the contract holder would like to -- to minimize his operations on the site.
BY MR. JIMENEZ-EKMAN:
Q Understanding that that's the way the department would analyze the issue, in fact, the department never made that determination?
A That's correct.
MR. AVERBACH: I'll interpose an objection, perhaps belatedly. That's beyond the scope of the 30(b)(6) notice.
MR. JIMENEZ-EKMAN: Can we take a quick break?
(A brief recess was taken.)
(Deposition Exhibit No. 5 was marked for identification and attached to the transcript.)
BY MR. JIMENEZ-EKMAN:
Q The court reporter has shown you what's marked as Kouts Rule 30(b)(6) Deposition Exhibit 5.



Have you seen this before, Mr. Kouts?
A No.
Q You see it's titled, quote, "Delivery Commitment Schedule Summary Report, Year 2 Preliminary Draft," end quote. And at the top it reads, quote, "Civilian Radioactive Waste Management System Management and Operating Contractor," end quote.
Did I read those correctly?
A There were no quotes, but, yes.
Q The quotes are for the court reporter.
A Yes, you did.
Q Have you ever seen any final reports that related to the Delivery Commitment Schedule Summary Report for Year 2?
A The department never prepared one.
Q So this is a contractor document?
A That's correct.
Q If you turn to page 15, please, you see under 3.1, shipping mode and cask design?
A Yes.
Q Understanding the department did not prepare this and that you haven't seen it, I'm just



going to ask you whether you agree or disagree with the -- some of the statements in this first paragraph here. Quote --
MR. AVERBACH: Before you do that, if you're going to do it, I would object. Each of those statements are going to be beyond the scope of the 30(b)(6) notice.
BY MR. JIMENEZ-EKMAN:
Q Quote, "The first generic issue is the inability to determine the exact shipping mode and cask design most appropriate for each site," end quote.
Now, I'm drawing your attention to this sentence. You haven't seen this before. Feel free to read whatever else in the exhibit you want, to get context here.
MR. AVERBACH: I'll object -- object on lack of foundation.
BY MR. JIMENEZ-EKMAN:
Q Let me put it this way.
MR. AVERBACH: Calls for speculation.
BY MR. JIMENEZ-EKMAN:







55c0c1eb-0a4e-4dc1-b45e-36a57ec779b4

Q Does the department agree that in arriving at a shipping mode and cask design, that a generic issue is the inability to determine the exact shipping mode and cask design most appropriate for each site?

MR. AVERBACH: Objection; lack of foundation, calls for speculation.

THE WITNESS: Can you read the question back.

(The record was read by the reporter.)

MR. AVERBACH: The question is also vague.

THE WITNESS: No.

BY MR. JIMENEZ-EKMAN:

Q So the department's position is that it's possible to determine the exact shipping mode and cask design most appropriate for each site?

MR. AVERBACH: Objection; vague.

THE WITNESS: At the appropriate point in the planning process, the department's view is that there would be enough information to determine shipping mode and general cask design most appropriate for each site in working through the planning process with the contract holders.



BY MR. JIMENEZ-EKMAN:

Q That has not happened yet, correct?

MR. AVERBACH: Is your question confined to your client?

If you're not going to answer me, I'll object, it's vague.

THE WITNESS: You have to be time-specific associated with that statement.

BY MR. JIMENEZ-EKMAN:

Q Okay. As of today, has that process occurred?

MR. AVERBACH: Objection; vague, beyond the scope.

THE WITNESS: The process was initiated two times by the department, and information was provided to the department based on the responses to the DCSs.

BY MR. JIMENEZ-EKMAN:

Q Has the department made determinations as a result of the initiation of those processes?

MR. AVERBACH: Objection; vague. Objection; outside the scope.

THE WITNESS: What determinations?



BY MR. JIMENEZ-EKMAN:

Q Well, about the exact shipping mode and cask design most appropriate for each site. That's what we've been talking about here.

A To the extent at the time the planning process was underway, the department was looking at determining the exact shipping mode and cask design most appropriate for each site based on the planning process. The department is not involved in the planning process at this point.

Q And I guess what I'm asking is: Did those processes reach a conclusion so that a determination was made with respect to each site?

MR. AVERBACH: Same objection; asked and answered.

THE WITNESS: At a determination, no. But information I believe was available to the extent that the department had information as to general shipping mode and cask design associated with various sites that were in the first planning area, if you will.

BY MR. JIMENEZ-EKMAN:

Q Now, if you look lower down on the page,



Mr. Kouts, this is actually -- I'm going to ask you about the carryover sentence from pages 15 to 16, which is, quote, "The exact equipment required at a site cannot be determined until the specific cask system to be utilized has been selected," end quote.

Does the department agree or disagree with that?

MR. AVERBACH: Objection; vague, lack of foundation, outside the scope.

THE WITNESS: I agree with that.

BY MR. JIMENEZ-EKMAN:

Q Move on to Topic 8. Topics 6 and 7 were withdrawn. Topic 8 is "The 1987 Nuclear Waste Policy Amendments Act and its effect on the civilian radioactive waste management program, including without limitation the (a) effect on DOE's plans to site, license, construct geological repository, and (b) effect on DOE's plans to site, license, construct a monitored retrievable storage facility", end quote.

Did I read that one right?

A Yes.

Q Was it the department that made or







55c0c1eb-0a4e-4dc1-b45e-36a57ec779b4

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ENERGY NORTHWEST, | ) | |
| | ) | |
| Plaintiff, | ) | No. 04-0010C |
| | ) | |
| v. | ) | Chief Judge Damich |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**AMENDED RULE 30(B)(6) NOTICE OF DEPOSITION**

Please take notice that pursuant to RCFC 30(b)(6), the plaintiff, Energy Northwest, will take the deposition of the United States, or the person or persons designated by the United States, upon oral examination before an officer authorized by law to administer oaths commencing at 9:00 a.m. on June 12, 2008 at the offices of Jenner & Block LLP, 1099 New York Avenue, NW, Suite 900, Washington, DC 20001-4412. Pursuant to RCFC 30(b)(6), Energy Northwest requests that the Government designate a representative to testify regarding the subjects listed on Exhibit A.

Dated: June 9, 2007

Respectfully submitted,

[signature]

NORMAN M. HIRSCH
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611
(312) 923-2782 telephone
(312) 840-7782 facsimile

EXHIBIT
Kouts 30(b)6 #1
6/12/08

**Exhibit A**

1. Energy Northwest's acceptance allocations had DOE commenced waste acceptance under the Standard Contract on January 31, 1998.

2. The SNF acceptance rate at which DOE would have performed after the ten year period reflected in the 1991 Annual Capacity Report assuming that DOE commenced waste acceptance under the Standard Contract on January 31, 1998.

3. The basis for the acceptance rate contained in the "Preliminary Estimates of the Total-System Cost For The Restructured Program: An Addendum To The May 1989 Analysis Of The Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program" (DOE/RW-0295P).

4. The earliest date on which DOE will commence acceptance of SNF under the Standard Contract, including without limitation, DOE announcements that the earliest possible date for waste acceptance is 2017.

5. The type of casks and any other ancillary equipment DOE would have used to accept SNF from Energy Northwest under the Standard Contract had it commenced performance on January 31, 1998, including without limitation: (a) the capacity of the cask in number of SNF assemblies; (b) the weight of the cask prior to loading; (c) the approximate weight of the cask when fully loaded with SNF assemblies; and (d) whether the cask closure would have been bolted or welded.

6. Withdrawn.

7. Withdrawn.

8. The 1987 Nuclear Waste Policy Amendments Act and its effect on the civilian radioactive waste management program, including without limitation the (a) effect on DOE's plans to site, license, construct a geologic repository, and (b) effect on DOE's plans to site, license, construct a monitored retrievable storage facility.

9. DOE's efforts to seek modification of any provision of the Nuclear Waste Policy Amendments Act of 1987 limiting the capacity of a Monitored Retrievable Storage facility or linking the schedule of such a facility to the schedule for a repository.

10. Efforts to site a Monitored Retrievable Storage facility between 1989 and 1995, including without limitation, the efforts of the Nuclear Waste Negotiator to site a Monitored Retrievable Storage facility.

11. Withdrawn.

Case 1:04-cv-00106-EJD Document 130 Filed 06/20/2008 Page 1 of 23

# In the United States Court of Federal Claims

No. 04-106 C
(Filed: June 20, 2008)

*************************************

| | |
|---|---|
| | * |
| **DAIRYLAND POWER COOPERATIVE,** | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| **THE UNITED STATES,** | * |
| | * |
| Defendant. | * |
| | * |

*************************************

**ORDER**

Pursuant to the Trial Preparation Order of February 21, 2008, Plaintiff, Dairyland Power Cooperative ("Dairyland") and Defendant, the United States ("the Government") filed their motions *in limine* on April 29, 2008. The parties filed their responses on May 15, 2008, and a hearing was held on May 29, 2008. Based on the arguments of the parties in the pleadings and at the hearing, below is the Court's decision on each of the outstanding motions.

## I. Defendant's Motion *In Limine* to Exclude the Admission at Trial of Documents Prepared by Government Contractors

The Government, as it has in other spent nuclear fuel ("SNF") cases, seeks to exclude all documents that were prepared by Department of Energy ("DOE") contractors. The Government gives a number of reasons to exclude these documents; however, none of these reasons is persuasive to the Court. For the reasons set forth below, the Government's Motion *In Limine* to Exclude the Admission at Trial of Documents Prepared by Government Contractors ("Def.'s Mot. to Exclude Contractor Documents") is DENIED.

### A. Admissibility of the Documents under Fed. R. Evid. 803(8)(A)

#### 1. Background

There are approximately 140 documents[1] at issue which were prepared by contractors for

[1] According to the Government there are 137 documents that fall into this category. Def.'s Mot. to Exclude Contractor Documents at 1. According to Dairyland, there are "nearly 140."

DOE regarding research and planning relating to the disposal of SNF. Def.'s Mot. to Exclude Contractor Documents, App.1-11; Pl.'s Resp. at 1; Tr. 8:18-21.[2]

The Government does not contend that the documents are not relevant, rather, the Government argued that the contractor documents are not admissible because they are not covered by any of the exceptions to the hearsay rule under Fed. R. Evid. 803 and that they are not admissions under Fed. R. Evid. 801(d). Def.'s Mot. to Exclude Contractor Documents at 6-14; Tr. 8:24-17:19. Dairyland responded that the documents are admissible under a number of theories including, the public records exception to the hearsay exclusion under Fed. R. Evid. 803(8)(A) or as non-hearsay under Fed. R. Evid. 801(d)(2)(C) or (D). Plaintiff's Response to Defendant's Motion In Limine to Exclude the Admission at Trial of Document's Prepared by Government Contractors ("Pl.'s Resp. to Def.'s Mot. to Exclude Contractor Documents ") at 7-15; Tr. 18:23-22:23.

**2. Applicable Law**

At this time the primary issue before the Court is the admissibility of the contractor documents. *PR Contractors, Inc. v. United States*, 69 Fed. Cl. 468, 469 (2006) ("A motion *in limine* is a preliminary motion that serves a gatekeeping function and permits the trial judge to eliminate from further consideration evidentiary submissions that clearly would be inadmissible for any purpose.") If the documents are found to be admissible, the question of whether the statements contained within the contractor documents can be attributed to DOE is a subsidiary question which can be addressed during trial. Tr. 7:4-25. To determine the admissibility of the contractor documents the Court looks to Fed. R. Evid. 803(8)(A) which provides that "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth the activities of the office or agency" are not excluded by the hearsay rule "unless the sources of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A).

The contractor documents were not created by DOE; however, this Court holds that, while DOE contractor documents may not have been directly created by DOE, the exception in Fed. R. Evid. 803(8)(A) allows for admission of the documents. While the Government attempts to argue that DOE contractors have a limited amount of responsibility, this Court finds that "[t]o a significant, if not exclusive extent, DOE's activities, duties, and responsibilities under the NWPA [Nuclear Waste Policy Act], have been conducted through its national laboratories and management and operations ("M&O") contractors." *Yankee Atomic Elec. Co. v. United States* ("*Yankee*"), No. 98-126C, 2004 U.S. Claims LEXIS 363, at *8 (Fed. Cl. Sept. 17, 2004) (citing

---

Dairyland's Response to Defendant's Motion *In Limine* to Exclude the Admission at Trial of Documents Prepared by Government Contractors. ("Pl.'s Resp. to Def.'s Mot. to Exclude Contractor Documents ") at 1.

[2] Tr. (page #:paragraph #) refers to the transcript from the oral argument on the parties' motions *in limine* held on May 29, 2008.

*Westinghouse Electric Co. v. United States*, 1997 WL 1068204 at *2 (Fed. Cl. 1997)).[3] Fed. R. Evid. 803(8)(A) is to be construed broadly to include

> those activities done by national laboratories at the behest of DOE and within the parameters thereof. The court is mindful of defendant's point that some of the documents contain a disclaimer that the views are those of the contractor/author, not of any government agency, a position that is . . . not dispositive o[f] their admissibility as public records.

*Pacific Gas & Elec. Co. v. United States* ("*PG&E*"), 73 Fed. Cl. 333, 438 (2006) (citing *Yankee,* 2004 U.S. Claims LEXIS 363, at *22-23). The Government advanced the same position in the instant matter as it did in *Yankee* and *PG&E*, that the documents do not contain the views of any government agency. The Government argued at the hearing on May 29, 2008, that the reports prepared by contractors do not set forth the activities of DOE, rather the documents contain suggestions, recommendations, and advice of contractors hired to provide this information. Tr. 10:15-22. The Government also contended, *inter alia*, that the contractors are not public officials because they are not employees or agents of DOE. Def.'s Mot. to Exclude Contractor Documents at 6-10; Tr. 9:20-25. And while the Government makes a number of arguments regarding whether or not the statements contained in the documents should be attributed to DOE, it has not persuaded the Court that these documents are inadmissible hearsay.

**3. Conclusion**

The Government's position that the documents are not admissible under Fed. R. Evid. 803(8)(A) is unavailing. The contractors in this matter have a significant amount of responsibility under the NWPA for activities related to the disposal of SNF. The Court concludes that these documents constitute "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth the activities of the office or agency." Fed. R. Evid. 803(8)(A). There has been no contention that "the sources of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A). Therefore, the contractor documents are admissible.

This Court agrees with and adopts the reasoning set forth in *Yankee* and *PG&E*. The documents are admissible under Fed. R. Evid. 803(8)(A). However, in making the determination

---

[3] Dairyland excerpted for the Court the testimony of Dr. John Bartlett, the former Director of the Office of Civilian Radioactive Waste Management ("OCRWM"). Dr. Bartlett was asked during the *Yankee* trial, "[w]hen you were director, to what extent did you and OCRWM rely upon studies prepared by the management and operations contractor such as this one?" Dr Bartlett responded, "[a]ll of the work is done by the - by the support of contractors. That's what they're there for. The Department of Energy has - OCRWM itself has about 65 employees. The program has about 5,000 employees if you look at it this way. These are contractor people." Pl.'s Resp. Def.'s Mot. to Exclude Contractor Documents at 6; *see also Yankee,* 2004 U.S. Claims LEXIS 363, at * n.5.

that the documents are admissible, the Court has not determined that the contractor's "[r]ecords, reports, statements, or data compilations" reflect or establish DOE policy. Fed. R. Evid. 803(8)(A); *see also Yankee,* 2004 U.S. Claims LEXIS 363, at *29. This determination shall be made if the issue arises at trial.

### B. Admissibility of the Documents under Fed. R. Evid. 801(d)(2)(C) or (D)

#### 1. Background

Dairyland also seeks the admission of the documents as admissions of a party opponent under Fed. R. Evid. 801(d)(2)(C) or (D). Tr. 21:8-12. The Government contended that the contractors were not "authorized" to make statements on behalf of DOE. Def.'s Mot. to Exclude Contractor Documents at 23. The Government relied on the principle that "[c]ourts have historically applied agency law to determine whether the declarant was authorized by the party to make the statement at issue." *Id.* at 24 (citing 5 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 801.32[1], at 801-69-70 (2d ed. 2008); Tr. 15:16-17:16.

Dairyland argued that, "[i]n most if not all cases, the contractors were actually hired to *write* the reports in question, so clearly the statements made in the reports–like the analysis and other work underlying the reports–were 'authorized' by DOE." Pl.'s Resp. to Def.'s Mot. to Exclude Contractor Documents at 16. Moreover, some documents contain the express statement that "this report was prepared as an account of work sponsored by an agency of the United States Government." *Id.* at 16. Additionally, Dairyland again cited to the *Yankee* trial testimony of Dr. John Bartlett, a former director of OCRWM. Tr. 21:13-19. When asked to what extent the M&O contractors were "authorized by the Department to make statements concerning the subjects addressed in studies," Dr. Bartlett responded that "they have full authority to accomplish and report this work." Pl.'s Resp. to Def.'s Mot. to Exclude Contractor Documents at 17.

#### 2. Applicable Law

According to Fed. R. Evid. 801(d) Statements which are not hearsay:

> A statement is not hearsay if (2) Admission by a party-opponent. The statement is offered against a party and is . . . (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

Fed. R. Evid. 801(d)(2)(C), (D).

In the instant matter it is clear that these Government contractors are authorized by DOE to make the statements contained in the documents at issue. DOE fulfills its mission through the use of Government contractors. The Government cannot now disavow a relationship that was created contractually simply because it would be beneficial to the pending litigation. Additionally, the Court finds that the management and operations ("M&O") contractors at issue here are akin to employees that

carried out DOE's contractual responsibilities under the Nuclear Waste Policy Act [NWPA] and the Standard Contract. *Yankee Atomic Elec. Co.*, 2004 U.S. Claims LEXIS 363, at *8. Therefore, the Court agrees with Dairyland, as well as *Yankee* and *PG&E*, that the documents are admissible as admissions by a party-opponent under Fed. R. Evid. 801(d)(2)(C) and (D). Fed. R. Evid. 801(d)(2) "expressly acknowledges that an admission by a party-opponent is not hearsay if the statement is offered against the party and was actually made by him in either his individual or representative capacity." *Mayor of City of Philadelphia v. Educational Equality League*, 94 S.Ct. 1323, 1345-1346 (1974). Further, "under Fed. R. Evid. 801(d)(2)(C), all that is required for such an 'admission' to be admissible at trial is that it is made by 'a person authorized by the party to make a statement concerning the subject.'" *PG&E*, 73 Fed. Cl. at 440.

### 3. Conclusion

The Court finds that the DOE contractors were authorized, in fact contracted, to make statements for DOE concerning the transportation and disposal of SNF pursuant to the Standard Contract. Additionally, as stated above, the Court finds that the DOE contractors are akin to employees that worked for DOE and carried out its duties under the NWPA and the Standard Contract. The Court, therefore, holds that the documents are admissible under Fed. R. Evid. 801(d)(2) (C) and (D). Whether or not the document reflects or establishes DOE policy shall be determined at trial should the issue arise.

## II. Dairyland's Motion to Exclude Evidence of the Reasons for DOE's Delay in Performance – i.e., Its Breach of Contract

Dairyland seeks to exclude any evidence that the Government might offer regarding the reason for DOE's breach. According to Dairyland, in recent spent nuclear fuel trials the Government has attempted to introduce evidence concerning the reason for DOE's breach which delayed and confused the proceedings. For the reasons set forth below Dairyland's Motion to Exclude Evidence of the Reasons for DOE's Delay in Performance – i.e., Its Breach of Contract is GRANTED.

### A. Background

Despite the broad title of Dairyland's motion it does not seek to exclude all evidence of the reasons for DOE's delay in performance, rather Dairyland seeks to exclude evidence that advances the Government's position regarding "unavoidable delay." Specifically, Dairyland seeks to exclude testimony by Mr. Christopher Kouts, a senior official at DOE, regarding the reasons for the delay of the Yucca Mountain project, such as budgetary issues, because they are not relevant to the damages issue presented in this case. Dairyland's Motion to Exclude Evidence of the Reasons for DOE's Delay in Performance ("Pl.'s Mot. to Exclude Evidence of Delay") at 1. According to Dairyland, *inter alia*, the Government is barred from raising the issue of "unavoidable delay" by the mandamus order issued by the D.C. Circuit. Pl.'s Mot. to Exclude Evidence of Delay at 2; Tr. 24:23-25; 25:1-4; *see Northern States Power Co. v. Department of Energy*, 128 F.3d 754, 760 (D.C. Cir. 1997). Dairyland also alleges that the Government has waived its ability to argue unavoidable delay by failing to plead the matter as an affirmative defense. Pl.'s Mot. to Exclude Evidence of Delay at 7; Tr, 25:19-26:5.

At oral argument the Government agreed that based on the D.C. Circuit's ruling at this time it is

"unable to make the argument with respect to unavoidable delays." Defendant's Response to Plaintiff's Motion to Exclude Evidence of the Reasons for the Department of Energy's Delay in Performance ("Def.'s Resp. to Pl.'s Mot. to Exclude Evidence of Delay") at 2; Tr. 26:23-27:4. However, the Government argued that it should be able to put forth evidence regarding "DOE's progress towards developing an MRS, monitored retrievable storage system." Def.'s Resp. to Pl.'s Mot. to Exclude Evidence of Delay at n1; Tr. 27:17-28:7. And if Dairyland challenges the 1991 ACR [Annual Capacity Report] the Government seeks to be permitted to describe the circumstances surrounding its creation and any allegations of "bad faith" surrounding the creation of the 1991 ACR that may arise. Def.'s Resp. to Pl.'s Mot. to Exclude Evidence of Delay at 3-4; Tr. 29:2-30:7.

### B. Applicable Law

The Court holds, that despite the fact that the D.C. Circuit mandamus order is now on appeal in the U.S. Court of Appeals for the Federal Circuit, while the appeal is pending the mandamus order is still in effect. *See Nebraska Public Power District v. United States*, 73 Fed. Cl. 650, 673 (holding that the subject mandamus was void because the D.C. Circuit "operated in excess of its jurisdiction and, specifically, without an appropriate waiver of sovereign immunity."); Tr. 24:13-14. Specifically, the D.C. Circuit's writ of mandamus states:

> We preclude DOE from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim. This necessarily means, of course, that DOE not implement any interpretation of the Standard Contract that excuses its failure to perform on the grounds of "acts of Government in either its sovereign or contractual capacity." 10 C.F.R. § 961.11, Art. IX.A.

*Northern States Power Co. v. Department of Energy*, 128 F.3d 754, 760 (D.C. Cir. 1997).

### C. Conclusion

The Court shall not permit any evidence submitted by the Government, including any testimony by Mr. Kouts, that seeks to advance the position that "its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim." *Northern States Power Co.*, 128 F.3d at 760. Any testimony by Mr. Kouts that does not concern an "interpretation of the Standard Contract that excuses its failure to perform on the grounds of 'acts of Government in either its sovereign or contractual capacity'" shall be allowed. *Id.*

## III. Dairyland Power Cooperative's Motion *In Limine* to Exclude Evidence Inconsistent with the Government's Contention Interrogatory Answers

Dairyland seeks to preclude the Government from introducing evidence that it claims is inconsistent with the Government's answers to contention interrogatories. Dairyland Power Cooperative's Motion *In Limine* to Exclude Evidence Inconsistent with the Government's Contention Interrogatory Answers ("Pl.'s Mot. to Exclude Evid. Inconsistent Interrog.") at 1. According to Dairyland, the Government made several concessions in its answers to interrogatories and, therefore,

many issues are no longer in dispute. *Id.*; Tr. 35:15-24. For the reasons set forth below Dairyland Power Cooperative's Motion *In Limine* to Exclude Evidence Inconsistent with the Government's Contention Interrogatory Answers is GRANTED IN PART AND DENIED IN PART.

