**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**ENERGY NORTHWEST'S APPENDIX IN SUPPORT OF ITS RESPONSE TO MOTION IN LIMINE TO STRIKE PLAINTIFF'S CLAIM FOR INTEREST**

---


OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
202-639-6000

NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)


June 30, 2008

*Attorneys for Plaintiff*

# Table Of Contents To Appendix

Declaration of Gregory P. Armatrout ........................................................................A. 01

Exhibt A: Citibank Promissory Note ................................................................A. 04

Exhibit B: Executive Board Resolution No. 1250 ......................................................A. 08

Exhibit C: Executive Board Resolution No. 1350 ......................................................A. 34

Exhibit D: Excerpts from Columbia Generating Station Electric Revenue Bonds, Series 2003-F Official Statement ................................................................A. 61

Exhibit E: Summary of financing charges ..................................................................A. 84

*Carolina Power & Light Corp. v. United States*, No. 04-37C, 2008 WL 2154103 (Fed. Cl. May 19, 2008)..........................................................................................A. 88

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ENERGY NORTHWEST,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 04-010C<br><br>Chief Judge Damich |

**DECLARATION OF GREGORY P. ARMATROUT**

Gregory P. Armatrout declares as follows:

1. I am currently Manager of Finance Services for Energy Northwest ("EN"). I have held this position since 2003. As Manager of Finance Services I have responsibility for general accounting for EN including accounting processes and systems.

2. From 1993 through 2003, I was Manager of Treasury Services for EN. As Manager of Treasury Services, I was responsible for EN's outstanding debt and for new borrowing undertaken on behalf of the corporation. While Manager of Treasury Services, I was responsible for EN's issuance of debt to finance EN's dry cask storage project.

3. In 2002, EN borrowed funds to finance the cost of its dry cask storage project, some portion of which had already been incurred. The dry cask storage project represented a significant capital expenditure for EN, one which would adversely affect the cost of electricity generated by EN and ultimately charged to the public and municipal utilities that are members of EN. Accordingly, EN financed a portion of the capital cost of the dry cask storage project to ensure that the cash flows for the project matched the depreciation value for the project. The funds were borrowed in two steps.

4. On May 10, 2002, EN was advanced $34,518,000.00 against a promissory note from Citibank (the "Citibank Note"), which was issued pursuant to a Credit Agreement between

EN and Citibank. A true and correct copy of the Citibank Note is attached as Exhibit A. Borrowing on the Citibank Note was authorized by EN Executive Board Resolution No. 1250, a true and correct copy of which is attached as Exhibit B. The May 10, 2002 advance provided short-term financing for past and ongoing dry cask storage expenses pending EN's issuance of long-term debt in the form of Electric Revenue Bonds.

5. On May 29, 2003, EN issued Columbia Generating Station Electric Revenue Bonds, Series 2003-F (the "2003-F Electric Revenue Bonds"), which generated total proceeds of $46,071,329.70. Of the total proceeds, $36,514,185.86 was raised to fund the dry cask storage project. Of this amount, $34,518,000.00 was used to retire the advancement against the Citibank Note, $1,361,526.00 was used to pay for additional dry cask storage expenses, and $639,659.85 was used to fund the pro-rata portion of the delivery expenses of the bonds associated with dry cask storage expenses.

6. A true and correct copy of EN Executive Board Resolution No. 1301 authorizing issuance of the 2003-F Electric Revenue Bonds is attached as Exhibit C. A true and correct copy of excerpts of the Official Statement for the 2003-F Electric Revenue Bonds is attached as Exhibit D.

7. Between May 10, 2002 and May 24, 2003, EN paid $941,379.98 in financing charges for the $34,518,000.00 advance against the Citibank Note used to fund the dry cask storage project. A true and accurate summary of these charges prepared at my direction based on EN's accounting records is attached as Exhibit E.

8. Between May 28, 2003 and June 30, 2006, EN made finance charge payments of $5,127,529.17 to holders of the 2003-F Electric Revenue Bonds associated with the portion of the bond proceeds used for dry cask storage expenses. A true and accurate summary of these charges prepared at my direction based on EN's accounting records is attached as Exhibit E.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 30, 2008.

Gregory P. Armatrout

# EXHIBIT A

**PROMISSORY NOTE**

$136,780,000 Dated: May 10, 2002

FOR VALUE RECEIVED, the undersigned, ENERGY NORTHWEST, a municipal corporation and a joint operating agency of the State of Washington (the "***Borrower***"), HEREBY PROMISES TO PAY to the order of CITIBANK, N.A. (the "***Bank***") the principal amount of $136,780,000 or, if less, the aggregate principal amount of all Advances made by the Bank to the Borrower pursuant to the Credit Agreement (as hereinafter defined) outstanding on the Termination Date (as defined in the Credit Agreement), payable on the Termination Date.

The Borrower promises to pay interest on the principal amount of each Advance from the date of such Advance until such principal amount is paid in full, at such interest rates, and payable at such times, as are specified in the Credit Agreement referred to below.

Both principal and interest are payable in lawful money of the United States of America to the Bank, in same day funds, by wire transfer to 399 Park Avenue, New York, New York 10043, ABA Number 021-000-089, Account No. 3042-4445, Account Name: Energy Northwest, or to such other address as the Bank may from time to time designate in a written notice delivered to the Borrower. Each Advance made by the Bank to the Borrower and the maturity thereof, and all payments made on account of the principal amount thereof, shall be recorded by the Bank and, prior to any transfer thereof, endorsed on the grid attached hereto which is a part of this Promissory Note.

Principal of and interest on this Note are payable solely out of the special funds provided therefore in Resolution No. 1250, adopted by the Executive Board of the Borrower on April 25, 2002 (the "***Note Resolution***"). This Note shall not constitute an obligation of the State of Washington, either general or special, or a general obligation of the Borrower, but shall be payable solely from the sources described in the Note Resolution.

This Promissory Note is the Note referred to in, and is entitled to the benefits of, the $136,780,000 Credit Agreement, dated as of April 25, 2002 (the "***Credit Agreement***"), between the Borrower and the Bank. The Credit Agreement, among other things, (i) provides for the making of advances (the "***Advances***") by the Bank to the Borrower from time to time, in an aggregate amount not to exceed at any time outstanding the U.S. dollar amount first above mentioned, the indebtedness of the Borrower resulting from each such

Advance being evidenced by this Promissory Note, and (ii) contains provisions for acceleration of the maturity hereof upon the happening of certain stated events and also for prepayments on account of principal hereof prior to the maturity hereof upon the terms and conditions therein specified.

**ENERGY NORTHWEST**

By ______________________

Name: John F. Cockburn
Title: Chairman, Executive Board

ATTEST:

______________________

Stephen M. Buck
Assistant Treasurer and Authorized Officer

## ADVANCES AND PAYMENTS OF PRINCIPAL

| Date | Amount of Advance | Type of Advance and Interest Period (if any) | Amount of Principal Paid or Principal Prepaid | Unpaid Balance | Notation Made By |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

# EXHIBIT B

EXECUTIVE BOARD

RESOLUTION NO. 1250

A RESOLUTION AUTHORIZING THE ISSUANCE OF A PROMISSORY NOTE OF ENERGY NORTHWEST IN A PRINCIPAL AMOUNT NOT TO EXCEED $142,000,000 TO EVIDENCE THE OBLIGATION OF ENERGY NORTHWEST TO REPAY AMOUNTS ADVANCED UNDER A CREDIT AGREEMENT FOR THE PURPOSE OF REFINANCING A PORTION OF THE COST OF THE COLUMBIA GENERATING STATION AND FOR THE PURPOSE OF PAYING OR REIMBURSING ALL OR A PORTION OF THE COST OF CONSTRUCTING AND ACQUIRING ADDITIONAL SPENT FUEL STORAGE FOR THE COLUMBIA GENERATING STATION, APPROVING THE FORM AND SUBSTANCE OF SAID CREDIT AGREEMENT AND AUTHORIZING THE EXECUTION AND DELIVERY THEREOF.

*Adopted April 25, 2002*

TABLE OF CONTENTS

Page

ARTICLE I

DEFINITIONS; INTERPRETATION; PROMISSORY NOTE RESOLUTION TO CONSTITUTE CONTRACT

Section 1.01. Definitions....2
Section 1.02. Interpretation....5
Section 1.03. Promissory Note Resolution to Constitute Contract....6

ARTICLE II

APPROVAL OF CREDIT AGREEMENT; AUTHORIZATION AND ISSUANCE OF PROMISSORY NOTE

Section 2.01. Authorization of Credit Agreement....6
Section 2.02. Authorization of Promissory Note....6
Section 2.03. Pledge of Revenues and Other Amounts....7
Section 2.04. Separate Utility Systems....7

ARTICLE III

GENERAL TERMS AND PROVISIONS

Section 3.01. The Terms of the Promissory Note....7
Section 3.02. Execution of Promissory Note....8
Section 3.03. Promissory Note Is Not A Negotiable Instrument....8

ARTICLE IV

PREPAYMENT OF PROMISSORY NOTE

Section 4.01. Prepayment of Promissory Note....8

ARTICLE V

FUNDS AND ACCOUNTS

Section 5.01. Funds and Accounts Established Pursuant to Resolution No. 640....8
Section 5.02. Establishment of Accounts....9
Section 5.03. Application of Revenues and Other Amounts....9

TABLE OF CONTENTS
(continued)

Page

Section 5.04. General Revenue Fund ..... 10
Section 5.05. The Promissory Note Payment Account ..... 10
Section 5.06. Findings ..... 10
Section 5.07. Promissory Note Proceeds Account ..... 11
Section 5.08. Investment of Funds ..... 11

ARTICLE VI

COVENANTS TO SECURE THE PROMISSORY NOTE

Section 6.01. To Fix, Establish, Maintain and Collect Sufficient Rates and Charges ..... 11
Section 6.02. Concerning the Agreements and Resolution No. 640 ..... 12
Section 6.03. Payment of Principal of and Interest on the Promissory Note ..... 12
Section 6.04. Protection of Security; Additional Indebtedness ..... 12
Section 6.05. Further Assurances ..... 13
Section 6.06. Compliance With Resolutions ..... 13
Section 6.07. Parity Refunding Bonds ..... 13

ARTICLE VII

DEFAULTS AND REMEDIES

Section 7.01. Events of Default ..... 13
Section 7.02. Remedies; Appointment of Trustee ..... 13

ARTICLE VIII

SUPPLEMENTAL RESOLUTIONS

Section 8.01. Supplemental Resolutions Effective With Consent of the Bank ..... 14

ARTICLE IX

MISCELLANEOUS

Section 9.01. Benefits of Resolution Limited to Energy Northwest and the Bank ..... 14
Section 9.02. Promissory Note Resolution Binding Upon Successors or Assigns of Energy Northwest ..... 14
Section 9.03. No Personal Liability ..... 14

TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| Section 9.04. | Effect of Saturdays, Sundays and Legal Holidays | 14 |
| Section 9.05. | Partial Invalidity | 15 |
| Section 9.06. | Law and Place of Enforcement of the Promissory Note Resolution | 15 |
| Section 9.07. | Successors and Assigns | 15 |
| Section 9.08. | Effect of Article and Section Headings and Table of Contents | 15 |
| Section 9.09. | Effectiveness of the Promissory Note Resolution | 15 |

EXHIBITS

Exhibit A - Credit Agreement
Exhibit B - Resolution No. 640
Exhibit C - Resolution No. 1042
Schedule I – Columbia Refunded Bonds Maturing On July 1, 2003

EXECUTIVE BOARD
RESOLUTION NO. 1250

A RESOLUTION AUTHORIZING THE ISSUANCE OF A PROMISSORY NOTE OF ENERGY NORTHWEST IN A PRINCIPAL AMOUNT OF NOT TO EXCEED $142,000,000 TO EVIDENCE THE OBLIGATION OF ENERGY NORTHWEST TO REPAY AMOUNTS ADVANCED UNDER A CREDIT AGREEMENT FOR THE PURPOSE OF REFINANCING A PORTION OF THE COST OF THE COLUMBIA GENERATING STATION AND FOR THE PURPOSE OF PAYING OR REIMBURSING ALL OR A PORTION OF THE COST OF CONSTRUCTING AND ACQUIRING ADDITIONAL SPENT FUEL STORAGE FOR THE COLUMBIA GENERATING STATION, APPROVING THE FORM AND SUBSTANCE OF SAID CREDIT AGREEMENT AND AUTHORIZING THE EXECUTION AND DELIVERY THEREOF

WHEREAS, under the provisions of Chapter 43.52 of the Revised Code of the State of Washington, as amended (the "Act"), Energy Northwest has heretofore been duly organized as a joint operating agency and a municipal corporation of the State of Washington and is authorized, among other things, to issue, from time to time, its revenue bonds or notes to provide funds for any of its corporate purposes; and

WHEREAS, in accordance with the Act and pursuant to Resolution No. 640, adopted by the Board of Directors of Energy Northwest on June 26, 1973, as amended and supplemented ("Resolution No. 640"), Energy Northwest (i) has specified and adopted the plan and system for the acquisition and construction by Energy Northwest of the electric generating plant and associated facilities constituting the "Columbia Generating Station" ("Columbia" or the "Project") as a separate utility system, and (ii) has heretofore issued thereunder its "Energy Northwest Nuclear Project No. 2 Revenue Bonds" (the "Prior Lien Bonds") to finance or refinance the cost of the Project; and

WHEREAS, the Prior Lien Bonds are payable from and secured by a pledge of and lien on all income, revenues, receipts and profits derived by Energy Northwest through the ownership and operation by Energy Northwest of the Project and all other moneys required to be deposited in the "Revenue Fund" created pursuant to Resolution No. 640 (collectively, the "Revenues"); and

WHEREAS, pursuant to Resolution No. 1167, adopted March 22, 2001, Energy Northwest has covenanted not to issue additional Prior Lien Bonds, or any other bonds, notes or other obligations pari passu with outstanding Prior Lien Bonds, for the purposes set forth in Resolution No. 640; and

WHEREAS, Resolution No. 640 permits Energy Northwest to issue revenue bonds or notes which are a charge upon any portion of the Revenues junior or inferior to the lien on such Revenues created by Resolution No. 640, in favor of the Prior Lien Bonds for the purpose, among others, of refinancing the cost of the Project; and

WHEREAS, in accordance with its statutory authority and pursuant to Resolution No. 1042, adopted by the Executive Board of Energy Northwest (the "Executive Board") on

1032816.1

October 23, 1997, as amended and supplemented ("Resolution No. 1042"), Energy Northwest has heretofore authorized and issued, in series, from time to time, for the purposes set forth in Resolution No. 1042, including refinancing the cost of the Project, Electric Revenue Bonds having a charge on the Revenues which is junior and inferior to the lien on such Revenues created by Resolution No. 640 in favor of the Prior Lien Bonds; and

WHEREAS, Section 713 (b) of Resolution No. 1042 permits Energy Northwest, under a separate resolution to, among other things, issue its bonds, notes or other obligations payable from and secured by a pledge of the Revenues ranking on a parity with the pledge and lien created by Resolution No. 1042 in favor of the Electric Revenue Bonds, for the purpose of refinancing the cost of the Project; and

WHEREAS, Energy Northwest proposes to refinance a portion of the cost of the Project by providing all or a portion of the funds necessary to refund the principal of its outstanding Nuclear Project No. 2 Refunding Revenue Bonds described on Schedule I hereto, maturing on July 1, 2003 (collectively, the "Refunded Bonds"), issued pursuant to Resolution No. 640; and

WHEREAS, Energy Northwest proposes to provide funds for the purpose of paying or reimbursing all or a portion of the costs of constructing and acquiring additional on-site spent fuel storage for the Columbia Generating Station; and

WHEREAS, Energy Northwest and Citibank have agreed to enter into a certain Credit Agreement, dated as of April 25, 2002, whereby Energy Northwest may borrow up to $142,000,000 for such purposes and will agree to issue its Promissory Note (hereinafter defined) to evidence such borrowing; and

WHEREAS, the Executive Board has determined that it is advisable and in the best interests of Energy Northwest and the electric ratepayers of the Pacific Northwest to refund the Refunded Bonds, to pay or reimburse the Costs of constructing and acquiring additional spent fuel storage for the Columbia Generating Station and to enter into the Credit Agreement and to issue its Promissory Note for the purposes of obtaining a portion of the funds necessary therefor.

NOW THEREFORE, BE IT RESOLVED BY THE EXECUTIVE BOARD OF ENERGY NORTHWEST AS FOLLOWS:

## ARTICLE I

## DEFINITIONS; INTERPRETATION; PROMISSORY NOTE RESOLUTION TO CONSTITUTE CONTRACT

Section 1.01. Definitions. (a) Except as otherwise provided in subsection (b) of this Section 1.01 or in the recitals hereto, all capitalized terms used in this Promissory Note Resolution shall have the same meanings as are ascribed to such terms in Resolution No. 640 or Resolution No. 1042, as applicable.

(b) Unless the context shall clearly indicate some other meaning or may otherwise require, the terms defined in this subsection shall, for all purposes of this Promissory Note Resolution and of any resolution or other instrument amendatory hereof or supplemental hereto and of any certificate, opinion, instrument or document herein or therein mentioned, have the meanings herein specified, with the following definitions to be equally applicable to both the singular and plural form of any term herein defined and vice versa:

"Authorized Officer" when used with reference to Energy Northwest shall mean the Chairman or Secretary of the Executive Board or the Chief Executive Officer, the Chief Financial Officer or any Assistant Treasurer of Energy Northwest, or such other officer designated by resolution of Energy Northwest to perform the act or sign the document in question.

"Bank" shall have the same meaning herein as is ascribed to such term in the preamble to the Credit Agreement.

"Business Day" shall have the same meaning herein as is ascribed to such term in the Credit Agreement.

"Bond Fund" shall have the same meaning as is ascribed to such term in the Credit Agreement.

"Bond Fund Trustee" shall mean the banking corporation serving as Bond Fund Trustee under the Prior Lien Supplemental Resolutions for the Refunded Bonds.

"Chief Executive Officer" shall mean the person duly appointed and acting as the Chief Executive Officer of Energy Northwest.

"Chief Financial Officer" shall mean the person duly appointed and acting as the Chief Financial Officer of Energy Northwest.

"Citibank" shall mean Citibank, N.A., a national banking association having its principal office in New York, New York.

"Credit Agreement" shall mean that certain Credit Agreement (including all exhibits thereto), dated as of April 25, 2002, by and between Energy Northwest, as Borrower, and the Bank, a copy of which is attached hereto as Exhibit A.

"Debt Service Accounts" shall mean the accounts by that name created in the Debt Service Fund.

"Debt Service Fund" shall mean the fund by that name created in Section 502(b) of Resolution No. 1042.

"Executive Board" shall mean the Executive Board of Energy Northwest established under Section 43.52.374 of the Act, or such other board, body, commission or agency succeeding to the functions thereof.

"General Revenue Fund" shall have the same meaning herein as is ascribed to such term in Resolution No. 1042.

"Maturity Date" shall mean, when used in reference to the Promissory Note, June 25, 2003.

"Notice of Borrowing" shall have the same meaning herein as is ascribed to such term in the Credit Agreement.

"Outstanding" or "outstanding" shall mean, as of any date, the Promissory Note theretofore or thereupon issued or authorized pursuant to the Resolution, except any portion of the Promissory Note paid in full.

"Parity Bonds" shall mean, collectively, the bonds, notes or other obligations heretofore or hereafter issued pursuant to Resolution No. 1042 or pursuant to a separate resolution adopted pursuant to Section 713(b) thereof.

"Parity Debt" shall have the same meaning herein as is ascribed to such term in Resolution No. 1042.

"Parity Refunding Bonds" shall mean an issue of bonds, notes or other obligations of Energy Northwest constituting Parity Debt and authorized to be issued for the purpose of paying the principal of the Promissory Note when due.

"Parity Resolution" shall mean Resolution No. 1042 or any separate resolution adopted pursuant to Section 713(b) thereof.

"Parity Supplemental Resolution" shall mean a resolution adopted by Energy Northwest pursuant to and in compliance with Article II of Resolution No. 1042 providing for an issue of Electric Revenue Bonds.

"Payment Date" shall have the same meaning herein as is ascribed to such term in Resolution No. 1042.

"Prior Lien Bonds" shall mean, collectively, the bonds heretofore issued pursuant to Resolution No. 640.

"Prior Lien Resolution" shall mean Resolution No. 640.

"Prior Lien Supplemental Resolution" shall mean a resolution supplemental to Resolution No. 640 adopted by Energy Northwest pursuant to Section 10.1(a) thereof authorizing a series of Prior Lien Bonds.

"Project" or "Columbia" shall mean Energy Northwest Nuclear Project No. 2, as the same is defined in Resolution No. 640.

"Promissory Note" shall mean the Energy Northwest Columbia Refunding Revenue Promissory Note, 2002A authorized and issued to the Bank pursuant to Section 2.02

hereof to evidence the obligation of Energy Northwest to repay the amounts advanced to Energy Northwest by the Bank under the Credit Agreement, or any substitution or replacement thereof.

"Promissory Note Payment Account" shall mean the Columbia Refunding Revenue Promissory Note Payment Account established in Section 5.02 (a) hereof.

"Promissory Note Proceeds Account" shall mean the Columbia Refunding Revenue Promissory Note Proceeds Account established in Section 5.02 (b) hereof.

"Promissory Note Resolution" shall mean this Promissory Note Resolution as from time to time amended or supplemented by one or more Supplemental Promissory Note Resolutions.

"Refunded Bonds" shall have the same meaning herein as is ascribed to such term in the recitals hereto.

"Resolution No. 640" shall have the same meaning herein as is ascribed to such term in the recitals hereto. A copy of Resolution No. 640 is attached hereto as Exhibit B.

"Resolution No. 1042" shall have the same meaning herein as is ascribed to such term in the recitals hereto. A copy of Resolution No. 1042 is attached hereto as Exhibit C.

"Supplemental Promissory Note Resolution" shall mean any resolution adopted by Energy Northwest pursuant to and in compliance with the provisions of Section 8.01 hereof amending or supplementing the provisions of the Promissory Note Resolution or any Supplemental Promissory Note Resolution.

"State" shall mean the State of Washington.

Section 1.02. Interpretation. (a) In the Promissory Note Resolution, unless the context otherwise requires:

(i) Articles and Sections referred to by number shall mean the corresponding Articles and Sections of the Promissory Note Resolution.

(ii) The terms "hereby", "hereof", "herein", "hereunder" and any similar terms, as used in the Promissory Note Resolution, refer to the Promissory Note Resolution, and the term "hereafter" shall mean after, and the term "heretofore" shall mean before, the date of adoption of the Promissory Note Resolution.

(iii) Words of the masculine gender shall mean and include correlative words of the feminine and neuter genders and words importing the singular number shall mean and include the plural number and vice versa.

(iv) Words importing persons shall include firms, associations, partnerships (including limited partnerships), trusts, corporations and other legal entities, including public bodies, as well as natural persons.

(b) Nothing in the Promissory Note Resolution expressed or implied is intended or shall be construed to confer upon, or to give to, any person, other than Energy Northwest and the Bank any right, remedy or claim under or by reason of the Promissory Note Resolution or any covenant, condition or stipulation thereof. All of the covenants, stipulations, promises and agreements herein contained, shall be for the sole and exclusive benefit of Energy Northwest and the Bank.

Section 1.03. Promissory Note Resolution to Constitute Contract. The provisions of the Promissory Note Resolution shall be a part of the contract of Energy Northwest with the Bank and shall be deemed to be and shall constitute a contract between Energy Northwest and the Bank. The pledge made hereby and the provisions, covenants and agreements herein set forth to be performed by or on behalf of Energy Northwest shall be for the benefit, protection and security of the Bank.

## ARTICLE II

## APPROVAL OF CREDIT AGREEMENT; AUTHORIZATION AND ISSUANCE OF PROMISSORY NOTE

Section 2.01. Authorization of Credit Agreement. The form and substance of that certain Credit Agreement, by and between Energy Northwest and the Bank, dated as of April 25, 2002, is hereby approved in the form presented to this meeting. It is hereby determined that Energy Northwest shall borrow up to but not in excess of $142,000,000 under the Credit Agreement for the purpose of (i) providing a portion of the funds necessary to refund, on or prior to their stated maturity date, the principal of the Refunded Bonds; and (ii) to provide funds for the payment or reimbursement of all or a portion of the costs of capital additions, improvements or betterments to the Project consisting of the installation of facilities sufficient to meet the additional on-site spent fuel storage requirements through 2010, including necessary auxiliary equipment and engineering services. The Credit Agreement shall be executed on behalf of Energy Northwest by the manual signature of the Chief Executive Officer or the Chief Financial Officer and it shall be delivered on behalf of Energy Northwest by either of such Officers with such changes, amendments and alterations as the Chief Executive Officer or the Chief Financial Officer, as the case may be, shall approve. Approval of such changes by such Officer shall be evidenced by the execution and delivery thereof by such Officer. The Chief Executive Officer, the Chief Financial Officer and any other Authorized Officer delegated by either of them is hereby authorized to borrow money, draw down funds, execute and deliver all necessary certificates and notices, make all payments and do all other things necessary to carry out the transactions contemplated by the Credit Agreement on behalf of Energy Northwest, including the execution and delivery from time to time of a Notice of Borrowing to the Bank.

Section 2.02. Authorization of Promissory Note. Energy Northwest is hereby authorized to issue its Promissory Note in the form set forth in Exhibit B to the Credit Agreement for the purpose of evidencing its obligation to repay amounts borrowed under the Credit Agreement as provided therein and in Section 2.01 hereof. To that end there is hereby created and established a note issue of Energy Northwest to be known and designated as the "Energy Northwest Columbia Refunding Revenue Promissory Note, 2002A." The Promissory Note shall be issued pursuant and subject to the terms and conditions contained in the Credit

Agreement and the Promissory Note Resolution, in an amount up to but not in excess of the amounts borrowed under the Credit Agreement.

Section 2.03. Pledge of Revenues and Other Amounts. (a) The Promissory Note is payable solely from and secured by the funds pledged therefor, subject to the provisions of the Promissory Note Resolution permitting the application thereof for the purposes and on the terms and conditions set forth herein. In addition to any other amounts pledged as security for the payment of the Promissory Note by the Promissory Note Resolution, there are hereby pledged as security for the payment of the principal of and interest on the Promissory Note in accordance with its terms and the provisions of the Promissory Note Resolution: (i) subject to the provisions of Section 5.01 hereof, the Revenues; and (ii) the Promissory Note Payment Account, including the proceeds of any Parity Refunding Bonds issued by Energy Northwest for the purpose of refunding the Promissory Note.

(b) The Promissory Note shall constitute Parity Debt for all purposes of the Promissory Note Resolution, Resolution No. 1042 and any separate resolution adopted in accordance with Section 703(b) of Resolution No. 1042.

(c) The pledge hereby made by Energy Northwest shall be valid and binding from the time of adoption of the Promissory Note Resolution by the Executive Board. The Revenues and other amounts pledged and hereafter received by Energy Northwest shall immediately be subject to the lien of such pledge without any physical delivery or further act, and the lien of the aforesaid pledge shall be valid and binding as against any parties having claims of any kind in tort, contract or otherwise against Energy Northwest irrespective of whether such parties have notice of the foregoing pledge.

Section 2.04. Separate Utility Systems. Nothing contained in the Promissory Note Resolution shall prevent Energy Northwest from authorizing and issuing bonds, notes, warrants, certificates or other obligations or evidences of indebtedness, to acquire, construct, develop, compile or otherwise obtain any separate or other project as permitted by the Act and any incidental properties to be constructed, developed, compiled or otherwise acquired in connection therewith, which project shall be a separate utility system or project and which bonds, notes or other obligations or evidences of indebtedness shall be payable solely from the revenues or other income derived from the ownership or operation of such project.

ARTICLE III

GENERAL TERMS AND PROVISIONS

Section 3.01. The Terms of the Promissory Note. (a) The Promissory Note shall mature, shall bear interest at the rates per annum and shall be payable as to principal and interest at the times and in the manner provided in the Credit Agreement.

(b) The Promissory Note shall be issued in substantially the form set forth in Exhibit B to the Credit Agreement.

(c) The principal of and interest on the Promissory Note shall be payable in any coin or currency of the United States of America which at the time of payment is legal tender for public and private debts.

Section 3.02. Execution of Promissory Note. The Promissory Note shall be executed with the manual or facsimile signature of the Chairman of the Executive Board or the Chief Executive Officer of Energy Northwest and attested with the manual or facsimile signature of any Authorized Officer, and Energy Northwest's seal, or a facsimile thereof, shall be imprinted or impressed thereon. In case any of the Authorized Officers who shall have signed or attested the Promissory Note shall cease to be such Authorized Officer before such Promissory Note has been actually issued and delivered, such Promissory Note shall be valid nevertheless and may be issued by Energy Northwest with the same effect as though the persons who had signed and attested such Promissory Note had not ceased to be such Officer.

Section 3.03. Promissory Note Is Not A Negotiable Instrument. The Promissory Note is not a negotiable instrument within the meaning of Section 54.24.120 of the Revised Code of Washington. Energy Northwest shall deem and treat the Bank as the absolute owner thereof, whether such Promissory Note shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal of and interest thereon and for all other purposes, and all such payments shall be valid and effectual to satisfy and discharge the liability upon such Promissory Note to the extent of the sum or sums so paid and Energy Northwest shall not be bound by any notice or knowledge to the contrary.

## ARTICLE IV

## PREPAYMENT OF PROMISSORY NOTE

Section 4.01. Prepayment of Promissory Note. The Promissory Note may be prepaid prior to its Maturity Date as provided in the Credit Agreement.

## ARTICLE V

## FUNDS AND ACCOUNTS

Section 5.01. Funds and Accounts Established Pursuant to Resolution No. 640. (a) The special fund of Energy Northwest created by Section 6.1 of Resolution No. 640 and known as the "Revenue Fund" shall be continued for so long as any of the Prior Lien Bonds remain Outstanding. The Revenue Fund shall be held in trust and administered by Energy Northwest. Energy Northwest covenants and agrees that it will pay into the Revenue Fund as promptly as practicable after receipt thereof, all Revenues; and further covenants and agrees that such Revenues shall be trust funds in the hands of Energy Northwest. As soon as practicable after the date on which the Prior Lien Bonds are no longer Outstanding, Energy Northwest shall transfer forthwith all moneys and securities held in the Revenue Fund to the General Revenue Fund, as provided in Resolution No. 1042.

(b) The Revenues paid into the Revenue Fund shall be and hereby are pledged to the punctual payment of the principal of and interest on the Promissory Note and to the

security thereof in accordance with the provisions of the Promissory Note Resolution, and subject, so long as any of the Prior Lien Bonds remain Outstanding, to the lien and pledge of Resolution No. 640. The Promissory Note and all other Parity Debt are a charge upon the Revenues junior and inferior to the payments to be made into the Bond Fund, and are subject to the payments, if any, to be made into the "Fuel Fund" established pursuant to Section 6.4 of Resolution No. 640, the payments to be made into the "Reserve and Contingency Fund" established pursuant to Section 6.5 of Resolution No. 640 and payments required to be made under Resolution No. 640 with respect to Energy Northwest's cost of operating and maintaining the Project and amounts required for the payment of taxes, assessments or other governmental charges or payments in lieu thereof.

(c) The Bond Fund shall be continued for so long as any Prior Lien Bonds remain Outstanding. As soon as practicable after the date on which the Prior Lien Bonds are no longer Outstanding, Energy Northwest shall direct, in writing, the Bond Fund Trustee under Resolution No. 640 to deliver forthwith all moneys and securities held in the Bond Fund, except for amounts, if any, required to be held by said Bond Fund Trustee to provide for the payment of the principal (including sinking fund installments) of, premium, if any, and interest on the Prior Lien Bonds and expenses of the Bond Fund Trustee, to Energy Northwest, who shall deposit such moneys and securities in the General Revenue Fund established pursuant to Section 502 of Resolution No. 1042.

(d) The special funds of Energy Northwest, known as the "Fuel Fund" and the "Reserve and Contingency Fund", established pursuant to Section 6.4 and Section 6.5, respectively, of Resolution No. 640, shall be continued so long as any Prior Lien Bonds remain Outstanding. As soon as practicable after the date on which the Prior Lien Bonds are no longer Outstanding, Energy Northwest shall transfer forthwith all moneys and securities held in the Fuel Fund and in the Reserve and Contingency Fund to the General Revenue Fund.

Section 5.02. Establishment of Accounts. In accordance with the Act, the following special accounts are hereby created:

(a) the "Columbia Refunding Revenue Promissory Note Payment Account" to be held by Energy Northwest; and

(b) the "Columbia Refunding Revenue Promissory Note Proceeds Account" to be held by Energy Northwest.

Such Accounts shall be held in trust and their existence shall be continued for so long as the Promissory Note or any portion thereof remains Outstanding.

Section 5.03. Application of Revenues and Other Amounts. So long as the Prior Lien Bonds shall remain Outstanding, Energy Northwest hereby obligates and binds itself irrevocably to pay, after first providing for all required deposits and payments under Resolution No. 640 as provided in Section 5.01, to each trustee or paying agent of Parity Debt, and to each person entitled thereto in the event there is no trustee or paying agent for such Parity Debt, the respective amounts scheduled to be paid on such Parity Debt in accordance with its terms without preference or priority of any Parity Debt over any other Parity Debt, including the

deposits into the Promissory Note Payment Account hereinafter specified. In the event that Energy Northwest shall have insufficient funds to make all the payments required pursuant to the preceding sentence, Energy Northwest shall pay to each trustee or paying agent of Parity Debt and to each person entitled thereto, as applicable, its pro rata share of the amounts available to Energy Northwest for such payments. With respect to payments to be made to the Bank hereunder, Energy Northwest shall set aside and pay, as and when the same shall become due, whether on the Maturity Date or otherwise, for deposit into the Promissory Note Payment Account, from the Revenues theretofore deposited in the Revenue Fund the amount, which, when added to the amount then on deposit in the Promissory Note Payment Account, will make the amount on deposit in such Account, equal to the amount of principal and the amount of interest due and payable on the Promissory Note. There shall also be deposited in the Promissory Note Payment Account all other amounts required by the Promissory Note Resolution to be so deposited, including the proceeds from the sale of any bonds, notes or other obligations of Energy Northwest issued for the purpose of refunding the Promissory Note.

Section 5.04. General Revenue Fund. On and after the date on which there shall be no Prior Lien Bonds Outstanding, the amounts on deposit in the General Revenue Fund shall be trust funds in the hands of Energy Northwest and, subject to the provisions of Section 504(b) of Resolution No. 1042, shall be used and applied as provided in Resolution No. 1042 solely for the purpose of paying principal and interest on Parity Debt (including the Promissory Note), the cost of operating and maintaining the Project and paying all other costs, charges and expenses in connection with the costs of making repairs, renewals, replacements, additions, betterments and improvements to and extensions of the Project and for purposes of paying all other charges and obligations against said revenues, income, receipts, profits and other moneys of whatever nature now or hereafter imposed thereon by law or contract, to the payment of which for such purposes said Revenues and other moneys are hereby pledged.

Section 5.05. The Promissory Note Payment Account. (a) Energy Northwest shall pay to the Bank from the moneys on deposit in the Promissory Note Payment Account the amounts required for the payment of the principal of and interest on the Promissory Note, at the times and in the manner provided in the Promissory Note and the Credit Agreement.

(b) Moneys on deposit with Energy Northwest in the Promissory Note Payment Account shall be held in trust solely for the Bank.

(c) The Promissory Note shall constitute a prior charge over all other charges or claims whatsoever against the Promissory Note Payment Account, subject to the provisions of Sections 5.01 and 6.04 hereof.

Section 5.06. Findings. The Executive Board hereby finds and determines that, in creating the Promissory Note Payment Account, due regard has been given to the cost of operating and maintaining the Project and amounts required for the payment of taxes, assessments or other governmental charges or payments in lieu thereof, lawfully imposed against the properties or revenues of the Project payable by Energy Northwest and that it has not obligated Energy Northwest to pay into the Promissory Note Payment Account a greater amount of the Revenues then in its judgment will be available over and above such cost of maintenance, operation and taxes, assessments, or other governmental charges or payments in lieu thereof.

