**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# ENERGY NORTHWEST'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF EILEEN SUPKO

---

NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, D.C. 20005
(202) 639-6000

June 30, 2008

*Attorneys for Plaintiff*

# Table Of Contents

Table Of Contents ..... ii

Table Of Contents To Appendix ..... iii

Table Of Authorities ..... iv

Introduction ..... 1

I. Factual Background. ..... 2

A. The Acceptance Rate Issue. ..... 2

B. Ms. Supko's Background And Opinions. ..... 5

C. The Government's Position And Motion. ..... 8

II. Argument: Ms. Supko's Acceptance Rate Report Is Admissible Under Rule 702 Because It Is Relevant And Reliable. ..... 9

A. The Government's Attack On The "Reasonableness" Issue Is Misdirected And Unfounded. ..... 10

B. The Government's Criticisms Of Ms. Supko's Methodology For Determining The Effect Of Different Acceptance Rates Are Immaterial. ..... 12

1. The Acceptance Rate Scenarios Used For Modeling Are Appropriate. ..... 12

2. The Adjustments The Government Contends Are Necessary Do Not Undermine The Accuracy Of Ms. Supko's Model. ..... 15

Conclusion ..... 19

**Table Of Contents To Appendix**

Unpublished Orders Cited

*Carolina Power & Light Co., and Florida Power Corp. v. United States*, No. 04-3C (82 Fed. Cl. 23, May 19, 2008)....................App. 1

*Dairyland Power Coop. v. United States*, No. 04-0106C, slip op. (Fed. Cl. June 20, 2008)....................App. 36

Documents Cited

Excerpt from the December 7, 2007 Deposition of Eileen Supko....................App. 59

Excerpt from Eileen Supko Testimony in the February 23, 2007 Trial Transcript in *System Fuels, Inc. and Entergy Arkansas, Inc., v. United States,* No. 03-2623C....................App. 61

# Table Of Authorities

## Cases

*Boston Edison Co. v. United States*, 80 Fed. Cl. 468 (2008) ..................... 11

*Carolina Power & Light Co. v. United States*, No. 04-37C, 2008 WL 2154103
(Fed. Cl. May 19, 2008) ..................... 3, 4, 11

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003) ..................... 3

*Dairyland Power Coop. v. United States*, No. 04-106C, slip. op. (Fed. Cl. June 20, 2008) .......... 5

*David Nassif Assocs. v. United States*, 557 F.2d 249 (Ct. Cl. 1977) ("*Nassif I*") ..................... 4

*David Nassif Assocs. v. United States*, 644 F.2d 4 (Ct. Cl. 1981) ("*Nassif II*") ..................... 4

*Energy Northwest v. United States*, 69 Fed. Cl. 500 (2006) ..................... 3

*Ind. Mich. Power Co. v. United States*, 57 Fed. Cl. 88 (2003) ..................... 3, 4

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ..................... 9

*N. States Power Co. v. United States*, 78 Fed. Cl. 449 (2007) ..................... 3, 12

*S. Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396 (2007)
("*Southern Nuclear I*") ..................... 3, 4, 8, 12

*S. Nuclear Operating Co. v. United States*, 79 Fed. Cl. 135 (2007) ("*Southern Nuclear II*") ........ 4

*Sys. Fuels, Inc. v. United States*, 79 Fed. Cl. 182 (2007) ("*Entergy Arkansas II*") ..................... 3, 4

*Sys. Fuels, Inc. v. United States*, 79 Fed. Cl. 37 (2007) ("*Entergy Arkansas I*") ................. 3, 4, 11

*Tenn. Valley Auth. v. United States*, 60 Fed. Cl. 665 (2004) ("*TVA I*") ..................... 3

*Tenn. Valley Auth. v. United States*, 69 Fed. Cl. 515 (2006) ("*TVA II*") ..................... 3, 12

*Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249 (2006) ..................... 3, 12

## Other Authorities

RESTATEMENT (SECOND) OF CONTRACTS ..................... 4

## Rules

FED. R. CIV. P. 26(a)(2) ..................... 5

FED. R. EVID. 702 ..................... 2, 9

## Introduction

The Government has moved to exclude a portion of the testimony that plaintiff Energy Northwest ("EN") intends to offer from an expert on nuclear fuel and spent nuclear fuel ("SNF") storage and management issues, Eileen Supko of Energy Resources International ("ERI"). The portion the Government seeks to exclude is from Ms. Supko's report regarding the overall acceptance rate applicable to the Department of Energy's ("DOE") program under the Nuclear Waste Policy Act ("the NWPA") and the Standard Contract, which we refer to as her "Acceptance Rate Report." Citing two brief references to the word "reasonable" in her Acceptance Rate Report, the Government argues that Ms. Supko has an insufficient basis or methodology to reach any expert opinions regarding "reasonableness" under the Contract. However, the Government has mischaracterized Ms. Supko's report. The core of Ms. Supko's Acceptance Rate Report is her analysis concerning the effect of alternative overall industry acceptance rates (explained below) on certain objectives or criteria that the DOE identified shortly after the passage of the NWPA and the execution of the Standard Contract. That analysis is independent of the "reasonableness" issue on which the Government focuses, and is plainly relevant to help the Court evaluate for itself the appropriate acceptance rate in this case.

