**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# ENERGY NORTHWEST'S APPENDIX IN SUPPORT OF ITS RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF EILEEN SUPKO

---

NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
202-639-6000

June 30, 2008

*Attorneys for Plaintiff*

**Table Of Contents To Appendix**

Unpublished Orders Cited

*Carolina Power & Light Co., and Florida Power Corp. v. United States*, No. 04-3C (82 Fed. Cl. 23, May 19, 2008)....................App. 1

*Dairyland Power Coop. v. United States*, No. 04-0106C, slip op. (Fed. Cl. June 20, 2008)....................App. 36

Documents Cited

Excerpt from the December 7, 2007 Deposition of Eileen Supko....................App. 59

Excerpt from Eileen Supko Testimony in the February 23, 2007 Trial Transcript in *System Fuels, Inc. and Entergy Arkansas, Inc., v. United States*, No. 03-2623C....................App. 61

Westlaw.


Carolina Power & Light Co. v. U.S.
Fed.Cl.,2008.

United States Court of Federal Claims.
CAROLINA POWER & LIGHT COMPANY, and Florida Power Corporation, Plaintiffs,
v.
The UNITED STATES, Defendant.
**No. 04-37C.**

May 19, 2008.

**Background:** Public utility subsidiaries which operated five nuclear reactors brought suit against the United States for partial breach of standard contract for disposal of spent nuclear fuel (SNF).

**Holdings:** The United States Court of Federal Claims, Wheeler, J., held that:
(1) acceptance rate of 3,000 metric tons of uranium (MTUs) per year was reasonable measure of performance of standard contract;
(2) utility was entitled to recover labor costs for work of its employees on breach-related projects in award of damages for government's partial breach of standard contract;
(3) damages award was not subject to reduction for "avoided" cost of loading Department of Energy (DOE) transportation casks when DOE finally arrived to accept SNF; and
(4) utility was not entitled to recover allowance for funds used during construction (AFUDC) representing estimated debt and equity costs of capital funds necessary to finance construction.

Judgment for plaintiffs.

West Headnotes

**[1] Damages 115 ⚷121**

115 Damages
115VI Measure of Damages
115VI(C) Breach of Contract
115k121 k. Partial Performance. Most Cited Cases
In awarding damages for a partial breach of contract, a court must endeavor to place the injured party in as good a position as it would have been had the breaching party fully performed.

**[2] Damages 115 ⚷62(4)**

115 Damages
115III Grounds and Subjects of Compensatory Damages
115III(B) Aggravation, Mitigation, and Reduction of Loss
115k62 Duty of Person Injured to Prevent or Reduce Damage
115k62(4) k. Breach of Contract. Most Cited Cases
If one party to a contract provides notice that it does not intend to perform, the non-breaching party becomes obligated to mitigate damages, meaning that it must take reasonable steps to avoid further losses or damages stemming from the breach.

**[3] Damages 115 ⚷45**

115 Damages
115III Grounds and Subjects of Compensatory Damages
115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)1 In General
115k41 Expenses
115k45 k. Breach of Contract. Most Cited Cases
In a breach of contract case, the non-breaching party is entitled to recover its reasonable costs incurred in its efforts to mitigate damages.

**[4] Damages 115 ⚷22**

115 Damages
115III Grounds and Subjects of Compensatory Damages
115III(A) Direct or Remote, Contingent, or


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Prospective Consequences or Losses
115III(A)1 In General
115k21 Natural and Probable Consequences of Breaches of Contract
115k22 k. In General. Most Cited Cases

**Damages 115 ⚷23**

115 Damages
115III Grounds and Subjects of Compensatory Damages
115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)1 In General
115k21 Natural and Probable Consequences of Breaches of Contract
115k23 k. Under Circumstances Within Contemplation of Parties. Most Cited Cases

**Damages 115 ⚷189**

115 Damages
115IX Evidence
115k183 Weight and Sufficiency
115k189 k. Breach of Contract in General. Most Cited Cases

To recover damages for breach of contract, plaintiffs must show that: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach was a substantial causal factor in the incurrence of damages; and (3) the damages are established with reasonable certainty.

**[5] Damages 115 ⚷45**

115 Damages
115III Grounds and Subjects of Compensatory Damages
115III(A) Direct or Remote, Contingent, or Prospective Consequences or Losses
115III(A)1 In General
115k41 Expenses
115k45 k. Breach of Contract. Most Cited Cases

To eliminate or reduce plaintiff's mitigation damages in a breach of contract case, a defendant must show that the plaintiff's mitigation efforts were inappropriate or unreasonable.

**[6] Damages 115 ⚷117**

115 Damages
115VI Measure of Damages
115VI(C) Breach of Contract
115k117 k. Mode of Estimating Damages in General. Most Cited Cases

Breaching party in a breach of contract case may seek deductions from damages for costs that the non-breaching party avoided by not having to perform.

**[7] United States 393 ⚷74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases

Acceptance rate of 3,000 metric tons of uranium (MTUs) per year was reasonable measure of performance of standard contract for disposal of spent nuclear fuel (SNF) by the Department of Energy (DOE), for purposes of measuring damages for partial breach of standard contract; overwhelming weight of evidence demonstrated that both DOE and nuclear utilities expected DOE to accept between 2,650 MTUs and 3,000 MTUs per year from the industry.

**[8] United States 393 ⚷74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Government was not entitled to deduct costs incurred by nuclear utility in removing CRUD, sludge, and unused racks from spent fuel pools from award of damages for partial breach of standard contract for disposal of spent nuclear fuel (SNF), on ground that utility would have incurred such costs even absent the breach at time of plant's decommissioning either in 2026 or 2046, absent any credible evidence showing with reasonable certainty what such costs would be in 2026 or 2046.

**[9] United States 393 ⚷74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases

Nuclear utility was entitled to recover railroad track maintenance costs in award of damages for government's partial breach of standard contract for disposal of spent nuclear fuel (SNF), where partial breach caused utility to transport SNF by rail to one of its plants for interim storage, requiring periodic maintenance and safety checks on rail lines, notwithstanding government's speculative assertion that Department of Energy (DOE) would have accepted fuel by rail if had performed, and thus such costs would have been incurred in any case.

**[10] United States 393 ⚷74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases

Nuclear utility was entitled to recover labor costs for work of its employees on breach-related projects in award of damages for government's partial breach of standard contract for disposal of spent nuclear fuel (SNF), notwithstanding government's contention that only labor costs for hourly employees, and salaried employees who spent more than 50 percent of their hours on a breach-related project during any one year qualified as incremental to the breach, as government's “50 percent rule” was arbitrary and without support in law.

**[11] United States 393 ⚷74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases

Nuclear utility was entitled to recover stores overhead and indirect overhead expenses in award of damages for government's partial breach of standard contract for disposal of spent nuclear fuel (SNF), notwithstanding government's objection that utility could not recover any portion of overhead costs because they were fixed costs which were not incremental to the breach, as overhead costs were incurred and were properly attributable to mitigation projects and activities.

**[12] United States 393 ⚷74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases

Nuclear utility was entitled to recover cost of study to determine if existing crane at plant would need modification and upgrade to lift heavier dry storage casks in award of damages for government's partial breach of standard contract for disposal of spent nuclear fuel (SNF), notwithstanding government's objection that utility failed to explain why costs incurred to perform crane studies would not have been performed in the absence of breach.


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[13] United States 393 ⚷74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases

Nuclear utility was entitled to recover licensing and communications expenses incurred in activating additional spent fuel storage pools in award of damages for government's partial breach of standard contract for disposal of spent nuclear fuel (SNF), notwithstanding government's objection that such costs were not a direct result of government's delay in performance.

**[14] United States 393 ⚷74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases

Nuclear utility was not entitled to recover cost of upgrading component cooling water (CCW) system at nuclear power plant in award of damages for government's partial breach of standard contract for disposal of spent nuclear fuel (SNF), where utility likely would have performed the upgrades of power uprate and steam generator replacement, even if the Department of Energy had begun accepting spent SNF at the plant on January 31, 1998, pursuant to the standard contract.

**[15] United States 393 ⚷74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases

Nuclear utility was not entitled recover to cost of re-rack operation at nuclear power plant in award of damages for government's partial breach of standard contract for disposal of spent nuclear fuel (SNF); although evidence showed that re-rack project did provide additional SNF storage space, it also showed that utility would most likely have performed the project in any event absent government's breach.

**[16] United States 393 ⚷74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases

Award of damages to nuclear utility for government's partial breach of standard contract for disposal of spent nuclear fuel (SNF) was not subject to reduction for “avoided” cost of loading Department of Energy (DOE) transportation casks when DOE finally arrived to accept SNF, as such costs were not avoided but merely deferred; moreover, government failed to present any evidence showing with reasonable certainty what such costs would have been if it had performed.

**[17] United States 393 ⚷74(14)**

393 United States
393III Contracts
393k74 Rights and Remedies of Contractors
393k74(12) Damages and Amount of Recovery
393k74(14) k. Delay. Most Cited Cases

Nuclear utility was not entitled to recover allowance for funds used during construction (AFUDC) representing estimated debt and equity costs of capital funds necessary to finance construction in award of damages for government's partial breach of standard contract for disposal of spent nuclear


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fuel (SNF), absent evidence tying borrowed money to specific breach-related projects.

***25** Brad Fagg, with whom were Paul M. Bessette, and David M. Kerr, Morgan Lewis & Bockius, LLP, Washington, D.C., for Plaintiffs.
Andrew P. Averbach, with whom were Jeffrey S. Bucholtz, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and ***26** Harold D. Lester, Jr., Assistant Director, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C., Jane K. Taylor, Marian E. Sullivan, Christopher J. Carney, Lisa L. Donahue, and Stephen Finn, of Counsel, for Defendant.

*OPINION AND ORDER*

WHEELER, Judge.FN1

FN1. This case was transferred to Judge Thomas C. Wheeler on December 5, 2005, pursuant to Rule 40.1(b) of the Rules of the Court of Federal Claims.

Plaintiffs Carolina Power & Light Company ("CP & L") and Florida Power Corporation ("FPC") claim damages of $91,029,704 from Defendant caused by the failure of the Department of Energy ("DOE") to collect and dispose of spent nuclear fuel beginning January 31, 1998 under the terms of DOE's Standard Contract. CP & L and FPC are wholly-owned subsidiaries of Progress Energy, Inc., a public utility in the southeast United States. Plaintiffs' damages consist of costs incurred in mitigation of DOE's partial breach of the Standard Contract. This Court has jurisdiction over Plaintiffs' claim pursuant to the Tucker Act, 28 U.S.C. § 1491(a). *See PSEG Nuclear, LLC v. United States,* 465 F.3d 1343 (Fed.Cir.2006). Defendant's liability for partial breach of contract has been established. *See Maine Yankee Atomic Power Co. v. United States,* 225 F.3d 1336, 1337-40 (Fed.Cir.2000) ("*Maine Yankee*"); *N. States Power Co. v. United States,* 224 F.3d 1361, 1367 (Fed.Cir.2000). Thus, only damages are at issue.

CP & L and FPC (collectively "Progress Energy" or "Plaintiffs") operate five nuclear reactors at four power plants in North Carolina, South Carolina, and Florida. The power plants are known as Harris, Brunswick, Robinson, and Crystal River. Plaintiffs' damages claims fall into five categories: (1) $208,120 to complete a study for a dry storage facility known as an Independent Spent Fuel Storage Installation ("ISFSI") at the Brunswick plant; (2) $32,734,951 to activate two additional spent fuel storage pools at the Harris plant; (3) $16,975,182 to ship spent fuel from the Robinson and Brunswick plants to the Harris plant; (4) $36,436,059 to construct and load the Robinson plant ISFSI; and (5) $4,675,392 to design, construct, and replace spent fuel racks at the Crystal River Plant.

The United States Court of Appeals for the Federal Circuit has held that nuclear utilities may recover proven incurred costs as mitigation damages for DOE's partial breach, but may not recover forecasted future costs. *Indiana Michigan Power Co. v. United States,* 422 F.3d 1369, 1375-77 (Fed.Cir.2005) ( "*Indiana Michigan*"). Consequently, Plaintiffs have limited their claims in this case to costs incurred through December 31, 2005. In accord with the *Restatement (Second) of Judgments* § 26 (1982), Plaintiffs retain the right to bring later actions on claims for damages incurred thereafter. *See Indiana Michigan,* 422 F.3d at 1378.

Defendant opposes Plaintiffs' claims in part, but acknowledges that Plaintiffs at a minimum are entitled to recover $44,339,037. Defendant accepts responsibility for an additional $16,962,904, increasing the total to $61,301,941, if the Court agrees with Plaintiffs' view of DOE's obligations under the Standard Contract. Defendant's objections to Plaintiffs' damages generally are that: (1) Plaintiffs have not properly credited DOE for costs they would have incurred absent the breach; (2) Plaintiffs have not shown that certain costs increased incrementally as a result of the breach; and (3) certain costs were not caused by the breach, or are otherwise unsupported or unallowable. Defend-


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ant agrees that Plaintiffs' claimed costs were foreseeable at the time of contracting, and that the incurred costs were reasonable.

The Court conducted a nine-day trial in Washington, D.C. during November 5-16, 2007. The witnesses in order of appearance were: Lou Martin, former manager of nuclear fuel at Progress Energy; Steve Edwards, supervisor of Progress Energy's Spent Fuel Management Unit; Robert Kunita, former CP & L senior engineer; Alva Wayne Worthington, Progress Energy's lead engineer of the Spent Fuel Management Unit; Michael Culver, a Progress Energy reactor engineer; Dean Tibbitts, a Progress Energy engineer; ***27** Tom Lehmann, former FPC nuclear chemistry manager; Ted Williams, superintendent of major projects at Progress Energy; Tom Pollog, a DOE engineer in the Office of Waste Management within DOE's Office of Civilian Radioactive Waste Management ("OCRWM"); Robert Morgan, DOE's former director of OCRWM; David Zabransky, a nuclear utility specialist in the OCRWM's Office of Waste Management; Mike Calvello, manager of Nuclear Generation Business Services at Progress Energy; Defendant's experts, Gregory Maret and Larry Johnson; and Michael Lawrence, DOE's former director of the OCRWM.

The Court also accepted the parties' designations of previous deposition and trial testimony from eight witnesses who were unable to testify at trial: Lake H. Barrett, DOE's former deputy director of the OCRWM; Alan Brownstein, DOE's former director of the OCRWM Regulatory Coordination Division; Christopher Kouts, DOE's former director of the OCRWM Office of Waste Management; Loring E. Mills, former executive with the Edison Electric Institute ("EEI"); Ronald Milner, former chief operating officer of the OCRWM; Robert M. Rosselli, former director of DOE's Resource Management Division; Nancy H. Slater, former team leader in the OCRWM Regulatory Coordination Division; and Victor W. Trebules, former director of the Office of Project Control at OCRWM. The parties filed post-trial briefs on January 22, 2008, and reply briefs on February 19, 2008. The Court heard closing arguments on April 4, 2008.

For the reasons explained below, the Court finds that Plaintiffs are entitled to recover $82,845,926 in mitigation damages through December 31, 2005. The Court agrees in large part with Plaintiffs' interpretation of DOE's Standard Contract. In furtherance of the purposes of the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101-10270 (1982), the intent of the Standard Contract was for DOE to begin collecting and disposing of spent nuclear fuel beginning January 31, 1998, and to do so in sufficient quantities so that nuclear utilities would not need to provide any additional storage facilities at individual reactor locations. DOE contemplated the establishment of two central repositories, and an interim storage facility if needed, where the spent fuel would be stored. One of these repositories was to be located at Yucca Mountain, Nevada. As events unfolded, the central repositories were not established, and DOE did not collect or dispose of any spent fuel beginning January 31, 1998. To date, DOE has yet to collect and dispose of any spent fuel, even as nuclear plant owners have been paying billions of dollars in fees to DOE under the Standard Contract. Plaintiffs alone have paid DOE $661 million in fees through December 31, 2005.

The Court has disallowed four elements of Plaintiffs' damages claim. For two such items, the Crystal River re-rack project ($4,675,392) and the Harris component cooling water system upgrade ($1,166,640), the Court concludes that Plaintiffs would have incurred these expenses for other reasons absent DOE's partial breach. For various manual journal entries challenged by Defendant ($345,701), Plaintiffs have not met their burden of showing what these expenses were for, or whether they were caused by DOE's breach. Plaintiffs' claim for Allowance for Funds Used During Construction ("AFUDC") ($1,996,045) is in reality a claim for interest against the Government, and is unallowable by law. *See*28 U.S.C. § 2516(a). Deduction of these


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

disallowed items from Plaintiffs' total claim, $91,029,704, yields a recovery to Plaintiffs of $82,845,926.

*Findings of Fact* FN2

FN2. This statement of facts constitutes the Court's principal findings of fact under Rule 52(a) of the Court. Other findings of fact and rulings on mixed questions of fact and law are set forth in the later analysis.

A. *Progress Energy's Nuclear Power Plants*

In December 2000, CP & L merged with FPC and became known as Progress Energy. (Edwards, Tr. 223).FN3 One effect of this ***28** merger was to place all of the nuclear plants of CP & L and FPC into one organization. *Id.* CP & L is the majority owner of the Harris and Brunswick plants, and the full owner of the Robinson plant. (Stip. 5). FPC is the majority owner of the Crystal River plant. (Stip. 6). For convenience, the Court will refer to "Progress Energy" in describing events that apply both to CP & L and FPC.

FN3. In this opinion, the Court will refer to the trial transcript by witness and page as "Name, Tr. _____," and to trial exhibits as "PX _____" for Plaintiffs' exhibits, and "DX_____" for Defendant's Exhibits. The expert witnesses presented their expert analyses through demonstrative exhibits, which the Court will refer to as "PX-D_____" for Plaintiffs, and "DX-D_____" for Defendant. The parties' joint pretrial stipulations of fact, filed on October 19, 2007, are referred to as "Stip. _____." The Court will refer to the testimony of the eight witnesses who were unable to attend the trial as "Name, *Case Name,* Tr. _____," or if the previous testimony was by deposition as "Name, Date Dep., Tr. _____." For lengthy exhibits, citations include a page number where available, or otherwise a reference to the last four digits of Bates numbers.

*Harris* is a single unit pressurized water reactor ("PWR") located near New Hill, North Carolina, southwest of Raleigh. (Stip. 24). The Harris plant began commercial operation in 1987 and currently is licensed to operate through 2026. (Stip. 25). In 2006, Progress Energy submitted an application to the Nuclear Regulatory Commission ("NRC") to renew the Harris operating license for an additional 20 years. (Stip. 26).

*Brunswick* is a two unit boiling water reactor ("BWR") located near Southport, North Carolina, on the Atlantic Coast south of Wilmington. (Stip. 48). Brunswick Units 1 and 2 began commercial operations in 1977 and 1975, and are licensed to operate through 2036 and 2034 respectively. (Stip. 49).

*Robinson* is a single unit PWR located near Hartsville, South Carolina. (Stip. 34). Robinson began commercial operation in 1971 and is licensed to operate through 2030. (Stip. 35).

*Crystal River* is a single unit PWR located near Crystal River, Florida, on the Gulf Coast north of Tampa. (Stip. 19). The Crystal River plant began commercial operation in 1977 and currently is licensed to operate through 2016. (Stip. 20). Progress Energy plans to submit an application to the NRC in September 2008 to renew the Crystal River operating license for an additional 20 years. (Edwards, Tr. 232, 235).

B. *The Nuclear Waste Policy Act*

In 1977, President Carter announced that reprocessing of spent nuclear fuel and the development of advanced plutonium-based reactors in the United States would be deferred indefinitely. *See*H.R.Rep. No. 97-491(I), at 27 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3794. President Carter adopted this policy to curb the potential for proliferation of nuclear weapons arising from an expanded plutoni-


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

um-based nuclear economy. *Id.* The new policy caused a spent fuel bottleneck in the United States. Domestic nuclear reactors had not been designed with lifetime spent fuel storage capacity, and no near-term destination for spent fuel existed. H.R.Rep. No. 97-491(I), at 28; (Martin, Tr. 73, 80).

On January 7, 1983, Congress passed the Nuclear Waste Policy Act of 1982 ("NWPA"), Pub.L. 97-425, 96 Stat. 2201, codified at 42 U.S.C. §§ 10101-10270 (1982). In adopting the NWPA, Congress recognized that "radioactive waste creates potential risks and requires safe and environmentally acceptable methods of disposal," and that "a national problem has been created by the accumulation of [spent nuclear fuel]." 42 U.S.C. § 10131(a)(1)-(2). Congress also found that:

> [W]hile the Federal Government has the responsibility to provide for the permanent disposal of high-level radioactive waste and such spent nuclear fuel as may be disposed of in order to protect the public health and safety and the environment, the costs of such disposal should be the responsibility of the generators and owners of such waste and spent fuel.

§ 10131(a)(4). The NWPA further provided that the generators and owners of spent fuel had the responsibility to provide for, and pay the cost of, interim storage of spent fuel "until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this Act."§ 10131(a)(5).

In pursuit of the NWPA's objectives, Congress directed the Secretary of DOE to "enter into contracts with any person who generates***29** or holds title to high-level radioactive waste, or spent nuclear fuel, of domestic origin for the acceptance of title, subsequent transportation, and disposal of such waste or spent nuclear fuel." § 10222(a)(1). Congress required the contracts to provide that:

> (A) following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved *as expeditiously as practicable* upon the request of the generator or owner of such waste or spent fuel; and
>
> (B) in return for the payment of fees established by this section, the Secretary *beginning not later than January 31, 1998,* will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subtitle.

§ 10222(a)(5) (emphasis added). Congress mandated that the utilities' fees be sufficient to support the costs of the Government's spent fuel disposal efforts. § 10222(a)(2)-(3).

C. *The Standard Contract*

On February 4, 1983, DOE published in the Federal Register the proposed terms for the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste" (the "Standard Contract"). 48 Fed.Reg. 5458 (Feb. 4, 1983); (Stip. 8). DOE received many comments to the proposed Standard Contract from utilities and industry representatives, including CP & L and FPC. (Stip. 10; Martin, Tr. 136-40; PX 6). Nuclear plant owners and operators were required to enter into DOE's Standard Contract as a condition to obtaining renewal of their operating licenses. *Indiana Michigan,* 422 F.3d at 1372 (citing 42 U.S.C. § 10222(a)(1); *Maine Yankee,* 225 F.3d at 1337), (Morgan, Tr. 1419-20). Consequently, the Standard Contract was not the product of any negotiation. (Lawrence, Tr. 2135). Utilities effectively had no choice but to sign the Standard Contract, or risk having the NRC shut down their nuclear power plants. (Morgan, Tr. 1419-20).

DOE issued the Standard Contract as a final rule on April 18, 1983. 48 Fed.Reg. 16590 (Apr. 18, 1993); (Stip. 11). CP & L executed the Standard Contract on June 3, 1983, and FPC executed the Standard Contract on June 30, 1983. (PX 10, 11). CP & L's contract covered the spent fuel generated at the


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Brunswick, Harris, and Robinson plants. (Stip. 12). FPC's contract covered the spent fuel generated at the Crystal River plant. *Id.* The provisions of the CP & L and FPC Standard Contracts were identical. (PX 10, 11).FN4

FN4. In describing the Standard Contract, the Court will refer to CP & L's contract (PX 10), although the terms of the FPC contract (PX 11) are the same. The terms and provisions of the Standard Contract also are available at 10 C.F.R. § 961.11 (1983).

Consistent with the intent of the NWPA, the Standard Contract required DOE to "accept title to all SNF ... provide subsequent transportation for such material to the DOE facility, and dispose of such material in accordance with the terms of this contract." (PX 10, Article IV, B, "DOE Responsibilities"). DOE was required to begin performance "after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF ... has been disposed of." (PX 10, Article II, "Scope"). The Standard Contract required DOE to issue an annual capacity report ("ACR") every year, beginning no later than July 1, 1987, to project DOE's annual spent fuel receiving capacity for the ten years "following the projected commencement of operation of the initial DOE facility." (PX 10, Article IV, B, 5(b)). DOE was required to issue an annual acceptance priority ranking ("APR") beginning April 1, 1991 to identify the order in which spent fuel and other high level waste would be collected, with the general rule being that the oldest fuel or waste would be picked up first. (PX 10, Article IV, B, 5(a)). After DOE issued an APR, the Standard Contract required each utility to submit a delivery commitment schedule ("DCS") to DOE identifying the spent fuel that the utility "wishe[d]" to deliver to DOE beginning sixty-three months thereafter. (PX 10, Article V, B, "Delivery Commitment Schedule"). DOE would approve or disapprove the DCS within three months of receipt. *Id.* If DOE disapproved a DCS, it would advise the utility of the reasons for disapproval, and the ***30** utility would have 30 days to submit a "revised schedule." *Id.* Utilities had the right to adjust the quantities of spent fuel up or down by 20 percent, and, subject to DOE's approval, to exchange an approved DCS with other utilities higher up the APR list. *Id.*

The Standard Contracts required utilities to pay certain fees to DOE. (PX 10, Article VIII, "Fees and Terms of Payment"). CP & L and FPC agreed to pay a one-time fee to cover spent fuel discharged through April 1983. *Id.* CP & L, for example, made a $100 million dollar payment to DOE in 1983. (Martin, Tr. 79). The Standard Contract also required the payment of quarterly fees after April 1983. Through December 31, 2005, Progress Energy, CP & L, and FPC have paid approximately $661 million in fees to DOE for the disposal of spent fuel under Plaintiffs' Standard Contracts. (Stip. 16).

