**No. 04-0010C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# ENERGY NORTHWEST'S APPENDIX TO ITS RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE THE ADMISSION AT TRIAL OF DOCUMENTS PREPARED BY GOVERNMENT CONTRACTORS

---


NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
(202) 639-6000


June 30, 2008

*Attorneys for Plaintiff*

## Table Of Contents To Appendix

Documents Cited

Excerpt from the May 10, 2002 Deposition of Lake Barrett ....................................A 001

Excerpt from the July 14, 2004 Trial Transcript in *Yankee Atomic*............................A 005

Pacific Northwest National Laboratory, "About PNNL,"
http://www.pnl.gov/about/default.asp...............................................................A 008

Trial Exhibits Excerpted

PX 1 .........................................................................................................................A 009

PX 58 .......................................................................................................................A 017

PX 64 .......................................................................................................................A 018

PX 65 .......................................................................................................................A 019

PX 89 .......................................................................................................................A 021

PX 101 .....................................................................................................................A 024

PX 140 .....................................................................................................................A 026

PX 238 .....................................................................................................................A 027

PX 336 .....................................................................................................................A 029

PX 407 .....................................................................................................................A 031

PX 424 .....................................................................................................................A 033

PX 430 .....................................................................................................................A 035

PX 462 .....................................................................................................................A 038

PX 532 .....................................................................................................................A 042

Unpublished Orders or Cases Cited

*Dairyland Power Coop. v. United States*, No. 04-0106C, slip op.
(Fed. Cl. June 20, 2008)......................................................................A 043

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 2450874
(Fed. Cl. Sept. 17, 2004) .......... A 066

*Wisc. Elec. Power Co. v. United States*, No. 00-697C, slip op.
(Fed. Cl. Aug. 16, 2007) .......... A 079

*Westinghouse Elec. Corp. v. United States*, Nos. 93-445C, 93-446C,
1997 WL 1068204 (Fed. Cl. June 4, 1997) .......... A 109

1104

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER : 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC : 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & : 98-485C, 98-486C,
LIGHT COMPANY; NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; : 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; : 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
- - - - - - - - - - - - - - - - - X
(Caption continued on the next page)

Continued Deposition of LAKE H. BARRETT
Washington, D. C.
Friday, May 10, 2002
8:06 a.m.

Job No.: 11792-11
Pages 1104 to 1437, Volume 5
Reported by: Diane Gomez, RPR

1105

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
- - - - - - - - - - - - - - - - - X

1106

Continued Deposition of LAKE H. BARRETT, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public in and for the District of Columbia.

1107

A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORI[TY] OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:

DEVON E. HEWITT, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

HOWARD CAYNE, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000

APPEARANCES CONTINUED

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT:

TIMOTHY R. MACDONALD, ESQUIRE
ARNOLD & PORTER
Suite 4500
370 17th Street
Denver, Colorado 80202-1370
(303) 863-2334

ON BEHALF OF PLAINTIFFS SOUTHERN NUCLEAR OPERATI
COMPANY, ALABAMA POWER COMPANY, and GEORGIA PO
COMPANY:

RONALD A. SCHECHTER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D. C. 20004-1206
(202) 942-5000



APPEARANCES CONTINUED

ON BEHALF OF PLAINTIFF COMMONWEALTH EDISON COMPANY:

CHRISTOPHER P. TOMPKINS, ESQUIRE
JENNER & BLOCK, L.L.C.
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

ON BEHALF OF DEFENDANT UNITED STATES:

HEIDE L. HERRMANN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D. C. 20530
(202) 307-0290

ALSO PRESENT:

Thomas Harding, Arnold & Porter



CONTENTS


| EXAMINATION OF LAKE H. BARRETT | PAGE |
|---|---|
| By Mr. Cayne | 1114 |
| By Ms. Hewitt | 1327 |
| By Mr. Schechter | 1376 |
| By Mr. Tompkins | 1428 |


EXHIBITS

(Attached to the Transcript)


| BARRETT DEPOSITION EXHIBIT | PAGE |
|---|---|
| 55 "Preferred Repository Receipt Rates Based on Waste Management System Cost Risks and Logistic Impacts" | 1133 |
| 56 Letter dated 5/5/87 from N. McLeod to H. Steinberg | 1139 |
| 57 "Determination of Cost-Effective Waste Management Receipt Rates" | 1148 |
| 58 Parametrics Analysis for Future Program Costs Scenarios dated 11/5/99 | 1166 |
| 59 Letter dated 11/5/86 from J. Braitman to R. Izatt | 1206 |




EXHIBITS CONTINUED

(Attached to the Transcript)


| BARRETT DEPOSITION EXHIBIT | PAGE |
|---|---|
| 60 "Disposal Contract and Annual Capacity Report, Briefing for OCRWM Executive Committee, November 1986" | 1218 |
| 61 Document "Edison Electric Institute Utility Nuclear Waste Management Group" dated 12/8/87 | 1222 |
| 62 Statement of L. Barrett before the Subcommittee on Energy and Power, 4/29/87 | 1231 |
| 63 Program History Briefing to Secretary Pena by L. Barrett | 1243 |
| 64 DOE News Release dated 1/30/98 | 1257 |
| 65 "Analysis of the Total Time Life-Cycle Cost of the Civilian Radioactive Waste Management Program, December 1998" | 1267 |
| 66 Draft RFP | 1287 |
| 67 Draft Environmental Impact Statement dated 8/12/99 | 1294 |

because of short-cooled fuel"?
MS. HERRMANN: Objection. Speculation.
A No.
Q Do you understand the term "derate"?
A I understand the term as I use it. How the author is using it I don't know.
Q How would you use it?
A It is to reduce the design capacity or reduce the output.
Q And do you understand the term "short-cooled fuel"?
A Yes.
Q What does that mean?
A Lower megawatt days per metric ton on the fuel.
Q Based on the understanding of those two terms you just expressed, if the author of that sentence used those two terms in the way you just explained them, do you understand this sentence?
MS. HERRMANN: Objection. Speculation.
A No.
(Deposition Exhibit Barrett 57 was marked



for identification and was attached to the transcript.)
Q Mr. Barrett, the court reporter has handed you a document marked for identification as Exhibit 57. It is captioned Determination of Cost-effective Waste Management Receipt Rates. It is by R.W. McKee, M-c-K-e-e. It starts at Bates PA-221971. And it continues through PA-221980. Do you have that document before you?
A I believe so. I can't read the Bates number at the bottom, but go ahead. Yes.
Q And you'll see that the first two pages of this consecutively-Bates-numbered document appear to be the same other than the fact that the first page looks as if a buck slip covered over a portion of the left-hand column, correct?
A Correct.
Q Do you know a person named R.W. McKee?
A No.
Q Have you ever heard of that person?
A I've heard the name.
Q Are you familiar with Pacific Northwest



Laboratory?
A Yes.
Q What is Pacific Northwest Laboratory?
A It's a contractor in Richland, Washington.
Q Were those contractors relied on often by the Department of Energy in connection with the development, design, and construction of the waste management system?
MS. HERRMANN: Objection. Vague.
A We use them as advisors and analysts for the waste management system.
Q Do you continue to so use them through today?
A No.
Q Through when did you use them?
A Through the late eighties.
Q There's also another name at the top of the first page, H.D. Huber, H-u-b-e-r. Do you know that individual?
A No.
Q Did you ever rely on the work of Pacific Northwest Laboratory?



MS. HERRMANN: Objection. Vague.
A I used it as input.
Q For what purposes?
A For advice on systems analysis.
Q Did you ever personally assign work out to be performed by Pacific Northwest Laboratory?
A I don't remember me personally, but my staff did.
Q Did you authorize your staff to assign work out to Pacific Northwest Laboratory?
A Yes.
Q I take it then you considered the work of Pacific Northwest Laboratory to be competent?
A Yes.
Q I turn your attention to page Bates number PA-221972. It's the second page of the document. Actually, returning to the first page, do you see the buck slip on the first page? It says, '91 HLRWM conference papers, volume two, "high priority."
A I see it.
Q Is that your writing?
A No.

1432

lower than the reference, current reference plan?
MS. HERRMANN: Same objection.
A I don't think so. I have no intention -- I haven't really talked about wanting to lower below what our reference acceptance rate is. I don't know why we would do it unless -- the only reason we would do it would be for potential funding cuts or funding limitations or funding caps is the only reason we would do that, which we would hope we don't have to do.
Q And, actually, that brings me to my last set of questions about funding. You've testified previously today about a number of instances in which you have wanted to pursue the program in some manner, whether it be the MRS through voluntary siting in '94, the MPC in the mid-nineties. All of these programs were constrained by the lack of congressional appropriations?
MS. HERRMANN: Objection to the extent it mischaracterizes testimony.
Q The money you were --
MR. SCHECHTER: Did he answer?

1433

A Yes.
Q So your answer is yes?
A I said basically yes.
Q Was this money that you were hoping to spend on these various projects money from the nuclear waste fund?
A Either the nuclear waste fund or the defense fund.
Q Or the defense fund, okay. So this would have been money that utilities or other purchasers paid in and is already sitting there? It wouldn't have been a separate -- some sort of separate budget appropriation outside of the fund?
MS. HERRMANN: Objection to the extent it calls for a legal conclusion.
A Well, it requires appropriations.
Q Sure.
A But they would be appropriations from the waste fund or from the defense fund.
Q Okay. And any future funding constraints that limit your ability to meet 2010, those would be restraints on spending money that's already in the

1434

funds or is being paid on a regular basis?
A Yes.
Q Okay.
MR. TOMPKINS: I believe that's all I have.
We reserve our right to reopen the deposition pending resolution of the outstanding document production issues.
MS. HERRMANN: And of course we object to that.
MR. TOMPKINS: Other than that, we're done.
(Signature having not been waived, the deposition of Lake H. Barrett was concluded at 5:21 p.m.)

ACKNOWLEDGMENT OF DEPONENT

I, Lake H. Barrett, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

____________________ ____________________
(DATE) (SIGNATURE)

1435

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLI(

I, Diane Gomez, Registered Professional Reporter, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 22nd day of May, 2002.

My commission expires:
June 14, 2005

____________________
NOTARY PUBLIC IN AND FOR
THE DISTRICT OF COLUMBIA

574

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC )
COMPANY, CONNECTICUT YANKEE ) Case Nos.:
ATOMIC POWER COMPANY, and MAINE ) 98-126C
YANKEE ATOMIC POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
V. )
THE UNITED STATES, ) Consolidated
Defendant. )

Courtroom Number 7

National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Wednesday, July 14, 2004

VOLUME 3

The parties met, pursuant to the notice of the Judge, at 10:01 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW

575

APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAI[illegible] YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
PETER J. SKALABAN, JR., ESQ.
MICHAEL R. MINER, ESQ.
VIVEK H. HATTI, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY and CONNECTICUT YANKEE ATOMIC POWER COMPANY
GERALD GARFIELD, ESQ.
General Counsel
Day, Berry & Howard, LLP
CityPlace I
Hartford, Connecticut 06103
(860) 275-0182

576

APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

ON BEHALF OF THE DEFENDANT:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

** Index appears at the end of transcript **

577

P R O C E E D I N G S

MR. SHAPIRO: Your Honor, we're ready to proceed with Dr. Bartlett.

THE COURT: Good.

MR. SHAPIRO: The plaintiffs call John Bartlett.

THE COURT: Okay.

Whereupon,

JOHN WESLEY BARTLETT

was called as a witness, and, having first been duly sworn, was examined and testified as follows:

MR. SHAPIRO: Your Honor, once again, we have a notebook with some documents we would like to provide the witness and to provide copies to you as well, and to government counsel.

I know we have the fan, Your Honor, which is pleasant. But, obviously, if you have any trouble hearing, let us know.

THE COURT: I'm more worried about the reporter.

DIRECT EXAMINATION

BY MR. SHAPIRO:

Q Would you state your name for the record, please.

A My name is John Wesley Bartlett.

614

BY MR. SHAPIRO:
Q Dr. Bartlett, behind tab 1 is a document that's been received in evidence as Plaintiffs' Exhibit 175. It's titled: Civilian Radioactive Waste Management System Throughput Rate Analysis. Prepared for Department of Energy by the management and operations contractor. And, as Ms. Herrmann pointed out, it has a date on it of August 17th, 1993.
A Uh-huh.
Q Let me ask you, first, do you recognize this document?
A Oh, yes.
Q Was this document completed during your tenure as director?
A It was not completed, but it was written during -- it takes time to prepare these.
Q And is this the sort of study that you were referring to when you said that there were studies and program documents that support a 3,000 MTU acceptance rate?
A Yes, it is.
Q Do you recall the conclusion of this particular study, Dr. Bartlett?
A Well, if I may read the conclusion -- based on the foregoing considerations.

615

Q I'm sorry to interrupt, Dr. Bartlett. If you could tell us first where you're reading from.
A I'm reading from page IX in the document, where it says Conclusions.
Q Okay. I'm sorry to interrupt. If you would like to continue.
A Under Conclusions, it says: Based on the foregoing considerations, the preferred range of throughput rates is from 3,000 MTU per year to 4,000 MTU per year.
Q What is your understanding of that conclusion, Dr. Bartlett?
A My understanding is that is an appropriate assessment based on the look at alternatives that was part of this effort, that this is the appropriate rate at which the system should be operated at steady state.
Q When you say appropriate, what do you mean by appropriate?
A That it is the most effective, most cost effective, in particular, with respect to costs incurred to do the operations and costs imposed on the utilities.
Q Dr. Bartlett, as I mentioned when I described the cover of this document, it was prepared

616

by the management and operations contractor at that time. When you were director, to what extent did you and OCRWM rely upon studies prepared by the management and operations contractor such as this one?
A All of the work is done by the -- by the support contractors. That's what they're there for. The Department of Energy has -- OCRWM itself has about 65 employees. The program has about 5,000 employees, if you look at it this way. These are contractor people.
The M&O organizes all of them, but it includes activities within Sandia National Laboratories, Los Alamos National Laboratory, Livermore National Laboratory, the US Geological Survey.
And a lot of the engineering is done by, at our time, the TRW Systems, M&O contractor, management and operations contractor.
The work is done by those folks. And the job of the DOE people is to oversight that, do the program planning, give them guidance and direction for what their activities should be.
Q And when you were director, Dr. Bartlett, to what extent was the M&O authorized by the Department to make statements concerning the subjects addressed

617

in studies such as Plaintiffs' Exhibit 175?
A They have full authority to accomplish and report this work.
Q Dr. Bartlett, when you were director of OCRWM, did you consider a 3,000 metric ton acceptance rate to be reasonable in light of the program's objectives?
A Yes, I did.
Q Did you consider when you were director, Dr. Bartlett, whether any other rates of acceptance might be reasonable in addition to 3,000 metric tons?
A Well, if you go much above 3,000, then essentially what you've done is established excess capacity that doesn't get used. It's like leaving an airplane sitting at the dock rather than having it flying. And so you don't need to make the expense or have excessive capability.
On the other hand, if you don't have enough, if you don't have the 3,000, then you're not doing your job with respect to taking this spent fuel from the reactors at an appropriate rate to avoid their occurring costs for additional storage.
Q If I could ask you just to explain a little bit more the first of those instances. If you have excess capacity, what do you mean by excess capacity?

come after Mr. Pennington and Mr. Collier.

But while we're talking about witnesses, maybe we can get some more specification from the government about who they actually intend to call. So far, we have 24 named on a will-call list. The only ones I've heard from for sure are the four experts and two former Yankee Atomic employees, Dr. Kadak, and Mr. Buchheit.

Now, Mr. Ekman did tell me off the record that Mr. Milner and Mr. Kouts definitely would be called. And I wonder if the government would like to add -- confirm that and add to the list. Because it's -- as I mentioned on the first day of trial, we need to prepare for cross-examination. And preparing for 24 is something we'll do if we have to, but it would be, I think, reasonable for the government to narrow down that list as soon as they can.

So since Mr. Lester has raised the issue, maybe we can get some more information today.

MR. EKMAN: Your Honor, on that issue, I told Mr. Stouck out in the hall that I thought -- I gave him a couple additional witnesses we believe was going to be definites. That was Mr. Kouts and Mr. Milner.

In addition, I said I thought, after I had



some time to think about the first week, that, perhaps, on Monday, I might have some additional information for him, both with respect to additions to the list as well as maybe to a preliminary order as to some of those witnesses.

But we are working as best we can, and we will have those names to him as soon as they're available.

THE COURT: Okay. Well, do the best you can. And I detect that both parties are operating in good faith, and I trust this will continue.

MR. STOUCK: I hope there's no further need to bother the Court with those matters.

THE COURT: All right. That's what we are here for. So we'll adjourn at -- well, we are adjourned.

Ten o'clock tomorrow morning.

(Whereupon, at 5:15 p.m., the hearing was adjourned, to be reconvened at 10:00 a.m. on Thursday, July 15, 2004.)



C O N T E N T S


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JOHN WESLEY BARTLETT | 577 | 655 | 729 | 738 |
| FRANK C. GRAVES | 741 | | | |

AFTERNOON SESSION: 655


E X H I B I T S


| EXHIBIT NO. | MARKED | RECEIVED |
|---|---|---|
| DX-23 | | 726 |
| DX-145 | | 728 |
| DX-147 | | 728 |




CERTIFICATE OF REPORTER

DOCKET NO.: 98-126C
CASE TITLE: Yankee Atomic v. U.S.
HEARING DATE: July 14, 2004
LOCATION: Washington, D.C.

I hereby certify that the proceedings and evidence are contained fully and accurately on the tapes and notes reported by me at the hearing in the above case before the United States Court of Federal Claims.

Date: July 14, 2004

____________________________

Vicky J. Stallsworth, RMR, CRR
Official Reporter
Heritage Corporation
Suite 600
1220 L Street, N.W.
Washington, D.C. 20005-4019




# About PNNL

Welcome to the Pacific Northwest National Laboratory, located in Richland, on the sunny eastern side of Washington state. PNNL is one of the U.S. Department of Energy's (DOE's) ten national laboratories, managed by DOE's Office of Science. PNNL also performs research for other DOE offices as well as government agencies, universities, and industry to deliver breakthrough science and technology to meet today's key national needs. Our Laboratory

- provides the facilities, unique scientific equipment, and world-renowned scientists/engineers to strengthen U.S. scientific foundations for fundamental research and innovation
- prevents and counters acts of terrorism through applied research in information analysis, cyber security, and the non-proliferation of weapons of mass destruction
- increases U.S. energy capacity and reduces dependence on imported oil through research of hydrogen and biomass-based fuels
- reduces the effects of energy generation and use on the environment.

PNNL currently has approximately 4,000 staff members and a business volume of $760 million. The William R. Wiley Environmental Molecular Sciences Laboratory, a DOE Office of Science national scientific user facility, is located on PNNL's Richland campus. PNNL operates a marine research facility in Sequim, and has satellite offices in Seattle and Tacoma, Washington; Portland, Oregon; and Washington, D.C.

Battelle has operated PNNL for DOE and its predecessors since 1965. A unique feature of Battelle's contract with DOE allows our staff to work for private industry. To learn more about PNNL, see our Delivering Science and Solutions [PDF, 560 KB] brochure.

Thank you for visiting the PNNL web site, and if you have questions or comments, please contact us.

Department of Energy
Washington, D.C. 20585

JUN 27 1983

Mr. R. F. Lewis
Washington Public Power Supply System
3000 George Washington Way
P. O. Box 968
Richland, WA 99352

Dear Mr. Lewis:

Subject: Contract Number DE-CR01-83NE44424

Enclosed herewith is one fully executed copy of subject contract.

Please acknowledge receipt of this contract by completing the "Acknowledgement" below and returning it to:

U.S. Department of Energy
Office of Procurement Operations
Attn: Thomas S. Keefe
Room Number 1J-027
1000 Independence Avenue, SW
Washington, DC 20585

Sincerely,

[signature]

Thomas S. Keefe
Contracting Officer
Office of Procurement Operations

Enclosure

ACKNOWLEDGEMENT:

ROBERT F. LEWIS
MANAGER, CORPORATE CONTRACTS
& MATERIAL MANAGEMENT
Contractor's Authorized Representative
Name and Title (Type/Print)

[signature]
Signature

June 30, 1983
Date

Plaintiff's Exhibit
001

Energy Northwest
v.
The United States
04-10C

U. S. DEPARTMENT OF ENERGY CONTRACT NO. DE-CR01-83NE44424

# CONTRACT FOR DISPOSAL OF SPENT NUCLEAR FUEL AND/OR HIGH-LEVEL RADIOACTIVE WASTE.

THIS CONTRACT, entered into this 13th day of June 1983, by and between the UNITED STATES OF AMERICA (hereinafter referred to as the "Government"), represented by the UNITED STATES DEPARTMENT OF ENERGY (hereafter referred to as "DOE") and WASHINGTON PUBLIC POWER SUPPLY SYSTEM, (hereinafter referred to as the "Purchaser"), a municipal corporation organized and existing under the laws of the State of Washington.

## WITNESSETH THAT:

WHEREAS, the DOE has the responsibility for the disposal of spent nuclear fuel and high-level radioactive waste of domestic origin from civilian nuclear power reactors in order to protect the public health and safety, and the environment; and

WHEREAS, the DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent nuclear fuel; and

WHEREAS, all costs associated with the preparation, transportation, and the disposal of spent nuclear fuel and high-level radioactive waste from civilian nuclear power reactors shall be borne by the owners and generators of such fuel and waste; and

WHEREAS, the DOE is required to collect a full cost recovery fee from owners and generators delivering to the DOE such spent nuclear fuel and/or high level radioactive waste; and

WHEREAS, the DOE is authorized to enter into contracts for the permanent disposal of spent nuclear fuel and/or high-level radioactive waste of domestic origin in DOE facilities; and

WHEREAS, the Purchaser desires to obtain disposal services from DOE; and

WHEREAS, DOE is obligated and willing to provide such disposal services, under the terms and conditions hereinafter set forth; and

WHEREAS this contract is made and entered into under the authority of the DOE Organization Act (Pub. L. 95-91, 42 U.S.C. 7101 et seq.) and the Nuclear Waste Policy Act of 1982 (Pub. L. 97-425, 42 U.S.C. 10101 et seq.)

NOW, THEREFORE, the parties hereto do hereby agree as follows:

ARTICLE I - DEFINITIONS

As used throughout this contract, the following terms shall have the meanings set forth below:

1. The term "assigned three-month period" means the period that each Purchaser will be assigned by DOE, giving due consideration to the Purchaser's assignment preference, for purposes of reporting kilowatt hours generated by the Purchaser's nuclear power reactor and for establishing fees due and payable to DOE.
2. The term "cask" means a container for shipping spent nuclear fuel and/or high-level radioactive waste which meets all applicable regulatory requirements.

ARTICLE II - SCOPE

This contract applies to the delivery by Purchaser to DOE of SNF and/or HLW of domestic origin from civilian nuclear power reactors, acceptance of title by DOE to such SNF and/or HLW, subsequent transportation, and disposal of such SNF and/or HLW and, with respect to such material, establishes the fees to be paid by the Purchaser for the services to be rendered hereunder by DOE. The SNF and/or HLW shall be specified in a delivery commitment schedule as provided in Article V below. The services to be provided by DOE under this contract shall begin, after commencement of facility operations, not later than January 31, 1998 and shall continue until such time as all SNF and/or HLW from the civilian nuclear power reactors specified in Appendix A, annexed hereto and made a part hereof, has been disposed of.

ARTICLE III - TERM

The term of this contract shall be from the date of execution until such time as DOE has accepted, transported from the Purchaser's site(s) and disposed of all SNF and/or HLW of domestic origin from the civilian nuclear power reactor(s) specified in Appendix A.

ARTICLE IV - RESPONSIBILITIES OF THE PARTIES

A. Purchaser's Responsibilities

1. Discharge Information

(a) On an annual basis, commencing October 1, 1983, the Purchaser shall provide DOE with information on actual discharges to date and projected discharges for the next

ten (10) years in the form and content set forth in Appendix B, annexed hereto and made a part hereof. The information to be provided will include estimates and projections and will not be Purchaser's firm commitment with respect to discharges or deliveries.

(b) No later than October 1, 1983, the Purchaser shall provide DOE with specific information on:

(1) Total spent nuclear fuel inventory as of April 7, 1983;

(2) Total number of fuel assemblies removed from the particular reactor core prior to 12:00 A.M. April 7, 1983 for which there are plans for reinsertion in the core, indicating the current planned dates for reinsertion in the core. Estimates of the burned and unburned portion of each individual assembly are to be provided.

(c) In the event that the Purchaser fails to provide the annual forecast in the form and content required by DOE, DOE may, in its sole discretion, require a rescheduling of any delivery commitment schedule then in effect.

2. Preparation for Transportation

(a) The Purchaser shall arrange for, and provide, all preparation, packaging, required inspections, and loading activities necessary for the transportation of SNF and/or HLW to the DOE facility. The Purchaser shall notify DOE of such activities sixty (60) days prior to the commencement of such activities. The preparatory activities by the Purchaser shall be made in accordance with all applicable laws and regulations relating to the Purchaser's responsibilities hereunder. DOE may designate a representative to observe the preparatory activities conducted by the Purchaser at the Purchaser's site, and the Purchaser shall afford access to such representative.

(b) Except as otherwise agreed to by DOE, the Purchaser shall advise DOE, in writing as specified in Appendix F, annexed hereto and made a part hereof, as to the description of the material in each shipping lot sixty (60) days prior to scheduled DOE transportation of that shipping lot

(c) The Purchaser shall be responsible for incidental maintenance, protection and preservation of any and all shipping casks furnished to the Purchaser by DOE for the performance of this contract. The Purchaser shall be liable for any loss of or damage to such DOE-furnished property, and for expenses incidental to such loss or damage while such casks are in the possession and control of the Purchaser except as otherwise provided for hereunder. Routine cask maintenance, such as scheduled overhauls, shall not be the responsibility of the Purchaser.

B. DOE Responsibilities

1. DOE shall accept title to all SNF and/or HLW, of domestic origin, generated by the civilian nuclear power reactor(s) specified in Appendix A, provide subsequent transportation for such material to the DOE facility, and dispose of such material in accordance with the terms of this contract.

2. DOE shall arrange for, and provide, a cask(s) and all necessary transportation of the SNF and/or HLW from the Purchaser's site to the DOE facility. Such cask(s) shall be furnished sufficiently in advance to accommodate scheduled deliveries. Such casks(s) shall be suitable for use at the Purchaser's site, meet applicable regulatory requirements, and be accompanied by pertinent information including, but not limited to, the following:

(a) written procedures for cask handling and loading, including specifications on Purchaser-furnished cannisters for containment of failed fuel;

(b) training for Purchaser's personnel in cask handling and loading, as may be necessary;

(c) technical information, special tools, equipment, lifting trunnions, spare parts and consumables needed to use and perform incidental maintenance on the cask(s); and

(d) sufficient documentation on the equipment supplied by DOE.

3. DOE may fulfill any of its obligations, or take any action, under this contract either directly or through contractors.

4. DOE shall annually provide to the Purchaser pertinent information on the waste disposal program including information on cost projections, project plans and progress reports.

5.(a) Beginning on April 1, 1991, DOE shall issue an annual acceptance priority ranking for receipt of SNF and/or HLW at the DOE repository. This priority ranking shall be based on the age of SNF and/or HLW as calculated from the date of discharge of such material from the civilian nuclear power reactor. The oldest fuel or waste will have the highest priority for acceptance, except as provided in paragraphs B and D of Article V and paragraph B.3 of Article VI hereof.

(b) Beginning not later than July 1, 1987, DOE shall issue an annual capacity report for planning purposes. This report shall set forth the projected annual receiving capacity for the DOE facility(ies) and the annual acceptance ranking relating to DOE contracts for the disposal of SNF and/or HLW including, to the extent available, capacity information for ten (10) years following the projected commencement of operation of the initial DOE facility.

## ARTICLE V - DELIVERY OF SNF AND/OR HLW

### A. Description of SNF and HLW

The Purchaser shall deliver to DOE and DOE shall, as provided in this contract, accept the SNF and/or HLW which is described in accordance with Article VI.A. of this contract, for disposal thereof.

RLS

Battelle
Pacific Northwest Laboratories

Internal Distribution

MK White
MR Shay
RC Walling
JFF:File/LB

Date: January 24, 1984

To: R. J. Hall

From: J. F. Fletcher Jack

Subject: Revised Waste Acceptance Schedule from Draft Mission Plan

Enclosed are examples of possible waste acceptance schedules for a two repository system based on the ground rules for waste acceptance presented in section II of the Mission Plan. The Mission Plan states that "the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year". This was interpreted to read "the cumulative acceptance rate will be equal to or greater than the cumulative discharge rate of spent fuel in each year" to allow the early planned receipt of fuel in anticipation of future peaks in the spent fuel discharge projections. The initial acceptance rate is sensitive to the amount of fuel stored in FIS in 1998, thus cases were generated assuming that FIS is fully utilized and assuming that no FIS is required. The fuel discharge schedule is derived from DOE/RL-83-1.

The first two enclosed tables assume the current planning base of two repositories (1998 and 2003 start-up) with receipt rates of 1800 MTU increasing to 3000 MTU after five years of operation. As can be seen from the post reactor basin storage requirements, this receipt rate will not meet the Mission Plan criteria independent of the FIS assumptions for this spent fuel requirements projection. The second two tables show that a higher rate of acceptance is required to meet the acceptance criteria in the first five years of operation of the first repository. Also included, for your reference, are more detailed tables which reflect the calculations involved in generating the above information.

It should be noted that the draft Mission Plan and the summary table (Table II-1) addresses the deployment of the second repository in 2003 rather than in 2002 as has previously been considered. To forestall any concern as to the required acceptance rates, the full set of tables above was duplicated to cover the 2002 start-up of the second repository. As the duplicated tables show, the conclusions are the same for either year of deployment.

An update of the Spent Fuel Storage Requirements report is scheduled for release in April and it should be noted that the expected reduced requirements in the update may effect the required receipt rates reported here.

Enclosures

Received
JAN 25 1984
M K White

Plaintiff's Exhibit
058

Energy Northwest
v.
The United States
04-10C

54-1900-001 (3-71)

17
EBM

Battelle
Human Affairs Research Centers

Project Number

Internal Distribution
J Fletcher
RJ Hall
GM Holter
WS Kelly
DK Kreid
KJ Schneider
J Young

Date April 26, 1984

To Emmett Moore

From Thomas Overcast and Susan Carney

Subject MRS Institutional Report

## 1.0 SUMMARY

- The Ohio legislature approved the state's entry into the Midwest Low-Level Radioactive Waste Disposal Compact.
- DOE is considering temporary at-reactor storage of spent fuel as a back-up system for the repository program.
- The General Accounting Office criticized DOE's handling of patent rights in a proposed research and development contract with Battelle Memorial Institute.
- Senator Pete Domenici has asked DOE to address an environmental group's demands on the nuclear waste program.
- Congressional responses to DOE waste management: Representative Morris Udall (D-Ariz.) has introduced DOE authorizaton legislation requiring revision of the mission plan, while Senator Pete Domenici (R-N.M.) has asked DOE to workout differences with environmental groups to prevent lawsuits over implementation of NWPA.

## 2.0 LEGISLATION OKAYS OHIO ENTRY INTO LLW COMPACT

The Ohio legislature approved the state's entry into the Midwest Low-Level Radioactive Waste Disposal Compact. The original bill passed the House 73-22 in June 1983; a slightly amended bill passed the Senate on March 21, 1984 by a vote of 29-2. The House concurred, 69-20, with the amended legislation.

A member of Governor Richard F. Celeste's staff said that the governor will "definitely . . . sign the bill as soon as it is officially received. Ohio joins five other states, Missouri, Iowa, Michigan, Indiana, and Minnesota in the compact.

A 018

Plaintiff's Exhibit
064

Energy Northwest
v.
The United States
04-10C

Date 4-15-02 Exhibit # 17
Case Yankee Atomic vs United States
Deponent Robert Russell
Reporter Martin M. Rice
Naegeli Reporting Corporation
(800) 528-3335 FAX (503) 227-7123

PNL-117-3151
00621787 001

# Preliminary Analysis of the Total System Life Cycle Cost of the Commercial High-Level Radioactive Waste Disposal Program

FINAL DRAFT

April 27,1984

Work Performed Under Contract No. DE-AC01-83-NE-44301

Plaintiff's Exhibit
065

Energy Northwest
v.
The United States
04-10C

**Prepared By:**
**Roy F. Weston, Inc.**
**For The**
**U.S. Department of Energy**
Office of Civilian Radioactive Waste Management

DEPARTMENT OF ENERGY · UNITED STATES OF AMERICA



PNL-020-1491

# Preliminary Analysis of the Total System Life Cycle Cost of the Commercial High-Level Radioactive Waste Disposal Program

by: Frank Haines
Gregory Hartkopf
Alyson Hennelly
Jack Jones
Andrew Leiter
M. Judson Lilly
Douglas Tonkay
Thomas Wood

April 27, 1984

Work Performed Under Contract No. DE-AC01-83-NE-44301

Prepared by

Roy F. Weston, Inc.

for

The U.S. Department of Energy

Office of Civilian Radioactive Waste Management

# INDEX TO TABLES OF ISSUES

# RELATED TO THE STANDARD CONTRACT


| | |
|---|---|
| Table 1 | Acceptance Criteria |
| Table 2 | Acceptance Rate/Capacity |
| Table 3 | Procedural |
| Table 4 | Logistics |
| Table 5 | Rights Allocation |
| Table 6 | Scheduling |
| Table 7 | Interfacing/Coordination |
| Table 8 | Contract Clarification/Modification |




EXHIBIT
Zabransky 13
4-17-08

Plaintiff's Exhibit
089

Energy Northwest
v.
The United States
04-10C

APPENDIX A

10 CFR 961 STANDARD CONTRACT

ISSUES DESCRIPTION AND DISCUSSION

IDENTIFIER: 001 LAST ENTRY: January 7, 1987

BASELINE: CONTRACT

REFERENCE: ARTICLE I, Definition 20

STATEMENT: The term "year" means the period which begins on October 1 and ends on September 30.

