**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**SUPPLEMENTAL VOLUME XI**
**(Pages A 1548 to A 1579)**

---

**ENERGY NORTHWEST'S CORRECTED APPENDIX IN SUPPORT OF ITS CORRECTED NOTICE OF DESIGNATION OF DEPOSITION AND PRIOR TRIAL TESTIMONY OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO ADMIT PRIOR TESTIMONY INTO EVIDENCE**

---

NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
202-639-6000

July 3, 2008

*Attorneys for Plaintiff*

**Table Of Contents To Appendix – Supplemental Volume XI**

Amended Rule 30(b)(6) Notice of Deposition..........................................................A 1548

Chart of Energy Northwest Deposition Designations................................................A 1550

Excerpted June 12, 2008 Rule 30(b)(6) Deposition of Christopher Kouts................A 1551

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| ENERGY NORTHWEST, | ) | |
| | ) | |
| Plaintiff, | ) | No. 04-0010C |
| | ) | |
| v. | ) | Chief Judge Damich |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**AMENDED RULE 30(B)(6) NOTICE OF DEPOSITION**

Please take notice that pursuant to RCFC 30(b)(6), the plaintiff, Energy Northwest, will take the deposition of the United States, or the person or persons designated by the United States, upon oral examination before an officer authorized by law to administer oaths commencing at 9:00 a.m. on June 12, 2008 at the offices of Jenner & Block LLP, 1099 New York Avenue, NW, Suite 900, Washington, DC 20001-4412. Pursuant to RCFC 30(b)(6), Energy Northwest requests that the Government designate a representative to testify regarding the subjects listed on Exhibit A.

Dated: June 9, 2007

Respectfully submitted,

NORMAN M. HIRSCH
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611
(312) 923-2782 telephone
(312) 840-7782 facsimile

EXHIBIT
Kouts 30(b)6 #1
6/12/08

**Exhibit A**

1. Energy Northwest's acceptance allocations had DOE commenced waste acceptance under the Standard Contract on January 31, 1998.

2. The SNF acceptance rate at which DOE would have performed after the ten year period reflected in the 1991 Annual Capacity Report assuming that DOE commenced waste acceptance under the Standard Contract on January 31, 1998.

3. The basis for the acceptance rate contained in the "Preliminary Estimates of the Total-System Cost For The Restructured Program: An Addendum To The May 1989 Analysis Of The Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program" (DOE/RW-0295P).

4. The earliest date on which DOE will commence acceptance of SNF under the Standard Contract, including without limitation, DOE announcements that the earliest possible date for waste acceptance is 2017.

5. The type of casks and any other ancillary equipment DOE would have used to accept SNF from Energy Northwest under the Standard Contract had it commenced performance on January 31, 1998, including without limitation: (a) the capacity of the cask in number of SNF assemblies; (b) the weight of the cask prior to loading; (c) the approximate weight of the cask when fully loaded with SNF assemblies; and (d) whether the cask closure would have been bolted or welded.

6. Withdrawn.

7. Withdrawn.

8. The 1987 Nuclear Waste Policy Amendments Act and its effect on the civilian radioactive waste management program, including without limitation the (a) effect on DOE's plans to site, license, construct a geologic repository, and (b) effect on DOE's plans to site, license, construct a monitored retrievable storage facility.

9. DOE's efforts to seek modification of any provision of the Nuclear Waste Policy Amendments Act of 1987 limiting the capacity of a Monitored Retrievable Storage facility or linking the schedule of such a facility to the schedule for a repository.

10. Efforts to site a Monitored Retrievable Storage facility between 1989 and 1995, including without limitation, the efforts of the Nuclear Waste Negotiator to site a Monitored Retrievable Storage facility.

11. Withdrawn.

# ENERGY NORTHWEST DEPOSITION AND TRIAL TESTIMONY DESIGNATIONS

**Energy Northwest v. The United States**
**No. 04-10C**
**Chief Judge Damich**

## CHRISTOPHER KOUTS

| | | | | |
|---|---|---|---|---|
| 6/12/2008 30(b)(6) Deposition | [5:12] - [6:3] | [37:11] - [41:16] | [69:21] - [75:11] | [96:8] - [96:14] |
| | [7:9] - [7:17] | [42:6] - [43:7] | [75:21] - [76:20] | [99:6] - [102:13] |
| | [9:13] - [11:19] | [45:1] - [45:20] | [79:18] - [84:5] | [103:10] - [108:21] |
| | [12:2] - [15:7] | [48:14] - [51:18] | [84:14] - [84:19] | [114:6] - [115:9] |
| | [16:10] - [23:4] | [52:8] - [55:21] | [86:10] - [90:1] | [115:16] - [117:2] |
| | [23:11] - [28:9] | [58:8] - [58:12] | [91:2] - [92:11] | [118:5] - [118:19] |
| | [29:6] - [31:1] | [58:22] - [64:20] | [93:9] - [93:16] | |
| | [34:1] - [36:6] | [66:14] - [69:12] | [93:20] - [94:17] | |

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------x
ENERGY NORTHWEST, :
Plaintiff, :
-vs- : Case No. 04-10C
UNITED STATES OF AMERICA, :
Defendant. : PAGES 1 - 123
------------------------------x

30(b)(6) Deposition of Christopher A. Kouts
Washington, D.C.
Thursday, June 12, 2008

Reported by: Tammy S. Newton

JOB NO. 187874

2

June 12, 2008
9:00 a.m.

Deposition of Christopher A. Kouts held at the offices of:
Jenner & Block
1099 New York Avenue, N.W.
Washington, D.C.

Pursuant to notice, before Tammy S. Newton, a Notary Public in and for the District of Columbia.

3

APPEARANCES
For the Plaintiff:
DAVID JIMENEZ-EKMAN, ESQUIRE
Jenner & Block, LLP
One IBM Plaza
Chicago, Illinois 60611
(312) 923-2782

For the Defendant:
ANDREW P. AVERBACH, ESQUIRE
SHARON A. SNYDER, ESQUIRE
Department of Justice
Commercial Litigation Branch
1100 L Street, N.W., Room 11012
Washington, D.C. 20530
(202) 353-0527

Also Present:
Colby Block, Intern

4

C O N T E N T S


| EXAMINATION OF CHRISTOPHER A. KOUTS BY: | PAGE: |
|---|---|
| Mr. Jimenez-Ekman | 5 |
| Mr. Averbach | 110 |
| Mr. Jimenez-Ekman | 113 |

| DEPOSITION EXHIBITS: | FOR ID: |
|---|---|
| No. 1 - 30(b)(6) Notice of Deposition | 5 |
| No. 2 - Expert Report Prepared by Eileen Supko | 5 |
| No. 3 - Acceptance Priority Ranking and Annual Capacity Report | 19 |
| No. 4 - Preliminary Estimates of the Total System Costs for the Restructured Program | 37 |
| No. 5 - Summary Report | 75 |
| No. 6 - Letter Dated December 17, 1992 | 103 |


(All exhibits attached to transcript.)

Thereupon,
Christopher A. Kouts,
was called for examination by counsel for the Plaintiff, and, after having been sworn by the notary, was examined and testified as follows:
(Deposition Exhibit No. 1 was marked for identification and attached to the transcript.)
(Deposition Exhibit No. 2 was marked for identification and attached to the transcript.)
EXAMINATION BY COUNSEL FOR THE PLAINTIFF
BY MR. JIMENEZ-EKMAN:
Q Good morning, Mr. Kouts. My name is David Jimenez-Ekman. We met a little bit more than a year ago, I think, although I didn't ask you any questions at the Dairyland deposition. I understand that you're here today as the Department of Energy's designated Rule 30(b)(6) designated witness; is that correct?
A Yes.
Q I'm going to show you what's been marked as Exhibit 1.
A I see it.
Q Have you seen Exhibit 1 before?



A I've seen versions of it. Not this specific version, but I have seen the questions that are identified here.
MR. AVERBACH: Let me clarify on the record. We showed him the copy of the unamended one that didn't have the dates and whatnot. But he has seen these specific topics that are set forth here.
BY MR. JIMENEZ-EKMAN:
Q And what, if anything, did you do, Mr. Kouts, to prepare to be the department's Rule 30(b)(6) witness on the topics listed on the third page of Exhibit 1?
A I met with counsel and discussed them.
Q Who did you meet with?
A Mr. Averbach and Sharon, I forgot your last name.
MS. SNYDER: Snyder.
THE WITNESS: And Lisa's last name is?
MR. AVERBACH: Donohue.
THE WITNESS: Those were the three attorneys with the Justice Department.
BY MR. JIMENEZ-EKMAN:



Q Did you meet with anyone else?
A No.
Q Was anyone else present for the meeting?
A No.
Q How long did you meet with them?
A I believe for about two hours.
Q When did you meet them?
A Last week.
Q Did you review any documents to prepare for your role as a representative of the Department of Energy in this deposition?
A I reviewed documents that counsel provided me.
Q Do you remember any of those documents?
A They were essentially some of the depositions and some of the testimony that I had given in the past.
Q So they showed you prior testimony that you had given. Do you remember what prior testimony they showed you?
A Specifically, I don't remember the specific instances. I leafed through them, you know,



basically. But, you know, I couldn't give you the specifics. If counsel wants to provide you those specifics, they can later, but I don't have it with me.
Q Do you remember any -- any particular testimony?
A I believe there was some -- I believe some of the transcripts I looked at were related to the Dairyland trial -- the Dairyland case, if you will. Beyond that, I don't have any specifics.
Q Do you remember any other documents besides your prior testimony that counsel showed you during preparation for the deposition today?
A There were, I believe, some correspondence between the Justice Department and your firm. But beyond that, no.
Q Do you remember the general subject matter of the correspondence between Department of Justice and Jenner & Block?
A I believe it had to do with some discussion about the topics that I would testify on and whether or not the previous depositions and testimony that I

had given in court essentially addressed those subjects, and the tenor of the correspondence, as I remember, that in many cases this has already been gone over many times before, and they did not understand the need for me to have this deposition or that I hadn't already answered these questions in the past.

To the best of my memory, that's what those documents contained.

Q Do you remember reviewing any other documents in preparation for your deposition?
A No.
Q Did you consult with anybody at the Department of Energy who was not an attorney to gather any factual or other information to answer the questions that are listed in Topic -- I'm sorry -- in Exhibit 1?
A I talked to Mr. Zabransky about cask capacities and so forth, but beyond that, no.
Q So Mr. Zabransky was the only other person you consulted to prepare for your deposition today?
A That's correct.



Q When did you talk to Mr. Zabransky?
A Well, I talked to Mr. Zabransky every day. On this particular subject, I believe it was sometime last week.
Q And how long did you talk to him?
A On that subject, probably for about 10 seconds.
Q That's a pretty short conversation.
Yes, and I'm sorry. You made a good distinction. On that particular topic, that is relating to your preparation for this deposition, can you tell -- can you, please, state what you said to Mr. Zabransky and Mr. Zabransky said to you.
A It was whether or not my understanding of potential cask capacities was consistent with his understanding, and the answer was yes.
Q And what did you tell him your understanding of potential cask capacities was?
A It's related to, I believe, Question No. 5, which had to do with the weights and the capacities, if you will, of casks that might have been available in the time frame associated with when Energy



Northwest might have been serviced by the department.
Q And you told him your understanding, and he confirmed that?
A I gave him my perspective, and he agreed it was consistent with his perspective.
Q What was the perspective that you gave him? What did you tell him?
A Essentially, to the extent that there might have been rail casks available ranging from about 100 tons to 125 tons in hook weight and that the cask capacities, at least from a BWR facility, which I believe is what your client's facility is, would range anywhere from 44 assemblies to 68 assemblies.
Q And he said that was -- in his view, that was accurate?
A In his view, that was consistent with his understanding of casks that might had been available had the department had the capacity to receive fuel at some future time.
Q Did you discuss with Mr. Zabransky any other topic relating to your preparation for your deposition today?



