**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# ENERGY NORTHWEST'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

---

NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, D.C. 20001
(202) 639-6000

July 18, 2008

*Attorneys for Plaintiff*

# Table Of Contents


Table Of Contents ..... ii

Table Of Authorities ..... iv

Introduction ..... 1

Statement of Facts ..... 2

I. Background Regarding Energy Northwest And Columbia Generating Station. ..... 2

A. Energy Northwest. ..... 2

B. Columbia Generating Station. ..... 2

1. The Electricity Generation Process. ..... 3

2. Temporary Storage Of Spent Nuclear Fuel At Columbia. ..... 4

3. Full Core Discharge Capability. ..... 6

II. Background Of The Nuclear Waste Policy Act And The Standard Contract. ..... 7

A. The NWPA Was Enacted To Fulfill A Longstanding Federal Obligation To Dispose Of The By-Products Of Commercial Nuclear Power. ..... 7

B. Development And Execution Of The Standard Contract. ..... 9

C. The Parties' Understanding At The Time Of Contracting Was That DOE Would Accept Fuel At A Rate That Would Preclude The Need For Additional Storage After January 1998 And Reduce The Backlog Of Accumulated SNF. ..... 11

III. DOE's Announcement of Delays And Eventual Breach. ..... 14

A. DOE's Initial Delay Announcement And The Nuclear Waste Policy Amendments Act Of 1987. ..... 14

B. DOE Announces Further Delays. ..... 16

C. DOE Publishes Lower Acceptance Rates. ..... 16

D. Any Hope Of DOE Performance Vanishes. ..... 17

E. DOE Publishes The "Lower" 900 Ton Rate To Limit Its Liability. ..... 18

IV. EN's Response To DOE's Delays. ..... 20

A. EN's Early Planning Activities. ..... 20

B. After DOE's Default Becomes Certain, EN Carefully Evaluates Its SNF Storage Options. ..... 21

C. EN Pursues Dry Cask Storage And Re-Evaluates Its Options. ..... 23

D. EN Implements Dry Cask Storage. ..... 24

Statement of Issues and Fact and Law ..... 26

V. Applicable Legal Principles. ..... 26

A. EN's Burden of Proof For Its Mitigation Damages. .......... 26

B. The Government's Burden of Proof. .......... 27

VI. At Trial, EN Will Establish Foreseeability, Causation, And The Reasonable Certainty Of Its Damages. .......... 29

A. EN's Need To Add Additional Storage Is A Foreseeable Result Of DOE's Failure To Perform. .......... 29

B. DOE's Breach Of Contract Is The Substantial Cause Of EN's Need To Implement Dry Cask Storage. .......... 30

C. EN Can Establish With Reasonable Certainty It Has Incurred $56,859,341 In Damages Through August 31, 2006. .......... 33

VII. Remaining Issues of Fact And Law. .......... 34

A. The Court Should Use The 3,000 Ton Acceptance Rate To Adjudicate EN's Damages. .......... 35

B. The Government Cannot Show That EN's Decision To Implement Dry Cask Storage Is Unreasonable. .......... 40

C. The Government Is Not Entitled To Offsets For The Speculative Cost of Cask Loading And Plant Modifications EN Will Still Incur When DOE Eventually Performs. .......... 43

D. EN Should Recover The Costs Of Employee Time Spent On The ISFSI. .......... 46

E. EN Is Entitled To Recover Internal Services Charges Associated With The Dry Cask Storage Project. .......... 48

F. EN Is Entitled To Recover Financing Costs Associated With Dry Cask Storage. .......... 49

Conclusion .......... 50

# Table Of Authorities

## CASES

*Ace-Fed. Reporters, Inc. v. Barram*, 226 F.3d 1329 (Fed. Cir. 2000) ........................................ 28

*Am. Capital Corp. v. Fed. Deposit Ins. Corp.*, 472 F.3d 859 (Fed. Cir. 2006) ........................... 27

*Anchor Sav. Bank, F.S.B. v. United States*, 81 Fed. Cl. 1 (2008) ............................................... 26

*Bigelow v. RKO Radio Pictures*, 327 U.S. 251 (1946) ............................................................ 28

*Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348 (Fed. Cir. 2001) .................. 27, 28

*Boston Edison Co. v. United States*, 80 Fed. Cl. 468 (2008) ...................................................... 11

*Carolina Power & Light Co. v. United States*, 82 Fed. Cl. 23 (2008)................................. passim

*Centex Corp. v. United States*, 55 Fed. Cl. 381 (2003)........................................................... 50

*Chain Belt Co. v. United States*, 115 F. Supp. 701 (Ct. Cl. 1953)....................................... 27, 49

*Citizens Fed. Bank v. United States*, 66 Fed. Cl. 179 (2005), *aff'd*, 474 F.3d 1314 (Fed. Cir. 2007)........................................................................................................ 29, 43

*Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652 (2003)............................. 37, 39, 40

*Consumers Energy Co. v. United States*, 65 Fed. Cl. 364 (2005)......................................... 37, 40

*Convay Co. v. Sperry Rand Corp.*, 672 F.2d 781 (9th Cir. 1982) .............................................. 47

*David Nassif Assocs. v. United States*, 557 F.2d 249 (Ct. Cl. 1977) ("*Nassif I*")........................ 36

*David Nassif Assocs. v. United States*, 644 F.2d 4 (Ct. Cl. 1981) ("*Nassif II*") .......................... 36

*Dep't of Water & Power v. United States*, 131 F. Supp. 329 (S.D. Cal. 1955)........................... 49

*Dunn Appraisal Co. v. Honeywell Info. Sys. Inc.*, 687 F.2d 877 (6th Cir. 1982) ........................ 47

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002)............................... 27, 28

*Energy Northwest v. United States*, 69 Fed. Cl. 500 (2006).................................................. 1, 39

*Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336 (2005) ................................ 40

*Entergy Nuclear Indian Point 2, LLC v. United States*, 64 Fed. Cl. 515 (2005).......................... 40

*Eureka Inv. Corp. v. Chi. Title Ins. Co.*, 743 F.2d 932 (D.C. Cir. 1984)..................................... 28

*Fla. Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239 (4th Cir. 1987)............... 7, 8

*Franconia Assocs. v. United States*, 61 Fed. Cl. 718 (2004) ...................................................... 29

*Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300 (5th Cir. 1976) ........................................ 48

*Gen. Ins. Co. of Am. v. City of Colorado Springs*, 638 P.2d 752 (Co. 1982) .............................. 28

*Home Sav. of Am., F.S.B. v. United States*, 399 F.3d 1341 (Fed. Cir. 2005)............................... 41

*Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060 (Fed. Cir. 2001) ..................... 26

*In re Kellett Aircraft Corp.*, 186 F.2d 197 (3d Cir. 1950) ......................................................... 29

*Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.3d 1272 (D.C. Cir. 1996)
(“*Indiana Michigan I*”) ........................................................................................ 8, 9, 18

*Indiana Michigan Power Co. v. United States*, 57 Fed. Cl. 88 (2003)
(“*Indiana Michigan II*”)...................................................................................... 38, 39, 40

*Indiana Michigan Power Co. v. United States*, 422 F.3d 1369 (Fed. Cir. 2005)
(“*Indiana Michigan III*”) ................................................................................... 26, 27, 30

*Koby v. United States*, 53 Fed. Cl. 493 (2002) ................................................................... 29, 43

*Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed. Cir. 1987)................................. 27

*Locke v. United States*, 283 F.2d 521 (Ct. Cl. 1960) ................................................................ 28

*Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336 (Fed. Cir. 2000).............. 1, 10

*Maxima Corp. v. United States*, 847 F.2d 1549 (Fed. Cir. 1988)............................................... 36

*Nader v. Allegheny Airlines, Inc.*, 512 F.2d 527 (D.C. Cir. 1975),
*rev'd other grounds*, 426 U.S. 290 (1976)................................................................................ 28

*Northern States Power Co. v. Dep't of Energy*, 128 F.3d 754 (D.C. Cir. 1997)
(“*Northern States I*”), *cert. denied*, 525 U.S. 1016 (1998) ..................................................... 18

*Northern States Power Co. v. United States*, 224 F.3d 1361 (Fed. Cir. 2000)
(“*Northern States II*”) ................................................................................................... 9

*Northern States Power Co. v. United States*, 78 Fed. Cl. 449 (2007)
(“*Northern States III*”) ........................................................................................... passim

*Old Stone Corp. v. United States*, 450 F.3d 1360 (Fed. Cir. 2006), *cert. denied*,
127 S. Ct. 1831 (2007)......................................................................................... 41, 42

*Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333 (2006) .................................. 44, 45, 47

*Penncro Assocs., Inc. v. United States*, No. 04-2549, 2006 WL 1320252
(D. Kan. May 15, 2006), *aff'd*, 499 F.3d 1151 (10th Cir. 2007) ............................................ 28

*Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35 (2001). ..................................... 36

*Roedler v. Dep't of Energy*, 255 F.3d 1347 (Fed. Cir. 2001) ..................................................... 36

*Sacramento Mun. Util. Dist. v. United States*, 63 Fed. Cl. 495 (2005)
("*Sacramento Mun. Util. Dist. I*")......................................................................................... 40

*Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332 (2006)
("*Sacramento Mun. Util. Dist. II* ") ........................................................................ passim

*Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396 (2007)
("*Southern Nuclear I*")...................................................................................................... passim

*Southern Nuclear Operating Co. v. United States*, 79 Fed. Cl. 135 (2007)
("*Southern Nuclear II*") .............................................................................................. 35, 38, 39

*System Fuels, Inc. v. United States*, 65 Fed. Cl. 163 (2005) ("*Entergy Arkansas I*") .................. 40

*System Fuels, Inc. v. United States*, 79 Fed. Cl. 37 (2007) ("*Entergy Arkansas II*") ........... passim

*System Fuels, Inc. v. United States*, 79 Fed. Cl. 182 (2007) ("*Entergy Arkansas III*").... 38, 39, 41

*System Fuels, Inc. v. United States*, 66 Fed. Cl. 722 (2005) ("*Grand Gulf I*") ........................... 40

*System Fuels, Inc. v. United States*, 78 Fed. Cl. 769 (2007) ("*Grand Gulf II*") ................... passim

*Tenn. Valley Auth. v. United States*, 60 Fed. Cl. 665 (2004) ("*TVA I*") ...................................... 40

*Tenn. Valley Auth. v. United States*, 69 Fed. Cl. 515 (2006) ("*TVA II*") ............................. passim

*Torncello v. United States*, 681 F.2d 756 (Ct. Cl. 1982) ........................................................... 37

*United States v. Peavey Barge Line*, 748 F.2d 395 (7th Cir. 1984)............................................. 49

*Westfed Holdings, Inc. v. United States*, 407 F.3d 1352 (Fed. Cir. 2005)................................... 27

*Wickham Contracting Co. v. Fischer*, 12 F.3d 1574 (Fed. Cir. 1994)......................................... 50

*Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249 (2006) ..................................... passim

**STATUTES & REGULATIONS**

42 U.S.C. § 10131 (1982)...................................................................................... 7, 8, 29

42 U.S.C. § 10161 (1982)............................................................................................... 8

42 U.S.C. § 10162 (1988) .......... 15

42 U.S.C. § 10165 (1988) .......... 15

42 U.S.C. § 10168 (1988) .......... 15

42 U.S.C. § 10172 (1988) .......... 15

42 U.S.C. § 10172a (1988) .......... 15

42 U.S.C. § 10222 (1982) .......... 8, 10, 11, 37

42 U.S.C. § 10242 (1988) .......... 15

42 U.S.C. § 10243 (1988) .......... 15

42 U.S.C. §§ 10132-10145 (1982) .......... 8

Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425, 96 Stat. 2201 (1983) (originally codified at 42 U.S.C. §§ 10131-10270) .......... 7

Nuclear Waste Policy Amendments Act, Pub L. 100-120, §§ 5001-65, 101 Stat. 1330, 1330-227 to -255 (1987) .......... 15

Policy Relating to the Siting of Fuel Processing Plants and Related Waste Management Facilities, 10 C.F.R. pt. 50, App. F (2008) (last amended Mar. 5, 1980) .......... 7

Siting of Fuel Reprocessing Plants and Related Waste Management Facilities, 35 Fed. Reg. 17,530 (Nov. 14, 1970) (to be codified at 10 C.F.R. pt. 50) .......... 7

Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, 48 Fed. Reg. 16,590 (Apr. 18, 1983) (to be codified at 10 C.F.R. pt. 961) .......... 9, 10

Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste, 48 Fed. Reg. 5,45 (Feb. 4, 1983) (to be codified at 10 C.F.R. pt. 961) .......... 9

**OTHER AUTHORITIES**

Dep't of Energy Final Interpretation, 60 Fed. Reg. 21,793 (May 3, 1995) .......... 18

Dep't of Energy Notice of Inquiry, 59 Fed. Reg. 27,007 (May 24, 1994) .......... 18

Energy Northwest, Columbia Generating Station, http://www.energy-northwest.com/generation/cgs/index.php (last visited July 16, 2008) .......... 3

H.R. Rep. No. 97-491, pt. 1 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792 .......... 9

Matthew L. Wald, *As Nuclear Waste Languishes, Expense to U.S. Rises*, N.Y. Times, Feb. 17, 2008, at 16 .......... 18

Nuclear Power Policy, Statement by the President on His Decisions Following a Review of U.S. Policy, 13 Weekly Comp. Pres. Doc. 506, 507 (Apr. 7, 1977) ..................................... 8

Nuclear Regulatory Comm'n, Backgrounder on Reactor License Renewal (Apr. 2007), http://www.nrc.gov/reading-rm/doc-collections/fact-sheets/ license-renewal-bg.html............. 3

Restatement (Second) of Contracts § 204........................................................................ 35

Restatement (Second) of Contracts § 347................................................................... 26, 44

Restatement (Second) of Contracts § 350........................................................................ 27

S. Hearing Rep. No. 100-230, pt. 2 (1987)...................................................................... 15

S. Rep. No. 100-152 (1987)............................................................................................ 15

**Introduction**

This case presents a straightforward claim for breach of contract damages. In 1983, Energy Northwest ("EN") and the U.S. Department of Energy ("DOE") entered into a contract, the Standard Contract For The Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste (the "Standard Contract" (JX1).) EN has fulfilled all of its obligations under the Standard Contract, including the payment of more than $150 million in fees to DOE since 1983. (Joint Stipulation ¶ 13; PX 748.)[1] The DOE breached its principal obligation under the Standard Contract, to commence acceptance of spent nuclear fuel ("SNF") and high-level radioactive waste ("HLW") in January 1998 – as Your Honor found in entering summary judgment on liability in EN's favor. *Energy Northwest v. United States*, 69 Fed. Cl. 500, 506 (2006); *see also Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1342 (Fed. Cir. 2000) ("The breach involved all the utilities that had signed the contract – the entire nuclear electric industry."). Accordingly, the sole issue to be resolved at trial is the amount of damages caused by DOE's breach of the Standard Contract.

