IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ENERGY NORTHWEST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-10C |
| | ) | (Chief Judge Damich) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO ENERGY NORTHWEST'S RESPONSE TO THE GOVERNMENT'S MOTION TO STRIKE ENERGY NORTHWEST'S DESIGNATION OF DEPOSITION AND PRIOR TRIAL TESTIMONY

Defendant, the United States, respectfully submits this reply to plaintiff's July 9, 2008 response to the Government's motion to strike plaintiff's designations of deposition and trial testimony. Plaintiff, Energy Northwest, essentially fails to address our primary challenge to its designations, preferring instead either to accuse the Government of some procedural error or to suggest that the Government has already made these same arguments in other spent nuclear fuel ("SNF") cases. Plaintiff's arguments miss the mark.

DISCUSSION

I. A MOTION TO STRIKE UNDER THESE CIRCUMSTANCES IS PROCEDURALLY PROPER AND, INDEED, THE ONLY RATIONAL MANNER OF ADDRESSING THE STAGGERING TESTIMONIAL DESIGNATIONS THAT ENERGY NORTHWEST SUBMITTED

In its response brief, Energy Northwest asserts that the Government's motion to strike is somehow procedurally improper because the Court directed Energy Northwest to submit deposition designations. Response, at 2-4. Energy Northwest claims that, because the Court issued a deadline of May 30, 2008 for the submission of deposition designations and a deadline of June 30, 2008 for the submission of objections to those designations, the Government essentially should be found to have waived any objections to those designations because it has

not met the June 30, 2008 deadline for submitting its objections and counter-designations and that the Government "agreed" to these deadlines, although it then requests that the Government be given "a short period of time" to respond to its massive designations.[1]

As an initial matter, when the Government "agreed" to the deadlines in the Court's April 21, 2008 trial preparation order, the Government had no idea that Energy Northwest would submit over 3,300 pages of deposition designations. The sheer volume of Energy Northwest's designations is staggering. As we explained in our motion to strike, the plaintiff in Pacific Gas & Electric Co. v. United States, Nos. 04-74C & -75C (Fed. Cl.), designated approximately 274 pages of testimony, while the plaintiffs in System Fuels, Inc. v. United States, No. 03-2624C (Fed. Cl.), and Boston Edison Co. v. United States, No. 99-447C (Fed. Cl.), designated approximately 390 pages and 546 pages, respectively. Even in Dairyland Power Cooperative v. United States, No. 04-106C (Fed. Cl.), an SNF case that was just tried before this Court, the number of pages designated was approximately 1,116 pages – a number almost one-third the size of Energy Northwest's designations.

We were shocked when we received Energy Northwest's designations, particularly since, prior to May 30, 2008, Energy Northwest had provided absolutely no indication that it intended to designate past testimony that would exceed in length the entire nine-day 3,130-page trial

[1] Energy Northwest requests that the Court deny our motion and require us to respond to the designations "in a short period of time." Response at 4. However, there are nearly three months before the trial is scheduled to begin so that it is not necessary to punish the Government for filing a motion that it believed appropriate by requiring an oppressive turn-around on thousands of pages of designations. If the Court denies our motion to strike, we request at least 30 days from that denial to file objections and counter-designations to plaintiff's designations. The effort to respond to the more than 3,300 pages of designations and identify appropriate counter-designations will be extremely time-consuming and will plainly detract us from other trial preparation activities.

transcript in the Pacific Gas & Electric case. Although Energy Northwest accuses the Government of some type of gamesmanship by filing its motion to strike, any questionable conduct involves Energy Northwest's suggestion of deadlines for our agreement without informing us of the enormous volume of designations that it intended to submit. Energy Northwest had years to put together its massive 3,300-page set of deposition designations. Its suggestion that the Government should have to respond to these in total within 30 days, or else waive its objections and right to counter-designate, is outrageous.[2]

In any event, we did not subvert – either intentionally or inadvertently – the rules of the Court through our motion to strike. Our intention simply was to draw the Court's attention to the fact that this plaintiff has submitted more pages of deposition and trial designations than any other plaintiff in any other SNF trial. Energy Northwest's submission of over 3,300 pages of testimonial designations is not in keeping with the spirit of the Rules of the Court or the Court's preference for live testimony. See Kolb v. Suffolk County, 109 F.R.D. 125, 127 (E.D.N.Y. 1985) (even deposition testimony conceded to be admission under Fed. R. Evid. 801(d)(2)(D) should not be used in place of witness's live testimony when witness is readily available to

