**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**VOLUME III OF VII**
**(Pages A 0282 to A 0444)**

---

# ENERGY NORTHWEST'S APPENDIX IN SUPPORT OF ITS REVISED NOTICE OF DESIGNATION OF DEPOSITION AND PRIOR TRIAL TESTIMONY OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO ADMIT PRIOR TESTIMONY INTO EVIDENCE

---

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
202-639-6000

NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

August 29, 2008

*Attorneys for Plaintiff*

## Table Of Contents To Appendix – Volumes I to VII

### Volume I

Documents Cited

DOE's Responses to Utility Plaintiffs' First Set of Interrogatories....A 0001

DOE's Responses to Utility Plaintiffs' Joint Supplemental Interrogatories....A 0013

April 3, 2002 Notice of Rule 30(b)(6) Deposition....A 0028

April 18, 2002 Notice of Rule 30(b)(6) Deposition....A 0033

November 12, 2004 Notice of Rule 30(b)(6) Deposition....A 0039

March 2, 2005 Notice of Rule 30(b)(6) Deposition....A 0043

April 19, 2007 Notice of Rule 30(b)(6) Deposition....A 0047

June 9, 2008 Notice of Rule 30(b)(6) Deposition....A 0050

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 2450874
(Fed. Cl. Sept. 17, 2004) (unpublished)....A 0052

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, slip. op.
(Fed. Cl. Sept. 21, 2004) (unpublished)....A 0065

*Wisc. Elec. Power Co. v. United States*, No. 00-697C, slip op.
(Fed. Cl. Aug. 16, 2007) (unpublished)....A 0075

Defendant's Unopposed Motion to Designate Prior Trial Testimony of
Mr. Robert L. Morgan in System Fuels....A 0105

### Volume II

Deposition Transcripts and Trial Testimony Excerpts

Chart of Energy Northwest Deposition and Trial Testimony Designations....A 0111

Barrett, Lake....A 0123
April 22, 2002....A 0124
April 23, 2002....A 0149
April 26, 2002....A 0173
May 8, 2002....A 0204
May 10, 2002....A 0228
May 14, 2002....A 0252

### Volume II (continued)


Brownstein, Alan ..........A 0257
April 9, 2002 ..........A 0258


### Volume III


Brownstein, Alan (continued)..........A 0282
April 10, 2002 ..........A 0282
April 11, 2002 ..........A 0308
June 14, 2002 ..........A 0319

Cole, Billy M. ..........A 0328
March 12, 2002 ..........A 0329
March 13, 2002 ..........A 0360
June 4, 2002 ..........A 0369

Dreyfus, Daniel ..........A 0373
May 15, 2002 ..........A 0374

Klein, Susan ..........A 0384
April 24, 2002 (Rule 30(b)(6))..........A 0385
April 25, 2002 (Rule 30(b)(6))..........A 0419

Kouts, Christopher ..........A 0428
January 30, 2004 ..........A 0429
August 2, 2004 (in the *Yankee Atomic* Trial Transcript) ..........A 0440


### Volume IV


Kouts, Christopher (continued)..........A 0445
April 11, 2005 (Rule 30(b)(6))..........A 0445
July 12, 2005 (in the *TVA* Trial Transcript)..........A 0459
January 16, 2007 (in the *System Fuels Mississippi* Trial Transcript) ..........A 0463
April 12, 2007 (in the *System Fuels Entergy Arkansas* Trial Transcript)..........A 0465
May 1, 2007 (Rule 30(b)(6))..........A 0472
May 2, 2007 ..........A 0484
June 12, 2008 (Rule 30(b)(6)) ..........A 0502

Lawrence, Michael..........A 0531
May 20, 2002 ..........A 0532
May 21, 2002 ..........A 0572
November 16, 2007 (in the *Carolina Power* Trial Transcript)..........A 0587

## Volume V


Milner, Ronald ........ A 0599
May 1, 2002 ........ A 0600
May 2, 2002 ........ A 0629
May 3, 2002 ........ A 0661
May 7, 2002 ........ A 0675
May 8, 2002 ........ A 0690
August 11, 2004 (in the *Yankee Atomic* Trial Transcript) ........ A 0695

Morgan, Robert ........ A 0703
March 21, 2002 ........ A 0704
March 22, 2002 ........ A 0737
June 25, 2002 ........ A 0745
August 3, 2004 (in the *Yankee Atomic* Trial Transcript) ........ A 0751
November 13, 2007 (in the *Carolina Power* Trial Transcript) ........ A 0757


## Volume VI


Pollog, Thomas ........ A 0762
April 11, 2002 (Rule 30(b)(6)) ........ A 0763
April 12, 2002 (Rule 30(b)(6)) ........ A 0799
May 15, 2002 (Rule 30(b)(6)) ........ A 0819
May 16, 2002 (Rule 30(b)(6)) ........ A 0823
August 4, 2004 (in the *Yankee Atomic* Trial Transcript) ........ A 0826
July 12, 2005 (in the *TVA* Trial Transcript) ........ A 0839
November 15, 2006 (in the *Northern States* Trial Transcript) ........ A 0846

Rosselli, Robert ........ A 0855
April 15, 2002 ........ A 0856
April 16, 2002 ........ A 0885

Rusche, Benard ........ A 0887
May 16, 2002 ........ A 0888
May 17, 2002 ........ A 0911

Slater-Thompson, Nancy ........ A 0921
April 21, 1999 ........ A 0922
April 22, 1999 ........ A 0932

## Volume VII


Slater-Thompson, Nancy (continued) ........ A 0941
June 13, 2002 ........ A 0941

Trebules, Victor ........ A 0955
April 17, 2002 ........ A 0956
April 18, 2002 (Deposition in Yankee Cases) ........ A 0982

Williams, Jeffrey ........ A 0985
June 11, 2002 ........ A 0986
January 22, 2004 ........ A 0993

Zabransky, David ........ A 1000
April 17, 2002 ........ A 1001
April 18, 2002 ........ A 1027
April 19, 2002 ........ A 1050
June 5, 2002 ........ A 1057
June 6, 2002 ........ A 1060
January 29, 2004 ........ A 1064
August 5, 2004 (in the *Yankee Atomic* Trial Transcript) ........ A 1067
March 29, 2005 (in the *SMUD* Trial Transcript) ........ A 1080
April 12, 2005 (Rule 30(b)(6)) ........ A 1083
July 12, 2005 (in the *TVA* Trial Transcript) ........ A 1092
October 27, 2005 (in the *Southern Nuclear* Trial Transcript) ........ A 1097

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :



(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia
Wednesday, April 10, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,



LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:26 a.m., Wednesday, April 10, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) (770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

APPEARANCES: (Continued)

On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, Georgia Power Company:

JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:

DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:

NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350



APPEARANCES: (Continued)

On behalf of the Defendant:

UNITED STATES DEPARTMENT OF JUSTICE
BY: BRYANT S. BANES, ESQ.
RUSSELL A. SHULTIS, ESQ.
1100 L Street, N.W.
Washington, D.C. 20530



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| ALAN BROWNSTEIN | PLAINTIFFS | DEFENDANT |
| By Mr. Tomaszczuk | 250 | |
| By Mr. Banes | | 388 |
| By Mr. Tomaszczuk | 407 | |
| By Mr. Hirsch | 411 | |

Afternoon Session -- 326


E X H I B I T S


| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 21 | 251 |
| 22 | 263 |
| 23 | 273 |
| 24 | 278 |
| 25 | 286 |
| 26 | 296 |
| 27 | 302 |
| 28 | 304 |
| 29 | 312 |
| 30 | 321 |
| 31 | 347 |





| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 32 | 356 |
| 33 | 361 |
| 34 | 364 |
| 35 | 380 |
| 36 | 410 |
| 37 | 414 |
| 38 | 424 |
| 39 | 428 |
| 40 | 428 |
| 41 | 452 |
| 42 | 452 |

270

who, you know, formulated the waste acceptance rate.
I testified I always took that as a given, as an input in my reports, and I just don't know who did it, who was responsible for how it worked, the process.
I was not involved in that, and that's --
MR. BANES: I just want to make it clear he identified a lot of names, and I just want to make it clear that, you know, I just wanted, I wanted it to be clear on the record that all those names aren't necessarily the person that developed the rate.
THE WITNESS: That's true.
MR. BANES: All right, so I mean if you're looking for the person exactly that developed the rate, we have tried to be as thorough as we could in the answers to our interrogatories, so these additional names may not get you anything if you investigate those, so I just want to put that on the record.
THE WITNESS: I just don't know.
BY MR. TOMASZCZUK:
Q. Okay. I believe yesterday you

271

testified, as I recall it, that Mr. Isaacs may have been responsible for that.
Do you recall saying that?
A. I do. And what I was trying to do when I came up with that answer is in my mind, go through -- I did not have in front of me yesterday organizational charts, and I believe it was, you know, that policy or that outreach division that he had, whatever name. We can go back.
I think they had responsibility for the development of the mission plan because I knew it wasn't the underlying organizations, but within that organization, who did it, and certainly the process of how it was constructed, I'm absolutely blind to. I don't know.
That's what I wanted to clarify.
Q. Do you know whether Mr. Isaacs reported to Mr. Gale?
And you can look at Brownstein Exhibit 21 if it helps, the third page.
A. I know he did not. It's clear on this, on the third page that Tom Isaacs reported to Bill Purcell at that time.
Q. All right, because Mr. Isaacs was the

272

director of the Repository Coordination Division as depicted on this chart?
A. Right.
Q. So he may or may not have been involved in the preparation of the rates used in the mission plan?
A. You're speaking of the original mission plan?
Q. The nineteen, let's talk about the 1985 mission plan.
A. Yeah. That's before my time, so I don't know.
Q. Right. What about the 1987 amendments?
Looking at any of these charts, does that help you identify which individuals or offices prepared the amendments?
A. Looking at the May '86, to the best of my recollection, it would have been prepared somewhere under the Office of Policy and Outreach.
That's to the best of my recollection.
Q. And do you know who was the director of that office in May of '86?
A. Not from this chart, I don't.

273

Q. All right.
MR. BANES: If it's helpful, Alex, I just note for the record that Mr. Isaacs is one of the people that we identified in our response as knowledgeable of, as knowledgeable of the contents of the mission plan in '85.
MR. TOMASZCZUK: Okay. I appreciate that.
MR. BANES: Mr. Trebules was another person.
MR. TOMASZCZUK: Okay. Ms. Reporter, please mark as Brownstein 23 a document which I believe I can represent is a copy of the Nuclear Waste Policy Act amendments 1987.
(Brownstein Exhibit No. 23 was marked for identification.)
MR. BANES: Before we start Exhibit 23, I'm just going to make a blanket legal conclusion objection so I don't have to do it for every question.
(The witness reviewed the document.)
MR. TOMASZCZUK: I just note for the record that I think since the term linkages is used in this document, which Mr. Brownstein

prepared the cover memo to and was involved in, I think I have a right to ask him some questions about his understanding of that term, but I understand your objection, and note my position for the record.
MR. BANES: Okay.
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Does this exhibit Brownstein No. 23 refresh your recollection in any way with respect to the subject of linkages as that term is used in Brownstein Exhibit 20?
A. It does. I was referring to the licensing conditions that are, that are listed.
Q. In subparagraph (d) on Brownstein 23?
A. Correct.
Q. And were you referring to all of the conditions, or just some of the conditions that are enumerated there?
A. I certainly -- let's go through them. I'm certainly referring to No. 1.
Q. Okay. And No. (1) states construction of such facility may not begin until the Commission has issued a license for the construction of a repository under Section



10135(d) of this title?
A. Right. And you know, in my mind, I was also referring to (3) and (4), not really (2).
Q. Okay. All right. And (3) refers to a 10,000 metric ton limitation for the MRS?
A. Correct.
Q. And then (4) refers to a total limitation of 15,000 metric tons for the MRS, right?
A. Right. The 10,000 as stated here is linked to the acceptance of fuel at the repository itself, and 15,000 is irregardless of that, the overall limit.
Q. Right. And just stated in sort of layman's terms, what is your understanding of the limitation that you just referred to in (d)(1)?
A. That we could not proceed within an MRS, and MRS -- I'll just use the acronym -- until we had gotten a license from the Nuclear Regulatory Commission.
Q. A license for what?
A. For construction of a repository.
Q. Okay. So in Brownstein Exhibit 20, at



page 4, your understanding is when that term linking is used, that that's a catchall term to encompass at least these three conditions or linkages that you just testified about?
A. That's what I was referring to, yes.
Q. Okay. Do you know whether those linkages were repealed or still exist today?
MR. BANES: Objection. Calls for legal conclusion.
Go ahead, sir.
THE WITNESS: They have never been repealed.
The MRS was never successful. The Office of Negotiators that was established by the Amendments Act never successfully identified an MRS, and so we, the idea, that facility came to an end.
BY MR. TOMASZCZUK:
Q. And was, when was that?
A. I don't recall.
Q. You don't, you have no approximate understanding of when that occurred?
A. There were two, there were two negotiators appointed to implement the Amendments Act.



Both served terms. Both ended their terms unsuccessfully.
I don't recall the dates of those terms.
Q. Would it have been between 1990 and 1995?
A. It would have been.
Q. So somewhere in that timeframe?
A. Yes. That's a guess.
Q. That's fair. I just ask for your best recollection.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. If I said that decision was made in or about December of 1992, would that sound roughly accurate to you?
MR. BANES: Object. It calls for speculation.
THE WITNESS: I would rather stand by my last answer.
BY MR. TOMASZCZUK:
Q. Okay. Let me ask you another question, Mr. Brownstein, about this document.
Could you turn to page 7?

A. Okay.
Q. Do you know whose handwriting that is on this document?
A. No. I can't even distinguish a word.
Q. Okay. Can you tell whether it's your handwriting or not?
A. I can tell that it is not my handwriting.
Q. All right.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, I would like to have marked as Brownstein No. 24 -- I got it right -- the Annual Capacity Report issued in December of 1990.
(Brownstein Exhibit No. 24 was marked for identification.)
BY MR. TOMASZCZUK:
Q. Have you seen this document before today?
A. Yes.
Q. You had a hand in its preparation?
A. I did.
Q. Is this one of the documents you



looked at to prepare for your deposition?
A. I looked at excerpts from an ACR and never read the whole ACR, and I cannot testify that it was in 1990, the ACR.
I have reviewed excerpts of an ACR.
Q. Okay. By the way, did you review any documents last night between the time we adjourned and when we recommenced this morning?
A. No. You wore me out. I did not.
Q. If I could direct your attention to the summary page, Roman Numeral Five, do you recall whether you prepared the summary?
A. I prepared the summary in this document consistent with how I testified yesterday and how all the ACRs were prepared.
Q. Okay. The first paragraph, second sentence states, "This report is currently scheduled to be the last in the series of ACRs to be published by DOE." Okay?
A. Yes.
Q. Do you know why this was scheduled to be the last in the series of ACRs to be published by DOE?
A. Well, they go on to explain in the next sentence consistent at that time with my



understanding of the contract, the ACR was then going to be replaced by the annual Acceptance Priority Ranking report.
Q. So with replacement of the ACR by the APR, there would be no more need for an ACR?
A. Correct.
Q. Okay.
A. That's how I interpreted the contract.
Q. Okay. And the next paragraph appears to reflect what we saw in the draft with respect to an upper and lower bounded waste acceptance schedule, right?
A. Correct.
Q. And those upper and lower bounded schedules are reflected at page 7?
A. They are.
Q. There is no source identified for the lower bounding case in Table 2.2, is there?
A. That's correct.
Q. And do you know what the source of this, of the data on this table was?
A. I don't.
MR. BANES: You are not limited to that page in order to answer that question.
BY MR. TOMASZCZUK:



Q. And I imposed no such limitation in my question.
A. Okay. Let me refresh my memory.
(The witness reviewed the document.)
THE WITNESS: I honestly don't recall. I'm referring back to page 5 in the middle paragraph where we talk about the source for the upper bounding case, and identified that, and have the sentence the lower bounding case requires early MRS siting, but complies with the current 10,000 MTU storage limit part of the repository operation.
That is referring to the linkages that we just talked about, so I do not recall how we were consistent with the 10,000 MTU, but came up with these exact numbers.
I just don't recall that.
BY MR. TOMASZCZUK:
Q. Is it your best recollection that you did not develop the data on this Table 2.2?
(The witness reviewed the document.)
THE WITNESS: I'm hesitating because I'm deeply trying to think about, about how that was developed.
(There was a pause in the

proceedings.)
THE WITNESS: I'm sorry. I just don't recall.
BY MR. TOMASZCZUK:
Q. Okay. In any event. It is true, is it not, that the conditions for the lower bounding case reflected in Table 2.2 never materialized, right?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Could you clarify what you mean?
BY MR. TOMASZCZUK:
Q. Sure. There was no MRS?
A. That's correct.
Q. Right. And the language that you referred to on page 5, it indicates, does it not, that the lower bounding case requires MRS siting, and then refers to the 10,000 MTU storage limitation?
A. That's correct. That process never, never materialized.
Q. So there would be no reason to use the data in Table 2.2 for any purpose now, would there?



MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: Well, given what counsel has said, if there was a, miraculously an MRS that became available today, since the Amendments Act was not appealed, as I understand it, an MRS would still be subject to that, but that's -- I'm not a lawyer.
That would be my response.
BY MR. TOMASZCZUK:
Q. Are you aware of any efforts being made to miraculously site an MRS today?
A. Not by the government. The closest thing would be the private fuel storage facility.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. The draft mission plan amendment that's identified as the source for the data in Table 2.1, did that not assume repository operations starting in 2003?
A. I would like to refer back to that document.
Q. Okay.



A. Do I have that?
Q. I don't know. Can we go off the record for a minute?
MR. BANES: Sure.
(A discussion was held off the record.)
MR. TOMASZCZUK: We can go back on.
BY MR. TOMASZCZUK:
Q. This ACR also has two Tables 3.1 and 3.2?
A. Yes.
Q. All right. And 3.1 are the purchaser's annual allocations for the upper bounding case, and 3.2 is the allocations for the lower bounding case, correct?
A. Correct.
Q. And both of these tables are based on an oldest fuel first priority ranking, correct?
A. They are.
Q. And that was consistent with the policy and plan at the time, right?
A. Yes.
Q. Could I ask you to just turn to the cover sheet of this document, Mr. Brownstein, No. 24?



A. Sure.
Q. There is handwritten in the upper right-hand corner the name Payton?
A. Yes.
Q. Do you know who Payton is?
A. Yes.
Q. Who is that?
A. That's Mary Lee Payton, and she worked for me.
Q. She worked for you at this time?
A. Yes.
Q. Is there any substantive reason why her name is handwritten on this document that you know of?
A. No.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. What were Ms. Payton's duties?
A. One of the principal duties she had was overseeing EIA's work for us on the RW-859 form.
She did other things, but that was one of her principal duties.
Q. Okay. Did she keep your official

Q. Did any utilities comment on the draft APR?
A. I honestly can't recall. I have a general impression that we did receive comments, but I'm hard pressed to tell you from who or how many.
I just can't recall.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. And was the, was an APR issued?
A. Yes.
MR. TOMASZCZUK: Ms. Reporter, can you mark as Brownstein No. 27 a document dated December 1991 entitled, "1991 Acceptance Priority Ranking"?
(Brownstein Exhibit No. 27 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Have you seen this document before today?
A. I have.
Q. Did you help prepare it?



A. I did.
Q. Is this a document that you reviewed prior to your deposition?
A. It is not.
Q. Did you prepare the summary narrative which appears at page 3?
A. I'm sure I had a part in preparing or reviewing; certainly responsible for it.
Q. Okay. And what about the data that appears on the subsequent pages?
A. Again, the contractors prepared that data.
Q. I'm sorry. The contractors prepared, provided to DOE the data which DOE then used to prepare the table?
A. The table itself was physically prepared by, by a contractor.
Q. By PNL?
A. Yes, using EIA data.
Q. Okay. And did you review it for accuracy at or about the time it was prepared?
A. I did.
MR. TOMASZCZUK: I propose we take a morning break.
It's eleven o'clock.



MR. BANES: Okay.
(A recess was taken.)
MR. TOMASZCZUK: Back on the record. Ms. Reporter, I would like you to mark as Brownstein No. 28 a copy of the draft 1988 mission plan amendment, and there aren't any Bates numbers on this version.
(Brownstein Exhibit No. 28 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. All right. Mr. Brownstein, you may recall when we were talking about the December 1990 ACR?
A. Yes.
Q. And the December 1990 ACR refers at page 7 and Table 2 dash 1 to this draft mission plan amendment, right?
A. Yes.
Q. And it identifies this draft mission plan amendment as the source for the data in table 2 dash 1 of the 1990 ACR?
A. Correct.
Q. Okay. And I believe you testified



that you may have reviewed but did not prepare any part of the draft 1988 mission plan amendment?
A. Correct.
Q. And let me just ask you, sir, with respect to this particular document, do you know who within OCRWM was responsible for developing?
A. If you go to the page, third page marked to the reader, at the bottom of that page, it indicates that comments should be submitted to Tom Isaacs, so he would have been the person in charge of that.
Q. And that's the same Mr. Isaacs that we saw in one of the organization charts and that you testified about yesterday, correct?
A. Today, right.
Q. Right. And is Mr. Isaacs still at OCRWM?
A. He is not. I believe I testified he is in the DOE family.
I believe he works at the National Lab.
Q. Do you know which one?
A. The West Coast, so it's either Berkeley or Livermore. I forget which one.

318

certainly indicates to me that this is a very
early unreviewed draft document.
BY MR. TOMASZCZUK:
Q. Does it appear to be a draft document
to you?
MR. BANES: Objection -- lack of
foundation.
Do you want him to guess?
MR. TOMASZCZUK: No. I --
MR. BANES: We can look at this
document. He can read it, but if he didn't have
a part in it, I don't know if he can say what it
means.
BY MR. TOMASZCZUK:
Q. Well, he received a copy of it, didn't
you?
A. Yes.
Q. And did you read it at or about the
time you, it was sent to you?
A. I probably did.
MR. BANES: Objection -- asked and
answered.
He already testified he doesn't
remember.
MR. TOMASZCZUK: Mr. Banes, we're

319

going to be here a long time if you continue to
make objections which I consider to be
ill-advised and not consistent with the rules of
the court.
I would encourage you to make your
objection. Fine, go ahead make it.
MR. BANES: Are you just telling me
that I just did something inconsistent with the
rules of the court?
All I did was ask you to set a
foundation for this document.
He doesn't remember it. He didn't
write it, and he has testified that he doesn't
know what it means other than just reading what
it says.
That's a valid objection. If you want
to ask him what something means, you need to lay
a foundation for it first.
BY MR. TOMASZCZUK:
Q. At or about the time you received this
document in August 14th, 1991, did you
understand this to be a draft document?
A. This was a, this was, clearly was a
contractor document.
Contractors prepare studies all the

320

time at DOE's direction.
That automatically means to me that it
was, it was a, it was something that DOE had not
signed off on.
Now whether this was the first draft
or the last draft, who knows? But it was a
contractor document.
The contractor documents are regularly
prepared. They regularly go through extensive
review and modification before they're, if
they're ever accepted as a DOE document.
Q. After you received the document, did
you do anything other than read it?
A. I cannot specifically recall. My
normal operation would be to, to read it.
If I had comments, I would make those
comments either verbally or in writing. I use
both.
Q. And do you recall sitting here today
whether you made any comments on this particular
document?
A. I honestly cannot recall.
Q. All right.
(There was a pause in the
proceedings.)

321

MR. TOMASZCZUK: Mr. Brownstein, let's
mark as, and Ms. Reporter, as Brownstein Exhibit
30 the Annual Capacity Report dated December
1991.
It has on it the Bates stamp numbers
HQR-001-2357 through 2373.
(Brownstein Exhibit No. 30
was marked for
identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. And have you seen the document before
today?
A. Yes.
Q. And were you responsible for preparing
it?
A. Consistent with how I have testified
about those documents, yes.
Q. All right. At Roman Numeral Five of
the summary, there is a reference to, in the
second paragraph, to statutory schedule linkages
between the MRS facility and the repository set
forth in the Nuclear Waste Policy Act, Nuclear
Waste Policy of 1982 -- it looks like the word
act is missing -- as amended will be modified.

AFTERNOON SESSION
(1:16 p.m.)
MR. TOMASZCZUK: Back on the record.
THE WITNESS: Yes, sir.
Whereupon,
ALAN BROWNSTEIN,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:
FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS FLORIDA POWER AND LIGHT COMPANY, NORTHERN STATES POWER COMPANY, DUKE POWER, INDIANA MICHIGAN POWER COMPANY, BOSTON EDISON COMPANY, GPU NUCLEAR, INCORPORATED, POWER AUTHORITY OF THE STATE OF NEW YORK, OMAHA PUBLIC POWER DISTRICT, NEBRASKA PUBLIC POWER DISTRICT:
BY MR. TOMASZCZUK:
Q. Good afternoon, Mr. Brownstein. I remind you you're still under oath, but she won't redo the swearing process again.
I think at the break we were looking at the ACR for December 1991, Brownstein Exhibit 30.



I understood your testimony just as we broke to be that the 8,200 metric ton figure was based on the MRS limitations contained in the Nuclear Waste Policy Act amendments, was that right?
A. I said it was consistent with those, that's correct.
Q. And this ACR assumes that an MRS will initiate operations in 1998, is that correct?
A. Yes.
Q. If --
A. We refer to it as commencement of facility operations.
In 1998, facility in my mind includes either an MRS or repository, but yes.
Q. That's reflected on Roman Numeral Five of the summary, right?
A. I was reading off of page 4.
Q. Okay. I'll take it.
A. It's probably in the summary.
Q. All right. I was referring to Roman Numeral Five, second paragraph, sort of the middle of the first sentence there.
A. This is consistent with -- yes.
Q. A site for monitored retrievable



source facility will be obtained, and the facility will initiate operations in 1998.
Do you see that?
A. Actually --
Q. Roman Numeral Five of the summary.
A. Right.
Q. Second paragraph.
A. Um-hm.
Q. Second line of the second paragraph.
A. Right. That is the, that is an assumption. There are a series of assumptions.
Q. Right. And that's one of them, that the MRS --
A. Yes.
Q. Will initiate operations in 1998?
A. Right. It also includes a break in the linkages will be made with the Nuclear Waste Policy Act.
Q. Now the MRS was never sited, is that right?
A. That's correct.
Q. Is the -- and this may relate to the previous answer you just gave -- is the 8200 MTU figure for waste management operations in 1998 consistent with the linkages between the



construction authorization for the repository and the construction authorization for the MRS?
MR. BANES: Objection -- compound, and asks for a legal conclusion.
THE WITNESS: I believe it's consistent with, with the licensing conditions one and three of the, of the Nuclear Waste Policy Act amendments, Exhibit 23.
BY MR. TOMASZCZUK:
Q. And condition one is the linkage between the construction authorization for the repository and for the MRS, is that right?
A. Right.
Q. Okay. Would you then turn to this ACR at page 4?
A. Okay.
Q. And I direct your attention to the second paragraph.
A. Okay.
Q. You can read the paragraph or of course any part of the document you would like.
I would like to direct your attention in particular to the last sentence of the second paragraph on page 4.
(The witness reviewed the document.)

330

THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Now this seems to say that if the linkages between the construction of the MRS and the construction of the repository are maintained, which is the first linkage as I understand it, that we have been talking about, it is stated here that commencement of facility operations and initial acceptance of DOE, by DOE could not start until at least 2007?
A. That's correct. That's referring to the repository if the law was not changed.
Q. I guess I don't understand then your previous answer.
Perhaps you can explain it to me, where you indicated that the 8,200 MTU figure for WMS operations in 1998 was consistent with the linkages between the construction authorizations for the MRS and the repository.
A. Well, the Amendments Act said that we could not accept I think more than 10,000 until we received the license for construction of the repository.
Q. Right.
A. And I believe -- I need to go back to

331

another document, but I believe our estimate at the time was that we would not obtain a construction authorization from the NRC until about 2007.
I think that was the basis for that statement.
Q. Right, but if you go back to -- I'm sorry. I didn't want to cut you off.
Go ahead.
A. I mean you need construction authorization, and then you need a separate license from the NRC to, to accept waste, and so I believe that was our estimate of when without the linkage, without the change in the law, that would be the earliest that we could do it, that we can accept the repository.
I'm not sure I understand any inconsistencies there.
Q. I guess my question related to the assumption that's stated in the summary at Roman Numeral Five, which is the facility and the MRS facility initiating operations in 1998.
A. Um-hm.
Q. And my subsequent question to the effect that, you know, is that consistent with

332

the linkages, the construction linkages, and I understood you to say yes, and I'm trying to reconcile that testimony and that portion of the document with what appears at page 4, which seems to say that if the linkages are maintained, we can't start until 2007.
(The witness reviewed the document.)
THE WITNESS: Well, let's go back in pieces.
If we had an MRS, we could start accepting at an MRS, you know, as early as 1998.
I think that's, there were a series of assumptions associated with that.
BY MR. TOMASZCZUK:
Q. But I understand you to be saying on page 4 that if the linkages were maintained, you couldn't do that --
MR. BANES: Objection. Go ahead.
BY MR. TOMASZCZUK:
Q. In 1998?
MR. BANES: Objection. Calls for a legal conclusion, but you can go ahead.
THE WITNESS: Well, let's go back to the paragraph on page 4.
Let's read it in its entirety.

333

BY MR. TOMASZCZUK:
Q. Sure.
A. The acceptance rates in Table 2.1 do not reflect an MRS facility schedule linkages with the repository development that were imposed by the Nuclear Waste Policy Act, but are consistent with the 10,000 MTU storage capacity limit contained in NWPA for an MRS facility before repository starts operation.
Okay. So these acceptance rates assumed commencement, assume commencement of facility operations in 1998.
There appears -- I mean there is a series of if then statements for each of these.
Independently, I'm comfortable with them. I understand them.
I'm just trying to understand where this disconnect is that, that you see.
Can we go point out which sentence-by-sentence that you're uncomfortable with?
Q. Let me just -- I'm happy to try and do that.
Let me perhaps get at this another way.

What did you understand either then or now the first sentence of the first, of the second full paragraph at page 4 to be stating, and in particular, the portion that says the acceptance rates in Table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA?
A. Okay.
Q. And you can, of course, read the whole thing in its context, but my question to you is what is meant by that phrase?
MR. BANES: Objection. Calls for a legal conclusion, asked and answered.
THE WITNESS: To me --
MR. BANES: Speaks for itself. Go ahead.
THE WITNESS: To me, it says it assumes that a facility, an MRS facility would be built, and it is only consistent -- and that's a large assumption which is explained in this and other documents about the challenges of constructing an MRS.
It assumes that an MRS will come on line in '98, and it tries to explain the



projected waste acceptance rate by saying we have limited that by the linkage or the limit in the Amendments Act.
And in fact the next, very next sentence says these acceptance rates assume commencement of facility operations in '98, so that part is assumed, and the, and the projected waste acceptance rate is recognized as the legal limit.
BY MR. TOMASZCZUK:
Q. Do you know whether the Secretary of Energy in late 1989 had determined that the repository would not be ready until 2010?
A. I believe we have to go back to the Secretary's, I think we have referred to it as the 60-day report or the reassessment report to review what the Secretary determined.
Q. Okay.
A. I mean if I, I believe, if I recall, one of the documents, I think he talked about 2010, but I would have to go back and review.
Q. That's my recollection as well, but let me ask this question, Mr. Brownstein.
Could commencement of facility operations have occurred in an MRS facility



starting in 1998 if the schedule linkages were not changed?
MR. BANES: Objection. Calls for a legal conclusion.
You can answer.
THE WITNESS: The, the key first step in the ability to begin operations in an MRS in 1998 depended, consistent with the law, depended on this successful completion of the Office of Waste Negotiator established by law and the completion of his mission.
That was the first step.
BY MR. TOMASZCZUK:
Q. Okay. I appreciate that answer. I'm not sure it was responsive to my question, but let me try again.
Could commencement of facility operations have occurred in an MRS starting in 1998 if the schedule linkages were not changed?
MR. BANES: Same objection.
THE WITNESS: If we had an MRS site, and it depended on when we had that site -- there is a stream of assumptions we have to go through.
You know, theoretically possible if we



got the site early enough and we received the appropriate approvals, but there is a host of assumptions in that statement.
(There was a pause in the proceedings.)
THE WITNESS: Let me -- to elaborate on the answer, I'll just read from the ACR.
In the first paragraph, it says DOE recognizes that --
BY MR. TOMASZCZUK:
Q. I'm sorry. What page are you on?
A. I'm on page 4. DOE recognizes that under current conditions, waste acceptance at a DOE facility can begin in 1998 only if the federal government is able to consummate a timely agreement which is enacted in the federal law with a host state or Indian tribe for the siting of an MRS facility. The Office of Nuclear Waste Negotiator, the head of which is a representative of the federal government, appointed by the President, is actively seeking a state or Indian tribe willing to host an MRS facility or geologic repository.
So I believe that statement in the paragraph preceding, you know, it's consistent

with what I just said and explains the assumption and challenges.

Q. And would that agreement that's alluded to in the text of page 4 that you just read from, would that require Congressional approval?

MR. BANES: Objection -- asked and answered.

THE WITNESS: Actually I don't know. We would have to go back to the Nuclear Waste Policy Act, the Amendments Act.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. In the text that you just quoted from, Mr. Brownstein, what did you mean by the parenthetical reference which is enacted into federal law.

(The witness reviewed the document.)

THE WITNESS: I believe I was referring to the provisions of the Nuclear Waste Policy Act amendments.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:



Q. Do you have an understanding as to the acceptance rate that DOE would have sought to operate a repository if it had not breached the standard contract?

A. If it had not what?

Q. Breached the contract.

A. I don't accept the premise.

MR. BANES: Objection.

BY MR. TOMASZCZUK:

Q. You don't accept the premise that DOE breached the contract?

A. I don't.

Q. Do you know whether the Courts of Appeals have determined that issue?

A. Apparently they have.

MR. BANES: The courts have not determined that issue.

They have determined whether the DOE has partially breached the contract, not fully.

MR. TOMASZCZUK: Well, we can pull out the Court of Appeals decision with that.

MR. BANES: I think we could. Why don't we read that into the record, too?

MR. TOMASZCZUK: You'll have your opportunity, Mr. Banes, to examine the witness,



and I encourage you to do so.

If you would like to go into that, we would be delighted to have it happen.

I'm not going to use my time to go into it, but if you want to, feel free.

BY MR. TOMASZCZUK:

Q. Mr. Brownstein, do you understand that the Courts of Appeals have determined that DOE has breached, or to use the language of your counsel, partially breached the contract?

A. Yes.

Q. Okay. And my question to you is do you have an understanding as to the acceptance rate that DOE would have sought to operate the repository if it had not breached the contract?

MR. BANES: Objection. Calls for a legal conclusion.

THE WITNESS: The, all the --

MR. BANES: Objection.

THE WITNESS: Acceptance rates under whatever those conditions were never hidden by the department.

They were always published, and they were always updated, and document after document in the ACR and in the mission plan amendments,



and I'm sure in other public documents, whatever is in those documents was our waste acceptance rate at the time with the assumptions associated with it.

BY MR. TOMASZCZUK:

Q. Okay. Now as I understand your current duties, they involve working with EPA and NRC?

Did I understand that correctly?

A. As I testified, since I believe it was July, I have been on a detail with other duties and responsibilities prior to that, that's accurate.

Q. Okay. And did I understand you to have some role in the Environmental Impact Statement preparation?

A. My, my division had a role in that.

Q. Did you say you were the lead person with EPA on that?

A. You're mixing two different subjects.

Q. Okay. I don't mean to, I'm just trying to --

A. Let me --

Q. Understand what you said.

A. Try to clarify; my role had a support

BY MR. TOMASZCZUK:
Q. Was the 1992 APR subject to revision?
A. I don't understand.
MR. BANES: Objection -- vague.
THE WITNESS: I don't understand the question.
BY MR. TOMASZCZUK:
Q. Okay. Were the acceptance rates embodied in the 1992 APR subject to change?
A. Have you given me a copy of the 1992?
Q. No, I haven't yet.
MR. BANES: You can look at it if you want.
BY MR. TOMASZCZUK:
Q. Do you need it to answer my question?
A. In the context of how previous waste acceptance rates schedules were subject to changes, is that --
Q. In whatever context you would like to fashion your answer.
A. Well, I guess I prefer to see the document to make --
Q. You can't answer my question without seeing the document?
A. I would prefer to --



Q. I understand your preference. My question is can you answer it without seeing the document?
A. I'm trying to give you, you know, my honest answer.
I mean I want to make sure what I said in the APR.
Q. I mean you can --
MR. BANES: You don't have to answer if you can't.
BY MR. TOMASZCZUK:
Q. It's a fairly straightforward question. If you can't answer it without the document, that's fine.
If you can, then I would like your best answer.
A. Okay. For the record, please just repeat the question again.
THE REPORTER: Question: "Were the acceptance rates embodied in the 1992 APR subject to change?"
MR. BANES: Objection -- vague.
THE WITNESS: I am assuming that they were.
BY MR. TOMASZCZUK:



Q. And on what do you base that assumption, Mr. Brownstein?
A. Every document that you have shown me and that I can recall always talks about, always qualifies the waste acceptance rate as projected or preliminary or illustrative subject to change, and referring to many other conditions, whether statutory or other conditions, so that's how I base my answer.
Q. Okay.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Ms. Reporter, would you mark as Brownstein 32 a document entitled 1992 Annual Capacity Report, Revision 1, has on it a date of May 1993, has the Bates number PA-102592 through 102629?
And I would note this document appears to be marked Revision 1, Mr. Brownstein.
THE WITNESS: Okay.
(Brownstein Exhibit No. 32 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:



Q. Have you seen this document before today?
A. I have seen it.
Q. Did you prepare it?
A. No.
Q. Who did?
A. The person responsible for this one was Nancy Montgomery.
Notice the date and her name in it as opposed to mine as the previous ACRs, the organizational change that we discussed.
Q. Right. She is identified at page 2 of this document?
A. Right.
Q. In previous ACRs, I believe you had been identified as the contact person?
A. Correct.
Q. So you happily passed on those duties to Ms. Montgomery?
A. Actually, to be truthful, at that time, I don't believe the word happily was the right one.
Q. All right -- my poor attempt at humor, sir.
Did you approve the document?

Q. Okay. Are the rankings reflected in this APR subject to change?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: The, there is a discussion about that on page 4 of the document.
BY MR. TOMASZCZUK:
Q. Can you direct me to that?
A. The first full paragraph on page 4.
Q. Um-hm.
A. Talks about changes, potential changes.
Q. And where do you see that language? I'm sorry.
I'm looking at the paragraph. Can you point me to that?
Q. Okay. In the middle of the paragraph, in order to avoid difficulties and subsequently implementing the waste acceptance process and consistent with its May 15th, 1991 communication, all purchasers revisions to future APRs will be addressed as follows.
There is then a series of sentences and explains on how the APR would be changed under different circumstances.



Q. Okay.
A. That also -- I'm sorry -- continues down into the next paragraph as well.
Q. Okay.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Mr. Brownstein, did you have any role to play in connection with the preparation of the instructions for the Delivery Commitment Schedules?
A. Yes, in the same way that -- yes, I did.
Q. Okay. Do you recall when OCRWM began working on Delivery Commitment Schedule instructions?
A. Not specifically.
Q. Would it have been at or about this time? Prior to it?
A. It would have been prior. We would have started thinking about that.
MR. TOMASZCZUK: Okay. Ms. Reporter, can we mark as Brownstein 34 an eight-page document with the heading U.S. Department of Energy instructions for completing the Appendix



C Delivery Commitment Schedule?
(Brownstein Exhibit No. 34 was marked for identification.)
THE WITNESS: Okay.
BY MR. TOMASZCZUK:
Q. Have you seen this document before today?
A. Yes.
Q. And can you tell me what role you had to play in its preparation?
A. I believe I played a leading role in preparing this probably with others like Nancy, but I certainly had a hand in this.
Q. Do you, are you able to identify any particular paragraphs that you drafted?
A. No, oh. No. Not by -- I recall going through this a number of times.
Q. You're identified as one of two contact persons at page 4 of the instructions, right?
A. Correct.
Q. Who was Mr. Nick Graham?
A. To the best of my recollection, he worked for the contracting officer at the time.



Q. Did any contractors assist your office in the preparation of this document?
A. Yes.
Q. And do you know who they were?
A. It would have been, it would have been PNL, and it could have been, and it could have been Billy Cole, who may at this time have moved on to JAI Corporation.
If that was the case, I may have gotten dual assistance, but it was PNL and Billy.
Q. Do you recall or do you know whether Mr. McDuffie worked on this?
A. The best of my recollection, he did.
Q. And what was the purpose of this document?
A. It was instructions to the utilities for how to complete Appendix C of the contract, the Delivery Commitment Schedule.
Q. On the first page, I'll refer to these as paragraphs, or maybe they're sections, but in any event, talk about paragraphs, there is a No. 3, when to submit.
Do you see that?
A. Yes, I do.

Q. And the first sentence says, "Beginning January 1, 1992, Purchasers shall submit DCSs at least 63 months prior to requested delivery"?
A. Correct.
Q. All right. Why were you giving purchasers that instruction?
A. I believe that comes directly from the standard disposal contract itself.
Q. At this point in time, when was DOE anticipating to begin performance of its obligations under the contract?
A. With all the caveats that we have stated previously, the goal at that time was still as indicated in the ACRs, I believe to begin waste acceptance in '98.
That was a goal, and I tried to distinguish in my mind to you the separation between a goal and a contractual commitment, and further elaborate that I operate under the time that the contractual commitment, irrespective of the court order, of the court decision, was conditional at that time.
Q. Now DOE did not begin performance in January 1998, did they?



A. Correct.
Q. And indeed sitting here today, they've not begun performance, isn't that true?
A. That's correct.
Q. When is the, a utility supposed to, given that unfortunate set of circumstances, when is a utility supposed to submit its DCS forms now?
A. Reading from paragraph 3, and I believe this is consistent with the language in the disposal contract, purchaser shall submit the DCSs at least 63 months prior to requested delivery.
Q. So if a utility today requested delivery 63 months from today, it needed to, it is required to submit its DCS today?
MR. BANES: Objection. Calls for legal conclusion.
You may answer.
THE WITNESS: The, the contract laid out a process of a series of interactions between the government and the utilities that would eventually lead to waste acceptance.
It was, it was a choreographed dance if you will.



We provide information. They begin the thinking process, and that included the DCSs, all the way up to the FDSs where the FDSs, both sides got serious in terms of things like what cask to bring, what date we should show up.
The contract laid out the terms to, to begin that process.
You would not expect the department to commit to a specific date of a specific month, you know, years ahead of time really for the benefit of the utility because you could not have the government, you could not have the utility saying show up at my door on this particular day at this particular time when they in fact may be going, undergoing a fuel outage so they wouldn't want us to show up.
Our view of the contract was it laid out that process on how we would interact as two bodies, to come together at an appropriate time.
That was the significance in my mind of it, irrespective of a date.
It set those, set that series of procedures on, on how we would interact together.
That's how I interpret the contract.



BY MR. TOMASZCZUK:
Q. Okay. And how do those series of procedures apply now where DOE has not yet begun performance and has stated it won't begin until 2010 at the earliest?
MR. BANES: Objection.
THE WITNESS: I have left that area for the last seven years, so I'm not current on in the last seven years, how the office, you know, is prepared to deal with it.
I just don't deal with that set of issues any longer.
BY MR. TOMASZCZUK:
Q. You don't have any ideas about that?
A. I have no idea actually.
(There was a pause in the proceedings.)
BY MR. TOMASZCZUK:
Q. Could I direct your attention to the second page of these instructions, Mr. Brownstein, to the paragraph background information, and I direct your attention to subparagraph (c)?
A. Okay.
Q. You see the sentence that reads the

process described herein? Let's just start there.

I presume that process is one that you alluded to in your previous answer, right, an elaborate contractual mechanism?

A. Yes.

Q. Assumes, herein assumes that the FWMS -- that's a defined term somewhere?

A. It's federal waste management system.

Q. Thank you -- will be able to accept the purchasers' SNF beginning in 1998 according to the acceptance rate reflected in the 1991 ACR?

A. Correct.

Q. Did you draft that sentence do you know?

A. I can't recall if I drafted that specific sentence.

I certainly agree with it.

Q. And we know that FWMS did not begin in 1998, right?

A. Correct.

Q. So isn't it true, therefore, that the process described herein is no longer applicable?



MR. BANES: Objection. Calls for a legal conclusion.

THE WITNESS: Given how I'm interpreting what you have asked, I mean to rephrase that, I don't agree with that.

I mean the process laid out in the contract through the ACR, the APR, the DCSs and the FDSs, you have, in my mind, to be the utilities and also then you have to go through that process at least of the, of the DCSs and the FDSs in order that when waste acceptance does begin, we show up at an agreed-to time with the right equipment and the time that is, that is agreed to by the utilities.

There is still a process that has to be gone through, irrespective of the date.

BY MR. TOMASZCZUK:

Q. But you would agree, would you not, Mr. Brownstein, that at least what you described in this document and these instructions was based on an assumption which has not occurred, correct?

A. That is correct.

Q. Now the reference here to the 1991 ACR, that ACR was a planning document, right?



A. Yes.

Q. Okay. And as I understood your testimony, that was distinguishable from the 1991 APR?

A. Yes.

Q. So why, in these instructions, did you refer to the 1991 ACR, a planning document, instead of to the 1991 APR, which I understood to be something more than that?

MR. BANES: You're allowed to read all that if you need to, plus those other two documents.

THE WITNESS: Yeah. I understand that, and I think I do want to go back to that.

BY MR. TOMASZCZUK:

Q. Okay.

A. Okay.

(The witness reviewed the document.)

THE WITNESS: Okay. I just needed to refresh my memory.

The APR --

BY MR. TOMASZCZUK:

Q. Which document are you referring to, just so our record is clear?

A. Sure. I'm sorry -- the 1991 APR.



Q. Okay. Hold on. Let me get that.

A. Okay.

(There was a pause in the proceedings.)

BY MR. TOMASZCZUK:

Q. Brownstein Exhibit 27 by my recollection?

A. Right, or any APR. We can go to Exhibit 33 as well.

Q. Okay.

A. The point I wanted to make, I have clearly in my testimony tried to distinguish in some way between the ACRs and the APRs.

The, the APRs do not deal, are really not required to deal with waste acceptance rates.

They're, they're intended to deal with, with the purchaser's place in the queue if you will, and I have stated for the last two days, you know, it was very important for the utilities to get this data right because this queue was going to be locked in place, and in fact, you showed me and document earlier that talked about what we would do with future changes because that they were going to be

disruptive for both sides, so this does not deal with waste acceptance rates.

This deals with irrespective of the waste acceptance rates, where the utilities would be in the queue.

MR. BANES: Let the record reflect the witness is referring to the Annual Priority Ranking 1991.

THE WITNESS: 1991 or 1992, they both do the same thing.

MR. BANES: 1992?

THE WITNESS: Yes. In order to fill out a DCS, and in order for them, for the utilities to understand what this unchanging queue, how many should be responsive to the instruction of 63 months and before, you're going to have to make an assumption about a rate.

If the rate, for example, I'm referring to the 1992 APR, if we were going to accept a hundred MTU during the first year, whatever that year was, the only people that would be required under our interpretation to submit a DCS would be the first, first 12 utilities.



So we then had to apply, so the utilities could meet these instructions, a projected waste acceptance rate which is referred to in the 1991 ACR to this unchanging if you will, queue.

Is that responsive to your question?

BY MR. TOMASZCZUK:

Q. I don't know, but I think I understood what you just told me.

Well, if these instructions -- strike that.

Given that DOE has not commenced performance, would you agree that the DCS process has been suspended?

MR. BANES: Objection. Calls for a legal conclusion.

THE WITNESS: I guess suspended is an appropriate word.

It's not ongoing.

BY MR. TOMASZCZUK:

Q. Okay. And assuming that these instructions remain applicable and are not changed, if DOE starts in 2010, isn't it true that the first DCSs per these instructions would be due in 2004?



MR. BANES: Objection. Mischaracterizes the instructions, and calls for a legal conclusion.

THE WITNESS: A lot has occurred in the last seven years.

I would think the person responsible now would want to review what we did, why we did it, and how we did it, and to see, you know, the applicability in sum or in part as to how they're going to proceed.

I wouldn't purport to say that they should take these and throw them out or take them and adopt them in total.

I don't think a responsible manager would use this as input in helping make a decision.

BY MR. TOMASZCZUK:

Q. Changed circumstances might warrant reviewing and revising these to reflect those circumstances, is that fair?

A. I think that is.

Q. If the, as I understand these instructions, if the ACR on which the DCSs are based is a planning document, which I understand it to be, are the DCSs also planning documents?



MR. BANES: Objection. Calls for a legal conclusion.

THE WITNESS: In my mind, they are. In order to get, if we can just set aside a specific date for a second, in order to get the government with the right equipment to be able to get through the gate of the utility at the right time, there has to be planning that takes place.

For example, we need to know years in advance how many BWR and PWR casks we should make sure are available through whatever means.

We ought to know how many truck casks and how many rail casks we ought to have available.

In order to do that, we need to understand whose fuel we're going to accept, so there has to be communication between the utilities and us years in advance in order to, to allow that marriage to occur at the end, irrespective of the date.

I believe -- as you know, I did not negotiate this contract in '83, but I believe that was the intent of the process that was laid which we have talked about the ACR, the APR, the

DCSs and the FDSs.
I think that, in that sense, that's a planning arrangement. That's a way to respond to your question, but I think that is responsive.
BY MR. TOMASZCZUK:
Q. Okay. Mr. Brownstein, did you have a role to play in the preparation of what I'll refer to as the TSLCC reports -- total system life cycle cost reports?
A. No. Again, I may have, consistent with, I may have reviewed drafts, you know, as my responsibilities as a division director or as a branch chief, but in terms of its preparation, no.
Q. Okay. Same question with respect to fee adequacy reports -- did you have a role to play in the preparation of those?
A. At one time in the organization, for one short period of time, I did, but under the time that I had that responsibility, I don't recall that we actually issued it during that time period.
Q. Can you put a year on that activity for me?



A. There was a short period of time under the Bartlett, when Bartlett was director that I had those responsibilities.
Q. Early 1990s, am I right about that?
A. Yes. Yes. I think Dreyfus came on in '94, so it was probably in the '91, '92, '93 time period for a short period of time.
Q. But your best recollection is that while you had those duties, that no such fee adequacy report was issued?
A. That's my recollection. My recollection, I did some work in that, but there was another reorganization and someone else took that, so that's my recollection.
Q. Okay. Did you have a role to play in what I believe you referred to as SRD system requirements documents?
A. I did not except again, to the extent that there were occasions where I was asked to review them, but I had no hand in their preparation.
Q. Do you recall whether PNL was tasked to prepare proposed changes to the standard contract?
A. The best of my recollection, we asked



PNL to do a lot of think pieces, and I would guess that they, that I either asked them to or they did that as one of their pieces, so I would answer yes, to the best of my recollection.
(There was a pause in the proceedings.)
MR. TOMASZCZUK: Mr. Brownstein, let me hand first to the court reporter a document dated April 13, 1992, a "Don't say it -- write it" memorandum from Patrick McDuffie, subject, proposed contract changes, and it has Bates stamped in the lower right-hand corner the number CTR-013-1880 through 1923.
(Brownstein Exhibit No. 35 was marked for identification.)
MR. TOMASZCZUK: While you're looking at that, can we go off the record a minute?
(A recess was taken.)
MR. TOMASZCZUK: Back on the record?
MR. BANES: You bet.
BY MR. TOMASZCZUK:
Q. Mr. Brownstein, have you seen Brownstein Exhibit 35 before today?
A. I have seen this or similar document



like it, whether it was one before or after it, so yes, in general.
This specific draft, I'm not absolutely sure.
Q. And I believe you testified before we took the break that you had asked PNL to prepare this?
A. What I was trying to indicate before the break, as I indicated in my previous testimony, we, we asked PNL to do a number of think pieces over time, and it is highly likely that we did ask them to do this.
Whether I did, I'm not sure. We addressed this one to Nancy Montgomery, so Nancy may have directly asked them, but certainly, you know, working for me, so indirectly I would have.
Q. Do you know why this particular think piece, to just your term, was commissioned?
A. Specifically, no. In general, we were working on a number of issues with the utilities, and you know, there is an ACR resolution process which we have talked about, and at different points in time, I'm sure as those discussions proceeded, we, we asked them

A. I wanted to be clear of whether those milestones if you will were associated by time, and I have not done that analysis.
Q. Is it at least fair to say that a number of the activities depicted on this chart have not yet occurred?
A. It is fair to say that.
MR. TOMASZCZUK: I propose so we have a clear record, that we mark this as Brownstein Exhibit No. 37. It is -- 36.
And I propose that we mark this as Exhibit 36 and have it attached to the transcript so the record is clear with respect to my questions about this and the questions of counsel for the government posed to you about this.
MR. BANES: The government joins in that proposal.
(Brownstein Exhibit No. 36 was marked for identification.)
MR. TOMASZCZUK: Great. And with that, I will defer to my able colleague, Mr. Hirsch.
EXAMINATION BY COUNSEL FOR PLAINTIFF



COMMONWEALTH EDISON COMPANY
BY MR. HIRSCH:
Q. Good afternoon, Mr. Brownstein. My name is Norm Hirsch.
I'm an attorney for Commonwealth Edison Company, one of the plaintiffs in this litigation.
I'm going to be asking you a series of questions.
Just like Mr. Tomaszczuk said, if you don't understand a question I'll be asking, please feel free to ask for clarification.
A. Okay. Thank you.
Q. I want to ask you about a couple of questions that Mr. Banes asked you a little while ago.
I believe that you testified in response to a question that it was your understanding that prior to acceptance by the DOE, utilities were responsible for storage of SNF?
Do you recall that?
A. Yes.
Q. And I think we got into this a little yesterday, but it's your understanding I take it



that the D.C. Circuit has now held that the DOE was required to begin SNF acceptance in 1998?
A. I have never read the decision, but that's my understanding of it.
Q. And I believe we also had some testimony from you that it was DOE's objective or goal to eliminate the need for utilities to provide on-site storage after the DOE began acceptance, is that correct?
MR. BANES: Objection -- vague.
THE WITNESS: It's correct, and I used the term and testified to such to distinguish between intent and goal and objectives as opposed to a contractual commitment.
BY MR. HIRSCH:
Q. All right, but the DOE goal or objective was to eliminate the need for utilities to provide on-site storage after the DOE began acceptance of spent nuclear fuel, is that correct?
A. That was a goal.
Q. Now Mr. Banes also asked you a question about whether the mission plans were incorporated in the contract.
Do you recall that?



A. Yes.
Q. Was it your understanding that the mission plans were required to be issued by the Nuclear Waste Policy Act?
A. It is my understanding.
Q. And did you ever have any discussions with individuals at DOE as to what the purpose of that requirement was?
A. The mission plan?
Q. Yes, or the requirement to issue a mission plan in the Nuclear Waste Policy Act.
A. No.
Q. What was your understanding of the purpose of the mission plans?
A. Really very elementary understanding, that, that the law required that we issue a mission plan.
The purpose of the mission plan was to describe what our goals and objectives were, and describe the program in general terms.
Q. And I take it that at least while you were at the DOE, the DOE made an effort to be as accurate as possible in the mission plans in terms of describing what its current plans and objectives were?

A. I believe that's true for all the RW documents.

Since the beginning, I think we've tried as a goal if you will to be an open and transparent program, and to, to try to put as much information out in the public as we could, and make that as accurate as we could.

Q. Okay. So it would be correct to say that the DOE made an effort in the mission plans to be as accurate and informative as possible, is that correct?

A. Yes.

MR. HIRSCH: We're on 37, is that correct?

(Brownstein Exhibit No. 37 was marked for identification.)

BY MR. HIRSCH:

Q. Mr. Brownstein, I have handed you what has been marked as Brownstein Deposition Exhibit 37, which is a two-page document titled, "Questions from Representative Hastert," and then it appears to have answer on it.

It has Bates labels HQR-010-1635 through 1636.



Do you recognize this document, Mr. Brownstein?

A. I don't recall it, but I, it's a document that I would normally prepare and has my name on it, so I would like to get a chance to read it.

Q. Why don't you do that?

(The witness reviewed the document.)

THE WITNESS: Okay.

BY MR. HIRSCH:

Q. Brownstein Deposition Exhibit 37 was a document you prepared, is that correct?

A. Yes.

Q. And do you recall what the circumstances were that you prepared this document?

A. Under the normal course of business, when a senior program officer testifies, we will get either prehearing or post-hearing questions, and this will be allocated to the subject area expertise, and drafts prepared.

What you're showing me is a draft answer.

From this, of course, I can't, cannot tell what the official answer that went out is.



It would have, normally have gone through many levels of review both within the department and outside the department before it was actually submitted, so I am assuming that this is, this is the initial draft prepared by me.

Q. And do you know for whose signature or testimony this would have been provided?

A. I would have to take a best guess.

Q. And what would that be?

A. That --

MR. BANES: Objection. Calls for speculation.

Go ahead.

THE WITNESS: Okay. The guess would be either the director of RW or the Secretary of Energy.

BY MR. HIRSCH:

Q. And you see the part of the document where it lists question.

I take it from this document that this was a question posed by Representative Hastert?

A. Correct.

Q. And do you see the answer that was apparently drafted, drafted by you says the 1998



target date was identified originally in Section 302 of the Nuclear Waste Policy Act of 1992 and subsequently incorporated in the standard contracts entered into between the Department of Energy?

A. Yes.

Q. And the nuclear utilities; I take it that was a correct statement?

MR. BANES: Calls for a legal conclusion.

THE WITNESS: I believe it to be a correct statement.

BY MR. HIRSCH:

Q. And then you go on to say that, that the '98 date was selected as a compromise.

Do you know what basis you had for making that statement?

A. Yes. Why I said that is at the time the act was passed, there was no, to the best of my understanding at the time, and today, there was no detailed design, and all of the things, all the analysis that would be necessary to, to project and predict when, from a technical perspective if you will, a repository could be built, that's not what the law my understanding

of the law did.
Q. Have you yourself looked at the legislative history of the Nuclear Waste Policy Act?
MR. BANES: Objection -- lack of foundation.
THE WITNESS: I may have looked at excerpts of floor debates.
I'm just trying to recall whether I did that from the, the Amendments Act or from the original act, but I certainly went through some language.
BY MR. HIRSCH:
Q. Right. You didn't make an effort to look through the entire legislative history of the Nuclear Waste Policy Act, correct?
A. No.
Q. Now the last statement in this paragraph, the first page, is "Notwithstanding this explanation and lacking contemporary hindsight, the nuclear utilities undertook long-range planning for the acceptance of their spent fuel by the Department and the need for possible onsite storage based on the 1998 date"?
A. Yes.



Q. What did you mean by lacking the temporary hindsight?
A. What it means to me is the problems and challenges associated with the completion of a facility of this magnitude was clearer on the day this response was written than the day the Nuclear Waste Policy Act was passed.
Q. Is another way of saying that lacking the ability to look into the future?
A. Sure.
MR. BANES: Objection -- asked and answered.
BY MR. HIRSCH:
Q. Then it goes on to say the nuclear utilities undertook long-range planning for the acceptance of their spent fuel by the department and the need for possible on-site storage based on the 1998 date.
When you said that, did you mean that the utilities for planning purposes or long-range planning purposes had assumed that the DOE would begin performing in 1998?
MR. BANES: Objection -- lack of foundation, and calls for speculation.
THE WITNESS: I don't know what the



utilities assumed.
I mean the statement as I wrote it and as I meant it, the utilities started looking from a planning perspective, assuming that DOE would begin acceptance in '98.
It doesn't mean anymore than that.
BY MR. HIRSCH:
Q. Now you said, went on to say by the end of 1998, it is projected that approximately 38,200 metric tons of spent nuclear fuel will be in storage at reactor sites across the country?
A. Um-hm.
Q. Do you know where you got that information?
A. I probably got that from one of two sources.
Probably I either got it from an EIA document, or -- the DOE Energy Information Administration analysis or report, or a PNL document.
Q. Now --
A. To the best of my recollection.
Q. Okay. Thanks. It goes on to say until the federal government begins to accept the spent nuclear fuel from utilities, available



storage capacity at each reactor site will continue to decrease, and other alternatives such as dry storage will be needed.
Do you know what your basis for making that statement was?
A. As each day goes on, spent fuel is produced, and the utilities, as they undergo, have to replace that spent fuel on, on a regular basis.
That spent fuel has to go somewhere on their site, and the first line defense of the utilities if you will is their storage pool, and space was running out in their storage pools, and they were going to have to look at, at alternatives.
Once they looked at alternatives like reracking, they would then have to look at alternatives beyond the storage pool.
Q. So as of the time you wrote this document, you recognized that, that nuclear utilities were running out of, out of space in their storage pools, is that correct?
A. That was no secret. Everyone understood that.
Q. Okay. And then you go on to say, "As

a result, the Nation's ratepayers will be further burdened by additional costs."

It is projected that by 1998, 1650 metric tons from 28 reactors will be in dry storage at 19 different reactor sites in 17 states.

Again, what was your basis for that statement?

A. Again, the same that I responded to you before.

It, to the best of my recollection, it was in the, either in the EIA report or PNL report.

Q. And when you said the nation's ratepayers will be further burdened, what did you mean by that?

A. The utilities, until we accepted the fuel, the storage remained the utility's responsibility.

If the utility needed to do, find storage alternatives like on-site dry storage, that the utility would be responsible for paying, and in turn, that cost, the utilities would then try to recoup that cost of the commissions to the ratepayers.



Q. The last sentence in here says that if the federal government were not to begin accepting the spent fuel by 2010, it is projected that 11,500 MTUs from 82 reactors will be in dry storage at 54 different reactor sites in 30 states.

Again, was that information you got from EIA or PNL?

A. To the best of my recollection, it is.

Q. Have you seen any contemporary estimates of how much spent fuel will be in dry storage if the DOE doesn't begin performing until 2010?

A. I have not looked at that certainly in the last several years.

Q. Do you know if other people at DOE have made an effort to determine that?

A. I would think that they have.

Q. Do you know whose involved in that effort?

A. I would direct you to one of two people.

I would think either Jeff Williams or Dave Zabransky would be knowledgeable about that.



MR. HIRSCH: Mark this 38.

(Brownstein Exhibit No. 38 was marked for identification.)

BY MR. HIRSCH:

Q. Mr. Brownstein, I have handed you what has been marked as Brownstein Deposition Exhibit 38, which is a document titled, "Spent Fuel Acceptance DOE's Process for Change," appears to be authored by you, and it's got Bates labels HQR-010-2386 through 2399.

Do you recognize this document as a document you prepared?

(The witness reviewed the document.)

THE WITNESS: I recall that this document was prepared for me by one of my contracting support people, and I need to go further and tell you that while there is marks in here by me, I don't recall that this is the draft, that this was, this was actually used at this summit.

This is, this is a my recollection is early draft.

The reason I do that is because of the cartoons in here, I believe I decided not to do



that, so I think this is different than the final one, again, to the best of my recollection.

BY MR. HIRSCH:

Q. What contractor would have prepared this document?

A. It would have been, again, either PNL or somebody at JAI, Johnson Associates, you know, Billy Cole.

I'm not sure which one.

Q. And apparently at least as a draft was something that was presented for you to present at the, what was called the Decision Makers' Summit?

A. Sir, that's what it says. I don't recall that.

I gave a lot of speeches. I don't recall that one, but yes, that's what it appears to be.

Q. Let me just ask you what was the Decision Makers' Summit?

A. I have no recollection.

Q. And do you know what the U.S. Radwaste Management entity or group is?

A. I don't.

earliest to the latest.
The intent of that was to give us some idea of the age and therefore the characteristics of the fuel that it might consider, so you would, so that is not identifying specific fuel.
That two scenarios, that one in time for an FDS, it would then identify specific fuel and it could be within that range which would be fine, and if it wasn't, then that could be another matter, but it wasn't specific fuel that was identified.
BY MR. HIRSCH:
Q. In the DCS form?
A. Right.
Q. So well, let me put it this way. If a utility identified some fuel from, again, from Reactor A in the DCS form, in the final delivery form, it could identify fuel for pick-up from a different reactor as long as it met the basic contract requirements, is that correct?
MR. BANES: Objection. Calls for legal conclusion.
Go ahead.
THE WITNESS: I probably ought to take



a minute and refresh my memory on the instructions.
MR. HIRSCH: Okay. If you want to look at it, that's fine.
(The witness reviewed the document.)
THE WITNESS: I'm sorry. Now that I have done that, can I ask you to repeat or --
MR. HIRSCH: Can you read it back?
THE REPORTER: Question: "So well, let me put it this way. If a utility identified some fuel from, again, from Reactor A in the DCS form, in the final delivery form, it could identify fuel for pick-up from a different reactor as long as it met the basic contract requirements, is that correct?"
THE WITNESS: I want to agree with the statement, with the only caveat is there could be some situation where that could be problematic, but in general, yes.
BY MR. HIRSCH:
Q. That statement is correct?
A. In general, yes.
(There was a pause in the proceedings.)
MR. HIRSCH: Let me have the court



reporter mark something.
This is an accompanying document to this, so let's go ahead and mark this as 42.
(Brownstein Exhibits Nos. 41 and 42 were marked for identification.)
THE WITNESS: Okay.
BY MR. HIRSCH:
Q. Mr. Brownstein, I have handed you what has been marked as Brownstein Deposition Exhibit 41 and Brownstein Deposition Exhibit 42.
Brownstein Deposition Exhibit 41 is a memorandum for the Secretary from Dan Dreyfus.
It has Bates labels HQR-001-0339 and HQR-001-311 through 312.
Can you identify these documents?
A. Can I?
Q. What they are.
A. Yes.
Q. Can you tell me what you understand they are?
A. Sure. They're, as I said, they're recommendations to the Secretary to approve the department's issuance of a Notice of Inquiry regarding waste acceptance issues.



Q. And did you prepare Exhibit 41 and 42, the text, that is?
A. Yes.
Q. And I guess Exhibit 42 shows that it was approved by the Secretary, is that correct, the Secretary of Energy?
A. Yes.
Q. That would have been Hazel O'Leary, is that right?
A. Yes. That doesn't look like -- yes. Yes.
Q. And on the right-hand column of Exhibit 41, on the second page, everybody signed off on this memo before I guess it went to the Secretary, is that correct?
A. That's correct, um-hm.
Q. You see in the discussion section --
A. Looking at 41 or 42?
Q. I'm sorry. Let's look at 41, the first page.
A. Okay.
Q. On the discussion section, first paragraph, second sentence, it says, "While it is the Department's preliminary view that the Act does not impose a statutory obligation to

accept spent nuclear fuel absent an operational repository or a suitable storage facility constructed under the Act, the Department may have created an expectation that it would begin accepting spent fuel in 1998 through its implementation of the Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste"?
A. Yes.
Q. What did you mean when you wrote that in this document?
A. To me, the words are clear. The sentence is clear.
I meant what it said.
Q. Well, what had the department done to create an expectation it would begin accepting fuel in 1998?
MR. BANES: Objection. It calls for a legal conclusion.
THE WITNESS: I would argue what we have talked about the last two days in terms of the ACRs and the APRs following the process that was detailed in the contract.
BY MR. HIRSCH:
Q. You mean by issuing the reports like



the mission plans and the ACRs, the DOE had created an expectation it would begin accepting spent fuel in 1998, is that correct?
A. I would not --
MR. BANES: Calls for legal conclusion.
THE WITNESS: No, I would not include the mission plan in that because the mission plan was part of the statute, not part of the contract, but the rest of that statement was accurate.
BY MR. HIRSCH:
Q. All right. So for example, by issuing the ACRs, the department could have created an expectation it would begin accepting spent fuel in 1998, is that correct?
MR. BANES: Objection. Calls for a legal conclusion.
THE WITNESS: May have created an expectation.
(There was a pause in the proceedings.)
BY MR. HIRSCH:
Q. At the, under the issue heading at the, on the first page of Exhibit 41 --



A. Okay.
Q. Do you see a reference to eliciting the views of interested parties on several issues, one, they're listed as one, two and three?
A. Yes.
Q. And the third option is options through the nuclear waste fund to offset a portion of the financial burden which may be incurred by utilities in continuing to store spent nuclear fuel at reactor sites beyond 1998, is that right?
A. Yes.
Q. What was your understanding at that time of what the financial burden was to the utilities for storing spent nuclear fuel beyond 1998?
MR. BANES: Objection -- asked and answered, and calls for speculation.
THE WITNESS: Things like adding dry storage to accommodate the spent fuel.
BY MR. HIRSCH:
Q. Mr. Brownstein, did you have any discussions at the DOE that the DOE's inability to start accepting waste could delay reactor



decommissioning?
A. I was aware of that, and you know, over ten years dealing with the subject, I considered I would certainly have had a discussion about that, but I don't recall a specific discussion, but I may have.
Q. Well, let me put it this way. You were aware I take it of the possibility that the DOE's failure to pick up spent nuclear fuel could cause utilities to delay reactor decommissioning, is that correct?
MR. BANES: Objection -- misleading. Calls for speculation.
THE WITNESS: Yes.
BY MR. HIRSCH:
Q. Were you informed of that by utilities?
A. I don't have a specific recollection of that.
Q. Did your contractors study those issues?
A. They may have.
Q. Do you recall any particular studies done by PNL or your other contractors on that issue?

A. I don't, but that's not to say that PNL -- we have seen PNL did a number of think pieces, and that may have been one.
I don't recall a specific document.
(There was a pause in the proceedings.)
BY MR. HIRSCH:
Q. Mr. Brownstein, do you recall that Mr. Tomaszczuk asked you some questions about the statutory linkages between the MRS facility and the repository?
A. I do.
Q. And as I recall, I think this is correct, one of the, one of the linkages you identified was that you couldn't construct an MRS until the NRC issued a license for the permanent repository.
Do you recall that?
A. Yes.
Q. All right. Was there a second linkage between the MRS and the repository that the DOE couldn't select an MRS site until the President recommended the permanent repository site?
MR. BANES: Objection. Calls for a legal conclusion.



You can answer if you remember.
THE WITNESS: I need to reread that act. It's been a while.
BY MR. HIRSCH:
Q. Well, we'll endeavor to get you that.
A. For homework assignment?!
Q. Is it correct that President Bush just about a couple of months ago recommended a permanent repository site?
A. He did.
MR. HIRSCH: Can we go off the record here?
MR. BANES: Sure.
(A discussion was held off the record.)
BY MR. HIRSCH:
Q. Will you look at, look back I should say at Brownstein Deposition Exhibit 32?
That is the 1992 ACR.
A. Okay.
Q. Do you see, I would like to refer you to page 3.
There is a statement that I think we may have seen in one of the earlier reports, but it's also in here, recited in here, that, quote,



if the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that facility operation and initial acceptance of SNF by DOE could not start until at least 2007?
A. Yes.
Q. That was a correct statement at the time, was it not, Mr. Brownstein?
MR. BANES: Objection -- asked and answered.
THE WITNESS: Yes.
BY MR. HIRSCH:
Q. All right. And I think you testified earlier that the, that the rate -- actually I would like you to look back at Brownstein Deposition Exhibit 30 for a minute.
That's the December 1991 ACR.
A. Okay.
Q. Do you see on page 2366 of this document that that contains projected waste acceptance rate?
A. Um-hm. Yes.
Q. And I believe you testified earlier that the rates that were identified in there



were based on or consistent with the statutory limitation on the MRS in the 1987 act amendments, is that correct?
MR. BANES: Objection -- misleading.
THE WITNESS: With respect to the 10,000 MTU limit.
BY MR. HIRSCH:
Q. All right. And is it correct that, and I guess -- and I think you testified to this, that a similar, although slightly different rate was used as the lower bounding case in the prior ACR.
Do you recall that?
A. I recall that.
Q. All right. Apart from the acceptance rate identified in Exhibit 30 in that lower bounding case, is it correct that the DOE had never used that acceptance rate or that type of acceptance rate before?
MR. BANES: Objection -- irrelevant and misleading.
THE WITNESS: When you say that type of acceptance rate, you're referring to 2.1?
BY MR. HIRSCH:
Q. Right. Well, let me clarify it; 2.1

refers to an acceptance rate that after a couple of years, goes up to 900 metric tons a year.
Do you see that?
A. Yes.
Q. And I believe that the lower bounding case example from the previous ACR went up to 875 metric tons.
Do you recall that?
A. Right. I do.
Q. My question is before Exhibit 30 in the prior ACR with the lower bounding case, is it correct that the DOE had never used rates, acceptance rates that low before?
MR. BANES: Objection -- misleading, and lack of foundation.
THE WITNESS: I don't want to speak for -- when you're making a blanket statement DOE never, you know, did, DOE is a large organization.
I can't recall that they did, and this was in response to, to the Amendments Act, so I believe you're right, to the best of my recollection.
BY MR. HIRSCH:
Q. And for example, the rates in the



mission plan were higher than the 1991 ACR, is that correct?
A. Yes.
Q. And the rates in the ACRs before I think it was the 1990 ACR that had the lower bounding case were higher than the rates in Table 2.1, is that correct?
MR. BANES: Objection -- misleading.
THE WITNESS: No. I thought that had a lower total.
BY MR. HIRSCH:
Q. I think I excluded the lower bounding case, but let me rephrase the question.
A. Oh.
Q. If I can find the document.
(There was a pause in the proceedings.)
BY MR. HIRSCH:
Q. Mr. Brownstein, is it correct that the acceptance rates identified in the Annual Capacity Report before December 1990 had a higher acceptance rate than was shown in December 1991 ACR?
A. I believe that's accurate.
Q. All right. And in fact, the December



1990 ACR had an upper bounding case that also had a higher acceptance rate than the 1991 ACR, is that correct?
A. That's I think Exhibit 24.
(The witness reviewed the document.)
THE WITNESS: Now that I have that in front of me, say that one more time.
MR. HIRSCH: Could you read the question?
THE REPORTER: Question: "All right. And in fact, the December 1990 ACR had an upper bounding case that also had a higher acceptance rate than the 1991 ACR, is that correct?"
THE WITNESS: That is not Exhibit 34.
MR. HIRSCH: Exhibit 24 -- I apologize.
(The witness reviewed the document.)
THE WITNESS: Is this 24?
MR. HIRSCH: Yeah.
THE WITNESS: I'm on December. That's what I'm looking at.
Is 1990, you wanted to compare that with, you wanted me to compare, your question was?
MR. HIRSCH: Why don't you read the



question back?
THE WITNESS: Comparing the December '91 ACR I believe?
BY MR. HIRSCH:
Q. Right, right, with the upper bounding case.
A. Right. And I'm trying to find the 1991 ACR.
I have the 1990.
Q. It's 30.
(There was a pause in the proceedings.)
THE WITNESS: Okay. I have that. I'm sorry.
MR. HIRSCH: That's fine. I think you better read the question back.
THE REPORTER: Question: "All right. And in fact, the December 1990 ACR had an upper bounding case that also had a higher acceptance rate than the 1991 ACR, is that correct?"
THE WITNESS: That is correct. I'm sorry.
MR. HIRSCH: That's fine. I think this is probably a good time to stop, and start again tomorrow.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :



(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia
Thursday, April 11, 2002

Continued deposition of ALAN BROWNSTEIN, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being previously duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman,



LLP, 1650 Tysons Boulevard, McLean, Virginia 22102-4859, at 9:38 a.m., Thursday, April 11, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
ALEX D. TOMASZCZUK, ESQ.
DANIEL S. HERZFELD, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7901)

On behalf of Plaintiff Sacramento Municipal Utility District:
DAVID S. NESLIN, ESQ.
Arnold & Porter
370 Seventeenth Street, Suite 4500
Denver, Colorado 80202-1370
(303) 863-2301

APPEARANCES: (Continued)

On behalf of Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:

JEFFREY L. HANDWERKER, ESQ.
Arnold & Porter
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
(202) 942-6101

On behalf of Plaintiff Wisconsin Electric Power Company:

DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 Fourteenth Street, N.W.
Washington, D.C. 20005-2011
(202) 434-1675

On behalf of Plaintiff Commonwealth Edison Company:

NORMAN M. HIRSCH, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350



APPEARANCES: (Continued)

On behalf of the Defendant:

UNITED STATES DEPARTMENT OF JUSTICE
BY: BRYANT S. BANES, ESQ.
RUSSELL A. SHULTIS, ESQ.
1100 L Street, N.W.
Washington, D.C. 20530



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR PLAINTIFFS | DEFENDANT |
|---|---|---|
| ALAN BROWNSTEIN | | |
| By Mr. Hirsch | 475 | |
| By Mr. Banes | | 543 |
| By Mr. Hirsch | 557 | |
| By Mr. Neslin | 561 | |
| By Mr. Carney | 641 | |
| By Mr. Handwerker | 647 | |

Afternoon Session -- 561


E X H I B I T S


| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 43 | 479 |
| 44 | 490 |
| 45 | 506 |
| 46 | 514 |
| 47 | 519 |
| 48 | 534 |
| 49 | 538 |
| 50 | 562 |
| 51 | 576 |
| 52 | 589 |
| 53 | 593 |
| 54 | 598 |





| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 55 | 602 |
| 56 | 605 |
| 57 | 607 |
| 58 | 609 |
| 59 | 612 |
| 60 | 617 |
| 61 | 620 |
| 62 | 621 |
| 63 | 634 |
| 64 | 636 |
| 65 | 659 |
| 66 | 671 |
| 67 | 680 |
| 68 | 717 |
| 69 | 728 |
| 70 | 733 |
| 71 | 753 |
| 72 | 754 |
| 73 | 759 |
| 74 | 762 |
| 75 | 763 |
| 76 | 772 |

Certified question: Page 525, line 13

Q. And at a 900 metric ton rate, or
excuse me. Strike that.
At a 900 metric ton rate, using that 80,000 total, do you agree that it would take over 80 years to eliminate the backlog of spent fuel and pick it all and remove it all?
MR. BANES: Do you want a calculator?
THE WITNESS: Yeah, if you want me to, yeah. I'm not going to do it in my head.
BY MR. HIRSCH:
Q. I'll give you a piece of paper.
A. Fine.
Q. I think --
MR. BANES: I think the math is fairly clear. I don't think that even needs to be asked.
MR. HIRSCH: Well, I think it's a pretty rough calculation.
MR. BANES: All right.
THE WITNESS: Roughly.
BY MR. HIRSCH:
Q. It would roughly take over 80 years to remove all spent fuel, is that correct?
MR. BANES: Objection -- irrelevant.
THE WITNESS: Yes.



BY MR. HIRSCH:
Q. All right. Do you have an understanding at the time, or strike that.
Do you have an understanding, Mr. Brownstein, of what the DOE considers the optimal period to run the spent fuel program, the length of time?
MR. BANES: Objection -- vague as to what optimal means.
BY MR. HIRSCH:
Q. Let me rephrase the question. Mr. Brownstein, do you have an understanding of what the DOE considers to be the optimal period of time to run the spent fuel disposal program?
MR. BANES: Objection -- vague, and calls for speculation.
THE WITNESS: The only way I would know how to answer that question is to go back, go to our total system life cycle cost documents which estimates the, the time of the program and the costs associated with that, and we, we can do that on -- there's an office that does that on a regular basis.
They assume acceptance rates. They assume the costs associated with everything



from, from the acceptance period, the pre-closure period to the post-closure period.
All costs associated with the program, that's what I would need to, to answer your question, and even then, I don't know that I'm in a position to say that that is optimal, but that would certainly give an indication of what the system is planning for the period for operations of the program.
BY MR. HIRSCH:
Q. So, so I understand the, I think they're called the TSLCC reports?
A. That's correct.
Q. Is that correct?
A. Total system life cycle cost.
Q. The TSLCC costs would show what the DOE's projection of how long the facility or the program should operate, is that correct?
MR. BANES: Objection. Calls for speculation.
THE WITNESS: Yes, but again, I then could not testify whether that includes an optimal rate or some other basis.
BY MR. HIRSCH:
Q. The TSLCC costs would show what the



DOE's projection of how long the program should operate, is that correct?
A. That would be my --
MR. BANES: Objection -- lack of foundation.
THE WITNESS: That would be my understanding.
I don't do the TSLCC report, but that would be my understanding.
MR. HIRSCH: Why don't we take five minutes here?
MR. BANES: Okay.
(A recess was taken.)
(Brownstein Exhibit No. 45
was marked for
identification.) ^
BY MR. HIRSCH:
Q. Mr. Brown, I have handed you what has been marked as Brownstein Deposition Exhibit 45, which is a document titled, "Utility and DOE Efforts to Improve the Standard Disposal Contract -- an Experiment in Cooperation."
And it's Bates labeled HQR-043-0592 through 0595.
Do you recognize this as a paper that

you and Mr. Billy Cole authored?
A. Yes.
Q. And where was it presented?
A. I'm not absolutely sure, but based on the format, I would think it was at the International Waste Conference that we held at that time annually.
Now we hold it every several years, and I do not recall what year.
Q. When you say International Waste Conference, what does that mean, or what was that?
A. It was a, one of the engineering groups sponsored a, at one time, a yearly conference to discuss high-level waste issues.
I forget the exact title of the conference. I thought it was something International High-Level Waste Conference, something like that, and for one of those years, we put a paper together and presented it.
Q. When you say one of the engineering groups sponsored this seminar?
A. Like a, well, it wasn't -- it was like a three or four-day conference.
Q. Right.



A. And one of the professional engineering groups; I would be speculating.
Q. And is it fair to say that the purpose of the conference was for engineers who were dealing with spent nuclear fuel issues in various countries to get together to talk about relevant issues?
A. Yes.
Q. I believe in Mr. Morgan's deposition, we had a document that referenced an international conference in Vienna.
Do you know where this conference, where the conference where you presented the paper was held?
A. Probably, most of them that I recall were held in Las Vegas, so it was probably Las Vegas, but I can't be absolutely sure.
Q. And did you and Mr. Cole present Deposition Exhibit 45 at the conference?
A. My recollection is this paper was part of the proceedings, the published proceedings, and I probably made a presentation, you know, using slides, based on.
Q. Do you recall what the year was that you presented this paper?



A. I do not.
Q. You see on the first page of the document, there's a discussion about basically the adoption of a standard contract?
A. What paragraph are you referring to?
Q. I'm referring to the discussion section in the first I think five paragraphs after the discussion heading there, basically the first five paragraphs of the discussion section.
A. Okay.
Q. Do you want to read those to yourself?
A. Sure.
(The witness reviewed the document.)
BY MR. HIRSCH:
Q. Let me know when you're finished reading.
(The witness reviewed the document.)
THE WITNESS: I have read the first five paragraphs.
BY MR. HIRSCH:
Q. Do you see that there's a description in those paragraphs of the process or the way in which the standard contract was adopted?
A. Yes.



Q. And then there's a statement near the bottom of the first page "This process created the perception among many utilities that they had been pressured into signing a contract that appeared unresponsive to their needs, unfair, and inadequate"?
A. Yes.
Q. Do you see that statement? Had you heard comments like that from utility representatives in your position at DOE?
MR. BANES: Objection -- irrelevant.
THE WITNESS: Yes.
BY MR. HIRSCH:
Q. And do you believe that there was some merit to those complaints?
MR. BANES: Same objection.
THE WITNESS: The perception existed. What I tried to describe in these, in these five paragraphs is this covered a very long-term project at the very early stage when, you know, the parts of the system and implementation details were far from known, but the statute required that we do that.
The department did that expeditiously as required by the, by the statute, and I know

those perceptions were out there, and I think some of them had some merit, not all of them.

BY MR. HIRSCH:

Q. Which of the complaints did you think had some merit?

MR. BANES: Objection -- irrelevant.

THE WITNESS: I think the timing aspects, and, and the fact that this had been done via the federal rulemaking process were two complaints that I heard.

BY MR. HIRSCH:

Q. What do you mean by the timing aspect?

A. I believe the law, the statute required that these contracts, in order for a utility to be eligible for disposal services, the statute set a timeframe, which was very short, they had to sign this contract by, and I heard that, you know, a number of utilities would have preferred, you know, individual negotiations as opposed to doing this via rulemaking.

Again, the time that you're asking me about was, was before I was there, so these were, you know, things that I, that I heard.

Q. Well, did you think that some of the



utilities' complaints about the, the short time for I guess promulgation and adoption or execution of the contract had some merit?

MR. BANES: Objection -- irrelevant.

THE WITNESS: I understood them. The law was the law. That's what the law required, and the department implemented it at that time as expeditiously as it could.

BY MR. HIRSCH:

Q. Do you know whether utilities communicated the complaints that you're identifying -- strike that.

Do you know whether the utilities communicated the complaints that you heard prior to the execution of the standard contract?

MR. BANES: Objection -- lack of foundation.

THE WITNESS: They did. I believe they did in responding to the proposed rulemaking.

They certainly, the industry committed their concerns in writing as part of the public record.

BY MR. HIRSCH:

Q. Do you see further down in the



paragraph on page 593, it's, at the top it says, "Adding to the utilities' frustrations was the fact that they were paying into the Nuclear Waste Fund at a rate of approximately $1.5 million per day for service to be rendered by the Department at least 15 years into the future."

A. I do.

Q. Do you know if that $1.5 million figure is still what the utilities are paying or whether it's lower or higher at this point?

A. I do not know that. I know the rate is the same.

I do not know if the, if the 1.5 million per day is correct or not.

Q. Based on current events, that the date that the department is going to begin has now been extended beyond that original 15 years, is that correct?

MR. BANES: Objection. Calls for legal conclusion.

Calls for speculation.

THE WITNESS: Yes.

MR. HIRSCH: Let's mark this as 46.

(Brownstein Exhibit No. 46



was marked for identification.) ^

BY MR. HIRSCH:

Q. Mr. Brownstein, I hand you what's been marked as Brownstein Deposition Exhibit 46, which is a two-page document with a title "ACR Issues Status Report December 31st, 1991," and it has the Bates labels HQR-003-0314 through 0315.

Do you recognize this document, sir?

(The witness reviewed the document.)

THE WITNESS: I don't believe I have ever seen this document, to the best of my recollection.

BY MR. HIRSCH:

Q. I think you testified yesterday about an ACR issue resolution process.

Do you recall that?

A. Yes.

Q. And does this memo appear to be a summary of where people were in the ACR issues resolution process?

MR. BANES: Objection -- lack of foundation.

THE WITNESS: Where they were? I

don't understand where they were.

BY MR. HIRSCH:

Q. Let me strike that. Does Exhibit 46 appear to be essentially a status report regarding the progress of the ACR issues resolution process?

MR. BANES: Same objection.

THE WITNESS: That is what the document purports to show.

BY MR. HIRSCH:

Q. Do you know who prepared this document?

A. I don't recall seeing this, so I don't.

Q. There is a reference in the third paragraph to something called the M&O.

Do you see that?

A. Yes.

Q. Do you know what M&O represents?

A. Yes.

Q. What is M&O?

A. That was the management and operating contractor.

Q. And was that PNL?

A. No. At the time -- I'm looking at the



date at the top.

Q. Which is?

A. December 31st, 1991.

Q. Okay.

A. During that time, the M&O was the principal, and that was TRW.

Q. Does it appear to you that this document, Exhibit 46, was prepared by TRW?

A. I don't know.

Q. Was TRW involved in the ACR issues resolution process?

A. I, I think by this time, they, through one of their subs, they were, one of their subcontractors.

Q. Which subcontractor is that?

A. That would have been JAI.

Q. And by December 1991, was Mr. Billy Cole working for JAI?

A. Yes, to the best of my recollection.

Q. You see in the first sentence of this document, Exhibit 46, it says this standard disposal contract which defines the spent nuclear fuel and high-level radioactive waste acceptance process was unfortunately developed in such a way that the terms and conditions



contained numerous omissions, inconsistencies, ambiguities and contradictions?

A. Yes.

Q. "An OCRWM review of the Standard Disposal Contract identified 34 issues requiring resolution before waste acceptance could begin"?

A. Just a second.

Q. Sure.

(There was a pause in the proceedings.)

THE WITNESS: I'm sorry.

BY MR. HIRSCH:

Q. Would you agree that the standard contract contained omissions, inconsistencies, ambiguities and contradictions?

MR. BANES: Objection. Calls for a legal conclusion.

THE WITNESS: To the extent that the issues that the utility representatives and we agreed, which were I think the series of 34, and that is probably the right number, those 34 could be characterized in that grouping.

BY MR. HIRSCH:

Q. There were 34 issues identified in this document?



A. That's what this says. And to the best of my recollection, I think that's accurate.

Q. And so you would agree that there were at least -- strike that.

So you would agree that there were 34 issues that had been identified where there were omissions, inconsistencies, ambiguities or contradictions in the standard contract?

MR. BANES: Objection. Calls for legal conclusion.

THE WITNESS: There were 34 issues that we recognized, we being the department and utilities, that needed to be clarified for whatever the reason.

BY MR. HIRSCH:

Q. And so at minimum, that would have reflected that the standard contract was ambiguous on those issues, isn't that correct?

MR. BANES: Objection. Calls for a legal conclusion.

THE WITNESS: No. It could have been, it could have had omissions. It could have had inconsistencies.

I mean there are a host of reasons

why.
BY MR. HIRSCH:
Q. All right. There were 34 issues where there was either an omission, an inconsistency, an ambiguity or a contradiction, is that correct?
MR. BANES: Same objection.
THE WITNESS: To the best of my recollection.
MR. HIRSCH: Mr. Brownstein -- strike that. Let's mark another exhibit.
(Brownstein Exhibit No. 47 was marked for identification.) ^
BY MR. HIRSCH:
Q. Mr. Brownstein, I have handed you what has been marked as Brownstein Deposition Exhibit 47, which is a copy of the March 1995 DOE Acceptance Priority Ranking Annual Capacity Report.
It doesn't appear to have Bates labels.
Do you recognize that this document is a copy of the DOE 1995 APR/ACR?
MR. BANES: Objection -- lack of



foundation.
THE WITNESS: That's what it indicates, yes.
BY MR. HIRSCH:
Q. And did you review the 1995 ACR/APR before it was released?
A. I don't recall.
Q. What was your position in early 1995 at the DOE?
A. Formally I testified that I took on my new responsibilities in March of '95, which is the date of this report, and I can't recall when, when that, when those formal detail papers were signed.
I may have been doing those responsibilities some time before, which is why I have answered your question the way I have.
Q. Is it correct that before a document like Exhibit 47 would be released, it would be circulated in draft form for some period before it was released?
A. It would normally have been circulated for concurrence through the concurrence chain, yes.
Q. And my question is do you think it is



likely that you reviewed a draft before it was issued?
A. I may have. I can't say likely. I may have.
Q. Have you reviewed the document since then?
A. No. This document?
Q. Yes.
A. No.
(There was a pause in the proceedings.)
BY MR. HIRSCH:
Q. Will you look at the bottom of page 3 of the document?
Do you see the statement due to the uncertainty associated with the date of commencement of operation of the waste management system, the annual nominal waste acceptance rates are presented by year, years of operation in the system rather than by specific calendar years?
A. I do.
Q. And do you see on the Table 1 on page 4 of the document that instead of specific years for the start of DOE operations, it just says



Year 1, Year 2, Year 3?
A. Yes.
Q. And that was a departure from the previous ACR documents, is that correct?
A. I need to review that decision. Can we go back to the previous one?
Q. Sure.
(There was a pause in the proceedings.)
THE WITNESS: Excuse me. Was that the '92?
MR. HIRSCH: I'm just looking.
MR. HANDWERKER: Exhibit 32.
MR. HIRSCH: Exhibit 32.
(The witness reviewed the document.)
THE WITNESS: Assuming that there was no ACRs between '92 and '95, I agree.
BY MR. HIRSCH:
Q. Well, just for clarification, you were looking at Brownstein Deposition Exhibit 32?
A. Yes.
Q. Is that correct? And Brownstein Deposition Exhibit 32 on Table 2.1 on page 4 shows specific dates for the beginning of DOE acceptance of SNF?

that the allocation occurs?
A. Yes.
Q. So according to the instructions, and I stand corrected if I misstated this earlier, but the utility would look at the most recent ACR to identify what calendar year it had an acceptance allocation in, and then submit a form 63 months before that, is that correct?
A. Yes.
Q. And is it correct that in the 1995 APR/ACR document that the DOE issued, the DOE removed the calendar dates for acceptance by the DOE?
A. Yes.
Q. Now Mr. Brownstein, are you familiar with an individual, I think you mentioned him yesterday, named Jim Carlson?
A. Yes.
Q. And what was Mr. Carlson's role in the program?
A. In what timeframe?
Q. All right. When you started, what was Mr. Carlson's role?
A. In 1985?
Q. Right.



A. We have to go back to the organizational charts again.
MR. HIRSCH: Off the record.
(A discussion was held off the record.)
BY MR. HIRSCH:
Q. Looking at Exhibit 21, why don't you take a minute to look at that?
I guess what I'm trying to get from you, Mr. Brownstein, is just sort of a general understanding of what Mr. Carlson's role in the waste program was.
A. Well --
MR. BANES: Objection. Calls for speculation.
THE WITNESS: He served in many different capacities over the years, varying capacities, so --
BY MR. HIRSCH:
Q. When you started, what was his capacity?
(The witness reviewed the document.)
THE WITNESS: Looking at page 3 of that exhibit marked September '85 --
BY MR. HIRSCH:



Q. Right.
A. It's my recollection that he worked under the Office of Storage and Transportation Systems.
Q. Did he report to Mister is that Hilley?
A. Hilley; well, if my recollection is correct, then he would have reported to Hilley.
I can't recall whether he reported to Klein or to Barrett. You know, under which division?
Q. And the L. Barrett here listed on the September '85 organization chart, is that Mr. Lake Barrett?
A. Yes.
Q. At the time that Mr. Carlson left DOE, do you recall what his responsibilities were?
A. I believe he was in an acting position as acting director of the Office of Acceptance, Transportation and Integration.
Q. Are you referring to a particular page of Exhibit 21?
A. I'm sorry. I was referring to Exhibit 22.
I believe that was the latest that you



presented to me yesterday.
Q. Right. Right. So I'm sorry. Which box on Exhibit 22 are you referring to here?
A. On the third line, the middle box; that's my recollection.
Q. Do you believe that when Mr. Cole left, he was with the Office of Acceptance, * Transportation and Integration?
A. Mr. Carlson.
Q. I'm sorry -- Mr. Carlson.
A. Yes.
Q. And do you know what his position there was?
A. I believe he was the acting office director.
(Brownstein Exhibit No. 48 was marked for identification.) ^
BY MR. HIRSCH:
Q. Mr. Brownstein, I have handed you what has been marked as Brownstein Deposition Exhibit 48, which is essentially a group exhibit showing correspondence between ComEd and the DOE relating to ComEd DCS forms.
In particular, I would like to refer

you to a few pages of this document.
A. Okay.
Q. You see that the first page is a letter from the DOE from Beth Tomasoni to Jeanne Tortorelli at Commonwealth Edison Company transmitting some accepted DCS forms?
A. Yes.
Q. And is that your signature on the forms?
A. On the, on the one marked 0266?
Q. Right.
A. Yes.
Q. And you're listed as the technical representative?
A. Yes.
Q. What does the technical representative signify there?
A. The, really means the program office. In other words, the contracting office is a procurement office not part of the RW program.
It's, they're the ones who technically administer all the contracts or the contracts for the department, and before the contracting officer does it, she has something that is called a COTR -- contracting officer technical



representative.
It, it's just a link between the program and procurement, and I was that person.
Q. And then your signature is also on page 267, which is the next page?
A. Yes.
Q. And then do you see following that is some DCSs that were, DCS forms that were submitted by ComEd in September of '93?
And I believe if you go to the page that is marked CE03746, starting there, it's a little hard because they're not sequentially numbered.
A. Okay. Okay. Let me try -- CE03746.
Q. Right.
A. Okay.
Q. And do you see on, starting on page 3747, there are, there is an approved DCS form, and again there is a signature.
I believe that's your signature as the technical representative?
A. Yes.
Q. And at this time, you're identified as the Chief, Logistics and Utility Interface Branch?



A. Right.
Q. And your signature does also appear on the other forms that are immediately behind that first one we looked at, is that correct?
A. Associated with the December 6 letter, yes.
Q. And then looking further into the document, on the pages starting COF-001-2156?
A. Yes.
Q. Do you see there is more DCS forms submitted by ComEd in 1994?
A. Yes.
Q. And I guess these forms you'll see starting on 2159 were approved by Ms. Slater?
A. Right.
Q. Do you see following those forms, there's a transmittal letter from ComEd from a Ken, Kenneth Petersen to Ms. Tomasoni transmitting DCS forms that were dated September 1995?
A. Yes.
Q. Mr. Brownstein, do you recall ever seeing those forms that were submitted by ComEd in September 1995?
A. No. I had moved on by that time, so I



had not.
Q. I'll represent to you that ComEd didn't receive a response to those 19 September 1995 forms.
Did you, were you ever engaged in any discussions or did you ever have any discussions about what to do with forms ComEd had submitted in September 1995.
A. No, I did not.
MR. HIRSCH: Take five minutes here. I'm almost done.
MR. BANES: Okay.
(A recess was taken.)
BY MR. HIRSCH: Back on the record.
(Brownstein Exhibit No. 49 was marked for identification.) ^
BY MR. HIRSCH:
Q. Mr. Brownstein, I have handed you what has been marked as Brownstein Deposition Exhibit 49, which is a document, it's Bates labeled EDB-002-0562, and it runs through 0618.
Let's go off the record here for a second.
(There was a pause in the

Thank you.
A. Okay.
Q. Are you familiar with the activities of the Monitored Retrievable Storage Commission in 1989?
A. I was aware of it, had some familiarity with it, yes.
Q. What was their responsibility?
A. Their responsibilities were laid out by statute, and I would rather not speculate.
I would rather go back to the statute to do that.
Q. Okay. Did you review, were you -- strike that.
Were you aware of the fact that the Monitored Retrievable Storage Commission issued a report in November of 1989?
A. I have a recollection of that.
Q. Did you review their report after it was issued?
A. I would like to be able to see the report in order to answer your question.
Q. Okay. I would like to have marked as Brownstein Exhibit 69, a document entitled, "Nuclear Waste: Is There a Need for Federal



Interim Storage? U.S. Monitored Retrievable Storage Review Commission Washington D.C.," November 1989.
Bates number, starting Bates number is PA-172230, and I will represent for counsel and the witness that in the interests of saving my strength, I have only printed out the first 26 pages of the document, which consists of the summary of the conclusions and recommendations.
If you need to look at the entire document, which is lengthy, I'll be happy to provide you with a copy of that. Okay.
(Brownstein Exhibit No. 69 was marked for identification.) ^
BY MR. HANDWERKER:
Q. And I will tell you in advance, Mr. Brownstein, you can look at whatever amount of this document you need to refresh your recollection, but I'm going to focus all of my questions on, on the conclusions that are in the front.
(The witness reviewed the document.)
THE WITNESS: I believe that I, I did read this document back then.



BY MR. HANDWERKER:
Q. Okay. Take a look if you would at the page marked with the letters xvi at the bottom.
It's Bates number PA-172244.
A. Okay.
Q. And at the bottom of the first column, under conclusion No. 4, do you see the statement that the schedule linkage presently in the Nuclear Waste Policy Act -- strike that.
The Nuclear Waste policy Amendments Act, open paren, MRS construction may not begin until the Nuclear Regulatory Commission issues a license for the construction of a repository, close paren, would make it impossible for an MRS to be operational more than three years before the repository.
Do you see that?
A. Yes.
Q. Do you agree with that conclusion?
MR. BANES: Objection -- lack of foundation.
THE WITNESS: I'm not, my responsibilities, you know, within RW did not include working on the MRS in terms of technically how you would construct one or how



it would work, so I have no independent basis on which to say I agree or I disagree.
BY MR. HANDWERKER:
Q. That's fair enough. Did you discuss that conclusion with anyone within the Department of Energy that you can recall?
A. To get clarity of this was an accurate statement or not?
Q. Yes. Yes.
A. No. I wouldn't have a basis to challenge the commission.
Q. At this time, in November 1989, is that around the time that the DOE Secretary issued the report, the 60-day report reassessing the nuclear waste program?
A. My recollection is that that 60-day report was issued in '89.
I don't recall when in '89.
Q. And that report, the 60-day report, delayed the opening of the repository from 2003 until 2010, is that correct?
A. I believe that's correct.
Q. And three years prior to 2010 is 2007 obviously, right?
A. That's the way the math works.

Q. Is that the -- you're right.
A. Sorry.
Q. It's pretty obvious. Is that the basis for the inclusion of the 2007 date in the subsequent ACRs that we looked at earlier for the date on which facility operations could begin if the scheduling linkages were not modified or repealed?
MR. BANES: Objection -- lack of foundation.
THE WITNESS: Please show me the statement you're referring to in the ACR.
I'm trying to answer your questions.
BY MR. HANDWERKER:
Q. Take a look at the 1991 ACR, which is Exhibit 30, and in particular, in Brownstein Exhibit 30, could you take a look at page 4, which is Bates Number HQR-001-2365?
A. Okay.
Q. And in the second paragraph, the last sentence which reads, we discussed earlier, if the current linkages between MRS facility construction and repository construction authorization are maintained, it is estimated that commencement of facility operations and



initial acceptance of SNF by the Department of Energy could not start until at least 2007?
A. Yeah. That's my recollection. That's consistent, so I agree.
Q. Okay. So if the siting linkages between MRS facility construction and repository construction authorization are maintained, then facility operations and initial acceptance of spent nuclear fuel by DOE cannot start more than three years before repository, repository operations start, is that correct?
MR. BANES: Calls for a legal conclusion.
Go ahead.
THE WITNESS: My understanding is the law would have to change on this.
We were following statute.
(There was a pause in the proceedings.)
MR. HANDWERKER: I would like to have marked as Brownstein Exhibit No. 70 a document entitled, "Civilian Radioactive Waste Management Program Plan Volume 1" dated I think December 19th, 1994. Yes.
That is as referenced on the second



page.
It's got the U.S. Department of Energy seal on it, and the first Bates number is SN174276(D) and the final Bates number is SN174362, and I will represent for counsel and for the witness that I have provided to you Volume 1, which is the program overview.
There are two additional volumes.
(Brownstein Exhibit No. 70 was marked for identification) ^
BY MR. HANDWERKER:
Q. Take as much time as you need to familiarize yourself with the program plan, which could take years, right?
Let me ask you as a starting point to help you out do you recognize this document as the December 19th, 1994 program plan?
A. Yes.
Q. And did you review this document at or about the time it was released?
A. I reviewed parts of the document.
Q. Okay. The parts of the document that you reviewed, were they interspersed throughout the program plan, or were they focused on any



particular part?
A. As I recall, they were in a number of different sections, not in one location.
Q. Okay. Did you play any role in preparing any parts of the program plan?
A. I believe that I did.
Q. Which parts did you play a role in preparing?
A. In order to answer that question, I would need to go and look through it.
Q. Okay. Maybe -- go ahead.
A. Those, those sections that describe activities then under my responsibility at the time, which I would have to then look through and show, and that's for preparing, and then I reviewed, you know, other sections as well.
Q. Okay. Maybe when I asked my questions about particular parts, that might help focus on those parts of the program plan that you did prepare.
Okay?
A. I would rather do it that way.
Q. That's fine. Take a look if you would at page X -- I'm sorry. Strike that -- ix -- my Roman Numerals are terrible -- which is Bates

246

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - - - - - - X

YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) :
Plaintiffs, :
v. :
THE UNITED STATES, :
Defendant. :

- - - - - - - - - - - - - - - - - - - - X

Washington, D.C.
Friday, June 14, 2002

Continued deposition of ALAN BROWNSTEIN, a witness herein, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to agreement, the witness being previously duly sworn, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 8:40 a.m., Friday, June 14, 2002, the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs:
JERRY R. STOUCK, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5800

On behalf of the Defendant:
KEVIN B. CRAWFORD, ESQ.
RUSSELL A. SHULTIS, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W., Room 12128
Washington, D.C. 20530
202-305-9640



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| ALAN BROWNSTEIN | PLAINTIFFS |
| By Mr. Stouck | 250 |
| | DEFENDANT |
| By Mr. Crawford | 437 |
| Afternoon Session - Page 377 | |


E X H I B I T S


| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 83 - Defendant's Witness List | 251 |
| 84 - Withdrawn by counsel | 259 |
| 84 - Preliminary Draft, DCS Review Process, 10/13/92 | 261 |
| 85 - Letter dated 12/22/92 with attachments | 272 |
| 86 - Letter dated 3/13/97 | 290 |
| 87 - Letter dated 9/25/92 with attachments | 294 |
| 88 - Letter dated 12/1/92 with attachments | 298 |
| 89 - Attachment | 304 |
| 90 - Letter dated 1/7/93 with attachments | 307 |
| 91 - Letter dated 4/8/93 with attachments | 308 |
| 92 - Informal Memorandum | 321 |
| 93 - Letter dated 4/28/93 | 328 |
| 94 - Agenda for Conference Call with DOE on Delivery Commitment Schedules, 5/12/93 | 333 |





| | |
|---|---|
| 95 - Memo undated | 334 |


E X H I B I T S (Continued)


| BROWNSTEIN EXHIBIT NO. | PAGE NO. |
|---|---|
| 96 - Memo undated | 334 |
| 97 - Memo dated 6/14/93 | 340 |
| 98 - Letter dated 6/10/93 | 366 |
| 99 - Letter dated 7/15/93 | 368 |
| 100 - Memo dated 7/8/93 | 370 |
| 101 - Letter dated 7/26/93 with attachment | 372 |
| 102 - Letter dated 2/4/92 | 377 |
| 103 - Letter dated 4/6/92 | 380 |
| 104 - Letter dated 4/25/94 with attachment | 382 |
| 105 - Letter dated 9/28/95 | 383 |
| 106 - Memo dated 3/28/91 with attachments | 408 |
| 107 - Questions for Senator Mathews | 410 |
| 108 - Letter dated 10/19/90 with attachment | 413 |
| 109 - Letter dated 8/22/91 with attachment | 419 |

P R O C E E D I N G S
Whereupon,
ALAN BROWNSTEIN,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:
EXAMINATION BY COUNSEL
FOR PLAINTIFFS (RESUMED)
BY MR. STOUCK:
Q. Good morning, Mr. Brownstein.
A. Good morning.
Q. Welcome back. Thanks for coming back. As I mentioned very briefly before we started here, I have some more questions for you obviously. And, because your deposition has been a little bit fragmented in time, no fault of yours, with your first few days and then May 23rd and then today and because I've been busy with other depositions, I have tried hard to limit the amount of duplication there may be today; but we may have a little.
If we get into an area that we've covered before, I apologize and I will certainly try to keep that to a minimum. I realized last night when I was getting ready for today that there may be a little



more of that than is ideal, but it's not because I want to ask you the same questions.
Would you mark this as the next exhibit, please.
MR. CRAWFORD: For the record you may always remind Mr. Stouck if he begins to duplicate and he'll take note of that I'm sure.
MR. STOUCK: Absolutely.
(Brownstein Exhibit No. 83 was marked for identification.)
BY MR. STOUCK:
Q. Mr. Brownstein, you've been handed a document that's been marked Exhibit No. 83. This is a document entitled Defendant'S Witness List which has been prepared by the Department of Justice under a court order in the -- well, this one is in the Yankee Atomic case, but we've got something similar in the Connecticut Yankee and Maine Yankee cases.
This is a list of folks the government may call as witnesses at the trial of this action. If you turn to page 2, you'll see your name.
A. Yes.
Q. Did you know prior to right now that you might be called as a witness at the trial of this action?



A. Yes.
Q. You discussed that with counsel?
MR. CRAWFORD: Well, I'll object to that and I'll instruct him not to answer that.
BY MR. STOUCK:
Q. The question then is how do you know that, who told you that?
A. Discussions with the Department of Justice attorneys.
Q. And for how long have you known that?
A. I think -- in one of our conversations, from one of the depositions, I think I asked the question about the next steps.
Q. This is a brief description as you'll see under your name of the topics that the government has told you they may call you to give testimony about. And would you just take a look at it. I want to ask you a couple questions about the subjects.
A. Okay.
Q. Remind me when you started working on waste acceptance at the Department of Justice?
A. September 1985.
Q. Now --
A. Department of Energy.
Q. Department of Energy, thank you. I take



it that prior to September of 1985 you would have no personal knowledge about any of these subjects, implementation of standard contract, priority for shutdown reactors, how the Department of Justice was handling that?
A. That's correct.
Q. And when did you stop working on waste acceptance matters?
A. March of 1995.
Q. Subsequent to that time, you would have had no personal knowledge of these topics; is that right?
A. Hallway conversations with people, but I didn't stay very much connected with it.
Q. You would not be able to testify about what the Department of Energy was doing in these areas subsequent to the time you stopped working on them; is that right?
A. I think that's fair.
Q. The exchange approval process which is the last mentioned subtopic, if you will, here, I thought you told me previously that -- I showed you some documents or I asked you some questions about exchange approval criteria.
And I thought the testimony from you was

Q. Do you recognize this document, Mr. Brownstein?
A. I don't recall ever seeing this one.
Q. This is a document that says at the top Preliminary Draft, DCS Review Process, 10/31/92. Do you know if there was written guidance that was ever approved by your office regarding the manner in which delivery commitment schedules should be reviewed?
MR. CRAWFORD: Objection, vague.
THE WITNESS: I just don't recall.
BY MR. STOUCK:
Q. Okay. One way or the other?
A. We obviously went through approving and in some cases disapproving. So I'm sure we had criteria. But I don't recall the document or a document.
Q. Okay.
A. I couldn't point to a document and say this was it. There must have been something, I just don't recall.
Q. Okay. Well, now you don't recall it. But, when you say there must have been something, why is that, is that because you have written guidance on everything, why do you say there must have been something?



MR. CRAWFORD: Objection, asked and answered. Let me just say, objection, answered.
THE WITNESS: We went through a process of having to determine whether we're going to approve or disapprove the DCSs. I would have had criteria. I don't recall what kind of document it was.
BY MR. STOUCK:
Q. What was your personal involvement, the nature of your personal involvement in the process of approving or disapproving DCSs?
A. I believe that for a period of time I signed as the approval of DCSs, I mean we testified to this before, as the COTR, the contracting officer's technical representative. So in essence I was the approval or disapproval official for the program.
Q. When I spoke to Mr. Williamson, I deposed Mr. Williamson, Doug Williamson, he told me that he would review these DCSs. And he up through his management I guess made recommendations to the Department of Energy about approval or disapproval. Does that sound right?
A. TRW as a contractor was our support in that area. When you say Doug Williamson, at my level it was Billy Cole, I reported to Billy. So the TRW



family would make recommendations after their review, I do recall that.
Q. That's what he said, he would send them up to Billy Cole and Billy Cole would send them up to you. When I asked about the nature of your involvement, I do recall that you testified that you signed as the technical representative.
But what would land on your desk, would an approval -- you know, some document that says we recommend approval, or what would you actually do before you signed that piece of paper, you know, what kind of substantive involvement would you have in this approval or disapproval process, if any?
A. I don't specifically recall now. I may have had my staff review the TRW work. The things that would get my attention were those where it required or was suggesting a disapproval. So I would recall, you know, particularly focusing on that.
If they were recommended for approval, you know, I would probably read it over, you know, make sure -- you know, I would do a cursory review. That was not true for disapprovals, disapprovals received a lot more attention.
Q. Approvals were done on a relatively routine basis, is that what you're saying?



MR. CRAWFORD: Objection.
THE WITNESS: Right.
BY MR. STOUCK:
Q. They didn't call for attention at your level?
MR. CRAWFORD: Objection, vague.
BY MR. STOUCK:
Q. That seems to be what you're saying?
A. That's correct.
Q. Now, in this document that you're looking at, No. 84, near the bottom there's a new paragraph. It says WA, which is defined above in the second line as waste acceptance, will then enter the DCS into the processing and approval system, parentheses, PAS, database. Do you see that?
A. Right.
Q. Do you know what that is?
A. I vaguely recall, that was a -- that was a TRW database. It wasn't a DOE database.
Q. Did you have access to it?
MR. CRAWFORD: Objection, vague.
THE WITNESS: If I wanted it, I probably did.
BY MR. STOUCK:
Q. Did you ever use it?

MR. STOUCK: Can we mark this as whatever the next number is.

(Brownstein Exhibit No. 86 was marked for identification.)

BY MR. STOUCK:

Q. This is a letter from Beth Tomasoni, contracting officer, to Mr. Lee Hill at Northeast Utilities, March 13, 1997. I appreciate that this is after the period when you stopped working directly on waste acceptance matters. But the first sentence here says, the Department of Energy has received your delivery commitment schedules submitted pursuant to Article V.B of the standard contract. And then it says, the department at this time is not able to approve your DCS submittal. Do you see that?

A. Yes.

Q. Do you know why the department was not able at that time to approve the DCS submittal?

MR. CRAWFORD: Objection to the lack of foundation and to the extent it calls for speculation.

THE WITNESS: I wouldn't have a basis to answer the question. I don't know.

BY MR. STOUCK:

Q. Do you know whether a decision was made



within RW to across the board respond to DCS submittals in this way; in other words, to just say that the department is not able to approve?

A. I don't know.

MR. CRAWFORD: Objection, asked and answered, lack of foundation, and to the extent it calls for speculation.

Now give your answer.

THE WITNESS: I have no idea.

BY MR. STOUCK:

Q. You were not involved in any such decision?

A. No.

Q. And you wouldn't know the basis for any such decision if it was made?

A. I have no idea.

Q. Okay. Thank you. And would you give the same answers if I asked you if you knew whether such a decision had been made to not approve final delivery commitment schedules; in other words, if the department was regularly in the practice of sending out letters in response to final delivery schedules that said we are not able at this time to approve, you don't know if that was their practice or not; is that right?



MR. CRAWFORD: Let me object to the vagueness; and, based on his prior testimony, I'll object to foundation.

THE WITNESS: I really have no idea. I mean I had other responsibilities.

BY MR. STOUCK:

Q. If such a decision was made, it wasn't made while you were in waste acceptance?

A. That's correct.

Q. And you don't know if the decision was made or not?

A. I do not know.

Q. And wouldn't know any basis for a decision if it was made?

A. Right.

Q. Okay. Thank you. You referred earlier I think, maybe I referred earlier to the fact that -- well, let me just ask this, do you recall that the department disapproved some delivery commitment schedules that had been submitted by Yankee Atomic Electric Company?

MR. CRAWFORD: Objection, vague; objection, foundation and to the extent it calls for speculation.

THE WITNESS: Yes.



BY MR. STOUCK:

Q. And do you recall the reasons or reason why those delivery commitment schedules were disapproved?

MR. CRAWFORD: Objection, vague, overbroad, lack of foundation, best evidence.

THE WITNESS: I would rather review the document. But, without reviewing the documents, my recollection is that they asked for DCS approval for greater than their allocation.

BY MR. STOUCK:

Q. Okay. I'm going to show you some documents, I'm not hiding them from you. But before we do that, though, what was the nature of your involvement in the department's consideration of whether or not to approve those delivery commitment schedules that requested acceptance of more than an allocation?

MR. CRAWFORD: Objection, asked and answered.

THE WITNESS: Well, I'm not sure really what you're asking. I was involved, I recommended disapproval of the DCS, you know, I talked with my management about it, talked with procurement about it, I know that there were meetings with Yankee

people who came down. There were as I recall exchanges of letters. So I was extensively involved with that.

BY MR. STOUCK:

Q. Did you attend meetings?

A. Yes.

Q. With Yankee people?

A. Yes.

MR. CRAWFORD: Why don't we take a break before the next exhibit.

MR. STOUCK: Let's go off the record.

(Recess.)

(Brownstein Exhibit No. 87 was marked for identification.)

BY MR. STOUCK:

Q. Mr. Brownstein, you've been handed what's been marked as Exhibit No. 87. This is a letter from R. M. Grube on Yankee Atomic letterhead to DOE contracting officer dated September 25, 1992. Have you seen this before?

A. Yes.

Q. You would have seen this at about the time or after the time it came in?

A. Yes.

Q. How did this come to your attention?



A. Well, I'm on the cc list. So sometimes utilities put me on the cc, sometimes I would get it from the contracting officer.

Q. Could I see that. So a copy came directly to you of RW-432?

A. Right, in this case.

Q. Do you recall whether prior to -- and the substance of this is that they're submitting delivery commitment schedules. It says, quote, please note that because the Yankee Nuclear Power Station is permanently shutdown and to facilitate decommissioning, we are requesting that DOE accept all of the spent nuclear fuel in storage at the station over a three year period starting in 1998 as indicated on the DCSs, close quote. Have I read that correctly?

A. Yes.

Q. Okay. Do you recall whether prior to receipt of this correspondence there were discussions between Yankee and DOE about priority acceptance for its spent fuel?

A. I don't recall.

Q. One way or the other?

A. Right. I mean there were discussions. But, in terms of whether it was before this date or



after this date, I don't recall that.

Q. Okay. What did you do when you got a copy of this correspondence? And I'm trying to find out, there were discussions, there's a lot of correspondence, we're going to look at that. But I'll trying get a very detailed understanding of exactly how you, Alan Brownstein, responded to or reacted to this letter. What did you do?

A. Are you asking how I reacted or how I responded?

Q. Well, if there's a difference, tell me both.

A. Well, how I responded, I have to go back to whether there are notes that I took. I mean I kept and turned in -- you know, when I had discussions with utilities, I generally wrote them down. And that's part of the record somewhere. And how I specifically responded I don't recall.

How I reacted, I mean I recall that which is clearly they were requesting approval of a DCS that went beyond their allocation. And that was a cause of concern.

Q. Okay.

A. And I don't recall now whether, you know, the flow of paperwork from, you know, the review from



TRW, whatever, I mean I knew this was a problem as soon as I saw the letter.

Q. Problem in the sense that it very well could be a basis for disapproval?

A. Yes.

Q. Okay. Well, had a decision been made prior to this time that it would be a basis for disapproval? In other words, I believe the instructions and other documents that we've looked at indicate that the DCSs were to be filled out in such a manner that they matched the allocations in the ACR.

So I mean, at the time this letter came in, was it fairly clear that it was going to be a basis for disapproval or rather was it something that, you know, might well be disapproval, was open to consideration, and let's review this issue?

MR. CRAWFORD: Objection, best evidence.

THE WITNESS: In my mind, and again I do recall that there were, you know, a lot of correspondence again which I have not reviewed. But no, I knew that this was going to be -- you know, when I reviewed it, it was going to be a basis for disapproval.

BY MR. STOUCK:

Q. Because a decision had been made prior to this time that the DCSs had to match the allocations?
A. Yes. And I think we were clear -- or as I recall we were clear in that whether in the general or specific instructions. I mean it certainly would not have been a surprise to anyone.
MR. STOUCK: Let's mark this as No. 88, please.
(Brownstein Exhibit No. 88 was marked for identification.)
BY MR. STOUCK:
Q. Okay. Here is a letter that has been marked as Exhibit No. 88, Mr. Brownstein. This is from Linda Strand, contracting officer, to Mr. J. M. Buchheit, Yankee Atomic Electric Company. And it looks like it's dated December 1, 1992, with a received stamp a couple of days or a few days later.
Anyway this is the response to Exhibit No. 87, right? It looks like that?
A. Yes. I just want to a chance to read it.
Okay.
Q. This is a response to the prior exhibit; is that right?
A. Yes.
Q. What involvement did you, Alan Brownstein,



have in the preparation of this letter?
MR. CRAWFORD: Objection, vague.
THE WITNESS: At a minimum I reviewed and concurred in it.
BY MR. STOUCK:
Q. Okay. Do you recall anything else?
A. My recollection is that Nancy and I talked rather extensively about it. I think she did the legwork of putting the draft together. I know we discussed an awful lot and then submitted it to -- I suppose we submitted it to our management and then to the contracting officer. So there was time spent on the letter.
Q. When you say submitted to your management, is there a specific individual that that is a reference to?
A. Whoever -- I'm trying to think of who I reported to at the time. I think at this time I probably reported to Jim Carlson. And I probably went to one management chain above that. You know, I don't specifically recall. I know I didn't -- I acted in concert -- I made sure my management was aware of this issue.
Q. And who was one level above Carlson at that time, do you recall?



A. I think it was Milner.
Q. Okay. Let's just assume it was Carlson and Milner and obviously we can check that with the charts. But, just for purposes of this discussion, whoever those people were, you went up one level for sure and maybe two?
MR. CRAWFORD: Well, I'll object, asked and answered and to the extent that mischaracterizes what he said.
THE WITNESS: My recollection is that I would have gone -- if, in fact, using the assumption that Carlson was my first line supervisor at the time and Milner was my second, I clearly would have discussed it with both of them, if that was the organizational chain at the time.
BY MR. STOUCK:
Q. What if it was different people? I mean is there something about those two individuals --
A. Well --
MR. CRAWFORD: Well, then I'll object to the mischaracterization of his testimony. I think he went ahead and assumed that. And that was based on the position, not the people.
BY MR. STOUCK:
Q. That's my question. Was it the position



or the people? I mean if there were different people there, you might not have gone to both of them?
A. No. Actually I don't recall how high this one got. It's conceivable this one could have gotten above Milner.
MR. CRAWFORD: That was the basis of my first objection, was that he didn't recall.
THE WITNESS: In terms of why I said that about Milner, I've worked closely with Milner since the first day I have been there. And there was frankly little -- when there were decisions to be made, you know, he served a long time as my mentor. I would have discussed these things with him.
BY MR. STOUCK:
Q. Okay. Did this letter, Exhibit No. 88, get more review by your management than other disapproval letters, DCS disapproval letters?
MR. CRAWFORD: Objection, vague.
THE WITNESS: It got more review by me. And, because it was a disapproval, and I can't recall if this was the first disapproval or not, you know, my management, I just can't recall how many chains up, you know, were aware of it and probably reviewed it too.
BY MR. STOUCK:

Q. And, on the prior page, when you're describing again -- I apologize, I've only got the one copy of this. But it says that the acceptance rates in table 2.1 do not reflect the MRS facility schedule linkages with the repository development that were imposed by the NWPA but are consistent with the 10,000 MTU storage capacity limit contained in the NWPA for an MRS facility before a repository starts operation. Do you see that?
A. Yes.
Q. Do you know why the entire 10,000 MTU capacity limit was not allocated over the ten year period?
MR. CRAWFORD: Objection, best evidence; objection, asked and answered many times.
THE WITNESS: I don't recall. I was asked that. I don't recall.
BY MR. STOUCK:
Q. Again I'm sorry, I did not recall if you were asked that specific question.
A. I don't recall.
Q. And I take it you don't recall going back to these comments of Mr. Benz which again were on a different document, but you don't recall to whatever extent that inconsistency with the 10,000 MTU limit



was being pursued here, why the 10,000 MTU limit was not allocated over the first three or four or five years, why it was not done on a more rapid basis, you just don't recall the basis for that; is that right?
MR. CRAWFORD: Objection, best evidence; objection, asked and answered.
THE WITNESS: Yeah, that's true.
MR. STOUCK: Let me show you another exhibit.
(Brownstein Exhibit No. 109 was marked for identification.)
BY MR. STOUCK:
Q. Exhibit No. 109 is another letter from Mr. Benz on Weston letterhead dated August 22, 1991, addressed to you, subject, review of draft delivery commitment schedule instructions and comments enclosed. It says comments on draft DCS instructions dated August 2, 1991, Ed Benz. These comments are dated August 19, 1991. Do you see that?
A. Yes.
Q. Do you recall these comments?
A. No. I mean obviously they were to me, I got them, but I don't have a specific recollection of them.



Q. Okay. At the very end of these comments from Mr. Benz is a paragraph entitled General. Do you see that?
A. Yes.
Q. And it says here suggest addition of text to deal with questions such as what does it mean to have an approved DCS. Do you see that?
A. Yes.
Q. Do you recall that comment?
A. No. I don't specifically recall the document. I got a lot of comments on the instruction.
Q. Do you know whether the instructions as ultimately issued did address the question of what it means to have an approved DCS?
A. I don't believe that we did that.
Q. Okay. Do you recall discussion of that issue or a discussion of whether or not the instructions should address this issue?
A. No. The instructions from our point of view were -- the instructions had to be clear enough that the utilities -- you know, that it made sense, that the utilities can fill them out, fill out the DCSs. You know, broader questions were beyond the scope in my view of instructions for a form.



Q. Broader questions like what the significance was of an approved DCS?
A. Sure.
Q. Was that an issue or question that the department as of, you know, August 1991, the time of these comments, had a position on?
MR. CRAWFORD: Objection to the extent of lack of foundation and objection to the extent it calls for speculation.
THE WITNESS: No. My only hesitation, you know, any comments -- whatever the department felt about the DCSs beyond documents that we've been examining here from a policy point of view may have been in response to questions from the Hill. I don't specifically recall them, but it may have. So I don't think we addressed those type of things.
BY MR. STOUCK:
Q. Okay. Just to understand what you're saying, you don't think you addressed those type of things because -- why not?
A. I don't think there was -- nobody was clamoring for it, nobody was asking. I mean they were hypothetical questions. Nobody raised it. It wasn't discussed, at least that's my recollection.
Q. Was that because it was obvious what it

meant, I mean is that why it wasn't addressed or rather is it -- maybe it was a legitimate question, but there was no real reason to address it at the time?

MR. CRAWFORD: Objection to the extent it calls for speculation.

THE WITNESS: From my perspective, you know, I was charged with implementing the contract. We did what was necessary to implement that contract. And I don't think we needed to answer, you know, a broader question.

No one was asking broader questions. I mean there's a lot of good comments in here. Broader questions, you just don't need to do it, no one was really asking, there was not really a demand.

BY MR. STOUCK:

Q. At the time, August of 1991, when the instructions for DCSs were being developed, did you, Alan Brownstein, have a good understanding of what it meant to have an approved DCS?

MR. CRAWFORD: Objection to -- never mind.

THE WITNESS: I had an understanding. Whether it was a good understanding or not, I don't know how to judge that.

BY MR. STOUCK:



Q. Do you believe that you understood the legal significance of an approved DCS?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

THE WITNESS: I'm not a lawyer.

BY MR. STOUCK:

Q. Well, you're not a lawyer. But at this time you were working on the program and you were working on these matters. And sometimes nonlawyers have understandings of legal things that relate to their jobs. Maybe you did and maybe you didn't, but I don't know that that's responsive to my question. At this time did you have an understanding of the legal significance of an approved DCS?

MR. CRAWFORD: Objection to the extent it calls for a legal conclusion.

THE WITNESS: Probably not, because I don't recall having a discussion with anybody about that.

BY MR. STOUCK:

Q. Okay. What about at some subsequent time prior to the time that you ceased working on these matters? I'm looking for my notes here. I think it was March 1995. Did you have any discussions with anyone that would have given you, Alan Brownstein, an



understanding of the legal significance of approved DCSs?

MR. CRAWFORD: Same objection.

THE WITNESS: Not that I recall.

BY MR. STOUCK:

Q. And subsequent to that, in '95, you have had no such discussions; is that right or is that not right?

MR. CRAWFORD: Same objection.

THE WITNESS: I think I testified earlier that I may have reviewed a DOJ, you know, document, a reply.

BY MR. STOUCK:

Q. In this litigation?

A. In this litigation.

Q. Was that subsequent to the last time we were here in this deposition room?

A. No.

Q. It was prior to that?

A. Yes.

Q. Was it prior to your first deposition?

A. Yes.

Q. Do you know whether it was prior to or after the DOJ document was filed in court or was it a DOJ document that was filed in court?



MR. CRAWFORD: Objection to the extent it calls for speculation.

THE WITNESS: I reviewed it -- a draft DOJ document. And I testified to that before too.

BY MR. STOUCK:

Q. Okay. Again I really apologize.

A. Yeah.

Q. It's been a long deposition, I just did not recall that. I'm not trying to ask you the same questions over.

A. And I believe, you know, that addressed some of that issue. So that's what jogged my memory.

Q. So based on that you have an understanding or at least at the time you read this you had an understanding of what DOJ's current position about the legal significance of this is?

MR. CRAWFORD: Well, objection, asked and answered and to the extent that that may have mischaracterized anything he previously testified to.

THE WITNESS: There was discussion about --

MR. CRAWFORD: And I'm going to instruct the witness not to reveal anything about any discussions with any DOJ lawyers about any kind of matter discussed with respect to this litigation at

all.
THE WITNESS: Okay. Well, that's fine. I think somewhere in that draft there was, you know, some views expressed about what the government's -- Department of Justice's views were with respect to the legal effect of the DCSs. I read those words.
BY MR. STOUCK:
Q. Approximately when was that, do you recall, within the last year?
MR. CRAWFORD: Objection to the extent it calls for speculation.
THE WITNESS: Yeah, within a year, within the last year.
BY MR. STOUCK:
Q. Okay. Can you place it any more specifically than that in time?
MR. CRAWFORD: Objection, asked and answered.
THE WITNESS: No.
BY MR. STOUCK:
Q. But, prior to reading that draft and prior to whatever discussions grew out of that draft, you had no understanding of the legal significance, you had no discussions with anyone who would have given you any other basis for having any understanding of



the legal significance of the DCSs; is that right?
A. That's right. And why I brought that up is because, you know, my reaction was, well, that's interesting, when I read that it was interesting. I never discussed it or thought about that before.
Q. Directing your attention to the very last sentence of Exhibit No. 109, I'll read it, it says what liabilities and obligations on the part of both parties are locked in by the DCS submittal and approval process.
A. Okay.
Q. Now, that's a question that -- you know, the words are different. But it's very similar to this question about the legal significance, is that right, do you agree with that?
A. I agree with your statement.
Q. So, therefore, you had no understanding of what liabilities and obligations on the part of both parties are locked in by the DCS submittal and approval process contemporaneous with this document in August of '91; is that right?
A. That's right.
Q. And you had no understanding about those matters as of the time you stopped working on waste acceptance matters in March 1995?



A. That's accurate.
Q. And you had no understanding about those matters at least prior to the time that whatever understanding you gained by reading this draft that you just referred to?
A. That's correct.
(Recess.)
BY MR. STOUCK:
Q. Do you know whether the standard contract or any of these -- not these standard contracts but any of these individual waste acceptance contracts with the utilities were ever amended?
MR. CRAWFORD: Well, object to the extent of lack of foundation and to the extent it would call for speculation.
But go ahead.
MR. STOUCK: I'm not asking for speculation, I'm just asking if he knows if any of them were ever amended.
MR. CRAWFORD: Then maybe my objection is more appropriately objection, vague.
THE WITNESS: Yeah, I believe there were some modifications made. It would be hard for me to tell you what they were. But I remember there were some modifications made.



BY MR. STOUCK:
Q. Okay. When, do you recall, was it during your time, before your time, after your time?
A. I believe there were some modifications made during my time.
Q. Okay.
A. And before. I mean some of the contracts I think had -- very few of the contracts had some special language put in.
Q. At the outset?
A. At the outset. In other words, between the time the final rule was adopted and the signing.
Q. Yes.
A. I think we had language in there to accommodate the special ownership arrangements. There may have been others.
Q. Okay. Now, were these changes that you're referring to changes that were made to, say, only one contract or maybe a small group or rather were they changes that were made to every single one of the contracts?
MR. CRAWFORD: Objection, best evidence.
THE WITNESS: I interpreted your question before -- the answer is they were to individual contracts. That's why this was a modification signed

# COLE

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :



(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia
Tuesday, March 12, 2002

Deposition of BILLY M. COLE, a witness, called for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons



Boulevard, McLean, Virginia 22102-4859, at 10:30 a.m., Tuesday, March 12, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
DEVON E. HEWITT, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703)(770-7962)

On behalf of the Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
M. STANFORD BLANTON, ESQ.
Balch & Bingham, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205)251-8100

APPEARANCES (Con't)

On behalf of Plaintiff Commonwealth Edison Company:
THEODORE T. EIDUKAS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of Plaintiff Sacramento Municipal Utility District:
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303)(863-2334)

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 14th Street, N.W.
Washington, D.C. 20005-2011



(202) 434-1675)

On behalf of the Defendant:

R. ALAN MILLER, ESQ.
ERIN E. POWELL, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C.
(202) 616-0383

ALSO PRESENT
SCOTT VANCE



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR | |
|---|---|---|
| Billy M. Cole | PLAINTIFF | DEFENDANT |
| By Ms. Hewitt | 8 | |

Afternoon Session - Page 105


E X H I B I T S


| COLE EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 | 80 |
| 2 | 197 |




P R O C E E D I N G S

Whereupon,
BILLY M. COLE,
was called as a witness by counsel for Plaintiffs, and having been duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MS. HEWITT:

Q. Good morning, Mr. Cole. My name is Devon Hewitt, and I represent ten of the Plaintiffs in the nuclear utility cases or the spent fuel cases as we call them.
We are here to do your deposition today.
Have you ever had your deposition taken before?
A. No.
Q. Generally what happens is that people ask you questions, and you're required obviously to tell the answers to the best of your recollection truthfully.
Today you will be asked questions by me primarily, but after I'm completed with my questions, other attorneys here representing

they sent me out to California. I got interviewed and got hired, and I built, spent the next three years building environmental systems to simulate space for putting reactors into. We launched the reactor, and in that time, I learned more, got more books, learned more about nuclear, about the reactor, everything like that.

Q. I hesitate to ask this, but can you just give me a small summary about what the reactor in space program is, really low level?

A. Very low level?

Q. Yes.

A. Well, at that time, they were looking for a power source for satellites, and it didn't have to be a lot of power.

The first reactor, actually the only reactor that's ever been put up there I think was that first one, only put out 525 watts -- five good light bulbs.

It was a plutonium powered reactor that used beryllium drums as reflectors. The core was only about, oh, probably one foot in diameter and maybe a foot and half tall with a couple hundred PU rods in it.



It was a thermal electric conversion. The heat from that was sent down into thermal electric thermacouples basically, generated heat and generated electricity, very low.

It was physically with all of the cooling, and it was cooled by sodium, liquid metal, and it's, the whole thing stood probably 12 feet tall. Like I said, the reactor sat right on top.

Q. Did you receive any specialized training while you were at Atomics International?

A. No.

Q. And how long did you stay with that company?

A. Three years until they shut the program down.

Q. And what did you do after that?

A. I went looking for a job, and I applied at, since I had been in that field, I applied for a job at Idaho, INEL, Idaho National Engineering Laboratory and Pacific Northwest Laboratory.

I was offered a job at both places. I took the one at Pacific Northwest Laboratory.



Sounded better.

Q. And what position were you hired for initially when you joined?

A. As a laboratory technician to build sodium loop for what -- they were trying to get a contract called the FFTF, the fast flux test reactor, and they had 8,000 people out there, and nobody had any experience with liquid metals, and I walked in the door.

My resume said I had built components for the space reactors, and they were liquid metal cooled, and so I got hired, set up their first liquid metal safety programs for dealing with sodium, built the first sodium loop for the FFTF.

That was one of my first responsibility, and until I decided that the laboratory environment was a dead end street for me professionally, and then moved to become an engineering technician.

Q. You became an engineering technician at PNL or another entity?

A. No. I stayed with PNL for 13 and a half -- no. I'm sorry -- 23 and a half years that go-around. Had probably 15 different jobs



while I was there.

Q. How long were you a laboratory technician?

A. Year, year and a half maybe at PNL.

Q. And then following that position, you moved into the engineering technician position?

A. Um-hm, as a computer programmer and supporting the engineers and emulating whatever they were coming up with, emulate that kind of, all their engineering concepts on computers.

Q. Was this in support of any particular federal program?

A. Oh, God, yes, lots of them. That's what PNL did. It was a prime contractor for the Department of Energy, well, the Atomic Energy Commission first, and then ERDA, and then the Department of Energy, and we had lots of different contracts.

My primary areas that I worked on in that position were looking at the economics of the nuclear power industry related to, you know, you have got to remember it was fledgling back in those days.

We didn't have a lot of reactors, and so we were doing economic analyses does it make

sense to build nuclear power plants versus other sources?
Q. When was this? What period of time?
A. Sixty-four, five, in there.
Q. And --
A. I worked on the PNL, was hired by the Bonneville Power Administration to site nuclear power plants in the Pacific Northwest.
Then I worked on that project, got the sites, all the reactors sited.
This was back when a turnkey thousand megawatt plant was oh, about a hundred million dollars with fuel.
I worked on siting nuclear power plants for Korea.
After a while, I got promoted to the exempt status for the, non-exempt status at the company, became a, what they called a specialist.
Q. When was this?
A. 1970 I think, around that time, maybe a little before.
Q. And your title at that point?
A. Specialist.
Q. And what were you a specialist in?



A. I used to tell people that asked that, I would say anything you want.
I just did whatever was necessary.
Q. How long did you hold this position as specialist?
A. Oh, couple of years; then I got promoted to engineering staff, and then to -- couple of years, and then to, promoted to be a scientist and promoted to be a manager.
Most of my career there -- I did various jobs, but you know, most of it related to nuclear power, nuclear electric power one way or the other.
I was the person that developed the spent fuel data base that the government still uses today where the utilities, I think Form 859 or something like that. I can't remember. Is that the form number?
Anyway, the utilities have to fill out, used to fill out every year until things kind of fell apart; originally it was a volunteer -- well, let me back up a little.
In the nineteen, late 1970's, PNL was contracted by the government to develop what was called the commercial radioactive waste



management impact statement, and we had to figure out, project into the future how much nuclear power there would be as well as all the supporting requirements for nuclear reprocessing facilities, fabrication facilities, everything, and what its environmental impact would be if we had such a thing.
This was, I don't know, a five or six-year. Program we published the report in around 1980, probably seven-volume thing, very big.
One of the requirements, of course, before you can sit there and determine how much spent fuel is going to be in the future, you have got to have a starting spot, and I decided and one of the things we had to do was trace like 140 isotopes from birth to death and for a hundred thousand year, figure out what's going to happen to them, so I wrote all the computer programs.
Of course I was responsible for that, developing computer programs to emulate the system through life, but one of the other things I did was I said I would like to know how much spent fuel is out there right now, and I have a



starting basis for determining where it's going to go, so I contacted probably 14 or 15 people in the, I think at that time, it was ERDA, and * NRC, and I got 14 or 15 different answers.
Nobody seemed to know exactly how much spent fuel was out there, and I couldn't understand that because by it was around early 1970s when I was doing some of that, it was a very fledgling industry and there shouldn't be a lot.
Everything that ever had been generated prior to 1970 had already been reprocessed with the exception of a couple of sticks of old rock point stuff and some gunette stuff that was sitting around, so I decided well, I'm just going to send a survey out to the utilities and ask them these questions how much spent fuel's in the pool, when did it get discharged, and get some basic information about it.
So I developed a survey knowing that it had to be voluntary. I had no authority to do anything like that, so one thing I had to learn in my life was if you want somebody to fill out a blank piece of paper, forget it.

Especially if it's not going to pay them to do it, they're going to throw it in the trash.
So what I did, I developed a survey. Then I filled in all the blanks. Whether I knew it or not, I used good engineering judgment, and then I sent it to them, and I said, you know, if this data is wrong, scratch it out.
Well, most people look at that and say you dumb SOB, that's wrong, and they scratch it out and give me the right data, and that's how I originally populated the first data base, and it just took off from there.
And then in 1983, right after the Nuclear Waste Policy Act was passed in the department of -- let's see, what was it called -- Energy Information Administration took over the role and made it official.
Q. Let me take you back to when this project started.
When did you say this project regarding the civilian radioactive waste management program started?
A. That impact statement work, if I remember correctly, we started working on that some time around '5.



Q. And what was your position at PNL at that time?
A. By then, I was a specialist, or yeah, I think I was still a specialist.
Q. And what was your role on this project?
A. Primary role was all of the engineering computer applications, did a, developed computer programs to emulate the system.
Q. Who did you report to in this position on this project?
A. Mr. Robert McKee.
Q. And what was his position?
A. He was the program manager.
Q. What entity gave PNL this assignment to do the impact statement?
A. Officially the DOE Richland operations office.
Q. And what was that office? What were the functions of that office?
A. Responsible for the Hanford nuclear reservation and all the activities there.
Pacific Northwest Laboratories was one of the entities that worked there.



Q. Did you interact with that office at all while you were working on this project?
A. Oh, yes.
Q. And who did you interact with, if you can recall?
A. Don't remember. It was more administrative, their role.
The technical interaction came from headquarters, DOE headquarters, and like I say, I can't remember if it was DOE or ERDA in those days.
I think by the end, it was DOE.
Q. What does ERDA stand for?
A. I've got to think about that right now -- Energy Research and Development Administration.
It was, only existed a couple of years in between the AEC and DOE.
Every administration has to kind of make its mark, change something, change happy to glad, something like that.
Q. What was the purpose of this impact statement or this project?
A. Just see what the environmental impacts are going to be on this industry.



Suppose people went out and build all these reactors to supply all this electricity and build all the associated infrastructure, the fabrication facilities, the mining, the reprocessing, because this was a closed fuel cycle at that time.
Q. Did you address in this project the disposal of spent nuclear fuel?
A. Oh, yes.
Q. And in what way did you address that?
A. Well, we looked at various alternatives.
Besides deep geologic disposal, we looked at seabed disposal.
We looked at shooting the stuff, putting it in orbit around the sun.
We looked at above-ground disposal. We looked at all types of shallow land or above-ground dry wells, casks. We looked at everything there was. It was a big program.
Q. Did you make any recommendations regarding alternatives for disposal of spent nuclear fuel?
A. If I remember right, the recommendation that came out of that report, and

this is just, I just think this was right, was that probably the safest thing to do would be reprocess it, vitrify it, and dump it in the ocean, but politically that wouldn't be feasible, and so I think the final recommendation was deep geologic disposal.
Q. Did the report or project address who would be responsible for that disposal function?
A. No.
Q. Mr. Cole, do you have an understanding of the term acceptance rate?
A. Sure.
Q. What is your understanding of that term?
A. It's a rate, a rate meaning, rate means function of, over a period of time, how much something can be taken.
Q. And do you have an understanding of how that term has been used in connection with the civilian radioactive waste management program?
A. Oh, yes.
Q. And how has that term been used, or what is your understanding of the term?
A. It's, acceptance rate in this, for



this program is a rate at which spent nuclear fuel could be taken from the utilities by the government.
Q. In the civilian radioactive waste management impact statement, was acceptance rate addressed in any way?
A. Yes, it was. It wasn't at a very high level, not down to details of reactors and utilities and things like that.
It was so much energy was projected to be produced by nuclear over time, and that amount of energy would generate so much spent fuel, and you had to do something with it.
You either reprocessed it or you disposed of it, and it addressed both of those issues as an industry, but it was, also had projections in there that we would probably have two times the amount of spent fuel, maybe, maybe more than that, maybe three times the amount of spent fuel than we wound up projecting today.
It looked like the sky was the limit in those days. People were buying reactors and ordering reactors right and left, and it's going to be great.
So you had all of this industry and



all of these megawatts that were going to be generated by nuclear, so in order to have a repository system that would handle all this stuff, you were going to have to have a couple of big repositories probably, you know, something in the neighborhood of three to six thousand tons per year acceptance, but just about the time the report got published, President Carter says no more reprocessing.
All of a sudden, the utilities started having, becoming, fear of becoming constipated, no place to put their fuel.
Q. When was the report published?
A. I think it was 1980.
Q. And do you recall how the acceptance rates that were referred to in that document were developed?
A. Yeah. It was you've got this much stuff you have got to dispose of over a period of time, what makes sense? At what rate can I take the stuff and eventually get rid of it all, and you know, you built a facility size based on that.
You don't build a facility that takes it all in one day because nobody can afford



that, and you don't build a facility that takes it over 300 years. That doesn't do anybody any good, so you look at a reasonable period of time, and you iterate a few times and figure out what's, how can I keep the cost down and still get the job done?
And you also don't want to -- you take a bunch at first, and then the only thing you're taking is discharge after that.
You have to make sure you keep up with the discharge, so it was, like I said, it was a, strictly on a high level.
Q. You made reference in your previous response to a reasonable period of time.
I didn't understand that. Could you explain that a little better?
A. Well, yes. You don't want a facility operating beyond the point in time where you predict all the reactor is going to be shutting down and so they're left with fuel sitting around at that point in time.
That was considered reasonable, and it would operate, you know, probably to the end of reactor, reactors', plural, life.
Q. And was there an understanding of how

long that would be at that point in time?
A. Clarify that a little bit. It's not a matter of understanding what it would be.
It was a matter of what we, of the various predictions and the various scenarios we developed on what it could be.
Had nothing to do with reality. This was predictions, and it was like if it did this, then this is what you would do.
If it did that, then this is what you would do. That was it.
Q. Is it right to say that, that your earlier answer indicated that the acceptance rate was developed in a way to keep up with the discharge by reactors?
A. That was not the total way it was developed.
That was part of what you tried to achieve.
You want to, you want to make sure that you size your facility big enough so that you can keep up with what's being discharged plus work off some of the backlog, and then at the end of this hypothetical period of time, whatever that is, you drew a line somewhere in



the sand.
You can't say it's going to operate forever. Otherwise your study continues forever.
You draw a line saying okay, we're going to cut the study off here. Everybody shuts down. All these reactors that are operating, they're shut down, and the system dwindles down, the facility closes up.
Q. Now that goal of trying to develop a rate that would keep up with discharges and work off of the backlog, was that a goal that PNL articulated, or was it something that DOE --
A. That was not a goal. You're misinterpreting what this report was about.
The goal was not to establish acceptance rates or anything in that report.
It was a, purely an Environmental Impact Statement. If these things happened, what was the impacts to the environment.
Had nothing to do with acceptance rates. That was just one little, less than 1 percent of the piece of the thing.
Q. But is it accurate to say one of the factors was developing an acceptance rate that



would keep up, to use your term, with discharges and work off the backlog?
A. Sure.
Q. And that factor, was that something that you suggested or PNL suggested be considered in this report, or was that a factor that was indicated to PNL by DOE or another agency?
A. I can't answer that question because it's neither.
It's just part of an analysis that you do. If I do it this way, I've got all this stuff, and it's going to be generated at this rate, and I've got to dispose of it, so I dispose of it. I build a facility to handle it.
It's a hypothetical situation, purely hypothetical, hypothetical repositories, hypothetical reactors. They didn't exist.
Q. To your knowledge, was this the first time an analysis had been done about disposing of spent nuclear fuel?
A. No, it wasn't the first time. There was programs ongoing the government had. I think one was called AFR program, where they were looking at ways of not necessarily



disposing, but AFR meaning away from reactor, how you get maybe central facilities built to handle spent fuel.
Later they called them MRSs and ISFSIs and all this other kind of stuff.
The government had a lot of programs ongoing before that.
This was just the Environmental Impact Statement, what the impacts are going to be to the environment.
There was another study that just preceded that, was kind of started sooner, ended sooner, but was overlapping a little called the GEIS, G-E-I-S, Generic Environmental Impact Statement.
You did a generic, and then you do a specific.
Q. What did you do after this mission plan was or impact statement was published?
A. What did I do after that? In the, this was published I think around 1980.
In the early 1980s, DOE started its, what was called -- the terminology may be incorrect, but it's, it's the implication, the spent fuel management program.

PNL, and I don't remember all the details of the transition, but PNL became the manager of that program for the government, or M&O if you will, whatever they called them, about 1981 some time, '81, '82 in there.

When the program was given to PNL to take over, Mr. Darrell Newman was the first, was the manager of that program, and I was consulted, installed as the deputy manager of the program.

Q. What were your responsibilities as deputy manager of this program?

A. Predominantly some of the things I discussed before; one of the, well, one of the primary things that was going on that we were doing was called the storage requirements report that we were developing for the DOE.

This was DOE's way of trying to find out how big a problem the utilities had after the President had shut down reprocessing, and utilities were complaining to the government that they had problems.

You know, the government screws them there. They were looking to the government to help them out, and so we were doing spent fuel



storage requirements report.

It was based on the information I was getting back from the utilities on this survey I developed, and that's why I was put in charge of that, because I had knowledge in that area.

The utilities would fill this out, tell us how much spent fuel they currently had, when it was discharged.

We got to the point where we knew every stick of spent fuel that was out there by its first name.

We knew everything there, and then they would also give us a ten-year projection of what they're planning to do in the future so we could try to figure out then when they were going to run out of storage space and when they were going to have a problem, and that's what that report did.

It tried to, it was used by DOE to get the Congress basically to say hey, these guys have a problem and here is what the problem is.

Q. Did you work with anybody in the federal government on this project or this report?

A. Oh, yes. It's, federal government



funded it. I mean it was DOE's report.

Q. And who within DOE did you work with?

A. Oh, God. Well, the person DOE Richland operations that was responsible for it was a man named Phil Craig.

I don't know if he's still alive today, but -- and then later, it was, there were other people.

I'm just trying to -- the ones that come to mind, David Langstaff, Dr. Langstaff at Richland operations.

People at headquarters, I don't remember.

Q. Did you have any other functions or responsibilities as deputy manager of the spent fuel management program?

A. Oh, yeah. See, it was in, in 1982, when the government, when the government -- I have got to separate governments here -- when the DOE was trying to help Congress figure out what to do and the development of the Nuclear Waste Policy Act was taking place.

Part of that development was trying to figure out okay, the government is going to step in and try to help the utilities with this



problem because they felt some responsibility.

On the other hand, they're going to tell the utilities you've got to pay for it and we'll try to get it done for you.

One of the things you have to figure out is how much are you going to charge the government?

One of my responsibilities as the manager, not as the technical person, but as the manager was doing the, the fee adequacy analysis, but in the early days, it wasn't called fee adequacy.

What we were calling it then was it was just to develop the fee. How much are you going to charge the utilities?

And you have to come up with a way of figuring out what's reasonable, and you've got to figure out what -- you do analyses on the total system. What's it going to cost to build a system? How long is it going to operate? How much spent fuel are you going to discharge? How much money are you going to need from them and how do you charge them?

Do you charge -- you know, in the case, what it wound up with, of course, as we

all know, is based on electricity generated and sold, not originally and sold, but later and sold. Contract was modified later.

Came up to be in the early days, best analysis at that time, if I remember correctly, was .85 mils per kilowatt hour, so we said one mill should be adequate, and that got, we fed that information to the DOE, and they fed it to Congress.

Q. Did you feed that information to DOE by way of a report or --

A. Oh, yes.

Q. A document?

A. Yes -- report. The man who was responsible for developing that stuff was a Mr. Roger Engel, E-n-g-e-l.

Q. And did you work with Mr. Engel in producing these reports?

A. At the time he produced it, I was working with him.

Later, I became his, quote, manager, but he was mainly responsible for that, and a bunch of other people were responsible for developing that, the original fee.

I don't know if he was even in charge



of it at that time. I just know he worked on it.

There were a lot of other people who worked on it. It was a big job.

Q. In developing this fee that DOE would charge to the utilities, was the acceptance rate ever considered?

A. I don't think that rate had a heck of a lot to do with it other than the rate was probably something that people worried about in the total system life cycle cost which you would have to have to do a fee.

Figure out, you know, you've got to figure out what the whole system is going to cost you so you can go back and figure out how much money you need and then how you're going to charge them and what, you know, and what your basis is going to be.

You know, I'm sure they had some rate in there, but it was I'm sure also on an aggregate, you know, just how much spent fuel have we got to, is the industry going to give us?

Q. Do you know who was responsible for coming up with an analysis of the total system



life cycle cost?

A. At that time, I don't know specifically.

My guess would have probably been something like Bob McKee or somebody like that, just in the nature of the work, but I'm not really sure.

Q. Did you have any input into this type of analysis?

A. No.

Q. Are you aware or have any knowledge about the acceptance rates that were used in the, developing that answer at that time?

A. I'm -- no, I'm not, I haven't, I don't remember seeing those reports.

I'm, my assumption would be that it was whatever the kinds of rates and stuff that came out of the Environmental Impact Statement because that was all published, you know, something that looked reasonable.

Q. Did PNL or you have any other duties with regards to developing the Nuclear Waste Policy Act?

A. PNL did, but I was still not high enough up the ladder yet that I had a lot to do



with the language or anything in the Nuclear Waste Policy Act.

Q. Do you recall who did have that responsibility?

A. Nope.

Q. Other than the storage requirements report and the fee adequacy analysis, did you have any other responsibilities as deputy manager of the spent fuel management program?

A. After the Nuclear Waste Policy Act became law January 7th, 1983, when President Reagan signed it, yes, I did.

Some of the first provisions in there was to go forth and develop a federal interim storage facility concept because the law recognized that you're talking 14, 15 years before you may have a big facility to take this fuel, so it provided a mechanism for some interim storage called the federal interim storage facility, and this was anybody who applied to the NRC for relief could send their fuel to this facility.

It was a separate fee that they had to pay, so our job was to develop, figure out what it was going to cost, how this physically, what,

what would this facility look like, what kind of storage mechanisms.

It had to be I think 1900 tons was the maximum rate, the maximum limit that you could store there, and I think it -- so we had to come, you know, our job was to get this report for DOE.

DOE had to turn this report into Congress, and so we did. We came up with the federal interim storage program recommending probably dry well storage would be the most expensive way of doing it, and develop the fee mechanism for charging them for doing it.

Gave it to DOE, and it just sits, sits on the shelf until a utility comes in saying hey, I've got a problem. I need to store fuel.

Q. Do you remember when this report was produced?

A. Eighty-three, to the best of my recollection.

Q. And at that point in time, were you still deputy manager, PNL spent fuel management program?

A. Um-hm.

Q. How long did you hold that position?



A. Until late '83 when PNL asked me if I would -- see, in '83, when the Nuclear Waste Policy Act was passed, some of the DOE RW was formed -- didn't exist before.

Q. What does RW refer to?

A. Radioactive waste, but it's DOE's Office of Civilian Radioactive Waste Management is the full term.

Q. And I believe it's used as an acronym?

A. OCRWM, OCRWM -- Office of Civilian Radioactive Waste Management -- anyway, it was formed in '83.

Well, a lot of the people that were brought into DOE RW did not have nuclear backgrounds, especially backgrounds in the civilian area, so I was asked by PNL to take an assignment to Washington, D.C., to open up PNL's waste management office and to help become a tutor for a lot of these DOE people who couldn't spell spent fuel, so I had an office that I set up at, on M Street at 21st and M for PNL, and then I had an office on the seventh floor in the Forrestal Building where I worked daily with the DOE people.

Q. And what position or title did you



hold at this time?

A. I don't know. Don't even remember. I've got a stack of business cards I should have brought on all my jobs.

I can't remember what -- specialist in something probably.

Q. And how long did you occupy this position?

A. I was there for probably a year, year and a half, a little over a year.

Let's go less than a year. I don't -- year and four months, something like that.

You can't, when you're on a temporary assignment like that, you're not allowed to stay more than, in those days, more than a year and a half or there's a tax problem because, see, I was on per diem. Well, I was on expenses. They were paying my, making my house payments.

Since I was gone, they paid for a housesitter. They made my rent payments here, and I was making out like a bandit.

Q. And that had to stop?

A. It had to stop. That's right. No. No. You know, you recovered actual expenses, but after a period of time, there was a tax,



some kind of liability, and so I left town before the year and a half was up, make sure that it wouldn't be a problem for the company.

Went back to PNL out in Richland, and took over a position of manager of the, I think it was called waste acceptance programs or something like that.

Q. And who did you report to at PNL in that role?

A. Oh, over time, it was two or three different people moved in and out of there.

One of them was Ron Liikala, L-i-i-k-a-l-a.

Another was Jack McElroy. Those were the two I remember.

Q. How long were you manager of waste acceptance at PNL?

A. From middle of '84 -- I'm sorry -- middle of '85 until January '89.

It was waste acceptance transportation, and this is all starting to come back to me now.

The program was office, was waste acceptance transportation and something else. I can't remember.

I was responsible -- basically it's a civilian program, so I was put responsible for it.
Q. When you opened up the radioactive waste office here for Richland in 1983, what were your duties during that year and four months you were here in Washington?
A. As I explained, my primary duty was to sit with the DOE people who were, had no real knowledge of the nuclear power industry, and help tutor them, get them up to speed.
Q. Who did you interact with at DOE at that time?
A. Everybody in DOE RW. You get the, get the roster out, and I interacted with everybody, some more than others, but everybody at one point in time.
That was my job, and when they had a problem they couldn't figure out how to solve, they asked me if I could get it solved, and I was liaison back to PNL, to the technical community back there, to instruct them on what DOE needed.
Q. Did you have any role in developing the standard contract?



A. No, none other than I explained. Oh, the contract -- no. No. Nope.
Just had a big role in trying to interpret it.
Q. And when did your role trying to interpret the standard contract begin?
A. At July 1983, after the contract was signed by the utilities and became public, we had to, as deputy manager of the program at this time, I had to try to sit down and interpret the contract and figure out what roles and responsibilities were for both sides, and I can keep talking while I fill up my coffee cup.
(There was a pause in the proceedings.)
BY MS. HEWITT:
Q. Did you have any initial impression about the standard contract, Mr. Cole?
MR. MILLER: Objection -- vague.
MS. HEWITT: You can still answer. I'm not sure you can say objections on behalf of a witness you don't represent.
MR. MILLER: I can. I think certainly that I'm entitled to enter objections concerning the form of the question, sure.



BY MS. HEWITT:
Q. Did you have any initial impressions, Mr. Cole?
A. My impression of the contract, whether it be initial or later, is the same.
It was put together in haste. It was fraught with ambiguities, contradictions, incorrect statements, but it was pretty damned good under the circumstances.
Q. And what circumstances are you referring to?
A. How quick it had to be put together.
Q. Why did it need to be put together so quickly?
A. Because the law required it. It said you had to have one in place and signed by July something '83.
The Nuclear Waste Policy Act didn't get passed until January 7th, '83.
It was a short period of time to get the right people together, to put it -- and it was my understanding, even though I wasn't part of putting it together, there were people from the government and the utilities both were helping write the language.



Consequently, you know, you get a lot of things in there that didn't line up later on.
That was one of the first things I was trying to do was interpret the contract to figure out on a time line basis who was to do what to whom, and that's what we did.
That's how we found these problems, and then we came up with issues, things that need to be resolved because it didn't make any sense.
Q. What didn't make any sense?
A. Some of the things in the contract.
Q. Did you have understanding about whether or not the utilities could or could not sign the contract?
A. It was my impression that they were required to sign the contract. They had no choice.
Q. Why did they have no choice?
A. I don't know. That was my impression. If they wanted this service I guess.
I had just always been told they didn't have a choice.
Sometimes I do what I'm told.
Q. I presume, Mr. Cole, you're familiar

were, we wound up I think with 32.
I said originally there were 54, but after reviewing them, we concluded some of them were no longer issues as we misinterpreted something possibly, or in 90 percent of the cases, it was these two issues are really the same thing and they were combined, but the final set I think was 32.
Q. Did you have responsibility for any issue or issues in particular?
A. All of them; that was my job, identifying the issues, and you know, figuring out who's, how they got done, yes, and I, the utilities took theirs, we took ours.
Some of them were our job to come up with the recommendations for resolution. Some were passed on to other people in the DOE or DOE contractor community because we needed some of their advice on some of them, but most of them, we did.
Q. How long did this process continue?
A. That's a, something I can't specifically remember is when it terminated.
I think it was some time in the early nineties was the last time we had these



get-togethers, and I can't remember what the circumstances were.
I was thinking about that last night. I was trying to remember what the circumstances were that caused this thing to stop because it was really healthy, and I don't remember whose side decided to stop it and why, but I enjoyed it.
We were really getting something done I thought.
Q. Did the issue of acceptance rate come up in these discussions on the issues to be resolved with regard to the standard contract?
A. Yes, if I remember. Like I say, if you give me that list of issues, I could point it out.
I think there was one or two issues that related to interpretation, the oldest fuel first and then kind of stuff which impacts not necessarily the rate.
The rate was not an issue, but how you allocate the rate.
Q. And why was rate not an issue?
A. It just wasn't. We had a rate that we were working with. We were told by the program



what the rate was going to be at that time. I think a full-blown system, everybody projecting it was going to be 3,000 tons a year ramping up from, I don't know, 600, 1200 tons, something like that, ramp up to 3,000, and that's the rate we dealt with.
Q. When was that rate provided to you or PNL?
A. As soon as the program began, 1983.
Q. And that was provided to you by?
A. By DOE.
Q. And anybody particularly within DOE?
A. No. It was part of the program guidance you get.
Q. Do you recall in what form this program guidance was given to PNL?
A. There is a terminology that the government used back then.
I can't remember what it was called. Just comes in as a set of guidance, go forth and do the following things. Here is how much money you're going to get, and there is a budget process, and you get the guidance, and you go to work trying to interpret the guidance, and you go back to DOE and say this is really what you



want? Is this this kind of stuff? And everybody agrees okay, this is what I really meant to say, and go do this, and here is, here is information you need to work with. Here is an acceptance rate, for example.
Q. Did you have any knowledge of how DOE came up with this 3,000 number?
A. Not first-hand, but it is my opinion that it derived from the old commercial radioactive waste management impact statement that a repository could handle, and I think in there they were showing repositories could handle about 3,000 tons a year, and I think that was the basis.
Later somebody said whoa, wait a minute. The impact statement was based on a hypothetical program that was going to take a lot more stuff in, so that may be too high a rate, but that's how it started I think.
Q. Do you know whether or not this rate was the rate that DOE contemplated taking spent nuclear fuel at the time it signed the standard contract?
A. Whether it -- I don't think it was more, as much of a plan at that time as it was

a, as a druther, what they would like to do, what they tried to do.
It was a, yeah, I guess you would call it -- it was a planning base, okay? Here is a goal. Let's, what have we got to do to achieve it?
Q. Do you have any knowledge about what either the utilities' or DOE's intentions were with regard to the rate of acceptance when either party signed the standard contract?
A. No. No, nothing to do with signing the contract, no.
Q. But do you have an understanding what the parties thought would likely happen at this time?
A. No, because the contract specified DOE would go away and develop an acceptance rate and publish it in 1986, and it would called the Annual Capacity Report, and the utilities were given, if I remember right, prior to publishing each one, every year the utilities were given advanced copies for comment, and then we would incorporate their comments, and sometimes we had, I remember in some of the early ones, we had appendices which delineated and echoed their



comments.
Q. Do you know whether DOE had any guidelines that it relied on in developing the acceptance rate?
A. Like I told you, I think the first acceptance rate came from the commercial radioactive waste management impact statement, which was their document. That's all they had.
I don't know. There may have been some other thing. I was not privy to it.
Q. Are you familiar with a meeting that occurred in December of 1983?
The meeting was titled proceedings of the 1983 civilian radioactive waste management information meeting.
A. I'm not familiar with the report, no.
Q. I'm going to --
A. But the meeting sounds interesting. I'm trying to figure out what meeting it was.
Who was there?
Q. I'm going to give you a couple of excerpts from the report that was issued from that.
A. Who issued the report?
Q. It's the report that says on the title



that it was sponsored by U.S. Department of Energy Office of Civilian and Radioactive Waste Management.
A. Sponsored by, but who, was this an -- what's the report number?
Q. There is a number in the upper left-hand corner. I show you the --
A. That makes a difference. What's the report number? Is it EI report?
Q. I don't see that designation, and I don't know if it has -- there is a CONF?
I'll give you this title. Take a look at it. It's got a forward. I've got excerpts, Table of Contents of that meeting, and then I've got a couple of pages from that report which actually excerpt the program overview given by Robert Morgan, so just take a look at it and see if you have any familiarity with this that might refresh your recollection on the top.
A. Like I said, I'm not familiar with the report, but maybe the meeting.
(The witness reviewed the document.)
THE WITNESS: No, I was not party to this.
This was a high-level meeting, Bob



Morgan and his staff.
This was not the information meetings I thought it was.
(The witness reviewed the document.)
BY MS. HEWITT:
Q. You can see that there is a portion of that Robert Morgan program overview that I have highlighted?
A. Um-hm.
Q. That indicates --
A. Basic strategy.
Q. Yes. Can you take a look at that?
A. Um-hm. I did.
Q. And we're going to make this probably Billy Cole Exhibit No. 1 to the deposition.
(Cole Exhibit No. 1 was marked for identification.)
BY MS. HEWITT:
Q. Does that strategy sound familiar to you at all?
A. Oh, yeah.
Q. How are you familiar with that strategy?
A. That was a, that was the purpose. The

basic purpose of the Nuclear Waste Policy Act was to try to help keep the utilities from having to run out of storage space, so the utilities are in there for generating electricity and not storing fuel.

You know, the government had a responsibility to help them because they, like I said, they stopped reprocessing.

This is a basic strategy, and a part of the primary mission was to try to keep them from having to add more storage.

That was one of the major goals of the program.

Q. Do you know that was one of the major goals of the standard contract?

MR. MILLER: Objection. Lacks foundation.

THE WITNESS: I don't know if the contract had a goal or not.

The contract was roles and responsibilities and who does what to whom and when.

BY MS. HEWITT:

Q. In this testimony, Mr. Morgan states that during the first year of operation of the



repository in 1998, comma, we should be receiving fuel at a rate so that no utility would have to add any further storage facilities either on site or at another location?

A. That's right.

Q. Do you have any knowledge about whether or not this strategy was used in developing the acceptance rate?

A. At that time, probably not.

Q. What do you mean?

A. I don't think that Mr. Morgan was, I don't think the initial acceptance rate was based on what it was going to take to solve the utilities' problems on spent fuel storage.

That's my own opinion. I think it was purely a rate that you could operate a repository.

I don't think -- it wasn't until later years that we started worrying about whether, you know, specific utilities had problems or not and what, and what would be a reasonable rate for that.

Now recognizing that if you start receiving it for a 3,000 ton system with a ramp-up starting at 1200 tons, there would have



been plenty of storage capacity to make sure that the utilities would not need additional storage, so that was, it was secondary because there is plenty capacity there.

If you did it at that rate, that was a rate that a repositor could operate, and by chance, it was plenty to keep the information storage.

The first utility that said he was going to have storage problems turned out not to be the first utility with storage problems, but they were telling us information, but they had legal problems and they couldn't tell us necessarily the whole truth all the time, and so we were planning our program based on the information given to us by the utilities.

You know, the first one that had a storage problem that did something was Virginia Power, but the first one who said he was going to have one was Portland General Electric, and then because they were worrying about some hand ties, they couldn't tell us the truth.

Q. When DOE provided you with the 3,000 rate, did you have an understanding about whether or not DOE believed this would be a rate



that would be sufficient to make sure that utilities would not have to have additional storage?

A. I just answered that question -- No, I don't think so.

I think it was the date that a repository could operate, and just so happens that it is, was plenty, and because I know based on the information, that was my job to know how much storage problems these utilities had and when they had them, and there was plenty, but if they were considering all of that, I was not privy and not party to that information.

Q. Initially it was intended there would be two repositories to take spent nuclear fuel?

A. That was the initial thinking in the law, yes.

Q. Why?

A. One in the east, and one to share the burden of, the political burden predominantly, of mostly electricity generate nuclear. Consequently the spent fuel it generates is in the east.

Most of the places where it was probably going to be best to site a repository

I don't know if any substantive changes were made.
I don't remember any.
Q. Why don't we take a look at the summary in the Annual Capacity Report dated 1987.
In the fourth line, it says that the Annual Capacity Report was for planning purposes?
A. That's right.
Q. Do you have an understanding of what that term means?
A. Sure.
Q. What does it mean?
A. It means it's for planning. It means you're supposed to use this to go plan in, you know, building, whatever you're going to do.
It's for the utilities and the DOE's contractors to plan its programs.
Q. In your opinion, were the utilities entitled to rely on what was in this plan?
A. At that time, yes. It's for planning purposes. It's not carved in stone because it was going -- it could change, and it did change, and it's always for planning purposes.



It's not a commitment.
Q. Um-hm. There is a term in the next line called waste management system.
Do you know what that term refers to?
A. Yeah.
Q. What does it refer to?
A. In this case, it was referring to whatever facilities and transportation infrastructure DOE would come up with in total.
Q. Can you name some aspects of the waste management system?
A. Repository, transportation, interim storage, if it was, quote, to be approved by the government or by the Congress, those were the major facilities.
Q. The second paragraph starts with a reference to system configuration and states that the system configuration used as the basis for this report is that defined in the mission plan amendment?
A. Um-hm.
Q. Do you know what mission plan amendment that term refers to?
A. Yeah. They amended the nuclear waste or they amended the mission plan some time '86



or so, and they kept amending the mission plan throughout the program.
Q. What was the mission plan?
A. It was DOE's overall plan on its mission to provide a facility and/or facilities to take the fuel away from the utilities.
Q. Did PNL have any role in developing the mission plan?
A. Yes.
Q. What was PNL's role?
A. I don't know. I wasn't personally involved in it.
Q. Who was?
A. Don't know.
Q. But you know that PNL had some involvement?
A. I know they did because they had involvement in that program. They had their fingers in it for years, yes.
Q. Okay.
A. I'm sure they provided some input to it, but I can't remember which contractor authored the mission plan, or maybe DOE did and just collected information from the various contractors.



I don't remember. I didn't work on it.
Q. Further down the paragraph, almost, you know, the last quarter, there is a term, a sentence that reads the allocation of quote, unquote, acceptance rights is currently based on the projected annual capacity of the WNS, WMS to receive SNF and the age of permanently discharged spent fuel as determined from 1985 data?
A. Um-hm.
Q. When it says the projected annual capacity of the WMS to receive SNF, what aspect of the WMS formed the basis for the projected annual capacity?
A. Just this acceptance rate right here -- 1200, 1200, 1200, and 2000.
Q. But that reflected the capacity of what?
A. Of the system in total, the waste management system, it's, its ability to take fuel.
Utilities don't care whether it's a hole in the ground or where it goes or if it's sitting out on a train at four miles an hour

specifically efficiency of operations, but efficiency of carrying out provisions of the contract sometimes, but predominantly operational considerations.

Q. Do you recall what some of those efficiency issues might have been?

A. Like I said, if you get that list, I can point them out to you.

I don't.

Q. On page 8, I think it's the only paragraph on that page --

A. Um-hm.

Q. The first sentence says the number of purchasers whose final delivery schedules may be accommodated in any given year will be constrained by the capacity of the WMS to accept SNF?

A. Correct.

Q. Why, why would why would the repository or the WMS operate as a constraint on the utilities?

A. If your capacity is 3,000 tons, and the utilities want to give you 4,000 tons, you can't take it.

It's constrained by the, like this



says, it constrained by the capacity of the system.

Q. Was DOE projecting that utilities would want to give DOE spent nuclear fuel in excess of 3,000 metric tons per year?

A. Sure.

Q. Why would that be the case?

A. Because the utility said so.

Q. Why would they have said that?

A. Most of it was informal, but comments that were coming in and stuff on this report, for example, some comments came in says, from some utilities, it said what do you mean I'm only going to get 30 tons acceptance in the first year? I've got a contract that says you're going to come pick up all my fuel in 1998.

I mean, yes, some of them were being, reading and interpreting how they wanted to interpret it and being obstinate like a lot of people can be.

Q. The second sentence in that paragraph says that the acceptance capacity available for allocation through the purchasers will equal the system operating capacity?



A. Um-hm.

Q. Unless part of that operating capacity is used to accommodate contingencies?

A. Um-hm. All that means is that if you've got a 3,000 ton capacity, that's all we're going to allocate, and if something comes up, you've got an emergency, you have to interrupt that, if it could handle it without any other problems, fine, but if it's not, it may slip everybody in the queue.

Q. So is it correct to say that DOE developed the acceptance rate based on the capacity of the system to take spent nuclear fuel?

A. Yes. That's exactly what it is.

Q. Was that always its guidelines in developing the acceptance rate do you know?

A. They are equal. The acceptance rate is the, the system capacity is the ability for it to accept spent fuel.

Q. Well, you could have a system capacity that is 3,000, but DOE could choose to accept less than 3,000?

A. That's different.

Q. Why is that different?



A. If they chose to accept less than 3,000, then they're not allocating the system capacity, and that's what it said it did.

Wouldn't make much sense to build a facility for 3,000 tons and only take 2,000 tons if you're, unless you're in a ramp-up phase and had problems, and planning, mission plans, things like that don't recognize those kind of contingencies.

You build a 3,000, you operate a 3,000 once you ramp up. Doesn't really recognize the other.

Q. Lunch is ready, so I think this might be a good time, we have been going for about two hours, to take a break.

A. Okay.

MS. HEWITT: Unless somebody disagrees?

Okay. Why don't we take why don't we say 45 minutes for lunch?

Why don't we go off the record?

(Whereupon, at 12:27 p.m., the deposition was recessed, to reconvene at 1:15 p.m. the same day.)

AFTERNOON SESSION
(1:17 p.m.)
MS. HEWITT: Why don't we go back on the record?
Whereupon,
BILLY M. COLE,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:
FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFFS
BY MS. HEWITT:
Q. Mr. Cole, I would like to finish up just getting an outline of your professional history.
We sort of got detoured a little bit on the substance of your duties there, but how long did you work on the waste management program for PNL?
A. The period of time that I worked on waste management problems, whether you call it -- the waste management program has some official connotation to it, but working in the waste management area for PNL, probably from early '70s, maybe late '60s, early '70s off and



on.
In those days, I did a lot of other little things in those days, but that's, when I started working on it was probably '68, '69 as a technician writing computer programs.
I also worked on the nuclear powered artificial heart program.
I also built some telescopes up on top of the mountain for the Aurora program.
I also did some work for Rutgers University for PNL in tracking Russian satellites and things like this -- a lot of things.
Q. You had said earlier that you were the manager of waste acceptance at PNL from the middle of 1985 until January 1989, is that right?
A. Probably middle of '85 until January of '89, yes.
Q. What happened in January 1989?
A. I resigned my position at Battelle and left.
Q. Why did you resign?
A. I got a better offer.
Q. And what was that?



A. Vice president of JAI Corporation.
Q. What is JAI Corporation?
A. Johnson Associates, Incorporated, Nuclear Engineering, Beltway bandit.
Q. And what position did you take with them?
A. Vice president.
Q. And what were your responsibilities as vice president?
A. Bring in money.
Q. Did you continue to work on the DOE civilian radioactive waste management program?
A. Yes, I did. I turned around and subcontracted back to PNL.
Q. Did your tasks differ in any way now that you were working for JAI?
A. No, not really. I just was no longer in charge.
I was a subcontractor.
Q. Who did you report to when you were at JAI working on this civilian radioactive waste management program?
A. I think the person that took over for me I believe at that time was Rick Walling, but the man working on most of this stuff for Rick



was Pat McDuffie, so most of my interfaces were with Pat.
Q. And at this time in 1989, who were you interacting with at DOE, if anybody?
A. Alan Brownstein; let's see. What was her name? The people that worked for Alan -- Mary Lou, Mary Lou Payton I think was her name.
Q. And how long, how long were you in the position of vice president at JAI?
A. Well, I'm still. Still there on my business card, even though I'm not very active, but they still, the Board of Directors keeps both me, and I don't refuse it, so that gives me free business cards.
Q. Have you been employed by JAI continuously since 1989?
A. No.
Q. Did there come a point in time where you left JAI?
A. Yes. Yes.
Q. And when was that?
A. August 1993.
Q. And where did you go?
A. I went back to work for PNL, and when I say PNL, I mean Battelle.

Battelle Memorial Institute operated the Pacific Northwest Laboratories for the Department of Energy, so I worked for Battelle, but they contacted me and asked me to open up an office for them in Germantown, Maryland, on the mixed nuclear waste program since I had done one for the spent fuel program, and after some negotiations and some reasoning, had a lot to do with retirement benefits, I accepted, went up and got the office open, got the program started.

A year and a half later in 1995, Secretary O'Leary downsized all the laboratories.

One of the first ways of downsizing was what they called an enhanced retirement package, so they were downsizing PNL.

On the payroll, I was a PNL employee even though I was here in the Washington, D.C. area, and I was eligible, and I took it, so I retired physically formally and finally retired from Battelle in May 30th -- no -- April 30th, 1995.

May 1st, went back to JAI, same position.



Q. When you returned to JAI on May 1st of 1995, did you return to work on the civilian radioactive waste management program?

A. Yes, I did. One of the roles when I first went to work for JAI, I was working doing some work still for PNL plus a few others, some classified stuff that I can't talk about, but we did a lot of things.

In 1991, DOE hired a new M&O contractor, management and operating contractor, for the commercial waste management program.

The M&O was no longer PNL. It was TRW.

JAI was one of the teammates with TRW that bid on that contract, and we won it.

I became the manager of the waste acceptance department for the new program. What goes around comes around.

Q. And when you returned in 1995 to JAI, did you resume that role?

A. I resumed that role again, yes, because there was a couple interim managers while I was gone that for one reason or another didn't work out well with DOE, so I came back in.



Q. In your role as manager for waste acceptance, either at PNL or at JAI, did you have occasion to participate in all the APRs that were produced by DOE?

A. Yes.

Q. And did you have occasion to participate in the production of all the ACRs produced by DOE?

A. Yes, in one form or another, yes.

Q. What other responsibilities did you have in the mid-1980s at PNL with regard to the waste management program?

You had mentioned the, developing the ACRs as one, one additional task.

A. No. I told you the FIMS, which is the federal interim storage program, F-I-M-S.

Storage requirements report, I was responsible for developing that.

The ACR issue resolution process, there were a lot of other little jobs. We were doing technical jobs like determining what the effects would be on spent fuel in dry storage for long periods of time and with certain types of atmospheres, either oxygen or inert atmospheres and things like this.



We had all kinds of the nitties going on.

We also developed the first dry storage cask for testing spent fuel in dry storage called the REA 2023 built by Riddenhall Eggers & Associates. It's still sitting out in Idaho right now with fuel in it.

Q. Did you have any role in developing or producing the fee adequacy reports that were issued by DOE?

A. Yes.

Q. What was your role?

A. My predominant role was as manager responsible for the report.

The man who actually did the work was Roger Engel.

I had to approve it, but typically I approved most anything Roger did. He was good.

Q. Were you responsible for or did you have any role in producing the total system life cycle reports issued by DOE annually after the standard contract was executed?

A. I never had a lot of involvement in the early years of total system life cycle cost stuff.

Later years in the nineties, I would feed information to the people that were doing it, things like acceptance rates and things like that.

Q. Did there come a time where you practically retired from JAI?

And I know you say you're still affiliated with them, but I also understand that you're retired now?

A. I keep trying to be retired, yes. February 11th, ninety, is it '99 I think was when the contract that TRW had was over, and I decided well, that's a good time to bow out.

I worked for 50 years. I paid in Social Security for 50 years, and I decided it's time to quit.

Q. So at that, at the point in time where you stopped working on the civilian management waste project or program?

A. Yes.

Q. I would like to go back to the ACR process.

A. Okay.

Q. We talked about the June 1987 ACR report.



I am going to give you the next ACR report dated June 1988 that DOE issued.

Just take a glance at it to see if you recognize that as indeed the 1998, 1988 ACR report.

(The witness reviewed the document.)

THE WITNESS: Yes. It's got the blue cover on it.

Yep, that's it.

BY MS. HEWITT:

Q. And are there acceptance rates listed therein?

A. I'm sure there are. Let me find them. Yep.

Q. Now did PNL prepare this 1988 report?

A. Yes.

Q. And did you participate in that preparation of the report?

A. Yes.

Q. How did you secure or come up with the acceptance rates listed in the 1988 report?

A. It says so right here -- source 1988 mission plan amendment.

Q. And did you have any discussions with DOE about using those acceptance rates in the



1988 report?

A. Yeah, we had discussions, but this was the mission. This is what we were told to use.

By then, things were changing. It was getting pretty obvious they weren't going to be able to get a facility operating as soon as they wanted. That's why the new date in here.

Q. When did DOE begin to realize that they would not be able to meet the January 31st, 1998 date?

A. I don't remember specifically, but that was recognized in that, and that's why they amended the mission plan.

Q. And that's when, do you recall?

A. Um-um. Does it have a date here? It was the 1998 mission plan, so I guess it was around then.

Q. Do you have knowledge about the nature of that amendment?

A. The only thing I remember was that the program was, start date of the program was going to slip by five years or so.

Just couldn't see how they were going to get there based on all the roadblocks and impediments that kept being thrown at them.



Q. Did you have any input or participate in the process of recommending the use of an MRS facility in connection with the waste management system?

A. No. It was not my role to recommend one, no.

Q. Did you participate in any analysis regarding the MRS system?

A. No. I mean I, I believe that the MRS was the solution to the problem.

That was my own personal belief, and I let everybody know that, including DOE and all the other contractors, but not everybody listens to me.

Q. I'm sorry?

A. I just said but not everybody listens to me.

Q. What was the problem that you, that you referred to in your earlier response?

A. Well, that I didn't think, first of all, I didn't think that the Nuclear Waste Policy Act was correctly written.

I thought that the MRS should have been the focus and that the repository deep geologic disposal or whatever final disposition

Q. Okay. Can you hand that back to me, please? I think we're done with that.
(There was a pause in the proceedings.)
BY MS. HEWITT:
Q. Mr. Cole, what was your role in developing or producing the 1990 Annual Capacity Report?
A. I was responsible for developing it.
Q. I'm going to hand you a document that's entitled the Annual Capacity Report, a date on it December 1990, and just take a quick look like you have earlier to confirm that is indeed the report that we're speaking about.
(The witness reviewed the document.)
THE WITNESS: Yes.
BY MS. HEWITT:
Q. And if you could locate the page that has the acceptance rates on it? I don't know offhand from here where they appear.
A. Oh, yeah. Upper and lower bounds, yes.
Q. Did you have any role in developing the upper or lower bounds as they are reflected in the 1990 Annual Capacity Report?



A. No. Those were fed to us. As you can see, the upper bound was the same from the previous report.
Now they were recognizing they still had a problem and the problem, the rate was the same in the previous report, but the dates changed again.
They were back to 1998 acceptance dates, but they kind of felt they could maybe do that if they had this lower bound, and the lower bound, the basis for the lower bound was what they felt the transportation system could accommodate.
That's where that came from.
Q. And what do you base this knowledge on?
Did you have discussions with DOE about this?
A. Yeah. Yeah. That's where they told me it came from.
Q. And why did transportation suddenly figure in the development of the --
A. Well, if you can't transport the stuff, it doesn't matter how big a facility you have.



If you can't get it there, it doesn't matter.
That's the maximum they felt, you know, there was some limits the transportation program started working under.
They felt that they might struggle to do better than this.
Q. And --
A. Why they used that as a lower bound instead of upper bound, I don't know, but that's what they used.
Q. With whom at DOE are you speaking with at this time about the ACR?
A. Mr. Alan Brownstein is responsible for the ACR, but he wasn't the one dictating what had to be down.
He's the messenger. Somebody hired the man.
I think, I think the person responsible for the transportation program and coming up with those numbers, the high-level person at this time I believe was Keith Klein.
He's now director of Richland operations, DOE Richland operations.
Q. Did you ever have occasion to see any



documents reflecting transportation limitations on acceptance?
A. I probably did. I just don't remember specifically.
I read everything I could on it.
Q. Do you recall exactly what the technical limitations were on the ability to accept spent nuclear fuel?
A. What I remember, it was how quickly they could get all the casks and infrastructure in place, but I don't -- that's all I remember.
Q. Did the 10,000 annual capacity limit applied to the MRS figure into this acceptance rate at all?
A. Into this one?
Q. Yes.
A. Obviously not. It shows 24,000 here. There is an upper bound.
Q. How about in the lower bound numbers?
A. I don't, I don't think that -- like I said, I think the limitation here was the transportation infrastructure, and the lower bound had nothing to do with facility.
That's my recollection.
Q. Could I see the document back?

A. Um-hm. I can't remember all the details on those upper and lower bounds and those, in that particular, that was kind of an anomaly report.
I didn't like it. I didn't like doing it because I didn't think it was good guidance for the utilities, and these were supposed to be guidance documents, but DOE was under some pressure.
We kind of cured the problem I think in the next year's report.
Q. DOE was under pressure from whom?
A. When I say DOE, DOE has lots of people. People that are responsible for getting this report out was under pressure by upper management to get something out, but they, the upper management was concerned with program slippage, what are we going to do about it?
So they had to put something out by -- contract required it, but I think they really wanted to, you know, put something out that didn't have a lot of specificity.
That's my own interpretation.
Q. Did you have any discussions with DOE about whether it was appropriate to issue an ACR



given that DOE recognized that the facility would not be available in 1998?
A. No, because the Annual Capacity Report is required under the contract, and it's put out there based on all the knowledge and based on all the planning as a planning document.
There was never any discussion of whether it should be put out.
It was, its contents were always under discussion, of course.
Q. Did you ever have discussions with DOE about the appropriateness of using an upper bounding and a lower bounding case?
A. Yeah. I said I didn't like it.
Q. And to whom did you relay these concerns?
A. To Mr. Brownstein.
Q. And what were their responses or his response?
A. Well, bottom line is this is the way it's going to be done.
I mean I don't remember the details of the conversation.
I just remember I never liked it, and when I don't like something, I tell people, so I



know I would have told him.
Q. And why didn't you like it again?
A. Because it's supposed to be a planning document, and there is not enough specificity there for anybody to plan to.
If I were a utility, I couldn't use it.
Q. Why not? Could you be more specific?
A. Because it doesn't tell me how much capacity is going to be available for me in any given year.
It just gives me a range, and I can't plan to that.
That's just my own opinion.
Q. And did DOE ever expressly disagree with your opinion?
A. Obviously; they printed it anyway.
Q. Well, they could have printed it but still agreed that you were, that you had the right opinion.
A. Yeah. There were a lot of people that agreed with it, yeah.
Q. Agreed with your opinion?
A. Yes, most definitely, yes.
Q. Do you recall who --



A. No.
Q. Those people were?
A. No. Mr. Brownstein was probably one of them, but his hands were tied, too.
Sometimes politics controls what we do. Reality doesn't. Science doesn't. Politics does.
Sometimes those of us down in the trenches don't know what all the political problems that are going on, either.
Q. I'm going to now turn to the December 1991 annual acceptance, Annual Capacity Report, and is it correct to assume that you had some role in producing that document as well?
A. Yes, I had a role in it.
Q. All right. I'm going to hand you a document entitled Annual Capacity Report with the date 1991 on it, and if you would just confirm that that's the document that we are both speaking about?
(The witness reviewed the document.)
THE WITNESS: Um-hm. That's it.
BY MS. HEWITT:
Q. And I see you have located the page which has the acceptance rates on them?

A. Right.
Q. Do you know how those acceptance rates were developed?
A. Yes. I developed them.
Q. And how did you develop those acceptance rates?
A. This was using information out of the nuclear waste policy amendments which made the statement that you couldn't -- well, first of all, back up.
By this point in time, DOE, it basically had the MRS as part of its mission, part of its planning. It was going to be there they were hoping.
And in order to do it, under the requirements of the Nuclear Waste Policy Amendments Act, the act stated if you had an MRS, it could not accept more than 10,000 metric tons of fuel until the repository became either operational or licensed, was something like that.
The mission I think at that point in time showed MRS they could maybe could get one going in 1998, a limited capacity probably.
Repository wouldn't start probably



until 2010, 12 years later, so they asked me, you know, what would be a reasonable rate because, you know, we can't build a big full-blown facility to get started, but we would like to make sure that we have something that's useful, so I came up with this rate which recognized the 10,000 ton limit over a 12-year period even though we only published ten years here because that's all that was required in the contract, to publish the first ten years, but if you add the other two years in here, you get another 1800 tons, and you have got 10,000.
It also recognized what the utilities had told us were their storage requirements, their need for out of tool, out of tool storage, recognizing the ability or inability to keep a full core reserve.
Information fed to us through a form they filled out every year called the RW 859; based on that information, in 1998, there was less than 400 tons of allocable storage capacity required on the aggregate by all utilities.
Now this takes us back to my statements earlier about issues of operations versus issues of equity.



This is an equity issue. How the utilities might want to divide that up amongst themselves can be their problem, but we would provide enough capacity so that they would not, they as an entity would not have to add any additional storage capacity.
The second year, 1999, they were telling me that it was like 575 tons required.
The third year was 850 or something like that, and from then on out, it was a nominal 850, 950 ton, nominal 900 tons, so I looked at that and says geeze, isn't that kind of nice? I've got 10,000 tons of capacity that I can use over a 12-year period, and lo and behold, I can also lay it out so that the utilities won't have to, if we actually did that, utilities, even though it's not what we were wanting, it's not 3,000 tons, but it is enough to keep them from having to add additional storage.
Q. And why was that a factor in your consideration of developing the acceptance rate?
A. Because that's a, that's the whole purpose of the Nuclear Waste Policy Act was to keep the utilities from having to add new



storage so they could keep operating.
Q. And in your opinion, did the standard contract reflect those purposes?
A. Did the contract reflect those purposes?
(There was a pause in the proceedings.)
THE WITNESS: Don't know. Don't know if it had anything to do with the contract as far as purpose goes.
The contract was a mechanism of roles and responsibilities, not purpose.
The act, the Nuclear Waste Policy Act was the purpose.
The contract was a way of implementing it, and that's how this rate came about.
BY MS. HEWITT:
Q. And was it your contention that this was a reasonable rate to you to use?
A. Absolutely; if you can only do a limited amount of capability, it would be nice to do it, so it really helped solve some problems, which was the initial problem they were trying to solve.
Q. And could you state again what that

A. That's very -- I can't answer that yes or no because as the program slips the date it thinks it can get something started, then the amount of spent fuel in the beginning year that the utilities are going to have to add additional storage for -- excuse me for ending the sentence -- well, is going to increase, so you will get to a point in time, if you don't start the thing until 2010, probably 400 tons is not enough for the first year.

It was based on a 1998 start date, and we could look back in that report and see what it would be in 2010, but I would imagine it's probably more in the neighborhood of thousand, 1200 tons, somewhere in that, additional storage required that year.

See, the reason you didn't worry about it prior to '98, '98 was the date that the contract and the law said DOE had to start providing that capability.

That year if they did 400 tons, they could take care of that problem.

Didn't mean utilities didn't have a problem before that, but under the law, they were required to take care of their own problem



before that.

There were some that had to add storage prior to that, that date. A lot of them had to.

Q. Did you have a role in publishing or producing the Annual Capacity Report and acceptance priority ranking that's dated March 1995?

A. My only role in that one was as a reviewer because I was back working at PNL on the mixed nuclear waste program at that time, and I was asked to review the thing before it went to press.

Q. Do you know why this document was published concurrently with the APR, the ACR and the APR were published concurrently as opposed to separately as they had previously?

A. Didn't make any sense to keep them separate.

It's cheaper to do one document, and since the information, since we originally back in the '87, '88, '89 documents, it was one, even though we didn't call it that, it made sense to make one out of it.

Q. I'm going to hand you the APR/ACR



dated March 1995 to see if you remember reviewing that document.

(The witness reviewed the document.)

THE WITNESS: Um-hm. Yeah. I think it was kind of a cookie cutter report.

BY MS. HEWITT:

Q. Can you secure or find the page with the acceptance rates on it, please?

A. Um-hm.

Q. Did you have any role in developing those acceptance rates that are included in the March 1995 report?

A. Yeah.

Q. And what was your involvement in securing those acceptance rates?

A. I have already told you; 1991 they were developed, and they were used every year since then.

Q. So those were the same rates?

A. Yeah, 469, yeah.

Q. But in this report, if I remember correctly, they don't have calendar year designation?

A. Right. They finally did year one, year two, year three, yeah.



Q. And that was based on your recommendation?

A. I don't know by then. I had recommended earlier. Somebody finally thought it was a good idea I guess, and I, my career, I got a lot of these they finally get around to doing something five years later and I go nanner, nanner, nanner, told you so, I told you so.

Well, that happens in this business. The government moves slower than the contractors want them to.

Q. Do you recall that DOE announced in 1995 that they would not be able to take spent nuclear fuel by the January 31st, 1998 deadline?

A. I think back then they were publicly announcing it, yeah.

Q. Did you have any discussions with DOE about the appropriateness of publishing an APR/ACR given that announcement?

A. No. No. They were still obligated to publish one.

It just, just didn't make a lot of sense to have a report with a date if you couldn't meet the date, and so that's why they

long at this rate, can I take everything on a aggregate basis and get the job done? What is it going to cost me?
It was done more at that level.
Q. Did you ever provide information for the total system life cycle reports regarding the acceptance rate?
A. Not regarding acceptance rate, but I did in regarding how much spent fuel would be discharged over time because I was responsible for calculating the amount of spent fuel that would be discharged that the system had to be designed to.
Q. Do you have any knowledge about how the system was designed by DOE?
A. Boy, that's an interesting question, how the system was designed.
Q. The waste management system.
A. Well, the waste management system encompasses thousands of pieces.
Which part of it?
Q. The repository.
A. All right. The repository -- how it was designed -- well, there have been several designs.



The first design that was used for all planning purposes was a salt repository.
It was going to have -- spent fuel was going to be taken apart and consolidated into cannisters that would hold about ten metric tons apiece.
These would be put in rooms with boreholes drilled in the rooms in the floors, and these cannisters would be set down in the floors.
All the disassembly hardware would be canned up separately and just used part as backfill and stuff like that.
That was the basic repository design until -- because everybody thought that salt was the best location, and then it became more of a political program instead of a technical program on where could we put this stuff, and so they developed, came up with these three political sites.
One was the Permean Basin in Texas, the Panhandle of Texas, which was a salt dome. The was all on the Hanford reservation, and the tuff at Yucca Mountain.
Q. Did they --



A. Two of these were throw-aways.
Q. Which two?
A. The two that got thrown away. The salt got thrown away because it was a lousy storage medium.
The salt got thrown away because it was not on federal land, and the tuff was the only thing left.
Q. Do you know how DOE determined that the repository ultimately built would take or receive 3,000 metric tons of spent fuel a year versus some other number?
A. It was designed to do that. It was designed to accept so many rail casks and/or truck casks in a given year, and unload them and process the fuel and put it in storage container or in, you know, disposal packages, and you build the number of receiving bays.
I think they figured they could do it with three receiving bays, and you design all the stuff so you can take 3,000 tons.
Q. And do you know why they designed it to a 3,000 ton, metric ton annual capacity?
A. It seemed the original, if I remember right, like I said, the original was I think



based more on what came out of the old storage, the commercial radioactive waste management impact statement, but in the, the later years, kind of de facto, that appeared to be a pretty good number that if you built a facility and operated it nominally at that rate, it would operate 35, 40 years, and by then, all the reactors had shut down, and you have taken all the fuel and cleaned up the backlog, and that period of time would be about, would be reasonable because the last reactor would shut down in 2038 and you would shut the, close the doors on the repository in 2040 or five years, maybe 45, somewhere, a few years later after you get the last fuel after it's cooled a couple of years, and if you did anything at a faster rate, then you would take a lot up front, and you would be sitting idle for a lot of time and the cost would be too high.
If you did it the slower rate, the utilities would be stuck with storing it on their site too many years after they shut down, so it turned out to be a pretty good number.
Q. Do you know if DOE conducted any analysis on this topic?

A. Oh, God, yeah. How about $20 million worth or more?
Every year, somebody did an analysis to make sure that was still a good number, and that was all TSLCC work, things like that.
Q. Did PNL participate in any of these analyses?
A. Yeah, probably. Everybody did. Practically every laboratory out there participated.
Q. And did you personally participate in any of these analyses?
A. No.
Q. And is it your testimony that these analyses concluded uniformly that 3,000 was a good rate to use for designing the repository?
A. Um-hm, based on the latest information on how much spent fuel is projected to be discharged through the life of the program until the last reactor shuts down.
Q. Is there significance to the 35, 40-year timeframe that you referenced in your prior answer?
A. That's when the last reactor shuts down is like 2038, and if you get a repository



starting to operate in Year 2000 or so, you operate 35 years, 40 years, then it's all done, and if you're doing 3,000 tons a year, you're taking care of the, what's being discharged, which is nominal 2000 tons a year plus got a little extra to work off the backlog.
Q. Now where did you get the figure 2000 a year being what is discharged?
A. That's what the, that's what the utilities discharge every year.
Q. And was the repository designed to accommodate the discharges?
A. Plus work off the backlog.
Q. Now in the acceptance rates that were used in the acceptance capacity reports, did they reflect what the utilities would discharge or the idea of working off a backlog?
A. I don't know how many times I've got to repeat how that acceptance rate was developed in the Annual Capacity Report.
It was based on if you started the facility in 1998, 400 tons the first year would be adequate to make sure that you at least didn't have to add additional storage in that year, every year, the same.



Had nothing to do with 3,000 tons working off backlog or anything.
It was the minimum that could be done to keep them from adding additional storage.
Q. But before that rate was implemented, there was a 3,000, a ramp-up to 3,000?
A. Um-hm.
Q. And is it fair to say that, that when the Annual Capacity Report used the 3,000 metric ton annual acceptance rate, that that reflected what was required to work off what utilities were discharging as well as attacking a backlog?
A. Oh, yes, definitely. I'm sorry. I misinterpreted the question.
Yes.
Q. I'm not always very clear.
A. No. No. That's, that's -- you're absolutely right. That was, that was the initial hope of the program.
Not only did they want to help utilities so they wouldn't have to add additional capacity, they wanted to make sure that you had to work off the backlog.
Otherwise you've got utilities ultimately shutting their reactors down and



sitting there storing that fuel for many, many years.
If you only handle a 2,000 ton per year acceptance rate, you would have to operate probably a 60, 70-year repository to finally work off the backlog.
Utilities, that's not what they were paying for.
Q. I'm going to take you back to the fee adequacy discussion we had earlier.
In preparing fee adequacy reports, did PNL or DOE ever consider the impact of the delay on implementing the repository or when DOE would actually take spent nuclear fuel?
A. I'm sure that, that it did impact it, but not directly, because like I said, most of the fee adequacy analysis was based on the TSLCC, which had to use that as a concern when they could operate, how much it's going to cost them each year to operate, when they could get built, et cetera, et cetera, and utilities are lucky because they didn't raise the fee.
They just figured it was not the wisest thing to do at that time.
They could have. The contract allowed

it to happen.

(There was a pause in the proceedings.)

BY MS. HEWITT:

Q. Did you have any role in performing environmental assessment of the MRS?

A. No.

Q. If everybody would be okay with this, I suggest we take about a ten-minute break. That will bring us up to three o'clock, and then -- or three o'clock or so, and then we can go hopefully until about five when you're released for the day, Mr. Cole, if that's okay?

A. I'm at your disposal. I can stay here through Saturday morning.

Q. We hope we're not going to be here by Saturday morning.

A. But I didn't bring a sleeping bag!

MS. HEWITT: Okay. We could go off the record.

(A recess was taken.)

BY MS. HEWITT:

Q. Mr. Cole, I would like to just go back and clarify a couple of things that I'm not sure are very clear on the record.



A. Okay.

Q. I want to ask you a couple more questions about the acceptance rate which was first introduced I believe in the 1991 Annual Capacity Report.

A. Okay.

Q. And to refresh your recollection, the acceptance rate that was used started in year 1998 with a 400 MTU annual rate and ramped up in about two years up to 900 MTU annual rate, and if I'm correct in my recollection, you stated that you helped develop this acceptance rate that was included in this Annual Capacity Report?

A. It was my -- I developed it personally.

I mean I can't pass that one off to anybody else.

That was my idea.

Q. Okay. The Annual Capacity Report, when it reports this rate, only goes for a period of ten years, right?

A. That's correct.

Q. Was there an understanding or an intention with regard to what an acceptance rate



would be following the ten years?

A. No. We never really did one for greater than the ten-year period.

Q. If I remember correctly --

A. Not for the purpose of allocating capacity.

Q. Now you stated earlier that it was your opinion that the 900 MTU annual rate was a reasonable rate in your view, is that right?

A. Yes, based on the information given to us by the utilities.

Q. Do you have an opinion about whether or not it would be a reasonable rate to use for more than ten years?

A. I would have to look at the data given by the utilities, and I could tell you yes or no then, but I can't remember what it was beyond that point in time.

If they were still saying that they didn't need any more capacity than that for additional storage, then it would be reasonable. If they needed more, then it wouldn't be because that was, the bases for that was what could we do at a minimum and still keep them from getting in trouble?



Q. Now when we talked about the genesis of the 900 MTU rate and compared it to the numbers in the storage requirements document, I think it was evident from your review that the numbers that were included in the acceptance rate 1991 document were greater than the total storage requirements that were needed, that were reflected in the storage requirements documents?

A. Nominally.

Q. What do you mean by nominally?

A. Well, there may have been one year when it creeped a little more than 900, but most of the years were under 900.

Q. And was there any reason that you chose a figure that was higher than what those rates were in the storage requirements document?

A. Yes.

Q. What was the reason?

A. I had 10,000 tons to divide up over 12 years, and it worked out pretty slick.

If you do 900 tons a year for 11 years, and -- I mean for ten years, and you do four and six, voila, you've got 10,000. I didn't even need my calculator for that one.

Q. You also referred in your earlier

answers to, on occasion to program guidance that you received from DOE?
A. Um-hm.
Q. In what form was that program guidance provided?
A. Comes in as written guidance.
Q. Were there actual documents that were provided to PNL with regard to preparation of the acceptance in the Annual Capacity Report?
A. Yes. Yes. Said to go do it. You know, program guidance is fairly, oh, sometimes vague, sometimes with the understanding that you know what you have to do anyway.
Sometimes you write your own guidance, give it to DOE, and then they officially give it to you, but the program guidance in this case would come in and say the contract specifies da, da, da, you do this, go develop this report.
Q. Did you ever receive program guidance in a written form from DOE that instructed you to use a certain acceptance rate in an Annual Capacity Report?
A. I don't remember specifically getting an acceptance rate in written guidance, no.
When the guidance comes in, it comes



from DOE headquarters to DOE Richland operations, from DOE Richland operations to our contract officer.
It's a contract to contract, and along with some budget authority, and then it dribbles down to people like myself as program managers, and it's usually one or two lines saying what you're supposed to do, and then you get together, and you, you as the contractor, start putting together a more detailed set of, if you will, guidance, what you really think they want, and then you echo it back to them.
You meet with them. You get on a plane, you fly to D.C. and you meet with them and say here is what I'm proposing to do, is this really what you had in mind?
And then you start discussing content and things like this, and they tell you what, you know, if they have some requirements or not, and that's when it all happens.
Q. As far as you recall, were there any written exchanges on the issue of what acceptance rates to use in the ACR?
A. I don't recall any, but I don't know. There may have been.



I just don't recall.
Q. Earlier you referred to some efforts that DOE was undertaking to get Congress to do something about the lack of a repository or other facilities to take spent nuclear fuel by 1998.
Do you recall any specific actions dealing with taking with Congress?
A. Several times a year, several, I know a couple, sometimes more, the director of the DOE waste management program was called, would meet, give testimony to Congress about the status of the program and what was happening, what the problems were, and what, kind of what he needed from them.
I mean this is all Congressional public record and stuff in these meetings, so --
Q. And it was your impression that at these meetings, they were requesting Congressional intervention in order to allow them to fulfill their responsibility?
A. Oh, I don't know how those discussions go.
It's not so much Congressional intervention, no.



It's Congress wrote the law. Congress changed the law on them, and they're going in there and telling them because you changed the law, this is all I can do. I just want you to know it.
I don't know what took place specifically in those meetings.
I just know they happened.
Q. Um-hm. Okay. The last follow-up I have is that regarding the testimony you gave on the fee adequacy reports, and you said at one point in time, the fee was not adequate?
A. That is correct.
Q. Was that ever reported in a report that PNL produced or that you participated in?
A. No. It was not produced at PNL. That was produced by, when I was working under the program, of TRW in '92 or somewhere around then, and DOE decided not to publish that I think.
I think, well, I'm not sure. I can't remember now if they -- I know they decided not to publish the fact that it wasn't adequate.
They may have published a fee adequacy report saying for right now, it's adequate, knowing full well it wasn't because they felt

A. Came from the Annual Capacity Report, from the one that was published in '91.
Q. And am I right that --
A. I believe.
Q. Am I right that utilities couldn't propose to deliver more than the amount of spent nuclear fuel they were allocated in a particular year?
A. They could propose it, but it would be disapproved.
Q. So is it fair to say that the rights that utilities had to deliver a certain amount of spent nuclear fuel came from the ACR?
A. Yes.
Q. As opposed to from the Delivery Commitment Schedules themselves?
A. No. The Delivery Commitment Schedule's based on the ACR.
It told them, the ACR told them what they had.
This is why in '91, we knew that starting some time soon, I can't remember the dates, they were going to be '93 or so, they're going to be two or three are going to be submitting Delivery Commitment Schedules.



That's why we told them, to give them like a three-month comment period and review of the '91 report that said speak now or forever hold your peace.
This is the portion of the capacity that's allocated to your utility, and here is how it was given to you and why it was given to you, and so they knew that information.
Then I can't remember, '92 or '93, they start submitting Delivery Commitment Schedules based on that information.
Q. Now I think you said earlier that the utilities had a reasonable basis to rely on some of the ACR reports, but not on the other ones.
Do you recall that testimony?
A. Yeah, I agree.
Q. And would it be fair to say that for those ACR reports, ACR reports for which they did not have a reasonable basis to rely on, the Delivery Commitment Schedules then were also not reliable documents?
A. The delivery schedule process started out, like I said, I think in '92 or three based on the information out of the '91 report.
At that point in time, everybody felt



that that was a good reliable basis. Everything was still fairly on track, or at least DOE kept hoping they could meet that date.
After some time in, oh, I think some time '94, '95 when it, '95 or so when it became apparent that they weren't going to meet the dates, the Delivery Commitment Schedule process was terminated. No longer were required to send them in because they didn't have any meaning anymore.
I'm not that sure of those dates, but it's right in that period of time.
Q. I'm going to hand you a document that I believe you authored when you were at E.R. Johnson & Associates that actually does have a Bates number on it, thank God, and it's -- actually we have two numbers.
One is PA hyphen 222543 is the beginning Bates number, and there is also a PNL number, which is 0081286.
The document is entitled, "Department of Energy Delivery Commitment Schedules for Spent Nuclear Fuel," and it has two names on the document, a Marlies Klose.
A. Marlies Klose.



Q. From TRW, and then your name, Billy M. Cole.
Will you take a look at this document and see if it's familiar to you?
(The witness reviewed the document.)
THE WITNESS: Yeah. This was for some technical symposium somewhere.
It was not really considered a document.
It's a presentation.
BY MS. HEWITT:
Q. Did you make the presentation?
A. Probably not; I can't remember when this was.
What's the date?
Q. Well, that was going to be one of my questions.
A. This was probably I'm guessing around '92 or so based on -- all this does is just reiterate and summarize what's in the ACR and how the, how the allocation process worked, and I can't remember what technical meeting this was for.
Q. I'm going to, I would like to make that Cole Exhibit No. 2 to the deposition.

(Cole Exhibit No. 2 was marked for identification.)

BY MS. HEWITT:

Q. And I'm going to give you another document which I believe --

A. This must have been around '92 because it references '91 documents.

Q. I believe this document that I'm about to hand you was developed around the same time.

It's on the same topic. It discussed -- the title of the document is status of Delivery Commitment Schedules.

This, it has got your name written on it. It's got Alan Brownstein's name.

It says EEI slash U waste meeting November 6th, 1992.

It also has a Bates number on it CTR hyphen 003 hyphen 1772, and the first part has Alan Brownstein and then your name written, and then attached to this document is a, the same title with your name written in type on it.

A. Yeah. We did up a lot of generic presentation material. And in those days, Alan and I were kind of interchangeable.



We would run, if somebody asked can you tell us what this is all about, this program and stuff, and how this process works, and so I would either slip my name in it or he would slip his name in and we would go give the presentation.

This is the same, actually the same, exact same information is in here.

Q. Did you develop the, either of those documents?

A. I was the manager in charge of getting the work done.

People who worked for me developed the information in there, and I reviewed it and said yep, that's correct at that time.

This was just keeping track of the DCSs that came in.

Q. Were you familiar with the instructions that were provided to all fours in connection with the Delivery Commitment Schedule?

A. The instructions that were provided to whom?

Q. To, to the utilities.

(A discussion was held off the record.)



THE WITNESS: It was some, there was some letter or instructions that went out to the utilities from the DOE explaining what they were supposed to do, and give them a sample form I think.

BY MS. HEWITT:

Q. I'm going to give you --

A. I just don't remember.

Q. A copy of the document entitled U.S. Department of Energy instructions for completing the Appendix C Delivery Commitment Schedule general instructions.

And actually I have the document number here which I have covered up, but it's SN 120564.

Why don't you take a look at these pages and see if that seems familiar to you in any way?

(The witness reviewed the document.)

THE WITNESS: Yeah, it's familiar, but I, I wasn't with TRW at that time.

I was off working for PNL again on the mixed waste program, but I know what was in it.

BY MS. HEWITT:



Q. Did you have any role actually drafting these instructions?

A. No.

Q. There is a paragraph here that talks about the ACR?

A. Wait a minute. Back up. To be honest, yeah, probably because I think we started drafting those before I left, but it all got completed later.

It was just trying to give guidance to the utilities on how to fill these things out.

Q. Well, there is a section in here that talks about the annual acceptance rates in the ACR, and in particular, it states that the process described herein, and I believe that it refers to the Delivery Commitment Schedule process, assumes that the FWMS will be able to accept the purchaser's SNF beginning in 1998?

A. Correct.

Q. According to the acceptance rate reflected in the ACR; then it goes on to say in the event that such circumstances change, all DCSs previously approved by DOE may need to be reevaluated by DOE and the purchasers.

Do you recall that at all from the

instructions?
A. If that's what they said, that makes sense, yeah, because things can change.
Q. So was the Delivery Commitment Schedule a final commitment by DOE to take the fuel reflected therein from the utility?
MR. MILLER: Lack of foundation.
THE WITNESS: I, my personal belief is that it was a commitment by DOE to take this stuff and a commitment by the utilities to deliver, yes.
And I guess I need to leave it at that because, yes, I think that's true. It is, it did represent a commitment, and I, you know, I know that things changed afterwards.
They couldn't get a facility done in '98, as we all know, and things like that, but it does not excuse an obligation.
Q. What do you mean by that?
A. DOE had an obligation to take something under the contract.
Now how much, that could be debated because it doesn't tell, quote, amounts in the contract.
If you read the language, I think



literally they could have taken one spent fuel assembly in and met their obligation.
Q. Was that ever expressed as the intent of DOE?
A. Of course not. Their intent was to get a facility operating in '98, to take the stuff away fast enough so the utilities would not have to add additional storage.
That was the intent.
Q. And do you think that DOE had that intent when they signed the standard contract?
A. Of course.
MR. MILLER: Objection. Calls for the -- lack of foundation.
Sorry.
BY MS. HEWITT:
Q. On what do you base that opinion of yours?
A. They were given that job by Congress, and the job they were given was to, between the DOE and the utilities, to develop a contract and enter into this contract and carry out the roles and responsibilities of the contract, and they went to work trying to do it.
Q. Did you ever have discussions with



people at DOE about their obligations under the standard contract in this regard?
A. Oh, of course. Of course I did. I said you guys are liable. You guys are required to take this stuff.
Q. Did they agree?
A. No, not necessarily. Some of them, you know, when you get, when you, when you get somebody in the corner and there is no way out, then they can make other statements.
They can say well, according to this, it says commencement of facility operations, we don't have a facility to operate, so we don't have to do anything, but they were instructed by their legal counsel to say that, in my opinion.
I don't necessarily think that the people I dealt with were technical people.
I don't think necessarily that those were their feelings or words or anything.
It had just gotten to the point where now we have got to fall back on other provisions in the contract, things like I think there were some provisions in here in case you can't do your job, things beyond your control, stuff like that. There are -- all that stuff is in there.



Q. Did there come a time where utilities stopped submitting Delivery Commitment Schedules?
A. Yes. I think it was around '95. I think, because I think DOE basically said you don't need to send anymore because that's when things kind of fell apart.
They couldn't make the '98 date, so they didn't have that much meaning anymore.
Q. Can you describe in greater detail what DOE said to utilities in that regard?
A. Nope. Don't know. I wasn't there when I think that stopped. I can't remember specifically the stop date.
It was some time in '95, and if I was there, it was right after I came back from PNL.
The guy who probably has some of the most knowledge on that is a Dr. Williamson.
He was the man responsible for doing the DCSs at TRW. He worked for me -- Douglas Williamson.
Q. But it is your recollection that DOE did instruct the utilities to stop submitting the DCSs?
A. No. They stopped -- I don't know how

they stopped.
I don't know if it was under DOE direction or the utilities just decided to stop, why it stopped. I don't know.
I know it stopped. I don't know why. I really don't recall the thing that triggered stopping the DCSs.
Q. Did there come a point in time where it was apparent that submitting the Delivery Commitment Schedules would be a useless exercise in your opinion?
A. In some respects, that's going to have a two-part answer.
I felt that probably should continue the DCSs even if you couldn't make the '98 date if you were to qualify saying that this is your piece of the allocation, whenever the thing starts, so complete the process, and then put it on the shelf for whatever reason made more sense than just quitting to me, but if it was date specific, I could see where people would say hey, this is worthless, waste of time.
Q. And when would that have become apparent to utilities in your opinion?
A. Whenever DOE made a statement that



it's not going to meet the '98 date, whenever that was.
I don't know that specific date; some time in the mid-1995 or so when they came out with that, but it would have been nice if you had completed the process, everybody submitted all their schedules, assuming '98 date, and then you put it on the shelf and you change it from '98 to year one, whenever year one is.
(There was a pause in the proceedings.)
BY MS. HEWITT:
Q. If it was changed to year one as you suggested, then how could you know when to submit your DCS if it was required to be submitted 63 months before?
A. Because when the process started, '98 was the date.
DOE could just change it to year one after that.
They were -- you had the whole set for about a five-year period, and then you just put them on the shelf.
(There was a pause in the proceedings.)



BY MS. HEWITT:
Q. Were --
A. I never told DOE to do that. Just, you know, just I hate to see something not finished.
Q. There were a number of contractors supporting the civilian radioactive waste management program at DOE, right?
A. Yes.
Q. How would you characterize PNL's role relative to the other contractors that were working with DOE?
A. Depends on the point in time.
Q. Why don't you go through the various segments of time for us?
A. Nuclear Waste Policy Act was passed. PNL was the first management and operating contractor for the DOE's program because they were the ones managing the program before the act was passed for DOE, so they just continued that role.
In 1991, it was turned over to TRW because they felt they needed an integration contractor.
The program was getting big. You had



a lot of things going on, and needed, quote, somebody to come in and integrate. That was the superficial reasoning.
The real reasoning is every so often, DOE likes to change, which they did again here just recently.
At the time PNL was the M&O, various other people were also working on the program through PNL, and you know, Oak Ridge, Idaho, Sandia, just a lot of contractors did various pieces, each one thinking he was the one that should be in charge.
Q. But PNL was in charge of that at that point in time?
A. Well, of course. We were formally in charge of the managing the program, but we were instructed also to divy up, give various other labs and contractors pieces of the pie.
For example, I think it was Oak Ridge at that time that had the responsibility for developing the transportation program.
Even though we had the overall management responsibility, they had that piece of it, just that kind of stuff.
Q. And then when TRW took over the role

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
- - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) :
FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) :
NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese,J.) :
DUKE POWER, A Division of :
DUKE ENERGY CORP. :
(98-485C)(Sypolt,J.) :
INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) :
SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) :
SOUTHERN NUCLEAR OPERATING COMPANY, :
et al. :
(98-488C)(Yock, S.J.) :
COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) :
BOSTON EDISON COMPANY :
(99-447C)(Allegra, J.) :
GPU NUCLEAR, INCORPORATED :



(00-440C)(Bush, J.) :
WISCONSIN ELECTRIC POWER COMPANY :
(00-697C)(Merow, S.J.) :
POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) :
OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) :
NEBRASKA PUBLIC POWER DISTRICT :
(01-116C)(Sypolt, J.) :
TENNESSEE VALLEY AUTHORITY :
(01-249C)(Bruggink, J.) :
Plaintiffs, :
v. :Discovery
THE UNITED STATES, :Judge:
Defendant. :(Judge
- - - - - - - - - - - - - - - - - - - - -xSypolt)
McLean, Virginia
Wednesday, March 13, 2002

Continued deposition of BILLY M. COLE, a witness, recalled for examination by counsel for Plaintiffs in the above-entitled matter, pursuant to notice, the witness being duly sworn by CATHERINE S. BOYD, a Notary Public in and for the Commonwealth of Virginia, taken at the offices of Shaw Pittman, LLP, 1650 Tysons



Boulevard, McLean, Virginia 22102-4859, at 10:30 a.m., Wednesday, March 13, 2002, and the proceedings being taken down by Stenotype by CATHERINE S. BOYD and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiffs Florida Power & Light Company, Northern States Power Company, Duke Power, Indiana Michigan Power Company, Boston Edison Company, GPU Nuclear, Incorporated, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District:
DEVON E. HEWITT, ESQ.
ALEX D. TOMASZCZUK, ESQ.
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703)(770-7962)

On behalf of the Plaintiffs Southern Nuclear Operating Company, Alabama Power, Georgia Power:
M. STANFORD BLANTON, ESQ.
Balch & Bingham, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
(205)251-8100

APPEARANCES (Con't)

On behalf of Plaintiff Commonwealth Edison Company:
THEODORE T. EIDUKAS, ESQ.
Jenner & Block, LLC
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of Plaintiff Sacramento Municipal Utility District:
TIMOTHY R. MACDONALD, ESQ.
Arnold & Porter
Suite 4500
370 Seventeenth Street
Denver, Colorado 80202-1370
(303)(863-2334)

On behalf of Plaintiff Wisconsin Electric Power Company:
DONALD J. CARNEY, ESQ.
Perkins Coie, LLP
607 14th Street, N.W.
Washington, D.C. 20005-2011



(202) 434-1675)

On behalf of the Defendant:

R. ALAN MILLER, ESQ.
ERIN E. POWELL, ESQ.
U.S. Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C.
(202) 616-0383

ALSO PRESENT
SCOTT VANCE



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR | |
| --- | --- | --- |
| Billy M. Cole | PLAINTIFF | DEFENDANT |
| By Ms. Hewitt | 259 | |
| By Mr. Blanton | 260 | |
| By Mr. Eidukas | 331 | |
| By Mr. Macdonald | 347 | |
| By Mr. Miller | | 504 |
| Afternoon Session - Page 347 | | |


E X H I B I T S


| COLE EXHIBIT NO. | PAGE NO. |
| --- | --- |
| 3 | 381 |
| 4 | 398 |
| 5 | 410 |
| 6 | 442 |
| 7 | 459 |




P R O C E E D I N G S

Whereupon,

BILLY M. COLE,

the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:

FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

BY MS. HEWITT:

Q. Back on the record; good morning, Mr. Cole.

This is day two of your deposition. As I mentioned yesterday afternoon, I was pretty much finished with my questions, and I was going to yield to my esteemed colleagues here around the table to allow them to ask questions, but I did find one document or one e-mail when I was going through some documents last night that I was hoping perhaps you could place in context for me, if you have ever seen it or know anything about it.

I think you're a recipient. The document number, Bates number, there are two that I have.

One is HQR hyphen 061 hyphen 0007, and

They just manage contracts. They toss stuff over the fence saying go do this, and you toss the product back.

In the case of DOE, it's hands-on program management, so you work, the contractor becomes extension of staff, and so you work on a daily basis over the phone if you're not physically there or in their face in their office if you are.

Sometimes you write down in document things if it's necessary.

Sometimes you just discuss it and go forward to solve the problem.

The analysis that was done there was based on, as you saw, the information out of the storage department report, which was a published document.

Q. What should we look for if we wanted to try to find whatever you gave Mr. Brownstein reflecting that acceptance rate?

A. I can't even remember what form it was in, so I don't know.

May have just been a piece of paper where I show it to him.

It may have been, I may have just



copied the table out of the back of the storage requirements report and said hey, you know, if we do it this way, we can have an acceptance rate that you might be able to do, still have the utilities, and he bought it.

Q. Okay.

A. They were concerned about getting there just like you guys were concerned about them showing up.

Q. Assume for the purpose of argument with me a minute that there was a legislative prohibition on beginning construction of an MRS until you had a construction permit for the repository.

A. Okay.

Q. Would that have affected either the rates you developed, the schedule you developed, or the viability of it?

A. Yes.

Q. How so?

A. That was, the rate was to accommodate that particular situation from the Nuclear Waste Policy Amendments Act that said you couldn't -- if you had an MRS, and I know they were planning on having one because they were feeling at that



time it was the only way they were going to be able to meet a '98 date, and it could only store 12,000, I mean 10,000 tons, and projected repository operating date was not until 2010, so there was 12 years, that I divided the 10,000 tons up and still was able to show where, if you did it at this rate, it would still be enough acceptance capacity to keep the utilities from having to add additional at-reactor storage on the aggregate.

Q. Okay.

A. And it would then say if you could do that, would say I could build an MRS. It didn't have to be a huge one, but I could get something going.

Q. All right. I didn't make my question clear.

A. Maybe I didn't make my answer clear.

Q. Did you assume in doing that rate, in developing that rate, did you assume that DOE would be able to begin construction of an MRS before DOE received a license to build the repository?

A. I assumed that somehow, DOE was going to be able to have a small interim storage



facility, MRS, whatever, AFR, whatever you wanted to call it, available in '98, and that was part of that, yeah, I assumed, yes, operating in '98.

Somehow they would do it because the getting the license for repository, you had to precede operation of an MRS by a lot of years.

They could get a license for repository much sooner than 2010, of course. They would have to.

That's when the 2010 would be the operating date, so construction would start many years before that and license many years before that, so it was, timing was about right.

Q. What was the estimate on the schedule for the construction of the repository from the date they got their license to build the repository?

A. I do not remember the dates. Don't remember.

Q. I'm still not sure I understand your answer on the development of the rate.

Did you assume that they could not start the repository, I mean -- excuse me -- the MRS construction until they got a repository

contractor, they throw everything away that everybody else ever did and reinvent the wheel, not invented here type attitude, well, we can do better, so it hasn't been used since '91 to my knowledge, maybe '92 while they were developing theirs.

But like I said, Dr. McLeod had such a tremendous memory, he can probably tell you every line of code in it. The guy can tell you when it was used, how it was used, and everything about it probably.

Q. Okay. Can you just -- I'm done with that document then.

Can you just refresh our recollection, I don't recall who Mr. McLeod is.

A. Dr. McLeod is a vice president of JAI Corporation, still working about half time I think on this program, and you can contact him. I don't know his phone number. He's got an office downtown, but you can contact the home office, which is 703-645-0440, and the secretary there can get to him for you, get you a number where you can get him.

I don't know his number down there because they moved offices, and so I don't know.



Q. Okay. I appreciate that.

A. He's a good one to talk to. He's also responsible for the later years, couple years ago, or last year, in developing the new projections for the amount of spent fuel that will be discharged to feed to TSLCC, that kind of stuff.

Q. Okay.

A. Got a lot of knowledge.

Q. Good. And then finally, I'm going to ask you just one or two more questions on the 1991 ACR acceptance rates. I would feel left out if I didn't get a chance to ask about it, too!

A. Okay.

MR. MILLER: As long as it's not repetitive hopefully.

THE WITNESS: It's going to be interesting if I haven't heard the question, but go ahead.

BY MR. EIDUKAS:

Q. I'll try to be new.

A. That's all right. I was being facetious.

Q. Okay.



MR. MILLER: I wasn't.

THE WITNESS: Oh.

MR. EIDUKAS: I knew that.

BY MR. EIDUKAS:

Q. In developing the 400, 600, 900 MTU rate that appeared for the first time in the 1991 ACR, I believe you testified that you developed that rate by taking a look at what the spent fuel needs of the utilities would be, projected to be in the aggregate?

A. That is correct.

Q. And then try to match that up with the 10,000 MTU that was projected to be available from an MRS that you anticipated to start operating in 1998, is that a fair characterization?

A. That's 90 percent correct. It, basically what I tried to do was to see if, what the storage requirements in the aggregate would be and to see if that 10,000 ton would accommodate it, and when I did the numbers, yeah, it will accommodate it.

Now can it accommodate it on an annual basis, too, and how would I divide it on an annual bases as a receive rate, and that's, that



sort of fit.

Q. And you divided the 10,000 up, MTU up over a 12-year period?

A. Right.

Q. And could you again -- I think you probably said this in relation to another question or another context, but where did that 12-year period come from that you were dividing that 10,000 up?

A. That assumption was that --

MR. MILLER: Asked and answered.

THE WITNESS: MRS could get started in 1998 and repository in 2010, and subtract one from the other.

BY MR. EIDUKAS:

Q. Okay. And when you were developing that rate, was it your anticipation that, or strike that.

What did you anticipate would happen to the rate after that 12-year period when a repository was expected to be opened?

A. I did not have an anticipation. That was not my job.

Q. Okay. Did anyone expect, did you expect that the 900 rate would continue past the

time when a repository would be opened?
MR. MILLER: Asked and answered.
THE WITNESS: I assumed that if you had a facility operating, that you had a repository, starting in 2010, that after you get some kind of a ramp-up, yeah, you're probably going to be up to 3,000 tons.
How quick, I don't know, but that was an assumption, but I didn't -- that had nothing to do with this analysis on the early day acceptance rate.
BY MR. EIDUKAS:
Q. So when you created that acceptance rate in the 1991 ACR, you did not, you did not anticipate past there -- that was based on the 12-year period and you didn't anticipate --
A. Actually was only 10 years. The ACR only goes for ten years.
I just used the 12 year because that was the -- you couldn't get ten, more than 10,000 tons in an MRS under the law prior to that repository operating, so I divided over those 12 years.
Q. Thank you. And so I guess what I was trying to get at and may have been misphrasing



it was you didn't intend or anticipate one way or the other that the 900 rate would continue in perpetuity or indefinitely past that ten-year period?
A. No.
MR. MILLER: Asked and answered.
THE WITNESS: I did not intend that it would, and I assumed that it wouldn't, but that was not even a consideration at that time. Didn't look at it.
MR. EIDUKAS: That's all I have.
MR. MILLER: No questions.
MS. HEWITT: Why don't we break for lunch? And then I think we'll finish up.
MR. CARNEY: I don't have any questions.
MS. HEWITT: So the only remaining attorney asking questions will be Mr. Macdonald.
THE WITNESS: Okay.
MS. HEWITT: Okay. We're off the record.
MR. EIDUKAS: Okay.
(Whereupon, at 12:37 p.m., the deposition was recessed, to reconvene at 1:15 p.m. the same day.)



AFTERNOON SESSION
(1:33 p.m.)
Whereupon,
BILLY M. COLE,
the witness on the stand at the time of recess, having been previously duly sworn, was further examined and testified as follows:
EXAMINATION BY COUNSEL FOR DEFENDANT SACRAMENTO MUNICIPAL UTILITY DISTRICT
BY MR. MACDONALD:
Q. Good afternoon, Mr. Cole. We met yesterday.
My name is Tim Macdonald, and I represent Sacramento Municipal Utility District which I will refer to out of habit as SMUD.
A. I know SMUD, yes.
Q. And the same ground rules as have been described to you before -- if you don't understand a question that I ask, please stop me, and I will try to clarify it.
I'm handing you a document entitled spent fuel storage requirements 1990 dash 2040, a November 1990 document that we talked about yesterday.
A. Um-hm.



Q. And here is a copy.
MR. MILLER: Oh, thank you.
BY MR. MACDONALD:
Q. And from your prior testimony, this is the document that you have used in coming up with the 1991 ACR acceptance rates, is that correct?
A. I think this was it, yes. Yeah, that looks like it.
Q. And if you flip to B94, which I think is also the page you took a look at yesterday when Devon was questioning you, and this is a chart entitled annual storage requirements by utility, comma, maximum inpool capacity, comma, MTIHM dash no new orders forecast.
And just to clarify for me, that the MTIHM, is that a, essentially the same as what we have been talking about as MTU?
A. For all practical purposes, yes. That's metric tons initial heavy metal.
Q. Okay. And the rates across the bottom of that chart starting in 1998 are 362, 385, 551, 381, 811 on down the line?
A. Um-hm. No. Go ahead. I just noticed the same table exists on page B62. I can't

figure out why.
Go ahead.
Q. And these, at least to the best of your recollection, are the numbers you used?
A. I think this was the source, yes.
Q. And you said the acceptance rates that you came up with in the '91 ACR which were 400, 600, 900, 900 on forward, satisfy on an aggregate these needs starting in 1998?
A. Um-hm. Pretty close, yes. Yeah. There is a couple of years when it went a little over 900, some years went under 900, but nominal.
Q. And when you say in the aggregate, explain again what you mean.
A. What I meant was that if you take all the reactors, all the utilities who claim they had reactors that were going to need additional storage capacity beyond what their pools could handle, for example, in 1998, and you add up all that capacity requirement, it was 362 metric tons.
Q. Would the oldest fuel first allocation of acceptance rights satisfy these needs with the rates that you came up with in the 1991 ACR?



A. The concept of oldest fuel first did not have anything to do with developing this rate.
It had that's how you allocate this rate.
Once you have established what your rate is, then you do an allocation based on the age of the fuel.
That did not enter into this.
Q. When you say it didn't enter into it, I guess maybe my question was poorly worded.
One of the, one of the goals or one of the purposes that I thought you said was that the rates you had chosen would allow, would be such that no reactor --
A. Would have to add additional storage in the aggregate.
Q. In the aggregate?
A. Um-hm.
Q. If the acceptance rate, if the acceptance slots were not allocated to those utilities with storage needs, you would have a disconnect there?
A. No. As we said, it was an equity issue. It was if the utilities, we would



provide that amount of storage capacity, we, the DOE, and if some utilities had a need and others didn't have a need, they could work that out as an internal equity issue.
They had DCSs. They could exchange them or do whatever.
Q. Was it your expectation when you came up with the 1991 ACR that that is in fact what would happen to prevent any utility from having to build that reactor storage?
A. No, I did not anticipate that would happen honestly, but it was the, about the only thing we could come up with that looked feasible and a facility that could get started at that point in time where it could do something for the utilities, and the utilities had recognized that any, most of these issues, whether it be emergencies, whether it be shutdown reactors, whether it be whatever issue, was really equity.
They could choose to redistribute that capacity once it has been allocated.
Q. Is it fair to say that without a reallocation --
A. You would need more capacity.
Q. You would need more capacity?



A. Absolutely. If that's where you were going, that's the answer, because without a reallocation, you would have certain utilities that are running out of storage in a given year, others that are not.
You're just not going to -- some of those utilities that are running out of storage did not have allocations in those years, and some utilities that were, that weren't running out of storage did have allocations.
That's just the way the system works. Some were smarter planners, had bigger pools. Some didn't.
Q. When you said they were smarter planners, weren't the pools designed in a much earlier time?
A. On some reactors; the older reactors, yeah, and they were designed to hold initially what, 180 days of fuel, to cool it long enough to send it off to reprocessing, and that didn't happen.
They had to re-rack, so maybe they had more than that. Maybe they had a year, two years worth of storage.
When the later reactors were being

(There was a pause in the proceedings.)

BY MR. MACDONALD:

Q. I'm now handing you the December 1990 without the appendix, so I don't think I have any questions about the appendix.

A. The 1990? I thought you were, the last one you gave me was the '91?

Q. I was. I'm jumbling my documents up. I apologize.

A. Okay. Page 5 you said?

Q. Yes. For the record, you're now looking at the Annual Capacity Report dated December 1991, is that correct?

A. That's correct.

Q. Page 5 reflects the 400, 600, 900 rates that you developed, correct?

A. That's correct.

Q. At the time you developed these rates, you thought that this was achievable under the existing law, is that correct?

A. I thought that it satisfied the existing law.

Whether or not somebody can go out and get this thing built or not was going to be a



function of whether Congress would let them do it and things like this, but if you abide by the existing law, this was how you would have to, this is a way to divide it up.

Q. Did you think this was achievable?

A. That was not my goal. I think it's achievable today if Congress would say go do it, but yes, it's achievable if Congress would let DOE do it.

Q. In your view, did it require changes in the Nuclear Waste Policy Act or the '87 amendments --

A. No.

Q. To achieve this?

A. No. This was to reflect what the '87 amendments had in it, which was this 12 years between the two facilities.

Q. And that is the capacity limit that we have talked about before?

A. Ten thousand tons, yes.

Q. Would you turn to page 4 of the document, please?

And the middle paragraph, would you read for the record the last sentence beginning if the current linkages?



A. If the current linkages between the MRS facility construction and the repository construction authorization are maintained, it is estimated that commencement of facility operations and initial acceptance of spent fuel by DOE could not start until at least 2007.

Q. What does that sentence mean to you?

A. Well, it means that the way the law reads, there's certain linkages in there.

If you go by certain dates, it may not be achievable to do the '98.

Q. And do you know what those certain linkages are?

A. I know that they exist, I would have to go back and read the law to see what they are.

Q. Do you agree with this statement that if the current linkages are maintained, the facility operations could not start until at least 2007?

A. I would have to say that it is probably correct because that's what we wrote in there, and nobody is saying anything differently.

I can't say right now whether I agree



with it unless I go back and read the law.

Q. You have no reason, you have no reason to disagree with it?

A. I have no reason to disagree with it. That's a very good possibility that this, take these linkages specific, that may be the case, which says that my earlier statement of how the linkages worked to get the '98 was not true.

Q. And if this statement is correct, it would not be possible to satisfy the 400, 600, 900 rate starting in 1998 that appears on page 5?

A. If this statement is correct, that is true, but the assumptions that people in the trenches were making at that time was they were still hoping to make a '98 date, and they were still hoping to get Congress to do something to do it, but this looks like if you, like what it's saying here is if you follow the letter of the law, there may be some prohibitions of doing that unless they could get the repository licensed sooner, and then, then you can, so this just makes certain assumptions here.

Q. Based on this statement, does it appear that it was, that anyone at DOE or at

Battelle where you were working thought that it could?

A. I was not at Battelle at this time.

Q. I apologize. Where were you in --

A. I was, well, I was, I was with TRW, the subcontract on the TRW at this time in '91.

Wait. When did this get published? Oh, this one -- December of '91. Yeah. I was with TRW starting in February of '91, but it doesn't matter.

This is a DOE document. It comes out, and it makes this statement, and I'm fairly confident that the statement was read over many times by many people before it got published.

Following the letter of the law, based on their current, probably had some charts laid out there getting from here to there, they may have concluded they were going to have a hard time getting anything moving that, as quickly as '98 unless they could get Congress to relieve them of some of these, some limitations somewhere.

That's the way it reads.

Q. Without some change in the law?

A. Yeah.



Q. Are you aware or are you familiar with the report of the Monitored Retrievable Storage Review Commission dated November 1, 1989?

A. Just one moment. Excuse me just a minute.

Q. Certainly.

A. Okay. This makes the statement, yes, that these do not reflect the linkages, that they -- okay. Yeah.

What was your question?

Q. Whether you are familiar with the report of the Monitored Retrievable Storage Review Commission that came out?

A. Some parts of it; was that Dr. Dale Klein, and was he on that commission?

Q. Dr. Dale Klein, Dr. Frank Parker.

A. Parker, yeah.

Q. And a Mr. Alex Radin.

A. Radin, yeah; I know Klein and Parker, yeah.

Q. Sitting here today, you have no at least --

A. I can't remember what, what their finding was.

Q. I'm going to hand you a copy of this



report of the Monitored Retrievable Storage Review Commission dated November 1, 1989.

It's titled nuclear waste, colon, is there a need for federal interim storage, question mark.

The Bates number is PNL dash 173 dash 1825.

A. Okay.

Q. I'm handing you the Executive Summary. It's a relatively thick document, so you can take a minute to look it over if you would.

(The witness reviewed the document.)

THE WITNESS: Okay.

BY MR. MACDONALD:

Q. If you would turn to the second page of the Executive Summary, and look at the second column, and read for me midway through that second column the paragraph with where, the sentence starting with however?

A. However, the schedule linkage presently in the NWPAA, paren, MRS construction, may not begin until Nuclear Regulatory Commission issues a license for construction of repository, paren, would make it impossible for the MRS to be operational more than three years



before the repository.

Q. Does that refresh your recollection as to the linkage in the 1987 amendments to the Nuclear Waste Policy Act?

A. Like I said, this is starting to come back.

Yeah, when I saw this and saw the statements that the linkage puts things in there because that further makes the statement that it does not abide by the linkage in here. Just assumes they can get something going, because one of the things I think the commission recommended was, you know, maybe got to get rid of those linkages. Otherwise we can't do anything.

Q. So without a change in the law, the system or the rates set forward in the '91 ACR were unauthorized to begin in 1998?

A. Don't know if they were unauthorized. I don't necessarily agree with that term.

Q. Would they comply with the 1987 amendments to the Nuclear Waste Policy Act?

A. If DOE, if Congress let DOE go take the fuel and stick it in some of their federal facilities, yes, it would, and that was a small

of privilege documents that we're contesting.

MR. MILLER: You know, in that case, I don't know a thing about those issues, so I can't speak to that.

(Whereupon, at 5:39 p.m., the taking of the instant deposition ceased.)

---------------------------

BILLY M. COLE

SUBSCRIBED AND SWORN to before me this----------

day of-------------------------------, 20------.

---------------------------

NOTARY PUBLIC

My commission expires:



CERTIFICATE OF NOTARY PUBLIC

I, Catherine S. Boyd, the Notary Public before whom the proceeding occurred, pages 245 through 505, do hereby certify that the witness was duly sworn, that the testimony of said witness was taken by me and thereafter reduced to this typewritten transcript under my supervision, that said transcript is a true record of the testimony given by said witness, that I am neither counsel for, related to, nor employed by any of the parties to this proceeding, and further, that I am not a relative or an employee of any attorney or counsel employed by the parties thereto, or financially or otherwise interested in the outcome of the proceeding, or any action involved therewith.

Witness my signature and seal:

CATHERINE S. BOYD
Notary Public in and for
The Commonwealth of Virginia

My commission expires:
February 28, 2006

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

\- - - - - - - - - - - - - - - - - - - - - - - -x
YANKEE ATOMIC ELECTRIC COMPANY, :
(98-126C) (Merow, S.J.) :
CONNECTICUT YANKEE ATOMIC POWER COMPANY, :
(98-154C) (Merow, S.J.) :
MAINE YANKEE ATOMIC POWER COMPANY, :
(98-474C) (Merow, S. J.) :
Plaintiffs, : Discovery
: Judge
v. : (Judge
: Sypolt)
THE UNITED STATES, :
Defendant. :
\- - - - - - - - - - - - - - - - - - - - - - - -x

VOLUME I
Pages 1 - 228

Deposition of BILLY M. COLE, held at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Ninth Floor, Washington, D.C., commencing at 10:30 a.m., Tuesday, June 4, 2002, before Heidi L. Jeffreys, RDR, CRR, Notary Public.



A P P E A R A N C E S O F C O U N S E L:
ON BEHALF OF PLAINTIFFS:

FOR YANKEE ATOMIC ELECTRIC POWER COMPANY, CONNECTIC YANKEE ATOMIC POWER COMPANY, AND MAINE YANKEE ATOM POWER COMPANY:

SPRIGGS & HOLLINGSWORTH
BY: JERRY STOUCK, ESQUIRE
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5389

ON BEHALF OF THE DEFENDANTS:
FOR THE UNITED STATES:

U.S. DEPARTMENT OF JUSTICE
BY: HEIDE L. HERRMANN, ESQUIRE
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0290



I N D E X

WITNESS


| ON BEHALF OF THE PLAINTIFFS: | Examination by: | Page |
|---|---|---|
| B. M. Cole | Mr. Stouck | 5 |


EXHIBITS


| No. | Description | Page |
|---|---|---|
| 8 | Defendant's witness list | 20 |
| 9 | Deposition transcript | 24 |
| 10 | Memo (Coles to McKee and Wegeng) | 37 |
| 11 | Letter dated 4-11-83 | 112 |
| 12 | CSFM program document | 116 |
| 13 | Article | 118 |
| 14 | Article | 126 |
| 15 | Letter dated 12-15-86 | 129 |
| 16 | Contract | 136 |
| 17 | Letter dated 12-30-86 | 140 |
| 18 | Letter dated 2-8-87 | 151 |
| 19 | Letter dated 3-5-87 | 151 |
| 20 | Memo dated 6-5-87 | 157 |
| 21 | Letter dated 12-22-87 | 169 |
| 22 | Memo dated 10-5-90 | 174 |
| 23 | '89 ACR draft | 174 |
| 24 | Memo dated 8-14-91 | 182 |
| 25 | Letter dated 3-13-97 | 195 |




EXHIBITS (Continuing)


| No. | Description | Page |
|---|---|---|
| 26 | Memo dated 4-22-91 | 200 |
| 27 | Memo dated 6-28-91 | 200 |
| 28 | Memo dated 6-18-92 | 202 |
| 29 | Memo dated 6-29-92 | 205 |
| 30 | Letter dated 12-29-92 | 216 |

BILLY M. COLE, called as a witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. STOUCK:

Q. Good morning, Mr. Cole. We've met briefly before we went on the record. I'm Jerry Stouck. I'm a lawyer. I represent three utility companies in this litigation, Yankee Atomic Electric, Connecticut Atomic Power Company, and Maine Yankee Atomic Power Company.

I'm aware that you were previously deposed for several days in another phase of this litigation, and I'm familiar with that testimony, and I will ask you some questions, just some follow-up questions, about some of the things you said then.

My first question, though, is have you done anything subsequent to the last deposition to prepare for today's deposition?

A. Nothing.

Q. Okay. Prior to the last deposition did you do anything different to prepare for today's deposition? For instance, today's deposition is in the three cases I mentioned.

A. I didn't do anything to prepare for either, because I didn't really know what to prepare. This is,



ask me questions, and if I remember it, I'll tell you what I remember.

Q. When you say you did nothing to prepare for either, you've not met with Department of Justice lawyers?

A. Yes, I did.

Q. You did?

A. Uh-huh.

Q. Prior to the last deposition?

A. Prior to the last deposition, but it was nothing -- I didn't do anything to prepare. They asked me a bunch of the same questions that people from Shaw Pittman asked me.

Q. Right. But you're not represented by the Department of Justice?

A. I am not represented by anyone.

Q. Okay. And when did the meetings with the Department of Justice occur; do you recall?

A. Phew! It was probably two or three weeks before the deposition; maybe four weeks. I don't remember exactly. I think it lasted half a day, three-quarters of a day -- half a day, probably.

And then there was another telephone conference that lasted a couple of hours the day before or two days before --



Q. Okay.

A. -- the deposition.

Q. Was there anyone at the meeting or on the phone call other than Department of Justice lawyers?

A. No.

Q. Nobody from the Department of Energy?

A. No one from the Department of Energy.

Q. Okay. Did the Department of Justice lawyers during either of those sessions, the meeting or the call, explain to you any of the positions, legal positions, they're taking in this litigation?

A. No.

Q. Okay.

A. I mean, I know what their position is. I worked on the program for -- since its inception, so I know what the positions are.

Q. Okay. What do you mean by that? You know what the positions are --

A. Well, I know the positions -- I know basically what both sides are -- what their position is. I mean, the Department of Energy says it doesn't really have an obligation, and the utilities say, yeah, you do. I mean, that's the bottom line, so...

Q. That's one bottom line, I guess you could call it.



A. Yeah.

Q. What about -- what's your understanding of the government's position on acceptance rates?

MS. HERRMANN: Objection; foundation.

THE WITNESS: My position on their --

BY MR. STOUCK:

Q. No, your understanding of their position on acceptance rates, if you have one.

A. I guess I don't know how to couch it in terms of their position on acceptance rates. The acceptance rates were established in this program in the beginning based on some hypothetical estimates of how big the repository program is going to be, what looked like a reasonable rate to accept fuel. It wasn't a lot of bases for it in those early days.

You have to recognize this program didn't start with the passage of the Nuclear Waste Policy Act on January 7th, 1983. It had been ongoing for quite a few years.

The whole purpose of this was after President Carter stopped reprocessing the utilities started being concerned with their spent fuel pools becoming constipated; they would have nowhere to put the stuff since they were no longer reprocessing. So, the government said, "We'll help you, we'll pass a law, but

can't remember. Things look -- I agree with you, things look disjointed here.
Q. Okay.
A. Oh, I think we were talking about the total system life cycle costs and this 400, 600 and 900, and I was trying to make a point that really didn't have a heck of a lot to do with the total system life cycle cost.
The total system is over a period of many, many years and billions of dollars, and this gets lost in the noise, this initial rate.
Q. Well -- right. Well, the 4-6-9 is not relevant to the total system life cycle cost, is it?
A. Well, I can't remember if when they did the TSLCC whether they used the -- what they used. I don't remember. But even if they used it, it's only for the first few years, and then you had the facility start operating. The last TSLCC makes the assumption, I think, that the system doesn't start until 2010. They have 4-6-9, and it builds up quick, and when it's all done it's $42 billion, and you close the doors.
Q. Right. Going back to the 4-6-9, though, did 900 -- I thought you just indicated that 900 would not have been the rate for in perpetuity.
A. No, that's correct, it's not.



Q. Under the '91 ACR rates that you developed, as you previously testified, when would the 900 rate end or change?
A. Twelve years later, when the repository started operating, back then.
Q. Then what would it be?
A. I don't know what -- because I was only looking at that ten-year period.
Q. But the rate would have gone up?
A. Yes, it would have gone up --
Q. Reflecting that the 4-6-9 was tied to the MRS?
A. To the MRS, that's correct.
Now, in the 2010 concept I don't know. It may be 4-6-9-12. You know, it may go up pretty fast.
Q. Well, there's no MRS today.
A. I know.
Q. So, maybe it would start higher than 4.
A. Or lower?
Q. I don't know.
A. I don't know, either, but it's all hypothetical, anyway. It doesn't matter. There isn't an MRS, and, so...
Q. Anyway, you can't interpret any better than I can this passage on 280?



A. TSLCC, the impact of the 4-6-9 on that. And I was trying to make the point that it was irrelevant to that. It didn't matter what the rate was in the first few years in the overall cost of the program.
Q. What is the '91 ACR rate relevant to?
A. In '91 it did make a difference. Today it doesn't.
Q. So, in '91 the 4-6-9 rate was relevant to the then-current TSLCC?
A. Yeah, as far as I know.
Q. I see. Okay.
A. I did not develop the TSLCC in '91. I don't know. I'm assuming they used that rate for the first 12 years and assumed a repository operating, and then you'd come in with probably 12-2-3 or something like that.
Q. Okay. Let's go off for just a second.
(There was a discussion off the record.)
BY MR. STOUCK:
Q. Now, my next question is on page -- hold on.
451, I believe. You say in the middle of page 451, starting on line 16, "The DCS process and approval system was so simple that I can't even imagine



we're discussing it."
Do you see that?
A. Uh-huh.
Q. And I guess --
A. But --
Q. Well --
A. It's --
Q. Yeah, take a look at that.
A. Is that me making that statement?
Q. I think so, "The Witness:"
A. Why does it say, "By Mr. MacDonald"?
Q. No, no. On line 16 it says, "The Witness:" -- that's you -- "The DCS process" --
A. Okay.
Q. Well, I mean, does that not -- do you want to amend that or change it or --
A. No, I'm just confused. Who is MacDonald?
Q. MacDonald is one of the lawyers. I think Devin Hewitt started off asking questions, but then at the end other lawyers got a chance to ask. I think this is Tim MacDonald.
I'm just -- can you just explain to me why it is it was so simple that you couldn't even imagine -- I mean, what was so simple about the approval process? Why did you make that statement?

since DOE came up with new program plans and things saying, we've got new start dates, and they're saying this is supposed to be 63 months prior to delivery, what's the use of submitting it now?
The other alternative is DOE might have said, you may as well stop submitting it, because it's premature.
Q. This letter doesn't indicate who --
A. It does not.
Q. At least this letter indicates that DOE was not able to approve it, for whatever unspecified reason.
A. It didn't say why, yes. It may have been that there was an error in them. I don't know.
Q. Who would know more about that, do you think?
A. In '97? You'll have to talk to Dave Zabransky, because when he took this over he had a couple of people working for him at that point, and they took over DCS process back from the contract. TRW took it back to DOE, and, so, I don't know what --
Q. Let's assume that the Yucca Mountain Senate vote is negative; in other words, no override of a Nevada veto, okay?
A. Uh-huh.
Q. And let's assume that no disposal -- well,



just assume that -- no, let's assume no disposal facility is ever licensed, for whatever reason.
A. Okay.
Q. Maybe they get through the Senate but something else happens.
A. Okay.
Q. And no further delivery commitment schedules are ever submitted.
A. Okay.
Q. The program freezes.
Do you have any understanding in that circumstance -- let me ask this:
Do you have any opinion in that circumstance about whether DOE would still be obligated to accept this?
MS. HERRMANN: Let's get a big old speculation objection, and it calls for a legal conclusion.
THE WITNESS: Your statement -- let me see if I can rephrase it correctly -- is that they decide to shut down all the operations out at Yucca Mountain, do nothing --
BY MR. STOUCK:
Q. For whatever reasons.
A. I don't care what the reasons are, but it's



just all shut down.
Q. Yeah.
A. Then, in my opinion, they ought to give the money back to the utilities and the utilities are stuck.
Q. Okay. I guess what I'm really trying to get at is your own understanding of this relationship in light of -- the relationship between the DCSs and the obligation, because I think -- I think you said that, you know, it's a step along the way, it's something that sort of needs to be done to make the process work, but I'm trying to find out if that's the same thing as saying it defines the obligation. In your mind, I'm talking about.
A. In my own mind, it's just a piece of the process, but the process has to -- has a starting spot and then an ending spot. And this process has been interrupted for a lot of reasons, so it has to restart. So, anything that had been done prior, in my opinion, in my own opinion, is null and void. The DCSs that were submitted to me, they are worthless. They should be redone because we don't have a 1998 date anymore. They were based on 63 months prior to acceptance, acceptance beginning on January 31st, '98. That didn't happen.
When we get a new date that somebody can carve in stone and get a little more confidence in, then



you start the process again, 63 months prior to. If at that point in time everybody feels 63 months prior to is enough time to -- is enough lead time -- and that's all it was for before, give me five years lead time to figure out that I can be there and pick it up.
Right now it should all be thrown in the trash. It's worthless.
Q. Because it was based on assumptions that are no longer valid?
A. It's based on a program plan that's no longer valid.
Q. Okay.
MR. STOUCK: Why don't you mark these as 26 and 27, please.
(The documents were marked as requested.)
BY MR. STOUCK:
Q. Mr. Cole, Exhibits 26 and 27 are memos from -- I think they're both from Mr. McDuffy and Mr. Vance to Mr. Brownstein and Mr. Langstaff, one dated April 22, 1991, and the other dated June 28, 1991, and these are comments on -- well, let's take one at a time.
Exhibit 26 just says that it's comments on the EEI/UWASTE, U-W-A-S-T-E, preliminary discussion papers on 11 issues under review. These are 11 of the ACR resolution process issues, and my question is simply

# DREYFUS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - X
YANKEE ATOMIC ELECTRIC :
COMPANY, :
Plaintiff, :
v. : No. 98-126C
THE UNITED STATES, : (Senior Judge Merow)
Defendant. :
- - - - - - - - - - - - - - X

Washington, D.C.
Wednesday, May 15, 2002

Deposition of DANIEL A. DREYFUS, a witness herein, called for examination by counsel for Plaintiff in the above-entitled matter, pursuant to agreement, the witness being duly sworn by JAN A. WILLIAMS, a Notary Public in and for the District of Columbia, taken at the offices of Spriggs & Hollingsworth, 1350 I Street, N.W., Washington, D.C., 20005-3305, at 9:30 a.m., Wednesday, May 15, 2002, and the proceedings being taken down by Stenotype by JAN A. WILLIAMS, RPR, and transcribed under her direction.



APPEARANCES:

On behalf of the Plaintiff:
ROBERT L. SHAPIRO, ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
202-898-5879

On behalf of the Defendant:
RUSSELL A. SHULTIS, ESQ.
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
Federal Claims Section
1100 L Street, N.W.
Washington, D.C. 20530
202-305-7561



C O N T E N T S


| WITNESS | EXAMINATION BY COUNSEL FOR |
|---|---|
| DANIEL A. DREYFUS | PLAINTIFF |
| By Mr. Shapiro | |

Afternoon Session - Page ^


E X H I B I T S


| DREYFUS EXHIBIT NO. | PAGE NO. |
|---|---|
| 1 - Memo dated 7/8/93 | 25 |
| 2 - Testimony of Daniel A. Dreyfus before the Senate Committee on Energy and Natural Resources, September 22, 1993 | 53 |
| 3 - Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program | 63 |
| 4 - Memo dated 12/6/93 | 69 |
| 5 - Memo with attachment | 80 |
| 6 - Department of Energy Notice of Inquiry | 85 |
| 7 - Notice of Inquiry on Waste Acceptance Issues | 87 |
| 8 - DOE Notice | 91 |
| 9 - Statement for the Record by Daniel A. Dreyfus dated 6/9/95 | 111 |
| 10 - DOE 1994 Annual Report to Congress | 119 |
| 11 - Letter dated 4/25/94 with attachment | 124 |




E X H I B I T S (Continued)


| DREYFUS EXHIBIT NO. | PAGE NO. |
|---|---|
| 12 - Letter dated 6/15/84 with attachments | 135 |
| 13 - 1992 Annual Capacity Report | 140 |
| 14 - Letter dated 9/28/95 | 147 |
| 15 - Letter dated 5/26/94 | 159 |
| 16 - Letter dated 12/20/94 | 163 |
| 17 - Memo dated 3/27/95 with attachments | 178 |

P R O C E E D I N G S
Whereupon,
DANIEL A. DREYFUS,
was called as a witness by counsel for Plaintiff, and having been duly sworn by the Notary Public, was examined and testified as follows:
EXAMINATION BY COUNSEL
FOR PLAINTIFF
BY MR. SHAPIRO:
Q. Would you state your name for the record, please.
A. Daniel A. Dreyfus.
Q. Dr. Dreyfus, have you ever had your deposition taken before?
A. I'm not sure. Not recently.
Q. Well, your attorney has probably gone over the procedure with you, but let me just mention it briefly on the record. I'll be asking you a series of questions. We have a court reporter who is taking down your answers. I just ask that you answer truthfully.
And certainly, if you don't understand a question, you don't hear it, whatever, just ask me to clarify and I'll do that. There's no point in trying to answer a question if you don't understand what the



question is. It's just that simple.
If you want to take a break at any point, just let us know, we'll stop, really it's a pretty informal proceeding. Do you have any questions about what we're doing today?
A. No, I think I understand.
Q. Have you done anything to prepare for your deposition today?
A. No, not really.
Q. You didn't review any documents?
A. I have not reviewed any documents.
Q. You're represented by the Department of Justice counsel?
A. Department of Justice.
Q. When did you decide to be represented by the Department of Justice for this matter?
A. When I was first notified that I was on the list of potential people to be called for deposition. And I couldn't -- recently, but I'm not sure exactly when.
Q. And, in this past month or two, have you talked about your possible deposition with anybody other than government counsel?
A. No.
Q. Let me ask what you understand what the



current case is about, do you have any understanding of what the current case is, what the cases are about that you're being deposed for?
A. Well, I have a general understanding of the cases, but I am not currently informed about the status of the case.
Q. What's your general understanding of what the case is about?
A. Well, when I was director, the original actions were probably initiated, at that time there were a number of cases. I understand that they have been consolidated, but I couldn't tell you the parties to the various consolidations.
And the last that I recall knowing is that fundamentally there are two cases active now of which this is one that is before the court of claims I believe. That's about it, no specifics about contentions or positions.
Q. We'll get into a little bit of the details later on, I just want to get a sense of where we are on that. Why don't we start just with a sense of what your background is, how you got to be director. We'll move through the stages of that pretty quickly, but just to get a bio perhaps starting with where you went to college, that kind of thing. Can you tell me



your educational background?
A. You want a 71-year bio. I'm an engineer by training. I have two engineering degrees and a Ph.D. in political science. I have held a number of engineering positions.
My first government job I was a machine gunner in Korea. I worked for the department of -- well, I started out working for Texaco as a construction engineer. Then I went to Alaska where I was a remote site planning engineer for the Corps of Engineers.
I worked for the Department of the Interior. I worked on Capitol Hill for about 12 years. My last position there was staff director of what had become the Senate Energy Committee while I was there.
It was originally the Senate Committee on Interior and Insular Affairs. And then the Senate reorganized in the 1970s and it became the Energy Committee. I was professional staff member there and ultimately the staff director of the Senate Energy Committee.
I left the government for ten or 12 years, worked in the natural gas industry, a research position for the Gas Research Institute. And I was

appointed to -- well, I went back into the Department of Energy initially as a special assistant to the Secretary. And that was in 1993, in February.

Q. You mean '83 probably, 1983 or '93?

A. The first Clinton Administration. I got there in February. And I served as a noncareer -- NCS as special assistant to the Secretary until about October of that year, when I was confirmed -- when the nomination was sent up and I was confirmed by the Senate.

And I left there in January of '97, the end of the first term, when the Secretary left, Hazel O'Leary. And I left at that point. I worked for the Smithsonian Institution for a few years, the Museum of Natural History, I was associate director for operations, and then I retired.

Q. I'll just ask about a couple of the highlights there. You worked for the Senate Energy Committee. Can I get a sense of time frame, when were those 12 years roughly?

A. They ended about -- well, they were in the 1970s. I went there about '68 and I left there about '80. I was not there when the act was passed in '82, I was gone before that.

Q. You're referring to the Nuclear Waste



Policy Act?

A. That's correct.

Q. During your tenure working for the Senate Energy Committee and its predecessors, did you ever work with any issues dealing with nuclear waste?

A. I was staff director, I essentially worked on everything that was before the committee. There were things before the committee. There was no organization -- the Office of Civilian Radioactive Waste did not exist.

There were things going on, but there were -- things like the Clinch River breeder reactor issues, early discussions about what the options were for long-term disposal. Those sorts of things were before the committee in the late seventies.

Q. What sorts of early discussions was the committee engaged in regarding the ultimate disposal of nuclear waste?

A. At that time there were scientific activities going on, a variety of academic studies and that sort of thing considering everything, deep seabed disposal, long-term monitoring storage, geologic storage, space shots, it was pretty broad gauged, and for the most part academic studies and reports.



Q. Did anything rise to the level of being proposed as a bill in Congress that you worked on?

A. My recollection is that there were formative pieces of legislation. None of them came to the point of imminent action in both houses or anything like that.

Q. What was your personal role in working on any of these preliminary proposals for dealing with nuclear waste?

A. Basically a management role of legislation, scheduling, preparation scheduling, review of papers.

Q. Since there wasn't much legislation at that early stage, there wasn't much of a role that you had it sounds like in dealing with nuclear waste issues?

A. No.

Q. And, when you worked for the Natural Gas Institute, did you have any involvement at all with the nuclear industry?

A. I did -- I was -- I'm trying to remember. Vice president for planning essentially, I can't remember the specific title. And I did energy projections, I presided over an economic group that did energy projections.



And, of course, since natural gas is associated with electricity, it was that kind of thing, awareness and looking at potential projections of generation, that sort of thing.

Q. If I heard correctly, you said that, when you went into the Department of Energy in 1993, you referred to it as going back into the Department of Energy?

A. No, I went back to the government. But not -- I had no previous involvement with the Department of Energy.

Q. I'm sorry, I might have misunderstood. It's helpful if you wait until I finish asking a question until you begin your answer. That way the court reporter can get a clear record.

How did you come to become Secretary O'Leary's special assistant?

A. Well, I'm not sure I can -- I'm not sure I know. I at the time had been in Washington for a long time. I had a lot of acquaintances on Capitol Hill. I had known Secretary O'Leary professionally when she was in the department or its predecessor organizations at an earlier time.

And several people thought I should be back in the government. And I at that point in my

13

career thought it might be a good idea too. So I was asked and I went. And initially she had just come in and the special assistant position was -- it was staffing a new administration basically. And she had a position in her office and I agreed to take it.

Q. Had you been active in the Clinton campaign?

A. No.

Q. You said you knew Secretary O'Leary previously. How did you know her?

A. She had several appointed positions in the Carter Administration and worked on the Senate committee when I was on the committee staff.

Q. You said you served in the role of special assistant from roughly February to October of 1993. What did you do as special assistant to the Secretary?

A. That was early in the administration. And the department was staffing up. I did whatever needed to be done that morning. It was very general scope job in her office.

Q. How was her office staffed, how many special assistants were there?

A. At that time? I think, for a period of time, I was the only one. Then people came on as

14

they were selected. It was quite a period of time before all of the appointed positions were filled. And, you know, as folks were selected, they showed up. But there were not very many each at the end.

Q. Did you have a particular series of parts of the department for which you were responsible as special assistant as opposed to other parts that some --

A. Not at the beginning. As people came on, assignments sort of congealed and that sort of thing and we began to -- we began to develop a portfolio.

Q. When did you first start to work on matters pertaining to the Office of Civilian Radioactive Waste Management?

A. Well, in a role as a member of the Secretary's office, probably from the outset as they showed up at that level.

Q. Is it all right, for perhaps ease of speaking if nothing else, if we refer to the Office of Civilian Radioactive Waste management as RW?

A. That's all right with me.

Q. Are you familiar with the abbreviation RW?

A. It's my designation for four years, RW, I'm familiar with it, yes.

Q. You state you started working on RW

15

matters almost from the beginning when you became --

A. I worked with those matters that were salient at the time. So, to the extent that they came to the Secretary's office for -- and required staffing, probably, yes.

Q. What sorts of matters did you work on when you were special assistant to the Secretary dealing with RW?

A. I couldn't say. I mean it's been nearly ten years. A sequence of things I worked on on that issue. I couldn't sort out between October and November.

Q. How did you come to be director of RW?

A. I was appointed by the President presumably at the Secretary's desire or certainly acquiescence.

Q. Did you ask for that position?

A. I was interested in it, yes.

Q. Why were you interested in the position?

A. It seemed at the time to be a significant matter. It was -- the program at that point was very much in a situation where management engineering were relevant.

Q. Are you familiar with a term called the plum book?

16

A. Yes, I know what that is.

Q. What's your understanding of what the plum book is?

A. Well, it's a list of what are supposed to be desirable positions in government. I don't think that position was one of them.

Q. Are you familiar with a term called the prune book?

A. Yes, I am.

Q. What's your understanding of what the prune book is?

A. The opposite, those positions which are there but not necessarily desirable.

Q. Did you understand that the position of director of RW was one of the positions in the prune book?

A. Yes.

Q. Yet you were still interested in becoming director?

A. I've done things like that before. Not since.

Q. You viewed it as a worthwhile challenge?

A. I volunteered to go to Korea as well.

Q. Did you view RW as needing particular help, is that part of your interest in becoming

was the essence of the thing. And I tried to do that.

Q. So, if I understand correctly, it was your view as director that the best way to expedite acceptance of spent fuel and to do it efficiently was to get the Yucca Mountain decision made one way or the other?

MR. SHULTIS: Objection, mischaracterizes prior testimony.

THE WITNESS: I think that focuses the thing a little bit more than the complexity of that situation would provide. But it is the fact that the program at that time did not have authority for interim storage. And the interim storage under the law at that time hinged upon a recommendation of the repository. So the repository was central to any other options that I could perceive as director.

MR. SHAPIRO: Is this a good time for a break.

(Recess.)

(Dreyfus Exhibit No. 2 was marked for identification.)

BY MR. SHAPIRO:

Q. Dr. Dreyfus, I have handed you what we've marked for purposes of identification as Dreyfus 2.



Do you recognize this document?

A. No. What is it? I mean I understand what the title says and I see annual report to Congress below, but I don't know where it came from.

Q. I'll represent to you that this came from a compilation that was part of RW's annual report to Congress. And the particular part, what I've handed to you, was titled Testimony of Daniel A. Dreyfus before the Senate Committee of Energy and Natural Resources, September 22, 1993. And it appears to be prepared testimony that you gave to the Senate committee as it was considering your nomination to become director of RW. Does that refresh your recollection as to what's in this document?

A. Okay. I have read enough of it now. It is I think my prepared statement from my confirmation hearing which I gather was included as an appendix to the annual report to Congress that was sent up at some later date. So yes, I guess I know what it is.

Q. I want to point your attention -- I mean feel free to refer to any part of the two pages that you would like. I'm going to point your attention to a particular section on the second page of this two-page exhibit, the back page of it, Dreyfus 2.

Do you see there are columns, and I'm



looking at the bottom of the first column, where it says, to improve the existing program, at least two considerations should be addressed quickly. The expectation has been that beginning in 1998 the spent fuel at nuclear power plant sites would begin to be accepted by the federal government and removed to a federally operated facility. Do you recall that testimony?

A. Oh, yes.

Q. I want to focus back on the words the expectation has been that beginning in 1998 the federal government would start removing the spent fuel. What was your understanding of what that expectation was?

A. At the time that I did this, my understanding was that the act provided for the Secretary to take -- begin taking -- accepting fuel in '98. That was a provision of the act. And I understood that very well.

The circumstances on this date which was 1993 was that -- and that was the circumstances, that there were a number of important investment decisions pending in utilities and in utility commissions having to do with on-site storage investments that needed to be made.



And the outlook for the federal government to take acceptance was becoming a rather significant question in those proceedings. That was what this alludes to. I think I did earlier this morning mention that.

Q. Now, the expectation that the federal government would start removing spent fuel from utilities in 1998, regarding that expectation, did you have any understanding of how fast the government was expected to start taking spent fuel from utilities in 1998?

MR. SHULTIS: Objection, calls for a legal conclusion. Mr. Dreyfus is not a 30(b)(6) witness.

THE WITNESS: Did I have any understanding of it?

BY MR. SHAPIRO:

Q. Yes.

A. By the time that I prepared this statement, I was aware of the technical aspects of moving waste and accepting of waste and had some sense of the pace of doing that, yes. I don't recall what the contemporary assumptions in the documents were regarding acceptance.

I know that they changed over time and were -- there were schedules and various assumptions

for fee adequacy determinations and that sort of thing. I can't recall what that was. But at the time I'm sure I had a sense of pace, yes.

Q. What was your understanding of what -- let me ask this differently.

Was it your understanding that the pace of spent fuel acceptance was a matter of technical ability of RW to accept the waste?

MR. SHULTIS: Objection, calls for a legal conclusion.

THE WITNESS: If I could make a statement about this document before us, the point of this remark here is not the pace of acceptance but the probable inability to initiate it -- of initiating waste acceptance on the date in the act.

BY MR. SHAPIRO:

Q. You're referring to some meaningful amount of acceptance, though, in 1998 that utilities were concerned about?

MR. SHULTIS: Objection, vague, calls for a legal conclusion.

THE WITNESS: My concern -- this is, of course, my statement to the committee as the nominee. So my view of the situation. What I was saying here essentially is that a lot of people were out there



trying to figure out what they ought to do about on-site storage.

And there was no expression as to what we were going to do. The '98 expectation hung there without further elucidation, at least that was my feeling at the time, and that we needed clarification on that. And I was not focused on how much would be taken in the first year. That question was what was the first year.

So, while I can speak to statements of pace, it has nothing to do with this statement really. This statement was the more difficult matter that nobody had said we that we would not start in '98. And decisions were having to be made predicated on whether we would or not.

So I simply want to draw the distinction that, if you want to talk about the acceptance rate, fine. But that was not the point of this remark.

BY MR. SHAPIRO:

Q. Let me see if I can try to focus in on where I might see the connection. The focus of the remark in your testimony, Dreyfus 2, was that utilities were planning on-site dry storage or other storage of spent fuel in lieu of DOE coming to pick the fuel up, correct?



A. That's correct.

Q. And, to some extent then, how fast DOE might come to pick up the spent fuel might influence how much storage utilities might have to provide or whether they might have to provide storage at all, true?

A. Yes, that's true. But again, if you don't start at all, then the rate is sort of moot. Until you start the rate is not important. At this point there was no -- there had been no expression of when might we start as opposed to '98. That was the essence of what I thought was an important issue.

And I will not refute the fact that once you start how fast you do it is important, that's true, yes. That wasn't what I was aiming at here. We weren't at that level of abstraction, we were back from it aways.

Q. Let me just confirm then from Dreyfus 2, you understood by September of 1993 that utilities were already spending money in anticipation that DOE would not pick up -- start picking up spent fuel in 1998?

MR. SHULTIS: Objection, the document speaks for itself.

THE WITNESS: I don't know that I say for



the utilities that they were spending money in the expectation we would not pick it up. They were spending money on additional storage which most probably they would have had to spend in any event. But I don't know that.

I mean an individual reactor-by-reactor basis, I don't know whether the expenditures were -- at that particular time were because of their expectation in '98 they would not be made. What I was aware of was that there was a good deal of investment going on.

Those making it needed to have some sense of what future they were playing into. And the '98 date was no longer an operational assumption for planning purposes because at that point we were already beyond the ability to do anything by '98 in my judgment.

So that point I thought was important. And I was very conscious of the fact that big bucks were being spent based on planning outlooks without a government statement of what the planning outlook ought to be. That's the essence of those paragraphs.

BY MR. SHAPIRO:

Q. And, in September of 1993, what was your understanding as to what the planning horizon was as

to when DOE might start removing spent fuel from utility sites?
A. My understanding is probably a matter of record because I testified ad nauseam at the time. And that was a very common question, always caveated by if, in fact, the Yucca Mountain characterization proves -- leads to a recommendation.
I cannot recall what might have been the best bet on this date. I believe that planning documents that came out under my auspices suggested a beginning of fuel acceptance in about 2010 or thereabouts, but I haven't looked at those documents recently and I don't remember exactly.
And I don't remember whether that would have been the date in '93. It's the one that sticks in my mind predicated I think on licensing about now of the repository.
Q. And, given that relatively distant time horizon to start accepting spent fuel, issues such as the rate of acceptance once you start were of lesser significance to you as director then, when you were director of RW?
A. They were secondary and not -- I don't know about lesser. It depends on what particular issue is before you at the time. As a technical



matter, in planning a transportation program, they're pretty significant.
So, if that was the day you were talking about transportation, preparation for transportation campaign, then pace is not insignificant and certainly not secondary. They have an important implication on long-term expenditure rates.
So I wouldn't relegate them to I didn't think about it because I was focused on the date. But they were a longer horizon question and of importance I think to everyone secondary to the date. It's zero until you start.
Q. And, focusing on one of the examples you gave, for instance, the budget projection document, you wanted to use the most accurate projection of rate of acceptance in such a document as you could?
A. You're not talking about a budget document for annualized appropriation, you're talking about the long-term?
Q. Long-term budget of the program.
A. And specifically what? The budget profiles we provided for appropriation didn't go that far or get that detailed. But we did look at rates in the context of planning documents for transportation, acceptance at the repository,



technical questions of placement and acceptance above ground facilities at the repository, a variety of other circumstances where we looked at it, yeah.
When we did that, we anticipated trying to be realistic, the best case scenario, the best assumption as to what the pace would be.
Q. When you say best case scenario, best assumption, do you mean the fastest rate or the most accurate projection of what the rate would be?
A. Well, for a financial determination, what you would like is an internally consistent and reasonable view of the future. That would be what -- in a financial outlook, total system life cycle cost we used to call it I think, what will it cost all the way out to closure of the repository.
One seeks a reasonable and internally consistent scenario. With regard to the technical business of the transportation campaign, of course, that gets you into availability of equipment and rational use of the railroads and utilities' individual capabilities to facilitate the acceptance, all of that.
(Dreyfus Exhibit No. 3 was marked for identification.)
BY MR. SHAPIRO:



Q. Dr. Dreyfus, we have handed you what we've marked as Dreyfus 3. Just looking at the cover, do you recognize this document?
A. I know what this is, yeah.
Q. What is this document?
A. Well, this is a total system life cycle cost analysis. And this is the 1995 version.
Q. Let me represent to you also that this is an excerpt of the document. You probably remember the documents can get to be quite thick in their entirety. This is basically the introduction and summary of the document. Dreyfus 3 then is one of these total system life cycle cost studies that you just referred to?
A. Uh-huh.
Q. And what was the purpose of these studies?
A. Well, these studies had several purposes actually. They were part of a planning effort to project the budgetary requirements for the long term. They were one input into the fee sufficiency determination required by the act and a management tool to fundamentally keep track of costs past, current, and future on what the program was doing. And, of course, a basis for responding to the most frequently asked questions in reviews and

Congressional oversight and budgetary oversight and everybody else's oversight.

Q. I want to refer you, Dr. Dreyfus, to page 8 of Dreyfus 3, this excerpt of the September 1995 total system life cycle cost study, specifically to the table marked table 1-2. Do you see that table?

A. Uh-huh.

Q. What is this table supposed to represent?

MR. SHULTIS: Objection, the document speaks for itself.

THE WITNESS: The question that I'm having myself is that the title here says receipt and emplacement rate. And it doesn't say acceptance rate, it says receipt and emplacement rate. And I can no longer recall what that -- what the -- what definitional considerations there might be in that.

Let's see, this was '95. It appears to -- this appears to state the rate of receipt of fuel at the repository. So it would be the transportation rate. It is not clear in this context and the material in here. I'm used to seeing it in a different format which may be a later format.

BY MR. SHAPIRO:

Q. And the receipt rates that are noted in this table 1-2 in Dreyfus 3, those were intended to



be the best estimate of how fast RW would be receiving spent fuel?

MR. SHULTIS: Objection, calls for a legal conclusion. The document speaks for itself.

THE WITNESS: Again I don't recall the definitional aspect of this table and the underlying assumptions associated with this, because they -- the program was evolutionary. And there was some times when there were assumptions that some of this would go to an interim stop before it went to the repository.

I read the words, it says receipt and emplacement. My recollection of the later part of the program was that it was not necessarily emplaced at receipt, but it could be received at a different rate than it was emplaced. So there's a variety of things here that, out of the context of a contemporary briefing, I'm not confident on reading it right.

BY MR. SHAPIRO:

Q. Let me try to help out a little bit. Let me point you to page 1 of this document, Dreyfus 3. The second paragraph on that page, it starts out where it says numerous scenarios could have been selected for cost analysis. The scenario used in



this analysis is a one-repository system without interim storage. Does that statement help clarify what's represented here?

A. It clarifies one question, yes, that they're not talking about interim storage. Well, I would interpret that as to be the transportation rates that we used to develop this expenditure profile. And I have no reason to suppose they wouldn't be the acceptance rates at the utilities, but it doesn't say that.

But, if there's no interim storage, they would arrive at the repository at the rate they are taken from the utilities. So this would have been the rate of acceptance.

Q. And for planning purposes, for a document such as Dreyfus 3, the total system life cycle cost study, you were trying to use the most accurate projections of receipt and acceptances as you could, true?

A. A reasonable one in the context of the way you stand at the time. A reasonable outlook that's internally consistent would be what you would want.

Q. Are you aware of any other projections that RW was using at this time as to how fast it would receive or accept spent fuel from utilities?



A. Those numbers look reasonably familiar as long-range planning numbers.

Q. Just for clarification, for the record, the numbers you're referring to are the numbers at table 1-2?

A. Yes. They are numbers that look to me familiar within reason. They're not exactly the numbers that I remember. But it's a buildup rate that's roughly what I'm used to seeing in the planning documents, contemporary planning documents.

Q. You say the numbers in table 1-2 are not exactly the numbers that you recall. Do you have a specific recollection of different numbers?

A. I only seem to remember the first year being 400 rather than 300 which leads me to believe that some of the others are not the same ones I remember. But there were -- as I said this was an evolutionary program. From time to time things changed.

And these documents were not primary documents, they excerpted -- this particular document borrowed assumptions from other planning documents. I don't know what the initial origins of these numbers were or what the vintage of them were.

I seem to recall the 3,000 and later

steady state situation. I for some reason recall 400 in the first state and I don't know about the interim ones. But they're pretty much what --

Q. But it's your recollection that, when you were director of RW, the planning documents with respect to receipt of utility spent fuel had some ramp-up from the 300 or 400 MTU up to a steady state of 3,000 MTU per year?

A. Yes.

(Dreyfus Exhibit No. 4 was marked for identification.)

BY MR. SHAPIRO:

Q. Dr. Dreyfus, you've been handed what we've had marked as Dreyfus Exhibit 4. Do you recognize this document?

A. I can't say I recognize the document. I know what it is.

Q. What is it?

A. It's an options paper to the Secretary from myself dated 1993.

Q. December 6, 1993?

A. Yes.

Q. What do you mean by an options paper?

A. Well, when I read it, it states that there is an issue. And there are a list of possible



near-term policy initiatives. That's what I would call options.

Q. Why would you have sent this memo to the Secretary?

A. Well, I don't specifically recall the memo out of the several years of activity. But I would suppose it was either in response to an inquiry or as an initiative simply calling to the Secretary's attention the fact that we had an issue that we should be addressing.

And I don't recollect whether it was my initiative to bring this to the Secretary or whether I was responding to some written memo or other request for a paper like this.

Q. Down at the bottom of the first page of the memorandum, Dreyfus 4, where it says Discussion, the first issue is waste disposal contracts. Do you see that?

A. Uh-huh.

Q. And discussed in the memorandum are several options for dealing with the waste disposal contracts?

A. Uh-huh.

Q. The first of those under waste disposal contracts is the option where the department could



declare its intention to work with appropriate parties to modify the waste disposal contracts to compensate for the government's inability to start accepting waste in 1998. I know you don't recall the specific memorandum, but do you recall a consideration of that particular option?

MR. SHULTIS: Objection, calls for a legal conclusion.

THE WITNESS: These -- let me look one more time at all of them. All of these look like familiar topics of discussion at the time.

BY MR. SHAPIRO.

Q. Let me focus on this first option of giving compensation to parties related to the government's inability to begin accepting waste in 1998. What do you recall about consideration of that option?

MR. SHULTIS: Same objection.

THE WITNESS: What do I recall about it? In what context over a period of time?

BY MR. SHAPIRO:

Q. Let me ask more specifically, why were you considering compensating utilities?

MR. SHULTIS: Objection, calls for a legal conclusion.



THE WITNESS: Why did I include it in a memo of options?

BY MR. SHAPIRO:

Q. Yes.

A. Well, first of all it's an obvious possibility. And so I think on the face of it it's obvious. It's been in the context of the discussions right along. There were discussions at the time about it. And it remains I guess to this day one of the possibilities.

Q. Did you believe that utilities should be compensated on account of RW's inability to begin accepting waste in 1998?

MR. SHULTIS: Objection, calls for a legal conclusion.

THE WITNESS: Did I believe it in terms of making a determination about the authority to do it?

BY MR. SHAPIRO:

Q. Just as a policy matter, as an option, were you advocating that policy option?

MR. SHULTIS: Same objection. Also Mr. Dreyfus is not a 30(b)(6) witness.

THE WITNESS: In this memo obviously I did not choose an option. I was laying out those which I thought ought to be on the table. And did I think it

Q. When DOE was looking at this economic analysis, were you looking at the costs both to DOE as well as the costs to utilities of handling the spent fuel?

A. I'm not sure there's a distinction. Every individual reactor has its own situation with regard to where the fuel will be when it's picked up and what kind of technology it will be in. And you kind of have to look at it as -- it gets to be a pretty detailed thing.

Q. Was the department trying to minimize both utility costs and the department's costs or was the department just focused on the department's costs?

A. I'm kind of reluctant to pursue -- basically any economic analysis looks at all the costs. And there's nothing in this history that gets to that kind of a determination. In very gross terms, the advantage of that canister was the elimination of rehandling.

And some of the rehandling kind of went away because highly specialized disposal canisters weren't going to travel. So you weren't going to be able to use it for emplacement which at one time was a possibility. You weren't going to have an MRS and you weren't going to use it for temporary storage at



that MRS.

When you get down -- depending upon the scenario, you get different kinds of opportunities to multipurpose something. If you can't multipurpose, you don't need a multipurpose canister. So all I'm saying is my recollection of it is that the economics were looking worse rather than better as the program went forward because of changes in the program and changes in the estimates of the cost of the canister.

But the ultimate decision I recall, and again the chronology is old, I mean I'm not -- I think this decision to terminate that program occurred as a result of about a $60 million cut in the program that came overnight without consultation in Congress.

Q. You're referring to the fiscal year '96 budget or something else?

A. I don't remember which one it was, what fiscal year. But in the Congress 60 million of the appropriation was sequestered. And I was confronted with running the program for $60 million less than the plan contemplated. It had to come from someplace. And my priority at the time I put on the Yucca Mountain tunnel.

Q. I'm going to have a document marked and



show you a small piece of economic analysis I'm interested in.

(Dreyfus Exhibit No. 9 was marked for identification.)

BY MR. SHAPIRO:

Q. Dr. Dreyfus, you've been handed what we've had marked as Dreyfus Exhibit 9 which appears to be a statement for the record to the U.S. Nuclear Regulatory Commission by yourself. It's dated June 9 of 1995. Do you recall offering statements like this to the NRC?

A. I appeared before the NRC several times, I recall that.

Q. Dr. Dreyfus, I can see you're taking a look at the document. And I'm going to tell you in advance I'm going to focus on one paragraph which is on the second page of this document, the first paragraph following the heading Multipurpose Canister Costs.

A. Okay. I have a sense of it.

Q. Specifically I want to focus on, in the middle of that paragraph, there is a sentence that says the at-reactor cost savings include the reduction in spent fuel operating costs. Do you see that sentence?



A. I see it.

Q. Do you recall what sort of spent fuel operating costs were being considered with respect to the MPC costs?

A. No. And, when I read it right now, I'm not sure I understand what it says. I'm sure I did at the time because I wouldn't have read it to the commission without knowing what it says. But I don't know. The implication is that there would be less fuel in the pool, you would use this instead of additional pool capacity. Otherwise I can't follow why the cost of pool storage would be reduced by a canister. I do not follow that logic in this statement.

Q. Was there ever any consideration that use of the MPC concept would permit a shutdown reactor to stop operation of its pool entirely and, thereby, save costs?

A. Well, use of any canister would probably -- if you move it to dry storage, you've removed it from the pool. That's why I don't follow why this canister is -- I can't follow the logic in that sentence at this point in my recollection.

Q. Was the department encouraging the use of dry storage by utilities?

# KLEIN

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------------------X YANKEE ATOMIC ELECTRIC COMPANY :

(98-126C)(Merow, S.J.) : CONNECTICUT YANKEE ATOMIC POWER COMPANY :

(98-154C)(Merow, S.J.) : MAINE YANKEE ATOMIC POWER COMPANY :

(98-474C)(Merow, S.J.) : FLORIDA POWER & LIGHT COMPANY :

(98-483C)(Wilson, J.) : NORTHERN STATES POWER COMPANY :

(98-484C)(Wiese, J.) : DUKE POWER, a Division of DUKE ENERGY CORP.:

(98-485C)(Sypolt, J.) : INDIANA MICHIGAN POWER COMPANY :

(98-486C)(Hodges, J.) : SACRAMENTO MUNICIPAL UTILITY DISTRICT :

(98-488C)(Yock, S.J.) : SOUTHERN NUCLEAR OPERATING COMPANY, et al. :

(98-614C)(Merow, S.J.) : COMMONWEALTH EDISON COMPANY :

(98-621C)(Hewitt, J.) : BOSTON EDISON COMPANY :

(99-447C) (Allegra, J.) : GPU NUCLEAR, INCORPORATED :

(00-440C)(Bush, J.) : WISCONSIN ELECTRIC POWER COMPANY : VOLUME

(00-697C)(Merow, S.J.) : I POWER AUTHORITY OF THE STATE OF NEW YORK :

(00-703C)(Damich, J.) : OMAHA PUBLIC POWER DISTRICT :

(01-115C)(Bush, J.) : NEBRASKA PUBLIC POWER DISTRICT :Discovery

(01-116C)(Sypolt, J.) :Judge: TENNESSEE VALLEY AUTHORITY :(Judge

(01-249C)(Bruggink, J.) :Sypolt)

Plaintiffs, :PAGES

V. :1 - 274

THE UNITED STATES, :

Defendant. :

-------------------------------------------X

Deposition of Susan Klein

Washington, DC

Wednesday, April 24, 2002

Reported by: Denise Dobner Vickery, RMR, CRR

JOB NO. 144539

April 24, 2002

9:37 A.M.

Deposition of Susan Klein, held at the offices of:

Jenner & Block

601 13th Street, NW

12th Floor

Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Norman M. Hirsch, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Alex D. Tomaszczuk, Esq.

Balch & Bingham LLP
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
1275 Pennsylvania Avenue, NW, Tenth Floor
Washington, DC 20004

Thereupon,
SUSAN KLEIN
was called for examination, and, after having been duly sworn or affirmed, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR THE PLAINTIFF,
COMMONWEALTH EDISON
BY MR. HIRSCH:
Q. Ms. Klein, my name is Norm Hirsch. I'm a lawyer at Jenner & Block in Chicago. I represent Commonwealth Edison Company. I'm going to be asking you some questions today.
If you don't understand a question I've asked, please tell me and I'll try and rephrase it. Otherwise, I'll assume you understood my question.
A. (Nods head).
Q. If you need a break at any point today, please let me know and we'll stop and take a break.
A. (Nods head).
Q. Mr. Zabransky -- I'm sorry.
A. That's okay. You got Zabransky on your brain.
Q. Move from the last deposition.



Ms. Klein, are you aware that there's a protective order in the spent nuclear fuel cases?
A. I think there is, yes.
Q. All right. What I'm going to do is I'm going to hand you a copy of the protective order and I'd like you to take a minute to look at it.
A. Okay.
MR. HIRSCH: Mark that as Exhibit 1.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 1.)
THE WITNESS: (Pause). Okay. I don't fully understand it at this point, but I've read through it.
BY MR. HIRSCH:
Q. Okay. Would you generally agree to abide by the terms in the protective order, Ms. Klein?
A. If something is labeled confidential, yes, I will keep it confidential.
Q. Okay. All right. That's fine.
Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 1 or I'm handing you that document, which is the notice of deposition that was



issued on April 18th for today's Rule 30(b)(6) deposition. And if you look on the exhibit page, you'll see four topics. That's page 5. You see those topics?
A. Yes, I see those topics.
Q. And you understand you're supposed to be the Rule 30(b)(6) designated Department of Energy witness for these four topics?
A. Yes.
Q. What's your current position, Ms. Klein?
A. I'm a senior policy adviser to the Director and Deputy Director of the Office of Civilian Radioactive Waste Management at the Department of Energy.
Q. And how long have you been the senior policy adviser?
A. For about three years.
Q. So, since about 1999?
A. Yes. I was transferred there but detailed back to general counsel for a couple years.
Q. When was your detail back to General Counsel's Office?



A. I think it was '97 that I was transferred to RW, but I was detailed back to general counsel to work with the general counsel at the time on any legal issues and then later on it was limited to issues involving this litigation.
Q. Okay. We'll get back to that in a second. But who do you report to as the senior policy adviser?
A. Lake Barrett. Ron Milner and Lake Barrett.
Q. And Mr. Barrett's current title is?
A. Deputy Director of the Office of Civilian Radioactive Waste Management.
Q. And Mr. Milner's title is?
A. He's the COO, the Chief Operating Officer of the Office of Civilian Radioactive Waste Management at DOE.
Q. And is the Office of Civilian Radioactive Waste Management otherwise known by its acronym as OCRWM?
A. OCRWM, yes, and actually with regard to Ron, I think now I just report to Lake. I was reporting to Ron when he was also Acting Deputy, but now that Margaret is here, to just correct the record. I don't

know how important that is but --
Q. I'm sorry.
A. -- to be perfectly accurate, right now I report to Lake, not to Ron.
Q. Okay.
A. Okay.
Q. And when did you stop reporting to Ron Milner?
A. When Margaret Chu became the Director.
Q. You also report to Ms. Chu?
A. Yes, I do.
Q. Now, it is my understanding that you're a lawyer; is that correct?
A. Yes.
Q. And when did you graduate from college, Ms. Klein?
A. 1971.
Q. And where did you go to law school?
A. Case Western Reserve in Cleveland, Ohio.
Q. And when did you graduate from Case Western?
A. 1974.
Q. And can you give me just a rough outline of what your employment has been after you got out of law



school?
A. I went to work for the United States General Accounting Office. Worked there for three years.
Q. So, from 1974 to?
A. To 1977.
Q. Okay.
A. I wrote decisions of the controller general. And then I left the General Counsel's Office there and went to what was at the time FEA, the Federal Energy Administration, for three months until it became the Department of Energy in 1977.
Q. And have you been at the Department of Energy from 1977 to the present?
A. Yes.
Q. And can you give me the outline of your employment history at the Department of Energy?
A. I worked in general counsel for a couple years. I can't remember the exact number. I don't know how much detail you want, but then from there I went to conservation and at the time it was called conservation and solar. Worked on the residential conservation service program.



Q. Roughly when was that?
A. I think it was probably '80, 1980. I'm not sure. And then 1984, I believe it was, I came to work in the nuclear area. It was when Ronald Reagan was elected. If that was '84, that's when it was.
Q. And what department did you work in in the nuclear?
A. At the time it was called Assistant General Counsel for International Development and Defense Programs.
Q. And what were your responsibilities in that position?
A. The Price Anderson Act, transportation of nuclear materials, the Low Level Waste Policy Act of 1980. That was generally my areas -- those were generally my areas.
Q. And who did you report to when you were in that position?
A. Leon Silverstorm.
Q. And who was he?
A. The Assistant General Counsel for IDDP, International Development and Defense Programs.



Q. Did you have any involvement in the passage of the Nuclear Waste Policy Act of 1982?
A. My office handled it, but it was not under me. There was another lawyer in the office handling it, but she would report on it in staff meetings.
Q. And what office was that at the time?
A. International Development -- well, it might have changed its name. That office changed its name many times. I'm not sure what its name was, but it was the same general group of lawyers. We were reorganized. We became Nuclear Affairs and later on Civilian Nuclear Programs. The defense part was taken out, but...
Q. Okay.
A. I don't remember the exact name during that period.
Q. So there was another lawyer in this Nuclear Affairs Office --
A. Uh-huh.
Q. -- better term, who worked on the Nuclear Waste Policy Act?
A. Yes.

Q. And who was that?
A. Amy Shamora.
Q. Is she still with the Department of Energy?
A. Last I heard, she went back to GAO. We had both actually worked at GAO together, but I don't know if she's retired or what.
Q. And so I wasn't sure. Did you do any work in terms of the Nuclear Waste Policy Act?
A. After its passage, yes.
Q. Okay.
A. Not before its passage.
Q. I see. What kind of work did you do in connection with the Nuclear Waste Policy Act?
A. Price Anderson issues and transportation issues at this time. Later on I did much more, but that's all I did right after passage. I did not work on the standard contract.
Q. Okay.
A. I guess I shouldn't answer your questions before you ask them.
Q. That's fine. When you say you worked on transportation issues, what kind of issues did you



work? What do you mean by that?
A. Well, generally I worked on transportation issues within the department. Our own transportation of nuclear materials, which was under the defense program area, and I interpreted the Department of Transportation regulations and the NRC regulations and our exemption under the Atomic Energy Act. It was really with Price Anderson that I worked with the people in OCRWM.
Q. Okay. So, how long did you work as that in that Assistant General Counsel position?
A. Until I came to RW and I became the Assistant General Counsel of that division eventually.
Q. And when did you become the Assistant General Counsel for RW?
A. I don't remember. I was in that position acting. I came to RW in about -- what did I say? '97. I'd say around '92. I mean, I can -- yeah, '92, approximately.
Q. So, just so I'm clear, from 1984 to roughly 1992 you were in this position as Assistant General Counsel in this office whose name changed but --



A. No.
Q. I'm sorry. Go ahead.
A. I wasn't the Assistant General Counsel from '84 until '92. I was an attorney in that office.
Q. All right. Okay.
A. From '92 to '97 approximately I was the Assistant General Counsel.
Q. All right. For RW?
A. Which means --
Q. In RW; is that right?
A. No. It's in the general --
Q. All right.
A. It's in the General Counsel's Office. We had many clients and RW was one of them, but actually at a certain point in time the whole RW program was moved to the Assistant General Counsel for Environment because we were doing the environmental assessments was the biggest part of the project, and so it was moved there for several years. It was taken out of that office and moved there and then it was moved back to that office.
Q. So, from this period 1984 to 1982 -- '92 --



excuse me -- you were an attorney in this office?
A. Yes.
Q. Of the Assistant General Counsel?
A. That's right.
Q. Whose responsibilities included nuclear affairs?
A. Yes. Absolutely. That's correct.
Q. All right. And when you moved into the position in 1992 of Assistant General Counsel, who did you report to?
A. Jerry Pruzan. He was the deputy general counsel for -- I don't know what they called it -- programs or something.
Q. What did your responsibilities include as the Assistant General Counsel during that period starting in 1992?
A. Interpretation of the Atomic Energy Act. Interpretation of the Nuclear Waste Policy Act. Interpretation of the Low Level Waste Policy Act. And in those capacities, there were many offices that I supported. Environment, safety and health, OCRWM, nuclear energy.

Q. Who did Mr. Pruzan report to?
A. The general counsel.
Q. And that was?
A. I think that was Farrell. I'm not positive.
Q. Farrell?
A. Mike Farrell. I'm not sure. It also was Steve Wakefield. I don't remember.
Q. And how long were you in that position as Assistant General Counsel?
A. I think about five years. I'm not sure, but I think about five years.
Q. So, roughly from 1992 to 1997?
A. Uh-huh. Now, later on I reported to other people. I'm just -- at that time I reported to Jerry Pruzan when I first became.
Q. All right. When you -- as you went along from '92 to '97, who else did you report to?
A. Frank Bay.
Q. Who's he?
A. He was a political appointee. He was and that Jerry Pruzan. They were all political appointees. So they came and went.



Q. I see. All right.
A. And then Mark Schroeder and then --
Q. These people had the title of?
A. Deputy.
Q. Deputy general counsel?
A. For something. It changed around a lot, but... And then after Mark Schroeder was Mary Anne Sullivan, not Marian but Mary Anne Sullivan.
Q. Right. Anybody else that you reported to during that period?
A. Not that I can remember.
Q. And what was Mary Anne Sullivan's title?
A. At the time she was deputy general counsel for something like environment and security. Something like that. And then she became the General Counsel later.
Q. Okay. Now, what position did you take in 1997?
A. The senior policy adviser to RW.
Q. And that's the position you're in now?
A. Yes.
Q. Now, you mentioned that you had a detail?



A. Uh-huh.
Q. Somewhere during this period '97 to the present?
A. Uh-huh.
Q. And when was that detail?
A. 1997 till the end of 1999.
Q. Okay. And what was your detail? What was the position you held?
A. Okay. I was -- I had moved physically. Well, I think the first year I didn't. I don't remember now. But anyway I reported to Mary Anne Sullivan with regard to legal issues, and then when time allowed, I worked on my senior policy adviser hat for Lake Barrett. But I was technically an employee of RW for payroll purposes, et cetera.
Q. All right.
A. And then eventually that changed. So that I didn't work on all legal issues. I just worked on issues related to the spent fuel litigation.
Q. And when did you start working exclusively on issues related to the spent fuel litigation?
A. I don't remember. I think it was the last



six months of that period.
Q. So, probably in 1999?
A. Yes. But during that whole period, I worked on the spent fuel litigation.
Q. From '97 to --
A. Yes.
Q. -- '99?
And you say during that detail you reported to Mary Anne Sullivan?
A. Yes. For legal issues I reported to Mary Anne Sullivan.
Q. Okay. And her title at that time was? Had she become --
A. General Counsel.
Q. -- General Counsel?
A. I believe for most of that time anyway.
Q. Was there a particular reason that you were given about why you should serve on the detail?
A. There was nobody else to do it.
Q. I see. All right. Well, were you perceived as having special expertise in the area?
A. Yes. Absolutely.

Q. And that expertise was in what?
A. I worked on this litigation since before. Before it became litigation. I worked on these issues. I was counsel to RW on standard contract issues.
Q. So when you were in this detail from '97 to '99, approximately what percentage of your time did you work on the detail as opposed to your regular job?
A. I would say 75 percent.
Q. And the remaining 25 percent of the time you were working on your job as senior policy adviser?
A. Uh-huh.
MS. POWELL: You have to answer yes for the record.
THE WITNESS: Yes. I'm sorry.
BY MR. HIRSCH:
Q. You can't pick up a nod.
A. Uh-huh doesn't count.
Q. That's right. Thank you.
I think you just mentioned a little while ago that you've been working on standard contract issues for quite a long time?



A. Yes.
Q. When did you start working on the standard contract issues?
A. When Bob Nordhaus was General Counsel, which was about a year after the Clinton Administration. I'm sorry. That's how I figure.
Q. All right. So that would be roughly '93?
A. Uh-huh. Sounds good.
Q. Did somebody ask you to start working on standard contract issues?
A. Yes.
Q. Who was that?
A. Bob Nordhaus.
Q. I'm sorry. What was Mr. --
A. Oh, he was the General Counsel before Mary Anne Sullivan was the General Counsel.
Q. And do you know why he picked you to work on the position?
MS. POWELL: We're getting into attorney-client privilege here. So your who asked is fine, but...
MR. HIRSCH: Well, I think somebody asking



her to take a job isn't the subject of attorney-client privilege.
MS. POWELL: And I'm going to object to -- I didn't object to that question, but now you're going into why he chose and it's being perceived as work product. And, you know.
BY MR. HIRSCH:
Q. Well, did Mr. Nordhaus tell you why he wanted you to work on the standard contract issues?
MS. POWELL: I'm going to -- it's --
THE WITNESS: Should I answer that one? I mean, I have a simple answer, that's all.
MS. POWELL: Okay.
THE WITNESS: That was -- that was in my job description basically. That's what I was. I was the lawyer for RW.
BY MR. HIRSCH:
Q. And what kind of work have you done -- strike that.
Starting in 1993 when you were requested by Bob Nordhaus, what kind of work did you do on standard contract issues?



MS. POWELL: Again, we're getting into work -- I mean, work product privileges? She's here as a 30(b)(6). I understand you have a right to ask background questions with respect to Ms. Klein and I certainly haven't objected to that. You can establish her job history, but we're not offering her -- we're offering her as a 30(b)(6) and you're getting into what the General Counsel's Office did on the standard contract. That's squarely within the work product, attorney-client privilege.
MR. HIRSCH: Well, first of all, to my knowledge there wasn't -- this litigation, spent nuclear fuel litigation wasn't going on during the period that I asked her about. So I don't know how it could be work product. And, secondly, me just asking her what kind of issues she worked on during this period doesn't constitute a request for work product or privileged information.
Are you going to instruct her not to answer? Are you going to let her answer the question?
MS. POWELL: Just because -- the attorney-client work product privilege is not just

limited to this, as you well know. You're getting into what the General Counsel did in 1993 with respect to certain cases and that's part of the work product and attorney-client privilege. You can ask Ms. Klein generally what she worked on and we walked through that and I didn't object, but now you're trying to get into things that fall squarely within the privileges. No problems with background in general description, but you've done that.

MR. HIRSCH: Could you read the last question back.

(Requested material was read.)

BY MR. HIRSCH:

Q. Can you answer that question, please?

MS. POWELL: I'm going to instruct her not to answer.

THE WITNESS: I think it falls into privilege, actually.

MS. POWELL: I'm going to instruct her not to answer.

THE WITNESS: I know I'm not. It does. I think --



BY MR. HIRSCH:

Q. Well, I'm sorry, Ms. Klein, I don't think you want to start offering legal advice in these depositions.

A. No. I mean, I know the answer. So that's why I think but...

Q. Are you going to follow your lawyer's advice not to answer the question?

MS. POWELL: I'm instructing you not to answer.

THE WITNESS: Yes, yes.

MR. HIRSCH: And I hope it's clear for the record, but I think, first of all, this litigation wasn't pending. I don't think there was any litigation pending back in 1993. So this can't be work product and what I asked her didn't call for attorney-client privilege, but move on.

BY MR. HIRSCH:

Q. Your work -- strike that.

In your work as the senior policy adviser, is that primarily legal work or policy work?

A. Well, I'm the liaison with the General



Counsel's Office. We have lots of legal issues in our office, and so I am the liaison with the General Counsel's Office. Plus, I work on the concerns program and other areas.

Q. Well, what is the general job responsibilities of the senior policy adviser?

A. Well, it involves anything that happens to be coming up at the moment. I mean, so I've worked on the Inspector General report looking into bias in the program. I've worked on many employee concerns that raise issues. I mean, I work, I do work on the spent fuel litigation. Not in a legal capacity.

Q. Well, what kind of work do you do on the spent fuel litigation that's not in a legal capacity?

A. I review the briefs that the Justice Department writes.

Q. Any other work along those lines?

A. I'm a 30(b)(6) witness.

Q. Okay. Anything else?

A. I concur in responses to DCS submittals.

Q. When you started out as a senior policy adviser in '97 and recognizing you had this detail



along the way, were you reporting to Lake Barrett?

A. Yes.

Q. Was there anybody else you reported to?

A. Ron Milner. Because Ron Milner was the Acting Deputy Director.

Q. Do you know how long Mr. Milner was the Acting Deputy Director?

A. Whenever Lake is the Acting Director, Ron is the Acting Deputy Director. Many years.

Q. At one point Mr. Dreyfus was the Director; is that correct?

A. This is correct.

Q. He was the Director before Mr. Barrett?

A. Before -- well, in between there's been Ivan Itkin was the Director most recently.

Q. Okay. All right. At any point --

A. Lake has never been the Director I don't think.

Q. He's been the Acting Director?

A. Only the Acting Director.

Q. At any point did you report to Mr. Dreyfus?

A. No. Well, let me think. Let me make sure

that I'm saying. No.
Q. Have you ever -- strike that.
Did you ever report to Mr. Itkin?
A. Yes.
Q. When was that?
A. When he was the Director of the program, which was a couple years ago.
Q. In your job as the senior policy adviser, who regularly reports to you?
A. No one.
Q. Are there a group of people who you typically work with in the senior policy adviser position?
A. I work with different people on different issues. Plus, we have a front office staff that meets every day, supports Lake or whoever is the Director at the time in whatever they may need. Which could be some just harebrain thing that Nevada said yesterday and we have to all run around and respond. There's a group of us who do that.
Q. In terms of the standard contract and working on the standard contract, are there people you regularly work with --



A. Yes.
Q. -- in that area?
And who would those people be?
A. Dave Zabransky, Tom Pollog and Glenn Gardner.
Q. What's Mr. Gardner's position?
A. He works for Dave Zabransky. I don't know his title.
Q. Anybody else that you work with on the standard contract issue?
A. In RW?
Q. Right.
A. Lake.
Q. Lake Barrett?
A. Yes. No, I can't think of anybody now else.
Q. Do you have an employment GS grade with the government?
A. I'm an SES 4.
Q. And how long have you been an SES 4?
A. A year and a half.
Q. And what were you before that?
A. An SES 3 and then an SES 2 and SES 1.
Q. Okay. Have you reviewed any documents to



prepare for your deposition today?
A. Yes.
Q. What have you reviewed?
A. I reviewed some DCS submissions, some of DOE's responses. I reviewed letters from mainly Andy Kadak to the department and Maine Yankee. Priority for shutdown reactors and I reviewed the department's responses. I reviewed the NRC regulations on Greater-Than-Class-C waste. I know I reviewed other things. Oh, I reviewed the contracting officer's 1991 instructions to the purchasers on how to fill out their DCS forms.
Q. Anything else that you can remember?
A. No, I can't think of anything else. No.
Q. Did you review any deposition transcripts before the deposition today?
A. No.
Q. Have you spoken to anyone besides your lawyers from the Department of Justice about your deposition today?
A. Yes.
Q. Who have you spoken to?



A. I've spoken to Dave Zabransky, Tom Pollog, Beth Tomasoni, Glenn Gardner, Alyssa Turner, Nancy Slater or Nancy Slater Thomas -- Thompson. I have spoken to Lake Barrett, Alan Brownstein. I think that's it.
Q. Who's Ms. Melissa Turner?
A. Alyssa Turner.
Q. Alyssa Turner?
A. Uh-huh.
Q. Okay. Who's she?
A. At one time she reviewed DCS submittals.
Q. What did you talk to Mr. Zabransky about in terms of your deposition?
MS. POWELL: Okay. You can answer to the extent that attorney-client -- the attorneys were not present, but I'm going to object and instruct you not to answer if the conversations occurred with attorneys present.
THE WITNESS: I'm just trying to think what we talked about when the attorneys weren't present. Just things like "How did it go today? Terrible." That kind of thing.

A. It was about two hours.
Q. And this meeting last week, not the one with Lake Barrett but with Tom Pollog and the other people, how long did that last?
A. I'd say about two hours.
Q. Have you spoken to Nancy Slater Thompson -- is that it?
A. Uh-huh.
Q. Outside of these meetings that you just described about your deposition?
A. No.
Q. What about Mr. Brownstein; have you spoken to Mr. Brownstein outside of these meetings you described where the lawyers were present about your deposition?
A. I think I might have discussed the date or something like that, but nothing else.
Q. And in terms of a discussion you had with Mr. Barrett -- strike that.
Have you had a discussion with Mr. Barrett about your deposition outside the presence of the DOJ lawyers?



A. No.
Q. Why don't we take five minutes here.
A. Okay.
(Recess, 10:18 a.m. to 10:26 a.m.)
(Thereupon, the reporter marked for identification Deposition Exhibit No. 2.)
BY MR. HIRSCH:
Q. Ms. Klein, I have one clarification question. Did you say you were currently an SES 5?
A. 4, 4.
Q. 4; okay. And when did you become an SES 4?
A. I think it was a year and a half ago. Approximately.
Q. And I'm going to reveal my ignorance of government job classifications, but what does SES stand for?
A. Senior Executive Service.
Q. All right. And when you started at DOE, were you in that SES designation?
A. No.
Q. I see.
A. I was a GS 11.



Q. Okay.
A. No, not at DOE. I was a GS 11 at GAO out of law school.
Q. Okay. When you started at DOE, what was your GS level?
A. I don't remember.
Q. Take a guess.
A. 12, 13. I don't know.
Q. All right.
A. 14.
Q. When did you move into the SES category?
A. When I became the Assistant General Counsel for Nuclear I think it was called Nuclear Affairs at time. When I became the Assistant General Counsel of Civilian Nuclear Programs.
Q. And that would have been around --
A. SES 1.
Q. -- 1984?
A. No. 1992.
Q. Oh, I'm sorry. Okay. And you started out in 1992 as an SES 1?
A. Right. Correct.



Q. All right. Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 2, which is a letter from the Department of Energy to R. J. Hanley, contractor administrator at Commonwealth Edison Company, dated March 4, 1992 and then attached to that is US Department of Energy Instructions for Completing Appendix C Delivery Commitment Schedule and this document has Bates label CEO 3656 through 664.
Ms. Klein, do you recognize Klein Deposition Exhibit 2 as the DOE's instructions for filling out DCS forms to utilities?
A. The attachment, yes.
Q. And that the cover letter that is on the first two pages of the exhibit are the cover letter that goes with the instructions; is that correct?
A. I haven't seen this particular one, but it looks like most of them look, yes.
Q. Did you review the DCS instructions at the time that they were first sent out?
A. No.
Q. And when I say DCS instructions, you understand I'm referring to delivery commitment

role the DCS forms that are filled out by the utilities play in terms of the Radioactive Waste Management Program?

MS. POWELL: The same objection, beyond the scope, but you can answer.

THE WITNESS: Could you repeat that. Sounds like the same question, but I know there's a different word in there.

BY MR. HIRSCH:

Q. I guess what I'm just getting at, Ms. Klein, is: After the forms are submitted and they're approved, what does the DOE do with the forms? What function do they serve? That's what I'm getting at.

A. They become the legally binding commitment of the department.

Q. Do they have any role in DOE's planning of the spent nuclear fuel program?

MS. POWELL: Same objection, beyond the scope, but you can answer to your personal knowledge.

THE WITNESS: Yes.

BY MR. HIRSCH:

Q. And what role is this?



MS. POWELL: Same objection. You can answer.

THE WITNESS: I'm thinking, actually. I'm thinking because we have -- we're planning for a greater acceptance rate once we begin operation, but those were the planning rates based on an MRS, which was limited by statute to 10,000 metric tons.

BY MR. HIRSCH:

Q. So, is it my understanding that the DOE is now currently planning for a higher acceptance rate than the acceptance rate upon which the DCS forms were originally submitted; is that correct?

A. We're planning for that, but it's for planning purposes, yes.

Q. All right. We're getting into one of the other topics, but what is the rate that the DOE is currently planning on accepting spent nuclear fuel?

A. 400 the first year of operation of a repository. 600 -- just to be sure -- the next year. 1200 the year thereafter. 2,000 the year thereafter. 3,000 the following year and then a steady state 3,000 for 10-year period. I mean, that whole thing covers



10 years.

Q. Will you look back at Klein Deposition Exhibit 2.

A. Uh-huh.

Q. You see on the first page of the general instructions?

A. Uh-huh.

Q. It says on the When to Submit part, and I'm reading the last I think sentence. "For each allocation listed in the 1991 ACR or subsequent ACRs as appropriate, a purchaser must submit at least one DCS for the allocation of at least 63 months prior to the date that the allocation occurs (e.g., if a purchaser has an allocation in 1998, a DCS must be submitted for that allocation by September 30, 1992)."

Is it correct that utilities were supposed to submit a DCS form at least 63 months before the utility had an allocation in the latest ACR report from the DOE?

A. Yes.

MS. POWELL: Beyond the scope, but you can answer.



THE WITNESS: Oh.

MS. POWELL: No, you can answer.

THE WITNESS: Yes.

BY MR. HIRSCH:

Q. And I think that you've said earlier that the 1990 -- or strike that.

You recall that the 1991 ACR had an acceptance rate that was based on a ramp-up up to 900 metric tons for the first 10 years?

MS. POWELL: Objection, beyond the scope.

THE WITNESS: I don't know that.

MS. POWELL: But you can answer.

THE WITNESS: I don't know whether it was in 1991. I know -- I don't know what was in 1991.

BY MR. HIRSCH:

Q. Do you know what the 1995 ACR --

A. Yes.

Q. -- had in terms of acceptance rates?

MS. POWELL: Let me -- I'm going to object as to beyond the scope. Just give me a moment.

THE WITNESS: I will be --

MS. POWELL: It's beyond the scope, but

different question, but...
BY MR. HIRSCH:
Q. Are you going to follow your lawyer's advice --
A. Yes.
Q. -- not to answer that question?
Ms. Klein, at some point did the DOE decide to suspend the D CS process?
A. We've never used the word suspend, but, yes, we decided to stop processing them.
Q. Stop processing DCS forms?
A. No. Excuse me. We processed them in a sort. We decided to stop approving or disapproving them.
Q. And when did the DOE make that decision?
A. I think it was around '97. In 1997 early.
Q. Can you give me a month in 1997 when that decision was made?
A. No.
Q. You just --
A. I think early 1997.
Q. In the first three months?
A. Yes, I think in the first three months.



Q. And who was involved in making that decision?
A. The Office of General Counsel, the Office of Procurement whatever. Procurement because it was a contracting officer who was the final sign-off and the Office of Civilian Radioactive Waste Management, OCRWM. I don't know if anybody else was involved.
Q. Okay. When you say the Office of General Counsel, who at the Office of General Counsel was involved in that decision?
A. I can answer that question?
I was involved in that decision, Mary Anne Sullivan was involved in that decision, Eric Fygi was involved in that decision. And I don't remember if Bob -- I think Bob Nordhaus was gone already.
Q. Who was Mr. Fygi?
A. He's the principal Deputy General Counsel and has been for many years.
Q. Principal Deputy General Counsel?
A. Uh-huh.
Q. At DOE?
A. At DOE, uh-huh.
Q. And --



A. F-y-g-i, by the way.
Q. Is Mr. Fygi still in that position?
A. Yes, he is.
Q. And who was involved in the decision from the Office of Procurement?
A. Tomasoni and her supervisors. I don't remember who it was involved. Could have been Jay Cavanaugh. I'm not sure.
Q. Could have been who? I didn't hear you.
A. Jay Cavanaugh, but I'm not sure.
Q. Does Ms. Tomasoni report to Mr. Cavanaugh?
A. She did. I don't know if she still does. He's moved around a lot, but...
Q. What's Ms. Tomasoni's current position with DOE?
A. I believe she's still a contracting officer, but she no longer is our contracting officer. She works on other contracts.
Q. And who was involved in the decision to stop approving DCS forms from the Office of Civilian Radioactive Waste Management otherwise known as OCRWM?
A. Dreyfus was there. I believe it was Dreyfus.



Lake Barrett -- that's Dan Dreyfus. Lake Barrett, Dave Zabransky. I'm just trying to think of who else. I don't think Alan was involved any more at all. I think that's all I can remember at the moment.
Q. Did the Director of OCRWM make the final determination as to the DOE's stopping approving DCS forms?
A. I don't know who made the final determination. There was lots of discussion over a long period of time, and it was the advice of the General Counsel and Beth Tomasoni as the contracting officer technically has to be the one to put her name down and be comfortable with it. And she takes advice from her technical representative, who was at the time Dave Zabransky, who does what Dan Dreyfus tells him, so...
Q. Well, I guess that your answer goes to my next question, which is: Ultimately did the Director of OCRWM have to sign off on the decision to stop approving or disapproving DCS forms?
A. The only people I know who actually had to sign a letter with this was the contracting officer and the technical representative.

Q. All right. All right. And I misspoke as to my question or let me rephrase my question. Did the Director of OCRWM have to approve the decision to have the DOE stop approving or disapproving DCS forms?
A. I don't know whether he had to. That's a hard question, but he did approve it.
Q. All right.
A. We all -- it was an elective agreement. We all agreed. There wasn't a disagreement.
Q. Did the Director of OCRWM put anything in writing reflecting his approval of the decision to stop approving DCS forms?
A. I don't know. I don't remember that he did.
Q. Was there a written recommendation made with respect to the DOE stopping the approval or disapproval of DCS forms?
A. There were memos written in the General Counsel's Office --
MS. POWELL: If you can answer, to the extent that it's getting into privileged.
THE WITNESS: -- addressing issues involved in this, but I don't think there was ever -- I



don't know. I don't remember that there was ever an action memorandum. Normally if there's some big decision, you send an action memorandum to the Secretary and you get everybody to concur on the bottom. And that's why I say I don't know that Dan Dreyfus had to. The Secretary could have said, "This is the way we're doing it," and that's what happens in the government. But I don't remember that there was an action memorandum on this topic. I don't think there was.
BY MR. HIRSCH:
Q. Do you know whether the decision to stop approving DCS forms was approved by the Secretary of the Department of Energy?
A. I don't know that personally, but my guess is the Secretary was aware of it. That's my guess.
Q. And who was the Secretary back then?
A. I'm trying --
Q. We're talking 1997 I guess.
A. Was that Hazel O'Leary? In 1997.
Q. Would have been either Hazel O'Leary or Bill?
A. Pena was after Hazel O'Leary.



Q. Oh, okay.
A. So I don't -- I think my guess is it was Hazel O'Leary, but that's a guess.
Q. Why do you think that the Secretary of the Department of Energy probably signed off on that decision?
MS. POWELL: I object. That's a mischaracterization of what Ms. Klein testified, but you can answer.
THE WITNESS: I was just going to say, I don't think the Secretary signed off on it.
BY MR. HIRSCH:
Q. All right.
A. I think the Secretary was probably made aware through the special assistants. That --
Q. All right.
A. -- this was going on on advice of counsel.
Q. And why do you think that the Secretary of the department was probably made aware of that?
A. Because the General Counsel talks quite frequently with the Secretary about legal issues and informs the Secretary of anything important.



Q. Were you ever told that the Secretary of the Department of Energy had signed off on the decision?
A. No. I mean, not that I remember. I don't remember being told that the Secretary had signed off on it, no.
Q. Who made the recommendation to stop approving DCS forms?
A. I believe it was the General Counsel.
Q. And that was Mary Anne Sullivan?
A. Yes. Could have been Bob Nordhaus, but I think not. I think it was Mary Anne.
Q. And what was the reason for the recommendation to stop approving DCS forms?
MS. POWELL: And, again, as we informed you in our letter yesterday, we're going to assert our attorney-client work product privilege over the reasons for this. I understand you need to ask your questions, Mr. Hirsch, but -- to make the record for a future date with Judge Sypolt, but I'm going to instruct the witness not to answer that question.
MR. HIRSCH: Well, as I think we related to Marian yesterday when we got her letter, we don't

agree that the attorney-client privilege is applicable here. It appears to us that the DOE's defense in part is based on its theory that its obligations are limited to approve DCS forms, what Ms. Klein just said.

We now know that the DOE made a conscious decision to stop approving DCS forms and, therefore, I think the government has put squarely at issue the reason that decision was made and we're entitled to find out the reasons for the decision.

Having made a decision, which you claim at least had some legally operative consequences, then we're entitled to find out what the reasons for the decisions are.

Could you read the question back, please.

(Requested material was read.)

MS. POWELL: And it's the same objection and we can make our record, and if the judge orders us to answer, we will certainly do so at a future date, but at this time I'm instructing the witness not to answer.

BY MR. HIRSCH:

Q. You're going to follow your lawyer's



instruction?

A. Yes, I am.

But I have to go to the ladies' room a moment.

MR. HIRSCH: You want to take a break here, that's fine.

(Recess, 11:11 to 11:18 a.m.)

BY MR. HIRSCH:

Q. Ms. Klein, what was the reason that the DOE suspended the approval of DCS forms?

A. I should answer that?

Q. Can you answer without consulting with your attorney?

MS. POWELL: I think she'd like to consult to make sure. We have a lot of privilege issues here. So, I mean obviously --

THE WITNESS: I'm happy to answer if it's not privileged, but I think it's privileged.

(Conferring with counsel).

MR. HIRSCH: Okay. The record should reflect that Ms. Klein is consulting with her attorney.

THE WITNESS: It was on advice of counsel.

BY MR. HIRSCH:



Q. Was there any reason for suspending the DCS process besides advice of counsel?

A. I can answer that from my personal view? Shall I answer? That's not as a 30(b)(6) witness.

Q. Well, I don't know if it is or it isn't, Ms. Klein, but can you answer the question?

A. Okay. Well, all I know is my feeling at the time was -- how shall I put it? In that period it was clear that we were not going to be able to begin acceptance in 1998, and it appeared more up front to not be pretending that we were going to continue to do it. I mean, that was my own view at the time. But I don't know the department's. The reason that I know that the department made the decision was because counsel advised. That's the only DOE position that I know of.

Q. Your position, Ms. Klein, was that the DOE wasn't going to be able to start performing in 1998?

A. Right.

Q. And, therefore, it shouldn't pretend in the DCS process like it was going to start; is that correct?



MS. POWELL: I want to make it clear it's beyond the scope, but you can answer to the best of your knowledge.

MR. HIRSCH: I don't believe it's beyond the scope.

MS. POWELL: You asked her personal knowledge just now.

MR. HIRSCH: Well, I don't recognize that this is beyond the scope. Just so that's clear, but...

THE WITNESS: Repeat your question then. I'm sorry. I got confused with the beyond the scopes here.

BY MR. HIRSCH:

Q. Yeah, that's fine. Your -- strike that.

Ms. Klein, it was your belief as I understand it that the DOE was not going to be able to begin performing in 1998 and, therefore, the DCS process should be suspended because the DOE shouldn't pretend like it was going to start performing in 1998?

MS. POWELL: Okay. The same objection, beyond the scope and vague, but you can answer.

THE WITNESS: Yes.
BY MR. HIRSCH:
Q. All right. And do you know whether that position was also the basis for counsel's recommendation to stop approving DCS forms?
MS. POWELL: And I'm going to again assert the same objection as to the basis for counsel's recommendation is covered by attorney-client work product privilege.
THE WITNESS: And I'm going to follow my lawyer's advice.
BY MR. HIRSCH:
Q. Do you know whether anyone from the White House or the Office of Management and Budget was involved in the decision-making process to suspend the DCS process?
A. I know they were involved at some point in time, but I don't remember where or what or, you know, I remember, but I don't remember their involvement in the DCS process. But it wouldn't surprise me.
Q. Why would it not surprise you?
A. Because we --



MS. POWELL: Same objection, beyond the scope, but you can answer.
THE WITNESS: Because we have a close relationship with the people at OMB who are budget examiners. They like to know what's going on at all times that could affect the department's financial situation.
BY MR. HIRSCH:
Q. And who do you deal with at the department or -- excuse me -- Office of Management and Budget?
A. Right now --
MS. POWELL: Beyond the scope. Go ahead.
BY MR. HIRSCH:
Q. On these issues.
A. Right now John Pfieffer, P-f-i-e-f-f-e-r. Before that it was Steve Goldberg and Gary Bentham. Don't ask me how to spell that.
Q. Back in this early 1997 time frame when the decision was made to suspend the DCS process, who were you dealing with at that time in the Office of Management and Budget?
A. Well, I know Gary was there. Gary Bentham,



and I don't remember if it was Steve Goldberg or John Pfieffer. Might have been John Pfieffer then.
Q. Do you know whether those individuals were informed of the decision?
A. No, I don't know.
MS. SULLIVAN: Can we take a minute?
(Pause.)
BY MR. HIRSCH:
Q. Do you know whether anyone at the White House was informed of the decision to stop approving DCS forms?
A. I don't know.
MS. POWELL: Wait. Well, okay. If you don't know.
THE WITNESS: I don't know.
MS. POWELL: We're getting into substance she doesn't know but, you know.
BY MR. HIRSCH:
Q. Ms. Klein, I think you mentioned a little while ago that you thought that there were some memos prepared regarding the decision to suspend the DCS process. Do you recall that?



A. Do I recall saying that here?
Q. Yes.
A. Yes.
Q. And when were those memos written, roughly?
A. The time frame they were on the suspension of the DCS process?
Q. Right.
A. I'm guessing 1996.
Q. And who wrote those memos?
MS. POWELL: You can answer.
THE WITNESS: Procurement counsel.
BY MR. HIRSCH:
Q. Who was procurement counsel at that time?
A. Should I say that?
I think Janet Barsey.
Q. How do you spell the last name?
A. B-a-r-s-e-y.
Q. And what office was she in?
A. The General Counsel is divided up with various assistant General Counsel. She was for the Assistant General Counsel for Procurement and Financial Assistance. I think it has a different name now.

Sullivan as her advice, and it was communicated to Beth and Doug Baptist, who also was a contracting officer. And Dave Zabransky. I don't remember if it was in a meeting or telephone. I don't remember exactly how, but I don't remember there being any memorandum.

Q. Okay. When you said Beth a minute ago, you meant Beth Tomasoni?

A. Tomasoni, yes.

Q. Do you know whether there was an e-mail prepared informing people about the decision?

A. I would be surprised if there was, but, no, I don't know.

MR. HIRSCH: 3.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 3.)

THE WITNESS: Am I supposed to be reading this?

BY MR. HIRSCH:

Q. Yes.

A. The whole thing?

Q. Let me just identify it for a minute.

A. Okay.



Q. I have a question about a specific part of it, Ms. Klein. If you want to read other parts, you're welcome to.

What I've marked as Klein Deposition Exhibit 3 is a portion of the transcript of the Dave Zabransky deposition that was taken last week. It's from April 17th of last week.

And, Ms. Klein, while you're welcome to read any part of this that you would like, the part that I was going to refer you to is on page 25 and 26.

A. Okay. (Pause.)

Q. Do you --

A. Give me just one moment. I'm a very slow reader.

Q. Please take your time.

A. That's why I'm not going to read the whole document or we'd be here all day.

MS. SULLIVAN: Before you ask your first question about the document, can we have a minute?

THE WITNESS: Okay.

(Discussion off the record.)

THE WITNESS: Okay.



BY MR. HIRSCH:

Q. Do you see on these pages that Mr. Zabransky refers to the decision to stop approving DCS forms?

A. Uh-huh.

Q. And you see that at the top of page 26, Exhibit 3, Mr. Zabransky says, "I believe it," the decision.

A. Right.

Q. "Was tied to a court decision in the Court of Appeals." He says it's "the department's obligation."

A. Uh-huh.

Q. Okay. He said that might have been 1996 and then there's a question.

"Would that be the decision that said paraphrasing -- and nobody is going to hold you to my paraphrase -- that the Department of Energy has an unconditional obligation to begin acceptance of spent fuel in 1998?"

Answer: "To the best of my recollection."

Was there a decision from the DC Circuit in the Indiana Michigan case in 1996 saying that the Department of Energy had an unconditional obligation to



begin accepting spent nuclear fuel in 19 --

MS. POWELL: I'm going to object.

BY MR. HIRSCH:

Q. -- 98?

MS. POWELL: Beyond the scope, but you can answer that.

THE WITNESS: I believe it was 1996. I'm not sure of the year, but there was the Indiana Michigan case that held reciprocal only to the payment of fees. That was the one condition.

BY MR. HIRSCH:

Q. All right. And was the decision to stop approving DCS forms tied to the decision that had come down in the Indiana Michigan case?

MS. POWELL: Again, we're getting into the substance of General Counsel's or the basis for General Counsel's making the recommendation and we assert the attorney work product privilege and instruct the witness not to answer.

MR. HIRSCH: Well, let me just say that I think to the extent that Mr. Zabransky already testified about it, there's been a waiver here and so

among other, in addition to all the other reasons we've discussed, I don't think the attorney-client privilege applies. Are you instructing the witness not to answer?

MS. POWELL: I am. I understand Mr. Zabransky was testifying to the best of his recollection. We stand by our objection and instruct the witness not to answer.

BY MR. HIRSCH:

Q. Are you going to follow your lawyer's advice, Ms. Klein?

A. Yes.

Q. Were there meetings at the Department of Energy regarding how the DOE was going to respond to the Indiana Michigan case after it came down from the DC Circuit?

MS. POWELL: Object to beyond the scope. You can answer.

THE WITNESS: Yes.

BY MR. HIRSCH:

Q. And when were those meetings held?

A. Constantly thereafter.



Q. I don't think we need to mark this as an exhibit, but I'm just going to hand you a copy of the Indiana. Let me give counsel one as well.

MS. POWELL: Could we mark that if it's all right?

MR. HIRSCH: Fine. Go ahead. I'm just going to refer to the date.

THE WITNESS: Yeah, decided July 23rd. Okay.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 4.)

BY MR. HIRSCH:

Q. Okay. Ms. Klein, I've marked as Klein Deposition Exhibit 4 a copy of a printed decision from the United States Court of Appeals for the District of Columbia Circuit in Indiana Michigan Power Company, et al. V. the Department of Energy.

Does this document reflect that the decision came down from the DC Circuit in July of 1996?

A. Yes, it does.

Q. And does that decision help refresh your recollection about what meetings were held following



the decision from the DC Circuit?

A. Yeah, there were. I mean, there were meetings before this and after this. There were lots and lots of meetings. There were so many meetings, I couldn't begin to remember all or with whom. There were meetings with Justice, meetings within GC.

Q. NGC. What is NGC?

A. Within General Counsel.

Q. I'm sorry.

A. GC is General Counsel. Sorry.

Q. I misunderstood you. Was the Indiana Michigan case discussed at any of the meetings you previously testified about regarding the decision to suspend the DCS process?

MS. POWELL: And again I'll object on the basis that you're getting into the substance of attorney-client work product privilege and instruct the witness not to answer the question. And hopefully she'll follow my advice.

BY MR. HIRSCH:

Q. Are you going to follow your lawyer's advice?

A. Yes.



Q. Is it correct that before the Indiana Michigan case came down, the Department of Energy's position was that it did not have a firm obligation to begin picking up spent nuclear fuel in 1998?

MS. POWELL: I'm going to object to beyond the scope and to the extent it calls for a legal conclusion, but you can answer if you know.

THE WITNESS: Yes. We said it was conditioned upon the operation of a repository.

BY MR. HIRSCH:

Q. And that was the position that was rejected by the DC Circuit; is that correct?

A. Yes.

Q. After this decision came down, that's the Indiana Michigan decision, did the department conclude that the previously approved DCS forms represented a binding obligation of the Department of Energy?

MS. POWELL: That's just a time frame. You can answer.

THE WITNESS: Yes.

BY MR. HIRSCH:

Q. And it was after this decision that the DOE

determined to stop approving DCS forms; is that correct?
MS. POWELL: One second. You can answer with respect to the time frame only. I mean to the extent that you're making any connection between the decision and -- the decision in the DC Circuit and DOE's decision, we would object to that. But you can answer.
THE WITNESS: Yeah, it was late '96. So that would be after July '96.
BY MR. HIRSCH:
Q. It was within -- let me put it this way, Ms. Klein. It was within six months of the decision in the Indiana Michigan case that the department decided to stop approving DCS forms; is that correct?
MS. POWELL: That's the same objection, but you can answer that.
THE WITNESS: It was within six months from that decision, but I'm not saying there was a connection.
BY MR. HIRSCH:
Q. Well, Ms. Klein, was there a connection or



not?
MS. POWELL: I'm going to object on the basis that there's attorney-client privilege, work product privilege. We're getting into the reasons, the bases. It was upon advice of General Counsel and to the extent we're getting into the General Counsel's reasons for the decision, I will instruct the witness not to answer.
BY MR. HIRSCH:
Q. Are you going to follow your lawyer's advice?
A. Yes.
Q. Is it correct that the DOE hasn't approved any DCS forms submitted by utilities since early 1997?
A. Yes.
Q. Are you aware that Mr. Zabransky testified last week that the DOE doesn't even review the DCS forms when they -- if they're submitted by utilities?
A. I became aware of it when I read this just now, but I was not aware of it before --
Q. All right.
A. -- reading this exhibit.
Q. Mr. Zabransky's transcript.



A. 3. Yes.
Q. Will you also look at page 36, 37 of Mr. Zabransky's transcript.
A. Are we back to Zabransky?
Q. Back to Exhibit --
A. 3.
Q. -- 3.
A. (Pause). Okay.
Q. I'm going to refer you in particular to page 37.
A. Oh, I just read --
Q. Did I --
A. I read page 35 and 36.
Q. I apologize if I misstated a page. Why don't you go ahead and read page 37.
A. Okay. (Pause).
MS. POWELL: Before you ask your question, Mr. Hirsch, I should have done this earlier when it was marked, but it does appear that this is not the final transcript of Mr. Zabransky. So...
MR. HIRSCH: It is the rough ASCII.
THE WITNESS: It looks pretty rough since



I can't read some of the words, but I think I get the point here.
BY MR. HIRSCH:
Q. All right. What I'm going to refer you to in particular we start at the bottom of page 36.
A. Okay.
Q. And there's a question. "Well, if I'm the utility and I'm trying to decide when I need to -- I think it's -- send in my DCS, how do I determine that?"
Answer: "Based upon the fact in DOE said it doesn't anticipate the repository to operate prior to 2010."
Question: "So under that analysis or interpretation, no DCS would be due as we sit here today; is that correct?"
Answer: "As of this point in time, that's correct."
Do you see that answer?
A. I do see that answer.
Q. Do you agree with Mr. Zabransky that given the current status of the nuclear waste program that there are no DCS forms due from the utilities?

MS. POWELL: I'm going to object to beyond the scope and to the extent it calls for a legal conclusion, but you can answer.

MR. HIRSCH: I don't think it's beyond the scope.

THE WITNESS: So under that analysis. Would you ask your question again.

BY MR. HIRSCH:

Q. I'll rephrase it. Do you agree with Mr. Zabransky's statement in the deposition we just read that at this point in time there are no DCSs due from the utilities to the Department of Energy?

MS. POWELL: Same objection.

THE WITNESS: But not for the reason that he stated in it. Because we're no longer --

BY MR. HIRSCH:

Q. Do you agree?

A. We're no longer approving or disapproving them.

Q. So you agree that there are no DCSs due from the utilities at this point in time; is that correct?

MS. POWELL: I'm going to object to beyond



the scope and to the extent it calls for a legal conclusion, but you can answer.

THE WITNESS: This is my opinion. Because I know I'm here to talk about the department's position and I don't know that the department has a position on this. But it seems to me that since we've been writing everyone and saying we're not able to approve them that they would have a right not to be sending them in.

But that's -- I haven't analyzed the issue or thought about it, to be honest. Or discussed it to get a departmental position on it.

BY MR. HIRSCH:

Q. Well, as far as you're concerned, there aren't any DCSs due from the utilities at this point; is that correct?

MS. POWELL: Same objections.

THE WITNESS: Again, this is my gut reaction. This is the first time I thought about it. So that's my gut reaction is yes, I agree.

BY MR. HIRSCH:

Q. And the reason?



A. It's not the department's position that I know of. So...

Q. Do you know if the department has taken a formal position with respect to this issue?

MS. POWELL: Same objection, but you can answer.

THE WITNESS: No, I don't. This particular twist on this issue has never been presented to get a departmental position on it.

BY MR. HIRSCH:

Q. I'm sorry. I didn't mean to interrupt?

A. That's okay. I finished.

Q. All right. But it's your position that no DCSs are due because the department has stopped approving or disapproving them; is that correct?

MS. POWELL: Same objection.

THE WITNESS: Let me put it this way. If I was a utility, I would continue to send them in. But so I would not -- if the utility called me and asked me for my advice, I'd say just keep going. So I don't really. I have -- as I say, I haven't really analyzed it, but based on the fact that we've been



writing letters and saying we cannot approve it at this time, I could see why a utility would think "why should I bother to send it in," but I don't really. I don't know legally in contract interpretation what the right answer is. I really don't.

BY MR. HIRSCH:

Q. You would understand given the fact that the DCS -- strike that.

You would understand that given that DOE has stopped approving DCS forms that a utility could decide to stop submitting them; is that correct?

A. I could understand.

MS. POWELL: Objection, beyond the scope, leading conclusion, but you can answer.

THE WITNESS: I could understand that, yes.

BY MR. HIRSCH:

Q. And is Mr. Zabransky now the head of the office that's in charge of approving DCS forms?

A. He is the head of -- I forgot what it's called, transportation and waste acceptance. He's the Acting Director of Transportation and Waste Acceptance.

Q. All right. And there was a question: "Does this document anywhere inform the reader about when year 1 is?" Answer: "I have not found such a statement in the document as to what year 1 is."

And I believe that based on your testimony, you haven't identified what year year 1 would be either based on this document; is that correct?

MS. POWELL: Again, I'll object to beyond the scope.

THE WITNESS: I haven't read the whole document in a long time. So I don't know, but I don't -- I don't know what it says as to -- but this table does not tell you.

BY MR. HIRSCH:

Q. Right.

A. This particular table does not.

Q. All right. And we looked at another table on page 4, which is Projected Nominal Acceptance Rates in Exhibit 5, and that doesn't have any years either; is that correct?

A. That's correct.

MS. POWELL: Same objection.



BY MR. HIRSCH:

Q. All right. You see Mr. Zabransky's next or the next question and the answer. Question: "Would it be possible for a utility using that document -- the 1995 ACR -- to determine when its delivery commitment schedule was due?" Answer: "I don't believe so."

A. I see that.

Q. Do you agree with Mr. Zabransky's position on this issue?

MS. POWELL: Again, it's beyond the scope, but you can answer to your personal opinion.

THE WITNESS: I think the utilities all know that 2010 has been our projected date. So, but -- and I have not read this whole document recently. So, but based on those two tables, if you're just looking at those two tables and don't know that our projected date is 2010. But --

BY MR. HIRSCH:

Q. All right.

A. -- we have been quite vocal on 2010.

Q. All right. Well, we'll get to the vocal part in a minute, Ms. Klein, but if the DOE's position



currently is that it's going to start in 2010, would the DCS submissions from the utility be due 63 months before that date?

A. Yes.

MS. POWELL: I'm going to object to beyond the scope. To the extent it calls for legal conclusion, but you can answer that.

THE WITNESS: Yes.

BY MR. HIRSCH:

Q. Why don't we take a lunch break.

A. That's a good idea.

(Recess, 12:08 to 1:07 p.m.)

AFTERNOON SESSION

(Thereupon, the reporter marked for identification Deposition Exhibit No. 7.)

(Thereupon, the reporter marked for identification Deposition Exhibit No. 8.)

(Recess, 1:07 to 1:16 p.m.)

BY MR. HIRSCH:

Q. Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 7, which is a letter from Ken Petersen, Kenneth Petersen at ComEd to Beth



Tomasoni at the Department of Energy dated September 25, 1996, and then attached to the letter are a series of DCS forms and the Bates labels for this document is COF 02165 through 2172.

Ms. Klein, do you recognize Klein Deposition Exhibit 7 to be the DCS forms ComEd submitted for proposed delivery year 2002?

A. I'm just looking for the proposed delivery.

Q. That's line 2.3.

A. Yes. I recognize it.

Q. Do you recall seeing Klein Deposition Exhibit 7 at or about the time it was sent?

A. I don't recall seeing it, but...

Q. All right. I'd like you to look at Klein Deposition Exhibit 8, which you should have in front of you. Klein Deposition Exhibit 8 is the DCS forms submitted by Commonwealth Edison company for year 2002 and these don't have a Bates label. They have the page numbers where we got them, which was from the government appendix to the Summary Judgment Motion in this case, and those appendix pages are 284 through 290.

Q. Wouldn't that also cause the DOE to have to reevaluate the DCS forms that had been previously submitted?

MS. POWELL: That's beyond the scope.

THE WITNESS: Not necessarily. I don't think necessarily.

BY MR. HIRSCH:

Q. Well --

A. One of the -- I don't think -- we could still have a legal obligation to pick up a smaller amount, but we would perhaps be picking up more and that way we'd limit, hopefully, our damages by picking up more than is legally obligated and catching up. Let's put it that way. We would like to catch up in a few years.

Q. Well, the utilities who first submitted -- strike that.

And the utilities who submitted DCS forms based on the 1991 ACR were using whatever the allocation that DOE had provided based on the 900 rate, weren't they?

MS. POWELL: Beyond the scope.



THE WITNESS: I know the '95 year. I don't know the numbers in the 1991. So I don't know. I know in 1995. Were they the same? I don't know.

MR. HIRSCH: 12.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 12.)

THE WITNESS: Is this the 1991?

BY MR. HIRSCH:

Q. Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 12, which is a copy of the December 1991 Annual Capacity Report or ACR report from Department of Energy. And in particular I'd ask you to refer to page 9 of the document, which is a table.

Does this Table 3.1 reflect that the DOE was providing allocations to utilities based on a 900 metric ton rate after a two-year ramp-up?

MS. POWELL: I'm going to object to beyond the scope and the document speaks for itself, but you can answer to your personal knowledge.

THE WITNESS: Yes.

BY MR. HIRSCH:

Q. Now, to the extent that a utility submitted a



DCS form based on the allocation it had for a particular year, that was based on the 400, 600, 900 rate; is that correct?

A. Yes, that's correct.

MS. POWELL: And I'll object, beyond the scope, but you can answer.

BY MR. HIRSCH:

Q. Now, if the DOE plans on accepting at a higher rate closer to the 3,000 metric ton rate, would that cause the DOE to reevaluate the DCS forms that had been previously submitted by the utilities?

MS. POWELL: Once again, beyond the scope.

THE WITNESS: Well, it would be required to reevaluate I guess is a fair word. To reevaluate, yes. Whether we would change it or not, I don't know.

BY MR. HIRSCH:

Q. It would be required to reevaluate the DCS forms?

A. That's just my interpretation. It's not -- I don't know the department's position on this. I've never gotten a departmental position.

Q. Well, the DOE isn't planning on telling a



utility that they're basically stuck with whatever allocation they put in based on the 900 rate, even though the DOE is actually using a larger rate, are they?

MS. POWELL: Object to beyond the scope.

MR. HIRSCH: I don't think it is.

THE WITNESS: I don't understand the question.

BY MR. HIRSCH:

Q. Well --

A. What do you mean stuck with? You mean they were not -- well, go ahead.

Q. Well, let me try and give you an example. Let's just take GP. Look back at Table 3.1.

A. Uh-huh.

Q. Take GPU Nuclear there. Do you see there's an allocation there for 31.1?

A. Uh-huh. Yes.

Q. And presumably GPU Nuclear may have -- let's assume that they submitted a DCS form for that first year for 31.1 metric tons.

A. Yes.

Q. All right. Now that the DOE is planning on picking up at a rate which is significantly higher than the 900 metric ton rate, does the DOE intend to take the position that GPU would be limited to the 31 metric tons from the original 1991 ACR?

MS. POWELL: I'm going to object as beyond the scope, calls for speculation and to the extent it calls for a legal conclusion. But if you can answer that.

MR. HIRSCH: It's not beyond the scope, but --

THE WITNESS: As I say, I don't know what DOE's formal position is on this, but we wouldn't necessarily do it through the mechanism of a DCS. We would reevaluate. I don't know that we would amend the DCS. I don't know what we would do, but we would definitely reevaluate and I don't know what we would -- how we would go about taking the more than 31. If we had capacity for more than 31. I don't know the mechanism that we would use.

I doubt we would amend the DCS, to be honest, because we're not interested in increasing our



legal obligation. We're not interested in increasing damages against the government. So I think we would do it in a way that we could pick up more but without being legally obligated.

BY MR. HIRSCH:

Q. So I'm sorry. I wasn't sure what you meant by reevaluate the situation.

A. Well, reevaluate is the word in here.

Q. I see.

A. It says that we would reevaluate and I would -- it seems to me when we get closer to having a facility, we're going to have to relook at the whole process and how to go about it, I mean.

Q. Relook at the whole DCS process?

A. Relook at the standard contract and the DCS process would be part of it because we have stopped processing them and we will need to start processing them again. So it seems to me that we would have to make some adjustments, but what mechanism we would use, I don't think anyone that I know of has thought about it yet.

Q. Well, looking at year 5 --



A. Okay.

Q. -- on the table.

A. GPU?

Q. No, for anybody.

A. For everybody year 5.

Q. Look at year 5. According to year 5, there's allocations for 900 metric tons on here.

A. Uh-huh.

Q. You see that?

A. Uh-huh.

Q. And I believe you testified earlier that the current plan for the DOE is to pick up 3,000 metric tons?

A. Yes, that's correct.

Q. By the fifth year?

A. Yes.

Q. All right. So that's even on my mathematically challenged basis another 2100 metric tons?

A. Yes.

Q. Do you know how the DOE would allocate or determine how it was going to have that additional 2100



tons removed?

A. No, I don't know.

MR. HIRSCH: Off the record.

(Recess, 1:52 to 2:02 p.m.)

BY MR. HIRSCH:

Q. Ms. Klein, when will the Department of Energy start removing fuel from the utilities under the standard contract?

A. Our current plan is 2010.

Q. And would you say that it's more likely than not that the DOE will make that 2010 date?

A. Yes, I would say it is more likely than not.

Q. What's the basis for your -- for that belief?

A. I believe the site will be designated in August, which is the major milestone.

Q. When you say designated in August, do you mean --

A. Congress will override the state's veto.

Q. And just so we are all on the same page and it's clear for the record, Secretary Abraham recommended the site; is that correct?

A. Yes, on February 14th.

get the repository open by the 2010?
A. We plan to submit a license application to the Nuclear Regulatory Commission in 2004.
Q. Is it correct that the Nuclear Waste Policy Act in Section 10134 gives the DOE 90 days to submit a license application to Congress after the President's recommendation for the site becomes final?
A. Should I?
It's not -- after the designation takes effect 90 days. That's what it says, yes.
Q. Right, right. And according to your plan, the designation would take place in August of 2002; is that correct?
A. That's correct.
Q. Why is it that the DOE is not -- or strike that.
I take it from what you're saying that the DOE is not going to make the 90-day deadline for submitting a license application?
A. That's not the current plan is to make the 90 days.
Q. Okay.



A. Some people are actually thinking about that still, but that is the current plan the Secretary testified last week 2004 before Congressman Buyer.
Q. All right. Why is it that the DOE isn't going to be able to make that original statutory 90-day deadline?
A. Well, that -- I mean, that's a legal conclusion, but it's not one that I worked on, okay, but I know it. The General Counsel's Office looked at. They said that is not a requirement that we have to. We do not lose our authority if we don't meet the 90-day deadline. It was to expedite the process and not to slow the process, down and NRC sent us a sufficiency letter as required by the statute and said that we had enough information to go forward with an application. But we have open items that we needed to resolve with them before they wanted to docket it.
Q. So, basically the DOE's position is even if we don't make the 90-day statutory deadline, that doesn't prevent us from submitting a license application?
A. That's correct.
MR. HIRSCH: Let's mark this as 13.



(Thereupon, the reporter marked for identification Deposition Exhibit No. 13.)
BY MR. HIRSCH:
Q. Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 13, which is a cover letter to the President from the Secretary of the Department of Energy dated February 14, 2002, and then attached to that is the Recommendation by the Secretary of Energy Regarding the Suitability of the Yucca Mountain Site for a Repository under the Nuclear Waste Policy Act of 1982.
A. Yes.
Q. Do you recognize this document as the Secretary's cover letter and recommendation for that Yucca Mountain site?
A. Yes.
Q. Did you have a role in preparing Exhibit 13?
A. I reviewed it several times in draft.
Q. Who else was involved in preparing it?
A. Lots of people. Mostly there was a group in the Secretary's office. There is Mike Vogel, who works for our -- the chief scientist for the M&O



contractor, was very involved in it. Christopher Kouts, who works in the front office with me. Alan Brownstein. Lee Otis, the General Counsel. Joe Davis or Davies. Joe Davis I think his name was. And some special assistants in the Secretary's office.
Q. Will you look at page 43 of the recommendation.
A. Uh-huh.
Q. Actually, bear with me. I've given you the wrong page number. Okay. 45.
A. Yes.
Q. You see where the Secretary says in the report: "Our current plans call for final license application at the end of 2004, not 2006"?
A. Yes, I do.
Q. When it says the end of 2004, do you know what month is referred to there?
A. My guess is December.
Q. December of 2004?
A. I don't know for sure, but I think that's -- obviously they purposefully said the end to give some flexibility there, but...

Q. All right. And have you been involved in discussions at DOE about when the license application is going to be submitted?
A. Yes.
MS. POWELL: Again, just answer with respect to outside of any privileged conversation.
THE WITNESS: (Nods head).
BY MR. HIRSCH:
Q. And when is it your understanding that the license application is going to be submitted?
A. 2004.
Q. When in 2004?
A. I would guess maybe December just because it says the end, but there is discussion of moving it up if possible. There is discussion.
Q. But as best you can tell, the current plan would be to submit the license application around December '04; is that correct?
A. Yes.
Q. All right. Now, would you look at page 45 of the document. Hopefully I'll have the right --
A. That's the page we're on.



Q. Yeah.
A. Okay.
Q. Little further down. Actually, let me refer you to a different page. Page 3 of the document.
A. Not the letter but the document?
Q. Not the letter but the report.
A. Okay.
Q. I apologize. You see the statement in the second or the first full paragraph on page 3 that says: "In short, even if the Yucca Mountain recommendation were accepted today, an estimated minimum of eight more years lies ahead before the site would become operational."
A. Uh-huh.
Q. Do you know what the term estimated minimum of eight more years means?
MS. POWELL: Object to beyond the scope, but if you know, answer.
BY MR. HIRSCH:
Q. That's right within the scope.
A. I can guess what the purpose was of saying that, but I can't tell you. I just know 2010. That



gets you to 2010.
Q. All right. Well, you reviewed a draft of this document; is that correct?
A. Yes. I understand the audience that this particular sentence was addressed to and that was --
Q. Who --
A. -- that we're not going to start tomorrow transporting spent fuel around the country. We have time to work out these issues. That was the impetus itself behind these kind of statements.
Q. Well, does the DOE have an estimate of the maximum amount of time that it would take for the site to become operational?
A. I don't think so. We have an estimated date of 2010. That's our date.
Q. But that's referred to as the minimum date, isn't it, here?
A. Well, it is they say minimum date there. That's what it says, an estimated minimum.
Q. Will you look at page 6 of the document. You see in the paragraph right above the 3 heading?
A. Uh-huh.



Q. There's a statement there that: "The NWPA by its terms contemplated that the entire process of siting, licensing, and constructing a repository would have been completed more than four years ago, by January 31, 1998." You see that statement?
A. I do.
Q. Do you agree that the Nuclear Waste Policy Act contemplated that process of siting, licensing, and constructing a repository would have been completed by January 1998?
MS. POWELL: I object, beyond the scope and to the extent it calls for a legal conclusion. You can answer.
THE WITNESS: I'm thinking. Yes.
BY MR. HIRSCH:
Q. Ms. Klein, will you look at page 40 -- excuse me -- 19 in the back.
A. 19?
Q. Right. Last paragraph, first sentence says: "This is not an insignificant point" --
A. Wait a minute. Where are you?
Q. I'm sorry. Last --

MS. POWELL: I understand.
MR. HIRSCH: So I do want it understood that if I don't respond to every single one, I'm not agreeing with your position.
BY MR. HIRSCH:
Q. But go ahead and answer.
A. I don't know the answer. I already forgot the question. But when you said it, I know I didn't know the answer.
MR. HIRSCH: All right. Let's read it back.
(Requested material was read.)
THE WITNESS: No, I don't know.
MR. HIRSCH: Let's mark this 16.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 16.)
BY MR. HIRSCH:
Q. Ms. Klein, I've shown you what's been marked as Klein Deposition Exhibit 16, which is a document titled Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program. It's dated May 2001 and it's apparently RW publication



or DOE/RW. It has a designation 0533.
A. Yes.
Q. Let me just ask you. What does the 0533 represent?
A. I have absolutely no idea.
Q. That's fine.
A. I'm sure it's a way to find the document somewhere. I don't know.
Q. Incidentally, I didn't ask you this before. Do the different offices in OCRWM have different designation numbers?
A. This means OCRWM, RW, but, yeah, I mean there are. There's -- but I don't think that's related to this.
Q. No. I'm changing the subject just for a minute.
A. There's RW 40 and there's RW 50 and I don't know which one is which.
Q. All right. What's the designation of the office that you're in now?
A. RW 2 is how I -- my little routing symbol.
Q. All right. Okay.



A. Which means I report directly to the Deputy Director. He's RW 2. Margaret is RW 1.
Q. Okay. Do you recognize Klein Deposition Exhibit 16 as the May 2001 total system life cycle cost report put out by OCRWM?
A. Yeah. I mean, it's labeled that way. I'm not real familiar with the document, but...
Q. Did you review the document before it was issued?
A. I may have.
MS. POWELL: Object. It's beyond the scope, but answer.
THE WITNESS: I may have reviewed pieces of it. I didn't review the whole thing.
BY MR. HIRSCH:
Q. Will you look at page 3-8 at the bottom.
A. Yes.
Q. And in particular this with some cost assumptions. Do you see this?
A. Cost by phase.
Q. Right.
A. Yeah. Historical, future, yes.



Q. All right. Now, let me just ask you in general. Is one of the purposes of the total system life cycle cost reports to determine the total cost of the Nuclear Waste Disposal Program?
MS. POWELL: Objection.
THE WITNESS: Yeah.
MS. POWELL: Beyond the scope, but --
THE WITNESS: Yes.
MS. POWELL: -- you can answer.
BY MR. HIRSCH:
Q. And is one of the reasons that that's done to make a determination whether the fees that are being charged to the utilities are sufficient?
A. I think that's --
MS. POWELL: Same objection. Go ahead.
THE WITNESS: I think that's required by the statute that we do that, yes.
BY MR. HIRSCH:
Q. All right. Now, going back to the bullet points on page 3-8 of Exhibit 16.
A. Uh-huh.
Q. Does this show a construction phase for the

together -- RW puts together a budget and gives it to our controller. The department puts together its whole budget, gives it to OMB. It becomes part of the President's budget and it gets released as the President's budget, whenever the budget cycle is. I don't know.

BY MR. HIRSCH:

Q. But to your knowledge, there's been a budget proposal submitted for OCRWM for the fiscal year 2003; is that correct?

A. I think so.

MS. POWELL: Same objection, but you can answer.

THE WITNESS: I think so.

BY MR. HIRSCH:

Q. And do you know whether that budget proposal contains an estimate of the annual expenditures necessary to open Yucca Mountain by 2010?

MS. POWELL: I'm going to object, beyond the scope and to the extent it calls for anything that would be covered by the executive privilege. I don't know.



THE WITNESS: My guess if it's been released it will only -- I think it only has 2003. I don't think it goes into anything beyond 2003.

BY MR. HIRSCH:

Q. Is there some other --

A. But I don't know.

Q. Is there some other DOE document which would identify the amount of money that DOE needs appropriated to open the repository by 2010?

A. TSLCC.

MS. POWELL: Same objection, beyond the scope, but...

THE WITNESS: I believe it's in the TSLCC, which is one of these exhibits here.

MR. HIRSCH: 20.

(Thereupon, the reporter marked for identification Deposition Exhibit No. 20.)

BY MR. HIRSCH:

Q. Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 20, which is a document from US General Accounting Office titled Testimony before the Subcommittee on Energy and Air Quality,



Committee on Energy and Commerce, House of Representatives, and it's identified for release on delivery March 21, 2002. Apparently it's a statement of Ms. Gary Jones, Director, Natural Resources and Environment.

Have you ever seen this testimony from GAO?

A. No, I have not.

Q. Will you look at page 9 of the document.

A. Yes.

Q. On page 9 there's a statement in the middle of the second paragraph that says: "Third, the four-year construction time period that DOE's current schedule allows may be too short. For example, a contractor hired by DOE to independently review the estimated costs and schedule for the nuclear waste program reported that the four-year construction period was too optimistic and recommended that the construction phase be extended by a year and a half." You see that?

A. I do see that.

Q. Now, I guess you testified earlier that the DOE has now shortened the construction period from four years to two years; is that correct?



A. That's the estimate, yes.

Q. All right. And this report says a contractor concluded that four years was too optimistic; is that correct?

A. That's what this says.

Q. All right. And do you know who the contractor hired by the DOE to independently review estimated costs and schedule for the nuclear waste program was?

MS. POWELL: Objection, beyond the scope, but you can answer.

THE WITNESS: I believe I do.

BY MR. HIRSCH:

Q. And who's that?

A. Burns and Roe.

Q. When were they retained?

MS. POWELL: Same objection. You can answer.

THE WITNESS: I don't know exactly when they were retained.

BY MR. HIRSCH:

Q. Well, what was the assignment given to Burns

and Roe?
MS. POWELL: Same objection, but you can answer.
THE WITNESS: I only know this from hearsay, but I mean overhearing people who are involved in this talk about it, but they were to do an independent review of the program. I'm not sure what their whole scope was.
BY MR. HIRSCH:
Q. And do you know when -- was there a written report from Burns and Roe?
MS. POWELL: Same objection. You can answer.
THE WITNESS: I believe there was.
BY MR. HIRSCH:
Q. And did that report conclude that the DOE would take approximately five and a half years to construct the facility?
MS. POWELL: Same objection.
THE WITNESS: I don't know.
BY MR. HIRSCH:
Q. That's what the GAO testimony seems to



indicate, isn't that?
A. That's what the GAO testimony indicates. We do not agree with GAO on many things about the repository program.
MR. HIRSCH: I'm going to make a request that the Burns and Roe report be produced. I don't think we've gotten that produced. We couldn't find it.
MS. SULLIVAN: I'm going to suggest that you at the end of Ms. Klein's deposition, since we have a list growing, that you send me a letter.
BY MR. HIRSCH:
Q. The report goes on to say: "Bechtel anticipates a five-year period of construction between the receipt of construction authorization from NRC and the opening of the repository." Are you aware of such an estimate by Bechtel that it would take five years to construct the facility?
MS. POWELL: Same objection, beyond the scope, but you can answer.
THE WITNESS: No, I'm not aware of one. (Witness conferring with counsel.)



BY MR. HIRSCH:
Q. Will you look at page 10 of the report or the testimony, Klein Deposition Exhibit 20. Do you see at the very top of that page there's a statement in there: "In its August 2001 report on alternative means for financing and managing the program, DOE stated that unless the program's funding is increased, the budget might become the 'determining factor' whether DOE will be able to accept wastes in 2010."
Were you aware or are you aware, Ms. Klein, that the DOE has taken that position?
MS. POWELL: Object to beyond the scope, but you can answer.
THE WITNESS: I worked on that report and I remember emphasizing how important the budget is. I don't remember if we said it was the determining factor or not, but yes, the budget is a big issue.
BY MR. HIRSCH:
Q. And is it correct that it's a big issue because if the DOE doesn't get enough money, it can't open the repository in 2010?
A. That's true.



Q. Would that report that I guess is referenced in the footnote 7 show what the annual level of appropriations the DOE needs to open a repository on time?
A. I don't believe so.
MS. POWELL: I was going to say, beyond the scope but if you know.
THE WITNESS: It's public. You can get that on our Web site and you could see. That's why I don't think it would have a bunch of numbers in it.
BY MR. HIRSCH:
Q. Are you aware that there is a time line on the DOE Web site regarding Yucca Mountain?
MS. POWELL: Objection, beyond the scope, but you can answer.
THE WITNESS: I don't know that there's still one on there, but that doesn't surprise me I guess.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 21.)
BY MR. HIRSCH:
Q. Ms. Klein, I've handed you what's been marked

A. Start permit -- permanent closure. No, it's 21. Excuse me.
Q. 2010.
A. I'm looking at the wrong place. "If licensed, first possible waste acceptance" 2010.
Q. So that's an assumption that if the facility is licensed by the NRC, that's the first possible waste acceptance that can occur?
A. At the repository.
Q. Right.
A. We can't accept it if it's not licensed. We can't accept spent fuel at the repository without a license to possess nuclear material.
Q. And you know what the term first possible waste acceptance is supposed to mean?
MS. POWELL: Object, but if you know.
THE WITNESS: I think it says first possible. I have to look it up. I mean, first possible.
BY MR. HIRSCH:
Q. It also implies that it might not be accepted in 2010, doesn't it?



MS. POWELL: Object. The document speaks for itself, but you can answer.
THE WITNESS: A lot of things could happen. An earthquake could come. We could have another 9/11. I don't know.
BY MR. HIRSCH:
Q. Is there a DOE document which reflects a range of possible dates that the DOE will start accepting fuel from utilities under standard contract?
A. Earlier. Much earlier we were hoping for a 2007 date, but in the last several years it's been 2010. But that was even -- that was just a pie in the sky the 2007, but that was kind of --
Q. The 2007 date was a pie in the sky date?
A. It was a hope. It was something that we would have liked to do, but it required NRC. It required a lot of regulatory action that we weren't sure we could get. So I don't know that we ever published it. It was just we were struggling with trying to figure out how to meet our waste acceptance obligation.
Q. All right. The 2007 projected acceptance date is dead at this point, isn't it?



A. Yeah, I would -- well, it hasn't been discussed that I know of that, I've known about in a long time. The 2007 has not been discussed, no.
Q. And does the fact that it's not been discussed reflect that it's not under consideration?
A. No. The new director is looking at all possibilities, and she's talking to people about accelerating.
Q. Are you aware of any current proposal of the DOE to begin accepting spent nuclear fuel before 2010?
A. Repeat that. Do you have objection in? Repeat the beginning of it. I'm sorry.
Q. Let me restate it. Are you aware of any current proposal by the DOE to begin accepting fuel earlier than 2010?
A. No.
Q. Going back to the question I guess I asked you a little earlier. Is there a DOE document that you've seen that reflects a range of acceptance dates starting in 2010 and including -- or strike that?
Have you reviewed a document at DOE which reflects this range to start removing spent nuclear



fuel from the utilities starting in 2010 and extending to some later date?
MS. POWELL: Objection, vague, but if you can answer.
THE WITNESS: Yeah, I don't understand the question. I think I know what you're asking, but it's -- try one more time.
BY MR. HIRSCH:
Q. All right. I will. Does the DOE have a current estimate that shows that it could start removing fuel spent nuclear fuel in 2010 and then projects out other possible start dates later than 2010?
A. No, not that I'm aware of.
MR. HIRSCH: Why don't we take five minutes here.
(Recess, 4:00 to 4:09 p.m.)
BY MR. HIRSCH:
Q. Ms. Klein, I think we got into this a little earlier, but let me just ask you. What is the Department of Energy's current estimate of the rate that it will begin removing spent nuclear fuel under

the standard contract if it starts performing in 2010?
A. Okay. For planning purposes only, 400 the first year, 600 the second, 1200 the third, 2,000 the fourth, 3,000 the fifth and 3,000 thereafter for the next five years. The whole thing is 10 years, however that calculates to 2019.
Q. And does the DOE anticipate that the 3,000 rate will extend beyond that first 10-year period?
A. We have not addressed that issue that I'm aware of.
Q. Is it correct that there's about 84,000 tons of commercial -- strike that.
Is it correct that the DOE has estimated that there's about 84,000 tons of commercial spent nuclear fuel that will have to be removed during the course of this program?
A. I believe --
MS. POWELL: Objection to beyond the scope, but you can answer.
THE WITNESS: I believe that's what's in the Secretary's statement. I have to go back and check, but sounds right.



BY MR. HIRSCH:
Q. Well, is it correct that the DOE would have to continue performing at the 3,000 period for some period of time -- strike that.
Isn't it correct that the DOE would have to continue performing at 3,000 rate for some period of time after that first initial 10-year period to remove those 83 or 84,000 tons of waste?
MS. POWELL: It's beyond the scope. You can answer.
THE WITNESS: It would require a legislative amendment because right now the Act only authorizes 70,000 metric tons in the first repository. So somebody would have to do something to work this out.
BY MR. HIRSCH:
Q. Well, even to get to the 70,000 tons, that's the limit of the repository.
A. I have to do my math here. 10 --
Q. Isn't it reasonable to assume that the DOE is going to have to continue to perform at a 3,000 metric ton rate after the initial 10-year period in order to



remove waste up to the capacity limit?
MS. POWELL: Same objection.
THE WITNESS: Not --
MS. POWELL: You can answer.
THE WITNESS: Not necessarily. I mean, we do have to eventually dispose of it all, but I don't know that there's a time frame. We have Navy spent fuel and I don't -- I don't know about the time frame, whether it has to be 3,000 -- or excuse me -- the rate, whether it has to continue at 3,000.
BY MR. HIRSCH:
Q. Do you know how long the repository facilities are designed to operate?
MS. POWELL: Same objection, but you can answer if you know.
THE WITNESS: I think it's 25 years.
BY MR. HIRSCH:
Q. Well, given that the repository is only designed to operate for 25 years, isn't it reasonable to assume or fair to assume that the DOE is going to have to continue picking up at a 3,000 rate beyond that first 10-year period?



MS. POWELL: Same objection.
THE WITNESS: I don't know why it has to be at 3,000 rate. That's my -- I don't know that that's the rate at which we will have to be picking up, I mean. I just know that's the way the Act is written. We have to do a report on whether a second repository is appropriate.
BY MR. HIRSCH:
Q. When is the DOE supposed to do that report on the -- let me just finish.
MS. POWELL: Yeah.
BY MR. HIRSCH:
Q. -- on the second repository?
MS. POWELL: Let me object, beyond the scope. You can answer.
THE WITNESS: I don't remember. I'd have to look at the statute, but it's supposed to talk about the need for a second repository.
BY MR. HIRSCH:
Q. Well, focusing on the 3,000 metric ton rate for a minute, do you know what the basis of that rate is?

A. My --
MS. POWELL: Well --
THE WITNESS: You don't have to say anything. I'm just waiting for you to have the opportunity.
My understanding is that at the time we came up with that figure, that was approximately the utility discharge rate and that we took 70,000 metric tons and divided it by 25. Both those reasons gave us the 3,000 and then we had 4, 6, 12, too, as a ramp-up period, less transportation and all that.
BY MR. HIRSCH:
Q. Let's talk about the first reason for a minute. The utility discharge -- strike that.
The DOE had looked at the utility discharge rate?
A. That's what I was informed of. I didn't personally do that.
Q. And is it correct generally that the 3,000 metric ton rate would equal the discharge rate plus some amount to get rid of the backlog of spent nuclear fuel?



MS. POWELL: I'm just going to note for the record that we offered Mr. Pollog on I think -- I think that you're talking about this topic, but you can answer.
THE WITNESS: I don't remember. I wasn't told about the backlog. I was informed that it was based on 3,000 was at the time the average utility discharge rate. So...
BY MR. HIRSCH:
Q. It was your understanding that the --
A. I don't know about the backlog issue at all.
Q. All right.
A. About that that accounted for a backlog.
Q. Is it your understanding that the 3,000 rate would keep up with the utility discharge rate?
A. Yes.
Q. Is that correct?
A. Uh-huh.
Q. And then I guess you mentioned the other reason or rationale. I'm sorry. What was the second rationale?
A. 70,000 metric tons, which is how much we're



authorized to put in the first repository, divided by the life of the repository, which is 25 years.
Q. Gives you about 3,000 metric tons a year?
A. Uh-huh.
Q. Given both of those reasons, are you aware of any reason why the DOE would run the repository at Yucca Mountain at a rate less than 3,000 metric tons?
MS. POWELL: Object to beyond the scope, but you can answer.
THE WITNESS: I understand there are lots of ramp-up issues. There's transportation issues. There's utility interface issues. Casks. I mean, that could affect it, but that was our planning and what we'd like to do is be able to do that at 3,000. But I know there's lots of things that need to be worked out.
BY MR. HIRSCH:
Q. Well, assuming that all the ramp-up issues are resolved including transportation?
A. Uh-huh.
Q. Are you aware of any reason why the DOE wouldn't operate the facility at a 3,000 metric ton



rate --
A. No, I'm not.
Q. -- over the life of the facility?
A. No, I'm not aware of any reason we would not do that.
Q. All right. You got or we saw this maybe a little earlier. In order to open by 2010, does the DOE need to essentially build a rail line from the existing rail line in Nevada to the repository?
MS. POWELL: Objection, beyond the scope, but you can answer.
THE WITNESS: That's one of the possibilities is building a rail line. The other is to have -- I know one of the counties wanted to have some sort of system through there. I think it's Lincoln County, Nevada. To have a transportation truck centrally located site. So we haven't made the decision yet. Mostly rail is our preferred alternative, but we haven't decided the routes and the methods.
BY MR. HIRSCH:
Q. So, well, is there -- is it correct that

there's not currently rail access to Yucca Mountain?
MS. POWELL: Objection, beyond the scope, but you can answer.
THE WITNESS: Yes.
BY MR. HIRSCH:
Q. And do you know how far from the current rail lines Yucca Mountain is?
MS. POWELL: Same objection.
THE WITNESS: No, I don't know.
BY MR. HIRSCH:
Q. So, in order to have rail access to Yucca Mountain, the DOE or its contractors would have to arrange for a rail line to be laid for however long that distance is; is that correct?
MS. POWELL: Same objection.
THE WITNESS: That sounds correct to me, but I'm not positive. But that does sound correct.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 22.)
BY MR. HIRSCH:
Q. Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 22, which is Volume 2 to



the Viability Assessment of a Repository at Yucca Mountain, Preliminary Design Concept for the Repository and Waste Package issued by the Department of Energy, and this was issued apparently in December of 1998. I believe one of our earlier exhibits was Volume 1 to the viability --
A. I think it was the overview.
Q. It was the overview -- you're right -- of the viability assessment from December of '98 and now I've given Volume 2.
Did you see this document at or about the time it was issued?
MS. POWELL: Objection, beyond the scope.
THE WITNESS: I have seen this document at or about the time that it was issued.
BY MR. HIRSCH:
Q. Did you have any role in helping to prepare Exhibit 22?
MS. POWELL: Same objection.
THE WITNESS: No, not that I remember. I'm pretty positive I didn't. I'm looking to see which piece.



BY MR. HIRSCH:
Q. I'm going to -- you can look at whatever part of it you'd like.
A. No, I did look at the overview, but this part I had no input in.
Q. Okay. What I'd like to refer you to is page 3-2 of the document. Do you see on page 32 there's a table Annual Repository Receipt Rates?
A. Uh-huh.
Q. And does this table reflect the 400, 600, 1200, 2,000, 3,000 metric ton rates that you previously identified?
A. Yes.
Q. Does this also show the 3,000 metric ton rate extending on from 2015 till 2032?
A. Yes, it does.
MR. HIRSCH: 23.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 23.)
BY MR. HIRSCH:
Q. Ms. Klein, I've handed you what's been marked as Klein Deposition Exhibit 23. It's a document



titled Analysis of the Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program dated September 1995, Department of Energy.
Did you review this document at or about the time it was issued?
MS. POWELL: Object to beyond the scope but...
THE WITNESS: I don't remember if I did. I may have.
BY MR. HIRSCH:
Q. Look at page 8 of the document. Look back at page 7, bottom of the page. You see at the last paragraph it says: "The Program Approach assumes that all SNF is stored at utility sites prior to being transported to the MGDS."
And the MGDS is the repository we've been referring to earlier; is that correct?
A. Yes.
Q. And then it says: "No MRS or interim storage facility costs, or storage costs at utility sites are included in this TSLCC analysis." Is it correct as of the date of this report, September '95, that the DOE

was not planning on building an MRS facility?
MS. POWELL: Object to beyond the scope, but if you know, you can answer.
THE WITNESS: I believe that's true, yes. We were not planning.
BY MR. HIRSCH:
Q. All right. And just for the record, an MRS facility is a monitored retrievable storage facility?
A. That's correct.
Q. Will you look at the next page of the document. There's a table there MGDS Receipt/Emplacement Rates.
A. Uh-huh.
Q. Does this table reflect that the DOE would remove spent nuclear fuel at a 3,000 metric ton rate from period 2014 until I think it's 2039?
A. Yes, it does. For planning purposes.
Q. Will you pull back out of your stack there of exhibits Klein Deposition Exhibit 16, please. I've asked you to look back at Klein Deposition Exhibit 16, which is the May 2001 total system life cycle cost report.



Will you look at the table located on page 4-14 of this document. Let me just ask you. Is it correct that Exhibit 16 is the last version of the total system life cycle cost report that the DOE has issued?
MS. POWELL: Objection to beyond the scope, but if you know, you can answer.
THE WITNESS: I believe so.
BY MR. HIRSCH:
Q. And does this table that's part of Exhibit 14 show that the DOE is projecting that it will remove spent nuclear fuel from utilities at a rate of 3,000 metric tons from the period 2014 through 2039?
MS. POWELL: Same objection, but you can answer.
THE WITNESS: Yes. As targets only, yes.
BY MR. HIRSCH:
Q. And then the prior years 2010 through 2013 reflect a 400, 600, 1200, 2,000 ramp-up rate that you provided earlier?
A. Yes.
Q. Is that correct?



A. That's correct.
Q. Do you have any reason to believe that this removal rate that's set out in this table is not the DOE's current estimate for the rate it intends to operate at?
A. I do not know that this is -- this was done in May 2001. I wouldn't know necessarily that the Secretary or the General Counsel or the Under Secretary would be aware of these planning numbers that OCRWM has given. So, and we have never asked the official DOE position on what they plan to do after that 10-year period. So, I mean...
Q. All right. Exhibit 16 --
A. But it is clearly in there as something that OCRWM has said as a target only.
Q. All right. And that Exhibit 16 was released to the public and to Congress and to all utilities?
A. Yes, it was.
Q. Is that correct?
A. Yes, it was.
Q. That Exhibit 16 shows the DOE performing at the 3,000 rate from 2014 through 2039?



A. For planning purposes, yes.
Q. Do you see on page -- well, I'd like you to refer further down on page 4-14. There is a statement in the middle of the third paragraph under the table that says, DOE'S "development and procurement of transportation casks for DOE SNF are not part of the CRWMS."
A. Uh-huh.
Q. You see that statement? I have to go back to my table of acronyms.
A. That means the Civilian Radioactive Waste Management System.
Q. I see. And do you know why the cost of transportation casks is not part of the Civilian Radioactive Waste Management System?
MS. POWELL: It's beyond the scope, but if you know, you can answer.
THE WITNESS: I don't know the answer.
BY MR. HIRSCH:
Q. Is there some other department of DOE that's supposed to pay for those transportation casks?
MS. POWELL: Same objection.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
------------------------------------------X YANKEE ATOMIC ELECTRIC COMPANY :
(98-126C)(Merow, S.J.) : CONNECTICUT YANKEE ATOMIC POWER COMPANY :
(98-154C)(Merow, S.J.) : MAINE YANKEE ATOMIC POWER COMPANY :
(98-474C)(Merow, S.J.) : FLORIDA POWER & LIGHT COMPANY :
(98-483C)(Wilson, J.) : NORTHERN STATES POWER COMPANY :
(98-484C)(Wiese, J.) : DUKE POWER, a Division of DUKE ENERGY CORP.:
(98-485C)(Sypolt, J.) : INDIANA MICHIGAN POWER COMPANY :
(98-486C)(Hodges, J.) : SACRAMENTO MUNICIPAL UTILITY DISTRICT :
(98-488C)(Yock, S.J.) : SOUTHERN NUCLEAR OPERATING COMPANY, et al. :
(98-614C)(Merow, S.J.) : COMMONWEALTH EDISON COMPANY :
(98-621C)(Hewitt, J.) : BOSTON EDISON COMPANY :
(99-447C) (Allegra, J.) : GPU NUCLEAR, INCORPORATED :
(00-440C)(Bush, J.) : WISCONSIN ELECTRIC POWER COMPANY : VOLUME
(00-697C)(Merow, S.J.) : II POWER AUTHORITY OF THE STATE OF NEW YORK :
(00-703C)(Damich, J.) : OMAHA PUBLIC POWER DISTRICT :
(01-115C)(Bush, J.) : NEBRASKA PUBLIC POWER DISTRICT :Discovery
(01-116C)(Sypolt, J.) :Judge: TENNESSEE VALLEY AUTHORITY :(Judge
(01-249C)(Bruggink, J.) :Sypolt)
Plaintiffs, :PAGES
V. :275 - 533

THE UNITED STATES, :

Defendant. :

-------------------------------------------X

Deposition of Susan Klein

Washington, DC

Thursday, April 25, 2002

Reported by: Denise Dobner Vickery, RMR, CRR

JOB NO. 144540

April 25, 2002

9:54 A.M.

Deposition of Susan Klein, held at the offices of:

Jenner & Block

601 13th Street, NW

12th Floor

Washington, DC 20005

Pursuant to notice, before Denise Dobner Vickery, a Registered Merit Reporter, Notary Public of the District of Columbia.

APPEARANCES:

Jenner & Block
For the Plaintiff COMMONWEALTH EDISON
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
BY: Norman M. Hirsch, Esq.

Shaw Pittman Potts & Trowbridge
For the Plaintiffs NORTHERN STATES POWER COMPANY, et al.
1650 Tysons Boulevard
McLean, VA 22102-4859
(703) 770-7962
BY: Alex D. Tomaszczuk, Esq.

Balch & Bingham LLP
For the Plaintiffs SOUTHERN NUCLEAR OPERATING COMPANY, et al.
1275 Pennsylvania Avenue, NW, Tenth Floor
Washington, DC 20004

Q. Okay. I've handed you what's been marked as Klein Deposition Exhibit 27, which is a document put out by the Office of Civilian Radioactive Waste Management titled Waste Acceptance System Requirements Document.
A. Uh-huh.
Q. Revision 4 and it's dated January 2002. Are you familiar with this document?
A. No.
Q. Have you seen system requirements documents put out by the Department of Energy?
A. I have seen one, yes, but it wasn't this one.
Q. All right. Was it an earlier version of the system --
A. I've seen actually a later version. I believe it's dated March 2002 and it's not called Waste Acceptance System Requirements Document. It's has a different title.
Q. All right.
A. I don't remember the title.
Q. Do you know what the purpose of the system requirements documents are?



A. Well, it's a way of controlling I mean -- and I'm saying this in my layperson's knowledge, but as you see, it says up there QA on the top. And you all probably know how important quality assurance is in the nuclear world and it's all done through requirements documents and making sure everything is done in accordance with requirements and signed off by people, and that is really the requirements document is the requirements. That is what you follow. That's the final word for the moment. They're revised quite frequently. As you can see, this is Revision 4. But there's a process you have to go through to revise them and have everybody concur on them.
Q. So that the requirements document is the document which is supposed to control what or how the program operates?
A. Yes, that's true.
Q. All right. Will you look at page 46 of Exhibit 27.
A. Uh-huh.
Q. Do you see that there's a table here. Estimated Schedule for Acceptance of Commercial and



Government-Managed Nuclear Material.
A. Yes.
Q. All right. And I'm going to refer you to the right-hand side, which is the commercial SNF. Do you see that on the table?
A. Yes.
Q. Okay. And at the top hand box it says, Total Projected Quantities and it shows 83,800. That's the projected quantity of spent nuclear fuel from commercial reactors that the DOE anticipates handling under the program; is that correct?
A. That's my understanding, yes.
Q. Okay. And further down you see there's a box following over from Projected Acceptance Schedule and this shows "Accept commercial SNF at the following estimated annual rates." I think it's metric tons per year. It says, "400 in 2010, 600 in 2011, 1200 in 2012, 2,000 in 2013, 3,000 in 2014 through the end of emplacement." You see that there?
A. I do.
Q. Is that the DOE's current expectation regarding the rates that it will perform at when the



repository opens?
A. Approximately, yes. As you know, at the end of that there's a lower number at the very end of the whole period, but that is approximately for planning purposes what we expect to be able to accept at the repository. 4, 6, 12, 3, 3, 3, 3.
Q. This shows 3,000 through -- 2014 through the end of emplacement.
A. Yes, but I think at the end of emplacement it actually gets lower in the figures in the document that I saw, which is also in the requirements document. Let's see what footnote H says here. "In later years annual rates may be reduced." Okay. "To match annual utilities' discharges." That explains the difference.
Q. Okay. So the theory in the later years is that the utility discharge rate may go down?
A. That's correct.
Q. Is that correct?
A. Yes.
Q. And so the rate might go down because the utilities are discharging less fuel?
A. That's correct. That's what this footnote

says.
Q. All right. But at least until the utility discharge rate goes down, it's the DOE's expectation, is it not, that they're going to continue to pick up 3,000 metric tons?
A. That is the expectation for planning purposes, yes.
Q. Does the DOE consider a 3,000 metric ton acceptance rate to be a reasonable rate to run the spent nuclear fuel program at?
A. I would -- yes.
Q. All right. Will you look at Klein Deposition Exhibit -- the one we just marked and then went on past -- 26.
A. Okay.
Q. In particular, what I'd like to refer you to is page 6 of Exhibit 26.
A. Yes.
Q. You have that there. This page 6 is what I think is labeled as a Time-Phased Cost Summary in Constant 1998 Dollars for the DOE spent nuclear fuel program. You see that?



A. Yes, I do.
Q. All right. Have you seen this time line before?
A. Not that I remember.
Q. Does this time line show the construction period for the repository taking approximately five years.
MS. SULLIVAN: Objection, document speaks for itself.
THE WITNESS: It says 2005 to 2010 under construction -- above the word construction.
BY MR. HIRSCH:
Q. All right. So that's about five years?
A. That looks like five years to me.
Q. And that timetable assumes that the DOE would have obtained a license by 2005, does it not?
MS. SULLIVAN: Objection, document --
BY MR. HIRSCH:
Q. Let me clarify rephrase the question. That time line assumes that the DOE would have obtained a license from the NRC to begin construction in 2005, does it not?



MS. SULLIVAN: Same objection. Document speaks for itself.
THE WITNESS: Yes. We can't begin construction until we get a license from the NRC.
BY MR. HIRSCH:
Q. And that date is shown on this time line as 2005.
MS. SULLIVAN: Same objection.
THE WITNESS: I don't see that, but I see construction starts in 2005. We have to have a construction authorization licensing. It says 2002 to -- I mean, I don't quite understand these, what all these little things are, but I agree. I mean, in order to begin construction, we need a construction authorization from the Commission.
BY MR. HIRSCH:
Q. All right. I think you mentioned yesterday at some point that the DOE had gotten a report from Bechtel along the lines -- or strike that.
I think you mentioned yesterday that the DOE had some kind of estimate that the facility could be built in two years. Do you recall that?



A. I don't know if I said that came from the BSC document. Yes, but there were -- yeah, there is a possibility that once we get the construction authorization, we could construct a facility sufficient to receive waste in two years. There is a -- I don't know if there's -- if it's in a particular planning document, but what I said was that BSC relooked at their figures and they have come up with a baseline of the repository accepting waste in 2010.
Q. Well, that's what I was hoping to find out. To the best of your knowledge, is there a document from Bechtel, Bechtel whatever their name, BSC, whatever we want to call them.
A. Uh-huh.
Q. That says that Bechtel can in two years build a facility sufficient to start receiving waste?
MS. SULLIVAN: Objection, beyond the scope. You can answer.
THE WITNESS: I don't know what the time frames are within there. I don't know whether it's shortened the time to get the license application. I don't know, and I would assume there is a document, but

is the Nuclear Waste Disposal Fund and the other is the Defense Waste Disposal Fund. Some of it is appropriated for the purpose of disposing of defense waste. But we use all that money for the program.

BY MR. TOMASZCZUK:

Q. You testified in response to some of the questions posed by Mr. Hirsch that DOE expected for planning purposes when it begins performance to ramp up to 3,000 MTU rate and stay at that steady state rate for a number of years. Do you recall that testimony?

A. Yes, I do.

Q. And that's reflected in various documents that Mr. Hirsch showed you yesterday and today as well?

A. Yes.

Q. And you used that term planning purposes in your answer?

A. Yes.

Q. That intention of DOE to ramp up to the 3,000 MTU rate, is that being used by DOE for purposes other than planning purposes?

A. No, not that I know of.

Q. Is that 3,000 MTU rate the rate that DOE was



to use to determine if the fees are sufficient?

MS. SULLIVAN: Objection, beyond the scope. Answer if you know.

THE WITNESS: I don't know. I'd have to look at the TSLCC to know.

BY MR. TOMASZCZUK:

Q. Would you do so. If you need to refer to a document to answer the question, that's fine. TSLCC, Number 16.

A. That's the most recent one. I have a few of them here. And would you repeat the question?

MR. TOMASZCZUK: Ms. Reporter, could you read it back.

(Requested material was read.)

THE WITNESS: (Pause). I haven't found it. I'm working on it.

BY MR. TOMASZCZUK:

Q. That's all right. Take your time.

A. It appears from this document that those are the rates that we assumed in determining the cost of the program.

Q. And did you have a page of the document that



you referred to?

A. Well, page 4-14 has the -- actually 4-13 says assumptions about. These are the assumptions on waste acceptance. The table that's on page 4-14. That's what I based my answer on.

Q. All right. Can I just direct your attention also to the letter, which is the third page in Exhibit 16. It's the third page. I think you passed it.

A. Not the iii page you mean. Where is it? There we go.

Q. And you're welcome to read the entire letter. I was going to direct your attention to the third paragraph, first sentence.

A. Okay. I've read the third paragraph, yes.

Q. All right. Could you read the first sentence for me out loud.

A. "The TLSCC analysis provides the basis for assessment of the adequacy of the Nuclear Waste Fund fee as required by the NWPA."

Q. And that's in a letter from Mr. Barrett, right, to the readers?

A. That's correct.



Q. All right. So, DOE is using the 3,000 MTU rate for the purposes of determining adequacy of the fee, correct?

MS. SULLIVAN: Objection, beyond the scope and also the document speaks for itself. You can answer the question.

THE WITNESS: Yes.

BY MR. TOMASZCZUK:

Q. They're using that rate basically to design the facility that they're planning to build at Yucca Mountain; is that right?

A. Yes.

Q. They're using it in any number of documents that we've seen here over the last couple of days, correct?

A. Yes.

Q. Wouldn't it be fair to say, Ms. Klein, that the lower rate that DOE is using, that is, the rate that goes up to 900 MTU and stops there, is being used for one purpose and that is for this litigation?

MS. SULLIVAN: Objection, beyond the scope. You can answer as to your personal opinion.

acceptance of spent nuclear fuel from permanently shutdown reactors." Do you see where I'm reading?
A. I do.
Q. Is that another way of characterizing what you had previously testified to on what --
A. Let -- you mean just a moment ago? Yes. I mean, I agree with this statement and I think that I think it's true. If the department had the end capability to provide the storage and if the rate exceeds the published rate, the department would have the flexibility to address the issue. I think there may be lots of policy considerations that we're not aware of now, but I do think we would have the flexibility to address it.
Q. One of the -- strike that.
Previously you testified that the purpose of the priority provision was to give the department flexibility to move shutdown reactors to the front of the cue if DOE determines it's appropriate. Do you remember that testimony?
A. Yes, I do.
Q. When in your view would it be appropriate to



move a shutdown reactor to the front of the acceptance cue.
MS. POWELL: Object to beyond the scope.
THE WITNESS: Well, in my view, there would be in my own personal view.
MS. POWELL: I object to beyond the scope, but you can answer the question.
THE WITNESS: My own personal view. I think that there's concerns to encourage people to shut down and to sort of give people a prize for shutting down. That's one concern. There's another concern on the other side. If you have a property sitting there that could be totally green field, you should be able to move forward and cut your losses and move on. So I think there's lots of different policy issues there that would have to be addressed.
And my guess is that different administrations would have different views on what's the more important policy. So I just think it gives DOE the flexibility to look at these things. But how the department will come out at the time that that flexibility is truly available, it's a guess.



BY MR. MACDONALD:
Q. And it's a guess right now because DOE is not currently accepting spent fuel?
A. Yes.
Q. And when DOE begins accepting spent fuel, if it is at a rate that exceeds the rates published in the annual capacity report, DOE could evaluate the policy concerns you've identified?
A. Yes.
Q. And decide whether or not to give priority to shutdown reactors?
A. That's correct.
Q. Is another purpose of the priority for shutdown provision to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity?
A. That is what the department said in its -- I think it's the final standard contract rulemaking. I believe that is what the department said, yes.
Q. That's what the department said in April of 1983 when it published the standard contract?
A. Yes. Yes. I believe there was a commenter



who didn't want us to have that provision in there, and in response we said we wanted to keep it for that reason that you just read.
Q. And the reason that I just read was to prevent reactors from waiting 20 or 30 years to be decommissioned after they finished generating electricity?
A. Well, to have the flexibility to do that. I mean, not to necessarily do that, but to have the flexibility to allow them to not have to wait 20 or 30 years to be decommissioned.
Q. Would you agree that one of the reasons that priority provision was included was to prevent reactors from waiting 20 or 30 years to be decommissioned?
A. Yeah. I'd like to see the exact words that we said at the time. If I could.
Q. I'm happy to provide another exhibit.
A. I figure you had it there. Another exhibit.
Q. I'm not going to provide you my notes, however, at this time.
A. I was wondering what you were reading from. I thought it was rulemaking but, no, it was your notes.

MR. MACDONALD: Exhibit 49.
(Thereupon, the reporter marked for identification Deposition Exhibit No. 49.)
(Discussion off the record.)
THE WITNESS: I don't know where it is. Do you? Somewhere in here we say.
BY MR. MACDONALD:
Q. If it will help, if it gets us out of here earlier, I will refer you to page 0005 at the bottom, which I believe is the fifth page of the document on the left-hand column, the first full paragraph. And this is referring to Exhibit 49 for the record, the April 18, 1983 Federal Register Notice Publication of the final version of the standard contract.
A. Okay. I have read it. It does say, "This type of priority is necessary to prevent reactors from waiting 20 to 30 years to be decommissioned after they finish generating electricity." You have a question that I'm supposed to be answering? I'm sorry. I forgot where we were.
Q. I believe you were previously testifying that -- strike that.



My question is: Was the reason this provision was included, the priority shutdown provision, that is because it was necessary to prevent reactors from waiting 20 or 30 years to be decommissioned?
A. Yes.
Q. And DOE included this provision despite the fact that four commenters recommended the deletion of the provision?
A. Yes, that's correct.
Q. And as you explained I believe earlier, acceptance of fuel from a shutdown reactor would allow that reactor to go to green fields I believe is the word that you used; is that correct?
A. Yes, it would. In most cases, it would allow them to go to green fields, yes.
Q. If DOE had begun accepting fuel in 1998 at a 3,000 MTU rate or a ramp-up, a reasonable ramp-up to a 3,000 MTU rate, do you have an opinion as to whether DOE could have given priority to shutdown reactors without harming or prejudicing the rights of operating utilities.



MS. POWELL: Object to beyond the scope, but you can answer.
THE WITNESS: It could have given. I think that would be policy considerations that would be looked at, but it would make it certainly --
BY MR. MACDONALD:
Q. Would have made it easier?
A. Much easier, yes.
(Discussion off the record.)
(Thereupon, the reporter marked for identification Deposition Exhibit No. 50.)
BY MR. MACDONALD:
Q. Ms. Klein, I've just marked -- had marked for you Exhibit 50, which is a memo dated June 28, 1991 from P. N. McDuffie and S. A. Vance to D. C. Langstaff and A. B. Brownstein. Do you have that there before you?
A. Yes, I do.
Q. I believe we discussed earlier Mr. Vance, Scott Vance, who you know; is that right?
A. That's correct.
Q. And Mr. A. B. Brownstein is Alan Brownstein;



is that right?
A. Yes.
Q. And you are familiar with Mr. Brownstein?
A. Yes, I am.
Q. And D. C. Langstaff, is that Dave Langstaff?
A. I don't know D. C. Langstaff.
Q. You don't know D. C. Langstaff?
A. I have no idea.
Q. But Mr. Brownstein works -- currently works for OCRWM; is that correct?
A. That's correct.
Q. And he worked for OCRWM in 1991; is that correct?
A. Yes.
Q. To the best of your knowledge?
A. Yes. Sorry.
Q. The subject of this memo is "Recommended DOE positions on 17 contract implementation issues"?
A. Yes.
Q. Please look at as much -- look at as much of the document as you need to, but I'm going to ask you questions about page 5. The first issue at the top of

# KOUTS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
INDIANA MICHIGAN POWER )
COMPANY, )
Plaintiff, )
v. ) No. 98-486C
THE UNITED STATES, )
Defendant. )
COMMONWEALTH EDISON COMPANY, )
Plaintiff, )
v. ) No. 98-621C
THE UNITED STATES, )
Defendant. )
- - - - - - - - - - -
DEPOSITION OF CHRISTOPHER ALEXANDER KOUTS
VOLUME I

The deposition of CHRISTOPHER ALEXANDER KOUTS was convened on Friday, January 30, 2004, commencing at 10:21 AM, at the offices of SHAW PITTMAN LLP, 2300 N Street, N.W., Washington, D.C., before Cheryl A. Lord, RPR, CRR, and Notary Public for the District of Columbia.

APPEARANCES



For Plaintiff Indiana Michigan Power Company:
Devon E. Hewitt, Esquire
Jay E. Silberg, Esquire
SHAW PITTMAN LLP
1650 Tysons Boulevard
McLean, VA 22102-485
(703) 770-7962
For Plaintiff Commonwealth Edison Company:
Christopher Tompkins, Esquire
JENNER & BLOCK LLC
One IBM Plaza
Chicago, IL 60611-7603
(312) 222-9350
APPEARANCES CONTINUED
For Defendant:
R. Alan Miller, Esquire
Stephen Finn, Esquire
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
Commercial Litigation Branch
1100 L Street, N.W., Room 12000
Washington, D.C. 20530



(202) 616-0383
Also present:
Eileen Supko

CONTENTS


| EXAMINATION BY | PAGE |
|---|---|
| Ms. Hewitt | 5 |


EXHIBITS


| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Nuclear Waste, Nos. GAO-02-765T, 14 pages | 114 |
| 2 | Yucca Mountain Project Status - Exhibits | 123 |
| 3 | Nuclear Waste Disposal, FY 2004 Congressional Budget, pages 565-580 | 131 |
| 4 | Testimony Before Congress, 4-7-03 | 213 |


PROCEEDINGS

CHRISTOPHER ALEXANDER KOUTS, a witness called for examination, having been first duly sworn, was examined and testified as follows:



EXAMINATION BY COUNSEL FOR PLAINTIFF
INDIANA MICHIGAN POWER COMPANY
BY MS. HEWITT:

Q. Good morning, Mr. Kouts.
My name is Devon Hewitt, and I represent Indiana Michigan Power Company in this case. I'm a partner at Shaw Pittman, and I'm going to be taking your deposition here today.
Have you ever been deposed before?
A. Yes, I have.
Q. You might, then, know the rules of depositions, but in any event, I'm going to repeat some instructions just so we understand how this might work today.
I'm going to ask you a series of questions, and I ask that you answer them truthfully. If you don't understand a question or how its phrased or how you think I might mean a certain term, I just ask that you ask for clarification or ask that I repeat something so that it's clear to you.

Is that all right?
A. That's fine.
Q. And I'm also accused of speaking too quickly, and occasionally I have a lisp, so again, if anything is not quite understandable to you, just ask me to repeat it. That's totally fine with me.
Is that okay?
A. That's fine.
Q. And again if you'd like to take a break or need a glass of water, or anything that we can do to make this more comfortable for you, please ask.
Will you be willing to do that?
A. Thank you.
Q. Okay. Also, although I'll ask all these questions, your attorney, Mr. Miller, may on occasion object to certain questions that I ask, which is entirely within his right.
However, you are required to answer the question unless he specifically instructs you not to answer.



Do you understand that?
A. I understand it.
Q. Okay. I think we'll proceed.
On what occasions have you been deposed before?
A. Once before in 1999, and I don't remember the specific case, but it related to litigation that's ongoing right now with the 1998 date.
Q. Was it related to the litigation that a utility --
A. Yes --
Q. -- brought against DOE --
A. -- it was.
Q. I should ask you to let me finish my question just so the record is clear.
So I'll repeat it.
Was it related to litigation that a utility has brought against DOE that was filed in the Court of Federal Claims?
A. I can't speak to that.
I know it was litigation associated



with the utility and the department. I don't know where it was filed. I'm not an attorney.
Q. And other than on that occasion, have you ever been deposed before?
A. No.
Q. How long have you worked at DOE?
A. I've worked at the Department of Energy since approximately 1976.
Q. Did you start working at DOE straight out of college or graduate school?
A. No.
Excuse me.
No.
I started working at DOE after I had worked in private industry and at the Environmental Protection Agency.
Q. I'd like to quickly go through your background, and I mean very quickly, because I don't want to take a lot of time to do that.
Can you just quickly tell me what your educational background is.
A. I have 2 degrees in engineering.



Q. And where are they from?
A. They are from George Washington University, and I am a licensed professional engineer.
Q. And when did you receive your degrees from GW?
A. My bachelor's degree in chemical engineering was in 1971. My master's degree in engineering mechanics was in 1974.
Q. Do you have any other educational degrees or certificates?
A. Other than the professional engineering license, no.
Q. And what did you do after you finished your education?
A. After I finished my education, I began working at Atlantic Research Corporation. After that I went to a consulting firm for a short period of time in energy-related technologies. And shortly after that, I began my federal employment at the Environmental Protection Agency.

Q. How long were you at the Atlantic Research Corporation?
A. Roughly about 2 years.
Q. And would you have started there directly after you received your master's?
A. I finished my master's while I was working there. I was finishing my master's thesis wile I worked for Atlantic Research Corporation.
Q. Where is that corporation located?
A. Where I worked at, it was located in Gainesville, Virginia, and also at their Alexandria, Virginia, offices.
Q. What kind of work do you do for that company?
A. I did thermostructural analysis on graphite rocket nozzles.
Q. Rocket nozzles?
A. That's correct.
Atlantic Research Corporation manufactures various propulsion systems for military application.



Q. And after you left Atlantic Research Corporation, you mentioned you went to a consulting firm.
What was the name of the consulting firm?
Do you recall?
A. Applied Sciences Inc.
Q. And what did you do for that company?
A. Provided support to alternative fuels development basically as a contract to the Navy.
Q. What kind of fuels?
A. These were synthetic petroleum fumes that would be distilled. They were generated from shale oil.
Q. Did any of this work have to do with nuclear fuel or spent nuclear fuel?
A. No, it did not.
Q. How long did you work for Applied Sciences Inc.?
A. For a period of about 3 to 6 months.



Q. And do you recall what year you joined Environmental Protection Agency?
A. I believe it was 1976.
Q. And what position did you first hold at EPA?
A. I was a project officer working on a federal regulation to reduce noise emissions from transportation equipment.
Q. Sounds interesting.
How long did you stay at EPA?
A. Approximately 3 years.
Q. Did you have any other positions at EPA other than project officer for this noise emissions study?
A. No.
Q. Why did you leave Environmental Protection Agency?
A. I received an opportunity or I was selected for a position to work at the Department of Energy that was newly formed.
Q. And what position was that?
A. It was a position that was in an



office called the office of mineral leasing policy development within the office of resource applications at the Department of Energy.
Q. And did you join DOE, then, 1979?
A. Approximately.
Q. And what title did you hold when you joined DOE?
A. I can't recall specifically. I believe it was regulatory specialist.
Q. And what sort of duties did you have in that position?
A. My primary responsibility was to develop a regulation working with the Department of Interior to address royalties from federal oil leases.
Q. And how long did you hold this position?
A. Approximately 1 to 2 years, I believe.
Q. What was the next position you held at DOE?
A. Next position I held at DOE was in

the office of environment, where I worked in an office that dealt with implementation of the National Environmental Policy Act.
Q. Is that also known as NEPA?
A. Yes, it is.
Q. And what were your duties in this position?
A. I was working with nuclear programs within the department and assisting them to meet their obligations under the National Environmental Policy Act.
Q. What title did you hold in this position?
A. I honestly can't recall the specifics of the title. It was related to a specialist who works in NEPA-related activities.
Q. Who was your supervisor in this position?
A. Robert Stern.
Q. What nuclear programs did you work with while you held this position?
A. The office of nuclear waste



isolation was one of them, where I assisted in the development and the review of the generic environmental impact statement on commercially generated wastes. There were also other programs I worked with related to field activities at DOE sites.
Q. How long did you work in this position or this office of environment?
A. Till approximately 1980. I don't remember the specific date.
Q. And then what was your next position at DOE?
A. My next position at DOE was working in the office of conservation and renewable energy where we were responsible for the development of energy from municipal waste.
Q. I have to apologize for my lack of knowledge about energy, but -- and waste, but what is municipal waste?
A. Municipal waste is what you would typically throw away in your garbage that was picked up every couple of days.



Q. And what were your responsibilities with regard to municipal waste?
A. My responsibilities had to do with development, managing -- let's say managing departmental laboratory work, which looked at thermochemical processes to take municipal waste and extract either heat or usable distillates that could be used as a fuel for different substances, for different end uses.
Q. And how long did you hold this position?
A. Oh, I held that position until about 1985, various positions in that area.
Q. Did you during this period, the 1980 to 1985 period, have any participation or relationship with the drafting of the standard contract?
A. No, I did not.
Q. Do you have an understanding of the term standard contract as I used that?
A. I do have an understanding.
Q. What did you do in 1985?



A. 1985, I joined the Office of Civilian Radioactive Waste Management.
Q. And what position did you assume in that office at that time?
A. It was a position in the monitored retrievable storage team.
Q. If I use the term OCRWM to refer to the Office of Civilian Radioactive Waste Management, would you understand what I meant?
A. Yes, I would.
Q. And if I use the term MRS to refer to monitored retrievable storage, would you understand what I meant?
A. Yes, I would.
Q. I think I'll use those terms as we go forward.
A. That's fine.
Q. And what were your functions as part of the MRS team?
A. Initially, it was to develop the needs and feasibility analysis that was a major component of the department's proposal to the

Congress on monitored retrievable storage.
Q. And did your tasks or responsibilities change over time?
A. They evolved to where I was heading the team for a period of time while my direct supervisor was off on other duties.
Q. And who was that?
A. That was James Carlson.
Q. How long did you participate in the MRS team?
A. Approximately 3 years.
Q. Would it be correct to say that you were on this team from 1985 to 1988, approximately?
A. Approximately, yes.
Q. Did you change positions or responsibilities in 1988, approximately?
A. Yes, I did.
Q. And what happened at that time?
A. The office was reorganized, and I was reorganized into a systems integration group.
Q. What does, systems integration,



mean?
A. Within the context of the program, it's the group that looks across all 3 major functional areas of the program, waste acceptance, transportation, and disposal, or in that case, there was another function, which was storage, and does cross-cutting analyses to look at efficiencies and effective ways to implement the program.
Q. You mentioned at that time there was a fourth storage.
Is there no longer a fourth component to the waste management system?
A. With the passage of the 1987 amendments act, which null and voided the department's siting proposal of the MRS facility, that had a major impact on future storage-related activities.
However, they remained at a relatively low level up until the time of the development of various facility designs to support legislation that was being considered in



Congress on interim storage.
Q. And what about currently?
Is there still a storage element or sector within the program?
A. No, there is not.
Q. When you refer to a waste acceptance portion of the program, and in fact, I don't want to put words in your mouth, what is the term that DOE or OCRWM uses when it talks about the 3 parts, sectors, divisions?
What do they call it within the program?
MR. MILLER: Objection, vague.
But go ahead if you understand.
BY MS. HEWITT:
Q. I don't know what you said when you said that within the program there are 3 -- or 3, used to be 4, and I didn't know whether you said parts or divisions or sectors or -- I don't know what the term is.
I'd like to use the correct term.
A. There are several ways that --



several interpretations. I think that the -- we refer to it primarily as functions, the acceptance function, the transportation function, and the disposal function.
BY MS. HEWITT:
Q. Thank you very much.
I always like to be correct.
If you could briefly describe for me what OCRWM views as the waste acceptance function under the program.
A. Briefly, it's interaction with utilities and management of the standard contract with utilities.
Q. And currently, is there a person that is responsible or a leader or supervisor of the waste acceptance function?
A. Yes, there is.
Q. And who is that?
A. It's myself.
Q. Oh.
Could you describe what OCRWM regards as the transportation function within the

program?
A. Currently, the definition of the transportation function encompasses the development of equipment and capability to move high-level waste materials from the standard contract holders and DOE sites.
In addition to that, that program is also -- that function is also responsible for the development of infrastructure within the state of Nevada, specifically a rail spur to the Yucca Mountain site.
Q. You mentioned, to move high-level waste.
Is that function also responsible for moving spent nuclear fuel?
A. Yes.
Q. And who was in charge of that function?
A. Director of the office of national transportation is Mr. Gary Lanthrum, L-A-N-T-H-R-U-M.
Q. And if you'd be kind enough to



describe what the disposal function covers within the program.
A. Simplistically, the disposal function is responsible for receiving spent fuel and high-level waste materials from the transportation function at the disposal site preparing it for disposal and emplacing it for disposal, and eventually closing the site.
Q. And who at DOE is in charge of that function?
A. The deputy director of the -- I can't remember the specific title -- the deputy director responsible for the Yucca Mountain project, deputy director of OCRWM, is John Arthur.
Q. Now, is there a separate individual or office that is in charge of ensuring that these 3 functions work together well as a system?
A. Yes, there is.
Q. And what is that office or person?
A. That person manages the office of systems analysis and strategy development.



Q. And is that office also within OCRWM?
A. Yes, it is.
Q. And who is in charge of that office?
A. I am.
Q. Okay. Back to 1988.
When you started in the systems integration group, was the systems integration group similar to the systems analysis and strategy development office that you're currently heading right now?
A. It was a more narrowly defined office. It wasn't an office. It was a branch.
Q. M-hm.
A. So it had similar responsibilities, fewer staff, lesser resources.
Q. How long did you work for the systems integration group?
A. About 3 months.
Q. Oh.
What did you do for those 3 months?
A. We initiated an effort to do a



programwide system study that addressed a variety of issues that were being raised by the monitored retrievable storage commission that had been appointed by Congress.
Q. What happened after 3 months?
A. After 3 months I was promoted to take over the transportation function of the program.
Q. So this still would have been in 1988?
A. Approximately.
Q. Approximately.
And how long were you working on the transportation function of the program?
A. Approximately 3 years.
Q. So until approximately 1991?
A. About.
Q. And what was occurring in the transportation function between 1988 and 1991?
A. There were several initiatives that that branch had under way, the most visible of which was the development of spent fuel

Q. Well, what happened to that effort?
A. Due to budget restrictions, we -- I had to downscope the program and reduce the amount of designs that we were developing. When I left the program, we were down to one primary rail cask and one backup rail cask design and one primary truck cask and one backup truck cask design.
Q. Did you work with contractors or subcontractors in developing the cask design?
A. Cask contractors were under contract to the department for the development of the designs.
Q. And who were they at that time?
A. At the time that I downscoped the program?
Q. At the time that you were working on the development of the design.
A. There were 5 initial contractors for the rail casks. It was Nupac, N-U-P-A-C, NAC Corporation -- Nuclear Assurance Corporation -- and B and W, Babcock & Wilcox. B and W.



I'm sorry.
Babcock & Wilson. Make it simple.
Q. I think it's Wilcox.
But B and W is the same.
A. Right.
Q. I think you said there were 5.
A. Correct.
The 2 truck contractors -- I haven't thought about these in a long time.
Q. Your memory is admirable.
A. -- were General Atomics Corporation and Westinghouse Corporation.
Q. And then when you downscoped the program, did you keep 2 of those designs on board or on the shelf, so to speak?
MR. MILLER: Objection, compound.
Go ahead.
A. As I mentioned earlier, we kept one primary design and one backup design for both truck and rail.
BY MS. HEWITT:
Q. And which of those designs did you



maintain?
A. We maintained the B and W design and the NAC design as a backup for the rail, and we maintained the General Atomics design for the truck with a backup of the Westinghouse design.
Q. Were these designs ever discussed with utilities or otherwise made public?
A. During the time period which I managed that program, there were multiple occasions where we briefed the public industry on the progress of the effort.
Q. To your knowledge, has anything happened to advance the progress of those designs within DOE?
A. My -- to my knowledge, only one design was eventually completed, which was the General Atomics truck cask design, which was also turned over to them for completion. And the government does not hold any rights to that design any further as far as I know. The other design efforts were terminated.
Q. Do you know whether DOE ever



authorized General Atomics to go ahead and manufacture such a cask according to that design?
A. To my knowledge, they have never requested or funded General Atomics to construct a cask according to that design.
Q. Do you know whether General Atomics has manufactured such a cask on its own nickel?
A. I'm unaware that they have.
Q. What did you do in 1991?
A. In 1991, I was transferred to a different office within the program to work on strategic planning-related activities.
Q. What is strategic planning within OCRWM?
A. Essentially long-range vision for the program and evaluating future contingency situations.
Q. In this capacity, did you have occasion to address the contingency of whether or not DOE could take spent nuclear fuel by 1998?
A. To my recollection, we did not address that specific question.

Q. What kind of questions did you address?
A. Looking at innovative ways to implement the program in the near term and the long term.
Q. Such as?
A. Redefinition of interpretation of what the Nuclear Waste Policy Act says in certain areas.
Q. For example?
A. Whether given the requirements of the act that the department is required to demonstrate disposal or demonstrate a capability to dispose of materials.
Q. Were there any other issues under the standard contract similar to that that you can recall that you addressed or considered while you were in that office?
A. I didn't think that was an issue under the standard contract that I just mentioned.
Q. Oh, I'm sorry.



A. We did not address issues related to the standard contract. That was for a different area of the program.
Q. I'm sorry.
I didn't mean to mischaracterize your testimony.
A. That's fine.
Q. To clarify, what area of the program did that refer to?
A. Those individuals who worked in the waste acceptance function of the program.
Q. Well, were there other issues like that that you considered that you can recall at this time?
A. Innovative ways to find potential host sites for high-level waste storage or disposal facilities.
Q. Anything else?
A. I can't recall others at this point.
Q. How long were you in this office?
A. Good question.
I was in that office for



approximately I'd say about 2 years.
Q. During this time, did you ever have the opportunity or occasion to address issues that arise under the standard contract?
A. Not that I recall.
Q. During this time, did you ever have occasion or the opportunity to address issues related to the annual capacity reports?
A. Not that I recall.
Q. During this time, did you ever have the opportunity or occasion to address issues related to delivery commitment schedules?
A. Not that I recall.
Q. What did you do in 1992 or 1993?
A. In that time frame, I believe I was -- I became the director of a division that dealt with regulatory coordination activities related to the department's interactions with Nuclear Regulatory Commission.
Q. How long did you hold this position?
A. Approximately a year, year and a half.



Q. You're killing me here.
A. It gets worse.
(Discussion off the record.)
BY MS. HEWITT:
Q. What kind of interactions was DOE having with NRC?
A. To my recollection, at that period of time, the department was interacting with commission staff on issues related to site characterization at Yucca Mountain primarily.
Q. What kind of issues were coming up in that regard?
Were there any major ones that you addressed during your time as director?
MR. MILLER: Objection, vague.
But go ahead if you can answer.
A. I can't remember specifics at this point.
BY MS. HEWITT:
Q. Okay. What happened after you were director of that office, division, whatever?
A. After I was there for about a year

to a year and a half, I was transferred to another position called the planning division, which was a division of staff that directly supported the director of the program, and policy making, strategic planning activities.

Q. So you mentioned that you were supporting the director of the program.

Who was that at this time?

A. At that time, it was Daniel Dreyfus.

Q. Okay. And what were your responsibilities in this office?

A. Simplistically, to make sure that the director had all the information that he needed in order to carry out the functions of his responsibilities.

Q. Was this an SES position?

A. No, it was not.

Q. Do you know what I mean when I say, SES?

For the record, SES means senior executive service; is that right?

A. Correct.



(Discussion off the record.)

BY MS. HEWITT:

Q. How long were you in this division, position?

A. I headed that division for approximately 2 years.

Q. When you were in that position, did you have occasion to become familiar with the civilian radioactive waste management program plan that was issued in December of 1994?

A. Yes, I did.

Q. Did you have any responsibility in drafting it?

A. I managed the effort that produced the document, yes.

Q. When you said you managed the effort, what exactly does that mean?

A. That the staff underneath my direct supervision and with contractor support developed the document, and I supervised and managed the activity.

Q. Did your office produce the



document?

A. It was a publication of the program, not at my specific office.

Q. What I'm trying to get at is: Was the program drafted by the staff in your office or one of the other functions within OCRWM?

A. There was participation from all elements of the program in the drafting of the document.

Q. What office had the responsibility for pulling all that together and producing the document?

A. As I remember, my division at that time did.

Q. Well, what did you do in 1996?

I think we're up to 1996.

Do you recall making a position change around that time?

A. Yes.

I was reorganized into heading another division, which was entitled, storage and energy technology -- or storage and technology



division, as I remember. Yeah.

Q. And you were director of this division?

A. Yes, I was.

Q. And what did this division do?

A. Its primary function was to develop a topical safety analysis report on a centralized interim storage facility that could be implemented should the Congress give the department authorization to -- and a site upon which to build that facility.

Q. My understanding is that Congress never appropriated sufficient funds to do so; is that correct?

A. Congress never passed legislation authorizing the development of such a facility.

Q. How long were you in this position?

A. Roughly about a year and a half to 2 years.

Q. So around 1998, approximately, you took on another position; is that correct?

A. Correct.

Q. And what was that?
A. I was -- well, the office was reorganized, as I remember. The division which I was heading was abolished, and I was transferred to the office -- well, I was -- I became a liaison with the Yucca Mountain project residing in Washington, D.C. My direct supervisor was the project manager of the Yucca Mountain project.
Q. And who was that at the time?
A. At that time, it was Dr. Russ Dyer, D-Y-E-R.
Q. And how long did you function as a liaison with Yucca Mountain?
A. Up until October of 2002.
Q. Oh. A healthy 4 years almost.
So what did you do as liaison?
A. I was responsible for making sure that major products that were produced by the Yucca Mountain project were coordinated and approved through DOE headquarters.
Q. You used the term products.
A. Correct.



Q. What do you mean, products?
What do you mean by the term products?
A. By, products, major documents.
I was also responsible for management of a variety of technical issues from a policy level for the project.
Q. Can you give me some examples on some of the major products that Yucca Mountain produced and that you had responsibility to oversee or review during that time?
A. Yes.
Q. Oh, good.
Thank you.
Would you go ahead and do so, please.
A. Certainly.
First of which was the viability assessment that was directed by Congress to be submitted in 1998. The other major products were managing the revisions -- or I should say, managing the regulatory process that ended in the



issuance of 10 CFR, part 963, which were the site suitability guidelines that were finalized in late 2001.
In addition to that, I was also responsible for making sure that all site recommendation documents that were a part of the secretary's recommendation to the president were acceptable to senior policymakers within the department.
Q. That's quite impressive.
Anything else?
A. There's a lot more, but the question is, how much do you want me to go into detail?
Q. I obviously don't want minutiae. I confess that I am not familiar with everything that was produced and certainly not familiar with these documents.
In your mind, are those the major things that you addressed during those 4 years?
A. Those are the highlights.
Q. What happened in October 2002?
A. In October 2002, the current



director of the office, Dr. Margaret Chu, reorganized, and I assumed on an acting basis the -- being the director of the office of systems analysis and strategy development.
Q. And I take it that you have assumed that position since 2002 until today?
A. It was on an acting basis until approximately August of last year when I was then made permanent in that position.
Q. Congratulations.
A. Thank you.
Q. I think.
And in this position, to whom do you directly report?
A. To the deputy director of the office of program development -- strategy and program development.
Q. And who would that be?
A. Mr. Theodore Garrish.
Q. And who does he report to?
A. He reports to the director of OCRWM, Dr. Margaret Chu.

Q. Since assuming the position of acting director and then permanent director of systems -- is it systems and analysis or systems analysis?
A. Systems analysis and strategy development.
Q. What have your tasks and responsibilities been in this position?
A. Briefly?
Q. Please.
A. They are to manage the waste acceptance function of the program, to conduct systems analyses, to manage safeguards and security policy. I think -- there are a variety of other less significant functions, but those are the highlights.
Q. Does your office have responsibility for collecting information that might impact the schedule by which the repository will be constructed?
MR. MILLER: I'm sorry.
Would you read that back.



(The reporter read the last question.)
MS. HEWITT: Oh, go ahead and object.
MR. MILLER: Objection, vague.
But answer if you know.
A. No.
BY MS. HEWITT:
Q. Is there an office or person within OCRWM that has that responsibility?
MR. MILLER: Same objection.
But answer if you know.
A. My perspective is that the gentleman I mentioned earlier, John Arthur, who is responsible for the Yucca Mountain project, would have that type of information or would be responsible for collecting that type of information.
BY MS. HEWITT:
Q. Does your office have responsibility for collecting any information regarding a schedule by which the repository might be



operational?
MR. MILLER: Same objection.
But go ahead if you can answer.
A. My office uses information developed by other offices in their activities and uses that as a basis to conduct systems analysis.
As such, we use information developed by other areas of the program. Other than the waste acceptance function, we look to collect information from the other functions of the program and to conduct analyses.
BY MS. HEWITT:
Q. And is part of that analysis analysis that involves scheduling and milestones for the program?
MR. MILLER: Objection, vague and irrelevant.
But go ahead.
And partially answered already.
But go ahead.
A. Not specifically, no.
BY MS. HEWITT:



Q. Are you familiar with the term baseline?
A. Yes, I am.
Q. What does that term mean to you?
A. In the context of our program, it is a snapshot of where the program is at a specific period in time.
Q. When you use the term where the program is, what do you mean, where it is?
A. To expand on that, basically, the baseline -- there are several baselines within the program. There is a technical baseline. There is a cost and schedule baseline.
So the baseline from a technical standpoint is a compilation of the technical requirements. The technical baseline is a compilation of the technical requirements of the program. The cost and schedule baseline is essentially the snapshot of where the cost and the schedule program are at any one specific point in time.
Q. Is the cost and schedule baseline

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC )
COMPANY, CONNECTICUT YANKEE ) Case Nos.:
ATOMIC POWER COMPANY, and MAINE ) 98-126C
YANKEE ATOMIC POWER COMPANY, ) 98-154C
Plaintiffs, ) 98-474C
V. )
THE UNITED STATES, )
Defendant. )

Courtroom Number 5

National Courts Building
717 Madison Place, N.W.
Washington, D.C.

Monday, August 2, 2004

VOLUME 15

The parties met, pursuant to the notice of the Judge, at 10:03 a.m.

BEFORE: THE HONORABLE JAMES F. MEROW



APPEARANCES:
ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY, CONNECTICUT YANKEE ATOMIC POWER COMPANY and MAINE YANKEE ATOMIC POWER COMPANY:
JERRY STOUCK, ESQ.
ROBERT SHAPIRO, ESQ.
CATHERINE R. BAUMER, ESQ.
PETER J. SKALABAN, JR., ESQ.
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005
(202) 898-5800

ON BEHALF OF YANKEE ATOMIC ELECTRIC COMPANY and CONNECTICUT YANKEE ATOMIC POWER COMPANY
MERRILL J. ATKINS, ESQ.
Assisting General Counsel
19 Midstate Drive
Auburn, Massachusetts 01560
(508) 721-3042



APPEARANCES CONTINUED:

ON BEHALF OF MAINE YANKEE ATOMIC POWER COMPANY:
JOSEPH D. FAY, ESQ.
General Counsel
Maine Yankee
321 Old Ferry Road
Wiscasset, Maine 04578
(207) 882-5603

ON BEHALF OF THE DEFENDANT:
HAROLD LESTER, JR., ESQ.
JOHN EKMAN, ESQ.
MARIAN E. SULLIVAN, ESQ.
HEIDE L. HERRMANN, ESQ.
R. ALAN MILLER, ESQ.
KEVIN B. CRAWFORD, ESQ.
RUSSELL SHULTIS, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-7562

** Index appears at the end of transcript **



P R O C E E D I N G S

MR. STOUCK: Your Honor.
THE COURT: Yes.
MR. STOUCK: Good morning.
THE COURT: Good morning.
MR. STOUCK: I believe I owe the Court and Mr. Lester a response on whether our case is done. It was left sort of dangling on Thursday. And I would like to address that if I may.
THE COURT: Sure.
MR. STOUCK: Okay. And, frankly, it provides an opportunity, I think, to address in a more comprehensive way -- I think we have this 1726 question.
THE COURT: Oh, fine.
MR. STOUCK: And I would like to do that. It's come up most days but it's been a little piecemeal. I want to make sure we've not been whipsawed, on the one hand under a pretrial process that encourages dealing with a lot of details out of court, and then we get to court and then we are told that we really need to have more witnesses here.
So if I could just address our position on this --
THE COURT: Sure.

MR. LESTER: Your Honor, also, I guess, we are prepared to begin our case. And we would start that with a written motion for judgment based on partial findings. This motion is based largely on the exchanges theory that the Yankees had presented as their sole basis upon which they depend to support their damages claim.

Our motion is geared towards the speculative nature of the hypothetical model that Mr. Graves presented and its failure to rely upon contemporaneous documents to support the theories that Mr. Graves announced. And the fact that some of his theories are in fact in conflict with some of the contemporaneous records.

We in our written motion identified case law that supports that and tried to cite some of the transcripts. With the Court's permission we can go ahead and file it electronically. But I have copies of the electronic signatures. And with the Court's permission if I hand the Court these copies, I would ask that it be deemed admitted and that the later electronic filing today will count back to this point in time if that's necessary.

THE COURT: Sure.

MR. LESTER: It's nice and short, Your



Honor.

THE COURT: Okay. I'll defer a ruling on this, get an objection from Plaintiff, which I assume I will, and I'll defer ruling on it for the time being. And do you have a witness that you wish to present?

MR. LESTER: We do, Your Honor. Before we start, though, if we could take just a short five-minute break.

THE COURT: Sure.

MR. LESTER: A short 10-minute break I'm told. But our first witness will be Christopher Kouts from the Department of Energy.

THE COURT: Okay. A little bit after quarter of then.

MR. LESTER: Thank you, Your Honor.

(Whereupon, a recess was taken at 11:37 a.m., and the proceedings reconvened at 11:49 a.m.)

MS. SULLIVAN: Yes, Your Honor, the government calls its first witness, Christopher Kouts.

THE COURT: Okay.

Whereupon,

CHRISTOPHER KOUTS

was called as a witness, and, having first been duly



sworn, was examined and testified as follows:

MS. SULLIVAN: Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. SULLIVAN:

Q Good morning, Mr. Kouts. Where are you currently employed?

A I'm currently employed with the Office of Civilian Radioactive Waste Management at the Department of Energy.

Q What is your current position at DOE?

A I'm director of the office of systems analysis and strategy development.

Q What are your responsibilities in your current position?

A Briefly, my office is responsible for analytical activities to determine and to evaluate how the waste management system is being deployed, in other words how the waste acceptance component of the system, how the transportation component and how the repository component can act efficiently.

I also have responsibility for the waste acceptance component, the management of the standard contract with utilities. And I also have safeguards and securities policy, technical baseline management, and a variety of other activities.



Q So do your responsibilities include planning for waste acceptance from the utilities pursuant to the standard contract?

A Yes, they do.

Q How long have you held your current position?

A I was appointed to my current position on an acting basis in October of 2002, and on a permanent basis in July of last year.

Q To whom do you report?

A I report to the deputy director, what we call the deputy director of the east, who is responsible for strategy program development, Mr. Theodore Garrish.

Q And to whom does Mr. Garrish report?

A Mr. Garrish reports to Dr. Margaret Chu, who is the current director of the office.

Q And to whom does Dr. Chu report?

A Dr. Chu reports to the Undersecretary and the Secretary of Energy.

Q When did you first join the Office of Civilian Radioactive Waste Management?

A In the summer of 1985.

Q Would you briefly summarize the positions that you've held within the Office of Civilian

Q Is DOE currently -- does DOE currently have any plan for acceptance of commercial spent nuclear fuel that does not lead to the repository?
A Not to my knowledge.
Q And how likely is it in your view that Congress would provide relief from the National Environmental Policy Act and the EIS requirements for a DOE operated spent nuclear fuel storage facility?
A That's difficult to say. There have been substantial NEPA reviews already done for the Nevada test site in terms of the repository.
For me to speculate on what Congress might or might not do is very difficult to say.
Q You cannot testify how likely or unlikely it is that that relief would be granted; is that what you're saying?
A I don't have a crystal ball in terms of what Congress might do if they wanted to expedite the acceptance or the receipt, if you will, of commercial fuel.
Q So you can't testify one way or the other how likely it is or unlikely it is that Congress would give relief from the NEPA requirements for DOE operated storage facilities; is that correct?
A I don't really have a basis for speculating



on that. My sense is for the NRC review, that's clearly a requirement for all of our facilities. There might be some consideration being given to an expedited NEPA review. I think that's probably more likely than that exclusion of NRC review.
Q Excuse me for one moment. I'm looking for a document. Excuse me, again. I've got more papers here than I can keep organized.
You referred -- yeah, I was going to skip this.
MR. STOUCK: Your Honor, best laid plans. I turned to the document that we just don't have any other copies of, so I apologize for the interruption. I believe I can work around it and then come back. We're running one over from the office. Let me just take a moment to figure out how to do that.
Well, excuse me for one second. I think I can work around it for at least five or 10 minutes. Again, I apologize.
BY MR. STOUCK:
Q Mr. Kouts, you referred to legislation in the 1990s that would have required or provided for interim storage. Do you recall that?
A Yes, I do.
Q Did the Department of Energy support that



legislation?
A It's not up to the Department of Energy to support legislation. It's up to the administration at the time to support or not support the legislation. At the time, as I remember, the administration in -- the Clinton administration at that time was not supportive of those bills.
Q Okay. Let's go back to DOE first. Did the Secretary of Energy in the Clinton administration take a position on the legislation that would have provided for interim storage in the late '90s that you testified about?
A I believe the -- there were some statements made by Secretary O'Leary that -- public statements that she made that indicated that she was in favor of some kind of legislation to meet the 1998 date.
Q Did she support the legislation that you referred to that was introduced?
A I don't remember specific statements made by the Secretary. I do remember the statements of administrative policy, the SAPs, if you will, that were issued by OMB. But I quite honestly can't remember what Secretary O'Leary might have said in public or in testimony.
Q But you do remember what President Clinton's



position was?
A Yes.
Q What was that? That was that he would veto it, isn't it correct, if it passed?
A That's correct, that's correct.
Q I've got my documents. So if I may approach, Your Honor.
THE COURT: Yeah. Certainly.
MR. STOUCK: This is DX-7112. I've got two copies for the Court. I've got one copy for the witness.
BY MR. STOUCK:
Q Mr. Kouts, this decision plan is a detailed milestone compilation of how the Department of Energy plans to meet the goal of accepting commercial spent nuclear fuel by 2010; isn't that correct?
A This is a milestone dictionary that supports the plan to address that, yes.
Q Milestone dictionary. It contains dozens and dozens of interim milestones that need to be met in order for the 2010 date to hold; isn't that correct?
A Yes.
Q How long did it take to prepare this plan?
A I would say that this was August of 2003,

BY MR. STOUCK:
Q This is on page 2011, Your Honor. This is a copy of the Indiana Michigan trial transcript. And on line 2010 -- page 2010, line 21, does DOE currently plan or have the capability to take -- are you there, Mr. Kouts?
A I'm trying to get there.
Q 2010?
A 2000?
Q 2010.
A Page 2010.
Q Line 21.
A Page 2010. Line 21.
Q Are you there? Mr. Kouts, are you there?
A I'm there.
Q Question, does DOE currently plan or have the capability to take 6,000 metric tons uranium from commercial nuclear power plants in 2011?
Answer: Unless it was canistered, probably not.
That was your testimony under oath in the Indiana Michigan trial, correct?
A Well --
Q Was that your testimony under oath in the Indiana Michigan trial?



MS. SULLIVAN: Objection. Argumentative.
THE WITNESS: Maybe I'm looking at a different page.
BY MR. STOUCK:
Q Let's get an answer to that question first. Was that your testimony under oath? Then we'll find out if you want to change it.
MS. SULLIVAN: Objection. Argumentative. Badgering the witness.
THE COURT: Well, he can read it in context and then decide.
THE WITNESS: Line 21, page 2010. It says does DOE currently plan or have the capability to take 600 metric tons of uranium from commercial nuclear power plants in 2011. And it says unless it was canistered, probably not.
You know, I simply did not remember there were also transportable storage casks.
I would also hasten to the next page, page 2011, where it says it can't take 600 metric tons of uranium in 2011, correct.
And I went through a discussion of the throughput rate of the fuel handling demonstration facility, to the extent that 400 metric tons is to make waste packages.



But I also explained here there is potential for us to take bare fuel at the fuel handling facility if we're putting it in storage only and potentially we can still meet that 600 tons.
So I corrected it on the next page, if you will, that that facility could have the capability of receiving that if we're just going to storage only.
BY MR. STOUCK:
Q I want to change subjects. You understand the term failed fuel -- this is not in the transcript. This is a new subject. We're turning away from 2010. We turning away from canistered fuel. We're turning to a few other things. And I hope I can wrap it up in 10 or 15 minutes.
You understand the term failed fuel to mean fuel that requires special handling at the repository, correct?
MS. SULLIVAN: Objection. Beyond the direct.
THE COURT: That's true.
MR. STOUCK: It's metaphysical, Your Honor. Our view is there is no difference. If he says they're going to meet the 2010 date he's saying they're going to take failed fuel. Or he's not going to take failed fuel.



THE COURT: Well, in that context, in terms of the scheduling, fine, you can continue.
BY MR. STOUCK:
Q You understand the term failed fuel to mean fuel that requires special handling at the repository?
A It has other meanings in NRC, but yes, I understand that context.
Q So, according to your understanding, spent fuel that does not require special handling is not failed, according to your understanding. Is that sort of the definition as far as the repository goes?
A Well, standard in terms of the standard contract is basically bare spent fuel. That essentially would not be failed because it would require us to do special handling at the repository.
So to the extent that failed fuel means it in that sense, yes, I understand.
Q And if it doesn't require special handling, it's not failed. That's your understanding -- according to your understanding?
A If it doesn't require special handling at our facilities, yes.
Q Now, there was -- another subject again, I don't mean to -- I just want to get through some short ones here. I'm turning now to the GAO report that

litigating, you can show this to him to bring out his views. But it doesn't necessarily mean that the commissioners' views would be subject to a finding.

MR. STOUCK: Your Honor, I think the statement in this transcript, which we contend is an admission of party opponent, on page 41 is that "I fear a lot of this reading that I do is driven by lawyers rather than technical types."

And if Commissioner McGaffigan fears that, that is admissible for the proof -- for the truth of the fear. That's -- you know, I mean, so -- yeah, the people have read and Mr. Kouts has read. And if I could just move on to one subject, I'd like to put one other --

MS. SULLIVAN: Your Honor, we reserve our objection to hearsay. It's clear on the statement that Commissioner McGaffigan made there and two pages ahead, this is based on things that he read, he's making statements in an advisory committee meeting. And we reserve our objection.

THE WITNESS: Do you want me to respond to this or --

BY MR. STOUCK:

Q You can get that from your own lawyer on redirect if she so chooses. Let's take a look at



page 42. Commissioner McGaffigan again says: And we have suffered from that ever since. I think he's referring back to the -- if you read through this, to the cancellation of the MPC. And I think it's all partitioned now, and it may well be influenced more by lawyers than by technical types.

Do you see that?

A On page 42.

Q Yeah. Commissioner McGaffigan: And we have suffered from that ever since. And I think it's all partitioned now, and it may well be influenced more by lawyers than by technical types.

A I see that.

Q Are you aware of those concerns being expressed?

A Now that I read them, yes.

Q You weren't aware of those concerns prior to today?

A As I mentioned earlier, I haven't read this cover to cover. I was aware of certain statements made, but I have not reviewed it, no.

Q Have you ever prior to today heard concerns being expressed about lawyers rather than technical types having influence on the program?

A No. I have not.



Q Okay. Mr. Kouts, during the course of your employment at OCRWM, you had no responsibility at any time for administering the standard contract; isn't that right?

A That's not true. Since on an acting basis of -- as I testified earlier, as of October 2002, when I was appointed to this position, my responsibilities include management of the standard contracts.

Q Okay.

A So prior to that time, I think that statement would be correct. Subsequent to that time, it would not be correct.

Q This distinction that you testified to about -- that, as I understood it, there was some distinction that you were referring to to receipt rate and acceptance rate. Do you recall that?

A Yes.

Q When did the Department first draw that distinction?

A I believe it -- it drew it in the -- I think it was reflected in the DCS process that we went through for -- that we went through for the 1998 date.

Q For the '98 date?

A Yes.

Q Okay. Do you know if it was drawn prior to



that? I guess you had no --

A I really -- that's my surmise.

Q Because you had no responsibility for contract matters prior to 2000?

A That's correct.

Q Now if I ask you now just a few questions about GTCC, I think we can wrap it up.

MS. SULLIVAN: Your Honor, we've been going an hour and a half. Are we --

MR. STOUCK: That's fine. I've got a few questions about GTCC. If they want to break, that's fine.

THE COURT: Would you like a break at this point?

THE WITNESS: I can keep going.

MS. SULLIVAN: If the witness is fine, that's fine.

MR. STOUCK: I would be happy to do it.

THE COURT: Go ahead. If you need a break just let us know.

THE WITNESS: Okay. Thank you.

THE COURT: Sure.

BY MR. STOUCK:

Q Actually, I will take a sip of water.

A On second thought, I think a quick break