**No. 04-10C**
**(Chief Judge Damich)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**ENERGY NORTHWEST,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

**VOLUME IV OF VII**
**(Pages A 0445 to A 0598)**

---

# ENERGY NORTHWEST'S APPENDIX IN SUPPORT OF ITS REVISED NOTICE OF DESIGNATION OF DEPOSITION AND PRIOR TRIAL TESTIMONY OR, IN THE ALTERNATIVE, MOTION FOR LEAVE TO ADMIT PRIOR TESTIMONY INTO EVIDENCE

---

OF COUNSEL:

WILLIAM D. HEINZ
DAVID JIMÉNEZ-EKMAN
CHRISTOPHER TOMPKINS
APRIL A. OTTERBERG
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 222-9350

DAVID A. HANDZO
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412
202-639-6000

NORMAN M. HIRSCH
Jenner & Block LLP
330 N. Wabash Ave
Chicago, IL 60611
(312) 923-2782 (tel.)
(312) 840-7782 (fax)

August 29, 2008

*Attorneys for Plaintiff*

# Table Of Contents To Appendix – Volumes I to VII

## Volume I

Documents Cited

DOE's Responses to Utility Plaintiffs' First Set of Interrogatories..........................A 0001

DOE's Responses to Utility Plaintiffs' Joint Supplemental Interrogatories.............A 0013

April 3, 2002 Notice of Rule 30(b)(6) Deposition..................................................A 0028

April 18, 2002 Notice of Rule 30(b)(6) Deposition................................................A 0033

November 12, 2004 Notice of Rule 30(b)(6) Deposition ........................................A 0039

March 2, 2005 Notice of Rule 30(b)(6) Deposition................................................A 0043

April 19, 2007 Notice of Rule 30(b)(6) Deposition................................................A 0047

June 9, 2008 Notice of Rule 30(b)(6) Deposition....................................................A 0050

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, 2004 WL 2450874
(Fed. Cl. Sept. 17, 2004) (unpublished)..........................................................A 0052

*Yankee Atomic Elec. Co. v. United States*, No. 98-126C, slip. op.
(Fed. Cl. Sept. 21, 2004) (unpublished)..........................................................A 0065

*Wisc. Elec. Power Co. v. United States*, No. 00-697C, slip op.
(Fed. Cl. Aug. 16, 2007) (unpublished)..........................................................A 0075

Defendant's Unopposed Motion to Designate Prior Trial Testimony of
Mr. Robert L. Morgan in System Fuels ..........................................................A 0105

## Volume II

Deposition Transcripts and Trial Testimony Excerpts

Chart of Energy Northwest Deposition and Trial Testimony Designations .............A 0111

Barrett, Lake ..........................................................................................................A 0123
April 22, 2002 .........................................................................................A 0124
April 23, 2002 .........................................................................................A 0149
April 26, 2002 .........................................................................................A 0173
May 8, 2002 ............................................................................................A 0204
May 10, 2002 ..........................................................................................A 0228
May 14, 2002 ..........................................................................................A 0252

## Volume II (continued)


Brownstein, Alan ....................A 0257
April 9, 2002 ....................A 0258


## Volume III


Brownstein, Alan (continued)....................A 0282
April 10, 2002 ....................A 0282
April 11, 2002 ....................A 0308
June 14, 2002 ....................A 0319

Cole, Billy M. ....................A 0328
March 12, 2002 ....................A 0329
March 13, 2002 ....................A 0360
June 4, 2002 ....................A 0369

Dreyfus, Daniel....................A 0373
May 15, 2002 ....................A 0374

Klein, Susan....................A 0384
April 24, 2002 (Rule 30(b)(6))....................A 0385
April 25, 2002 (Rule 30(b)(6))....................A 0419

Kouts, Christopher....................A 0428
January 30, 2004....................A 0429
August 2, 2004 (in the *Yankee Atomic* Trial Transcript) ....................A 0440


## Volume IV


Kouts, Christopher (continued)....................A 0445
April 11, 2005 (Rule 30(b)(6))....................A 0445
July 12, 2005 (in the *TVA* Trial Transcript)....................A 0459
January 16, 2007 (in the *System Fuels Mississippi* Trial Transcript) ....................A 0463
April 12, 2007 (in the *System Fuels Entergy Arkansas* Trial Transcript)......A 0465
May 1, 2007 (Rule 30(b)(6))....................A 0472
May 2, 2007 ....................A 0484
June 12, 2008 (Rule 30(b)(6)) ....................A 0502

Lawrence, Michael....................A 0531
May 20, 2002 ....................A 0532
May 21, 2002 ....................A 0572
November 16, 2007 (in the *Carolina Power* Trial Transcript)....................A 0587

## Volume V

Milner, Ronald ........ A 0599
May 1, 2002 ........ A 0600
May 2, 2002 ........ A 0629
May 3, 2002 ........ A 0661
May 7, 2002 ........ A 0675
May 8, 2002 ........ A 0690
August 11, 2004 (in the *Yankee Atomic* Trial Transcript) ........ A 0695

Morgan, Robert ........ A 0703
March 21, 2002 ........ A 0704
March 22, 2002 ........ A 0737
June 25, 2002 ........ A 0745
August 3, 2004 (in the *Yankee Atomic* Trial Transcript) ........ A 0751
November 13, 2007 (in the *Carolina Power* Trial Transcript) ........ A 0757

## Volume VI

Pollog, Thomas ........ A 0762
April 11, 2002 (Rule 30(b)(6)) ........ A 0763
April 12, 2002 (Rule 30(b)(6)) ........ A 0799
May 15, 2002 (Rule 30(b)(6)) ........ A 0819
May 16, 2002 (Rule 30(b)(6)) ........ A 0823
August 4, 2004 (in the *Yankee Atomic* Trial Transcript) ........ A 0826
July 12, 2005 (in the *TVA* Trial Transcript) ........ A 0839
November 15, 2006 (in the *Northern States* Trial Transcript) ........ A 0846

Rosselli, Robert ........ A 0855
April 15, 2002 ........ A 0856
April 16, 2002 ........ A 0885

Rusche, Benard ........ A 0887
May 16, 2002 ........ A 0888
May 17, 2002 ........ A 0911

Slater-Thompson, Nancy ........ A 0921
April 21, 1999 ........ A 0922
April 22, 1999 ........ A 0932

## Volume VII

Slater-Thompson, Nancy (continued) .......... A 0941
June 13, 2002 .......... A 0941

Trebules, Victor .......... A 0955
April 17, 2002 .......... A 0956
April 18, 2002 (Deposition in Yankee Cases) .......... A 0982

Williams, Jeffrey .......... A 0985
June 11, 2002 .......... A 0986
January 22, 2004 .......... A 0993

Zabransky, David .......... A 1000
April 17, 2002 .......... A 1001
April 18, 2002 .......... A 1027
April 19, 2002 .......... A 1050
June 5, 2002 .......... A 1057
June 6, 2002 .......... A 1060
January 29, 2004 .......... A 1064
August 5, 2004 (in the *Yankee Atomic* Trial Transcript) .......... A 1067
March 29, 2005 (in the *SMUD* Trial Transcript) .......... A 1080
April 12, 2005 (Rule 30(b)(6)) .......... A 1083
July 12, 2005 (in the *TVA* Trial Transcript) .......... A 1092
October 27, 2005 (in the *Southern Nuclear* Trial Transcript) .......... A 1097

0001

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------x

SOUTHERN NUCLEAR OPERATING )
COMPANY, ALABAMA POWER )
COMPANY, and GEORGIA POWER )
COMPANY )
Plaintiffs, ) No. 98-614C
v. )
THE UNITED STATES, )
Defendant. )

---------------------------------x

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---------------------------------x

SOUTH CAROLINA ELECTRIC & GAS )
COMPANY and SOUTH CAROLINA )
PUBLIC SERVICE AUTHORITY, )
Plaintiffs, ) No. 04-0101C
v. )
THE UNITED STATES OF AMERICA, )
Defendant. )

---------------------------------x



Deposition of CHRISTOPHER A. KOUTS
Washington, D.C.
Monday, April 11, 2005
9:26 a.m.

Job No.: 1-53961
Pages 1 - 155
Reported By: Joan V. Cain

Deposition of CHRISTOPHER A. KOUTS, held at the law offices of:

ARNOLD & PORTER
555 Twelfth Street, Northwest
Washington, D.C. 20004-1206
(202) 942-5000

Pursuant to Notice, before Joan V. Cain, Certified Court Reporter and Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, AND GEORGIA POWER COMPANY:

M. STANFORD BLANTON, ESQUIRE
K.C. HAIRSTON, ESQUIRE
BALCH & BINGHAM, LLP
1710 Sixth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 226-3417

ON BEHALF OF PLAINTIFFS SOUTH CAROLINA ELECTRIC & GAS COMPANY and SOUTH CAROLINA PUBLIC SERVICE AUTHORITY:

CHRISTOPHER TOMPKINS, ESQUIRE
JENNER & BLOCK LLP
One IBM Plaza
Chicago, Illinois 60611-7603
Telephone: (312) 222-9350



A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF DEFENDANT:

HEIDE L. HERRMANN, ESQUIRE
STEPHEN FINN, ESQUIRE
JOSHUA E. GARDNER, ESQUIRE
U.S. DEPARTMENT OF JUSTICE
CIVIL DIVISION
1100 L Street, Northwest
Washington, D.C. 20530
Telephone: (202) 305-3315

CONTENTS


| EXAMINATION OF CHRISTOPHER A. KOUTS | PAGE |
|---|---|
| By Mr. Blanton | 7, 147 |
| By Mr. Tompkins | 112 |
| By Ms. Herrmann | 150 |


EXHIBITS

(Attached to the Transcript.)


| KOUTS DEPOSITION EXHIBITS | PAGE |
|---|---|
| 1 Protective Order, 4/8/05 | 10 |
| 2 DOE Report, July 2004 | 14 |
| 3 Letter from Mr. Zabransky to Mr. Cocherell, 7/28/04 | 31 |
| 4 Civilian Radioactive Waste Management System Requirements Document Rev 06 | 45 |
| 5 Letter from Mr. Zabransky to Mr. Cocherell, 12/1/04 | 50 |
| 6 Dr. Chu's Presentation 2/7/05 | 75 |
| 7 Summary of Mr. Garrish's Statement, 3/10/05 | 82 |
| 8 Mr. Garrish's Statement, 3/10/05 | 105 |




EXHIBITS CONTINUED

(Attached to the Transcript.)


| KOUTS DEPOSITION EXHIBITS | PAGE |
|---|---|
| 9 30(b)(6) Notice of Deposition | 112 |
| 10 Letter from Mr. Zabransky to Mr. Carden, 11/3/04 | 130 |
| 11 Letter from Mr. Detmer to Mr. Johnson with Attachment, 3/4/92 | 134 |
| 12 DOE's Supplemental Privilege Log, December 2004 | 137 |
| 13 Copy of Protective Order, 2/14/05 | 150 |




PROCEEDINGS

CHRISTOPHER A. KOUTS

having been sworn, testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY, AND GEORGIA POWER COMPANY

BY MR. BLANTON:

Q Mr. Kouts, good morning. My name is Stan Blanton. I'm one of the lawyers representing Southern Nuclear Operating Company in the case of Southern Nuclear Operating Company, Alabama Power Company & Georgia Power Company versus United States of America.

You're here today, as I understand it, pursuant to a Rule 30(b)(6) deposition notice and a personal deposition notice we've served in that case; is that correct?

MS. HERRMANN: Let me just say, just for the record, Mr. Kouts is here today pursuant to a 30(b)(6) deposition notice. We have received an order from the court, dated April 8, 2005, regarding the government's Motion for Protective Order on the



deposition notice that Southern Nuclear served on Mr. Kouts in his individual capacity.

MR. BLANTON: Right.

MS. HERRMANN: And our understanding is that the court has granted the government's Motion for Protective Order, except to the extent that he has decided to allow questioning regarding the -- let me put this right --

MR. BLANTON: Why don't you mark that as Deposition Exhibit 1 to the deposition. We've got a copy of the order. We can make it an exhibit.

MS. HERRMANN: Great. The court talked about the start date for the repository, and so it's our understanding that the date that the Department of Energy now plans to commence SNF disposal given the time frame for the damages to be determined in this litigation keyed to 2010. We understand that to be a proper area for cross-examination in this deposition. We do not understand that Mr. Kouts is here to address any other topics in his personal capacity.

MR. BLANTON: Well, what the court's order

anything you've testified to in any of those cases where your position has changed, where you would change anything you've said?
A No.
Q Other than the 2010 start date, has there been -- is there any issue about which you've testified in any of those previous either depositions or trials where the Department of Energy's position has changed, to your knowledge?
A No.
Q Now, as I understand it, you've been designated as the government's designated witness for the purpose of testifying about the 2004 Annual Priority Ranking & Annual Capacity Report document.
MR. BLANTON: Is that correct, Ms. Herrmann?
MS. HERRMANN: That is correct.
BY MR. BLANTON:
Q Okay. Mr. Kouts, do you understand that you've been designated the government's representative to testify about that subject?
A Yes.



MR. BLANTON: Let's get a copy of that, K.C.
Let's mark that as Kouts' 2.
(Kouts' Deposition Exhibit 2 was marked for identification and was attached to the deposition transcript.)
BY MR. BLANTON:
Q And she'll give you the original, Mr. Kouts.
MS. HERRMANN: Can I get a copy of Kouts' 1?
MR. BLANTON: Yeah.
BY MR. BLANTON:
Q Mr. Kouts, when you've had a chance to familiarize yourself with Kouts 2 in front of you, let me know.
A I'm familiar with it.
Q Could you identify that document, please, sir?
A It's the Acceptance Priority Ranking & Annual Capacity Report that was issued by the Department in July 2004.



Q Who was responsible at the Department of Energy for this document?
MS. HERRMANN: Objection, vague.
BY MR. BLANTON:
Q Can you answer the question?
A The Department of Energy was responsible for it.
Q Well, what individual within the Department of Energy was responsible for this -- for producing this document?
A It was developed by my staff with contractor assistance.
Q Is your title the same as it was when you testified in the Yankee trial?
A Yes, it is.
Q Is your reporting relationship the same?
A Yes, it was -- yes, it is.
Q So you report to Ted Garrish?
A That's correct.
Q Has there been any change in the reporting relationship since -- I don't know if it's doctor or Ms. Chu -- decided to leave the Department of



Energy?
A No, there has not been.
Q So Mr. Garrish is now acting director. Is that his correct title?
A No, it is not.
Q What is his correct title at this point in time?
A It remains what it was before.
Q Which is?
A Deputy director for strategy and program development.
Q So there's no -- is there an acting director?
A No, there is not.
Q Who on your staff worked on the Annual Capacity -- or the Acceptance Priority Ranking & Annual Capacity Report?
A Dave Zabransky and Tom Pollog.
Q What was the purpose of issuing this report in July of '04?
A The purpose was to -- this report was to accompany a letter and was accompanied by a letter

to contract holders to initiate the planning process under the standard contract in anticipation of receiving shipments in 2010.

Q When you refer to the planning process under the standard contract, explain to me what you mean by that.

A Essentially, the Department asked contract holders to submit delivery commitment schedules based on the information provided in the Acceptance Priority Ranking & Annual Capacity Report.

Q When is the last time DOE had issued an Acceptance Priority Ranking & Annual Capacity Report before the July '04 report, if you're aware?

A We issued several. I don't remember exactly the last one. I was not involved at the time in managing that area when they were issued.

Q On page 1 of the document, the first paragraph -- the first sentence of the second paragraph -- strike all that. We're going to start over.

The first sentence of the second paragraph says, "The Standard Contract requires the Department



to issue an annual," and that annual is in a small case, "Acceptance Priority Ranking report and an Annual Capacity Report (ACR)." How often does the standard contract require the Department to issue a document such as has been marked as your Deposition Exhibit 2?

MS. HERRMANN: Objection, calls for a legal conclusion.

BY MR. BLANTON:

Q What's your understanding of the contractual requirement?

A My understanding of the contractual requirement is that if the Department was requesting DCSs, that it would be issued on an annual basis.

Q Why only if the Department was asking for DCSs?

A My own personal view is that the -- there'd be no need for it.

Q Why is that?

A Because the Department would not -- essentially, would be signaling that we were not accepting fuel 63 months prior to the date of -- of



acceptance.

Q I'm sorry. What would signal the Department didn't intend to accept fuel within 63 months?

A The fact that we were not issuing -- or requesting DCSs.

Q So do I understand your testimony correctly then to be that the impetus for the issuance of the Acceptance Priority Ranking & Annual Capacity Report is the Department of Energy's intent to request DCSs?

A That's my understanding.

Q And by DCSs, we mean delivery commitment schedules; is that correct?

A That's correct.

Q And delivery commitment schedules are also addressed in the standard contract; is that correct?

A Yes.

Q Do I also understand from your testimony that it's the Department's position that they will -- that the Department will only request DCSs to be submitted by contract holders when the



Department has an intention to accept fuel within 63 months?

A That's correct. I believe it's 63 months from the year we're going to.

Q Right.

A 63 months from -- prior to the year we're going to accept fuel, not 63 months prior to the point in time that we're going to be accepting fuel.

Q So to help this make sense on the record, as I understand, the standard contract provides that within 63 months of the year in which fuel is to be accepted, the contract holder is to submit a Delivery Commitment Schedule; is that correct?

A The Department will request it. It's up to the contract holder as to whether or not they're going to submit it.

Q Right. And it's the Department of Energy's position that it will only request these delivery commitment schedules within 63 months of the date when the Department of Energy has determined it will accept -- of the year in which the Department of Energy has determined it will accept fuel?

A That's correct.
Q Now, the last sentence in that paragraph says, "As specified in the Standard Contract, the ACR is for planning purposes only and, thus, is not contractually binding on either DOE or the Purchasers." Do you see that sentence?
A Yes.
Q Has a similar sentence been in each of the other APR and ACR documents, to your knowledge?
A I can't answer that. I don't know.
Q Okay. Is the reference to planning purposes the same thing as what you referred to a minute ago as the purpose of this document being to initiate the planning process?
A Yes.
Q Is the APR/ACR document that's marked as Exhibit 2 to your deposition intended to have any planning function from the utility, contract holder's standpoint?
MS. HERRMANN: Objection, calls for a legal conclusion.
MR. BLANTON: I'm just asking what DOE



intends for its document to -- what purpose its document serves.
A It's to inform the contract holders what priority they have and what the expectations are of the Department in being able to receive materials in any specific year.
Q Does DOE intend for the contract holders to rely on the statements of intent in that document, for lack of a better term, in doing their own on-site storage plan?
A That's a decision on the part of the utilities.
Q Well, is there any document or other statement by DOE on which DOE intends for utilities to rely on doing their own storage plan?
A Not that I'm aware of.
Q If a utility was to forgo developing an on-site storage capability in reliance on what the Department of Energy said in the document that is marked as Exhibit 2 to your deposition and then DOE failed to accept fuel on the schedule that's set forth in Exhibit 2, what would the DOE's position be



with respect to any hardship that utility suffered as a result of having relied on the Acceptance Priority Ranking & Annual Capacity Report?
MS. HERRMANN: I'm sorry, Stan. I just didn't get the whole question. Can you read it back?
(The reporter read the record as requested.)
MS. HERRMANN: Objection, calls for a legal conclusion. Foundation.
BY MR. BLANTON:
Q You may answer, if you know.
A That would -- that would be a question for attorneys. I'm not an attorney.
Q So it's correct then -- or is it correct then that DOE's position is that utilities shouldn't count on the APR/ACR for the purpose of making any on-site storage decisions, because DOE won't take the position that they'll stand behind this document?
MS. HERRMANN: Objection, compound. Foundation.



A A utility's decision is a utility's decision. The Department has no control over what the utilities may or may not do based upon the information that the Department gives them, nor does the Department want any control over that.
BY MR. BLANTON:
Q And if we turn to page 2 of Exhibit 2, Table 1 is entitled "Projected Nominal Waste Acceptance Rates for Spent Nuclear Fuel." Do you see where I'm directing you to?
A Yes.
Q Now, do you recall testimony you've given in the previous cases about a distinction between receipt rates and acceptance rates?
A Yes.
Q Are the acceptance -- is acceptance rate the correct term -- based on that prior testimony, is acceptance rate the correct term for what's shown here as being the -- the MTU of spent nuclear fuel that DOE has indicated for each of the years?
A Yes.
Q And as I understand it, acceptance rate in

your nomenclature has contractual significance, as opposed to just the technical capacity of the repository system; is that correct?
A That's correct.
Q Do you know what the source of the acceptance rates shown in Table 1 of Exhibit 2 to your deposition is?
A Yes.
Q What is it?
A It's our systems requirements document.
Q When's the last time one of those -- the systems requirements document has been issued?
A The last revision was issued in September 2004.
Q Okay. So this would have been -- since this document was done in July of '04, it would be based on an earlier revision of the system requirements document?
A That's correct.
Q Do you know what version of the system requirements document this was based on?
A Provision 5.



Q And how did those numbers get into the system requirements document?
A The system requirements document, the parent systems requirements document is a document that's controlled by the director of the program, and any revisions to that document require the director's approval.
Q I understand that. My question is, is the -- are you aware of the -- of the technical basis for these acceptance rates, how they were arrived at?
A They were considered to be an appropriate acceptance rate for the facility capabilities that the Department is designing.
Q Let me rephrase my question and see if I can make it more understandable. For instance for the year 2014, the acceptance rate shown here is 3,000 metric tons, correct?
A Yes.
Q Did somebody sit down and decide, okay, it's going to be 3,000. It's not going to be 2900. It's not going to be 3100. It's going to be 3,000?



A It's based on facility capabilities.
Q Okay. And who would have been responsible for calculating those facility capabilities?
A This is a system requirements document. The requirement is set down and the facilities are designed to meet it. So, therefore, it's an analysis of what's a reasonable maximum rate for the system to receive in any one year, and facilities and transportation capabilities are designed to meet it.
Q Okay. So based on that, my understanding from you is you start out with the number and then the number drives the design; is that correct?
A Yes.
Q And who determined that this acceptance rate was a reasonable maximum acceptance rate for the program?
A I don't know that any one person determined it. There have been a series of analyses over many years that had been done to indicate that that's a reasonable rate -- a maximum rate for the system to operate under.



Q And as I understand your definition of acceptance rate from your prior testimony, this is what DOE intends for it to be its contractual commitment, correct?
A Yes.
Q Now, Appendix A is the acceptance priority ranking in the 2004 report? It starts just a couple pages after the one we were just looking at -- well, I'm sorry. Table 2 is next, and then Appendix A is Acceptance Priority Ranking.
A Mm-hmm. Yes.
Q As I understand it, this is a list of the -- of every contract holder's quantity of spent fuel based on the date of -- permanent discharge from the reactor, correct?
A Yes.
Q Were there any changes from the last APR, whenever it was, to the ranking of fuel that was discharged, say, prior to 1998?
A Purchasers and contract holders had changed; therefore, where Entity A may have had that right, Entity B may now own that right, but the

original allocation to the -- to that fuel still remains. That has not changed.
Q Okay. So that -- whoever owns that right, the rights derive from some spent fuel assembly somewhere, correct?
A Yes.
Q And those spent fuel assemblies are still ranked in the same order they have always been ranked, as far as you know?
A Yes.
Q Okay. And what would cause the owner of that allocation to change? Somebody buys a plant, is that --
A Just redistribution of the industry.
Q And by that you mean somebody buys the plant and all the fuel on the site --
A Yes.
Q -- or something like that? Now, the acceptance capacity allocations in this document are simply an arithmetic calculation of the acceptance rate by the APR; is that correct?
A Yes.



Q Now, in the -- at least in your Commonwealth Edison deposition and possibly others, you gave a good bit of testimony about a milestone schedule --
A Yes.
Q -- that was developed with the end point being opening, I guess, or at least a significant milestone being the opening of the repository; is that correct?
A Yes.
Q You recall that testimony?
A Yes.
Q Now, is that milestone schedule what this -- the commencement date intentions reflected in this APR/ACR is based on?
A Yes.
MR. BLANTON: It's tab 2 in my book, but it's not by your little index.
MR. HAIRSTON: What's the date?
MR. BLANTON: July 28, '04, letter.
BY MR. BLANTON:
Q Did I understand you correctly a second



ago, Mr. Kouts, to say Mr. Dave Zabransky reports to you?
A Yes.
MR. BLANTON: Let's mark that as Exhibit 3.
(Kouts' Deposition Exhibit 3 was marked for identification and was attached to the deposition transcript.)
BY MR. BLANTON:
Q And I think we saw a minute ago in Exhibit 2, Mr. Kouts, and I think you testified that what drove the timing of the issuance of the 2004 ACR/APR was DOE's desire to begin -- recommence the DCS submittal and approval process; is that correct?
A Yes.
Q And you have what's been marked as Exhibit 3 to your deposition in front of you, and -- which is a July 28, 2004, letter to Ron Cocherell at Southern Nuclear Operating Company by David K. Zabransky. Have you ever seen that letter or a similar letter?
A Yes.
Q Did Mr. Zabransky send these letters under



your direction or supervision?
A Yes.
Q Prior to the submittal of this letter to the contract holders, what would -- and, say, between 1998 and July 28 of 2004 -- let's say between January 31 of 1998 and July 28 of 2004, what would DOE have done had a contract holder submitted a Delivery Commitment Schedule to DOE?
MS. HERRMANN: Objection, speculation.
A I don't know.
Q Well, does the contract limit the submission of DCS to only when the DOE asks for them?
A That's a legal question.
Q To your knowledge?
A The contract holder can do whatever it wants in terms of submitting information.
Q Would DOE have processed it prior to July 28th of '04?
MS. HERRMANN: Objection, speculation.
A I don't know.
BY MR. BLANTON:

Q Why did DOE determine to recommence the DCS process in July of '04?
A Because they thought it was -- the Department thought it was appropriate to initiate the planning process in anticipation and receipt of shipments in 2010.
Q Who was involved in that decision?
A I was, Mr. Garrish, and various other senior people within the Department.
Q Do you recall any of their names, other than you and Mr. Garrish?
A Our general counsel was involved. In terms of additional senior management within the Department, that was Mr. Garrish's responsibility. He did not reveal to me who was involved. I take my directions from Mr. Garrish.
Q Now, at the time this July 28 letter was sent, this Exhibit 3 to your deposition, was there an appropriation or a budget request pending before the Congress for the radioactive -- civilian radioactive waste program?
A Yes.



Q What was the amount of that appropriation request?
A I believe it was $880 million.
Q What was the status of that budget request at the time of this letter?
A Congress had not acted on them yet.
Q Had there been any activity in Congress with respect to appropriations to the civilian radioactive waste program as of July of '04? Had one house passed an appropriations bill or a committee issued out a budget?
A I believe the House had issued a mark of 131 million for the program. The Senate had not issued a mark.
Q Now, as of July of '04, what was your understanding as to what a budget shortfall of $750 million would do to your schedule for accepting fuel beginning in 2010?
A Based on the testimony that the director of the program had given to Congress, if we did not receive our funding request for FY 2005, the 2010 date was in jeopardy.



Q And the director of the program at the time was Mrs. Chu, is that right, or Ms. Chu?
A Yes.
Q And as I understand your testimony, she had testified to Congress that if you didn't get the whole 880 million, then the 2010 date was in jeopardy?
A Yes.
Q Did you disagree with that?
A It's not up to me to disagree with the director. That's the policy of the program.
Q Well, personally, did you agree with what she said or disagree with it?
MS. HERRMANN: Objection, relevance.
MR. BLANTON: He knows a lot about this program.
A Best way for me to answer that is if we received 879 million, I still think we could meet 2010. If we received a substantial amount below 880 million, my sense was that that would be a real factor in our ability to meet it.
BY MR. BLANTON:



Q And I presume that you would consider, at least as of July of '04, if you'd gotten the $750 million less that would have been a substantial amount below 880?
A Yes.
Q So at the time this July of '04 letter was issued, the Department was aware that there was a budget problem with meeting the 2010 date. Is that a fair statement?
MS. HERRMANN: Objection, mischaracterizes prior testimony.
A Until Congress acts, we have no budget mark.
BY MR. BLANTON:
Q And as of July, all you knew about what Congress was doing is that one House had given you 750 million less, approximately 20 percent of what you'd asked for?
A That's correct.
Q And there was no doubt in your mind that if that stayed the case, 2010 could not happen; is that right?

45

A I have no idea what the Environmental Protection Agency will do in response to the court's ruling.
Q Okay.
MR. BLANTON: What are we up to, Number 3 so far?
THE COURT REPORTER: Number 4 is our next number.
MR. BLANTON: That's going to be Kouts' Number 4.
(Kouts' Deposition Exhibit 4 was marked for identification and was attached to the deposition transcript.)
BY MR. BLANTON:
Q Do you recognize the document the court reporter's marked as Exhibit 4 to your deposition, Mr. Kouts?
A Yes.
Q What is that?
A It's the Civilian Radioactive Waste Management System Requirements Document, Rev 6.
Q Is that the document you referred to just a

46

few minutes ago in your deposition testimony as being the latest revision to the system requirements document for the waste management system?
A Yes.
Q Referring to page 8 of that document, there's a Table 1 entitled "CRWMS Receipt Rates." The CRWMS refers to Civilian Radioactive Management System?
A Yes.
Q Are the receipt rates shown in Table 1 of the column commercial SNF and HLW received annually at repository at least through the period of time covered by the ACR/APR, are those receipt rates identical to the acceptance rates shown in your Exhibit 2 to the APR/ACR?
MS. HERRMANN: Objection. The documents are the best evidence of their contents.
A Yes.
BY MR. BLANTON:
Q Is there any practical difference then between receipt rates and acceptance rates, under your definition?

47

MS. HERRMANN: Objection, vague.
A They're the same.
BY MR. BLANTON:
Q Is the -- does DOE refer to this as the SRD or the CRD, this document --
A The CRD.
Q -- whatever it is, Kouts' 4? Is that document produced by your organization, the people working under you, or is it produced by somebody else at DOE?
A It's produced by my organization.
Q Who works on the CRD in your organization?
A Mr. Steve Gomberg.
Q I'm sorry. Could you spell that last name?
A G-o-m-b-e-r-g.
Q Was there a particular reason for this revision of the CRD to be issued? Was there some significant change between this version and the previous version?
A The revisions from the previous one are identified in the document.
Q So in order to see the difference between

48

this document and Rev 5, I would look at the list of revisions and changes listed in page Roman 7 through Roman 9; is that correct?
A No, it's not.
Q All right. So are there changes other than the ones listed in these -- on these pages?
A No.
Q I'm sorry? I asked if this -- if pages 7 through 9, Roman 7 through Roman 9, indicate the changes through the various revisions of the document, and you say that's not correct?
A You said from the previous version.
Q Okay. I should have said the previous versions.
A Yes.
Q Okay. And then it would be correct?
A Yes.
Q So on page Roman 9, does that describe all of the revisions from this document as compared to revision 5?
A It summarizes them, yes.
Q Does Mr. Gomberg report directly to you, or

is there an intermediate level of reporting in between you and he?
A He reports directly to me.
Q What's his title?
A His position description is a general engineer, I believe.
Q And do I understand it correctly that this -- the function of this document is to essentially provide the design requirements to all the different elements of DOE that are involved in either the design or implementation or operation of the radioactive waste management system?
A Yes.
MS. HERRMANN: Mr. Blanton, are we coming to a good place for a break?
MR. BLANTON: I think we're coming to an excellent place for a break, sure. Do you want to take a break?
THE WITNESS: Sure.
(Recessed at 10:37 a.m.)
(Reconvened at 10:48 a.m.)
MR. BLANTON: Mark that Kouts' 5 please,



ma'am.
(Kouts' Deposition Exhibit 5 was marked for identification and was attached to the deposition transcript.)
BY MR. BLANTON:
Q Mr. Kouts, do you recognize what's been marked as Exhibit 5 to your deposition?
A Yes.
Q Would you identify that, please?
A It's a letter to Mr. Ronald Cocherell informing him that the resumption of the DSC process was premature.
Q Have you seen either that letter or one like it prior to your deposition today?
A Yes.
Q That again is signed by Mr. Zabransky as contracting officer. Did he also report to you during the December '04 time frame?
A Yes.
Q The second -- well, first of all, back up. Are you aware whether the Department of Energy received any delivery commitment schedules from



Southern Nuclear after the July 28, '04 letter?
A I'm not sure. They could have.
Q Do you know whether this letter went out to everybody -- all contract holders, whether or not they'd received or submitted a DCS?
A My assumption would be that this only went out to those who submitted forms, since lower in the letter it says, "Enclosed with this letter are any original DCS forms that you may have submitted with your response."
Q All right. In the second sentence of that letter states, "However, recent developments relating to the FY 2005 budget along with other issues have led the Department to conclude that the resumption of the DCS process was premature."
Let me ask you first, did you participate in drafting this letter?
A I signed off on it.
Q So you reviewed the finished product, at least, before it went out?
A I approved the finished product before it went out, yes.



Q Do you know if you reviewed or approved any drafts?
A I don't remember.
Q Was the principal author of the letter Mr. Zabransky?
A Yes.
Q What are the recent developments relating to the fiscal year 2005 budget that that sentence refers to?
A I believe that our funding level was in the range of about $579 million.
Q As opposed to the 880 we referred to a minute ago, 880 million?
A That's correct.
Q What impact, if any, did that have on the repository schedule?
A It meant that we would not be able to fund activities, necessary activities that we had planned for FY '05 in anticipation of opening the repository in 2010.
Q Were there specific activities that were going to fall by the wayside as a result of the

case to the Commission for the licensing repository.
Q Okay. And as of December 31st -- excuse me -- December 1, 2004, you had concluded that at least a rational enough possibility that it warranted delaying or suspending the Delivery Commitment Schedule process again?
A That in relation with other issues, yes.
Q Okay. Do you know anything more about the EPA standard as we sit here today on April the 11th, 2005, than you did on December the 1st, 2004?
A Yes.
Q What do you know differently?
A I am aware of public statements made by senior managers at the Environmental Protection Agency indicating that they will issue a draft standard this summer.
Q They indicate what that draft standard would be?
A Not in their public statements.
Q Have you had private conversations with anybody at EPA about what the draft standard will be?



A No.
Q Do you have any expectation as to what the draft standard will be?
A No.
MS. HERRMANN: Objection, speculation.
BY MR. BLANTON:
Q Did the public statements by EPA indicate that it would be consistent with the NAS' recommendations?
A I don't remember.
Q Does DOE anticipate a challenge to the standard if it's not consistent with NAS' recommendations?
MS. HERRMANN: Objection, speculation. Foundation.
A The Department anticipates that whatever challenges are made is in the mind of those who may make the challenges.
BY MR. BLANTON:
Q What did the Department mean by the statement that the resumption of the DCS process was premature, in the letter of December 1, 2004?



A That the Department no longer believed that it could be able to receive fuel in 2010. Therefore, the initiation of the planning process was premature.
Q Did the Department believe -- as of December 1, 2004, did the Department believe that it should have not resumed the process in July of '04?
A No.
Q In the second sentence of this letter -- well, let me back up a minute.
You've mentioned the shortfall in the '05 appropriation. You've mentioned the exhaustion of the appeals of the EPA health and safety standard, and you've mentioned the Commission's failure to act on the appeal to the licensing -- of the Licensing Support Network decision by the Presiding Officer. Were there any other issues that led the Department to conclude that the resumption of the DCS process was premature, other than those?
A You've mischaracterized my previous testimony. The appeal was not the issue. It was the -- of the Department certification process. It



was the rejection of the Department certification by the PAPO board, Preapplication Presiding Officer Board; that was the basis, not the appeal that the Department made.
Q Okay. Well let me start over again. You've mentioned the budget shortfall for FY '05. You've mentioned the exhaustion of the appeals of the EPA rad standard, and you've mentioned the rejection of the certification of the Licensing Support Network as issues that led the Department to conclude that the resumption of the DCS process was premature. Are there any other issues, other than those three, that led the Department to that decision?
A No.
Q Now, could you explain what the impact of the rejection of the Licensing Support Network had?
A By NRC rules, the Department is to certify its collection of documents six months prior to the submission of a license application; therefore, with the rejection of the Department certification, that meant that the license application would have to be

& Gas Company and the South Carolina Public Service Authority in this matter. I have some questions for you. I'm not going to replow the ground that Mr. Blanton touched on this morning. If I ask you the same questions that Mr. Blanton asked, would you give the same answers?
A Yes.
Q Okay. Mr. Kouts, how did you prepare for your deposition today?
A I reviewed documents related to the issuance of the 2004 annual priority ranking and acceptance capacity report -- Acceptance Priority Ranking & Annual Capacity Report.
Q Do you know what documents those were?
A Yes. I believe they were Exhibit 1 -- no. Excuse me -- Exhibit 2 that I was asked about earlier.
Q Okay. Did you review any other documents?
A Yes, I did. I reviewed Exhibit 3 or a similar document, and I also reviewed Exhibit 5.
Q Were there any other documents that are not exhibits here today that you reviewed in preparation



for your deposition?
A Yes, I did.
Q And do you recall what documents those are?
A I recall what one of those documents was, yes.
Q And what is that document?
A It was a letter sent under the signature of Mr. Zabransky to, I believe, a gentleman at the Tennessee Valley Authority, dated November 3rd, which responded to questions related to the DCS process that that contract holder had.
Q Mr. Kouts, the court reporter has put in front of you what's been marked as Kouts' Exhibit 9. It's a 30(b)(6) Notice of Deposition, which we served on behalf of SCE&G and South Carolina Public Service Authority in this case, and it lists a number of topics on Attachment A to Kouts' Exhibit 9. Is it your understanding that you're here today to testify regarding these topics?
A Yes.
Q And that your testimony will be as a representative of DOE?



A Yes.
Q Okay. Okay. Can you look at Kouts' Exhibit 4 please, and if you'd turn to page 1 of the document, under Section 1.2 "Purpose," the second paragraph, there's a sentence which states, "The CRD establishes requirements for the design, development operation of the CRWMS. It is specifically -- it specifically addresses the top-level governing laws and regulations (EG. Nuclear Waste Policy Act, NWPA 10 CFR part 63, 10 CFR part 71, et cetera)." What does this statement mean?
MS. HERRMANN: Objection, foundation.
A The document speaks for itself.
BY MR. TOMPKINS:
Q What's your understanding of what requirements are incorporated into the CRD?
A For the portion that you read, it incorporates specific direction of the Nuclear Waste Policy Act, NRC regulation 10 CFR part 63, which are disposal licensing regulations for the repository. 10 CFR part 71 has to do with the transport of spent fuel and high-level waste materials, et cetera. My



assumptions there is that there are other federal regulations that are also called out that this program has to comply with.
Q Okay. If you'd turn to page 11 of the document, please. Section 3.3.1, "Waste Acceptance Element Requirements," subparagraph B here, there's a reference in the second line of B in the EM/RWMOA (Owendoff -- O-w-e-n-d-o-f-f -- and Barrett 1999.)
Do you know what that's referring to? Is that another document?
MS. HERRMANN: Objection, foundation.
A Yes.
BY MR. TOMPKINS:
Q Okay. What document is that?
A It's a memorandum of understanding between our program and the Office of Environmental Management in relation to materials that will be provided by the Office of Environmental Management for disposal in the repository.
Q Okay. Can you turn to Kouts' Exhibit 2, please? I believe Mr. Blanton asked you some

that is not beyond the scope of our notice. Our notice refers to the allocations. It may specifically refer to the allocations in this particular document; however, I think we both know that our notice is broader than that.
MS. HERRMANN: I think both of us learned in law school that when we're specific, we're specific, and that's what we do. So, seriously, short leash and then we're out of here.
MR. TOMPKINS: Okay.
BY MR. TOMPKINS:
Q If you'd turn to Kouts' Exhibit 5, please. I believe in response to questions from Mr. Blanton you indicated that you did not expect this letter was sent to utilities that did not submit DCS forms after the July 2004 request?
A That's correct, and I certainly answered that, because if you look in the second paragraph it says, "Enclosed with this letter are any original DCS forms that you may have submitted with your response."
Q Do you know if a similar letter was sent to



utilities that did not submit DCS forms?
A I'm not positive about that. It's possible that it was.
Q Okay. Mr. Kouts, Mr. Blanton asked you some questions about the appeal of the D.C. Circuit Court of Appeals' ruling on the EPA issue?
A Yes.
Q Okay. Did DOE itself appeal that ruling?
MS. HERRMANN: Chris, I have to object to the scope again. How does fit into your notice?
MR. TOMPKINS: Our notice does include a topic regarding why DOE elected under topic 3 that resumption of the DCS process was premature, and that covers topics about the reasons why resumption of the DCS process is premature. This is the only question I'm asking about the topic.
MS. HERRMANN: Maybe you could establish a foundation for that then, so we don't have to keep arguing about this.
BY MR. BLANTON:
Q Mr. Kouts, I just have one simple question. Did DOE itself participate in the appeal of that



D.C. Circuit opinion?
MS. HERRMANN: Objection, beyond the scope. You can answer if you can.
A No, it did not.
BY MR. TOMPKINS:
Q Okay. If you can look at Kouts' Exhibit 3, please. I believe you testified that this was the letter that was sent out to utilities requesting DCS submissions in July of 2004?
A That's correct.
Q Okay. And a similar letter was sent to each utility?
A As far as I know, yes.
Q Okay. And those letters attached what's the third page of the exhibit, which were instructions for completing the Appendix C Delivery Commitment Schedule?
A Yes.
Q Have you seen these instructions before?
A Yes, I have.
Q Okay. Do you know who prepared these instructions?



A They were prepared by my staff with contractor support.
Q And who on your staff prepared them?
A Mr. Zabransky and Mr. Pollog.
Q And which contractor would have been involved in its preparation?
A Contractors of Bechtel SAIC Corporation.
Q If you turn to page 2 of the instructions, paragraph 7(a), there's a statement, "DOE recognizes that many purchasers have submitted and DOE has approved DCSs based upon the January 31, 1998, operations date included in the standard contract. Purchasers should submit new DCSs based upon the currently planned operation date of 2010." Do you see that statement?
A Yes.
Q Okay. What -- what is the current status of those prior DCS submissions referred to in paragraph 7(a)?
A My understanding is they're the subject of litigation.
Q What is the Department's position regarding

the effect that new DCS submissions would have on those old DCS submissions?

MS. HERRMANN: Objection, foundation. Calls for a legal conclusion.

A The Department has responded to questions on that issue essentially to the extent that the former DCSs -- before the Department will approve new DCSs under this or under the 2004 APR/ACR report, that essentially an agreement would need to be reached that the former DCSs were no longer under consideration.

BY MR. BLANTON:

Q What do you mean by no longer under consideration?

A That these would supplant -- that the new DCS -- approved DCSs would supplant whatever had occurred in the past.

Q And the prior DCS would no longer have any effect?

A The prior DCS was a planning document, and this DCS would also be a planning document. It basically reflects that this is the most current



planning that the Department has.

Q Okay.

(Kouts' Deposition Exhibit 10 was marked for identification and was attached to the deposition transcript.)

BY MR. TOMPKINS:

Q Mr. Kouts, have you seen this document before?

A Yes, I have.

Q Okay. Is this one of the documents that you said that you reviewed in preparation for your deposition here today?

A Yes.

Q Okay. Who wrote this document?

A I think there were a variety of contributors to the document.

Q Do you know who they were?

A Mr. Zabransky, Mr. Pollog, myself, help from counsel.

Q If you turn to the second page of this document, Mr. Kouts, the last paragraph, there's a statement halfway down the paragraph, "We anticipate



that any new DCSs that are approved will replace rather than supplement the approved DCSs to eliminate any potential confusion regarding the relationship between previously approved DCSs and new DCSs. We will seek prior to approving the new DCSs from any purchasers with previously approved DCSs an agreement in writing that any new DCSs that are approved actually replace rather than supplement the previously approved DCSs. That agreement will be reflected in any future DCS approvals."

Is this the response to this question that you just testified about?

A Yes.

Q Okay. Would -- upon the resumption of the DCS process, would the Department approve any new DCSs without an agreement that they replace the old DCSs?

MS. HERRMANN: Objection, foundation. Speculation.

A That's what the letter says, and that's what the Department's intention is.

BY MR. TOMPKINS:



Q So the Department's intention is to condition approval of new DCSs on an agreement that the old DCSs will be replaced?

MS. HERRMANN: Asked and answered.

A Yes.

BY MR. TOMPKINS:

Q So if a utility does not agree that the new DCS submissions would replace the old DCS submissions, the Department would not approve the new DCS submissions?

MS. HERRMANN: Objection, foundation. Speculation.

A That's what the letter says.

BY MR. TOMPKINS:

Q Is that the position of DOE?

A Yes.

Q Do you know what provision of the contract allows DOE to condition approval of new DCSs based on this agreement?

MS. HERRMANN: Objection, calls for a legal conclusion.

A I wouldn't know.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

TENNESSEE VALLEY AUTHORITY, )
Plaintiff, ) Case No. 01-249C
v. )
THE UNITED STATES, )
Defendant. )

Courtroom 4
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, July 12, 2005
Volume 8

The parties met, pursuant to the notice of the Judge, at 10:10 a.m.

BEFORE: THE HONORABLE CHARLES F. LETTOW



APPEARANCES:
ON BEHALF OF THE PLAINTIFF:
PETER K. SHEA, ESQ.
EDWIN W. SMALL, ESQ.
TENNESSEE VALLEY AUTHORITY
400 West Summit Hill Drive
Knoxville, Tennessee 37902-1499
(865) 632-7319

ON BEHALF OF THE DEFENDANT:
ALAN J. LO RE, ESQ.
SONIA ORFIELD, ESQ.
SHARON A. SNYDER, ESQ.
KEVIN CRAWFORD, ESQ.
U.S. Department of Justice
1100 L Street, Northwest
Washington, D.C. 20530
(202) 305-7562

***Index appears at end of transcript***



P R O C E E D I N G S
\- - - - -
THE COURT: Good morning. I congratulate our reporter on solving her technical difficulties so promptly. Good job. Do we have any preliminary matters before we continue with the cross-examination of Mr. Kouts?
MR. LO RE: Your Honor, we did have one preliminary matter, and the Court's indulgence, we would like to have a sidebar. Is that possible?
THE COURT: I suppose what we might do -- well, yes, we can always excuse Mr. Kouts temporarily.
MR. LO RE: This is actually something I would prefer is just discussed off --
THE COURT: Let us do this right down by the reporter.
(Discussion off the record.)
THE COURT: The Court thanks counsel and thanks them for their cooperation one with another. With that, Mr. Small, are you ready to continue with your cross-examination?
MR. SMALL: Yes, Your Honor.
Whereupon--
CHRISTOPHER KOUTS



a witness, called for examination, having been previously duly sworn, was examined and testified further as follows:
CROSS-EXAMINATION (Resumed)
BY MR. SMALL:
Q. Good morning, Mr. Kouts.
A. Kouts. Good morning.
Q. I'd like to return first to something you talked about yesterday under the heading M&O contractors. Did I have that right?
A. Yes.
Q. Okay. And what is an M&O contractor again?
A. The M&O designation stands for management and operating contractor.
Q. And I believe you talked about documents that were produced by M&O contractors and how there would be some indication that the Department had approved those documents, is that right?
A. I believe my testimony was to the effect that the contractor document was not accepted by the Department unless it was published under the Department's letterhead with the Department's seal and with the Department's document designation.
Q. Okay. And so a document that did not meet the criteria that you've just testified to would simply be a contractor document, as opposed to a DOE

there is no acceptance rate obligation in the standard contract?
A. Not that I'm aware of.
Q. Yesterday, there was talk, and I think you described -- discussed several exhibits that were fee adequacy assessments, is that correct?
A. Yes.
Q. And those fee adequacy assessments refer to the amount of money that's being paid by the utilities into the Nuclear Waste Fund, is that correct?
A. The fee adequacy assessments are prepared in order to determine the adequacy of the fee in terms of the total cost of the program.
Q. Now, those fee adequacy assessments, my understanding, have been done annually from, since the program began in the early '80s, is that correct?
A. There's a requirement in the Nuclear Waste Policy Act that the Secretary review the adequacy of the fee on an annual basis.
Q. And of course, operating utilities like Tennessee Valley Authority are paying fees quarterly under that, aren't they?
A. Yes.
Q. And those fees that are being paid



quarterly are based on nuclear generation?
A. That's correct.
Q. Has the rate that the utilities are paying, that rate per amount of nuclear generation, ever been changed since 1983?
A. No, it has not.
Q. I take it then from your answer that all the fee adequacy assessments have found that the fees being charged are adequate, is that correct?
A. Yes.
Q. And that adequacy is judged in part by the cost reflected in the TSLCCs, isn't that correct?
A. Yes, in part.
Q. And of course, those TSLCCs have assumptions in them about how the systems going to operate, correct?
A. That's correct.
Q. In this litigation, Mr. Kouts, the lawyers sometimes start using terms that the witnesses may not be exactly familiar with. On the other hand, they may be terms that the lawyers have borrowed from the witnesses. One such term is a steady state acceptance rate. Did you have some understanding of what that term might mean?
A. Yes.



Q. Would you please explain what that term would mean to you?
A. Steady state acceptance rate is one where the rate is kept constant over a period of years.
Q. And if I talked about a long-term steady state acceptance rate, would you have an understanding of what that means?
A. Steady state acceptance rate over a long period of time.
Q. Now, has DOE ever published any documents indicating that it planned on a long-term steady state acceptance rate of 900 metric tons a year?
A. You have to define what long-term means.
Q. Well, sir, over, I guess I would say over the life of the program, after an initial ramp-up. Let me, I guess let me go back and ask a few questions to clarify that.
Yesterday, in your testimony, there was some discussion of, of an initial ramp-up. Do you recall that testimony?
A. Yes, I do.
Q. And the concept, at least as I understood it, was that basically, when you start a program, you can't immediately -- or it's not, at least it's not a good idea to plan to immediately go to what you



anticipate the program long-term operational rate would be, but that you'd like a few years to ramp-up to it. Is that a fair statement?
A. Generally, yes.
Q. Okay. And I know we looked at many documents during your testimony yesterday in which the documents indicated that there would be a ramp-up to a steady state rate of 3,000 tons. Do you recall some of those documents?
A. Yes, I do.
Q. In looking over those documents last evening, it looked to me like that virtually all of those documents that ramped up to a steady state 3,000 rate did so in either four or five years; that is to say that the 3,000 rate would be attained in year, operational year five or operational year six, would you say that's correct?
A. Yes.
MR. LO RE: Your Honor?
THE COURT: Mr. Lo Re.
MR. LO RE: I'm going to object and move for that last answer to be stricken on the grounds that it is vague with respect to the, to the term of the documents that are referred to in the question and also with respect to exactly what system we're

talking about here.
MR. SMALL: I'll be happy to clarify and go into detail, Your Honor.
THE COURT: All right. Let's not strike the question and answer, but cover the details on examination, cross-examination and redirect.
MR. LO RE: Fine, Your Honor.
BY MR. SMALL:
Q. I'd like to refer then to some of the exhibits that you referred to yesterday during your cross -- during your examination, both direct and cross perhaps. I think you probably have them all up there with you.
A. Okay.
Q. To the extent you do not, please let me know, and I'll make sure that we furnish them. The first document that I would call your attention to would be Plaintiff's Exhibit 11, and that would be the June 1985 mission plan.
A. Okay.
Q. And if you would, please, turn to the portion of that document that relates to the acceptance rate. I believe that would be page 26 of the document.
A. Okay.



Q. If I'm reading that correctly, it indicates that, "Spent fuel acceptance operations will start in 1998," is that correct?
A. Yes.
Q. And after a ramp-up period, the Department would be taking 3,000 MTUs per year of spent fuel in the sixth year of operation, is that correct?
A. Yes.
Q. I think that's all I have on that exhibit. I would next refer you to Plaintiff's Exhibit 96.
A. I don't believe I have that in my stack here. Oh, here it is.
Q. And that's the February 1985 fee adequacy assessment?
A. Yes.
Q. If you would, please, turn to page three of that document? Is there an acceptance rate indicated on page three?
A. There are two acceptance rates indicated there.
Q. Okay. But in the beginning acceptance rate, it shows a start date of 1998?
A. For the first repository, yes.
Q. Yes, sir, and it shows that there would be a ramp-up to 3,000 tons a year beginning in



operational year six?
A. That's correct.
Q. Thank you, sir. That's all I have on that one. I would next call your attention to Plaintiff's Exhibit 94.
A. Okay.
Q. That should be the April 1986 TSLCC.
A. Yes.
Q. I would refer you to page 14 of that document. Does that document also indicate a 1998 start date of SNF acceptance?
A. Yes.
Q. And does it also indicate a ramp-up to 3,000 tons a year in operational year six?
A. Yes.
Q. Thank you, sir. That's all I have on that document. I would next call your attention to Plaintiff's Exhibit 97.
A. Okay.
Q. That's the March 1986 fee adequacy analysis.
A. Yes.
Q. Call your attention to page four.
A. Yes.
Q. Does that document indicate a spent nuclear



fuel acceptance starting in 1998?
A. Yes.
Q. Does it also indicate a ramp-up to 3,000 tons a year beginning in operational year six?
A. Yes, it does.
Q. Thank you, sir. That's all I have on that document. And just for clarification, when I'm referring to operational year six, I'm of course counting the years since the beginning of acceptance, acceptance operations, is what I'm referring to, is that your understanding?
A. Yes.
Q. I would next call your attention to Plaintiff's Exhibit 20.
A. Okay.
Q. That should be the September 1995 TSLCC.
A. Yes.
Q. I'd like to refer you to page eight of that document.
A. Yes.
Q. That document shows spent nuclear fuel acceptance beginning in year 2010, correct?
A. That's correct.
Q. And it shows a ramp-up to 3,000 tons a year in operational year five, doesn't it?

A. Yes.
Q. I would next call your attention to Plaintiff's Exhibit 25.
A. Okay.
Q. That should be the December 1998 TSLCC.
A. That's correct.
Q. I call your attention to page 15, spent nuclear fuel acceptance rate appear on that page, sir?
A. Yes, it does.
Q. Again, does it show a 2010 start date for spent nuclear fuel acceptance?
A. Yes.
Q. It also shows a ramp-up to 3,000 tons a year beginning in operational year five, doesn't it?
A. Yes, it does.
Q. Thank you, sir. That's all I have for that exhibit. Next call your attention to Plaintiff's Exhibit 29.
A. Okay.
Q. That should be the May 2001 TSLCC, is that correct?
A. That's correct.
Q. I call your attention to page 4-14.
A. Yes.



Q. That also shows a spent nuclear fuel acceptance, doesn't it?
A. Yes, it does.
Q. It shows acceptance beginning in 2010?
A. Yes.
Q. And it shows acceptance ramping up to 3,000 tons a year in operational year five?
A. That's correct.
Q. That's all I have on that document, sir. I would also call your attention to Plaintiff's Exhibit 36.
A. Go ahead.
Q. Call your attention to page two of that document, which should be the July 2004 APR/ACR. Okay. Is that document the July 2004 APR/ACR, sir?
A. Yes, it is.
Q. And on page two, there's a spent nuclear fuel acceptance rate?
A. Yes, there is.
Q. And that shows spent nuclear fuel acceptance starting in 2010?
A. Yes.
Q. And it shows a ramp-up to 3,000 tons a year in operational year five, doesn't it?
A. Yes, it does.



Q. I don't think I've asked you this question, but if I have, I apologize, and I'll say, just say that it's nothing more than I'm asking a second time, and I do apologize if I have. Has the Department ever published a document where it indicated it was going to pick up spent nuclear fuel at the rate of 900 metric tons a year for the life of the program?
MR. LO RE: Your Honor, that's been asked and answered, and I just, rather than put it as an objection, I would just point out that I believe the question was already asked and answered.
THE COURT: Yes, but applying the three strikes rule, I'm not sure it's been asked a third time. The objection is overruled.
THE WITNESS: No.
BY MR. SMALL:
Q. Has the Department ever published a document indicating that it was going to use a 2,100 metric ton per year rate for the life of the program?
A. No.
Q. Now, when I say for the life of the program, I of course did not mean to imply that there would not be a short ramp-up period of, say, five years at the beginning, and I assume that in answering those questions, you made that assumption



as well?
A. As well as the ramp down rate at the end of the operational life of the facility.
Q. Yesterday, in discussing the 1995 ACR/APR, you indicated that there had been some clearance problem in getting it approved for publication. Do you recall that testimony?
A. Yes.
Q. Why was there a clearance problem?
A. I don't know. I wasn't involved at the time. I simply was reflecting on the words that were produced in the document.
Q. In the Department's operational planning documents for the spent nuclear fuel program, are operations based on 40-hour workweeks?
A. Not necessarily.
Q. What are they based on?
A. They're based on a -- it has varied throughout the development of the program in terms of how often you want to operate the facilities, whether you would operate them on a six-day basis with a day off for maintenance, whether or not you would operate them on a straight, over, around-the-clock basis on a shift basis.
So I'd really have to say that that varied

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-------------------------------------x
SYSTEM FUELS, INC., on its own behalf :
and as agent for SYSTEM ENERGY :
RESOURCES, INC., and SOUTH :No. 03-2624C
MISSISSIPPI ELECTRIC :
POWER ASSOCIATION, :
Plaintiff, :
vs. :
THE UNITED STATES, :
Defendant. :
-------------------------------------x

Courtroom 5
National Courts Building
717 Madison Place NW
Washington, D.C.

Tuesday, January 16, 2007

VOLUME 6

The parties met, pursuant to the notice of the Judge, at 10:00 a.m.

BEFORE: THE HONORABLE SUSAN G. BRADEN



APPEARANCES:
ON BEHALF OF PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ.
JACK Y. CHU, ESQ.
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean, Virginia 22102
(703) 770-7674
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman
2300 N Street, NW
Washington, D.C. 20037
(202) 663-8000

and
L. JAGER SMITH, JR., ESQ.
Wise Carter Child & Caraway, P.A.
600 Heritage Building
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5500



APPEARANCES (Continued:)
ON BEHALF OF THE DEFENDANT:
SHARON A. SNYDER, ESQ.
ALAN J. LO RE, ESQ.
STEPHEN FINN, ESQ.
SCOTT DAMELIN, ESQ.
MARIAN SULLIVAN, ESQ.
U.S. Department of Justice
1100 L Street, NW
Washington, D.C. 20036

(Index appears at end of transcript)



P R O C E E D I N G S
- - - - -

THE COURT: All right. I have a lot of different papers here. I am sure I have got everything I need. Let me just tell you a little bit about this week's schedule.

I am going to have to break this afternoon about 3:15 for a doctor's appointment at 3:30. It shouldn't -- it is downtown. It shouldn't take me that long. I am hoping I will be back here before 4:30. I'm sorry to do that, but I can work until 7 tonight to make up the time. We will be starting at 9 every other day this week, and I have nothing else during the week that will interfere with our schedule so we can run through. I don't think this -- I'm sorry to do this to you, but that's where we are.

I am ready to begin, unless there is something. I have a lot of different motions, obviously, that have been filed in the last couple of days. I have looked at all of them and I know that we have granted the government's request to put some deposition testimony in. I don't know if you got that or

THE COURT: You need this witness to do that?

MR. SILBERG: I think he is probably the easiest one to use for that purpose, without trying to call a nuclear waste negotiator.

THE COURT: Well, I heard from somebody -- in one of the cases that I heard from the negotiator himself. It had to do Sacramento, was it not?

MR. LO RE: I don't think so. I don't recall that, Your Honor.

THE COURT: I saw somebody. And he told me how excited he was and what a dismal experience it had been.

MR. SILBERG: And as with Mr. Kouts having lived through that, I can agree with both, but there are perhaps four or five questions that can get me to that point, I believe, with Mr. Kouts.

THE COURT: All right.

BY MR. SILBERG:

Q. Mr. Kouts, the nuclear waste negotiator never concluded a negotiation for a volunteered MRS site, did he?



A. No, he did not.

Q. Okay. Did he ever begin to negotiate an agreement with a volunteered site?

A. Essentially Congress cut off the funds to that effort before he was able to do that. And it was unlikely that -- it was unclear that there was a site that was willing to enter into that at that point.

Q. And was there legislation that was proposed after the nuclear waste negotiator went out of existence in Congress that might have authorized an MRS site?

A. There were interim storage bills that were introduced in the House and the Senate, not by the Department, but by, you know, by various representatives and senators to try to have an interim storage facility.

THE COURT: They were looking at an Indian tribe or something, it seems to me, at one point.

THE WITNESS: Yes, that's correct, but there was no legislation submitted by the Department, that's correct.

THE COURT: Right.

BY MR. SILBERG:



Q. And President Clinton who was President at the time, correct?

A. Yes, he was.

Q. And he threatened to veto that legislation, did he not?

A. Yes, he did.

Q. And the legislation was never enacted?

A. Actually, he did veto a piece of legislation that was a very watered-down piece of legislation.

Q. But that legislation never had any interim storage provisions in it?

A. That's correct, it never got that far.

Q. Okay. And with respect to the -- let's go back a minute to the 1991 report. Do you have the instructions?

You are familiar with the instructions that were issued to utilities to submit the delivery commitment schedules?

A. Generally, yes.

Q. If I might, Your Honor. I have handed you a document entitled U.S. Department of Energy instructions for completing the Appendix C, delivery commitment schedule, general instructions.



You are familiar with the document?

A. Yes.

Q. And this, if you look at paragraph 1 of this document, if you could turn on the ELMO. The paragraph 1 of this document says that the delivery commitment schedule provides the purchasers with the opportunity to inform DOE of their plans for utilizing their allocations of projected federal waste management system acceptance capacity; is that correct?

A. Yes.

Q. So it refers to the utilities' plans, all right?

A. Yes.

Q. And if you look at paragraph 7C of this document on page 5, I flipped one page too far, I think we have a copy that did not copy the even-numbered pages, Your Honor. Excuse me.

I assume the copies that you have are also missing --

MR. LO RE: That's correct.

MR. SILBERG: We will replace those, Your Honor, I apologize. I do have another

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
------------------------------------x
SYSTEM FUELS, INC., and ENTERGY :
ARKANSAS, INC., :
Plaintiffs, :NO. 03-2623C
vs. :
THE UNITED STATES, :
Defendant. :
------------------------------------x
Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.

Thursday, April 12, 2007

The parties met, pursuant to the notice of the Judge at 9:03 a.m.

BEFORE THE HONORABLE CHARLES LETTOW



APPEARANCES:
ON BEHALF OF PLAINTIFF:
ALEX D. TOMASZCZUK, ESQ.
JACK Y. CHU, ESQ.
Pillsbury Winthrop Shaw Pittman
1650 Tysons Boulevard
14th Floor
McLean, Virginia 22102
(703) 770-7674
and
JAY E. SILBERG, ESQ.
Pillsbury Winthrop Shaw Pittman
2300 N Street, N.W.
Washington, D.C. 20037
(202) 663-8000
and
L. JAGER SMITH, JR., ESQ.
Wise Carter Child & Caraway, P.A.
600 Heritage Building
401 East Capitol Street
Jackson, Mississippi 39201
(601) 968-5500



APPEARANCES (Continued:)
ON BEHALF OF THE DEFENDANT:
JOSHUA E. GARDNER, ESQ.
MARIAN SULLIVAN, ESQ.
ALAN J. LO RE, ESQ.
SCOTT DAMELIN, ESQ.
U.S. Department of Justice
1100 L Street, N.W.
Washington, D.C. 20036

***Index appears at end of transcript***



P R O C E E D I N G S
- - - - - (9:03 a.m.)

THE COURT: Welcome back. The Court appreciates the organization and care with which the site visit was undertaken and successfully accomplished. Is there anything preliminarily this morning before we begin, Mr. Gardner?

MR. GARDNER: Not from the government, Your Honor.

THE COURT: Mr. Tomaszczuk?

MR. TOMASZCZUK: Nor from Plaintiffs.

THE COURT: All right. Yes?

MR. GARDNER: And the government would call its next witness, Christopher Kouts.

THE COURT: Thank you very much. Mr. Kouts, you're familiar with the process, if you'd approach the bench and stop and raise your right hand to be sworn?

THE WITNESS: Yes, sir.

Whereupon--

CHRISTOPHER KOUTS

a witness, called for examination, having been duly sworn, was examined and testified as follows:

THE COURT: Thank you. Please be

seated. And before you begin, please state your full name for the record.
THE WITNESS: Yes, sir. My name's Christopher Alexander Kouts.
THE COURT: Thank you. You may proceed.
MS. SULLIVAN: Good morning, Your Honor.
DIRECT EXAMINATION
BY MS. SULLIVAN:
Q. Mr. Kouts, where are you currently employed?
A. I'm currently employed within the Office of Civilian Radioactive Waste Management at the U.S. Department of Energy.
Q. And what is your position with the Department of Energy?
A. I am director of the Waste Management Office within the Office of Civilian Radioactive Waste Management.
Q. And what are your responsibilities in that position?
A. I am responsible for the waste acceptance aspects of the system, including management of the standard contract. I'm also



responsible for systems analysis and basically coordination with other DOE programs on DOE waste materials.
Q. And your responsibilities include planning for waste acceptance from the utilities pursuant to the standard contract?
A. Yes, they do.
Q. How long have you held your current position?
A. These duties I've been responsible for on an acting basis and then, later on, a permanent basis since, I believe, October of 2002.
Q. Could you bring the microphone just a little closer to you?
A. Okay.
Q. Thank you. When did you first join the Office of Civilian Radioactive Waste Management?
A. In June of 1985.
Q. Would you please summarize the positions you've held within the office since that time, briefly?
A. All right. I began my employment at the Office of Civilian Radioactive Waste



Management in the MRS development team. That was a group that was intended, that essentially developed the monitored retrievable storage proposal to Congress in compliance with Section 141 of the Nuclear Waste Policy Act. I worked in that position for approximately three years, held a brief position in integration activities for about a month or two and then was appointed to head the office's transportation program.
I held that office for about three years, and then I worked on strategic and contingency plans for the program, that's in the early '90s now, for a period of time. After that, I was appointed to take over a division that dealt with regulatory coordination with the Nuclear Regulatory Commission and all interactions of the program with the NRC.
After that, I accepted a division that supported the director at that time, Dr. Daniel Dreyfus, who was the political appointee at that time for a period of years. After that position, I moved on to take over a division that developed a topical safety analysis report on centralized air and storage, which was an



effort to essentially expedite the licensing and eventual, hopefully, deployment of an interim storage facility in anticipation of legislation that was being considered in Congress at that time, that was somewhere in the mid-'90s.
Shortly after that, I became -- kind of an interesting job, which was I was a liaison between the Yucca Mountain project in Nevada and DOE headquarters, and I had basically two masters, the head of the Yucca Mountain project and also the director of the program.
And my responsibilities in that position, which lasted about five years, were essentially to make sure that any major technical and policy products that came out of the program were fully coordinated and, policy wise, correct with the implementation of the Yucca Mountain project.
The major activities I was involved in during that time period had to do with the viability assessment that was submitted and -- that was required by Congress to be submitted in 1998, and then after that, until

anticipation of repository construction and operation.
Q. I'd like to now provide you what's been marked as Defendant's Exhibit 57, again, an excerpt of that document.
MS. SULLIVAN: May I approach, Your Honor?
THE COURT: Yes.
BY MS. SULLIVAN:
Q. Mr. Kouts, could you identify Defendant's Exhibit 57 -- or the excerpt from which, the document from which this excerpt is taken?
A. Yes, I can. This is the, I think, only finalized program mission plan amendment. If you remember, the mission plan was required by the Act to provide a road map in terms of how we were going to implement the program, and at this point in time, it was felt that since there were some major changes to the program, that we needed to provide an amendment to the mission plan. And this document has essentially that amendment, along with comments on the draft amendment that was issued prior to this and the Department's responses to those



comments.
Q. Were you involved in the preparation of this document?
A. I believe I was involved in reviewing it. I might have been involved in responding to comments related to MRS issues.
Q. And what was your position within the program at the time this document was issued?
A. I was still working as part of the MRS team.
MS. SULLIVAN: Your Honor, at this time, we would move for admission of Defendant's Exhibit 57.
MR. SILBERG: No objection.
THE COURT: Admitted.
(Defendant Exhibit Number DX-57 was received in evidence.)
BY MS. SULLIVAN:
Q. Could I direct your attention to page six of this document, the paragraph that begins, "as already mentioned," if you could read that paragraph into the record, please?
A. "As already mentioned, several important milestones have been achieved. However, the experience gained in achieving



those milestones and advances in the technical planning of the program, coupled with the decrease in the budget for fiscal 1987 and uncertainty about fiscal year 1988, have led the DOE to reassess and rebaseline the program for the first repository and to revise its schedule, see table one.
The new schedule shows a five-year extension of the date for waste acceptance at the first repository, from 1998 to 2003. As explained later, the DOE could nonetheless start accepting waste in 1998 at an MRS facility."
Q. What was the state of DOE's planning at the time this document was issued?
A. Essentially, that the MRS was going to be our only vehicle to receive materials in the 1998 timeframe and that that had to be linked to the repository's beginning operation in 2003.
Q. How did DOE's budget appropriations affect this program plan?
MR. SILBERG: Objection, Your Honor, relevance.
THE COURT: Again, the Court will hear



this evidence. It is not now relevant, but it may be.
MS. SULLIVAN: Your Honor, with count two of Arkansas's complaint, they've made allegations with regard to DOE's budget, budgets and whether or not DOE's failure to act has been the result of inadequate funds. That's, in part, a reason for presenting this evidence.
THE COURT: Is that the good-faith claim?
MR. SILBERG: I don't believe there's any reference to budgets. The good-faith claim doesn't deal with the physical Yucca Mountain program. It deals with the waste acceptance and the handling of the ACRs and the DCSes. It does not deal with whether or not Yucca Mountain was constructed, whether they had enough money for Yucca Mountain, whether there were quality assurance problems with Yucca Mountain.
Those were not relevant to a good-faith and fair dealing claim, and we've not made any allegations to that.
MS. SULLIVAN: Your Honor, I have

So since there was no discussion about when this year might be, it's kind of hard, that might have been implicit with what was intended by the document, but it doesn't specifically state it.

BY MR. SILBERG:

Q. So in 1995, DOE was assuming that this one linkage, the capacity link would remain, but made no assumption as to the schedule linkage, and in fact, because there are no dates, the schedule linkage is irrelevant, is that a good summary?

A. I don't know that I would agree with that characterization. I think it does indicate that, certainly, 1998 is in question, but the only way you're going to have a facility available before 2010 is to somehow have the schedule linkages addressed. So I think, although this doesn't specifically address the schedule linkages, it's implicit in its discussion, my perspective is it's implicit in its discussion.

And it's following the same concept that we would implement an MRS, assuming we got authorization for -- or a site, if you will,



and specific direction to do that, as well as the schedule linkages were removed, although it doesn't state that, my sense is that that's what the general intent of the document was.

Q. But there's nothing in there that makes that assumption, that assumption went away after the 1991 ACR?

A. I don't think it went away after the 1991 ACR. I think it was still carried within the program. I think this document is just reflecting the uncertainty in 1998 operations, but still an expectation that there was a potential for having the facility available in, you know, several years after 1998, still well in advance of 2010 operations of the repository.

Q. But DOE never undertook any steps since the Negotiator was out of business in 1995, never took, never undertook any steps either to recreate the Negotiator or to undertake its own siting program?

A. We didn't undertake those specific steps, but as I testified earlier, I was involved in my efforts within the program to develop a design for a facility that could be



deployed very quickly, assuming that legislation was passed.

So although the Negotiator went away, and that was unsuccessful, and there was Congressional direction also, as you may remember, that basically directed the Department to no longer issue certain grants for the Negotiator, that was done the previous year, but the Department still, as a contingency, it was also developing that topic of safety in its analysis report, and I had personal knowledge of that since I was one of the people in the program that was doing that.

Q. But you weren't looking for a site?

A. No, we were not looking for a site at that time, that's correct.

Q. In September of 1991, it's correct, is it not, that the General Accounting Office issued a study on the MRS facility, are you familiar with that study?

A. I remember the issuance of the study. I don't remember the specifics of it. I'd be happy to review it, if you have it available.

Q. I do, Plaintiff's Exhibit 198. I've handed you a document, GAO/RCDE, 91-194, U.S.



General Accounting Office report to Congressional requestors, September 1991, entitled, "Nuclear waste operation of monitored retrievable storage facility is unlikely by 1998." Is this the document you're reflecting on?

A. Yes.

Q. And calling your attention to page five of that document --

MS. SULLIVAN: I'm sorry, Mr. Silberg, I'd like to lodge a foundation objection, Your Honor. This is a report by GAO, a different branch. There's been no foundation laid for Mr. Kouts' testimony about this document.

MR. SILBERG: Mr. Kouts said he was aware of the document, and I believe he said that.

THE COURT: He did say that. That's about as far as we've gotten.

BY MR. SILBERG:

Q. Mr. Kouts, you're aware of the General Accounting Office?

A. Yes, I am.

Q. Can you tell us what it is?

A. It's essentially an office that

supports requests for Congressional review and for individual review of different aspects of the government.

Q. Are you aware that DOE regularly receives reports by GAO?

A. Yes, I am.

Q. And are you aware that DOE received this report by GAO?

A. I assumed it received it, yes.

MR. SILBERG: Your Honor, I would ask admission of this document.

MS. SULLIVAN: Your Honor, there's still been no foundation laid that Mr. Kouts is the proper witness to talk about this document, and he's not a 30(b)(6) witness with regard to the Department of Energy's views on this document, and, again, it's a Congressional document. He's not the proper witness.

THE COURT: The Court can ask about three questions and solve all this, but I'm reluctant to do so. Mr. Silberg, why don't you ask those three questions? Well, let me start with the first one. Mr. Kouts, what were your responsibilities in September of 1991?

THE WITNESS: In September of 1991, I



was supporting strategic and contingency planning for the program.

THE COURT: Did that include an MRS?

THE WITNESS: Yes, generally looking at, certainly, the contingency of having an MRS available, yes.

THE COURT: Now, Mr. Silberg, I've gotten you started.

BY MR. SILBERG:

Q. And in the context of that, were you aware at that time or thereafter of this report?

A. Yes, I believe I read it when it was issued.

Q. And this report deals with GAO's analysis of the MRS program?

A. My assumption is that its an analysis primarily of the schedule aspects of an MRS, yes.

MR. SILBERG: I repeat the request.

THE COURT: Ms. Sullivan?

MS. SULLIVAN: The only foundation is that Mr. Kouts read the report at the time it was issued, not that he had any involvement in it, contributed to it, we would renew our



foundation objection.

THE COURT: Well, except that this is, the GAO might be an arm of Congress, but it's still part of the government, and as a consequence of that --

MS. SULLIVAN: Your Honor --

THE COURT: I'm sorry, go ahead.

MS. SULLIVAN: I'm not sure the report of GAO can be construed as admissions against the administrative branch.

THE COURT: It can't.

MS. SULLIVAN: Okay.

THE COURT: It can't, I don't think there's any doubt about that. But on the other hand, at least, at least there's not in the Court's mind, I might be wrong, I basically agree with you, but on the other hand, there is a public record and a report.

MS. SULLIVAN: I think that's true, Your Honor, my concern goes to Mr. Kouts being the proper witness to talk about this, and I'll draw a parallel to my direct examination where I asked him about the MRS Commission report, where Mr. Kouts was directly involved in the activities of the MRS Commission from the DOE



side, and I asked him based on that knowledge.

I don't think we've established the foundation for the admission of, in his testimony, about this document, in the same vein that I did with that report.

THE COURT: Well, it might be admissible under Federal Rule of Evidence 803(a). That doesn't mean that Mr. Kouts agrees with it or agrees with all the statements or assumptions.

MS. SULLIVAN: Or is the proper witness to talk about it.

THE COURT: Well, it was part of his responsibilities to know about these things at the time, that's why -- I'm sorry to help counsel out, but that's why I asked the two questions I did. I find it very hard not to help counsel out, but the objection is actually overruled.

MS. SULLIVAN: Thank you, Your Honor.

THE COURT: Now, you move for admissibility.

MR. SILBERG: I do.

THE COURT: It's admitted under Federal Rule of Evidence 803(a). That's not to

MR. SILBERG: And I'll get to that, I was just trying to set the scene for that question.
THE COURT: Well, the Court is at a real disadvantage here, it neither has the document nor the transcript. Why don't you ask Mr. Kouts if he recalls testifying about the document first, and then let's go from there.
BY MR. SILBERG:
Q. Mr. Kouts, do you remember testifying in the Northern States Power case about a report prepared by the Clinch River MRS task force?
A. Yes, I do.
Q. And that task force was composed of citizens in that area, governmental officials in that area?
A. Yes, it was.
Q. And having looked at this transcript, does this refresh your recollection as to the nature of the linkage that was proposed by that task force on MRS operation?
A. Yes.
Q. And as refreshed, do you now recall that the Clinch River task force proposed that



the MRS be allowed to go into operation, even though Yucca Mountain had not been, or a repository had not been licensed?
A. The portion of the testimony that I reviewed had to do with the 300 ton limit that you asked me about and you showed me in that trial, and that's what the substance of my testimony was. I'd have to look at the other linkage to see whether or not any linkages that that task force had in relation to the operation of the facility, to see whether that was consistent or inconsistent.
Q. Well, why don't you tell us what you remember of the 300 metric ton linkage, and maybe that will short-circuit this process?
A. Essentially, that they were recommending that no more than 300 metric tons, that the facility be licensed for no more acceptance than 300 metric tons total.
Q. And was that limit tied to the status of the repository at all?
A. I don't know the answer to that question. I'd have to go back and look at the specifics of the recommendations of the task force.



Q. Can I draw your attention to transcript 3399, at line 23, carrying over to page 3400, at line 4?
THE COURT: Now, you don't have a question pending, Mr. Kouts. Let's wait for it.
BY MR. SILBERG:
Q. And having looked at that, does that refresh your recollection as to whether there was a linkage between operation up to a 300 metric ton capacity limit and the repository licensing?
A. My testimony indicates that, and I believe it does.
Q. And what was the nature of that linkage, if you could briefly summarize it, in your recollection?
A. Honestly, Mr. Silberg, I don't remember the specifics of it, and I've testified to it in that trial because I had the document in front of me, and I could interpret it, but I don't have that in my specific recollection.
Q. Is your recollection that the linkage would have allowed MRS to go into operation,



even though the repository had not been licensed for no more than 300 metric tons?
A. According to my testimony in that trial, yes. I, again, I have no reason to doubt myself, but I had the document in front of me at that time.
Q. If we could look at Plaintiff's Exhibit 295 --
MR. SILBERG: Handing the witness Plaintiff's Exhibit 295.
BY MR. SILBERG:
Q. Could you describe this letter please, Mr. Kouts?
A. It's a letter from the Secretary of Energy, and first of all, it's dated May 29th, 1992. It's under Secretary of Energy's letterhead. It's signed by the Secretary of Energy at that time, James D. Watkins, and it's a letter to Mr. James J. Howard, who was chairman and chief executive officer of Northern States Power Company.
Q. And do you recognize this letter?
A. I believe I've seen it before, yes.
Q. Do you recognize Mr. Watkins' signature?

A. Yes, I do believe I recognize the Secretary's signature.

MR. SILBERG: Your Honor, I'd ask that this document be admitted as Plaintiff's Exhibit 295.

MS. SULLIVAN: Objection, Your Honor, on foundation. We haven't established when he's seen it, whether he had any opportunity -- responsibility for its preparation or its review, and also a relevance objection, it's a letter that's sent to Northern States Power.

THE COURT: Sustained.

BY MR. SILBERG:

Q. When did you become aware of this letter, Mr. Kouts?

A. I believe it was in, either a deposition or at a trial, but not contemporaneously with the development of the letter itself.

Q. The letter, if you look to the -- it's the fourth page of this exhibit, contains a, it says, "key MRS program milestones." Are you familiar with MRS program milestones that the Department had promulgated at or about this time?



MS. SULLIVAN: Excuse me.

THE WITNESS: Generally, yes.

MS. SULLIVAN: Your Honor, is the witness being examined about this document? Because I don't think it's been moved into evidence.

THE COURT: No, I think, but on the other hand, this is just a general reference to the program milestones. It isn't detailed as to what those program milestones are, so that's allowable.

MS. SULLIVAN: Thank you, Your Honor.

BY MR. SILBERG:

Q. And are those milestones what the DOE had in mind for the program as of May 1992?

MS. SULLIVAN: Objection, Your Honor, vague as to "those milestones."

MR. SILBERG: I'm talking about the milestones on this page.

MS. SULLIVAN: That's my objection, Your Honor, he's being asked about a document that hasn't been moved into evidence.

THE COURT: That's right, but he's being asked essentially to acknowledge and verify something that is on an attachment to a



letter. That's permissible because the actual substance of it isn't in evidence yet. He's just asking whether that reflects his understanding of what was contemporaneously in DOE's contemplation.

MS. SULLIVAN: Your Honor, that wasn't the question that Mr. Silberg asked, and if that's the question, if Your Honor's question is the question he wants to ask --

THE COURT: That's what I think Mr. Silberg ought to have been driving at.

MS. SULLIVAN: If that's the question, then I will sit down.

BY MR. SILBERG:

Q. You can answer the question.

A. Could you repeat the question?

THE COURT: Let's start all over again. Ask a question, Mr. Silberg.

BY MR. SILBERG:

Q. Did the program milestones, to your knowledge, Mr. Kouts, reflect the MRS program milestones adopted by the Department or adopted by the Department at or around May 1992?

MS. SULLIVAN: Objection, vague. Are we talking about the milestones on this page?



MR. SILBERG: We are indeed.

THE COURT: Thank you.

THE WITNESS: Could you read the question back to me, please?

(The reporter read the record as requested.)

THE WITNESS: Yes.

MR. SILBERG: Your Honor, I would ask that this page of the document be admitted as -- we can make it Plaintiff's Exhibit 295-A.

MS. SULLIVAN: Your Honor, clearly, it's labeled, "enclosure." It's an attachment to the document. I fear that putting this single page in without any context, there will not be a proper foundation for the document for admission, basis for admission of it.

THE COURT: Well --

MR. SILBERG: The witness has already --

THE COURT: I have a small problem along those lines, but there is a fax tag line at the top of the page that provides a date, it's some context for this.

MR. SILBERG: The witness' testimony provides that context as well, Your Honor.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------:

DAIRYLAND POWER COOPERATIVE, :
Plaintiff, :
v. : No. 04-106C
UNITED STATES OF AMERICA, :
Defendant. :

----------------------------------:

ENERGY NORTHWEST, :
Plaintiff, :
v. : No. 04-0010C
UNITED STATES OF AMERICA, :
Defendant. :

----------------------------------:

Washington, D.C.
Tuesday, May 1, 2007
Volume 1

Deposition of:
CHRISTOPHER KOUTS

called for oral examination by counsel for Plaintiff, Dairyland Power Cooperative, pursuant to notice at the Law Offices of Greenberg Traurig, LLP 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Vicky Stallsworth Reiner of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:10 a.m., when were present on behalf of the respective parties:



A P P E A R A N C E S

On behalf of Dairyland Power Cooperative:
JERRY STOUCK, ESQUIRE
ROBERT L. SHAPIRO, ESQUIRE
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202) 331-3173

On behalf of Energy Northwest:
DAVID JIMENEZ-EKMAN, ESQUIRE
CHRISTOPHER TOMPKINS, ESQUIRE
Jenner & Block, LLP
330 N. Wabash Avenue
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of Defendant:
ALAN J. LO RE, ESQUIRE
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Suite 12070
Washington, D.C. 20530
(202) 307-0226



C O N T E N T S


EXAMINATION BY: PAGE
Counsel for Dairyland ................... 6
Counsel for the Defendant ............... 296
Counsel for Dairyland ................... 305

KOUTS DEPOSITION EXHIBITS: * PAGE
1 Summary of employment history at DOE .. 6
2 Excerpt of testimony at PG&E trial .... 28
3 Excerpt of testimony at PG&3 trial .... 40
4 Standard Contract between Dairyland Power Cooperative and the Department of Energy, dated June 15, 1983 ........ 58
5 March 04, 1992 letter from M. Detmer to Mr. J.E. Barrett at PG&E ........... 66
6 Excerpt of testimony at PG&E trial .... 79
7 Delivery-commitment schedule forms .... 91
8 July 28, 2004 letter from Mr. Zabransky to William Berg ....................... 104
9 Letter to Russ Shultis identifying 30(b)(6) topics ....................... 114
10 Letter from Marian Sullivan designating witnesses for 30(b)(6) topics ......... 114




C O N T E N T S (Continued)


11 Notice of Deposition .................. 114
12 Segment of trial testimony from Yankee Atomic trial ................... 127

KOUTS DEPOSITION EXHIBITS: * PAGE
13 Excerpt from proceedings of 1983 Civilian Radioactive Waste Management information meeting held in December of 1983 .............................. 150
14 June 1987 Annual Capacity Report ...... 166
15 1988 Annual Capacity Report ........... 172
16 December 1991 Annual Capacity Report .. 193
17 1987 Monitored Retrievable Storage submission to Congress ................ 206
18 1995 APR and ACR ...................... 218
19 Excerpt of 1985 Mission Plan .......... 271
20 Excerpt from June 4, 1999 deposition in Yankee Atomic case ................ 275
21 Letter from Michael J. Lawrence to Ben Rusche, dated July 23rd, 1984 ..... 281
22 Memorandum on the Department of Energy memo letterhead stationary dated

C O N T E N T S (Continued)

December 21, 1992 .................... 284
23 Letter from Spencer Abraham, Secretary of Energy, to Senator Orrin Hatch, dated July 8, 2002 .................... 288
24 Memorandum on the Department of Energy memo letterhead stationary dated December 20, 1991 .................... 290

(*Exhibits attached to transcript.)



P R O C E E D I N G S

\- - - - - -

Whereupon,

CHRISTOPHER KOUTS

was called as a witness, and, having first been duly sworn, was examined and testified as follows:

(Kouts Exhibit No. 1 was marked for identification.)

EXAMINATION

BY MR. STOUCK:

Q Good morning, Mr. Kouts.
A Good morning.
Q We've met before. And I know that you are experienced at testifying in depositions, so I won't belabor the mechanics.
Is there any reason today, like illness or medication, that you cannot give your best testimony?
A Not that I'm aware of.
Q Okay. You've been handed what's been marked Exhibit Number 1 to this deposition, which is a -- a summary, I would say, I think of your



employment history at DOE. And I want to ask you about the accuracy of this document.

MR. LO RE: Is this -- for the record, Counsel, is this a document --

MR. STOUCK: I don't know the source of this document, if that's your question. Okay. I don't know where this came from. It's a compilation from somewhere. I don't -- it's certainly not an official resume. It doesn't look like one to me. That's why I'm going to ask him about the accuracy of it. That's one of the reasons.

BY MR. STOUCK:

Q So starting at the top, Mr. Kouts you did join DOE in 1985; is that correct?
A Yes.
Q Approximately when in 1985?
A I believe it was in June of 1985.
Q What was your immediately prior position? Or were you in school? Or did you have a job?
A No. I worked in a different area of the Department, in the Office of Conservation and Renewable Energy.



Q I see. So June of '85 is when you joined OCRWM?
A That's correct.
Q Prior to that you were employed by the Department of Energy?
A Yes.
Q When were you first employed by the Department of Energy?
A I believe I was first employed by the Department of Energy in 1978.
Q Okay. But prior to June of 1985, you had no involvement with OCRWM or the spent nuclear fuel program; is that correct?
A No. That's not correct.
Q Okay. What -- prior to June 1985, what involvement did you have with OCRWM or the spent nuclear fuel program?
A In one of the positions that I held, which was working, at that time, for the Office of Environment, and I don't remember the specific organizational name at that time because that has mutated over the years, I was responsible for

MR. STOUCK: Yeah. And I'll also note that we did find a copy of the order for you.

MR. LO RE: Thank you.

BY MR. STOUCK:

Q I'm just curious about this. And we'll talk about MRS matters a little later, Mr. Kouts. But I was curious about the centralized interim storage facility that was being worked on in some fashion in this '95/'96 time frame.

Can you just briefly tell me how that came about that DOE was looking at that in that time frame?

A In that time frame, and I believe if you go back, you could look at our budget request for that time frame, the Department requested funds to develop a topical safety analysis report for a centralized interim storage facility.

The rationale behind undertaking this effort was that there were a variety of bills that were winding their way through Congress. And all of those bills anticipated a very quick deployment of a storage facility, should a site be identified and



should the Congress approve it, which would also have meant that the Nuclear Waste Policy Act would have had to be amended.

In anticipation of the potential passage of those bills, the Department undertook the development of a topical safety analysis report to -- that would have been used to expedite the licensing of such a facility should authorization modifying the Act allowing the implementation of such a facility be passed and enacted by Congress and signed by the President.

Q Okay. And was the development of that safety analysis report your principal responsibility during the time that you were in this position, starting after your work for Dr. Dreyfus?

A No. There were other activities within the division.

Q Okay. Well, how would you -- just, again, summarize your -- what was the job that you were in at that time? Generally, what were your responsibilities?

A Well, in addition to the topical safety



analysis report on -- on a centralized interim storage facility, we also worked on a topical safety analysis report for a dry transfer system that could be deployed at reactor sites. And the potential use of that would have been to assist those reactors that did not have transfer capability on site for spent fuel into dry storage devices or into larger transportation casks.

Q Okay. What was your position? What was your title? It indicates here, on this paper that we're looking at, storage and technology division?

A That's correct.

Q You were working in that division?

A I was the director of the storage and technology division.

Q Okay. You were the director. Got it. Okay.

And were both of those SARs completed, the two that you've told me about?

A Yes, they were.

Q And do you -- you know, what's your best -- and was your next position as Yucca Mountain



liaison?

A That's correct.

Q And that was liaison between headquarters and the Yucca Mountain project office?

A That's correct.

Q Can you give me your best estimate of when you assumed that position?

A It was in either in late 1997 or early 1998. I remember undertaking a substantial effort on the -- on the 1998 viability assessment, which is incorrectly identified here. You have it down as a liability assessment. It's a viability assessment that was directed by Congress. That was submitted in 1998. I remember working on it. And I believe I started, perhaps, in late 1997 in that position.

Q Okay.

A But I -- again, I don't have a specific month that I transferred into my new duties.

Q Okay. And your next position was your current position; is that correct? First on an acting basis and then permanent?

A Actually, this is inaccurate. Because

the office of systems analysis and strategy development no longer exists. We reorganized last year. And the title of my office now is the waste management office. And I'm director of that office.
It has essentially the same duties that the previous position had except they don't have safeguards now. That went to another organization. But by and large that's -- it was a major change.
Q Well, let's take it one step at a time. After you left your position as Yucca Mountain liaison, did you become the director for what was then called the Office of Systems Analysis and Strategy Development?
A I became the acting director for that office.
Q Was that in 2002?
A Yes.
Q When in 2002?
A Approximately in October of 2002.
Q And at some point you became the not acting but the permanent director of that office?
A I believe that was in July of 2003, as



your paper indicates.
Q Right. And then at some point, that office, as you just said, was reorganized, kept most of its functions. Maybe a couple went somewhere else. Kept most of its functions but now has a different name?
A That's correct.
Q And you're still the director?
A Yes, I am.
Q And when did that reorganization take place?
A The reorganization took place last year. The effective date of the organization was April or May. I don't remember the specific date.
Q Okay. Thanks a lot. For now, I'm done with that piece of paper, although obviously you can keep it in front of you.
Let me ask you this, Mr. Kouts. I want to get -- since the beginning of 2006, about the last year, almost a half, can you give me your best estimate of approximately what percentage of your time, what percentage of your time from, you know,



in the last, say, year and a half, just an estimate, but your best estimate, what percentage of your time has been spent in any way on this spent nuclear fuel litigation, whether depositions, trial testimony, talking to lawyers, getting ready for things. Just an estimate. But I would like your best estimate.
MR. LO RE: Objection. Vague.
BY MR. STOUCK:
Q If you're more comfortable with a different time -- if there's some other way you can estimate in your mind a different time frame, that would be okay, too.
MR. LO RE: Same objection.
THE WITNESS: I'd say somewhere between 10 and 20 percent of my time.
BY MR. STOUCK:
Q And that would be since the beginning of 2006?
A Roughly. If you're talking about actual time spent in the office or whether in depositions or in court, I would say no more than 10 to 20 percent.



MR. STOUCK: Okay. Thanks. Can you mark this as Number 2, please.
(Kouts Exhibit No. 2 was marked for identification.)
BY MR. STOUCK:
Q Mr. Kouts, you've been handed what's been marked as Exhibit Number 2 to this deposition, which is an excerpt of your testimony at the Pacific Gas and Electric trial last summer. I was questioning you. And just to orient you, as you may recall, I asked you some questions about ACRs and APRs and DCSs. And you gave me some answers, which I thought were different from answers that you had given in a deposition in June of 1999. And I asked you about that.
And again, just generally -- we'll look at the specific testimony. Just generally, you told me you had learned some things since that deposition which led you to have different answers. That's how you explained the discrepancy. Do you recall the exchange, generally?
A Generally.

A That was the Department's desire, yes.
Q Okay. Now, the -- the DCSs that were approved in the 1990s, they were based on acceptance rates, you know, in the '91 ACR and elsewhere that reflected an MRS with a capacity limit of 10,000 MTU. Is that your understanding?
A That's correct.
Q Okay. And that MRS -- well, no MR -- currently, DOE's plans do not include an MRS; is that correct?
A That's correct.
Q Do you know whether or not the DCSs that were submitted in the 1990s and approved by DOE are still binding today?
A You know, that's a legal question. And that's a reason why we're involved in 65 different actions. I think there is a view that -- it's what this litigation is all about.
Q What's your understanding of whether or not those approved DCSs are still binding today?
MR. LO RE: Calls for a legal conclusion.
THE WITNESS: My sense is, yes, they're



still binding.
BY MR. STOUCK:
Q Even though -- okay. Even though -- okay. Even though the MRS is not currently part of your plan?
A Yes.
MR. STOUCK: Okay. All right. I want to turn now to the 30(b)(6) topics, which I know will make Mr. Lo Re happy -- less unhappy.
MR. LO RE: Everything is relative.
MR. STOUCK: Do you want to take a short break? I'm ready to plow forward, but if you want to take a short break, we can do that for a while and then have lunch.
THE WITNESS: I can keep going.
MR. STOUCK: Okay.
(Kouts Exhibit Nos. 9, 10 and 11 were marked for identification.)
(Discussion off the record.)
MR. STOUCK: Okay. We've got three exhibits here. And just to summarize a colloquy we just had off the record, Exhibit 9 is my letter to



Russ Shultis, identifying the 30(b)(6) topics that we wanted to put to the government's designated deponents.
Exhibit Number 10 is Marian's letter responding to me and identifying three witnesses, Mr. Kouts, Mr. Pollog, Mr. Zabransky as the designated witnesses for certain respective topics.
There was a subsequent letter, which I'm not going to burden the record with, that took number 15 away from Mr. Kouts and put it on to Mr. Zabransky.
And Exhibit Number 11 is a -- a notice of this deposition which takes the 30(b)(6) topics designated for Mr. Kouts in Exhibit 10 and subtracts out topic number 15, because that was moved to Mr. Zabransky, and renumbers the remaining topics 1 through 8. And that's what we're going to be dealing with momentarily. Okay.
MR. LO RE: Okay.
MR. STOUCK: Is that okay with you?
MR. LO RE: Does that make sense to you?
THE WITNESS: That's fine.



MR. LO RE: Thank you.
BY MR. STOUCK:
Q Mr. Kouts, I think all you need from all of that is number 11, actually. But you can keep the other ones handy in case that's wrong. Here is number 11.
You understand that you have been designated as a 30(b)(6) witness to testify on the government's behalf on certain topics that are listed in Exhibit Number 11; is that right?
A Yes.
Q Okay. And just tell me, in your own words, what is your understanding of what that role entails?
A Providing answers for the government on these specific questions.
Q Okay. And are you able to do that today?
A Yes, I am.
Q Okay. Let's take the first one. And I'll read it into the record as topic number 1 on the -- on Exhibit 11.
The rate(s) of acceptance that DOE

planned to use under the Standard Contracts, A, before DOE determined that it would not begin accepting spent fuel in a permanent repository in 1998; and, B, after that time.

A Okay.

Q Do you understand the topic?

A Yes.

Q Okay. Let's start with when did DOE make the determination that's referred to here, that it would not begin acceptance at the repository in 1998?

A I believe -- well, the government provided notice to the Congress in early March 1987 that the Department schedule for the beginning of waste acceptance at a repository would not be in 1998. So it was an early March of 1987.

Q Okay. Notice to the Congress, do you know in what form? Was there a particular document that was transmitted to Congress that you're thinking of?

A Yes. The MRS proposal to Congress identified the fact that the repository was no



longer going to be submitted -- going to be operational until 2003.

Q And that is the document -- can I just show it to you? We'll get to this later. But it's marked as Defendant's Exhibit 107 in the PG&E case. And it's called Monitored Retrievable Storage submission to Congress in 1987. Is it is that the document you're referring to?

A Correct.

MR. LO RE: Let the record reflect the counsel has shown the exhibit.

BY MR. STOUCK:

Q As I said, I think we'll get to it later.

So that's what you identify as the -- as the time that that -- this determination was made that, you know, officially, that acceptance at a repository would not begin in 1998?

A The decision was made several months prior to the submission of that document, but it was in that general time frame, yes.

Q Okay. All right. Did you have any involvement in that determination?



A In the determination?

Q It would --

A Did the government have any involvement in that? Is that what you're asking? Or asking --

Q Chris Kouts.

A -- me, personally, whether I had had involvement?

Q Yes.

A In the decision to delay the repository 5 years, I sat in the briefings associated with the schedule for the repository but I was not the decision maker.

Q Okay. And did you have any responsibility for the decision?

A I was working in the MRS program at that time. I had no responsibility in the repository schedule area.

Q Now, again, back to -- to this topic number 1, it refers to the rates of acceptance that DOE planned to use. Do you see that? This is on your Exhibit Number 11.

A Yes.



Q Okay. What is your understanding of that term the -- the rate of acceptance that DOE planned to use? Before I ask you questions about it, I want to get your understanding of that phrase.

A Okay. I'm getting confused as to whether or not you're asking me as a statement on the part of government or personal.

So if you could preface your statements by saying I'm asking your personal opinion or your personal involvement, or I'm asking for the government's position on it, that would be very helpful.

Q All of these -- I'm sorry.

That's a very fair question, Mr. Kouts, and let me try to address it. And if your counsel wants to add something, I'm sure he will.

We're in a part of the deposition now, this Rule 30(b)(6) part of the deposition, where all of the questions that I'm asking you are addressed to you in your capacity as a 30(b)(6) witness, which means that you are speaking for -- for the government, if that's your understanding of what

represent to you as pages 26 and 27 of the 1985 Mission Plan. I've only got one copy. I'm sorry. We'll get more copies if necessary. This is the Mission Plan.

MR. LO RE: Are you marking this as an exhibit?

MR. STOUCK: No.

BY MR. STOUCK:

Q That is pages 26 and 27 from the 1985 Mission Plan. You can just take my representation on that. Those are the rates we've just been talking about; is that right?

A Yes.

Q Okay. Are those the receipt rates that DOE was planning to use in 1985?

MR. LO RE: Objection. Asked and answered.

THE WITNESS: As I testified earlier or as I provided information earlier, these were the nominal design rates in which the facilities would have -- have to be sized in order to meet this schedule.



And to the extent that any design work in the system was ongoing, which was very embryonic, these were the guides to the engineers to understand basically how many receipt bays they would need in any one year in order to meet what's identified here.

BY MR. STOUCK:

Q So you would not say that DOE was planning -- that those are the receipt rates that DOE was planning. It's just too preliminary? Is that the -- is that the tenor of your response? Or was DOE planning to use those receipt rates?

MR. LO RE: Objection. Asked and answered.

THE WITNESS: As the Mission Plan says in numerous places, these schedules are illustrative and can change. So the -- what might have been the planning basis for this, and subsequently into the program those did evolve and change. As we get into other documents, you'll see how they did change.

BY MR. STOUCK:

Q At this time.



A At this time, this was more or less -- the best way for me to represent it was the technical baseline for the program in the sense that this -- that the facilities needed to be designed to address this kind of receipt rate into the system.

Q Okay. But you would not say these are receipt rates that DOE was planning to use, which is, again, the language of the topic?

A Again, planning -- again, going back to your question, which was plan to use under the Standard Contracts, I think you have to go back to the Annual Capacity Report. And as we move forward, you'll see that that evolves also as the -- our deployment of the system.

Q Right. Those are acceptance rates?

A Right.

Q Now we're talking about receipt rates.

A Correct.

Q Are the rates on that piece of paper, pages 26 and 27 from the 1985 Mission Plan, are you able to say that those are receipt rates that DOE was planning to use at that time or are you not able



to say that, for whatever reason? For example, because the -- you know, there just were not any plans that were sufficiently formed that you're able to testify that DOE was planning to use those rates?

MR. LO RE: Objection. Asked and answered.

BY MR. STOUCK:

Q Or for whatever other reason you're not able to say that DOE was planning to use those rates? That's just --

A I would characterize these as receipt rates and design basis rates for those who were doing design work for the facilities to size those facilities from a design standpoint.

Q Okay. Thank you. Let me have that back.

MR. STOUCK: Now let's mark this, which is number 15, I think.

(Kouts Exhibit No. 15 was marked for identification.)

BY MR. STOUCK:

Q All right. Exhibit 15, Mr. Kouts, is the 1988 ACR. Is that what you have in front of you?

A Yes.
Q Okay. Good. And I take it, on page -- is it 5? What page is this on? Yeah. Page 5 -- are you on page 5?
A Yes.
Q In 1988, those were the acceptance rates that DOE was planning to use under the Standard Contract; is that right?
A Yes.
Q Okay. Actually, I'll tell you what, before we get into the '88, let's go back to the '87 for a moment, if we could. And you can certainly consult the ACR if you want to.
Do you know whether the -- well, you do know that DOE, in the 1980s, missed certain deadlines or milestones in the statute for various steps in the repository siting process; is that right? There were statutory milestones that DOE did not scrupulously conform to?
MR. LO RE: Objection. Counsel, can you explain how that relates to this 30(b)(6) notice, Counsel?



MR. STOUCK: I'm going to ask him whether it affected rates.
MR. LO RE: Does it relate to the 30(b)(6)?
MR. STOUCK: I'm going to ask him whether it affected rates.
BY MR. STOUCK:
Q My question is: Isn't it true that DOE missed -- there were statutory milestones in the NWPA for siting a repository and DOE missed at least some of those statutory deadlines?
MR. LO RE: Objection. Beyond the scope.
MR. STOUCK: I'm trying to orient him.
MR. LO RE: Beyond the scope of this deposition.
THE WITNESS: In relation to the repository, I would have to review the Act. I believe the MRS proposal certainly was delayed due to litigation brought on by the state of Tennessee.
In terms of the issuance of the Mission Plan, which is the only milestone that I believe -- I would have to go back and count the months under



which the Act required that the Department to issue that. My sense is that the desire of Congress was to have it submitted earlier. But I would have to review the Act to make determinations as to what potential statutory milestones were missed by the Department.
BY MR. STOUCK:
Q Okay. Thank you for that, Mr. Kouts.
Do you know whether or not the NWPA specified milestones for various steps in the process of siting repositories?
MR. LO RE: Same objection. And the question -- now I'll object on the grounds that, are you now asking Mr. Kouts as the 30(b)(6) witness or in his personal capacity?
MR. STOUCK: We're on 30(b)(6).
MR. LO RE: I'll object as outside the scope of this notice. This notice says nothing, Jerry, about --
MR. STOUCK: Okay. I'll ask him in his personal capacity.
BY MR. STOUCK:



Q Do you know whether or not the NWPA set forth milestones, dates by which DOE had to take various steps in the process of siting one or more repositories? If you know, fine. If you don't know, just tell me.
A I would have to go back and review the Act.
Q So you don't know.
A Not offhand.
Q Okay. Thank you. Now, the 1987 amendments to the NWPA, are you generally familiar with that enactment?
A Yes.
Q Okay. And that statute imposed something we've already referred to, which is -- it authorized an MRS, correct?
A Yes.
Q And it imposed a 10,000 MTU capacity limitation on the MRS until a repository was operational; is that correct?
A Yes.
Q Okay. And it also linked the -- in some

A Yes.
Q Okay.
MR. STOUCK: Can we mark this, please.
(Kouts Exhibit No. 16 was marked for identification.)
BY MR. STOUCK:
Q Mr. Kouts, you've been handed what's marked Deposition Exhibit Number 16. This is the December 1991 Annual Capacity Report, correct?
A Yes.
Q Okay. Now, if you turn to page 5, you will find rates. And my question is: As of December 1991, is it correct that these rates shown here on page 5 are the rates of acceptance that DOE was planning to use under the Standard Contracts?
A Yes.
Q Okay. And these rates assume -- or these rates reflect, I think is a better word, these rates reflect the 10,000 MTU capacity limit from the 1987 amendments? It assumes -- well it assumes that that capacity limit is in place, but that the linkage between MRS construction and repository construction



is not in place; is that correct?
A As well as the siting and -- as well as the siting linkages, yes.
Q Yes. So with that correction, my statement is correct?
A Yes.
Q Okay. Did DOE at this time in December 1991 believe it was likely that the construction -- what I'll call the construction linkage would be removed?
MR. LO RE: Objection vague as to the term likely.
THE WITNESS: The government believed that this was the best strategy for it to undertake. In terms of whether or not it would ultimately be successful, that was in the hands of Congress. And the Department could only anticipate that, assuming a site was found and the Nuclear Waste Negotiator was successful, that Congress would approve that agreement which would address the linkages.
So to the extent that the Department's -- whether or not the Department's strategy was likely



at this time, it was the Department's belief that it was the best strategy in order to get 1998 waste acceptance and it threw all its resources behind it.
BY MR. STOUCK:
Q Would it be helpful to have a definition of likely?
A Sure.
Q My definition is "more likely than not." That's what I mean when I say likely. Okay. Greater than 50 percent chance.
So, again, the question is: At the time of this ACR, did the government believe it was likely that the construction linkage would be removed in a manner and a time frame that allowed commencement of MRS operations in 1998?
You know, do you know? It's always do you know. If you don't know, just tell me you don't know.
A Based on the -- based on the options available to the Department in terms of strategies, it was considered to be the best strategy to follow. In terms of the Department's trying to forecast what



Congress would do, you know, the Department's not in the business of trying to forecast what Congress would do.
However, it was, from the government's perspective and from the Department's perspective, reasonable to expect that, if there was a willing host to the facility, and if there was an agreement that was negotiated by the Negotiator, which was part of the strategy that we did not get into in the discussion of the Secretary's reassessment report, that, given those eventualities, that Congress would have approved it and would have given the Department the flexibility in order to have the facility available in the 1998 time frame.
Q As of the time of this ACR, which is December 1991, the Department had no projection of the likelihood of the construction linkage being removed; is that your testimony?
A No, it's not.
MR. LO RE: Objection. Mischaracterizes.
BY MR. STOUCK:
Q I asked if, at the time of this document,

Q Okay. Okay. What role, if any, did you play, yourself, Mr. Kouts, yourself, so I'm departing from the 30(b)(6). I'm asking about Chris Kouts, what role, if any, did you yourself play in the development of this December 1991 ACR, Exhibit 16?

MR. LO RE: Objection. Asked and answered.

THE WITNESS: In the development, I believe I reviewed this document before it went out in my capacity where I was at the time in the program. But I was not directly involved in the development, no.

BY MR. STOUCK:

Q Okay. Where you were in the program at that time was the head of the transportation program, according to Exhibit 1?

A At this time I believe I was probably working in strategy and contingency planning of the program.

Q Okay. Thank you. So you reviewed and commented or just reviewed or....



A Reviewed and commented. Usually when documents are sent out for review, if people have comments, they provide comments.

Q Who is -- what part of the DOE -- what are the comments -- to what part of DOE were the comments directed? In other words, who was responsible for this document?

A That document would have been the responsibility of Mr. Brownstein, I believe, who is identified in the document.

Q Okay. All right. Let's -- in the -- okay.

MR. STOUCK: Can we mark this, please, as Exhibit Number 17.

(Kouts Exhibit No. 17 was marked for identification.)

BY MR. STOUCK:

Q I believe -- you have you have been handed what's been marked Exhibit Number 17, Mr. Kouts. It's the 1987 Monitored Retrievable Storage submission to Congress. Is that right?

A Yes.



Q You've referred to this, maybe we both have, a couple of times today already, right?

A Yes.

Q Did you yourself, Chris Kouts, play any role in developing this document?

A I helped write it.

Q Okay. Do you know -- yeah. When DOE recommended the 15,000-ton capacity limit that's reflected in this document, you can see reference to it, for example, on page 27, probably elsewhere, when DOE recommended that capacity limit, why did DOE recommend a capacity limit of 15,000 MTU? What was the derivation of that number?

MR. LO RE: Objection. Asked and answered.

THE WITNESS: To the best of my recollection, and I will -- since you're asking me, I will answer it to my recollection, since I'm not responding -- I'm assuming your question is not as a 30(b)(6) witness, but as my own personal recollection.

To the best of my recollection, it was



a -- it derived somewhat from the concept of operations at a facility and the construct of the department's vision of MRS at that time. The MRS was a packaging facility that was to receive spent fuel and package it into disposal ready canisters for subsequent shipment to the repository.

The 15,000-ton limit was a -- an inventory -- it was an inventory of spent fuel that was felt to be approximately 5 years of maximum receipt capability that would be used as a pool of spent fuel that would be used for those packaging operations.

So it was somewhat subject to the construct of the operations of the facility.

And it was -- the 15,000-ton limit was less than 25 percent of the total capacity of the repository. And that was deemed to be an appropriate amount for the facility.

BY MR. STOUCK:

Q Okay. So this --

A To the best of my recollection.

Q Okay. And this inventory of spent fuel

that was felt to be approximately 5 years of maximum receipt capability, so just by arithmetic, that means that maximum receipt capability would be 3,000 tons a year for 5 years? Is that -- is my math right?

A That's correct. Except that the facility would not have initiated operations at 3,000 metric tons. It would have ramped up. So you're talking about a downstream capability. And I believe that was the -- the sizing that we used for the processing -- the processing facilities on the site.

Q Okay. Thank you for that.

Now, we're moving right along here. I'm sorry.

A Having reviewed the document --

Q Yeah.

A -- and it's amazing how these things come back to me.

Q What page are you on?

A I'm on page 27.

Q Yeah. That's where I was, too.

A It says here, in the second full



paragraph: In addition, DOE recommends that the storage capacity of the MRS facility be limited to 15,000 metric tons. This capacity is sufficient to offset potential storage shortfalls at reactors for approximately 5 years. But it is less than the one-third spent fuel obligation to develop a geologic repository. And progress in achieving this mandate is monitored very closely by a wide range of interesting parties.

So, again, what I gave you was my recollection. I have no reason to believe that the document is -- you know, is incorrect. But I did not remember that specific aspect.

Q What you're now saying is that -- I guess it's in the document, so I assume it's right. You're saying, this is right. That the 15,000 MTU was -- that number was derived from the fact that it was sufficient to offset potential storage shortfalls at reactors for approximately 5 years.

MR. LO RE: Objection. Mischaracterizes the testimony.

THE WITNESS: As I remember -- this is



what we stated in the document. What I'm suggesting to you is that, as we were developing the size of the facility, I believe that 5 years of full operation was also something that sticks in my mind. So, although this is stated here, I believe there were other -- there was other rationale for providing the 15,000 metric tons. And that seems to stick in my memory. So I --

BY MR. STOUCK:

Q That's fine, Mr. Kouts. That's why you're here. I've read the document. So that's why I'm asking you for, you know, whatever you can add to that.

Thank you. Now, let's turn now to -- don't put this in the record.

(Discussion off the record.)

BY MR. STOUCK:

Q If you guys are ready.

A Sure.

Q Let me try to do a little filler here. Ramp up. Okay. Let's talk about ramp up. Is there a similar distinction between receipt rate and



acceptance rate with respect to ramp up? Does the distinction between those concepts also apply to ramp up?

A Yes.

Q Okay. Would you say that the reason the distinction applies to ramp up as well as to steady state rates, it's the same reason that there's a distinction with respect to steady-state rates?

A I don't think I understand your question.

Q Okay. Let me try to straighten it out and clarify it.

There's a distinction between receipt rates and acceptance rates at the steady-state rate; is that correct? We talked about that earlier. At least in concept, there's a distinction. The rates may actually be the same or close to the same. But it's a different concept, receipt rate versus acceptance rate.

A That's correct.

Q Okay. And my understanding is that, from your testimony, is that the reason that distinction exists, largely, is to have some buffer or

be provided, again, to contract holders at the appropriate time in the future, 63 months prior to the time the Department is going to initiate acceptance.

So the simple answer to your question is we have a technical planning baseline, in terms of what the facilities are being designed to. And as the design evolves, we will be informed by more information and will be able to provide more specific information to contract holders at the appropriate time.

Q Is the technical baseline to which you refer, is that the same thing as the receipt rates that DOE, as of today, is planning to use?

A Those provide guidance. The receipt rates that you're referring to on our technical baseline documents provide guidance to facility designers as to what to design their facilities to.

To the extent that they -- again, as I've testified earlier today and in court in other case, the designers may look at some additional capability in order to meet those receipt rates, due to



anomalous situations, maintenance cycles, so forth and so on.

So the baseline requirements are generally the minimal requirements that the designers have to meet. There may be some additional capacity in the system. So --

Q So the receipt rate -- excuse me. I'm sorry. Go ahead. I didn't mean to interrupt.

The receipt rates would be the rates in the technical baseline or maybe a little bit above those?

A Correct.

Q Okay. And at the present time, there are no acceptance rates that DOE is planning to use under the Standard Contract; is that correct? Those will only become available 63 months before facility operations?

A That's correct.

Q Okay. Let's move now. If you take -- go all the way back to Exhibit Number 11, it says, list of topics. I am going to move on to another topic, believe it or not.



And that is -- it's listed -- I'm going to skip over topic number 2 for now. And I'm going to go straight to topic number 3. And let me ask you what is -- are you there?

A Yes.

Q Okay. What is the earliest date that DOE currently believes it will begin accepting spent fuel under the Standard Contracts?

MR. LO RE: I would like to just put on the record, the government objects to this as outside the scope of the trial and in violation of the order and the decision in Indiana/Michigan.

Go ahead, you can answer.

THE WITNESS: The current planning baseline for the program is to begin receipt in the 2017 time frame. And that schedule is predicated on passage of the administration's legislation that was submitted earlier this year and last year and the availability of annual appropriations to meet the cash flow provided to Congress earlier this year.

BY MR. STOUCK:

Q Okay. So 2017 is the earliest date that



DOE currently believes it will begin accepting spent fuel under the Standard Contracts?

A Subject to the caveats that I stated in my answer, yes.

Q Earlier -- earliest date might bring those in. That's what I said. And then he was saying he thinks it's important to do something.

A It's the earliest date, subject to the caveats that I stated in my previous answer.

Q Okay. Thank you for that.

And then we move now to topic number -- that's listed on the list as number 4. If you could just look at that and let me ask you what acceptance rate -- we just covered this, actually, in a different form. But since it's on my list, let me just ask it again. And I apologize. I won't dwell on it.

What acceptance rate is DOE planning to use once spent fuel acceptance begins pursuant to the Standard Contracts?

MR. LO RE: Asked and answered.

BY MR. STOUCK:

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
----------------------------------:
DAIRYLAND POWER COOPERATIVE, :
Plaintiff, :
v. : No. 04-106C
:
UNITED STATES OF AMERICA, :
Defendant. :
----------------------------------:
:
ENERGY NORTHWEST, :
Plaintiff, :
v. : No. 04-0010C
:
UNITED STATES OF AMERICA, :
Defendant. :
----------------------------------:

Washington, D.C.
Wednesday, May 2, 2007
Volume 2

Deposition of:

CHRISTOPHER KOUTS

called for oral examination by counsel for Plaintiff, Dairyland Power Cooperative, pursuant to notice at the Law Offices of Greenberg Traurig, LLP 800 Connecticut Avenue, N.W., Suite 500, Washington, D.C., before Vicky Stallsworth Reiner of Capital Reporting, a Notary Public in and for the District of Columbia, beginning at 9:45 a.m., when were present on behalf of the respective parties:



A P P E A R A N C E S

On behalf of Dairyland Power Cooperative:
JERRY STOUCK, ESQUIRE
KEVIN E. STERN, ESQUIRE
Greenberg Traurig, LLP
800 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20006
(202) 331-3173

On behalf of Energy Northwest:
DAVID JIMENEZ-EKMAN, ESQUIRE
CHRISTOPHER TOMPKINS, ESQUIRE
Jenner & Block, LLP
330 N. Wabash Avenue
Chicago, Illinois 60611-7603
(312) 222-9350

On behalf of Defendant:
ALAN J. LO RE, ESQUIRE
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Suite 12070
Washington, D.C. 20530
(202) 307-0226



C O N T E N T S


EXAMINATION BY: PAGE
Counsel for Energy Northwest ............ 316
Counsel for the Defendant ............... 426
Counsel for Energy Northwest ............ 439
Counsel for the Defendant ............... 446

KOUTS DEPOSITION EXHIBITS: * PAGE
25 Document .............................. 319
26 Document .............................. 324
27 Document .............................. 338
28 Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program .................... 350
29 Preliminary Estimates of the Total System Cost for the Restructured Program, dated December 1990 .......... 361
30 Report issued by the GAO, entitled: Operation of Monitored Retrievable Storage Facility Is Unlikely by 1998 .. 377
31 Report entitled OCRWM Planning for No MRS Contingency .................... 393




C O N T E N T S (Continued)


32 Letter from James Watkins to Bennet Johnston ....................... 398
33 Document .............................. 417
34 Interrogatory responses Government provided in Energy Northwest .......... 420


(*Exhibits attached to transcript.)

P R O C E E D I N G S
\- - - - - -
Whereupon,
CHRISTOPHER KOUTS
was called as a witness, and, having first been duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. TOMPKINS:
Q Good morning, Mr. Kouts.
A Good morning.
Q Just a couple cleanup questions on your background. I know that yesterday you testified that you joined OCRWM in 1985.
A That's correct.
Q Okay. So you didn't have any development -- prior to '85, you didn't do any work developing the Standard Contract that's at issue in this case?
MR. LO RE: Objection. Asked and answered.
THE WITNESS: That's correct.
BY MR. TOMPKINS:



Q Okay. In the 1985 Mission Plan, which was an exhibit yesterday, Exhibit 19, did you do any work on that Mission Plan?
MR. LO RE: Objection. Asked and answered.
THE WITNESS: No, I did not.
BY MR. TOMPKINS:
Q Now, I know you testified yesterday that when you first joined OCRWM, you joined the MRS team. What was your role on the MRS team?
A I was responsible primarily for the needs and feasibility analysis which was a substantial part of the overall proposal that was provided. In addition, I contributed to other aspects of the proposal.
Q And what other aspects were those?
A There was an environmental assessment that was also submitted. There was a program plan that was developed in addition to that. In addition, there were design activities that I was involved with for the facility. And I also, as I testified yesterday, participated in writing the



volume 1, which is the proposal document itself.
Q Now, my understanding is the proposal was required to be submitted pursuant to Section 141 of the NWPA?
MR. LO RE: Objection. No foundation.
THE WITNESS: That's correct.
BY MR. TOMPKINS:
Q Mr. Kouts, do you understand why you were developing this MRS proposal?
MR. LO RE: Objection. Vague.
THE WITNESS: It was a requirement of the Act.
BY MR. TOMPKINS:
Q Okay.
A Of the Nuclear Waste Policy Act.
Q Okay. And were you familiar with Section 141 of the Nuclear Waste Policy Act?
A Yes, I was. Yes, I am.
Q Okay. As of 1985 when you started work on this proposal, did the NWPA authorize DOE to construct an MRS?
MR. LO RE: Objection. Calls for legal



conclusion.
THE WITNESS: No.
MR. TOMPKINS: Mark this as the next exhibit.
(Kouts Exhibit No. 25 was marked for identification.)
BY MR. TOMPKINS:
Q Mr. Kouts, you have been handed what's been marked as Exhibit 25 to your deposition. Have you seen this document before?
A I believe I have, yes.
Q Okay. Did you participate in drafting this document or approving this document?
A I believe I participated in the review of this document before it went out.
Q Turn to page 5. And I double-sided this so we don't use too much paper here.
The second full paragraph on this page indicates -- and, actually, I'll read it here. The last sentence of this paragraph: The new schedule shows a five-year extension of the date for waste acceptance at the first repository from 1998 to

Q Okay. And who was your supervisor at this point, if you remember?
A James Carlson.
Q James Carlson.
If you look, Mr. Kouts, please, at Kouts Exhibit 15. Mr. Kouts, with respect to Kouts Exhibit 15, which is the 1988 Annual Capacity Report, did you participate in the drafting of this document?
A No, I did not.
Q Okay. And, again, as with the 1987 report, did you participate in the approval of this document? Did you directly approve this document?
A I believe I may have reviewed it. My duties at this point in time, I believe, had changed. And I may have been head of the transportation program. But, in any event, I probably -- I believe I did review it before it went out, yes.
Q Mr. Kouts, do you recall having any discussions with the authors of this document about its contents?



A No.
Q And the same question with respect to Kouts Exhibit 14. Did you have any discussions or recall any discussions with the author of that document?
A I don't recall any.
MR. TOMPKINS: Can we take a short five-minute break?
(Whereupon, at 10:21 a.m. a recess was taken until 10:28 a.m.)
BY MR. TOMPKINS:
Q Okay. Mr. Kouts, returning for a brief moment to Kouts Exhibit 14, do you have any knowledge about the motivations of the individuals preparing this document or the reasons they prepared it?
MR. LO RE: Objection. Calls for speculation.
THE WITNESS: No.
BY MR. TOMPKINS:
Q Okay. And with respect to Kouts Exhibit 15, the 1988 ACR, do you have any knowledge



about the motivations of the individuals that prepared this or the reasons they prepared this report?
MR. LO RE: Objection. Calls for speculation. Chris, these documents all speak for themselves. Mr. Kouts is working in a large organization. He's testified repeatedly about his involvement in the ACR and his review of those reports. I'm going to object to you continuing asking him about documents and people who wrote documents to the extent he already testified about his involvement in those documents.
THE WITNESS: No.
(Kouts Exhibit No. 27 was marked for identification.)
BY MR. TOMPKINS:
Q Okay. Mr. Kouts, you've been handed a document marked Kouts Exhibit 27. Have you seen this document before?
A Yes.
Q Okay. Were you involved in the preparation of this document?



A Yes.
Q Okay. And what was your role on the preparation of this document?
A I was one of the staff members and managers who contributed to aspects of it, and since it was prepared as a result of an upcoming hearing to be held by the Monitored Retrievable Storage Review Commission, I also helped prepare the DOE official who testified in front of the Commission in relation to this position.
Q And do you know who that official was?
A Yes, I do.
Q Who was it?
A Thomas Isaacs.
Q Mr. Kouts, was this document actually submitted to the MRS Review Commission?
A Yes. I believe it was. It was a published DOE document. And I believe it was given to the Commission. I don't know whether it went under a separate letter or it was just given to them, perhaps when we went to the hearing.
Q Mr. Kouts, do you know what the purpose

of the MRS Review Commission was?
MR. LO RE: Objection. Calls for speculation. The document speaks for itself.
THE WITNESS: The purpose of the MRS Review Commission was laid out the Nuclear Waste Policy Act.
BY MR. TOMPKINS:
Q Sitting here today, do you have any knowledge about the purpose of the Review Commission, other than it was called for by the NWPA?
A Generally, to my recollection, it was a group that was commissioned by Congress to provide perspective to Congress on their independent view as to whether or not an MRS facility should be a part of the Federal Waste Management System.
Q Turn to page 1 of this document, Mr. Kouts: There's two bullets at the top of this page. And the second bullet states: Recognizing the difficulty of DOE-directed siting through national or regional screening, the DOE prefers an MRS facility that is sited through the efforts of



the Nuclear Waste Negotiator, especially if the siting negotiations led to linkages that allow advantages of an MRS facility to be more fully realized.
Mr. Kouts, were you involved in this aspect of the document?
A I don't remember specifically.
Q Okay. Do you recall, Mr. Kouts, why DOE preferred to site an MRS through the efforts of the Negotiator?
MR. LO RE: Objection. Calls for speculation.
THE WITNESS: My perspective is that the Department was unsuccessful in its siting of an MRS and its efforts to siting an MRS in the state of Tennessee. And the Department felt that perhaps a third party not related to the Department would be more successful than the Department was.
BY MR. TOMPKINS:
Q Okay. Mr. Kouts, am I correct that the siting provisions of the '87 amendments for an MRS provided two options for siting the MRS? One



through a department process and one through a Negotiator?
A I'd have to review the Act. I know there was a screening process that was available to the Secretary. However, that was -- that was somewhat constrained by the provisions in the Act which did not allow the Secretary to select a site until after a repository site was selected.
Q Okay.
A Therefore, embarking on site screening when repository siting was substantially in the future was not a path that the Department was excited about embarking upon.
Q Mr. Kouts, do you know if, following the '87 amendments, the Department has ever pursued its independent siting process for an MRS?
A Not to my knowledge, no.
Q Okay. So following the 1987 amendments, the Department was relying exclusively on the Negotiator to site an MRS?
A Yes.
Q I would like to turn to page 11 of this



document, Mr. Kouts. The last paragraph on this page states that: Early federal acceptance can reduce any potential problems resulting from the fact that the longer federal acceptance is delayed, the more utilities must make decisions about storage options that may involve doing something to the spent fuel (for example, consolidating it or loading it into canisters of some sort) other than simply storing it as it is.
If any operations are performed on the spent fuel before key elements of the federal system (example, the waste package) are well defined, they run the risk of being incompatible with the system design that is finally developed, thereby leading to increased costs.
Do you see that, Mr. Kouts?
A Yes, I do.
Q Okay. At this time, were you aware that one of the concerns resulting from delayed acceptance was that utilities may have to process the fuel in some manner and that may be incompatible with the repository?

A I don't recall whether or not, from where I sat in the program, that I was privy to discussions where this was an issue. I -- you know, the document speaks for itself in that regard. I don't remember contributing to this aspect of this document.

Q Okay. This document, did this represent the position of the Department at this time?

MR. LO RE: Objection. Calls for speculation. Mr. Kouts is not testifying as a 30(b)(6) witness today.

THE WITNESS: My own personal perspective, yes, this represented the DOE position on the MRS facility as of June 1989.

BY MR. TOMPKINS:

Q Okay. And do you have any reason to believe that this was not, at this time, the position of the Department?

A No.

Q Mr. Kouts, do you know if, in light of the delay, the Department has provided any guidance to utilities about what forms of canisters and dry



cask storage it should implement?

MR. LO RE: Objection. Vague as to the term "should."

THE WITNESS: I don't recall.

BY MR. TOMPKINS:

Q Mr. Kouts, if utilities had asked which form of dry cask storage it should implement, would the Department have provided any guidance?

MR. LO RE: Objection. Calls for speculation. Objection. Hypothetical.

THE WITNESS: Since I wasn't involved in that area at that time, I have no way of knowing whether or not -- what the Department would have done had a utility asked for such guidance.

BY MR. TOMPKINS:

Q Okay. At any time during your time at OCRWM, has there been a time that you were in a position that would have dealt with such a request?

A Yes.

Q And when was that?

A Since October of 2002.

Q And that's when you became acting



director of the systems integration group?

A That's when I became acting director of the office of systems analysis and strategy development.

Q Mr. Kouts, you testified briefly yesterday about the TAD concept.

A Yes.

Q Is that a recent change in the strategy of the Department for designing the waste package?

A You'll have to define what "recent" means.

Q Within the past 2 years.

A Yes.

Q Okay. Mr. Kouts, I just want to talk about the waste package for a moment here. The waste package is an item which is being designed by DOE, is that correct, and its contractors?

MR. LO RE: Objection. Vague.

THE WITNESS: The Department's approach is to have components of the waste package designed by private industry in accordance with a performance spec that was issued on a preliminary basis in



November of last year.

So in answer to your question, the Department is designing parts of the waste package.

BY MR. TOMPKINS:

Q And when the Department submits its license application to the repository for the NRC, are you going to need to include the design of the waste package in the license application?

MR. LO RE: Objection. Calls for speculation.

THE WITNESS: Not necessarily.

BY MR. TOMPKINS:

Q What do you mean by not necessarily?

A The Department will provide the appropriate analytical basis, including the TAD specification in its demonstration of how the waste package will meet Environmental Protection Agency and Nuclear Regulatory Commission standards.

Q So the Department is going to provide performance specifications in the license application?

MR. LO RE: Objection. Calls for

speculation. Objection. Mischaracterizes the prior testimony.
THE WITNESS: That decision hasn't been made yet.
BY MR. TOMPKINS:
Q Okay. Mr. Kouts, the design of the repository and the specifications that you're going to be submitting to the NRC with respect to waste packages, is that entirely within the control of the DOE?
MR. LO RE: Objection. Vague.
THE WITNESS: In answer to your question, I indicated that we hadn't decided -- the Department hadn't decided whether specifications are going to be submitted to the NRC. So to the answer of the part of the question not in relation to that, certainly the design of the repository is entirely in control of DOE.
BY MR. TOMPKINS:
Q Okay. And Mr. Kouts, until the DOE has a design for the repository, is it possible for a utility to design a waste package that would be



acceptable for that repository design?
MR. LO RE: Objection. Calls for speculation.
THE WITNESS: Anything is possible.
BY MR. TOMPKINS:
Q It could meet the final repository design; is that correct?
MR. LO RE: Same objection.
BY MR. TOMPKINS:
Q But absent actually seeing DOE's design, it would be very difficult for a utility to design something that meets the repository design?
MR. LO RE: Objection. Vague.
THE WITNESS: Certainly knowledge of the Departments perspective and approach on long-term disposal would be needed in order to successfully develop a design that potentially might be acceptable to the Department for disposal purposes.
BY MR. TOMPKINS:
Q And as you testified, the TAD concept is relatively new. Has the Department's approach changed several times over the course of the



program?
MR. LO RE: Objection. Vague.
THE WITNESS: You have to help me with approach, what you mean by approach.
BY MR. TOMPKINS:
Q The concept of waste package that the Department was going to implement. Has that changed over time?
A The design of a waste package has evolved over time, yes.
(Kouts Exhibit No. 28 was marked for identification.)
BY MR. TOMPKINS:
Q Mr. Kouts, I've handed you what's been marked Exhibit 28 to your deposition, which is titled Report to Congress on Reassessment of the Civilian Radioactive Waste Management Program.
Did you participate in drafting this document?
A No, I did not.
Q Okay. Did you have any role in reviewing or providing input into this document?



A I believe I reviewed it before it went out of the Department, yes.
Q Do you know why this document was prepared?
MR. LO RE: Objection. Vague. The document speaks for itself.
THE WITNESS: It was the Secretary's reassessment of the program. It was initiated when the Secretary came into office as Secretary Watkins. And there was later congressional direction to submit his reassessment to it. And this is the report that was, according to the foreword, submitted to Congress in compliance with their request.
BY MR. TOMPKINS:
Q Okay. On page -- in the executive summary, roman, at page vii, the fourth paragraph down, there's a sentence which states: This schedule shows a significant slip for the expected start date of repository operations from the year 2003 to approximately 2010.
Did the start date for repository

operations slip from 2003 to 2010 in the 1989 time frame?
A Yes.
Q Okay. And do you know the reasons for that change in projected start date?
MR. LO RE: Objection. Asked and answered. Objection. Overly broad.
THE WITNESS: The -- there was additional work that needed to be done for repository site characterization. In addition, it was anticipated that obtaining environmental permits from the state of Nevada would be a challenge. And other activities outside the Department's control, such as NRC review of the license application, et cetera, were potentially issues that would -- that were considered in the -- in the new schedule provided by the Secretary.
BY MR. TOMPKINS:
Q Turn to page 10 of the document, Mr. Kouts. Does this schedule reflect the new schedule that the Secretary was going to implement in 1989 following the reassessment?



MR. LO RE: Objection. Calls for speculation.
THE WITNESS: Yes.
BY MR. TOMPKINS:
Q Okay. Looking at the top half of this page, there is a repository schedule there which contains a number of milestones for development and construction of the repository. Is that correct?
A Yes.
Q Okay. And over on the right-hand side -- and you can correct me if I'm reading this wrong -- it appears that the Department was projecting that it would receive construction authorization for the repository at the end of 2004.
A That's what the document says.
Q Okay. Now, Mr. Kouts, I believe earlier you testified that, when DOE made its proposal to Congress for the MRS facility, it proposed linking start of receipt at the MRS to construction authorization for the repository; is that correct?
A That's correct.
Q Okay. So under this new schedule, which



came into being in 1989, if Congress had adopted the linkage that had been proposed by DOE, receipt could not begin at the MRS until 2004?
MR. LO RE: Objection. Calls for speculation. Objection. Mischaracterizes his prior testimony.
THE WITNESS: My perspective is that, had the Department known that construction authorization for the repository would not be until 2004, it would not have submitted such linkages. The linkages that the Department submitted were based on the fact that, at that point in time, the repository was intended to begin operations in 2003. And the construction authorization for the repository was expected to be received in 1998.
So the simple answer to your question, had the Department known that construction authorization for the repository would have been in 2004, it would not have submitted linkages such that the MRS would not have begun operation in 2004 since the intent of the department in the MRS proposal was to have the MRS available in 1998.



BY MR. TOMPKINS:
Q And the reason the -- the reason the Department intended to have an MRS in 1998 was so that waste receipt could begin in 1998?
A That's correct.
Q Okay. And so the Department viewed the MRS facility as a way of meeting this deadline in light of the slippage of the repository schedule?
A It wasn't as a way. It was the only way the Department had available to it in order to meet the 1998 time frame.
And with the disapproval, if you will, by Congress of the MRS proposal, it was at that point in time a new strategy that the program -- that the program developed a new strategy and began a process to support the Office of the Nuclear Waste Negotiator to develop grants and to find an MRS site which would hopefully would also engender an agreement with the localities that would allow Congress to readdress the linkages that the 1987 amendments to the Act -- to the Act to the extent that those constraints would have been released so

the Departments could still have a facility available in the 1998 time frame.

Q I believe you testified earlier, though, that the original NWPA did not authorize DOE to construct an MRS. Is that correct?

A Yes.

Q Okay. So when the Department made its proposal in 1987, it already announced the repository had been delayed from 1998 to 2003; is that correct?

A Yes.

Q Okay. And at that time, at the time it made the proposal, the Department asked Congress to authorize an MRS so it could begin waste acceptance in 1998 in light of the repository delay; is that correct?

A Yes.

Q Okay. If you look at the schedule on this page 10, Mr. Kouts, for the MRS facility, there's a -- there's a bar here, in about the middle of the section on the MRS, that says: Volunteer siting.



Do you see that?

A Yes.

Q Okay. And it appears that, in this schedule, Department anticipated that siting activities for the MRS would begin in February of 1990 and end at the end of 1992; is that correct?

A That's what the schedule says.

Q Okay. So this -- this schedule anticipates that DOE would have an MRS site at the end of 1992; is that correct?

A As I read this schedule, it says candidate sites identified in March of 1993.

Q Okay. So this schedule anticipates that the Department would have an MRS site by March of 1993?

A Or sites available.

Q Okay. Looking a little bit further down at the construction schedule for the MRS, there's a line which indicates that simple receiving facility construction would begin in January of 1997. Do you see that?

A Yes.



Q Okay. Do you know what is meant by simple receiving facility?

A Generally, yes.

Q And what is that?

A That the purpose of the facility would be essentially to either use existing storage transport casks, take them to the site and put them on pads or to use a canister-based system that would store fuel and transfer the canisters on site into storage devices such that the facility could be built in a very rapid and -- manner.

Q So I believe you testified yesterday that DOE's original conception -- or one of DOE's original conceptions of the MRS facility was as an integrated facility that would have fuel handling capability?

A I believe you mischaracterized my testimony. I basically said that it also had packaging capability to consolidate spent fuel, to put those consolidated fuel rods into disposal-ready canisters that would have serviced either of the three repository sites that the Department, at that



time, was -- was characterizing.

Q Okay. Would the simple receiving facility have those capabilities?

A No.

Q Okay. And then it appears that, beginning in January 1998, DOE was going to start remaining MRS construction. Do you know if, at that time, they intended to construct those facilities?

MR. LO RE: Objection. The document speaks for itself.

BY MR. TOMPKINS:

Q Those being the packaging facilities you just referred to?

A No. The Department was not going to embark on that path.

Q Okay. If you know, what further facilities did it plan to construct, starting in January of 1998, under this schedule?

A I don't recall exactly. I believe there were larger facilities that would have allowed greater capacity, potentially, to accept, other than the initial capability of the simple transfer

facility. But I don't recall the specifics of that.
Q Okay. And was there a reason that the Department was no longer considering packaging facilities, the type that they were proposing in the 1997 time frame?
MR. LO RE: Objection. Calls for speculation.
BY MR. TOMPKINS:
Q If you know.
A It had somewhat to do with the site that we were characterizing. It wasn't felt that that type of packaging would be needed for -- based on our understanding of Yucca Mountain.
Q And when you say the site you were characterizing, you mean the site for the repository, Yucca Mountain?
A That's correct.
Q Okay. And what about that site eliminated the need for those types of packaging facilities, if you know.
A At that point in time, we were looking at a thin-walled waste package which could easily be



transferred into on site. And the need for rod consolidation and the other aspects of the original MRS proposal were not deemed necessary at that point.
To look in context, this was 5 years -- actually 2 years beyond. But the -- there were a lot of challenges associated with doing a lot of the packaging aspects of the MRS as we originally conceived it.
And this was -- again, the strategy of the program was to get something deployed as quickly as possible. Had we initiated and had Congress approved the MRS proposal in the 1987 time frame, we could have gone forward and developed all that. We would have had the developmental time.
At this point in time --as the time period between where we were in the program at that time, 1989 and 1998, as that was getting smaller, we had to look at more simplistic facilities, more initial waste acceptance at an MRS.
(Kouts Exhibit No. 29 was marked for identification.)



BY MR. TOMPKINS:
Q Mr. Kouts, I've handed you what's we've marked as Exhibit 29 to your deposition, which is titled Preliminary Estimates of the Total System Cost for the Restructured Program, dated December 1990.
Have you seen this document before, Mr. Kouts?
A Yes. I believe I have.
Q Were you involved in the preparation of this document?
A No.
Q Do you know if you reviewed this document at the time it was issued?
A I would have reviewed it from the standpoints of the transportation costs associated in this document, since I was head of the OCRWM transportation program.
Q Okay. Mr. Kouts, what is your understanding of the purpose of the total system cost studies, which the Department has undertaken from time to time?



A The purpose of total system life cycle cost estimates is to support an annual assessment of the adequacy of the fee by the Secretary, as required by the Nuclear Waste Policy Act.
Q And the total system cost portion of that effort looks at the anticipated costs of the program?
A Looks at the past and anticipated cost of the program through repository operations and repository closure and any monitoring that may be done.
Q Okay. And so I've seen a number of these reports. They're updated periodically as the Department's plans for the program change and you incorporate the latest plans?
A That's correct.
Q Okay. I would like to take a look at Appendix A of this document, which is entitled Waste Acceptance Tables.
Now, the ACR documents that you were asked about yesterday, they only project the first 10 years of the program; is that correct?

A First 10 years of waste acceptance, yes.
Q Okay. The first 10 years of waste acceptance.
Table A1 includes some waste acceptance schedules, is that correct, or projected waste acceptance schedules?
A Yes.
Q Okay. And looking at the columns in the far right-hand side, there's two columns there. And they're both labeled Total Annual System Acceptance. Do you see that?
A Yes.
Q Okay. And there's one column under that that's labeled Spent Fuel?
A Yes.
Q Does this column represent the amount of spent fuel that the Department anticipated receiving in any particular year at the time of this report?
A Yes.
Q Okay. And just looking at the rates here, it starts at 400 in 1998, and then you accept 400 in 1999; is that correct?



A Yes.
Q Okay. And then it ramps up to 900 metric tons and maintains 900 metric tons from 2000 until 2009; is that correct?
A Yes.
Q Okay. Now, this period, I guess, from 1998 to 2008, does that correspond to the 10 year represented by the ACR?
MR. LO RE: Vague as to the term "ACR."
THE WITNESS: Assuming an ACR was written with these acceptance rates, it would cover the first 10 years, yes.
BY MR. TOMPKINS:
Q Okay. What I'm really interested in, Mr. Kouts, is what happens after the first 10 years, beginning in 2009, '10 and '11 and actually going up to 2018 and 2020.
Were these the acceptance rates that the Department intended to use following the 10-year period represented in the ACR?
A Well, this is one table of several tables in this document. So this facility has an MRS, a



single repository column. And table A2, it has a first repository and a second repository. And I'm trying to understand the difference between A3 and A2. But, you know, I would have to study them to understand it.
So for the purposes of analysis, these are -- my sense is that these were waste acceptance tables. All three of them were used by the analyst to do a -- what my perspective is, probably a perimetric analysis of the total cost of the program.
Q Okay. And you've identified some differences between table A1 and table A2. It looks like table A1 anticipates a single repository system?
A That's what it says.
Q And table A2, it looks like at some point DOE would build a second repository?
A In reviewing the document, it appears that reading A1 and A2, it's based on an end-of-reactor-life case, which would mean no new orders of reactors. Table A3 is an upper reference



case, which my sense is assumes that new reactors would be developed and there would be additional fuel that would have to be provided to the system.
So my sense is that the total system life cycle cost estimators, back in this time frame, were looking, again, at a perimetric analysis as to whether or not the -- what the cost of the program would be given any three of these potential scenarios.
Q Okay. And looking -- looking at table A1 for the moment, beginning in 2009, it looks like the -- it indicates the Department would anticipate receiving 900 metric tons?
A That's what the document says.
Q And then it ramps up for a number of years to 1800 metric tons?
A That's what the document says.
Q For a period of 5 years?
A That's what the document says.
Q And then after that, it would ramp up to a rate of 3,000 metric tons. Do you see that?
A That's what the document says.

Q If the Department was using these rates in this document, do you know if they had any relation to the rates the Department actually intended to implement at this time?
A You would have to go back to the Annual Capacity Reports and, more specifically, the one that was -- the previous ones pointed to, which was the one issued in 1991, in anticipation of 1998 operations.
These were, again used by the analyst to -- as schedules to evaluate, you know, perimetrically what the total cost of the program might be.
So in terms of whether or not these would be used, you would have to look to a subsequent ACR that had the rates that the Department was intending contract holders to respond with DCSs to.
Q Okay. Well, I think I probably misphrased my question, because obviously you made the distinction yesterday between receipt rates and acceptance rates.
So do these tables represent the receipt



rate that the Department anticipated using?
A What the tables say is that they are waste acceptance schedules. So my sense is they are waste acceptance schedules.
Q Mr. Kouts, even though the ACR only projects 10 years, I'm assuming that the Department still would have some sort of plan for what was going to happen beyond that first 10 years; is that correct?
A Well, the construct of the ACR is that, for each successive year, let's assume that the Department was initiating waste acceptance in 1998. And the 1991 ACR provides the first 10 years. And in 1992, it would provide an additional year. And so forth and so on.
So the planning basis would be updated on an annual basis to inform the contract holders of succeeding years, if you will, of what planning -- planned waste acceptance the Department would have.
Q But the Department itself, because it's building facilities and constructing them and designing them, the Department needs to look beyond



10 years; isn't that correct?
A The Department is responsible for disposal of all the spent fuel under contract.
Q Okay. In this report, is this looking at how the Department, at this time, was planning on disposing of all the spent fuel that had been generated or would be generated?
A For the purposes of cost estimating, these are schedules that the estimators used to evaluate repository -- cost of repository operation and closure, out to 2042 in one case and 2049 in another and 2051 in another.
And the costs would also have to encompass a monitoring period and eventual closure of the repository.
So for the purposes of this analysis, this analysis requires that an estimate be made of the cost of the program up until the point of repository closure.
Q And as you testified, the purpose of this estimate is to provide input into the fee adequacy study; is that correct?



A That's correct.
Q And DOE is required to look at the adequacy of the fee each year to make sure it's collecting enough money to cover the cost of the program?
A The Secretary is responsible for evaluating the fee on an annual basis to determine whether or not the fee is -- the fee should be reduced or increased.
So the fee adequacy analysis, should the Secretary determine the fee is more than adequate, he is potentially bound to go inform the Congress that the fee needs to be reduced.
So it works both ways. It's not just whether or not the cost of the program or the fee should go up, but whether or not also the fee should go down based on the analytical approach that the Department has taken.
Q And for the purpose of doing that study, the Department needs a forecast of what's going to happen over the life of the program that it believes is accurate; is that correct?

371

A Well, the Department hopefully would not conduct analyses that are inaccurate. But in order to assure that you have bounded the cost, what this analysis did was look at various scenarios of the program.
Q Okay.
A And the scenarios were, you know, identified in the three tables.
Q Okay. And while each of the three tables represents a different case, all three tables include the same waste acceptance schedule for the first 20 years of the program; isn't that correct?
A Well, I would have to evaluate each of the individual tables to see whether or not, indeed, they did. But they look similar, just on initial glance.
Q Okay. So, regardless of which one of these cases you're looking at, the Department was looking at an acceptance rate that began at 400, ramped up to 900 for a period of time until the repository operated, and then, over a period of time, ramped up to 3,000 metric tons.

372

MR. LO RE: Objection. The document speaks for itself.
THE WITNESS: The document reflected the strategy of the program, which was that an MRS would not exceed 10,000 tons until the first repository was in operation. So acceptance rates were based on that. Afterwards, there was a ramp up over a 5-year period to 3,000 metric tons in 2015 of spent fuel.
BY MR. TOMPKINS:
Q And so at the time this report was issued, the Department was projecting that a repository would begin operations in 2010?
A That's correct.
Q And so that's why you're reflecting the ramp up in 2010 from 900 to 1800 and then up to 3,000?
A That's correct. It also was projecting the second repository would be operational in 2039.
Q At least in tables A2?
A And A3.
Q And A3.
MR. TOMPKINS: Let's take a 5-minute

373

break.
(Whereupon, at 11:19 a.m. a recess was taken until 11:27 a.m.)
BY MR. TOMPKINS:
Q Okay. Mr. Kouts, just following up on one question about Kouts Exhibit 29, this document is used, as you say, to allow the Secretary to evaluate whether the fee should be raised or lowered in any particular year; is that correct?
A That's correct.
Q Okay. I would like to turn briefly to Kouts Exhibit 16, which was marked yesterday, the 1991 Annual Capacity Report.
A Okay.
Q And, again, Mr. Kouts, did you participate in drafting this document at all?
A No, I did not.
Q Okay. And did you review or approve this document prior to being published?
A I may have reviewed it. I was not the approving official.
Q Okay. And did you have any discussions

374

with the people who actually drafted the document? Do you recall?
A I don't recall any.
Q And do you know personally the motivations of the people who was drafting this, the purpose they drafted it for?
MR. LO RE: Objection. Calls for speculation.
THE WITNESS: No, I do not.
BY MR. TOMPKINS:
Q I would like to turn to -- back to Kouts Exhibit 5 for a moment. This document was the letter to contract holders, in this case, Pacific Gas & Electric, enclosing the DCS instructions.
And, again, I think Mr. Stouck may have asked you these questions yesterday, but I just want to confirm. Were you involved at all in drafting these DCS instructions or this letter?
A No, I was not.
Q Okay. And did you have any input in the drafting of this letter or these instructions?
A Not to my recollection.

Q Okay. And at that time, were you aware of the purpose of this document or the reasons that it was being issued?
MR. LO RE: Objection. Calls for speculation.
THE WITNESS: I knew at the time that we started the planning process with the utilities, but the specifics of it and the significance of the documents was not something that I was involved with. So I was not -- I was not involved in this process.
BY MR. TOMPKINS:
Q Were you personally -- did you, at this time in 1992, actually review any DCS submissions submitted by utilities?
A No, I did not.
Q And I believe you just said that you were aware that the planning process was ongoing. But at this time in 1992, were you aware of the significance of Delivery Commitment Schedules?
MR. LO RE: Objection. Vague.
THE WITNESS: Again, I was not involved



in this area of the program. And to the significance of any aspect of it, I was not intimately involved with.
(Kouts Exhibit No. 30 was marked for identification.)
BY MR. TOMPKINS:
Q Mr. Kouts, you've been handed what's been marked Exhibit 30 to your deposition, which is a report issued by the GAO, entitled: Operation of Monitored Retrievable Storage Facility Is Unlikely by 1998.
Have you seen this document before?
A Yes, I have.
Q Did you see this at the time it was issued in 1991, September 1991?
A I believe I did. I remember the existence of such a document, yes.
Q Okay. At this time in September of 1991, what was your position at OCRWM?
A I was either -- I was in one of two positions. I was either head of the transportation program or I was working on strategic and



contingency planning, since -- I don't remember the exact change over date. So I could have been in either of those two positions.
Q And when you referred to contingency planning, what duties did that job entail?
A Basically working with the director of the office at that time in developing strategies, contingencies about how the program might move forward if we were unsuccessful implementing it as we currently planned.
Q Okay. We'll touch on that in a minute, Mr. Kouts.
Turning to Exhibit 30, can you turn to page 3 of this document, please, Mr. Kouts. And three-quarters of the way down the page, the report has a section called principal findings. And it appears the principal finding of the report is that an MRS was unlikely by 1998.
The report states in the paragraph right underneath that heading, first, DOE's plans depend on a negotiator's completing and Congress' approving a siting agreement by the end of 1992 that would



permit early development of an MRS facility.
Do you see that statement?
A Yes, I do.
Q Okay. Do you know if that statement was true?
MR. LO RE: Objection. Calls for speculation. The document speaks for itself.
THE WITNESS: That seems to be inconsistent with what the Secretary's reassessment report had in terms of, to my recollection, that we reviewed just a little bit earlier, that a site had to be identified by March of 2003.
So I don't know on what basis that this information was received by the GAO or, you know, on what basis they made that conclusion.
BY MR. TOMPKINS:
Q At this time, were you familiar with the schedule that the program was operating under for siting of an MRS?
A Generally, yes, but in terms of the specifics of when we needed something specifically, I don't recall it.

A Not specifically, no.
Q Okay. Turn to page 11 of this report. The first full paragraph here indicates that the position of the Negotiator was filled in August of 1990. Do you know if that's true?
A The document speaks for itself.
Q Do you have any knowledge yourself about whether or not that's true?
A I don't have any independent knowledge as to whether or not that's true or untrue.
Q Okay. Mr. Kouts, turning back to the principal findings on page 3, the GAO indicates that it believes that an MRS facility was unlikely by 1998.
At this point in September of 1991, did you believe that an MRS facility was unlikely to be operating by 1998?
MR. LO RE: Objection. Asked and answered. Mr. Kouts has testified repeatedly about his understanding of an MRS. If you want to ask the GAO about their opinion, I suggest that you attempt to ask them.



This is an improper question of this witness who has now sat here for close to 12 hours of deposition and numerous times in trial and has testified about his opinions and understanding of the MRS in this time frame.
Go ahead and answer if you can.
THE WITNESS: My perspective as an employee of the program, was that we were doing everything we could to implement the MRS in 1998. And the Department still had a belief and I had a belief that that was still attainable.
BY MR. TOMPKINS:
Q It was attainable. Was it likely?
MR. LO RE: Objection. Vague.
THE WITNESS: I believe it was -- I -- it's difficult to think back as to how I thought in 1991. My perspective at that point was that we still had a very good chance of being successful and that we were going to do everything we could to have that facility available.
In terms of likely or unlikely, there were lots of variables. My belief was that there



was a strong desire to have a facility available to meet our obligations under the contract. And that if the Negotiator found a site, that Congress would approve changes to the conditions under the Act such that we would be able to operate it.
So whether it was likely or unlikely, I believed from my own perspective that it was a very viable approach and that it had -- it had merit to pursue.
BY MR. TOMPKINS:
Q Your last answer, I think, indicates that it was dependent upon a number of other factors; is that true?
MR. LO RE: Objection. Mischaracterizes the testimony.
BY MR. TOMPKINS:
Q And one of those was whether or not the Negotiator identified a site and reached an agreement with the host?
A Yes.
Q Okay. And another contingency was whether or not Congress acted and authorized such a



facility?
A Congress had already authorized the facility.
Q Would Congress need to approve any agreement reached by the Negotiator?
MR. LO RE: Objection. Calls for speculation.
THE WITNESS: The plan was that the negotiated agreement with the host site would address the linkages in the Nuclear Waste Policy Act. So in order for the linkages to be removed, Congress had to approve the agreement.
So had those linkages not existed, it's unclear to me whether or not Congress would have had to approve the agreement; other than if the agreement was monetary, that Congress would have had to approve that it was agreeing to the monetary provisions of that agreement.
BY MR. TOMPKINS:
Q But the Department, at this point, needed to change the linkages which were enacted in 1987 to actually begin acceptance in 1998; is that correct?

MR. LO RE: Objection. No foundation.
THE WITNESS: The Department could not change the linkages. Congress had to change the linkages.
BY MR. TOMPKINS:
Q Okay. And so one of the contingencies for DOE's plan to begin waste acceptance in 1998 was a change by Congress of the existing linkages?
MR. LO RE: Objection. Asked and answered.
THE WITNESS: I wouldn't characterize it as a contingency. I would characterize it as that was the strategy of the Department in having a facility available in 1998, as presented in the Secretary's reassessment report in 1989.
BY MR. TOMPKINS:
Q And without a change in the linkages, the Department would not be able to have an MRS facility in 1998; is that correct?
MR. LO RE: Objection. Mischaracterizes the testimony.
THE WITNESS: If Congress did not change



the linkages such that the Department could not deploy an MRS, until -- or it could not build an MRS until the repository construction authorization was received, the Department would have been unable to have a facility available in the 1998 time frame.
BY MR. TOMPKINS:
Q Were there any other actions that beginning waste acceptance in 1998 was dependent upon? Was there any other necessary contingencies required for acceptance of waste in 1998?
MR. LO RE: Objection. Vague. Objection. Asked and answered.
THE WITNESS: Congress would have to appropriate the funds for the Department to deploy the facility. The Nuclear Regulatory Commission would have to license the facility in a timely manner such that the Department could construct it in a time frame that would allow it to have operations in 1998.
There would have had to have been -- any litigation associated with the facility would have had to be addressed in a rapid manner. Extended



litigation would have affected the schedule.
If the Department was unable to obtain permits necessary for the construction of such a facility, depending on wherever that facility was sited, that could have been an issue.
And any aspect of the deployment of the facility that required essentially an action by an outside agency other than the Department was outside the Department's control and potentially could affect the schedule to have it implemented by 1998.
BY MR. TOMPKINS:
Q At this time, in September of 1991, did you have any view about the likelihood of Congress changing the linkages?
MR. LO RE: Objection. Asked and answered.
THE WITNESS: Based on my understanding of the views of the Senate Energy Committee, there was strong support in the Senate Energy Committee for identification of the site, approval of a negotiated agreement that would address the linkages. And there seemed to be other support in



Congress for such an activity.
So to the extent that, of my own personal knowledge, that's what I was led to believe.
BY MR. TOMPKINS:
Q And I missed part of that answer. Which committee in Congress were you referring to?
A Senate Energy and Natural Resources.
Q And did you have any interactions with them about these linkages and removing these linkages?
A In my position that I was in at the time in strategic and contingency planning, I was privy to discussions where the director either informed me or my management about conversations that he had with Congress at that time.
And that was also communicated throughout the program.
Q In September of 1991, were you monitoring the progress of the Nuclear Waste Negotiator and his siting effort?
MR. LO RE: Objection. Asked and answered.

Q If you turn to page 11 of this document, Mr. Kouts. There's identification here of a mandatory MRS siting process. Do you see that?
A Yes.
Q Okay. Do you recall if the Department was looking at a mandatory siting process at this time?
A No, it was not.
Q It was not.
A No. This was a report provided by contractors. It was not -- this is not a DOE document. These are the views of contractor staff within, at that time -- this would have been TRW was the M&O contractor at that time.
So these were the views of contractors, not the Department.
Q These contractors, they were operating at the behest of the Department at the Department's direction; is that true?
A They were paid by the Department. And they provided deliverables to the Department for its consideration.



Q Okay. So they were asked to prepare this document and the conclusions in this document?
MR. LO RE: Objection. No foundation.
THE WITNESS: They may have been asked to prepare a report on the MRS contingency. The contents of the report was developed by contractor staff, not by DOE staff. These are the views of a contractor who worked for this area of the program.
BY MR. TOMPKINS:
Q Okay. On page 11, there's a statement about this mandatory siting process. The second to last paragraph states: A mandatory process could offer the only hope of achieving an MRS in time to receive waste from utilities on a schedule they could accept.
Do you see that?
A I see that.
Q Okay. And do you know if the Department shared that view at this time?
MR. LO RE: Objection. Asked and answered.
THE WITNESS: No.



BY MR. TOMPKINS:
Q It did not?
A It did not.
Q Did you have this view?
MR. LO RE: Objection. Asked and answered.
THE WITNESS: No.
(Kouts Exhibit No. 32 was marked for identification.)
BY MR. TOMPKINS:
Q Mr. Kouts, you have been handed what's been marked as Exhibit 32 to your deposition. It's a letter from James Watkins to Bennet Johnston, chairman of the Energy and Natural Resources Committee in the United States Senate. Have you seen this letter before?
A Yes, I have.
Q Okay. And did you see this letter around the time it was drafted in December of 1992?
A No. I saw it after it was sent.
Q Okay. Were you working in the office contingency planning at this time?



A Yes.
Q Okay. Did you have any input into the content of this letter or its attachment?
A No.
Q Okay. James Watkins, was he the Secretary of Energy at the time?
MR. LO RE: Objection. Document speaks for itself.
THE WITNESS: Yes, he was.
BY MR. TOMPKINS:
Q Okay.
A I should say he was the outgoing Secretary of Energy.
Q Okay. The outgoing Secretary of Energy. Do you know when he left his position?
A Shortly after this letter was sent. There was a change in administration.
Q Okay. He attaches to this letter -- I will -- actually, turning to the letter itself, the second paragraph indicates: Enclosed for your information is a summary of my new strategy to provide interim storage in 1998. Do you see that?

A Yes.
Q Okay. And then attached is a document which is titled: A New Strategy for Management of Commercial Spent Nuclear Fuel; is that correct?
A That's what the document says.
Q Okay. Did you participate at all in the drafting of this attachment?
A No, I did not.
Q Okay. Do you know who drafted it?
A No, I do not.
Q Okay. Did this represent -- okay.
The first page under the heading MRS Facility and Siting, the first sentence indicates the Office of the Nuclear Waste Negotiator established under the NWPA as amended in 1997 has spent more than 2 years seeking a voluntary host and site for an MRS facility. That office has not been able to identify a final candidate site that can be recommended to Congress by June 1993 and that will permit spent fuel receipt by January 1998, as planned. Thus, alternative actions are required.
Do you see that?



A Yes, I do.
Q Okay. Was this the position of the Department of Energy at this time that the MRS facility could not be cited in time to receive spent fuel in January 1998?
MR. LO RE: Objection. Asked and answered. Objection. Calls for speculation.
THE WITNESS: That's what the Secretary's letter and the attachment said.
BY MR. TOMPKINS:
Q Okay. And the Secretary of Energy speaks for the Department?
A Yes, he does.
Q Okay. At this time, do you have any reason to disagree with the Secretary's assessment?
MR. LO RE: Objection. Vague as to the term "at this time."
THE WITNESS: At this time?
BY MR. TOMPKINS:
Q In December of 1992, did you agree with Secretary Watkins' conclusion?
MR. LO RE: Objection. Asked and



answered.
THE WITNESS: I don't know that I had an opinion one way or the other as to whether the Secretary was right or wrong. This was the new strategy as he represented it, which was changed shortly after he left office.
So, again, I don't know that I had an opinion one way or the other as to whether or not he was right or wrong.
BY MR. TOMPKINS:
Q He -- you had no opinion about whether this was right or wrong?
MR. LO RE: Objection. Mischaracterizes the prior testimony.
THE WITNESS: I don't remember having an opinion at that time as to whether or not the Secretary was right or wrong.
BY MR. TOMPKINS:
Q The document continues and identifies some potential alternative actions. The first of which refers to a multiple purpose and standardized container system. What was that?



MR. LO RE: Objection. No foundation.
THE WITNESS: Well, the document goes on to explain what that is. Reading from the document, it says: Such a system would simplify the design of a storage facility but would require expeditious development and certification to be effective.
And it -- this a standardized system for spent fuel receipt, storage, transport and disposal could be developed to reduce cost, minimize, handling and spent fuel assemblies and provide more efficient storage at both an interim storage site and nuclear plant sites.
BY MR. TOMPKINS:
Q Was this the MPC concept, that's commonly referred to as an MPC?
A Yes.
It goes on to say that the Department should plan for the use of federal government sites for interim storage.
Q Okay.
A So this was, again, a change in strategy from the perspective of where the program was at

MR. TOMPKINS: Dairyland.
THE WITNESS: Dairyland. Okay.
BY MR. TOMPKINS:
Q Okay. Mr. Kouts, I believe you testified that you were the head of the transportation branch from 1988 to 1991 --
A Yes.
Q -- is that correct?
A That's correct.
Q And in that position, were you responsible for procurement of SNF transport casks?
A I was not procuring them at that time. We were designing them at that time.
Q Okay.
A So if I was still head of that program when those needed to be procured, I would have been the head of that. But at that time, we were not involved in the procurement process.
Q But you were in the design process at that time --
A That's correct.
Q -- in the late '80s, early '90s?



A That's correct.
Q Okay. And were you using vendors to design those casks?
A Yes, we were.
Q Okay. Did the Department in the '80 to early '90s time frame select any cask that it intended to use for transportation when the program began operating?
A The Department didn't select any casks. The Department was designing casks that potentially could be of use at a time when we would begin operations. We did not -- we selected vendors to develop designs. And we down scoped the amount of vendors based on funding restraints. But in terms of selecting casks, I guess I'm struggling with the context of your answer.
Q Okay. Which vendors were working on this -- on this process?
A Now you're challenging my memory. For the two truck casks that we were developing, it was Westinghouse Corporation and General Atomics.
For the three rail casks that we were



developing, it was NAC Corporation, Babcock & Wilcox, and an organization that I don't believe exists any more, which was Newpack.
Q Okay. And I believe you just testified that there was a winnowing process and you reduced the number of vendors at some point?
A During my tenure in that position, due to a reduction in fund funding, we terminated one design effort, which was the Newpack effort. We selected two primary efforts and kept two backups. The primaries were General Atomics and Babcock & Wilcox, B W.
And the backups for the rail were NAC. And for the truck was Westinghouse.
Q Okay. Turn to Appendix E of Exhibit 4, please, Mr. Kouts.
This specific exhibit, Exhibit 4 is a contract between Dairyland and the Department of Energy. Are you aware of whether or not the contracts with other purchasers, such as Energy Northwest, have the same terms and same version of Appendix E?



A My understanding is they are similar if not identical.
Q Okay. The first page of Appendix E contains some nominal physical dimensions for spent fuel assemblies. Do you see that?
A Yes, I do.
Q And the cross-section of a BWR assembly measurement is 6 inches by 6 inches. Do you see that?
A That's what the document says, yes.
Q So any BWR fuel, provided it meets the other requirements in here, which is 6 inches by 6 inches, will be standard fuel --
MR. LO RE: Objection.
BY MR. TOMPKINS:
Q -- under Appendix E.
MR. LO RE: This document speaks for itself.
THE WITNESS: Not necessarily. If it -- it has to meet the length requirements, et cetera. Also, there are some issues associated with -- with the state of the fuel, whether it's failed and so

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------x
ENERGY NORTHWEST, :
Plaintiff, :
-vs- : Case No. 04-10C
UNITED STATES OF AMERICA, :
Defendant. : PAGES 1 - 123
------------------------------x

30(b)(6) Deposition of Christopher A. Kouts
Washington, D.C.
Thursday, June 12, 2008

Reported by: Tammy S. Newton

JOB NO. 187874



June 12, 2008
9:00 a.m.

Deposition of Christopher A. Kouts held at the offices of:

Jenner & Block
1099 New York Avenue, N.W.
Washington, D.C.

Pursuant to notice, before Tammy S. Newton, a Notary Public in and for the District of Columbia.



APPEARANCES

For the Plaintiff:
DAVID JIMENEZ-EKMAN, ESQUIRE
Jenner & Block, LLP
One IBM Plaza
Chicago, Illinois 60611
(312) 923-2782

For the Defendant:
ANDREW P. AVERBACH, ESQUIRE
SHARON A. SNYDER, ESQUIRE
Department of Justice
Commercial Litigation Branch
1100 L Street, N.W., Room 11012
Washington, D.C. 20530
(202) 353-0527

Also Present:
Colby Block, Intern



C O N T E N T S


| EXAMINATION OF CHRISTOPHER A. KOUTS BY: | PAGE: |
| --- | --- |
| Mr. Jimenez-Ekman | 5 |
| Mr. Averbach | 110 |
| Mr. Jimenez-Ekman | 113 |

| DEPOSITION EXHIBITS: | FOR ID: |
| --- | --- |
| No. 1 - 30(b)(6) Notice of Deposition | 5 |
| No. 2 - Expert Report Prepared by Eileen Supko | 5 |
| No. 3 - Acceptance Priority Ranking and Annual Capacity Report | 19 |
| No. 4 - Preliminary Estimates of the Total System Costs for the Restructured Program | 37 |
| No. 5 - Summary Report | 75 |
| No. 6 - Letter Dated December 17, 1992 | 103 |


(All exhibits attached to transcript.)

5

Thereupon,
Christopher A. Kouts,
was called for examination by counsel for the Plaintiff, and, after having been sworn by the notary, was examined and testified as follows:
(Deposition Exhibit No. 1 was marked for identification and attached to the transcript.)
(Deposition Exhibit No. 2 was marked for identification and attached to the transcript.)
EXAMINATION BY COUNSEL FOR THE PLAINTIFF
BY MR. JIMENEZ-EKMAN:
Q Good morning, Mr. Kouts. My name is David Jimenez-Ekman. We met a little bit more than a year ago, I think, although I didn't ask you any questions at the Dairyland deposition. I understand that you're here today as the Department of Energy's designated Rule 30(b)(6) designated witness; is that correct?
A Yes.
Q I'm going to show you what's been marked as Exhibit 1.
A I see it.
Q Have you seen Exhibit 1 before?

6

A I've seen versions of it. Not this specific version, but I have seen the questions that are identified here.
MR. AVERBACH: Let me clarify on the record. We showed him the copy of the unamended one that didn't have the dates and whatnot. But he has seen these specific topics that are set forth here.
BY MR. JIMENEZ-EKMAN:
Q And what, if anything, did you do, Mr. Kouts, to prepare to be the department's Rule 30(b)(6) witness on the topics listed on the third page of Exhibit 1?
A I met with counsel and discussed them.
Q Who did you meet with?
A Mr. Averbach and Sharon, I forgot your last name.
MS. SNYDER: Snyder.
THE WITNESS: And Lisa's last name is?
MR. AVERBACH: Donohue.
THE WITNESS: Those were the three attorneys with the Justice Department.
BY MR. JIMENEZ-EKMAN:

7

Q Did you meet with anyone else?
A No.
Q Was anyone else present for the meeting?
A No.
Q How long did you meet with them?
A I believe for about two hours.
Q When did you meet them?
A Last week.
Q Did you review any documents to prepare for your role as a representative of the Department of Energy in this deposition?
A I reviewed documents that counsel provided me.
Q Do you remember any of those documents?
A They were essentially some of the depositions and some of the testimony that I had given in the past.
Q So they showed you prior testimony that you had given. Do you remember what prior testimony they showed you?
A Specifically, I don't remember the specific instances. I leafed through them, you know,

8

basically. But, you know, I couldn't give you the specifics. If counsel wants to provide you those specifics, they can later, but I don't have it with me.
Q Do you remember any -- any particular testimony?
A I believe there was some -- I believe some of the transcripts I looked at were related to the Dairyland trial -- the Dairyland case, if you will. Beyond that, I don't have any specifics.
Q Do you remember any other documents besides your prior testimony that counsel showed you during preparation for the deposition today?
A There were, I believe, some correspondence between the Justice Department and your firm. But beyond that, no.
Q Do you remember the general subject matter of the correspondence between Department of Justice and Jenner & Block?
A I believe it had to do with some discussion about the topics that I would testify on and whether or not the previous depositions and testimony that I

had given in court essentially addressed those subjects, and the tenor of the correspondence, as I remember, that in many cases this has already been gone over many times before, and they did not understand the need for me to have this deposition or that I hadn't already answered these questions in the past.

To the best of my memory, that's what those documents contained.

Q Do you remember reviewing any other documents in preparation for your deposition?

A No.

Q Did you consult with anybody at the Department of Energy who was not an attorney to gather any factual or other information to answer the questions that are listed in Topic -- I'm sorry -- in Exhibit 1?

A I talked to Mr. Zabransky about cask capacities and so forth, but beyond that, no.

Q So Mr. Zabransky was the only other person you consulted to prepare for your deposition today?

A That's correct.



Q When did you talk to Mr. Zabransky?

A Well, I talked to Mr. Zabransky every day. On this particular subject, I believe it was sometime last week.

Q And how long did you talk to him?

A On that subject, probably for about 10 seconds.

Q That's a pretty short conversation.

Yes, and I'm sorry. You made a good distinction. On that particular topic, that is relating to your preparation for this deposition, can you tell -- can you, please, state what you said to Mr. Zabransky and Mr. Zabransky said to you.

A It was whether or not my understanding of potential cask capacities was consistent with his understanding, and the answer was yes.

Q And what did you tell him your understanding of potential cask capacities was?

A It's related to, I believe, Question No. 5, which had to do with the weights and the capacities, if you will, of casks that might have been available in the time frame associated with when Energy



Northwest might have been serviced by the department.

Q And you told him your understanding, and he confirmed that?

A I gave him my perspective, and he agreed it was consistent with his perspective.

Q What was the perspective that you gave him? What did you tell him?

A Essentially, to the extent that there might have been rail casks available ranging from about 100 tons to 125 tons in hook weight and that the cask capacities, at least from a BWR facility, which I believe is what your client's facility is, would range anywhere from 44 assemblies to 68 assemblies.

Q And he said that was -- in his view, that was accurate?

A In his view, that was consistent with his understanding of casks that might had been available had the department had the capacity to receive fuel at some future time.

Q Did you discuss with Mr. Zabransky any other topic relating to your preparation for your deposition today?



A No.

Q I'll move on to Topic 1 of Exhibit 1 listed on the third page, which is, quote, "Energy Northwest's acceptance allocation had DOE commenced waste acceptance under the Standard Contract on January 31st, 1998," end quote.

Did I read that right, sir?

A Yes.

Q Mr. Kouts, has the DOE ever determined the amount of spent nuclear fuel it would have picked up from Energy Northwest and the schedule for picking it up had the DOE commenced performance under the Standard Contract on January 31st, 1998?

A No.

Q Why not?

A Basically, it was beyond the planning horizon of the department.

Q And it remains beyond the planning horizon of the department?

A Yes.

Q Do you know, for purposes of this litigation, whether the department has any position on

the acceptance, allocation, or amount of SNF it would have picked up and the schedule for picking it up from Energy Northwest?

MR. AVERBACH: I'm going to object to the extent that calls for a legal conclusion. It's also, I believe, vague.

THE WITNESS: Can you repeat the question.

(The record was read by the reporter.)

THE WITNESS: No.

BY MR. JIMENEZ-EKMAN:

Q So from a programmatic perspective, the department does not have a position on that; is that correct?

MR. AVERBACH: Objection; vague.

THE WITNESS: The department has no plans. It has no position.

BY MR. JIMENEZ-EKMAN:

Q And it has no position on what it would have done had it commenced performance and January 31st, 1998, correct?

MR. AVERBACH: Objection; vague and mischaracterizes his testimony.



THE WITNESS: The department never got far enough in its planning process in order to address that issue.

BY MR. JIMENEZ-EKMAN:

Q So it does not, in fact, have a position, correct?

A That's correct.

Q I'm going to show you what the reporter has marked as Kouts Exhibit 2.

A Okay.

Q And --

MR. AVERBACH: Let's go off the record.

(Discussion off the record.)

MR. JIMENEZ-EKMAN: Counsel correctly points out, I should have identified what I just handed Mr. Kouts as Kouts Rule 30(b)(6) Exhibit 2.

BY MR. JIMENEZ-EKMAN:

Q Mr. Kouts, you haven't seen this before, have you?

A No, I have not.

Q Can you, please, turn, sir, to Table 3, and it's on page 11 of Exhibit 2. I'll represent to you,



sir, that Exhibit 2 is an expert report prepared by Eileen Supko, at Energy Resources International that Energy Northwest has had prepared in this case. And Table 3 represents her calculation of allocations for Energy Northwest had the Department of Energy commenced waste acceptance in 1998 and assuming a ramp-up to a 3,000 MTU overall acceptance rate.

MR. AVERBACH: For the sake of clarity, is there a particular document that rate corresponds to?

MR. JIMENEZ-EKMAN: I'm not -- if you have an objection, you can make it. I'm not sure what you're asking. I'm not trying to be difficult, but I just represented that's -- that's what this is.

BY MR. JIMENEZ-EKMAN:

Q And I take it from your prior answer, Mr. Kouts, that the department, since it never got to the stage where Energy Northwest's allocations were on the planning horizon, that the department does not have a position as to whether Table 3 is accurate or inaccurate; is that correct?

MR. AVERBACH: Objection; lack of foundation, calls for speculation.



THE WITNESS: If this acceptance rate ramped up to 3,000 tons in five years, this would have been inconsistent with the department's planning in 1991 ACR APR, and it's far and above more acceptance than the department was planning; therefore, these rates would not be consistent with the department's view as to how it would have performed in 1998, based on the 1991 ACR APR.

BY MR. JIMENEZ-EKMAN:

Q And understanding that my question is a little bit different, on the -- on the assumption that the -- putting aside the 1991 ACR -- I'm not asking whether Table 3 would or would not have happened. But putting that aside, on the assumption that the department had commenced waste acceptance in 1998 and ramped up to a 3,000 MTU overall acceptance rate, does the department have a position one way or another as to whether these would have been Energy Northwest's allocations under an oldest-fuel-first allocation?

MR. AVERBACH: I'm going to object on the grounds it lacks foundation. I'm also going to lodge an objection on the grounds this particular question

is beyond the scope of what clearly everyone knows is the government's position with respect to DOE's obligations under Standard Contract. In particular, I think because of that, your question is beyond the topic listed as -- designated as Topic No. 1 and I think beyond all the other topics, as well.

THE WITNESS: Without analyzing how the -- these numbers were generated and whether or not they're consistent with the department's understanding of how the allocations would have been to other reactors at higher acceptance rates, I would have no way of knowing whether or not the department would agree or disagree with this analysis.

BY MR. JIMENEZ-EKMAN:

Q As far as you know, no one at the department has done the analysis you just described?

A That's correct.

Q If you turn a page in Exhibit 2, you'll see there's a Table 4, which also shows an allocation prepared by Ms. Supko based on different acceptance -- overall acceptance rates assumptions. I assume that also some analysis would be required to determine



whether the department believed this was accurate given those assumptions, and that analysis hasn't been done?

MR. AVERBACH: Objection.

Mr. Kouts, for the sake of clarity -- and perhaps counsel can elaborate exactly what assumptions are based on this table, in order to enable you to answer that question.

MR. JIMENEZ-EKMAN: Counsel, I don't know you. The proper objections under the rules are as to form, foundation, and so on. You've made three speaking objections in a row. I'd hate to have to terminate and come back.

MR. AVERBACH: Excuse me. That's inaccurate. First of all, I'm permitted to object on the ground your question is beyond the scope of the 30(b)(6) deposition. Second of all, I will advise Mr. Kouts to look at any cross-reference that looks at Table 4 and to examine the document thoroughly.

You have presented him with a document that is beyond the scope of this deposition notice, asked him if the department has any understanding about it.



That is inaccurate. If you want to show him a document that he's never seen before, I think it's improper not to suggest to him that, No. 1, look at the entirety of the document; and 2, explain to him what the assumptions underlying the document are.

MR. JIMENEZ-EKMAN: You've just given another further speaking objection and a speech. I really -- I'd hate to have to bring Mr. Kouts back here again. But you can object it's beyond the scope. If you're going to instruct him not to answer or terminate, go ahead. I think it's clearly in the scope. There's no reason to argue with you on the record about that.

BY MR. JIMENEZ-EKMAN:

Q The bottom line is, Mr. Kouts, if you need time to look at the rest of the document -- it doesn't sound, from your prior answer, like you need that time, because the answer was we haven't done this analysis. I just ask whether your answer was the same for Table 4.

A The answer is yes.

(Deposition Exhibit No. 3 was marked for



identification and attached to the transcript.)

BY MR. JIMENEZ-EKMAN:

Q You've seen Kouts Rule 30(b)(6) Deposition Exhibit 3 before, Mr. Kouts?

A Yes, I have.

Q What is it?

A It's the acceptance priority ranking and annual capacity report issued by the department in July of 2004.

Q And what was the purpose of the department's issuance of this document in 2004?

A Purpose of this document was to initiate the planning process under the Standard Contract with the intent the department was planning on accepting spent fuel in the year -- from contract holders in the year 2010.

MR. JIMENEZ-EKMAN: I'm sorry. Could I have that back, please.

(The record was read by the reporter.)

BY MR. JIMENEZ-EKMAN:

Q And does this document, Exhibit 3, contain an assumption about the overall acceptance rate for

21

the first 10 years of operation of the program? I'll
rephrase that.
Does this document contain an assumption about the overall annual acceptance rates of once -- once acceptance commences?
MR. AVERBACH: Again, I'm going to object on the ground the question's beyond the scope of the 30(b)(6) notice.
THE WITNESS: Table 1, page 2 has the projected nominal waste acceptance rates for spent nuclear fuel for the first 10 years of operation.
BY MR. JIMENEZ-EKMAN:
Q And Table 1, page 2 shows the department reaching a 3,000 MTU overall acceptance rate in the fifth year of operation, correct?
A Yes.
Q Now, there's also what's referred to in Appendix A as the acceptance priority ranking, correct?
MR. AVERBACH: Same objection.
THE WITNESS: Yes.
BY MR. JIMENEZ-EKMAN:

22

Q Does the acceptance priority ranking accurately depict the allocations, if any, to Energy Northwest in the first 10 years of program operation at a rate ramping up to 3,000 tons in the fifth year of operation?
MR. AVERBACH: Same objection.
THE WITNESS: Yes.
BY MR. JIMENEZ-EKMAN:
Q What are those allocations based on?
MR. AVERBACH: Objection; vague.
THE WITNESS: The allocations are based on the information the department had at that time about discharges of spent fuel from contract holders and the dates of those discharges and essentially matching those amounts, if you will, at any specific date with the acceptance capability through the first 10 years of operation.
BY MR. JIMENEZ-EKMAN:
Q It's essentially a mathematical operation where you essentially count down the list of discharges until you fulfill your capacity for a particular year; is that correct?

23

A It's a mathematical process that essentially allocates the amount in any one year based on the discharge dates that are applicable for that specific year.
Q And when you say based on the discharge dates, the appendix -- the APR applies the oldest-fuel-first scheme contained in the Standard Contract, correct?
A It applies the oldest-fuel-first priority, yes.
Q I didn't mean scheme in any derogatory way. I just meant it as a way of doing something.
Does the Department of Energy maintain a database showing discharges and -- well, I'll start that. Does the Department of Energy maintain a database showing the discharges from commercial nuclear reactors in the United States?
MR. AVERBACH: Objection; beyond the scope of the 30(b)(6).
THE WITNESS: The Energy Information Administration for the department receives that information and also the department issues forms for

24

the contract holders to fill out, RW-859 forms that updates its understanding of what spent fuel exists in its discharges.
BY MR. JIMENEZ-EKMAN:
Q You said RW-859. That's capital R capital W dash 859, correct?
A That's correct.
Q Those forms get put into a database that EIA maintains; is that right?
A The department maintains the database. EIA develops information for the department projections of spent fuel. But the Office of Civilian Radioactive Waste Management retains the databases for those purposes.
Q You said projections of spent fuel. What do you mean by that?
MR. AVERBACH: Beyond the scope of the notice.
THE WITNESS: Projections of spent-fuel discharges based on expected energy generation, future energy generation by the operating reactors.
BY MR. JIMENEZ-EKMAN:

Q So the department can project, based on historical data, what the future discharges are likely to be; is that correct?

MR. AVERBACH: Same objection.

THE WITNESS: Yes, and for the purposes of projecting the amount of fee that will be provided to the department for financial statements and so forth.

BY MR. JIMENEZ-EKMAN:

Q So the answer was yes. And the reason the department does that is to determine the amount of the fee; is that correct?

A Future fees that may come into the department for the purpose of financial statements, yes.

Q So with that clarification, that's correct?

A Yes.

Q And does the department have the capability to use that data and those projections to create APRs given a certain assumption regarding program performance over a period of time?

MR. AVERBACH: Objection concerning the scope of the 30(b)(6) notice.



THE WITNESS: The department primarily uses the RW-859 forms for that purpose.

BY MR. JIMENEZ-EKMAN:

Q So RW-859 forms are used to construct an APR; is that correct?

A It's data input into the APR ACR process, yes.

Q Can you use the -- well, let me start over.

Does the department have the capability to use that data to create an APR that includes future discharges?

MR. AVERBACH: Let me state my objection concerning -- rather than doing this on each question. To the extent you're asking about the APR process, I'm going to lodge an objection and -- I meant to say RW-859 process -- I'm going to lodge an objection concerning the scope of the 30(b)(6) notice rather than doing it each time. Go ahead.

THE WITNESS: Best way for me to answer that: The government didn't come prepared to this deposition to go through an exhaustive discussion of the RW-859 process and how that information is used in



order to develop APR, ACRs. If that was within the scope of the 30(b)(6), then the government would have come prepared to answer that.

I've been answering those questions based on my own personal knowledge, and we're right up to the limit of my personal knowledge of this. So if you want to pursue this, I suggest that you would have to, again, ask another 30(b)(6) question for the department to prepare for in order to answer it.

BY MR. JIMENEZ-EKMAN:

Q Your lawyer's going to reach over and hit you, Mr. Kouts, for suggesting that. I'll tell you, I'm at the end of my outline for this question. Is the answer, you're not sure one way or another, as you sit here, whether the department has the capability I asked about in my prior question?

MR. AVERBACH: I'm not sure at this point anyone knows what the prior question was.

If you do, you can answer the question. But I'll object as vague.

BY MR. JIMENEZ-EKMAN:

Q I can repeat it, or you can have it read



back.

A The department's ability to project into the future is dependent on the information provided in the RW-859 forms. To the extent that it does not have information to -- from the contract holders for that personal perspective -- from their own parochial perspective, if you would, the department has no basis to project beyond what -- what's been provided to them.

MR. JIMENEZ-EKMAN: May I have that back, please.

(The record was read by the reporter.)

BY MR. JIMENEZ-EKMAN:

Q Mr. Kouts, you did not consult the database that you've described in preparing yourself to answer questions as the department's representative on Topic 1, correct?

A No, that's not correct.

Q You did consult that database?

A I -- the department has no position on Topic 1; therefore, there was nothing to consult.

Q Okay. So in fact, it is correct that you

did not consult the database in preparing to answer questions regarding Topic 1, correct?
A It had no relevance.
Q And so you did not consult it, correct?
A That's correct.
Q Let's move on to Topic 2, which is, quote, "The SNF acceptance rate at which DOE would have performed after the 10-year period reflected in the 1991 Annual Capacity Report assuming that DOE commenced waste acceptance under the Standard Contract on January 31st, 1998," end quote.
Did I read that correctly?
A Yes.
Q Mr. Kouts, has the DOE ever determined the overall industry acceptance rate at which it would have performed after the 10-year period in the 1991 ACR?
A No.
Q So is it correct, as you sit here today, that the department has no position as to the rate of performance after the initial 10-year period?
MR. AVERBACH: Objection; calls for a legal



conclusion.
THE WITNESS: The department's planning did not extend beyond the 10 years identified in the 1991 ACR APR.
BY MR. JIMENEZ-EKMAN:
Q Has the department ever determined or estimated a rate that the department considers reasonable beyond the 10-year period?
MR. AVERBACH: Objection; vague.
THE WITNESS: The department did not project beyond that 10-year period for the purposes of the 1991 ACR APR.
BY MR. JIMENEZ-EKMAN:
Q Understanding it hasn't issued a document that the department considers to be of contractual significance, has the department studied or analyzed what a reasonable rate would be --
MR. AVERBACH: Objection; vague.
BY MR. JIMENEZ-EKMAN:
Q -- after the first 10 years, sir?
MR. AVERBACH: Objection; vague.
THE WITNESS: Related to 1998 waste



acceptance, no.
BY MR. JIMENEZ-EKMAN:
Q Did the department ever determine or estimate a rate after the first 10-year period that would have served the goals of the department's program?
MR. AVERBACH: Objection; vague.
THE WITNESS: I don't understand the question.
BY MR. JIMENEZ-EKMAN:
Q Well, does the program, sir, have any goals?
MR. AVERBACH: Objection.
You can answer the question if you want.
THE WITNESS: The program has a mission that's laid out in the Nuclear Waste Policy Act to manage and dispose of spent nuclear fuel and high-level waste.
BY MR. JIMENEZ-EKMAN:
Q And also to work off the backlog at existing plants?
MR. AVERBACH: Objection; calls for legal



conclusion and beyond the scope of the 30(b)(6) deposition notice.
THE WITNESS: The department's mission is to accept spent nuclear fuel for disposal, and the department is still following through on that mission.
BY MR. JIMENEZ-EKMAN:
Q That's the extent of the department's mission and goal with this program?
MR. AVERBACH: Same objection.
THE WITNESS: The mission and goal of the program is to manage and dispose of spent nuclear fuel and high-level waste. That is the overarching goal for this program, under the authorization of the Nuclear Waste Policy Act.
BY MR. JIMENEZ-EKMAN:
Q Is part of that goal to operate the program at an acceptance rate that keeps up with continuing industry discharges?
MR. AVERBACH: Objection; beyond the scope, and calls for a legal conclusion.
THE WITNESS: The department develops a planning basis for the program based on the amount of

resources that it's been given and what it projects it will need and the capabilities of the facilities that it plans on building. And that approach has been consistent throughout the program's history.
BY MR. JIMENEZ-EKMAN:
Q Now, over the years, the department has published a number of documents containing estimates of system performance, correct?
MR. AVERBACH: Objection; vague.
THE WITNESS: Projections of system performance, yes.
BY MR. JIMENEZ-EKMAN:
Q Are you familiar with the 1985 mission plan?
A Yes, I am.
Q And that projected system performance, which included a 3,000 MTU overall acceptance rate starting in year six, correct?
MR. AVERBACH: Objection; beyond the scope.
THE WITNESS: I would have to review the document to verify that your statement was correct.
BY MR. JIMENEZ-EKMAN:



Q Well, has the department ever published a document where it indicated it was going to pick up spent nuclear fuel at the rate of 900 MTU for the entire life of the program?
MR. AVERBACH: Objection; beyond the scope.
Are we still on Topic 2?
THE WITNESS: No.
BY MR. JIMENEZ-EKMAN:
Q Has the department ever published a document indicating it was going to use a 2,100 metric ton per year rate for the life of the program?
MR. AVERBACH: Same objection.
THE WITNESS: No.
BY MR. JIMENEZ-EKMAN:
Q Now, are you aware of any department projection of total system performance that does not eventually reach a steady state performance level of 3,000 MTU?
A Yes.
Q What?
A I believe the early mission plan and the mission plan amendments looked at acceptance rates of



6,000, assuming that two repositories were in the system.
Q Are you aware of any projection of total system performance that eventually reaches a steady state performance level of less than 3,000 MTU?
MR. AVERBACH: Objection to this line of question on the ground it's beyond the scope of the 30(b)(6) notice.
THE WITNESS: No.
BY MR. JIMENEZ-EKMAN:
Q Now, has -- has the department ever prepared estimates of the overall industry acceptance rates after the first 10 years shown in the 1991 ACR for purposes of estimating total system costs?
MR. AVERBACH: Same objection. The question is also vague.
THE WITNESS: Can you read the question back, please.
(The record was read by the reporter.)
THE WITNESS: Yes.
BY MR. JIMENEZ-EKMAN:
Q And why does it do that?



MR. AVERBACH: Same objection.
THE WITNESS: The analyses are done to project the adequacy or to analyze the adequacy of the fee as required by the Nuclear Waste Policy Act, which requires a secretary to annually review the adequacy of the fee.
BY MR. JIMENEZ-EKMAN:
Q And the secretary is required to review the adequacy of the fee and then report his or her findings to Congress, correct?
A No.
Q There's no requirement that Congress be -- receive a notice of the findings?
MR. AVERBACH: Objection; calls for a legal conclusion, beyond the scope.
THE WITNESS: No.
BY MR. JIMENEZ-EKMAN:
Q As a matter of practice, does the secretary submit the findings to Congress?
MR. AVERBACH: Objection; beyond the scope.
THE WITNESS: No.
MR. JIMENEZ-EKMAN: Can you mark this as 4.

(Deposition Exhibit No. 4 was marked for identification and attached to the transcript.)

THE WITNESS: I would like to supplement what I said earlier. If the secretary determines that the fee is either inadequate or more than adequate, the secretary is required, under the act, to inform the Congress about any inadequacy or over-adequacy of the fee, but he is not required to report on an annual basis if he finds the fee adequate.

BY MR. JIMENEZ-EKMAN:

Q I'm showing you what's been marked as Kouts Rule 30(b)(6) Deposition Exhibit 4. Have you seen this before?

A Yes.

Q What is it?

A It's a December 1990 document issued by the Office of Civilian Radioactive Waste Management that's entitled Preliminary Estimates of the Total System Costs for the Restructured Program: An Addendum to the May 1989 Analysis of the Total System Life Cycle Cost for the Civilian Radioactive Waste Management Program.

Q Now, at the time that Exhibit 4 was



prepared, it was still the department's position that waste acceptance would commence under the Standard Contract in 1998, correct?

A It was certainly the department's intent, yes.

Q And when you say, "intent," was it not also the department's articulated position?

A It was the department's articulated goal, recognizing the fact that Congress needed to modify the Nuclear Waste Policy Act in order for the department to be successful in meeting that goal.

Q But at least at this time, the department's articulated position was that it was still possible to achieve the 1998 commencement date, correct?

A Assuming that it received appropriate authorization, yes.

Q Now, this document, Exhibit 4, calculates the total system life cycle cost for the program, correct?

A Yes.

Q And you'd agree that the level of total cost depends on, among many other things, the level of



performance under the program, correct?

MR. AVERBACH: Objection; beyond the scope.

THE WITNESS: I don't understand the question.

BY MR. JIMENEZ-EKMAN:

Q Okay. In any given year, if the department accepts more waste in that year, other things equal, the cost for that year is higher, correct?

MR. AVERBACH: Objection; vague and beyond the scope.

THE WITNESS: I don't really understand the question that you're asking.

BY MR. JIMENEZ-EKMAN:

Q Well, does it cost more for the department to run a program with a higher overall acceptance rate than with a lower overall acceptance rate?

MR. AVERBACH: Beyond the scope.

THE WITNESS: The best way for the government to answer that question is that the -- if you look at the financial structure of the program and the setup of the nuclear waste fund, spending less and having a lower acceptance rate will essentially have a



more positive impact on the adequacy of the fee, since near-term dollars would be -- which are typically in the analysis more -- more weighty in the adequacy of the fee as opposed to longer term dollars.

Therefore, lower acceptance rates would have a very positive impact on the adequacy of the fee, because the program would be spaced over a very, very long period of time. So the -- although the acceptance rate is a consideration in the adequacy of the fee, the overall financial structure of the program really dictates how that works. And that is the purpose of this document to really support a fee adequacy analysis.

It would be arguable that the best thing, from a fee adequacy standpoint, would be for the department not to perform until very far in the distant future, because there would be a tremendous growth in the nuclear waste fund, and the amount of resources available would allow it to -- would allow a very high balance in that fund.

I'm explaining my answer to you.

BY MR. JIMENEZ-EKMAN:

Q And I think your very thorough answer is far above the very simple thing I was asking but I think assumes what I'm asking. You got to know, in order to analyze total system life cycle costs, what the performance is going to be -- you got to make an estimate of that in every year, correct?

A You have to -- I would agree with that. You have to analyze the cost for the program in a specific year over the life of the program. You have to project what the assumptions are for each of those years.

Q And one of the assumptions that you have to make, because it affects cost, is how much you're going to accept in that particular year, correct?

MR. AVERBACH: Objection; beyond the scope.

THE WITNESS: Yes.

BY MR. JIMENEZ-EKMAN:

Q Okay. Now, by the way, did you look at this document, Exhibit 4, in preparing for your deposition today?

A No.

Q Was that because you looked at it many



times in the past?

A Yes.

Q And you're quite familiar with it?

A I would say the government is familiar with the document.

Q Now, if you look at -- the Bates labels are hard to read on this copy. It's Table A-1.

A I have it.

Q What are the purpose of Tables A-1 and tables on the two following pages, A-2 and A-3?

MR. AVERBACH: Objection; beyond the scope.

THE WITNESS: These provided assumptions into the analysis that were considered in the analysis of the total system cost.

BY MR. JIMENEZ-EKMAN:

Q Can you describe the basis on which these tables were prepared? I'll rephrase it.

What was the process used to prepare these tables?

A The cost analyst would go and use the -- use assumptions based typically on the current planning basis of the program. And at this point in



time, the planning basis was that an MRS facility would be available in the 1998 time frame, that the acceptance of that facility would be limited to 10,000 tons until the repository was in operation, which was projected to be in 2010, and then the acceptance rate would increase up to a steady state 3,000 metric tons per year level.

Q That's --

A That was Table A-1. Table A-2 was similar. Table A-2 had one repository -- A-1 had one repository. Table A-2 had two repositories, second repository starting in operation in 2038. Table 3 had similar assumptions to Table A-2, and I don't quite understand the difference. Apparently there were differences. I'd have to go and look at this. But it's also a two-repository system, a different variant of it.

Q Tables A-1 through A-3 represent different cases within the overall planning basis of the department at the time Exhibit 4 was prepared?

A They were -- they were analytical cases by the costers at that time for the purposes of looking



at long-term adequacy of the fee.

Q And where did the costers get the analytical assumptions that are contained in these tables?

A Talking to other people in the program, getting a sense of what their view was as to when facilities might come on-line, for instance a second repository. Those were, again -- there were no actual planning activities for a second repository at that time. So these were, again, analytical cases for the purposes of determining the adequacy of the fee.

But the simple answer to your question is the cost estimators made judgments, if you will, as to how to bracket what the overall costs of the program might be, and for the purposes of projecting the adequacy of the fee. And in every case, they were consistent with the department's intent to begin operations in 1998 and consistent with the department's approach to not exceed 10,000 tons in the first 10 years related to the restrictions -- the capacity restrictions that still remain today in the Nuclear Waste Policy Act.

Q Who was the secretary at the time this document was prepared, Exhibit 4?
A Secretary Watkins, James Watkins.
Q And Secretary Watkins approved Exhibit 4?
MR. AVERBACH: Objection; beyond the scope, lack of foundation.
THE WITNESS: Secretary, to my knowledge, never saw this report.
BY MR. JIMENEZ-EKMAN:
Q What chain of government officials, if any, had to sign off on this report?
MR. AVERBACH: Objection; beyond the scope.
THE WITNESS: It would be the senior management of the Office of Civilian Radioactive Waste Management.
BY MR. JIMENEZ-EKMAN:
Q Do you know who that was at the time?
MR. AVERBACH: Same objection.
THE WITNESS: At that time, assuming that he involved himself, that was John Bartlett.
BY MR. JIMENEZ-EKMAN:
Q Was there anything in Tables A-1 through A-3 of Exhibit 4 that was inconsistent with the department's planning basis at the time this was issued?



MR. AVERBACH: Objection; vague.
THE WITNESS: Since the department had no second repository program, it's difficult to say whether or not it was inconsistent with the program that did not exist. But again, as I indicated, the government did these analyses for the adequacy of the fee. And the assumption at this point was that there would be a second repository program, which Congress terminated in the 1987 amendments.
And the assumption was that at some future time, there would be a second repository program. The cost estimators made judgments about when that program might initiate waste acceptance and the rates that they might have accepted waste and the length of duration of the repository. And they made assumptions about the type of repository and the cost of the repository. These were all, again, for the purposes of cost estimating.
The department had no position as to what the second repository would be, where it would be, what kind of media it would be, how much it would cost or whatever. This was done essentially for the purposes of looking at bands of costs to determine the adequacy of the fee, and there was no departmental policy on many of the assumptions that were made here. They were analytical estimates.



Normally the only reasonable assumptions that were not -- that were near term that the department had indicated an interest in and a position on was initiation of acceptance in 1998 and the availability of the first repository in 2010.
BY MR. JIMENEZ-EKMAN:
Q Nobody in the senior management of the Office of Civilian Radioactive Waste Management took a look at Tables A-1 through A-3 and said that's not a reasonable basis to estimate costs, because it's inconsistent with our planning basis, correct?
MR. AVERBACH: Objection; beyond the scope.
THE WITNESS: That's not consistent with what I said earlier, which was to the extent that the department had no position on a second repository; therefore, these were analytical estimates. To the extent the management of the program felt they were as good an estimate as something else for a second repository, they didn't object to using that as an assumption basis for the purposes of these cost estimates.
But there was no position on the department on a second repository program, since the program was terminated and with the express intent that the secretary would provide a report between January 1, 2007 and January 1, 2010 and the need for a second repository.



BY MR. JIMENEZ-EKMAN:
Q My question was whether anybody at the department objected to the analytical assumptions made in this document to estimate total system life cycle costs.
MR. AVERBACH: I think he answered the question, so I object.
THE WITNESS: To the extent the document was issued, there must not have been an objection.
BY MR. JIMENEZ-EKMAN:

Q You don't know one way or another?
A If there was an objection, the report would not have been issued.
Q So -- you've seen this before, and as far as you know, this is the final version of this document, correct?
A As far as I know, yes.
Q Now, you've -- in your answers, you've talked a number of times about the assumption regarding a second repository and how that had not been developed at all, et cetera. Each of these tables shows the analytical assumption as you've described it of reaching 3,000 MTU performance by Year 15 of performance, correct?
MR. AVERBACH: Objection; the documents speak for themselves.
THE WITNESS: I would say Year 17 of performance -- Year 17, I believe.
BY MR. JIMENEZ-EKMAN:
Q I think you're right. I apologize.
So with that correction, each of them shows -- each of the tables reflecting the analytical



assumptions that went into the cost estimate in Exhibit 4 shows performance at 400 MTUs for the first two years, 900 MTUs, I think I've counted, for the next nine years, five -- I'm sorry -- 1,800 MTUs for the next five years, and then 3,000 after that; correct?
MR. AVERBACH: Same objection.
THE WITNESS: No. My reading of the tables indicate the first two years are at 400, the next 10 years are at 900. Then the next five years are 1,800, and then the Year 17, I believe is -- starts with 3,000.
BY MR. JIMENEZ-EKMAN:
Q Sorry. It's hard to read the small numbers as one gets older. So I'm not trying to mislead you. Obviously, the government's favorite objection is the document speaks for itself.
My point here is, this document doesn't -- I'm sorry -- this document, which was used to estimate total system life cycle cost, does not contain any analytical basis other than that for the first 17 years, correct?



MR. AVERBACH: Objection; vague and mischaracterizes his testimony.
THE WITNESS: It is what it is. The table -- first three tables are consistent for the first 17 years.
BY MR. JIMENEZ-EKMAN:
Q They're consistent for the first 17 years, and these three cases, Tables A-1 through A-3, were the only analytical assumptions used by the government to prepare Exhibit 4, correct? The only analytical assumptions regarding overall system performance, correct?
A Regarding waste acceptance, yes.
Q Okay. There was no other analytical assumption regarding waste acceptance -- overall waste acceptance made in calculating the total system life cycle cost in Exhibit 4, correct?
A Yes.
MR. AVERBACH: Objection; beyond the scope of the 30(b)(6) notice.
MR. JIMENEZ-EKMAN: Move on to Topic 4.
(Discussion off the record.)



(A brief recess was taken.)
THE WITNESS: If I could, just correct the record. The -- in the meeting with the attorneys last week, Mr. Zabransky was there for a short period of time, and I misidentified the other attorney in the room. It was Sonia Orfield, just to amend the record.
BY MR. JIMENEZ-EKMAN:
Q Okay. Thank you for that.
I realized during the break that I forgot to indicate when I moved on to Topic 3. Topic 3 started with the introduction of Exhibit 4. Topic 3 was the -- quote, "The basis for the acceptance rate contained in the 'Preliminary Estimates of the Total-System Cost For The Restructure Program: An Addendum To The May 1999 Analysis Of The Total System Life Cycle Cost of the Civilian Radioactive Waste Management Program'," end quote.
A I believe that was May 1989, not 1999 as you state.
Q Yes. Thank you.
And now I am ready to move on to Topic 4, which is, quote, "the earliest date on which DOE will

commence acceptance of SNF under the Standard Contract, including without limitation, DOE announcements that the earliest possible date for waste acceptance is 2017," end quote.

Did I read that correctly, Mr. Kouts?

A Yes.

Q What is the department's current position on the earliest date on which it will accept waste under the Standard Contract?

A Well, the department's baseline for the program is still 2017 at this time. However, the director, in testimony to Congress and as recently as last week, had indicated that with an adjustment to the funding profile that was provided in the President's budget, to essentially flatline the program until a construction authorization is available from the Nuclear Regulatory Commission; that the department is in the process of re-baselining the program.

The director provided his perspective in a press conference last week that that date would be approximately 2020, but the department has not



completed its analysis of the re-baselining as of yet.

Q And when you reference to the director, it's the office -- the director of the Office of Civilian Radioactive Waste Management?

A That's correct.

Q Who is the director?

A Edward Sproat.

Q Is it the department's position that the director does not speak for the department? Is that why, in your last answer, you clarified the director's personal view as opposed to the department's view?

MR. AVERBACH: Objection; vague, beyond the scope, calls for a legal conclusion.

THE WITNESS: The director definitely speaks for the department. However, the analytical process to complete the re-baselining of the program has not been completed. He was providing his perspective as to what that re-baselining might be, but the re-baselining has not been completed.

BY MR. JIMENEZ-EKMAN:

Q It's the director's view, however, that the 2017 commencement of waste acceptance is -- I think



I'm quoting here -- clearly out the window, correct?

A Yes.

Q Do you know the department's schedule, if anything, for re-baselining the program, as you describe it?

A Yes. It should be completed this summer.

Q Meaning by Labor Day, which is how we measure summer in Chicago? Is that approximately when it's expected?

A Yes.

Q The department filed, in the last month or two, its application for a license to construct a repository with the NRC, correct?

A It submitted its license application last week on June 3rd.

Q Does that license application contain a projected start date or potential start dates for operation of the repository?

A Yes, it does.

Q And what date or dates does it contain?

A March 2017.

Q You described, Mr. Kouts, Congressional



action on the department's budgetary request -- correct? -- in one of your prior answers?

MR. AVERBACH: Objection.

BY MR. JIMENEZ-EKMAN:

Q I just want to refer you to your prior testimony. I think you described the Congressional action as flatlining, or perhaps it was presidential action, flatlining the program until construction authorization was received?

A Yes. The funding profile for the program that had been submitted to Congress last year showed much higher budgets in order to meet a 2017 date. Given the realities of the inability of the department to receive those kinds of funds, a decision was made to essentially keep the request consistent with last year as this year and the following year at approximately the $500 million level, but that -- but that approach has implications on the ultimate opening date of the repository, which requires a re-baselining of the program.

Q What activities, if the department had the funds, would continue while the NRC licensing process

proceeds? I should say, that will not as a result of the budgetary issues.
A Activities such as completion of the design and initiation of construction of the nearly 300-mile rail access spur to the site, which is approximately a 2 to $3 billion project. The intent was to have the rail access spur available to support repository construction to assist in the movement of heavy materials, aggregate and other materials that would be needed for repository construction. Those types of activities, as well as additional activities at the site that would be precursors to construction were deferred until after the construction authorization was received.
Q And the construction authorization is subject to challenge by intervenors and interested parties; is that right?
A Yes, it is.
Q And, in fact, they have already filed challenges to that, correct?
A They've sent letters but have not filed motions, if you will, to the department's knowledge,



with the Nuclear Regulatory Commission. And the proceedings will not begin formally until and unless the Nuclear Regulatory Commission completes its acceptance review and dockets the license application.
Q And Nevada has sent letters opposing the docketing of that application, correct?
A Yes.
Q The re-baselining of the program that you've described as going on now, that's happened several times over the history of the program, correct?
A Yes.
Q Originally, as specified in the NWPA, the department intended to commence waste acceptance in 1998, correct?
A Correct.
Q And --
MR. AVERBACH: If you're going to ask more questions about what has happened previously, I'm going to object as beyond the scope.
BY MR. JIMENEZ-EKMAN:
Q I think we can move on to Topic 5, which



is, quote, "The type of casks and any other ancillary equipment DOE would have used to accept SNF from Energy Northwest under the Standard Contract had it commenced performance on January 31st, 1998, including without limitation: (a) the capacity of the cask in number of SNF assemblies; (b) the weight of the cask prior to loading; (c) the approximate weight of the casks when fully loaded with SNF assemblies; and (d) whether the cask closure would have been bolted or welded," end quote.
Did I read that correctly?
A Yes.
Q Other than your conversation with Mr. Zabransky, you didn't -- did you do anything else to prepare specifically for this question?
A No.
Q Did you go back and review any historical documents of the department or anything else?
A No.
Q Did the department ever make any determination regarding the type of casks and ancillary equipment it would have used to accept SNF



from Energy Northwest under the Standard Contract if it had begun performance in 1998?
A No. The department undertook no specific analysis on that subject.
Q And that's -- I just want to make sure that the record is clear. My question was as of 1998, and I want to make sure that your answer was also that that analysis had not been taken as of 1998, correct?
A That's correct.
Q So the DOE did not, as of 1998, make a determination as to the capacity of the casks in number of SNF assemblies it would have used at Energy Northwest, correct?
A As I indicated, it did not undertake any analysis, their projections of the types of casks that could have been available beyond the 10-year period. I mean, there's certainly opportunities to conjecture as to what might be available under that time frame and to the extent that would have a great deal to do on the capabilities of the facility.
But assuming it's a rail facility, and assuming it's a BWR facility, a boiling water reactor

facility, you can make projections as to the types of casks and capacities that could have been servicing that particular reactor. It could at least provide a range as to what it might be.

Q The department did not, in fact, do that, correct?

A No, it did not.

Q I think you indicated the phrase opportunity for conjecture?

A Yeah.

Q That's what it would have been, correct?

A Correct.

Q So as to the weight of the casks prior to loading, it would have been conjecture as to what the department would have used beginning in 1998, correct?

A Well, that's a separate question about what we would have been using in 1998.

Q For Energy Northwest?

A For Energy Northwest, according to the department's evaluation, you were not contained in the first 10 years -- Energy Northwest was not contained in the first 10 years of operation. So you would have



to project what casks might be available in the 2008-and-beyond time frame in terms of what -- what transportation, rail transportation casks might be available. The department -- that was beyond the department's planning horizon, certainly.

Q So the department's never done that?

A It's never done a formal analysis, no.

Q Has it done an informal analysis?

A The -- there is knowledge within the department as to the range, if you will, of casks that might have been available in that time frame for a BWR reactor. But did the department plan on it? No. Was it expecting it? No. But certainly the department's aware of what would be available in the industry and could project about the types of casks that could be used at a reactor, if you were shipping in the 2010 -- 2000-and-beyond time frame.

Q It could have done that, but because it was beyond the planning horizon --

A -- it didn't need to.

Q So it did not, in fact, do it?

A No, it do not.



Q Same answer for the approximate weight of the casks when fully loaded with SNF assemblies? That was never determined by the department prior to 1998, correct?

A That's correct.

Q And never analyzed before 1998, correct

A Other than knowledge of what casks would potentially have been available, no.

Q And whether the cask closure that would have been used at the end starting in 1998, that was also never determined or analyzed by the department prior to 1998, correct?

MR. AVERBACH: I'm sorry. Were you attempting to read or paraphrase Subsection D there?

BY MR. JIMENEZ-EKMAN:

Q Do you understand the question, Mr. Kouts?

A Yes. The department --

MR. AVERBACH: I object on the ground that it's vague.

THE WITNESS: The department's expectations would not be a welded closure. It would be a bolted closure, since the department's view is that it would



be providing transportation casks, and no transportation casks that currently exist are welded, to have welded closures. They all have bolted closures.

BY MR. JIMENEZ-EKMAN:

Q So as you sit here today, the expectation would be that it would be bolted closures?

A That's correct.

Q Was that analysis undertaken prior to 1998?

A There was no analysis, since there weren't any welded casks.

Q What about, sir, the center of gravity of casks? Did the department analyze or determine the nature of the center of gravities of casks that would have been used at EN prior to 1998 if the department had begun performance in 1998?

A No.

Q Same question with respect to the diameter of the casks.

A That's correct. The answer is no.

Q I'm going to read you a statement, sir, and I'm going to ask you whether the department agrees or

disagrees with this. Quote, "DOE has not identified the particular cask that it will use to accept SNF from Energy Northwest. DOE's current efforts are focused upon development of the transportation, aging, and disposable canister system specifications and TAD canisters. DOE has not determined whether these tag designs will be usable at EN."

MR. AVERBACH: I'll object on the ground it's beyond the scope of the deposition notice. I'll also object on the grounds it's a compound question.

THE WITNESS: The department's development of the transportation aging and disposal canisters is intended to service as wide an applicability in the industry as possible. It would be the department's expectation that the TADS that are under development, assuming that there was a rail reactor, that these could be handled and would be utilized at the vast majority of reactors that can handle rail casks. And its program is designed to make sure that that eventuality occurs.

BY MR. JIMENEZ-EKMAN:

Q I'm going to take your counsel's advice and



break it up. I'm going to start with the first sentence. Quote, "DOE has not identified the particular casks that it will use to accept SNF from Energy Northwest," end quote. Agree or disagree?

MR. AVERBACH: Objection.

THE WITNESS: The department needs a time frame.

MR. AVERBACH: Excuse me. Objection; vague, beyond the scope of the deposition notice.

THE WITNESS: I -- the department needs for clarity, if you will, to understand the context of your question.

BY MR. JIMENEZ-EKMAN:

Q Well, the DOE -- let me put it this way. It's correct, isn't it, that the DOE has never identified the particular cask that it will use to accept SNF from Energy Northwest?

A Yes.

Q It's also correct that the department has not determined whether the TAD designs will be usable at EN in particular or not, correct?

MR. AVERBACH: Objection; beyond the scope



of the deposition notice.

THE WITNESS: The department has not undertaken that specific analysis. However, the expectation of the department in the development of the TAD, that would be broadly applicable to all utilities who have rail cask capability.

BY MR. JIMENEZ-EKMAN:

Q But the department has not determined one way or another, specifically with respect to Energy Northwest and its particular facilities and physical plant, whether or not the TAD design will work there, correct?

MR. AVERBACH: Objection; asked and answered.

THE WITNESS: Yes.

BY MR. JIMENEZ-EKMAN:

Q Now, the TAD design is not finalized yet, correct?

MR. AVERBACH: Objection; beyond the scope.

THE WITNESS: Correct.

BY MR. JIMENEZ-EKMAN:

Q In fact, the contract for design was



awarded last month, in May 2008, correct?

MR. AVERBACH: Same objection.

THE WITNESS: There were two contracts awarded.

BY MR. JIMENEZ-EKMAN:

Q When were those contracts awarded?

A I don't have the specific date. They were awarded last month.

Q At this time, the department has issued performance standards, correct?

MR. AVERBACH: Objection; vague and beyond the scope. To the extent we're asking -- you're asking about TADS, I interpose a continuing objection.

THE WITNESS: Performance specifications.

BY MR. JIMENEZ-EKMAN:

Q A performance specification differs from a final design, correct?

A Yes.

Q When is it the department's expectation that the final design for the TAD will be completed?

A Applications for TAD-related technology will be submitted to the Nuclear Regulatory Commission

toward the end of next year. At that point in time, the designs would have been mature enough for the NRC to make any judgment as to the safety of them and whether or not they comply with 10 CFR Part 71 and 10 CFR Part 72, along with the equipment associated with it.

Q And at the time that the application is submitted, it then -- the design remains subject to revision based on the result of the NRC proceedings, correct?

MR. AVERBACH: Objection; beyond the scope.

THE WITNESS: Yes.

BY MR. JIMENEZ-EKMAN:

Q Now, is it true that the TAD will likely require additional shielding and have lower capacity than commercially available NPCs?

MR. AVERBACH: Same objection.

THE WITNESS: Lower capacity, yes. Additional shielding, no.

BY MR. JIMENEZ-EKMAN:

Q Is it possible for the department to say, with respect to the casks that it would have used to



pick up fuel from EN if it had started in 1998, whether it's more likely than not that the casks would have held between 56 and 68 assemblies?

MR. AVERBACH: Objection; vague.

THE WITNESS: I'd say the estimate would have been anywhere between -- if the department did estimate, would be anywhere between 44 and 68.

BY MR. JIMENEZ-EKMAN:

Q So if -- based on your current knowledge base, the department's current knowledge base, if the department had engaged in that process, that would have been the department's estimate?

A To the extent that a projection was needed, that essentially was the range of casks that were projected to be available in that general time frame, which related to 44 BWRs or up to 68 BWRs.

Q Is it possible to say, in that time frame in 1998, that it is more likely than not that whatever container used would have been cylindrical?

MR. AVERBACH: Objection; vague.

THE WITNESS: Yeah, I would agree.

BY MR. JIMENEZ-EKMAN:



Q Is it possible for the department to say whether -- if it had commenced performance under the Standard Contract in 1998, whether the cask used to pick up fuel from Energy Northwest would have been between 177 and 208 inches in diameter?

MR. AVERBACH: Calls for speculation.

THE WITNESS: Without more information as to the specifics of the casks that might be have been available, no, the department would not go that far.

BY MR. JIMENEZ-EKMAN:

Q And would it have -- I'm sorry. Would it have been possible to say -- I apologize, Mr. Kouts. My last question should have referred to the length of the cask as opposed to the diameter. Does that change your answer at all?

MR. AVERBACH: Do you need the question read back?

THE WITNESS: No. That's a general -- those are general lengths. It could be a range. It could be less. It could be more. But, you know, around that range I would say.

BY MR. JIMENEZ-EKMAN:



Q Now, I'm going to ask you about diameter. Is it possible for the department to say that it's more likely than not that the cask DOE would have used to pick up spent nuclear fuel from Energy Northwest in 1998 would have had a diameter between 86 and 98 inches?

MR. AVERBACH: Objection; beyond the scope.

THE WITNESS: Again, I answer that the same way I answered the length. Without looking at the specifics of the casks that had the capacities of between 44 and 68 and reviewing them, you know, the department really couldn't say. That also depends on their certificate of certification, if you will, or certificate of compliance within the Nuclear Regulatory Commission and the specific designs of those casks. So to the extent the department had those to review, then they would be able to comment on them.

BY MR. JIMENEZ-EKMAN:

Q Is it possible for the department to say whether it is more likely than not that the cask DOE would have used to pick up spent nuclear fuel, if DOE

had commenced performance in 1998, would have weighed, when loaded, between 208,000 pounds and 277,000 pounds?

MR. AVERBACH: Objection; calls for speculation, lack of foundation.

THE WITNESS: Again, without looking specifically at the certificates of compliance and understanding the specifics of the casks, the department wouldn't speculate. It would probably be in a similar range, but it could be slightly different. I don't know.

BY MR. JIMENEZ-EKMAN:

Q Could have been higher; could have been lower, depending on specifics?

A Correct.

Q And those specifics, because the department did not commence performance in 1998, were never determined, correct?

MR. AVERBACH: Objection; outside the scope.

THE WITNESS: They were never analyzed, that's correct.



BY MR. JIMENEZ-EKMAN:

Q They were never analyzed, and I guess I'm using "determine" as the next step. Because they were never analyzed, they were certainly never determined, correct?

A That's correct.

Q Now, you made a couple of references to the rail cask issue with -- I'm sorry -- a couple of references that the TAD should be usable in a broad swath of plants that can accept rail casks, correct?

A That's correct.

Q Did the department ever make a determination, or has it ever made a determination, about whether it would use a truck or rail cask to accept SNF from Energy Northwest?

MR. AVERBACH: Objection; outside the scope.

THE WITNESS: No, it has not. The department's position would be that the -- they would try to provide the highest capacity cask it had available that could be serviced by that individual reactor in order to minimize the amount of loadings



and also handlings at the repository. So to the extent the department was biased in terms of what it would provide, it would want to provide the highest capacity cask, as well as, probably, the contract holder would like to -- to minimize his operations on the site.

BY MR. JIMENEZ-EKMAN:

Q Understanding that that's the way the department would analyze the issue, in fact, the department never made that determination?

A That's correct.

MR. AVERBACH: I'll interpose an objection, perhaps belatedly. That's beyond the scope of the 30(b)(6) notice.

MR. JIMENEZ-EKMAN: Can we take a quick break?

(A brief recess was taken.)

(Deposition Exhibit No. 5 was marked for identification and attached to the transcript.)

BY MR. JIMENEZ-EKMAN:

Q The court reporter has shown you what's marked as Kouts Rule 30(b)(6) Deposition Exhibit 5.



Have you seen this before, Mr. Kouts?

A No.

Q You see it's titled, quote, "Delivery Commitment Schedule Summary Report, Year 2 Preliminary Draft," end quote. And at the top it reads, quote, "Civilian Radioactive Waste Management System Management and Operating Contractor," end quote.

Did I read those correctly?

A There were no quotes, but, yes.

Q The quotes are for the court reporter.

A Yes, you did.

Q Have you ever seen any final reports that related to the Delivery Commitment Schedule Summary Report for Year 2?

A The department never prepared one.

Q So this is a contractor document?

A That's correct.

Q If you turn to page 15, please, you see under 3.1, shipping mode and cask design?

A Yes.

Q Understanding the department did not prepare this and that you haven't seen it, I'm just

going to ask you whether you agree or disagree with the -- some of the statements in this first paragraph here. Quote --

MR. AVERBACH: Before you do that, if you're going to do it, I would object. Each of those statements are going to be beyond the scope of the 30(b)(6) notice.

BY MR. JIMENEZ-EKMAN:

Q Quote, "The first generic issue is the inability to determine the exact shipping mode and cask design most appropriate for each site," end quote.

Now, I'm drawing your attention to this sentence. You haven't seen this before. Feel free to read whatever else in the exhibit you want, to get context here.

MR. AVERBACH: I'll object -- object on lack of foundation.

BY MR. JIMENEZ-EKMAN:

Q Let me put it this way.

MR. AVERBACH: Calls for speculation.

BY MR. JIMENEZ-EKMAN:



Q Does the department agree that in arriving at a shipping mode and cask design, that a generic issue is the inability to determine the exact shipping mode and cask design most appropriate for each site?

MR. AVERBACH: Objection; lack of foundation, calls for speculation.

THE WITNESS: Can you read the question back.

(The record was read by the reporter.)

MR. AVERBACH: The question is also vague.

THE WITNESS: No.

BY MR. JIMENEZ-EKMAN:

Q So the department's position is that it's possible to determine the exact shipping mode and cask design most appropriate for each site?

MR. AVERBACH: Objection; vague.

THE WITNESS: At the appropriate point in the planning process, the department's view is that there would be enough information to determine shipping mode and general cask design most appropriate for each site in working through the planning process with the contract holders.



BY MR. JIMENEZ-EKMAN:

Q That has not happened yet, correct?

MR. AVERBACH: Is your question confined to your client?

If you're not going to answer me, I'll object, it's vague.

THE WITNESS: You have to be time-specific associated with that statement.

BY MR. JIMENEZ-EKMAN:

Q Okay. As of today, has that process occurred?

MR. AVERBACH: Objection; vague, beyond the scope.

THE WITNESS: The process was initiated two times by the department, and information was provided to the department based on the responses to the DCSs.

BY MR. JIMENEZ-EKMAN:

Q Has the department made determinations as a result of the initiation of those processes?

MR. AVERBACH: Objection; vague. Objection; outside the scope.

THE WITNESS: What determinations?



BY MR. JIMENEZ-EKMAN:

Q Well, about the exact shipping mode and cask design most appropriate for each site. That's what we've been talking about here.

A To the extent at the time the planning process was underway, the department was looking at determining the exact shipping mode and cask design most appropriate for each site based on the planning process. The department is not involved in the planning process at this point.

Q And I guess what I'm asking is: Did those processes reach a conclusion so that a determination was made with respect to each site?

MR. AVERBACH: Same objection; asked and answered.

THE WITNESS: At a determination, no. But information I believe was available to the extent that the department had information as to general shipping mode and cask design associated with various sites that were in the first planning area, if you will.

BY MR. JIMENEZ-EKMAN:

Q Now, if you look lower down on the page,

Mr. Kouts, this is actually -- I'm going to ask you about the carryover sentence from pages 15 to 16, which is, quote, "The exact equipment required at a site cannot be determined until the specific cask system to be utilized has been selected," end quote.

Does the department agree or disagree with that?

MR. AVERBACH: Objection; vague, lack of foundation, outside the scope.

THE WITNESS: I agree with that.

BY MR. JIMENEZ-EKMAN:

Q Move on to Topic 8. Topics 6 and 7 were withdrawn. Topic 8 is "The 1987 Nuclear Waste Policy Amendments Act and its effect on the civilian radioactive waste management program, including without limitation the (a) effect on DOE's plans to site, license, construct geological repository, and (b) effect on DOE's plans to site, license, construct a monitored retrievable storage facility", end quote.

Did I read that one right?

A Yes.

Q Was it the department that made or



initiated the proposal to Congress in 1987 that it be allowed to construct an MRS?

MR. AVERBACH: Objection. Can you repeat that question?

(The record was read by the reporter.)

MR. AVERBACH: I'll let you answer the question. Go ahead.

Objection; it's outside the scope.

You can answer the question, however.

THE WITNESS: Section 141 of the Nuclear Waste Policy Act directed the department to submit a proposal on a monitored retrievable storage facility. So the department submitted the proposal in compliance with Congressional direction.

BY MR. JIMENEZ-EKMAN:

Q Prior to the 1987 amendments, the act did not permit the department to construct an MRS, correct?

MR. AVERBACH: Objection; calls for legal conclusion, outside the scope.

THE WITNESS: The facility was not authorized until the 1987 amendments were passed or



enacted, yes.

BY MR. JIMENEZ-EKMAN:

Q So prior to 1987, the department had no authority to proceed with an MRS, correct?

MR. AVERBACH: Same objection.

THE WITNESS: Correct. The only authority it had was to send a proposal to Congress regarding it.

BY MR. JIMENEZ-EKMAN:

Q Now, at the time that the department submitted the proposal in 1987, the department's planning basis was to commence waste acceptance until -- I'm sorry -- the department's planning basis was to have the repository available starting in 2003, correct?

MR. AVERBACH: Objection; outside the scope.

THE WITNESS: At the time the MRS proposal was submitted to Congress, the planning basis for the first repository was 2003, that's correct.

BY MR. JIMENEZ-EKMAN:

Q And the proposal that -- the MRS proposal,



I should say, that the department submitted to Congress seeking authority to proceed with an MRS was for an MRS with a 15,000 MTU capacity, correct?

A Capacity limited to 15,000 metric tons, yes.

Q And the capacity limit would -- I'm sorry. Start again.

And that that capacity would be available from 1998 to 2003, correct?

MR. AVERBACH: Objection; vague.

THE WITNESS: That capacity limit would be available throughout the life of the facility.

BY MR. JIMENEZ-EKMAN:

Q The proposal that the department made contemplated, at that point, however, that the repository would be operational in 2003, correct?

MR. AVERBACH: Objection; outside the scope.

THE WITNESS: Yes.

BY MR. JIMENEZ-EKMAN:

Q And at that point, it was the department's intention to use the MRS to commence waste acceptance

in 1998 to get to the 2003 date that the repository would be available, correct?

MR. AVERBACH: Same objection.

THE WITNESS: It was certainly the department's intent to have the MRS available in the 1998 time frame to begin waste acceptance. But the MRS facility, as envisioned by the department and as presented in the proposal to Congress, indicated it was an integral part of the overall system, which was doing packaging for the repository. So the MRS life span was to service throughout the life of the first repository in that packaging capability.

What I'm trying to impart to you, that the facility was designed more than just to deal with the first five years until the repository was available. It was an integral part of the system, and it basically, at least the vision at that time, was for the facility to consolidate fuel, to put it in disposal-ready canisters to ship to the repositories so the service of the repository was minimized.

So the operation of the facility was key to the operation of the repository.



BY MR. JIMENEZ-EKMAN:

Q At the time it submitted its proposal that resulted in the 1987 amendments, was it the department's planning basis to use the entire 15,000 MTUs of capacity between 1998 and 2003?

MR. AVERBACH: Outside the scope. I also object to the characterization.

THE WITNESS: No, it was not.

BY MR. JIMENEZ-EKMAN:

Q Did the department have any planning basis as to how much capacity the MRS, if approved at 15,000 MTUs -- I'll start over. I'm sorry.

Did the department have a planning basis as to how much of the MRS's requested 15,000 MTU capacity would be used over the first five years of waste acceptance?

MR. AVERBACH: Objection; vague and outside the scope.

THE WITNESS: I believe there were a variety of documents that the department issued around that time that indicated the acceptance rate of the MRS for those first five years, yes.



BY MR. JIMENEZ-EKMAN:

Q What was that acceptance rate?

A I don't recall. I'd have to review those documents.

Q But it's your recollection, as you sit here, that it was less than the entire 15,000 MTU capacity?

A There were ramp-up rates for the MRS that did not -- that certainly would not have allowed it to have taken 15,000 metric tons in the first five years.

Q Did those ramp-up rates reach a -- I guess we can't call it steady state, because it's not long enough. Did they reach the highest level of 3,000 MTU per year?

A I believe at the end of that time period -- the end of the five years, it did. The ramp-up rates typically were about five years -- four to five years to get up to the 3,000 metric tons per year capability.

Q Ultimately, Congress passed the 1987 Amendments Act, correct?

A Yes.



Q The authorization the department received was only for a 10,000 MRS -- I'm sorry -- 10,000 MTU MRS, correct?

A No.

Q Right. What was the capacity of the MRS that Congress authorized in the 1987 Amendments Act?

MR. AVERBACH: Objection; calls for a legal conclusion.

THE WITNESS: The capacity MRS was not to exceed -- 10,000 metric tons until the first repository was operational and no more than 15,000 tons in total at any time.

BY MR. JIMENEZ-EKMAN:

Q How, if at all, did the department change its plans to site, construct, and license a repository in an MRS after Congress passed the 1987 amendments?

A What time frame are you referring to?

Q From the time immediately after the 1987 amendments were passed for the next, say, year or two.

A For the first year or two after it, the department determined it wasn't going to pursue an MRS based on the -- based on the schedule limitations and

the schedule conditions that were contained in the act. Subsequent to that, in the 1988-'89 time frame, Secretary Watkins basically indicated that the department would seek to have the schedule restrictions removed so that the MRS could be available in the 1998 time frame, in compliance with the direction of Congress and in -- consistent with the signed contracts with utilities.

Q Now, you referred to them as schedule restrictions?

A Schedule conditions.

Q Schedule conditions.

One of them limited the capacity to 10,000 tons until the repository was operational?

A That was not a schedule condition.

Q What were the scheduling conditions that you described?

A The scheduling condition was that the MRS could not begin construction until a construction authorization was received for the first repository.

Q And as we sit here today, no such construction authorization has been received, correct?



A That's correct.

Q Does -- recognizing, Mr. Kouts, that the NRC process we talked about has a number of contingencies in it, does the department have a planning basis for how long the process of obtaining construction authorization for a repository will take?

MR. AVERBACH: Objection as to time frame, vague.

THE WITNESS: The Nuclear Waste Policy Act, I believe Section 114, indicates that the Nuclear Regulatory Commission has three years to reach a decision from the time of submission of a license application, and it can request an additional year if it comes to Congress and provides a rationale for that.

BY MR. JIMENEZ-EKMAN:

Q And that's the department's planning basis?

A That's the department's planning basis.

Q You indicated in your last answer that Secretary Watkins determined that he would attempt to persuade Congress to remove or modify some of the schedule conditions?



A That's correct.

Q Did the Secretary or the department ever propose legislation that would have altered the schedule conditions?

A The department has indicated in its documents that that was to be proposed as part of the President's nuclear -- or energy strategy, I believe, in the 1990 time frame. So the department did pursue that through the legislative package that was provided to the administration on energy issues.

MR. JIMENEZ-EKMAN: Can I have that back.

(The record was read by the reporter.)

BY MR. JIMENEZ-EKMAN:

Q Do you know whether a draft bill or amendment was actually drafted and submitted to the President?

A I can only refer to the fact that the department expressed its intent that it was going to provide that. I do not have a copy of that or whatever the department did provide.

Q Well, putting aside whether you have one here today, do you know whether it actually happened



as opposed from the department expressing its intent to do it?

A The -- I believe the document I'm referring to is the Secretary's 1989 Reassessment Report in which it's clearly stated that it would be provided as part of the President's energy package. And my expectation was that everything in that -- in that document was followed through on by the department. But I do not have the specific document that might have been submitted to the administration for consideration.

Q So your expectation, based on your understanding of the practices of the department, is that something was proposed. But as you sit here, you don't know whether, in fact, something was proposed, correct?

A My expectation was something was proposed. As to how it was addressed by the administration, that's a separate issue.

Q And you don't know, as you sit here, whether, in fact, something was proposed?

A No, I do not. But my expectation would be

that it was.
Q And you don't know what, if anything, the President did once the proposal that you expected was made was given to him, correct?
A That's correct.
Q Did you do anything to investigate that before you came to your deposition today?
A No, I did not.
Q I guess, do you have any knowledge, other than the 1989 document, indicating that a proposal was to be made to the President to be included as part of the President's energy package? Do you have any knowledge, other than that, with respect to what, if anything, happened with the Secretary's desire to have the schedule conditions modified?
A No, I do not.
Q Is there someone who is still with the department who would know more about that?
A I have no idea.
Q We'll move on to Topic 10, which also has the virtue of being the last topic.
Topic 10 is quote, "Efforts to site a



Monitored Retrievable Storage facility between 1989 and 1995, including without limitation, the efforts of the Nuclear Waste Negotiator to site a Monitored Retrievable Storage facility," end quote.
After the 1987 amendments were passed, did the department undertake any independent effort to site an MRS?
A What time frame --
MR. AVERBACH: Objection; vague.
THE WITNESS: -- are you referring to?
BY MR. JIMENEZ-EKMAN:
Q Any time after 1987.
A Most of the department's efforts were focused through the office of the nuclear waste negotiator as directed by Secretary Watkins in the 1989 Reassessment Report of the program. So those were the primary efforts of the department.
Q Do you know whether any effort was made by the department independent of the negotiator to site a facility?
A Well, in point of fact, after the second negotiator stepped down, Secretary O'Leary was



actually the acting nuclear waste negotiator. So to the extent that she provided guidance in that regard -- and I believe there were still some residual grant activities going on, since that office -- the negotiator's office had not sunset it at that time, there were -- through the offices of the Secretary, there were still some efforts, since she was the acting negotiator.
Q So other than however the fact that the Secretary at that point was wearing two hats, one of the secretary and one of the negotiator, there were no independent efforts by the department, independent from the hat of the negotiator, to site a facility, correct?
A After the sunsetting of the negotiator's office, there were still contacts with many of the -- with several of the interested parties who had been working with the office of negotiator. But beyond those informal contacts with certain of those interested parties, if you will, the department essentially did not initiate anything further.
Q You've used the term sunsetting. You're



being colloquial for lapsing of the authority of the negotiator?
A That's correct.
Q When did the authority of the negotiator lapse under the 1987 amendments?
A I believe it was the seven-year sunset. So it was in 1994.
Q And other than the time period that you've described where Secretary O'Leary was the secretary and the acting negotiator, during the existence of the authority, between 1987 and 1994 of the negotiator, the department did not undertake any independent efforts to site a facility, correct?
A That's correct.
Q The -- can you tell me who were the negotiators and what time periods they served?
A The first negotiator was David Leroy, and he served, I believe, until the '92-'93 time frame. I believe --
Q When was Mr. Leroy appointed?
A It was, I believe, in the 1990 time frame. That's my best recollection.

Q Okay.
A Then after he stepped down, there was another -- I believe his last name was Stallings; I don't remember his first name. And he stayed for a period of time and then left. And then for the residual amount of time the negotiator's office was in existence, it was the -- on an acting basis, it was Secretary O'Leary.
Q Do you recall whether Mr. Stallings was -- vacated the office in approximately February of 1995?
A I don't recall specifically.
Q What, if any, involvement -- again, putting aside the two-hat scenario, but what, if any, involvement did the department or its agents have in the activities of the negotiator?
A Well, the department administered a grant program for the negotiator. It was a multiphased program. Phase 1, which were initially feasibility grants, I believe there were 20 of those that were issued by the department. Then there were Phase 2-A grants, which I believe there were four of those, which they were, I believe, about $200,000 each.



And then there were the Phase 2-B grants, where there were two very interested parties who wanted to sign those and pursue, but Congress cut off the funding. Those grants were in the order of 2- to $3 million. But those -- Congress cut off that process through the budgetary process.
Q Did the department provide any additional support or have any additional involvement in the activities of the negotiator?
A Yes, it did. It provided staff to go out and brief interested parties on what an MRS would look like. There were substantial design efforts underway to look at different designs of a facility that might be more acceptable, if you will, to an individual host site.

Our people spent a lot of time working directly with the office to try to give them every -- office of negotiator give them every information -- every bit of information we could in order to facilitate the siting process. So there were considerable staff and monetary resources that were allocated for that process.



Environmental analyses were done of sites, preliminary environmental analyses, those kinds of things, and essentially the facility could be sited anywhere. That's what those environmental analyses demonstrated.
Q Ultimately, the nuclear waste negotiator was not successful in siting an MRS, correct?
A That's correct.
Q Did the negotiator ever identify any voluntary hosts that were willing to permit construction after MRS?
A Absolutely.
Q When you say absolutely, who did the negotiator identify that was willing to host an MRS?
A The -- there were many sites that wanted to host the facility and wanted the construction. The issue was the buy-in of the political leadership of that state, particularly the governor. And in every case, when it was elevated to the governor, the governor said no.

But the simple answer to your question is there were many local governments, as there are today,



who would be willing to host a facility. It's the political structure of the state that typically intervenes and is very difficult to overcome, as history has shown.
Q Focusing on the 1991 time period, the negotiator hadn't identified any municipality where the governor of the state had also indicated a willingness to host the MRS, correct?
A In that time frame, there were several governors who had not said no.
Q Who were those?
A I believe there were State of Utah, State of Wyoming, State of New Mexico. Primarily, there were several of those where Indian tribes were very much interested in hosting the facility. The Mescalero Apaches in New Mexico. The Goshute tribe in Utah, which right now is still considering to have private fuel storage on their site.

It was a private venture in Wyoming. I don't remember the specific locality, but the interactions with the governor's level essentially wanted to allow the studies to be completed,

feasibility studies, if you will, and additional work before they took a policy position in that time frame that you suggested.
Q In 1991?
A That's correct.
Q When was it, Mr. Kouts, that the last of the states said no way?
MR. AVERBACH: The states he just identified?
BY MR. JIMENEZ-EKMAN:
Q Or of any potential state.
A The process didn't really end until the Senate -- specifically there were -- the Congress cut off the funding for the follow-on grants to do substantial additional work to determine the acceptance of it. I believe -- I believe there was a strong indication that the State of Wyoming -- the governor of the State of Wyoming had a very negative attitude on the facility. But I don't believe the State of Utah or the State of New Mexico, at least at the governor's level, had weighed in, because it hadn't gotten to their level.



With the cutoff of the funding, the follow-on funding, that essentially terminated those projects.
Q So the processes terminated before the governors expressed a final view in those instances?
A I believe that was the case, yes, except in the case of Wyoming where there was a very strong view offered by the governor.
Q And do you recall when the funding was terminated by Congress?
A I believe it was in the '93-'94 time frame. I have to go back and look, but it was in that general time frame.
Q Let me ask you now about Indian tribes which you mentioned. Did any of the Indian tribes go beyond the initial grant stage with the negotiator?
A Yes.
Q Which ones?
A It was the Mescalero Apaches and Goshute tribe in Utah. They went to the Phase 2-B stage, and they were also in the Phase 2-A stage. And there were two other projects, but I don't recall specifically



what they were. I know there were four grants issued in the Phase 2-A stage, two of which were the Indian tribes I mentioned earlier.
Q And two of which were the states?
A They were, I think, private -- more private ventures, not Indian tribes.
(Deposition Exhibit No. 6 was marked for identification and attached to the transcript.)
BY MR. JIMENEZ-EKMAN:
Q I know you've seen Exhibit 6 before.
A Yes, I have.
Q I know, because it was used in the Dairyland deposition.
A Yes, it was.
Q And Exhibit 6 is a December 17th, 1992 letter from James D. Watkins, the Secretary of Energy at that time to the chairman of the Committee on Energy and Natural Resources, correct?
A That's correct.
Q Exhibit 6 reflects the position of the department as articulated by the secretary at the time it was sent, correct?



A Well, it represents a new strategy that the secretary would like to pursue or believes the department should pursue. And this was at the end of his tenure as energy secretary, and it was in response to a letter from Senator Johnston that was dated December 10, 1992. So it was a proposed strategy, if you will, by the outgoing Secretary of Energy how to bring about waste acceptance in 1998.
Q When did Mr. Watkins -- when did his tenure end?
A I believe it ended the next month with the seating of the new administration.
Q And at least at the time, Mr. Watkins still spoke for the department, correct?
A Yes, he did.
Q And recognizing that certain aspects of the letter are proposing a new strategy, the factual positions articulated by the secretary in this letter are the factual positions of the department, correct?
MR. AVERBACH: I'll object to the extent any of the factual positions expressed in this letter are beyond any of the subject matters contained in the

30(b)(6) notice. I also object on the ground it's compound. There are numerous positions set forth here.

THE WITNESS: Certainly provided the department's view of the secretary at that time but recognizing that the new administration came in and did not necessarily agree with the view of the outgoing secretary. But it certainly represented it at the time.

BY MR. JIMENEZ-EKMAN:

Q It certainly represented the -- at that time, the department's view, correct?

A Yes, it did.

Q If you look on page 2 under "MRS facility and siting," the second sentence says, "that office," meaning the negotiator, "has not been able to identify a viable candidate site that can be recommended to Congress by June 1993 and that will permit spent fuel received by January 1998 as planned."

MR. AVERBACH: I'm not sure he was with you. I think he was looking on page 2.

THE WITNESS: When you say page 2, I was



looking -- which page 2 are you referring to? This one?

MR. JIMENEZ-EKMAN: The second page. I'm sorry. When it's double-sided -- it's the new policy to save paper, and I think, not so coincidentally, money.

MR. AVERBACH: Where was your sentence?

THE WITNESS: It was -- I found it here in the first paragraph, if you will, of the -- under "MRS facility and siting."

BY MR. JIMENEZ-EKMAN:

Q At the time that was made, that was a true statement that represented the position of the department, correct?

A Certainly represented the position of the secretary.

Q Didn't it also represent the position of the department?

A Secretary speaks for the department. Yes, it does.

Q By transit of properties, Mr. Kouts -- I think that's what it's called -- that represents the



position of the department at the time, correct?

A Yes.

Q And you also indicated that Secretary Watkins, at that time, was proposing a new strategy, which I'll paraphrase here -- but correct me if any particulars -- if I got it wrong -- that essentially involved moving away from the use of an MRS and proposed instead intra-storage at individual utility sites in a standardized container; is that right?

A Not exactly.

Q Can you articulate what you understood the new strategy to be was?

A I believe the secretary's indicating looked at -- that the department had looked at potential alternative actions. But the -- I think the most interesting one was storage facility for spent nuclear fuel at any federal government site or sites should be made available for use by January 1998, and the fact that the department wanted to go a different path, if you will, and try to identify federal sites or candidate federal sites as opposed to go through the office of negotiator.



The standardized container system was, I think, less of a highlight on the siting issue, which is, I believe, the subject of this deposition question. So that was the -- his new approach is to identify federal sites and develop a generic schedule and see if we can move spent fuel. If we would have moved spent fuel to federal sites, by -- for Congress to make a selection of a site, if you will, by the end of 1993.

Q I guess that's what I get if I ask you to characterize a document.

There are a number of proposals in here, correct?

A That's correct.

Q And one of them is to pursue storage on existing federal sites, correct?

A Yes.

Q And another one is to develop a standardized container system that would permit storage at existing utility sites, correct?

A Yes.

MR. AVERBACH: I object to this line as

because it would have essentially had a great deal to do with appropriations of funds over a long period of time.

MR. AVERBACH: Nothing in addition to those questions.

FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. JIMENEZ-EKMAN:

Q The strategy, Mr. Kouts, that you've described as having been concluded by the department -- determined by the department to be the best strategy for approaching Congress, was that adopted by the secretary at the time?

A The secretary was certainly aware of it, yes. He was supportive of it, yes.

Q And is that the strategy that's described in the 1989 document that you're -- that you referred to earlier as your source of knowledge regarding any legislative proposals?

A Not specifically. The document basically indicates that -- I would have to review it. My recollection is that the document indicated that the department's efforts to site an MRS in Tennessee were



unsuccessful and believed that usage of the office of the negotiator was a greater path to success or the best path for success at that time. So that's why the department redirected its efforts to focus on supporting the negotiator, as I testified earlier.

Q I guess I'm trying to -- did -- as I understood your prior testimony, it was that a proposal was intended to be included in the 1990 President's energy package for modification of the scheduling conditions you've described, correct?

A Correct.

Q And you don't know what, if anything, was contained in that proposal or whether it ultimately was, in fact, made, correct?

A Correct.

Q Now, I'm understanding your testimony to be that the department determined that it would be best to wait to make any Congressional proposal until after it had obtained an agreement with a willing host?

A Let me clarify my position. As we moved forward with the fact there was not expected action by Congress, absent a -- absent any specific agreement



for a host or identification of a host state, the strategy evolved, if you will.

Initially, it was to submit it directly to Congress. Then it evolved to working with a negotiator and to include it in the package that the negotiator would submit to Congress for approval, assuming that he found a willing host state. So I think that the -- the approach evolved as we moved forward.

Q Okay. When -- when did -- well, I assume you had some discussions with counsel during the break, correct?

A Not really. The only conversation I had is that counsel wanted to ask me a few questions, and that's the only -- that was the substance of it.

Q And I didn't intend to invade the attorney-client privilege. Don't tell me what the substance of your conversations were. I guess, when did the strategy evolution you described occur?

A It was probably in the '90-'92 time frame, as we were going forward and working with the negotiator, that since the -- the agreement and the



strategy was for the agreement, assuming there was one developed, had to be approved by the Congress, that that was the best vehicle, if you will, for Congress also to address removal of the schedule linkages.

Q So that strategy evolution you said occurred in the '92 to '93 time frame?

A I would say probably '91-'92 time frame. That's my recollection. It was fairly common knowledge known within the program that the strategy was to focus on a negotiated agreement to be approved by Congress that would address the linkages. At the time that the secretary's report was done in 1989, the initial thoughts were, we'll just submit some kind of legislation to Congress to address it.

But again, it evolved as we moved forward and it felt that that was probably the negotiator's agreement, assuming that one was agreed to, that that was the best vehicle, if you will, to get those linkages addressed, since you would have had a specific site. You would have had a monetary deal, negotiated, if you will. You would have had approval of the governor. And at that point in time, the

117

department would also -- and that agreement would also request that the schedule linkages be removed.

Q And there's something about the testimony you've just given, more anything that you discussed with counsel or thought about during the break or anything, does that then refresh your recollection that no proposal was included as part of the government's 1990 energy package, or you are just saying you still don't know what, if anything, happened to that?

A I still have no recollection about that. I have testified in many trials and in depositions that the department strategy to obtain removal of linkages was through a negotiated agreement with the negotiator. I think if you go back and review my transcripts, you'll see I stated this in court on several occasions and in numerous depositions.

Q I understand that. I'm trying to focus on the specific question of what, if anything, was ultimately submitted to Congress.

A Again, I stand by my previous testimony.

Q So this doesn't change that you're not

118

sure --

A No.

Q -- whether or not --

A That's correct.

Q Let me get the whole question out.

You're not sure whether or not the expectation expressed in the 1989 report that you've described was ultimately fulfilled either with a submission to the President or from the President to Congress, correct?

A That's correct.

Q And you describe the evolution, I think, somewhere between '91, '92, maybe '93; you're not sure? It's an evolution, right? So it occurs over a period of time?

A I believe it was -- it was early on in the process with the negotiator, which would probably be in the '91-'92 time frame. That's the best of my recollection, yes.

Q And was this change in strategy -- do you recall whether it was memorialized in any documents?

A I can't recall specifically, but I believe

119

it was. I just don't know what specific documents it might be in there.

MR. AVERBACH: Let's go off the record.

(Discussion off the record.)

(A brief recess was taken.)

(The record was read by the reporter.)

MR. JIMENEZ-EKMAN: We've been off the record for a while, and there's been some colloquy -- some friendly colloquy by counsel attempting to address our position regarding the adequacy of the answers given on this topic. An offer has been made to have something faxed over here, but unfortunately, everybody at the Department of Justice is out to lunch.

Please note the laughter. This was not a -- it was not intended as an insult.

As a result of that, we haven't resolved this issue, and we've agreed, I guess, to disagree and potentially take it up and resolve it later. But other than -- and so for that reason, I'm not closing the Rule 30(b)(6) deposition. And I note it's 13 after noon at this point.

120

Do you reserve signature?

MR. AVERBACH: Yes.

(Whereupon, the signature not having been waived, the deposition concluded at 12:13 p.m.)

* * *

ACKNOWLEDGMENT OF DEPONENT

I, Christopher A. Kouts, do hereby acknowledge I have read and examined the foregoing pages of testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any changes and/or corrections, if any, appear in the attached errata sheet signed by me.

_____ ______________________________

Date Christopher A. Kouts

# LAWRENCE

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
et al., )
)
Plaintiffs, )
vs. ) No. 98-126C
UNITED STATES, )
Defendant. )

DEPOSITION OF MICHAEL J. LAWRENCE, VOLUME I

May 20, 2002
Richland, Washington



APPEARANCES

For the Plaintiff Yankee Atomic Electric, Connecticut Yankee Atomic Power Company Maine Yankee Atomic Power Company:

Robert L. Shapiro
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5879
(202) 682-1639 Fax

For the Defendant:

Heide L. Herrmann
R. Alan Miller
United States
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0290
(202) 514-8624 Fax



APPEARANCES

For the Plaintiff Sacramento Municipal Utility District:

Timothy R. Macdonald
Arnold & Porter
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2334
(303) 832-0428 Fax

For the Plaintiff Commonwealth Edison Company:

Christopher P. Tompkins
Jenner & Block
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350
(312) 840-8786 Fax



APPEARANCES

For the Plaintiff Boston Edison Company, Duke Power, Florida Light & Power, GPU Nuclear, Indiana Michigan Power Company, Northern States Power Company, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District, PSEG Nuclear, LLC:

Daniel S. Herzeld
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7612
(703) 770-7901 Fax

EXAMINATION INDEX


| EXAMINATION BY: | PAGE NO. |
|---|---|
| Mr. Shapiro | 10 |


EXHIBIT INDEX


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 1 | 43-page Draft Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste SN048683 - SN048724. | 67 |
| 2 | 16-page Federal Register Part IV Department of Energy Standard Contract for Disposal of Spent Nuclear Fuel and/or High Level Radioactive Waste DC-107942 - DC-107956. | 91 |
| 3 | 11-page Memorandum dated April 8, 1983 ZAB-001-0893 - ZAB-001-0902. | 101 |




EXHIBIT INDEX


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 4 | 4-page letter to Robert Morgan from Yankee Atomic Electric Company dated March 4, 1983 YDK-026-103054 - YDK-026-103057. | 107 |
| 5 | 6-page letter to Robert Morgan from Northeast Utilities dated March 3, 1983 CDB-021-0180 - CDB-021-0185. | 110 |
| 6 | 87-page letter to Robert Morgan from Edison Electric Institute dated March 7, 1983 YDK-026-103876 - YDK-026-103963. | 114 |
| 7 | 21-page Federal Register Part II Department of Energy Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste DC-107922 - DC-107941. | 131 |




EXHIBIT INDEX


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 8 | 4-page Seminar on the Nuclear Waste Policy Act of 1982 - Its Requirements and Significance May 3-5, 1983 agenda YDK-026-104312 - YDK-026-104315. | 164 |
| 9 | 56-page letter to Gentlemen from Robert M. Rosselli attaching Report on Financing the Disposal of Commercial Spent Nuclear Fuel and Processed High-Level Radioactive Waste PNL028-2010 - PNL028-2064. | 166 |
| 10 | 7-page Memorandum dated September 15, 1983 from Richard H. Williamson Re: Mission Plan Strategy PNL-173-1282 - PNL-173-1288. | 181 |




EXHIBIT INDEX


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 11 | 127-page Draft Civilian Radioactive Waste Management Program Mission Plan Volume I Overview and Current Program Plans December 20, 1983 CTR042-1065 - CTR042-1191. | 194 |
| 12 | 3-page Proceedings of the 1983 Civilian Radioactive Waste Management Information Meeting excerpt dated December 12-15, 1983 SN069588 - SN069600. | 199 |
| 13 | 40-page Statement of Michael J. Lawrence Acting Director Office of Civilian Radioactive Waste Management Department of Energy Before the Subcommittee of Energy Conservation and Power House Committee on Energy and Commerce PNL 173-0225 - PNL 173-0264. | 201 |

EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 14 | 4-page letter to Emmett Moore from Thomas Overcast dated April 26, 1984 Re: MRS Institutional Report PNL 117-3151 - PNL 117-3154. | 205 |
| 15 | 24-page Mission Plan for the Civilian Radioactive Waste Management Program Volume I and II of II Volumes April 1984 (No Bates number.) | 206 |
| 16 | 1-page AP Wire SN044976. | 214 |
| 17 | 14-page Nuclear Waste Fund Fee Adequacy: An Assessment. Second Annual Report July 1984 PA-177336 - PA-177349. | 218 |



BE IT REMEMBERED that on Monday, May 20, 2002, at 1550 George Washington Way, Richland, Washington, at 9:31 a.m., before SHAUNA L. BEACH, CCR, RMR, CRR, Notary Public in and for the State of Washington, appeared MICHAEL J. LAWRENCE, VOLUME I, the witness herein;

WHEREUPON, the following proceedings were had, to wit:

<<<<<< >>>>>>

MICHAEL J. LAWRENCE,having been first duly sworn by the Notary, deposed and testified as follows:

EXAMINATION

BY MR. SHAPIRO:

Q. Would you state your name for the for the record, please.
A. Michael J. Lawrence.
Q. Mr. Lawrence, have you had your deposition taken before?
A. I don't really recall.
Q. Well, let me explain since -- maybe it's been a while, let me explain just very briefly what we're



going to be doing today. Hopefully speed up the process.
It's really basically a conversation. I'll be asking you questions. You'll be answering. It's a bit more formal than a typical conversation. We have a court reporter who is taking down everything that's said.
Counsel for the government may be making objections after I ask questions that may say the word "objection" and say a few other things that's for the written record. But would you -- unless something unusual happens, you will be expected to answer.
If I ask a question that you're confused about, I'm not sure what I'm really asking, please ask me to rephrase it, since it's not helpful to anybody to try to answer a question that's unclear to you.
Do you understand what we're doing today?
A. Yes.
Q. Mr. Lawrence, are you represented by the government counsel today?
A. Yes.
Q. When did you ask for representation by the government?



A. It was about three weeks ago.
Q. And before you asked for representation by the government, did you discuss potentially giving a deposition today with anyone?
A. No.
Q. Have you prepared for your deposition today in any way?
A. Yes.
Q. How have you prepared?
A. I discussed with government lawyers last Thursday, the process.
Q. When you say "the process," what do you mean?
MS. HERRMANN: Objection.
Don't discuss what we talked about in our meeting.
Q. (By Mr. Shapiro) I'm just asking what you mean by "process."
MS. HERRMANN: I'm telling you not to answer.
Q. (By Mr. Shapiro) Did you discuss what -- what the procedures are for a deposition?
MS. HERRMANN: Don't answer the question.
Q. (By Mr. Shapiro) Are you not answering the question?

A. We did not discuss anything of merit in the case. It was the formality of questions and answers. That was all.
Q. And other than your conversation with government counsel, have you discussed potentially testifying with anybody else?
A. No.
Q. Did you review any documents to prepare for testifying today?
A. No.
Q. Let me ask about your background. It might help me understand just where you -- you fit in. Why don't we start from your current position and work backyard.
What is your current position?
A. I'm associate laboratory director for Energy Science & Technology at the Pacific Northwest National Lab.
Q. What do you do as associate director for Energy Science & Technology?
A. I'm responsible for the energy programs, the information science programs, and material science programs that the laboratory conducts for the Department of Energy and industry.
Q. How long have you been in this position?



A. Since April 1st.
Q. Of this year?
A. This year.
Q. In this position, do you do any work for the Office of Civilian Radioactive Waste Management?
A. Not to the best of my knowledge.
Q. How many people come under your supervision as associate director?
A. 620.
Q. That's a lot of people. There may be somebody involved somewhere doing something for Civilian Radioactive Waste Management but you may not be personally aware of?
A. That's correct.
Q. And before April 1st, what was your prior position?
A. I was the manager of Nuclear Safety & Technology at Pacific Northwest National Lab.
Q. When did you start that position?
A. I don't recall the specific date.
Q. Just approximately.
A. January 2001.
Q. What kind of work did you do when you were manager of Nuclear Safety & Technology?
A. In general, I was responsible for our nuclear



technology programs at PNNL.
Q. And in that position, did you do any work for the Office of Civilian Radioactive Waste Management?
A. I don't believe so.
Q. You didn't do any work personally for Civilian Radioactive Waste Management?
A. That's correct.
Q. By the way, I've been using the long name, Office of Civilian Radioactive Waste Management. Are you familiar with the abbreviated acronym RW?
A. Yes.
Q. Can we use the term RW to abbreviate for Office of Civilian Radioactive Waste Management?
A. Yes.
Q. Prior to your position of manager of Nuclear Safety & Technology, what was your position before that?
A. Manager of International Nuclear Programs.
Q. What did you do in that position.
A. I was responsible for our international nuclear work.
Q. What do you mean by "international"? What sort of international nuclear work were you responsible for?
A. We have international nuclear safety programs. We



have projects with international nuclear organizations. I was responsible for developing and carrying out that work.
Q. And when did you start that position as manager of International Nuclear Programs?
A. July 2000.
Q. And prior to July of 2000, what was your position?
A. I worked for British Nuclear Fuels, Limited.
Q. What was your position at British Nuclear Fuels, Limited?
A. I was executive vice-president and manager of the waste treatment plant project.
Q. When did you start that position?
A. April of 1999.
Q. You say manager -- executive vice-president and manager of the waste treatment program. What sort of waste treatment? What sort of waste were you treating?
A. It was to build a treatment plant for the defense wastes that's buried at the Hanford site.
Q. And why did you leave the BNFL position?
A. I had a serious disagreement with the way BNFL was managing -- handling that project and responding to problems on that project.
Q. What sort of disagreement?

A. I -- there was a serious cost overrun, which they would not acknowledge responsibility for, and they would not go along with my recommendation to provide the government with an alternative way of getting the job done.
Q. So you left as a matter of principle?
A. Yes.
Q. When did you start at BNFL?
A. July 1995.
Q. In April of '99, you were executive vice-president and manager of the waste treatment program. What was your position at BNFL before that?
A. Immediately prior to that, I was chief operating officer and executive vice-president of BNFL in Fairfax, Virginia.
Q. When did you start that position?
A. January '98, I believe.
Q. What did you do as chief operating officer and executive vice-president?
A. I was responsible for the execution of a number of the projects that BNFL was conducting for the Department of Energy or private industry.
Q. You referred to BNFL, you were chief operating officer. Was that BNFL United States operations?
A. Yes. It's BNFL, Inc.



Q. And then you reported to someone in Great Britain?
A. No, I reported to the CEO of BNFL, Inc.
Q. Why did you switch positions from chief operating officer to become manager of the waste treatment program?
A. There were two reasons: One, there were, I felt, a very strong influence on our operations in the U.S. by the British parent that made it difficult at times to carry out the programs the way I felt they should be; and two, I really looked for an opportunity to return to the Tri-Cities.
Q. Before you were chief operating officer, what was your prior position?
A. I was president and CEO of Bajarito Scientific Corporation. Would you like me to spell that?
Q. I'm sure the court reporter would.
A. B-a-j-a-r-i-t-o.
Q. What did that company do, when you were president?
A. Bajarito was a subsidiary of BNFL, Inc. It had been acquired in 1995. It was located in Los Alamos, New Mexico. And it developed and provided scientific instrumentation for the classification of nuclear waste.
Q. Scientific instrumentation for the classification of nuclear waste. Can you explain a little bit



more just what that means?
A. The Department of Energy has a number of drums of wastes that are called transuranic wastes, which have to be disposed of in a geologic formation of which the waste isolation pilot plant in Carlsbad, New Mexico, was to be the final disposition site.
In order to be eligible for disposal, the waste had to meet certain criteria and composition. Our system allowed a drum to be measured to determine whether or not it met those criteria.
Q. When did you start that position with Bajarito?
A. July 1995.
Q. And prior to that position, what -- what was your employment?
A. From October 1991 until July 1995, I was counselor for nuclear policy for the United States State Department at the United States Mission to the Vienna International Organizations in Vienna, Austria.
Q. What did you do in that position?
A. I was responsible on a day-to-day basis for the United States representation to the International Atomic Energy Agency, which was located in Vienna.
Q. Did the International Atomic Energy Agency deal



with civilian radioactive waste management issues?
A. Yes.
Q. What sort of issues were you involved in dealing with civilian radioactive waste management, when you were counselor?
A. The IAEA sets very broad, general international guidelines or standards for a number of nuclear activities, including the management, disposal of nuclear waste. And so consequently, I would be -- could be involved in discussing criteria, requirements for waste disposal.
Q. In that position, as counselor for nuclear policy at the State Department, did you have a relationship with RW?
A. No.
Q. So there was no attempt at the State Department to make sure that its policies were consistent with what RW was doing?
A. Not that I ever saw.
Q. And prior to that position, as counselor for nuclear policy, what did you do?
A. I was director of waste operations for Chem Nuclear Environmental Services in Golden, Colorado.
Q. And what did you do as director of waste

operations for Chem Nuclear?
A. Tried to develop business with either government or industry for the management, storage, treatment, or disposal of various types of nuclear wastes.
Q. What was Chem's capability? What sort of business were you trying to develop for them?
A. We were attempting to have the Department of Energy look at a concept called privatization, where we would actually build -- finance and build and provide services to treat or manage nuclear waste in return for a fixed unit price by the government.
Q. Why were you trying to develop this business through the Department of Energy?
A. Because the government had a number of obligations to meet in the cleanup of their sites. And their budgets were insufficient to allow them to meet all their requirements.
Q. You referred to the government having obligations to clean up its own sites. Did you ever try to develop business through RW?
A. No.
Q. Why did you leave the Chem Nuclear position?
A. I was offered a diplomatic post in Vienna,



Austria.
Q. And that was attractive?
A. Yes.
Q. Why did you leave the diplomatic post in Austria?
A. Four years was enough time.
Q. You worked your way back to beautiful Tri-Cities?
A. I went to Sante Fe.
Q. Before Chem Nuclear, where did you work?
A. I was the manager of the Richland Operations Office for the Department of Energy in Richland, Washington.
Q. So I'm going to get my dates mixed up. When did you start with the Chem Nuclear position?
A. August 1991 -- 1990. I'm sorry. August 1990.
Q. And when did you become manager of the DOE Richland operations office?
A. June 1984.
Q. What did you do as manager of Richland operations office?
A. I was responsible for all the operations and programs associated with the Hanford site.
Q. Did any of those programs have a relationship to RW?
A. Yes.
Q. Which ones?



A. Up until 1987 -- I forget the month -- Hanford was one of the candidate sites for geological repository for high-level waste and spent fuel disposal for RW.
Q. Other than the connection of Hanford being a candidate site for a geological repository, did your work as manager of the Richland operations office have any other connections to RW?
A. No.
Q. When Hanford was a candidate site, what sort of work did you do involving Hanford's location as a geological repository?
A. Through an assistant manager and divisions and branches under that assistant manager, we were responsible for the characterization of the basalt under the Hanford site to determine if it qualified to be either a finalist or the repository or to be the repository or to disqualify it if the data did not support its selection.
Q. And why did that work stop?
A. Congress in '87 amended the Nuclear Waste Policy Act to focus all attention on Yucca Mountain, and to terminate the other two programs, including the one at Hanford and the one at Death Smith County,



within 90 days.
Q. About how many people did you supervise when you were manager of the Richland operations office?
A. There were about 340 Feds and anywhere between 12,500 to 15,000 contract employees.
Q. Why did you leave that position as manager of the Richland operations office?
A. I was ready for something different and I also felt that the Secretary of Energy, who I reported to, wanted all decisions to be made in Washington, but left the managers in the field responsible for those decisions.
Q. So you were left with the consequences of the decisions that you couldn't make?
A. That's correct.
Q. Who was the DOE Secretary at that time?
A. Admiral James Watkins.
Q. Prior to your work at the -- as manager of the Richland operations office, what was your position before that?
A. I was -- and I'm not sure if the title "acting" was in there or not -- but I was the director of the Nuclear Waste Policy Act Implementation Office at the Department of Energy in Washington, D.C.
Q. The Nuclear Waste Policy Act Implementation

Office, that was the precursor of RW?
A. Correct.
Q. Why did you leave that position as acting director of that program?
A. Two reasons: One, the Nuclear Waste Policy Act required a political appointee to be the director of RW, and one was found and accepted; two, the manager of the Richland operations office was a job that I very much wanted.
Q. Why did you want that job?
A. It would give me the responsibility for carrying out and fulfilling a number of nuclear and scientific programs that were of great interest and challenging.
Q. And how long were you director or acting director of the Nuclear Waste Policy Act Implementation Office?
A. From January of '84 to June of '84.
Q. And prior to January of '84 -- January of '84, what was your position?
A. I was the deputy director of the Nuclear Waste Policy Act Implementation Office and the -- I think it was director of spent fuel storage and transportation programs in the Nuclear Waste Policy Act Implementation Office.



Q. When did you start that position?
A. That position started in January of '83.
Q. And before that position, what did you do?
A. I was deputy director of the DOE program for geologic storage and disposal, which existed prior to the passage of the Nuclear Waste Policy Act. And I don't recall the name of that organization.
Q. When did you start that position?
A. I really don't recall. My guess would be late 1980, early 1981.
Q. What did you do in that position?
A. As deputy director, I was responsible for overseeing the -- the implementation of the programs that were conducted in that organization and acting for the director when he was not there.
Q. Who was the director of that program? Do you recall?
A. His name was Frank Coffman.
Q. What sorts of program does that office conduct?
A. It was looking for geologic repository and providing or monitoring the storage of spent fuel at commercial plants around the country.
Q. Why did -- what was your understanding as to why DOE had a program to look for a geological repository?



MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: The Atomic Energy Commission and its successor agencies had a statutory responsibility for the permanent disposal of nuclear waste.
Q. (By Mr. Shapiro) And these programs were an effort to meet that statutory obligation?
MS. HERRMANN: Same objections.
THE WITNESS: It was my understanding.
Q. (By Mr. Shapiro) And besides looking for a geological repository, what other programs was that office engaged in?
A. That was its primary responsibility.
Q. Were there any other responsibilities?
A. Not that I recall.
Q. You mentioned monitoring the storage of spent fuel at commercial plants. Why was that office monitoring the storage of spent fuel at commercial plants?
A. In the mid 1970s, when commercial efforts to provide reprocessing and recycle services for commercial nuclear plants were not available, because of either delays in facilities or facilities that didn't work, the ERDA and



subsequently DOE monitored that situation to determine if any action or activities by the government were necessary or warranted to avert premature -- premature shutdown of nuclear plants.
Q. What is -- what did ERDA stand for?
A. Energy Research & Development Administration.
Q. And that administration was merged into DOE?
A. Correct.
Q. And you referred to reprocessing not being available. Was that also due in part to President Carter's administration's policy against domestic reprocessing?
A. Not initially.
Q. Initially private industry was doing well enough on its own?
A. That's correct.
Q. Why was ERDA concerned that the commercial plants be able to continue operating? Commercial plants, why was that a concern of ERDAs?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: The Energy Research & Development Administration was interested in the energy supply of the country. And if nuclear plants were to shut down due to lack of storage space, that would affect the energy supply of the

country. So they had an interest in the energy supply to the country and the ability of the plants to operate.
Q. (By Mr. Shapiro) Did you ever have a sense that ERDA, or subsequently DOE, felt an obligation to maintain a situation such that civilian generation of electricity through nuclear power would continue to be viable?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: Can you rephrase that?
Q. (By Mr. Shapiro) Did you ever have a sense that ERDA felt an obligation to the civilian nuclear electric generation industry to maintain its viability by providing a -- some sort of an outlet for the nuclear waste?
MS. HERRMANN: Same objection.
THE WITNESS: There was never, in my mind, a legal obligation to do so at that point in time.
Q. (By Mr. Shapiro) Was there any other sort of obligation, a moral obligation?
MS. HERRMANN: Objection. Vague. Foundation.
THE WITNESS: No.
Q. (By Mr. Shapiro) You said that -- that office



monitored whether or not current nuclear power plants might have to shut down. How -- how -- how did that office do that?
A. We employed a number of -- of different approaches, but the most useful and accurate means was we contracted with Nuclear Assurance Corporation of Georgia, which maintained records on storage space and plans for utilities and we would work from that data.
Q. Nuclear Assurance Corp., that's also known by the acronym NAC?
A. NAC.
Q. And the data that NAC collected was the data on how much waste the plants were discharging from the reactors?
A. Among other things.
Q. What other things -- what other sorts of information was NAC collecting?
A. How much storage space they had, what their expansion plans were, what their capabilities were to compact or consolidate their fuel to provide for more storage, among other things.
Q. And your office collected that data and analyzed it to determine when various nuclear plants might run out of space?



A. Correct.
Q. Do you have any recollection of what that analysis was showing back in the -- in the 1980 time frame?
MS. HERRMANN: Objection. Vague.
THE WITNESS: In general, we always -- it always appeared that three, four, five -- some period of time in the future, plants would run out of storage space and consequently subsequently shut down. And in reality, each year the utilities seemed to find a way to provide more storage space or to adjust their operation, that that date always got pushed out into the future.
Q. (By Mr. Shapiro) How were utilities adding more storage space?
A. One very prevalent way was putting in racks that allowed fuel to be stored more compactly.
Q. That's a process that's also known as reraking?
A. Correct. The other was fuel consolidation, where the fuel rods would be taken out of their assembly configuration and packed -- the rods packed much closer together in -- in tubes or canisters. There was also double raking, two tiers within a pool. A number of ways of handling that.
Q. Was fuel consolidation a significant effort by utilities? Let me rephrase that.



How many utilities do you recall were engaged in fuel consolidation?
A. I don't recall. I'd say a majority.
Q. Do you know if fuel consolidation continued to be a significant contributor to adding to utilities' capability to store spent fuel?
You're not understanding the question?
A. Because you -- you didn't give me a time frame.
Q. After 1980.
A. My recollection was it became somewhat routine.
Q. You said the utilities managed to deal with limited capacity both by adding to capacity and adjusting their operations. How did they adjust their operations to deal with limited capacity to store spent fuel?
A. Longer operating cycles.
Q. Is that also referred to as burning up the fuel to a higher level --
A. Higher burn-up.
Q. And in higher burn-up, you're basically taking the same fuel and you're using it for a longer period of time before you put in another round of fresh fuel?
A. Correct.
Q. What was your personal role as deputy director of

that office, the office that dealt with the geologic repositories and that also monitored the storage situation at civilian plants?
A. To act for the director when he wasn't there and monitor the progress of the programs for him.
Q. You say, act for the director when he wasn't there. What did that entail?
A. I would consider those typical deputy responsibilities.
Q. How long were you in that position?
A. I believe it was for a little over a year.
Q. And what did you do prior to that position?
A. For a brief period of time, I had responsibility for trying to -- looking at impediments to commercial reprocessing, to determine if commercial reprocessing services could be once again provided for the commercial nuclear industry.
Q. What office was that position in?
A. I don't recall.
Q. And what did you do prior to that position?
A. I was the director of Spent -- Spent Fuel Storage & Transport in -- again, I just -- another waste organization in DOE.
Q. And what did you do as director of Spent Fuel



Storage & Transport?
A. Monitored the storage situation and the ability of the transport industry to move spent fuel and waste around the country.
Q. And when did you start in that position?
A. My best recollection is '87.
Q. '77?
A. I'm sorry. '77.
Q. You said in that position as director of Spent Fuel Storage & Transportation you -- you monitored the spent fuel storage situation. Was that the same sort of monitoring activity that -- that the geologic repository office was involved in a few years later, or was it different monitoring?
A. Could you repeat the question?
Q. You said that when you were director of Spent Fuel Storage & Transportation, that office monitored the spent fuel storage situation. I'm asking you to compare that monitoring activity to the monitoring activity you described a little bit earlier that went on in the office in which you were the deputy director that dealt primarily with geologic repositories.
A. Yes.
Q. Same activity? Did the responsibility --



A. Are you referring to the Nuclear Waste Policy Act Implementation Office deputy director role?
Q. No, the one that you described prior to that. I don't have the exact title in my notes, but it -- it's deputy director of geologic repositories, which you said was a primary function of that office, but it also did some monitoring --
A. Yeah. No, they were different.
Q. Okay. How were they different?
A. I did not focus on storage and transportation in the latter position.
Q. So when you describe some of the monitoring that that office did, that was done by people other than yourself?
A. To the best of my recollection.
Q. But the monitoring itself actually -- you described what the Geologic Repository Office did, was collect data from NAC and analyze it and figure out when plants might be running out of room. Is that the same sort of work that the Spent Fuel Storage & Transportation Office was engaged in?
A. Yes.
Q. Did that responsibility at some point transition from the Spent Fuel Storage & Transportation



Office to -- to the Geologic Repository Office or --
A. It was reorganized into it.
Q. But you had more of a direct role in that work, when you were director of Spent Fuel Storage & Transportation?
A. Correct.
Q. What was your role?
A. To monitor the storage situation in utilities and determine what their plans and needs would be and if they would impact their operations.
Q. What did you understand the purpose of that work to be?
A. To determine if utilities were going to have to shut down their plants early and, if so, to consider if the United States Government should do anything about it.
Q. And in that position, then, did you prepare -- prepare reports for policy makers on those issues?
A. Yes.
Q. You said earlier that the studies tended to show that almost whenever you picked a time, four, five years in the future, some plants were going to run out of room. Did that analysis cause you to -- to recommend some action to policy makers at

Department of Energy?
A. We had under consideration the construction of a facility for the interim storage of spent fuel. That name of such a facility goes by a number of different names, such as the away from reactor, or AFR, storage facility, to a monitored retrievable, or MRS, facility, to an -- to an interim spent fuel storage facility, ISFSF. But they were all fundamentally the same facility.
Q. When you say there was consideration of such a facility, who was considering the facility?
A. I was. And when I would make reports about projected needs, the people that I was providing that to would be considering it. But there was never a decision to actually provide that capability, which would have required legislation and the approval of Congress.
Q. Who were you reporting to when you were director of Spent Fuel Storage & Transportation?
A. To the -- the director of the overall waste management program.
Q. Now, you said you were considering some sort of an interim storage facility. Did you ever actually recommend that the government move forward with such a facility?



A. I don't recall.
Q. Did the individual that you report to or others in -- in more policy-making positions, did they oppose such a facility?
A. No.
Q. You weren't given instructions, you know, Don't recommend a facility because we're not going to move forward with that?
A. No.
Q. What's your recollection as to why nothing happened with those considerations that a facility -- of an interim storage facility?
A. A compelling case couldn't be made that the facility was needed, nor that it was a government responsibility to do so.
Q. When you say a compelling case couldn't be made that a facility was needed, why was that, if the analysis was showing that plants might have to shut down in four or five years?
A. Because the next year, it was still four or five years out.
Q. You also said a compelling case couldn't be made that it was a Federal responsibility to do this. Did you actually look at whether or not this was a Federal obligation?



A. My recollection was quite clear that it was not a government obligation.
Q. Was the issue whether or not it was a government obligation, was that in fact an issue that was considered by your office?
A. What was considered by my office was that in the -- should we seek to make it a Federal responsibility in order to ensure adequate electricity from the nuclear plants.
Q. And your office recommended that DOE not seek to make the interim spent fuel storage a Federal responsibility?
A. I don't really recall. It's too long ago.
Q. When you were looking at plans for some of these interim storage facilities, do you have any recollection as to what they were supposed to do?
A. They would serve as a centralized storage facility, such that the overflows which would be occurring at a number of utilities could be accommodated in one facility.
Q. And how would those facilities store the spent fuel?
A. They were storing it in their reactor storage basins, which, you know -- which we had monitored and looked at variability to do so.



Q. My question wasn't -- the -- the theoretical interim storage facility that you were considering, how would that facility have stored the spent fuel?
A. There were various techniques, depending upon the age of the fuel. You could have -- initially we looked at storage pools or basins. Subsequently, in looking at fuel that had been cooled for a longer period of time, we looked at dry cask storage or dry vault storage.
Q. Is there a difference between dry cask storage and dry vault storage?
A. Absolutely.
Q. What's the difference?
A. Casks are -- have smaller capacity and are primarily passively cooled; whereas, a vault would be a large building in which fuel elements or consolidated fuel elements would be put in sleeves with a central cooling capability.
Q. About how much spent fuel were you considering storing at one of these facilities?
A. I don't recall.
Q. Do you have any recollection on an annual basis how much spent fuel one of these facilities might receive?

EXAMINATION (Continuing)
BY MR. SHAPIRO:
Q. Mr. Lawrence, as you might imagine, the one part that we spent the least amount of time on this morning as we went over your background, and we'll spend more time on it the rest of the day, is the time when you worked for RW and its predecessor, the Nuclear Waste Policy Act Implementation Office.
How did you come to work for that office?
A. In December of 1982, Congress passed the Nuclear Waste Policy Act of 1982. It laid out a number of activities which the Department of Energy needed to undertake to implement the Act. The Department had just received a new -- a new Secretary of Energy whose name was Don Hodel. And he requested that the manager of the Savannah River plant, Bob Morgan, come up from Savannah River on a temporary assignment to begin the implementation of the Act. And Bob Morgan, who I knew and had worked with previously, and who knew that I was deputy director of the waste program at that time, requested that I come down and be his deputy and to also cover the responsibilities which I had had previously on Spent Fuel Storage & Transportation.



Q. Did the Nuclear Waste Policy Act Implementation Office, did that basically take over the Geologic Repository Office?
A. Yes.
Q. Do you have any sense as to why the director of the Geologic Office, why that individual did not become director of the Nuclear Waste Policy Act Implementation Office?
MS. HERRMANN: Objection. Speculation.
THE WITNESS: The simple answer is he wasn't asked to by the Secretary of Energy.
Q. (By Mr. Shapiro) You don't have any sense as to why he wasn't asked?
MS. HERRMANN: Same objection.
THE WITNESS: That would purely be speculation on my part.
Q. (By Mr. Shapiro) You said you knew Mr. Morgan before December '82. How did you know Mr. Morgan?
A. In one of those previous jobs, when I was the -- I think I used the term director of Spent Fuel Storage & Transport -- it might have been assistant director, I'm not sure -- but he was -- he was also, like, an accounting director of the whole program. And he had asked me -- and he had actually given me that responsibility for -- for



Spent Fuel Storage & Transport previously, back in the roughly '77 time frame. So we had worked together.
Q. Nuclear Waste Policy Act became law January 7th, 1983. I'll represent that to you. Do you have any recollection as to when you did first become involved, then, with the -- the Nuclear Waste Policy Act Implementation Office? Was it before then or was there some time prior to that when you knew it was going to pass and so DOE was getting its act together?
A. Prior to its passage by Congress, which was December, the President didn't sign it until January, the office that I was deputy director of was very involved in monitoring and supporting the legislative process. I was not directly involved in that. But during staff meetings or other activities, we'd conduct -- you know, the -- the progress of that bill and the passage of that bill was something that was generally discussed.
Q. You said that -- that the Geologic Repository Office was involved in -- in monitoring and supporting. What did the Office do to support the Nuclear Waste Policy Act legislation?
A. Well, with any piece of legislation, there are



amendments and provisions, and basically you have members of Congress, or more particularly their staffs, trying to spell out how something should work. They would often ask the people who had the responsibility for doing that work, would this work or that work and how would this work. And consequently, through our Legislative Affairs Office, we would often discuss with them the pros and cons of the various approaches they were considering. Not me personally, but others within that group.
Q. Do you recall who was involved in that effort?
A. The director of -- Mr. Coffman was involved.
Q. And besides Mr. Coffman, do you recall anyone else who was involved in supporting the NWPA legislation effort?
A. Not in any major way.
Q. You said that you were not personally involved in -- in that effort. Did you have any role in -- in the NWPA legislative effort at all?
MS. HERRMANN: Objection. Vague.
THE WITNESS: I indicated previously that in staff meetings, certain things would be discussed and I could give my opinion. But it was never direct or specific or -- direct or specific.

Q. (By Mr. Shapiro) Do you remember any issues that came up at these meetings?
A. No.
Q. The Regan Administration, to your recollection, was generally supporting the NWPA?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: The administration very much wanted to see the Nuclear Waste Policy Act passed.
Q. (By Mr. Shapiro) What was your understanding as to why the administration wanted the Act passed?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: I previously had indicated that through the Atomic Energy Act, the -- the Department had a -- had a responsibility to provide for the permanent disposal of nuclear waste. The Nuclear Waste Policy Act provided a congressionally approved process to do so. And it was clearly felt that a process set in law was far preferable to an ad hoc program.
Q. (By Mr. Shapiro) What do you mean by an ad hoc program?
A. One which does not specifically have a legal basis for the actions and steps you are taking.



Q. Let me try to rephrase to make sure I understand.
So the administration liked the NWPA because it provided a specific congressionally authorized, mandated path to meet the obligations that were otherwise set out in the Atomic Energy Act, but for which there was no particular mechanism for -- for achieving those responsibilities?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: With the exception of the term "liked." I would have said was supportive of the act. I would say that's -- that characterization is -- is accurate.
Q. (By Mr. Shapiro) Was there any particular about the pathway prescribed by the NWPA that was supported by the administration or was it just, Gee, this is -- this is a solution; let's go with it?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: Difficult to answer in a specific sense. But one thing that is very much timely is the process by which the Department could recommend a site and a state object to it and have Congress then override or deal with that



was -- was a provision of the Act that we felt was quite good.
Q. (By Mr. Shapiro) What did you like about that provision of the Act?
A. It allowed national needs and priorities to be considered in relation to individual state or local objections.
Q. Were there any other particular facets of the NWPA that -- that were deemed attractive by the administration when it was being considered?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: The overall process of going from a large group of sites, to a -- to a narrowing down, to a selection of a specific site, with times and dates associated with them were felt as a useful way to lay out a program with an end point, which if it could be met was our intention to try to meet that.
Q. (By Mr. Shapiro) What about the funding mechanism for the -- for the program? Did the administration have any particular view on the -- on the advisability of the funding mechanism?
MS. HERRMANN: Same objections.
THE WITNESS: Well, it was generally



considered that the storage and disposal of the waste was a utility responsibility. And therefore, the beneficiaries of the nuclear power and energy should pay for that service. And the 1.0 mill per kilowatt fee was considered to be an equitable and fair way to provide the money necessary to provide the services.
Q. (By Mr. Shapiro) Let me go to the time when Mr. Morgan asked you to -- to work for the NWPA Project Office. And do you recall, again, when -- when that might have been?
A. Well, my -- it was the -- it was late in the week preceding my first day on the job. And my first day on the job was the day after the Red Skins won the Super Bowl. So I think that's -- I think that was the 30th of January of 1983.
Q. Before starting in the job as -- and you started the job as deputy director with Mr. Morgan?
A. Correct.
Q. Before starting that position, what did Mr. Morgan tell you as to how -- what his strategy was for -- for the Office?
A. There was no discussion before that.
Q. Did you have discussions with anyone other than Mr. Morgan, as to what the strategy was for the

program?
A. No.
Q. Who did Mr. Morgan report to?
A. The Secretary of Energy as manager of the Savannah River Operations Office. And subsequently as the director of the Nuclear Waste Policy Act Implementation Office.
Q. Was the Secretary of Energy the day-to-day report? Was there anybody who you dealt with on an intermediate basis, other than the Secretary?
A. I dealt with Mr. Morgan. Who Mr. Morgan dealt with, I'm not sure. A number, though, within the Department: Legal, Congressional, the Secretary's Office, per se.
Q. When you started with the NWPA Project Office in around January 30th of 1983, how many people were there? How large of an office are we talking about?
A. The Secretary had transferred into what was the previous repository program. Some people from policy and planning. But I can't recall the -- the number of people all total.
Q. Once you got there in January 30th, how was the Office organized?
A. There was -- there was myself and Mr. Morgan and



there were several administrative or staff support people. And there were basically three groups. Whether they're divisions or something, I don't recall. There was the geologic repository group, there was the spent fuel storage and transportation group, and there was a business administration, budgeting-type group.
Q. The spent fuel storage and transportation group, was that group doing the same work that had previously been done by the office that you were director of -- the same spent fuel storage and transportation issues?
A. It was pretty much the same -- the same people.
Q. After you got to the NWPA implementation office in January -- January of 1983, what did you understand the top priorities of the Office to be?
A. To provide a geologic repository beginning in 1998.
Q. Were there any other priorities?
A. There were a number -- well, it was -- it was fulfilling all of the requirements of the Act, leading to that.
Q. What about kind of in the immediate time frame after -- after January of '83? What were the -- do you recall what -- what immediately had to be



done?
A. Two things, which I recall -- among what I'm sure were many -- was the development of a Mission Plan and the establishment and signing of a contract with utilities such that the funds necessary for the program could begin to be collected.
Q. Let me start with the -- with the second of those topics, the establishment of the contract.
What -- what did you understand the need to be with -- to establish a contract? Was that just to get the money? Or was there -- was there more to it than that?
A. Well, it was to establish our -- our responsibilities and utilities' responsibilities.
Q. What was your role in establishing the contract?
A. I was not all that involved in it.
Q. Who was involved in establishing the contract?
A. Within the Nuclear Waste Policy Act Office, Mr. Morgan delegated that responsibility to Mr. Rosselli, who was in the business administration or whatever that grouping was, who also was working very closely with the Legal Department at the Department of Energy and -- and Contracts.
Q. There was a separate Contracts Office outside of the Nuclear Waste Policy Act Implementation



Office?
A. There is. And -- and I -- I would speculate that the Department of Energy's professionals were assisting the offices of the -- the Nuclear Waste Policy Act Implementation Office team in establishing that contract, because it -- quite frankly, it wasn't something that we had -- had had experience in.
Q. You said you had a somewhat limited role. Do you remember more precisely what was your role as deputy director of the Office in terms of development of the contract?
A. I would give my opinions when issues would come up. I would support Mr. Morgan in any way that he would ask me. We would discuss options and approaches in general. I also had the responsibility for -- I shouldn't say I had the responsibility. I took the opportunity about every two months to go up on Capitol Hill and meet with either the members or their staff who had potential sites in their district, to brief them or talk to them about where the program was.
Q. Let me focus on that -- the concept of a contract for -- what was your understanding as to the significance of the fact that the NWPA mandated

that utilities and the Department of Energy enter into contracts?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: Contract was necessary to collect the fee, and would allow us to establish contractual commitments in terms of when services would begin to be available.
Q. (By Mr. Shapiro) These would be contractual commitments on the part of the Department of Energy to make the services available?
MS. HERRMANN: Same objection.
THE WITNESS: Commitments as to when services would begin to be available.
Q. (By Mr. Shapiro) What do you mean by "begin to be available"?
A. Well, the Act called for us to begin accepting nuclear waste in 1998, so our goal was to have a facility to begin accepting nuclear waste in 1998. We knew then that the rate and the ability to accept waste then or whenever it became available would be constrained. So consequently, we wanted to provide as much information as we could to utilities to assist them in their planning process so they could ensure that they could keep their



fuel up until that time, until when they could eventually ship to a repository, whenever that might be.
Q. And so I'm sure I understand or try to make clear my understanding what you've just said: So that because DOE understood that the rate at which it would accept spent fuel and even its ability to accept spent fuel might be constrained, part of what it wanted to put into the contract was a mechanism to provide utilities with as much information as possible about those issues?
MS. HERRMANN: Objection to the extent it mischaracterizes prior testimony.
THE WITNESS: I will -- I wouldn't agree with that.
Q. (By Mr. Shapiro) Okay.
A. At the time we were signing or proposing and signing contracts, we were very, very early in the process. We did not have a facility designed and subsequently -- consequently, we also did not know what our ability to accept waste and fuel would be. So we knew there would be information that the utilities would like but we were in no position to provide. Nevertheless, to get general obligations down, begin accepting in '98, being



the primary one, we needed to sign contracts which would allow the utilities to start putting the 1.0 mill per kilowatt hour into the Waste Fund.
Q. So DOE understood that the utilities would have liked the contracts to have firm terms as far as the -- the rate of spent fuel acceptance after 1998, but DOE just didn't have a means of specifying something at that time, at the beginning of 1983?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: That's an accurate representation.
Q. (By Mr. Shapiro) And because DOE didn't have a means of specifying something in 1983, you left that -- that term in the contract open?
A. I don't recall how that was covered in the contract, per se. I do recall in either general discussions with the utilities or when they would talk to us, we made it clear to them that we certainly wouldn't be able to accept everything that they wanted to ship to us right away, but that we would try to provide information which would help them get a better feel for where -- where and when they might be able to ship as the program developed.



Q. And when you say it was clear that DOE wouldn't be able to take everything right away, you meant right away, in 1998?
A. Correct. Or ever. Couldn't take everything -- there were physical constraints with how much you could accept in any given year.
Q. Why did -- let me ask a different question.
How did you know that utilities would have wanted DOE to accept more spent fuel in any given year, certainly by 1998, than was going to be your capability to do so?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: In our discussions with utilities, it was clear that they had a liability for the spent fuel while it remained in their possession. If they could transfer that spent fuel to us, and therefore this responsibility and liability for that fuel, then it would rest with the government. It was in their best interest to get rid of as -- as much of it as they could, as quickly as they could.
Q. (By Mr. Shapiro) Let me ask you a few questions about the process that -- that DOE took to create this contract. Do you recall that it was done through a -- a regulatory rule-making procedure?

MS. HERRMANN: Objection. Foundation.
THE WITNESS: I really don't recall.
Q. (By Mr. Shapiro) Do you recall that DOE issued something called a Notice of Proposed Rule Making with a draft contract?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: I don't specifically recall.
Q. (By Mr. Shapiro) But you have a general recollection?
A. The -- the term you just used sounds -- sounds vaguely familiar in my head, but I don't have any recollection. It was too long ago.
Q. You don't have any recollection, then, as to why that mechanism was used as opposed to some other mechanism to draft the contract?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: I don't recall specifically. It may have been reported in the Nuclear Waste Policy Act. But that would be pure speculation on my part.
Q. (By Mr. Shapiro) Do you recall when you first saw a draft of the proposed contract?
A. No.



Q. But you would have seen a draft or drafts before one was finalized?
A. Most likely, yes. But I cannot recall ever sitting down and reading verbatim the contract.
Q. Ever?
A. Not in one sitting.
Q. So the whole time that you were deputy director, you never actually focused and read the whole contract?
MS. HERRMANN: Asked and answered.
THE WITNESS: I do recall discussing the basic provisions and services and terms and conditions of the contract, but I do not specifically recall in one sitting, sitting down and having that much time or patience and actually reading the entire contract from cover to cover.
Q. (By Mr. Shapiro) Did you have -- did you have a sense, when you got to the Implementation Office in the end of January, that that work on developing the contract was already ongoing?
A. I don't recall.
Q. Were you at the Implementation Office right at the beginning or were there people at work for some period of time before you got there?
A. The -- the program was a continuation of work that



had preceded it. So clearly, the geologic work and other issues were things that were -- were picked up in process and progress.
I can't recall, though, about the contract because that was -- that was fairly specific to the Nuclear Waste Policy Act.
(Exhibit No. 1 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed a document that we've just marked for purposes of identification as Lawrence Exhibit 1, which on its cover appears to be a "Draft Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste." And it has handwritten on the cover "EEI's Unsolicited Comments."
A. Uh-huh. (Witness answers affirmatively.)
Q. Do you recall looking at drafts of the contract like this?
A. I do recall looking at at least portions of this contract. Whether it was this contract or a subsequent contract, I have no idea.
Q. Now, page -- the cover of this document, in the upper right-hand corner, has a date 1/25/83.
A. Uh-huh. (Witness answers affirmatively.)



Q. I'm sure that pertains to something. I don't know what that would be.
A. Uh-huh. (Witness answers affirmatively.)
Q. But then would that indicate, gee, this draft or at least these comments of the draft might have been done even before you got to the Implementation Office?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: Well, since I indicated that my first day there was in -- like the 29th, just by sheer logic you would assume that to be the case, if this date is accurate.
Q. (By Mr. Shapiro) Now, you said that you reviewed drafts or portions of drafts like -- like the one that we have here as Exhibit 1. What were you looking at the drafts for?
A. Sensibility, doability, consistency with the law would be the three good places to start.
Q. When do you mean by "sensibility"?
A. By sensibility, I mean are we stating things that we have the ability to deliver on or to do.
Q. Is that different -- you mentioned sensibility and doability and conformance with the law. What did you mean by doability?

A. Physically is it possible.
Q. Possible?
And conformance with the NWPA, you were also looking at that issue?
A. Yes.
Q. Did you have a particular role in reviewing these draft contracts, as opposed to others who might be involved in the process of looking at it from kind of an overall levels at the deputy director level?
MS. HERRMANN: Objection. Compound.
THE WITNESS: When I looked at it, I looked at it in my position as a deputy and the overall responsibility for the Act. But I also brought to it my experience base in the terms -- like transport, receipt, and handling, to ensure that it was reasonable and practical and doable.
Q. (By Mr. Shapiro) Do you recall any particular concerns you had with any of the early drafts, about the practicality, the doability of what was doing proposed?
MS. HERRMANN: Objection. Assumes facts not in evidence.
THE WITNESS: I do recall paying particular attention to the issues associated with start-up, ramp-up, and ability to meet what would



eventually become design rates. And I wanted to make sure that we were not overly optimistic or committing to something which practice and experience said we couldn't meet or we would have great difficulty in meeting.
Q. (By Mr. Shapiro) What do you mean by the start-up or ramp-up?
A. If a facility says it will be able to receive, round number -- this has no basis in fact -- 1,000 metric tons of fuel a year for some period of time, you will not be able to achieve that design limit. There will be unforeseen problems. There will be bugs in the system. There will be things that constrain your ability to meet that. So that you need to factor into your plans a lesser capacity, which only over time would eventually reach your design capacity.
Q. Was there some sort of analysis that you were employing to -- to figure out how much time you would need to work up to the design capacity?
A. No. It was only basing it on experience and subsequent -- wanted to make sure that that concept was -- was appropriately handled.
Q. And what do you mean by "appropriately handled"? How would that concept be appropriately handled in



the concept of ramping up to DOE?
A. To make it clear that in this case an acceptance rate and therefore the ability to take fuel from the utilities, it was clear to anyone from -- from the beginning, that there would be constraints on that.
Q. Do you recall, did -- did any of the drafts of the contract have -- have, then, an actual proposed acceptance rate that you were looking at the ramp-up to that to make sure that it wasn't too fast? Is that what you're talking about?
A. To the best of my knowledge, I don't recall if that was in the contract or not. I do know that that was a concept which we tried to illustrate and point out in our Mission Plan, our Draft Mission Plan.
Q. We'll probably turn more to the Mission Plan a little later. Let me focus at this point on one subject at a time on the contract.
If you turn your attention to Exhibit 1, to a couple of the suggested comments that were made and see if you recall anything about what happened to those.
First, on Page 3.
MS. HERRMANN: Are you looking at Bates



No. 3?
MR. SHAPIRO: I'm looking at Page 3 of the document. I guess the Bates number, the last three digits are 686.
THE WITNESS: Uh-huh. (Witness answers affirmatively.)
Q. (By Mr. Shapiro) Near the bottom, under the Article II, Section B there, someone wrote in a suggestion that -- that says that -- to the effect that "each party agrees to use its best efforts to allow delays in furthering the purposes of this contract."
A. I'm sorry, whereabouts are you? I'm reading the handwritten Article II, A. That's not what you're saying?
Q. If I said II, A, I misspoke. II, B.
A. The one that's crossed out?
Q. The last sentence of that is crossed out and then there is some handwriting under that contract. And the last sentence of that handwriting begins, "Each party agrees to use its best efforts to avoid delays in furthering the purposes of this contract."
Do you see where I am?
A. Yeah.

Q. Okay. Do you recall that concept being considered?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: I can't say that I do.
Q. (By Mr. Shapiro) Let me turn your attention to the next page, Page 4 of the draft.
A. Uh-huh. (Witness answers affirmatively.)
Q. Under where it says "Article III," and then there is a "Section B Schedule for Delivery Commitments," which actually has been crossed out, but I want to ask you about the draft language there.
It refers to delivery commitment schedules as set forth in an appendix and annexed hereto. And then it says they shall be furnished to DOE by purchaser. And if approved by DOE, shall become part of this contract.
Do you recall that concept at all?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: I have a general recollection of that concept and the fact that I would have had serious concerns and reservations about that because we weren't in any position, whatsoever, to make a commitment like that at that particular point in time.



Q. (By Mr. Shapiro) So you would have been particularly concerned about making those approved delivery commitment schedules part of the contract? Was that the part that would have troubled you?
A. If they were in any way to become a contractual obligation and binding, yes, they definitely would have been a concern to me.
Q. One of your -- one of the things you were looking at when you were reviewing terms was -- was making sure that DOE didn't commit itself to do something that it would have a tough time doing.
A. Everything in the Nuclear Waste Policy Act was going to be tough. But particularly those things which were outside of our control, I was concerned about.
Q. Was part of your concern an understanding that since DOE would be entering into a contract, that the government might face some financial responsibility if it couldn't meet its commitments that it was entering into?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I wouldn't limit it to financial. I would refer to it as any obligation



which I felt we couldn't meet.
Q. (By Mr. Shapiro) Did the fact that you were negotiating into a contract affect the level of your concern about entering into commitments that DOE would have great difficulty meeting?
MS. HERRMANN: Objection. Vague.
THE WITNESS: Can you rephrase that?
Q. (By Mr. Shapiro) Let me come at it in a different direction.
You mentioned that the Atomic Energy Act put forward an obligation to the government to ultimately dispose of spent fuel. Would that have troubled you just to have that obligation out there by itself, something like that?
MS. HERRMANN: Objection. Vague.
THE WITNESS: The -- the obligation was for nuclear waste, not spent fuel. But no, that -- that obligation in a general sense would not have concerned me. It -- someone had to be responsible and the government was the most likely person -- organization.
Q. (By Mr. Shapiro) What concerned you about taking on more specific obligations?
A. To the degree there is a specific date, a specific capacity, those become much more focused and



direct, and consequently you wanted to make sure that you had a reasonable ability to meet it.
Q. Would that concern have been any -- that concern of yours have been any less if the terms would simply be in a statute or a regulation as opposed to being set forth in a contract?
MS. HERRMANN: Objection. Speculation.
THE WITNESS: In the sense that I was not the author of the legislation or the statute that you referred to, you know, I would have just been the recipient of direction. I would be less concerned in making that -- I had no hand in making the commitment, I was given the commitment; versus a contract which I am more than a party to, but in -- in actually negotiating and laying down those responsibilities and, therefore, I have a greater role and responsibility in saying what I can reasonably do and not do.
Q. (By Mr. Shapiro) But there wasn't anything about the -- about the construct of a contract, per se, as opposed to a regulation that -- that concerned you?
A. I viewed the contract as something which we were a party to and had a hand in developing and negotiating and consequently would feel a greater

responsibility in the contract.
Q. You referred a couple of times to negotiating the contract. Was there a real negotiation or was it a matter of the Department of Energy simply setting out the terms of the contract?
MS. HERRMANN: Objection. Vague. Compound. Foundation.
THE WITNESS: To the best of my recollection, there was only going to be one contract for all utilities. We were interested in finding out their views on the contract via drafts, meetings, whatever. Prior to formalizing the contract and whether that was through some process, I just don't recall.
So, you know, we were interested, just as we were interested in our ability to live up to the contract. We wanted to know the views of the utilities about the contract before finalizing it.
Q. (By Mr. Shapiro) My understanding, you wanted to know their views. I'm trying to get a sense of the extent to which there was negotiation. How would you characterize what a negotiation is?
A. I recognize -- I used the term "negotiation" because normally in a contract, that's what one does. In this case, I think it's probably a --



the wrong phrase to use. More appropriately, it would be to get their comments and views on the contract before we finalized our -- the contract we would offer to the utilities.
Q. Because your office understood that you don't have two parties with equal negotiating ability; the utilities had to sign a contract ultimately with DOE or shut their facilities down?
MS. HERRMANN: Objection. Calls for a legal conclusion. Compound.
THE WITNESS: Theoretically the utilities did not have to sign the contract. They only needed to sign the contract if they wanted to eventually show that they had a disposal path for their waste or spent fuel.
Q. (By Mr. Shapiro) What was your understanding of how a utility could continue to operate without signing the contract?
MS. HERRMANN: Objection. Calls for a legal conclusion. Vague.
THE WITNESS: Theoretically speaking, they could continue to provide interim storage indefinitely for their fuel.
Q. (By Mr. Shapiro) Do you recall any discussions at the end of NWPA Implementation Office concerning



the draft contracts of what -- what the general strategy was of the Office in terms of what it was trying to accomplish with the contracts?
MS. HERRMANN: Objection. Vague.
THE WITNESS: We wanted to -- we wanted to provide a legal basis for the collection of the fee. Two, establish responsibilities and -- and dates when services would begin to be available. And three, we wanted to, to the best of our ability, have the contract, you know, be considered fair and reasonable while protecting the government and the taxpayers' rights, as well as providing the utilities with a -- as -- as reasonable a planning base as we could given the limited information we had.
Q. (By Mr. Shapiro) Do you recall any -- do you recall what the DOE strategy was for how the contract would handle the issue of how fast DOE could or would take the waste?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: The concept was as more information became available, and plans, or our capabilities became clearer, we would share that information with utilities to assist them in their planning process. Because they had to -- they had



the responsibility up until the time we took the fuel, it was theirs, and they had to know in advance what was expected of them or what -- what -- more accurately, what they could expect from us.
Q. (By Mr. Shapiro) Other than mechanisms to continually provide additional information, was there any strategy for an act -- developing an actual acceptance rate of -- for the contract of how fast DOE would take the spent fuel?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: My recollection was at some point in the future, as the program developed, the site was selected, the design was done, therefore its location was known, its transport capability was known, we would, prior to the actual shipment, of course, try to firm up an acceptance rate. And prior to that time, we would provide to the utilities some of the general considerations that would go into our thinking with regard to who could ship what, when.
Q. (By Mr. Shapiro) But DOE decided not to put any particular acceptance rate terms in the contract itself?
MS. HERRMANN: Objection. Foundation.

THE WITNESS: That's my recollection.
Q. (By Mr. Shapiro) What about the sequence of acceptance? By that I mean, from -- from what utility would DOE take spent fuel first? In what order they would take the spent fuel? Was there a general strategy that DOE was trying to implement in the strategy on that issue?
MS. HERRMANN: Same objection.
THE WITNESS: There were various considerations. Probably the most important was whether a reactor was facing a -- an imminent certifiable shutdown if they weren't allowed to ship. Then there were other considerations, such as the heat load of the fuel, how high a burn-up, and how long it had been cooled, which creates demands on the receiving, handling, and storage. And I'm sure there were others, but I just can't recall.
Q. (By Mr. Shapiro) When you -- you referred to an imminent certifiable potential shutdown by a -- by a utility, what -- could you describe a little bit more what -- what would constitute such a situation at a utility?
A. They physically were unable to discharge any additional fuel.



Q. Would this concept include the consideration as to whether or not that utility could add more storage at its site?
A. That could be a consideration.
Q. What about accepting spent fuel from permanently shut down reactors, reactors that are being decommissioned? Was there any thought about taking that spent fuel faster or slower than any other?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: There are two considerations in that example. One is, the reactor is already shut down, so it would do no -- not have a -- an effect on the generation of electricity, but it would have a financial impact on the utility for keeping a site active longer. And those would have to be balanced. We were not indifferent towards the issue of causing additional expenditures by the ratepayer.
On the other hand, in balancing -- in balancing, you would take it from a reactor that's shut down already, waiting to be decommissioned, versus an active, operating reactor, supplying electricity to the taxpayer, that would have to shut down because of no storage space. In



general, we -- I believe we indicated to them -- or would indicate that that operating reactor would take precedence as a general rule of thumb.
Q. (By Mr. Shapiro) And would operating reactors that -- that otherwise weren't running out of space, would they then have third priority?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: They would not have as high a priority as certainly the first that was operating that would have to shut down.
Q. (By Mr. Shapiro) I pointed you a few moments ago on Page 4 of what we are calling Exhibit 1, this draft contract, to a section that dealt with delivery commitment schedules.
Is there an Article III, Section B, Page 4? Do you recall what the general strategy was for this delivery commitment schedule process or was there a -- a general strategy for that process?
A. Well, are you talking about this paragraph under III, B?
Q. That's correct.
A. "On an annual basis, commencing on October 1, 1985 Purchaser shall provide DOE a forecast of estimated deliveries during the succeeding 10 year period"?



Q. Right. And I'll tell you that this precise language is not precisely how it ultimately came to be in the contract, but I'm just talking about this general idea.
MS. HERRMANN: Objection. Foundation. Vague.
THE WITNESS: I view this wording as somewhat strange because I'm not sure what they're talking about, deliveries during succeeding 10-year period from October 1985, because -- since we weren't to have ability to accept it until '98. So it -- it strikes me as kind of strange right here.
Q. (By Mr. Shapiro) Let me ask about a different topic.
This draft contract, I think in general there is a reference to spent fuel and high-level radioactive waste. What did you understand to -- what did you understand the term "high-level radioactive waste" to -- to cover?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I believe there should be a definition of high-level radioactive waste in this contract.

referring to there?
A. A fuel assembly is an array of fuel pins containing the nuclear material. But it's held in place -- the pins are held in place by end assembly -- end units, end caps, spacers, various other components that make up the fuel assembly. And that's the material that I'm referring to. Because once you disassemble it, you're left with just the rods, you also have some hardware left over.
Q. I've previously heard the term "nonfuel components." Is that what you're referring to?
A. Yes.
Q. You're familiar with the term "nonfuel components"?
A. It's -- it's pretty much a general term that -- that reflects what it says.
Q. Okay. What about the term "greater than class C waste"? Are you familiar with that term?
A. I'm familiar -- I'm -- I know -- I've heard the term, but I don't recall -- I don't recall the specifics of it.
Q. Are you aware that greater than class C waste is one of the by-products that comes about when a commercial nuclear power plant is decommissioned,



that a certain amount of the waste is greater than class C waste?
A. Yes, in general.
Q. What's your understanding of -- of what the utilities are supposed to do with that greater than class C waste?
MS. HERRMANN: Objection. Foundation. Calls for a legal conclusion.
THE WITNESS: My recollection, which is very vague, was that the Nuclear Waste Policy Act, I don't believe, specifically addressed that. I could be wrong. And consequently, I think there was some uncertainty regarding that.
Q. (By Mr. Shapiro) What about the term that we just referred to, the high-level radioactive waste? Do you have any recollection as to whether or not there was consideration as to whether or not greater than class C waste would be considered that sort of high -- highly radioactive material?
MS. HERRMANN: Objection. Foundation. Calls for a legal conclusion.
THE WITNESS: No, I -- I have no recollection of whether or not that was intended to cover that or not.
Q. (By Mr. Shapiro) Let's go back to this Exhibit 1



for a moment, to another term that's suggested in here. And it's on -- the last three numbers of the Bates number are 688.
A. Uh-huh. (Witness answers affirmatively.)
Q. It looks like this is some new language that someone is recommending. And specifically at the bottom, "Exchanges" --
A. Yeah.
Q. -- it's commenting or suggesting that purchasers, utilities, have the right to exchange approved delivery commitment schedules with other utilities. Do you recall that concept?
MS. HERRMANN: Objection. Vague.
THE WITNESS: I recall the concept. And in general, it was viewed as a means of allowing the utilities to have the flexibility to work among themselves for any -- should there be any restrictions on -- on their ability to -- to ship us, and if -- if they could work out with another utility, that did have the rights, they could have some right to do that. In general, it was a -- to provide some flexibility on the utility's part.
(Exhibit No. 2 marked for identification.)



Q. (By Mr. Shapiro) Mr. Lawrence, we've handed what we've marked for purposes of identification as Exhibit 2. Which I'll represent to you is a Notice of Proposed Rule Making for Standard Contract for Disposal of Spent Nuclear Fuel and/or High-level Radioactive Waste.
Do you recall this document?
A. Not until you gave it to me. But now that I see it, it certainly answered a question that I couldn't recall earlier. There was a rule making.
Q. Now, this document, the first column, it's pretty standard for notices of proposed rule making. It says, for further information you can contact three individuals. And it -- it lists a Mr. Rosselli, a Mr. Cavanagh, and Mr. Winnick.
A. Uh-huh. (Witness answers affirmatively.)
Q. What's your recollection of -- of the roles of those three individuals in developing the -- the contract?
MS. HERRMANN: Objection. Compound.
THE WITNESS: When I told you the structure of the Nuclear Waste Policy Act Implementation Office, I mentioned that there was a business administration and contracts. Mr. Rosselli was the head of that. It was not the

title that is shown here. That's -- that was from, I think, a previous organization. But nonetheless, the -- the room was the right room.
I'm sorry, I forget -- I forget the rest of the question.
Q. (By Mr. Shapiro) I was interested in the role of each of these three individuals. You mentioned Mr. Rosselli. Do you -- do you remember, did -- did these three individuals have particular roles in developing the contract --
MS. HERRMANN: Objection. Compound.
Q. (By Mr. Shapiro) -- or was it just sort of a team effort?
A. I can only talk in broad general responsibilities.
Mr. Rosselli was part of the Nuclear Waste Policy Implementation Office, which given the date of this publication in the Federal Register, this probably was something that was in process as a result of the signing of the Act by the President on -- January 7th, did you say?
Q. Yes.
A. -- and the beginning of the Nuclear Waste Policy Act Implementation Office on or about January 30th.
Given this date, that would have had to have



been in the pipeline prior to that. So Mr. Rosselli would have been handling contracts, business.
Mr. Cavanagh, I don't recall specifically Jim Cavanagh, but from looking at the title there, he would have been within the Department of Energy, a professional in our contracting and procurement office. So he would have been a professional -- not part of the Nuclear Waste Policy Act Implementation Office, but a person with responsibility in DOE for their contracts and procurement.
And the last person, Mr. Winnick I do remember, and he was the Office of General Counsel and consequently he was our legal adviser.
Q. On the page that at the top it's 5461 of Exhibit 2, right before where it says Part 61, it says it's -- this notice was issued in Washington and that the name of the person actually issuing the notice is a Hilary Rauch.
A. Rauch.
Q. Rauch. What do you recall her role being?
A. He was director of Procurement & Assistance within the Department of Energy, and as such was Mr. Cavanagh's boss.



Q. Other than being Mr. Cavanagh's boss, do you remember Mr. Rauch having any particular role in the development of the contract?
A. Not really.
Q. Other than the individuals that we just talked about -- Mr. Rosselli, Mr. Cavanagh, Mr. Winnick, Mr. Rauch -- do you recall who else was involved in developing the contract?
A. Boy, it's been so long, I really don't recall.
Q. Was there anyone else in the -- in the Counsel's Office besides Mr. Winnick who was involved?
A. There were other individuals in the Counsel's Office that I dealt with, but I do not believe they were associated with the contract.
Q. Part of the -- of this Notice of Proposed Rule Making that I've pointed you to, by Mr. Rauch's name, it says it -- the notice was issued in Washington January 31. Compare that to Exhibit 1, where at least somebody's written at the top of the cover page January 25th, '83, which at least seems to indicate that some sort of advanced drafts were being circulated.
Do you recall advanced drafts being circulated prior to publication of the Notice of Proposed Rule Making?



MS. HERRMANN: Objection. Asked and answered.
THE WITNESS: I don't have any recollection of advanced drafts being circulated.
Q. (By Mr. Shapiro) So you don't know who else besides the Edison Electric Institute might have received an advanced draft?
A. No.
MS. HERRMANN: Speculation.
MR. SHAPIRO: Why don't we go off the record for a minute.
(Off the record discussion.)

(Recess 12:10 - 1:24 p.m.)

EXAMINATION (Continuing)
BY MR. SHAPIRO:
Q. Mr. Lawrence, I'd like to ask you again about, now, Exhibit 2, the Notice of Proposed Rule Making and the draft contract that's in there.
Let me direct your attention to page at the top that's 5462. Do you have that page?
A. Uh-huh. (Witness answers affirmatively.)
Q. And in the second column, where it actually starts with the draft of the contract, the several

recitals, "Whereas" clauses in the middle of the column --
A. Yes.
Q. -- I want to ask you about a couple of those.
The second one refers to all costs associated with the preparation, transportation, and the disposal of spent nuclear fuel and high-level radioactive waste being borne by the owners.
Do you recall that concept?
A. Yes.
Q. I've also heard that referred to as a "full cost recovery concept." Have you ever heard that term?
A. I've heard that term and I don't think that would be appropriate for this particular contract.
Q. Why not?
A. Full cost recovery is a concept for the government providing services in its laboratories and other -- it's not clear to me that the activities covered by the Nuclear Waste Policy Act are one and the same as those covered by full cost recovery contracts that the government has with other users. So I just wouldn't associate those two.
Q. Was your understanding, though, that RW was to recoup all of its expenses --



A. Yes.
Q. -- from -- from utilities?
A. Yes.
Q. Did that recovering all of the expenses concept -- how did that affect -- let me ask it this way.
Did the concept that all of the expenses were going to be recovered by RW, did that have any impact on how you viewed the government's obligations under the contract?
MS. HERRMANN: Objection. Foundation. Calls for a legal conclusion.
THE WITNESS: The -- could you repeat the question?
Q. (By Mr. Shapiro) Did the concept that RW was going to recover all of its expenses from the utilities, did that concept have any impact on your understanding of -- of the government's obligations under the contract that it was entering into?
MS. HERRMANN: Same objections.
THE WITNESS: No. Our obligations would be dictated by the Nuclear Waste Policy Act, not by the fact that we were going to get paid for it.
Q. (By Mr. Shapiro) You didn't view any difference, then, between the government -- what the



government was being obligated to do by the statute and what it was obligating itself to do by entering into the contracts?
MS. HERRMANN: Object to the extent it mischaracterizes prior testimony. Foundation. Calls for a legal conclusion.
THE WITNESS: The purpose of the contract was to carry out the provisions of the Nuclear Waste Policy Act. So from that perspective, I wouldn't see any contradiction or differences.
Q. (By Mr. Shapiro) The concept that utilities were paying for the government's services, that didn't cause the government to feel that it was obligated, then, to perform the services in a way that was particularly useful to utilities?
MS. HERRMANN: Foundation. Calls for a legal conclusion. Vague.
THE WITNESS: I -- I wouldn't phrase it that way at all.
Q. (By Mr. Shapiro) How would you phrase it?
A. We were providing services to the utilities as specifically authorized by the Nuclear Waste Policy Act and the utilities were to pay a fee commensurate with us recovering our costs for



doing that work.
Q. I want to go back to something we had covered at least briefly before that. I think it's also covered in Exhibit 2.
You had said that utilities didn't have to enter into these contracts, that they had an option not to. Do you recall us discussing that?
A. What I recall saying is that it wasn't clear to me that they had to sign the contract. They could choose, you know, not to and continue to provide for storage of their fuel.
Q. Well, I'll point you to the page that's marked at the top 5458. It's the -- it's the first page of the notice after the cover. The third column there, and paragraph -- I guess the easiest way to look at it -- second from the bottom, the one that starts out "Section 302 of the Act."
A. Uh-huh. (Witness answers affirmatively.)
Q. It says -- it contains two provisions which demonstrate the importance that the NWPA places on the contract. And the first is that the NRC will not renew or issue a license to a utility that has not entered into a contract.
Do you recall that provision?
A. No, I don't recall that specific provision.

Q. Do you recall anything generally like that?
A. No, I didn't -- I didn't recall it.
Q. But you understand the provision like that --
A. Yeah.
Q. -- would have limited the utilities' ability not to enter into contracts?
A. That's correct.
Q. The Notice of Proposed Rule Making refers to a -- a hearing that was held on March 3, a month after the publication of the -- of the notice. Do you have any recollection of that hearing?
A. You're using the term "hearing." I don't have recollection of a hearing. I do have recollection of a public meeting we had in the Department of Energy Forrestal Auditorium.
Q. Okay. What do you understand the difference between a -- to be between a hearing and a public meeting?
A. A hearing tends to be a more formal process with minutes -- not minutes, but with transcripts and the like. I don't recall if that was the case. I do recall a public meeting where we were dialoguing with the participants who came.
Q. What do you recall about that meeting?
MS. HERRMANN: Objection. Vague.



THE WITNESS: I really only have one specific memory, and that was a Mr. Larry Penberthy from Western Washington, who has for years had theories about how to treat and process nuclear waste, coming up and having a great big chart and rolling it out in front of everybody, and Bob Morgan actually to get up and hold one end of it. And it really wasn't pertinent to the meeting, but it was kind of amusing in my mind. But that's the only thing I specifically remember.
Q. I know it's long years back.
Were there -- were there discussions with -- with utilities or others outside of DOE other than at this public meeting?
A. I don't recall any specifically.
Q. You weren't involved in any, though?
A. I don't recall any.
Q. Do you recall industry representatives talking to you about various proposed contract terms on the telephone or approaching you individually in any way?
A. Again, I -- I just don't recall any. I do recall having sessions with environmental groups, Congressional aides, utilities representatives, NRC representatives about the whole concept of



implementing the Act.
Q. What's your recollection as to what was going on between the time that the -- this Notice of Proposed Rule Making came out February 4th of '83 and either when comments came in in March or even when the final rule of contract came out in April? What was going on within RW?
MS. HERRMANN: Objection. Vague.
THE WITNESS: The Act had a number of milestones or activities you were supposed to conduct within X number of days within passage of the Act. We were trying to meet all of those deadlines despite the fact that we were just getting an organization in place to do so. Consequently, there were a lot of long hours, and there was an urgency about trying to meet these near-term deadlines.
Q. (By Mr. Shapiro) What sorts of deadlines are you referring to?
A. I would assume that it had a deadline for getting a draft contract out. I would assume -- and I know that it had one for getting out a Mission Plan. So the -- these were things -- there were a number of things which Congressional staffers, legislators, in their efforts to put together a



process in the Nuclear Waste Policy Act specified things that all of a sudden we were being called on to actually physically produce and go through all of the mechanics to make it happen; such as a Federal Register notice doesn't just appear.
Q. Sure.
A. So we were trying to get off to a good start and to get these documents out as quickly as we could and to meet the deadlines. I -- to meet the deadlines, as quickly as we could, but consistent with the deadlines in the Act.
Q. Focusing specifically on the -- the deadline of getting a contract out, do you recall what was being done in this time frame between publication of the proposed rule in February and, let's say, April, when the final rule came out?
A. I don't recall what specifically happened, no.
(Exhibit No. 3 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, we've handed to you what's been marked as Lawrence Exhibit 3. And generally, you know, you'll be seeing a number of exhibits in hopes of jogging your recollection about some of the things that we might have gone

Do you recall that complaint?
A. No, I don't. In part because the Nuclear Waste Policy Act certainly had a number of milestones which it's not at all clear to me that those interim milestones would need to be in this contract.
Q. Which milestones are you referring to?
A. Mission Plan, contract -- contract out for signing, and the like.
Q. What about milestones -- more physical milestones of actually getting closer to DOE taking the spent fuel?
MS. HERRMANN: Objection. Vague. I'm not sure I hear the question in there.
Q. (By Mr. Shapiro) Do you understand the question?
A. No.
Q. Okay. You referred to recollection that there were certain milestones within the NWPA for the contract for the Mission Plan. Do you recall there being milestones that would more concretely put RW on the path of actually receiving spent fuel, other than the 1998 date?
MS. HERRMANN: Objection. Calls for a legal conclusion. NWPA and the standard contract are the best evidence of their contents.



THE WITNESS: Upon reading the contract, it does seem to have other dates or time frames in here, such as 12 months prior to delivery date, within 30 days, other things like that, which would indicate to me that there are other interim steps in here. It's just the main feature of the contract was to begin taking the fuel in '98.
Q. (By Mr. Shapiro) Point your attention to further down in the same paragraph that we were talking about, really the next concept, wherein in addition to there not being other milestones -- or at least that's the complaint of Edison Electric Institute -- the letter complains that the contract does not commit DOE to accept any given quantity of -- of spent fuel or -- or high-level waste.
Do you recall that complaint?
A. Where are we here in this --
Q. The top paragraph on Page 8 of Exhibit 6.
A. Uh-huh. (Witness answers affirmatively.) Oh, I see it.
I previously commented that the utilities wanted to know and have more specific information regarding difficulties, but that we were in no position to provide that.



Q. Do you recall any discussions with utilities, back-and-forth discussions about that issue?
A. No specific discussions, no.
Q. If RW was not in a position to commit itself to a specific rate, was RW -- did you understand RW, then, to be committing itself to -- to take spent fuel that -- at a reasonable rate that would ultimately develop as you did more work?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
THE WITNESS: That would be an objective, but by no means were we in any position then to make any commitments regarding that. And it may not ever materialize.
Q. (By Mr. Shapiro) What do you mean, it may not ever materialize?
A. There could be just basic constraints on the ability of the system, receipt capability of the transport system, to move the fuel at a rate equal to or greater than its generation. I mean, I can speculate, but I won't as to what might that cause that -- reasons for that. And so consequently, although it's something that you would like to be able to have, we certainly were in no position to commit to it.



Q. And I think I asked about a reasonable rate and you referred to a rate that was equal to or greater than the rate at which spent fuel was generated. Does that reflect your understanding that in an abstract sense, accepting spent fuel --
A. I don't recall the specific context of that. We'd have to go back and look at that.
Q. Okay. Let me just ask what -- what -- what you meant -- would you mean, then, in the abstract, if -- if RW could accept spent fuel at a rate that was -- that was at least equal to the discharge rate that that would be something that would be reasonable.
MS. HERRMANN: Objection to the extent it mischaracterizes prior testimony. Speculation.
THE WITNESS: I'm not recalling the context in which we were discussing it before. I would think that you would want to -- it would be desirable if at all possible to not only take the waste that was being generated, but to over a -- some reasonable period of time -- which I'm not sure what that would be -- you could work off the backlog. So it would have to be greater.
Q. (By Mr. Shapiro) And the countervailing pressure on achieving that rate would be the technical

obligation to accept spent fuel from utilities at
a particular rate?
MS. HERRMANN: Objection. Calls for a
legal conclusion.
THE WITNESS: At this particular point
in time, I wouldn't feel as if we were limiting
anything because we weren't making an obligation
with regard to acceptance rate. The only
obligation we felt we were making was to begin
accepting waste or spent fuel beginning in '98.
Q. (By Mr. Shapiro) Now, I know you've testified
that it was your understanding that eventually
things would get -- at least utilities would get
additional information from RW as to how fast we
would be able to deliver spent fuel to RW.
Did you foresee a time when the government
would be obligated to accept a certain amount of
spent fuel from utilities within a particular
amount of time?
MS. HERRMANN: Objection. Calls for a
legal conclusion. Speculation.
THE WITNESS: Yes, I think we always
anticipated that when it was clear what our
capabilities were, and we felt confident enough in
those capabilities, that we could commit that we



would do so. However, we probably, even -- even
at that stage, would have probably put -- wanted
some clause to allow us to change that and not
legally obligated us, because we -- there were too
many -- too many variables that could affect your
ability to actually deliver.
Q. (By Mr. Shapiro) Do you recall anything in the
contract that was signed in 1983 that established
a form or a mechanism to -- to create that
subsequent obligation?
A. I don't recall specifically.
Q. Do you recall generally?
A. Well, in looking at the contract, I know it talked
about getting a -- just now, it -- it appeared
that they were supposed to give us a delivery
schedule which we could either accept or reject,
and there would be some process of back-and-forth
with the utilities regarding that.
My general opinion would have been you would
have had to get much closer to the actual date of
an acceptance before you could actually really
commit. And as I indicated, there would be some
provisions in case you wouldn't be able to accept
it that would not result in any penalty on the
government's part.



Q. The delivery commitment schedule process that you
just referred to, did you view those as creating
binding commitments, then, to the parties?
MS. HERRMANN: Objection. Calls for a
legal conclusion.
THE WITNESS: I wouldn't use the term
"binding commitments."
Q. (By Mr. Shapiro) What term would you use?
A. Good faith efforts to work with the utilities and
share information so that they could get a
reasonable approximation of when they would be
able to ship and how much they would be able to
ship.
Q. So you viewed the delivery commitment schedule
process as more of a planning tool?
A. That's my recollection.
(Exhibit No. 7 marked
for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, we've handed you
what's been marked as Lawrence Exhibit 7. We've
reached, finally, the final rule that was
published in the Federal Register. Now, I'll
represent to that you by final rule, that this is
the -- the final draft of the contract that was --



through various iterations, ultimately DOE entered
into.
Do you recall the publication of the standard
contract, the final contract in the Federal
Register?
A. No, I don't.
Q. Were you involved at all in -- in the final edits,
changes to the prior drafts that resulted in
the -- in the final rule?
A. I would assume that I was, but I have no specific
recollection of it whatsoever.
Q. I'll point your attention, Mr. Lawrence, to a
particular term on the page at the top that's
marked 16592.
A. Uh-huh. (Witness answers affirmatively.)
Q. The second column on that page, at the bottom of
column, the last paragraph that starts on that
column referring to -- it says, "Five commenters
questioned the lack of a definition for 'emergency
deliveries.'" It says, "We have intentionally not
defined the term 'emergency delivery.'"
Do you recall that issue of whether or not to
define an emergency delivery -- or how to define
an emergency delivery being considered in 1983?
A. No, I don't.

Q. Do you recall the -- the one concept that is mentioned there on the -- that carries over to the next column, the one situation which would receive consideration by RW would be a delivery needed to permit a licensed reactor to continue its operations. Do you recall that?
A. I believe I've stated previously that I felt that would be at a very high priority. And it appears that was covered by the contract -- or covered in the discussion of the contract.
Q. Do you recall -- independent of the document that we're looking at, do you recall any discussion on whether or not that concept would be determined an emergency delivery or is that whole term, "emergency delivery," something that you don't recollect?
A. I don't recall the emergency delivery concept.
Q. Okay. Do you recall the term "annual capacity report"?
A. Not really.
Q. We've discussed just a few moments ago the concept of DOE issuing a report that would project forecasts of -- of how fast they might ultimately accept spent fuel. Do you have any recollection of that concept turning into something called



"annual capacity reports"?
A. No, I -- I don't recall the term "annual capacity reports."
Q. Do you -- do you recall reports like those, whether or not you recall the -- the -- the specific title?
MS. HERRMANN: Objection. Vague.
THE WITNESS: I mean, since I don't recall, I have no -- it's not clear to me what an annual capacity -- whose capacity is referred to? Is it --
Q. (By Mr. Shapiro) I'll represent to you that there are documents called annual capacity reports that -- that are referring to RW's capacity --
A. Oh.
Q. -- to receive spent fuel.
But you don't recall those?
A. No, I don't recall those.
Q. Are you aware that in three of the -- the cases that are being litigated, the ones that -- that I represent the plaintiffs, the Yankee Atomic case, the Connecticut Yankee case, the Maine Yankee case, that you've been listed by the government as a potential witness for the government in those cases?



A. I know I received something, but I don't recall which cases. I haven't really spent any time thinking about it.
Q. When the government lists who their witnesses are going to be and they also list the subjects on which they might testify about, are you aware that the subjects on which you're listed as testifying about include annual capacity reports?
A. No, I'm not aware of that.
Q. Do you have any idea how -- how you would be associated with annual capacity reports --
MS. HERRMANN: Objection.
Q. (By Mr. Shapiro) -- if you have no recollection of that?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: I had no participation on putting my name on that list. And I will only assume that it was because the official duties that I had at -- at or around that time.
Q. (By Mr. Shapiro) While I'm on that subject, let me cover a couple of things which are listed as potentially testifying about. And I'm not sure you're involved.
Do you recall the 1987 amendments to the



Nuclear Waste Policy Act?
A. I remember the one that specifically said stop work at Hanford and Death Smith County and focus on Yucca very vividly.
Q. Do you recall any others?
A. No.
Q. Did you have any involvement with the implementation of the 1987 amendments to the NWPA other than stopping work at Hanford?
MS. HERRMANN: Objection. Vague.
THE WITNESS: No.
Q. (By Mr. Shapiro) We'll discuss a little later the 1985 Mission Plan.
Are you aware that there was a move to amend the Mission Plan in 1987?
A. No.
Q. You had no involvement in any consideration of amendments of the NW -- of the NWPA Mission Plan in 1987?
A. No. In fact, my only involvement with the Mission Plan was in issuing the draft. I had no involvement in the finalization of that draft.
Q. Is that because the -- the finalization was -- that was done after you left RW?
A. Right.

statute just how fast DOE starts taking the spent fuel in 1998.
Do you recall any discussions with Hill staffers or others on that issue, as on -- as to what was intended in the legislation with respect to the 1998 date?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I don't find that beginning to accept spent fuel by January 31, 1998, as ambiguous. The acceptance rate over time and as our capacity allowed, it was clearly over time we wanted to avoid shutdowns and ultimately take all of the fuel, at least up to the capacity limit of the repository, which continues to be a problem. But from my own perspective, if we were just able to accept one spent fuel element in January of '98, and perhaps no more that entire year, we would have at least -- at least met the obligation we were committing to.
Q. (By Mr. Shapiro) So it's your understanding of the NWPA, that all it committed DOE to accept in 1998 was -- was one fuel element?
MS. HERRMANN: Objection. Calls for a legal conclusion.



THE WITNESS: No, that wasn't what I said. But I -- I said technically we would have met that contractual obligation once we did that. Ultimately, over time, our objective was to accept waste at a rate that would avoid shutdowns and be able to eventually work off the backlog. But over what period of time that was and under what rate, we were in no position to commit to at that particular point in time.
Q. (By Mr. Shapiro) Did you have discussions with Hill staffers or anyone within RW about the concept of acceptance of one fuel element in 1998 technically meeting RW's obligations?
A. No. I'm certain -- I feel quite certain I didn't have discussions along those lines, because it wasn't our intent.
Q. What was your intent, then?
A. Our intent would have been able to begin accepting it and continue accepting the -- the waste or spent fuel at a rate that over some reasonable period of time, number of years, would have gotten up to whatever the design capacity of the repository was to be. I don't believe at that point in time we had a firm repository rate in mind, although that could -- maybe we did. I



don't know. I just don't recall it. But that -- that we would, over a period of time, be able to get up to that.
We -- we weren't interested in playing games and just taking one and declaring victory. But in terms of commitments, we knew we weren't in a position to commit to any specific quantity that first year or second year, at that particular point in time.
MR. SHAPIRO: Is now a good time for a little break?
MS. HERRMANN: Sure.
(Recess 2:45 - 2:59 p.m.)

EXAMINATION (Continuing)
BY MR. SHAPIRO:
Q. Mr. Lawrence, I want to direct your attention to another part of the -- the final rule, Federal Register notice, the part that starts at the top of the page, 16598.
The first column there, the first new paragraph that starts in that column refers to comments -- I think we've read probably one of those -- that refer to the lack of a performance standard other than the January 31, 1998, date.



In the middle of the -- of that paragraph it says, "DOE has considered this comment and the suggestion that suitable language be included in the contract, but it has not decided not to adopt the recommended modification."
Do you recall the decision not to -- to adopt the recommended modification?
A. No, I don't recall that.
Q. Later on in that paragraph, it says that the 1998 date is called for in the Act and we believe it to be a realistic date.
Does that comport with your recollection? Did you view the 1998 date as being realistic?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: At that point in time, I did.
Q. (By Mr. Shapiro) Did there come a point in time when you didn't believe that the 1998 date was realistic?
MS. HERRMANN: Same objection.
THE WITNESS: I believe that the 1998 date was achievable, but there were a large number of activities that had to be successful in order to meet that date and so it was not an easy date to meet, by any stretch of the imagination, but it

was realistic and reasonable, certainly. Given 1984 or '83 is the time frame we're talking about, it certainly was.
Q. In 1983, was your expectation that DOE would meet the 1998 date necessary by having a repository open by that date or perhaps by meeting that date by some other means?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: Our plan was to have a repository open by that date.
Q. (By Mr. Shapiro) So when you say you felt it was realistic that you could meet the 1998 date, you thought it was realistic that DOE could have a repository open by 1998?
A. Yes.
Q. Turning back to the language in Exhibit 7, that paragraph, it says, "Our performance will be judged by meeting this date." Do you recall what was meant by "meeting this date"?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: Being able to begin accepting waste or spent fuel as of that date.
Q. (By Mr. Shapiro) Would that entail accepting



spent fuel in 1998 at a meaningful rate?
MS. HERRMANN: Same objections. Vague.
THE WITNESS: I don't know what you mean by "meaningful rate."
Q. (By Mr. Shapiro) Going back to a discussion we had earlier, did this reference to "meeting that date," was it intended that -- that that could be met by simply taking one fuel element in 1998?
MS. HERRMANN: Objection since Mr. Lawrence did not author this document. Foundation. Speculation. Vague.
THE WITNESS: While this would not have been our intent, I would have felt we had met a commitment should that have been the case.
Q. (By Mr. Shapiro) What commitment are you referring to?
A. Take one spent fuel element by January 30th, 1998, for permanent disposal.
Q. Did you ever consider whether or not RW had a commitment to accept spent fuel for any purpose other than permanent disposal?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: The ultimate purpose of our taking spent fuel was permanent disposal.



Q. (By Mr. Shapiro) Did you ever consider, though, having -- whether or not you had a commitment to store -- storing spent fuel from utilities in 1998, even if you might not start to dispose of it until some later period in time?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: My recollection is that in the Draft Mission Plan, which I was involved with, we talked about the possibility of interim storage leading up to the repository. But there was clearly no legal requirement in the Nuclear Waste Policy Act for it, nor was it clear that that was something which we could ultimately do. But it was something that was to be considered.
Q. (By Mr. Shapiro) I want to turn your attention now to the next page, 16599, of the final rule; specifically to Section 961.4 of the final rule that's titled "Deviations." It refers to a mechanism where utilities could seek to deviate from the standard contract.
Do you recall any utility requesting a deviation from the standard contract?
A. No.
Q. Do you recall any discussions about potential



deviations from the terms of the standard contract?
A. No.
Q. I want to turn now to the next page, get to the actual text of the contract. The first column, about halfway down the column, has a number of "whereas" clauses. And the second one there, if you could read that one, it says, that "Whereas, the DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved as expeditiously as practicable upon the request of the generator or owner of such wastes or spent nuclear fuel."
I'll represent to you that that particular "whereas" clause was not in the earlier Notice of Proposed Rule Making.
A. Uh-huh. (Witness answers affirmatively.)
Q. Do you recall why that language was -- was added to the final rule?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: Previously stated, we wanted to be as transparent and work with the utilities as best we could. And this is an

indication of our intent to do exactly what it says here.
Q. (By Mr. Shapiro) So the intent was to take the spent fuel as quickly as practicable?
A. As expeditiously as practicable upon request of the generator. There are a number of things which could impact the practicality of it, however; the transport system, restrictions, legal objections, and the like.
Q. What about the first part of that "whereas" clause that refers to "following commencement of operation of a repository"? Did you ever view there being a distinction between the rate at which DOE would accept spent fuel before a repository became operational as opposed to after that time?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: As I previously indicated, the concept of interim storage prior to repository was something which I had had responsibility for back in the '70s, as well as something which we -- my recollection was we had at least addressed the possibility of that or at least the concept of that in the Mission Plan.
These words make it clear that we are not



talking about interim storage or taking it before the repository starts. So even though it was a concept that people had discussed and we knew that -- that utilities -- some utilities, at least, would like us to have, this contract clearly did not cover that.
Q. (By Mr. Shapiro) That's your recollection of -- of the contract?
A. Based upon this reading and my recollection of the contract.
Q. I want to just ask you so that it's clear in my mind about another potential reading of this, to make sure that, I guess -- I guess, that that other reading is not what you recollect.
The other reading would be that perhaps RW would take the spent fuel at some lower rate after 1998, but perhaps before an operation of a repository took effect; but once repository became operational, then DOE had the obligation to take the spent fuel as quickly as practicable.
That's not your recollection?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: No, that's not my recollection.



Q. (By Mr. Shapiro) Mr. Lawrence, let me ask you to turn to -- it's the next page. Focusing on Article V, it's the third column on the page. It starts -- it's 16601. Do you have that page?
A. Uh-huh. (Witness answers affirmatively.)
Can I ask a question?
Q. Sure.
A. I noticed there is notations and additions here. What does that refer to? Because it's not in the original Federal Register notice.
Q. Another one of my questions. I'll ask it now.
Do you have any sense of what those notations are?
A. I asked you first.
Q. I don't know.
A. Okay. The answer is no. I'm going to ignore what's written here because it's not part of the record.
Q. I'm not asking you to read it. I think the section I'm referring to now -- I think all of the sections that I'm referring to are not ones that are affected by the handwritten notes.
The third column on 16601, the first new paragraph begins on that page, in fact has the number 2 on it, refers to DOE approval or



disapproval of delivery commitment schedules. I want to focus in actually on the bottom of that paragraph. It says that purchaser shall have the right to adjust quantities of SNF and/or high-level waste plus or minus 20 percent.
Do you recall that provision?
A. Not specifically.
Q. Do you recall it generally?
A. In general, we wanted to provide as much flexibility as we could. And this would appear to be consistent with that. So it would be consistent with what I recall our intent to be.
Q. But you don't have any more specific recollection of why 20 percent as opposed to some other percentage?
A. No.
Q. The next thing I want to point your attention to, Mr. Lawrence, is at the bottom of that column, a section dealing with exchanges. We've looked at prior language that was similar to this. There is one change I want to focus in on. It says here, in the middle, the "Purchaser shall have the right to exchange approved delivery commitment schedules with parties to the other contracts with DOE for disposal of SNF and/or HLW; provided, however,

Q. Was the Mission Plan something that was drafted by different parts of your office, so there's not a particular drafts person, or was -- or was there someone who -- who ultimately had some responsibility for drafting this thing?
A. I -- I don't recall. I would certainly -- and this just would be a guess on my part. But I would actually hope that we had one person at the end to put it all together so it looked like one document. We did have a communications organization that most likely had that responsibility.
(Exhibit No. 10 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed what we've had marked as Lawrence Exhibit 10. First page of which seems to be a memorandum, subject line is Mission Plan Strategy, dated in March -- I'm sorry -- the date at the top is September 15th of 1983. There is also a received date by someone in March of '84.
Do you recall this document?
A. No, I don't.
Q. What about the -- the nuclear waste strategy and



overview proposal that starts on the next page? Do you recall that overview proposal?
A. No, I don't.
Q. Let me stick to the first page for just a moment, to the -- to the distribution list, to see if I can understand who the various players are.
The distribution list on that starts with Bob Morgan and then yourself.
A. Uh-huh. (Witness answers affirmatively.)
Q. Is that list of names, is that consistent with your recollection of who would have been involved in the preparation of the Mission Plan?
A. I -- I would not characterize it necessarily involved in the preparation. These were key program and policy people who would -- you know, are responsible for aspects of the implementation of the Act and so they would have been involved in certainly reviewing this document and making sure it made sense and having a hand in preparing the Mission Plan.
Q. The name one up from the bottom, Keith Klein, do you recall what his role was?
A. Keith was -- was working on the geologic repository group under Bill Bennett, was my recollection.



Q. Let me turn your attention to a couple of concepts on the next page of the Exhibit 10. It's the Overview Proposal. It refers to the central focus of the program is that DOE will begin accepting spent fuel in significant quantities in 1998.
Do you have any recollection of that statement?
A. No, I don't recall any of the specifics of this document.
Q. Do you have any idea what would have been meant by the term "significant quantities"?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: Well, in -- in reality, I would -- I would say it -- it is -- it is a clear indication that we weren't talking about just accepting one spent fuel element for disposal, but that we did intend to accept as much as we'd reasonably and safely could leading up to eventually reaching capacity, the design capacity.
Q. (By Mr. Shapiro) And there are four dashes under that -- that central focus. The third one says that "The lack of existence of particular type facilities will not delay or postpone the acceptance of spent fuel."



Do you recall that concept?
A. No, I can't say that I do.
Q. What about the next dashed concept, that "This posture is designed to ensure that all utilities will have firm planning schedules for the disposition of their nuclear wastes sufficiently early to determine their on-site interim storage needs during the 1990s"?
Do you recall that concept?
A. I think this is in keeping with what I said earlier, that we wanted to be transparent and work with the utilities and give them as much information when we could. The time frame stated in this -- in here, by the 1990s, during the 1990s, we would have selected a repository -- the repository site for the first repository. Basically either we would be in the final licensing process or close to it and we would have a design. So we could start working with the utilities in the '90s had we been able to maintain the schedules envisioned at this particular point in time.
Q. Do you have any understanding of what the connection would be between not letting the lack of existence of a particular type of facility have

with enabling utilities to have a firm planning schedule for the disposition of their spent fuel?
MS. HERRMANN: Objection. Foundation. Speculation. Assumes facts not in evidence.
THE WITNESS: We had always envisioned a concept where once the repository was under -- was approved and was either under construction or to be constructed, that you would need a receipt in handling capacity or a buffer storage, as referred to here, to -- between the time the fuel actually comes in and the time it goes down the shaft into the repository. So if there were some delay in some subsequent handling capability, you could still begin accepting in the buffer storage facility, but that buffer storage facility was tied to the geologic repository.
Q. (By Mr. Shapiro) Would the buffer storage facility be something at the repository itself or -- or something apart from that?
A. It would --
MS. HERRMANN: Objection. Speculation.
THE WITNESS: It was always envisioned that it would be at the repository site so you wouldn't have to transport things twice.
Q. (By Mr. Shapiro) During earlier parts of today,



we've been talking about different receipt rates at which RW might have been expecting that it might receive spent fuel. Was it your understanding that we were talking about receipt at the buffer facility or receipt within the actual disposal facility?
MS. HERRMANN: Objection. Vague.
THE WITNESS: At the receiving facility or buffer storage, however you want to call it.
Q. (By Mr. Shapiro) How large did DOE envision this buffer storage facility being?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: I -- I don't recall, and that would be very dependent upon the type of buffer storage. I believe -- my recollection is that the -- the initial Draft Mission Plan called for looking at a transportable storage cask that would in and of itself provide the buffer storage capability, where the -- where the material itself would be canistered and you would have to handle it a minimum number of times.
Q. (By Mr. Shapiro) This would be a -- a canister -- a dry canister that you could simply put on a concrete pad until you were ready to deal with it?



A. My recollection was that we wanted to see if it would be possible to encapsulate or put the spent fuel into a canister at the utility site, put it in a transport cask that either, one, if you could economically do this, then that just becomes the storage. Or because that could be very, very expensive to meet all of the transport requirements, have it in an over pack. So you take it out of the over pack and then set it out and then move the cask back to get more spent fuel. The -- the principle which we were trying to follow there was minimizing the handling of the fuel and the need to pack and unpack and minimize any contamination.
Q. Can we turn back to Exhibit 10 that we were just talking about, that -- the same page and the -- and the next heading is called Waste Acceptance Schedule.
The second dashed entry says that "The central criteria for this schedule is: An acceptance rate during the first 5 years such that no utility would have to build additional storage facilities after 1998."
Do you recall that concept?
A. I don't specifically recall the concept, but it's



consistent with my recollection of how we wanted to implement the Act.
Q. And the next dashed entry is an acceptance rate after the first five years equivalent to the actual rate of utility discharge of spent fuel each year. Do you recall that concept?
A. I would say the same thing I did about the last one: it's consistent.
I would emphasize that this says -- this is our planning base. This is what we'd like to do. And that's how our Mission Plan would -- would lay this out. So it represents, you know, what our plans would be.
Q. And I think, if I recall correctly from your prior testimony, your review of -- of the Mission Plan for issues such as insuring it was consistent with what you thought was actually doable; that these criteria were not simply pie-in-the-sky hopes, but actually your reasonable expectations of what you would be able to do.
MS. HERRMANN: Objection. Foundation. Speculation. Vague.
THE WITNESS: As a planning basis, it's what we originally set out with the intent -- with the hopes of doing. We may find out during the

course of technical work and design that it's not possible to achieve that. So this is just a planning basis.
Q. (By Mr. Shapiro) Did you expect to be able to -- to meet these goals?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: "Expect" would be too strong a word.
Q. (By Mr. Shapiro) Turn to the next hash mark that would -- refers to the planning basis assumes that individual utilities after 1998, whose turn to ship spent fuel to DOE, has not occurred based on the contractual specification of oldest fuel first, but otherwise need to add more on-site interim storage, would have two options: Arranging for transhipment or purchasing the right to ship spent fuel to DOE from another utility who is next in the queue.
Let me take those two concepts in turn. First, the transhipment. Do you recall that concept?
A. Yes.
Q. How did transhipment play into expectations as to how the program would operate?



MS. HERRMANN: Objection. Foundation. Vague.
THE WITNESS: Theoretically a utility with excess storage space could loan that excess space to another utility that needed it. My current thought is that was probably naive.
Q. (By Mr. Shapiro) Is that because of the political difficulties of moving spent fuel from one person's pool to another?
A. Yes. And a pragmatic business approach of why take a risk if you don't have to.
Q. What about the second approach, of purchasing the right to ship spent fuel from a utility that's next in the queue?
A. This -- that's another way of saying the exchange rights for shipping with another utility. And I think this is probably a little bit more pragmatic and it assumes they are not going to give you that right, they are going to charge you for that right.
Q. Is this statement consistent with your expectation that utilities that needed an early slot would be able to purchase the right to do so from -- from utilities that are earlier in the queue?
MS. HERRMANN: Objection. Foundation.



Speculation to the extent it mischaracterizes prior testimony.
THE WITNESS: This just reflected the fact that if we gave the utilities flexibility, they would work out any problems that they had.
Q. (By Mr. Shapiro) And it was your expectation that -- that they would in fact be able to work that out?
A. Yes.
Q. Was there ever a concern when you were at RW that these purchases or exchanges might not work out because of the -- the risk referenced with respect to the transhipment problems that, Gee, why take a risk and sell my -- my earlier spot in the queue?
Was that ever a concern that you recall being voiced about the exchange provision working?
A. I don't recall us ever discussing or believing that in a true necessity they couldn't work it out.
Q. What do you mean by a "true necessity"?
A. I have to shut down unless I can put this fuel somewhere. And I would think a utility that had excess storage space or -- or was earlier in the queue could very easily arrive at a negotiated price that would allow that to happen.



Q. So if I understand correctly, what -- what you mean by if faced with a necessity, you mean that a situation that would cause a utility that wanted to purchase the earlier spot, to pay enough money to -- to get somebody to -- to sell it?
A. As much or as little. Depends upon the utility and -- and that -- that had the space.
Q. Let me turn your attention, then, to the next page of the document. Down near the bottom of the page, it's the -- actually, the last dash, the item after that, it says that if by 1994, it is known that the first repository will be delayed, but by an expected period of less than 2 years, then DOE will take one of two actions. And it -- it refers to a design the size of a buffer storage facility. And then the second option is take title to the spent fuel and have it placed in dry storage casks and pay a rental fee.
Take those one at a time.
Do you recall consideration of this idea of designing the size of the buffer storage facilities to -- to handle a two-year delay in the opening of the first repository?
A. I don't specifically remember it.
Q. What about the -- the second option, of DOE taking

title to the spent fuel? Do you remember consideration of that idea?
A. No, I don't specifically remember that either.
Q. Do you generally remember that -- that notion?
A. Yeah, I think I -- I commented earlier about transportable storage cask and having the flexibility to accommodate unforeseen events, but to give you enough flexibility. This whole process and whole system required flexibility in order to be workable, and these seemed to be reasonable assumptions for a planning base.
Q. Why would DOE take title to utility spent fuel at the utility sites in 1998?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: Well, at this particular point in time, which was September 15th, 1983, I believe we had contracts that said we would begin accepting waste in '98. So it would be to fulfill that contractual provision.
Q. (By Mr. Shapiro) The terms that we've just gone over in this -- in this overview proposal, most of them did not find their way into the -- the final Mission Plan. Do you have any recollection -- I mean, I can go through them one at a time and



perhaps I should.
The -- let me start -- the first one we talked about. The lack of existence of a particular facility not delaying acceptance of spent fuel. That's not quite in the Mission Plan, I'll represent to you, quite that way.
Do you have any recollection as to what might have accounted for that change?
A. I had -- didn't -- wasn't involved in the issuance of the final Mission Plan.
Now, if you were to tell me what was in the Draft Mission Plan -- I don't recall -- I don't think it found its way into the Draft Mission Plan either. It may have. I just have no recollection.
Q. Maybe it's fairer to go slower and go to the Draft Mission Plan first.
(Exhibit No. 11 marked for identification.)
Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed what we've marked as Exhibit 11, which is a Draft Mission Plan.
A. This is not the one I was referring to.
Q. I will later show you another Draft Mission Plan.



We've got two.
A. I don't believe this one was ever issued publicly.
Q. This one, referring to Exhibit 11, is dated December 20th, 1983. Do you recall this -- this draft?
A. Vaguely.
Q. What was the purpose of this draft, if it wasn't distributed publicly?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: Well, before a document would go out for public review, even in draft form, it had to make sure it reflected what the Department of Energy's views and thoughts were. So any document had multiple drafts before it's -- before it was issued. And this would -- my recollection would be it would serve that purpose, for internal DOE review and comment.
Q. (By Mr. Shapiro) Would this document have passed your review?
A. Actually, at the time this was being issued, I was on a one-month assignment in the Secretary's Office, and I -- so I would doubt that I had specifically reviewed this version -- this December 20, 1983, version.
Q. What were you doing in the Secretary's Office,



December of '83?
A. I was representing -- I was -- my responsibility was to represent the sites' needs and -- to the Secretary -- to the Secretary's Office.
Q. Did someone else serve as -- in an acting capacity as deputy director at that time?
A. I don't believe so. It was unexpected, but come January 1, they needed to move Mr. Morgan to another position, which was the acting assistant secretary for Defense programs. And because of that, they moved me back into the director's position for the -- for the Nuclear Waste Policy Act Implementation Office.
Q. Actually, this draft, Exhibit 11, the cover of it refers to the office of Civilian Radioactive Waste Management.
A. Uh-huh. (Witness answers affirmatively.)
Q. That seems to indicate that the Implementation Office had become RW by that time? Do you recall that?
A. I didn't recall that, no.
Q. You do recall, generally, that there was a time when the Implementation Office became the Civilian Radioactive Waste Management?
A. I'd forgotten that.

Q. Do you recall significance to that transition from an Implementation Office to the Civilian -- Office of Civilian Radioactive Waste Management?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: I would speculate it may have been required by the Act, to have the Office up and running by that time. I do know that the Department was having difficulty in finding a person to be the political appointee called for in the Act to head the Office. And so that's -- that was the difficulty.
Q. (By Mr. Shapiro) They couldn't find anybody who wanted the job?
A. Well, I'm on record as saying they needed a person smart enough to do it and dumb enough to take it. So that was -- I can't get away from that. Fortunately Ben Rusche came along.
Q. Let me point your attention to the page after the table of contents of Exhibit 11, Page 1-1. The bottom of the page, the last sentence actually, this sentence seems to have the same concept that we talked about earlier, that the waste acceptance schedule will, initially, preclude the need for additional at-reactor storage and ultimately



remove from at-reactor storage all waste that is more than five years old.
A. Uh-huh. (Witness answers affirmatively.)
Q. Does the fact that this concept is in the December 20th draft, does that refresh your recollection at all as to the significance of that concept?
MS. HERRMANN: Objection. Vague. Speculation.
THE WITNESS: I have to admit, I doubt if there is something that could refresh my memory from something this long ago. But certainly the concept described here is consistent with my recollection of how we were trying to implement the Act so as to preclude unnecessary additional storage and unnecessary additional expense.
Q. (By Mr. Shapiro) Again, this time pointing your attention to Page 2-1, two more pages into the document. The second paragraph there says that "The Department does not intend to delay or postpone the acceptance of civilian radioactive wastes even if a permanent geologic repository is not completed by 1998."
Do you recall that intent?
MS. HERRMANN: Objection. Foundation.
THE WITNESS: I -- I did not recall this



provision or this portion of the -- of the strategy. Even though I would say it's consistent with my understanding of what we were trying to -- or hopeful of doing. But even as it states here, that was -- probably went beyond the original Nuclear Waste Policy Act and called for additional Congressional approval to make it possible.
Q. (By Mr. Shapiro) You needed additional Congressional approval because you might need some additional facilities?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: Some of the things we were proposing, we did not have the legislative authority to do.
(Recess 4:34 - 4:54 p.m.)

(Exhibit No. 12 marked for identification.)

EXAMINATION (Continuing)
BY MR. SHAPIRO:
Q. Mr. Lawrence, you were just handed what we've marked as Lawrence Exhibit 12. It's titled "Proceedings of the 1983 Civilian Radioactive



Waste Management Information Meeting, December 1983." The document is dated February of '84.
Do you recall this meeting at all?
A. No, I wasn't there.
Q. Do you recall Mr. -- helping Mr. Morgan prepare for this meeting?
A. No, I don't.
Q. Let me turn your attention to the second page of this exhibit. It says, at the bottom, actually, 12. It's -- last three numbers, Bates No. 600. And the second paragraph that starts on that page says, "We are concerned with the schedule on the repository is extremely optimistic for getting to 1998."
Do you recall that concern?
A. Yes.
Q. Is that consistent with your recollection? Were you concerned that having a repository operational by 1998 was extremely optimistic?
A. I -- I've previously stated that it required a number of things to occur and the possibility that any or all of those could be delayed would jeopardize the date. So I mean, this is consistent with what I've said.
Q. I know there were things that would jeopardize the

repository happening, but do you think it was likely that the repository would be operational by 1998 or did you think that was extremely optimistic thinking?

MS. HERRMANN: Asked and answered several times.

THE WITNESS: The '98 date was doable.

(Exhibit No. 13 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, we've handed you what we've had marked as Lawrence Exhibit 13, which is titled "Statement of Michael Lawrence, Accounting Director, RW." It's dated February 22, 1984.

Do you recall this statement?

A. I remember a number of Congressional hearings, not necessarily this specific one.

Q. Is it fair to say that this document represents your written testimony to the committee?

A. Yeah.

Q. I want to turn your attention, Mr. Lawrence, to the -- I guess it's the third page of the document, although it says 2 at the top. The last three numbers are the Bates No. 228. The last



paragraph on that page says, "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31, 1998."

Is it fair, then, to say that as of February 22, '84, the plan was still to accept spent fuel at a rate that would preclude the need for additional at-reactor storage after January 31, 1998?

A. Assuming we had a repository in place by January 31, 1998.

Q. And that was also part of the plan, to have a repository operational by 1998?

A. Well, the statement you're referring to says, by achieving this fundamental objective, which was beginning to accept it no later than January 31, 1998. So I was just linking those two thoughts. You can't decouple them.

Q. I think you just referred to having a repository operating by 1998 and I don't quite see that in this statement.

A. I'm sorry. You're right. It says we're beginning to accept high-level radioactive waste for safe



management, storage, and permanent disposal on a firm schedule, beginning not later than January 31, 1998.

Q. So as of February of '84, taking this spent fuel as of 1998 to -- fast enough to preclude the need for at-reactor storage was not necessarily linked to having a repository operating.

MS. HERRMANN: Objection to the extent it mischaracterizes his testimony.

THE WITNESS: I believe, but I would need to go look at the Act, that there were certain things that had to occur before you could start shipping and accepting waste. Although I don't recall exactly, I think it might have been things like you had a license to construct the repository. You had selected the site. A number of things had been approved.

So this statement here, in quotes, would -- I think has a number of other activities that have gone on before it that would have had to have occurred.

It then says, By achieving this objective, meaning all those predecessor events would have occurred, it says, "this will initially preclude the need for additional at-reactor storage" and



"ultimately remove all eligible waste." That -- that to me indicates some uncertainty of whether or not it would always preclude the need for additional storage.

Q. (By Mr. Shapiro) Turn your attention, Mr. Lawrence, to Page 13 of this -- of this statement. The third paragraph says that when finalized in mid 1984, the Mission Plan will be submitted to Congress. I'll represent to that you the Mission Plan was not finalized until midyear 1985. Do you recall what caused the delay in -- in finalizing the Mission Plan?

A. No, I don't. All I -- I -- I believe -- and I'm sure you can check this -- that we issued the draft -- well, I've been saying the Draft Mission Plan in May, but sometime while I was the director of the Office, which would have been between January and July.

Q. Well, I'll represent to you that it was -- it was dated April of '84.

A. Okay.

Q. And there is a --

A. So I mean --

Q. -- there is a transmittal from you dated May 2nd of '84, so you're right on.

A. Okay. Okay. Yeah, I left the program to come out here in the end of June 1984, so I -- and I really don't have any recollection or experience with what caused the delay in getting it out.
(Exhibit No. 14 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed what has been marked as Lawrence Exhibit 14, which is a memorandum on Battelle letterhead dated April 26, 1984, and subject line is MRS Institutional Report.
I want to turn your attention, first, to the third page of the document. The paragraph in the middle of the page under subject "Domenici Asks DOE to Address Environmentalists' Demands." It says, "Michael Lawrence, acting director of the waste program, said that he had discussed the same points raised by Domenici in an interview with Berick but Lawrence still says DOE believes that the 'key thing to maintain is the 1998 date as a commitment.'" That "even if full-scale operation cannot be achieved by 1998, some initial capacity could be available to receive spent fuel."
Do you recall that statement?



MS. HERRMANN: Objection. Vague.
Let me just say, take as much time you need to read the rest of this.
THE WITNESS: I don't remember this specific statement, but this specific statement is consistent with my recollection of our responsibilities.
Q. (By Mr. Shapiro) Do you have a recollection of what the initial capacity is that you would have been referring to, some initial capacity? Is that the buffer facility that you had referred to earlier? Was that something else?
MS. HERRMANN: Objection. Speculation. Compound.
THE WITNESS: The receipt and handling facility's capability to accept fuel is what would be initial capacity in my mind.
(Exhibit No. 15 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed what's been marked as Lawrence Exhibit 15. This is the April '84 draft of the Mission Plan that you've referred to previously. I'll represent to you, by the way, that this is an excerpt of that.



You might imagine that the Mission Plan draft was much longer.
Let me direct your attention, first, to the cover letter that -- or transmittal letter that appears right after the -- the cover. The last paragraph says that this April '84 Mission Plan incorporates changes in response to comments on a preliminary version --
A. I'm sorry, where are you?
Q. The last paragraph on that page.
A. Oh, okay.
Q. It looks like the "Th" is obliterated.
A. I'm with you. Okay.
Q. It says, "The Department issued that preliminary version in order to obtain input from States, affected Indian tribes, Nuclear Regulatory Commission and other Federal agencies early in the preparation process."
Does that statement refresh your recollection as to the purpose of --
A. The DOE document?
Q. -- the December '83 draft that we reviewed earlier?
A. Well, it -- I have to admit it doesn't really refresh my memory, but it does seem to clearly



state that that was a document that did go out for comment.
Q. If it went out for comment, is that -- is that, then, consistent with your prior statement? Would that indicate that that draft was -- was -- was vetted at least to the Department level to reflect the DOE's views as to how they felt the program would operate?
A. Yes, it would.
Q. Do you recall making any particular changes from the December '83 draft to this April '84 draft of the Mission Plan?
A. I -- I can't remember any specific changes, no.
Q. Let me point your attention to Page 2-2, place acceptance schedule there. There is a column in the middle that seems to represent the actual waste acceptance, the one that says "first repository acceptance." Am I correct to say that that is the column that represents waste acceptance?
A. Certainly appears to. And I would also add that those figures in there more appropriately represent the ramp-up that I referred to earlier.
Q. What do you mean by "more appropriately"?
A. You may recall early it said 1,800 tons a year for

the first five years and then 3,000 tons. This is
400, 400, 400, 900, 1800. They are much lower
cumulative total, but much more accurately
reflect -- reflecting my technical judgment and
opinion as to what we could expect.
Q. Do you recall how -- how the numbers in that
column were developed?
MS. HERRMANN: Objection. Foundation.
Speculation.
THE WITNESS: My vague recollection
would be much more based upon judgment and
experience.
Q. (By Mr. Shapiro) Mr. Lawrence, I'm going to ask
you to compare the two Draft Mission Plans,
Exhibit 11, the December '83 draft, and Exhibit
15, I believe, the April '84 draft; about a couple
of those changes that we talked about, things that
were in the earlier draft that -- that I don't
believe are in the later draft.
In particular, do you have the earlier draft
in front of you?
A. I do.
Q. Page 2-1?
A. Okay.
Q. At the bottom of the first paragraph, you might



recall we discussed the concept that no utility
will have to provide additional storage capacity
after January 31, 1998. And that does not appear
in the April '84 draft.
A. Uh-huh. (Witness answers affirmatively.)
Q. Do you have any recollection as to why that change
was made?
MS. HERRMANN: Objection. Asked and
answered.
THE WITNESS: The statement in the
initial draft represents an assumption, planning
assumption, on our part. It is not a requirement
of the Nuclear Waste Policy Act. I would think in
getting comments back on the original plan, and
specifically earlier referred here to things like
discussions with Mr. Berick that Senator Domenici
asked us to do, that -- I'm speculating, now --
but my recollection is the environmental and
intervenor groups didn't want -- were opposed to
the Department doing more than the law required
and may have objected to that provision. In which
case, it -- it's one -- that's one potential
reason why it wouldn't find its way into the final
report.
Q. But you don't recall specifically why -- why it's



not in the report?
A. No.
Q. Can you think of any other potential reasons as to
why that statement was taken out of the draft?
MS. HERRMANN: Objection. Speculation.
THE WITNESS: I -- I'd -- if I had to
speculate, it would be because that is not a
requirement of the Nuclear Waste Policy Act.
Q. (By Mr. Shapiro) And by the time you got to the
April '84 draft, you were trying to -- to limit
what you're planning to do to the minimum
statutory requirements in the Nuclear Waste Policy
Act?
MS. HERRMANN: Objection to the
mischaracterization of prior testimony.
THE WITNESS: Exactly. That's not what
I said. We -- we were going to do as much as we
could. We had to, one, satisfy the Act; and then
two, do it in such a way that would minimize the
likelihood of legal objections to what we were
doing, which we knew could slow up and prevent us
from meeting our objectives.
So to the extent we were trying to do more
than the Act required, that could be -- result in
a lawsuit, which would slow us down and prevent us



from meeting our key objective. So we had to back
off on some of those provisions, some of those
things that we may have wanted to do, but didn't
have the legal authority to do.
Q. (By Mr. Shapiro) Just a couple of other concepts
that are in the December '83 report.
One in the next paragraph that we discussed,
that the Department has not intended to delay or
postpone acceptance of wastes even if a permanent
geologic repository is not completed by 1998.
That term also seems to have --
A. Didn't make it in.
Q. -- to have been left out of the next draft. Do
you have any recollection of what happened there?
MS. HERRMANN: Objection. Asked and
answered. Speculation.
THE WITNESS: I would assume the exact
same thing that I said about the earlier
statement.
Q. (By Mr. Shapiro) But you don't recall?
A. No, I don't recall specifically.
Q. Sticking now with Exhibit 15, the April '84
draft --
A. Uh-huh. (Witness answers affirmatively.)
Q. -- let me direct your attention to Page 2-8. At

the bottom there's a section that's titled "Federal Storage to Meet Waste Acceptance Commitments."
A. Uh-huh. (Witness answers affirmatively.)
Q. It says, "In order to begin accepting waste in January 1998, the Department is considering methods whereby delays in the completion of the repositories can be accommodated." And that gives a for-instance. "The Department may provide Federal at-reactor storage to maintain the Waste Acceptance Schedule in the event of a delay in the repository schedule that does not threaten successful completion of the repository."
The term Waste Acceptance Schedule is -- is capitalized. Do you have any recollection of what's being referred to as the Waste Acceptance Schedule?
A. On Page 2.1 it says, "Based on the approach described previously, the Department has prepared a Waste Acceptance Schedule which specifies, in the aggregate, the quantities of commercial nuclear wastes that the Department will accept beginning in 1988. This schedule is presented in Table 2-1 on Page 2.2." So I'm assuming it's referring to that.



Q. Do you recall if in fact there was supposed to be -- that one is referring to the other or is that what you're gleaning from the document?
MS. HERRMANN: Objection. The document speaks for itself.
THE WITNESS: It appears fairly obvious to me that that's what it refers to.
Q. (By Mr. Shapiro) Mr. Lawrence, I'll represent to you that the -- the final Mission Plan, at least the one that came out in June of '85, refers to two scenarios, the -- the authorized plan and the improved performance plan.
When you were at RW, do you recall any discussion of two such plans?
MS. HERRMANN: Objection. Foundation. Vague.
THE WITNESS: No, I don't recall dual plans. To the best of my recollection, we only had one plan.
(Exhibit No. 16 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, I've handed to you what's been marked as Lawrence Exhibit 16, which I believe is a AP wire of a story. And at the



bottom it refers to -- to you, Michael Lawrence, Rusche's predecessor, had resisted pressure from Senator Johnston and the utility industry to proceed simultaneously with both an underground dump and an above-ground facility capable of storing the wastes for 50 to 100 years.
Do you recall having pressure from Senator Johnston or others about pursuing both the repository and some other facility to store waste?
A. Yes.
Q. What was Senator Johnston urging you to do?
A. Simultaneously provide a monitored storage facility and a repository.
Q. Were you resisting that suggestion?
A. I didn't have the authority to do that. The Act didn't provide -- it said you could study it, but you had to get Congressional approval to do it. You could not commit to do it without Congressional approval. And there was strong opposition by environmental groups and actually some nuclear people who felt that if you really went for the interim, you'd never get to the geologic repository.
So there were a number of people who opposed the idea of doing both.



Q. Were you studying the idea with an intent of making a proposal to Congress to actually authorize this repository -- monitored retrievable storage facility?
A. We were planning on submitting a proposal to Congress to develop a monitored retrievable storage facility as an available option to geologic repository should it be needed. My personal opinion was I was a proponent and a believer that MRS capability was a practical thing to do. But I also recognized, from all my experience leading up to this particular point in time, that there was also opposition to it, as well. And without the legal authority and the -- and the approval of Congress to do it, I wasn't in any position to commit to it.
Q. Why do you say it was a practical thing to do, the MRS?
A. To accommodate any unforeseen delays in the repository; to accommodate any, perhaps, problems you would find once you had started operating the repository. If you had to shut down for a while, if your shaft was somehow not working properly, it -- it was a form of buffer storage which would allow the system to continue to operate. You had

lag capacity.
Q. The first, there was reasons to accommodate unforeseen delays in the repository, is part of that idea to enable the Department to -- to meet its obligations to start taking spent fuel from utilities in 1998, even if a repository is available?
A. Would you repeat the question.
Q. You referred to unforeseen delays in the repository as one justification for -- for having monitored retrievable storage. Was it the desire to be able to accommodate unforeseen delays in the repository in part based upon the need for DOE to be able to meet its obligation to start accepting spent fuel from utilities in 1998?
A. That's correct.
Q. You said a couple of times that DOE couldn't commit to preparing an MRS because it didn't have Congressional authorization to -- to actually build an MRS. Do you contrast that with a repository? Did you have Congressional authorization to build a repository?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: I think the Nuclear Waste



Policy Act of 1982 charges the Department with the selection of a site and design/construction licensing and operation of a facility for the permanent disposal, a geologic facility for permanent disposal. So that's the obligation.
Q. (By Mr. Shapiro) But even with the repository, you needed Congressional authorizations every year to -- to keep studying and -- and developing it, and you had to -- you needed Presidential approval, you needed to be able to override a state veto?
A. There were a number of other obligations, but the basic undertaking was -- was approved by Congress.
Q. As opposed to the MRS, that even the basic undertaking was not yet approved?
A. The Department never received the authority to build an MRS, to the best of my knowledge.
(Exhibit No. 17 marked for identification.)

Q. (By Mr. Shapiro) Mr. Lawrence, you've been handed a document that we've called Lawrence Exhibit No. 17. It's from July of 1984. It's titled "Nuclear Waste Fund Fee Adequacy: An Assessment." It says it's a second annual report.



Do you recall this document?
A. No. I'd left the program at this point in time.
Q. It says it's the second annual report. Do you recall the first of these annual reports?
A. My thought was that it was the same as this Rosselli report that you showed me earlier, but it's not clear that's the case.
Q. I know you said that you left the month before. Perhaps the work on this started when you were at -- still at RW. But you don't recall any work on -- on this fee adequacy report?
MS. HERRMANN: Objection. Speculation. Compound.
THE WITNESS: It is the same report. This the first one right here, document 19.
I'm sorry, what was the question again?
Q. (By Mr. Shapiro) The report that -- that -- the July '84 report came -- came out the month after you left RW?
A. Uh-huh. (Witness answers affirmatively.)
Q. But knowing the documents don't come out in a couple of days, I was asking if you recall any work on this report before you left RW.
A. No, I don't recall any specific work on this report, although I recall that we were continually



collecting cost estimates and revenue projections. And since the conclusion is the one mill remained adequate, there would have been no -- you know, this would have been pretty much status quo.
Q. Let me point your attention to Page 3 of -- of the July '84 report. Again, there's some -- there are some assumptions listed in the middle of the page. One of those is repository receipt rates. And it -- it maintains the -- the same rates that -- that were noted in the earlier report, 1,800 MTU for the first five years and then 3,000 MTU yearly thereafter.
A. Uh-huh. (Witness answers affirmatively.)
Q. These rates you observed considerably fast or at least in the first four years than those in the April '84 draft of the mission plan. Do you have any recollection as to why subsequent to the April '84 draft, RW would still have been using these faster rates for the fee adequacy report?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: This is a financial analysis, not a planning document for -- for receipt and handling. Consequently, it looks to me as if at least in that -- in that regard to

receipt rates, the same assumption is used on the previous report were used here, and maybe for consistency sake or ease of calculation, it was done that way. I -- I don't know otherwise.
I would -- I would add, that things like the fee adequacy report would -- its specific purpose was to see if the fee was sufficient and whether or not the utilities would need to change their 1.0 mill per kilowatt hour. Anything in the assumptions would not -- we wouldn't -- we wouldn't have felt that anything in the assumptions would have changed the either contractual requirements or commitments or operational plans. This is just for illustrative purposes for the fee.
Q. (By Mr. Shapiro) Do you have any sense as to how the repository receipt rates received in any DOE facility, how those receipt rates would impact the fee adequacy analysis?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: That would require sensitivity analysis, which I'm not aware of.
MR. SHAPIRO: Let me take a quick break and I might be at the end of my questioning. Only



three more people to go.
(Recess 5:36 - 5:50 p.m.)

EXAMINATION (Continuing)
BY MR. SHAPIRO:
Q. Mr. Lawrence, I just have a couple more questions for you, really, about your transition out of radioactive waste management.
Do you recall the time when you left RW, June of '84, did you have any particular transition out of that office?
A. We had a party at O'Donnell's in Bethesda.
Q. Besides the party in Bethesda, was -- were there briefing books prepared for your successor?
A. I don't recall a briefing book.
Q. Was anything done to effect the transition to the next director?
A. There were -- there were meetings and discussions.
Q. Was the next director Mr. Rusche?
A. Yes.
Q. He in fact was the first Presidentially appointed director?
A. Right.
Q. What sorts of discussions did you have -- did you have with Mr. Rusche?



A. You know, basically the Mission Plan. The Mission Plan served as a very good transition document because the Draft Mission Plan, which was issued there in late April early May, laid out our thinking. And so he was able to review that and see what we had in store and in mind.
Q. Did you discuss with Mr. Rusche at all the contract that -- that RW had with the utilities?
A. I don't recall.
Q. Did you discuss with Mr. Rusche the acceptance rate issue of utilities' desire that -- that DOE establish a firmer schedule for accepting spent fuel?
A. I don't recall.
Q. Did you discuss your understanding of RW's legal obligations with Mr. Rusche?
A. I don't recall specifically, but I would assume I did. I know his statements in this press release here were consistent with my understanding regarding a commitment to begin accepting waste in '98.
Q. Do you recall discussing with Mr. Rusche any further obligation to -- to accept any particular quantity of spent fuel beginning in 1998?
A. No, I don't -- I have no recollection of that.



Q. After you left RW, did Mr. Rusche or others ever contact you for clarification or input on any issues that they were facing?
A. No, I don't believe they did.
MR. SHAPIRO: That's all I have.
(Signature reserved.)
(Deposition adjourned at 5:54 p.m.)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

YANKEE ATOMIC ELECTRIC COMPANY, )
et al., )
)
Plaintiffs, )
vs. ) No. 98-126C
UNITED STATES, )
Defendant. )

DEPOSITION OF MICHAEL J. LAWRENCE, VOLUME II

May 21, 2002
Richland, Washington



APPEARANCES

For the Plaintiffs Yankee Atomic Electric, Connecticut Yankee Atomic Power Company Maine Yankee Atomic Power Company:

Robert L. Shapiro
Spriggs & Hollingsworth
1350 I Street, N.W.
Washington, D.C. 20005-3305
(202) 898-5879
(202) 682-1639 Fax

For the Defendant:

Heide L. Herrmann
R. Alan Miller
United States
Department of Justice
1100 L Street, N.W.
Washington, D.C. 20530
(202) 307-0290
(202) 514-8624 Fax



APPEARANCES

For the Plaintiff Sacramento Municipal Utility District:

Timothy R. Macdonald
Arnold & Porter
370 Seventeenth Street
Suite 4500
Denver, Colorado 80202-1370
(303) 863-2334
(303) 832-0428 Fax

For the Plaintiff Commonwealth Edison Company:

Christopher P. Tompkins
Jenner & Block
One IBM Plaza
Chicago, Illinois 60611-7603
(312) 222-9350
(312) 840-8786 Fax



APPEARANCES

For the Plaintiffs Boston Edison Company, Duke Power, Florida Light & Power, GPU Nuclear, Indiana Michigan Power Company, Northern States Power Company, Power Authority of the State of New York, Omaha Public Power District, Nebraska Public Power District, PSEG Nuclear, LLC:

Daniel S. Herzfeld
Shaw Pittman, LLP
1650 Tysons Boulevard
McLean, Virginia 22102-4859
(703) 770-7612
(703) 770-7901 Fax

EXAMINATION INDEX


| EXAMINATION BY: | PAGE NO. |
|---|---|
| Mr. Macdonald | 7 |
| Mr. Tompkins | 79 |
| Mr. Herzfeld | 123 |


EXHIBIT INDEX


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 18 | 10-page letter to Robert Morgan from Alabama Power dated March 4, 1983 HQR-052-0272 - HQR-052-0280. | 22 |
| 19 | 6-page Memorandum to Michael J. Lawrence MOV.19990831.0061. | 35 |
| 20 | 37-page Memorandum to various from Michael J. Lawrence dated March 28, 1984 MOV.19990831.0022. | 62 |




EXHIBIT INDEX


| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| 21 | 7-page Mission Plan for the Civilian Radioactive Waste Management Program Volume II of II Volumes dated April 1984 (No Bates number.) | 67 |
| 22 | 25-page letter to Ben C. Rusche from Michael J. Lawrence dated July 23, 1984 (No Bates number.) | 98 |
| 23 | 8-page handwritten notes titled: Nuclear Waste Acceptance Schedule Alternatives mov.19990831.0058. | 120 |




BE IT REMEMBERED that on Tuesday, May 21, 2002, at 1550 George Washington Way, Richland, Washington, at 9:36 a.m., before SHAUNA L. BEACH, CCR, RMR, CRR, Notary Public in and for the State of Washington, appeared MICHAEL J. LAWRENCE, the witness herein;

WHEREUPON, the following proceedings were had, to wit:

<<<<<< >>>>>>

MICHAEL J. LAWRENCE, having been previously sworn by the Notary, deposed and testified as follows:

EXAMINATION

BY MR. MACDONALD:

Q. Good morning, Mr. Lawrence.
A. Good morning.
Q. We met yesterday off the record. But, for the record, I'm Tim Macdonald. I represent Sacramento Municipal Utility District, otherwise known as SMUD. You won't be offended if I refer to them as SMUD?
The same ground rules that Mr. Shapiro went



over yesterday apply to me as well. If you don't understand a question that I ask, please stop me and I will try to clarify my question or make it so that we are on the same page. Okay?
A. Right.
Q. Yesterday I think you mentioned that you did not recall whether you had been deposed before. Is that right?
A. Yeah, I don't think I have, but somewhere back in the old brain cells, I -- I may have been, but I -- but it made no impression on me.
Q. Not recently?
A. Certainly not recently.
Q. And I think you also testified that you hadn't discussed this deposition with anyone, other than counsel for the government. Is that correct?
A. Yes, although the fact that a lawsuit was pending and we would probably be called was something which Bob Morgan, Bob Rosselli, and I, because we're friends also, we were aware of. But we did not discuss of the substance of the case.
Q. Do you have reason to talk with Mr. Morgan or Mr. Rosselli generally?
A. Not really Mr. Morgan, because he lives some distance away. Mr. Rosselli and I both reside in

flexibility was and should have been provided for in the government's assigning of priorities because of a number of circumstances that might require you to give a high priority to a transfer.

Q. And a reactor -- the example you just gave of a reactor having a leak in its spent fuel pool, that could -- or would fall under a sort of emergency situation?

MS. HERRMANN: Objection. Calls for a legal conclusion.

THE WITNESS: I -- I would not necessarily believe that would have to be an emergency situation.

Q. (By Mr. Macdonald) You recall yesterday you discussed with Mr. Shapiro a clause in the contract providing that DOE could give priority for emergencies and that emergency provision is not defined in the standard contract?

A. I recall that discussion.

Q. If a reactor had a leak in its spent fuel pool, under what provision other than the emergency provision would they be entitled to priority?

MS. HERRMANN: Objection. Speculation. Calls for a legal conclusion. Standard contract is the best evidence of its contents.



THE WITNESS: I don't recall the specific provisions of this contract, but what I was indicating would be my belief that flexibility should be established to allow the government to make decisions such as that. But the contract speaks for itself.

Q. (By Mr. Macdonald) If you'd turn to Page 16593 of Exhibit 7 --

A. (Witness complies.)

Q. -- and look at the first column, the first full paragraph. States that "Article VI.B.3(b) gives priority to SNF/HLW from permanently shutdown reactors, and four commenters recommended that this provision be deleted. This type of priority is necessary to prevent reactors from waiting 20 or 30 years to be decommissioned after they finish generating electricity. Therefore, we have not accepted the recommendation."

Do you see where I'm reading?

A. Yes.

Q. Do you recall, generally, that certain utilities recommended deleting the provision for priority for shut-down reactors?

MS. HERRMANN: Objection. Foundation.

THE WITNESS: No, I don't recall that.



Q. (By Mr. Macdonald) Do you recall DOE reaching the conclusion that a priority for shut-down reactors is necessary to prevent reactors waiting 20 to 30 years to be decommissioned after they've finished generating electricity --

MS. HERRMANN: Objection. Foundation.

Q. (By Mr. Macdonald) -- as stated in the final published version of the standard contract, Exhibit 7?

A. I recall that it was an issue that we wanted to acknowledge, and as stated in the contract that some -- some priority be given to them so that they wouldn't have to wait for an extended period of time before they would ship.

Q. And it was DOE's intent that they not be forced to wait for an extended period of time before they should ship?

MS. HERRMANN: Objection. Foundation. Calls for a legal conclusion.

THE WITNESS: I would say that the contract -- you know, what it says here -- is fairly clear. It doesn't say they'd be the first, second, or third, but it says there would be consideration.

I also would point out that it -- clearly



this is something that can only occur once the repository is in operation, not prior to.

Q. (By Mr. Macdonald) And explain that for me.

A. My understanding is that we would not be able to start receiving wastes or accepting it until certain events had occurred. And it was clear that even if the repository weren't finished, it had been -- its construction license has been granted, that its construction had started, that there was a relatively well-defined end date. And so consequently, you could begin the movement of fuel, but -- but that its -- it wasn't for indefinite interim storage. It would be for eventual, in not too indefinite period of time, permanent disposal in a repository.

Q. So I understand your last answer, you stated that it was clear that even if the repository weren't finished, it had been -- its construction license has been granted, that its construction had started, that there's a relatively well-defined end date, and so consequently you could begin the movement of fuel. What did you mean by that?

MS. HERRMANN: Objection. Compound.

THE WITNESS: When the Nuclear Waste Policy Act was being debated in Congress and while

we were working to implement it, we received comments from a number of organizations concerning its implementation or had discussions with people concerning that. And it was clear that a number of organizations, particularly environmental organizations, had objections to monitored retrievable storage or shipment to a repository before it was clear that that was going to be an acceptable permanent disposal site.

That is why the Mission Plans that we looked at -- and the law itself says we should study an MRS, but we -- and make recommendations concerning it, but we did not have the authority to do it. It was because of these objections.

So my comment on the last answer reflected the fact that in deference to those concerns, shipments not be allowed or not be provided for until it was clear that the facility for permanent disposal was in fact going to be approved and operational such that there wouldn't be just temporary storage at the site.

Q. The focus of the Nuclear Waste Policy Act was getting a repository up and running?

MS. HERRMANN: Objection. Calls for a legal conclusion.



THE WITNESS: I think -- my opinion, it was clear that the primary focus of the Nuclear Waste Policy Act was to provide a permanent disposal of radioactive waste.

Q. (By Mr. Macdonald) And that means a repository, correct?

MS. HERRMANN: Same objection.

THE WITNESS: That's my interpretation.

(Exhibit No. 18 marked for identification.)

Q. (By Mr. Macdonald) Mr. Lawrence, I've had marked as Exhibit 18 a letter to Robert Morgan dated March 4, 1983, from Alabama Power Company. Do you have that document before you?

A. Yes, I do.

Q. I see you're leafing through it, at least briefly. Take as much time as you need. But do you recollect having seen this letter before?

A. No, I don't recollect having seen it before.

Q. I believe you testified yesterday you were aware that utilities had commented on the proposed contract published in the Federal Register on February 4, 1983. Is that correct?

A. That's correct.



Q. And you were aware of those comments but weren't sure if you actually reviewed specifically the comments that came in from utilities?

A. I said I couldn't recollect reviewing them. I feel my -- my speculation is that I did look through them, but I can't say that I looked through all or any specific one, since we got comments from a large number of utilities and others. I was, in general, aware of the comments and the general classification of comments and the issues they provided.

Q. Was Bob Rosselli primarily responsible for reviewing comments from utilities on the standard contract?

MS. HERRMANN: Objection. Foundation.

THE WITNESS: His organization was primarily responsible for reviewing those comments, but I can't speculate as to whether he personally went through them.

Q. (By Mr. Macdonald) When you say "his organization," he was the head -- the head of which branch or division of RW at that time?

A. He was associate director of management of the Nuclear Waste Policy Act Office, which subsequently became the Office of Civilian



Radioactive Waste Management.

Q. And so it was either Mr. Rosselli or people under Mr. Rosselli you believe would have been responsible for reviewing comments on the standard contract?

MS. HERRMANN: Objection. Foundation. Speculation. Asked and answered.

THE WITNESS: My speculation would be that people under Mr. Rosselli read each and every comment letter and then provided either summary documentation or representations as to what the comments were. I can't -- I have no knowledge of what Mr. Rosselli did or didn't do.

Q. (By Mr. Macdonald) Yesterday you recall you had discussions with Mr. Shapiro about the second "whereas" clause in the standard contract, which states --

A. Where are we?

Q. Lawrence Exhibit 7, Page 16600.

And the second "whereas" clause states, "Whereas, the DOE has the responsibility, following commencement of operation of a repository, to take title to the spent nuclear fuel or high-level radioactive waste involved as expeditiously as practicable upon the request of

the generator or owner of such waste or spent nuclear fuel."
Do you see where I'm reading?
A. Yes.
Q. Do you recall having discussions yesterday with Mr. Shapiro about this provision?
A. Yes.
Q. If you would turn to Page 8 of Exhibit 18, the letter from Alabama Power dated March 4, 1983, to Mr. Morgan. Under No. 7, the second sentence reads, "In this regard, we would like to emphasize the importance of the annual receipt rate of the disposal facility being designed, to the extent practicable, to be commensurate with the levels of spent nuclear fuel being generated annually and the need to also reduce the back-log of spent fuel as expeditiously as possible. Consistent with Section 302(a)(5) of the Act, the contract should express the intent of DOE to take title to spent nuclear fuel as expeditiously as practicable upon request of the generator or owner."
Do you see where I'm reading?
A. Yes.
Q. Do you understand -- or do you believe that this comment was adopted by DOE in publishing the final



version of the standard contract set forth in Exhibit 7?
MS. HERRMANN: Objection. Foundation. Speculation. Standard contract is the best evidence of its contents and speaks for itself.
THE WITNESS: I'd have to read the contract to find out what the contract says. As I read this comment, however, I can understand why the utility would feel that way. But I also believe -- my belief now and I believe it would have been then, that we would not have been able to accommodate that contract, because it says to take title to the fuel as expeditiously as practicable upon request of the generator or owner. And my belief is that the Nuclear Waste Policy Act, which we were operating to fulfill, said we'd take title to it once we had an operating repository.
Q. (By Mr. Macdonald) If you would look at Exhibit 7, Page 16600, the second "whereas" clause --
A. Uh-huh. (Witness answers affirmatively.)
Q. -- we just looked at, states that DOE has the responsibility to take title to the spent nuclear fuel as expeditiously as practicable upon the request of the generator or owner of such waste or



spent nuclear fuel, correct?
A. Uh-huh. (Witness answers affirmatively.)
Q. Is that not the same language set forth in Exhibit 18, as requested by Alabama Power?
MS. HERRMANN: Objection. Both documents are the best evidence of their contents and speak for themselves.
THE WITNESS: No, I don't believe that accurately reflects what's in document 18, because it's -- it's preceded document -- item -- Exhibit 7, says, "following commencement of the operation of a repository to take title to the spent fuel." That provision -- that comment is not included in Alabama's comment.
Q. (By Mr. Macdonald) I believe you testified yesterday that it was DOE's intent, expectation, that a repository be operational by January 31, 1998. Is that correct?
A. That's correct.
Q. And in fact, if you would look at Lawrence Exhibit 2, the February 4, 1983, published version of the draft standard contract, if you will look at second page of Exhibit 2, the third --
A. What page is that?
Q. That's page 5458. I know the print is a little



bit hard to read, but if you would look at the third column, about middle of the page, the last paragraph -- the last sentence of the paragraph that begins, "The proposed standard contract would establish." The last sentence of that paragraph states, "the Act directs DOE to begin repository operations no later than January 31, 1998."
A. Uh-huh. (Witness answers affirmatively.)
Q. Do you see where I'm reading?
A. Yes.
Q. Do you agree with that statement that the Act directs DOE to begin repository operations no later than January 31st, 1998?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: That is one of many things that the Act directs the DOE to do, but it also directed it to get approvals and -- and a number of other actions, prior to that occurring, which could make that impossible to do.
Q. (By Mr. Macdonald) I understand it could be impossible --
A. Yeah.
Q. -- for a variety of reasons. But you would --
A. Otherwise, it does direct the Department to do

so -- to have a repository in operation by January 31st, 1998.
Q. And based on what we just discussed in Exhibit 7, final version of the standard contract, DOE also obligated itself to take fuel as expeditiously as practicable once that repository was operational, correct?
MS. HERRMANN: Objection. Foundation. Calls for a legal conclusion. The document speaks for itself. Asked and answered.
THE WITNESS: I think the "whereas" clause we're referring to is fairly clear in what it says. Including the phrase "as expeditiously as practicable," which implies a number of considerations.
Q. (By Mr. Macdonald) I appreciate that "as expeditiously as practicable" means -- could mean a variety of things. But you would agree that, as we just discussed in Lawrence Exhibit 2, the Act directed DOE to begin repository operations by January 31st, 1998. And as set forth in Exhibit 7, DOE also is obligated take fuel as expeditiously as practicable once that repository was operating, correct?
MS. HERRMANN: Objection. Calls for a



legal conclusion. Now it's compound. Asked and answered.
THE WITNESS: To the extent that you just quoted two statements from two documents that -- they appear to be, you know, what the documents say. But the documents themselves are -- you know, clearly state those positions.
I -- I -- I'm just -- I'm wondering how we go from a draft document to a final document. I would think that the only applicable document is the final, which is Exhibit 7.
Q. (By Mr. Macdonald) What do you understand "as expeditiously as practicable" to mean?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
THE WITNESS: That the Department would not unduly restrict or delay receipt and transfer of fuel; that it would -- if it had the ability to do so, it would begin accepting waste according to the priorities and the -- the acceptance criteria that was to be laid out, and would do so once it knew just what its capabilities, in terms of receipt, were.
Q. (By Mr. Macdonald) When you say, "it would not unduly delay receipt and transfer of fuel," do you



mean -- I guess, what do you mean? Where there would be no technical barriers to the receipt of fuel?
MS. HERRMANN: Objection to the extent it mischaracterizes his testimony.
THE WITNESS: Would you repeat the question.
Q. (By Mr. Macdonald) You testified a minute ago that you understood "as expeditiously as practicable" to mean that the Department would not unduly restrict or delay receipt and transfer of fuel. Do you recall that testimony?
A. Yes.
Q. I'm just trying to understand what you mean by the Department would not unduly restrict or delay receipt and transfer of fuel.
A. As an example, if a fuel shipment was very low on the priority list and there were higher priority shipments out there, that would -- that would classify as higher priority shipments would be out there, but for whatever reason they weren't going to be shipped, then the government would move to -- to -- to go down on the priority list and take fuel earlier.
Q. Was it DOE's intention to accept fuel once the



repository was up and running at its design rate?
MS. HERRMANN: Objection. Foundation. Calls for a legal conclusion. Asked and answered.
THE WITNESS: I've already testified that the design rate was something we knew would not be achieved initially and it would take time to get to it. And no matter what the design rate was, it was always our -- our receipt would always be driven by our physical capability to safely receive and -- and process the waste.
Q. (By Mr. Macdonald) I understand you testified about a reasonable ramp-up period that you characterized, if I remember from yesterday, around three to five years. Is that correct?
A. That was -- that was an estimate that we used for planning purposes only. But that was used.
Q. Did you believe that a three- to five-year ramp-up was a reasonable ramp-up period?
MS. HERRMANN: Objection. Foundation. Speculation. Asked and answered repeatedly yesterday.
THE WITNESS: Based upon technical judgment some 15 years ahead of the fact, it appeared at that time a three- to five-year ramp-up was a reasonable amount of -- rate of

time.
Q. (By Mr. Macdonald) Did you understand DOE to have an unconditional obligation to begin accepting spent fuel on January 31st, 1998?
MS. HERRMANN: Objection. Calls for a legal conclusion. Vague.
THE WITNESS: As I understand the question, absolutely not.
Q. (By Mr. Macdonald) And why do you say that?
MS. HERRMANN: Same objections.
THE WITNESS: Because I felt the Department could only receive the waste once we had a repository licensed and in operation.
Q. (By Mr. Macdonald) So in your view, until DOE had a repository licensed and in operation, it had no obligation to accept spent fuel?
MS. HERRMANN: Objection. Calls for speculation.
THE WITNESS: It was my belief that the contract which we signed did commit the government to begin accepting title to the fuel and take responsibility -- begin taking title to the fuel by January 31st, 1998. But we did not know then at what rate that could be or what that would ultimately entail.



Q. (By Mr. Macdonald) When you say "begin accepting title to the fuel," are you positing that that would have been done possibly at the reactor site?
MS. HERRMANN: Objection. Speculation. Asked and answered yesterday.
THE WITNESS: That was a possibility.
Q. (By Mr. Macdonald) And you felt that was a possibility consistent with the Nuclear Waste Policy Act and the standard contract?
MS. HERRMANN: Same objections. And now it calls for a legal conclusion.
THE WITNESS: I would have to state I believe the contract has to speak for itself. My personal views and opinion don't alter anything in the contract. I did believe then and now that when we entered into these contracts, we were committing to have a capability or take responsibility by '98. But I also was concerned then, as I am now, that we could not and did not make any commitment as to the rate at which we would be able to begin taking responsibility and ownership of the fuel.
Q. (By Mr. Macdonald) I'm not sure that answers exactly the question I asked. And I'll rephrase it because I'm not sure you liked the question,



but I'll --
With respect to the standard contract, did you believe that taking title of the spent fuel at the reactor site was consistent with the Nuclear Waste Policy Act?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: No, I don't believe that was consistent with the intent of the Nuclear Waste Policy Act. The intent of the Nuclear Waste Policy Act, in my opinion, was for us to have a repository in operation by January 31st, 1998. And all of the other provisions of the Act and subsequently the contract were based upon that premise.
MR. MACDONALD: Take a five-minute break?
MS. HERRMANN: Sure.
(Recess 10:27 - 10:35 a.m.)
(Exhibit No. 19 marked for identification.)

EXAMINATION (Continuing)
BY MR. MACDONALD:
Q. Mr. Lawrence, I've had marked for identification



as Exhibit 19 a draft memorandum to Michael J. Lawrence and it is from Robert M. Rosselli, and the subject is "Use of Reference Case Assumptions as the Technical/Costing Baseline for OCRWM's Program." Is that document before you?
A. Yes.
Q. I appreciate that this is a draft document. And if you turn to Page 4, 5, and 6 you'll see some handwritten notations. And at the top it states, "Rosselli Comments, Version 2 of 24 February '84." And in parentheses, "(Editorially revised by Head)."
Do you see that --
A. Uh-huh. (Witness answers affirmatively.)
Q. -- notation?
A. Uh-huh. (Witness answers affirmatively.)
Q. Do you know if those are Robert Rosselli's handwritten comments?
A. Umm, I can't -- I can't say whether those are Bob's or not. I get the impression they're Charlie Head's, but that would just be a guess on my part.
Q. What gives you that impression?
A. Well, for one thing it says, "Editorially revised by Head." And I am going to speculate that

Q. And if would you look at the language on Page 9.6 of Exhibit 21, it uses the word "will" and states that "additional storage capacity needed to accommodate the delay in schedule will be provided by the Department."
A. Uh-huh. (Witness answers affirmatively.)
Q. Correct?
A. Uh-huh. (Witness answers affirmatively.)
Q. Does that eliminate the ambiguity that you believed existed in -- look at it on Page 2-1 of Exhibit 15.
A. No, it -- it most certainly wouldn't reduce or -- or eliminate the ambiguity. I would say -- where was it in the first one?
Q. It was on Page 2-1 of Exhibit 15, the last sentence of the first full paragraph.
A. Yeah. Yeah. In fact, I would in general believe that a statement that appears in Volume I, Page 2.1, in the first paragraph of Program Strategy, would probably have gotten more attention than the last sentence on -- in Section 9.4 of Volume II. And one possibility would be -- didn't catch -- if in fact it was intentional.
As I've previously testified, it's a Draft Mission Plan. It states what our -- what we would



like to be able to do; what our assumptions were in doing it. And then it would go after public comment.
And perhaps, you know, clearly from my recollection, what is stated there is something which I personally would have liked to have been able to provide, and I think many of the people implementing the program would have liked to have been able to provide. But also, as testified yesterday and discussed today, the Nuclear Policy Act was a balance and there were people for things and against things and things in there and not in there.
And so it only said what we'd like to be able to do, but it just by saying it didn't give us the authority or the ability to do it.
Q. If --
A. Is that clear?
Q. I'm not sure. If -- if you had read the last sentence on Page 9-6 of Exhibit 21 in 1984 --
A. Uh-huh. (Witness answers affirmatively.)
Q. -- would you have approved of that statement and let it stay in this Draft Mission Plan that you published publicly?
A. You're asking me to look in hindsight -- comment



today in hindsight on something that is -- that is very difficult. You know, I -- I don't know if I physically and actually read that sentence or not, or if I would have changed it then or not. I can't say that.
Q. You can't say either way?
A. I can't say either way.
Q. You may have left it in; you may have taken it out?
MS. HERRMANN: Speculation.
Q. (By Mr. Macdonald) The court reporter can't get a nod. Was that a "yes"?
A. I cannot say what I would have done back then.
MR. MACDONALD: Take a five-minute break?
(Recess 11:56 - 12:08 p.m.)

EXAMINATION (Continuing)
BY MR. MACDONALD:
Q. Mr. Lawrence, if you would take out Exhibit 13 for me, which is your statement dated February 22nd, 1984, before the Subcommittee to Energy Conservation and Power.
A. (Witness complies.)
Q. If you would turn to Page 2, which is Bates Page



228.
A. (Witness complies.)
Q. And I know you discussed this with Mr. Shapiro briefly yesterday, but I just wanted to direct your attention to the statement in the middle of the page, "These activities are fashioned on the fundamental objective of the Nuclear Waste Policy Act of 1982."
A. Uh-huh. (Witness answers affirmatively.)
Q. Do you see where I'm reading?
A. Uh-huh. (Witness answers affirmatively.)
Q. Do you know where you would have taken this fundamental objective of the NWPA from?
A. Well, the quote is from the Nuclear Waste Policy Act.
Q. And that quote is "to accept high-level radioactive waste for safe management, storage and permanent disposal on a firm schedule beginning not later than January 31st, 1998."
A. That's were the quote is taken from. I'm sure there is context around that quote about having a geologic repository licensed and constructed and in operation.
Q. But you believed this was the fundamental objective of the NWPA, as demonstrated by your

testimony to the House Committee, in Exhibit 13,
correct?
MS. HERRMANN: Calls for a legal conclusion.
THE WITNESS: A fundamental -- the term "fundamental objective" represents my judgment at that point in time, my opinion. It doesn't necessarily mean it was the fundamental objective.
Q. (By Mr. Macdonald) In your view, it was the objective?
A. Yes. But in the context that we were requesting an appropriation of a quarter of a billion dollars for a geologic repository, I think that had to be factored -- that was pretty big objective, as well.
Q. Having the repository was a pretty big objective?
A. Having a repository was the primary means of which that objective could be met.
Q. Your statement goes on to say that "By achieving this fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31st, 1998."
Do you see where I'm reading?



A. I see that.
Q. Did you anticipate that DOE would meet the fundamental objective of the NWPA?
MS. HERRMANN: Objection. Speculation. Calls for a legal conclusion. Asked and answered. Mischaracterization.
THE WITNESS: It was our goal to have a repository selected, constructed, licensed and in operation by January 31, 1998. That was our objective. That was our goal.
Was I certain it was going to happen? No.
Q. (By Mr. Macdonald) Did you believe that DOE would meet this fundamental objective of the NWPA, when you were acting director in 1984?
MS. HERRMANN: Same objection. Asked and answered like 18 times yesterday.
THE WITNESS: I believed that we could meet that objective.
Q. (By Mr. Macdonald) And if you met that objective, it would preclude the need for additional at-reactor storage, correct?
A. If we achieved that objective, and the ramp-up and acceptance rates were as anticipated and the -- and the spent fuel storage arising at the utilities were as projected, it would preclude the



need for additional storage capacity.
Q. Additional storage capacity after January 31st, 1998?
A. That's correct.
MR. MACDONALD: I think for now I am done with my questions. Like we have in the other depositions, I will reserve my right to reopen the deposition pending document issues and motions to compel and the like.
MS. HERRMANN: We continue to oppose your reservation.
MR. MACDONALD: Off the record.
(Recess 12:14 - 1:45 p.m.)

EXAMINATION

BY MR. TOMPKINS:
Q. Mr. Lawrence, my name is Chris Tompkins. I'm from the law firm of Jenner & Block.
Before I start, I just want to make sure we have the ground rules straight. The same rules that Tim and Robert Shapiro before me laid down still apply. If you don't understand my question, please let me know. If you want to clarify any answers, please let me know.
My first question is back in this 1983/1984



time period, when RW was putting together the standard contracts, did RW foresee that if it did not make the 1998 date and could not begin acceptance of spent fuel, that utilities would have expenses related to storing spent fuel and would have to build additional storage after 1998?
MS. HERRMANN: Objection. Foundation. Speculation.
THE WITNESS: Yes, it was anticipated that over time, that additional storage and expenses would be incurred by the utilities.
Q. (By Mr. Tompkins) And was it also anticipated that over a period of years, this may eventually result in problems for operating reactors in maintaining fuel pools and maintaining operations?
MS. HERRMANN: Same objections.
THE WITNESS: Yes, I think that was a natural consequence of -- of no -- no place to send the fuel.
Q. (By Mr. Tompkins) Okay. And further, depending on the length of the -- of the delay, was it anticipated that continued storage of spent fuel at reactor sites could eventually result in a delay of decommissioning of reactors, after they had reached the end of their -- their licensed

term or their -- or their life operating period?
MS. HERRMANN: Same objections.
THE WITNESS: All of the things you've said are just a natural consequence and progress of having no place to send fuel. Ultimately all of those things occur.
Q. (By Mr. Tompkins) Now, I believe you previously testified this morning and yesterday that with regard to acceptance rates, the Department did not want to make a commitment to any specific rates, at least early in the process, in 1983, 1984. Is that correct?
A. What I believe I said was that we did not have the capability to make any commitment to acceptance rates before we had more information on the design and capabilities of the repository.
Q. But you did testify that you were trying to provide utilities with as much information so that they could plan themselves, as far as how much fuel they were going to have on-site?
A. I believe what I said is we intended to provide them as much information as early as possible. But basically nothing we had in the '83/'84 time frame could provide a reasonable basis for planning. That would all be subsequent to that.



Q. Now, a utility who was looking into the future and seeing what their storage needs were, they would need some sort of lead time to be able to plan to add additional storage if it was anticipated that pickup would begin at a lower rate or wouldn't begin at all in 1998?
A. That's correct.
Q. Do you know how long that lead time would be for a utility if they wanted to add additional dry storage on their site, for example?
MS. HERRMANN: Objection. Speculation.
THE WITNESS: It's difficult to say with any accuracy what that would be, because it would require licensing actions and -- and other activities. But this -- in general, we knew we wouldn't be in a position to give them more information until sometime in the '90s, assuming a '98 opening, and that they would have to plan accordingly prior to that time. And even once we did give them that information, they needed to plan accordingly.
Q. (By Mr. Tompkins) So the utility could be in a position where they should plan for additional at-reactor storage that they never build?
A. Yes.



Q. Was this ever communicated to the utilities?
A. I don't have a specific recollection, but I know that we felt and I -- and I believe communicated, but I have no specific recollection, that, you know, the utilities were responsible for the fuel up until the time we took title to it and they had to plan accordingly and provide sufficient storage to -- for the continued operation of their reactors.
Q. The utilities and the Department, however, were aware of a date that -- 1998 that was set in the Nuclear Waste Policy Act?
MS. HERRMANN: Objection. Speculation.
THE WITNESS: I assume. We certainly were aware of the date set in the Act, but a date set in the Act did not mean that the physical, you know, repository would in fact be in place by then. That was our intent and that was our plan. Everyone in this business knows that plans can often change.
Q. (By Mr. Tompkins) In that case, what was the intent of putting a date in the statute? I mean, was -- was it your view or the Department that in passing the Nuclear Waste Policy Act in 1982, Congress, at the very least, put the Federal



Government in a position where a policy was disposal would begin in 1998?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
THE WITNESS: The date in the Act was clearly a date that Congress wanted the Department of Energy to meet. But the Congress also put a number of provisions and activities and precursor events that had to occur, I assume with full recognition that if those dates weren't met, that it would make it difficult to meet the '98 date. But they were all prerequisites.
Q. (By Mr. Tompkins) I'd like to go back to Lawrence Exhibit 13. Back on Page 2 again, which is Bates No. PNL-173-0228, I believe you previously testified this quote here in the middle of this page was something that came from the Nuclear Waste Policy Act.
A. That's my assumption.
Q. What is your interpretation of what a "firm schedule" means, as -- as it appears in this quote?
MS. HERRMANN: Objection. Foundation. Speculation. Calls for a legal conclusion.
THE WITNESS: I can't say for certain

Exhibit 20 for a minute, shifting gears a little bit.

Going back to Page 1-2 of this document, the -- the title across the top is "Program Objectives." I believe you testified earlier that under the original Nuclear Waste Policy Act of 1982, a MRS facility was not authorized and that the Department under -- under that department, while it was to study an MRS, could not actually site and -- and construct an MRS. Is that correct?

A. My recollection was that, although there were certain members of Congress who wanted an MRS, there wasn't sufficient support to have a provision to provide an MRS included in the Act. So instead, the Act I believe required the Department to do a study and submit to them a study for an MRS for whatever purposes. And one such purpose might be for those people who wanted it to try to push it forward.

Q. Under Program Objective 2 here it states, "To submit a proposal to Congress to develop Monitored Retrievable Storage Facilities as an option to geologic repositories in the event that such repositories cannot be sited or licensed."



Does this objective infer that an MRS facility was going to be a backup to a repository?

MS. HERRMANN: Objection. Asked and answered.

THE WITNESS: I think that that was at least one of the intents.

Q. (By Mr. Tompkins) So the primary focus of the Act was to dispose of waste in a repository and not an MRS?

MS. HERRMANN: Objection. Asked and answered. Calls for a legal conclusion.

THE WITNESS: I believe that the original intent was repository, yes.

MR. TOMPKINS: I'd like to take a short break. I'm expecting a document and I need to check to see if it's arrived.

(Recess 2:21 - 3:06 p.m.)

EXAMINATION (Continuing)

BY MR. TOMPKINS:

Q. I'd like to apologize for the delay, but technology was conspiring against us in addition to other things.

(Exhibit No. 22 marked for identification.)



Q. (By Mr. Tompkins) I'm showing you, Mr. Lawrence, Exhibit No. 22.

Exhibit 22 is a document that we pulled off of RIS-Web. And I was just looking for a Bates number to put in the record; however, it doesn't look like there is one except for the number on the side, which is 90002 and then it's 2008.

Mr. Lawrence, is this a letter that you wrote?

A. (Examination of documents.) Although I don't recall -- recall this specific letter, that is my signature. The letter itself appears to have been written by a person with the initials RDH, and I don't recall who that was.

Q. This letter is dated July 23rd, 1984. Had you moved to Richland by this point?

A. I couldn't recall the exact date, but it's obvious that I was the manager on that date, because I signed it as such.

Q. Okay. Am I correct in interpreting the letter that they're commenting from the Richland office about the Draft Mission Plan that we had looked at previously, dated April 1984?

A. The third page here is entitled "RL Comments on the Draft Mission Plan Dated April 1984." And I



assume that reflects the fact that these are RL's comments, or Richland Operations comments. And as stated here -- I guess that's enclosure one.

Q. What role would the Richland Operations Office have had in reviewing the -- the Draft Mission Plan?

A. The Mission Plan called for a process to select a repository site and also to provide for taking both commercial and Defense wastes into the repository. Richland would have had two primary areas of interest.

One, Richland was at that time under consideration for a geologic repository. So it would have been appropriate to comment on the site -- the siting and the site selection process.

Rockwell, who was our contractor at that time, was managing the program at Hanford, looking at the basalt under the Hanford site for a repository.

The other aspect, the second aspect that we would have been interested in, would have been the fact that Pacific Northwest Laboratory was responsible for tracking the spent fuel storage needs of the utilities and so, consequently, they would have -- or could have provided comments.

And according to this letter, I assumed they and Rockwell did provide comments on. But NPL would have provided comments on the commercial spent fuel storage needs.

Q. On the first page of this letter, it states, "The most significant comments, some of which are discussed in detail" below "are as follows:" Number one, it states, "It should be noted that to eliminate the need for additional at-reactor storage after January 31, 1998, the initial waste acceptance rate for 1998 should be about 2,800 MTU plus some amount up to 630 MTU, depending upon the extent Federal Interim Storage is utilized."

Do you know if this 2,800 MTU plus some amount is sufficient -- is sufficient to eliminate the need for additional at-reactor storage?

Perhaps more precisely, do you have any reason to doubt the adequacy of this forecast?

MS. HERRMANN: Objection. Foundation. Speculation.

THE WITNESS: If I -- you know, I signed this letter, so I -- I know no reason why to doubt that estimate.

Q. (By Mr. Tompkins) You said you didn't remember this specific letter. Would you have reviewed



this letter, though, before you signed it. I do see that it has your signature on it.

A. I certainly would have read the letter before signing it.

Q. And would you have agreed with its contents before signing it?

A. Based upon my knowledge at that time, I -- I would believe that whatever I put in this letter and signed would reflect my views or what I reasonably expected to be accurate.

Q. Now, this letter is addressed to Mr. Ben Rusche, a director. Was he the director at this point? You had left, obviously, and gone to Richland, but --

A. Yes, we've already established that he was the first director of the Office of Civilian Radioactive Waste Management, who was, you know approved by the Senate.

Q. Comment No. 2, the second sentence states, "If title to the fuel passes to the DOE on January 31, 1998, as implied in the DOE/utility disposal contracts, the financial responsibility for this post-1997 storage could rest with DOE. This cost has not yet been considered in the Nuclear Waste Fund Fee Adequacy Analysis."

Did this comment reflect your viewpoint at



this time?

MS. HERRMANN: Objection. Calls for a legal conclusion. Relevance. Speculation.

THE WITNESS: This -- reading this section -- or this comment No. 2, it states an implication, therefore not a -- a specific, but an implied or an implication of the contracts. And points out that these are costs that were not in the nuclear waste fund fee adequacy analysis that we, I think, have here as document, Exhibit 17.

Q. (By Mr. Tompkins) This Statement 2, however, does imply that someone at Richland was concerned that DOE would be responsible for storage after January 31, 1998 -- financially responsible?

MS. HERRMANN: Objection. Speculation. Calls for a legal conclusion.

THE WITNESS: It would indicate to me that someone raised the possibility that if the government was responsible for storage after 1998, that the costs would be significant and that cost had not yet been put into the fee adequacy analysis.

Q. (By Mr. Tompkins) Well, the statement specifically implied in the DOE/utility disposal contracts. That's on the top of Page 2.



A. Uh-huh. (Witness answers affirmatively.)

Q. So this is inferring that -- that DOE has responsibility for these costs under the standard contract?

MS. HERRMANN: Objection. Calls for a legal conclusion.

THE WITNESS: No, I would not characterize it the way you did.

Q. (By Mr. Tompkins) How would you characterize it?

A. I would say if the DOE were to -- I think it means there's an uncertainty here. Because I cannot -- because I would assume all costs that we knew would be incurred would be put into the fee adequacy report. And so they're drawing attention to the fact that there is uncertainty or could be uncertainty about the costs for this additional storage, and therefore drawing attention to Mr. Rusche, that that is something that should be considered.

I'd go further. That my recollection is that although we knew that a goal -- or we established as a goal for the Department was to preclude the need for building additional at-reactor storage after we began accepting the waste, that was a goal which we couldn't guarantee and could not

commit to take the fuel such that that would not occur.
Now, one possible -- and I'm just speculating here -- but one possible explanation is, from the time I left and Mr. Rusche came on board, Mr. Rusche being a -- the -- a full -- fully appointed and approved director of the Office of Civilian Radioactive Waste Management, may have been stating services or capabilities that he now wanted to bring to the program that went beyond what was in our original -- what was in the Mission Plan in April of '84.
And I recall -- I'll call your attention to Exhibit 16, which states, basically he wanted to do something which was further -- or beyond what I was talking about. So consequently, if subsequent to Mr. Rusche being confirmed and coming into position as director, he had contemplated the possibility of the government assuming a contractual responsibility for all fuel and storage post '98, it would seem reasonable to point out what the cost of that assumption or desire could be so that he could factor into -- that into his consideration.
But what it says here doesn't change what's



in the Mission Plan, and it certainly doesn't change what's in the contract.
Q. But this statement specifically says, "as implied in the DOE/utility disposal contract." It doesn't -- it doesn't reference any -- any new policy imposed by Mr. Rusche.
MS. HERRMANN: Is that a question?
Q. (By Mr. Tompkins) Does it?
MS. HERRMANN: Objection. Speculation. The document speaks for itself.
THE WITNESS: Well, I -- I -- I'm going to speculate that the use of the word "implied" is clear and that it doesn't say as "stated in the disposal contract" or "as required in the disposal contract." Implied means that it is something not clearly and specifically spelled out.
If I felt it was a contractual obligation, I do not believe I would have used the word "implied."
Q. (By Mr. Tompkins) And yet someone, either the person that wrote this letter for you or you at this time, recognized that that was the implication from the contract, even if it wasn't clearly stated?
MS. HERRMANN: Objection. Calls for a



legal conclusion. Speculation.
THE WITNESS: I can't recall what -- what would have been going through my mind at this point in time.
Q. (By Mr. Tompkins) Moving to the first enclosure attachment to this letter, enclosure one, which at the top is titled "RL Comments on Draft Mission Plan."
Could you read, for now, just the -- the paragraph under Item No. 3.
A. (Witness complies.) Okay, I've read 3.
Q. Okay. We had talked briefly -- or actually at some length earlier about the -- the goal of precluding the need for additional at-reactor storage. In this first paragraph under No. 3, the third sentence, I believe, in states that "This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31, 1998."
Doesn't this statement imply that it was actually the intent and goal of the NWPA to preclude the need for -- the need for additional at-reactor storage and not just a goal of the Department?
MS. HERRMANN: Objection. Calls for a



legal conclusion. Document speaks for itself.
THE WITNESS: I think the statement is rather clear. And I would specifically note the use of the word "intent" rather than "requirement."
Q. (By Mr. Tompkins) Well, certainly in trying to implement the NWPA, DOE was -- and RW was -- was charged with -- was implementing Congress's intent. Is that true?
MS. HERRMANN: Objection. Calls for a legal conclusion. Vague.
THE WITNESS: Clearly we were charged with carrying out the requirements of the law and, to the degree we possibly could, to meet the intent of the law, to the best we could discern it and the best we could do it.
Q. (By Mr. Tompkins) Well, the intent of the law is reflected in the requirements, is it not?
MS. HERRMANN: Objection. Calls for a legal conclusion.
THE WITNESS: Yes. And to the best of my knowledge, the Act does not say it is a requirement of this Act that facilities be provided such that no additional storage capacity is necessary. But I don't recall that specially.

Q. (By Mr. Tompkins) But this intent, as reflected here in this document, conflicts with the requirements of the Act?

MR. HERRMANN: Objection. Calls for a legal conclusion.

THE WITNESS: I would have to reread the Act, but I believe this intent goes beyond the requirement of the Act.

Q. (By Mr. Tompkins) There is no provision in the Act, however, that the intent was not to preclude the additional -- was not to preclude the need for additional at-reactor storage?

MS. HERRMANN: Objection.

THE WITNESS: There are too many negatives in there. Could you repeat the questions?

Q. (By Mr. Tompkins) Sure. I'd be glad to.

There's -- there aren't any provisions in the Act which state that the purpose of the Act is not -- is -- I'm sorry. Yeah.

A. Yeah.

Q. This is getting a little out there.

The Act does not contain any provisions which state that the purpose of the Act is anything other than to preclude the need for additional



at-reactor storage?

MS. HERRMANN: Objection. Calls for a legal conclusion. Nuclear Waste Policy Act is the best evidence of its contents.

THE WITNESS: There's still too many negatives in your question for me to understand it. I would maybe try to offer some helpful -- it might be easier to say that there is no provision in the Act requiring the Department to ensure that additional storage space is not required by the utilities after 1998.

Q. (By Mr. Tompkins) Well, there's -- there's nothing in the Act that's -- that states that DOE's mission is anything other than to -- to preclude at-reactor storage?

MS. HERRMANN: Objection. Calls for a legal conclusion. Best evidence.

THE WITNESS: My recollection and understanding was that Congress in passing the Act wanted to ensure a system was in place to safely dispose of nuclear waste by 1998. It was also my understanding that many of these supporters of the Act felt that a benefit of doing so would be to preclude the need for additional and costly at-reactor storage to be provided. And therefore,



by having a repository in place by '98 and to begin accepting waste by '98, it was hoped that additional storage at reactors could be precluded.

In the Mission Plans, both drafts that we've looked -- talked about, it states that the Department sought to provide capability such that additional storage would not have to be provided. All of those, I think, are reflected in writing in the exhibits we've got here.

But having said that, I saw nothing in those documents that said it was a legal requirement of the Act that that be the case.

Q. (By Mr. Tompkins) This statement here, though, does link up that goal with the Act and the purpose of the Act.

A. It links it up with -- via the word "intent," which to me implies that it was something desirable but not a specific requirement.

My belief is I would have used the word "requirement" because it's a much stronger word and -- and something that -- certainly conveys much more of a commitment or an obligation than the word "intent."

Q. This paragraph goes on to discuss the appropriate acceptance rate to achieve that goal.



A. Uh-huh. (Witness answers affirmatively.)

Q. Again, it states that the acceptance rate should start at 2800 MTU per year and increase to 2500 MTU per year in six years rather than starting at 400 MTU per year and increasing to 3,000 MTU per year.

A. Uh-huh. (Witness answers affirmatively.)

Q. Are you aware of where these numbers would have been generated or how they would have been calculated?

MS. HERRMANN: Objection. Foundation and speculation.

THE WITNESS: I don't recall specifically, but that is the type of information that we relied upon PNL to provide. And consequently, since the '84 Mission Plan -- Draft Mission Plan had the acceptance rate, which we've previously discussed, at the buildup, this would have been drawing attention to the fact that what was in the Mission Plan, and the stated objectives in the Mission Plan, resulted in an -- in an inconsistency.

Q. (By Mr. Tompkins) It implies that the -- the ramp-up in the Mission Plan, which started at 400 MTUs, was insufficient to preclude more at-reactor

storage during the first five years.
MS. HERRMANN: Objection to the characterization of what's written in the document. The document speaks for itself.
THE WITNESS: This statement is commenting on a draft plan and saying that based upon the analysis that was conducted by individuals here, they felt that it was insufficient.
Q. (By Mr. Tompkins) The -- the second paragraph, first sentence, makes a reference to selective acceptance of spent fuel only from reactors having difficulty maintaining a full core reserve.
A. Uh-huh. (Witness answers affirmatively.)
Q. What is full core reserve?
A. Full core reserve is the amount of space that the utility needs available in its spent fuel storage basin to accommodate the capability to discharge all the fuel that is in the core of the reactor at any given time. It is considered a desirable but not essential capability. Its impact, if not available, is that a utility could have a protracted outage if it needed to remove the fuel from its reactor to do any repairs or work necessary. And it was therefore something that



many utilities sought to have as somewhat of an insurance policy.
Q. We discussed earlier that RW would be inclined to grant priority to an operating reactor that had some sort of emergency that would preclude it from continuing to operate. Would maintaining full core reserve be this type of emergency that we were speaking about earlier?
MS. HERRMANN: Object to the mischaracterization of prior testimony.
THE WITNESS: No, I would not view that as being an emergency situation.
Having said that, my recollection -- and I'm not certain of this; I -- it's been too long. But I believe there might have been a situation, an isolated situation, or certainly a limited number of situations, where perhaps the -- the operating procedures of a reactor called for full core reserve capability or a requirement of operation costs. But in general, that was not the case, and therefore it would not constitute an emergency.
Q. (By Mr. Tompkins) Moving to the final paragraph. I'll give you a chance to read it first.
A. I have read it.
Q. Okay, you've read it.



The second sentence here says, "Assuming DOE would be financially responsible for the additional spent fuel storage after 1997, as reflected in the 17 year excess in the 'remaining backlog' of Table II-1, something on the order of one billion 1983 dollars would be required for this additional interim storage at power reactor."
Do you know if this estimate back in 1983 was accurate?
MS. HERRMANN: Objection. Beyond the scope of this deposition. Objection. Calls for a legal conclusion. Objection. Speculation. Foundation.
THE WITNESS: Based upon the fact that that number is in an enclosure to a document that I signed and sent in, I have no reason to doubt that it was a reasonable estimate based upon the assumptions stated in the paragraph.
Q. (By Mr. Tompkins) Like the text of the letter that we looked at just a little while ago, this comment here also evidences someone's recognition that DOE could be financially responsible for additional storage required after 1997; is that correct?
MS. HERRMANN: Objection. Calls for a



legal conclusion. Asked and answered.
THE WITNESS: Could you repeat the question?
Q. (By Mr. Tompkins) This statement evidences that someone at RW, or at the Richland Operations Office, was concerned about the cost of additional at-reactor storage at reactors after 1987, if -- if the '98 date wasn't -- wasn't met, and reflected DOE's potential responsibility for that -- for that amount.
MS. HERRMANN: Same objections and now it's compound.
THE WITNESS: That would not reflect my -- the way I would characterize that. I would -- I would say that this is drawing attention to a potential cost based upon certain assumptions. It is not stating anything in definite or absolute terms whatsoever.
Q. (By Mr. Tompkins) But your interpretation of this comment is reflected in the -- in the cover letter you sent along in -- in Comment No. 2. Again, I don't mean to go back to this again and again, but it says, the fuel passage -- "as implied in the DOE/utility disposal contracts."
MS. HERRMANN: Is that a question?

2060

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
-----------------------------------x
CAROLINA POWER & LIGHT COMPANY and :
FLORIDA POWER CORPORATION, :
Plaintiffs, :No. 04-37C
vs. :
THE UNITED STATES, :
Defendant. :
-----------------------------------x
Courtroom 6
National Courts Building
717 Madison Place NW
Washington, D.C.

Friday, November 16, 2007
Volume 9

The parties met, pursuant to the notice of the Judge at 9:32 a.m.

BEFORE THE HONORABLE THOMAS C. WHEELER



APPEARANCES:
ON BEHALF OF PLAINTIFFS:
Arnold Bradley Fagg, ESQUIRE
Paul Bessette, ESQUIRE
Linda Eaton, ESQUIRE
David Kerr, ESQUIRE
Morgan, Lewis & Bockius
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-5191

ON BEHALF OF THE DEFENDANT:
Andrew P. Averbach, ESQUIRE
Christopher J. Carney, ESQUIRE
Marian Sullivan, ESQUIRE
Lisa Donahue, ESQUIRE
U. S. Department of Justice, Civil Division
Commercial Litigation Branch
1100 L Street, N.W.
12th Floor
Washington, D.C. 20530
(202) 353-0527

Index appears at end of transcript



P R O C E E D I N G S
(9:32 a.m.)

THE COURT: We're on the record this morning for day 9 in the trial of Carolina Power. And I think we can have the government call the next witness.

MR. AVERBACH: Good morning, Your Honor, thank you. We have a couple of very small preliminaries.

THE COURT: Sure.

MR. AVERBACH: First, I believe on Wednesday morning, in connection with the 52(c) motion, I had represented to the Court that the PG&E appeal had been scheduled for oral arguments in January. I wanted to correct that statement. I am informed that the scheduling has not been finalized yet. It may well be in January, but that has not been set in stone by the Federal Circuit, and I wanted to make sure the Court was aware of that.

THE COURT: Okay, I appreciate knowing that.

MR. AVERBACH: The second matter is one that Ms. Sullivan would like to address.

THE COURT: All right.



MS. SULLIVAN: Your Honor, just to finish up with the matters with regard to depo designations, I filed last night and this morning two filings. The one last night was a motion for the admission of testimony designations for Loring Mills.

THE COURT: I have that motion.

MS. SULLIVAN: Okay. I was going to provide the Court with copies if you didn't have it. And then this morning, I just filed a very short response to the supplemental designations that Plaintiffs had filed with the responsive motion to strike. I have copies of that and have already provided copies to counsel, if the Court would like those.

THE COURT: Yes, please.

MS. SULLIVAN: And, Your Honor, one matter with regard to the Mills' testimony, as I noted in my motion, there are seven exhibits discussed in Mr. Mills' testimony in Northern States, four of which have already been admitted by the Court. But we would also seek the admission of the three additional exhibits, Defendant's Exhibit 23 and 102, and Plaintiffs' Exhibit 28, based on Mr. Mills' testimony.

THE COURT: Your motion states that the Plaintiff concurs with your motion, is that correct?

MR. FAGG: That's correct, Your Honor. We did not recite any objections to the three additional exhibits, so we'll stand by that.

THE COURT: So for the sake of a complete record, I will admit Defendant's Exhibits 23 and 102, and Plaintiffs' Exhibit 28, and I will accept the designated portions of the Mills' testimony from the Northern States Power Company case.

(Defendant's Exhibit Numbers DX-23 and DX-102 were received in evidence.)

(Plaintiffs' Exhibit Number PX-28 was received in evidence.)

MS. SULLIVAN: Thank you, Your Honor.

MR. FAGG: And one additional, if I may, Your Honor, with a related matter, we talked about the designations of Mr. Rusche a few days ago. And you may recall that the government agreed if we would change the basis of our motion to rule 32 rather than rule 801, they would consent to the designations. And when we raised that, Your Honor said, all



right. And we just wanted to confirm that meant motion made and granted.

THE COURT: Yes, again, for the sake of a clear record, I will grant that deposition designation for Mr. Rusche.

MR. FAGG: Thank you very much, Your Honor.

THE COURT: Yes.

MR. AVERBACH: Your Honor, the government's next witness is Michael Lawrence. And Mr. Lo Re will be conducting the examination.

THE COURT: All right.

Whereupon--

MICHAEL LAWRENCE

a witness, called for examination, having been duly sworn, was examined and testified as follows:

THE COURT: Please be seated.

THE WITNESS: Thank you.

THE COURT: Good morning, Mr. Lo Re.

MR. LO RE: Good morning, Your Honor.

THE COURT: You may proceed.

MR. LO RE: Thank you.

DIRECT EXAMINATION

BY MR. LO RE:



Q. Good morning, Mr. Lawrence.

A. Good morning.

Q. Mr. Lawrence, could you state your full name for the record?

A. Michael J. Lawrence.

Q. And where are you currently employed?

A. I'm employed by Battelle Pacific Northwest National Laboratory in Richland, Washington.

Q. Does your work currently involve work for the Office of Civilian Radioactive Waste Management?

A. No, it does not.

Q. Can you provide the Court with a brief description of your career? Why don't we start with your education after high school, and then career subsequent to your education?

A. I have a degree in physics from the University of Maryland. While at the University of Maryland, I started a career with the Atomic Energy Commission, first, as a summer intern, and then a production engineer in 1969. I continued in working for the Atomic Energy Commission until it became the Energy Research and Development Administration in



1974, and then became the Department of Energy, I believe it was 1977.

During that time, I was responsible for environmental impact statements, isotope development programs, and then eventually programs for the storage and disposal of radioactive waste. In the 1977 timeframe or so, I was responsible for spent fuel storage programs of the Department of Energy. And in the late '70s and early '80s was involved in the geologic repository program.

When the Nuclear Waste Policy Act was passed in 1982, and the Department of Energy set up a Nuclear Waste Policy Act implementation office at the end of January 1983, I was the deputy director of that implementation office. And in January of 1984, I was the acting director of the Office of Civilian Radioactive Waste Management until the summer of that year, at which time Mr. Rusche was confirmed as a political appointee to run that office.

And I was -- I went to Washington State as the Department of Energy's manager of the Richland operation office overseeing the

Hanford site. I did that until 1990, when I resigned from the government. I went into private industry, doing work on cleanup of radioactive sites. But then in 1991, I was appointed, given a limited diplomatic appointment to represent the United States with the International Atomic Energy Agency in Vienna, Austria. And I served in that capacity from 1991 to 1995.

In 1995, I returned to the United States, and I was the president and chief executive officer of a small nuclear instrumentation firm in Los Alamos, New Mexico. And subsequently, was brought -- came back to Washington as the chief operating officer of the parent company, or the company that owned that organization, British Nuclear Fuels, Limited.

In 1999, I went back to Washington State and to the Richland area as the general manager of the waste vitrification plant project, but I resigned from that position in 2000, and subsequently joined Battelle at the Department of Energy's Pacific Northwest National Laboratory.



I've served in nuclear programs there up until around 1984 when I was named deputy laboratory director for campus development responsible for providing new facilities for the laboratory. That position was successfully completed about a year ago, and I am now the manager of nuclear programs at the lab.

Q. Now, I want to go back to your work with the implementation office. What years was that, do you recall?

A. It started in January of 1983, and the implementation office transformed into the Office of Civilian Radioactive Waste Management and I left there, I believe it was July of 1984. It was the summer of 1984, in any event.

Q. And let me just back up, if I may. Before the implementation office, what was the office that you were in?

A. I don't recall the specific name of that organization, but it was responsible for the Department of Energy's programs for establishing geologic repositories for the disposal of nuclear waste, either from utilities in commercial applications and possibly also defense applications.



Q. And in that position, did you work with the development of what became the Nuclear Waste Policy Act?

A. I did not work directly on that. I did not interact with members of Congress or staff, or directly with utilities with the intent of actually putting the Act into place.

Q. Were you aware that the Act was something that was being worked on, on Capitol Hill?

A. Yes, I was.

Q. And what, if anything, was your involvement with that, the development of the Act?

A. Well, in staff meetings and other meetings where the people and the organization will be talking about activities under consideration for the Act, the steps and the processes that the Act would lay out to site a repository. I would certainly offer my views and opinions about what was possible, not possible, what was practical.

The issue, as I see it, was up until the Nuclear Waste Policy Act, the government and the Department of Energy almost had to act



ad hoc in the process of trying to develop and site a nuclear repository, so it could begin accepting waste.

And it was clear that some legislative legal basis and process for doing it and for collecting the money to pay for that needed to be established. And that's what the Nuclear Waste Policy Act was all about. But I was not directly involved in interacting with Congress or congressional staff in its formulation.

Q. Now let's talk about after the time that the Act was passed, which was, I guess, late '82, and then early 1983, at that point, when did you transition into the implementation office? And if you can provide the circumstances under which you transitioned to that new job?

A. I believe the Act passed in December of 1982. I believe it was signed into law by President Reagan in early January of 1983, and that was about at that same time a new Secretary of Energy had been appointed, Donald Paul Hodel.

And Secretary Hodel's -- one of his first activities was implementation of the

2072

Nuclear Waste Policy Act. Even though there was an existing organization at the Department of Energy, up until that time, responsible for geologic repositories and disposal, Secretary Hodel had met and had been quite impressed with the manager of the Savannah River operations office with the Department of Energy, Mr. Bob Morgan. And felt that this important task of implementing the Act, he had confidence that Mr. Morgan would be best suited to implement the Act.

And he asked Mr. Morgan to come to Washington and head up what was then known as the Nuclear Waste Policy Act implementation office. Mr. Morgan, in looking and assembling the people that he would have with him to help do that, looked at the existing organization. And I was the deputy director of that repository program at that time. We knew each other from previous working together, and he called me and asked me to come and be his deputy for the implementation office, as well as head up the activity for interim spent fuel storage in the implementation office. And that all occurred, that actually went into place the

2073

last Monday of January 1983.

Q. Now, upon your arrival in the implementation office, what were your duties?

A. I worked with Mr. Morgan in putting in place all of the activities which the Department had to do to implement the Nuclear Waste Policy Act. And that was in general and more specifically, I had direct responsibility for implementing or putting in place those activities associated with transportation and interim storage of spent fuel.

Q. And did your work involve the review of the Act?

A. Yes, obviously, we had to look and say what were the requirements, what were we required to do in the Act, and what were the steps necessary to make that happen.

Q. Let's take a look at the Act.

MR. LO RE: Your Honor, we have copies of the -- this is the Nuclear Waste Policy Act as written in 1983. Currently, the current version includes amendments. So what I'd like to do is I'm not planning to move this into evidence, but I'd like to pass this out and use it with the witness. I have copies for counsel

2074

and for the Court?

THE COURT: All right.

MR. LO RE: If I may approach, Your Honor?

THE COURT: Yes.

BY MR. LO RE:

Q. Okay. Mr. Lawrence, you have in front of you a document marked Public Law 97-425 and it says January 7th, 1983. Do you see that document?

A. Yes I do.

Q. And are you familiar with it?

A. Yes, I am.

Q. And what is it, sir?

A. It is the Nuclear Waste Policy Act as signed by President Reagan.

Q. And I think we actually have a copy we can put up on the screen.

Let's look at some of the provisions of this Act. I'd like you to turn, if you could, to page 45. No, I'm sorry -- yes, 45. And I'm referring to there are Bates numbers on the lower -- it's landscape, so I guess it's on the lower left hand side.

Do you see those Bates numbers?

2075

A. Yes, I'm there.

Q. And before we talk about that specific provision of the Act, can you tell the Court what you understood the obligations were upon DOE as part of this Act? In other words, what did the Act obligate DOE to do?

A. The Act obligated the Department of Energy to begin the process and accept specified quantities of either spent fuel or nuclear waste for permanent geologic disposal or disposal -- anyway storage, if geologic disposal was not possible.

And that would commence in January of 1998. It provided the steps and activities that would be necessary to lead up to that for planning purposes and for licensing purposes and planning. And it also provided the mechanism whereby rate payers, the beneficiaries of nuclear energy, would pay for those disposal services, so it wouldn't be based upon the taxpayer overall, but by the beneficiaries of nuclear energy.

Q. Now let's look at the section I pointed out earlier, which is section 302, which is under the heading nuclear waste fund?

Q. And were you aware of any political issues surrounding the development of an MRS at this time as of '84?
A. Yes. I think there were feelings that monitored retrievable storage was a potentially acceptable and suitable interim storage, an ability for the government to begin to implement its responsibility to take title and possession of the fuel. But it was not a suitable permanent solution to the disposition of the spent fuel or waste, and that ultimately some other means would be necessary.
MR. LO RE: Thank you, Your Honor, I have no further questions?
THE COURT: All right. Cross-examination.
MR. FAGG: Just a bit, Your Honor.

CROSS-EXAMINATION

BY MR. FAGG:
Q. Good morning, Mr. Lawrence.
A. Good morning.
Q. You and I never met before this morning, correct?
A. Correct.
Q. You had your deposition taken in



connection with spent fuel proceedings in the past, correct?
A. Correct.
Q. And was that on two days back in or around 2002?
A. I believe so.
Q. Did you review those deposition transcripts to prepare for today?
A. I looked through them, but quite frankly, I didn't read them all.
Q. Okay.
MR. FAGG: May I approach, Your Honor?
THE COURT: Yes.
BY MR. FAGG:
Q. Mr. Lawrence, I'm just going to place on the table next to you those deposition transcripts in case we need to refer to them, okay?
A. Yes.
Q. You're represented by the Department of Justice for these purposes?
A. Yes, I am.
Q. Did you confer with the Department of Justice prior to your testimony today?
A. Yes, I did.



Q. Mr. Lawrence, you talked a bit about the standard contract on direct, do you recall that?
A. Yes, I do.
Q. Let's talk about your involvement in the standard contract. You were not all that involved in the establishment of the standard contract, is that a fair statement?
A. That's correct.
Q. And at least back in 2002, when we were five years closer than we are today, you did not recall that the standard contract came from a Federal Register notice, correct?
A. I believe that's the case.
Q. Okay. You don't remember when you first saw the standard contract, correct?
A. I don't recall specifically, no, I knew it would have been in 1983.
Q. At least as of five years ago, you'd never sat down and read the whole thing cover to cover, correct?
A. I had never read it in one sitting, but I was familiar with all of the provisions and aspects.
Q. You did not remember the term annual



capacity report, correct?
A. That is correct, I did not recall that specific term. I did recall that acceptance rate and receipt rates and ability to predict what and when we would take it from the utilities was an important issue.
Q. You don't recall in January of '83, when you got to the office, whether the standard contract was already being developed or not, do you?
A. That's correct, I don't recall that from January of '83.
Q. Negotiation's probably the wrong phrase to use regarding how the standard contract was formed, correct?
A. Yes, negotiations would not have been the proper term. We used to use terms like consultation, concurrence and other things where we would get individual views to try to shape our opinion on those things. But, you know, and in reality, and in reflection since the Nuclear Waste Policy Act was not signed into law until January of 1983, anything that had gone on prior to that time would most likely have been based on assumptions and

the specifics of the acceptance rate, that that could cause some problems at utilities whose fuel may not have been oldest, and therefore, higher up in the queue, but had a storage problem. We wanted to leave it up to the utilities to be able to exchange the time at which they could send the fuel to us to alleviate problems for the utilities.

Q. During this time period, putting our heads back in 1983 when you were putting together the standard contracts, it was foreseeable if DOE failed to perform, additional storage and expenses would be incurred by the utilities, correct?

A. That's correct.

Q. Do you recall with Mr. Lo Re on direct, Mr. Lawrence, speaking about the capacity of the system, do you recall those discussions?

A. Yes, I do.

Q. And you recall that you said you would know that capacity by 1987 when you issued the annual capacity report, do you recall that?

A. I don't recall saying we would know with certainty the capacity as of 1987. I



knew -- I did say that we'd be able to state what we anticipated the capacity to be.

Q. And what was the capacity of the system as it was stated by DOE in 1987, do you know that?

MR. LO RE: Objection, no foundation.

THE COURT: He can tell us if he doesn't know. I'll take the answer.

THE WITNESS: What eventually was stated in 1987, I do not recall. I wasn't associated with the program at the time.

BY MR. FAGG:

Q. You had left by that point, correct?

A. That's correct.

Q. And in fact, you weren't around in 1987 when Congress passed the amendments to the Nuclear Waste Policy Act, you were not around in this office, the Office of Civilian Radioactive Waste Management, correct?

A. No, I was not around. However, I was at Hanford, where one of the sites that had been selected for the three repository sites to be investigated was located. And consequently, I was still involved in the sense of the basalt waste isolation project with the program.



Q. And in fact, your recollections about the 1987 amendments was essentially that Hanford was no longer a candidate site, correct?

A. Yes, that was definitely my recollection.

Q. You wouldn't use -- well, let me ask you. Delivery commitment schedules, a term used in the contract, did you have any familiarity with that term?

A. Yes.

Q. You wouldn't call those binding commitments, correct?

MR. LO RE: Objection, Your Honor, outside the scope of direct examination.

MR. FAGG: We looked at all kinds of pieces of the contract, Your Honor. I think it's a fair question.

THE COURT: I don't think he spoke about delivery commitment schedules, so I'll sustain the objection.

BY MR. FAGG:

Q. The primary focus of the Nuclear Waste Policy Act was permanent disposal of nuclear waste, and your interpretation meant that was a



repository and not an MRS, correct?

A. That meant that ultimate disposal in a repository would be necessary and the MRS would only be used if there would be a delay or a problem with having that repository available in the '98 timeframe.

Q. And I think you said it was your intent and expectation at the time you were there that there would be a permanent repository, correct?

A. That was our plan.

Q. And in fact, your belief was that the standard contract clearly did not cover or contemplate interim storage, correct?

A. No, that's not correct. There are two provisions in the Act for possible interim storage. One is -- I believe it's limited to 1800 metric tons, and then the other is that associated with the monitored retrievable storage facility. You know, initially, we did not factor into our base assumptions the interim storage or the MRS, but the possibility that they could be required existed.

Q. Let's go back to your deposition, if we could, Mr. Lawrence. This is impeachment.

And I'm at page 149 and 50. Mr. Lawrence, in your deposition -- are you with me?
A. Yes, I am.
Q. You were asked the question -- I'm about the middle of the page on page 149, "what about the first part of that whereas clause that refers to following commencement of operation of a repository, did you ever view there being a distinction between the rate at which DOE would accept spent fuel before a repository became operational, as opposed to after that time?"
There's an objection.
And you testified, "as I previously indicated, the concept of interim storage prior to repository was something which I had had responsibility for back in the '70s, as well as something which we -- my recollection was we had at least addressed the possibility of that or at least the concept of that in the mission plan.
"These words make it clear that we are not talking about interim storage or taking it before the repository starts, so even though there was a concept that people had discussed



and we knew that, that utilities, some utilities at least would like us to have, this contract clearly did not cover that."
Were you asked that question and did you give that answer?
A. Yes, I did.
Q. And specifically, your recollection is that DOE would not take it at some lower rate at an interim facility, and then as quickly as practicable after a permanent repository became operational, correct?
A. Would you repeat that question?
Q. Let's try to court reporter reading it back, and if you don't understand it, I'll rephrase it.
THE REPORTER: "Question: And specifically, your recollection is that DOE would not take it at some lower rate at an interim facility, and then as quickly as practicable after a permanent repository became operational, correct?"
THE WITNESS: As I understand the question, it has as its foundation that we would begin accepting prior to the repository being available, at some rate, a lower rate.



And that in my -- I think I was stating specifically, I did not recollect or believe we were committing to accept anything before January of 1998.
BY MR. FAGG:
Q. That wasn't quite my question, Mr. Lawrence, so let me try it again.
A. Okay.
Q. At this time, as you understood the contract that you testified about on direct, you did not contemplate DOE initiating acceptance in 1998 at some slow rate, slower than otherwise contemplated, at an interim storage or an MRS, and then only ramping up to a higher rate when a permanent repository became operational, that was not how you thought about it, correct?
MR. LO RE: Objection, vague, objection, mischaracterizes the witness's testimony.
THE COURT: Overruled, I'll take his answer.
THE WITNESS: Since we were not planning, therefore were not anticipating, having interim storage either at a federal



interim storage facility or at an MRS, it's correct to say we were not planning on doing that.
BY MR. FAGG:
Q. Okay. Thank you. And in fact, I think you said on direct, to the extent there was an MRS, the rates you were planning were the same rates that you were planning for a permanent repository, correct?
A. What I said was I would assume they were the same rates. I couldn't see a reason not to have them about the same.
Q. In 1983, you viewed the 1998 date as a realistic date, correct?
A. That's correct.
Q. And as a reasonable date, correct?
A. Although I viewed it as a reasonable date, I also viewed it as a very challenging date.
Q. As of 1983, that date was doable, correct?
A. That date was doable, assuming all of the steps laid out in the Nuclear Waste Policy Act, and the timeframes we assumed for them to take were, in fact, met.

Q. And when you were asked this question before, you didn't provide all of those qualifications, did you, Mr. Lawrence?
A. I don't recall if I did or not, but I'm --
Q. Should we find out? Page 201. Impeachment. You with me, Mr. Lawrence?
A. I am, and I see I said the 1998 date was doable.
Q. And that's all you said, right?
A. That's correct.
MR. LO RE: Well, Your Honor --
THE WITNESS: I'd like to see if I maybe said something later.
MR. LO RE: And while the witness is doing that, I will again put on the record that this is not impeachment. Impeachment is, as the Court said, a contrary statement. The fact that Mr. Lawrence has elaborated on an answer he gave, a one word answer he gave five years ago today in court really is not an inconsistent statement with what he said then.
THE COURT: I'm going to take his testimony and I'll let it stand. I would just note for the record that we're dealing with a



case that unfortunately has relevant events that were some 24, 25 years ago. And certainly the Court will draw no adverse reflection on this witness's credibility just because he may have said things a little bit differently in 2002 than he may have said today.
MR. LO RE: Thank you, Your Honor.
THE COURT: But in the interest of a full record, I think it's useful to have references to testimony that were five years closer in time to the events.
MR. FAGG: Thank you, Your Honor.
THE WITNESS: I now have had a chance to look at my deposition. And on the previous page, page 200, I said, "I previously stated that it required a number of things to occur and the possibility that any or all of those could be delayed would jeopardize the date. So I mean, this is consistent with what I've said."
And so consequently, when I was subsequently asked, is the date doable, when I said the date is doable, I think it has to be viewed in the context of my earlier statement that said a number of things had to occur, and



that there was a possibility that there could be delays.
BY MR. FAGG:
Q. Okay, thank you, Mr. Lawrence. Let's move and talk a little bit about the mission plans that you talked about with Mr. Lo Re on direct. Do you recall that?
A. Yes, I do.
Q. Now, as I understood it, you were involved in Plaintiffs' Exhibit 22, the April 1984 draft of the mission plan, correct?
A. That's correct.
Q. But you were aware that there had been a prior draft which we also looked at, Plaintiffs' Exhibit 17, correct?
A. That's correct.
Q. And before a draft mission plan goes out to Congress or the public or utilities, there's an effort to make sure it's reasonable, realistic, clear, correct?
A. That's correct.
Q. All right. And before it would go out for public review, even in draft form like these documents, it would reflect the Department's views and thoughts, correct?



A. That's correct. I would add that as you worked your way towards a final, those reviews would probably become more in depth and detailed. And that the more preliminary a draft would be, the more clearly you were just -- you were expressing your best intent or your ideas, but you didn't have the value of feed back on them. So they didn't get -- you weren't as -- you were looking to solicit comment. And therefore, you didn't feel it was final, you didn't feel it was a commitment, but you were looking to get a reaction. You certainly meant it to be accurate, and to accurately reflect your plans, but it was not reflecting commitment.
Q. Okay. Thank you. Let's look at the passage that we talked about a bit on direct, or Mr. Lo Re talked about a bit on direct, in Plaintiffs' Exhibit 17. The first and earlier draft, December 1983 mission plan. And Mr. Lo Re asked you about the last two sentences in the first paragraph on what's Bates page 172, do you recall that?
A. The last two sentences in the first paragraph on 172, yes, I do.

Q. Okay. And referring to no additional storage capacity after January 31st, 1998, and then subsequently keeping up with the utility discharge rate, correct?
A. That's correct.
Q. And that was consistent with how DOE was trying to implement the Act at that time, correct?
A. That is consistent with an objective or a goal that the Department had. And my recollection is it was also consistent with what we knew the utilities would like to be the case.
Q. And that goal didn't change in the ensuing four months, did it, from December of '83 -- well, I may not have counted my months right, but from December of '83 to April of '84, that didn't change, did it?
A. I believe it did.
Q. Well, in February of '84 -- let's go to your congressional statement, do you have that in front of you?
A. Yes, I do.
Q. In February of 1984, you told Congress, at page 0228, "by achieving this



fundamental objective and implementing an appropriate waste acceptance schedule, this will initially preclude the need for additional at-reactor storage by nuclear utilities after January 31st, 1998. And ultimately remove all eligible waste from at-reactor storage." You said that to Congress?
A. That's correct.
Q. And you were truthful when you talked to Congress?
A. Yes, I was.
Q. And no one from the congressional committee you testified said, wait a minute, you're mischaracterizing the fundamental objective of the Nuclear Waste Policy Act, right?
A. I don't recall what their questions or response was to this testimony, specifically.
Q. And more particularly, the exercise Mr. Lo Re went through with you on comparing the 1983 draft and the 1984 draft, in particular, five years ago, you didn't recall any specific changes between those two drafts, correct?
A. I did not recall any specific changes



and did not look at one versus the other to be able to refresh my memory of what changes did occur.
MR. FAGG: If I may approach, Your Honor?
THE COURT: Yes.
BY MR. FAGG:
Q. I'm going to Plaintiffs' Exhibit 15. Mr. Lawrence, I'm handing to you Plaintiffs' Exhibit 15, which is a memorandum regarding the mission plans that you testified about on direct. Do you recall that document?
A. I recall this document in the sense that we were provided with some general assumptions and planning basis that would go into the preparation of the mission plan. Specifically the details of this, I do not recall.
Q. But you're indicated as a recipient of the document, the second?
A. That's correct.
Q. Any reason to believe you did not receive this document?
A. No, I'm certain I did.
Q. We'd offer Plaintiffs' Exhibit 15?



MR. LO RE: No objection.
THE COURT: Plaintiffs' Exhibit 15 is admitted.
(Plaintiffs' Exhibit Number PX-15 was received in evidence.)
BY MR. FAGG:
Q. And just briefly, Mr. Lawrence, if you go to the second page of that document, there's a discussion about waste acceptance schedule. And in the second sort of bullet down, it says, "the central criteria for this schedule is an acceptance rate during the first five years such that no utility would have to build additional storage facilities after 1998. And an acceptance rate after the first five years equivalent to the actual rate of utility discharge of spent fuel each year."
And again, is that consistent with what you understood the central criteria of the schedule to be at the time this memo was written in September of 1983?
A. My recollection then and now is that was an objective or a goal that we wanted to have for the mission plan, and for our ability to implement the Act.

Q. Now, as I understand it, shortly after the issuance of the April 2004 version of this mission plan, you left, I guess in the summer of '84, you left the office, right?
A. That's correct.
Q. And subsequently, you had occasion to comment on or provide comments on that mission plan, didn't you?
A. Yes, I did.
MR. FAGG: May I approach, Your Honor?
THE COURT: Yes.
BY MR. FAGG:
Q. And it's Plaintiffs' Exhibit 26. And could you just identify what I've handed you, Mr. Lawrence, as Plaintiffs' Exhibit 26 for the record?
A. Yes, these are comments provided by the Richland operations office of the Department of Energy back to the Office of Civilian Radioactive Waste Management on the draft mission plan, which was sent out for comment in April of 1984, and the unique situation or somewhat unique situation that I was responding to something which I had issued in a previous position.



Q. That is a unique situation. You weren't very hard on yourself, were you? I'll rephrase.
A. I found some mistakes which was not something -- or not mistakes, but some issues that I needed to point out to Mr. Rusche. But that's not at all surprising in that in the months between the time the draft was issued and the time we gave them our comments, more was learned, as we expected. And we were able to provide more insight as to the impacts of the mission plan.
Q. Let's talk about some of those.
MR. FAGG: We would offer Plaintiffs' Exhibit 26?
MR. LO RE: No objection.
THE COURT: Plaintiffs' Exhibit 26 is admitted.
(Plaintiffs' Exhibit Number PX-26 was received in evidence.)
BY MR. FAGG:
Q. And your signature appears on here in the cover letter, correct?
A. That's correct.
Q. And Mr. Rusche was your successor as



the director of the program, correct?
A. Yes. To be more specific, though, Mr. Rusche was the first political appointee and full nonacting director of the Office of Civilian Radioactive Waste Management.
Q. Mr. Morgan and yourself were acting and not political appointees, and then Rusche was a political appointee?
A. Yeah. Again, to be more specific -- and I'm not certain of this -- but I believe that Mr. Morgan was the director of the Nuclear Waste Policy Act implementation office, but that the law required the Office of Civilian Radioactive Waste Management to be stood up, I believe it was one year after signing of the Act. And that's when I was in place. And so I was the acting director of the Office of Civilian Radioactive Waste Management, as opposed to the implementation office.
Q. And at the time you signed this letter out in July of 1984, you were -- had become manager of the Richland operations office of DOE?
A. That's correct.
Q. And so you were essentially responding



as, what, an interested party on the prior April draft plan? Well, let me ask you, why were you responding?
A. Well, the one very specific reason we were responding is we had a site that was under consideration for a repository.
Q. So --
A. Plus -- plus the Pacific Northwest laboratory, which the Richland operations office was responsible for, was the contractor, the government owned contractor operated laboratory providing support to the Office of Civilian Radioactive Waste Management on spent fuel storage, which would involve both the MRS and the federal interim storage aspects of the program.
Q. Okay. And you have this two page cover letter, and then there's enclosures. I think this version and the only version we have just has enclosure 1, but you're offering this enclosure, you say, "and offer our comments to you in the following enclosures," do you see that?
A. Yes, I do.
Q. And then moving further down in your

letter, you characterize the most significant comments or summarize them, do you see that?
A. Yes, I do.
Q. And you state, "it should be noted that to eliminate the need for additional at-reactor storage after January 31st, 1998, the initial waste acceptance rate for 1998 should be about 2800 MTU, plus some amount up to 630 MTU, depending upon the extent," there's an "of" missing, I think, of federal interim storage -- I'm sorry, you were right, I was wrong -- "depending upon the extent federal interim storage is utilized."
Okay, and you see that comment?
A. Yes, I do.
Q. Okay. So do you recall that you are telling Mr. Rusche, your successor, that at least in the initial years, they need to take more MTUs per year than is reflected in the April schedule we looked at, correct?
A. I wouldn't phrase it that way. I said -- I was just pointing out a consequence of what was the rates that they were using based upon the generation rates of utilities. Whether or not they needed to do it was a



decision of the Office of Civilian Radioactive Waste Management.
Q. And moving over to the additional comments that you were offering to Mr. Rusche on enclosure 1, one set of comments you're offering to Mr. Rusche in paragraph 3, and I'm looking at starting with the second sentence, it says, "based upon our interpretation of the NWPA, the minimum acceptance rate should be based upon the rate at which spent fuel is generated by civilian nuclear power reactors. This would be consistent with the NWPA intent that no power reactor would require additional spent fuel storage after January 31st, 1998."
That was a comment you were offering to Mr. Rusche, correct?
A. Yes.
Q. And one more passage in this document I'd like to ask you about, if you could turn over to the next page, Mr. Lawrence, comment 4.
Another comment that you're offering to Mr. Rusche regards the one mill per kilowatt hour fees. You recall testifying about those fees on direct, correct?
A. Yes.



Q. And you say here in this document to Mr. Rusche, in the last sentence, "if the present mission plan initial acceptance rate of 400 MTU per year is retained, it is likely that the one mill per kilowatt hour fee will be perceived as too high, in addition to not providing post 1997 storage relief to the utilities as intended by the NWPA, see previous comment."
Again, this is a comment on the April 1984 document that you were offering to your successor, who is the director of the Office of Civilian Radioactive Waste Management, correct, Mr. Lawrence?
A. That's correct.
MR. FAGG: Thank you, I have no further questions, Your Honor.
THE COURT: Any redirect, Mr. Lo Re?
MR. LO RE: Just a bit, Your Honor.

REDIRECT EXAMINATION

BY MR. LO RE:
Q. Mr. Lawrence, Mr. Fagg asked you about interim storage, do you remember that?
A. Yes, I do.
Q. And he showed you a passage from your



deposition?
A. Yes.
MR. LO RE: I'd like to -- Your Honor, I'd like to show the witness another passage from his deposition in response to the testimony that was elicited, for clarity's sake.
MR. FAGG: Again, Your Honor, I think he can ask the question, but I don't think that's a proper use of prior deposition testimony.
THE COURT: Just ask him a question.
MR. LO RE: Sure.
BY MR. LO RE:
Q. Did you consider that you were in any way precluded from using an MRS to begin performance under the Nuclear Waste Policy Act?
A. Yes, I did, because Congress had not authorized an MRS. So we were precluded from doing that. If we wanted to provide an MRS, we would have to ask Congress for the authorization and appropriations to do so.
Q. And did you consider that performance could begin with an MRS, in other words, assuming congressional authorization?

MR. LO RE: Objection, mischaracterizes the testimony, Your Honor, and asked and answered.
THE COURT: Overruled.
THE WITNESS: We certainly desired to fully and completely implement both the letter and the spirit of the law. Sometimes, however, we found that depending upon who you talked to in Congress or the legislative history as you looked at it, there were some conflicts and there were differing goals and objectives. And consequently, when it came to intent or legislative history, those were things that we may not be in a position -- it might be impossible to fully implement them, because they could be contradictory.
BY MR. FAGG:
Q. And maybe -- and I don't mean to belabor this, Mr. Lawrence. And maybe I'm being too general in my questions. Let's go back to what we were just talking about, Plaintiffs' Exhibit 26. Enclosure 1. And there's a statement, I won't characterize it, but there's a statement about the intent of the Nuclear Waste Policy Act. Not an intent, an



interpretation.
A. Interpretation.
Q. Interpretation.
A. Yes.
Q. And on the next page, it says, as -- where is it at. I'm sorry, it's on that page.
Interpretation of the Nuclear Waste Policy Act. And then on the prior page -- I'm sorry, I'm moving too far around in the -- too quickly in the document. Let's focus on that one.
A. Uh-huh.
Q. Based upon our interpretation of the NWPA. Now, let's just focus on this. That was, in fact, your interpretation of the NWPA when you signed this letter out, correct?
A. The words speak for themselves in that it says our interpretation, which means some judgment was brought into this. Otherwise, I believe we would have said the Nuclear Waste Policy Act requires. By saying our interpretation of the Nuclear Waste Policy Act, I think makes it clear that, in my mind, the Nuclear Waste Policy Act was not specific or clear in what they desired, but we had to



interpret that into it.
Q. This was your interpretation, though, right?
A. That's correct.
Q. Okay. And so there might be other interpretations, but this was your interpretation?
A. It was our interpretation that there was an objective in the passage of the Nuclear Waste Policy Act to preclude the need for additional at-reactor storage. Yes.
Q. But that's not what you said here, is it, Mr. Lawrence? You said the interpretation of the NWPA is the minimum acceptance rate should be based upon the rate at which spent fuel is generated, correct?
MR. LO RE: Your Honor, if I may ask that Mr. Lawrence be permitted to finish. I think he was finishing his answer earlier, and was accidentally cut off by counsel.
MR. FAGG: I apologize if I cut you off, Mr. Lawrence.
THE COURT: Did you finish your answer, Mr. Lawrence, previously?
THE WITNESS: That sentence says that



if you interpret a goal of the Nuclear Waste Policy Act to be to preclude -- if you interpret the Nuclear Waste Policy Act's intent or goal or objective, whatever you want to call it, I don't know, but it's not specific in the Act, but to preclude the need for the utilities to continue to add storage space, then a natural consequence of that would be an acceptance rate by the DOE that would be equal to what they were generating.
So we were pointing out a fact that the numbers used in the draft mission plan would not be adequate to achieve that objective.
BY MR. FAGG:
Q. Just -- and I'm not going to belabor this, Mr. Lawrence, but in your prior answer, you said, intent, goal, objective. You didn't tell Mr. Rusche any of that back in 1983, did you? You did not use the word intent, you did not use the word goal, you did not use the word objective, did you?
A. I used the words in 1983 that it was based upon our interpretation of the Nuclear Waste Policy Act.