### A. Background

Dairyland seeks to exclude evidence that is inconsistent with the Government's answers to five contention interrogatories: numbers 9, 13, 15, 16 and 17. Pl.'s Mot. to Exclude Evid. Inconsistent Interrog. at 1. According to Dairyland, based on the Government's answers to the contention interrogatories, the Government has conceded that it is not going to dispute the reasonableness of Dairyland's mitigation efforts. *Id.* at 8; Tr. 35:15-24. Additionally, Dairyland argues that the Government admitted it is not taking a position on the timing of DOE's acceptance of failed fuel. *Id.*

The Government contended that Dairyland seeks to shift its burden of establishing the "but for," *i.e.* non-breach, world to the Government through its contention interrogatories. Defendant's Response to Plaintiff's Motion to Exclude Evidence Inconsistent with the Government's Contention Interrogatory Answers ("Def.'s Resp. to Pl.'s Mot. to Exclude Evid. Inconsistent Interrog.") at 7; Tr. 38:6-13. According to the Government, it "cannot state whether, absent DOE's delay, Dairyland's failed fuel would have been accepted on the same schedule as Dairyland's standard fuel." Def.'s Resp. to Pl.'s Mot. to Exclude Evid. Inconsistent Interrog. at 8; Tr. 40:17-20, 41:3-9. Furthermore, based on its answers to interrogatories, the Government is not precluded from responding to any evidence regarding failed fuel adduced by Dairyland at trial. Def.'s Resp. to Pl.'s Mot. to Exclude Evid. Inconsistent Interrog. at 8. Additionally, the Government conceded that it "does not currently plan to challenge the reasonableness of the actions that Dairyland took regarding its storage decisions at LACBWR [LaCrosse Boiling Water Reactor]." *Id.* at 10; Tr. 44:8-13. The Government further argued that this does not relieve Dairyland of establishing the reasonableness of its actions and that DOE's delay caused Dairyland to incur the costs. Def.'s Resp. to Pl.'s Mot. to Exclude Evid. Inconsistent Interrog. at 10; Tr. 44:1-7, 14-20.

### B. Applicable Law

Dairyland seeks to limit the Government's introduction of evidence based on its answers to contention interrogatories. According to Dairyland the Government should be limited at trial to presenting evidence that is consistent with its answers to contention interrogatories. Dairyland argues that evidence "contradicting the government's contentions is irrelevant and inadmissible under Fed. R. Evid. 401 and 402." Pl.'s Mot. to Exclude Evid. Inconsistent Interrog. at 1. The relevance of this information is not the real issue, rather the issue before the Court is whether a party is bound by its answers to contention interrogatories. According to the United States Court of Appeals for the Federal Circuit:

> [D]iscovery allows the plaintiff to develop facts to support the theory of the complaint and allows the defendant to develop facts to support its defenses. (internal citation omitted). Second, discovery is designed to allow the defendant to pin down the plaintiff's theories of liability and to allow the plaintiff to pin down the defendant's theories of defense, thus confining discovery and trial preparation to information that is pertinent to the theories of the case.

*O2 Micro International. Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1365 (Fed. Cir. 2006). Therefore, the Government in answering Dairyland's contention interrogatories has addressed its "theories of defense." Trial preparation for both parties has proceeded based on the information provided during discovery in this matter.

### C. Conclusion

Upon review of the Government's answers to contention interrogatories, the pleadings of the parties, and the arguments made on May 29, 2008, the Court holds the following with respect to each interrogatory:

**Interrogatory 9**–Dairyland asked the Government if it contends that it is was unreasonable for Dairyland to study, analyze, investigate and/or implement dry storage subsequent to DOE's partial breach. Defendant's Response to Plaintiff's First Set of Interrogatories as Amended in Response to the Court's February 5, 2007 Order and Supplemented Following the Close of Fact Discovery ("Def.'s Resp. to Interrogs.") at 24. The Government responded that only through an expert report will it argue that it was unreasonable for Dairyland to study, investigate and/or implement dry storage. *Id.*; Tr. 44:8-13. Additionally, in answering the interrogatory the Government specifically stated that it does not concede that the study, investigation and/or implementation of dry storage were caused by DOE's partial breach. Def.'s Resp. to Interrogs. at 24-25.

The Government shall be allowed to put forth evidence that the damages claimed in studying, analyzing, investigating and/or implementing dry storage was not due to DOE's breach whether or not it is in an expert report. But, the Government shall only be allowed to argue that it was unreasonable for Dairyland to study, analyze, investigate and/or implement dry storage through expert reports.

**Interrogatory 13**–Dairyland asked the Government if it would have picked up Dairyland's failed fuel later than the rest of its SNF, if it began acceptance starting not later than January 31, 1998. Def.'s Resp. to Interrogs. at 33. The Government stated that David Zabransky, an employee of the Office of Civilian Radioactive Waste Management, explained the issues that might arise relating to the acceptance of failed fuel in *Yankee*. *Id.* at 34. According to the Government "although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them under the same schedule as standard fuel . . . ." *Id.*; Tr. 40:5-9. The Government then supplemented its answer concluding that what the Government "would have" done is irrelevant to the case, but rather the only question that needs to be considered is what the Government was required to do under the Standard Contract. Defendant's Supplemental Response to Plaintiff's Interrogatory Number 13 Pursuant to the Court's December 21, 2007 Order ("Def.'s Supp. Resp.") at 5. The Government affirmatively stated that in a "'but for' world Dairyland's failed fuel would not have been accepted pursuant to the terms of the Standard Contact on the same schedule as standard SNF until and unless Dairyland had established that the failed fuel could have been safely handled and transported to a federal facility . . . ." *Id.* at 6. Also, the Government contended that according to the Standard Contract, Dairyland is required to obtain confirmation from DOE as to the "technical feasibility" of accepting such fuel pursuant to the "currently agreed to schedule." *Id.*; Tr. 40:5-9, 42:5-18. Further, because Dairyland has never inventoried all of its failed fuel they do not have sufficient information to allow for a determination of when the failed fuel would have been picked up. Def.'s Supp. Resp. at 6-7; Tr. 40:17-

24. According to the Government, Dairyland cannot meet its burden of establishing that DOE would have accepted the failed fuel on the same schedule as standard SNF. Def.'s Supp. Resp. at 7.

Based on the Government's answers to Dairyland's contention interrogatories, it shall be allowed to put forth evidence regarding the acceptance of failed fuel pursuant to the Standard Contract. However, because the Government specifically stated in its answers to contention interrogatories that what it "would have" done regarding the acceptance of failed fuel is irrelevant, the Government shall not put forth any evidence regarding when it would have accepted failed fuel. This includes any evidence to support the position that it would have picked up Dairyland's failed fuel later than the rest of its SNF. The Government shall be limited to what it was required to do pursuant to the Standard Contract.

**Interrogatory 15**–Dairyland asked the Government if they contend it was unreasonable for Dairyland to store SNF in the wet fuel storage pool after the partial breach. Def.'s Resp. to Interrogs. at 35. The Government's response indicated that it would not contest the reasonableness of Dairyland's storage of SNF in its wet pools except as argued in the Government's expert reports. *Id.* at 36. Additionally, the answer to the contention interrogatory specifically stated that the Government does not concede that Dairyland's maintenance of its wet fuel storage pool was due to DOE's partial breach of the Standard Contract. *Id.*

Based on the Government answers to contention interrogatories, it shall be allowed to put forth any evidence that the maintenance of the wet fuel storage pools was not due to DOE's partial breach of the Standard Contract. But, the Government shall only be allowed to argue the "reasonableness" of Dairyland's storage of SNF in the wet fuel storage pool through expert reports.

**Interrogatory 16**–Dairyland asked the Government to describe all options Dairyland should have explored for the storage of SNF after the partial breach. *Id.* The Government responded that it is not required to determine alternatives for the storage of SNF. *Id.* at 37. Further, the Government stated that it does not plan to argue that Dairyland should have explored or implemented any particular strategy for storage of SNF except as identified in expert reports. *Id.* The Government also indicated that it does not concede that DOE's partial breach was the cause of any particular method chosen by Dairyland. *Id.*

The Court acknowledges that the Government does not concede that DOE's partial breach was the cause of any particular method chosen by Dairyland. Additionally, based on the Government's answer it shall be allowed to present evidence from expert reports regarding alternative storage methods. However, since the Government specifically stated that it does not plan to argue that Dairyland should have explored or implemented any particular strategy for storage of SNF, it will not be allowed to present evidence regarding a particular strategy Dairyland should have explored for the storage of SNF after the partial breach, unless it was identified in an expert report.

**Interrogatory 17**–Dairyland asked the Government to describe all options Dairyland should have explored for the storage of its failed fuel. *Id.* According to the Government's response, it is not required to determine alternatives for the storage of failed fuel. *Id.* at 38. Further, the Government stated that it does not plan to argue that Dairyland should have explored and/or implemented a particular method of storage for failed fuel except as identified in expert reports. *Id.* The Government also stated that while it was required to accept failed fuel under the Standard Contract it was not required to accept failed fuel

under the same schedule as standard SNF. *Id.*

The Government shall be allowed to present evidence from expert reports regarding storage methods for failed fuel. The Government shall also be allowed to present evidence regarding the contention that they were not obligated to accept failed fuel on the same schedule as standard SNF. However, since the Government specifically stated that it does not plan to argue that Dairyland should have explored any particular strategy for storage of failed fuel, it shall not be allowed to present evidence regarding a particular strategy Dairyland should have explored for the storage of failed fuel after the partial breach, unless it was identified in an expert report.

## IV. Motions *In Limine* to Exclude the Testimony of Expert Witnesses

### A. Background

On April 29, 2008, Dairyland filed motions to exclude the testimony of the following Government experts: Warren K. Brewer, R. Larry Johnson, and Jonathan A. Neuberger. The Government filed responses on May 15, 2008. On April 29, 2008, the Government filed motions to exclude the testimony of the following Dairyland experts: Ivan F. Stuart, Charles Wilkins and Frank C. Graves. Dairyland filed responses on May 15, 2008. Each motion *in limine* was addressed at the hearing on May 29, 2008. Because the applicable law is the same for the all the experts, it will be recited only once and then applied to each expert who is the subject of a motion *in limine*.

For the reasons set forth below Dairyland's Motion *in Limine* to Exclude Warren K. Brewer's Testimony is DENIED; Dairyland's Motion to Exclude R. Larry Johnson's Testimony is GRANTED IN PART AND DENIED IN PART; Dairyland's Motion to Exclude Jonathan A. Neuberger is DENIED; the Government's Motion to Exclude Expert Testimony [Charles L. Wilkins] Regarding Overhead Costs is DENIED; the Government's Motion to Exclude the Testimony of Ivan F. Stuart is DENIED; and the Government's Motion to Exclude Frank C. Graves is DENIED.

### B. Applicable Law

Testimony by experts is governed by Fed. R. Evid.702, as amended in 2000. Fed. R. Evid. 702. Testimony by Experts states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the fact of the case.

Fed. R. Evid. 702.

#### 1. The proposed expert witness must be qualified

A witness must be qualified as an expert based on their "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. This standard is disjunctive; therefore, an expert may be qualified based on any one of the five criteria found in the rule. *Waldorf v. Shuta*, 142 F.3d 601, 626 (3d Cir. 1998) (error

to exclude expert testimony based on practical experience, as "otherwise qualified witness is not disqualified merely because of a lack of academic training."); *Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994) (an expert can testify based on training even if they possess no experience; however, testimony regarding the application of training principles requires a basis in experience). An expert need only be qualified and need not be the best and the brightest for the testimony to be admissible. *See* Matthew Bender & Co., Inc., *Federal Rules of Evidence Manual* § 702.02 [3] (citing G. Joseph & S. Saltzburg, *Evidence in America* § 51.3 ("trial judges are not to demand that the proffered expert possess the highest possible credentials or skills, or be the most qualified of all conceivable experts."))

### 2. Under *Daubert* and Fed. R. Evid. 702, the Court must act as a gatekeeper

Even after the Court has determined that an expert is qualified, it continues to act as a gatekeeper as required by Fed. R. Evid. 702. *Daubert v. Merrell Dow Pharmaceuticals, Inc.* ("*Daubert*")*,* 509 U.S. 579, 597 (1993) ("the Rules of Evidence–especially Rule 702–do assign to the trial judge the task of ensuring that an expert's testimony both rests on reliable foundation and is relevant to the task at hand.").

#### a. The expert's testimony must be reliable

The Court must make a determination that the evidence is reliable. This requires an "assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. To this end, *Daubert* set forth a five factor, nondispositive, "flexible" test to aid the court. *Id.* at 594; Matthew Bender & Co., Inc., *Federal Rules of Evidence Manual* § 702.02 [5].[4] These factors are:

1) whether the theory or technique can be or has been tested;
2) whether the theory or technique has been subjected to peer review and publication;
3) the known or potential rate of error;
4) the existence and maintenance of standards controlling the technique's operations; and
5) the degree of general acceptance.

*Daubert*, 509 U.S. at 593-94.

On remand the Ninth Circuit, "undertook[] 'the task of ensuring that an expert's testimony both rests on reliable foundation and is relevant to the task at hand.'" *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1313 (1995)(internal citation omitted). According to the Ninth Circuit after the issuance of the Supreme Court's decision in *Daubert* it is the court's "responsibility to determine whether those experts' proposed testimony amounts to scientific knowledge, constitutes good science, and was derived by the scientific method." *Daubert*, 43 F.3d at 1316 (internal citations omitted).

#### b. The expert's testimony must be relevant

As with all evidence, any expert's testimony must be relevant. According to Fed. R. Evid. 702, testimony by an expert must "assist the trier of fact to understand the evidence or to determine a fact in

[4]Many cases cite a four factor, nondispositive, "flexible" test. Factor number four, "the existence and maintenance of standards controlling the technique's operations" is often not cited, although it is present in *Daubert*.

issue." Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591; *see also* Fed. R. Evid. 401 (defining relevant evidence as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") and Fed. R. Evid. 402 (regarding generally the admissibility of evidence, "[a]ll relevant evidence is admissible . . . . [e]vidence which is not relevant is not admissible."). Another aspect of relevance is whether the expert testimony is sufficiently tied to the facts of the case such that it will aid in resolving the factual dispute. *Daubert*, 509 U.S. at 591 (citing *United States v. Downing*, 753 F.2d 1224, 1242 (3d. Cir. 1985)). This inquiry can be described "as one of fit." *Daubert*, 509 U.S. at 591.

#### 3. Discretion, appellate standard of review and the burden of proof

The proponent of the evidence has the burden of proving the admissibility of the expert testimony by a preponderance of the evidence. Fed. R. Evid. 702, Advisory Committee Notes (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)). The admission of expert testimony is in the discretion of the trial court. *Acoustical Design, Inc. v. Control Elect. Co.*, 932 F.2d 939, 942 (Fed. Cir. 1991) (citing *Salem v. United States Lines Co.*, 370 U.S. 31 (1962)). And expert rulings are reviewed according to the abuse of discretion standard. *General Electric Co. v. Joiner* ("*Joiner*"), 522 U.S. 136, 139 (1997). *Joiner* concluded that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. However, the Supreme Court in *Daubert* noted that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

#### 4. *Daubert* applies even if the testimony is not "scientific" testimony

The Supreme Court has also held that the gatekeeper function found in *Daubert* applies to the testimony of experts who do not testify based on scientific principles, but based on "technical, or other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). There is no reason to attempt to make a distinction between scientific, technical or other specialized knowledge when deciding the question of the admissibility of the expert's testimony. *Id.* at 148 ("Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'"(citations omitted)). The trial judge must ensure that the expert testimony is both reliable and relevant, even if it is not based on scientific principles. *Id.* at 149.

However, the "factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 150 (internal citations omitted). The Supreme Court further concluded that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152. The court has the same type "of latitude in determining *how* to test an expert's reliability . . . as it enjoys when it decides *whether* that expert's relevant testimony is reliable." *Id.* (emphasis in original).

### C. Pending Motions

#### 1. Dairyland's Motion to Exclude Warren K. Brewer's Testimony

Mr. Brewer has worked in the nuclear industry for over 30 years and is one of the owners of ABZ,

Inc., an engineering consulting company performing work for the commercial nuclear power industry. Defendant's Response to Dairyland's Motion to Exclude Warren K. Brewer's Testimony ("Def.'s Resp. to Pl.'s Mot. to Exclude Brewer") App. at 4, 27-42. He attended the Bettis Reactor Engineering School and received an M.S. in Nuclear Engineering from MIT. *Id.*

**a. Dairyland's Position**

According to Dairyland, Mr. Brewer's expert report critiques the opinions of Dairyland's expert Todd Smith regarding the increased cost of removing the reactor pressure vessel (RPV) from Dairyland's plant due to the presence of SNF.[5] Dairyland's Motion to Exclude Warren K. Brewer's Testimony ("Pl.'s Mot. to Exclude Brewer") at 1; Tr. 48:7-13. The RPV, an internal component at LACBWR, was removed between 2005 and 2007. This increased cost is one category of Dairyland's damages. Dairyland claims that the cost of RPV removal would have been significantly lower had DOE timely performed the Standard Contract. Dairyland proffered Mr. Smith's report in an attempt to justify this conclusion that the cost would have been lower in the non-breach world. Pl.'s Mot. to Exclude Brewer at 1. Dairyland contended that Mr. Brewer merely reviews the documents relied upon by Mr. Smith, as well as other evidence, and then offers his opinion of the evidence without completing any independent analysis. *Id*. at 2; Tr. 50:24-52:16. Dairyland seeks to exclude Mr. Brewer's opinion because it is not based on reliable principles or methods and is an intrusion on the role of the judge as the ultimate arbiter of fact and law. *Id*; Tr. 49:25 - 50:7.

Dairyland asserted that Mr. Brewer's testimony is nothing more than his own, subjective belief that certain non-breach world costs calculated by Dairyland's expert Mr. Smith are not supported. Pl.'s Mot. to Exclude Brewer at 5. Because Mr. Brewer did not perform any calculations of his own, Dairyland alleged that the opinion is nothing more than *ipse dixit*, and is not admissible. *Id.* at 6-8, 19; Tr. 50:24-52:16.

Dairyland also contended that Mr. Brewer is to testify that cask loading cost should be deducted from damages. Pl.'s Mot. to Exclude Brewer at 21. Cask loading costs include the cost of loading the SNF into a cask to be picked up and transferred to DOE. Def.'s Resp. to Pl.'s Mot. to Exclude Brewer App. at 25. According to Dairyland this has repeatedly been rejected by other SNF judges based on the rationale that the cask loading costs are not avoided but are merely deferred until a later time when DOE performs. *Id.* at 23. Non-breach costs need only be deducted when they entirely avoided; here the cost will be incurred in the future. *Id.*

**b. The Government's Position**

According to the Government, Dairyland's primary criticism is that, while Mr. Brewer offers a critique of the deficiencies in Todd Smith's report regarding RPV removal in the "but for" world, Mr. Brewer failed to complete his own model calculating his proposed cost for this removal. Defendant's Response to Plaintiff's Motion to Exclude Warren K. Brewer's Testimony ("Def.'s Resp. to Mot. to Exclude Brewer") at 1; Tr. 52:18-53:6. The Government contended that Mr. Brewer used established and reliable engineering principles to provide a useful basis for understanding the deficiencies in Mr. Smith's report. Def.'s Resp. to Mot. to Exclude Brewer at 2; Tr. 53:12-23. According to the Government, Mr. Brewer is an expert in the field of nuclear engineering with experience in nuclear reactor design,

[5]The Government did not file a motion to exclude the testimony of Todd Smith.

construction, testing and operation. Def.'s Resp. to Mot. to Exclude Brewer at 4; Tr. 54:1-10. Mr. Brewer has repeatedly been qualified as an expert in other SNF cases. Def.'s Resp. to Mot. to Exclude Brewer at 4. The Government argued that Mr. Brewer also offers the opinion that two studies performed by a Dairyland contractor would have been required regardless of when DOE accepted Dairyland's SNF, that operations and maintenance costs claims by Dairyland do not depend on the amount of SNF stored in the spent fuel pool, and finally that in the "but for" world Dairyland would have incurred costs to transfer its SNF to DOE, therefore, these costs are not recoverable by Dairyland. *Id.* at 8.

**c. Conclusion**

Based on the pleadings filed herein and the arguments of counsel, the Court holds that Mr. Brewer's testimony is both reliable and relevant. *Daubert,* 509 U.S. at 597 ("the Rules of Evidence–especially Rule 702–do assign to the trial judge the task of ensuring that an expert's testimony both rests on reliable foundation and is relevant to the task at hand."). Mr. Brewer shall be allowed to testify at trial. The Court holds that any argument regarding Mr. Brewer's lack of independent analysis goes to the weight of his testimony rather than the admissibility.

**2. Dairyland's Motion to Exclude R. Larry Johnson's Testimony**

Mr. Johnson is a partner emeritus of Johnson Lambert & Co. and the Chairman/CEO of Veris Consulting, LLC, a litigation consulting service. Dairyland's Motion to Exclude R. Larry Johnson's Testimony ("Pl.'s Mot. to Exclude Johnson"), App. at 27-32. As a partner with Ernst & Young and later a managing partner with Johnson Lambert & Co., he oversaw the firms' accounting and auditing practices. *Id.* Mr. Johnson received a B.S. from the University of Maryland and has completed M.B.A. course work at George Washington University. *Id.*

**a. Dairyland's Position**

Dairyland seeks to exclude the testimony of Larry Johnson which critiques the expert opinions of two Dairyland experts, Charles Wilkins and Todd Smith. Pl.'s Mot. to Exclude Johnson at 1; Tr. 60:3-10, 71:20-24. Mr. Johnson concluded, based on a review of the Wilkins and Smith reports, that 1) Dairyland's asserted damages include costs that are not "incremental" and should be subtracted from the damages claim;[6] 2) Dairyland's asserted damages include costs that are not "reasonable" and should be subtracted; and 3) PFS damages and lobbying should be deducted based on instruction from counsel. Pl.'s Mot. to Exclude Johnson at 1; Tr. 57:19-58:14-23.

According to Dairyland, the "but for" standard used by Mr. Johnson in determining incremental costs is incorrect as a matter of law. *Id.* at 7; Tr. 55:13-24, 56:12- 57:14, 73:1-15. Dairyland asserts that the governing standard for causation, which should be used in determining incremental damages, is whether the breach is a substantial causal factor in the damages. Pl.'s Mot. to Exclude Johnson at 7 (citing *Indiana Michigan Power v. United States*, 422 F.3d 1369, 1371 (Fed. Cir. 2005)) Dairyland states that it must show that: 1) the damages were reasonably foreseeable by the breaching party at the time of

---

[6]Mr. Johnson explains "costs includable as an element of damages must be incremental to the partial breach in order to be characterized as damages. As such, those costs must be directly related and necessary to the activities caused by the breach and reflect expenditures that would not have been made but for the breach." Pl.'s Mot. to Exclude Johnson, App. at 8.

contracting; 2) the breach is a substantial causal factor in the damages; and 3) the damages are shown with reasonable certainty. Pl.'s Mot. to Exclude Johnson at 7 (citing *Indiana Michigan v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005)). Therefore, according to Dairyland, Mr. Johnson's determination of incremental costs is not reliable or relevant because it is based on an incorrect legal premise; that is, it uses the "but for" standard rather than the substantial causal factor standard. *Id.* at 8; Tr. 56:12-22. Dairyland thus seeks to exclude Mr. Johnson's analysis regarding overhead costs. Pl.'s Mot. to Exclude Johnson at 8. Dairyland also contends that Mr. Johnson does not offer any expert testimony when he opines that certain costs are not "reasonable" and should be excluded. *Id.* at 9.