Section 5.07. Promissory Note Proceeds Account. (a) Energy Northwest shall deposit, as and when received, into the Promissory Note Proceeds Account, the proceeds of all Advances (as defined in the Credit Agreement) made by the Bank under the Credit Agreement. From and after the date of adoption of the Promissory Note Resolution and prior to making any transfer from the Revenue Fund with respect to the principal or sinking fund installments coming due with respect to the Refunded Bonds, Energy Northwest is authorized to make the following transfers from the amounts on deposit in the Promissory Note Proceeds Account, without regard to priority: (i) commencing on or before the 25th day of July, 2002 and on or before the 25th day of July and of each month thereafter, Energy Northwest may transfer to the Bond Fund Trustee, for credit to the Principal Accounts and/or the Bond Retirement Accounts for the Refunded Bonds, the amount required by each related Prior Lien Supplemental Resolution to be so deposited on and before June 25, 2003; and (ii) Energy Northwest shall apply amounts for the payment to the persons entitled thereto, or reimbursement to Energy Northwest, of all or a portion of the costs of constructing or acquiring additional facilities sufficient to meet the on-site spent fuel storage requirements for the Project through 2010, including the necessary auxiliary equipment and engineering services..

(b) Amounts on deposit in the Promissory Note Proceeds Account, pending their application as provided in subsection (a) above, shall be subject to a prior and paramount lien and charge in favor of the Bank, and the Bank shall have a valid claim on such moneys for the further security of the Promissory Note until paid out or transferred as herein provided.

Section 5.08. Investment of Funds. (a) Except as otherwise provided herein, moneys in the Promissory Note Proceeds Account shall, to the fullest extent practicable and reasonable, be invested and reinvested by Energy Northwest, solely in Investment Securities (as defined in Resolution No. 1042) which shall mature or be subject to redemption at the option of the owner thereof on or prior to the respective dates when the moneys therein will be required for the purpose of making the transfers required by Section 5.07 hereof.

## ARTICLE VI

## COVENANTS TO SECURE THE PROMISSORY NOTE

Energy Northwest shall faithfully do and perform and fully observe and keep any and all covenants, undertakings, stipulations and provisions contained in the Credit Agreement and, in addition, hereby makes the following covenants and agreements for the benefit of the Bank.

Section 6.01. To Fix, Establish, Maintain and Collect Sufficient Rates and Charges. Energy Northwest hereby covenants that it shall fix, establish, maintain and collect rates and charges for electric power and energy, including capability, and other services, facilities and commodities, sold, furnished or supplied by the Project, including power and energy delivered therefrom to or for the account of Energy Northwest, which shall be fair and non-discriminatory and adequate, whether or not the generation or transmission of power and energy by the Project is suspended, interrupted or reduced for any reason whatever, to provide Energy Northwest with revenues sufficient: (i) to pay the costs of proper operation, maintenance and repair of the Project; (ii) to make the deposits required to be made into the funds and

accounts established under the Promissory Note Resolution, the Prior Lien Resolution and the Parity Resolution; (iii) to pay all other costs, expenses and charges specified in Section 5.01(g) of the Credit Agreement; and (iv) to pay any and all other amounts which Energy Northwest may now or hereafter become obligated to pay or set aside from said revenues by law or contract.

Section 6.02. Concerning the Agreements and Resolution No. 640. So long as the Promissory Note is Outstanding, Energy Northwest will not (i) voluntarily consent to or permit any rescission of or consent to any amendment to or otherwise take any action under or in connection with any of the Net Billing Agreements which will in any manner impair or adversely affect the ability of Energy Northwest to perform its obligations, or of the Bank to enforce its rights, under the Credit Agreement, the Promissory Note or the Promissory Note Resolution or (ii) voluntarily consent to or permit any rescission of or consent to any amendment to or modification of or otherwise take any action under or in connection with, the Project Agreement, the Assignment Agreement or the 1989 Letter Agreement which will in any manner impair or adversely affect the ability of Energy Northwest to perform its obligations, or of the Bank to enforce its rights, under the Credit Agreement, the Promissory Note or the Promissory Note Resolution; and Energy Northwest shall perform all of its obligations under said Agreements and shall take such actions and proceedings from time to time as shall be necessary to protect and safeguard the security for the payment of all amounts due under the Credit Agreement and the Promissory Note afforded by the provisions of said Agreements. Energy Northwest will not, so long as any amounts payable by Energy Northwest under the Credit Agreement shall remain unpaid or any Parity Bonds or Prior Lien Bonds remain Outstanding, consent to or agree to any change, amendment or modification of Resolution No. 640 or Resolution No. 1042 which would in any way or manner prejudice or affect adversely the rights or interests of the Bank.

Section 6.03. Payment of Principal of and Interest on the Promissory Note. Energy Northwest will duly and punctually pay or cause to be paid, but only from the Revenues pledged under the Promissory Note Resolution and subject to the provisions hereof, the outstanding principal amount of the Promissory Note and interest accrued thereon when due and payable and at the places and in the manner provided in the Promissory Note and the Credit Agreement, according to the true intent and meaning thereof, and will faithfully do and perform and fully observe and keep any and all covenants, undertakings, stipulations and provisions contained in the Promissory Note, the Promissory Note Resolution and the Credit Agreement.

Section 6.04. Protection of Security; Additional Indebtedness. (a) The Revenues and other amounts pledged hereunder are and will be free and clear of any pledge, lien, charge or encumbrance thereon or with respect thereto prior to the pledge created by the Promissory Note Resolution, except as otherwise provided in Section 5.01 hereof, and all corporate action on the part of Energy Northwest to that end has been duly and validly taken. Energy Northwest shall at all times, to the extent permitted by law, defend, preserve and protect the pledge of the Revenues and other moneys, securities and funds pledged under the Promissory Note Resolution and all of the rights of the Bank hereunder against all claims and demands of all persons whomsoever.

(b) Energy Northwest will not hereafter issue any bonds, notes or other obligations payable out of and secured by a pledge and lien on Revenues which will rank in

priority over the pledge and lien on the Revenues created by the Promissory Note Resolution in favor of the Promissory Note.

(c) Nothing contained herein or in the Credit Agreement shall be construed to prohibit the issuance by Energy Northwest of bonds, notes or other obligations payable out of and secured by a pledge of and lien on Revenues which will rank on a parity with the pledge and lien on the Revenues created by the Promissory Note Resolution in favor of the Promissory Note or which is junior, subordinate or inferior to the pledge and lien on the Revenues created hereby. *Provided, however,* Energy Northwest shall not issue any such Parity Debt unless, on the date of issue thereof, the contracts or agreements described in Section 203(e)(i) or (ii) of Resolution No. 1042 are in full force and effect and no Event of Default hereunder shall have occurred and be continuing.

Section 6.05. Further Assurances. Energy Northwest will at any and all times, insofar as it may be authorized so to do by law, pass, make, do, execute, acknowledge and deliver all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights, revenues and other funds hereby pledged or assigned to the payment of the obligations of Energy Northwest under the Credit Agreement payable from the Revenues, including the Promissory Note, or intended so to be, or which Energy Northwest may hereafter become bound to pledge or assign.

Section 6.06. Compliance With Resolutions. So long as any of the Prior Lien Bonds or Parity Bonds are Outstanding, Energy Northwest shall comply in all respects with each of the provisions, covenants and agreements of or contained in Resolution No. 640 and Resolution No. 1042.

Section 6.07. Parity Refunding Bonds. Energy Northwest hereby covenants and agrees that on or prior to the Maturity Date it will adopt a resolution authorizing the issuance of an issue of Parity Refunding Bonds for the purpose of paying the principal of the Promissory Note on or prior to the Maturity Date. Energy Northwest hereby further covenants and agrees that it will use its best efforts to market and sell such an issue of Parity Refunding Bonds for such purpose.

## ARTICLE VII

## DEFAULTS AND REMEDIES

Section 7.01. Events of Default. Each of the events specified in Section 6.01 of the Credit Agreement is hereby defined as and declared to be and shall constitute an "Event of Default" for purposes of the Promissory Note Resolution.

Section 7.02. Remedies; Appointment of Trustee. Upon the happening of any Event of Default, then and in every such case the Bank may pursue any remedy available at law or in equity, to the extent permitted by law, as provided in Article VI of the Credit Agreement.

## ARTICLE VIII

## SUPPLEMENTAL RESOLUTIONS

Section 8.01. Supplemental Resolutions Effective With Consent of the Bank. Energy Northwest may, from time to time with the written consent of the Bank, adopt a resolution amendatory hereof or supplemental hereto (herein defined and referred to as a "Supplemental Promissory Note Resolution"); provided that the Bank shall respond to the written request of the Borrower for consent to an amendment or supplement pursuant to this Section 8.01 as soon as practical, and in any event within thirty (30) days of receipt of such notice by the Bank; and provided, further, that if no response shall be received by the Borrower from the Bank within such 30-day period, consent to such amendment or supplement shall be deemed given.

## ARTICLE IX

## MISCELLANEOUS

Section 9.01. Benefits of Resolution Limited to Energy Northwest and the Bank. With the exception of rights and benefits herein expressly conferred, nothing expressed or mentioned in or to be implied from the Promissory Note Resolution, the Credit Agreement or the Promissory Note is intended or should be construed to confer upon or give to any person other than Energy Northwest and the Bank, any legal or equitable right, remedy or claim under or by reason of or in respect to the Promissory Note Resolution or any covenant, condition, stipulation, promise, agreement or provision herein contained. The Promissory Note Resolution and all of the covenants, conditions, stipulations, promises, agreements and provisions hereof are intended to be and shall be for and inure to the sole and exclusive benefit of Energy Northwest and the Bank as herein and therein provided.

Section 9.02. Promissory Note Resolution Binding Upon Successors or Assigns of Energy Northwest. All the terms, provisions, conditions, covenants, warranties and agreements contained in the Promissory Note Resolution shall be binding upon the successors and assigns of Energy Northwest and shall inure to the benefit of the Bank.

Section 9.03. No Personal Liability. No member of Energy Northwest, no member of the Board of Directors or of the Executive Board and no officer or employee of Energy Northwest shall be individually or personally liable for the payment of the principal of or interest on the Promissory Note or for any amount due and owing under the Credit Agreement. Nothing herein contained shall, however, relieve any such member, officer or employee from the performance of any duty provided or required by law.

Section 9.04. Effect of Saturdays, Sundays and Legal Holidays. Except as otherwise provided in the Credit Agreement, whenever the Promissory Note Resolution requires an action, including payments required to be made hereunder, to be taken on a Saturday, Sunday or on a day which is a legal holiday at the place designated for such action, such action shall be taken on the first Business Day occurring thereafter. Except as may otherwise be provided in the Credit Agreement, whenever in the Promissory Note Resolution the time within which any

action is required to be taken or within which any right will lapse or expire shall terminate on a Saturday, Sunday or legal holiday, such time shall continue until midnight on the next succeeding Business Day.

Section 9.05. Partial Invalidity. If any one or more of the covenants or agreements or portions thereof provided in the Promissory Note Resolution, the Credit Agreement or the Promissory Note on the part of Energy Northwest to be performed shall be determined by a court of competent jurisdiction to be contrary to law, then such covenant or covenants, or such agreement or agreements, or such portions thereof, shall be deemed severable from the remaining covenants and agreements or portion thereof and the invalidity thereof shall in no way affect the validity of the other provisions of the Promissory Note Resolution, the Credit Agreement or the Promissory Note, but the Bank shall retain all the rights and benefits accorded to them hereunder or thereunder and under any applicable provisions of law.

Section 9.06. Law and Place of Enforcement of the Promissory Note Resolution. The Promissory Note Resolution shall be construed and interpreted in accordance with the laws of the State; provided, however, that as between the Bank and Energy Northwest, Energy Northwest's obligations under the Promissory Note and the Credit Agreement shall be governed and construed in accordance with the laws of the State of New York. Except as otherwise agreed to in the Credit Agreement, all suits and actions arising out of the Promissory Note Resolution shall be instituted in a court of competent jurisdiction in the State.

Section 9.07. Successors and Assigns. Whenever in this Promissory Note Resolution Energy Northwest is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in this Promissory Note Resolution contained by or on behalf of Energy Northwest shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

Section 9.08. Effect of Article and Section Headings and Table of Contents. The heading or titles of the several articles and sections hereof, and any table of contents appended hereto or to copies hereof, shall be solely for convenience of reference and shall not affect the meaning, construction, interpretation or effect of the Promissory Note Resolution.

Section 9.09. Effectiveness of the Promissory Note Resolution. This Promissory Note Resolution shall become effective upon its adoption.

Adopted by the Executive Board of Energy Northwest this 25th day of April, 2002.

______________________________
Chairman of the Executive Board

Attest:

______________________________
Secretary

Approved as to Form and Legality:

______________________________
Office of General Counsel

EXHIBIT A

[CREDIT AGREEMENT]

EXHIBIT B

[RESOLUTION NO. 640]

EXHIBIT C

[RESOLUTION NO. 1042]

SCHEDULE I

Columbia Refunded Bonds Maturing On July 1, 2003

| Series | Amount |
|---|---|
| 1993A | $ 3,395,000 |
| 1994A | 8,270,000 |
| 1996A | 825,000 |
| 1997B | 42,270,000 |
| 1998A | 42,020,000 |

1032816.1

Adopted by the Executive Board of Energy Northwest this 25th day of April, 2002.

Chairman of the Executive Board

Attest:

Secretary

Approved as to Form and Legality:

Office of General Counsel

# EXHIBIT C

Final

# EXECUTIVE BOARD RESOLUTION

## NO. 1301

## A SUPPLEMENTAL RESOLUTION PROVIDING

## FOR THE ISSUANCE OF

## $41,330,000

## ENERGY NORTHWEST

## COLUMBIA GENERATING STATION

## ELECTRIC REVENUE BONDS, SERIES 2003-F

## TABLE OF CONTENTS

(THIS TABLE OF CONTENTS IS NOT A PART OF THE SUPPLEMENTAL RESOLUTION AND IS ONLY FOR CONVENIENCE OF REFERENCE.)

Section | Page

ARTICLE I.

DEFINITIONS AND INTERPRETATION

Section 1.1. Certain Definitions ..... 2
Section 1.2. Interpretation ..... 5

ARTICLE II.

AUTHORIZATION AND ISSUANCE OF THE SERIES 2003-F BONDS

Section 2.1. Authorization; Purpose and Description ..... 5
Section 2.2. Optional Redemption of Series 2003-F Bonds ..... 6
Section 2.3. Sinking Fund Redemption ..... 6

ARTICLE III.

AUTHENTICATION AND DELIVERY OF SERIES 2003-F BONDS

Section 3.1. Authorized Amount of 2003-F Bonds ..... 6
Section 3.2. Authentication and Delivery of Series 2003-F Bonds ..... 7
Section 3.3. Related Agreements ..... 7

ARTICLE IV.

APPLICATION OF PROCEEDS OF SERIES 2003-F BONDS

Section 4.1. Application of Proceeds of Series 2003-F Bonds and Other Moneys ..... 7
Section 4.2. Cost of Issuance Account ..... 7

ARTICLE V.

CREATION OF DEBT SERVICE ACCOUNT, AND DETERMINATIONS UNDER THE RESOLUTION

Section 5.1. Creation of Debt Service Account ..... 8
Section 5.2. Creation of Series 2003-F Construction Fund ..... 8
Section 5.3. Determinations under Article V of the Resolution ..... 10
Section 5.4. Determinations under Section 505 of the Resolution ..... 10

ARTICLE VI.

REDEMPTION OF THE SERIES 2003-F BONDS


Section 6.1. Provisions for the Redemption of the Series 2003-F Bonds .......... 11
Section 6.2. Redemption Manner .......... 11
Section 6.3. Selection of Series 2003-F Bonds to Be Redeemed .......... 11
Section 6.4. Notice .......... 12
Section 6.5. Redemption Payments .......... 12


ARTICLE VII.

CERTAIN ANCILLARY MATTERS


Section 7.1. Book-Entry Provisions .......... 13
Section 7.2. Transfers Outside Book-Entry System .......... 14
Section 7.3. Payments and Notices to Nominee .......... 14
Section 7.4. Provisions Relating to Bond Insurance .......... 14
Section 7.5. Rights of MBIA in an Event of Default .......... 16


ARTICLE VIII.

PARTICULAR COVENANTS OF ENERGY NORTHWEST


Section 8.1. Further Instruments and Action .......... 16
Section 8.2. Additional Tax Covenants .......... 16


ARTICLE IX.

CONCERNING THE TRUSTEE AND PAYING AGENT


Section 9.1. Appointment of Trustee .......... 17
Section 9.2. Notice; Full Information .......... 17
Section 9.3. Ambiguous or Inconsistent Provisions .......... 17
Section 9.4. Trustee as Paying Agent; Additional Paying Agents .......... 17
Section 9.5. Enforced Delay .......... 18


ARTICLE X.

MISCELLANEOUS


Section 10.1. Severability .......... 18
Section 10.2. Notices .......... 18
Section 10.3. Holidays .......... 18
Section 10.4. Effective Date .......... 19

| | |
|---|---|
| EXHIBIT A | Form of Series 2003-F Bond |
| EXHIBIT B | Form of Representation Letter |
| EXHIBIT C | Continuing Disclosure Undertaking |
| SCHEDULE I | Maturities, Principal Amounts, Interest Rates and Prices |
| SCHEDULE II | Optional Redemption Prices |
| SCHEDULE III | Sinking Fund Installments |
| SCHEDULE IV | Application of Series 2003-F Bond Proceeds |

ACCEPTANCE AND ACKNOWLEDGMENT

EXECUTIVE BOARD
RESOLUTION NO. 1301

A SUPPLEMENTAL RESOLUTION PROVIDING FOR THE ISSUANCE OF ENERGY NORTHWEST COLUMBIA GENERATING STATION ELECTRIC REVENUE BONDS, SERIES 2003-F.

WHEREAS, under the provisions of Chapter 43.52 of the Revised Code of the State of Washington, as amended, Energy Northwest ("Energy Northwest") has heretofore been duly organized as a joint operating agency and a municipal corporation of the State of Washington and authorized, among other things, to issue from time to time its negotiable revenue bonds to provide funds for any of its corporate purposes; and

WHEREAS, in accordance with its statutory authority and pursuant to Resolution No. 1042, entitled "A RESOLUTION PROVIDING FOR THE ISSUANCE OF THE WASHINGTON PUBLIC POWER SUPPLY SYSTEM COLUMBIA GENERATING STATION ELECTRIC REVENUE BONDS" ("Resolution No. 1042"), adopted by the Executive Board of Energy Northwest (the "Executive Board") on October 23, 1997, Energy Northwest has heretofore authorized the issuance of Bonds in series from time to time and the application of the proceeds thereof for and to the purposes set forth in such Resolution; and

WHEREAS, pursuant to Resolution No. 1259, adopted by the Executive Board on June 27, 2002 ("Resolution No. 1259") Energy Northwest determined that it was desirable and in the best interests of Energy Northwest and the electric ratepayers of the Pacific Northwest to issue an additional series of Bonds pursuant to and in accordance with Article II and Section 901 of Resolution No. 1042 for the purpose of providing funds to pay the cost of constructing and acquiring certain capital improvements at the Columbia Generating Station, including the payment of certain outstanding promissory notes heretofore issued for such purpose under Resolution No. 1250, adopted by the Executive Board on April 25, 2002; and

WHEREAS, Section 901 of Resolution No. 1042 provides for the adoption by Energy Northwest of supplemental resolutions without the consent or concurrence of the owners of the Bonds to, among other things, provide for the issuance of one or more Series of Bonds, and to prescribe the terms and conditions pursuant to which such Bonds may be issued, paid or redeemed; and

WHEREAS, Energy Northwest has determined that it is in its best interest and in the best interest of the electric ratepayers of the Pacific Northwest to provide for the issuance of a Series of Bonds at this time.

NOW, THEREFORE, BE IT RESOLVED BY THE EXECUTIVE BOARD OF ENERGY NORTHWEST AS FOLLOWS:

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

Section 1.1. Certain Definitions. (a) Except as otherwise provided in subsection (b) of this Section 1.1, all terms which are defined in Section 101 of the Resolution and in the preamble hereto shall have the same meanings in this Supplemental Resolution as such terms are given in the Resolution.

(b) As used in this Supplemental Resolution, the following terms and phrases shall have the respective meanings hereinafter set forth unless the context shall clearly indicate that another meaning is intended (singular definitions herein shall be deemed to include the plural thereof and vice versa):

"Authorized Officer" shall mean the Chairman of the Executive Board, the Vice Chairman of the Executive Board, the Secretary of the Executive Board, the Chief Executive Officer or Acting Chief Executive Officer of Energy Northwest, the Chief Financial Officer, the Treasurer, any Assistant Treasurer or Assistant Secretary of Energy Northwest, and any other officer designated from time to time as an Authorized Officer by resolution of the Executive Board.

"Authorized Purpose" shall mean any one or more of the purposes described in Section 201 of Resolution No. 1042.

"Bond Depository" shall mean DTC or any other securities depository selected by Energy Northwest which agrees to follow the procedures required to be followed by such securities depository in connection with the Series 2003-F Bonds.

"Business Day" shall mean a day other than a day on which (a) commercial banks located in Seattle, Washington or New York, New York are required or authorized by law to close, or (b) the New York Stock Exchange is closed.

"Chief Executive Officer" shall mean the duly appointed and acting Chief Executive Officer of Energy Northwest.

"Chief Financial Officer" shall mean the duly appointed and acting Chief Financial Officer of Energy Northwest.

"Continuing Disclosure Undertaking" shall mean the Continuing Disclosure Undertaking authorized pursuant to Section 7.2 hereof, to be dated as of May 29, 2003 whereby Energy Northwest covenants to provide certain updates of information to enable the Underwriters to comply with Rule 15c2-12, promulgated under the Securities and Exchange Act of 1934, as amended, substantially in the form attached hereto as Exhibit C, and all amendments thereto.

"Corporate Trust Office" shall mean the corporate trust office of the Trustee, located in Seattle, Washington at the address shown in Section 10.2, or such other location designated in writing by the Trustee from time to time.

"Costs of the 2003-F Authorized Purpose" shall mean all costs paid or incurred by Energy Northwest in connection with the planning, acquisition and construction of the 2003-F Authorized Purpose, as such costs are defined in Section 5.2 of this Supplemental Resolution.

"Defeasance Obligations" shall have the meaning assigned to such term in Resolution No. 1042.

"DTC" shall mean The Depository Trust Company and its successors and assigns.

"Fitch" shall mean Fitch, Inc., a corporation duly organized under the law of the State of Delaware, its successors and assigns.

"Government Obligations" shall mean (i) obligations issued by the United States or by any agency or instrumentality thereof guaranteed as to principal and interest by the full faith and credit of the United States, (ii) certificates evidencing direct ownership of the right to the payment of the principal of and interest on obligations described in clause (i), provided (A) that such obligations are held in the custody of a bank or trust company satisfactory to the Trustee or Energy Northwest, as the case may be, in a special account separate from the general assets of such custodian and (B) that such certificates are issued by the United States Treasury, and (iii) shares of a money market fund, organized as a "Massachusetts" or "business" trust, evidencing a proportionate interest in a portfolio consisting exclusively of obligations of the type described in clause (i), provided that (A) the Trustee has received an opinion of counsel acceptable to the Trustee to the effect that the shareholders of such fund are beneficial owners of ratable interests in the fund's portfolio of securities, (B) the instrument governing such trust has not been amended subsequent to the date of such opinion and (C) such fund is rated in the highest rating category by each Rating Agency then rating the Series 2003-F Bonds.

"MBIA" shall mean MBIA Insurance Corporation a New York stock insurance company, or any successor thereto or assignee thereof.

"MBIA Policy" means the financial guaranty insurance policy to be issued by MBIA in connection with the Series 2003-F Bonds, authorized in Section 7.7 of this Supplemental Resolution.

"Moody's" shall mean Moody's Investors Service, Inc., a corporation organized and existing under the laws of the State of Delaware, and its successors and assigns.

"Owner of 2003-F Bonds" or "holder of Series 2003-F Bonds" or "owner" or "holder" shall mean the registered owner of any Series 2003-F Bond.

"Participants" shall mean those broker-dealers, banks and other financial institutions for which DTC holds 2003-F Bonds as securities depository.

"Paying Agent" shall mean the Trustee or such other or additional Paying Agent designated from time to time pursuant to Section 9.4 of this Supplemental Resolution.

"Person" shall mean a natural person, firm, association, corporation, public body or any other legal entity.

"Rating Agency" shall mean Fitch, Moody's or Standard & Poor's or, if any of Fitch, Moody's or Standard & Poor's does not furnish a rating on the Series 2003-F Bonds, then each such nationally recognized rating agency then rating the Series 2003-F Bonds.

"Representation Letter" shall mean the Representation Letter, authorized pursuant to Section 7.1 hereof, from Energy Northwest to DTC, substantially in the form attached hereto as Exhibit B, and all amendments thereto.

"Resolution" or "Resolution No. 1042" shall mean Resolution No. 1042 adopted by the Executive Board on October 23, 1997, as amended and supplemented from time to time by one or more Supplemental Resolutions.

"Securities Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Series 2003-F Bonds" or "2003-F Bonds" shall mean Energy Northwest Columbia Generating Station Electric Revenue Bonds, Series 2003-F authorized to be issued pursuant to Section 2.1 of this Supplemental Resolution and any Series 2003-F Bonds issued in exchange or replacement therefor.

"Series 2003-F Construction Fund" shall mean the Fund by such name, created and established by Section 5.2 of this Supplemental Resolution

"Series 2003-F Cost of Issuance Account" shall mean the Account by that name established in Section 4.2 hereof.

"Standard & Poor's" or "S&P" shall mean Standard & Poor's Ratings Services, a Division of The McGraw-Hill Companies, Inc., organized and existing under the laws of the State of New York, and its successors and assigns.

"Supplemental Resolution" shall mean this supplemental resolution, including any supplemental resolutions hereto.

"Tax Requirements" shall mean those provisions of (i) the Tax Reform Act of 1986, as amended, (ii) the Code, and (iii) the temporary, proposed, or final regulations promulgated thereunder by the United States Treasury Department which are applicable to the Series 2003-F Bonds and which must be complied with in order that the interest on the Series 2003-F Bonds not be, and continue not to be, includable in the gross income of the owners thereof for federal income tax purposes.

"2002 Promissory Note" shall mean that certain promissory note of Energy Northwest, dated May 10, 2002, evidencing the obligation of Energy Northwest to repay $34,518,000.00 borrowed under a certain Credit Agreement, by and between Energy Northwest and Citibank, N.A., dated April 25, 2002, for the purpose paying a portion of the Costs of acquiring and constructing the 2003-F Authorized Purpose.

"2003-F Authorized Purpose" shall mean collectively the Authorized Purposes described in Section 2.1(b) hereof, a portion of the Costs of which are to be financed from the proceeds of the sale of the Series 2003-F Bonds, as provided in this Supplemental Resolution.

Section 1.2. Interpretation. All references to Section numbers or Article numbers which do not specify the document to which such Section numbers or Article numbers relate shall be deemed to refer to Section numbers or Article numbers, as the case may be, contained in this Supplemental Resolution. All references to Exhibits, Appendices and Schedules which do not specify the document to which such relate shall be deemed to refer to the Exhibits, Appendices and Schedules, as the case may be, to this Supplemental Resolution. This Supplemental Resolution shall otherwise be interpreted as set forth in Section 102 of the Resolution.

ARTICLE II.

AUTHORIZATION AND ISSUANCE OF THE SERIES 2003-F BONDS

Section 2.1. Authorization; Purpose and Description. (a) Authorization. In accordance with and pursuant to Section 201 of the Resolution, there is hereby created for issuance under this Supplemental Resolution a Series of Bonds (the "Series 2003-F Bonds"), in the aggregate principal amount of $41,330,000 bearing the descriptive title "Energy Northwest Columbia Generating Station Electric Revenue Bonds, Series 2003-F" and in the form attached hereto as Exhibit A. Subject to the terms of this Supplemental Resolution, the Series 2003-F Bonds shall be entitled to the benefits, protection and security of the provisions of, and shall be payable solely from, and secured by the funds pledged therefor under, the Resolution.

(b) Purposes. The Series 2003-F Bonds are being issued to provide moneys to pay a portion of the cost of the acquisition, construction and equipping of the following described improvements to the Columbia Generating Station authorized pursuant to Section 201 of Resolution No. 1042 (collectively, the "2003-F Authorized Purpose"): (i) The initial phase of a dry spent fuel storage facility ( the *Independent Spent Fuel Storage Facility* or "ISFSI") located approximately 500 meters north-northwest of the existing reactor building, the initial phase consisting of two reinforced concrete storage pads each pad to contain 18 concrete/steel over packs for radiation shielding from the spent fuel; each over pack to consist of concentric cylinders of carbon steel liners filled with concrete shielding; inside each over pack will be a low-nitrogen, corrosion-resistant stainless steel canister with .5 inch thick walls and will contain a basket holding sixty-eight fuel assemblies; (ii) Security Computer System consisting of dual computer systems, coax and fiber optic wiring, new work stations, printers, storage devices, multiplexers and card readers; (iii) Hydrogen Water Chemistry project consisting of a hydrogen storage facility located 3000 feet southeast of the reactor building, associated piping to the plant and the injection system; (iv) the acquisition and installation, from time to time, of ISFSI Outer Casks consisting of additional over packs for the ISFSI facility; (v) Replacement of Process Monitoring Systems consisting of 13 process radiation monitors and the associated high range turbine building and radwaste building monitors; and (vi) Replacement of Reactor Feed Water Heaters consisting of the sixth stage feedwater heaters A and B and/or (vii) such other improvements described in Section 201 of the Resolution, provided that such other improvements had been reviewed by the Executive Board. The 2003-F Bonds are also being issued for the purpose of paying certain expenses relating to their issuance.

(c) Principal and Interest Payment Dates. The Series 2003-F Bonds shall mature on July 1, in each of the years and in the principal amounts, shall be sold to the public initially at the prices, and shall bear interest at the rates per annum from the date thereof, payable on July 1, 2003 and semi-annually thereafter on January 1 and July 1 of each year, until payment of the principal thereof, all as shown on Schedule I attached hereto and made a part hereof.

(d) Denominations. The Series 2003-F Bonds shall be issued in denominations of $5,000 or any integral multiple thereof. Each Series 2003-F Bond shall be identified by a legend consisting of the letters "AR" and the number of the Series 2003-F Bond. The Series 2003-F Bonds of each maturity of each identifying letter legend shall be numbered in consecutive numerical order from one upwards within a maturity, but need not be authenticated or delivered in consecutive order.

(e) Date of the Bonds. The Series 2003-F Bonds initially delivered hereunder all shall be dated as of the date of their delivery to the original purchasers thereof. Each Series 2003-F Bond issued in exchange for or upon the transfer of the Series 2003-F Bonds thereafter shall be dated as of the date six months preceding the first interest payment date next following the date of such exchange or transfer, unless (i) such date of exchange or transfer shall be an interest payment date, in which case it shall be dated as of such date of exchange or transfer, (ii) such date of exchange or transfer is a date prior to the first interest payment date for such Series 2003-F Bond, in which case it shall be dated the date of delivery of the Series 2003-F Bonds or (iii) as shown by the records of the Trustee, interest on the Series 2003-F Bonds shall be in default, in which case it shall be dated as of the date to which interest has been paid in full on the Series 2003-F Bond or Series 2003-F Bonds surrendered in exchange for such Series 2003-F Bond. The amount of interest payable on the Series 2003-F Bonds on any interest payment date shall be computed on the basis of a 360-day year consisting of twelve 30-day months.

Section 2.2. Optional Redemption of Series 2003-F Bonds. At the option of Energy Northwest, the Series 2003-F Bonds, if any, set forth on Schedule II attached hereto and made a part hereof shall be subject to redemption prior to maturity at the time or times, in such order of maturity, upon such notice, and at such redemption prices with respect to each such Series 2003-F Bond to be redeemed, all as set forth on said Schedule II.

Section 2.3. Sinking Fund Redemption. The Series 2003-F Term Bonds, if any, set forth on Schedule III attached hereto and made a part hereof shall be retired by Sinking Fund Installments in the respective principal amounts set forth on said Schedule III on July 1 of each of the years set forth on said Schedule III.

## ARTICLE III.

## AUTHENTICATION AND DELIVERY OF SERIES 2003-F BONDS

Section 3.1. Authorized Amount of 2003-F Bonds. In accordance with and for the purpose of Section 203(c) of the Resolution, the aggregate principal amount of the 2003-F Bonds which may be executed by Energy Northwest and authenticated and delivered by the Trustee and

secured by the Resolution is limited to $41,330,000 except as otherwise provided in the Resolution.

Section 3.2. Authentication and Delivery of Series 2003-F Bonds. Pursuant to and in accordance with Section 203 of the Resolution, the Series 2003-F Bonds shall be executed by Energy Northwest and delivered to the Trustee for authentication, and upon the written direction of Energy Northwest the Series 2003-F Bonds shall be authenticated by the Trustee and shall be delivered to or upon the request and authorization of Energy Northwest, but only upon receipt by the Trustee of all of the items listed in Section 203 of the Resolution and of the following:

(a) the Representation Letter;

(b) the proceeds of sale of the Series 2003-F Bonds, for application in accordance with Section 4.1; and

(c) such other closing documents and Opinions of Counsel as the Trustee or Energy Northwest may reasonably request.

Section 3.3. Related Agreements. Each of the Representation Letter and the Continuing Disclosure Undertaking, in substantially the form presented to this meeting and annexed hereto as Exhibits B and C, respectively, are hereby approved. The Authorized Officers, and each of them without the others, are hereby authorized to execute and deliver the Representation Letter and the Continuing Disclosure Undertaking on behalf of Energy Northwest, together with such changes, variations, omissions and insertions as such officers or any of them shall deem appropriate, without additional action by the Executive Board; such execution shall constitute conclusive evidence of such approval. Said Authorized Officers, and each of them without the others, are hereby further authorized to do all things necessary to carry out the transactions contemplated by the Representation Letter and the Continuing Disclosure Undertaking.

## ARTICLE IV.

## APPLICATION OF PROCEEDS OF SERIES 2003-F BONDS

Section 4.1. Application of Proceeds of Series 2003-F Bonds and Other Moneys. (a) In accordance with and for the purposes of Section 203(c) of the Resolution, Energy Northwest hereby irrevocably directs that simultaneously with the delivery of the Series 2003-F Bonds, all the proceeds of the sale shall be paid to the Trustee, for application in the amounts and for the purposes authorized in the Resolution and as set forth on Schedule IV attached hereto and made a part hereof.

(b) The Authorized Officers, and each of them without the others, are hereby authorized and directed on behalf of Energy Northwest to give written directions to the Trustee, as Trustee and Paying Agent, as to the investments to be made under the Resolution of the proceeds of the Series 2003-F Bonds.

Section 4.2. Cost of Issuance Account. In accordance with Article V of the Resolution, there is hereby created and established with the Trustee a special trust fund designated the "Columbia Generating Station Electric Revenue Bonds, Series 2003-F Cost of Issuance

Account" (the "Series 2003-F Cost of Issuance Account"), to be held and maintained in the custody of the Trustee as a special trust account, separate and apart from all other funds of Energy Northwest and the Trustee, for the benefit of Energy Northwest and the persons providing services to Energy Northwest in connection with the issuance, sale and delivery of the Series 2003-F Bonds. The portion of the proceeds of the Series 2003-F Bonds and other moneys of Energy Northwest legally available therefor, if any, set aside and held in trust in the Series 2003-F Cost of Issuance Account as provided in Schedule IV attached hereto shall be applied to, and applied solely for, the payment, or reimbursement to Energy Northwest for the payment, of the cost of issuance of the Series 2003-F Bonds upon the written direction of an Authorized Officer of Energy Northwest. Moneys in the Series 2003-F Cost of Issuance Account not required for immediate disbursement for the foregoing purposes shall, to the fullest extent practicable and reasonable, be invested and reinvested by the Trustee at the written direction of Energy Northwest in Investment Securities. All income resulting from the investment or reinvestment of the Series 2003-F Cost of Issuance Account shall accrue to and be deposited in such Account. Moneys remaining in the Series 2003-F Cost of Issuance Account after all such costs shall have been paid in full shall, at the direction of Energy Northwest, be transferred to Energy Northwest for deposit in the Series 2003-F Construction Fund; *provided, however*, if the Executive Board has theretofore determined that the acquisition, construction and installation of the 2003-F Authorized Purpose has been completed, such moneys shall be deposited in the Debt Service Account established pursuant to Section 5.1 hereof and applied in a manner consistent with the Tax Requirements.