The Government's motion should be denied. There is no dispute that Ms. Supko has the qualifications of an expert. And there is also no doubt that Ms. Supko will testify at the trial of this case, because the Government has ***not*** filed a motion directed at the opinions contained in two other reports by Ms. Supko disclosed in this case. Consequently, little if any time would be conserved in this bench trial by eliminating this particular slice of her testimony. Moreover, Ms. Supko has been retained by numerous other utilities in their cases against the Government for breach of the Standard Contract, and six other Judges on this Court – all of the Judges to consider the question – have rejected the Government's objections directed at the opinions

contained in Ms. Supko's Acceptance Rate Report, and permitted her to offer that testimony in a total of seven cases. Because Ms. Supko's testimony is relevant and clearly satisfies the criteria of Federal Rule of Evidence 702, this Court should follow the persuasive rulings by the other Judges and permit Ms. Supko to offer the testimony in her Acceptance Rate Report.

## I. Factual Background.

### A. The Acceptance Rate Issue.

As Your Honor knows, this is a case against the Government for breach of the Standard Contract for the Removal of Spent Nuclear Fuel and High-Level Radioactive Waste (the "Standard Contract"). The Court has entered a finding of liability against the Government, and the remaining issue is damages. The principal item of damages EN seeks is for costs related to the procurement of additional storage for its SNF made necessary because of the Government's breach of the Standard Contract. The parties' experts generally agree on a methodology for measuring damages. The methodology involves comparing the actual costs which have been incurred by EN as a result of the DOE's failure to perform under the Standard Contract (the "breach scenario") to the estimated costs that would have been expended if the DOE had performed its obligations under the Standard Contract (the "non-breach scenario"). To the extent the costs under the breach scenario, in any given year, exceed the costs under the non-breach scenario, EN has suffered damages as a result of the DOE's failure to perform under the Contract.

It is here that the issue of what the parties and the experts refer to as the "acceptance rate" becomes relevant. As used by the parties and the experts, the acceptance rate refers to the overall aggregate rate at which the DOE would have accepted SNF from all the various holders of the Standard Contract each year starting in 1998. Under the Standard Contract, the overall acceptance rate is then presumptively distributed to the various contract holders based on the

date each of them discharged their fuel, a scheme known as "oldest fuel first," or "OFF." As Your Honor recognized in the Court's opinion granting summary judgment on liability in favor of EN, the higher the overall acceptance rate, the sooner the Government would have begun accepting SNF ***from*** EN. *Energy Northwest v. United States*, 69 Fed. Cl. 500, 504-05 (2006). Although EN has considerable damages even at the lowest acceptance rate advocated by the Government (a rate ramping up to 900 MTU annually for the first 10 years), application of the acceptance rate can affect the costs EN would have incurred in the non-breach scenario. Thus, EN's damages expert, Michael P. Emmert, has offered opinions on the extent of damages which vary depending on the acceptance rate. (Emmert Rpt. at 2-24, 36-37, C.App. 20-24, 36-37.[1])

The acceptance rate is disputed because, as every Judge of this Court to consider the question has found, the Standard Contract does not contain any overall rate of acceptance at which the DOE was obligated to perform.[2] As recently stated in *Carolina Power & Light*, the purpose of determining an acceptance rate in these SNF cases is to devise a reasonable basis, consistent with the parties' expectations, for determining damages in light of DOE's breach of

---

[1] To avoid unnecessary duplication of material appended to all pending motions in limine, references herein to "C.App. x" refer to the Energy Northwest's Consolidated Appendix in Support Of Its Three Motions To Exclude The Government's Proffered Experts. Citations to "S.App. x" refer to the supplementary material included in the appendix to this response to the Government's motion to exclude testimony from Ms. Supko. Citations to "Gov't App. x" refer to the Government's appendix in support of its Motion.