D. *The Acceptance Rate*

The Standard Contract did not contain a specific acceptance rate, but instead established a process by which DOE would identify and collect quantities of spent fuel from the utilities. (PX 10, Articles IV-VII). Although lacking a specific rate, the Standard Contract required DOE to take title to, transport, and dispose of all spent nuclear fuel or high-level radioactive waste "as expeditiously as practicable," commencing not later than January 31, 1998. (PX 10 at 1, 6, 9). Progress Energy's manager of nuclear fuel understood these terms to mean that, after January 31, 1998, utilities would not have to provide any additional storage at their nuclear reactors. (Martin, Tr. 84-85; PX 35 at 8). His expectation was that the Standard Contract, once DOE began performance in 1998, would "solve [Progress Energy's] spent fuel storage problems." (Martin, Tr. 80).

This understanding of DOE's obligation was based on both the provisions of the Standard Contract,


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and DOE's contemporaneous written and oral communications. For example, DOE assumed in a June 1983 report on financing the disposal of spent fuel that its acceptance rate for the nuclear industry would be 1,800 metric tons of uranium ("MTUs") per year for the first five years, and 3,000 MTUs per year thereafter. (PX 8 at 9). DOE confirmed the five-year ramp up to a permanent 3,000 MTU acceptance rate in its February 1985 "Nuclear Waste Fund Fee Adequacy: An Assessment." (PX 27 at 3). According to Mr. Martin, the nuclear industry was discharging approximately 2,000 MTUs per year during the mid-1980s. Consequently, DOE's planned 3,000 MTU per year acceptance rate "would be consistent with DOE's taking fuel on a schedule that did not require [Progress Energy] to be adding ... storage capacity." (Martin, Tr. 108).

In December 1983, Robert Morgan, DOE's Acting Director of OCRWM, advised the nuclear industry that:

> Technically, the Act does not specify how much waste or spent fuel we must begin receiving [on January 31, 1998]. In fact, if we accepted one spent fuel element in 1998 we would technically be in accordance with the Act. However, we did not believe that that meets the intent of the Act. The basic strategy which we've outlined in the mission plan, is that beginning in 1998, utilities will not have to provide any additional storage facilities on site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location.

(PX 19 at 11). Two months later, Michael Lawrence, DOE's next Acting Director of OCRWM, testified to Congress that the "fundamental objective" of the NWPA was "to accept high-level radioactive waste for safe management, storage and permanent disposal on a firm schedule, beginning not later than January 31, 1998." (PX 21 at 2). Mr. Lawrence further explained that "[b]y achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998, and, ultimately, remove all eligible waste from at-reactor storage." *Id.*

Progress Energy also based its understanding of DOE's acceptance rate obligation on statements made in DOE's draft mission plans and its June 1985 final mission plan. ***31** The NWPA required DOE to prepare the mission plan to provide an "informational basis sufficient to permit informed decisions to be made in carrying out the repository program...."42 U.S.C. § 10221(a). Congress required the mission plan to include, among other things, an estimate of the "total repository capacity required to safely accommodate the disposal of all high-level radioactive waste and spent nuclear fuel expected to be generated through December 31, 2020," the number and type of repositories required to provide such disposal, and the acceptance schedule for each repository. § 10221(a)(9).

The December 20, 1983 draft mission plan, which DOE circulated to Congress and the utilities, stated that the "waste acceptance schedule will, initially, preclude the need for additional at-reactor storage after January 31, 1998 and, ultimately, remove from at-reactor storage all waste that is more than 5-years old." (PX 17 at 1078). In this draft mission plan, at "Table II-1: Waste Acceptance Schedule," DOE projected two repositories. The first repository would accept spent fuel at a rate of 1,800 MTUs for the first five years, and 3,000 MTUs thereafter. DOE projected that after five years, a second repository with identical acceptance rates would become operational. This plan meant that in 2003, the sixth year of the program, DOE would accept 4,800 MTUs from the nuclear industry, 3,000 MTUs in the first repository and 1,800 MTUs in the second. DOE estimated that only 2,718 MTUs of spent fuel would be generated in the nuclear industry in 2003. The remainder of the 4,800 MTU acceptance capacity in 2003 would be applied toward reducing the backlog of older fuel. *Id.* at


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1082.

According to the 1983 draft mission plan, DOE recognized the possibility that the 1,800 MTU acceptance rate during the first five years would not cover the total spent fuel generated for each individual utility. *Id.* at 1081-82. DOE planned, however, that if a utility encountered such a problem, it could "arrange for the right to ship spent fuel to the Department from a utility who is next in queue in shipment allocation...."*Id.* at 1081-83. The draft mission plan also stated that DOE did "not intend to delay or postpone the acceptance of civilian radioactive wastes even if a permanent geologic repository is not completed by 1998." *Id.* at 1080. DOE planned to avoid any untimely performance through use of a Federal Interim Storage or Monitored Retrievable Storage ("MRS"). (PX 17 at 1080; Lawrence, Tr. 2086-87). DOE planned for the MRS, if necessary, to receive spent fuel at the same rate that DOE was planning for the permanent repository. (Lawrence, Tr. 2151; PX 31 at 126; PX 36 at 20).

DOE published the final version of the mission plan in June 1985. (PX 31). The mission plan adopted as the "authorized system" a phased repository acceptance schedule with the first repository receiving 3,000 MTUs per year after a five-year ramp up period. *Id.* at 26. The mission plan's acceptance rates were based in part on attempting to keep pace with spent fuel discharges and alleviating the need for additional storage at nuclear reactors. (Pollog, Tr. 1231-32). The mission plan also outlined an "Improved Performance System," illustrating the possibility of incorporating an MRS into the program. (PX 31 at 27). DOE described the expected role of an MRS in the Federal Waste Management Program:

> The MRS facility would allow the DOE to accept spent fuel without interruption even if the repository is delayed or its emplacement operations are reduced. The MRS facility would safely store spent fuel until the repository was capable of receiving and emplacing it. Moreover, waste-acceptance activities would not be affected by temporary slowdowns or other operational problems that could be experienced at the repository. Consequently, a firm schedule for spent-fuel acceptance could be established to accommodate the DOE's contractual commitments to the utilities paying fees into the Nuclear Waste Fund.

*Id.* at 73. The waste acceptance schedule for the Improved Performance System provided for the MRS to accept spent fuel prior to 1998 and to achieve a steady rate of 3,000 MTUs per year starting in 1998. *Id.* at 27. According to DOE, this proposed schedule would "provide assurance that the DOE's acceptance of spent fuel in 1998 and subsequent***32** years will be at sufficient rates to meet obligations." *Id.* at 87.

DOE's internal correspondence also is relevant in assessing the agency's understanding. In a July 23, 1984 letter, Mr. Lawrence, then manager of DOE's Richland, Washington Operations Office, observed:

> It should be noted that to eliminate the need for additional at-reactor storage after January 31, 1998, the initial waste acceptance rate for 1998 should be about 2,800 MTU plus some amount up to 630 MTU, depending upon the extent Federal Interim Storage is utilized.

(PX 26 at 1199). In attached comments to his letter, Mr. Lawrence stated:

> Based upon our interpretation of the NWPA, the minimum acceptance rate should be based upon the rate at which spent fuel is generated by civilian nuclear power reactors. This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998.

*Id.* at 1201. Mr. Lawrence confirmed at trial that these statements reflected his interpretation of the NWPA. (Lawrence, Tr. 2174).

A September 15, 1983 DOE memorandum similarly states that "the central criteria for this schedule is


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

an acceptance rate during the first 5 years such that no utility would have to build additional storage facilities after 1998." (PX 15 at 1046).

Lake Barrett, another of DOE's deputy directors of OCRWM, testified in a deposition that in 1986, DOE was designing a system to receive 3,000 MTUs a year. He stated "[m]y recollection is that the MRS was to receive 3,000 tons a year circa that time prior to the amendments act, which was in excess of the generation rate of around 2,000." (Barrett, Apr. 22, 2002 Dep., Tr. 51-52). Mr. Barrett explained that accepting fuel in excess of the generation rate was "significant" because DOE had to "design a system to remove the backlog of materials that were accumulating under the intent of the act." *Id.* at 52. Mr. Barrett confirmed that the 3,000 MTU per year rate was consistent with the intent of the NWPA to reduce the backlog of spent fuel throughout the nation in a reasonable period of time. *Id.* at 59; (*see also* Barrett, May 10, 2002 Dep., Tr. 1163-66).

Based upon DOE's assertions and its own understanding, CP & L's 1986 Spent Fuel Management Plan reported that "DOE is currently planning to remove from utility storage all spent fuel on a schedule that will preclude utilities from having to provide any additional storage capacity at nuclear power plant sites after January 31, 1998."(PX 35 at 8).

E. *DOE's Partial Breach*

By 1987, DOE knew that it would not have a functioning permanent repository to begin accepting spent fuel on January 31, 1998. DOE estimated that a permanent repository would be delayed at least five years, until 2003. (DX 59 at 6). On March 31, 1987, DOE submitted a proposal to Congress for construction of an MRS facility in Tennessee capable of "[f]ull-scale operation at a rate of about 2500 to 3000 MTU per year." (PX 36 at 20; DX 59 at 11). Mr. Lawrence testified that, at the time of contract formation in 1983, there was no reason for the MRS acceptance rate to differ from the permanent repository acceptance rate. (Lawrence, Tr. 2151). DOE planned to use the MRS facility to act "as a system buffer that would allow continued waste acceptance regardless of changes in the schedule of waste emplacement for the first several years of operation at the first repository." (DX 59 at 11). Expecting a five-year delay in the permanent repository, DOE requested Congress to limit the storage capacity for the MRS to 15,000 MTUs and it designed the MRS facility to have a 3,000 MTU acceptance rate capacity. (Kouts, *Pac. Gas,* Tr. 2775-76; Milner, May 3, 2002 Dep., Tr. 555-56; PX 36 at 20; DX 59 at 5, 11).

In 1987, Congress amended the NWPA and authorized DOE to construct an MRS facility. *See*Nuclear Waste Policy Amendments Act of 1987, Pub.L. No. 100-203, §§ 5001-5065, 101 Stat. 1330, 1330-227 to 1330-255 (1987) (codified in scattered sections of Title 42). Recognizing the potential for the MRS to become the de facto repository, Congress set two conditions for the start ***33** of MRS operations: (1) construction could not begin until a license was issued for the construction of a permanent repository; and (2) storage capacity at the MRS could not exceed 10,000 MTUs. 42 U.S.C. § 10168(d)(1), (3). In June 1987, DOE published its first statutorily required ACR, noting that it was "for planning purposes only, and, thus, is not contractually binding on either DOE or the Purchasers." (PX 38 at 2). The 1987 ACR adopted the acceptance rate schedule of the 1987 Mission Plan Amendment: 1,200 MTUs annually during 1998-2002, 2,000 MTUs in 2003, and 2,650 MTUs annually thereafter. (PX 38 at 7).

By November 1989, DOE projected a "significant slip for the expected start of repository operations-from the year 2003 to approximately 2010." (DX 71 at vii). In April 1991, DOE published its first official APR setting the order of fuel acceptance based on the "oldest fuel first." (Pollag, Tr. 1312, 1321-22; DX 99). DOE also published the 1991 ACR with acceptance rates based on three key as-


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sumptions: only an MRS facility would be operable, the MRS would have a 10,000 MTU capacity, and Congress would amend the NWPA to remove the condition that construction of the MRS could not begin until a license was issued for a permanent repository. (PX 53 at 4-5). Based on these assumptions, DOE projected an acceptance rate of 400 MTUs in 1998, 600 MTUs in 1999, and 900 MTUs annually during 2000-2007, for a total of 8,200 MTUs through 2007. *Id.* No acceptance rates beyond 2007 were projected. DOE, however, never proposed and Congress never passed an amendment to remove the linkage between the MRS facility and the licensing of a permanent repository. (Kouts, *Sys.Fuels,* Tr. 3480, 3540-41).

In 1991, the General Accounting Office ("GAO") reported that "it is unlikely that DOE will meet its objective to have an MRS facility operating by 1998." (PX 156 at 19). In 1995, President Clinton stated that he would veto proposed legislation removing the linkages between a permanent repository and an MRS facility. *Sys. Fuels, Inc. v. United States,* 79 Fed.Cl. 37, 47 (2007). Even though performance was "unlikely" and even though two of DOE's three assumptions underlying the 1991 ACR's 900 MTU rate were unrealistic and in fact never came to pass, DOE continued to apply the 900 MTU rate in its 1995 ACR. (Milner, May 3, 2002 Dep., Tr. 412; PX 60 at 4). Like all previous ACRs, the 1995 ACR stated that it was "for planning purposes only and thus is not contractually binding on DOE or the Purchasers." (Pollog, Tr. 1247-48; PX 53 at 1-2; PX 60 at 1). By 1995, DOE had announced that it would not accept *any* spent fuel until a permanent repository or temporary facility was built, or until 2010 at the earliest. *See Indiana Michigan,* 422 F.3d at 1372 (citing 59 Fed.Reg. 27,007-27,008 (May 25, 1994); *Maine Yankee,* 225 F.3d at 1338).

When DOE began accepting DCSs in 1992, it expected the utilities to adhere to the 900 MTU rate set forth in its 1991-1995 ACRs. (Zabransky, Tr. 1498; Pollag, Tr. 1277-78; PX 53 at 7; PX 55 at 1090). Plaintiffs complied with DOE's DCS instructions without complaint and submitted DCSs according to the allocation set forth in the most recent ACR/APR. (Stip. 17; Kunita, Tr. 746, 759; DX 119 at 0036; DX 129; DX 136; DX 170; DX 172). DOE suspended approval of the DCSs after the United States Court of Appeals for the District of Columbia Circuit issued its decision in *Indiana Michigan Power Co. v. Dep't of Energy,* 88 F.3d 1272, 1277 (D.C.Cir.1996), holding that DOE's obligation to pick up spent fuel was not conditioned upon the existence of a facility to receive the spent fuel. (Stip. 18). Today, DOE is not approving any DCSs from any utility. (Zabransky, Tr. 1527; Pollog, Tr. 1290).

In 2004, DOE published another ACR, this time with a ramp up to a 3,000 MTU acceptance rate based on the assumption that a repository would be operational at Yucca Mountain, Nevada beginning in 2010. (PX 128 at 2). At trial, however, DOE's David Zabransky testified that the earliest possible date for DOE performance now is 2017. (Zabransky, Tr. 1528).

F. *Plaintiffs' Mitigation Efforts*

Progress Energy bases its spent nuclear fuel management plans upon the need to maintain "full core reserve" at each of its ***34** plants. (Stip. 4). Full core reserve means having "sufficient open and usable space in the spent fuel pool so you can discharge the entire reactor core into the spent fuel pool." (Edwards, Tr. 231). Full core reserve is not an absolute or regulatory requirement, but for economic and risk management reasons is applied as a company objective.

The Progress Energy nuclear plants typically refuel on either eighteen-month or two-year cycles. (Edwards, Tr. 229). To refuel one of its nuclear power plants, Progress Energy removes spent fuel from a reactor and temporarily places it in a spent fuel pool connected to the reactor. (Edwards, Tr. 226-27). Spent nuclear fuel comes in the form of


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"assemblies," which are measured in MTUs. (Edwards, Tr. 229). The number of assemblies in an MTU depends upon whether the reactor is a pressurized water reactor ("PWR") or boiling water reactor ("BWR"). (Edwards, Tr. 229-30).

1. *Brunswick*

Brunswick has two spent fuel pools, which are not connected. (Stip. 50). CP & L increased the capacity of the Brunswick spent fuel pools in 1977 and 1984 by replacing the existing spent fuel storage racks with higher density racks. (Stip. 51). To alleviate spent fuel pool capacity constraints during 1989-2005, CP & L transported 3,853 spent fuel assemblies in 113 total shipments from Brunswick Units 1 and 2 to Harris. (Stip. 52). The spent fuel shipments from Brunswick to Harris are scheduled to end in 2008, due in part to the expiration of the cask license in October 2008, and because the remaining capacity at Harris ultimately will be needed for storage of Harris spent fuel. (Edwards, Tr. 244-45).

Consequently, Progress Energy is pursuing dry storage at Brunswick. (Edwards, Tr. 245). Dry storage at a nuclear plant typically takes the form of an "Independent Spent Fuel Storage Installation," or "ISFSI." As is typical for such large projects, Progress Energy commissioned an architect-engineer to look for a desirable location and define the scope of the dry-storage project by considering whether soil remediation or plant modifications would be required. (Edwards, Tr. 247-48). Progress Energy incurred approximately $200,000 for the Brunswick ISFSI study. (Edwards, Tr. 247).

2. *Harris*

CP & L originally planned for the Harris plant to accommodate four nuclear units, numbered 1, 2, 3, and 4. (Stip. 27). CP & L intended that Units 1 and 4 would share spent fuel pools A and B, and Units 2 and 3 would share spent fuel pools C and D. (Stip. 28). Construction of Unit 1 and the Fuel Handling Building, housing all four spent fuel pools, was well under way when CP & L changed its plans. (Stip. 29). CP & L cancelled the construction of Units 2, 3, and 4, and instead, completed construction of Unit 1, portions of the Fuel Handling Building, and all four spent fuel pools. *Id.* CP & L partially completed the piping and major pieces of equipment associated with Units 2 and 3 that supplied spent fuel pools C and D, but CP & L did not complete the Spent Fuel Pool Cooling and Cleanup ("SFPCC") System for Units 2 and 3. *Id.*CP & L left in place the installed components of the SFPCC System not required for Unit 1, but they remained dormant. (Stip. 29; Edwards, Tr. 262-65).

To maintain full core reserve at Robinson and Brunswick Units 1 and 2, CP & L shipped a number of spent fuel assemblies during the 1990's from Robinson and Brunswick to Harris for storage in Harris spent fuel pools A and B. (Stip. 30). To accommodate the Brunswick and Robinson spent fuel, CP & L added racks to the Harris A and B pools in 1991 and again to the B pool in 1996. (Stip. 31).

By November 1998, however, CP & L determined that, because of DOE's partial breach, it would have to activate pools C and D at Harris and arrange for the storage of spent fuel in those pools. (Edwards, Tr. 343-44; PX 95). CP & L incurred approximately $32.7 million to activate and store spent fuel in the C and D pools. (PX-D 1). This amount includes the cost of plant modifications, completing the component cooling water system, removing CRUD (an unwanted particulate material), changing technical specifications, performing public outreach efforts,***35** and installing racks. (Edwards, Tr. 344-45, 352, 355, 377-78; PX 95; DX 304). CP & L also incurred approximately $16.9 million in transportation costs shipping spent fuel from Robinson to Harris from 2000 through 2004, and from Brunswick to Harris from 2001 through 2005. (PX 137; PX-D1).

3. *Robinson*


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Robinson has a single spent fuel pool. (Stip. 36). CP & L significantly increased the capacity of the Robinson spent fuel pool in 1983 by replacing some of the existing low density spent fuel storage racks with higher density racks. (Stip. 43). To alleviate spent fuel pool capacity constraints, CP & L transported spent fuel from Robinson to Brunswick from 1977 to 1981. (Stip. 37). In addition, CP & L shipped spent fuel from Robinson to Harris from 1990 to 2004. (Stip. 38). For these shipments, CP & L used rail casks, known as IF-300s, that it owned. (Stip. 39).

Progress Energy stopped the shipments of spent fuel from Robinson to Harris in 2004 due to license restrictions on the spent fuel shipping cask. (Edwards, Tr. 251). Progress Energy also knew that DOE would not perform under the Standard Contract for the foreseeable future, and that the Harris pools would be needed for spent fuel at the Harris plant. (Edwards, Tr. 244-45, 251).

In 2002, Progress Energy decided to build dry storage at Robinson. (Edwards, Tr. 251-52). Progress Energy incurred approximately $36 million to build and load the Robinson ISFSI. (PX-D1). This amount includes the costs to design and build the ISFSI, construct a travel path, replace railroad lines, expand plant security and make modifications to the cask preparation area, including an upgrade to the crane to lift the heavier storage cask.

4. *Crystal River*

Crystal River has two interconnected spent fuel pools, A and B. (Stip. 21). FPC increased the capacity of the spent fuel pools in 1978 and 1991 by replacing the existing spent fuel storage racks with higher density racks. (Stip. 22). The licensed capacity of the Crystal River spent fuel pools after the 1978 and 1991 re-rack projects was 1,357 spent fuel assemblies. (Stip. 23). In 2001, Progress Energy re-racked Crystal River pool B by removing the spent fuel storage racks and replacing them with racks that could hold more spent fuel. (Edwards, Tr. 239, lines 11-25). This effort cost Progress Energy approximately $4.6 million. (Edwards, Tr. 239, lines 5-8).

*Discussion*

A. *Standards for Decision*

[1][2] In awarding damages for a partial breach of contract, the Court must endeavor "to place the injured party in as good a position as it would have been had the breaching party fully performed." *Indiana Michigan,* 422 F.3d at 1373 (citing *San Carlos Irrigation & Drainage Dist. v. United States,* 111 F.3d 1557, 1562 (Fed.Cir.1997)). "[T]he general principle is that all losses, however described, are recoverable." *Id.* (quoting *Restatement (Second) of Contracts* § 347, cmt. c (1981)). If one party to a contract provides notice that it does not intend to perform, the non-breaching party becomes obligated to mitigate damages, meaning that it must take reasonable steps to avoid further losses or damages stemming from the breach. *Sys. Fuels, Inc.,* 79 Fed.Cl. at 51-52; *see also First Heights Bank, FSB v. United States,* 422 F.3d 1311, 1317 (Fed.Cir.2005) (stating "[t]he law requires that the non-breaching party make only 'those efforts that are fair and reasonable under the circumstances.' ") (quoting *Home Sav. of Am., FSB v. United States,* 399 F.3d 1341, 1353 (Fed.Cir.2005)). As the Federal Circuit has stated, "once a party has reason to know that performance by the other party will not be forthcoming, ... he is expected to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise." *Indiana Michigan,* 422 F.3d at 1375 (quoting *Restatement (Second) of Contracts* § 350, cmt. b). Mitigation damages "are intended to reimburse a non-breaching party to a contract for the expenses it incurred in attempting to rectify the injury the breach caused it." *Citizens Fed. Bank v. United States,* 474 F.3d 1314, 1320 (Fed.Cir.2007).

***36** [3][4][5][6] The non-breaching party is entitled


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to recover its reasonable costs incurred in its efforts to mitigate damages. Plaintiffs must show that: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach was a substantial causal factor in the incurrence of damages; and (3) the damages are established with reasonable certainty. *Indiana Michigan,* 422 F.3d at 1373 (citing *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1320 (Fed.Cir.2002)). Defendant also bears a burden of proof in cases involving mitigation damages. To eliminate or reduce Plaintiffs' mitigation damages, Defendant must show that Plaintiffs' efforts were inappropriate or unreasonable. *Id.* at 1375; *see also First Heights Bank,* 422 F.3d at 1316-17; *S. Nuclear Operating Co. v. United States,* 77 Fed.Cl. 396, 403-04 (2007); *Pac. Gas & Elec. Co. v. United States,* 73 Fed.Cl. 333, 406 (2006), *appeal docketed,*No.2007-5046 (Fed.Cir. Jan. 24, 2007); *Tennessee Valley Auth. v. United States,* 69 Fed.Cl. 515, 523 (2006). Defendant may also seek deductions for costs that the non-breaching party avoided by not having to perform. *See Lisbon Contractors, Inc. v. United States,* 828 F.2d 759, 769 (Fed.Cir.1987); *Restatement (Second) of Contracts* § 347(c).

"Because the purpose of a damages award is to put the non-breaching party 'in as good a position as [it] would have been in had the breaching party fully performed,' the logical starting point for a damages analysis is an understanding of the breaching party's obligations under the contract." *Rumsfeld v. Applied Cos.,* 325 F.3d 1328, 1336 (Fed.Cir.2003) (brackets in original); *see also PSEG Nuclear, LLC,* 465 F.3d at 1351 ("Any issues related to the types of damages permitted under the contract, if any, and the extent of those damages can be resolved by solely resolving the DOE's contractual obligations."); *Pac. Gas & Elec. Co.,* 73 Fed.Cl. at 375 n. 38 (holding that damages can be determined "[o]nly by determining the scope of defendant's performance obligation"). The Court's interpretation of DOE's contractual obligation to pick up spent fuel is aided by three factors. First, as always, the Court looks to the plain and unambiguous language of the agreement. *Hercules Inc. v. United States,* 292 F.3d 1378, 1380 (Fed.Cir.2002). Second, "[w]here a contract implements or fulfills a statutory requirement, the interpretation of the contract will be guided by the underlying statute." *Sys. Fuels, Inc.,* 79 Fed.Cl. at 52 (citing *The Dalles Irrigation Dist. v. United States,* 71 Fed.Cl. 344, 354 n. 11 (2006)). Here, DOE entered into the Standard Contracts with nuclear utilities to fulfill the purposes of the NWPA, and the Standard Contract should be read in light of the intentions of the NWPA. *See, e.g., Maine Yankee,* 225 F.3d at 1341-42 (addressing the Standard Contract in terms of the NWPA's requirements); *Indiana Michigan Power Co.,* 88 F.3d at 1274-77 (looking to the NWPA to determine DOE's obligations under the Standard Contract, and vacating DOE's contract interpretation as contrary to the statute). Third, the Court looks to the intent of the parties. *See Commonwealth Edison Co. v. United States,* 56 Fed.Cl. 652, 662 (2003) ("The purpose of contract interpretation is to carry out the intent of the parties.") (citing *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991)).