PROBLEM: The "year" used for determining annual acceptance rates for the waste acceptance schedules in SRD Tables I-1 and III-1 is the calendar year. Article II indicates DOE disposal services will start not later than January 31, 1998. Article V, B. implies first receipt of spent fuel in the month of April (63 months after January 1, 1992).

ISSUE:

1 What is the official "year" for DOE's Annual Capacity Report and commitment to Final Delivery Schedules?

2 Will the first year's acceptance commitments (MTU) be prorated for the number of months services are rendered in a partial year?

3 Is DOE obligated to commit to acceptance of the annual quantities as specified in the waste acceptance schedule, or to the cumulative scheduled acceptance quantity?

COMMENT: DOE approval of Final Delivery Schedules for the initial "year" of operation of the repository (or MRS) will be based on the Annual Capacity Report, which in turn, is based on the Acceptance Schedules in the technical baselines (SRD, etc.). The Acceptance Schedules (and hence the DOE Final Delivery Schedule commitments in MTU/year) are based on a Calendar year starting on January 1. It appears that the term "year" could be interpreted from the contract to start on January 31, April 1 or October 1. If the Acceptance Schedules can be interpreted to imply "annual rate", then the DOE commitment to Final Delivery Schedules in the first "year" of operation can be prorated for the actual number of months of service to be rendered. This will result in attaining an annual acceptance rate as implied in the Acceptance Schedule, but perhaps not attaining the annual cumulative scheduled acceptance quantities. While the Annual Capacity Report is the only official contract basis for DOE commitments, the Purchasers will be anticipating acceptance based on the MIssion Plan and SRD Acceptance Schedules. A DOE position on the definition of the term "year" or other basis for the first year's commitment to Final Delivery Schedules will assist the Purchasers in their spent fuel management planning.

SCHEDULE: DOE's definition should be established not later than and included in the Annual Acceptance Priority Ranking to be issued on April 1, 1991.

RECOMMENDATION: TBD

BASIS: DOE statement of intent.

DATE: TBD

PNL-6288

# 1987 Annual Review of the Adequacy of the 1.0 mill per kWh Waste Disposal Fee

R. L. Engel

July 1987

Prepared for the U.S. Department of Energy
under Contract DE-AC06-76RLO 1830

Pacific Northwest Laboratory
Operated for the U.S. Department of Energy
by Battelle Memorial Institute

PNL-6288

Plaintiff's Exhibit
101

Energy Northwest
v.
The United States
04-10C

**DISCLAIMER**

This report was prepared as an account of work sponsored by an agency of the United States Government. Neither the United States Government nor any agency thereof, nor Battelle Memorial Institute, nor any of their employees, makes any warranty, expressed or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately owned rights. Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise, does not necessarily constitute or imply its endorsement, recommendation, or favoring by the United States Government of any agency thereof, or Battelle Memorial Institute. The views and opinions of authors expressed herein do not necessarly state or reflect those of the United States Government or any agency thereof, or Battelle Memorial Institute.

PACIFIC NORTHWEST LABORATORY
*operated by*
BATTELLE MEMORIAL INSTITUTE
*for the*
UNITED STATES DEPARTMENT OF ENERGY
*under Contract DE-AC06-76RLO 1830*

PNL-SA-18764

# DETERMINATION OF COST EFFECTIVE WASTE MANAGEMENT SYSTEM RECEIPT RATES

R. W. McKee
H. D. Huber

January 1991

For Presentation at the
Second Annual High-Level Radioactive
Waste Management Conference
Las Vegas, Nevada
April 28 - May 3, 1991

Work supported by
the U.S. Department of Energy
under Contract DE-ACO6-76RLO 1830

Pacific Northwest Laboratory
Richland, Washington 99352



Plaintiff's Exhibit
140

Energy Northwest
v.
The United States
04-10C

TRW

TRW Environmental Safety Systems Inc.

2650 Park Tower Drive, Suite 800
Vienna, VA 22180
703.204.8500

SN 76000 QA: N/A

October 25, 1995
VA.WA.EJL.10/95.219

Mr. Samuel Rousso
Director, Waste Acceptance, Storage & Transportation, RW-40
Office of Civilian Radioactive Waste Management
U.S. Department of Energy
1000 Independence Avenue S.W.
Washington, DC 20585

Dear Mr. Rousso:

Subject: DE-AC01-91RW-00134; Waste Acceptance Support: *DCS Monthly Status Report - October 1995* (WAD 95-40, WBS 3.3.1.1.2, Activity No. 335314)

The attached subject report provides the status of the Delivery Commitment Schedules (DCS) received as of October 15, 1995. The changes from the previous report consist of adding the data and status of the following new DCS submittals:

| DCS Number | Rev. No | Company | Reactor |
|---|---|---|---|
| 01-0501-4367-01 | 0 | Baltimore Gas & Electric Co. | Calvert Cliffs 1 |
| 01-0601-4368-01 | 0 | Boston Edison Company | Pilgrim 1 |
| 01-0705-4481-01 | 0 | Carolina Power & Light Co. | Robinson 2 |
| 01-0705-4481-02 | 0 | Carolina Power & Light Co. | Harris |
| 01-1012-4372-01 | 0 | Commonwealth Edison | Zion 1 |
| 01-1012-4372-02 | 0 | Commonwealth Edison | Zion 1 |
| 01-1012-4372-03 | 0 | Commonwealth Edison | Zion 1 |
| 01-1012-4372-04 | 0 | Commonwealth Edison | Zion 1 |
| 01-1012-4372-05 | 0 | Commonwealth Edison | Zion 1 |
| 01-5701-4469-01 | 0 | Connecticut Yankee Atomic Power Co. | Haddam Neck |
| 01-1508-4379-01 | 0 | Duke Power Company | Oconee 3 |
| 01-3901-4407-01 | 0 | New York Power Authority | Fitzpatrick |
| 01-3101-4398-01 | 0 | Niagra Mohawk Power Corp. | Nine Mile Point 1 |
| 01-3201-4399-01 | 0 | Northeast Utilities Service Co. | Millstone 1 |
| 01-4401-4419-01 | 0 | Rochester Gas & Electric Corp. | Ginna |
| 01-5203-4423-01 | 0 | Virginia Electric & Power Co. | Surry 1 |

Plaintiff's Exhibit
238

Energy Northwest
v.
The United States
04-10C

TRW Inc.

1921

EXHIBIT
Zabransky 50
4-18-02

Printed on recycled paper

CTR-024-0033

A 027

In addition, the Purchaser name, Power Authority New York, was changed to New York Power Authority to reflect the actual name of the Purchaser.

This report fulfills the requirement of FY 95 Work Authorization Directive 95-40, WBS 3.3.1.1 - Contract and Policy Procedures.

If you have any questions or require further information, please contact Ernie Leonard at (703) 204-8917.

Sincerely,

James B. Blandford
Deputy Assistant General Manager,
Office of Waste Acceptance, Storage and Transportation

JBB:EJL:as

Enclosure: (1)

cc: E. Benz, Weston
L. Desell, DOE/RW-44/45
F. F. Emami, TES1/38
E. R. Johnson, JAI
R. F. Kelly, TES1/37
A. S. Kubo, TES1/3
N. Slater, DOE/RW-44
P. Smith, DOE/RW-44
T. R. Stevens, TES1/41
R. D. Tagg, TES1/12
B. R. Teer, TES1/37
E. Turner DOE/RW-45
D. K. Zabransky, DOE/RW-44
L. B. Wimmer, TES1/37
Chron File
Records Processing Center
A. D. Sidler, TES1/41
WA Staff

Waste Stream

A 029

Plaintiff's Exhibit
336

Energy Northwest
v.
The United States
04-10C

EXHIBIT
Zabransky 41
4-18-02

A00000000-01717-1701-00002 Rev. 00
QA: N/A

**Civilian Radioactive Waste Management System**
**Management & Operating Contractor**

# BASIS FOR THE VA AND TSLCC COST ESTIMATE OPERATIONAL WASTE STREAM

**June 11, 1998**

Prepared for:

U. S. Department of Energy
Office of Civilian Radioactive Waste Management
1000 Independence Avenue, SW
Washington, D.C. 20585

Prepared by:

TRW Environmental Safety Systems Inc.
2650 Park Tower Drive
Vienna, Virginia 22180

Under Contract Number
DE-AC08-91RW00134

U.S. DEPARTMENT OF ENERGY

OFFICE OF CIVILIAN RADIOACTIVE WASTE MANAGEMENT

REPORT TO THE HOUSE COMMITTEE ON APPROPRIATIONS

# PLAN FOR TRANSPORTATION CASK FABRICATION AND THE DEPLOYMENT OF WASTE ACCEPTANCE CAPABILITIES

DECEMBER 2000



Plaintiff's Exhibit
407

Energy Northwest
v.
The United States
04-10C

Executive Summary

This plan was prepared by the Office of Civilian Radioactive Waste Management on behalf of the Secretary of Energy in response to direction from the House Committee on Appropriation on the Energy and Water Development Appropriations Act, 2001. The plan provides the Department of Energy strategy for the timely fabrication of transportation casks and deployment of waste acceptance capabilities.

The Department's plan builds on the successful transportation experience gained in its current radioactive materials shipping campaigns as well as recent private sector advances in the design, certification and manufacture of efficient spent nuclear fuel transportation technology. It provides sufficient time for detailed logistics and acquisition planning and mobilizing the manufacturing capabilities, technical resources and equipment necessary to assure performance of the Department's waste acceptance mission.

The Department's plan for the timely fabrication and deployment of waste acceptance capabilities is embodied in the Draft Request For Proposal "Acquisition of Waste Acceptance and Transportation Services for the Office of Civilian Radioactive Waste Management."[1] The strategy adopted for this draft solicitation was structured to make maximum use of private industry capabilities as mandated by the Nuclear Waste Policy Act, as amended.[2] The Department believes that current industry performance has shown that manufacturing capacity is available to meet present and future cask fabrication needs and that private industry can ensure the timely provision of the necessary services and equipment required to fulfill the Office of Civilian Radioactive Waste Management waste acceptance mission objectives at competitive fixed prices and fixed rates. This approach was developed with contract holders' input, along with input from equipment vendors and other interested parties.

The Department has been focusing its efforts on site characterization activities at Yucca Mountain, Nevada to determine if this site is suitable for further development as a geologic repository. Due to funding constraints, the Department has prioritized its scientific and engineering activities on timely completion of site characterization. If the site is recommended by the President and approved by Congress, the Department intends to implement this plan, updated as necessary, to acquire and deploy the transportation infrastructure in a manner that will allow for timely waste acceptance.

---

[1] Draft RFP number DE-RE-98RW00320, Acquisition of Waste Acceptance and Transportation Services for the Office of Civilian Radioactive Waste Management, September 1998.

[2] NWPA section 137(a)(2).

WBS: 3.2.3
QA: N/A

**Civilian Radioactive Waste Management System**
**Management & Operating Contractor**

# Calculation Method for the Projection of Future Spent Nuclear Fuel Discharges

**TDR-WAT-NU-000002 Rev 01**

**February 2002**

Prepared for:

U.S. Department of Energy
Office of Civilian Radioactive Waste Management
1000 Independence Avenue, S.W.
Washington, DC 20585

Prepared by:

Bechtel SAIC Company, LLC
955 L'Enfant Plaza SW
Suite 8000
Washington DC 20585

Under Contract Number
DE-AC08-01NV12101

**Plaintiff's Exhibit**
**424**

**Energy Northwest**
**v.**
**The United States**
**04-10C**


PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

**DISCLAIMER**

This report was prepared as an account of work sponsored by an agency of the United States Government. Neither the United States Government nor any agency thereof, nor any of their employees, nor any of their contractors, subcontractors or their employees, makes any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or any third party's use or the results of such use of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately owned rights. Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise, does not necessarily constitute or imply its endorsement, recommendation, or favoring by the United States Government or any agency thereof or its contractors or subcontractors. The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States Government or any agency thereof.


PROTECTED MATERIAL TO BE DISCLOSED ONLY IN ACCORDANCE WITH UNITED STATES COURT OF FEDERAL CLAIMS PROTECTIVE ORDER

FROM : Ed Benz <"Ed Benz" <ebenz2-conv>>
TO : Thomas Pollog <"Thomas Pollog" <ebenz2-conv>>
CC : Dave Zabransky <"Dave Zabransky" <ebenz2-conv>>, Robert Burgoyne <"Robert Burgoyne" <ebenz2-conv>>, David Siefken <"David Siefken" <ebenz2-conv>>, Joanne Thompson <"Joanne Thompson" <ebenz2-conv>>, Steven L Ross <"Steven L Ross" <ebenz2-conv>>
DATE = 03/18/2002
TIME : 16:19:00 GMT
SUBJECT : MPC Concept Information Document
BODY : Attached is the MPC document revised to address your comments. (The section numbering in the last section is wrong and we are working to correct that.)
I'm still trying to connect to get the DPC drop -release calculation, and I'll send that along when I get it.

b

Kouts 11
2/19/04 85
PENGAD-Bayonne, N. J.

Plaintiff's Exhibit
430

Energy Northwest
v.
The United States
04-10C

CTR116 0306

# Multipurpose Canister for Commercial SNF Concept Information

# Civilian Radioactive Waste Management System

## Revision 00

*February, 2002*
*U. S. Department of Energy*
*Office of Civilian Radioactive Waste Management*
*Washington, DC 20585*

**DISCLAIMER**

This document was prepared as an account of work sponsored by an agency of the United States Government. Neither the United States Government nor any agency thereof, nor any of their employees, nor any of their contractors, subcontractors or their employees, makes any warranty, express or implied, or assumes any legal liability or responsibility for the accuracy, completeness, or any third party's use or the results of such use of any information, apparatus, product, or process disclosed, or represents that its use would not infringe privately owned rights. Reference herein to any specific commercial product, process, or service by trade name, trademark, manufacturer, or otherwise, does not necessarily constitute or imply its endorsement, recommendation, or favoring by the United States Government or any agency thereof or its contractors or subcontractors. The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States Government or any agency thereof.

BECHTEL SAIC COMPANY, LLC

SEP 29 2003

QA: N/A
RECEIVED BY BSC CCU
DATE: 09/30/2003

Christopher A. Kouts
U.S. Department of Energy
Office of Civilian Radioactive
Waste Management
Office of Systems Analysis and
Strategy Development
1000 Independence Avenue, SW
Washington, DC 20585

CONTRACT NO. DE-AC28-01RW12101 – FISCAL YEAR (FY) 2003 LETTER REPORT FOR TOTAL SYSTEM LIFE CYCLE COST (TSLCC) OF THE CIVILIAN RADIOACTIVE WASTE MANAGEMENT (CRWM) PROGRAM

Bechtel SAIC Company, LLC (BSC) has prepared a draft of the FY03 letter report for the analysis of the TSLCC of the CRWM Program. The work associated with this letter report is consistent with the contract requirement included in Section C2, Paragraph 4.0, Program Integration Functions and is included as part of the BSC work scope under the work breakdown structure element 9.1.3.

The report included in this submittal meets our commitment to develop a TSLCC estimate for the purposes of determining the adequacy of the fee charged for electricity generated and sold using commercial nuclear reactors.

In addition to the TSLCC letter report, we are including the TSLCC assumptions document with this submittal. This document identifies the major assumptions that form the basis for the parametric cost analysis used in preparing this report.

Please contact Ricky Robinson at (702) 295-4761 if you have any questions or comments.

Russell Fray
for John T. Mitchell, Jr.
President and General Manager

9/29/2003
Date Signed

JTM:RJR:ls - 0922038855

Enclosures:
As Stated

cc:
W. J. Arthur, III, DOE, Las Vegas, NV
R. S. Hajner, BSC, Las Vegas, NV
C. S. Hawk, BSC, Washington, DC
W. C. Moller, BSC, Washington, DC
R. J. Robinson, BSC, Las Vegas, NV
V. W. Trebules, Jr., DOE, Las Vegas, NV

Plaintiff's Exhibit
462

Energy Northwest
v.
The United States
04-10C

# Total System Life Cycle Cost Update Letter Report Of the Civilian Radioactive Waste Management Program

**September 2003**

**LETTER REPORT**

The Total System Life Cycle Cost is produced by the Department of Energy's Office of Civilian Radioactive Waste Management (OCRWM) as the Program's estimate of the costs to license, construct, and operate a repository to implement the Federal policy for permanent geologic disposal of the Nation's spent nuclear fuel and high-level radioactive waste. The FY 2003 cost estimate was calculated in FY 2000 constant dollars.

This letter report is being issued to update the *Analysis of the Total System Life Cycle Cost (TSLCC) of the Civilian Radioactive Waste Management Program,* published in May 2001 and supports the Secretary of Energy's annual Fee Adequacy Assessment, as required by the Nuclear Waste Policy Act as amended. The Nuclear Waste Policy Act of 1982, as amended (NWPA), requires the Secretary of Energy to annually review the amount of fees assessed to civilian nuclear power generators. The purpose of the annual review is to assure that sufficient funds are accumulated in the Nuclear Waste Fund to offset the costs associated with the acquisition, licensing, design, construction, operation (including nuclear waste transportation), maintenance, monitoring, and decommissioning of the repository. The TSLCC supports the Secretary's efforts to perform the annual Fee Adequacy Assessment.

The 2003 cost review is based on the May 2001 cost estimate data plus the Critical Decision -1 (CD-1) document; the Fiscal Year (FY) 2003 Re-plan; approved Baseline Change Proposals (BCPs), and approved trends. This year's cost analysis was limited to a parametric approach using cost data from the May 2001 TSLCC along with current design trends being implemented into the project. The CD-1 document provided a detailed analysis of the Yucca Mountain Repository Project cost through final design and a range estimate for the majority of the work through construction completion. The operations cost (e.g., emplacement, monitoring, and closure), was maintained at the values in the May 2001 report with adjustments limited to a phased implementation approach and additional costs due to the changes in quantity of waste. For purposes of comparison the FY 2003 cost data remains in FY 2000 constant dollars.

Analysis was conducted for two cases, the TSLCC Statutory Case and Fee Adequacy TSLCC Case. The TSLCC Statutory Case represents the authorized systems and is consistent with the reference design for the emplacement of 70,000 metric tons of heavy metal (MTHM) of civilian and defense nuclear waste, as specified in the NWPA. The TSLCC Statutory Case provides a reference cost that will not change due to variations in the amount of spent nuclear fuel and high-level waste destined for disposal at the repository and includes defense waste. The second case, the Fee Adequacy TSLCC Case, is based on the emplacement of 110,136 MTHM and includes all reactors that have been granted license extensions as of June 2003. As more reactors are granted license extensions, and the Department of Energy's Office of Environmental Management (EM) refines its waste stream, the amount of waste to be disposed of will change. The Fee Adequacy TSLCC will be updated over time to reflect the additional amount of waste requiring disposal.

The Office of Civilian Radioactive Waste Management has made cost savings a priority, and cost savings were evaluated as part of the analysis in both TSLCC cases. The TSLCC Statutory Case has a total cost of $49.4 billion. The Fee Adequacy TSLCC includes a 10 percent increase in waste (from 97,800 MTHM to 110,136 MTHM), however additional costs for the increase in the waste inventory were offset by cost savings in the areas of the waste package and transportation. Taking into consideration the estimating accuracy associated with evolving designs and the parametric estimating techniques used, the analysis indicates that the May 2001 TSLCC estimate (Fee Adequacy TSLCC) for the cost associated with Civilian Radioactive Waste Management Program remains valid at $57.5 billion. The design will mature and the associated estimates will

be based on bottoms-up techniques, prior to the submittal of CD-2, resulting in significantly improved estimating accuracy. Additional cost savings are expected from the initiatives of the Office of Science and Technology Program in the range of $5 billion to $7 billion.

The results of this estimate indicates that the current 1.0 mil ($0.001) per kilowatt-hour (kWh) fee charged for electricity generated and sold using a commercial nuclear reactor is still adequate. The changes in the nuclear waste stream and the cost reductions have resulted in a life cycle cost that has not changed. Analysis of the new Defense Cost Share Model also showed minimal impact on Fee Adequacy. A detailed analysis of the impact of the latest costs and economic data will be provided at a later date.

In light of the 10% increase in waste with no change in cost indicated the actual unit cost ($/MTHM of emplaced waste) is decreasing through significant cost savings. The unit cost per MTHM has decreased from $0.588 million to $0.522 million.

**Conclusion**

The TSLCC analysis provides the basis for the determination that the fee remains adequate. In addition, this TSLCC is the basis for the calculation of the Government's share of disposal costs for DOE-owned and managed spent nuclear fuel and high-level radioactive waste. These calculations will be added at a later date.

Since the enactment of the Nuclear Waste Policy Act through fiscal year 2003, the Program has expended $7.5 billion in year-of-expenditure dollars. For estimating purposes, those costs have been escalated to FY 2000 dollars of $9.0 billion. The total estimated cost to complete the Program from fiscal year 2003 to permanent closure of a potential repository is approximately $48.5 billion in constant FY 2000 dollars. The total cost estimate for disposing of all waste remains valid with the May 2001 TSLCC of $57.5 billion.

This report introduced the Statutory TSLCC Case to provide a reference case of 70,000 MTHM. Each year the amount of waste requiring geologic disposal will change based on updated projections. The TSLCC Statutory Case provides a reference cost that will not change due to variations in the amount of waste and will provide a basis for controlling and monitoring the scope of the repository.

Cost savings continue to be a priority for the program. Through cost savings, the cost of total waste disposal did not change significantly from the estimate in May of 2001, with an increase of 12,336 MTHM of waste into the system. For a description of the savings and design modifications, since the May 2001 Report, see Attachment 1.

# DETERMINATION OF COST EFFECTIVE WASTE MANAGEMENT SYSTEM RECEIPT RATES

R. W. MCKEE
Pacific Northwest Laboratory
P.O. Box 999, K6-25
Richland, WA 99352
(509) 376-1309

H. D. HUBER
Pacific Northwest Laboratory
P.O. Box 999, K6-25
Richland, WA 99352
(509) 376-1309

'91 HLRWM Conference Papers Vol. 2

"High Priority"

## ABSTRACT

A comprehensive logistics and cost analysis has been carried out to determine [illegible] re po- [illegible] man- [illegible] han the [illegible] t rate. [illegible] Repos- [illegible] basic [illegible] inties [illegible] nsider- [illegible] 2015 [illegible] ears [illegible] ed. [illegible] MTU/yr [illegible] the [illegible] cally [illegible] MRS. [illegible] ts are [illegible] 00 MTU/ [illegible] in the [illegible] ieved [illegible] /yr. [illegible] receipt rate for minimum system costs depends on the MRS startup date and ranges from 3,500 to 6,000 MTU/yr. With a 1998 MRS and a 2010 repository, the added cost of providing the MRS is offset by at-reactor storage cost reductions and the total system cost of $10.0 billion is virtually the same as for the repository-only system.

## INTRODUCTION

A comprehensive logistics and cost analysis is being carried out by Pacific Northwest Laboratory (PNL)[a] to determine if there are potential benefits to the high-level waste system for receipt rates other than the current 3,000 MTU/yr design basis receipt rate. The scope of the analysis includes both a Repository-Only System and a Storage-Only or Basic (MRS) System. To allow for current uncertainties in facility startup scheduling the following combination of facility startup dates are considered:

| Repository Startup Year | MRS Startup Year |
|---|---|
| 2010 | None |
| 2010 | 1998 |
| 2010 | 2007 |
| 2015 | None |
| 2015 | 1998 |
| 2015 | 2012 |

Receipt rates ranging from 1,500 to 6,000 MTU/yr have been evaluated for both the MRS and repository facilities. The common assumption for facility design work and for system studies has been to use a 3,000 MTU/yr receipt rate for both of these facilities. There is, however, no fundamental reason for identical receipt rates, nor is there a clearly documented rationale for the 3,000 MTU/yr receipt rate. Thus, the objective of this study is to identify advantageous receipt rates and to determine if they differ over the range of conditions specified above and by how much and why.

Possible effects of both unconstrained and constrained MRS storage limits are being examined. The constrained storage limits are those specified by the Nuclear Waste Policy Amendments Act, i.e., 10,000 MTU of spent fuel prior to the repository startup and 15,000 MTU following the repository startup. Results for the constrained storage limit cases were not yet available when this paper was prepared.

## WASTE MANAGEMENT SYSTEM

The waste management system for this study was defined to include 1) at-reactor pool and dry storage facilities, 2) shutdown reactor facilities maintained solely for the purpose of

[a]Pacific Northwest Laboratory is operated by Battelle Memorial Institute for the U.S. Department of Energy under Contract DE-AC06-76RLO 1830.



Plaintiff's Exhibit
532

Energy Northwest
v.
The United States
04-10C

EXHIBIT
Barrett 57
5-10-02

PA-221971

# In the United States Court of Federal Claims

No. 04-106 C
(Filed: June 20, 2008)

****************************************

DAIRYLAND POWER COOPERATIVE,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

****************************************

**ORDER**

Pursuant to the Trial Preparation Order of February 21, 2008, Plaintiff, Dairyland Power Cooperative ("Dairyland") and Defendant, the United States ("the Government") filed their motions *in limine* on April 29, 2008. The parties filed their responses on May 15, 2008, and a hearing was held on May 29, 2008. Based on the arguments of the parties in the pleadings and at the hearing, below is the Court's decision on each of the outstanding motions.

## I. Defendant's Motion *In Limine* to Exclude the Admission at Trial of Documents Prepared by Government Contractors

The Government, as it has in other spent nuclear fuel ("SNF") cases, seeks to exclude all documents that were prepared by Department of Energy ("DOE") contractors. The Government gives a number of reasons to exclude these documents; however, none of these reasons is persuasive to the Court. For the reasons set forth below, the Government's Motion *In Limine* to Exclude the Admission at Trial of Documents Prepared by Government Contractors ("Def.'s Mot. to Exclude Contractor Documents") is DENIED.

### A. Admissibility of the Documents under Fed. R. Evid. 803(8)(A)

#### 1. Background

There are approximately 140 documents[1] at issue which were prepared by contractors for

[1] According to the Government there are 137 documents that fall into this category. Def.'s Mot. to Exclude Contractor Documents at 1. According to Dairyland, there are "nearly 140."

DOE regarding research and planning relating to the disposal of SNF. Def.'s Mot. to Exclude Contractor Documents, App.1-11; Pl.'s Resp. at 1; Tr. 8:18-21.[2]

The Government does not contend that the documents are not relevant, rather, the Government argued that the contractor documents are not admissible because they are not covered by any of the exceptions to the hearsay rule under Fed. R. Evid. 803 and that they are not admissions under Fed. R. Evid. 801(d). Def.'s Mot. to Exclude Contractor Documents at 6-14; Tr. 8:24-17:19. Dairyland responded that the documents are admissible under a number of theories including, the public records exception to the hearsay exclusion under Fed. R. Evid. 803(8)(A) or as non-hearsay under Fed. R. Evid. 801(d)(2)(C) or (D). Plaintiff's Response to Defendant's Motion In Limine to Exclude the Admission at Trial of Document's Prepared by Government Contractors ("Pl.'s Resp. to Def.'s Mot. to Exclude Contractor Documents ") at 7-15; Tr. 18:23-22:23.

**2. Applicable Law**

At this time the primary issue before the Court is the admissibility of the contractor documents. *PR Contractors, Inc. v. United States*, 69 Fed. Cl. 468, 469 (2006) ("A motion *in limine* is a preliminary motion that serves a gatekeeping function and permits the trial judge to eliminate from further consideration evidentiary submissions that clearly would be inadmissible for any purpose.") If the documents are found to be admissible, the question of whether the statements contained within the contractor documents can be attributed to DOE is a subsidiary question which can be addressed during trial. Tr. 7:4-25. To determine the admissibility of the contractor documents the Court looks to Fed. R. Evid. 803(8)(A) which provides that "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth the activities of the office or agency" are not excluded by the hearsay rule "unless the sources of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A).

The contractor documents were not created by DOE; however, this Court holds that, while DOE contractor documents may not have been directly created by DOE, the exception in Fed. R. Evid. 803(8)(A) allows for admission of the documents. While the Government attempts to argue that DOE contractors have a limited amount of responsibility, this Court finds that "[t]o a significant, if not exclusive extent, DOE's activities, duties, and responsibilities under the NWPA [Nuclear Waste Policy Act], have been conducted through its national laboratories and management and operations ("M&O") contractors." *Yankee Atomic Elec. Co. v. United States* ("*Yankee*"), No. 98-126C, 2004 U.S. Claims LEXIS 363, at *8 (Fed. Cl. Sept. 17, 2004) (citing

---

Dairyland's Response to Defendant's Motion *In Limine* to Exclude the Admission at Trial of Documents Prepared by Government Contractors. ("Pl.'s Resp. to Def.'s Mot. to Exclude Contractor Documents ") at 1.

[2] Tr. (page #:paragraph #) refers to the transcript from the oral argument on the parties' motions *in limine* held on May 29, 2008.

*Westinghouse Electric Co. v. United States*, 1997 WL 1068204 at *2 (Fed. Cl. 1997)).[3] Fed. R. Evid. 803(8)(A) is to be construed broadly to include

> those activities done by national laboratories at the behest of DOE and within the parameters thereof. The court is mindful of defendant's point that some of the documents contain a disclaimer that the views are those of the contractor/author, not of any government agency, a position that is . . . not dispositive o[f] their admissibility as public records.

*Pacific Gas & Elec. Co. v. United States* ("*PG&E*"), 73 Fed. Cl. 333, 438 (2006) (citing *Yankee,* 2004 U.S. Claims LEXIS 363, at *22-23). The Government advanced the same position in the instant matter as it did in *Yankee* and *PG&E*, that the documents do not contain the views of any government agency. The Government argued at the hearing on May 29, 2008, that the reports prepared by contractors do not set forth the activities of DOE, rather the documents contain suggestions, recommendations, and advice of contractors hired to provide this information. Tr. 10:15-22. The Government also contended, *inter alia*, that the contractors are not public officials because they are not employees or agents of DOE. Def.'s Mot. to Exclude Contractor Documents at 6-10; Tr. 9:20-25. And while the Government makes a number of arguments regarding whether or not the statements contained in the documents should be attributed to DOE, it has not persuaded the Court that these documents are inadmissible hearsay.

**3. Conclusion**

The Government's position that the documents are not admissible under Fed. R. Evid. 803(8)(A) is unavailing. The contractors in this matter have a significant amount of responsibility under the NWPA for activities related to the disposal of SNF. The Court concludes that these documents constitute "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth the activities of the office or agency." Fed. R. Evid. 803(8)(A). There has been no contention that "the sources of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A). Therefore, the contractor documents are admissible.

This Court agrees with and adopts the reasoning set forth in *Yankee* and *PG&E*. The documents are admissible under Fed. R. Evid. 803(8)(A). However, in making the determination

---

[3] Dairyland excerpted for the Court the testimony of Dr. John Bartlett, the former Director of the Office of Civilian Radioactive Waste Management ("OCRWM"). Dr. Bartlett was asked during the *Yankee* trial, "[w]hen you were director, to what extent did you and OCRWM rely upon studies prepared by the management and operations contractor such as this one?" Dr Bartlett responded, "[a]ll of the work is done by the - by the support of contractors. That's what they're there for. The Department of Energy has - OCRWM itself has about 65 employees. The program has about 5,000 employees if you look at it this way. These are contractor people." Pl.'s Resp. Def.'s Mot. to Exclude Contractor Documents at 6; *see also Yankee,* 2004 U.S. Claims LEXIS 363, at * n.5.

that the documents are admissible, the Court has not determined that the contractor's "[r]ecords, reports, statements, or data compilations" reflect or establish DOE policy. Fed. R. Evid. 803(8)(A); *see also Yankee,* 2004 U.S. Claims LEXIS 363, at *29. This determination shall be made if the issue arises at trial.

### B. Admissibility of the Documents under Fed. R. Evid. 801(d)(2)(C) or (D)

#### 1. Background

Dairyland also seeks the admission of the documents as admissions of a party opponent under Fed. R. Evid. 801(d)(2)(C) or (D). Tr. 21:8-12. The Government contended that the contractors were not "authorized" to make statements on behalf of DOE. Def.'s Mot. to Exclude Contractor Documents at 23. The Government relied on the principle that "[c]ourts have historically applied agency law to determine whether the declarant was authorized by the party to make the statement at issue." *Id.* at 24 (citing 5 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 801.32[1], at 801-69-70 (2d ed. 2008); Tr. 15:16-17:16.

Dairyland argued that, "[i]n most if not all cases, the contractors were actually hired to *write* the reports in question, so clearly the statements made in the reports–like the analysis and other work underlying the reports–were 'authorized' by DOE." Pl.'s Resp. to Def.'s Mot. to Exclude Contractor Documents at 16. Moreover, some documents contain the express statement that "this report was prepared as an account of work sponsored by an agency of the United States Government." *Id.* at 16. Additionally, Dairyland again cited to the *Yankee* trial testimony of Dr. John Bartlett, a former director of OCRWM. Tr. 21:13-19. When asked to what extent the M&O contractors were "authorized by the Department to make statements concerning the subjects addressed in studies," Dr. Bartlett responded that "they have full authority to accomplish and report this work." Pl.'s Resp. to Def.'s Mot. to Exclude Contractor Documents at 17.