A No.
Q I'll move on to Topic 1 of Exhibit 1 listed on the third page, which is, quote, "Energy Northwest's acceptance allocation had DOE commenced waste acceptance under the Standard Contract on January 31st, 1998," end quote.
Did I read that right, sir?
A Yes.
Q Mr. Kouts, has the DOE ever determined the amount of spent nuclear fuel it would have picked up from Energy Northwest and the schedule for picking it up had the DOE commenced performance under the Standard Contract on January 31st, 1998?
A No.
Q Why not?
A Basically, it was beyond the planning horizon of the department.
Q And it remains beyond the planning horizon of the department?
A Yes.
Q Do you know, for purposes of this litigation, whether the department has any position on

the acceptance, allocation, or amount of SNF it would have picked up and the schedule for picking it up from Energy Northwest?

MR. AVERBACH: I'm going to object to the extent that calls for a legal conclusion. It's also, I believe, vague.

THE WITNESS: Can you repeat the question.

(The record was read by the reporter.)

THE WITNESS: No.

BY MR. JIMENEZ-EKMAN:

Q So from a programmatic perspective, the department does not have a position on that; is that correct?

MR. AVERBACH: Objection; vague.

THE WITNESS: The department has no plans. It has no position.

BY MR. JIMENEZ-EKMAN:

Q And it has no position on what it would have done had it commenced performance and January 31st, 1998, correct?

MR. AVERBACH: Objection; vague and mischaracterizes his testimony.



THE WITNESS: The department never got far enough in its planning process in order to address that issue.

BY MR. JIMENEZ-EKMAN:

Q So it does not, in fact, have a position, correct?

A That's correct.

Q I'm going to show you what the reporter has marked as Kouts Exhibit 2.

A Okay.

Q And --

MR. AVERBACH: Let's go off the record.

(Discussion off the record.)

MR. JIMENEZ-EKMAN: Counsel correctly points out, I should have identified what I just handed Mr. Kouts as Kouts Rule 30(b)(6) Exhibit 2.

BY MR. JIMENEZ-EKMAN:

Q Mr. Kouts, you haven't seen this before, have you?

A No, I have not.

Q Can you, please, turn, sir, to Table 3, and it's on page 11 of Exhibit 2. I'll represent to you,



sir, that Exhibit 2 is an expert report prepared by Eileen Supko, at Energy Resources International that Energy Northwest has had prepared in this case. And Table 3 represents her calculation of allocations for Energy Northwest had the Department of Energy commenced waste acceptance in 1998 and assuming a ramp-up to a 3,000 MTU overall acceptance rate.

MR. AVERBACH: For the sake of clarity, is there a particular document that rate corresponds to?

MR. JIMENEZ-EKMAN: I'm not -- if you have an objection, you can make it. I'm not sure what you're asking. I'm not trying to be difficult, but I just represented that's -- that's what this is.

BY MR. JIMENEZ-EKMAN:

Q And I take it from your prior answer, Mr. Kouts, that the department, since it never got to the stage where Energy Northwest's allocations were on the planning horizon, that the department does not have a position as to whether Table 3 is accurate or inaccurate; is that correct?

MR. AVERBACH: Objection; lack of foundation, calls for speculation.



THE WITNESS: If this acceptance rate ramped up to 3,000 tons in five years, this would have been inconsistent with the department's planning in 1991 ACR APR, and it's far and above more acceptance than the department was planning; therefore, these rates would not be consistent with the department's view as to how it would have performed in 1998, based on the 1991 ACR APR.

BY MR. JIMENEZ-EKMAN:

Q And understanding that my question is a little bit different, on the -- on the assumption that the -- putting aside the 1991 ACR -- I'm not asking whether Table 3 would or would not have happened. But putting that aside, on the assumption that the department had commenced waste acceptance in 1998 and ramped up to a 3,000 MTU overall acceptance rate, does the department have a position one way or another as to whether these would have been Energy Northwest's allocations under an oldest-fuel-first allocation?

MR. AVERBACH: I'm going to object on the grounds it lacks foundation. I'm also going to lodge an objection on the grounds this particular question

is beyond the scope of what clearly everyone knows is the government's position with respect to DOE's obligations under Standard Contract. In particular, I think because of that, your question is beyond the topic listed as -- designated as Topic No. 1 and I think beyond all the other topics, as well.

THE WITNESS: Without analyzing how the -- these numbers were generated and whether or not they're consistent with the department's understanding of how the allocations would have been to other reactors at higher acceptance rates, I would have no way of knowing whether or not the department would agree or disagree with this analysis.

BY MR. JIMENEZ-EKMAN:

Q As far as you know, no one at the department has done the analysis you just described?

A That's correct.

Q If you turn a page in Exhibit 2, you'll see there's a Table 4, which also shows an allocation prepared by Ms. Supko based on different acceptance -- overall acceptance rates assumptions. I assume that also some analysis would be required to determine



whether the department believed this was accurate given those assumptions, and that analysis hasn't been done?

MR. AVERBACH: Objection.

Mr. Kouts, for the sake of clarity -- and perhaps counsel can elaborate exactly what assumptions are based on this table, in order to enable you to answer that question.

MR. JIMENEZ-EKMAN: Counsel, I don't know you. The proper objections under the rules are as to form, foundation, and so on. You've made three speaking objections in a row. I'd hate to have to terminate and come back.

MR. AVERBACH: Excuse me. That's inaccurate. First of all, I'm permitted to object on the ground your question is beyond the scope of the 30(b)(6) deposition. Second of all, I will advise Mr. Kouts to look at any cross-reference that looks at Table 4 and to examine the document thoroughly.

You have presented him with a document that is beyond the scope of this deposition notice, asked him if the department has any understanding about it.



That is inaccurate. If you want to show him a document that he's never seen before, I think it's improper not to suggest to him that, No. 1, look at the entirety of the document; and 2, explain to him what the assumptions underlying the document are.

MR. JIMENEZ-EKMAN: You've just given another further speaking objection and a speech. I really -- I'd hate to have to bring Mr. Kouts back here again. But you can object it's beyond the scope. If you're going to instruct him not to answer or terminate, go ahead. I think it's clearly in the scope. There's no reason to argue with you on the record about that.

BY MR. JIMENEZ-EKMAN:

Q The bottom line is, Mr. Kouts, if you need time to look at the rest of the document -- it doesn't sound, from your prior answer, like you need that time, because the answer was we haven't done this analysis. I just ask whether your answer was the same for Table 4.

A The answer is yes.

(Deposition Exhibit No. 3 was marked for



identification and attached to the transcript.)

BY MR. JIMENEZ-EKMAN:

Q You've seen Kouts Rule 30(b)(6) Deposition Exhibit 3 before, Mr. Kouts?

A Yes, I have.

Q What is it?

A It's the acceptance priority ranking and annual capacity report issued by the department in July of 2004.

Q And what was the purpose of the department's issuance of this document in 2004?

A Purpose of this document was to initiate the planning process under the Standard Contract with the intent the department was planning on accepting spent fuel in the year -- from contract holders in the year 2010.

MR. JIMENEZ-EKMAN: I'm sorry. Could I have that back, please.

(The record was read by the reporter.)

BY MR. JIMENEZ-EKMAN:

Q And does this document, Exhibit 3, contain an assumption about the overall acceptance rate for

the first 10 years of operation of the program? I'll rephrase that.
Does this document contain an assumption about the overall annual acceptance rates of once -- once acceptance commences?
MR. AVERBACH: Again, I'm going to object on the ground the question's beyond the scope of the 30(b)(6) notice.
THE WITNESS: Table 1, page 2 has the projected nominal waste acceptance rates for spent nuclear fuel for the first 10 years of operation.
BY MR. JIMENEZ-EKMAN:
Q And Table 1, page 2 shows the department reaching a 3,000 MTU overall acceptance rate in the fifth year of operation, correct?
A Yes.
Q Now, there's also what's referred to in Appendix A as the acceptance priority ranking, correct?
MR. AVERBACH: Same objection.
THE WITNESS: Yes.
BY MR. JIMENEZ-EKMAN:



Q Does the acceptance priority ranking accurately depict the allocations, if any, to Energy Northwest in the first 10 years of program operation at a rate ramping up to 3,000 tons in the fifth year of operation?
MR. AVERBACH: Same objection.
THE WITNESS: Yes.
BY MR. JIMENEZ-EKMAN:
Q What are those allocations based on?
MR. AVERBACH: Objection; vague.
THE WITNESS: The allocations are based on the information the department had at that time about discharges of spent fuel from contract holders and the dates of those discharges and essentially matching those amounts, if you will, at any specific date with the acceptance capability through the first 10 years of operation.
BY MR. JIMENEZ-EKMAN:
Q It's essentially a mathematical operation where you essentially count down the list of discharges until you fulfill your capacity for a particular year; is that correct?



A It's a mathematical process that essentially allocates the amount in any one year based on the discharge dates that are applicable for that specific year.
Q And when you say based on the discharge dates, the appendix -- the APR applies the oldest-fuel-first scheme contained in the Standard Contract, correct?
A It applies the oldest-fuel-first priority, yes.
Q I didn't mean scheme in any derogatory way. I just meant it as a way of doing something.
Does the Department of Energy maintain a database showing discharges and -- well, I'll start that. Does the Department of Energy maintain a database showing the discharges from commercial nuclear reactors in the United States?
MR. AVERBACH: Objection; beyond the scope of the 30(b)(6).
THE WITNESS: The Energy Information Administration for the department receives that information and also the department issues forms for



the contract holders to fill out, RW-859 forms that updates its understanding of what spent fuel exists in its discharges.
BY MR. JIMENEZ-EKMAN:
Q You said RW-859. That's capital R capital W dash 859, correct?
A That's correct.
Q Those forms get put into a database that EIA maintains; is that right?
A The department maintains the database. EIA develops information for the department projections of spent fuel. But the Office of Civilian Radioactive Waste Management retains the databases for those purposes.
Q You said projections of spent fuel. What do you mean by that?
MR. AVERBACH: Beyond the scope of the notice.
THE WITNESS: Projections of spent-fuel discharges based on expected energy generation, future energy generation by the operating reactors.
BY MR. JIMENEZ-EKMAN:

25

Q So the department can project, based on historical data, what the future discharges are likely to be; is that correct?
MR. AVERBACH: Same objection.
THE WITNESS: Yes, and for the purposes of projecting the amount of fee that will be provided to the department for financial statements and so forth.
BY MR. JIMENEZ-EKMAN:
Q So the answer was yes. And the reason the department does that is to determine the amount of the fee; is that correct?
A Future fees that may come into the department for the purpose of financial statements, yes.
Q So with that clarification, that's correct?
A Yes.
Q And does the department have the capability to use that data and those projections to create APRs given a certain assumption regarding program performance over a period of time?
MR. AVERBACH: Objection concerning the scope of the 30(b)(6) notice.