To mitigate its damages, EN has incurred approximately $60 million in costs to procure additional SNF storage in the form of an Independent Spent Fuel Storage Installation ("ISFSI") and dry storage casks. There is no dispute that EN has actually incurred that amount in costs relating to the ISFSI project – indeed, the parties have so stipulated. (Joint Stipulation ¶ 28.) The issues to be tried, therefore, relate to a variety of objections the Government has raised on

---

[1] EN uses the following citation conventions in this memorandum: (1) References to "PX __" and "JX __" refer to exhibits on EN's Trial Exhibit List which will be filed with the Court on July 31, 2008, and the Parties' Joint Exhibit List (Dkt. No. 129) filed on June 30, 2008; (2) references to "Test. App. __" refer to EN's Corrected Appendix In Support Of Its Corrected Notice Of Designation Of Deposition And Prior Trial Testimony Or, In The Alternative, Motion For Leave To Admit (Dkt No. 118) or the supplement to that appendix filed on July 3, 2008 (Dkt. No. 138); (3) references to "Joint Stipulation" refer to the Joint Stipulations Of Fact filed on June 30, 2008 (Dkt. No. 127); and (4) references to "C.App. __" refer to EN's Consolidated Appendix in Support of Its Three Motions To Exclude The Government's Proffered Experts (Dkt. No. 111). Copies of Trial Exhibits will be provided to Chambers on July 31, 2008 in accordance with the Trial Preparation Order.

causation and other grounds. As we demonstrate below, and will show at trial, the Government's objections are meritless, and the Court should enter judgment in favor of EN for the full amount sought, $56,859,341.

## Statement of Facts

### I. Background Regarding Energy Northwest And Columbia Generating Station.

#### A. Energy Northwest.

Plaintiff Energy Northwest is a municipal corporation and joint operating agency of the State of Washington.[2] EN was originally established in 1957 to allow publicly-owned utility districts in Washington state to combine resources to build electricity generation facilities. As a public entity, EN provides electricity to public utilities and municipalities on a not-for-profit basis. EN is governed by a twenty-two (22) member Board of Directors and an eleven (11) member Executive Board, which makes most policy decisions for EN. Each member of the EN Board of Directors represents one of twenty-two (22) public utility districts and municipal utilities that are currently members of EN. (Joint Stipulation ¶ 1.) EN owns and operates the Columbia Generating Station ("Columbia"), the nuclear power plant at issue in this case. EN also owns three other electricity generating projects: (1) Packwood Lake Hydroelectric Project, (2) Nine Canyon Wind Project, and (3) White Bluffs Solar station.

#### B. Columbia Generating Station.

Columbia is a 1,150 megawatt boiling water reactor ("BWR") located on DOE's Hanford Reservation in Richland, Washington. (Joint Stipulation ¶ 4.) EN received a construction permit to commence construction of Columbia in March 1973, and received an operating license from the Nuclear Regulatory Commission ("NRC") on December 20, 1983. (Joint Stipulation ¶ 5; PX 57.) Columbia commenced commercial operations in December 1984, and is currently licensed

[2] EN was previously known as the Washington Public Power Supply System. In November 1998, the Executive Board of the company approved a name change to Energy Northwest. (Joint Stipulation ¶ 2.) The name change did not involve any change to the corporate structure of the entity. (*Id.* ¶ 2.) For simplicity, this memorandum uses "EN" for all time periods.

to operate through December 20, 2023. (*Id.*) EN anticipates that in January 2010, it will submit an application to extend Columbia's operating license for an additional 20 years, through 2043, and expects to receive the extension based on extensions granted to similarly situated plants. (PX 468 at ENW 0488184; PX 495); *see* Nuclear Regulatory Comm'n, Backgrounder on Reactor License Renewal (Apr. 2007), http://www.nrc.gov/reading-rm/doc-collections/fact-sheets/ license-renewal-bg.html.

**1. The Electricity Generation Process.**

Columbia is a General Electric-designed BWR that generates electricity by using nuclear fission to generate steam, which in turn drives large turbines to produce electricity. Heat generated in the reactor core boils water into high-pressure steam. The steam spins large turbines connected to a large electric generator, producing electricity. After flowing through the turbines, the steam moves through a condenser where it is cooled back into water and recirculated back to the reactor, continuing the cycle.

**Figure 1 — Diagram Depicting Operation Of A BWR.**[3]




Nuclear fuel utilized in the reactor core to create a self-sustaining nuclear fission reaction consists of uranium pellets, which are sealed inside long metal rods that are approximately 14 to 15 feet long. (Joint Stipulation ¶ 15.) A number of metal fuel rods are arranged in a bundle to

[3] A short video tour of Columbia is also available on EN's website and has been included on EN's Exhibit List as PX 524. *See* Energy Northwest, Columbia Generating Station, http://www.energy-northwest.com/generation/cgs/index.php (last visited July 16, 2008).

form an individual fuel assembly. (*Id.*) After a fuel assembly has been used to generate nuclear fission for a period of time, the uranium becomes depleted and the fuel assembly no longer contributes efficiently to the nuclear chain reaction. (*Id.* ¶ 16.) At that point, the fuel assemblies become "spent" and are referred to as spent nuclear fuel, or "SNF." (*Id.*) Columbia is shut down periodically (currently once every twenty-four (24) months) for a short period referred to as a "refueling outage" in order to replace a portion of the core with new fuel.

**Figure 2 — Illustration Of A Typical BWR Assembly.**




**2. Temporary Storage Of Spent Nuclear Fuel At Columbia.**

Spent fuel discharged from the reactor is temporarily stored in what is commonly referred to as a "spent fuel pool." Columbia's spent fuel pool is a large (40 feet by 34 feet and 39 feet deep) stainless-steel lined pool of water, a natural radiation shield. (Joint Stipulation ¶ 17.) Consequently, the spent fuel pool both cools SNF assemblies and provides station personnel with complete shielding from the radiation emitted from the assemblies. The SNF assemblies are stored in stainless steel racks that contain a number of storage locations that can each accommodate an individual assembly.

**Figure 3 — A Typical Spent Fuel Pool.**



Columbia's spent fuel pool is part of the original design of the plant, and its dimensions are fixed and cannot be altered within the existing plant design. Like many commercial nuclear plants, the spent fuel pool at Columbia was originally designed under the assumption that fuel would be sent off-site to be reprocessed – a process that allows recovery of usable uranium and plutonium from SNF assemblies for future use, and reduces the overall volume of waste that must be disposed. In Columbia's case, the spent fuel pool was initially designed to accommodate 1,020 total assemblies, approximately one-and-one-third reactor cores. (Joint Stipulation ¶ 20.) Before Columbia's start of commercial operations in 1984, the capacity of the spent fuel pool was increased to 2,658 assemblies through a process known as "re-racking." (*Id.*) Re-racking involves either installing additional racks in empty spaces of the spent fuel pool or replacing existing racks with racks with more closely spaced storage cells, both of which permit the storage of more assemblies within the fixed dimensions of the spent fuel pool.

Besides re-racking, nuclear utilities have developed another option to increase temporary on-site storage of SNF: the use of dry storage casks at an Independent Spent Fuel Storage Installation, or "ISFSI." An ISFSI is a concrete pad on which SNF is stored inside of large storage casks made of metal and/or concrete. Radiation shielding is provided by the metal and/or concrete structure of the cask, and heat is passively removed through air moving through vents in the cask. As a result of DOE's breach, EN implemented dry cask storage in 2002. EN utilizes the HI-STORM cask system manufactured by Holtec International, which consists of (1) an inner

multi-purpose canister ("MPC") containing SNF assemblies, which is placed into (2) a concrete overpack known as the HI-STORM 100. In the future, the MPC can be transferred into a HI-STAR 100 overpack for transportation off-site.

**Figure 4 — HI-STORM 100s At Columbia's ISFSI.**



**3. Full Core Discharge Capability.**

It is a common industry practice to attempt to retain enough empty space in the spent fuel pool to accommodate the total number of assemblies contained in the reactor core, which in the case of Columbia is 764 assemblies. This operating practice is known as maintaining "full core discharge capability" ("FCDC") or "full core reserve." FCDC is not a regulatory requirement or a safety-related concern, and nuclear utilities, including Columbia, have operated without FCDC. FCDC can be important in the unlikely event that an operational problem can be remedied only by completely discharging the reactor core. While this is a risk, events forcing an unplanned full-core offload are rare. Accordingly, the decision to operate without FCDC is a business decision that weighs numerous factors, including the remote risk that a maintenance event would require a full core offload, alternative means to make a repair, and the cost and time required to regain FCDC in the event a full core offload becomes necessary.

## II. Background Of The Nuclear Waste Policy Act And The Standard Contract.

### A. The NWPA Was Enacted To Fulfill A Longstanding Federal Obligation To Dispose Of The By-Products Of Commercial Nuclear Power.

In 1982, Congress passed the Nuclear Waste Policy Act of 1982 ("NWPA"). Pub. L. No. 97-425, 96 Stat. 2201 (1983) (originally codified at 42 U.S.C. §§ 10131-10270). The NWPA was enacted to solve the "national problem . . . created by the accumulation of (A) spent nuclear fuel from nuclear reactors; and (B) radioactive waste from (i) reprocessing of spent nuclear fuel; (ii) activities related to medical research, diagnosis, and treatment; and (iii) other sources." 42 U.S.C. § 10131(a)(2) (1982).

The NWPA provided a statutory framework for an obligation that had long been recognized by the U.S. Government. Ever since President Eisenhower established the Atoms-for-Peace program to encourage nuclear-based electricity generation, the federal government recognized that it had responsibility for disposing of the byproducts of commercial nuclear power. *Fla. Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239, 244 (4th Cir. 1987). Until the late 1970s, the utility industry and DOE's predecessor, the Atomic Energy Commission ("AEC"), believed that most SNF would be reprocessed, a strategy used successfully by many other countries with active nuclear power programs. Under AEC rules, disposal of high-level waste generated by reprocessing was limited to federally owned or controlled repositories. *See* Policy Relating to the Siting of Fuel Processing Plants and Related Waste Management Facilities, 10 C.F.R. pt. 50, App. F (2008) (last amended Mar. 5, 1980); *see also* Siting of Fuel Reprocessing Plants and Related Waste Management Facilities, 35 Fed. Reg. 17,530, 17,532 (Nov. 14, 1970) (to be codified at 10 C.F.R. pt. 50) ("[H]igh-level waste repositories should be under Federal ownership and responsibility.").

In April 1977, due to concerns about nuclear proliferation, President Carter issued a policy statement that halted reprocessing of spent nuclear fuel. Nuclear Power Policy, Statement by the President on His Decisions Following a Review of U.S. Policy, 13 Weekly Comp. Pres.

Doc. 506, 507 (Apr. 7, 1977). Following that decision, DOE announced an initiative to develop federal repositories for disposal of un-reprocessed SNF. *See Fla. Power & Light*, 826 F.2d at 251-52; (*see also* PX 13; PX 15; PX 18). The DOE policy was a "logical extension . . . of the long-established Federal responsibility for permanent disposal of high-level wastes." *Fla. Power & Light*, 826 F.2d at 251. However, in the absence of explicit statutory authority to construct a repository for disposal of SNF, DOE could not proceed beyond studying the issue. (PX13; PX15; PX18.)

The NWPA provided DOE with legal authorization to provide a solution to the accumulation of SNF at commercial nuclear reactors. 42 U.S.C. § 10131(b)(2) (1982) (stating that one purpose of the NWPA was "to establish the Federal responsibility, and a definite Federal policy, for the disposal of such waste and spent fuel"). The NWPA established a firm schedule and deadline by which DOE was to assume responsibility for SNF disposal. *Id.* § 10131(b)(1) (indicating that one purpose of the NWPA was "to establish a schedule for the siting, construction, and operation of repositories . . . ."). The NWPA contemplated a series of steps that would lead to operation of a repository and acceptance of SNF and HLW beginning in January 1998. *Id.* §§ 10132-10145; *Indiana Michigan Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1277 (D.C. Cir. 1996) ("*Indiana Michigan I*"). While Congress had settled on a policy of permanent disposal, the NWPA also provided that DOE was to *study* whether interim storage at a Monitored Retrievable Storage facility ("MRS") would facilitate waste disposal and report back to Congress. 42 U.S.C. § 10161(b)-(c) (1982). However, the NWPA did not authorize DOE to build an MRS.

The NWPA mandated that DOE enter into contracts with utilities which would provide that DOE was to begin providing disposal services "no later than January 31, 1998." *Id.* § 10222(a)(5)(B). The contracts were also to provide that "the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel." *Id.* § 10222(a)(5)(A). The

contracts were to be a "quid pro quo" under which the DOE would dispose of SNF and HLW beginning not later than January 31, 1998 in return for payment of fees. *Indiana Michigan I*, 88 F.3d at 1276; *see Northern States Power Co. v. United States*, 224 F.3d 1361, 1364 (Fed. Cir. 2000) ("*Northern States II*"); H.R. Rep. No. 97-491, pt. 1 at 58-59 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3792, 3824-25.

**B. Development And Execution Of The Standard Contract.**

On February 4, 1983, soon after President Reagan signed the NWPA, the DOE published an initial draft of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste in the Federal Register. 48 Fed. Reg. 5,458, 5,462-71 (Feb. 4, 1983) (to be codified at 10 C.F.R. pt. 961) (also found at PX 24). While the draft contract provided that the services were to begin no later than January 31, 1998, it did not contain any provisions stating the rate at which DOE would accept fuel at that time. The general consensus, both within DOE and among affected utilities, was that the draft contract was hastily written and incomplete. As one DOE witness has testified, the contract was "fraught with ambiguities, contradictions, [and] incorrect statements." (Test. App. 387; PX 158.)