[2] Similarly, Energy Northwest's suggestion that the Government's filing of a motion to strike is a "tactic" that it has "employed in other cases," Response at 3, is unfounded. In other SNF cases, the Court has not issued an order identifying a deadline for the submission of deposition designations. Instead, various plaintiffs have simply submitted a "notice" of deposition designations and filed them in the record of the case. The Court's rules do not provide for the filing of such a notice and, as a result, do not indicate when, if ever, the Government could file objections or counter-designations. In other cases, we have filed motions to strike based upon the plaintiffs' failure to file a motion with the Court for leave to submit deposition designations and to permit the Government an opportunity to object. Here, our motion to strike is based upon the overwhelming breadth of Energy Northwest's designations, as well as our identification of specific objections to categories of designations. Nevertheless, Energy Northwest has mischaracterized the basis of the Government's actions in other cases.

testify at trial). In fact, Energy Northwest's massive submission deprives the Court of its ability to assess testimony for credibility and truthfulness. Given the sheer volume of the testimonial submissions here, there may be no reason to present live testimony. Indeed, the Court may legitimately ask why it should conduct a trial of this matter at all.

Energy Northwest complains that our motion was not contemplated by the Court's trial preparation order or authorized by the Court's Rules. However, Energy Northwest has identified nothing in the Court's rules that precludes the Government's request or makes it somehow inappropriate. Energy Northwest's assertion that the Government could only make a generalized objection to the massive breadth of Energy Northwest's designations, but, at the same time, was obligated to perform the massive amount of work necessary to identify every single individual objection to every single page of testimony and to identify the entirety of its counter-designations, all without knowing whether the Court would agree with us that Energy Northwest's designations are overbroad, is an attempt to obligate the Government to undertake massive amounts of busywork that may ultimately be unnecessary. We presume that, if the parties' positions were reversed, Energy Northwest would not want to pay the enormous attorney fees that would be necessary to fund the review and counter-designation work in which its attorneys would have to engage to respond to massive deposition designations by the Government and would think that it had the right, before it undertook such extensive work, to ask the Court for relief. We cannot understand why the Government has no such equivalent right.

## II. THE GOVERNMENT'S MOTION CHALLENGES THE ENTIRETY OF PLAINTIFF'S DEPOSITION AND TRIAL DESIGNATIONS

Energy Northwest essentially fails to address our primary concern regarding the volume of testimonial designations that it filed.

First, as we discussed in our motion to strike, Energy Northwest designated such a huge volume of testimony that it provides for essentially a "shadow" trial. In other words, although Energy Northwest intends to proffer evidence live at trial, its proposed designations exceed the length of the entire nine-day Pacific Gas trial. Even Energy Northwest admits that it is "[t]rying part of this case through the designations," Response at 2, precluding the Court from evaluating their credibility on the stand, in violation of the basic purposes of a trial. See United States v. Mathis, 559 F.2d 294, 299 (5th Cir. 1977) ("[t]he jury's observation of the demeanor of the witness and the effectiveness of cross-examination in the discovery of the truth are the traditional reasons for the preference" for live testimony). Further, the massive breadth of the designations, both in size and scope, makes it likely that the Government will have to identify massive counter-designations to ensure that the Government has not inadvertently failed to respond to some issue that Energy Northwest may raise in post-trial briefing. Plainly, Energy Northwest is creating essentially a paper trial, which contradicts the basis purpose of this Court's fact-finding mission.

Second, there can be no doubt that permitting plaintiff to designate over 3,300 pages of prior testimony allows plaintiff to circumvent the Court's time limits for trial.[3] As we noted in

---

[3] The Court meticulously maintained time-keeping records during the recent trial in Dairyland Power Cooperative v. United States, No. 04-106C (Fed. Cl.), cautioning each party that, when it had exceeded its allotted time, it would not be provided any additional time.

our motion to strike, the number of pages designated exceeds any other SNF case that has already been tried. Energy Northwest justifies its massive designations by stating that the Government's "unfounded" position on the rate of acceptance requires it to present evidence regarding the entire 25-year DOE program. Response at 2. Yet, the Government does not require designations to explain its position regarding the acceptance rate issue, and no other plaintiff has found it necessary to designate the massive number of pages of testimony that Energy Northwest allegedly requires to deal with that issue. In fact, as the Court knows from the recent Dairyland trial, the Government utilizes a minimum of time for evidence of rate. Again, no other SNF plaintiff has required the incredible volume sought by plaintiff here, whether to put forth its position on rate or to prove its damages.