**b. The Government's Position**

The Government contended that Mr. Johnson offers valuable testimony regarding accounting and damages matters and that Mr. Johnson performed valuable analysis that Dairyland failed to perform. Defendant's Response to Dairyland's Motion to Exclude R. Larry Johnson's Testimony ("Def.'s Resp. to Pl.'s Mot. to Exclude Johnson") at 1-2. Mr. Johnson offers a comprehensive framework for evaluating the validity and basis of Dairyland's damages claim. *Id.* at 2; Tr. 61:6-20. According to the Government, Mr. Johnson properly offers the opinion that certain costs claims by Dairyland are not incremental to the Government's partial breach because Dairyland would have incurred the same costs even if DOE had performed. Def.'s Resp. to Pl.'s Mot. to Exclude Johnson at 7; Tr. 68:1- 70:12. Mr. Johnson's opinion regarding incremental costs critique Dairyland's claims regarding: 1) overhead and general and administrative costs; 2) labor costs charges to the "Baseline" activity code; and 3) miscellaneous costs such as activities performed by Dairyland contractors' charges related to the decommissioning of the plant, and Nuclear Regulatory annual fees. Def.'s Resp. to Pl.'s Mot. to Exclude Johnson at 7-8.

The Government claimed that Mr. Johnson's testimony regarding reasonable costs is from the cost and accounting perspective, not a legal one. *Id.* at 14. Additionally, Mr. Johnson performed valuable modeling of two SNF acceptance scenarios, one with a "fuel-out" date in 2005 and one with a "fuel-out" date after 2008. *Id.* at 11-12.

**c. Conclusion**

The Court concludes that Mr. Johnson's testimony is both reliable and relevant. Mr. Johnson's testimony, "reasoning [and] [] methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. Mr. Johnson's testimony is also relevant, as it "assist[s] the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591.

The Court understands Dairyland's concern that Mr. Johnson's incremental cost analysis uses the 'but for' standard rather than the substantial causal factor test found in *Indiana Michigan*, 422 F.3d at 1373. Pl.'s Mot. to Exclude Johnson at 7. However, according to the Federal Circuit, "the selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion." *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1318 (Fed. Cir. 2007). Therefore, it is arguable that either test could be appropriate. As recently as May 19, 2008, Judge Wheeler in *Carolina Power* stated "[f]or each of the disputed damages items here, the Court will apply the but-for test or the substantial causal factor test as appropriate." *See Carolina Power v. United States*, No. 04-37C, 2008 WL 2154103 *20 (Fed. Cl. May 19, 2008). Any issues regarding Mr. Johnson's testimony regarding incremental cost are open for Dairyland on cross-examination. *Daubert*, 509 U.S. at 596 ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Mr. Johnson shall also be allowed to testify regarding his two different models for SNF acceptance scenarios, as they provide an alternative to Dairyland's acceptance theory. Mr. Johnson shall be allowed to testify regarding overhead costs.

Mr. Johnson shall not be allowed to testify regarding his opinion as to whether PFS and lobbying costs incurred by Dairyland are properly attributable to DOE's breach. *Sparton Corp. v. United States*, 77 Fed. Cl. 1, 9 (2007) ("Expert testimony is an improper mechanism for offering a legal opinion to the Court."). A conclusory statement by Mr. Johnson, based on the advice of the Government's counsel, that these specific costs cannot be attributed to the breach, followed by the subtraction of these costs from Dairyland's claimed damages, does not "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591.

### 3. Dairyland's Motion to Exclude Jonathan A. Neuberger's Testimony

Mr. Neuberger is a principal in the economics consulting firm Economists Incorporated. Dairyland's Motion to Exclude Jonathan A. Neuberger's Testimony, App. ("Pl.'s Mot. to Exclude Neuberger, App.") at 5, 46. He received a Master's Degree and Ph.D in Economics from Johns Hopkins University. *Id.*

#### a. Dairyland's Position

Dairyland asserted that the opinions of Dr. Neuberger are merely criticisms of the testimony of Mr. Graves and that Dr. Neuberger failed to create a competing model to contradict the model created by Mr. Graves. Dairyland's Motion to Exclude Jonathan A. Neuberger's Testimony ("Pl.'s Mot. to Exclude Neuberger") at 1; Tr. 127:19-128:18. According to Dairyland, Mr. Neuberger's opinions are speculative and impressionistic. Pl.'s Mot. to Exclude Neuberger at 2. And the testimony is unreliable, irrelevant, confusing and a waste of the court's time. *Id.*; Tr. 127:5-9, 128:11-18.

#### b. The Government's Position

The Government takes the position that if the testimony of Mr. Graves is excluded, then the Government will not seek to introduce the testimony of Dr. Neuberger. Defendant's Response to Plaintiff's Motion to Exclude the Testimony of Jonathan A. Neuberger ("Def.'s Resp. to Pl.'s Mot. to Exclude Neuberger") at 1-2, Fn. 1; Tr. 126:19-22. The Government argued that Dr. Neuberger applied well-established and reliable economic principles and provides the Court with a useful basis for understanding the significant deficiencies contained within Mr. Graves' hypothetical exchanges model. Def.'s Resp. to Pl.'s Mot. to Exclude Neuberger at 1, 2. Dr. Neuberger has analyzed the models used by Mr. Graves and has offered an economic critique of Mr. Graves' model and resulting conclusions. *Id.* at 8.

#### c. Conclusion

The Court holds that the testimony of Dr. Neuberger shall be allowed. The Government offers Dr. Neuberger to explore its disputes with the modeling presented by Mr. Graves. *See infra* ¶ 6. Because the Court will allow the testimony of Mr. Graves, the Court finds that the testimony of Dr. Neuberger will "assist the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702. In this case the fact at issue is the disputed acceptance rate for SNF and the potential for exchanges as allowed by

Case 1:04-cv-00106-EJD Document 182 Filed 06/23/2008 Page 17 of 25

the Standard Contract. Dr. Neuberger's opinion is a reliable and relevant critique of the modeling used by Mr. Graves concerning both the acceptance rate and possible exchanges. *Daubert*, 509 U.S. at 587 ("[t]he Rules basic standard of relevance is thus a liberal one.").

**4. The Government's Motion to Exclude Expert Testimony (of Charles Wilkins) Regarding Overhead Costs**

Mr. Wilkins is a Certified Public Accountant with more than 35 years of dispute resolution experience in matters in which the U.S. Government was a party. Dairyland's Response to Defendant's Motion *In Limine* to Exclude Expert Testimony Regarding Overhead Costs, App. ("Pl.'s Resp. to Def.'s Mot. to Exclude Overhead Costs") at 2. He is now a Senior Managing Director in the Forensic Litigation Consulting practice of FTI Consulting, Inc. *Id.* Mr. Wilkins holds B.A.'s from California State University and LaSalle University along with an M.B.A. from the University of California. *Id.*

**a. The Government's Position**

The Government requests exclusion of the expert testimony of Charles Wilkins, who will testify regarding Dairyland's overhead cost allocation to breach-related projects. Defendant's Motion *In Limine* to Exclude Expert Testimony Regarding Overhead Costs ("Def. Mot. to Exclude Overhead Costs") at 1; Tr, 74:21-24. The Government insists that this testimony is not relevant because overhead costs are not attributable to the breach. Def. Mot. to Exclude Overhead Costs at 4. Recovery of overhead costs, which the Government contends Dairyland would have incurred regardless of breach, would put Dairyland "in a significantly better position in the breach world," contrary to the fundamental principles of contract damages. *Id.* The Government contends that Dairyland offers no evidence that it would actually have been able to allocate the resources to non-breach related projects, thus incurring "opportunity costs." *Id.* at 11; Tr. 75:18-24, 81:3-8. Alternatively, the Government requests that Mr. Wilkins' testimony be limited to matters specifically addressed in his report. *Id.* at 12-13.

**b. Dairyland's Position**

According to Dairyland, Mr. Wilkins' "work demonstrates that, but for the government's breach, Dairyland would not have incurred its claimed overhead and G&A costs in connection with its breach related activities." Pl.'s Resp. to Def.'s Mot. to Exclude Overhead at 1-2. Dairyland alleged that it need not prove that the cost would not have been incurred absent the breach, but rather all that they must prove is that if the costs "are properly allocated to breach-related activities, then the resources represented by those costs would have been efficiently devoted to other uses or reduced absent the breach." *Id.* at 2; Tr. 81:15-6, 83:16-9. The claimed overhead cost consists of "incurred service center and operations costs that were required to support LACBWR activities, including activities associated with the government's breach." Pl.'s Resp. to Def.'s Mot. to Exclude Overhead at 2. The Government's contention that it is necessary for Mr. Wilkins to "analyze exactly how Dairyland's overhead and G&A resources would have been used absent the breach" is without merit. *Id.* at 5. According to Dairyland, the argument that Dairyland must demonstrate precisely how the overhead and G&A resources would have been used absent the breach has consistently been raised in other SNF cases and has been "almost universally rejected." *Id.*; Tr. 81:23-83:15.

**c. Conclusion**

The Court holds that Mr. Wilkins shall be allowed to testify regarding Dairyland's overhead costs.

Any argument that the Government makes regarding the fact that Dairyland offers no evidence as to how it would have allocated the overhead and G&A resources in a non-breach world–an argument that has been rejected by other judges on this court–goes to the legal standard by which overhead costs could be awarded by this Court. It does not effect the admissibility of Mr. Wilkins' testimony.

The issue of overhead costs has been present in many SNF cases. For example, in *Carolina Power*, Judge Wheeler allowed Plaintiff's claim for overhead costs, reasoning that "[o]verhead, by definition, is a cost of doing business, and for some period of time, part of Progress Energy's "business" was mitigating DOE's partial breach. Overhead recovery is necessary to compensate Plaintiff's fully." *See Carolina Power v. United States*, No. 04-37C, 2008 WL 2154103 *28 (Fed. Cl. May 19, 2008); (citing *Sys. Fuels, Inc. v. United States*, 78 Fed. Cl. 769, 799-800 (2007) (rejecting Governments principle that all "loader costs" [overhead] would have been incurred absent DOE's breach)). Overhead costs were awarded in *Pacific Gas & Electric v. United States*, 73 Fed. Cl. 333 (2006), but were ultimately rejected in *Sacramento Mun. Util. Dist v. United States*, 70 Fed. Cl. 332, 376-77 (2006) (holding that plaintiff failed to meet the burden of demonstrating that such costs, in fact, were incremental) and *System Fuels, Inc. v. United States*, 78 Fed. Cl. 796, 798-800 (2007) (holding that plaintiff failed to meet burden of demonstrating that these costs would not have been incurred in the absence of DOE's delay).

Finally, while the Government urges the Court to limit Mr. Wilkins' testimony to matters found in his expert report this Court holds that it is unnecessary to limit Mr. Wilkins' testimony in advance of trial.

### 5. The Government's Motion *In Limine* to Exclude the Testimony of Ivan F. Stuart

Mr. Stuart has over 40 years of experience in the nuclear industry, including in the field of spent fuel transportation and storage. Defendant's Motion *In Limine* to Exclude the Testimony of Ivan F. Stuart, App. at 2, 24-26. He is a registered professional nuclear engineer and President of I. Stuart & Co., Inc., an international nuclear consulting firm. *Id.* Mr. Stuart received a B.S. in Mechanical Engineering from the Newark College of Engineering and a graduate degree from the New York University/ U.S. Air Force Meteorological Program. *Id.*

#### a. The Government's Position

The Government seeks to exclude Mr. Stuart's testimony that 1) the acceptance rate of 3,000 MTU per year by DOE would have been readily achievable by DOE; 2) sufficient advanced work by DOE was possible in view of the large body of experience in the transportation of spent fuel gathered by and/or available to DOE prior and subsequent to 1983; 3) adequate planning and preparations would have ensured the availability of a sufficient number of casks; 4) exchanges of acceptance allocations among contracting utilities would have been accommodated; and 5) there are no site-specific conditions that would have prevented DOE from utilizing acceptance campaigns to transport SNF from Dairyland. Defendant's Motion *In Limine* to Exclude the Testimony of Ivan F. Stuart ("Def.'s Mot. to Exclude Stuart") at 2; Tr. 87:9-16. According to the Government, these opinions are wholly irrelevant, they lack sufficient support and fail to take into account contradictory information. Def.'s Mot. to Exclude Stuart at 2; Tr. 87:20-4; 93:23-94:6. The Government contended that Mr. Stuart's testimony is after the fact testimony about what DOE should have done. Def.'s Mot. to Exclude Stuart at 8-10. Furthermore, Mr. Stuart's opinions are irrelevant and unreliable because they offer an opinion as to what DOE could have achieved, as opposed to what it was required to achieve. *Id.*; Tr. 88:5-18. Finally, the Government complained that Mr. Stuart performed no analysis to reach his conclusion. Def.'s Mot. to Exclude Stuart

at 10; Tr. 90:12- 91:19, 94:7-11.

**b. Dairyland's Position**

According to Dairyland, Mr. Stuart has 40 years of experience in the nuclear industry, including ten years as senior vice president of NAC International, Inc., "that designed, developed and manufactured spent fuel transportation and storage casks." Opposition to Motion *In Limine* to Exclude the Testimony of Ivan F. Stuart ("Pl.'s Opp. to Def.'s Mot. to Exclude Stuart") at 1. Mr. Stuart will testify: "1) that there are no technical impediments to DOE operating its SNF program at a rate of 3000 MTU with a reasonable ramp-up beginning in 1998; 2) that sufficient casks and rail and other transportation equipment could have been available to DOE to accommodate concentrated acceptance 'campaigns' of spent fuel from utilities; and 3) that there are no site-specific conditions at Dairyland's LACBWR nuclear plant site that would have prevented DOE from using acceptance campaigns to transport SNF from the site." Pl.'s Opp. to Def.'s Mot. to Exclude Stuart 1-2. Mr. Stuart has testified in *Yankee*, *Sacramento Municipal Utility District (SMUD)*, and *PG&E*. Dairyland opines that the Government did not seek to exclude Mr. Stuart's testimony in the other SNF trials where it was offered (the Government did object at trial to one narrow issue regarding Mr. Stuart's testimony in *SMUD*). *Id.* at 3-4. Dairyland contends that it is entitled to present evidence consistent with its theory regarding acceptance rate and that the lack of technical impediments show DOE's ability to perform and support the "reasonableness" of Dairyland's proposed rate. *Id.* at 3; Tr. 96:24-97:4.

**c. Conclusion**

Mr. Stuart shall be allowed to testify. The Court is satisfied that Mr. Stuart's testimony is both reliable and relevant. Additionally, Mr. Stuart's report adequately describes how his experience in the nuclear industry led to the conclusions reached. Fed. R. Evid. 702, Advisory Committee Notes ("If a witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.").

**6. The Government's Motion *In Limine* to Exclude the Testimony of Plaintiff's Expert Witness, Frank C. Graves**

Mr. Graves is a principal with the Brattle Group, a firm that provides consulting and expert testimony in economics, finance and regulation to corporations, law firms and governments. Brattle Group Home Page, http://www.brattle.com (follow the "About Brattle" hyperlink). He has over 25 years of experience assisting utilities in the design and implementation of long-range planning, investment and operating policies. Dairyland's Opposition to Defendant's Motion *In Limine* to Exclude the Testimony of Plaintiff's Expert Witness, Frank C. Graves ("Pl.'s Opp. to Mot. to Exclude Graves"), App. at 15. Mr. Graves received a B.A. in mathematics from Indiana University and an M.S. with a concentration in finance from the M.I.T. Sloan School of Management. Brattle Group Home Page, http://www.brattle.com (follow the "Consultants" hyperlink, then browse by the "G" hyperlink, then the "Graves, Frank C." hyperlink) (last visited June 10, 2008).

**a. The Government's Position**

According to the Government, Mr. Graves will offer his opinion on two issues. First, Mr. Graves will offer testimony regarding an economically reasonable acceptance rate of SNF. Defendant's Motion *In*

*Limine* to Exclude the Testimony of Plaintiff's Expert Witness, Frank C. Graves ("Def.'s Mot. to Exclude Graves") at 1; Tr. 105:3-6. The Government contended that Mr. Graves "does not possess any knowledge, skill, experience, training, or education in the areas implicated by an opinion concerning the rate at which DOE would have accepted SNF from the industry beginning in 1998." Def.'s Mot. to Exclude Graves at 17; Tr. 107:22-109:12. Secondly, Mr. Graves will offer testimony regarding the acceleration of Dairyland's place in the Standard Contract's "oldest-fuel-first" acceptance queue. Def.'s Mot. to Exclude Graves at 1-2; Tr. 104:19-105:2. According to the Government, Mr. Graves' hypothetical exchanges market is based on speculative and overly-simplistic economic theory and is not properly grounded upon underlying facts. Def.'s Mot. to Exclude Graves at 20; Tr. 105:7-9. The Government argued that this hypothetical exchanges market is speculative because it assumes that a market for exchanges of SNF acceptance allocations in the queue would have been "analogous to a perfectly competitive market." Def.'s Mot. to Exclude Graves at 25; Tr. 106:2-6. Additionally, the Government claimed that Mr. Graves' model is speculative because it assumes that DOE would "approve[] all exchanges, even though utilities are required to submit their exchange requests to DOE, which has, 'in its sole discretion,' the right to approve or disapprove those requests." Def.'s Mot. to Exclude Graves at 8; Tr. 105:22-23.

The Government urged this Court to accept the reasoning found in *PG&E* and exclude the testimony of Mr. Graves. Tr. 105:18-21. According to the Government, the court in *PG&E* found that Mr. Graves' hypothetical exchanges model is premised upon factually-unsupported and speculative assumptions. Def.'s Mot. to Exclude Graves at 34; Tr. 105:18-106:17. And, this Court should also find that Mr. Graves' model is "too speculative to be helpful to the court in its resolution of this case." *Id.* at 35 (citing *PG&E*, 73 Fed. Cl. at 436).

**b. Dairyland's Position**

According to Dairyland, this Court should reject the Government's argument for the same reason Judge Merow rejected it in *Yankee*. Tr. 111:5-10, 17-23. Dairyland asserted that Mr. Graves is an economist who provides an economic analysis of a reasonable rate of acceptance based on the economic need for the removal of SNF. Plaintiff's Response to Defendant's Motion to Exclude Graves ("Pl.'s Resp. to Mot. to Exclude Graves") at 3. Mr. Graves is not an expert on DOE's programs; however, he is the "*only* witness who will present evidence regarding the reasonable rate of acceptance based on utilities' economic needs for spent fuel removal." *Id.* Dairyland contended that Mr. Graves' opinion regarding acceptance rate is relevant, since this is an open term in the Standard Contract and DOE is obligated to perform at a reasonable rate. *Id.* at 3-4; Tr.112:12-22. Further, Mr. Graves' focus is on what would be considered a reasonable rate from an economic perspective. Pl.'s Resp. to Mot. to Exclude Graves at 4.

Dairyland also contended that the Government's objection to Mr. Graves' hypothetical exchanges model is without merit. *Id.* at 8. According to Dairyland, Mr. Graves' accepts that under the Standard Contract the pick-up queue is initially based on when the fuel was discharged from the reactor, *i.e.* oldest fuel receiving the first allocations. *Id.* However, subject to DOE approval utilities could exchange their slot in the queue. *Id.* Dairyland asserted that Mr. Graves' report "provides a robust estimate, based on established economic principles, of how an exchange process would have influenced the timing and sequence of DOE's acceptance of Dairyland's spent fuel." *Id.* at 9. Dairyland contended that the difficulty in modeling is due to the breach (there is no real world data) and "[t]he defendant who has wrongfully broken a contract should not be permitted to reap advantage for his own wrong by insisting on proof which by reason of his breach is unobtainable." *Id.* at 12 (citing *Locke v. United States*, 283 F.2d 521 (Ct. Cl. 1960).

c. **Conclusion**

The Court concludes that Mr. Graves shall be allowed to testify. The Court holds that Mr. Graves' testimony regarding an economically reasonable rate of SNF acceptance, which is based on his analysis of available documents, is reliable and relevant to this matter. In every SNF case that is before the Court of Federal Claims the acceptance rate of SNF has been at issue. For example, in *PG&E*, 73 Fed. Cl. 333 and *Yankee Atomic Electic Co v. United States*, 73 Fed. Cl. 249 (2006) two different rates were held to be appropriate. Both cases have been appealed and the rate of acceptance is a central issue in the appeal. Mr. Graves has analyzed a number of different acceptance rates, even using the rate found in the 1991 Annual Capacity Report (900 MTU), which is advanced by the Government and was determined to be a reasonable rate in *PG&E*. Def.'s Mot. to Exclude Graves, App. at 63D-63F; *PG&E*, 73 Fed. Cl. at 400. To the extent that the Government disagrees with the rate of acceptance that Mr. Graves determined to be appropriate, there will be ample opportunity for cross-examination. *Daubert*, 509 U.S. at 596 ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Additionally, the Court holds that the Government's arguments regarding Mr. Graves' economically reasonable rate of SNF acceptance goes to the weight of his testimony, not to its admissibility. *Yankee Atomic Electric Co. v. United States*, No. 98-126C, 2004 WL 1535686 *6 (Fed. Cl. June 28, 2004).

The Court also holds that Mr. Graves' testimony regarding his hypothetical exchanges model is reliable and relevant to this matter. In *Energy Capital Corp*., this Court awarded lost profit damages based on an economic model that contained an estimation of a number of eligible and energy viable properties that would have participated in the Affordable Housing Energy Loan Program ("AHELP").[7] *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1334 (Fed. Cir. 2002) (*aff'g in part, rev'g in part* 47 Fed. Cl. 382 (Damich, C.J.)). The Government argued that this Court "erred as a matter of law by engaging in 'rampant' and 'unsupported' speculation in arriving at its determination that Energy Capital would have realized profits from the AHELP venture." *Id*. at 1328. The Government specifically attacked the sufficiency of the evidence regarding participation in AHELP because it depended upon the consent of both the property owners and the first mortgagees.[8] *Id*. at 1329. The Court is struck by the similarities

[7]The AHELP was an agreement between Energy Capital and the Department of Housing and Urban Development ("HUD") that eliminated "the regulatory barriers to financing energy improvements in HUD properties." *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1327 (Fed. Cir. 2002). Under the agreement Energy Capital could originate loans to HUD property owners and in exchange HUD agreed to provide Energy Capital security on the loan. *Id*. Shortly after entering into the AHELP agreement it was terminated by HUD. *Id*. at 1319. This termination occurred before Energy Capital had completed any loans. *Id*. Energy Capital filed suit in the Court of Federal Claims seeking to recover lost profit damages as a result of HUD's breach of contract. *Id*.