## ARTICLE V.

## CREATION OF DEBT SERVICE ACCOUNT, AND DETERMINATIONS UNDER THE RESOLUTION

Section 5.1. Creation of Debt Service Account. In accordance with and for the purposes of Article V of the Resolution, there is hereby created and established a special trust account in the Debt Service Fund to be known as the "Columbia Generating Station 2003-F Debt Service Account" (the "Debt Service Account"), which shall be held by the Trustee, subject to the lien of the Resolution.

Section 5.2. Creation of Series 2003-F Construction Fund. In accordance with and for the purposes of Article V of the Resolution, there is hereby created and established a special trust fund to be known as the "Columbia Generating Station Electric Revenue Bond Construction Fund, 2003" (the "Series 2003-F Construction Fund"). The Series 2003-F Construction Fund shall be held in trust by Energy Northwest, separate and apart from all other funds or accounts of Energy Northwest, solely to pay a portion of the Costs of the 2003-F Authorized Purpose. Pending application to pay such Costs as herein provided, amounts in the Construction Fund shall be held in trust for the benefit of the Owners.

(a) Investment of Moneys in the 2003-F Construction Fund. Pending their application as herein provided, amounts in the Series 2003-F Construction Fund shall be invested by Energy Northwest in Investment Securities, which shall mature or be subject to redemption within three (3) years from the date of their purchase. Any such investment shall be made with due regard to the estimated dates of payment of a portion of the Costs of the 2003-F Authorized

Purpose. All interest earned by reason of such investments shall accrue to the Series 2003-F Construction Fund. In the event that moneys that are so invested are needed in the Series 2003-F Construction Fund to meet obligations thereof, for which funds are not otherwise available, then Energy Northwest shall sell or present for redemption said investments to the extent required to provide for such purpose.

(b) Deposits to 2003-F Construction Fund. From the proceeds of sale of the 2003-F Bonds there shall be deposited in the Series 2003-F Construction Fund the amount described on Schedule IV. There shall also be deposited in the Series 2003-F Construction Fund, the amounts, if any, received by Energy Northwest from time to time by reason of the breach or default of contractors in connection with the construction or acquisition of the 2003-F Authorized Purpose and the proceeds of salvage sales, if any.

(c) Costs of the 2003-F Authorized Purpose. Payment of a portion of the Costs of the 2003-F Authorized Purpose shall be made from the amounts on deposit in the 2003-F Construction Fund. For purposes of this Supplemental Resolution, such Costs shall include costs of constructing, acquiring and installing the 2003-F Authorized Purpose, as described in Section 2.1(b) hereof, and shall include, but not be limited to, the following:

(i) Paying or reimbursing the costs of engineering and other fees and expenses properly incurred in connection with the 2003-F Authorized Purpose, interest on the 2003-F Bonds during the period of construction of the 2003-F Authorized Purpose and the payment of the principal of and interest on the 2002 Promissory Note;

(ii) the cost of obtaining any and all permits and licenses, required by any governmental agency or authority having jurisdiction, or useful, in connection with the acquisition and construction of the 2003-F Authorized Purpose and placing the same in operation;

(iii) obligations incurred for labor and materials and to contractors, builders and material suppliers in connection with the acquisition and construction of the 2003-F Authorized Purpose, for machinery and equipment for the restoration and relocation of property necessary in connection with such construction, for the removal and relocation of structures and the clearing of lands; and

(iv) the cost to Energy Northwest of the performance of engineering and other professional services rendered to Energy Northwest in connection with the acquisition and construction of the 2003-F Authorized Purpose and placing the same in operation.

(d) Manner of Paying Costs of Construction. Transfer or payment from the Series 2003-F Construction Fund shall be made in accordance with the provisions of this subsection 5.2(d). Upon preparation of vouchers approved by the Chief Financial Officer, the Chief Executive Officer shall approve and direct the payment of all amounts due and owing on account of the Costs of the 2003-F Authorized Purpose.

Prior to any transfer or payment from the Series 2003-F Construction Fund with respect to obligations for work, materials, equipment or supplies, there shall be filed with the Executive Board (i) the certificate of an independent engineer required by Section 201 of the

Resolution with respect to those improvements described in clause (iii) and clause (iv) of said Section, (ii) a certificate of the Chief Executive Officer stating that an obligation in the amounts set forth in such vouchers have been incurred by Energy Northwest and that each item thereof is a proper charge and in a reasonable amount against the Series 2003-F Construction Fund and has not theretofore been paid, or if theretofore paid, that such item has not been theretofore reimbursed to Energy Northwest, and that, insofar as such obligation was incurred for work, materials, equipment or supplies such work was actually performed, or such equipment, materials or supplies were actually installed in furtherance of the construction of the 2003-F Authorized Purpose, or delivered for storage or fabrication at a place approved by the Chief Executive Officer and under the control of Energy Northwest, or is a progress payment due on equipment being fabricated to order and (iii), if a payment is requested for an improvement other than one described in items (i) through (vi) of Section 2.1 of this Supplemental Resolution, prior to any transfer or payment from the Series 2003-F Construction Fund with respect thereto, there shall be filed with the Executive Board, in addition to any engineer's certificate(s) described in clause (i) above, a certificate of an independent engineer stating that such improvement is described in Section 201 of the Resolution.

Upon approval by the Chief Executive Officer, the Chief Financial Officer or any other Authorized Officer shall pay such obligation from the Series 2003-F Construction Fund.

The Authorized Officers are hereby authorized and directed to execute and deliver in the name of Energy Northwest any and all documents, papers, receipts, orders and releases that are required or convenient to enable Energy Northwest to effect the construction and acquisition of the 2003-F Authorized Purpose and to pay from 2003-F Bond proceeds any and all amounts required to perform fully the obligations of Energy Northwest with respect to the 2003-F Authorized Purpose.

(e) Distribution of Surplus Money in the Series 2003-F Construction Fund. As soon as practicable after the Executive Board determines that the acquisition, construction and installation of the 2003-F Authorized Purpose has been completed in every material respect, any balance then remaining in the Series 2003-F Construction Fund shall be transferred to the Trustee for deposit in the Debt Service Account established pursuant to Section 5.1 hereof and applied in a manner consistent with the Tax Requirements.

Section 5.3. Determinations under Article V of the Resolution. Pursuant to Article V of the Resolution, the Trustee is hereby directed to apply amounts on deposit in the Debt Service Account for payment of the (i) Principal Installments, if any, due on the Series 2003-F Bonds on each Payment Date, (ii) interest due on the Series 2003-F Bonds on each Payment Date, and (iii) the Redemption Price for the Series 2003-F Bonds on any redemption date therefor, all in accordance with Article II of this Supplemental Resolution.

Section 5.4. Determinations under Section 505 of the Resolution. (a) Pursuant to Section 505(b) of the Resolution, if Sinking Fund Installments are established for the Series 2003-F Bonds under Section 2.3 of this Supplemental Resolution, the Trustee is hereby directed to apply amounts deposited in the Debt Service Account for payment of such Sinking Fund Installments for the Series 2003-F Bonds to the purchase of the Series 2003-F Bonds in accordance with the provisions of said Section 505(b) of the Resolution.

(b) In accordance with and for purposes of Sections 203(c)(viii) and 505(c) of the Resolution, Energy Northwest shall receive a credit in respect of the Sinking Fund Installment due on any Payment Date with respect to any Series 2003-F Bond which has been redeemed (except from moneys credited to the Debt Service Account for payment of such Sinking Fund Installments) or otherwise acquired by Energy Northwest and delivered to the Trustee for cancellation by the Trustee prior to the giving of the notice of redemption provided for below and which has not theretofore been applied as a credit against any Sinking Fund Installment; provided, however, that Energy Northwest shall give written notice to the Trustee at least 45 days prior to any Sinking Fund Installment Date that such Series 2003-F Bonds are to be so credited. Subject to the foregoing and unless Energy Northwest shall otherwise determine in a certificate delivered to the Trustee by an Authorized Officer, each such Series 2003-F Bond shall be credited by the Trustee at 100% of the principal amount thereof against the next ensuing Sinking Fund Installment and the principal amount of Series 2003-F Bonds to be redeemed by Sinking Fund Installment, and the amount required to be on deposit in the Debt Service Fund for such purpose on such Sinking Fund Installment Date shall be reduced accordingly.

(c) Subject to and in accordance with the provisions of Article VI hereof, the Trustee shall call for redemption on such Sinking Fund Installment Date such amount of Series 2003-F Bonds selected by lot (in such manner as may be deemed fair and proper by the Trustee), as will exhaust all moneys, if any, required to be on deposit in the Debt Service Account on or before such Sinking Fund Installment Date for the purpose of meeting the requirements applicable to the Series 2003-F Bonds as set forth on Schedule III attached hereto and made a part hereof.

## ARTICLE VI.

## REDEMPTION OF THE SERIES 2003-F BONDS

Section 6.1. Provisions for the Redemption of the Series 2003-F Bonds. (a) At the option of Energy Northwest, the Series 2003-F Bonds maturing on or after July 1, 2014 are subject to redemption on and after July 1, 2013, in each case, in whole, or in part by lot, at any time, at a Redemption Price equal to 100% of the principal amount of the Bonds so called for redemption, in accordance with Schedule II hereto.

(b) The Series 2003-F Bonds maturing July 1, 2018 are subject to mandatory redemption prior to maturity, in accordance with Schedule III hereto.

Section 6.2. Redemption Manner. In accordance with and for the purposes of Section 401 of the Resolution, any redemption of all or any part of the Series 2003-F Bonds shall be made in the manner provided in this Article VI.

Section 6.3. Selection of Series 2003-F Bonds to Be Redeemed. In accordance with Section 402 of the Resolution, in the event of redemption at any time of only a part of the outstanding Series 2003-F Bonds of a particular maturity, the Trustee shall select the Series 2003-F Bonds of such maturity to be redeemed by lot, using such method as it shall determine in its sole discretion. For the purposes of this Section, Series 2003-F Bonds which have theretofore been selected by lot for redemption shall not be deemed outstanding. The Trustee shall not be

required to transfer Series 2003-F Bonds for a period of fifteen (15) days prior to the selection of Series 2003-F Bonds for redemption or to transfer any Series 2003-F Bonds for which the Trustee has provided notice of redemption pursuant to Section 6.4 hereof.

Section 6.4. Notice. (a) Energy Northwest shall give written notice to the Trustee of its election to redeem Series 2003-F Bonds in the manner provided in Section 403 of the Resolution. Such notice shall be given at least forty-five (45) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee with respect to Series 2003-F Bonds. If notice of redemption is given as stated above, the Series 2003-F Bonds called for redemption shall become due and payable on the redemption date specified in the notice and interest thereon will cease to accrue from and after the redemption date specified in the notice, if moneys sufficient for the redemption of the Series 2003-F Bonds to be redeemed, together with interest thereon to the redemption date, are held by the Paying Agent for such Series 2003-F Bonds on the redemption date. In the event notice of redemption shall have been given as provided herein, the Trustee, if it holds moneys to be applied to the payment of the Redemption Price, shall pay (or otherwise Energy Northwest, prior to the redemption date, shall pay to the Trustee, in cash, an amount which, in addition to other moneys, if any, held by such Trustee, will be sufficient to pay) on the redemption date the Redemption Price, together with accrued interest thereon of all the Series 2003-F Bonds to be redeemed.

(b) In accordance with Section 403 of the Resolution, in the case of any redemption, the Trustee shall, in its own name or in the name of Energy Northwest, give notice by first-class mail or deliver by overnight courier or telecopy to the owners of the Series 2003-F Bonds or portions thereof to be redeemed at their addresses set forth in the registration books maintained pursuant to Section 304 of the Resolution. The Trustee shall mail or deliver by overnight courier or telecopy a copy of such notice not less than thirty (30) days before the redemption date. Notwithstanding the foregoing, the Trustee shall give notice of redemption at the option of Energy Northwest as specified in this Section 6.4 only if there has been deposited with the Trustee an amount which, in addition to other moneys, if any, available therefor held by such Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, together with accrued interest thereon, all the Series 2003-F Bonds to be redeemed. Such available moneys shall be invested by the Trustee at the written direction of Energy Northwest, but only in Government Obligations or Defeasance Obligations maturing within thirty (30) days or earlier as needed.

Section 6.5. Redemption Payments. If notice of redemption has been duly given by mailing or delivery by overnight courier or telecopy as herein provided, then the Series 2003-F Bonds or portions thereof called for redemption shall be due and payable on the redemption date at the applicable Redemption Price. Provision for payment of the Redemption Price, together with accrued interest, shall be made by the Trustee to or upon the order of the holders of the Series 2003-F Bonds or portions thereof called for redemption upon surrender of such Bonds.

From and after the redemption date designated in such notice, and provided that moneys for the redemption of all the Series 2003-F Bonds (or portions thereof) to be redeemed on such redemption date, together with interest thereon to such redemption date, shall be held by the Trustee so as to be available therefor on the date fixed for such redemption, notwithstanding that any Series 2003-F Bonds or portions thereof so called for redemption in whole or in part shall

not have been surrendered for cancellation, no further interest shall accrue upon the principal of any of the Series 2003-F Bonds (or portions thereof) so called for redemption; and such Series 2003-F Bonds (or such portions thereof) shall cease to be entitled to any benefit or security under the Resolution and this Supplemental Resolution, and the holders thereof shall have no rights in respect of such Series 2003-F Bonds (or such portions thereof) except to receive payment of the Redemption Price thereof and interest accrued to the date fixed for redemption and, to the extent provided in Section 6.4 hereof, to receive Series 2003-F Bonds for any unredeemed portions of redeemed Series 2003-F Bonds.

## ARTICLE VII.

## CERTAIN ANCILLARY MATTERS

Section 7.1. Book-Entry Provisions. (a) The Series 2003-F Bonds of each maturity shall be initially issued in the form of a separate single fully registered Series 2003-F Bond (which may be typewritten) in book-entry only form. Upon initial issuance, the ownership of the Series 2003-F Bonds shall be registered in the books of Energy Northwest kept by the Registrar in the name of Cede & Co., as nominee (the "Nominee") of the Bond Depository. Except as provided in Section 7.5 hereof, all of the Outstanding Series 2003-F Bonds shall be registered on the books of Energy Northwest kept by the Registrar in the name of such Nominee.

(b) With respect to the Series 2003-F Bonds so registered, Energy Northwest and the Trustee shall have no responsibility or obligation to any Participant or to any Person on behalf of which a Participant holds an interest in the Series 2003-F Bonds. Without limiting the generality of the immediately preceding sentence, Energy Northwest and the Trustee shall have no responsibility or obligation (unless the Trustee is at the time the Bond Depository) with respect to (i) the accuracy of the records of the Bond Depository, the Nominee or any Participant with respect to any ownership interest in the Series 2003-F Bonds, (ii) the delivery to any Participant or any other Person, other than an owner as shown on the registration books of Energy Northwest, of any notice with respect to the Series 2003-F Bonds, or (iii) the payment to any Participant or any other Person, other than an owner as shown on the registration books of Energy Northwest, of any amount with respect to principal of or interest on the Series 2003-F Bonds. Energy Northwest and the Trustee may treat and consider the Person in whose name each Series 2003-F Bond is registered on such books as the owner of such Series 2003-F Bond for the purpose of payment of principal of and interest on such Series 2003-F Bond, for the purpose of giving notices and other matters with respect to such Series 2003-F Bond and for all other purposes whatsoever.

(c) The Trustee shall pay all principal of and interest on the Series 2003-F Bonds only to or upon the order of the respective owners, as shown on the registration books of Energy Northwest maintained by the Registrar, or their respective attorneys, duly authorized in writing, and all such payments shall be valid and effective to fully satisfy and discharge the obligations hereunder with respect to the payment of principal of and interest on the Series 2003-F Bonds to the extent of the sum or sums so paid. No Person other than an owner, as shown on such books, shall receive a Series 2003-F Bond evidencing the obligation to make payments of principal and interest pursuant to this Supplemental Resolution. Upon delivery by the Bond Depository to the Trustee and Energy Northwest of written notice to the effect that the Bond Depository has

determined to substitute a new nominee in place of the Nominee, and subject to the provisions herein with respect to record dates, the term Nominee in this Supplemental Resolution shall refer to such new nominee of the Bond Depository.

Section 7.2. Transfers Outside Book-Entry System. In the event (i) the Bond Depository determines not to continue to act as securities depository, or (ii) Energy Northwest determines that the Bond Depository shall no longer so act and delivers a written certificate to the Trustee to that effect, then Energy Northwest will discontinue the book-entry system with the Bond Depository. If Energy Northwest determines to replace the Bond Depository with another qualified securities depository, Energy Northwest shall prepare or direct the preparation of a new, single, separate, fully registered Series 2003-F Bond for each maturity registered in the name of such successor or substitute qualified Bond Depository or its nominee, or make such other arrangements acceptable to Energy Northwest and the Bond Depository as are not inconsistent with the terms of this Supplemental Resolution. If Energy Northwest fails to identify another qualified securities depository to replace the Bond Depository, then the Series 2003-F Bonds shall no longer be restricted to being registered in the name of the Nominee, but shall be registered on the registration books of Energy Northwest maintained by the Registrar in whatever name or names the Participants transferring or exchanging certificates shall designate in accordance with the provisions of Article III of the Resolution.

Section 7.3. Payments and Notices to Nominee. Notwithstanding any other provision of this Supplemental Resolution to the contrary, so long as any Series 2003-F Bond is registered in the name of the Nominee, all payments with respect to principal of and interest on such Series 2003-F Bond, all procedures relating to the tender and purchase of such Series 2003-F Bond and all notices with respect to such Series 2003-F Bond shall be made and given, respectively, as provided in the Representation Letter or as otherwise instructed by the Bond Depository.

Section 7.4. Provisions Relating to Bond Insurance. (a) MBIA shall be deemed to be the sole holder of the Series 2003-F Bonds insured by it for the purpose of exercising any voting right or privilege or giving any consent or direction or taking any other action that the holders of the Series 2003-F Bonds insured by it are entitled to take pursuant to the Resolution. The Series 2003-F Bonds insured by MBIA shall not be accelerated without its consent.

(b) The rights of MBIA set forth in this Supplemental Resolution may not be modified or amended without its prior written consent. Any amendment or modification of the Resolution that requires the consent of Owners shall also require the prior written consent of MBIA. MBIA must be given written notice of any amendment or modification of the Resolution that does not require the consent of Owners. Any reorganization or liquidation plan with respect to Energy Northwest must be acceptable to MBIA. In the event of any reorganization or liquidation, MBIA shall have the right to vote on behalf of all owners of Series 2003-F Bonds insured by it absent a default by MBIA under their policies insuring such obligations. MBIA's consent shall be required in addition to Owner consent, when required, to remove the Trustee and to appoint any successor trustee.

(c) Copies of any modification or amendment to the Resolution shall be sent to Fitch, Standard & Poor's and Moody's at least 10 days prior to the effective date thereof.

(d) Amounts paid by MBIA under the MBIA Policy shall not be deemed paid for purposes of the Resolution and shall remain Outstanding and continue to be due and owing until paid by Energy Northwest in accordance with the Resolution. MBIA shall, to the extent they make any payments of principal of or interest on the Bonds, become subrogated to the rights of the recipients of such payments in accordance with the terms of their respective Insurance Policies. The Resolution shall not be discharged unless all amounts due or to become due to MBIA have been paid in full or duly provided for.

(e) With respect to claims upon the Insurance Policies and Payments by and to MBIA, if, by 11 a.m., New York City time on the Business Day prior to the related scheduled interest payment date or principal payment date ("Payment Date") there is not on deposit with the Trustee, after making all transfers and deposits required under the Resolution, moneys sufficient to pay the principal of and interest on the Series 2003-F Bonds insured by MBIA due on such Payment Date, the Trustee shall make a claim under the MBIA Policy and give notice to MBIA and to MBIA's designated agent (if any) (the "Bond Insurer's Fiscal Agent") by telephone or telecopy of the amount of such deficiency, and the allocation of such deficiency between the amount required to pay interest on such Series 2003-F Bonds and the amount required to pay principal of such Series 2003-F Bonds, confirmed in writing to such Bond Insurer and MBIA's Fiscal Agent by 12:00 noon, New York City time, on such Business Day by filling in the form of Notice of Claim and Certificate delivered with the MBIA Policy.

In the event the claim to be made is for a mandatory sinking fund redemption installment, upon receipt of the money's due, the Trustee shall authenticate and deliver to affected Owners who surrender their Series 2003-F Bonds a new Series 2003-F Bond or Series 2003-F Bonds in an aggregate principal amount equal to the unredeemed portion of the Series 2003-F Bond surrendered. The Trustee shall designate any portion of payment of principal on Series 2003-F Bonds paid by MBIA, whether by virtue of mandatory sinking fund redemption, maturity or other advancement of maturity, on its book as a reduction in the principal amount of Series 2003-F Bonds registered to the then current Owner, whether DTC or its nominee or otherwise, and shall issue a replacement Series 2003-F Bond to MBIA, registered in its name, in a principal amount equal to the amount of principal so paid (without regard to authorized denominations); provided that the Paying Agent's failure to so designate any payment or issue any replacement Series 2003-F Bond shall have no effect on the amount of principal or interest payable by Energy Northwest on any Series 2003-F Bond or the subrogation rights of MBIA.

The Trustee shall keep a complete and accurate record of all funds deposited by MBIA into its Policy Payments Account (hereinafter defined) and the allocation of such funds to payment of interest on and principal paid in respect of any Series 2003-F Bond. MBIA shall have the right to inspect such records at reasonable times upon reasonable notice to the Trustee.

Upon payment by or on behalf of MBIA of a claim under the MBIA Policy the Trustee shall establish a separate special purpose trust account for the benefit of the Series 2003-F Owners referred to herein as the "MBIA Policy Payments Account" and over which the Trustee shall have exclusive control and sole right of withdrawal. The Trustee shall receive any amount paid under the MBIA Policy in trust on behalf of the Series 2003-F Owners and shall deposit any such amount in the MBIA Policy Payments Account and distribute such amount only for purposes of making the payments for which a claim was made. Such amounts shall be

disbursed by the Trustee to the Owners in the same manner as principal and interest payments are to be made with respect to the Series 2003-F Bonds under the sections hereof regarding payment of Series 2003-F Bonds. It shall not be necessary for such payments to be made by checks or wire transfers separate from the check or wire transfer used to pay debt service with other funds available to make such payments.

Funds held in the MBIA Policy Payments Account shall not be invested by the Paying Agent and may not be applied to satisfy any costs, expenses or liabilities of the Paying Agent.

Any funds remaining in the MBIA Policy Payments Account following a Payment Date shall promptly be remitted to MBIA.

(f) MBIA shall be provided with all reports, notices and correspondence to be delivered under the terms of the Resolution.

(g) The notice address of MBIA is: MBIA Insurance Corporation, 113 King Street, Armonk, New York 10504, Attention: Insured Portfolio. In any case in which notice or other communication refers to an Event of Default, then a copy of such notice or other communication shall also be sent to the attention of General Counsel and shall be marked to indicate "URGENT MATERIAL ENCLOSED."

(h) MBIA shall be deemed to be a third party beneficiary of the covenants and agreements contained in Article VII of the Resolution and shall have the power to enforce any right, remedy or claim conferred, given or granted to it thereunder or hereunder.

Section 7.5. Rights of MBIA in an Event of Default. Upon the occurrence and continuance of an Event of Default as defined in the Resolution, MBIA shall be entitled to control and direct the enforcement of all rights and remedies granted to the Owners or the Trustee for the benefit of the Owners under this Supplemental Resolution.

## ARTICLE VIII.

## PARTICULAR COVENANTS OF ENERGY NORTHWEST

Section 8.1. Further Instruments and Action. Energy Northwest will from time to time execute and deliver such further instruments and take such further action as may be reasonable and as may be required to carry out the purposes of this Supplemental Resolution.

Section 8.2. Additional Tax Covenants. (a) Energy Northwest covenants with the holders from time to time of the Series 2003-F Bonds that it will comply with the Tax Requirements. The Authorized Officers, and each of them without the others, are hereby authorized to execute all certificates, agreements and other documents necessary or desirable to evidence compliance with such covenant, and are hereby authorized and directed to make all investments of moneys under the Resolution and this Supplemental Resolution, in accordance with such certificates and agreements, required thereby.

(b) In connection with, and in furtherance of, the foregoing covenant, the Authorized Officers, and each of them without the others, are hereby authorized and directed to pay to the United States Treasury Department at such time or times and in such amounts as shall be required by the Treasury Department all amounts required under Section 148 of the Code to be rebated, including, without limitation, (i) as of and within 60 days after the fifth, tenth and fifteenth anniversaries of January 1, 2003, an amount equal to the amount required under Section 148 of the Code to be rebated on such dates and (ii) as of and within 60 days after the date on which all of the Series 2003-F Bonds have been retired, an amount equal to the balance of all rebatable amounts. Such payments shall be made to the Internal Revenue Service at the Internal Revenue Service Center, Ogden, Utah 84201. Each such payment shall be accompanied by Internal Revenue Service Form 8038-T (or any successor or other applicable form).

## ARTICLE IX.

## CONCERNING THE TRUSTEE AND PAYING AGENT

Section 9.1. Appointment of Trustee. Pursuant to and in accordance with Section 601 of the Resolution, Energy Northwest hereby designates BNY Western Trust Company as Trustee who shall signify its acceptance of the duties and obligations imposed upon it by the Resolution and by this Supplemental Resolution as such Trustee by executing and delivering to Energy Northwest a written acceptance of the provisions of the Resolution. The rights of the holders of the Series 2003-F Bonds to participate in any decision to remove the Trustee and to participate in any decision to appoint a successor Trustee in the event of the removal, resignation, disability or refusal to act of the Trustee shall be governed by the provisions of Section 601 of the Resolution.

Section 9.2. Notice; Full Information. For the purposes of Sections 801 and 802 of the Resolution, the Trustee shall not be required to take notice, or be deemed to have notice, of any event of default under this Supplemental Resolution other than a default in the payment of the principal or Redemption Price of, or the interest on, any Series 2003-F Bond unless specifically notified in writing of such event of default by the holders of at least twenty-five percent (25%) in aggregate principal amount of the Series 2003-F Bonds then Outstanding. The Trustee may, however, at any time, in its discretion, require of Energy Northwest full information and advice as to the performance of any of the covenants, conditions and agreements contained in this Supplemental Resolution.

Section 9.3. Ambiguous or Inconsistent Provisions. The Trustee may construe any of the provisions of this Supplemental Resolution insofar as the same may appear to be ambiguous or inconsistent with any other provision hereof, and any construction of any such provision hereof by the Trustee in good faith shall be binding upon the holders of the Series 2003-F Bonds.

Section 9.4. Trustee as Paying Agent; Additional Paying Agents. As provided in Section 304 of the Resolution, the Trustee shall be the Paying Agent for the Series 2003-F Bonds. Energy Northwest may at any time appoint an additional paying agent or paying agents. Any appointment of an additional or successor Paying Agent shall be made by written instrument executed by an Authorized Officer of Energy Northwest and shall be effective immediately after the Trustee shall have consented to such appointment in writing and such paying agent shall have

accepted its obligations under this Supplemental Resolution by delivery of a written instrument to that effect to Energy Northwest and the Trustee.

Section 9.5. Enforced Delay. From the effective date of this Supplemental Resolution, the Trustee, or any successor in interest, shall not be considered in breach of or default in its obligations with respect to any obligations created hereunder or progress in respect thereto, in the event of enforced delay ("unavoidable delay") in the performance of such obligations due to unforeseeable causes beyond its control and without its fault or negligence, including but not limited to acts of God, or of the public enemy, acts of a government, acts of the other party, fires, flood, epidemics, quarantine restrictions, strikes, freight embargoes, earthquakes, explosion, mob violence, riot, inability to procure or general sabotage or rationing of labor, equipment, facilities, sources of energy, material or supplies in the open market, malicious mischief, condemnation, and unusually severe weather due to such causes or any similar events and/or occurrences beyond the control of the Trustee.

## ARTICLE X.

## MISCELLANEOUS

Section 10.1. Severability. In case any one or more of the provisions of this Supplemental Resolution or of the Series 2003-F Bonds shall, for any reason, be held to be illegal or invalid, such illegality or invalidity shall not affect any other provisions of this Supplemental Resolution or of such Series 2003-F Bonds, and this Supplemental Resolution and the Series 2003-F Bonds shall be construed and enforced to the end that the transactions contemplated hereby be effected and the obligations contemplated hereby be enforced as if such illegal or invalid provisions had not been contained therein.

Section 10.2. Notices. Except as otherwise specifically provided for in this Supplemental Resolution, all notices required by the terms hereof to be given to the Trustee, Energy Northwest or the Owners of the Series 2003-F Bonds shall be deemed given, if given in writing and mailed by first-class mail, postage prepaid, sent by overnight courier or telecopy and

(i) if to the Trustee, addressed to it at Two Union Square, 601 Union Street, Suite 1720, Seattle, WA 98101;

(ii) if to Energy Northwest, addressed to it at Energy Northwest, P.O. Box 968 (Mail Drop: PE60), Richland, WA 99352, Attention: Treasury Services; and

(iii) if to any owner of a Series 2003-F Bond, addressed to such owner at the address set forth in the registration books maintained by the Trustee pursuant to Section 304 of the Resolution; or, as to Energy Northwest or the Trustee, as any of them shall from time to time designate by notice in writing to the others. The Insurer, if any, shall receive copies of all notices required to be delivered to the Owners of the Series 2003-F Bonds.

Section 10.3. Holidays. Except as otherwise provided in this Supplemental Resolution, if any date fixed for the performance of any covenant hereunder shall not be a Business Day, such covenant shall instead be performed on the next succeeding Business Day.

Section 10.4. Effective Date. This Supplemental Resolution shall become effective in accordance with its terms upon the filing with the Trustee, of (i) a certified copy of each of the Resolution and this Supplemental Resolution, (ii) a Bond Counsel Opinion that this Supplemental Resolution has been duly adopted and the provisions thereof are valid and binding upon Energy Northwest, and (iii) the written approval of the Administrator.

Adopted by the Executive Board of Energy Northwest this 30th day of **April**, 2003.

Attest:

[signature]
Chairman

______________________________
Secretary

Approved as to Form and Legality:

______________________________
Counsel

Adopted by the Executive Board of Energy Northwest this 30th day of **April,** 2003.

Attest:

Sid W. Morrison
Secretary

Chairman

Approved as to Form and Legality:

Counsel

Adopted by the Executive Board of Energy Northwest this 30th day of April, 2003.

Attest:

______________________________
Chairman

______________________________
Secretary

Approved as to Form and Legality:

______________________________
Counsel

# EXHIBIT D

*NEW ISSUE — BOOK-ENTRY ONLY*

*In the opinion of Orrick, Herrington & Sutcliffe LLP, Special Tax Counsel, based on an analysis of existing laws, regulations, rulings and court decisions and assuming, among other matters, the accuracy of certain representations and compliance with certain covenants, interest on the Series 2003-F Bonds is excluded from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code of 1986. In the further opinion of Special Tax Counsel, interest on the Series 2003-F Bonds is not a specific preference item for purposes of the federal individual or corporate alternative minimum taxes, although Special Tax Counsel observes that such interest is included in adjusted current earnings in calculating federal corporate alternative minimum taxable income. See "TAX EXEMPTION" herein.*

# Energy Northwest

## $41,330,000

## Columbia Generating Station Electric Revenue Bonds, Series 2003-F

**Dated: Date of delivery** **Due: July 1, as shown on the inside cover**

The Series 2003-F Bonds are being issued for the purpose of refunding certain short-term indebtedness heretofore issued by Energy Northwest in connection with the Columbia Generating Station, to pay costs of other capital improvements at the Columbia Generating Station, and to pay costs relating to the issuance of the Series 2003-F Bonds, as more fully described herein. The Series 2003-F Bonds are special revenue obligations of Energy Northwest secured and payable as provided herein on a subordinated basis to the Columbia Prior Lien Bonds described herein.

The Series 2003-F Bonds will be issued in fully registered form, registered in the name of Cede & Co., as registered owner and nominee for The Depository Trust Company, New York, New York ("DTC"). DTC will act as securities depository for the Series 2003-F Bonds. Individual purchases will be made in book-entry form, in denominations of $5,000 and integral multiples thereof. So long as Cede & Co. is the registered owner of the Series 2003-F Bonds and nominee of DTC, references herein to holders or registered owners shall mean Cede & Co. and shall not mean the beneficial owners of the Series 2003-F Bonds. See "BOOK-ENTRY ONLY SYSTEM" and Appendix H hereto. Principal of the 2003-F Bonds is payable at the principal office of BNY Western Trust Company, Seattle, Washington, as Trustee for the Series 2003-F Bonds. Interest on the Series 2003-F Bonds is payable semiannually on January 1 and July 1 of each year, commencing July 1, 2003, by check or draft of the Trustee, as set forth herein or, under the circumstances described herein, by wire transfer to the registered owner. As long as Cede & Co. is the registered owner as nominee of DTC, payments on the Series 2003-F Bonds will be made to such registered owner, and disbursement of such payments will be the responsibility of DTC and DTC participants as described herein.

*The Series 2003-F Bonds are subject to redemption prior to maturity as set forth herein.*

Payments when due of the principal of and interest on the Series 2003-F Bonds will be insured by a financial guaranty insurance policy issued by MBIA Insurance Corporation ("MBIA"). See "INTRODUCTION – Bond Insurance."

MBIA

**The Series 2003-F Bonds are special revenue obligations of Energy Northwest, payable solely from the sources described herein, including amounts derived pursuant to Net Billing Agreements with the United States of America, Department of Energy, acting by and through the Administrator of the**

# Bonneville Power Administration

**from net billing credits and from cash payments from the Bonneville Fund, as described herein. Bonneville's obligations under the Net Billing Agreements are not general obligations of the United States of America and are not secured by the full faith and credit of the United States of America. The Series 2003-F Bonds do not constitute an obligation of the State of Washington or of any political subdivision thereof, other than Energy Northwest. Energy Northwest has no taxing power.**

**MATURITY SCHEDULE — See Inside Cover**

The Series 2003-F Bonds are offered when, as, and if issued and received by the Underwriters, subject to the approval of legality by Willkie Farr & Gallagher, New York, New York, Bond Counsel to Energy Northwest, and to certain other conditions. Certain legal matters will be passed upon for Energy Northwest by its General Counsel and for Bonneville by its General Counsel and by its Special Counsel, Orrick, Herrington & Sutcliffe LLP, New York, New York. Certain legal matters will be passed upon for the Underwriters by O'Melveny & Myers LLP, New York, New York, Counsel to the Underwriters. It is expected that the Series 2003-F Bonds in definitive form will be available for delivery to DTC in New York, New York, on or about May 29, 2003.

**Citigroup**
**JPMorgan**

**Prager, Sealy & Co., LLC**

**Goldman, Sachs & Co.**
**UBS PaineWebber Inc.**

May 14, 2003

## MATURITIES, PRINCIPAL AMOUNTS, INTEREST RATES, YIELDS AND PRICES

### The Series 2003-F Bonds

### $41,330,000 Columbia Generating Station Electric Revenue Bonds

| Year (July 1) | Amount | Interest Rate | Yield | CUSIP |
|---|---|---|---|---|
| 2007 | $2,590,000 | 5.00% | 2.14% | 29270CGA7 |
| 2008 | 2,720,000 | 5.00 | 2.44 | 29270CGB5 |
| 2009 | 2,855,000 | 5.00 | 2.73 | 29270CGC3 |
| 2010 | 3,000,000 | 5.00 | 3.04 | 29270CGD1 |
| 2011 | 3,150,000 | 5.00 | 3.27 | 29270CGE9 |
| 2012 | 3,305,000 | 5.00 | 3.39 | 29270CGF6 |
| 2013 | 3,475,000 | 5.00 | 3.51 | 29270CGG4 |
| 2014 | 3,645,000 | 5.25 | 3.64* | 29270CGH2 |
| 2015 | 3,835,000 | 5.25 | 3.75* | 29270CGJ8 |
| 2016 | 4,040,000 | 5.25 | 3.86* | 29270CGK5 |

**$8,715,000 5.00% Term Bonds due July 1, 2018 Priced to Yield 4.00%* CUSIP 29270CGL3**

* Priced to July 1, 2013 par call date.