[2] *See, e.g., Carolina Power & Light Co. v. United States*, No. 04-37C, 2008 WL 2154103, at *6, *14 (Fed. Cl. May 19, 2008) (noting the Standard Contract did not contain a rate of acceptance); *Sys. Fuels, Inc. v. United States*, 79 Fed. Cl. 182, 184 (2007) ("*Entergy Arkansas II*") (same); *Sys. Fuels, Inc. v. United States*, 79 Fed. Cl. 37, 42 (2007) ("*Entergy Arkansas I*") (same); *N. States Power Co. v. United States*, 78 Fed. Cl. 449, 451 (2007) (same); *S. Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396, 410 (2007) (same); *Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249, 258 (2006) (same); *Tenn. Valley Auth. v. United States*, 69 Fed. Cl. 515, 521 (2006) ("*TVA II*") (same); *Energy Northwest*, 69 Fed. Cl. at 504 n.6 (same); *Tenn. Valley Auth. v. United States*, 60 Fed. Cl. 665, 668 (2004) ("*TVA I*") (same); *Ind. Mich. Power Co. v. United States*, 57 Fed. Cl. 88, 97-99 (2003) (noting the Standard Contract did not contain a rate of acceptance and explaining that it is the Court's duty to fill in this missing term); *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 662-63 (2003) (same).

contract. 2008 WL 2154103, at *17. And "[w]hen the parties to a bargain sufficiently definite to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." RESTATEMENT (SECOND) OF CONTRACTS § 204. This Court adheres to the view that if a contract does not provide a term essential for determining damages, damages are determined based on the intent of the parties at the time of contracting. *David Nassif Assocs. v. United States*, 644 F.2d 4, 5 (Ct. Cl. 1981) ("*Nassif II*"); *David Nassif Assocs. v. United States*, 557 F.2d 249, 258 (Ct. Cl. 1977) ("*Nassif I*"). Indeed, in other SNF cases heard by this Court, in calculating damages, the Judges have analyzed the acceptance rate by examining the intent of the parties at the time of contracting (as opposed to after the DOE realized it would breach and changed its conduct). *See, e.g.*, *Carolina Power & Light*, 2008 WL 2154103, at *17; *Entergy Arkansas II*, 79 Fed. Cl. at 184-87; *S. Nuclear Operating Co. v. United States*, 79 Fed. Cl. 135, 138-40 (2007) ("*Southern Nuclear II*"); *Entergy Arkansas I*, 79 Fed. Cl. at 57-58; *Southern Nuclear I*, 77 Fed. Cl. at 435-39 & n.38; *Indiana Michigan*, 57 Fed. Cl. at 99-100.

Consequently, the issue of the rate at which the Government would have performed – a rate that is "reasonable" under all the circumstances in light of the expectations of the parties when they contracted – is relevant to the trial of this case. Indeed, as Your Honor recently found in the *Dairyland* case, in ruling that similar testimony from the plaintiff's expert Frank Graves would be admitted: "In every SNF case that is before the Court of Federal Claims the acceptance rate of SNF has been at issue . . . . [T]he Court holds that the Government's arguments regarding Mr. Graves' ***economically reasonable rate of SNF acceptance*** goes to the weight of his testimony, not to its admissibility." *Dairyland Power Coop. v. United States*, No. 04-106C, slip. op. at 21 (Fed. Cl. June 20, 2008) (emphasis supplied).

**B. Ms. Supko's Background And Opinions.**

The Government's motion in limine is directed at a portion of the testimony EN seeks to introduce at trial from expert Eileen M. Supko of Energy Resources International, Inc. The Government's motion does ***not*** challenge the admissibility of Ms. Supko's testimony on the grounds that she is unqualified as an expert. Indeed, Ms. Supko's credentials to offer testimony regarding SNF management issues are unmatched. Ms. Supko has more than 20 years experience working in the nuclear industry, with primary expertise in the storage and disposal of SNF and the DOE's plans regarding SNF storage and disposal. After she received a B.S. in Nuclear Engineering in 1985, Ms. Supko served as a Nuclear Fuel Projects Engineer at the Carolina Power and Light Company. Since 1990, Ms. Supko has been a consultant with ERI. As a consultant, she has assisted and advised commercial utilities, members of Congress, state and local officials, and the nuclear industry trade group Nuclear Energy Institute on a variety of nuclear fuel issues, including analysis of DOE's civilian SNF management program, nuclear fuel storage, SNF transport and disposal issues, and fuel cycle issues. Ms. Supko has authored more than 35 reports, presentations, and publications in leading nuclear energy journals.

In this case, EN has disclosed under Federal Rule of Civil Procedure 26(a)(2) three expert reports containing opinions from Ms. Supko on three topics closely bound with her 20 years of SNF-related experience. ***First***, EN has disclosed a report containing opinions from Ms. Supko on the acceptance rights EN would have received under the Standard Contract given two overall acceptance rate scenarios. The opinions in this report are ***not*** being challenged by the Government's Motion. ***Second***, EN has disclosed a report containing opinions from Ms. Supko on the state of dry cask SNF storage technology in the late 1990s. Again, the opinions in this report are ***not*** being challenged by the Government. Consequently, regardless how the Court rules on this Motion, EN will present testimony from Ms. Supko at trial.