In determining the contemporaneous understanding of the parties, the Court should give the greatest weight to those actions occurring closer in time to contract formation, before the contract has become the subject of a dispute. *Sys. Fuels, Inc.,* 79 Fed.Cl. at 53 (citing *Old Colony Trust Co. v. Omaha,* 230 U.S. 100, 118, 33 S.Ct. 967, 57 L.Ed. 1410 (1913) ("Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence."); *Blinderman Constr. Co. v. United States,* 695 F.2d 552, 558 (Fed.Cir.1982) ( "It is a familiar principle of contract law that the parties' contemporaneous construction of an agreement, before it has become the subject of dispute, is entitled to great weight in its interpretation.")). As the Court observed in *System Fuels:*


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> The closer in time to contract formation, and the more distant the prospect of litigation, the more reliable the parties' practical interpretation should be. In the face of litigation, when "[s]elf-interest stimulates ***37** the mind to activity, and sharpens its perspicacity," parties "often claim more, but rarely less, than they are entitled to."

79 Fed.Cl. at 53 (quoting *Brooklyn Life Ins. Co. of N.Y. v. Dutcher,* 95 U.S. 269, 273, 24 L.Ed. 410 (1877)). These basic principles will guide the Court in the analysis of an unusual and somewhat complex factual setting.

B. *Interpretation of the Standard Contract*

[7] The Standard Contract did not contain an express acceptance rate for DOE's performance. It is not surprising that the Standard Contract lacked any mention of the precise quantity of spent fuel that DOE would begin accepting in 1998. Plaintiffs here, as well as all industry participants, executed their Standard Contracts in 1983, nearly 15 years before DOE's acceptance of spent fuel was to begin. DOE would have been remarkably clairvoyant to have known in 1983 how much spent fuel would exist in 1998, and how much spent fuel would need to be collected in 1998 to avoid the need for additional storage facilities at individual nuclear plants. Moreover, in 1983, DOE at most would have been targeting industry-wide quantities of spent fuel, rather than reactor-specific quantities to include in each Standard Contract. A more sensible approach, and the one that DOE adopted, was to include obligations in the Standard Contract that would achieve the goals of the NWPA.

It is apparent to the Court that the NWPA's purpose was to establish one or more central repositories for the storage of spent nuclear fuel so that nuclear utilities would not need to provide for additional spent fuel storage at their reactors. The NWPA specifically states as a finding that nuclear plant owners and operators have the responsibility to pay for interim storage of spent fuel "*until such waste and spent fuel is accepted by the Secretary of Energy in accordance with the provisions of this [Act].*" 42 U.S.C. § 10131(a)(5) (emphasis added). The Standard Contract echoes the NWPA's objective by reciting that "DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel *...as expeditiously as practicable* upon the request of the generator or owner." (PX 10 at 1) (emphasis added). The NWPA and the Standard Contract specify that DOE will begin performance by January 31, 1998. 42 U.S.C. § 10222(a)(5)(B); (PX 10, Article II, "Scope"). The Standard Contract applies to "*all*" spent fuel generated by Plaintiffs, which DOE "shall accept" and "dispose of ... in accordance with the terms of this contract." (PX 10, Article IV, B, "DOE's Responsibilities").

DOE's efforts to draft the mission plan required by the NWPA, 42 U.S.C. § 10221(a), confirm the agency's contemporaneous understanding of its obligations. The NWPA mandated that DOE's mission plan contain an estimate of "the total repository capacity required to safely accommodate the disposal of all high-level radioactive waste and spent nuclear fuel expected to be generated through December 30, 2020 ...." § 10221(a)(9). All of DOE's early mission plans, and related statements and actions, reflect an intent to achieve this objective:

- DOE's June 1983 report on financing the disposal of spent fuel is based upon an acceptance rate of 1,800 MTUs for the first five years, and 3,000 MTUs per year thereafter. (PX 8 at 9).

- A September 15, 1983 DOE memorandum states that "the central criteria for this schedule is an acceptance rate during the first 5 years such that no utility would have to build additional storage facilities after 1998." (PX 15 at 1046).

- DOE's Robert Morgan advised the nuclear industry in December 1983 that "[t]he basic strategy which we've outlined in the mission plan, is that beginning in 1998, utilities will not have to provide any additional storage facilities


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

on site.” (PX 19 at 11).

• DOE's December 20, 1983 draft mission plan stated that the “waste acceptance schedule will, initially, preclude the need for additional at-reactor storage after January 31, 1998 and, ultimately, remove from at-reactor storage all waste that is more than 5-years old.” (PX 17 at 1068). The “Waste Acceptance Schedule”***38** in this document projected two repositories that would begin accepting a total of 4,800 MTUs per year by 2003. *Id.* at 1082. The schedule shows the collection of all spent fuel generated through 2020, as mandated by the NWPA. *Id.*

• DOE's Michael Lawrence testified before Congress on February 22, 1984 that the “fundamental objective” of the NWPA was “to accept high-level radioactive waste for safe management, storage and permanent disposal on a firm schedule, beginning not later than January 31, 1998,” and that “[b]y achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998, and, ultimately, remove all eligible waste from at-reactor storage.” (PX 21 at 1102).

• Mr. Lawrence reiterated in comments to a July 23, 1984 DOE Richland, Washington Operations Office letter that “the minimum acceptance rate should be based upon the rate at which spent fuel is generated by civilian nuclear power reactors,” and that “[t]his would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998.” (PX 26 at 1201).

• DOE's February 1985 “Nuclear Waste Fund Fee Adequacy: An Assessment” confirms a five-year ramp up to a 3,000 MTU annual acceptance rate. (PX 27 at 3).

• DOE's final version of the mission plan, published in June 1985, adopted as the “authorized system” a phased repository acceptance schedule with the first repository receiving 3,000 MTUs per year after a six-year ramp up period. (PX 31 at 26). The mission plan's acceptance rates were based in part on attempting to keep pace with spent fuel discharges and alleviating the need for additional storage at nuclear reactors. (Pollog, Tr. 1231).

• The June 1985 mission plan also outlined an “Improved Performance System” illustrating the possible incorporation of an MRS into the program “*to accommodate DOE's contractual commitments* to the utilities paying fees into the Nuclear Waste Fund.”(PX 31 at 73) (emphasis added).

The foregoing DOE statements and actions soon after passage of the NWPA reflect the mutual expectations of the parties. *See Sys. Fuels, Inc.,* 79 Fed.Cl. at 56 (“DOE's behavior in the years that closely followed the enactment of the NWPA and contract formation serves as a more reliable basis for contract interpretation than the retrenching steps it took once the prospect of breach and liability appeared on the horizon.”).

Even as late as 1987, after DOE expected a five-year delay in performance at a permanent repository and received authority from Congress to build an MRS facility, DOE expected its permanent acceptance rate to exceed the industry's generation rate by a comfortable margin. (*See* DX 59 at 6; PX 38 at 7). The Standard Contract required the 1987 ACR to “set forth the projected annual receiving capacity for the DOE facility(ies) ... for ten (10) years following the projected commencement of operation of the initial DOE facility.” (PX 10, Art. IV, B, 5(b)). DOE's projected 2,650 MTU acceptance rate was consistent with the 1987 Mission Plan Amendment. (PX 38 at 7).

The fee schedule imposed upon the utilities also is relevant to the interpretation of the Standard Contract. The NWPA contained a fee structure for establishing a Nuclear Waste Fund for purposes of


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

performing radioactive waste disposal activities. *See*42 U.S.C. § 10222. The Nuclear Waste Fund would be comprised in large part of the fees received from nuclear utilities under the Standard Contract, and would be used to achieve the purposes of the NWPA, including the development of spent fuel repositories and the acceptance and transportation of spent fuel from individual reactors. § 10222(c)-(d). Through December 31, 2005, Progress Energy, CP & L, and FPC have paid DOE approximately $661 million in fees for the disposal of spent fuel under the Standard Contracts. (Stip. 16). It is not plausible to conclude that these enormous fee payments were for anything other than DOE's ***39** full performance of the obligations described above. The provisions of the NWPA, the Standard Contract, and DOE's contemporaneous understanding of its obligations all point to the conclusion that utilities holding a Standard Contract would not need to provide for additional spent fuel storage space after January 31, 1998.

In reaching the above conclusion, the Court is not applying a missing term to DOE's Standard Contract. Rather, the Court reads the Standard Contract in light of the NWPA's purpose and the parties' expectations at the time of contract formation. The Standard Contract required DOE to begin accepting and transporting whatever amount of spent fuel was necessary beginning January 31, 1998 so that utilities such as Plaintiffs would not need to provide for additional spent fuel storage space after that date. There can be no question that DOE breached the Standard Contract by failing to collect any spent fuel in 1998 or in any year thereafter. Under such circumstances, the Court's obligation is to devise some reasonable method for the calculation of Plaintiffs' damages. *Bluebonnet Sav. Bank, FSB v. United States,* 266 F.3d 1348, 1357 (Fed.Cir.2001) ("[T]he court's duty is to 'make a fair and reasonable approximation of the damages.' ") (quoting *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960)). The Court cannot allow Defendant to escape responsibility for its damages just because the exercise is complex or difficult. *S. Nuclear Operating Co.,* 77 Fed.Cl. at 432 ("Difficulties in determining what DOE would have done had the DOE commenced performance as required under the Standard Contract does not shield defendant from liability."). As a reasonable basis for calculating Plaintiffs' damages, the Court is persuaded that an industry-wide acceptance rate of 3,000 MTUs per year would have satisfied DOE's contractual obligations. The Court agrees with Plaintiffs that 3,000 MTUs per year is a proper benchmark for measuring the steps that DOE should have undertaken, and intended to undertake, in executing the Standard Contract.

Defendant has advanced a number of arguments for its position that a 3,000 MTU acceptance rate was not a requirement of the Standard Contract. Defendant asserts, for example, that CP & L, by virtue of its membership and participation in the Edison Electric Institute ("EEI") and the Utility Nuclear Waste Management Group ("UNWMG"), should be bound by comments that those associations submitted to DOE regarding the Standard Contract. Def.'s Post-Trial Brief at 17, 19, 40-42, 118-24. These comments, along with other industry submittals, purportedly reflect an understanding that the Standard Contract would not contain a specific acceptance rate. *Id.* Defendant failed, however, to present any reliable evidence showing that Plaintiffs agreed with or even knew about the comments of EEI, UNWMG, or others in the industry. At most, Defendant showed that Plaintiffs were members of two trade associations and attended some of their meetings. Based on the record presented at trial, the Court declines to impute selected industry comments to Plaintiffs.

Moreover, although some industry representatives argued in 1983 that a quantity of spent fuel ought to be included, and drafted proposed terms, the Standard Contract was not the product of negotiation. Rather, the NWPA authorized DOE to issue a contract that nuclear plant owners and operators would be required to sign. Any entity failing to execute the Standard Contract would not receive NRC li-


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

censing for continued operations. *See Maine Yankee,* 225 F.3d at 1337 (stating that the NWPA made entry into such contracts mandatory for the utilities); *Commonwealth Edison Co. v. United States,* 877 F.2d 1042, 1045 (D.C.Cir.1989) (observing that utilities "had no real choice but to agree to whatever terms the federal government offered.").

Defendant also argues that inserting a 3,000 MTU acceptance rate into the Standard Contract is improper because DOE expressly rejected inserting any numerical rate, and the nuclear industry understood that the mission plan was not a part of the Standard Contract. Def.'s Post-Trial Brief at 32-40, 118-27. It is true that none of the planning documents that contain the 3,000 MTU acceptance rate were part of the Standard Contract. Statements made in the statutorily ***40** mandated 1985 Mission Plan, and the contractually required 1987 ACR, however, along with other contemporaneous statements by DOE and Plaintiffs, demonstrate the parties' understanding of DOE's acceptance rate obligation *before* the specter of litigation tainted the process. The overwhelming weight of this evidence demonstrates that both DOE and Plaintiffs expected DOE to accept between 2,650 MTUs and 3,000 MTUs per year from the industry. Consequently, the 3,000 MTU rate is a reasonable measure of DOE's performance absent the breach.

Finally, and perhaps most importantly, DOE's actions from 1987 and thereafter were taken with an eye toward minimizing agency liability under the Standard Contract. As of 1987, DOE reported the existence of 35 pending lawsuits against it. *See Sys. Fuels, Inc.,* 79 Fed.Cl. at 56-57 (describing in detail how DOE's 1991 ACR was "severely flawed."); *S. Nuclear Operating Co.,* 77 Fed.Cl. at 415. DOE's David Zabransky conceded at trial that, faced with massive litigation, the 900 MTU rate was an agency attempt to minimize its obligations under the Standard Contract. (Zabransky, Tr. 1516-17). Similarly, the Court cannot accept that Plaintiffs would have agreed to pay the same staggering fees under the Standard Contract in exchange for 70 percent less performance from DOE (acceptance of 900 MTUs per year, instead of 3,000 MTUs per year). At an acceptance rate of 900 MTUs per year, DOE would never achieve the goals of the NWPA, because the acceptance rate would be less than one-half of the waste generated in any year.

Essentially, Defendant asserts that the Standard Contract allowed DOE to determine unilaterally the measure of its performance eight years after contract execution, and after DOE concluded that it would not be able to perform. When asked at closing argument whether Defendant was claiming that "as consideration for these $660 million in fees paid by the Plaintiff, the pick-up rate is whatever the Government says it is," counsel for the Government responded that DOE was only limited by the duty of good faith. Closing Arg., Apr. 4, 2008 at 75. "There is a striking asymmetry when plaintiff pays in full for performance by defendant virtually at defendant's option." *Commonwealth Edison Co.,* 56 Fed.Cl. at 664. If the Court were to accept this position, it would have little choice but to find Defendant's obligation illusory and the Standard Contract unenforceable. *See id.* at 663-64 (rejecting the Government's "minimalist interpretation of its obligations under the Standard Contract").

Twelve years ago, Defendant unsuccessfully argued the it had no obligation under the NWPA or the Standard Contract to collect and transport any spent fuel. *See Indiana Michigan Power Co.,* 88 F.3d at 1275-77. The Court of Appeals for the District of Columbia Circuit noted:

> [T]he Secretary [of DOE] now contends that the payment of fees was for nothing. At oral argument, one of the panel compared the government's position to a Yiddish saying: "Here is air; give me money," and asked counsel for the Department to distinguish the Secretary's position. He found no way to do so, nor have we.

*Id.* at 1276. At closing argument in the present case, Defendant only slightly modified this position:

> [W]hen we're talking about the essence of the


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> contract, the relevant question with regard to dates isn't where is the fuel going to be in 1998 or 1999 or 2000 or any year in the short term after 1998, it's where is the fuel going to be in 2098 or 3098 or 10098. That's the essence of the deal.

Closing Arg., Apr. 4, 2008 at 75. It appears that in twelve years, Defendant's position has evolved from: (a) the utilities are paying fees to DOE for no performance to (b) the utilities are paying fees to DOE for baby steps toward performance in the year 2098, 3098, or 10098, or whatever year DOE chooses. The Court does not find this position at all persuasive.

Contrary to Defendant's position, Plaintiffs did not bargain for the promise that the Government would perform the Standard Contract a thousand or more years from now. It did not bargain for "the first baby steps toward getting to the point where the ***41** Federal Government can assume responsibility for all of this nuclear waste and tuck it away." Closing Arg., Apr. 4, 2008 at 76. Plaintiffs did not agree to pay $661 million in fees under the Standard Contract in exchange for DOE unilaterally determining its own obligations *after* it realized that timely performance was not possible. Rather, Plaintiffs bargained for and have paid $661 million in fees for DOE's commitment to take all of Plaintiffs' spent fuel as expeditiously as practicable beginning on January 31, 1998. The evidence closest in time to contract execution demonstrates that the parties understood this obligation to mean that DOE would accept enough fuel from Plaintiffs such that they would not have to build any additional at-reactor storage after January 31, 1998. The parties' understanding is supported by Congress's statement of purpose that the Federal Government should take responsibility for all spent fuel in order to eliminate the public health and safety risks associated with at-reactor storage of radioactive waste. Nothing in the Standard Contract or the NWPA supports Defendant's position that the 900 MTU acceptance rate fulfills DOE's obligation to take all of Plaintiffs' spent fuel as expeditiously as practicable.

C. *Elements of Plaintiffs' Burden of Proof*

Before addressing each of the disputed damages items, the Court will explain in greater detail the three elements that Plaintiffs must meet to satisfy their burden of proof. As previously noted, Plaintiffs must show that: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are established with reasonable certainty.

1. *Foreseeability*

Plaintiffs may only recover for mitigation costs that were "reasonably foreseeable by the breaching party at the time of contracting." *Indiana Michigan,* 422 F.3d at 1373. "While the general response to a breach must be foreseen, the particular way that a mitigating decision is implemented need not." *S. Nuclear Operating Co.,* 77 Fed.Cl. at 405. Defendant does not contest the foreseeability element of Plaintiffs' claim. DOE certainly was aware that if it failed to pick up Plaintiffs' spent fuel, Plaintiffs would have to incur substantial costs storing the spent fuel on their own. *See Indiana Michigan,* 422 F.3d at 1375 ("Having been placed in a position where they are required to find alternate storage for SNF, the utilities must *de facto* accept responsibility to guard against the environmental impact of improperly-disposed and maintained SNF, a situation which the NWPA was enacted to avoid."); *Sys. Fuels, Inc.,* 79 Fed.Cl. at 59 ("DOE should have foreseen that its failure to perform under the Standard Contract would result in damages of the nature and magnitude that System Fuels claims"); *Sys. Fuels, Inc. v. United States,* 78 Fed.Cl. 769, 791 (2007) ("[T]he record contains clear and convincing evidence that on June 30, 1983, it was 'foreseeable' to DOE that, if performance could not be commenced by January 31, 1998, Plaintiffs would have to make interim arrangements...."); *S. Nuclear Operating Co.,* 77 Fed.Cl. at 404 ("That plaintiffs would generally incur storage expenses of the nature and magnitude sought here was foresee-


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

able."); *Tennessee Valley Auth.,* 69 Fed.Cl. at 528 (DOE recognized that "utilities might be forced to build additional on-site storage facilities if DOE were not successful in performing under its contracts for SNF disposal."). The Court agrees that Plaintiffs' efforts to store its spent fuel after it became aware that DOE was unlikely to perform, including activation of the Harris C and D pools, the Robinson ISFSI, the Brunswick ISFSI, and interplant shipments of spent fuel, should have been reasonably foreseen by DOE at the time of contracting.

2. *Causation*

Plaintiffs bear the burden of proving that DOE's partial breach was a substantial causal factor of each claimed mitigation cost. *See Indiana Michigan,* 422 F.3d at 1373. Although *Indiana Michigan* stated that the utilities must satisfy the substantial causal factor test, previous decisions of this Court have applied the more difficult "but-for" causation***42** test. *See, e.g., Sys. Fuels, Inc.,* 79 Fed.Cl. at 58 ("DOE's non-performance was a 'but-for' cause of [the utility's] decision to expand its dry fuel storage capacity."); *N. States Power Co. v. United States,* 78 Fed.Cl. 449, 462 (2007) (holding that utility presented sufficient evidence showing that it would have pursued cheaper interim storage options in the but-for world). *But see Sys. Fuels, Inc.,* 78 Fed.Cl. at 804 (finding that DOE's partial breach was a substantial factor for incurring the costs to build a bay door); *Pac. Gas & Elec. Co.,* 73 Fed.Cl. at 415 ("The court agrees with plaintiff that the government's breach of the Standard Contract was a substantial causal factor in plaintiff's need to remove the off-gas equipment from Humboldt Bay."). Indeed, at times, Plaintiffs use "but-for" causation language in its own brief. *See* Pls.' Post-Trial Brief at 68 (stating that "had DOE not breached, these specific activities would not have been necessary."). "[T]he selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion." *Citizens Fed. Bank,* 474 F.3d at 1318. For each of the disputed damages items here, the Court will apply the but-for test or the substantial causal factor test as appropriate.

Turning to the definition of "substantial causal factor," Defendant contends that "[e]xpenses are recoverable as damages when, and only when, plaintiffs have established that they would not have been incurred in the absence of a failure by DOE [to perform]." Def.'s Post-Trial Reply Brief at 1-2; *see also* Def.'s Post-Trial Brief at 156 (stating that Plaintiffs may only recover for a cost that they could show with certainty were "incremental to the partial breach."); Def.'s Post-Trial Reply Brief at 31-32 ("A plaintiff sustains its burden of proof *only* by presenting a complete picture of its actual expenses and, as a basis for comparison, a complete picture of the expenses that it would have incurred absent a breach.") (emphasis in original); Def.'s Post-Trial Brief at 115 (arguing that "*Indiana Michigan* requires Progress Energy to show that, at a minimum, had DOE begun accepting fuel in 1998, it would not have incurred the costs it now seeks as damages"). The Court reads these statements essentially as slight variations of the "but-for" causation test. As explained above, while it is true that Plaintiffs may recover if they can show that they would not have incurred a cost but-for the breach, it is also true that Plaintiffs may recover if they can show that the breach was a substantial causal factor in the claimed cost. Defendant's many statements suggesting otherwise are not well founded.

To meet the substantial causal factor test, Plaintiffs must definitely establish a causal connection and show that the mitigation costs flowed "inevitably and naturally" from the breach. *Sys. Fuels, Inc.,* 78 Fed.Cl. at 795 (quoting *Franconia Assocs. v. United States,* 61 Fed.Cl. 718, 750 (2004)); *see also Am. Fed. Bank, FSB v. United States,* 72 Fed.Cl. 586, 598 (2006) ("Provided that a causal connection can be 'definitely established' between the breach of contract and events that subsequently occur, the harm to the injured party from such con-


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sequences must be recoverable as damages in mitigation, while obversely, the benefits of the direct consequences of the breach must be credited against a recovery.") (internal citations omitted). While Plaintiffs need not show that DOE's partial breach was the sole cause of an incurred cost, Plaintiffs must show that the alleged mitigation effort was more than a purely business judgment that would have been made irrespective of the breach. *Compare Citizens Fed. Bank,* 474 F.3d at 1320 (affirming the trial court's application of the substantial factor test and its finding that the plaintiff may recover for an activity that was "due in part to mitigate the effects" of the breach), *and S. California Fed. Sav. & Loan Ass'n v. United States,* 422 F.3d 1319, 1337 (Fed.Cir.2005) (affirming the trial court's finding that the breach "was the principal cause of [the plaintiff's] recapitalization and was the substantial factor in [the plaintiff] incurring higher costs of funds after the breach"), *with Indiana Michigan,* 422 F.3d at 1376 (affirming the trial court's factual finding that the utility's 1989 decision to re-rack was made "in the normal course of business" before the utility had reason to believe that DOE would not perform); *see also* ***43***California Fed. Bank v. United States,* 395 F.3d 1263, 1268 (Fed.Cir.2005) (holding that a causal connection between the breach and the claimed damages "must be definitely established," but "[t]hat is not to say that the breach must be the sole factor or sole cause in the [damages]"); *Sys. Fuels, Inc.,* 78 Fed.Cl. at 795; *Franconia Assocs. v. United States,* 61 Fed.Cl. 718, 750 (2004) ( "[P]laintiffs need not show that each dollar claimed was entirely unaffected by outside events.").

"[I]n determining whether a decision was substantially caused by DOE's delay, reasonable not absolute certainty suffices." *Yankee Atomic Elec. Co. v. United States,* 73 Fed.Cl. 249, 268 (2006), *appeal docketed,*No.2007-5025 (Fed.Cir. Dec. 7, 2006). As the Court of Claims noted in *Locke v. United States:*

> [T]he constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. *Bigelow et al. v. RKO Radio Pictures,* 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652. Difficulty of ascertainment is not to be confused with right or recovery. Nor does it exonerate the defendant that his misconduct, which has made necessary the inquiry into the question of harm, renders that inquiry difficult. *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684. The defendant who has wrongfully broken a contract should not be permitted to reap advantage from his own wrong by insisting on proof which by reason of his breach is unobtainable. *Crichfield v. Julia,* 2 Cir., 147 F. 65.

151 Ct.Cl. 262, 283 F.2d 521, 524 (1960).

To determine which costs were caused by DOE's partial breach, Progress Energy created a causation model representing the spent fuel management actions that Plaintiffs did take in the real world and those actions that Plaintiffs would have taken had DOE performed at the 3,000 MTU rate. (PX 137; Edwards, Tr. 279; Worthington, Tr. 860). Progress Energy also created a second model at the request of the Government that represented the actions Progress Energy would have taken had DOE performed at the 900 MTU rate. (DX 329; Edwards, Tr. 502). Mr. Worthington, Lead Engineer of Progress Energy's Spent Fuel Management Unit, was the employee primarily responsible for preparing the 3,000 MTU causation model. (Worthington, Tr. 785; Edwards, Tr. 483). Steve Edwards, supervisor of Progress Energy's Spent Fuel Management Unit, directed and reviewed all of Mr. Worthington's work on the 3,000 MTU rate causation model. (Edwards, Tr. 279-80).