#### 2. Applicable Law

According to Fed. R. Evid. 801(d) Statements which are not hearsay:

> A statement is not hearsay if (2) Admission by a party-opponent. The statement is offered against a party and is . . . (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

Fed. R. Evid. 801(d)(2)(C), (D).

In the instant matter it is clear that these Government contractors are authorized by DOE to make the statements contained in the documents at issue. DOE fulfills its mission through the use of Government contractors. The Government cannot now disavow a relationship that was created contractually simply because it would be beneficial to the pending litigation. Additionally, the Court finds that the management and operations ("M&O") contractors at issue here are akin to employees that

carried out DOE's contractual responsibilities under the Nuclear Waste Policy Act [NWPA] and the Standard Contract. *Yankee Atomic Elec. Co.*, 2004 U.S. Claims LEXIS 363, at *8. Therefore, the Court agrees with Dairyland, as well as *Yankee* and *PG&E*, that the documents are admissible as admissions by a party-opponent under Fed. R. Evid. 801(d)(2)(C) and (D). Fed. R. Evid. 801(d)(2) "expressly acknowledges that an admission by a party-opponent is not hearsay if the statement is offered against the party and was actually made by him in either his individual or representative capacity." *Mayor of City of Philadelphia v. Educational Equality League*, 94 S.Ct. 1323, 1345-1346 (1974). Further, "under Fed. R. Evid. 801(d)(2)(C), all that is required for such an 'admission' to be admissible at trial is that it is made by 'a person authorized by the party to make a statement concerning the subject.'" *PG&E*, 73 Fed. Cl. at 440.

**3. Conclusion**

The Court finds that the DOE contractors were authorized, in fact contracted, to make statements for DOE concerning the transportation and disposal of SNF pursuant to the Standard Contract. Additionally, as stated above, the Court finds that the DOE contractors are akin to employees that worked for DOE and carried out its duties under the NWPA and the Standard Contract. The Court, therefore, holds that the documents are admissible under Fed. R. Evid. 801(d)(2) (C) and (D). Whether or not the document reflects or establishes DOE policy shall be determined at trial should the issue arise.

**II. Dairyland's Motion to Exclude Evidence of the Reasons for DOE's Delay in Performance – i.e., Its Breach of Contract**

Dairyland seeks to exclude any evidence that the Government might offer regarding the reason for DOE's breach. According to Dairyland, in recent spent nuclear fuel trials the Government has attempted to introduce evidence concerning the reason for DOE's breach which delayed and confused the proceedings. For the reasons set forth below Dairyland's Motion to Exclude Evidence of the Reasons for DOE's Delay in Performance – i.e., Its Breach of Contract is GRANTED.

**A. Background**

Despite the broad title of Dairyland's motion it does not seek to exclude all evidence of the reasons for DOE's delay in performance, rather Dairyland seeks to exclude evidence that advances the Government's position regarding "unavoidable delay." Specifically, Dairyland seeks to exclude testimony by Mr. Christopher Kouts, a senior official at DOE, regarding the reasons for the delay of the Yucca Mountain project, such as budgetary issues, because they are not relevant to the damages issue presented in this case. Dairyland's Motion to Exclude Evidence of the Reasons for DOE's Delay in Performance ("Pl.'s Mot. to Exclude Evidence of Delay") at 1. According to Dairyland, *inter alia*, the Government is barred from raising the issue of "unavoidable delay" by the mandamus order issued by the D.C. Circuit. Pl.'s Mot. to Exclude Evidence of Delay at 2; Tr. 24:23-25; 25:1-4; *see Northern States Power Co. v. Department of Energy*, 128 F.3d 754, 760 (D.C. Cir. 1997). Dairyland also alleges that the Government has waived its ability to argue unavoidable delay by failing to plead the matter as an affirmative defense. Pl.'s Mot. to Exclude Evidence of Delay at 7; Tr, 25:19-26:5.

At oral argument the Government agreed that based on the D.C. Circuit's ruling at this time it is

"unable to make the argument with respect to unavoidable delays." Defendant's Response to Plaintiff's Motion to Exclude Evidence of the Reasons for the Department of Energy's Delay in Performance ("Def.'s Resp. to Pl.'s Mot. to Exclude Evidence of Delay") at 2; Tr. 26:23-27:4. However, the Government argued that it should be able to put forth evidence regarding "DOE's progress towards developing an MRS, monitored retrievable storage system." Def.'s Resp. to Pl.'s Mot. to Exclude Evidence of Delay at n1; Tr. 27:17-28:7. And if Dairyland challenges the 1991 ACR [Annual Capacity Report] the Government seeks to be permitted to describe the circumstances surrounding its creation and any allegations of "bad faith" surrounding the creation of the 1991 ACR that may arise. Def.'s Resp. to Pl.'s Mot. to Exclude Evidence of Delay at 3-4; Tr. 29:2-30:7.

### B. Applicable Law

The Court holds, that despite the fact that the D.C. Circuit mandamus order is now on appeal in the U.S. Court of Appeals for the Federal Circuit, while the appeal is pending the mandamus order is still in effect. *See Nebraska Public Power District v. United States*, 73 Fed. Cl. 650, 673 (holding that the subject mandamus was void because the D.C. Circuit "operated in excess of its jurisdiction and, specifically, without an appropriate waiver of sovereign immunity."); Tr. 24:13-14. Specifically, the D.C. Circuit's writ of mandamus states:

> We preclude DOE from concluding that its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim. This necessarily means, of course, that DOE not implement any interpretation of the Standard Contract that excuses its failure to perform on the grounds of "acts of Government in either its sovereign or contractual capacity." 10 C.F.R. § 961.11, Art. IX.A.

*Northern States Power Co. v. Department of Energy*, 128 F.3d 754, 760 (D.C. Cir. 1997).

### C. Conclusion

The Court shall not permit any evidence submitted by the Government, including any testimony by Mr. Kouts, that seeks to advance the position that "its delay is unavoidable on the ground that it has not yet prepared a permanent repository or that it has no authority to provide storage in the interim." *Northern States Power Co.*, 128 F.3d at 760. Any testimony by Mr. Kouts that does not concern an "interpretation of the Standard Contract that excuses its failure to perform on the grounds of 'acts of Government in either its sovereign or contractual capacity'" shall be allowed. *Id.*

## III. Dairyland Power Cooperative's Motion *In Limine* to Exclude Evidence Inconsistent with the Government's Contention Interrogatory Answers

Dairyland seeks to preclude the Government from introducing evidence that it claims is inconsistent with the Government's answers to contention interrogatories. Dairyland Power Cooperative's Motion *In Limine* to Exclude Evidence Inconsistent with the Government's Contention Interrogatory Answers ("Pl.'s Mot. to Exclude Evid. Inconsistent Interrog.") at 1. According to Dairyland, the Government made several concessions in its answers to interrogatories and, therefore,

many issues are no longer in dispute. *Id.*; Tr. 35:15-24. For the reasons set forth below Dairyland Power Cooperative's Motion *In Limine* to Exclude Evidence Inconsistent with the Government's Contention Interrogatory Answers is GRANTED IN PART AND DENIED IN PART.

**A. Background**

Dairyland seeks to exclude evidence that is inconsistent with the Government's answers to five contention interrogatories: numbers 9, 13, 15, 16 and 17. Pl.'s Mot. to Exclude Evid. Inconsistent Interrog. at 1. According to Dairyland, based on the Government's answers to the contention interrogatories, the Government has conceded that it is not going to dispute the reasonableness of Dairyland's mitigation efforts. *Id.* at 8; Tr. 35:15-24. Additionally, Dairyland argues that the Government admitted it is not taking a position on the timing of DOE's acceptance of failed fuel. *Id.*

The Government contended that Dairyland seeks to shift its burden of establishing the "but for," *i.e.* non-breach, world to the Government through its contention interrogatories. Defendant's Response to Plaintiff's Motion to Exclude Evidence Inconsistent with the Government's Contention Interrogatory Answers ("Def.'s Resp. to Pl.'s Mot. to Exclude Evid. Inconsistent Interrog.") at 7; Tr. 38:6-13. According to the Government, it "cannot state whether, absent DOE's delay, Dairyland's failed fuel would have been accepted on the same schedule as Dairyland's standard fuel." Def.'s Resp. to Pl.'s Mot. to Exclude Evid. Inconsistent Interrog. at 8; Tr. 40:17-20, 41:3-9. Furthermore, based on its answers to interrogatories, the Government is not precluded from responding to any evidence regarding failed fuel adduced by Dairyland at trial. Def.'s Resp. to Pl.'s Mot. to Exclude Evid. Inconsistent Interrog. at 8. Additionally, the Government conceded that it "does not currently plan to challenge the reasonableness of the actions that Dairyland took regarding its storage decisions at LACBWR [LaCrosse Boiling Water Reactor]." *Id.* at 10; Tr. 44:8-13. The Government further argued that this does not relieve Dairyland of establishing the reasonableness of its actions and that DOE's delay caused Dairyland to incur the costs. Def.'s Resp. to Pl.'s Mot. to Exclude Evid. Inconsistent Interrog. at 10; Tr. 44:1-7, 14-20.

**B. Applicable Law**

Dairyland seeks to limit the Government's introduction of evidence based on its answers to contention interrogatories. According to Dairyland the Government should be limited at trial to presenting evidence that is consistent with its answers to contention interrogatories. Dairyland argues that evidence "contradicting the government's contentions is irrelevant and inadmissible under Fed. R. Evid. 401 and 402." Pl.'s Mot. to Exclude Evid. Inconsistent Interrog. at 1. The relevance of this information is not the real issue, rather the issue before the Court is whether a party is bound by its answers to contention interrogatories. According to the United States Court of Appeals for the Federal Circuit:

> [D]iscovery allows the plaintiff to develop facts to support the theory of the complaint and allows the defendant to develop facts to support its defenses. (internal citation omitted). Second, discovery is designed to allow the defendant to pin down the plaintiff's theories of liability and to allow the plaintiff to pin down the defendant's theories of defense, thus confining discovery and trial preparation to information that is pertinent to the theories of the case.

*O2 Micro International. Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1365 (Fed. Cir. 2006). Therefore, the Government in answering Dairyland's contention interrogatories has addressed its "theories of defense." Trial preparation for both parties has proceeded based on the information provided during discovery in this matter.

**C. Conclusion**

Upon review of the Government's answers to contention interrogatories, the pleadings of the parties, and the arguments made on May 29, 2008, the Court holds the following with respect to each interrogatory:

**Interrogatory 9**–Dairyland asked the Government if it contends that it is was unreasonable for Dairyland to study, analyze, investigate and/or implement dry storage subsequent to DOE's partial breach. Defendant's Response to Plaintiff's First Set of Interrogatories as Amended in Response to the Court's February 5, 2007 Order and Supplemented Following the Close of Fact Discovery ("Def.'s Resp. to Interrogs.") at 24. The Government responded that only through an expert report will it argue that it was unreasonable for Dairyland to study, investigate and/or implement dry storage. *Id.*; Tr. 44:8-13. Additionally, in answering the interrogatory the Government specifically stated that it does not concede that the study, investigation and/or implementation of dry storage were caused by DOE's partial breach. Def.'s Resp. to Interrogs. at 24-25.

The Government shall be allowed to put forth evidence that the damages claimed in studying, analyzing, investigating and/or implementing dry storage was not due to DOE's breach whether or not it is in an expert report. But, the Government shall only be allowed to argue that it was unreasonable for Dairyland to study, analyze, investigate and/or implement dry storage through expert reports.

**Interrogatory 13**–Dairyland asked the Government if it would have picked up Dairyland's failed fuel later than the rest of its SNF, if it began acceptance starting not later than January 31, 1998. Def.'s Resp. to Interrogs. at 33. The Government stated that David Zabransky, an employee of the Office of Civilian Radioactive Waste Management, explained the issues that might arise relating to the acceptance of failed fuel in *Yankee*. *Id.* at 34. According to the Government "although DOE is required to accept failed fuel and nonstandard fuel under the Standard Contract, DOE is not necessarily obligated to accept them under the same schedule as standard fuel . . . ." *Id.*; Tr. 40:5-9. The Government then supplemented its answer concluding that what the Government "would have" done is irrelevant to the case, but rather the only question that needs to be considered is what the Government was required to do under the Standard Contract. Defendant's Supplemental Response to Plaintiff's Interrogatory Number 13 Pursuant to the Court's December 21, 2007 Order ("Def.'s Supp. Resp.") at 5. The Government affirmatively stated that in a "'but for' world Dairyland's failed fuel would not have been accepted pursuant to the terms of the Standard Contact on the same schedule as standard SNF until and unless Dairyland had established that the failed fuel could have been safely handled and transported to a federal facility . . . ." *Id.* at 6. Also, the Government contended that according to the Standard Contract, Dairyland is required to obtain confirmation from DOE as to the "technical feasibility" of accepting such fuel pursuant to the "currently agreed to schedule." *Id.*; Tr. 40:5-9, 42:5-18. Further, because Dairyland has never inventoried all of its failed fuel they do not have sufficient information to allow for a determination of when the failed fuel would have been picked up. Def.'s Supp. Resp. at 6-7; Tr. 40:17-

24. According to the Government, Dairyland cannot meet its burden of establishing that DOE would have accepted the failed fuel on the same schedule as standard SNF. Def.'s Supp. Resp. at 7.

Based on the Government's answers to Dairyland's contention interrogatories, it shall be allowed to put forth evidence regarding the acceptance of failed fuel pursuant to the Standard Contract. However, because the Government specifically stated in its answers to contention interrogatories that what it "would have" done regarding the acceptance of failed fuel is irrelevant, the Government shall not put forth any evidence regarding when it would have accepted failed fuel. This includes any evidence to support the position that it would have picked up Dairyland's failed fuel later than the rest of its SNF. The Government shall be limited to what it was required to do pursuant to the Standard Contract.

**Interrogatory 15**–Dairyland asked the Government if they contend it was unreasonable for Dairyland to store SNF in the wet fuel storage pool after the partial breach. Def.'s Resp. to Interrogs. at 35. The Government's response indicated that it would not contest the reasonableness of Dairyland's storage of SNF in its wet pools except as argued in the Government's expert reports. *Id.* at 36. Additionally, the answer to the contention interrogatory specifically stated that the Government does not concede that Dairyland's maintenance of its wet fuel storage pool was due to DOE's partial breach of the Standard Contract. *Id.*

Based on the Government answers to contention interrogatories, it shall be allowed to put forth any evidence that the maintenance of the wet fuel storage pools was not due to DOE's partial breach of the Standard Contract. But, the Government shall only be allowed to argue the "reasonableness" of Dairyland's storage of SNF in the wet fuel storage pool through expert reports.

**Interrogatory 16**–Dairyland asked the Government to describe all options Dairyland should have explored for the storage of SNF after the partial breach. *Id.* The Government responded that it is not required to determine alternatives for the storage of SNF. *Id.* at 37. Further, the Government stated that it does not plan to argue that Dairyland should have explored or implemented any particular strategy for storage of SNF except as identified in expert reports. *Id.* The Government also indicated that it does not concede that DOE's partial breach was the cause of any particular method chosen by Dairyland. *Id.*

The Court acknowledges that the Government does not concede that DOE's partial breach was the cause of any particular method chosen by Dairyland. Additionally, based on the Government's answer it shall be allowed to present evidence from expert reports regarding alternative storage methods. However, since the Government specifically stated that it does not plan to argue that Dairyland should have explored or implemented any particular strategy for storage of SNF, it will not be allowed to present evidence regarding a particular strategy Dairyland should have explored for the storage of SNF after the partial breach, unless it was identified in an expert report.

**Interrogatory 17**–Dairyland asked the Government to describe all options Dairyland should have explored for the storage of its failed fuel. *Id.* According to the Government's response, it is not required to determine alternatives for the storage of failed fuel. *Id.* at 38. Further, the Government stated that it does not plan to argue that Dairyland should have explored and/or implemented a particular method of storage for failed fuel except as identified in expert reports. *Id.* The Government also stated that while it was required to accept failed fuel under the Standard Contract it was not required to accept failed fuel

under the same schedule as standard SNF. *Id.*

The Government shall be allowed to present evidence from expert reports regarding storage methods for failed fuel. The Government shall also be allowed to present evidence regarding the contention that they were not obligated to accept failed fuel on the same schedule as standard SNF. However, since the Government specifically stated that it does not plan to argue that Dairyland should have explored any particular strategy for storage of failed fuel, it shall not be allowed to present evidence regarding a particular strategy Dairyland should have explored for the storage of failed fuel after the partial breach, unless it was identified in an expert report.

## IV. Motions *In Limine* to Exclude the Testimony of Expert Witnesses

### A. Background

On April 29, 2008, Dairyland filed motions to exclude the testimony of the following Government experts: Warren K. Brewer, R. Larry Johnson, and Jonathan A. Neuberger. The Government filed responses on May 15, 2008. On April 29, 2008, the Government filed motions to exclude the testimony of the following Dairyland experts: Ivan F. Stuart, Charles Wilkins and Frank C. Graves. Dairyland filed responses on May 15, 2008. Each motion *in limine* was addressed at the hearing on May 29, 2008. Because the applicable law is the same for the all the experts, it will be recited only once and then applied to each expert who is the subject of a motion *in limine*.

For the reasons set forth below Dairyland's Motion *in Limine* to Exclude Warren K. Brewer's Testimony is DENIED; Dairyland's Motion to Exclude R. Larry Johnson's Testimony is GRANTED IN PART AND DENIED IN PART; Dairyland's Motion to Exclude Jonathan A. Neuberger is DENIED; the Government's Motion to Exclude Expert Testimony [Charles L. Wilkins] Regarding Overhead Costs is DENIED; the Government's Motion to Exclude the Testimony of Ivan F. Stuart is DENIED; and the Government's Motion to Exclude Frank C. Graves is DENIED.

### B. Applicable Law

Testimony by experts is governed by Fed. R. Evid.702, as amended in 2000. Fed. R. Evid. 702. Testimony by Experts states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the fact of the case.

Fed. R. Evid. 702.

#### 1. The proposed expert witness must be qualified

A witness must be qualified as an expert based on their "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. This standard is disjunctive; therefore, an expert may be qualified based on any one of the five criteria found in the rule. *Waldorf v. Shuta*, 142 F.3d 601, 626 (3d Cir. 1998) (error

to exclude expert testimony based on practical experience, as "otherwise qualified witness is not disqualified merely because of a lack of academic training."); *Berry v. City of Detroit*, 25 F.3d 1342, 1350 (6th Cir. 1994) (an expert can testify based on training even if they possess no experience; however, testimony regarding the application of training principles requires a basis in experience). An expert need only be qualified and need not be the best and the brightest for the testimony to be admissible. *See* Matthew Bender & Co., Inc., *Federal Rules of Evidence Manual* § 702.02 [3] (citing G. Joseph & S. Saltzburg, *Evidence in America* § 51.3 ("trial judges are not to demand that the proffered expert possess the highest possible credentials or skills, or be the most qualified of all conceivable experts."))

### 2. Under *Daubert* and Fed. R. Evid. 702, the Court must act as a gatekeeper

Even after the Court has determined that an expert is qualified, it continues to act as a gatekeeper as required by Fed. R. Evid. 702. *Daubert v. Merrell Dow Pharmaceuticals, Inc.* ("*Daubert*")*,* 509 U.S. 579, 597 (1993) ("the Rules of Evidence–especially Rule 702–do assign to the trial judge the task of ensuring that an expert's testimony both rests on reliable foundation and is relevant to the task at hand.").

#### a. The expert's testimony must be reliable

The Court must make a determination that the evidence is reliable. This requires an "assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. To this end, *Daubert* set forth a five factor, nondispositive, "flexible" test to aid the court. *Id.* at 594; Matthew Bender & Co., Inc., *Federal Rules of Evidence Manual* § 702.02 [5].[4] These factors are:

1) whether the theory or technique can be or has been tested;
2) whether the theory or technique has been subjected to peer review and publication;
3) the known or potential rate of error;
4) the existence and maintenance of standards controlling the technique's operations; and
5) the degree of general acceptance.

*Daubert*, 509 U.S. at 593-94.

On remand the Ninth Circuit, "undertook[] 'the task of ensuring that an expert's testimony both rests on reliable foundation and is relevant to the task at hand.'" *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1313 (1995)(internal citation omitted). According to the Ninth Circuit after the issuance of the Supreme Court's decision in *Daubert* it is the court's "responsibility to determine whether those experts' proposed testimony amounts to scientific knowledge, constitutes good science, and was derived by the scientific method." *Daubert*, 43 F.3d at 1316 (internal citations omitted).

#### b. The expert's testimony must be relevant

As with all evidence, any expert's testimony must be relevant. According to Fed. R. Evid. 702, testimony by an expert must "assist the trier of fact to understand the evidence or to determine a fact in

[4]Many cases cite a four factor, nondispositive, "flexible" test. Factor number four, "the existence and maintenance of standards controlling the technique's operations" is often not cited, although it is present in *Daubert*.

issue." Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591; *see also* Fed. R. Evid. 401 (defining relevant evidence as "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.") and Fed. R. Evid. 402 (regarding generally the admissibility of evidence, "[a]ll relevant evidence is admissible . . . . [e]vidence which is not relevant is not admissible."). Another aspect of relevance is whether the expert testimony is sufficiently tied to the facts of the case such that it will aid in resolving the factual dispute. *Daubert*, 509 U.S. at 591 (citing *United States v. Downing*, 753 F.2d 1224, 1242 (3d. Cir. 1985)). This inquiry can be described "as one of fit." *Daubert*, 509 U.S. at 591.

**3. Discretion, appellate standard of review and the burden of proof**

The proponent of the evidence has the burden of proving the admissibility of the expert testimony by a preponderance of the evidence. Fed. R. Evid. 702, Advisory Committee Notes (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)). The admission of expert testimony is in the discretion of the trial court. *Acoustical Design, Inc. v. Control Elect. Co.*, 932 F.2d 939, 942 (Fed. Cir. 1991) (citing *Salem v. United States Lines Co.*, 370 U.S. 31 (1962)). And expert rulings are reviewed according to the abuse of discretion standard. *General Electric Co. v. Joiner* ("*Joiner*"), 522 U.S. 136, 139 (1997). *Joiner* concluded that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146. However, the Supreme Court in *Daubert* noted that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

**4. *Daubert* applies even if the testimony is not "scientific" testimony**

The Supreme Court has also held that the gatekeeper function found in *Daubert* applies to the testimony of experts who do not testify based on scientific principles, but based on "technical, or other specialized knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). There is no reason to attempt to make a distinction between scientific, technical or other specialized knowledge when deciding the question of the admissibility of the expert's testimony. *Id*. at 148 ("Experts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'"(citations omitted)). The trial judge must ensure that the expert testimony is both reliable and relevant, even if it is not based on scientific principles. *Id*. at 149.

However, the "factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id*. at 150 (internal citations omitted). The Supreme Court further concluded that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id*. at 152. The court has the same type "of latitude in determining *how* to test an expert's reliability . . . as it enjoys when it decides *whether* that expert's relevant testimony is reliable." *Id*. (emphasis in original).

**C. Pending Motions**

**1. Dairyland's Motion to Exclude Warren K. Brewer's Testimony**

Mr. Brewer has worked in the nuclear industry for over 30 years and is one of the owners of ABZ,

Inc., an engineering consulting company performing work for the commercial nuclear power industry. Defendant's Response to Dairyland's Motion to Exclude Warren K. Brewer's Testimony ("Def.'s Resp. to Pl.'s Mot. to Exclude Brewer") App. at 4, 27-42. He attended the Bettis Reactor Engineering School and received an M.S. in Nuclear Engineering from MIT. *Id.*

**a. Dairyland's Position**

According to Dairyland, Mr. Brewer's expert report critiques the opinions of Dairyland's expert Todd Smith regarding the increased cost of removing the reactor pressure vessel (RPV) from Dairyland's plant due to the presence of SNF.[5] Dairyland's Motion to Exclude Warren K. Brewer's Testimony ("Pl.'s Mot. to Exclude Brewer") at 1; Tr. 48:7-13. The RPV, an internal component at LACBWR, was removed between 2005 and 2007. This increased cost is one category of Dairyland's damages. Dairyland claims that the cost of RPV removal would have been significantly lower had DOE timely performed the Standard Contract. Dairyland proffered Mr. Smith's report in an attempt to justify this conclusion that the cost would have been lower in the non-breach world. Pl.'s Mot. to Exclude Brewer at 1. Dairyland contended that Mr. Brewer merely reviews the documents relied upon by Mr. Smith, as well as other evidence, and then offers his opinion of the evidence without completing any independent analysis. *Id*. at 2; Tr. 50:24-52:16. Dairyland seeks to exclude Mr. Brewer's opinion because it is not based on reliable principles or methods and is an intrusion on the role of the judge as the ultimate arbiter of fact and law. *Id*; Tr. 49:25 - 50:7.

Dairyland asserted that Mr. Brewer's testimony is nothing more than his own, subjective belief that certain non-breach world costs calculated by Dairyland's expert Mr. Smith are not supported. Pl.'s Mot. to Exclude Brewer at 5. Because Mr. Brewer did not perform any calculations of his own, Dairyland alleged that the opinion is nothing more than *ipse dixit*, and is not admissible. *Id.* at 6-8, 19; Tr. 50:24-52:16.

Dairyland also contended that Mr. Brewer is to testify that cask loading cost should be deducted from damages. Pl.'s Mot. to Exclude Brewer at 21. Cask loading costs include the cost of loading the SNF into a cask to be picked up and transferred to DOE. Def.'s Resp. to Pl.'s Mot. to Exclude Brewer App. at 25. According to Dairyland this has repeatedly been rejected by other SNF judges based on the rationale that the cask loading costs are not avoided but are merely deferred until a later time when DOE performs. *Id.* at 23. Non-breach costs need only be deducted when they entirely avoided; here the cost will be incurred in the future. *Id.*

**b. The Government's Position**

According to the Government, Dairyland's primary criticism is that, while Mr. Brewer offers a critique of the deficiencies in Todd Smith's report regarding RPV removal in the "but for" world, Mr. Brewer failed to complete his own model calculating his proposed cost for this removal. Defendant's Response to Plaintiff's Motion to Exclude Warren K. Brewer's Testimony ("Def.'s Resp. to Mot. to Exclude Brewer") at 1; Tr. 52:18-53:6. The Government contended that Mr. Brewer used established and reliable engineering principles to provide a useful basis for understanding the deficiencies in Mr. Smith's report. Def.'s Resp. to Mot. to Exclude Brewer at 2; Tr. 53:12-23. According to the Government, Mr. Brewer is an expert in the field of nuclear engineering with experience in nuclear reactor design,

[5]The Government did not file a motion to exclude the testimony of Todd Smith.

construction, testing and operation. Def.'s Resp. to Mot. to Exclude Brewer at 4; Tr. 54:1-10. Mr. Brewer has repeatedly been qualified as an expert in other SNF cases. Def.'s Resp. to Mot. to Exclude Brewer at 4. The Government argued that Mr. Brewer also offers the opinion that two studies performed by a Dairyland contractor would have been required regardless of when DOE accepted Dairyland's SNF, that operations and maintenance costs claims by Dairyland do not depend on the amount of SNF stored in the spent fuel pool, and finally that in the "but for" world Dairyland would have incurred costs to transfer its SNF to DOE, therefore, these costs are not recoverable by Dairyland. *Id.* at 8.

**c. Conclusion**

Based on the pleadings filed herein and the arguments of counsel, the Court holds that Mr. Brewer's testimony is both reliable and relevant. *Daubert,* 509 U.S. at 597 ("the Rules of Evidence–especially Rule 702–do assign to the trial judge the task of ensuring that an expert's testimony both rests on reliable foundation and is relevant to the task at hand."). Mr. Brewer shall be allowed to testify at trial. The Court holds that any argument regarding Mr. Brewer's lack of independent analysis goes to the weight of his testimony rather than the admissibility.

**2. Dairyland's Motion to Exclude R. Larry Johnson's Testimony**

Mr. Johnson is a partner emeritus of Johnson Lambert & Co. and the Chairman/CEO of Veris Consulting, LLC, a litigation consulting service. Dairyland's Motion to Exclude R. Larry Johnson's Testimony ("Pl.'s Mot. to Exclude Johnson"), App. at 27-32. As a partner with Ernst & Young and later a managing partner with Johnson Lambert & Co., he oversaw the firms' accounting and auditing practices. *Id.* Mr. Johnson received a B.S. from the University of Maryland and has completed M.B.A. course work at George Washington University. *Id.*

**a. Dairyland's Position**

Dairyland seeks to exclude the testimony of Larry Johnson which critiques the expert opinions of two Dairyland experts, Charles Wilkins and Todd Smith. Pl.'s Mot. to Exclude Johnson at 1; Tr. 60:3-10, 71:20-24. Mr. Johnson concluded, based on a review of the Wilkins and Smith reports, that 1) Dairyland's asserted damages include costs that are not "incremental" and should be subtracted from the damages claim;[6] 2) Dairyland's asserted damages include costs that are not "reasonable" and should be subtracted; and 3) PFS damages and lobbying should be deducted based on instruction from counsel. Pl.'s Mot. to Exclude Johnson at 1; Tr. 57:19-58:14-23.

According to Dairyland, the "but for" standard used by Mr. Johnson in determining incremental costs is incorrect as a matter of law. *Id.* at 7; Tr. 55:13-24, 56:12- 57:14, 73:1-15. Dairyland asserts that the governing standard for causation, which should be used in determining incremental damages, is whether the breach is a substantial causal factor in the damages. Pl.'s Mot. to Exclude Johnson at 7 (citing *Indiana Michigan Power v. United States*, 422 F.3d 1369, 1371 (Fed. Cir. 2005)) Dairyland states that it must show that: 1) the damages were reasonably foreseeable by the breaching party at the time of

---

[6]Mr. Johnson explains "costs includable as an element of damages must be incremental to the partial breach in order to be characterized as damages. As such, those costs must be directly related and necessary to the activities caused by the breach and reflect expenditures that would not have been made but for the breach." Pl.'s Mot. to Exclude Johnson, App. at 8.

contracting; 2) the breach is a substantial causal factor in the damages; and 3) the damages are shown with reasonable certainty. Pl.'s Mot. to Exclude Johnson at 7 (citing *Indiana Michigan v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005)). Therefore, according to Dairyland, Mr. Johnson's determination of incremental costs is not reliable or relevant because it is based on an incorrect legal premise; that is, it uses the "but for" standard rather than the substantial causal factor standard. *Id.* at 8; Tr. 56:12-22. Dairyland thus seeks to exclude Mr. Johnson's analysis regarding overhead costs. Pl.'s Mot. to Exclude Johnson at 8. Dairyland also contends that Mr. Johnson does not offer any expert testimony when he opines that certain costs are not "reasonable" and should be excluded. *Id.* at 9.

**b. The Government's Position**

The Government contended that Mr. Johnson offers valuable testimony regarding accounting and damages matters and that Mr. Johnson performed valuable analysis that Dairyland failed to perform. Defendant's Response to Dairyland's Motion to Exclude R. Larry Johnson's Testimony ("Def.'s Resp. to Pl.'s Mot. to Exclude Johnson") at 1-2. Mr. Johnson offers a comprehensive framework for evaluating the validity and basis of Dairyland's damages claim. *Id.* at 2; Tr. 61:6-20. According to the Government, Mr. Johnson properly offers the opinion that certain costs claims by Dairyland are not incremental to the Government's partial breach because Dairyland would have incurred the same costs even if DOE had performed. Def.'s Resp. to Pl.'s Mot. to Exclude Johnson at 7; Tr. 68:1- 70:12. Mr. Johnson's opinion regarding incremental costs critique Dairyland's claims regarding: 1) overhead and general and administrative costs; 2) labor costs charges to the "Baseline" activity code; and 3) miscellaneous costs such as activities performed by Dairyland contractors' charges related to the decommissioning of the plant, and Nuclear Regulatory annual fees. Def.'s Resp. to Pl.'s Mot. to Exclude Johnson at 7-8.

The Government claimed that Mr. Johnson's testimony regarding reasonable costs is from the cost and accounting perspective, not a legal one. *Id.* at 14. Additionally, Mr. Johnson performed valuable modeling of two SNF acceptance scenarios, one with a "fuel-out" date in 2005 and one with a "fuel-out" date after 2008. *Id.* at 11-12.

**c. Conclusion**

The Court concludes that Mr. Johnson's testimony is both reliable and relevant. Mr. Johnson's testimony, "reasoning [and] [] methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. Mr. Johnson's testimony is also relevant, as it "assist[s] the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591.

The Court understands Dairyland's concern that Mr. Johnson's incremental cost analysis uses the 'but for' standard rather than the substantial causal factor test found in *Indiana Michigan*, 422 F.3d at 1373. Pl.'s Mot. to Exclude Johnson at 7. However, according to the Federal Circuit, "the selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion." *Citizens Fed. Bank v. United States*, 474 F.3d 1314, 1318 (Fed. Cir. 2007). Therefore, it is arguable that either test could be appropriate. As recently as May 19, 2008, Judge Wheeler in *Carolina Power* stated "[f]or each of the disputed damages items here, the Court will apply the but-for test or the substantial causal factor test as appropriate." *See Carolina Power v. United States*, No. 04-37C, 2008 WL 2154103 *20 (Fed. Cl. May 19, 2008). Any issues regarding Mr. Johnson's testimony regarding incremental cost are open for Dairyland on cross-examination. *Daubert*, 509 U.S. at 596 ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Mr. Johnson shall also be allowed to testify regarding his two different models for SNF acceptance scenarios, as they provide an alternative to Dairyland's acceptance theory. Mr. Johnson shall be allowed to testify regarding overhead costs.