26

THE WITNESS: The department primarily uses the RW-859 forms for that purpose.
BY MR. JIMENEZ-EKMAN:
Q So RW-859 forms are used to construct an APR; is that correct?
A It's data input into the APR ACR process, yes.
Q Can you use the -- well, let me start over.
Does the department have the capability to use that data to create an APR that includes future discharges?
MR. AVERBACH: Let me state my objection concerning -- rather than doing this on each question. To the extent you're asking about the APR process, I'm going to lodge an objection and -- I meant to say RW-859 process -- I'm going to lodge an objection concerning the scope of the 30(b)(6) notice rather than doing it each time. Go ahead.
THE WITNESS: Best way for me to answer that: The government didn't come prepared to this deposition to go through an exhaustive discussion of the RW-859 process and how that information is used in

27

order to develop APR, ACRs. If that was within the scope of the 30(b)(6), then the government would have come prepared to answer that.
I've been answering those questions based on my own personal knowledge, and we're right up to the limit of my personal knowledge of this. So if you want to pursue this, I suggest that you would have to, again, ask another 30(b)(6) question for the department to prepare for in order to answer it.
BY MR. JIMENEZ-EKMAN:
Q Your lawyer's going to reach over and hit you, Mr. Kouts, for suggesting that. I'll tell you, I'm at the end of my outline for this question. Is the answer, you're not sure one way or another, as you sit here, whether the department has the capability I asked about in my prior question?
MR. AVERBACH: I'm not sure at this point anyone knows what the prior question was.
If you do, you can answer the question. But I'll object as vague.
BY MR. JIMENEZ-EKMAN:
Q I can repeat it, or you can have it read

28

back.
A The department's ability to project into the future is dependent on the information provided in the RW-859 forms. To the extent that it does not have information to -- from the contract holders for that personal perspective -- from their own parochial perspective, if you would, the department has no basis to project beyond what -- what's been provided to them.
MR. JIMENEZ-EKMAN: May I have that back, please.
(The record was read by the reporter.)
BY MR. JIMENEZ-EKMAN:
Q Mr. Kouts, you did not consult the database that you've described in preparing yourself to answer questions as the department's representative on Topic 1, correct?
A No, that's not correct.
Q You did consult that database?
A I -- the department has no position on Topic 1; therefore, there was nothing to consult.
Q Okay. So in fact, it is correct that you

did not consult the database in preparing to answer questions regarding Topic 1, correct?
A It had no relevance.
Q And so you did not consult it, correct?
A That's correct.
Q Let's move on to Topic 2, which is, quote, "The SNF acceptance rate at which DOE would have performed after the 10-year period reflected in the 1991 Annual Capacity Report assuming that DOE commenced waste acceptance under the Standard Contract on January 31st, 1998," end quote.
Did I read that correctly?
A Yes.
Q Mr. Kouts, has the DOE ever determined the overall industry acceptance rate at which it would have performed after the 10-year period in the 1991 ACR?
A No.
Q So is it correct, as you sit here today, that the department has no position as to the rate of performance after the initial 10-year period?
MR. AVERBACH: Objection; calls for a legal



conclusion.
THE WITNESS: The department's planning did not extend beyond the 10 years identified in the 1991 ACR APR.
BY MR. JIMENEZ-EKMAN:
Q Has the department ever determined or estimated a rate that the department considers reasonable beyond the 10-year period?
MR. AVERBACH: Objection; vague.
THE WITNESS: The department did not project beyond that 10-year period for the purposes of the 1991 ACR APR.
BY MR. JIMENEZ-EKMAN:
Q Understanding it hasn't issued a document that the department considers to be of contractual significance, has the department studied or analyzed what a reasonable rate would be --
MR. AVERBACH: Objection; vague.
BY MR. JIMENEZ-EKMAN:
Q -- after the first 10 years, sir?
MR. AVERBACH: Objection; vague.
THE WITNESS: Related to 1998 waste



acceptance, no.
BY MR. JIMENEZ-EKMAN:
Q Did the department ever determine or estimate a rate after the first 10-year period that would have served the goals of the department's program?
MR. AVERBACH: Objection; vague.
THE WITNESS: I don't understand the question.
BY MR. JIMENEZ-EKMAN:
Q Well, does the program, sir, have any goals?
MR. AVERBACH: Objection.
You can answer the question if you want.
THE WITNESS: The program has a mission that's laid out in the Nuclear Waste Policy Act to manage and dispose of spent nuclear fuel and high-level waste.
BY MR. JIMENEZ-EKMAN:
Q And also to work off the backlog at existing plants?
MR. AVERBACH: Objection; calls for legal



conclusion and beyond the scope of the 30(b)(6) deposition notice.
THE WITNESS: The department's mission is to accept spent nuclear fuel for disposal, and the department is still following through on that mission.
BY MR. JIMENEZ-EKMAN:
Q That's the extent of the department's mission and goal with this program?
MR. AVERBACH: Same objection.
THE WITNESS: The mission and goal of the program is to manage and dispose of spent nuclear fuel and high-level waste. That is the overarching goal for this program, under the authorization of the Nuclear Waste Policy Act.
BY MR. JIMENEZ-EKMAN:
Q Is part of that goal to operate the program at an acceptance rate that keeps up with continuing industry discharges?
MR. AVERBACH: Objection; beyond the scope, and calls for a legal conclusion.
THE WITNESS: The department develops a planning basis for the program based on the amount of

33

resources that it's been given and what it projects it will need and the capabilities of the facilities that it plans on building. And that approach has been consistent throughout the program's history.
BY MR. JIMENEZ-EKMAN:
Q Now, over the years, the department has published a number of documents containing estimates of system performance, correct?
MR. AVERBACH: Objection; vague.
THE WITNESS: Projections of system performance, yes.
BY MR. JIMENEZ-EKMAN:
Q Are you familiar with the 1985 mission plan?
A Yes, I am.
Q And that projected system performance, which included a 3,000 MTU overall acceptance rate starting in year six, correct?
MR. AVERBACH: Objection; beyond the scope.
THE WITNESS: I would have to review the document to verify that your statement was correct.
BY MR. JIMENEZ-EKMAN:

34

Q Well, has the department ever published a document where it indicated it was going to pick up spent nuclear fuel at the rate of 900 MTU for the entire life of the program?
MR. AVERBACH: Objection; beyond the scope.
Are we still on Topic 2?
THE WITNESS: No.
BY MR. JIMENEZ-EKMAN:
Q Has the department ever published a document indicating it was going to use a 2,100 metric ton per year rate for the life of the program?
MR. AVERBACH: Same objection.
THE WITNESS: No.
BY MR. JIMENEZ-EKMAN:
Q Now, are you aware of any department projection of total system performance that does not eventually reach a steady state performance level of 3,000 MTU?
A Yes.
Q What?
A I believe the early mission plan and the mission plan amendments looked at acceptance rates of

35

6,000, assuming that two repositories were in the system.
Q Are you aware of any projection of total system performance that eventually reaches a steady state performance level of less than 3,000 MTU?
MR. AVERBACH: Objection to this line of question on the ground it's beyond the scope of the 30(b)(6) notice.
THE WITNESS: No.
BY MR. JIMENEZ-EKMAN:
Q Now, has -- has the department ever prepared estimates of the overall industry acceptance rates after the first 10 years shown in the 1991 ACR for purposes of estimating total system costs?
MR. AVERBACH: Same objection. The question is also vague.
THE WITNESS: Can you read the question back, please.
(The record was read by the reporter.)
THE WITNESS: Yes.
BY MR. JIMENEZ-EKMAN:
Q And why does it do that?

36

MR. AVERBACH: Same objection.
THE WITNESS: The analyses are done to project the adequacy or to analyze the adequacy of the fee as required by the Nuclear Waste Policy Act, which requires a secretary to annually review the adequacy of the fee.
BY MR. JIMENEZ-EKMAN:
Q And the secretary is required to review the adequacy of the fee and then report his or her findings to Congress, correct?
A No.
Q There's no requirement that Congress be -- receive a notice of the findings?
MR. AVERBACH: Objection; calls for a legal conclusion, beyond the scope.
THE WITNESS: No.
BY MR. JIMENEZ-EKMAN:
Q As a matter of practice, does the secretary submit the findings to Congress?
MR. AVERBACH: Objection; beyond the scope.
THE WITNESS: No.
MR. JIMENEZ-EKMAN: Can you mark this as 4.

(Deposition Exhibit No. 4 was marked for identification and attached to the transcript.)

THE WITNESS: I would like to supplement what I said earlier. If the secretary determines that the fee is either inadequate or more than adequate, the secretary is required, under the act, to inform the Congress about any inadequacy or over-adequacy of the fee, but he is not required to report on an annual basis if he finds the fee adequate.

BY MR. JIMENEZ-EKMAN:

Q I'm showing you what's been marked as Kouts Rule 30(b)(6) Deposition Exhibit 4. Have you seen this before?

A Yes.

Q What is it?

A It's a December 1990 document issued by the Office of Civilian Radioactive Waste Management that's entitled Preliminary Estimates of the Total System Costs for the Restructured Program: An Addendum to the May 1989 Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program.

Q Now, at the time that Exhibit 4 was



prepared, it was still the department's position that waste acceptance would commence under the Standard Contract in 1998, correct?

A It was certainly the department's intent, yes.

Q And when you say, "intent," was it not also the department's articulated position?

A It was the department's articulated goal, recognizing the fact that Congress needed to modify the Nuclear Waste Policy Act in order for the department to be successful in meeting that goal.

Q But at least at this time, the department's articulated position was that it was still possible to achieve the 1998 commencement date, correct?

A Assuming that it received appropriate authorization, yes.

Q Now, this document, Exhibit 4, calculates the total system life cycle cost for the program, correct?

A Yes.

Q And you'd agree that the level of total cost depends on, among many other things, the level of



performance under the program, correct?

MR. AVERBACH: Objection; beyond the scope.

THE WITNESS: I don't understand the question.

BY MR. JIMENEZ-EKMAN:

Q Okay. In any given year, if the department accepts more waste in that year, other things equal, the cost for that year is higher, correct?

MR. AVERBACH: Objection; vague and beyond the scope.

THE WITNESS: I don't really understand the question that you're asking.

BY MR. JIMENEZ-EKMAN:

Q Well, does it cost more for the department to run a program with a higher overall acceptance rate than with a lower overall acceptance rate?

MR. AVERBACH: Beyond the scope.

THE WITNESS: The best way for the government to answer that question is that the -- if you look at the financial structure of the program and the setup of the nuclear waste fund, spending less and having a lower acceptance rate will essentially have a



more positive impact on the adequacy of the fee, since near-term dollars would be -- which are typically in the analysis more -- more weighty in the adequacy of the fee as opposed to longer term dollars.