Utilities and industry provided comments on the draft contract. For example, the Edison Electric Institute specifically commented on the lack of an acceptance rate. (PX 30 at YDK-026-103883.) EN itself attempted to negotiate terms of the contract with the DOE at a March 30, 1983 meeting in Washington, D.C. At that meeting, EN was told that there would be no negotiation – in the words of one of EN's representatives, DOE's message was that the contract was "a take-it-or-leave-it deal; you can take the contract or leave the plant." (PX 32 at ENW 0182547.)

DOE published a final version of the Standard Contract on April 18, 1983. 48 Fed. Reg. 16,590, 16,590-608 (Apr. 18, 1983) (to be codified at 10 C.F.R. pt. 961) (also found at PX 34). The final contract made some of the changes requested by utilities. However, contrary to the Government's suggestion in other SNF cases that the DOE "rejected" comments regarding the

acceptance rate, the DOE's final notice publishing the Standard Contract did not refer at all to the issue of an acceptance rate or the utility comments on that issue. *Id.* at 16,598. Instead, the notice focused on a different set of utility comments, which the Government chose not to accept, regarding the issue of whether there should be intermediate performance milestones before the 1998 date.[4] *Id*.

Utilities like EN had little choice but to execute the standard agreement as offered. *See*, *e.g.*, *Maine Yankee*, 225 F.3d at 1337 ("The [NWPA] effectively made entry into [the Standard Contract] mandatory for the utilities . . . ."); *Carolina Power & Light Co. v. United States*, 82 Fed. Cl. 23, 39 (2008) ("[T]he Standard Contract was not a product of negotiation."). This is because the NWPA directed the NRC that it could not issue or renew a license unless the applicant had signed a contract or was certified to be in good faith negotiations for a contract. 42 U.S.C. § 10222(b)(1) (1982). On February 16, 1983, the NRC notified EN and other applicants that it interpreted the NWPA to require execution of a contract by June 30, 1983. (PX 27.)

Energy Northwest executed the Contract For the Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste No. DE-CR01-83NE44424 (the "Standard Contract") with DOE on June 13, 1983. (JX 1.) Given that EN expected to receive its operating license for Columbia by the end of the year, it had no choice but to execute the contract. (PX 37, PX43, PX46.) In its June 14, 1983 transmittal letter, EN specifically commented that DOE had "essentially dictated the terms of this contract on a take-it-or leave-it basis." (PX 48.) At the time of the execution of the contract, EN believed that it would not require any additional storage to reach the 1998 date for the commencement of disposal services under the Standard Contract. (PX 43 at ENW 0182519.)

---

[4] In fact, while the contract did not contain a rate, after the Standard Contract was finalized, DOE Secretary Donald Hodel reaffirmed that "it is my intention that this commitment in the contracts, together with the overall thrust of the Act, will create an obligation for the Department to accept spent fuel in 1998 whether or not a repository is in operation. This should enable utilities to plan for their projected waste disposal needs with confidence and certainty." (Letter from Donald P. Hodel, Secretary of DOE, to J. Bennett Johnston, U.S. Senator (Sept. 7, 1984), PX 76.)

### C. The Parties' Understanding At The Time Of Contracting Was That DOE Would Accept Fuel At A Rate That Would Preclude The Need For Additional Storage After January 1998 And Reduce The Backlog Of Accumulated SNF.

While the Standard Contract did not address the acceptance rate under the Contract, the DOE and utilities shared a common understanding, based on the NWPA, that the purpose of the DOE disposal program was to solve the SNF storage problem. That understanding was that after January 31, 1998, DOE would accept SNF at a rate sufficient to (1) prevent utilities from needing additional on-site storage; and (2) reduce the backlog of SNF accumulated at nuclear reactors so that they could be decommissioned in a timely manner at the end of their licensed life. Numerous decisions in SNF cases have repeatedly recognized these as the goals of the NWPA and the Standard Contract.[5]

At trial, EN will present largely undisputed evidence of this understanding in the form of contemporaneous documents prepared by DOE itself and the prior trial and deposition testimony of numerous DOE witnesses.[6] One of these documents is DOE's draft of the Mission Plan, a document Congress directed DOE to prepare (42 U.S.C. § 10221(b) (1982)), distributed in December 1983. In the draft Mission Plan, DOE stated that "[t]he waste materials will be accepted in accordance with a Waste Acceptance Schedule designed to provide an acceptance rate in the first five years such that no utility will have to provide additional storage after January

---

[5] *See, e.g.*, *Carolina Power & Light*, 82 Fed. Cl. at 40; *Boston Edison Co. v. United States*, 80 Fed. Cl. 468, 486 (2008); *System Fuels, Inc. v. United States*, 79 Fed. Cl. 37, 59 (2007) ("*Entergy Arkansas II*"); *Northern States Power Co. v. United States*, 78 Fed. Cl. 449, 451-52 (2007) ("*Northern States III*"); *Southern Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396, 404, 413, 437 (2007) ("*Southern Nuclear I*"); *Yankee Atomic Elec. Co. v. United States*, 73 Fed. Cl. 249, 265 (2006); *Tenn. Valley Auth. v. United States*, 69 Fed. Cl. 515, 519 (2006) ("*TVA II*").

[6] While EN summarizes some of the evidence it will present here, EN also refers the Court to Plaintiff's Response To The Court's Order To Show Cause filed on August 5, 2005 (Dkt. No. 30), and accompanying Proposed Findings Of Uncontroverted Fact (Dkt. No. 32). EN has also asked the Court to admit much of this testimony in its Corrected Notice Of Designation Of Deposition And Prior Trial Testimony Or, In The Alternative, Motion For Leave To Admit Prior Testimony Into Evidence (Dkt. No. 118).

31, 1998. Subsequently, the acceptance rate will be equal to or greater than the actual discharge rate of spent fuel each year." (PX 55 at 0006.)

The acting director of the DOE program, Robert Morgan, reiterated the intentions expressed in this draft of the Mission Plan at a December 1983 industry conference. At that conference, Morgan told utilities that "[t]he basic strategy which we've outlined in the mission plan, is that beginning in 1998 utilities will not have to provide any additional storage facilities on site. During the first year of operation of the repository in 1998, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location." (JX 6 at SN 069599.)

These documents, and many others, are also consistent with the testimony of DOE witnesses:

- Robert Morgan, the first director of the SNF program, testified in his deposition that the intent of the program and the NWPA was to avoid having the utilities provide on-site storage. (Test. App. 875.)
- Michael Lawrence, the second acting director of the SNF program, by then known as the Office of Civilian Radioactive Waste Management ("OCRWM"), testified in his deposition that the intent of the NWPA and DOE's intent was to prevent the utilities from having to build additional SNF storage facilities after 1998, and to reduce the backlog of accumulated SNF. (Test. App. 687-88, 710.)
- Mr. Lawrence also testified under oath before Congress in 1984 that achieving the "fundamental objective" of the NWPA would "initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998." (PX 60 at PNL 173-0228; *see also* Test. App. 690-91, 704-05.)
- Ben Rusche, the first politically-appointed director of OCRWM, testified that there was a "strategy" or "objective" of preventing additional storage on site. (Test. App. A 1187.) Rusche also testified that this goal was "consistent" with the NWPA. (Test. App. 1189, 1193-94, 1204-05.)
- Robert Rosselli, one of the three individuals who drafted the Standard Contract, testified that he understood that DOE was responsible for eliminating the need for additional at-reactor storage after 1998. (Test. App. 1156, 1158-59.)
- Lake Barrett, the acting or deputy director of OCRWM from 1993 until February 2002, testified that the "intent of the [NWPA]" was to reduce the backlog of SNF located at the utilities as soon as practical and that the 3,000 rate was chosen for that reason. (Test. App. 188; *see also* Test. App. 135-37, 145-56, 255-56.)

- Victor Trebules, the DOE official responsible for preparing the DOE 1985 Mission Plan, testified that DOE's objective was "reaching waste acceptance rates that would preclude the utilities from having to provide additional on-site storage" and that DOE intended to operate at a rate sufficient to work down the backlog of SNF. (Test. App. 1269; *see also id.* at 1277, 1282, 1309-10.)
- Tom Pollog, DOE's Rule 30(b)(6) witness on the rate of acceptance DOE planned to use under the Standard Contract, testified that DOE's goal in the mid-1980s was to "alleviate the purchaser's need to have storage outside of their [spent fuel] pools." (Test. App. 980; *see also id.* at 305, 340.)

It is also largely uncontradicted that the numerical acceptance rate that would meet these objectives would, at a minimum, ramp up to a steady-state rate of at least 3,000 tons per year. DOE published the 3,000 ton rate, or a comparable rate, in virtually every program document from the start of the program through 1990, including the December 1983 Draft Mission Plan (PX 55), the April 1984 Draft Mission Plan (PX 62), and the final version of the Mission Plan that DOE published in 1985 in accordance with Congress's directives (JX 8 & JX 9). Furthermore, it is the rate DOE has used in every planning document published since 1995. The appropriateness of the 3,000 ton rate is supported by the uncontradicted testimony of numerous DOE witnesses:

- Lake Barrett testified in his deposition that the 3,000 ton rate has been DOE's way of achieving the requirement of reducing the existing SNF backlog since he joined the program in 1985. (Test. App. 145-46, 153, 265.) Mr. Barrett explained that a slower rate, such as 900 tons, would not keep up with the utility discharge rate, much less reduce the backlog of SNF. (Test. App. 170-72.) Mr. Barrett also testified that each of the system studies prepared by DOE from the mid-1980s to the mid-1990s supported the 3,000 ton rate. (Test. App. 153.) Finally, Mr. Barrett testified that using a rate that was "too low" would result in "reactors needing to put in dry storage" and that, based on all the relevant factors, 3,000 tons was a reasonable rate to use. (Test. App. 265.)
- Tom Pollog, DOE's Rule 30(b)(6) witness on the rates of acceptance that DOE planned to use under the Standard Contract, testified that the 3,000 ton rate was the rate that DOE determined in the mid-1980s would achieve DOE's objective of alleviating the need for utilities to construct additional on-site storage. (Test. App. 980.)
- Susan Klein, DOE's Rule 30(b)(6) witness on the issue of "what rate the DOE is planning to use once [SNF] acceptance begins," testified that DOE plans to use the 3,000 ton rate when it begins accepting SNF and that the rate will ramp up to

3,000 tons by the fifth year after DOE begins removing SNF. (Test. App. 473-74, 487.)

- Christopher Kouts, DOE's Rule 30(b)(6) witness in this case, testified that DOE has never projected total system performance that reached a steady state performance level of less than 3,000 tons. (Test. App. 1559.)

EN also shared the understanding that it would not have to add additional storage after 1998. In the "Action Memorandum" asking the EN Executive Board to approve execution of the Standard Contract, EN senior management stated "There is sufficient spent fuel storage space at WNP-2 [Columbia] to last until the late 1990's, and it is believed that no alternate storage will be required to reach the 1998 date." (PX 43 at ENW 0182519; *see also* PX 46 at ENW 0647212.) An analysis of expected discharges conducted at the time Columbia was starting operations also confirmed that EN had sufficient storage to get to 1998, when DOE would commence acceptance of SNF. (PX 68 at ENW 0053500-01.)

## III. DOE's Announcement of Delays And Eventual Breach.

### A. DOE's Initial Delay Announcement And The Nuclear Waste Policy Amendments Act Of 1987.

Within four years of the passage of the NWPA, it became clear DOE had not made sufficient progress to permit a repository to open for waste acceptance by January 1998. In January 1987, DOE published a Draft Mission Plan Amendment that announced that the repository would be delayed at least five years, from 1998 until 2003. (PX 90 at DER-002-3165.) DOE explained that the new schedule was the result of a "re-baselin[ing]" of the program based on its progress against existing milestones and technical planning. (*Id.*)

Although the repository was delayed, DOE stated that it would ask Congress to authorize it to construct a temporary storage facility, an MRS, to permit waste acceptance to begin in 1998 as required by the NWPA and Standard Contract. To allay fears that the MRS would become a de-facto SNF repository, DOE stated that it would propose a 15,000-ton limit on the total capacity of its proposed MRS, and prohibit the MRS from receiving any SNF until DOE also received construction authorization for a repository. (*Id.* at DER-020-3170.)

Despite these restrictions, in its submission to Congress regarding the MRS, DOE projected that the MRS would be able to operate at an acceptance rate of between 2,000 and 3,000 tons per year after a short ramp-up period, and that the overall program would reach 2,500 to 3,000 tons per year by 2004 following the opening of the repository in 2003. (JX 10 at PNL-037-0308, PNL-030-0330; PX 92 at PA199105-07.) In June 1987, DOE repeated its proposal in the final version of the Mission Plan Amendment. (JX 13 at FOI 004-1918-19, FOI 004-1966-67.) OCRWM director Benard Rusche testified before Congress that DOE's MRS proposal would enable DOE to meet its obligations under the NWPA, and *prevent the necessity of adding additional storage at reactor sites*. (S. Rep. No. 100-152 at 79, 84, 172 (1987); S. Hearing Rep. No. 100-230, pt. 2 at 169, 213 (1987).)

In December 1987, Congress passed the Nuclear Waste Policy Amendments Act (the "1987 Amendments Act"). Pub L. 100-120, §§ 5001-65, 101 Stat. 1330, 1330-227 to -255 (1987). Among other things, the 1987 Amendments Act authorized DOE to site and construct an MRS.[7] 42 U.S.C. § 10162(b) (1988). Congress also enacted modified versions of DOE's proposed MRS restrictions, mandating that a site could not be selected for the MRS until DOE recommended a site for the repository, and that construction of the MRS could not begin until DOE had received construction authorization for the repository. *Id.* §§ 10165(b), 10168(d). DOE also restricted the capacity of an MRS to 10,000 tons prior to operation of a repository and 15,000 tons thereafter. *Id.* § 10168(d)(3). Finally, the 1987 Amendments created the office of the Nuclear Waste Negotiator to negotiate with states and Indian tribes to host an MRS facility. *Id.* §§ 10242(a), 10243(a).

[7] The 1987 Amendments also directed DOE to study only Yucca Mountain as a potential repository site and directed DOE to defer consideration of a site for a second repository until after January 1, 2007. 42 U.S.C. §§ 10172(a), 10172a (1988).