Energy Northwest also asserts that designating testimony is a far more efficient way to proceed instead of burdening the record with live testimony. Yet, Energy Northwest's plan to present essentially a paper trial is the antithesis of what a trial is about. See Mathis, 559 F.2d at 299; Kolb, 109 F.R.D. at 127. Trial lawyers, whether they are trying a case involving a small claim or a claim worth millions of dollars, are expected to synthesize and summarize complex facts for presentation to the trier of fact. Instead of preparing a trial strategy that accomplishes those goals, Energy Northwest prefers to clutter the record with thousands of pages of testimony through which the Court and defendant will have to digest, in addition to preparing for the trial testimony that Energy Northwest intends to present. Such a strategy is not efficient, and the Court possesses the authority to limit Energy Northwest's ability to circumvent the Court's role in making credibility determinations from live evidence. See Baskett v. United States, 2 Cl. Ct. 356, 359 (1983) (discussing this Court's power over trial proceedings and evidence).

Third, the sheer volume of Energy Northwest's designations is overbroad and unduly burdensome both for the defendant and for the Court. The designations require not only that defendant review and make appropriate objections, but also review for document issues such as whether the proper foundation has been laid for each document that plaintiff attempts to introduce through deposition or trial testimony. The Court then must review all of those objections and rule upon them. Further, defendant must review and counter-designate where the record must be completed or supplemented. With over 3,300 pages of testimonial designation, the task, requiring many man-hours for the Government and the Court, is daunting.

Moreover, counter-designations of this magnitude do not comport with the spirit of either Rule 32 or Rule 801(d)(2)(C). Rule 32 contemplates the use of deposition testimony when a witness is unavailable for trial. In its response to our motion, Energy Northwest states that its presentation of massive designations is "far more efficient than calling witnesses to give live testimony . . . ." Response at 2. Yet, hundreds of the pages of testimony that Energy Northwest has designated are of Government witnesses who will appear at trial, including Christopher Kouts, Robert Morgan, David Zabranksy, and Alan Brownstein. Energy Northwest's stated rationale for its designations conflicts with the actual designations that it made.

Energy Northwest shifts the blame for the volume of designations to the Government and asserts that it had to provide an overbroad number of pages because, in other SNF cases, the Government has complained that plaintiffs have not established through their designations that a particular deponent was a Government employee whose testimony constitutes an "admission" by the Government. Response at 12-13. This argument is meritless. Every proponent of a deposition designation pursuant to Federal Rule of Evidence 801(d)(2)(D) must provide the

showing necessary that the testimony that they have designated for admission falls with the scope of the responsibility of the witness. This requirement does not justify the designation of over 3,300 pages of prior testimony, and Energy Northwest's designations do not necessarily eliminate this failure in many instances.

Finally, Energy Northwest asserts that we failed to provide any examples of its failure to provide appropriate foundation and authentication for the admission of documents included within the designations in our motion and that, in any event, those objections should be made when we respond to its designations. However, there are many examples of this failure in the designations. For example, Energy Northwest designated the following testimony from David Zabranksy to provide foundation for Plaintiff's Exhibit No. 89:

> Q: Do you recognize this document.
>
> A: I don't recognize this specific document, no.
>
> * * *
>
> Q: Can you tell me, based on your experience at DOE, what the function of this particular document is? Is this a particular type of document that gets generated in the course of processing changes to a contract at DOE.
>
> A: No, I don't know what the function of this document is.

Zabransky dep. (4/17/02) at 126:18-127:20, DA2. We could offer a number of other examples of such testimony. See, e.g., PX162, Kouts dep. (10/11/06, Ex 5) at 45-47, DA4-5; PX 190, Milner dep. (5/7/02, Ex 76) at 589-591, DA7. The point is that, because of the volume of designations, the task of checking each of the documents for foundation and authentication is overly burdensome, time-consuming, and not justified in light of the purpose of a trial: to allow the Court to evaluate the demeanor and credibility of witnesses.