[8]The Government urged the appellate court to find the evidence upon which the damages award was based speculative for several reasons, *inter alia*, Energy Capital did not provide testimony from the first mortgagees and Fannie Mae never consented to any AHELP loans in its capacity as first mortgagee. *Energy Capital Corp.,* 302 F.3d at 1329. The Government urges that this Court exclude Mr. Graves under a similar premise. According to the Government under the Standard Contract DOE must approve all exchanges; however, DOE has not approved any exchanges, nor have they been asked to do so. Def's Mot. at 8. The Court declines to exclude

between the Government's arguments in *Energy Capital Corp.* and the instant action. *See Yankee Atomic Electric Co. v. United States*, No. 98-126C, 2004 WL 1535686 (Fed. Cl. June 28, 2004). In *Energy Capital Corp.*, the Federal Circuit held that the Government's "argument seems to be an indirect attack on the sufficiency of the evidence . . . . In any event, we conclude that the Court of Federal Claims drew reasonable inferences based on all of the evidence . . . to arrive at its findings . . . ." *Id.* In *Energy Capital Corp.*, this Court based its lost profit damages award on evidence the Government argued was too speculative. At the present time only admissibility, not a determination of damages, is at issue. And, the admission of Mr. Graves' testimony is solely in the discretion of the trial court. *See Acoustical Design, Inc.*, 932 F.2d at 942 (Fed. Cir. 1991).

Despite the Government's urging to the contrary, the Court concludes that Mr. Graves' testimony is based on sufficient facts and evidence to allow for admissibility. The Court agrees with *Yankee* that "[b]y partially breaching the contract, defendant cannot exclude Graves' opinion on the grounds that there is no market data. There is no market data because the government's breach thwarted this possibility." *Yankee*, No. 98-126C, No. 98-126C, 2004 WL 1535686 *4 (Fed. Cl. June 28, 2004).

## V. Procedures Regarding Sequestration

### A. Background

On April 29, 2008, both Dairyland and the Government filed proposed procedures regarding sequestration as required by the Trial Preparation Order of February 21, 2008. The Government has decided to invoke sequestration under Fed. R. Evid. 615; therefore, the parties agreed to the following procedures:

> 1. Witnesses who have testified should not be permitted to discuss their testimony with witnesses who have not yet testified.
>
> 2. An attorney should not be permitted to relate, in any form, the substance of previous testimony to witnesses who have not yet testified.

However, the parties cannot agree regarding whether an attorney should be permitted to counsel a witness during breaks in the witness's testimony.

### B. Applicable Law

Fed. R. Evid. 615 Exclusion of Witness states:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize the exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by statute to be present.

---

Mr. Graves' testimony based on the Government's argument regarding DOE approval.

Fed. R. Evid. 615 does not specifically preclude attorneys from consulting with witnesses during breaks in testimony, however, the Court retains discretion to limit attorney consultation, even where the witness is a party, in order to "maintain the status quo during a brief recess in which there is virtual certainty that any conversation between the witness and his lawyer would relate exclusively to his ongoing testimony." *Perry v. Leeke*, 488 U.S. 272, 273, 284 (1989) (holding that trial court order directing defendant not to consult with his attorney during 15-minute breaks in testimony did not violate Sixth Amendment right to assistance of counsel). *Reynolds v. Alabama Department of Transportation* applied *Perry* and extended that ruling to a civil matter, holding that a prohibition on consultation with witnesses is appropriate "subject to exceptions permitting attorneys to consult with those witnesses testifying on different occasions on different topics, to consult with witnesses about non-testimonial matters during evenings and weekends and, upon approval of the court, to consult with witnesses even about their testimony." *Reynolds v. Alabama Department of Transportation,* 4 F. Supp.2d 1055, 1064-65 (1998).

During oral arguments Dairyland urged the Court to allow counsel to be able to confer with witnesses during breaks in testimony with a limitation that counsel not relate prior testimony to the witness. Tr. 129:20-25. According to the Government in order to have unfettered testimony a bright-line rule that prohibits an attorney from counseling a witness during breaks would be appropriate. Tr. 131:2-24.

**C. Conclusion**

The Court is cognizant of the Government's concern in this instance. However, the Court sees no reason to so limit the role of counsel during trial that there can be no consultation with witnesses. This issue can be resolved with a limiting instruction by the Court. Therefore, counsel shall be allowed to consult with witnesses during breaks in testimony, however, they may not discuss the testimony of any other witness that has appeared before the Court. This limiting instruction provides for a "clear line . . . to prevent witnesses from hearing about the testimony of other witnesses." Defendant's Notice of Proposed Procedures for Sequestration at 2.

s/ Edward J. Damich
EDWARD J. DAMICH
Chief Judge

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| DAIRYLAND POWER COOPERATIVE, Plaintiff, | ) | |
| v. | ) | No. 04-106C (Chief Judge Damich) |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO EXCLUDE THE TESTIMONY OF JONATHAN A. NEUBERGER**

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

PATRICK B. BRYAN
JOSHUA E. GARDNER
SCOTT SLATER
Trial Attorneys
U.S. Department of Justice

RUSSELL A. SHULTIS
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 305-2503

Attorneys for Defendant

May 15, 2008

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INDEX TO APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY . . . . . . . . . . 2

II. DR. NEUBERGER'S EXPERIENCE AND QUALIFICATIONS . . . . . . . . . . . . 6

III. DR. NEUBERGER'S OPINIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

A. Mr. Graves' Models And Opinions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

B. Dr. Neuberger's Economic Critique Of Mr. Graves' Exchanges Model . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

IV. DR. NEUBERGER'S ECONOMIC CRITIQUE OF MR. GRAVES' MODEL IS BOTH RELEVANT AND RELIABLE . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

testimony at trial: (1) that DOE would have approved every exchange; (2) that every utility would have offered its rights to the exchanges market; (3) that all exchanges would occur at the marginal price; and (4) that market participants had perfect information and were driven by solely economic considerations. Pl. A32-33 (Neuberger Report at 29-30 ¶¶ 76-77); see PG&E, 73 Fed. Cl. at 436.

## IV. DR. NEUBERGER'S ECONOMIC CRITIQUE OF MR. GRAVES' MODEL IS BOTH RELEVANT AND RELIABLE

Dairyland's primary challenge to Dr. Neuberger's testimony is that, although he has offered an economic critique of Mr. Graves' hypothetical "but for" world model, he has not offered an alternative model. Pl. Mot. at 6, 10-15. Dairyland asserts that, because Dr. Neuberger has not developed an alternative model, his opinions that Mr. Graves' model produces unreliable results is based upon conjecture and speculation. Id. Dairyland's criticism of Dr. Neuberger's opinions is without merit.

As an initial matter, contrary to Dairyland's novel and unsupported contention, courts have routinely allowed expert critiques of damages models without offering an alternative model. See, e.g., California Fed. Bank v. United States, 54 Fed. Cl. 704, 708-9, 712 n.12 (2002) (accepting defendant's expert's critique of plaintiff's damages model without requiring defendant's expert to offer alternative model), aff'd, 395 F.3d 1263 (Fed. Cir. 2005); Seaboard Lumber Co. v. United States, 48 Fed. Cl. 814, 827-28 (2001) (accepting Government expert's critique of opposing expert's damages model without requiring expert to offer alternative model), aff'd, 308 F.3d 1283 (Fed. Cir. 2002).

Second, Dairyland's complaints about Dr. Neuberger's opinions fail to recognize that the burden of demonstrating the "but for" world for purposes of establishing an entitlement to the

recovery of damages falls squarely upon Dairyland, and not the Government. See Pacific Gas & Electric Co. v. United States, 73 Fed. Cl. 333, 386 (2006), appeal pending, No. 2007-5046 (Fed. Cir.) ("Plaintiff bears the burden of 'establishing what might have been' with reasonable certainty had defendant performed the Standard Contract.") (quoting Glendale Fed. Bank, FSB v. United States 239 F.3d 1374, 1380 (Fed. Cir. 2001)); see also id. at 406 ("[t]o derive the proper amount for the damages award, the cost resulting from the breach must be reduced by the costs, if any, that the plaintiff[] would have experienced absent a breach" (quoting Bluebonnet Sav. Bank, FSB v. United States, 339 F.3d 1341 at 1345 (Fed. Cir. 2003))).; see also San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1563 (Fed. Cir. 1997) ("[a] plaintiff must show that but for the breach, the damages alleged would not have been suffered") (emphasis added).[10]

---

[10] Dairyland relies upon case law from outside the Federal Circuit, such as Elcock v. Kmart Corp., 233 F.3d 734 (3d Cir. 2000), Winters v. Fru-Con Inc., 498 F.3d 734 (7th Cir. 2007), and Clark v. Takata Corp., 192 F.3d 750, 757 (7th Cir. 1999), for the erroneous proposition that Dr. Neuberger's testimony must be precluded because he did not present an alternative model to support his critique of Mr. Graves' theories. Pl. Mot. at 6-7. Dairyland's reliance on these cases in misplaced. None of these cases – which involve tort, product liability, and design-defect claims wherein the court critiques the methodology of the plaintiff's liability expert – articulates such a bright-line rule. In fact, in Winters, the court specifically noted that alternative design testing is not an absolute prerequisite to the admission of expert testimony in light of the fact that "the Daubert inquiry is a flexible one." Winters, 498 F.3d at 742-743 (noting that "[t]here could be situations where the district court determines the proposed expert's testimony regarding an alternative design is reliable despite a lack of testing of the alternative design because the expert has adhered to the 'standards of intellectual rigor that are demanded in [his or her] professional work,' such as relying on the data generated by other researchers, making proper personal observation or taking other appropriate actions.")(citations omitted). Further, because these cases involve tort and product liability claims in which the court critiqued the methodology utilized by plaintiff's expert witness, insofar as these cases are relevant at all, these cases are consistent with the Government's position, in that they support the notion that the burden rests upon plaintiff – and not the defendant's expert – to show "'what might have been'" with reasonable certainty," PG&E, 73 Fed. Cl. at 386. See, e.g., Clark, 192 F.3d at 758 (affirming trial court's exclusion of plaintiff's expert who "failed to identify, much less offer, any evidence to support his conclusion that a lap belt, if properly fastened, could have" prevented plaintiff's injury).

Indeed, Dairyland has it backwards. It is Mr. Graves who has based his opinions upon insufficient facts and data and who has failed properly to consider significant factors in his model, and Dr. Neuberger's opinion simply attempts to alert the Court to these substantial deficiencies based upon the application of well-established, reliable economic principles. Indeed, in creating his model, Mr. Graves spoke to no utilities – including Dairyland – as to their willingness to participate in his hypothetical exchanges market. Def. A73-74 (Graves Deposition, June 19, 2007, at 117:18-118:1); Def. A78-79, 81. (Graves Deposition, Sept. 6, 2007, at 8:8-9:16, 13:24-14:1, 23:30-24:2). As Dr. Neuberger repeatedly discussed in both his expert report and his deposition, "reliable principles and methods" of economic modeling require consideration of a variety of factors, and Mr. Graves completely failed to consider these factors in his model. Pl. A7, Pl. A18, Pl. A21, Pl. A23-24 (Neuberger Report at 4 ¶ 14, 15 ¶ 38, 18 ¶ 47-48, 20 ¶ 52-55); Def. A87, 92-94, 100-101 (Neuberger Deposition at 22:18-24:22, 49:9-51:2, 56:13-21, 113:9-114:6). To the extent that Mr. Graves' model lacks sufficient evidentiary support or otherwise lacks credibility, the Government need not offer an alternative damages model. See Columbia First Bank, FSB v. United States, 60 Fed. Cl. 97, 107-08 (2004) (rejecting plaintiff's expert's damages model because it was not based upon sufficient factual evidence, did not use assumptions that were "moored in that factual evidence," and was not credible).

Dairyland's contentions that Dr. Neuberger has presented no methodology and otherwise has not "done the work" necessary to support his critique of Mr. Graves' model, and that the absence of a quantitative analysis is fatal to Dr. Neuberger's expert opinions, Pl. Mot. at 4-5, are without legal or factual merit. In fact, as Dr. Neuberger explained in his deposition, he performed a quantitative analysis through his extensive analysis Mr. Graves' allocation rights

model, the formulas that drive Mr. Graves' model, and the cost estimates that are the key inputs to Mr. Graves' economic sequence model. Def. A84-85 (Neuberger Dep. at 13:15-14:11). Dr. Neuberger explained in his deposition the methodology that he performed to complete his critique of Mr. Graves' model:

> I used my knowledge, training and experience as an economist to conduct a critical review of Mr. Graves' model, including the assumptions, the methodology and the predictions of that model. That methodology is a well-established methodology among trained economists. I would say every economist who enters a graduate program in economics is trained in that methodology beginning right from the start of the program.

Def. A86 (Neuberger Dep. at 20:19-21:7). In conducting his economic analysis, Dr. Neuberger performed a three-step methodology that is universally employed by professional economists: (1) Dr. Neuberger performed an economic assessment of the assumptions upon which Mr. Graves' modes are based; (2) Dr. Neuberger analyzed the underlying methodology that Mr. Graves utilized in developing his models; and (3) Dr. Neuberger assessed the predictions of the modeling framework that Mr. Graves developed to determine whether the predictions made economic sense. Def. A87 (Neuberger Deposition at 22:18-25:15).

Dr. Neuberger also explained the difference in methodology between the creation of a model and the critique of a model:

> If a model is considered to be deficient in let's say the fundamental assumptions underlying the model's behavior, if you tweak that model, you're still ignoring the deficiency. You still have the deficiency in there. Are some of Mr. Graves' simulations more meaningful than others? Perhaps. But I still think, if you have got a model that is deficient, simulating that model under various circumstances doesn't make it suddenly not deficient anymore. So that is the primary reason that I didn't run my own scenarios of [Mr. Graves'] model. Because I believe the fundamental structure is deficient. The output is going to be informed by those deficiencies.

> So just focusing on a subset of the scenarios doesn't overcome those deficiencies. Yes, there is variability in the results using [Mr. Graves'] model. But the model in every one of its variations in those scenarios still has the fundamental deficiencies that I identify in my report.

Def. A93 (Neuberger Deposition at 50:1-19).

Dr. Neuberger's methodology, based upon his significant experience applying well-established economic principles, is more than sufficient to allow him to offer expert opinions in this case. See First Tennessee, 268 F.3d at 334-35 (accepting expert testimony based upon "[expert's] own practical experiences throughout forty years in the banking industry"); First Union, 423 F.3d at 862 (allowing for qualification of expert based upon "knowledge, skill, experience, training or education"); Betterbox Communications, 300 F.3d at 329 (affirming expert testimony based upon "personal knowledge or experience . . . rather than a methodology that satisfies the Daubert factors"). Indeed, rather than *ipse dixit*, as Dairyland suggests, Dr. Neuberger explained that his critiquing methodology is subject to replication by other experts, and provides the Court with a basis for determining the reliability of Dr. Neuberger's opinions:

> I think if you took this model, Mr. Graves' report, and gave it to 10 other economists, there would be tremendous overlap in the criticism that each of those economists would present in terms of review, critical review of Mr. Graves' work.

Def. A87 (Neuberger Deposition at 22:1-6); see Def. A86 (Neuberger Deposition at 21:2-7 ("[My] methodlogy is a well-established methodology among trained economists. I would say every economist who enters a graduate program in economics is trained in that methodology beginning right from the start of the program."); Def. A88 (Neuberger Deposition at 28:5-18). Further, Dr. Neuberger explained that an another economist could test his methodology in critiquing Mr. Graves by performing the same analysis that he performed – in short, by

"reviewing [Mr. Graves'] model, reviewing the results, looking at the predictions and seeking if those predictions are sufficiently reliable and sufficiently robust to provide a reasonable basis for quantifying damages." Def. A90 (Neuberger Deposition at 35:3-9). Simply put, Dr. Neuberger's opinions have a sufficient indicia of reliability to qualify him as an expert in this case.

Dairyland next contends that, because Dr. Neuberger has not run any alternative models, Dr. Neuberger lacked any degree of confidence in his opinions and that this lack of confidence is evidenced by the use of the word "may" and "could" in his opinions. Pl. Mot. at 8. In this regard, as Dairyland would have it, Dr. Neuberger cannot state his "flimsy opinions" with a "reasonable degree of certainty," thereby rendering them unhelpful to the Court. Id. Contrary to Dairyland's assertion, Dr. Neuberger unequivocally stated his confidence that Mr. Graves' model produces unreliable results, even without developing a counter-model, based upon his understanding of economics and review of the scenarios modeled by Mr. Graves in his report. Def. A89 (Neuberger Dep. at 33:8-10) ("As it currently stands, I believe [Mr. Graves'] model is not adequate for the purpose for which it is offered."); Def. A90 (Graves Deposition at 35:21-36:7). Indeed, Dr. Neuberger explained the basis of his findings:

> But I see a lot of variation in [Mr. Graves'] model from relatively small changes in parameters. I think as a result, those results are not what I would call robust. And I think most economists, if not all of them, would agree with me, that a model whose results change quite significantly as a result of small perturbations in parameters in that model is not a robust model, and is one that should not be relied on by a court.

Def. A91 (Neuberger Dep. at 40:6-14).

Dr. Neuberger further explained the qualitative effect of Mr. Graves' failure to produce a proper model:

> In order to provide predictions that are relevant to damages, Mr. Graves must reliably estimate the timing, quantity and cost of exchanges. In my opinion, [Mr. Graves'] analysis fails to provide reliable estimates of these key variables.
>
> In fact, Mr. Graves does not actually model exchanges but simply assumes that they will occur and enable Dairyland to have its spent fuel removed earlier than under an allocation based on the OFF priority ranking. His general model cannot identify the parties to any individual transaction. He does not describe a market mechanism that would produce the exchanges that he predicts. He fails to adequately consider factors, such as uncertainty or risk aversion, which would affect his hypothetical market. These deficiencies are largely the same as those I addressed in my expert analysis in the <u>Pacific Gas & Electric</u> case. Mr. Graves also ignores the potential negative impact of certain contract provisions on the schedule of acceptance, such as uncertainty related to DOE review of [DCSs] and proposed exchanges, and the possibility of separate treatment of failed fuel.

Pl. A6-7 (Neuberger Report at 3-4, ¶¶ 13-14); Def. A90-91, 94, 96, 106, 111-13 (Neuberger Deposition at 36:22-38:5, 55:14-56:21, 84:9-85:9, 160:7-161:15, 188:8-191:11, 195:21-197:1). There simply is no basis for Dairyland's contention that Dr. Neuberger has not offered a sufficiently definitive opinion in this case.

Finally, Dairyland claims that Dr. Neuberger's opinions are of no help to the Court because Dr. Neuberger, as Dairyland would have it, is merely "merely pointing out weaknesses" in Mr. Graves' analysis. Pl. Mot. at 4. However, that is precisely why Dr. Neuberger's opinions <u>are</u> helpful to the Court in this case. One of Dr. Neuberger's opinions is that Mr. Graves' model is deficient for a variety of reasons and that, based upon these deficiencies, the Graves' model tells the Court little, if anything, as to how an exchanges market would have operated in the "but

for" world. Dr. Neuberger seeks to offer the Court a framework for evaluating the validity and reliability of Mr. Graves' hypothetical exchanges model. Based upon Dr. Neuberger's critique, the Court will be able to understand the significant errors and omissions contained in Mr. Graves' model and analysis and why the model fails to meet Dairyland's burden of proof. Absent a reliable "exchanges" model, this Court should rely upon the contractual mechanism for allocating acceptance rights, referred to in the Standard Contract as OFF. Consequently, Dr. Neuberger's testimony is both relevant and helpful to the Court in understanding the significant deficiencies contained in Mr. Graves' model.[11]

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny Dairyland's motion to exclude the expert testimony of Dr. Neuberger.

---

[11] Indeed, after Dr. Neuberger offered his economic critique of Mr. Graves' model, Mr. Graves submitted a rebuttal report in which he endeavored to incorporate into his model or otherwise respond to many of Dr. Neuberger's criticisms. However, as we will demonstrate at trial, Mr. Graves' "modeling" of the issues such as political risk and uncertainty lack any empirical support, and Mr. Graves only "models" each of these issues separately, rather than considering the collective effects that these issues may have upon the results of his model. Regardless of the serious deficiencies in Mr. Graves' revised analysis, the fact that such a revised analysis was conducted supports the conclusion that Dr. Neuberger's economic critique is relevant and reliable and warrants serious consideration by the Court.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

s/Russell A. Shultis by s/ Patrick B. Bryan
RUSSELL A. SHULTIS
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-7571
Fax: (202) 305-2503

Attorneys for Defendant

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

ALAN J. LO RE
Senior Trial Counsel

PATRICK B. BRYAN
JOSHUA E. GARDNER
SCOTT SLATER
Trial Attorneys
U.S. Department of Justice

May 15, 2008

Bacardi & Co. Ltd. v. New York Lighter Co., Inc.
E.D.N.Y.,2000.

United States District Court, E.D. New York.
BACARDI & COMPANY LIMITED and Bacardi-Martini U.S.A., Inc. Plaintiffs,
v.
NEW YORK LIGHTER COMPANY, INC., John Nordstrom, and Maryanne Nordstrom, Defendants.
**No. 97-CV-7140 JS VVP.**

March 15, 2000.

William R. Golden, Jr., Sarah L. Reid, Margaret Ferguson, Kelley Drye & Warren LLP, New York, New York, for Plaintiffs.
Elliot J. Feldman, John H. Weber, Pepper Hamilton LLP, Washington, D.C., District of Columbia, William H. Wexler, North Babylon, New York, A. Kathleen Tomlinson, Farrell, Fritz, P.C., Uniondale, New York, for Defendants.

*MEMORANDUM AND ORDER*

SEYBERT, J.
***1** Pending before the Court is defendants' motion to exclude the plaintiffs' expert testimony on the issue of consumer confusion. Succinctly, defendants seek to preclude the expert testimony of Robert Reitter and Norman Passman of Guideline Research Corporation. Consistent with the persistent tit-for-tat nature of this litigation,[FN1] also pending before the Court is plaintiffs' cross-motion to exclude the expert testimony of defendants' consumer confusion expert, Dr. Jerome Milch. The likelihood of consumer confusion issue is at the heart of the present trademark infringement litigation.[FN2]

FN1. For example, the docket sheet in this two year-old case reflects 224 entries, and the case file is barely contained in fourteen file folder-boxes.

FN2. Also presently pending before the Court is plaintiffs' motion for summary judgment.

The background of this case is well-known to everyone involved, as are the facts and allegations underlying the complaint and the counter-claims. Thus, the Court will recite only those facts that may be relevant to the pending motions. Briefly, plaintiffs manufacture and sell rum under the trade name “Bacardi,” and have used this name as a trademark for rum since 1862. Complaint, ¶¶ 8-9. Defendants distribute cigarette lighters which bear the designation “Bacarbi.” Amended Answer, ¶ 22. Plaintiffs claim that the defendants' Bacarbi lighters unlawfully replicate the appearance of their product, and unlawfully infringes their Bacardi trademark. Complaint, ¶¶ 28, 37.

For the reasons discussed below, the defendants' motion is denied, and the plaintiffs' cross-motion likewise is denied.

*LEGAL STANDARD*

There are two federal rules of evidence governing testimony by expert witnesses. First, Rule 702 provides that:

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. Meanwhile, Rule 703 governs the foundation for the opinions of expert testimony. The rule provides that:
[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Fed.R.Evid. 703.