**ENERGY NORTHWEST**
**P.O. Box 968**
**Richland, Washington 99352**
**Telephone (509) 372-5000**
**Facsimile (509) 372-5649**
**www.energy-northwest.com**

**Executive Board Members**

John F. Cockburn, Chairman
Dan G. Gunkel, Vice Chairman
Sid W. Morrison, Secretary
Vera Claussen, Assistant Secretary
Margaret Allen
Darrel Bunch
Tom Casey
Edward E. Coates
Larry Kenney
Amy C. Solomon
Roger C. Sparks

**Administrative Staff**

| | |
|---|---|
| Chief Executive Officer/Chief Nuclear Officer | Joseph V. Parrish |
| Vice President, Nuclear Generation | Rodney L. Webring |
| Vice President, Technical Services | Dale K. Atkinson |
| Vice President, Energy/Business Services/ Public Information Officer | John W. Baker |
| Vice President, Corporate Services/General Counsel/Chief Financial Officer | Albert E. Mouncer |

*Financial Advisor*
Public Financial Management, Inc.

*Bond Counsel*
Willkie Farr & Gallagher

**BONNEVILLE POWER ADMINISTRATION**
**P.O. Box 3621**
**Portland, Oregon 97208**
**Telephone (503) 230-3000**
**www.bpa.gov**

| | |
|---|---|
| Administrator and Chief Executive Officer | Stephen J. Wright |
| Deputy Administrator and Deputy Chief Executive Officer | Steven G. Hickok |
| Chief Operating Officer (Acting) | Ruth B. Bennett |
| General Counsel | Randy A. Roach |
| Chief Financial Officer | James H. Curtis |

*Special Counsel*
Orrick, Herrington & Sutcliffe LLP

No dealer, broker, salesman or other person has been authorized by Energy Northwest or by the Underwriters to give any information or to make any representations, other than as contained in this Official Statement, and, if given or made, such other information or representations must not be relied upon as having been authorized by Energy Northwest or the Underwriters. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Series 2003-F Bonds, by any person in any jurisdiction in which such offer, solicitation, or sale would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction.

The information set forth herein has been furnished by Energy Northwest and Bonneville and includes information obtained from other sources which are believed to be reliable, the information and expressions of opinion contained herein are subject to change without notice and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of Energy Northwest or Bonneville since the date hereof.

Except as specifically described herein, none of the information herein was provided by the Participants, the Pacific Northwest Electric Power and Conservation Planning Council, or the Trustee and none of such entities participated in the preparation of this Official Statement. This Official Statement has not been submitted to such entities for review, comment or approval.

Other than with respect to information concerning MBIA Insurance Corporation ("MBIA") contained under "INTRODUCTION - Bond Insurance" and Appendix E "MBIA Specimen Financial Guaranty Insurance Policy" herein, none of the information in this Official Statement has been supplied or verified by MBIA and MBIA does not make any representation or warranty, express or implied, as to: (i) the accuracy or completeness of such information; (ii) the validity of the Bonds; or (iii) the tax exempt status of the interest on the Series 2003-F Bonds.

This Official Statement contains statements which, to the extent they are not recitations of historical fact, constitute "forward-looking statements." In this respect, the words "estimate," "project," "anticipate," "expect," "intend," "believe" and similar expressions are intended to identify forward-looking statements. A number of important factors affecting Energy Northwest's or Bonneville's business and financial results could cause actual results to differ materially from those stated in the forward-looking statements.

The Underwriters have provided the following sentence for inclusion in the Official Statement: "The Underwriters have reviewed the information in the Official Statement in accordance with, and as a part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information."

The prospective financial information included in this offering document, including any forward-looking or prospective financial information, has been prepared by, and is the responsibility of the management of Energy Northwest and Bonneville. PricewaterhouseCoopers has neither examined nor compiled such prospective financial information and, accordingly, PricewaterhouseCoopers does not express an opinion or any other form of assurance with respect thereto. The PricewaterhouseCoopers reports included in this offering document relate to the historical financial information of Energy Northwest projects and Bonneville. They do not extend to the prospective financial information and should not be read to do so.

IN CONNECTION WITH THE OFFERING OF THE SERIES 2003-F BONDS, THE UNDERWRITERS MAY OVERALLOT OR EFFECT TRANSACTIONS WHICH STABILIZE OR MAINTAIN THE MARKET PRICE OF SUCH BONDS AT LEVELS ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME.

## TABLE OF CONTENTS


| | Page |
|---|---|
| INTRODUCTION | 1 |
| Energy Northwest | 2 |
| The Bonneville Power Administration | 3 |
| Series 2003-F Bonds | 6 |
| Net Billing Agreements | 7 |
| Bond Insurance | 8 |
| PLAN OF FINANCE | 10 |
| General | 10 |
| Estimated Sources and Uses of Funds | 10 |
| INCLUSION BY SPECIFIC REFERENCE | 11 |
| DESCRIPTION OF THE SERIES 2003-F BONDS | 11 |
| General | 11 |
| Redemption | 11 |
| BOOK-ENTRY ONLY SYSTEM; TRANSFERABILITY AND REGISTRATION | 12 |
| LEGAL MATTERS | 13 |
| TAX EXEMPTION | 13 |
| RATINGS | 14 |
| UNDERWRITING | 14 |
| CONTINUING DISCLOSURE | 15 |
| MISCELLANEOUS | 15 |

**APPENDICES**

APPENDIX A — Proposed Forms of Opinions of Bond Counsel
APPENDIX B — Proposed Form of Opinion of Special Tax Counsel
APPENDIX C — Summary of the Continuing Disclosure Agreement
APPENDIX D — Federal System Unaudited Quarterly Report for the six months ended March 31, 2003
APPENDIX E — MBIA Specimen Financial Guaranty Insurance Policy

[THIS PAGE INTENTIONALLY LEFT BLANK]

# OFFICIAL STATEMENT

## Energy Northwest

## $41,330,000

## Columbia Generating Station Electric Revenue Bonds, Series 2003-F

Energy Northwest, a municipal corporation and a joint operating agency of the State of Washington (formerly known as the Washington Public Power Supply System), proposes to issue $41,330,000 Columbia Generating Station Electric Revenue Bonds, Series 2003-F (the "Series 2003-F Bonds"). The Series 2003-F Bonds are being issued pursuant to Chapter 43.52 of the Revised Code of Washington, as amended (the "Act") and the resolutions of Energy Northwest hereinafter referred to for the purpose of providing funds to refund the outstanding portion of the Columbia Promissory Note (as hereinafter defined) heretofore issued by Energy Northwest for the purpose of financing the costs of planning, construction and acquisition of the Columbia Independent Spent Fuel Storage Installation Facility ("ISFSI"), to pay costs of other capital improvements at the Columbia Generating Station, and to pay costs relating to the issuance of the Series 2003-F Bonds. The Series 2003-F Bonds are secured on a subordinated basis to the Prior Lien Bonds (as hereinafter defined) from amounts derived pursuant to Net Billing Agreements with the United States of America, Department of Energy, acting by and through the Administrator of the Bonneville Power Administration from net billing credits and from cash payments from the Bonneville Fund, as described herein. The Series 2003-F Bonds will be secured on a parity with bonds heretofore issued by Energy Northwest pursuant to the Columbia Electric Revenue Bond Resolution (hereinafter defined), and additional bonds or notes that may be issued by Energy Northwest in the future under, or other obligations of Energy Northwest that may be secured pursuant to, the Columbia Electric Revenue Bond Resolution or any Separate Subordinated Resolution (as such terms are hereinafter defined). See "SECURITY FOR THE NET BILLED BONDS" in the 2003-A & B Official Statement (as hereinafter defined).

Capitalized terms used in this Official Statement and not defined herein shall have the meanings given to such terms in the Official Statement of Energy Northwest dated March 20, 2003 prepared in connection with the Series 2003-A Bonds and the Series 2003-B Bonds (the "2003-A & B Official Statement"), portions of which are incorporated herein by reference, as described below. ***This Official Statement is not complete unless read in conjunction with the information from the 2003-A& B Official Statement incorporated herein by reference.*** See "INCLUSION BY SPECIFIC REFERENCE."

Energy Northwest has previously issued Net Billed Bonds (as hereinafter defined) for Projects 1 and 3 and the Columbia Generating Station. The receipts, income and revenues derived from each Project under the related Net Billed Resolutions secure only the related Net Billed Bonds. For further information, see "SECURITY FOR THE NET BILLED BONDS" in the 2003-A & B Official Statement

Energy Northwest furnishes this Official Statement, which includes the cover page and inside cover page hereof and the appendices hereto, in connection with the sale of the Series 2003-F Bonds.

## INTRODUCTION

This Introduction is not intended to provide all information material to a prospective purchaser of the Series 2003-F Bonds and is qualified in all respects by the more detailed information set forth elsewhere in this Official Statement and in those portions of the 2003-A & B Official Statement incorporated herein by reference. See "INCLUSION BY SPECIFIC REFERENCE."

**ENERGY NORTHWEST**

Energy Northwest was organized in 1957 as the Washington Public Power Supply System. By resolution of its Executive Board adopted on June 2, 1999, the Washington Public Power Supply System officially changed its name to Energy Northwest. It currently has 18 members, consisting of 15 public utility districts and the cities of Richland, Seattle and Tacoma, all located in the State of Washington. Energy Northwest has the authority, among other things, to acquire, construct and operate plants, works and facilities for the generation and transmission of electric power and energy and to issue bonds and other evidences of indebtedness to finance the same.

Energy Northwest owns and operates a nuclear electric generating station, the Columbia Generating Station (sometimes hereinafter referred to as "Columbia Generating Station" or "Columbia"), formerly known as Nuclear Project No. 2, with a net design electrical rating of 1,153 megawatts. Energy Northwest also owns an operating hydroelectric facility, the Packwood Lake Hydroelectric Project ("Packwood"), with a name-plate rating of 27.5 megawatts. Energy Northwest also owns and/or has financial responsibility for four other nuclear electric generating projects which have been terminated: Energy Northwest Nuclear Project No. 1 ("Project 1"), Energy Northwest Nuclear Project No. 3 ("Project 3") and Energy Northwest Nuclear Projects Nos. 4 and 5 ("Projects 4 and 5"). Energy Northwest also owns the Hanford Generating Project ("HGP"), which ceased operation in 1987, and site restoration activities coordinated with the United States Department of Energy ("DOE") are continuing. For discussions concerning the termination of Projects Nos. 1, 3, 4 and 5, see "ENERGY NORTHWEST — Project 1," "— Project 3," "— Projects 4 and 5" and "— Site Restoration of Projects 1, 3, 4 and 5" in the 2003-A &B Official Statement. Projects 1, 3 and Columbia are collectively referred to herein as the "Net Billed Projects." Each of the foregoing projects (collectively, the "Projects" and individually, a "Project") is financed and accounted for as a separate utility system, except for Projects 4 and 5, which were financed and accounted for as a single utility system separate and apart from all other Energy Northwest Projects. All of Energy Northwest's Projects are located in the State of Washington.

The United States of America, Department of Energy, acting by and through the Administrator of the Bonneville Power Administration ("Bonneville"), has acquired the capability of Projects 1, 3 and Columbia. As more fully discussed under "SECURITY FOR THE NET BILLED BONDS — Net Billing Agreements" in the 2003-A & B Official Statement, Bonneville pays Energy Northwest for such capability pursuant to Net Billing Agreements, with payments being made through a combination of credits against customer bills and cash payments from the Bonneville Fund (as hereinafter defined). Bonneville's obligations to make such payments under the Net Billing Agreements continue notwithstanding suspension or termination of any of Projects 1, 3 or Columbia.

**The Columbia Generating Station**

Columbia is an operating nuclear electric generating station located about 160 miles southeast of Seattle, Washington, near Richland, Washington on the DOE Hanford Reservation. Columbia commenced commercial operation in 1984 and has a net design electrical rating of 1,153 megawatts. Columbia consists of a General Electric Company-designed boiling water reactor and nuclear steam supply system, a turbine-generator and the necessary transformer, switching and transmission facilities to deliver the output to the transmission facilities of the Federal System located in the vicinity of Columbia. The entire project capability of Columbia has been acquired by Bonneville under the Columbia Net Billing Agreements. Since commencing commercial operation, Columbia has operated at a cumulative capacity factor of 66.6% and has generated 117,253,914 megawatt-hours (net of station use but excludes credit for "Economic Dispatch") of electric power through March 2003. For further information relating to Columbia, see "ENERGY NORTHWEST — The Columbia Generating Station" in the 2003-A & B Official Statement.

Energy Northwest has obtained all permits and licenses required to operate Columbia, including a site certification agreement with the State of Washington and an operating license for Columbia issued by the United States Nuclear Regulatory Commission (the "NRC"). The operating license expires in 2023.

**Project 1**

Project 1 is a terminated, partially constructed, nuclear electric generating project located about 160 miles southeast of Seattle, Washington, near Richland, Washington on DOE's Hanford Reservation. In May 1994, Energy

Northwest's Board of Directors adopted a resolution terminating Project 1. For further information relating to Project 1, see "ENERGY NORTHWEST — Project 1" and "— Site Restoration of Projects 1, 3, 4 and 5" in the 2003-A & B Official Statement. See "SECURITY FOR THE NET BILLED BONDS — Net Billing Agreements" in the 2003-A & B Official Statement for further discussion of the above-mentioned termination and related issues.

**Project 3**

Project 3 is a terminated, partially constructed, nuclear electric generating project located in Grays Harbor County, Washington, about 70 miles southwest of Seattle, Washington. In May 1994, Energy Northwest's Board of Directors adopted a resolution requesting the termination of Project 3. Project 3 was terminated in June 1994. For further information relating to Project 3, see "ENERGY NORTHWEST — Project 3" and "— Site Restoration of Projects 1, 3, 4 and 5" in the 2003-A & B Official Statement. See "SECURITY FOR THE NET BILLED BONDS — Net Billing Agreements" in the 2003-A & B Official Statement for further discussion of the above-mentioned termination and related issues.

**Projects 4 and 5**

Projects 4 and 5 were terminated in January 1982. The bonds issued by Energy Northwest in connection with Projects 4 and 5 (the "Project 4/5 Bonds") went into default on July 22, 1983 and approximately $2.25 billion principal amount of Project 4/5 Bonds, together with accrued interest thereon, remain unpaid except for two distributions to bondholders in 1993 and 1995. All trusts created under the resolution authorizing the Project 4/5 Bonds were terminated and Energy Northwest and the trustee under said resolution were released from all of their obligations thereunder. Bonneville is not a party to any agreements that secured payment of the costs of Projects 4 and 5.

**THE BONNEVILLE POWER ADMINISTRATION**

The information under this heading has been derived from information provided to Energy Northwest by Bonneville. For detailed information with respect to Bonneville, see "THE BONNEVILLE POWER ADMINISTRATION" in the 2003-A & B Official Statement.

Bonneville was created by Federal law in 1937 to market electric power from the Bonneville Dam and to construct facilities necessary to transmit such power. Today, Bonneville markets electric power from 30 federally-owned hydroelectric projects, most of which are located in the Columbia River Basin and all of which were constructed and are operated by the United States Army Corps of Engineers (the "Corps") or the United States Bureau of Reclamation (the "Bureau"), and from several non-federally-owned projects, including the Columbia Generating Station. Bonneville sells and/or exchanges power under contracts with over 100 utilities in the Pacific Northwest and Pacific Southwest and with several industrial customers. It also owns and operates a high voltage transmission system comprising approximately 75% of the bulk transmission capacity in the Pacific Northwest.

Bonneville's primary customer service area is the Pacific Northwest region, an area comprised of Oregon, Washington, Idaho, western Montana and small portions of California, Nevada, Utah and Wyoming (sometimes referred to herein as the "Pacific Northwest," the "Northwest," the "Region," or "Regional"). Bonneville estimates that this 300,000 square mile service area has a population of approximately ten million people. Electric power sold by Bonneville accounts for about 45% of the electric power consumed within the Region. Bonneville also exports power that is surplus to the needs of the Region to the Pacific Southwest, primarily to California.

Bonneville is one of four regional Federal power marketing agencies within the DOE. Bonneville is required by law to meet certain energy requirements in the Region and is authorized to acquire power resources, to implement conservation measures and to take other actions to enable it to carry out its purposes. Bonneville is also required by law to operate and maintain its transmission system and to provide transmission service to eligible customers and to undertake certain other programs, such as fish and wildlife protection, mitigation and enhancement.

Certain information about Bonneville is contained in the 2003-A & B Official Statement and is incorporated herein by reference.

Bonneville's updated quarterly financial report for the six months beginning October 1, 2002 is included as Appendix D to this Official Statement. Such information is in lieu of Bonneville's quarterly financial report for the three months beginning October 1, 2002 included as Appendix A-2 to the 2003-A & B Official Statement.

The following supplements the information found in the 2003-A & B Official Statement under the captions:

"BONNEVILLE POWER ADMINISTRATION — DEVELOPMENTS RELATING TO BONNEVILLE'S POWER MARKETING APPROACH AND BONNEVILLE'S FINANCIAL CONDITION — Fiscal Year 2003 Financial Developments":

> Based on Bonneville's updated quarterly review dated as of May 2003, Bonneville now estimates that if current forecasts of costs, streamflows and discretionary power sales are realized, Bonneville would have net revenues in fiscal year 2003 of about negative $28 million. This calculation excludes $356 million in positive net revenue arising from debt management actions under the Debt Optimization Proposal. The fiscal year end net revenue projection also excludes about $20 million in non-cash, mark-to-market accounting adjustments under the Financial Accounting Standards Board Statement of Accounting Standard No. 133. These forecasted results incorporate a total of about $85 million in one time improvements to cash flows arising from (i) arrangements with Energy Northwest to apply funds from a settlement with a paying agent of certain original Net Billed Bonds to pay current Net Billed Project costs, and (ii) the use of surety bonds in lieu of reserve funds for certain series of Net Billed Project Bonds. In addition, the May 2003 updated forecast reflects somewhat improved forecasts of Columbia River basin precipitation levels, power marketing conditions and expense levels.
>
> On the basis of its May 2003 quarterly review, Bonneville now expects that it is much less likely to rely on short-term borrowing from the United States Treasury, deferral of early amortization under the Debt Optimization Proposal, or deferrals of Bonneville's United States Treasury repayments, to meet its fiscal year end reserve level goals.
>
> Given the many variables and assumptions upon which such forecasts are based, actual revenues could differ substantially from those indicated in such forecasts.
>
> Several of Bonneville's customer and related groups have filed separate suits in the Ninth Circuit Court challenging Bonneville's decision to initiate proceedings necessary for implementing the SN-CRAC. These parties are seeking to set aside Bonneville's finding that the SN-CRAC has triggered. If successful, the litigation could result in the court remanding back to Bonneville its decision that the conditions permitting Bonneville to adjust its power rates under the SN-CRAC have been met. The petitioners have not sought expedited review by or injunctive relief from the court.

"BONNEVILLE POWER ADMINISTRATION — POWER BUSINESS LINE — Customers and Other Power Contract Parties of Bonneville's Power Business Line — Effect on Bonneville of Developments In California Power Markets":

> In March 2003, FERC issued an order in the California Refund docket increasing the potential refund liability of participants, including Bonneville, to the proceeding. The increase is due to the substitution of producing area natural gas prices in place of the California gas index prices previously used in the calculation. Assuming Bonneville's estimate of its refund exposure is correct, Bonneville's aggregate refund exposure would still be less than the amount owed to Bonneville by the Cal-ISO and Cal-PX.

"BONNEVILLE POWER ADMINISTRATION — POWER BUSINESS LINE — Customers and Other Power Contract Parties of Bonneville's Power Business Line — Effect on Bonneville of the Enron Bankruptcy":

On April 25, 2003, Bonneville and Enron entered into an agreement to settle all claims between them relating to all power sales and purchase agreements between Bonneville and Enron. Under the settlement, Bonneville has agreed to cause to be paid to Enron a single lump sum payment of approximately $99 million, which reflects a discount in Bonneville's favor in the mark-to-market value of the remaining terms of the power transactions. The settlement agreement further provides that all of the claims and obligations of the parties with respect to the foregoing transactions are extinguished.

The lump sum payment to Enron will be provided by the United States Treasury from the Judgment Fund. The Judgment Fund is a continuing, indefinite appropriation by Congress for the payment of certain claims and settlements involving the United States and certain of its agencies and instrumentalities. Bonneville is obligated to reimburse the United States Treasury for such payments and Bonneville expects that the reimbursement terms with the United States Treasury will provide that Bonneville make full repayment, together with interest, by the end of December 2006. This repayment period coincides roughly with the original final payment term of the related Enron power transactions.

The anticipated schedule of Bonneville's reimbursement payments to the United States Treasury would be substantially less than the net payments Bonneville would have otherwise made to Enron had the power transactions continued to their original expiration dates. In addition, Bonneville estimates that it has a surplus of firm power through fiscal year 2006. Thus, Bonneville believes that the extinguishment of Enron's obligation to sell power to Bonneville will not have an adverse effect on Bonneville's ability to meet its contracted load obligations through fiscal year 2006.

"BONNEVILLE POWER ADMINISTRATION — BONNEVILLE LITIGATION — PacifiCorp v. United States":

On May 1, 2003, the court granted PacifiCorp's petition to compel arbitration. Bonneville is in the process of analyzing the court's opinion to determine whether to appeal.

"BONNEVILLE POWER ADMINISTRATION — BONNEVILLE LITIGATION — City of Burbank, California v. United States":

The claims filed by the cities under the Contract Disputes Act were denied by Bonneville's Contracting Officer, and in April 2003, the cities filed an appeal with the Department of Energy Contract Board of Appeals.

"BONNEVILLE POWER ADMINISTRATION — BONNEVILLE LITIGATION — 5(b) / 9 (c) Policy Challenge":

In March 2003, the court granted the settlement agreement and motion to dismiss filed jointly by Bonneville and the petitioners.

"BONNEVILLE POWER ADMINISTRATION — BONNEVILLE LITIGATION — National Wildlife Federation v. U.S. Army Corps of Engineers":

In March 2003, plaintiffs appealed the court's January ruling upholding the Corps' ROCASOD.

"BONNEVILLE POWER ADMINISTRATION — BONNEVILLE LITIGATION — ESA Litigation — National Wildlife Federation v. National Marine Fisheries Service":

In early May 2003, the U.S. District Court judge issued a decision on the adequacy of the 2000 Biological Opinion. The ruling provides that the 2000 Biological Opinion is inadequate because it relies on offsite mitigation measures that are "not reasonably certain to occur."

The court has remanded the 2000 Biological Opinion back to NOAA Fisheries to correct the deficiencies identified by the court. To address the court's concern that offsite measures are not reasonably certain to occur, it is possible that NOAA Fisheries may increase the forms and extent of mitigation measures beyond those required in the 2000 Biological Opinion as reviewed by the court. If NOAA Fisheries were to include additional or expanded measures in a new or amended biological opinion it is possible that substantial additional costs could be borne by Bonneville.

**SERIES 2003-F BONDS**

**Security**

The Series 2003-F Bonds are special revenue obligations of Energy Northwest issued under and pursuant to Resolution No. 1042, adopted on October 23, 1997 (as amended and supplemented, the "Columbia Electric Revenue Bond Resolution"), and a supplemental resolution adopted on April 30, 2003 (the "Columbia 2003-F Electric Revenue Bond Supplemental Resolution"). The Series 2003-F Bonds are secured on a subordinated basis to the Columbia Prior Lien Bonds (as hereinafter defined) by a pledge of all receipts, income and revenues derived by Energy Northwest from the ownership and operation of Columbia. The Series 2003-F Bonds are secured on parity with $777,080,000 outstanding principal amount of Columbia Electric Revenue Bonds, heretofore issued pursuant to the Columbia Electric Revenue Bond Resolution and will be secured on a parity with any additional bonds or notes that may be issued by Energy Northwest in the future (the "Columbia Electric Revenue Bonds") or other obligations of Energy Northwest that may be secured pursuant to the Columbia Electric Revenue Bond Resolution or under one or more separate resolutions creating a pledge of and lien on the receipts, income and revenues derived from the Columbia Generating Station of equal rank with the pledge and lien created by the Columbia Electric Revenue Bond Resolution in favor of the Columbia Electric Revenue Bonds issued thereunder.

Conditions to the issuance of additional bonds are described in Appendix G-1, "SUMMARY OF CERTAIN PROVISIONS OF ELECTRIC REVENUE BOND RESOLUTIONS AND SUPPLEMENTAL ELECTRIC REVENUE BOND RESOLUTIONS" and in Appendix G-2, "SUMMARY OF CERTAIN PROVISIONS OF PRIOR LIEN RESOLUTIONS NOS. 769, 640 AND 775 — Subsequent Series of Bonds" in the 2003-A & B Official Statement.

Energy Northwest has $1,312,531,018 of bonds currently outstanding which were issued pursuant to Resolution No. 640, adopted on June 26, 1973 (as amended and supplemented, the "Columbia Prior Lien Resolution"). Bonds issued pursuant to the Columbia Prior Lien Resolution are hereinafter referred to as the "Columbia Prior Lien Bonds."

Energy Northwest has $948,610,000 of bonds currently outstanding which were issued pursuant to Resolution No. 769, adopted on September 18, 1975 (as amended and supplemented, the "Project 1 Prior Lien Resolution"). Bonds issued pursuant to the Project 1 Prior Lien Resolution are hereinafter referred to as the "Project 1 Prior Lien Bonds." Energy Northwest has $1,032,005,000 of bonds (the "Project 1 Electric Revenue Bonds") currently outstanding which were issued pursuant to Resolution No. 835, adopted on November 23, 1993 (as amended and supplemented, the "Project 1 Electric Revenue Bond Resolution"). Bonds issued pursuant to the Project 1 Electric Revenue Bond Resolution are hereinafter referred to as the "Project 1 Electric Revenue Bonds."

Energy Northwest has $747,827,106 of bonds currently outstanding which were issued pursuant to Resolution No. 775, adopted on December 3, 1975 (as amended and supplemented, the "Project 3 Prior Lien Resolution," and together with the Project 1 Prior Lien Resolution and the Columbia Prior Lien Resolution, the "Prior Lien Resolutions"). Bonds issued pursuant to the Project 3 Prior Lien Resolution are hereinafter referred to as the "Project 3 Prior Lien Bonds." Energy Northwest has $1,000,210,000 of bonds (the "Project 3 Electric Revenue Bonds") currently outstanding which were issued pursuant to Resolution No. 838, adopted on November 23, 1993 (as amended and supplemented, the "Project 3 Electric Revenue Bond Resolution," and together with the Project 1 Electric Revenue Bond Resolution and the Columbia Electric Revenue Bond Resolution, the "Electric Revenue Bond Resolutions"). Bonds issued pursuant to the Project 3 Electric Revenue Bond Resolution are hereinafter referred to as the "Project 3 Electric Revenue Bonds."

The Columbia Prior Lien Bonds, the Project 1 Prior Lien Bonds and the Project 3 Prior Lien Bonds are collectively referred to herein as the "Prior Lien Bonds." The Columbia Electric Revenue Bonds, the Project 1 Electric Revenue Bonds and the Project 3 Electric Revenue Bonds are collectively referred to herein as the "Electric Revenue Bonds." The Prior Lien Bonds, the Electric Revenue Bonds, including the Series 2003-F Bonds and any bonds or notes which may be issued pursuant to the Separate Subordinated Resolutions (as defined in the 2003-A & B Official Statement) are collectively referred to herein as the "Net Billed Bonds." Under the Electric Revenue Bond Resolutions, Energy Northwest has covenanted with the owners from time to time of the Electric Revenue Bonds not to issue any more Prior Lien Bonds or any other obligations having a lien on a parity with the Prior Lien Bonds. For a discussion of additional Net Billed Bonds which may be issued by Energy Northwest for refunding and other purposes, see "SECURITY FOR THE NET BILLED BONDS — Additional Bonds" in the 2003-A & B Official Statement.

**Purpose of Issuance**

Energy Northwest is issuing the Series 2003-F Bonds for the purpose of providing funds to refund the Columbia Refunding Revenue Promissory Note, 2002A (the "Columbia Promissory Note") issued by Energy Northwest under the Columbia Credit Agreement, dated as of April 25, 2002, by and between Citibank, N.A. and Energy Northwest (the "Columbia Credit Agreement"), which was issued to finance the cost of planning, construction and acquisition of the ISFSI, to pay costs of other capital improvements at the Columbia Generating Station, and to pay costs relating to the issuance of the Series 2003-F Bonds. See "Plan of Finance."

## NET BILLING AGREEMENTS

Under the Net Billing Agreements, the Participants in each Net Billed Project have contracted to purchase the capability of that Net Billed Project and have agreed to provide Energy Northwest with funds necessary to meet costs of that Net Billed Project. These costs include the amounts that Energy Northwest is obligated to pay in each contract year into the various funds provided for in the related Net Billed Resolutions for debt service and for all other purposes of the Net Billed Project. The Net Billing Agreements also effected a simultaneous assignment of the project capability from the Participants to Bonneville and created an obligation of Bonneville to pay the Participants (from net billing credits provided by Bonneville and from cash payments from the Bonneville Fund, as described herein) for their respective shares of the costs of the Net Billed Projects. Thus, Bonneville is ultimately obligated to meet such costs.

Under the Net Billing Agreements, payments to Energy Northwest are not made directly by Bonneville, but rather by the Participants. Such payments by the Participants are to be made in accordance with each Participant's participation in the purchase of the capability of the Net Billed Project. Bonneville pays for the capability of the Net Billed Project assigned by the Participants to it by crediting (or net billing) Bonneville's bills to Participants for power and other services purchased from Bonneville by the amount of the payment required to be made by the Participants to Energy Northwest. To the extent that the total amount of Bonneville's bills to each Participant (and consequently the amount of such credit available) over a contract year (July 1 to June 30) is less than the payment required to be made by the Participant to Energy Northwest, Bonneville is obligated to pay the deficiency in cash to the Participant from the Bonneville Fund. In the opinion of Bonneville's General Counsel, under Federal statutes Bonneville may only make payments to the United States Treasury from net proceeds; all cash payment obligations of Bonneville, including cash deficiency payments relating to Net Billed Bonds and other operating and maintenance expenses have priority over payments by Bonneville to the United States Treasury. Net proceeds are gross cash receipts remaining in the Bonneville Fund after deducting all of the costs paid by Bonneville to operate and maintain the Federal System other than those used to make payments to the United States Treasury for: (i) the repayment of the Federal investment in certain transmission facilities and the power generating facilities at federally-owned hydroelectric projects in the Pacific Northwest; (ii) debt service on bonds issued by Bonneville and sold to the United States Treasury; (iii) repayments of appropriated amounts to the Corps and the Bureau for certain costs allocated to power generation at federally-owned hydroelectric projects in the Pacific Northwest; and (iv) costs allocated to irrigation projects as are required by law to be recovered from power sales.

Cash payments and the provision of credits by Bonneville and payments by Participants under the Net Billing Agreements are required whether or not the related Net Billed Project is completed, operable or operating and notwithstanding the suspension, interruption, interference, reduction or curtailment of Net Billed Project output

or termination of the related Net Billed Project and such payments or credits are not subject to any reduction, whether by offset or otherwise, and are not conditioned upon the performance or nonperformance by Energy Northwest, Bonneville or any Participant under the Net Billing Agreements or any other agreement or instrument.

*Bonneville's obligations under the Net Billing Agreements are not general obligations of the United States of America and are not secured by the full faith and credit of the United States of America.*

For further information as to the Net Billing Agreements, see "SECURITY FOR THE NET BILLED BONDS — Net Billing Agreements" in the 2003-A & B Official Statement.

## BOND INSURANCE

### MBIA Municipal Bond Insurance Policy

Concurrently with the issuance of the of the Series 2003-F Bonds, MBIA Insurance Corporation ("MBIA") will issue its Financial Guaranty Policy (the "MBIA Policy") for the Series 2003-F Bonds in the aggregate principal amount of $41,330,000. The following information has been furnished by MBIA for use in this Official Statement. Reference is made to Appendix E for a specimen of MBIA's Policy.

MBIA's policy unconditionally and irrevocably guarantees the full and complete payment required to be made by or on behalf of the Issuer to the Paying Agent or its successor of an amount equal to (i) the principal of (either at the stated maturity or by an advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Series 2003-F Bonds as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed by MBIA's policy shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner of the Series 2003-F Bonds pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law (a "Preference").

MBIA's policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Series 2003-F Bonds. MBIA's policy does not, under any circumstance, insure against loss relating to: (i) optional or mandatory redemptions (other than mandatory sinking fund redemptions); (ii) any payments to be made on an accelerated basis; (iii) payments of the purchase price of the Series 2003-F Bonds upon tender by an owner thereof; or (iv) any Preference relating to (i) through (iii) above. MBIA's policy also does not insure against nonpayment of principal of or interest on the Series 2003-F Bonds resulting from the insolvency, negligence or any other act or omission of the Paying Agent or any other paying agent for the Series 2003-F Bonds.

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by MBIA from the Paying Agent or any owner of a Series 2003-F Bond the payment of an insured amount for which is then due, that such required payment has not been made, MBIA on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with U.S. Bank Trust National Association, in New York, New York, or its successor, sufficient for the payment of any such insured amounts which are then due. Upon presentment and surrender of such Series 2003-F Bonds or presentment of such other proof of ownership of the Series 2003-F Bonds, together with any appropriate instruments of assignment to evidence the assignment of the insured amounts due on the Series 2003-F Bonds as are paid by MBIA, and appropriate instruments to effect the appointment of MBIA as agent for such owners of the Series 2003-F Bonds in any legal proceeding related to payment of insured amounts on the Series 2003-F Bonds, such instruments being in a form satisfactory to U.S. Bank Trust National Association, U.S. Bank Trust National Association shall disburse to such owners or the Paying Agent payment of the insured amounts due on such Series 2003-F Bonds, less any amount held by the Paying Agent for the payment of such insured amounts and legally available therefor.

MBIA is the principal operating subsidiary of MBIA Inc., a New York Stock Exchange listed company (the "Company"). The Company is not obligated to pay the debts of or claims against MBIA. MBIA is domiciled in the State of New York and licensed to do business in and subject to regulation under the laws of all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, the Virgin Islands of the United States and the Territory of Guam. MBIA has three branches, one in the Republic of France, one in the Republic of Singapore and one in the Kingdom of Spain. New York has laws prescribing minimum capital requirements, limiting classes and concentrations of investments and requiring the approval of policy rates and forms. State laws also regulate the amount of both the aggregate and individual risks that may be insured, the payment of dividends by MBIA, changes in control and transactions among affiliates. Additionally, MBIA is required to maintain contingency reserves on its liabilities in certain amounts and for certain periods of time.

MBIA does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding the policy and MBIA set forth under the heading BOND INSURANCE — MBIA Municipal Bond Insurance Policy. Additionally, MBIA makes no representation regarding the Series 2003-F Bonds or the advisability of investing in the Series 2003-F Bonds.

The Financial Guarantee Insurance Policies are not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

**MBIA Information**

The following documents filed by the Company with the Securities and Exchange Commission (the "SEC") are incorporated herein by reference:

(1) The Company's Annual Report on Form 10-K for the year ended December 31, 2002.