***Third***, EN has disclosed a report by Ms. Supko entitled "Expert Report Regarding Determination Of The U.S. Department of Energy's Overall Spent Nuclear Fuel Acceptance Rate" (the "Acceptance Rate Report"). It is portions of the opinions contained in this third report which the Government seeks to exclude.

The core of the Acceptance Rate Report is analyses that Ms. Supko performed using "SPNTFUEL," ERI's electronic model of spent fuel acceptance industry-wide. The SPNTFUEL model was developed by ERI outside of the litigation context, to facilitate its provision of business and technical consulting advice to nuclear operators, its principal business. The SPNTFUEL model reads in historical SNF discharge data provided by operators to the DOE on forms known as DOE "RW-859s." The model also uses projected SNF discharge data and data regarding storage capacity at individual utilities, either from the DOE RW-859 database, or provided by individual operators. Based on these inputs, the computer model "calculates the remaining cycle-by-cycle discharge date through the end of each plant's assumed operating license expiration date." (Acceptance Rate Rpt. at Appendix A-1, Gov't App. 30.)

In this case, Ms. Supko used the SPNTFUEL model to analyze the way that certain acceptance rate scenarios would have affected certain industry factors, assuming the DOE had commenced performance in 1998 as called for by the Standard Contract. Ms. Supko summarizes:

> Counsel for Energy Northwest requested that I assume the start of acceptance of spent nuclear fuel (SNF) by January 31, 1998, the date called for in the Standard Contract. Given that assumption, I was asked to provide an opinion on the impact of the DOE's rate of acceptance of SNF assemblies from the nuclear industry as a whole on two key issues identified by both DOE and nuclear utilities: (1) the aggregate amount of additional at-reactor storage capacity nuclear utilities would be required to provide in order to continue operations after January 31, 1998; and (2) the utilities' ability to timely decommission their nuclear power plants, i.e., the length of any delay in decommissioning caused by the continued presence of SNF . . . I have determined that, if DOE had begun acceptance of spent nuclear fuel by

> January 31, 1998, an overall steady-state spent fuel acceptance rate of 3,000 metric tons of uranium (MTU) per year, reached after a five-year ramp-up period, would have limited the amount of additional storage capacity needed at nuclear power plants after that date, kept up with the annual discharge rate of 2,000 MTU of spent fuel, and worked off the 37,000 MTU backlog of SNF in storage at nuclear power plants to allow timely decommissioning . . .

(Acceptance Rate Rpt. at 1 (emphasis supplied), Gov't App. 5.)

There are a total of four references to "reasonableness" in Ms. Supko's twenty-five page report. In a single line in a section of her report relating to whether it matters to her analysis how quickly the DOE would have increased to the 3,000 ton acceptance rate – referred to as the "ramp up" – Ms. Supko's report states: "It is my opinion that that this ***ramp-up rate*** represents a reasonable ramp-up period and annual acceptance rate for the start of waste acceptance by DOE," and "I have concluded that it is reasonable to use the 3,000 MTU base case with a five year ***ramp-up period*** because it is both conservative and consistent with DOE's current planning basis for waste acceptance." (*Id*. at 17, 20, Gov't App. 21, 24 (emphasis supplied).) In the concluding section of the report, Ms. Supko essentially repeats this conclusion, stating: "It is also my conclusion that the 3,000 MTU Base Case ***ramp-up*** rate currently employed by DOE is a reasonable rate of acceptance and a rate that would have been practicable for the start of waste acceptance in a non-breach scenario, particularly in the early years of waste acceptance." (*Id*. at 25 (emphasis added).) These are the only three references to the reasonableness of an acceptance rate in her 25-page report.[3]

Because of her unparalleled experience and expertise, Ms. Supko has been employed by numerous other plaintiffs in cases brought against the Government for breach of the Standard Contract. Ms. Supko has offered opinions substantially similar to the Acceptance Rate Report in seven other cases. Those cases were:

---

[3] There is an additional reference to "reasonableness" that does not refer to the acceptance rate. (*Id*. at 14.)

- *Southern Nuclear Operating Company v. United States*, No. 98-614C;
- *Sacramento Municipal Utility District v. United States*, No. 98-488C;
- *Northern States Power Company v. United States*, No. 98-484C;
- *Wisconsin Electric Power Company v. United States*, No. 00-697C;
- *Systems Fuels, Inc. v. United States*, No. 03-2623C (Entergy Arkansas);
- *Systems Fuels, Inc. v. United States*, No. 03-2624C (Entergy Grand Gulf); and
- *Boston Edison Company v. United States*, No. 99-447C.