Progress Energy used the DOE's 2004 APR/ACR projections as the measure of DOE's performance. (Worthington, Tr. 863). According to the 2004 APR/ACR, DOE would begin accepting spent fuel at a permanent repository in 2010 and would accept 400 MTUs in 2010, 600 MTUs in 2011, 1,200 MTUs in 2012, 2,000 MTUs in 2013, and 3,000


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

MTUs thereafter. (Worthington, Tr. 863; PX 128 at 2). Progress Energy applied these projections beginning with 1998 as Year 1. (Edwards, Tr. 303). The 2004 APR/ACR projections slightly differ from the projections in early planning documents such as the 1985 Mission Plan and the 1987 ACR, primarily in the ramp-up rate during the early years of operation. (*Compare* PX 128 at 2, *with* PX 38 at 7, *and* PX 31 at 26). As Mr. Edwards testified, "[a]ll of them seemed to get to the 3,000 [MTU rate] in about a four-to-five-year time frame, ... how you got to that 3,000 [MTU rate] varied.... Since it got to the rate that we thought was the right rate to use consistent with the earlier documents and it was the most recently issued from DOE, we decided that this was the most appropriate rate to use." (Edwards, Tr. 304).

Based on the industry-wide acceptance rate and each reactor's acceptance priority ranking, Progress Energy knew precisely how much spent fuel DOE would have accepted from each of its reactors. For example, in Year 1 when DOE would only accept 400 MTUs from the industry, DOE would not accept any spent fuel from Plaintiffs. (PX 128 at B.2). In Year 2, DOE would accept only 69.7 MTUs from the Robinson plant. (PX 128 at B.4). In Year 5, when the industry-wide acceptance rate reached 3,000 MTUs, DOE would accept 102.5 MTUs from Brunswick, 43.3 MTUs from Robinson, and 46.3 MTUs from Crystal River. (PX 128 at B.13-14). Knowing exactly how much storage***44** space was available at its four plants in 1998, how many spent fuel assemblies and MTUs CP & L and FPC generated each year after 1998, and DOE's precise quantities for acceptance at the 3,000 MTU rate, Progress Energy assessed with reasonable certainty what storage activities it would have had to take absent DOE's partial breach. (Edwards, Tr. 302; PX 137).

After using its causation model to isolate the breach-related projects, Progress Energy identified and collected the costs for the breach-related projects using the accounting and project number system that Progress Energy uses to track costs in the normal course of business. (Edwards, Tr. 320-23; Calvello, Tr. 1594, 1618; PX 140). Progress Energy excluded some costs that it concluded were not caused by DOE's partial breach. (Edwards, Tr. 328-336). For example, Progress Energy did not include $6.7 million for the cost of shipping 782 assemblies to the Harris pool, and $1,087,280 for the cost of changing the racks in the Harris B pool. (Stip. 59; Edwards, Tr. 335-36). Progress Energy thoroughly analyzed its data until, in Mr. Edwards's words, "it was accurate to the best of our knowledge." (Edwards, Tr. 321). Plaintiffs' $91,029,704 claim results from this process. (*See* Edwards, Tr. 279). Except where identified to the contrary below, the Court concludes that DOE's partial breach caused Progress Energy to incur the claimed costs as part of its effort to maintain full core reserve and avoid a power plant shutdown.

3. *Reasonable Certainty*

Plaintiffs may only recover those damages that they can show with reasonable certainty. *Indiana Michigan,* 422 F.3d at 1373. "While the amount of damages need not be 'ascertainable with absolute exactness or mathematical precision[,]' recovery for speculative damages is precluded." *Id.* (holding that utility may recover for actual damages incurred to the time of trial, but not for speculative prospective mitigation damages) (quoting *San Carlos Irrigation & Drainage Dist.,* 111 F.3d at 1563) (alteration in original). With these principles in mind, the Court ordered the parties to undergo a comprehensive pretrial accounting review process to reach agreement as much as possible on the costs associated with each of Progress Energy's mitigation efforts. *See* March 23, 2006 Pretrial Order on Damages. With Progress Energy's cooperation, Defendant reviewed invoices, purchase orders and contracts, accounting records and work orders, and other electronic data. (DX-D5 at 6). As a result of this process, Defendant agreed that Progress Energy's incurred costs included $4,675,392 for the Crystal River Re-rack, $32,734,951 for the Harris C & D Pool Activation, $16,975,181 for the spent fuel


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

shipment campaigns, $36,436,059 for the Robinson ISFSI, and $208,120 for the Brunswick ISFSI, for a total of $91,029,704 in claimed damages through December 31, 2005. *Id.* at 8. Defendant does not contest the accuracy of the dollar amounts for the vast majority of Progress Energy's claim, $90,684,002 to be exact.

D. *Defendant's Reduction of Damages*

Once Plaintiffs demonstrate foreseeability, causation, and certainty, Defendant may reduce damages by showing either that Plaintiffs did not undertake reasonable mitigation efforts, or that the efforts they did undertake were unreasonable. *See Sys. Fuels, Inc.,* 79 Fed.Cl. at 52 (citing *Tennessee Valley Auth.,* 69 Fed.Cl. at 523); *see also Indiana Michigan,* 422 F.3d at 1375; *First Heights Bank,* 422 F.3d at 1316-17; *S. Nuclear Operating Co.,* 77 Fed.Cl. at 403-04; *Pac. Gas & Elec. Co.,* 73 Fed.Cl. at 406. Defendant may also seek deductions for costs that Plaintiffs avoided by not having to perform. *Lisbon Contractors,* 828 F.2d at 769; *Restatement (Second) of Contracts* § 347(c), cmt. d; *Corbin on Contracts* § 57.10 ("The only saving that is to be deducted is the saving of expense with respect to performance by the plaintiff that the defendant's breach has made unnecessary."). "[A]ny 'benefits' the government seeks to offset must be shown to a reasonable certainty, or they must be denied as too speculative to meet the standards set forth by the Federal Circuit in *Indiana Michigan.*" *Sys. Fuels, Inc.,* 79 Fed.Cl. at 71 (internal citations omitted).

The evidence shows, and Defendant does not contest, that when Progress Energy realized***45** DOE was unlikely to perform, it undertook efforts to store its fuel on an interim basis and avoid having to shut down its power plants. Defendant does not seek any reductions on the grounds that Progress Energy failed to take appropriate steps to mitigate the loss, or that Progress Energy's mitigation efforts were unreasonably costly. Defendant, does however, seek a $9,818,462 reduction for costs avoided because of the breach that the Court will address below.

E. *Disputed Mitigation Costs*

The parties agree that, under the 3,000 MTU measure of performance, Plaintiffs should recover $61,301,941 in mitigation damages. Def.'s Post-Trial Brief at 73; (Johnson, Tr. 2018-19; DX-D5 at 42-43). The remaining $29,727,762 of Plaintiffs' claim consists of eleven items that Defendant asserts are not recoverable even at the 3,000 MTU rate. Defendant argues that Plaintiffs failed to meet their burden of proof under *Indiana Michigan* for nine items, that an additional $9,818,462 should be deducted to account for costs that Plaintiffs "avoided" by not having to perform, and that $1,996,045 in imputed interest expense is barred by law. The Court will address each of the disputed items below.

1. *CRUD Cleanup and Rack Disposal at Harris C & D Pools*

[8] When CP & L introduced Brunswick fuel into the Harris borated FN5 pools, it caused a particulate material known as "CRUD" to accumulate in the C and D pools. (Edwards, Tr. 377). Unlike most radioactive materials, CRUD has a very short half-life of about five years. (Edwards, Tr. 379-80). Currently, the Harris plant is licensed to operate through 2026, and an application to renew the license through 2046 is under review. (Edwards, Tr. 385). In the absence of DOE's breach, CP & L would not have activated the C and D pools, and, thus, would have allowed the CRUD to remain in the pools until the Harris plant is decommissioned, either in 2026 or in 2046. (Edwards, Tr. 379-80). After sitting either twenty or forty years, the Harris CRUD would have become less radioactive, thereby reducing exposure risks to Progress Energy employees and allowing Progress Energy to ship it offsite under existing regulations for "low level" radioactive waste. (Edwards, Tr. 384-85). As such, CP & L's strategy was to leave the CRUD in the


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pools until plant decommissioning when it would be less expensive to remove it. (Edwards, Tr. 385).

FN5. The term "borated" is an adjective referring to the state of being mixed or impregnated with borax or boric acid. Webster's New Collegiate Dictionary 132 (10th ed.2001).

As a direct result of DOE's partial breach and the need to activate the C and D pools, however, CP & L had to remove the CRUD in 1999 and 2000. (Edwards, Tr. 379). At that time, the CRUD had not yet aged sufficiently to be shipped off site and CP & L had to design special collection vessels to store the CRUD until it decayed long enough to allow shipment. (Edwards, Tr. 384). CP & L incurred $297,294 for the cost of CRUD clean-up and $330,345 for the costs of sludge clean-up. (DX-D5 at 43). Similar to the CRUD, DOE's partial breach required CP & L to remove unused racks from the C pool which CP & L would have otherwise left there indefinitely. (Edwards, Tr. 387). CP & L incurred $174,636 for the cost of disposing of the unused racks. (DX-D5 at 43).

Defendant does not dispute that DOE's partial breach required CP & L to remove the CRUD, sludge, and unused racks in order to activate the Harris C and D pools. Nonetheless, Defendant contends that $802,275 should be deducted from Progress Energy's claim because Progress Energy would need to remove and dispose of the CRUD, sludge, and unused racks at decommissioning. Def.'s Post-Trial Brief at 145; (Maret, Tr. 1766-67; Johnson, Tr. 2016).

The evidence persuasively shows that the cost of removing and disposing of the CRUD, sludge, and unused racks was caused by DOE's partial breach. Defendant may reduce the damages award where it shows that the mitigation costs were unreasonable, or that as a result of the partial breach, CP & L avoided an expense. As the Court held in *System Fuels, Inc.:*

> ***46** *Indiana Michigan* limits recoverable damages to those that can be "shown with reasonable certainty," such that "recovery for speculative damages is precluded." Correlatively, any "benefits" the government seeks to offset must be shown with reasonable certainty, or they must be denied as too speculative to meet the standards set forth by the Federal Circuit in *Indiana Michigan.*

*Sys. Fuels, Inc.,* 79 Fed.Cl. at 71 (internal citations omitted) (holding Defendant failed to prove offsets with reasonable certainty).

It is true that, had DOE performed and CP & L not been forced to activate the Harris C and D pools to mitigate the damage caused by DOE, Progress Energy would have been required to remove CRUD, sludge, and unused racks at plant decommissioning. At present, however, Progress Energy's Harris plant decommissioning clean-up is likely to occur in 2046. As Progress Energy correctly points out:

> It is simply impossible to estimate the cost of these disposal activities 40 years from now. Indeed, during decommissioning these would not be isolated costs but part of a much larger disposal and cleanup effort. And, even if one could isolate the potential costs four decades hence, they would likely be much less than the dollars actually expended in or around 1998 because of economies of scale and, with regard to CRUD, the radioactivity would have decayed significantly as it sat in the pool, rendering its handling and disposal far cheaper than it was in the real world.

Pls.' Post-Trial Brief at 36 (citing Edwards, Tr. 383-85). The Court finds Plaintiffs' analysis to be persuasive. Absent any credible evidence showing with reasonable certainty Progress Energy's CRUD, sludge, and unused rack clean-up costs in 2026 or 2046, the Court will not deduct such speculative future amounts from the damages award. The cost for the CRUD, sludge, and unused rack cleanup will be included in Plaintiffs' damages award.



© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2. *Railroad Track Maintenance*

[9] Progress Energy included $260,037 in railroad track maintenance costs in its claim. (DX-D5 at 43). Without doubt, DOE's partial breach caused Progress Energy to transport spent fuel by rail to the Harris plant for interim storage. *See* Def.'s Post-Trial Brief at 153. In order to safely ship the spent fuel, Progress Energy periodically performed maintenance and safety checks on the rail lines. (Edwards, Tr. 390-91). Thus, DOE's partial breach was a substantial causal factor in the maintenance of the rail lines.

The evidence introduced at trial shows that Progress Energy, absent DOE's breach, would have preferred for DOE to use rail casks to pick up the spent fuel. (Edwards, Tr. 389, 580; Zabransky, Tr. 1528). There is no evidence in the record, however, demonstrating that DOE would have used rail casks. *See id.* Thus, the method of DOE's hypothetical performance absent the breach is entirely speculative. *See Sys. Fuels, Inc.*, 79 Fed.Cl. at 71 ("It is not possible to ascertain the method DOE will ultimately use for SNF acceptance.").

Defendant argues that Progress Energy should not recover for maintenance costs because Plaintiffs "failed to prove that they would not have made any portion of their expenditures upon railroad track maintenance ... if DOE had commenced accepting fuel in 1998." Def.'s Post-Trial Brief at 153; (*see also* Johnson, Tr. 1962). Put another way, the Government speculates that DOE would have accepted fuel by rail had it performed, and argues that Plaintiffs may only recover if they disprove the Government's speculation. The Government cites no authority for this position, and this Court expressly has rejected it on multiple occasions. *See, e.g., Sys. Fuels, Inc.,* 79 Fed.Cl. at 71; *Sys. Fuels, Inc.,* 78 Fed.Cl. at 795, 801-03. *See also Restatement (Second) of Contracts* § 352, cmt. a (stating that doubts shall be resolved against the breaching party).

Plaintiffs have demonstrated that DOE's partial breach was a substantial causal factor of the cost of railroad track maintenance, and Defendant has provided no reason to deduct the costs. The Government does not even allege that it was unreasonable for Progress Energy to conduct the railroad maintenance work or that Progress Energy spent an unreasonable sum on this project. The cost for ***47** the railroad track maintenance will be included in Plaintiffs' damages award.

3. *Internal Labor*

[10] Progress Energy used the labor of 511 employees on breach-related projects at a cost of $15,175,982. (DX 308 at 17). Defendant agrees that Progress Energy's use of internal labor was reasonably foreseeable and that Progress Energy proved its labor costs with reasonable certainty. Defendant contends, however, that 29 percent of the labor costs, or $4,383,222, were not "incremental to the partial breach." Def.'s Post-Trial Brief at 156-59; (see also Johnson, Tr. 2015; DX 308 at 18, n. 55; DX-D5 at 43). According to Defendant's expert, Mr. Johnson, only the labor costs for hourly employees, and salaried employees who spent more than 50 percent of their hours on a breach-related project during any one year qualify as "incremental to the breach." (Johnson, Tr. 2004-08). Under this approach, 112,843 hours of work on breach-related mitigation projects by more than 300 salaried employees do not qualify as "incremental to the breach." (PX 166). For example, applying his "50 percent rule," Mr. Johnson concludes that Larry Bacote's 1,141 hours of labor were incremental to the breach because all 1,141 hours occurred in 2005. By the same rule, Mr. Johnson concludes that none of John Jankens's 3,599 hours of labor were incremental to the partial breach because Mr. Jankens never worked more than 830 hours on breach-related projects in any one year. (PX 166 at 1-2). Despite Mr. Johnson's testimony that his opinion reflected "a reasonable assertion of the amount of incremental labor," the Court finds his "50 percent rule" to be arbitrary and without support in the law. (Johnson, Tr. 2004).


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

As Defendant admits in its post-trial brief, similar arguments have been considered and uniformly rejected by this Court. *See Sys. Fuels, Inc.,* 79 Fed.Cl. at 67 (holding that "charges for internal labor shall be allowed as mitigation costs without any reduction"); *Sys. Fuels, Inc.,* 78 Fed.Cl. at 798 (rejecting the Government's argument that internal labor costs were not incremental); *S. Nuclear Operating Co.,* 77 Fed.Cl. at 442 (finding that use of internal labor was "less expensive than hiring contractors which reduces costs to ratepayers and ultimately to the federal taxpayers who bear the burden of judgments entered by this court"); *Pac. Gas & Elec. Co.,* 73 Fed.Cl. at 408 ("To the extent that the costs of PG & E's internal labor were in fact performed on a 'breach-related project,' ... the court finds that such labor costs should be properly awarded to plaintiff."); *Tennessee Valley Auth.,* 69 Fed.Cl. at 538-39 (holding that whether the utility would have paid its salaried employees in all events was immaterial).

In *Northern States Power Co.,* the Court rejected the defendant's challenge to internal labor costs for 200-plus employees who charged, on average, slightly more than one hour per week to breach-related activities over an eight year period. The Court reasoned:

> We are unable, however, to discern any principled distinction between the employee fully engaged in breach-related work and the employee whose involvement in such work may have been only limited. In either case, a cost was incurred that is properly chargeable to the activity benefitted-the development of a dry storage facility.... [I]t is quite appropriate to recognize as a cost of mitigation any diversion of labor that was applied to the accomplishment of that mitigation....'[T]he test for recovery is a targeted one: whether use of the internal resources by [plaintiff] deprived it of the ability to employ those resources on other projects.' We adopt this conclusion as our own.

*N. States Power Co.,* 78 Fed.Cl. at 468 (quoting *Tennessee Valley Auth.,* 69 Fed.Cl. at 539). The Court sees no basis to depart from this well-reasoned position. Every hour that a Progress Energy employee spent on a breach-related project was an hour that the employee did not spend doing other productive work for Progress Energy. The evidence shows that DOE's partial breach caused Progress Energy to spend $15,175,982 in labor costs on breach-related projects. Defendant has not produced any evidence showing these costs to be unreasonable.***48** Plaintiffs' $15,175,982 in labor costs will be included in their damages award.

4. *Overhead*

[11] Plaintiffs' damages claim includes $2,336,679 for stores overhead and $1,895,031 for indirect overhead expenses. Stores overhead consists primarily of warehousing costs such as procurement, expediting, quality control, receipt inspections, material handling, and related labor costs. (Edwards, Tr. 405-06). Indirect overhead consists of Construction Work in Project costs, which pays the salaries of management level individuals and financial persons. (Edwards, Tr. 407-08; Calvello, Tr. 1613-15). All projects that use stores overhead and indirect overhead, including breach-related projects, are allocated a portion of the costs through specific project codes in Progress Energy's internal accounting system. (Edwards, Tr. 592-93; Calvello, Tr. 1611-13). Most of Progress Energy's overhead expenses are fixed, meaning they do not change with the volume of business activity. (Edwards, Tr. 597; Johnson, Tr. 1988-90; DX-D5 at 28). Progress Energy did not quantify the amount, if any, by which its overhead costs increased as a result of the breach-related projects. (Edwards, Tr. 600-02).

Defendant does not dispute that Progress Energy used warehousing services for breach-related projects. (Johnson, Tr. 2029). Rather, Defendant contends that Progress Energy may not recover any portion of overhead costs because they are fixed costs, and thus not "incremental to the breach." Def.'s Post-Trial Brief at 159. According to Defendant, Progress Energy failed to show any eco-


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

nomic harm resulting from DOE's partial breach. Defendant argues that "Plaintiffs supplied no evidence, as they could have attempted, that fluctuations in their overhead charges coincided with their engagement in breach-related activities...." Def.'s Post-Trial Reply Brief at 46. Consequently, Defendant seeks to reduce Progress Energy's stores overhead claim by $2,190,504 and its indirect overhead claim by $1,819,575. (DX-D5 at 43). Plaintiffs respond that if breach-related projects did not receive their fair allocation of overhead, then other projects would assume a disproportionate amount of the total overhead costs. (Calvello, Tr. 1613).

The Court sees no basis in law or logic for Defendant's position. Plaintiffs' overhead costs were incurred and are properly attributable to mitigation projects and activities. If no overhead charges were allocated to the mitigation projects, Plaintiffs' other projects would be more expensive than anticipated. *Id.* Overhead, by definition, is a cost of doing business, and for some period of time, part of Progress Energy's "business" was mitigating DOE's partial breach. Overhead recovery is necessary to compensate Plaintiffs fully. *See Sys. Fuels, Inc.,* 78 Fed.Cl. at 799-800 (rejecting the Government's principle that all "loader costs" [overhead] would have been incurred absent DOE's breach). The Court will allow the recovery of Plaintiffs' stores overhead and indirect overhead expenses.

5. *Robinson Crane Studies*

[12] Prior to DOE's partial breach, CP & L used its 125-ton capacity Robinson crane to load 75-ton IF 300 casks for shipment to Harris and Brunswick. (Edwards, Tr. 251-52, 261-62; Worthington, Tr. 823-24). As part of its $36 million Robinson ISFSI project, Progress Energy concluded that it would be "prudent" to determine if its existing Robinson crane was qualified to lift the heavier 110-ton ISFSI dry-storage casks. (Worthington, Tr. 824, 857). Progress Energy commissioned contractors to study the need for a crane modification at a cost of $368,121, and as a result, did in fact modify and upgrade the Robinson crane. Although Defendant does not challenge the cost of the Robinson ISFSI or the cost of the crane upgrade, it challenges the cost of the crane studies. In Defendant's words, Progress Energy "failed to explain why the costs incurred to perform these studies would not have been performed in the absence of any delay by DOE."Def.'s Post-Trial Reply Brief at 48.

Defendant's contention is without merit. Defendant does not contest that DOE's partial breach directly led to Progress Energy's need to construct the Robinson ISFSI and to upgrade the crane to load the heavier dry storage casks. Progress Energy could not ***49** have known if it was necessary to upgrade the crane unless it commissioned the studies that Defendant now challenges. Mr. Worthington, Progress Energy's engineer responsible for the installation of the crane modification, testified that the crane studies would have been necessary had the crane not needed to be modified to load the ISFSI dry storage cases. (Worthington, Tr. 824-32). On these facts, it is clear that DOE's partial breach was a substantial causal factor in the cost of the Robinson crane study. Defendant produced no evidence showing that the Robinson crane study was an unnecessary expense or that its costs were unreasonable. The $368,121 for the Robinson crane study will be included in Plaintiffs' damages award.

6. *Licensing and Communications Expenses for Harris Pools*

[13] In order to activate the Harris C and D pools, CP & L had to seek regulatory approval from the NRC. (Edwards, Tr. 345). The NRC's licensing process allowed for community and environmental groups to oppose a utility's application, and the occurrence of such opposition was common. (Edwards, Tr. 346-50). The NRC's rules of practice for licensing procedures provided that "[a]ny person whose interest may be affected by a proceeding and who desires to participate as a party shall file a written petition for leave to intervene." 10 C.F.R. §


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2.174 (1998). Full Atomic Safety Licensing Board ("ASLB") hearings often were held for large capital projects at nuclear power plants. (Edwards, Tr. 348-49).

North Carolina Waste Awareness Network, an environmental organization, and the Board of Commissioners of Orange County ("BCOC"), a governmental organization, actively opposed CP & L's opening of the Harris C and D pools. (Edwards, Tr. 349). The BCOC filed formal oppositions with the NRC, and the NRC conducted full ASLB hearings. (Edwards, Tr. 345, 349-50). CP & L ultimately prevailed in its position that the activation of the Harris C & D pools posed no significant safety hazards. *See In re Carolina Power & Light Co.,* 53 N.R.C. 113, 2001 WL 208730 (2001) (denying BCOC's petition for review of staff's issuance of license amendment).

CP & L also engaged in community outreach efforts when dealing with plant modifications and contested NRC proceedings. (Edwards, Tr. 350-51). CP & L undertook such efforts when seeking approval of the C and D pool activation. (Edwards, Tr. 352). CP & L incurred $1,800,500 in NRC proceedings to defend its licensing request, and $100,288 for its community outreach efforts related to this request. (DX-D5 at 43). In the absence of DOE's partial breach, these expenditures would not have been necessary. (Edwards, Tr. 352-53); *see also N. States Power Co.,* 78 Fed.Cl. at 464 ("[P]laintiff should not have to bear the unavoidable costs associated with [an activity] that defendant acknowledges constituted an otherwise reasonable and successful effort to mitigate damages."). Defendant's argument that these costs were not a direct result of DOE's delay in performance is without any basis. The $1,900,788 in legal and communications expenses will be allowed.

7. *Upgrade to the Harris Component Cooling Water System*

[14] Plaintiffs claim $1,166,640 as the cost of upgrading the component cooling water ("CCW") system at the Harris plant. Plaintiffs assert that these upgrades primarily were due to the opening of the C and D spent fuel pools at the Harris plant, while Defendant argues that the CCW upgrades were necessary to accommodate the increased heat loads from CP & L's power uprate and steam generator replacement. (Maret, Tr. 1774-75; DX 307 at 8-10; DX-D4 at 11-14). The Court must determine whether DOE's failure to accept spent fuel at the Harris plant beginning January 31, 1998 was a substantial causal factor of CP & L's CCW upgrade expense.

The work that CP & L performed on the CCW upgrade consisted of replacing pump impellers in the cooling system, enabling more cold water to circulate at a higher pressure. (Edwards, Tr. 547; Tibbitts, Tr. 1034). CP & L authorized the CCW upgrade for three independent reasons, all relating to dissipating heat more effectively: (1) activation***50** of the C and D spent fuel pools; (2) the power uprate enhancement; and (3) the steam generator replacement. (Edwards, Tr. 543).

One means of analyzing this issue is to consider the increased heat load from each source. Defendant's expert, Mr. Maret, established that, aside from the opening of the C and D spent fuel pools, the additional heat load placed on the CCW system after power uprate was 19.5 MBTU/hour-13.2 MBTU/hour in additional heat load on the residual heat remover ("RHR") heat exchanger, and 6.3 MBTU/hour in additional heat load in the A and B spent fuel pools. (Maret, Tr. 1785-89; DX 307 at 10; DX-D4 at 13-14). In comparison, the licensed heat load limit for the C and D pools increased from 1.0 MBTU/hour to 7.0 MBTU/hour. *Id.* The combined increase in heat load on the CCW system attributable to the RHR heat exchanger and the A and B pools is more than twice the total allowable heat load in the C and D pools. *Id.* This data strongly suggests that the CCW upgrades would have been needed regardless of the opening of the C and D pools.