Mr. Johnson shall not be allowed to testify regarding his opinion as to whether PFS and lobbying costs incurred by Dairyland are properly attributable to DOE's breach. *Sparton Corp. v. United States*, 77 Fed. Cl. 1, 9 (2007) ("Expert testimony is an improper mechanism for offering a legal opinion to the Court."). A conclusory statement by Mr. Johnson, based on the advice of the Government's counsel, that these specific costs cannot be attributed to the breach, followed by the subtraction of these costs from Dairyland's claimed damages, does not "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *Daubert*, 509 U.S. at 591.

### 3. Dairyland's Motion to Exclude Jonathan A. Neuberger's Testimony

Mr. Neuberger is a principal in the economics consulting firm Economists Incorporated. Dairyland's Motion to Exclude Jonathan A. Neuberger's Testimony, App. ("Pl.'s Mot. to Exclude Neuberger, App.") at 5, 46. He received a Master's Degree and Ph.D in Economics from Johns Hopkins University. *Id.*

#### a. Dairyland's Position

Dairyland asserted that the opinions of Dr. Neuberger are merely criticisms of the testimony of Mr. Graves and that Dr. Neuberger failed to create a competing model to contradict the model created by Mr. Graves. Dairyland's Motion to Exclude Jonathan A. Neuberger's Testimony ("Pl.'s Mot. to Exclude Neuberger") at 1; Tr. 127:19-128:18. According to Dairyland, Mr. Neuberger's opinions are speculative and impressionistic. Pl.'s Mot. to Exclude Neuberger at 2. And the testimony is unreliable, irrelevant, confusing and a waste of the court's time. *Id.*; Tr. 127:5-9, 128:11-18.

#### b. The Government's Position

The Government takes the position that if the testimony of Mr. Graves is excluded, then the Government will not seek to introduce the testimony of Dr. Neuberger. Defendant's Response to Plaintiff's Motion to Exclude the Testimony of Jonathan A. Neuberger ("Def.'s Resp. to Pl.'s Mot. to Exclude Neuberger") at 1-2, Fn. 1; Tr. 126:19-22. The Government argued that Dr. Neuberger applied well-established and reliable economic principles and provides the Court with a useful basis for understanding the significant deficiencies contained within Mr. Graves' hypothetical exchanges model. Def.'s Resp. to Pl.'s Mot. to Exclude Neuberger at 1, 2. Dr. Neuberger has analyzed the models used by Mr. Graves and has offered an economic critique of Mr. Graves' model and resulting conclusions. *Id.* at 8.

#### c. Conclusion

The Court holds that the testimony of Dr. Neuberger shall be allowed. The Government offers Dr. Neuberger to explore its disputes with the modeling presented by Mr. Graves. *See infra* ¶ 6. Because the Court will allow the testimony of Mr. Graves, the Court finds that the testimony of Dr. Neuberger will "assist the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702. In this case the fact at issue is the disputed acceptance rate for SNF and the potential for exchanges as allowed by

the Standard Contract. Dr. Neuberger's opinion is a reliable and relevant critique of the modeling used by Mr. Graves concerning both the acceptance rate and possible exchanges. *Daubert*, 509 U.S. at 587 ("[t]he Rules basic standard of relevance is thus a liberal one.").

### 4. The Government's Motion to Exclude Expert Testimony (of Charles Wilkins) Regarding Overhead Costs

Mr. Wilkins is a Certified Public Accountant with more than 35 years of dispute resolution experience in matters in which the U.S. Government was a party. Dairyland's Response to Defendant's Motion *In Limine* to Exclude Expert Testimony Regarding Overhead Costs, App. ("Pl.'s Resp. to Def.'s Mot. to Exclude Overhead Costs") at 2. He is now a Senior Managing Director in the Forensic Litigation Consulting practice of FTI Consulting, Inc. *Id.* Mr. Wilkins holds B.A.'s from California State University and LaSalle University along with an M.B.A. from the University of California. *Id.*

#### a. The Government's Position

The Government requests exclusion of the expert testimony of Charles Wilkins, who will testify regarding Dairyland's overhead cost allocation to breach-related projects. Defendant's Motion *In Limine* to Exclude Expert Testimony Regarding Overhead Costs ("Def. Mot. to Exclude Overhead Costs") at 1; Tr, 74:21-24. The Government insists that this testimony is not relevant because overhead costs are not attributable to the breach. Def. Mot. to Exclude Overhead Costs at 4. Recovery of overhead costs, which the Government contends Dairyland would have incurred regardless of breach, would put Dairyland "in a significantly better position in the breach world," contrary to the fundamental principles of contract damages. *Id.* The Government contends that Dairyland offers no evidence that it would actually have been able to allocate the resources to non-breach related projects, thus incurring "opportunity costs." *Id.* at 11; Tr. 75:18-24, 81:3-8. Alternatively, the Government requests that Mr. Wilkins' testimony be limited to matters specifically addressed in his report. *Id.* at 12-13.

#### b. Dairyland's Position

According to Dairyland, Mr. Wilkins' "work demonstrates that, but for the government's breach, Dairyland would not have incurred its claimed overhead and G&A costs in connection with its breach related activities." Pl.'s Resp. to Def.'s Mot. to Exclude Overhead at 1-2. Dairyland alleged that it need not prove that the cost would not have been incurred absent the breach, but rather all that they must prove is that if the costs "are properly allocated to breach-related activities, then the resources represented by those costs would have been efficiently devoted to other uses or reduced absent the breach." *Id.* at 2; Tr. 81:15-6, 83:16-9. The claimed overhead cost consists of "incurred service center and operations costs that were required to support LACBWR activities, including activities associated with the government's breach." Pl.'s Resp. to Def.'s Mot. to Exclude Overhead at 2. The Government's contention that it is necessary for Mr. Wilkins to "analyze exactly how Dairyland's overhead and G&A resources would have been used absent the breach" is without merit. *Id.* at 5. According to Dairyland, the argument that Dairyland must demonstrate precisely how the overhead and G&A resources would have been used absent the breach has consistently been raised in other SNF cases and has been "almost universally rejected." *Id.*; Tr. 81:23-83:15.

#### c. Conclusion

The Court holds that Mr. Wilkins shall be allowed to testify regarding Dairyland's overhead costs.

Any argument that the Government makes regarding the fact that Dairyland offers no evidence as to how it would have allocated the overhead and G&A resources in a non-breach world–an argument that has been rejected by other judges on this court–goes to the legal standard by which overhead costs could be awarded by this Court. It does not effect the admissibility of Mr. Wilkins' testimony.

The issue of overhead costs has been present in many SNF cases. For example, in *Carolina Power*, Judge Wheeler allowed Plaintiff's claim for overhead costs, reasoning that "[o]verhead, by definition, is a cost of doing business, and for some period of time, part of Progress Energy's "business" was mitigating DOE's partial breach. Overhead recovery is necessary to compensate Plaintiff's fully." *See Carolina Power v. United States*, No. 04-37C, 2008 WL 2154103 *28 (Fed. Cl. May 19, 2008); (citing *Sys. Fuels, Inc. v. United States*, 78 Fed. Cl. 769, 799-800 (2007) (rejecting Governments principle that all "loader costs" [overhead] would have been incurred absent DOE's breach)). Overhead costs were awarded in *Pacific Gas & Electric v. United States*, 73 Fed. Cl. 333 (2006), but were ultimately rejected in *Sacramento Mun. Util. Dist v. United States*, 70 Fed. Cl. 332, 376-77 (2006) (holding that plaintiff failed to meet the burden of demonstrating that such costs, in fact, were incremental) and *System Fuels, Inc. v. United States*, 78 Fed. Cl. 796, 798-800 (2007) (holding that plaintiff failed to meet burden of demonstrating that these costs would not have been incurred in the absence of DOE's delay).

Finally, while the Government urges the Court to limit Mr. Wilkins' testimony to matters found in his expert report this Court holds that it is unnecessary to limit Mr. Wilkins' testimony in advance of trial.

### 5. The Government's Motion *In Limine* to Exclude the Testimony of Ivan F. Stuart

Mr. Stuart has over 40 years of experience in the nuclear industry, including in the field of spent fuel transportation and storage. Defendant's Motion *In Limine* to Exclude the Testimony of Ivan F. Stuart, App. at 2, 24-26. He is a registered professional nuclear engineer and President of I. Stuart & Co., Inc., an international nuclear consulting firm. *Id.* Mr. Stuart received a B.S. in Mechanical Engineering from the Newark College of Engineering and a graduate degree from the New York University/ U.S. Air Force Meteorological Program. *Id.*

#### a. The Government's Position

The Government seeks to exclude Mr. Stuart's testimony that 1) the acceptance rate of 3,000 MTU per year by DOE would have been readily achievable by DOE; 2) sufficient advanced work by DOE was possible in view of the large body of experience in the transportation of spent fuel gathered by and/or available to DOE prior and subsequent to 1983; 3) adequate planning and preparations would have ensured the availability of a sufficient number of casks; 4) exchanges of acceptance allocations among contracting utilities would have been accommodated; and 5) there are no site-specific conditions that would have prevented DOE from utilizing acceptance campaigns to transport SNF from Dairyland. Defendant's Motion *In Limine* to Exclude the Testimony of Ivan F. Stuart ("Def.'s Mot. to Exclude Stuart") at 2; Tr. 87:9-16. According to the Government, these opinions are wholly irrelevant, they lack sufficient support and fail to take into account contradictory information. Def.'s Mot. to Exclude Stuart at 2; Tr. 87:20-4; 93:23-94:6. The Government contended that Mr. Stuart's testimony is after the fact testimony about what DOE should have done. Def.'s Mot. to Exclude Stuart at 8-10. Furthermore, Mr. Stuart's opinions are irrelevant and unreliable because they offer an opinion as to what DOE could have achieved, as opposed to what it was required to achieve. *Id.*; Tr. 88:5-18. Finally, the Government complained that Mr. Stuart performed no analysis to reach his conclusion. Def.'s Mot. to Exclude Stuart

at 10; Tr. 90:12- 91:19, 94:7-11.

**b. Dairyland's Position**

According to Dairyland, Mr. Stuart has 40 years of experience in the nuclear industry, including ten years as senior vice president of NAC International, Inc., "that designed, developed and manufactured spent fuel transportation and storage casks." Opposition to Motion *In Limine* to Exclude the Testimony of Ivan F. Stuart ("Pl.'s Opp. to Def.'s Mot. to Exclude Stuart") at 1. Mr. Stuart will testify: "1) that there are no technical impediments to DOE operating its SNF program at a rate of 3000 MTU with a reasonable ramp-up beginning in 1998; 2) that sufficient casks and rail and other transportation equipment could have been available to DOE to accommodate concentrated acceptance 'campaigns' of spent fuel from utilities; and 3) that there are no site-specific conditions at Dairyland's LACBWR nuclear plant site that would have prevented DOE from using acceptance campaigns to transport SNF from the site." Pl.'s Opp. to Def.'s Mot. to Exclude Stuart 1-2. Mr. Stuart has testified in *Yankee*, *Sacramento Municipal Utility District (SMUD)*, and *PG&E*. Dairyland opines that the Government did not seek to exclude Mr. Stuart's testimony in the other SNF trials where it was offered (the Government did object at trial to one narrow issue regarding Mr. Stuart's testimony in *SMUD*). *Id.* at 3-4. Dairyland contends that it is entitled to present evidence consistent with its theory regarding acceptance rate and that the lack of technical impediments show DOE's ability to perform and support the "reasonableness" of Dairyland's proposed rate. *Id.* at 3; Tr. 96:24-97:4.

**c. Conclusion**

Mr. Stuart shall be allowed to testify. The Court is satisfied that Mr. Stuart's testimony is both reliable and relevant. Additionally, Mr. Stuart's report adequately describes how his experience in the nuclear industry led to the conclusions reached. Fed. R. Evid. 702, Advisory Committee Notes ("If a witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.").

**6. The Government's Motion *In Limine* to Exclude the Testimony of Plaintiff's Expert Witness, Frank C. Graves**

Mr. Graves is a principal with the Brattle Group, a firm that provides consulting and expert testimony in economics, finance and regulation to corporations, law firms and governments. Brattle Group Home Page, http://www.brattle.com (follow the "About Brattle" hyperlink). He has over 25 years of experience assisting utilities in the design and implementation of long-range planning, investment and operating policies. Dairyland's Opposition to Defendant's Motion *In Limine* to Exclude the Testimony of Plaintiff's Expert Witness, Frank C. Graves ("Pl.'s Opp. to Mot. to Exclude Graves"), App. at 15. Mr. Graves received a B.A. in mathematics from Indiana University and an M.S. with a concentration in finance from the M.I.T. Sloan School of Management. Brattle Group Home Page, http://www.brattle.com (follow the "Consultants" hyperlink, then browse by the "G" hyperlink, then the "Graves, Frank C." hyperlink) (last visited June 10, 2008).

**a. The Government's Position**

According to the Government, Mr. Graves will offer his opinion on two issues. First, Mr. Graves will offer testimony regarding an economically reasonable acceptance rate of SNF. Defendant's Motion *In*

*Limine* to Exclude the Testimony of Plaintiff's Expert Witness, Frank C. Graves ("Def.'s Mot. to Exclude Graves") at 1; Tr. 105:3-6. The Government contended that Mr. Graves "does not possess any knowledge, skill, experience, training, or education in the areas implicated by an opinion concerning the rate at which DOE would have accepted SNF from the industry beginning in 1998." Def.'s Mot. to Exclude Graves at 17; Tr. 107:22-109:12. Secondly, Mr. Graves will offer testimony regarding the acceleration of Dairyland's place in the Standard Contract's "oldest-fuel-first" acceptance queue. Def.'s Mot. to Exclude Graves at 1-2; Tr. 104:19-105:2. According to the Government, Mr. Graves' hypothetical exchanges market is based on speculative and overly-simplistic economic theory and is not properly grounded upon underlying facts. Def.'s Mot. to Exclude Graves at 20; Tr. 105:7-9. The Government argued that this hypothetical exchanges market is speculative because it assumes that a market for exchanges of SNF acceptance allocations in the queue would have been "analogous to a perfectly competitive market." Def.'s Mot. to Exclude Graves at 25; Tr. 106:2-6. Additionally, the Government claimed that Mr. Graves' model is speculative because it assumes that DOE would "approve[] all exchanges, even though utilities are required to submit their exchange requests to DOE, which has, 'in its sole discretion,' the right to approve or disapprove those requests." Def.'s Mot. to Exclude Graves at 8; Tr. 105:22-23.

The Government urged this Court to accept the reasoning found in *PG&E* and exclude the testimony of Mr. Graves. Tr. 105:18-21. According to the Government, the court in *PG&E* found that Mr. Graves' hypothetical exchanges model is premised upon factually-unsupported and speculative assumptions. Def.'s Mot. to Exclude Graves at 34; Tr. 105:18-106:17. And, this Court should also find that Mr. Graves' model is "too speculative to be helpful to the court in its resolution of this case." *Id.* at 35 (citing *PG&E*, 73 Fed. Cl. at 436).

**b. Dairyland's Position**

According to Dairyland, this Court should reject the Government's argument for the same reason Judge Merow rejected it in *Yankee*. Tr. 111:5-10, 17-23. Dairyland asserted that Mr. Graves is an economist who provides an economic analysis of a reasonable rate of acceptance based on the economic need for the removal of SNF. Plaintiff's Response to Defendant's Motion to Exclude Graves ("Pl.'s Resp. to Mot. to Exclude Graves") at 3. Mr. Graves is not an expert on DOE's programs; however, he is the "*only* witness who will present evidence regarding the reasonable rate of acceptance based on utilities' economic needs for spent fuel removal." *Id.* Dairyland contended that Mr. Graves' opinion regarding acceptance rate is relevant, since this is an open term in the Standard Contract and DOE is obligated to perform at a reasonable rate. *Id.* at 3-4; Tr.112:12-22. Further, Mr. Graves' focus is on what would be considered a reasonable rate from an economic perspective. Pl.'s Resp. to Mot. to Exclude Graves at 4.

Dairyland also contended that the Government's objection to Mr. Graves' hypothetical exchanges model is without merit. *Id.* at 8. According to Dairyland, Mr. Graves' accepts that under the Standard Contract the pick-up queue is initially based on when the fuel was discharged from the reactor, *i.e.* oldest fuel receiving the first allocations. *Id.* However, subject to DOE approval utilities could exchange their slot in the queue. *Id.* Dairyland asserted that Mr. Graves' report "provides a robust estimate, based on established economic principles, of how an exchange process would have influenced the timing and sequence of DOE's acceptance of Dairyland's spent fuel." *Id.* at 9. Dairyland contended that the difficulty in modeling is due to the breach (there is no real world data) and "[t]he defendant who has wrongfully broken a contract should not be permitted to reap advantage for his own wrong by insisting on proof which by reason of his breach is unobtainable." *Id.* at 12 (citing *Locke v. United States*, 283 F.2d 521 (Ct. Cl. 1960).

c. **Conclusion**

The Court concludes that Mr. Graves shall be allowed to testify. The Court holds that Mr. Graves' testimony regarding an economically reasonable rate of SNF acceptance, which is based on his analysis of available documents, is reliable and relevant to this matter. In every SNF case that is before the Court of Federal Claims the acceptance rate of SNF has been at issue. For example, in *PG&E*, 73 Fed. Cl. 333 and *Yankee Atomic Electic Co v. United States*, 73 Fed. Cl. 249 (2006) two different rates were held to be appropriate. Both cases have been appealed and the rate of acceptance is a central issue in the appeal. Mr. Graves has analyzed a number of different acceptance rates, even using the rate found in the 1991 Annual Capacity Report (900 MTU), which is advanced by the Government and was determined to be a reasonable rate in *PG&E*. Def.'s Mot. to Exclude Graves, App. at 63D-63F; *PG&E*, 73 Fed. Cl. at 400. To the extent that the Government disagrees with the rate of acceptance that Mr. Graves determined to be appropriate, there will be ample opportunity for cross-examination. *Daubert*, 509 U.S. at 596 ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Additionally, the Court holds that the Government's arguments regarding Mr. Graves' economically reasonable rate of SNF acceptance goes to the weight of his testimony, not to its admissibility. *Yankee Atomic Electric Co. v. United States*, No. 98-126C, 2004 WL 1535686 *6 (Fed. Cl. June 28, 2004).

The Court also holds that Mr. Graves' testimony regarding his hypothetical exchanges model is reliable and relevant to this matter. In *Energy Capital Corp*., this Court awarded lost profit damages based on an economic model that contained an estimation of a number of eligible and energy viable properties that would have participated in the Affordable Housing Energy Loan Program ("AHELP").[7] *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1334 (Fed. Cir. 2002) (*aff'g in part, rev'g in part* 47 Fed. Cl. 382 (Damich, C.J.)). The Government argued that this Court "erred as a matter of law by engaging in 'rampant' and 'unsupported' speculation in arriving at its determination that Energy Capital would have realized profits from the AHELP venture." *Id*. at 1328. The Government specifically attacked the sufficiency of the evidence regarding participation in AHELP because it depended upon the consent of both the property owners and the first mortgagees.[8] *Id*. at 1329. The Court is struck by the similarities

[7]The AHELP was an agreement between Energy Capital and the Department of Housing and Urban Development ("HUD") that eliminated "the regulatory barriers to financing energy improvements in HUD properties." *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1327 (Fed. Cir. 2002). Under the agreement Energy Capital could originate loans to HUD property owners and in exchange HUD agreed to provide Energy Capital security on the loan. *Id*. Shortly after entering into the AHELP agreement it was terminated by HUD. *Id*. at 1319. This termination occurred before Energy Capital had completed any loans. *Id*. Energy Capital filed suit in the Court of Federal Claims seeking to recover lost profit damages as a result of HUD's breach of contract. *Id*.

[8]The Government urged the appellate court to find the evidence upon which the damages award was based speculative for several reasons, *inter alia*, Energy Capital did not provide testimony from the first mortgagees and Fannie Mae never consented to any AHELP loans in its capacity as first mortgagee. *Energy Capital Corp.,* 302 F.3d at 1329. The Government urges that this Court exclude Mr. Graves under a similar premise. According to the Government under the Standard Contract DOE must approve all exchanges; however, DOE has not approved any exchanges, nor have they been asked to do so. Def's Mot. at 8. The Court declines to exclude

between the Government's arguments in *Energy Capital Corp*. and the instant action. *See Yankee Atomic Electric Co. v. United States*, No. 98-126C, 2004 WL 1535686 (Fed. Cl. June 28, 2004). In *Energy Capital Corp*., the Federal Circuit held that the Government's "argument seems to be an indirect attack on the sufficiency of the evidence . . . . In any event, we conclude that the Court of Federal Claims drew reasonable inferences based on all of the evidence . . . to arrive at its findings . . . ." *Id*. In *Energy Capital Corp*., this Court based its lost profit damages award on evidence the Government argued was too speculative. At the present time only admissibility, not a determination of damages, is at issue. And, the admission of Mr. Graves' testimony is solely in the discretion of the trial court. *See Acoustical Design, Inc.*, 932 F.2d at 942 (Fed. Cir. 1991).

Despite the Government's urging to the contrary, the Court concludes that Mr. Graves' testimony is based on sufficient facts and evidence to allow for admissibility. The Court agrees with *Yankee* that "[b]y partially breaching the contract, defendant cannot exclude Graves' opinion on the grounds that there is no market data. There is no market data because the government's breach thwarted this possibility." *Yankee*, No. 98-126C, No. 98-126C, 2004 WL 1535686 *4 (Fed. Cl. June 28, 2004).

## V. Procedures Regarding Sequestration

### A. Background

On April 29, 2008, both Dairyland and the Government filed proposed procedures regarding sequestration as required by the Trial Preparation Order of February 21, 2008. The Government has decided to invoke sequestration under Fed. R. Evid. 615; therefore, the parties agreed to the following procedures:

> 1. Witnesses who have testified should not be permitted to discuss their testimony with witnesses who have not yet testified.
>
> 2. An attorney should not be permitted to relate, in any form, the substance of previous testimony to witnesses who have not yet testified.

However, the parties cannot agree regarding whether an attorney should be permitted to counsel a witness during breaks in the witness's testimony.

### B. Applicable Law

Fed. R. Evid. 615 Exclusion of Witness states:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize the exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a person authorized by statute to be present.

---

Mr. Graves' testimony based on the Government's argument regarding DOE approval.

Fed. R. Evid. 615 does not specifically preclude attorneys from consulting with witnesses during breaks in testimony, however, the Court retains discretion to limit attorney consultation, even where the witness is a party, in order to "maintain the status quo during a brief recess in which there is virtual certainty that any conversation between the witness and his lawyer would relate exclusively to his ongoing testimony." *Perry v. Leeke*, 488 U.S. 272, 273, 284 (1989) (holding that trial court order directing defendant not to consult with his attorney during 15-minute breaks in testimony did not violate Sixth Amendment right to assistance of counsel). *Reynolds v. Alabama Department of Transportation* applied *Perry* and extended that ruling to a civil matter, holding that a prohibition on consultation with witnesses is appropriate "subject to exceptions permitting attorneys to consult with those witnesses testifying on different occasions on different topics, to consult with witnesses about non-testimonial matters during evenings and weekends and, upon approval of the court, to consult with witnesses even about their testimony." *Reynolds v. Alabama Department of Transportation,* 4 F. Supp.2d 1055, 1064-65 (1998).

During oral arguments Dairyland urged the Court to allow counsel to be able to confer with witnesses during breaks in testimony with a limitation that counsel not relate prior testimony to the witness. Tr. 129:20-25. According to the Government in order to have unfettered testimony a bright-line rule that prohibits an attorney from counseling a witness during breaks would be appropriate. Tr. 131:2-24.

**C. Conclusion**

The Court is cognizant of the Government's concern in this instance. However, the Court sees no reason to so limit the role of counsel during trial that there can be no consultation with witnesses. This issue can be resolved with a limiting instruction by the Court. Therefore, counsel shall be allowed to consult with witnesses during breaks in testimony, however, they may not discuss the testimony of any other witness that has appeared before the Court. This limiting instruction provides for a "clear line . . . to prevent witnesses from hearing about the testimony of other witnesses." Defendant's Notice of Proposed Procedures for Sequestration at 2.

s/ Edward J. Damich
EDWARD J. DAMICH
Chief Judge

H
Yankee Atomic Elec. Co. v. U.S.
Fed.Cl.,2004.
Only the Westlaw citation is currently available.
United States Court of Federal Claims.
YANKEE ATOMIC ELECTRIC COMPANY, Plaintiff,
v.
THE UNITED STATES, Defendant.
**No. 98-126 C.**

Sept. 17, 2004.

ORDER [FN1]

FN1. This should also be deemed applicable in *Connecticut Yankee v.. United States*, No. 98-154 and *Maine Yankee v. United States*, No. 98-474.MEROW, Senior J.

***1** This matter is before the court on plaintiffs' Bench Memorandum Addressing the Admissibility of Certain Exhibits Prepared by Contractors, to which defendant filed its Response, and plaintiffs filed a Reply Memorandum.

Plaintiffs assert that exhibits charted in Exhibit 1 to the Bench Memorandum are admissible as non-hearsay pursuant to Fed.R.Evid. 801(d)(2) and several other hearsay exceptions. For the most part they are documents of national laboratories and other contractors to the Department of Energy ("DOE") and include analysis of priority for shutdown reactors and other acceptance scenarios, fuel shipment strategies, consideration of failed fuel and delivery commitment schedules, allocations between nuclear utilities, program costs, treatment of greater-than-class C waste ("GTCC"), trading of acceptance rights, and the effects of trading of acceptance rights on transportation-all part of the development of DOE's spent nuclear fuel program.

The documents concerned are relevant to the issues in this litigation. Although the parties commendably reached agreement with respect to the admission of most of the many exhibits offered in this action, defendant objected to numerous contractor documents charted in Exhibit 1 to plaintiffs' Bench Memorandum. Subsequently, the parties stipulated to the admission of these documents, reserving objection as to their use particularly for the truth of the matters asserted therein. *See* Yankee Atomic's Submittal of Admitted Exhibits for Both Parties filed July 30, 2004. Plaintiffs posit: (1) many, if not all, of the documents are public records pursuant to Fed.R.Evid. 803(8); (2) the documents are authorized statements of DOE or statements made by servants or agents of DOE within the scope of that servitude under Fed.R.Evid. 801(d)(2)(C); and (3) two of the documents are ancient and therefore admissible pursuant to Fed.R.Evid. 803(16).

Contesting the asserted public nature of these exhibits, defendant finds fault with plaintiffs' premise that documents generated by national laboratories, such as the Pacific Northwest National Laboratory ("PNNL"),[FN2] are documents of a government agency. Defendant also argues that statements from such entities are not DOE policy which is formed only at the highest levels of the Department. Public records are asserted by defendant to be limited to those classic documents such as reports of convictions, automobile titles, applicants for government firefighting positions, court records, and weather.

FN2. In addition to PNNL, the contractors include Battelle Memorial Institute; Martin Marietta Energy Systems, Inc. and Science Applications International Corp.; TRW Environmental Safety Systems, Inc.; Weston, Rogers & Associates; Pacific Nuclear; E.R. Johnson for Oak Ridge National Laboratory; ERM Program Management Co.; and Lockheed Martin Idaho Technologies, Inc.

*The contractors-who are they?*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Plaintiffs assert DOE relies on its contractors to provide highly technical and specialized expertise in formulating DOE's policies and plans under the Nuclear Waste Policy Act ("NWPA") and related statutes and regulations, as well as under the Standard Contract for spent nuclear fuel ("SNF") involved in this litigation. In this regard, defendant asserts plaintiffs have misrepresented the status of documents from PNNL, stating that plaintiffs rely only on a page from the PNNL website which "[f]ar from establishing that PNNL is part of DOE, that page indicates that PNNL performs work for other Government agencies as well as private industry," and is operated for DOE by Battelle, a private contractor. Def. Resp. at 2. "Thus, the Yankees have shown no more reason to believe that PNNL is part of DOE than the Department of Defense or a private company."*Id.*

***2** Initially, the court notes the ".gov" designation of PNNL-www.pnl.gov. The organization is presented as holding governmental status. Absent evidence disassociating the organizations from action as DOE surrogates with governmental-type status, the documents relevant to DOE's spent fuel program from any of these entities have been admitted. Going further, however, a brief foray into PNNL's website reveals that "[r]esearchers at [PNNL], an *Office of Science* laboratory within the U.S. Department of Energy, are advancing the frontiers of scientific knowledge and rapidly translating their discoveries into innovative technologies. *Seewww.pnl.gov* (Last visited August 5, 2004) (link in original). The link to "Office of Science," the scientific advisor to the Secretary of Energy, describes its Director as an Assistant Secretary equivalent, nominated by the President of the United States and confirmed by the Senate. Duties and responsibilities of the Director of the Office of Science include advising the Secretary of Energy "with respect to the well-being and management of the multipurpose laboratories under the jurisdiction of the Department, excluding laboratories that constitute part of the nuclear weapons *www.science.doe.gov/sub/director/statutory Responsibilities.htm* (last visited August 5, 2004), citing 42 U.S.C. § 7139. DOE's Office of Science, Office of Resource Management ("ORM") Fiscal 2005 Year Budget Request to Congress includes approximately $108 million dollars for PNNL. *www.sc.doe.gov/orm/Budget Finance/ Budget Finance main.htm.* p. 29 (last visited August 5 & 6, 2004).

Document authors also include the Idaho National Engineering and Environmental Laboratory ("INEEL").FN3 DOE's Office of Science "... funds research and development projects conducted at [Idaho National Engineering and six other laboratories], which are overseen by other DOE *www.science.doe.gov/Sub/Organizatio* offices."FN4*n/Map/national labs and userfacilities.htm,* p. 2 (last visited August 12, 2004); *See alsowww.inel.gov/* (Last visited August 11, 2004). As noted by counsel, INEEL is apparently operated by private contractors including Battelle Memorial Institute. The DOE Idaho Operations Office website represents public accessibility to documents from the Idaho Operations Office, its operating contractors, and predecessor organizations. *www.id.doe.gov/FOIA/home.htm.Missouri, ex rel. Garstang v. United States Dept. of Interior,* 297 F.3d 745, 750-51 (8th Cir.2002).

FN3. With respect to the status of Rob Campbell, one of the originators of documents in question, the Idaho Operations Office website has a directory for DOE and for INEEL. There is not a listing for a Rob Campbell under INEEL. Robert A. (Rob) Campbell is listed in the DOE directory as a nuclear engineer in Washington, DC.

FN4. The Office of Science website reports a fiscal year 2005 budget request of $7,261,000 for INEEL, categorized under the Idaho Operations Office total budget request of $8,396,000 inclusive of the INEEL request. *See* FY 2005 Congressional Budget Request for DOE's Office of Sci-

ence, p. 25 located at *www.sc.doe.gov/orm/Budget Finance/ Budget Finance main.htm.* (Last visited August 12, 2004).

INEEL provides management and technical services for DOE's spent nuclear fuel program.

Established in 1949 as the National Reactor Testing Station, the INEEL was once the site of the world's largest concentration of nuclear reactors. Fifty-two test reactors-most of them first-of-a-kind-were built and operated, including the Navy's first prototype nuclear propulsion-plant. Of these, three are still operating .... The INEEL provides specialized management, applied research, systems analysis, proof-of-concept engineering, technological support, and related services for various offices of the Department of Energy (DOE). [Those services include the] Spent Nuclear Fuel Program:

***3** The Spent Nuclear Fuel Program consists of the National Spent Nuclear Fuel Program and the INEEL Spent Nuclear Fuel Program. The National Spent Nuclear Fuel Program provides a coordination and integration role in defining and ensuring resolution of the issues for disposition of DOE-owned spent nuclear fuel in the geologic repository, including quantification of the DOE spent nuclear fuel inventory. The National Spent Nuclear Fuel Program provides quality assurance certification of the DOE complex spent nuclear fuel programs.

*www.inel.gov/about* (Last visited August 12, 2004), p. 3.

To a significant, if not exclusive extent, DOE's activities, duties and responsibilities under the NWPA, have been and are conducted through its national laboratories and management and operation ("M & O") contractors. *See Westinghouse Electric Co. v. United States,* 1997 WL 1068204 at *2 (Fed.Cl.1997) ("Unlike a typical Government contract through which the Government obtains products and services to assist it in carrying out its mission, DOE uses the M & O contract to conduct its mission.").*See also*42 U.S.C. § 10222(d) authorizing the Secretary of Energy to expend funds for nongeneric research, development and demonstration activities under the Act and "the costs associated with acquisition, design, modification, replacement, operation, and construction of facilities at a repository site," and 42 U.S.C. § 7257(authorizing the Secretary of Energy to "acquire, construct, improve, repair, operate, and maintain laboratories ....") and 42 U .S.C. § 7139(a) and (b)(3) (authorizing the Director of DOE's Office of Science to advise the Secretary of Energy "with respect to the well-being and management of the multipurpose laboratories under the jurisdiction of the Department."). Witness testimony was not to the contrary. Dr. Bartlett, former director of the Office of Civilian Radioactive Waste Management ("OCRWM") within DOE testified that OCRWM's work was performed by M & O contractors with oversight from DOE.FN5

FN5. Dr. Bartlett testified at trial:

Q. Dr. Bartlett, as I mentioned when I described the cover of this document, it was prepared by the management and operations contractor at that time. When you were director, to what extent did you and OCRWM rely upon studies prepared by the management and operations contractor such as this one?