Therefore, lower acceptance rates would have a very positive impact on the adequacy of the fee, because the program would be spaced over a very, very long period of time. So the -- although the acceptance rate is a consideration in the adequacy of the fee, the overall financial structure of the program really dictates how that works. And that is the purpose of this document to really support a fee adequacy analysis.

It would be arguable that the best thing, from a fee adequacy standpoint, would be for the department not to perform until very far in the distant future, because there would be a tremendous growth in the nuclear waste fund, and the amount of resources available would allow it to -- would allow a very high balance in that fund.

I'm explaining my answer to you.

BY MR. JIMENEZ-EKMAN:

41

Q And I think your very thorough answer is far above the very simple thing I was asking but I think assumes what I'm asking. You got to know, in order to analyze total system life cycle costs, what the performance is going to be -- you got to make an estimate of that in every year, correct?
A You have to -- I would agree with that. You have to analyze the cost for the program in a specific year over the life of the program. You have to project what the assumptions are for each of those years.
Q And one of the assumptions that you have to make, because it affects cost, is how much you're going to accept in that particular year, correct?
MR. AVERBACH: Objection; beyond the scope.
THE WITNESS: Yes.
BY MR. JIMENEZ-EKMAN:
Q Okay. Now, by the way, did you look at this document, Exhibit 4, in preparing for your deposition today?
A No.
Q Was that because you looked at it many

42

times in the past?
A Yes.
Q And you're quite familiar with it?
A I would say the government is familiar with the document.
Q Now, if you look at -- the Bates labels are hard to read on this copy. It's Table A-1.
A I have it.
Q What are the purpose of Tables A-1 and tables on the two following pages, A-2 and A-3?
MR. AVERBACH: Objection; beyond the scope.
THE WITNESS: These provided assumptions into the analysis that were considered in the analysis of the total system cost.
BY MR. JIMENEZ-EKMAN:
Q Can you describe the basis on which these tables were prepared? I'll rephrase it.
What was the process used to prepare these tables?
A The cost analyst would go and use the -- use assumptions based typically on the current planning basis of the program. And at this point in

43

time, the planning basis was that an MRS facility would be available in the 1998 time frame, that the acceptance of that facility would be limited to 10,000 tons until the repository was in operation, which was projected to be in 2010, and then the acceptance rate would increase up to a steady state 3,000 metric tons per year level.
Q That's --
A That was Table A-1. Table A-2 was similar. Table A-2 had one repository -- A-1 had one repository. Table A-2 had two repositories, second repository starting in operation in 2038. Table 3 had similar assumptions to Table A-2, and I don't quite understand the difference. Apparently there were differences. I'd have to go and look at this. But it's also a two-repository system, a different variant of it.
Q Tables A-1 through A-3 represent different cases within the overall planning basis of the department at the time Exhibit 4 was prepared?
A They were -- they were analytical cases by the costers at that time for the purposes of looking

44

at long-term adequacy of the fee.
Q And where did the costers get the analytical assumptions that are contained in these tables?
A Talking to other people in the program, getting a sense of what their view was as to when facilities might come on-line, for instance a second repository. Those were, again -- there were no actual planning activities for a second repository at that time. So these were, again, analytical cases for the purposes of determining the adequacy of the fee.
But the simple answer to your question is the cost estimators made judgments, if you will, as to how to bracket what the overall costs of the program might be, and for the purposes of projecting the adequacy of the fee. And in every case, they were consistent with the department's intent to begin operations in 1998 and consistent with the department's approach to not exceed 10,000 tons in the first 10 years related to the restrictions -- the capacity restrictions that still remain today in the Nuclear Waste Policy Act.

45

Q Who was the secretary at the time this document was prepared, Exhibit 4?
A Secretary Watkins, James Watkins.
Q And Secretary Watkins approved Exhibit 4?
MR. AVERBACH: Objection; beyond the scope, lack of foundation.
THE WITNESS: Secretary, to my knowledge, never saw this report.
BY MR. JIMENEZ-EKMAN:
Q What chain of government officials, if any, had to sign off on this report?
MR. AVERBACH: Objection; beyond the scope.
THE WITNESS: It would be the senior management of the Office of Civilian Radioactive Waste Management.
BY MR. JIMENEZ-EKMAN:
Q Do you know who that was at the time?
MR. AVERBACH: Same objection.
THE WITNESS: At that time, assuming that he involved himself, that was John Bartlett.
BY MR. JIMENEZ-EKMAN:
Q Was there anything in Tables A-1 through

46

A-3 of Exhibit 4 that was inconsistent with the department's planning basis at the time this was issued?
MR. AVERBACH: Objection; vague.
THE WITNESS: Since the department had no second repository program, it's difficult to say whether or not it was inconsistent with the program that did not exist. But again, as I indicated, the government did these analyses for the adequacy of the fee. And the assumption at this point was that there would be a second repository program, which Congress terminated in the 1987 amendments.
And the assumption was that at some future time, there would be a second repository program. The cost estimators made judgments about when that program might initiate waste acceptance and the rates that they might have accepted waste and the length of duration of the repository. And they made assumptions about the type of repository and the cost of the repository. These were all, again, for the purposes of cost estimating.
The department had no position as to what

47

the second repository would be, where it would be, what kind of media it would be, how much it would cost or whatever. This was done essentially for the purposes of looking at bands of costs to determine the adequacy of the fee, and there was no departmental policy on many of the assumptions that were made here. They were analytical estimates.
Normally the only reasonable assumptions that were not -- that were near term that the department had indicated an interest in and a position on was initiation of acceptance in 1998 and the availability of the first repository in 2010.
BY MR. JIMENEZ-EKMAN:
Q Nobody in the senior management of the Office of Civilian Radioactive Waste Management took a look at Tables A-1 through A-3 and said that's not a reasonable basis to estimate costs, because it's inconsistent with our planning basis, correct?
MR. AVERBACH: Objection; beyond the scope.
THE WITNESS: That's not consistent with what I said earlier, which was to the extent that the department had no position on a second repository;

48

therefore, these were analytical estimates. To the extent the management of the program felt they were as good an estimate as something else for a second repository, they didn't object to using that as an assumption basis for the purposes of these cost estimates.
But there was no position on the department on a second repository program, since the program was terminated and with the express intent that the secretary would provide a report between January 1, 2007 and January 1, 2010 and the need for a second repository.
BY MR. JIMENEZ-EKMAN:
Q My question was whether anybody at the department objected to the analytical assumptions made in this document to estimate total system life cycle costs.
MR. AVERBACH: I think he answered the question, so I object.
THE WITNESS: To the extent the document was issued, there must not have been an objection.
BY MR. JIMENEZ-EKMAN:

Q You don't know one way or another?
A If there was an objection, the report would not have been issued.
Q So -- you've seen this before, and as far as you know, this is the final version of this document, correct?
A As far as I know, yes.
Q Now, you've -- in your answers, you've talked a number of times about the assumption regarding a second repository and how that had not been developed at all, et cetera. Each of these tables shows the analytical assumption as you've described it of reaching 3,000 MTU performance by Year 15 of performance, correct?
MR. AVERBACH: Objection; the documents speak for themselves.
THE WITNESS: I would say Year 17 of performance -- Year 17, I believe.
BY MR. JIMENEZ-EKMAN:
Q I think you're right. I apologize.
So with that correction, each of them shows -- each of the tables reflecting the analytical



assumptions that went into the cost estimate in Exhibit 4 shows performance at 400 MTUs for the first two years, 900 MTUs, I think I've counted, for the next nine years, five -- I'm sorry -- 1,800 MTUs for the next five years, and then 3,000 after that; correct?
MR. AVERBACH: Same objection.
THE WITNESS: No. My reading of the tables indicate the first two years are at 400, the next 10 years are at 900. Then the next five years are 1,800, and then the Year 17, I believe is -- starts with 3,000.
BY MR. JIMENEZ-EKMAN:
Q Sorry. It's hard to read the small numbers as one gets older. So I'm not trying to mislead you. Obviously, the government's favorite objection is the document speaks for itself.
My point here is, this document doesn't -- I'm sorry -- this document, which was used to estimate total system life cycle cost, does not contain any analytical basis other than that for the first 17 years, correct?



MR. AVERBACH: Objection; vague and mischaracterizes his testimony.
THE WITNESS: It is what it is. The table -- first three tables are consistent for the first 17 years.
BY MR. JIMENEZ-EKMAN:
Q They're consistent for the first 17 years, and these three cases, Tables A-1 through A-3, were the only analytical assumptions used by the government to prepare Exhibit 4, correct? The only analytical assumptions regarding overall system performance, correct?
A Regarding waste acceptance, yes.
Q Okay. There was no other analytical assumption regarding waste acceptance -- overall waste acceptance made in calculating the total system life cycle cost in Exhibit 4, correct?
A Yes.
MR. AVERBACH: Objection; beyond the scope of the 30(b)(6) notice.
MR. JIMENEZ-EKMAN: Move on to Topic 4.
(Discussion off the record.)



(A brief recess was taken.)
THE WITNESS: If I could, just correct the record. The -- in the meeting with the attorneys last week, Mr. Zabransky was there for a short period of time, and I misidentified the other attorney in the room. It was Sonia Orfield, just to amend the record.
BY MR. JIMENEZ-EKMAN:
Q Okay. Thank you for that.
I realized during the break that I forgot to indicate when I moved on to Topic 3. Topic 3 started with the introduction of Exhibit 4. Topic 3 was the -- quote, "The basis for the acceptance rate contained in the 'Preliminary Estimates of the Total-System Cost For The Restructure Program: An Addendum To The May 1999 Analysis Of The Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program'," end quote.
A I believe that was May 1989, not 1999 as you state.
Q Yes. Thank you.
And now I am ready to move on to Topic 4, which is, quote, "the earliest date on which DOE will

53

commence acceptance of SNF under the Standard Contract, including without limitation, DOE announcements that the earliest possible date for waste acceptance is 2017," end quote.
Did I read that correctly, Mr. Kouts?
A Yes.
Q What is the department's current position on the earliest date on which it will accept waste under the Standard Contract?
A Well, the department's baseline for the program is still 2017 at this time. However, the director, in testimony to Congress and as recently as last week, had indicated that with an adjustment to the funding profile that was provided in the President's budget, to essentially flatline the program until a construction authorization is available from the Nuclear Regulatory Commission; that the department is in the process of re-baselining the program.
The director provided his perspective in a press conference last week that that date would be approximately 2020, but the department has not

54

completed its analysis of the re-baselining as of yet.
Q And when you reference to the director, it's the office -- the director of the Office of Civilian Radioactive Waste Management?
A That's correct.
Q Who is the director?
A Edward Sproat.
Q Is it the department's position that the director does not speak for the department? Is that why, in your last answer, you clarified the director's personal view as opposed to the department's view?
MR. AVERBACH: Objection; vague, beyond the scope, calls for a legal conclusion.
THE WITNESS: The director definitely speaks for the department. However, the analytical process to complete the re-baselining of the program has not been completed. He was providing his perspective as to what that re-baselining might be, but the re-baselining has not been completed.
BY MR. JIMENEZ-EKMAN:
Q It's the director's view, however, that the 2017 commencement of waste acceptance is -- I think