**B. DOE Announces Further Delays.**

It soon became apparent that DOE would be unable to take advantage of the *additional* means of on-time performance that Congress had authorized. In the 1988 Draft Mission Plan Amendment and the 1988 Annual Capacity Report, DOE projected that it would be unable to accept SNF at all until 2003. (JX 16; PX 108.) Then, in a November 1989 Report to Congress, DOE announced that the Secretary of Energy had concluded that it would be impossible to open a repository before 2010. (JX 22 at YMP 002-0188, 199-202.) Under either the schedule linkages DOE originally proposed to Congress, or the actual linkages passed by Congress in 1987, the 2010 projected date for the repository made it virtually impossible for DOE to begin waste acceptance in 1998. (*Id.* at YMP 002-0190-91, 208-210.) DOE stated that it intended to ask Congress to modify the restrictions placed on the MRS in the 1987 Amendments to accommodate further delay in the repository schedule in the hope that the Nuclear Waste Negotiator could identify a site for an MRS. (*Id.*)

**C. DOE Publishes Lower Acceptance Rates.**

Beginning in 1990, DOE published several acceptance rate scenarios which, unlike the previous Annual Capacity Report ("ACR") documents and numerous DOE program documents, including the statutorily mandated Mission Plan documents, now included a much lower acceptance rate. Each of those documents assumed that Congress would eliminate the linkages between the repository and MRS that Congress put in place in 1987. (PX 138.) In its 1990 ACR, DOE published two such rates: (1) an "upper-bounding" acceptance rate that reached 3,000 tons/year by 2003 assuming that Congress enacted legislation which both increased the capacity limitation on the MRS facility and modified the schedule linkages, thus allowing the MRS to begin accepting fuel 12 years prior to the repository; and (2) a "lower-bounding" acceptance rate that reaches only 875 tons/year through 2008 based on the assumption that Congress enacted legislation that changed only the schedule linkages. (*Id.* at PA102771-73.)

In ACRs published in 1991, 1993, and 1995, DOE dropped its upper-bounding rate and published a modified version of the 1990 lower-bounding rate that assumed that DOE would pick up 400 tons in 1998, 600 tons in 1999, and 900 tons from 2000 through 2008. (PX 156, PX 182, PX 220.) In each of these reports, DOE explicitly stated that its acceptance projections assumed Congressional actions to modify the schedule linkages between the MRS and the repository. (JX 32 at HQR 004-0358, JX 40 at DB-102319, JX 46 at AZT 001 0341.) As reflected in a preliminary cost estimate developed by DOE for the restructured program, DOE projected that when the repository commenced operations in 2010, the acceptance rate would ramp up to 3,000 tons by 2015. (PX 137 at PNL 1071666.)

**D. Any Hope Of DOE Performance Vanishes.**

Any hope that DOE could site an MRS and convince Congress to enact necessary legislative changes in time to commence waste acceptance by January 1998 was soon extinguished. In 1991, the General Accounting Office issued a report that concluded that an MRS facility was unlikely to be operating by 1998. (PX 154.) The report noted that DOE's plans depended on the success of the Nuclear Waste Negotiator's working out a siting agreement by the end of 1992 – even though the Negotiator did not believe this could be accomplished. (*Id.* at HQR 043-3299-00.)

In a December 1992 letter to Senator J. Bennett Johnston, Secretary of Energy Admiral James Watkins stated that the Nuclear Waste Negotiator "has not been able to identify a viable candidate site that can be recommended to Congress by June 1993 and that will permit spent fuel receipt by January 1998 as planned." (JX 37 at HQR 064-3849.) The letter indicated that DOE was examining other alternatives to actual acceptance of SNF in 1998, such as furnishing utilities with a "multiple purpose and standardized container system" that could be used to store waste on-site. (*Id.* at HQR 064-3849-50.) A little more than a year later, new DOE Secretary Hazel O'Leary directed that OCRWM pursue a multi-purpose canister program to offset the burdens that would be associated with the now-certain default of the January 1998 deadline. (PX 196.)

DOE's December 1994 Program Plan officially dropped consideration of the MRS entirely as DOE began focusing exclusively on development of a repository by 2010. (PX 214 at SN 174313-14, SN 174351.)

In the meantime, in May 1994, DOE published a "Notice of Inquiry" in the Federal Register announcing its preliminary determination that it had no obligation to accept SNF from utilities in the absence of a repository or some other facility. Dep't of Energy Notice of Inquiry, 59 Fed. Reg. 27,007, 27,007-09 (May 24, 1994) (also found at PX 205). One year later in May 1995, DOE published its "final interpretation" announcing that DOE would not commence acceptance of SNF until 2010 and that its non-performance was excused in light of the lack of a repository. Dep't of Energy Final Interpretation, 60 Fed. Reg. 21,793, 21,794-97 (May 3, 1995) (also found at PX 225). Utilities challenged DOE's interpretation in the D.C. Circuit, which rejected DOE's attempts to avoid its responsibilities under the NWPA and Standard Contract by pointing to the lack of a facility. *Indiana Michigan I*, 88 F.3d at 1276. DOE's subsequent attempt to excuse its delay by characterizing its breach as "unavoidable" was rejected by the D.C. Circuit in 1997. *Northern States Power Co. v. Dep't of Energy*, 128 F.3d 754, 759-60 (D.C. Cir. 1997) ("*Northern States I*"), *cert. denied*, 525 U.S. 1016 (1998).

DOE failed to commence waste acceptance in January 1998. In February of this year, the New York Times quoted Edward F. Sproat III, director of DOE's Office of Civilian Radioactive Waste Management, as saying that DOE's latest official projected start date of 2017 is "clearly out the window." Matthew L. Wald, *As Nuclear Waste Languishes, Expense to U.S. Rises*, N.Y. Times, Feb. 17, 2008, at 16 (also found at PX 511). DOE's 30(b)(6) witness confirmed that the 2017 date has been abandoned and that DOE is currently "re-baselining" the program and expects to announce a new projected start date in September 2008. (Test. App. 1564.)

**E. DOE Publishes The "Lower" 900 Ton Rate To Limit Its Liability.**

At trial, EN will present evidence that DOE's continued publication of the 900 ton acceptance rate between 1991 and 1995 was an attempt by DOE to limit its liability to utilities in

light of the (increasing) likelihood that DOE would not perform its obligations under the Standard Contract beginning in 1998.

EN will call Scott Vance, one of the individuals involved in preparing the ACR for DOE, who has previously testified that he had raised concerns about the "low rate" contained in the 1991 ACR prior to its publication with Alan Brownstein of DOE. *See Yankee Atomic*, 73 Fed. Cl. at 273. At the *Yankee* trial Mr. Vance testified:

> I was told at that time specifically from Alan Brownstein that the lower rate was going to be used. The decision had already been made. And the reason for that was that it was obvious at that point that '98 was not going to be met and that they desired to limit the liability to purchasers.

*Id*. (quoting Mr. Vance's trial testimony). Circumstantial evidence cited above (at 17-18) confirms Mr. Vance's testimony. By the time that DOE issued the 1991 ACR in March 1991, DOE already had announced that it would not be able to open a repository until 2010, and given the many obstacles it faced, including Congressionally-mandated timing conditions that made such action impossible, DOE had substantial reason to doubt that it would be able to open an MRS by 1998 to accept SNF.

EN will also present the testimony of current DOE employees that DOE's continued use of a 900 ton rate – after the idea for the MRS facility that the Government contends could have justified that rate was "dead" – was for the purpose of minimizing its own liability. As noted above, the evidence conclusively reveals that by the time DOE issued the 1995 APR/ACR in March 1995 (and in fact, far earlier), the possibility of building an MRS was no longer viable, and DOE had dropped it from its plans. Dave Zabransky, who was directly involved in the decision to use the 900 ton rate in the 1995 ACR/APR document, conceded that the MRS plan was dead by 1995. (Test. App. 1412, 1415-16; *see also* Test. App. 141-42, 219, 238, 258.) Mr. Zabransky also admitted that from the date that it published the 1995 APR/ACR document in 1995, DOE never used the 900 ton rate for planning the federal waste management system. (*Id.*

at 1416-17.) Mr. Zabransky admitted in his deposition that DOE continued to use that rate to attempt to limit its obligations to the utilities:

> Q. Why did the Department of Energy publish a document [the 1995 APR/ACR] to be used as the basis for delivery commitment schedules using rates which it was not using itself for the purpose of planning the system?
>
> A. The Department carried over the rates it had used in the previous ACR and did not change them.
>
> Q. Was the Department trying to minimize the commitments it had to utilities who were parties to the standard contracts in using this document, in using Exhibit 5?
>
> A. I believe that was a consideration.

(*Id.* at 1417.)

## IV. EN's Response To DOE's Delays.

From the passage of the NWPA, EN closely monitored the DOE program hopeful that DOE would be in a position to begin accepting SNF by 1998. However, as DOE failed to make progress toward waste acceptance, EN began planning to meet its SNF storage needs in the event that DOE would default on its obligations. This process played itself out over many years from DOE's initial announcement of repository delays in 1987 through its actual failure to perform in 1998. In 1999, EN made the decision to move forward with a project to implement dry cask storage at the Columbia site to provide for continued SNF storage through whatever period was required by DOE's default.

### A. EN's Early Planning Activities.

Monitoring the DOE program and evaluating various SNF storage options fell primarily to Dave Larkin, who worked for many years in EN's fuels department where he had responsibility for nuclear fuel procurement and the "back end" of the fuel cycle, including the ultimate disposition of SNF. In October 1987, Mr. Larkin briefed the EN Executive Board that DOE was "backing away" from its commitment to take delivery of SNF by 1998, and projected

that the date for commencement of SNF acceptance "[a]t best . . . is the year 2005, more likely it is the year 2010." (PX 105 at EN 0053595; *see also* PX 106 at ENW 0486738-39.)

Mr. Larkin continued monitoring the DOE storage program through the late 1980s and into the early 1990s.[8] In June 1991, Mr. Larkin prepared an initial white-paper for senior management that provided a review of what SNF storage options might be available to Columbia in light of the possibility that DOE might not begin removing SNF in 1998. (JX 29.) Mr. Larkin identified several potential options for increasing SNF storage, including (1) re-racking, (2) consolidation of rods from SNF assemblies, and (3) various forms of dry cask storage. (*Id.* at ENW 0053513-50.) At the October 1992 meeting of the EN Executive Board, Mr. Larkin noted that any hope of timely DOE performance appeared remote given DOE had not identified a potential site for an MRS. (JX 36; PX 166 at ENW 0487126.)

**B. After DOE's Default Becomes Certain, EN Carefully Evaluates Its SNF Storage Options.**

Following DOE's May 1994 Notice of Inquiry, it was clear to EN that DOE would not perform beginning in 1998. EN Managing Director William Counsil asked Dave Larkin to evaluate EN's SNF storage options in light of DOE's default. During the early part of 1995, Mr. Larkin conducted an extensive examination of SNF storage alternatives. This process included meetings with potential re-rack and cask vendors such as Vectra, Sierra Nuclear Corporation, Holtec International, and Siemens Power Corporation. Mr. Larkin and others at EN also visited existing dry storage facilities at Oconee, Surry, and Calvert Cliffs.

In June 1995, Mr. Larkin presented the results of his evaluation to a group of senior EN management, which included Bill Counsil, Assistant Manager of Operations Vic Parrish, Plant Manager John Swailes, and Engineering Director Joe Burn. (JX 51, WNP-2 Spent Fuel Storage:

[8] Mr. Larkin made additional presentations to the Executive Board and EN Senior Management in 1988, 1990, and 1991 noting that delays in the DOE program could require EN to add additional SNF storage. (JX 18; JX 19; PX 129; JX 27; PX 143.) The EN Board of Directors was also briefed on the issue in 1989. (PX 117.)

An Evaluation of Alternatives (the "1995 Larkin Study").) The 1995 Larkin Study stated that it was prepared because "DOE currently projects that it will be unable to complete a federal repository to accept spent nuclear fuel before the year 2010. Additional slippage is probable." (*Id.* at ENW 0251378.) The study examined a number of potential alternatives:

- **Mescalero Private Fuel Storage Facility.** Northern States Power and the Mescalero Apache Indians had signed an agreement in 1994 to pursue construction of a private SNF storage facility on tribal lands. The 1995 Larkin Study noted the potential Mescalero facility would not be available in time to meet EN's needs, and appeared to be more expensive than storage on-site.
- **Reprocessing in Europe.** Two European companies, BNFL and Cogema, indicated they might be willing to offer reprocessing services to U.S. nuclear utilities. However, it appeared that reprocessing overseas would be cost-prohibitive and would require permits and licenses to ship SNF overseas.
- **DOE Interim Storage.** Mr. Larkin noted that bills pending in Congress would authorize DOE to build an interim SNF storage facility. However, such an option was dependent on legislative action and even if authorized, DOE would still need to construct the facility. No such legislation was ever passed, and in any event, President Clinton threatened to veto any such measure.
- **Completion of the WNP-1 Spent Fuel Pool.** Mr. Larkin considered completing the spent fuel pool at a partially built reactor adjacent to Columbia. Construction of WNP-1 had been suspended in the early 1980s after the demand for electricity in the Pacific Northwest did not meet levels expected in the early 1970s. Mr. Larkin eliminated this option because it (1) required a costly capital investment to make the WNP-1 pool operational, (2) would have required an NRC licensing proceeding, (3) involved higher operational costs than other options, and (4) would contaminate the WNP-1 site and complicate decommissioning.
- **Re-racking.** Mr. Larkin considered various forms of re-racking. Based on information obtained from potential rack vendors Holtec and Siemens, it appeared that a full re-rack of the pool through replacement of all existing racks could further expand the capacity of the Columbia spent fuel between 1350 and 1620 storage locations. In addition, as an alternative to a complete re-racking, Siemens believed it would be possible to add 400-500 additional storage locations by placing racks in existing empty spaces in the spent fuel pool.
- **Dry Storage.** Finally, Mr. Larkin examined various forms of dry storage, including use of concrete and metal storage casks and use of multi-purpose canisters furnished by DOE.

Based on the recommendations in the 1995 Larkin Study, EN senior management made a preliminary decision that it would begin taking steps toward implementing dry cask storage. (JX 53; JX 54 at ENW 0487310.) While re-racking was technically feasible, it could have provided only a maximum of 10 to 12 years of additional storage capacity. At that time, DOE's earliest projection for simply commencing waste acceptance was 2010, with EN's first allocation several years after that date, and EN justifiably believed that performance would be further delayed. Accordingly, EN concluded that pursuing re-racking would only defer, and not avoid, implementation of dry cask storage. In addition, dry cask storage provided a modular solution that could be expanded in increments as DOE's delay continued. In light of all of these considerations, EN decided that it made sense to pursue dry cask storage.