It is axiomatic that the trial court has the power to issue pretrial rulings that will ensure the efficient operation of the trial. We have requested that the Court either strike Energy Northwest's testimonial designations in their entirety or, at the very least, impose a strict page limitation on the number of deposition designations that Energy Northwest may offer (a number that we propose the Court limit to 250 pages) and require that the designations be read into the record during the trial. A requirement to read the designations into the record will assist Energy Northwest in narrowing the issues that it intends to present to the Court, assist it in focusing its trial strategy, and reduce the volume of designations that the Court must consider.[4]

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court deny Energy Northwest's motion to designate deposition or trial testimony or, in the alternative, order Energy Northwest to reduce the volume of designations and require that it read those designations into the record at trial.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Harold D. Lester, Jr.
HAROLD D. LESTER, JR.
Assistant Director

[4] Energy Northwest has raised several other arguments in its response brief. In response to those arguments, we respectfully refer the Court to our motion to strike, in which we discuss those arguments.

OF COUNSEL:

JANE K. TAYLOR
Office of General Counsel
U.S. Department of Energy
1000 Independence Ave., S.W.
Washington, D.C. 20585

SCOTT DAMELIN
SONIA ORFIELD
Trial Attorneys
Department of Justice
Washington, D.C. 20530

July 25, 2008

s/Sharon A. Snyder
SHARON A. SNYDER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington D.C. 20530
Tele: (202) 616-0347
Fax: (202) 307-2503

Attorneys for Defendant

# Appendix

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-----------------x
YANKEE ATOMIC ELECTRIC COMPANY; : Case Nos. 98-126C,
CONNECTICUT YANKEE ATOMIC POWER . 98-154C, 98-474C,
COMPANY; MAINE YANKEE ATOMIC · 98-483C, 98-484C,
POWER COMPANY; FLORIDA POWER & . 98-485C, 98-486C,
LIGHT COMPANY, NORTHERN STATES : 98-488C, 98-614C,
POWER COMPANY; DUKE POWER, a : 98-621C, 99-447C,
Division of DUKE ENERGY CORP.; 00-440C, 00-695C,
INDIANA MICHIGAN POWER COMPANY; . 00-703C, 01-115C,
SACRAMENTO MUNICIPAL UTILITY : 01-116C, 01-249C
-----------------X
(Caption continued on the next page)

Deposition of DAVID ZABRANSKY
Washington, D.C.
Wednesday, April 17, 2002
9:38 a.m

Job No.: 12597-1
Pages 1 through 226, Volume 1
Reported by: Diane Gomez, RPR

2

DISTRICT; SOUTHERN NUCLEAR :
OPERATING COMPANY, et al.; :
COMMONWEALTH EDISON COMPANY; :
BOSTON EDISON COMPANY; GPU :
NUCLEAR, INCORPORATED; WISCONSIN :
ELECTRIC POWER COMPANY; POWER :
AUTHORITY OF THE STATE OF NEW :
YORK; OMAHA PUBLIC POWER DISTRICT;:
NEBRASKA PUBLIC POWER DISTRICT; :
and TENNESSEE VALLEY AUTHORITY, :
Plaintiffs :
v. :
THE UNITED STATES, :
Defendant :
-----------------X

3

Deposition of DAVID ZABRANSKY, held at the offices of:

ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004
(202) 942-5000

Pursuant to agreement, before Diane Gomez, Registered Professional Reporter and Notary Public of the District of Columbia.

4

APPEARANCES

ON BEHALF OF PLAINTIFFS FLORIDA POWER & LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INC., POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, and NEBRASKA PUBLIC POWER DISTRICT:
ALEX D. TOMASZCZUK, ESQUIRE
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 847-5097

ON BEHALF OF PLAINTIFF SACRAMENTO MUNICIPAL UTILITY DISTRICT.
JEFFREY L. HANDWERKER, ESQUIRE
ARNOLD & PORTER
555 12th Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

125

and the industry that became known as the ACR issue resolution process. I don't know when it began exactly. My recollection is sometime in the '86ish time frame, '87ish time frame. But I don't have knowledge as to when it started.
Q Would the ACR issue resolution process have dealt with changes to the contract?
A It would have dealt with issues that the utilities as a group and DOE thought required discussion for clarification. It could have resulted in changes to the contract.
Q Okay. Do you recall what those issues were?
A Specifically, no. There were 30-something-odd issues I believe, but I don't recall offhand what they were.
Q Do you recall ever any discussion -- and I'm looking at the first page of Exhibit 12 to your deposition where in the whereas clause it has "Whereas the DOE has responsibility following the commencement of operation of a repository," and has a change indicated and has "delete the word 'repository' and