Pursuant to these rules, “the trial judge has broad discretion in the matter of the admission or exclusion

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of expert evidence, and his [or her] action is to be sustained unless manifestly erroneous."*Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962); *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 224 (2d Cir.1999) (evidentiary rulings are reviewed for abuse of discretion); *see also**Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.1996) (evidentiary rulings will not be overturned unless manifestly erroneous). However, "expert testimony must be based upon reliable theories or principles."*F.D.I.C. v. Suna Assoc., Inc.*, 80 F.3d 681, 686 (2d Cir.1996) (citation omitted).

***2** In order to determine the admissibility of expert witness testimony, the Supreme Court has set forth a two-prong relevance/reliability inquiry.*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). First, the trial judge must determine whether the expert is proposing to testify to scientific knowledge. *Id.* at 592."The adjective 'scientific' implies a grounding in the methods and procedures of science" and "the word 'knowledge' connotes more than subjective belief or unsupported speculation."*Id.* at590. Second, the court must determine whether the testimony "will assist the trier of fact to understand or determine a fact in issue."*Id.* at 592.In other words, the proper analysis is one that ensures that the proffered expert testimony "is not only relevant, but reliable."*Id.* at 589.

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (1999), the Court expanded *Daubert'* s holding to all expert testimony, rather than just the scientific testimony challenged in the *Daubert* case. *Kumho*, 119 S.Ct. at 1174. The Court re-emphasized the relevance/reliability standard in determining the admissibility of expert testimony: Rule 702"establishes a standard of evidentiary reliability ... requir[ing] a valid connection to the pertinent inquiry as a precondition to admissibility ... [and] a reliable basis in the knowledge and experience of the relevant discipline."*Id.* at 1175 (internal quotations, citations, brackets and ellipses omitted). In sum, the objective of *Daubert*"is to ensure the reliability and relevancy of expert testimony."*Id.* at 1176.

Nevertheless, the Second Circuit has adopted a rather broad standard for the admissibility of expert witness testimony.

Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.

*Boucher*, 73 F.3d at 21 (internal quotations and citations omitted). Finally, the court must take into consideration the expert's background and practical experience when deciding whether an expert is qualified to render opinion testimony. *McCullock v. H .B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir.1995). With these legal principles in mind, the Court turns to an analysis of the issues raised by the present motions.

*DISCUSSION*

I. Defendants' Motion to Preclude Testimony of Robert Reitter and Norman Passman of Guideline Research Corporation on Issue of Consumer Confusion

Plaintiffs propose to elicit at trial the expert testimony of Robert Reitter and Norman Passman of Guideline Research Corporation ("GRC") regarding the issue of consumer confusion. Passman is the founder and chair of GRC, and has been conducting marketing research for over thirty-five years. He possesses both an undergraduate degree and an M.B.A. from Long Island University, and has been involved with over 5,000 consumer-related studies. Passman has appeared as an expert witness in over thirty-five federal court cases.

***3** Reitter shares a similarly impressive resume. Reitter is the senior vice-president of GRC, and holds undergraduate and graduate degrees from Yale University. He also has over thirty-five years of experience in marketing research.

The fact that Passman and Reitter are educated and experienced in their respective fields, however, does not end the inquiry into reliability. Rather, the Court also must consider whether the experts "employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."*Kumho*, 119 S.Ct. at 1176. To do this, the Court "should consider the specific factors identified in *Daubert"* to the degree that such factors "are

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

reasonable measures of the reliability of expert testimony."*Id.*

The non-exclusive factors set forth by the Supreme Court in *Daubert* are

(1) whether the theory or technique relied on has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation in the case of a particular scientific technique; and (4) whether the theory or method has been generally accepted by the scientific community.

*Donnelly v. Ford Motor Company*, 80 F.Supp.2d 45, 48 (E.D.N.Y.1999) (citing *Daubert*, 509 U.S. at 593-94). These factors are to be applied flexibly, and the trial court is granted broad latitude to determine reliability in light of the facts of a particular case. *Kumho*, 119 S.Ct. at 1176.

In this case, at plaintiffs' request, Passman and Reitter prepared a report entitled "A Consumer Perception Study of a 'BACARBI' Lighter" (the "report" or "study"). The purpose of the study was "to determine to what extent, if any, relevant consumers are likely to be confused by the Bacarbi lighter into thinking that it actually contains liquor, or that it is put out by or is authorized by Bacardi, the maker of rum."Brief in Support of Defendants' Motion to Exclude Expert Testimony on Consumer Confusion ("Def.Brief"), Exhibit A. The study found that "[a] very high proportion of relevant consumers, 69%, is likely to be confused by the Bacarbi lighter."*Id.* As set forth in the report, Passman and Reitter found that based upon their survey of 255 respondents, 37% identified liquor as the contents of the item shown, and almost half (49%) thought Bacardi either was affiliated with the lighter or had authorized its production. *Id.*

Defendants attack the report, the surveys forming the basis of the report, and the report's conclusions. The primary basis for defendants' disagreement with the study and its parts and conclusion is the analysis of the report conducted for defendants by Dr. Jerome Milch. As previously mentioned, plaintiffs have filed a cross-motion to disqualify Dr. Milch. The Court's discussion of the cross-motion is found in Section II., *infra.*

***4** Dr. Milch criticizes the plaintiffs' likelihood of confusion study in several respects. Briefly stated, Dr. Milch claims that (1) the site selection was not scientific; (2) the relevant universe of consumers was not surveyed; (3) the actual market conditions were not approximated during the surveys; (4) GRC's interview procedures were unreliable and prone to subjective interpretation; and (5) Passman and Reitter misinterpreted their own data. Def. Brief, at 8-19; *see also* Defendants' Memorandum of Law in Reply, at 9-10.

Prior to conducting its analysis of the GRC study and defendants' challenges thereto, the Court first must set forth some basic principles of trademark law in order to focus its inquiry. As recently set forth by the Second Circuit,

The Lanham Act protects the rights of the first user of a trademark, particularly where that mark is a strong one. Trademark law accomplishes this by barring a later user from employing a confusingly similar mark, likely to deceive purchasers as to the origin of the later user's product, and one that would exploit the reputation of the first user. *See**Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1135 (2d Cir.1982). The Lanham Act therefore makes a person who uses "any word, term, name, symbol, or device ... or any false designation of origin, false or misleading description of fact ... which is likely to cause confusion," liable in a civil suit to one damaged by such act. 15 U .S.C. § 1125(a)(1).

*Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 742 (2d Cir.1998) (ellipses in original). Therefore, the issue of likelihood of confusion is central to plaintiffs' causes of action under the Lanham Act. The defendants' motion to exclude evidence of likelihood of confusion as irrelevant under Fed.R.Evid. 402 is DENIED.

Likelihood of confusion ordinarily is analyzed by weighing the eight factors first announced and applied in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.1961).*See**Streetwise*, 159 F.3d at 743. These factors are the (1) strength of plaintiff's mark; (2) similarity between the plaintiff's mark and the challenged mark; (3) competitive proximity of the products; (4) likelihood that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiff will eventually produce a product like the challenged product, thereby "bridging the gap"; (5) actual confusion; (6) defendant's good faith or lack thereof; (7) quality of the defendant's product as compared to plaintiff's product; and (8) relative sophistication of prospective and actual purchasers of the products. *Polaroid,* 287 F.2d at 495;*see also**Streetwise,* 159 F.3d at 743. These eight factors are not dispositive, and other circumstances may be relevant to the likelihood of confusion analysis, depending on the particular case. *Streetwise,* 159 F.3d at 743.

For purposes of the present motions, it is sufficient to point out the pervasiveness of the likelihood of confusion survey in Lanham Act litigation.*Schering,* 189 F.3d at 225 ("[t]he use of surveys is ... far more prevalent in trademark law than in most other areas."). The standard governing the administration of a proper likelihood of confusion survey originally was set forth in this district in *Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp. 1189, 1205 (E.D.N.Y.1983), and has been repeatedly used and cited by courts throughout the country. *See**Schering,* 189 F.3d at 225. The factors included in this standard include whether

***5** (1) the "universe" was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) objectivity of the entire process was assured.

*Kids "R" Us,* 559 F.Supp. at 1205 (citing Manual for Complex Litigation, 116 (5th ed.1981)).

Despite the prevalence of likelihood of confusion surveys in trademark litigation, it is important to give heed to the Second Circuit's admonition that there is no general rule supporting the admissibility of surveys into evidence for *all* purposes. *Schering,* 189 F.3d at 225. A necessary corollary of this principle is that expert testimony that is based upon consumer surveys also cannot be admitted for *all* purposes.

As thoroughly discussed by the Second Circuit in *Schering,* there are two important controversies that "tend to complicate the question of whether survey evidence should be admitted in a particular case."*Schering,* 189 F.3d at 225. The first issue touches upon "the proper consequence of a finding of methodological error in a survey."*Id.* The second issue, which is not explicitly argued by the parties in the present motion, is the proper rationale under which proposed survey evidence should be admitted into evidence. *Id.* at 226.

Although these two issues are extensively intertwined, the law is that where, as here, the challenged survey asks respondents "about their presently-existing states of mind to establish facts about the group's mental impressions," such state-of-mind evidence falls under Rule 803(3) of the Federal Rules of Evidence, and is thus properly admitted on that basis. *Schering,* 189 F.3d at 227-28, 230. Aside from this important holding, the Second Circuit also held that "[r]egardless of the basis cited for admitting these surveys, *errors in methodology ... properly go only to the weight of the evidence."* *Id.* at 228 (emphasis added). This holding is limited only by the Court's balancing of the probative value of the evidence as opposed to its likely prejudice or confusion under Rule 403. *Id.*

As applied to this case, the Court views *Schering* as dispositive of the motion to exclude the expert testimony of Reitter and Passman, as well as the results of the surveys upon which their expert testimony is based.[FN3] There is no doubt that the questions asked of survey respondents were intended to gauge the respondents' then-existing states of mind about the products shown to them, and thus the surveys are admissible under the Rule 803(3) hearsay exception. Additionally, the *Schering* Court made it clear that the methodological attacks of the type asserted by defendants against the GRC report, and by extension to the testimony of Passman and Reitter, go to the weight of such evidence, not to its admissibility. *Schering,* 189 F.3d at 228. Therefore, defendants' motion to exclude the expert testimony of Reitter and Passman under Fed.R.Evid. 702 is DENIED.[FN4]

FN3. The Court doubts that a "typical" or "traditional" *Daubert* analysis can be conducted in assessing evidence of the type

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

challenged here. *SeeKumho,* 119 S.Ct. at 1175 ("there are many different kinds of experts, and many different kinds of expertise."). In the trademark context, there is a particular need to emphasize that the *Daubert* factors are not "a definitive checklist," that they are flexible, and that the Court's "gatekeeping inquiry must be tied to the facts of a particular case ."*Id.* (quotation marks and citations omitted). Nevertheless, to the extent that a *Daubert* analysis can be applied to the challenged expert testimony at issue in this motion, the Court does not hesitate to hold that the theories and techniques relied upon by GRC have been amply tested in this field of inquiry; that there has been extensive peer review, publication, and open and unfettered commentary in the field; and that the likelihood of confusion survey methods have been, and presently are, generally accepted by the relevant social-scientific community. *SeeDaubert,* 509 U.S. at 592-95;*Kumho,* 119 S.Ct. at 1175. Although the Court certainly can imagine circumstances where a likelihood of confusion consumer survey may indeed lead to nothing more than the proverbial (and doomed) "apples and oranges" comparison, *seeBoucher,* 73 F.d at 21, the survey here passes the *Daubert* test with flying colors.

FN4. Although the Court agrees with defendants that the surveys may not have been as perfect as possible, consideration of the weight of these alleged methodological errors must await the Court's determination of the plaintiffs' pending summary judgment motion.

***6** The Court also denies defendants' challenge to the proposed testimony as more prejudicial than probative under Fed.R.Civ.P. 403. The Court cannot say that the probative value of the expert testimony and survey evidence "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."Fed.R.Evid. 403. The Court has considered and rejected defendants' remaining arguments. The motion to exclude the plaintiffs' expert testimony under Rule 403 is DENIED.

II. Plaintiffs' Cross-Motion to Preclude Testimony of Dr. Milch Regarding Consumer Confusion

The plaintiffs' challenge to Dr. Milch's report stands on slightly different ground, primarily because Dr. Milch did not conduct a market survey of his own. Rather, his report is limited to a critique of the methodology of the plaintiffs' report prepared by GRC. Affidavit of Paul W. Garrity, Exhibit 3. Dr. Milch's report is entitled "Analysis and Review of 'A Consumer Perception Study of a 'Bacarbi' Lighter." ' *Id.* As noted in Section I., *supra,* Dr. Milch's report contains several criticisms that defendants contend severely undercut the GRC report. Those criticisms are extensive, and will not be repeated again here. Rather, the Court turns to an evaluation of Dr. Milch's qualifications as an expert witness.

Dr. Jerome E. Milch is Senior Manager of Marketing Research for the Corporate Services business unit of American Express. He has a Ph.D. from the Massachusetts Institute of Technology and has been a professor at both Cornell University and the University of Pittsburgh. Dr. Milch's training is in social science research, and he has specialized for the last sixteen years in market research. Among his duties is the identification of research issues, research design, and result analysis.

Plaintiffs argue that Dr. Milch does not qualify as an expert to render testimony in this case. Plaintiffs contend that Dr. Milch lacks knowledge and experience in the relevant area, and that Dr. Milch does not meet the *Daubert* standard for the admissibility of his proposed testimony. In particular, plaintiffs argue that (1) Dr. Milch's opinions are of no use to the court, that is, that his opinions are not relevant; and (2) the methodology of Dr. Milch's critique is defective, resulting in evidence that is patently unreliable. *See* Plaintiffs' Memorandum of Law in Support of Cross-Motion to Exclude Expert Testimony, at 4-15.

Despite these arguments, the Court is more than satisfied that Dr. Milch qualifies as an expert under Fed.R.Evid. 702. Dr. Milch presents a resume thick with accomplishments in market research, among other things, and the Court determines that he possesses the "knowledge, skill, experience, training, or education" to "assist the trier of fact to understand

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the evidence."Fed.R.Evid. 703. Moreover, there is no valid challenge to the basis for Dr. Milch's opinions under Rule 703; although Dr. Milch did not conduct his own survey, he bases his opinions on the survey methodology and results of the GRC report. The Court already has determined the GRC surveys and report to be facts or data "of a type reasonably relied upon by experts in the particular field."Fed.R.Evid. 703. The cross-motion to exclude Dr. Milch's testimony under Rules 104(a) and 702 is DENIED.

***7** Plaintiffs' argument that Dr. Milch's proposed testimony is not relevant is simply specious. Indeed, it would be an odd result for the Court to determine that the GRC report and the testimony of Reitter and Passman are relevant to the likelihood of confusion issue, while making an opposite determination regarding Dr. Milch. The cross-motion to exclude Dr. Milch's testimony under Rule 402 is DENIED.

Moreover, as discussed previously, plaintiffs' arguments that Dr. Milch's methodology is skewed is an argument that goes to the weight of such evidence, not its admissibility.[FN5] *See* *Schering*, 189 F.3d at 227-28. For essentially the same reasons the Court has determined that plaintiffs' proposed expert testimony meets the *Daubert* standard, the Court also is satisfied that Dr. Milch's testimony meets the same standard for admissibility of expert testimony.

> FN5. Again, although the Court agrees with plaintiffs that Dr. Milch's criticisms of the GRC report may not be entirely valid, the weight of this evidence will be considered by the Court in ruling upon the plaintiffs' pending summary judgment motion.

Finally, the Court finds that Dr. Milch's testimony is more probative than prejudicial. Therefore, plaintiffs' cannot succeed on their cross-motion under Rule 403.

The Court has considered and rejected plaintiffs' remaining arguments in support of their cross-motion to exclude the testimony of Dr. Milch. The cross-motion is DENIED.

*CONCLUSION*

For the reasons discussed above, the defendants' motion to preclude the expert testimony of Robert Reitter and Norman Passman is DENIED. The plaintiffs' cross-motion to preclude the testimony of Dr. Milch likewise is DENIED.

E.D.N.Y.,2000.
Bacardi & Co. Ltd. v. New York Lighter Co., Inc.
Not Reported in F.Supp.2d, 2000 WL 298915 (E.D.N.Y.), 54 U.S.P.Q.2d 1335, 54 Fed. R. Evid. Serv. 380

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In re Blech Securities Litigation
S.D.N.Y.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
In re: BLECH SECURITIES LITIGATION
**No. 94 Civ. 7696(RWS).**

March 26, 2003.

Kaplan, Kilsheimer & Fox, New York, NY, By: Richard Kilsheimer, Robert N. Kaplan, Milberg Weiss Bershad Hynes & Lerach, New York, NY, By: David J. Bershad, Richard H. Weiss, Brian C. Kerr, Gilman and Pastor, Saugus, MA, By: David Pastor, Pater A. Lagorio, Curtis V. Trinko, LLP, New York, NY, By: Neal A. DeYoung, for Plaintiff, of counsel.
Cadwalader, Wickersham & Taft, New York, NY, By: Dennis J. Block, Michael G. Dolan, Suzanne J. Romajas, Adam M. Masin, for Defendant Bear, Stearns & Co., Inc., of counsel.
Wexler & Burkhart, Mitchel Field, NY, By: Stephen B. Wexler, for Defendant Baird Patrick & Co., Inc., of counsel.

*OPINION*

SWEET, J.
***1** This Document Relates to: ALL ACTIONS

The parties to this consolidated securities action have moved *in limine* to exclude certain evidence from the trial, which is anticipated to commence on April 7.

The Plaintiffs seek to:

1. Preclude Defendants from calling witnesses, who are not made available to testify live at trial;

2. Exclude testimony about Self-Regulatory Organizations ("SRO") Regulatory Provisions

Defendant Bear Stearns & Co., Inc. ("Bear Stearns") seeks to:

1. Exclude evidence as irrelevant, inadmissible, and prejudicial;

2. Exclude audio-tapes and related transcripts;

3. Exclude evidence as to Bear Stearns relating to the U.S. Attorney's Criminal Proceedings and the SEC's Proceedings against David Blech ("Blech");

4. Hold a separate trial from Defendants Blech, David Blech & Company, Inc. ("DBCO"), and Baird Patrick & Co., Inc. ("Baird Patrick") and to bifurcate the issues of liability and damages;

5. Modify the Court's Class Certification Order and to exclude certain evidence.

Defendant Baird Patrick & Co. ("Baird Patrick") seeks to:

1. Exclude Blech's plea allocution and the amended complaint in the SEC proceedings against Blech.

The motions are dispensed of as follows for the reasons set forth below:

I. Plaintiffs' motion to preclude Defendants from calling witnesses, who are not made available to testify live at trial is denied as unnecessary.

II. Plaintiffs' motion to exclude testimony about SRO Regulatory Provisions is denied.

III. Bear Stearns' motion to exclude evidence as irrelevant, inadmissible, and prejudicial is denied in part and granted in part. Those records, which are business records and admissions against interest, will be admitted against Baird Patrick and as evidence of the Blech scheme to defraud.

IV. Bear Stearns' motion to exclude audio-tapes and related transcripts is denied in part and granted in part.

V. Bear Stearns' motion to exclude evidence relating to the U.S. Attorney's Criminal Proceedings and the SEC's Proceedings against Blech is denied in part and granted in part.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

VI. Bear Stearns' motion for a separate trial and bifurcation is denied. The requested instruction will be given.

VII. Bear Stearns' motion to modify the Court's Class Certification Order and to exclude certain evidence is granted in part and denied in part.

VIII Baird Patrick's motion to exclude Blech's plea allocution and the amended complaint in the SEC proceedings against Blech is denied in part and granted in part.

The plaintiffs have challenged the qualifications and testimony of Bear Stearns experts Daniel R. Fischel ("Fischel") and Baird Patrick's expert Vincent Buchanan ("Buchanan"). Bear Stearns and Baird Patrick have challenged the qualifications of the plaintiffs' experts Howard Berg ("Berg") and Blaine F. Nye ("Nye"). As set forth below, all experts are qualified and objections to their testimony are sustained in part.

*Prior Proceedings*

***2** This class action alleging securities violations by Bear Stearns, a clearing broker for DBCO; Baird Patrick, a broker; DBCO; and various issuers, was initiated on October 21, 1994.

Discovery was commenced and completed, and various motions have been disposed of, familiarity with which is assumed. *See*In re Blech Sec. Litig., 928 F.Supp. 1279 (S.D.N.Y.1996) (*"Blech I"* ); *In re* Blech Sec. Litig., 961 F.Supp. 569 (S.D.N.Y.1997) (*"Blech III"* ); *In re Blech Sec. Litig.*, No. 94 Civ. 7696(RWS), 2002 WL 31356498 (S.D.N.Y. Oct. 17, 2002) (*"Blech IV"* ).

Defendant Blech is in bankruptcy proceedings in New York, and consequently, this action has been stayed against him pursuant to the automatic state provisions of the Bankruptcy Code. Defendant DBCO went out of business in 1994, is now defunct, and has not been represented by counsel or been in active party in this litigation for several years. Certain settlements with initial defendants have been reached, and the remaining active defendants are Bear Stearns and Baird Patrick. The instant motions were fully submitted on February 24, 2003.

*THE PLAINTIFFS' MOTIONS*

_____ I. *Motion to Preclude Defendants from Calling Witnesses who Are Not Made to Testify Live*

Plaintiffs have sought a pretrial ruling that any witnesses under defendants' control, who testify on the defense case, be made available to testify live on the Plaintiffs' case rather than by deposition. The application appears unnecessary.

The parties will identify their witnesses in the pretrial order. If the Plaintiffs wish to present in their case witnesses under the defendants' control, they will identify them and, if necessary, subpoena them. It is assumed that this formality will not be required, and that the parties will be willing to produce witnesses under their control.

II. *Motion to Exclude Testimony about SRO Regulatory Provisions*

The Plaintiffs have moved *inlimine* to exclude testimony about Self-Regulatory Organizations ("SRO") Regulatory Provisions. For the reasons discussed below, the motion *inlimine* is denied.[FN1]

> FN1. The term "SRO Rules," for purposes of this motion, includes New York Stock Exchange Rules 342, 382, 401, 405 and 431, NASD Rule 3230, AMEX Rule 400 and Federal Reserve Board Regulation T.

A. *NYSE Rule 382*

In 1982, the New York Stock Exchange deleted those portions of NYSE Rule 405 that had imposed supervisory duties on clearing brokers and made NYSE Rule 382 "the exclusive [NYSE] Rule which concerns itself with the [clearing] relationship."NYSE Rule 382, as amended, permits clearing brokers to contractually allocate all supervisory and other responsibilities vis-a-vis the customer solely to the introducing broker and requires the clearing agreement to specifically address the clearing broker's and the introducing broker's respective responsibilities in the following seven areas: (1) opening, approving and monitoring

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

of accounts; (2) extension of credit; (3) maintenance of books and records; (4) receipt and delivery of funds and securities; (5) safeguarding of funds and securities; (6) confirmations and statements; and (7) acceptance of orders and execution of transactions, thereby giving recognition not only to a clearing broker's more ministerial activities but also to a clearing broker's normal function as a creditor.