Any documents filed by the Company pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act of 1934, as amended, after the date of this Official Statement and prior to the termination of the offering of the Series 2003-F Bonds offered hereby shall be deemed to be incorporated by reference in this Official Statement and to be a part hereof. Any statement contained in a document incorporated or deemed to be incorporated by reference herein, or contained in this Official Statement, shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any other subsequently filed document which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Company files annual, quarterly and special reports, information statements and other information with the SEC under File No. 1-9583. Copies of the SEC filings (including (1) the Company's Annual Report on Form 10-K for the year ended December 31, 2002, and (2) the Company's Quarterly Report on Form 10-Q for the quarters ended March 31, 2002, June 30, 2002 and September 30, 2002), are available (i) over the Internet at the SEC's web site at http://www.sec.gov; (ii) at the SEC's public reference room in Washington, D.C.; (iii) over the Internet at the Company's web site at http://www.mbia.com; and (iv) at no cost, upon request to MBIA Insurance Corporation, 113 King Street, Armonk, New York 10504. The telephone number of MBIA is (914) 273-4545.

As of December 31, 2001, MBIA had admitted assets of $8.5 billion (audited), total liabilities of $5.6 billion (audited), and total capital and surplus of $2.9 billion (audited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. As of December 31, 2002, MBIA had admitted assets of $9.2 billion (audited), total liabilities of $6.0 billion (audited), and total capital and surplus of $3.2 billion (audited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities.

**Financial Strength of MBIA**

Moody's Investors Service, Inc. rates the financial strength of MBIA "Aaa."

Standard & Poor's, a division of The McGraw-Hill Companies, Inc. rates the financial strength of MBIA "AAA."

Fitch Ratings rates the financial strength of MBIA "AAA."

Each rating of MBIA should be evaluated independently. The ratings reflect the respective rating agency's current assessment of the creditworthiness of MBIA and its ability to pay claims on its policies of insurance. Any further explanation as to the significance of the above ratings may be obtained only from the applicable rating agency.

The above ratings are not recommendations to buy, sell or hold the Series 2003-F Bonds, and such ratings may be subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the Series 2003-F Bonds. MBIA does not guaranty the market price of the Series 2003-F Bonds nor does it guaranty that the ratings on the Series 2003-F Bonds will not be revised or withdrawn.

## PLAN OF FINANCE

### GENERAL

The Series 2003-F Bonds are being issued for the purpose of providing funds to refund the Columbia Promissory Note, to pay costs of other capital improvements at the Columbia Generating Station, and to pay costs relating to the issuance of the Series 2003-F Bonds. The Columbia Promissory Note was issued by Energy Northwest pursuant to the Columbia Credit Agreement for the purpose of financing the costs of planning, construction and acquisition of the ISFSI. For a description of the ISFSI, see "ENERGY NORTHWEST — The Columbia Generating Station — Nuclear Fuel" in the 2003-A & B Official Statement.

### ESTIMATED SOURCES AND USES OF FUNDS

Sources of Funds

| | |
|---|---|
| Proceeds of Series 2003-F Bonds | $41,330,000.00 |
| Original Issue Premium | 4,741,329.70 |
| Total | $46,071,329.70 |

Uses of Funds

| | |
|---|---|
| Deposit to Construction Fund[(1)] | $45,270,555.35 |
| Costs of Issuance for Series 2003-F Bonds[(2)] | 800,774.35 |
| Total | $46,071,329.70 |

(1) Includes payment of the Columbia Promissory Note.
(2) Includes underwriters' discount and bond insurance premium.

## INCLUSION BY SPECIFIC REFERENCE

Portions of Energy Northwest's 2003-A & B Official Statement, dated March 20, 2003, subject to the information contained elsewhere herein, are included in this Official Statement by specific reference, namely the information under the captions:

Security for the Net Billed Bonds (other than the information under the heading "Bond Insurance")
Energy Northwest
The Bonneville Power Administration

| | |
|---|---|
| Appendix A-1 | Federal System Audited Statements for the years ended September 30, 2002 and 2001 |
| Appendix B | Audited Financial Statements of Energy Northwest Projects for the year ended June 30, 2002 |
| Appendix E | Energy Northwest Participant Utility Share Fiscal Year 2003 Budgets |
| Appendix F | Summary of Certain Provisions of Related Contracts |
| Appendix G-1 | Summary of Certain Provisions of Electric Revenue Bond Resolutions and Supplemental Electric Revenue Bond Resolutions |
| Appendix G-2 | Summary of Certain Provisions of Prior Lien Resolutions Nos. 769, 640 and 775 |
| Appendix H | Book-Entry Only System |

Any reference to the Series 2003-A Bonds or the Series 2003-B Bonds in the information incorporated herein by reference shall be read to be a reference to the Series 2003-F Bonds unless the context thereof clearly indicates that such information is only applicable to the Series 2003-A Bonds or the Series 2003-B Bonds. The 2003-A & B Official Statement is currently on file with each of the nationally recognized securities information repositories within the meaning of Rule 15c2-12 under the Securities Exchange Act of 1934, as amended, and the Municipal Securities Rulemaking Board. The 2003-A & B Official Statement is also available at http://delivery.i-dealprospectus.com/default.asp?id=%41%3a5254%3d8%3c.

## DESCRIPTION OF THE SERIES 2003-F BONDS

### GENERAL

The Columbia Electric Revenue Bond Resolution authorizes the issuance of the Series 2003-F Bonds for the purpose of refunding the Columbia Promissory Note previously issued and of paying the costs relating to the issuance of the Series 2003-F Bonds.

The Series 2003-F Bonds will initially be dated the date of delivery, and will mature on July 1 in the years and bear interest, payable on January 1 and July 1 of each year, commencing July 1, 2003, at the rates shown on the inside cover of this Official Statement. Interest on the Series 2003-F Bonds is payable by check or draft mailed to the registered owners thereof by BNY Western Trust Company, as Trustee for the Series 2003-F Bonds. Principal of the Series 2003-F Bonds is payable at the office of the Trustee in Seattle, Washington. Notwithstanding the foregoing, upon the written request of a registered owner of at least $1,000,000 in aggregate principal amount of Series 2003-F Bonds outstanding delivered to the Trustee at least ten days prior to any date on which interest or both principal and interest are payable on such Bonds, the principal of and premium, if any, and interest on such Bonds will be paid by wire transfer of immediately available funds on such date to an account specified by such registered owner in its request.

### REDEMPTION

#### Optional Redemption

The Series 2003-F Bonds maturing on or before July 1, 2013 are not subject to redemption prior to maturity. The Series 2003-F Bonds maturing on and after July 1, 2014 will be subject to redemption prior to maturity at the option of Energy Northwest on and after July 1, 2013, in whole or in part at any time, in such order of maturity as is selected by Energy Northwest and by lot within a maturity, at a redemption price equal to the principal amount of such Bonds to be redeemed, together with accrued interest to the redemption date.

**Sinking Fund Redemption**

The Series 2003-F Bonds maturing on July 1, 2018 are subject to sinking fund redemption on July 1 in the years and in the amounts set forth below, at a price equal to the principal amount thereof, plus accrued interest to the date fixed for redemption.

| Year | Amount |
|---|---|
| 2017 | $4,250,000 |
| 2018† | 4,465,000 |

† Final Maturity

**Notice of Redemption**

The Columbia 2003-F Electric Revenue Bond Supplemental Resolution requires that notice of redemption of any Series 2003-F Bonds is to be given by first-class mail or in such other manner as is required by the Supplemental Resolution not less than 30 days nor more than 60 days before the redemption date to the registered owners of the Series 2003-F Bonds which are to be redeemed. Such notice shall be deemed conclusively to be received by the registered owners of the Series 2003-F Bonds which are to be redeemed, whether or not such notice is actually received. Mailing of such notice of redemption shall not be a condition precedent to such redemption and failure to mail any such notice or any defect therein shall not affect the validity of the redemption proceedings for the Series 2003-F Bonds being redeemed. The Supplemental Resolution further provides that, notice of redemption having been given as described above, the Series 2003-F Bonds called for redemption shall become due and payable on the redemption date specified in such notice and that interest thereon shall cease to accrue from and after the redemption date, if moneys sufficient for the redemption of the Series 2003-F Bonds to be redeemed, together with interest thereon to the redemption date, are held by the Paying Agent for such Series 2003-F Bonds on the redemption date.

## BOOK-ENTRY ONLY SYSTEM; TRANSFERABILITY AND REGISTRATION

The Series 2003-F Bonds will be available to the ultimate purchasers in book-entry form only, in denominations of $5,000 and integral multiples thereof. Purchasers of the Series 2003-F Bonds will not receive certificates representing their interests in such Bonds purchased, except as described in Appendix H to the Series 2003-A & B Official Statement, "BOOK-ENTRY ONLY SYSTEM." The Depository Trust Company ("DTC"), New York, New York will act as securities depository ("Securities Depository") for the Series 2003-F Bonds.

As discussed in Appendix H to the 2003-A & B Official Statement, transfers of ownership interests in the Series 2003-F Bonds will be accomplished by book entries made by DTC and, in turn, by DTC Participants acting on behalf of Beneficial Owners of the Series 2003-F Bonds. The Columbia 2003-F Electric Revenue Bond Supplemental Resolution provides that Energy Northwest shall not be required to issue, transfer or exchange the related Series 2003-F Bonds for a period of ten days next preceding any interest payment date therefor, to issue, transfer or exchange any Series 2003-F Bond for a period of ten days next preceding any selection of the Bonds to be redeemed or for a period of ten days thereafter or to transfer or exchange any such Bonds which have been designated for redemption within a period of 60 days next preceding the date fixed for redemption.

Energy Northwest, the Trustee, the Paying Agent and any other person may treat the registered owner of any Series 2003-F Bond as the absolute owner of such Bond for the purpose of making payment thereof and for all other purposes and Energy Northwest, the Trustee and the Paying Agent shall not be bound by any notice or knowledge to the contrary, whether such Series 2003-F Bond shall be overdue or not. All payments of or on account of interest or principal to any registered owner of any such Series 2003-F Bond shall be valid and effectual and shall be a discharge of Energy Northwest, the Trustee and Paying Agent in respect of the liability upon such Series 2003-F Bond, to the extent of the sum or sums paid.

## LEGAL MATTERS

The approving opinion of Willkie Farr & Gallagher, Bond Counsel to Energy Northwest, as to the legality of the Series 2003-F Bonds will be in substantially the form appended hereto in Appendix A. The opinion of Orrick, Herrington & Sutcliffe LLP, Special Tax Counsel, as to the exclusion of the interest on the Series 2003-F Bonds from the gross income of the owner thereof for federal income tax purposes will be in substantially the form appended hereto in Appendix B.

Bond Counsel and General Counsel to Energy Northwest will also render opinions with respect to the validity and enforceability of the Net Billing Agreements and the Assignment Agreement. In rendering their opinions with respect to the Net Billing Agreements, Bond Counsel and General Counsel to Energy Northwest will assume the correctness of the opinions of counsel to each of the Participants, rendered in 1971, 1972, 1973 and 1974 as to (1) the due organization of and the due authorization of such Net Billing Agreements by such Participants, (2) except in the case of one Participant as to which there was an irregularity in the proceedings relating to the execution of the Net Billing Agreements to which it is a party, the due execution and delivery by such Participants of such Net Billing Agreements and (3) the fact that such Net Billing Agreements did not violate or conflict with applicable law. As to the due authorization, execution and delivery of the Net Billing Agreements and the Assignment Agreement by Bonneville and certain other matters, Bond Counsel and General Counsel to Energy Northwest will rely on the opinion of Bonneville's General Counsel. A copy of the proposed form of this opinion of Bond Counsel is appended hereto in Appendix A.

See "SECURITY FOR THE PRIOR LIEN BONDS — Net Billing Agreements" and "— Assignment Agreements" in the 2003-A & B Official Statement for a discussion of Bonneville's agreement to pay directly to Energy Northwest certain amounts which are not paid by a Participant and for a discussion of certain of Bonneville's obligations under the Assignment Agreements.

Certain legal matters, including the enforceability against Bonneville of the Net Billing Agreements and the Assignment Agreement, will be passed upon for Bonneville by its General Counsel and by its Special Counsel, Orrick, Herrington & Sutcliffe LLP, New York, New York.

Certain legal matters will be passed upon for the Underwriters by O'Melveny & Myers LLP, New York, New York, Counsel to the Underwriters.

## TAX EXEMPTION

In the opinion of Special Tax Counsel, based upon an analysis of existing laws, regulations, rulings and court decisions, and assuming, among other matters, compliance with certain covenants and the accuracy of certain representations, interest on the Series 2003-F Bonds is excluded from gross income for federal income tax purposes under Section 103 of the Internal Revenue Code of 1986 (the "Code"). Special Tax Counsel is of the further opinion that interest on the Series 2003-F Bonds is not a specific preference item for purposes of the federal individual or corporate alternative minimum taxes, although Special Tax Counsel observes that such interest is included in adjusted current earnings in calculating federal corporate alternative minimum taxable income. In rendering its opinion, Special Tax Counsel has relied on the opinion of Bond Counsel as to the validity of the Series 2003-F Bonds and the due authorization and issuance of the Series 2003-F Bonds. A complete copy of the proposed form of opinion of Special Tax Counsel is set forth in Appendix B hereto.

Series 2003-F Bonds purchased, whether at original issuance or otherwise, for an amount higher than their principal amount payable at maturity (or, in some cases, at their earlier call date) ("Premium Bonds") will be treated as having amortizable bond premium. No deduction is allowable for the amortizable bond premium in the case of bonds, like the Premium Bonds, the interest on which is excluded from gross income for federal income tax purposes. However, the amount of tax-exempt interest received, and a purchaser's basis in a Premium Bond, will be reduced by the amount of amortizable bond premium properly allocable to such purchaser. Beneficial Owners of Premium Bonds should consult their own tax advisors with respect to the proper treatment of amortizable bond premium in their particular circumstances.

The Code imposes various restrictions, conditions and requirements relating to the exclusion from gross income for federal income tax purposes of interest on obligations such as the Series 2003-F Bonds. Energy Northwest and Bonneville have made certain representations and covenanted to comply with certain restrictions designed to ensure that interest on the Series 2003-F Bonds will not be included in federal gross income. Inaccuracy of these representations or failure to comply with these covenants may result in interest on the Series 2003-F Bonds being included in gross income for federal income tax purposes, possibly from the date of original issuance of the Series 2003-F Bonds. The opinion of Special Tax Counsel assumes the accuracy of these representations and compliance with these covenants. Special Tax Counsel has not undertaken to determine (or to inform any person) whether any actions taken (or not taken) or events occurring (or not occurring) after the date of issuance of the Series 2003-F Bonds may adversely affect the value of, or the tax status of interest on, the Series 2003-F Bonds.

Certain agreements, requirements and procedures contained or referred to in the Resolutions, as applicable, the Tax Matters Certificates to be executed by Energy Northwest and by Bonneville simultaneously with the issuance of the Series 2003-F Bonds, and other relevant documents may be changed and certain actions may be taken or omitted under the circumstances and subject to the terms and conditions set forth in such documents. Special Tax Counsel expresses no opinion as to any Series 2003-F Bond or the interest thereon if any such change occurs or action is taken or omitted upon the advice or approval of counsel other than Orrick, Herrington & Sutcliffe LLP.

Although Special Tax Counsel is of the opinion that interest on the Series 2003-F Bonds is excluded from gross income for federal income tax purposes, the ownership or disposition of, or the accrual or receipt of interest on, the Series 2003-F Bonds may otherwise affect a Beneficial Owner's federal or state tax liability. The nature and extent of these other tax consequences will depend upon the particular tax status of the Beneficial Owner or the Beneficial Owner's other items of income or deduction. Special Tax Counsel expresses no opinion regarding any such other tax consequences.

The opinion of Special Tax Counsel is based on current legal authority and represents Special Tax Counsel's judgment as to the proper treatment of the Series 2003-F Bonds for federal income tax purposes. It is not binding on the IRS or the courts. Special Tax Counsel's engagement with respect to the Series 2003-F Bonds ends with the issuance of the Series 2003-F Bonds, and, unless separately engaged, Special Tax Counsel is not obligated to defend the tax-exempt status of the Series 2003-F Bonds in the event of an audit examination by the IRS. Under current procedures, parties other than Energy Northwest, including Beneficial Owners, will have little if any right to participate in the examination process. Moreover, because achieving judicial review in connection with an audit examination of tax-exempt bonds is difficult, obtaining an independent review of IRS positions with which Energy Northwest or Bonneville legitimately disagree, may not be practical. If such a situation arises, Energy Northwest, Bonneville or Beneficial Owners of the Series 2003-F Bonds may incur significant expense, loss of market value to the Beneficial Owners, or both.

## RATINGS

Fitch, Inc. ("Fitch"), Moody's and S&P are expected to assign the Series 2003-F Bonds the ratings of AAA, Aaa and AAA, respectively, based on the MBIA Policy. Ratings were applied for by Energy Northwest and certain information was supplied by Energy Northwest and Bonneville to such rating agencies to be considered in evaluating the Series 2003-F Bonds. Such ratings reflect only the respective views of such rating agencies, and an explanation of the significance of such ratings may be obtained only from the rating agency furnishing the same. There is no assurance that any or all of such ratings will be retained for any given period of time or that the same will not be revised downward or withdrawn entirely by the rating agency furnishing the same if, in its judgment, circumstances so warrant. Any such downward revision or withdrawal of such ratings may have an adverse effect on the market price of the Series 2003-F Bonds.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Series 2003-F Bonds from Energy Northwest and to make a bona fide public offering of such Bonds at not in excess of the public offering prices set forth on the inside cover of this Official Statement. Aggregate underwriters' compensation under the bond purchase contract is $309,274.35. The Underwriters' obligations are subject to certain conditions

precedent contained in the bond purchase contract and they will be obligated to purchase all such Series 2003-F Bonds if any such Bonds are purchased. The Series 2003-F Bonds may be offered and sold to certain dealers, banks and others (including underwriters and other dealers depositing such Series 2003-F Bonds into investment trusts) at prices lower than such initial offering prices and such initial offering prices may be changed from time to time by the Underwriters of the Series 2003-F Bonds.

## CONTINUING DISCLOSURE

Pursuant to Rule 15c2-12 under the Securities Exchange Act of 1934 ("Rule 15c2-12"), Energy Northwest and Bonneville will enter into a Continuing Disclosure Agreement, to be dated the date of delivery of the Series 2003-F Bonds for the benefit of holders of the Series 2003-F Bonds, to provide certain financial information and operating data relating to Energy Northwest (the "Energy Northwest Annual Information"), certain financial information and operating data relating to Bonneville (the "Bonneville Annual Information" and, together with Energy Northwest Annual Information, the "Annual Information") and to provide notices of the occurrence of certain enumerated events with respect to Series 2003-F Bonds, if material. Energy Northwest Annual Information is to be provided not later than December 31 of each year, commencing December 31, 2003. The Bonneville Annual Information is to be provided not later than March 31 of each year, commencing March 31, 2004. The Annual Information will be filed with each Nationally Recognized Municipal Securities Information Repository (the "NRMSIRs") and with the State Depository for the State of Washington, if such State Depository exists (the "State Depository"). At this time, there is no State Depository. Notices of aforesaid enumerated events will be filed by Energy Northwest with the NRMSIRs or the Municipal Securities Rulemaking Board (the "MSRB") and with the State Depository. Energy Northwest and Bonneville have complied with all previous undertakings with respect to Rule 15c2-12. For a description of the nature of the information to be provided in the Annual Information and the notices of such material events, see Appendix C, "SUMMARY OF THE CONTINUING DISCLOSURE AGREEMENT" to this Official Statement.

## MISCELLANEOUS

The references, excerpts and summaries contained herein and in the 2003-A & B Official Statement, incorporated by reference herein, of the Net Billed Resolutions, the Net Billing Agreements, the Columbia Project Agreement, the Assignment Agreement, the Post Termination Agreements and any other documents or agreements referred to herein or therein do not purport to be complete statements of the provisions of such documents or agreements and reference should be made to such documents or agreements for a full and complete statement of all matters relating to the Series 2003-F Bonds, the basic agreements securing the Series 2003-F Bonds and the rights and obligations of the holders thereof. Copies of the forms of the Net Billed Resolutions, Net Billing Agreements, the Columbia Project Agreement, Assignment Agreements for the Net Billed Projects, including copies of the forms of such agreements as amended for Project 1 and copies of the Post Termination Agreements and other reports, documents, agreements and studies referred to herein and in the Appendices hereto are available upon request at the office of Energy Northwest in Richland, Washington.

The authorizations, agreements and covenants of Energy Northwest are set forth in the Net Billed Resolutions and neither this Official Statement or the 2003-A & B Official Statement, incorporated by reference herein, nor any advertisement of the Series 2003-F Bonds is to be construed as a contract with the holders of the Series 2003-F Bonds. Any statements made in this Official Statement or in the 2003-A & B Official Statement, incorporated herein, involving matters of opinion or estimates, whether or not expressly so identified, are intended merely as such and not as representations of fact.

Bonneville has furnished the information herein relating to it.

The delivery of this Official Statement has been duly authorized by Energy Northwest.

**ENERGY NORTHWEST**

By: /s/ John F. Cockburn
Chairman of Executive Board

By: /s/ Albert E. Mouncer
Chief Financial Officer

# EXHIBIT E

## Energy Northwest
## Columbia Generating Station
## Independent Spent Fuel Storage Installation Facility (ISFSI)

| Fiscal Year | Amount Outstanding | Days | Interest | Interest Rate |
|---|---|---|---|---|
| 2002 | $ 34,518,000.00 * | 52 | $ 139,053.54 | 2.83% |
| 2003 | $ 34,518,000.00 | 333 | 802,326.44 | 2.55% |
| Total Note 02-03 * | $ 34,518,000.00 | 385 | $ 941,379.98 | 2.59% |
| 2003 | $ 36,514,185.86 ** | 32 | $ 145,590.89 | 4.55% |
| 2004 | $ 36,514,185.86 | 365 | 1,660,646.09 | 4.55% |
| 2005 | $ 36,514,185.86 | 365 | 1,660,646.09 | 4.55% |
| 2006 | $ 36,514,185.86 | 365 | 1,660,646.09 | 4.55% |
| Total Interest from Series 2003-F | $ 36,514,185.86 | 1127 | $ 5,127,529.17 | 4.55% |

| | Average Outstanding Balance | Days | Interest | Interest Rate |
|---|---|---|---|---|
| Total Interest 05/10/02 - 06/30/06 | $ 36,005,897.79 | 1512 | $ 6,068,909.15 | 4.07% |

* $34,518,000.00 was advanced on May 10, 2002 by Promissory Note between Energy Northwest and Citibank, N.A.
** Series 2003-F was issued with proceeds totaling $46,071,329.70. Of the total proceeds, $36,514,185.86 was used to fund ISFSI expenses.

ISFSI Interest.xls

# Energy Northwest
## Columbia Generating Station Series 2003-F
## Electric Revenue Bonds, Series 2003-F

| Uses of Funds | | |
|---|---|---|
| Cost of Issuance | $ | 193,500.00 |
| Underwriters Discount | | 309,274.35 |
| Bond Insurance | | 298,000.00 |
| **Total Delivery Expenses** | **$** | **800,774.35** |
| | | |
| Payment of Promissory Note | $ | 34,518,000.00 |
| Other ISFSI Costs | | 1,361,526.00 |
| Other Capital Improvements | | 9,390,000.00 |
| Additional Proceeds | | 1,029.35 |
| **Total Other Uses of Funds** | **$** | **45,270,555.35** |
| | | |
| **Total Proceeds** | **$** | **46,071,329.70** |

| ISFSI Portion of Proceeds: | | |
|---|---|---|
| Payment of Promissory Note | $ | 34,518,000.00 |
| Other ISFSI Costs | | 1,361,526.00 |
| Pro-Rata of Delivery Expenses | | 634,659.86 |
| **Total ISFSI Proceeds** | **$** | **36,514,185.86** |

**Outstanding Bonds Series 2003-F**

| Year (July 1) | | Amount | Interest Rate |
|---|---|---|---|
| 2007 | $ | 2,590,000 | 5.00% |
| 2008 | | 2,720,000 | 5.00% |
| 2009 | | 2,855,000 | 5.00% |
| 2010 | | 3,000,000 | 5.00% |
| 2011 | | 3,150,000 | 5.00% |
| 2012 | | 3,305,000 | 5.00% |
| 2013 | | 3,475,000 | 5.00% |
| 2014 | | 3,645,000 | 5.25% |
| 2015 | | 3,835,000 | 5.25% |
| 2016 | | 4,040,000 | 5.25% |
| 2018 | | 8,715,000 | 5.00% |
| | $ | 41,330,000 | |
| | | | |
| 5.00% Bonds | $ | 29,810,000 | |
| 5.25% Bonds | $ | 11,520,000 | |
| | $ | 41,330,000 | |
| | | | |
| Annual Interest | $ | 2,095,300 | |
| | | | |
| Effective Interest Rate | | 4.55% | |

ISFSI Interest.xls

COLUMBIA GENERATING STATION
CITIBANK TAXABLE NOTE / FY 2002 - FY 2003
**INTEREST PAYMENT DATES / AMOUNTS**

| Interest Payment Date | * May Advance (05/10/02) | ** July Advance (07/25/02) | ** August Advance (08/23/02) | ** September Advance (09/25/02) | ** October Advance (10/24/02) | ** November Advance (11/25/02) | ** December Advance (12/23/02) | ** January Advance (01/23/03) | ** February Advance (02/25/03) | ** March Advance (03/25/03) | April Advance (04/10/03) | Total Payments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ | $ |
| 07/25/02 | 207,216.92 *** | | | | | | | | | | | 207,216.92 |
| 08/23/02 | 77,579.21 | 18,126.09 | | | | | | | | | | 95,705.30 |
| 09/25/02 | 87,605.82 | 20,468.77 | 20,468.77 | | | | | | | | | 128,543.36 |
| 10/24/02 | 76,806.19 | 17,945.48 | 17,945.48 | 17,945.48 | | | | | | | | 130,642.63 |
| 11/25/02 | 85,604.64 | 20,001.20 | 20,001.20 | 20,001.20 | 20,001.20 | | | | | | | 165,609.44 |
| 12/23/02 | 62,742.22 | 14,659.48 | 14,659.48 | 14,659.48 | 14,659.48 | 14,659.48 | | | | | | 136,039.62 |
| 01/23/03 | 71,039.96 | 16,598.22 | 16,598.22 | 16,598.22 | 16,598.22 | 16,598.22 | 16,598.22 | | | | | 170,629.28 |
| 02/25/03 | 73,408.28 | 17,151.57 | 17,151.57 | 17,151.57 | 17,151.57 | 17,151.57 | 17,151.57 | 17,151.57 | | | | 193,469.27 |
| 03/25/03 | 61,480.39 | 14,364.66 | 14,364.66 | 14,364.66 | 14,364.66 | 14,364.66 | 14,364.66 | 14,364.66 | 14,364.66 | | | 176,397.67 |
| 04/10/03 | 33,890.54 | 7,918.40 | 7,918.40 | 7,918.40 | 7,918.40 | 7,918.40 | 7,918.40 | 7,918.40 | 7,918.40 | 7,918.40 | | 105,156.14 |
| 04/25/03 | 31,785.33 | | | | | | | | | | | 31,785.33 |
| 05/12/03 | 36,186.37 | | | | | | | | | | | 36,186.37 |
| 05/21/03 | 19,071.20 | | | | | | | | | | | 19,071.20 |
| 05/29/03 | 16,962.91 | | | | | | | | | | | 16,962.91 |
| TOTAL | $ 941,379.98 | $ 147,233.87 | $ 129,107.78 | $ 108,639.01 | $ 90,693.53 | $ 70,692.33 | $ 56,032.85 | $ 39,434.63 | $ 22,283.06 | $ 7,918.40 | $ 0.00 | $ 1,613,415.44 |

* Aggregate Advance Amount was $34,518,000.00

** Aggregate Monthly Advance Amount is $8,065,000.00.

*** $139,053.54 Was Costed to the previous Fiscal Year.

ISFSI Interest.xls

Carolina Power & Light Co. v. U.S.
Fed.Cl.,2008.
Only the Westlaw citation is currently available.
United States Court of Federal Claims.
CAROLINA POWER & LIGHT COMPANY, and Florida Power Corporation, Plaintiffs,
v.
The UNITED STATES, Defendant.
**No. 04-37C.**

May 19, 2008.

**Background:** Public utility subsidiaries which operated five nuclear reactors brought suit against the United States for partial breach of standard contract for disposal of spentnuclearfuel (SNF).

**Holdings:** The United States Court of Federal Claims, Wheeler, J., held that:
(1) acceptance rate of 3,000 metric tons of uranium (MTUs) per year was reasonable measure of performance of standard contract;
(2) utility was entitled to recover labor costs for work of its employees on breach-related projects in award of damages for government's partial breach of standard contract;
(3) damages award was not subject to reduction for “avoided” cost of loading Department of Energy (DOE) transportation casks when DOE finally arrived to accept SNF; and
(4) utility was not entitled to recover allowance for funds used during construction (AFUDC) representing estimated debt and equity costs of capital funds necessary to finance construction.

Judgment for plaintiffs.

**[1] Damages 115 ⚷121**

115 Damages
115VI Measure of Damages
115VI(C) Breach of Contract
115k121 k. Partial Performance. Most Cited Cases
In awarding damages for a partial breach of contract, a court must endeavor to place the injured party in as good a position as it would have been had the breaching party fully performed.

**[2] Damages 115 ⚷62(4)**

115 Damages
115III Grounds and Subjects of Compensatory Damages
115III(B) Aggravation, Mitigation, and Reduction of Loss
115k62 Duty of Person Injured to Prevent or Reduce Damage
115k62(4) k. Breach of Contract. Most Cited Cases
If one party to a contract provides notice that it does not intend to perform, the non-breaching party becomes obligated to mitigate damages, meaning that it must take reasonable steps to avoid further losses or damages stemming from the breach.

**[3] Damages 115 ⚷45**

115 Damages
115III Grounds and Subjects of Compensatory Damages
115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)1 In General
115k41 Expenses
115k45 k. Breach of Contract. Most Cited Cases
In a breach of contract case, the non-breaching party is entitled to recover its reasonable costs incurred in its efforts to mitigate damages.

**[4] Damages 115 ⚷22**

115 Damages
115III Grounds and Subjects of Compensatory Damages
115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)1 In General

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

115k21 Natural and Probable Consequences of Breaches of Contract
115k22 k. In General. Most Cited Cases

**Damages 115 ⚷23**

115 Damages
115III Grounds and Subjects of Compensatory Damages
115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)1 In General
115k21 Natural and Probable Consequences of Breaches of Contract
115k23 k. Under Circumstances Within Contemplation of Parties. Most Cited Cases

**Damages 115 ⚷189**

115 Damages
115IX Evidence
115k183 Weight and Sufficiency
115k189 k. Breach of Contract in General. Most Cited Cases
To recover damages for breach of contract, plaintiffs must show that: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach was a substantial causal factor in the incurrence of damages; and (3) the damages are established with reasonable certainty.

**[5] Damages 115 ⚷45**

115 Damages
115III Grounds and Subjects of Compensatory Damages
115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)1 In General
115k41 Expenses
115k45 k. Breach of Contract. Most Cited Cases
To eliminate or reduce plaintiff's mitigation damages in a breach of contract case, a defendant must show that the plaintiff's mitigation efforts were inappropriate or unreasonable.

**[6] Damages 115 ⚷117**

115 Damages
115VI Measure of Damages
115VI(C) Breach of Contract
115k117 k. Mode of Estimating Damages in General. Most Cited Cases
Breaching party in a breach of contract case may seek deductions from damages for costs that the non-breaching party avoided by not having to perform.

**[7] United States 393 ⚷74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases
Acceptance rate of 3,000 metric tons of uranium (MTUs) per year was reasonable measure of performance of standard contract for disposal of spent-nuclearfuel (SNF) by the Department of Energy (DOE), for purposes of measuring damages for partial breach of standard contract; overwhelming weight of evidence demonstrated that both DOE and nuclear utilities expected DOE to accept between 2,650 MTUs and 3,000 MTUs per year from the industry.

**[8] United States 393 ⚷74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases
Government was not entitled to deduct costs incurred by nuclear utility in removing CRUD,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sludge, and unused racks from spent fuel pools from award of damages for partial breach of standard contract for disposal of spentnuclearfuel (SNF), on ground that utility would have incurred such costs even absent the breach at time of plant's decommissioning either in 2026 or 2046, absent any credible evidence showing with reasonable certainty what such costs would be in 2026 or 2046.

**[9] United States 393 74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases

Nuclear utility was entitled to recover railroad track maintenance costs in award of damages for government's partial breach of standard contract for disposal of spentnuclearfuel (SNF), where partial breach caused utility to transport SNF by rail to one of its plants for interim storage, requiring periodic maintenance and safety checks on rail lines, notwithstanding government's speculative assertion that Department of Energy (DOE) would have accepted fuel by rail if had performed, and thus such costs would have been incurred in any case.

**[10] United States 393 74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases

Nuclear utility was entitled to recover labor costs for work of its employees on breach-related projects in award of damages for government's partial breach of standard contract for disposal of spentnuclearfuel (SNF), notwithstanding government's contention that only labor costs for hourly employees, and salaried employees who spent more than 50 percent of their hours on a breach-related project during any one year qualified as incremental to the breach, as government's "50 percent rule" was arbitrary and without support in law.

**[11] United States 393 74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases

Nuclear utility was entitled to recover stores overhead and indirect overhead expenses in award of damages for government's partial breach of standard contract for disposal of spentnuclearfuel (SNF), notwithstanding government's objection that utility could not recover any portion of overhead costs because they were fixed costs which were not incremental to the breach, as overhead costs were incurred and were properly attributable to mitigation projects and activities.

**[12] United States 393 74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases

Nuclear utility was entitled to recover cost of study to determine if existing crane at plant would need modification and upgrade to lift heavier dry storage casks in award of damages for government's partial breach of standard contract for disposal of spentnuclearfuel (SNF), notwithstanding government's objection that utility failed to explain why costs incurred to perform crane studies would not have been performed in the absence of breach.

**[13] United States 393 74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases

Nuclear utility was entitled to recover licensing and communications expenses incurred in activating additional spent fuel storage pools in award of damages for government's partial breach of standard contract for disposal of spentnuclearfuel (SNF), notwithstanding government's objection that such costs were not a direct result of government's delay in performance.

**[14] United States 393 ⚷74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases

Nuclear utility was not entitled to recover cost of upgrading component cooling water (CCW) system at nuclear power plant in award of damages for government's partial breach of standard contract for disposal of spentnuclearfuel (SNF), where utility likely would have performed the upgrades of power uprate and steam generator replacement, even if the Department of Energy had begun accepting spent SNF at the plant on January 31, 1998, pursuant to the standard contract.

**[15] United States 393 ⚷74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases

Nuclear utility was not entitled recover to cost of re-rack operation at nuclear power plant in award of damages for government's partial breach of standard contract for disposal of spentnuclearfuel (SNF); although evidence showed that re-rack project did provide additional SNF storage space, it also showed that utility would most likely have performed the project in any event absent government's breach.

**[16] United States 393 ⚷74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases

Award of damages to nuclear utility for government's partial breach of standard contract for disposal of spentnuclearfuel (SNF) was not subject to reduction for "avoided" cost of loading Department of Energy (DOE) transportation casks when DOE finally arrived to accept SNF, as such costs were not avoided but merely deferred; moreover, government failed to present any evidence showing with reasonable certainty what such costs would have been if it had performed.

**[17] United States 393 ⚷74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases

Nuclear utility was not entitled to recover allowance for funds used during construction (AFUDC) representing estimated debt and equity costs of capital funds necessary to finance construction in award of damages for government's partial breach of standard contract for disposal of spentnuclearfuel (SNF), absent evidence tying borrowed money to specific breach-related projects.

Brad Fagg, with whom were Paul M. Bessette, and David M. Kerr, Morgan Lewis & Bockius, LLP, Washington, D.C., for Plaintiffs.

Andrew P. Averbach, with whom were Jeffrey S. Bucholtz, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Harold D. Lester, Jr., Assistant Director, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., Jane K. Taylor, Marian E. Sullivan, Christopher J. Carney, Lisa L. Donahue, and Stephen Finn, of Counsel, for Defendant.