In each case, the Government has objected; in each case, the Court has permitted Ms. Supko to testify regarding the opinions in the Acceptance Rate Report. Indeed, in *Southern Nuclear I*, Judge Merow recited Ms. Supko's testimony at length, and relied on Ms. Supko's conclusions regarding the acceptance rate. 77 Fed. Cl. at 437-39.

**C. The Government's Position And Motion.**

The Government has not disclosed any expert opinions on acceptance rate issues. Consequently, the Government will not offer any testimony regarding the effect on program objectives of various potential accept rates. Similarly, the Government has not disclosed any expert on what would constitute a "reasonable" acceptance rate under the Standard Contract.

Instead, the Government filed a motion to exclude Ms. Supko's testimony "regarding the reasonableness of the 3,000 metric tons of uranium . . . per year steady-state acceptance rate for the acceptance of spent nuclear fuel . . . that counsel for plaintiff presented to her." (Mot. at 1.) The Government then attacks Ms. Supko's opinion concerning "reasonableness" of a particular acceptance rate as "not at issue in this case." (*Id.* at 11-15.) The Government also asserts that Ms. Supko's opinion on "reasonableness" is not reliable. (*Id.* at 16-20.) Finally, the Government asserts that her model lacks "evidentiary support." (*Id.* at 20-28.)

## II. Argument: Ms. Supko's Acceptance Rate Report Is Admissible Under Rule 702 Because It Is Relevant And Reliable.

We have no quarrel with the Government's recitation of the basic legal standard for admissibility under Rule 702 of the Federal Rules of Evidence. We have cited the same legal standard to the Court in our motions to exclude the Government's putative experts. Under Rule 702, a designated expert may offer opinion testimony if (1) the witness is properly qualified as an expert, (2) the opinion testimony is "based upon sufficient facts or data," (3) the opinion testimony is "the product of reliable principles and methods," (4) "the witness has applied the principles and methods reliably to the facts of the case," and (5) the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. These requirements apply to scientific and non-scientific expert testimony alike. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

However, unlike the testimony proffered by the Government's putative experts, as six Judges of this Court have already concluded, Ms. Supko's opinions from the Acceptance Rate Report meet these standards. ***First***, the Government's arguments focused on "reasonableness" are misplaced and unfounded. The Government's characterization of Ms. Supko's entire Acceptance Rate Report as an opinion on "reasonableness" merely sets up a false straw man – Ms. Supko's report analyzes the effect of various acceptance rate scenarios on the contemporaneously-recognized objectives of the NWPA and the DOE, testimony that is useful to the Court to make its own acceptance rate determination independent of the limited references in Ms. Supko's report on which the Government focuses. (Part I.A.)

***Second***, the Government's attack on the reliability of Ms. Supko's opinions regarding the effect of different acceptance rates – as opposed to the "reasonableness" conclusion – is incorrect. The Government has identified certain additional adjustments it says Ms. Supko

should have made to her model, but the missing link is any showing that those adjustments would be material; the undisputed testimony is that it would not be. (Part I.B.)

### A. The Government's Attack On The "Reasonableness" Issue Is Misdirected And Unfounded.

The Government's entire motion is phrased as a request to exclude Ms. Supko's putative testimony about the "reasonableness" of particular acceptance rate scenarios. The Government asserts that the testimony is irrelevant, and that she did not use a reliable methodology in arriving at a conclusion regarding "reasonableness." (Mot. at 11-20.) The Government's attack on Ms. Supko's testimony regarding "reasonableness" is no ground to exclude her testimony for two reasons.

***First***, the Government's focus on the "reasonableness" issue is a classic straw man the Government has set up simply to knock down. Indeed, the concept of reasonableness is mentioned only in several short references in a 25 page report. The Government has baselessly focused on those lines, characterized Ms. Supko's opinion as about "reasonableness," and then attacked the opinion in that way. But Ms. Supko's analysis is about how different acceptance rate scenarios would affect two factors – how much, in the aggregate, additional at-reactor storage would be required given certain scenarios, and how much, in the aggregate, decommissioning would be delayed. (Acceptance Rate Rpt. at 1.) The determinations on those issues, and the analysis and calculations she performed to make those determinations, are the testimony for which EN relies on Ms. Supko, and intends to call her.[4]

---

[4] For that reason, we do not address the Government's attack (at 16-20) on the "reliability" of the ultimate conclusion regarding "reasonableness," other than to note that the criteria it properly notes apply to experts – a limit to the ability to use subjective judgment based on experience, an examination whether the method was subject to peer review, an examination of whether the opinion is accepted in the community, and an examination of the rate of error – also apply to the Government's purported experts. As we demonstrated in our motion to preclude, in particular,