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CP & L's contemporaneous documentation is consistent with this suggestion. In a January 1998 presentation, Mr. Edwards addressed the advantages and disadvantages of utilizing the CCW system to provide cooling for the C and D pool activation. (Edwards, Tr. 554; DX 185 at 9205). Mr. Edwards identified as one of the disadvantages the fact that "there [would be] inadequate long-term (post power up rate) CCW margin without plant modification (additional heat exchanger capacity and pump upgrades)." *Id.*In a related bar graph, the largest single annual increase in heat load occurs in the year when the initial phase of the power uprate would be performed. (Edwards, Tr. 555-57; DX 185 at 9206). Similarly, in an April 1998 presentation, Mr. Edwards indicated that the "CCW upgrade [would be performed] to accommodate power uprate impacts." (Edwards, Tr. 557-59; PX 90 at 9231). In December 1998, Mr. Edwards stated "the existing CCW system [was] adequate for near-term operation until power uprate is implemented." (Edwards, Tr. 559-60; DX 206 at 4846).

Based upon the evidence, the Court finds that the opening of the Harris C and D spent fuel pools was the least important of three reasons for the CCW upgrades. The Court therefore concludes that CP & L likely would have performed the CCW upgrades because of the power uprate and steam generator replacement, even if DOE had begun accepting spent fuel at the Harris plant on January 31, 1998. Accordingly, Plaintiffs' claim for the CCW upgrade expenses, $1,166,640, is denied.

8. *Crystal River Re-rack Program*

[15] Plaintiffs claim $4,675,392 as the cost to perform a re-rack operation at FPC's Crystal River, Florida nuclear plant. The issue is whether FPC incurred this expense due to DOE's failure to begin accepting spent fuel on January 31, 1998, or whether FPC performed the re-rack operation for a different reason, to resolve a "Boraflex degradation" problem. To grant Plaintiffs' claim, the Court must find that DOE's material breach in failing to accept spent fuel was a substantial causal factor in FPC's decision to perform the re-rack operation.

"Boraflex" is a soft-rubber neutron absorbing material used to control criticality in spent fuel pools. (Maret, Tr. 1798-1801). Impregnated in the Boraflex rubber material is boron carbide, which acts as a neutron absorber, and silicon dioxide, which acts as a filler. *Id.* FPC discovered that Boraflex is subject to degradation following exposure to high levels of gamma radiation. (Maret, Tr. 1801-02; DX 307 at 11 n. 25). When Boraflex breaks down into its constituent materials, boron carbide and silicon dioxide (silica) can leach into the spent fuel pool. *Id.* The Boraflex degradation causes problems relating both to criticality and silica contamination. The loss of boron reduces the ability of the racks to absorb neutrons, and the silica is a contaminant that can find its way into the reactor vessel or other systems within the plant. (Maret, Tr. 1802; Lehmann, Tr. 1126). Silica contamination is a threat to the fuel cladding, which serves as the principal barrier to release of radiation into the environment.***51** (Maret, Tr. 1804-05; DX 307 at 11). FPC's fuel vendor imposed silica concentration limits on the reactor coolant system to limit damage to the fuel that it had supplied and warranted. (Maret, Tr. 1805-06).

In 1995, FPC first suspected that it had a Boraflex degradation problem. (Lehmann, Tr. 1111). In a November 1996 silica assessment report, an FPC team recommended that "[r]emoval of the silica contamination-the Boraflex from the racks, or replacement of the racks would provide the optimum solution." (PX 72 at 3355). FPC's only concern with replacing the racks was that it might not be cost-effective. (Lehmann, Tr. 1117). FPC had received estimates that a re-rack operation would cost between $7 and $8 million. (Lehmann, Tr. 1117-18; PX 72 at 3349). FPC considered other solutions to the Boraflex degradation problem, such as a reverse osmosis method, taking credit for soluble boron, or using a device known as a "racksaver." (Lehmann, Tr. 1127-28, 1157-58, 1166-70; Culver, Tr. 937;


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

DX 182 at 9512). These alternative solutions were less costly than re-racking, but were considered "band-aid" solutions. (Lehmann, Tr. 1169-70).

In December 1996, FPC notified the Westinghouse Corporation, the manufacturer of the racks in the spent fuel pool, that plant modifications would be necessary to manage anticipated silica levels. (Lehmann, Tr. 1118-20; DX 159). FPC believed that Westinghouse was responsible for the Boraflex degradation problem occurring in the racks. (Lehmann, Tr. 1124). FPC and Westinghouse ultimately negotiated a re-rack solution for $3.2 million, much lower than FPC's original $7-8 million estimate. (PX 87 at 3532-33). Westinghouse offered a discount of approximately $1 million for this project, where in negotiations FPC had complained about the degradation of the original Boraflex racks. (Lehmann, Tr. 1197-98, 1209). FPC obtained 117 additional storage spaces from the re-rack operation. (Lehmann, Tr. 1201-02).

Of particular significance is a December 1997 FPC Request for Project Approval ("RPA"). (DX 182). In this document, Mr. Lehmann completed a questionnaire and scoresheet of reasons for performing the re-rack operation. *Id.* at 9515-16. FPC's company policy and instructions for completing the questionnaire are found in the "Integrated Planning Manual, Revision 5." (PX 166). The instructions provide 36 potential questions for consideration, and guidance on a scoring system of 1-10 for each question. *Id.* at 6357-64. The preparer is required to respond only to relevant questions, which in the case of the re-rack project were Question nos. 23, 28, 29, and 35. (DX 182 at 9515-16). In answering these questions, Mr. Lehmann awarded only six of 28 total points for anything having to do with additional on-site storage. (Lehmann, Tr. 1173-88). The majority of the points, and the driving reasons for the re-rack project, were to resolve the Boraflex degradation and the silica contamination problems. The assignment of even six points may have been exaggerated, because Mr. Lehmann based the score on an assumed four years of additional storage space, but he indicated elsewhere in the same report that full core reserve could be maintained for three additional years. (Lehmann, Tr. 1183-85). For three years of additional space, the score would have been four points, not six. (Lehmann, Tr. 1182-83).

Based upon all the evidence, the Court concludes that the Crystal River re-rack project did provide additional storage space for spent fuel, but that FPC most likely would have performed this project in any event absent DOE's breach. The re-rack decision became a cost-effective solution to the Borax degradation and silica contamination problems once Westinghouse lowered its price. The Court cannot say that DOE's failure to accept spent fuel at Crystal River beginning January 31, 1998 was a substantial causal factor for the re-rack project. Accordingly, Plaintiffs' claim for the cost of this project, $4,675,392, is denied.

9. *Manual Journal Entries*

After examining Progress Energy's accounting records during the Court-ordered review process, Defendant agreed that Plaintiffs supported $90,684,002 of their claimed costs with reliable documentation and evidence.***52** Defendant contends, however, that Plaintiffs failed to support the remaining $345,701 of their claim with adequate detail or documentation. (DX-D5 at 42-43; Johnson, Tr. 2013-14; Calvello, Tr. 1597). Plaintiffs admit that this portion of their claim is not supported with particular documentation such as an invoice, but maintains that they have met their burden of proof through witness testimony explaining how the manual adjustments were entered and why they are accurate and reliable. Pls.' Post-Trial Brief at 73.

The items in question are manual journal entries to correct mistakes, such as labor or materials inadvertently billed to the wrong project or account. (Edwards, Tr. 420). These entries do not have the same level of documentary support as the other costs comprising Plaintiffs' claim. Without documentation, Plaintiffs could not explain why particu-


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lar costs were incurred, what they were for, or whether they would have been incurred absent the breach. (DX 308 at 21). The mere offering of corrected journal entries, without more, does not satisfy Plaintiffs' burden where the entries are challenged by Defendant. These costs, totaling $345,701, must be removed from Plaintiffs' damages as unsupported. (Johnson, Tr. 2017-18; DX 308 at 21; DX-D5 at 44).

10. *DOE Cask Loading Absent the Breach*

[16] In addition to challenging ten specific costs on causation and certainty grounds, Defendant claims the damages award should be reduced by $9,818,462 for the "avoided" cost of loading DOE casks. Def. Br. at 154-56; (Johnson, Tr. 1968; DX-D5 at 43). Defendant did not cite to a single case in support of its position in its post-trial brief, and dropped the argument entirely in its post-trial reply brief. The Court can only guess that this is because the Court has uniformly rejected Defendant's proposed cask loading reduction in its previous spent nuclear fuel decisions. *See Sys. Fuels, Inc.,* 79 Fed.Cl. at 70-71; *Sys. Fuels, Inc.,* 78 Fed.Cl. at 797; *N. States Power Co.,* 78 Fed.Cl. at 468-69; *Pac. Gas & Elec. Co.,* 73 Fed.Cl. at 416; *Sacramento Mun. Util. Dist. v. United States,* 70 Fed.Cl. 332, 372 (2006); *Tennessee Valley Auth.,* 69 Fed.Cl. at 542. Defendant has not provided any compelling reason why the Court should depart from this well established precedent, and the Court finds that its predecessors' reasoning applies with equal force to the present facts.

It is true that under the terms of the Standard Contract, Plaintiffs must bear the cost of loading DOE transportation casks when DOE arrives to accept its spent fuel. (PX 10 at 6850; Edwards, Tr. 388). It is also true that "[b]ecause DOE has not yet begun accepting fuel, Progress Energy has to date not incurred any costs associated with loading to DOE."Def.'s Post-Trial Brief at 100 (citing Edwards, Tr. 572). Plaintiffs, however, have not avoided the cost of loading DOE casks. The loading costs have merely been deferred. *Sys. Fuels, Inc.,* 78 Fed.Cl. at 797 ("[C]ask loading costs are more accurately characterized as deferred costs rather than avoided costs."); *Pac. Gas & Elec. Co.,* 73 Fed.Cl. at 416 (holding that plaintiff's loading costs were deferred and not avoided); (Edwards, Tr. 3 88-89; Johnson, Tr. 2021; Maret, Tr. 1904-05). When DOE arrives to pick up Plaintiffs' spent fuel in the future, Progress Energy will have to pay the loading costs that Defendant now seeks to impose. *See id.* The Court sees no reason why Progress Energy should have to pay twice for the same performance. *See Restatement (Second) of Contracts* § 347(c), cmt. d; *Corbin on Contracts* § 57.10.

Even if Plaintiffs' loading costs were avoided and not deferred, Defendant failed to present any evidence showing with reasonable certainty what Plaintiffs' loading costs would have been had DOE performed. To calculate the number of "avoided" loadings, Defendant's expert, Gregory Maret, "assumed" that Progress Energy would load 75-ton IF 300 casks at Brunswick, Harris, and Robinson, and GA-4 truck casks at Crystal River. (DX-D4 at 22; Maret, Tr. 1817-24). Mr. Maret then made what he considered reasonable assumptions about the costs associated with those loadings. (Maret, Tr. 1824-26). Mr. Maret's assumptions, while possibly reasonable, are contradicted by the evidence. When DOE does arrive to ***53** pick up fuel, it can choose from several types and sizes of casks, from "smaller truck weight casks" to larger 100-ton rail casks. (Maret, Tr. 1820-21). Currently, DOE has not identified the type or size of cask that it will use at Progress Energy's plants. (Edwards, Tr. 389; Zabransky, Tr. 1527). Nor has DOE agreed to accept without repacking the already loaded dual purpose casks at Robinson, (Edwards, Tr. 389). Indeed, DOE has not committed to using railroad casks at all. *Id.* Given the uncertainties surrounding both the method and cost of hypothetical loading of DOE casks absent the breach, the Court finds that Mr. Maret's assumptions do meet the standard for reasonable certainty required under the law. *See Sys. Fuels, Inc.,* 79 Fed.Cl. at 71 ("Prior decisions have


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

concluded that '[a]s matters now stand, any benefit inhering in [the utility] because of delayed loading costs would be entirely speculative. It is not possible to ascertain the method DOE will ultimately use for SNF acceptance.' ") (quoting *Tennessee Valley Auth.,* 69 Fed.Cl. at 542); *N. States Power Co.,* 78 Fed.Cl. at 468-69; *Sys. Fuels, Inc.,* 78 Fed.Cl. at 797 ("[C]ask loading costs are more accurately characterized as deferred costs rather than avoided costs."); *Pac. Gas & Elec. Co.,* 73 Fed.Cl. at 416 (holding that given the speculative nature of the future costs, "the court declines to engage in a guessing game as to whether such deferred costs will have increased or decreased by the time (if ever) defendant performs the parties' Standard Contract"); *Sacramento Mun. Util. Dist.,* 70 Fed.Cl. at 372 (declining to deduct speculative loading costs); *Tennessee Valley Auth.,* 69 Fed.Cl. at 542 ("[B]oth DOE and [plaintiff] contemplate that DOE will still perform under the contract at some future date. As matters now stand, any benefit ... because of delayed loading *costs* would be entirely speculative."). For these reasons, Defendant did not meet its burden to show costs that Progress Energy avoided by not having to perform. Defendant's proposed $9,818,462 reduction is rejected.

11. *AFUDC*

[17] Plaintiffs claim as damages a charge for an Allowance for Funds Used During Construction ("AFUDC"), the amount of which represents the "estimated debt and equity costs of capital funds necessary to finance the construction of new regulated assets." (Edwards, Tr. 588; DX 268 at 63). Defendant argues that this cost should not be recoverable because it is the functional equivalent of interest on a claim, and is not allowable in claims against the Government in the absence of a waiver of sovereign immunity.

Under 28 U.S.C. § 2516(a), a party may not recover interest upon a claim against the United States in the Court of Federal Claims unless specifically permitted by contract or statute. As Defendant correctly points out, no provision of the Standard Contract, nor the NWPA or any other act of Congress, provides for the payment of interest on damages claims. Def.'s Post-Trial Brief at 163 (citing *Maine Yankee Atomic Power Co. v. United States,* 225 F.3d 1336, 1340 (Fed.Cir.2000)).

Plaintiffs attempt to escape this rule by characterizing AFUDC as "interest *as* a claim" rather than "interest *on* a claim." Pls.' Post-Trial Reply Brief at 41 (emphasis in original). In support, Plaintiffs point out that AFUDC is "calculated in real time and applied contemporaneously with the project." Pls.' Post-Trial Brief at 70 (citing Edwards, Tr. 403). Plaintiffs rely upon *Wickham Contracting Co. v. Fischer,* 12 F.3d 1574 (Fed.Cir.1994), for the proposition that "a contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract." Pls.' Post-Trial Brief at 71 (quoting *Wickham,* 12 F.3d at 1582). Defendant responds that *Wickham* is inapplicable to the facts here because the contract in *Wickham* involved the "Changes" clause which authorized recovery of interest to address a contract change. Def.'s Post-Trial Brief at 165. Moreover, Defendant argues, " '[t]he changed work must be directly traced to a specific loan or necessity for increased borrowing must be shown to have been required by extra work or delay caused by the Government.' " Def.'s Post-Trial Brief at 166 (quoting *Gevyn Constr. Corp. v. United States,* 827 F.2d 752, 754 (Fed.Cir.1987)); *see also* Pls.' Post-Trial Brief at 71 (admitting that under *Wickham,* they must show that ***54** "borrowed funds were used in connection with the ... project.") (quoting *Wickham,* 12 F.3d at 1583).

The Court finds it unnecessary to decide whether *Wickham* applies to a contract that does not contain the Changes clause because Plaintiffs failed to provide any evidence tying any borrowed money to specific projects. The record shows that Progress Energy borrowed money at the company level and not at the project level. (Edwards, Tr. 591-92). Consequently, there is no direct "one-to-one corres-


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pondence" between any borrowing and any particular breach-related project. (Edwards, Tr. 591-92). While this capital structure may, as Plaintiffs contend, be commercially reasonable and conform with Federal Energy Regulatory Commission ("FERC") requirements, the absence of any evidence establishing a direct causal connection between the cost of borrowing and specific breach-related projects renders Plaintiffs' $1,996,045 AFUDC claim not recoverable. *See Sys. Fuels, Inc.,* 79 Fed.Cl. at 69 ("Failing to have established that its claimed financing costs are directly related to required borrowing through specific debt instruments, [plaintiff] cannot recover its costs of capital."); *N. States Power Co.,* 78 Fed.Cl. at 471-72 ("Absent proof of any borrowings with which the interest claim can be causally identified, however, plaintiff's cost of capital damages become conceptually indistinguishable from prejudgment interest, *i.e.,* interest on a claim."). (DX-D5 at 43).

*Conclusion*

Based upon the foregoing, the Court awards damages to Plaintiffs for $82,845,926 through December 31, 2005. The Clerk is directed to enter judgment for Plaintiffs in this amount. Pursuant to Rule 54, costs are awarded to Plaintiffs.

IT IS SO ORDERED.

Fed.Cl.,2008.
Carolina Power & Light Co. v. U.S.
82 Fed.Cl. 23

END OF DOCUMENT


© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# In the United States Court of Federal Claims

No. 04-106 C
(Filed: June 20, 2008)

**************************************
*
**DAIRYLAND POWER COOPERATIVE,** *
*
Plaintiff, *
*
v. *
*
**THE UNITED STATES,** *
*
Defendant. *
*
**************************************

## ORDER

Pursuant to the Trial Preparation Order of February 21, 2008, Plaintiff, Dairyland Power Cooperative ("Dairyland") and Defendant, the United States ("the Government") filed their motions *in limine* on April 29, 2008. The parties filed their responses on May 15, 2008, and a hearing was held on May 29, 2008. Based on the arguments of the parties in the pleadings and at the hearing, below is the Court's decision on each of the outstanding motions.

### I. Defendant's Motion *In Limine* to Exclude the Admission at Trial of Documents Prepared by Government Contractors

The Government, as it has in other spent nuclear fuel ("SNF") cases, seeks to exclude all documents that were prepared by Department of Energy ("DOE") contractors. The Government gives a number of reasons to exclude these documents; however, none of these reasons is persuasive to the Court. For the reasons set forth below, the Government's Motion *In Limine* to Exclude the Admission at Trial of Documents Prepared by Government Contractors ("Def.'s Mot. to Exclude Contractor Documents") is DENIED.

#### A. Admissibility of the Documents under Fed. R. Evid. 803(8)(A)

##### 1. Background

There are approximately 140 documents[1] at issue which were prepared by contractors for

[1] According to the Government there are 137 documents that fall into this category. Def.'s Mot. to Exclude Contractor Documents at 1. According to Dairyland, there are "nearly 140."

DOE regarding research and planning relating to the disposal of SNF. Def.'s Mot. to Exclude Contractor Documents, App.1-11; Pl.'s Resp. at 1; Tr. 8:18-21.[2]

The Government does not contend that the documents are not relevant, rather, the Government argued that the contractor documents are not admissible because they are not covered by any of the exceptions to the hearsay rule under Fed. R. Evid. 803 and that they are not admissions under Fed. R. Evid. 801(d). Def.'s Mot. to Exclude Contractor Documents at 6-14; Tr. 8:24-17:19. Dairyland responded that the documents are admissible under a number of theories including, the public records exception to the hearsay exclusion under Fed. R. Evid. 803(8)(A) or as non-hearsay under Fed. R. Evid. 801(d)(2)(C) or (D). Plaintiff's Response to Defendant's Motion In Limine to Exclude the Admission at Trial of Document's Prepared by Government Contractors ("Pl.'s Resp. to Def.'s Mot. to Exclude Contractor Documents ") at 7-15; Tr. 18:23-22:23.

**2. Applicable Law**

At this time the primary issue before the Court is the admissibility of the contractor documents. *PR Contractors, Inc. v. United States*, 69 Fed. Cl. 468, 469 (2006) ("A motion *in limine* is a preliminary motion that serves a gatekeeping function and permits the trial judge to eliminate from further consideration evidentiary submissions that clearly would be inadmissible for any purpose.") If the documents are found to be admissible, the question of whether the statements contained within the contractor documents can be attributed to DOE is a subsidiary question which can be addressed during trial. Tr. 7:4-25. To determine the admissibility of the contractor documents the Court looks to Fed. R. Evid. 803(8)(A) which provides that "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth the activities of the office or agency" are not excluded by the hearsay rule "unless the sources of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A).

The contractor documents were not created by DOE; however, this Court holds that, while DOE contractor documents may not have been directly created by DOE, the exception in Fed. R. Evid. 803(8)(A) allows for admission of the documents. While the Government attempts to argue that DOE contractors have a limited amount of responsibility, this Court finds that "[t]o a significant, if not exclusive extent, DOE's activities, duties, and responsibilities under the NWPA [Nuclear Waste Policy Act], have been conducted through its national laboratories and management and operations ("M&O") contractors." *Yankee Atomic Elec. Co. v. United States* ("*Yankee*"), No. 98-126C, 2004 U.S. Claims LEXIS 363, at *8 (Fed. Cl. Sept. 17, 2004) (citing

---

Dairyland's Response to Defendant's Motion *In Limine* to Exclude the Admission at Trial of Documents Prepared by Government Contractors. ("Pl.'s Resp. to Def.'s Mot. to Exclude Contractor Documents ") at 1.

[2] Tr. (page #:paragraph #) refers to the transcript from the oral argument on the parties' motions *in limine* held on May 29, 2008.

*Westinghouse Electric Co. v. United States*, 1997 WL 1068204 at *2 (Fed. Cl. 1997)).[3] Fed. R. Evid. 803(8)(A) is to be construed broadly to include

> those activities done by national laboratories at the behest of DOE and within the parameters thereof. The court is mindful of defendant's point that some of the documents contain a disclaimer that the views are those of the contractor/author, not of any government agency, a position that is . . . not dispositive o[f] their admissibility as public records.

*Pacific Gas & Elec. Co. v. United States* ("*PG&E*"), 73 Fed. Cl. 333, 438 (2006) (citing *Yankee,* 2004 U.S. Claims LEXIS 363, at *22-23). The Government advanced the same position in the instant matter as it did in *Yankee* and *PG&E*, that the documents do not contain the views of any government agency. The Government argued at the hearing on May 29, 2008, that the reports prepared by contractors do not set forth the activities of DOE, rather the documents contain suggestions, recommendations, and advice of contractors hired to provide this information. Tr. 10:15-22. The Government also contended, *inter alia*, that the contractors are not public officials because they are not employees or agents of DOE. Def.'s Mot. to Exclude Contractor Documents at 6-10; Tr. 9:20-25. And while the Government makes a number of arguments regarding whether or not the statements contained in the documents should be attributed to DOE, it has not persuaded the Court that these documents are inadmissible hearsay.

**3. Conclusion**

The Government's position that the documents are not admissible under Fed. R. Evid. 803(8)(A) is unavailing. The contractors in this matter have a significant amount of responsibility under the NWPA for activities related to the disposal of SNF. The Court concludes that these documents constitute "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth the activities of the office or agency." Fed. R. Evid. 803(8)(A). There has been no contention that "the sources of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A). Therefore, the contractor documents are admissible.

This Court agrees with and adopts the reasoning set forth in *Yankee* and *PG&E*. The documents are admissible under Fed. R. Evid. 803(8)(A). However, in making the determination

---

[3] Dairyland excerpted for the Court the testimony of Dr. John Bartlett, the former Director of the Office of Civilian Radioactive Waste Management ("OCRWM"). Dr. Bartlett was asked during the *Yankee* trial, "[w]hen you were director, to what extent did you and OCRWM rely upon studies prepared by the management and operations contractor such as this one?" Dr Bartlett responded, "[a]ll of the work is done by the - by the support of contractors. That's what they're there for. The Department of Energy has - OCRWM itself has about 65 employees. The program has about 5,000 employees if you look at it this way. These are contractor people." Pl.'s Resp. Def.'s Mot. to Exclude Contractor Documents at 6; *see also Yankee,* 2004 U.S. Claims LEXIS 363, at * n.5.

that the documents are admissible, the Court has not determined that the contractor's "[r]ecords, reports, statements, or data compilations" reflect or establish DOE policy. Fed. R. Evid. 803(8)(A); *see also Yankee,* 2004 U.S. Claims LEXIS 363, at *29. This determination shall be made if the issue arises at trial.

### B. Admissibility of the Documents under Fed. R. Evid. 801(d)(2)(C) or (D)

#### 1. Background

Dairyland also seeks the admission of the documents as admissions of a party opponent under Fed. R. Evid. 801(d)(2)(C) or (D). Tr. 21:8-12. The Government contended that the contractors were not "authorized" to make statements on behalf of DOE. Def.'s Mot. to Exclude Contractor Documents at 23. The Government relied on the principle that "[c]ourts have historically applied agency law to determine whether the declarant was authorized by the party to make the statement at issue." *Id.* at 24 (citing 5 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 801.32[1], at 801-69-70 (2d ed. 2008); Tr. 15:16-17:16.

Dairyland argued that, "[i]n most if not all cases, the contractors were actually hired to *write* the reports in question, so clearly the statements made in the reports–like the analysis and other work underlying the reports–were 'authorized' by DOE." Pl.'s Resp. to Def.'s Mot. to Exclude Contractor Documents at 16. Moreover, some documents contain the express statement that "this report was prepared as an account of work sponsored by an agency of the United States Government." *Id.* at 16. Additionally, Dairyland again cited to the *Yankee* trial testimony of Dr. John Bartlett, a former director of OCRWM. Tr. 21:13-19. When asked to what extent the M&O contractors were "authorized by the Department to make statements concerning the subjects addressed in studies," Dr. Bartlett responded that "they have full authority to accomplish and report this work." Pl.'s Resp. to Def.'s Mot. to Exclude Contractor Documents at 17.

#### 2. Applicable Law

According to Fed. R. Evid. 801(d) Statements which are not hearsay:

> A statement is not hearsay if (2) Admission by a party-opponent. The statement is offered against a party and is . . . (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

Fed. R. Evid. 801(d)(2)(C), (D).