A. All of the work is done by the-by the support contractors. That's what they're there for. The Department of Energy has-OCRWM itself has about 65 employees. The program has about 5,000 employees if you look at it this way. These are contractor people.

The M & O organizes all of them, but it includes activities within Sandia National Laboratories, Los Alamos National Laboratory, Livermore National Laboratory, the U.S. Geological Survey.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> And a lot of the engineering is done by, at our time, the TRW Systems, M & O contractor, management and operations contractor.
>
> The work is done by those folks. And the job of the DOE people is to oversight that, do the program planning, give them guidance and direction for what their activities should be.
>
> Trial Tr. at 615:24-616:22.

With this background, the court examines whether these contractor documents can be relied upon for the truth of the matters asserted therein.

*Public records*

Hearsay, an out-of-court statement, is generally inadmissible for the truth of its contents since cross-examination at trial is not possible. Generally, deference is given to personal appearance at trial with cross-examination.Fed.R.Evid. 801 and 802. Notwithstanding the general rule, however, some out-of-court statements are excluded from this prohibition because "under certain circumstances, a statement, although it is hearsay, may still possess circumstantial guarantees of trustworthiness sufficient to justify its admission as evidence."*Moss v. Ole South Real Estates, Inc.*, 933 F.2d 1300, 1305 (5th Cir.1991), citing *Rock v. Huffco Gas & Oil Co.*, 922 F.2d 272, 280 (5th Cir.1991).

Rule 803 excludes several categories of evidence from the hearsay ban, including data compilations of the activities by and of a public agency.Fed.R.Evid. 803(8)(A) provides in relevant part that "[t]he following are not excluded by the hearsay rule, even though the declarant is available as a witness: ... (8) Public records and reports. Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency,...." The Advisory Committee Notes explain that "[j]ustification for the exception is the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record."*See Moss,* 933 F.2d at 1305,*citing Bradford Trust Co. v. Merrill Lynch, Pierce, Fenner and Smith,* 805 F.2d 49, 54 (2nd Cir.1986) ("Rule 803(8) 'is premised on the assumption that public officials perform their duties properly without motive or interest other than to submit accurate and fair reports." ').

***4** Since the assurance of accuracy is generally greater for public records than for private business records, the proponent is usually not required to establish their admissibility through foundation testimony.[FN6] Rule 803 documents are non-hearsay and admissible regardless of the availability of the declarant. As *Weinstein's Federal Evidence* explains: "[n]early all of the exceptions [to the hearsay rule in rule 803] represent types of hearsay evidence that judicial experience reveals have sufficient reliability to justify consideration by the trier of fact with or without the presence of the declarant and regardless of whether the declarant is absent, that absence can be explained." 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* at 803-1 (Joseph M. McLaughlin ed., 2d ed.2004). This treatment is premised on both the underlying trustworthiness of public documents as well as the desire to avoid calling a government official to attest to the same.*Vanadium Corp. v. Fidelity & Deposit Co.,* 159 F.2d 105, 109 (2nd Cir.1947) (inconvenience would result if testimony from government officials was required; an official duty provides circumstantial probability of trustworthiness).*See generally Standard Havens Products, Inc. v. Gencor Industries,* 953 F.2d 1360, 1371-72 (Fed.Cir.1991) (upholding admission of patent Certificate of Correction under public record exception to the hearsay rule).

> FN6. Though foundational testimony is generally not required, "... a custodian or other qualified witness must testify if questions have been raised about the manner in which the records were made or kept...." 5

Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* § 803.10[2], pp. 803-92.

Admissibility is presumed and the burden of proof is on the party opposing introduction. *Columbia First Bank FSB v. United States,* 58 Fed. Cl. 333, 339 (Fed.Cl.2003) (quoting *Weinstein's Federal Evidence* § 803.10[2] ).*See also Coast Fed. Bank, FSB v. United States,* 48 Fed. Cl. 402, 446 (2000)*rev'd,*309 F.3d 1353 (Fed.Cir.2002), *vacated by*320 F.3d 1338 (Fed.Cir.2003), *aff'd en banc,*323 F.3d 1035 (Fed.Cir.2003) (noting that "the rule shifts the burden of demonstrating 'lack of trustworthiness' to the opponent of the evidence once it is established that the evidence is in fact a public record") (citing *Johnson v. City of Pleasanton,* 982 F.2d 350, 352 (9 th Cir.1992) and *Zeus Enterprises, Inc. v. Alphin Aircraft, Inc.,* 190 F.3d 238, 241 (4th Cir.1999) (explaining that under Rule 803(8), admission is presumed as a matter of course absent sufficient negative factors of untrustworthiness for which the opponent of admission bears the burden of proof). Although presumptively admissible, there are ample possible arguments for exclusion. Fed.R.Evid. 803(8) advisory committee's note (The rule "assumes admissibility in the first instance but with ample provision for escape if sufficient negative factors are present.").

Plaintiffs contend that most of the documents are maintained in DOE files or on government websites and are public records of DOE that "set [ ] forth the activities of" DOE.[FN7]

FN7. Plaintiffs state that "... except for a few exhibits (PX0148, PX0163, PX0169, PX0172, PX0184, PX01845, PX0856, PX1156 and PX1157), the challenged documents were kept in files either at DOE's headquarters or at Pacific Northwest National Laboratory, or are maintained on the government's RIS-Web or at the National Technical Information Service's website, *www.ntis.gov.* a central resource of government-funded scientific, technical, engineering, and business related information."Pls.' Reply, pp. 6-7.

Public agency under Rule 803(8)(A) is construed broadly and extends to quasi-public entities. In *Erickson v. Baxter Healthcare, Inc.,* 151 F.Supp.2d 952 (N.D.Ill.2001) a report from the Institute of Medicine, a private subsidiary of the National Academy of Sciences, also a private entity, was admitted under Rule 803(8), the court reasoning that the Academy was a quasi-public entity created by Act of Congress specifically to conduct investigations for and report to Congress, and the subject report was within that mandate. The agency's legal duty to provide reports whenever called upon by Congress supplied the requisite " 'indicia of reliability commensurate with a public entity."' 151 F.Supp.2d at 967, citing Michael H. Grahman, *Federal Practice & Proc.: Evid.* § 7049. at 476 (Interim ed.2000) and *Gilbrook v. City of Westminster,* 177 F.3d 839, 848, 858 (9th Cir.1999) (admitting report of citizens' committee appointed by city counsel as a public record). In *United States v. Davis,* 826 F.Supp. 617, 621 (D.R.I.1993), a report of a contractor on behalf of the Environmental Protection Agency ("EPA") as to the nature and extent of environmental contamination at a hazardous waste site was admitted under Fed.R.Evid. 803(8)(C) as a report of a public agency.[FN8] *See also Watts v. City of Hartford,* 2004 WL 717132 at *4, n. 8 (D.Conn.2004) ("A non-governmental entity may be deemed a public agency for purposes of this exception when it has an ongoing legal duty to provide the government with information or when it is a quasi-public entity created by the government to service its needs.") (citations omitted).*See also Ellis v. International Playtex, Inc.,* 745 F.2d 292, 301 (4th Cir.1984) (admitting studies of the Center for Disease Control, a branch of the United States Department of Health and Human Services, as well as a study conducted by state health departments, as public offices), *Dynasciences Corp. v. United States,* 214 Ct.Cl. 643 (1977) (upholding admission of performance reports furnished to the Renegotiation Board by procuring agencies), and *United*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*States v. Tyson,* 1986 WL 9250 at *8 (E.D.Pa.1986) (noting that the inclusion of reports of independent contractors in a report of a governmental agency did not preclude application of the Rule).

FN8. Although *United States v. Davis,* 826 F.Supp. 617 (D.R.I.1993) and other authorities cited herein involve other subsections of Rule 803(8), construction of "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies" is common to the court's focus here on subsection (A) "the activities of the office or agency."Furthermore, to the extent that the documents in question here fall under subsection (C) as "... factual findings resulting from an investigation made pursuant to authority granted by law ....“ the cases are directly analogous.

***5** Moreover, it is not necessary that the government agency have firsthand knowledge of all matters contained in the records as long as the agency has " 'firsthand knowledge *of the investigation*....” ' *United States v. Davis,* 826 F.Supp. 617, 621, n. 19 (D.R.I.1993), *citing Robbins v. Whelan,* 653 F.2d 47, 52 (1[st] Cir.1981).*See Matter of Oil Spill by the Amoco Cadiz,* 954 F.2d 1279, 1308 (7[th] Cir.1992) (describing Rule 803(8) as admitting multilevel hearsay and noting that the Rule does not require the document be kept in the course of a regularly conducted activity). Personal knowledge is satisfied if a colleague or subordinate has knowledge. *Weinstein's Federal Evidence* § 803.10[3](a). The Supreme Court in *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) concluded that opinions or conclusions derived from data contained in a report are admissible under 803(8)(C). 488 U.S. at 161-62. *See also Robbins v. Whelan,* 653 F.2d 47, 52 (1[st] Cir.1981) (rejecting an argument that firsthand knowledge was lacking in a Department of Transportation compilation of data provided by car manufacturers, and admitting the compilation under Rule 803(8)(C)). Moreover, any tentative findings and statistical compilations contained in the documents do not preclude application of the Rule. *Ellis v. Int'l Playtex, Inc.,* 745 F.2d at 301.

Defendant cites *Marsee v. United States Tobacco Co.,* 866 F.2d 319 (10[th] Cir.1989) in support of its assertion that contractor documents should not be admitted under Fed.R.Evid. 803(8).*Marsee* upheld the exclusion of reports from the International Agency for Research on Cancer and the National Institute of Health as hearsay because they did not qualify under several hearsay exceptions including Rule 803(8)(C). That Rule declares as non hearsay "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (C) in civil actions and proceedings and against the Government in criminal cases, factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness."(emphasis supplied).*Marsee* applied subsection (C), concluding that "[n]either document reflects the findings of a government agency authorized by law to report on the adverse health effect of smokeless tobacco." 866 F.2d at 325, emphasis added. The case does not address subsection (A) analyzed by the court here. Of note is the trial court decision, *Marsee v. United States Tobacco Co.,* 639 F.Supp. 466, 470 (W.D.Okla.1986), which admitted a Report of the Surgeon General's Advisory Committee as an "authoritative, exhaustive study by a public agency ..." under Fed.R.Evid. 803(8)(C).

*Zeus Enterprise, Inc. v. Alphin Aircraft, Inc.,* 190 F.3d 238, 241 (4[th] Cir.1999) cited by defendant, concluded that the decision of an administrative law judge ("ALJ") fit within 803(8)(C) over objection that the ALJ's decision was not the result of an "investigation" as Rule 803(8)(C) requires. The analysis here is not that the contractor documents were the result of an investigation; the focus is whether they are records, reports or data compilations of any kind of a public agency. Likewise, *Hawthorne Partners v. AT & T Technologies, Inc.,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1994 WL 63054 (N.D.Ill.1994), cited by defendant, is distinguishable. In *Hawthorne Partners,* at issue was the admission of a preliminary report prepared by PRC Environmental Management, Inc. a private contractor hired by the EPA. Amidst questions of reliability because one of the parties had a role in the creation of the preliminary report, the court found the document did not fit the definition of public record under Rule 803(8) and lacked sufficient trustworthiness under the escape clause of Rule 803(8)(C) (providing for admission under the preceding subsections "... unless the sources of information or other circumstances indicate lack of trustworthiness."). Exclusion under Fed.R.Evid. 403 due to potential improper influence on a jury that outweighed the probative value of the preliminary report, was also cited.

***6** Defendant also cites *Smith v. Isuzu Motors Ltd.,* 137 F.3d 859 (5th Cir.1998) in support of its argument that the documents are preliminary or interim evaluation of staff members and thus cannot fall within the hearsay exception of 803(8)(A). By way of background, *Smith* was a products liability case concerning the safety of the Isuzu Trooper. A Congressman requested that the National Highway Traffic Safety Administration ("NHTSA") establish stability standards for certain types of passenger vehicles. Although the NHTSA rejected the request, plaintiffs sought to introduce a memorandum from NHTSA staff members that supported plaintiffs' liability theory. Noting that Fed.R.Evid. 803(8)(C) is a hearsay exception for "factual findings resulting from an investigation made pursuant to authority granted by law" absent indicia of untrustworthiness, *Smith* rejected admission of those pre-investigation documents under Fed.R.Evid. 803(8)(A), reasoning that if preliminary investigative reports were allowed under 803(8)(A), then 803(8)(C)-factual findings of an investigation-would be eviscerated. "If memoranda reflecting the preliminary opinions of agency staff members were admissible under Rule 803(8)(A), then Rule 803(8)(C)'s limitations would be meaningless." 137 F.3d at 862.

Likewise, defendant's reliance on *Blue Water Environmental, Inc. v. United States,* 60 Fed. Cl. 48 (2004) is unavailing. In *Blue Water Environmental*, the court held that a private contractor operating Brookhaven National Laboratory under an M & O contract with DOE was not a federal agency under the Tucker Act. Accordingly, the court held it lacked jurisdiction over a bid protest by a disappointed subcontractor "without reaching the issue of whether DOE's supervision of [the contractor's activities] might qualify as federal actions for other purposes."60 Fed. Cl. at 52. Similarly, *United States v. Orleans,* 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976), cited by defendant, held a contractor was not a federal agency for purposes of the Federal Tort Claims Act. Questions of whether a contractor is a federal agency under the Tucker Act or the Federal Tort Claims Act are not the same as the court's evidentiary inquiry here.

In this case, the records, reports, statements or data compilations, in any form, to the extent they are the activities of the DOE, are construed broadly to include those activities done by national laboratories at the behest of DOE and within the parameters thereof. The court is mindful of defendant's point that some of the documents contain a disclaimer that the views are those of the contractor/author, not of any government agency, a position that is relevant to the court's analysis of whether the documents are separately admissible as admissions of DOE, but not dispositive on their admissibility as public records. DOE cannot bifurcate its responsibilities for SNF and/or high level waste ("HLW") disposal by utilizing its M & O contractors to develop DOE's spent nuclear fuel program. Contracting statutory and regulatory responsibility does not eliminate the underlying public nature of these documents. *Erickson v. Baxter Healthcare, Inc.,* 151 F.Supp.2d 952, 967 (N.D.Ill.2001); *Watts v. City of Hartford,* 2004 WL 717132 at * 4 (D.Conn.2004); *United States v. Davis,* 826 F.Supp. 617, 621 (D.R.I.1992).*See also United States v. Lykes Bros. S.S. Co.,* 432 F.2d 1076, 1079-80 (5th Cir.1970)("[T]he duty to prepare the report can be

delegated, under government regulations, to an independent agency or to a foreign government without the report losing its character, when submitted through the appropriate United States agency, as a report of a 'department or agency of the United States." '); *United States v. Summit Equip. & Supplies, Inc.,* 805 F.Supp. 1422, 1425, 1429-30 (N.D.Ohio 1992) (admitting the report of on-site coordinator and an EPA contractor who assisted in evaluating the extent of the contamination as public records); *McGonigle v. Combs,* 968 F.2d 810, 825 (9th Cir.1992) (declining to find error in the trial court's admission of a file memorandum written by a member of the staff of Kentucky's Director of Securities), and *Butkin Precision Mfg. Corp. v. United States,* 211 Ct.Cl. 110, 544 F.2d 499, 506 (Ct.Cl.1976) (affirming finding based on reports by government officials to the Renegotiation Board in the regular course of their and its business, citing Fed.R.Evid. 801(d)(2) [admission of a party opponent] and 803(8)[public records, reports, and data compilations of public agencies setting forth activities of that agency] ).

***7** Counsel for defendant represented that at least some of the SNF operations involved in the documents at issue are conducted by a hybrid of governmental and private individuals or organizations. To the extent that defendant has established that a document was completely privately maintained-that is, was not located (or ever located) in DOE or the national laboratory files, admission will not extend to the truth of the contents. However, to the extent the documents are from PNNL, INEEL or other national laboratory files, constitute the activities of that office or agency, are otherwise relevant, and were duly received by DOE, their admission shall, in appropriate context, extend to the truth of the contents under Fed.R.Evid. 803(8) as "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency ..." FN9

FN9. Defendant did not argue proffered documents of PNNL were not of "activities" of PNNL.

Defendant predicts that if so-called contractor documents are construed as public documents under Fed.R.Evid. 803(8), all sorts of extraneous data from a contractor could be inserted into government files, creating irrelevant litigation fodder. Application of the Rule in this instance, however, is not so productive of dross. A document generated by a contractor at DOE's behest must first of all be relevant. It also must be a record, report, statement, or compilation of data "in any form" "of" FN10 the agency. The court has allowed the admission of relevant documents that were (1) located in DOE files; (2) were (or are) the activities of DOE; and (3) do not contain any indicia of untrustworthiness.

FN10. It would perhaps be hyper-technical to note that the Rule includes as public documents data compilations in any form "of" not "by" the agency, the latter perhaps a more exclusive proposition.

Defendant argues that allowing contractor documents to be admissible as public documents would create a "ridiculous" result because, under plaintiffs' theory, all documents generated by a construction contractor under contract to build a federal courthouse would become "public records" and a contractor could potentially generate documents that could be used against the government in litigation. The "contractors" involved in the instant document issues are in no way analogous to a contractor who bids for and obtains a contract to construct a building. The documents indicate that the contractor personnel who operate DOE facilities are functionally indistinguishable from the DOE employees who request and use their research or drafting input. They are more akin to contract employees of DOE. *See United States v. Hopkins,* 427 U.S. 123, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976). There is no way courthouse construction contractor employees would be performing court work in an equivalent manner. Data compilations, records, reports or statements "of" public offices or agencies "setting forth" the activities of that agency are within the

scope of the hearsay exception. The qualifier "of" does not mean that data compilations, records, reports and statements must in all situations have been authored by the public office or agency-just that they must have emanated therefrom. These are "... documents generated or collected by the national government in the course of its public functions."*In re Oil Spill by the Amoco Cadiz,* 954 F.2d at 1309. Here the documents produced by and from the government files as categorized by the Bates stamps satisfy that requirement.

***8** Moreover, in many situations, the documents are referred to, or data is used in other government documents, adding both to their reliability and their authenticity. *See United States v. Davis,* 826 F.Supp. 617, 620 (D.R.I.1993) (draft investigative report by government contractor regarding the nature and extent of contamination at a hazardous waste disposal site was what its proponent claimed, citing Fed.R.Evid. 901(a) and (6)(7)),[FN11]*Gilbrook v. City of Westminster,* 177 F.3d 839, 858 (9th Cir.1999) (noting the presumption that public records are authentic and trustworthy with the burden on the opponent of the evidence to present "enough negative factors to persuade a court that a report should not be admitted.").

FN11.Fed.R.Evid. 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."Among the illustrative, but not limited, examples are "a purported public record, report, statement, or date compilation, in any form [ ] from the public office where items of this nature are kept."Fed.R.Evid. 901(b)(7).

Any reliance on contractor documents for a proposed finding(s) of fact may also require an accompanying discussion of the matters discussed herein. In that regard, data, opinion or other matters contained in a contractor document does not, however, necessarily serve to establish DOE policy. Nevertheless, such data, opinion, or other matter may be probative on, or appropriate evidence of, DOE's knowledge or the reasonableness of the data, opinion, or other matter.

*Authorized statements*

Plaintiffs also advocate the contractor documents under Fed.R.Evid. 801(d)(2) as admissions of defendant under either subsection (C) ("a statement by a person authorized by the party to make a statement concerning the subject") or subsection (D) ("a statement by the party's agent or servant concerning a matter within the scope of the agency or employment made during the existence of the relationship").[FN12] Plaintiffs insist that the contractors were "authorized" to make the statements concerning the subjects in the reports in the sense that they were specifically requested to perform work for DOE, matters which are not in dispute.[FN13]Defendant counters that authorization to do work is not the same as authorization to make binding admissions on behalf of DOE. Defendant argues that a request for technical recommendations does not stamp the imprimatur of the government on the resulting work product.

FN12. In relevant part, Fed.R.Evid. 801(d)(2) provides:

(d) Statements which are not hearsay. A statement is not hearsay if-

...

(2) Admission by party-opponent. The statement is offered against a party and is ... (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, ...

FN13. Indeed, Defendant's Response to Plaintiff's Bench Memorandum Addressing the Admissibility of Certain Exhibits Prepared by Contractors, which asserts that M & O contractors do not make DOE policy, admits that these contractors provided advice, input, suggestions and recommendations to the Department.

" '[A]dmissions [by a party-opponent] are outside the framework of hearsay exceptions, classed as nonhearsay, and excluded from the hearsay rule." ' FN14*The Globe Savings Bank, F.S.B. v. United States*, 61 Fed. Cl. 91, 94 (2004), citing 2 Charles McCormick, *McCormick on Evidence* § 254, at 137 (John W. Strong ed., 5th ed.1999). "It is a 'widely accepted rule that admissions of a party-opponent under Rule 801(d)(2) are accorded generous treatment in determinations of admissibility." ' *Id.*, at 96-97, *citing Aliotta v. National R.R. Passenger Corp.*, 315 F.3d 756, 761 (7th Cir.2003).

FN14." 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."Fed.R.Evid. 801(c).

*Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544, 564-65 (2003) held that statements by a subsidiary were not admissions of the parent under Fed.R.Evid. 801(d)(2)(D) as there was no demonstration that the parent exercised sufficient control to establish an agency relationship, and no showing that the parent authorized the subsidiary to speak on its behalf. Similarly, due to lack of control on direction, no agency relationship was found between Westfed and its independent and other consultants to warrant introduction of their reports as party admissions. *See also Columbia First Bank, F.S.B. v. United States*, 58 Fed. Cl. 333, 340-41 (2003) (noting that to justify admission under Rules 803(d)(2)(D) an agency relationship must be established and the statement must have been made during the existence and scope of that relationship).*But see Coast Federal Bank, F.S.B. v. United States*, 48 Fed. Cl. 402, 228 (2000) (admitting reports from Goldman Sachs & Co. and plaintiff's external auditor as Rule 803(d)(2)(D) party admissions), and *Globe Savings Bank, supra*, (admitting deposition testimony of the former director of the Analysis and Evaluation Division of the Federal Savings and Loan Insurance Corporation under this Rule).

***9** On the issue of agency and authorization, plaintiffs cite trial testimony of Dr. Bartlett, former director of the Office of Civilian Radioactive Waste Management ("OCRWM") within DOE that the M & O contractors were authorized by the Department to make statements concerning the subjects addressed in studies. The dispute, however, is not really whether the work was authorized-these contractors did not research unilaterally. The question is whether the conclusions and recommendations therein were authorized positions of DOE under agency principles, or "only" technical input requisite to DOE's formulation of its policies and statements.FN15

FN15."This report was prepared as an account of work sponsored by an agency of the United States Government."PX0169. Trial testimony concerning the contractual relationship between Bechtel SAIC Company ("BSC"), OCRWM's current M & O contractor, explained that contractors assist DOE in the latter's work through an annual work plan augmented by technical direction letters should additional work be needed. The M & O contractors supervise their own work and prepare reports. Trial. Tr. at 3449:5-3450:1.

Under defendant's reasoning, the difference, if any, between one who is authorized to bind his or her principal on a matter, and one who is authorized to make a statement concerning a matter-a dubious distinction described in *Glendale* as a murky eddie-may be more imagined than real. Rule 801(d)(2)(D) is not limited to "agents," but also to "servants." Their statements made within the scope of their servitude fall within the Rule. Thus, discounting the

typical response that the author is not authorized to speak or bind the party against whom admission is sought, Michael H. Graham, *Handbook of Federal Evidence* § 801.23 (5th ed.2001) explains:

The obvious difficulty with applying strict agency principles is that agents or servants are very rarely authorized to make damaging statements-the truck driver is hired to drive, not to talk. However as a result of the fact that it also seemed unreasonable to deny admission to inculpatory statements by the driver about the driving he was hired to do in light of the probable reliability of such statements, courts often stretched to find a basis for admissibility.

In recognition of the reliability and reasonableness of admitting such statements, Rule 801(d)(2)(D) declares statements of an agent or servant concerning a matter within the scope of his agency or employment to be defined as not hearsay if made during the existence of the relationship. Authority to speak is thus no longer of concern; all that is required is that the statement concern a matter within the scope of the agency or employment, and that the agent or servant still be employed at the time of making the statement. A statement meeting the requirement of Rule 801(d)(2)(D) is not made inadmissible simply because the statement was made to the employer and not a third person.

Graham at 168-78, extensive footnotes omitted.

Recognizing there are instances when representatives or agents can speak for the government, defendant cites as distinguishable, *Glendale Federal Bank, F.S.B. v. United States,* 39 Fed. Cl. 422, 452 (1997). In *Glendale*, the experts were on the government's witness list, so it was evident that their opinions in the case were consistent with the government as the sponsoring party. By designating them as experts, the government conferred agency on the designated experts and agreed to be bound by their statements. Absent evidence of adoption of the specific statements, data or position by DOE, defendant argues that neither 801(d)(2)(C) (authorized statement), nor 801(d)(2)(D) (statement by agent within the scope of agency), apply.

***10** A contract can create agency. *Rotec Indus. Inc. v. Mitsubishi Corp.,* 215 F.3d 1246, 1256 (Fed.Cir.2000) (citing *Chemtool Inc. v. Lubrication Technologies, Inc.,* 148 F.3d 742, 745 (7th Cir.1998) ("Although 'an agency relationship can be created by contract or conduct, not all contracts create agency relationships and not all conduct creates agency relationships." '). Citing *Condus v. Howard Savings Bank,* 986 F.Supp. 914, 916 (D.N.J.1997), plaintiffs recognize that contractors can either be agents, or non-agents, depending on the particular terms of the contract. Indeed, as plaintiffs point out, Battelle, one of the contractors in this case, was described as DOE's agent in the latter's 1981 experimental program for the underground storage of nuclear waste. *Paul v. Federal Mine Safety and Health Review Com'n,* 812 F.2d 717, 718 (D.C.Cir.1987). Here, due to the unique relationship between DOE and its contractors-who essentially perform DOE's governmental function of research for the development of the spent nuclear fuel program-these contractors are agents plaintiffs argue, citing *Westinghouse Electric Corp.,* 1997 WL 1068204 at *2 (noting the uniqueness of the DOE M & 0 contracts which involve use of government facilities, a long-term relationship between the M & O contractor and DOE with a close connection between the work and DOE's mission, and work that is substantially separate from other business of the contractor); *Michaels v. Michaels,* 767 F.2d 1185, 1201 (7th Cir.1985) (finding telexes by broker to a potential buyer of a closely held corporation to be admissions by an agent).

Defendant's reliance on *Kirk v. Raymark Industries, Inc.,* 61 F.3d 147, 163-64 (3rd Cir.1995) is not dispositive. *Kirk* focused on whether or not a non-testifying expert (a presumably impartial examiner), while undeniably retained by a party, is not necessarily authorized to make admissions against the party until such time as a decision is made by that party to call that expert at trial, citing Michael H. Graham, *Federal Practice and Procedure: Evid-*

*ence* § 6722, at 502(Interim Edition 1992) (the authority of the agent to speak as to a subject must be established at trial).*Reid Bros. Logging Co.v. Ketchikan Pulp Co.,* 699 F.2d 1292 (9th Cir.1983) although cited by defendant, supports the admission of the contractor documents. In *Reid Bros.*, a report was prepared by an employee of the Oji Paper Company of Japan, a shareholder of Alaska Pulp Company, the parent company of defendant Alaska Lumber and Pulp Company, at the latter's request. The report was circulated to defendant's officers and managers. Accordingly, there was no question that the author was authorized to make statements concerning these matters and the admission of the report under Rule 801(d)(2)(C) was found to be proper.FN16

FN16.*Reid* also noted that there was no requirement that an authorized statement be communicated to a third party. 699 F.2d 1307, n. 25; citations included Advisory Committee Notes.

There is authority that it is not necessary that the speaker communicate to other than his or her employer in order for the statement to be a binding admission against the latter. *See Theriot v. J. Ray McDermott & Co., Inc.,* 742 F.2d 877, 882 (5th Cir.1984) (finding statement made only to the principal himself is nevertheless admissible against the principal under this section) and Michael H. Graham, *Handbook of Federal Evidence* § 801.22, pp. 166-67, n.9. *See also Rollins v. Board of Governors for Higher Educ.,* 761 F.Supp. 939, 942-43 (D.R.I.1991) (finding a report prepared at defendant's request admissible as a statement authorized by the party, even if it was not prepared for consumption outside the Department).

***11** While plaintiffs' position in this regard is not without support, the court need not reach the separate admissibility of contractor documents under Rule 801. As "servants," direct employees of DOE could make binding admissions as to matters within their employment duties, and there may be no good reason to not afford the same evidentiary treatment to the contractors here. Any distinction between a nuclear physicist preparing tonnage estimates for DOE under a direct employment contract versus the M & O contracts here is questionable, and at best a matter of degree. On the other hand, while trial involved a myriad of issues to be resolved, the particular agency or servant relationship, and the extent of any authorization by the DOE to these contractors to make admissions on their behalf, counsel against finding statements made in these documents to be "admissions" by the DOE absent specific evidence that the contractual relationship included binding the government in this regard. These contractors were retained under unique circumstances to perform DOE's function, provided critical and essential data and input to DOE, and operate and manage the national laboratories for and on behalf of DOE. In a very real sense, these contractors performed DOE's statutory mission, or at a minimum provided the technical input to perform the same. Perhaps the murkiness in the waters of this Rule lies in the intertwining of the use of the words "admission by party-opponent" to denote the hearsay exception of Rule 801(d)(2), then described as a "statement" authorized by the party (here, the contractors were authorized to make the reports but those reports may not necessarily be admissions), or a "statement" by an agent or servant within the scope of that servitude (here, as servants the contractors made reports that also may not necessarily be admissions).FN17 Admissions and statements are not necessarily the same. As a result, the court does not rule on the admissibility of the contractor documents under Rule 801(2), but reserves the issue for consideration with respect to any objection(s) made to specific proposed finding(s).

FN17. The Advisory Committee Notes state that: "[n]o authority is required for the general proposition that a statement authorized by a party to be made should have the status of an admission by the party."

*Business records, ancient documents and the like*

Plaintiffs also argue the documents are admissible

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

for their truth as business records under Fed.R.Evid. 803(8) (records of regularly conducted activity) or Fed.R.Evid. 801(d)(2)(B) (a statement of which defendant has manifested an adoption or a belief in its truth). Two of the documents, PX0641, dated February 2, 1984 (the authenticity of which is challenged by defendant) and PX0968, dated April 27, 1984, are independently admissible as ancient documents under Fed. R. Evid 803(a), plaintiffs urge.

The court reserves ruling on remaining alternative theories to the extent that admissibility for truth is addressed herein, but reserves the issue(s) for consideration with respect to any objection(s) made to specific proposed findings(s).

Accordingly, for the reasons stated above, it is ORDERED that:

***12** (1) Plaintiffs shall promptly electronically file the Bench Memorandum Addressing the Admissibility of Certain Exhibits dated July 12, 2004, and tendered to the court during trial proceedings, which Memorandum shall upon receipt be deemed filed *nunc pro tunc* (July 12, 2004);

(2) Proposed findings and objections to proposed findings, filed by the parties, shall clearly indicate, in the supporting record citations, any reliance on the contractor generated documents discussed herein.

Fed.Cl.,2004.
Yankee Atomic Elec. Co. v. U.S.
Not Reported in Fed.Cl., 2004 WL 2450874 (Fed.Cl.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# In the United States Court of Federal Claims

No. 00-697 C

**(FILED UNDER SEAL August 16, 2007)**[1/]

| | |
|---|---|
| WISCONSIN ELECTRIC POWER COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

## ORDER

This is one of a series of some fifty pending cases involving contracts between the Department of Energy ("DOE") and nuclear electric utilities for the disposal of spent nuclear fuel ("SNF"). Citing *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000) and *Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000), defendant was found liable for partial breach of contract for failure to commence acceptance and disposal of SNF by January 31, 1998, and Plaintiff's Motion for Partial Summary Judgment on liability was granted. (Order of October 8, 2004, Dkt. 172.) Trial on damages will commence on September 10, 2007. Before the court are:

(1) Defendant's Motion *in Limine* to Exclude from Trial Exhibits Prepared by Government Contractors ("Contractors Motion");

(2) Defendant's Motion *in Limine* to Exclude the Testimony of Plaintiff's Expert Witness, Ms. Eileen M. Supko, Regarding the Impact of the Rate of Acceptance Under the Standard Contract ("Supko Motion");

---

[1/] Because it addresses documents submitted under seal, this Order is **sealed**. By motion or stipulation, parties shall submit any proposed redactions on or before **August 27, 2007**. Until that date, and pending resolution of any disagreements concerning proposed redactions, this Order shall not be publically available.

(3) Defendant's Motion for Partial Summary Judgment Regarding Plaintiff's Claim for Prejudgment Interest ("Cost of Capital Motion"); and

(4) Defendant's Motion to Strike Plaintiff's Deposition and Trial Testimony Designations and, in the Alternative, Motion *in Limine* to Preclude Reliance Upon Those Designations as Substantive Evidence Pursuant to RCFC 32(a) and Federal Rule of Evidence 801(d)(2) ("Deposition and Trial Testimony Designations Motion").