55

I'm quoting here -- clearly out the window, correct?
A Yes.
Q Do you know the department's schedule, if anything, for re-baselining the program, as you describe it?
A Yes. It should be completed this summer.
Q Meaning by Labor Day, which is how we measure summer in Chicago? Is that approximately when it's expected?
A Yes.
Q The department filed, in the last month or two, its application for a license to construct a repository with the NRC, correct?
A It submitted its license application last week on June 3rd.
Q Does that license application contain a projected start date or potential start dates for operation of the repository?
A Yes, it does.
Q And what date or dates does it contain?
A March 2017.
Q You described, Mr. Kouts, Congressional

56

action on the department's budgetary request -- correct? -- in one of your prior answers?
MR. AVERBACH: Objection.
BY MR. JIMENEZ-EKMAN:
Q I just want to refer you to your prior testimony. I think you described the Congressional action as flatlining, or perhaps it was presidential action, flatlining the program until construction authorization was received?
A Yes. The funding profile for the program that had been submitted to Congress last year showed much higher budgets in order to meet a 2017 date. Given the realities of the inability of the department to receive those kinds of funds, a decision was made to essentially keep the request consistent with last year as this year and the following year at approximately the $500 million level, but that -- but that approach has implications on the ultimate opening date of the repository, which requires a re-baselining of the program.
Q What activities, if the department had the funds, would continue while the NRC licensing process

proceeds? I should say, that will not as a result of the budgetary issues.
A Activities such as completion of the design and initiation of construction of the nearly 300-mile rail access spur to the site, which is approximately a 2 to $3 billion project. The intent was to have the rail access spur available to support repository construction to assist in the movement of heavy materials, aggregate and other materials that would be needed for repository construction. Those types of activities, as well as additional activities at the site that would be precursors to construction were deferred until after the construction authorization was received.
Q And the construction authorization is subject to challenge by intervenors and interested parties; is that right?
A Yes, it is.
Q And, in fact, they have already filed challenges to that, correct?
A They've sent letters but have not filed motions, if you will, to the department's knowledge,



with the Nuclear Regulatory Commission. And the proceedings will not begin formally until and unless the Nuclear Regulatory Commission completes its acceptance review and dockets the license application.
Q And Nevada has sent letters opposing the docketing of that application, correct?
A Yes.
Q The re-baselining of the program that you've described as going on now, that's happened several times over the history of the program, correct?
A Yes.
Q Originally, as specified in the NWPA, the department intended to commence waste acceptance in 1998, correct?
A Correct.
Q And --
MR. AVERBACH: If you're going to ask more questions about what has happened previously, I'm going to object as beyond the scope.
BY MR. JIMENEZ-EKMAN:
Q I think we can move on to Topic 5, which



is, quote, "The type of casks and any other ancillary equipment DOE would have used to accept SNF from Energy Northwest under the Standard Contract had it commenced performance on January 31st, 1998, including without limitation: (a) the capacity of the cask in number of SNF assemblies; (b) the weight of the cask prior to loading; (c) the approximate weight of the casks when fully loaded with SNF assemblies; and (d) whether the cask closure would have been bolted or welded," end quote.
Did I read that correctly?
A Yes.
Q Other than your conversation with Mr. Zabransky, you didn't -- did you do anything else to prepare specifically for this question?
A No.
Q Did you go back and review any historical documents of the department or anything else?
A No.
Q Did the department ever make any determination regarding the type of casks and ancillary equipment it would have used to accept SNF



from Energy Northwest under the Standard Contract if it had begun performance in 1998?
A No. The department undertook no specific analysis on that subject.
Q And that's -- I just want to make sure that the record is clear. My question was as of 1998, and I want to make sure that your answer was also that that analysis had not been taken as of 1998, correct?
A That's correct.
Q So the DOE did not, as of 1998, make a determination as to the capacity of the casks in number of SNF assemblies it would have used at Energy Northwest, correct?
A As I indicated, it did not undertake any analysis, their projections of the types of casks that could have been available beyond the 10-year period. I mean, there's certainly opportunities to conjecture as to what might be available under that time frame and to the extent that would have a great deal to do on the capabilities of the facility.
But assuming it's a rail facility, and assuming it's a BWR facility, a boiling water reactor

facility, you can make projections as to the types of casks and capacities that could have been servicing that particular reactor. It could at least provide a range as to what it might be.

Q The department did not, in fact, do that, correct?

A No, it did not.

Q I think you indicated the phrase opportunity for conjecture?

A Yeah.

Q That's what it would have been, correct?

A Correct.

Q So as to the weight of the casks prior to loading, it would have been conjecture as to what the department would have used beginning in 1998, correct?

A Well, that's a separate question about what we would have been using in 1998.

Q For Energy Northwest?

A For Energy Northwest, according to the department's evaluation, you were not contained in the first 10 years -- Energy Northwest was not contained in the first 10 years of operation. So you would have



to project what casks might be available in the 2008-and-beyond time frame in terms of what -- what transportation, rail transportation casks might be available. The department -- that was beyond the department's planning horizon, certainly.

Q So the department's never done that?

A It's never done a formal analysis, no.

Q Has it done an informal analysis?

A The -- there is knowledge within the department as to the range, if you will, of casks that might have been available in that time frame for a BWR reactor. But did the department plan on it? No. Was it expecting it? No. But certainly the department's aware of what would be available in the industry and could project about the types of casks that could be used at a reactor, if you were shipping in the 2010 -- 2000-and-beyond time frame.

Q It could have done that, but because it was beyond the planning horizon --

A -- it didn't need to.

Q So it did not, in fact, do it?

A No, it do not.



Q Same answer for the approximate weight of the casks when fully loaded with SNF assemblies? That was never determined by the department prior to 1998, correct?

A That's correct.

Q And never analyzed before 1998, correct

A Other than knowledge of what casks would potentially have been available, no.

Q And whether the cask closure that would have been used at the end starting in 1998, that was also never determined or analyzed by the department prior to 1998, correct?

MR. AVERBACH: I'm sorry. Were you attempting to read or paraphrase Subsection D there?

BY MR. JIMENEZ-EKMAN:

Q Do you understand the question, Mr. Kouts?

A Yes. The department --

MR. AVERBACH: I object on the ground that it's vague.

THE WITNESS: The department's expectations would not be a welded closure. It would be a bolted closure, since the department's view is that it would



be providing transportation casks, and no transportation casks that currently exist are welded, to have welded closures. They all have bolted closures.

BY MR. JIMENEZ-EKMAN:

Q So as you sit here today, the expectation would be that it would be bolted closures?

A That's correct.

Q Was that analysis undertaken prior to 1998?

A There was no analysis, since there weren't any welded casks.

Q What about, sir, the center of gravity of casks? Did the department analyze or determine the nature of the center of gravities of casks that would have been used at EN prior to 1998 if the department had begun performance in 1998?

A No.

Q Same question with respect to the diameter of the casks.

A That's correct. The answer is no.

Q I'm going to read you a statement, sir, and I'm going to ask you whether the department agrees or

disagrees with this. Quote, "DOE has not identified the particular cask that it will use to accept SNF from Energy Northwest. DOE's current efforts are focused upon development of the transportation, aging, and disposable canister system specifications and TAD canisters. DOE has not determined whether these tag designs will be usable at EN."

MR. AVERBACH: I'll object on the ground it's beyond the scope of the deposition notice. I'll also object on the grounds it's a compound question.

THE WITNESS: The department's development of the transportation aging and disposal canisters is intended to service as wide an applicability in the industry as possible. It would be the department's expectation that the TADS that are under development, assuming that there was a rail reactor, that these could be handled and would be utilized at the vast majority of reactors that can handle rail casks. And its program is designed to make sure that that eventuality occurs.

BY MR. JIMENEZ-EKMAN:

Q I'm going to take your counsel's advice and



break it up. I'm going to start with the first sentence. Quote, "DOE has not identified the particular casks that it will use to accept SNF from Energy Northwest," end quote. Agree or disagree?

MR. AVERBACH: Objection.

THE WITNESS: The department needs a time frame.

MR. AVERBACH: Excuse me. Objection; vague, beyond the scope of the deposition notice.

THE WITNESS: I -- the department needs for clarity, if you will, to understand the context of your question.

BY MR. JIMENEZ-EKMAN:

Q Well, the DOE -- let me put it this way. It's correct, isn't it, that the DOE has never identified the particular cask that it will use to accept SNF from Energy Northwest?

A Yes.

Q It's also correct that the department has not determined whether the TAD designs will be usable at EN in particular or not, correct?

MR. AVERBACH: Objection; beyond the scope



of the deposition notice.

THE WITNESS: The department has not undertaken that specific analysis. However, the expectation of the department in the development of the TAD, that would be broadly applicable to all utilities who have rail cask capability.

BY MR. JIMENEZ-EKMAN:

Q But the department has not determined one way or another, specifically with respect to Energy Northwest and its particular facilities and physical plant, whether or not the TAD design will work there, correct?

MR. AVERBACH: Objection; asked and answered.

THE WITNESS: Yes.

BY MR. JIMENEZ-EKMAN:

Q Now, the TAD design is not finalized yet, correct?

MR. AVERBACH: Objection; beyond the scope.

THE WITNESS: Correct.

BY MR. JIMENEZ-EKMAN:

Q In fact, the contract for design was



awarded last month, in May 2008, correct?

MR. AVERBACH: Same objection.

THE WITNESS: There were two contracts awarded.

BY MR. JIMENEZ-EKMAN:

Q When were those contracts awarded?

A I don't have the specific date. They were awarded last month.

Q At this time, the department has issued performance standards, correct?

MR. AVERBACH: Objection; vague and beyond the scope. To the extent we're asking -- you're asking about TADS, I interpose a continuing objection.

THE WITNESS: Performance specifications.

BY MR. JIMENEZ-EKMAN:

Q A performance specification differs from a final design, correct?

A Yes.

Q When is it the department's expectation that the final design for the TAD will be completed?

A Applications for TAD-related technology will be submitted to the Nuclear Regulatory Commission

69

toward the end of next year. At that point in time, the designs would have been mature enough for the NRC to make any judgment as to the safety of them and whether or not they comply with 10 CFR Part 71 and 10 CFR Part 72, along with the equipment associated with it.

Q And at the time that the application is submitted, it then -- the design remains subject to revision based on the result of the NRC proceedings, correct?

MR. AVERBACH: Objection; beyond the scope.

THE WITNESS: Yes.

BY MR. JIMENEZ-EKMAN:

Q Now, is it true that the TAD will likely require additional shielding and have lower capacity than commercially available NPCs?

MR. AVERBACH: Same objection.

THE WITNESS: Lower capacity, yes. Additional shielding, no.

BY MR. JIMENEZ-EKMAN:

Q Is it possible for the department to say, with respect to the casks that it would have used to

70

pick up fuel from EN if it had started in 1998, whether it's more likely than not that the casks would have held between 56 and 68 assemblies?

MR. AVERBACH: Objection; vague.

THE WITNESS: I'd say the estimate would have been anywhere between -- if the department did estimate, would be anywhere between 44 and 68.

BY MR. JIMENEZ-EKMAN:

Q So if -- based on your current knowledge base, the department's current knowledge base, if the department had engaged in that process, that would have been the department's estimate?

A To the extent that a projection was needed, that essentially was the range of casks that were projected to be available in that general time frame, which related to 44 BWRs or up to 68 BWRs.