### C. EN Pursues Dry Cask Storage And Re-Evaluates Its Options.

Between July 1996 and July 1999, EN conducted a comprehensive review of its dry cask storage options. During this period EN issued two separate Requests for Proposals ("RFP") to dry cask storage vendors. EN issued its first RFP in June 1996 and received proposals from four cask vendors. However, EN elected not to award a contract because (1) none of the proposals met all of EN's requirements, (2) some cask designs had not received licenses, (3) one of the bidders was experiencing financial difficulties, (4) the NRC was in the process of scrutinizing the quality assurance programs of cask vendors, and (5) a vendor with substantial resources and experience, Westinghouse Electric Company, had decided to enter the dry cask storage business.

In early 1997 and again in early 1998, EN senior management twice decided to delay implementation of dry cask storage in part to delay expenditures that would have imposed significant pressure on EN's annual budgets but also to facilitate identification of the best cask vendors for EN's needs. The initial decision to delay came in February 1997, when EN decided that it could safely delay implementation of dry cask storage by at least a year, even if it meant losing FCDC, to permit cask vendors time to complete licensing on new cask designs that were in the pipeline. (JX 61; PX 291; PX 299.)

After receiving initial vendor proposals in September 1997, EN again decided to further delay dry cask storage. (PX 319; PX 323; PX 333.) As part of this re-evaluation process, EN re-examined its 1995 decision not to re-rack. (JX 65; JX 66; PX 331.) The results of the re-examination confirmed EN's initial determination. Re-racking was technically feasible but still would not offer a complete solution because of the Government's already announced delay and uncertainty about when it would perform. Accordingly, while EN decided that it could pursue a rack expansion project as a backup option should dry cask storage be further delayed, the best solution was to proceed with dry cask storage.

In April 1999, EN completed evaluation of proposals received in response to its second RFP and decided to award the dry cask storage contract to Holtec International. (JX 70; PX 367.) Holtec's proposal was judged to be superior based on its scoring on both technical and commercial factors. The EN Executive Board approved entry into a contract with Holtec at its May 27, 1999 meeting. (PX 374.) EN and Holtec signed a contract for the supply of a dry cask storage system on July 30, 1999. (PX 379.) The contract called for Holtec to provide its HI-STORM 100 storage system and related services and equipment. Approximately 19 other nuclear plants in the United States use Holtec-supplied casks for dry cask storage.

**D. EN Implements Dry Cask Storage.**

Following EN's award of a contract to Holtec, EN created a project team and established a schedule for the project. This step involved significantly increasing the staffing for the project. In July 2000, Steve Scammon, an experienced EN project manager, was named Program Manager for the ISFSI and assigned overall responsibility for the implementation and completion of the dry cask storage project. At various points, more than 20 EN employees were dedicated to the design, engineering, and licensing work for substantially all of their time. These individuals were both drawn from the ranks of EN employees diverted from their normal duties and hired as new contractor employees. In some instances, EN needed to hire contractors to perform the normal duties of EN employees assigned to the ISFSI project.

The project schedule called for five primary activities needed to implement dry cask storage: (1) design of the ISFSI itself and any needed plant modification, (2) licensing of any modifications by the NRC and NRC approval of use of dry cask storage, (3) construction, (4) development of appropriate operational procedures and related equipment, and (5) actual cask loading.

Implementation of dry cask storage at Columbia required several major construction projects outside the existing Columbia plant. *First*, the ISFSI itself is a heavily engineered concrete pad on which dry storage casks are placed. Because the ISFSI is located outside of Columbia's existing security fence, the ISFSI needed to have its own fence and security system, which was interconnected with the existing plant security system. *Second*, EN also constructed three new auxiliary buildings related to the ISFSI – a small electrical building to house electrical components of the ISFSI security and radiation monitoring equipment, a storage building, and an office building for ISFSI staff. *Third*, EN constructed a heavy haul path from the Columbia reactor building to the ISFSI itself along with several other concrete pads to provide operational space for cask loading. The haul path is needed to accommodate the heavy loads of casks as they are moved from the reactor building to the ISFSI.

After conducting an engineering analysis of requirements of the Holtec's cask system, EN also identified several modifications that needed to be made to existing infrastructure in the Columbia reactor building. These involved adding further structural supports, modifying the railroad bay floor to permit movement of casks in and out of the reactor building, and modifying the spent fuel pool and refuel floor to specifically accommodate staging and loading the Holtec cask system.

EN commenced plant modifications and ISFSI construction activities in the fall of 2001 and finished roughly a year later, in the summer of 2002. (Joint Stipulation ¶ 24.) In August 2002, EN performed a dry run of the loading process to demonstrate to the NRC that it was prepared to load dry storage casks and operate an ISFSI. EN received notice from the NRC on

September 13, 2002 that it had met all requirements for implementation of dry cask storage and could proceed with loading its dry storage casks. (PX 450.)

EN commenced its initial cask loading campaign in late September 2002, loading its first cask and placing it on the ISFSI on September 22, 2002. By December 9, 2002, EN completed its first loading campaign, safely offloading a total of five casks containing 340 SNF assemblies from the Columbia spent fuel pool to the ISFSI. (Joint Stipulation ¶ 27.) EN conducted a second loading campaign of ten casks in early 2004, successfully offloading a total of 680 additional SNF assemblies to the ISFSI and restoring FCDC. (*Id.*) Most recently, between February and May 2008, EN loaded an additional 12 casks, bringing the total number of casks at the Columbia ISFSI to 27 casks containing 1,836 SNF assemblies. EN expects it will continue to periodically load casks until DOE eventually performs.

**Statement of Issues and Fact and Law**

**V. Applicable Legal Principles.**

The legal principles applicable to this case are clear. The basic remedy for breach of contract is to award damages sufficient to place the non-breaching party in the position it would have been in had the contract been performed. *Indiana Michigan v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) ("*Indiana Michigan III*") (citation omitted); *Southern Nuclear I*, 77 Fed. Cl. at 403. "[T]he general principle is that all losses, however described, are recoverable." Restatement (Second) of Contracts § 347, cmt. c. One measure of the damages required to make the plaintiff whole is the cost of arranging a substitute transaction in place of the promised contract performance. *Hughes Commc'ns Galaxy, Inc. v. United States*, 271 F.3d 1060, 1067-68 (Fed. Cir. 2001); *Anchor Sav. Bank, F.S.B. v. United States*, 81 Fed. Cl. 1, 124-25 (2008); Restatement (Second) of Contracts § 347 cmts. a, b.

**A. EN's Burden of Proof For Its Mitigation Damages.**

The damages sought by EN are for arranging for a partial substitute for DOE's performance in the light of the delay in SNF acceptance. In EN's case, this is the cost of adding

dry cask storage capacity at its Columbia plant to permit continued operations until DOE eventually performs. As the Federal Circuit recognized in *Indiana Michigan III*, EN's costs were incurred to mitigate the more substantial loss that could have occurred if EN had been forced to shut down Columbia as a result of DOE's breach. *See* 422 F.3d at 1375. Indeed, EN was obligated to "'take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise.'" *Id.* (quoting Restatement (Second) of Contracts § 350, cmt. b). EN is entitled to recover the cost of these substitute arrangements. *See id.*; *see also Chain Belt Co. v. United States*, 115 F. Supp. 701, 713-14 (Ct. Cl. 1953).

The Federal Circuit has stated that to recover damages in these cases, plaintiff utilities must show: (1) the damages were reasonably foreseeable by the breaching party; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty. *Indiana Michigan III*, 422 F.3d at 1373 (citing *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1320 (Fed. Cir. 2002)); *see also Entergy Arkansas II*, 79 Fed. Cl. at 52; *Sacramento Mun. Util. Dist. v. United States*, 70 Fed. Cl. 332, 360 (2006) ("*Sacramento Mun. Util. Dist. II*"); *TVA II*, 69 Fed. Cl. at 523. All three elements are questions of fact. *Bluebonnet Sav. Bank, F.S.B. v. United States*, 266 F.3d 1348, 1355-57 (Fed. Cir. 2001).

### B. The Government's Burden of Proof.

After the plaintiff has established the loss resulting from the breach, the burden shifts to the Government to show that the damages should be reduced by costs or other losses that the injured party has avoided by not having to perform. *Carolina Power & Light*, 82 Fed. Cl. at 36 (*citing Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 769 (Fed. Cir. 1987)); *Southern Nuclear I*, 77 Fed. Cl. at 433-34; *Entergy Arkansas II*, 79 Fed. Cl. at 71; *TVA II,* 69 Fed. Cl. at 543; *see also Am. Capital Corp. v. Fed. Deposit Ins. Corp.*, 472 F.3d 859, 869 (Fed. Cir. 2006) (placing the burden of proving an offset on the Government); *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1370 (Fed. Cir. 2005) ("If the government want[s] an offset, it [is] the government's burden to prove with reasonable certainty [the offset]."); *Eureka Inv. Corp. v. Chi.*

*Title Ins. Co.*, 743 F.2d 932, 942 (D.C. Cir. 1984) (burden of production of evidence tending to mitigate or abate damages is on the defendant); *Penncro Assocs., Inc. v. United States*, No. 04-2549, 2006 WL 1320252, at *15 (D. Kan. May 15, 2006) (burden of proving costs avoided is on the breaching party), *aff'd*, 499 F.3d 1151 (10th Cir. 2007); *Gen. Ins. Co. of Am. v. City of Colorado Springs*, 638 P.2d 752, 759 (Co. 1982) (burden of showing reduction of damages is on the defendant).

EN expects the Government will argue to the contrary – that EN has the obligation of proving the lack of offsets by showing to the very last detail what the non-breach world would have looked like. In effect, the Government would require EN, the innocent party, to disprove any uncertainty about the non-breach world – uncertainty created by DOE itself. In support of its argument, the Government generally cites a number of lost profit and *Winstar* cases, in which damages necessarily require proof of profits *plaintiff would have received* in the non-breach world. That is not the type of damages at issue here. As Judge Merow recognized in *Southern Nuclear I*, damages here actually exist in liquidated form in the *breach world*. 77 Fed. Cl. at 435. It would be perverse to allow the party in default to benefit from the uncertainty it has created by breaching the contract. *Id.*[9] Accordingly, once the plaintiff proves its damages flow from actions undertaken in response to the breach, the burden is appropriately on the Government to establish any expense it claims would have been incurred in the non-breach

[9] The risk of any uncertainty in damages must fall on the party that breached the contract. *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264-65 (1946); *Energy Capital*, 302 F.3d at 1327. Where "a reasonable probability of damages can be clearly established, uncertainty as to the amount will not preclude recovery." *Locke v. United States*, 283 F.2d 521, 524 (Ct. Cl. 1960); *Bluebonnet*, 266 F.3d at 1356-57 (same); *Ace-Fed. Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed. Cir. 2000) (same). A "defendant who has wrongfully broken a contract should not be permitted to reap advantage from his own wrong by insisting on proof which by reason of his breach is unobtainable." *Locke*, 283 F.2d at 524. Furthermore, it is appropriate to place the burden of proof on this issue on the Government because the Government's proposed offsets depend on the type of cask DOE would have used had it performed, a factual matter uniquely within DOE's control. *Cf. Nader v. Allegheny Airlines, Inc.*, 512 F.2d 527, 538 (D.C. Cir. 1975) (placing burden on defendant on issue that was "particularly within the knowledge'" of the defendant), *rev'd other grounds*, 426 U.S. 290 (1976).

world and therefore has been avoided because of the breach. *Id.* The Government cannot require EN to prove a series of negatives under the guise of the causation requirement. *Cf. Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 750 (2004).

The Government also bears the burden of showing any mitigation-related activities were unreasonable. *Entergy Arkansas II*, 79 Fed. Cl. at 52; *Southern Nuclear I*, 77 Fed. Cl. at 407; *Yankee Atomic*, 73 Fed. Cl. at 264; *TVA II*, 69 Fed. Cl. at 523. This burden is a high one. As this Court has observed, "Monday-morning quarterbacking is irrelevant to an award of mitigation costs." *Citizens Fed. Bank v. United States*, 66 Fed. Cl. 179, 185 (2005), *aff'd*, 474 F.3d 1314 (Fed. Cir. 2007). "'[T]he rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter.'" *Koby v. United States*, 53 Fed. Cl. 493, 497 (2002) (quoting *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198-99 (3d Cir. 1950)).

## VI. At Trial, EN Will Establish Foreseeability, Causation, And The Reasonable Certainty Of Its Damages.

### A. EN's Need To Add Additional Storage Is A Foreseeable Result Of DOE's Failure To Perform.

There can be no dispute that it was foreseeable to DOE at the time of contracting that a failure to perform on time would require additional SNF storage. A loss is foreseeable if it follows inevitably from a breach. *TVA II*, 69 Fed. Cl. at 528. Moreover, as Judge Merow has ruled, what must be foreseeable is the need for additional storage, not the specific technical solution employed to provide that additional storage. *Southern Nuclear I*, 77 Fed. Cl. at 405. Here, the NWPA itself stated its purpose was to deal with the "national problem" created by the accumulation of spent nuclear fuel. 42 U.S.C. § 10131(a)(2) (1982). Indeed, as discussed above (at 11-14), there is a mountain of contemporaneous evidence that one of the principal objectives underlying the NWPA and the Standard Contract was ensuring that utilities would not have to

build any additional at-reactor storage after 1998. For this reason, every Judge who has addressed this issue has concluded that it was foreseeable to DOE that utilities like EN would take steps to expand storage capacity if DOE did not perform.[10]

**B. DOE's Breach Of Contract Is The Substantial Cause Of EN's Need To Implement Dry Cask Storage.**

The evidence here will also show that the Government's breach was the substantial cause (as well as the but-for cause) of EN's decision to pursue dry cask storage at Columbia. In that connection, EN will show both that (1) the reason EN decided to implement dry cask storage was its knowledge of DOE's impending and then actual breach; and (2) had DOE performed beginning in 1998 at either the 3,000 ton or the 900 ton rates, or some rate in between, EN would not have had to build dry cask storage.