126

insert the phrase 'DOE facility.'" do you remember that ever being a subject of the ACR issues task force?
A It was not.
Q Or, excuse me, ACR issue resolution process?
A I don't -- I don't recall it as one of the issues, no.
Q Do you recall in any other context a question regarding changing the word "repository" to "DOE facility" in that clause?
A I do not recall that.
Q Even since you've been at DOE?
A No, do not recall.
MR. CRAWFORD: Can we take a break?
MR. BLANTON: Yeah, we sure can.
(There is a recess from the record.)
Q Mr. Zabransky, Exhibit 13 to your deposition is a document entitled Index to Tables of Issues Related to the Standard Contract and has a Bates number CTR 0060139 at the bottom. And goes from 0139 to 0174 on the Bates numbers.

127

(Deposition Exhibit Zabransky 13 was marked for identification and was attached to the transcript.)
Q Do you recognize this document?
A I don't recognize this specific document, no.
Q Do you recognize any of the issues as issues that the ACR issues resolution process addressed?
A This appears to be some of the issues, if not all the issues -- some of the issues that were developed as part of the ACR issue resolution team meeting the DOE process, whatever you want to call it.
Q Can you tell, based on your experience at DOE, what the function of this particular document is? Is this a particular type of document that gets generated in the course of processing changes to a contract at DOE?
A No, I don't know what the function of this document is.
Q Let me get you to look for a second at -- it's going to be -- the Bates number at the bottom of

128

the page is going to be CTR -- excuse me. That's not right either. CTR 0060158. This is talking generally about the purchaser's right to adjust the quantities of SNF and HLW plus or minus 20 percent from its delivery commitment schedule.
A Yes.
Q Do you remember that being an issue in the ACR issues resolution process?
A That was an issue that was identified.
Q Could you describe what the issue was?
A Well, the issue that was identified by DOE was that -- and again, I was not at the DOE at the time, but as DOE identified the issue for our discussion was that how was that going to work and what did that mean. And how would that be -- how would that affect transportation cask planning and procurement. So it was a scheduling and procurement and cask availability issue that they wanted to discuss.
Q And the "that" being the option of the purchaser to adjust the quantities listed in the DCS by 20 percent? When you say "that," is that what

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - x

SYSTEM FUELS, INC., on its own :
behalf and as agent for SYSTEM ENERGY :
RESOURCES, INC., and SOUTH MISSISSIPPI : No. 03-2624C
ELECTRIC POWER ASSOCIATION, : (Judge Braden)
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. : PAGES 1 - 96

- - - - - - - - - - - - - - - - - - - - x

October 11, 2006
Washington, D.C.

Deposition of CHRISTOPHER KOUTS, held at the offices of Pillsbury, Winthrop, Shaw, Pittman, 2300 N Street, N.W., Washington, D.C., commencing at 9:43 a.m., Wednesday, October 11, 2006, before Elizabeth Mingione, Notary Public.



DA3

Page 42

MRS facility, which is a prerequisite for initiation of the waste acceptance process in 1998.
What is your understanding, if you have any, as to significant progress that had been made as of February 1992?
A. Reading on in the letter, the director says, For example, the department has awarded four grants in jurisdictions who are studying the feasibility of hosting an MRS facility. Several other grant applications have also been received and are being processed by the department.
So my assumption is that the progress is directly related to the issuance of additional grants.
Q. Okay. At this time were you involved in the MRS program?
A. No, I was not.
Q. Were you involved in the waste acceptance program at this point in time?
A. No, I was not.
MS. SULLIVAN: Objection, vague.
A. No, I was not.
Q. The last sentence of the letter states

Page 43

that, well, first, do you understand the term waste acceptance process? What does that mean to you?
A. Yes.
Q. And what does that mean to you?
A. The acceptance of spent fuel by the department in accordance with the provisions of the standard contract.
Q. Okay. Let's come back to that. I don't know if we need to mark this.
MS. SULLIVAN: I would like anything that the witness is shown to be marked as an exhibit to the deposition. It's created problems in the past.
MR. SILBERG: Well, if we are going to do that, let me just get an additional first page of the document so it's clear --
MS. SULLIVAN: I appreciate that.
MR. SILBERG: -- where it comes from.
MS. SULLIVAN: That's good.
BY MR. SILBERG:
Q. In the last sentence of the February 14, 1992 letter says, "I remain confident that waste acceptance can begin in 1998 at an MRS facility." To