***3** The Clearing Agreement entered into between Bear Stearns and DBCO ("Clearing Agreement") allocated the responsibilities between DBCO and Bear Stearns for monitoring its customers' accounts and ensuring that the trading therein complied with applicable rules and regulations and for responding to customer inquiries and complaints remaining in compliance with the net capital rules and reporting requirements, and for reporting on at least a monthly basis "all financial information and reports" filed with the National Association of Securities Dealers, the SEC or any SRO, including monthly and quarterly Financial and Operational Combined Uniform Single Reports ("FOCUS" Reports), issuing confirmations, monthly account statements and notices directly to customers and for supplying daily reports, including customer confirmations, margin status reports, money line reports and daily commission detail reports.

B. *Evidence Relating To SRO Rules Is Relevant To An Evaluation Of Bear Stearns' Conduct*

Evidence of Bear Stearns' compliance with the SRO Rules is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."Fed.R.Evid. 401. Indeed, the standard for finding relevance "is not high." *United States v. Southland Corp.*, 760 F.2d 1366, 1375 (2d Cir.1985), *cert.denied*,474 U.S. 825 (1985).

Here, evidence that Bear Stearns' conduct was consistent with the SRO Rules (and the Clearing Agreement which derives from the SRO Rules and allocates responsibilities and defines rights and obligations in accord with custom and practice in the clearing industry) is directly relevant to demonstrate (i) the industry standard for routine conduct for a clearing broker and creditor, and (ii) whether or not Bear Stearns' conduct under those standards was entirely routine and appropriate conduct for the industry or engaged in non-actionable aiding and abetting or whether it "crossed the line" and became an active participant in David Blech's manipulative scheme.

The *Blech IV* decision held that "an otherwise innocent act if undertaken with an intent to manipulate the market, can become a contrivance to accomplish a security fraud,"*In re Blech Sec. Litig.*, No. 94 Civ. 7696(RWS), 2002 WL 31356498, at *17 (S.D.N.Y. Oct. 17, 2002) (holding a question of fact existed as to Bear Stearns' intent in purportedly withholding stock from short sellers and delaying sell-outs under Reg T, even if such actions were "not a security violation in and of [themselves]"), and stated that the issue was whether Bear Stearns performed its clearing functions "knowingly in such a manner as to enhance the Blech market manipulation scheme."*In re Blech Sec. Litig.*, 2002 WL 31356498, at *6.

Here, Bear Stearns maintains (i) that its conduct was not motivated by a fraudulent intent, but rather by the normal and routine motivations of a clearing broker and creditor, (ii) that information in Bear Stearns' possession concerning DBCO's trading activities, obtained as a result of its normal, routine functions as a clearing broker acting in compliance with industry practice, did not constitute knowledge of Blech's fraudulent scheme, and (iii) that, although certain information in Bear Stearns' possession might (in theory) have caused DBCO's compliance department or regulatory authorities to conduct an investigation, because Bear Stearns had no obligation under the SRO Rules to do so, Bear Stearns was not acting either recklessly or with a motive to commit fraud by not investigating any alleged "red flags."

***4** Whether its conduct constituted a direct, knowing participation in Blech's fraud is the ultimate issue. The SRO Rules are evidence of industry practice but do not constitute an exemption from liability. The effect of any "red flags" in the context of Rules is relevant. The 1999 amendment to NYSE Rule 382 enacted after the events at issue is not relevant to Bear Stearns' conduct in 1994. *See**Van Alen v. Dominick & Dominick, Inc.*, 441 F.Supp. 389, 396 (S.D.N.Y.1976) (testimony of defendant firm's officers that they believed the firm was operating within the guidelines set forth by the NYSE found

relevant to defendant's lack of scienter), *aff'd,*560 F.2d 547 (1977); *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 94 Civ. 5587(PKL)(RLE), 2002 WL 31780188, at *2 (S.D.N.Y. Dec. 11, 2002) (evidence of defendant's state of mind at the time could tend to show he did not act with scienter).

Indeed, the Court's *Blech IV* decision expressly recognized that a factual issue at trial will be whether Bear Stearns performed its functions pursuant to the SRO Rules and the Clearing Agreement "knowingly in such a manner as to enhance the Blech market manipulation scheme."*In re Blech Sec. Litig.*, 2002 WL 31356498, at *6.

Thus, the SRO Rules and compliance with the rules are relevant to analyses performed and opinions given by Plaintiffs. Bear Stearns' affirmative defenses that (i) "in the conduct of its affairs ... [it] did not know, and in the exercise of reasonable care could not have known, of any of the acts, misstatements or omissions by [Blech or DBCO]" (Block Aff. Ex. 10 (Answer) ¶ 118) and (ii) "Bear Stearns acted at all times relevant to the allegations of the Complaint in good faith" (Block Aff. Ex. 10 (Answer) ¶ 119).

The Plaintiffs' motion *inlimine* to exclude testimony regarding SRO Regulatory provisions is, therefore, denied.

*BEAR STEARNS' MOTIONS*

III. *Motion to Exclude Evidence as Irrelevant, Inadmissible, and Prejudicial*

Defendant Bear Stearns has moved *inlimine* pursuant to Rules 402, 403, 602, 802, 805, and 1002 of the Federal Rules of Evidence to preclude Plaintiffs from offering the following evidence:

1. Internal materials of Defendant DBCO-including memoranda and employee notes-("Internal DBCO Documents");

2. Communications by Stanley Berk ("Berk Communications"), including a spreadsheet of trades created by Berk in connection with this litigation and various regulatory investigations ("Berk Spreadsheet"); and

3. Communications by Defendant Baird Patrick and its equities trader, Alifehim Prodani ("Prodani") ("Baird Patrick Communications").

The Internal DBCO Documents include intra-office memoranda and letters, handwritten notes by DBCO employees, internal policies and procedures memoranda, and other documents showing daily DBCO activities.

*Benesch's April 1994 Memo*

On or about April 19, 1994, DBCO's former compliance director, John Benesch ("Benesch") sent an internal memorandum to David Blech ("Blech") and Steve Ross ("Ross")-DBCO's top two executives-detailing serious concerns about DBCO's trading practices ("April 19th Benesch Memo"). The concerns reflected in the memo include, among other things:

***5** • Unauthorized trades, supported by various verbal and written customer complaints;

• Large blocks being executed within the last half hour and many crosses with specific market makers;

• Numerous customer tickets stamped after the close;

• Possible wash sales between D. Blech & Co. market making account and certain employee or family related accounts;

• Numerous sellouts, reneges and cancels all indicating possible unauthorized trading, and

• Positions in error account held well over 1 or 2 days.

Such concerns, according to the memo, were unresolved after months of internal discussion and DBCO's compliance director believed that "[DBCO] will not pass its next regulatory audit without certain restrictions or sanctions being placed on our business by the NASD."

As to relevance, under Fed.R.Evid. 401, evidence of the existence and scope of the Blech scheme is a "fact that is of consequence to the determination of the action," and the Benesch memo is evidence that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

makes the existence of that fact "more probable."

The Benesch memo is not hearsay because it is a business record under Fed.R.Evid. 803(6). Fed.R.Evid. 803(6) favors admission of evidence if the evidence has any probative value at all. *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 101 (2d Cir.1995). Documents may be admitted as business records under Rule 803(6), even though they are not the business records of one of the parties, and here DBCO is still a defendant in this litigation. *United States v. Consolidated Edison Co. of N.Y.*, 580 F.2d 1122, 1131 n. 18 (2d Cir.1978); *Schactman Fagan, Inc. v. Winthrop Labs., Inc.*, 1985 WL 3126, *1 (S.D.N.Y. Oct. 15, 1985). The key determination as to whether a document falls under the business record exception to the hearsay rule is whether the document is trustworthy. *Miss. River Grain Elevator, Inc. v. Bartlett & Co., Grain*, 659 F.2d 1314, 1319 (5th Cir.1981).

The Benesch memo was prepared by Benesch, DBCO's compliance director, and the preparation of the memorandum was within Benesch's regular business activity. It was prepared by a person in a position of knowledge of the facts conveyed, at a time when he had no motive to lie. Accordingly, the Benesch memo constitutes a business record under Rule 803(6) and is, therefore, excluded from the hearsay rule.

As to Fed.R.Evid. 403, the prejudice claimed by Bear Stearns must be substantial and unfair. *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 151 (2d Cir.1997); *Weinstein's Federal Evidence*, § 403.04 (Matthew Bender 2003). Here, the probative value of the Benesch memo is not outweighed by any prejudicial value. The Benesch memo tends to prove DBCO's manipulative conduct, which the Plaintiffs must prove as part of their case in chief.

DBCO's former compliance assistant and liaison with the DBCO trading room, Michelle Kristel ("Kristel"), maintained a notebook from May through August 1994 ("Kristel Notebook"). The notebook relates parts of conversations among various DBCO employees characterized as "hearsay within hearsay," under Rule 805 as well.

***6** As to Fed.R.Evid. 401, the Kristel Notebook does provide relevant and reliable evidence of DBCO's trading practices. Although characterized as a personal diary by Bear Stearns, the Kristel Notebook constitutes a business record under Rule 803(6). The notebook was compiled as part of Kristel's duties as an employee in the compliance department of DBCO. It was kept "in the course of a regularly conducted business activity," and "it was the regular practice of that business activity to make" the business record. Fed.R.Evid. 803(6). It represents a record of various events that she observed and contemporaneously recorded in her notebook, as part of her duties as a compliance officer of DBCO. The fact that these notes are handwritten and contained in a written notebook does not defeat the applicability of the business record exception in Rule 803(6).*United States v. McPartlin*, 595 F.2d 1321, 1347-48 (7th Cir.1979), *cert.denied*,444 U.S. 833 (1979) (court held that personal a appointment book was a business record within Rule 803(6) as it was part of a regular business activity and entries were made with regularity, at or near the time of the event described in the appointment book); *United States v. Hedman*, 630 F.2d 1184, 1197-98 (7th Cir.1980), *cert.denied*,450 U.S. 965 (1981) (court held that diary which contained a detailed description of bribes paid over the years was a business record under Rule 803(6) because the diary was kept as a business activity and entries were made with regularity at or near the time of the recorded events).

The Kristel Notebook also constitutes an admission by a party-opponent under Fed.R.Evid. 801(d)(2), offered against DBCO as evidence of the illegal conduct which occurred at DBCO during the relevant time period.

Portions of the notes contain hearsay within hearsay under Fed.R.Evid. 805, in particular conversations Kristel had with other DBCO employees, DBCO memoranda, and trading tickets, all constitute inadmissible hearsay within hearsay. With respect to the DBCO documents, such as internal memoranda and trading tickets that formed part of the Kristel Notebook, these documents conform to the business records exception of the hearsay rule and, therefore, are not hearsay. Certain of the conversations would constitute admissions of a party-opponent under Rule 801(d)(2). A further hearing may be required before introduction of the notebook to identify such conversations.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Benesch and Kristel made certain handwritten notes. Benesch made a note in preparation for the April 19th Benesch Memo, stating:

Bear Stearns is controlling certain aspects of our operations and trading. They have conducted conference calls instructing & informing us of the excessive violations & that we are above all clearance firms when it comes to these problems & their auditors will pick up these excessive practices.

(Block Aff. Ex. 6 at 2.)

Kristel made an undated notation stating, "Trading is given account numbers after the close-in some cases with DB trades 2-3 days after Trade Date."

***7** Benesch's "memo to the file," dated April 13, 1994, describes various conversations within DBCO regarding "verbal complaints," concerns that the firm might "fall below net capital," and late trades. His "memo to the file," dated April 19, 1994, states, "New management may be put into place, effectively removing D[avid] B[lech] from day-to-day power. Compliance issues will be addressed."

Benesch's March 24, 1994 "memo to the file" describes a conversation in which Benesch told DBCO's Mark Germain about his "great concerns" regarding DBCO's operations-"[A]s usual MG said to handle it & I informed him that the only way to was to either go to Bear Stearns, Citibank, SEC or quit. MG said to handle it but I replied that I don't have the authority or backing."

Benesch's handwritten notes of a purported May 4, 1994 conversation with Blech and DBCO's Steve Ross state: "The sellouts under David's RR # are wide spread and in accounts that should or could pay for such positions but now only reflect possible unauthorized trading but that the title of such [accounts] cause doubt if such clients will ever complain (i.e., Esther [Blech, a relative] )."

Kristel's handwritten memorandum to Benesch summarized Rick Silverman's statements on May 12, 1994 that "illegal" activity was occurring in DBCO accounts.

Benesch's May 13, 1994 memorandum to Blech and Ross stated that there had been little progress on the corrective procedures suggested in the April 19, 1994 memo and confirming that Blech and Ross would provide Benesch with "counsel of your choice" to review the compliance concerns.

Further, as with the other DBCO documents discussed above, Bear Stearns contends these notes are inadmissible hearsay and hearsay within hearsay against Bear Stearns under Rules 802 and 805 and should be excluded under Rule 403.

The notes were taken by Benesch and by Kristel as part of their normal business activities, as compliance officers of DBCO, and reflect the compliance-related observations of both Benesch and Kristel. The notes are business records, not hearsay, under Rule 803(6). As to the hearsay within hearsay objection, a further hearing may be required to identify conversations constituting admissions.

Bear Stearns seeks to exclude other internal DBCO documents. The documents include sample DBCO order tickets with date stamps and an April 26, 1994 memo from Kristel to Blech about "time stamp deficiencies" on certain order tickets; Spindel's January 17, 1994 letter to Blech resigning as DBCO's financial and operations principal and describing various concerns with "capital, operations, and regulatory climate and leadership"; Benesch's July 7, 1994 memo resigning as compliance director and his September 6, 1994 memo resigning his employment; and various internal DBCO documents detailing firm policy and procedures, including a June 9, 1993 memo outlining "Trading Desk Responsibilities," and a January 19, 1994 memo to DBCO employees attaching an insert to update the DBCO compliance manual.

***8** These documents constitute business records and will be treated as the documents previously described.

Bear Stearns seeks to bar admission of a 77-page spreadsheet, entitled "Blech Securities Trades Through Berk Accounts" ("Berk Spreadsheet"), by Stanley Berk with his associates at the advice of counsel after the events at issue. This spreadsheet is a compilation of material from other documents, such as Berk's bank statements.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The Berk Spreadsheet does not constitute a business record, but the Plaintiffs seek its introduction as an admission against interest, maintaining that it reflects fictitious trades and was presented to the government to describe Berk's relationship with Blech. The spreadsheet, in and of itself, does not appear to be an admission against interest and is not admissible.

Bear Stearns seeks to exclude DBCO documents that reference Baird Patrick and its equities trader, Prodani, and their involvement in trades in Blech securities, principally upon grounds of relevance. For example, the Kristel Notebook, discussed above, contains the following references (among others) to internal DBCO conversations about Baird Patrick and Prodani:

R[ick] S[ilverman]: All D[avid] B[lech]'s accounts should be shipped out. It stinks what goes on in these accounts. That's why I get the tickets signed because it stinks and I want to get out of the loop-Same reason why I stay away from BPAT [Baird Patrick].

M[ichelle] K[ristel]: But other people are still doing bus[iness] with Ali [Prodani].

R[ick] S[ilverman]: Pat's a big boy. He's been around long enough ... We'll get a slap on the wrist for the time stamps. You live with that but this other stuff stinks like parking or something.

...

Those records, which are business records and admissions against interest, will be admitted against Baird Patrick and as evidence of the Blech scheme to defraud. If necessary, a further hearing can be held to identify such documents.

IV. *Motion to Exclude Audio Tapes and Related Transcripts*

Defendant Bear Stearns has moved *inlimine* pursuant to Rules 402, 403, 802 and 805 of the Federal Rules of Evidence to preclude Plaintiffs from offering four categories on the audio tapes and corresponding transcripts (collectively, "audio tapes") that were produced by Bear Stearns in this litigation:

1. Audio tapes regarding transactions in securities that are not one of the fifteen Blech Securities which remain in this case pursuant to the Court's order dated October 17, 2002 (the "Non-Class Securities Tapes").

2. Audio tapes reflecting communications between Bear Stearns and anonymous phone callers who purport to blow the whistle on D. Blech & Co.'s ("DBCO's) manipulation scheme on August 31, 1994 (and at later dates) (the "Anonymous Caller Tapes").

3. Audio tapes reflecting communications with Stanley Berk (or his employees or his bank) (collectively, "Berk") (the "Berk Tapes").

***9** 4. Audio tapes regarding events occurring *after* September 22, 1994, the date on which Bear Stearns removed DBCO from its clearance system (the "Post-September 22 Tapes").

The Non-Class Securities Tapes are alleged by Plaintiffs to evidence the manipulative scheme of David Blech ("Blech") and D. Blech & Co. ("DBCO") and Bear Stearns' knowledge of that scheme.

Fed.R.Evid. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence."Evidence of David Blech's financial condition, his need to bring in capital by selling off whatever liquid securities he could, and his use of controlled accounts, including the trust accounts and various other accounts, to engage in parking, prearranged wash sales, "painting the tape," and other fictitious transactions to effectuate his scheme, is relevant.

In addition, Plaintiffs seek to establish that Bear Stearns was aware of Blech's financial difficulties, concerned about the state of the collateral for the margin debt which it had advanced to Blech, DBCO, and its customers, and took steps to protect itself, including (i) demanding that Blech and DBCO reduce their debits with the knowledge that in order to do so they would have to engage in fraudulent and fictitious trades, and then clearing those trades, (ii) withholding securities from the market in order to maintain the artificially inflated price of those securities, and (iii) contriving trades to reduce the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

DBCO debt.

Because the Non-Class Securities Tapes are relevant to the common scheme alleged and Bear Stearns' knowledge, they will be admitted.

At Bear Stearns' request, a limiting instruction will be given at the time of the introduction of the Non-Class Securities Tapes that they are offered only with respect to the existence of a scheme to defraud, and that, in order to recover, the Plaintiffs must establish by separate evidence that their allegations of Blech's scheme and Bear Stearns' knowledge apply with respect to the Class Securities.

The Anonymous Caller Tapes are relevant as to Bear Stearns' knowledge and intent and are therefore admissible though not to establish the facts recounted by the caller and an instruction to that effect will be given if requested.

The Berk Tapes are admissible on the same grounds as the Non-Class Securities Tapes.

The Post-September 22 Tapes do not constitute admissions and are not relevant as to the knowledge and intent of Bear Stearns during the relevant period.

V. *Motion to Exclude Evidence Relating to Criminal and SEC Proceedings Against David Blech*

Defendant Bear Stearns has moved pretrial *inlimine* to bar admission of the plea allocution of David Blech ("Blech") in *United States v. David Blech,* 97 Cr. 0403, and the judgment entered on that allocution and the amended complaint dated September 13, 1999, the orders entered on September 23, 1999 and January 31, 2002 against Blech, Richard Silverman ("Silverman") (DBCO's head trader) and Alifehim Prodani ("Prodani") (Baird Patrick's trader) ("SEC action consent orders"), and SEC Administrative orders against Blech (*In the Matter of Blech,* Securities Exchange Act Release No. 43693, 2000 SEC LEXIS 2698 (Dec. 8, 2000)), Silverman and Prodani, *SEC v. Blech,* Litigation Release No. 17354, 2002 SEC LEXIS 292 (Feb. 6, 2002)), Joseph Septimus ("Septimus") and Suzanne Pelosi ("Pelosi") (*In the Matter of Septimus and Pelosi,* Securities Act Release No. 7695, 1999 SEC LEXIS 1310 (Jun. 30, 1999)), and Pelosi (*In the Matter of Pelosi,* Securities Act Release No. 7927, 2000 LEXIS 2720) (Dec. 13, 2000)) ("Administrative Orders").

***10** For the reasons set forth below, the motion is denied part and granted in part.

The Blech allocution admitted to the securities fraud engaged with Stanley Berk, in which stocks were "flipped" but not actually purchased, and unauthorized guarantees were submitted to extend his margin credit at Bear Stearns.

On September 13, 1999, the SEC filed an amended complaint in *SEC v. Blech,* 99 Civ. 4770, alleging that Blech, Silverman, and Prodani directly participated in a market manipulation for numerous biotechnology securities from June 1, 1994 through September 22, 1994. On September 23, 1999, Blech entered into a consent order ("Consent Order") with the SEC, which was entered as a final judgment of permanent injunction and other equitable relief by consent against David Blech on December 5, 1999 ("Final Judgment") in *SEC v. Blech,* 99 Civ. 4770. The Final Judgment enjoined Blech, *interalia,* from violating the securities laws and required Blech to disgorge $19,713,653.50, including interest. Blech expressly agreed to the Consent Order "without admitting or denying the allegations of the Commission's Complaint."On January 31, 2002, Silverman (DBCO's head trader) and Prodani (an equities and stockbroker trader at Baird Patrick) similarly consented to entry of judgments in the SEC action, entered on January 31, 2002. As with Blech, they did so "without admitting or denying the allegations of the Commission's Complaint."

On June 30, 1999, the SEC instituted administrative proceedings against Septimus, a DBCO employee, and Pelosi, DBCO's CEO and principal secretary, alleging both wilfully aided and abetted DBCO in violating the securities laws. *In the Matter of Septimus and Pelosi,* Securities Act Release No. 7695, 1999 SEC LEXIS 1310 (June 30, 1999). On December 13, 2000, pursuant to Pelosi's offer of settlement, the SEC ordered Pelosi to cease and desist from violating the securities laws and to pay a $5,000 civil penalty. Pelosi expressly consented to the order "without admitting or denying the findings" set forth therein.

On December 8, 2000, the SEC ordered, pursuant to

Blech's offer of settlement, that Blech be immediately "barred from association with any broker or dealer."*In the Matter of Blech,* Securities Exchange Act Release No. 43693, 2000 SEC LEXIS 2698, at *4 (Dec. 8, 2000). Blech expressly consented to the order "without admitting or denying the findings set forth" in the order. *Id.* at 1. On February 6, 2002, the SEC ordered Silverman suspended from associating with a broker or dealer for six months and ordered Prodani suspended from associating with a broker or dealer for nine months (the "Administrative Consent Orders"). As with the consent orders in the SEC action, both Silverman and Prodani consented to the suspensions "without admitting or denying the findings of fact" contained in the respective orders. *Id.*

Blech's allocution, a statement against his penal interest, is not hearsay. *E.g.,United States v. Wimbley,* No. 01-1048, 2000 U.S.App. LEXIS 38603, at *6 (2d Cir. Aug. 29, 2000) ("This circuit has recognized plea allocutions as statements against penal interests" and thus an exception to the hearsay rule under Rule 80(b)(3).). It also establishes the existence of that particular fraud, which is relevant to the Plaintiffs' case. It does not establish Bear Stearns' participation, in that fraud and Bear Stearns is entitled to an instruction if requested to that effect if the plea and judgment are introduced. Whether Bear Stearns was the object of the fraud or a direct participant in the fraud is an issue to be determined by trial.

***11** The statements contained in the amended complaint are inadmissible hearsay, excluded by Rules 801, 802, and 803 of the Federal Rules of Evidence. This document is not evidence of anything other than the existence of an accusation. As the Second Circuit held, a complaint is not admissible to prove the truth of its contents. *Stevenson v. Hearst Consol. Publ'ns, Inc.,* 214 F.2d 902, 907 (2d Cir.1954) ("Of course, the complaint was inadmissible as hearsay to prove the truth of its contents.").

The SEC judgments are inadmissible under Federal Rule of Evidence 408, providing:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.