*OPINION AND ORDER*

WHEELER, Judge.[FN1]

***1** Plaintiffs Carolina Power & Light Company ("CP & L") and Florida Power Corporation ("FPC") claim damages of $91,029,704 from Defendant caused by the failure of the Department of Energy ("DOE") to collect and dispose of spentnuclearfuel beginning January 31, 1998 under the terms of DOE's Standard Contract. CP & L and FPC are wholly-owned subsidiaries of Progress Energy, Inc., a public utility in the southeast United States. Plaintiffs' damages consist of costs incurred in mitigation of DOE's partial breach of the Standard Contract. This Court has jurisdiction over Plaintiffs' claim pursuant to the Tucker Act, 28 U.S.C. § 1491(a).*See PSEG Nuclear, LLC v. United States,* 465 F.3d 1343 (Fed.Cir.2006). Defendant's liability for partial breach of contract has been established. *See Maine Yankee Atomic Power Co. v. United States,* 225 F.3d 1336, 1337-40 (Fed.Cir.2000) ("*Maine Yankee*"); *N. States Power Co. v. United States,* 224 F.3d 1361, 1367 (Fed.Cir.2000). Thus, only damages are at issue.

CP & L and FPC (collectively "Progress Energy" or "Plaintiffs") operate five nuclear reactors at four power plants in North Carolina, South Carolina, and Florida. The power plants are known as Harris, Brunswick, Robinson, and Crystal River. Plaintiffs' damages claims fall into five categories: (1) $208,120 to complete a study for a dry storage facility known as an Independent Spent Fuel Storage Installation ("ISFSI") at the Brunswick plant; (2) $32,734,951 to activate two additional spent fuel storage pools at the Harris plant; (3) $16,975,182 to ship spent fuel from the Robinson and Brunswick plants to the Harris plant; (4) $36,436,059 to construct and load the Robinson plant ISFSI; and (5) $4,675,392 to design, construct, and replace spent fuel racks at the Crystal River Plant.

The United States Court of Appeals for the Federal Circuit has held that nuclear utilities may recover proven incurred costs as mitigation damages for DOE's partial breach, but may not recover forecasted future costs. *Indiana Michigan Power Co. v. United States,* 422 F.3d 1369, 1375-77 (Fed.Cir.2005) ( "*Indiana Michigan*"). Consequently, Plaintiffs have limited their claims in this case to costs incurred through December 31, 2005. In accord with the *Restatement (Second) of Judgments* § 26 (1982), Plaintiffs retain the right to bring later actions on claims for damages incurred thereafter. *See Indiana Michigan,* 422 F.3d at 1378.

Defendant opposes Plaintiffs' claims in part, but acknowledges that Plaintiffs at a minimum are entitled to recover $44,339,037. Defendant accepts responsibility for an additional $16,962,904, increasing the total to $61,301,941, if the Court agrees with Plaintiffs' view of DOE's obligations under the Standard Contract. Defendant's objections to Plaintiffs' damages generally are that: (1) Plaintiffs have not properly credited DOE for costs they would have incurred absent the breach; (2) Plaintiffs have not shown that certain costs increased incrementally as a result of the breach; and (3) certain costs were not caused by the breach, or are otherwise unsupported or unallowable. Defendant agrees that Plaintiffs' claimed costs were foreseeable at the time of contracting, and that the incurred costs were reasonable.

***2** The Court conducted a nine-day trial in Washington, D.C. during November 5-16, 2007. The witnesses in order of appearance were: Lou Martin, former manager of nuclear fuel at Progress Energy; Steve Edwards, supervisor of Progress Energy's

Spent Fuel Management Unit; Robert Kunita, former CP & L senior engineer; Alva Wayne Worthington, Progress Energy's lead engineer of the Spent Fuel Management Unit; Michael Culver, a Progress Energy reactor engineer; Dean Tibbitts, a Progress Energy engineer; Tom Lehmann, former FPC nuclear chemistry manager; Ted Williams, superintendent of major projects at Progress Energy; Tom Pollog, a DOE engineer in the Office of Waste Management within DOE's Office of Civilian Radioactive Waste Management ("OCRWM"); Robert Morgan, DOE's former director of OCRWM; David Zabransky, a nuclear utility specialist in the OCRWM's Office of Waste Management; Mike Calvello, manager of Nuclear Generation Business Services at Progress Energy; Defendant's experts, Gregory Maret and Larry Johnson; and Michael Lawrence, DOE's former director of the OCRWM.

The Court also accepted the parties' designations of previous deposition and trial testimony from eight witnesses who were unable to testify at trial: Lake H. Barrett, DOE's former deputy director of the OCRWM; Alan Brownstein, DOE's former director of the OCRWM Regulatory Coordination Division; Christopher Kouts, DOE's former director of the OCRWM Office of Waste Management; Loring E. Mills, former executive with the Edison Electric Institute ("EEI"); Ronald Milner, former chief operating officer of the OCRWM; Robert M. Rosselli, former director of DOE's Resource Management Division; Nancy H. Slater, former team leader in the OCRWM Regulatory Coordination Division; and Victor W. Trebules, former director of the Office of Project Control at OCRWM. The parties filed post-trial briefs on January 22, 2008, and reply briefs on February 19, 2008. The Court heard closing arguments on April 4, 2008.

For the reasons explained below, the Court finds that Plaintiffs are entitled to recover $82,845,926 in mitigation damages through December 31, 2005. The Court agrees in large part with Plaintiffs' interpretation of DOE's Standard Contract. In furtherance of the purposes of the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101-10270 (1982), the intent of the Standard Contract was for DOE to begin collecting and disposing of spentnuclearfuel beginning January 31, 1998, and to do so in sufficient quantities so that nuclear utilities would not need to provide any additional storage facilities at individual reactor locations. DOE contemplated the establishment of two central repositories, and an interim storage facility if needed, where the spent fuel would be stored. One of these repositories was to be located at Yucca Mountain, Nevada. As events unfolded, the central repositories were not established, and DOE did not collect or dispose of any spent fuel beginning January 31, 1998. To date, DOE has yet to collect and dispose of any spent fuel, even as nuclear plant owners have been paying billions of dollars in fees to DOE under the Standard Contract. Plaintiffs alone have paid DOE $661 million in fees through December 31, 2005.

***3** The Court has disallowed four elements of Plaintiffs' damages claim. For two such items, the Crystal River re-rack project ($4,675,392) and the Harris component cooling water system upgrade ($1,166,640), the Court concludes that Plaintiffs would have incurred these expenses for other reasons absent DOE's partial breach. For various manual journal entries challenged by Defendant ($345,701), Plaintiffs have not met their burden of showing what these expenses were for, or whether they were caused by DOE's breach. Plaintiffs' claim for Allowance for Funds Used During Construction ("AFUDC") ($1,996,045) is in reality a claim for interest against the Government, and is unallowable by law. *See* 28 U.S.C. § 2516(a). Deduction of these disallowed items from Plaintiffs' total claim, $91,029,704, yields a recovery to Plaintiffs of $82,845,926.

*Findings of Fact*[FN2]

A. *Progress Energy's Nuclear Power Plants*

In December 2000, CP & L merged with FPC and

became known as Progress Energy. (Edwards, Tr. 223).FN3 One effect of this merger was to place all of the nuclear plants of CP & L and FPC into one organization. *Id.* CP & L is the majority owner of the Harris and Brunswick plants, and the full owner of the Robinson plant. (Stip. 5). FPC is the majority owner of the Crystal River plant. (Stip. 6). For convenience, the Court will refer to "Progress Energy" in describing events that apply both to CP & L and FPC.

*Harris* is a single unit pressurized water reactor ("PWR") located near New Hill, North Carolina, southwest of Raleigh. (Stip. 24). The Harris plant began commercial operation in 1987 and currently is licensed to operate through 2026. (Stip. 25). In 2006, Progress Energy submitted an application to the Nuclear Regulatory Commission ("NRC") to renew the Harris operating license for an additional 20 years. (Stip. 26).

*Brunswick* is a two unit boiling water reactor ("BWR") located near Southport, North Carolina, on the Atlantic Coast south of Wilmington. (Stip. 48). Brunswick Units 1 and 2 began commercial operations in 1977 and 1975, and are licensed to operate through 2036 and 2034 respectively. (Stip. 49).

*Robinson* is a single unit PWR located near Hartsville, South Carolina. (Stip. 34). Robinson began commercial operation in 1971 and is licensed to operate through 2030. (Stip. 35).

*Crystal River* is a single unit PWR located near Crystal River, Florida, on the Gulf Coast north of Tampa. (Stip. 19). The Crystal River plant began commercial operation in 1977 and currently is licensed to operate through 2016. (Stip. 20). Progress Energy plans to submit an application to the NRC in September 2008 to renew the Crystal River operating license for an additional 20 years. (Edwards, Tr. 232, 235).

B. *The Nuclear Waste Policy Act*

In 1977, President Carter announced that reprocessing of spentnuclearfuel and the development of advanced plutonium-based reactors in the United States would be deferred indefinitely. *See*H.R.Rep. No. 97-491(I), at 27 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3794. President Carter adopted this policy to curb the potential for proliferation of nuclear weapons arising from an expanded plutonium-based nuclear economy. *Id.* The new policy caused a spent fuel bottleneck in the United States. Domestic nuclear reactors had not been designed with lifetime spent fuel storage capacity, and no near-term destination for spent fuel existed. H.R.Rep. No. 97-491(I), at 28; (Martin, Tr. 73, 80).

***4** On January 7, 1983, Congress passed the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub.L. 97-425, 96 Stat. 2201, codified at 42 U.S.C. §§ 10101-10270 (1982). In adopting the NWPA, Congress recognized that "radioactive waste creates potential risks and requires safe and environmentally acceptable methods of disposal," and that "a national problem has been created by the accumulation of [spentnuclearfuel]."42 U.S.C. § 10131(a)(1)-(2). Congress also found that:

> [W]hile the Federal Government has the responsibility to provide for the permanent disposal of high-level radioactive waste and such spentnuclearfuel as may be disposed of in order to protect the public health and safety and the environment, the costs of such disposal should be the responsibility of the generators and owners of such waste and spent fuel.

§ 10131(a)(4). The NWPA further provided that the generators and owners of spent fuel had the responsibility to provide for, and pay the cost of, interim storage of spent fuel "until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this Act."§ 10131(a)(5).

In pursuit of the NWPA's objectives, Congress directed the Secretary of DOE to "enter into contracts with any person who generates or holds title to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

high-level radioactive waste, or spentnuclearfuel, of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spentnuclearfuel." § 10222(a)(1). Congress required the contracts to provide that:

> (A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spentnuclearfuel involved *as expeditiously as practicable* upon the request of the generator or owner of such waste or spent fuel; and
>
> (B) in return for the payment of fees established by this section, the Secretary *beginning not later than January 31, 1998,* will dispose of the high-level radioactive waste or spentnuclearfuel involved as provided in this subtitle.

§ 10222(a)(5) (emphasis added). Congress mandated that the utilities' fees be sufficient to support the costs of the Government's spent fuel disposal efforts. § 10222(a)(2)-(3).

C. *The Standard Contract*

On February 4, 1983, DOE published in the Federal Register the proposed terms for the "Standard Contract for Disposal of SpentNuclearFuel and/or High Level Radioactive Waste" (the "Standard Contract").48 Fed.Reg. 5458 (Feb. 4, 1983); (Stip. 8). DOE received many comments to the proposed Standard Contract from utilities and industry representatives, including CP & L and FPC. (Stip. 10; Martin, Tr. 136-40; PX 6). Nuclear plant owners and operators were required to enter into DOE's Standard Contract as a condition to obtaining renewal of their operating licenses. *Indiana Michigan,* 422 F.3d at 1372 (citing 42 U.S.C. § 10222(a)(1); *Maine Yankee,* 225 F.3d at 1337), (Morgan, Tr. 1419-20). Consequently, the Standard Contract was not the product of any negotiation. (Lawrence, Tr. 2135). Utilities effectively had no choice but to sign the Standard Contract, or risk having the NRC shut down their nuclear power plants. (Morgan, Tr. 1419-20).

***5** DOE issued the Standard Contract as a final rule on April 18, 1983. 48 Fed.Reg. 16590 (Apr. 18, 1993); (Stip. 11). CP & L executed the Standard Contract on June 3, 1983, and FPC executed the Standard Contract on June 30, 1983. (PX 10, 11). CP & L's contract covered the spent fuel generated at the Brunswick, Harris, and Robinson plants. (Stip. 12). FPC's contract covered the spent fuel generated at the Crystal River plant. *Id.* The provisions of the CP & L and FPC Standard Contracts were identical. (PX 10, 11).FN4

Consistent with the intent of the NWPA, the Standard Contract required DOE to "accept title to all SNF ... provide subsequent transportation for such material to the DOE facility, and dispose of such material in accordance with the terms of this contract."(PX 10, Article IV, B, "DOE Responsibilities"). DOE was required to begin performance "after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF ... has been disposed of."(PX 10, Article II, "Scope"). The Standard Contract required DOE to issue an annual capacity report ("ACR") every year, beginning no later than July 1, 1987, to project DOE's annual spent fuel receiving capacity for the ten years "following the projected commencement of operation of the initial DOE facility."(PX 10, Article IV, B, 5(b)). DOE was required to issue an annual acceptance priority ranking ("APR") beginning April 1, 1991 to identify the order in which spent fuel and other high level waste would be collected, with the general rule being that the oldest fuel or waste would be picked up first. (PX 10, Article IV, B, 5(a)). After DOE issued an APR, the Standard Contract required each utility to submit a delivery commitment schedule ("DCS") to DOE identifying the spent fuel that the utility "wishe[d]" to deliver to DOE beginning sixty-three months thereafter. (PX 10, Article V, B, "Delivery Commitment Schedule"). DOE would approve or disapprove the DCS within three months of receipt. *Id.* If DOE disapproved a DCS, it would advise the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

utility of the reasons for disapproval, and the utility would have 30 days to submit a "revised schedule." *Id.* Utilities had the right to adjust the quantities of spent fuel up or down by 20 percent, and, subject to DOE's approval, to exchange an approved DCS with other utilities higher up the APR list. *Id.*

The Standard Contracts required utilities to pay certain fees to DOE. (PX 10, Article VIII, "Fees and Terms of Payment"). CP & L and FPC agreed to pay a one-time fee to cover spent fuel discharged through April 1983. *Id.* CP & L, for example, made a $100 million dollar payment to DOE in 1983. (Martin, Tr. 79). The Standard Contract also required the payment of quarterly fees after April 1983. Through December 31, 2005, Progress Energy, CP & L, and FPC have paid approximately $661 million in fees to DOE for the disposal of spent fuel under Plaintiffs' Standard Contracts. (Stip. 16).

D. *The Acceptance Rate*

***6** The Standard Contract did not contain a specific acceptance rate, but instead established a process by which DOE would identify and collect quantities of spent fuel from the utilities. (PX 10, Articles IV-VII). Although lacking a specific rate, the Standard Contract required DOE to take title to, transport, and dispose of all spentnuclearfuel or high-level radioactive waste "as expeditiously as practicable," commencing not later than January 31, 1998. (PX 10 at 1, 6, 9). Progress Energy's manager of nuclear fuel understood these terms to mean that, after January 31, 1998, utilities would not have to provide any additional storage at their nuclear reactors. (Martin, Tr. 84-85; PX 35 at 8). His expectation was that the Standard Contract, once DOE began performance in 1998, would "solve [Progress Energy's] spent fuel storage problems."(Martin, Tr. 80).

This understanding of DOE's obligation was based on both the provisions of the Standard Contract, and DOE's contemporaneous written and oral communications. For example, DOE assumed in a June 1983 report on financing the disposal of spent fuel that its acceptance rate for the nuclear industry would be 1,800 metric tons of uranium ("MTUs") per year for the first five years, and 3,000 MTUs per year thereafter. (PX 8 at 9). DOE confirmed the five-year ramp up to a permanent 3,000 MTU acceptance rate in its February 1985 "Nuclear Waste Fund Fee Adequacy: An Assessment."(PX 27 at 3). According to Mr. Martin, the nuclear industry was discharging approximately 2,000 MTUs per year during the mid-1980s. Consequently, DOE's planned 3,000 MTU per year acceptance rate "would be consistent with DOE's taking fuel on a schedule that did not require [Progress Energy] to be adding ... storage capacity."(Martin, Tr. 108).

In December 1983, Robert Morgan, DOE's Acting Director of OCRWM, advised the nuclear industry that:

> Technically, the Act does not specify how much waste or spent fuel we must begin receiving [on January 31, 1998]. In fact, if we accepted one spent fuel element in 1998 we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act. The basic strategy which we've outlined in the mission plan, is that beginning in 1998, utilities will not have to provide any additional storage facilities on site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location.

(PX 19 at 11). Two months later, Michael Lawrence, DOE's next Acting Director of OCRWM, testified to Congress that the "fundamental objective" of the NWPA was "to accept high-level radioactive waste for safe management, storage and permanent disposal on a firm schedule, beginning not later than January 31, 1998."(PX 21 at 2). Mr. Lawrence further explained that "[b]y achieving this fundamental objective and implementing an appropriate waste acceptance

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998, and, ultimately, remove all eligible waste from at-reactor storage."*Id.*

***7** Progress Energy also based its understanding of DOE's acceptance rate obligation on statements made in DOE's draft mission plans and its June 1985 final mission plan. The NWPA required DOE to prepare the mission plan to provide an "informational basis sufficient to permit informed decisions to be made in carrying out the repository program...."42 U.S.C. § 10221(a). Congress required the mission plan to include, among other things, an estimate of the "total repository capacity required to safely accommodate the disposal of all high-level radioactive waste and spentnuclearfuel expected to be generated through December 31, 2020," the number and type of repositories required to provide such disposal, and the acceptance schedule for each repository. § 10221(a)(9).

The December 20, 1983 draft mission plan, which DOE circulated to Congress and the utilities, stated that the "waste acceptance schedule will, initially, preclude the need for additional at-reactor storage after January 31, 1998 and, ultimately, remove from at-reactor storage all waste that is more than 5-years old."(PX 17 at 1078). In this draft mission plan, at "Table II-1: Waste Acceptance Schedule," DOE projected two repositories. The first repository would accept spent fuel at a rate of 1,800 MTUs for the first five years, and 3,000 MTUs thereafter. DOE projected that after five years, a second repository with identical acceptance rates would become operational. This plan meant that in 2003, the sixth year of the program, DOE would accept 4,800 MTUs from the nuclear industry, 3,000 MTUs in the first repository and 1,800 MTUs in the second. DOE estimated that only 2,718 MTUs of spent fuel would be generated in the nuclear industry in 2003. The remainder of the 4,800 MTU acceptance capacity in 2003 would be applied toward reducing the backlog of older fuel.*Id.* at 1082.

According to the 1983 draft mission plan, DOE recognized the possibility that the 1,800 MTU acceptance rate during the first five years would not cover the total spent fuel generated for each individual utility. *Id.* at 1081-82.DOE planned, however, that if a utility encountered such a problem, it could "arrange for the right to ship spent fuel to the Department from a utility who is next in queue in shipment allocation...."*Id.* at 1081-83.The draft mission plan also stated that DOE did "not intend to delay or postpone the acceptance of civilian radioactive wastes even if a permanent geologic repository is not completed by 1998."*Id.* at 1080.DOE planned to avoid any untimely performance through use of a Federal Interim Storage or Monitored Retrievable Storage ("MRS"). (PX 17 at 1080; Lawrence, Tr. 2086-87). DOE planned for the MRS, if necessary, to receive spent fuel at the same rate that DOE was planning for the permanent repository. (Lawrence, Tr. 2151; PX 31 at 126; PX 36 at 20).

DOE published the final version of the mission plan in June 1985. (PX 31). The mission plan adopted as the "authorized system" a phased repository acceptance schedule with the first repository receiving 3,000 MTUs per year after a five-year ramp up period. *Id.* at 26.The mission plan's acceptance rates were based in part on attempting to keep pace with spent fuel discharges and alleviating the need for additional storage at nuclear reactors. (Pollog, Tr. 1231-32). The mission plan also outlined an "Improved Performance System," illustrating the possibility of incorporating an MRS into the program. (PX 31 at 27). DOE described the expected role of an MRS in the Federal Waste Management Program:

> ***8** The MRS facility would allow the DOE to accept spent fuel without interruption even if the repository is delayed or its emplacement operations are reduced. The MRS facility would safely store spent fuel until the repository was capable of receiving and emplacing it. Moreover, waste-acceptance activities would not be affected by temporary slowdowns or other operational prob-

> lems that could be experienced at the repository. Consequently, a firm schedule for spent-fuel acceptance could be established to accommodate the DOE's contractual commitments to the utilities paying fees into the Nuclear Waste Fund.

*Id.* at 73.The waste acceptance schedule for the Improved Performance System provided for the MRS to accept spent fuel prior to 1998 and to achieve a steady rate of 3,000 MTUs per year starting in 1998. *Id.* at 27.According to DOE, this proposed schedule would "provide assurance that the DOE's acceptance of spent fuel in 1998 and subsequent years will be at sufficient rates to meet obligations."*Id.* at 87.

DOE's internal correspondence also is relevant in assessing the agency's understanding. In a July 23, 1984 letter, Mr. Lawrence, then manager of DOE's Richland, Washington Operations Office, observed:

> It should be noted that to eliminate the need for additional at-reactor storage after January 31, 1998, the initial waste acceptance rate for 1998 should be about 2,800 MTU plus some amount up to 630 MTU, depending upon the extent Federal Interim Storage is utilized.

(PX 26 at 1199). In attached comments to his letter, Mr. Lawrence stated:

> Based upon our interpretation of the NWPA, the minimum acceptance rate should be based upon the rate at which spent fuel is generated by civilian nuclear power reactors. This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998.

*Id.* at 1201.Mr. Lawrence confirmed at trial that these statements reflected his interpretation of the NWPA. (Lawrence, Tr. 2174).

A September 15, 1983 DOE memorandum similarly states that "the central criteria for this schedule is an acceptance rate during the first 5 years such that no utility would have to build additional storage facilities after 1998."(PX 15 at 1046).

Lake Barrett, another of DOE's deputy directors of OCRWM, testified in a deposition that in 1986, DOE was designing a system to receive 3,000 MTUs a year. He stated "[m]y recollection is that the MRS was to receive 3,000 tons a year circa that time prior to the amendments act, which was in excess of the generation rate of around 2,000."(Barrett, Apr. 22, 2002 Dep., Tr. 51-52). Mr. Barrett explained that accepting fuel in excess of the generation rate was "significant" because DOE had to "design a system to remove the backlog of materials that were accumulating under the intent of the act."*Id.* at 52.Mr. Barrett confirmed that the 3,000 MTU per year rate was consistent with the intent of the NWPA to reduce the backlog of spent fuel throughout the nation in a reasonable period of time. *Id.* at 59; (*see also* Barrett, May 10, 2002 Dep., Tr. 1163-66).

***9** Based upon DOE's assertions and its own understanding, CP & L's 1986 Spent Fuel Management Plan reported that "DOE is currently planning to remove from utility storage all spent fuel on a schedule that will preclude utilities from having to provide any additional storage capacity at nuclear power plant sites after January 31, 1998."(PX 35 at 8).

E. *DOE's Partial Breach*

By 1987, DOE knew that it would not have a functioning permanent repository to begin accepting spent fuel on January 31, 1998. DOE estimated that a permanent repository would be delayed at least five years, until 2003. (DX 59 at 6). On March 31, 1987, DOE submitted a proposal to Congress for construction of an MRS facility in Tennessee capable of "[f]ull-scale operation at a rate of about 2500 to 3000 MTU per year."(PX 36 at 20; DX 59 at 11). Mr. Lawrence testified that, at the time of contract formation in 1983, there was no reason for the MRS acceptance rate to differ from the permanent repository acceptance rate. (Lawrence, Tr.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- Fed.Cl. ---- 


2151). DOE planned to use the MRS facility to act "as a system buffer that would allow continued waste acceptance regardless of changes in the schedule of waste emplacement for the first several years of operation at the first repository."(DX 59 at 11). Expecting a five-year delay in the permanent repository, DOE requested Congress to limit the storage capacity for the MRS to 15,000 MTUs and it designed the MRS facility to have a 3,000 MTU acceptance rate capacity. (Kouts, *Pac. Gas,* Tr. 2775-76; Milner, May 3, 2002 Dep., Tr. 555-56; PX 36 at 20; DX 59 at 5, 11).

In 1987, Congress amended the NWPA and authorized DOE to construct an MRS facility. *See*Nuclear Waste Policy Amendments Act of 1987, Pub.L. No. 100-203, §§ 5001-5065, 101 Stat. 1330, 1330-227 to 1330-255 (1987) (codified in scattered sections of Title 42). Recognizing the potential for the MRS to become the de facto repository, Congress set two conditions for the start of MRS operations: (1) construction could not begin until a license was issued for the construction of a permanent repository; and (2) storage capacity at the MRS could not exceed 10,000 MTUs. 42 U.S.C. § 10168(d)(1), (3). In June 1987, DOE published its first statutorily required ACR, noting that it was "for planning purposes only, and, thus, is not contractually binding on either DOE or the Purchasers."(PX 38 at 2). The 1987 ACR adopted the acceptance rate schedule of the 1987 Mission Plan Amendment: 1,200 MTUs annually during 1998-2002, 2,000 MTUs in 2003, and 2,650 MTUs annually thereafter. (PX 38 at 7).

By November 1989, DOE projected a "significant slip for the expected start of repository operations-from the year 2003 to approximately 2010."(DX 71 at vii). In April 1991, DOE published its first official APR setting the order of fuel acceptance based on the "oldest fuel first." (Pollag, Tr. 1312, 1321-22; DX 99). DOE also published the 1991 ACR with acceptance rates based on three key assumptions: only an MRS facility would be operable, the MRS would have a 10,000 MTU capacity, and Congress would amend the NWPA to remove the condition that construction of the MRS could not begin until a license was issued for a permanent repository. (PX 53 at 4-5). Based on these assumptions, DOE projected an acceptance rate of 400 MTUs in 1998, 600 MTUs in 1999, and 900 MTUs annually during 2000-2007, for a total of 8,200 MTUs through 2007. *Id.* No acceptance rates beyond 2007 were projected. DOE, however, never proposed and Congress never passed an amendment to remove the linkage between the MRS facility and the licensing of a permanent repository. (Kouts, *Sys.Fuels,* Tr. 3480, 3540-41).

***10** In 1991, the General Accounting Office ("GAO") reported that "it is unlikely that DOE will meet its objective to have an MRS facility operating by 1998."(PX 156 at 19). In 1995, President Clinton stated that he would veto proposed legislation removing the linkages between a permanent repository and an MRS facility. *Sys. Fuels, Inc. v. United States,* 79 Fed.Cl. 37, 47 (2007). Even though performance was "unlikely" and even though two of DOE's three assumptions underlying the 1991 ACR's 900 MTU rate were unrealistic and in fact never came to pass, DOE continued to apply the 900 MTU rate in its 1995 ACR. (Milner, May 3, 2002 Dep., Tr. 412; PX 60 at 4). Like all previous ACRs, the 1995 ACR stated that it was "for planning purposes only and thus is not contractually binding on DOE or the Purchasers."(Pollog, Tr. 1247-48; PX 53 at 1-2; PX 60 at 1). By 1995, DOE had announced that it would not accept *any* spent fuel until a permanent repository or temporary facility was built, or until 2010 at the earliest. *See Indiana Michigan,* 422 F.3d at 1372 (citing 59 Fed.Reg. 27,007-27,008 (May 25, 1994); *Maine Yankee,* 225 F.3d at 1338).

When DOE began accepting DCSs in 1992, it expected the utilities to adhere to the 900 MTU rate set forth in its 1991-1995 ACRs. (Zabransky, Tr. 1498; Pollag, Tr. 1277-78; PX 53 at 7; PX 55 at 1090). Plaintiffs complied with DOE's DCS instructions without complaint and submitted DCSs according to the allocation set forth in the most recent

ACR/APR. (Stip. 17; Kunita, Tr. 746, 759; DX 119 at 0036; DX 129; DX 136; DX 170; DX 172). DOE suspended approval of the DCSs after the United States Court of Appeals for the District of Columbia Circuit issued its decision in *Indiana Michigan Power Co. v. Dep't of Energy,* 88 F.3d 1272, 1277 (D.C.Cir.1996), holding that DOE's obligation to pick up spent fuel was not conditioned upon the existence of a facility to receive the spent fuel. (Stip. 18). Today, DOE is not approving any DCSs from any utility. (Zabransky, Tr. 1527; Pollog, Tr. 1290).

In 2004, DOE published another ACR, this time with a ramp up to a 3,000 MTU acceptance rate based on the assumption that a repository would be operational at Yucca Mountain, Nevada beginning in 2010. (PX 128 at 2). At trial, however, DOE's David Zabransky testified that the earliest possible date for DOE performance now is 2017. (Zabransky, Tr. 1528).

F. *Plaintiffs' Mitigation Efforts*

Progress Energy bases its spentnuclearfuel management plans upon the need to maintain "full core reserve" at each of its plants. (Stip. 4). Full core reserve means having "sufficient open and usable space in the spent fuel pool so you can discharge the entire reactor core into the spent fuel pool."(Edwards, Tr. 231). Full core reserve is not an absolute or regulatory requirement, but for economic and risk management reasons is applied as a company objective.

The Progress Energy nuclear plants typically refuel on either eighteen-month or two-year cycles. (Edwards, Tr. 229). To refuel one of its nuclear power plants, Progress Energy removes spent fuel from a reactor and temporarily places it in a spent fuel pool connected to the reactor. (Edwards, Tr. 226-27).Spentnuclearfuel comes in the form of "assemblies," which are measured in MTUs. (Edwards, Tr. 229). The number of assemblies in an MTU depends upon whether the reactor is a pressurized water reactor ("PWR") or boiling water reactor ("BWR"). (Edwards, Tr. 229-30).

1. *Brunswick*

***11** Brunswick has two spent fuel pools, which are not connected. (Stip. 50). CP & L increased the capacity of the Brunswick spent fuel pools in 1977 and 1984 by replacing the existing spent fuel storage racks with higher density racks. (Stip. 51). To alleviate spent fuel pool capacity constraints during 1989-2005, CP & L transported 3,853 spent fuel assemblies in 113 total shipments from Brunswick Units 1 and 2 to Harris. (Stip. 52). The spent fuel shipments from Brunswick to Harris are scheduled to end in 2008, due in part to the expiration of the cask license in October 2008, and because the remaining capacity at Harris ultimately will be needed for storage of Harris spent fuel. (Edwards, Tr. 244-45).

Consequently, Progress Energy is pursuing dry storage at Brunswick. (Edwards, Tr. 245). Dry storage at a nuclear plant typically takes the form of an "Independent Spent Fuel Storage Installation," or "ISFSI." As is typical for such large projects, Progress Energy commissioned an architect-engineer to look for a desirable location and define the scope of the dry-storage project by considering whether soil remediation or plant modifications would be required. (Edwards, Tr. 247-48). Progress Energy incurred approximately $200,000 for the Brunswick ISFSI study. (Edwards, Tr. 247).

2. *Harris*

CP & L originally planned for the Harris plant to accommodate four nuclear units, numbered 1, 2, 3, and 4. (Stip. 27). CP & L intended that Units 1 and 4 would share spent fuel pools A and B, and Units 2 and 3 would share spent fuel pools C and D. (Stip. 28). Construction of Unit 1 and the Fuel Handling Building, housing all four spent fuel pools, was well under way when CP & L changed its plans. (Stip. 29). CP & L cancelled the construc-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

tion of Units 2, 3, and 4, and instead, completed construction of Unit 1, portions of the Fuel Handling Building, and all four spent fuel pools. *Id.* CP & L partially completed the piping and major pieces of equipment associated with Units 2 and 3 that supplied spent fuel pools C and D, but CP & L did not complete the Spent Fuel Pool Cooling and Cleanup ("SFPCC") System for Units 2 and 3. *Id.*CP & L left in place the installed components of the SFPCC System not required for Unit 1, but they remained dormant. (Stip. 29; Edwards, Tr. 262-65).

To maintain full core reserve at Robinson and Brunswick Units 1 and 2, CP & L shipped a number of spent fuel assemblies during the 1990's from Robinson and Brunswick to Harris for storage in Harris spent fuel pools A and B. (Stip. 30). To accommodate the Brunswick and Robinson spent fuel, CP & L added racks to the Harris A and B pools in 1991 and again to the B pool in 1996. (Stip. 31).

By November 1998, however, CP & L determined that, because of DOE's partial breach, it would have to activate pools C and D at Harris and arrange for the storage of spent fuel in those pools. (Edwards, Tr. 343-44; PX 95). CP & L incurred approximately $32.7 million to activate and store spent fuel in the C and D pools. (PX-D 1). This amount includes the cost of plant modifications, completing the component cooling water system, removing CRUD (an unwanted particulate material), changing technical specifications, performing public outreach efforts, and installing racks. (Edwards, Tr. 344-45, 352, 355, 377-78; PX 95; DX 304). CP & L also incurred approximately $16.9 million in transportation costs shipping spent fuel from Robinson to Harris from 2000 through 2004, and from Brunswick to Harris from 2001 through 2005. (PX 137; PX-D1).

3. *Robinson*

***12** Robinson has a single spent fuel pool. (Stip. 36). CP & L significantly increased the capacity of the Robinson spent fuel pool in 1983 by replacing some of the existing low density spent fuel storage racks with higher density racks. (Stip. 43). To alleviate spent fuel pool capacity constraints, CP & L transported spent fuel from Robinson to Brunswick from 1977 to 1981. (Stip. 37). In addition, CP & L shipped spent fuel from Robinson to Harris from 1990 to 2004. (Stip. 38). For these shipments, CP & L used rail casks, known as IF-300s, that it owned. (Stip. 39).

Progress Energy stopped the shipments of spent fuel from Robinson to Harris in 2004 due to license restrictions on the spent fuel shipping cask. (Edwards, Tr. 251). Progress Energy also knew that DOE would not perform under the Standard Contract for the foreseeable future, and that the Harris pools would be needed for spent fuel at the Harris plant. (Edwards, Tr. 244-45, 251).

In 2002, Progress Energy decided to build dry storage at Robinson. (Edwards, Tr. 251-52). Progress Energy incurred approximately $36 million to build and load the Robinson ISFSI. (PX-D1). This amount includes the costs to design and build the ISFSI, construct a travel path, replace railroad lines, expand plant security and make modifications to the cask preparation area, including an upgrade to the crane to lift the heavier storage cask.

4. *Crystal River*

Crystal River has two interconnected spent fuel pools, A and B. (Stip. 21). FPC increased the capacity of the spent fuel pools in 1978 and 1991 by replacing the existing spent fuel storage racks with higher density racks. (Stip. 22). The licensed capacity of the Crystal River spent fuel pools after the 1978 and 1991 re-rack projects was 1,357 spent fuel assemblies. (Stip. 23). In 2001, Progress Energy re-racked Crystal River pool B by removing the spent fuel storage racks and replacing them with racks that could hold more spent fuel. (Edwards, Tr. 239, lines 11-25). This effort cost Progress Energy approximately $4.6 million. (Edwards, Tr. 239, lines 5-8).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Discussion*

A. *Standards for Decision*

[1][2] In awarding damages for a partial breach of contract, the Court must endeavor "to place the injured party in as good a position as it would have been had the breaching party fully performed."*Indiana Michigan,* 422 F.3d at 1373 (citing *San Carlos Irrigation & Drainage Dist. v. United States,* 111 F.3d 1557, 1562 (Fed.Cir.1997))."[T]he general principle is that all losses, however described, are recoverable."*Id.* (quoting *Restatement (Second) of Contracts* § 347, cmt. c (1981)). If one party to a contract provides notice that it does not intend to perform, the non-breaching party becomes obligated to mitigate damages, meaning that it must take reasonable steps to avoid further losses or damages stemming from the breach.*Sys. Fuels, Inc.,* 79 Fed.Cl. at 51-52;*see also First Heights Bank, FSB v. United States,* 422 F.3d 1311, 1317 (Fed.Cir.2005) (stating "[t]he law requires that the non-breaching party make only 'those efforts that are fair and reasonable under the circumstances.'") (quoting *Home Sav. of Am., FSB v. United States,* 399 F.3d 1341, 1353 (Fed.Cir.2005)). As the Federal Circuit has stated, "once a party has reason to know that performance by the other party will not be forthcoming, ... he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise."*Indiana Michigan,* 422 F.3d at 1375 (quoting *Restatement (Second) of Contracts* § 350, cmt. b). Mitigation damages "are intended to reimburse a non-breaching party to a contract for the expenses it incurred in attempting to rectify the injury the breach caused it."*Citizens Fed. Bank v. United States,* 474 F.3d 1314, 1320 (Fed.Cir.2007).