***Second***, the conclusions Ms. Supko does reach regarding the effect of the acceptance rate on the two criteria counsel asked her to focus on are plainly relevant to the issues in this case. Of course, as noted above (at 8), over the Government's objections, six other Judges on this Court have already reached that conclusion. And that conclusion is clearly right. As this Court has recognized, with no acceptance rate this Court must necessarily look to contemporaneous evidence regarding the parties' intent with respect to the acceptance rate. As several Judges of this Court have concluded, the contemporaneous evidence – including (i) the legislative history of the Nuclear Waste Policy Act ("NWPA"), (ii) numerous DOE program documents issued around the time of the execution of the Standard Contract, and (iii) depositions of DOE personnel given in coordinated discovery – makes clear that DOE viewed the program objectives as including the two criteria EN counsel identified for Ms. Supko (namely, avoidance of additional at-reactor storage in the aggregate, and working off the backlog of accumulated SNF so that decommissioning would not be delayed).[5] It is a matter of common judicial sense that, in

---

the testimony of Charles Stuart (Dkt. No. 112), none of Mr. Stuart's testimony satisfies these criteria.

[5] *See, e.g.*, *Carolina Power & Light Co.*, 2008 WL 2154103, at *19 ("The evidence closest in time to contract execution demonstrates that the parties understood this obligation to mean that DOE would accept enough fuel from Plaintiffs such that they would not have to build any additional at-reactor storage after January 31, 1998."); *Boston Edison Co. v. United States*, 80 Fed. Cl. 468, 486 (2008) ("This court has repeatedly held that DOE should have foreseen that its nonperformance under the Standard Contract would cause nuclear power plants to incur significant storage expenses, given that the avoidance of these costs was the impetus for, and objective of, the NWPA." (quotation and citations omitted)); *Entergy Arkansas I*, 79 Fed. Cl. at 59 ("DOE's planning documents cited avoidance of storage costs as a goal for the SNF program from its inception . . . ."); *N. States Power Co.*, 78 Fed. Cl. at 451-52 ("DOE recognized from the start, however, that fulfillment of the Act's purpose dictated a waste acceptance rate that would eliminate the need for any utility to provide its own at-reactor storage after January 31, 1998" and would exceed the discharge rate.); *S. Nuclear I*, 77 Fed. Cl. at 404 (2007) ("The intent of the NWPA and the parties to the Standard Contract was to avoid the construction by utilities of additional at-reactor storage after January 31, 1998." (quotation and citation omitted)); *Yankee Atomic*, 73 Fed. Cl. at 265 (same); *TVA II*, 69 Fed. Cl. at 519 ("One of the goals of the Nuclear Waste Policy Act was to reduce the backlog of spent nuclear fuel that had accumulated at nuclear

evaluating the reasonableness of various acceptance rate scenarios, the Court will want to consider how well those scenarios would have accomplished the articulated program objectives. Indeed, the evidence also reveals that the DOE reached the same conclusion that Ms. Supko reached in her report – that a 3,000 ton acceptance rate was necessary to achieve those objectives – and the DOE used a 3,000 ton acceptance rate in numerous official program documents.

### B. The Government's Criticisms Of Ms. Supko's Methodology For Determining The Effect Of Different Acceptance Rates Are Immaterial.

The Government also criticizes several aspects of the modeling that Ms. Supko performed to reach the conclusions about the effect of four acceptance rate scenarios on the two criteria identified by counsel, and relevant to the reasonableness determination. The Government asserts (at 13-14) that the acceptance rates modeled do not "have any basis in DOE program documents," and (at 23-29) that the model she used is flawed because it represents elements of both the so-called "breach world" and "non-breach world." The Government's arguments are incorrect.

#### 1. The Acceptance Rate Scenarios Used For Modeling Are Appropriate.

At the outset, the Government's argument that Ms. Supko did not model acceptance rates with any "basis in DOE program" documents is misplaced for two reasons. ***First***, the argument misses the mark because the Government mistakes the purpose of Ms. Supko's model, which is not to model the specifics of an actual alternative reality that the Government considered. Rather, it is to assist Your Honor in determining what rate would meet the objectives conemplated by the NWPA and the parties and is therefore "reasonable" under the circumstances for determining damages. Given that, as the Government argues in the Motion and will no doubt argue again, DOE never made a final year-by-year determination of a specific rate at which it

---

power facilities around the nation. Another goal of the waste disposal program was to reduce utilities' need to provide for storage of spent fuel outside the pools attendant to their reactors.").

would have performed – at least beyond its assertion that the 1991 ACR rate determines the first ten years – the Government's argument that Ms. Supko's scenarios are contrafactual is particularly hypocritical.