In the instant matter it is clear that these Government contractors are authorized by DOE to make the statements contained in the documents at issue. DOE fulfills its mission through the use of Government contractors. The Government cannot now disavow a relationship that was created contractually simply because it would be beneficial to the pending litigation. Additionally, the Court finds that the management and operations ("M&O") contractors at issue here are akin to employees that

carried out DOE's contractual responsibilities under the Nuclear Waste Policy Act [NWPA] and the Standard Contract. *Yankee Atomic Elec. Co.*, 2004 U.S. Claims LEXIS 363, at *8. Therefore, the Court agrees with Dairyland, as well as *Yankee* and *PG&E*, that the documents are admissible as admissions by a party-opponent under Fed. R. Evid. 801(d)(2)(C) and (D). Fed. R. Evid. 801(d)(2) "expressly acknowledges that an admission by a party-opponent is not hearsay if the statement is offered against the party and was actually made by him in either his individual or representative capacity." *Mayor of City of Philadelphia v. Educational Equality League*, 94 S.Ct. 1323, 1345-1346 (1974). Further, "under Fed. R. Evid. 801(d)(2)(C), all that is required for such an 'admission' to be admissible at trial is that it is made by 'a person authorized by the party to make a statement concerning the subject.'" *PG&E*, 73 Fed. Cl. at 440.

### 3. Conclusion

The Court finds that the DOE contractors were authorized, in fact contracted, to make statements for DOE concerning the transportation and disposal of SNF pursuant to the Standard Contract. Additionally, as stated above, the Court finds that the DOE contractors are akin to employees that worked for DOE and carried out its duties under the NWPA and the Standard Contract. The Court, therefore, holds that the documents are admissible under Fed. R. Evid. 801(d)(2) (C) and (D). Whether or not the document reflects or establishes DOE policy shall be determined at trial should the issue arise.

## II. Dairyland's Motion to Exclude Evidence of the Reasons for DOE's Delay in Performance – i.e., Its Breach of Contract

Dairyland seeks to exclude any evidence that the Government might offer regarding the reason for DOE's breach. According to Dairyland, in recent spent nuclear fuel trials the Government has attempted to introduce evidence concerning the reason for DOE's breach which delayed and confused the proceedings. For the reasons set forth below Dairyland's Motion to Exclude Evidence of the Reasons for DOE's Delay in Performance – i.e., Its Breach of Contract is GRANTED.

### A. Background

Despite the broad title of Dairyland's motion it does not seek to exclude all evidence of the reasons for DOE's delay in performance, rather Dairyland seeks to exclude evidence that advances the Government's position regarding "unavoidable delay." Specifically, Dairyland seeks to exclude testimony by Mr. Christopher Kouts, a senior official at DOE, regarding the reasons for the delay of the Yucca Mountain project, such as budgetary issues, because they are not relevant to the damages issue presented in this case. Dairyland's Motion to Exclude Evidence of the Reasons for DOE's Delay in Performance ("Pl.'s Mot. to Exclude Evidence of Delay") at 1. According to Dairyland, *inter alia*, the Government is barred from raising the issue of "unavoidable delay" by the mandamus order issued by the D.C. Circuit. Pl.'s Mot. to Exclude Evidence of Delay at 2; Tr. 24:23-25; 25:1-4; *see Northern States Power Co. v. Department of Energy*, 128 F.3d 754, 760 (D.C. Cir. 1997). Dairyland also alleges that the Government has waived its ability to argue unavoidable delay by failing to plead the matter as an affirmative defense. Pl.'s Mot. to Exclude Evidence of Delay at 7; Tr, 25:19-26:5.

At oral argument the Government agreed that based on the D.C. Circuit's ruling at this time it is

"unable to make the argument with respect to unavoidable delays." Defendant's Response to Plaintiff's Motion to Exclude Evidence of the Reasons for the Department of Energy's Delay in Performance ("Def.'s Resp. to Pl.'s Mot. to Exclude Evidence of Delay") at 2; Tr. 26:23-27:4. However, the Government argued that it should be able to put forth evidence regarding "DOE's progress towards developing an MRS, monitored retrievable storage system." Def.'s Resp. to Pl.'s Mot. to Exclude Evidence of Delay at n1; Tr. 27:17-28:7. And if Dairyland challenges the 1991 ACR [Annual Capacity Report] the Government seeks to be permitted to describe the circumstances surrounding its creation and any allegations of "bad faith" surrounding the creation of the 1991 ACR that may arise. Def.'s Resp. to Pl.'s Mot. to Exclude Evidence of Delay at 3-4; Tr. 29:2-30:7.

### B. Applicable Law

The Court holds, that despite the fact that the D.C. Circuit mandamus order is now on appeal in the U.S. Court of Appeals for the Federal Circuit, while the appeal is pending the mandamus order is still in effect. *See Nebraska Public Power District v. United States*, 73 Fed. Cl. 650, 673 (holding that the subject mandamus was void because the D.C. Circuit "operated in excess of its jurisdiction and, specifically, without an appropriate waiver of sovereign immunity."); Tr. 24:13-14. Specifically, the D.C. Circuit's writ of mandamus states:

> We preclude DOE from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim. This necessarily means, of course, that DOE not implement any interpretation of the Standard Contract that excuses its failure to perform on the grounds of "acts of Government in either its sovereign or contractual capacity." 10 C.F.R. § 961.11, Art. IX.A.

*Northern States Power Co. v. Department of Energy*, 128 F.3d 754, 760 (D.C. Cir. 1997).

### C. Conclusion

The Court shall not permit any evidence submitted by the Government, including any testimony by Mr. Kouts, that seeks to advance the position that "its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim." *Northern States Power Co.*, 128 F.3d at 760. Any testimony by Mr. Kouts that does not concern an "interpretation of the Standard Contract that excuses its failure to perform on the grounds of 'acts of Government in either its sovereign or contractual capacity'" shall be allowed. *Id.*

## III. Dairyland Power Cooperative's Motion *In Limine* to Exclude Evidence Inconsistent with the Government's Contention Interrogatory Answers

Dairyland seeks to preclude the Government from introducing evidence that it claims is inconsistent with the Government's answers to contention interrogatories. Dairyland Power Cooperative's Motion *In Limine* to Exclude Evidence Inconsistent with the Government's Contention Interrogatory Answers ("Pl.'s Mot. to Exclude Evid. Inconsistent Interrog.") at 1. According to Dairyland, the Government made several concessions in its answers to interrogatories and, therefore,

many issues are no longer in dispute. *Id.*; Tr. 35:15-24. For the reasons set forth below Dairyland Power Cooperative's Motion *In Limine* to Exclude Evidence Inconsistent with the Government's Contention Interrogatory Answers is GRANTED IN PART AND DENIED IN PART.

### A. Background

Dairyland seeks to exclude evidence that is inconsistent with the Government's answers to five contention interrogatories: numbers 9, 13, 15, 16 and 17. Pl.'s Mot. to Exclude Evid. Inconsistent Interrog. at 1. According to Dairyland, based on the Government's answers to the contention interrogatories, the Government has conceded that it is not going to dispute the reasonableness of Dairyland's mitigation efforts. *Id.* at 8; Tr. 35:15-24. Additionally, Dairyland argues that the Government admitted it is not taking a position on the timing of DOE's acceptance of failed fuel. *Id.*

The Government contended that Dairyland seeks to shift its burden of establishing the "but for," *i.e.* non-breach, world to the Government through its contention interrogatories. Defendant's Response to Plaintiff's Motion to Exclude Evidence Inconsistent with the Government's Contention Interrogatory Answers ("Def.'s Resp. to Pl.'s Mot. to Exclude Evid. Inconsistent Interrog.") at 7; Tr. 38:6-13. According to the Government, it "cannot state whether, absent DOE's delay, Dairyland's failed fuel would have been accepted on the same schedule as Dairyland's standard fuel." Def.'s Resp. to Pl.'s Mot. to Exclude Evid. Inconsistent Interrog. at 8; Tr. 40:17-20, 41:3-9. Furthermore, based on its answers to interrogatories, the Government is not precluded from responding to any evidence regarding failed fuel adduced by Dairyland at trial. Def.'s Resp. to Pl.'s Mot. to Exclude Evid. Inconsistent Interrog. at 8. Additionally, the Government conceded that it "does not currently plan to challenge the reasonableness of the actions that Dairyland took regarding its storage decisions at LACBWR [LaCrosse Boiling Water Reactor]." *Id.* at 10; Tr. 44:8-13. The Government further argued that this does not relieve Dairyland of establishing the reasonableness of its actions and that DOE's delay caused Dairyland to incur the costs. Def.'s Resp. to Pl.'s Mot. to Exclude Evid. Inconsistent Interrog. at 10; Tr. 44:1-7, 14-20.

### B. Applicable Law

Dairyland seeks to limit the Government's introduction of evidence based on its answers to contention interrogatories. According to Dairyland the Government should be limited at trial to presenting evidence that is consistent with its answers to contention interrogatories. Dairyland argues that evidence "contradicting the government's contentions is irrelevant and inadmissible under Fed. R. Evid. 401 and 402." Pl.'s Mot. to Exclude Evid. Inconsistent Interrog. at 1. The relevance of this information is not the real issue, rather the issue before the Court is whether a party is bound by its answers to contention interrogatories. According to the United States Court of Appeals for the Federal Circuit:

> [D]iscovery allows the plaintiff to develop facts to support the theory of the complaint and allows the defendant to develop facts to support its defenses. (internal citation omitted). Second, discovery is designed to allow the defendant to pin down the plaintiff's theories of liability and to allow the plaintiff to pin down the defendant's theories of defense, thus confining discovery and trial preparation to information that is pertinent to the theories of the case.

*O2 Micro International. Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1365 (Fed. Cir. 2006). Therefore, the Government in answering Dairyland's contention interrogatories has addressed its "theories of defense." Trial preparation for both parties has proceeded based on the information provided during discovery in this matter.

### C. Conclusion

Upon review of the Government's answers to contention interrogatories, the pleadings of the parties, and the arguments made on May 29, 2008, the Court holds the following with respect to each interrogatory:

**Interrogatory 9**–Dairyland asked the Government if it contends that it is was unreasonable for Dairyland to study, analyze, investigate and/or implement dry storage subsequent to DOE's partial breach. Defendant's Response to Plaintiff's First Set of Interrogatories as Amended in Response to the Court's February 5, 2007 Order and Supplemented Following the Close of Fact Discovery ("Def.'s Resp. to Interrogs.") at 24. The Government responded that only through an expert report will it argue that it was unreasonable for Dairyland to study, investigate and/or implement dry storage. *Id.*; Tr. 44:8-13. Additionally, in answering the interrogatory the Government specifically stated that it does not concede that the study, investigation and/or implementation of dry storage were caused by DOE's partial breach. Def.'s Resp. to Interrogs. at 24-25.

The Government shall be allowed to put forth evidence that the damages claimed in studying, analyzing, investigating and/or implementing dry storage was not due to DOE's breach whether or not it is in an expert report. But, the Government shall only be allowed to argue that it was unreasonable for Dairyland to study, analyze, investigate and/or implement dry storage through expert reports.

**Interrogatory 13**–Dairyland asked the Government if it would have picked up Dairyland's failed fuel later than the rest of its SNF, if it began acceptance starting not later than January 31, 1998. Def.'s Resp. to Interrogs. at 33. The Government stated that David Zabransky, an employee of the Office of Civilian Radioactive Waste Management, explained the issues that might arise relating to the acceptance of failed fuel in *Yankee*. *Id.* at 34. According to the Government "although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them under the same schedule as standard fuel . . . ." *Id.*; Tr. 40:5-9. The Government then supplemented its answer concluding that what the Government "would have" done is irrelevant to the case, but rather the only question that needs to be considered is what the Government was required to do under the Standard Contract. Defendant's Supplemental Response to Plaintiff's Interrogatory Number 13 Pursuant to the Court's December 21, 2007 Order ("Def.'s Supp. Resp.") at 5. The Government affirmatively stated that in a "'but for' world Dairyland's failed fuel would not have been accepted pursuant to the terms of the Standard Contact on the same schedule as standard SNF until and unless Dairyland had established that the failed fuel could have been safely handled and transported to a federal facility . . . ." *Id.* at 6. Also, the Government contended that according to the Standard Contract, Dairyland is required to obtain confirmation from DOE as to the "technical feasibility" of accepting such fuel pursuant to the "currently agreed to schedule." *Id.*; Tr. 40:5-9, 42:5-18. Further, because Dairyland has never inventoried all of its failed fuel they do not have sufficient information to allow for a determination of when the failed fuel would have been picked up. Def.'s Supp. Resp. at 6-7; Tr. 40:17-

24. According to the Government, Dairyland cannot meet its burden of establishing that DOE would have accepted the failed fuel on the same schedule as standard SNF. Def.'s Supp. Resp. at 7.

Based on the Government's answers to Dairyland's contention interrogatories, it shall be allowed to put forth evidence regarding the acceptance of failed fuel pursuant to the Standard Contract. However, because the Government specifically stated in its answers to contention interrogatories that what it "would have" done regarding the acceptance of failed fuel is irrelevant, the Government shall not put forth any evidence regarding when it would have accepted failed fuel. This includes any evidence to support the position that it would have picked up Dairyland's failed fuel later than the rest of its SNF. The Government shall be limited to what it was required to do pursuant to the Standard Contract.

**Interrogatory 15**–Dairyland asked the Government if they contend it was unreasonable for Dairyland to store SNF in the wet fuel storage pool after the partial breach. Def.'s Resp. to Interrogs. at 35. The Government's response indicated that it would not contest the reasonableness of Dairyland's storage of SNF in its wet pools except as argued in the Government's expert reports. *Id.* at 36. Additionally, the answer to the contention interrogatory specifically stated that the Government does not concede that Dairyland's maintenance of its wet fuel storage pool was due to DOE's partial breach of the Standard Contract. *Id.*

Based on the Government answers to contention interrogatories, it shall be allowed to put forth any evidence that the maintenance of the wet fuel storage pools was not due to DOE's partial breach of the Standard Contract. But, the Government shall only be allowed to argue the "reasonableness" of Dairyland's storage of SNF in the wet fuel storage pool through expert reports.

**Interrogatory 16**–Dairyland asked the Government to describe all options Dairyland should have explored for the storage of SNF after the partial breach. *Id.* The Government responded that it is not required to determine alternatives for the storage of SNF. *Id.* at 37. Further, the Government stated that it does not plan to argue that Dairyland should have explored or implemented any particular strategy for storage of SNF except as identified in expert reports. *Id.* The Government also indicated that it does not concede that DOE's partial breach was the cause of any particular method chosen by Dairyland. *Id.*

The Court acknowledges that the Government does not concede that DOE's partial breach was the cause of any particular method chosen by Dairyland. Additionally, based on the Government's answer it shall be allowed to present evidence from expert reports regarding alternative storage methods. However, since the Government specifically stated that it does not plan to argue that Dairyland should have explored or implemented any particular strategy for storage of SNF, it will not be allowed to present evidence regarding a particular strategy Dairyland should have explored for the storage of SNF after the partial breach, unless it was identified in an expert report.

**Interrogatory 17**–Dairyland asked the Government to describe all options Dairyland should have explored for the storage of its failed fuel. *Id.* According to the Government's response, it is not required to determine alternatives for the storage of failed fuel. *Id.* at 38. Further, the Government stated that it does not plan to argue that Dairyland should have explored and/or implemented a particular method of storage for failed fuel except as identified in expert reports. *Id.* The Government also stated that while it was required to accept failed fuel under the Standard Contract it was not required to accept failed fuel

under the same schedule as standard SNF. *Id.*

The Government shall be allowed to present evidence from expert reports regarding storage methods for failed fuel. The Government shall also be allowed to present evidence regarding the contention that they were not obligated to accept failed fuel on the same schedule as standard SNF. However, since the Government specifically stated that it does not plan to argue that Dairyland should have explored any particular strategy for storage of failed fuel, it shall not be allowed to present evidence regarding a particular strategy Dairyland should have explored for the storage of failed fuel after the partial breach, unless it was identified in an expert report.

## IV. Motions *In Limine* to Exclude the Testimony of Expert Witnesses

### A. Background

On April 29, 2008, Dairyland filed motions to exclude the testimony of the following Government experts: Warren K. Brewer, R. Larry Johnson, and Jonathan A. Neuberger. The Government filed responses on May 15, 2008. On April 29, 2008, the Government filed motions to exclude the testimony of the following Dairyland experts: Ivan F. Stuart, Charles Wilkins and Frank C. Graves. Dairyland filed responses on May 15, 2008. Each motion *in limine* was addressed at the hearing on May 29, 2008. Because the applicable law is the same for the all the experts, it will be recited only once and then applied to each expert who is the subject of a motion *in limine*.

For the reasons set forth below Dairyland's Motion *in Limine* to Exclude Warren K. Brewer's Testimony is DENIED; Dairyland's Motion to Exclude R. Larry Johnson's Testimony is GRANTED IN PART AND DENIED IN PART; Dairyland's Motion to Exclude Jonathan A. Neuberger is DENIED; the Government's Motion to Exclude Expert Testimony [Charles L. Wilkins] Regarding Overhead Costs is DENIED; the Government's Motion to Exclude the Testimony of Ivan F. Stuart is DENIED; and the Government's Motion to Exclude Frank C. Graves is DENIED.

### B. Applicable Law

Testimony by experts is governed by Fed. R. Evid.702, as amended in 2000. Fed. R. Evid. 702. Testimony by Experts states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the fact of the case.

Fed. R. Evid. 702.

#### 1. The proposed expert witness must be qualified

A witness must be qualified as an expert based on their "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. This standard is disjunctive; therefore, an expert may be qualified based on any one of the five criteria found in the rule. *Waldorf v. Shuta*, 142 F.3d 601, 626 (3d Cir. 1998) (error

to exclude expert testimony based on practical experience, as "otherwise qualified witness is not disqualified merely because of a lack of academic training."); *Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994) (an expert can testify based on training even if they possess no experience; however, testimony regarding the application of training principles requires a basis in experience). An expert need only be qualified and need not be the best and the brightest for the testimony to be admissible. *See* Matthew Bender & Co., Inc., *Federal Rules of Evidence Manual* § 702.02 [3] (citing G. Joseph & S. Saltzburg, *Evidence in America* § 51.3 ("trial judges are not to demand that the proffered expert possess the highest possible credentials or skills, or be the most qualified of all conceivable experts."))

**2. Under *Daubert* and Fed. R. Evid. 702, the Court must act as a gatekeeper**

Even after the Court has determined that an expert is qualified, it continues to act as a gatekeeper as required by Fed. R. Evid. 702. *Daubert v. Merrell Dow Pharmaceuticals, Inc.* ("*Daubert*"), 509 U.S. 579, 597 (1993) ("the Rules of Evidence–especially Rule 702–do assign to the trial judge the task of ensuring that an expert's testimony both rests on reliable foundation and is relevant to the task at hand.").

**a. The expert's testimony must be reliable**

The Court must make a determination that the evidence is reliable. This requires an "assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. To this end, *Daubert* set forth a five factor, nondispositive, "flexible" test to aid the court. *Id.* at 594; Matthew Bender & Co., Inc., *Federal Rules of Evidence Manual* § 702.02 [5].[4] These factors are:

1) whether the theory or technique can be or has been tested;
2) whether the theory or technique has been subjected to peer review and publication;
3) the known or potential rate of error;
4) the existence and maintenance of standards controlling the technique's operations; and
5) the degree of general acceptance.

*Daubert*, 509 U.S. at 593-94.

On remand the Ninth Circuit, "undertook[] 'the task of ensuring that an expert's testimony both rests on reliable foundation and is relevant to the task at hand.'" *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1313 (1995)(internal citation omitted). According to the Ninth Circuit after the issuance of the Supreme Court's decision in *Daubert* it is the court's "responsibility to determine whether those experts' proposed testimony amounts to scientific knowledge, constitutes good science, and was derived by the scientific method." *Daubert*, 43 F.3d at 1316 (internal citations omitted).

**b. The expert's testimony must be relevant**

As with all evidence, any expert's testimony must be relevant. According to Fed. R. Evid. 702, testimony by an expert must "assist the trier of fact to understand the evidence or to determine a fact in

[4]Many cases cite a four factor, nondispositive, "flexible" test. Factor number four, "the existence and maintenance of standards controlling the technique's operations" is often not cited, although it is present in *Daubert*.

issue." Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591; *see also* Fed. R. Evid. 401 (defining relevant evidence as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") and Fed. R. Evid. 402 (regarding generally the admissibility of evidence, "[a]ll relevant evidence is admissible . . . . [e]vidence which is not relevant is not admissible."). Another aspect of relevance is whether the expert testimony is sufficiently tied to the facts of the case such that it will aid in resolving the factual dispute. *Daubert*, 509 U.S. at 591 (citing *United States v. Downing*, 753 F.2d 1224, 1242 (3d. Cir. 1985)). This inquiry can be described "as one of fit." *Daubert*, 509 U.S. at 591.

### 3. Discretion, appellate standard of review and the burden of proof

The proponent of the evidence has the burden of proving the admissibility of the expert testimony by a preponderance of the evidence. Fed. R. Evid. 702, Advisory Committee Notes (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)). The admission of expert testimony is in the discretion of the trial court. *Acoustical Design, Inc. v. Control Elect. Co.*, 932 F.2d 939, 942 (Fed. Cir. 1991) (citing *Salem v. United States Lines Co.*, 370 U.S. 31 (1962)). And expert rulings are reviewed according to the abuse of discretion standard. *General Electric Co. v. Joiner* ("*Joiner*"), 522 U.S. 136, 139 (1997). *Joiner* concluded that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. However, the Supreme Court in *Daubert* noted that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

### 4. *Daubert* applies even if the testimony is not "scientific" testimony

The Supreme Court has also held that the gatekeeper function found in *Daubert* applies to the testimony of experts who do not testify based on scientific principles, but based on "technical, or other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). There is no reason to attempt to make a distinction between scientific, technical or other specialized knowledge when deciding the question of the admissibility of the expert's testimony. *Id.* at 148 ("Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'"(citations omitted)). The trial judge must ensure that the expert testimony is both reliable and relevant, even if it is not based on scientific principles. *Id.* at 149.

However, the "factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 150 (internal citations omitted). The Supreme Court further concluded that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152. The court has the same type "of latitude in determining *how* to test an expert's reliability . . . as it enjoys when it decides *whether* that expert's relevant testimony is reliable." *Id.* (emphasis in original).

## C. Pending Motions

### 1. Dairyland's Motion to Exclude Warren K. Brewer's Testimony

Mr. Brewer has worked in the nuclear industry for over 30 years and is one of the owners of ABZ,

Inc., an engineering consulting company performing work for the commercial nuclear power industry. Defendant's Response to Dairyland's Motion to Exclude Warren K. Brewer's Testimony ("Def.'s Resp. to Pl.'s Mot. to Exclude Brewer") App. at 4, 27-42. He attended the Bettis Reactor Engineering School and received an M.S. in Nuclear Engineering from MIT. *Id.*

**a. Dairyland's Position**

According to Dairyland, Mr. Brewer's expert report critiques the opinions of Dairyland's expert Todd Smith regarding the increased cost of removing the reactor pressure vessel (RPV) from Dairyland's plant due to the presence of SNF.[5] Dairyland's Motion to Exclude Warren K. Brewer's Testimony ("Pl.'s Mot. to Exclude Brewer") at 1; Tr. 48:7-13. The RPV, an internal component at LACBWR, was removed between 2005 and 2007. This increased cost is one category of Dairyland's damages. Dairyland claims that the cost of RPV removal would have been significantly lower had DOE timely performed the Standard Contract. Dairyland proffered Mr. Smith's report in an attempt to justify this conclusion that the cost would have been lower in the non-breach world. Pl.'s Mot. to Exclude Brewer at 1. Dairyland contended that Mr. Brewer merely reviews the documents relied upon by Mr. Smith, as well as other evidence, and then offers his opinion of the evidence without completing any independent analysis. *Id*. at 2; Tr. 50:24-52:16. Dairyland seeks to exclude Mr. Brewer's opinion because it is not based on reliable principles or methods and is an intrusion on the role of the judge as the ultimate arbiter of fact and law. *Id*; Tr. 49:25 - 50:7.

Dairyland asserted that Mr. Brewer's testimony is nothing more than his own, subjective belief that certain non-breach world costs calculated by Dairyland's expert Mr. Smith are not supported. Pl.'s Mot. to Exclude Brewer at 5. Because Mr. Brewer did not perform any calculations of his own, Dairyland alleged that the opinion is nothing more than *ipse dixit*, and is not admissible. *Id.* at 6-8, 19; Tr. 50:24-52:16.