Plaintiff's filed Responses and defendant filed Replies.

**Contractors Motion**

According to defendant, included in plaintiff's Exhibit List filed December 18, 2006, are twenty-seven documents authored by companies under contract with DOE to develop a repository or other facility to store SNF – performance required by DOE under the Standard Contract. Authors include: Pacific Northwest Laboratories ("PNL"); Martin Marietta Energy Systems, Inc. ("Martin Marietta"); TRW Environmental Safety Systems, Inc. ("TRW"), and Battelle Memorial Institute ("Battelle").

Defendant seeks to preclude admission of these exhibits because:

(1) These contractors were hired to give advice, not to make policy decisions. They are not part of DOE, and their writings, some of which were never seen by DOE, are not government documents;

(2) The documents are not admissible under Fed. R. Evid. 803(8)(A) because they are not records, reports, statements, or data compilations of public officers or agencies setting forth the activities of the office or agency;

(A) they are not public documents because DOE's contractors are not agents of the government; and

(B) they were not prepared or adopted by DOE, so they are not public records or reports of DOE's activities;

(3) The contractor documents are not records of regularly conducted activity under Fed. R. Evid. 803(6);

(4) The contractors were not authorized to speak on DOE's behalf, so are not admissible under Fed. R. Evid. 801(d)(2)(C) or 801(d)(2)(D) as admissions of DOE;

(5) DOE has not adopted any statement contained therein, so they are not admissible under Fed. R. Evid. 801(d)(2)(B); and

(6) While some of the documents may be "ancient" (more than twenty years old), hearsay statements therein are not admissible.

Pointing to the critical role of DOE's contractors, plaintiff cites to the denial of substantially similar motions in *Pacific Gas and Electric Co. v. United States*, 73 Fed. Cl. 333, 439 (2006) and *Yankee Atomic Electric Co. v. United States*, 2004 WL 2450874 (Fed. Cl. Sept. 17, 2004). Plaintiff argues these documents are admissible under (1) Fed. R. Evid. 803(8)(a) as public records or reports of DOE's activities; (2) Fed. R. Evid. 801(d)(2)(C) as statements authorized by DOE; (3) Fed. R. Evid. 801(d)(2)(D) as statements of agents or servants of DOE; (4) Fed. R. Evid. 801(d)(2)(B) as documents in which DOE has "manifested an adoption or belief;" (5) Fed. R. Evid. 803(6) as business records; and/or (6) Fed. R. Evid. 803(16) as "ancient documents." Plaintiff also points out that some of the challenged documents are not contractor documents, and asserts that any objection that a document is a "draft" goes to its weight, not its admissibility.

In pursuit of its contractual responsibilities for which nuclear utilities were and are paying, DOE entered into management and operations ("M & O") contracts with highly-skilled entities, including national laboratories, authors of the contractor documents. To a significant extent, DOE's performance of its responsibilities under the Nuclear Waste Policy Act ("NWPA") and the Standard Contracts has been conducted through M & O contractors. *Yankee Atomic*, 2004 WL 245087, at *3. Plaintiff cites the trial testimony of Dr. John Bartlett, former Director of the Office of Civilian Radioactive Waste Management ("OCRWM"), that OCRWM had about 65 employees; its M & O contractor (then TRW Systems), with about 5,000 employees, did DOE's work. As noted by the undersigned's prior decision in *Yankee Atomic*, PNL, located in Richland, Washington, is one of ten national laboratories managed by DOE's Office of Science. PNL provides scientific and technical research

and "currently has approximately 4,200 staff members and a business volume of $750 million . . . . Battelle has operated [PNL] for DOE and its predecessors since 1965." www.pnl.gov/about (last visited July 27, 2007). *See Yankee Atomic*, 2004 WL 245087, at *2 (noting PNL's ".gov" web address and the Office of Science' fiscal 2005 budget request of $108 million for PNL); *Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332, 336 n.1 & 362 n.27 (2006) (granting in part a motion to file designated trial and deposition testimony as substantive evidence pursuant to Fed. R. Evid. 801(d) and RCFC 32(a), including that of "Mr. Michael Lawrence, Associate Laboratory Director for Energy Science & Technology at DOE's Pacific Northwest National Laboratory," and citing an April 1984 memorandum authored by Battelle, "DOE consultant").

Without prejudging (particularly since only parts of only some of the documents are provided), but in order to possibly narrow disagreements and encourage stipulations concerning admissibility, the court notes the following from plaintiff's Exhibit List:

1. PX55: January 24, 1984, "Memo from Fletcher (Battelle [PNL]) to Hall re: Revised Waste Acceptance Schedule from Draft Mission Plan." (Def.'s Contractors Mot., App. 1.) Neither Hall nor Fletcher are identified. The document is ancient. Fed. R. Evid. 803(16).

2. PX70: September 1, 1984, "DOE, 1984 Annual Review of the 1.0 Mill per kWh Waste Disposal Fee (PNL-5241), prepared by [PNL]." (Def.'s Contractors Mot., App. 1) The document is ancient and recites that it was prepared by PNL, operated by Battelle, under contract with DOE. (Pl.'s Resp. to Def's Contractors Mot., App. 3.)

3. PX101: "1986 Annual Review of the Adequacy of the 1.0 mill per kWh Waste Disposal Fee." (Def.'s Contractors Mot., App. 1.) The document is ancient and contains the same representation, that it was prepared by PNL, operated by Battelle, under contract with DOE. (*Id*. at App. 5-6.)

4. PX121: April 27, 1984,[2/] Final Draft of "Preliminary Analysis of the Total System Life Cycle Cost of the Civilian High-Level Radioactive Waste Disposal Program," prepared under contract by Roy F. Weston, Inc. for OCRWM. The document page provided has DOE's seal on the lower right-hand corner. (*Id.* at App. 7.) The document is ancient.

5. PX131: "1987 Annual Review of the Adequacy of the 1.0 mill per kWh Waste Disposal Fee," dated July 1987 prepared by PNL. It contains the same representation as PX101, that it was prepared by PNL, operated by Battelle, under contract with DOE. (*Id*. at App. 8-9.) By the time of trial, the document will be ancient.

6. PX196: May, 1990 "Commercial Spent Fuel Management and Concrete Cask Testing Programs Monthly Progress Report" was prepared by PNL, operated by Battelle, under contract with DOE. (*Id*. at App. 10-11.)

7. PX197: May 1, 1990, "Facility Interface Capacity Assessment (FICA) Project, Cask-Handling Assessment Point Beach Units 1 and 2." (Def.'s Contractors Mot., App. 1.) Other than an entry on plaintiff's Exhibit List, no part of this document was provided.

8. PX215: January 1, 1991, "Determination of Cost Effective Waste Management System Receipt Rates" by PNL operated by Battelle for DOE and noted as (1) presented at the Second Annual High-Level Radioactive Waste Management Conference, Las Vegas, Nevada, April 28 - May 3, 1991; and (2) "supported" by DOE. (Pl.'s Resp. to Contractors Mot., App. 12-13.)

9. PX223: June 28, 1991, "Memo from McDuffie to Langstaff Re: Recommended DOE Positions on 18 Contract Implementation Issues." (Def.'s Contractors Mot., App. 1.) Other than its entry on plaintiff's Exhibit List attached to defendant's Contractors Motion, no part of this document was provided, nor is the author or recipient identified.

10. PX230: September 1, 1991, "Martin Marietta Energy Systems, Inc., Site and Facility Waste Transportation Services Planning Document, Point Beach Nuclear

[2/] Plaintiff's Exhibit List records the document's date as April 27, 1987. The date is April 27, 1984. (Pl.'s Resp. to Contractors Mot., App. 7.)

Plant Unit 1, Wisconsin Electric Power Company, Draft, Revision 0." (Def.'s Contractors Mot., App. 1.) Other than its entry on plaintiff's Exhibit List, no part of this document was provided. Martin Marietta Energy Systems, Inc. was or is one of DOE's contractors. *Yankee Atomic Elec. Co. v. United States*, 2004 WL 2450874, *1 n.2. *See* www.oakridge.doe.gov/ornlseb/General%20Information%20Files/Small%20 Business%20Subcontracting%20Plan.htm (last visited July 19, 2007) (reporting that Martin Marietta Energy Systems, Inc. was awarded a contract in 1984 to manage and operate three Oakridge sites).

11. PX341: June 3, 1994, "Request for Proposal (RFP) for the Multi-Purpose Canister (MPC) System" by TRW, M & O Contractor for OCRWM. (Pl.'s Resp. to Contractors Mot., App. 14-17.) TRW was, or is, one of DOE's M & O contractors. *Yankee Atomic*, 2004 WL 2450874, *1 n.2, *3 n.5.

12. PX361: November 11, 1994, Clearance Request for Public Release of Information for material entitled "Lessons Learned From the DCS Process," signed by TRW. (Pl.'s Resp. to Contractors Mot., App. 18-19.)

13. PX396: October 25, 1995, letter from Blumford ("TRW") to Rousso ("DOE") regarding monthly status report on Delivery Commitment Schedules ("DCSs"). Other than its entry on plaintiff's Exhibit List, no part of this document was provided.

14. PX564: December 1, 1999, "Report to Update Total System Life Cycle Cost Estimate for Site Recommendation/License Application" prepared by TRW for DOE. (Pl.'s Resp. to Contractors Mot., App. 20-21.)

15. PX593: April 1, 2001, "Independent Cost Estimate Review of the Civilian Radioactive Waste Management Program 2000 Total Life Cycle Cost for DOE, OCRWM." (Def.'s Contractors Mot., App. 2.) Other than its entry on plaintiff's Exhibit List, no part of this document was provided.

16. PX774: undated PNL memorandum "re: Need for Maintenance of Full Core Reserve." (Def.'s Contractors Mot., App. 2.) Other than its entry on plaintiff's Exhibit List, no part of this document was provided.

17. PX912: February 26, 1984, memorandum "re: MRS Institutional Report." (Def.'s Contractors Mot., App. 2.) Other than its entry on plaintiff's Exhibit List, no part of this document was provided.

18. PX918: June 11, 1998, "Basis for the VA and TSLCC [Total System Life Cycle Costs] Cost Estimate Operational Waste Stream" prepared by TRW under contract with DOE/OCRWM. (Pl.'s Resp. to Contractors Mot., App. 22.)

19. PX922: October 19, 1990, "[l]etter from E.F. Benz to A. Brownstein, OCRWM DOE, re: Review of Draft Annual Capacity Report." (Def.'s Contractors Mot., App. 2.) No other information was provided.

20. PX923: "Spent Fuel Acceptance Rate." (Def.'s Contractors Mot., App. 2.) No other information was provided.

21. PX928: June 28, 1991, "Memo from P.A. McDuffie/ S.A. Vance to D.C. Langstaff/ A.B. Brownstein re: Recommended DOE Positions on 17 Contract Implementation Issues." (Def.'s Contractors Mot., App. 2.) No other information was provided.

22. PX931: May 22, 1991, "Memo from P. A. McDuffie/ S. A. Vance to A. B. Brownstein/ D. C. Langstaff re: Comments on EEI/UWASTE Positions on Eleven Issues." (Def.'s Contractors Mot., App. 2.) No further information was provided.

23. PX937: "1984 Annual Review of the Adequacy of the 1-Mill/KWH Waste Disposal Fee" dated September, 1984 prepared by PNL for DOE. (Pl.'s Resp. to Contractors Mot., App. 23.) The document is ancient.

24. PX938: "CRWMS [Civilian Radioactive Waste Management System] Program Baseline Change – Justification for Changing to a Multipurpose Canister-Based System." (Def.'s Contractors Mot., App. 2.) No other information was provided.

25. PX940: March 12, 1984, "Memorandum from R. Liikala (Battelle) to Distribution re: Waste Management Program Strategy, attachment." (Def.'s Contractors Mot., App. 2.) The document is ancient. No further information was provided.

26. PX952: May 25, 2000, "Document entitled Commercial Spent Nuclear Fuel Additional Storage Installations, Plans and Requirements." (Def.'s Contractors Mot., App. 2.) No additional information was provided.

27. PX969: February 2002 "Total System Life Cycle Cost for Site Recommendation Letter Report," prepared by Bechtel SAIC Company for DOE. (Pl.'s Resp. to Contractors Mot., App. 24-25.) There was testimony at the *Yankee Atomic* trial that Bechtel SAIC Company was OCRWM's M & O contractor. *See Yankee Atomic*, 2004 WL 2450874, at *9 n.15.

"A motion *in limine* is a preliminary motion that serves a gatekeeping function and permits the trial judge to eliminate from further consideration evidentiary submissions that clearly would be inadmissable for any purpose." *PR Contractors, Inc. v. United States*, 69 Fed. Cl. 468, 469 (2006). However, "'[s]ome evidentiary submissions [] cannot be evaluated accurately or sufficiently by the trial judge in such a procedural environment.'" *Id.* at 469-70 (alterations in original) (citing *Jonasson v. Lutheran Child & Family Servs.*, 115 F.3d 436, 440 (7th Cir. 1997)).

From the *Yankee Atomic* case, the court is generally familiar with M & O contractor documents in this context. However, the evidentiary rulings in that case concerning contractor documents were made in connection with trial proceedings. Although the DOE contractors are the same, required foundation, authenticity and other evidentiary requisites must be established for each document in this case, absent stipulation. In this regard, contractor documents may be relevant not only on planning, but also on issues of foreseeability, commercial reasonableness, or what performance was possible, reasonable or probable. Factors cited by defendant, including DOE's knowledge or possession of the document, the scope of the authoring contractor's employment, etc. are fact-intensive inquiries, best vented at trial. The court is not ruling on the admissibility of these documents, either individually or collectively. These determinations await trial. However, because the wholesale exclusion of these documents has not been established, and they are best evaluated at trial after appropriate foundations have been laid, the Contractors Motion *in limine* is denied without prejudice to renewal during, or after, trial to the extent a contractor document is proposed for admission, or cited as support for a proposed factual finding.

**Supko Motion**

Defendant seeks to preclude the testimony of Ms. Eileen Supko, one of plaintiff's proffered expert witnesses. Ms. Supko testified as an expert in several SNF trials to date, including before the undersigned.[3/] Applying different annual rates, Ms. Supko opines on the impact of those rates on two criteria identified by plaintiff's counsel: (1) the aggregate amount of additional at-reactor storage capacity that nuclear utilities would need to continue operations after January 31, 1998, and (2) the ability of utilities to "timely" decommission (permanently shut down) their nuclear power plants. Defendant objects to her testimony in this regard as not relevant, not based on a reliable or testable methodology, and inconsistent with plaintiff's theory of DOE's contractual obligations. Reasonableness of any particular rate is simply not an issue in this case according to defendant. As Ms. Supko admits no expertise in construing the Standard Contract or the NWPA, and is not offering an opinion as to how DOE would have performed, her expertise and opinion would not be helpful to the court, the hallmark of, and reason for, expert testimony, defendant argues.

Plaintiff counters that under the Rule 702 of the Federal Rules of Evidence, Ms. Supko's expert analysis and opinions, applying her specialized knowledge regarding SNF storage by commercial nuclear utilities, will assist the court "in understanding the practical implications of the acceptance rates that the parties have proffered in this damages case." (Pl.'s Resp. to Supko Mot., 2.)

Ms. Supko has more than twenty years of experience in the nuclear industry, with emphasis on storage and disposal of SNF. She holds a Bachelor of Science degree in Nuclear Engineering from Pennsylvania State University, and her

---

[3/] Ms. Supko was qualified as an expert witness in *Northern States Power Co. v. United States*, No. 98-484C (Wiese, J.) (Pl.'s Resp. to Supko Mot., App. 35-36) (qualifying on issues of acceptance rate, spent fuel management, spent fuel transportation and utility treatment of those issues), in *Southern Nuclear Operating Co. v. United States*, No. 98-614C (Merow, J.) (Pl.'s Resp. to Supko Mot., App. 35-36 (qualifying on DOE's nuclear waste management program, storage and disposal of SNF, modeling of acceptance rates, and allocations of SNF acceptance rights), in *Indiana Michigan Power Co. v. United States*, 60 Fed. Cl. 639, 646-47 (2004) (Hodges, J.) (accepting as expert on acceptance rates, SNF storage and licensing). Briefing available electronically indicates she also testified at the trials in *System Fuels, Inc. v. United States*, No. 03-2624C (Braden, J.) and *System Fuels, Inc. v. United States*, No. 03-2623C (Lettow, J.).

employment and professional background is outlined in her expert report. She is not being offered as an expert in determining DOE's obligations under the Standard Contract, which is a matter for the court. Rather, her modeling of the effect of different acceptance rates on the industry involves specialized knowledge that may be of assistance to the court. Defendant's specific objection in this regard is that the four alternative acceptance scenarios she applied are not found in any DOE document. Regardless, the application of various rates industry-wide can be of assistance to the court, not necessarily in construing DOE's contract obligations, but in resolving causation, foreseeability, reasonableness or windfall. In any event, however, her opinions and applications do not supplant the court's role as interpreter of legal obligations herein. *Pacific Gas and Electric Co. v. United States*, 73 Fed. Cl. 333, 433 (2006) ("Expert testimony is not objectionable simply because it embraces an ultimate issue to be decided by the court."). Defendant's objections to her methodology and support, or lack thereof, and the asserted inconsistencies in her calculations and applications, can be vented in cross-examination, with resulting impact on the weight the court may give to her opinion(s) and analysis. The Supko motion is **denied** without prejudice to renewal at trial.

**Cost of Capital Motion**

Defendant's motion for partial summary judgment titles a category of plaintiff's claimed damages as prejudgment interest. Plaintiff calls it weighted average cost of capital. Regardless of its label, these costs are included in the report of plaintiff's expert witnesses, Richard Sieracki, Chief Executive Office, and Kenneth Metcalfe, President, of the Kenrich Group, LLC ("Kenrich").[4/] (Pl.'s Resp. to Cost of Capital Mot., App. 1-22.) Defendant asserts the report presents plaintiff's damages in nominal[5/] or actual dollars ($48.4 million) and then adjusts that number upwards by more than forty million dollars to reflect the time value of money, to arrive at

---

[4/] Defendant has not objected to the qualifications of these experts.

[5/] "Nominal dollars retain their *number* over time, while real dollars retain their *value*." *Sandstrom v. Principi*, 358 F.3d 1376, 1377 n.1 (Fed. Cir. 2004) (emphasis in original) (rejecting claim that cost of living adjustment was not prejudgment interest). "[O]ne nominal dollar in 1969 . . . remained one nominal dollar in 1996 . . . . One real dollar in 1969, however, would retain its purchasing power, and would have been worth between four and five nominal dollars by 1996." *Id. See also District of Columbia v. United States*, 67 Fed. Cl. 292, 344 (2005) (inflationary increase would violate statutory bar).

"2007 dollars" ($91 million). Under the undisputed material facts, this increase is the substantive equivalent of prejudgment interest, defendant alleges, and since prejudgment interest is barred by statute, 28 U.S.C. § 2516(a), as a matter of law, defendant is entitled to a judgment of dismissal of this component of damages.

While agreeing that prejudgment interest is statutorily barred, plaintiff asserts its claim here is for the actual expense of raising the millions of dollars to pay for the additional SNF storage needed because of DOE's delay(s) in commencing performance. Plaintiff asserts it incurred costs to finance its mitigation expenditures including the construction of an Independent Spent Fuel Storage Installation ("ISFSI"). Costs were financed through the company's general capital structure, from public capital markets, not specific loans. Rates used to attract public funds were established by the Wisconsin Public Service Commission.

Consequential cost of capital resulting from a partial breach differs from prejudgment interest and is not barred as a matter of law, plaintiff adds, because: (1) weighted average cost of capital is the real economic cost of capital spent on SNF storage; while prejudgment interest is a statutory addition to all damages or costs; (2) weighted average cost of capital varies from year to year, while the rate of prejudgment interest remains constant regardless of capital market fluctuations; and (3) prejudgment interest is most often calculated as simple, not compound. Plaintiff concludes that: (1) recovery of its costs of financing is not precluded as a matter of law, and (2) sufficient material facts have been submitted that such costs were incurred; accordingly, defendant's motion for partial summary judgment should be denied.

Prejudgment interest against the United States is precluded by 28 U.S.C. § 2516(a) (2000).[6/] In *England v. Contel Advanced Systems, Inc.*, the Federal Circuit construed the "no-interest rule" broadly:

> [T]he force of the no-interest rule cannot be avoided simply by devising a new name for an old institution: "[T]he character or nature of 'interest'

---

[6/] 28 U.S.C. § 2516(a) provides:
(a) Interest on a claim against the United States shall be allowed in a judgment of the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof.

> cannot be changed by calling it 'damages,' 'loss,' 'earned increment,' 'just compensation,' 'discount,' 'offset,' or 'penalty,' or any other term, because it is still interest and the no-interest rule applies to it."

384 F.3d 1372, 1379 (Fed. Cir. 2004) (citing *Library of Congress v. Shaw*, 478 U.S. 310, 321 (1986) (alterations in original) (quoting *United States v. Mescalero Apache Tribe*, 207 Ct. Cl. 369, 518 F.2d 1309, 1322 (1975)). *See also Columbia First Bank v. United States*, 54 Fed. Cl. 693, 699 (2002) (rejecting plaintiffs' claim for $4.4 million to "'compensat[e] the plaintiff for the lost use of the money for the intervening period'" because of the ban on prejudgment interest) (alteration in original) (record citations omitted).

However, there is a difference between interest *on* a claim (*i.e.*, prejudgment interest which begins accruing when a claim arises and continues through the pendency of the action) vice interest *as* a claim – such as interest actually paid to obtain capital to mitigate a breach or as a consequence of a breach, the latter being recoverable. "[The] distinction 'between interest as an element of damages and "interest on a claim"' is well-recognized." *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135, 163 (2002), *aff'd in relevant part*, 407 F.3d 1352 (Fed. Cir. 2005).[7/] *See also Centex Corp. v. United States*, 55 Fed. Cl. 381, 390 (2003), *aff'd*, 395 F.3d 1283 (Fed. Cir. 2005) ("Courts frequently distinguish, however, between 'interest *on* a claim,' generally precluded by the statute, and 'interest *as* a claim' which courts

---

[7/] Defendant is also mistaken in claiming error in plaintiff's reliance on *Westfed Holdings, Inc. v. United States*, 52 Fed. Cl. 135 (2002) and in asserting that two cases cited therein are "inapposite to an analysis of whether waiver of sovereign immunity exists that would permit [plaintiff] to recover its [weighted average cost of capital] damages from the Government pursuant to the no-interest rule." (Def.'s Reply at 4-5 n.3.) While the two cases cited do not concern the statutory ban on prejudgment interest against the United States, both cases do concern statutory bans on prejudgment interest, and both award consequential increased financing costs, rejecting claims an award would violate a statutory bar. *Pacific Gas and Electric Co. v. Howard P. Foley Co.*, Civ. No. 85-2922SW, 1993 WL 299219, at *4 (N.D. Calif. July 27, 1993) (rejecting claim that cost of capital was prejudgment interest barred by statute in private antitrust or RICO actions, commenting "[t]he mere fact that [] damage can be computed in terms of 'interest' does not make it impermissible prejudgment interest"); *United Power Ass'n v. L. K. Comstock & Co.*, Civ. No. 3-89, 1992 WL 402906, at *8 (D. Minn. Oct. 27, 1992) (similar).

may treat as an element of compensation. For that reason, . . . foreseeable financing costs can be an element of expectancy damages.").

Accordingly, financing costs are not interest and have been awarded in appropriate circumstances. "The Court of Federal Claims properly determined that the breach of the forbearances was a substantial factor in Bluebonnet's increased financing costs because it forced Bluebonnet to raise capital at a time when FIRREA had made investments in thrifts riskier and considerably less attractive." *Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348, 1356 (Fed. Cir. 2001). Financing costs have been included in mitigation damages. *Old Stone Corp. v. United States*, 450 F.3d 1360, 1368 (Fed. Cir. 2006), *cert. denied*, 127 S.Ct. 1831 (2007). *See also LaSalle Talman Bank, F.S.B. v. United States*, 462 F.3d 1331, 1334-35 (Fed. Cir. 2006) (noting that all raised capital has a cost); *LaSalle Talman Bank v. United States*, 317 F.3d 1363, 1374-75 (Fed. Cir. 2003) (noting that "capital is not 'costless,'" and concluding the trial court erred in not allowing recovery of costs incurred in obtaining equity capital, because "the cost of capital does not depend on whether payment is made as debt, or out of anticipated future earnings."); *Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1582 (Fed. Cir. 1994) ("Although interest on equity capital is not recoverable, a contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract."). *Cf. J.D. Hedin Constr. Co. v. United States*, 456 F.2d 1315, 1330 (Fed. Cir. 1972) ("Interest paid on bank loans made because of financial stringency resulting from a breach by the [g]overnment of a contract between it and the borrower is not recoverable as an item of damage.")

Foreseeable costs of obtaining financing because of the government's breach are recoverable. *Bluebonnet Sav. Bank v. United States*, 266 F.3d 1348, 1354-58 (Fed. Cir. 2001). Defendant asserts *Bluebonnet* is distinguishable, limited to its facts – a contract was to infuse funds into an acquired thrift. (Def.'s Reply to Cost of Capital Mot., 4.) *Bluebonnet*, however, is not so factually limited; neither is its holding. While the underlying Assistance Agreement in *Bluebonnet* included the government's agreement to provide financial assistance, including promissory notes, asset coverage and yield maintenance, the government also agreed that for ten years the thrift could maintain regulatory capital at levels lower than required by regulation and could include subordinated debt in calculating required regulatory capital. Dividend forbearances would cover the costs of the acquisition. Passage of FIRREA breached the regulatory capital and dividend forbearances, which led to the thrift's

search for capital, at a cost. "The Court of Federal Claims properly determined that the breach of the forbearances was a substantial factor in Bluebonnet's increased financing costs . . . ." 266 F.3d at 1356. The Federal Circuit did not carve out the narrow allowance defendant urges.

Recoverability of incurred financing costs as a result of a government breach of contract was recently reiterated:

> In *Bluebonnet*, this court affirmed the Court of Federal Claims' finding that it was foreseeable that a thrift would be 'forced to seek even more capital to meet heightened regulatory requirements' and that it was also foreseeable that the costs and risks associated with meeting these requirements would have other negative economic consequences such as 'increas[ing] the costs of securing debt or equity financing.' 266 F.3d at 1356; *see also Home Sav. [of America, FSB v. United States*, 399 F.3d 1341,] [] 1355 (Fed. Cir. 2005); *cf. S. Cal. Fed. Sav. v. United States*, 422 F.3d 1319, 1336-37 (Fed. Cir. 2005).

*Citizens Fed. Sav. Bank v. United States*, 474 F.3d 1314, 1321 (Fed. Cir. 2007) (first alteration in original).

Both parties cite *Tennessee Valley Authority v. United States*, 69 Fed. Cl. 515 (2006), *appeal dismissed*, 188 Fed. Appx. 1006 (2006) – plaintiff in reliance; defendant asserting error. *Tennessee Valley Authority*, another SNF case, included in mitigation damages a category of costs referred to as an Allowance for Funds Used During Construction ("AFUDC"). For rate-making purposes, AFUDC was added to the amount of capital used on construction projects to compensate for the cost of those funds. This industry-wide practice is consistent with FERC regulations. 18 C.F.R. pt. 101 Uniform System of Accounts Prescribed for Public Utilities and Licensees Subject to the Provisions of the Federal Power Act, Electric Plant Instructions, ¶ 3.A(17) (AFUDC "includes the net cost for the period of construction of borrowed funds used for construction purposes and a reasonable rate on other funds when so used."). "TVA's cost of capital is equal to the interest rate that it pays on debt; as an entity of the federal government, TVA finances capital projects either through operating cash flows or through debt, and has no equity." 69 Fed. Cl. at 541. TVA's AFDUC was the average monthly interest charge on its short-term and long-term debts allocated to different projects based on the percentage of that project's

capital cost to the total capital projects of the plant. *Id.* Accordingly, a percentage of the total AFUDC was added to the costs of TVA's mitigating efforts. As the court there observed:

> Building the dry storage facilities required that TVA muster the financial resources to do so. The AFUDC represents the costs TVA incurred in so doing. The record is bereft of any evidence that TVA had sufficient financial resources derived from its cash flow to fund the tens of millions of dollars that were required for the dry storage facilities.

69 Fed. Cl. at 542. Likewise, here, defendant does not suggest that plaintiff had sufficient cash flow to pay the millions required to construct dry storage.

*Tennessee Valley* relied upon *Wickham Contracting Co. v. Fisher*, 12 F.3d 1574 (Fed. Cir. 1994). Under the Contracts Disputes Act ("CDA"), 41 U.S.C. § 607(g)(1) (1988), in *Wickham*, the non-breaching party sought to include in recovery of damages for the government's payment delay, interest on equity capital used to cover expenses. "Although interest on equity capital is not recoverable, a contractor may recover interest actually paid on funds borrowed because of the government's delay in payments and used on the delayed contract." 12 F.3d at 1582 (citing *Gevyn Constr. Corp. v. United States*, 827 F.2d 752, 754 (Fed. Cir. 1987) (applying 28 U.S.C. § 2516(a)).

*Tennessee Valley Authority* rejected the government's argument that a match between capital expenditures and a specific debt instrument was necessary for any recovery, holding that TVA's general debt costs, allocated by the size of the mitigation projects was sufficient. 69 Fed. Cl. at 541-42.

In *Richlin Security Service Co. v. Chertoff,* 437 F.3d 1296 (Fed. Cir.), *cert. denied*, 127 S.Ct. 253 (2006)[8/] the Federal Circuit, applying the CDA, held that a contractor could not recover interest on amounts paid by agency to discharge back wage liability because the contractor had not actually paid any interest. "[I]nterest is allowable only when the contractor has incurred a cost of money to finance [the] additional work." 437 F.3d at 1301 (quotations omitted) (second alteration in

---

[8/] The Federal Circuit's *Richlin* decision was issued on January 31, 2006, the same date as the CFC's decision in *Tennessee Valley.*

original). Actual out-of-pocket expenditure was described as a Congressional "bright-line rule for the computation of interest." 437 F.3d at 1302. The "changed work either must be directly traced to a specific loan or a necessity for increased borrowing must be shown to have been required by extra work or delay caused by the government." *Gevyn Constr. Corp. v. United States*, 827 F.2d 752, 754 (Fed. Cir. 1987). "In the latter situation, the allowance of interest depend[s] upon a specific showing that the course of borrowing was affected by the change in question, i.e., that apart from the normal borrowing pattern, there was a necessity to borrow specifically due to the change in question." *Singer Co. Librascope Div. v. United States*, 215 Ct. Cl. 281, 322, 568 F.2d 695, 718 (1977); *Framlau Corp. v. United States*, 215 Ct. Cl. 185, 198, 568 F.2d 687, 694 (1977) (To recover interest, plaintiff must establish that it was "forced to borrow to perform the changed work," and "prove what part, if any, of its large borrowings were attributable to compensable changes.") (footnote omitted); *Bell v. United States*, 186 Ct. Cl. 189, 404 F.2d 975, 984 (1968) (allowing a contractor to recover interest on borrowing caused by government changes to contract); *Dravo Corp. v. United States*, 219 Ct. Cl. 416, 427, 594 F.2d 842, 847 (1979) ("[I]t is clear that this court still holds to the view that direct tracing to a specific loan or necessity for increased borrowing is still required to be proven in order for a contractor to recover for interest costs under an equitable adjustment theory.").

Defendant has not established that, as a matter of law, under the undisputed material facts, plaintiff's claims for increased financing costs are prejudgment interest under 28 U.S.C. § 2516(a).

The Kenrich report quantifies plaintiff's claimed damages from 1998 through 2005, in both nominal and in "2007 dollars." The two categories are described in various ways, some supportive of defendant's position that the time-adjusted claim represents inflation, the time value of money – in short, interest, or its surrogate. The categories are described as "the nominal dollar and present value estimate of costs incurred by [plaintiff] in excess of those costs that would have been incurred if DOE disposed of spent fuel from the nuclear industry in 1998, at the assumed rate of acceptance." (Pl.'s Resp. to Cost of Capital Mot., App. 7.) "Nominal dollars are unadjusted for the effects of financing or the time value of money." (*Id*. at n.10.) In other parts of the report, however, actual out-of-pocket costs are described. "[P]ast damages are restated in 2007 dollars by applying [plaintiff's] after-tax weighted average cost of capital from the middle of each year in which damages were incurred

through March 27, 2007, *appropriately increasing past damages to account for the utility's financing costs*." (*Id.* at App. 8 n.13, emphasis supplied.)

> An additional element of past damages is the increased financing costs associated with the money spent by [plaintiff] to address the impacts of DOE's failure to pick up spent fuel from the nuclear industry in 1998. [Plaintiff] has had to finance the costs that it has incurred because of DOE's failure to perform in accordance with its contractual obligations from the time those costs were incurred. [Plaintiff's] after-tax weighted average cost of capital rates were used to calculate [plaintiff's] increased financing costs. The applicable annual rates were applied to the total nominal damages incurred each year from the middle of that year through March 27, 2007.

(*Id.* at App. 17.)