Q Is it possible to say, in that time frame in 1998, that it is more likely than not that whatever container used would have been cylindrical?

MR. AVERBACH: Objection; vague.

THE WITNESS: Yeah, I would agree.

BY MR. JIMENEZ-EKMAN:

71

Q Is it possible for the department to say whether -- if it had commenced performance under the Standard Contract in 1998, whether the cask used to pick up fuel from Energy Northwest would have been between 177 and 208 inches in diameter?

MR. AVERBACH: Calls for speculation.

THE WITNESS: Without more information as to the specifics of the casks that might be have been available, no, the department would not go that far.

BY MR. JIMENEZ-EKMAN:

Q And would it have -- I'm sorry. Would it have been possible to say -- I apologize, Mr. Kouts. My last question should have referred to the length of the cask as opposed to the diameter. Does that change your answer at all?

MR. AVERBACH: Do you need the question read back?

THE WITNESS: No. That's a general -- those are general lengths. It could be a range. It could be less. It could be more. But, you know, around that range I would say.

BY MR. JIMENEZ-EKMAN:

72

Q Now, I'm going to ask you about diameter. Is it possible for the department to say that it's more likely than not that the cask DOE would have used to pick up spent nuclear fuel from Energy Northwest in 1998 would have had a diameter between 86 and 98 inches?

MR. AVERBACH: Objection; beyond the scope.

THE WITNESS: Again, I answer that the same way I answered the length. Without looking at the specifics of the casks that had the capacities of between 44 and 68 and reviewing them, you know, the department really couldn't say. That also depends on their certificate of certification, if you will, or certificate of compliance within the Nuclear Regulatory Commission and the specific designs of those casks. So to the extent the department had those to review, then they would be able to comment on them.

BY MR. JIMENEZ-EKMAN:

Q Is it possible for the department to say whether it is more likely than not that the cask DOE would have used to pick up spent nuclear fuel, if DOE

had commenced performance in 1998, would have weighed, when loaded, between 208,000 pounds and 277,000 pounds?

MR. AVERBACH: Objection; calls for speculation, lack of foundation.

THE WITNESS: Again, without looking specifically at the certificates of compliance and understanding the specifics of the casks, the department wouldn't speculate. It would probably be in a similar range, but it could be slightly different. I don't know.

BY MR. JIMENEZ-EKMAN:

Q Could have been higher; could have been lower, depending on specifics?

A Correct.

Q And those specifics, because the department did not commence performance in 1998, were never determined, correct?

MR. AVERBACH: Objection; outside the scope.

THE WITNESS: They were never analyzed, that's correct.



BY MR. JIMENEZ-EKMAN:

Q They were never analyzed, and I guess I'm using "determine" as the next step. Because they were never analyzed, they were certainly never determined, correct?

A That's correct.

Q Now, you made a couple of references to the rail cask issue with -- I'm sorry -- a couple of references that the TAD should be usable in a broad swath of plants that can accept rail casks, correct?

A That's correct.

Q Did the department ever make a determination, or has it ever made a determination, about whether it would use a truck or rail cask to accept SNF from Energy Northwest?

MR. AVERBACH: Objection; outside the scope.

THE WITNESS: No, it has not. The department's position would be that the -- they would try to provide the highest capacity cask it had available that could be serviced by that individual reactor in order to minimize the amount of loadings



and also handlings at the repository. So to the extent the department was biased in terms of what it would provide, it would want to provide the highest capacity cask, as well as, probably, the contract holder would like to -- to minimize his operations on the site.

BY MR. JIMENEZ-EKMAN:

Q Understanding that that's the way the department would analyze the issue, in fact, the department never made that determination?

A That's correct.

MR. AVERBACH: I'll interpose an objection, perhaps belatedly. That's beyond the scope of the 30(b)(6) notice.

MR. JIMENEZ-EKMAN: Can we take a quick break?

(A brief recess was taken.)

(Deposition Exhibit No. 5 was marked for identification and attached to the transcript.)

BY MR. JIMENEZ-EKMAN:

Q The court reporter has shown you what's marked as Kouts Rule 30(b)(6) Deposition Exhibit 5.



Have you seen this before, Mr. Kouts?

A No.

Q You see it's titled, quote, "Delivery Commitment Schedule Summary Report, Year 2 Preliminary Draft," end quote. And at the top it reads, quote, "Civilian Radioactive Waste Management System Management and Operating Contractor," end quote.

Did I read those correctly?

A There were no quotes, but, yes.

Q The quotes are for the court reporter.

A Yes, you did.

Q Have you ever seen any final reports that related to the Delivery Commitment Schedule Summary Report for Year 2?

A The department never prepared one.

Q So this is a contractor document?

A That's correct.

Q If you turn to page 15, please, you see under 3.1, shipping mode and cask design?

A Yes.

Q Understanding the department did not prepare this and that you haven't seen it, I'm just

going to ask you whether you agree or disagree with the -- some of the statements in this first paragraph here. Quote --

MR. AVERBACH: Before you do that, if you're going to do it, I would object. Each of those statements are going to be beyond the scope of the 30(b)(6) notice.

BY MR. JIMENEZ-EKMAN:

Q Quote, "The first generic issue is the inability to determine the exact shipping mode and cask design most appropriate for each site," end quote.

Now, I'm drawing your attention to this sentence. You haven't seen this before. Feel free to read whatever else in the exhibit you want, to get context here.

MR. AVERBACH: I'll object -- object on lack of foundation.

BY MR. JIMENEZ-EKMAN:

Q Let me put it this way.

MR. AVERBACH: Calls for speculation.

BY MR. JIMENEZ-EKMAN:



Q Does the department agree that in arriving at a shipping mode and cask design, that a generic issue is the inability to determine the exact shipping mode and cask design most appropriate for each site?

MR. AVERBACH: Objection; lack of foundation, calls for speculation.

THE WITNESS: Can you read the question back.

(The record was read by the reporter.)

MR. AVERBACH: The question is also vague.

THE WITNESS: No.

BY MR. JIMENEZ-EKMAN:

Q So the department's position is that it's possible to determine the exact shipping mode and cask design most appropriate for each site?

MR. AVERBACH: Objection; vague.

THE WITNESS: At the appropriate point in the planning process, the department's view is that there would be enough information to determine shipping mode and general cask design most appropriate for each site in working through the planning process with the contract holders.



BY MR. JIMENEZ-EKMAN:

Q That has not happened yet, correct?

MR. AVERBACH: Is your question confined to your client?

If you're not going to answer me, I'll object, it's vague.

THE WITNESS: You have to be time-specific associated with that statement.

BY MR. JIMENEZ-EKMAN:

Q Okay. As of today, has that process occurred?

MR. AVERBACH: Objection; vague, beyond the scope.

THE WITNESS: The process was initiated two times by the department, and information was provided to the department based on the responses to the DCSs.

BY MR. JIMENEZ-EKMAN:

Q Has the department made determinations as a result of the initiation of those processes?

MR. AVERBACH: Objection; vague. Objection; outside the scope.

THE WITNESS: What determinations?



BY MR. JIMENEZ-EKMAN:

Q Well, about the exact shipping mode and cask design most appropriate for each site. That's what we've been talking about here.

A To the extent at the time the planning process was underway, the department was looking at determining the exact shipping mode and cask design most appropriate for each site based on the planning process. The department is not involved in the planning process at this point.

Q And I guess what I'm asking is: Did those processes reach a conclusion so that a determination was made with respect to each site?

MR. AVERBACH: Same objection; asked and answered.

THE WITNESS: At a determination, no. But information I believe was available to the extent that the department had information as to general shipping mode and cask design associated with various sites that were in the first planning area, if you will.

BY MR. JIMENEZ-EKMAN:

Q Now, if you look lower down on the page,

Mr. Kouts, this is actually -- I'm going to ask you about the carryover sentence from pages 15 to 16, which is, quote, "The exact equipment required at a site cannot be determined until the specific cask system to be utilized has been selected," end quote.
Does the department agree or disagree with that?
MR. AVERBACH: Objection; vague, lack of foundation, outside the scope.
THE WITNESS: I agree with that.
BY MR. JIMENEZ-EKMAN:
Q Move on to Topic 8. Topics 6 and 7 were withdrawn. Topic 8 is "The 1987 Nuclear Waste Policy Amendments Act and its effect on the civilian radioactive waste management program, including without limitation the (a) effect on DOE's plans to site, license, construct geological repository, and (b) effect on DOE's plans to site, license, construct a monitored retrievable storage facility", end quote.
Did I read that one right?
A Yes.
Q Was it the department that made or



initiated the proposal to Congress in 1987 that it be allowed to construct an MRS?
MR. AVERBACH: Objection. Can you repeat that question?
(The record was read by the reporter.)
MR. AVERBACH: I'll let you answer the question. Go ahead.
Objection; it's outside the scope.
You can answer the question, however.
THE WITNESS: Section 141 of the Nuclear Waste Policy Act directed the department to submit a proposal on a monitored retrievable storage facility. So the department submitted the proposal in compliance with Congressional direction.
BY MR. JIMENEZ-EKMAN:
Q Prior to the 1987 amendments, the act did not permit the department to construct an MRS, correct?
MR. AVERBACH: Objection; calls for legal conclusion, outside the scope.
THE WITNESS: The facility was not authorized until the 1987 amendments were passed or



enacted, yes.
BY MR. JIMENEZ-EKMAN:
Q So prior to 1987, the department had no authority to proceed with an MRS, correct?
MR. AVERBACH: Same objection.
THE WITNESS: Correct. The only authority it had was to send a proposal to Congress regarding it.
BY MR. JIMENEZ-EKMAN:
Q Now, at the time that the department submitted the proposal in 1987, the department's planning basis was to commence waste acceptance until -- I'm sorry -- the department's planning basis was to have the repository available starting in 2003, correct?
MR. AVERBACH: Objection; outside the scope.
THE WITNESS: At the time the MRS proposal was submitted to Congress, the planning basis for the first repository was 2003, that's correct.
BY MR. JIMENEZ-EKMAN:
Q And the proposal that -- the MRS proposal,



I should say, that the department submitted to Congress seeking authority to proceed with an MRS was for an MRS with a 15,000 MTU capacity, correct?
A Capacity limited to 15,000 metric tons, yes.
Q And the capacity limit would -- I'm sorry. Start again.
And that that capacity would be available from 1998 to 2003, correct?
MR. AVERBACH: Objection; vague.
THE WITNESS: That capacity limit would be available throughout the life of the facility.
BY MR. JIMENEZ-EKMAN:
Q The proposal that the department made contemplated, at that point, however, that the repository would be operational in 2003, correct?
MR. AVERBACH: Objection; outside the scope.
THE WITNESS: Yes.
BY MR. JIMENEZ-EKMAN:
Q And at that point, it was the department's intention to use the MRS to commence waste acceptance

in 1998 to get to the 2003 date that the repository would be available, correct?

MR. AVERBACH: Same objection.

THE WITNESS: It was certainly the department's intent to have the MRS available in the 1998 time frame to begin waste acceptance. But the MRS facility, as envisioned by the department and as presented in the proposal to Congress, indicated it was an integral part of the overall system, which was doing packaging for the repository. So the MRS life span was to service throughout the life of the first repository in that packaging capability.