*First*, as discussed in greater detail above (at 20-26), EN's reason for constructing dry storage was DOE's breach. After years of little or no progress in the DOE program, DOE's publication of the "Notice of Inquiry" in May 1994 (PX 205) signaled that DOE would not perform in 1998, and indeed obligated utilities to take steps to mitigate the effects of the breach. *Indiana Michigan III*, 422 F.3d at 1375. The 1995 Larkin Study specifically stated it was undertaken because "DOE currently projects that it will be unable to complete a federal

[10] *See, e.g.*, *Carolina Power & Light*, 82 Fed. Cl. at 41 ("The Court agrees that Plaintiffs' efforts to store its spent fuel after it became aware that DOE was unlikely to perform . . . should have been reasonably foreseen by DOE at the time of contracting."); *Entergy Arkansas II*, 79 Fed. Cl. at 59 ("DOE should have foreseen that its failure to perform under the Standard Contract would result in damages of the nature and magnitude that [the plaintiff] claims."); *System Fuels, Inc. v. United States*, 78 Fed. Cl. 769, 791 (2007) ("*Grand Gulf II*") ("[T]he record contains clear and convincing evidence that on June 30, 1983, it was 'foreseeable' to DOE that, if performance could not be commenced by January 31, 1998, Plaintiffs would have to make interim arrangements . . . ."); *Southern Nuclear I*, 77 Fed. Cl. at 404 ("That Plaintiffs would generally incur storage expenses of the nature and magnitude sought here was foreseeable."); *TVA II*, 69 Fed. Cl. at 528 ("In short, the court finds it was entirely foreseeable to DOE that failure to perform under the contract would result in damages of the nature and magnitude that [the plaintiff] claims.").

repository to accept spent nuclear fuel before the year 2010. Additional slippage is probable." (JX 51 at ENW 0251378.) As EN witnesses will testify, its entire long-range decision making process addressing alternative storage was conducted in light of the fact that DOE had stated it would not perform on time, and that even DOE's anticipated 2010 performance projection was subject to serious question.

*Second*, EN will also demonstrate at trial that, *had DOE performed*, EN would not have implemented dry cask storage. Instead, EN had lower-cost alternatives available to address its storage needs (if any), which would have provided more than enough capacity if DOE had performed on a timely basis. To confirm this point, EN's damages expert, Michael P. Emmert, developed an inventory model of SNF which shows the amount of SNF storage space in EN's spent fuel pool assuming that DOE actually performed. (Emmert Rpt. at 16-24, C.App. 16-24.) Using that model, Mr. Emmert will demonstrate that had DOE performed at either the 3,000 ton rate, or the 900 ton rate the Government advocates, EN could have avoided implementing dry cask storage.

Mr. Emmert's model illustrates that had DOE performed at a rate ramping up to 3,000 tons per year, or a rate approximating that rate, EN would not have required *any* additional SNF storage to continue operations. (*Id.* at 20-23, C.App. 20-23.) However, Mr. Emmert has conservatively assumed that, had DOE performed, EN would have installed additional racks in currently empty spaces in its spent fuel pool to provide some additional SNF storage capacity. EN's technical expert, Eric Bush, who has 13 years of experience with Holtec performing re-racks (and whose testimony on this issue is uncontroverted), will testify that this rack expansion could have provided EN with additional capacity of at least 478 additional locations. (Bush Rpt. at 3-4, C.App. 42-43.) A similar rack expansion option was considered contemporaneously by EN in the 1995 Larkin Study, and was included in EN's contingency plan if its dry cask storage project was delayed. (PX 231 at ENW 0251393; JX 69 at ENW 50575; PX 504; PX 357 at

ENW 0560839-900; PX 359 at ENW 0561918-20.) EN management would have chosen this option, over dry cask storage, if DOE had performed.

Furthermore, while EN believes a higher acceptance rate should apply, even at the 900 ton acceptance rate advocated by the Government, EN could have avoided constructing dry cask storage.[11] Specifically, Mr. Emmert's inventory model (which the Government has no evidence to contradict) demonstrates that EN would have had sufficient storage space to accommodate its SNF storage needs through the time of DOE's first acceptance of SNF from EN if it conducted a full re-rack of the Columbia spent fuel pool. (Emmert Rpt. at 23-24, C.App. 23-24.) Mr. Bush, EN's technical expert, has determined that it was feasible to gain approximately 1,392 locations through a full re-rack of the Columbia spent fuel pool, a conclusion undisputed by the Government in this case. (Bush Rpt. at 3-4, C.App. 42-43.)

As discussed above (at 22), the contemporaneous evidence supports the conclusion that EN also considered a re-rack feasible and considered pursuing a re-rack at various points, including in the 1995 Larkin Study. EN rejected the re-rack option because it was clear that DOE's lengthy delay would eventually require implementing dry cask storage even after a re-rack. Accordingly, as EN witnesses will testify, if EN had believed that DOE would timely perform even under the lower 900 ton rate, it would have re-racked rather than constructed dry cask storage. In awarding damages in *Northern States III*, Judge Weise accepted a similar argument that a plaintiff would have re-racked had DOE performed. 78 Fed. Cl. at 462.

[11] In its analysis of the 900 ton rate, EN has assumed that the DOE would have eventually ramped up to 3,000 tons by 2015. As discussed below (at 36), the Government has refused to take a position on the rate that would apply after the 10-year period reflected in the ACR document. However, DOE's 900 ton rate projections assumed that a repository would open in 2010, and a 1990 Total System Life Cycle Cost Report assumed acceptance would reach 3,000 tons by 2015. (PX 137 at PNL-107-1666-68.) Furthermore, DOE's Rule 30(b)(6) witness in this case, Christopher Kouts, has testified that DOE has never projected a steady sate performance level of less than 3,000 tons. (Test. App. 1559.)

**C. EN Can Establish With Reasonable Certainty It Has Incurred $56,859,341 In Damages Through August 31, 2006.**

While the Government contests that EN is entitled to certain categories of costs it claims as damages, there appears to be no real dispute that EN can calculate its damages with reasonable certainty. After a thorough review of EN's accounting system and documentation, Mr. Emmert has identified a total of $60,131,280 in expenses in the breach world related to the dry cask storage project that EN would not have incurred had DOE performed. The Government has stipulated that EN has *actually incurred* these amounts. (Joint Stipulation ¶ 28.) Mr. Emmert categorized these expenses into seven categories (Emmert Rpt. at 24-31, C.App. 24-31):

- **Long-Range Planning Activities.** EN incurred $594,714 between 1995 and 1999 to study its SNF storage options, including analyzing available SNF storage options, selecting a dry cask storage vendor, analyzing potential ISFSI sites, and conducting ISFSI security studies.
- **ISFSI Facilities.** EN incurred $12,341,867 to construct the ISFSI itself, the required fencing and security systems, auxiliary buildings, and the heavy haul path between the ISFSI and the reactor building.
- **Plant Modifications.** EN incurred $4,497,033 to analyze the movement of the Holtec dry storage system in the reactor building and the design, procurement, installation, and project management activities associated with all modifications made to the Columbia reactor building to accommodate dry cask storage.
- **Dry Cask Procurement.** EN incurred $23,214,330 related to the procurement of dry storage casks, including the costs of the casks themselves and extensive NRC-required quality oversight activities performed by EN during fabrication.
- **Dry Cask Loading Costs.** EN incurred $6,694,546 in connection with the actual loading, welding, and transport of the casks loaded through August 31, 2006. These costs include not only the costs of loading the cask itself but extensive preparation work for each cask loading campaign and activities related to placement of each cask on the ISFSI. This category also includes costs related to the cask loading demonstration performed for the NRC in 2002.
- **Regulatory, Licensing, Program & Ancillary Equipment.** EN incurred $6,719,881 in costs to license and operate the ISFSI. These include costs related to the development of ISFSI operating procedures and training of employees working on the ISFSI and costs associated with any ancillary equipment required to use the Holtec dry storage system.
- **Financing.** EN incurred financing costs specifically to fund the ISFSI and related projects. Specifically, a portion of ISFSI expenses were funded through borrowing against a short-term promissory note and later through issuance of

Electric Revenue Bonds specifically to raise funds for the ISFSI. Through August 2006, EN incurred $6,068,909 in financing costs associated with this borrowing.

Mr. Emmert has calculated EN's damages through August 31, 2006 to be $56,859,341. (Emmert Rebuttal Rpt. at 39, C.App. 262.) Mr. Emmert arrives at this amount by taking the total of $60,131,280 in the seven categories listed above and subtracting the SNF storage expenses EN would have incurred in the non-breach world. Under a 3,000 ton rate, Mr. Emmert deducts $3,271,939, which represents the cost of the rack expansion Mr. Emmert conservatively assumes EN would have performed in the non-breach world.[12]

## VII. Remaining Issues of Fact And Law.

The principal remaining issues relate primarily to Government challenges to causation and other challenges to specific categories of damages. These issues are:

A. DOE's rate of acceptance of SNF in the non-breach world and the related issue of causation.

B. Whether EN's decision to pursue dry cask storage was a reasonable mitigation measure.

C. Whether EN's damages should be reduced to take account of costs associated with loading DOE casks that EN will still incur when DOE eventually performs.

D. Whether EN can recover the cost of EN employees who spent time working on the dry cask storage project.

E. Whether EN can recover internal services costs recorded to EN's dry cask storage project to account for the cost of support services such as procurement, accounting, and computer services.

F. Whether EN can recover financing costs associated with the borrowing EN undertook to finance the cost of its dry cask storage project.

As discussed in greater detail below, issues A and B relate to the broader issues of causation and whether EN chose a reasonable means of mitigating the effects of DOE's breach.

---

[12] Alternatively, if the 900 ton rate were to apply, Mr. Emmert deducts $12,001,730, the estimated costs to EN of conducting a full re-rack, which leaves total damages of $48,129,550. (Emmert Rebuttal Rpt. at 40-41 & n.76, C.App. 263-64.)

In contrast, issues C through F relate to specific offsets or deductions that the Government claims should be made to EN's damages.

### A. The Court Should Use The 3,000 Ton Acceptance Rate To Adjudicate EN's Damages.

As discussed above (at 30-32), EN can show it suffered damages caused by the breach regardless of the acceptance rate determination. EN can establish it would not have needed dry cask storage at the 3,000 ton rate, the Government's 900 ton rate, or a rate in between. However, the rate does affect the amount of any setoff for costs EN would have incurred to add further in-pool storage in the non-breach world. In particular, the rate of acceptance affects whether EN would have implemented an optional limited rack expansion or a full re-rack in the non-breach world, and the associated damage offsets associated with those alternatives.

As this Court recently stated in *Carolina Power & Light*, the purpose of determining an acceptance rate in these SNF cases is to provide a reasonable basis for determining damages in light of DOE's breach of contract. 82 Fed. Cl. at 39. This does not require the Court to determine the exact sequence each spent fuel assembly in the industry would be picked up, but rather to determine a reasonable basis for estimating EN's damages based on DOE's contractual obligations. *Id.* Indeed, several Judges have been able to determine the plaintiff's damages without even determining the exact numerical acceptance rate required by the Standard Contract. *Southern Nuclear Operating Co. v. United States*, 79 Fed. Cl. 135, 138-39 (2007) ("*Southern Nuclear II*") (citing cases).

There are three legal doctrines that provide guidance about how the court should identify a rate for the purpose of estimating damages. *First*, "[w]hen the parties . . . have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts § 204. This court adheres to the view that courts fill open contract terms according to the intent of the parties at the time of contracting. *David Nassif Assocs. v. United States*, 644 F.2d 4, 5 (Ct.

Cl. 1981) ("*Nassif II*"); *David Nassif Assocs. v. United States*, 557 F.2d 249, 258 (Ct. Cl. 1977) ("*Nassif I*"). *Second*, in determining contractual intent, the Court should give more weight to actions occurring closer in time to contract formation than later actions, particularly when later actions were taken with knowledge that a breach might occur. *Carolina Power & Light*, 82 Fed. Cl. at 36-37, 40-41; *Entergy Arkansas III*, 79 Fed. Cl. at 53. *Third*, where (as here) a contract implements a statutory scheme, the contract should be interpreted in accordance with the underlying statute. *Roedler v. Dep't of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001).[13]

With those principles in mind, the essence of each party's acceptance rate argument can be stated simply:

EN believes the acceptance rate most appropriate for measuring damages in this case is a rate ramping up to 3,000 tons. The 3,000 ton rate is the rate that (1) DOE published roughly contemporaneously with execution of the Standard Contract; (2) DOE has used in its planning for most of the history of the program, including in statutorily-mandated program documents; (3) uncontradicted evidence from DOE witnesses and EN's expert demonstrates would fulfill the twin goals of the program; and (4) DOE has assumed in determining whether utilities are paying the appropriate amount in fees under the NWPA and the Standard Contract.

In contrast, the Government argues that it had essentially unfettered discretion to set the acceptance rate, and that damages should be measured at the 900 ton acceptance rate that DOE utilized in the 1991 and 1995 ACRs for the years between 1998 and 2008. Beyond the rate for the first 10 years the Government is non-committal – stating in recent Rule 30(b)(6) testimony that DOE has no basis for estimating the acceptance rate after the first ten years. (Test. App. 1553-55.) Accordingly, while EN is unsure what the Government intends to argue, based on

---

[13] Moreover, even to the extent that the Government has some discretion in performing under contract, the implied obligation of good faith and fair dealing prohibits DOE from thwarting the justified expectations of the parties about the purpose of the Standard Contract. *See* Restatement (Second) of Contracts § 205 cmt. a; *Maxima Corp. v. United States*, 847 F.2d 1549, 1556 (Fed. Cir. 1988); *Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35, 58-59, 61, 64 (2001).

instructions provided to the Government's experts, it appears the Government simply intends to argue that EN could not have incurred damages because it had no allocations during the first ten years of acceptance, and has no position on what would have occurred after 2008.

The Government's suggestion that it alone could establish an acceptance rate is plainly wrong because it would render the contract illusory. *Consumers Energy Co. v. United States*, 65 Fed. Cl. 364, 371 (2005) (citing *Torncello v. United States*, 681 F.2d 756, 760 (Ct. Cl. 1982)). "We note as one of the most elementary propositions of contract law that a party may not reserve to itself a method of unlimited exculpation without rendering its promises illusory and the contract void . . . ." *Torncello*, 681 F.2d at 760. There would be "a striking asymmetry" to a contract under which EN has paid $150 million in fees for performance "virtually at defendant's option." *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 664 (2003). As Your Honor has already noted with respect to the Standard Contract, this Court should construe the contract in such a way to avoid rendering it illusory. *Consumers Energy*, 65 Fed. Cl. at 371-72. To do otherwise would be contrary to Congressional intent that DOE and utilities were to enter into contracts for SNF disposal. *See* 42 U.S.C. § 10222(a)(1) (1982). "Plaintiffs did not agree to pay $661 million in fees under the Standard Contract in exchange for DOE unilaterally determining its own obligations *after* it realized that timely performance was not possible." *Carolina Power & Light*, 82 Fed. Cl. at 41.