Page 44

your understanding was that the position of the Office of Civilian Radioactive Waste Management in 1992?
MS. SULLIVAN: Objection. Document speaks for itself.
A. The director of the program is stating that in a letter, that's -- he speaks for the program.
Q. Okay. Did he ever lose confidence that waste acceptance can begin in 1998 at an MRS facility?
MS. SULLIVAN: Objection, vague, foundation.
A. I have no idea of knowing that.
Q. Did there come a time when the office acknowledged that waste acceptance can begin -- that waste acceptance could not begin in 1998 at an MRS facility?
MS. SULLIVAN: Objection, vague.
A. I believe the department indicated in documents to some extent later in the '90s that its ability to receive materials by 1998 was, you know, that it did not foresee that it could. The director at that time was Daniel Dreyfus. I believe he sent a letter to that effect.

Page 45

Q. And when was that letter sent?
A. I don't know the specific date.
Q. And to whom did he send it?
A. I don't know.
Q. Were you involved in the MRS process in the mid 1990s?
A. No, I was not.
Q. Okay. Were you involved in the waste acceptance process in the mid 1990s?
A. No, I was not.
MS. SULLIVAN: Objection, vague.
- - -
(A document was marked as Deposition Exhibit Number 5)
- - -
BY MR. SILBERG:
Q. I'm asking the reporter to mark a letter dated May 29, 1992 from Admiral James D. Watkins to Mr. James J. Howard, Northern States Power Company. First, do you know who Admiral Watkins is or was?
A. He was the Secretary of Energy at that time.

Page 46

Q. Have you ever seen this letter before?
A. No, I have not.
Q. Do you know who might have prepared it?
MS. SULLIVAN: Objection, foundation.
A. No, I do not.
Q. In the third paragraph, do you know anyone who might have seen it?
MS. SULLIVAN: Objection, foundation, vague.
BY MR. SILBERG:
Q. At the time it was being prepared?
MS. SULLIVAN: Same objections.
A. It would probably have gone through the director of the program.
Q. And at the time who was that?
A. I believe that would still have been Dr. Bartlett.
Q. The third paragraph of the letter states that the department will develop a permanent nuclear waste repository in a timely fashion. Do you understand what a timely fashion means in this letter?
MS. SULLIVAN: Objection, foundation. The

Page 47

document speaks for itself.
A. My assumption is that, just as it says in the second page, that timely fashion is 2010. And if you look at the first full paragraph on the second page, it says we expect to start accepting spent fuel at the repository in 2010. So I would assume that's what the secretary means.
Q. And that of course is no longer the department's expectation?
A. That's correct.
Q. Is it still the department's expectation that a permanent repository will commence operation within six years of completion of the NRC reviews, the license application, the language on the top of page 2 of the letter?
MS. SULLIVAN: Objection, relevance.
A. If I am to assume that this means that the department would begin operation of a repository six years after it -- within six years after receipt of a construction authorization, yes.
Q. Okay. The second full paragraph on page 2 of this letter says that the MRS schedule assumes that

Page 48

the nuclear waste negotiator would begin development of a negotiated agreement with the candidate MRS host in the first half of 1993.
Was there a candidate MRS host by the first half of 1993?
A. I think there were several hosts by that time.
Q. There were several?
A. Potential hosts.
Q. Was there a candidate MRS host?
A. I don't know specifically what the secretary was referring to or what site the secretary was referring to at that point.
Q. Did the nuclear waste negotiator begin development of a negotiated agreement with the candidate MRS host in the first half of 1993?
MS. SULLIVAN: Objection, foundation, asked and answered.
A. He may have begun it but there was never an agreement that was negotiated.
Q. Do you know who he may have begin it with?
A. No, I do not.

Page 49

Q. Are you aware whether -- I'm sorry. In the third paragraph it refers to formal negotiations between the potential host and the negotiator over the siting of an MRS. To your knowledge did such formal negotiations ever take place?
A. Since I was not intimately involved with the process, I have no way of knowing.
Q. Okay.
A. All I know is that there was no final negotiated agreement that was ever completed.
Q. In the next paragraph, it's the fourth full paragraph on page 2 of the letter it says, "To meet our schedules, we have established specific interim milestones to impose discipline and accountability." Are you familiar with any such milestones?
MS. SULLIVAN: Objection, foundation. The document speaks for itself.
A. My assumption would be that it's the enclosure to the letter that has key MRS program milestones.
Q. Have you ever seen those milestones before?
A. I may have, but they don't specifically