Fed.R.Evid. 408. *SeealsoNew York City Dep't of Fin. v. Twin Rivers, Inc.,* 182 F.3d 900 (2d Cir.1999) (affirming the district court's exclusion of a consent judgment because it was inadmissible to prove facts related to a settling party's liability).

The plaintiffs in support of the admissibility of the Administrative orders have cited *United States v. Gilbert,* 668 F .2d 94, 97 (2d Cir.1981), for the proposition that such orders can establish knowledge or intent. Such knowledge gained at the time of the proceedings is immaterial here.

VI. *Motion for Separate Trials and Bifurcation*

Defendant Bear Stearns has moved *inlimine* pursuant to Rules 20(b) and 42(b) of the Federal Rules of Civil Procedure for a separate trial from defendants Blech, DBCO, and Baird Patrick. In the alternative, Bear Stearns requests that the Court issue a limiting instruction under Federal Rule of Evidence 105, directing the jury not to consider evidence against Bear Stearns that is admissible only against the other defendants. Baer Stearns also moves to bifurcate the issues of liability and damages in any trial involving Bear Stearns, pursuant to Rule 42(b). For the reasons stated below, Bear Stearns' motion is denied, and the requested instruction will be given.

A. *Separate Trial for Bear Stears Legal Standard*

Under Federal Rule of Civil Procedure 42(b), courts have the authority to grant a separate trial "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy."Likewise under Federal Rule of Civil Procedure 20(b), courts can sever a trial in order to "prevent a party from being embarrassed, delayed, or put to expense by the inclusion of a party against whom the party asserts no claim and who asserts no claim against the party."

In deciding whether to grant bifurcation or severance of a trial, courts do not apply a bright line rule, but "rather engage in a balancing test."*Lennon v.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Seaman,* 99 Civ. 2664(LBS), 2002 U.S. Dist. LEXIS 1237, at *34 (S.D.N.Y. Jan. 28, 2002). Factors generally considered include:

***12** (1) whether the issues sought to be tried separately are significantly different from one another; (2) whether the severable issues require the testimony of different witnesses and different documentary proof; (3) whether the party opposing the severance will be prejudiced if it is granted; and (4) whether the party requesting the severance will be prejudiced if it is not granted.

*Martinez v. Robinson,* No. 99 Civ. 11911(DAB)(JCF), 2002 U.S. Dist. LEXIS 4454, at *5 (S.D.N.Y. March 18, 2002) (quoting *Lewis v. Triborough Bridge & Tunnel Auth.,* No. 97 Civ. 0607(PKL), 2000 U.S. Dist. LEXIS 4982, at *4-5 (S.D.N.Y. April 19, 2000).

Nonetheless, "separate trials remain the exception rather than the rule."*Lewis,* 2000 U.S. Dist. LEXIS 4982, at *5 (same); *Bowers v. Navistar Int'l Transp. Corp.,* No. 88 CIV 8857(SS), 1993 U.S. Dist. LEXIS 6129, at *6 (S.D.N.Y.1993) (same); *Monaghan v. SZS 33 Assocs., L.P.,* 827 F.Supp. 233, 245 (S.D.N.Y.1993) (same).*See also*Fed.R.Civ.P. 42(b), advisory committee note (explaining that "separation of issues for trial is not to be routinely ordered"). As courts have repeatedly stated, "the presumption is that all claims in a case will be resolved in a single trial, and 'it is only in exceptional instances where there are special and persuasive reasons for departing from this practice that distinct causes of action asserted in the same case may be made the subject of separate trials." ' *Martinez,* 2002 U.S. Dist. LEXIS 4454, at *5-6 (quoting *Miller v. American Bonding Co.,* 257 U.S. 304, 307 (1921)); *Lewis,* 2000 U.S. Dist. LEXIS 4982, at *5-6 (same); *seealsoBowers,* 1993 U.S. Dist. LEXIS 6129, at *5 ("The piecemeal trial of separate issues in a single suit is not to be the usual course."); *Phillips v. Lenox Hill Hosp.,* No. 86 Civ. 1026(RWS), 1986 WL 12512, at *1 (S.D.N.Y. Oct. 24, 1986) ("[C]ourts have emphasized that separate trials should not be ordered unless such a disposition is clearly necessary."); *Monaghan,* 827 F.Supp. at 246 (highlighting "the fundamental presumption which favors the trial of all issues to a single jury and underlies the assumption of Rule 42(b) that bifurcation ... is reserved for truly extraordinary situations of undue prejudice"). This is the case because "generally efficient judicial administration favors having only one trial whenever possible." *Id.* at 245 (citation omitted).

In a motion for severance or bifurcation, the moving party bears the burden of establishing that "separate trials are necessary to prevent prejudice or confusion and serve the ends of justice."*Bowers,* 1993 U.S. Dist. LEXIS 6129, at *7; *Lennon,* 2002 U.S. Dist. LEXIS 1237, at *33 (same); *Martinez,* 2002 U.S. Dist. LEXIS 4454, at *6 ("[T]he burden is on the party seeking bifurcation to demonstrate that it is warranted."). Here, Baer Stearns does not sufficiently establish the distinctiveness of the issues and evidence at stake and the prejudice it would suffer from a single trial.

*Overlapping Issues and Evidence*

***13** Separate trials are not appropriate when "issues, witnesses and documentary evidence overlap."*Bowers,* 1993 U.S. Dist. LEXIS 6129, at *8; *Monaghan,* 827 F.Supp. at 245 ("[T]he court may find bifurcation to be inappropriate where the issues, witnesses and documentary evidence central to both claims overlap...."). This is the case because it is a "waste of judicial resources to have to rehash factual issues."*Lewis,* 2000 U.S. Dist. LEXIS 4982, at *8. Courts have recognized that "[n]early every trial involving multiple defendants will involve some separate issues of fact that call for testimony from different witnesses on entirely unrelated matters."*Id.* at *10. However, the question in a severance or bifurcation motion is "whether separate trials will require *substantial* overlap of witnesses or documentary proof."Id. (emphasis added); *Phillips,* 1986 WL 12512, at *2 (focusing on the existence of a "significant overlap of evidence").

In the present case there is "significant evidentiary overlap" in the issues against Bear Stearns and Baird Patrick. *Lewis,* 2000 U.S. Dist. LEXIS 4982, at *10. Plaintiff is attempting to show that "Bear Stearns' financial interest and participation in DBCO's trading of Blech Securities" was "connected to the manipulative conduct by Baird Patrick of the market in Blech Securities."(Pls.' Mem. at 7.) As both Bear Stearns and Baird Patrick were financially bound to the market in Blech Securities, much of the documentary evidence and testimony proffered by the Plaintiffs against them overlaps.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

For instance, the notes authored by Michelle Kristel, a member of DBCO's compliance department, will be brought by Plaintiffs to prove their claims against both Bear Stearns and Baird Patrick. According to Ms. Kristel's notes, Bear Stearns in July of 1994 had substantially increased DBCO's margin requirements by 25%, while DBCO and Baird Patrick were heavily trading in the Blech Securities. (Block Aff., Ex. B at 52.)

Furthermore, although the memorandum by John Benesch, dated April 19, 1994 (Block Aff., Ex. A) does not expressly refer to Bear Stearns, it bears on the "knowledge and activity" of Bear Stearns. *In re Blech Sec. Litig.*, No. 94 Civ. 7696(RWS), 2002 U.S. Dist. LEXIS 19835, at *34 (Oct. 17, 2002). Moreover, Mr. Benesch was involved in numerous communications with Bear Stearns' employees regarding trading in Blech Securities, and Mr. Benesch was the contact person for Bear Stearns in connection with certain of the initial offerings of Blech securities. (Trinko Decl., Ex. A, Aug. 13 1997 Benesch Tr. at 78, 145, 158.) Plaintiffs intends to call Mr. Benesch, Ms. Kristel, "as well as other former employees or associates of Belch and DBCO," as "material witnesses" against both Bear Stearns and Baird Patrick. (Pls.' Mem. at 11.)

Plaintiff's expert witnesses base their opinions on evidence that involves the acts of both Baird Patrick and Bear Stearns. Nye, for instance, relies on the database of Bear Stearns in extrapolating the amount of Plaintiffs' damages arising from its claims for relief against both defendants. (Nye Expert Report at 11). The testimony of Berg will address the trades effectuated by Stanley Berk, whose testimony would also be required at both the trials of Baird Patrick and Bear Stearns. Thus, Plaintiffs' claims against Bear Stearns and Baird Patrick present "far from two distinct and separate claims involving substantially different sets of witnesses."*Bowers*, 1993 U.S. Dist. LEXIS 6129, at *4 (holding that two claims are "fundamentally intertwined" when "necessitating extensive testimony by the same factual and expert witnesses").

*No Undue Prejudice*

***14** Baird Stearns further would not suffer from "undue prejudice" from a single trial with Baird Patrick. *Pavone v. Gibbs*, No. CV 95-0033, 1997 U.S. Dist. LEXIS 16530, at *5 (E.D.N.Y. Sep. 29, 1997) (denying a severance motion since "Defendants have made no showing of undue prejudice"); *Monaghan*, 827 F.Supp. at 246 (holding that record did not support granting of Rule 42(b) since movant failed to prove "undue prejudice").

In its motion papers, Bear Stearns refers to three categories of evidence that would result in "significant risk of jury confusion and prejudice": internal DBCO documents; communications (and spreadsheet) of Blech's co-conspirator, Stanley Berk; and Baird Patrick communications. (Bear Stearns Mem. at 4.) However, Bear Stearns only provides three limited excerpts from the "more than 350 potential trial exhibits" (Bear Stearns Mem. at 1) as its sole ground for severance of the trial in this action. (Bear Stearns Memo. at 5). These three examples exhibit nothing "truly extraordinary" so as to warrant Rule 42(b) relief. *Monaghan*, 827 F.Supp. at 246. Furthermore, "when the claims, witnesses and evidence overlap, no prejudice is visited upon the parties by joint trial of the claims. This is so because the evidence on one claim is relevant and necessary to establish an independent but interrelated claim against another party to the lawsuit."*Bowers*, 1993 U.S. Dist. LEXIS 6129, at *9 (citation omitted).

In the criminal context, courts have recognized that guilt by association and spillover prejudice is less likely when there is a "reasonable number of defendants." *United States v. Dacunto*, No. 00 Cr. 620(AGS), 2001 U.S. Dist. LEXIS 42, at *7 (S.D.N.Y. Jan. 4, 2001). As this Court has explained, "When many defendants are tried together in a complex case and they have significantly different levels of culpability, the risk of prejudice is heightened ."*Id.* at 9.; *see also*United States v. Berger, 224 F.3d 107, 116 (2d Cir.2000) (noting that "any prejudicial spillover was limited, given the relatively small number of defendants and the fact that most or all of them were involved in the major frauds"). In the present case, jury confusion is less likely since there are only two active defendants.

Finally, as Bear Stearns suggests, a Rule 105 instruction, providing a jury with appropriate guidance, can cure potential "spillover prejudice" from trial testimony concerning Baird Patrick. (Bear Stearns Mem. at 10.) As held by *Lewis v. Triborough*

*Bridge & Tunnel Authority,*"any prejudice or confusion can be remedied by a carefully drafted jury instruction." 2000 U.S. Dist. LEXIS 4982, at *14; *see alsoDayton Monetary Assocs. v. Donaldson Lufkin & Jenrette Sec. Corps*, 1999 U.S. Dist. LEXIS 3254, at *17-18 (S.D.N.Y. Mar. 19, 1999) ("[R]isk [of spillover prejudice] can be eliminated through appropriate jury instructions and does not necessitate a separate trial.").

*Request for Limiting Instruction Will Be Given as Necessary*

***15**Federal Rule of Evidence 105 states the following: "When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly."*See alsoUnited States v. Downing,* 297 F.3d 52, 59 (2d Cir.2002) (holding that a limiting instruction directing the jury to consider evidence admissible only against one defendant and not the other was appropriate).

However, "[a] request for a limiting instruction should be specific and timely."*United States v. Thirion,* 813 F.2d 146, 155 (8th Cir.1987). As the commentary to the Federal Rules of Evidence explains, "[T]he request should be pinpointed to meet the problematic evidence ... [I]f the objection is only to a single statement, the requested instruction should focus the jury on the problematic statement, rather than to the witness' testimony as a whole."U.S.C.S. Fed. Rules Evid., R. 105, Commentary (2002). In each instance, "[s]hould a concrete instance of [jury] confusion [later] arise, the Court may take remedial action, including issuing curative instructions."*HCC, Inc. v. RH & M Machine Co.,* No. 96 Civ. 4920(PKL), 1998 U.S. Dist. LEXIS 18968, *4 (S.D.N.Y. Dec. 4, 1998).

B. *Bifurcation Between Liability and Damages*

Likewise, Bear Stearns' request to bifurcate the liability and damage phases of the trial is denied since there is overlapping evidence and no undue prejudice.

*Overlapping Issues and Evidence*

In this case, the "issues of liability and damages are intertwined,"*P.K. Vichare v. Ambac Inc.,* 106 F.3d 457, 466 (2d Cir.1996) (denying bifurcation due to overlapping liability and damage issues in a Title VII discrimination suit), resulting in "an inevitable overlap of witnesses and documentary evidence central to both ... claims."*Monaghan,* 827 F.Supp. at 246 (denying bifurcation due to overlapping liability and damage evidence in a personal injury suit). Plaintiffs will be compelled to recall both of its expert witnesses, as well as reintroduce the documentary evidence upon which their opinions are based, should Plaintiffs be required to separately litigate the issue of damages after a jury trial is held on the issue of liability.

Courts grant bifurcation when it would "limit or streamline the remaining issues."*Lewis,* 2000 U.S. Dist. LEXIS 4982, at *12; *Dayton Monetary Assocs.*, 1999 U.S. Dist. LEXIS 3254, at *16 (same). Such streamlining can only take place "where the need to examine the same witnesses in both phases of the separated trial would be at a minimum."*HCC, Inc.*, 1998 U.S. Dist. LEXIS 18968, at *2. Otherwise, "duplicative testimony and redundant assessment of factual issues would be inefficient, reducing rather than increasing judicial economy."*Id.* at 6 (holding that the plaintiff's statutory and common law unfair competition and tortious interference claims, in this patent infringement case, would likely include testimony on liability relevant to damage issues).

*No Undue Prejudice*

***16** Bear Stearns fails to make a showing of undue prejudice that would result from an a single trial on both liability and damages issues. At most, Bear Stearns argues, "The jury's consideration of Bear Stearns' intent, knowledge, and actions during the relevant time period should not be cluttered by evidentiary digressions into specific damage issues for each of the Blech Securities."(Bear Stearns Mem. at 13.) Bear Stearns thus does not overcome the "fundamental presumption which favors the trial of all issues to a single jury,"*Monaghan,* 827 F.Supp. at 246, and that a single jury, with appropriate guidance from the Court, will be able to differentiate the issues of liability and damages.

VII. *Motion to Modify the Court's Class Certification*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Order and Exclude Certain Evidence*

Defendant Bear Stearns has moved, pursuant to Rule 23 of the Federal Rules of Civil Procedure, to amend the Court's May 11, 1999 Class Certification Order (the "Class Order") and has moved *in limine* to exclude certain related evidence from the trial of this action. For the reasons stated below, Bear Stearns' motion is granted in part and denied in part.

Rule 23(c)(1) of the Federal Rules of Civil Procedure gives the Court the discretion to amend the Class Order. It states: "An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits."*Seealso*Fed. R. Civ. Proc. 23(d) (giving the Court broad discretion to make appropriate orders in class actions).

The Class Period is amended to commence on March 1, 1994, as agreed by both parties. (Pls.' Br. at 1 n. 1; Bear Stearns' Br. at 6.) Plaintiffs allege no damages prior to March 1, 1994. Plaintiffs' damage expert defines the "Damages Period" as March 1, 1994 through September 24, 1994 (Block Aff. Ex. F (Nye Report) ¶ 3) and calculates his estimate of damages based on that period (*Id.* ¶¶ 27-32, Ex. 4). He testified that he used March 1, 1994 as the starting date for damages in accordance with his instructions from Plaintiff's counsel and with "my understanding of the Court ruling."(Block Aff. Ex. G (Nye Tr.) at 52). Plaintiffs further agree that Bear Stearns was not the exclusive clearing broker to D. Blech & Co., Inc. ("DBCO") until March 1994. The amended Class Period is thus March 1, 1994 to September 21, 1994.

The definition of Blech Securities is also amended to cover only those securities for which Plaintiffs are seeking damages. Bear Stearns has moved to have the term, "Blech Securities," which is currently defined to include the securities of 22 companies, amended to eliminate the 7 securities as to which Plaintiffs have stated they will not be seeking damages. (Pls.' Rule 56.1 Statement ¶ 2). Plaintiffs agree in their opposition to this requested modification (Pls.' Br. at 1 n. 1), consistent with the Court's ruling on Bear Stearns' motion for summary judgment. *SeeIn re: Blech Sec. Litig.*, No. 94 Civ. 7696(RWS), 2002 WL 31356498, at *2 (S.D.N.Y. Oct. 17, 2002).

***17** Since Bear Stearns' alleged actions occurred only in the secondary markets, the Court rules that persons who purchased in the primary markets cannot recover against Bear Stearns. Bear Stearns was not an underwriter of the Blech Securities, and the Complaint alleges "no interrelationship ... between the manipulations of primary market and that of the secondary market."(Block Aff. Ex. C (Class Order) at 19.) Furthermore, as Berg, Plaintiffs' own liability expert has testified, Bear Stearns did not direct the price of any IPO, and no connection has been established between the IPOs and Bear Stearns' debit reduction requests. (Block Aff. Ex. H (Berg Tr.) at 208-209.) Bear Stearns is thus only liable to members of the subclass for secondary market transactions, beginning no earlier than March 1, 1994.

All named representative who did not purchase Blech Securities at issue in this case, or who did not submit documentation as proof of their purchases, are dismissed from the case. Four of the named PlaintiffsStephen B. Ehrlich, Timothy D. Peykes, Robert Libauer, and James Wrightare dismissed from the case because they purchased only shares of the Blech Securities that are no longer at issue. (Block Aff. Ex. A (Compl.) at ¶¶ 13-14, 23-24. Three other PlaintiffsAbraham Garfinkel, Raizy Levitin, and Edward Mehfarare dismissed as class representatives for failure to produce documents demonstrating that they purchased any Blech Security.

With the removal of these seven class representatives, there are six Blech Securities, which have no named plaintiff as a class representative. However, since seven named representatives remain, they can adequately represent the interests of persons who purchased Advanced Surgical, Ecogen, Guilford Pharmaceuticals, Microbe, Neoprobe, and Pharmos. As previously held in granting class certification, although Plaintiffs did not purchase all 22 Blech Securities during the class period, Plaintiffs' claims to all Blech Securities "more than satisf[ied] the typicality requirement."*In re Blech Sec. Litig.*, 187 F.R.D. 97, 105 (S.D.N.Y.1999). This is the case because the typicality requirement of Rule 23(a)"does not require that the situations of the named representatives and the class members be identical,"*In re NASDAQ*, 172 F.R.D. 119, 126 (S.D.N.Y.1997), or "co-extensive interests between the representative parties and members of the class."*Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y.1981). It is only necessary that they arise "from the same course of events" and

that each class member make "similar legal arguments to prove the defendant's liability."*In re Blech Sec. Litig.*, 187 F.R.D. at 105 (quoting *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.1992).*See also**Tedesco v. Mishkin*, 689 F.Supp. 1327, 1335-36 (S.D.N.Y.1988) ("[I]t is not necessary for the named Plaintiffs to have invested in all of the investment vehicles" when "the supplemental amended complaint alleges a single pattern of fraud. The named Plaintiffs' claims arise out of that scheme, which also gives rise to the claims of the other class members. Further, the claims of the named Plaintiffs and class members are based on identical legal theories."). Thus, there need not be a class representative for every Blech security, as long as all the securities are part of a common fraudulent or manipulative scheme.

*BAIRD PATRICK'S MOTIONS*

VIII *Baird Patrick's motion to exclude Blech's plea Allocution and the amended complaint in the SEC Proceedings against Blech*

***18** Defendant Baird Patrick has moved *in limine* to exclude Blech's plea allocution and the amended complaint in the SEC proceedings against Blech. Baird Patrick's motion is denied in part and granted in part in accordance with Section V of this opinion, dealing with Bear Stearns' motion to exclude evidence relating to the U.S. Attorney's Criminal Proceedings and the SEC's Proceedings against Blech. Thus, Blech's plea allocution will not be excluded, while the amended complaint in the SEC proceedings against Blech will be excluded.

*EXPERT WITNESSES*

The standard for the admissibility of expert testimony at trial is set forth in Federal Rule of Evidence 702:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the case.

Fed.R.Evid. 702.

The standard was the subject of extensive analysis by the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). The Supreme Court directed that "the trial judge is to act as a 'gatekeeper' with respect to expert testimony to ensure that such testimony is both relevant and reliable."*Primavera Familienstifung v. Askin*, 130 F.Supp.2d 450, 522 (S.D.N.Y.2001) (citing *Daubert*, 509 U.S. at 589-591). Thus, "[t]he determination as to the relevance and reliability of such evidence is committed to the sound discretion of the trial court.").*Id.* In *Kumho Tire Co. v. Carmichael,* the Supreme Court clarified that this gatekeeper function applies to all expert testimony, not just scientific testimony. 526 U.S. at 147 (explaining that Rule 702 makes "no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge. It makes clear that any such knowledge might become the subject of expert testimony.").

The Supreme Court proceeded to provide district courts with a checklist for assessing the reliability of expert testimony. This list of "specific factors" "neither necessarily nor exclusively applies to all experts or in every case."*Kumho Tire*, 526 U.S. at 141. Listed considerations include whether an expert's theory can be tested, "whether the theory or technique has been subjected to peer review and publication,""the known or potential rate of error", and "general acceptance" *Daubert*, 509 U.S. at 593-594. As repeatedly stressed, the "list of factors was meant to be helpful, not definitive."*Kumho Tire*, 526 U.S. at 151. *See also**Daubert*, 509 U.S. at 594 ("The inquiry envisioned by Rule 702 is, we emphasize, a flexible one."); *Amorgianos v. AMTRAK*, 303 F.3d 256, 266 (2d Cir.2002) ("[T]he *Daubert* inquiry is fluid and will necessarily vary from case to case."). Thus, "[t]he trial court is to use its discretion to determine what are reasonable criteria of reliability and whether the proposed testimony meets those criteria based on the peculiarities of the case before it."*Primavera*, 130 F.Supp.2d at 522.

***19** However, "[t]he Rules' basic standard of relevance ... is a liberal one,"*Daubert*, 509 U.S. at 587, and "the district court's *Daubert* gatekeeping role does not permit the district court, in ruling on

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

evidentiary sufficiency, to reject admissible expert testimony."*Amorgianos,* 303 F.3d at 267-268. As the Advisory Committee noted, "A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."Fed.R.Evid. 702, Advisory Comm. Notes.

This case is complicated by the fact that the parties have not contended that there is an accepted methodology for determining liability and calculating damages in market manipulation cases. Market behavior is not as objectively ascertainable as reactions in the world of physical science. As the Advisory Committee to Rule 702 recognized, "Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others. Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise."Fed.R.Evid. 702, Advisory Comm. Notes.