***13** [3][4][5][6] The non-breaching party is entitled to recover its reasonable costs incurred in its efforts to mitigate damages. Plaintiffs must show that: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach was a substantial causal factor in the incurrence of damages; and (3) the damages are established with reasonable certainty. *Indiana Michigan,* 422 F.3d at 1373 (citing *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1320 (Fed.Cir.2002)). Defendant also bears a burden of proof in cases involving mitigation damages. To eliminate or reduce Plaintiffs' mitigation damages, Defendant must show that Plaintiffs' efforts were inappropriate or unreasonable. *Id.* at 1375;*see also First Heights Bank,* 422 F.3d at 1316-17;*S. Nuclear Operating Co. v. United States,* 77 Fed.Cl. 396, 403-04 (2007); *Pac. Gas & Elec. Co. v. United States,* 73 Fed.Cl. 333, 406 (2006), *appeal docketed,*No.2007-5046 (Fed.Cir. Jan. 24, 2007); *Tennessee Valley Auth. v. United States,* 69 Fed.Cl. 515, 523 (2006). Defendant may also seek deductions for costs that the non-breaching party avoided by not having to perform. *See Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 769 (Fed.Cir.1987); *Restatement (Second) of Contracts* § 347(c).

"Because the purpose of a damages award is to put the non-breaching party 'in as good a position as [it] would have been in had the breaching party fully performed,' the logical starting point for a damages analysis is an understanding of the breaching party's obligations under the contract."*Rumsfeld v. Applied Cos.,* 325 F.3d 1328, 1336 (Fed.Cir.2003) (brackets in original); *see also PSEG Nuclear, LLC,* 465 F.3d at 1351 ("Any issues related to the types of damages permitted under the contract, if any, and the extent of those damages can be resolved by solely resolving the DOE's contractual obligations."); *Pac. Gas & Elec. Co.,* 73 Fed.Cl. at 375 n. 38 (holding that damages can be determined "[o]nly by determining the scope of defendant's performance obligation"). The Court's interpretation of DOE's contractual obligation to pick up spent fuel is aided by three factors. First, as always, the Court looks to the plain and unambiguous language of the agreement.*Hercules Inc. v. United States,* 292 F.3d 1378, 1380 (Fed.Cir.2002). Second, "[w]here a contract implements or fulfills a statutory requirement, the interpretation of the con-

tract will be guided by the underlying statute." *Sys. Fuels, Inc.,* 79 Fed.Cl. at 52 (citing *The Dalles Irrigation Dist. v. United States,* 71 Fed.Cl. 344, 354 n. 11 (2006)). Here, DOE entered into the Standard Contracts with nuclear utilities to fulfill the purposes of the NWPA, and the Standard Contract should be read in light of the intentions of the NWPA. *See, e.g., Maine Yankee,* 225 F.3d at 1341-42 (addressing the Standard Contract in terms of the NWPA's requirements); *Indiana Michigan Power Co.,* 88 F.3d at 1274-77 (looking to the NWPA to determine DOE's obligations under the Standard Contract, and vacating DOE's contract interpretation as contrary to the statute). Third, the Court looks to the intent of the parties. *See Commonwealth Edison Co. v. United States,* 56 Fed.Cl. 652, 662 (2003) ("The purpose of contract interpretation is to carry out the intent of the parties.") (citing *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991)).

***14** In determining the contemporaneous understanding of the parties, the Court should give the greatest weight to those actions occurring closer in time to contract formation, before the contract has become the subject of a dispute. *Sys. Fuels, Inc.,* 79 Fed.Cl. at 53 (citing *Old Colony Trust Co. v. Omaha,* 230 U.S. 100, 118, 33 S.Ct. 967, 57 L.Ed. 1410 (1913) ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence."); *Blinderman Constr. Co. v. United States,* 695 F.2d 552, 558 (Fed.Cir.1982) ("It is a familiar principle of contract law that the parties' contemporaneous construction of an agreement, before it has become the subject of dispute, is entitled to great weight in its interpretation.")). As the Court observed in *System Fuels:*

> The closer in time to contract formation, and the more distant the prospect of litigation, the more reliable the parties' practical interpretation should be. In the face of litigation, when "[s]elf-interest stimulates the mind to activity, and sharpens its perspicacity," parties "often claim more, but rarely less, than they are entitled to."

79 Fed.Cl. at 53 (quoting *Brooklyn Life Ins. Co. of N.Y. v. Dutcher,* 95 U.S. 269, 273, 24 L.Ed. 410 (1877)). These basic principles will guide the Court in the analysis of an unusual and somewhat complex factual setting.

B. *Interpretation of the Standard Contract*

[7] The Standard Contract did not contain an express acceptance rate for DOE's performance. It is not surprising that the Standard Contract lacked any mention of the precise quantity of spent fuel that DOE would begin accepting in 1998. Plaintiffs here, as well as all industry participants, executed their Standard Contracts in 1983, nearly 15 years before DOE's acceptance of spent fuel was to begin. DOE would have been remarkably clairvoyant to have known in 1983 how much spent fuel would exist in 1998, and how much spent fuel would need to be collected in 1998 to avoid the need for additional storage facilities at individual nuclear plants. Moreover, in 1983, DOE at most would have been targeting industry-wide quantities of spent fuel, rather than reactor-specific quantities to include in each Standard Contract. A more sensible approach, and the one that DOE adopted, was to include obligations in the Standard Contract that would achieve the goals of the NWPA.

It is apparent to the Court that the NWPA's purpose was to establish one or more central repositories for the storage of spentnuclearfuel so that nuclear utilities would not need to provide for additional spent fuel storage at their reactors. The NWPA specifically states as a finding that nuclear plant owners and operators have the responsibility to pay for interim storage of spent fuel "*until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this [Act].*" 42 U.S.C. § 10131(a)(5) (emphasis added). The Standard Contract echoes the NWPA's objective by reciting that "DOE has the responsibility, following

commencement of operation of a repository, to take title to the spentnuclearfuel...*as expeditiously as practicable* upon the request of the generator or owner."(PX 10 at 1) (emphasis added). The NWPA and the Standard Contract specify that DOE will begin performance by January 31, 1998. 42 U.S.C. § 10222(a)(5)(B); (PX 10, Article II, "Scope"). The Standard Contract applies to "*all*" spent fuel generated by Plaintiffs, which DOE "shall accept" and "dispose of ... in accordance with the terms of this contract."(PX 10, Article IV, B, "DOE's Responsibilities").

***15** DOE's efforts to draft the mission plan required by the NWPA, 42 U.S.C. § 10221(a), confirm the agency's contemporaneous understanding of its obligations. The NWPA mandated that DOE's mission plan contain an estimate of "the total repository capacity required to safely accommodate the disposal of all high-level radioactive waste and spentnuclearfuel expected to be generated through December 30, 2020 ...."§ 10221(a)(9). All of DOE's early mission plans, and related statements and actions, reflect an intent to achieve this objective:

• DOE's June 1983 report on financing the disposal of spent fuel is based upon an acceptance rate of 1,800 MTUs for the first five years, and 3,000 MTUs per year thereafter. (PX 8 at 9).

• A September 15, 1983 DOE memorandum states that "the central criteria for this schedule is an acceptance rate during the first 5 years such that no utility would have to build additional storage facilities after 1998."(PX 15 at 1046).

• DOE's Robert Morgan advised the nuclear industry in December 1983 that "[t]he basic strategy which we've outlined in the mission plan, is that beginning in 1998, utilities will not have to provide any additional storage facilities on site."(PX 19 at 11).

• DOE's December 20, 1983 draft mission plan stated that the "waste acceptance schedule will, initially, preclude the need for additional at-reactor storage after January 31, 1998 and, ultimately, remove from at-reactor storage all waste that is more than 5-years old."(PX 17 at 1068). The "Waste Acceptance Schedule" in this document projected two repositories that would begin accepting a total of 4,800 MTUs per year by 2003. *Id.* at 1082.The schedule shows the collection of all spent fuel generated through 2020, as mandated by the NWPA. *Id.*

• DOE's Michael Lawrence testified before Congress on February 22, 1984 that the "fundamental objective" of the NWPA was "to accept high-level radioactive waste for safe management, storage and permanent disposal on a firm schedule, beginning not later than January 31, 1998," and that "[b]y achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998, and, ultimately, remove all eligible waste from at-reactor storage."(PX 21 at 1102).

• Mr. Lawrence reiterated in comments to a July 23, 1984 DOE Richland, Washington Operations Office letter that "the minimum acceptance rate should be based upon the rate at which spent fuel is generated by civilian nuclear power reactors," and that "[t]his would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998."(PX 26 at 1201).

• DOE's February 1985 "Nuclear Waste Fund Fee Adequacy: An Assessment" confirms a five-year ramp up to a 3,000 MTU annual acceptance rate. (PX 27 at 3).

***16** • DOE's final version of the mission plan, published in June 1985, adopted as the "authorized system" a phased repository acceptance schedule with the first repository receiving 3,000 MTUs per year after a six-year ramp up period. (PX 31 at 26). The mission plan's acceptance rates were based in part on attempting to

keep pace with spent fuel discharges and alleviating the need for additional storage at nuclear reactors. (Pollog, Tr. 1231).

• The June 1985 mission plan also outlined an "Improved Performance System" illustrating the possible incorporation of an MRS into the program "*to accommodate DOE's contractual commitments* to the utilities paying fees into the Nuclear Waste Fund." (PX 31 at 73) (emphasis added).

The foregoing DOE statements and actions soon after passage of the NWPA reflect the mutual expectations of the parties. *See Sys. Fuels, Inc.,* 79 Fed.Cl. at 56 ("DOE's behavior in the years that closely followed the enactment of the NWPA and contract formation serves as a more reliable basis for contract interpretation than the retrenching steps it took once the prospect of breach and liability appeared on the horizon.").

Even as late as 1987, after DOE expected a five-year delay in performance at a permanent repository and received authority from Congress to build an MRS facility, DOE expected its permanent acceptance rate to exceed the industry's generation rate by a comfortable margin. (*See* DX 59 at 6; PX 38 at 7). The Standard Contract required the 1987 ACR to "set forth the projected annual receiving capacity for the DOE facility(ies) ... for ten (10) years following the projected commencement of operation of the initial DOE facility."(PX 10, Art. IV, B, 5(b)). DOE's projected 2,650 MTU acceptance rate was consistent with the 1987 Mission Plan Amendment. (PX 38 at 7).

The fee schedule imposed upon the utilities also is relevant to the interpretation of the Standard Contract. The NWPA contained a fee structure for establishing a Nuclear Waste Fund for purposes of performing radioactive waste disposal activities. *See*42 U.S.C. § 10222. The Nuclear Waste Fund would be comprised in large part of the fees received from nuclear utilities under the Standard Contract, and would be used to achieve the purposes of the NWPA, including the development of spent fuel repositories and the acceptance and transportation of spent fuel from individual reactors. § 10222(c)-(d). Through December 31, 2005, Progress Energy, CP & L, and FPC have paid DOE approximately $661 million in fees for the disposal of spent fuel under the Standard Contracts. (Stip. 16). It is not plausible to conclude that these enormous fee payments were for anything other than DOE's full performance of the obligations described above. The provisions of the NWPA, the Standard Contract, and DOE's contemporaneous understanding of its obligations all point to the conclusion that utilities holding a Standard Contract would not need to provide for additional spent fuel storage space after January 31, 1998.

***17** In reaching the above conclusion, the Court is not applying a missing term to DOE's Standard Contract. Rather, the Court reads the Standard Contract in light of the NWPA's purpose and the parties' expectations at the time of contract formation. The Standard Contract required DOE to begin accepting and transporting whatever amount of spent fuel was necessary beginning January 31, 1998 so that utilities such as Plaintiffs would not need to provide for additional spent fuel storage space after that date. There can be no question that DOE breached the Standard Contract by failing to collect any spent fuel in 1998 or in any year thereafter. Under such circumstances, the Court's obligation is to devise some reasonable method for the calculation of Plaintiffs' damages. *Bluebonnet Sav. Bank, FSB v. United States,* 266 F.3d 1348, 1357 (Fed.Cir.2001) ("[T]he court's duty is to 'make a fair and reasonable approximation of the damages.'") (quoting *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960)). The Court cannot allow Defendant to escape responsibility for its damages just because the exercise is complex or difficult. *S. Nuclear Operating Co.,* 77 Fed.Cl. at 432 ("Difficulties in determining what DOE would have done had the DOE commenced performance as required under the Standard Contract does not shield defendant from liability."). As a reasonable

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

basis for calculating Plaintiffs' damages, the Court is persuaded that an industry-wide acceptance rate of 3,000 MTUs per year would have satisfied DOE's contractual obligations. The Court agrees with Plaintiffs that 3,000 MTUs per year is a proper benchmark for measuring the steps that DOE should have undertaken, and intended to undertake, in executing the Standard Contract.

Defendant has advanced a number of arguments for its position that a 3,000 MTU acceptance rate was not a requirement of the Standard Contract. Defendant asserts, for example, that CP & L, by virtue of its membership and participation in the Edison Electric Institute ("EEI") and the Utility Nuclear Waste Management Group ("UNWMG"), should be bound by comments that those associations submitted to DOE regarding the Standard Contract. Def.'s Post-Trial Brief at 17, 19, 40-42, 118-24. These comments, along with other industry submittals, purportedly reflect an understanding that the Standard Contract would not contain a specific acceptance rate. *Id.* Defendant failed, however, to present any reliable evidence showing that Plaintiffs agreed with or even knew about the comments of EEI, UNWMG, or others in the industry. At most, Defendant showed that Plaintiffs were members of two trade associations and attended some of their meetings. Based on the record presented at trial, the Court declines to impute selected industry comments to Plaintiffs.

Moreover, although some industry representatives argued in 1983 that a quantity of spent fuel ought to be included, and drafted proposed terms, the Standard Contract was not the product of negotiation. Rather, the NWPA authorized DOE to issue a contract that nuclear plant owners and operators would be required to sign. Any entity failing to execute the Standard Contract would not receive NRC licensing for continued operations. *See Maine Yankee,* 225 F.3d at 1337 (stating that the NWPA made entry into such contracts mandatory for the utilities); *Commonwealth Edison Co. v. United States,* 877 F.2d 1042, 1045 (D.C.Cir.1989) (observing that utilities "had no real choice but to agree to whatever terms the federal government offered.").

***18** Defendant also argues that inserting a 3,000 MTU acceptance rate into the Standard Contract is improper because DOE expressly rejected inserting any numerical rate, and the nuclear industry understood that the mission plan was not a part of the Standard Contract. Def.'s Post-Trial Brief at 32-40, 118-27. It is true that none of the planning documents that contain the 3,000 MTU acceptance rate were part of the Standard Contract. Statements made in the statutorily mandated 1985 Mission Plan, and the contractually required 1987 ACR, however, along with other contemporaneous statements by DOE and Plaintiffs, demonstrate the parties' understanding of DOE's acceptance rate obligation *before* the specter of litigation tainted the process. The overwhelming weight of this evidence demonstrates that both DOE and Plaintiffs expected DOE to accept between 2,650 MTUs and 3,000 MTUs per year from the industry. Consequently, the 3,000 MTU rate is a reasonable measure of DOE's performance absent the breach.

Finally, and perhaps most importantly, DOE's actions from 1987 and thereafter were taken with an eye toward minimizing agency liability under the Standard Contract. As of 1987, DOE reported the existence of 35 pending lawsuits against it. *See Sys. Fuels, Inc.,* 79 Fed.Cl. at 56-57 (describing in detail how DOE's 1991 ACR was "severely flawed."); *S. Nuclear Operating Co.,* 77 Fed.Cl. at 415.DOE's David Zabransky conceded at trial that, faced with massive litigation, the 900 MTU rate was an agency attempt to minimize its obligations under the Standard Contract. (Zabransky, Tr. 1516-17). Similarly, the Court cannot accept that Plaintiffs would have agreed to pay the same staggering fees under the Standard Contract in exchange for 70 percent less performance from DOE (acceptance of 900 MTUs per year, instead of 3,000 MTUs per year). At an acceptance rate of 900 MTUs per year, DOE would never achieve the goals of the NWPA, because the acceptance rate would be less than one-half of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

waste generated in any year.

Essentially, Defendant asserts that the Standard Contract allowed DOE to determine unilaterally the measure of its performance eight years after contract execution, and after DOE concluded that it would not be able to perform. When asked at closing argument whether Defendant was claiming that "as consideration for these $660 million in fees paid by the Plaintiff, the pick-up rate is whatever the Government says it is," counsel for the Government responded that DOE was only limited by the duty of good faith. Closing Arg., Apr. 4, 2008 at 75. "There is a striking asymmetry when plaintiff pays in full for performance by defendant virtually at defendant's option."*Commonwealth Edison Co.,* 56 Fed.Cl. at 664.If the Court were to accept this position, it would have little choice but to find Defendant's obligation illusory and the Standard Contract unenforceable. *See id.* at 663-64 (rejecting the Government's "minimalist interpretation of its obligations under the Standard Contract").

***19** Twelve years ago, Defendant unsuccessfully argued the it had no obligation under the NWPA or the Standard Contract to collect and transport any spent fuel. *See Indiana Michigan Power Co.,* 88 F.3d at 1275-77.The Court of Appeals for the District of Columbia Circuit noted:

> [T]he Secretary [of DOE] now contends that the payment of fees was for nothing. At oral argument, one of the panel compared the government's position to a Yiddish saying: "Here is air; give me money," and asked counsel for the Department to distinguish the Secretary's position. He found no way to do so, nor have we.

*Id.* at 1276.At closing argument in the present case, Defendant only slightly modified this position:

> [W]hen we're talking about the essence of the contract, the relevant question with regard to dates isn't where is the fuel going to be in 1998 or 1999 or 2000 or any year in the short term after 1998, it's where is the fuel going to be in 2098 or 3098 or 10098. That's the essence of the deal.

Closing Arg., Apr. 4, 2008 at 75. It appears that in twelve years, Defendant's position has evolved from: (a) the utilities are paying fees to DOE for no performance to (b) the utilities are paying fees to DOE for baby steps toward performance in the year 2098, 3098, or 10098, or whatever year DOE chooses. The Court does not find this position at all persuasive.

Contrary to Defendant's position, Plaintiffs did not bargain for the promise that the Government would perform the Standard Contract a thousand or more years from now. It did not bargain for "the first baby steps toward getting to the point where the Federal Government can assume responsibility for all of this nuclear waste and tuck it away."Closing Arg., Apr. 4, 2008 at 76. Plaintiffs did not agree to pay $661 million in fees under the Standard Contract in exchange for DOE unilaterally determining its own obligations *after* it realized that timely performance was not possible. Rather, Plaintiffs bargained for and have paid $661 million in fees for DOE's commitment to take all of Plaintiffs' spent fuel as expeditiously as practicable beginning on January 31, 1998. The evidence closest in time to contract execution demonstrates that the parties understood this obligation to mean that DOE would accept enough fuel from Plaintiffs such that they would not have to build any additional at-reactor storage after January 31, 1998. The parties' understanding is supported by Congress's statement of purpose that the Federal Government should take responsibility for all spent fuel in order to eliminate the public health and safety risks associated with at-reactor storage of radioactive waste. Nothing in the Standard Contract or the NWPA supports Defendant's position that the 900 MTU acceptance rate fulfills DOE's obligation to take all of Plaintiffs' spent fuel as expeditiously as practicable.

C. *Elements of Plaintiffs' Burden of Proof*

Before addressing each of the disputed damages items, the Court will explain in greater detail the three elements that Plaintiffs must meet to satisfy

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

their burden of proof. As previously noted, Plaintiffs must show that: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are established with reasonable certainty.

1. *Foreseeability*

***20** Plaintiffs may only recover for mitigation costs that were "reasonably foreseeable by the breaching party at the time of contracting."*Indiana Michigan,* 422 F.3d at 1373."While the general response to a breach must be foreseen, the particular way that a mitigating decision is implemented need not."*S. Nuclear Operating Co.,* 77 Fed.Cl. at 405.Defendant does not contest the foreseeability element of Plaintiffs' claim. DOE certainly was aware that if it failed to pick up Plaintiffs' spent fuel, Plaintiffs would have to incur substantial costs storing the spent fuel on their own. *See Indiana Michigan,* 422 F.3d at 1375 ("Having been placed in a position where they are required to find alternate storage for SNF, the utilities must *de facto* accept responsibility to guard against the environmental impact of improperly-disposed and maintained SNF, a situation which the NWPA was enacted to avoid."); *Sys. Fuels, Inc.,* 79 Fed.Cl. at 59 ("DOE should have foreseen that its failure to perform under the Standard Contract would result in damages of the nature and magnitude that System Fuels claims"); *Sys. Fuels, Inc. v. United States,* 78 Fed.Cl. 769, 791 (2007) ("[T]he record contains clear and convincing evidence that on June 30, 1983, it was 'foreseeable' to DOE that, if performance could not be commenced by January 31, 1998, Plaintiffs would have to make interim arrangements...."); *S. Nuclear Operating Co.,* 77 Fed.Cl. at 404 ("That plaintiffs would generally incur storage expenses of the nature and magnitude sought here was foreseeable."); *Tennessee Valley Auth.,* 69 Fed.Cl. at 528 (DOE recognized that "utilities might be forced to build additional on-site storage facilities if DOE were not successful in performing under its contracts for SNF disposal."). The Court agrees that Plaintiffs' efforts to store its spent fuel after it became aware that DOE was unlikely to perform, including activation of the Harris C and D pools, the Robinson ISFSI, the Brunswick ISFSI, and interplant shipments of spent fuel, should have been reasonably foreseen by DOE at the time of contracting.

2. *Causation*

Plaintiffs bear the burden of proving that DOE's partial breach was a substantial causal factor of each claimed mitigation cost. *See Indiana Michigan,* 422 F.3d at 1373.Although *Indiana Michigan* stated that the utilities must satisfy the substantial causal factor test, previous decisions of this Court have applied the more difficult "but-for" causation test. *See, e.g., Sys. Fuels, Inc.,* 79 Fed.Cl. at 58 ("DOE's non-performance was a 'but-for' cause of [the utility's] decision to expand its dry fuel storage capacity."); *N. States Power Co. v. United States,* 78 Fed.Cl. 449, 462 (2007) (holding that utility presented sufficient evidence showing that it would have pursued cheaper interim storage options in the but-for world).*But see Sys. Fuels, Inc.,* 78 Fed.Cl. at 804 (finding that DOE's partial breach was a substantial factor for incurring the costs to build a bay door); *Pac. Gas & Elec. Co.,* 73 Fed.Cl. at 415 ("The court agrees with plaintiff that the government's breach of the Standard Contract was a substantial causal factor in plaintiff's need to remove the off-gas equipment from Humboldt Bay."). Indeed, at times, Plaintiffs use "but-for" causation language in its own brief. *See* Pls.' Post-Trial Brief at 68 (stating that "had DOE not breached, these specific activities would not have been necessary.")."[T]he selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion."*Citizens Fed. Bank,* 474 F.3d at 1318.For each of the disputed damages items here, the Court will apply the but-for test or the substantial causal factor test as appropriate.

***21** Turning to the definition of "substantial causal

factor," Defendant contends that "[e]xpenses are recoverable as damages when, and only when, plaintiffs have established that they would not have been incurred in the absence of a failure by DOE [to perform]." Def.'s Post-Trial Reply Brief at 1-2; *see also* Def.'s Post-Trial Brief at 156 (stating that Plaintiffs may only recover for a cost that they could show with certainty were "incremental to the partial breach."); Def.'s Post-Trial Reply Brief at 31-32 ("A plaintiff sustains its burden of proof *only* by presenting a complete picture of its actual expenses and, as a basis for comparison, a complete picture of the expenses that it would have incurred absent a breach.") (emphasis in original); Def.'s Post-Trial Brief at 115 (arguing that "*Indiana Michigan* requires Progress Energy to show that, at a minimum, had DOE begun accepting fuel in 1998, it would not have incurred the costs it now seeks as damages"). The Court reads these statements essentially as slight variations of the "but-for" causation test. As explained above, while it is true that Plaintiffs may recover if they can show that they would not have incurred a cost but-for the breach, it is also true that Plaintiffs may recover if they can show that the breach was a substantial causal factor in the claimed cost. Defendant's many statements suggesting otherwise are not well founded.

To meet the substantial causal factor test, Plaintiffs must definitely establish a causal connection and show that the mitigation costs flowed "inevitably and naturally" from the breach. *Sys. Fuels, Inc.,* 78 Fed.Cl. at 795 (quoting *Franconia Assocs. v. United States,* 61 Fed.Cl. 718, 750 (2004)); *see also Am. Fed. Bank, FSB v. United States,* 72 Fed.Cl. 586, 598 (2006) ("Provided that a causal connection can be 'definitely established' between the breach of contract and events that subsequently occur, the harm to the injured party from such consequences must be recoverable as damages in mitigation, while obversely, the benefits of the direct consequences of the breach must be credited against a recovery.") (internal citations omitted). While Plaintiffs need not show that DOE's partial breach was the sole cause of an incurred cost, Plaintiffs must show that the alleged mitigation effort was more than a purely business judgment that would have been made irrespective of the breach. *Compare Citizens Fed. Bank,* 474 F.3d at 1320 (affirming the trial court's application of the substantial factor test and its finding that the plaintiff may recover for an activity that was "due in part to mitigate the effects" of the breach), *and S. California Fed. Sav. & Loan Ass'n v. United States,* 422 F.3d 1319, 1337 (Fed.Cir.2005) (affirming the trial court's finding that the breach "was the principal cause of [the plaintiff's] recapitalization and was the substantial factor in [the plaintiff] incurring higher costs of funds after the breach"), *with Indiana Michigan,* 422 F.3d at 1376 (affirming the trial court's factual finding that the utility's 1989 decision to re-rack was made "in the normal course of business" before the utility had reason to believe that DOE would not perform); *see also California Fed. Bank v. United States,* 395 F.3d 1263, 1268 (Fed.Cir.2005) (holding that a causal connection between the breach and the claimed damages "must be definitely established," but "[t]hat is not to say that the breach must be the sole factor or sole cause in the [damages]"); *Sys. Fuels, Inc.,* 78 Fed.Cl. at 795;*Franconia Assocs. v. United States,* 61 Fed.Cl. 718, 750 (2004) ("[P]laintiffs need not show that each dollar claimed was entirely unaffected by outside events.").

***22** "[I]n determining whether a decision was substantially caused by DOE's delay, reasonable not absolute certainty suffices."*Yankee Atomic Elec. Co. v. United States,* 73 Fed.Cl. 249, 268 (2006), *appeal docketed,*No.2007-5025 (Fed.Cir. Dec. 7, 2006). As the Court of Claims noted in *Locke v. United States:*

> [T]he constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. *Bigelow et al. v. RKO Radio Pictures,* 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652.Difficulty of ascertainment is not to be confused with right or recovery. Nor

> does it exonerate the defendant that his misconduct, which has made necessary the inquiry into the question of harm, renders that inquiry difficult. *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684.The defendant who has wrongfully broken a contract should not be permitted to reap advantage from his own wrong by insisting on proof which by reason of his breach is unobtainable. *Crichfield v. Julia,* 2 Cir., 147 F. 65.

151 Ct.Cl. 262, 283 F.2d 521, 524 (1960).

To determine which costs were caused by DOE's partial breach, Progress Energy created a causation model representing the spent fuel management actions that Plaintiffs did take in the real world and those actions that Plaintiffs would have taken had DOE performed at the 3,000 MTU rate. (PX 137; Edwards, Tr. 279; Worthington, Tr. 860). Progress Energy also created a second model at the request of the Government that represented the actions Progress Energy would have taken had DOE performed at the 900 MTU rate. (DX 329; Edwards, Tr. 502). Mr. Worthington, Lead Engineer of Progress Energy's Spent Fuel Management Unit, was the employee primarily responsible for preparing the 3,000 MTU causation model. (Worthington, Tr. 785; Edwards, Tr. 483). Steve Edwards, supervisor of Progress Energy's Spent Fuel Management Unit, directed and reviewed all of Mr. Worthington's work on the 3,000 MTU rate causation model. (Edwards, Tr. 279-80).

Progress Energy used the DOE's 2004 APR/ACR projections as the measure of DOE's performance. (Worthington, Tr. 863). According to the 2004 APR/ACR, DOE would begin accepting spent fuel at a permanent repository in 2010 and would accept 400 MTUs in 2010, 600 MTUs in 2011, 1,200 MTUs in 2012, 2,000 MTUs in 2013, and 3,000 MTUs thereafter. (Worthington, Tr. 863; PX 128 at 2). Progress Energy applied these projections beginning with 1998 as Year 1. (Edwards, Tr. 303). The 2004 APR/ACR projections slightly differ from the projections in early planning documents such as the 1985 Mission Plan and the 1987 ACR, primarily in the ramp-up rate during the early years of operation. (*Compare* PX 128 at 2, *with* PX 38 at 7, *and* PX 31 at 26). As Mr. Edwards testified, “[a]ll of them seemed to get to the 3,000 [MTU rate] in about a four-to-five-year time frame, ... how you got to that 3,000 [MTU rate] varied.... Since it got to the rate that we thought was the right rate to use consistent with the earlier documents and it was the most recently issued from DOE, we decided that this was the most appropriate rate to use.”(Edwards, Tr. 304).

***23** Based on the industry-wide acceptance rate and each reactor's acceptance priority ranking, Progress Energy knew precisely how much spent fuel DOE would have accepted from each of its reactors. For example, in Year 1 when DOE would only accept 400 MTUs from the industry, DOE would not accept any spent fuel from Plaintiffs. (PX 128 at B.2). In Year 2, DOE would accept only 69.7 MTUs from the Robinson plant. (PX 128 at B.4). In Year 5, when the industry-wide acceptance rate reached 3,000 MTUs, DOE would accept 102.5 MTUs from Brunswick, 43.3 MTUs from Robinson, and 46.3 MTUs from Crystal River. (PX 128 at B.13-14). Knowing exactly how much storage space was available at its four plants in 1998, how many spent fuel assemblies and MTUs CP & L and FPC generated each year after 1998, and DOE's precise quantities for acceptance at the 3,000 MTU rate, Progress Energy assessed with reasonable certainty what storage activities it would have had to take absent DOE's partial breach. (Edwards, Tr. 302; PX 137).

After using its causation model to isolate the breach-related projects, Progress Energy identified and collected the costs for the breach-related projects using the accounting and project number system that Progress Energy uses to track costs in the normal course of business. (Edwards, Tr. 320-23; Calvello, Tr. 1594, 1618; PX 140). Progress Energy excluded some costs that it concluded were not caused by DOE's partial breach. (Edwards, Tr. 328-336). For example, Progress Energy did not

include $6.7 million for the cost of shipping 782 assemblies to the Harris pool, and $1,087,280 for the cost of changing the racks in the Harris B pool. (Stip. 59; Edwards, Tr. 335-36). Progress Energy thoroughly analyzed its data until, in Mr. Edwards's words, “it was accurate to the best of our knowledge.”(Edwards, Tr. 321). Plaintiffs' $91,029,704 claim results from this process. (*See* Edwards, Tr. 279). Except where identified to the contrary below, the Court concludes that DOE's partial breach caused Progress Energy to incur the claimed costs as part of its effort to maintain full core reserve and avoid a power plant shutdown.

3. *Reasonable Certainty*

Plaintiffs may only recover those damages that they can show with reasonable certainty. *Indiana Michigan,* 422 F.3d at 1373.“While the amount of damages need not be ‘ascertainable with absolute exactness or mathematical precision [,]’ recovery for speculative damages is precluded.”*Id.* (holding that utility may recover for actual damages incurred to the time of trial, but not for speculative prospective mitigation damages) (quoting *San Carlos Irrigation & Drainage Dist.,* 111 F.3d at 1563) (alteration in original). With these principles in mind, the Court ordered the parties to undergo a comprehensive pretrial accounting review process to reach agreement as much as possible on the costs associated with each of Progress Energy's mitigation efforts. *See* March 23, 2006 Pretrial Order on Damages. With Progress Energy's cooperation, Defendant reviewed invoices, purchase orders and contracts, accounting records and work orders, and other electronic data. (DX-D5 at 6). As a result of this process, Defendant agreed that Progress Energy's incurred costs included $4,675,392 for the Crystal River Re-rack, $32,734,951 for the Harris C & D Pool Activation, $16,975,181 for the spent fuel shipment campaigns, $36,436,059 for the Robinson ISFSI, and $208,120 for the Brunswick ISFSI, for a total of $91,029,704 in claimed damages through December 31, 2005. *Id.* at 8. Defendant does not contest the accuracy of the dollar amounts for the vast majority of Progress Energy's claim, $90,684,002 to be exact.

D. *Defendant's Reduction of Damages*

***24** Once Plaintiffs demonstrate foreseeability, causation, and certainty, Defendant may reduce damages by showing either that Plaintiffs did not undertake reasonable mitigation efforts, or that the efforts they did undertake were unreasonable. *See Sys. Fuels, Inc.,* 79 Fed.Cl. at 52 (citing *Tennessee Valley Auth.,* 69 Fed.Cl. at 523);*see also Indiana Michigan,* 422 F.3d at 1375;*First Heights Bank,* 422 F.3d at 1316-17;*S. Nuclear Operating Co.,* 77 Fed.Cl. at 403-04;*Pac. Gas & Elec. Co.,* 73 Fed.Cl. at 406.Defendant may also seek deductions for costs that Plaintiffs avoided by not having to perform. *Lisbon Contractors,* 828 F.2d at 769;*Restatement (Second) of Contracts* § 347(c), cmt. d; *Corbin on Contracts* § 57.10 (“The only saving that is to be deducted is the saving of expense with respect to performance by the plaintiff that the defendant's breach has made unnecessary.”).“[A]ny ‘benefits’ the government seeks to offset must be shown to a reasonable certainty, or they must be denied as too speculative to meet the standards set forth by the Federal Circuit in *Indiana Michigan.”Sys. Fuels, Inc.,* 79 Fed.Cl. at 71 (internal citations omitted).

The evidence shows, and Defendant does not contest, that when Progress Energy realized DOE was unlikely to perform, it undertook efforts to store its fuel on an interim basis and avoid having to shut down its power plants. Defendant does not seek any reductions on the grounds that Progress Energy failed to take appropriate steps to mitigate the loss, or that Progress Energy's mitigation efforts were unreasonably costly. Defendant, does however, seek a $9,818,462 reduction for costs avoided because of the breach that the Court will address below.

E. *Disputed Mitigation Costs*

The parties agree that, under the 3,000 MTU meas-

ure of performance, Plaintiffs should recover $61,301,941 in mitigation damages. Def.'s Post-Trial Brief at 73; (Johnson, Tr. 2018-19; DX-D5 at 42-43). The remaining $29,727,762 of Plaintiffs' claim consists of eleven items that Defendant asserts are not recoverable even at the 3,000 MTU rate. Defendant argues that Plaintiffs failed to meet their burden of proof under *Indiana Michigan* for nine items, that an additional $9,818,462 should be deducted to account for costs that Plaintiffs "avoided" by not having to perform, and that $1,996,045 in imputed interest expense is barred by law. The Court will address each of the disputed items below.

1. *CRUD Cleanup and Rack Disposal at Harris C & D Pools*

[8] When CP & L introduced Brunswick fuel into the Harris borated FN5 pools, it caused a particulate material known as "CRUD" to accumulate in the C and D pools. (Edwards, Tr. 377). Unlike most radioactive materials, CRUD has a very short half-life of about five years. (Edwards, Tr. 379-80). Currently, the Harris plant is licensed to operate through 2026, and an application to renew the license through 2046 is under review. (Edwards, Tr. 385). In the absence of DOE's breach, CP & L would not have activated the C and D pools, and, thus, would have allowed the CRUD to remain in the pools until the Harris plant is decommissioned, either in 2026 or in 2046. (Edwards, Tr. 379-80). After sitting either twenty or forty years, the Harris CRUD would have become less radioactive, thereby reducing exposure risks to Progress Energy employees and allowing Progress Energy to ship it offsite under existing regulations for "low level" radioactive waste. (Edwards, Tr. 384-85). As such, CP & L's strategy was to leave the CRUD in the pools until plant decommissioning when it would be less expensive to remove it. (Edwards, Tr. 385).