***Second***, the Government's factual assertion is baseless. As described in more detail below, all of the rates considered by Ms. Supko, from 900 MTU annually up to 6,000 MTU annually, ***are*** contained in DOE program documents, which Ms. Supko cites in her report. (*See* DOE Documents cited in Acceptance Rate Report at 7-8 n.8-13, Gov't App. 11-12.) Ms. Supko modeled a total of four scenarios, each of which is based on program documents:

- **Scenario 1.** This is the 3,000 MTU base case, which is based on the rate used in every single DOE document since 1995, including DOE's most recent Acceptance Capacity Report, DOE's Total System Life Cycle Cost estimate documents, DOE System Requirements documents, and the Viability Assessment for Yucca Mountain. (*See* DOE Documents cited in Acceptance Rate Report at 7-8 n.8-13, Gov't App. 11-12.) It is correct that the "ramp up" used in the documents cited by the Government from shortly after Standard Contract execution, which also used a 3,000 MTU acceptance rate, had a different ramp up than the scenario Ms. Supko used, but to address this very issue, Ms. Supko performed a sensitivity analysis that showed that difference in ramp up would not affect the results of her analysis. (Acceptance Rate Report at 17-20, Gov't App. 21-24.)
- **Scenario 2.** This is the 900 MTU case. The Government's position in this litigation is that, after a short ramp-up period, for the first 10 years, as reflected in the 1991 Acceptance Capacity Report, the acceptance rate would have been 900 MTUs if acceptance had commenced in 1998. The Government's criticism of this scenario (Mot. at 14) is that Ms. Supko extended it out beyond the first 10 years. While the Government

is correct about what Ms. Supko did, the Government does not mention that she did that because the Government has not identified – in this litigation, or in the 1991 ACR, what the rate would have been after the first 10 years assuming (contrary to fact) that the 1991 ACR rate was implemented. Nor, to counsel's knowledge, has the Government ever ruled out that it would take the position that the rate would have continued on at a 900 MTU rate beyond the first ten years. In light of the Government's refusal to take a position on this issue, there is no basis to criticize Ms. Supko for this reason.

- **Scenario 3.** This scenario is Ms. Supko's attempt to address the issue the Government raises regarding Scenario 2: It is ramping up to the 900 MTU case represented in the 1991 ACR for the first 10 years, and then 1,800 MTU for 5 years, and then 3,000 MTU thereafter. This scenario is based on an evaluation of numerous program documents that contemplate an eventual 3,000 MTU steady state performance, and one DOE document in particular, the 1990 Total System Life Cycle Cost Report, which shows a transition or bridge between the 900 MTU rate in the 1991 ACR and an eventual 3,000 MTU rate. (*See* Acceptance Rate Report at 8 n.13, Gov't App. 12.)
- **Scenario 4.** Although a 6,000 MTU rate does appear in several DOE documents, Ms. Supko states in her report, it is offered as a sensitivity analysis to determine if there is an acceptance rate that may be "too fast"; i.e., is higher than required to achieve program goals, at a cost that is therefore unnecessarily high.

These four scenarios are the best possible to analyze factors based on the known facts available and the fact that this is all hypothetical – i.e., the Government failed to commence acceptance in 1998.

**2. The Adjustments The Government Contends Are Necessary Do Not Undermine The Accuracy Of Ms. Supko's Model.**

The Government's criticism that Ms. Supko modeled a "hybrid" between the breach and non-breach worlds is likewise misplaced. On this score, the Government has essentially identified a number of additional adjustments the Government contends that she should have made to her model – to reflect capacity that was added to pools after 1998, to account for individual utility policies regarding full core operating reserves rather than industry policies, and to account for the fact that some SNF storage pool spaces may not be usable. (Mot. at 24-29.) The Government suggests that these issues render Ms. Supko's conclusions inadmissible because they lack "evidentiary support." (Mot. at 20.)

The Government's argument is misplaced because it misapprehends the nature and purpose of Ms. Supko's model, and omits her testimony that she has analyzed the issues, and the nits the Government picks are not material to her conclusions. ***First***, the Government's position proceeds from the mistaken belief that it is necessary to precisely match certain facts that the Government believes would have been present in the non-breach world in order for Ms. Supko's modeling to have value. But, particularly given the purpose of the SPNTFUEL model, that is unnecessary. The model is intended to estimate additional at-reactor storage necessary under certain assumptions, and the decommissioning wait periods – ***but all in the aggregate***.

Moreover, Ms. Supko is using the SPNTFUEL model in this case solely to reach conclusions about the ***relative*** merits of the four acceptance rate scenarios being examined, not to render some absolute conclusions at any particular plant. Here, the output is used only to compare the relative overall impact on utilities of the 900 MTU acceptance rate proposed by the Government to a 3,000 MTU steady state rate advanced by EN (and to check it against a 6,000 MTU steady-state rate for sensitivity purposes). For example, the Government complains that

Ms. Supko included certain plant modifications made after 1998 at approximately twelve individual plants, which they assert reduced the amount of additional at-reactor storage required under the 3,000 MTU rate scenario. (Mot. at 25-26.) But, as discussed below, those same assumptions would have the same effect – reducing additional at reactor storage – using the other acceptance rates she models.