Dairyland also contended that Mr. Brewer is to testify that cask loading cost should be deducted from damages. Pl.'s Mot. to Exclude Brewer at 21. Cask loading costs include the cost of loading the SNF into a cask to be picked up and transferred to DOE. Def.'s Resp. to Pl.'s Mot. to Exclude Brewer App. at 25. According to Dairyland this has repeatedly been rejected by other SNF judges based on the rationale that the cask loading costs are not avoided but are merely deferred until a later time when DOE performs. *Id.* at 23. Non-breach costs need only be deducted when they entirely avoided; here the cost will be incurred in the future. *Id.*

**b. The Government's Position**

According to the Government, Dairyland's primary criticism is that, while Mr. Brewer offers a critique of the deficiencies in Todd Smith's report regarding RPV removal in the "but for" world, Mr. Brewer failed to complete his own model calculating his proposed cost for this removal. Defendant's Response to Plaintiff's Motion to Exclude Warren K. Brewer's Testimony ("Def.'s Resp. to Mot. to Exclude Brewer") at 1; Tr. 52:18-53:6. The Government contended that Mr. Brewer used established and reliable engineering principles to provide a useful basis for understanding the deficiencies in Mr. Smith's report. Def.'s Resp. to Mot. to Exclude Brewer at 2; Tr. 53:12-23. According to the Government, Mr. Brewer is an expert in the field of nuclear engineering with experience in nuclear reactor design,

[5] The Government did not file a motion to exclude the testimony of Todd Smith.

construction, testing and operation. Def.'s Resp. to Mot. to Exclude Brewer at 4; Tr. 54:1-10. Mr. Brewer has repeatedly been qualified as an expert in other SNF cases. Def.'s Resp. to Mot. to Exclude Brewer at 4. The Government argued that Mr. Brewer also offers the opinion that two studies performed by a Dairyland contractor would have been required regardless of when DOE accepted Dairyland's SNF, that operations and maintenance costs claims by Dairyland do not depend on the amount of SNF stored in the spent fuel pool, and finally that in the "but for" world Dairyland would have incurred costs to transfer its SNF to DOE, therefore, these costs are not recoverable by Dairyland. *Id.* at 8.

#### c. Conclusion

Based on the pleadings filed herein and the arguments of counsel, the Court holds that Mr. Brewer's testimony is both reliable and relevant. *Daubert,* 509 U.S. at 597 ("the Rules of Evidence–especially Rule 702–do assign to the trial judge the task of ensuring that an expert's testimony both rests on reliable foundation and is relevant to the task at hand."). Mr. Brewer shall be allowed to testify at trial. The Court holds that any argument regarding Mr. Brewer's lack of independent analysis goes to the weight of his testimony rather than the admissibility.

### 2. Dairyland's Motion to Exclude R. Larry Johnson's Testimony

Mr. Johnson is a partner emeritus of Johnson Lambert & Co. and the Chairman/CEO of Veris Consulting, LLC, a litigation consulting service. Dairyland's Motion to Exclude R. Larry Johnson's Testimony ("Pl.'s Mot. to Exclude Johnson"), App. at 27-32. As a partner with Ernst & Young and later a managing partner with Johnson Lambert & Co., he oversaw the firms' accounting and auditing practices. *Id.* Mr. Johnson received a B.S. from the University of Maryland and has completed M.B.A. course work at George Washington University. *Id.*

#### a. Dairyland's Position

Dairyland seeks to exclude the testimony of Larry Johnson which critiques the expert opinions of two Dairyland experts, Charles Wilkins and Todd Smith. Pl.'s Mot. to Exclude Johnson at 1; Tr. 60:3-10, 71:20-24. Mr. Johnson concluded, based on a review of the Wilkins and Smith reports, that 1) Dairyland's asserted damages include costs that are not "incremental" and should be subtracted from the damages claim;[6] 2) Dairyland's asserted damages include costs that are not "reasonable" and should be subtracted; and 3) PFS damages and lobbying should be deducted based on instruction from counsel. Pl.'s Mot. to Exclude Johnson at 1; Tr. 57:19-58:14-23.

According to Dairyland, the "but for" standard used by Mr. Johnson in determining incremental costs is incorrect as a matter of law. *Id.* at 7; Tr. 55:13-24, 56:12- 57:14, 73:1-15. Dairyland asserts that the governing standard for causation, which should be used in determining incremental damages, is whether the breach is a substantial causal factor in the damages. Pl.'s Mot. to Exclude Johnson at 7 (citing *Indiana Michigan Power v. United States*, 422 F.3d 1369, 1371 (Fed. Cir. 2005)) Dairyland states that it must show that: 1) the damages were reasonably foreseeable by the breaching party at the time of

---

[6]Mr. Johnson explains "costs includable as an element of damages must be incremental to the partial breach in order to be characterized as damages. As such, those costs must be directly related and necessary to the activities caused by the breach and reflect expenditures that would not have been made but for the breach." Pl.'s Mot. to Exclude Johnson, App. at 8.

contracting; 2) the breach is a substantial causal factor in the damages; and 3) the damages are shown with reasonable certainty. Pl.'s Mot. to Exclude Johnson at 7 (citing *Indiana Michigan v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005)). Therefore, according to Dairyland, Mr. Johnson's determination of incremental costs is not reliable or relevant because it is based on an incorrect legal premise; that is, it uses the "but for" standard rather than the substantial causal factor standard. *Id.* at 8; Tr. 56:12-22. Dairyland thus seeks to exclude Mr. Johnson's analysis regarding overhead costs. Pl.'s Mot. to Exclude Johnson at 8. Dairyland also contends that Mr. Johnson does not offer any expert testimony when he opines that certain costs are not "reasonable" and should be excluded. *Id.* at 9.

**b. The Government's Position**

The Government contended that Mr. Johnson offers valuable testimony regarding accounting and damages matters and that Mr. Johnson performed valuable analysis that Dairyland failed to perform. Defendant's Response to Dairyland's Motion to Exclude R. Larry Johnson's Testimony ("Def.'s Resp. to Pl.'s Mot. to Exclude Johnson") at 1-2. Mr. Johnson offers a comprehensive framework for evaluating the validity and basis of Dairyland's damages claim. *Id.* at 2; Tr. 61:6-20. According to the Government, Mr. Johnson properly offers the opinion that certain costs claims by Dairyland are not incremental to the Government's partial breach because Dairyland would have incurred the same costs even if DOE had performed. Def.'s Resp. to Pl.'s Mot. to Exclude Johnson at 7; Tr. 68:1- 70:12. Mr. Johnson's opinion regarding incremental costs critique Dairyland's claims regarding: 1) overhead and general and administrative costs; 2) labor costs charges to the "Baseline" activity code; and 3) miscellaneous costs such as activities performed by Dairyland contractors' charges related to the decommissioning of the plant, and Nuclear Regulatory annual fees. Def.'s Resp. to Pl.'s Mot. to Exclude Johnson at 7-8.

The Government claimed that Mr. Johnson's testimony regarding reasonable costs is from the cost and accounting perspective, not a legal one. *Id.* at 14. Additionally, Mr. Johnson performed valuable modeling of two SNF acceptance scenarios, one with a "fuel-out" date in 2005 and one with a "fuel-out" date after 2008. *Id.* at 11-12.

**c. Conclusion**

The Court concludes that Mr. Johnson's testimony is both reliable and relevant. Mr. Johnson's testimony, "reasoning [and] [] methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. Mr. Johnson's testimony is also relevant, as it "assist[s] the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591.

The Court understands Dairyland's concern that Mr. Johnson's incremental cost analysis uses the 'but for' standard rather than the substantial causal factor test found in *Indiana Michigan*, 422 F.3d at 1373. Pl.'s Mot. to Exclude Johnson at 7. However, according to the Federal Circuit, "the selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion." *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1318 (Fed. Cir. 2007). Therefore, it is arguable that either test could be appropriate. As recently as May 19, 2008, Judge Wheeler in *Carolina Power* stated "[f]or each of the disputed damages items here, the Court will apply the but-for test or the substantial causal factor test as appropriate." *See Carolina Power v. United States*, No. 04-37C, 2008 WL 2154103 *20 (Fed. Cl. May 19, 2008). Any issues regarding Mr. Johnson's testimony regarding incremental cost are open for Dairyland on cross-examination. *Daubert*, 509 U.S. at 596 ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Mr. Johnson shall also be allowed to testify regarding his two different models for SNF acceptance scenarios, as they provide an alternative to Dairyland's acceptance theory. Mr. Johnson shall be allowed to testify regarding overhead costs.

Mr. Johnson shall not be allowed to testify regarding his opinion as to whether PFS and lobbying costs incurred by Dairyland are properly attributable to DOE's breach. *Sparton Corp. v. United States*, 77 Fed. Cl. 1, 9 (2007) ("Expert testimony is an improper mechanism for offering a legal opinion to the Court."). A conclusory statement by Mr. Johnson, based on the advice of the Government's counsel, that these specific costs cannot be attributed to the breach, followed by the subtraction of these costs from Dairyland's claimed damages, does not "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591.

### 3. Dairyland's Motion to Exclude Jonathan A. Neuberger's Testimony

Mr. Neuberger is a principal in the economics consulting firm Economists Incorporated. Dairyland's Motion to Exclude Jonathan A. Neuberger's Testimony, App. ("Pl.'s Mot. to Exclude Neuberger, App.") at 5, 46. He received a Master's Degree and Ph.D in Economics from Johns Hopkins University. *Id.*

#### a. Dairyland's Position

Dairyland asserted that the opinions of Dr. Neuberger are merely criticisms of the testimony of Mr. Graves and that Dr. Neuberger failed to create a competing model to contradict the model created by Mr. Graves. Dairyland's Motion to Exclude Jonathan A. Neuberger's Testimony ("Pl.'s Mot. to Exclude Neuberger") at 1; Tr. 127:19-128:18. According to Dairyland, Mr. Neuberger's opinions are speculative and impressionistic. Pl.'s Mot. to Exclude Neuberger at 2. And the testimony is unreliable, irrelevant, confusing and a waste of the court's time. *Id.*; Tr. 127:5-9, 128:11-18.

#### b. The Government's Position

The Government takes the position that if the testimony of Mr. Graves is excluded, then the Government will not seek to introduce the testimony of Dr. Neuberger. Defendant's Response to Plaintiff's Motion to Exclude the Testimony of Jonathan A. Neuberger ("Def.'s Resp. to Pl.'s Mot. to Exclude Neuberger") at 1-2, Fn. 1; Tr. 126:19-22. The Government argued that Dr. Neuberger applied well-established and reliable economic principles and provides the Court with a useful basis for understanding the significant deficiencies contained within Mr. Graves' hypothetical exchanges model. Def.'s Resp. to Pl.'s Mot. to Exclude Neuberger at 1, 2. Dr. Neuberger has analyzed the models used by Mr. Graves and has offered an economic critique of Mr. Graves' model and resulting conclusions. *Id.* at 8.

#### c. Conclusion

The Court holds that the testimony of Dr. Neuberger shall be allowed. The Government offers Dr. Neuberger to explore its disputes with the modeling presented by Mr. Graves. *See infra* ¶ 6. Because the Court will allow the testimony of Mr. Graves, the Court finds that the testimony of Dr. Neuberger will "assist the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702. In this case the fact at issue is the disputed acceptance rate for SNF and the potential for exchanges as allowed by

the Standard Contract. Dr. Neuberger's opinion is a reliable and relevant critique of the modeling used by Mr. Graves concerning both the acceptance rate and possible exchanges. *Daubert*, 509 U.S. at 587 ("[t]he Rules basic standard of relevance is thus a liberal one.").

**4. The Government's Motion to Exclude Expert Testimony (of Charles Wilkins) Regarding Overhead Costs**

Mr. Wilkins is a Certified Public Accountant with more than 35 years of dispute resolution experience in matters in which the U.S. Government was a party. Dairyland's Response to Defendant's Motion *In Limine* to Exclude Expert Testimony Regarding Overhead Costs, App. ("Pl.'s Resp. to Def.'s Mot. to Exclude Overhead Costs") at 2. He is now a Senior Managing Director in the Forensic Litigation Consulting practice of FTI Consulting, Inc. *Id.* Mr. Wilkins holds B.A.'s from California State University and LaSalle University along with an M.B.A. from the University of California. *Id.*

**a. The Government's Position**

The Government requests exclusion of the expert testimony of Charles Wilkins, who will testify regarding Dairyland's overhead cost allocation to breach-related projects. Defendant's Motion *In Limine* to Exclude Expert Testimony Regarding Overhead Costs ("Def. Mot. to Exclude Overhead Costs") at 1; Tr, 74:21-24. The Government insists that this testimony is not relevant because overhead costs are not attributable to the breach. Def. Mot. to Exclude Overhead Costs at 4. Recovery of overhead costs, which the Government contends Dairyland would have incurred regardless of breach, would put Dairyland "in a significantly better position in the breach world," contrary to the fundamental principles of contract damages. *Id.* The Government contends that Dairyland offers no evidence that it would actually have been able to allocate the resources to non-breach related projects, thus incurring "opportunity costs." *Id.* at 11; Tr. 75:18-24, 81:3-8. Alternatively, the Government requests that Mr. Wilkins' testimony be limited to matters specifically addressed in his report. *Id.* at 12-13.

**b. Dairyland's Position**

According to Dairyland, Mr. Wilkins' "work demonstrates that, but for the government's breach, Dairyland would not have incurred its claimed overhead and G&A costs in connection with its breach related activities." Pl.'s Resp. to Def.'s Mot. to Exclude Overhead at 1-2. Dairyland alleged that it need not prove that the cost would not have been incurred absent the breach, but rather all that they must prove is that if the costs "are properly allocated to breach-related activities, then the resources represented by those costs would have been efficiently devoted to other uses or reduced absent the breach." *Id.* at 2; Tr. 81:15-6, 83:16-9. The claimed overhead cost consists of "incurred service center and operations costs that were required to support LACBWR activities, including activities associated with the government's breach." Pl.'s Resp. to Def.'s Mot. to Exclude Overhead at 2. The Government's contention that it is necessary for Mr. Wilkins to "analyze exactly how Dairyland's overhead and G&A resources would have been used absent the breach" is without merit. *Id.* at 5. According to Dairyland, the argument that Dairyland must demonstrate precisely how the overhead and G&A resources would have been used absent the breach has consistently been raised in other SNF cases and has been "almost universally rejected." *Id.*; Tr. 81:23-83:15.

**c. Conclusion**

The Court holds that Mr. Wilkins shall be allowed to testify regarding Dairyland's overhead costs.

Any argument that the Government makes regarding the fact that Dairyland offers no evidence as to how it would have allocated the overhead and G&A resources in a non-breach world–an argument that has been rejected by other judges on this court–goes to the legal standard by which overhead costs could be awarded by this Court. It does not effect the admissibility of Mr. Wilkins' testimony.

The issue of overhead costs has been present in many SNF cases. For example, in *Carolina Power*, Judge Wheeler allowed Plaintiff's claim for overhead costs, reasoning that "[o]verhead, by definition, is a cost of doing business, and for some period of time, part of Progress Energy's "business" was mitigating DOE's partial breach. Overhead recovery is necessary to compensate Plaintiff's fully." *See Carolina Power v. United States*, No. 04-37C, 2008 WL 2154103 *28 (Fed. Cl. May 19, 2008); (citing *Sys. Fuels, Inc. v. United States*, 78 Fed. Cl. 769, 799-800 (2007) (rejecting Governments principle that all "loader costs" [overhead] would have been incurred absent DOE's breach)). Overhead costs were awarded in *Pacific Gas & Electric v. United States*, 73 Fed. Cl. 333 (2006), but were ultimately rejected in *Sacramento Mun. Util. Dist v. United States*, 70 Fed. Cl. 332, 376-77 (2006) (holding that plaintiff failed to meet the burden of demonstrating that such costs, in fact, were incremental) and *System Fuels, Inc. v. United States*, 78 Fed. Cl. 796, 798-800 (2007) (holding that plaintiff failed to meet burden of demonstrating that these costs would not have been incurred in the absence of DOE's delay).

Finally, while the Government urges the Court to limit Mr. Wilkins' testimony to matters found in his expert report this Court holds that it is unnecessary to limit Mr. Wilkins' testimony in advance of trial.

**5. The Government's Motion *In Limine* to Exclude the Testimony of Ivan F. Stuart**

Mr. Stuart has over 40 years of experience in the nuclear industry, including in the field of spent fuel transportation and storage. Defendant's Motion *In Limine* to Exclude the Testimony of Ivan F. Stuart, App. at 2, 24-26. He is a registered professional nuclear engineer and President of I. Stuart & Co., Inc., an international nuclear consulting firm. *Id.* Mr. Stuart received a B.S. in Mechanical Engineering from the Newark College of Engineering and a graduate degree from the New York University/ U.S. Air Force Meteorological Program. *Id.*

**a. The Government's Position**

The Government seeks to exclude Mr. Stuart's testimony that 1) the acceptance rate of 3,000 MTU per year by DOE would have been readily achievable by DOE; 2) sufficient advanced work by DOE was possible in view of the large body of experience in the transportation of spent fuel gathered by and/or available to DOE prior and subsequent to 1983; 3) adequate planning and preparations would have ensured the availability of a sufficient number of casks; 4) exchanges of acceptance allocations among contracting utilities would have been accommodated; and 5) there are no site-specific conditions that would have prevented DOE from utilizing acceptance campaigns to transport SNF from Dairyland. Defendant's Motion *In Limine* to Exclude the Testimony of Ivan F. Stuart ("Def.'s Mot. to Exclude Stuart") at 2; Tr. 87:9-16. According to the Government, these opinions are wholly irrelevant, they lack sufficient support and fail to take into account contradictory information. Def.'s Mot. to Exclude Stuart at 2; Tr. 87:20-4; 93:23-94:6. The Government contended that Mr. Stuart's testimony is after the fact testimony about what DOE should have done. Def.'s Mot. to Exclude Stuart at 8-10. Furthermore, Mr. Stuart's opinions are irrelevant and unreliable because they offer an opinion as to what DOE could have achieved, as opposed to what it was required to achieve. *Id.*; Tr. 88:5-18. Finally, the Government complained that Mr. Stuart performed no analysis to reach his conclusion. Def.'s Mot. to Exclude Stuart

at 10; Tr. 90:12- 91:19, 94:7-11.

**b. Dairyland's Position**

According to Dairyland, Mr. Stuart has 40 years of experience in the nuclear industry, including ten years as senior vice president of NAC International, Inc., "that designed, developed and manufactured spent fuel transportation and storage casks." Opposition to Motion *In Limine* to Exclude the Testimony of Ivan F. Stuart ("Pl.'s Opp. to Def.'s Mot. to Exclude Stuart") at 1. Mr. Stuart will testify: "1) that there are no technical impediments to DOE operating its SNF program at a rate of 3000 MTU with a reasonable ramp-up beginning in 1998; 2) that sufficient casks and rail and other transportation equipment could have been available to DOE to accommodate concentrated acceptance 'campaigns' of spent fuel from utilities; and 3) that there are no site-specific conditions at Dairyland's LACBWR nuclear plant site that would have prevented DOE from using acceptance campaigns to transport SNF from the site." Pl.'s Opp. to Def.'s Mot. to Exclude Stuart 1-2. Mr. Stuart has testified in *Yankee*, *Sacramento Municipal Utility District (SMUD)*, and *PG&E*. Dairyland opines that the Government did not seek to exclude Mr. Stuart's testimony in the other SNF trials where it was offered (the Government did object at trial to one narrow issue regarding Mr. Stuart's testimony in *SMUD*). *Id.* at 3-4. Dairyland contends that it is entitled to present evidence consistent with its theory regarding acceptance rate and that the lack of technical impediments show DOE's ability to perform and support the "reasonableness" of Dairyland's proposed rate. *Id.* at 3; Tr. 96:24-97:4.

**c. Conclusion**

Mr. Stuart shall be allowed to testify. The Court is satisfied that Mr. Stuart's testimony is both reliable and relevant. Additionally, Mr. Stuart's report adequately describes how his experience in the nuclear industry led to the conclusions reached. Fed. R. Evid. 702, Advisory Committee Notes ("If a witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.").

**6. The Government's Motion *In Limine* to Exclude the Testimony of Plaintiff's Expert Witness, Frank C. Graves**

Mr. Graves is a principal with the Brattle Group, a firm that provides consulting and expert testimony in economics, finance and regulation to corporations, law firms and governments. Brattle Group Home Page, http://www.brattle.com (follow the "About Brattle" hyperlink). He has over 25 years of experience assisting utilities in the design and implementation of long-range planning, investment and operating policies. Dairyland's Opposition to Defendant's Motion *In Limine* to Exclude the Testimony of Plaintiff's Expert Witness, Frank C. Graves ("Pl.'s Opp. to Mot. to Exclude Graves"), App. at 15. Mr. Graves received a B.A. in mathematics from Indiana University and an M.S. with a concentration in finance from the M.I.T. Sloan School of Management. Brattle Group Home Page, http://www.brattle.com (follow the "Consultants" hyperlink, then browse by the "G" hyperlink, then the "Graves, Frank C." hyperlink) (last visited June 10, 2008).

**a. The Government's Position**

According to the Government, Mr. Graves will offer his opinion on two issues. First, Mr. Graves will offer testimony regarding an economically reasonable acceptance rate of SNF. Defendant's Motion *In*

*Limine* to Exclude the Testimony of Plaintiff's Expert Witness, Frank C. Graves ("Def.'s Mot. to Exclude Graves") at 1; Tr. 105:3-6. The Government contended that Mr. Graves "does not possess any knowledge, skill, experience, training, or education in the areas implicated by an opinion concerning the rate at which DOE would have accepted SNF from the industry beginning in 1998." Def.'s Mot. to Exclude Graves at 17; Tr. 107:22-109:12. Secondly, Mr. Graves will offer testimony regarding the acceleration of Dairyland's place in the Standard Contract's "oldest-fuel-first" acceptance queue. Def.'s Mot. to Exclude Graves at 1-2; Tr. 104:19-105:2. According to the Government, Mr. Graves' hypothetical exchanges market is based on speculative and overly-simplistic economic theory and is not properly grounded upon underlying facts. Def.'s Mot. to Exclude Graves at 20; Tr. 105:7-9. The Government argued that this hypothetical exchanges market is speculative because it assumes that a market for exchanges of SNF acceptance allocations in the queue would have been "analogous to a perfectly competitive market." Def.'s Mot. to Exclude Graves at 25; Tr. 106:2-6. Additionally, the Government claimed that Mr. Graves' model is speculative because it assumes that DOE would "approve[] all exchanges, even though utilities are required to submit their exchange requests to DOE, which has, 'in its sole discretion,' the right to approve or disapprove those requests." Def.'s Mot. to Exclude Graves at 8; Tr. 105:22-23.

The Government urged this Court to accept the reasoning found in *PG&E* and exclude the testimony of Mr. Graves. Tr. 105:18-21. According to the Government, the court in *PG&E* found that Mr. Graves' hypothetical exchanges model is premised upon factually-unsupported and speculative assumptions. Def.'s Mot. to Exclude Graves at 34; Tr. 105:18-106:17. And, this Court should also find that Mr. Graves' model is "too speculative to be helpful to the court in its resolution of this case." *Id*. at 35 (citing *PG&E*, 73 Fed. Cl. at 436).

**b. Dairyland's Position**

According to Dairyland, this Court should reject the Government's argument for the same reason Judge Merow rejected it in *Yankee*. Tr. 111:5-10, 17-23. Dairyland asserted that Mr. Graves is an economist who provides an economic analysis of a reasonable rate of acceptance based on the economic need for the removal of SNF. Plaintiff's Response to Defendant's Motion to Exclude Graves ("Pl.'s Resp. to Mot. to Exclude Graves") at 3. Mr. Graves is not an expert on DOE's programs; however, he is the "*only* witness who will present evidence regarding the reasonable rate of acceptance based on utilities' economic needs for spent fuel removal." *Id*. Dairyland contended that Mr. Graves' opinion regarding acceptance rate is relevant, since this is an open term in the Standard Contract and DOE is obligated to perform at a reasonable rate. *Id*. at 3-4; Tr.112:12-22. Further, Mr. Graves' focus is on what would be considered a reasonable rate from an economic perspective. Pl.'s Resp. to Mot. to Exclude Graves at 4.

Dairyland also contended that the Government's objection to Mr. Graves' hypothetical exchanges model is without merit. *Id*. at 8. According to Dairyland, Mr. Graves' accepts that under the Standard Contract the pick-up queue is initially based on when the fuel was discharged from the reactor, *i.e.* oldest fuel receiving the first allocations. *Id*. However, subject to DOE approval utilities could exchange their slot in the queue. *Id*. Dairyland asserted that Mr. Graves' report "provides a robust estimate, based on established economic principles, of how an exchange process would have influenced the timing and sequence of DOE's acceptance of Dairyland's spent fuel." *Id*. at 9. Dairyland contended that the difficulty in modeling is due to the breach (there is no real world data) and "[t]he defendant who has wrongfully broken a contract should not be permitted to reap advantage for his own wrong by insisting on proof which by reason of his breach is unobtainable." *Id*. at 12 (citing *Locke v. United States*, 283 F.2d 521 (Ct. Cl. 1960).

c. **Conclusion**

The Court concludes that Mr. Graves shall be allowed to testify. The Court holds that Mr. Graves' testimony regarding an economically reasonable rate of SNF acceptance, which is based on his analysis of available documents, is reliable and relevant to this matter. In every SNF case that is before the Court of Federal Claims the acceptance rate of SNF has been at issue. For example, in *PG&E*, 73 Fed. Cl. 333 and *Yankee Atomic Electic Co v. United States*, 73 Fed. Cl. 249 (2006) two different rates were held to be appropriate. Both cases have been appealed and the rate of acceptance is a central issue in the appeal. Mr. Graves has analyzed a number of different acceptance rates, even using the rate found in the 1991 Annual Capacity Report (900 MTU), which is advanced by the Government and was determined to be a reasonable rate in *PG&E*. Def.'s Mot. to Exclude Graves, App. at 63D-63F; *PG&E*, 73 Fed. Cl. at 400. To the extent that the Government disagrees with the rate of acceptance that Mr. Graves determined to be appropriate, there will be ample opportunity for cross-examination. *Daubert*, 509 U.S. at 596 ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Additionally, the Court holds that the Government's arguments regarding Mr. Graves' economically reasonable rate of SNF acceptance goes to the weight of his testimony, not to its admissibility. *Yankee Atomic Electric Co. v. United States*, No. 98-126C, 2004 WL 1535686 *6 (Fed. Cl. June 28, 2004).