Mr. Metcalfe testified in deposition that plaintiff's weighted average cost of capital was calculated after-tax, because most of these mitigating expenses were deducted from income. "If you use a pre-tax rate, you would be overcompensating the plaintiff in this case. The pretax rate would be higher." (*Id.* at App. 25.) Without the cost of capital adjustment, "plaintiff is not made whole[;] . . . it spent money that it otherwise would not have spent. That money has a value including this pure time value of money, including inflation, since the dollars the utility spent are not worth what they were when they spent them, and including risk factors." (*Id.* at App. 25-26.) Mr. Metcalfe testified these risk factors were market-place driven. Plaintiff is a public, regulated utility that seeks both debt and equity capital from public markets.[9/] Rates for equity capital are approved by the Wisconsin Public Utility Commission and paid to investors who purchase common or preferred stock. Components of weighted average cost of capital include expenses of common equity, preferred stock, long-term debt and short-term debt. (*Id. at* App. 43.) "[Plaintiff's] weighted average costs of capital mean that its financing costs are greater than it otherwise would have had." (*Id.* at App. 58.)

---

[9/] Mr. Metcalfe also testified that Wisconsin Energy, a holding company, holds all the common stock of plaintiff. (*Id.,* App. 28-29.)

Historical components and calculations of plaintiff's capital structure from 1975 through 2000 were submitted with its Response, except for years 1994 and 1999, years in which the prior ratios and costs were used. The after-tax weighted average cost of capital goes through 2005. Apparently, there were no rate cases from 2000 until 2006. (*Id.* at App. 77-78.)

Plaintiff also submits an excerpt of the deposition of Ione Straub, Nuclear Power Department Budget Coordinator at the time plaintiff constructed the ISFSI. For the time period of 1989 through July of 1996, "the company issues commercial paper daily to cover its cash flow needs, so any costs that the company would incur would primarily be met with some form of – require some form of financing." (Pl.'s Resp. to Cost of Capital Motion, App. 82.) On the other hand, she testified that because funds were used to finance these mitigating projects, plaintiff and its ratepayers lost earning opportunities.

> [I]f the company would not have had to incur the charges associated with these projects, it would have been able to use those funds to go out and, if it had additional funds, to procure commercial paper or some other means to which it would have accrued some earnings, so there's alternatives to using the funds for this project. Lost opportunity, if you will, that the company lost by virtue of having to build these casks in the facility.

(*Id.* at App. 83-84.) In short, rates were higher because funds used for mitigation could have earned income.

David Ackerman, plaintiff's business consultant, testified in deposition that plaintiff's capital costs are financed proportionately with debt and equity capital. (*Id.* at App. 74, 78.) Operations and maintenance costs, and to a certain extent fuel expenses, are paid from rate revenue. (*Id.* at App. 75.)

In response to Interrogatory No. 63, after objections, plaintiff responded to inquiry as to the source, date and amount of funded capital:

> [Plaintiff] generally does not conduct financings for specific projects, and did not do so with respect to the ISFSI project. Therefore, all capital costs incurred by [plaintiff] were financed at the overall cost of

> capital, as detailed in Binder C, "Cost of Capital." The increased financing costs included in [plaintiff's] damage claim are based on the company's overall costs of capital as determined and authorized in rate cases by [plaintiff's] primary regulatory agency, the Public Service Commission of Wisconsin ("PSCW").

(*Id.* at App. 63-64.)

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986). Summary judgment will not be granted "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The court must resolve all reasonable inferences in favor of the nonmoving party. *Id.* at 255. The burden on the moving party is to demonstrate that there is no genuine issue of material fact, and may be discharged upon a showing "that there is an absence of evidence to support the nonmoving party's case." *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1563 (Fed. Cir. 1987) (quoting *Celotex,* 106 S.Ct. at 2554). The burden then shifts to the nonmoving party to produce evidence setting forth specific facts of a genuine issue for trial. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 249-50, 256; *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 627 (Fed. Cir. 1984) (holding that the nonmovant "must set out, usually in an affidavit by one with knowledge of specific facts, what specific evidence could be offered at trial."). To create "a genuine issue of fact, the nonmovant must do more than present some evidence on an issue it asserts is disputed." *Avia Group Int'l v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1560 (Fed. Cir. 1988).

Plaintiff has set forth sufficient genuine issues of material facts such as to preclude summary dismissal of its claim for costs of raising capital. *California Fed. Bank, FSB v. United States*, 245 F.3d 1342, 1350 (Fed. Cir. 2001) (reversing summary judgment on lost profits, because the existence and amount of economic damages are factual matters, not amenable to summary adjudication if there are genuine issues of material fact). Defendant did not meet its burden of establishing

that recovery of actual costs incurred to raise the capital needed to fund the mitigating efforts is precluded as a matter of law.

**Deposition and Trial Testimony Designations Motion**

Plaintiff's Deposition and Trial Testimony Designations filed December 18, 2006 (Dkt. 256), asserts the identified testimony transcript pages are from government agents and employees, are of statements concerning matters within the scope of their employment or agency, and therefore, are admissions of a party-opponent, admissible under Rule 801(d)(2)(D) of the Federal Rules of Evidence and *Globe Savings Bank, FSB v. United States*, 61 Fed. Cl. 91, 96-97 (2004).

Defendant moved to strike the designations and, alternatively to preclude their admission. Defendant argues admission should have been sought by motion, not notice,[10/] and in any event, the designations do not meet the requisites of Rule 801(d)(2)(D). If not stricken, the court should first rule on any objections defendant has to the admissibility of each particular statement, any admitted statement should be read into the record by plaintiff, and then defendant could read any counter-designations to complete the record.[11/]

Defendant's assertions that admission of deposition testimony requires witness unavailability, and counters the general preference for live testimony, are rejected. To admit statements of a party-opponent, plaintiff need not establish the witness is unavailable. Neither is the general preference for live testimony a consideration in this context. "Under [Rule 801(d)(2)(D)], the proffering party need not prove that the witness is unavailable nor does the party need also to invoke RCFC 32(a)(2) regarding admissibility of deposition testimony." *Rodriguez v. United States*, 69 Fed. Cl. 487, 494 n.8 (2006) (citing *Globe Sav. Bank,* 69 Fed. Cl. at 94-97). Likewise, in *Long Island Savings Bank, F.S.B. v. United States*, 63 Fed. Cl. 157, 164 (2004), the

---

[10/] Under RCFC, Appendix A, paragraph 15(b), "[a]ny party intending to present substantive evidence by way of deposition testimony, other than as provided by Fed. R. Evid. 801(d), shall serve and file a separate motion for leave to file the transcript of such testimony." To the extent required, the court construes plaintiff's Deposition and Trial Testimony Designations as a motion.

[11/] Defendant notes that deposition excerpts were required to be read into the record in the *Tennessee Valley Authority* and *Systems Fuels, Inc.* (No. 03-2623C) trials. (Def.'s Dep. Designation Mot. at 19, n.10.)

court noted a party "need not demonstrate that any of the declarants whose deposition testimony it seeks to admit at trial pursuant to Fed. R. Evid. 801(d)(2)(D) will be unavailable as witnesses at trial," and the "common law's preference for live testimony has no bearing on the use of party admissions as evidence." *Id.* at 163.

To be admissible under Rule 801(d)(2)(D), a statement must: (1) be offered against a party; (2) concern a matter within the scope of the employment with or for the party against whom the statement is offered; and (3) be made "during the existence of [his or her] relationship" with the United States. *Globe Savings*, 61 Fed. Cl. at 97 (citing cases). "It is a 'widely accepted rule that admissions of a party-opponent under Rule 801(d)(2) are accorded generous treatment in determinations of admissibility.'" *Id*. at 96 (citing *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 761 (7th Cir. 2003)).

Defendant does not dispute that plaintiff seeks to offer statements "against" defendant, satisfying the first requirement. As for the second, defendant argues that the witnesses were not authorized to make binding "admissions" on behalf of the government, and plaintiff has not matched the job descriptions for each witness with the statement sought to be admitted. Thirdly, that some of the witnesses were not employed by the government at the time of their depositions, defendant concludes, prevents their use.

An "admission" of a party-opponent, in this context, is broader than an "admission" of liability or other legal conclusion. Illustratively, "yes, we owe the money" may generally be a binding legal admission and conclusion; but, in determining whether a statement is hearsay, "admissions" are statements made in furtherance of the deponent's government job or contract. "Simply put, to qualify as an admission, the statement need only be related to the declarant's duties." 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 801.33[2][c], 801-74.3 (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 2007). "A statement is not hearsay if – . . . the statement is offered against a party and is . . . a statement by a person authorized by the party to make a statement concerning the subject." Fed. R. Evid. 801(d)(2)(D). In this context, a witness is authorized to make statements within the scope of his or her governmental responsibilities. "[I]n order to constitute an admission under FED. R. EVID. 801(d)(2)(D), the statements of the agent must concern a matter within the scope of the agency, made during the relationship." *First Annapolis Bancorp, Inc. v. United States*, 72 Fed. Cl. 369, 376 (2006) (citing *Nekolny*

*v. Painter*, 653 F.2d 1164, 1171-72 (7th Cir. 1981)). *See also Rodriguez*, 69 Fed. Cl. at 493 n.8; *PR Contractors, Inc. v. United States*, 69 Fed. Cl. 468, 473 (2006).

Defendant concedes that the following twelve of the seventeen[12/] witnesses were employed by DOE or the Nuclear Regulatory Commission ("NRC") at the time of their trial or deposition testimony:

1. Mr. Lake Barrett,
2. Mr. Alan Brownstein,
3. Ms. Tammy Croote,
4. Ms. Susan Klein,
5. Mr. Christopher Kouts,
6. Mr. Ronald Milner,
7. Mr. Thomas Pollog,
8. Mr. Peter Rabideau,
9. Mr. Robert Roselli,
10. Ms. Nancy Slater (Thompson),
11. Mr. Victor Trebules,
12. Mr. David Zabransky.

Nevertheless, defendant argues, their designated testimony must concern matters within the scope of their duties for DOE's OCRWM or NRC, and that foundational requisite is missing. Defendant points out that in *Globe* and *Long Island*, the court required the plaintiffs match the subject matter of the designated deposition testimony with the deponent's job or position description.[13/] In response, plaintiff asserts that depositions of all of these witnesses concerned their work with either DOE's OCRWM or NRC. Presumably, deposition testimony that may not have been designated or other knowledge covers these concerns, and foundational issues can be

[12/] Defendant's Motion states deposition or trial testimony of **nineteen** present or former government or government contractor employees was proffered. Plaintiff's Deposition and Trial Testimony Designations, filed December 18, 2006, Dkt. 256, Attachment A, lists **seventeen.** Tammy Croote and Peter Rabideau are on defendant's list, but not on plaintiff's Designation. (*Cf.* Def.'s Dep. Designation Mot., 2 n.1 with Pl.'s Dep. and Trial Test. Designation, Dkt. 256, filed Dec. 18, 2006.) Counsel should address this matter at the Pretrial Conference.

[13/] In *Long Island*, the court matched job descriptions with proffered testimony. 63 Fed. Cl. at 164 n.15.

resolved through cooperation of counsel before trial. These designations are not stricken.

As for five individuals, Messrs. Kouts, Pollog, Rabideau and Zabransky and Ms. Croote – "whom the government expects to call in its case-in-chief, the designation of deposition testimony may not be necessary. *Sacramento Mun. Util. Dist. v. United States*, No. 98-488C, Order at 2 (Fed. Cl. March 16, 2005) (unpublished) (denying motion to designate prior testimony of witnesses who were scheduled to testify at trial.) Accordingly, in the event defendant calls any of these witnesses, Plaintiff's Deposition and Trial Testimony Designations as to Messrs. Kouts, Pollog, Rabideau and Zabransky and Ms. Croote, which the court construes as a motion, is **denied** and is otherwise **deferred** as set forth herein.

The following are four government officials who testified in deposition or trial in other SNF cases about their roles in the formation of the Standard Contract, the passage of the NWPA and early DOE planning in the 1980s and early 1990s, but were not federally employed at the time of deposition, twenty-some years later.

Michael Lawrence was Acting Director of OCRWM, Deputy Director of the NWPA Project Office at the time the Standard Contracts were signed, and Associate Laboratory Director for Energy Science and Technology at DOE's Pacific Northwest National Laboratory. *Southern Nuclear Operating Co. v. United States*, __ Fed. Cl. __, 2007 WL 2005164, at *15 (July 9, 2007); *Pacific Gas and Electric*, 73 Fed. Cl. at 389; *Yankee Atomic*, 73 Fed. Cl. at 266; *Sacramento Mun. Util. Dist.*, 70 Fed. Cl. at 336 n.1. He was also identified in response to interrogatories in this case, among "DOE Personnel" who were "involved with and may have knowledge of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste contained within the notice of proposed rule-making at 48 Fed. Reg. 5458 (Fed. [sic] 4, 1983)." (Pl.'s Resp. to Dep. Designation Mot., Exh. A, unn.3.)

Robert Morgan, was Director of the Nuclear Waste Policy Act Office, the precursor to the Office of Civilian Radioactive Waste Management within DOE from January 1983 to January 1984. He testified in at least four prior SNF trials. *Yankee Atomic*, *Tennessee Valley Authority*, *Pacific Gas and Electric,* and the recent trial in *Northern States Power Co. v. United States*, No. 98-484C (Fed. Cl.) where he testified on November 16, 2006. Def's Unopposed Mot. to Designate Prior Test. of Mr. Robert L. Morgan at 1-2, *Systems Fuels, Inc. v. United States*, No. 03-2623C (Fed. Cl. Jan. 5, 2007). In *Southern Nuclear*, defendant also designated prior trial

testimony of Mr. Morgan. Def.'s Objection to Pls.' Designations of Dep. and Trial Test. at 9, *Southern Nuclear Operating Co. v. United States*, No. 98-614C (Fed. Cl. Mar. 16, 2006). In two other SNF cases, defendant's unopposed Motions to Designate Prior Trial Testimony of Mr. Morgan, citing Mr. Morgan's retirement from federal service in 1988, the passage of time and his extensive prior testimony, were granted. Order, *System Fuels, Inc. v. United States*, No. 03-2624C (Fed. Cl. January 8, 2007) and Order, *System Fuels, Inc. v. United States*, No. 03-2623C (Fed. Cl. January 8, 2007).

Dr. Daniel Dreyfus also held high-level positions at DOE, including Director of DOE's Office of Civilian Radioactive Waste Management – a position requiring Presidential appointment and Senate confirmation. While he was retired at the time of his deposition, presumably his testimony, including the segments plaintiff wishes to admit, concern his work for DOE. Dr. Dreyfus is also on plaintiff's witness list.

Bernard Rusche was the "former first presidentially appointed and confirmed director of the Office of Civilian Radioactive Waste Management . . . ." (Pl.'s Resp. to Mot. to Strike, Exh. C, *Yankee* Trial Transcript Excerpt at 3697.) Defendant's witness list in *Yankee Atomic* included Benard Rusche:

> Mr. Rusche, former Director of the Office of Civilian Radioactive Waste Management, will provide testimony about the implementation of the NWPA and the 1987 Amendments to the NWPA, including the issuance and content of the 1985 Mission Plan and 1987 Mission Plan Amendment, the issuance and content of the ACRs, and the technical, legal, and political obstacles to the implementation of the NWPA, as well as other relevant matters.

(Pl.'s Resp. to Dep. Designation Mot., Exh. B, 7.)

Defendant cites cases for the general rule that the employment or contractual relationship must have been intact at the time of the statement, or here, the deposition. For example in *Young v. James Green Mgt., Inc.,* 327 F.3d 616, 622-23 (7th Cir. 2003), in a letter, an employee resigned because of illegal racially discriminatory acts he was asked to perform, and referred any questions to his attorney. Plaintiffs sought to admit this letter as evidence of racial discrimination. "The district court determined that the letter was not admissible under this provision. We cannot say

that, in light of the totality of the circumstances, this ruling was an abuse of discretion. [The resigning employee's] assertions regarding discrimination were not made during the existence of his employment relationship [with defendant]. [The resigning employee's] letter of resignation is not admissible under Rule 801(d)(2)(D) because the justification for the rule simply is not present in this situation." 327 F.3d at 622.

Assuming the prior sworn testimony of these individuals concerned matters within the scope of their government employment or agency (indeed, that is why they were deposed - they were not questioned about their retirement plans), does their retirement or civilian employment at the time of their deposition change the evidentiary nature of their sworn testimony? While plaintiff does not advocate this position, and cites no authority therefore, it seems eminently reasonable in this case as to these former high-level government officials regarding matters that occurred in the 1980s and 1990s when they held those positions. Also, concerns have been raised about duplicative testimony, age and travel restrictions. For example, Mr. Morgan retired from the government in 1988 and does not live in close proximity. Deposition testimony of these witnesses has been admitted in other SNF cases, and efficiency would encourage at least the limited use of depositions. The court has heard live testimony of several of these witnesses in prior SNF trials. Defendant does not suggest any bias.

Presumably recognizing these four individuals were not federally-employed at the time of their depositions, plaintiff cites alternatively, Rule 801(d)(2)(c) which defines as non-hearsay statements of a party-opponent if the statements are (1) offered against a party opponent, and (2) the statement is by a person "authorized by the party to make a statement concerning the subject." Again, neither the unavailability of the witness not the general preference for live testimony, prevents admission.

These four individuals are not authorized to make statements on the government's behalf and plaintiff did not meet its burden in this regard, defendant replies. The court's determinations of agency here are not based upon the mere fact that these individuals were listed as having knowledge. They held high-level positions, and the court assumes the testimony tendered concerns their work done within the course and scope of those positions. For example, the deposition designation of Mr. Lawrence concerns his congressional testimony in 1984 after the contracts in issue were signed. Apparently, he was chosen or had authority to testify

to Congress about the contracts and/or early program developments. That his Congressional testimony was shortly after the contracts were signed does not alter the court's conclusion in this regard. Likewise, Mr. Morgan's deposition testimony concerning his presentation to the nuclear industry after the contracts were signed exemplifies his authority. That his public representation of DOE was after the contracts were signed goes to the weight of his statements, not the admissibility. Moreover, any statements he made on DOE's behalf concerning early program developments may be relevant. Certainly, government officials who testify before Congressional hearings on DOE's behalf, represent DOE at industry conferences, were "authorized" to say what they said. Defendant apparently concedes that at least Mr. Dreyfus, who held a series of senior positions within DOE and was staff director for the Senate Energy Committee "was authorized to make statements on behalf of DOE when he was employed by DOE does not make him an "agent" of DOE for the purposes of his deposition testimony given many years after he left Government service." (Def.'s Reply to Dep. Designation Mot., at 5-6.) Presumably, the subject deposition testimony concerns his time when he was so authorized, and not his activities after he left government service. That these gentlemen were authorized agents, deposed after that agency ended, but about that agency, goes to the weight of those statements, not their non-hearsay character.

Under the circumstances of this SNF litigation, under either Rule 801(d)(2)(C) or (D), and alternatively, under Rule 807 and RCFC 32(a)(3)(f), the court will not preclude the admission of these deposition designations. Accordingly, defendant's Motion to Strike and Motion in Limine on Rule 801(d)(2)(D) grounds is **denied**. *Air Land Forwarders, Inc. v. United States*, 172 F.3d 1338, 1344 (Fed. Cir. 1999) (noting "significant additional assurances of reliability" may allow admissibility under Rule 807, the residual exception to the hearsay rule); *Kinser v. Gehl Co.*, 184 F.3d 1259, 1275 (10th Cir. 1999) ("Although Burrough had retired at the time of these depositions, he continued to perform consulting services for Gehl on projects he had overseen during his full-time tenure with the company. Moreover, prior to being deposed in this case, current project engineer Viesselmann met with Burrough to review the former structure of Gehl's engineering department and the evolution of Gehl's closed-throat balers' designs. The preceding facts, both of which were established through Viesselmann's testimony, constitute independent and sufficient corroboration of Burrough's authority to make statements on behalf of Gehl and/or the scope of Burrough's employment. Because the topics discussed in Burrough's deposition excerpts all concerned events and policies occurring during his

employment, the district court did not err in admitting this testimony pursuant to Rule 801(d)(2).").

After arguing plaintiff should not be able to admit trial testimony of Mr. Morgan from the trials in *Tennessee Valley Authority, Yankee Atomic, Pacific Gas and Electric*, and most recently, *Northern States Power Co. v. United States*, No. 98-484C (Fed. Cl.)[14/] or excerpts from his deposition, defendant turns around and requests that Mr. Morgan's prior trial testimony be admitted in defendant's case, citing RCFC 32(a). Mr. Morgan was deposed extensively in early coordinated discovery proceedings and has testified in four trials. Plaintiffs in all SNF cases presumably have had, and still have, similar motives to query Mr. Morgan about his recollection of the formation of the Standard Contract some twenty years ago – the same standardized contract shared by all plaintiffs, and the same breach by DOE. "The breach involved all the utilities that had signed the contract – the entire nuclear electric industry." *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000). Plaintiff objects, asserting it had no opportunity to cross-examine Mr. Morgan in the three prior SNF cases cited, and Mr. Morgan is needed to authenticate "the substantial number of documents on the Government's exhibit list, which documents were apparently submitted to him when DOE developed the Standard Contract." Plaintiff did, however, take Mr. Morgan's deposition and designated testimony from his deposition taken in this case on March 21, 2002; March 22, 2002; June 25, 2002; August 3, 2004; July 14, 2005 and November 15, 2006. Plaintiff does not suggest any questions that were not asked or any opportunity to fully vent at these depositions, nor does plaintiff suggest that counsel in any of the three prior trials did not adequately examine Mr. Morgan, nor that counsels' interests were other than co-extensive, nor that plaintiff has some additional party-specific area of questioning Mr. Morgan about events that occurred more than twenty years ago. While there may be some factual differences that may have affected the breath or vigor of examination by plaintiffs' counsel in these other matter, plaintiff does not suggest such. As negotiations are continuing between counsel on stipulations as to authentication of certain documents, presumably consensus can be reached in this regard.

---

[14/] In *System Fuels, Inc. v. United States*, No. 03-2623C (Fed. Cl.) and *System Fuels, Inc. v. United States*, No. 03-2624C (Fed. Cl.), the court granted defendant's motion to designate the entirety of Mr. Morgan's testimony from *Northern States* as substantive evidence.

As for the statements of the remaining witnesses whose depositions were designated, defendant objects because the deponent or witness was a government contractor. In this regard, the court adopts the reasoning of the court in *Pacific Gas and Electric Co. v. United States*, 73 Fed. Cl. 333, 439 (2006) that contractor documents, in addition to being admissible under Fed. R. Evid. 803(A) (as "[r]ecords, reports, statements, or data compilations, in any from, of public offices or agencies, setting forth (A) the activities of the office or agency," were non-hearsay admissions of parties. That testimony and not documents are the subject of inquiry here does not alter the result. The same Rule is cited in both cases. *See also Beck v. Haik*, 377 F.3d 624, 639-40 (6th Cir. 2004). Accordingly, the deposition excerpts of Messrs. Edward Benz, Billy Cole and Patrick McDuffie are not precluded.

The question is not, as defendant suggests, whether the contractor was authorized to make admissions on behalf or, or bind, the government. Again, an admission is not as to legal liability. In this context, an "admission" may be that the design rate or other input or analysis used by the contractor within the scope of its contract with DOE was "X". Of course, data either directly or indirectly, must have been conveyed to DOE. That two of the deposition witnesses were retired at the time of their deposition, goes to the weight of those statements, not their nonhearsay character.[15/]

Rather, the inquiry is "whether (a) statements made by DOE contractors were beneficial to, and offered by, plaintiff, and (b) such statement were 'authorized by the party to make a statement concerning the subject." *Pacific Gas and Electric Co. v. United States*, 73 Fed. Cl. 333, 440 (2006) (citing *Yankee Atomic*, 2004 WL 2450874, at *8) ("recognizing that the 'authorized' nature of statements made by contractors in performing work for DOE [was] 'not in dispute'"). As the court in *Pacific Gas and Electric Co.* observed, the contractors were "'authorized'" – indeed, in some cases, contracted by DOE to make such statements. *Id.* These contractors were hired by DOE to do DOE's work. To the extent that any statement was made was inconsistent with DOE's position, contrary evidence or argument can be advanced.

[15/] Mr. Cole is on defendant's witness list. Accordingly, the court defers admission of his testimony, pending defendant's decision to call him as a witness. If he is, to the extent that defendant may object that cross-examination goes beyond the scope of direct, the court will allow cross-examination into the areas of the deposition designation, with re-direct, etc. as appropriate.

Before any of plaintiff's designations should be allowed, defendant asks that the court first rule on its objections to each particular designation, and then, to the extent that the court admits any designated testimony, the court should consider first, defendant's counter-designations. Plaintiff objects to the nature of some of defendant's objections. Any objections made at the time the deposition was taken are preserved. To the extent a designation or counter-designation is cited as support for a finding, any objections as to lack of foundation, etc. may then be raised. Plaintiff's objection to defendant's counter-designations will be addressed, to the extent required, at such time as plaintiff's deposition designations are cited in post-trial briefing in support of a factual finding. Any issues concerning exhibits referred to in deposition testimony will have to be resolved in that event.

Defendant asks that any deposition designations be read into the record which would encourage reduction in volume. Defendant asserts that the court's order that designations be read aloud in *Systems Fuels, Inc. v. United States*, No. 03-2623C (Fed. Cl.) significantly reduced volume. Another advantage is that objections can be ruled on upon offering the testimony, and defendant could then offer and read its counter designations, which would streamline the court's consideration of the same. If the court orders designated testimony be read into the record, plaintiff is prepared to stipulate that designations read into the record in *Tennessee Valley* and *Systems Fuels*, would not have to be read into the record again. Defendant objects to wholesale adoption of testimony in prior cases, arguing that "[h]aving opposed repeatedly any effort to consolidate these cases in the past, WEPCO cannot now seek 'consolidation' for the purpose of avoiding the need to read into the record the testimony that it seeks to designate as substantive evidence in this case." (Def.'s Reply at 14.) By limiting deposition designations to those cited in support of a proposed finding, the number may be reduced. Also, as the court has previously encouraged stipulations of facts (and continues to encourage the same), record size may also be lessened. Accordingly, the request that deposition designations be read into the record, is denied. RCFC 32(c) ("Except as otherwise directed by the court, a party offering deposition testimony pursuant to this rule may offer it in stenographic or nonstenographic for. . . ."). *Cf. Long Island Savings Bank, FSB v. United States*, 63 Fed. Cl. at 166.

Upon representation that some of the witnesses whose testimony has been designated may testify at trial, and upon consideration of the foregoing, deposition designations of any witness called to testify at trial will be disregarded. In that event,

the court will allow cross-examination, re-direct, etc. to go beyond direct to address designated areas. *Pacific Gas and Electric,* 73 Fed. Cl. at 442 (striking deposition designations not relied upon by parties in post-trial briefing), *Renda Marine, Inc. v. United States*, 66 Fed. Cl. 639, 645 (2005) (citing *United States v. Int'l Bus. Machs. Corp.*, 90 F.R.D. 377, 382 (S.D.N.Y. 1981) (disregarding designated deposition testimony of witnesses who testified at trial); Order at 2, *Sacramento Mun. Util. Dist. v. United States*, No. 98-488C (Fed. Cl. March 16, 2005) (denying motion to designate prior testimony of witnesses who were to testify at trial).

Accordingly, it is **ORDERED**:

(1) Defendant's Contractors Motion is **DENIED** without prejudice to renewal during, or after trial, as set forth above, to the extent a contractor document is proposed for admission, or cited as support for a proposed finding;

(2) Defendant's Supko Motion is **DENIED** without prejudice;

(3) Defendant's Cost of Capital Motion is **DENIED;** and

(4) Defendant's Deposition and Trial Testimony Designations Motion is **GRANTED in part, DENIED in part and DEFERRED** as set forth above.

s/ James F. Merow
James F. Merow
Senior Judge

C
Westinghouse Elec. Corp. v. U.S.
Fed.Cl.,1997.

United States Court of Federal Claims.
WESTINGHOUSE ELECTRIC CORPORATION
and Westinghouse Savannah River Company
v.
UNITED STATES.
**No. 93-445C, 93-446C.**

June 4, 1997.

HARKINS, Senior J.
***1** Examination of the courtesy copy of the transcript for the May 30, 1997, bench ruling discloses garbling or differences that could result in confusion. Examples include: Tr., p. 4, line 14, "people conference" for pretrial conference; Tr., p. 8, lines 9-25 and Tr., p. 16, lines 1-25, absence of quotation markings; and Tr., p. 17, lines 7-8, failure to show Roman numbers in references to sections and paragraphs.

During trial of this case, a comprehensive restructuring of documentary exhibit identification and RCFC Appendix G documentation was ordered on May 14, 1997. The documentary record is limited to stipulations and exhibits allowed to be filed on May 15, 1997, and subsequently.

In order to clarify the record and facilitate review of the bench ruling,

IT IS ORDERED:

1. A clear copy of the bench ruling read at the May 30, 1997, session is attached to this order. No changes in substance are made in the attached copy of the bench ruling.

2. Where there is any difference between the May 30, 1997, transcript and the attached copy, the provisions of the attached copy of the bench ruling control.

BENCH RULING

Procedural development of these cases has been protracted and characterized by confusion. The confusion is generated from the special contractual relationships applicable to Government-Owned Contract-Operated (GOCO) facilities. Confusion was further compounded by the filing of two complaints on July 19, 1993, with different corporations named as plaintiffs. These complaints were treated as unrelated contracts although they had been negotiated in response to a single RFP issued by DOE-SR that involved maintenance and operation of the Savannah River Site (SRS). The complaints were consolidated on December 17, 1993; discovery was completed on September 22, 1995. At a pretrial conference on July 24, 1996, a trial date was established for January 14, 1997, in Aiken, South Carolina. After the pretrial conference, defendant's third attorney of record made an appearance on October 29, 1996, and, to permit additional preparation time, a new trial date was set for May 13-23, 1997.

***2** On the first day of trial, pursuant to the pretrial order the parties were to complete Appendix G procedures: requested proposed findings of fact (Appendix G, ¶ s 11(a) & (b)), stipulations (Appendix G, ¶ 14), and joint statements of issues of fact and law (Appendix G, ¶ 15). At the pretrial conference, plaintiff listed exhibits 1-14 and five witnesses; defendant listed exhibits 1-82 and 28 witnesses.

During completion of Appendix G procedures on the first day of trial, it became apparent that the parties had failed to comply with Appendix G procedures, and with the pretrial conference order. The parties had compiled an array of documents in chronological order that reflected an incomplete analysis of the contentions of the parties. The stipulation of facts under Appendix G, proposed findings of fact and joint statements of legal and contractual issues were either nonexistent or contained erroneous descriptions and references. To remedy

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

this confusion, counsel were directed to compile new lists of plaintiff's exhibits, defendant's exhibits, and joint exhibits. As a result the documentary record of this case contains joint exhibits Nos. 1-44; plaintiff's exhibits Nos. 1-21; and defendant's exhibits Nos. 1-73.Defendant's exhibits 19, 29, 29a and 30 were not admitted. Proof was closed on May 23, 1997.

FACTS

The parties filed a stipulation of facts that numbered from 1 to 112. With the exception of Nos. 4, 44, 45, 46, 69, 70, 71, 72, 109, 110, 111, and 112, the facts stipulated are accepted and adopted by the court. The facts controlling this bench ruling follow.

The SRS is one of the major economic engines in Georgia and South Carolina. Employees at SRS number approximately 12,000. The Westinghouse Savannah River Corporation (WSRC), the corporation that manages and operates the SRS under a cost plus fee contract, during fiscal year 1991 accrued direct and indirect costs that totaled $1,837 billion.

DOE normally uses M & O contractors to manage and operate its Government-owned facilities. The DOE M & O contract is unique. Unlike a typical Government contract through which the Government obtains products and services to assist it in carrying out its mission, DOE uses the M & O contract to conduct its mission. Unlike a typical Government contractor that owns and operates facilities for performing a mix of Government and commercial work, the DOE M & O contractor manages and operates a Government-owned facility exclusively for Government-related activities. The Government provides almost all funding.

DOE uses the M & O contracts for the operation, maintenance, or support of Government-owned or Government-controlled research, development, special production, or testing facilities wholly or principally devoted to one or more major DOE programs. The M & O contract is characterized by: (1) use of Government-owned or Government-controlled facilities; (2) DOE's need to maintain a special, close relationship with the contractor and contractor personnel; (3) work that is wholly or substantially separate from the contractor's other business, if any; and (4) the close relationship with DOE's mission and the need for a long-term continuing arrangement.

***3** The Federal Acquisition Regulations System codifies and publishes uniform policies and procedures for acquisitions by all executive agencies. This system consists of the FAR and agency acquisition regulations that implement or supplement the FAR.

For DOE, the DEAR implements the FAR and supplements the FAR for matters not covered in the FAR. The FAR and DEAR apply to all DOE acquisitions of supplies and services that obligate appropriated funds. The DEAR generally provides that M & O contracts be based on the provisions of the DEAR and the FAR.

The M & O contracts provide the primary criteria for determining allowable costs. The contracts define allowable and unallowable costs, restrict reimbursement to only allowable costs, and specify other requirements that the M & O contractors must comply with. Adherence to contract terms is essential to ensuring that M & O contractors claim and DOE reimburses only costs which both parties intended to be allowable.