What I'm trying to impart to you, that the facility was designed more than just to deal with the first five years until the repository was available. It was an integral part of the system, and it basically, at least the vision at that time, was for the facility to consolidate fuel, to put it in disposal-ready canisters to ship to the repositories so the service of the repository was minimized.

So the operation of the facility was key to the operation of the repository.



BY MR. JIMENEZ-EKMAN:

Q At the time it submitted its proposal that resulted in the 1987 amendments, was it the department's planning basis to use the entire 15,000 MTUs of capacity between 1998 and 2003?

MR. AVERBACH: Outside the scope. I also object to the characterization.

THE WITNESS: No, it was not.

BY MR. JIMENEZ-EKMAN:

Q Did the department have any planning basis as to how much capacity the MRS, if approved at 15,000 MTUs -- I'll start over. I'm sorry.

Did the department have a planning basis as to how much of the MRS's requested 15,000 MTU capacity would be used over the first five years of waste acceptance?

MR. AVERBACH: Objection; vague and outside the scope.

THE WITNESS: I believe there were a variety of documents that the department issued around that time that indicated the acceptance rate of the MRS for those first five years, yes.



BY MR. JIMENEZ-EKMAN:

Q What was that acceptance rate?

A I don't recall. I'd have to review those documents.

Q But it's your recollection, as you sit here, that it was less than the entire 15,000 MTU capacity?

A There were ramp-up rates for the MRS that did not -- that certainly would not have allowed it to have taken 15,000 metric tons in the first five years.

Q Did those ramp-up rates reach a -- I guess we can't call it steady state, because it's not long enough. Did they reach the highest level of 3,000 MTU per year?

A I believe at the end of that time period -- the end of the five years, it did. The ramp-up rates typically were about five years -- four to five years to get up to the 3,000 metric tons per year capability.

Q Ultimately, Congress passed the 1987 Amendments Act, correct?

A Yes.



Q The authorization the department received was only for a 10,000 MRS -- I'm sorry -- 10,000 MTU MRS, correct?

A No.

Q Right. What was the capacity of the MRS that Congress authorized in the 1987 Amendments Act?

MR. AVERBACH: Objection; calls for a legal conclusion.

THE WITNESS: The capacity MRS was not to exceed -- 10,000 metric tons until the first repository was operational and no more than 15,000 tons in total at any time.

BY MR. JIMENEZ-EKMAN:

Q How, if at all, did the department change its plans to site, construct, and license a repository in an MRS after Congress passed the 1987 amendments?

A What time frame are you referring to?

Q From the time immediately after the 1987 amendments were passed for the next, say, year or two.

A For the first year or two after it, the department determined it wasn't going to pursue an MRS based on the -- based on the schedule limitations and

89

the schedule conditions that were contained in the act. Subsequent to that, in the 1988-'89 time frame, Secretary Watkins basically indicated that the department would seek to have the schedule restrictions removed so that the MRS could be available in the 1998 time frame, in compliance with the direction of Congress and in -- consistent with the signed contracts with utilities.
Q Now, you referred to them as schedule restrictions?
A Schedule conditions.
Q Schedule conditions.
One of them limited the capacity to 10,000 tons until the repository was operational?
A That was not a schedule condition.
Q What were the scheduling conditions that you described?
A The scheduling condition was that the MRS could not begin construction until a construction authorization was received for the first repository.
Q And as we sit here today, no such construction authorization has been received, correct?

90

A That's correct.
Q Does -- recognizing, Mr. Kouts, that the NRC process we talked about has a number of contingencies in it, does the department have a planning basis for how long the process of obtaining construction authorization for a repository will take?
MR. AVERBACH: Objection as to time frame, vague.
THE WITNESS: The Nuclear Waste Policy Act, I believe Section 114, indicates that the Nuclear Regulatory Commission has three years to reach a decision from the time of submission of a license application, and it can request an additional year if it comes to Congress and provides a rationale for that.
BY MR. JIMENEZ-EKMAN:
Q And that's the department's planning basis?
A That's the department's planning basis.
Q You indicated in your last answer that Secretary Watkins determined that he would attempt to persuade Congress to remove or modify some of the schedule conditions?

91

A That's correct.
Q Did the Secretary or the department ever propose legislation that would have altered the schedule conditions?
A The department has indicated in its documents that that was to be proposed as part of the President's nuclear -- or energy strategy, I believe, in the 1990 time frame. So the department did pursue that through the legislative package that was provided to the administration on energy issues.
MR. JIMENEZ-EKMAN: Can I have that back.
(The record was read by the reporter.)
BY MR. JIMENEZ-EKMAN:
Q Do you know whether a draft bill or amendment was actually drafted and submitted to the President?
A I can only refer to the fact that the department expressed its intent that it was going to provide that. I do not have a copy of that or whatever the department did provide.
Q Well, putting aside whether you have one here today, do you know whether it actually happened

92

as opposed from the department expressing its intent to do it?
A The -- I believe the document I'm referring to is the Secretary's 1989 Reassessment Report in which it's clearly stated that it would be provided as part of the President's energy package. And my expectation was that everything in that -- in that document was followed through on by the department. But I do not have the specific document that might have been submitted to the administration for consideration.
Q So your expectation, based on your understanding of the practices of the department, is that something was proposed. But as you sit here, you don't know whether, in fact, something was proposed, correct?
A My expectation was something was proposed. As to how it was addressed by the administration, that's a separate issue.
Q And you don't know, as you sit here, whether, in fact, something was proposed?
A No, I do not. But my expectation would be

that it was.
Q And you don't know what, if anything, the President did once the proposal that you expected was made was given to him, correct?
A That's correct.
Q Did you do anything to investigate that before you came to your deposition today?
A No, I did not.
Q I guess, do you have any knowledge, other than the 1989 document, indicating that a proposal was to be made to the President to be included as part of the President's energy package? Do you have any knowledge, other than that, with respect to what, if anything, happened with the Secretary's desire to have the schedule conditions modified?
A No, I do not.
Q Is there someone who is still with the department who would know more about that?
A I have no idea.
Q We'll move on to Topic 10, which also has the virtue of being the last topic.
Topic 10 is quote, "Efforts to site a



Monitored Retrievable Storage facility between 1989 and 1995, including without limitation, the efforts of the Nuclear Waste Negotiator to site a Monitored Retrievable Storage facility," end quote.
After the 1987 amendments were passed, did the department undertake any independent effort to site an MRS?
A What time frame --
MR. AVERBACH: Objection; vague.
THE WITNESS: -- are you referring to?
BY MR. JIMENEZ-EKMAN:
Q Any time after 1987.
A Most of the department's efforts were focused through the office of the nuclear waste negotiator as directed by Secretary Watkins in the 1989 Reassessment Report of the program. So those were the primary efforts of the department.
Q Do you know whether any effort was made by the department independent of the negotiator to site a facility?
A Well, in point of fact, after the second negotiator stepped down, Secretary O'Leary was



actually the acting nuclear waste negotiator. So to the extent that she provided guidance in that regard -- and I believe there were still some residual grant activities going on, since that office -- the negotiator's office had not sunset it at that time, there were -- through the offices of the Secretary, there were still some efforts, since she was the acting negotiator.
Q So other than however the fact that the Secretary at that point was wearing two hats, one of the secretary and one of the negotiator, there were no independent efforts by the department, independent from the hat of the negotiator, to site a facility, correct?
A After the sunsetting of the negotiator's office, there were still contacts with many of the -- with several of the interested parties who had been working with the office of negotiator. But beyond those informal contacts with certain of those interested parties, if you will, the department essentially did not initiate anything further.
Q You've used the term sunsetting. You're



being colloquial for lapsing of the authority of the negotiator?
A That's correct.
Q When did the authority of the negotiator lapse under the 1987 amendments?
A I believe it was the seven-year sunset. So it was in 1994.
Q And other than the time period that you've described where Secretary O'Leary was the secretary and the acting negotiator, during the existence of the authority, between 1987 and 1994 of the negotiator, the department did not undertake any independent efforts to site a facility, correct?
A That's correct.
Q The -- can you tell me who were the negotiators and what time periods they served?
A The first negotiator was David Leroy, and he served, I believe, until the '92-'93 time frame. I believe --
Q When was Mr. Leroy appointed?
A It was, I believe, in the 1990 time frame. That's my best recollection.

Q Okay.
A Then after he stepped down, there was another -- I believe his last name was Stallings; I don't remember his first name. And he stayed for a period of time and then left. And then for the residual amount of time the negotiator's office was in existence, it was the -- on an acting basis, it was Secretary O'Leary.
Q Do you recall whether Mr. Stallings was -- vacated the office in approximately February of 1995?
A I don't recall specifically.
Q What, if any, involvement -- again, putting aside the two-hat scenario, but what, if any, involvement did the department or its agents have in the activities of the negotiator?
A Well, the department administered a grant program for the negotiator. It was a multiphased program. Phase 1, which were initially feasibility grants, I believe there were 20 of those that were issued by the department. Then there were Phase 2-A grants, which I believe there were four of those, which they were, I believe, about $200,000 each.



And then there were the Phase 2-B grants, where there were two very interested parties who wanted to sign those and pursue, but Congress cut off the funding. Those grants were in the order of 2- to $3 million. But those -- Congress cut off that process through the budgetary process.
Q Did the department provide any additional support or have any additional involvement in the activities of the negotiator?
A Yes, it did. It provided staff to go out and brief interested parties on what an MRS would look like. There were substantial design efforts underway to look at different designs of a facility that might be more acceptable, if you will, to an individual host site.
Our people spent a lot of time working directly with the office to try to give them every -- office of negotiator give them every information -- every bit of information we could in order to facilitate the siting process. So there were considerable staff and monetary resources that were allocated for that process.



Environmental analyses were done of sites, preliminary environmental analyses, those kinds of things, and essentially the facility could be sited anywhere. That's what those environmental analyses demonstrated.
Q Ultimately, the nuclear waste negotiator was not successful in siting an MRS, correct?
A That's correct.
Q Did the negotiator ever identify any voluntary hosts that were willing to permit construction after MRS?
A Absolutely.
Q When you say absolutely, who did the negotiator identify that was willing to host an MRS?
A The -- there were many sites that wanted to host the facility and wanted the construction. The issue was the buy-in of the political leadership of that state, particularly the governor. And in every case, when it was elevated to the governor, the governor said no.
But the simple answer to your question is there were many local governments, as there are today,



who would be willing to host a facility. It's the political structure of the state that typically intervenes and is very difficult to overcome, as history has shown.
Q Focusing on the 1991 time period, the negotiator hadn't identified any municipality where the governor of the state had also indicated a willingness to host the MRS, correct?
A In that time frame, there were several governors who had not said no.
Q Who were those?
A I believe there were State of Utah, State of Wyoming, State of New Mexico. Primarily, there were several of those where Indian tribes were very much interested in hosting the facility. The Mescalero Apaches in New Mexico. The Goshute tribe in Utah, which right now is still considering to have private fuel storage on their site.
It was a private venture in Wyoming. I don't remember the specific locality, but the interactions with the governor's level essentially wanted to allow the studies to be completed,

feasibility studies, if you will, and additional work before they took a policy position in that time frame that you suggested.