Applying the governing legal principles discussed above, EN respectfully submits that the only possible result is for the Court to use the 3,000 ton acceptance rate to measure damages. As discussed above (at 11-14), the 3,000 ton rate is the rate that DOE published shortly after the execution of the Standard Contract. It is also the rate DOE has used in its planning for most of the history of the program, including in statutorily-mandated program documents and other program documents it issued between 1983 and 1990, and from 1995 to the present. In addition, as discussed above (at 7-9), it is clear that the purpose of the NWPA was to deal with the accumulation of SNF across the nation, and that the parties' contemporaneous understanding of

the Contract was that it was intended to eliminate the need for additional storage capacity at utilities after 1998. It is also uncontradicted (at 13-14) that DOE determined that the 3,000 ton rate DOE used in its planning documents was the rate necessary to accomplish that purpose. It is also the rate that DOE has used in performing statutorily-mandated evaluations of whether utilities are paying adequate fees under the Standard Contract. *E.g.*, *Carolina Power & Light,* 82 Fed. Cl. at 30; *Southern I,* 77 Fed. Cl. at 414. Accordingly, except for one case currently on appeal, a number of Judges of this Court who have reached this issue to date have either determined that the rate should be 3,000 tons, or determined that the 3,000 ton rate was within a range of reasonable rates.[14]

Conversely, there will be no evidence presented at trial demonstrating that the 900 ton rate would meet the objectives of the NWPA or the contemporaneous expectations of the parties regarding the purpose and objectives of the Contract. As discussed above (at 14-20), the 900 ton rate was an alternative developed only after DOE's repository program fell behind, and as DOE itself admits, was impossible to achieve without Congressional action removing statutory restrictions between the MRS and repository – action that never even came close to occurring. The 900 ton rate is also completely inconsistent with the DOE program documents, such as the statutorily-required Mission Plan, and other DOE documents, authored much closer to the time of the NWPA and the execution of the Standard Contract, which used the 3,000 ton acceptance rate. Furthermore, as discussed above (at 18-20), there is evidence that rather than a realistic rate for planning purposes, the 900 ton rate was published in an attempt to limit DOE's liability in light of its impending and inevitable breach.

[14] *Carolina Power & Light,* 82 Fed. Cl. at 39; *System Fuels, Inc. v. United States,* 79 Fed. Cl. 182, 187 n.4 (2007) ("*Entergy Arkansas III*"); *Entergy Arkansas II,* 79 Fed. Cl. at 56-57, 58 & n.20; *Southern Nuclear II,* 79 Fed. Cl. at 139; *Southern Nuclear I,* 77 Fed. Cl. at 439 n.38; *Indiana Michigan Power Co. v. United States,* 57 Fed. Cl. 88, 100 (2003) ("*Indiana Michigan II*").

In effect, by advocating the 900 ton rate, the Government is arguing that the bargain struck with utilities imposed no obligation to timely remove SNF in exchange for the payment of millions in fees. This argument is plainly wrong. *Carolina Power & Light*, 82 Fed. Cl. at 38-41. Given these facts, it should not be surprising that, again (with one exception currently on appeal), every opinion to consider DOE's 900 ton rate has rejected use of that rate to measure damages in these cases.[15]

Finally, in this case and other cases, the Government has asserted a closely related argument that its obligation is limited to acceptance allocations reflected in approved Delivery Commitment Schedules ("DCSs") submitted by utilities based on the allocations in the 1991 and later ACRs. However, as EN demonstrated in response to the Government's summary judgment motion in this case (Dkt. No. 30 at 22-34), the Government's argument is inconsistent with the contract provisions on which it purports to rely, the language of the ACRs, and the testimony of DOE officials responsible for their administration. Moreover, as Your Honor recognized in this case and in *Consumers Energy*, the DCS process could not establish a delivery date, and DOE itself abandoned the DCS process. *Energy Northwest*, 69 Fed. Cl. at 505; *Consumers Energy*, 65

[15] *Carolina Power & Light*, 82 Fed. Cl. at 39-40 (rejecting the Government's argument that "[t]he Standard Contract allowed DOE to determine unilaterally the measure of its performance . . . ."); *Entergy Arkansas III*, 79 Fed. Cl. at 187 ("The government's contentions regarding causation at a capacity-limited low rate of acceptance at a MRS operating without an attendant repository are unavailing."); *Southern Nuclear II*, 79 Fed. Cl. at 139-40 ("For all these reasons, the 1991 ACR rates were not given credence as the performance DOE would have provided in the absence of the breaching delays."); *Entergy Arkansas II*, 79 Fed. Cl. at 57-58 ("Accordingly, causation must be determined under a general plan of acceptance that provides for a ramp-up to a steady-state collection rate involving a repository, with or without a MRS, not a rate constrained by capacity limits on a stand-alone MRS, as the Government argues."); *Southern Nuclear I*, 77 Fed. Cl. at 437 ("The court finds on this record that the contingent rates of acceptance in the 1991 ACR do not fulfill DOE's contractual duties to commence performance [and] were not an accurate indicator of how DOE would have performed . . . ."); *Indiana Michigan II*, 57 Fed. Cl. at 100 (rejecting use of an acceptance rate based on "an interim storage facility that was not selected, authorized, or approved"); *Commonwealth Edison*, 56 Fed. Cl. at 666 ("The court does not agree with defendant that it is entitled to limit its damages based upon an optional disposal method of which it did not avail itself.").

Fed. Cl. at 369-72. For these reasons, the Government's approved-DCS argument has similarly been rejected by numerous judges of this Court.[16]

In sum, this Court should use 3,000 ton rate to measure EN's damages in this case.

**B. The Government Cannot Show That EN's Decision To Implement Dry Cask Storage Is Unreasonable.**

As a backup to its argument that DOE had no obligation to receive SNF on a reasonable schedule, the Government attempts to second-guess EN's response to DOE's breach, arguing that EN should have pursued a re-rack of its spent fuel pool rather than implement dry storage. Notably, each of the Government's expert witnesses, R. Larry Johnson, Charles Stuart, and Raymond Hartman, agrees that EN would have to implement dry cask storage at some point due to DOE's breach. (Johnson Rpt. at 9-10, C.App. 195-96; Stuart Rpt. at 7, C.App. 85; Hartman Rpt. at 12, C.App. 131.) However, the Government argues that EN should have re-racked first, and then completed construction of dry storage in 2009 (the "re-rack first alternative"). (Johnson Rpt. at 9, C.App. 9.) The Government's only support for the re-rack first alternative are the opinions of Dr. Hartman that a re-rack sequence offered a small cost advantage on a net present value basis, and of Mr. Stuart that, based on his limited experience, he would have elected to re-rack first.

As discussed above (at 29), the Government bears the burden of establishing that EN's chosen means of mitigating damages was unreasonable. The law requires only that a non-breaching party choose a commercially reasonable means of mitigation. *Southern Nuclear I*, 77 Fed. Cl. at 406; *accord Home Sav. of Am., F.S.B. v. United States*, 399 F.3d 1341, 1353 (Fed.

[16] *System Fuels, Inc. v. United States*, 66 Fed. Cl. 722, 730-33 (2005) ("*Grand Gulf I*"); *System Fuels, Inc. v. United States*, 65 Fed. Cl. 163, 176 (2005) ("*Entergy Arkansas I*"); *Entergy Nuclear Indian Point 2, LLC v. United States*, 64 Fed. Cl. 515, 524 n.14, 525 (2005); *Entergy Nuclear Generation Co. v. United States*, 64 Fed. Cl. 336, 343 n.8, 344-45 (2005); *Sacramento Mun. Util. Dist. v. United States*, 63 Fed. Cl. 495, 504-05 (2005) ("*Sacramento Mun. Util. Dist. I*"); *Tenn. Valley Auth. v. United States*, 60 Fed. Cl. 665, 671 & n.7, 672-74 (2004) ("*TVA I*"); *Indiana Michigan II*, 57 Fed. Cl. at 98; *Commonwealth Edison*, 56 Fed. Cl. at 663-66.

Cir. 2005) (the non-breaching party must make "fair and reasonable efforts to mitigate"). When a choice was required between two reasonable courses of action, the Government cannot complain that the utility chose one course, rather than the other. *Southern Nuclear I*, 77 Fed. Cl. at 407; *Sacramento Mun. Util. Dist. II*, 70 Fed. Cl. at 367. A party is not required to choose the absolute cheapest mitigation option. *Old Stone Corp. v. United States*, 450 F.3d 1360, 1370 (Fed. Cir. 2006) (affirming damages higher than minimum possible amount where the plaintiff's mitigation efforts were reasonable under the circumstances), *cert. denied*, 127 S. Ct. 1831 (2007); *Home Sav.*, 399 F.3d at 1353 (affirming damages award though one component was not the least-cost mitigation alternative); *Sacramento Mun. Util. Dist. II*, 70 Fed. Cl. at 368 n.35 (holding the law "d[id] not require" mitigation at the "least cost" to the Government).

Judges of this Court have provided additional guidance about the reasonableness of mitigation decisions in the SNF context. *First*, where a plaintiff's mitigation efforts are successful, they are presumptively reasonable. *Entergy Arkansas III*, 79 Fed. Cl. at 60; *TVA II*, 69 Fed. Cl. at 529. There is no question that EN's dry storage project successfully provided additional SNF storage capacity and prevented the shut-down of Columbia. *Second*, the approval of particular means of mitigation by regulatory bodies such as the NRC and rate-making authorities is an indication of reasonableness. *Southern Nuclear I*, 77 Fed. Cl. at 427; *Yankee Atomic*, 73 Fed. Cl. at 285, 293. *Third*, and most important here, in making their decisions, utilities were permitted to consider uncertainty about when, if ever, DOE was going to perform and to plan for the possibility that DOE would not perform for decades. *Yankee Atomic*, 73 Fed. Cl. at 289-90, 292, 294, 298; *Northern States III*, 78 Fed. Cl. at 459-60.

On May 30, EN moved in limine to exclude the testimony of the Government's expert witnesses, Raymond Hartman and Charles Stuart, who provide the basis for the Government's arguments that EN did not reasonably mitigate its damages. (Dkt. Nos. 111 & 112.) EN does not seek to re-argue those motions here. However, in addition to not meeting the threshold standards established by the Federal Rules of Evidence, the opinions of Dr. Hartman and Mr.

Stuart are also simply wrong. Dr. Hartman's analysis has three separate errors that incorrectly skew his analysis in favor of a re-rack. (Dkt. No. 111, Hartman Mot. at 9.) As EN's expert Michael Emmert will testify, when Dr. Hartman's errors are corrected, the re-rack first alternative is actually *more* expensive on a net present value basis. (Emmert Rebuttal Rpt. at 15-17, C.App. 238-40.) Furthermore, Mr. Stuart both (1) fails to conduct the very cost benefit analysis he opines is necessary; and (2) fails to identify a single tangible benefit, cost or otherwise, that EN would have gained by waiting for other utilities to gain experience with dry cask storage. (Dkt. No. 112, Stuart Mot. at 10-12.)

Even assuming the opinions of the Government's experts are admissible (which they are not), the Government simply cannot show that EN's mitigation is commercially unreasonable. As described more fully above (at 20-24), EN conducted a comprehensive review of the various options it might pursue to expand its SNF storage capacity in light of DOE's breach. EN recognized that a re-rack was technically feasible and would add a not-insignificant amount of additional SNF storage. However, it was also clear that a re-rack alone would not be sufficient to offer a solution to the SNF storage quandary created by DOE's breach. In short, as Mr. Emmert's inventory model demonstrates, a re-rack would not have avoided eventual implementation of dry storage, *a fact each Government expert concedes*. (Hartman Rpt. at 15, 17, C.App. 134, 136; Johnson Rpt. at 9, C.App. 195; Stuart Rpt. at 7, C.App. 85.) That undisputed fact by itself makes EN's decision reasonable.

Ultimately, dry cask storage was preferred because (1) it offered a complete life-of-plant solution; (2) it was modular and could be expanded as necessary – an important factor given the great uncertainty (which remains today) regarding the date for DOE's future performance; and (3) it avoided the disruption of conducting *two* capital projects rather than one. Moreover, even assuming the re-rack first option *might have* saved some money on a NPV basis using Dr. Hartman's assumptions (which EN does not concede), cost alone is insufficient to make EN's decision unreasonable. *See Old Stone*, 450 F.3d at 1370; *Sacramento Mun. Util. Dist. II*, 70 Fed.

Cl. at 368 n.35. Accordingly, the Government's arguments amount to little more than a complaint that EN did not choose a mitigation option that would have reduced damages (in this case, but not the next), something DOE, the party in breach, would have preferred. This is exactly the type of Monday-morning quarterbacking that the law does not allow. *See Citizens Fed. Bank*, 66 Fed. Cl. at 185; *Koby*, 53 Fed. Cl. at 497.

### C. The Government Is Not Entitled To Offsets For The Speculative Cost of Cask Loading And Plant Modifications EN Will Still Incur When DOE Eventually Performs.

The Government asserts that it is entitled to offsets to EN's damages in the amount of $3.4 million to account for expenses that would have been incurred in connection with cask loading activities had DOE timely performed. The Government's claimed offsets include the costs that would be associated with loading DOE casks in the non-breach world as well as certain preparatory activities to load DOE casks, such as infrastructure modifications,[17] procedure development and training, and equipment purchases[18] that the Government claims would have been needed for cask loading. Because the Government breached the Contract and these activities have never occurred, the Government estimates its claimed offsets based on actual costs incurred by EN in connection with implementation of dry cask storage, which the Government's damages expert uses as proxies for DOE costs. The Government is not entitled to its claimed reductions or offsets for three reasons.

*First*, contrary to the Government's argument, the costs the Government argues should be offset have not been avoided by EN but only deferred. The Government's basis for its claimed offsets is the general rule that "any cost or other loss that [the non-breaching party] *has avoided by not having to perform*" must be subtracted from damages. Restatement (Second) of Contracts

---

[17] The reductions proposed by the Government still in dispute are the installation of cask pit restraints, modifications to the wash down basis, and the installation of a haul path.

[18] The Government claims EN would have purchased a device similar to the HERMIT device used for loading Holtec casks. In addition, the Government has challenged the purchase of an underwater camera used for cask loading, claiming it could be used for other purposes.