DA5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - -)
YANKEE ATOMIC ELECTRIC COMPANY )
(98-126C)(Merow, S.J.) )
CONNECTICUT YANKEE ATOMIC POWER ) Volume IV
COMPANY ) Washington, D.C.
(98-154C)(Merow, S.J.) ) Tuesday
MAINE YANKEE ATOMIC POWER COMPANY) May 7, 2002
(98-474C)(Merow, S.J.), et al., )
Plaintiffs, )
v. )
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - - - - - - - - - -)

Continued Deposition of RONALD A. MILNER, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being duly sworn by CHERYL A. LORD, a Notary Public in and for the District of Columbia, taken at the offices of SPRIGGS & HOLLINGSWORTH, 1350 I Street, N.W., Washington, D.C., at 9:30 a.m., Tuesday, May 7, 2002, and the proceedings being taken down by Stenotype by CHERYL A. LORD, RPR, CRR, and transcribed under her direction.

Page 588

A. Apparently so, yeah.
Q. And I believe that was Milner Exhibit 51. You can get that in front of you if you'd like.
And let me just say for the record, we're in a different locale this morning, but I believe all of the exhibits that have been previously marked are here and are present and available if you may need to refer to them in any of your testimony today.
My question to you is, there appears to be the notation handwritten next to your name, with comment.
Do you see that?
A. I do, yeah.
Q. Is that your handwriting, sir?
A. Actually very difficult to tell. I would assume so, but it doesn't look exactly like mine.
(Mr. MacDonald entered the room.)
BY MR. TOMASZCZUK:
Q. Do you know what comment you made on a draft of the APR/ACR that was appended to this document?
A. I have no idea.
Q. You agree that this notation appears to reflect that you had some comment on the draft?
A. I think it does, yes.

Page 589

Q. But no present recollection as to what you had to say?
A. I don't recall. It could have been very minor. I don't know.
Q. Would there be some written record of what your comment was?
A. Typically the way the process works is, when the document is circulated and there's a comment, it's unlikely that that comment had been retained in the handwritten form, but I don't know for sure.
Q. Did Mr. Zabransky work for you at this point in time?
A. He did not, no.
Q. Do you recall, Mr. Milner, what your position was at or about the time you would have commented on this draft APR/ACR?
A. Judging by the code indication there, I -- it's likely I would have been director of the office of program management integration.
Q. And that's suggested to you by the designation, RW 30?
A. Correct.
MR. TOMASZCZUK: Ms. Reporter, could we mark as Milner Exhibit 76 a series of DCS forms and

Page 590

related correspondence between the department of energy and Northern States Power Company.
BY MR. TOMASZCZUK:
Q. And I can represent that these documents were appended to one of the government's motions for summary judgment in this case, and I've put them together as one document just for purposes of facilitating your review. I have some questions for you about this packet.
(Milner Exhibit No. 76 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Mr. Milner, do you recall seeing any of these documents before today?
A. I've certainly seen the DCSs before, and I don't recall these specific ones.
Q. You've certainly seen the generic DCS form but don't recall seeing the specific Northern States DCS forms?
A. Correct.
Q. Would you have seen these at or about the time they were submitted by Northern States Power Company?
A. Likely I would not have, no.

Page 591

Q. And why is that?
A. In at least the later ones in the '97, '98 time frame, I believe at that point in time, I was acting deputy director, so -- of the program, so that would have been handled by an office below that level.
Q. It would have been below your radar screen, so to speak?
A. Correct.
Q. What about the early ones that were recently submitted and approved in the 19- --
A. Potentially earlier.
Q. -- '95?
These fairly reflect, do they not, a series of DCS forms and some approvals of those by the department of energy?
A. Yes.
MR. SHULTIS: Objection as to characterization.
BY MR. TOMASZCZUK:
Q. You can disagree with me if you'd like, sir.
Is that a fair characterization?
MR. SHULTIS: Same objection.
A. I believe that they were reflecting

CERTIFICATE OF FILING

I hereby certify under penalty of perjury that on July 25, 2008, a copy of "DEFENDANT'S REPLY TO ENERGY NORTHWEST'S RESPONSE TO THE GOVERNMENT'S MOTION TO STRIKE ENERGY NORTHWEST'S DESIGNATION OF DEPOSITION AND PRIOR TRIAL TESTIMONY" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Sharon A. Snyder