Nonetheless, expert testimony is especially appropriate in this case. The Advisory Committee Notes to Rule 702 instruct, "There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute."Here, proper testimony is for an expert familiar with the market to explain terms and practices that a lay jury would not understand. As the Second Circuit stated, "Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts."*United States v. Bilzerian,* 926 F.2d 1285, 1294 (2d Cir.1991); *United States v. Russo,* 74 F.3d 1383, 1395 (2d Cir.1996) (same). Furthermore, "it is proper for an expert to testify as to the customs and standards of an industry, and to opine as to how a party's conduct measured up against such standards."*Primavera,* 130 F.Supp.2d at 529. Thus, experts in this case can testify that particular practices deviate from the norm, what effects they may have on the market, and whether Bear Stearns or Baird Patrick would have been aware of these effects.

I. *Plaintiffs' Motions against Defendants' Experts*

_____ A. *Fischel*

Bear Stearns' expert witness, Fischel, is qualified to testify. Fischel has presented similar types of analyses in the past. *E.g.,AUSA Life Ins. v. Ernst & Young,* 119 F.Supp.2d 394, 401-402 (admitting Fischel's testimony in securities fraud case) (S.D.N.Y.2000); *Endo v. Albertine,* 863 F.Supp. 708, 723-724 (N.D.Ill.1994) (admitting Fishel's testimony regarding causation). A law professor at the University of Chicago, who has written and lectured on economic issues relating to the law for a number of years, Fischel can bring to bear knowledge and expertise in economic matters that can assist the jury in evaluating Nye's analysis.

***20** Courts have often allowed expert testimony for the sole purpose of critiquing and thereby helping to explain the work of an expert witness retained by another party. *E.g.,Fryniarz v. Nike, Inc* ., No. 00 Civ. 2623(NRB), 2002 WL 1968351, at *2 (S.D.N.Y. Aug. 23, 2002) (allowing testimony of an expert who pointed out flaws in the opposing party's expert study); *Bicardi & Co., Ltd. v. New York Lighter Co., Inc.,* No 97-CV-7140 (JS VVP), 2000 WL 298915, at *6 (E.D.N.Y. Mar. 15, 2000) (admitting testimony of a critiquing expert in a trademark infringement case).

Fischel's liquidity theory, positing that the price of Blech Securities plummeted because the market became illiquid when Blech dropped out of the market, is a proper hypothesis for the jury's evaluation. "When a trial court ... rules that an expert's testimony is reliable, this does not necessarily mean that contradictory expert testimony is unreliable."Fed.R.Evid. 702, Advisory Comm. Notes. In this case, the jury can best form a judgment when presented with the two experts' competing theories.

However, further voir dire is necessary for Fischel to properly explain his calculations to the Plaintiffs. In their briefs, Plaintiffs indicate that they have repeatedly requested the materials and information on which Fischel based his calculations, but they have yet to receive a response. (Pls.' Br. at 3-4 (indicating that requests were issued on March 19, 2002; October 28, 2002; November 12, 2002; November 26, 2002).)

Finally, the inaccuracy in Fischel's Exhibit D must be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

corrected. Only one of the Blech SecuritiesNeoprobeincreased by an amount greater than the 3.90 return that Exhibit D purports to show for the portfolio of all fifteen securities. This security had a return of 5 .16. Exhibit D must, therefore, indicate that this return is only true for one stock, not all fifteen, and it must specify the stock by name.

__________ B. *Buchanan*

Beard Patrick's expert, Buchanan, is also qualified to testify. Although he has no prior court qualifications, he has testified as am expert witness in SEC and NASD proceedings. (Baird Patrick's Br. at 9; Buchanan *Curriculum Vitae* ) He has further acquired specialized knowledge of the stock brokerage industry through forty years of experience in almost all areas of business, including back office operations; sales, trading, syndicate operations; and senior management and ownership. *Id.* As the Advisory Committee Notes to Rule 702 explain, "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."*See alsoPrimavera*, 130 F.Supp.2d at 523 (holding that an expert witness with extensive background and qualification in economics and in the analysis of securities prices and interest rates could qualify as an expert in the area of CMO prices).

***21** Buchanan can testify as to what ordinary broker activity entails and as to the customs and practices of the industry. However, he cannot conclude that Baird Patrick's trades were proper. First, his knowledge of Baird Patrick's trading activities is based almost exclusively on their trading records. (Buchanan Tr. at 28-29.) He engaged in no express methodology to reach his conclusions and admitted that he never discussed Baird Patrick's trading in Blech Securities with Prodani.

Furthermore, Buchanan's conclusion that Baird Patrick did not engage in parking or other stock manipulation improperly impinges upon the roles of the court and jury. Such "inappropriately drawn conclusions regarding the legal significance of various facts" has been rejected by the Southern District Court and Second Circuit. *Media Sports & Arts S.r.L. v. Kinney Shoe Corp*, No. 95 Civ. 3901(PKL), 1999 U.S. Dist. LEXIS 16035, at *6 (S.D.N.Y. Oct. 19, 1999); *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505 (2d Cir.1977) (rejecting an expert witness's testimony for going beyond a business's common practice). Buchanan can testify from the records that there was a delay in settling the trade by Wexford Clearing, Baird Patrick's clearing firm, and what in his opinion the delay might have caused. However, he cannot determine the legal significance of documentary evidence. This is the case because "[a]lthough an expert may opine on the ultimate issue of fact, she 'may not give testimony stating ultimate legal conclusions based on those facts," 'which are in the jury's realm to decide. *Media Sport*, 1999 U.S. Dist. LEXIS 16035, at *4 (quoting *Bilzerian*, 926 F.2d at 1294. Baird Patrick itself agrees that "Buchanan should only opine on the ultimate issues of fact," and "[t]o the extent that his report goes to ultimate legal issues, trial counsel will avoid questions that go to opinions of ultimate legal issues." (Baird Patrick's Br. at 12.)

Buchanan's opinion as to Berk's credibility is likewise improper and has no probative value for the jury. *SeeUnited States v. Scop*, 846 F.2d 135, 142 (2d Cir.1988) ("The credibility of witnesses is exclusively for the determination by the jury."). In both his Report and testimony, Buchanan repeatedly draws conclusion from his interpretation of the "tenor" and "tone" of the witnesses' deposition testimonies. (Buchanan Report at 9; Buchanan Tr. at 120.) This subjective review of evidence is improper. *Kumo Tire Co.*, 526 U.S. at 155 (expressing "concern" at the "subjectiveness" of the witness's "mode of analysis"). Furthermore, the fact that the expert witness had read someone else's deposition would not give him "personal knowledge of the underlying facts."*Pretter v. Metro N. Commuter R.R. Co.*, No. 00 Civ. 4366(JSR), 2002 U.S. Dist. LEXIS 18332, at *5 (S.D.N.Y. Sept. 30, 2002). Thus, as repeatedly held, "evidence is not helpful if it draws inferences or reaches conclusions within the jury's competence or within the exclusive function of the jury."*Nichols v. Am. Nat'l Ins. Co.*, 154 F.3d 875, 883 (8th Cir.1998).*See alsoPrimavera*, 130 F.Supp.2d at 528 (stating that an expert opinion should not be admitted "where it would merely tell the jury what result to reach.").

***22** Finally, Buchanan's opinion, that Baird Patrick could not have been a control person for the purpose of federal securities violations, is unfounded and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

inadmissible. Buchanan has no personal or specialized knowledge as to Baird Patrick's operations or seating arrangements. There is "simply is too great an analytical gap" between Buchanan's general experience in the industry and his conclusion on the control issue. *Lippe v. Bairnco Corp.,* No. 96 Civ. 7600(DC), 2003 U.S. Dist. LEXIS 1133, at *16 (S.D.N.Y. Jan. 28, 2003) (quoting *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997)).

II. *Defendants' Motions against Plaintiffs' Experts*

A. *Berg*

Berg is qualified to testify as an expert witness. He has thirty years of experience in the securities industry, including executive positions at major securities firms. Furthermore, he has a substantial background as a testifying expert at depositions, arbitration hearings, and in court. He was qualified as an expert in securities matters on at least nine occasions, and he has testified on clearing house issues in at least seven arbitration matters. (Pls .' Br. at 3-4.) *See alsoCohen v. J.B. Oxford & Co., Inc.,* No. C-1-02-571, slip op. at 6 (S.D.Ohio Oct. 9, 2002).

The Defendants general attack on Berg's methodology is unsuccessful. There is no established methodology for determining liability in market manipulation cases, and Berg's report has a "traceable, analytical basis in objective fact."*Primavera,* 130 F.Supp.2d at 522 (quoting *Bragdon v. Abbott,* 524 U.S.624, 653 (1998)). The materials reviewed by an expert and the expert's background and experience provide further indicia of reliability. As held in *SEC v. U.S. Envtl., Inc.,* No. 94 Civ. 6608(PKL)(AJP), 2002 WL 31323832, at *3 (S.D.N.Y. Oct. 16, 2002):

Since the conclusions which Lowry [the expert] arrives at are based on his analysis of the trading records and other documents provided to him, and the process of comparing information contained therein with his knowledge of the standard practices of the securities industry, the reliability of his testimony can be sufficiently evaluated by inquiring into Lowry's thirty years of experience as a regulator, compliance director, and securities consultant, as well as his experience testifying as an expert in approximately 30 securities actions.

Berg, likewise, has thirty years of experience in the securities industry (Berg Bear Stearns' Report at 2-3; Berg Tr. at 8-33), and he based his analysis on Bear Stearns' trading database and the trading records, deposition testimonies, and telephone transcripts provided to him. (Pls.' Br. at 14-15.)

In his report, Berg discusses the clearing industry, its standards and practices, and the role of a clearing broker. (Berg Bear Stearns Report at 9-18.) This testimony is certainly admissible and helpful to a jury.

However, Berg cannot testify as to legal conclusions. "Although an expert may opine on the ultimate issue of fact, she 'may not give testimony stating ultimate legal conclusions based on those facts." ' *Media Sport,* 1999 U.S. Dist. LEXIS 16035, at *4 (quoting *Bilzerian,* 926 F.2d at 1294). This is the case because "[e]xpert evidence should not be permitted to 'usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Primavera,* 130 F.Supp.2d at 528 (quoting *GST Telecomm., Inc. v. Irwin,* 192 F.R.D. 109, 110 (S.D.N.Y.2000). Thus, in securities cases, the use of expert testimony must be "carefully circumscribed," *Bilzerian,* 926 F.2d at 1294, and experts are not to improperly use specific statutory and regulatory language, such as "manipulation" and "scheme to defraud" to describe the defendants' actions.*Scop,* 846 F.2d at 139-140.

***23** Berg, therefore, cannot simply state that he knows the market was manipulated. He can, however, point to factors indicating to him that market manipulation occurred, testify as to Bear Stearns' practices, and provide his reasoning as to why he believes they were manipulative. Rather than asserting, "Bear Stearns actively engaged in manipulative conduct aimed at directly affecting the market prices of the Blech Securities" (Berg Bear Stearns Report at 6), Berg should describe the evidence indicating that Bear Stearns' actions were manipulative. He cannot conclude, "Bear Stearns knowingly directed material components of a complex, concealed manipulative scheme to artificially inflate and maintain the market prices for Blech Securities during the time in which it acted as the clearing form [sic] for DBCO."(Berg Bear Stearns Report at 40-41.) Instead, he should limit himself to explaining why he believes that Bear

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Stearns's had knowledge that there did not exist a viable market for Blech Securities and that it acted upon this knowledge.

Similarly, it is an issue for the jury's determination: whether downsizing debit balances led to sham transactions. It is thus improper for Berg to state that Bear Stearns "continuously and systematically directed DBCO to reduce its debit balances with the knowledge that it would result in manipulative trading in Blech Securities, and then financed and cleared such trades."(Berg Bear Stearns Report at 30.) However, Berg can testify to industry practice with respect to reducing debt.

Thus, it is crucial that Berg provide specific factual support in the record for his opinions. *See**Three Crown L.P. v. Salomon Bros., Inc.*, 906 F.Supp. 876, 893-894 (S.D.N.Y.1995). As the Court has previously noted, "noting in either *Daubert* or the Federal Rules of Evidence requires a District Court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."*Primavera,* 130 F.Supp.2d at 524-525 (quoting *Joiner,* 522 U.S. at 146).

Berg needs to limit his testimony to specific transactions, indicating the existence of market manipulation. General statements without adequate factual support are inadmissible. Berg admits his report does not identify the specific transactions he contends were manipulated in Blech controlled accounts. (Berg Tr. at 156.) Berg further does not provide any written record summarizing or listing the manipulative trades executed in response to any of the twenty "mandates" he identifies. (Berg Tr. at 163-185.) Without linking the debt mandates to particular trades or categories of trade, the testimony is inadmissible. Berg may, however, testify as to his understanding of the effect of debt mandates.

Additionally, without reference to specific exhibits, Berg may not testify that Bear Stearns had knowledge that the IPO market was manipulated. He may testify on the effect of the receipt of IPO fees on the relationship between DBCO and Bear Stearns.

***24** Likewise, Berg needs to identify the specific source documentation for his statements about collateral swaps. (Berg Tr. at 288-289.)

In terms of painting the tape, or creating sham transactions to inflate a price, Berg cannot testify without reference to specific statements or exhibits that Bear Stearns "knew that DBCO was executing tape-painting trades to meet its demands."(Berg Bear Stearns Report at 32.) But, he can testify to any facts that lead to the conclusion that the tape was painted, and that Bear Stearns was aware of it.

Berg does not provide adequate evidence of impropriety by Mr. Shulman ("Shulman") of Bear Stearns. Berg could not identify the source of the documentation for his conclusions that Schulman monitored the accounts in which fraudulent trading was occurring, and he admitted that he could not recall if Shulman "monitored a specific trade." (Berg Tr. at 228.)

In terms of Bear Stearns' "withholding of supply," Berg's testimony is adequately supported. He can testify with regards to the specific securities he referencesHemaSure and Bioseptra. (Berg Bear Stearns Report at 33-34.) Furthermore, he provides supporting documentation for his statements. *E.g.* referencing statements by Joseph Gottlieb from recorded internal telephone conversations (Berg Bear Stearns Report at 33.)

Berg may testify as to any specific instances in which he believes Bear Stearns "violat[ed] Reg. T for purposes of parking and free riding in Blech Securities" (Berg Bear Stearns Report at 9), the basis for that belief, and the effect that such violations had on the relationship between DBCO and Bear Stearns.

Berg's testimony about "red flags," such as excessive day breaks, is acceptable. (Berg Bear Stearns Report at 27). Berg may identify the factors, which he believes indicate market manipulation by Blech and DBCO. Although Bear Stearns may have had no legal and contractual obligation to investigate these "red flags," their existence presents circumstantial evidence of Bear Stearns' scienter, or knowledge of Blech's and DBCO's trading activities. As held in *Blech IV,* even if Bear Stearns performed all the functions assigned to it as a clearing broker, liability can still attach if "these functions were performed knowingly in such a manner as to enhance the Blech market manipulation scheme."*In re Blech Sec. Litig.,* 2002 WL 31356498, at *6.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Berg's testimony should not be excluded as unfairly prejudicial to Bear Stearns. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...."Fed.R.Evid. 403. In conducting this balancing test, "the general rule is that the balance should be struck in favor of admission."*United States v. Dennis,* 625 F.2d 782, 797 (8th Cir.1980).*See also**Daubert,* 509 U.S. at 587 ("The Rules' basic standard of relevance ... is a liberal one.").

B. *Nye*

***25** As an initial matter, Nye is qualified to testify as an expert witness. He has an extensive background as a financial economist and 22 years of experience as a consultant and expert witness in the areas of market efficiency, materiality, causation, and damages in securities actions. He has testified as an expert witness in more than 100 cases and is currently the President of Stanford Consulting Group, Inc., which provides research and consulting services in financial economics. (Nye Report ¶ 1.)

Under Federal Rule of Evidence 702, in order to admit expert testimony, the trial court must first determine that "the testimony is the product of reliable principles and methods" and that "the witness has applied the principles and methods reliably to the case."Fed.R.Evid. 702. This assessment of reliability requires the court to "determine whether the expert testimony has 'a traceable, analytical basis in objective fact.' " *Primavera,* 130 F.Supp.2d at 522 (quoting *Bragdon,* 524 U.S. at 653). This is the case here. There is no established way of calculating damages in market manipulation cases against which to check Nye's methodology. However, Nye provides the rationale and basis for his calculations and the back-up data to support them. He applies established econometric techniques and regression analysis that have been subject to peer review and have a quantifiable rate of error. *See**Daubert,* 509 U.S. at 593-594. His testimony is thus "grounded in an accepted body of learning or experience in the expert's field," and he explains "how the conclusion is so grounded." Fed.R.Evid. 702, Advisory Comm. Notes.

The Defendants general attack on Nye's methodology amounts to a simple disagreement of opinion. Where evidence meets the standards of Rule 702, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means" of attack. *Daubert,* 509 U.S. 579 at 596. Thus, "conventional devices, rather than wholesale exclusion" are "the appropriate safeguards" for this evidence.*Id.*

There is further nothing improper for Nye to assume liability and limit his testimony at trial to damage issues. Nye is not the Plaintiffs' liability expert. Plaintiffs can meet their burden of proving Defendants' liability with other evidence.

Nye's methodology for calculating inflation per share is also valid. The Defendants fault Nye for failing to take into consideration "firm-specific factors" (Bear Stearns' Br. at 11; Baird Patrick's Br. at 6). Nye, in turn, claims to have taken these factors into account in his definition of the industry. He states, "We considered it because by definition of the industry, all the company specific information has an expectation of zero around the industry line. In other words, a given company, one particular company, could have a return path that's different, company specific from the industry. In fact all of them do, but for every one that's above the line, there is one below the line because the line is their aggregate. So company specific variations around the industry sum to zero."(Nye Tr. at 85.) The proper way to account for firm-specific factors is again a difference of opinion to be resolved at trial, not grounds for disqualification. The same applies to the key disagreement between experts as to how liquidity factors into the analysis.

***26** Nye's methodology for the calculation of the number of damaged shares is likewise admissible. First, Bear Stearns attacks Nye for not making any calculation reducing the amount of damages of the common fund by those not expected to file. It is the common practice to award an aggregate verdict for the class as a whole. *E.g.,**In re Melridge, Inc. Sec. Litig.,* 837 F.Supp. 1076 (D.Or.1993) (upholding jury award of Rule 10b-5 damages based upon model of Plaintiffs' expert, which assumed that all class members would file claims). Whether or not class members ultimately submit a claim form, as long as they have not opted out, they remain members of the class and are bound by the judgment. The purpose of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

class certification is to permit adjudication of all the class members' claims.

If the Plaintiffs prevail at trial, the class as a whole, not merely those who submit claims, obtains a common fund, and every class member has the right to collect damages. As explained by *Boeing Co. v. Van Gemert*, the class members' "right to share the harvest of the lawsuit upon proof of their identity, whether or not they exercise it, is a benefit in the fund created by the efforts of the class representatives and their counsel."444 U.S. 472, 480 (1980).*See alsoIn re Oxford Health Plans, Inc. Sec. Litig.*,MDL 1222(CLB), slip op. at 7-8 (S.D.N.Y. Feb. 11, 2003) (explaining that "[i]t is no objection to following prior procedures," and awarding aggregate class wide damages in order to create a common fund for class members, that "certain members of the class may neglect to file proofs of claim").

Second, Bear Stearns argues that Nye's damage calculations are overstated because he failed to account for "out-and-in" traders, or purchasers of Blech Securities who sold their shares prior to the period. Defendants are not entitled to an offset, factoring in any gains made by these traders. As the court explained in *In re Crazy Eddie Sec. Litig.*, 948 F.Supp. 1154, 1172 (E.D.N.Y.1995):

While such an off-set may be appropriate for purposes of sentencing in a criminal case, [defendant] presents no reason why he is entitled to this off-set here, let alone why a perpetrator of securities fraud would generally have any off-set against the class merely because there were some purchasers fortunate enough not to have been injured.

This is the case because the investor is injured at the time of the purchase of a security at an artificially inflated price. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972) ("[T]he correct measure of damages under § 28 of the [Exchange] Act, 15 U.S.C. § 78bb(a), is the difference between the fair value of all that the ... seller received and the fair value of what he would have received had there been no fraudulent conduct.").

Third, there was nothing improper for Nye to extrapolate damages from Bear Stearns' database to total reported volume. As Bear Stearns' database did not include all trading volume in Blech Securitiesthough it did include the majority of trading volume in damage securitiesNye had to extrapolate from Bear Stearns' volume figures to calculate total damages. Bear Stearns cites no evidence that shows why transactions in the Bear Stearns' database are not representative. This is an issue that can be explored further at trial.

***27** Bear Stearns' remaining arguments against Nye's methodology for the calculation of the number of damaged shares are similarly insufficient to bar his testimony. Bear Stearns contends that Nye's volume calculation is wrong because "he did not deduct trades made by holders of Blech Accounts ... through broker dealers other than DBCO."(Bear Stearns' Br. at 15.) Bear Stearns' own expert, Fischel, acknowledged at his deposition that Nye properly eliminated from his damage calculations trading in Blech-related accounts through Bear Stearns, Stanley Berk, and Ali Prodani of Baird Patrick, and that he himself did no investigation of whether or not there were any additional Blech-related accounts. (Fischel Report ¶ 18; Fischel Tr. at 123.) Moreover, Fischel did no analysis of trading in any of those accounts, nor of the extent to which Nye's damage calculations would be affected if trading by those accounts were eliminated. (Fischel Tr. at 125-26.) Bear Stearns also claims that Nye failed to distinguish between the alleged wrongful conduct of Bear Stearns and the other defendants as to each of the Blech Securities. In denying the Bear Stearns' summary judgment motion, the Court already established that the Plaintiffs must allege loss causation as to each security. *In re Blech Sec. Litig.*, 2002 WL 31356498. As to participation in the Blech market manipulation scheme, if it is established by the Plaintiffs' proof, the liability will be joint and several. *In re Del-Val Fin. Corp. Sec. Litig.*, 868 F.Supp. 547, 558 (S.D.N.Y.1994) ("The basic rule in securities actions is joint and several liability among defendants against whom judgment is entered."); *Musick, Peeler & Garrett v. Employers Ins* ., 508 U.S. 286, 292 (1993) (finding that parties who have violated securities laws "share joint liability for that wrong under a remedial scheme established by the federal courts").

Bear Stearns, however, correctly argues that Nye should not apply his analysis to IPO transactions. As Bear Stearns' alleged actions occurred only in secondary markets, as determined above, persons who purchased in the primary market cannot recover

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

against Bear Stearns. Blech was not an underwriter of the Blech Securities, and the Complaint alleges "no interrelationship ... between the manipulations of primary market and that of the secondary market."(Class Order at 19.) Furthermore, as Berg, Plaintiffs' own liability expert testified, Bear Stearns did not direct the price of any IPO, and there is no connection between the IPOs and Bear Stearns' debit reduction requests. (Berg Tr. at 208-209.)

*CONCLUSION*

The evidentiary rulings set forth above can be clarified as necessary in a pretrial conference during the week of March 31st, at a time convenient to counsel and the Court. The pretrial order will be submitted on April 4 and any issues concerning it will be heard at 9:30 a.m. on that date.

Any further limitations or clarification of the testimony of the experts can be the subject of voir dire hearings during the trial out of the hearing of the jury.

***28** It is so ordered.

S.D.N.Y.,2003.
In re Blech Securities Litigation
Not Reported in F.Supp.2d, 2003 WL 1610775 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.