***25** As a direct result of DOE's partial breach and the need to activate the C and D pools, however, CP & L had to remove the CRUD in 1999 and 2000. (Edwards, Tr. 379). At that time, the CRUD had not yet aged sufficiently to be shipped off site and CP & L had to design special collection vessels to store the CRUD until it decayed long enough to allow shipment. (Edwards, Tr. 384). CP & L incurred $297,294 for the cost of CRUD clean-up and $330,345 for the costs of sludge clean-up. (DX-D5 at 43). Similar to the CRUD, DOE's partial breach required CP & L to remove unused racks from the C pool which CP & L would have otherwise left there indefinitely. (Edwards, Tr. 387). CP & L incurred $174,636 for the cost of disposing of the unused racks. (DX-D5 at 43).

Defendant does not dispute that DOE's partial breach required CP & L to remove the CRUD, sludge, and unused racks in order to activate the Harris C and D pools. Nonetheless, Defendant contends that $802,275 should be deducted from Progress Energy's claim because Progress Energy would need to remove and dispose of the CRUD, sludge, and unused racks at decommissioning. Def.'s Post-Trial Brief at 145; (Maret, Tr. 1766-67; Johnson, Tr. 2016).

The evidence persuasively shows that the cost of removing and disposing of the CRUD, sludge, and unused racks was caused by DOE's partial breach. Defendant may reduce the damages award where it shows that the mitigation costs were unreasonable, or that as a result of the partial breach, CP & L avoided an expense. As the Court held in *System Fuels, Inc.:*

> *Indiana Michigan* limits recoverable damages to those that can be "shown with reasonable certainty," such that "recovery for speculative damages is precluded."Correlatively, any "benefits" the government seeks to offset must be shown with reasonable certainty, or they must be denied as too speculative to meet the standards set forth by the Federal Circuit in *Indiana Michigan.*

*Sys. Fuels, Inc.,* 79 Fed.Cl. at 71 (internal citations omitted) (holding Defendant failed to prove offsets with reasonable certainty).

It is true that, had DOE performed and CP & L not been forced to activate the Harris C and D pools to mitigate the damage caused by DOE, Progress Energy would have been required to remove CRUD, sludge, and unused racks at plant decommissioning. At present, however, Progress Energy's Harris plant decommissioning clean-up is likely to occur in 2046. As Progress Energy correctly points out:

> It is simply impossible to estimate the cost of these disposal activities 40 years from now. Indeed, during decommissioning these would not be isolated costs but part of a much larger disposal and cleanup effort. And, even if one could isolate the potential costs four decades hence, they would likely be much less than the dollars actually expended in or around 1998 because of economies of scale and, with regard to CRUD, the radioactivity would have decayed significantly as it sat in the pool, rendering its handling and disposal far cheaper than it was in the real world.

***26** Pls.' Post-Trial Brief at 36 (citing Edwards, Tr. 383-85). The Court finds Plaintiffs' analysis to be persuasive. Absent any credible evidence showing with reasonable certainty Progress Energy's CRUD, sludge, and unused rack clean-up costs in 2026 or 2046, the Court will not deduct such speculative future amounts from the damages award. The cost for the CRUD, sludge, and unused rack cleanup will be included in Plaintiffs' damages award.

2. *Railroad Track Maintenance*

[9] Progress Energy included $260,037 in railroad track maintenance costs in its claim. (DX-D5 at 43). Without doubt, DOE's partial breach caused Progress Energy to transport spent fuel by rail to the Harris plant for interim storage. *See* Def.'s Post-Trial Brief at 153. In order to safely ship the spent fuel, Progress Energy periodically performed maintenance and safety checks on the rail lines. (Edwards, Tr. 390-91). Thus, DOE's partial breach was a substantial causal factor in the maintenance of the rail lines.

The evidence introduced at trial shows that Progress Energy, absent DOE's breach, would have preferred for DOE to use rail casks to pick up the spent fuel. (Edwards, Tr. 389, 580; Zabransky, Tr. 1528). There is no evidence in the record, however, demonstrating that DOE would have used rail casks. *See id.*Thus, the method of DOE's hypothetical performance absent the breach is entirely speculative. *See Sys. Fuels, Inc.,* 79 Fed.Cl. at 71 ("It is not possible to ascertain the method DOE will ultimately use for SNF acceptance.").

Defendant argues that Progress Energy should not recover for maintenance costs because Plaintiffs "failed to prove that they would not have made any portion of their expenditures upon railroad track maintenance ... if DOE had commenced accepting fuel in 1998."Def.'s Post-Trial Brief at 153; (*see also* Johnson, Tr. 1962). Put another way, the Government speculates that DOE would have accepted fuel by rail had it performed, and argues that Plaintiffs may only recover if they disprove the Government's speculation. The Government cites no authority for this position, and this Court expressly has rejected it on multiple occasions. *See, e.g., Sys. Fuels, Inc.,* 79 Fed.Cl. at 71;*Sys. Fuels, Inc.,* 78 Fed.Cl. at 795, 801-03.*See also Restatement (Second) of Contracts* § 352, cmt. a (stating that doubts shall be resolved against the breaching party).

Plaintiffs have demonstrated that DOE's partial breach was a substantial causal factor of the cost of railroad track maintenance, and Defendant has provided no reason to deduct the costs. The Government does not even allege that it was unreasonable for Progress Energy to conduct the railroad maintenance work or that Progress Energy spent an unreasonable sum on this project. The cost for the railroad track maintenance will be included in Plaintiffs' damages award.

3. *Internal Labor*

[10] Progress Energy used the labor of 511 employ-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ees on breach-related projects at a cost of $15,175,982. (DX 308 at 17). Defendant agrees that Progress Energy's use of internal labor was reasonably foreseeable and that Progress Energy proved its labor costs with reasonable certainty. Defendant contends, however, that 29 percent of the labor costs, or $4,383,222, were not "incremental to the partial breach." Def.'s Post-Trial Brief at 156-59; (see also Johnson, Tr. 2015; DX 308 at 18, n. 55; DX-D5 at 43). According to Defendant's expert, Mr. Johnson, only the labor costs for hourly employees, and salaried employees who spent more than 50 percent of their hours on a breach-related project during any one year qualify as "incremental to the breach." (Johnson, Tr. 2004-08). Under this approach, 112,843 hours of work on breach-related mitigation projects by more than 300 salaried employees do not qualify as "incremental to the breach." (PX 166). For example, applying his "50 percent rule," Mr. Johnson concludes that Larry Bacote's 1,141 hours of labor were incremental to the breach because all 1,141 hours occurred in 2005. By the same rule, Mr. Johnson concludes that none of John Jankens's 3,599 hours of labor were incremental to the partial breach because Mr. Jankens never worked more than 830 hours on breach-related projects in any one year. (PX 166 at 1-2). Despite Mr. Johnson's testimony that his opinion reflected "a reasonable assertion of the amount of incremental labor," the Court finds his "50 percent rule" to be arbitrary and without support in the law. (Johnson, Tr. 2004).

***27** As Defendant admits in its post-trial brief, similar arguments have been considered and uniformly rejected by this Court. *See* *Sys. Fuels, Inc.,* 79 Fed.Cl. at 67 (holding that "charges for internal labor shall be allowed as mitigation costs without any reduction"); *Sys. Fuels, Inc.,* 78 Fed.Cl. at 798 (rejecting the Government's argument that internal labor costs were not incremental); *S. Nuclear Operating Co.,* 77 Fed.Cl. at 442 (finding that use of internal labor was "less expensive than hiring contractors which reduces costs to ratepayers and ultimately to the federal taxpayers who bear the burden of judgments entered by this court"); *Pac. Gas & Elec. Co.,* 73 Fed.Cl. at 408 ("To the extent that the costs of PG & E's internal labor were in fact performed on a 'breach-related project,' ... the court finds that such labor costs should be properly awarded to plaintiff."); *Tennessee Valley Auth.,* 69 Fed.Cl. at 538-39 (holding that whether the utility would have paid its salaried employees in all events was immaterial).

In *Northern States Power Co.,* the Court rejected the defendant's challenge to internal labor costs for 200-plus employees who charged, on average, slightly more than one hour per week to breach-related activities over an eight year period. The Court reasoned:

> We are unable, however, to discern any principled distinction between the employee fully engaged in breach-related work and the employee whose involvement in such work may have been only limited. In either case, a cost was incurred that is properly chargeable to the activity benefitted-the development of a dry storage facility.... [I]t is quite appropriate to recognize as a cost of mitigation any diversion of labor that was applied to the accomplishment of that mitigation....'[T]he test for recovery is a targeted one: whether use of the internal resources by [plaintiff] deprived it of the ability to employ those resources on other projects.'We adopt this conclusion as our own.

*N. States Power Co.,* 78 Fed.Cl. at 468 (quoting *Tennessee Valley Auth.,* 69 Fed.Cl. at 539). The Court sees no basis to depart from this well-reasoned position. Every hour that a Progress Energy employee spent on a breach-related project was an hour that the employee did not spend doing other productive work for Progress Energy. The evidence shows that DOE's partial breach caused Progress Energy to spend $15,175,982 in labor costs on breach-related projects. Defendant has not produced any evidence showing these costs to be unreasonable. Plaintiffs' $15,175,982 in labor costs will be included in their damages award.

4. *Overhead*

[11] Plaintiffs' damages claim includes $2,336,679 for stores overhead and $1,895,031 for indirect overhead expenses. Stores overhead consists primarily of warehousing costs such as procurement, expediting, quality control, receipt inspections, material handling, and related labor costs. (Edwards, Tr. 405-06). Indirect overhead consists of Construction Work in Project costs, which pays the salaries of management level individuals and financial persons. (Edwards, Tr. 407-08; Calvello, Tr. 1613-15). All projects that use stores overhead and indirect overhead, including breach-related projects, are allocated a portion of the costs through specific project codes in Progress Energy's internal accounting system. (Edwards, Tr. 592-93; Calvello, Tr. 1611-13). Most of Progress Energy's overhead expenses are fixed, meaning they do not change with the volume of business activity. (Edwards, Tr. 597; Johnson, Tr. 1988-90; DX-D5 at 28). Progress Energy did not quantify the amount, if any, by which its overhead costs increased as a result of the breach-related projects. (Edwards, Tr. 600-02).

***28** Defendant does not dispute that Progress Energy used warehousing services for breach-related projects. (Johnson, Tr. 2029). Rather, Defendant contends that Progress Energy may not recover any portion of overhead costs because they are fixed costs, and thus not "incremental to the breach." Def.'s Post-Trial Brief at 159. According to Defendant, Progress Energy failed to show any economic harm resulting from DOE's partial breach. Defendant argues that "Plaintiffs supplied no evidence, as they could have attempted, that fluctuations in their overhead charges coincided with their engagement in breach-related activities...." Def.'s Post-Trial Reply Brief at 46. Consequently, Defendant seeks to reduce Progress Energy's stores overhead claim by $2,190,504 and its indirect overhead claim by $1,819,575. (DX-D5 at 43). Plaintiffs respond that if breach-related projects did not receive their fair allocation of overhead, then other projects would assume a disproportionate amount of the total overhead costs. (Calvello, Tr. 1613).

The Court sees no basis in law or logic for Defendant's position. Plaintiffs' overhead costs were incurred and are properly attributable to mitigation projects and activities. If no overhead charges were allocated to the mitigation projects, Plaintiffs' other projects would be more expensive than anticipated. *Id.* Overhead, by definition, is a cost of doing business, and for some period of time, part of Progress Energy's "business" was mitigating DOE's partial breach. Overhead recovery is necessary to compensate Plaintiffs fully. *See Sys. Fuels, Inc.,* 78 Fed.Cl. at 799-800 (rejecting the Government's principle that all "loader costs" [overhead] would have been incurred absent DOE's breach). The Court will allow the recovery of Plaintiffs' stores overhead and indirect overhead expenses.

5. *Robinson Crane Studies*

[12] Prior to DOE's partial breach, CP & L used its 125-ton capacity Robinson crane to load 75-ton IF 300 casks for shipment to Harris and Brunswick. (Edwards, Tr. 251-52, 261-62; Worthington, Tr. 823-24). As part of its $36 million Robinson ISFSI project, Progress Energy concluded that it would be "prudent" to determine if its existing Robinson crane was qualified to lift the heavier 110-ton ISFSI dry-storage casks. (Worthington, Tr. 824, 857). Progress Energy commissioned contractors to study the need for a crane modification at a cost of $368,121, and as a result, did in fact modify and upgrade the Robinson crane. Although Defendant does not challenge the cost of the Robinson ISFSI or the cost of the crane upgrade, it challenges the cost of the crane studies. In Defendant's words, Progress Energy "failed to explain why the costs incurred to perform these studies would not have been performed in the absence of any delay by DOE."Def.'s Post-Trial Reply Brief at 48.

Defendant's contention is without merit. Defendant does not contest that DOE's partial breach directly

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

led to Progress Energy's need to construct the Robinson ISFSI and to upgrade the crane to load the heavier dry storage casks. Progress Energy could not have known if it was necessary to upgrade the crane unless it commissioned the studies that Defendant now challenges. Mr. Worthington, Progress Energy's engineer responsible for the installation of the crane modification, testified that the crane studies would have been necessary had the crane not needed to be modified to load the ISFSI dry storage cases. (Worthington, Tr. 824-32). On these facts, it is clear that DOE's partial breach was a substantial causal factor in the cost of the Robinson crane study. Defendant produced no evidence showing that the Robinson crane study was an unnecessary expense or that its costs were unreasonable. The $368,121 for the Robinson crane study will be included in Plaintiffs' damages award.

6. *Licensing and Communications Expenses for Harris Pools*

***29** [13] In order to activate the Harris C and D pools, CP & L had to seek regulatory approval from the NRC. (Edwards, Tr. 345). The NRC's licensing process allowed for community and environmental groups to oppose a utility's application, and the occurrence of such opposition was common. (Edwards, Tr. 346-50). The NRC's rules of practice for licensing procedures provided that "[a]ny person whose interest may be affected by a proceeding and who desires to participate as a party shall file a written petition for leave to intervene."10 C.F.R. § 2.174 (1998). Full Atomic Safety Licensing Board ("ASLB") hearings often were held for large capital projects at nuclear power plants. (Edwards, Tr. 348-49).

North Carolina Waste Awareness Network, an environmental organization, and the Board of Commissioners of Orange County ("BCOC"), a governmental organization, actively opposed CP & L's opening of the Harris C and D pools. (Edwards, Tr. 349). The BCOC filed formal oppositions with the NRC, and the NRC conducted full ASLB hearings. (Edwards, Tr. 345, 349-50). CP & L ultimately prevailed in its position that the activation of the Harris C & D pools posed no significant safety hazards. *See In re Carolina Power & Light Co.,* 53 N.R.C. 113, 2001 WL 208730 (2001) (denying BCOC's petition for review of staff's issuance of license amendment).

CP & L also engaged in community outreach efforts when dealing with plant modifications and contested NRC proceedings. (Edwards, Tr. 350-51). CP & L undertook such efforts when seeking approval of the C and D pool activation. (Edwards, Tr. 352). CP & L incurred $1,800,500 in NRC proceedings to defend its licensing request, and $100,288 for its community outreach efforts related to this request. (DX-D5 at 43). In the absence of DOE's partial breach, these expenditures would not have been necessary. (Edwards, Tr. 352-53); *see also N. States Power Co.,* 78 Fed.Cl. at 464 ("[P]laintiff should not have to bear the unavoidable costs associated with [an activity] that defendant acknowledges constituted an otherwise reasonable and successful effort to mitigate damages."). Defendant's argument that these costs were not a direct result of DOE's delay in performance is without any basis. The $1,900,788 in legal and communications expenses will be allowed.

7. *Upgrade to the Harris Component Cooling Water System*

[14] Plaintiffs claim $1,166,640 as the cost of upgrading the component cooling water ("CCW") system at the Harris plant. Plaintiffs assert that these upgrades primarily were due to the opening of the C and D spent fuel pools at the Harris plant, while Defendant argues that the CCW upgrades were necessary to accommodate the increased heat loads from CP & L's power uprate and steam generator replacement. (Maret, Tr. 1774-75; DX 307 at 8-10; DX-D4 at 11-14). The Court must determine whether DOE's failure to accept spent fuel at the Harris plant beginning January 31, 1998 was a substantial causal factor of CP & L's CCW upgrade ex-

pense.

***30** The work that CP & L performed on the CCW upgrade consisted of replacing pump impellers in the cooling system, enabling more cold water to circulate at a higher pressure. (Edwards, Tr. 547; Tibbitts, Tr. 1034). CP & L authorized the CCW upgrade for three independent reasons, all relating to dissipating heat more effectively: (1) activation of the C and D spent fuel pools; (2) the power uprate enhancement; and (3) the steam generator replacement. (Edwards, Tr. 543).

One means of analyzing this issue is to consider the increased heat load from each source. Defendant's expert, Mr. Maret, established that, aside from the opening of the C and D spent fuel pools, the additional heat load placed on the CCW system after power uprate was 19.5 MBTU/hour-13.2 MBTU/hour in additional heat load on the residual heat remover ("RHR") heat exchanger, and 6.3 MBTU/hour in additional heat load in the A and B spent fuel pools. (Maret, Tr. 1785-89; DX 307 at 10; DX-D4 at 13-14). In comparison, the licensed heat load limit for the C and D pools increased from 1.0 MBTU/hour to 7.0 MBTU/hour.*Id.* The combined increase in heat load on the CCW system attributable to the RHR heat exchanger and the A and B pools is more than twice the total allowable heat load in the C and D pools. *Id.* This data strongly suggests that the CCW upgrades would have been needed regardless of the opening of the C and D pools.

CP & L's contemporaneous documentation is consistent with this suggestion. In a January 1998 presentation, Mr. Edwards addressed the advantages and disadvantages of utilizing the CCW system to provide cooling for the C and D pool activation. (Edwards, Tr. 554; DX 185 at 9205). Mr. Edwards identified as one of the disadvantages the fact that "there [would be] inadequate long-term (post power up rate) CCW margin without plant modification (additional heat exchanger capacity and pump upgrades)."*Id.*In a related bar graph, the largest single annual increase in heat load occurs in the year when the initial phase of the power uprate would be performed. (Edwards, Tr. 555-57; DX 185 at 9206). Similarly, in an April 1998 presentation, Mr. Edwards indicated that the "CCW upgrade [would be performed] to accommodate power uprate impacts."(Edwards, Tr. 557-59; PX 90 at 9231). In December 1998, Mr. Edwards stated "the existing CCW system [was] adequate for near-term operation until power uprate is implemented."(Edwards, Tr. 559-60; DX 206 at 4846).

Based upon the evidence, the Court finds that the opening of the Harris C and D spent fuel pools was the least important of three reasons for the CCW upgrades. The Court therefore concludes that CP & L likely would have performed the CCW upgrades because of the power uprate and steam generator replacement, even if DOE had begun accepting spent fuel at the Harris plant on January 31, 1998. Accordingly, Plaintiffs' claim for the CCW upgrade expenses, $1,166,640, is denied.

8. *Crystal River Re-rack Program*

***31** [15] Plaintiffs claim $4,675,392 as the cost to perform a re-rack operation at FPC's Crystal River, Florida nuclear plant. The issue is whether FPC incurred this expense due to DOE's failure to begin accepting spent fuel on January 31, 1998, or whether FPC performed the re-rack operation for a different reason, to resolve a "Boraflex degradation" problem. To grant Plaintiffs' claim, the Court must find that DOE's material breach in failing to accept spent fuel was a substantial causal factor in FPC's decision to perform the re-rack operation.

"Boraflex" is a soft-rubber neutron absorbing material used to control criticality in spent fuel pools. (Maret, Tr. 1798-1801). Impregnated in the Boraflex rubber material is boron carbide, which acts as a neutron absorber, and silicon dioxide, which acts as a filler. *Id.* FPC discovered that Boraflex is subject to degradation following exposure to high levels of gamma radiation. (Maret, Tr. 1801-02; DX 307 at 11 n. 25). When Boraflex breaks down into

its constituent materials, boron carbide and silicon dioxide (silica) can leach into the spent fuel pool. *Id.* The Boraflex degradation causes problems relating both to criticality and silica contamination. The loss of boron reduces the ability of the racks to absorb neutrons, and the silica is a contaminant that can find its way into the reactor vessel or other systems within the plant. (Maret, Tr. 1802; Lehmann, Tr. 1126). Silica contamination is a threat to the fuel cladding, which serves as the principal barrier to release of radiation into the environment. (Maret, Tr. 1804-05; DX 307 at 11). FPC's fuel vendor imposed silica concentration limits on the reactor coolant system to limit damage to the fuel that it had supplied and warranted. (Maret, Tr. 1805-06).

In 1995, FPC first suspected that it had a Boraflex degradation problem. (Lehmann, Tr. 1111). In a November 1996 silica assessment report, an FPC team recommended that "[r]emoval of the silica contamination-the Boraflex from the racks, or replacement of the racks would provide the optimum solution."(PX 72 at 3355). FPC's only concern with replacing the racks was that it might not be cost-effective. (Lehmann, Tr. 1117). FPC had received estimates that a re-rack operation would cost between $7 and $8 million. (Lehmann, Tr. 1117-18; PX 72 at 3349). FPC considered other solutions to the Boraflex degradation problem, such as a reverse osmosis method, taking credit for soluble boron, or using a device known as a "racksaver." (Lehmann, Tr. 1127-28, 1157-58, 1166-70; Culver, Tr. 937; DX 182 at 9512). These alternative solutions were less costly than re-racking, but were considered "band-aid" solutions. (Lehmann, Tr. 1169-70).

In December 1996, FPC notified the Westinghouse Corporation, the manufacturer of the racks in the spent fuel pool, that plant modifications would be necessary to manage anticipated silica levels. (Lehmann, Tr. 1118-20; DX 159). FPC believed that Westinghouse was responsible for the Boraflex degradation problem occurring in the racks. (Lehmann, Tr. 1124). FPC and Westinghouse ultimately negotiated a re-rack solution for $3.2 million, much lower than FPC's original $7-8 million estimate. (PX 87 at 3532-33). Westinghouse offered a discount of approximately $1 million for this project, where in negotiations FPC had complained about the degradation of the original Boraflex racks. (Lehmann, Tr. 1197-98, 1209). FPC obtained 117 additional storage spaces from the re-rack operation. (Lehmann, Tr. 1201-02).

***32** Of particular significance is a December 1997 FPC Request for Project Approval ("RPA"). (DX 182). In this document, Mr. Lehmann completed a questionnaire and scoresheet of reasons for performing the re-rack operation.*Id.* at 9515-16.FPC's company policy and instructions for completing the questionnaire are found in the "Integrated Planning Manual, Revision 5." (PX 166). The instructions provide 36 potential questions for consideration, and guidance on a scoring system of 1-10 for each question. *Id.* at 6357-64.The preparer is required to respond only to relevant questions, which in the case of the re-rack project were Question nos. 23, 28, 29, and 35. (DX 182 at 9515-16). In answering these questions, Mr. Lehmann awarded only six of 28 total points for anything having to do with additional on-site storage. (Lehmann, Tr. 1173-88). The majority of the points, and the driving reasons for the re-rack project, were to resolve the Boraflex degradation and the silica contamination problems. The assignment of even six points may have been exaggerated, because Mr. Lehmann based the score on an assumed four years of additional storage space, but he indicated elsewhere in the same report that full core reserve could be maintained for three additional years. (Lehmann, Tr. 1183-85). For three years of additional space, the score would have been four points, not six. (Lehmann, Tr. 1182-83).

Based upon all the evidence, the Court concludes that the Crystal River re-rack project did provide additional storage space for spent fuel, but that FPC most likely would have performed this project in any event absent DOE's breach. The re-rack decision became a cost-effective solution to the Borax degradation and silica contamination problems once

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westinghouse lowered its price. The Court cannot say that DOE's failure to accept spent fuel at Crystal River beginning January 31, 1998 was a substantial causal factor for the re-rack project. Accordingly, Plaintiffs' claim for the cost of this project, $4,675,392, is denied.

9. *Manual Journal Entries*

After examining Progress Energy's accounting records during the Court-ordered review process, Defendant agreed that Plaintiffs supported $90,684,002 of their claimed costs with reliable documentation and evidence. Defendant contends, however, that Plaintiffs failed to support the remaining $345,701 of their claim with adequate detail or documentation. (DX-D5 at 42-43; Johnson, Tr. 2013-14; Calvello, Tr. 1597). Plaintiffs admit that this portion of their claim is not supported with particular documentation such as an invoice, but maintains that they have met their burden of proof through witness testimony explaining how the manual adjustments were entered and why they are accurate and reliable. Pls.' Post-Trial Brief at 73.

The items in question are manual journal entries to correct mistakes, such as labor or materials inadvertently billed to the wrong project or account. (Edwards, Tr. 420). These entries do not have the same level of documentary support as the other costs comprising Plaintiffs' claim. Without documentation, Plaintiffs could not explain why particular costs were incurred, what they were for, or whether they would have been incurred absent the breach. (DX 308 at 21). The mere offering of corrected journal entries, without more, does not satisfy Plaintiffs' burden where the entries are challenged by Defendant. These costs, totaling $345,701, must be removed from Plaintiffs' damages as unsupported. (Johnson, Tr. 2017-18; DX 308 at 21; DX-D5 at 44).

10. *DOE Cask Loading Absent the Breach*

***33** [16] In addition to challenging ten specific costs on causation and certainty grounds, Defendant claims the damages award should be reduced by $9,818,462 for the "avoided" cost of loading DOE casks. Def. Br. at 154-56; (Johnson, Tr. 1968; DX-D5 at 43). Defendant did not cite to a single case in support of its position in its post-trial brief, and dropped the argument entirely in its post-trial reply brief. The Court can only guess that this is because the Court has uniformly rejected Defendant's proposed cask loading reduction in its previous spent-nuclearfuel decisions. *See Sys. Fuels, Inc.*, 79 Fed.Cl. at 70-71;*Sys. Fuels, Inc.*, 78 Fed.Cl. at 797;*N. States Power Co.*, 78 Fed.Cl. at 468-69;*Pac. Gas & Elec. Co.*, 73 Fed.Cl. at 416;*Sacramento Mun. Util. Dist. v. United States*, 70 Fed.Cl. 332, 372 (2006); *Tennessee Valley Auth.*, 69 Fed.Cl. at 542.Defendant has not provided any compelling reason why the Court should depart from this well established precedent, and the Court finds that its predecessors' reasoning applies with equal force to the present facts.

It is true that under the terms of the Standard Contract, Plaintiffs must bear the cost of loading DOE transportation casks when DOE arrives to accept its spent fuel. (PX 10 at 6850; Edwards, Tr. 388). It is also true that "[b]ecause DOE has not yet begun accepting fuel, Progress Energy has to date not incurred any costs associated with loading to DOE."Def.'s Post-Trial Brief at 100 (citing Edwards, Tr. 572). Plaintiffs, however, have not avoided the cost of loading DOE casks. The loading costs have merely been deferred. *Sys. Fuels, Inc.*, 78 Fed.Cl. at 797 ("[C]ask loading costs are more accurately characterized as deferred costs rather than avoided costs."); *Pac. Gas & Elec. Co.*, 73 Fed.Cl. at 416 (holding that plaintiff's loading costs were deferred and not avoided); (Edwards, Tr. 388-89; Johnson, Tr. 2021; Maret, Tr. 1904-05). When DOE arrives to pick up Plaintiffs' spent fuel in the future, Progress Energy will have to pay the loading costs that Defendant now seeks to impose. *See id.*The Court sees no reason why Progress Energy should have to pay twice for the same performance. *See Restatement (Second) of Contracts* §

347(c), cmt. d; *Corbin on Contracts* § 57.10.

Even if Plaintiffs' loading costs were avoided and not deferred, Defendant failed to present any evidence showing with reasonable certainty what Plaintiffs' loading costs would have been had DOE performed. To calculate the number of "avoided" loadings, Defendant's expert, Gregory Maret, "assumed" that Progress Energy would load 75-ton IF 300 casks at Brunswick, Harris, and Robinson, and GA-4 truck casks at Crystal River. (DX-D4 at 22; Maret, Tr. 1817-24). Mr. Maret then made what he considered reasonable assumptions about the costs associated with those loadings. (Maret, Tr. 1824-26). Mr. Maret's assumptions, while possibly reasonable, are contradicted by the evidence. When DOE does arrive to pick up fuel, it can choose from several types and sizes of casks, from "smaller truck weight casks" to larger 100-ton rail casks. (Maret, Tr. 1820-21). Currently, DOE has not identified the type or size of cask that it will use at Progress Energy's plants. (Edwards, Tr. 389; Zabransky, Tr. 1527). Nor has DOE agreed to accept without repacking the already loaded dual purpose casks at Robinson, (Edwards, Tr. 389). Indeed, DOE has not committed to using railroad casks at all. *Id.* Given the uncertainties surrounding both the method and cost of hypothetical loading of DOE casks absent the breach, the Court finds that Mr. Maret's assumptions do meet the standard for reasonable certainty required under the law. *See Sys. Fuels, Inc.*, 79 Fed.Cl. at 71 ("Prior decisions have concluded that '[a]s matters now stand, any benefit inhering in [the utility] because of delayed loading costs would be entirely speculative. It is not possible to ascertain the method DOE will ultimately use for SNF acceptance.'") (quoting *Tennessee Valley Auth.*, 69 Fed.Cl. at 542);*N. States Power Co.*, 78 Fed.Cl. at 468-69;*Sys. Fuels, Inc.*, 78 Fed.Cl. at 797 ("[C]ask loading costs are more accurately characterized as deferred costs rather than avoided costs."); *Pac. Gas & Elec. Co.*, 73 Fed.Cl. at 416 (holding that given the speculative nature of the future costs, "the court declines to engage in a guessing game as to whether such deferred costs will have increased or decreased by the time (if ever) defendant performs the parties' Standard Contract"); *Sacramento Mun. Util. Dist.*, 70 Fed.Cl. at 372 (declining to deduct speculative loading costs); *Tennessee Valley Auth.*, 69 Fed.Cl. at 542 ("[B]oth DOE and [plaintiff] contemplate that DOE will still perform under the contract at some future date. As matters now stand, any benefit ... because of delayed loading *costs* would be entirely speculative."). For these reasons, Defendant did not meet its burden to show costs that Progress Energy avoided by not having to perform. Defendant's proposed $9,818,462 reduction is rejected.

11. *AFUDC*

***34** [17] Plaintiffs claim as damages a charge for an Allowance for Funds Used During Construction ("AFUDC"), the amount of which represents the "estimated debt and equity costs of capital funds necessary to finance the construction of new regulated assets."(Edwards, Tr. 588; DX 268 at 63). Defendant argues that this cost should not be recoverable because it is the functional equivalent of interest on a claim, and is not allowable in claims against the Government in the absence of a waiver of sovereign immunity.

Under 28 U.S.C. § 2516(a), a party may not recover interest upon a claim against the United States in the Court of Federal Claims unless specifically permitted by contract or statute. As Defendant correctly points out, no provision of the Standard Contract, nor the NWPA or any other act of Congress, provides for the payment of interest on damages claims. Def.'s Post-Trial Brief at 163 (citing *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1340 (Fed.Cir.2000)).

Plaintiffs attempt to escape this rule by characterizing AFUDC as "interest *as* a claim" rather than "interest *on* a claim." Pls.' Post-Trial Reply Brief at 41 (emphasis in original). In support, Plaintiffs point out that AFUDC is "calculated in real time and applied contemporaneously with the

project."Pls.' Post-Trial Brief at 70 (citing Edwards, Tr. 403). Plaintiffs rely upon *Wickham Contracting Co. v. Fischer,* 12 F.3d 1574 (Fed.Cir.1994), for the proposition that "a contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract."Pls.' Post-Trial Brief at 71 (quoting *Wickham,* 12 F.3d at 1582). Defendant responds that *Wickham* is inapplicable to the facts here because the contract in *Wickham* involved the "Changes" clause which authorized recovery of interest to address a contract change. Def.'s Post-Trial Brief at 165. Moreover, Defendant argues, " '[t]he changed work must be directly traced to a specific loan or necessity for increased borrowing must be shown to have been required by extra work or delay caused by the Government.'" Def.'s Post-Trial Brief at 166 (quoting *Gevyn Constr. Corp. v. United States,* 827 F.2d 752, 754 (Fed.Cir.1987)); *see also* Pls.' Post-Trial Brief at 71 (admitting that under *Wickham,* they must show that "borrowed funds were used in connection with the ... project.") (quoting *Wickham,* 12 F.3d at 1583).

The Court finds it unnecessary to decide whether *Wickham* applies to a contract that does not contain the Changes clause because Plaintiffs failed to provide any evidence tying any borrowed money to specific projects. The record shows that Progress Energy borrowed money at the company level and not at the project level. (Edwards, Tr. 591-92). Consequently, there is no direct "one-to-one correspondence" between any borrowing and any particular breach-related project. (Edwards, Tr. 591-92). While this capital structure may, as Plaintiffs contend, be commercially reasonable and conform with Federal Energy Regulatory Commission ("FERC") requirements, the absence of any evidence establishing a direct causal connection between the cost of borrowing and specific breach-related projects renders Plaintiffs' $1,996,045 AFUDC claim not recoverable. *See Sys. Fuels, Inc.,* 79 Fed.Cl. at 69 ("Failing to have established that its claimed financing costs are directly related to required borrowing through specific debt instruments, [plaintiff] cannot recover its costs of capital."); *N. States Power Co.,* 78 Fed.Cl. at 471-72 ("Absent proof of any borrowings with which the interest claim can be causally identified, however, plaintiff's cost of capital damages become conceptually indistinguishable from prejudgment interest, *i.e.,* interest on a claim."). (DX-D5 at 43).

*Conclusion*

***35** Based upon the foregoing, the Court awards damages to Plaintiffs for $82,845,926 through December 31, 2005. The Clerk is directed to enter judgment for Plaintiffs in this amount. Pursuant to Rule 54, costs are awarded to Plaintiffs.

IT IS SO ORDERED.

FN1. This case was transferred to Judge Thomas C. Wheeler on December 5, 2005, pursuant to Rule 40.1(b) of the Rules of the Court of Federal Claims.

FN2. This statement of facts constitutes the Court's principal findings of fact under Rule 52(a) of the Court. Other findings of fact and rulings on mixed questions of fact and law are set forth in the later analysis.

FN3. In this opinion, the Court will refer to the trial transcript by witness and page as "Name, Tr. _____," and to trial exhibits as "PX _____" for Plaintiffs' exhibits, and "DX_____" for Defendant's Exhibits. The expert witnesses presented their expert analyses through demonstrative exhibits, which the Court will refer to as "PX-D_____" for Plaintiffs, and "DX-D_____" for Defendant. The parties' joint pretrial stipulations of fact, filed on October 19, 2007, are referred to as "Stip. _____." The Court will refer to the testimony of the eight witnesses who were unable to attend the trial as "Name, *Case Name,* Tr. _____," or if the previous testimony was by deposition as "Name, Date

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Dep., Tr. _____." For lengthy exhibits, citations include a page number where available, or otherwise a reference to the last four digits of Bates numbers.

FN4. In describing the Standard Contract, the Court will refer to CP & L's contract (PX 10), although the terms of the FPC contract (PX 11) are the same. The terms and provisions of the Standard Contract also are available at 10 C.F.R. § 961.11 (1983).

FN5. The term "borated" is an adjective referring to the state of being mixed or impregnated with borax or boric acid. Webster's New Collegiate Dictionary 132 (10th ed.2001).

Fed.Cl.,2008.
Carolina Power & Light Co. v. U.S.
--- Fed.Cl. ----, 2008 WL 2154103 (Fed.Cl.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.