***Second***, missing from the record is ***any*** showing that the issues the Government has raised would have any effect on the result. The Government has not offered – in this case, or any of the seven other cases in which Ms. Supko's testimony on the acceptance rate was admitted – any contrary testimony from any expert. Similarly, the Government has never offered any testimony from any expert (or DOE fact witness, for that matter) that the changes to the model that it says Ms. Supko should make have a material effect on the outcomes.

Consequently, what the Government is left with is Ms. Supko's testimony on the issue[6] – testimony the Government has failed to bring to the Court's attention. In fact, Ms. Supko testified, in prior trials, and in this case, that she has examined the factors identified by the Government. It is not practical to adjust further some of those factors for the purpose of the aggregate analysis she has performed but, more importantly, Ms. Supko has determined that they would not affect her conclusions. For example, it is neither practical nor necessary to account for the differences in the additional storage added at some plants the Government says should have been considered. Ms. Supko has analyzed whether making the adjustments focused on by the Government would affect the results of her model. It would not. (Entergy Arkansas Trial Test. at 2615-16, S.App. 62; *N. States Power Co.* Trial Test. at 2583, Gov't App. 141.) The

[6] Presumably, testimony about an aspect of a model could be so obvious to the Court that testimony on materiality of a flaw would be unnecessary. But that is not the case here – the model is complex and it is certainly not self-evident that the issues the Government has raised render the model unreliable.

effect on each of the scenarios, an increase in capacity, affects all scenarios similarly. And the 3,000 MTU scenario has more "buffer" before additional storage is necessary, so its advantages over the other scenarios are not diminished. Consequently, while there may be minor differences in the absolute numbers resulting from each scenario, the overall relative outcomes – and the results showing the 3,000 MTU scenario as the closest "fit" to the articulated DOE program objectives – does not change. (Entergy Arkansas Trial Test. at 2615-16, 2674, S.App. 62, 66; *S. Nuclear Operating Co.* Trial Test. at 755, Gov't App. 82; *N. States Power Co.* Trial Test. at 2583, Gov't App. 141.)

There is no showing that the other issues highlighted by the Government are any more material. For example, based on her undisputed industry knowledge, Ms. Supko's model assumes a common practice that each utility maintains space to discharge one full reactor core, known as full core reserve capacity. It is certainly true that some utilities do, from time to time, vary from that standard (which is not required by NRC licenses or any safety concerns), but Ms.Supko has determined that changing that assumption will not affect the overall outcome of her calculations or analysis. (EN Supko Dep. at 58-59, S.App. 60; Entergy Arkansas Trial Test. at 2640-41, S.App. 64-65.) Nor will, as the Government contends, taking account of the "usable capacity" of a pool. (Entergy Arkansas Trial Test. at 2629-32, S. App. 63.) That is a number that can change annually based on how a utility uses a pool, and the numbers she uses are a reasonable representation and a good average. (*Id.*) These adjustments may slightly change the absolute numbers generated by the SPNTFUEL model, but the change will be slight in the aggregate (the issue addressed by the model), and – because they have a similar effect on each scenario – will not change the relative conclusions.

All of these issues are matters that the Government has repeatedly cross-examined

Ms. Supko about in the six previous cases where she has testified, and the Government will no doubt cross-examine her again about those issues assuming she testifies in this case on this issue. At most, they would go to the weight of her testimony (although, as she has explained, they do not undermine that weight). In any case, none of them rise to the level of making her testimony inadmissible in this case.

## Conclusion

Ms. Supko's credentials are undisputed, as is her ability to offer opinions contained in two of the three reports EN disclosed from her in this case. Consequently, she will testify in this case, regardless of the outcome of the Government's motion. Six other Judges of this Court have heard and denied the Government's challenge to the opinions in Ms. Supko's Acceptance Rate Report. She should similarly be permitted to offer that testimony here. For the foregoing reasons, the Court should deny the Government's motion.

Dated: June 30, 2008

Respectfully submitted,

s/ Norman M. Hirsch
NORMAN M. HIRSCH
Jenner & Block LLP
330 N Wabash Avenue
Chicago, IL 60611
(312) 923-2782 telephone
(312) 840-7782 facsimile

OF COUNSEL:

David A. Handzo
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
(202) 639-6000

William D. Heinz
David Jiménez-Ekman
Christopher Tompkins
April A. Otterberg
Jenner & Block LLP
330 N Wabash Avenue
Chicago, IL 60611
(312) 222-9350

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of June 2008, a copy of the foregoing Energy Northwest's Response In Opposition to Defendant's Motion In Limine To Exclude The Testimony Of Eileen Supko was filed electronically with the Court's CM/ECF system. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Norman M. Hirsch