The Court also holds that Mr. Graves' testimony regarding his hypothetical exchanges model is reliable and relevant to this matter. In *Energy Capital Corp*., this Court awarded lost profit damages based on an economic model that contained an estimation of a number of eligible and energy viable properties that would have participated in the Affordable Housing Energy Loan Program ("AHELP").[7] *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1334 (Fed. Cir. 2002) (*aff'g in part, rev'g in part* 47 Fed. Cl. 382 (Damich, C.J.)). The Government argued that this Court "erred as a matter of law by engaging in 'rampant' and 'unsupported' speculation in arriving at its determination that Energy Capital would have realized profits from the AHELP venture." *Id*. at 1328. The Government specifically attacked the sufficiency of the evidence regarding participation in AHELP because it depended upon the consent of both the property owners and the first mortgagees.[8] *Id*. at 1329. The Court is struck by the similarities

[7]The AHELP was an agreement between Energy Capital and the Department of Housing and Urban Development ("HUD") that eliminated "the regulatory barriers to financing energy improvements in HUD properties." *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1327 (Fed. Cir. 2002). Under the agreement Energy Capital could originate loans to HUD property owners and in exchange HUD agreed to provide Energy Capital security on the loan. *Id*. Shortly after entering into the AHELP agreement it was terminated by HUD. *Id*. at 1319. This termination occurred before Energy Capital had completed any loans. *Id*. Energy Capital filed suit in the Court of Federal Claims seeking to recover lost profit damages as a result of HUD's breach of contract. *Id*.

[8]The Government urged the appellate court to find the evidence upon which the damages award was based speculative for several reasons, *inter alia*, Energy Capital did not provide testimony from the first mortgagees and Fannie Mae never consented to any AHELP loans in its capacity as first mortgagee. *Energy Capital Corp.,* 302 F.3d at 1329. The Government urges that this Court exclude Mr. Graves under a similar premise. According to the Government under the Standard Contract DOE must approve all exchanges; however, DOE has not approved any exchanges, nor have they been asked to do so. Def's Mot. at 8. The Court declines to exclude

between the Government's arguments in *Energy Capital Corp*. and the instant action. *See Yankee Atomic Electric Co. v. United States*, No. 98-126C, 2004 WL 1535686 (Fed. Cl. June 28, 2004). In *Energy Capital Corp*., the Federal Circuit held that the Government's "argument seems to be an indirect attack on the sufficiency of the evidence . . . . In any event, we conclude that the Court of Federal Claims drew reasonable inferences based on all of the evidence . . . to arrive at its findings . . . ." *Id*. In *Energy Capital Corp*., this Court based its lost profit damages award on evidence the Government argued was too speculative. At the present time only admissibility, not a determination of damages, is at issue. And, the admission of Mr. Graves' testimony is solely in the discretion of the trial court. *See Acoustical Design, Inc.*, 932 F.2d at 942 (Fed. Cir. 1991).

Despite the Government's urging to the contrary, the Court concludes that Mr. Graves' testimony is based on sufficient facts and evidence to allow for admissibility. The Court agrees with *Yankee* that "[b]y partially breaching the contract, defendant cannot exclude Graves' opinion on the grounds that there is no market data. There is no market data because the government's breach thwarted this possibility." *Yankee*, No. 98-126C, No. 98-126C, 2004 WL 1535686 *4 (Fed. Cl. June 28, 2004).

## V. Procedures Regarding Sequestration

### A. Background

On April 29, 2008, both Dairyland and the Government filed proposed procedures regarding sequestration as required by the Trial Preparation Order of February 21, 2008. The Government has decided to invoke sequestration under Fed. R. Evid. 615; therefore, the parties agreed to the following procedures:

1. Witnesses who have testified should not be permitted to discuss their testimony with witnesses who have not yet testified.

2. An attorney should not be permitted to relate, in any form, the substance of previous testimony to witnesses who have not yet testified.

However, the parties cannot agree regarding whether an attorney should be permitted to counsel a witness during breaks in the witness's testimony.

### B. Applicable Law

Fed. R. Evid. 615 Exclusion of Witness states:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize the exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by statute to be present.

---

Mr. Graves' testimony based on the Government's argument regarding DOE approval.

Fed. R. Evid. 615 does not specifically preclude attorneys from consulting with witnesses during breaks in testimony, however, the Court retains discretion to limit attorney consultation, even where the witness is a party, in order to "maintain the status quo during a brief recess in which there is virtual certainty that any conversation between the witness and his lawyer would relate exclusively to his ongoing testimony." *Perry v. Leeke*, 488 U.S. 272, 273, 284 (1989) (holding that trial court order directing defendant not to consult with his attorney during 15-minute breaks in testimony did not violate Sixth Amendment right to assistance of counsel). *Reynolds v. Alabama Department of Transportation* applied *Perry* and extended that ruling to a civil matter, holding that a prohibition on consultation with witnesses is appropriate "subject to exceptions permitting attorneys to consult with those witnesses testifying on different occasions on different topics, to consult with witnesses about non-testimonial matters during evenings and weekends and, upon approval of the court, to consult with witnesses even about their testimony." *Reynolds v. Alabama Department of Transportation,* 4 F. Supp.2d 1055, 1064-65 (1998).

During oral arguments Dairyland urged the Court to allow counsel to be able to confer with witnesses during breaks in testimony with a limitation that counsel not relate prior testimony to the witness. Tr. 129:20-25. According to the Government in order to have unfettered testimony a bright-line rule that prohibits an attorney from counseling a witness during breaks would be appropriate. Tr. 131:2-24.

**C. Conclusion**

The Court is cognizant of the Government's concern in this instance. However, the Court sees no reason to so limit the role of counsel during trial that there can be no consultation with witnesses. This issue can be resolved with a limiting instruction by the Court. Therefore, counsel shall be allowed to consult with witnesses during breaks in testimony, however, they may not discuss the testimony of any other witness that has appeared before the Court. This limiting instruction provides for a "clear line . . . to prevent witnesses from hearing about the testimony of other witnesses." Defendant's Notice of Proposed Procedures for Sequestration at 2.

s/ Edward J. Damich
EDWARD J. DAMICH
Chief Judge

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - x

ENERGY NORTHWEST, :

Plaintiff, : No. 04-10c

vs. : (Chief Judge Damich)

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - - x

Deposition of EILEEN M. SUPKO, held at the offices of Department of Justice, 1100 L Street, N.W., Washington, D.C., commencing at 9:43 a.m., Friday December 7, 2007, before Elizabeth Mingione, Notary Public.

HENDERSON LEGAL SERVICES
1015 15th Street, N.W., Suite 525
Washington, D.C. 20005
(202) 220-4158

Page 58

A. Well --
MR. TOMPKINS: Object to the form, foundation.
A. A target that many companies have, not all of them.
Q. But it's, I mean, it seems to you to be a more, I mean it's a better choice in the model in terms of accurately reflecting what utilities are doing than having an assumption of zero full core reserve?
MR. TOMPKINS: I object to the form.
A. It is somewhat consistent with industry practice. Some companies assume greater than one full core reserve. Many assume that they'll try to maintain one full core reserve. And there are companies that impinge upon it from time to time. So I picked the middle and assumed one full core reserve.
Q. Now, how do you reconcile the fact that in your industry-wide model you hold everyone to one full core reserve, but in this specific analysis that you performed at the request of counsel you assume Energy Northwest may have been able to operate without full

Page 59

core reserve for up to 17 years?
A. The overall analysis that I've done isn't meant to predict or indicate how a company would or would not have discharged spent nuclear fuel. It's a projection of how the individual, the acceptance rates that I've modeled, the different scenarios that I've modeled would affect the industry overall in terms of additional storage requirements and post shut down storage requirements.
It's not meant to say that a company -- and I state that very clearly in the report -- might do something differently in terms of their storage planning. Another example is they might make a different assumption regarding their, what they -- whether they maintain full core reserve or not.
This is a projection using the assumptions that I've made. And the analysis, the pool analysis for Energy Northwest is simply a calculation that shows given their pool capacity that while they would have lost full core reserve, they wouldn't have lost the ability to operate.
Q. Now, if you increased your operating

Page 60

reserve assumption beyond one full core reserve, it could potentially increase the amount of additional at-reactor storage that you have calculated. Is that right?
A. It's possible. Yes.
Q. Also just looking at that same paragraph on page 14 that we were looking at previously of your overall report, you state that Energy Northwest could have altered its fuel management strategies in order to avoid constructing additional storage. Is that right?
A. Yes.
Q. Is it your opinion that Energy Northwest would have altered its fuel management strategies in order to avoid constructing additional storage?
A. No.
MR. TOMPKINS: I object to the form.
Q. Do you have any basis for stating what Energy Northwest would have done?
A. No.
Q. Have you discussed fuel management strategy options with Energy Northwest personnel at all?

Page 61

MR. TOMPKINS: I object to the form.
A. Other than understanding what their current fuel management planning is, I have not talked about anything other than that.
Q. Do you know if it would have made economic sense to implement these strategies?
A. I haven't looked at it.
MR. TOMPKINS: Object to the form.
A. No.
Q. Have you performed any analyses to confirm exactly what could have been achieved through these strategies either for Energy Northwest or for the utilities as a whole?
A. No.
Q. Have you performed any analyses to confirm that these strategies would have made economic sense either for Energy Northwest or the utilities as a whole?
A. No.
MR. TOMPKINS: Object to the form.
Q. Do you know what the cost would have been to Energy Northwest to implement these strategies?

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------------x

SYSTEM FUELS, INC., and ENTERGY :
ARKANSAS, INC., :
Plaintiffs, :NO. 03-2623C
vs. :
THE UNITED STATES, :
Defendant. :

------------------------------------x

Courtroom 6
National Courts Building
715 Madison Place, N.W.
Washington, D.C.

Friday, February 23, 2007

VOLUME 9

The parties met, pursuant to the notice of the Judge at 9:31 a.m.

BEFORE THE HONORABLE CHARLES LETTOW



73eaabc4-58fc-4efa-add7-f095443bb8dc

the model and the spreadsheet that you used to calculate additional storage requirements to determine how they compare against the two key issues that counsel identified, correct?
A. Yes.
Q. Now, let's turn to plant capacities. Now, we spoke earlier about how your model assumes dry storage for utilities who claim they would not have gone dry in the but-for world, correct?
A. Yes.
Q. And your model also assumes post 1998 reracks for about a dozen plants, correct?
A. That's correct. I mentioned that earlier today.
Q. That's right.
A. I started with my existing database.
Q. That's right. So in other words, with regard to pool capacities, your model is not consistently utilizing pool capacities for utilities as they existed in 1998, correct?
A. For approximately 10 percent, yes, that's correct.
Q. So for 10 percent of your model, you assume post 1998 reracks in a but-for world,



correct?
A. Yes, I did.
Q. For example, I think you testified about you used South Carolina's post 1998 rerack in your but-for world model, correct?
A. Yes.
Q. And you include Southern Nuclear's plant hatch post 1998 rerack in your model in this case, correct?
A. Yes. Southern Nuclear indicated that had DOE, had they known DOE was going to perform in 1998, they would have done that prior to 1998.
Q. So that's an example, really, of a rerack that you believe would be consistent with the but-for world as that utility would see it, correct?
A. That's correct.
Q. Now, in addition to that post 1998 rack, the plant hatch actually installed, you also include in your model, a plant hatch's second bathtub rack that wasn't installed, correct?
A. That's correct because counsel for Southern Nuclear indicated that they would have



used that had DOE performed in 1998. It was licensed. They hadn't installed it.
Q. They hadn't installed it. You'd agree that the use of post 1998 pool capacity has had an impact upon your calculation of additional storage requirements, correct?
A. It can have an impact. I would, because scenarios one and scenarios four ramp up to a 3000 rate or higher within five years, the effect on those scenarios would be relatively small, it would result in both scenarios two and scenarios three having much higher or somewhat higher, I don't know the exact number, additional storage requirements.
Q. You haven't actually done the analysis though to determine what would happen in your model if you stripped out the post 1998 reracks, correct?
A. I have not.
Q. Now, of course, the amount of at-reactor storage you calculated would be even greater if you omitted the 2000 plant hatch rerack from your pool capacity analysis, correct?
A. It would be a fraction, a small amount



greater, yes.
Q. And in fact, if you assumed -- or, sorry, if you did not assume the post 1998 rerack for Southern Nuclear, you would have calculated Southern Nuclear as having additional at-reactor storage after 1998 based upon a strict oldest fuel first basis, correct?
A. I believe that's correct, yes.
Q. So in other words, that would take the total number of plants with additional at-reactor storage under your scenario one from 14 plants to 15 plants, correct?
A. Yes.
Q. Now, you didn't endeavor to determine what the world looked like for every pool as of 1998, correct?
A. As I stated earlier, I started with my existing database when I first did this analysis in 2004. There have not been many companies who made changes to the pool capacities after 1998. As I said, I believe there was about a dozen of them that have had some change in their capacity.
Q. And, of course, had you wanted to, you have the technical ability to know what the





73eaabc4-58fc-4efa-add7-f095443bb8dc

761 spaces for effective capacity, do you see that?
A. Yes.
Q. As compared to your assumed effective capacity in your model of 758 spaces, correct?
A. Yes.
Q. So in other words, actually, you assumed three fewer spaces for ANO unit 2 than it believes it could handle as of 1998, correct?
A. Yes.
Q. Now, you're aware of other plants that had pool capacities where there's a difference between licensed and usable capacity, correct?
A. Yes.
Q. And you don't know whether if you used actual capacity for all plants, you would calculate additional storage requirements for more than 14 plants, correct?
A. I don't understand the use of your word "actual capacity."
Q. Well, we've just seen, Ms. Supko, that the numbers you've used for actual capacity are different than the numbers ANO actually had for effective capacity, correct?



A. Well, if we could look back at the table that's marked page B7, it shows the actual capacity bumping up and down on a semiannual basis, depending upon what was going on within the spent fuel pool. I see that the -- if we look at the column that says, "ultrasonic testing and reconstitution taking up 24 assemblies," that was a periodic activity, it looks like it happens, probably related to when refueling outages occur, and results in changes.
So there isn't necessarily one actual capacity for any one given pool. It changes on a regular basis. As I stated, the number that I used, I think, is representative of the operating pool capacities based on what was reported in 1998. Could that number go up or down in the future? Yes, of course.
Q. The RW-859 data from 1998, that was submitted based upon information before 1998, correct?
A. No, it was dated based on 1998.
Q. Actually, I'm sorry, I actually reversed it, the RW-859 data -- let me back up. Let me ask you if you know, the 1998 RW-859



data, when did utilities submit that?
A. In 1999.
Q. Okay. And do you know if it's based upon information through 1999?
A. It's meant to reflect information, excuse me, December 31st, 1998.
Q. Have you done any analysis, Ms. Supko, to look at how a pool capacity could change within a given year?
A. I have not.
Q. Okay. And you have no reason to believe that the 1998 number reflected here, the 745, that that changed at all in a given year, do you, you have no insight into that?
A. No, I don't.
Q. And do you know, if we engaged in this exercise for 104 reactors or 104 plants, which I assure you we will not do today, much to everyone's chagrin, do you know how your numbers would compare to the numbers that utilities would actually assume for 1998?
A. They could be higher or lower. I think that the numbers that I used are a reasonable representation and probably a pretty good average.



Q. But you haven't gone back to look?
A. I haven't.
Q. Okay. Let's talk about full core reserve. You're familiar with the term "full core reserve," correct?
A. Yes.
Q. As well as the term "operating reserve," correct?
A. Operating reserve may mean different things to different companies.
Q. You tell me what you understand the term "operating reserve" to mean generally.
A. There are some nuclear power plants -- first, a full core reserve is enough space in the pool to discharge the entire core of spent nuclear fuel. So, for example, for Arkansas Nuclear 1 or 2, it would be 177 assemblies. There are some companies who, for either reasons, to facilitate operations during a refueling outage or for prudent planning purposes, may actually reserve more than, in this case, more than the 177 assemblies.
Many companies though, their typical practice is that they reserve one full core reserve, although some may reserve a multiple



73eaabc4-58fc-4efa-add7-f095443bb8dc

their full core reserve, correct?
MR. SILBERG: Again, Your Honor.
THE COURT: Sustained.
BY MR. GARDNER:
Q. Prior to 1998, Ms. Supko, you're aware of utilities that had impinged upon their full core reserve, correct?
A. Yes.
Q. Now, if you were to increase the amount of operating reserve that a particular plant would want to maintain, that could increase the additional storage requirements you calculated for that particular plant, correct?
A. That's possible. However, particularly, it's more a matter of timing. It may move the timing of when they had to add dry storage forward in time, so, for example, if their calculated requirement in my model said it was going to occur in 2005, might have moved to 2004, the previous refueling outage.
But for, particularly for companies that, for which there was calculated additional storage requirements, it shouldn't change the overall number through their end of license



because when that final core is discharged, you know, everything fills up the pool. So the answer has to be perhaps, it would depend upon the individual situation and the timing.
Q. Because it could either delay a particular plant having additional storage requirements or it could potentially preclude it all together, right, or actually, the other way around, right, it could either make someone have additional storage requirements earlier or make a utility have additional storage requirements it otherwise wouldn't, correct, it would just depend?
A. Yes, that's correct.
Q. And if you in fact, in your model, assumed operating reserves for each pool, rather than the uniform assumption you make of one full core reserve, you don't know whether that would push someone into having additional storage requirements that otherwise wouldn't have additional storage requirements?
MR. SILBERG: Objection, no foundation that the witness or any witness knows what all operating reserve requirements are at any particular point in time, in actual or but-for.



MR. GARDNER: Your Honor, may I address that?
THE COURT: Yes.
MR. GARDNER: Ms. Supko stated during her qualifications that every utility, these are her clients and that she gets information from these utilities, it strikes me it's not too difficult a task to go to these utilities and say, hey, what's your operating policy, what's your operating reserve? Now, whether or not Ms. Supko did that is another issue, but that's not an impossible task by any means.
MR. SILBERG: And whether it's necessary or feasible or relevant is yet another question.
MR. GARDNER: And if I may address that?
THE COURT: Mr. Gardner.
MR. GARDNER: The reason it's relevant, Your Honor, is Plaintiffs are trying to put forward through Ms. Supko a depiction of the but-for world, and I am simply trying to vet, if you actually modelled what utilities were actually doing in the but-for world, what's the impact on her model. That's all



this question goes to.
THE COURT: Operating reserve is such a vague concept because it has application only to some utilities and it has a different application depending on what the utility is, I'm having a lot of trouble with the definition of your question, Mr. Gardner, but you may try it. Overruled.
THE WITNESS: Could you repeat your question, please?
BY MR. GARDNER:
Q. Sure. If you assumed the operating reserves for each pool rather than the uniform one full core reserve assumption that you make in your model, you don't know whether that would push someone into having additional storage requirements that otherwise wouldn't have additional storage requirements?
A. Well, I haven't calculated that. However, having worked for a public utility and having all of the nuclear operating companies in the country being clients of mine at one point or another, not all, I would note, for spent fuel issues, some of it are front end issues, most nuclear operating companies are





73eaabc4-58fc-4efa-add7-f095443bb8dc

hesitant to do something that would cause them to spend money before they needed to spend money or to spend money that they wouldn't have to spend money.
So if the choice of an operating reserve was the only thing that resulted in additional storage, my calculation of additional storage, the companies that I know would try to do something, maybe change their operating reserve policy, in order to not spend the money and take that action.
Q. But, of course, you're speculating, right?
MR. SILBERG: Objection. The witness just -- counsel asked the witness to speculate. Now, that she's given him an answer --
THE COURT: Well, she answered the question to the best of her own knowledge, based on what she already knows personally about the policies of various utilities around the country. Let's leave it at that. It is what it is.
MR. GARDNER: It is what it is, Your Honor.
THE COURT: Calling it something is



not going to make it any different than what it is.
BY MR. GARDNER:
Q. Let's shift gears and talk about the outputs or results of your model. As you testified on direct, the amount of additional at-reactor storage that you've calculated has changed over the course of the various expert reports that you've authored in spent fuel cases, correct?
A. Yes, it has changed somewhat.
Q. Now, why don't we take a look at a demonstrative that the government has, and unfortunately, it is labeled Supko Demonstrative 4 by the government. There are a series of them. I'm only going to show you one, but I'll give you the --
THE COURT: Let's give it a different number.
MR. GARDNER: I was about to give it a different number.
THE COURT: Let's do that.
MR. GARDNER: I don't believe we have any demonstratives yet, except maybe the opening.



THE COURT: Well, we have, we're up through DDX-5, so the next one is 6.
MR. GARDNER: What do you want to call it, Your Honor?
THE COURT: DDX-6, that's my next number.
MR. GARDNER: DDX-6 it is.
(Defendant Demonstrative Exhibit Number DDX-6 was marked for identification.)
THE COURT: I hope your folks have --
MR. GARDNER: I'm sure we do.
MR. SILBERG: Mr. Gardner, you sent us several days ago something that's identified as Supko Demonstrative 1.
MR. GARDNER: Uh-huh.
MR. SILBERG: And you just identified this as 4.
THE COURT: We take what Mr. Gardner gives us.
MR. GARDNER: To be clear, I am giving Ms. Supko the entire set of demonstratives that we turned over, I'm asking her about slide four of a series of six demonstratives.
THE COURT: I'm sorry, do you have them all bundled together?



MR. GARDNER: I sure do.
THE COURT: Let's call the whole thing DDX-6.
MR. GARDNER: I think that's fantastic. I only plan on talking to Ms. Supko about Supko demonstrative DDX-9 -- 6-4 is the only one I'm going to ask her about. I apologize about that confusion, Your Honor.
THE COURT: No, we're not confused. We've gotten it all straight.
BY MR. GARDNER:
Q. Now, Ms. Supko, I want to focus here on Supko Demonstrative 4, and you've seen this demonstrative before, correct?
A. Yes.
Q. Okay. This is a summary of your table 2 from four of your previous -- or three of your previous reports, plus this report, correct?
A. Yes.
Q. Okay. Now, in Commonwealth Edison, you assumed under a 3000 rate that there would be 1600 MTUs of additional at-reactor storage, correct?
A. Yes, that was calculated based on an





73eaabc4-58fc-4efa-add7-f095443bb8dc

times the license term that I evaluated in this, is certainly a stretch for what was planned. Could you call that unreasonable? Yes, of course.

And scenario three, with the cumulative storage, both scenarios two and three have cumulative storage requirements that are several times or many times one year's annual discharges, and when one looks at the plant-by=plant data for those scenarios, it's several hundred metric tons per unit, which would be difficult to accommodate.

And all of that information taken together would make scenario three to be not as reasonable an acceptance rate as scenario one, and I've already stated that I believe scenario four would not have been efficient.

BY MR. SILBERG:

Q. Ms. Supko, you were asked a number of questions about plants such as -- or utilities such as Northern States Power and Wisconsin Electric saying that they would have reracked rather than added dry storage, do you remember that discussion?

A. Yes.



Q. Assuming that you have taken those changes -- or sorry about that, since you said that you had not taken those statements into account in most cases, how would that affect the results of your analysis and your opinions?

A. It would have, had those plants reracked, it would have resulted in a reduction in the additional storage requirements for all the scenarios, although it would probably be somewhat more dramatic in scenarios one and four, just because of the timing of the ramp-up to a rate that exceeds the annual discharge rate.

MR. SILBERG: One moment, Your Honor.

THE COURT: Yes.

MR. SILBERG: At this time, I would move to admit Plaintiff's Exhibit 163, 164, 269, 270, 271, 273, 274, and Plaintiff Demonstrative Exhibits 2-1 to 2-21.

THE COURT: Mr. Gardner, do you have any recross before we do this?

MR. GARDNER: I do not, Your Honor.

THE COURT: Okay.

MR. GARDNER: But I do have an objection.



THE COURT: Yes, no, I just wanted to make sure that we had covered all the testimony first.

MR. GARDNER: The testimony is complete, as far as the government is concerned.

THE COURT: Thank you.

MR. GARDNER: If the Court is ready, the government would renew its motion to strike Ms. Supko because she has not met the requirements of Rule 702.

THE COURT: That is denied.

MR. GARDNER: Okay.

THE COURT: Now, you had a further objection, I think, to the admissibility of exhibits, correct.

MR. GARDNER: Well, there were a couple of them, Your Honor, and maybe we could take them in pieces.

THE COURT: When you say strike the testimony, you really meant strike the testimony of Ms. Supko?

MR. GARDNER: That's exactly what I meant, Your Honor.

THE COURT: That's denied. Let's go on to the exhibits.



MR. GARDNER: Well, with respect to the expert reports, our objection to the expert reports are to the same as the testimony that you have heard --

THE COURT: Then PX-163 and PX-164 are admitted.

(Plaintiff Exhibit Numbers PX-163 and PX-164 were received in evidence.)

THE COURT: PDX-2-1 through PDX-2-21 are admitted for limited purposes, that is, as demonstratives only.

(Plaintiff Demonstrative Exhibit Numbers PDX-2-1 through PDX-2-21 were received in evidence.)

MR. SILBERG: Thank you, Your Honor.

THE COURT: Now, I didn't say anything about PDX-267, 270, 271, 273, and 274.

MR. SILBERG: I'm sorry, it should be 269, and if I said 267, I was in error.

THE COURT: I misspoke. I'm sure that's so.

MR. GARDNER: The government objection is that, frankly, we have the same objections broadly to all of those, but we have some