On February 19, 1988, the DOE through its Savannah River Operations Office (SR) issued a RFP for a new M & O contractor to replace E.I. DuPont deNemours and Company (DuPont). The RFP contemplated the award of two contracts: (1) a cost-reimbursement no-fee contract for the 6-month phasein or transition period (as later executed and amended, the transition contract), and (2) a cost-plus award-fee M & O contract with a period of performance of 5 years (as later executed and amended, the M & O contract).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Fed.Cl. Page 3


Westinghouse Electric Corporation (WEC), incorporated on May 12, 1988, a subsidiary, WSRC, whose purpose was to perform the M & O contract.

DuPont had maintained and operated the SRS facilities from 1950 to April 1, 1989. *Generally see E.I. DuPont deNemours & Co. v. The United States,* 24 Cl.Ct. 435 (1991).

The RFP in the special contract requirements in H.5-Subcontracts, provided in subsection a.(2):

"Except as may be expressly set forth therein, any consent by the Contracting Officer to the placement of subcontracts shall not be construed to constitute approval of the subcontractor or any subcontract terms or conditions, determination of the allowability of any cost, revision of this contract or any of the respective obligations of the parties thereunder, or creation of any subcontractor privity of contract with the Government."

Section L.31 of the February 1988 RFP, entitled "Personnel Appendix," provided:

"A Personnel Appendix, setting forth basic employee compensation and personnel administration concepts will be negotiated with the successful offeror and incorporated into the contract as Appendix A to Section J. Exhibit 1 to this Section L contains information on potentially applicable compensation and personnel administrative issues."

Section L.57.A, Part 7 entitled "Exceptions and Deviations," provided:

"The offeror shall identify and explain any exceptions or deviations taken or conditional assumptions made with respect to any aspect of this solicitation, including the Offeror Representations, Certifications, and other Statements of the Offeror, the draft contract, the DOE system of regulations and orders, and the DOE fee policy. Any exceptions taken must contain sufficient amplification and justification to permit evaluation. The benefit to the Government shall be explained for each exception taken. Such exceptions will not, of themselves, automatically cause a proposal to be determined unacceptable. A large number of exceptions, or one or more significant exceptions not providing benefit to the Government, however, may result in rejection of your proposal as unacceptable."

***4** Similarly, Section L.57B., Part 3, Paragraph D., entitled "Compensation and Personnel Administration Plan," provided, in pertinent part:

"It is the intent of DOE to include in the resultant contract a "Personnel Appendix" setting forth agreed-upon compensation and benefits provisions, the cost of which will be allowable under the contract. Exhibit 1 to this Section L contains information on the Personnel Appendix which will be negotiated with the successful offeror."

Similarly, Section L.57.C., Part 8, entitled "Exceptions and Deviations," provided:

"A. The offeror shall identify and explain any exceptions or deviations taken or conditional assumptions made with respect to the Cost data, financial disclosure, and contract type requirements included in Volume III-Financial Considerations.

B. Any exception taken must contain sufficient amplification and justification to permit evaluation. The benefit to the Government shall be explained for each exception taken. Such exceptions will not, of themselves, automatically cause a proposal to be determined unacceptable. A large number of exceptions, or one or more significant exceptions not providing benefit to the Government, however, may result in rejection of your proposal as unacceptable."

Exhibit 1 to Section L of the RFP provided:

"DOE intends to reach an advance understanding with the successful offeror on personnel costs and related expenses. The agreed upon contractor policies, wage and salary programs, and fringe benefit plans will be incorporated into this contract as Appendix A to Section J."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

On May 20, 1988, WEC submitted its initial response to the RFP. In the cover letter, WEC stated:

"For this contract, we have established the Westinghouse Savannah River Company as an on-site, wholly-owned subsidiary, with a single purpose-the management and operation of the Savannah River Plant to meet DOE's expectations. Our organization will have full business unit status that offers high corporate visibility. Westinghouse Savannah River Company (WSRC) will also have the flexibility to implement a mutually compatible set of personnel policies similar to those already existing at Savannah River."

The letter further pointed out that for more than 40 years, WEC has remained on the job at DOE complex facilities. Six of these sites have missions and projects that closely parallel operations at SRS: Westinghouse Hanford Company, Idaho Chemical Processing Plant, Westinghouse Materials Company of Ohio, West Valley Demonstration Project, Waste Isolation Pilot Plant, and Bettis Atomic Power Laboratory.

In the cover letter enclosing its response to the RFP, WEC stated that Joseph G Wise, General Counsel, was authorized to negotiate on behalf of WEC and Ambrose L. Schwallie was authorized to provide additional information during evaluation of the proposal.

WEC's May 20, 1988, response did not contain a proposed Personnel Appendix.

In Paragraph 5.A.3 of Volume I of the response, entitled "Specific Provisions," WEC and WSRC stated:

***5** "Westinghouse and its principal subcontractor, Bechtel, agree to negotiate specific provisions of the compensation and benefits program for inclusion in the "Personnel Appendix" of the contract."

Part 2 of the response, entitled "Transition Period Costs," provided, in part:

"The Westinghouse travel policy is described in Attachment 1 to Part 2, Corporate Procedure CP-T70. The amount shown for relocation represents a historical annual average determined by the Westinghouse Headquarters Human Relations Department, as illustrated in Table 2-3 and described in our Corporate relocation policy (Attachment II to Part 2). If Westinghouse is the successful offeror, we intended to negotiate in advance understanding for these costs as described in Section L, Exhibit 1 of the RFP."

At Table 2-3 of Volume III of WEC's response, entitled "Relocation Cost Estimate," WEC provided estimates of relocation costs, including for "Income Tax Reimbursement," and stated: "These dollar figures reflect average relocation costs. If Westinghouse is the successful offeror, it intends to negotiate an advance understanding with DOE-SR relative to the recovery of these costs as described in Section L, Exhibit 1."

With respect to the request in RFP, Part IV, Section L.57.c the response stated "Westinghouse has taken no exceptions or deviations or made any conditioned assumptions with respect to the cost data, financial disclosure, and contract type requirements included in Vol. III-Financial Considerations."

On June 10, 1988, DOE issued Amendment 005 to the RFP. Amendment 005 stated:

"In addition to the Transition Management Plan called for in Part 3, Paragraph C, the offeror shall present an alternative Transition Management Plan based upon a five-month phase-in period, commencing November 1, 1988 and ending March 31, 1989. Full turn over of responsibilities for management and operation of the Savannah River Plant would be effective April 1, 1989."

On June 23, 1988, WEC submitted an alternative transition management plan in response to Amendment 005.

On July 1, 1988, DOE sent Mr. Stern, WEC Vice

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

President, a letter stating: "We are writing to advise you that the proposal submitted by Westinghouse Electric Corporation for management and operation of the Savannah River Plant (RFP No. DERP09-88SR18035) has been selected for further discussions."The letter further advised that "representatives of the Savannah River Operations Office, composed of members of the Source Evaluation Board (SEB) and its advisors, will visit your office in Pittsburgh on Tuesday, July 19, 1988, for further discussions."It also stated that Westinghouse was to provide oral presentations of its responses to questions enclosed in the letter.

The July 1, 1988, letter also informed WEC and WSRC about the submission date for revised proposals and stated:

"Westinghouse may make any changes to its proposal it deems necessary or may simply confirm that the proposal submitted on May 20, 1988 (as amended on June 24, 1988), will not be revised. It is not necessary to attempt to incorporate into your revised proposal the responses or documents provided during the oral discussion unless the responses or documents are meant to modify your proposal. Any modifications to the proposal must be made in the form of revised or supplemental pages, and these pages are to be submitted on paper which is a different color from that originally used. Additionally, the changes are to be highlighted by placing a vertical line in the margin along-side the changed material."

***6** On July 19, 1988, representatives of DOE met with representatives of WEC and WSRC at Westinghouse offices in Pittsburgh (Monroeville, PA).

The following persons attended meetings on July 19-20, 1988:

Mr. Charles Simpson

Deputy Manager, Savannah River Operations Office (SR)

Chairman, Source Evaluation Board (SEB)

Mr. Ernest Chaput

Assistant Manager for Administration, SR

Member/Alternate Chairman, SEB

Mr. Louis Lewis

Acting Assistant Manager for Project Management, SR

Member, SEB

Mr. Stephen R. Wright

Director, Environmental Division, SR

Member, SEB

Mr. Robert L. Chandler

Director, Process and Weapons Division, SR

Member, SEB

Mr. Warren E. Bergholz

Chief Counsel, SR

Legal Advisor, SEB

Mr. Ronald Simpson

Chief, Contracts and Procurement Branch, SR

Executive Secretary, SEB

Mr. Donald C. Drennon

Director, Contracts and Services Division, SR

Deputy Chairman Business Management/Financial Advisory Committee, SEB

Mr. William E. Wisenbaker

Director, Quality and Materials Assurance Division, SR

Deputy Chairman Technical Management Advisory Committee, SEB

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Most of the time was devoted to formal presentations by various representatives of WEC and WSRC. In general, the WEC and WSRC representatives spoke, and the DOE representatives listened.

At the July 19, 1988 oral presentation, WEC was represented by:

Mr. L.J. Hollick-Proposal Coordinator; assisted Mr. Schwallie in preparing and submitting proposal

Mr. William Quinn-Responsible for policy advice on Human Resources issues

Mr. Ambrose Schwallie-Proposal Manager; overall responsibility for proposal preparation and policy decisions

Mr. Joseph Wise-Overall responsibility for all contractual negotiations, including a briefing on “Exceptions and Deviations”

At the July 19, 1988, meeting, WSRC provided DOE with a draft of its proposed Personnel Appendix A. Paragraph O, entitled “Tax Allowances,” provided: “Employees will be provided an allowance for additional income or FICA taxes incident to reimbursed taxable relocation costs.”This paragraph did not apply to newly hired employees.

At the July 19, 1988, meeting in Pittsburgh, DOE also hand-delivered a copy of its draft Personnel Appendix to a WEC and WSRC representative. The DOE draft Personnel Appendix delivered on July 19, 1988, was 50 pages long, single-spaced. It read, in part:

“Only those items of personnel costs and related expenses that are set forth herein or specifically referenced in this Personnel Appendix are allowable costs by advance understanding under this Contract.”

DOE's draft Personnel Appendix, at Part IX.B., read, in part:

“3. *Non-allowable Costs*

d. Payments for employee's social security taxes incident to reimbursed relocation costs.”

The quoted language at section 3.d in the DOE draft Personnel Appendix is different from the DEAR, which reads, in relevant part:

***7** “Payments for employee's income taxes or FICA (social security taxes) incident to reimbursed relocation costs.”

The words “income taxes or FICA” and the parentheses around social security taxes in the DEAR were omitted from the DOE draft Personnel Appendix delivered on July 19, 1988.

By letter dated July 28, 1988, Mr. Theodore Stern, Executive Vice President of WEC, sent a revised, red-lined version of DOE's draft Personnel Appendix to DOE as a counterproposal. There were no changes to the provision at Section IX, B.3,d.

Mr. Stern's July 28, 1988, letter included the following paragraphs:

“Also, for your convenience, as we continue negotiations on a Personnel Appendix for SRP, we are providing a revised version (labeled Revision 1) of the full text of your document. Our proposed additions are in italics; deletions are indicated by lines through the original text. Generally, these changes reflect Westinghouse personnel policies at other DOE locations, and assumptions we have made regarding current policies and practices in effect at SRP, such as Pay Policies.”

In addition, Mr. Stern's letter states the following change to the Personnel Appendix required further explanation in the area Incentive Compensation:
“Second, we have retained language in the appendix relating to incentive compensation, since we believe that further discussion with DOE-SR and additional evaluation of this sensitive area is required before appendix language can be finalized. The language drafted is similar to that in our other DOE personnel appendices.”

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

WEC's counterproposal in Item IX-Travel and Relocation Costs-redlined section A. Travel-1. General Policy, and Regular Business Travel subpart d. Section B. Relocation Costs (Only Exempt Employees-Exceptions Require Contracting Officer Approval). Subsection 3, (Non-allowable Costs) d, Payments for employee's social security taxes incident to reimbursed relocation costs, was not redlined.

On August 9, 1988, WEC and WSRC and DOE officials met for negotiations at SRS. Those attending the August 9 negotiations included Joseph Wise, William Quinn, and Ambrose Schwallie from WSRC and Donald Drennon, Ronald Simpson, and Ernest Chaput from DOE-SR. At the August 9th meeting, the WSRC counterproposal, a redlined version of the July 19, 1988, DOE draft Personnel Appendix, was discussed.

On August 19, 1988, after negotiations for the M & O contract had concluded, WEC and WSRC submitted a best and final offer, that included a Personnel Appendix.

On September 8, 1988, WEC and WSRC were selected as the awardees for the Transition and M & O contracts, respectively.

On November 21, 1988, P.W. Kasper, Manager of DOE-SR and contracting officer, awarded WSRC the M & O Contract (Contract No. DE-AC09-895R188035) to become effective April 1, 1989.

Mr. Berton Roth, Director, Procurement and Assistant Management Directorate, DOE Headquarters, had the authority to approve FAR/DEAR deviations, but he was unaware of the language of the Personnel Appendix in the M & O contract. No deviation was requested by DOE-SR prior to November 21, 1988.

***8** The Personnel Appendix incorporated in the M & O contract contained a number of provisions which were unresolved on November 21, 1988. Examples are:

Section III-Pay Policies, subsection D.-Salary Increase Fund, subparagraph 2. Incentive Payments;

Section III, subsection E.-Approval of Individual Salary Actions-included the statement: “The information provided by the Contractor shall be those amounts to be incurred as allowable costs under the Contract.”

Section III, subsection G.-Severance Pay-provides in subparagraph

“1. Except as provided in paragraph 2, an employee (except construction craft rate employees) whose services are no longer required under this contract due to reduction in workforce, shall receive a severance pay allowance of one week's base salary for each full year of service up to a maximum of 26 weeks. For former SRP or former contractor employees who received severance pay funded by the federal government, “service” shall mean and be limited to continuous service performed by an employee at the Savannah River Plant.”

Section III, subsection L.-Death Benefits-provides:

“The Contractor may pay an employee's salary or regular wage for two weeks following the date of the employee's death.

If the deceased employee's period of continuous service exceeds 5 years, the Contractor may approve an additional 1 month's base salary provided death was not preceded by an illness of more than 1 month during which the employee was paid.

Payment will be made for any portion of vacation not taken by the deceased employee.”

Section V.-Pensions, subsection B.-Funding, subparagraph 4. Credit Service at WSRC.

Section V.-Pensions, subsection F.-Supplemental Retirement Income Plan.

Section IX-Travel and Relocation Costs, subsection

B. 3. Non-allowable costs, subparagraph d. “Payments for employees social security taxes incident to reimbursed relocation costs.”

On September 26, 1988, DOE entered into a letter contract (i.e., the Transition contract) with WEC the parent corporation. Pursuant to the Transition contract, WEC immediately began work intended to facilitate the transition from DuPont to WSRC. As is the custom with letter contracts, certain terms and conditions of the Transition contract were negotiated and agreed by the parties after performance had begun. Performance of the Transition contract began on September 27, 1988, and was completed on March 31, 1989.

The letter contract, issued by DOE on September 26, 1988, and accepted by WEC on September 27, 1988, and the definitized version that followed it, contained the Allowable Cost and Payment Clause set forth in the DEAR, 48 C.F.R. § 952.216-7, which incorporated the cost principles set forth at FAR Part 31.2, under which tax gross-up costs paid to relocated employees are unallowable. There was no Appendix A or personnel appendix in the letter contract or in the definitized version of the contract that followed.

The WEC Transition contract was definitized on March 31, 1989, by Contract Modification M006. The definitized Transition contract stated: “Relocation costs will be reimbursed in accordance with the Westinghouse Relocation Policy (Corporate Procedure CP-T70, January 1986).... This understanding is applicable to all relocations for which commitments have been made prior to April 1, 1989....”

***9** By memoranda to L. James Tillman at DOE headquarters, dated March 10, and 20, 1989, DOE-SR requested approval of certain deviations from FAR Part 31 in connection with the Transition contract, including a deviation that would allow WEC to recover certain income tax gross-up costs for WEC transferred employees. By memorandum dated April 5, 1989, Mr. Tillman granted the requested deviations.

Operation of the SRS requires construction work on a regular and continuous basis. During the years that DuPont was the contractor at the site, DuPont managed the construction work itself.

WEC's proposal for the SRS identified BNI as WEC's teammate and principal subcontractor, with responsibility for construction work at the site. WEC's subcontract with BNI for the Transition contract incorporates the relocation cost provisions of Appendix A of the M & O contract by reference. The DOE-SR contracting officer, Mr. Drennon, approved the BNI subcontract on January 16, 1990.

In September 1989, Charles Monroe, DOE-SR, observed that the language in Section IX, subparagraph B.3,d. of the Personnel Appendix was not the same as in DEAR 970.3102-16(c)(4). Mr. Monroe brought the language in Section IX, subparagraph B.3.d. of the Personnel Appendix to the attention of the contracting officer, Mr. Drennon.

On October 3, 1989, contracting officer Drennon referred Mr. Wise at WSRC to Section IX, subparagraph B.3, Non-Allowable Costs (Relocation). The letter states, in part:

“It was our intent that the list of unallowable relocation costs conform to the list contained in DEAR 970.3102-16(c). DEAR 970 .3102-16(c)(4), which itself contains a typographical error in that” of” should read “or” [also see FAR 31.205-35(c)(4) ], indicates that payments for employee's income taxes or social security taxes reimbursed incident to relocation are unallowable. We regret this error and intend to make the appropriate correction by contract modification in the near future.”

By letter dated October 16, 1989, Mr. Wise responded to Mr. Drennon, stating:

“WSRC strongly disagrees with your characterization of the clause as containing a typographical error. The matter of reimbursement of employees' income taxes, relating to relocation, was proposed by

Westinghouse in its proposal and was specifically discussed during the negotiations of the contract.... We have been and expect to continue to reimburse employees for the income taxes associated with their relocation costs and expect to continue to recover them under our contract."

In November 1989, Mr. Simpson drafted a message to Mr. Wise stating:

"We clearly have a major disconnect on this issue. Drennon's letter to you of 10/3 was honorable in intent. I have nothing in my records indicating this was discussed ... If you can shed any light on when the matter of income tax reimbursement was discussed it would help greatly. Did you by any chance keep any notes?... There is no question about the reimbursement appearing in your proposal."

***10** Both WSRC and BSRI continued to pay income tax gross-up costs after the October 3, 1989, letter.

Effective July 1, 1991, WSRC changed its policy on tax gross-up costs. As of that date, it no longer paid gross-ups for WSRC and BSRI new hires. From July 1991 through March 31, 1992, WSRC continued to pay tax gross-up costs and to charge those costs to the M & O contract for WSRC and BSRI transferred employees.

On April 1, 1992, WSRC notified DOE that:

"After March 31, 1992 we will not offer gross up to any employees except in unusual circumstances for which we obtain prior Contracting Officer approval."

By letter dated April 1, 1992, Mr. Wise provided DOE with an estimate of gross-up costs paid as of March 31, 1992. The total for WSRC new hires and transfers was $6,273,119; for BSRI the total was $3,591,55. The combined total was $9,864,676.

On December 2, 1992, an assistant DOE Inspector General, on the subject OIG Official Draft Report on "Allowable Cost at DOE Management and Operating Contractors," sent a memorandum to DOE-Hq Chief Financial Officer and Deputy Director, Procurement, Assistance and Program Management. With respect to the income tax gross-up issue, under the SRS M & O contract, the letter stated:

"WSRC employees were reimbursed for income taxes paid on relocation benefits. The OIG staff determined that these costs were being reimbursed contrary to the FAR and the DEAR. The M & O contract was silent on this issue. The OIG staff met with DOE-SR staff and was informed that DOE-SR management was aware of this issue in that there had been correspondence between DOE and WSRC. OIG staff was provided with copies of all correspondence documented in the contract files. After reviewing the correspondence, it became apparent that DOE-SR did not intend to disallow the income tax reimbursements. In fact, on September 21, 1991, DOE-SR requested an approval for a deviation from compliance with the FAR for income tax expenses previously reimbursed. The DOE Office of Procurement, Assistance and Program Management, HQ denied this request in a letter dated October 31, 1991. We were informed that this was the last evidence of correspondence addressing the issue."

On April 19, 1993, M.P. Fiori, DOE-SR contracting officer, issued two Final Decisions.

With respect to the M & O contract, the contracting officer determined:

"Based on the above, I, as Contracting Officer, find that there is no basis, in contract or in equity, for finding that gross-up costs are allowable. Therefore, all costs heretofore reimbursed to WSRC on account of costs incurred for WSRC and BSRI employees' income taxes incident to reimbursement for relocation expenses are disallowed and WSRC's claim to retain these funds is denied. The amount of these costs includes the $9,563,000 set out above plus any other costs incurred subsequent to this cal-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

culation. In addition, all future payments of this type are unallowable under the M & O contract. You are directed to cease any draw downs against the Letter of Credit to reimburse any person or entity for these costs as of the date of receipt of this letter."

***11** With respect to the Transition contract, the contracting officer determined:

"Based on the above, I, as Contracting Officer, find that all costs heretofore reimbursed to BNI by WEC for payments made by BNI to BNI employees for income taxes incident to reimbursement for relocation expenses are disallowed and WEC's claim to retain these funds is denied. The amount of these costs includes the $554,000 set out above plus any other gross-up costs incurred subsequent to this calculation. In addition, all future payments of this type are unallowable under the transition contract. You are directed to cease any draw downs against the Letter of Credit to reimburse any person or entity for these costs as of the date of this letter. Please provide an accurate accounting, the format presented above, of these costs incurred as of the date of receipt of this letter."

DISPOSITION

ISSUES:

1. Whether amounts paid by WEC to reimburse BNI for payments BNI made to reimburse employees for income taxes incident to reimbursed relocation costs ( "gross-up" ) are allowable under the transition contract between WEC and DOE-SR.

2. Whether amounts paid by WSRC to reimburse transferred and newly hired employees of WSRC and BSRI for income taxes incident to reimbursed relocation costs ( "gross-up" ) are allowable under WSRC's Management and Operating (M & O) Contract.

Income tax gross up is defined: The costs that are at issue in these cases are allowances paid to employees to recognize the tax consequences of reimbursement for relocation costs. Under a relocation policy, the employee is reimbursed by the employer for certain relocation costs when the employer requests the relocation. Whether an employee incurs any income tax liability for such reimbursement depends on whether the expenses that are reimbursed are deductible for federal and state income tax purposes. Some relocation costs are not deductible for tax purposes. If an employer reimburses an employee for non-deductible relocation expenses, that reimbursement is taxable income and generates additional tax liability for the employee. If the employer does not reimburse the employee for that tax liability, the effect is to impose a penalty on employees who are required or requested to move for the employer's convenience. In order to compensate the employees for the total cost of relocation and to avoid that penalty, many employers have a practice of reimbursing the employee for the increased tax associated with reimbursement for relocation costs. The process of calculating the additional reimbursement necessary to make the employee whole for the liability is often referred to as a tax "gross-up" calculation.

Credibility of witnesses: During the trial, plaintiff called four witnesses: W. Quinn-WSRC Manager of Human Resources; R. Dutton-WSRC's former senior counsel; J.G. Wise-WSRC's General Counsel; and D.C. Drennon-former C.O. DOE-SR. Defendant called five witnesses: A.L. Schwallie-WSRC President; J. Cote-DOE-SR Assistant Manager for Administration; C.B. Monroe-DOE-SR Chief Industrial Relations Branch, Personnel and Management Evaluation Division; R.M. Newburn-former DOE-SR Special Assistant to Director; and R.D. Simpson-DOE-SR Director of Contract Management Division.

***12** All of the witnesses suffered from a lack of memory recall for specific times or events. Defendant's attack on the integrity and credibility of J.G. Wise was exaggerated and overkill. In addition to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

memory lapse due to passage of time, the credibility of J.G. Wise was diminished by reason of his position as a transferee from WEC-Hanford, some documentation for which he was responsible was authored by his employees, and the testimony of other WSRC employees was more open.

As a general proposition, examination of documentary evidence is more productive for factual determinations than testimony given years after the events involved. *United States v. S. Gypsum,* 333 U.S. 364, 396, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

Both the relocation contract and the M & O contract are controlled by the FAR and the DEAR. The DEAR implements and supplements the FAR System. 48 C.F.R. 970.3001-1 provides that the provisions of FAR Part 30 shall be followed for M & O contracts. 48 C.F.R. 970.3100-2 Responsibilities provides:

(a) The Procurement Executive is responsible for developing and revising the policy and procedures for the determination of allowable costs reimbursable under a management and operating contract, and for seeing that they are properly coordinated with other Headquarters offices having joint interest.

(b) The Head of Contracting Activity is responsible for following the policy, principles and standards set forth herein in establishing the compensation provisions of contracts and subcontracts and for submission of deviations for Headquarters consideration.

Deviations require special procedures: 48 C.F.R. 970.3100-3 provides:
Deviations from the policy and principles set forth in this subpart shall not be made unless such action is authorized by the Procurement Executive, on the basis of a written justification stating clearly the special circumstances involved. Where appropriate, any approved deviation shall be reflected in the compensation provisions of the contract.

Cost determinations are dependent on DEAR principles an specific contract terms: 48 C.F.R. 970.3101-4 provides:
The amount reimbursable under management and operating contracts shall be determined in accordance with the principles set forth in this subpart and in accordance with the terms of the respective contract on the basis of audit. In the event that the contractual terms differ, or are inconsistent with (see 970.3100-3 for approval of deviations) the principles stated herein, the contractual terms control. It is expected however, contractual terms to be based on the principles therein. The audit may be performed directly by DOE (or by the cognizant Federal agency pursuant to arrangements made by the DOE).

Understandings should be reached in advance of the incurrence of costs. 48 C.F.R. 970.3013-6(a) provides:
It is important that agreement between DOE and its management and operating contractors be reached in advance of the incurrence of costs in categories where reasonableness as to amounts or allocability to the management and operating contract are difficult to determine in order to avoid possible subsequent disallowance or dispute. Any such agreement should be incorporated in the contract. But the absence of such agreement on any element of cost will not, in itself, serve to make the element either allowable or unallowable. Examples of costs on which advance agreements may be particularly important are: ... (9) Employee compensation, including amounts of money or percentage of payment authorized to be expended annually for groups of employees for all types of wage and salary increases, travel, relocation expenses and other personnel costs.

***13** It also provides in (c) “With regard to the costs at (a)(9) above:

(1) compensation for personal services includes ages and salaries, bonuses and incentives, premium payments, pay for time not worked, and supplementary compensation and benefits, such as pen-

sion and retirement, group insurance, severance pay plans, and other forms of compensation covered by 970.3102.2."

When the RFP was issued on February 19, 1988, both parties recognized the transfer of the SRS to a new M & O contract would be pursuant to arrangements subject to the DEAR. In its initial response submitted on May 20, 1988, WEC left negotiations of specific cost and compensation provisions for subsequent negotiations-and took no exceptions or deviations, or made no conditional assumptions with respect to the requirements included in RFP Volume III-"Financial Considerations."

At the oral presentations, the parties exchanged drafts for a Personnel Appendix. Although the drafts differed in treatment of allowances for additional income or FICA taxes incident to reimbursed relocation costs, the record does not establish these differences were either recognized or discussed during the two days involved.

When the revised red-lined or highlighted version of the DOE draft Personnel Appendix was sent as a counterproposal on July 28, 1988, no changes were made in the language of Section IX-B.3.d. and Pay Policies and Incentive Compensation were reserved for further discussion and evaluation. Subsection 3, (nonallowable costs) d. was not red-lined.

The record is unclear as to whether Section IX B.3. was discussed during the August 9, 1988, meeting. It is clear, however, that the matter was not negotiated to completion at that time. Other matters, such as Price-Anderson Act liability, treatment of DuPont continuing employees, and maintenance of good community relations at the SRS, were pressing. Both WEC and DOE-SR were under pressure to proceed with the business of the takeover of M & O operations and the time constraints to be ready by the April 1, 1989, deadline.

When the M & O contract was signed on November 21, 1988, by the manager, DOE-SR no deviation for approval for income tax gross-up had been requested. A number of provisions of the Personnel Appendix incorporated in the M & O contract remained unresolved when WSRC stated work on April 1, 1989.

As a result there was no final DOE-HQ or DOE-SR approved Personnel Appendix to the M & O contract during 1989. On November 9, 1989, R.D. Simpson wrote to J. Wise "We clearly have a major disconnect" on the income tax gross-up issue, and requested additional information. (Jt.Ex. 25)

Terms of the Personnel Appendix continued to be unresolved on February 8, 1990, when DOE-SR prepared for negotiations on the award fee for Fiscal Year 1990. Negotiations of WSRC requests were considered as other matters for negotiation and deferred. The revisions requested by WSRC included the following:

c. Revision of Personnel Appendix, Article VI, Paragraph B.3. *Non-Allowable Costs.*This section is in conflict with DEAR 970.3102-16(c) because employer reimbursement of income tax incident to relocation is *not* identified as unallowable. Correction of this clerical error has been discussed with WSRC.

***14** The August 28, 1992, and October 12, 1992, exchange of correspondence between DOE-SR Manager Hekman and A.L. Schwallie, WSRC President, establish that the provisions of the Personnel Appendix were still unresolved and were subject to further negotiations. (D Ex. 62, 63, 64)

The transition contract has an advance understanding which uses and refers to the Westinghouse corporate procedure CP-T70, January 1986. This corporate policy limits itself in its title to transferred employees. The corporate policy as explained by Mr. Wise limits it to transfers.

The transition subcontract between WEC and BNI, is silent as to the allowability of tax gross up to BNI employees during the transition period. The letter subcontract revises the allowability provision

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to incorporate Section IX of the proposed personnel appendix that was found in WEC's Best and Final Offer sent to DOE on August 19, 1988. Section IX of the proposed Personnel Appendix deals with the payment of relocation costs. There is no specific mention of reimbursement to employees of income taxes incident to reimbursed relocation costs or tax gross-up.

Under DEAR 952.216-7, the contracting officer must look to the provisions of the FAR and DEAR that apply to the situation at hand. In the case here, the contract as written is silent on the allowance of gross-up. The applicable section of the DEAR is DEAR 970.3102-16(c)(4). The section makes unallowable payments for employee's income taxes or FICA (social security taxes) incident to reimbursed relocation costs. These payments are not allowable under the WEC and BNI letter subcontract under the plain meaning of the contract. DOE is not allowed under the dictates of the 1988 DEAR provisions to reimburse this cost as an allowable cost under the contract as written and approved by the contracting officer.

Both plaintiff and defendant assert that the M & O Personnel Appendix A, as written and incorporated by reference on November 21, 1988, became effective on that date. Thereafter, they argue, the Appendix was subject to further subsequent amendment and approval by the DOE-SR C.O. In such event, the negotiations after November 21, 1988, related to a post execution change. This scenario does not accord with the documentary record. Moreover, if it is an accurate statement of the contractual relationship, such change would require approval by DOE-HQ for the deviation. Such approval was never obtained.

On the documentary evidence and on the testimony at trial, plaintiff has failed to establish that the income tax gross-up was an allowable cost under the transition contract for costs incurred by BNI and under the M & O contract for costs incurred by WSRC and BSRI.

Other plaintiff arguments:

1. Equitable estoppel ... [I]t is well settled that the Government may not be estopped on the same terms as any other litigant. *Heckler v. Community Health Services,* 467 U.S. 51, 60, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). The following quote from that case applies:

***15** Justice Holmes wrote: “Men must turn square corners when they deal with the Government.”This observation has its greatest force when a private party seeks to spend the Government's money. Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law; respondent could expect no less than to be held to the most demanding standards in its quest for public funds. This is consistent with the general rule that those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law.

*Heckler,* 467 U.S. at 63. Plaintiff cannot meet the reliance requirement. Mr. Wise, by his own admission during trial, was familiar with the DEAR and the FAR. WEC's own proposal recognizes the requirements of the DEAR and the FAR. Reliance on the language of the DOE draft of a Personnel Appendix was contrary to the law that plaintiff knew. If plaintiff wanted a specific deviation or exception to the FAR or the DEAR, it has shown it knew how to receive one as was done under the transition contract between WEC and DOE. Reliance on DOE did not cause plaintiff to change its position for the worse. Reliance on its own interpretation of its contract language made plaintiff change its position for the worst.

2. Plaintiff argues the contracting officer gave WEC approval to enter into the BNI subcontract for the transition. By the very terms of the letter subcontract between WEC and DOE this approval does not denote allowance of a cost. Section H.2 states that the consent to placement of subcontractors shall not be construed as approval of the subcon-

tractor or any subcontract terms or conditions or determination of allowability of costs. Plaintiff must lose on that theory.

Plaintiff's April 29, 1997, motion for sanctions against defendant, which was deferred pending completion of trial, is denied. For reasons stated at the beginning of trial, there was a general breakdown of Appendix G procedures and a failure by both parties to comply with the pretrial order as to exhibits and stipulations.

Accordingly, an order will be filed that directs the Clerk to enter judgment for defendant on WEC's claims in docket No. 93-445C and on WSRC'd claims in docket No. 930446C.Defendant's judgment on its countercalim in docket No. 93-445C is for the sum of $917,486.22 and on its counterclaim in docket No. 93-446C is for the sum of $10,960,292. Pursuant tot stipulation 10 and defendant's exhibit 65, interest will be calculated from December 11, 1992, at rates fixed by the Secretary of the Treasury. No Costs.

Fed.Cl.,1997.
Westinghouse Elec. Corp. v. U.S.
Not Reported in Fed.Cl., 1997 WL 1068204 (Fed.Cl.), 42 Cont.Cas.Fed. (CCH) P 77,338

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.