Q In 1991?

A That's correct.

Q When was it, Mr. Kouts, that the last of the states said no way?

MR. AVERBACH: The states he just identified?

BY MR. JIMENEZ-EKMAN:

Q Or of any potential state.

A The process didn't really end until the Senate -- specifically there were -- the Congress cut off the funding for the follow-on grants to do substantial additional work to determine the acceptance of it. I believe -- I believe there was a strong indication that the State of Wyoming -- the governor of the State of Wyoming had a very negative attitude on the facility. But I don't believe the State of Utah or the State of New Mexico, at least at the governor's level, had weighed in, because it hadn't gotten to their level.



With the cutoff of the funding, the follow-on funding, that essentially terminated those projects.

Q So the processes terminated before the governors expressed a final view in those instances?

A I believe that was the case, yes, except in the case of Wyoming where there was a very strong view offered by the governor.

Q And do you recall when the funding was terminated by Congress?

A I believe it was in the '93-'94 time frame. I have to go back and look, but it was in that general time frame.

Q Let me ask you now about Indian tribes which you mentioned. Did any of the Indian tribes go beyond the initial grant stage with the negotiator?

A Yes.

Q Which ones?

A It was the Mescalero Apaches and Goshute tribe in Utah. They went to the Phase 2-B stage, and they were also in the Phase 2-A stage. And there were two other projects, but I don't recall specifically



what they were. I know there were four grants issued in the Phase 2-A stage, two of which were the Indian tribes I mentioned earlier.

Q And two of which were the states?

A They were, I think, private -- more private ventures, not Indian tribes.

(Deposition Exhibit No. 6 was marked for identification and attached to the transcript.)

BY MR. JIMENEZ-EKMAN:

Q I know you've seen Exhibit 6 before.

A Yes, I have.

Q I know, because it was used in the Dairyland deposition.

A Yes, it was.

Q And Exhibit 6 is a December 17th, 1992 letter from James D. Watkins, the Secretary of Energy at that time to the chairman of the Committee on Energy and Natural Resources, correct?

A That's correct.

Q Exhibit 6 reflects the position of the department as articulated by the secretary at the time it was sent, correct?



A Well, it represents a new strategy that the secretary would like to pursue or believes the department should pursue. And this was at the end of his tenure as energy secretary, and it was in response to a letter from Senator Johnston that was dated December 10, 1992. So it was a proposed strategy, if you will, by the outgoing Secretary of Energy how to bring about waste acceptance in 1998.

Q When did Mr. Watkins -- when did his tenure end?

A I believe it ended the next month with the seating of the new administration.

Q And at least at the time, Mr. Watkins still spoke for the department, correct?

A Yes, he did.

Q And recognizing that certain aspects of the letter are proposing a new strategy, the factual positions articulated by the secretary in this letter are the factual positions of the department, correct?

MR. AVERBACH: I'll object to the extent any of the factual positions expressed in this letter are beyond any of the subject matters contained in the

30(b)(6) notice. I also object on the ground it's compound. There are numerous positions set forth here.

THE WITNESS: Certainly provided the department's view of the secretary at that time but recognizing that the new administration came in and did not necessarily agree with the view of the outgoing secretary. But it certainly represented it at the time.

BY MR. JIMENEZ-EKMAN:

Q It certainly represented the -- at that time, the department's view, correct?

A Yes, it did.

Q If you look on page 2 under "MRS facility and siting," the second sentence says, "that office," meaning the negotiator, "has not been able to identify a viable candidate site that can be recommended to Congress by June 1993 and that will permit spent fuel received by January 1998 as planned."

MR. AVERBACH: I'm not sure he was with you. I think he was looking on page 2.

THE WITNESS: When you say page 2, I was



looking -- which page 2 are you referring to? This one?

MR. JIMENEZ-EKMAN: The second page. I'm sorry. When it's double-sided -- it's the new policy to save paper, and I think, not so coincidentally, money.

MR. AVERBACH: Where was your sentence?

THE WITNESS: It was -- I found it here in the first paragraph, if you will, of the -- under "MRS facility and siting."

BY MR. JIMENEZ-EKMAN:

Q At the time that was made, that was a true statement that represented the position of the department, correct?

A Certainly represented the position of the secretary.

Q Didn't it also represent the position of the department?

A Secretary speaks for the department. Yes, it does.

Q By transit of properties, Mr. Kouts -- I think that's what it's called -- that represents the



position of the department at the time, correct?

A Yes.

Q And you also indicated that Secretary Watkins, at that time, was proposing a new strategy, which I'll paraphrase here -- but correct me if any particulars -- if I got it wrong -- that essentially involved moving away from the use of an MRS and proposed instead intra-storage at individual utility sites in a standardized container; is that right?

A Not exactly.

Q Can you articulate what you understood the new strategy to be was?

A I believe the secretary's indicating looked at -- that the department had looked at potential alternative actions. But the -- I think the most interesting one was storage facility for spent nuclear fuel at any federal government site or sites should be made available for use by January 1998, and the fact that the department wanted to go a different path, if you will, and try to identify federal sites or candidate federal sites as opposed to go through the office of negotiator.



The standardized container system was, I think, less of a highlight on the siting issue, which is, I believe, the subject of this deposition question. So that was the -- his new approach is to identify federal sites and develop a generic schedule and see if we can move spent fuel. If we would have moved spent fuel to federal sites, by -- for Congress to make a selection of a site, if you will, by the end of 1993.

Q I guess that's what I get if I ask you to characterize a document.

There are a number of proposals in here, correct?

A That's correct.

Q And one of them is to pursue storage on existing federal sites, correct?

A Yes.

Q And another one is to develop a standardized container system that would permit storage at existing utility sites, correct?

A Yes.

MR. AVERBACH: I object to this line as

because it would have essentially had a great deal to do with appropriations of funds over a long period of time.
MR. AVERBACH: Nothing in addition to those questions.
FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIF
BY MR. JIMENEZ-EKMAN:
Q The strategy, Mr. Kouts, that you've described as having been concluded by the department -- determined by the department to be the best strategy for approaching Congress, was that adopted by the secretary at the time?
A The secretary was certainly aware of it, yes. He was supportive of it, yes.
Q And is that the strategy that's described in the 1989 document that you're -- that you referred to earlier as your source of knowledge regarding any legislative proposals?
A Not specifically. The document basically indicates that -- I would have to review it. My recollection is that the document indicated that the department's efforts to site an MRS in Tennessee were



unsuccessful and believed that usage of the office of the negotiator was a greater path to success or the best path for success at that time. So that's why the department redirected its efforts to focus on supporting the negotiator, as I testified earlier.
Q I guess I'm trying to -- did -- as I understood your prior testimony, it was that a proposal was intended to be included in the 1990 President's energy package for modification of the scheduling conditions you've described, correct?
A Correct.
Q And you don't know what, if anything, was contained in that proposal or whether it ultimately was, in fact, made, correct?
A Correct.
Q Now, I'm understanding your testimony to be that the department determined that it would be best to wait to make any Congressional proposal until after it had obtained an agreement with a willing host?
A Let me clarify my position. As we moved forward with the fact there was not expected action by Congress, absent a -- absent any specific agreement



for a host or identification of a host state, the strategy evolved, if you will.
Initially, it was to submit it directly to Congress. Then it evolved to working with a negotiator and to include it in the package that the negotiator would submit to Congress for approval, assuming that he found a willing host state. So I think that the -- the approach evolved as we moved forward.
Q Okay. When -- when did -- well, I assume you had some discussions with counsel during the break, correct?
A Not really. The only conversation I had is that counsel wanted to ask me a few questions, and that's the only -- that was the substance of it.
Q And I didn't intend to invade the attorney-client privilege. Don't tell me what the substance of your conversations were. I guess, when did the strategy evolution you described occur?
A It was probably in the '90-'92 time frame, as we were going forward and working with the negotiator, that since the -- the agreement and the



strategy was for the agreement, assuming there was one developed, had to be approved by the Congress, that that was the best vehicle, if you will, for Congress also to address removal of the schedule linkages.
Q So that strategy evolution you said occurred in the '92 to '93 time frame?
A I would say probably '91-'92 time frame. That's my recollection. It was fairly common knowledge known within the program that the strategy was to focus on a negotiated agreement to be approved by Congress that would address the linkages. At the time that the secretary's report was done in 1989, the initial thoughts were, we'll just submit some kind of legislation to Congress to address it.
But again, it evolved as we moved forward and it felt that that was probably the negotiator's agreement, assuming that one was agreed to, that that was the best vehicle, if you will, to get those linkages addressed, since you would have had a specific site. You would have had a monetary deal, negotiated, if you will. You would have had approval of the governor. And at that point in time, the

117

department would also -- and that agreement would also
request that the schedule linkages be removed.
Q And there's something about the testimony you've just given, more anything that you discussed with counsel or thought about during the break or anything, does that then refresh your recollection that no proposal was included as part of the government's 1990 energy package, or you are just saying you still don't know what, if anything, happened to that?
A I still have no recollection about that. I have testified in many trials and in depositions that the department strategy to obtain removal of linkages was through a negotiated agreement with the negotiator. I think if you go back and review my transcripts, you'll see I stated this in court on several occasions and in numerous depositions.
Q I understand that. I'm trying to focus on the specific question of what, if anything, was ultimately submitted to Congress.
A Again, I stand by my previous testimony.
Q So this doesn't change that you're not

118

sure --
A No.
Q -- whether or not --
A That's correct.
Q Let me get the whole question out.
You're not sure whether or not the expectation expressed in the 1989 report that you've described was ultimately fulfilled either with a submission to the President or from the President to Congress, correct?
A That's correct.
Q And you describe the evolution, I think, somewhere between '91, '92, maybe '93; you're not sure? It's an evolution, right? So it occurs over a period of time?
A I believe it was -- it was early on in the process with the negotiator, which would probably be in the '91-'92 time frame. That's the best of my recollection, yes.
Q And was this change in strategy -- do you recall whether it was memorialized in any documents?
A I can't recall specifically, but I believe

119

it was. I just don't know what specific documents it might be in there.
MR. AVERBACH: Let's go off the record.
(Discussion off the record.)
(A brief recess was taken.)
(The record was read by the reporter.)
MR. JIMENEZ-EKMAN: We've been off the record for a while, and there's been some colloquy -- some friendly colloquy by counsel attempting to address our position regarding the adequacy of the answers given on this topic. An offer has been made to have something faxed over here, but unfortunately, everybody at the Department of Justice is out to lunch.
Please note the laughter. This was not a -- it was not intended as an insult.
As a result of that, we haven't resolved this issue, and we've agreed, I guess, to disagree and potentially take it up and resolve it later. But other than -- and so for that reason, I'm not closing the Rule 30(b)(6) deposition. And I note it's 13 after noon at this point.

120

Do you reserve signature?
MR. AVERBACH: Yes.

(Whereupon, the signature not having been waived, the deposition concluded at 12:13 p.m.)

* * *

ACKNOWLEDGMENT OF DEPONENT

I, Christopher A. Kouts, do hereby acknowledge I have read and examined the foregoing pages of testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any changes and/or corrections, if any, appear in the attached errata sheet signed by me.

_____ ___________________________________

Date Christopher A. Kouts