§ 347(c) (emphasis added). In past cases, the Government has not cited a single case supporting its view that it may be entitled to an offset for costs which are merely deferred, and in fact this position has been uniformly rejected in past SNF cases. *Carolina Power & Light*, 82 Fed. Cl. at 52-53 (no offset for loading costs); *Entergy Arkansas II*, 79 Fed. Cl. at 70-71 (same); *Grand Gulf II*, 78 Fed. Cl. at 797 (no offset for various plant modifications required for DOE loading); *Northern States III*, 78 Fed. Cl. at 468-69 (no offset for loading costs); *Pacific Gas & Elec. Co. v. United States*, 73 Fed. Cl. 333, 416 (2006) (same); *Sacramento Mun. Util. Dist. II*, 70 Fed. Cl. at 372-73 (same); *TVA II*, 69 Fed. Cl. at 542-43 (same).

Significantly, there is no dispute that EN will *still incur* the costs the DOE seeks to deduct from damages when DOE eventually performs at some point in the future. EN will incur the labor and related costs associated with actually loading DOE casks when DOE eventually performs. (Stuart Dep. at 275-76, C.App. 475.) In addition, there will be costs associated with development of cask loading procedures and training materials. (*Id.* at 261-63, C.App. 471-72.) Finally, because the plant modifications made to implement dry cask storage were specific to the Holtec cask system, EN will need to perform engineering analyses to determine what modifications will be required for DOE-supplied casks, and make further infrastructure modifications (*Id.* at 278-81, C.App. 476), and EN will still need to purchase equipment specific to the DOE cask design (*Id.* at 289-92, C.App. 478-79).[19]

*Second*, in addition to the fact that the reductions sought by the Government represent activities that are only deferred, the method used by the Government to calculate its reductions is speculative. As is discussed more fully in EN's motion in limine to bar the testimony of Charles Stuart, the Government's offset claim rests entirely on the opinion offered by Mr. Stuart about

[19] As noted above, the Government calculates its offsets by looking at the costs of dry cask-related activities it claims are comparable. However, as EN witnesses will testify and as Mr. Stuart admits, the breach-related activities were performed specifically for the Holtec dry cask storage system. As EN's expert Eric Bush will testify, the modifications required for each cask system requires a separate analysis and DOE's eventual system likely will require different modifications.

(1) the type of cask that DOE would have used in the non-breach world; and (2) why that hypothetical cask is *similar enough* to the Holtec dry cask system to utilize actual costs as proxies for non-breach world costs. However, as argued more fully in EN's motion in limine, and as Rule 30(b)(6) testimony from the Government confirms, the DOE never identified the type of cask it would have used to pick up fuel from EN beginning in 1998 or the type of cask it will use when it begins in the future. Furthermore, Mr. Stuart has not performed the engineering analyses required to determine what modifications are needed based on his speculative assumptions regarding design of the hypothetical DOE-supplied cask.

Furthermore, at his Rule 30(b)(6) deposition in this case, the Government's witness on the cask DOE would have used had it performed, Mr. Kouts, could not state whether a hypothetical DOE cask would have likely matched any of the various characteristics of the DOE cask that Mr. Stuart claimed could be assumed. (Test. App. A 1565-66.) In fact, while all but one of Mr. Stuart's proxy casks are welded shut, Mr. Kouts testified that the transportation cask that DOE would have used had it started performing in 1998 would have used a bolted closure. (Test. App. 1566.) This is significant because welding a storage cask represents a significant expense and would make DOE casks less expensive to load than Holtec casks. Yet, the Government's experts do not take any of these differences into account in their calculations.

Faced with this issue, Judge after Judge of this Court has declined to speculate regarding loading-related costs that would have been incurred by utilities in the non-breach world given uncertainties surrounding both the method and costs of loading hypothetical DOE casks.[20] As

[20] *Carolina Power & Light*, 82 Fed.Cl. at 52-53 (no offset for loading costs); *Entergy Arkansas II*, 79 Fed. Cl. at 70-71 (same); *Grand Gulf II*, 78 Fed. Cl. at 800-04 (no offset for costs of various plant modifications necessary to load casks); *Northern States III*, 78 Fed. Cl. at 468-69 (no offset for supposed saved loading costs); *Southern Nuclear I*, 77 Fed. Cl. at 450-51 (no offset for loading costs and second bathtub rack); *PG&E*, 73 Fed. Cl. at 416 (no offset for purported saved loading costs); *Yankee Atomic*, 73 Fed. Cl. at 285-86 (no offset for supposed benefit in loading dual-purpose canisters that might eventually be transportable); *Sacramento Mun. Util. Dist. II*, 70 Fed. Cl. at 372-73 (2006) (no offset for costs of preparing, packaging, inspecting, and loading SNF for delivery to DOE); *TVA II*, 69 Fed. Cl. at 542-43 (no offset for loading costs).

Judge Lettow noted, "[a]s matters now stand, any benefit inhering in [the utility] because of delayed loading costs would be entirely speculative. It is not possible to ascertain the method DOE will ultimately use for SNF acceptance." *TVA II*, 69 Fed. Cl. at 542. Because the type of cask DOE would have used in the non-breach world is speculative, as is the type of cask DOE will eventually use, any "benefit" that EN may have incurred by avoiding either the modifications needed to load casks or the expenses associated with cask loading itself is also inherently speculative.

*Third*, with respect to its arguments regarding preparatory activities, the Government ignores provisions of the Standard Contract itself. Although EN will bear the costs of actually loading casks, the Standard Contract provides that DOE will provide a cask "suitable for use at the Purchaser's site." (JX 1 at Art. IV.B.2.) A cask suitable for EN's site means that EN would not incur any expenses to make modifications. Furthermore, the Standard Contract provides that DOE would provide written procedures, training, tools and other ancillary equipment needed to use the cask. (JX 1 at Art. IV.B.2(a)-(d).) Accordingly, the Government's suggestion that EN would have incurred any of these costs in the non-breach world is contradicted by the Standard Contract itself.

**D. EN Should Recover The Costs Of Employee Time Spent On The ISFSI.**

In implementing its dry cask storage project and subsequent cask loading activities, EN relied on a combination of its own employees and contractors. The time spent by 344 EN employees on the project was tracked through electronic time-sheets using EN's work order system, and the associated cost was assigned directly to the dry cask storage project. Accordingly, EN has claimed the cost of internal time directly charged to the dry cask storage project as damages.

As it has in other spent fuel damages cases, the Government contends that each salaried employee must spend a threshold percentage of his or her total time on mitigation activities for EN to recover the cost of the employee's labor. In this case, the Government's expert Larry

Johnson asserts that an employee must devote more than 50% of his time in any particular year for the time to be recoverable, reasoning that any individual who worked less than 50% of his time on dry cask storage still would have been employed by EN even if DOE had not breached.

Applying Mr. Johnson's threshold percentage generates completely arbitrary results. For example, Mr. Johnson excludes the time of EN employee John Maganas, who worked a total of 1,289 hours on the dry cask storage project, but no more than 49% of his time in any particular year was devoted to dry cask storage. In contrast, Mr. Johnson does not challenge the time of Vincent Cortese, who worked 692 total hours on the project because he spent 60% of his time on the dry cask storage project in 2002. In total, Mr. Johnson excludes the cost of approximately 20,000 hours of employee time from EN's damages under his rule, apparently assuming this is not time that EN could have used for other purposes had DOE not breached.

The Government's arbitrary approach has been uniformly rejected by the Court in prior cases.[21] As Judge Wheeler recently stated, Mr. Johnson's rule is "arbitrary and without support in the law." *Carolina Power & Light*, 82 Fed. Cl. at 47. Mr. Johnson's rule fails to recognize that every hour spent by EN employees on breach-related activities is an hour that the employee did not spend on other productive work for EN. *See id*. When viewed as the loss of time that could have been spent on other activities, there is no "principled distinction" between an employee who was fully devoted to a breach activity and an employee whose role was more limited. *Northern States III*, 78 Fed. Cl. at 468. Mr. Johnson's rule also creates a perverse incentive for utilities to use contract labor on breach-related activities rather than potentially less expensive internal labor. *See Southern Nuclear I*, 77 Fed. Cl. at 442-43.[22]

---

[21] *Carolina Power & Light*, 82 Fed. Cl. at 47-48; *Entergy Arkansas II*, 79 Fed. Cl. at 66-67; *Grand Gulf II*, 78 Fed. Cl. at 798; *Northern States III*, 78 Fed. Cl. at 468; *Southern Nuclear I*, 77 Fed. Cl. at 442-43; *TVA II*, 69 Fed. Cl. at 539; *PG&E*, 73 Fed. Cl. at 408-09.

[22] Other courts have recognized that a party is entitled to recover the cost of its employees' time, even salaried employees' time, responding to either a breach of contract or a tort. *Dunn Appraisal Co. v. Honeywell Info. Sys. Inc.*, 687 F.2d 877, 883-84 (6th Cir. 1982) (affirming award of damages for management time incurred in resolving problems with defective computer system); *Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781, 785-86 (9th Cir. 1982) (allowing

There is no reason for a different ruling in this case. All time spent by an EN employee on the dry cask storage project, whether an hour or a thousand hours, represents time that the employee could not devote to other projects or tasks, and thus represents a loss to EN. As EN's senior managers will testify, EN could have devoted the 20,000 person-hours Mr. Johnson arbitrarily eliminates from damages to numerous other activities. In addition, EN was undergoing a reduction in its workforce during the relevant time period and might have employed fewer personnel had DOE performed its obligations under the Standard Contract. The Government has not raised any challenge to whether EN's time records accurately reflect time worked on dry cask storage, or claimed that the accounting system's costs applied for each hour of time do not represent EN's actual costs.[23] Accordingly, the Government's assertion that some of EN's internal labor charges should be excluded from its damages has no merit.

**E. EN Is Entitled To Recover Internal Services Charges Associated With The Dry Cask Storage Project.**

EN's damages claim also includes internal services charges, including costs of support services such as personnel supervision, payroll, procurement, accounting, and information technologies such as the computer network and telephone system. These services are necessary support for EN employees while they perform their day-to-day activities and are accordingly allocated to the very projects to which each employee also charges his time. EN accumulates these costs in a single set of accounts and allocates them to each project based on the hours the

recovery of portion of supervisor's salaries); *Freeport Sulphur Co. v. S/S Hermosa*, 526 F.2d 300, 303-06 (5th Cir. 1976) (allowing recovery of the costs of salaried engineers utilized to make repair).

[23] Mr. Johnson also excludes $454,331 in overtime charges based exclusively on a 2003 audit conducted by EN's internal auditor. That audit determined that in some isolated instances, EN employees had misapplied EN's overtime policy. The audit did not identify any instance in which the employee did not work the time identified, merely that some time was incorrectly classified as overtime. Furthermore, the audit revealed only *one* instance in which 10 hours of dry cask storage time was classified incorrectly. Accordingly, given that Mr. Johnson does not dispute that employees actually worked the time recorded, his wholesale exclusion of a portion of the overtime in EN's claim is inappropriate.

employees charge to the project. Accordingly, for every hour an EN employee charged to the dry cask storage project, the project was also charged a portion of the total costs to support that employee's activities.

As with the costs of internal labor, Mr. Johnson asserts that these internal services costs should be excluded because they are "fixed" or did not change as a result of the breach. Mr. Johnson's arguments make no more sense with respect to internal services charges than they do with respect to internal labor. Mr. Johnson does not dispute that EN employees working on the dry cask storage project were supported by the efforts of various corporate departments. Multiple courts in other SNF cases have awarded plaintiff utilities the costs of similar administrative overheads. *Carolina Power & Light*, 82 Fed. Cl. at 48; *Entergy Arkansas II*, 79 Fed. Cl. at 65, 68-69; *Grand Gulf II*, 78 Fed. Cl. at 799-00. Other federal court cases also support the award of overhead costs. *United States v. Peavey Barge Line,* 748 F.2d 395, 399-01 (7th Cir. 1984) (affirming award of overhead charges for lock and dam repair); *Dep't of Water & Power v. United States*, 131 F. Supp. 329, 330-32 (S.D. Cal. 1955) (allowing recovery of indirect charges for labor, tools, and administrative and general expense); *Chain Belt*, 115 F. Supp. at 712, 713 & n.5 (allowing recovery of a 5% administrative overhead charge).

### F. EN Is Entitled To Recover Financing Costs Associated With Dry Cask Storage.

In Defendant's Motion In Limine To Strike Plaintiff's Claim For Interest, the Government argues that EN should not be permitted to recover the financing costs incurred when EN borrowed funds to finance the cost of the dry cask storage project it was forced to build as a result of DOE's breach. (Dkt. No. 109.) As EN explains more fully in its Opposition to that motion (Dkt. No. 131), the increased financing costs EN seeks are recoverable on the recognized authority of interest ***as an independent claim***: they are actual out-of-pocket damages directly traceable to the mitigation efforts EN was required to undertake, costs which were reasonably foreseeable to the Government at the time of contracting and are valid expectation damages. In

other SNF cases, Judges of this Court have recognized that a plaintiff can recover these costs if it can present evidence of the type EN will present in this case – evidence clearly linking the financing costs it paid with the dry cask storage project. *Entergy Arkansas II*, 79 Fed. Cl. at 70; *Grand Gulf II*, 78 Fed. Cl. at 807-08; *TVA II*, 69 Fed. Cl. at 542; *see Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1582 (Fed. Cir. 1994); *Centex Corp. v. United States*, 55 Fed. Cl. 381, 390 (2003).

**Conclusion**

For the reasons set forth above and to be established through trial evidence, the Court should enter judgment for damages in the amount of $56,859,341.

Dated: July 18, 2008

Respectfully submitted,

s/ Norman M. Hirsch
NORMAN M. HIRSCH
Jenner & Block LLP
330 N Wabash Avenue
Chicago, IL 60611
(312) 923-2782 telephone
(312) 840-7782 facsimile

OF COUNSEL:

David A. Handzo
Jenner & Block LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
(202) 639-6000

William D. Heinz
David Jiménez-Ekman
Christopher Tompkins
April A. Otterberg
Jenner & Block LLP
330 N Wabash Avenue
Chicago, IL 60611
(312) 222-9350

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of July 2008, a copy of the foregoing Energy Northwest's Memorandum Of Contentions Of Fact And Law was filed electronically with the Court's CM/ECF system. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Norman M. Hirsch